Exhibit 42

Robert C. Farias

Wellesley, MA

October 20, 2004

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3                  NO. 01CV12257-PBS
 4
 5     _____
 6     In re:  PHARMACEUTICAL           )
 7     INDUSTRY AVERAGE WHOLESALE       )
 8     PRICE LITIGATION                 )
                                        )
       _____ )
 9     THIS DOCUMENT RELATES TO:        )
       ALL ACTIONS                      )
10     _____ )
11
12                 DEPOSITION OF ROBERT C. FARIAS,
13     called as a witness by and on behalf of the
14     Defendants, pursuant to the applicable provisions
15     of the Federal Rules of Civil Procedure, before P.
16     Jodi Ohnemus, Notary Public, Certified Shorthand
17     Reporter, Certified Realtime Reporter, and
18     Registered Merit Reporter, within and for the
19     Commonwealth of Massachusetts, at the offices of
20     Harvard Pilgrim Health Care, 93 Worcester Road,
21     Wellesley, Massachusetts, on Wednesday, 20 October,
22     2004, commencing at 10:05 a.m.
```

EXHIBIT
Hartin - 52
2-28-06

Robert C. Farias

Wellesley, MA

October 20, 2004

---

**Page 2**

1  APPEARANCES:
2
3          HAGENS BERMAN, LLP
4          BY:  David S. Nalven, Esq.
5          One Main Street
6          4th Floor
7          Cambridge, MA  02142
8          617 482-3700
9          Davidn@hagens-berman.com
10         For the Plaintiffs
11
12
13         PATTERSON, BELKNAP, WEBB
14         & TYLER, LLP
15         BY:  Adeel A. Mangi, Esq.
16         1133 Avenue of the Americas
17         New York, NY  10036-6710
18         212 336-2000
19         aamangi@pbwt.com
20         for the Defendants
21
22

---

**Page 4**

1              I N D E X
2
3  TESTIMONY OF:    DIRECT CROSS REDIRECT RECROSS
4
5  ROBERT C. FARIAS
6  (By Mr. Mangi)      5         143
7  (By Mr. Nalven)         121
8
9              E X H I B I T S
10  EXHIBIT         DESCRIPTION         PAGE
11
12  Exhibit Farias 001   HPH 1-51        67
13
14  Exhibit Farias 002   HPH 52-75       85
15
16  Exhibit Farias 003   HPH 168-195       92
17
18  Exhibit Farias 004   HPH 246-282      107
19
20
21
22

---

**Page 3**

1  APPEARANCES:  (CONT'D)
2
3          HARVARD PILGRIM HEALTH CARE
4          BY:  Harvey D. Cotton, Esq.
5          93 Worcester Road
6          Wellesley, MA  02481-9181
7          617 509-7252
8          Harvey_cotton@hphc.org
9          for Harvard Pilgrim Health Care
10
11
12
13
14
15
16
17
18
19
20
21
22

---

**Page 5**

1      ROBERT C. FARIAS,
2          having first been duly sworn,
3          testified as follows to
4          direct interrogatories
5  BY MR. MANGI:
6      Q.   Good morning, Mr. Farias.  As I introduced
7  myself earlier, I'm Adeel Mangi from Patterson,
8  Belknap, Webb & Tyler, and we represent the
9  Defendants in this action here today.  Have you
10  ever been deposed before?
11      A.   I have not, no.
12      Q.   Okay.  Let me give you some of the ground
13  rules for a deposition.
14      A.   Sure.
15      Q.   First of all, it's important to answer any
16  questions verbally so that the court reporter can
17  take them down.
18      A.   Uh-huh.  Yes.
19      Q.   If at any point a question that I ask is
20  unclear, please feel free to tell me that, and I'll
21  do my best to rephrase it.
22      A.   Okay.

Henderson Legal / Spherion
(202) 220-4158

Robert C. Farias                                                        October 20, 2004

Wellesley, MA

Page 6

1    Q.   If at any point you need a break, feel
2    free to let me know.  We'll do that.  Okay?
3    A.   Yes.
4    Q.   Okay.
5         MR. NALVEN:  If I may, just one other
6    thing, Mr. Farias.  From time to time I may
7    interpose an objection to the question --
8         THE WITNESS:  Sure.
9         MR. NALVEN:  -- for various reasons that
10   you may not understand.
11        THE WITNESS:  Uh-huh.
12        MR. NALVEN:  Your lawyer can instruct you
13   what to do.  I only ask that you give me at least a
14   half second between the time that the question is
15   asked and the time the question is answered for me
16   to say "objection --"
17        THE WITNESS:  Will do.
18        MR. NALVEN:  If it's called for.  Thanks
19   very much.
20   Q.   Now, you understand that you're here today
21   as a corporate representative speaking on behalf of
22   Harvard Pilgrim, correct?

Page 7

1    A.   Yes.
2    Q.   What did you do to prepare for your
3    deposition today?
4    A.   I spoke with Harvey.
5    Q.   Anything else?
6    A.   No.  That was it.  I did review the
7    participating hospital agreement to look at what
8    language was specifically represented in there
9    related to drug pricing.
10   Q.   Did you look at any other documents?
11   A.   No.  I looked at the hospital agreement.
12   Q.   Did you speak with anyone other than Mr.
13   Cotton in preparation for your deposition today?
14   A.   I spoke with Richard Francis.  He had --
15   actually, it wasn't directly in preparation for
16   this, but he had spoken to me previously.  He's in
17   the reimbursement team and reports to me.
18   Q.   What did you discuss with Mr. Francis?
19   A.   He had told me what his involvement was.
20   Q.   Do you have an understanding as to what
21   this case is about?
22        MR. NALVEN:  Objection.

Page 8

1    Q.   You can answer.
2    A.   Okay.  Not in depth.  I mean, Harvey
3    briefed me, but I don't have an in-depth
4    understanding.
5    Q.   Other than discussions with Mr. Cotton, do
6    you have any other knowledge about what this --
7    about this case?
8    A.   No, I do not.
9    Q.   Okay.  Can you, just by way of background,
10   describe for me your educational background.
11   A.   Sure.
12   Q.   After high school.
13   A.   Yeah.  I have an undergraduate degree --
14   bachelor of science -- in health services
15   administration, and I have an MBA.
16   Q.   When did you get the bachelor's degree?
17   A.   1982.
18   Q.   What institution did you attend?
19   A.   Providence College.
20   Q.   And then when did you get the master's
21   qualification?
22   A.   In 1989.

Page 9

1    Q.   From what institution did you get that?
2    A.   Providence College.
3    Q.   After graduating with your bachelor's
4    degree in 1982, did you take up employment?
5    A.   Yes.
6    Q.   Where did you start working then?
7    A.   Memorial Hospital of Rhode Island.
8    Q.   What was your title at Memorial Hospital?
9    A.   I had several titles there.  Initially, I
10   was an employment coordinator -- I guess the title
11   was, then a compensation administrator, and then a
12   staff accountant.
13   Q.   I take it none of those positions involved
14   issues relating to drug pricing or reimbursement.
15   A.   Well, not directly pricing, no.
16   Q.   Was there some indirect connection to
17   these issues?
18   A.   The only -- I mean, as a stretch,
19   reimbursement -- part of my job is in the finance
20   department as a staff accountant -- was preparing
21   Medicare cost reports, which, you know, is hospital
22   reimbursement, but not reimbursement in the sense

3 (Pages 6 to 9)

Robert C. Farias
October 20, 2004

Wellesley, MA

Page 10

1   of paying providers.
2       Q.   Those cost reports assess the amounts that
3   the hospital was being paid in relation to services
4   rendered to Medicare patients, is that correct?
5       A.   It's a standard form requirement, HCFA
6   2552 Medicare cost reports.  All hospitals that are
7   participating in Medicare have to file these
8   reports.
9       Q.   How long did you remain employed at
10  Memorial Hospital?
11      A.   Eight and a half years.
12      Q.   So, that was from 1982 until about 1990?
13      A.   Uh-huh.
14      Q.   The three positions you described earlier,
15  did those cover the entire period of your
16  employment for Memorial?
17      A.   Yes.  Uh-huh.
18      Q.   Also, just for the court reporter's
19  benefit, if you will let me finish the question
20  before answering, just so she can get it in the
21  transcript.
22      A.   Yes.

Page 11

1       Q.   As part of your responsibilities as a
2   staff accountant, did you gain an understanding of
3   the methodology that Medicare used to reimburse
4   Memorial?
5           MR. NALVEN:  Objection.
6       Q.   You can answer.
7       A.   Yes.
8       Q.   Okay.  And what was your understanding of
9   the methodology that Medicare was using to
10  reimburse Memorial?
11          MR. NALVEN:  Objection.
12      Q.   Go ahead.
13      A.   Okay.  For -- it was -- those were the
14  early days of the prospective payment system for
15  inpatient services.  We were reimbursed, you know,
16  according to DRG -- a predetermined payment
17  methodology.  The cost report was used as a
18  mechanism for settling for those areas that were
19  not reimbursed according to the prospective
20  reimbursement system.
21          So, at that time on the outpatient side,
22  it was -- you know, it was an aggregate form of

Page 12

1   reimbursement.  It wasn't on a claims level of
2   reimbursement.  So, it would be a cost or some
3   formula related to cost reimbursement.  In addition
4   to that, there was medical education costs that,
5   you know, that Medicare would pay the hospitals.
6       Q.   Incidentally, as we proceed, when counsel
7   puts forward an objection, he's just securing it
8   for the record for the transcript.  So, you should
9   still go ahead and answer the questions after he's
10  made his objection.
11      A.   I understand.
12      Q.   Unless, of course, your attorney directs
13  you not to answer a question.  Okay.  In 1990 you
14  left your position at Memorial, is that correct?
15      A.   Yes.
16      Q.   Did you then enter your MBA program?
17      A.   No.  I -- my MBA program was done part
18  time.
19      Q.   Okay.  What job did you move to in '99?
20      A.   I went to Miriam Hospital in Providence.
21      Q.   I'm sorry.  Is that Miriam?
22      A.   Miriam, yes.

Page 13

1       Q.   M-y-r-i-a-m?
2       A.   M-i-r-i-a-m.
3       Q.   How long did you remain at Miriam
4   Hospital?
5       A.   Four and a half years.
6       Q.   Until sometime in 1994?
7       A.   Uh-huh.
8       Q.   And what position did you hold at Miriam
9   Hospital?
10      A.   The title was reimbursement supervisor.
11      Q.   You held that title throughout your time
12  at Miriam?
13      A.   Yes.
14      Q.   What were your responsibilities as a
15  reimbursement supervisor?
16      A.   I had responsibility for -- again, the
17  third-party reimbursement, Medicare cost reports,
18  also a lot of my time was spent -- there was a
19  teaching program there managing and understanding
20  the -- it was a significant part of reimbursement,
21  the scheduling of the interns and residents -- not
22  doing that, but understanding it and incorporating

4 (Pages 10 to 13)

Robert C. Farias
Wellesley, MA

October 20, 2004

Page 14

1  that appropriately into the Medicare cost reports.
2  I also had responsibility with -- along with the
3  billing department -- for managing the hospital's
4  charge, uhm, description master. Working with the
5  third-party payers, Blue Cross, uhm, so forth.
6     Q.  Okay. During your time at Miriam
7  Hospital, did you have any knowledge regarding what
8  Miriam paid to acquire drugs?
9     A.  No, I did not.
10    Q.  Okay. Do you know whether or not the
11 price paid to acquire drugs was tied to any
12 particular benchmarks?
13        MR. NALVEN: Objection.
14    A.  I do not know that.
15    Q.  How about at your time at Memorial
16 Hospital, do you have any knowledge as to what
17 Memorial paid to acquire drugs?
18    A.  No.
19    Q.  Do you know whether or not that price was
20 tied to any benchmarks?
21        MR. NALVEN: Objection.
22    A.  No.

Page 15

1     Q.  Okay. So, in 1994 you left Miriam
2  Hospital, is that correct?
3     A.  Uh-huh.
4     Q.  Where did you move to in '94?
5     A.  Charlton Memorial Hospital in Fall River,
6  Mass.
7     Q.  You had also acquired your MBA by this
8  time?
9     A.  Yes.
10    Q.  How long did you remain at Charlton
11 Hospital?
12    A.  18 months.
13    Q.  Until sometime in '95?
14    A.  Actually, I think you've got the years a
15 little bit wrong.
16    Q.  Do I?
17    A.  Yeah, I think. It was -- I was -- I'm
18 trying to remember now. Miriam through '95,
19 because I came here in 1996 -- December of '96.
20 So, you do the math.
21    Q.  So, you were at Charlton from sometime
22 around '95 to sometime around '96?

Page 16

1     A.  Yes, right.
2     Q.  Okay. What was your title at Charlton
3  Memorial Hospital?
4     A.  Same as I had at Miriam.
5     Q.  Reimbursement --
6     A.  Supervisor, yes.
7     Q.  -- supervisor. You held that title
8  throughout your time at Charlton Memorial?
9     A.  Yes.
10    Q.  What were your responsibilities?
11    A.  The same responsibilities. Very similar
12 responsibilities.
13    Q.  While at Charlton, did you gain an
14 understanding as to what Charlton was paying to
15 acquire drugs?
16    A.  No.
17    Q.  And in 1996, you came to Harvard, is that
18 correct?
19    A.  That's right, yes.
20    Q.  Which entity did you join in 1996?
21    A.  I'm sorry. I don't understand.
22    Q.  Sure. Well, who was your employer in

Page 17

1  1996?
2     A.  Harvard Pilgrim Health Care.
3     Q.  Okay. Have you worked at Harvard Pilgrim
4  continuously from 1996 to the present?
5     A.  Yes.
6     Q.  Okay. Would you take me through your job
7  titles during that time period.
8     A.  Sure. When I came to Harvard Pilgrim my
9  first title was senior regional business
10 consultant. I was in that role for 18 months.
11 That position involved -- I had a portfolio of
12 providers that I was responsible for. As that time
13 it was -- it was a couple of things. It was
14 contracting with those providers. In addition,
15 there was a responsibility where we would work with
16 them on their performance, specifically in the
17 concept of the physician groups, the local care
18 units. We would go out and do performance
19 management meetings to talk with them about how
20 they were performing within the various financial
21 models that they were contracted under.
22    Q.  Okay. What was the next title you moved

Robert C. Farias                                                    October 20, 2004
Wellesley, MA

Page 18

1  to?
2     A.  Next title was senior project manager; and
3  I did that for about two years.  That function was
4  in the network management area -- a variety of
5  projects related to network management that could
6  be related to medical management, could be related
7  to referral authorization type things; could be
8  related to managing recontracting efforts.  Just a
9  wide variety of projects.
10    Q.  When you say, "network," you're referring
11 to networks of providers?
12    A.  That's right.  It was an
13 internally-focused position.
14    Q.  What do you mean by that?
15    A.  Meaning that I didn't have contact with
16 providers.  I worked on projects that supported the
17 work of network management.
18    Q.  Okay.  You held that position for about
19 two years you said?
20    A.  That's right.
21    Q.  Okay.  What was the next area that you
22 moved into?

Page 19

1     A.  Next area was specifically to the
2  contracting department in a project management
3  role.  That title was manager of planning and
4  administration.
5     Q.  Okay.  And you moved into that position
6  sometime around 2000, is that correct?
7     A.  Probably about 2000, yeah.
8     Q.  What were your responsibilities in that
9  position?
10    A.  In that position I was responsible for
11 both the administrative side of managing the
12 contracting department and the administrative side
13 -- I mean the departmental administrative budget,
14 the infrastructure of the department -- project
15 management specific to the contracting department.
16 For example, you know, when recontracting was, you
17 know, kicking off, I would be responsible for
18 drafting, you know, notification letters that would
19 go out to the -- to the providers, responsible for
20 working with legal on updating the contract
21 templates, and also, managing the work flows
22 related to recontracting.  And again, a wide

Page 20

1  variety of projects.  You know, liaisons with other
2  departments and so forth.
3     Q.  The focus you said was entirely on the
4  administrative side of managing the department?
5     A.  Administration and planning.  The planning
6  -- it was really a split function, and it continues
7  to be.  But the planning side was related to, you
8  know, the significant, you know, project business
9  unit initiatives, contracting being primarily --
10    Q.  How long did you remain in that position?
11    A.  Actually, it was a little bit of an
12 evolution.  Probably about a year.  That position
13 evolved into my current role, director of planning
14 and administration.  When there was a
15 reorganization, contracting became more of a broad
16 business unit again.  Network service and
17 operations is the name of the business unit.  So,
18 my title now and following being manager of
19 planning and administration for contracting was
20 director of planning administration for network
21 service and operations.
22    MR. MANGI:  I'm sorry.  Could you read

Page 21

1  back that last answer, please.
2     (Answer read back.)
3     Q.  So, your current position is director of
4  planning and administration, right?
5     A.  Right.
6     Q.  And you've held that since 2001.
7     A.  Yeah.
8     Q.  Okay.  Have your responsibilities changed
9  from your manager of planning and administration
10 position?
11    A.  Yes.  In addition to those
12 responsibilities, I have reporting -- folks
13 reporting to me, including the provider
14 communications and training area.  There's a small
15 group of project managers and a budget coordinator
16 which, again, they focus primarily on the
17 infrastructure and administration side of things.
18 In addition to that, the provider reimbursement
19 area reports to me.
20    Q.  What are your responsibilities in relation
21 to that provider reimbursement area?
22    A.  The manager of provider reimbursement

6 (Pages 18 to 21)

Robert C. Farias
October 20, 2004
Wellesley, MA

Page 22

1 reports to me.
2 Q. And who is that manager?
3 A. Steve Twelves.
4 Q. Now, the manager of planning and
5 administration position you referred to earlier --
6 A. Uh-huh.
7 Q. -- was that also focused on provider
8 contracting?
9 A. Uh-huh.
10 Q. Okay. In your current position do you
11 have any responsibility for pharmacies or pharmacy
12 contracting?
13 A. No.
14 Q. Okay. Do you have any dealings with
15 pharmacy benefits managers or PBMs?
16 A. No.
17 Q. Okay. So, is it fair to say that
18 throughout your time at Harvard Pilgrim, your focus
19 has been on the provider or medical side, as
20 opposed to the pharmacy side of the business?
21 MR. NALVEN: Objection.
22 A. Yes.

Page 23

1 Q. Okay. Now, in your current position, do
2 you subscribe to any industry pricing publications?
3 MR. NALVEN: Objection.
4 A. I don't. I don't --
5 Q. Others in your department do?
6 A. The reimbursement -- I don't know the
7 details around what the reimbursement department --
8 if they subscribe to the document, you know,
9 anything -- or if they get the information online.
10 I don't know.
11 Q. Okay.
12 MR. NALVEN: Note my objection to the
13 prior question, please.
14 Q. Okay. What price reporting publications
15 does Harvard Pilgrim use?
16 A. As stated in our contracts, the Medicare
17 AWP, average wholesale price.
18 Q. Let me back up a bit.
19 A. Sure.
20 Q. Do you understand that -- whether AWP is
21 published anywhere?
22 A. I understand it's provided by Medicare.

Page 24

1 Q. So, your understanding is that AWP is
2 provided to Harvard Pilgrim by Medicare?
3 A. Uh-huh.
4 Q. Where do you come by that understanding?
5 A. The way we describe it in our provider
6 contracts is, "based on Medicare AWP updates."
7 Q. Is that contractual language the only
8 basis for your view that AWP is provided to Harvard
9 Pilgrim by Medicare?
10 A. That and what I've known from my
11 reimbursement staff, yes.
12 Q. Are you familiar with First Data Bank?
13 A. No.
14 Q. Have you ever heard of First Data Bank?
15 A. No.
16 Q. Have you ever heard of Redbook?
17 A. Redbook I've heard of, yes.
18 Q. Okay. Do you know what Redbook is? And
19 we're not talking about the ladies' magazine.
20 A. No. I know. I don't know specifically.
21 Q. Okay. Do you have a general understanding
22 as to the nature of that publication?

Page 25

1 MR. NALVEN: Objection.
2 A. No.
3 Q. Are you a member of any professional
4 associations or industry associations?
5 A. No.
6 Q. Are you familiar with Harvard Community
7 Health Plans?
8 A. Yes.
9 Q. Okay. What is the relationship between
10 Harvard Community Health Plan and Harvard Pilgrim
11 Health Care?
12 A. Well, Harvard Community Health Plan was
13 one of the organizations that merged with Pilgrim
14 Health Care to form Harvard Pilgrim Health Care.
15 Q. Okay. And that merger took place around
16 2000, is that correct?
17 A. It was prior to that. It was prior to my
18 coming to Harvard Pilgrim.
19 Q. Okay. So, when you came to Harvard
20 Pilgrim that merger had already taken place.
21 A. Yes.
22 Q. Okay. Does Harvard Pilgrim at present own

Robert C. Farias                                                    October 20, 2004
Wellesley, MA

Page 26

1  any pharmacies?
2      A.   Not to my knowledge.
3      Q.   Does it own any provider networks?
4      A.   I guess I don't understand what you mean
5  by "own."
6      Q.   Well, does it own any hospitals?
7      A.   No.
8      Q.   Okay.  Does it have any physicians' groups
9  -- practicing physicians that are direct employees
10 of Harvard Pilgrim?
11     A.   I don't -- there is Nashua Medical Group
12 in New Hampshire, which I don't understand fully
13 the reporting relationship, but I believe they're
14 an owned small group.
15     Q.   Did you say it was natural medical?
16     A.   Nashua.
17     Q.   How would you spell that?
18     A.   N-a-s-h-u-a.
19     Q.   Okay.  Do you know what -- is that a -- is
20 that a group of practicing physicians?
21     A.   Yes, it's a small group.
22     Q.   Okay.

Page 27

1      A.   Yeah.
2      Q.   And it's your understanding that Harvard
3  Pilgrim owns that practice?
4      A.   Yes.
5      Q.   Do you have any involvement in relation to
6  that practice?
7      A.   No.
8      Q.   Okay.  Do you have any knowledge regarding
9  how that practice acquires drugs?
10     A.   No.
11     Q.   Do you have any knowledge regarding how
12 that practice is reimbursed for drugs, if at all?
13     A.   No.
14     Q.   Do you know whether Harvard Pilgrim, at
15 present, purchases drugs directly from any
16 wholesalers or manufacturers?
17     A.   I don't know.
18     Q.   Do you know whether Harvard Pilgrim has
19 ever purchased drugs directly from wholesalers or
20 manufacturers?
21     A.   I don't know.
22     Q.   Now, your focus is on the provider side of

Page 28

1  business, right?
2      A.   That's correct.
3      Q.   Do you have an understanding as to the
4  methodology that Harvard Pilgrim uses at present to
5  reimburse providers for drugs that are administered
6  in office?
7      A.   Yes.
8          MR. NALVEN:  Objection.
9      Q.   And to clarify the question, by
10 "providers" here, I'm referring to physicians
11 rather than hospitals.
12     A.   Yes.
13     Q.   Okay.  What is the methodology that
14 Harvard Pilgrim uses at present to reimburse
15 physicians for drugs that are distributed in
16 office?
17         MR. NALVEN:  Objection.
18     A.   We have a drug fee schedule.
19     Q.   Does Harvard Pilgrim independently
20 generate that drug fee schedule?
21         MR. NALVEN:  Objection.
22     A.   Independently?  I --

Page 29

1      Q.   Yeah, I mean, is the fee schedule
2  something that Harvard Pilgrim generates
3  internally, or do you rely upon a vendor or some
4  other entity to provide a fee schedule to you?
5          MR. NALVEN:  Objection.
6      A.   No.  We generate the fee schedule based on
7  information.
8      Q.   When you say, "information," what are you
9  referring to?
10     A.   The AWP.
11     Q.   What is the relation of the number on the
12 fee schedules for any particular drug to its AWP?
13     A.   It's a percentage of AWP.
14     Q.   Okay.  What is that percentage?
15     A.   95 percent.
16     Q.   So, is it fair to say that Harvard Pilgrim
17 currently reimburses providers for drugs
18 administered in office at 95 percent of AWP?
19     A.   Yes.
20     Q.   Now, this drug fee schedule you referred
21 to, is there only one master fee schedule that's
22 applied to all practices?

8 (Pages 26 to 29)

Robert C. Farias
October 20, 2004

Wellesley, MA

Page 30

1     A.   Yes.
2     Q.   And that applies across all of Harvard
3 Pilgrim's plans as well?
4     A.   Yes.
5     Q.   Who at Harvard Pilgrim is responsible for
6 maintaining that fee schedule?
7     A.   It --
8       MR. NALVEN:   Objection.
9     A.   The folks in our reimbursement department,
10 Richard Francis.
11     Q.   And they report in to you, is that
12 correct?
13     A.   Through the manager, yes.
14     Q.   How often is the drug fee schedule
15 updated?
16     A.   It's -- it can vary. It's updated in
17 accordance with the updates that we receive from
18 Medicare. Generally, quarterly.
19     Q.   How long has Harvard Pilgrim reimbursed
20 physicians for drug administered in office at 95
21 percent of AWP?
22     A.   I don't know.

Page 31

1     Q.   Was that the methodology in use when you
2 came to the company?
3     A.   I don't know.
4     Q.   Okay. How long do you know that the
5 methodology -- this methodology has been in use?
6     A.   At least the last three years.
7     Q.   So, you know this methodology has been in
8 use since 2001, is that correct?
9     A.   Yes.
10     Q.   And prior to 2001, you don't know what
11 methodology Harvard Pilgrim used to reimburse
12 providers for drugs administered in office?
13     A.   That's correct.
14     Q.   How did you come to know in 2001 that this
15 methodology was in use?
16       MR. NALVEN:   Objection.
17     A.   Just through my involvement in the
18 projects and the position I was in.
19     Q.   Is it your understanding that that
20 methodology was already in use prior to 2001, or
21 was it being implemented when you first became a --
22     A.   I don't know.

Page 32

1     Q.   Now, let's switch gears for a moment and
2 talk about hospitals.
3     A.   Sure.
4     Q.   Do you have an understanding as to the
5 methodology that Harvard Pilgrim currently uses to
6 reimburse hospitals for drugs that are administered
7 to patients?
8       MR. NALVEN:   Objection.
9     A.   Yes.
10     Q.   All right. What is that methodology?
11       MR. NALVEN:   Objection.
12     A.   The Harvard Pilgrim drug fee schedule.
13     Q.   All right. Is that the same fee schedule
14 that we discussed --
15     A.   Yes.
16     Q.   -- that's used in reimbursing providers?
17     A.   Yes.
18       MR. NALVEN:   Objection.
19     Q.   Does that apply to both the inpatient and
20 outpatient departments of hospitals?
21     A.   Not necessarily. Actually, no.
22     Q.   Okay.

Page 33

1     A.   The nature of inpatient reimbursement is
2 that we wouldn't pay according to a drug fee
3 schedule.
4     Q.   Can you describe what the reimbursement is
5 that's used in relation to inpatient?
6     A.   Inpatient, there could be a variety of
7 reimbursement mechanisms. It could be a per diem.
8 It could be a DRG reimbursement. And for some
9 cases, it could be a case rate. In any of those
10 methodologies, the reimbursement would be for all
11 services received while inpatient, and there
12 wouldn't be distinct payment for any ancillary
13 outpatient or drug services.
14     Q.   So, in relation to inpatients, Harvard
15 Pilgrim does not pay any amount that's specific to
16 reimbursement for drugs administered to the
17 patients, is that correct?
18       MR. NALVEN:   Objection.
19     A.   That's correct. There is one instance
20 where there could be payment for a drug: If a
21 hospital were on a percent-of-charge contract,
22 then, by the nature of the reimbursement

9 (Pages 30 to 33)

Robert C. Farias                                                    October 20, 2004
Wellesley, MA

Page 34

1   methodology, they would be paid a percentage of
2   whatever charges the hospital submitted.
3       Q.   And the charges would include a component
4   that pertains to drug costs, is that correct?
5       A.   It could, yes.
6           MR. NALVEN:  Objection.
7       Q.   In that instance, in the percent-of-charge
8   case --
9       A.   Uh-huh.
10      Q.   -- do you have an understanding as to
11  whether the amount that the hospital bills Harvard
12  Pilgrim in relation to drugs can be expressed by
13  reference to any particular benchmark?
14          MR. NALVEN:  Objection.
15      A.   That's a difficult question to answer.
16  The hospitals establish their charges.  I wouldn't
17  know what they were basing that on.
18      Q.   So, it's whatever the hospital would
19  customarily charge for the drug is the amount that
20  Harvard Pilgrim will pay in that instance, is that
21  correct?
22          MR. NALVEN:  Objection.

Page 35

1       A.   No, we would pay -- we would negotiate a
2   discount off of charges.
3       Q.   The discount that's negotiated in that
4   instance, would that apply to all charges across
5   the board, or would there be a specific negotiation
6   in relation to drug reimbursement?
7       A.   There would not be a specific related to
8   drug reimbursement.  There may be differences
9   between inpatient and outpatient.  Generally,
10  that's what you would see.
11      Q.   Well, sticking with the inpatient
12  component --
13      A.   Sure.
14      Q.   -- I understand that the -- there may be a
15  percentage discount of the charge that's
16  negotiated.  My question is, the amount that the
17  hospital will charge in relation to drugs
18  specifically --
19      A.   Uh-huh.
20      Q.   -- can that be expressed by reference to a
21  particular benchmark, be it AWP or anything else?
22          MR. NALVEN:  Objection.

Page 36

1       A.   I don't know.
2       Q.   Do you know how common those percent of
3   charge contracts are in relation to Harvard
4   Pilgrim's overall hospital contracting?
5       A.   They're rare.
6       Q.   Okay.
7           MR. NALVEN:  Note my objection.
8       Q.   So that was the inpatient side.  So, when
9   you describe the use of Harvard Pilgrim's drug fee
10  schedule --
11      A.   Uh-huh.
12      Q.   -- in relation to hospitals, were you
13  referring them exclusively to the outpatient
14  sector?
15      A.   Yes.
16      Q.   So, in relation to drugs that are
17  administered to outpatients in hospitals --
18      A.   Yes.
19      Q.   -- is it fair to say that Harvard Pilgrim
20  reimburses the hospitals at 95 percent of AWP?
21      A.   Yes.
22      Q.   How long has that methodology been in use?

Page 37

1           MR. NALVEN:  Objection.
2       A.   Well, as I said, my awareness, the last
3   three years.
4       Q.   You became aware of that methodology in
5   relation to its use --
6       A.   Uh-huh.
7       Q.   -- in outpatient departments in hospitals
8   at the same time that you become aware of its use
9   in relation to providers?
10          MR. NALVEN:  Objection.
11      A.   That's right.
12      Q.   Do you know what methodology was in use in
13  relation to reimbursing outpatients -- hospitals in
14  relation to outpatients prior to 2001?
15          MR. NALVEN:  Objection.
16      A.   Unsure.
17      Q.   When you say, "unsure," do you mean you
18  have an idea but you're not certain about it?
19      A.   I don't know.
20      Q.   Okay.  Now, in addition to paying
21  providers -- when I say, "providers," now I'm
22  referring to -- actually, let's -- let me withdraw

Henderson Legal / Spherion
(202) 220-4158

Robert C. Farias

Wellesley, MA

October 20, 2004

Page 38

1  that question and let's be more clear.  Switching
2  back to physicians now --
3      A.   Yes.
4      Q.   -- when Harvard Pilgrim reimburses
5  physicians in relation to drugs administered in
6  office, does it break out a drug component versus
7  an administration fee or a -- that's fine.  Go
8  ahead.
9      A.   Yes.
10     Q.   Okay.  The drug component, that's what's
11 expressed on the fee schedule, is that correct?
12     A.   Both components would be expressed on a
13 fee schedule.
14     Q.   Okay.  Now --
15         MR. NALVEN:  Objection.
16     Q.   -- the 95 percent of AWP --
17     A.   Uh-huh.
18     Q.   -- part of the fee schedule that you
19 referred to earlier --
20     A.   Uh-huh, right.
21     Q.   -- that's the reimbursement in relation to
22 the drugs, is that correct?

Page 39

1      A.   Correct.
2      Q.   Okay.  Does the fee schedule also contain
3  a separate amount that's paid for administrative
4  fees -- administration fees?
5      A.   For some -- yeah.  I mean, it's not that
6  the fee schedule -- I mean, there are standard
7  codes that provide for administration of drugs.
8      Q.   Okay.  And those are CPT codes, is that
9  correct?
10     A.   CPT or HCPCs, yeah.
11     Q.   Okay.  So, Harvard Pilgrim will reimburse
12 a provider, both for a procedure of administering a
13 drug in relation to the relevant CPT or HCPC code,
14 and will reimburse at 95 percent of AWP in relation
15 to the drug administered.  Is that a fair
16 statement?
17     A.   It's fair, but I don't have complete
18 knowledge of the instances where an administration
19 code would be per -- you know what I mean -- if
20 that happens in every case.
21     Q.   Do you have an understanding of what
22 providers -- and referring now to both physicians

Page 40

1  and hospitals --
2      A.   Yes.
3      Q.   -- pay to acquire drugs?
4      A.   No.
5      Q.   Okay.  Do you have an understanding as to
6  whether the amount that they pay to acquire drugs
7  can be expressed by reference to any particular
8  benchmark?
9          MR. NALVEN:  Objection.
10     A.   I don't know.
11     Q.   Okay.  Have you ever heard of the term
12 "whole acquisition cost" or WAC?
13     A.   Yes.
14     Q.   Okay.  What's your understanding of that
15 term?
16     A.   Just as it describes itself, that it would
17 be what -- the price that the providers pay to
18 acquire the drug.
19     Q.   Okay.  So, is it fair to say that you
20 understand that providers acquire drugs at or close
21 to WAC?
22     A.   I really don't know.

Page 41

1      Q.   Is it fair to say that your earlier answer
2  when you described what you understood WAC to be --
3      A.   Uh-huh.
4      Q.   -- was based just on the language --
5      A.   Yes.
6      Q.   -- of the term?
7      A.   Yes.
8          MR. NALVEN:  Objection.
9      Q.   You understand that providers acquire
10 drugs at an amount lower than what Harvard Pilgrim
11 reimburses them in relation to those drugs, is that
12 correct?
13     A.   I don't know that.
14     Q.   Okay.  Well, you understand that most of
15 the providers that Harvard Pilgrim contracts with
16 are in the business of making money rather than
17 losing money, right?
18         MR. NALVEN:  Objection.
19     A.   I can't -- I don't know that.
20     Q.   Okay.  Well, do you generally assume that
21 physicians Harvard Pilgrim is contracting with are
22 acquiring drugs at a price lower than what you

11 (Pages 38 to 41)

Robert C. Farias                                                                October 20, 2004

Wellesley, MA

---

Page 42

1  reimburse them for?
2        MR. NALVEN:  Objection.
3     A.  I don't know.
4     Q.  Would others at Harvard Pilgrim be more
5  familiar with that issue?
6        MR. NALVEN:  Objection.
7     A.  I couldn't answer for others.
8     Q.  Okay.  Is it fair to say that Harvard
9  Pilgrim does not require providers to disclose
10  their acquisition costs as part of their contracts
11  with Harvard Pilgrim?
12        MR. NALVEN:  Objection.
13     A.  Within my area, we do not.
14     Q.  Uh-huh.  And indeed, Harvard Pilgrim
15  doesn't require them to disclose their acquisition
16  costs for drugs in any other way that you're aware
17  of, is that correct?
18     A.  Not that I'm aware of, no.
19        MR. NALVEN:  Objection.
20     Q.  Indeed, the providers' acquisition costs
21  are not relevant to Harvard Pilgrim's calculation
22  of the amount that it's going to reimburse them for

---

Page 43

1  drugs.  Is that a fair statement?
2        MR. NALVEN:  Objection.
3     A.  Yes.
4     Q.  So, indeed, if providers' acquisition
5  costs for drugs were to change, that would not
6  alter the amount that Harvard Pilgrim is
7  reimbursing them for drugs, is that correct?
8        MR. NALVEN:  Objection.
9     A.  That's correct.
10     Q.  And indeed, if Harvard Pilgrim were to
11  learn more information about what providers paid to
12  acquire drugs, that would not change the amount
13  that Harvard Pilgrim is reimbursing for drugs.  Is
14  that a fair statement?
15        MR. NALVEN:  Objection.
16     A.  That's a fair statement.
17     Q.  Now, what is your involvement at present
18  in relation to Harvard Pilgrim's contracts with
19  physicians?
20        MR. NALVEN:  I'm sorry.  May I hear the
21  question again, please.
22        (Question read back.)

---

Page 44

1        MR. NALVEN:  Objection.
2     A.  I don't have direct involvement with
3  physician contracting, other than providing the
4  tools that the contracting consultants need as far
5  -- you know, like the contract templates, the
6  reimbursement strategy.  That is what my --
7     Q.  When you say, "contract consultants," what
8  are you referring to there?
9     A.  The staff that is responsible for directly
10  working with the providers --
11     Q.  And those are?
12     A.  -- in negotiating and administering the
13  contracts.
14     Q.  Those are Harvard Pilgrim's employees,
15  right?
16     A.  That's correct.
17     Q.  And when you refer to "reimbursement
18  strategy," what are you talking about there?
19     A.  The reimbursement staff reporting to me,
20  you know, what -- how are we going to -- the
21  physician fee schedule generally is a good example.
22  The physician fee schedule is an RBRVS fee

---

Page 45

1  schedule -- how are we going to update the fee
2  schedule in the coming year?  That's what I'm
3  talking about.
4     Q.  Do you have an understanding as to the
5  criteria Harvard Pilgrim uses when deciding whether
6  or not to contract with a provider?
7     A.  Yes.
8     Q.  Okay.  What are those criteria?
9     A.  Well, generally, it's -- I mean, they have
10  to be credentialed, and they have to meet all of
11  the credentialing standards.  There has to be a
12  need.  The fact of the matter is, in our service
13  area, our network is robust.  You know what I mean?
14  So, we're not -- it's not like a network
15  development situation where we're going out and
16  seeking providers.
17     Q.  Anything else?
18     A.  No.
19     Q.  Okay.  Since Harvard Pilgrim has one fee
20  schedule that it applies to all providers, is it
21  fair to say that there is no negotiation between
22  Harvard Pilgrim and providers over the amount that

---

12 (Pages 42 to 45)

Robert C. Farias                                                    October 20, 2004
Wellesley, MA

| | |
|---|---|
| **Page 46** | **Page 48** |

Page 46

1  will be reimbursed in relation to drugs
2  administered in office?
3       MR. NALVEN:  Objection.
4    A.  It's difficult for me to say.  I don't
5  know.
6    Q.  Okay, because you're not directly involved
7  in that --
8    A.  That's correct.
9    Q.  -- administration process?
10   A.  That's correct.
11   Q.  Okay.  Just let me finish the question so
12 the court reporter can take that down, please.  But
13 you do know for a fact that there's one fee
14 schedule that's applied across the board, and that
15 there are no variations from that, is that correct?
16   A.  That's correct.
17   Q.  Has there ever been any discussion that
18 you're aware of at Harvard Pilgrim about changing
19 the methodology that's used to reimburse providers
20 for drugs administered in office or in hospital
21 outpatient departments?
22       MR. NALVEN:  Objection.

Page 47

1    A.  Yes.
2    Q.  Okay.  When did that discussion take
3  place?
4    A.  Earlier this year.
5        MR. NALVEN:  Objection.
6        MR. MANGI:  What's your objection?
7        MR. NALVEN:  It incorporated the previous
8  question, which used terms that are ambiguous under
9  the circumstances.
10   Q.  So, "earlier this year," you're referring
11 to what time period?
12   A.  I would say the spring of 2004.
13   Q.  Who was involved in that discussion?
14   A.  It would have been a group of us within
15 network management, the reimbursement manager,
16 folks in contracting, reimbursement staff, myself.
17   Q.  Who headed out that effort, do you know?
18   A.  I mean, I would just say generally the
19 reimbursement staff.
20   Q.  Okay.  What was discussed?
21   A.  Really what the discussion grew out of was
22 the fact that Medicare is changing its methodology

Page 48

1  for reimbursing -- reimbursing drugs.  And what we
2  tried to understand -- because I understand there's
3  a transition period that they're actually -- they
4  changed their methodology in 2004, and that they're
5  going to be continuing to change it over time.  And
6  the discussion stemmed from, okay, well, what are
7  we, as a health plan, going to do?  You know, what
8  are our options, given that this change is
9  occurring?
10   Q.  And part of the reason for that was for
11 the past few years Harvard Pilgrim has reimbursed
12 providers for drugs administered in office at the
13 same rate as Medicare, is that correct?
14   A.  Not at the same rate, but based on the AWP
15 updates.
16   Q.  Okay.
17   A.  Okay.
18   Q.  How is the rate that Harvard Pilgrim
19 reimburses providers for drugs administered in
20 office different from what Medicare reimburses?
21   A.  I don't know what the differential is
22 between the two fee schedules.

Page 49

1    Q.  Okay.  So, what was the result of that
2  discussion pertaining to whether or not to change
3  reimbursement methodologies?
4    A.  Well, we -- for 2004, we continue to pay
5  under the same methodology.  So, we haven't
6  executed a change yet.
7    Q.  Uh-huh.  Is a change contemplated?
8    A.  Again, we're still having discussions,
9  trying to understand what the market change is
10 going to be.
11   Q.  Okay.
12       MR. NALVEN:  Note my objection.
13   Q.  Are you familiar with the term "ASP"?
14   A.  I've heard it, yes.
15   Q.  Have you heard that term in relation to
16 the Medicare changes we were just discussing?
17   A.  Yes.
18   Q.  Are you familiar with that term in any
19 other context?
20   A.  No.
21   Q.  All right.  Is it fair to say that there
22 is still no settled definition of what ASP will be?

13 (Pages 46 to 49)

Robert C. Farias

Wellesley, MA

October 20, 2004

Page 50

1        MR. NALVEN:  Objection.
2     A.  I don't know.
3     Q.  Okay.  Do you have an understanding as to
4  how ASP is calculated?
5     A.  I do not.
6     Q.  Now, we spoke earlier about the
7  administrative fee component of reimbursement to
8  providers for drugs administered in office.  Do you
9  recall that testimony?
10    A.  Yes.
11    Q.  Do you have an understanding as to whether
12  that amount alone -- leaving aside drug
13  reimbursement -- would be sufficient to cover
14  providers' overhead costs?
15       MR. NALVEN:  Objection.
16    A.  I don't know.
17    Q.  All right.  And is that because you're not
18  the person who works closely with providers?
19       MR. NALVEN:  Objection.
20    A.  It's because generally I wouldn't know
21  what the overhead costs of a provider are.
22    Q.  Do others at Harvard Pilgrim have that

Page 51

1  information?
2     A.  I would say no.
3     Q.  All right.  To the best of your knowledge,
4  has Harvard Pilgrim ever studied what providers'
5  overhead costs are?
6     A.  Not specifically, no.
7     Q.  Why does Harvard Pilgrim use this 95
8  percent of AWP formula in relation to reimbursing
9  providers for drugs administered in office?
10    A.  I don't know the specific rationale.
11    Q.  Do you have an understanding as to what
12  the benefits are of using that formula?
13       MR. NALVEN:  Objection.
14    A.  In a general way, it provides consistency
15  across our network -- consistent payment.
16    Q.  Harvard Pilgrim could change that
17  reimbursement methodology at any time it chose to
18  do so, subject to contractual obligations.  Is that
19  a fair statement?
20    A.  Subject to contractual obligations, yes.
21       MR. NALVEN:  Objection.
22    Q.  And indeed, if Harvard Pilgrim chose to

Page 52

1  move to a benchmark other than AWP, it could do
2  that, correct?
3        MR. NALVEN:  Objection.
4     A.  Through a recontracting effort.
5     Q.  Right, subject to contractual obligations.
6  And indeed, it could have done so at any time in
7  the past, subject to contractual obligations,
8  correct?
9        MR. NALVEN:  Objection.
10    A.  Yes.
11    Q.  If Harvard Pilgrim does decide to change
12  the reimbursement methodology that it uses, would
13  it be fair to say that the actual amounts that are
14  paid to physicians are unlikely to change
15  drastically?
16       MR. NALVEN:  Objection.
17    A.  I'm not sure --
18    Q.  Sure.  Well, let me clarify.
19    A.  I understand.
20    Q.  You discussed that there -- you said that
21  there are discussions currently underway --
22    A.  Uh-huh.

Page 53

1     Q.  -- about whether or not Harvard Pilgrim
2  should change the methodology?
3     A.  Right.
4     Q.  That it uses to reimburse, right?
5     A.  Correct.
6     Q.  And that current methodology is AWP minus
7  5 percent.
8     A.  Correct.
9     Q.  All right.  My question is, if Harvard
10  Pilgrim were to use a different methodology --
11  let's say it were to use wholesale acquisition cost
12  plus a percentage, rather than AWP minus a
13  percentage --
14    A.  Sure, uh-huh.
15    Q.  -- the actual dollar amounts that Harvard
16  Pilgrim reimburses providers are unlikely to
17  change.  Is that a fair statement?
18       MR. NALVEN:  Objection.
19    A.  It's really unknown.  It could be budget
20  neutral.  It could be less.  It's unknown.
21    Q.  Okay.  Do you agree with me that if you
22  take a higher number and a lower number, you can

14 (Pages 50 to 53)

Robert C. Farias                                                                    October 20, 2004

Wellesley, MA

Page 54

1  either minus a percentage from the higher number or
2  add a percentage to the lower one, and you'll end
3  up in the same place, right, as a general
4  proposition?
5      A.   Right.
6      Q.   Okay.  So, if Harvard Pilgrim were to move
7  from an AWP minus formula to a WAC plus a
8  percentage formula, it could, if it so chose, end
9  up at the same number, is that correct?
10          MR. NALVEN:  Objection.
11     A.   Depends on what the differential is
12  between WAC and AWP, and I don't know that.
13     Q.   Okay.  The discussions that you referred
14  to about changing methodologies --
15     A.   Uh-huh.
16     Q.   -- were any -- was the use of any
17  benchmarks other than AWP as a basis for
18  reimbursement part of that discussion?
19          MR. NALVEN:  Objection.
20     A.   I mean, I know the concept of ASP was
21  introduced, again, looking at the Medicare, but I
22  don't know specifically, you know, we had gotten

Page 55

1  that far that we had decided or thought about using
2  another benchmark.
3      Q.   Okay.  Was there a discussion about using
4  ASP as a possible benchmark?
5          MR. NALVEN:  Objection.
6      A.   No, not specifically.
7      Q.   Okay.  Was there any discussion about
8  using WAC as a benchmark?
9      A.   Really, what --
10          MR. NALVEN:  Objection.
11     A.   Again, not specifically, and I'll just
12  offer that really what it was is getting an
13  understanding of what Medicare's approach was, and
14  how we might or might not apply that approach.
15     Q.   Now, in relation to the administrative
16  fees for procedures, does Harvard Pilgrim pay the
17  same amount for a procedure in a physician's office
18  as it would for the same procedure if it were
19  performed in a hospital setting?
20     A.   I can't be sure if there's a differential
21  -- if there would be a differential or not.
22     Q.   Okay.  Do you know as a general matter

Page 56

1  whether Harvard Pilgrim has a preference for drugs
2  that are infused or injected to be administered in
3  physician's offices versus in hospitals?
4          MR. NALVEN:  Objection.
5      A.   I don't know about a preference.
6      Q.   Okay.  Does Harvard Pilgrim regard one
7  side of care as being more cost effective to
8  Harvard Pilgrim as opposed to the other?
9      A.   Again, it's -- I think it's a market -- a
10  market issue, reimbursement.  I mean, fee schedules
11  have site of service differentials that I'm aware
12  of, and that would be to the only extent that I
13  would say that, but I don't --
14     Q.   By "site of service," are you referring to
15  geographical regions or are you referring to --
16     A.   No, site of service as to the development
17  of any fee schedule -- not any fee schedule, but
18  provider fee schedules.  Medicare employs a
19  methodology called, "site of service differential"
20  where they'll reimburse as a slight differential
21  for services provided in a physician office versus
22  in a hospital setting.

Page 57

1      Q.   Do you have an understanding as to which
2  is higher?
3      A.   The physician side is higher.
4      Q.   Okay.  On what do you base that knowledge?
5      A.   Based on my general knowledge of
6  reimbursement.
7      Q.   Okay.  To the best of your knowledge, has
8  Harvard Pilgrim ever studied or analyzed the
9  relative costs of administration in physicians'
10  offices versus in hospitals?
11     A.   Could you define "cost."
12     Q.   Sure.  The cost to Harvard Pilgrim or the
13  amount that Harvard Pilgrim pays to either a
14  physician's office or a hospital.  Has Harvard
15  Pilgrim ever studied the relative costs of one
16  versus the other?
17     A.   I would imagine that -- I mean, I
18  shouldn't say I imagine, but I imagine that they
19  would have as part of a general analysis.  I mean,
20  we would do that with anything.
21     Q.   Okay.  Are you familiar with any specific
22  studies?

15 (Pages 54 to 57)

Robert C. Farias

October 20, 2004

Wellesley, MA

Page 58

1    A.  No.
2    Q.  Okay.  Who would be responsible for
3  conducting those studies?
4    A.  It would -- it would be -- it would be
5  really a coordination between our finance folks --
6  it could be several areas.  It could be our finance
7  folks.  It could be trend folks.  It could be folks
8  on the network side of the reimbursement
9  department.
10    Q.  Do you know of any person in particular
11  whose department that would fall within or who
12  would have overall responsibility for such
13  analysis?
14    A.  General analysis -- and I don't know
15  specifically, you know, the analysis that you're
16  talking to, but general analysis -- again, I can go
17  back to not the drug fee schedule, but the
18  physician fee schedule, generally, there would be a
19  project team, which would involve the reimbursement
20  department, Steve Twelves, my reimbursement
21  manager, along with a manager in an area called
22  financial planning and analysis within our finance

Page 59

1  area.
2    Q.  Okay.  Who is that manager?
3    A.  His name is Chris McTiernan.
4    Q.  Just to be clear, did you just distinguish
5  between a drug fee schedule and a physician fee
6  schedule?
7    A.  I said the physician fee schedule update,
8  generally.  The physician fee schedule includes all
9  the components.  It would include E&M codes.  It
10  would include, you know, laboratory components.  It
11  would just include everything, all of the
12  components of the --
13    Q.  Okay.  Part of which is the drug fee
14  schedule?
15    A.  That's correct.
16    Q.  Does Harvard Pilgrim serve as a Medicare
17  carrier?
18    A.  I'm sorry.  We have a First Seniority
19  product, which is a Medicare product.
20    Q.  Okay.  Is that Medicare supplemental
21  insurance?
22    A.  It's supplemental.

Page 60

1    Q.  Let me withdraw that question.  Why don't
2  you tell me what that product is?
3    A.  Okay.  It's an HMO product for senior
4  population.  Instead of having Medicare, they
5  participate in First Seniority.
6    Q.  It's an alternative to Medicare?
7    A.  Yes.
8      MR. COTTON:  If you know, Bob.
9    Q.  Are you aware that Medicare patients pay a
10  percentage copayment in relation to drugs that are
11  administered to them in physicians' offices?
12    A.  I don't know the specifics of the Medicare
13  program --
14    Q.  Okay.
15    A.  -- from the member side.
16    Q.  Do you know whether Harvard Pilgrim offers
17  any forms of insurance that cover any out-of-pocket
18  expenses incurred by Medicare beneficiaries?
19    A.  I don't know the details, no.
20    Q.  When you say you "don't know the details,"
21  do you know whether or not such a product exists?
22    A.  Well, I know our products generally

Page 61

1  include -- you know, may include deductibles and
2  copayments, but I wouldn't know the specifics.
3    Q.  Okay.  So, you don't know whether or not
4  there are any products that cover the out-of-pocket
5  expenses for a Medicare beneficiary?
6    A.  No.
7    Q.  Do you know whether or not drug
8  manufacturers contract directly with providers?
9    A.  I don't know.
10    Q.  So, you have no idea whether drug
11  manufacturers do or do not contract with physicians
12  or hospitals.  Is that a fair statement?
13    A.  Yes.
14    Q.  Do you know whether or not drug
15  manufacturers have free sample programs?  Have you
16  ever heard of such programs?
17    A.  I've heard of them.  Yes.
18      MR. NALVEN:  Objection.
19    Q.  Okay.  So you're aware that such free
20  sample programs exist?
21      MR. NALVEN:  Objection.
22    A.  I don't know if they're programs.  I know,

16 (Pages 58 to 61)

Robert C. Farias                                                   October 20, 2004
                              Wellesley, MA

Page 62

1  you know, I know folks who work in the health
2  profession that, you know, would have told me that,
3  you know, we got samples, but --
4      Q.   Are you familiar with the term "specialty
5  pharmacy"?
6      A.   Yes.
7      Q.   Okay.  And you know that Harvard Pilgrim
8  contracts with specialty pharmacies, correct?
9      A.   Yes.
10     Q.   Okay.  What is your involvement in
11 relation to specialty pharmacies?
12     A.   I don't have any direct relationship to
13 it, no, none.
14     Q.   Do you have an understanding as to how
15 Harvard Pilgrim's arrangement with specialty
16 pharmacies work?
17         MR. NALVEN:  Note my objection.
18     A.   In a general way.
19     Q.   Okay.  Who is the person at Harvard
20 Pilgrim most knowledgeable about those specialty
21 pharmacy arrangements?
22     A.   I would assume it would be someone -- and

Page 63

1  I don't know who -- in the pharmacy area.
2         MR. NALVEN:  You're aware that we've had a
3  deposition of James Kenny.
4         MR. MANGI:  I have already moved on.
5         MR. NALVEN:  I'm sorry?
6         MR. MANGI:  I am done with specialty
7  pharmacies.
8      Q.   Now, AWP or average wholesale price --
9      A.   Uh-huh.
10     Q.   -- you understand that that is a benchmark
11 used for purposes of reimbursement, correct?
12     A.   Yes.
13     Q.   Okay, and basically --
14         MR. NALVEN:  Objection.
15     Q.   -- as we've discussed, you are aware that
16 reimbursement is made at a percentage discount off
17 AWP, right?
18     A.   That's correct.
19     Q.   Do you have any knowledge as to how AWP is
20 determined?
21     A.   No.
22     Q.   So, as you reported earlier, all you know

Page 64

1  about it is that it's a number provided to Harvard
2  Pilgrim by Medicare --
3      A.   Through --
4      Q.   -- that's your understanding?
5      A.   Through Medicare, yes.
6      Q.   Have you ever heard AWP referred to as
7  "Ain't What's Paid," are you familiar with that?
8      A.   No.
9      Q.   Okay.  Are you familiar with the major
10 drug wholesalers operating in the market today?
11         MR. NALVEN:  Objection.
12     A.   No.  I mean, I would know the names of
13 some big pharmaceutical companies just from general
14 knowledge, but no.
15     Q.   Okay.  Now, are you familiar with the term
16 "prompt pay discount"?
17     A.   Yes.
18     Q.   Have you ever heard that term?  What's
19 your understanding of what a prompt pay discount
20 is?
21     A.   Again, just a standard, you know, business
22 term.  If you pay within a certain period of time

Page 65

1  that you would get -- be entitled to a discount.
2  10 percent if you pay within 30 days or something
3  like that.
4      Q.   All right.  Okay.  Are you aware that
5  there are entities in the market, drug wholesalers,
6  that are distinct from drug manufacturers?
7      A.   Say that again.
8      Q.   Yeah.
9      A.   Please.
10     Q.   Are you aware that there are drug
11 wholesalers in the marketplace that are distinct
12 from drug manufacturers?
13     A.   No.
14         MR. MANGI:  Can we take a short break.
15         (Recess was taken.)
16     Q.   Has Harvard Pilgrim been involved in any
17 litigations other than this one that pertain to
18 drug pricing or reimbursement?
19     A.   I don't know.
20     Q.   Okay.  Does Harvard Pilgrim -- withdraw
21 that.  Has Harvard Pilgrim ever taken the position
22 that any providers have conspired with drug

Robert C. Farias
Wellesley, MA

October 20, 2004

Page 66

1  manufacturers to inflate drugs' average wholesale
2  prices?
3      MR. NALVEN:  Objection.
4      A.  I don't know.
5      Q.  Okay.  So, to the best of your knowledge,
6  Harvard Pilgrim has never taken that position.
7      A.  That's correct.
8      MR. NALVEN:  Objection.
9      Q.  All right.  To the best of your knowledge,
10  has Harvard Pilgrim ever taken the position that
11  any PBMs or pharmacies have conspired with drug
12  manufacturers to inflate drugs' average wholesale
13  prices?
14      MR. NALVEN:  Objection.
15      A.  To the best of my knowledge, they have
16  not.
17      Q.  To the best of your knowledge, has Harvard
18  Pilgrim ever taken the position that drug
19  manufacturers have artificially inflated the
20  average wholesale prices for drugs?
21      MR. NALVEN:  Objection.
22      A.  I have no way of knowing.

Page 67

1      Q.  Okay.  So, to the best of your knowledge,
2  Harvard Pilgrim has not taken that position?
3      A.  That's correct.
4      MR. NALVEN:  Objection.
5      Q.  Let's turn to some documents.
6      MR. MANGI:  Before we do that, Mr. Cotton,
7  can we put a stipulation on the record to the
8  effect that the documents produced by Harvard
9  Pilgrim in this case -- which run from HPH 1 to HPH
10  1170 -- are authentic copies of documents produced
11  from Harvard Pilgrim's files and are business
12  records within the meaning of the federal rules of
13  evidence?
14      MR. COTTON:  Yes.
15      MR. MANGI:  Let's start with this one
16  right here.  Off the record.
17      (Discussion off the record.)
18      MR. MANGI:  Let' start with HPH 1 to 49.
19  We will mark that as Exhibit 1, please.
20      (HPH 1-51 marked Exhibit Farias 001.)
21      Q.  Actually, I apologize.  It should go.
22  through to 51 rather than 49.  I'm afraid a couple

Page 68

1  of pages eluded my staple.  I realize it's a long
2  document.  I'll draw your attention to particular
3  parts of it.  But please familiarize yourself, and
4  let me know when you're done.
5      MR. COTTON:  Look it over so you know
6  exactly what it is.
7      MR. NALVEN:  With respect to the
8  stipulation between defense counsel and counsel for
9  HPHC, Plaintiffs reserve their rights to challenge
10  authenticity and the evidentiary nature of the
11  documents.
12      A.  (Witness reviews document.)  Uh-huh.
13      Q.  Are you familiar with this document?
14      A.  Yes.
15      Q.  Okay.  Have you seen this document before?
16      A.  Yes.
17      Q.  Okay.  Is this a document that you use in
18  the regular course of business?
19      A.  I don't use it.
20      Q.  Okay.  Is this a document you had seen
21  prior to preparing for your deposition today?
22      A.  Yes.

Page 69

1      Q.  Okay.  Can you describe for me in general
2  terms what this contract is -- who this contract is
3  between?
4      A.  Okay.  Sure.  This is -- Harvard Pilgrim
5  contracts with physicians in a construct called
6  "local care units."  So, it would be groups of
7  physicians.  It could be an IPA, a PHO.  It could
8  be, you know, specific physician practices and so
9  forth.  There could be a -- this one in particular
10  is with physicians and hospitals.  So, there could
11  be a hospital partner to the agreement as well.
12  So, there are some variations.  But, again, this is
13  a local care unit.
14      It describes the responsibilities of, you
15  know, just the regular definition, but it describes
16  the responsibilities of the physicians and the plan
17  under this arrangement.
18      Q.  Uh-huh.  When you refer to an IPA or PHO,
19  what are you referring to?  What do those stand
20  for?
21      A.  Independent practice association,
22  physician/hospital association.

18 (Pages 66 to 69)

Robert C. Farias                                                                    October 20, 2004
Wellesley, MA

Page 70

1    Q.   All right.  Are those -- well, what are
2    those?
3    A.   Okay.
4    Q.   What is an independent practice
5    association?
6    A.   Okay.  It could be -- it's a group of
7    physicians that come together as an entity for
8    contracting purposes or other purposes.
9    Q.   All right.
10   A.   Physician/hospital association would be a
11   hospital and a group of physicians that, again,
12   come together for the purposes of contracting and
13   other purposes.
14   Q.   All right.  Now, and on the page that's --
15   it has a Bates number, which is that number on the
16   bottom right, the HPH number.
17   A.   Yes.
18   Q.   If you turn to Page HPH 4, there's -- in
19   the fifth line down in brackets it says, "IPA.  PHO
20   or PO."
21   A.   Uh-huh.
22   Q.   What is the PO there?

Page 71

1    A.   Physician organization.
2    Q.   All right.  How is a PO different from an
3    IPA?
4    A.   I'll be honest.  I don't know how to
5    describe that.  I --
6    Q.   Okay.  Is it fair to say, though, that the
7    PO is another instance of physicians coming
8    together for purpose of --
9    A.   Contracting, right.
10   Q.   -- contracting?
11   A.   Yes.
12   Q.   Now, this particular document we're
13   looking at, Exhibit 1, this is a template, is that
14   right?
15   A.   That's correct.
16   Q.   When Harvard Pilgrim enters into contracts
17   with either physicians -- or hospitals in this
18   instance -- is this template the basis for
19   negotiation as to contractual terms?
20   MR. NALVEN:  Objection.
21   A.   I'm not sure I understand "basis for
22   negotiation."

Page 72

1    Q.   Let me rephrase it.  Is this form of
2    contract offered to physicians or hospitals as a
3    take-it-or-leave-it proposition, or is there a
4    negotiation over specific terms?
5    A.   There could be negotiation.
6    Q.   Are there particular terms that are
7    subject to negotiation, or is everything on the
8    table?
9    A.   Everything is not on the table.
10   Q.   Okay.  Is -- are the terms in relation to
11   drug reimbursement subject to a negotiation?
12   A.   Within -- the answer is no.  I mean --
13   Q.   Okay.  Now, I'd like to draw your
14   attention to HPH 6.  Right at the top of the page
15   there there's a definition of fee schedule, right?
16   A.   Yes.
17   Q.   Is that the same fee schedule that we've
18   been referring to earlier today?
19   MR. NALVEN:  Objection.
20   A.   Yes.
21   Q.   Uh-huh.  And indeed, Harvard Pilgrim only
22   has one fee schedule that it applies across the

Page 73

1    board, correct?
2    MR. NALVEN:  Objection.
3    A.   That's not true, that there's -- there's
4    one drug fee schedule.
5    Q.   You're quite right.  Let me rephrase the
6    question.  There's only one drug fee schedule that
7    Harvard Pilgrim has, which is always across the
8    board.
9    A.   Yes.
10   Q.   Now, I'd like to draw your attention first
11   to Page HPH 16.  And under 4.0, "Compensation," you
12   see that the document refers to Appendix B as
13   containing the terms of compensation, right?
14   A.   Yes.
15   Q.   Okay.  So, let's turn to Appendix B, which
16   is at HPH 29.  Okay.  Under "Fee For Service
17   Payments," do you see Paragraph A on "Physician
18   Services"?
19   A.   Yes.
20   Q.   Okay.  Could you review that paragraph,
21   please, and let me know when you're done.
22   A.   (Witness reviews document.)  Yes.

19 (Pages 70 to 73)

Robert C. Farias                                                          October 20, 2004
Wellesley, MA

Page 74

1    Q.   Okay.  Now, the second sentence of that
2    states, "Fees payable shall be equal to the amount
3    set forth in the plan's fee schedule --"
4    A.   Yes.
5    Q.   "-- in effect at the time."  Now, am I
6    correct in understanding then that there are
7    different fee schedules for different plans?
8    A.   Different?  No.
9    Q.   Okay.  Well, what I'm trying to understand
10   is -- my impression is that there's one drug fee
11   schedule.  So, when this contract refers to "amount
12   set forth in the plan's fee schedule in effect at
13   the time the services are rendered," is it
14   referring to the possibility of there being more
15   than one, or is it referring to the same fee
16   schedule in there --
17   A.   There are -- the drug fee schedule is a
18   component of --
19   Q.   Right.
20   A.   -- the physician fee schedule.
21   Q.   Okay.  So, there are different fee
22   schedules for different plans, but all of them

Page 75

1    incorporate the same drug fee schedule, is that
2    correct?
3    A.   I'm not sure when you're saying "different
4    plans."
5    Q.   Yeah.  Well, I'm using the term in the
6    contract here.
7    A.   Oh, "Plan" is a defined term.  That's
8    Harvard Pilgrim Health Care.
9    Q.   Okay.
10   A.   So, that's one plan.
11   Q.   I understand.  Okay.  When you say there
12   are different physician fee schedules --
13   A.   Uh-huh.
14   Q.   -- what's the basis for that variation?
15   A.   It's really a historical basis.  Several
16   years ago, and I don't know the exact time, we
17   moved to a standard physician fee schedule called
18   HPPO, which is our RPRVS-based fee schedule.
19   Q.   When you say, "HPPO," what are you
20   referring to?
21   A.   It's the name, as it says here, "Insert
22   name of applicable fee schedule."  That's an

Page 76

1    internal name describing that fee schedule.
2    Q.   What does that stands for?
3    A.   Harvard Pilgrim Physician -- I don't know
4    what the O stands for, but --
5    Q.   Okay.
6    A.   -- that's what it is.  Prior to that --
7    and you may see references within the contract --
8    that there was a PIPA fee schedule, Pilgrim
9    Independent Practice Association fee schedule.  So,
10   there may be providers that, you know, are still --
11   you know, contract has not been renegotiated, and
12   they may still be under that fee schedule.
13   Q.   Okay.
14   A.   But these fee schedules, again, are made
15   up of components.  Okay.
16   Q.   When was that prior fee schedule in use?
17   A.   The PIPA fee schedule?
18   Q.   Right,
19   A.   Again, I don't recall the exact -- as I
20   said, for some providers it may be in use now.
21   Q.   All right.
22   A.   Ah.

Page 77

1    Q.   Let me rephrase the question then.  When
2    was it being inserted in contracts or used in
3    contracts as a basis for reimbursement?
4    A.   At least five years ago.  I'm not certain
5    of the time.
6    Q.   Okay.  And going back five years to 1999,
7    at that point you don't know what the basis was for
8    drug reimbursement, is that correct?
9    A.   That's correct.
10   Q.   Continuing on here in that same paragraph
11   on Page HPH 29, the second paragraph -- I'm sorry
12   -- second sentence, "Fee schedule shall be equal to
13   the amount set forth in the plan's fee schedule in
14   effect at the time services are rendered."  And
15   that continues, "Provided, however, that the
16   inflator to the fee schedule shall not apply to
17   certain codes included in the fee schedule."  And
18   it continues.  What's the inflator that's being
19   referred to there?
20   A.   If there was a negotiated multiplier on
21   certain codes within the fee schedule -- ranges of
22   codes within the fee schedule.

Robert C. Farias                                                    October 20, 2004
                              Wellesley, MA

Page 78

1    Q.   Okay.  So, the fee schedule in general is
2    subject to negotiation, is that correct?
3    A.   It can be.
4    Q.   Okay.  Would that negotiation include the
5    drug fee schedule?
6    A.   No.
7    Q.   Okay.  So, the drug fee schedule is
8    nonnegotiable?
9    A.   Right.
10   Q.   Okay.  The rest of the physician fee
11   schedule can be subject to negotiation?
12   A.   Could be, yes.
13   Q.   Okay.  Are you aware of instances where it
14   has been changed through a process of negotiation?
15   A.   Yes.
16   Q.   Okay.  What's the basis for those
17   differentials?
18        MR. NALVEN:  Objection.
19   A.   The basis would be the same as it would be
20   with any provider -- what the market would be
21   dictating, what the provider's position is,
22   leverage, book of business, just whatever would

Page 79

1    apply to any negotiation.
2    Q.   So, it could be based on a competitive
3    dynamic.  Is that a fair statement?
4        MR. NALVEN:  Objection.
5    A.   I don't know that I would use that term,
6    but market, yes.
7    Q.   Okay.  Some physicians or some practices
8    would have more bargaining power than others.  Is
9    that a fair statement?
10       MR. NALVEN:  Objection.
11   A.   For many reasons, yes.
12   Q.   Okay.  What could some of those reasons
13   be?
14   A.   One example could be -- it could be, you
15   know, the geographic area that they're located in.
16   Again, these are -- these are general drivers.  I
17   have no knowledge of specific drivers.
18   Q.   Uh-huh.
19   A.   But just in the health care marketplace,
20   geographic location, the size of the organization,
21   whatever -- whatever -- however you define
22   leverage.

Page 80

1    Q.   And part of that is Harvard Pilgrim's aim
2    is to ensure adequate coverage for its members,
3    right?
4    A.   Correct.
5    Q.   So, if there is a particular specialty
6    practice that's the only one in an area, they would
7    have more leverage in negotiations.  Is that a fair
8    statement?
9        MR. NALVEN:  Objection.
10   A.   I wouldn't say they would.  I would say
11   they could.
12   Q.   Now, the process of negotiation, does that
13   encompass the amount that's paid to physicians as
14   an administrative -- as an administration fee in
15   relation to the administration of drugs?
16   A.   Could you say the question again, please.
17   Q.   Sure.  Yeah.  I mean, we spoke earlier
18   about how Harvard Pilgrim reimburses 95 percent of
19   AWP in relation to drugs that are administered,
20   right?
21   A.   Uh-huh.  Right.
22   Q.   And we also spoke about a separate

Page 81

1    administration fee that's paid in some instances
2    where there is a CPT or a HCPCS code, correct?
3    A.   Yes.
4    Q.   This process of negotiation that leads to
5    these inflators, does -- is that payment for
6    administration fees --
7    A.   Uh-huh.
8    Q.   -- is that subject to negotiation?
9    A.   I don't know if that's an excluded code.
10   I don't know.
11   Q.   Okay.  Who would know whether or not
12   that's part of -- that forms part of the process of
13   negotiation?
14   A.   I would -- more the reimbursement folks
15   would know the specifics of what codes were
16   allowable to inflate.
17   Q.   Okay.  And continuing on here, on HPH 29,
18   it says, "Provided however, inflator to the fee
19   schedule should not apply to certain provisions
20   included in the fee schedule that are set at a
21   particular rate and are not inflated for any
22   provider across of plan's network."

21 (Pages 78 to 81)

Robert C. Farias

October 20, 2004

Wellesley, MA

Page 82

1    The amount of drug reimbursement falls
2  within that exception, is that correct?
3    A.  That's correct.
4    Q.  So, it's not subject to negotiation.
5    A.  That's correct.
6    Q.  I'd like to draw your attention now to HPH
7  31.  You will see there Appendix C.  You're
8  referring to a quality advance program.
9    A.  Correct.
10    Q.  Okay.  Are you familiar with that program?
11    A.  Yes, I am.
12    Q.  Okay.  What is the quality advance
13  program?
14    A.  In general terms, it can be described as a
15  pay-for-performance program that's offered to a
16  group of our local care units.  It includes several
17  components.  It includes a rewards for excellence
18  program that is based on HEDIS measures.  If they
19  meet certain targets according to those HEDIS
20  measures -- H-E-D-I-S -- measures that they would
21  be subject to a payment, a per-member-per-month
22  payment on that component.

Page 83

1    In addition to the rewards for excellence
2  component, there are specific clinical practice
3  support components, focused areas that the LCUs,
4  again, have targets to work towards.  And if they
5  are successful in achieving those targets, again,
6  they are eligible for a per-member-per-month payout
7  for those components.  Under the clinical practice
8  supports components, there are -- for adult LCUs,
9  there are three measures.  There is a radiology
10  measure; there is a laboratory measure; and then
11  there is a clinical IT component of that.
12    There are a couple of unique payouts for
13  -- there are only three pediatric practices.  ADHD,
14  first line antibiotics measures that they have.  In
15  addition to that, there are other smaller
16  components, but there is a medical director stipend
17  that is awarded the medical director for
18  administering the program -- again, having met
19  certain criteria and demonstrating their support
20  and their management of the program.
21    Q.  You referred to HEDIS.  What is HEDIS, if
22  you know?

Page 84

1    A.  See, now you're going to ask me what --
2  it's -- I don't know what the acronym stands for,
3  but what it is -- it's a national data set of
4  quality measures based on claims submitted.  That's
5  what I know about that.
6    Q.  Is cost control part of the assessment of
7  quality pursuant to this program?
8    MR. NALVEN:  Objection.
9    A.  I don't understand.
10    Q.  Yeah.  If physicians are able to lower
11  their costs --
12    A.  Uh-huh.
13    Q.  -- is that something that's assessed as
14  part of this program?
15    MR. NALVEN:  Objection.
16    A.  Not specifically, no, no.
17    Q.  Okay.  Does this program include an
18  assessment of drug utilization?
19    A.  No.
20    Q.  So, it doesn't, assess, for example,
21  whether physicians are using some drugs versus
22  others --

Page 85

1    A.  No.
2    Q.  -- that may be different in terms of their
3  cost to Harvard Pilgrim?
4    A.  No.  No.
5    MR. MANGI:  Let's mark another document,
6  please.  This is HPH 52 to 75.
7    (HPH 52-75 marked Exhibit Farias 002.)
8    Q.  Take a look at that, please, and let me
9  know when you're done.
10    A.  (Witness reviews document.)  Okay.
11    Q.  Okay.  Are you familiar with this
12  document?
13    A.  I have a general knowledge of this
14  document, not a deep familiarity.
15    Q.  Okay.  This, again, is a template, though,
16  correct?
17    A.  That's correct.
18    Q.  This template pertains to physicians'
19  groups, be they primary care or specialty, right?
20    A.  Correct.
21    Q.  Now, Harvard Pilgrim offers different
22  products, is that right, different health insurance

22 (Pages 82 to 85)

Robert C. Farias                                                                October 20, 2004
                                    Wellesley, MA

Page 86

1   plans that the company offers?
2       A.   Yes.
3       Q.   Okay.  Do some of those plans require
4   members to go to primary care physicians and then
5   get referrals to specialists?.
6       A.   Go to primary care physicians.
7       Q.   Yeah.  In other words, do some plans
8   permit members to go directly to specialists and
9   others require them to go through primary care
10  physicians first?
11      A.   The way you're asking the question, I
12  don't know how to describe that.  I mean, again, in
13  general terms, a PPO would not require selection of
14  a PCP.
15      Q.   Right.
16      A.   So, the answer would be no.  HMO you
17  require a PCP, and you would --
18      Q.   So, it varies according to the type of
19  plan?
20      A.   Yes, right.
21      Q.   And that instances where -- well, withdraw
22  that question.  Now, do these templates change from

Page 87

1   year to year, do you know?
2            MR. NALVEN:  Objection.
3       A.   To some extent, yes.
4       Q.   Okay.  Is there a master file of templates
5   maintained somewhere to the best of your knowledge?
6       A.   Master file?  Yes.  I mean, they're posted
7   on a departmental bulletin board, yeah.
8       Q.   Okay.  And so, previous contracts from
9   previous -- well, let me withdraw that.  Templates
10  from contracts of previous years are available on
11  that bulletin board, is that correct?
12      A.   Some are.
13      Q.   Okay.  If I wanted to ascertain the
14  reimbursement methodologies that were used by
15  Harvard Pilgrim prior to 2001, could I go to
16  contracts for previous years to figure that out?
17      A.   Possibly.
18      Q.   Now, this is a template not a real
19  contract.
20      A.   That's correct.
21      Q.   But a real contract would have the fee
22  schedule attached to it, is that correct?

Page 88

1       A.   I don't know that it would always have the
2   fee schedule attached.  It could be referenced.
3       Q.   Okay.  Are contracting providers given a
4   copy of the fee schedule?
5       A.   They're given a sample.
6       Q.   Okay.  Does the fee schedule expressly
7   show the formula, 95 percent of AWP, or does it
8   just contain dollar sums?
9       A.   Dollar sums.
10      Q.   Okay.  So what would be contained in the
11  drug component of the fee schedule?  Would there be
12  an NDC number and then a dollar amount?
13      A.   I don't know what coding is used, but it
14  would be a dollar amount.
15      Q.   Okay.  Is there anything on the fee
16  schedule that indicates the methodology used to
17  arrive at those numbers?
18      A.   Not that I'm aware of.
19      Q.   You have seen the fee schedules, is that
20  correct?
21      A.   I've seen the sample fee schedules, yes.
22      Q.   Okay.  Who at Harvard Pilgrim would know

Page 89

1   what reimbursement methodologies were in use prior
2   to 2001 in relation to providers?
3            MR. NALVEN:  Objection.
4       A.   Richard Francis was here --
5       Q.   Uh-huh.
6       A.   -- then he may have some knowledge.
7       Q.   Anyone else?
8       A.   There could be some contracting managers
9   that were here at the time that may have knowledge.
10      Q.   Okay.  Do you know of anyone in particular
11  who may have that knowledge?
12      A.   Again, besides Richard Francis, there's a
13  contracting manager that was here then, Steve
14  Kostos, K-o-s-t-o-s.
15      Q.   What's Mr. Kostos position?
16      A.   He's a contracting manager.
17      Q.   Now, excuse me, on Exhibit 2, could I draw
18  your attention to HPH 54, please.  Do you see
19  Paragraph 3.1 at the bottom of the page?
20      A.   Yes.
21      Q.   There's a reference there to the plans
22  "claims payment, policies, and procedures as

23 (Pages 86 to 89)

Robert C. Farias
Wellesley, MA
October 20, 2004

Page 90

1  detailed in the manual --"
2    A.   Yes.
3    Q.   Are you familiar with that manual?
4    A.   Yes.
5    Q.   Okay.  In general terms, what does that
6  manual contain?
7    A.   Just as it describes, it contains our
8  payment policies and procedures.
9    Q.   Does that manual describe the
10  methodologies that are used to arrive at the
11  amounts of reimbursement in relation to drugs?
12    A.   No.
13    Q.   Okay.  Does it contain any discussion of
14  the amounts paid as administration fees in relation
15  to drugs administered in office?
16    A.   No.  In fact, I don't -- probably offering
17  -- I don't know that it -- I don't know that it
18  even includes anything specific to drug payments.
19    Q.   Okay.  So, it just includes the logical
20  nuts and bolts of how to submit a claim?
21    A.   It includes that.  It does include, you
22  know, some specific -- for some specific lines of

Page 91

1  business, you know, nuances, but I don't know if
2  there is anything specific to drug reimbursement in
3  there.  I can't recall if there is.
4    Q.   Let's turn to HPH 57, please.  At the top
5  of the page do you see 4.4A, states, "The plan
6  reserves the right to conduct audits to verify the
7  accuracy of members' bills in compliance with the
8  plan's billing guidelines."  This refers to the
9  possibility of Harvard Pilgrim auditing providers,
10  is that correct?
11    A.   Yes.
12    Q.   Okay.  Has Harvard Pilgrim audited
13  providers to the best of your knowledge?
14    A.   Yes.
15    Q.   Okay.  Is that something that's done on an
16  ongoing basis?
17    MR. NALVEN:  Objection.
18    A.   Yes.
19    Q.   Okay.  Are there particular triggering
20  points for audits, or are audits conducted on a
21  randomized basis?
22    A.   I don't know the protocol.

Page 92

1    Q.   Okay.  Do you know whether or not those
2  audits include analysis of providers' acquisition
3  costs for drugs?
4    A.   I don't know.
5    Q.   Okay.  Who's in charge of those audits?
6    A.   The audits are generally claims audits
7  managed by a group within the claims services area.
8    Q.   Is there a particular person that's in
9  charge of that area?
10    A.   The director is Terry Lee, and then I
11  don't know the reporting structure under him, but
12  Terry Lee is the in-charge guy.
13    MR. MANGI:  Let's mark this as Exhibit 3,
14  please.
15    (HPH 168-195 marked Exhibit Farias 003.)
16    Q.   Actually, you know, before we get to that,
17  perhaps I could just ask you one question
18  generally, which is, the template we discussed
19  earlier was a template for primary care
20  physician/specialty care physicians.  That's the
21  one we were looking at earlier.
22    A.   This one just now, yes.

Page 93

1    MR. NALVEN:  Is that 1 or 2?
2    MR. MANGI:  2.
3    Q.   This was 2, yeah.  We also looked at -- I
4  have here some other documents that I haven't yet
5  marked as exhibits, which are templates for primary
6  care physicians and then specialty care physicians.
7    A.   Uh-huh.
8    Q.   Do you have any idea what the basis is for
9  the distinction between, you know, templates for
10  each of them or a template for both of them?
11    A.   Yeah.  No, I don't.  These I'm not as
12  familiar with as the medical service agreements.
13    Q.   So, we were looking at Exhibit 3.
14    A.   Yes.
15    Q.   Now, this is a template of a contract with
16  a hospital, correct?
17    A.   Correct.
18    Q.   Okay.  And you will see on Page 168 that's
19  referring to both inpatient and outpatient
20  services --
21    A.   Sure.
22    Q.   -- that are being provided to members.  I

Robert C. Farias

October 20, 2004

Wellesley, MA

Page 94

1  draw your attention to Page 174, please.  Paragraph
2  4.18 states that -- subject to exceptions -- "The
3  payments to the hospitals will be made in the
4  amount set forth in Exhibit A to this document,"
5  right?
6      A.   Yes.
7      Q.   And then below that it's one of those
8  exceptions, which is -- well, let me withdraw that
9  question.  Below that in Clause B, there's a
10  reference to -- and this is on Page HPH 174, "The
11  parties agree to convert the methodology for
12  payments for covered inpatient services rendered to
13  members by hospital to a DRG-based methodology."
14          Do you know whether or not that conversion
15  has taken place?
16      A.   That conversion is taking place.  It's
17  underway.
18      Q.   So, what is the previous -- preDRG
19  methodology that's used for reimbursement with
20  patients?
21      A.   Predominantly per diem.
22      Q.   Okay.  So, the conversion here is from per

Page 95

1  diem amounts to a DRG-based --
2      A.   That's correct.
3      Q.   And the clause continues that the
4  conversion will not change the actual amounts that
5  are being reimbursed --
6      A.   That's correct.
7      Q.   -- right?  So, the idea there is, though
8  the methodology is changing, the amounts that are
9  being paid will remain the same.
10      A.   That's correct.
11      Q.   Okay.  What's the basis for that clause?
12          MR. NALVEN:  Objection.
13      A.   The basis for the clause is that Harvard
14  Pilgrim wants to standardize its reimbursement
15  methodology -- inpatient reimbursement methodology
16  to a DRG methodology.  In order to execute that,
17  because of -- there may be -- there could be
18  several reasons.  There could be reasons where that
19  hospital -- that contract is expiring, we want to
20  move them to the DRG methodology.  Until the time
21  happens or the analysis can be done so that we can
22  agree upon what the budget neutral conversion is,

Page 96

1  the contract may expire prior to that happening.
2  So that we want to continue the contract, but we
3  want to make sure that we don't wait until the next
4  contracting cycle to move to the DRG methodology.
5  So, it's to allow us the flexibility to move to the
6  DRG methodology outside of -- possibly outside of
7  the term of the contract.
8      Q.   Okay.  And this -- the last sentence of
9  this clause, "Providing that the amounts that are
10  being paid to the hospital are going to remain the
11  same."
12      A.   Uh-huh.
13      Q.   That's necessary to ensure that hospitals
14  will agree to be subject to this conversion, right?
15          MR. NALVEN:  Objection.
16      A.   That's correct.
17      Q.   Because a hospital will say, fine, change
18  your methodology, but the amounts that are
19  reimbursed should not change, right?
20      A.   That's correct.
21      Q.   Okay.  And indeed, the same position would
22  likely be adopted by physicians if Harvard Pilgrim

Page 97

1  were to change the methodology applied to them,
2  right?
3          MR. NALVEN:  Objection.
4      A.   I'm sorry.
5      Q.   Yeah.  Well, here Harvard Pilgrim is
6  changing the methodology it uses to reimburse
7  hospitals, right?
8      A.   Correct.
9      Q.   But to ensure that hospitals will agree to
10  that change taking place, it's giving them
11  insurance that the change will be revenue neutral,
12  right?
13      A.   Correct.
14      Q.   Okay.  And that's necessary to ensure
15  hospitals will agree to the change, right?
16      A.   Correct.
17          MR. NALVEN:  Objection.
18      Q.   Now, if Harvard Pilgrim were to similarly
19  change the methodology that it uses to reimburse
20  physicians, it would likely have to give a similar
21  assurance to ensure they'd enter into the
22  contracts, right?

25 (Pages 94 to 97)

Robert C. Farias
October 20, 2004

Wellesley, MA

Page 98

1      MR. NALVEN:  Objection.
2      A.   I don't know that we can say that
3   globally.
4      Q.   Okay.  What's your basis for thinking
5   things might be different in the physician
6   landscape?
7      A.   Again, this is talking about a specific --
8   this is talking about a reimbursement methodology
9   change.
10     Q.   Right.
11     A.   It's not talking about -- it's not talking
12  about a fee schedule.  It's an inpatient
13  reimbursement methodology.  And again, when you're
14  looking at inpatient versus outpatient, there are
15  differences.  Like outpatient, for example, there
16  are so many different lines of business that you
17  wouldn't necessarily, you know, contract across the
18  board on outpatient.  There could be a specific
19  line of business.  Lab, for example.
20     Q.   Uh-huh.
21     A.   If you're paying for laboratory services,
22  you wouldn't necessarily guarantee that it was

Page 99

1   going to be budget neutral, because if it was
2   revealed somehow -- and again, this is just
3   speculation -- but if it was revealed that
4   laboratory services were being paid in a
5   nonstandard way --
6      Q.   Uh-huh.
7      A.   -- you wouldn't necessarily guarantee --
8   you can't say with certainty that that would be the
9   case.
10     Q.   I think I understand your concern.  So,
11  let me try and narrow the question.
12     A.   Uh-huh.
13     Q.   Let's include labs and other similar
14  services --
15     A.   Yeah.
16     Q.   -- and let's talk specifically about the
17  drug fee schedule.
18     A.   Yes.
19     Q.   Okay.  The drug fee schedule is based on a
20  methodology, right?
21     A.   Right.
22     Q.   And the same way that hospital

Page 100

1   reimbursement is based on a methodology.
2      A.   Uh-huh.  Right.
3      Q.   Okay.  If Harvard Pilgrim were to change
4   the methodology used to calculate the drug fee
5   schedule, okay --
6      A.   Uh-huh.
7      Q.   -- to implement that change, it would
8   likely have to give a similar assurance to
9   physicians, right, that it would be -- the change
10  would be revenue neutral?
11     MR. NALVEN:  Objection.
12     Q.   Is that a fair statement?
13     MR. NALVEN:  Objection.
14     A.   Again, I can't -- I can't say that with
15  certainty, because, again, the physician contract
16  -- I mean, you've seen -- we don't -- we don't
17  specify, you know, a change to a specific
18  component.  We talk about the physician fee
19  schedule.
20     Q.   Uh-huh.
21     A.   So, I can't say with certainty that that's
22  the case.

Page 101

1      Q.   Okay.  But you can say with certainty that
2   Harvard Pilgrim could change the methodology it
3   uses to calculate the fee schedule if it chose to.
4      MR. NALVEN:  Objection.
5      Q.   Right?
6      A.   Yes.
7      Q.   Could change it from a --
8      A.   Based on the, you know, recontracting.
9      Q.   Right.  Right.
10     A.   Yeah.
11     Q.   Subject to contractual obligation.
12     A.   Right.  Right.  Right.
13     Q.   It could change the methodology from a
14  AWP-based methodology to a WAC-based methodology,
15  an ASP-based methodology?
16     A.   Uh-huh.  True.
17     Q.   Anything else if it so choose?
18     MR. NALVEN:  Objection.
19     A.   Yes.
20     Q.   And it could have done so at any point in
21  the past if it so choose.
22     MR. NALVEN:  Objection.

Henderson Legal / Spherion
(202) 220-4158

Robert C. Farias                                                          October 20, 2004
Wellesley, MA

Page 102

1    Q.   Right?
2    A.   Yes.
3    Q.   Always subject to contractual obligations.
4    A.   Correct.
5         MR. NALVEN:  Objection.
6    Q.   Going to Page 175, which I think you might
7    already be there --
8    A.   Yes --
9    Q.   -- Clause 4.3, can you take a look at
10   that, please.  Let me know when you're done.
11   A.   (Witness reviews document.)  Okay.
12   Q.   Okay.  Now, that provides that Harvard
13   Pilgrim will pay the hospital the lower of the
14   hospital's charges or the amount specified on the
15   fee schedule.
16   A.   Yes.
17   Q.   Is that a fair statement?
18   A.   Yes.
19   Q.   With reference to any particular
20   transaction, okay, if I wanted to go back and
21   figure out whether reimbursement was based on the
22   hospital's actual charge on the fee schedule, how

Page 103

1    would I figure that out?
2    A.   I don't know specifically.
3    Q.   Would it be fair to say that I'd have to
4    go and look at claims data pertaining to that
5    particular transaction?
6    A.   Yes.
7    Q.   And, again, turning to Clause 4.8, which
8    is further down that page --
9    A.   Uh-huh.
10   Q.   -- you see the second sentence, "The
11   responsible party will pay the lower of bill
12   charges or the designated fee schedule for all
13   outpatient services where the payment is based on a
14   fee schedule as listed in Exhibit A."
15   A.   Yes.
16   Q.   Here, again, if I wanted to know whether
17   the bill charge or the fee schedule formed the
18   basis for reimbursement in a particular
19   transaction, I'd have to go and look at the
20   claims data, correct?
21   A.   Correct.
22   Q.   I'd like to draw your attention now to

Page 104

1    Exhibit A, which starts at HPH 191.
2    A.   Uh-huh.
3    Q.   Now, this exhibit provides the template
4    for the hospital compensation, right?
5    A.   Correct.
6    Q.   It starts off there on 191 with "Inpatient
7    Services," and there are specific amounts listed
8    there.  Those are -- although it is 00 in this
9    template, those are per diem rates, right?
10   A.   Correct.
11   Q.   And if you go over to the next page, which
12   is 192, there we have "outpatient rates," which --
13   underneath "Outpatient Services" it says, "The
14   lower of charges or negotiated rates."  And that's
15   the same issue we were just talking about, right?
16   A.   Uh-huh.  Correct.
17   Q.   To know which it is, you'd have to look at
18   claims data.
19   A.   Correct.
20   Q.   Do you have a sense as to in what
21   proportion of base cases reimbursement is based on
22   actual charges as opposed to a negotiated rate?

Page 105

1    A.   I don't.
2    Q.   Okay.  And then further along on Page 193,
3    you have a section that refers to "Drugs and
4    Imaging Agents," right?
5    A.   Yes.
6    Q.   Now, that is only in reference to the
7    outpatient services, right?
8    A.   That's correct.
9    Q.   Okay.  And this provides for reimbursement
10   based on the HCPC drug fee schedule updated
11   periodically in accordance with Medicare average
12   wholesale price updates, right?
13   A.   Correct.
14   Q.   Now, when you referred earlier to your
15   understanding that average wholesale price is
16   something supplied by Medicare, is this the
17   contracting clause you refer as your basis for that
18   understanding?
19   A.   Yes, it is.
20   Q.   And the HCPC drug fee schedule, that's the
21   same drug fee schedule?
22   A.   Just to correct, that's Harvard Pilgrim

27 (Pages 102 to 105)

Page 106

1  Health Care not HCPC.
2      Q.   You are quite right.  I apologize -- which
3  answers my question, which is to the same fee
4  schedule we've been discussing.
5      A.   Yes.
6      Q.   Turning to Page 195, there is a section
7  providing for price protection terms.
8      A.   Uh-huh.
9      Q.   Are you familiar with this section of the
10  contract?
11      A.   Yes.
12      Q.   What is being discussed here?
13      A.   Okay.  What the issue is here is this
14  relates to provider contracts that are
15  percent-of-charge contracts.  Because a health plan
16  would have no way of managing the -- the hospital
17  manages its own charge master, its own charge book
18  in setting its own charges.  In order to maintain
19  -- if we choose to pay them 80 percent of
20  charges -- and that's an example given here -- if
21  we choose to pay them 80 percent of charges -- we
22  negotiate 80 percent of charges.  We don't choose.

Page 107

1  If we negotiate 80 percent of charges, they
2  increase their charges, they would be getting this
3  increase over time.  With price protection, we have
4  the right to understand how they're increasing
5  their charges so that we can recalibrate our
6  discount so that we continue to pay them what we
7  originally negotiated and not be subject to
8  fluctuations based on how they're changing their
9  charge book.
10      Q.   Okay.  Thank you.  Just give me a moment
11  to run through some of these.
12      A.   Sure.
13      Q.   I don't want to repeat questions I've
14  already asked you.
15          MR. MANGI:  Okay.  The next document we
16  will turn to is HPH 246 to 282.  Mark that, please,
17  as Exhibit 4.
18          (HPH 246-282 marked Exhibit Farias 004.)
19      Q.   Could you please review that, and let me
20  know when you're done.
21      A.   (Witness reviews document.)  I'm fine.
22      Q.   Are you familiar with this document?

Page 108

1      A.   Yes.
2      Q.   What is this document?
3      A.   Okay.  This document is, again, one of the
4  -- it's a -- again, as I described, a local care
5  unit contract document -- different financial model
6  than what we looked at previously.  This is a
7  budget capitation agreement for a limited risk
8  model that Harvard Pilgrim used -- there's a couple
9  of LCs that still have it -- but used it for a
10  couple of years, as its predominant model for a
11  large portion of its LCU network.  What this -- the
12  financial terms of this model, the hospitals were
13  "at risk" in a general term -- at risk for Pool 1
14  or outpatient services -- generally defined as
15  outpatient services.  I guess that's the overview.
16      Q.   Okay.  When was this -- when you said a
17  couple of years, when was this in use as a
18  predominant model?
19      A.   2001 and 2002.
20      Q.   And its use was then discontinued, is that
21  correct?
22      A.   It -- many of the LCUs were migrated, if

Page 109

1  you will, to the document that we looked at
2  previous -- under the terms of the document that we
3  looked at previously, a fee-for-service arrangement
4  with the quality advance program.
5      Q.   What was the basis for the decision to
6  move from budgeted capitation agreements to the
7  alternative arrangement?
8      A.   Generally, just, again, it was really a
9  marketplace thing.  The old -- the risk-sharing
10  arrangements that physicians were under -- and
11  again, this is really global, it's not really
12  specific to Harvard Pilgrim -- general trend away
13  from the budgeted capitation or risk-sharing
14  agreements for a large percentage of the network
15  that generally smaller type practice -- practices
16  that don't have sophisticated infrastructure so
17  they can manage under the terms of a risk
18  arrangement.
19      Q.   Uh-huh.
20      A.   And again, the general trend in the
21  marketplace to pay for performance programs, such
22  as quality advance.  Again, physician

Robert C. Farias
Wellesley, MA

October 20, 2004

Page 110

1  representations that they want to get, you know,
2  incentive -- they will incentivize more in a
3  focused way for things that they had direct control
4  over.
5      Q.  Uh-huh.  Describe for me, if you would,
6  how the arrangement contemplated by this agreement
7  would work.
8      A.  Okay.  The financial arrangement would be
9  -- well, any -- a budget capitation arrangement --
10  a budgeted cap amount would be set.  That would be
11  described in the terms of the profit and loss
12  statement as the revenue to the LCU, local care
13  unit.  Budget capitation amount would be set.
14  Their performance would be measured against
15  expenses.  And the expenses were a representation
16  of the aggregate medical costs of providing
17  services.  Again, looking at Pool 1 only, which are
18  outpatient services.
19      Q.  Uh-huh.
20      A.  So, we would measure the budgeted
21  capitation revenue against the medical cost expense
22  at the end of the year and understand if there was

Page 111

1  a, you know, not for-profit, but profit or loss in
2  terms of a P&L, a profit or loss.  If there was a
3  profit, the LCUs would share in that profit.  If
4  there was a loss, subject to a withhold -- like the
5  claims that are paid for the physicians would be
6  subject to a withhold -- that withhold would be
7  held back to cover any losses.  If there was a
8  partial, you know, loss, they would use the
9  withhold and then return the withhold back.  Just a
10  standard risk arrangement within the market.
11      Q.  Okay.  So, pursuant to the terms of these
12  agreements, the amount that was paid in the first
13  instance was a capitated amount.  And there was no
14  separate --
15      A.  No.
16      Q.  I'm sorry.  Go ahead.
17      A.  The distinction is budgeted capitation.
18      Q.  Okay.
19      A.  This is a paper -- really a paper
20  accounting.  A memorandum account, if you will.
21      Q.  Okay.
22      A.  Direct capitation, which you're referring

Page 112

1  to, direct capitation is you pay amount,
2  irrespective of the services, and the group has
3  full risk.  Okay.  So, this is budgeted capitation.
4  They are paid for the services that they provide on
5  an ongoing basis, according to fee schedules,
6  standard fee schedules, and so forth.  And that's
7  what represents the expenses in the memorandum
8  account, and then there's a settlement process at
9  the end of the year.
10      Q.  I see.  I see.  So, the amounts that are
11  actually paid throughout the year prior to the
12  settlement would be similar to the amounts that are
13  being paid currently under the different type of
14  arrangement?
15      A.  That's correct, yes.
16      Q.  And would the amounts that were paid
17  pursuant to these agreements prior to the
18  settlement include a drug component based on a fee
19  schedule?
20      A.  They could, although at this moment, and I
21  know there's an exhibit in here that will tell us
22  what was included -- right.  They would have been

Page 113

1  paid that way, right.
2      Q.  Okay.
3      A.  Right.
4      Q.  Why don't we take a look at the exhibit
5  you were talking about.
6      A.  Uh-huh.  Sure.
7      Q.  Are you referring to Page 276?
8      A.  Yes, I am.
9      Q.  Okay.  So, this is Appendix E.  See where
10  it says, "included in and excluded from capitation
11  revenue"?
12      A.  Uh-huh.
13      Q.  It starts off with, "The services included
14  in the budgeted capitation revenue --"
15      A.  Uh-huh.
16      Q.  Part B of that is, "Physicians
17  Administered --" I'm sorry.  "Pharmaceuticals
18  administered --"
19      A.  (Witness reviews document.)  I'm reading
20  from Appendix E, 1-B, "Pharmaceuticals administered
21  in a physician's office or on an outpatient basis
22  in a hospital facility, these services are included

29 (Pages 110 to 113)

Robert C. Farias                                                October 20, 2004

Wellesley, MA

Page 114

1  in the budgeted capitation revenue delineated in
2  Appendix C."
3      Q.   Right.  So, during the -- since this was
4  in the 2001/2002 time period, payments then would
5  have been based on the 95 percent of AWP
6  methodology in the first instance, right?
7      A.   Yes.
8      Q.   Then at the end of the year, those total
9  amounts would be compared to the budgeted capitated
10 amount, which would then form the basis for a
11 distribution of either the profit or the deficit.
12 Is that a fair statement?
13     A.   Yes, but understanding that the budgeted
14 capitation amount is an aggregate number.  It's not
15 identified separately by different components.
16 It's a single number.
17     Q.   Right.  Okay.  If I could draw your
18 attention to 271, HPH 271, you will see, sir,
19 towards the top of the page they are called D-1 and
20 D-2.  These provide the terms of surplus
21 distribution or deficit sharing, right?
22     A.   Yes.

Page 115

1      Q.   And since this is a template, the
2  percentages in which the surplus or the deficit
3  will be distributed or shared are blank.  Did those
4  percentages vary from contract to contract?
5      A.   They could vary.
6      Q.   Okay.  Do you know of instances where they
7  did vary?
8      A.   Not specific instances that I could cite,
9  no.
10     Q.   Okay.  So, you don't know whether they did
11 vary or they didn't?  Well, let me withdraw that
12 question.  Do you have any basis for knowing
13 whether or not this did, in fact, vary from
14 contract to contract?
15     A.   Based on the contract form, I would.
16     Q.   Based on the fact that it's a blank.
17     A.   Yes.
18     Q.   Okay.  So, your assumption would be that
19 that was a -- those percentages were negotiated
20 from contract to contract?
21     MR. NALVEN:  Objection.
22     A.   Again, our approach would be that there

Page 116

1  would be a standard distribution, but I don't know.
2      Q.   Okay.  Well, your assumption, based on the
3  fact that they are blank, is that there was
4  variation?
5      A.   Right.
6      MR. NALVEN:  Objection.
7      Q.   Okay.  And if there was variation, the
8  basis for that variation would have been
9  negotiation between the contracting parties, right?
10     A.   Correct.  Correct.
11     MR. NALVEN:  Objection.
12     Q.   Okay.  If I wanted to know in any
13 particular case what the distribution was, I'd have
14 to go and look at the particular contract, right?
15     A.   That's correct.
16     MR. MANGI:  Off the record.
17     (Recess was taken.)
18     Q.   Now, we've spoken about average wholesale
19 price today, and we've also spoken about wholesale
20 acquisition cost or WAC, right?
21     A.   Yes.
22     Q.   Do you have any understanding of what the

Page 117

1  relationship is between those two benchmarks?
2      A.   I don't.
3      Q.   Okay.  Do you have an understanding as to
4  whether one is generally higher or lower than the
5  other?
6      A.   I don't.
7      Q.   Okay.  Now, we've also spoken about a
8  number of instances where fee schedules are
9  negotiated, right?
10     A.   Correct.
11     Q.   Now, in those instances -- or indeed in
12 any case where Harvard Pilgrim is making payments
13 to a provider -- Harvard Pilgrim is looking to get
14 the best deal that it can, right?
15     MR. NALVEN:  Objection.
16     A.   I don't know that I would represent it
17 that way.
18     Q.   Okay.  How would you represent it?
19     A.   There are lots of contracting motivations.
20 I mean -- and, as we talked about earlier, you
21 know, predominant is maintaining a comprehensive
22 and stable network.

Robert C. Farias
Wellesley, MA
October 20, 2004

Page 118

1    Q.   Okay.  Let's take that as a consummate.
2  Let's assume that there is a network sufficient to
3  ensure coverage for Harvard Pilgrim's members.
4    A.   Uh-huh.
5    Q.   In that case, when choosing between
6  alternatives, Harvard Pilgrim will choose the most
7  cost effective option, right -- assuming all else
8  is equal?
9    A.   Uh-huh.  Yes.
10   Q.   Okay.  'Cause Harvard Pilgrim is a
11  for-profit entity, right?
12   A.   No.
13   Q.   No.  It's not a for-profit entity?
14  Really?  It's a not-for-profit entity?
15   A.   That's correct.
16   Q.   Okay.  But Harvard Pilgrim is still
17  looking to operate on the most effective business
18  model possible, right?
19   A.   Yes.  Yes.
20   Q.   Okay.  Harvard Pilgrim's efforts to ensure
21  that it gets the best deal that it can would --
22        MR. NALVEN:  Object -- sorry.

Page 119

1        MR. MANGI:  I'll withdraw that, and I'll
2  start again.
3    Q.   So, we can agree, right, that, subject to
4  an adequate coverage network and all those other
5  factors being in place, Harvard Pilgrim is looking
6  to get the best deal that it can, right?
7    A.   That's your terminology.
8    Q.   Sure.
9    A.   My -- I would represent it as fair
10  reimbursement, and I wouldn't -- I wouldn't
11  characterize it that way.
12   Q.   Okay.  So, it's looking to get fair
13  reimbursement on the terms that are most cost
14  effective to Harvard Pilgrim, right?
15   A.   Yes.
16   Q.   Okay.  And that remains the case in the
17  hospital sector, even though it's changed --
18  Harvard Pilgrim is changing the methodologies from
19  a per diem rate to a DRG-based rate, correct?
20   A.   Could you help me with the question,
21  please.
22   Q.   Sure.

Page 120

1    A.   I'm --
2    Q.   Even in the hospital sector Harvard
3  Pilgrim is changing its reimbursement methodology
4  from per diem to a DRG-based reimbursement for
5  inpatient, right?
6    A.   Correct.
7    Q.   And while that change is taking place, it
8  doesn't affect the fact that Harvard Pilgrim is
9  seeking to ensure it makes reimbursement at the
10  most cost effective basis possible, right?
11   A.   Cost -- right, yes.
12   Q.   That fact is a constant that's not altered
13  by a change in the reimbursement methodology,
14  right?
15   A.   Correct.
16   Q.   Okay.  And the same would be true if
17  changes were made in the physician reimbursement
18  methodology.  Harvard Pilgrim would still be
19  looking to make reimbursement on the most cost
20  effective basis possible, right?
21   A.   Yes.
22   Q.   Okay.  Okay.  So, that could be true,

Page 121

1  regardless of whether reimbursements currently tied
2  to AWP were tied to another benchmark -- say WAC or
3  ASP, right?
4        MR. NALVEN:  Objection.
5    A.   Yes.
6    Q.   In other words, that remains -- that
7  motivation remains a constant, regardless of the
8  methodology that's in use.
9        MR. NALVEN:  Objection.
10   A.   Yes.
11       MR. MANGI:  That is all the questions I
12  have for now.
13       CROSS-EXAMINATION
14  BY MR. NALVEN:
15   Q.   Mr. Farias, I'm David Nalven.  I represent
16  the Plaintiffs in this case.  I have just a few
17  questions.
18   A.   Sure.
19   Q.   In connection with establishing a fee
20  schedule for prescription drugs that are
21  administered by doctors, what is Harvard Pilgrim
22  seeking to cover in reimbursing doctors for the

31 (Pages 118 to 121)

Robert C. Farias
October 20, 2004

Wellesley, MA

Page 122

1    prescription drugs they administer?
2        A.   The drugs.
3        Q.   And the drugs alone, right?
4            MR. MANGI:  Object to the form.
5        A.   Yes.
6        Q.   Does Harvard Pilgrim view its
7    reimbursement of physicians for prescription drugs
8    as an opportunity for the physicians to mark up the
9    physician's drug costs?
10           MR. MANGI:  Object to the form.
11       A.   Could you repeat the question, please.
12       Q.   Does Harvard Pilgrim view its
13   reimbursement of physicians for prescription drugs
14   as an opportunity for the physicians to mark up the
15   cost of the physician's drugs?
16           MR. MANGI:  Object to the form.
17       A.   No.
18       Q.   Do you know the prices that doctors pay
19   for prescription drugs that they administer?
20       A.   No.
21       Q.   Are you aware of rebates that are paid by
22   manufacturers to physicians in connection with

Page 123

1    drugs purchased by physicians?
2        A.   I have heard in general terms about
3    rebate, but I don't know what they are or how they
4    work.
5        Q.   What do you know about rebates paid by --
6        A.   I've heard the term in or seen the term in
7    literature about pharmacy rebates.  That's really
8    it.
9        Q.   Have you ever seen any information
10   concerning the magnitude of rebates paid by
11   pharmaceutical manufacturers to doctors for the
12   drugs --
13       A.   No.
14       Q.   -- that doctors purchase?
15       A.   No.
16           MR. MANGI:  Object to the form.
17       Q.   Is it important to Harvard Pilgrim that
18   its prices -- that the rates at which it
19   reimburses doctors in connection with prescription
20   drugs be as accurate as possible?
21           MR. MANGI:  Object to the form.
22       A.   It's difficult -- I don't really

Page 124

1    understand what you're saying as far as "accurate
2    as possible."
3        Q.   Well, is it important that you fairly
4    reimburse physicians for the drugs that they
5    purchase and then administer?
6        A.   As a general concept, it's important that
7    we fairly reimburse.
8        Q.   Okay.  Does Harvard Pilgrim have an
9    interest in controlling its expenditures in
10   connection with the administration of prescription
11   drugs by physicians?
12       A.   Again, I can talk about that as a general
13   concept that it is important for a responsible
14   health plan to manage medical cost trends.
15       Q.   When you say, "medical cost trends," what
16   do you mean?
17       A.   I mean that, again, this is my
18   representation that I think it's a given that
19   medical costs will -- you know, are projected to
20   increase by a certain percentage over time.  And as
21   a responsible health plan or health administrator,
22   that you would want to manage the projection of

Page 125

1    those trends.  I mean, you can't assume that it's
2    going to be flat.  Again, this is a marketplace
3    discussion.  But you can't assume that, you know,
4    that you have any ability to maintain level
5    funding; that there is going to be an incremental
6    increase over time and that -- we would manage the
7    medical cost trend.
8        Q.   But within those trends, Harvard Pilgrim's
9    goal is to control its drug spending, isn't it?
10       A.   That could be a component, yes.
11       Q.   Now, you were asked earlier about whether
12   Harvard Pilgrim had ever proposed to its providers
13   that it use a different basis other than AWP for
14   setting reimbursement.  Do you recall that?
15       A.   I -- I didn't take the question as did we
16   propose it to our providers, as had we had
17   discussions about it.
18       Q.   And you said that you had not.
19           MR. MANGI:  Object.
20       A.   We've had internal discussion about it,
21   but we hadn't proposed anything to our providers.
22       Q.   Correct.  And I guess the question I have

32 (Pages 122 to 125)

Robert C. Farias                                                                October 20, 2004

Wellesley, MA

Page 126

1  is why not?
2      A.  As I describe, because we were looking at
3  the Medicare state and because of it being in
4  fluctuation, we didn't have a landing spot yet.
5      Q.  But even before the notion of ASP was
6  introduced through the recent Medicare reform
7  legislation --
8      A.  Uh-huh.
9      Q.  -- there may still have been opportunities
10  to propose to providers a different way of
11  determining reimbursement rates, wouldn't there
12  have been?
13          MR. MANGI:  Objection.  Form.  Foundation.
14      A.  There could have been.
15      Q.  But as far as you know, Harvard Pilgrim
16  has used AWP as the basis for reimbursement.
17      A.  Correct.
18      Q.  Now, why is that?
19      A.  I don't know.
20      Q.  Well, is it because it's a term that
21  everybody who's involved in the health care
22  industry and profession has heard of?

Page 127

1          MR. MANGI:  Object to the form.
2      A.  I can't say that's the reason.
3      Q.  Is it because everybody uses it?
4          MR. MANGI:  Object to the form.
5      A.  I can't say.
6      Q.  Do you understand AWP to be an industry
7  standard?
8      A.  That's my understanding, yes.
9      Q.  And it's also a standard and a price list
10  that's reflected in what Harvard Pilgrim receives
11  from Medicare, right?
12          MR. MANGI:  Object to the form.
13      A.  I'm not sure I understand.
14      Q.  Harvard Pilgrim receives AWP pricing from
15  Medicare.
16      A.  Oh, the pricing.  Right, yes.
17      Q.  And so, as a result of its coming from
18  Medicare, does that provide Harvard Pilgrim with a
19  degree of confidence in its accuracy?
20          MR. MANGI:  Objection.  Form.  Foundation.
21      A.  I mean, explicitly, do we think in those
22  terms, no.  But generally, a larger data set -- and

Page 128

1      I can talk about, again, our general -- our
2  RBRVS-based physician fee schedule where we rely on
3  the RBUs that are provided through Medicare because
4  of the size of the data set.  Again, this isn't
5  related directly to drugs, but it is a larger data
6  set.  So, you can make that call.
7      Q.  Well, I'm really trying to understand --
8      A.  Yeah.
9      Q.  -- why it is that Harvard Pilgrim has and
10  continues to use and rely on AWP.
11      A.  Right.  Right.
12      Q.  And so, that's why I turned to Medicare.
13      A.  Sure.
14      Q.  And I'll ask whether the fact that
15  Medicare is large --
16      A.  Right.  Right.
17      Q.  -- Medicare is run by the United States
18  government --
19      A.  Uh-huh.
20      Q.  -- does that influence Harvard Pilgrim's
21  judgment --
22          MR. MANGI:  Object.

Page 129

1      Q.  -- to the accuracy of AWP?
2          MR. MANGI:  Object to the form.
3      A.  Again, I don't think it explicitly affects
4  our judgment.  Again, as I said, AWP is, from my
5  perspective an industry standard, and that's why we
6  would use that.
7      Q.  And are you aware of the office of the
8  inspector general in the health and human services
9  administration?
10      A.  Yes.
11      Q.  What do you understand the office of the
12  inspector general to be?
13      A.  Well, today, I don't know.  My previous
14  hospital experience as being in the reimbursement
15  area, I was aware of the office of inspector
16  general looking at one thing that we would have to
17  do is research the federal register and review, you
18  know, publications from the office of inspector
19  general, Medicare sanctioned providers, that type
20  of thing in a general way.
21      Q.  So, it's an investigatory agency.
22      A.  Yeah.  Uh-huh.

33 (Pages 126 to 129)

Robert C. Farias
Wellesley, MA
October 20, 2004

Page 130

1    Q.   And it's a watchdog.
2    A.   Uh-huh.
3    Q.   And it's there to protect Medicare.
4        MR. MANGI:  Object to the form.
5    Q.   Is that your understanding?
6    A.   If that's what -- I don't know.
7    Q.   Well --
8    A.   I would assume that's what it is, based on
9    my knowledge.
10   Q.   And so, Medicare is not only large, but it
11   also has this investigatory agency that is a
12   watchdog for it.
13       MR. MANGI:  Object to the form.
14   Q.   Is that your understanding?
15   A.   Yes.
16   Q.   And Medicare has a pretty large budget,
17   doesn't it?
18   A.   Yes.
19   Q.   Medicare -- do you know what Medicare
20   spends a year on prescription drugs?
21   A.   I don't know.
22   Q.   Do you know what portion of all

Page 131

1    prescription drugs purchased in the United States
2    are reimbursed by Medicare?
3    A.   No.
4    Q.   Is it 10 percent, 20 percent, do you know?
5        MR. MANGI:  Object to the form.
6    A.   I don't know.
7    Q.   But it's a large amount.
8        MR. MANGI:  Object to the form.
9    A.   I don't know.
10   Q.   The reason I ask is I'm just wondering
11   whether the fact that Medicare is large
12   reimburser --
13   A.   Uh-huh.
14   Q.   -- of prescription drugs, explicitly or
15   implicitly, does that influence your thinking as it
16   relates to the confidence that you have in
17   information concerning AWP received from Medicare?
18       MR. MANGI:  Object to the form.
19   A.   See, it's not so much the size, but it's
20   really the -- I think more of a standardization.
21   If this is, you know, an industry standard
22   approach, as with hospital DRG methodology -- DRG

Page 132

1    is a well-known standard methodology of reimbursing
2    inpatient services, and that's the methodology that
3    Medicare employs.  So, in that way you could say
4    based on size that it would have some merit.
5    Q.   What is your understanding of the role the
6    pharmaceutical manufacturers have in setting AWP?
7    A.   I don't know what that is.
8    Q.   You're not aware of any role that
9    manufacturers play in setting AWP, is that correct?
10   A.   Well, as in any industry, you know, people
11   set their prices.  I don't know the methodology.
12   Q.   Now, you were asked earlier whether the
13   physicians' acquisition cost for drugs would affect
14   the amount that Harvard Pilgrim reimbursed them.
15   A.   Right.
16   Q.   And I thought that you had answered that
17   it wasn't one of the factors that went into your
18   determining what you reimbursed physicians.
19   A.   Right.  I was asked if I knew what
20   physicians paid for the drugs.  My answer was no.
21   And if my answer is no, I don't -- we wouldn't --
22   we couldn't use that to determine.

Page 133

1    Q.   So, when you said that it wasn't relevant
2    in your determination --
3    A.   Uh-huh.
4    Q.   -- as to what to reimburse physicians, the
5    reason that it's not relevant is because -- the
6    reason that you said it was not relevant -- just to
7    clarify your answer -- is because --
8    A.   Uh-huh.
9    Q.   -- you didn't have that information.  Is
10   that what you were saying?
11   A.   Well, I'm just saying that I couldn't use
12   the information to do it.  I mean, it just wouldn't
13   -- it wouldn't be -- it wouldn't come into play.
14   Q.   It wouldn't come into play because you
15   don't have it.  Is that what you mean?
16       MR. MANGI:  Object to the form.
17   Mischaracterizes his testimony.
18   Q.   Let me ask it a different way.
19   A.   Yeah.
20   Q.   Just to make sure.
21   A.   Uh-huh.
22   Q.   This is really to understand --

34 (Pages 130 to 133)

Robert C. Farias

Wellesley, MA

October 20, 2004

Page 134

1    A.   Sure.
2    Q.    -- your testimony.  Let's suppose that you
3 did the have the physician's actual acquisition
4 cost --
5    A.   Uh-huh.
6    Q.    -- would that information be used in
7 Harvard Pilgrim's determining what it would
8 reimburse physicians for prescription drugs that
9 the physicians administered?
10    MR. MANGI:  Objection.  Asked and
11 answered.
12    A.   I don't know if it would be.
13    Q.   Well, let me ask you this:  You testified
14 earlier that you're generally aware from your life
15 experience --
16    A.   Uh-huh.
17    Q.    -- that physicians receive free samples.
18    A.   Yes.
19    Q.   Are you aware whether physicians receive
20 free samples of drugs that they administer?
21    A.   I don't know what the nature of the
22 samples are that they receive.

Page 135

1    Q.   Let's suppose that a physician receives a
2 free sample, administers it to a patient who's a
3 Harvard Pilgrim member -- are you with me --
4    A.   Uh-huh.
5    Q.    -- and then charges Harvard Pilgrim for
6 that drug that the doctor received for free and
7 administered to the patient --
8    A.   Uh-huh.
9    Q.    -- would Harvard Pilgrim think it relevant
10 in determining whether to reimburse the doctor for
11 that drug that the doctor got it for free?
12    MR. MANGI:  Object to the form, and also
13 you're asking him to assume that the physician
14 commits a crime.
15    Q.   You can answer the question.
16    A.   I -- I don't know that we -- I don't know.
17 I don't know that we would go into that -- I don't
18 know that we would make any assumptions about that.
19    Q.   No, I understand that.  But I'm asking you
20 to make an assumption.  I'm asking you to assume
21 that the doctor receives the drug for free.
22    A.   Uh-huh.

Page 136

1    Q.   Would Harvard Pilgrim consider that
2 relevant in determining whether to pay the doctor
3 for the drug cost or not?
4    MR. MANGI:  Again, objection to the form
5 and improper hypothetical to the extent you're
6 asking him to assume the physician commits a crime.
7    A.   No, we wouldn't -- we wouldn't factor that
8 in.  We wouldn't do that level of exploration.
9    Q.   Again, though, Mr. Farias, I understand
10 that you wouldn't do that level of exploration, but
11 I'm asking you to assume that the doctor got the
12 drug for free.  Would you reimburse the doctor,
13 based on AWP minus 5 percent, even though the
14 doctor got it for free?  Would that be relevant to
15 you that the doctor got it for free?
16    MR. MANGI:  Same objections.
17    A.   If the provider submitted a claim in
18 conformance with his contract, provider submitted a
19 claim for a covered service, Harvard Pilgrim would
20 reimburse for that service under the terms of the
21 contract.
22    Q.   For the service.  And when you say, "the

Page 137

1 service," you mean, as well, the drug?
2    A.   Right.
3    Q.   And is that because you assume that the
4 doctor, in submitting that bill, paid for the drug?
5    MR. MANGI:  Object to the form.
6    A.   Not -- again, not at that level of detail.
7 We would be assuming that the provider is
8 performing under the terms of his contract or her
9 contract with Harvard Pilgrim.
10    Q.   Okay.  So, when you give me that answer,
11 you really think about it in terms of at the level
12 of the claims submission?
13    A.   That's correct.
14    Q.   Okay.  What about at the larger level,
15 just in general if the doctors -- if the doctor is
16 generally administering drugs that it receives for
17 free and you know that?
18    A.   I don't know that.
19    MR. MANGI:  I'm sorry.  Just to avoid me
20 interrupting --
21    MR. NALVEN:  I'm sorry.
22    MR. MANGI:  -- can I have a standing

35 (Pages 134 to 137)

Robert C. Farias                                                                                          October 20, 2004

Wellesley, MA

Page 138

1  objection to this line of questioning so I don't
2  interrupt you again?
3  MR. NALVEN:  Of course you may.  Of course
4  you may.
5  Q.  If you would assume as a hypothetical
6  question that the doctor has no costs -- no drug
7  costs in connection with its administration of
8  drugs, would that influence Harvard Pilgrim in its
9  determination of how much to reimburse doctors in
10 connection with their administration of drugs?
11 MR. MANGI:  It's a different question, so
12 I'll object to the form.
13 A.  I'm having a really tough time making an
14 assumption that I can't see as a valid assumption.
15 I'm sorry.
16 Q.  And what's the assumption that you don't
17 understand to be a valid assumption?
18 A.  That physicians aren't paying for drugs.
19 Q.  Okay.  Well, may I ask you to assume that
20 fact, even though you don't believe that it's a
21 valid assumption.
22 MR. MANGI:  Are you asking him to assume

Page 139

1  that all physicians are getting drugs for free?
2  Q.  You can answer the question.
3  MR. MANGI:  Object to the form then.
4  A.  Okay.  You can ask me to make that
5  assumption.
6  Q.  Okay.  Now, if you assume that the doctor
7  receives the drug for free, would that influence
8  Harvard Pilgrim's decision as to whether to pay the
9  doctor -- reimburse the doctor for providing the
10 drugs to one of Harvard Pilgrim's members?
11 MR. MANGI:  Object to the form.
12 A.  It could.
13 Q.  Under what circumstances?
14 A.  But I have to say, under the terms of our
15 provider contracts, we agree to reimburse for
16 covered services, as defined in member contracts.
17 So, if these are covered services, we have agreed
18 to pay for those services.  And where they're
19 coming from or what they're paying -- that is not a
20 consideration.
21 Q.  Okay.  So, you would reimburse because you
22 feel like that's your legal obligation under the

Page 140

1  contract.
2  MR. MANGI:  Object to the form.
3  A.  Because it is our legal obligation under
4  the contract.
5  Q.  If you had information that physicians
6  were getting discounts and rebates that allowed
7  them to purchase the drugs that they administer at
8  10 percent of the cost that Harvard Pilgrim
9  reimburses them, when you negotiate your next
10 contract with the physicians, would the fact that
11 they pay only 10 percent of what you had previously
12 reimbursed them under the old contract influence
13 your judgment as to whether to change the
14 reimbursement rate?
15 MR. MANGI:  Object to the form and also
16 foundation in that the witness is not involved in
17 negotiations.
18 A.  Could you restate that, please.
19 Q.  You're coming to the end of a contract
20 period --
21 A.  Yes.
22 Q.  -- you learn that the physician pays only

Page 141

1  10 percent of the cost that you, Harvard Pilgrim,
2  have been reimbursing them all along for a drug --
3  A.  Uh-huh, right.
4  Q.  -- and that they're getting a 90 percent
5  profit on the drug --
6  A.  Uh-huh.
7  Q.  -- when you turn to renegotiate that
8  contract, would the fact that the doctor pays only
9  10 percent of what you are reimbursing --
10 A.  We don't but --
11 Q.  -- influence your judgment?
12 A.  We talked about before, we don't negotiate
13 our physician -- our drug fee schedule.
14 Q.  And that's because you rely on the
15 Medicare AWP.
16 MR. MANGI:  Object to the form.
17 A.  Well, no, that's not because.  We do use
18 AWP as a basis, yes.  But that's not the reason why
19 we don't negotiate it.  We, as I said before, we
20 don't negotiate it because we want standardization
21 across the network.
22 Q.  Okay.  Well, what if you came to

36 (Pages 138 to 141)

Robert C. Farias                                                    October 20, 2004
                          Wellesley, MA

Page 142

1  understand that every physician was obtaining the
2  drugs that it administered to Harvard Pilgrim
3  patients at 10 percent of the amount that Harvard
4  Pilgrim --
5      A.  Uh-huh.
6      Q.  -- was reimbursing them --
7          MR. MANGI:  Object to the form.  And are
8  you asking about all drugs?
9      Q.  -- would that influence Harvard Pilgrim's
10 judgment in setting its reimbursement rates?
11         MR. MANGI:  Same objection.
12     A.  Under -- and I can only speak in general
13 terms.  Understanding generally what the
14 marketplace is and what the benchmarks are in the
15 marketplace, it could.
16     Q.  Including the physicians' costs.
17         MR. MANGI:  Object to the form.
18     A.  Again, I don't know.  I don't know how
19 we're defining physician costs.  I can't answer
20 that.
21     Q.  Okay.  You don't have any information
22 concerning what physicians pay for the drugs, do

Page 143

1  you?
2      A.  No.
3      Q.  And so, as a result of not having that
4  information, you're not able to make judgments
5  concerning Harvard Pilgrim's reimbursement rates
6  based on the actual acquisition costs, are you?
7          MR. MANGI:  Objection.  Form.  Foundation.
8      A.  No.
9          MR. NALVEN:  Okay.  Thank you.  I have
10 nothing further.
11         REDIRECT EXAMINATION
12 BY MR. MANGI:
13     Q.  I have a few more questions, I'm afraid.
14     A.  Sure.
15     Q.  In response to one of Mr. Nalven's
16 questions earlier, you said it's important for
17 Harvard Pilgrim to fairly reimburse for drugs.
18 What did you mean by that?
19     A.  Again, I didn't mean it to be specific to
20 drugs.  I just mean in general terms.
21     Q.  Okay.
22     A.  Fairly reimburse is to reimburse

Page 144

1  appropriate to the marketplace some reasonable
2  representation of cost.  And again, I'm talking in
3  general terms, not specific to reimbursement, but
4  just the general reimbursement, you know, strategy
5  and approach and thinking that we would fairly
6  compensate for services rendered.
7      Q.  Well, fair reimbursement would include an
8  element of profit to a pharmacy or a physician,
9  correct?
10     A.  It could, yes.
11     Q.  Because Harvard Pilgrim certainly would
12 not consider a fair reimbursement to be
13 reimbursement that was exactly equal to acquisition
14 costs, right, because then a pharmacy or provider
15 would be making no money?
16     A.  That would be true -- I mean, again, I can
17 talk in general terms.
18     Q.  Sure.
19     A.  It's very hard from my position to talk
20 about specific lines of business as it relates to
21 reimbursement.
22     Q.  So, general terms.

Page 145

1      A.  In general terms -- in general terms a
2  health plan would recognize that there are overhead
3  costs that need to be covered as part of the
4  reimbursement equation.
5      Q.  Right.  And in addition to covering
6  overhead costs, businesses need to make money,
7  right?  Pharmacies and providers need to make
8  money, and Harvard Pilgrim recognizes that fact in
9  the marketplace, right?
10         MR. NALVEN:  Note my objection.
11     A.  Again, I mean, I can talk about the -- you
12 know, the cost-plus margin, again, general
13 approach --
14     Q.  Uh-huh.
15     A.  -- making money is a difficult concept for
16 me, being in a nonprofit.
17     Q.  Okay.  Let me rephrase the question
18 then --
19     A.  Okay.
20     Q.  -- then in a way that makes more sense.
21 The cost element includes acquisition costs and
22 overhead costs and other costs?

37 (Pages 142 to 145)

Robert C. Farias                                                October 20, 2004
Wellesley, MA

Page 146

1    A.   Correct.
2    Q.   Right?
3    A.   Uh-huh.
4    Q.   Now, Harvard Pilgrim recognizes that when
5    reimbursing providers and pharmacies, a fair
6    reimbursement would be an amount of reimbursement
7    that covers all of those costs and includes an
8    element of margin, right?
9    A.   Yes.
10   Q.   Now, you understand that -- withdraw that.
11   We discussed earlier the reimbursement for drugs
12   and the reimbursement that goes as an
13   administration fee.
14   A.   Right.
15   Q.   Right?  Do you have an understanding as to
16   whether or not the administration fees that Harvard
17   Pilgrim pays to providers are sufficient to cover
18   their overhead costs?
19        MR. NALVEN:  Objection.
20   A.   I don't know specifically, no.
21   Q.   Okay.  If it transpired that the
22   administration fees paid were inadequate --

Page 147

1    A.   Uh-huh.
2    Q.   -- to cover overhead costs --
3    A.   Right.
4    Q.   -- then for the reimbursement that Harvard
5    Pilgrim pays overall to be fair --
6    A.   Uh-huh.
7    Q.   -- the amount paid in reimbursement for
8    drugs would have to subsidize an inadequate
9    administration fee, right?
10        MR. NALVEN:  Objection.
11   A.   Yeah.
12   Q.   I'm sorry.  Your answer was yes?
13   A.   Yes.  And, again, I'm --
14   Q.   General terms.
15   A.   Harvey's going to tell me I'm saying too
16   much.
17        THE WITNESS:  I'm sorry.
18        MR. COTTON:  Explain your answer.  That's
19   fine.
20   A.   Again, in general reimbursement terms,
21   that's why I keep saying it's difficult for me to
22   say in specific lines of business, again, just

Page 148

1    because of the nature, and it's not because of what
2    Harvard Pilgrim does.  It's not because of what
3    specific providers do.  But the nature of what
4    reimbursement is and how it's evolved over time,
5    that it's very difficult, within lines of business,
6    to say -- and again, I'm going to keep using
7    hospitals to make this generic -- but for
8    laboratory services, that what we pay for
9    laboratory is an appropriate charge -- you know,
10   cost plus margin for laboratory, for radiology,
11   it's -- it is, you know, a mix of services across
12   the board.  So --
13   Q.   I hear you.
14   A.   Okay.
15   Q.   But as a general proposition, it's fair to
16   say that in every case for -- to fairly reimburse
17   you are looking to cover cost, plus margin.
18   A.   An appropriate margin, yeah.
19   Q.   Okay.  Now, in response to other questions
20   from Mr. Nalven, you said that you have heard about
21   manufacturer rebates, is that correct?
22   A.   Yes.

Page 149

1    Q.   You heard about manufacturer rebates and
2    discounts to providers.
3    A.   Again, I'm really sketchy.  I mean, I know
4    I've heard about it, but I don't know who and how
5    it works.
6    Q.   Okay.  It's fair to say that you know that
7    manufacturers do contract with providers to give
8    them rebates and discounts, but you don't know
9    anything more about that phenomenon.
10   A.   I've heard, you know, "drug rebates" as a
11   phrase, but I don't know.
12   Q.   Do you know whether those contracts exist
13   in the marketplace?
14   A.   I -- I don't know that it's a contract.  I
15   don't know what the --
16   Q.   Okay.  Let me put it another way.
17   A.   -- vehicle is.
18   Q.   You understand that manufacturers do
19   provide discounts and rebates to providers.
20   A.   Uh-huh.  Yes.
21   Q.   Now, Mr. Nalven asked you some questions
22   about whether manufacturers set AWP.  Do you know

38 (Pages 146 to 149)

Robert C. Farias                                                                October 20, 2004
                                    Wellesley, MA

| Page 150 |
|---|
| 1   who sets AWP?
2       A.   I -- again, I didn't know that it was set.
3   I don't know.
4       Q.   Okay.  So you have no idea who sets AWP.
5       A.   Right.
6       Q.   You referred to AWP as being an industry
7   standard.
8       A.   Yes.
9       Q.   When you say that, do you understand that
10  it's standard of the industry to use AWP as a
11  reimbursement benchmark, correct?
12      A.   Yes.
13          MR. NALVEN:  Objection.
14      Q.   And you understand that it's standard in
15  the industry to reimburse at a discount off AWP,
16  correct?
17      A.   Yes.
18      Q.   Mr. Nalven asked you a bunch of questions
19  about OIG and Medicare.
20      A.   Uh-huh.
21      Q.   You're not an expert in OIG or Medicare,
22  are you? |

| Page 152 |
|---|
| 1       Q.   So, if a physician were committing a crime
2   and billing for a drug that he had got as a free
3   sample, Harvard Pilgrim would still reimburse him,
4   but would hope that the authorities would catch up
5   with him, right?
6       A.   I think that's safe to say.
7       Q.   And Harvard Pilgrim doesn't have any
8   knowledge about what providers' acquisition costs
9   are, right?
10      A.   No.
11      Q.   Doesn't require them to disclose those.
12      A.   No.
13      Q.   And if it learned that those were higher
14  or lower than it currently thinks they are, that
15  wouldn't change the fact that it reimburses that
16  methodology, which is 95 percent of AWP?
17      A.   Correct.
18      Q.   Indeed, if it learned that in a particular
19  instance physicians were getting a particular drug
20  at a -- were getting a rebate or a discount from a
21  manufacturer on a particular drug, that wouldn't
22  change the fact that Harvard Pilgrim's standard |

| Page 151 |
|---|
| 1       A.   No.
2       Q.   So, you were just testifying about your
3   general impressions, is that right?
4       A.   Based on previous experiences, yes.
5       Q.   Okay.  But you have no precise knowledge
6   about what the role of OIG is in relation to
7   Medicare.
8       A.   No.
9          MR. NALVEN:  Objection.
10      Q.   Now, then there were a whole bunch of
11  questions about whether or not -- well, your
12  knowledge of physicians' acquisition costs and so
13  on.
14      A.   Yes.
15      Q.   Let's see if we can get that straight in
16  my mind, based on your earlier testimony when we
17  were speaking.
18      A.   Uh-huh.
19      Q.   Physicians' acquisition costs form no part
20  of Harvard Pilgrim's reimbursement methodology,
21  right?
22      A.   Correct. |

| Page 153 |
|---|
| 1   across the board methodology is 95 percent of AWP?
2       A.   Correct.
3          MR. NALVEN:  Objection.
4          MR. MANGI:  That's it.
5          MR. NALVEN:  I have nothing further.
6          THE WITNESS:  Okay.  Great.
7          (Whereupon the deposition ended at
8          12:52 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22 |

39 (Pages 150 to 153)

Robert C. Farias                                                      October 20, 2004

Wellesley, MA

Page 154

```
 1   Commonwealth of Massachusetts
 2   Middlesex, ss.
 3        I, P. Jodi Ohnemus, Notary Public
 4   in and for the Commonwealth of Massachusetts,
 5   do hereby certify that there came before me
 6   on the 20th day of October, 2004, the deponent
 7   herein, who was duly sworn by me; that the ensuing
 8   examination upon oath of the said deponent was
 9   reported stenographically by me and transcribed
10   into typewriting under my direction and control;
11   and that the within transcript is a true record of
12   the questions asked and answers given at said
13   deposition.
14        I FURTHER CERTIFY that I am neither
15   attorney nor counsel for, nor related to or
16   employed by any of the parties to the action
17   in which this deposition is taken; and, further,
18   that I am not a relative or employee of any
19   attorney or financially interested in the outcome
20   of the action.
21
22
```

Page 155

```
 1
 2        IN WITNESS WHEREOF I have hereunto set my
 3   hand and affixed my seal of office this
 4   20th day of October, 2004, at Waltham.
 5
 6   _____
 7   _____
 8
 9        P. Jodi Ohnemus, RPR, RMR, CRR
10        Notary Public,
11        Commonwealth
12        of Massachusetts
13        My Commission Expires:
14        4/21/2007
15
16
17
18
19
20
21
22
```

40 (Pages 154 to 155)