Exhibit 43

1

1          UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

2

3                      ---o0o---

4

5   In re: PHARMACEUTICAL              MDL DOCKET NO.

    INDUSTRY AVERAGE WHOLESALE         CIVIL ACTION

6   PRICE LITIGATION                   01CV12257-PBS

7   _____

    THIS DOCUMENT RELATES TO:

8   ALL ACTIONS

9

10  - - - - - - - - - - - - - - - - - - -x

11

12              CONFIDENTIAL TRANSCRIPT

13                   1340 Concord Terrace

14                   Third Floor

15                   Sunrise, Florida

16                   September 20, 2004

17                   9:20 a.m. - 1:05 p.m.

18      DEPOSITION OF HAL GOLDMAN, PHARM D., R.Ph.

19          Taken before LISA EDWARDS, Registered Merit

20  Reporter and Notary Public for the State of Florida at

21  Large, pursuant to Notice of Taking Deposition filed in

22  the above cause.

Hal Goldman, Pharm D., R.Ph.     Confidential     September 20, 2004
Sunrise, FL

2 (Pages 2 to 5)

---

**Page 2**

APPEARANCES

1
2
3   JOHN MACORETTA, ESQ., of the firm of
4   SPECTOR, ROSEMAN & KODROFF
5   1818 Market Street, Suite 2500
6   Philadelphia, Pennsylvania 19103,
7   on behalf of the Plaintiffs.
8
9   GREGORY F. WELLS, ESQ., of the firm of
10  MORGAN, LEWIS & BOCKIUS, LLP
11  1111 Pennsylvania Avenue, NW
12  Washington, DC 20004,
13  on behalf of the Defendants Pfizer and
14   Pharmacia.
15
16  KEVIN B. LOVE, ESQ., of the firm of
17  HANZMAN & CRIDEN, P.A.
18  220 Alhambra Circle, Suite 400
19  Coral Gables, Florida 33134,
20  on behalf of Vista Healthplan.
21
22

---

**Page 4**

E X H I B I T S (C O N T.)

| Goldman | Description | For Ident. |
|---|---|---|
| Exhibit Goldman 008 | Winn-Dixie Services Agreement | 66 |
| Exhibit Goldman 009 | Dadeland Fact Sheet | 66 |
| Exhibit Goldman 010 | MedImpact Agreement | 72 |
| Exhibit Goldman 011 | TAP Pharmaceuticals Letter | 85 |
| Exhibit Goldman 012 | TAP Rebate Agreement | 85 |
| Exhibit Goldman 013 | Claim Audit Report | 85 |
| Exhibit Goldman 014 | TAP Chart | 85 |
| Exhibit Goldman 015 | Letter to Nestor Plana | 100 |

---

**Page 3**

INDEX

| Witness | Dir. | Cr. | Red. | Rec. |
|---|---|---|---|---|
| HAL GOLDMAN | 5 | 125 | 132 | |

E X H I B I T S

| Goldman | Description | For Ident. |
|---|---|---|
| Exhibit Goldman 001 | Pharmacy Svcs. Mgmt. Agreement | 16 |
| Exhibit Goldman 002 | I.V. Services Contract | 23 |
| Exhibit Goldman 003 | CuraScript Letter | 30 |
| Exhibit Goldman 004 | OncoScripts Contract | 47 |
| Exhibit Goldman 005 | HIP-MedChoice Agreement | 49 |
| Exhibit Goldman 006 | Ancillary agreement | 49 |
| Exhibit Goldman 007 | HIP-MedChoice Amendment | 49 |

---

**Page 5**

1  Thereupon--
2     HAL GOLDMAN, PHARM D., R.Ph.,
3  was called as a witness by the Defendants Pfizer and
4  Pharmacia and, having been first duly sworn, testified
5  as follows:
6     DIRECT EXAMINATION
7  BY MR. WELLS:
8    Q.  Good morning, Dr. Goldman.
9    A.  Good morning.
10    Q.  Thank you for taking time out of your day to
11  come in and talk to us about these issues.
12    Have you ever been deposed before?
13    A.  Yes, I have.
14    Q.  And how many times?
15    A.  In a prior life, I was a reserve police
16  officer.  So I was deposed in criminal cases once or
17  twice with that.  With the Plan, I believe it's been
18  three times.
19    Q.  Okay.  And at least in the times that you've
20  been with the Plan, what sort of were the general
21  circumstances of those?
22    A.  It was litigation against pharmaceutical

---

Hal Goldman, Pharm D., R.Ph. Confidential September 20, 2004
Sunrise, FL

3 (Pages 6 to 9)

---

**6**

1 manufacturers.
2 Q. Okay. And what were the subject matters of
3 those litigations?
4 A. I don't remember them all off the top of my
5 head. I will tell you that one was the Lupron case; we
6 had -- another one was Buspar; and I think the third one
7 was Cipro. I keep files in my office.
8 Q. And the Buspar and Cipro cases: Are those the
9 antitrust cases?
10 A. Yes, they are.
11 Q. Okay. And do you know when your deposition was
12 in the Lupron case?
13 A. I don't know the date offhand exactly. No, I
14 do not.
15 Q. Well, obviously, you've been through this
16 before, so I'm sure you know the ground rules. I'm
17 going to ask you questions and you're going to give
18 answers. The reporter is going to write down everything
19 we say. For that reason, it's important, obviously,
20 that all of our answers be verbal and not as you know in
21 casual conversation where you smile or nod your head,
22 that sort of thing.

---

**7**

1 If you have any questions about something that
2 I ask you, if you don't understand it or it doesn't make
3 sense to you, just let me know, and I'll try to rephrase
4 the question in a way that you'll understand. Also, if
5 you need a break at any time today, just let me know,
6 and we can take whatever time you need.
7 A. Okay.
8 Q. I'll do the same.
9 Also, you're here testifying, as I'm sure you
10 know, as a corporate representative for Vista
11 Healthplan, which means that your job is to provide the
12 company's knowledge in response to my questions.
13 One of the issues that that may pose is that as
14 I'm asking you questions, I may use the term "you" a
15 lot. And understand that unless I specify otherwise,
16 when I say "you," I'm talking about any knowledge that
17 the company has. So if there's something that you've
18 seen in a document or something that you've learned from
19 a co-worker, that information should be provided, as
20 opposed to what you may specifically understand.
21 A. Okay.
22 Q. Dr. Goldman, what is your educational

---

**8**

1 background?
2 A. I have a doctorate in pharmacy.
3 Q. And where is that from?
4 A. Mercer University in Atlanta, Georgia.
5 Q. And any other graduate education?
6 A. I have a degree -- a bachelor of science degree
7 in criminal justice from Florida International
8 University.
9 Q. And what is your current position at Vista?
10 A. I am the vice-president of pharmacy operations.
11 Q. And how long have you held that position?
12 A. It started off as a director role in '99. So
13 it became a vice-president role about a year and a half
14 ago.
15 Q. Were your duties the same when you were -- as a
16 director as they are now that you're the vice-president?
17 A. Yes, they were.
18 Q. And what was your job before 1999?
19 A. I was a project manager with a company called
20 Owen Healthcare.
21 Q. And what were your duties in that position?
22 A. As a pharmacist, I was responsible for

---

**9**

1 troubleshooting accounts they had within Florida within
2 hospitals to make sure that things were running okay.
3 If there were problems, I would go in and -- go in with
4 a team to correct it.
5 Q. When you say "problems," what sort of problems
6 are you talking about?
7 A. It could have been anything: staffing issues,
8 inventory control issues. It could have been the whole
9 gamut of the management of a hospital pharmacy.
10 Q. Did that have anything to do with the amount
11 that the hospital accounts were spending on
12 pharmaceuticals?
13 A. Not usually. Usually it had to do more with
14 not maintaining proper inventory. Not so much
15 overspending, but a lot of supply -- undersupply issues.
16 Q. Okay. How long did you hold that position?
17 A. It was probably about a year and a half.
18 Q. And what was your position before that?
19 A. Prior to that, I was a director of pharmacy
20 within what used to be the old Humana system of
21 hospitals that then became Columbia Healthcare.
22 Q. And what were your responsibilities in that

---

Hal Goldman, Pharm D., R.Ph.          Confidential                    September 20, 2004
                                      Sunrise, FL

4 (Pages 10 to 13)

**10**

1  position?
2      A.  I was responsible for the fiscal responsibility
3  for the department, overseeing purchasing, overseeing
4  staffing, overseeing the clinical services.
5      Q.  Did this include the purchase of prescription
6  drugs?
7      A.  Yes, it did.
8      Q.  And how long did you hold that position?
9      A.  I was a director within that network for
10  probably just about ten years.
11      Q.  And prior to that, did you hold any other
12  positions with any other health plans?
13      A.  No.  Not at all.
14      Q.  Have you ever held a position with a
15  pharmaceutical company?
16      A.  No, I have not.
17      Q.  And have you ever held a position with a
18  government agency?
19      A.  Aside from being a reserve police officer.
20  That's the extent of anything with the government.
21      Q.  I want to ask you some questions about Vista
22  Healthplan.  What business is Vista in?

**11**

1      A.  Vista Healthplan is an insurance company with
2  multiple lines of business.  And we are an end payer for
3  services provided to our members.
4      Q.  When you say "multiple lines of business," what
5  lines are there?
6      A.  We have Medicare, Medicaid, small- and
7  large-group HMO business; we have individual; we have
8  POS, point of service, and PPO; we also have a product
9  called Long-Term Care; and also the Healthy Kids
10  program.  We're a provider for Healthy Kids in the
11  state.
12      Q.  And does Vista have any affiliated entities?
13      A.  Well, based on how our organization is set up,
14  we do have by state law -- and I'm not the expert on
15  this, but our PPO insurance plan is separate, called the
16  Vista Insurance Plan.  That is how the State regulates
17  it.  And we also have Vista of South Florida, which is
18  -- for legal reasons when the purchase was done a couple
19  years ago is still a separate regulated entity in
20  Florida.  But we rolled everything under the header of
21  just Vista.
22      Q.  The purchase that you referred to:  Is that the

**12**

1  purchase of Beacon?
2      A.  I'm sorry.  That was the Foundation Health
3  purchase.
4      Q.  Okay.
5      A.  To this day, they are known as Vista of South
6  Florida.
7      Q.  At some point in time, all or part of Vista was
8  known as Beacon Health Plans?
9      A.  Beacon was a separate healthcare plan.
10      Q.  Okay.  Was that purchased by Vista?
11      A.  Actually, Vista was the name that everybody
12  changed to.  They were separate entities that all rolled
13  under Vista.  There was no Vista prior to all the
14  purchases.
15      Q.  Where does Vista market its products at?
16      A.  We have the South Florida region of Dade,
17  Broward and Palm Beach County; and then we have the
18  Northern Florida market, which I believe -- I'd have to
19  get a county list, quite honestly, but it's north of
20  Orlando up through the panhandle.
21      Q.  Does it market anywhere outside of Florida?
22      A.  No, we do not.

**13**

1      Q.  And approximately how many members does Vista
2  have?
3      A.  Currently, we have about 327,000 members.
4      Q.  Does Vista have competitors for the provision
5  of health insurance?
6      A.  There are a multitude of competitors in the
7  Florida market.
8      Q.  And who are the major competitors?
9      A.  Humana; probably -- I would have to say United;
10  Blue Cross.  Those are probably the big ones.  There's a
11  whole bunch of other little ones out there, too.
12      Q.  And how does Vista compete with these other
13  entities?
14      A.  I'm not an expert on the marketing side.  But
15  everybody has benefits that they design and go out there
16  and just try and sell based on what we have, sell our
17  services, our networks, our pharmacy formulary.
18      Q.  Does Vista compete on price?  Does it try to
19  provide the lowest price?
20      A.  I don't know if I would say the lowest price.
21  I think it's a competitive price.
22      Q.  And do your customers care about the cost of

Hal Goldman, Pharm D., R.Ph.        Confidential                September 20, 2004
                                    Sunrise, FL

14

1 the products that are available to them?
2     A.  I'm sure they do, because as a consumer I would
3 be concerned.
4     Q.  What sort of things do the customers do to show
5 you interest in lower cost?
6     A.  I can't answer that. I'm not involved in that
7 component.
8     Q.  Is it important for Vista to keep its costs
9 down in order to provide a competitive price?
10     A.  Yes, it is.
11     Q.  And does that include pharmaceutical costs?
12     A.  Yes, it does.
13     Q.  What efforts has Vista made to reduce its
14 pharmaceutical costs over the last, say, 15 years?
15     A.  I can only speak for the past five.
16     Q.  That's fine.
17     A.  The big area that we look at is we look at how
18 we can provide effective drugs with the multitude of
19 generics that have come on the market. It's giving us
20 less expensive alternatives to the brand agents that are
21 on the market. As I would say, newer isn't always
22 better. Obviously, we do look at contracting with

15

1 pharmaceutical vendors.
2     Q.  Okay.
3     A.  The other thing we do is we talk to our
4 physicians about effective prescribing.
5     Q.  Has Vista ever used a benefits consultant?
6     A.  I do not know.
7     MR. LOVE:  You're talking about a PPM?
8     THE WITNESS:  Actually, yeah. Thanks.
9     Are you referring to someone that would help
10     our product development side or pharmacy side?
11 BY MR. WELLS:
12     Q.  When I say "benefits consultant," I'm referring
13 to someone who had advised the pharmacy side on what
14 pharmaceutical benefits to offer.
15     A.  Well, are you talking about co-pays, that type
16 of information, how much do we charge members? Or are
17 you talking about the drugs that we carry?
18     Q.  Why don't I ask both, just to clarify.
19     A.  In terms of co-pays, that comes out of product
20 development. That doesn't come out of pharmacy. I'm
21 not aware of them using consultants. They may and I
22 just don't know about.

16

1     In terms of a pharmacy benefit management
2 company, I've been here five years. The plan has always
3 held its own pharmacy and therapeutics meetings, called
4 P & T, to determine drugs that are carried in the
5 formulary. And those decisions are based on clinical
6 need.
7     Prior to that, I don't know how that -- how
8 they did that, quite honestly.
9     MR. WELLS:  I'd like to have this marked as
10     Exhibit 1, please.
11     (Thereupon, Exhibit Goldman 001 was marked
12     for identification.)
13 BY MR. WELLS:
14     Q.  And Dr. Goldman, have you seen this agreement
15 before?
16     A.  Yes, I have.
17     Q.  And what is this agreement?
18     A.  With Beacon Healthplan, because they were such
19 a small plan, Ravine Rx was a clinical consulting
20 company that actually acted on behalf of Beacon to do
21 pharmacy services. They really were a direct arm of the
22 healthcare plan. They held P & T meetings just as if it

17

1 was an in-house pharmacy services department. They were
2 just so small that they couldn't afford -- that Beacon
3 did not have their own internal staff do it.
4     Q.  So this was something that was changed when
5 Beacon was rolled into Vista?
6     A.  Yes, it was.
7     Q.  If we look at the agreement with Beacon that's
8 marked as Exhibit 1 and specifically on the second page,
9 Section 1.1.1 -- actually, it's 1.1. There's a section
10 entitled Clinical Pharmacy Services.
11     Can you tell me what clinical pharmacy services
12 are?
13     A.  Clinical pharmacy services is basically
14 pharmacists that provide information whether it's to
15 physicians, to members, internally, just as we do
16 currently. We have an internal staff that does that.
17     Q.  At Section 1.1.1 the agreement states,
18 "Clinical pharmacists will identify network physicians
19 with high prescription average cost and contact such
20 network physicians to address pharmacy cost."
21     Is that something that Ravine Rx did under this
22 agreement?

Hal Goldman, Pharm. D., R.Ph.          Confidential          September 20, 2004
Sunrise, FL

6 (Pages 18 to 21)

18

1    A.  I believe they did, yes.
2    Q.  Is that something that you as Vista continue to
3  do internally now?
4    A.  We have done it off and on over the past five
5  years I have been here.  We do try and do this.  Part of
6  it's really more education to physicians to know when
7  new generics are coming on the market.  It's not
8  punitive; it's more informative.
9    Q.  And why did Beacon seek this service from
10 Ravine Rx?
11   A.  Because they had no internal pharmacy staff.
12   Q.  And is that a service that would have saved
13 Beacon money?
14   A.  Potentially it could, yes.
15   Q.  And if we look at Section 1.2 of this agreement
16 that starts on the same page, Page 2, it's entitled Drug
17 Utilization Evaluation.
18       And it states -- and I quote -- "Ravine Rx will
19 assist network in developing a drug utilization
20 evaluation program, the DUE program.  The DUE program
21 will allow network to monitor on a monthly basis any
22 specific drugs in order to identify" -- we seem to have

20

1  put an online step there that's in place so we don't
2  physically have to intervene.  It's done automatically
3  at the point of service.  If the drug should be once a
4  day and if they try to do it twice a day, it will stop
5  that prescription from going through and prompt the
6  pharmacist in the network to make a phone call to the
7  doctor.  It saves lives.
8    Q.  Does it also save money?
9    A.  You know what?  It's not so much the financial
10 side as it is the clinical side of the safety issues.
11 Not everything we do is always saving money.  In some
12 cases, it can.  But in most cases, it's really to
13 prevent accidental overdoses and accidental death.
14   Q.  If we look at Page 11 of this agreement, it's
15 entitled Compensation Schedule.
16       Can you explain how Ravine Rx was compensated
17 by Beacon under this agreement?
18   A.  I wish I could.  At the time of acquisition,
19 when Vista was -- at the time it was the old HIP of
20 Florida that was the original organization that I was
21 with prior to the rollup of the plans.  We tried to
22 establish that.  And nobody could give us a clear

19

1  a copy error here.  Page 3 is missing.
2    A.  Right.
3    Q.  I apologize for that.  I think I can still ask
4  my questions based on what we have here.
5        Can you tell me what a drug utilization
6  evaluation program is?
7    A.  A DUE program is really looking for trends in
8  the market, looking at things that may be going on,
9  whether they're appropriate or inappropriate.  So by
10 putting a program together like this you can help
11 identify inappropriate doses, quantity limit issues,
12 where if a pill should be given once a day and maybe a
13 doc is prescribing it twice a day.  So by putting that
14 program together, you can put limits in place to prevent
15 inappropriate prescribing.
16   Q.  And is that something that Vista continues to
17 do now internally?
18   A.  Yes, it is.
19   Q.  And what sort of steps does Vista do in its
20 drug utilization program?
21   A.  We routinely review prescription utilization
22 patterns.  If we see things that are inappropriate, we

21

1  answer.  That was part of the reason that we went ahead
2  and moved forward with the termination of this
3  agreement.
4    Q.  When was the agreement terminated?
5    A.  I want to say somewhere around 12 or -- I
6  believe it was about 1 of '00.
7    Q.  Does Vista contract directly with medical
8  providers, doctors, hospitals, that sort of thing?
9    A.  Yes, we do.  We have a provider relations
10 department that is responsible for obtaining contracts
11 from those people and negotiating contracts.
12   Q.  And do you know what the terms of the contracts
13 are that they have with physicians?
14   A.  Each contract can vary based on negotiations;
15 and it also varies based on the line of business,
16 whether it's a Medicare line of business or a commercial
17 line of business.
18       And it's based on the need in that particular
19 area.  You know, a rural area may get a little bit more
20 aggressive contract than a metropolitan area may get.
21 So they do vary contract by contract.
22   Q.  How does Vista reimburse for physician-

Hal Goldman, Pharm D., R.Ph.  Confidential   September 20, 2004
          Sunrise, FL

7 (Pages 22 to 25)

22

1 administered drugs?
2  A.  Vista does not in most cases reimburse doctors
3 for physician-administered drugs.  We use what is called
4 a drug replacement program, where the doctor administers
5 the drug, and then we have a specialty provider that
6 will replace that drug in his office or he'll order it
7 ahead of time and we'll send it over specifically
8 labeled for that patient and it will be given for that
9 patient.  We reimburse the specialty provider at that
10 time.
11  Q.  Is the use of the drug replacement program one
12 of the terms of your agreements with providers?
13  A.  I'd have to look at the newer contracts to see
14 if they're now writing that in as a requirement.  As I
15 said earlier, in some cases if there is a rural doc that
16 doesn't want to participate, they may let him carve out
17 of that program and bill us on a traditional method.  We
18 do try to keep those prices as close to what we may pay
19 our specialty provider to help control the cost.
20  Q.  When you say that those doctors may be able to
21 bill at a traditional method, what type of method are
22 you talking about?

23

1  A.  Where they would actually submit a HCFA claim
2 form for the office visit plus the drugs administered.
3 Based on the contract we have with that doctor, they
4 would be reimbursed accordingly.
5  Q.  And if I understood you correctly, you said
6 that Vista endeavors to make sure that -- or attempts to
7 make sure that the reimbursement paid to doctors under
8 that system approximates the reimbursement that it would
9 pay its specialty pharmacy?
10  A.  We try to, yes.
11  Q.  And how do you do that?
12  A.  It gets written into the contract accordingly.
13  Q.  Do you know who your current specialty pharmacy
14 is for that?
15  A.  Yes, I do.  The vendor is Florida I.V.
16 Services.
17  MR. WELLS:  I'd like to mark this as Exhibit 2.
18  (Thereupon, Exhibit Goldman 002 was marked
19  for identification.)
20 BY MR. WELLS:
21  Q.  I'm marking as Exhibit 2 is document entitled
22 Contract Approval and Control Form.  It bears Bates Nos.

24

1 BHP 1122 through 1204.
2  And Dr. Goldman, have you seen this document
3 before?
4  A.  Yes, I have.
5  Q.  And what is this document?
6  A.  This is the contract we have currently in place
7 with Florida I.V. Services that was negotiated by our
8 provider relations department.
9  Q.  If we turn to -- it begins with Bates No. 1183.
10 It's towards the back.  There's a 23-page spreadsheet
11 entitled Attachment C, pricing based on 8-30-01
12 proposal.
13  A.  Yes.
14  Q.  Is this the current pricing that's in place
15 between Vista and Florida I.V. Services?
16  A.  The terms are correct.  The actual dollar you
17 see here probably has changed over the time frame since
18 it's been in place because of price changes.
19  Q.  So when you say "the dollars," you're talking
20 about the furthest column on the right?
21  A.  Well, actually, probably both the left and
22 right columns, because of AWP.  That would reflect the

25

1 change -- or down there.  That would reflect the change.
2  Q.  Oh, okay.  And if we look at this document,
3 specifically looking at Page 1, it would appear that
4 there is a category of drugs called additives.  Is that
5 correct?
6  A.  Yes.
7  Q.  And how does Vista compensate Florida I.V.
8 Services for additives?
9  A.  It would be based on the current average
10 wholesale price minus 12 percent.
11  Q.  And on the same page -- and it continues
12 through to Page BHP 1186 -- there appears to be a second
13 category entitled Antibiotics, Anti-Fungals,
14 Anti-Virals.
15  How does Vista compensate Florida I.V. Services
16 for that category of drugs?
17  A.  That is done at average wholesale price minus
18 14.
19  Q.  And do you know how it came to be that the
20 additives category was priced at AWP minus 12 and the
21 antibiotics, et cetera, category was priced at AWP minus
22 14 percent?

Hal Goldman, Pharm. D., R.Ph.    Confidential    September 20, 2004
Sunrise, FL

8 (Pages 26 to 29)

**26**

1     A. No, I do not.
2     Q. Is it fair to say that that was a product of
3 the negotiations between Vista and Florida I.V.
4 Services?
5     A. Yes, it was.
6     Q. If we look at Page BHP 1186, there is a
7 category of drugs for chemotherapy. Do you see that?
8     A. Yes, I do.
9     Q. And how does Vista compensate Florida I.V.
10 Services for chemotherapy drugs?
11     A. That is based on their wholesale acquisition
12 cost plus 4 percent.
13     Q. So the pricing under this contract for
14 chemotherapy drugs is not based on AWP?
15     A. That is correct.
16     Q. Do you know how it came to be that chemotherapy
17 drugs were priced at WAC plus 4 percent?
18     A. Actually, on -- any of the products on these
19 pages are WAC-plus products. Those are drug replacement
20 programs that go to a physician's office. So it's a
21 standard of practice within the specialty providers to
22 price those products based on their acquisition cost.

**27**

1     Q. When you say "acquisition cost," whose
2 acquisition cost?
3     A. The specialty provider's acquisition cost.
4     Q. Is WAC then intended to represent the specialty
5 provider's acquisition cost?
6     A. Yes, it is.
7     Q. And do you know why the reimbursement to the
8 specialty provider was marked up 4 percent over WAC?
9     A. That was purely based on negotiations.
10     Q. Is it fair to say that if WAC represents the
11 provider's -- the specialty provider's acquisition
12 costs, then WAC plus 4 percent would provide them a
13 margin on providing that drug?
14     A. That is correct.
15     Q. If you look further on in the spreadsheet,
16 there's a category that starts on BHP 1188 and continues
17 through 1191. The category is called Fixed Pricing.
18     And is it fair to say that the drugs that are
19 reimbursed in this category are done so at a
20 predetermined price?
21     A. They are. And they're not all drugs. That's
22 one thing I want to point out, is that a lot of the

**28**

1 items in here are supplies. So it's done just for
2 pricing like that.
3     Q. I hope no one is eating or injecting Disetronic
4 batteries. I do understand that point.
5     But there are at least some drugs that are
6 subject to the fixed pricing standard; is that correct?
7     A. Yes. And if you'll notice, a lot of drugs that
8 are set at fixed pricing have -- are almost a zero. If
9 you look across to the column of what we will pay,
10 they're blank. There's a dash.
11     The reason for that is these are additives that
12 go into feedings for patients that are called TPM, total
13 parental nutrition. I believe -- and I don't know where
14 it is on here, but there's a set fee for TPM. So the
15 items that are fixed price we don't get charged extra
16 for. It's inherent in that master fee for the price of
17 a TPM per day, whether it's per liter per day or per how
18 many liters per day. That's why they're actually fixed
19 pricing.
20     Q. That fee that you talked about: Is that paid
21 by Vista to the specialty pharmacy?
22     A. Yes, it is.

**29**

1     Q. And that covers for lack of a better term the
2 bundle of all of the products that go into providing TPN
3 to a patient?
4     A. What would be considered standard additives.
5 There may be a few on the other pages that are not
6 considered part of the standard package and are charged
7 for separately.
8     Q. Okay. If we look at -- I'll try to make an
9 example here: On BHP 1189, there's something called
10 Lyposin III. Do you see that?
11     A. Yes.
12     Q. Okay. Do you know what that product is?
13     A. That is fat. That is infused with the TPN as a
14 separate item to coat the vein so the solution does not
15 burn the veins and also to give the member extra fat
16 product.
17     Q. And how does Vista compensate its specialty
18 pharmacy for that product?
19     A. There's a fixed pricing depending on -- well,
20 actually, they're all the same price on this one, at
21 $18.
22     Q. How did Vista come up with $18 for the

Hal Goldman, Pharm D., R.Ph.       Confidential                September 20, 2004
                                   Sunrise, FL

30

1  compensation?
2      A.  This was based on pricing provided to us by
3  Florida I.V. during contract negotiations.
4      Q.  When you say "pricing provided by Florida I.V.
5  services during the contract negotiations," what do you
6  mean by that?
7      A.  At the time, we had two vendors that were
8  trying to obtain our business.  They both sent in
9  pricing bids for the proposal to us to see who would
10  gain our business.
11     Q.  And who was the second vendor that was trying
12  to obtain your business?
13     A.  The second vendor was the incumbent at the
14  time, which was called CuraScript.
15         MR. WELLS:  I'd like to mark Exhibit 3, please.
16         (Thereupon, Exhibit Goldman 003 was marked
17     for identification.)
18  BY MR. WELLS:
19     Q.  Exhibit 3 is a letter dated February 9th, 2001,
20  from CuraScript to HIP Healthplan of Florida, Inc.
21  There is also a handwritten notation at the top of it
22  that says, "To Hal - pharmacy."  It bears the Bates Nos.

31

1  BHP 1205 through BHP 1260.
2      A.  Correct.
3      Q.  First of all, I assume you're the Hal that's
4  referenced at the top?
5      A.  Yes.
6      Q.  So it's fair to say you've seen this document
7  before?
8      A.  Yes, I have.
9      Q.  What is this document?
10     A.  The entire document is the contract we had with
11  the company that was then called OncoScripts.  They then
12  merged with CuraScript.  There's probably a document
13  talking about that in here.  So there's multiple
14  documents in this packet.
15     Q.  And the preexisting contract with CuraScript:
16  Is that what starts at BHP 1212?
17     A.  Let me take a look.  I believe that was
18  correct.  Actually, the original document started on
19  1220.  BHP 1220 was the initial one.
20     Q.  Okay.  And then what is the document we see
21  between 1212 and 1219?
22     A.  At the time that we merged under Dr. Scott's

32

1  ownership when he purchased HIP and then we had Beacon,
2  we also had Foundation.  We then started to use a
3  joinder agreement to join the new entities on to
4  existing contracts, whether it was a Vista -- an old HIP
5  contract that survived or an old Beacon contract or
6  potentially an old Foundation contract.
7          So this is actually the joinder adding the
8  North Florida plan at the time that was called
9  Healthplan Southeast, the Vista Insurance Plan,
10  Foundation and Beacon all on to this master agreement
11  that was then under the name of HIP.
12     Q.  Okay.  And what about the document at BHP 1208?
13     A.  This was performed for us at the time when we
14  were integrating the then-Foundation business under
15  Vista to show the savings that could be obtained based
16  on the vendor that was serving Foundation's line of
17  business prior to purchase.
18     Q.  And do you know what that vendor was?
19     A.  That vendor was, I believe, I.V. and Pulmonary
20  Services.
21     Q.  Was this a bid of sorts, then, that was
22  submitted by CuraScript?

33

1      A.  It was kind of an impromptu showing us about
2  rolling the business away from that vendor, that they
3  could save us money.
4      Q.  Okay.  And how could they save you money?
5      A.  I'd have to look at this.  It's been a while.
6  They calculated some drug savings and showed what their
7  charges would be versus what we were paying.  This is
8  what actually led to us going out to bid with the
9  other -- with another vendor, so that we wanted to do it
10  the right way and get price quotes from other people,
11  not just take an unsolicited bid.
12     Q.  Okay.  If we look at the numbers at the bottom
13  of Page 1208, there are several drugs listed there.
14  There's also a column entitled AWP, and the next column
15  is entitled Current Vendor AWP Minus.
16         Are those the prices that you were paying to
17  I.V. and Pulmonary Services at that time?
18     A.  These were speculative prices by CuraScript, as
19  we did not give them pricing.
20     Q.  Okay.
21     A.  This was a shot based on what everybody knows
22  everybody charges in the community.  And they were a

Hal Goldman, Pharm D., R.Ph.          Confidential          September 20, 2004
Sunrise, FL

10 (Pages 34 to 37)

34

1 small local player, so CuraScript assumed that they
2 would automatically be able to do better.
3     Q.  Florida I.V. and Pulmonary Services was a local
4 player?
5     A.  Yes.  Yes.
6     Q.  Do you know how CuraScript came up with the
7 numbers in the current vendor AWP minus?
8     A.  Purely based on knowledge of the community.  I
9 had questioned that with them at the time we did this.
10     Q.  And what did they say their knowledge that was
11 allowed them to come up with this?
12     A.  They figured based on what that company had for
13 buying power, based on their size, they were a single
14 pharmacy in the South Florida market, that this should
15 be about what their prices would be.  Here again, that's
16 why this didn't do much with us except have us go out to
17 bid.
18     Q.  Okay.  Do you know if their speculative prices
19 in the current vendor AWP minus were accurate?
20     A.  I didn't even look, to tell you the truth.
21     Q.  Do you know if the numbers they list for AWP
22 are accurate?

35

1     A.  I would have taken a guess that they would have
2 been correct.  I didn't look at each product, look each
3 one up separately.
4     Q.  Okay.  Now, you said this was the document that
5 caused you to go out to seek bids.  Are you talking
6 about for Foundation?
7     A.  No; for the entire organization.
8     Q.  For the entire organization?
9     A.  Yes.
10     Q.  And how did that process work?
11     A.  CuraScript was the incumbent we had asked to
12 please submit updated pricing, with the size of our
13 organization.
14        At the time the initial contract was done under
15 the HIP name, we were 200,000 lives.  At the time we
16 went out to bid, we were probably closer to probably
17 400,000 lives at the time.  We've lost membership over
18 the years.
19        So we felt we should be able to buy better
20 because we were a bigger organization.  So we had them
21 as our existing player and then Florida I.V., who
22 happens to be very local to us, only a couple miles from

36

1 our office.  Due to prior knowledge of them through
2 somebody in the provider's network, they requested to
3 bid on -- from them on our behalf.
4     Q.  Did you request a bid from anybody else?
5     A.  No, we did not.  We wanted to keep our business
6 local.
7     Q.  There's one thing I think I'm still not
8 understanding.
9     A.  Sure.
10     Q.  This document, 1208, you said was submitted to
11 compare CuraScript with I.V. and Pulmonary Services?
12     A.  That was the -- right.  Let me back up a tiny
13 bit on history.
14        Foundation Healthplan was due to get rolled
15 under the Vista contract.  And before we did that,
16 administration wanted us to go out to bid.  So knowing
17 it was going out to -- you know, that's kind of where
18 this happened.  CuraScript said, "We can save you this
19 money while you're taking so long to roll the Foundation
20 block of business over to our control," as we had done
21 with the Beacon business and we were starting to do with
22 our North Florida business.

37

1     Q.  So CuraScript was the incumbent in one line of
2 business and I.V. and Pulmonary Services was the
3 incumbent in another?
4     A.  Exactly.
5     Q.  Thanks.  That does clarify that.
6     A.  Yes.
7     Q.  So as a result of getting this from CuraScript,
8 you went into the bidding process?
9     A.  Yes, we did.
10     Q.  And you received a bid from CuraScript.  Is
11 that correct?
12     A.  That is correct.
13     Q.  And you received a bid from Florida I.V.
14 Services?
15     A.  That is correct.
16     Q.  Did you get a bid from I.V. and Pulmonary
17 Services?
18     A.  No, we did not.
19     Q.  Did you ask for one?
20     A.  We did not.  We chose not to.
21     Q.  And why not?
22     A.  We felt that it went back to buying power.

Hal Goldman, Pharm D., R.Ph.  Confidential  September 20, 2004
Sunrise, FL

11 (Pages 38 to 41)

38

1  They were a very small provider in the area, and we just
2  felt that they couldn't compete with the pricing that we
3  were going to be getting from the current vendor.
4      Q.  In the bidding process, did CuraScript submit a
5  new bid or did they rely on this that they had
6  submitted?
7      A.  CuraScript submitted new pricing.
8      Q.  What was the terms of that pricing?
9      A.  Boy, it was actually very similar to the
10  attachment that Florida I.V. has, to be honest. Their
11  pricing was very, very competitive between the two
12  vendors.
13     Q.  When you say "the pricing that Florida I.V.
14  Services had," that's the spreadsheet that we were
15  looking at in Exhibit 2?
16     A.  Yes, that is correct. The similar AWPs and
17  similar WAC pluses.
18     Q.  So under the CuraScript's proposal, some of the
19  drugs were based on AWP minus a percentage discount?
20     A.  Yes.
21     Q.  And some of them were based on a WAC plus
22  percentage basis?

39

1      A.  That is correct.
2      Q.  And were some of the drugs based on fixed
3  pricing?
4      A.  Yes.
5      Q.  If we look actually back at Exhibit 2, it's
6  Page BHP 1191. There is a category of drugs called
7  IVIG.
8      A.  Yes.
9      Q.  And what are those?
10     A.  That is intravenous Immuglobin.
11     Q.  And what is that?
12     A.  For patients that may be immunosuppressed that
13  need a boost to their immune system.
14     Q.  And how does Vista compensate Florida I.V.
15  Services for those drugs?
16     A.  It's based on what's written here. It's AWP or
17  acquisition cost plus 10 percent, whichever may be
18  higher.
19     Q.  And how does Vista determine the acquisition
20  cost?
21     A.  It's -- here again, it's the wholesale
22  acquisition cost at what Florida I.V. would pay. We

40

1  have a right to audit their invoices anytime we choose.
2      Q.  Has Vista ever actually done an audit of
3  Florida I.V. Services?
4      A.  We have done one audit through our internal
5  audit department. But they were really looking more at
6  the process of the drugs going through there to make
7  sure we had a closed loop of prescriptions written for
8  that patient. It was delivered to that doctor's office,
9  and that doctor's office had documentation of giving the
10  drug. We have not done an invoice audit as of yet.
11     Q.  Have you ever considered doing such an audit?
12     A.  We are trying to get it on the schedule, as a
13  matter of fact, with our internal auditing team.
14     Q.  Is there a reason why you're considering it?
15     A.  Just to make sure they're in compliance with
16  the contract.
17     Q.  So the acquisition cost plus 10 percent in here
18  you actually believe is based on WAC, then?
19     A.  Not WAC as defined as the price that's
20  established by drug company; but in the -- in the
21  concept of this contract, as we discussed earlier, it's
22  defined as their acquisition cost, Florida I.V.'s actual

41

1  acquisition cost of the product.
2      Q.  Is that also true, then, for the chemotherapy
3  drugs that we talked about earlier?
4      A.  That is correct. That holds true for all
5  products that are listed as an acquisition price or a
6  WAC cost.
7      Q.  And that's the actual acquisition cost by
8  Florida I.V. Services?
9      A.  That is correct.
10     Q.  And they've disclosed that information to you
11  as part of this contract?
12     A.  As part of this contract, the assumption we
13  made and we will validate with an audit is that if we
14  took 10 percent off what they're billing us at the
15  current time -- obviously, we can't go based on the
16  prices here, because this is quite a few years old --
17  then we should see an invoice to match that price.
18     Q.  The proposal that you got from CuraScript: Did
19  it also contain pricing for some drugs that was based on
20  their actual acquisition cost?
21     A.  Yes, it did.
22     Q.  Do you know what drugs that was for?

Hal Goldman, Pharm. D., R.Ph.    Confidential    September 20, 2004
Sunrise, FL

12 (Pages 42 to 45)

42

1    A.  It would have been the same class.  It was the
2  same type of setup.  Drugs that were sent to physicians'
3  offices were usually the ones that are on a WAC plus
4  basis.
5    Q.  If we look back at Exhibit 3, which is --
6  specially Page BHP 1208, which is the proposal from
7  CuraScript, at the top it says "Quarterly dispensing fee
8  savings."
9    Can you explain what that means?
10    MR. MACORETTA:  I'm sorry.  What page?
11    MR. WELLS:  BHP 1208.
12    MR. MACORETTA:  Oh, back to 1208.  Okay.
13    THE WITNESS:  Some vendors charge dispensing
14  fees; and that also helps to cover potentially how
15  they bid the price in on the drug.  A dispensing fee
16  could be $1.65.  Traditionally in our retail
17  pharmacy network, we pay pharmacies anywhere from
18  1.50 to $2.
19    In the case of their bid, I do know that they
20  were correct in making that.  There was a dispensing
21  fee, because there was one in the I.V. and Pulmonary
22  contract for everything that went out.  We did pay

43

1  them a dispensing fee.  Most specialty pharmacy
2  vendors do not charge dispensing fees.
3  BY MR. WELLS:
4    Q.  Below, it also says "Quarterly prompt pay
5  savings."  Can you explain what that means?
6    A.  I'd have to think back about this one.
7  Somewhere along the line in our HIP contract, we got an
8  additional 1 percent, I believe, if we paid within 15
9  days.  So they -- it may have been 2 percent, but they
10  calculated the prompt payment we would also obtain from
11  them as an added value.
12    Q.  So that was a discount that you were able to
13  get from CuraScript?
14    A.  That is correct.
15    Q.  And did that affect the net pricing of the
16  drugs for Vista?
17    A.  Yes, it did.
18    Q.  Is that also true of the dispensing fees?
19    A.  There were no dispensing fees with CuraScript.
20  So that is true.  Yes.  It does affect the cost of
21  drugs.  Yes, it does.
22    Q.  It's very easy when you ask my questions.

44

1    A.  Sorry.
2    Q.  No problem.  That was the question that I was
3  going to ask.
4    Just to clarify, the dispensing fee under the
5  I.V. and Pulmonary Services contract affected the net
6  price of the drugs?
7    A.  Yes, it did.
8    Q.  The pricing that we see on Page BHP 1208, the
9  CuraScript price column:  That's their price proposal to
10  you?
11    A.  That was based on the then-existing contract we
12  had that was attached to this page.
13    Q.  And do you know what the basis was for coming
14  up with those prices?
15    A.  Well, in terms of the rate?
16    Q.  Yes.
17    A.  It was based on negotiations that were held
18  back in probably 1999 or early 2000.  I think it was
19  '99.
20    Q.  Do you know if that price was based in any way
21  on AWP?
22    A.  I believe, because these were all drug

45

1  replacement drugs, these were all based on their
2  acquisition cost plus.  These would have been WAC plus
3  drugs.
4    Q.  So if we look at, for example, Anzemet, 20
5  milligrams, which is the first one listed, that contains
6  an AWP of $173.16 and a CuraScript price of $89.41.  Is
7  that correct?
8    A.  Yes.
9    Q.  And do you know how much of a discount off the
10  AWP that price represents?
11    A.  I'd have to do the numbers.  Let's see.
12    MR. LOVE:  Can we stipulate it is whatever it
13  is?
14    MR. WELLS:  We can.  I did the math myself last
15  night, and it comes out to 51.63 percent.
16    THE WITNESS:  Oh, the CuraScript price?
17  BY MR. WELLS:
18    Q.  Yes.
19    A.  I'm sorry.  I was calculating it off the
20  current vendor price.
21    There would be no correlation in theory based
22  on two different contractual relationships.

Hal Goldman, Pharm D., R.Ph.          Confidential                    September 20, 2004
                                      Sunrise, FL

46

1    Q.  Could you explain that? I'm sorry. I'm not
2  sure I understand.
3    A.  The AWP for both vendors would be the same, but
4  the acquisition cost may not be the same based on buying
5  power. CuraScript had seven pharmacies across the
6  United States, whereas I.V. and Pulmonary is one
7  pharmacy down in South Florida.
8      So to really do an apples-to-apples comparison,
9  you would have to do -- I'd rather it would be a
10  WAC-to-WAC comparison, based on the contract we had.
11  But that's -- yeah. That would be about a 50-something
12  percent discount. That is true.
13    Q.  If we look again at Exhibit 3, going back to
14  Page BHP 1254, is this the portion of the contract that
15  discusses the reimbursement to CuraScript under the
16  existing arrangement?
17    A.  At the time they calculated BHP 1208, they used
18  these pricings. And because Anzemet would be considered
19  related injectables to people on therapy, it would have
20  been an acquisition cost plus 10 percent contract.
21    Q.  So looking back at BHP 1208 -- and we'll stick
22  with our example of Anzemet -- the $89.41 listed as the

47

1  CuraScript price is actually their acquisition cost plus
2  10 percent. Is that correct?
3    A.  Based on the contract, yes, that is correct.
4    Q.  So I apologize, because I didn't do the math on
5  this one.
6    A.  That's okay.
7    Q.  But CuraScript's acquisition cost in this case
8  would be somewhere in the neighborhood of $80, then?
9    A.  Just about.
10    Q.  And that is more than a 50 percent discount off
11  the AWP listing of $173.16. Is that correct?
12    A.  Yes. That is correct.
13      MR. WELLS: This is going to be Exhibit 4.
14      MR. LOVE: Why don't we mark that and we'll
15    take a two-minute break.
16      MR. WELLS: No problem.
17      (Thereupon, Exhibit Goldman 004 was marked
18    for identification.)
19      (Thereupon a recess was taken, after which the
20    following proceedings were had:)
21  BY MR. WELLS:
22    Q.  Exhibit No. 4, Page BHP 36. And Dr. Goldman,

48

1  is this the approval for the contract with OncoScripts?
2    A.  Yes, this was.
3    Q.  Okay. And if we look at the section marked
4  Summary of Contract/Comments, it states, "Pharmacy
5  contract for injectables and I.V. drugs to replace
6  relationship with Med Decisions: already reviewed by
7  legal, medical and pharmacy and signed off on."
8      Who is Med Decisions?
9    A.  That's an error. That's not what it should
10  have been.
11    Q.  Okay.
12    A.  That should have been -- oh, God -- I can't
13  believe I'm going blank on the company name.
14      MR. LOVE: MedChoice?
15      THE WITNESS: MedChoice. Thank you.
16      MedChoice was the vendor at the time who
17    actually went out of business. They filed Chapter
18    11 in Florida.
19  BY MR. WELLS:
20    Q.  And what is the estimated fiscal impact of the
21  new contract with OncoScripts?
22    A.  Based on the numbers here, it was 600,000 at

49

1  the time.
2    Q.  That's a savings of 600,000?
3    A.  Yes. That's correct.
4      MR. WELLS: I'd like to mark 5, 6 and 7 please.
5      (Thereupon, Exhibit Goldman 005, Exhibit Goldman 006,
6  Exhibit Goldman 007 were marked for identification.)
7
8  BY MR. WELLS:
9    Q.  If we look at Exhibit 5, this is a service
10  agreement amendment between HIP Healthplan of Florida
11  and MedChoice, Incorporated, that bears the Bates Nos.
12  BHP 1722 through 1742.
13      Exhibit, I believe -- is the one-pager Exhibit
14  7?
15    A.  Yes.
16    Q.  Exhibit 7 bears the Bates No. BHP 1721; and
17  that is an amendment between HIP Healthplan of Florida
18  and MedChoice Pharmacy and Home Infusion Therapy
19  effective October 1st of 1997.
20      MR. MACORETTA: What was Exhibit 6?
21      MR. WELLS: Exhibit 6 is an ancillary provider
22    participation agreement with MedChoice. It bears

Hal Goldman, Pharm D., R.Ph.    Confidential      September 20, 2004
Sunrise, FL

14 (Pages 50 to 53)

50

1   the Bates No. BHP 1682 through 1718. That is dated
2   October 1st of 2000.
3      MR. MACORETTA: Okay.
4   BY MR. WELLS:
5     Q. Have you seen these three documents before?
6     A. Yes, I have.
7     Q. And are these documents the agreements with
8   MedChoice?
9     A. That is correct.
10     Q. And if we look at Exhibit 5 on the first page,
11   how is Vista or at the time HIP Healthplan of Florida
12   compensating MedChoice for drugs under this agreement?
13     A. This -- based on Page 1, this had to do with
14   replacement of agents to people that were in skilled
15   nursing facilities. So they were AWP minus 16 plus a
16   dispensing fee of $1.50 if it was a brand drug.
17     If it was a generic drug, it was AWP minus 16
18   percent plus a $1.50 dispensing fee.
19     If the product was under what we call a HCFA
20   MAC, MAC being the maximal allowable that we would pay,
21   it would be plus a $1.50 dispensing fee.
22     Q. If you look at the second page of this

51

1   agreement, BHP 1723, does this provide the reimbursement
2   for pharmaceuticals under the drug replacement program?
3     A. Based on about the third paragraph down under
4   drug replacement, yes, it does. And it gives the
5   pricing.
6     Q. What was that pricing?
7     A. That would have been AWP less 10 percent.
8     Q. And if we look at the next line, it states,
9   "All supplies, trays and equipment associated with the
10   drug replacement program will be reimbursed at
11   acquisition price plus 6 percent."
12     Is that accurate?
13     A. Yes, sir. At that time it was.
14     Q. And why were those products reimbursed on the
15   basis of acquisition price, whereas the drugs and
16   pharmaceutical agents were based on average wholesale
17   price?
18     A. I was not here at the time; and it was based on
19   the contracts that were negotiated.
20     Q. If we look at Page BHP 1734 through 1741, there
21   is a chart entitled MedChoice, Inc., Schedule B. And
22   does this chart concern reimbursement for drugs?

52

1     A. I believe it did.
2     Q. And how does this chart work?
3     A. Based on the product, the drug cost was listed
4   in the drug column. This is what we would have paid.
5     Q. Okay. And --
6     MR. LOVE: I'm showing him the first page, if
7   he cares to look at it, 1732.
8   BY MR. WELLS:
9     Q. I apologize. I guess the chart does start at
10   32.
11     A. But the pricing column is pricing -- we would
12   have based them based on their commission on a HCFA 1500
13   form.
14     Q. And do you know how these numbers in the drug
15   cost column were arrived at?
16     A. Absolutely not.
17     Q. Do you know if they're based on AWP?
18     A. Based on what they're -- I mean, if you look
19   at the contract, I believe there was some comment
20   here. These are considered home health products. I
21   can't remember if there was a phrasing on how home
22   health was covered. Let me look through real quick

53

1   under compensation.
2     No, I do not. Based on this, I'm not sure how
3   these prices were established.
4     Q. Is it fair to say that this is a fixed price
5   that would last the length of the contract?
6     A. I don't know if that would be a fair answer.
7     Q. Why not?
8     A. If an AWP were to go up over the length of the
9   contract -- and products tend to go up maybe two times a
10   year -- this was a three-year agreement. Towards the
11   end of three years, they could potentially be losing
12   money on a product. So I would think that these must
13   have been changes based on some sort of calculation,
14   that they were updatable.
15     Q. But you're not sure what that calculation is?
16     A. No, I am not.
17     Q. And you're not certain it was based on AWP?
18     A. No, I'm not.
19     Q. And when did MedChoice go out of business?
20     A. They went out of business and came back.
21   That's why they actually -- we switched vendors. I
22   believe our effective date on the CuraScript contract or

Hal Goldman, Pharm D., R.Ph.          Confidential          September 20, 2004
Sunrise, FL

15 (Pages 54 to 57)

---

**54**

1  OncoScripts contract was 1-00.
2        Somewhere in July or August, they started
3  having financial problems. That's what prompted us to
4  look at OncoScripts at the time, who is a vendor for our
5  parent company up in New York. They were a vendor for
6  HIP of New York. That's how we ended up contracting
7  with them on that. We saw there was going to be a
8  problem.
9        And somewhere either in the end of '99 or very
10  beginning of '00, they officially filed bankruptcy.
11  Then they came back to be -- a couple years later, Rob
12  Stevens somehow managed to get the name back and re-form
13  the company. He had sold the company, and that's how
14  they ended up going bankrupt.
15      Q.  Okay. When you said July or August, you were
16  talking about 1999?
17      A.  That is correct. We started hearing rumblings
18  that there was some financial problems and actually
19  spoke directly with them. And they told us that, yes,
20  it was true.
21      Q.  Then the agreement we've marked as Exhibit 6
22  actually takes effect?

---

**55**

1      A.  For Beacon Healthplans, because I believe
2  Exhibit 6 is a Beacon plan. Yes, that is correct.
3      Q.  Okay.
4      A.  At the time we integrated with them, which was
5  very short lived, actually, October of 2000 -- we were
6  purchased by Dr. Scott under the old HIP right about
7  October of 2000. And somewhere right around the first
8  of the year, we did terminate our relationship with
9  MedChoice for Beacon, on Beacon's behalf.
10      Q.  Were they then an incumbent provider to one of
11  your lines of business when you were seeking the bids
12  from CuraScript?
13      A.  They were an incumbent provider to one of the
14  companies, not really a line of business. It was purely
15  Beacon Healthplans. So they were the incumbent there.
16      Q.  And had Beacon come under the -- what is now
17  the Vista umbrella at that point?
18      A.  Yes. They were actually purchased prior to
19  HIP. They were one of the initial purchases.
20      Q.  Are the providers that contract with Vista
21  compensated in any way for participating in the drug
22  replacement program?

---

**56**

1      A.  Traditionally what's been done in the past is
2  doctors that participated in the drug replacement
3  program for an infused drug such as we'll cover get a
4  little bit more of an infusion fee versus what a
5  vendor -- a doctor that may be billing us for their
6  drugs.
7        We feel that's a better win for both sides.
8  The provider doesn't have to wait; he doesn't have to
9  inventory drug on his shelves; he doesn't have to wait
10  for us to pay the claim. He waits for us to pay for
11  truly his services rendered within our turnaround time
12  of claims payment. I don't know if he still does it
13  that way.
14      Q.  And is the infusion fee meant to compensate the
15  provider for his services, then?
16      A.  Yes, it is.
17      Q.  Do the providers negotiate the amount of that
18  infusion fee?
19      A.  They do that with our provider relations
20  account people. Yes, they do.
21      Q.  I think you had said earlier -- correct me if
22  I'm wrong -- that the provider agreements are

---

**57**

1  individually negotiated?
2      A.  Yes, they are.
3      Q.  And is that one of the terms that is at least
4  sometimes negotiated?
5      A.  Yes. Infusion fees are one of the items that
6  are.
7      Q.  Do you know if those fees are consistent across
8  practice types?
9      A.  They're close within practice types. What will
10  differentiate it is if we really need a doctor to
11  participate in our organization and he's in a rural area
12  in the panhandle, we may need to give him a few extra
13  dollars in order to get him into our plan to
14  participate, versus a doctor that's in the
15  Miami-Ft. Lauderdale area, where we've got, you know, a
16  whole host of physicians. So it does vary by area of
17  practice.
18      Q.  When you say "area," you're talking about
19  geography?
20      A.  Geography.
21      Q.  What about the sort of specialty types between,
22  say, chemotherapy and, you know, nephrology or some

---

Hal Goldman, Pharm D., R.Ph.          Confidential                    September 20, 2004
                                      Sunrise, FL

16 (Pages 58 to 61)

58

1   other?
2       A.  The oncologist will get maybe a different fee
3   because theirs are maybe more high tech than a
4   rheumatologist who's doing an infusion for arthritis.
5   So there may be some differences based on the contract
6   language.
7       It may even vary in an oncologist's language if
8   it's a high-tech infusion versus a lower-tech infusion.
9   And those can get spelled out a whole host of ways
10  depending upon the type of product we have.
11      Q.  Which factors does Vista consider in setting
12  the infusion fee that it pays to providers?
13      A.  Based on the knowledge I have, it's based on
14  what we actually discussed.  It's based on a physician's
15  practice location, do we need that physician in our
16  network, and how important is he to participate in our
17  drug replacement program based on our purchasing power
18  with volume.
19      Q.  Does Vista ever consider whether it's necessary
20  to increase the amount of the infusion fee to keep a
21  doctor who may already be in the network from referring
22  people to hospitals to get injectable drugs?

59

1       A.  You always want to do things that are
2   office-based that can be done in an office.  So I think
3   that would be a factor that might be considered.  Here
4   again, it also depends on, do we have 20 doctors in that
5   geographic location that we could just decide to remove
6   the doctor from our panel and refer that line of
7   business somewhere else?
8       Q.  Why is it that Vista wants to always, if
9   possible, do these sorts of services in the provider
10  offices?
11      A.  There's probably a couple of reasons for that.
12  Number one, of course, there is a higher cost of doing
13  an infusion in an outpatient or hospital setting.
14  There's also a time for a member.  Traditionally, with
15  infusions in a physician's office you don't have the
16  long waiting period; so less time lost from work, less
17  time lost from family time.
18      The third thing is, putting somebody into an
19  infusion center or a hospital to get an infusion exposes
20  them to a lot more germs than you do in a doctor's
21  office.  So then you're increasing the risk of how
22  you're getting what we call an invasive procedure, which

60

1   is the needle in the arm, so there's a higher chance --
2   not that I want to speak badly about hospitals, but
3   there's always a higher risk of infection that hospitals
4   have versus having this done in a doctor's office.
5       Q.  You talked about the situation and I think you
6   gave the example of Miami, where there might be a lot of
7   doctors in a given area.  Do those doctors compete to be
8   in your network?
9       A.  Some do; some may choose not to.  It does vary.
10  We do get requests from doctors to come on our panel and
11  we also get requests from members to have doctors that
12  they're comfortable with that we've got on the panel if
13  they may be a new member from a new group.
14      Q.  How do the different providers compete to get
15  onto the panel?
16      A.  I don't know if it's so much competition.
17  Florida is an any-willing-provider state.  However, they
18  have to agree to the terms.  So there is always ways if
19  you didn't want to have a provider, you don't have to
20  bring them on board.  But it's just a matter of our
21  need.
22      We also don't want to saturate the marketplace

61

1   and have a doctor that has -- if it's a PCP, primary
2   care provider, that has only two patients, and we've got
3   maybe another one that has 70 or 80.
4       Q.  You said earlier that one of your lines of
5   business was for Medicare.  Do you know how providers
6   that participate in that line of business are
7   compensated for administering drugs?
8       A.  It varies.  It may have been based on an AWP
9   minus; it can be based on the medication allowables; it
10  can be a whole host of negotiations that have gone on.
11  Each contract would have to be looked at to look at the
12  terms.
13      But here again, we try not to reimburse
14  transactions for drugs administered.  We really try to
15  keep them in the drug replacement program.
16      Q.  Drug replacement therapy.  That's even true for
17  Medicare?
18      A.  That's not based on a line of business.  It's
19  purely a company policy that we try to keep in place.
20      MR. WELLS:  Off the record for just a second.
21      (Discussion off the record.)
22      (Thereupon a recess was taken, after which the

Hal Goldman, Pharm D., R.Ph.          Confidential          September 20, 2004
Sunrise, FL

17 (Pages 62 to 65)

62

1    following proceedings were had:)
2    BY MR. WELLS:
3        Q.  I said we were going to move on to a new topic.
4    I want to ask one last question about the old topic
5    about dealing with providers.
6            We had talked about the bids that were
7    submitted by CuraScript in Florida, I.V. Systems. Vista
8    ended up choosing Florida I.V. Systems.  Is that
9    correct?
10       A.  That is correct.
11       Q.  And why is that?
12       A.  Actually, part of the reason was more than just
13   the pharmacy component of it.  Florida I.V. has got --
14   they're a subsidiary of a couple of companies that --
15   from what I know.  They also have a component of durable
16   medical equipment, DME, that the company that is called
17   Florida Home Medical can provide for us.
18           So to an extent, it was almost bundled
19   together.  Here again, I had nothing to do with that
20   component of it.  But that's one of the reasons they
21   were chosen.
22       Q.  How does Vista reimburse for drugs that are

63

1    administered in pharmacies?
2        A.  The general walk-in public, you're referring
3    to?
4        Q.  I would say any ways that you would reimburse
5    for those drugs.
6        A.  Addressing our retail network, which is the
7    most common way, we have an AWP minus for branded
8    agents.  And those do vary based on contract as an
9    entity.  As an average, we're about AWP minus 17 plus
10   $1.56.  That's across our entire network through the
11   United States.
12           Generic drugs are at an AWP rate.  That varies
13   once again, and there's a wide range on that.  They can
14   be MAC'd.  Looking at the MAC rate, that's AWP minus 56
15   percent plus, I believe, 1.56 also.
16       Q.  That's on average in your whole network?
17       A.  Yes.
18       Q.  How many pharmacies are there in your network?
19       A.  In the State of Florida currently there's
20   probably over 2,500.  Nationwide, because we have all
21   the major chains, we're probably close to 12,000.
22       Q.  And how does the process of signing up a

64

1    pharmacy into your network work?
2        A.  We get a request that comes to our desk.  It's
3    faxed in.  It's what we call basically a letter of
4    request to be a provider.  This really applies more to
5    independents; the chains are already in our network.  A
6    new store that opens automatically gets added.  So this
7    really applies to the mom-and-pop stores, the small
8    stores.
9            They would send a request to us.  We do a
10   geographical search by zip code and determine if we
11   really need that pharmacy.  And if we do, we will mail
12   out a contract that has our set current rate in that.
13       Q.  And what are the set current rates?
14       A.  The current rate for brand drugs is AWP minus
15   20 plus $1.50 or maybe $1.  The new one is $1.
16           On the generics, it's AWP minus 50 plus $1.50
17   or the MAC pricing.
18       Q.  And do the pharmacies typically try to
19   negotiate off of those rates?
20       A.  Actually, it's kind of like the provider
21   contracts:  It does depend on the location.  We try not
22   to flex on our current rate that we have in place.  If

65

1    it's a pharmacy that may be servicing an ACLF where we
2    have quite a few members where they have a blister card
3    and do some more work, we might drop the rate a tiny
4    bit.
5            Traditionally, when we do rate decreases we
6    actually talk to providers and we'll talk to the chief
7    operating officer, who's my boss, and talk about why we
8    want to do it.  We try to have standard contracts on the
9    pharmacy network, though.
10       Q.  But there still is, you said, some variation?
11       A.  Small wiggle room.
12       Q.  How is it that if the rate in the contract is
13   AWP minus 20, the network average is AWP minus 17?
14       A.  That's because we've got contracts with some
15   chains that are at AWP minus 16.  For example,
16   Walgreen's has a different rate than CVS might, than
17   Target might.  So because of the numbers, it will bring
18   the rate down, the average down, based on the numbers.
19       Q.  Do the chains have more buying power, for lack
20   of a better term?
21       A.  In terms of purchasing prescriptions, yes.  A
22   couple of chains, like Walgreen's, has their own

Hal Goldman, Pharm D., R.Ph.      Confidential              September 20, 2004
                                  Sunrise, FL

18 (Pages 66 to 69)

66

1  warehouse for pharmaceuticals that direct ship. I'm not
2  sure how the CVS/Eckerd's merger is going to be
3  affected, whether they can or can't. Publix doesn't
4  down here. They're one of our local food stores here
5  and in the Georgia area. So it does vary, based on the
6  side.
7        MR. WELLS: If we can mark this Exhibit 8,
8  please.
9        (Thereupon, Exhibit Goldman 008 was marked
10       for identification.)
11 BY MR. WELLS:
12    Q.  Exhibit 8 is a document entitled Ancillary
13 Services Agreement by Beacon Healthplans, Inc. It bears
14 the Bates Nos. BHP 262 through 280.
15    A.  Okay.
16       MR. WELLS: I'd also like to mark Exhibit 9,
17 please.
18       (Thereupon, Exhibit Goldman 009 was marked
19       for identification.)
20 BY MR. WELLS:
21    Q.  Exhibit 9 is a contract fact sheet with
22 Dadeland Medical Pharmacy. It bears the Bates Nos. BHP

67

1  236 through 257.
2     A.  Okay.
3     Q.  Are these both pharmacies that are in your
4  network?
5     A.  Dadeland, I believe, has now been merged over
6  under a Vista contract. Winn-Dixie is definitely in our
7  network.
8     Q.  I guess I should ask a different question: At
9  the time these contracts were in effect, they were both
10 in the network?
11    A.  Yes; under Beacon.
12    Q.  Okay. If we look at Exhibit 8, Page BHP 278,
13 what is the pricing for pharmacy drugs under this
14 contract?
15    A.  On brand name, it's AWP minus 17 plus $1 or the
16 store's usual and customary, if that price is less.
17       Then on generic drugs, it's AWP minus 30 plus
18 $1 or HCFA MAC plus a dollar or the store's usual and
19 customary; so that may fall out to be less so our
20 members aren't penalized.
21    Q.  It we look at the contract with Dadeland
22 Pharmacy, the first page, BHP 237, what is the pricing

68

1  for that agreement?
2     A.  Based on the cover sheet -- and that's what I'm
3  reading off of -- it's AWP minus 15 plus $1.50
4  dispensing for brand.
5        And generic drugs are AWP minus 25 plus $2
6  dispensing, or HCFA MAC plus $2.
7     Q.  Just to clarify, I think there's an Attachment
8  B to Page BHP 255.
9     A.  Right; which do match. Okay.
10    Q.  And if we look at Exhibit 9, Page 238, that
11 agreement became effective September 1st of the 1999.
12 Is that correct?
13    A.  That is correct. Based on the dates on this,
14 yes.
15    Q.  And if we look at Exhibit 8, Page BHP 262, that
16 agreement also took effect on that same date, September
17 1st of 1999?
18    A.  That is correct.
19    Q.  Do you know why Winn-Dixie got a greater
20 discount off of AWP than Dadeland Pharmacy did?
21    A.  No, I do not.
22    Q.  But they did, in fact, get a bigger discount

69

1  off of AWP. Is that correct?
2     A.  That actually -- they have -- let me look at
3  this. AWP minus 15. They actually have a worse
4  discount. The higher -- the lower the number, the
5  better the profit margin for the pharmacy.
6        So the independent, the Dadeland Pharmacy, is
7  AWP minus 15. Therefore they make -- we're making 15
8  percent off their cost. So they're going to make more
9  money.
10       In the case of Winn-Dixie, they're paying 17
11 off, so they make 2 percent less than the independent
12 does. So actually, it's flip-flopped. The higher the
13 discount, the less cost to the plan.
14       MR. LOVE: Dadeland is getting 15 percent and
15 Winn-Dixie is 17?
16       THE WITNESS: Right. So the plan pays
17 Winn-Dixie less for drugs.
18       MR. LOVE: That makes sense.
19 BY MR. WELLS:
20    Q.  In negotiating with pharmacies, does Vista
21 always try to get the lowest possible price from the
22 pharmacy?

Hal Goldman, Pharm D., R.Ph.          Confidential          September 20, 2004
Sunrise, FL

19 (Pages 70 to 73)

---

**70**

1      A.  Off of the AWP business account, we try to
2    negotiate higher.  Yes, we do.
3      Q.  And do you think that you get a price for
4    pharmacy-administered drugs that is competitive with the
5    price that your healthcare plan competitors such as
6    Humana are paying?
7      A.  I would say yes, based on our South Florida
8    market from when I talk to my peers.  We're all very
9    close, in the same ballpark.  The big chains let us know
10   where others are also.  If we ask for something
11   absolutely ridiculous, they're going to let us know.
12     Q.  Is it important for the purpose of Vista to be
13   in the ballpark of what the competitors are getting for
14   pharmacy drugs?
15     A.  It's not as much for being in the ballpark of
16   our competitor, but it's important for us to keep the
17   cost down in order to keep our insurance premiums down.
18     Q.  And do you think you've been successful in
19   doing that?
20     A.  We're trying to be.
21     Q.  Does Vista use a drug formulary?
22     A.  Yes, we do.

---

**71**

1      Q.  Is it the same formulary for all of your lines
2    of business?
3      A.  Currently, yes, it is.
4      Q.  Has it always been?
5      A.  As long as I have been with the company, yes,
6    it has been.  I believe even in the old Beacon, the old
7    Foundation, they had the same formulary for the entire
8    line of business.
9      Q.  How does Vista decide what drugs to put on the
10   formulary?
11     A.  We have a pharmacy and therapeutics committee
12   that meets quarterly; or if for some reason there's a
13   major issue that may occur such as a drug being
14   withdrawn or getting a warning, we can call an emergency
15   meeting.
16        The P & T committee is made up of outside
17   practicing physicians that have contracted with us.
18   Decisions are based on clinical need to have a drug on
19   the formulary.  It's based on a clinical decision.  We
20   do not bring financial dollars to the pharmacy and
21   therapeutics committee.  It is purely a clinical
22   committee.

---

**72**

1      Q.  Has Vista ever contracted with a pharmacy
2    benefits manager, or PBM?
3      A.  We do use a PBM currently.
4      Q.  Who is that?
5      A.  Currently, we use MedImpact Healthcare Systems
6    out of San Diego, California.
7        MR. WELLS:  This will be Exhibit 10.
8        (Thereupon, Exhibit Goldman 010 was marked
9    for identification.)
10   BY MR. WELLS:
11     Q.  This is entitled Service Agreement with Florida
12   Healthplan Management.  And it bears the Bates Nos. BHP
13   32 through 79.
14        Is this the agreement between Vista and
15   MedImpact?
16     A.  Yes, it is.
17     Q.  And how long has Vista been doing business with
18   MedImpact?
19     A.  This contract implemented in September of 2001.
20     Q.  And prior to that, had Vista ever done business
21   with another PBM?
22     A.  Prior to that, the old HIP of Florida used

---

**73**

1    Advanced PCS; the old Beacon used Walgreen's Health
2    Initiatives; the old Foundation used a company called
3    IPS, which was Foundation's PBM.  They had own their
4    own.  And Healthplan Southeast in North Florida used
5    Express Scripts.
6      Q.  Did anyone use Care Mark?
7      A.  No, not at all.
8      Q.  You could have had the grand slam.
9        How long did HIP of Florida use Advanced PCS?
10     A.  I'm sorry.  I forgot about one.  I started in
11   May of '99.  In about June of '99, we switched to a
12   company called -- I can't believe this.  Talk about
13   drawing a blank.  They're out of New Jersey.  I can't
14   think of their name.  It's ISM, Integrated Systems
15   Management.
16     Q.  How is it that Vista came to do business with
17   MedImpact in September of 2001?
18     A.  With the integration of all the healthcare
19   plans under common ownership by Dr. Scott, we felt the
20   need to do a full RFP process, which is a request for
21   proposals.  We mailed out about a 100-page document to
22   either nine or 12 vendors.

---

Hal Goldman, Pharm D., R.Ph.          Confidential                    September 20, 2004
                                       Sunrise, FL

20 (Pages 74 to 77)

**74**

1    You mentioned, you know, the Care Marks, the
2  Mercks of the world, Merck Medco at the time. We had a
3  bunch of other vendors. And some chose to bid; some
4  chose to not bid for our business. Then we did the
5  review of the nine that came in and we narrowed that
6  down to three, had finalist presentations with the three
7  vendors, and then chose MedImpact and negotiated the
8  contract language.
9    Q.  Do you know if Vista still has a copy of the
10  RFP that it sent out?
11   A.  I don't know if anybody does or doesn't, to be
12  honest with you, because there's no requirement for us
13  to keep those, quite honestly.
14   Q.  What about the responses that you got from the
15  different PBMs?
16   A.  No. Those we do not have, as a matter of fact.
17   Q.  You said you sent out, you thought, between
18  nine to 12 requests and you got nine responses?
19   A.  I think we got nine responses back. So I think
20  we sent -- I think it was nine, and nine came back. A
21  couple opted out not to bid. Advanced PCS and at the
22  time Merck Medco opted not to bid on our business at the

**76**

1  more aggressive than the traditional PBM could obtain
2  for you. We also needed a vendor that would be able to
3  give us rebate software for us to process our own
4  contracts.
5    So that's really why we narrowed it down to the
6  three vendors that we did narrow it down to. The
7  vendors that did not get an offer to come talk to us
8  couldn't do what we wanted.
9    Q.  Do you know who the other two finalists were,
10  for lack of a better term?
11   A.  One was the then-HIP vendor, ISM. The other
12  one was Argus Healthcare out of Kansas City, Missouri.
13   Q.  And why did you ultimately pick MedImpact?
14   A.  The service level they could offer us. They
15  truly came through with what we needed. Once they got a
16  face-to-face with them on our finalist presentations,
17  they did.
18   Q.  Let's take a look at Exhibit 10, which is the
19  agreement that you have with MedImpact. If we look at
20  Page 5 of this agreement, which is at BHP 0036, and
21  specifically Section 1.7, there's a reference to MAC.
22  And it says that this means the maximum allowable cost

**75**

1  time.
2    Q.  Did they tell you why?
3    A.  Merck Medco refused to bid on our business
4  because we did not want a full-service PBM. We had done
5  our own network contract and we did our own rebate
6  contracting; so those were services we knew we were not
7  going to use. They only wanted full service.
8    Advanced PCS at the time was in the middle of
9  the merger between Advanced Paradigm and PCS, and they
10  just were not in a situation at the time to bid on new
11  business for a couple of months.
12   Q.  Even though those two didn't bid, is it fair to
13  say the RFP process resulted in competition for your PBM
14  agreement?
15   A.  Yes, it does.
16   Q.  What were the terms of that competition in --
17  how did the different PBMs try to lure your business?
18   A.  Well, they all of course say they're the best,
19  truthfully. But what really narrowed down our choices
20  was based on how we wanted to do our business.
21    We needed a vendor that could allow us to have
22  our own network in place, because our rates were much

**77**

1  of generic products maintained as MAC drugs according to
2  the predefined criteria designated by MedImpact and
3  agreed to by Healthplan.
4    Do you know what the predefined criteria are
5  for creating the MAC list?
6    A.  Yes, I do.
7    Q.  What are they?
8    A.  MAC pricing -- this is traditionally what HCFA
9  also follows. There needs to be two or more generics on
10  the market for a MAC price to be put in place. And
11  that's really what sets the criteria.
12   Q.  Why do there have to be two or more generics?
13   A.  Because there has to be competition in order to
14  bring prices down.
15   Q.  Is it fair to say, then, that -- well, when a
16  brand-name drug comes off patent and a generic enters,
17  what happens to the price of that drug?
18   A.  There's different scenarios. If there is an
19  exclusivity granted to somebody because they may have
20  filed a lawsuit to get the patent removed, then you tend
21  to not see anything for the first six months.
22    If you have products that nobody really cares

Henderson Legal / Spherion
(202) 220-4158

Hal Goldman, Pharm D., R.Ph.      Confidential      September 20, 2004
Sunrise, FL

78

1  about and the drug company's not going to mind it, then
2  usually within a couple of months you'll see a decrease
3  in the cost that could range from 20 to 50 percent. It
4  does vary based on the product, the involved product.
5      If you get a drug that has low utilization, you
6  don't see the prices drop quite as much as a
7  high-utilized drug.
8      Q.  What about when what is called a blockbuster
9  drug comes off patent?  Let's assume you have the one
10  generic entrant that has a six-month exclusivity.  What
11  happens after that six months' exclusivity expires?
12      A.  It depends on how long it takes for others to
13  get on the market.  Traditionally, they're waiting in
14  the wings that day, and their products flood the market.
15  It depends on the price competitiveness.
16      The MAC doesn't necessarily get set
17  immediately.  They may take another month or two for
18  pricing to stabilize before the MAC gets applied by
19  MedImpact.  So that's the time frame in there of
20  drug-pricing change.
21      Q.  But long term, what happens when the -- when
22  more than one generic enters the market?

79

1      A.  The price goes through the floor.
2      Q.  And do you know what happens to the AWP, the
3  published AWP of the drug when that happens?
4      A.  Are we referring to the brand agent or generic
5  agent?
6      Q.  Well, let's ask about both.
7      A.  Brand companies traditionally -- if they're
8  still going to produce the product traditionally still
9  may take an increase every year.  They still have to
10  cover their production costs.  With inflation, they take
11  some increases.
12      The generic AWPs usually stabilize and don't
13  really change.  What changes is what pharmacies can buy
14  it for based on volume.  The only time you see an AWP
15  change is if you get short supply of a raw material.
16  That has been known to happen occasionally.
17      Q.  So for the generic product, then, I want to
18  make sure I understand you correctly.  The AWP
19  stabilizes, but the price at which the drug is available
20  on the market continues to drop?
21      A.  Based on the buying power of each individual
22  pharmacy.

80

1      Q.  In talking about generics where there's a MAC
2  pricing, you said that one of the criteria is there have
3  to be two or more manufacturers.
4      Is there any way for Vista to determine if it
5  gets a claim for such a drug that's under MAC pricing
6  which manufacturer actually produced that drug?
7      A.  We -- well, we can determine which -- what the
8  pharmacy claims they dispensed.  It's only as good as
9  what the pharmacy enters.  But every claim that we get
10  information on has an NDC, which is a national drug
11  code.  The first five places of that code are the
12  manufacturer.  So yes, we could determine that.
13      Q.  Looking back at Exhibit 10 and specifically
14  Page BHP 0036, we talked about the criteria of how a
15  drug gets on the MAC list.  Are there prices, I assume,
16  that are associated with the MAC list?
17      A.  Based on -- within MedImpact there are, yes.
18      Q.  And do you know how those prices are
19  determined?
20      A.  They have what they call multiple Med MACs.
21  There's -- we happen to use Med MAC 2, which is what we
22  use as our healthcare plan's choice, because that was

81

1  very similar to what we all had in place prior.
2      Q.  Do you know how that price is determined?
3      A.  That's a calculation of AWP minus 50 to 54, I
4  believe.  I'd have to look at their specific criteria.
5  But it's in that range.
6      Q.  Are there any other factors that are -- that
7  contribute to coming up with the MAC price, any sort of
8  dispensing fee or anything like that that's built into
9  it?
10      A.  No.  A dispensing fee is a separate component.
11      Q.  Before we move on, did the other PBMs that were
12  competing with your business also offer a MAC program?
13      A.  I believe; and we'd have to look at individual
14  contracts.  I know that Walgreen's had a -- some sort of
15  HCFA MAC in place; Express Scripts had a MAC in place;
16  IPS did.
17      With Integrated Systems, the company that was
18  working for HIP, because we were partnered with HIP of
19  New York we had a person up at HIP in New York that set
20  MAC pricing for ourselves.  We did an internal MAC.
21      Q.  Okay.  And what about the proposals that you
22  got from ISM and Argus Health Systems in -- was it

Hal Goldman, Pharm D., R.Ph.      Confidential      September 20, 2004
Sunrise, FL

22 (Pages 82 to 85)

82

1  September of 2000?
2      A.  They were both able to supply MACs.
3      Q.  Do you know what their basis was for coming up
4  with MAC pricing?
5      A.  I don't remember.
6      Q.  But that ability to do that was an important
7  factor for Vista in choosing its PBM?
8      A.  Yes, because we didn't want to spend manpower
9  time managing that.
10     Q.  Okay.  If we look again at Exhibit 10, and
11  specifically Page BHP 0040, Section 3.9 of the agreement
12  reads, "Drug Spend Guarantee: MedImpact guarantees a 4
13  percent savings (calculated based on drug cost per
14  member per month basis) on Healthplan's annual drug
15  spend for contract year one over the immediate preceding
16  full-plan year."
17         Did MedImpact meet that promise?
18     A.  Well, the interesting point is when you read
19  the criteria through this drug spend guarantee, it was a
20  bonus they threw in the contract.  As an organization,
21  we knew we would see nothing from this because there
22  were so many variabilities that would affect this drug

83

1  spend guarantee that this section is negotiated -- is
2  really negated.
3         If you look just at No. 2:  "Benefit changes,
4  market or industry changes, coverage changes," that goes
5  on to every month as we renew the plan.  Benefits
6  change.  So we receive no -- received no financial
7  remuneration out of this section, nor did we really
8  expect to.
9      Q.  If we look at Exhibit 10, Page BHP 0044 through
10  45, there's an Article VII entitled Rebate
11  Administration.
12         Can you explain what that means?
13     A.  The key component to this is the language that
14  says, "We may at the plan's option choose to use this."
15  We have not opted to use MedImpact's contracts.  We
16  chose to continue using our negotiated contracts with
17  our pharmaceutical vendors.
18     Q.  And what contracts does Vista have with
19  pharmaceutical vendors?
20     A.  I hold about 35 different contracts.  I'd have
21  to literally look through all of them and go through
22  them.

84

1      Q.  Are any of them with drug manufacturers?
2      A.  They are all with manufacturers, yes.
3      Q.  And in general, what are the -- what do the
4  contracts cover?
5      A.  Products that are dispensed for Vista
6  Healthplan for our members and only our members, based
7  on utilization patterns.  The key component over this
8  contract I have is the drug has to be in what they call
9  a favored position, which means on formulary.
10     Q.  And if you put it on the formulary, does Vista
11  gets some sort of rebate from the manufacturer?
12     A.  We get a rebate based on our utilization.
13     Q.  How are those rebates calculated?
14     A.  It varies by contract.  But basically, the
15  utilization of Drug A that -- they may be against all
16  the other products that are in what they call their
17  market basket.
18         If it's an antidepressant, an easy class to
19  talk about, if you look at a drug in the antidepressant
20  class, that may be an SSRI.  It depends against five or
21  six of our products.  And then when we get a rebate
22  based on what the market can hold, that can be either

85

1  tiered rebate or a flat rebate.  It varies by contract.
2         MR. WELLS:  This will be 11.
3         (Thereupon, Exhibit Goldman 011 was marked
4  for identification.)
5         MR. WELLS:  Exhibit 11 has a cover page to TAP
6  Pharmaceuticals from Dr. Goldman.  It's a letter
7  dated October 12, 2001.  It bears the Bates Nos. BHP
8  0080 through 94.
9         This is Exhibit 12, please.
10         (Thereupon, Exhibit Goldman 012 was marked
11  for identification.)
12         MR. WELLS:  Exhibit 12 is a pharmaceutical
13  rebate agreement between Vista Healthplan and TAP
14  Pharmaceuticals, Inc., bearing the Bates Nos. BHP
15  371 through 384.
16         This is Exhibit 13.
17         (Thereupon, Exhibit Goldman 013 was marked
18  for identification.)
19         MR. WELLS:  Exhibit 13 is a two-page chart
20  bearing the Bates Nos. BHP 385 through 386.
21         And if we can mark this as Exhibit 14, please.
22         (Thereupon, Exhibit Goldman 014 was marked

Hal Goldman, Pharm. D., R.Ph.    Confidential    September 20, 2004
Sunrise, FL

23 (Pages 86 to 89)

**86**

1 for identification.)
2 BY MR. WELLS:
3    Q. Can you tell me what Exhibit 11 is, please?
4    A. Exhibit 11 is actually multiple documents in
5 itself. Starting at BHP 0082, that was the agreement
6 for rebates. I believe this is for Lupron for what was
7 then HIP Healthplan of Florida that went into effect in
8 January of 2001.
9    Q. Okay.
10    A. BHP 0081 is a letter to my then-account manager
11 from TAP Pharmaceuticals asking for funding to help
12 print a new formulary book mid-year. We had had a lot
13 of changes in our formulary, and it just requested some
14 additional funding to do a mid-year production.
15       And then BHP 0080 is a letter explaining a name
16 change that was then Florida Healthplan Management
17 becoming Vista Healthplan.
18    Q. Okay. And then what is Exhibit 12?
19    A. Exhibit 12, I believe, was a renewed contract,
20 actually, for Lupron that went into place -- I think
21 this may have taken effect on 1-'01, or it may have been
22 backdated for the fourth quarter of '01. They wanted to

**87**

1 send us a new contract under Vista Healthplan. So it
2 was just a name-change contract.
3    Q. Okay. Is Exhibit 12 the most recent rebate
4 agreement that you have with TAP?
5    A. I believe this is the one that is still in
6 place, yes.
7    Q. If we look at Exhibit 12 and specifically Page
8 BHP 372 and Section 1.6, there's a section about
9 competitive products.
10       Can you explain what that means?
11    A. That is what I kind of talked about earlier
12 about each company produces their own market basket.
13 "Competitive products" in this case is one of their
14 major competitors, Zoladex, one of the big competitors
15 against Lupron.
16    Q. How is it that Vista came to enter into a
17 rebate agreement with TAP?
18    A. It was actually a continued agreement out of
19 HIP of New York. When we were sold to Dr. Scott, we
20 then broke off and had to obtain our own contracts.
21 Lupron had long been used by the organization. So once
22 we were sold, we went and obtained a contract for

**88**

1 Lupron.
2    Q. How is it that HIP of New York or HIP of
3 Florida came to do -- came to enter into a rebate
4 agreement with TAP?
5    A. It was because the product was on formulary.
6 They asked the vendor for a rebate, as I do currently
7 this day. Sometimes we're able to get rebates and
8 sometimes not. In this case, we were able to get a
9 rebate on Lupron from TAP.
10    Q. Why did you ask for a rebate from the
11 manufacturer of Zoladex?
12    A. Because we had so little utilization, we chose
13 to continue with Lupron. Lupron still is a standard of
14 practice out there. That's part of how far you look at
15 your formulary.
16       When you put products on the clinical need,
17 it's, "What's being written out there? What's the need
18 to have it in?" So in this case, Lupron was then out
19 selling Zoladex, and that's why Lupron remained on the
20 formulary. There was some clinical issues surrounding
21 Zoladex too.
22    Q. So then is Zoladex on the Vista formulary at

**89**

1 all?
2    A. Because it's an injectable product, if a doctor
3 writes it, our specialty vendor does try and ask him to
4 switch it to Lupron, because it is the agent we like to
5 use. If he refuses to, they still will get it.
6    Q. If we look at Exhibit 12, Page BHP 373, there's
7 a Section 3.1 that says, "Health Plans acknowledge that
8 the rebate program pursuant to this agreement
9 constitutes a discount within the meaning of Section
10 1128B(b) of the Social Security act." It continues.
11       Can you explain what that means, please?
12    A. Absolutely not. That is legal language drafted
13 by our Counsel.
14    Q. If we can now look at the next page, BHP
15 Section 374 and specifically Section 3.4, this is the
16 process that you talked about where Lupron would be put
17 on the Vista formulary. Is that correct?
18    A. That is correct.
19    Q. And does Section 3.4 preclude Vista from
20 putting Zoladex on its formulary?
21    A. It potentially could change our rebate market
22 share. It could also diminish what we get back based on

Hal Goldman, Pharm D., R.Ph.          Confidential          September 20, 2004
Sunrise, FL

24 (Pages 90 to 93)

**90**

1  utilization. They may see if we were starting to use
2  more Zoladex; then they would come back and renegotiate
3  the contract.
4      Q.  If we continue in this and look at Page BHP
5  383, it's entitled Schedule A: Rebate Agreement.
6  There's some various dosages of Lupron and some prices.
7      Can you tell me what those prices are?
8      A.  This is what the max the plan will pay for a
9  product is.
10     Q.  Okay.
11     A.  So based on how we do calculations in our
12  rebate software, it backs it back down to where we pay
13  no more than $250 -- well, it varies by product. I'm
14  using the Lupron Depot, 3.75 milligram, as an example.
15  So based on the $250, I would go above that amount paid
16  back to me as a rebate.
17     Q.  And do you know how that price compares to the
18  AWP for that dosage of Lupron?
19     A.  Not off the top of my head. I don't. I'd have
20  to look at it and check it.
21     Q.  Do you think it's lower than the AWP for
22  Lupron?

**91**

1      A.  Yes. It will be.
2          MR. MACORETTA: Objection.
3          MR. LOVE: He objected. You can answer.
4          THE WITNESS: Yes, it is.
5  BY MR. WELLS:
6      Q.  If we look at Exhibit 11 and specifically Page
7  BHP 0081: We talked about this briefly. The grant is a
8  request for TAP for distributing a new formulary
9  booklet.
10         Did you, in fact, get that grant from them?
11     A.  Yes, we did.
12     Q.  And have you ever sought any other grants from
13  TAP, first of all?
14     A.  No.
15     Q.  What about from other manufacturers?
16     A.  We did prior to about a year ago, when the
17  Office of Attorney guidelines came out with -- Office of
18  the Attorney General came down with new guidelines. We
19  are very much adhering to those guidelines. And really,
20  to sum it up, if it's something to do in our normal
21  course of business, the Plan is responsible to pay for
22  it; and therefore, the pharmaceutical industry cannot

**92**

1  help support it.
2      Q.  But prior to those guidelines coming out, Vista
3  sought grants from pharmaceutical manufacturers?
4      A.  It was common practice to help defer costs of
5  printing formulary books to do things like that, yes.
6      Q.  And did it get those grants?
7      A.  There were some. Some were managed as
8  management programs. Some may have actually been for
9  educational programs.
10     Q.  Do you know whether pharmaceutical
11  manufacturers gave similar types of grants to providers?
12     A.  I really don't know.
13     Q.  If we look at Exhibit 13, specifically Page BHP
14  385, there is a chart regarding the Lupron rebate. If
15  we look again -- and we will use the example of the 3.75
16  milligram injection. The third column has something
17  called basis price; and for that particular dosage, it's
18  $414.91.
19         Do you know what that basis price is?
20     A.  I'd have to go back to the original contract
21  and look where that comes from.
22     Q.  Okay. Do you know if it's in any way based on

**93**

1  AWP?
2      A.  I'd have to look. I don't remember.
3      Q.  And if we look at the next price -- or the next
4  column over; excuse me -- it says pay price: $164.91.
5      A.  Yes.
6      Q.  Is that the amount that Vista paid for that
7  dosage of Lupron after its rebates?
8      A.  That is what TAP was paying us.
9      Q.  Okay.
10     A.  If you take that number and add the $250 that I
11  talked about, that gives you the 414.91 basis price.
12     Q.  Okay. So the $164.91 was the amount of the
13  rebate per dose, then. Is that correct?
14     A.  That is correct.
15     Q.  And then Vista would have been paying $250 net
16  for that particular dose of Lupron?
17     A.  That is correct.
18     Q.  And do you know how much of a discount $250
19  would be off of this $414.91 basis price?
20     A.  It is written at 39.7 percent, rounding it
21  again.
22     Q.  If we look at Exhibit 14, specifically Bates

Hal Goldman, Pharm D., R.Ph.          Confidential                    September 20, 2004
                                       Sunrise, FL

25 (Pages 94 to 97)

---

94

1   No. -- actually, we can probably look at them together.
2        Is this a statement from TAP of the amount of
3   the rebates for the first quarter of 2002?
4        MR. MACORETTA: Which exhibit are you looking
5   at?
6        MR. WELLS: No. 14, BHP 389 through 390.
7        MR. MACORETTA: Thank you.
8        THE WITNESS: This is a portion of the
9   information.
10  BY MR. WELLS:
11  Q.  What information is missing?
12  A.  Well, as you see, it's been redacted from
13  prior. And this is just the summary under -- for
14  Beacon, what they would have gotten.
15  Q.  Okay. And the second page contains a check to
16  Vista Healthplan. Is that the total amount of the
17  rebate for that quarter to Vista?
18  A.  I believe that this check would have also
19  included another product that was on contract with TAP.
20  That was Prevacid. I'd have to look -- I'd have to see
21  the original records. I'm not sure if that's the entire
22  cost. I believe that's both Lupron and Prevacid

---

95

1   together.
2   Q.  Assuming that this is for Lupron and Prevacid
3   together, then how much did TAP pay Vista in rebates for
4   that quarter?
5   A.  Well, the total pay for that quarter was
6   $309,348.37.
7   Q.  And is this consistent with the amount of
8   rebates that you get from the other pharmaceutical
9   manufacturers?
10  A.  It varies based on the products and
11  utilization. I have some rebates that are $7,000
12  because they're not highly used products or they're
13  highly specific products. I have others that can hit
14  the $600,000 mark.
15  Q.  What's the product that you get the highest
16  rebate for?
17  A.  It's not so much a product; it's really how
18  many products I may be getting a check for. So it
19  really does vary.
20  Q.  Other than the amount of products involved, are
21  these documents concerning your rebate agreement with
22  TAP consistent with the rebate agreements that you have

---

96

1   with other manufacturers?
2   A.  In terms of the vouchers we get listing the
3   rebates?
4   Q.  And the terms of the discounts or the rebates.
5   A.  They're all very close. Some vary. There's
6   some differences. They're comparing an injectable
7   product versus an oral product, so there can be
8   differences in terms. But they're all very close to the
9   same.
10       MR. WELLS: I think if there is variation, we
11  might need to make a request to get copies of the
12  other rebate agreements produced.
13       MR. LOVE: Do you want a copy of every rebate
14  agreement they've got?
15       MR. WELLS: Well --
16       THE WITNESS: We have to notify every vendor if
17  we do that, because they're proprietary and
18  confidential. We actually had to notify MedImpact
19  that this was being shared.
20       MR. LOVE: We can -- you can request what you
21  want afterwards.
22       MR. WELLS: Okay.

---

97

1   BY MR. WELLS:
2   Q.  And just to clarify, you said you thought you
3   had between 30 and 35 manufacturer rebate agreements?
4   A.  Probably currently in place, yes.
5   Q.  If we go back to Exhibit 10, which is the
6   agreement with MedImpact, just to clarify, the rebate
7   administration program under Article VII: You said that
8   you have not taken advantage of it at all? Vista has
9   not?
10  A.  No, we have not.
11  Q.  And if we look at Exhibit 10, specifically
12  Pages BHP 0071 through 0074, there's a list of drug
13  manufacturers and drug names.
14       Is this a list of the rebate contracts that
15  MedImpact has with manufacturers that Vista could have
16  taken advantage of under Article VII?
17  A.  No. These were actually a list of our
18  contracts that were then in place, so that we had an
19  option to choose from MedImpact if there were drugs that
20  were available to us that we didn't already hold
21  contracts on.
22  Q.  And were there any?

---

Hal Goldman, Pharm D., R.Ph.          Confidential          September 20, 2004
                                      Sunrise, FL

26 (Pages 98 to 101)

| 98 |
|---|
| 1    A.  They had a multitude of potential ones that we |
| 2    could have chosen to use. |
| 3    Q.  And did you? |
| 4    A.  No, we did not. |
| 5    Q.  Why not? |
| 6    A.  We didn't want to share money with the PBM. |
| 7    And by the time they got done taking away their portions |
| 8    and utilization patterns, it wasn't worth the money, |
| 9    quite honestly. |
| 10   Q.  Did the other PBMs that were competing for your |
| 11   business in 2000, that being ISM and Argus Health |
| 12   Systems, offer similar rebate administration programs? |
| 13   A.  ISM held no contracts with any pharmaceutical |
| 14   vendors. They were able to supply the software to us. |
| 15   Argus at that time was able to do it, either let us use |
| 16   their contracts or use their software. |
| 17   Q.  And was the fact that ISM didn't have any |
| 18   contracts with pharmaceutical vendors a factor that |
| 19   Vista considered in not choosing them as their PBM? |
| 20   A.  No. Not at all. |
| 21   Q.  And why not? |
| 22   A.  We had already done our own direct contracting. |

| 99 |
|---|
| 1    So they were the current vendor that we were |
| 2    administering our current contracts under. So that was |
| 3    not an issue. |
| 4    Q.  And weren't the terms of the rebate |
| 5    administration program from Argus an issue? |
| 6    A.  No. Actually, it was not. |
| 7    Q.  We had talked about the time prior to -- I |
| 8    guess it was actually September of 2001. I think I have |
| 9    been saying September of 2000; I apologize. But the |
| 10   time where the PBM business was folded in with |
| 11   MedImpact. And you said prior to that, HIP of Florida |
| 12   was using Advanced PCS? |
| 13   A.  It was ISM. And prior to that, it was Advanced |
| 14   PCS. That was the correction I had made. |
| 15   Q.  I apologize. |
| 16   A.  That's okay. |
| 17   Q.  Do you know how HIP of Florida came to contract |
| 18   with ISM? |
| 19   A.  I started right after that was done. Based on |
| 20   what I knew and was told, that was because they were the |
| 21   current vendor for HIP of New York. Therefore, they |
| 22   wanted both states on the same platform. And therefore, |

| 100 |
|---|
| 1    we transitioned over to ISM. |
| 2    Q.  That was away from Advanced PCS? |
| 3    A.  Yes. |
| 4    Q.  Was there any sort of competitive bidding |
| 5    process at that time? |
| 6    A.  I don't know. |
| 7    Q.  What about when HIP began using Advanced PCS? |
| 8    Was there a competitive bidding process there? |
| 9    A.  I don't have any idea if there was an RFP that |
| 10   was formally done or not. |
| 11   Q.  You had said that Beacon was using Walgreen's |
| 12   as its PBM.  Is that correct? |
| 13   A.  That is correct; Walgreen's Health Initiatives. |
| 14   They were actually the first plan that transitioned over |
| 15   to MedImpact. |
| 16       MR. WELLS:  I'd like to mark this as Exhibit |
| 17   15. |
| 18       (Thereupon, Exhibit Goldman 015 was marked |
| 19   for identification.) |
| 20   BY MR. WELLS: |
| 21   Q.  Exhibit 15 starts with a cover letter to Nestor |
| 22   Plana of Beacon Healthplans dated August 31 of 1999, |

| 101 |
|---|
| 1    Bates No. BHP 0022 through 31. |
| 2       Is this the PBM agreement with Walgreen's? |
| 3    A.  This was actually a letter of intent. |
| 4    Q.  Okay. |
| 5    A.  This was not a contract. |
| 6    Q.  Do you know if this did result in a contract? |
| 7    A.  We've never found one. We don't believe it |
| 8    ever did. |
| 9    Q.  But Beacon did at some point use Walgreen's as |
| 10   its PBM? |
| 11   A.  Oh, yes, they did. |
| 12   Q.  And do you know what the terms of that |
| 13   agreement were? |
| 14   A.  It was actually -- the letter of intent did |
| 15   spell out the terms, pending the negotiation of the |
| 16   language. So this does spell out the terms of the |
| 17   contract -- |
| 18   Q.  Okay. |
| 19   A.  -- or of what would be a contract, when it came |
| 20   to be. |
| 21   Q.  So does this document then state the terms that |
| 22   Beacon was doing business with Walgreen's under? |

Hal Goldman, Pharm D., R.Ph.     Confidential      September 20, 2004
Sunrise, FL

27 (Pages 102 to 105)

**102**

1    A. Yes.
2    Q. Okay. And do you know how Beacon came to do
3    business with Walgreen's?
4    A. No, I do not.
5    Q. And under the agreement with Walgreen's, how
6    much was Beacon paying for pharmacy-administered drugs?
7    A. I believe -- I need to look and see if there's
8    an attachment on the back. It did vary by pharmacies.
9    There was an additional on Pages BHP 0030 to 0031.
10       It breaks out reimbursement terms for certain
11   chains and certain independents. And I believe on the
12   front page -- actually, they actually break down the
13   Walgreen's payment also on that page. It's in two
14   spots.
15   Q. How much was the payment to Walgreen's, then?
16   A. Walgreen's for -- let's see -- branded drugs
17   would have been AWP minus 15 percent plus $1.50, or AWP
18   minus 25 plus $2, or the HCFA MAC plus $2 or the usual
19   and customary, the U & C. That's spelled out on BHP
20   0030.
21   Q. Okay.
22   A. Page 0022 that I believe you may have been

**103**

1    looking at are the cost for drugs through the mail order
2    facility. So there's differentiations in what they pay
3    when people use mail order through the retail network.
4    Q. And did Beacon allow its members to obtain
5    prescriptions from the Walgreen's mail order pharmacy?
6    A. I believe there were lines of business that did
7    have a mail order benefit.
8    Q. And what was the reimbursement to Walgreen's
9    for the mail service pharmacy?
10   A. To keep consistent, I'll read it the way I've
11   done others. For brand-name drugs, it was AWP minus 20
12   plus 50 cents for a dispensing fee. For the generic
13   drugs, it was AWP minus 50 plus a dispensing fee of 50
14   cents.
15   Q. And then looking at Pages BHP 0030 to 31, this
16   is the Beacon Healthplan's network update. Is it fair
17   to say at this point that Beacon did not have its own
18   pharmacy network?
19   A. Actually, they did, based on -- these are their
20   contracts that they held that were negotiated. The plan
21   did have their own contracts.
22   Q. So these were the -- these reimbursement rates

**104**

1    reflect contracts that Beacon had directly with these
2    various pharmacies?
3    A. That is correct; at the time that they drafted
4    this.
5    Q. And then Walgreen's would be administering
6    claims basically under the terms of those contracts?
7    A. Yes.
8    Q. Do you know how the various reimbursement rates
9    for the different pharmacies were calculated?
10   A. What I was told was through negotiation.
11   Q. And just to clarify, if we take the example of
12   Albertson's, there are two lines there. One reads AWP
13   minus 14 percent plus $2 or U & C; and on the second
14   line it reads 20 percent plus $2/HCFA MAC plus
15   $2/U and C.
16      Is it fair to say the first line refers to
17   brand-name drugs and the second line to generics?
18   A. That is correct. We actually questioned that
19   when we obtained copies to make sure we knew the right
20   rates.
21   Q. Is it accurate to say the reimbursements shown
22   on Attachment 3 for brand-name drugs varied anywhere

**105**

1    from AWP minus 14 percent plus $2 to AWP minus 18
2    percent plus $1 for Sedano?
3    A. Yes; with variations all between.
4    Q. And is there a similar pattern or variation for
5    generic drugs?
6    A. Generic drugs were AWP minus 20 to upwards of
7    30. Dispensing fees varied from $1.25 to upwards of $2.
8    Then the HCFA MACs plus various dispensing fees also.
9    Q. If I recall correctly, you had said that the
10   Foundation line of business used an internal PMB called
11   IPS. Is that correct?
12   A. It was owned by HealthNet, who was the parent
13   of Foundation.
14   Q. Do you know how long Foundation was using that
15   internal PBM?
16   A. No, I do not.
17   Q. Do you know what drugs it covered?
18   A. The drugs covered would be based on the
19   formulary for Foundation at the time. It wouldn't have
20   mattered.
21   Q. Do you know whether Foundation had any rebate
22   agreements with any drug manufacturers?

Hal Goldman, Pharm D., R.Ph.　　　Confidential　　　September 20, 2004
Sunrise, FL

28 (Pages 106 to 109)

106

1　　A.　I believe all those rebate agreements were
2　national through IPS.
3　　Q.　But there were agreements with drug
4　manufacturers that resulted in rebates being paid to
5　Foundation?
6　　A.　Under what I've been told, yes, there were.
7　　Q.　Do you know what the terms of any of those
8　agreements were?
9　　A.　No, I do not.　That was confidential because of
10　the purchase.　We weren't to disclose that information.
11　　Q.　Do you know if Foundation ever compared the
12　prices that it was acquiring drugs at through this
13　internal PBM to AWP?
14　　A.　I don't have that answer.
15　　Q.　Does Vista own any of its own pharmacies?
16　　A.　No, we do not.
17　　Q.　Do you know if the internal PBM at Foundation
18　had any sort of a policy to purchase only one generic
19　manufacturer's product?
20　　A.　Well, because they didn't own pharmacies, they
21　were only a payor, not a purchaser.　We are not licensed
22　to buy drugs.

107

1　　Q.　I'm sorry.　The internal PBM of Foundation as
2　well?
3　　A.　They didn't own pharmacies.　They were purely
4　no different than MedImpact is to me.　PBMs pay the
5　drugs; they don't purchase drugs.
6　　Q.　Okay.　Do they -- was there a policy to only
7　reimburse for one particular manufacturer's drugs?
8　　A.　I'm not aware of one in place.
9　　Q.　Do you know whether that PBM gave any sort of a
10　right of first refusal to the incumbent generic
11　manufacturer if a new generic came on the market?
12　　A.　No, I do not.
13　　MR. WELLS:　I think it would be a good time for
14　a break.
15　　(Thereupon a recess was taken, after which the
16　following proceedings were had:)
17　BY MR. WELLS:
18　　Q.　I want to ask a couple more questions about
19　Exhibit 10, which is the MedImpact agreement, just to
20　make sure I understand something.
21　　A.　Sure.
22　　Q.　If we look at Section 7.1.2 on BHP 0045, does

108

1　that provision require MedImpact to disclose the amount
2　of the rebates it's getting from manufacturers to Vista?
3　　A.　As I know, if it's required under applicable
4　law.
5　　Q.　Okay.
6　　A.　I believe some states have some disclosure
7　rules.　Florida does not.
8　　Q.　Okay.　And then if we look, I guess, at Section
9　7.1.5 on BHP 0046, does this represent an agreement by
10　MedImpact to disclose those payments from the
11　pharmaceutical manufacturers to Vista?
12　　A.　If we chose to use this section, what this
13　would show is that MedImpact would have to show us truly
14　what they collected, then take their money out of it.
15　So it's what they call full disclosure now.
16　　Q.　So if you would have used this, MedImpact would
17　have gotten rebates from the manufacturers; and under
18　the terms of the contract, there would have been some
19　share where they keep some percentage of that and the
20　rest goes to you?
21　　A.　That is correct.
22　　Q.　So at the time of the negotiation of this

109

1　agreement, Vista understood that MedImpact, its PBM, was
2　getting rebates from pharmaceutical manufacturers?
3　　A.　That is correct.
4　　Q.　And pursuant to Section 7.1.5, had you taken
5　advantage of this service, Vista could have found out
6　from the PBM what the amount of those rebates was?
7　　A.　It would have been how much our percentage
8　would have been.　But the full disclosure really
9　represents how much money is collected on our behalf,
10　not their entire book of business.　So yes.
11　　Q.　But on Vista's behalf?
12　　A.　That is correct.
13　　Q.　But Vista chose not to take advantage of this
14　provision because it already had its own set of rebate
15　agreements with pharmaceutical manufacturers?
16　　A.　That is true.
17　　Q.　We've bandied about some terms and acronyms
18　today that I'm sure the court reporter loves us for.
19　I'd just like to ask you a little bit more in detail
20　about those and exactly what they mean to Vista.
21　　So let's start with AWP.　What does AWP mean to
22　Vista?

Hal Goldman, Pharm D., R.Ph.      Confidential                September 20, 2004
                                  Sunrise, FL

110

1    A.  AWP is what is known as average wholesale
2  price.
3    Q.  And what does Vista understand that to mean?
4    A.  That is a price that is established by a third
5  party such as First Databank. And they use some sort of
6  calculation to do a markup based on the -- usually it's
7  off of the published WAC by the manufacturer.
8    Q.  So it's Vista's understanding that the
9  publishers come up with the AWP by applying a markup to
10  the published WAC?
11    A.  Yes.
12    Q.  And is that markup fixed for all drugs?
13    A.  From what we've been learning, they vary from
14  product to product.
15    Q.  How long has this been Vista's understanding of
16  AWP, or average wholesale price?
17    A.  As long as I've been here, they've known that
18  it's a markup done by a third party.
19    Q.  Does Vista think that AWP is an actual average
20  of prices?
21    A.  In light of all the recent cases that we've
22  seen come before us, we've started to learn that it may

112

1  all realized that these are not true representations
2  anymore.
3    Q.  So Vista's belief, then, is that the markup has
4  changed over WAC?
5    A.  Oh, there's no doubt it has changed over the
6  years. That's why we're taking initiatives to contract
7  differently.
8    Q.  What does Vista think the markup over WAC
9  should be?
10    A.  I don't know if we know that. I think that
11  would be something for other experts to determine.
12    Q.  What did Vista expect the markup over WAC to
13  be?
14    A.  I don't know if anybody expected one. I think
15  we expected some sort of consistency. Whether we know
16  that right number, I don't know. I think here again we
17  would look to an outside consultant or some other kind
18  of expert to help us determine what really should be
19  appropriate.
20    Q.  In performing your job, is it important for you
21  to keep up with pharmaceutical pricing issues?
22    A.  It's part of the job I have to do. We have

111

1  not be truly an average. We're not real sure how it's
2  truly calculated and if it's a true representation.
3    Q.  When did Vista come to know that?
4    A.  We've probably been involved, you know, in -- I
5  think the Lupron case was one that was an eye opener,
6  based on what we've been told by Counsel. So I think
7  probably in the last two years, I guess.
8    Q.  How did those cases change your understanding
9  of what AWP meant?
10    A.  Well, I think it's brought more right --
11  brought more information to us showing us that it may
12  not truly be a true representation that we're paying
13  products off of. It's led us to look at the other
14  methods of reimbursing pharmacies.
15    Q.  What do you mean by "true representation"?
16    A.  In the old days -- and I've been in pharmacy
17  since I was 16 years old, quite honestly -- there used
18  to be a set markup. You always knew that the wholesale
19  price to AWP was a set amount. It's changed over the
20  years.
21    But now working with Vista and seeing the
22  lawsuits brought to our attention, I think that we've

113

1  other people on our staff that monitor some pricing. I
2  do get the price increases that come across my desk and
3  look at them. But most of what we see from vendors are
4  any changes in their wholesale acquisition change.
5    Monitoring AWP changes is much more detailed
6  and much more involved to do. We probably rely on our
7  PBM to look at things like this for us.
8    Q.  Do you subscribe to any sort of magazines or
9  periodicals that deal with pharmaceutical pricing?
10    A.  No, I do not. We actually get our pricing
11  online through our computer system, through MedImpact.
12  If we were to look up a drug, we can look at pricing.
13  We pay to have that availability.
14    Q.  And when you say it's -- there's online pricing
15  from MedImpact, what pricing does that give?
16    A.  The WAC pricing, the AWP pricing; and I believe
17  if there is a HCFA MAC loaded, it will show the HCFA
18  MAC.
19    Q.  AWP is a published number, right?
20    A.  Through reference books, yes.
21    Q.  And is WAC a published number?
22    A.  Vendors -- the pharmaceutical companies send

Hal Goldman, Pharm D., R.Ph.        Confidential        September 20, 2004
Sunrise, FL

30 (Pages 114 to 117)

114

1   them out. I believe the Red Book, I believe, does show
2   both pricing. I can't remember. It's been a while
3   since I've looked at one.
4       Q.  You mentioned the Red Book. Does Vista
5   subscribe to the Red Book?
6       A.  We actually stopped because we have online
7   access. The Red Book is updated four times a year.
8   Ours is updated as prices come online.
9       Q.  Do you know whether Vista stopped subscribing
10  to the Red Book?
11      A.  Probably two or three years ago. It was
12  probably two years ago.
13      Q.  And has Vista in the past ever subscribed to
14  any other pricing such as Databank, the Blue Book?
15      A.  I wanted to -- we had MediSpan updates in the
16  mail. That was probably about three years ago. We
17  actually received a courtesy subscription for a year
18  unsolicited.
19      Q.  Did you compare the prices that were published
20  in MediSpan to what was in the Red Book?
21      A.  No, we did not.
22      Q.  Did you ever consider any sources for pricing

115

1   information other than those pricing compendia?
2       A.  The other one is Databank, which is who our --
3   most of our PBMs use. So that's who the other pricing
4   came from.
5       Q.  Do you know if these different publications
6   have different AWPs for drugs?
7       A.  I believe there is a variation between what
8   used to be MediSpan and First Databank. But if I
9   remember correctly, they're now one company. I want to
10  say First Databank purchased MediSpan at some point. So
11  I think that has gone by the wayside and is now just
12  First Databank.
13      Q.  But whether they were two different companies,
14  Vista thought that there was some difference in the
15  AWPs?
16      A.  I believe there was some small variation.
17  Nothing we looked into, quite honestly.
18      Q.  Did Vista have any idea what caused that
19  variation?
20      A.  Two different third parties.
21      Q.  Did the fact that there was a variation there
22  ever cause you to question whether that AWP was an

116

1   actual average of prices?
2       A.  Not really. At the time, it did not.
3       Q.  Why not?
4       A.  Different people may average differently. We
5   chose to take who our PBM used for the set price.
6       Q.  Well, what do you mean by "average"?
7       A.  That's a good question. We don't know. It's
8   been brought to the attention. Back then, I think the
9   assumption was that the average wholesale prices would
10  be an average of what people could pay for the drug.
11      Q.  When you say "people," who are you talking
12  about?
13      A.  Pharmacies.
14      Q.  And when was it that you believed that that
15  an average of what pharmacies were paying for the drugs?
16      A.  I think that was early in my time with Vista.
17  I mean, I've been in pharmacy a long time, so I think
18  that was just my philosophy. The Plan's philosophy
19  would have probably been similar. I can't speak for my
20  predecessor.
21      Q.  You started at Vista in '99, was it?
22      A.  May of '99.

117

1       Q.  May of '99?
2       A.  Yes.
3       Q.  If we look back at Exhibits 8 and 9, which are
4   the contracts with Winn-Dixie and Dadeland, they're both
5   dated September of 1999. Correct?
6       A.  That is correct.
7       Q.  Was this at a time where you believe that
8   pharmacies were acquiring drugs at or around the AWP
9   price?
10      A.  My belief was. I was not part of Beacon at the
11  time. They were not owned by us. We were not under
12  common ownership at the time. But I believe that AWP
13  was an average of what purchasing could be done.
14      Q.  Okay. And -- but at this point in time, you
15  were paying Winn-Dixie -- or you were reimbursing them
16  AWP minus 17 percent for brand-name drugs and AWP minus
17  30 percent for generics. Is that correct?
18      A.  That is correct.
19      Q.  And if Winn-Dixie purchased a brand-name drug
20  at AWP and then was reimbursed AWP minus 17 percent, it
21  would be incurring a fairly significant loss for
22  dispensing that drug, would it not?

Hal Goldman, Pharm D., R.Ph.    Confidential    September 20, 2004
Sunrise, FL

31 (Pages 118 to 121)

<table>
<tr><td valign="top">

118
1    A. That is true.
2    Q. And if it was a generic drug, the amount of
3  that loss would be 30 percent. Is that correct?
4    A. That is correct.
5    Q. Did any pharmacy ever say to you, "You guys
6  aren't covering our costs under this contract"?
7    A. We have heard feedback in the past about that.
8  However, pharmacies do get discounts based on volume.
9  So an AWP is truly an average of what somebody might buy
10  it at. That doesn't take into account the factor of a
11  discount that the wholesaler may afford somebody. So
12  Winn-Dixie may be buying at a tremendously reduced AWP
13  price.
14    Q. So Vista understood that there were discounts
15  available to pharmacies that would reduce their
16  acquisition cost below AWP?
17    A. Based on value-buying power, that is correct.
18    Q. So Vista understood that the published AWPs in
19  the Red Book, for example, didn't account for those
20  discounts?
21    A. That is correct. They were truly an average of
22  what people might be able to buy for.

</td><td valign="top">

120
1  pharmaceutical company that they also term as a WAC,
2  which is wholesale acquisition cost. They really are
3  two different things.
4    Q. So when we were talking about the agreement
5  with, I think, CuraScript, that references there to WAC.
6  I think we talked about this earlier, but I want to make
7  sure it's clear: That is to the actual acquisition cost
8  that CuraScript or the specialty provider paid to the
9  drug wholesaler?
10    A. That is correct.
11    Q. And as part of that contract, to get your
12  business the specialty pharmacy agreed to disclose that
13  amount to Vista?
14    A. Contractually, we had a right to audit that.
15  Yes.
16    Q. What did Vista understand the published WAC to
17  mean?
18    A. Published WAC is the price that the
19  pharmaceutical manufacturers set for the product.
20    Q. Do you know it that price accounts for the
21  discounts that are available based on volume to
22  pharmacies?

</td></tr>
<tr><td valign="top">

119
1    Q. Is it fair to say it's a list price, then?
2    MR. MACORETTA: Objection.
3    MR. LOVE: You can answer.
4    A. You just did a list to what the pharmaceutical
5  company buys for; so I equated that to the WAC, not what
6  somebody buys for.
7    Q. What about the rebates that Vista was getting
8  from the pharmaceutical manufacturers? Were those
9  factored into AWP?
10    A. I have no idea. I wouldn't know that answer.
11    Q. Did you expect that they were?
12    A. No, because not every company probably gets
13  rebates.
14    Q. Another term that we have used a little
15  together is WAC, or wholesale acquisition cost.
16    Can you explain what Vista understands that
17  term to mean?
18    A. Actually, that's kind of got two connotations
19  with it. We've kind of jumped between the two.
20    When we've talked about my specialty provider,
21  we talk about wholesale acquisition cost that he pays
22  for products. Then there's a published WAC by the

</td><td valign="top">

121
1    A. I don't know if that does. I know it takes
2  in -- traditionally, when they publish a WAC, when a
3  drug hits the market it incurs waste recoup to research
4  and development, their sales and marketing. That may be
5  a factor. I don't know if that is or is not.
6    Q. We also saw in some of the agreements a
7  reference to U & C, or usual and customary charges.
8  What does that mean to --
9    A. The usual and customary charges are what may be
10  called in-store charges: that if the product was less
11  than our contracted rate, we would pay less than -- to
12  the pharmacy. There could be multiple reasons for that
13  occurring.
14    Q. And what would be the reasons that might occur?
15    A. In the case of generic drugs, they may be doing
16  an ad and may be having a loss leader for something that
17  instead of it being $10 for an item, they're selling it
18  for 4.99 to get somebody in the store. So we get the
19  added value.
20    They have to have done a buy-in in the product
21  and gotten a large inventory at a discount rate and
22  dropped the rate on a branded agent. So then we get

</td></tr>
</table>

Hal Goldman, Pharm D., R.Ph.          Confidential                September 20, 2004
Sunrise, FL

32 (Pages 122 to 125)

**122**

1  that afforded cost savings too.
2  Q. Has Vista actually reimbursed claims based on
3  U & C?
4  A. We could probably do an audit to find that, but
5  the pharmacy would put in their computer field -- they
6  would put their billed pricing. The bill price drops at
7  less than our calculated discounted rate. We get lower.
8  So they would override that manually.
9  Q. Who would override it?
10  A. The pharmacy does that's entering the price.
11  Q. How would Vista determine whether a particular
12  claim in your system was paid based on the contracted
13  rate or at U & C?
14  A. There are two fields. And we would see the
15  billed amount. If they billed less than our rate, the
16  billed amount and paid amount would match. Unless it's
17  a U & C, traditionally the billed amount -- our paid
18  amount is less than the billed amounts.
19  Q. Is there any way to figure that out other than
20  looking claim by claim to see if the billed amount
21  matches the paid amount?
22  A. I'd have to see it, if a report could be

**123**

1  designed; but it'd probably be a very, very long
2  process.
3  Q. Have you ever heard the term "ASP"?
4  A. No. I can't think of -- if I heard what the
5  three letters stood for, I might know it. But not as
6  the abbreviation.
7  Q. Have you ever heard the term "average sales
8  price"?
9  A. No. I've never seen that.
10  Q. We talked about Vista knowing that there were
11  volume discounts available to pharmacies that could
12  reduce their acquisition costs.
13  Were there any other types of discounts that --
14  that at Vista was available that pharmacies might be
15  able to get on drugs?
16  A. No, not at all. Not that I know of.
17  Q. What about prompt payment discounts?
18  A. Those are discounts that can be negotiated
19  between a wholesaler and a store. Whether or not a
20  store would have it is hard to tell. I think prompt
21  payments are always available in any sort of contract
22  language.

**124**

1  Q. Did -- under its pharmacy contracts with, for
2  example, Winn-Dixie, did Vista have the right to audit
3  those contracts?
4  A. In terms of the stores?
5  Q. Yes.
6  A. Every one of our current Vista contracts has an
7  audit clause.
8  Q. And would that audit clause allow Vista to
9  determine the amount of any discounts that the store was
10  getting for drugs that were dispensed to your members?
11  A. No. It had nothing to do with purchasing. It
12  was more auditing for fraud and appropriateness of
13  prescriptions.
14  Q. When you say "fraud," what do you mean?
15  A. Making sure that there was a prescription on
16  file for a prescription dispensed, making sure that if a
17  drug was returned to stock, we were credited
18  appropriately. It was more for appropriateness, not --
19  our contract spells out AWP minus. That is how we
20  reimburse the pharmacy.
21  MR. WELLS: Those are all my questions. Thank
22  you for taking your time.

**125**

1  I don't know if Mr. Macoretta has any questions
2  or not.
3  MR. LOVE: Can you step out just one second?
4  MR. WELLS: Sure.
5  (Thereupon a recess was taken, after which the
6  following proceedings were had:)
7  CROSS-EXAMINATION
8  BY MR. MACORETTA:
9  Q. Good afternoon. John Macoretta here for the
10  Plaintiffs.
11  Let me start you back at Exhibit 10, which is
12  your agreement with, I guess, MedImpact. I want to talk
13  to you about the rebate list that appears on Page BHP
14  0071.
15  A. Okay.
16  Q. Just so I understand, Exhibit D: That
17  represents a list of contracts that you then, meaning, I
18  guess, 2001 -- that Vista then had with drug
19  manufacturers?
20  A. That is the list we had then, yes.
21  Q. Okay. Did you ever see the list of rebate
22  contracts MedImpact had?

Hal Goldman, Pharm D., R.Ph.    Confidential        September 20, 2004
Sunrise, FL

33 (Pages 126 to 129)

126

1   A.  No.
2   Q.  So had you agreed to use their service,
3  presumably you would see that or you still wouldn't see
4  that list?
5   A.  No.  We would see that.  They would have to
6  show us who they can get rebates for us.
7   Q.  But they didn't do that until you agreed to do
8  the service?
9   A.  Right.  We opted not to.
10   Q.  Let me talk to you a little bit about the
11  pharmaceutical claims as well.
12      First of all, when a pharmacy submits a
13  claim -- this goes back to questions about U & C.  Is it
14  your experience that -- well, let me try it this way:
15  What percentage of claims are typically based on U & C?
16   A.  If it's 1 percent, that's probably a lot.
17   Q.  Okay.  That's because whatever the pharmacy
18  puts on its bill is usually higher or equal to what your
19  reimbursement amount is going to be?
20   A.  Usually, the pharmacy's amount is higher than
21  what we would pay.
22   Q.  Okay.  If you wanted to see -- presumably, you

127

1  get data every so often from your PMB saying, "This is
2  the claim and what we paid on them"?
3   A.  That is correct.
4   Q.  If that -- and somewhere in that data there's
5  probably something called ingredient costs?
6   A.  Yes.
7   Q.  Is there another field that tells you what the
8  basis of that ingredient cost calculation was?  The
9  source of payment field?
10   A.  No, it does not.  We don't get -- you're asking
11  if it's based on AWP or U & C?
12   Q.  If you wanted to figure out what it was based
13  on, yeah.
14   A.  We could probably analyze the data.  And if the
15  ingredients cost less than the discount plus the co-pay
16  didn't meet the contracted rate, then the guess would be
17  it was a U & C issue.
18   Q.  But do you know whether the PMB has that data
19  available?
20   A.  I'd have to see if it's on the claim field.  We
21  don't get the data that way now.
22   Q.  But there's a field for it?

128

1   A.  Well, there's a field for the billed amount and
2  there's a field for the paid amount.  So if the billed
3  amount and paid amount matches and it's different than
4  the discounted calculation, then that means we're
5  probably paying a U & C.
6   Q.  Okay.  I understand.
7      And today, all of Vista's physician-
8  administered drugs are through your specialty provider?
9   A.  I'm guessing about 90 percent of our drugs go
10  through the specialty provider.
11   Q.  Okay.  Do you know when they started using the
12  specialty provider?
13   A.  I will tell you that I started in May of '99,
14  and we were already doing drug replacement when I
15  started.
16   Q.  Drug replacement means use of the specialty
17  provider?
18   A.  Going to the doctor, yes.
19   Q.  Okay.
20   A.  It's a specialty pharmacy provider.
21   Q.  MAC prices:  You use something called the Med
22  MAC now?

129

1   A.  Yes.  We use Med MAC 2.
2   Q.  Do you know how that's calculated?
3   A.  No, I do not.
4   Q.  Do you know -- okay.  Do you know if it's
5  calculated with any reference to AWP or not?
6   A.  I am not sure if they do it or not that way.
7  That would be a question.  I'm not sure if it's in
8  MedImpact's contract language or that was a separate
9  question for them.  Well, I should say that we base it
10  off an AWP minus.
11   Q.  Well, what do you mean, you base it off an
12  AWP minus?
13   A.  Our Med MAC 2 is anywhere from 50 to 56
14  percent, roughly 54 percent.  That's how the MAC price
15  is loaded in the system through MedImpact.
16   Q.  I'm not sure I'm following you.  "Loaded in the
17  system."  Is it AWP minus some percentage?
18   A.  Yes.  And in the MedImpact field, it says MAC.
19  That price would be there per pill.
20   Q.  Okay.
21   A.  So the averaging in that class is either AWP
22  minus 50 to 54 or 50 to 56.  I can't really remember.

Hal Goldman, Pharm D., R.Ph.    Confidential       September 20, 2004
Sunrise, FL

34 (Pages 130 to 133)

---

130

1    Q.  So if we look on -- so I understand, this -- if
2  we look on the Med MAC 2 list for a certain type of
3  pill, it's not going to give me a dollar figure, but an
4  amount minus some number?
5    A.  It probably gives also a calculated dollar
6  figure for that given month.  But that's -- that could
7  change if an AWP changes or if the calculation changes.
8    Q.  Okay.  Are you aware of the actual prices that
9  pharmacies acquire drugs from manufacturers?
10    A.  Not -- aside from our specialty provider,
11  because we can back-calculate it, no.  Retail stores,
12  no, not at all.
13    Q.  In the specialty provider, do you actually
14  back-calculate it?
15    A.  Not really.  I don't have -- you know what?  I
16  don't have time to worry about that, truthfully.  We
17  will worry about seeing if it's right when we go and do
18  an audit.
19    Q.  Okay.  But in a retail pharmacy, you don't know
20  what they actually pay for the drugs?
21    A.  Absolutely not.
22    Q.  Is that -- do you know if that data is

---

131

1  available anywhere and you could look for it?
2    A.  I will tell you based on our contract language
3  we're not really permitted to ask for that.
4    Q.  Your contract is with who?
5    A.  With our retail network.  I can't go to
6  Winn-Dixie and say, "Tell me what you pay for these
7  drugs."
8    Q.  Because your contract with Winn-Dixie says you
9  can't?
10    A.  Right.
11    Q.  But there's no publicly available source of
12  that data that you know of?
13    A.  Not that I'm aware of, because I believe those
14  prices are established between the relationship between
15  the chain and their wholesaler.
16    Q.  If that kind of acquisition data was available,
17  would that be something you would be interested in
18  reviewing?
19    A.  I think that --
20    MR. WELLS:  Objection.
21    MR. LOVE:  You can answer.
22    A.  I think I alluded to this earlier.  We are

---

132

1  already moving forward with trying to change the
2  reimbursement model to the retail network.
3    Q.  What are you trying to change it to?
4    A.  Actually, we would like to go to -- we would
5  love to go to the published WAC by the manufacturer-plus
6  basis.
7    Q.  Then why don't you do that?
8    A.  The pharmacy world is really slow to change.
9  I've actually asked one of our chains to come back with
10  a proposal like that.
11    Q.  Have they done that?
12    A.  I'm still waiting.  Absolutely not.
13    Q.  Okay.  I presume you want to do that because
14  you think that'll help lower prices for you?
15    A.  Yeah.
16    Q.  Okay.  I think I -- I want to follow up.  The
17  discounts or rebates you receive from manufacturers:
18  How long have you been receiving them?
19    A.  Well, in -- let's see.  We were getting rebates
20  when I started in May of '99 through PCS.  When we
21  migrated to ISM at that point through HIP of New York,
22  we were getting rebates then.  We're still getting them.

---

133

1  My guess is that whoever HIP's relationship was with
2  before PCS, I'm sure there was some sort of rebate
3  agreement.
4    Q.  So when you say "through PCS," is that the
5  same -- that means you were getting the rebates PCS
6  negotiated as opposed to the current system, where you
7  get the ones you negotiate?
8    A.  Correct.  It would be similar to Section VII in
9  the MedImpact contract.
10    Q.  Now, when did it switch from getting rebates
11  that they negotiated to rebates you negotiated yourself?
12    A.  In June of '99, we switched to ISM; and those
13  rebates were negotiated by our parent company, HIP of
14  New York.
15    Q.  Okay.
16    MR. MACORETTA:  I believe that that is all the
17  questions I have right now.  Thank you.
18    THE WITNESS:  Okay.
19    REDIRECT EXAMINATION
20  BY MR. WELLS:
21    Q.  The WAC-plus model that you're looking at
22  moving to:  That's based on the published WAC?

---

Hal Goldman, Pharm D., R.Ph.         Confidential                September 20, 2004
                                     Sunrise, FL

35 (Pages 134 to 136)

---

134

1   A.  That is correct.
2   Q.  And that, you believe, is -- that published WAC
3   is marked up a fixed percentage to result in the
4   published AWP?
5   A.  Some sort of percentage, yes.
6   Q.  But both of those numbers are published?
7   A.  That is correct.
8       MR. WELLS:  Those are all my questions.
9       (Thereupon, the taking of the deposition was
10  concluded at 1:05 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22

---

135

1           CERTIFICATE OF OATH
2
3   STATE OF FLORIDA
4   COUNTY  OF  DADE
5
6       I, LISA EDWARDS, the undersigned authority,
7   certify that the following-named deponent personally
8   appeared before me and was duly sworn:
9       HAL GOLDMAN, PHARM D., R.Ph.
10      WITNESS my hand and official seal this 21st
11  day of September, 2004.
12
13
14
15      LISA EDWARDS
16      Notary Public - State of Florida
17      My Commission No. DD043463
18      Expires: July 19, 2005
19
20
21
22

---

136

1           REPORTER'S DEPOSITION CERTIFICATE
2
3   STATE OF FLORIDA   )
4   COUNTY  OF  DADE  )
5
6       I, LISA EDWARDS, Registered Merit Reporter,
7   certify that I was authorized and did stenographically
8   report the deposition of HAL GOLDMAN, PHARM D., R.Ph.;
9   that a review of the transcript was requested; and that
10  the transcript is a true and complete record of my
11  stenographic note.
12
13      I further certify that I am not a relative,
14  employee, attorney, or counsel of any of the parties,
15  nor am I a relative or employee of any of the parties'
16  attorney or counsel connected with the action, nor am I
17  financially interested in the action.
18
19      DATED this 21st day of September, 2004.
20
21          LISA EDWARDS
22

---