Exhibit 44

1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3

 4              No. 01CV12257-PBS

 5

 6

      *************************************

 7                                        *

      IN RE:  PHARMACEUTICAL INDUSTRY      *

 8    AVERAGE WHOLESALE PRICE LITIGATION   *

                                           *

 9    *************************************

10

11    DEPOSITION OF THOMAS E. GREENEBAUM, taken pursuant to

12    the Federal Rules of Civil Procedure, at CIGNA

13    Headquarters, 900 Cottage Grove Road, South Building,

14    Bloomfield, CT, before Diana M. Noel, a Registered

15    Professional Reporter, Certified Realtime Reporter,

16    and Licensed Shorthand Reporter No. 199, in and for

17    the State of Connecticut, on Friday, January 14, 2005,

18    commencing at 9:40 AM.

19

20

21

22
```

Thomas E. Greenebaum	Highly Confidential	January 14, 2005
Bloomfield, CT

2 (Pages 2 to 5)

**Page 2**

1  APPEARANCES:

2  FOR THE PLAINTIFFS:

3     EDWARD NOTARGIACOMO, ESQUIRE (By Telephone)
      HAGENN BERMAN
4     One Main Street
      Fourth Floor
5     Cambridge, MA 02141
      Tel: (617) 482-3700
6
   FOR THE DEFENDANTS:
7     ESTELLA J. SCHOEN, ESQUIRE
      PATTERSON, BELKNAP, WEBB & TYLER, LLP
8     1133 Avenue of the Americas
      New York, NY 10036-6710
9     Tel: (212) 336-2000
      e-mail: eschoen@pbwt.com
10
   FOR CONNECTICUT GENERAL LIFE INSURANCE COMPANY,
11  AND THE DEPONENT, THOMAS E. GREENEBAUM:
      PETER D. ST. PHILLIP, JR., ESQUIRE
12    LOWEY DANNENBERG BEMPORAD & SELINGER, P.C.
      The Gateway
13    One North Lexington Avenue
      White Plains, NY 10601
14    Tel: (914) 997-0500
      e-mail: pstphillip@ldbs.com
15             and
      MICHAEL WADE, ESQUIRE
16    Counsel - Legal & Public Affairs
17    CIGNA
18    900 Cottage Grove Road, S201
19    Hartford, CT 06152-5026
20    Tel: (860) 226-2457
21    e-mail: michael.wade@cigna.com
22

**Page 3**

1            INDEX OF EXAMINATION

2

3  DIRECT EXAMINATION BY MS. SCHOEN:............... 4

4  REDIRECT EXAMINATION BY MS. SCHOEN:............108

5  CROSS EXAMINATION BY MR. NOTARGIACOMO:..........101

6

7

8

9            INDEX OF EXHIBITS

10

11  Exhibit Greenebaum 001........................... 92

12

13  Exhibit Greenebaum 002........................... 97

14

15

16  MARKED QUESTION:           75:8

17

18

19

20

21

22

**Page 4**

1            THOMAS E. GREENEBAUM

2  having been first duly sworn, was examined and

3  testified as follows:

4

5            DIRECT EXAMINATION

6  BY MS. SCHOEN:

7     Q.  Hello, Mr. Greenebaum.

8     A.  Hello.

9     Q.  My name is Estella Schoen. I'm from the law

10  firm of Patterson, Belknap, Webb & Tyler, and I'm here

11  today representing the Defendants in this matter.

12        First let me ask you, have you ever been

13  deposed before?

14     A.  No.

15     Q.  Then I'd like to go over a few ground rules

16  which you may have already gone over with your counsel.

17  If I ask a question and that question is unclear in any

18  way or you don't understand it, please let me know, and

19  I'll try to rephrase it or explain it better.

20     A.  Uh-hum.

21     Q.  When I ask you a question, it's important

22  that you answer verbally, not with a nod of the head or

**Page 5**

1  shake of the head, because that just makes it difficult

2  for the court reporter to take down an answer.

3     A.  Okay.

4     Q.  And if you'd like to take a break at any

5  time, please just let me know and we can take a break.

6        Do you understand that today you're here

7  speaking on behalf of Cigna?

8     A.  Yes.

9     Q.  And did you do anything today to prepare for

10  this deposition?

11     A.  Yes.

12     Q.  Just very generally, could you tell me what

13  you did?

14     A.  We — I reviewed the issues that are

15  outstanding to familiarize myself with what I may be

16  asked in terms of questions.

17     Q.  Besides any conversations you may have had

18  with your counsel, did you speak with anyone else in

19  the company in preparation for your deposition here

20  today?

21     A.  Yes.

22     Q.  Can you tell me who that was?

Thomas E. Greenebaum          Highly Confidential          January 14, 2005
                                   Bloomfield, CT

3 (Pages 6 to 9)

```
 6
 1    A.  There were individuals just to give
 2  verification on time lines.
 3    Q.  Can you tell me the position of those
 4  individuals in the company?
 5    A.  I guess the -- it would be the Contracting
 6  Group within Cigna Pharmacy along with our Clinical
 7  Group.
 8    Q.  What is your title?
 9    A.  I'm the Chief Operating Officer of Cigna
10  Pharmacy.
11    Q.  I'd like to just step back for a moment and
12  get a little information about your background?
13    A.  Sure.
14    Q.  Can you tell me about your educational
15  background after high school.
16    A.  Yes.  I have a B.S. in construction
17  administration, and an M.B.A. in finance.
18    Q.  And can you tell me when did you start your
19  employment at Cigna?
20    A.  Three years ago.
21    Q.  Can you tell me in broad terms, prior to
22  coming to Cigna three years ago, about your employment
```

```
 7
 1  background?
 2    A.  Employment background, I worked as a General
 3  Manager of the Book of the Month Club, and prior to
 4  that I was the Chief Operating Officer of Marvel
 5  Entertainment, and prior to that I worked for an
 6  entertainment products company in Wisconsin as -- in
 7  varying levels.
 8    Q.  So would it be correct to say that prior to
 9  coming to Cigna three years ago, you had not previously
10  worked in the health insurance industry?
11    A.  That is true.
12    Q.  What about the healthcare industry generally?
13    A.  I have not prior to this position.
14    Q.  And when you came to Cigna three years ago,
15  did you come in as CEO of Cigna Pharmacy?
16    A.  I came in as -- first of all, it's COO, not
17  CEO.
18    Q.  COO?
19    A.  Chief Operating Officer, and I was the Chief
20  Operating Officer of Tel-Drug Pharmacy --
21  T E L-D R U G -- and was promoted six months ago into
22  my current position which is Chief Operating Officer of
```

```
 8
 1  all of Cigna Pharmacy.
 2    Q.  Just to clarify, you were the COO of Tel-Drug
 3  Pharmacy when you started in 19 -- well, 2001?
 4    A.  No.  2002, January.
 5    Q.  And then six months ago, you became the COO
 6  of Cigna Pharmacy?
 7    A.  Right.
 8    Q.  Can you tell me what Tel-Drug Pharmacy is?
 9    A.  Tel-Drug Pharmacy is a mail order pharmacy
10  that supports the Cigna Pharmacy benefit provided by
11  Cigna Healthcare.
12    Q.  How long has Tel-Drug been functioning in
13  that capacity for Cigna?
14    A.  Since 1993.
15    Q.  And since 1993, has tell drug been the only
16  mail order pharmacy provider for Cigna?
17    A.  Yes.  Since '93.
18    Q.  Since '93?
19    A.  Yes.
20    Q.  Do you know, between 1991 and 1993, how Cigna
21  -- if Cigna had a mail order pharmacy provider?
22    A.  No.
```

```
 9
 1    Q.  They did not?
 2    A.  They just had a retail network only.
 3    Q.  And can you tell me, in your position as COO
 4  of Tel-Drug, what your responsibilities were?
 5    A.  I was in charge of the entire operation from
 6  marketing to scrip acquisitions to dispensing of
 7  medications to patients through the mail.
 8    Q.  And can you tell me has Tel-Drug been a part
 9  of Cigna since 1993?
10    A.  Yes.
11    Q.  Do you know if Tel-Drug is a subsidiary of
12  Cigna?
13        MR. ST. PHILLIP:  Objection.  Calls for
14      a legal conclusion.
15        MS. SCHOEN:  You can still answer the
16      question.
17    A.  Yes, it is a legal entity.  Is that what
18  you're asking?
19    Q.  If it's a subsidiary of Cigna?
20    A.  Yes.
21    Q.  And can you tell me what your
22  responsibilities are currently as COO of Cigna
```

Thomas E. Greenebaum     Highly Confidential     January 14, 2005
Bloomfield, CT

4 (Pages 10 to 13)

```
                                                      10
1   Pharmacy?
2      A.  It includes oversight of the mail order
3   pharmacy, Tel-Drug, along with all of the operational
4   components of Cigna Pharmacy management, which includes
5   network operations for retail, account implementation,
6   and migration along with product design.
7      Q.  By product design, you mean the particular
8   pharmaceutical benefit plan you would offer to members?
9      A.  To clients, yes.
10     Q.  To clients -- employers?
11     A.  Employers.
12     Q.  And can you tell me what -- is Cigna Pharmacy
13  the correct terminology of what you're COO of, or is
14  there some other name?
15     A.  Cigna Pharmacy.
16     Q.  And does Cigna Pharmacy manage the
17  pharmaceutical benefits for all of Cigna?
18     A.  Yes.
19     Q.  Does that vary at all?  Are there any Cigna
20  plans, health plans, that are offered that are not
21  served by Cigna Pharmacy?
22     A.  No.
```

```
                                                      11
1      Q.  Does Cigna Pharmacy or any other part of
2   Cigna own their own pharmacies?
3      A.  Can you repeat the question?
4      Q.  Sure.
5          Does Cigna Pharmacy or any other part of
6   Cigna own pharmacies?
7      A.  Yes.
8      Q.  Does Cigna also contract with pharmacies that
9   it does not own?
10     A.  Yes.
11     Q.  And can you tell me approximately how many
12  pharmacies Cigna owns?
13     A.  We own two mail order pharmacies.  In
14  addition, we have staff model pharmacies in Arizona,
15  and I do not know how many.  It's ten approximately.
16     Q.  So it's -- one of the mail order pharmacy
17  that Cigna owns is Tel-Drug?
18     A.  Both.  One is Tel-Drug of Pennsylvania, LLC;
19  and one is Tel-Drug, Inc. in Sioux Falls, South Dakota.
20  Each are legal entities.
21     Q.  When you stay staff model pharmacies in
22  Arizona, do you mean that those are the only pharmacies
```

```
                                                      12
1   that Cigna owns, the approximately ten in Arizona?
2      A.  Yes.
3      Q.  Is there a reason that Cigna owns pharmacies
4   in Arizona and not in other parts of the country?
5          MR. ST. PHILLIP:  Objection.
6      A.  It's -- this is a unique environment where
7   Cigna owns its own medical services business which
8   provides hospital along with pharmacy, and those
9   pharmacies are within those medical operations.
10     Q.  So in Arizona, Cigna owns some hospitals?
11     A.  They own medical groups, and again, I'm not
12  one to really be talking to this piece of it.  You
13  would have to talk to the other person.
14     Q.  Is the reason for Cigna's ownership of this
15  particular medical group in the staff model, how you've
16  described it, is because it acquired some other entity
17  that previously owned those entities?
18     A.  Yes.
19     Q.  Do you know what entity it acquired?
20     A.  No, I do not.
21     Q.  Are you responsible in your current position
22  for relationships with the staff model pharmacies in
```

```
                                                      13
1   Arizona?
2      A.  Yes.
3      Q.  What is Cigna's service area?
4      A.  Nationwide.
5          Excuse me, I need clarification on that.
6   Is that pharmacy that you're asking?
7      Q.  I'm asking about Cigna's health insurance
8   network.
9      A.  Health insurance network is worldwide.
10     Q.  And is there a distinction between the health
11  insurance network and the pharmacy network?
12     A.  Yes.
13     Q.  Can you explain that distinction?
14     A.  The pharmacy network is within the United
15  States, Puerto Rico, and the Virgin Islands.  It does
16  not go into any other countries besides for that.
17     Q.  Are you responsible for overseeing the
18  relationship that Cigna has with the pharmacies it
19  contracts with?
20     A.  Yes.
21     Q.  Are you involved in the contracting process
22  with those pharmacies?
```

Thomas E. Greenebaum          Highly Confidential          January 14, 2005
                              Bloomfield, CT

5 (Pages 14 to 17)

14

1    A.  Yes.
2    Q.  And can you describe your involvement,
3  please?
4    A.  I oversee the contractual arrangements and do
5  the final review before authorizing releasing the
6  contract.
7    Q.  Does Cigna have a specialty pharmacy
8  provider?
9    A.  Yes, we do.
10   Q.  Can you tell me the name of that entity?
11   A.  It's Cigna Specialty Pharmacy.
12   Q.  And can you tell me how long that entity has
13  been providing Cigna with specialty pharmacy services?
14   A.  It has been in operation since May of 2002.
15   Q.  Prior to may of 2002, did Cigna have a
16  specialty pharmacy provider?
17   A.  No.
18   Q.  In your responsibilities of COO of Cigna
19  Pharmacy, are you responsible for overseeing Cigna
20  Specialty Pharmacy?
21   A.  Yes.
22   Q.  And can you tell me what services Cigna

15

1  Specialty Pharmacy provides?
2    A.  It's direct to consumer mail order service
3  for injectable or self-administered high dollar
4  medications to patients.
5    Q.  Does Cigna Specialty Pharmacy have the
6  ability to provide pharmaceuticals directly to a
7  physician's office --
8    A.  Yes.
9    Q.  -- for administration to the patient?
10   A.  Yes, but it would be patient specific.  We do
11  not provide medications to a doctor for the doctor to
12  resell.  We provide direct to patient.
13   Q.  If a doctor -- strike that.
14       Are any of the doctors that Cigna
15  contracts with required to use Cigna Specialty Pharmacy
16  provider to obtain drugs for their patients?
17       MR. ST. PHILLIP:  Objection to form.  It
18  calls for a legal conclusion.
19       THE WITNESS:  Can you repeat the
20  question, please.
21       MS. SCHOEN:  Can you read back the
22  question.

16

1       (The reporter read back.)
2    A.  They are not required.
3    Q.  Is the option of using Cigna Specialty
4  Pharmacy provided to all of Cigna's physicians?
5    A.  Yes.
6    Q.  Do you know how Cigna Specialty Pharmacy
7  obtains the pharmaceuticals that it provides to either
8  patients or physicians directly for a particular
9  patient?
10   A.  We purchase direct through the manufacturer
11  or through our wholesaler, and then distribute those
12  drugs through our Tel-Drug entities to the patients.
13   Q.  Do you have contracts directly with
14  pharmaceutical manufacturers?
15   A.  Yes.
16   Q.  And do those contracts provide Cigna with
17  either a discount or a rebate on pharmaceuticals that
18  Cigna purchases or uses?
19   A.  Yes.
20       MR. ST. PHILLIP:  Objection to form.  It
21  calls for a legal conclusion.
22   Q.  Does Cigna do any analysis of the -- strike

17

1  that.
2       Do you have an understanding of the
3  price that Cigna Specialty Pharmacy pays for the
4  pharmaceuticals that it purchases?
5    A.  Yes.
6    Q.  Is that price expressed in reference to any
7  particular benchmark in the industry?
8    A.  No.
9    Q.  Are those prices individually negotiated
10  between you and the manufacturer?
11       MR. ST. PHILLIP:  Objection to form.
12   A.  Yes.  I'm sorry.
13   Q.  And to your knowledge, they don't relate to
14  any benchmark in the industry?
15       MR. ST. PHILLIP:  Objection.  Asked and
16  answered.
17   A.  No.
18   Q.  For example, to -- strike that.
19       Are you familiar with the term
20  wholesalers acquisition cost or WAC?
21   A.  Yes.
22   Q.  Did their prices you purchase pharmaceuticals

Thomas E. Greenebaum          Highly Confidential          January 14, 2005
Bloomfield, CT

6 (Pages 18 to 21)

18

1  through Cigna Specialty Pharmacy bear any relationship
2  to the WAC price?
3     A.  They don't bear any relationship.  They are
4  negotiated prices.
5     Q.  So each individual pharmaceutical product
6  would be negotiated separately with each manufacturer?
7        MR. ST. PHILLIP:  Objection.
8     A.  No, not all.  Not all drugs are negotiated
9  specifically with the manufacturer.
10    Q.  If the drug is not negotiated specifically,
11 how is it negotiated?
12    A.  We would purchase it from our wholesaler
13 under our wholesaler contracts, and the wholesaler --
14 we have an arrangement, which is WAC minus or WAC plus,
15 depending on our negotiating agreement with our
16 wholesaler.
17    Q.  Do you have an understanding of the range of
18 minus or plus WAC that Cigna may obtain these products
19 from the wholesaler?
20       MR. ST. PHILLIP:  Limited to the
21    specialty pharmacy?
22       MS. SCHOEN:  Exactly.

19

1     Q.  Limited to the specialty pharmacy?
2     A.  Yes.
3     Q.  And can you tell me that range?
4     A.  No.  It's confidential.  It's a contracted
5  agreement with us and the wholesaler.
6     Q.  I'm asking for the range generally, not any
7  specific --
8     A.  It's plus or minus WAC.
9     Q.  Do you have an understanding that what we're
10 talking about today is -- well, I assume would be
11 designated by Mr. St. Philip as highly confidential
12 pursuant to the protective order in regard to this
13 matter?
14       MR. ST. PHILLIP:  To the extent -- I
15    mean, I'll talk to the witness about what the
16    law is, but if you'll give me a moment to
17    confer with the witness, we may be able to
18    hash out what we can and cannot respond to.
19       (Witness and counsel confer).
20    Q.  Based on your conversation with your counsel,
21 do you have any --
22       MR. ST. PHILLIP:  Just as a preface, our

20

1     position on the current levels of
2  reimbursement are confidential trade secret
3  information, and historical information over
4  the course of the class period here is not
5  currently in effect.  I'll allow the witness
6     to answer.
7     A.  So historically it would be a range of WAC
8  plus 5 to WAC minus 10.
9     Q.  And just for clarity, this range would be the
10 range of prices that you would receive from wholesalers
11 that you would purchase from?
12    A.  Yes.  This would be for products purchased
13 that would be distributed through our mail order
14 pharmacies.
15    Q.  Has Cigna historically purchased its
16 pharmaceutical products from one particular wholesaler
17 or many different wholesalers?
18    A.  One primary, and then several other secondary
19 along with direct from manufacturer.
20    Q.  Can you tell me the name of the one primary
21 wholesaler?
22    A.  McKesson.

21

1     Q.  Does Cigna also purchase pharmaceutical
2  products that are not related to its specialty pharmacy
3  service for it's Tel-Drug mail order service?
4     A.  Yes.
5     Q.  Do you have an understanding of the price
6  that Cigna pays for the drugs purchased for the
7  Tel-Drug mail order service?
8     A.  Yes.
9     Q.  Can you tell me what that understanding is?
10       MR. ST. PHILLIP:  The current price or
11    the historical price?
12       MS. SCHOEN:  Let's do historical prices.
13    A.  Are negotiated with the manufacturer direct
14 along with ones that are not negotiated directly.  They
15 are in a WAC range which could be in the same range of
16 plus 5 minus 10.
17       MS. SCHOEN:  I assume that you're
18    maintaining your objection to the witness
19    answering the question as to the current
20    rates in the mail order context as well.
21       MR. ST. PHILLIP:  Can you read that
22    back.

Thomas E. Greenebaum          Highly Confidential          January 14, 2005
                              Bloomfield, CT

7 (Pages 22 to 25)

22

1      (The reporter read back.)
2      MR. ST. PHILLIP:  Insofar as the -- what
3   he has testified that that information was --
4   the pricing information was related to a
5   contract between your clients and us, your
6   clients know that information.
7      MS. SCHOEN:  This would go to the
8   clients purchasing from a wholesaler which
9   would not involve the pharmaceutical
10  manufacturers.
11     MR. ST. PHILLIP:  I think that -- can I
12  confer with the witness about the sensitivity
13  of the information?
14     MS. SCHOEN:  Certainly.
15     (Witness and counsel confer).
16     MR. ST. PHILLIP:  Cigna considers the
17  price -- the price arrangements it currently
18  has with wholesalers to be competitive
19  information, vis-a-vis the pharmaceutical
20  manufacturers, and as a result, I instruct
21  the witness not to answer with respect to
22  current financial arrangements.

23

1      Q.  The WAC range that you described of plus 5
2   percent to minus 10 percent, would that hold true all
3   the way back through 1991?
4      A.  Yes.
5      Q.  Am I correct that the WAC range that you've
6   described of plus 5 percent to minus 10 percent only
7   applies to Cigna's purchases from the wholesaler?
8      A.  Correct.
9      Q.  Can you describe the price that Cigna may pay
10  if it purchases direct from a manufacturer in relation
11  to any industry benchmark?
12     A.  It's a --
13     MR. ST. PHILLIP:  Objection.
14     A.  It's a negotiated price.  It has no
15  relationship to any industry benchmark.
16     Q.  Am I correct that Cigna would negotiate with
17  manufacturers a direct purchase price that would allow
18  Cigna to purchase directly from manufacturers in some
19  cases?
20     A.  Yes.
21     Q.  And in other cases, Cigna would negotiate
22  with a manufacturer a rebate to receive on utilization

24

1   of a particular manufacturer's product?
2      A.  Yes.
3      Q.  Are part of your responsibilities supervising
4   -- strike that.
5         Do you have an understanding of the
6   reimbursement that Cigna provides to pharmacies with
7   whom it contracts?
8      A.  We make payments to retail pharmacies, yes.
9      Q.  And what are those payments for?
10     A.  Those payments are for drugs and services
11  provided to our members.
12     Q.  Do you have an understanding of the payments
13  that Cigna makes to the pharmacies that it contracts
14  with?
15     MR. ST. PHILLIP:  Objection to form.
16     A.  I'm not clear with your question.
17     Q.  Do you have an understanding of the amount of
18  the payment that Cigna pays to pharmacies with whom it
19  contracts?
20     A.  I understand the contracted rates, yes.
21     Q.  Can you tell me the methodology that Cigna
22  has employed in making payments to its pharmacies since

25

1   1991?
2      A.  Yes.  It's a formula approach that uses an
3   industry benchmark called AWP, and it's an AWP minus 4
4   brand and 4 generic, separate distinction between brand
5   and generic, and then there is a dispensed fee.
6      Q.  Do you have an understanding of the range of
7   percent below AWP that Cigna reimburses at?
8      A.  Yes.
9      MR. ST. PHILLIP:  Currently?
10     MS. SCHOEN:  Yes.
11     A.  Yes.
12     Q.  Do you have that understanding going back to
13  1991?
14     A.  Yes.
15     Q.  Can you tell me the range from 1991 to the
16  present?
17     A.  It falls under contractual arrangements that
18  I can't disclose.  It's competitive information.
19     MR. ST. PHILLIP:  Let me confer with the
20  witness just a second.
21     MS. SCHOEN:  We do have contracts in
22  this area up to.-- up to, I think, 2004.

Thomas E. Greenebaum   Highly Confidential   January 14, 2005
Bloomfield, CT

8 (Pages 26 to 29)

26

1    MR. ST. PHILLIP: I'll confer with the
2    witness.
3        (Witness and counsel confer.)
4        MR. ST. PHILLIP: Back on the record.
5    I've just explained to the witness the
6    parameters of the protective order in the
7    case, and the ability and disclosure rights
8    and obligations under the order, and the
9    witness thought that competitive information
10   might have been eked out because he thought
11   Mr. Notargiacomo was an Aetna client, so we
12   have cleared that up, and so the witness now
13   understands the parameters of the protective
14   order, and so if you would either read back
15   the question or ask it again, we will see
16   where it goes.
17       MS. SCHOEN: Would you read it back.
18       (The reporter read back.)
19   A.  I will give you historically the range has
20   been from minus 8 to minus 20 AWP.
21   Q.  Does the range that you've just described,
22   from AWP minus 8 percent to AWP minus 20 percent, apply

27

1    only to branded pharmaceuticals?
2    A.  No.  It would -- there's separate contracting
3    for generics, so methodology and range is the same.
4    Oh, no, it isn't.  It's different.  What am I thinking!
5    Q.  So then just answer my question again.
6        Does the range that you just described
7    of AWP to minus 20 percent to AWP minus 8 percent apply
8    only to branded?
9    A.  Only to branded.
10   Q.  Is there a different range that Cigna will
11   make payments at for generic pharmaceuticals?
12   A.  Yes.
13   Q.  Can you tell me what that range would be?
14   A.  I mean historically again would be minus 8 to
15   MAC, which MAC is minus 55, 60 roughly.
16   Q.  And just for clarity, when you say
17   historically, you're speaking back until 1991 until --
18   A.  Until --
19       MR. ST. PHILLIP: Current.  Current
20   contracts.
21       MS. SCHOEN: Okay.
22       MR. ST. PHILLIP: Is that correct?

28

1        THE WITNESS: Yes.
2    Q.  And you referenced the MAC price for
3    generics.
4        Does Cigna have its own MAC price list?
5    A.  Yes.
6    Q.  Can you tell me how Cigna formulates that
7    list?
8    A.  In general terms, we take in several
9    different sources of what the drugs would cost the
10   retail pharmacy out in -- through wholesalers, and
11   through that process determine what would be the
12   appropriate payment for that particular drug to the
13   retail pharmacies and set that MAC at that price.  So
14   it's using several different sources of data.
15   Q.  So tell me if I have this right.  Cigna uses
16   several different sources of data to determine the cost
17   to the retail pharmacies for these generic
18   pharmaceutical products?
19       MR. ST. PHILLIP: Objection.
20   A.  We determine what we will pay the pharmacy by
21   using that information, but the information that we
22   have been provided isn't the price that we would pay.

29

1    We make adjustments based on what we see in the
2    marketplace to be competitive.
3    Q.  So Cigna does put some effort into
4    understanding what retail pharmacists may have to pay
5    for a generic drug?
6        MR. ST. PHILLIP: Objection.
7    A.  Yes.
8    Q.  Can you tell me what sources or what process
9    Cigna goes through generally to make that
10   determination?
11   A.  We use wholesaler pricing.  We use our own
12   direct purchasing for our pharmacies.  We use
13   governmental established rates to make the comparison.
14   Q.  So, for example, if Cigna purchases a generic
15   drug through or for its Tel-Drug mail-order service,
16   you might look at the price Cigna is paying for that,
17   and take that into account when you set a MAC price for
18   that particular generic drug?
19       MR. ST. PHILLIP: Objection.
20   A.  Yes.  We do take that into account.
21   Q.  But at the same time -- strike that.
22       But would I also be correct to say that

Thomas E. Greenebaum          Highly Confidential          January 14, 2005
                              Bloomfield, CT

9 (Pages 30 to 33)

---

**30**

1  the price — the payment rather that Cigna makes to a
2  pharmacist for a generic pharmaceutical product would
3  not necessarily be at that price, but would be affected
4  by the competitive nature of the marketplace?
5      MR. ST. PHILLIP:  Objection.
6   A.  Yes.
7   Q.  So that price would build in some kind of a
8  reasonable margin for the pharmacists?
9      MR. ST. PHILLIP:  Objection.
10      Are you talking about all generic drugs?
11      MS. SCHOEN:  Yes.  We're talking about
12  generic drugs right now.
13   A.  In specific, we will look at what pharmacies
14  would acquire the drug for and what would be a
15  reasonable margin to make on that drug as part of our
16  analysis.
17   Q.  And when you say a reasonable margin, you
18  mean a reasonable margin for the pharmacist to make on
19  that particular drug?
20   A.  We would provide a profit margin which would
21  be competitive in the marketplace.
22   Q.  How do you determine if a particular profit

---

**31**

1  margin is competitive in the marketplace?
2      MR. ST. PHILLIP:  Objection.  Every time
3   a generic drug still?
4      MS. SCHOEN:  Yes.  We are still talking
5   about generic drugs.
6   A.  It's a practice, just a standard business
7  practice that we use and employ in terms of running a
8  business, and how much profit you need to make on the
9  drug versus other things in the pharmacy.  Just like
10  you would read analysts' reports.  We read analysts'
11  reports to see what retail pharmacies are making and
12  make appropriate adjustments.
13   Q.  So you basically do research and maybe have
14  conversations with pharmacists?
15   A.  We don't have conversations with the retail
16  environment about our MAC pricing.  We read analysts'
17  reports.  We make a good business decision.  We look at
18  protecting our members and clients to insure that they
19  get the best value when they are going to the retail
20  pharmacy, so by providing the best value, it will be
21  the lowest profit margin tolerable by the retail
22  environment.

---

**32**

1   Q.  So your goal is to provide the pharmacies for
2  generic drugs with the lowest payment that you can but
3  still allowing them to stay in business and have some
4  reasonable profit margin?
5      MR. ST. PHILLIP:  Objection.
6   A.  It's a reasonable accounting of it, yes.
7   Q.  Now, we've been talking about generic drugs.
8  Turning back to branded drugs, do you go through a
9  similar analyses when determining the payment to make
10  to a pharmacist for a generic — a branded drug?
11      MR. ST. PHILLIP:  Which analysis are we
12   talking about?
13      MS. SCHOEN:  The analyses where Cigna
14  would attempt to determine the price that a
15   pharmacist could buy a branded drug for and
16   then look at analysts' reports and other
17   information to determine an appropriate
18   reasonable profit margin.
19   A.  No.
20   Q.  Can you tell me what process Cigna would go
21  through to determine the payment rate for branded
22  pharmaceuticals to a pharmacist?

---

**33**

1      MR. ST. PHILLIP:  I guess I'm just going
2   to object insofar as there are thousands of
3   pharmacies, and so to the extent that you can
4   answer that generally, please do so.
5      MS. SCHOEN:  If there's no general
6   answer, then that can be the answer.  I'm
7   asking if there was a general answer like
8   there was for the generic.
9   A.  The general pricing methodology is based on
10  the number of pharmacies, the compliance to our
11  formulary to quality statistics, to — the other
12  criteria along with the competitive nature on what
13  other pharmacy benefit providers are reimbursing
14  through anecdotal information that we are able to
15  acquire, but there — I have to be more specific in
16  that this is not on a drug-by-drug basis like MAC.
17      MAC is on a drug-by-drug basis.  Brand
18  is purely a percentage off of AWP for all brands.
19   Q.  Why is there a difference between Cigna's
20  approach to payments to pharmacist for generic drugs
21  and payment to pharmacists for branded drugs?
22   A.  On the generics, the reason for the MAC

---

Thomas E. Greenebaum        Highly Confidential        January 14, 2005
Bloomfield, CT

10 (Pages 34 to 37)

---

**34**

1    pricing is the movement to the lower cost drugs which
2    are generic where there is a brand with a multisource
3    generic available. We only want to -- we only want to
4    pay for the generic value. Even if they decide to
5    dispense brand, we only want to pay for generic, so
6    it's a driving to the lowest net cost is why we set up
7    the generics the way we do, because we want movement to
8    the lowest cost for our patients.
9            Branding -- again, the way we do that is
10   an industry standard that has been out there prior to
11   1991, where there has been an established price or
12   percentage off AWP for the retail network.
13   Q.   Does Cigna offer a higher dispensing fee to
14   pharmacists for generic drugs over branded drugs?
15       MR. ST. PHILLIP: Objection.
16   A.   For the most part brand and generic dispensed
17   have the same dispensing fee.
18   Q.   So just to make sure that I understand your
19   answer, Cigna's methodology for determining its MAC
20   price list versus its methodology for determining how
21   to pay physicians -- rather pharmacists for branded
22   drugs, is due, at least in part, to wanting to drive

---

**35**

1    pharmacists to dispense the lower cost generics rather
2    than the higher cost branded drugs?
3    A.   Our goal, as our clients have contracted with
4    us, is to provide them the lowest net cost, so we will
5    arrange and organize our business to provide that
6    lowest net cost and still provide the health to the
7    patients. So we set up and try to drive to generics,
8    when they are therapeutically equivalent, as much as
9    possible.
10   Q.   So is it your understanding that the
11   reimbursement -- I'm sorry, the payment that Cigna
12   makes to pharmacists for generic drugs allows the
13   pharmacists the higher margin than the payments that
14   Cigna makes for branded drugs generally?
15       MR. ST. PHILLIP: Objection.
16   A.   I can't tell you what margin, because I don't
17   know what they're buying their drugs for.
18   Q.   You don't know what the pharmacists are
19   buying their branded drugs for?
20   A.   I don't know what the retail chains are
21   buying their drugs for exactly.
22   Q.   Branded drugs or generic drugs or both?

---

**36**

1    A.   Both.
2    Q.   Earlier I thought that you testified that
3    Cigna looks at what it pays for a particular generic
4    drug, and then uses that information to give it some
5    idea of what the pharmacists were paying for the same
6    generic drug, is that correct?
7        MR. ST. PHILLIP: Objection. That
8        mischaracterizes his testimony.
9    A.   That isn't correct. What I'm saying is that
10   we do purchase our own, but that does not tell me what
11   a retail pharmacy chain can purchase those same drugs
12   for. So all I can do is make estimates based on what I
13   can buy them for, but that doesn't tell me what they
14   are buying them for. It just gives me some
15   indications, and based on those indications, I make a
16   value decision at that point.
17   Q.   So looking at what Cigna pays for a
18   particular generic drug doesn't tell you exactly what a
19   pharmacist might pay, but it gives you an idea of the
20   range in which they are paying for drugs?
21       MR. ST. PHILLIP: Objection. Asked and
22       answered.

---

**37**

1    A.   Yes. It gives me an idea.
2    Q.   And likewise, Cigna's purchasing of branded
3    drugs for its mail order pharmacy would give you some
4    idea of what pharmacists in the retail world are paying
5    for branded drugs, is that correct?
6        MR. ST. PHILLIP: Objection.
7    A.   It gives us some idea, but I don't know what
8    their arrangements are with the wholesale community or
9    with the manufacturer. I don't know what their
10   arrangements are.
11   Q.   In terms of purchasing -- strike that.
12          In terms of retail pharmacies purchasing
13   from wholesalers, is it your understanding that the
14   retail pharmacists purchase from wholesalers in
15   relationship to the WAC price?
16       MR. ST. PHILLIP: Objection. Are you
17       talking about all retail pharmacists?
18       MS. SCHOEN: I'm talking about retail
19       pharmacists generally.
20   A.   In general, they buy in some relationship to
21   WAC, yes, as I understand it.
22   Q.   Is it correct that when Cigna determines how

---

38

1  much of a payment to provide to a pharmacist for a
2  branded drug, that it does not look at what Cigna pays
3  for branded drugs generally?
4          MR. ST. PHILLIP: Objection,
5      A. No. No. Again, it's following the line of
6  what's competitive out in the marketplace in terms of
7  what I will pay a pharmacist for a branded drug, and
8  understanding that my percentage off of AWP is purely a
9  pass-through to our clients so that I am not -- I am
10  setting the price that my client will pay for. And
11  that -- I think you'd have to restate the question so I
12  can get clarity on what you're asking.
13     Q. Sure. Let me ask it differently.
14         When Cigna determines what payment to
15  make to a pharmacist for a branded drug or branded
16  drugs generally, does Cigna care what the physician --
17  the pharmacist acquisition costs was?
18     A. No.
19     Q. Instead -- and let me know if I've got this
20  right -- what Cigna cares about is the competitive
21  marketplace and being at a reasonable place to allow it
22  to maintain the network of pharmacies in comparison to

39

1  other health plans?
2          MR. ST. PHILLIP: Objection.
3      A. I would characterize it that we set our
4  payments to the retail pharmacies so that it is
5  competitive in the industry.
6      Q. Who are you competing with?
7      A. We are competing with other pharmacy benefit
8  providers, and this is related to pharmaceuticals.
9  This is not related to healthcare.
10     Q. So, for example, you would be competing with
11  pharmacy benefit managers, like Caremark?
12         MR. ST. PHILLIP: Objection.
13     A. I would say that I would characterize them as
14  competitors, but that our pharmacy benefit that we
15  provide is not what they provide.
16     Q. Can you explain the difference?
17     A. The difference is that we are part of a
18  health plan. That's the difference. We are not
19  independent from a health plan.
20     Q. So would that difference be a difference
21  primarily for your clients?
22         MR. ST. PHILLIP: Objection.

40

1      A. It is a difference in terms of our clients.
2  It is a difference in terms of the benefit that we
3  provide relative to those other entities.
4          MR. ST. PHILLIP: Is this a good time
5      for a break?
6          MS. SCHOEN: I just have a couple more
7      questions.
8      Q. But this Cigna Pharmacy provides similar
9  services to Cigna that a pharmacy benefit provider or
10  rather a pharmacy benefit manager would provide to a
11  health insurance plan, is that correct?
12         MR. ST. PHILLIP: Objection. Objection.
13     If you understand it.
14     Q. For claims processing?
15     A. Yes. We provide claims processing.
16     Q. Formulary management?
17     A. Yes.
18     Q. I'm just trying to understand if there's any
19  other distinctions between the services that a pharmacy
20  benefit manager would provide and what Cigna is
21  providing to Cigna, because to me it seems like you are
22  basically serving the same function, with the exception

41

1  that Cigna Pharmacy is a part of the larger Cigna, and
2  a pharmacy benefit provider is an independent separate
3  entity.
4          MR. ST. PHILLIP: There is no question.
5          MS. SCHOEN: That is a question
6      actually.
7      Q. Is that correct?
8          MS. SCHOEN: I mean, we can go through a
9      whole line. I was just trying to shortcut
10     the question. Earlier he indicated there was
11     a distinction, and I don't want to miss
12     anything, if he can tell me if that's correct
13     or not. And if not, we can go through a
14     whole line of questions.
15         If there's no distinction, then I'm not
16     interested in going down this line.
17         MR. ST. PHILLIP: To the extent you
18     understand it, you can answer.
19     A. The distinction is we provide services to
20  Cigna Health Care members only. We do not provide
21  services to any other health plan. Pharmacy benefit
22  managers sell their services to multiple health plans.

Thomas E. Greenebaum     Highly Confidential     January 14, 2005
Bloomfield, CT

12 (Pages 42 to 45)

---

**42**

1  We only support our own which is Cigna health plans.
2  That is the distinction, and it is a significant
3  distinction.
4      MS. SCHOEN: Thank you. Why don't we
5      take a break now.
6      (Recess was taken).
7  Q. Can you tell me how long has Cigna's pharmacy
8  existed?
9  A. Cigna Pharmacy -- it is not a legal entity.
10 It has been part of Healthcare since Healthcare was
11 established, which is well before '91.
12 Q. And has Cigna Pharmacy always provided the
13 pharmaceutical benefit management services for Cigna?
14 A. Yes.
15 Q. Has Cigna ever used third party or any other
16 entity to provide those services?
17     MR. ST. PHILLIP: Objection. To the
18     extent that the question calls for a client's
19     relationship, if any, with any PBM, I'll note
20     that deposition subject 8 was excluded by the
21     court in the November 2, 2004 order, so we
22     would move in advance to strike the witness's

---

**43**

1  answer, but with that reservation, we'll
2  allow the witness to answer.
3      MS. SCHOEN: For the record, we
4  obviously disagree. This question falls
5  under other deposition subjects that were
6  allowed, in particular, deposition subject 1.
7      MR. ST. PHILLIP: With that, you can
8  answer, if you remember the question.
9      THE WITNESS: I do remember the
10 question.
11 A. We do contract with other pharmacy benefit
12 managers or have contracted with other pharmacy benefit
13 managers.
14 Q. Can you tell me when -- strike that.
15     Can you tell me whether Cigna currently
16 contracts with another pharmacy benefit manager?
17     MR. ST. PHILLIP: I will make the same
18     objection, and motion to strike.
19     MS. SCHOEN: And the same response.
20 A. There is two relationships that I know of at
21 this point.
22 Q. Can you tell me what those are?

---

**44**

1      MR. ST. PHILLIP: Same objection.
2  A. Those are current contract relationships that
3  I don't feel that I should be disclosing.
4      MR. ST. PHILLIP: Just so if that's the
5      client's position, it's also the lawyer's
6      position. We'll take the position that we
7      litigated this exclusive question before
8      Magistrate Judge Bowler. She ruled and
9      indicated that subjects 8, 9, and 10 were
10     excluded from the deposition.
11     As a result, I'm instructing the witness
12     not to answer.
13     MS. SCHOEN: Okay. Clearly it is our
14 position that this broad line of questioning
15 falls under deposition subjects that have
16 been allowed. As I've stated previously in
17 specific relationship to subject 1, under
18 Cigna's methodology for reimbursement and
19 paying for pharmaceutical products either
20 directly or through PVMs.
21     MR. ST. PHILLIP: I think we understand
22 your position.

---

**45**

1  Q. In 1991, did Cigna contract with a pharmacy
2  benefit manager?
3      MR. ST. PHILLIP: I will instruct the
4  witness not to answer.
5      MS. SCHOEN: Are you going to instruct
6  the witness not to answer any of the
7  questions about the relationship with the
8  pharmacy manager from 1991 to -- correct?
9      MR. ST. PHILLIP: I'm going to instruct
10 the witness not to answer any questions
11 concerning any relationship with any PBM, and
12 I'm going to rely on deposition instruction
13 No. 8 for that instruction.
14     MS. SCHOEN: Well, under deposition
15 subject No. 1, all methodologies your client
16 utilized or considered utilizing to determine
17 the amounts to pay or reimburse healthcare
18 providers and pharmacies, either directly or
19 through PVMs, for drugs administered or
20 dispensed requires some understanding of
21 whether there was a PBM to understand the
22 methodology for reimbursement.

Thomas E. Greenebaum          Highly Confidential          January 14, 2005
                                Bloomfield, CT

13 (Pages 46 to 49)

46

1      MR. ST. PHILLIP:  And I think we
2   understand each other's positions.
3      Q.  Can you tell me why Cigna, from 1991 to the
4   present, would have contracted with a pharmacy benefit
5   manager rather than simply relying on Cigna Pharmacy
6   which provides that service -- the pharmacy management
7   service as well?
8      MR. ST. PHILLIP:  I'd like the same
9   instruction, and rely on deposition subject
10  No. 9 specifically.
11     MS. SCHOEN:  So you're instructing him
12  not to answer?
13     MR. ST. PHILLIP:  Yes.
14  Ed, are you on the phone?
15     MR. NOTARGIACOMO:  Yeah.  I got kicked
16  off for a minute, but I'm back.
17     Q.  Can you tell me historically what percentage
18  of the pharmacy benefit services that Cigna provides to
19  its members has been administered by Cigna Pharmacy as
20  opposed to some other entity?
21     MR. ST. PHILLIP:  Same objection.
22  If the witness understand the questions,

47

1   I'll let him answer.
2      A.  Less than 5 percent was done by others during
3   that time frame.
4      Q.  You mentioned earlier you used the term
5   pass-through to client in terms of discussing the
6   payments that Cigna makes to pharmacists?
7      A.  Uh-hum.
8      Q.  Can you tell me what you mean by pass-through
9   to client?
10     MR. ST. PHILLIP:  Objection.  It calls
11  for a legal conclusion.  The witness can
12  answer.
13     A.  What I meant by pass-through is that Cigna
14  still pays the retail pharmacies, but what we bill the
15  client is the -- exactly the same amount that we paid
16  the retail pharmacy.
17     Q.  And is that true for all of the plans that
18  Cigna offers?
19     MR. ST. PHILLIP:  I'll just interpose an
20  objection based on deposition topic 22, but
21  to the extent that the witness can answer,
22  I'll allow him to answer.

48

1      A.  For the most part, that is the arrangement I
2   described is how we handle the retailing network.
3   There are varying plans where there are varying
4   discounts where it may or may not be a direct
5   pass-through, but in general terms, that is the
6   arrangement I described previously.
7      Q.  I believe you testified earlier that Cigna
8   contracts in some cases directly with manufacturers for
9   rebates for pharmaceutical products?
10     MR. ST. PHILLIP:  Objection.  The record
11  speaks for itself.
12     A.  As I had referred earlier, we do.
13     Q.  Does Cigna pass on the rebates that it
14  receives from pharmaceutical manufacturers to its
15  clients?
16     MR. ST. PHILLIP:  Objection.  It calls
17  for a legal conclusion as to what pass on
18  means, and it relates directly to topic
19  No. 22, which is your client's relationship
20  with your insured's, including all
21  methodologies by which you bill your
22  insureds, directly or indirectly, for

49

1   pharmaceuticals and pharmaceutical expenses
2   or administrative services.
3      The topic was excluded by Magistrate
4   Judge Bowler on the November 2, 2004 order,
5   and we will move to strike the witness's
6   answer, but I'll allow him to answer.
7      A.  We have financial arrangements that may
8   include sharing some of the rebate dollars with the
9   client.
10     Q.  And would that vary by client?
11     MR. ST. PHILLIP:  Same objection.
12     A.  Yes.
13     Q.  Would there be instances in which Cigna does
14  not share any of the rebates it might receive from a
15  pharmaceutical manufacturer with a client?
16     MR. ST. PHILLIP:  Same objection and
17  motion.
18     A.  Yes.  As I stated earlier, it varies by
19  client.
20     Q.  Earlier we were discussing the payments that
21  Cigna makes for branded pharmaceutical products that
22  pharmacists may dispense to members, and you had

Thomas E. Greenebaum      Highly Confidential      January 14, 2005
Bloomfield, CT

**14 (Pages 50 to 53)**

50

1   testified that there is variation in the discount off
2   of AWP that Cigna reimburses, is that correct?
3        MR. ST. PHILLIP: Objection. It
4        mischaracterizes the testimony.
5      A.  I believe -- I have already answered the
6   question. I guess I -- could you repeat what it is
7   that you're asking?
8      Q.  I'm referencing you back to the prior
9   testimony where you had testified that there is a
10   variation in the payment that Cigna may make to a
11   pharmacist for branded pharmaceutical products.
12        MR. ST. PHILLIP: Objection. I think it
13        mischaracterizes the testimony.
14      A.  I believe what I was stating was that there
15   is variation in what discounts off of AWP are provided
16   to the retail network based on a group of criteria that
17   we had outlined earlier.
18      Q.  And in particular, you referenced a variation
19   of AWP minus 8 percent to AWP minus 20 percent for
20   branded pharmaceuticals, is that correct?
21        MR. ST. PHILLIP: Object to the form.
22      A.  You'd have to repeat what you just stated in

51

1   terms of the range. I didn't --
2      Q.  The range that you had testified earlier that
3   Cigna makes payments to pharmacists for branded
4   pharmaceuticals was AWP minus 8 percent to AWP minus 20
5   percent?
6      A.  That is correct.
7      Q.  Can you tell me what causes the variation
8   between the minus 8 percent to the minus 20 percent?
9      A.  I already answered that question earlier,
10   based on the criteria that we use in determining the
11   discount off of AWP.
12      Q.  So the same criteria you mentioned earlier,
13   the number of pharmacies, compliance with the
14   formularies, the quality statistics, and the
15   competitive nature of the marketplace?
16      A.  Correct.
17      Q.  Are there any other causes for the variation?
18      A.  Those are, in general, what we use.
19      Q.  Is it correct that some pharmacists or retail
20   chains that Cigna would negotiate with would have more
21   leverage than others?
22        MR. ST. PHILLIP: Object to the form.

52

1      A.  What do you mean by leverage?
2      Q.  More leverage to -- more bargaining power in
3   the negotiation process? Would some pharmacists or
4   retail chains have more bargaining power when you, say,
5   sit down at the table with Cigna, than others?
6      A.  They may, but up until this point, we
7   negotiate based on a set of criteria, and we really
8   don't go beyond that subject criteria with any entity.
9      Q.  Well, within the set of criteria, there is
10   some variation?
11        MR. ST. PHILLIP: Objection. Go ahead.
12      A.  Like any negotiated arrangement, it's a
13   negotiated arrangement, so there's variation.
14      Q.  And my only question is whether some of that
15   variation is due to some pharmacists or retail networks
16   having more bargaining power than others?
17      A.  I mean, I answered that, that, you know, it's
18   a negotiated agreement, and there's all kinds of things
19   that enter into it based on what they are providing
20   from services and drugs.
21      Q.  I'm asking about one particular aspect of
22   that.

53

1      A.  Which aspect is that?
2      Q.  Which is whether some pharmacists or retail
3   chains have more bargaining power than others in these
4   negotiations?
5        MR. ST. PHILLIP: Objection. Asked and
6        answered.
7      A.  I guess I'm trying to understand what
8   aspect -- you keep referring to leverage. I guess I'm
9   trying to understand what piece are you looking at?
10   You know, there -- I don't -- I guess -- I'm not clear
11   on what leverage you're looking for.
12      Q.  Well, I used the term bargaining power.
13        Is that a term that has some meaning to
14   you?
15      A.  It does. If I'm the only pharmacy in a
16   community, you have bargaining power to negotiate a
17   better rate.
18      Q.  So the answer to my question is that yes,
19   some pharmacists or retail chains would have more
20   bargaining power than others?
21        MR. ST. PHILLIP: Objection. You asked
22        it a couple of times, and he has answered it

Thomas E. Greenebaum    Highly Confidential    January 14, 2005
Bloomfield, CT

15 (Pages 54 to 57)

---

54

1     a few times.
2        A.  My point is that each situation is unique.
3   Each negotiation is unique, and we settle on terms
4   based on that particular situation, and it varies by
5   chain. It varies by state. It varies by location.
6   There are a tremendous amount of variables that are
7   considered when negotiating.
8        Q.  And my question was just a little bit
9   different.
10           It goes to one particular facet of the
11  negotiation, not questioning whether it is the sole
12  facet but whether it is one, and whether it is the case
13  that in negotiations with pharmacists or a retail
14  chain, some may have more bargaining power than others?
15           MR. ST. PHILLIP:  We stipulate to that.
16           We stipulate to that.
17       Q.  Can you tell me why Cigna offers a dispensing
18  fee to pharmacists and retail chains in addition to the
19  reimbursement that you've described that's either based
20  on some percentage off of AWP or based on a MAC price
21  list?
22       A.  The dispensing fee is an industry standard.

---

55

1   A long time ago -- and I can't establish when, but
2   prior to '91 -- there was a price that was determined
3   for the drugs, and then there was a price determined to
4   put the drugs in the bottle, and the dispensing fee is
5   putting the drugs in the bottle.
6           Now, today, it is still carried on as a
7   practice, but has no relevance to a service being
8   provided as putting drugs in a bottle. It is just part
9   of the pricing platform that is used in the industry,
10  and we continue to maintain that.
11       Q.  So I just want to make sure I understand.
12          When you say there's no -- currently no
13  relevance to the service being provided, is that
14  because -- are you saying that the dispensing fee is
15  kind of an artificial concept now?
16          MR. ST. PHILLIP:  Objection.
17       A.  No, I didn't say that. It's just --
18       Q.  Can you explain a little more what you mean
19  by no relevance to the service being provided?
20       A.  It is now -- you really just look at the two
21  pieces together as this is the price I pay you.
22  Whether or not the service component is within the drug

---

56

1   price or the service component is within the
2   dispensing, you put the two together. That's the price
3   I'm paying you for the drugs and service.
4           So you really can't delineate those
5   separate any more; where at one time, long ago, there
6   was a true distinction between this is the cost of the
7   drugs, and this is the cost of the service.
8        Q.  I see.
9           So when you negotiate with a pharmacist,
10  or you look at a payment that you might consider making
11  to a pharmacist, you're going to consider the AWP based
12  price or the MAC based price that we talked about
13  earlier and the dispensing fee kind of as one package?
14          MR. ST. PHILLIP:  Objection.
15       A.  We negotiate a price AWP minus or MAC plus a
16  dispensing fee as our process of determining what we
17  will pay, and both of those are taken into account for
18  that payment. That's the process.
19       Q.  In negotiating with a pharmacist, do you ever
20  come across a situation where a pharmacist might say, I
21  really prefer a higher dispensing fee, and so, as a
22  part of the process, for some reason they value a

---

57

1   higher dispensing fee, and that might end up making the
2   AWP reimbursements, say, for a branded pharmaceutical
3   less?
4           MR. ST. PHILLIP:  Objection.
5           Foundation.
6        A.  I have not -- I have not seen that. What
7   people will negotiate, both pieces separately, and they
8   will negotiate them together. It varies by retail
9   pharmacy.
10       Q.  When you say people, are you referring to the
11  Cigna negotiators or the pharmacist negotiators?
12       A.  The retail pharmacy negotiators.
13       Q.  But regardless of how the retail pharmacist
14  would look at it, Cigna is looking at it as a total
15  payment with two prongs or two components?
16       A.  I believe I already answered that, and we
17  look at both components and in total.
18       Q.  Do you have an understanding of whether the
19  dispensing fees that Cigna provides covers the
20  pharmacist's costs of dispensing the drug and the
21  pharmacist's overhead?
22       A.  Am I aware -- can you ask the question again

---

Thomas E. Greenebaum     Highly Confidential     January 14, 2005
                            Bloomfield, CT

16 (Pages 58 to 61)

58

1 because I'm not clear?
2    Q.  Sure.
3       Do you have an understanding of whether
4 the dispensing fees that Cigna provides actually cover
5 the pharmacist's costs of dispensing the drug and any
6 attendant overhead costs that the pharmacist might
7 have?
8      MR. ST. PHILLIP:  I assume you're not
9     asking the question with respect to each of
10     the fifty odd thousand pharmacists?
11     MS. SCHOEN:  I'm asking as a general
12     matter.
13    A.  I have no idea if it's covering it or not.  I
14 can make my own personal assumptions, but as a
15 business, I don't know whether or not, you know, it
16 covers it because I don't know the intricacies of their
17 financial arrangements.
18    Q.  Does it matter to you whether it covers the
19 pharmacist's overhead and costs or not?
20    A.  What matters to Cigna is that they are
21 providing the services required for our patients.
22 That's what makes a difference to us.

59

1    Q.  For what Cigna believes to be a reasonable
2 payment?
3    A.  Correct.  That's correct.  Yes.
4    Q.  Do you know why Cigna uses the average
5 wholesale price or AWP as a benchmark for reimbursing
6 pharmacies?
7    A.  This is an industry standard that we are
8 following and have followed since 1991.
9    Q.  Has Cigna ever considered using a different
10 benchmark for payments to pharmacies?
11    A.  Have we considered?  We have considered, but
12 it's paddling upstream.  It would be so outside of what
13 everybody else is doing that we would lose all of our
14 business, because everybody is under the AWP minus
15 methodology.
16    Q.  Are there any other reasons that Cigna has
17 not made an attempt to switch from the AWP benchmark to
18 another benchmark?
19      MR. ST. PHILLIP:  Objection.  It assumes
20     facts not in evidence.
21    A.  You know, again, this is a battle that we
22 don't think is worth fighting.  Are there other

60

1 methodologies that you could implore?  Sure.  There are
2 businesses out there that do other things that are
3 outside the pharmaceutical industry, but in this
4 industry, this is what the industry uses, and that's
5 what we're following is an industry standard.
6    Q.  So would you say that the average wholesale
7 price benchmark, is that a convenient benchmark to use
8 for payments to pharmacies?
9      MR. ST. PHILLIP:  Objection.
10    A.  I can't say whether it's convenient.  It's
11 what we use as part of our pricing methodology to make
12 payments to the retail pharmacies.
13    Q.  Going back to our questions earlier, you had
14 testified as to the range of purchase prices that Cigna
15 may receive from wholesalers historically but objected
16 to providing that information currently.
17     I would ask, based on subsequent
18 conversations with counsel, if you're now willing to
19 testify as to the current range?
20    A.  We're not.
21    Q.  So that's distinct from the reimbursement or
22 payments provided to pharmacies?  You're putting that

61

1 in a different class of --
2      MR. ST. PHILLIP:  I'm sorry, what -- I'm
3     not understanding.
4      MS. SCHOEN:  Initially you had objected
5     to testimony on the current reimbursed
6     payment rates to pharmacies or retail chains,
7     and then allowed that testimony.
8      My question is whether that same
9     position would hold true for Cigna's
10     purchases of pharmaceuticals from
11     wholesalers?
12      MR. ST. PHILLIP:  I mean, I guess the
13     distinction that we are trying to draw here
14     is that Cigna's contractual rates with
15     wholesalers and pharmacies are more
16     competitively sensitive in terms of their
17     relationships in the industries and pricing
18     situations than historical rates.
19      And since this case involves a -- what
20     is it now 14 years -- 13-year time frame,
21     that based on the balancing of the
22     competitive harm to Cigna and the need for

Thomas E. Greenebaum        Highly Confidential        January 14, 2005
Bloomfield, CT

17 (Pages 62 to 65)

62

1  the parties in this case to have access to
2  information, we are taking the position that
3  current rates are -- the competitive
4  sensitivity of the current rates are trade
5  secrets and that include that testimony, and
6  that any historical rate over the time period
7  of the 13 years that exists in this
8  litigation are fair game.
9       MS. SCHOEN: So the upshot of that is
10  you're still directing the witness not to
11  answer those questions?
12       MR. ST. PHILLIP: With respect to
13  current contracted rates.
14   Q.  Is it correct that Cigna offers different
15  plans?
16       MR. ST. PHILLIP: I'm going to pose an
17  objection based on deposition topic No. 22
18  which calls for your clients' relationship
19  with your insureds, including all
20  methodologies by which you bill your
21  insureds, directly or indirectly, for
22  pharmaceuticals and pharmaceutical dispensing

63

1  or administration services, which topic was
2  excluded by Magistrate Judge Bowler in the
3  November 2nd, 2004 order.
4       MS. SCHOEN: This is a background
5  question to get to No. 1, which is
6  reimbursement methodologies and what -- the
7  goal is to establish whether the
8  reimbursement methodologies may differ by
9  plan, but before I can ask that question, I
10  need to understand if, in fact, Cigna offers
11  more than one health plan.
12       MR. ST. PHILLIP: All right. We'll
13  preserve our rights to strike the answer and
14  allow the witness to testify.
15   A.  Yes. We offer different plans to different
16  clients.
17   Q.  Does the reimbursement or payment that Cigna
18  makes to pharmacists or retail chains vary based on the
19  particular plan that a member may have?
20       MR. ST. PHILLIP: Same objection.
21   A.  If I understand the question correctly, we do
22  not reimburse the retail pharmacies any different rate

64

1  relative to a plan that a client may have. The
2  reimbursement rate to the retail pharmacies is
3  consistent across our base of client and plans.
4       Q.  Besides the example you told me about earlier
5  in Arizona, does Cigna own any hospitals or physician
6  groups?
7   A.  No.
8   Q.  Can you tell me what RX Prime is?
9   A.  RX Prime is our -- one of our pharmacy plans
10  within Cigna Pharmacy.
11       Q.  Can you describe what a pharmacy plan is?
12       MR. ST. PHILLIP: Again, I interpose an
13  objection based on topic No. 22.
14       You may answer.
15   A.  A pharmacy plan is the rates which are
16  charged to a client for pharmacy services, which
17  include not only dispensing of drugs both retail and
18  mail, but clinical programs and other services that we
19  may provide as it relates to pharmacy.
20   Q.  And how many pharmacy plans does Cigna have?
21       MR. ST. PHILLIP: Objection based on
22  topic No. 22.

65

1       You can answer.
2   A.  I don't have a count of the variations.
3  There are, as in any negotiated contract with our
4  clients, there are variations by client. So the plans
5  vary by client. They are specific to client.
6   Q.  So each client plan is going to be a bit
7  different from another client's plan?
8       MR. ST. PHILLIP: Again, I'm going to
9  object based on topic No. 22, and reserve our
10  right to strike the answer, but I'll allow
11  the witness to answer.
12   A.  Clients could have a similar plan to another
13  client. The client could have a totally different plan
14  based on what their requirements are in terms of what
15  programs they do or don't want to implement within
16  their client -- within their member base.
17   Q.  Is Health Source RX another pharmacy plan
18  that Cigna offers?
19   A.  Yes, it is.
20       MR. ST. PHILLIP: Another objection
21  based on topic No. 22.
22   A.  It was an acquired plan in our acquisition of

Thomas E. Greenebaum  Highly Confidential  January 14, 2005
         Bloomfield, CT

18 (Pages 66 to 69)

66

1 Health Source and was rolled into other pharmacy plans,
2 so Health Source RX doesn't exist any more in -- after
3 acquisition.
4   MS. SCHOEN: I would just note for the
5   record that questions regarding RX Prime and
6   Health Source RX are related to documents
7   produced by Cigna.
8   MR. ST. PHILLIP: And also topics
9   excluded by Magistrate Judge Bowler on the
10   November 2nd, 2004 order.
11   MS. SCHOEN: To understand the document,
12   I need to understand what these entities are.
13   MR. ST. PHILLIP: We reserve our rights.
14  Q. Did you have an understanding of whether
15 pharmacies or retail chains receive rebates from
16 pharmaceutical drugs that they dispense?
17  A. I'm not aware of that.
18  Q. Does Cigna take any steps to encourage
19 physician's to use a Cigna Specialty Pharmacy service?
20   MR. ST. PHILLIP: Objection.
21  A. We encourage them to use our specialty
22 pharmacy.

67

1  Q. How do you do that?
2  A. Through promotional material, phone calls.
3  Q. Any other ways?
4  A. No.
5  Q. Do you have an understanding that when a
6 physician administers a pharmaceutical in his office,
7 that he will receive an administration fee from Cigna
8 for that service?
9  A. This is outside --
10   MR. ST. PHILLIP: I'm going to object to
11  the question based on the exclusion of topic
12  No. 15 in Magistrate Judge Bowler's
13  November 2, 2004 order which relates to the
14  exact question posed by counsel, so we'll
15  move to strike the answer.
16   MS. SCHOEN: This also goes to
17  deposition subject 1.
18   MR. ST. PHILLIP: I understand that, but
19  15 is the more specific which exactly states
20  that for physician-administered drugs,
21  whether and to what extent your clients'
22  negotiations with providers about

68

1 reimbursement expressly dealt with a
2 distinction between (a) the reimbursement of
3 the drug itself and (b) the reimbursement for
4 the medical provider's administration
5 service.
6   That is the question that's asked, and
7 that is exactly the topic that has been
8 excluded by Magistrate Judge Bowler, so I'm
9 going to instruct the witness not to answer.
10   MS. SCHOEN: This is simply a question
11 to establish whether, in fact, there is such
12 an administration fee. It does not go to the
13 if the distinction between the two. It's
14 whether did they exist, and that falls
15 directly under all methodologies your client
16 utilized or considered utilizing to determine
17 the amounts to pay or reimburse to health
18 care providers, including doctors.
19   MR. ST. PHILLIP: It's our opinion that
20  the specific controls are general and trying
21  to obey Magistrate Judge Bowler's order, that
22  as a result we're going to instruct the

69

1 witness not to answer.
2  Q. So to your understanding, the ways that Cigna
3 encourages a physician to use the specialty pharmacy
4 services provided by Cigna are through promotional
5 materials and phone calls and no other ways; is that
6 correct?
7   MR. ST. PHILLIP: Objection.
8  Mischaracterizes the testimony.
9   The witness can answer.
10  A. I mean, I answered earlier how we promote our
11 service of the specialty pharmacy to doctors is through
12 FAXes, through promotional material, through phone
13 calls and FAXes.
14  Q. So the answer to my question is yes?
15   MR. ST. PHILLIP: Objection. He
16  answered your question.
17  A. Well, I had already previously stated what we
18 do.
19   MR. ST. PHILLIP: Is this an appropriate
20  point for a break?
21   MS. SCHOEN: Why don't we take a break
22  now.

Thomas E. Greenebaum          Highly Confidential          January 14, 2005
                               Bloomfield, CT

19 (Pages 70 to 73)

70

1              (Recess taken.)
2          MS. SCHOEN:  Back on the record.
3          Q.  Does Cigna subscribe to any pricing reporters
4    like for example, Redbook, First Data Bank, Med Span?
5          A.  Yes.
6          Q.  Can you tell me which ones, or all of them?
7          A.  Many of the industry standard ones:  Yes,
8    Redbook; yes, Med Span; yes, First Data Bank, and I'm
9    sure there are others.
10         Q.  Do you know which one Cigna would rely on in
11   determining the average price for its pharmacy
12   contracts?
13         A.  Our adjudication process uses First Data
14   Bank.
15         Q.  Do you know how Cigna decided which reporter
16   to use for that process?
17         A.  No, I don't know.
18         Q.  Are you aware that different pricing
19   reporters may list different actual wholesale prices?
20            MR. ST. PHILLIP:  Objection.
21         A.  I understand there is some variation.
22         Q.  Do you have an understanding of what the

71

1    variation is based upon?
2          A.  My understanding is I've looked at it, and
3    it's not significant.  It's on a drug-by-drug basis,
4    and the variance is very small.
5          Q.  And you don't know why there is such
6    variation —
7             MR. ST. PHILLIP:  Objection.
8          Q.  — is that correct?
9          A.  My understanding is that it's mostly timing.
10         Q.  Timing?
11         A.  In terms of when their databases are updated.
12         Q.  Do you have an understanding of the
13   relationship between average wholesale price and the
14   wholesale acquisition cost?
15         A.  I understand the two values, and there's a
16   variation in the relationship between the two.
17         Q.  When you say there's a variation in the
18   relationship between the two, can you tell me what you
19   mean by that?
20         A.  In that the difference between AWP and WAC
21   vary.
22         Q.  Drug-to-drug?

72

1          A.  Yes.
2          Q.  So in your understanding, there's no industry
3    standard relationship between average wholesale price
4    and the wholesale acquisition cost?
5             MR. ST. PHILLIP:  Objection.
6             Are you talking about the entire time
7          period?
8             MS. SCHOEN:  Yes, we are.
9             MR. ST. PHILLIP:  Objection.
10         A.  My understanding is that there's no
11   consistency between what the average wholesale — the
12   wholesale acquisition cost is to AWP.  It just varies.
13         Q.  Has Cigna ever done any analysis of the
14   relationship between the average wholesale price and
15   the wholesale acquisition cost generally?
16         A.  Generally, yes.
17         Q.  And can you tell me generally what the
18   results of such an analysis were?
19         A.  Yes.  That there is quite a bit of
20   variability between the two numbers on a drug-by-drug
21   basis.
22         Q.  Does Cigna have any understanding of the

73

1    relationship between the average wholesale price and
2    the actual acquisition cost for a particular drug?
3             MR. ST. PHILLIP:  Objection to form.
4          A.  Can you either restate it or clarify?
5          Q.  Sure, absolutely.
6             Do you have an understanding whether
7    there is a relationship between the average wholesale
8    prices as published in the reporters that we had
9    discussed and the actual acquisition cost of drugs
10   generally?
11         A.  The price that we purchase at versus the
12   established benchmark of AWP have a tremendous amount
13   of variability.  So you're asking again is there a
14   relationship?  There is a tremendous amount of
15   variability.
16         Q.  So would it be correct to say that Cigna does
17   not have any expectation that the average wholesale
18   price bears a particular relationship to the actual
19   acquisition cost?
20            MR. ST. PHILLIP:  Objection.
21         A.  The average wholesale price is a benchmark
22   for which we use, and the industry uses, as a mechanism

Thomas E. Greenebaum         Highly Confidential         January 14, 2005
Bloomfield, CT

20 (Pages 74 to 77)

---

74

1  to set up payments for pharmaceuticals and services
2  back to pharmacies, and what we purchase at is
3  something different. So that's as I understand it or
4  as we understand it.
5      Q.  I think I understand you. I just want to
6  understand. So you're saying that Cigna does not have
7  any expectation that the average wholesale price is,
8  say, any percentage above actual acquisition cost,
9  below actual acquisition cost or --
10         MR. ST. PHILLIP: Objection. -- go
11     ahead.
12     A.  I have -- when we negotiate our payment to
13  retailers as a percentage off of AWP, we don't take
14  that into account in terms of what we are purchasing
15  drugs for from the manufacturers. It -- we don't
16  depend on the relationship of what WAC is versus AWP.
17  We're concerned about what we're paying for the drugs
18  versus what we are providing services and payments back
19  to the retailers, so we look at those two pieces.
20         We don't look at the WAC versus AWP.
21  You've asked that several times. We don't -- it
22  doesn't influence us, nor do we have an expectation of

---

75

1  what AWP is. We use it as an industry standard
2  benchmark that has been out there for years, and so
3  that's how we set up, how we sell and pay for services,
4  and we use, you know, our negotiating skills in terms
5  of what we buy from manufacturers. We do use WAC as a
6  relationship when we purchase from a wholesaler only.
7  Otherwise, I really don't deal with WAC at all.
8         (The Court Reporter marked the question.)
9      Q.  I was also asking in addition to the question
10  about WAC, I was also asking about actual acquisition
11  costs.
12         Would the same statement that you just
13  made hold true for the actual acquisition cost, that
14  Cigna does not have an expectation of a relationship
15  between average wholesale price or actual acquisition
16  cost but, in fact, those are two separate pieces?
17         MR. ST. PHILLIP: Whose acquisition
18     cost?
19         MS. SCHOEN: Cigna's.
20         MR. NOTARGIACOMO: I'll object to the
21     question.
22         MR. ST. PHILLIP: Could you read it back

---

76

1      for me, please.
2         (The court reporter read back.)
3         MR. ST. PHILLIP: So -- if you
4      understand that, you can answer.
5      A.  Yeah, I mean, I think that our acquisition
6  costs are separate from AWP, and we don't have any
7  expectations of what the relationship is between what
8  we purchase the drug for versus what AWP is.
9         MR. WADE: Let me pause for one second.
10         (Discussion off the record.)
11     Q.  You explained to me earlier the methodology
12  that Cigna uses to reimburse pharmacies or historically
13  has used since 1991, which was a percentage off of AWP
14  plus a dispensing fee for branded drugs, and either a
15  percentage off of AWP or a MAC list price plus
16  dispensing fee for generic drugs.
17         Are there any other methodologies or
18  ways that Cigna has reimbursed pharmacies from 1991 to
19  the present for pharmaceutical products?
20     A.  First of all, we don't reimburse. We pay.
21  We make payments to retail pharmacies. There were a
22  couple specific instances where we were providing a

---

77

1  flat fee arrangement regardless of costs up or down to
2  the retail pharmacy for a period of time, but no longer
3  do that.
4      Q.  Do you know the time period that Cigna
5  employed the flat fee arrangement?
6      A.  I believe that the time frame was between
7  2002 to -- 2002 and 2003 -- no, 2002 through 2004 --
8  excuse me.
9      Q.  Can you tell me why Cigna employed the flat
10  fee arrangement during that time period?
11     A.  It was a request by part of the retail
12  network to do that type of reimbursement, and we
13  complied with the request.
14     Q.  When you say part of the retail network, do
15  you mean one particular retail chain?
16     A.  There were two retail chains that were
17  involved in that type of pricing.
18     Q.  And can you describe to me how the flat fee
19  arrangement worked?
20     A.  It was literally a flat fee. For every
21  prescription provided, we would provide a payment of a
22  flat fee.

---

**78**

1    Q. Was that fee in lieu of both the AWP minus

2  and the dispensing fee?

3    A. Yes.

4    Q. Can you give me an estimate of what

5   percentage of the pharmaceuticals dispensed to members

6  were covered by this flat fee arrangement during this

7  time period?

8        MR. ST. PHILLIP: Percentage of

9       pharmaceutical —

10       MS. SCHOEN: I want to have some way to

11       quantify it, so whichever way is easier for

12       you.

13    A. I would say, at most, 1 percent of

14  prescriptions dispensed in a year.

15    Q. Can you tell me did the flat fee arrangement

16  end in 2004?

17    A. Yes.

18    Q. Can you tell me why it ended at that time?

19    A. It was different than everything else we were

20  doing in the network, and we wanted to get all of our

21  pharmacy relationships to comply to one standard

22  methodology rather than having this outlier, and we

**79**

1  wanted to get rid of the outlier.

2    Q. So Cigna went to the retail networks that had

3  requested this and said, We're not going to do this any

4  more?

5    A. Yeah. We renegotiated the contracts.

6    Q. Besides the flat fee arrangement that you

7  just described, are there any other methodologies or

8  ways that pharmacists have been reimbursed — have been

9  paid rather — since 1991 for pharmaceutical products?

10    A. No.

11    Q. Can you tell me which retail networks

12  requested the flat fee arrangement?

13    A. No.

14    Q. And why not?

15    A. For specific relationships that we have

16  contractual relationships with — and I don't know that

17  I have to disclose my retail contracts in that, you

18  know, specific detail. What's the point?

19    Q. Well, we have a number of your retail

20  contracts already.

21      MR. ST. PHILLIP: And we agreed that a

22      sampling was sufficient for purposes of

**80**

1  disclosing that information, at least in

2  discovery, so —

3      MS. SCHOEN: To the extent we have not

4  received it, we will request one of these

5  contracts as a sample to make the sample

6  representative.

7    Q. In your opinion, would actual acquisition

8  costs be a practical way to — a practical benchmark to

9  reimburse pharmacists on for pharmaceutical products?

10      MR. ST. PHILLIP: Objection to form.

11    A. Can you restate that for me, please?

12    Q. Sure.

13      Instead of using AWP, would the

14  pharmacists' actual acquisitions cost for the drug be a

15  practical benchmark for Cigna to employ to reimburse

16  the pharmacists for the products that they dispense?

17      MR. ST. PHILLIP: Objection. It calls

18      for speculation.

19    A. It's a plausible way of doing it. Again, it

20  is against the standard that's out there, and in a

21  competitive environment it wouldn't be appropriate for

22  us to implement because it's outside the norm.

**81**

1    Q. If Cigna were to have used or to use, going

2  forward, the actual acquisition cost as a benchmark for

3  reimbursement, would that change the amount that it

4  ultimately reimburses the pharmacists or pays to the

5  pharmacists rather?

6      MR. ST. PHILLIP: Objection.

7      With all pharmacy products?

8      MS. SCHOEN: As a general matter, yes,

9      instead of the AWP standard which is

10      currently used.

11      MR. ST. PHILLIP: If you can answer it.

12    A. I don't know how to answer it. I mean — I

13  don't know.

14    Q. If I did use a different benchmark, however,

15  the competitive dynamics that you described to me

16  earlier would still be the same in terms of the

17  payments to the pharmacists?

18      MR. ST. PHILLIP: Objection. It calls

19      for speculation.

20    A. We would want to use the same benchmark that

21  the rest of the industry is using unless our clients

22  request us to do something different.

82

1    Q.  You told me earlier about Cigna's preparation
2  of its MAC list.
3        Can you tell me if AWP plays any role in
4  compiling the MAC lists?
5    A.  No.
6    Q.  It does not play a role, or you can't tell
7  me?
8    A.  It does not play a role.
9    Q.  Do you have an understanding of the term
10  usual and customary?
11    A.  Yes.
12    Q.  Can you tell me what your understanding is
13  of that term?
14    A.  Usual and customary as it relates to
15  pharmacy?
16    Q.  Yes.
17    A.  Usual and customary is a price that is
18  determined by a pharmacy.  If an uninsured person would
19  go in and get a prescription filled, that would be the
20  cash price.
21    Q.  Do you have an understanding of whether the
22  usual and customary price that's set by a pharmacist

83

1  would be higher or lower than the wholesale price?
2    A.  I'm not sure how they set their usual and
3  customary.
4    Q.  Has Cigna ever reimbursed for pharmaceutical
5  products based on a usual and customary price?
6    A.  Yes.
7    Q.  Can you tell me when that was?
8    A.  It's part of our existing plans where if the
9  member's co-pay is greater than the usual and customary
10  submitted by the pharmacy, we will give the lesser of
11  the two, so that if AWP -- if the co-pay was a hundred
12  dollars, and usual and customary is $78, the member
13  would pay $78 to the pharmacy.
14    Q.  Earlier you testified that Cigna does some
15  analysis or looks at analysts' reports regarding
16  pharmacy margins and its determination of MAC list
17  pricing.
18        MR. ST. PHILLIP:  Objection.  I think it
19        mischaracterizes the testimony.
20    A.  Yes.  That's not what I was saying.  What I
21  was trying to say is as we set our MAC pricing, we will
22  look at the analysts' reports to tell us and give us

84

1  some indication about what their profit margins are.
2  Typically the analyst reports do not break out
3  pharmaceuticals from the rest of their business:  All
4  we see is a cost of goods, and we make some estimates
5  to determine what their potential profit margin may be
6  on drugs, but it doesn't specifically tell us.
7    Q.  Can you tell me, based on those analysts'
8  reports, what have you concluded about the margin that
9  pharmacists are making on the drug?
10    A.  You mean --
11        MR. ST. PHILLIP:  Objection; foundation.
12        Go ahead.
13    A.  Are you looking for specific amounts or -- I
14  don't know what the specific numbers are.  I'd have to
15  go back to reporting, but again, it's an indicator for
16  us to make some decisions on how much markup we believe
17  they should receive on top of the acquisition costs
18  that we've estimated they can acquire the
19  pharmaceuticals for.  So it's an estimate on top of an
20  estimate.  So --
21    Q.  Right.  So you use the estimate -- the
22  estimated margin of what pharmacists are making on

85

1  products -- on drug dispensing to make your
2  determination -- to form you determination on the MAC
3  pricing --
4        MR. ST. PHILLIP:  Objection.
5    Q.  -- is that correct?
6    A.  Mostly, yes.  Yes.  We use those pieces of
7  information as estimates to allow us to establish what
8  we think the MAC price should be.
9    Q.  And what have those -- what are those
10  estimates?  What margin do you think pharmacists are
11  making on the drugs that you dispense?
12        MR. ST. PHILLIP:  Objection.  It calls
13        for speculation.
14    A.  To be honest with you, I don't have that
15  information at hand to tell you today.
16    Q.  So sitting here right now --
17    A.  No,  Sitting here right now, I can't, out of
18  memory, pull out specifically what that is.
19    Q.  Does Cigna have a formulary?
20    A.  Yes.
21    Q.  How many formularies does it have?
22    A.  We have one formulary.  No.  Wait a minute.

86

1    To describe it, we have one formulary with some
2    variations to it.
3      Q.   Would it be correct to say that the rebates
4    that Cigna receives from pharmaceutical manufacturers
5    are provided to Cigna in exchange for placement on the
6    Cigna formulary?
7      MR. ST. PHILLIP: Object.
8      A.   If it's determined that it is a preferred
9    drug -- it goes on our formulary -- all drugs are on
10    our formulary. I guess that's the first point. If
11    it's a preferred drug, there may be financial
12    arrangements that are created by keeping it on as a
13    preferred drug with the manufacturer.
14      Q.   And in exchange for keeping the drug on the
15    formulary, the manufacturer may give Cigna a rebate for
16    utilization of that drug; is that correct?
17      MR. ST. PHILLIP: Objection.
18      A.   By placement as a preferred drug on the
19    formulary, there is an opportunity to receive a rebate,
20    but not necessarily a given.
21      Q.   Do certain of the Cigna agreements with
22    pharmaceutical manufacturers provide for increasing

87

1    rebates as Cigna increases the utilization of a
2    particular drug amongst its members?
3      MR. ST. PHILLIP: Objection.
4      A.   It -- the rebate thresholds could go up based
5    on level of market share that the drug receives, which
6    may or may not be tied to utilization. It all depends
7    on its relationship to other drugs that are being
8    dispensed, but not necessarily based on volume.
9      Q.   So some of the rebate agreements Cigna may
10    have with pharmaceutical manufacturers have market
11    share --
12      A.   Yes.
13      Q.   -- provisions?
14      MR. ST. PHILLIP: Hold on just for the
15      record. I note that deposition subject
16      No. 12 deals with our understanding of
17      whether drug manufacturers provided health
18      care providers or pharmacies with discounts,
19      rebates, and other incentives that are not
20      reported in pricing compendia or otherwise
21      disclosed to the public.
22      As I look through the deposition, I

88

1      don't see anything specific to rebates, so I
2      preserve an objection based on a rebate line
3      of questioning, but I'll allow the witness to
4      answer.
5      A.   Can you restate the question?
6      Q.   I don't think there's a question pending.
7      MR. ST. PHILLIP: I was trying to get
8      that objection into the pending question. I
9      may or may not have been successful in that
10      regard.
11      Q.   Can you tell me has Cigna taken any actions
12    since 1991 to reduce the total expenditures for
13    pharmaceutical benefits?
14      MR. ST. PHILLIP: Objection.
15      I need a clarification. Whose
16      expenditures? Cigna's or its members?
17      MS. SCHOEN: Cigna's. Let's start with
18      Cigna's.
19      A.   I'm not clear I understand the question.
20      Q.   What actions, if any, has Cigna taken to
21    reduce its total expenditures on pharmaceutical
22    products?

89

1      A.   I mean, there have been many actions to
2    reduce our overall costs that a client would pay
3    through formulary management, contract negotiations,
4    both with the pharmaceutical manufacturers to retail
5    pharmacies to establishing clinical programs, and look
6    at utilization of high dollar drugs, and brand or
7    generic conversion programs where there's a
8    therapeutically equivalent generic to a brand, moving
9    folks to generics, where possible, would be some of the
10    methods we've employed to reduce expenses.
11      Q.   Would implementing the specialty pharmacy
12    program be one of those methods?
13      A.   Yes.
14      Q.   Prior to starting employment at Cigna, did
15    you have any understanding of the term average
16    wholesale price?
17      A.   No.
18      Q.   Or postal acquisition cost?
19      A.   No.
20      Q.   Do you have an understanding of how the
21    average wholesale price is set?
22      A.   I have an understanding that First Data Bank,

90

1  at least the one we use, uses a series of sources to
2  determine what the appropriate average wholesale price
3  should be for each specific drug. What sources it
4  uses, I don't know, but that they have some form of
5  methodology, but it's an industry standard that we've
6  just used.
7       MR. ST. PHILLIP: And just for
8      clarification, I don't know if the witness is
9      talking about the entire period at issue,
10     which is 1991 to present, or otherwise, so I
11     just want to make the record clear if that's
12     his answer for the whole period or not.
13      THE WITNESS: I would say it's for the
14     whole period.
15    Q. Have you ever heard the term used "ain't
16  what's paid"?
17    A. No. What is that?
18    Q. Instead of average wholesale price?
19    A. Oh, no.
20    Q. To your knowledge, have any pharmacy benefit
21  managers conspired with drug managers to inflate any
22  drug's average wholesale price?

91

1       MR. ST. PHILLIP: Can you read that back
2     for me.
3      (The reporter read back.)
4    A. Not that I know of.
5    Q. To your knowledge, have any pharmacies
6  conspired with any drug manufacturers to inflate any
7  drug's average wholesale price?
8    A. Again, not that I know of.
9    Q. Do you have any knowledge and understanding
10  of any activity undertaken by a drug manufacturer to
11  inflate the average wholesale prices -- average
12  wholesale price for their drugs?
13      MR. ST. PHILLIP: When you answer this
14     question, please don't divulge anything that
15     you discussed with your attorneys. To the
16     extent that you can answer the question with
17     information you received outside of any
18     discussion with your attorneys, you may do
19     so.
20    A. I have no knowledge.
21    Q. Do you have any knowledge of any claims that
22  Cigna may have against any pharmacy benefit manager.

92

1  that it has ever contracted with within a time period?
2    A. Define claims.
3      MR. ST. PHILLIP: Yeah. I object
4     insofar as it calls for a legal conclusion,
5     but go ahead.
6    A. What do you mean by claims?
7    Q. Bringing an actual litigation.
8    A. Oh, an action. Not that I'm aware of.
9      (Discussion off the record.)
10     (Lunch recess taken at 12:30.)
11     (Testimony resuming at 3:10.)
12     (Exhibit Greenebaum 001 marked.)
13      MR. ST. PHILLIP: While we're here, I'd
14     like to designate the transcript highly
15     confidential under the protective order, and
16     as I understand it, it gives me time to view
17     it within 30 days to undesignate matters that
18     aren't highly confidential, but I would like
19     to make that designation.
20      MS. SCHOEN: Back on the record.
21     MR. ST. PHILLIP: It's okay with you?
22      MS. SCHOEN: Yes. I have no objections

93

1  to your designating the transcript as highly
2  confidential.
3    Q. Mr. Greenebaum, I'm handing you what has been
4  marked as Exhibit Greenebaum 001, Greenebaum Exhibit 1.
5  For the record, the Bates range of this document is Cigna
6  035 to Cigna 044, and the document is entitled
7  Participating Pharmacy Agreement.
8    I have just a couple of questions about
9  the document, but feel free to have a look through it.
10    A. Okay, go ahead.
11    Q. Can you tell me what this document is?
12      MR. ST. PHILLIP: I'll just preserve my
13     objection under topic 25 to the
14     authentication and knowledge of documents.
15    A. This is a Participating Pharmacy Agreement
16  that we use with contracting retail pharmacies.
17    Q. In your experience, is this contract
18  representative of the contracts that Cigna enters into
19  with pharmacies?
20      MR. ST. PHILLIP: With permission of
21     counsel, I'd like to have a continuing
22     objection.

94

1          MS. SCHOEN: You may have a continuing
2      objection.
3      A. In general, it is. However, this — in
4  general, yes, this is what we use.
5      Q. And I'd just like to direct your attention to
6  the page that's Bates numbered Cigna 039, which is also
7  page 5 of the document.
8      A. Okay.
9      Q. At the bottom there's a paragraph No. 5
10  entitled Access to Books and Records. Do you see that?
11      A. Uh-hum.
12      Q. Would you mind — are you familiar with the
13  provisions in this —
14      A. If I could read it for a minute, please.
15      Q. Absolutely. Take your time.
16      A. Yes?
17      Q. Do you have an understanding of what
18  paragraph 5 provides?
19          MR. ST. PHILLIP: Objection. Insofar as
20          it calls for contractual interpretation which
21          would be a legal matter, and this witness is
22          not authorized to provide legal guidance.

95

1          To the extent that you can answer, you
2      may do so.
3      A. From a pharmacy law perspective, these types
4  of documents that they're referring to have to be kept
5  by the pharmacy provider, and that access to those,
6  both from a regulatory perspective and also from an
7  audit perspective on our part, they may need to be
8  available. That's my interpretation.
9      Q. Does Cigna ever take advantage of the audit
10  rights provided by this type of contractual provision?
11      A. Yes.
12          MR. ST. PHILLIP: Objection. Same
13          objection as the previous one.
14      Q. Can you describe in broad terms what types of
15  audits Cigna may conduct on pharmacies?
16      A. In broad terms, we will conduct desk audits
17  along with onsite visits. Desk audits would be
18  reviewing the claim records relative to appropriateness
19  based on formulary DAW, and then the onsite audits
20  would be reviewing these records that they would keep
21  onsite and compare those records with what was actually
22  submitted as a claim.

96

1      Q. And how often might Cigna conduct such an
2  audit?
3      A. Periodically.
4      Q. And can you — by periodically, would you
5  mean every six months, every two years? Something
6  else?
7      A. It depends on the desk audits. If the desk
8  audits are reviewing issues will trigger us to do an
9  onsite audit, so it depends on what we find.
10      Q. How often might you do the desk audit?
11      A. We look at them on a 90-day cycle when we are
12  reviewing 90 days worth of data and then going through
13  the audit process. So it's — I guess I would call it
14  quarterly but it's ongoing.
15      Q. I'd also like to direct your attention to the
16  last page of this document which is Exhibit A. If you
17  would take a moment and familiarize yourself with this
18  section if you're not already.
19      A. Okay.
20      Q. Would you say that the reimbursement for
21  covered services as described here in Exhibit A is a
22  fair representation of Cigna's contracts generally with

97

1  pharmacists?
2          MR. ST. PHILLIP: Objection based on
3          subject 25. The witness can answer.
4      A. In general, this is the format for which we
5  would contract for services.
6      Q. In your experience, how often is the
7  reimbursements based on the pharmacy's usual and
8  customary charge as provided in the second line item
9  here in Exhibit Greenebaum 001?
10      A. Are you asking what percentage of the time
11  does that go into effect? I don't know. I don't have
12  the data to provide that in this setting.
13          MS. SCHOEN: Those are all my questions
14          about that exhibit.
15          Let's mark this as Exhibit Greenebaum 002.
16          (Exhibit Greenebaum 002 marked.)
17      Q. I'm handing you what's been marked as
18  Exhibit Greenebaum 002. I'd like to direct your
19  attention to the last two pages of the document which
20  are the only two pages we'll be looking at today.
21      A. Okay.
22      Q. The title of the third page of the document

98

1   is Deposition Subjects.
2          Have you seen this document before?
3          MR. ST. PHILLIP: We're only talking
4      about the last two pages?
5          MS. SCHOEN: Exactly. We are only
6      talking about the last two pages of this
7      document that come under the heading
8      Deposition Subjects, and lists 25 line items.
9   A.   Yes, I've seen this before.
10  Q.   Just directing your attention to line item 3,
11  can you tell me the identities of or job position
12  titles of individuals who have been involved in the
13  decision of selecting the reimbursement methodologies
14  that we've discussed today?
15         MR. ST. PHILLIP: And for this witness
16     we're excluding the proviso?
17         MS. SCHOEN: Absolutely. We're just
18     talking about what we discussed today, which
19     would be limited to the pharmacy side of the
20     business.
21         MR. ST. PHILLIP: Okay.
22  A.   So this is payment methodologies, and this is

99

1   through from '91 to current?
2   Q.   Right, and I understand that you're not going
3   to be able to likely give me all the identities of
4   people --
5   A.   Right.
6   Q.   -- but can we can talk about who are the
7   people who are currently at Cigna who have been
8   involved in this process, that you're aware of?
9   A.   Well, it's my responsibility, in terms of
10  payment methodology currently, and my staff that work
11  for me is -- are the ones that are responsible for.
12  Q.   And what broad group would that fall under,
13  the Cigna Pharmacy group?
14  A.   Yes, that would fall under the Cigna Pharmacy
15  group.
16  Q.   And from 1991 to the present, would the
17  individuals in the Cigna Pharmacy group be the
18  individuals who would have been involved in selecting
19  the reimbursement methodologies that we've discussed
20  today?
21  A.   Yes. In one form or another, yes.
22  Q.   I believe you testified earlier that you were

100

1   not aware of rebates that drug manufacturers may
2   provide to pharmacies, is that correct?
3   A.   Correct.
4   Q.   Are you aware of any other type of discount
5   that drug manufacturers may provide to pharmacies?
6   A.   No.
7   Q.   For example, a discount based on direct
8   purchasing?
9   A.   They may exist for over-the-counter drugs or
10  -- but I don't know what the arrangements are with the
11  manufacturers.
12  Q.   Does Cigna's reimbursement for
13  pharmaceuticals to pharmacies bear any relationship to
14  Medicare's reimbursement rate?
15         MR. ST. PHILLIP: Objection to form.
16         MS. SCHOEN: Strike that actually.
17     I think at this time I have no further
18     questions, but I'd like to take a couple of
19     minutes.
20         MR. ST. PHILLIP: Take a few minutes and
21     review your notes, and we'll step out for a
22     few minutes, and then, Ed, are you going to

101

1   have a few questions for the witness?
2          MR. NOTARGIACOMO: Yes. I'm going to
3      have a few minutes' worth of questions.
4          MR. ST. PHILLIP: Okay, so we'll step
5      out.
6          MR. NOTARGIACOMO: I don't have very
7      many questions. It shouldn't take more than
8      five or ten minutes.
9          MR. ST. PHILLIP: Okay.
10
11         CROSS EXAMINATION
12  BY MR. NOTARGIACOMO:
13  Q.   Mr. Greenebaum, my name is Ed Notargiacomo,
14  as I said at the beginning of the deposition -- I think
15  I may have said. I represent the Plaintiff in this
16  action, and I have just a few follow-up questions
17  following your testimony earlier today.
18         I believe you testified earlier about --
19  and just to preface, I'm having some problems with my
20  phone, so if you can't hear me, let me know, and I'll
21  repeat the question.
22  A.   Okay.

102

1  Q.  You testified earlier about how you were
2  asked how each negotiation with pharmacies are unique
3  as far as they vary by location or by pharmacy group.
4        Do you remember those questions?
5  A.  Yes, I do.
6  Q.  And you said that there was variation based
7  on negotiation; do you remember that?
8  A.  Yes.
9  Q.  Now, those variations, however, eventually
10  manifest themselves as a price that is expressed as a
11  percentage discount off of AWP, is that correct?
12  A.  AWP or MAC with the dispensing fee.
13  Q.  So AWP in the context of a name brand drug,
14  correct?
15  A.  Correct.
16  Q.  And MAC for those drugs that are on Cigna's
17  MAC list?
18  A.  Correct.
19  Q.  Can you tell me, with respect to the claims
20  data that Cigna collects with respect to its
21  transactions, do you know whether the claims data
22  captures information about whether the payment to

103

1  pharmacies was based on AWP or MAC or U & C -- usual
2  and customary?
3  A.  Yes, we do track that data within our
4  databases.
5  Q.  So for any particular transaction, if I
6  wanted to know what the basis of payment was, Cigna's
7  claims data could tell me the answer to that question,
8  is that right?
9  A.  That is true, yes.
10  Q.  You testified that when you were asked, you
11  had no expectations about the interrelationship between
12  AWP and the actual acquisition costs of drugs.
13        Do you remember that question?
14  A.  Yes.
15  Q.  And you testified Cigna did not have any
16  expectation about that relationship.
17        Do you remember that?
18  A.  That's correct.
19  Q.  By that answer, did you mean that Cigna
20  doesn't focus on the relationship between AWP and the
21  actual acquisition costs when it's figuring out what
22  it's going to pay to pharmacies?

104

1  A.  Well, what we pay pharmacies is based on what
2  we do with the rest of the marketplace, which is a
3  percentage off of AWP based on the criteria that we
4  discussed earlier.
5  Q.  If I were to tell you that a manufacturer set
6  its price -- this is just a theoretical number -- at a
7  thousand percent over the actual cost of the particular
8  drug; is that something that you would find relevant in
9  -- is that something you would take into account in
10  negotiating prices that you paid to pharmacists?
11        MS. SCHOEN:  Objection to form.
12  A.  When you say a thousand percent, over what?
13  Q.  Over the actual cost -- let's say the actual
14  average cost of the drug.
15  A.  Over WAC are you saying?
16        MS. SCHOEN:  Objection to form.
17  Q.  I'm talking not necessarily a benchmark WAC,
18  but actual invoice prices?
19  A.  I don't know -- with the retail pharmacies, I
20  won't know what they're acquiring it for.  We would be
21  concerned from drugs that we would purchase if the AWP
22  was significantly out of the normal range from what we

105

1  would acquire it for.
2  Q.  Well, for that answer is it reasonable to say
3  that as far as your understanding of the industry, that
4  AWP does bear some relationship to the actual costs
5  that are paid for drugs in the marketplace?
6  A.  I'm not -- I guess I'm not clear on what
7  you're trying to ask.
8        Could you restate that, please?
9  Q.  Sure.
10        If I were to tell you that -- if you
11  were to come to some understanding that average
12  wholesale prices in general were inflated by 10
13  percent, is that something that you would find relevant
14  in your negotiations with retail pharmacies?
15        MS. SCHOEN:  Objection to form.
16  A.  Would I be concerned if it was inflated?  Is
17  that what you're asking me?
18  Q.  Basically, yes.
19  A.  Yes, I'd be concerned.
20  Q.  In your experience, if AWPs were priced --
21  again just theoretically -- 10 percent higher than they
22  are today across the board for all drugs, do you expect