Exhibit 45

Jill S. Herbold                                         January 14, 2005

Bloomfield, CT

1           UNITED STATES DISTRICT COURT                        1

2             DISTRICT OF MASSACHUSETTS

3

4

5                 No. 01CV12257-PBS

6

7

8     *****************************************

9                                               *

      IN RE:  PHARMACEUTICAL INDUSTRY           *

10    AVERAGE WHOLESALE PRICE LITIGATION         *

                                                 *

11    *****************************************

12

13    DEPOSITION OF JILL S. HERBOLD, taken pursuant to

14    the Federal Rules of Civil Procedure, at CIGNA

15    Headquarters, 900 Cottage Grove Road, South Building,

16    Bloomfield, CT, before Diana M. Noel, a Registered

17    Professional Reporter, Certified Realtime Reporter,

18    and Licensed Shorthand Reporter No. 199, in and for

19    the State of Connecticut, on Friday, January 14,

20    2005, commencing at 12:48 PM.

21

22

EXHIBIT NO. 030
2-27-06

Jill S. Herbold

January 14, 2005

Bloomfield, CT

2 (Pages 2 to 5)

---

**Page 2**

1  A P P E A R A N C E S :

2  FOR THE PLAINTIFFS:

3  EDWARD NOTARGIACOMO, ESQUIRE (By Telephone)
   HAGENN BERMAN
4  One Main Street
   Fourth Floor
5  Cambridge, MA 02141
   Tel: (617) 482-3700
6
   FOR THE DEFENDANTS:
7  ESTELLA J. SCHOEN, ESQUIRE
   PATTERSON, BELKNAP, WEBB & TYLER, LLP
8  1133 Avenue of the Americas
   New York, NY 10036-6710
9  Tel: (212) 336-2000
10  e-mail: eschoen@pbwt.com

11  FOR CONNECTICUT GENERAL LIFE INSURANCE COMPANY
    AND THE DEPONENT, JILL S. HERBOLD:
12  PETER D. ST. PHILLIP, JR., ESQUIRE
    LOWEY DANNENBERG BEMPORAD & SELINGER, P.C.
13  The Gateway
    One North Lexington Avenue
14  White Plains, NY 10601
    Tel: (914) 997-0500
15  e-mail: pstphillip@ldbs.com
    and
16  MICHAEL WADE, ESQUIRE
    Counsel - Legal & Public Affairs
17  CIGNA
18  900 Cottage Grove Road, S201
19  Hartford, CT 06152-5026
20  Tel: (860) 226-2457
21  e-mail: michael.wade@cigna.com
22

---

**Page 3**

1  INDEX OF EXAMINATION

2

3  DIRECT EXAMINATION BY MS. SCHOEN:................ 4

4  REDIRECT EXAMINATION BY MS. SCHOEN:............. 90

5  CROSS EXAMINATION BY MR. NOTARGIACOMO:.......... 80

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

---

**Page 4**

1  JILL S. HERBOLD

2  having been first duly sworn, was examined and

3  testified as follows:

4

5  DIRECT EXAMINATION

6  BY MS. SCHOEN:

7  Q.  Can you please state your name for the

8  record.

9  A.  Jill Herbold.

10  Q.  Can you spell your last name.

11  A.  It's H E R B O L D.

12  Q.  Ms. Herbold, my name Estella Schoen. I

13  introduced myself briefly before the deposition

14  started. I'm with the firm of Patterson, Belknap, Webb

15  & Tyler, and we represent the Defendants in this

16  matter, and I'll be asking you asking you some

17  questions today.

18       Can you tell me if you've ever been

19  deposed before?

20  A.  I have not.

21  Q.  To start out, we'll just go over a few ground

22  rules for the deposition which you may have gone over

---

**Page 5**

1  with your counsel.

2       If you have any question or don't

3  understand a question that I have for you, please just

4  let me know, and I'll try to rephrase the question or

5  explain it to you.

6       Also, if I ask you a question, and --

7  it's best to respond verbally so the court reporter can

8  take it down as it's difficult for her to take down a

9  nod of the head or a shake of the head.

10  A.  Yes.

11  Q.  And if you'd like to take a break, please

12  just let me know, and we can take one.

13       Do you understand, Ms. Herbold, that you

14  are here today speaking on behalf of Cigna?

15  A.  Yes.

16  Q.  And can you tell me what you've done to

17  prepare for giving testimony today?

18       MR. ST. PHILLIP:  Without going into any

19  conversations we had, you can tell her what

20  you've done.

21  A.  I have just been doing my job, and I have

22  also met with our legal counsel.

Jill S. Herbold                                              January 14, 2005

Bloomfield, CT

3 (Pages 6 to 9)

|   | 6 |
|---|---|
| 1 | Q. Besides speaking with your legal counsel, did |
| 2 | you speak with anyone else at Cigna in preparation for |
| 3 | your testimony today? |
| 4 | A. Yes, I did. I spoke with one person that has |
| 5 | knowledge of the topics prior to me becoming involved |
| 6 | in these topics. |
| 7 | Q. Can you tell me what your current position is |
| 8 | at Cigna? |
| 9 | A. I'm responsible for strategy and policy as |
| 10 | well as financial analysis for practitioner |
| 11 | reimbursement. |
| 12 | Q. And is that -- do you have a formal title? |
| 13 | A. Yes. Assistant Vice President Practitioner |
| 14 | Reimbursement. |
| 15 | Q. How long have you held the position of |
| 16 | Assistant Vice President for Practitioner |
| 17 | Reimbursement? |
| 18 | A. Since February 2004. |
| 19 | Q. And how long have you been employed by Cigna? |
| 20 | A. Since August 1993. |
| 21 | Q. Just to get a little background, can you tell |
| 22 | me about your educational history after high school. |

|   | 7 |
|---|---|
| 1 | A. Yes. I have a Bachelor's degree in actuary |
| 2 | sciences from the University of Illinois. |
| 3 | Q. And can you tell me generally about your work |
| 4 | history after college but prior to coming to Cigna? |
| 5 | A. I came to Cigna directly from college. |
| 6 | Q. And can you tell me in 1993, when you first |
| 7 | came to Cigna, what was your position? |
| 8 | A. I was an actuarial student. |
| 9 | Q. For how long were you an actuarial student? |
| 10 | A. Three years. |
| 11 | Q. And so in approximately 1996, you shifted |
| 12 | positions? |
| 13 | A. Yes. At that time I became a fellow of the |
| 14 | Site of Actuaries, and so I had completed -- I had |
| 15 | finished being a student at that point and just have |
| 16 | done actuarial positions since then. |
| 17 | Q. So in 1996, your title shifted to -- do you |
| 18 | know what your new title was? |
| 19 | A. Associate Actuary perhaps. |
| 20 | Q. Can you tell me approximately how long you |
| 21 | were an Associate Actuary? |
| 22 | A. Two years perhaps. |

|   | 8 |
|---|---|
| 1 | Q. So in approximately 1998, you shifted into a |
| 2 | different position? |
| 3 | A. Yes. I believe it was called Assistant |
| 4 | Actuary. |
| 5 | Q. And how long were you the assistant or an |
| 6 | assistant actuary? |
| 7 | A. Until 2001. |
| 8 | Q. And in 2001, did you -- were you given a new |
| 9 | title? |
| 10 | A. Yes. Assistant Vice President in Actuary. |
| 11 | Q. And for how long did you hold the position of |
| 12 | Assistant Vice President in Actuary? |
| 13 | A. I still do. |
| 14 | Q. And so are you -- do you have two titles? |
| 15 | One is Assistant Vice President of Actuary and one is |
| 16 | Assistant Vice President Practitioner Reimbursement, |
| 17 | or -- |
| 18 | A. To clarify, technically my title is Assistant |
| 19 | Vice President in Actuary right now. However, what I |
| 20 | oversee is practitioner reimbursement, so actuary is my |
| 21 | credentials. |
| 22 | Q. So your title is Assistant Vice President in |

|   | 9 |
|---|---|
| 1 | Actuary, but you have responsibility for Practitioner |
| 2 | Reimbursement? |
| 3 | A. That's correct. |
| 4 | Q. Can you tell me what other -- can you |
| 5 | describe your responsibilities as they currently exist |
| 6 | as Assistant Vice President in Actuary? |
| 7 | A. Yes. My current responsibilities are for |
| 8 | practitioner reimbursement, strategy and policy, for |
| 9 | the financial analysis associated with practitioner |
| 10 | reimbursement, as well as the operational loading of |
| 11 | our contracts with practitioners. |
| 12 | Q. Are you involved in negotiations with |
| 13 | practitioners? |
| 14 | A. Not on a routine basis. |
| 15 | Q. But occasionally you would be? |
| 16 | A. From time to time; yes. |
| 17 | Q. Since 2001, have those been your |
| 18 | responsibilities? |
| 19 | A. No. |
| 20 | Q. Can you tell me -- |
| 21 | A. Those have been my responsibilities since |
| 22 | February of 2004. |

Jill S. Herbold
January 14, 2005
Bloomfield, CT

4 (Pages 10 to 13)

10

1    Q.  Can you tell me what your responsibilities
2  were from 2001 through 20 -- through February of 2004?
3    A.  Yes.  I had a few different responsibilities
4  during that time period.  They were all financial in
5  nature.  One of those responsibilities was related to
6  the analysis of contracts with hospitals.  Another one
7  related to the analysis of our national contracts with
8  national vendors.
9    Q.  National vendors of what?
10   A.  Of ancillary services such as laboratory
11  services and home healthcare, and another
12  responsibility was around the analysis of practitioner
13  reimbursement.
14   Q.  When you did analysis of practitioner
15  reimbursement during that time period, can you tell me
16  what you were looking for?
17   A.  The basic function, which I still oversee
18  today, is to analyze proposed changes in our contracts
19  with physicians to understand the financial impact to
20  the organization.
21   Q.  And can you tell me at what point in the
22  negotiations with physicians do you -- does your

11

1  analysis play a role?  For example, does it play a role
2  at the starting point, at the mid point, at the
3  deciding on a final contract, or something else?
4    A.  It can play an impact at any one of those
5  points.
6    Q.  From 1998 through 2001, when you were an
7  Assistant Actuary, can you tell me a little bit about
8  your responsibilities then?
9    A.  I was responsible for pricing of our PPO line
10  of business.
11   Q.  Pricing to your clients like employers?
12   A.  Setting trends and manual rates.
13   Q.  To your employers -- I'm sorry, to your
14  clients?
15   A.  Setting -- the manual rates are used to set
16  the rates with clients, but there's also an
17  underwriting process that's taken into account, so an
18  underwriter would use my manual rates to determine the
19  final rate to the client.
20   Q.  Did your roles and responsibilities from 1998
21  to 2001 involve looking at reimbursement to physicians?
22   A.  No.

12

1    Q.  Just going backwards in time, from 1996 to
2  1998, when you were an associate actuary, can you tell
3  me a little bit about your responsibilities in that
4  role?
5    A.  Uh-hum.  I was the pricing actuary for our
6  Medicare risk line of business that we had at the time.
7  And I also spent a year in corporate finance.
8    Q.  Did any of your roles and responsibilities
9  from 1996 to 1998 involve looking at or involve in any
10  way reimbursement to physicians?
11   A.  No.
12   Q.  Did it involve in any way reimbursement to
13  hospitals?
14   A.  No.
15   Q.  Can you tell me briefly about your roles and
16  responsibilities from 1993 through approximately 1996,
17  when you were an actuarial student?
18   A.  Yes.  I worked in the defined contribution
19  pricing area in the retirement and investment business.
20  I also worked in -- it was doing financial projections
21  for two different lines of business in the healthcare
22  area, and those projections were gross revenues as well

13

1  as net underwriting gain.
2    Q.  Did any of the work that are your
3  responsibilities from 1993 through 1996 involve looking
4  at reimbursements to physicians?
5    A.  No.
6    Q.  Did it involve looking at reimbursements to
7  hospitals?
8    A.  No.
9    Q.  So would I be correct to say that you had not
10  been involved in reimbursement or payments to
11  physicians for their services until 2001?
12   A.  That's correct.
13   Q.  And do you have an understanding of how
14  providers physicians have been reimbursed by Cigna for
15  pharmaceutical products that are administered in a
16  physician's office?
17        MR. ST. PHILLIP:  Objection to form.
18        You can answer.  I may object, and when
19     I do that, I'm just creating a place holder
20     in the record for an objection that may be
21     decided later by a court or by someone else.
22     So when I intervene and say objection, then

Jill S. Herbold
                                                          January 14, 2005
                           Bloomfield, CT

                                                     5 (Pages 14 to 17)

| 14 | 16 |
|---|---|
| 1  after that you can either answer -- you can | 1  Q. And the rate exhibit, that would contain the |
| 2  answer the question. The other thing I may | 2  reimbursement rate for services and -- services of the |
| 3  do is instruct you not to answer, and then | 3  physician? |
| 4  you can decide whether or not you're going to | 4  A. That is correct. |
| 5  answer by instruction. | 5  Q. And it would also contain the rates for |
| 6  A. Could you please repeat the question? | 6  reimbursement of pharmaceutical products administered |
| 7  Q. Sure. | 7  in the physician's office? |
| 8      Do you have an understanding of how | 8  A. That's correct. |
| 9  Cigna has reimbursed physicians for pharmaceutical | 9  Q. And the rate exhibit would vary by |
| 10  products that are administered in a physician's office | 10  physician's practice? In other words, there are many |
| 11  from the period of 1991 to the present? | 11  different rate exhibits for the different physician |
| 12  A. I have knowledge during part of that time | 12  practices that Cigna contracts with? |
| 13  period. | 13  A. That is correct. |
| 14  Q. Can you tell me which part? | 14  Q. And is the variation in the rate exhibits due |
| 15  A. Since 2001. | 15  to the negotiation process that you described earlier |
| 16  Q. Since 2001, can you tell me how Cigna has | 16  with the physicians? |
| 17  reimbursed for pharmaceutical products | 17  A. That is correct. |
| 18  administered in their office? | 18  Q. For pharmaceuticals that Cigna would |
| 19  A. The reimbursement has been done per the | 19  reimburse that have been administered in the |
| 20  contracting terms. | 20  physician's office, would the rate exhibit contain a |
| 21  Q. How are the contract terms established? | 21  line item for each particular pharmaceutical product, |
| 22  A. Contract terms are frequently established via | 22  or would it group pharmaceutical products together in |

| 15 | 17 |
|---|---|
| 1  negotiations with the provider groups. They may also | 1  some way? |
| 2  be established for physicians -- well, using our | 2  A. Generally it would group pharmaceutical |
| 3  standards for physicians that we actually don't have | 3  products together. |
| 4  negotiations with. | 4  Q. And do you know if reimbursement for |
| 5  Q. So just to make sure I understand, you're | 5  pharmaceutical products may, in some cases at least, be |
| 6  saying in some cases you would go through a negotiation | 6  reimbursed based on some industry benchmark? |
| 7  process with a physician or a physician group, but in | 7      MR. ST. PHILLIP: Objection. |
| 8  other cases, the physician or physician group would | 8  A. Yes. If that is what was negotiated. |
| 9  accept a standard Cigna contract? | 9  Q. So in some cases, the negotiations may yield |
| 10  A. That's correct. | 10  a reimbursement rate that is based on a industry |
| 11  Q. And where in this contract -- strike that. | 11  benchmark, but in other cases it would not? |
| 12      Would the contract contain the | 12      MR. ST. PHILLIP: Objection. |
| 13  reimbursement that a physician would receive for a | 13  A. Yes. |
| 14  pharmaceutical product administered in the physician's | 14  Q. Do you know what industry benchmarks -- |
| 15  office? | 15  benchmark or benchmarks may be used? |
| 16  A. Yes. | 16  A. Average wholesale price is the typical. I do |
| 17  Q. So that would be in the terms of the | 17  not recall seeing any other contracts that use industry |
| 18  contract, or would it be in a fee schedule or a | 18  benchmarks -- use anything but average wholesale price. |
| 19  compensation schedule? | 19  Q. If the reimbursement rate for physicians for |
| 20  A. The way it is typically done is there is a | 20  pharmaceuticals is not expressed as a -- as in relation |
| 21  rate exhibit attached contract. I believe that it | 21  to the average wholesale price, how else would it be |
| 22  technically may become a part of the contract. | 22  expressed in the contract? |

Jill S. Herbold                                              January 14, 2005
Bloomfield, CT

6 (Pages 18 to 21)

---

18

1    A.   Sometimes it is expressed that we — the
2  reimbursement will be per Cigna's national standard
3  injectable reimbursement, and on occasion, it could be
4  specified that the reimbursement is based on a percent
5  of the billed charges.
6    Q.   Can you tell me approximately in what percent
7  of cases would the reimbursement be based on the AWP
8  benchmark that you just described?
9         MR. ST. PHILLIP:  What time period are
10         we talking about?
11         MS. SCHOEN:  Well, we were talking about
12         since 2001, because the witness testified
13         that prior to that she was not sure of the
14         methodology.
15    A.   Since the 2001 time period, we put a change
16  into effect and established that national standard in
17  January of 2002, and since that time, I believe
18  approximately half of the reimbursement has been based
19  like AWP standards versus approximately half according
20  to our national standards.
21    Q.   And you mentioned another option which is a
22  percentage of billed charges?

---

19

1    A.   Very small.
2    Q.   Can you tell me how Cigna's national standard
3  injectable reimbursement rate is set?
4    A.   It is a complex setting.  This will take a
5  few minutes.
6    Q.   You can tell me — I guess to start, maybe to
7  try to simplify it — just the broad factors that go in
8  or the sources Cigna uses if that helps at all.
9    A.   The — for many of the HCPCS codes that are
10  included within the scope of injectables, we start
11  looking at the average wholesale price, and to some of
12  those we will set the reimbursement at equal to the
13  average wholesale price.  Others, we will reimburse
14  less than the average wholesale price.
15         And there are other codes,
16  approximately — I believe it's 13 codes — which,
17  since September 7th of 2004, we have — we changed the
18  reimbursement methodology, and to set the fees on those
19  codes, we are using physician acquisition costs as well
20  as AWP.
21    Q.   And that's for 13 pharmaceutical products?
22    A.   13 HCPCS codes.

---

20

1    Q.   And how did that correspond with the
2  pharmaceutical products?
3    A.   It is my understanding, without having
4  pharmacy expertise, that — pharmaceutical products are
5  each assigned an NDC, National Drug Code, I believe,
6  and there are multiple NDCs that may be billed under a
7  HCPCS code.
8    Q.   Like a J-code?
9    A.   Yes.  A J-code is a HCPCS code.
10    Q.   So for 13 J-codes since September 7, 2004,
11  Cigna has been using the alternate methodology that you
12  just described?
13    A.   That is correct.
14    Q.   Now, putting aside those 13 J-codes, Cigna
15  has had its national standard injectable reimbursement
16  rate since January of 2002, and would there be any
17  other factors that Cigna would consider in setting the
18  reimbursement rate for the remainder of the drugs?
19    A.   No.
20    Q.   So you described to me that Cigna would look
21  at the code and sometimes would set it at the AWP,
22  sometimes would set it at a percentage less than AWP —

---

21

1    A.   Yes.  The percentages were fixed.  They
2  varied by code, but they are fixed.  They don't change
3  from time to time.
4    Q.   So for a particular code, Cigna would choose
5  a percentage AWP and stick with that percentage?
6    A.   That's correct, unless we decided there is
7  appropriate reason to change it.
8    Q.   Can you tell me the range below AWP that
9  these rates and the Cigna national standard injectable
10  reimbursement rate was varied?
11    A.   Typically 15 percent.  We have codes that are
12  up to 45 percent below AWP.
13    Q.   And you mentioned, I believe, that some
14  J-codes may be set at average wholesale price?
15    A.   That is correct.
16    Q.   Can you tell me what accounts for this — the
17  variation in the reimbursement rate?
18         MR. ST. PHILLIP:  Objection.
19         You can answer.
20    A.   The variation is based on what we can or what
21  our subsidiary is willing and able to provide the
22  service to our members for.

Jill S. Herbold

January 14, 2005

Bloomfield, CT

7 (Pages 22 to 25)

**22**

1   Q.   When you say the subsidiary, what do you
2   mean?
3   A.   It's a Cigna subsidiary.
4   Q.   Are you referring to the Cigna subsidiary
5   that would be providing the health plan services to the
6   members?
7   A.   The Cigna subsidiary that provides
8   pharmaceutical services.
9   Q.   Does that subsidiary have a name?
10  A.   Tel-Drug.
11  Q.   So why would -- strike that.
12       Why is Tel-Drug deciding what the
13  reimbursement rate should be as opposed to another part
14  of Cigna?
15  A.   The physicians, rather than acquiring the
16  injectable themselves, they can instead get it from
17  Tel-Drug and still administer it in their office, and
18  Tel-Drug will bill Cigna directly for the service. So
19  the physician never has to worry about paying or
20  receiving reimbursement for the injectable.
21  Q.   So what if a physician wanted to purchase the
22  drug himself and seek reimbursement from Cigna? Would

**23**

1   one mean the reimbursement would be the Cigna national
2   standard injectable reimbursement rate?
3   A.   That would be one potential, yes.
4   Q.   It could be in the contract between Cigna and
5   that particular provider?
6   A.   Uh-hum, yes.
7   Q.   So beyond considering what Tel-Drug is
8   willing to provide in terms of reimbursement, are there
9   any other factors that go into the variation between
10  the different reimbursement rates under Cigna's
11  national standard injectable reimbursement rate?
12  A.   No. As we're specifically talking about the
13  codes outside the approximate 13?
14  Q.   Uh-hum.
15  A.   It's for everything but those 13 codes. That
16  is all that is considered.
17  Q.   And who makes that decision at Tel-Drug?
18  A.   I do not know.
19  Q.   And do you know how Tel-Drug makes the
20  decision of being willing to expect reimbursement at
21  AWP for some drugs and at 45 percent below AWP for
22  other drugs?

**24**

1   A.   No.
2   Q.   And Tel-Drug is a -- as you said, it's a
3   subsidiary of Cigna?
4   A.   That's correct.
5   Q.   So I just want to make sure I understand
6   since it's seems a little complicated.
7        So if a physician receives a
8   pharmaceutical product through Tel-Drug, they use
9   Tel-Drug to obtain the product. From what you've told
10  me, I understand that Tel-Drug will provide that
11  product to the physician, and Tel-Drug will then seek
12  reimbursement for that product from Cigna?
13  A.   That's correct.
14  Q.   And Cigna will reimburse Tel-Drug?
15  A.   That's correct.
16  Q.   Do you know if the variation in the rates
17  that Tel-Drug is willing to accept for reimbursement
18  relate to Tel-Drug's -- relate to the cost of
19  Tel-Drug's acquisition of the product?
20  A.   I do not know.
21  Q.   So if I wanted to understand Tel-Drug's
22  reasoning, I would have to ask someone at Tel-Drug, I

**25**

1   presume, or is there someone in your group at Cigna
2   that could tell me that?
3        MR. ST. PHILLIP:  Objection.
4   A.   There is not someone in my group.
5   Q.   And you don't know who I would talk to at
6   Tel-Drug, or what department?
7   A.   Department would be Pharmacy Operations.
8   Q.   And in talking about Tel-Drug's provision of
9   their pharmaceutical products to physicians, are we
10  talking about a specialty pharmacy service that
11  Tel-Drug provides?
12  A.   Could you clarify your question?
13  Q.   Are you familiar with the term specialty
14  pharmacy?
15  A.   Not well enough to answer your question.
16  Q.   Do you know if Cigna has a specialty
17  pharmacy?
18  A.   I have seen announcements.
19       MR. ST. PHILLIP:  I guess I would object
20       insofar as I don't think the witness
21       understands what you mean by definition of a
22       specialty pharmacy.

Jill S. Herbold                                              January 14, 2005
Bloomfield, CT

8 (Pages 26 to 29)

|  | 26 |
|---|---|
| 1 | But you can answer. |
| 2 | A.  There is an area in Cigna that is getting |
| 3 | into specialty pharmacy.  Exactly what specialty means, |
| 4 | I do not understand. |
| 5 | Q.  Going back to the rate exhibits that we were |
| 6 | discussing previously, you had testified that |
| 7 | approximately 50 percent of the reimbursement rates for |
| 8 | pharmaceuticals dispensed in a physician's office would |
| 9 | be based on AWP -- |
| 10 | MR. ST. PHILLIP:  Objection. |
| 11 | Q.  -- is that correct? |
| 12 | A.  That is correct. |
| 13 | Q.  And can you tell me would those rates be |
| 14 | typically set at AWP or at a percentage off AWP or at a |
| 15 | percentage above AWP? |
| 16 | MR. ST. PHILLIP:  In terms of -- we went |
| 17 | through this a little bit on the pharmacy |
| 18 | side, but in terms of the prevailing rates in |
| 19 | the contracts today or historical rates? |
| 20 | MS. SCHOEN:  I think we're limited from |
| 21 | 2001 to the present, so that's what I'm |
| 22 | talking about. |

|  | 28 |
|---|---|
| 1 | variation between those different levels?  Would this |
| 2 | be based on, for example, negotiations with the |
| 3 | physician groups? |
| 4 | A.  That is exactly what it's based on. |
| 5 | Q.  So some physician groups would perhaps have |
| 6 | more bargaining power and demand higher reimbursement |
| 7 | rates for pharmaceutical products, and some may |
| 8 | demand -- have lesser demands? |
| 9 | A.  That is correct. |
| 10 | Q.  Is it also the case that a physician's group, |
| 11 | in negotiations with Cigna, may seek higher |
| 12 | reimbursement for pharmaceutical products in exchange |
| 13 | for WAC reimbursement in a whole other area of the fee |
| 14 | schedule of the rate exhibit? |
| 15 | MR. ST. PHILLIP:  Objection to form. |
| 16 | You can answer. |
| 17 | A.  Could you rephrase the question. |
| 18 | Q.  Sure.  Let me ask it in a different way, and |
| 19 | maybe it will be clear. |
| 20 | When Cigna negotiates with a physician's |
| 21 | group, are you negotiating the entire rate schedule or |
| 22 | rate exhibit as a whole, or are you negotiating it on a |

|  | 27 |
|---|---|
| 1 | MR. ST. PHILLIP:  And I would ask the |
| 2 | witness to go back to '91 to the extent she |
| 3 | knows or has acquired information about that |
| 4 | or has acquired information about that -- |
| 5 | MS. SCHOEN:  I think for now, since she |
| 6 | testified her knowledge is primarily from |
| 7 | 2001 to now, we'll start there -- |
| 8 | MR. ST. PHILLIP:  Fair enough. |
| 9 | MS. SCHOEN:  -- and then I can go back |
| 10 | and explore if there's any bits of knowledge |
| 11 | prior to that. |
| 12 | Q.  So from the period from 2001 to the present, |
| 13 | I believe you had testified that 50 percent |
| 14 | approximately of the rate exhibit would base |
| 15 | reimbursement for pharmaceutical products dispensed at |
| 16 | a physician's office on the AWP; is that correct? |
| 17 | A.  Yes. |
| 18 | Q.  And can you tell me if that reimbursement |
| 19 | rate would be set at the average wholesale price, above |
| 20 | the average wholesale price, or below? |
| 21 | A.  It can be set at any of those levels. |
| 22 | Q.  And can you tell me what determines the |

|  | 29 |
|---|---|
| 1 | piecemeal basis? |
| 2 | A.  The negotiation is completed in whole, so |
| 3 | negotiating all the physician's services. |
| 4 | Q.  So would it be correct to say that in some |
| 5 | cases a physician might accept a lesser reimbursement |
| 6 | for pharmaceutical products and instead demand a |
| 7 | greater reimbursement for a particular service, for |
| 8 | example? |
| 9 | A.  That can definitely happen. |
| 10 | Q.  And can you tell me the range that would |
| 11 | exist if I were to be able to look at all the rate |
| 12 | exhibits that Cigna has out there, the range and AWP |
| 13 | reimbursements that may exist? |
| 14 | A.  Can you clarify your question?  Are you |
| 15 | talking about all of Cigna's rate exhibits or the rate |
| 16 | exhibits that are based on AWP? |
| 17 | Q.  Thank you.  We're talking about all of the |
| 18 | rate exhibits that are based on AWP. |
| 19 | A.  I do not have enough knowledge to tell you |
| 20 | what the rate is. |
| 21 | Q.  Can you give me a rough estimate? |
| 22 | A.  My rough estimate would be between 80 and |

Jill S. Herbold                                         January 14, 2005

Bloomfield, CT

**30**

1   120.
2       Q.   And the variation between the 80 and 120
3   would be due to variability in the negotiation process
4   with physicians?
5       A.   That's correct.
6       Q.   In your experience, do certain groups of
7   physicians command higher reimbursement rates than
8   others -- for example, oncologists?
9       A.   There are certain physician groups that do
10  demand higher rates than other groups.
11      Q.   When you go into negotiations with
12  physicians, how does Cigna decide whether the baseline
13  will be the AWP based reimbursement that you've
14  described or the Cigna national standard injectable
15  reimbursement that you've described?
16      A.   It is a standard to use the Cigna national
17  reimbursement.  The reimbursement, other than the Cigna
18  national standard, is only on an exception basis.
19      Q.   So would it be correct to say that Cigna
20  would like you to use its national standard rates in
21  all negotiations and only does not use those if the
22  physicians' groups object?

**31**

1           MR. ST. PHILLIP:  Object.
2       A.   Yes.
3       Q.   And why would a physician group, if you know,
4   why would a physician group object to the use of
5   Cigna's national standard rates?
6       A.   Because they feel the reimbursement is
7   inappropriate.
8       Q.   If -- does Cigna ever negotiate variations
9   from its national standard rates?  In other words,
10  would Cigna ever present its rates to a physician as a
11  national standard rate, and the physician and Cigna
12  could negotiate from those rates or down from those
13  rates?
14      A.   Not -- the negotiation does not take place
15  that we negotiate at a percent of our national
16  standard.  That we do not do.
17      Q.   So if Cigna has a contract with a physician's
18  group, and that rate exhibit incorporates Cigna's
19  national standards rate, there would be no variation
20  and -- strike that.
21           So if a physician's group accepts
22  Cigna's national standard rates, it is not free to then

**32**

1   negotiate with Cigna to change those rates in any way;
2   it must accept those as is?
3           MR. ST. PHILLIP:  Objection.
4       Q.   Is that correct?
5       A.   If he accepts them, he accepts them.  If he
6   doesn't accept them, he negotiates otherwise.
7       Q.   I'm comparing -- this may be a more helpful
8   way to get to where I'm going.  Maybe I'm comparing it
9   to the AWP example where, as I understand it from you,
10  there is negotiation that results in different
11  reimbursement rates.
12          MR. ST. PHILLIP:  Objection.
13      A.   Yes.
14      Q.   So comparing to -- how does Cigna's use of
15  its national standard injectable rates compare to --
16          (Discussion off the record.)
17      Q.   Let me try this in a new way.
18          Is Cigna's national standard injectable
19  reimbursement rate a take it or leave it proposition?
20  In other words, there's no negotiation on those rates?
21      A.   When they accept the national standard,
22  they've accepted it.  If they want to negotiate

**33**

1   otherwise, negotiations can happen.
2       Q.   Do they happen on the basis of the national
3   standard injectable rates or not?
4       A.   Typically not.
5       Q.   At that point, if a physician's group wants
6   to negotiate the reimbursement rate it receives for
7   pharmaceuticals products, then that negotiation would
8   take place with a baseline of AWP, is that right?
9           MR. ST. PHILLIP:  Objection to form.
10          You can answer.
11      A.   That would be very common.
12      Q.   If I were to go out and look at all of
13  Cigna's rate exhibits, would I find anywhere -- I would
14  see the Cigna's national standard injectable
15  reimbursement rates minus 10 percent set as the
16  reimbursement rate?
17      A.   Not to my knowledge.
18      Q.   Or minus any percentage?
19      A.   No, not to my knowledge.
20      Q.   Plus any percentage?
21      A.   Not to my knowledge.
22      Q.   You mentioned that there's a small amount of

Jill S. Herbold                                         January 14, 2005
                          Bloomfield, CT
10 (Pages 34 to 37)

---

**34**

1   reimbursement to physicians that's based on a
2   percentage of billed charges?
3       A.   That is correct.
4       Q.   Can you tell me why Cigna reimburses based on
5   billed charges in a small number of cases?
6           MR. ST. PHILLIP:  Objection.
7           You can answer.
8       A.   Part of the negotiation process.
9       Q.   Would I be correct in assuming that in that
10  negotiation process, it would be the physician who
11  wanted to be reimbursed at a percentage of their billed
12  charges?
13          MR. ST. PHILLIP:  Objection.
14      A.   Yes.
15      Q.   I want to turn back to what -- to your
16  testimony earlier where you testified that there are 13
17  J-codes, that since September 7, 2004, have been
18  reimbursed using the different methodologies.
19      A.   Yes.
20      Q.   I believe you testified that the
21  reimbursement for those 13 codes is based, in part, on
22  the physician's acquisition cost, is that correct?

---

**35**

1       A.   Yes.
2       Q.   And can you tell me how Cigna determines the
3   physician's acquisition cost?
4       A.   It is information that we have through
5   working with a -- I don't know technically what they
6   are called, but essentially they are a pharmaceutical
7   consultant group.
8       Q.   And for those 13 J-codes, does Cigna
9   reimburse at what it believes the physician's actual
10  acquisition cost is?
11      A.   Yes.
12      Q.   Can you tell me instead what do you reimburse
13  at?
14      A.   It is reimbursed at the physician acquisition
15  cost plus 20 percent of the AWP.
16      Q.   And can you tell me the reasoning behind that
17  reimbursement methodology?
18      A.   The reasoning is that the -- for most of
19  those J-codes, generic equivalents have been introduced
20  for the drugs. They have -- with the introduction of
21  generic equivalents, the physician acquisition cost has
22  reduced significantly, and the -- so we have to make

---

**36**

1   sure that we cover physician acquisition cost, and we
2   have chosen to add on an additional amount to make sure
3   that we are paying above that amount in all situations.
4       Q.   So you want -- so Cigna wants to insure that
5   physicians are having their costs, their acquisition
6   costs covered in all cases?
7           MR. ST. PHILLIP:  Objection.
8       Q.   Is that correct?
9       A.   That is the intent.
10      Q.   Does Cigna also intend to provide physicians
11  with a reasonable margin above the acquisition cost?
12      A.   It is not something that we have done is
13  taken a position on what is considered reasonable, and
14  margin, and the appropriateness of that.
15          MR. ST. PHILLIP:  Can you read that
16  answer back.
17          (The court reporter read back.)
18      Q.   You mentioned that of the 13 drugs for which
19  Cigna has applied this relatively new methodology, that
20  many of them are -- have generic equivalents.
21          Can you tell me in a little more detail
22  why these 13 drugs were chosen?

---

**37**

1       A.   The 13 drugs were chosen because the prior
2   reimbursement methodology, which is as I described
3   otherwise, did not appropriately reflect the changes in
4   the market pricing over the last -- my understanding
5   it's been a couple of years that these generics have
6   become available, and have been introduced to drive
7   down the acquisition cost.
8       Q.   Does Cigna look at the physician's
9   acquisition cost for any drugs other than these 13 in
10  setting reimbursement rates?
11      A.   No.
12      Q.   And can you tell me why not?
13          THE WITNESS:  May I clarify the scope?
14          MS. SCHOEN:  Please.
15          MR. ST. PHILLIP:  You may.
16      A.   I need to clarify that my responses have been
17  related to injectable medications, not to vaccinations,
18  toxoid immunizations.
19          So would you like to ask that question?
20          MS. SCHOEN:  Can you read back the
21  question.
22          (The court reporter read back.)

---

Jill S. Herbold

Bloomfield, CT

January 14, 2005

**38**

1   A. We haven't felt it's been necessary.

2       MR. ST. PHILLIP: We've been going

3   awhile. When you find an appropriate

4   breaking point, we'd like to take a break.

5       MS. SCHOEN: We can take a break now.

6       (Recess taken.)

7   Q. So going back to the Cigna national standard

8   injectable reimbursement rate, those reimbursement

9   rates are set on a drug-by-drug basis, is that correct?

10  A. They are set by HCPCS code.

11  Q. So they are set on a J-code by J-code basis?

12  A. That is correct.

13  Q. So Cigna would look at each J-code and make

14  an individualized determination of the percentage below

15  AWP or otherwise that it should be -- the drug -- that

16  the J-code rather should be reimbursed at?

17  A. Yes. Each J-code is set individually.

18  Q. And just to make sure that I'm clear on your

19  prior testimony, the decision of whether to reimburse

20  based at AWP or below AWP by 15 percent or below AWP by

21  45 percent is all made by Tel-Drug?

22  A. Yes, I believe that is where discounts came

**39**

1   from.

2   Q. Can you think of any other place that those

3   rates may have come from?

4   A. Pharmacy Operations within Cigna that are

5   technically not of the Tel-Drug subsidiary but work

6   very closely with them.

7   Q. And you're not aware of the factors that go

8   into making the determination of the reimbursement

9   rate?

10  A. That is correct, I have no knowledge.

11  Q. Now, we discussed briefly that one particular

12  J-code may incorporate more than one NDC, is that

13  correct?

14  A. That is correct.

15  Q. So if a physician submits a reimbursement

16  claims form with only a J-code, under the -- how does

17  Cigna know what reimbursement to provide?

18  A. A reimbursement is set at the J-code level.

19  Q. Is it true that for each NDC, there may be a

20  different AWP?

21  A. It is my understanding that that is correct.

22  Q. So how does Cigna determine which average

**40**

1   wholesale price to use when it's determining a

2   reimbursement by J-code?

3   A. We obtain the average wholesale price at the

4   J-code level. There's a methodology that the vendor --

5   for lack of a better word -- uses to look across the

6   NDCs and come up with the appropriate average wholesale

7   price.

8   Q. And when say the vendor, you mean a third

9   party?

10  A. Yeah. It's not within Cigna.

11      MR. ST. PHILLIP: Could I clarify for a

12  second?

13      MS. SCHOEN: Sure.

14      (Witness and counsel confer).

15  Q. After conferring briefly with counsel, do you

16  have any --

17  A. Could you repeat the question.

18      MS. SCHOEN: Can you read back the

19  question.

20      (The court reporter read back.)

21  A. Yes. The third party is First Data Bank.

22  Q. So First Data Bank provides you with an AWP

**41**

1   by J-code?

2   A. That is correct.

3   Q. And I believe you had testified that First

4   Data Bank uses some methodology to arrive at that AWP

5   by J-code, but you're not exactly sure of which

6   methodology they use, is that correct?

7   A. No. They use a methodology.

8       My understanding of the methodology is

9   as follows. They take all of the NDC's appropriate to

10  bill underneath that J-code, and they break them into

11  brand drugs and generic drugs, and take the average of

12  the average wholesale prices of the brand drugs and the

13  average of the average wholesale prices of the

14  generics, and they use the lesser of the two of those

15  numbers.

16  Q. And if there are no generics, then I would

17  suppose they'd just take the average of the branded

18  drugs?

19  A. That is my understanding, yes.

20  Q. And so when the -- when Cigna is using the

21  average wholesale price by J-code for its national

22  standard injectable reimbursement rates, you're not

Jill S. Herbold                                          January 14, 2005
                        Bloomfield, CT

12 (Pages 42 to 45)

---

42

1  actually using the average wholesale price that relates
2  to a particular NDC unless that NDC is the only NDC for
3  a particular J-code?
4       MR. ST. PHILLIP: Objection.
5       You can answer.
6    A. That is correct.
7    Q. And going back to the other methodology for
8  reimbursing physicians for pharmaceutical products, the
9  AWP based methodology, is that based on J-code, or is
10  that based on an NDC?
11    A. I want to clarify. You're talking about the
12  rate exhibit when it says a certain percentage of AWP,
13  are those AWPs based on J-code versus NDC?
14    Q. Right.
15    A. The reimbursement is set at the HCPCS level,
16  the J-code level.
17    Q. So then would I be correct to say that if I
18  looked at Cigna's rate exhibits for all pharmaceuticals
19  that would be included under the rate exhibits, the
20  reimbursement rate would be set by J-code, not by NDC?
21       MR. ST. PHILLIP: Objection.
22    A. The -- it is always done by the appropriate

---

43

1  coding. It's not done by NDC. It is done by HCPCS
2  code or CPT code, whatever is appropriate for the
3  physician to bill according to the industry standard
4  coding requirements.
5    Q. So in the approximate 50 percent of the cases
6  where the rate exhibit is based on an AWP based
7  reimbursement, is the AWP referenced in that
8  reimbursement the AWP for a particular J-code, or is it
9  the AWP for a particular NDC?
10    A. AWP for a particular J-code.
11    Q. So once again, if there are multiple NDCs for
12  a particular J-code, the AWP that would be used would
13  be determined by First Data Bank, as you have
14  described, by averaging the different AWPs for the
15  different NDCs in that J-code, is that correct?
16    A. When we have a contract that we base the
17  reimbursement of injectables as a percentage of AWP,
18  those AWP amounts come from the First Data Bank.
19    Q. Are you aware that First Data Bank provides
20  AWPs by NDC?
21       MR. ST. PHILLIP: Objection.
22    A. I can only assume that they do. I do not

---

44

1  know for certain.
2    Q. But the AWPs you use and First Data Bank for
3  your rate exhibits are the ones that you've described
4  previously where First Data Bank would average the AWPs
5  for a J-code?
6       MR. ST. PHILLIP: Objection. It's
7    really been asked and answered, but if you
8    want to elaborate --
9    A. Yes. It's -- the AWP is set by J-code using
10  the method described earlier about averaging the
11  different AWPs across the NDCs.
12    Q. Prior to 2001, are you aware of what
13  methodologies Cigna used to reimburse providers for
14  pharmaceutical products?
15       MR. ST. PHILLIP: Objection to form.
16    You can answer.
17    A. In my conversations with colleagues who have
18  knowledge about that time, it is my understanding that
19  the reimbursement was as I have described, meaning that
20  it's per the contracting terms. It's -- those
21  contracting terms can take on different forms.
22       Prior to 2002, the national standard did

---

45

1  not exist, so that would not have been an option. So
2  the options prior to that would have just been AWP
3  based and percentable charges.
4    Q. If I were to go to the claims data for Aetna,
5  would -- how would I tell if a particular reimbursement
6  was based on AWP or it was based on a percent of billed
7  charges?
8       MR. WADE: You asked if she went to an
9    Aetna claim.
10       MS. SCHOEN: Excuse me?
11       MR. WADE: You asked if she went to an
12    Aetna claim.
13       MS. SCHOEN: I'm sorry, I don't mean
14    Aetna. I mean Cigna.
15    A. By looking at a claim, you could not tell.
16    Q. So can you just describe to me what I would
17  have to do to find that out?
18    A. You would have to find out what the
19  contracting terms are.
20    Q. Prior to 2002, do you have an idea of what
21  percentage of reimbursement to providers was based upon
22  the percent of billed charges as opposed to AWP?

---

Jill S. Herbold                                          January 14, 2005
                          Bloomfield, CT

                                                              46
1      A.  I do not know.
2      Q.  Do you know if that percentage would have
3   changed over time from 1991 to 2002?
4      A.  I do not know.
5      Q.  Does Aetna --
6          MR. ST. PHILLIP:  Cigna.
7          MS. SCHOEN:  Sorry.
8      Q.  Does Cigna have any -- strike that.
9          Does Cigna make any attempts to
10  encourage physicians to utilize Tel-Med -- Tel-Drug?
11         MR. ST. PHILLIP:  Objection to form.
12     A.  Yes.
13     Q.  And can you tell me how Cigna does that?
14     A.  Through written communications to the
15  providers.
16     Q.  Any other ways?
17     A.  I do not know for certain, but I would expect
18  that it was included within the Website that we have
19  for the practitioners.
20     Q.  But Cigna does not require physicians to use
21  the Tel-Drug service?
22     A.  That is correct.

                                                              47
1      Q.  When the rate -- when the reimbursement for
2   pharmaceutical products and the rate exhibit is based
3   on average wholesale price, is that reimbursement rate
4   set for all drugs together as a lumped unit, or would
5   certain individualized drugs sometimes be subject to
6   separate negotiations and have a separate reimbursement
7   rate?
8          MR. ST. PHILLIP:  Objection to form.
9      A.  I understand, from what I have seen in
10  contracts, all the injectables would be reimbursed at
11  the same percent AWP.  I have not seen a contract where
12  we've varied that percentage by particular J-code.
13     Q.  And what other categories of drugs would
14  there be in the rate exhibits besides the injectables
15  that you've referred to?
16     A.  Immunizations and vaccinations.
17     Q.  Any others?
18     A.  No.
19     Q.  Do you have an understanding of why
20  physicians pay for the drugs that they may administer
21  in an office?
22         MR. ST. PHILLIP:  Objection.

                                                              48
1      A.  No.
2          Oh, I do have to clarify that one.  On
3   injectables, no.  On the immunizations, we have more
4   recently, very recently actually, tried to get
5   information by talking with the manufacturers of the
6   immunizations that are able to sell directly to the
7   doctors.  Some manufacturers do that and others do not.
8      Q.  So in those cases, you might have been able
9   to obtain estimates of what the physician's office
10  might pay for the drugs?
11     A.  Yes.
12     Q.  Have you ever undertaken a similar inquiry
13  with regard to injectables?
14     A.  No.
15     Q.  And do you know why not?
16     A.  No.
17     Q.  Do you know if -- strike that.
18         Have you ever looked at the prices that
19  Tel-Drug pays for injectables?
20     A.  No.  I have no knowledge what Tel-Drug's
21  acquisition costs are.
22     Q.  Have you ever considered asking Tel-Drug what

                                                              49
1   its acquisitions costs were in order to utilize that
2   information in negotiations with physicians?
3          MR. ST. PHILLIP:  Objection.
4      A.  I personally have not considered that, but
5   it's possible perhaps that people that were involved
6   prior to my tenure might have considered that.
7      Q.  Would that yield information that would be
8   useful in negotiations with physicians?
9          MR. ST. PHILLIP:  I'm just going to
10         object insofar as there's been no foundation
11         of the corporate relationship, and so the
12         control between the various companies, and
13         there hasn't been any foundation for that, so
14         go ahead.
15         MS. SCHOEN:  The witness did testify
16         that Tel-Drug was a subsidiary of Cigna.
17         MR. ST. PHILLIP:  The witness hasn't
18         been authorized to testify about the
19         corporate structure, so to the extent that
20         testimony has been given, it hasn't been
21         consented to by the company.
22         MS. SCHOEN:  I'll start -- I'll ask a

Jill S. Herbold                                                    January 14, 2005
                              Bloomfield, CT

14 (Pages 50 to 53)

---

**50**

1       new question.
2       Q. Is the reason that Cigna has not acquired
3   this information from Tel-Drug because the information
4   would, in fact, not be useful in its negotiations with
5   providers?
6       A. No.
7       Q. Then what would the reason be?
8       A. We haven't done it. We haven't — it hasn't
9   been a consideration.
10      Q. But presumably if it would yield savings for
11  Cigna, in pharmaceutical reimbursement, you would have
12  done that?
13          MR. ST. PHILLIP: I ask the witness not
14      to guess.
15      A. If we knew Tel-Drug's acquisition costs, it
16  would just be another factor to consider in setting
17  reimbursement. It's not that it would necessarily
18  impact the reimbursement to physicians, because there
19  may be other valid reasons why we should sell it at a
20  different level. So there may or may not be savings
21  from knowing what Tel-Drug's acquisitions costs are.
22      Q. I think that you were telling me earlier

---

**51**

1   about the competitive nature of negotiations.
2           Would the competitive nature of
3   negotiations be one reason why that information may not
4   be -- may not impact the ultimate reimbursement rate?
5       A. Certainly.
6       Q. Does Cigna maintain its contracts with
7   providers in the regular occurrence of its business?
8           MR. ST. PHILLIP: I'm going to object.
9       The deposition topic No. 25 which reads, the
10      authentication and knowledge of all documents
11      produced in response to Defendants' subpoena,
12      and the extent to which such production is
13      responsive to the Defendants' demands was
14      excluded by the Magistrate Judge's ruling.
15          As a result, Cigna does not consent to
16      have this witness testify concerning the
17      authentication of documents.
18          MS. SCHOEN: Well, unfortunately at this
19      stage, we have no documents to authenticate
20      because Cigna has produced no contracts with
21      providers. So I'm trying to determine
22      whether such contracts exist and are

---

**52**

1   maintained so that we can then call for their
2   production.
3           MR. ST. PHILLIP: That's okay. We don't
4   consent to have this witness testify about
5   that.
6           MS. SCHOEN: Are you instructing her not
7   to answer this question?
8           MR. ST. PHILLIP: No.
9           THE WITNESS: Can you repeat the
10  question, please.
11          (The court reporter read back.)
12      A. It has a standard business practice to
13  maintain contracts with providers.
14      Q. And can you tell me where those contracts are
15  maintained, if you know?
16          MR. ST. PHILLIP: Same objection.
17      A. No response on that one.
18      Q. You don't know?
19      A. I don't have enough information to respond.
20      Q. Are you aware that some injectable products
21  can be obtained through a retail pharmacy network?
22      A. No, I do not have good knowledge about how

---

**53**

1   physicians acquire their injectables.
2           MR. ST. PHILLIP: Can we confer for a
3   second?
4           MS. SCHOEN: Sure.
5           (Witness and counsel confer.)
6       A. Counsel has clarified what he thought the
7   question was. So let me say that it is my
8   understanding that people can go to the local pharmacy
9   and get certain injectable medications.
10      Q. And do you have an understanding whether the
11  reimbursement that Cigna would provide to the
12  pharmacist for dispensing that injectable medication
13  would be the same as the reimbursement that Cigna would
14  provide to a provider who dispensed that and
15  administered that injectable medication?
16          MR. ST. PHILLIP: Objection.
17      A. I do not know.
18      Q. And would a variation between those two rates
19  be a product of what you've described to me earlier as
20  the negotiation process with a physician's group that
21  results in varying rates of reimbursement?
22          MR. ST. PHILLIP: Objection. Lack of

---

Jill S. Herbold

January 14, 2005

Bloomfield, CT

**54**

1  foundation. It calls for speculation.
2       You can answer.
3       A. There are negotiations with provider groups,
4  and there are also negotiations with pharmacies, and
5  those negotiations will yield the appropriate result
6  for reimbursement, and I know on the physician's side,
7  it does mean there are varying levels of reimbursement
8  for the same services to different physicians.
9       Q. When did you first become familiar with the
10  term average wholesale price?
11      A. It was -- I would have become familiar with
12  average wholesale price either during the time I was in
13  college or in taking the actuarial exams, so prior to
14  1996.
15      Q. And can you tell me what your current
16  understanding of AWP is?
17      A. My current understanding about what average
18  wholesale price is, it's a number that's used as a
19  benchmark, but I do not have -- and it's a very
20  frequently used benchmark in the pharmaceutical
21  industry. I do not know specifics about how it was
22  calculated.

**55**

1       Q. Are you familiar with the term wholesalers
2  acquisition cost or WAC?
3       A. I have become familiar with that term.
4       Q. Do you have any understanding of whether
5  there's a relationship between a WAC price and an AWP
6  price for a particular drug?
7       A. My limited exposure is that there is not a
8  consistent relationship between WAC and AWP across the
9  NDCs. So in other words, I do not think that WAC is
10  always a set percentage of AWP and all NDCs.
11      Q. Do you have any understanding of whether the
12  AWP bears any relationship to the actual acquisition
13  cost of drugs?
14          MR. ST. PHILLIP: Object to the form.
15      A. Whose acquisition cost?
16      Q. Acquisition costs generally.
17          MR. ST. PHILLIP: If you can answer
18      that, go ahead.
19      A. I don't think I can answer that one.
20      Q. What about Cigna's acquisition costs?
21      A. Can you please restate the whole question?
22      Q. Do you have any understanding as to whether

**56**

1  there's a relationship between the average wholesale
2  price and Cigna's acquisition cost for pharmaceutical
3  products?
4          MR. ST. PHILLIP: All pharmaceutical
5      products?
6          MS. SCHOEN: Let's start with all, and
7      then we can -- if you only know for
8      injectables, then that's where we'll go.
9       A. In what I do, that is outside the scope of
10  what I do, because I work on the reimbursement to
11  practitioners. I'm not involved with the acquisition
12  of pharmaceutical drugs and do not have that particular
13  knowledge that is relative to the pharmacy operations
14  area.
15      Q. So when you, in your work, use the average
16  wholesale price as a benchmark, you don't have any
17  expectation that it bears any particular relationship
18  with the actual acquisitions costs because that's a
19  separate thing --
20          MR. ST. PHILLIP: Objection to form.
21      Q. -- is that correct?
22      A. Yeah. I do not know that the acquisition

**57**

1  cost has a consistent relationship to the AWP. My
2  understanding is that the acquisition cost is either
3  less than or equal to the AWP.
4       Q. And where is that understanding from?
5       A. That understanding comes from my exposure to
6  AWP through my education and training, and really
7  through, over the last couple of years, just being
8  around and listening to what's going on in the industry
9  and what's going on at Cigna.
10      Q. Do you have any involvement or understanding
11  of the reimbursement provided by Cigna to hospitals for
12  pharmaceuticals administered in the hospital outpatient
13  department?
14      A. That reimbursement would be based on the
15  contractual terms.
16      Q. So once again, it would be based on rates
17  that were determined through a process of negotiation
18  with a hospital and a hospital group?
19      A. Yes.
20      Q. To your knowledge, has Cigna ever experienced
21  a situation where a physician's practice group
22  projected Cigna's rate exhibit rates?

Jill S. Herbold                                           January 14, 2005

Bloomfield, CT

16 (Pages 58 to 61)

---

58

1     A.  There have been physician groups that have
2  not accepted our proposed rate exhibits.
3     Q.  And what happens then?
4     A.  Either we come up with a new proposal through
5  the negotiation process or the provider — we do not
6  contract with the provider, so they are not a part of
7  our network.
8     Q.  And what determines which approach Cigna
9  takes?
10       MR. ST. PHILLIP:  Objection.
11    A.  What is the group demanding; how much level
12 of reimbursement is affordable; and is there a
13 particular need for that provider group in our network,
14 because certain specialties where we make sure we have
15 to have physicians -- a certain number of
16 physicians in our networks to insure an appropriate
17 access of care for our members.
18    Q.  So would it be correct to say that in order
19 to provide a plan that is -- that appeals to clients
20 like employer groups, Cigna has to work to maintain a
21 comprehensive network of providers?
22       MR. ST. PHILLIP:  Objection.

---

59

1     A.  To have sellable products, we do have to work
2  to maintain competitive networks.
3     Q.  Does Cigna ever approach a physician's group
4  with a take it or leave it contract?  In other words,
5  here's what our offer is, and we won't deviate from it
6  at all?
7     A.  Yeah.
8     Q.  Can you tell me approximately in what
9  percentage of cases does that happen as opposed to the
10 negotiation process?
11       MR. ST. PHILLIP:  Over what period of
12       time?
13       MS. SCHOEN:  Well, let's start with 2001
14       through the present.
15    A.  I do not know.
16    Q.  Are you familiar with -- strike that.
17       Do providers -- physician's groups or
18 physicians solicit bids from Cigna?
19       MR. ST. PHILLIP:  Objection.
20    A.  What do you mean by bid?
21    Q.  Say a proposal for a contract between Cigna
22 and that group, for that group to become a part of the

---

60

1  Cigna network.
2     A.  Yes.  I'm sure there have been situations
3  where provider groups have approached us to become
4  members of the Cigna network.
5     Q.  Are you aware of whether Cigna provides
6  reimbursement for the administration of a particular
7  drug in a physician's office?
8     A.  We do, at least during my tenure and my
9  knowledge.  Prior to like the 2001 time frame, I do not
10 have knowledge.
11    Q.  When Cigna considers the reimbursement for
12 deposition administration fee for service, can you tell
13 me how that fits into the negotiation process that
14 we've been discussing?
15       MR. ST. PHILLIP:  I'm just going to make
16       an objection based on the exclusion of
17       deposition topic No. 15, which deals with the
18       area of negotiation between the reimbursement
19       of the drug itself and the administrative
20       service.  The question is not precisely in
21       there, so I'll allow the witness to answer
22       it, but you're getting close.

---

61

1     A.  The reimbursement with our provider groups,
2  when negotiating, is considered in total, so it's the
3  final total contract that may be decided -- that will
4  be decided upon, and there are trade-offs made between
5  the different services as you go through the process of
6  negotiation and compromise to get to a solution that is
7  agreeable to both parties.
8     Q.  And would that statement be true for all of
9  the line items in the rate exhibit?
10       MR. ST. PHILLIP:  Objection.
11    Q.  In other words, you're looking at all the
12 line items in a rate exhibit together and the total
13 package -- not pulling out one line and just looking at
14 that -- pulling out one segment and looking at that?
15       MR. ST. PHILLIP:  Same objection.
16    A.  The negotiations are done looking across the
17 entire range of services that the provider groups
18 provide to the members, and during those negotiations
19 there are trade-offs to get to a final compromise
20 solution between ourselves and the provider group, and
21 during those negotiation discussions, it is -- it very
22 much happens that they talk about an individual line

---

Jill S. Herbold

January 14, 2005

Bloomfield, CT

62

1    item.
2        But when the bottom line is set, it's
3   what is the overall level of reimbursement. That's
4   what both parties have to get comfortable with.
5     Q. So could there ever be a case where Cigna may
6   agree to a higher reimbursement for the -- for
7   injectable drugs, for example, and -- in exchange for a
8   lower reimbursement for the physician's administrative
9   fee?
10       MR. ST. PHILLIP: I think actually that
11      question is right at the heart of this, so
12      we'll object based on Magistrate Judge's
13      exclusion in paragraph 15. But I'll allow
14      the witness to answer the question and
15      preserve our right to move to strike.
16       MS. SCHOEN: For the record, we clearly
17      disagree on that, but to move things along --
18     A. That could be a potential trade-off that does
19   happen during the negotiation process.
20     Q. From 2001 to the present, do any of the
21   reimbursement rates that Cigna uses rely on Medicare's
22   reimbursement rates?

63

1     A. For what services are you asking that
2   question of?
3     Q. In particular, drugs?
4     A. We have not based our reimbursement of any
5   injectable medications based on what Medicare pays.
6       MR. WADE: Estella, I'm sorry to
7      interrupt you. How much longer do you think
8      you'll be with Jill?
9       (Discussion off the record.)
10       (Recess deposition at 3:00 PM.)
11       (Deposition resumed at 4:05 PM.)
12     Q. Do you know if Cigna owns any physician
13   groups?
14     A. Yes, one.
15     Q. And can you tell me where that group is
16   located?
17     A. Phoenix, Arizona.
18     Q. And has -- do you know how the physicians in
19   that physician group acquire pharmaceutical products
20   that they administer to patients?
21     A. I have no idea.
22     Q. You don't know whether they -- that physician

64

1   group purchases the pharmaceutical products from a
2   wholesaler or a manufacturer?
3     A. No, I do not know.
4     Q. Have you ever considered looking at the --
5   that physician group's acquisition costs for
6   pharmaceutical products?
7     A. No.
8     Q. We spoke earlier about the average wholesale
9   price and about pricing reporters generally like First
10   Data Bank?
11     A. Yes.
12     Q. Do you know of other pricing reporters
13   besides First Data Bank?
14     A. I've heard of the name Redbook, and I'm aware
15   that our pharmacy area uses a system called Argus, but
16   I've recently learned that the numbers in Argus for AWP
17   are from First Data Bank.
18     Q. Do you have an understanding that the AWPs
19   for a particular drug may be different in First Data
20   Bank versus Redbook?
21       MR. ST. PHILLIP: Objection.
22     A. Yes. I have learned that they are different.

65

1     Q. Can you tell me how you learned that?
2     A. Because we've had contractors -- provider
3   groups have come back to our contractors who have
4   called me and have told me such, because they like to
5   quote a different number as AWP when trying to
6   negotiate to the right amount.
7     Q. So in the negotiation process, in the context
8   of a negotiation process, a provider might tell you or
9   someone else at Cigna that the Redbook has a different
10   AWP than First Data Bank; is that what you're saying?
11     A. I don't think they necessarily tell us that
12   the numbers are different, but they quote an AWP
13   number, and we tell them it's not the same as ours or
14   we tell them it is the same as ours.
15     Q. But the AWP that Cigna uses is always the
16   First Data Bank AWP?
17     A. That is correct.
18     Q. Do you have any other knowledge of why First
19   Data Bank might have a different average wholesale
20   price listed than another pricing service?
21     A. No.
22     Q. Earlier we also spoke of your understanding

Jill S. Herbold                                    January 14, 2005
                         Bloomfield, CT

18 (Pages 66 to 69)

66

1   of the term average wholesale price.
2           I wonder if you could tell me if your
3   understanding of that term has changed at all over time
4   or has it been static?
5       A.   It's been pretty static. I can't -- when I
6   first learned about AWP through my studies in my very
7   early career when I started becoming more involved, it
8   had the same meaning to me.
9       Q.   And how is AWP relevant to your studies?
10      A.   To pass my actuarial exam, we had to have
11  some basic understanding of products, healthcare
12  products, life insurance products and different things,
13  so there's a lot of -- wide scope of knowledge that you
14  have to pass the exams.
15      Q.   So this was a general actuarial exam, but it
16  required some particularized knowledge about the
17  healthcare industry?
18      A.   Yes.
19      Q.   And I believe you testified earlier that you
20  don't know the prices that pharmacies may pay to
21  acquire injectable drugs; is that fair?
22      A.   That's correct.

67

1       Q.   Do you have any understanding of -- strike
2   that.
3           Do you have any understanding of whether
4   the price that pharmacies pay for injectable drugs
5   bears any relationship to the average wholesale price?
6       A.   I'm sorry, you asked if I understand if the
7   acquisition cost of what group? Pharmacies?
8       Q.   The acquisition costs of injectable drugs by
9   pharmacies bears any relationship to the average
10  wholesale price?
11      A.   It is my understanding that there is no
12  consistent relationship to average wholesale price, but
13  that acquisition of drugs by pharmacy's providers is
14  typically at less than or equal to the average
15  wholesale price.
16      Q.   At the same time you presume that pharmacies
17  are -- providers are acquiring the pharmaceutical
18  products at a price that's less than the price that
19  Cigna reimburses that provider?
20          MR. ST. PHILLIP:  Objection.
21          Don't presume.
22      A.   I'm not sure I understand the whole question.

68

1       Q.   Sure.  I'll rephrase it.
2           Isn't it correct that when Cigna
3   reimburses a provider for a pharmaceutical product,
4   that Cigna will presume that that provider has
5   purchased that product for a price that's less than
6   what the reimbursement is?.
7           MR. ST. PHILLIP:  Same objection.
8       A.   We like to be able to cover the physician's
9   acquisition cost.  However, we are operating in a
10  competitive industry, and if the physicians are not
11  purchasing at lower rates that are available in the
12  market, so they're paying an amount that's higher than
13  they can buy the same thing from somebody else, then
14  it's potentially possible that our reimbursement can be
15  less than their acquisition cost, because we are a
16  competitor market driven company.  It's the marketplace
17  we operate in.
18      Q.   And any such loss that the provider may incur
19  for a pharmaceutical product, reimbursement could
20  potentially be made up by Cigna's reimbursement to that
21  provider for another line item on the rate exhibit,
22  isn't that correct?

69

1           MR. ST. PHILLIP:  Objection.  Calls for
2   speculation.
3       A.   That is correct.
4       Q.   Have some providers threatened to leave the
5   Cigna network during the negotiation process around the
6   rate exhibit reimbursement rates?
7       A.   That can happen during negotiations, yes.
8       Q.   And like you testified earlier, would that
9   either lead Cigna to offer perhaps a higher
10  reimbursement rate or lead Cigna to tell the physicians
11  group that the rates are nonnegotiable?
12          MR. ST. PHILLIP:  Objection.
13      A.   If the provider is unsatisfied with the
14  reimbursement, there could be other alternatives
15  negotiated, or there may not be a contract with that
16  provider.
17      Q.   You've testified that in your current role,
18  one of your many functions is to analyze the
19  reimbursement rates provided to providers?
20      A.   That is correct.
21      Q.   And can you tell me a little bit more about
22  what type of analysis that you engage in?

Jill S. Herbold

January 14, 2005

Bloomfield, CT

19 (Pages 70 to 73)

70

1    A.  The analysis that we do is to look at part
2  reimbursement as well as proposed reimbursement and how
3  much of an increase that is going to be, and what is
4  that overall impact going to be on the amount of costs
5  for our members.
6    Q.  Do you do that analysis on a physician's
7  group by physician's group basis?
8    A.  That is done, yes, basically a physician
9  group-by-physician group. It's whenever we have a
10  negotiation.  We could end up doing multiple analyses
11  depending on how many different scenarios there are
12  within the negotiations that we have.
13    Q.  So if there are different rounds of
14  negotiations that lead to different offers for rate
15  exhibits on the table, you might do an analysis for
16  each different rate exhibit before it's offered?
17    A.  Yes.
18    Q.  And are you looking at any in the -- in your
19  analysis, are you looking at any information that would
20  let you know whether the rates that you're considering
21  offering this provider are competitive in the
22  marketplace?

71

1    A.  Well, sometimes as part of our analysis, we
2  will look at what we are reimbursing other physicians
3  for the same services to help us understand is that
4  competitive with our other negotiations. My team can do
5  that.
6      Contract negotiators might have
7  discussions with providers about our reimbursement
8  versus the reimbursement that they might get from
9  another carrier.
10    Q.  And would Cigna take into account what the
11  providers have told them about what they may be getting
12  from another carrier?
13    A.  Indirectly, yes.  As it -- we make the
14  decisions -- it's really the outcome about what the
15  provider is going to be reimbursed is the outcome of
16  the negotiation process.  It's back and forth, give and
17  take, and there's many factors to consider.
18    Q.  Are injectable drugs included on the Cigna
19  formulary?
20    A.  I do not know.
21    Q.  Do you know whether Cigna receives rebates
22  from pharmaceutical manufacturers for injectable drugs?

72

1    MR. ST. PHILLIP:  What time frame?
2    MS. SCHOEN:  Let's start with currently.
3    A.  I do not know.
4    Q.  What about historically?  Do you know if
5  Cigna has, in the past, received rebates from
6  pharmaceutical manufacturers for injectable products?
7    A.  I do not know.
8    Q.  In the negotiation process with physicians
9  groups, who are Cigna's competitors?
10    MR. ST. PHILLIP:  Objection.
11    You can answer.
12    A.  Our competitors are the carriers who are
13  providing health care insurance coverage to other
14  members, to other people in the population.  So there's
15  numerous competitors out there.
16    Q.  Do you see pharmacy benefit managers as
17  competitors in this negotiation process with
18  physicians?
19    MR. ST. PHILLIP:  Objection.
20    A.  No, I do not see them as competitors as it
21  relates to a relationship with physicians.
22    Q.  I may have asked you this already, but given

73

1  the time lapse, I'll go ahead and ask you again.
2    Do you have any understanding of whether
3  providers may receive rebates from pharmaceutical
4  manufacturers for injectable drugs?
5    A.  I do not know.
6    Q.  What about for any other type of drugs that a
7  physician may administer in the physician's office?
8    A.  I do not know.
9    Q.  I believe you testified that it's your
10  understanding that providers may pay the average
11  wholesale price or some percentage below that for
12  pharmaceutical products administered in their office,
13  correct?
14    MR. ST. PHILLIP:  Objection.
15    A.  Could you please repeat the question.
16    Q.  I believe it was your testimony that
17  providers pay average wholesale price or some
18  percentage below average wholesale price for
19  pharmaceutical products administered in an office, is
20  that correct?
21    A.  That's my understanding.
22    Q.  Are you familiar with the term wholesaler's

Jill S. Herbold                                                   January 14, 2005

Bloomfield, CT

20 (Pages 74 to 77)

| 74 |
| --- |

1  acquisition costs?
2     A.  Yes.
3     Q.  And what is your understanding of that term?
4     A.  That it is -- it represents a rate amount
5  that is supposed to be the wholesaler's acquisition
6  cost, but exactly how it all gets calculated, I do not
7  know.  What I do know about it is that it -- every
8  situation -- I've never known it to be above AWP, so
9  less than AWP, but exactly what the number is doesn't
10  have a direct relationship with AWP.
11     Q.  Would you say that Cigna has an understanding
12  that providers need to make a profit margin in order to
13  stay in business?
14        MR. ST. PHILLIP:  Objection.
15     A.  Your question was if providers need a profit
16  margin to stay in business?
17     Q.  Is that correct?
18     A.  Yes.
19     Q.  And that as a general matter, Cigna assumes
20  that the reimbursement rates that it provides providers
21  will allow the physicians to make a fair and reasonable
22  margin and stay in business; isn't that correct?

| 75 |
| --- |

1        MR. ST. PHILLIP:  Objection.
2        THE WITNESS:  Could you repeat the
3     question.
4        (The court reporter read back.)
5     A.  The reimbursement to the providers is the
6  result of the negotiations, and while as we cannot
7  determine if that reimbursement will allow us -- will
8  allow the provider to make a profit or not, it is in
9  Cigna's interest that providers do stay in business,
10  because they are the ones that are servicing our
11  members.
12     Q.  Does Cigna have a preference for the site
13  that a physician administered drug is administered?
14        MR. ST. PHILLIP:  I'm sorry, can you
15     read that back.
16        (The court reporter read back.)
17     A.  To my knowledge, no.  The -- we want doctors
18  following standard medical protocols, but I do not know
19  of a specific statement of any sort related to that
20  matter.
21     Q.  For example, if a particular drug could be
22  administered in a physician's office but could also be

| 76 |
| --- |

1  administered in a hospital outpatient department, does
2  Cigna have any preference over the site of care?
3        MR. ST. PHILLIP:  Objection, insofar as
4     it calls for an across the board answer.  Go
5     ahead.
6     A.  The answer to that is that our preference, if
7  it was medically appropriate to do so, for that
8  injectable to be administered in a physician's office
9  because it generally is better for the member as well
10  as the lower medical costs.
11     Q.  And do you know why there are lower medical
12  costs in a physician's office as opposed to a hospital
13  outpatient department?
14     A.  That would be because of the overhead and
15  facility costs that is associated with the outpatient
16  facilities.
17     Q.  So Cigna's reimbursement to the hospital
18  would generally be greater than its reimbursement to a
19  physician's office for administration of the same
20  product?
21        MR. ST. PHILLIP:  I'm going to object.
22     Q.  Is that correct?

| 77 |
| --- |

1        MR. ST. PHILLIP:  The court excluded
2     deposition topic No. 18 which reads, whether
3     and to what extent you provide different
4     reimbursement rates for subject drugs when
5     they are administered in providers' offices
6     rather than in hospitals, including your
7     clients' rationale for doing so or not doing
8     so.  The Magistrate Judge excluded that
9     testimony, so I instruct the witness not to
10     answer.
11        MS. SCHOEN:  Well, clearly we disagree
12     and feel that this deposition topic falls
13     under other areas.
14        For purposes of moving forward today, we
15     will move forward.
16     Q.  Do you have any knowledge that doctors have
17  conspired with drug manufacturers to inflate drugs'
18  average wholesale price?
19        MR. ST. PHILLIP:  Object insofar as it
20     calls for a legal conclusion, but you can
21     answer.
22     A.  I have no knowledge.

Jill S. Herbold

Bloomfield, CT

January 14, 2005

21 (Pages 78 to 81)

| | 78 |
|---|---|
| 1 | Q.  Do you have any knowledge of any activities |
| 2 | undertaken by any drug manufacturers to inflate the |
| 3 | average wholesale prices for their drugs? |
| 4 | MR. ST. PHILLIP:  Same objection. |
| 5 | Go ahead. |
| 6 | A.  I have no knowledge. |
| 7 | MS. SCHOEN:  I think if I could, I'm |
| 8 | probably about to wrap up here.  I have to |
| 9 | look over my notes. |
| 10 | Ed, are you going to have any questions |
| 11 | of this witness? |
| 12 | MR. NOTARGIACOMO:  Yes, a few.  Not too |
| 13 | long. |
| 14 | MS. SCHOEN:  I have just a couple more |
| 15 | questions. |
| 16 | Q.  How does Cigna determine whether it's |
| 17 | achieving a competitive reimbursement level when |
| 18 | negotiating with providers? |
| 19 | MR. ST. PHILLIP:  Objection. |
| 20 | A.  We try to find the most credible sources of |
| 21 | information that we can, and sometimes we'll get |
| 22 | information from the providers.  We can also look at |

| | 79 |
|---|---|
| 1 | what we paid to other providers for the same or similar |
| 2 | types of services. |
| 3 | Q.  So on occasion, Cigna uses external sources |
| 4 | to assess its reimbursement levels to providers, is |
| 5 | that correct? |
| 6 | MR. ST. PHILLIP:  Objection. |
| 7 | A.  Yes.  The assessments that we're able to do |
| 8 | are -- that would really be external are not to |
| 9 | specific provider groups but rather to the competitive |
| 10 | position in the overall market. |
| 11 | Q.  Does Cigna attempt to lower its negotiated |
| 12 | rates with physicians over time? |
| 13 | A.  Cigna tries to get competitive rates with |
| 14 | physicians because we need to control the medical costs |
| 15 | for our members.  Sometimes that means competitive -- |
| 16 | we give increases.  Other times it means decreases. |
| 17 | Q.  And does Cigna have a way of determining |
| 18 | whether any increases or decreases of the reimbursement |
| 19 | rate in an attempt to be competitive have gone too far |
| 20 | or gone not far enough in the case of an increase? |
| 21 | A.  We don't have any specific way to assess that |
| 22 | beyond a retrospective look at the same type of |

| | 80 |
|---|---|
| 1 | information we would have had when we first made the |
| 2 | decision. |
| 3 | MR. ST. PHILLIP:  It relates to the |
| 4 | bankruptcy filings of the physicians groups. |
| 5 | MS. SCHOEN:  I have no further questions |
| 6 | at this time. |
| 7 | Ed? |
| 8 | |
| 9 | CROSS EXAMINATION |
| 10 | BY MR. NOTARGIACOMO: |
| 11 | Q.  Ms. Herbold, I'll be very brief.  If you |
| 12 | can't understand -- my name is Ed Notargiacomo.  I'm |
| 13 | not sure if I introduced myself to you prior to today. |
| 14 | I represent the Plaintiff in this action, and I have a |
| 15 | few more questions. |
| 16 | This afternoon, I guess, and partially |
| 17 | this morning -- I'm losing track at this point -- you |
| 18 | testified about -- I think it's payment to physicians |
| 19 | for -- to physicians and physician groups for physician |
| 20 | administered drugs provided to or administered to Cigna |
| 21 | members; is that fair to say? |
| 22 | A.  Could I ask that you repeat that question so |

| | 81 |
|---|---|
| 1 | I make sure I understand it correctly. |
| 2 | MR. NOTARGIACOMO:  I'm sorry, I couldn't |
| 3 | hear. |
| 4 | (The court reporter read back.) |
| 5 | Q.  It really is a preparatory question. |
| 6 | You testified today about the payment by |
| 7 | Cigna to physicians for physician administered drugs, |
| 8 | is that correct? |
| 9 | A.  Yes. |
| 10 | Q.  And in that you talked about two distinct |
| 11 | time periods: One time period being pre-2002; is that |
| 12 | correct? |
| 13 | A.  Could you repeat that. |
| 14 | Q.  One of the time periods we talked about is |
| 15 | the pre-2002 time period? |
| 16 | A.  My testimony today related primarily to the |
| 17 | period like 2002 and later.  I provided a little |
| 18 | testimony related to prior to 2002 based on my |
| 19 | conversations with people that have knowledge of that |
| 20 | time. |
| 21 | Q.  Still sticking with the pre-2002 time period, |
| 22 | based on your conversation with people in Cigna who |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

22 (Pages 82 to 85)

82

1  have knowledge of that period, is it your testimony
2  that Cigna reimburses the physician at a rate, a
3  negotiated rate, but a rate that was a percentage off
4  of -- expressed as a percentage off of average
5  wholesale price or AWP, is that correct?
6      MS. SCHOEN: Objection to form.
7         MR. ST. PHILLIP: If you could do that
8      one more time, we just increased in volume so
9      we'll be able to do it.
10     Q. Sticking with the period from 2002 earlier,
11  I'm basing your conversations with people at Cigna, was
12  it your testimony today that Cigna reimburses
13  physicians or reimbursed physicians at a price that was
14  a discount of average wholesale price?
15     MS. SCHOEN: Objection to form.
16     Q. Is that correct?
17     A. Prior to 2002, Cigna reimbursed physicians at
18  the negotiated rates. Those negotiated rates were
19  commonly expressed as percent of AWP. They may have
20  also been expressed as a percent of billed charges, but
21  those are the only two approaches that I'm aware of.
22     Q. And then for the period from 2002 on, you

83

1  said that approximately 50 percent of reimbursement is
2  done at or under that same methodology as a negotiated
3  price off of the average wholesale price or as a
4  percentage of bill charged; is that correct?
5      A. That is correct.
6      Q. And the other 50 percent is based on Cigna's
7  national standard pricing list, is that correct?
8      A. Yes, that is correct.
9      Q. And even the prices on Cigna's national
10  standard pricing list are expressed as a percentage off
11  of average wholesale price, is that correct?
12     A. Yes, some of them are. Not all of them are.
13     Q. Some of them are.
14         The ones that aren't, are you referring
15  specifically to the 13 -- the drugs that fall under the
16  13 codes that are based --
17     A. Yes.
18     Q. -- on something different?
19     A. Yes.
20     Q. And those exceptions, those 13 codes, the
21  reimbursement methodology for those drugs is based on
22  acquisition costs, but isn't it true that it also has a

84

1  part of the formula that is also based on average
2  wholesale price, is that correct?
3      A. That is correct.
4      Q. Would you agree with me that Cigna's goal is
5  to get the best -- when negotiating with physicians
6  about the reimbursement for physician administered
7  drugs, would you agree that Cigna's goal is to get the
8  best deal it can for itself while providing adequate
9  reimbursement to physicians for the drugs it
10  administers to its members?
11     A. Yes.
12     Q. And is it fair to say that Cigna expects that
13  the doctors in its network to make a living primarily
14  providing treatment to patients and not from large
15  markups on those physician administered drugs?
16     MS. SCHOEN: Objection to form.
17     A. Could you please repeat the question.
18     Q. Sure.
19         Is it fair to say that Cigna expects
20  that doctors in its networks are -- make their living
21  primarily providing treatment to patients and the
22  payment from providing treatment to patients and not

85

1  from large markups on prescription drugs that it
2  administers?
3      MS. SCHOEN: Objection to form.
4      A. With respect to the reimbursement of
5  practitioners for their services, we expect that the
6  physician is negotiating with us and another carrier so
7  that they can maintain sufficient profit margin to
8  operate their business and stay in business. We don't
9  have a specific expectation about exactly what their
10  billed charges might be for a particular service
11  because it's a difference between that billed charge
12  and the reimbursement amount that I would call and
13  refer to as a markup.
14     Q. When you use the term billed charge, what are
15  you referring to?
16     A. What I'm referring to there is the fee amount
17  that the physician would submit on the claim in order
18  for the claim to get paid. It's -- another way to say
19  it is it is the amount that the physician would charge
20  for an indemnity member.
21     Q. Let's turn back to the 13 codes that we
22  talked about a few minutes ago.

Jill S. Herbold

January 14, 2005

Bloomfield, CT

86

1    I believe you testified that one -- and
2    correct me if I'm wrong -- that the reason that Cigna
3    singled out these 13 codes for different treatment was
4    the fact that there became available on the market
5    generic forms of those drugs that were available at a
6    cheaper price, is that accurate?
7        A.  Yes, and let me clarify.  Our change that we
8    made was in reaction to the result of competitive
9    market forces.  Generic drugs were introduced that
10   drove down the acquisition cost, the cost of the
11   product in the marketplace.
12       Q.  And the change -- were you finished?
13       A.  Yes -- I'm finished, yes.
14       Q.  And the change in the reimbursement for those
15   codes that Cigna instituted, was that an attempt to
16   bring physician reimbursements for those codes in line
17   with the lower price available in the marketplace for
18   those drugs?
19       A.  Yes.
20       Q.  So if Cigna had information that other drugs
21   other than that 13 were available for a price that was
22   significantly less than the reimbursement that Cigna

87

1    currently provides in its national standard price list,
2    would Cigna take steps to try to bring the
3    reimbursement rate that it provides down to the level
4    that's available -- the level of reimbursement that's
5    available to doctors who purchase in the marketplace?
6        MS. SCHOEN:  Objection to form.
7        A.  Cigna is trying to make sure that we maintain
8    -- well, that we have competitive medical costs that we
9    are able to sell our products and have members, and
10   Cigna is -- also has an interest, as I've stated, in
11   making sure that the providers can stay in business.
12       And in terms of applying that to the
13   reimbursement for specific drugs, we made those changes
14   reflecting the changes that were going on in the
15   marketplace, and also what physicians were willing to
16   accept for reimbursement.
17       I mean, another way of thinking about
18   that is that we ranked the changes that we're aware of
19   in terms of market price changes, but it also -- we
20   have to factor in what is the reimbursement amount that
21   physicians are willing to accept.
22       Q.  You testified that -- when you were asked

88

1    whether Cigna understands what physicians paid for
2    physician administered drugs, you just testified that
3    Cigna didn't have an understanding of that.
4        Is that generally your testimony?
5        A.  We don't have specific knowledge about it.
6    The knowledge that we have is just based on what --
7    it's really based on we set a fee amount, and the
8    providers come back and complain about it or they
9    don't.  So it's not that we understand their specific
10   acquisition costs, but if our reimbursement is too low,
11   we hear about it.
12       Q.  I think you testified that one of the
13   exceptions is some -- with respect to some
14   manufacturers of immunization products.
15       Do you remember testifying about that?
16       A.  I'm sorry, can you please repeat that
17   question?
18       Q.  Sure.
19       I think that you testified with respect
20   to having had some contact with some manufacturers of
21   immunization products?
22       A.  Yes.

89

1        Q.  And in that way learning what the physician
2    acquisition price for immunization products -- at least
3    some products are; is that accurate?
4        A.  That is accurate.  My prior comment was
5    related to injectables.  I'm sorry, I didn't clarify
6    that.
7        Q.  That's okay.
8        As with respect to the immunization
9    products and the information that Cigna obtained with
10   respect to those conversations, did that information
11   then -- was that used by Cigna in determining what
12   reimbursement it would provide to physicians for those
13   immunization products?
14       A.  That's a very interesting question.  As I
15   mentioned, it is in the recent past, and to be more
16   specific, the last month and a half, that we have
17   gotten that information, and we have yet to make a
18   determination about exactly how we're going to set our
19   reimbursement on immunizations going forward.
20       MR. NOTARGIACOMO:  I have no other
21   questions.
22       MR. ST. PHILLIP:  I have none.

Jill S. Herbold

January 14, 2005

Bloomfield, CT

24 (Pages 90 to 92)

**90**

1      MR. WADE:  None for me.

2      MS. SCHOEN:  I have just a couple more

3    questions.

4

5      REDIRECT EXAMINATION

6  BY MS. SCHOEN:

7      Q.  The time period prior to 2002, you testified

8  as to the reimbursement methodologies generally

9  employed during that time period.  One was a

10  methodology based on the average wholesale price, and

11  the other was billed charges.

12      My question goes to the reimbursement

13  based on average wholesale price.

14      Can you tell me whether there was

15  variability in the reimbursement percentage above or

16  below AWP during the time prior to 2002?

17      MR. ST. PHILLIP:  Objection.  Asked and

18  answered.

19      Go ahead.

20      A.  I have no specific knowledge.  However, I

21  would have a hard time believing that there wasn't some

22  variation as a result of provider negotiations.

**91**

1      MS. SCHOEN:  No further questions.

2      MR. ST. PHILLIP:  We're done.

3      (The deposition adjourned at 5:00 PM.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

**92**

1          C E R T I F I C A T E

2      I, DIANA M. NOEL, a Registered Professional

Reporter, Certified Realtime Reporter, Licensed

3    Shorthand Reporter, and Notary Public duly commissioned

and qualified in and for the State of Connecticut, do

4    hereby certify that there came before me JILL S.

5    HERBOLD, who was by me duly sworn and thereupon

6    testified as appears in the foregoing deposition; that

said deposition was taken by me stenographically in the

7    presence of counsel and reduced to writing under my

direction; that this deposition is a true record of the

8    testimony given by the witness.

9

10      I further certify that I am neither attorney nor

counsel for, nor related to, nor employed by any of the

11    parties to the action in which this deposition is

12    taken, and further that I am not a relative or employee

of any attorney or counsel employed by the parties

13    hereto, or financially interested in the action.

14

15      IN WITNESS THEREOF, I have hereunto set my hand

16    this 19th day of January, 2005.

17

18          DIANA M. NOEL, Notary Public

            Registered Professional Reporter

            Certified Realtime Reporter

19            Licensed Shorthand Reporter No. 199

20

My Commission Expires:

21    June 30, 2007

22

Jill S. Herbold                                    January 14, 2005

Bloomfield, CT

1

| A | | | | |
|---|---|---|---|---|
| **A** | 71:10 | 54:13 66:10 | 80:16 | 36:2,3 65:6 |
| able 21:21 | accounts 21:16 | 66:15 | again 43:11 | 68:12 70:4 |
| 29:11 48:6,8 | accurate 86:6 | **Actuaries** 7:14 | 57:16 73:1 | 74:4 85:12 |
| 68:8 79:7 | 89:3,4 | actuary 7:1,19 | ago 85:22 | 85:16,19 |
| 82:9 87:9 | achieving | 7:21 8:4,6,10 | agree 62:6 | 87:20 88:7 |
| about 6:22 7:3 | 78:17 | 8:12,15,19,20 | 84:4,7 | amounts 43:18 |
| 11:7 12:3,15 | acquire 53:1 | 9:1,6 11:7 | agreeable 61:7 | analyses 70:10 |
| 18:10,11 | 63:19 66:21 | 12:2,5 | ahead 49:14 | analysis 6:10 |
| 22:19 23:12 | acquired 27:3 | add 36:2 | 55:18 73:1 | 9:9 10:6,7,12 |
| 25:8,10 | 27:4 50:2 | additional | 76:5 78:5 | 10:14 11:1 |
| 26:22 27:3,4 | acquiring | 36:2 | 90:19 | 69:22 70:1,6 |
| 29:15,17 | 22:15 67:17 | adequate 84:8 | all 10:4 19:8 | 70:15,19 |
| 42:11 44:10 | acquisition | adjourned | 23:16 29:3 | 71:1 |
| 44:18 49:18 | 19:19 24:19 | 91:3 | 29:11,15,17 | analyze 10:18 |
| 51:1 52:4,22 | 34:22 35:3 | administer | 30:21 33:12 | 69:18 |
| 54:17,21 | 35:10,14,21 | 22:17 47:20 | 36:3,6 38:21 | ancillary 10:10 |
| 55:20 61:22 | 36:1,5,11 | 63:20 73:7 | 41:9 42:18 | announceme... |
| 64:8,9 66:6 | 37:7,9 48:21 | administered | 47:4,10 | 25:18 |
| 66:16 69:21 | 50:15 55:2 | 13:15 14:10 | 51:10 55:10 | another 10:6 |
| 71:7,11,14 | 55:12,15,16 | 14:18 15:14 | 56:4,6 59:6 | 10:11 18:21 |
| 72:4 73:6 | 55:20 56:2 | 16:6,19 | 61:8,11 66:3 | 22:13 50:16 |
| 74:7 78:8 | 56:11,22 | 53:15 57:12 | 74:6 83:12 | 65:20 68:21 |
| 80:18 81:6 | 57:2 64:5 | 73:12,19 | allow 60:21 | 71:9,12 85:6 |
| 81:10,14 | 67:7,8,13 | 75:13,13,22 | 62:13 74:21 | 85:18 87:17 |
| 84:6 85:9,22 | 68:9,15 74:1 | 76:1,8 77:5 | 75:7,8 | answer 13:18 |
| 87:17 88:5,8 | 74:5 83:22 | 80:20,20 | along 62:17 | 14:1,2,3,5 |
| 88:11,15 | 86:10 88:10 | 81:7 84:6,15 | already 72:22 | 21:19 25:15 |
| 89:18 | 89:2 | 88:2 | also 5:6,22 | 26:1 28:16 |
| above 26:15 | acquisitions | administers | 11:16 12:7 | 33:10 34:7 |
| 27:19 36:3 | 49:1 50:21 | 84:10 85:2 | 12:20 15:1 | 36:16 42:5 |
| 36:11 74:8 | 56:18 | administrati... | 16:5 28:10 | 44:16 52:7 |
| 90:15 | across 40:5 | 60:6,12 | 36:10 54:4 | 54:2 55:17 |
| accept 15:9 | 44:11 55:8 | 76:19 | 65:22 75:22 | 55:19 60:21 |
| 24:17 29:5 | 61:16 76:4 | administrative | 78:22 82:20 | 62:14 72:11 |
| 32:2,6,21 | action 80:14 | 60:19 62:8 | 83:22 84:1 | 76:4,6 77:10 |
| 87:16,21 | 92:11,13 | Aetna 45:4,9 | 87:10,15,19 | 77:21 |
| accepted 32:22 | activities 78:1 | 45:12,14 | alternate 20:11 | answered 44:7 |
| 58:2 | actual 35:9 | 46:5 | alternatives | 90:18 |
| accepts 31:21 | 55:12 56:18 | Affairs 2:16 | 69:14 | any 5:2,18 11:4 |
| 32:5,5 | actually 15:3 | affordable | always 42:22 | 12:8,9,12 |
| access 58:17 | 42:1 48:4 | 58:12 | 55:10 65:15 | 13:2 17:17 |
| according | 62:10 | after 6:22 7:4 | am 92:9,12 | 20:16 23:9 |
| 18:19 43:3 | actuarial 7:8,9 | 14:1 40:15 | Americas 2:8 | 27:10,21 |
| account 11:17 | 7:16 12:17 | afternoon | amount 33:22 | 32:1 33:18 |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

2

| | | | | |
|---|---|---|---|---|
| 33:20 37:9 | 12:16 18:6 | assuming 34:9 | 87:18 | 71:16 75:4 |
| 39:2 40:16 | 18:18,19 | attached 15:21 | awhile 38:3 | 75:15,16 |
| 46:8,9,16 | 19:16 26:7 | attempt 79:11 | AWP 18:7,19 | 81:4 85:21 |
| 47:17 49:13 | 27:14 59:8 | 79:19 86:15 | 19:20 20:21 | 88:8 |
| 55:4,11,12,22 | 83:1 | attempts 46:9 | 20:22 21:5,8 | background |
| 56:16,17 | area 12:19,22 | attorney 92:9 | 21:12 23:21 | 6:21 |
| 57:10 62:20 | 26:2 28:13 | 92:12 | 23:21 26:9 | backwards |
| 63:4,12 | 56:14 60:18 | August 6:20 | 26:14,14,15 | 12:1 |
| 65:18 67:1,3 | 64:15 | authenticate | 27:16 29:12 | Bank 40:21,22 |
| 67:5,9 68:18 | areas 77:13 | 51:19 | 29:16,18 | 41:4 43:13 |
| 70:18,19 | aren't 83:14 | authentication | 30:13 32:9 | 43:18,19 |
| 73:2,6 75:19 | Argus 64:15 | 51:10,17 | 33:8 35:15 | 44:2,4 64:10 |
| 76:2 77:16 | 64:16 | authorized | 38:15,20,20 | 64:13,17,20 |
| 78:1,1,2,10 | Arizona 63:17 | 49:18 | 38:20 39:20 | 65:10,16,19 |
| 79:18,21 | around 10:12 | available 37:6 | 40:22 41:4 | bankruptcy |
| 92:10,12 | 57:8 69:5 | 68:11 86:4,5 | 42:9,12 43:6 | 80:4 |
| anyone 6:2 | arrive 41:4 | 86:17,21 | 43:7,8,9,10 | bargaining |
| anything 17:18 | aside 20:14 | 87:4,5 | 43:12,17,18 | 28:6 |
| anywhere | ask 5:6 24:22 | Avenue 2:8,13 | 44:9 45:2,6 | base 27:14 |
| 33:13 | 27:1 28:18 | average 1:10 | 45:22 47:11 | 43:16 |
| appeals 58:19 | 37:19 49:22 | 17:16,18,21 | 54:16 55:5,8 | based 17:6,10 |
| appears 92:6 | 50:13 73:1 | 19:11,13,14 | 55:10,12 | 18:4,7,18 |
| applied 36:19 | 80:22 | 21:14 27:19 | 57:1,3,6 | 21:20 26:9 |
| applying 87:12 | asked 44:7 | 27:20 39:22 | 64:16 65:5 | 28:2,4 29:16 |
| approach 58:8 | 45:8,11 67:6 | 40:3,6 41:11 | 65:10,12,15 | 29:18 30:13 |
| 59:3 | 72:22 87:22 | 41:12,13,13 | 65:16 66:6,9 | 34:1,4,21 |
| approached | 90:17 | 41:17,21 | 74:8,9,10 | 38:20 42:9,9 |
| 60:3 | asking 4:16,16 | 42:1 44:4 | 82:5,19 | 42:10,13 |
| approaches | 48:22 63:1 | 47:3 54:10 | 90:16 | 43:6,6 45:3,6 |
| 82:21 | assess 79:4,21 | 54:12,17 | AWPs 42:13 | 45:6,21 47:2 |
| appropriate | assessments | 56:1,15 64:8 | 43:14,20 | 57:14,16 |
| 21:7 38:3 | 79:7 | 65:19 66:1 | 44:2,4,11 | 60:16 62:12 |
| 40:6 41:9 | assigned 20:5 | 67:5,9,12,14 | 64:18 | 63:4,5 81:18 |
| 42:22 43:2 | assistant 6:13 | 73:10,17,18 | | 81:22 83:6 |
| 54:5 58:16 | 6:16 8:3,5,6 | 77:18 78:3 | **B** | 83:16,21 |
| 76:7 | 8:10,12,15,16 | 82:4,14 83:3 | B 4:11 | 84:1 88:6,7 |
| appropriately | 8:18,22 9:6 | 83:11 84:1 | Bachelor's 7:1 | 90:10,13 |
| 37:3 | 11:7 | 90:10,13 | back 26:5 27:2 | baseline 30:12 |
| appropriate... | associate 7:19 | averaging | 27:9 34:15 | 33:8 |
| 36:14 | 7:21 12:2 | 43:14 44:10 | 36:16,17 | basic 10:17 |
| approximate | associated 9:9 | aware 39:7 | 37:20,22 | 66:11 |
| 23:13 43:5 | 76:15 | 43:19 44:12 | 38:7 40:18 | basically 70:8 |
| approximately | assume 43:22 | 52:20 60:5 | 40:20 42:7 | basing 82:11 |
| 7:11,20 8:1 | assumes 74:19 | 64:14 82:21 | 52:11 65:3 | basis 9:14 29:1 |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

3

| | | | | |
|---|---|---|---|---|
| 30:18 33:2 | because 18:12 | 73:9,16 86:1 | 90:11 | 75:22 77:20 |
| 38:9,11 70:7 | 31:6 37:1 | believes 35:9 | bit 11:7 12:3 | 79:9 82:3,20 |
| be 4:16 9:15 | 50:3,18 | believing 90:21 | 26:17 69:21 | 83:22 87:19 |
| 13:9,20 15:2 | 51:20 56:10 | Belknap 2:7 | bits 27:10 | 88:10 |
| 15:17,18 | 56:18 58:14 | 4:14 | Bloomfield | buy 68:13 |
| 17:5,15,21 | 65:2,4 68:15 | below 21:8,12 | 1:16 | |
| 18:2,3,7 20:6 | 75:10 76:9 | 23:21 27:20 | board 76:4 | **C** |
| 20:16 21:14 | 76:14 79:14 | 38:14,20,20 | both 61:7 62:4 | |
| 22:5,13 23:1 | 85:11 | 73:11,18 | bottom 62:2 | C 2:1 92:1,1 |
| 23:3,4 25:7 | become 15:22 | 90:16 | brand 41:11 | calculated |
| 26:9,13 | 37:6 54:9,11 | BEMPORAD | 41:12 | 54:22 74:6 |
| 27:19,21 | 55:3 59:22 | 2:12 | branded 41:17 | call 52:1 85:12 |
| 28:2,19 29:4 | 60:3 | benchmark | break 5:11 | called 8:3 35:6 |
| 29:11,22 | becoming 6:5 | 17:6,11,15 | 38:4,5 41:10 | 64:15 65:4 |
| 30:3,13,19 | 66:7 | 18:8 54:19 | breaking 38:4 | calls 54:1 69:1 |
| 31:19 32:7 | been 4:2,18 | 54:20 56:16 | brief 80:11 | 76:4 77:20 |
| 33:11 34:9 | 5:21 6:19 | benchmarks | briefly 4:13 | Cambridge 2:5 |
| 34:10,11 | 9:17,21 | 17:14,15,18 | 12:15 39:11 | came 7:5,7 |
| 38:15,16 | 13:10,14 | benefit 72:16 | 40:15 | 38:22 92:4 |
| 39:19 42:17 | 14:19 16:19 | BERMAN 2:3 | bring 86:16 | can 4:7,10,18 |
| 42:19,20 | 18:18 20:11 | besides 6:1 | 87:2 | 5:7,12,16,19 |
| 43:12,13 | 34:17 35:19 | 47:14 64:13 | broad 19:7 | 6:7,21 7:3,6 |
| 47:5,10,14 | 37:5,6,16 | best 5:7 84:5,8 | Building 1:15 | 7:20 9:4,4,20 |
| 49:7 50:4,7 | 38:1,2 44:7 | better 40:5 | business 11:10 | 10:1,15,21 |
| 50:16,19,20 | 45:1,2 48:8 | 76:9 | 12:6,19,21 | 11:4,7 12:2 |
| 51:3,4 52:21 | 49:10,13,18 | between 23:4,9 | 51:7 52:12 | 12:15 13:18 |
| 53:13,19 | 49:20,20 | 28:1 29:22 | 74:13,16,22 | 14:1,1,4,14 |
| 57:14,16 | 50:9 58:1 | 30:2 49:12 | 75:9 85:8,8 | 14:16 18:6 |
| 58:18 61:3,4 | 60:2,14 66:4 | 53:18 55:5,8 | 87:11 | 19:2,6 21:8 |
| 61:8 62:5,18 | 66:5 82:20 | 56:1 59:21 | but 7:4 9:1,15 | 21:16,19,20 |
| 63:8 64:19 | before 1:16 | 60:18 61:4 | 11:16 15:7 | 22:16 26:1 |
| 68:8,14,20 | 4:13,19 | 61:20 85:11 | 17:11,18 | 26:13 27:9 |
| 69:14,15 | 70:16 92:4 | beyond 23:7 | 21:2 23:15 | 27:18,21,22 |
| 70:3,4 71:11 | behalf 5:14 | 79:22 | 26:1,18 35:6 | 28:16 29:9 |
| 71:15 74:5,8 | behind 35:16 | bid 59:20 | 39:5 41:5 | 29:10,14,21 |
| 75:21,22 | being 7:15 | bids 59:18 | 44:2,7 46:17 | 33:1,10 34:4 |
| 76:8,14,18 | 23:20 57:7 | bill 22:18 | 46:20 49:4 | 34:7 35:2,12 |
| 79:8,19 | 81:11 | 41:10 43:3 | 50:10 54:19 | 35:16 36:15 |
| 80:11 82:9 | believe 8:3 | 83:4 | 60:22 62:2 | 36:21 37:12 |
| 85:10 89:15 | 15:21 18:17 | billed 18:5,22 | 62:13,17 | 37:20 38:5 |
| bears 55:12 | 19:16 20:5 | 20:6 34:2,5 | 64:15 65:12 | 39:2 40:18 |
| 56:17 67:5,9 | 21:13 27:13 | 34:11 45:6 | 65:15 66:15 | 42:5 43:22 |
| became 7:13 | 34:20 38:22 | 45:22 82:20 | 67:12 72:22 | 44:16,21 |
| 86:4 | 41:3 66:19 | 85:10,11,14 | 74:6,9 75:18 | 45:16 46:13 |
| | | | | 52:1,9,14,21 |

Jill S. Herbold
Bloomfield, CT
January 14, 2005

4

53:2,8 54:2
54:15 55:17
55:19,21
56:7 59:8
60:12 63:15
65:1 68:13
68:14 69:7
69:21 71:4
72:11 75:14
77:20 78:21
78:22 84:8
85:7 87:11
88:16 90:14
**cannot** 75:6
**can't** 66:5
80:12
**care** 58:17
72:13 76:2
**career** 66:7
**carrier** 71:9,12
85:6
**carriers** 72:12
**case** 28:10 62:5
79:20
**cases** 15:6,8
17:5,9,11
18:7 29:5
34:5 36:6
43:5 48:8
59:9
**categories**
47:13
**certain** 30:6,9
42:12 44:1
46:17 47:5
53:9 58:14
58:15,15
**Certainly** 51:5
**Certified** 1:17
92:2,18
**certify** 92:4,9
**change** 18:15
21:2,7 32:1
86:7,12,14

**changed** 19:17
46:3 66:3
**changes** 10:18
37:3 87:13
87:14,18,19
**charge** 85:11
85:14,19
**charged** 83:4
**charges** 18:5
18:22 34:2,5
34:12 45:3,7
45:22 82:20
85:10 90:11
**cheaper** 86:6
**choose** 21:4
**chosen** 36:2,22
37:1
**Cigna** 1:14
2:17 5:14 6:2
6:8,19 7:4,5
7:7 13:14
14:9,16 15:9
16:12,18
19:8 20:11
20:14,17,20
21:4,9 22:3,4
22:7,14,18,22
23:1,4 24:3
24:12,14
25:1,16 26:2
28:11,20
29:12 30:12
30:14,16,17
30:19 31:8
31:10,11,17
32:1 34:4
35:2,8 36:4
36:10,19
37:8 38:7,13
39:4,17,22
40:10 41:20
44:13 45:14
46:6,8,9,13
46:20 49:16

50:2,11 51:6
51:15,20
53:11,13
57:9,11,20
58:8,20 59:3
59:18,21
60:1,4,5,11
62:5,21
63:12 65:9
65:15 67:19
68:2,4 69:5,9
69:10 71:10
71:18,21
72:5 74:11
74:19 75:12
76:2 78:16
79:3,11,13,17
80:20 81:7
81:22 82:2
82:11,12,17
84:12,19
86:2,15,20,22
87:2,7,10
88:1,3 89:9
89:11
**Cigna's** 18:2
19:2 23:10
29:15 31:5
31:18,22
32:14,18
33:13,14
42:18 55:20
56:2 57:22
68:20 72:9
75:9 76:17
83:6,9 84:4,7
**Civil** 1:14
**claim** 45:9,12
45:15 85:17
85:18
**claims** 39:16
45:4
**clarified** 53:6
**clarify** 8:18

25:12 29:14
37:13,16
40:11 42:11
48:2 86:7
89:5
**clear** 28:19
38:18
**clearly** 62:16
77:11
**client** 11:19
**clients** 11:11
11:14,16
58:19 77:7
**close** 60:22
**closely** 39:6
**code** 20:5,7,9
20:21 21:2,4
38:10 43:2,2
**codes** 19:9,15
19:16,19,22
21:11 23:13
23:15 34:21
83:16,20
85:21 86:3
86:15,16
**coding** 43:1,4
**colleagues**
44:17
**college** 7:4,5
54:13
**come** 39:3 40:6
43:18 58:4
65:3 88:8
**comes** 57:5
**comfortable**
62:4
**coming** 7:4
**command** 30:7
**commencing**
1:20
**comment** 89:4
**Commission**
92:20
**commissioned**

92:3
**common** 33:11
**commonly**
82:19
**communicati...**
46:14
**companies**
49:12
**company** 2:11
49:21 68:16
**compare** 32:15
**comparing**
32:7,8,14
**compensation**
15:19
**competitive**
51:1,2 59:2
68:10 70:21
71:4 78:17
79:9,13,15,19
86:8 87:8
**competitor**
68:16
**competitors**
72:9,12,15,17
72:20
**complain** 88:8
**completed**
7:14 29:2
**complex** 19:4
**complicated**
24:6
**comprehensi...**
58:21
**compromise**
61:6,19
**concerning**
51:16
**conclusion**
77:20
**confer** 40:14
53:2,5
**conferring**
40:15

Jill S. Herbold                                    January 14, 2005
Bloomfield, CT

5

| | | | | |
|---|---|---|---|---|
| Connecticut | 10:6,7,18 | 83:5,7,8,11 | 92:10,12 | decided 13:21 |
| 1:19 2:11 | 16:12 17:17 | 84:2,3 86:2 | couple 37:5 | 21:6 61:3,4 |
| 92:4 | 26:19 47:10 | correctly 81:1 | 57:7 78:14 | deciding 11:3 |
| consent 51:15 | 51:6,20,22 | correspond | 90:2 | 22:12 |
| 52:4 | 52:13,14 | 20:1 | court 1:1 5:7 | decision 23:17 |
| consented | contractual | cost 24:18 | 13:21 36:17 | 23:20 38:19 |
| 49:21 | 57:15 | 34:22 35:3 | 37:22 40:20 | 80:2 |
| consider 20:17 | contribution | 35:10,15,21 | 52:11 75:4 | decisions 71:14 |
| 50:16 71:17 | 12:18 | 36:1,11 37:7 | 75:16 77:1 | decreases |
| consideration | control 49:12 | 37:9 55:2,13 | 81:4 | 79:16,18 |
| 50:9 | 79:14 | 55:15 56:2 | cover 36:1 | Defendants 2:6 |
| considered | conversation | 57:1,2 67:7 | 68:8 | 4:15 51:11 |
| 23:16 36:13 | 81:22 | 68:9,15 74:6 | coverage 72:13 | 51:13 |
| 48:22 49:4,6 | conversations | 86:10,10 | covered 36:6 | defined 12:18 |
| 61:2 64:4 | 5:19 44:17 | costs 19:19 | CPT 43:2 | definitely 29:9 |
| considering | 81:19 82:11 | 36:5,6 48:21 | creating 13:19 | definition |
| 23:7 70:20 | 89:10 | 49:1 50:15 | credentials | 25:21 |
| considers | corporate 12:7 | 50:21 55:16 | 8:21 | degree 7:1 |
| 60:11 | 49:11,19 | 55:20 56:18 | credible 78:20 | demand 28:6,8 |
| consistent 55:8 | correct 9:3 | 64:5 67:8 | CROSS 3:5 | 29:6 30:10 |
| 57:1 67:12 | 13:9,12 | 70:4 74:1 | 80:9 | demanding |
| conspired | 15:10 16:4,8 | 76:10,12,15 | CT 1:16 2:19 | 58:11 |
| 77:17 | 16:13,17 | 79:14 83:22 | current 6:7 9:7 | demands 28:8 |
| consultant | 20:13 21:6 | 87:8 88:10 | 54:15,17 | 51:13 |
| 35:7 | 21:15 24:4 | Cottage 1:15 | 69:17 | department |
| contact 88:20 | 24:13,15 | 2:18 | currently 9:5 | 25:6,7 57:13 |
| contain 15:12 | 26:11,12 | could 14:6 | 72:2 87:1 | 76:1,13 |
| 16:1,5,20 | 27:16 28:9 | 18:3 23:4 | | depending |
| context 65:7 | 29:4 30:5,19 | 25:2,12 | _____D_____ | 70:11 |
| contract 11:3 | 32:4 34:3,9 | 28:17 31:12 | D 2:12 4:11 | DEPONENT |
| 14:21,22 | 34:22 36:8 | 40:11,17 | DANNENB... | 2:11 |
| 15:9,11,12,18 | 38:9,12 | 45:15 62:5 | 2:12 | deposed 4:19 |
| 15:21,22 | 39:10,13,14 | 62:18 66:2 | data 40:21,22 | deposition |
| 17:22 23:4 | 39:21 41:2,6 | 68:19 69:14 | 41:4 43:13 | 1:13 4:13,22 |
| 31:17 43:16 | 42:6,17 | 70:10 73:15 | 43:18,19 | 51:9 60:12 |
| 47:11 58:6 | 43:15 46:22 | 75:2,21,22 | 44:2,4 45:4 | 60:17 63:10 |
| 59:4,21 61:3 | 56:21 58:18 | 78:7 80:22 | 64:10,13,17 | 63:11 77:2 |
| 69:15 71:6 | 65:17 66:22 | 81:13 82:7 | 64:19 65:10 | 77:12 91:3 |
| contracting | 68:2,22 69:3 | 84:17 | 65:16,19 | 92:6,6,7,11 |
| 14:20 44:20 | 69:20 73:13 | couldn't 81:2 | day 92:16 | describe 9:5 |
| 44:21 45:19 | 73:20 74:17 | counsel 2:16 | deal 84:8 | 45:16 |
| contractors | 74:22 76:22 | 5:1,22 6:1 | deals 60:17 | described |
| 65:2,3 | 79:5 81:8,12 | 40:14,15 | decide 14:4 | 16:15 18:8 |
| contracts 9:11 | 82:5,16 83:4 | 53:5,6 92:7 | 30:12 | 20:12,20 |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

6

| | | | | |
|---|---|---|---|---|
| 30:14,15 | 64:22 65:5,9 | 39:16,22 | 36:22 37:1,9 | education 57:6 |
| 37:2 43:14 | 65:12,19 | 46:5,8,9,13 | 41:11,11,12 | educational |
| 44:3,10,19 | 66:12 70:11 | 46:20 51:6 | 41:18 47:4,5 | 6:22 |
| 53:19 | 70:13,14,16 | 51:15 54:7 | 47:13,20 | EDWARD 2:3 |
| detail 36:21 | 77:3 83:18 | 59:3,9 62:18 | 48:10 55:13 | effect 18:16 |
| determination | 86:3 | 75:12 76:1 | 56:12 62:7 | either 14:1 |
| 38:14 39:8 | difficult 5:8 | 78:16 79:11 | 63:3 66:21 | 54:12 57:2 |
| 89:18 | direct 3:3 4:5 | 79:17 | 67:4,8,13 | 58:4 69:9 |
| determine | 74:10 | doesn't 32:6 | 71:18,22 | elaborate 44:8 |
| 11:18 39:22 | direction 92:7 | 74:9 | 73:4,6 77:4 | else 6:2 11:3 |
| 51:21 75:7 | directly 7:5 | doing 5:21 | 77:17 78:3 | 13:21 17:21 |
| 78:16 | 22:18 48:6 | 12:20 70:10 | 80:20 81:7 | 65:9 68:13 |
| determined | disagree 62:17 | 77:7,7 | 83:15,21 | employed 6:19 |
| 43:13 57:17 | 77:11 | done 5:16,20 | 84:7,9,15 | 90:9 92:10 |
| determines | discount 82:14 | 7:16 14:19 | 85:1 86:5,9 | 92:12 |
| 27:22 35:2 | discounts | 15:20 36:12 | 86:18,20 | employee |
| 58:8 | 38:22 | 42:22 43:1,1 | 87:13 88:2 | 92:12 |
| determining | discussed | 50:8,12 | drug-by-drug | employer |
| 40:1 79:17 | 39:11 | 61:16 70:8 | 38:9 | 58:20 |
| 89:11 | discussing | 83:2 91:2 | due 16:14 30:3 | employers |
| deviate 59:5 | 26:6 60:14 | don't 5:2 15:3 | duly 4:2 92:3,5 | 11:11,13 |
| Diana 1:16 | Discussion | 21:2 25:5,20 | during 10:4,15 | encourage |
| 92:2,17 | 32:16 63:9 | 35:5 45:13 | 14:12 54:12 | 46:10 |
| did 6:1,4 8:8 | discussions | 52:3,18,19 | 60:8 61:18 | end 70:10 |
| 8:11 10:14 | 61:21 71:7 | 55:19 56:16 | 61:21 62:19 | engage 69:22 |
| 11:20 12:8 | dispensed 26:8 | 63:22 65:11 | 69:5,7 90:9 | enough 25:15 |
| 12:12 13:2,6 | 27:15 53:14 | 66:20 67:21 | 90:16 | 27:8 29:19 |
| 20:1 37:3 | dispensing | 79:21 85:8 | | 52:19 79:20 |
| 44:22 49:15 | 53:12 | 88:5,9 | | entire 28:21 |
| 54:9 89:10 | distinct 81:10 | down 5:8,8 | **E** | 61:17 |
| didn't 88:3 | DISTRICT 1:1 | 31:12 37:7 | E 2:1,1 4:11 | equal 19:12 |
| 89:5 | 1:2 | 86:10 87:3 | 92:1,1 | 57:3 67:14 |
| difference | doctors 48:7 | drive 37:6 | each 16:21 | equivalents |
| 85:11 | 75:17 77:16 | driven 68:16 | 20:5 38:13 | 35:19,21 |
| different 8:2 | 84:13,20 | drove 86:10 | 38:17 39:19 | 36:20 |
| 10:3 12:21 | 87:5 | drug 20:5 | 70:16 | eschoen@pb... |
| 16:11,11 | documents | 22:22 38:15 | earlier 16:15 | 2:10 |
| 23:10 28:1 | 51:10,17,19 | 55:6 60:7,19 | 34:16 44:10 | ESQUIRE 2:3 |
| 28:18 32:10 | does 10:22 | 64:19 75:13 | 50:22 53:19 | 2:7,12,16 |
| 34:18 39:20 | 11:1 22:9 | 75:21 77:17 | 64:8 65:22 | essentially |
| 43:14,15 | 30:12,21 | 78:2 | 66:19 69:8 | 35:6 |
| 44:11,21 | 31:8,14 | drugs 20:18 | 82:10 | established |
| 50:20 54:8 | 32:14 35:8 | 23:21,22 | early 66:7 | 14:21,22 |
| 61:5 64:19 | 36:10 37:8 | 35:20 36:18 | Ed 78:10 80:7 | 15:2 18:16 |
| | | | 80:12 | |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

7

| | | | | |
|---|---|---|---|---|
| Estella 2:7 | 42:12 43:6 | facilities 76:16 | 86:12,13 | 14:22 54:20 |
| 4:12 63:6 | 47:2 57:22 | facility 76:16 | firm 4:14 | Friday 1:19 |
| estimate 29:21 | 61:9,12 | fact 50:4 86:4 | first 4:2 7:6 | from 7:2,5 |
| 29:22 | 68:21 69:6 | factor 50:16 | 40:21,22 | 9:16 10:2 |
| estimates 48:9 | 70:16 | 87:20 | 41:3 43:13 | 11:6,20 12:1 |
| even 83:9 | exhibits 16:11 | factors 19:7 | 43:18,19 | 12:9,16 13:3 |
| ever 4:18 31:8 | 16:14 26:5 | 20:17 23:9 | 44:2,4 54:9 | 14:11 21:3 |
| 31:10 48:12 | 29:12,15,16 | 39:7 71:17 | 64:9,13,17,19 | 22:16,22 |
| 48:18,22 | 29:18 33:13 | fair 27:8 66:21 | 65:10,16,18 | 24:9,12 |
| 57:20 59:3 | 42:18,19 | 74:21 80:21 | 66:6 80:1 | 26:20 27:6 |
| 62:5 64:4 | 44:3 47:14 | 84:12,19 | fits 60:13 | 27:12,12 |
| every 74:7 | 58:2 70:15 | fall 83:15 | fixed 21:1,2 | 31:9,12,12 |
| everything | exist 9:5 29:11 | falls 77:12 | Floor 2:4 | 32:9 39:1,3 |
| 23:15 | 29:13 45:1 | familiar 25:13 | following | 43:18 46:3 |
| exactly 26:3 | 51:22 | 54:9,11 55:1 | 75:18 | 47:9 50:3,21 |
| 28:4 41:5 | expect 23:20 | 55:3 59:16 | follows 4:3 | 57:4,5 59:5 |
| 74:6,9 85:9 | 46:17 85:5 | 73:22 | 41:9 | 59:18 62:20 |
| 89:18 | expectation | far 79:19,20 | forces 86:9 | 64:1,17 |
| exam 66:10,15 | 56:17 85:9 | February 6:18 | foregoing 92:6 | 68:13 71:8 |
| EXAMINAT... | expects 84:12 | 9:22 10:2 | form 13:17 | 71:12,22 |
| 3:1,3,4,5 4:5 | 84:19 | Federal 1:14 | 28:15 33:9 | 72:5 73:3 |
| 80:9 90:5 | experience | fee 15:18 28:13 | 39:16 44:15 | 78:22 82:10 |
| examined 4:2 | 30:6 | 60:12 62:9 | 46:11 47:8 | 82:22 84:14 |
| example 11:1 | experienced | 85:16 88:7 | 55:14 56:20 | 84:22 85:1 |
| 28:2 29:8 | 57:20 | feel 31:6 77:12 | 82:6,15 | function 10:17 |
| 30:8 32:9 | expertise 20:4 | fees 19:18 | 84:16 85:3 | functions |
| 62:7 75:21 | Expires 92:20 | fellow 7:13 | 87:6 | 69:18 |
| exams 54:13 | explain 5:5 | felt 38:1 | formal 6:12 | further 80:5 |
| 66:14 | explore 27:10 | few 4:21 10:3 | forms 44:21 | 91:1 92:9,12 |
| exception | exposure 55:7 | 19:5 78:12 | 86:5 | |
| 30:18 | 57:5 | 80:15 85:22 | formula 84:1 | G |
| exceptions | expressed | filings 80:4 | formulary | gain 13:1 |
| 83:20 88:13 | 17:20,22 | final 11:3,19 | 71:19 | Gateway 2:13 |
| exchange | 18:1 82:4,19 | 61:3,19 | forth 71:16 | general 2:11 |
| 28:12 62:7 | 82:20 83:10 | finance 12:7 | forward 77:14 | 66:15 74:19 |
| excluded 51:14 | extent 27:2 | financial 6:10 | 77:15 89:19 | generally 7:3 |
| 77:1,8 | 49:19 51:12 | 9:9 10:4,19 | foundation | 17:2 55:16 |
| exclusion | 77:3 | 12:20 | 49:10,13 | 64:9 76:9,18 |
| 60:16 62:13 | external 79:3,8 | financially | 54:1 | 88:4 90:8 |
| Excuse 45:10 | e-mail 2:10,15 | 92:13 | Fourth 2:4 | generic 35:19 |
| exhibit 15:21 | 2:21 | find 33:13 38:3 | frame 60:9 | 35:21 36:20 |
| 16:1,9,20 | | 45:17,18 | 72:1 | 41:17 86:5,9 |
| 27:14 28:14 | F | 78:20 | free 31:22 | generics 37:5 |
| 28:22 31:18 | F 92:1 | finished 7:15 | frequently | 41:14,16 |

Jill S. Herbold
Bloomfield, CT
January 14, 2005

8

| | | | | |
|---|---|---|---|---|
| get 6:21 22:16 | 16:22 17:2 | hand 92:15 | 44:19 45:1,2 | 88:20 |
| 32:8 48:4 | 25:1,4 28:10 | happen 29:9 | 45:17,18,20 | HCPCS 19:9 |
| 53:9 61:6,19 | 28:21 31:3,4 | 33:1,2 59:9 | 46:2,8,18 | 19:22 20:7,9 |
| 62:4 71:8 | 31:18,21 | 62:19 69:7 | 47:6,9,11,19 | 38:10 42:15 |
| 78:21 79:13 | 33:5 35:7 | happens 58:3 | 48:2,3,8,12 | 43:1 |
| 84:5,7 85:18 | 53:20 57:18 | 61:22 | 48:18,20,22 | he 32:5,5,5,6 |
| gets 74:6 | 57:21 58:11 | hard 90:21 | 49:4,6 50:11 | 53:6 |
| getting 26:2 | 58:13 59:3 | Hartford 2:19 | 51:16,19 | head 5:9,9 |
| 60:22 71:11 | 59:22,22 | has 6:4 14:9,16 | 52:4,19,22 | Headquarters |
| give 29:21 | 61:20 63:15 | 14:19 18:18 | 53:10 54:11 | 1:15 |
| 71:16 79:16 | 63:19 64:1 | 20:11,15 | 54:19 55:3,4 | health 22:5 |
| given 8:8 49:20 | 67:7 69:11 | 22:19 25:16 | 55:11,22 | 72:13 |
| 72:22 92:8 | 70:7,7,9 | 27:3,4 29:12 | 56:12,16 | healthcare |
| giving 5:17 | groups 15:1 | 31:17 35:21 | 57:10 58:1,1 | 10:11 12:21 |
| go 4:21 15:6 | 28:3,5 30:6,9 | 36:19 49:20 | 58:14,15 | 66:11,17 |
| 19:7 23:9 | 30:10,22 | 50:2 51:20 | 59:1,1 60:2,3 | hear 81:3 |
| 27:2,9 30:11 | 54:3 58:1,20 | 52:12 53:6 | 60:10 62:4 | 88:11 |
| 33:12 39:7 | 59:17 60:3 | 57:1,20 | 63:4,21 64:4 | heard 64:14 |
| 45:4 49:14 | 61:1,17 | 58:20 63:18 | 64:18,22 | heart 62:11 |
| 53:8 55:18 | 63:13 65:3 | 65:9 66:3,4 | 65:3,3,4,18 | held 6:15 |
| 56:8 61:5 | 72:9 79:9 | 68:4 72:5 | 65:19 66:10 | help 71:3 |
| 73:1 76:4 | 80:4,19 | 74:11 83:22 | 66:14 67:1,3 | helpful 32:7 |
| 78:5 90:19 | group's 64:5 | 87:10 | 69:4 70:9,12 | helps 19:8 |
| goal 84:4,7 | group-by-ph... | hasn't 49:13 | 71:6,11 | her 5:8,19 27:6 |
| goes 90:12 | 70:9 | 49:17,20 | 72:22 73:2 | 52:6 |
| going 5:18 | Grove 1:15 | 50:8 | 74:10 75:12 | Herbold 1:13 |
| 12:1 14:4 | 2:18 | have 4:20,22 | 76:2 77:16 | 2:11 4:1,9,12 |
| 26:5 32:8 | guess 19:6 | 5:2,3,21,21 | 77:16,22 | 5:13 80:11 |
| 38:2,7 42:7 | 25:19 50:14 | 6:12,15,19 | 78:1,6,8,10 | 92:5 |
| 49:9 51:8 | 80:16 | 7:1,15 8:14 | 78:14 79:17 | here 5:14 78:8 |
| 57:8,9 60:15 | | 9:1,17,21 | 79:19,21 | hereby 92:4 |
| 70:3,4 71:15 | **H** | 13:13,14 | 80:1,5,14 | hereto 92:13 |
| 76:21 78:10 | H 4:11 | 14:8,12 15:3 | 81:19 82:1 | hereunto 92:15 |
| 87:14 89:18 | had 5:19 7:14 | 16:19 19:17 | 82:19 85:9 | here's 59:5 |
| 89:19 | 7:14 10:3 | 21:11 22:9 | 87:8,9,20 | high 6:22 |
| gone 4:22 | 12:6 13:9 | 24:22 25:18 | 88:3,5,6 | higher 28:6,11 |
| 79:19,20 | 20:15 26:6 | 28:5,8 29:19 | 89:16,17,20 | 30:7,10 62:6 |
| good 52:22 | 27:13 41:3 | 34:17 35:4 | 89:22 90:2 | 68:12 69:9 |
| gotten 89:17 | 65:2 66:8,10 | 35:19,20,22 | 90:20,21 | himself 22:22 |
| greater 29:7 | 80:1 86:20 | 36:2,12,20 | 92:15 | historical |
| 76:18 | 88:20 | 37:5,6,16 | haven't 38:1 | 26:19 |
| gross 12:22 | HAGENN 2:3 | 39:3,10 | 50:8,8 | historically |
| ground 4:21 | half 18:18,19 | 40:16 43:13 | having 4:2 | 72:4 |
| group 15:7,8 | 89:16 | 43:16 44:17 | 20:3 36:5 | history 6:22 |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

9

| | | | | |
|---|---|---|---|---|
| 7:4 | 44:7 45:4,5,8 | 71:13 | insofar 25:20 | 13:3,6 |
| **hold** 8:11 | 45:11 46:2 | **individual** | 49:10 76:3 | **involved** 6:5 |
| **holder** 13:19 | 48:17 50:10 | 61:22 | 77:19 | 9:12 13:10 |
| **home** 10:11 | 50:15 52:15 | **individualized** | **instead** 22:16 | 49:5 56:11 |
| **hospital** 57:12 | 55:17 56:7 | 38:14 47:5 | 29:6 35:12 | 66:7 |
| 57:18,18 | 63:12 66:2,2 | **individually** | **instituted** | **involvement** |
| 76:1,12,17 | 67:6,6 68:10 | 38:17 | 86:15 | 57:10 |
| **hospitals** 10:6 | 69:13 70:13 | **industry** 1:9 | **instruct** 14:3 | **isn't** 68:2,22 |
| 12:13 13:7 | 72:4 74:15 | 17:6,10,14,17 | 77:9 | 74:22 83:22 |
| 57:11 77:6 | 75:7,21 76:6 | 43:3 54:21 | **instructing** | **item** 16:21 |
| **how** 6:15,19 | 78:7 80:11 | 57:8 66:17 | 52:6 | 62:1 68:21 |
| 7:9,20 8:5,11 | 80:13 82:7 | 68:10 | **instruction** | **items** 61:9,12 |
| 13:13 14:8 | 86:2,20 | **inflate** 77:17 | 14:5 | **its** 20:15 30:20 |
| 14:16,21 | 88:10 | 78:2 | **insurance** 2:11 | 31:9,10 |
| 17:21 19:2 | **Illinois** 7:2 | **information** | 66:12 72:13 | 32:15 41:21 |
| 20:1 23:19 | **immunization** | 27:3,4 35:4 | **insure** 36:4 | 49:1 50:4 |
| 30:12 32:14 | 88:14,21 | 48:5 49:2,7 | 58:16 | 51:6,7 76:18 |
| 35:2 39:16 | 89:2,8,13 | 50:3,3 51:3 | **intend** 36:10 | 79:4,11 |
| 39:22 45:5 | **immunizatio...** | 52:19 70:19 | **intent** 36:9 | 84:10,13,20 |
| 46:13 52:22 | 37:18 47:16 | 78:21,22 | **interest** 75:9 | 87:1 |
| 54:21 58:11 | 48:3,6 89:19 | 80:1 86:20 | 87:10 | **itself** 60:19 |
| 60:13 63:7 | **impact** 10:19 | 89:9,10,17 | **interested** | 84:8 |
| 63:18 65:1 | 11:4 50:18 | **injectable** 18:3 | 92:13 | **I'll** 4:16 5:4 |
| 66:9 70:2,11 | 51:4 70:4 | 19:3 20:15 | **interesting** | 49:22,22 |
| 74:6 78:16 | **inappropriate** | 21:9 22:16 | 89:14 | 60:21 62:13 |
| 89:18 | 31:7 | 22:20 23:2 | **interrupt** 63:7 | 68:1 73:1 |
| **However** 8:19 | **included** 19:10 | 23:11 30:14 | **intervene** | 80:11 |
| 68:9 90:20 | 42:19 46:18 | 32:15,18 | 13:22 | **I'm** 4:14 6:9 |
| | 71:18 | 33:3,14 | **into** 5:18 8:1 | 11:13 13:19 |
| ___ **I** ___ | **including** 77:6 | 37:17 38:8 | 11:17 18:16 | 26:21 32:7,8 |
| **idea** 45:20 | **incorporate** | 41:22 52:20 | 23:9 26:3 | 32:8 38:18 |
| 63:21 | 39:12 | 53:9,12,15 | 30:11 39:8 | 45:13 49:9 |
| **if** 4:18 5:2,6,11 | **incorporates** | 62:7 63:5 | 41:10 60:13 | 51:8,21 |
| 17:4,8,19 | 31:18 | 66:21 67:4,8 | 71:10 | 56:11 60:2 |
| 19:8 22:21 | **increase** 70:3 | 71:18,22 | **introduced** | 60:15 63:6 |
| 24:7,16,21 | 79:20 | 72:6 73:4 | 4:13 35:19 | 64:14 67:6 |
| 25:16 27:10 | **increased** 82:8 | 76:8 | 37:6 80:13 | 67:22 75:14 |
| 27:18 29:11 | **increases** | **injectables** | 86:9 | 76:21 78:7 |
| 30:21 31:3,8 | 79:16,18 | 19:10 43:17 | **introduction** | 80:12,17 |
| 31:17,21 | **incur** 68:18 | 47:10,14 | 35:20 | 81:2 82:11 |
| 32:5,5,22 | **indemnity** | 48:3,13,19 | **investment** | 82:21 85:16 |
| 33:5,12 | 85:20 | 53:1 56:8 | 12:19 | 86:2,13 |
| 39:15 41:16 | **INDEX** 3:1 | 89:5 | **involve** 11:21 | 88:16 89:5 |
| 42:17 43:11 | **Indirectly** | **inquiry** 48:12 | 12:9,9,12 | **I've** 64:14,16 |

Jill S. Herbold                                                January 14, 2005

Bloomfield, CT

10

| | | | | |
|---|---|---|---|---|
| 74:8 87:10 | knew 50:15 | large 84:14 | 30:20 37:19 | 61:13,14,16 |
| | know 5:4,12 | 85:1 | 38:4 58:20 | 64:4 70:18 |
| **J** | 7:18 17:4,14 | last 4:10 37:4 | 60:9 64:9 | 70:19 |
| **J** 2:7 | 23:18,19 | 57:7 89:16 | 65:4 68:8 | losing 80:17 |
| **January** 1:19 | 24:16,20 | later 13:21 | 69:8 81:17 | loss 68:18 |
| 18:17,20:16 | 25:5,16 31:3 | 81:17 | limited 26:20 | lot 66:13 |
| 92:16 | 35:5 39:17 | lead 69:9,10 | 55:7 | low 88:10 |
| **Jill** 1:13 2:11 | 44:1 46:1,2,4 | 70:14 | line 11:9 12:6 | lower 62:8 |
| 4:1,9 63:8 | 46:17 48:15 | learned 64:16 | 16:21 61:9 | 68:11 76:10 |
| 92:4 | 48:17 52:15 | 64:22 65:1 | 61:12,13,22 | 76:11 79:11 |
| **job** 5:21 | 52:18 53:17 | 66:6 | 62:2 68:21 | 86:17 |
| **JR** 2:12 | 54:6,21 56:7 | learning 89:1 | 86:16 | LOWEY 2:12 |
| **Judge** 77:8 | 56:22 59:15 | least 17:5 60:8 | lines 12:21 | lumped 47:4 |
| **Judge's** 51:14 | 63:12,18,22 | 89:2 | list 83:7,10 | |
| 62:12 | 64:3,12 | leave 32:19 | 87:1 | **M** |
| **June** 92:21 | 66:20 70:20 | 59:4 69:4 | listed 65:20 | M 1:16 92:2,17 |
| **just** 4:21 5:3 | 71:20,21 | legal 2:16 5:22 | listening 57:8 | MA 2:5 |
| 5:12,21 6:21 | 72:3,4,7 73:5 | 6:1 77:20 | LITIGATION | made 38:21 |
| 7:15 12:1 | 73:8 74:7,7 | less 19:14 | 1:10 | 61:4 68:20 |
| 13:19 15:5 | 75:18 76:11 | 20:22 57:3 | little 6:21 11:7 | 80:1 86:8 |
| 18:8 19:7 | knowing 50:21 | 67:14,18 | 12:3 24:6 | 87:13 |
| 20:12 24:5 | knowledge 6:5 | 68:5,15 74:9 | 26:17 36:21 | Magistrate |
| 38:18 41:17 | 14:12 27:6 | 86:22 | 69:21 81:17 | 51:14 62:12 |
| 45:2,16 49:9 | 27:10 29:19 | lesser 28:8 | living 84:13,20 | 77:8 |
| 50:16 57:7 | 33:17,19,21 | 29:5 41:14 | LLP 2:7 | Main 2:4 |
| 60:15 61:13 | 39:10 44:18 | let 5:4,12 28:18 | loading 9:10 | maintain 51:6 |
| 78:14 82:8 | 48:20 51:10 | 32:17 53:7 | local 53:8 | 52:13 58:20 |
| 88:2,6 90:2 | 52:22 56:13 | 70:20 86:7 | located 63:16 | 59:2 85:7 |
| **J-code** 20:8,9 | 57:20 60:9 | let's 56:6 59:13 | long 6:15,19 | 87:7 |
| 38:11,11,13 | 60:10 65:18 | 72:2 85:21 | 7:9,20 8:5,11 | maintained |
| 38:16,17 | 66:13,16 | level 39:18 | 78:13 | 52:1,15 |
| 39:12,16,18 | 75:17 77:16 | 40:4 42:15 | longer 63:7 | make 15:5 |
| 40:2,4 41:1,5 | 77:22 78:1,6 | 42:16 50:20 | look 20:20 | 24:5 35:22 |
| 41:10,21 | 81:19 82:1 | 58:11 62:3 | 29:11 33:12 | 36:2 38:13 |
| 42:3,9,13,16 | 88:5,6 90:20 | 78:17 87:3,4 | 37:8 38:13 | 38:18 46:9 |
| 42:20 43:8 | known 74:8 | levels 27:21 | 40:5 70:1 | 58:14 60:15 |
| 43:10,12,15 | knows 27:3 | 28:1 54:7 | 71:2 78:9,22 | 71:13 74:12 |
| 44:5,9 47:12 | | 79:4 | 79:22 | 74:21 75:8 |
| **J-codes** 20:10 | **L** | Lexington 2:13 | looked 42:18 | 81:1 84:13 |
| 20:14 21:14 | L 4:11 | Licensed 1:18 | 48:18 | 84:20 87:7 |
| 34:17 35:8 | laboratory | 92:2,19 | looking 10:16 | 89:17 |
| 35:19 | 10:10 | life 2:11 66:12 | 11:21 12:9 | makes 23:17 |
| | lack 40:5 53:22 | like 5:11 11:11 | 13:3,6 19:11 | 23:19 |
| **K** | lapse 73:1 | 18:19 20:8 | 45:15 61:11 | making 39:8 |

Jill S. Herbold
Bloomfield, CT
January 14, 2005

11

| | | | | |
|---|---|---|---|---|
| 87:11 | 47:20 50:19 | means 26:3 | 2:21 | 53:16,22 |
| managers | 50:20,20 | 79:15,16 | mid 11:2 | 55:14,17 |
| 72:16 | 51:3,4 61:3 | medical 75:18 | might 29:5 | 56:4,20 |
| manual 11:12 | 62:5 64:19 | 76:10,11 | 48:8,10 49:6 | 58:10,22 |
| 11:15,18 | 66:20 68:18 | 79:14 87:8 | 65:8,19 | 59:11,19 |
| manufacturer | 69:15 71:11 | medically 76:7 | 70:15 71:6,8 | 60:15 61:10 |
| 64:2 | 72:22 73:3,7 | Medicare 12:6 | 85:10 | 61:15 62:10 |
| manufacture... | 73:10 82:19 | 63:5 | minus 33:15 | 63:6 64:21 |
| 48:5,7 71:22 | maybe 19:6 | Medicare's | 33:18 | 67:20 68:7 |
| 72:6 73:4 | 28:19 32:8 | 62:21 | minutes 19:5, | 69:1,12 72:1 |
| 77:17 78:2 | me 4:18 5:4,12 | medication | 85:22 | 72:10,19 |
| 88:14,20 | 5:16 6:5,7,22 | 53:12,15 | month 89:16 | 73:14 74:14 |
| many 16:10 | 7:3,6,20 9:4 | medications | more 28:6 32:7 | 75:1,14 76:3 |
| 19:9 36:20 | 9:20 10:1,15 | 37:17 53:9 | 36:21 39:12 | 76:21 77:1 |
| 69:18 70:11 | 10:21 11:7 | 63:5 | 48:3 66:7 | 77:19 78:4 |
| 71:17 | 12:3,15 | member 76:9 | 69:21 78:14 | 78:12,19 |
| margin 36:11 | 14:14,16 | 85:20 | 80:15 82:8 | 79:6 80:3,10 |
| 36:14 74:12 | 18:6 19:2,6 | members | 89:15 90:2 | 81:2 82:7 |
| 74:16,22 | 20:20 21:8 | 21:22 22:6 | morning 80:17 | 89:20,22 |
| 85:7 | 21:16 24:10 | 58:17 60:4 | most 35:18 | 90:1,17 91:2 |
| market 37:4 | 25:2 26:13 | 61:18 70:5 | 78:20 | Ms 3:3,4 4:6 |
| 68:12,16 | 27:18,22 | 72:14 75:11, | move 62:15,17 | 4:12 5:13 |
| 79:10 86:4,9 | 28:18 29:10 | 79:15 80:21 | 77:15 | 18:11 26:20 |
| 87:19 | 29:21 32:17 | 84:10 87:9 | moving 77:14 | 27:5,9 37:14 |
| marketplace | 34:4 35:2,12 | mentioned | MR 3:5 5:18 | 37:20 38:5 |
| 68:16 70:22 | 35:16 36:21 | 18:21 21:13 | 13:17,17:7 | 40:13,18 |
| 86:11,17 | 37:12 45:10 | 33:22 36:18 | 17:12 18:9 | 45:10,13 |
| 87:5,15 | 45:16 46:13 | 89:15 | 21:18 25:3 | 46:7 49:15 |
| markup 85:13 | 50:22 52:14 | met 5:22 | 25:19 26:10 | 49:22 51:18 |
| markups 84:15 | 53:7,19 | method 44:10 | 26:16 27:1,8 | 52:6 53:4 |
| 85:1 | 54:15 59:8 | methodologies | 28:15 31:1 | 56:6 59:13 |
| MASSACH... | 60:13 63:15 | 34:18 44:13 | 32:3,12 33:9 | 62:16 72:2 |
| 1:2 | 65:1,4,4 66:2 | 90:8 | 34:6,13 36:7 | 77:11 78:7 |
| matter 4:16 | 66:8 69:21 | methodology | 36:15 37:15 | 78:14 80:5 |
| 74:19 75:20 | 84:4 86:2,7 | 18:14 19:18 | 38:2 40:11 | 80:11 82:6 |
| may 4:22 | 90:1,14 92:4 | 20:11 35:17 | 42:4,21 | 82:15 84:16 |
| 13:18,20 | 92:5,6 | 36:19 37:2 | 43:21 44:6 | 85:3 87:6 |
| 14:2 15:1,22 | mean 22:2 | 40:4 41:4,6,7 | 44:15 45:8 | 90:2,6 91:1 |
| 17:5,9,15 | 23:1 25:21 | 41:8 42:7,9 | 45:11 46:6 | much 58:11 |
| 20:6 21:14 | 40:8 45:13 | 83:2,21 | 46:11 47:8 | 61:22 63:7 |
| 28:7,11 | 45:14 54:7 | 90:10 | 47:22 49:3,9 | 70:3 |
| 29:13 32:7 | 59:20 87:17 | MICHAEL | 49:17 50:13 | multiple 20:6 |
| 37:13,15 | meaning 44:19 | 2:16 | 51:8 52:3,8 | 43:11 70:10 |
| 39:3,12,19 | 66:8 | michael.wad... | 52:16 53:2 | must 32:2 |

Jill S. Herbold                                    January 14, 2005

Bloomfield, CT

12

| | | | | |
|---|---|---|---|---|
| my 4:12 5:21 | 39:12,19 | 72:17 | 24:20 25:4 | 27:5,7 38:5 |
| 8:18,20 9:7 | 42:2,2,2,10 | negotiations | 25:15 26:4 | 39:11 |
| 9:21 11:18 | 42:13,20 | 9:12 10:22 | 29:19 30:21 | number 34:5 |
| 20:3 25:4 | 43:1,9,20 | 15:1,4 17:9 | 31:14,14,16 | 54:18 58:15 |
| 29:22 33:17 | NDCs 20:6 | 28:2,11 | 31:22 33:3,4 | 65:5,13 74:9 |
| 33:19,21 | 40:6 43:11 | 30:11,21 | 33:17,19,21 | numbers 41:15 |
| 37:4,16 | 43:15 44:11 | 33:1 47:6 | 36:12 37:3 | 64:16 65:12 |
| 39:21 41:8 | 55:9,10 | 49:2,8 50:4 | 37:12,17 | numerous |
| 41:19 44:17 | NDC's 41:9 | 51:1,3 54:3,4 | 39:5,7 40:10 | 72:15 |
| 44:18 49:6 | necessarily | 54:5 61:16 | 41:5,22 | NY 2:8,14 |
| 53:7 54:17 | 50:17 65:11 | 61:18 69:7 | 42:20 43:1 | |
| 55:7 57:1,5,6 | necessary 38:1 | 70:12,14 | 43:22 45:1,1 | ———— O ———— |
| 60:8,8 66:6,6 | need 37:16 | 71:4 75:6 | 45:15 46:1,4 | O 4:11 |
| 66:10 67:11 | 58:13 74:12 | 90:22 | 46:17,20 | object 13:18 |
| 71:4 73:21 | 74:15 79:14 | negotiators | 47:11 48:7 | 25:19 30:22 |
| 75:17 78:9 | negotiate 31:8 | 71:6 | 48:15 49:4 | 31:1,4 49:10 |
| 80:12 81:16 | 31:12,15 | neither 92:9 | 50:2,4,13,17 | 51:8 55:14 |
| 81:18 89:4 | 32:1,22 33:6 | net 13:1 | 50:20 51:3,4 | 62:12 76:21 |
| 90:12 92:7 | 65:6 | network 52:21 | 51:15 52:6 | 77:19 |
| 92:15,20 | negotiated | 58:7,13,21 | 52:22 53:17 | objection |
| myself 4:13 | 17:8 69:15 | 60:1,4 69:5 | 54:19,21 | 13:17,20,22 |
| 80:13 | 79:11 82:3 | 84:13 | 55:7,9 56:11 | 17:7,12 |
| | 82:18,18 | networks | 56:12,22 | 21:18 25:3 |
| ———— N ———— | 83:2 | 58:16 59:2 | 58:2,5,6 | 26:10 28:15 |
| N 2:1 | negotiates | 84:20 | 59:15 60:9 | 32:3,12 33:9 |
| name 4:7,10,12 | 28:20 32:6 | never 22:19 | 60:20 61:13 | 34:6,13 36:7 |
| 22:9 64:14 | negotiating | 74:8 | 63:4 64:3 | 42:4,21 |
| 80:12 | 28:21,22 | new 2:8 7:18 | 65:13 67:22 | 43:21 44:6 |
| national 10:7,8 | 29:3 61:2 | 8:8 32:17 | 68:10 69:15 | 44:15 46:11 |
| 10:9 18:2,16 | 78:18 84:5 | 36:19 50:1 | 71:20 72:3,7 | 47:8,22 49:3 |
| 18:20 19:2 | 85:6 | 58:4 | 72:20 73:5,8 | 52:16 53:16 |
| 20:5,15 21:9 | negotiation | nod 5:9 | 74:6 75:8,18 | 53:22 56:20 |
| 23:1,11 | 15:6 16:15 | Noel 1:16 92:2 | 77:7,9 78:12 | 58:10,22 |
| 30:14,16,18 | 29:2 30:3 | 92:17 | 79:8,20 | 59:19 60:16 |
| 30:20 31:5,9 | 31:14 32:10 | none 89:22 | 80:13 83:12 | 61:10,15 |
| 31:11,15,19 | 32:20 33:7 | 90:1 | 84:14,22 | 64:21 67:20 |
| 31:22 32:15 | 34:8,10 | nonnegotiable | 88:9 92:12 | 68:7 69:1,12 |
| 32:18,21 | 53:20 57:17 | 69:11 | Notargiacomo | 72:10,19 |
| 33:2,14 38:7 | 58:5 59:10 | nor 92:9,10,10 | 2:3 3:5 78:12 | 73:14 74:14 |
| 41:21 44:22 | 60:13,18 | North 2:13 | 80:10,12 | 75:1 76:3 |
| 83:7,9 87:1 | 61:6,21 | not 4:20 9:14 | 81:2 89:20 | 78:4,19 79:6 |
| nature 10:5 | 62:19 65:7,8 | 13:9 14:3,4 | Notary 92:3,17 | 82:6,15 |
| 51:1,2 | 69:5 70:10 | 17:11,17,20 | notes 78:9 | 84:16 85:3 |
| NDC 20:5 | 71:16 72:8 | 18:13 23:18 | now 8:19 20:14 | 87:6 90:17 |

Henderson Legal Services
(202) 220-4158

Jill S. Herbold

January 14, 2005

Bloomfield, CT

13

| | | | | |
|---|---|---|---|---|
| obtain 24:9 | 86:1 88:12 | 86:20,21 | 70:4 79:10 | 48:10 66:20 |
| 40:3 48:9 | 90:9 | 89:20 90:11 | overhead | 67:4 73:10 |
| obtained 52:21 | ones 44:3 | others 19:13 | 76:14 | 73:17 |
| 89:9 | 75:10 83:14 | 30:8 47:17 | oversee 8:20 | paying 22:19 |
| occasion 18:3 | only 30:18,21 | 48:7 | 10:17 | 36:3 68:12 |
| 79:3 | 39:16 42:2 | otherwise 32:6 | owns 63:12 | payment 80:18 |
| occasionally | 43:22 56:7 | 33:1 37:3 | | 81:6 84:22 |
| 9:15 | 82:21 | 38:15 | **P** | payments |
| occurrence | operate 68:17 | our 5:22 9:11 | P 2:1,1 | 13:10 |
| 51:7 | 85:8 | 10:7,18 11:9 | package 61:13 | pays 48:19 |
| off 26:14 32:16 | operating 68:9 | 12:5 15:2 | paid 79:1 | 63:5 |
| 63:9 82:3,4 | operational | 18:20 21:21 | 85:18 88:1 | people 49:5 |
| 82:14 83:3 | 9:10 | 21:22 31:15 | paragraph | 53:8 72:14 |
| 83:10 | operations | 58:2,7,13,16 | 62:13 | 81:19,22 |
| offer 59:5 69:9 | 25:7 39:4 | 58:17 59:5 | part 14:12,14 | 82:11 |
| offered 70:16 | 56:13 | 61:1 62:15 | 15:22 22:13 | per 14:19 18:2 |
| offering 70:21 | opposed 22:13 | 63:4 64:15 | 34:8,21 58:6 | 44:20 |
| offers 70:14 | 45:22 59:9 | 65:3 68:14 | 59:22 70:1 | percent 18:4,6 |
| office 13:16 | 76:12 | 70:5 71:1,4,7 | 71:1 84:1 | 21:11,12 |
| 14:10,18 | option 18:21 | 72:12 75:10 | partially 80:16 | 23:21 26:7 |
| 15:15 16:7 | 45:1 | 76:6 79:15 | particular | 27:13 31:15 |
| 16:20 22:17 | options 45:2 | 86:7 87:9 | 16:21 21:4 | 33:15 35:15 |
| 26:8 27:16 | order 49:1 | 88:10 89:18 | 23:5 29:7 | 38:20,21 |
| 47:21 48:9 | 58:18 74:12 | ours 65:13,14 | 39:11 42:2,3 | 43:5 45:6,22 |
| 60:7 73:7,12 | 85:17 | ourselves | 43:8,9,10,12 | 47:11 82:19 |
| 73:19 75:22 | organization | 61:20 | 45:5 47:12 | 82:20 83:1,6 |
| 76:8,12,19 | 10:20 | out 4:21 29:12 | 55:6 56:12 | percentable |
| offices 77:5 | other 9:4 14:2 | 33:12 45:17 | 56:17 58:13 | 45:3 |
| Oh 48:2 | 15:8 16:10 | 45:18 61:13 | 60:6 63:3 | percentage |
| okay 52:3 89:7 | 17:11,17 | 61:14 72:15 | 64:19 75:21 | 18:22 20:22 |
| once 43:11 | 19:15 20:17 | 86:3 | 85:10 | 21:5,5 26:14 |
| 57:16 | 23:9,22 | outcome 71:14 | particularized | 26:15 33:18 |
| oncologists | 28:13 30:10 | 71:15 | 66:16 | 33:20 34:2 |
| 30:8 | 30:17 31:9 | outpatient | parties 61:7 | 34:11 38:14 |
| one 2:4,13 5:12 | 32:20 37:9 | 57:12 76:1 | 62:4 92:11 | 42:12 43:17 |
| 6:4 8:15,15 | 39:2 42:7 | 76:13,15 | 92:12 | 45:21 46:2 |
| 10:5,6 11:4 | 46:16 47:13 | outside 23:13 | party 40:9,21 | 47:12 55:10 |
| 23:1,3 39:11 | 50:19 55:9 | 56:9 | pass 66:10,14 | 59:9 73:11 |
| 39:12 48:2 | 59:4 61:11 | over 4:21,22 | past 72:5 89:15 | 73:18 82:3,4 |
| 51:3 52:17 | 64:12 65:18 | 37:4 46:3 | patients 63:20 | 83:4,10 |
| 55:19 61:13 | 69:14 71:2,4 | 57:7 59:11 | 84:14,21,22 | 90:15 |
| 61:14 63:14 | 72:13,14 | 66:3 76:2 | Patterson 2:7 | percentages |
| 69:18 81:11 | 73:6 77:13 | 78:9 79:12 | 4:14 | 21:1 |
| 81:14 82:8 | 79:1,16 83:6 | overall 62:3 | pay 47:20 | perhaps 7:19 |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

14

| | | | | |
|---|---|---|---|---|
| 7:22 28:5 | pharmacy 20:4 | 89:22 90:17 | 80:4,18,19 | 10:21 11:2,2 |
| 49:5 69:9 | 25:7,10,14,17 | 91:2 | 81:7 82:13 | 33:5 38:4 |
| **period** 10:4,15 | 25:22 26:3 | **Phoenix** 63:17 | 82:13,17 | 80:17 |
| 14:11,13 | 26:17 39:4 | **physician** 15:7 | 84:5,9 87:15 | **points** 11:5 |
| 18:9,15 | 52:21 53:8 | 15:7,8,8,13 | 87:21 88:1 | **policy** 6:9 9:8 |
| 27:12 59:11 | 56:13 64:15 | 16:3,11 | 89:12 | **population** |
| 81:11,15,17 | 72:16 | 19:19 22:19 | **physician's** | 72:14 |
| 81:21 82:1 | **pharmacy's** | 22:21 24:7 | 13:16 14:10 | **position** 6:7,15 |
| 82:10,22 | 67:13 | 24:11 28:3,5 | 15:14 16:7 | 7:7 8:2,11 |
| 90:7,9 | **PHILLIP** 2:12 | 29:5 30:9 | 16:10,20 | 36:13 79:10 |
| **periods** 81:11 | 5:18 13:17 | 31:3,4,10,11 | 26:8 27:16 | **positions** 7:12 |
| 81:14 | 17:7,12 18:9 | 34:10 35:14 | 28:10,20 | 7:16 |
| **person** 6:4 | 21:18 25:3 | 35:21 36:1 | 29:3 31:17 | **possible** 49:5 |
| **personally** | 25:19 26:10 | 39:15 43:3 | 31:21 33:5 | 68:14 |
| 49:4 | 26:16 27:1,8 | 58:1 63:12 | 34:22 35:3,9 | **potential** 23:3 |
| **PETER** 2:12 | 28:15 31:1 | 63:19,22 | 37:8 48:9 | 62:18 |
| **pharmaceuti...** | 32:3,12 33:9 | 64:5 70:8 | 53:20 54:6 | **potentially** |
| 1:9 13:15 | 34:6,13 36:7 | 73:7 75:13 | 57:21 59:3 | 68:14,20 |
| 14:9,17 | 36:15 37:15 | 80:19,19 | 59:17 60:7 | **power** 28:6 |
| 15:14 16:6 | 38:2 40:11 | 81:7 82:2 | 62:8 68:8 | **PPO** 11:9 |
| 16:21,22 | 42:4,21 | 84:6,15 85:6 | 70:6,7 73:7 | **practice** 16:10 |
| 17:2,5 19:21 | 43:21 44:6 | 85:17,19 | 75:22 76:8 | 52:12 57:21 |
| 20:2,4 22:8 | 44:15 46:6 | 86:16 88:2 | 76:12,19 | **practices** 16:12 |
| 24:8 25:9 | 46:11 47:8 | 89:1 | **piecemeal** 29:1 | **practitioner** |
| 27:15 28:7 | 47:22 49:3,9 | **physicians** | **place** 13:19 | 6:10,13,16 |
| 28:12 29:6 | 49:17 50:13 | 10:19,22 | 31:14 33:8 | 8:16,20 9:1,8 |
| 35:6 42:8 | 51:8 52:3,8 | 11:21 12:10 | 39:2 | 9:9 10:12,14 |
| 44:14 47:2 | 52:16 53:2 | 13:4,11,14 | **Plains** 2:14 | **practitioners** |
| 50:11 54:20 | 53:16,22 | 14:9,17 15:2 | **Plaintiff** 80:14 | 9:11,13 |
| 56:2,4,12 | 55:14,17 | 15:3 16:16 | **PLAINTIFFS** | 46:19 56:11 |
| 63:19 64:1,6 | 56:4,20 | 17:19 22:15 | 2:2 | 85:5 |
| 67:17 68:3 | 58:10,22 | 25:9 30:4,7 | **plan** 22:5 | **precisely** 60:20 |
| 68:19 71:22 | 59:11,19 | 30:12,22 | 58:19 | **preference** |
| 72:6 73:3,12 | 60:15 61:10 | 34:1 36:5,10 | **play** 11:1,1,4 | 75:12 76:2,6 |
| 73:19 | 61:15 62:10 | 42:8 46:10 | **please** 4:7 5:3 | **preparation** |
| **pharmaceuti...** | 64:21 67:20 | 46:20 47:20 | 5:11 14:6 | 6:2 |
| 16:18 17:20 | 68:7 69:1,12 | 49:2,8 50:18 | 37:14 52:10 | **preparatory** |
| 26:8 33:7 | 72:1,10,19 | 53:1 54:8 | 55:21 73:15 | 81:5 |
| 42:18 57:12 | 73:14 74:14 | 58:15,16 | 84:17 88:16 | **prepare** 5:17 |
| **pharmacies** | 75:1,14 76:3 | 59:18 63:18 | **plus** 33:20 | **prescription** |
| 54:4 66:20 | 76:21 77:1 | 68:10 69:10 | 35:15 | 85:1 |
| 67:4,7,9,16 | 77:19 78:4 | 71:2 72:8,18 | **PM** 1:20 63:10 | **presence** 92:7 |
| **pharmacist** | 78:19 79:6 | 72:21 74:21 | 63:11 91:3 | **present** 14:11 |
| 53:12 | 80:3 82:7 | 79:12,14 | **point** 7:15 | 26:21 27:12 |

Jill S. Herbold
Bloomfield, CT
January 14, 2005

15

| | | | | |
|---|---|---|---|---|
| 31:10 59:14 | pricing 11:9,11 | 27:15 28:7 | 65:2,8 67:19 | put 18:15 |
| 62:20 | 12:5,19 37:4 | 28:12 29:6 | 68:3,4,18,21 | putting 20:14 |
| preserve 62:15 | 64:9,12 | 33:7 42:8 | 69:13,16 | P.C 2:12 |
| President 6:13 | 65:20 83:7 | 44:14 47:2 | 70:21 71:15 | |
| 6:16 8:10,12 | 83:10 | 52:20 56:3,5 | 75:8 79:9 | **Q** |
| 8:15,16,19,22 | primarily 27:6 | 59:1 63:19 | 90:22 | qualified 92:4 |
| 9:6 | 81:16 84:13 | 64:1,6 66:11 | providers | question 5:2,3 |
| presumably | 84:21 | 66:12,12 | 13:14 44:13 | 5:4,6 14:2,6 |
| 50:10 | prior 6:5 7:4 | 67:18 72:6 | 45:21 46:15 | 25:12,15 |
| presume 25:1 | 18:13 27:11 | 73:12,19 | 50:5 51:7,21 | 28:17 29:14 |
| 67:16,21 | 37:1 38:19 | 87:9 88:14 | 52:13 58:21 | 37:19,21 |
| 68:4 | 44:12,22 | 88:21 89:2,3 | 59:17 67:13 | 40:17,19 |
| pretty 66:5 | 45:2,20 49:6 | 89:9,13 | 67:17 69:4 | 50:1 52:7,10 |
| prevailing | 54:13 60:9 | Professional | 69:19 71:7 | 53:7 55:21 |
| 26:18 | 80:13 81:18 | 1:17 92:2,18 | 71:11 73:3 | 60:20 62:11 |
| previously | 82:17 89:4 | profit 74:12,15 | 73:10,17 | 62:14 63:2 |
| 26:6 44:4 | 90:7,16 | 75:8 85:7 | 74:12,15,20 | 67:22 73:15 |
| pre-2002 81:11 | probably 78:8 | projected | 75:5,9 77:5 | 74:15 75:3 |
| 81:15,21 | Procedure | 57:22 | 78:18,22 | 80:22 81:5 |
| price 1:10 | 1:14 | projections | 79:1,4 87:11 | 84:17 88:17 |
| 17:16,18,21 | process 11:17 | 12:20,22 | 88:8 | 89:14 90:12 |
| 19:11,13,14 | 15:7 16:15 | proposal 58:4 | provides 22:7 | questions 4:17 |
| 21:14 27:19 | 30:3 34:8,10 | 59:21 | 25:11 40:22 | 78:10,15 |
| 27:20 40:1,3 | 53:20 57:17 | proposed | 43:19 60:5 | 80:5,15 |
| 40:7 41:21 | 58:5 59:10 | 10:18 58:2 | 74:20 87:1,3 | 89:21 90:3 |
| 42:1 47:3 | 60:13 61:5 | 70:2 | providing 22:5 | 91:1 |
| 54:10,12,18 | 62:19 65:7,8 | proposition | 72:13 84:8 | quote 65:5,12 |
| 55:5,6 56:2 | 69:5 71:16 | 32:19 | 84:14,21,22 | |
| 56:16 64:9 | 72:8,17 | protocols | provision 25:8 | **R** |
| 65:20 66:1 | produced | 75:18 | pstphillip@l... | R 2:1 4:11 92:1 |
| 67:4,5,10,12 | 51:11,20 | provide 21:21 | 2:15 | range 21:8 |
| 67:15,18,18 | product 15:14 | 23:8 24:10 | Public 2:16 | 29:10,12 |
| 68:5 73:11 | 16:21 24:8,9 | 36:10 39:17 | 92:3,17 | 61:17 |
| 73:17,18 | 24:11,12,19 | 53:11,14 | pulling 61:13 | ranked 87:18 |
| 77:18 82:5 | 53:19 68:3,5 | 58:19 61:18 | 61:14 | rate 11:19 |
| 82:13,14 | 68:19 76:20 | 77:3 89:12 | purchase | 15:21 16:1,2 |
| 83:3,3,11 | 86:11 | provided 57:11 | 22:21 87:5 | 16:9,11,14,20 |
| 84:2 86:6,17 | production | 69:19 80:20 | purchased | 17:10,19 |
| 86:21 87:1 | 51:12 52:2 | 81:17 | 68:5 | 19:3 20:16 |
| 87:19 89:2 | products 13:15 | provider 15:1 | purchases 64:1 | 20:18 21:10 |
| 90:10,13 | 14:10,17 | 23:5 53:14 | purchasing | 21:17 22:13 |
| prices 41:12,13 | 16:6,22 17:3 | 54:3 58:5,6 | 68:11 | 23:2,11 26:5 |
| 48:18 66:20 | 17:5 19:21 | 58:13 60:3 | purposes 77:14 | 27:14,19 |
| 78:3 83:9 | 20:2,4 25:9 | 61:1,17,20 | pursuant 1:13 | 28:14,21,22 |

Jill S. Herbold

January 14, 2005

Bloomfield, CT

16

| | | | | |
|---|---|---|---|---|
| 29:11,15,15 | reaction 86:8 | Redbook 64:14 | 21:10,17 | 87:20 88:10 |
| 29:18,20 | read 36:15,17 | 64:20 65:9 | 22:13,20,22 | 89:12,19 |
| 31:11,18,19 | 37:20,22 | REDIRECT | 23:1,2,8,10 | 90:8,12,15 |
| 32:19 33:6 | 40:18,20 | 3:4 90:5 | 23:11,20 | reimbursem... |
| 33:13,16 | 52:11 75:4 | reduced 35:22 | 24:12,17 | 13:4,6 29:13 |
| 38:8 39:9 | 75:15,16 | 92:7 | 26:7 27:15 | 86:16 |
| 42:12,18,19 | 81:4 | refer 85:13 | 27:18 28:6 | reimburses |
| 42:20 43:6 | reads 51:9 | referenced | 28:12,13 | 34:4 67:19 |
| 44:3 47:1,2,3 | 77:2 | 43:7 | 29:5,7 30:7 | 68:3 82:2,12 |
| 47:7,14 51:4 | really 44:7 | referred 47:15 | 30:13,15,17 | reimbursing |
| 57:22 58:2 | 57:6 71:14 | referring 22:4 | 31:6 32:11 | 42:8 71:2 |
| 61:9,12 | 79:8 81:5 | 83:14 85:15 | 32:19 33:6 | relate 24:18,18 |
| 68:21 69:6 | 88:7 | 85:16 | 33:15,16 | related 10:5,7 |
| 69:10 70:14 | Realtime 1:17 | reflect 37:3 | 34:1,21 | 37:17 75:19 |
| 70:16 74:4 | 92:2,18 | reflecting | 35:17 37:2 | 81:16,18 |
| 79:19 82:2,3 | reason 21:7 | 87:14 | 37:10 38:8,8 | 89:5 92:10 |
| 82:3 87:3 | 50:2,7 51:3 | regard 48:13 | 39:8,15,17,18 | relates 42:1 |
| rates 11:12,15 | 86:2 | Registered | 40:2 41:22 | 72:21 80:3 |
| 11:16,18 | reasonable | 1:16 92:2,18 | 42:15,20 | relation 17:20 |
| 16:5 21:9 | 36:11,13 | regular 51:7 | 43:7,8,17 | relationship |
| 23:10 24:16 | 74:21 | reimburse | 44:19 45:5 | 49:11 55:5,8 |
| 26:7,13,18,19 | reasoning | 16:19 19:13 | 45:21 47:1,3 | 55:12 56:1 |
| 28:7 30:7,10 | 24:22 35:16 | 24:14 35:9 | 47:6 50:11 | 56:17 57:1 |
| 30:20 31:5,9 | 35:18 | 35:12 38:19 | 50:17,18 | 67:5,9,12 |
| 31:10,12,13 | reasons 50:19 | 44:13 | 51:4 53:11 | 72:21 74:10 |
| 31:22 32:1 | rebates 71:21 | reimbursed | 53:13,21 | relative 56:13 |
| 32:11,15,20 | 72:5 73:3 | 13:14 14:9 | 54:6,7 56:10 | 92:12 |
| 33:3,15 | recall 17:17 | 14:17 17:6 | 57:11,14 | relatively |
| 37:10 38:9 | receive 15:13 | 34:11,18 | 58:12 60:6 | 36:19 |
| 39:3 41:22 | 73:3 | 35:14 38:16 | 60:11,18 | relevant 66:9 |
| 53:18,21 | received 72:5 | 47:10 71:15 | 61:1 62:3,6,8 | rely 62:21 |
| 57:16,22 | receives 24:7 | 82:13,17 | 62:21,22 | remainder |
| 62:21,22 | 33:6 71:21 | reimbursem... | 63:4 68:6,14 | 20:18 |
| 68:11 69:6 | receiving | 6:11,14,17 | 68:19,20 | remember |
| 69:11,19 | 22:20 | 8:16,20 9:2,8 | 69:6,10,14,19 | 88:15 |
| 70:20 74:20 | recent 89:15 | 9:10 10:13 | 70:2,2 71:7,8 | repeat 14:6 |
| 77:4 79:12 | recently 48:4,4 | 10:15 11:21 | 74:20 75:5,7 | 40:17 52:9 |
| 79:13 82:18 | 64:16 | 12:10,12 | 76:17,18 | 73:15 75:2 |
| 82:18 | Recess 38:6 | 13:10 14:19 | 77:4 78:17 | 80:22 81:13 |
| rather 22:15 | 63:10 | 15:13 16:2,6 | 79:4,18 83:1 | 84:17 88:16 |
| 38:16 77:6 | record 4:8 | 17:4,10,19 | 83:21 84:6,9 | rephrase 5:4 |
| 79:9 | 13:20 32:16 | 18:2,3,4,7,18 | 85:4,12 | 28:17 68:1 |
| rationale 77:7 | 62:16 63:9 | 19:3,12,18 | 86:14,22 | reporter 1:17 |
| RE 1:9 | 92:7 | 20:15,18 | 87:3,4,13,16 | 1:17,18 5:7 |

Henderson Legal Services
(202) 220-4158

Jill S. Herbold

Bloomfield, CT

January 14, 2005

17

| | | | | |
|---|---|---|---|---|
| 36:17 37:22 | 12:19 | says 42:12 | sellable 59:1 | 50:19 |
| 40:20 52:11 | retrospective | scenarios | separate 47:6 | side 26:18 54:6 |
| 75:4,16 81:4 | 79:22 | 70:11 | 47:6 56:19 | significantly |
| 92:2,2,3,18 | revenues 12:22 | schedule 15:18 | September | 35:22 86:22 |
| 92:18,19 | right 8:19 33:8 | 15:19 28:14 | 19:17 20:10 | similar 48:12 |
| reporters 64:9 | 42:14 62:11 | 28:21 | 34:17 | 79:1 |
| 64:12 | 62:15 65:6 | Schoen 2:7 3:3 | service 21:22 | simplify 19:7 |
| represent 4:15 | risk 12:6 | 3:4 4:6,12 | 22:18 25:10 | since 6:18,20 |
| 80:14 | Road 1:15 2:18 | 18:11 26:20 | 29:7 46:21 | 7:16 9:17,21 |
| represents | role 11:1,1 | 27:5,9 37:14 | 60:12,20 | 14:15,16 |
| 74:4 | 12:4 69:17 | 37:20 38:5 | 65:20 85:10 | 18:12,15,17 |
| require 46:20 | roles 11:20 | 40:13,18 | services 10:10 | 19:17 20:10 |
| required 66:16 | 12:8,15 | 45:10,13 | 10:11 13:11 | 20:16 24:6 |
| requirements | rough 29:21,22 | 46:7 49:15 | 16:2,2 22:5,8 | 27:5 34:17 |
| 43:4 | rounds 70:13 | 49:22 51:18 | 29:3 54:8 | singled 86:3 |
| respect 85:4 | routine 9:14 | 52:6 53:4 | 61:5,17 63:1 | site 7:14 75:12 |
| 88:13,19 | rules 1:14 4:22 | 56:6 59:13 | 71:3 79:2 | 76:2 |
| 89:8,10 | ruling 51:14 | 62:16 72:2 | 85:5 | situation 57:21 |
| respond 5:7 | | 77:11 78:7 | servicing 75:10 | 74:8 |
| 52:19 | —— S —— | 78:14 80:5 | set 11:15 19:3 | situations 36:3 |
| response 51:11 | S 1:13 2:1,11 | 82:6,15 | 19:12,18 | 60:2 |
| 52:17 | 4:1 92:4 | 84:16 85:3 | 20:21,22 | small 19:1 |
| responses | said 24:2 83:1 | 87:6 90:2,6 | 21:14 26:14 | 33:22 34:5 |
| 37:16 | 92:6 | 91:1 | 27:19,21 | solicit 59:18 |
| responsibilit... | same 47:11 | school 6:22 | 33:15 38:9 | solution 61:6 |
| 9:5,7,18,21 | 52:16 53:13 | sciences 7:2 | 38:10,11,17 | 61:20 |
| 10:1,3,5 11:8 | 54:8 61:15 | scope 19:10 | 39:18 42:15 | some 4:16 15:6 |
| 11:20 12:3,8 | 65:13,14 | 37:13 56:9 | 42:20 44:9 | 17:1,5,6,9 |
| 12:16 13:3 | 66:8 67:16 | 66:13 | 47:4 55:10 | 19:11 21:13 |
| responsibility | 68:7,13 71:3 | second 40:12 | 62:2 88:7 | 23:21 28:5,7 |
| 9:1 10:12 | 76:19 78:4 | 53:3 | 89:18 92:15 | 29:4 41:4 |
| responsible 6:9 | 79:1,22 83:2 | see 33:14 72:16 | setting 11:12 | 48:7 52:20 |
| 11:9 | savings 50:10 | 72:20 | 11:15 19:4 | 66:11,16 |
| responsive | 50:20 | seeing 17:17 | 20:17 37:10 | 69:4 73:11 |
| 51:13 | say 13:9,22 | seek 22:22 | 50:16 | 73:17 83:12 |
| restate 55:21 | 22:1 29:4 | 24:11 28:11 | shake 5:9 | 83:13 88:13 |
| result 51:15 | 30:19 40:8 | seems 24:6 | she 18:13 27:2 | 88:13,20,20 |
| 54:5 75:6 | 42:17 53:7 | seen 25:18 | 27:5 45:8,11 | 89:3 90:21 |
| 86:8 90:22 | 58:18 59:21 | 47:9,11 | shifted 7:11,17 | somebody |
| results 32:10 | 74:11 80:21 | segment 61:14 | 8:1 | 68:13 |
| 53:21 | 84:12,19 | SELINGER | Shorthand | someone 13:21 |
| resumed 63:11 | 85:18 | 2:12 | 1:18 92:3,19 | 24:22 25:1,4 |
| retail 52:21 | saying 15:6 | sell 48:6 50:19 | should 22:13 | 65:9 |
| retirement | 65:10 | 87:9 | 38:15,16 | something |

Jill S. Herbold                                          January 14, 2005

Bloomfield, CT

18

| | | | | |
|---|---|---|---|---|
| 11:3 3 6:12 | 28:15 31:1 | 75:18 83:7 | 77:4 | **taking** 54:13 |
| 83:18 | 32:3,12 33:9 | 83:10 87:1 | submit 85:17 | talk 25:5 61:22 |
| **sometimes** | 34:6,13 36:7 | **standards** 15:3 | submits 39:15 | **talked** 81:10 |
| 18:1 20:21 | 36:15 37:15 | 18:19,20 | **subpoena** | 81:14 85:22 |
| 20:22 47:5 | 38:2 40:11 | 31:19 | 51:11 | **talking** 18:10 |
| 71:1 78:21 | 42:4,21 | start 4:21 19:6 | subsidiary | 18:11 23:12 |
| 79:15 | 43:21 44:6 | 19:10 27:7 | 21:21 22:1,3 | 25:8,10 |
| **sorry** 11:13 | 44:15 46:6 | 49:22 56:6 | 22:4,7,9 24:3 | 26:22 29:15 |
| 45:13 46:7 | 46:11 47:8 | 59:13 72:2 | 39:5 49:16 | 29:17 42:11 |
| 63:6 67:6 | 47:22 49:3,9 | **started** 4:14 | such 10:10 | 48:5 |
| 75:14 81:2 | 49:17 50:13 | 66:7 | 51:12,22 | **team** 71:4 |
| 88:16 89:5 | 51:8 52:3,8 | **starting** 11:2 | 65:4 68:18 | **technically** |
| **sort** 75:19 | 52:16 53:2 | state 1:19 4:7 | sufficient 85:7 | 8:18 15:22 |
| **sources** 19:8 | 53:16,22 | 92:4 | **suppose** 41:17 | 35:5 39:5 |
| 78:20 79:3 | 55:14,17 | stated 87:10 | **supposed** 74:5 | **Tel** 2:5,9,14,20 |
| **South** 1:15 | 56:4,20 | statement 61:8 | sure 14:7 15:5 | **Telephone** 2:3 |
| **speak** 6:2 | 58:10,22 | 75:19 | 18:13 24:5 | **tell** 4:18 5:16 |
| **speaking** 5:14 | 59:11,19 | STATES 1:1 | 28:18 36:1,2 | 5:19 6:7,21 |
| 6:1 | 60:15 61:10 | static 66:4,5 | 38:18 40:13 | 7:3,6,20 9:4 |
| **specialties** | 61:15 62:10 | stay 74:13,16 | 41:5 53:4 | 9:20 10:1,15 |
| 58:14 | 64:21 67:20 | 74:22 75:9 | 58:14 60:2 | 10:21 11:7 |
| **specialty** 25:10 | 68:7 69:1,12 | 85:8 87:11 | 67:22 68:1 | 12:2,15 |
| 25:13,16,22 | 72:1,10,19 | **stenographic...** | 80:13 81:1 | 14:14,16 |
| 26:3,3 | 73:14 74:14 | 92:6 | 84:18 87:7 | 18:6 19:2,6 |
| **specific** 75:19 | 75:1,14 76:3 | steps 87:2 | 87:11 88:18 | 21:8,16 25:2 |
| 79:9,21 85:9 | 76:21 77:1 | stick 21:5 | sworn 4:2 92:5 | 26:13 27:18 |
| 87:13 88:5,9 | 77:19 78:4 | sticking 81:21 | system 64:15 | 27:22 29:10 |
| 89:16 90:20 | 78:19 79:6 | 82:10 | S201 2:18 | 29:19 34:4 |
| **specifically** | 80:3 82:7 | still 8:13 10:17 | | 35:2,12,16 |
| 23:12 83:15 | 89:22 90:17 | 22:17 81:21 | ———————— | 36:21 37:12 |
| **specifics** 54:21 | 91:2 | strategy 6:9 | **T** | 45:5,15 |
| **specified** 18:4 | **stage** 51:19 | 9:8 | **T** 92:1,1 | 46:13 52:14 |
| **speculation** | **standard** 15:9 | Street 2:4 | table 70:15 | 54:15 59:8 |
| 54:1 69:2 | 18:2,16 19:2 | strike 15:11 | take 5:8,8,11 | 60:12 63:15 |
| **spell** 4:10 | 20:15 21:9 | 22:11 31:20 | 5:12 19:4 | 65:1,8,11,13 |
| **spent** 12:7 | 23:2,11 | 46:8 48:17 | 31:14 32:19 | 65:14 66:2 |
| **spoke** 6:4 64:8 | 30:14,16,17 | 59:16 62:15 | 33:8 38:4,5 | 69:10,21 |
| 65:22 | 30:18,20 | 67:1 | 41:9,11,17 | 90:14 |
| **ST** 2:12 5:18 | 31:5,9,11,16 | **structure** | 44:21 59:4 | **telling** 50:22 |
| 13:17 17:7 | 31:22 32:15 | 49:19 | 71:10,17 | **Tel-Drug** |
| 17:12 18:9 | 32:18,21 | student 7:8,9 | 87:2 | 22:10,12,17 |
| 21:18 25:3 | 33:3,14 38:7 | 7:15 12:17 | taken 1:13 | 22:18 23:7 |
| 25:19 26:10 | 41:22 43:3 | studies 66:6,9 | 11:17 36:13 | 23:17,19 |
| 26:16 27:1,8 | 44:22 52:12 | subject 47:5 | 38:6 92:6,12 | 24:2,8,9,10 |
| | | | takes 58:9 | |

Jill S. Herbold

Bloomfield, CT

January 14, 2005

19

| | | | | |
|---|---|---|---|---|
| 24:22 25:6 | 82:1,12 88:4 | 29:12 30:9 | 77:5 82:19 | Three 7:10 |
| 25:11 38:21 | 92:8 | 31:19 32:10 | 85:7 88:8 | through 10:2,2 |
| 39:5 46:10 | than 19:14 | 34:16 39:19 | they'd 41:17 | 11:6 12:16 |
| 46:21 48:19 | 20:22 22:15 | 41:16 43:11 | they're 68:12 | 13:3 15:6 |
| 48:22 49:16 | 30:7,10,17 | 47:14 49:13 | they've 32:22 | 24:8 26:17 |
| 50:3 | 37:9 39:12 | 50:18,20 | thing 14:2 | 35:4 46:14 |
| Tel-Drug's | 57:3 65:10 | 54:3,4,7 55:7 | 56:19 68:13 | 52:21 57:6,7 |
| 24:18,19,21 | 65:20 67:14 | 58:1,12 60:2 | things 62:17 | 57:17 58:4 |
| 25:4 48:20 | 67:18 68:5 | 60:21 61:4 | 66:12 | 59:14 61:5 |
| 50:15,21 | 68:12,15 | 61:19 62:5 | think 25:20 | 66:6 |
| Tel-Med 46:10 | 74:9 76:18 | 67:11 69:14 | 26:20 27:5 | time 7:13 9:16 |
| tenure 49:6 | 77:6 86:21 | 69:15 70:11 | 39:2 50:22 | 9:16 10:4,15 |
| 60:8 | 86:22 | 70:13 72:15 | 55:9,19 | 12:1,6 14:12 |
| term 25:13 | Thank 29:17 | 76:11 85:16 | 62:10 63:7 | 18:9,15,17 |
| 54:10 55:1,3 | their 13:11 | 86:4 90:14 | 65:11 78:7 | 21:3,3 44:18 |
| 66:1,3 73:22 | 14:18 22:17 | 90:21 92:4 | 80:18 88:12 | 46:3 54:12 |
| 74:3 85:14 | 25:9 34:11 | THEREOF | 88:19 | 59:12 60:9 |
| terms 14:20,21 | 36:5,5 52:1 | 92:15 | thinking 87:17 | 66:3 67:16 |
| 14:22 15:17 | 53:1 68:15 | thereupon | third 40:8,21 | 72:1 73:1 |
| 23:8 26:16 | 73:12 78:3 | 92:5 | those 9:17,21 | 79:12 80:6 |
| 26:18 44:20 | 84:20 85:5,8 | there's 11:16 | 10:5 11:4 | 81:11,11,14 |
| 44:21 45:19 | 85:9 88:9 | 27:10 32:20 | 12:22 19:12 | 81:15,20,21 |
| 57:15 87:12 | them 32:5,5,6 | 33:22 40:4 | 19:18 20:14 | 82:8 90:7,9 |
| 87:19 | 36:20 39:6 | 49:10 55:5 | 23:15 26:13 | 90:16,21 |
| testified 4:3 | 41:10 65:13 | 56:1 66:13 | 27:21 28:1 | times 79:16 |
| 18:12 26:6 | 65:14 71:11 | 71:17 72:14 | 30:21 31:12 | title 6:12 7:17 |
| 27:6,13 | 72:20 83:12 | these 6:6 21:9 | 31:12 32:1,2 | 7:18 8:9,18 |
| 34:16,20 | 83:12,13 | 36:22 37:5,9 | 32:20 34:21 | 8:22 |
| 41:3 66:19 | themselves | 86:3 | 35:8,19 38:8 | titles 8:14 |
| 69:8,17 73:9 | 22:16 | they 9:5 10:4 | 39:2 41:14 | today 4:17 |
| 80:18 81:6 | then 7:16 11:8 | 15:1 21:1,2,2 | 42:13 43:18 | 5:14,17 6:3 |
| 86:1 87:22 | 13:22 14:3 | 22:16 24:8 | 44:20 48:8 | 10:18 26:19 |
| 88:2,12,19 | 24:11 27:9 | 31:6 32:21 | 52:14 53:18 | 77:14 80:13 |
| 90:7 92:6 | 31:22 33:7 | 32:22 33:2 | 54:5 61:18 | 81:6,16 |
| testify 49:15 | 41:16 42:17 | 35:5,6,20 | 61:21 82:18 | 82:12 |
| 49:18 51:16 | 50:7 52:1 | 38:10,11 | 82:21 83:20 | together 16:22 |
| 52:4 | 56:7,8 58:3 | 41:6,7,9,10 | 83:20,21 | 17:3 47:4 |
| testifying | 68:13 82:22 | 41:14 43:22 | 84:15 86:5 | 61:12 |
| 88:15 | 89:11 | 47:20 58:6 | 86:14,16,18 | told 24:9 65:4 |
| testimony 5:17 | there 15:20 | 61:22 63:20 | 87:13 89:10 | 71:11 |
| 6:3 34:16 | 16:10 19:15 | 63:22 64:22 | 89:12 | too 78:12 |
| 38:19 49:20 | 20:6,16 21:6 | 65:4,11,12 | thought 53:6 | 79:19 88:10 |
| 73:16 77:9 | 23:8 25:1,4 | 68:13 71:8 | threatened | topic 51:9 |
| 81:16,18 | 26:2 27:7 | 71:11 75:10 | 69:4 | 60:17 77:2 |

Henderson Legal Services
(202) 220-4158

Jill S. Herbold                                          January 14, 2005
Bloomfield, CT

20

| | | | | |
|---|---|---|---|---|
| 77:12 | 83:2,15 92:7 | up 21:12 40:6 | 30:2 31:19 | 32:17 79:17 |
| topics 6:5,6 | underneath | 58:4 68:20 | 53:18 90:22 | 79:21 85:18 |
| total 61:2,3,12 | 41:10 | 70:10 78:8 | variations 31:8 | 87:17 89:1 |
| toxoid 37:18 | understand | upon 45:21 | varied 21:2,10 | ways 46:16 |
| track 80:17 | 5:3,13 10:19 | 61:4 | 47:12 | Webb 2:7 4:14 |
| trade-off 62:18 | 15:5,24:5,10 | us 60:3 65:11 | various 49:12 | Website 46:18 |
| trade-offs 61:4 | 24:21 26:4 | 71:3 75:7 | vary 16:9 | well 6:10 9:10 |
| 61:19 | 32:9 47:9 | 85:6 | varying 53:21 | 12:22 15:2 |
| training 57:6 | 67:6,22 71:3 | use 11:18 | 54:7 | 18:11 19:19 |
| treatment | 80:12 81:1 | 17:17,18 | vendor 40:4,8 | 25:15 51:18 |
| 84:14,21,22 | 88:9 | 24:8 30:16 | vendors 10:8,9 | 59:13 70:2 |
| 86:3 | understanding | 30:20,21 | verbally 5:7 | 71:1 76:9 |
| trends 11:12 | 13:13 14:8 | 31:4 32:14 | versus 18:19 | 77:11 87:8 |
| tried 48:4 | 20:3 37:4 | 40:1 41:6,7 | 42:13 64:20 | went 26:16 |
| tries 79:13 | 39:21 41:8 | 41:14 44:2 | 71:8 | 45:8,11 |
| true 39:19 61:8 | 41:19 44:18 | 46:20 56:15 | very 19:1 | were 7:9,21 8:5 |
| 83:22 92:7 | 47:19 53:8 | 85:14 | 33:11 39:6 | 8:8 10:2,4,16 |
| try 5:4 19:7 | 53:10 54:16 | used 11:15 | 48:4 54:19 | 11:6 12:2,17 |
| 32:17 78:20 | 54:17 55:4 | 17:15 43:12 | 61:21 66:6 | 12:22 18:11 |
| 87:2 | 55:11,22 | 44:13 54:18 | 80:11 89:14 | 21:1 26:5 |
| trying 51:21 | 57:2,4,5,10 | 54:20 89:11 | via 14:22 | 29:11 33:12 |
| 65:5 87:7 | 64:18 65:22 | useful 49:8 | Vice 6:13,16 | 36:22 37:1 |
| turn 34:15 | 66:3,11 67:1 | 50:4 | 8:10,12,15,16 | 45:4 49:1,5 |
| 85:21 | 67:3,11 73:2 | uses 19:8 40:5 | 8:19,22 9:6 | 50:22 57:17 |
| two 7:22 8:14 | 73:10,21 | 41:4 62:21 | volume 82:8 | 82:18 86:5,9 |
| 12:21 41:14 | 74:3,11 88:3 | 64:15 65:15 | | 86:12,21 |
| 53:18 81:10 | understands | 79:3 | **W** | 87:14,15,22 |
| 82:21 | 25:21 88:1 | using 15:2 | WAC 28:13 | we'd 38:4 |
| Tyler 2:7 4:15 | undertaken | 19:19 20:11 | 55:2,5,8,9 | we'll 4:21 27:7 |
| type 69:22 | 48:12 78:2 | 34:18 41:20 | WADE 2:16 | 56:8 62:12 |
| 73:6 79:22 | underwriter | 42:1 44:9 | 45:8,11 63:6 | 78:21 82:9 |
| types 79:2 | 11:18 | utilize 46:10 | 90:1 | we're 23:12 |
| typical 17:16 | underwriting | 49:1 | want 24:5 | 26:20 29:17 |
| typically 15:20 | 11:17 13:1 | | 32:22 34:15 | 79:7 87:18 |
| 21:11 26:14 | unfortunately | **V** | 36:4 42:11 | 89:18 91:2 |
| 33:4 67:14 | 51:18 | vaccinations | 44:8 75:17 | we've 38:2 |
| | unit 47:4 | 37:17 47:16 | wanted 22:21 | 47:12 60:14 |
| **U** | UNITED 1:1 | valid 50:19 | 24:21 34:11 | 65:2 |
| Uh-hum 12:5 | University 7:2 | variability | wants 33:5 | whatever 43:2 |
| 23:6,14 | unless 21:6 | 30:3 90:15 | 36:4 | what's 57:8,9 |
| ultimate 51:4 | 42:2 | variation | wasn't 90:21 | when 7:6 10:14 |
| under 20:6 | unsatisfied | 16:14 21:17 | way 12:10,12 | 11:6 12:2,17 |
| 23:10 39:16 | 69:13 | 21:20 23:9 | 15:20 17:1 | 13:18,22 |
| 42:19 77:13 | until 8:7 13:11 | 24:16 28:1 | 28:18 32:1,8 | 22:1 28:20 |

Jill S. Herbold

Bloomfield, CT

January 14, 2005

21

| | | | | |
|---|---|---|---|---|
| 30:11 32:21 | 72:9,12 | 74:21 75:7,7 | 20:17,20,21 | **year** 12:7 |
| 38:3 40:1,8 | 81:22 87:5 | 77:15 | 20:22 21:4 | **years** 7:10,22 |
| 41:20,20 | 92:5 | **willing** 21:21 | 22:5,11,22 | 37:5 57:7 |
| 42:12 43:16 | **whole** 28:13,22 | 23:8,20 | 23:1,3 24:22 | **yet** 89:17 |
| 47:1,1 54:9 | 29:2 55:21 | 24:17 87:15 | 25:5,7,19 | **yield** 17:9 49:7 |
| 56:15 60:11 | 67:22 | 87:21 | 26:8,13 27:1 | 50:10 54:5 |
| 61:2 62:2 | **wholesale** 1:10 | **within** 19:10 | 27:14,19 | **York** 2:8 |
| 65:5 66:5,7 | 17:16,18,21 | 39:4 40:10 | 28:1,5 29:4 | **your** 4:7,10 5:1 |
| 68:2 77:4 | 19:11,13,14 | 46:18 70:12 | 29:10,22 | 6:1,3,7,22 |
| 78:17 80:1 | 21:14 27:19 | **without** 5:18 | 30:3,19,20 | 7:3,7,17,18 |
| 84:5 85:14 | 27:20 40:1,3 | 20:3 | 31:3,4,10,19 | 8:22 9:5,17 |
| 87:22 | 40:6 41:12 | **witness** 18:12 | 33:7,11,13,13 | 10:1,22 11:8 |
| **whenever** 70:9 | 41:13,21 | 25:20 27:2 | 34:9,10 | 11:11,13,13 |
| **where** 15:11 | 42:1 47:3 | 37:13 40:14 | 37:19 38:13 | 11:20 12:3,8 |
| 32:8,9 34:16 | 54:10,12,18 | 49:15,17 | 41:16 42:17 | 12:15 13:2 |
| 38:22 43:6 | 56:1,16 64:8 | 50:13 51:16 | 42:19,20 | 25:1,12,15 |
| 44:4 47:11 | 65:19 66:1 | 52:4,9 53:5 | 43:12,12 | 29:14 30:6 |
| 52:14 56:8 | 67:5,10,12,15 | 60:21 62:14 | 44:4 45:1,2,5 | 34:15 38:18 |
| 57:4,21 | 73:11,17,18 | 75:2 77:9 | 45:5,16,18 | 44:3 54:15 |
| 58:14 60:3 | 77:18 78:3 | 78:11 92:8 | 46:2,17 47:4 | 56:15 57:20 |
| 62:5 63:15 | 82:5,14 83:3 | 92:15 | 47:10,13 | 65:22 66:2,9 |
| **whether** 14:4 | 83:11 84:2 | **wonder** 66:2 | 49:7,7 50:4,7 | 69:17,18 |
| 30:12 38:19 | 90:10,13 | **won't** 59:5 | 50:10,11,16 | 70:18 73:9 |
| 51:22 53:10 | **wholesaler** | **word** 40:5 | 50:17 51:2 | 73:16 74:3 |
| 55:4,11,22 | 64:2 | **words** 16:10 | 53:11,13,13 | 74:15 77:6 |
| 60:5 63:22 | **wholesalers** | 31:9 32:20 | 53:18 54:11 | 81:22 82:1 |
| 67:3 70:20 | 55:1 | 55:9 59:4 | 57:14,16 | 82:11,12 |
| 71:21 73:2 | **wholesaler's** | 61:11 | 58:18 61:8 | 88:4 |
| 77:2 78:16 | 73:22 74:5 | **work** 7:3 13:2 | 69:8 70:19 | **you'd** 5:11 |
| 79:18 88:1 | **Whose** 55:15 | 39:5 56:10 | 71:10 74:11 | **you'll** 63:8 |
| 90:14 | **why** 22:11,12 | 56:15 58:20 | 76:14,18 | **you're** 14:4 |
| **which** 4:22 | 31:3,4 34:4 | 59:1 | 79:8 80:1 | 15:5 39:7 |
| 10:17 14:14 | 36:22 37:12 | **worked** 12:18 | 84:4,7 85:12 | 41:5,22 |
| 18:21 19:16 | 47:19 48:15 | 12:20 | 85:17,19 | 42:11 60:22 |
| 36:18 37:2 | 50:19 51:3 | **working** 35:5 | 87:2 89:12 | 61:11 65:10 |
| 39:22 41:5 | 65:18 76:11 | **worry** 22:19 | 90:21 | 70:20 |
| 51:9,12 58:8 | **wide** 66:13 | **would** 9:15 | **wrap** 78:8 | **you've** 4:18 |
| 60:17 77:2 | **will** 18:2 19:4 | 11:18 13:9 | **writing** 92:7 | 5:16,20 24:9 |
| 92:11 | 19:12,13 | 15:6,8,12,13 | **written** 46:14 | 30:13,15 |
| **while** 75:6 84:8 | 22:18 24:10 | 15:17,18 | **wrong** 86:2 | 44:3 47:15 |
| **White** 2:14 | 24:11,14 | 16:1,5,9,18 | | 53:19 69:17 |
| **who** 23:17 25:5 | 28:19 30:13 | 16:20,22 | **Y** | |
| 34:10 44:17 | 54:5 61:3 | 17:2,11,21 | **Yeah** 40:10 | **0** |
| 53:14 65:3 | 68:4 71:2 | 18:7 20:16 | 56:22 59:7 | 01CV12257-... |

Jill S. Herbold                                          January 14, 2005

Bloomfield, CT

22

| | | | | |
|---|---|---|---|---|
| 1:5<br>**0214** 12:5<br>**06152-50**26<br>2:19<br><br>**_____ 1 _____**<br>**10** 33:15<br>**10036-6710** 2:8<br>**10601** 2:14<br>**1133** 2:8<br>**12:48** 1:20<br>**120** 30:1,2<br>**13** 19:16,21,22<br>20:10,14<br>23:13,15<br>34:16,21<br>35:8 36:18<br>36:22 37:1,9<br>83:15,16,20<br>85:21 86:3<br>86:21<br>**14** 1:19<br>**15** 21:11 38:20<br>60:17 62:13<br>**18** 77:2<br>**19th** 92:16<br>**199** 1:18 92:19<br>**1991** 14:11<br>46:3<br>**1993** 6:20 7:6<br>12:16 13:3<br>**1996** 7:11,17<br>12:1,9,16<br>13:3 54:14<br>**1998** 8:1 11:6<br>11:20 12:2,9<br><br>**_____ 2 _____**<br>**20** 10:2 35:15<br>**2001** 8:7,8 9:17<br>10:2 11:6,21<br>13:11 14:15<br>14:16 18:12<br>18:15 26:21 | **27**:7,12<br>44:12 59:13<br>60:9 62:20<br>**2002** 18:17<br>20:16 44:22<br>45:20 46:3<br>81:17,18<br>82:10,17,22<br>90:7,16<br>**2004** 6:18 9:22<br>10:2 19:17<br>20:10 34:17<br>**2005** 1:20<br>92:16<br>**2007** 92:21<br>**212** 2:9<br>**226-2457** 2:20<br>**25** 51:9<br><br>**_____ 3 _____**<br>**3:00** 63:10<br>**30** 92:21<br>**336-2000** 2:9<br><br>**_____ 4 _____**<br>**4** 3:3<br>**4:05** 63:11<br>**45** 21:12 23:21<br>38:21<br>**482-3700** 2:5<br><br>**_____ 5 _____**<br>**5:00** 91:3<br>**50** 26:7 27:13<br>43:5 83:1,6<br><br>**_____ 6 _____**<br>**617** 2:5<br><br>**_____ 7 _____**<br>**7** 20:10 34:17<br>**7th** 19:17<br><br>**_____ 8 _____**<br>**80** 3:5 29:22 | **30**:2<br>**860** 2:20<br><br>**_____ 9 _____**<br>**90** 3:4<br>**900** 1:15 2:18<br>**91** 27:2<br>**914** 2:14<br>**997-0500** 2:14 | | |