Exhibit 46

James T. Kenney                                      September 20, 2004
                        Wellesley, MA

                                                                      1

 1                 UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3                     NO. 01CV12257-PBS

 4    _____

 5    In re:  PHARMACEUTICAL              )

 6    INDUSTRY AVERAGE WHOLESALE          )

 7    PRICE LITIGATION                    )

 8    _____   )

 9    THIS DOCUMENT RELATES TO:           )

10    ALL ACTIONS                         )

11    _____   )

12                 DEPOSITION of HARVARD PILGRIM HEALTH

13    CARE BY JAMES T. KENNEY, called as a witness by and

14    on behalf of the Defendants, pursuant to the

15    applicable provisions of the Federal Rules of Civil

      Procedure, Rule 30 (b)(6), before P. Jodi Ohnemus,

16    Notary Public, Certified Shorthand Reporter,

17    Certified Realtime Reporter, and Registered Merit

18    Reporter, within and for the Commonwealth of

19    Massachusetts, at the offices of Harvard Pilgrim

20    Health Care, 93 Worcester Road, Wellesley,

21    Massachusetts, on Monday, 20 September, 2004,

22    commencing at 10:50 a.m.

James T. Kenney                                                September 20, 2004
Wellesley, MA

2 (Pages 2 to 5)

---

**Page 2**

1  APPEARANCES:
2
3       HAGENS BERMAN, LLP
4       BY: David S. Nalven, Esq.
5       One Main Street
6       4th Floor
7       Cambridge, MA  02142
8       617 482-3700
9       Davidn@hagens-berman.com
10      For the Plaintiffs
11
12
13      PATTERSON, BELKNAP, WEBB
14      & TYLER, LLP
15      BY: Erik Haas, Esq.
16      1133 Avenue of the Americas
17      New York, NY  10036-6710
18      212 336-2222
19      ehaas@pbwt.com
20      for the Defendants
21
22

---

**Page 3**

1  APPEARANCES: (CONT'D)
2
3       HASSAN & REARDON
4       BY: James J. Horgan, Esq.
5       800 Boylston Street
6       Boston, MA  02199
7       617 859-3600
8          -and-
9       HARVARD PILGRIM HEALTH CARE
10      BY: Harvey D. Cotton, Esq.
11      93 Worcester Road
12      Wellesley, MA  02481-9181
13      617 509-7252
14      Harvey_cotton@hphc.org
15      For Harvard Pilgrim Health Care
16
17      (Via Telephone)
        SHOOK, HARDY & BACON
18      BY: Tiffany Killoren, Esq.
19      2555 Grand Road
20      Kansas City, MO  64108
21      816 559-2246
22      For Aventis Pharmaceuticals

---

**Page 4**

1                    I N D E X
2
3  TESTIMONY OF:     DIRECT CROSS REDIRECT RECROSS
4
5  JAMES T. KENNEY
6  (By Mr. Haas)     5          80
7  (By Mr. Nalven)        64
8
9              E X H I B I T S
10
11 EXHIBIT          DESCRIPTION        PAGE
12

13 Exhibit Kenney 001    HPH 449-489        39
14
15 Exhibit Kenney 002    HPH 490-535        39
16
17 Exhibit Kenney 003    HPH 417-439        39
18
19 Exhibit Kenney 004    HPH 398-416        39
20
21 Exhibit Kenney 005    HPH 536-544        61
22

---

**Page 5**

1             S T I P U L A T I O N S
2        It is agreed by and between counsel for
3  the respective parties that the deponent shall read
4  and sign the deposition transcript within thirty
5  (30) days from receipt; signing before a Notary
6  Public and the sealing of the transcript are
7  waived.
8        It is further agreed that all objections,
9  except as to form and motions to strike, are
10 reserved to the time of trial.
11       JAMES T. KENNEY,
12          having first been duly sworn,
13          testified as follows to
14          direct interrogatories
15 BY MR. HAAS:
16    Q.  Mr. Kenney, will you please state your
17 full name for the record.
18    A.  James Thomas Kenney, Jr.
19    Q.  Are you currently employed?
20    A.  Yes.
21    Q.  By whom?
22    A.  Harvard Pilgrim Health Care.

---

Henderson Legal / Spherion
(202) 220-4158

James T. Kenney                                   September 20, 2004
Wellesley, MA

3 (Pages 6 to 9)

| | 6 |
|---|---|
| 1 | Q. How long have you been employed by Harvard |
| 2 | Pilgrim? |
| 3 | A. 24 years. |
| 4 | Q. If you would, walk through for me the |
| 5 | various positions you've held and responsibilities |
| 6 | in those positions you've held over the last 24 |
| 7 | years. |
| 8 | A. Staff pharmacist was the first position, |
| 9 | just general dispensing pharmacy responsibilities, |
| 10 | fill prescriptions. Then I was assistant director |
| 11 | of pharmacy. My responsibilities were just |
| 12 | managing the day-to-day pharmacy operations, |
| 13 | managing the staff. |
| 14 | Q. Uh-huh. |
| 15 | A. Also, still fill prescriptions as |
| 16 | assistant director. Then I was a chief pharmacist |
| 17 | at one of our pharmacies and same responsibility |
| 18 | really as a chief as it was with an assistant |
| 19 | director. |
| 20 | Q. Uh-huh. |
| 21 | A. Just a different -- kind of a different |
| 22 | title. And then after that, I became pharmacy |

| | 7 |
|---|---|
| 1 | operations manager, and that was in 1988. And I've |
| 2 | held that position since then. And that position |
| 3 | involves negotiating contracts. |
| 4 | Q. When you say, "negotiating contracts," was |
| 5 | it negotiating contracts between Harvard Pilgrim |
| 6 | and pharmacy groups? |
| 7 | A. No, Harvard Pilgrim and manufacturers. |
| 8 | Q. And manufacturers. Let me back up to when |
| 9 | you were a staff pharmacist. When you say, "staff |
| 10 | pharmacist" for Harvard Pilgrim, Harvard Pilgrim |
| 11 | owned pharmacies at that time? |
| 12 | A. Well, Harvard Pilgrim was known as Harvard |
| 13 | Community Health Plan at that time. |
| 14 | Q. Is that a staff model HMO? |
| 15 | A. Correct. |
| 16 | Q. Aside from the staff model HMO, did |
| 17 | Harvard Community offer any other health plan or |
| 18 | product? |
| 19 | A. When I was a staff pharmacist, no. |
| 20 | Q. At any point in time since you started |
| 21 | till the merger in 2000, did Harvard Community |
| 22 | offer any product other than the staff model HMO? |

| | 8 |
|---|---|
| 1 | A. They had a group model, group practice |
| 2 | model HMO. |
| 3 | Q. What is a group practice model HMO? |
| 4 | A. It's a model where the -- a physician |
| 5 | group is contracted with the insurer to provide |
| 6 | services for the members who select the physician, |
| 7 | who is or participates in that particular group. |
| 8 | Q. In the group practice model, did Harvard |
| 9 | Community contract with independent pharmacy |
| 10 | groups? |
| 11 | MR. HORGAN: Objection. You can answer. |
| 12 | A. I'm trying to recall. Harvard Pilgrim |
| 13 | contracted with a third-party claims processor at |
| 14 | that time. I'm not sure what the relationship was |
| 15 | directly with the pharmacies. |
| 16 | Q. Uh-huh. Who was the claims processor? |
| 17 | A. Programs & Analysis. |
| 18 | Q. Do you have an understanding of whether |
| 19 | Programs & Analysis had its own network at that |
| 20 | time? |
| 21 | A. I don't recall. I don't know. |
| 22 | Q. Okay. With respect to the staff model HMO |

| | 9 |
|---|---|
| 1 | that is run by Harvard Community, is that still in |
| 2 | place? |
| 3 | A. No. |
| 4 | Q. When did Harvard Pilgrim -- Harvard |
| 5 | Community or Harvard Pilgrim dissolve that staff |
| 6 | model HMO -- |
| 7 | MR. HORGAN: Objection. |
| 8 | Q. -- or otherwise sell it? |
| 9 | MR. HORGAN: Objection. |
| 10 | A. I don't know. I don't recall the date. |
| 11 | Q. Just generally. |
| 12 | A. I know it became a group practice model a |
| 13 | few years ago. |
| 14 | Q. So, it's fair to say at some point in time |
| 15 | the staff model HMO run by Harvard Community was |
| 16 | transformed into a group practice model. |
| 17 | A. Yes. |
| 18 | Q. Okay. How did -- let me back up. Just |
| 19 | for the record, when we say, "staff model HMO," |
| 20 | that is with reference to a Health Plan that |
| 21 | Harvard Pilgrim offers to its members, whereby |
| 22 | Harvard Pilgrim owns the pharmacies and owns the |

James T. Kenney                                    September 20, 2004
Wellesley, MA

4 (Pages 10 to 13)

|  | 10 |
|---|---|
| 1 | physician clinics that provide services to the |
| 2 | Harvard Pilgrim members, is that correct? |
| 3 | A. Yes. |
| 4 | Q. How did Harvard acquire the drugs that |
| 5 | were dispensed in its pharmacies through the staff |
| 6 | model HMO? |
| 7 | MR. HORGAN: Objection. |
| 8 | A. It purchased them either direct from a |
| 9 | manufacturer or through a wholesaler. |
| 10 | Q. Similarly, with respect to the drugs |
| 11 | dispensed -- withdraw that question. With respect |
| 12 | to the drugs administered in physicians' offices, |
| 13 | how did Harvard acquire those drugs -- |
| 14 | MR. HORGAN: Objection. |
| 15 | Q. -- through the staff model HMO? |
| 16 | A. Same, either direct or through the |
| 17 | wholesaler. |
| 18 | Q. Were you involved at all in the |
| 19 | contracting or negotiation for the purchase of |
| 20 | drugs from either manufacturers or wholesalers for |
| 21 | the staff model HMO? |
| 22 | A. Yes. |

|  | 12 |
|---|---|
| 1 | Q. Uh-huh. And to your recollection, what |
| 2 | was the range of percentages markup or discount off |
| 3 | of WAC at which Harvard acquired drugs from |
| 4 | manufacturers for dispensing through its staff |
| 5 | model HMO pharmacists? |
| 6 | MR. HORGAN: Objection. You can answer. |
| 7 | A. 2 percent, to maybe 50, 60 percent. |
| 8 | Q. Above or below WAC? |
| 9 | MR. HORGAN: Objection. |
| 10 | A. Below WAC. |
| 11 | Q. With respect to brand name drugs -- let's |
| 12 | stick with brand name drugs for a moment. What was |
| 13 | the percentage markup or discount off of WAC that |
| 14 | Harvard Pilgrim acquired drugs from manufacturers |
| 15 | for its staff model HMO? |
| 16 | MR. HORGAN: Objection. Can you -- all |
| 17 | these are just if you know, all these questions. |
| 18 | A. The branded discount was 2 to 50 percent. |
| 19 | Q. 2 percent to 50 percent. |
| 20 | A. 2 to 50 percent off. |
| 21 | Q. Did the discounts off of WAC differ with |
| 22 | respect to generic drugs that Harvard purchased on |

|  | 11 |
|---|---|
| 1 | Q. And what was your involvement? |
| 2 | A. My role was to negotiate contracts with |
| 3 | those manufacturers that -- how do I phrase it? We |
| 4 | didn't really have a central function. So, each |
| 5 | pharmacy negotiated a few contracts. |
| 6 | Q. Uh-huh. |
| 7 | A. That's kind of how it worked. |
| 8 | Q. How many pharmacies were -- made up the |
| 9 | network of the staff model HMO? |
| 10 | A. At that time, I believe it was nine. |
| 11 | Q. So, is it correct that in your role over |
| 12 | the years as -- in the various pharmacy roles for |
| 13 | your staff model HMO, you negotiated purchase |
| 14 | contracts with manufacturers for the drugs |
| 15 | dispensed through the pharmacy? |
| 16 | A. In my role at the staff model, yes. |
| 17 | Q. To your recollection, were the prices for |
| 18 | the drugs that Harvard purchased from manufacturers |
| 19 | set based upon any particular benchmark? |
| 20 | MR. HORGAN: During the staff model HMO? |
| 21 | MR. HAAS: Yes. |
| 22 | A. I would say the benchmark was WAC. |

|  | 13 |
|---|---|
| 1 | behalf of its staff model HMO? |
| 2 | A. Yes. |
| 3 | Q. What were the discounts off of WAC that |
| 4 | Harvard Pilgrim received with respect to the |
| 5 | general risk purchased from manufacturers for its |
| 6 | staff model HMO? |
| 7 | A. 50 percent to 80 percent. |
| 8 | Q. At that time did Harvard negotiate |
| 9 | separate manufacturer rebate agreements with |
| 10 | manufacturers for the drugs that were dispensed or |
| 11 | administered by the staff model HMO? |
| 12 | A. No. |
| 13 | Q. Were the rebate -- withdraw that question. |
| 14 | Were the discounts off of WAC at which Harvard |
| 15 | acquired drugs from manufacturers inclusive of a |
| 16 | rebate that pertained to the drugs that were |
| 17 | dispensed or administered by the pharmacies -- |
| 18 | MR. HORGAN: Objection. |
| 19 | Q. -- or the clinics? |
| 20 | MR. HORGAN: Objection. |
| 21 | A. No. |
| 22 | Q. Was it your understanding that at the time |

James T. Kenney                                      September 20, 2004
Wellesley, MA

5 (Pages 14 to 17)

**14**

1  that you were negotiating these prices with
2  manufacturers for drugs for the staff model HMO
3  that Harvard Pilgrim was getting a particularly
4  good price from the manufacturers that wasn't
5  otherwise available in the marketplace?
6       MR. HORGAN: Objection.
7    A.  No.
8    Q.  So, to your understanding at the time, any
9  pharmacy could obtain drugs at between 2 percent to
10  50 percent or 60 percent off for brand name drugs
11  from manufacturers, is that correct?
12       MR. HORGAN: Objection.
13    A.  I don't know.
14    Q.  Was that your understanding at the time?
15    A.  I don't know.
16       MR. NALVEN: Objection.
17    A.  I don't know what any other pharmacies
18  were paying.
19    Q.  With respect to the drugs acquired from
20  wholesalers, was the price for the drugs that
21  Harvard Pilgrim purchased from wholesalers for the
22  staff model HMO based on any particular benchmark?

**15**

1    A.  WAC.
2    Q.  Uh-huh.  What was the range of discounts
3  off of WAC or above WAC at which Harvard acquired
4  brand name drugs from wholesalers?
5    A.  WAC plus 2 percent.
6    Q.  What was the discount above or below WAC
7  at which Harvard acquired generic drugs from
8  wholesalers for its staff model HMO?
9    A.  50 to 80 percent.
10    Q.  Off WAC?
11    A.  Uh-huh.
12    Q.  And again, was it your understanding at
13  the time that those were market prices that
14  otherwise would be available in the industry?
15       MR. NALVEN: Objection.
16       MR. HORGAN: Objection.
17    A.  Yes.
18    Q.  When you were negotiating with
19  manufacturers and wholesalers for the purchase of
20  drugs on behalf of staff model HMO, what was your
21  understanding of the term "WAC" or wholesale
22  acquisition cost?

**16**

1    A.  The price that the manufacturer charged
2  the wholesaler.
3    Q.  Did you have an understanding at the time
4  whether or not that price was published in any
5  industry compendia?
6    A.  No.
7       MR. NALVEN: Object to the form on that
8  last question, please.
9    Q.  With respect to tracking drug costs or
10  reimbursement internally at the staff model HMO,
11  did Harvard Pilgrim track the drugs that were
12  dispensed to its members based upon a benchmark or
13  at a cost amount, to your knowledge?
14       MR. HORGAN: Objection.
15    A.  Cost.
16    Q.  Did there come a point in time that you
17  became involved in the negotiation of rebates for
18  manufacturers?
19    A.  Yes.
20    Q.  When was that?
21    A.  1988.
22    Q.  What was your involvement at that time?

**17**

1    A.  My role was to establish a rebate program
2  -- or rebate contracts for Harvard Community Health
3  Plan.
4    Q.  Prior to 1988, did Harvard Community
5  Health Plan have any rebate program with
6  manufacturers?
7       MR. HORGAN: Objection.
8    A.  No.
9    Q.  To your knowledge, prior to 1998, did
10  Harvard Community Health Plan receive any rebates
11  through its contract with any pharmacy benefit
12  manager?
13    A.  I don't know.
14    Q.  Uh-huh.
15    A.  I'm sorry.  PBM, no.
16    Q.  At any point in time while you were at
17  Harvard Community Health Plan, did Harvard
18  Community contract with a PBM for the
19  administration of its pharmacy benefit?
20    A.  Could you repeat that question, please.
21    Q.  Yeah.  At any time that you worked for
22  Harvard Pilgrim, has Harvard Pilgrim contracted

James T. Kenney                                        September 20, 2004
Wellesley, MA

6 (Pages 18 to 21)

| 18 | 20 |
|---|---|
| 1  with a pharmacy benefit manager for the | 1  the '90s at some point. |
| 2  administration of its prescription drug benefit for | 2  Q.  Early '90s, late '90s? |
| 3  drugs administered or dispensed from pharmacies? | 3  A.  Not sure. |
| 4  A.  Yes. | 4  Q.  Uh-huh.  Did there come a point in time |
| 5  Q.  What PBMs has Harvard Pilgrim contracted | 5  that MedImpact replaced Pharmacare as the PBM of |
| 6  with? | 6  Harvard Community Health Plan? |
| 7  A.  Programs & Analysis, PHS.  I don't recall | 7  A.  Yes. |
| 8  what it stands for. | 8  Q.  When was that? |
| 9  Q.  Uh-huh. | 9  A.  Maybe four years ago.  So, around 2000. |
| 10  A.  Caremark, Pharmacare, MedImpact. | 10  Again, not certain of the exact date, but around |
| 11  Q.  When did Harvard Community contract with | 11  2000. |
| 12  Programs & Analysis? | 12  Q.  Were you involved in any of the processes |
| 13  A.  Prior to '88.  And to qualify what they | 13  by which Harvard Community Health Plan or later |
| 14  were, they were a claims processor primarily. | 14  Harvard Pilgrim negotiated and entered into |
| 15  MR. HORGAN:  Just wait for a question. | 15  contracts with any of these PBMs that we've |
| 16  He'll ask you what he needs to know. | 16  mentioned? |
| 17  Q.  What was the terms of the contract with | 17  A.  PHS. |
| 18  Programs & Analysis?  When did it start, and when | 18  Q.  Uh-huh.  Are you aware of the process that |
| 19  did it end -- if it ended? | 19  Harvard Pilgrim utilized or Harvard Community |
| 20  A.  I don't know. | 20  Health Plan utilized to negotiate or determine |
| 21  Q.  Was Programs & Analysis replaced by PHS as | 21  which of the other PBMs is would select at any |
| 22  the PBM of Harvard Community? | 22  point in time? |

| 19 | 21 |
|---|---|
| 1  A.  Yes. | 1  MR. HORGAN:  Objection. |
| 2  Q.  Do you have any idea when that was? | 2  A.  Yes, aware of the process. |
| 3  A.  I don't recall the exact date. | 3  MR. COTTON:  Off the record. |
| 4  Q.  Generally, do you remember when it was? | 4  (Discussion off the record.) |
| 5  A.  Around 1990 maybe. | 5  Q.  From a general perspective, does Harvard |
| 6  Q.  Did Caremark replace PHS as Harvard | 6  Pilgrim and Harvard Community engage in a bidding |
| 7  Community Health Plan's PBM? | 7  process in order to determine which PBM it will |
| 8  A.  They purchased PHS. | 8  select? |
| 9  Q.  Do you know when that was? | 9  MR. HORGAN:  Objection. |
| 10  A.  Again, don't recall. | 10  A.  Yes. |
| 11  Q.  Generally. | 11  Q.  Going back to your involvement in the |
| 12  A.  I couldn't even guess.  I don't -- I don't | 12  rebating process beginning in 1998, can you please |
| 13  recall. | 13  describe for me what that was. |
| 14  Q.  Did there come a point in time that | 14  A.  Negotiated with manufacturers for rebate |
| 15  Pharmacare replaced Caremark as Harvard Community | 15  contracts on products. |
| 16  Health Plan's PBM? | 16  Q.  Did anyone else work with you in |
| 17  A.  Yes. | 17  establishing this rebating function at Harvard? |
| 18  Q.  When was that? | 18  A.  Yes. |
| 19  A.  Again, I don't know the date.  I don't | 19  Q.  Who else worked with you? |
| 20  recall. | 20  A.  Ken -- Kenneth Kazarosian. |
| 21  Q.  Was it during the '90s? | 21  Q.  Okay.  Anyone else? |
| 22  A.  Yeah.  Definitely would have been during | 22  A.  No. |

James T. Kenney

September 20, 2004

Wellesley, MA

7 (Pages 22 to 25)

---

22

1      Q.  How did you go about establishing the
2   rebate program?
3      A.  Just met with manufacturers and requested
4   rebate contracts.
5      Q.  Uh-huh.  Did you do any analysis at the
6   time whether it be more effective to manage the
7   rebate program internally at Harvard Pilgrim,
8   rather than, say, externally through a PBM?
9      A.  No.
10      Q.  Did there ever come a point in time when
11   you did that analysis to determine whether or not
12   it would be better from Harvard Pilgrim's
13   perspective to manage the rebate function
14   internally or to do it outside through a PBM?
15      A.  Yes.
16      Q.  When did you do that?
17      A.  I did that when we converted to Pharmacare
18   as the PBM.
19      Q.  Did you engage in a similar process when
20   MedImpact became Harvard's PBM?
21      A.  No.
22      Q.  Did you conclude, through your analysis of

---

23

1   the relative effectiveness of managing the rebate
2   program internally versus through a PBM, that it
3   would be more effective for Harvard to manage the
4   rebating program internally than through
5   Pharmacare?
6          MR. NALVEN:  Objection to form.
7          MR. HORGAN:  Objection.
8      A.  Yes.
9      Q.  Okay.  What sort of information did you
10   use in making that analysis in reaching that
11   conclusion?
12          MR. NALVEN:  Objection.
13      A.  We took a basket of drugs, we calculated
14   our net cost for that basket of drugs, and the PBM
15   did the same.
16      Q.  Uh-huh.  When you say, "net cost," what
17   were the components of the net cost?
18      A.  That was the cost after rebates.
19      Q.  Uh-huh.  Did it include the ingredient
20   cost of the drug?
21      A.  Yes.
22      Q.  Did it include any servicing fees or

---

24

1   dispensing fees associated with the drug?
2      A.  I don't recall.
3      Q.  And you said it included the rebates --
4      A.  Uh-huh.
5      Q.  -- for manufacturers?  Was there anything
6   else that was included in that cost?
7      A.  Not that I recall.
8      Q.  Was any consideration given to any other
9   incentives provided by the pharmacy benefit manager
10   at that time?
11      A.  No.
12      Q.  Aside from Pharmacare, did any other of
13   the PBMs that were competing for Harvard's business
14   submit a similar analysis?
15          MR. NALVEN:  Objection.
16      A.  Not that I recall, no.
17      Q.  So, is it fair to say that at that time
18   Harvard Pilgrim was considering whether to delegate
19   the rebate function to Pharmacare, but based upon
20   its economic analysis, concluded that it would
21   retain that function internally?
22          MR. HORGAN:  Objection.

---

25

1      A.  Yes.
2      Q.  And again, to your knowledge, has Harvard
3   Pilgrim done such an analysis at any other point in
4   time?
5          MR. NALVEN:  Note my objection, please.
6      A.  I don't recall that we have.
7      Q.  So, when you set up the Harvard rebate
8   program in 1998, did you enter into contracts with
9   manufacturers at that time?
10      A.  Yes.
11      Q.  How were the rebates that Harvard Pilgrim
12   was to get under those contracts calculated, to
13   your recollection?
14      A.  They were a discount off of WAC.
15      Q.  Do you recall what the range of discounts
16   off of WAC that Harvard Pilgrim received on those
17   contracts?
18          MR. NALVEN:  Objection.
19      A.  1 percent to 90 percent.
20      Q.  On what drugs did Harvard Pilgrim receive
21   a rebate of up to 90 percent?
22          MR. HORGAN:  Objection.

---

James T. Kenney                                             September 20, 2004
Wellesley, MA

8 (Pages 26 to 29)

---

26

1    A.  Generics.
2    Q.  At that time did you give any
3  consideration to basing the rebate calculation off
4  of AWP instead of WAC?
5        MR. HORGAN:  Objection.  At what time?
6    Q.  At the time they created the rebate
7  program in 1988 -- '98.  Are you talking 1998 or
8  1988?
9    A.  '88.
10   Q.  1988.
11   A.  Can you repeat that question.
12   Q.  Sure.  At the time that you established
13  the Harvard rebate program in 1988, did you give
14  any consideration to calculating the rebates from
15  manufacturers off of an AWP rather than off of WAC?
16   A.  The -- no.
17   Q.  Did you request from manufacturers any
18  bids or proposals with respect to the rebates they
19  were willing to offer?
20   A.  Yes.
21        MR. HORGAN:  Objection.
22   Q.  How did that process work?

---

27

1    A.  We'd meet with a representative of the
2  company and asked them for a rebate contract on one
3  of their products.
4    Q.  Uh-huh.  Did you determine, before meeting
5  with the manufacturers, which otherwise
6  functionally-equivalent drugs were the competitors
7  of that manufacturer?
8    A.  Yes.
9    Q.  And for all those competitive drugs, did
10  you request manufacturers of those drugs to submit
11  proposals with respect to the rebates they were
12  willing to offer?
13        MR. HORGAN:  Objection.
14   A.  I can't say for sure if it was done every
15  time.
16   Q.  Let me ask it slightly differently.  In
17  connection with requesting rebates from
18  manufacturers, did you offer, as a quid pro quo, a
19  formulary access or a preferred formulary listing?
20        MR. HORGAN:  Objection.
21   A.  Sometimes, yes.
22   Q.  In what circumstances would you offer that

---

28

1  formulary status?
2        MR. HORGAN:  Objection.
3    A.  If that status existed.
4    Q.  And when would that status exist?
5    A.  When our pharmacy committee had made a
6  decision to put a drug on the formulary.
7    Q.  Is it fair to say that situation would
8  exist wherever there was otherwise clinically
9  equivalent and efficacious drugs?
10        MR. HORGAN:  Objection.
11   A.  No.
12   Q.  No.  In a situation where you had
13  otherwise clinically, efficacious, and safe drugs,
14  when wouldn't the proposal to provide preferential
15  or access to the formulary exist?
16        MR. HORGAN:  Objection.
17   A.  I'm not sure I understand the question.
18   Q.  I asked you whether this happens --
19  whether there's always a situation where you could
20  provide or Harvard Pilgrim would provide
21  preferential formulary status to otherwise
22  functionally-equivalent drugs?

---

29

1    A.  Uh-huh.
2    Q.  And you indicated it didn't always happen.
3    A.  Uh-huh.
4    Q.  So, my question is, when didn't it happen?
5        MR. HORGAN:  Objection.
6    A.  When the drugs were unique.
7    Q.  Right.  Other than the situations in which
8  the drugs are otherwise unique, i.e., when the
9  drugs are otherwise functionally equivalent --
10   A.  Okay.
11   Q.  -- was there any situation where Harvard
12  Pilgrim did not offer some preferred formulary
13  listing in exchange for rebates?
14        MR. HORGAN:  Objection.
15   A.  I would say, yes.
16   Q.  What circumstances wouldn't Harvard
17  Pilgrim offer a preferred formulary listing for
18  otherwise functionally-equivalent drugs?
19        MR. HORGAN:  Objection.
20   A.  At that time, some manufacturers would
21  contract even though the drug wasn't in a preferred
22  position or have a -- you know, be on the

---

James T. Kenney

September 20, 2004

Wellesley, MA

9 (Pages 30 to 33)

| | 30 |
|---|---|
| 1 | formulary. |
| 2 | Q.  What was your understanding at the time as |
| 3 | to the reason why the manufacturers would contract |
| 4 | in that situation? |
| 5 | MR. HORGAN:  Objection. |
| 6 | A.  To get information data, claims data back |
| 7 | on the products. |
| 8 | Q.  Uh-huh.  So, as a quid pro quo for |
| 9 | providing claims data to the manufacturers, the |
| 10 | manufacturers would provide rebates to Harvard |
| 11 | Pilgrim, is that correct? |
| 12 | MR. HORGAN:  Objection. |
| 13 | A.  I don't know. |
| 14 | Q.  Well, when you said, "in exchange for |
| 15 | claims data," what are you referring to? |
| 16 | A.  Pharmacy claims data.  There may be a |
| 17 | reason.  I don't know.  I don't know their ultimate |
| 18 | reason. |
| 19 | Q.  Where would they be getting pharmacy |
| 20 | claims data from? |
| 21 | MR. HORGAN:  Objection. |
| 22 | A.  From our PBM.  Well, actually, from me, |

| | 32 |
|---|---|
| 1 | the data and then calculate the rebates due, |
| 2 | prepare an invoice.  In the past, it was all done |
| 3 | manually. |
| 4 | Q.  Uh-huh.  Does Harvard Pilgrim retain |
| 5 | complete control over its formulary? |
| 6 | A.  Yes. |
| 7 | Q.  Has it -- Harvard Pilgrim ever considered |
| 8 | delegating that responsibility or that control to a |
| 9 | PBM? |
| 10 | MR. HORGAN:  Objection. |
| 11 | A.  I don't know. |
| 12 | Q.  From your perspective, does Harvard |
| 13 | Pilgrim have the ability to control which of |
| 14 | otherwise functionally-equivalent drugs are |
| 15 | dispensed by pharmacies -- |
| 16 | MR. HORGAN:  Objection. |
| 17 | Q.  -- through its formulary? |
| 18 | A.  Define "control." |
| 19 | Q.  Influence the drugs that are dispensed by |
| 20 | the pharmacies. |
| 21 | MR. HORGAN:  Objection. |
| 22 | A.  Yes. |

| | 31 |
|---|---|
| 1 | but the data comes from the PBM. |
| 2 | Q.  So, in other words, in order to calculate |
| 3 | the amount of rebate Harvard Pilgrim would provide |
| 4 | the claims data to the manufacturers, is that |
| 5 | correct? |
| 6 | MR. HORGAN:  Objection. |
| 7 | A.  That's correct. |
| 8 | Q.  How has the Harvard Pilgrim rebate program |
| 9 | changed over time since 1988? |
| 10 | MR. NALVEN:  Objection.  The basis for the |
| 11 | objection is Harvard Pilgrim in 1988. |
| 12 | Q.  Uh-huh.  Okay.  When I refer to "Harvard |
| 13 | Pilgrim," I'm referring to Harvard Pilgrim Health |
| 14 | Plan's current entity, as well as its successors. |
| 15 | That would include Harvard Community.  Okay.  With |
| 16 | that said, you can answer the question. |
| 17 | A.  The only substantive change is to automate |
| 18 | the process. |
| 19 | Q.  Uh-huh.  When you say, "automate the |
| 20 | process," what do you mean? |
| 21 | A.  We have a contract system.  We can load |
| 22 | the contract in, and the contract system will take |

| | 33 |
|---|---|
| 1 | Q.  Have you been involved at all in |
| 2 | contracting with either manufacturers or pharmacies |
| 3 | or hospitals or physicians at an amount that is set |
| 4 | based -- in whole or part -- based on AWP? |
| 5 | A.  Yes. |
| 6 | Q.  In what context have you been involved in |
| 7 | that? |
| 8 | A.  Negotiations with pharmacies. |
| 9 | Q.  What is your involvement with pharmacy |
| 10 | negotiations? |
| 11 | A.  I negotiate the specialty pharmacy |
| 12 | contracts for Harvard Pilgrim. |
| 13 | Q.  When did Harvard Pilgrim first enter into |
| 14 | a specialty pharmacy contract? |
| 15 | MR. HORGAN:  Objection. |
| 16 | A.  I believe the date would be October 1st, |
| 17 | 2002. |
| 18 | Q.  Is that with the Accredo -- |
| 19 | MR. HORGAN:  Objection. |
| 20 | A.  Yeah, that would be with the Accredo. |
| 21 | Q.  What was the impetus for Harvard Pilgrim |
| 22 | to enter into the contract with Accredo in October |

James T. Kenney

September 20, 2004

Wellesley, MA

10 (Pages 34 to 37)

34

1  2002?
2       MR. HORGAN: Objection.
3       A.  The desire to better manage high-cost
4  injectable products.
5       Q.  How would entering into a contract with a
6  special pharmacy allow Harvard Pilgrim to do that?
7       A.  They had the most experience and
8  familiarity with these types of products.
9       Q.  So, how did the experience of the
10  specialty pharmacies allow Harvard Pilgrim to
11  control their costs?
12      A.  They provided patient care services for
13  select products -- case management, if you will,
14  compliance programs.
15      Q.  How did the specialty pharmacy contract
16  that Harvard entered into with Accredo -- did
17  Accredo supply drugs to physicians for
18  administration to Harvard members on an as-needed
19  basis?
20      MR. HORGAN: Objection.
21      A.  Yes.
22      Q.  So, under that program, is it fair to say

35

1  that the physician would never take title to the
2  drug that was administered to the Pilgrim member?
3       MR. HORGAN: Objection.
4       A.  Can you define what you mean by "take
5  title"?
6       Q.  Let me ask it differently.  When Harvard
7  Pilgrim provided reimbursement for drugs that were
8  administered to its members and acquired from a
9  specialty pharmacy, who -- what entity did Harvard
10  Pilgrim reimburse?
11      A.  The specialty pharmacy.
12      Q.  So, when you say that the contract with
13  the specialty pharmacies were based on AWP, the
14  contracts were providing for reimbursement by
15  Harvard Pilgrim to the specialty pharmacy at an
16  amount based upon AWP, is that right?
17      A.  That's correct.
18      Q.  What other specialty pharmacy contracts
19  has Harvard Pilgrim entered into aside from the
20  Accredo contract in October 2002?
21      A.  CuraScript.
22      Q.  When was that?

36

1       A.  Same time.  Freedom Drug.
2       Q.  When was that?
3       A.  I believe that was January of '03.
4       Q.  Uh-huh.
5       A.  And Village Pharmacy.
6       Q.  Is that Brookline Village Apothecary?
7       A.  That's correct.  Also the same time as
8  Freedom, January of '03.
9       Q.  Is it fair to say the Accredo and
10  CuraScript contracts covered injectible drugs, and
11  the Freedom and Brookline Village Apothecaries
12  covered infertility drugs?
13      MR. HORGAN: Objection.
14      A.  No.
15      Q.  Okay.  Why did Harvard Pilgrim enter into
16  contracts with four specialty pharmacy providers?
17      A.  Based on expertise.
18      Q.  What were the differing expertise of the
19  four specialty pharmacies?
20      A.  Village and Freedom specialized in
21  infertility.  And the other two were broad
22  service -- multiple products, multiple categories.

37

1       Q.  Did -- withdraw that.  Why did Harvard
2  Pilgrim enter into contracts with two different
3  specialty pharmacy providers for the provision of a
4  broad range of drugs?
5       A.  To allow for overlap in the event of a
6  service problem with one provider.
7       Q.  Would the same rationale apply with
8  respect to entering into two contracts, one with
9  Freedom, and the other with Brookline Village
10  Apothecary for fertility drugs?
11      A.  Yes.
12      Q.  What was the process by which you entered
13  into the contracts with Accredo and CuraScript?
14  Was it a bidding process?
15      A.  Yes.
16      Q.  Did Harvard Pilgrim send out an RFP?
17      A.  Yes.
18      Q.  How many responses did it get?
19      A.  I don't recall the exact number.  On
20  specialty, it was somewhere around 20.
21      Q.  Uh-huh.  Of the 20 responses to the
22  request for a proposal for specialty pharmacy

Henderson Legal / Spherion
(202) 220-4158

James T. Kenney                                    September 20, 2004
Wellesley, MA

38

1  contracts in October of 2002, what led Harvard
2  Pilgrim to eventually contract with Accredo and
3  CuraScript?
4      A.  It was the delivery model, service model,
5  the care management services, and the contract
6  pricing.
7      Q.  Uh-huh.  In connection with this bidding
8  process, did you compare those attributes across
9  all the 20 candidates?
10     MR. HORGAN:  Objection.
11     A.  Yes.
12     Q.  And were any of the other 20 candidates
13 cheaper with respect to the ultimate contract
14 pricing, but not as satisfactory with respect to
15 the other elements of the response?
16     A.  I don't recall.
17     Q.  Did Harvard Pilgrim engage in the same
18 bidding process with respect to the fertility
19 contracts it entered into in January 2003?
20     A.  Yes.
21     Q.  Do you recall how many responses to
22 Harvard Pilgrim's request for a proposal were

39

1  received at that time?
2      A.  Three.
3      Q.  Who was the third?
4      A.  IVP Care.
5      MR. HAAS:  Okay.  I'm going to mark a
6  series of contracts now as Harvard Pilgrim
7  Deposition Exhibits 1, 2 and 3 for the record.
8      (Discussion off the record.)
9      (Recess was taken.)
10     (HPH 449-489 marked Exhibit Kenney 001)
11     (HPH 490-535 marked Exhibit Kenney 002)
12     (HPH 417-439 marked Exhibit Kenney 003)
13     (HPH 398-416 marked Exhibit Kenney 004)
14     Q.  We've marked as Harvard Pilgrim Deposition
15 Exhibits 1, 2, 3, and 4 a series of agreements.
16 The first is a document titled, "Accredo Pharmacy
17 Services Agreement."  It's Bates stamped HPH 449
18 through 489.
19     The second is a document titled,
20 "CuraScript Pharmacies Agreement."  It's Bates
21 stamped 490 through 535.  The third is a document
22 entitled, "Pharmacy Agreement."  It purports on its

40

1  face to be between Freedom Drug and Harvard Pilgrim
2  Health Care.  It's Bates stamped HPH 417 through
3  439.  And the fourth is an agreement that, on its
4  face, states, "Pharmacy Services Agreement."  It
5  purports to be Brookline Village Apothecary, Inc.
6  and Harvard Pilgrim Health Care.  It's Bates
7  stamped 398 through 416.
8      And for the record, Deposition Exhibit No.
9  1 also includes a series of amendments that are
10 annexed to the Accredo Pharmacy agreement.
11     Q.  Mr. Kenney, I'd ask that you take a look
12 at the documents that have been marked as Harvard
13 Pilgrim Deposition Exhibits 1, 2, 3, and 4, and
14 tell me whether you're familiar with them.  And if
15 so, what they are.
16     MR. HORGAN:  Take your time.
17     A.  (Witness reviews document.)  Okay.  I'm
18 ready for your question again, please.
19     Q.  Are you familiar with those documents?
20     A.  Yes.
21     Q.  What are they?
22     A.  These are the contracts that I negotiated

41

1  with each of the four parties here, Accredo,
2  CuraScript, Freedom, Brookline Village Apothecary.
3      Q.  Uh-huh.  Starting with the Accredo
4  contract, which we've marked as Harvard Pilgrim
5  Deposition Exhibit No. 1, does that agreement show
6  the rates at which Harvard Pilgrim agreed to
7  reimburse Accredo for drugs supplied to physicians
8  under this agreement?
9      A.  Yes.
10     Q.  Where does it show that?  I'll refer you
11 to HPH 461, if that helps you.
12     A.  The Schedule I, I believe, of the contract
13 specifies what we will reimburse Accredo for the
14 products.  And it's -- whether or not it's shipped
15 to the patient or the physician we pay the same
16 rate for a drug.
17     Q.  Uh-huh.
18     MR. NALVEN:  Note my objection to the
19 phrase, "supplied to the physician" in the prior
20 question.
21     Q.  In Schedule I there's a table with a
22 series of drugs listed, and toward the right of the

James T. Kenney                                      September 20, 2004
Wellesley, MA

12 (Pages 42 to 45)

---

42

1  table there is a column with percentages, which is
2  the fourth column from the right. And then the
3  second column to the right, there's another column
4  with percentages. I just can't read the top of
5  that column. Can you tell me what those two
6  columns represent in this table?
7      A.  Yes.
8      Q.  What do they represent?
9      A.  The fourth column in from the right is a
10 preferred discount rate. And the second column in
11 from the right is an exclusive discount rate.
12     Q.  What is a preferred discount rate as
13 differentiated from exclusive discount rate?
14     A.  Preferred would be not the only supplier
15 of specialty pharmacies to Harvard Pilgrim.
16     Q.  So, to the extent that any of these drugs
17 in this column are also supplied by another
18 specialty pharmacist, i.e., CuraScript, then is it
19 correct that Accredo would receive reimbursement
20 only under the -- at the rates in the column that
21 is entitled, "Preferred discount rate"?
22     MR. HORGAN:  Objection.

---

43

1      A.  No.
2      Q.  Okay. Can you explain to me how that
3  works.
4      A.  It's a pricing schedule based on how many
5  specialty pharmacies we do business with. So,
6  since we have more than one, we would refer to the
7  preferred column for pricing. If we were exclusive
8  with Accredo, we would refer to the exclusive.
9      Q.  One follow-up question in that regard:
10 Are there any of these drugs in this table for
11 which Accredo is the exclusive distributor --
12 withdraw that. Are there any drugs listed in this
13 table for which Accredo is the exclusive specialty
14 pharmacy for Harvard Pilgrim?
15     A.  Yes.
16     Q.  Which ones?
17     A.  Synergyst, all the growth hormones, which
18 are all the products in the second column that are
19 shown as "growth disorders --" actually, all
20 products on the first page, Accredo is the
21 exclusive specialty for those products. On the
22 second page, I'm not certain if they're exclusive

---

44

1  for any of these.
2      Q.  With respect to the drugs listed on the
3  first page then, is it correct that they would be
4  reimbursed at the rate set forth in the second
5  column from the right, which is, I believe you
6  mentioned, the exclusive discount rate?
7      A.  I'm not sure.
8      Q.  Now, with respect to these rates that are
9  reflected in these two columns, what are they
10 percentages of, and what do they represent?
11     A.  They represent a discount off of AWP.
12     Q.  Were these reimbursement discount rates,
13 i.e., discounts for the AWP, set through the
14 competitive bidding process that you described
15 earlier?
16     MR. NALVEN:  Objection to form.
17     A.  (Witness reviews document.)
18     MR. HORGAN:  Do you still have his
19 question in mind?
20     THE WITNESS:  Yeah, I do.
21     A.  The answer is no.
22     Q.  How were those rates set?

---

45

1      A.  They were negotiated with each supplier
2  after we determined they could meet the first two
3  criteria I gave you as to why we would look for a
4  specialty supplier --
5      Q.  Uh-huh.
6      A.  -- which was business service model, and
7  case management/care management capability.
8      Q.  Were those rates negotiated prior to the
9  time that a specialty pharmacy provider was
10 selected?
11     A.  No, we didn't negotiate the final rate
12 till we selected the finals.
13     Q.  Uh-huh. Let me back up then so we make
14 sure the record is clear. With respect to the
15 bidding process we discussed earlier whereby
16 Harvard Pilgrim selected two specialty pharmacists
17 out of a list of 20 to be its providers in October
18 of 2002, were the costs that the specialty
19 pharmacies would charge Harvard Pilgrim for the
20 drugs supplied to the doctors for administration to
21 Harvard Pilgrim's members a factor in deciding
22 which pharmacy to contract with?

---

James T. Kenney                                     September 20, 2004
Wellesley, MA

13 (Pages 46 to 49)

46

1          MR. HORGAN: Objection.
2      A.  Yes.
3      Q.  What disclosures did the pharmacies make
4  to Harvard Pilgrim in connection with that process?
5      A.  We requested a pricing proposal with their
6  RFP response.
7      Q.  How did the pricing proposal differ, if at
8  all, from the rates that were eventually negotiated
9  and formed the basis for Schedule I to the exhibit
10  marked as Deposition Exhibit No. 1?
11          MR. HORGAN: Objection.
12      A.  Select products were renegotiated at
13  different rates --
14      Q.  Uh-huh.
15      A.  -- after the original submission.
16      Q.  What percentage, roughly, of the drugs
17  listed here had prices or reimbursement rates that
18  were renegotiated after the bid was awarded?
19          MR. HORGAN: Objection.
20      A.  Less than 5 percent.
21      Q.  Okay.  So, it's fair to say for 95 percent
22  of these drugs the reimbursement rate was set or

47

1  determined through the competitive bidding process
2  we discussed earlier, correct?
3      A.  Yes.
4          MR. NALVEN: Note my objection.
5      Q.  Are any of these drugs listed on Schedule
6  I generics?
7      A.  (Witness reviews document.) No.
8      Q.  Under this agreement, is it accurate that
9  any generic drugs that were dispensed to --
10  withdraw the question.  Under this agreement, is it
11  accurate that any generic drugs that were supplied
12  by Accredo to physicians for administration to
13  Harvard Pilgrim's members would be reimbursed at
14  the lesser of Accredo's usual and customary charge
15  for MAC plus a dispensing fee?
16          MR. HORGAN: Objection.  Are you referring
17  to something in the contract?
18      A.  If you want to reference what I'm looking
19  at, it's on HPH 459, at the bottom of the page.
20          MR. HAAS: But I asked it more generally,
21  because it makes reference to what is on Schedule I
22  and what are versus what was not.  I asked a

48

1  foundational question, Were there any generics on
2  there?  And he said there were not.  So, that's why
3  I asked it in general terms.
4      Q.  But you may answer.
5      A.  (Witness reviews document.)  Yes, that's
6  correct.
7      Q.  Is there any way to -- back up.  Under
8  this agreement, has Accredo supplied any generic
9  drugs to physicians that have been administered to
10  Harvard Pilgrim's members?
11          MR. HORGAN: Objection.
12      A.  I don't know.
13      Q.  Is there any way of telling today whether
14  or not the generics that Accredo has provided to
15  Harvard Pilgrim's members under this agreement, if
16  any, were reimbursed at Accredo's usual and
17  customary charge or at MAC price?
18          MR. HORGAN: Objection.
19      A.  I'd have to look at detailed claims.
20      Q.  Is there any other way of making that
21  determination other than looking at the detailed
22  claims data?

49

1          MR. HORGAN: Objection.
2      A.  No.
3      Q.  What is your understanding of the term
4  "MAC"?
5      A.  It stands for maximum allowable cost.
6      Q.  Uh-huh.  And as used in this agreement,
7  when it refers to the PBM's MAC on page HPH 459,
8  what is that referring to?
9      A.  It refers to a MAC price that is set for a
10  specific generic drug.
11      Q.  Uh-huh.  When it references "the PBM's
12  MAC," was Accredo to use a MAC price or a MAC list
13  that was set by Harvard Pilgrim's PBM?
14      A.  Yes.
15      Q.  Who was the PBM at that time, do you
16  recall?
17      A.  MedImpact.
18      Q.  Uh-huh.  Do you have an understanding of
19  how MedImpact set the MAC lists that were utilized
20  by Harvard Pilgrim?
21      A.  I don't know.
22      Q.  Do you have any idea generally how MAC

James T. Kenney                                    September 20, 2004
                         Wellesley, MA

14 (Pages 50 to 53)

| 50 | 52 |
|---|---|
| 1   lists are created? | 1      A.  I'm not sure I understand the question. |
| 2       A.  Generally, an average pricing of | 2      Q.  Let me ask it differently.  Is there a |
| 3   generics -- | 3   particular reason why Harvard Pilgrim didn't set a |
| 4       Q.  Uh-huh. | 4   standard reimbursement rate for all drugs |
| 5       A.  -- based on the more than three suppliers, | 5   encompassed by this agreement and the amendments |
| 6   I think -- have to be at least four suppliers.  So, | 6   thereto? |
| 7   the average of the AWPs of the generics. | 7         MR. HORGAN:  Objection. |
| 8       Q.  What is the basis for your understanding | 8      A.  Yes. |
| 9   of how MAC prices are calculated? | 9      Q.  What was that reason? |
| 10      A.  Past knowledge of HCFA, MAC pricing, | 10     A.  Each product was negotiated at its own |
| 11  definitions from HCFA. | 11  rate with the supplier. |
| 12      Q.  Is it your understanding that in setting | 12     Q.  In setting reimbursement for drugs to the |
| 13  the CMS MAC prices that CMS factors into its MAC | 13  specialty pharmacy in 2002 and today, as a discount |
| 14  prices a series of variables, one of which is AWP? | 14  off of AWP, what was your understanding of the term |
| 15        MR. HORGAN:  Objection. | 15  "AWP"? |
| 16      A.  I don't know. | 16     A.  It was the price published by First Data |
| 17      Q.  Let me ask it in a better way, because | 17  Bank. |
| 18  that wasn't a very good question.  What is your | 18     Q.  Do you understand that AWP was a benchmark |
| 19  understanding of how CMS sets its MAC list? | 19  that was set as a markup over WAC? |
| 20      A.  I don't know. | 20        MR. HORGAN:  Objection. |
| 21        MR. HORGAN:  Objection. | 21     A.  No. |
| 22      A.  I don't know. | 22     Q.  Well, what was your understanding of how |

| 51 | 53 |
|---|---|
| 1       Q.  That's fair.  Have you had any discussions | 1   AWP was set -- if you have one? |
| 2   with MedImpact or any other PBM with respect to how | 2         MR. HORGAN:  Objection. |
| 3   they set their MAC prices or MAC lists? | 3      A.  I'm not sure. |
| 4       A.  Not that I recall. | 4      Q.  Sitting here today, do you have any |
| 5       Q.  Uh-huh.  What is your understanding of the | 5   understanding of how AWP is determined? |
| 6   term "usual and customary charge," as used in this | 6         MR. HORGAN:  Objection. |
| 7   agreement? | 7      Q.  Let me ask a different question.  Based |
| 8       A.  Their normal selling price. | 8   upon your experience as a purchaser -- |
| 9       Q.  I ask that you take a look at the Schedule | 9      A.  Uh-huh. |
| 10  I, which we've just been referring to, on Bates | 10     Q.  -- of drugs for a pharmacy, is it your |
| 11  stamp page HPH 461, as well as the amendment to | 11  understanding that AWP does not equal the cost at |
| 12  Accredo Pharmacy agreement, dated April 9th, 2004, | 12  which pharmacies can acquire drugs from either |
| 13  that has a similar but different table that's on | 13  manufacturers or wholesalers? |
| 14  page Bates stamped HPH 488. | 14        MR. HORGAN:  Objection. |
| 15        MR. HAAS:  And for the record, I'd just | 15     A.  I don't know that for sure. |
| 16  note that there is a range of percentage discounts | 16     Q.  Uh-huh.  Well, based upon your own |
| 17  listed in these two tables, and my question for the | 17  experience, is it fair to say that AWP represents, |
| 18  witness is -- | 18  you know, a significant markup over the price at |
| 19      Q.  -- why is there a range of discounts off | 19  which Harvard Pilgrim purchased drugs from |
| 20  of AWP provided for the different drugs over time? | 20  wholesalers or manufacturers? |
| 21        MR. HORGAN:  Objection. | 21        MR. HORGAN:  Objection. |
| 22        MR. NALVEN:  Objection. | 22     A.  Can you define "significant"? |

James T. Kenney
September 20, 2004
Wellesley, MA

15 (Pages 54 to 57)

54

1   Q.  Sure.  I believe you testified earlier
2   that for brand name drugs Harvard Pilgrim acquired
3   drugs from wholesalers at 2 percent to 4 percent
4   markup.  I believe that's right.
5       A.  2 percent.
6       Q.  2 percent markup.  So, let me ask the
7   question differently.  Is it fair to say that you
8   understood, based upon your experience purchasing
9   drugs from wholesalers, that a 2 percent markup
10  over WAC that AWP represented, typically, for brand
11  name drugs, an 18 to 23 percent markup above that?
12      MR. HORGAN:  Objection.
13      Q.  Above the price at which Harvard
14  Pilgrim --
15      A.  Yeah, I would --
16      Q.  -- acquired drugs?
17      MR. HORGAN:  Objection.
18      A.  I would say 14 to 23.
19      Q.  And would you agree that range of markup
20  was consistent with respect to most brand name
21  drugs?
22      MR. HORGAN:  Objection.

55

1       A.  Yes.
2       Q.  And based upon your experience contracting
3   with manufacturers on behalf of Harvard Pilgrim,
4   you understood that physicians and pharmacies could
5   acquire discounts and rebates from manufacturers
6   that would significantly lower their costs to well
7   below WAC, right?
8       MR. HORGAN:  Objection.
9       A.  I don't know that.
10      Q.  Well, didn't you testify earlier that in
11  your contracting with manufacturers for the
12  purchase of drugs from manufacturers that you were
13  able to acquire those drugs at amounts 2 percent to
14  50 or 60 percent below WAC for brand name drugs?
15      MR. HORGAN:  Objection.
16      A.  Yes.
17      MR. HORGAN:  I think part of the problem
18  is you're asking him to speak for all pharmacies --
19  other entities.  He's only worked in one.  He's
20  testified to --
21      Q.  What I'm trying to explore is really the
22  parameters of your understanding of AWP.  That's

56

1   why I'm asking it in sort of an indirect way, since
2   you testified you had limited knowledge directly.
3   So, what I'm trying to get is some of the
4   foundations of it.  And so, if I am being
5   confusing, that's really fundamentally what I'm
6   trying to do.  So, I apologize.
7       Are you aware, from you own personnel
8   experience, whether there has ever been a pharmacy
9   anywhere that has paid AWP for a drug -- for a
10  brand name drug?
11      A.  Yes.
12      Q.  Where?
13      A.  Athol, Massachusetts.
14      Q.  Where?
15      A.  Athol, Massachusetts.
16      Q.  Provide me the context for that.
17      A.  I worked as an intern --
18      Q.  Uh-huh.
19      A.  -- and they paid AWP for drugs.
20      Q.  When was that?
21      A.  Give me a minute.  1969, 1970.
22      Q.  Okay.  Let me go back to your background.

57

1   Can you just walk through -- post high school --
2   your education and employment history.  And give me
3   general terms what the dates were, where you
4   worked, and what your responsibilities were.
5       A.  Worked in Brewster's Pharmacy in Athol --
6       Q.  Uh-huh.
7       A.  -- as a clerk.  Then I went to pharmacy
8   school.  I worked there while I was in pharmacy
9   school.
10      Q.  Uh-huh.
11      A.  Actually, rephrase.  I did not work there
12  while I was in pharmacy school.  I apologize.  I
13  worked at Town Hall Pharmacy in Watertown,
14  Massachusetts while I was in pharmacy school.
15      Q.  What was your position there?
16      A.  Pharmacy intern.
17      Q.  Okay.
18      A.  I worked at CVS as a pharmacy intern.  I
19  worked at CVS as a registered pharmacist, and then
20  Harvard Community after that.
21      Q.  Okay.  Aside from the instance you
22  mentioned at Brewster's Pharmacy in Athol when you

James T. Kenney                                            September 20, 2004
Wellesley, MA

16 (Pages 58 to 61)

58

1  were a clerk in 1969 or 1970, are you aware of any
2  other instance whereby a pharmacy has paid AWP to
3  purchase a drug -- a brand name drug?
4      A.  No.
5          MR. HAAS:  Off the record.
6          (Discussion off the record.)
7      Q.  Turn with me to a document that's been
8  marked as Harvard Pilgrim Deposition Exhibit No. 3.
9  It's the contract between Harvard Pilgrim and
10  Freedom.  Turn with me to Page HPH 426, and you'll
11  note Exhibit A titled, "Infertility Medications and
12  Pricing," and they have a table at the top that
13  says, "Product and AWP Discount," and then below
14  they have a product and a fixed reimbursement
15  amount.  My question is simply this:  Do you have
16  an understanding as to why Harvard Pilgrim elected
17  to reimburse based upon the fixed reimbursement
18  around for those particular drugs?
19      A.  'Cause they were compounded products.
20      Q.  What does that mean?
21      A.  They were prepared and manufactured by the
22  pharmacy prior to dispensing.

59

1      Q.  So, why would that lead you to reimburse
2  at a fixed amount?
3      A.  Because they contain multiple ingredients,
4  so they couldn't be billed on an electronic claim
5  if there were multiple ingredients.  So, fixed
6  amount facilitated the billing process.
7      Q.  Are you responsible at all for contracting
8  for the mail order services provided to the Harvard
9  Pilgrim members?
10      A.  No.
11      Q.  Who handles that?
12      A.  Andrea Grande.
13      Q.  Do you know who, if any entity, provides
14  mail-order services for Harvard Pilgrim members?
15      A.  I believe it's Scrip Pharmacy.
16      Q.  Before Scrip Pharmacy, did any other
17  entity provide mail order services on behalf of
18  Harvard Pilgrim?
19      A.  Family Meds.
20      Q.  When did Harvard Pilgrim switch from
21  Family Meds to Scrip Pharmacy?
22      A.  I don't know.

60

1      Q.  Do you have any -- who is -- withdraw the
2  question.  Has Harvard Pilgrim contracted with an
3  entity known as Chronimed Pharmacy?
4      A.  Yes.
5      Q.  What is the nature of that relationship?
6      A.  I have a contract with Chronimed for -- I
7  believe it's for the drug, Fuzeon.
8      Q.  Is Chronimed another specialty pharmacy?
9      A.  Yes.
10      Q.  Was the contracted Chronimed pharmacy
11  entered into with a competitive bidding or
12  negotiation process?
13      A.  No.
14      Q.  How did you arrive at Chronimed as a
15  specialty pharmacy for that particular drug?
16      A.  They were the only pharmacy that could
17  dispense that drug.
18      Q.  As a consequence of -- well, withdraw the
19  question.  Would you agree with me that because
20  Chronimed was the sole provider of Fuzeon, they had
21  greater negotiating leverage with Harvard Pilgrim
22  with respect to the reimbursement rate that they

61

1  requested that they provide?
2          MR. NALVEN:  Objection.
3          MR. HORGAN:  Objection.
4      A.  I don't know.
5      Q.  Were you involved with negotiations with
6  Chronimed?
7      A.  I was.
8      Q.  Would you agree with me that Chronimed got
9  a relatively -- withdraw that question.  Would you
10  agree with me or is it fair to say that Chronimed
11  -- Cronimed's reimbursement rate for Fuzeon was
12  higher than the reimbursement rates afforded to
13  Accredo and CuraScript and Brookline and Freedom
14  for drugs under their agreement?
15          MR. HORGAN:  Objection.
16      A.  I mean, I don't know.
17          MR. HAAS:  Let's mark as Harvard Pilgrim
18  Deposition Exhibit No. 5 a document Bates stamped
19  HPH 536 through 544.
20          (HPH 536-544 marked Exhibit Kenney 005)
21      Q.  I ask that you take a look at what's been
22  marked as Harvard Pilgrim Deposition Exhibit No. 5,

James T. Kenney                                          September 20, 2004
                        Wellesley, MA

17 (Pages 62 to 65)

| 62 |
|---|
| 1 and tell me if you're familiar with the document. |
| 2 And if so, what it is. |
| 3    A. (Witness reviews document.) This is an |
| 4 agreement between Harvard Pilgrim and Chronimed to |
| 5 supply Fuzeon. |
| 6    Q. What was the reimbursement rate at which |
| 7 Harvard Pilgrim agreed to reimburse Chronimed for |
| 8 Fuzeon supplied to doctors for administration to |
| 9 Harvard Pilgrim members? |
| 10    A. This product is self-administered. I |
| 11 don't believe it goes to doctors, although I'm not |
| 12 sure. |
| 13    Q. Okay. What was the reimbursement rate at |
| 14 which Harvard Pilgrim agreed to reimburse Chronimed |
| 15 for Fuzeon? |
| 16    A. AWP minus 12 percent. |
| 17    Q. Uh-huh. Fair enough. Do you recall at |
| 18 all how that particular reimbursement rate was set? |
| 19    A. I requested a reimbursement rate. They |
| 20 submitted a rate, and we signed a contract. |
| 21    Q. Was there any negotiation over that rate? |
| 22    A. No. |

| 64 |
|---|
| 1 Exhibits 1 through 5 in this matter? |
| 2    A. Yes. |
| 3    Q. Do you recall also producing a one-page |
| 4 letter from ESI Specialty Services? |
| 5    A. Yes. |
| 6    Q. Were those documents all executed by |
| 7 Harvard Pilgrim in the regular course of business? |
| 8    A. Yes. |
| 9    Q. Do you maintain copies of all those |
| 10 documents in the regular course of business? |
| 11    A. Yes. |
| 12       MR. HAAS: I'll turn the questioning over |
| 13 to Plaintiffs' counsel now, reserving my right for |
| 14 follow-up. |
| 15          CROSS-EXAMINATION |
| 16 BY MR. NALVEN: |
| 17    Q. Good morning, Mr. Kenney. My name is |
| 18 David Nalven, and I represent the Plaintiffs in |
| 19 this action. You began work with Harvard Community |
| 20 Health Plan in what year? |
| 21    A. 1980. |
| 22    Q. Who is your current employer? |

| 63 |
|---|
| 1    Q. Did Harvard Pilgrim also enter into a |
| 2 specialty distribution services relationship with |
| 3 ESI Express Scripts? |
| 4    A. We did, yes. |
| 5    Q. And was that a contract for the |
| 6 reimbursement of the drug Prolastin and Somavert? |
| 7    A. Yes. |
| 8    Q. Is it accurate that under that agreement |
| 9 Harvard Pilgrim agreed to reimburse Express Script |
| 10 an amount of AWP minus 10 percent for Prolastin and |
| 11 Somavert supplied by Express Scripts to Harvard |
| 12 Pilgrim members? |
| 13    A. I don't recall the exact rate. |
| 14    Q. Uh-huh. Mr. Kenney, were you involved at |
| 15 all in the collection of documents that were |
| 16 produced to Defendants in this matter? |
| 17    A. Yes. |
| 18    Q. What was your involvement? |
| 19    A. I had a request from our attorneys to |
| 20 produce copies of specialty pharmacy agreements. |
| 21    Q. Uh-huh. And do you recall producing the |
| 22 documents that have been marked as Deposition |

| 65 |
|---|
| 1    A. Harvard Pilgrim Health Care. |
| 2    Q. And when did Harvard Pilgrim Health Care |
| 3 become your employer? |
| 4    A. I don't remember the exact date. |
| 5    Q. Was there an event that caused Harvard |
| 6 Pilgrim Health Care to become your current |
| 7 employer? |
| 8    A. Yes. |
| 9    Q. And what was that? |
| 10    A. It was the merger of Harvard Community |
| 11 Health Plan and Pilgrim Health Care. |
| 12    Q. And Harvard Community Health Plan and |
| 13 Harvard Pilgrim Health Care are different entities, |
| 14 aren't they? |
| 15    A. Yes. |
| 16    Q. They don't have any legal connection to |
| 17 each, are they? |
| 18    A. I don't know. |
| 19    Q. But they are separate and legal entities, |
| 20 aren't they? |
| 21       MR. HAAS: Objection to form. |
| 22       MR. HORGAN: Objection. |

James T. Kenney                                    September 20, 2004
                        Wellesley, MA

18 (Pages 66 to 69)

---

**66**

1    A.  Yes.
2    Q.  Now, when you worked for Harvard Community
3  health care, you said that you purchased
4  prescription drugs for the pharmacy at which you
5  worked.
6    A.  Yes.
7    Q.  And which pharmacy was that?  What was the
8  location?
9    A.  I worked in Cambridge, Massachusetts.
10   Q.  Where in Cambridge?
11   A.  1611 Cambridge Street, Cambridge,
12  Massachusetts.
13   Q.  Was that the only Harvard Community Health
14  Plan pharmacy that you worked at?
15   A.  No.
16   Q.  Did you work at other Harvard Community
17  Health Plan pharmacies?
18   A.  Yes.
19   Q.  Which ones?
20   A.  The pharmacy located in Medford,
21  Massachusetts.
22   Q.  Okay.

---

**67**

1    A.  I believe the address -- it's City Square
2  Mall, Medford, Mass.  I don't remember the exact
3  number.
4    Q.  Okay.  At the Medford Harvard Community
5  Health Plan location, did you play a role in the
6  purchase of prescription drugs?
7    A.  Yes.
8    Q.  Were there any other pharmacies that were
9  part of the Harvard Community Health Plan group
10  that you participated in the purchase of
11  prescription drugs at?
12   A.  No.
13   Q.  So, you participated in the purchase of
14  prescription drugs at two of the nine Harvard
15  Community Health Plan pharmacies?
16   A.  Yes.
17   Q.  And the other Harvard Community Health
18  Plan pharmacies each had a person who was
19  responsible for the purchase of prescription drugs
20  at each of those pharmacies, is that correct?
21   A.  I don't know that it was one person.  But
22  they were responsible for their own purchasing --

---

**68**

1  each site.
2    Q.  Separately.
3    A.  Right.
4    Q.  And do you -- you don't have any knowledge
5  with respect to the practices that they engaged in
6  in those other pharmacies with respect to purchases
7  of prescription drugs, do you?
8    A.  No.
9    Q.  Never saw their price lists?
10   A.  Yeah, I saw their pricing.
11   Q.  Okay.  Did you participate in the
12  negotiation of prescription drugs with respect to
13  the other Harvard Community Health Plan pharmacies?
14   A.  Yes.
15   Q.  How did you participate?
16   A.  While I was working in Medford, if I
17  negotiate a contract with a manufacturer, we
18  requested that the pricing be offered at our other
19  locations.
20   Q.  Okay.  So, your responsibility was -- your
21  direct responsibility was limited to the locations
22  that you worked at.  But you, in some cases, would

---

**69**

1  negotiate contracts that would affect other
2  pharmacies, is that correct?
3    A.  Yes.
4    Q.  Okay.  You were asked earlier about the
5  range of prices and the range of discounts off WAC
6  that you were able to obtain when you were
7  purchasing products for the pharmacies that you
8  worked at.  Do you remember that?
9    A.  Yes.
10   Q.  Now, when you were asked about the range,
11  were you recalling particular drugs that were at
12  one end of the range or the other?
13   A.  No, just all drugs.
14   Q.  General range?
15   A.  Uh-huh.
16   Q.  And just so the record is clear, what
17  years are we talking about when you were
18  participating in the direct negotiation of
19  prescription drug purchases?
20       MR. HAAS:  Objection to form.
21   A.  Range would be --
22   Q.  The years.

---

70
1    A.  Yeah.  I'm trying to recall.  '85, '86,
2  '87, somewhere in that range.
3    Q.  Okay.  So, somewhere between, say, 16 and
4  19 years ago, is that correct?
5    A.  That's correct.
6    Q.  And since that time, have you gone back
7  and looked at the contracts that you negotiated
8  when you were working in Cambridge or Medford?
9    A.  No.
10   Q.  Have you gone back and looked at the price
11  lists from the Cambridge and Medford days?
12   A.  No.
13   Q.  Do you have currently in your files the
14  contracts that you participated in negotiating 16
15  to 19 years ago?
16   A.  No.
17   Q.  So, when you said 10 to 90 percent, it was
18  really based on your recollection today of
19  negotiation from 16 to 19 years ago, is that
20  correct?
21   A.  That's correct.
22   Q.  You were asked about the range -- you

71
1  weren't asked about averages.  Did you ever have
2  any occasion to develop sort of an average discount
3  off WAC?
4    A.  No.
5    Q.  As you sit here today, you don't know what
6  the average would be?
7    A.  No.
8    Q.  Are the actual contracts that you
9  participated in working out on behalf of Harvard
10  Community Health Plan 16 to 19 years ago, are they
11  currently in the possession of Harvard Pilgrim
12  Health Care?
13   A.  No, not to my knowledge.
14   Q.  Where do you think they are?
15   A.  I don't know.
16   Q.  Would you have --
17   A.  I mean, they -- I don't know.  They'd be
18  at this -- at the pharmacy, I guess.  I don't
19  know -- if anywhere.
20   Q.  When you say, "the pharmacy," you mean --
21  I don't know what you mean by that.
22   A.  At Medford, for example.

72
1    Q.  Does that pharmacy still exist?
2    A.  Yes.
3    Q.  You were asked earlier about how CMS
4  determines MAC.
5    A.  Uh-huh.
6    Q.  And I think you had said that it was based
7  on an average of AWPs.
8      MR. HAAS:  Objection to the form,
9  construction --
10   A.  That was in reference to HCFA.
11   Q.  When you say, "HCFA," what do you mean?
12   A.  Meaning before HCFA became CMS.  I don't
13  know what the current CMS formulas look like today.
14   Q.  Okay.  Fair enough.  So, what period of
15  time were you talking about when you responded to
16  the question concerning how MAC was determined?
17   A.  Maybe five years ago.
18   Q.  You were also asked whether you were aware
19  of another pharmacy that paid AWP for its
20  prescription drugs.  Do you remember that?
21   A.  Uh-huh.
22   Q.  And you referred to a pharmacy in Athol

73
1  when you were an intern.
2    A.  (Witness nods.)
3    Q.  Now, are you aware of what -- currently --
4  what any other pharmacies -- strike that.  Are you
5  aware currently of what any other purchasers of
6  prescription drugs pay for their prescription
7  drugs?
8    A.  No.
9    Q.  You don't know what CVS pays, do you?
10   A.  No.
11   Q.  Or other third-party payers, do you?
12   A.  No.
13   Q.  Do you know what consumers pay for
14  prescription drugs?
15   A.  No.
16   Q.  Other insurance companies?
17   A.  No.
18   Q.  So, when you said you were not aware of
19  any other purchaser other than the Athol pharmacy
20  that paid AWP, and you said no, the reason you
21  answered no is because you don't know what anybody
22  else pays for its prescription drugs, is that

James T. Kenney                                    September 20, 2004
                    Wellesley, MA

20 (Pages 74 to 77)

---

**74**

1    correct?
2         MR. HAAS: Objection.
3         A. That's correct.
4         Q. With respect to your specialty pharmacy
5    contracts, the rates that are -- reimbursement
6    rates that are paid to Brookline Village Apothecary
7    and Freedom Drug, as set forth in the contracts
8    that are identified as Exhibits 3 and Exhibits 4,
9    those rates are identical, aren't they?
10        A. Yes.
11        Q. Why is it that they're identical?
12        MR. HORGAN: Objection.
13        A. Because I set the rates. I negotiated
14   those rates.
15        Q. And why is it that you determined that
16   they were to be identical?
17        MR. HORGAN: Objection.
18        A. They were determined to be identical,
19   because we bid out the business as a dual award to
20   two pharmacies.
21        Q. So, as between the two pharmacies, there
22   was no competition based on rates.

---

**75**

1         MR. HAAS: Objection.
2         MR. HORGAN: Objection.
3         A. That's correct.
4         Q. And you were asked earlier with respect to
5    negotiation of rebates whether you ever had
6    considered negotiating a rebate off of AWP as
7    opposed to WAC. Do you remember that question?
8         A. Yes.
9         Q. And you answered that you hadn't
10   considered that.
11        A. Correct.
12        Q. And why is that?
13        MR. HORGAN: Objection.
14        MR. HAAS: Objection.
15        A. The contracts offered from all the
16   manufacturers use WAC as the reference.
17        Q. Okay. Now, you understand that AWP is a
18   number that comes from First Data Bank and other
19   sources. Is that your understanding?
20        MR. HORGAN: Objection.
21        MR. HAAS: Objection. Same objection.
22        A. I understand that they publish that price.

---

**76**

1         Q. Have you ever received any information
2    from the AWP publishers, Redbook, Medi-Span,
3    concerning how AWP is set?
4         A. No.
5         Q. You have no direct knowledge as to how
6    they determine AWP one way or another, is that
7    correct?
8         A. That's correct.
9         Q. Did you ever meet with the Redbook people?
10        A. No, not that I recall.
11        Q. Does Harvard Community Health Plan then --
12   you have a subscription to Redbook?
13        A. Yes, we do.
14        Q. And so, you get the AWPs based on the
15   published number.
16        A. That's one of the sources, yes.
17        Q. What other sources?
18        A. First Data Bank.
19        Q. That is, you get the AWP information from
20   the third-party sources?
21        A. Correct.
22        Q. Do you ever receive AWP information from

---

**77**

1    manufactures?
2         A. Sometimes.
3         Q. What instances are you thinking of?
4         A. We'll get a notice of a new medication,
5    and there will be kind of an informational sheet
6    that says, Here's the drug. Here's the NDC number.
7    Here's the AWP price.
8         Q. Okay. Is that regularly how
9    pharmaceutical manufacturers let purchasers know
10   what the list price and what the AWP will be?
11        MR. HAAS: Objection to form.
12        A. I mean, I don't know for certain.
13        Q. But that's one of the ways that you
14   receive AWP information.
15        A. Correct.
16        Q. Okay. Now, in your negotiation with
17   prescription drug manufacturers, do you ever
18   receive information from those manufacturers as to
19   what their costs of -- their actual costs of
20   production are?
21        A. No.
22        Q. Are you ever provided with information as

---

78
1  to what the prices are that they sell -- they
2  actually sell their products for?
3       MR. HORGAN: Objection.
4       A.  Yes.
5       Q.  What sort of information have you received
6  from manufacturers concerning actual prices?
7       A.  I get a price list or a catalog with the
8  price.
9       Q.  But you understand the -- and you
10 understand the price list or the catalog list to be
11 the actual price that the manufacturer sells the
12 product for, is that correct?
13      MR. HAAS: Objection to form.
14      A.  To the group that the price list
15 represents.  So, if it's a, you know, hospital
16 price list, this is the price to hospitals, that
17 type of thing, yes.
18      Q.  So, have you ever received a price list
19 directed to third-party payers that is different
20 from a price list that you've also received to
21 other kinds of purchasers?
22      A.  No.

79
1       Q.  If you had received information concerning
2  how pharmaceutical manufacturers price their
3  products with respect to all purchasers, could you
4  have done a better job in negotiating prices for
5  Harvard Community Health Plan and its members?
6       MR. HAAS: Objection.  Hypothetical.
7       MR. HORGAN: Objection.
8       A.  I don't know.
9       Q.  The more information you have concerning
10 the manufacturers' price, the easier it is for you
11 to get a good price, isn't it?
12      MR. HAAS: Objection to form.
13      MR. HORGAN: Objection.
14      A.  I would say no.
15      Q.  Why would you say that?
16      A.  Because the manufacturers are subject to
17 government rebates, which has an impact on price.
18      Q.  Okay.  So, let me ask you this:  If you
19 had information from prescription-type drug makers
20 as to what their costs are, what they charge
21 government purchasers, what they charge double
22 purchasers, would that help you as a purchaser in

80
1  determining what price you should negotiate for
2  Harvard Community Health Plan members and Harvard
3  Pilgrim members?
4       MR. HAAS: Objection to form.
5       MR. HORGAN: Objection.
6       A.  I'm not sure.
7       Q.  Okay.
8       MR. NALVEN:  Thank you.  I have nothing
9  further.
10      REDIRECT EXAMINATION
11 BY MR. HAAS:
12      Q.  I just have one follow-up question with
13 respect to the questions of Plaintiffs' counsel.
14 Who at Harvard Community was responsible for
15 contracting with manufacturers and wholesalers
16 during the 1990s for Harvard Community-staffed HMO
17 pharmacies?
18      A.  That would be Ken Kazarosian.
19      Q.  And what is his position today?
20      A.  He's a -- I was just talking to him.  I
21 believe it's pharmacy contracts consultant is his
22 title.

81
1       Q.  So, it's fair to say that he was involved
2  in purchasing of drugs from manufacturers and
3  wholesalers on behalf of Harvard Community during
4  the 1990s, and he currently is responsible for
5  involved with the negotiation or contracting with
6  pharmacies for reimbursement by Harvard Pilgrim to
7  the pharmacies, is that correct?
8       MR. HORGAN: Objection to form.
9       A.  No.
10      Q.  I'm just trying to seek clarification as
11 to his positions.  Please explain to me his role
12 during the 1990s with respect to contracting with
13 manufacturers for the purchase of drugs or purchase
14 from wholesalers of drugs on behalf of the staff
15 model HMO and his role today in pharmacy
16 contracting.
17      A.  Okay.  The role in the early '90s was to
18 negotiate contracts with manufacturers.  And then
19 those contracts were extended to the staff model
20 pharmacies, and each pharmacy operated
21 independently in terms of all its own purchasing.
22 So, Ken never placed any orders.  He just

James T. Kenney                                  September 20, 2004
Wellesley, MA

22 (Pages 82 to 83)



82

1   negotiated a contract rate, then it was made
2   available to the sites for purchase or for use.
3       Q.  Uh-huh.
4       A.  His role today, he continues to negotiate
5   contracts on behalf of the closed-clinic
6   pharmacies.  And it's the same basic arrangement.
7   Each pharmacy chooses which drugs to buy.  They
8   purchase off of the Harvard Pilgrim contract.
9       Q.  When you refer to "closed-clinic
10  pharmacies," what are you referring to?
11      A.  The pharmacies that are restricted to
12  Harvard Pilgrim members only.
13          MR. HAAS:  Okay.  No further questions.
14          MR. NALVEN:  Nothing further.
15          (Whereupon the deposition ended at
16          12:50 p.m.)
17
18
19
20
21
22

83

1   Commonwealth of Massachusetts
2   Middlesex, ss.
        I, P. Jodi Ohnemus, Notary Public
3   in and for the Commonwealth of Massachusetts,
4   do hereby certify that there came before me
    on the 20th day of September, 2004, the deponent
5   herein, who was duly sworn by me; that the ensuing
6   examination upon oath of the said deponent was
    reported stenographically by me and transcribed
7   into typewriting under my direction and control;
    and that the within transcript is a true record of
8   the questions asked and answers given at said
9   deposition.
        I FURTHER CERTIFY that I am neither
10  attorney nor counsel for, nor related to or
11  employed by any of the parties to the action
    in which this deposition is taken; and, further,
12  that I am not a relative or employee of any
13  attorney or financially interested in the outcome
    of the action.
14      IN WITNESS WHEREOF I have hereunto set my
    hand and affixed my seal of office this
15  20th day of September, 2004, at Waltham.

16  _____

17  _____
            P. Jodi Ohnemus, RPR, RMR, CRR
18          Notary Public,
19          Commonwealth
20          of Massachusetts
21          My Commission Expires:
22          4/21/2007

James T. Kenney

September 20, 2004

Wellesley, MA

1

**A**

ability 32:13
able 55:13 69:6
about 22:1
  69:4,10,17
  70:22 71:1
  72:3,15
above 12:8
  15:3,6 54:11
  54:13
access 27:19
  28:15
Accredo 33:18
  33:20,22
  34:16,17
  35:20 36:9
  37:13 38:2
  39:16 40:10
  41:1,3,7,13
  42:19 43:8
  43:11,13,20
  47:12 48:8
  48:14 49:12
  51:12 61:13
Accredo's
  47:14 48:16
accurate 47:8
  47:11 63:8
acquire 10:4
  10:13 53:12
  55:5,13
acquired 12:3
  12:14 13:15
  14:19 15:3,7
  35:8 54:2,16
acquisition
  15:22
across 38:8
action 64:19
  83:11,13
ACTIONS
  1:10
actual 71:8
  77:19 78:6

78:11
actually 30:22
  43:19 57:11
  78:2
address 67:1
administered
  10:12 13:11
  13:17 18:3
  35:2,8 48:9
administrati...
  17:19 18:2
  34:18 45:20
  47:12 62:8
affect 69:1
affixed 83:14
afforded 61:12
after 6:22
  23:18 45:2
  46:15,18
  57:20
again 15:12
  19:10,19
  20:10 25:2
  40:18
ago 9:13 20:9
  70:4,15,19
  71:10 72:17
agree 54:19
  60:19 61:8
  61:10
agreed 5:2,8
  41:6 62:7,14
  63:9
agreement
  39:17,20,22
  40:3,4,10
  41:5,8 47:8
  47:10 48:8
  48:15 49:6
  51:7,12 52:5
  61:14 62:4
  63:8
agreements
  13:9 39:15

63:20
all 1:10 5:8
  10:18 12:16
  12:17 27:9
  32:2 33:1
  38:9 43:17
  43:18,19
  46:8 52:4
  55:18 59:7
  62:18 63:15
  64:6,9 69:13
  75:15 79:3
  81:21
allow 34:6,10
  37:5
allowable 49:5
also 6:15 36:7
  40:9 42:17
  63:1 64:3
  72:18 78:20
although 62:11
always 28:19
  29:2
am 56:4 83:9
  83:12
amendment
  51:11
amendments
  40:9 52:5
Americas 2:16
amount 16:13
  31:3 33:3
  35:16 58:15
  59:2,6 63:10
amounts 55:13
analysis 8:17
  8:19 18:7,12
  18:18,21
  22:5,11,22
  23:10 24:14
  24:20 25:3
Andrea 59:12
annexed 40:10
another 42:3

42:17 60:8
  72:19 76:6
answer 8:11
  12:6 31:16
  44:21 48:4
answered
  73:21 75:9
answers 83:8
any 7:17,20,22
  11:19 14:8
  14:17,22
  16:4 17:5,10
  17:11,16,21
  19:2 20:12
  20:15,21
  22:5 23:22
  24:8,8,12
  25:3 26:2,14
  26:17 29:11
  38:12 42:16
  43:10,12
  44:1 47:5,9
  47:11 48:1,7
  48:8,13,16,20
  49:22 51:1,2
  53:4 58:1
  59:13,16
  60:1 62:21
  65:16 67:8
  68:4 71:2
  73:4,5,19
  76:1 81:22
  83:11,12
anybody 73:21
anyone 21:16
  21:21
anything 24:5
anywhere 56:9
  71:19
apologize 56:6
  57:12
Apothecaries
  36:11
Apothecary

36:6 37:10
  40:5 41:2
  74:6
APPEARAN...
  2:1 3:1
applicable
  1:15
apply 37:7
April 51:12
aren't 65:14,20
  74:9
around 19:5
  20:9,10
  37:20 58:18
arrangement
  82:6
arrive 60:14
aside 7:16
  24:12 35:19
  57:21
ask 18:16
  27:16 35:6
  40:11 50:17
  51:9 52:2
  53:7 54:6
  61:21 79:18
asked 27:2
  28:18 47:20
  47:22 48:3
  69:4,10
  70:22 71:1
  72:3,18 75:4
  83:8
asking 55:18
  56:1
assistant 6:10
  6:16,18
associated 24:1
as-needed
  34:18
Athol 56:13,15
  57:5,22
  72:22 73:19
attorney 83:10

James T. Kenney                                    September 20, 2004
Wellesley, MA

2

| | | | | |
|---|---|---|---|---|
| 83:13 | 56:22 70:6 | 50:17 59:3 | 79:4 | **C** |
| **attorneys** | 70:10 | 60:19 73:21 | **between** 5:2 | **calculate** 31:2 |
| 63:19 | **background** | 74:13,19 | 7:5 14:9 40:1 | 32:1 |
| **attributes** 38:8 | 56:22 | 79:16 | 58:9 62:4 | **calculated** |
| **automate** | **BACON** 3:17 | **become** 65:3,6 | 70:3 74:21 | 23:13 25:12 |
| 31:17,19 | **Bank** 52:17 | **been** 5:12 6:1 | **bid** 46:18 | 50:9 |
| **available** 14:5 | 75:18 76:18 | 19:22 33:1,6 | 74:19 | **calculating** |
| 15:14 82:2 | **based** 11:19 | 40:12 48:9 | **bidding** 21:6 | 26:14 |
| **Aventis** 3:22 | 14:22 16:12 | 51:10 56:8 | 37:14 38:7 | **calculation** |
| **Avenue** 2:16 | 24:19 33:4,4 | 58:7 61:21 | 38:18 44:14 | 26:3 |
| **average** 1:6 | 35:13,16 | 63:22 | 45:15 47:1 | **called** 1:13 |
| 50:2,7 71:2,6 | 36:17 43:4 | **before** 1:15 5:5 | 60:11 | **Cambridge** 2:7 |
| 72:7 | 50:5 53:7,16 | 27:4 59:16 | **bids** 26:18 | 66:9,10,11,11 |
| **averages** 71:1 | 54:8 55:2 | 72:12 83:4 | **billed** 59:4 | 70:8,11 |
| **award** 74:19 | 58:17 70:18 | **began** 64:19 | **billing** 59:6 | **came** 83:4 |
| **awarded** 46:18 | 72:6 74:22 | **beginning** | **Boston** 3:6 | **can** 8:11 12:6 |
| **aware** 20:18 | 76:14 | 21:12 | **bottom** 47:19 | 12:16 21:12 |
| 21:2 56:7 | **basic** 82:6 | **behalf** 1:14 | **Boylston** 3:5 | 26:11 31:16 |
| 58:1 72:18 | **basing** 26:3 | 13:1 15:20 | **brand** 12:11 | 31:21 35:4 |
| 73:3,5,18 | **basis** 31:10 | 55:3 59:17 | 12:12 14:10 | 42:5 43:2 |
| **AWP** 26:4,15 | 34:19 46:9 | 71:9 81:3,14 | 15:4 54:2,10 | 53:12,22 |
| 33:4 35:13 | 50:8 | 82:5 | 54:20 55:14 | 57:1 |
| 35:16 44:11 | **basket** 23:13 | **being** 56:4 | 56:10 58:3 | **candidates** |
| 44:13 50:14 | 23:14 | **believe** 11:10 | **branded** 12:18 | 38:9,12 |
| 51:20 52:14 | **Bates** 39:17,20 | 33:16 36:3 | **Brewster's** | **can't** 27:14 |
| 52:15,18 | 40:2,6 51:10 | 41:12 44:5 | 57:5,22 | 42:4 |
| 53:1,5,11,17 | 51:14 61:18 | 54:1,4 59:15 | **broad** 36:21 | **capability** 45:7 |
| 54:10 55:22 | **be** 15:14 22:6 | 60:7 62:11 | 37:4 | **care** 1:13,20 |
| 56:9,19 58:2 | 22:12 23:3 | 67:1 80:21 | **Brookline** 36:6 | 3:9,15 5:22 |
| 58:13 62:16 | 29:22 30:16 | **BELKNAP** | 36:11 37:9 | 34:12 38:5 |
| 63:10 72:19 | 30:19 33:16 | 2:13 | 40:5 41:2 | 39:4 40:2,6 |
| 73:20 75:6 | 33:20 40:1,5 | **below** 12:8,10 | 61:13 74:6 | 65:1,2,6,11 |
| 75:17 76:2,3 | 42:14 44:3 | 15:6 55:7,14 | **business** 24:13 | 65:13 66:3 |
| 76:6,19,22 | 45:17 47:13 | 58:13 | 43:5 45:6 | 71:12 |
| 77:7,10,14 | 50:6 59:4 | **benchmark** | 64:7,10 | **Caremark** |
| **AWPs** 50:7 | 68:18 69:21 | 11:19,22 | 74:19 | 18:10 19:6 |
| 72:7 76:14 | 71:6,17 | 14:22 16:12 | **but** 20:10 | 19:15 |
| **a.m** 1:22 | 74:16,18 | 52:18 | 24:19 31:1 | **case** 34:13 45:7 |
| | 77:5,10 | **benefit** 17:11 | 38:14 47:20 | **cases** 68:22 |
| **B** | 78:10 80:18 | 17:19 18:1,2 | 48:4 51:13 | **catalog** 78:7,10 |
| **b** 1:15 4:9 | **became** 6:22 | 24:9 | 65:19 67:21 | **categories** |
| **back** 7:8 9:18 | 9:12 16:17 | **BERMAN** 2:3 | 68:22 77:13 | 36:22 |
| 21:11 30:6 | 22:20 72:12 | **better** 22:12 | 78:9 | **Cause** 58:19 |
| 45:13 48:7 | **because** 47:21 | 34:3 50:17 | **buy** 82:7 | **caused** 65:5 |

James T. Kenney

September 20, 2004

Wellesley, MA

3

| | | | | |
|---|---|---|---|---|
| **central** 11:4 | 72:12,13 | **compare** 38:8 | 80:21 | 81:19 82:5 |
| **certain** 20:10 | **collection** | **compendia** | **consumers** | **control** 32:5,8 |
| 43:22 77:12 | 63:15 | 16:5 | 73:13 | 32:13,18 |
| **Certified** 1:16 | **column** 42:1,2 | **competing** | **contain** 59:3 | 34:11 83:7 |
| 1:17 | 42:3,3,5,9,10 | 24:13 | **context** 33:6 | **CONT'D** 3:1 |
| **certify** 83:4,9 | 42:17,20 | **competition** | 56:16 | **converted** |
| **change** 31:17 | 43:7,18 44:5 | 74:22 | **continues** 82:4 | 22:17 |
| **changed** 31:9 | **columns** 42:6 | **competitive** | **contract** 8:9 | **copies** 63:20 |
| **charge** 45:19 | 44:9 | 27:9 44:14 | 17:11,18 | 64:9 |
| 47:14 48:17 | **come** 16:16 | 47:1 60:11 | 18:11,17 | **correct** 7:15 |
| 51:6 79:20 | 19:14 20:4 | **competitors** | 27:2 29:21 | 10:2 11:11 |
| 79:21 | 22:10 | 27:6 | 30:3 31:21 | 14:11 30:11 |
| **charged** 16:1 | **comes** 31:1 | **complete** 32:5 | 31:22,22 | 31:5,7 35:17 |
| **cheaper** 38:13 | 75:18 | **compliance** | 33:14,22 | 36:7 42:19 |
| **chief** 6:16,18 | **commencing** | 34:14 | 34:5,15 | 44:3 47:2 |
| **chooses** 82:7 | 1:22 | **components** | 35:12,20 | 48:6 67:20 |
| **Chronimed** | **Commission** | 23:17 | 38:2,5,13 | 69:2 70:4,5 |
| 60:3,6,8,10 | 83:21 | **compounded** | 41:4,12 | 70:20,21 |
| 60:14,20 | **committee** | 58:19 | 45:22 47:17 | 74:1,3 75:3 |
| 61:6,8,10 | 28:5 | **concerning** | 58:9 60:6 | 75:11 76:7,8 |
| 62:4,7,14 | **Commonwe...** | 72:16 76:3 | 62:20 63:5 | 76:21 77:15 |
| **circumstances** | 1:18 83:1,3 | 78:6 79:1,9 | 68:17 82:1,8 | 78:12 81:7 |
| 27:22 29:16 | 83:19 | **conclude** 22:22 | **contracted** 8:5 | **cost** 15:22 |
| **City** 3:20 67:1 | **Community** | **concluded** | 8:13 17:22 | 16:13,15 |
| **Civil** 1:15 | 7:13,17,21 | 24:20 | 18:5 60:2,10 | 23:14,16,17 |
| **claim** 59:4 | 8:9 9:1,5,15 | **conclusion** | **contracting** | 23:18,20 |
| **claims** 8:13,16 | 17:2,4,10,17 | 23:11 | 10:19 33:12 | 24:6 49:5 |
| 18:14 30:6,9 | 17:18 18:11 | **confusing** 56:5 | 55:2,11 59:7 | 53:11 |
| 30:15,16,20 | 18:22 19:7 | **connection** | 80:15 81:5 | **costs** 16:9 |
| 31:4 48:19 | 19:15 20:6 | 27:17 38:7 | 81:12,16 | 34:11 45:18 |
| 48:22 | 20:13,19 | 46:4 65:16 | **contracts** 7:3,4 | 55:6 77:19 |
| **clarification** | 21:6 31:15 | **consequence** | 7:5 11:2,5,14 | 77:19 79:20 |
| 81:10 | 57:20 64:19 | 60:18 | 17:2 20:15 | **Cotton** 3:10 |
| **clear** 45:14 | 65:10,12 | **consideration** | 21:15 22:4 | 21:3 |
| 69:16 | 66:2,13,16 | 24:8 26:3,14 | 25:8,12,17 | **could** 14:9 |
| **clerk** 57:7 58:1 | 67:4,9,15,17 | **considered** | 33:12 35:14 | 17:20 28:19 |
| **clinically** 28:8 | 68:13 71:10 | 32:7 75:6,10 | 35:18 36:10 | 45:2 55:4 |
| 28:13 | 76:11 79:5 | **considering** | 36:16 37:2,8 | 60:16 79:3 |
| **clinics** 10:1 | 80:2,14 81:3 | 24:18 | 37:13 38:1 | **couldn't** 19:12 |
| 13:19 | **Community-...** | **consistent** | 38:19 39:6 | 59:4 |
| **closed-clinic** | 80:16 | 54:20 | 40:22 69:1 | **counsel** 5:2 |
| 82:5,9 | **companies** | **construction** | 70:7,14 71:8 | 64:13 80:13 |
| **CMS** 50:13,13 | 73:16 | 72:9 | 74:5,7 75:15 | 83:10 |
| 50:19 72:3 | **company** 27:2 | **consultant** | 80:21 81:18 | **course** 64:7,10 |

James T. Kenney                                    September 20, 2004
Wellesley, MA

4

| | | | | |
|---|---|---|---|---|
| **COURT** 1:1 | 2:9 | **determined** | 46:13 51:13 | dispense 60:17 |
| covered 36:10 | day 83:4,15 | 45:2 47:1 | 51:20 53:7 | dispensed 10:5 |
| 36:12 | days 5:5 70:11 | 53:5 72:16 | 65:13 78:19 | 10:11 11:15 |
| created 26:6 | **day-to-day** | 74:15,18 | differentiated | 13:10,17 |
| 50:1 | 6:12 | **determines** | 42:13 | 16:12 18:3 |
| criteria 45:3 | deciding 45:21 | 72:4 | differently | 32:15,19 |
| **Cronimed's** | decision 28:6 | **determining** | 27:16 35:6 | 47:9 |
| 61:11 | **Defendants** | 80:1 | 52:2 54:7 | dispensing 6:9 |
| **CROSS** 4:3 | 1:14 2:20 | develop 71:2 | differing 36:18 | 12:4 24:1 |
| **CROSS-EX...** | 63:16 | **did** 7:16,21 8:8 | direct 4:3 5:14 | 47:15 58:22 |
| 64:15 | define 32:18 | 9:4,18 10:4 | 10:8,16 | dissolve 9:5 |
| **CRR** 83:17 | 35:4 53:22 | 10:13 12:21 | 68:21 69:18 | **distribution** |
| **CuraScript** | **Definitely** | 13:8 16:3,11 | 76:5 | 63:2 |
| 35:21 36:10 | 19:22 | 16:16 17:4,9 | directed 78:19 | **distributor** |
| 37:13 38:3 | **definitions** | 17:17 18:11 | direction 83:7 | 43:11 |
| 39:20 41:2 | 50:11 | 18:18,19 | directly 8:15 | **DISTRICT** 1:1 |
| 42:18 61:13 | delegate 24:18 | 19:6,14 20:4 | 56:2 | 1:2 |
| current 31:14 | delegating | 21:16 22:1,5 | director 6:10 | doctors 45:20 |
| 64:22 65:6 | 32:8 | 22:10,11,16 | 6:16,19 | 62:8,11 |
| 72:13 | delivery 38:4 | 22:17,19,22 | disclosures | document 1:9 |
| currently 5:19 | deponent 5:3 | 23:9,15,19,22 | 46:3 | 39:16,19,21 |
| 70:13 71:11 | 83:4,6 | 24:12 25:8 | discount 12:2 | 40:17 44:17 |
| 73:3,5 81:4 | **deposition** | 25:20 26:2 | 12:13,18 | 47:7 48:5 |
| customary | 1:12 5:4 39:7 | 26:13,17,22 | 15:6 25:14 | 58:7 61:18 |
| 47:14 48:17 | 39:14 40:8 | 27:4,9,18 | 42:10,11,12 | 62:1,3 |
| 51:6 | 40:13 41:5 | 29:12 33:13 | 42:13,21 | **documents** |
| **CVS** 57:18,19 | 46:10 58:8 | 34:9,15,16 | 44:6,11,12 | 40:12,19 |
| 73:9 | 61:18,22 | 35:9 36:15 | 52:13 58:13 | 63:15,22 |
| | 63:22 82:15 | 37:1,1,16,18 | 71:2 | 64:6,10 |
| _____ **D** _____ | 83:9,11 | 38:8,17 46:3 | discounts | does 21:5 32:4 |
| **D** 3:10 4:1 | describe 21:13 | 46:7 57:11 | 12:21 13:3 | 32:12 41:5 |
| data 30:6,6,9 | **described** | 59:16,20 | 13:14 15:2 | 41:10 53:11 |
| 30:15,16,20 | 44:14 | 60:14 63:1,4 | 25:15 44:13 | 58:20 72:1 |
| 31:1,4 32:1 | **DESCRIPTI...** | 65:2 66:16 | 51:16,19 | 76:11 |
| 48:22 52:16 | 4:11 | 67:5 68:11 | 55:5 69:5 | done 25:3 |
| 75:18 76:18 | desire 34:3 | 68:15 71:1 | discussed | 27:14 32:2 |
| date 9:10 19:3 | detailed 48:19 | 76:9 | 45:15 47:2 | 79:4 |
| 19:19 20:10 | 48:21 | **didn't** 11:4 | **Discussion** | don't 8:21,21 |
| 33:16 65:4 | **determination** | 29:2,4 45:11 | 21:4 39:8 | 9:10,10 |
| dated 51:12 | 48:21 | 52:3 55:10 | 58:6 | 14:13,15,17 |
| dates 57:3 | **determine** | differ 12:21 | discussions | 17:13 18:7 |
| **David** 2:4 | 20:20 21:7 | 46:7 | 51:1 | 18:20 19:3 |
| 64:18 | 22:11 27:4 | different 6:21 | disorders | 19:10,12,12 |
| Davidn@ha... | 76:6 | 6:21 37:2 | 43:19 | 19:19,19 |

James T. Kenney
Wellesley, MA

September 20, 2004

| | | | | |
|---|---|---|---|---|
| 24:2 25:6 | 36:10,12 | **easier** 79:10 | 63:1 | **example** 71:22 |
| 30:13,17,17 | 37:4,10 41:7 | **economic** | **entered** 20:14 | **except** 5:9 |
| 32:11 37:19 | 41:22 42:16 | 24:20 | 34:16 35:19 | **exchange** |
| 38:16 48:12 | 43:10,12 | **education** 57:2 | 37:12 38:19 | 29:13 30:14 |
| 49:21 50:16 | 44:2 45:20 | **effective** 22:6 | 60:11 | **exclusive** 42:11 |
| 50:20,22 | 46:16,22 | 23:3 | **entering** 34:5 | 42:13 43:7,8 |
| 53:15 55:9 | 47:5,9,11 | **effectiveness** | 37:8 | 43:11,13,21 |
| 59:22 61:4 | 48:9 51:20 | 23:1 | **entities** 55:19 | 43:22 44:6 |
| 61:16 62:11 | 52:4,12 | **efficacious** | 65:13,19 | **executed** 64:6 |
| 63:13 65:4 | 53:10,12,19 | 28:9,13 | **entitled** 39:22 | **exhibit** 4:11,13 |
| 65:16,18 | 54:2,3,9,11 | **ehaas@pbwt...** | 42:21 | 4:15,17,19,21 |
| 67:2,21 68:4 | 54:16,21 | 2:19 | **entity** 31:14 | 39:10,11,12 |
| 71:5,15,17,18 | 55:12,13,14 | **either** 10:8,16 | 35:9 59:13 | 39:13 40:8 |
| 71:21 72:12 | 56:19 58:18 | 10:20 33:2 | 59:17 60:3 | 41:5 46:9,10 |
| 73:9,21 | 61:14 66:4 | 53:12 | **equal** 53:11 | 58:8,11 |
| 77:12 79:8 | 67:6,11,14,19 | **elected** 58:16 | **equivalent** | 61:18,20,22 |
| **double** 79:21 | 68:7,12 | **electronic** 59:4 | 28:9 29:9 | **Exhibits** 39:7 |
| **drug** 16:9 18:2 | 69:11,13 | **elements** 38:15 | **Erik** 2:15 | 39:15 40:13 |
| 23:20 24:1 | 72:20 73:6,7 | **else** 21:16,19 | **ESI** 63:3 64:4 | 64:1 74:8,8 |
| 28:6 29:21 | 73:14,22 | 21:21 24:6 | **Esq** 2:4,15 3:4 | **exist** 28:4,8,15 |
| 35:2 36:1 | 81:2,13,14 | 73:22 | 3:10,18 | 72:1 |
| 40:1 41:16 | 82:7 | **employed** 5:19 | **establish** 17:1 | **existed** 28:3 |
| 49:10 56:9 | **dual** 74:19 | 6:1 83:11 | **established** | **experience** |
| 56:10 58:3,3 | **due** 32:1 | **employee** | 26:12 | 34:7,9 53:8 |
| 60:7,15,17 | **duly** 5:12 83:5 | 83:12 | **establishing** | 53:17 54:8 |
| 63:6 69:19 | **during** 11:20 | **employer** | 21:17 22:1 | 55:2 56:8 |
| 74:7 77:6,17 | 19:21,22 | 64:22 65:3,7 | **even** 19:12 | **expertise** 36:17 |
| 79:19 | 80:16 81:3 | **employment** | 29:21 | 36:18 |
| **drugs** 10:4,10 | 81:12 | 57:2 | **event** 37:5 65:5 | **Expires** 83:21 |
| 10:12,13,20 | | **encompassed** | **eventually** | **explain** 43:2 |
| 11:14,18 | ——————— | 52:5 | 38:2 46:8 | 81:11 |
| 12:3,11,12,14 | **E** | **end** 18:19 | **ever** 22:10 | **explore** 55:21 |
| 12:22 13:10 | **E** 4:1,9 | 69:12 | 32:7 56:8 | **Express** 63:3,9 |
| 13:15,16 | **each** 11:4 41:1 | **ended** 18:19 | 71:1 75:5 | 63:11 |
| 14:2,9,10,19 | 45:1 52:10 | 82:15 | 76:1,9,22 | **extended** 81:19 |
| 14:20 15:4,7 | 65:17 67:18 | **engage** 21:6 | 77:17,22 | **extent** 42:16 |
| 15:20 16:11 | 67:20 68:1 | 22:19 38:17 | 78:18 | **externally** 22:8 |
| 18:3 23:13 | 81:20 82:7 | **engaged** 68:5 | **every** 27:14 | |
| 23:14 25:20 | **earlier** 44:15 | **enough** 62:17 | **exact** 19:3 | ——————— |
| 27:6,9,10 | 45:15 47:2 | 72:14 | 20:10 37:19 | **F** |
| 28:9,13,22 | 54:1 55:10 | **ensuing** 83:5 | 63:13 65:4 | **face** 40:1,4 |
| 29:6,8,9,18 | 69:4 72:3 | **enter** 25:8 | 67:2 | **facilitated** 59:6 |
| 32:14,19 | 75:4 | 33:13,22 | **examination** | **factor** 45:21 |
| 34:17 35:7 | **early** 20:2 | 36:15 37:2 | 80:10 83:6 | **factors** 50:13 |
| | 81:17 | | | **fair** 9:14 24:17 |

James T. Kenney                                    September 20, 2004

Wellesley, MA

6

| | | | | |
|---|---|---|---|---|
| 28:7 34:22 | 27:19,19 | 78:20 79:19 | **give** 26:2,13 | 63:19 67:18 |
| 36:9 46:21 | 28:1,6,15,21 | 81:2,14 | 56:21 57:2 | 72:6 75:5 |
| 51:1 53:17 | 29:12,17 | **full** 5:17 | **given** 24:8 83:8 | 79:1,19 |
| 54:7 61:10 | 30:1 32:5,17 | **function** 11:4 | **go** 22:1 56:22 | **hadn't** 75:9 |
| 62:17 72:14 | **formulas** 72:13 | 21:17 22:13 | **goes** 62:11 | **HAGENS** 2:3 |
| 81:1 | **forth** 44:4 74:7 | 24:19,21 | **going** 21:11 | **Hall** 57:13 |
| **familiar** 40:14 | **foundational** | **functionally** | 39:5 | **hand** 83:14 |
| 40:19 62:1 | 48:1 | 29:9 | **gone** 70:6,10 | **handles** 59:11 |
| **familiarity** | **foundations** | **functionally-...** | **good** 14:4 | **happen** 29:2,4 |
| 34:8 | 56:4 | 27:6 28:22 | 50:18 64:17 | **happens** 28:18 |
| **Family** 59:19 | **four** 20:9 | 29:18 32:14 | 79:11 | **HARDY** 3:17 |
| 59:21 | 36:16,19 | **fundamentally** | **got** 61:8 | **Harvard** 1:12 |
| **Federal** 1:15 | 41:1 50:6 | 56:5 | **government** | 1:19 3:9,15 |
| **fee** 47:15 | **fourth** 40:3 | **further** 5:8 | 79:17,21 | 5:22 6:1 7:5 |
| **fees** 23:22 24:1 | 42:2,9 | 80:9 82:13 | **Grand** 3:19 | 7:7,10,10,12 |
| **fertility** 37:10 | **Freedom** 36:1 | 82:14 83:9 | **Grande** 59:12 | 7:12,17,21 |
| 38:18 | 36:8,11,20 | 83:11 | **greater** 60:21 | 8:8,12 9:1,4 |
| **few** 9:13 11:5 | 37:9 40:1 | **Fuzeon** 60:7 | **group** 8:1,1,3,5 | 9:4,5,15,21 |
| **files** 70:13 | 41:2 58:10 | 60:20 61:11 | 8:7,8 9:12,16 | 9:22 10:2,4 |
| **fill** 6:10,15 | 61:13 74:7 | 62:5,8,15 | 67:9 78:14 | 10:13 11:18 |
| **final** 45:11 | **from** 5:5 7:16 | | **groups** 7:6 | 12:3,14,22 |
| **finals** 45:12 | 10:8,20 | ——— **G** ——— | 8:10 | 13:4,8,14 |
| **financially** | 11:18 12:3 | **gave** 45:3 | **growth** 43:17 | 14:3,21 15:3 |
| 83:13 | 12:14 13:5 | **general** 6:9 | 43:19 | 15:7 16:11 |
| **first** 5:12 6:8 | 13:15 14:4 | 13:5 21:5 | **guess** 19:12 | 17:2,4,10,17 |
| 33:13 39:16 | 14:11,19,21 | 48:3 57:3 | 71:18 | 17:17,22,22 |
| 43:20 44:3 | 15:4,7 18:3 | 69:14 | | 18:5,11,22 |
| 45:2 52:16 | 21:5 22:12 | **generally** 9:11 | ——— **H** ——— | 19:6,15 20:6 |
| 75:18 76:18 | 24:12 26:14 | 19:4,11 | **H** 4:9 | 20:13,14,19 |
| **five** 72:17 | 26:17 27:17 | 47:20 49:22 | **Haas** 2:15 4:6 | 20:19 21:5,6 |
| **fixed** 58:14,17 | 30:20,22,22 | 50:2 | 5:15 11:21 | 21:17 22:7 |
| 59:2,5 | 31:1 32:12 | **generic** 12:22 | 39:5 47:20 | 22:12 23:3 |
| **Floor** 2:6 | 35:8,19 42:2 | 15:7 47:9,11 | 51:15 58:5 | 24:18 25:2,7 |
| **follows** 5:13 | 42:9,11,13 | 48:8 49:10 | 61:17 64:12 | 25:11,16,20 |
| **follow-up** 43:9 | 44:5 46:8 | **generics** 26:1 | 65:21 69:20 | 26:13 28:20 |
| 64:14 80:12 | 50:11 53:12 | 47:6 48:1,14 | 72:8 74:2 | 29:11,16 |
| **form** 5:9 16:7 | 53:19 54:3,9 | 50:3,7 | 75:1,14,21 | 30:10 31:3,8 |
| 23:6 44:16 | 55:5,12 56:7 | **get** 25:12 30:6 | 77:11 78:13 | 31:11,12,13 |
| 65:21 69:20 | 57:21 59:20 | 37:18 56:3 | 79:6,12 80:4 | 31:15 32:4,7 |
| 72:8 77:11 | 63:19 64:4 | 76:14,19 | 80:11 82:13 | 32:12 33:12 |
| 78:13 79:12 | 70:11,19 | 77:4 78:7 | **had** 8:1,19 | 33:13,21 |
| 80:4 81:8 | 75:15,18 | 79:11 | 28:5,12 34:7 | 34:6,10,16,18 |
| **formed** 46:9 | 76:2,19,22 | **getting** 14:3 | 46:17 51:1 | 35:6,9,15,19 |
| **formulary** | 77:18 78:6 | 30:19 | 56:2 60:20 | 36:15 37:1 |

Henderson Legal / Spherion
(202) 220-4158

James T. Kenney
Wellesley, MA
September 20, 2004

7

37:16 38:1
38:17,22
39:6,14 40:1
40:6,12 41:4
41:6 42:15
43:14 45:16
45:19,21
46:4 47:13
48:10,15
49:13,20
52:3 53:19
54:2,13 55:3
57:20 58:8,9
58:16 59:8
59:14,18,20
60:2,21
61:17,22
62:4,7,9,14
63:1,9,11
64:7,19 65:1
65:2,5,10,12
65:13 66:2
66:13,16
67:4,9,14,17
68:13 71:9
71:11 76:11
79:5 80:2,2
80:14,16
81:3,6 82:8
82:12
**Harvard's**
22:20 24:13
**Harvey** 3:10
**Harvey_cott...**
3:14
**has** 17:22 18:5
25:2 31:8
32:7 35:19
48:8,14
51:13 56:8,9
58:2 60:2
79:17
**HASSAN** 3:3
**have** 6:1 8:18

11:4 16:3
17:5 19:2,22
25:6 29:22
31:21 32:13
33:1,6 40:12
43:6 44:18
48:9,19
49:18,22
50:6 51:1
53:1,4 58:12
58:14,15
60:1,6 63:22
65:16 68:4
70:6,10,13
71:1,16 76:1
76:5,12 78:5
78:18 79:4,9
80:8,12
83:14
**having** 5:12
**HCFA** 50:10
50:11 72:10
72:11,12
**he** 18:16 48:2
81:1,4,22
82:4
**health** 1:12,20
3:9,15 5:22
7:13,17 9:20
17:2,5,10,17
19:7,16 20:6
20:13,20
31:13 40:2,6
64:20 65:1,2
65:6,11,11,12
65:13 66:3
66:13,17
67:5,9,15,17
68:13 71:10
71:12 76:11
79:5 80:2
**held** 6:5,6 7:2
**help** 79:22
**helps** 41:11

**here** 41:1
46:17 53:4
71:5
**hereby** 83:4
**herein** 83:5
**hereunto** 83:14
**Here's** 77:6,6,7
**He'll** 18:16
**He's** 55:19,19
80:20
**high** 57:1
**higher** 61:12
**high-cost** 34:3
**him** 55:18
80:20
**his** 44:18 80:19
80:21 81:11
81:11,15
82:4
**history** 57:2
**HMO** 7:14,16
7:22 8:2,3,22
9:6,15,19
10:6,15,21
11:9,13,20
12:5,15 13:1
13:6,11 14:2
14:22 15:8
15:20 16:10
80:16 81:15
**Horgan** 3:4
8:11 9:7,9
10:7,14
11:20 12:6,9
12:16 13:18
13:20 14:6
14:12 15:16
16:14 17:7
18:15 21:1,9
23:7 24:22
25:22 26:5
26:21 27:13
27:20 28:2
28:10,16

29:5,14,19
30:5,12,21
31:6 32:10
32:16,21
33:15,19
34:2,20 35:3
36:13 38:10
40:16 42:22
44:18 46:1
46:11,19
47:16 48:11
48:18 49:1
50:15,21
51:21 52:7
52:20 53:2,6
53:14,21
54:12,17,22
55:8,15,17
61:3,15
65:22 74:12
74:17 75:2
75:13,20
78:3 79:7,13
80:5 81:8
**hormones**
43:17
**hospital** 78:15
**hospitals** 33:3
78:16
**how** 6:1 9:18
10:4,13 11:3
11:7,8 22:1
25:11 26:22
31:8 34:5,9
34:15 37:18
38:21 43:2,4
44:22 46:7
49:19,22
50:9,19 51:2
52:22 53:5
60:14 62:18
68:15 72:3
72:16 76:3,5
77:8 79:2

**HPH** 4:13,15
4:17,19,21
39:10,11,12
39:13,17
40:2 41:11
47:19 49:7
51:11,14
58:10 61:19
61:20
**Hypothetical**
79:6

**I**

**idea** 19:2 49:22
**identical** 74:9
74:11,16,18
**identified** 74:8
**if** 6:4 12:17
18:19 27:14
28:3 34:13
40:14 41:11
43:7,22 46:7
47:18 48:15
53:1 56:4
59:5,13 62:1
62:2 68:16
71:19 78:15
79:1,18
**impact** 79:17
**impetus** 33:21
**Inc** 40:5
**incentives** 24:9
**include** 23:19
23:22 31:15
**included** 24:3
24:6
**includes** 40:9
**inclusive** 13:15
**independent**
8:9
**independently**
81:21
**indicated** 29:2
**indirect** 56:1