John M. Killion                HIGHLY CONFIDENTIAL                January 6, 2006
Boston, MA

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*****************************

IN RE: PHARMACEUTICAL            MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE       01CV12257-PBS

PRICE LITIGATION

*****************************    DEPOSITION OF

THIS DOCUMENT RELATES TO:        JOHN M. KILLION

ALL ACTIONS                      JANUARY 6, 2006

*****************************

    H I G H L Y   C O N F I D E N T I A L

DEPOSITION of JOHN M. KILLION, a witness called on

behalf of the Defendant Johnson & Johnson pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, Certified LiveNote Reporter, and Notary

Public in and for the Commonwealth of Massachusetts,

at the offices of Robins, Kaplan, Miller & Ciresi,

L.L.P., 800 Boylston Street, Boston, Massachusetts

02199, on Friday, January 6, 2006, commencing at

9:41 a.m.

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

---

2

1  APPEARANCES:  HAGENS BERMAN, LLP
2          Edward Notargiacomo, Esquire
3          One Main Street, 4th Floor
4          Cambridge, Massachusetts  02142
5          617-482-3700 / ed@hagens-berman.com
6            on behalf of the Plaintiffs
7
8          ROBINS, KAPLAN, MILLER & CIRESI, LLP
9          Christopher Sullivan, Esquire
10         800 Boylston Street
11         Boston, Massachusetts  02199-7610
12         617-267-2300
13           and
14         STEVEN E. SKWARA, ESQUIRE
15         Associate General Counsel
16         Blue Cross/Blue Shield of Massachusetts
17         401 Park Drive
18         Boston, Massachusetts  02215-3326
19         617-246-3531 / steven.skwara@bcbsma.com
20           Both on behalf of Plaintiff Blue
21           Cross/Blue Shield of Massachusetts
22  (CONTINUED)

---

4

1  APPEARANCES (Continued):
2
3  Participating via teleconference:
4
5          MORGAN, LEWIS & BOCKIUS, LLP
6          Kimberly K. Heuer, Esquire
7          1701 Market Street
8          Philadelphia, Pennsylvania  19103
9          215-963-4756 / kheuer@morganlewis.com
10           On behalf of the Defendants
11           Pfizer Inc. and Pharmacia Corp.
12
13
14
15
16
17
18
19
20
21
22

---

3

1  APPEARANCES (Continued):
2
3          PATTERSON, BELKNAP, WEBB & TYLER, LLP
4          Erik Haas, Esquire
5          Adeel A. Mangi, Esquire
6          1133 Avenue of the Americas
7          New York, New York  10036-6710
8          212-336-2000 / ehaas@pbwt.com /
9          aamangi@pbwt.com
10           On behalf of the Defendant
11           Johnson & Johnson
12
13  Participating via teleconference:
14
15          KELLEY, DRYE & WARREN, LLP
16          Lorianne K. Trewick, Esquire
17          101 Park Avenue
18          New York, New York  10178
19          212-808-7740
20           On behalf of the Defendant Dey,
21           Inc.
22  (CONTINUED)

---

5

1              I N D E X
2  WITNESS                      PAGE
3  JOHN M. KILLION
4    Direct Examination by Mr. Haas................. 006
5    Cross Exam by Mr. Notargiacomo................. 134
6    Redirect Examination by Mr. Haas............... 138
7
8            E X H I B I T S
9  NUMBER        DESCRIPTION        PAGE
10 Exhibit Killion 001, Two-page memorandum dated
11        May 1, 2002, to Dr. Fanale
12        from Dr. Cook, production
13        numbers BCBSMA-AWP-0003
14        and 0004.................... 062
15
16 Exhibit Killion 002, Two-page Specialty
17        Committee Meeting........... 086
18
19
20
21
22

---

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

**Page 6**

```
 1          PROCEEDINGS
 2              - - -
 3        JOHN M. KILLION, first having been duly
 4   sworn, testified as follows in answer to direct
 5   examination by MR. HAAS:
 6              - - -
 7     Q.  Please state your name for the record.
 8     A.  John Killion.
 9     Q.  Mr. Killion, are you currently
10   employed?
11     A.  Yes, I am.
12     Q.  By whom?
13     A.  Blue Cross/Blue Shield of
14   Massachusetts.
15     Q.  What is your current position?
16     A.  I am senior director, ancillary
17   services.
18     Q.  What is ancillary services?
19     A.  Responsibility for contracting with all
20   provider types with the exception of acute care
21   hospitals and physicians, so I have
22   responsibility for contracting with provider
```

**Page 7**

```
 1   types, such as ambulance, radiology, laboratory,
 2   physical therapy, occupational therapy, speech
 3   therapy, approximately a little over 40 or so
 4   different provider types other than M.D.s or
 5   acute care hospitals.
 6     Q.  Does any of your contracting with these
 7   various ancillary entities involve contracting
 8   for the reimbursement of physician-administered
 9   drugs?
10     A.  No.
11     Q.  Do you have an understanding that
12   physician-administered drugs are the drugs at
13   issue?
14     A.  Yes.
15     Q.  Who at Blue Cross/Blue Shield of
16   Massachusetts has the analogous position to yours
17   but that is in charge of reimbursement of
18   physician-administered drugs?
19     A.  That would be my peer, Sheila
20   Cizauskas, who is the senior director for
21   hospital physician contracting.
22     Q.  I am sorry.  I didn't catch that name?
```

**Page 8**

```
 1     A.  C-I-Z-A-U-S-K-A-S.
 2     Q.  What was her first name?
 3     A.  Sheila.
 4        MR. HAAS:  Off the record.
 5        (Discussion off the record.)
 6        MR. HAAS:  We again had our morning
 7   difficulties with the call-in number, so we just
 8   started, just, about five minutes into it.  So we
 9   are just going to continue with the background of
10   the witness.
11     Q.  What is Ms. Cizauskas' title?
12     A.  She is senior director for hospital
13   contracting.
14     Q.  Is she also responsible for contracting
15   with physician groups and physicians?
16     A.  She is, along with one other
17   individual.
18     Q.  Who is that other individual?
19     A.  Steve Fox.
20     Q.  What is Mr. Fox's title?
21     A.  Senior director, provider relations.
22     Q.  Who do you report to?
```

**Page 9**

```
 1     A.  Deb Devaux.
 2     Q.  What is her title?
 3     A.  Senior vice president, contracting.
 4     Q.  In your current --
 5        MR. HAAS:  Withdraw that question.
 6     Q.  When did you start at Blue Cross/Blue
 7   Shield of Massachusetts?
 8     A.  2001.
 9     Q.  What was your initial position?
10     A.  Director, ancillary services.
11     Q.  At any time from 2001 to the current
12   time frame, have you had any responsibilities
13   with respect to the negotiation or contracting of
14   reimbursement with physicians for drugs
15   administered to Blue Cross/Blue Shield of
16   Massachusetts members?
17     A.  Can you repeat that again?
18     Q.  Sure.  At any time from 2001 to today -
19   -
20     A.  Yes.
21     Q.  -- have you had any responsibilities
22   with respect to contracting for the reimbursement
```

John M. Killion       HIGHLY CONFIDENTIAL       January 6, 2006
Boston, MA

**10**

1  or the negotiation of reimbursement with
2  physicians for drugs that have been administered
3  to Blue Cross/Blue Shield of Massachusetts
4  members?
5      A.  Not directly.
6      Q.  When you say "not directly," have you
7  been indirectly involved in the contracting or
8  negotiation of reimbursement for physician-
9  administered drugs?
10     A.  Yes.
11     Q.  What is the indirect role that you have
12  had?
13     A.  In 2003, responsibility for
14  implementation of specialty pharmacy programs.
15     Q.  Does Blue Cross/Blue Shield of
16  Massachusetts have a specialty pharmacy program
17  that is used to supply drugs to physicians for
18  administration of drugs to the patients -- to the
19  members of Blue Cross/Blue Shield of
20  Massachusetts?
21     A.  Can you repeat that again?
22     Q.  Sure.  Does Blue Cross/Blue Shield of

**11**

1  Massachusetts have a specialty pharmacy program
2  that involves the provision of drugs to
3  physicians for the administration to members of
4  Blue Cross/Blue Shield of Massachusetts?
5      A.  We have a specialty pharmacy program.
6  It doesn't provide the drugs directly to the
7  physicians.  No.
8      Q.  Do you have a specialty pharmacy
9  program that involves at all the supply of drugs,
10 either to the physician or to the patient, which
11 are thereafter administered under the supervision
12 of physicians or their staff?
13     A.  Yes, we do.
14     Q.  Okay.  When was that program
15 implemented?
16     A.  In 2004 and 2005.
17     Q.  What is the name of that program?
18     A.  It is our specialty pharmacy program.
19     Q.  Does Blue Cross/Blue Shield of
20 Massachusetts have its own specialty pharmacy, or
21 does it contract with a specialty pharmacy?
22     A.  Contract.

**12**

1      Q.  What is the specialty pharmacy or
2  pharmacies?
3      A.  Priority Healthcare.
4      Q.  Any other one?
5      A.  Caremark.
6      Q.  Any others?
7      A.  No.
8      Q.  Is there a division of Priority
9  Healthcare that is actually the specialty
10 pharmacy?
11     A.  Yes.
12     Q.  Which division?
13     A.  Priority Healthcare is a specialty
14 pharmacy.
15     Q.  A physicians' supply company; right?
16     A.  It is a specialty pharmacy company that
17 supplies high-cost injectables.
18     Q.  Right.  Is there a particular division
19 of Priority Healthcare that you work with, or is
20 it just the Priority entity?
21     A.  Priority.
22     MR. SULLIVAN:  Erik, before we got

**13**

1  started, maybe it was due to the telephone or
2  whatnot, I just want to make sure that the entire
3  transcript is designated as highly confidential.
4      MR. HAAS:  Sure.
5  BY MR. HAAS:
6      Q.  Aside from your involvement with the
7  implementation of the specialty pharmacy program
8  you just described, have you had any other
9  involvement, directly or indirectly, with the
10 contracting for the reimbursement of physician-
11 administered drugs or the negotiation of such
12 contracts?
13     A.  No.
14     Q.  When did you switch positions from
15 director of ancillary contracting to senior
16 director?
17     A.  I didn't -- oh, switch positions from?
18 I am sorry.  Director of ancillary to senior
19 director?
20     Q.  Yes.
21     A.  That was in late 2004, I believe.
22     Q.  So you held your position as the

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

14

1  director until late 2004, at which time you were
2  elevated to senior director?
3     A. I believe that that's correct.
4     Q. When did you first hear about this
5  litigation?
6     A. Approximately 40 days ago or so.
7     Q. What have you done in connection with
8  this litigation since then?
9     A. Researched information on AWP.
10    Q. What did you research?
11    A. Any documents we have relative to AWP.
12    Q. And you say "documents we have." Is
13 that documents Blue Cross/Blue Shield of
14 Massachusetts has?
15    A. Correct.
16    Q. How did you research what documents you
17 had?
18    A. By going through my files.
19    Q. Did you search anybody else's files?
20    A. No.
21    Q. Did you review any publicly-available
22 information concerning AWP?

15

1     A. Can you reask that question?
2     Q. Sure. Did you do any research, in your
3  words, outside of your own files into what was in
4  the public domain that pertained to the term
5  "AWP" or the meaning of the term "AWP"?
6     A. No, I did not.
7     Q. Did you review any documents or surveys
8  or studies involving acquisition cost?
9        MR. SULLIVAN: Objection to the form.
10    Q. You can answer, unless he instructs you
11 not to answer.
12    A. Can you be more clear?
13    Q. You know, did you review any studies,
14 surveys, analyses in connection with your
15 research involving the acquisition cost that
16 doctors pay for drugs?
17    A. At the point in which I knew of the
18 litigation?
19    Q. We are talking now in connection with
20 what you said, the research that you did after
21 learning of the litigation 40 days ago.
22    A. I am -- I am aware of an article that

16

1  appeared in The Wall Street Journal.
2     Q. What did --
3     A. I believe it was in the early part of
4  2004.
5     Q. What was the nature of that article?
6     A. It referenced the acquisition cost
7  oncologists pay for oncology medications.
8     Q. Did you review any other publicly-
9  available information concerning acquisition
10 costs?
11    A. No, I did not.
12    Q. Aside from looking for documents from
13 your own files and reading The Wall Street
14 Journal article, what else did you do in
15 connection with this litigation, including the
16 preparation for this deposition?
17    A. I think preparation, meeting with Steve
18 Skwara, understanding the litigation as well as
19 the preparation -- preparing for the deposition.
20    Q. Did you read the Complaint that has
21 been filed in this action?
22    A. No, I have not.

17

1     Q. Have you read deposition transcripts of
2  the depositions taken in this action?
3     A. No, I have not.
4     Q. When did you meet with counsel?  I
5  don't want to get into the subject matter of your
6  discussions with counsel.  Just when did you meet
7  with counsel in preparation for the deposition?
8     A. That would have been Wednesday.
9     Q. Was that the only meeting you had with
10 counsel?
11    A. That's correct.
12    Q. Aside from your meeting with counsel
13 and any communications with counsel, which I
14 don't want to discuss, did you do anything else
15 to obtain an understanding as to how Blue
16 Cross/Blue Shield of Massachusetts contracts for
17 or negotiates for the reimbursement of physicians
18 for drugs administered to Blue Cross/Blue Shield
19 of Massachusetts members?
20    A. No.
21    Q. Let me step back for a minute, and if
22 you could describe for the record your education

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

---

**18**

1    post high school.
2        A.   Undergraduate degree, Providence
3    College.
4        Q.   What was your specialty?
5        A.   Healthcare services, or healthcare
6    administration.
7        Q.   What year did you obtain the degree?
8        A.   1985.  And graduate --
9        Q.   Let me stop you there.
10       A.   Sure.
11       Q.   In the course of your studies for your
12   healthcare administration degree, did you study
13   at all the workings of the pharmaceutical
14   industry or the pricing of prescription drugs?
15       A.   Not to my recollection.
16       Q.   Did you research at all the Medicare
17   system in connection --
18            MR. HAAS:  Withdraw that.
19       Q.   Did your courses involved in obtaining
20   your degree in healthcare administration involve
21   at all a review, analysis, study, or overview of
22   the Medicare system?

---

**19**

1        A.   Not to my recollection.
2        Q.   What was the nature of the courses that
3    you took, generally?
4        A.   Policy-related courses, healthcare
5    administration-related courses --
6        Q.   When you say --
7        A.   -- statistical courses.
8        Q.   Give me an understanding of what the
9    degree is.  When you say "healthcare
10   administration-related courses," what does that
11   mean?
12       A.   Courses related to the healthcare
13   system and the delivery of healthcare.
14       Q.   When you say "healthcare system," are
15   you focusing on the provider side, or does that
16   include something bigger, such as the supply of
17   healthcare services and drugs, the reimbursement
18   of drugs and services? How -- what does the term
19   "healthcare system" mean?
20       A.   The delivery of healthcare services to
21   members.
22       Q.   Did you get an understanding through

---

**20**

1    your courses at all as to how the reimbursement
2    of healthcare services worked?
3        A.   No.
4        Q.   So you didn't review at all the
5    insurance model?
6        A.   No.
7        Q.   So you didn't focus at all on the
8    manufacture and supply end of the chain or on the
9    insurance side of the chain.  Is it accurate,
10   therefore, that your focus was on the provider
11   aspect of the healthcare system?
12       A.   I would say that's correct.
13       Q.   So hospitals, physicians?
14       A.   Correct.
15       Q.   Did you also study retail pharmacies?
16       A.   No.
17       Q.   As part of your studies, did you gain
18   an understanding or did you gain an overview of
19   how hospitals and physicians acquire drugs?
20       A.   No.
21       Q.   What other education did you obtain
22   after obtaining your degree from Providence?

---

**21**

1        A.   Graduate courses at Suffolk University.
2        Q.   What was the nature of those courses?
3        A.   Public health.
4        Q.   What does the term "public health"
5    mean?
6        A.   I took courses in --
7            MR. SULLIVAN:  He asked you what the
8    term "public health" means.
9        A.   The delivery of services, healthcare
10   services.
11       Q.   What type of classes did you take?
12       A.   Statistics, and I can't recall the
13   other courses.
14       Q.   Did you take any courses involving the
15   United States public healthcare system, Medicare
16   or Medicaid?
17       A.   Not that I recall.
18       Q.   Okay.  What was the nature of the
19   statistics classes that you took that gave them a
20   public health orientation?
21       A.   I don't recall.
22       Q.   When did you graduate from Suffolk?

---

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

22

1      A.  I have not graduated yet from Suffolk.
2      Q.  When did you start taking courses at
3   Suffolk?
4      A.  Let's see.  Approximately 15 years ago,
5   I would say.
6      Q.  When was the last time you took a
7   course at Suffolk?
8      A.  Thirteen years ago.
9      Q.  So it is fair to say you didn't
10  complete your degree?
11     A.  That's correct.
12     Q.  Have you taken any other courses or
13  studies involving the healthcare system since
14  then?
15     A.  No.
16     Q.  Have you taken any training or courses
17  involving prescription drugs?
18     A.  No.
19     Q.  Please review for the record your
20  employment history after graduating from
21  Providence in 1985.
22     A.  I actually worked a year at Blue

23

1   Cross/Blue Shield of Massachusetts.
2      Q.  What was your position at that time?
3      A.  I was in the benefit department.
4      Q.  And when you say "benefit department,"
5   what was that?  What were the responsibilities of
6   that department?
7      A.  Responding to member-related benefit
8   issues.
9      Q.  So you held that position from 1985 to
10  1986?
11     A.  That's correct.
12     Q.  What did you do next?
13     A.  I left Blue Cross/Blue Shield of
14  Massachusetts and went to Tufts Health Plan.
15     Q.  What was your position at Tufts?
16     A.  I was a manage in the ancillary
17  services department.
18     Q.  What were your responsibilities as a
19  manager in the ancillary services department?
20     A.  Contracting with the ancillary network.
21     Q.  Did any of that responsibility or work
22  involve contracting for the reimbursement of

24

1   physician-administered drugs?
2      A.  No.
3      Q.  How long did you hold that position?
4      A.  I held that position for approximately
5   until '94, '95.
6      Q.  During your time at Tufts from 1986 to
7   1994 or '95, did you gain an understanding as to
8   the methodologies Tufts used to reimburse
9   physicians for drugs administered to its members?
10     A.  Can you rephrase -- say that time
11  period again?  I am sorry.
12     Q.  You said 1986 to 1994 or '95 while you
13  were a manager in the ancillary services
14  department?
15     A.  Yes.
16     Q.  Did you gain an understanding how Tufts
17  reimbursed physicians for drugs administered to
18  its members?
19     A.  No, I did not.
20     Q.  What did you do next?
21     A.  I became the manager of pharmacy
22  operations at Tufts.

25

1      Q.  What were your responsibilities in that
2   role?
3      A.  I was responsible for managing the
4   relationship with our pharmacy benefit manager.
5      Q.  Who was the PBM at the time?
6      A.  It was PCS, Prescription Card Services.
7      Q.  And when you say "managing the
8   relationship," what in particular did you do?
9      A.  Contract responsibility and program
10  development.
11     Q.  In connection with your work as the
12  manager of the pharmacy operations of Tufts, were
13  you involved at all with the contracting of
14  pharmacies themselves?
15     A.  No.
16     Q.  Is it fair to say that Tufts utilized
17  the network of PCS?
18     A.  That's correct.
19     Q.  So your contract was with PCS?
20     A.  Correct.
21     Q.  When you said -- when you referred to
22  program development, what programs are you

Henderson Legal Services
(202) 220-4158

John M. Killion        HIGHLY CONFIDENTIAL        January 6, 2006
Boston, MA

26

1    referring to?
2        A.  Report development to help physicians
3    understand prescribing consistent with programs
4    that we had put in place.
5        Q.  Are those formulary-type programs?
6        A.  Correct.
7        Q.  What type of formulary programs did
8    Tufts have in place at the time?
9        A.  We had a formulary of preferred drugs.
10       Q.  Did Tufts have a prior authorization
11   program?
12       A.  Yes, we did.
13       Q.  Did Tufts have a generic first program?
14       A.  When you say "generic first program" --
15       Q.  Did Tufts have any program in place to
16   encourage the prescription of generic drugs?
17       A.  We encouraged it, yes.
18       Q.  In what way?
19       A.  Providing reports to physicians;
20   profiling their prescribing patterns against
21   other like physicians for similar drugs.
22       Q.  Did Tufts provide any economic

27

1    incentives to the PBM or to the physicians in
2    order to encourage the prescription of generic
3    drugs?
4        A.  Yes.
5        Q.  What economic incentives?
6        A.  Physicians were at risk for pharmacy.
7        Q.  What does that mean?
8        A.  There was a budget established.
9        Q.  Is it that physicians were involved in
10   a capitated plan?
11       A.  It was a capitated plan.
12       Q.  We are talking now about the pharmacy
13   benefits side of the business; right?
14       A.  That's correct.  Retail pharmacy.
15       Q.  What was the risk that the physicians
16   bore under this capitated pharmacy benefit plan?
17       A.  As I recall, there was a budget
18   established by a physician group.
19       Q.  The physicians were not acquiring the
20   drugs; correct?
21       A.  When you say the physicians weren't
22   acquiring the drugs --

28

1        Q.  You said the budget was established by
2    physician group.  What was that budget for?
3        A.  No.  Tufts Health Plan established the
4    budget by physician group.
5        Q.  What was that budget for?
6        A.  For the delivery -- or for the expense
7    of retail pharmacy services.
8        Q.  What happened if that budget was
9    exceeded?
10       A.  I don't recall if there was any -- any
11   downside if the budget was exceeded.
12       Q.  So ultimately it comes back to my
13   initial question:  How were the physicians at
14   risk with respect to this retail pharmacy benefit
15   program?
16       A.  I don't recall specifically how they
17   were at risk.
18       Q.  Did Tufts contract with physicians in
19   connection with this retail pharmacy benefit
20   program?
21       A.  Not in connection with the program, no.
22       Q.  But it is your recollection this plan

29

1    somehow provided an economic incentive to the
2    doctors to prescribe generics first?
3        A.  That was one of the features of the
4    program.
5        Q.  What were the other features of the
6    program?
7        A.  Prescribing off of the formulary;
8    prescribing consistent with quantity limits that
9    were in place; obtaining prior authorization for
10   specific drugs that were identified.
11       Q.  Did the amount of the reimbursement
12   that the physicians received from Tufts under --
13   depend at all upon their compliance with this
14   program?
15       A.  I'm not sure if I understand what you
16   mean by reimbursement.
17       Q.  To effectuate this program, did Tufts
18   contract with the physicians?
19       A.  Tufts had contracts with the
20   physicians.
21       Q.  And in those contracts, was the
22   physicians' compliance with this program, the

Henderson Legal Services
(202) 220-4158

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

                                                                    30

1   retail pharmacy program, a condition as to -- a
2   condition that impacted the level of
3   reimbursement they received?
4       A.  I believe the answer to that is yes.
5       Q.  Did you have an understanding of those
6   contracts in connection with your work on these
7   programs?
8       A.  Not directly.
9       Q.  Did you have an understanding as to
10  whether or not the reimbursement of the drugs
11  administered in office were also included within
12  this capitated program of Tufts?
13      A.  I don't believe they were.
14      Q.  Do you have an understanding of whether
15  Tufts had any program in place to encourage the
16  administration of generic drugs in office?
17      A.  Not to my recollection.
18      Q.  What was your understanding as to how
19  Tufts was reimbursing for the drugs administered
20  in office?
21      A.  I don't recall.
22      Q.  How long did you hold that position?

                                                                    31

1   From 1995 until when?
2       A.  Approximately three years.
3       Q.  1995 to 1998?
4       A.  Yes.
5       Q.  What did you do next?
6       A.  I went to a company called Media One.
7       Q.  What was the work that Media One did?
8       A.  It was a cable company.
9       Q.  All right.  What was your position?
10      A.  It was a project management oversight
11  position.
12      Q.  How long did you hold that position?
13      A.  Four months.
14      Q.  Where did you go next?
15      A.  Back to Tufts.
16      Q.  What was your position when you
17  returned?
18      A.  I am sorry.  When I left -- correction
19  -- when I left Blue Cross, prior to going to
20  Media One, I went to --
21          MR. SULLIVAN:  I think you misspoke,
22  when you left Tufts?

                                                                    32

1   BY MR. HAAS:
2       Q.  When you left Tufts?
3       A.  When I left Tufts.
4       Q.  In 1998?
5       A.  In 1998.
6       Q.  All right.
7       A.  I went to Harvard Pilgrim.
8       Q.  All right.  What was your position at
9   Harvard Pilgrim in 1998?
10      A.  I was manager of physician contracting.
11      Q.  What were your responsibilities in that
12  role?
13      A.  Responsibilities were to -- specific
14  responsibilities were to move physicians that
15  were in one large risk pool without being
16  affiliated with a hospital entity to a hospital
17  entity as part of a risk relationship.
18      Q.  I am sorry.  I didn't understand that.
19  Your responsibilities involved moving physicians
20  from a --
21          MR. HAAS:  Withdraw that.
22      Q.  Your responsibilities involved moving

                                                                    33

1   physicians to a relationship with a hospital?
2       A.  Correct.
3       Q.  What relationship?
4       A.  A risk relationship.
5       Q.  What does that mean?
6       A.  A relationship where physicians bore
7   financial risk for the services they provided
8   consistent with whatever budget Harvard Pilgrim
9   had established at the time.
10      Q.  But what was the relationship with the
11  hospital that was related to that risk?
12      A.  That the hospitals were tied or the
13  physicians were tied directly to the budget that
14  was established with that hospital, that IPA
15  entity, as opposed to being in a pool unto
16  themselves that didn't have any management under
17  a hospital relationship.
18      Q.  Again when we're talking about these
19  risk pools, we are talking about capitated
20  reimbursement programs?
21      A.  Yes.
22      Q.  So is it my understanding that Harvard

John M. Killion    HIGHLY CONFIDENTIAL    January 6, 2006
Boston, MA

34

1   Pilgrim had a capitated reimbursement program
2   with physicians outside of hospitals, and your
3   job was to bring those physicians into a pool
4   that was -- that involved capitated reimbursement
5   through a hospital?
6       A.  That's correct.  And although those
7   physicians may have been part of a risk
8   arrangement in that pool prior to that
9   relationship with the hospital.  Some of them
10  might have been paid direct fee schedule and not
11  all of those.
12      Q.  How successful were you in moving
13  physicians to this hospital-based capitation
14  pool?
15      A.  Almost 99 percent of the physicians
16  were moved --
17      Q.  So --
18      A.  -- from that poorly-performing pool.
19      Q.  When you say it is a poorly-performing
20  pool, what does that mean?
21      A.  Harvard Pilgrim was going through a
22  restructuring at that time, and that was a pool

35

1   of -- a large pool of physicians that financially
2   was causing a strain on the company.
3       Q.  Because the reimbursement was large?
4       A.  I don't know specifically.  Because the
5   reimbursement was large or was an issue in
6   regards to physicians not having a management
7   relationship through a hospital and physician
8   leadership.
9       Q.  How did that relationship of the
10  hospital impact the level of moneys that Harvard
11  Pilgrim paid?
12      A.  I don't know.
13      Q.  Okay.  So at the completion of your
14  project, Harvard Pilgrim was left with a
15  situation where they were managing physicians'
16  reimbursement in a capitated pool for the
17  hospital management?
18      A.  At the completion, correct.
19      Q.  Now you said that this was a project
20  that involved a particularly poorly-performing
21  pool of physicians?
22      A.  That's correct.

36

1       Q.  What percentage of the physicians in
2   Harvard Pilgrim's network did this pool
3   represent?
4       A.  I don't recall.
5       Q.  Aside from this capitated reimbursement
6   relationship with physicians, how did
7   reimbursement -- how did Harvard Pilgrim
8   reimburse other physicians for drugs administered
9   in hospitals?
10      A.  I don't know.
11      Q.  When you say it was a fairly large
12  pool, how many physicians are we talking about?
13      A.  To the best of my recollection,
14  somewhere around 2,000 physicians.
15      Q.  All located in Massachusetts?
16      A.  Yes.
17      Q.  Did you have an understanding at that
18  time as to what the total physician network that
19  Harvard Pilgrim had?
20      A.  I did at the time.  I don't recall now.
21      Q.  Do you understand in general figures
22  what a range was?  Was it more than 10,000, less

37

1   than 10,000?
2       A.  I believe it was more than 10,000, but
3   again I don't recall.
4       Q.  How long did you hold that position?
5       A.  I was there for approximately two
6   years.
7       Q.  What did you --
8       A.  A little over two years.
9       Q.  What did you do next?
10      A.  I left and went to Media One.
11      Q.  You were at Media One for four months?
12      A.  That's correct.
13      Q.  And then what did you do?
14      A.  I left Media One and went back to Tufts
15  Health Plan.
16      Q.  Okay.  What was the position at Tufts
17  that you took on?
18      A.  I was in charge of ancillary services.
19      Q.  How long did you hold that position?
20      A.  One year.
21      Q.  And then you came to Blue Cross/Blue
22  Shield?

Henderson Legal Services
(202) 220-4158

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

38

1    A.  That's correct.
2    Q.  In your role at Tufts in charge of
3  ancillary services, did you have any involvement
4  with the reimbursement of physician-administered
5  drugs?
6    A.  No, I did not.
7    Q.  So is it fair to say that during your
8  career aside from the what you have testified
9  with respect to your work as the manager of
10  pharmacy operations at Tufts in managing the
11  nexus between the retail pharmacy program and the
12  physician side of the business and your role at
13  Harvard Pilgrim in shifting physicians to the
14  capitated hospital program, you have had no
15  involvement with the reimbursement of physician-
16  administered drugs?
17    A.  I have had involvement through the
18  specialty pharmacy program.
19    Q.  Okay.  With respect to other than --
20  other than with respect to the role we discussed
21  at Tufts and the role we discussed at Harvard
22  Pilgrim and the specialty pharmacy program that

39

1  you mentioned, have you had any other involvement
2  with the reimbursement of physician-administered
3  drugs?
4    A.  No.
5    Q.  Did you do anything to gain knowledge
6  as to the reimbursement of physician-
7  administered drugs for the specific purposes of
8  this deposition?
9    A.  Other than my discussion with Steve
10  Skwara.
11    Q.  On Wednesday?
12    A.  No.  Forty days, when I first heard
13  about this.
14    Q.  Okay.  So you had a discussion with
15  your counsel, and I don't want to get into the
16  subject matter of it, but aside from that
17  discussion with counsel, have you done anything
18  else to obtain an understanding of the
19  reimbursement and the negotiation and the
20  contracting for the reimbursement of physician-
21  administered drugs?
22    A.  No.

40

1    MR. SULLIVAN:  Could we take a break?
2    MR. HAAS:  Sure.
3    MR. SULLIVAN:  We have been going about
4  an hour.
5    MR. HAAS:  Sure.
6    (Recess taken at 10:22 a.m.)
7    (Recess ended at 10:33 a.m.)
8    MR. HAAS:  Back on the record.
9  BY MR. HAAS:
10    Q.  Mr. Killion, have you ever been deposed
11  before?
12    A.  Yes, I have.
13    Q.  When?
14    MR. SULLIVAN:  Before we get into that,
15  I think the witness would like to have the
16  question that you asked just before the break
17  reread.  I'm not sure he properly understood
18  that.
19    MR. HAAS:  I have no problem with your
20  clarifying your testimony, if you choose, Mr.
21  Killion.  If I could have the court reporter
22  reread the last question before the break.

41

1    (The reporter then read back as
2    follows: "Question: Okay.  So you
3    had a discussion with your
4    counsel, and I don't want to get
5    into the subject matter of it, but
6    aside from that discussion with
7    counsel, have you done anything
8    else to obtain an understanding of
9    the reimbursement and the
10    negotiation and the contracting
11    for the reimbursement of
12    physician-administered drugs?
13    "Answer: No.")
14    THE WITNESS:  And for clarification, my
15  understanding was when you were asking me that
16  consistent with, I believe, the previous
17  question, which was in preparation for the
18  deposition, which was, since I met with counsel
19  40 days ago to today.  My answer to that in the
20  context you asked it, was, yes, I do have knowledge
21  of a general sense, was, yes, I do have knowledge
22  of AWP and reimbursement to physicians --

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

42

```
 1        MR. HAAS: Okay.
 2        THE WITNESS: -- as part of my -- part
 3  of my responsibility for the specialty pharmacy
 4  program at Blue Cross/Blue Shield of
 5  Massachusetts.
 6  BY MR. HAAS:
 7     Q.  Prior to your work in 2003 and 2004 in
 8  the specialty pharmacy program, did you in your
 9  professional career have any involvement with the
10  negotiation, contracting, or setting of
11  reimbursement for physician-administered drugs?
12     A.  No.
13     Q.  So whatever knowledge in your
14  experience was derived from 2003 forward; is that
15  correct?
16     A.  Correct.
17     Q.  In 2003 and 2003, did you endeavor in
18  connection with the specialty pharmacy program to
19  obtain an understanding of Blue Cross/Blue Shield
20  of Massachusetts' historical practices with
21  respect to the negotiation, contracting, and
22  setting of reimbursement for physician-
```

43

```
 1  administered drugs?
 2     A.  Yes.
 3     Q.  Okay.  Please state your understanding
 4  as to all the ways that Blue Cross/Blue Shield of
 5  Massachusetts reimbursed physician-administered
 6  drugs from 1991 until today.
 7     A.  My understanding is Blue Cross/Blue
 8  Shield reimburses physician-administered drugs at
 9  a discount off of AWP.
10     Q.  Okay.  Do you also understand as the
11  witness testified yesterday that from 1991
12  through today Blue Cross/Blue Shield reimbursed
13  physician-administered drugs on a capitated
14  basis?
15     A.  No.
16     Q.  You have no understanding as to whether
17  they did, one way or the other?
18     A.  No, I don't.
19     Q.  Do you have any understanding as the
20  witness testified yesterday as to whether Blue
21  Cross/Blue Shield reimbursed physician-
22  administered drugs prior to 1995 on a charge
```

44

```
 1  basis with a U and C cap?
 2     A.  No.
 3     Q.  Do you have any understanding as to
 4  whether and to what extent Blue Cross/Blue Shield
 5  reimbursed physician-administered drugs on a
 6  withhold basis as the witness testified
 7  yesterday?
 8     A.  No.
 9     Q.  Okay.  So when you say that you have an
10  understanding of how Blue Cross/Blue Shield of
11  Massachusetts reimburses for physician-
12  administered drugs, it is just with -- solely
13  with respect to those drugs that Blue Cross/Blue
14  Shield of Massachusetts reimburses on a fee-for-
15  services basis to the extent they utilize a
16  percentage of AWP?
17     A.  That's correct.
18     Q.  Were you aware that prior to 1995 Blue
19  Cross/Blue Shield of Massachusetts did not
20  reimburse physician-administered drugs either
21  based upon a percentage of AWP or using fee
22  schedules calculated by Medicare or any other
```

45

```
 1  entity?
 2     A.  No.
 3        MR. SULLIVAN: Objection to the form.
 4     Q.  I am sorry.  I didn't get your answer.
 5        MR. SULLIVAN: Go ahead.
 6     A.  No.
 7     Q.  Now you say that you learned in 2003
 8  and 2004 -- first of all, do you know when this
 9  litigation started?
10     A.  I believe four years ago.
11     Q.  So 2003-2004 time frame, which is about
12  two years after the litigation started, what did
13  you then learn about how Blue Cross/Blue Shield
14  was then reimbursing physicians under its fee-
15  for-service program?
16     A.  That we reimbursed drugs at AWP minus
17  five percent.
18     Q.  Isn't it more accurate to say that Blue
19  Cross/Blue Shield reimbursed drugs at the amount
20  specified in the Medicare fee schedules at that
21  time?
22        MR. SULLIVAN: Objection to the form.
```

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

---

**46**

1    A.  Correct.
2    Q.  You have no understanding as to how in
3  particular Medicare derived the exact numbers in
4  its fee schedule; right?
5    A.  Off of AWP.
6    Q.  What is your basis for the
7  understanding of that point?
8    A.  That AWP is the -- or AWP is the
9  industry standard in regards to reimbursement for
10  drugs.
11    Q.  Do you have an understanding of what
12  the actual calculation was that Medicare used to
13  derive the numbers in its fee schedule?
14    A.  Not directly, no.
15    Q.  Do you have of any AWP they used?
16    A.  I believe it was Redbook.
17    Q.  Do you have an understanding of whether
18  all the carriers followed the same process in
19  reimbursing for physician-administered drugs
20  under Medicare?
21    A.  I'm not aware if they all followed the
22  same practice or not.

**47**

1    Q.  How in 2003-2004 did you obtain an
2  understanding as to how Blue Cross/Blue Shield of
3  Massachusetts reimbursed for physician-
4  administered drugs on a fee-for- service basis?
5    A.  Through the specialty pharmacy
6  committee that was put in place.
7    Q.  Who was on the specialty pharmacy
8  committee?
9    A.  I don't recall all the individuals, but
10  it was a cross-section of various individuals
11  from different departments, including pharmacy,
12  clinical, medical directors, people on my staff,
13  member services.
14    Q.  Okay.  If you could for me for the
15  record list the individuals that you do recall
16  and their titles.
17    A.  Pam Mortland.
18    Q.  What was her title?
19    A.  I believe she was manager of pharmacy
20  operations.
21    Q.  Who else?
22    A.  Joe Guianta, G-U-I-A-N-T-A.

**48**

1    Q.  What was his position?
2    A.  Pharmacy analyst.
3    Q.  Who else?
4    A.  Matt Connell.
5    Q.  What was his position?
6    A.  Director of pharmacy operations; Jan
7  Cook, medical director; Laurie Liscio, manager,
8  ancillary services; Janis Pochini, contract
9  manager, ancillary; David Lynch, pharmacy
10  analyst; Tim Fitzgibbons, analyst in the actuary
11  department; Paula Choquette, clinical case
12  manager; Heather Cooke, contract specialist in
13  the ancillary department; while not a full-time
14  member, Karen Jackson -- Wells-Jackson, and I
15  don't know her exact role, but she worked in
16  pharmacy.
17    Q.  Was there anyone from provider
18  reimbursement or provider contracting?
19    A.  Provider reimbursement, I believe Mike
20  Mulrey participated in some of the meetings.
21    Q.  Anybody else from the provider side?
22    A.  Not that I recall.

**49**

1    Q.  Was it common at Blue Cross/Blue Shield
2  of Massachusetts to have these cross- functional
3  committees?
4    A.  Very common.
5    Q.  So it was common to have people from
6  the pharmacy side of the business with people on
7  the provider side of the business?
8    A.  Depending upon the initiative.
9    Q.  Who did the committee report to?
10    A.  The committee reported to the new
11  medical management model committee.
12    Q.  The new management medical model?
13    A.  New medical management model.
14    Q.  Medical?
15    A.  Yes.  Acronym, NM3.  I should say that
16  is where I reported into.
17    Q.  What is the new medical management
18  model?
19    A.  It is a committee of senior level
20  individuals within the company that review major
21  initiatives we're looking to implement.
22    Q.  Who is on the committee?

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

---

50

1     A.   Maureen Coneys.
2     Q.   What is her title?
3     A.   She is the executive vice president --
4   excuse me -- senior vice president, healthcare
5   services.
6     Q.   Who else?
7     A.   John Fallon, chief medical officer;
8   Rena Vertes, senior VP, actuary; Kim Olson, vice
9   president, vendor management services; Harold
10  Picken, medical director, no longer on the
11  committee.
12    Q.   Was it the MM3 committee that had the
13  ultimate say as to whether the pharmacy committee
14  proposal would be adopted?
15    A.   Yes.
16        MR. SULLIVAN:  For the record, it is N,
17  as in Nancy, M3.
18        THE WITNESS:  Yes.  New.
19        MR. HAAS:  Thank you.
20  BY MR. HAAS:
21    Q.   Is anybody on -- was --
22        MR. HAAS:  Withdraw that question.

---

51

1     Q.   Was anybody on the specialty pharmacy
2   committee, for example Jan Cook, a medical
3   doctor?
4     A.   Jan Cook is a medical doctor.
5     Q.   Is there anybody else?
6     A.   No.
7     Q.   Were any members of the committee at
8   any point in time retail pharmacists?
9     A.   I am sorry.  Is your question were they
10  retail pharmacists at --
11    Q.   Were they retail pharmacists in the
12  retail pharmacy setting?
13    A.   While also working at Blue Cross/Blue
14  Shield?
15    Q.   Well, either while working at Blue
16  Cross/Blue Shield, i.e., in the staff model or in
17  their career to your knowledge.
18    A.   I don't know.
19    Q.   Today does Blue Cross/Blue Shield of
20  Massachusetts own or have any affiliations with
21  any retail pharmacies?
22    A.   No.

---

52

1     Q.   Does it have any -- does Blue
2   Cross/Blue Shield of Massachusetts currently own
3   or have any affiliations with physician clinics?
4     A.   No.
5     Q.   Does it own or have any affiliations
6   with hospitals?
7     A.   We have affiliations with hospitals,
8   yes.
9     Q.   Which hospitals?
10    A.   Which hospitals?
11    Q.   Yes.
12    A.   The major hospitals in Massachusetts.
13    Q.   What is the affiliation?
14    A.   A contract relationship for the
15  delivery of healthcare services.
16    Q.   What is the nature of that contract
17  relationship?
18    A.   I'm sorry.  Nature?
19    Q.   When you say you have a contract
20  relationship for the delivery of the healthcare
21  services, --
22    A.   Yes.

---

53

1     Q.   -- is that a reimbursement contract or
2   is that some other type of contract?
3     A.   It is a reimbursement contract.  It
4   includes quality components.
5     Q.   You say "quality components."  What
6   does that mean?
7     A.   We have a quality program in place that
8   looks at specific quality measures in relation to
9   reimbursements to our hospitals in our network.
10    Q.   Is your relationship with the hospitals
11  in your network different in kind than your
12  relationship with the physicians in your network?
13    A.   How so?
14    Q.   That is my question.  When I had asked
15  whether you had affiliations with providers, you
16  said no.  When I asked whether you had
17  affiliations with hospitals, you said yes, and
18  you referred to this relationship.
19    A.   I heard you say "owned."  We do have
20  affiliations with certainly physicians or
21  providers by virtue of the fact that we're a
22  healthcare insurer.

---

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

---

54

1    Q.  Right.
2    A.  We do have -- we don't own retail
3  pharmacies.  We have affiliations with pharmacies
4  --
5    Q.  All right.
6    A.  -- through our relationship with ESI,
7  which contracts with them directly on our behalf.
8    Q.  So you have an ownership interest in
9  these hospitals?
10      MR HAAS:  Withdraw that.
11    Q.  Blue Cross/Blue Shield of Massachusetts
12  has an ownership interest in the hospitals that
13  you referred to?
14      MR. SULLIVAN:  Objection to the form.
15    A.  We don't own the hospitals.
16    Q.  Do you have an ownership interest in
17  the hospitals?
18    A.  No.
19    Q.  Okay.  So it goes back to -- I am
20  confused.  Why are you -- what is the difference
21  in the nature of the relationship between Blue
22  Cross/Blue Shield of Massachusetts and providers

---

55

1  and the nature of the relationship between Blue
2  Cross/Blue Shield of Massachusetts and hospitals?
3    A.  I understood your question to be do we
4  have an ownership or an affiliation.  We have an
5  affiliation with hospitals, physicians, and
6  retail pharmacies in the delivery of healthcare
7  services to our members.  We do not own them, or
8  we don't have an ownership relationship.
9    Q.  Okay.  So there is no difference in
10  kind from a reimbursement perspective or an
11  ownership perspective or an affiliation
12  perspective between your relationship with
13  hospitals and doctors?
14    A.  (No audible response.)
15    Q.  When I initially asked this line of
16  question, I asked the same question for doctors
17  as I did for hospitals.  You said no as to
18  doctors.  You said yes as to hospitals.  I am
19  trying to get an understanding of why that is.
20      MR. SULLIVAN:  I think it had to do
21  with the question that you asked.  I think the
22  witness had said when you asked the first

---

56

1  question it was do you own or have affiliation
2  with any pharmacies.  Then when you asked about
3  hospitals, you asked if there was an affiliation
4  with hospitals, and he said yes.  I don't think
5  he is trying to be tricky.
6      MR. HAAS:  Okay.  If it is just an
7  ambiguity here, that is fine.  I don't want to
8  dwell on something if there is no difference.
9  That's what I am trying to drive at.
10  BY MR. HAAS:
11    Q.  In your mind, is there a difference
12  between Blue Cross/Blue Shield of Massachusetts'
13  relationship with doctors and with hospitals?
14    A.  We don't have an ownership
15  relationship.  We have an affiliation with doctors
16  and hospitals for the delivery of healthcare
17  services.
18    Q.  So but my precise question is whether
19  you see a difference in the nature of that
20  relationship.  Do you?
21    A.  The nature of the relationship -- my
22  answer to that would be a yes.

---

57

1    Q.  What is the difference?
2    A.  The difference is how we go about
3  contracting for the delivery of those services
4  and what programs we have in place specific to
5  those hospital relationships versus the contract
6  relationships we have with our physicians in our
7  network.
8    Q.  And how do they differ in your mind?
9    A.  Well, they differ in regards to
10  reimbursement methodology.  We pay hospitals on a
11  DRG-based reimbursement.  We don't pay physicians
12  on a DRG reimbursement.  We have quality programs
13  in place for our hospitals.  We have specific
14  pay-for-performance programs in place with our
15  physicians with different metrics, different
16  measures.  There are differences in how our
17  relationships are established.
18    Q.  When you say pay-for-performance
19  relationship with providers, what does that mean?
20    A.  It could mean a variety of different
21  things.  There are different quality measures
22  that we look at in regards to members'

---

John M. Killion         HIGHLY CONFIDENTIAL         January 6, 2006
Boston, MA

58

1  satisfaction levels that we negotiate with
2  physicians in their contracts.
3      Q.  All right.
4      A.  There are measures in regards to
5  management of, consistent with those quality
6  programs, management of medical services within a
7  defined parameter, financial parameter, and the
8  opportunity for physicians to share in
9  compensation for meeting those performance goals.
10     Q.  You are referring to the primary care
11 physician incentive program?
12     A.  That's right.
13     Q.  Previously --
14     A.  Well, actually that is one program.
15 The program I was referring to was a program we
16 refer to as the GPIP program, which is the Group
17 Physician Incentive Program.
18     Q.  I am sorry.  What was the name of that
19 program?
20     A.  It is GPIP, Group Physician Incentive
21 Program.
22     Q.  Is it fair to say that the overall

59

1  level of compensation that a physician receives
2  depends in part upon the achievement of the
3  metrics set forth in these programs?
4      A.  Correct.
5      Q.  Now just at a very general level, is it
6  that the physician receives more incentives if it
7  meets the metrics, or is it that it receives less
8  incentives than it would otherwise receive if it
9  does not?
10     A.  They receive more incentive if they
11 meet the metrics.
12     Q.  So it is an additional amount that they
13 could shoot for on top of what they would
14 otherwise be reimbursed?
15     A.  That's correct.
16     Q.  What --
17         MR. HAAS:  Withdraw that question.
18     Q.  Who was it that was responsible for the
19 formation of the specialty pharmacy committee?
20     A.  I was.
21     Q.  Did the concept of the specialty
22 pharmacy committee arise out of your

60

1  participation and discussions in the special
2  committee meetings that you held with the
3  Massachusetts Society of Clinical Oncology?
4      A.  No.
5      Q.  Okay.  Was that part of the rationale
6  for putting together the specialty pharmacy
7  committee?
8      A.  No.  Those meetings came after the
9  formation of the specialty pharmacy committee.
10     Q.  What is the oncology MASCO specialty
11 committee?
12     A.  I am sorry.  I didn't get your
13 question.
14     Q.  What is the oncology MASCO specialty
15 committee?
16     A.  I am familiar with the Massachusetts
17 Association of Clinical Oncologists or
18 Massachusetts Society of Clinical Oncologists,
19 MASCO.
20     Q.  Yes.
21     A.  My understanding is that is a committee
22 of oncologists that meet.  I'm not sure of the

61

1  frequency of their meetings.
2      Q.  Who is on the committee to your
3  knowledge?
4      A.  I don't know all of the members of the
5  committee, but having participated in discussions
6  with MASCO, Theresa Mulvey, who, I believe, is
7  the president of MASCO; Dr. Wisch, who is an
8  oncologist; Dr. Kagan, who is an oncologist; and
9  I'm not familiar with the -- I am not recalling
10 the other names of the oncologists that were part
11 of that committee.
12     Q.  And who participates in the specialty
13 committee with MASCO on behalf of Blue Cross/Blue
14 Shield of Massachusetts?
15     A.  When you say specialty committee with
16 MASCO, --
17     Q.  Yes.
18     A.  -- I am not familiar with what you are
19 referring to.
20         MR. HAAS:  Mark this.
21         (Two-page memorandum dated May 1,
22         2002, to Dr. Fanale from Dr. Cook,

John M. Killion     HIGHLY CONFIDENTIAL     January 6, 2006
Boston, MA

62

1        production numbers BCBSMA-AWP-0003
2        and 0004 marked Exhibit Killion 001
3        for identification.)
4 BY MR. HAAS:
5    Q.  We are marking as Deposition Exhibit
6 Killion 001 a document Bates stamped BCBSMA-AWP-
7 0003 to 0004.
8        (Handing Exhibit Killion 001 to
9        the witness.)
10    Q.  This is a document dated May 1, 2002,
11 from Jan Cook, M.D., to James Fanale, M.D., and
12 you will see on the subject line it refers to
13 Oncology, bracket, MASCO, Special Committee
14 Minutes, April 29, 2002.
15     Do you see that?
16    A.  Yes.
17    Q.  Let me ask it this way.  Are you
18 familiar with a committee referred to as the
19 oncology MASCO specialty committee?
20    A.  No.  I am familiar with MASCO.
21 Although I am aware that Jan Cook had regular
22 meetings with MASCO.

63

1    Q.  Were you aware that Jan Cook had
2 regular meetings with other physician societies?
3    A.  Yes.
4    Q.  What other physician societies?
5    A.  She participated in meetings with the
6 Mass. Arthrometric Society, the Mass.
7 Chiropractic Society, and a variety of other
8 medical societies.
9    Q.  Who is James Fanale, M.D.?
10    A.  James Fanale was our chief medical
11 officer.
12    Q.  And Steve Fox was the director of
13 provider relations?
14    A.  That's correct.
15    Q.  Who is Robert Mandel?
16    A.  Robert Mandel I believe at the time was
17 vice president for provider services.
18    Q.  He is no longer with the company?
19    A.  He left the company.  He is now back
20 with the company.
21    Q.  What is his current position?
22    A.  He is responsible for the

64

1 transformation initiative.
2    Q.  What is the transformation initiative?
3    A.  It is an initiative where -- how best
4 to describe the transformation initiative?  It is
5 a major initiative that Blue Cross/Blue Shield is
6 looking at in regards to having an impact on how
7 the -- the way in which healthcare is delivered
8 within the Commonwealth of Massachusetts.
9    Q.  And you say it is a major initiative to
10 have impact.  What does that mean?
11    A.  It is a priority for our company in
12 2006 and beyond.
13    Q.  I am trying to get an understanding of
14 what the initiative is.
15    A.  It is looking at a variety of different
16 issues with the healthcare system and how we as a
17 major player in the marketplace can be a leader
18 in addressing a number of those issues.
19    Q.  What are those issues?
20    A.  The uninsured pool; quality; misuse of
21 healthcare; underuse, overuse of healthcare; e-
22 health initiatives related to medical records.

65

1    Q.  Do any of the initiatives involve
2 reimbursement issues?
3    A.  I'm not aware at this point
4 specifically.  The committee is just forming.
5    Q.  Are you a member of that committee?
6    A.  Not as of yet.  Again the committee is
7 just forming.
8    Q.  To your understanding as of today,
9 given its early phase, does the committee
10 nevertheless have reimbursement for physician-
11 administered drugs as part of its agenda?
12    A.  I'm -- I'm not aware of one way or the
13 other whether or not that is part of the overall
14 agenda.
15    Q.  So turning back to what we have marked
16 as Deposition Exhibit Killion 001, when to your
17 knowledge was the first time that you
18 participated in any meeting of the MASCO
19 specialty committee?
20    A.  It would have been after we initiated
21 the specialty pharmacy committee at Blue
22 Cross/Blue Shield, which would have been, I

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

66

1  believe, sometime in 2003.
2     Q.  If you would look at that page, the
3  second arrow in the middle talks about "multiple
4  co-pays for cancer patients undergoing
5  chemotherapy."  For the record, it says, "MASCO
6  doctors are concerned that payments may be
7  foregoing chemotherapy in the office" --
8          MR. SULLIVAN:  I think it said
9  "patients."
10         MR. HAAS:  Is that what I said? Let me
11  read it again for the record so we are clear.
12  BY MR. HAAS:
13     Q.  "MASCO's doctors are concerned that
14  patients may be foregoing chemotherapy in the
15  office set because of multiple co-pays," close
16  quote.
17         And down at the bottom under "Action
18  Item," it says, quote, "Robert to look into
19  BCBSMA waiving co-pays for outpatient
20  chemotherapy.  Report back in one month."
21         Were you involved at all in any of your
22  work at Blue Cross/Blue Shield in any initiatives

67

1  designed to ensure that patients were
2  administered drugs in physicians' offices rather
3  than in the hospital?
4     A.  No.
5     Q.  Do you have any understanding of
6  whether it was an agenda of Blue Cross/Blue
7  Shield to encourage the administration of drugs
8  in office versus in the hospital setting?
9     A.  No.
10     Q.  Are you aware of any studies or
11  analyses of whether the costs of administering
12  drugs in office is less to Blue Cross/Blue Shield
13  of Massachusetts than administering drugs in the
14  hospital setting?
15     A.  Yes.
16     Q.  What are you aware of?
17     A.  That reimbursement in the hospital
18  setting is a more expensive setting than in the
19  physician office.
20     Q.  That is something that Blue Cross/Blue
21  Shield of Massachusetts studies or tracks?
22     A.  It is something we have looked at.

68

1     Q.  In what context has Blue Cross/Blue
2  Shield of Massachusetts looked at that?
3     A.  In understanding an analysis, what our
4  -- what our reimbursement is in the hospital
5  setting versus the office setting.
6     Q.  Were there studies done?
7     A.  I can't say there were specific studies
8  done, no.
9     Q.  Were there cost analyses done?
10     A.  I don't remember specific cost analyses
11  that were done.
12     Q.  What is the basis for your
13  understanding that Blue Cross/Blue Shield of
14  Massachusetts analyzed this?
15     A.  I know we had looked at reimbursement
16  specific to how hospitals were reimbursed for
17  medications, not only oncology, but medications,
18  versus how our reimbursement was structured in
19  the physician setting.
20     Q.  Did Blue Cross/Blue Shield have any
21  programs or plans or initiatives designed to
22  encourage the administration of drugs in office

69

1  because it was cheaper to Blue Cross/Blue Shield
2  of Massachusetts as well as the healthcare system
3  as a whole?
4     A.  No.  Not that I'm aware of.
5     Q.  What was the outcome of this analysis
6  that you are aware of which concluded that it's
7  less costly to administer the drugs in office
8  than in the hospital setting?
9     A.  The outcome of the analysis was looking
10  at how we reimburse in the hospital setting and
11  changing that reimbursement methodology.
12     Q.  Were you aware of any programs that
13  were put into place to waive the co-payments for
14  patients in the in-office setting in order to
15  encourage the administration of drugs in office?
16     A.  No.
17     Q.  Why is it that Jan Cook had these
18  meetings with or has these meetings with these
19  physician societies?
20     A.  There are three regional medical
21  directors.  Each of them are assigned specific
22  medical societies to work with and meet with.

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

70

1    Q.  Who are the other two in addition to
2  Jan Cook?
3    A.  Barry Zallen and Peter Goldbach.
4    Q.  And why are they assigned to meet with
5  these societies?
6    A.  We very much as an organization
7  encourage dialogue with our providers'
8  physicians.
9    Q.  Why do you encourage dialogue with
10 physicians?
11   A.  We believe that open dialogue leads to
12 better partnership and the better delivery of
13 services to our members if they are informed in
14 regards to initiatives that we are moving forward
15 on.
16   Q.  Is it important to Blue Cross/Blue
17 Shield of Massachusetts to maintain good
18 relations with the physicians in its networks?
19   A.  That is important.
20   Q.  Why is that important?
21   A.  It is certainly important because we
22 want to make sure that our members are getting

71

1  access to good care and that our physicians have
2  a satisfaction level in regards to the
3  relationship that we share with them.
4    Q.  All right.  When you say you want to
5  ensure that the members of Blue Cross/Blue Shield
6  have access to good care, does that mean you want
7  to ensure that the quality doctors are maintained
8  in the Blue Cross/Blue Shield of Massachusetts
9  network?
10   A.  That's correct.
11   Q.  Who is John O'Brien?
12   A.  John O'Brien is a provider -- provider
13 relations manager who works with our physicians.
14   Q.  Does he report to Steve Fox?
15   A.  Yes, he does.
16   Q.  So after you formed this specialty
17 pharmacy committee, what was the next thing you
18 did with respect to this pharmacy program
19 initiative?
20   A.  We discussed sending out an RFP to the
21 specialty pharmacies concerned with the price we
22 were paying for the cost of drugs and making sure

72

1  that we had good delivery systems in place to
2  provide necessary medications to our members in a
3  cost effective manner.
4    Q.  When was the first time that you heard
5  of a specialty pharmacy?
6    A.  When I was at Tufts Health Plan.
7    Q.  Was that in the 1986 to 1995 time
8  frame?
9    A.  Yes.
10   Q.  In what capacity did you learn about
11 specialty pharmacies while at Tufts?
12   A.  At that point they were just coming
13 into being.
14   Q.  What was your understanding at this
15 time of the role of the specialty pharmacy?
16   A.  That they had the ability to offer
17 specific drugs at more cost effective pricing
18 than we were paying at that point in time and
19 could also deliver drug management programs to
20 our members that would deliver a higher level of
21 quality.
22   Q.  Did Tufts utilize a specialty pharmacy

73

1  relationship?
2    A.  Not at that time.
3    Q.  Why not?
4    A.  We were just starting to look at it at
5  that point.
6    Q.  Did there come a point in time to your
7  knowledge that Tufts adopted the specialty
8  pharmacy model?
9    A.  It is my understanding they did.
10   Q.  Is that while you worked there?
11   A.  No.
12   Q.  When is it your understanding that they
13 adopted that model?
14   A.  At some point after I left.  I don't
15 know specifically when.
16   Q.  Did you do any analysis at Tufts as to
17 the potential savings to the organization in the
18 event they adopted a specialty pharmacy
19 relationship for the supply of physician-
20 administered drugs?
21   A.  No.  At that point I was involved in
22 the retail pharmacy side.

John M. Killion       HIGHLY CONFIDENTIAL       January 6, 2006
Boston, MA

---

74

1    Q.  Were you familiar with any studies or
2  analyses of that issue?
3    A.  I am familiar with The Wall Street
4  Journal article that looked at oncologists paying
5  for drugs at a discount off of AWP that came out
6  in '04.
7    Q.  Talking about the time frame when you
8  were at Tufts, were you aware of any analysis
9  done?
10   A.  No, I was not.
11   Q.  Who prepared the RFP?
12   A.  It was a departmental group of
13 individuals that were involved in the specialty
14 pharmacy committee.
15   Q.  So it was a subgroup of the specialty
16 pharmacy committee?
17   A.  That's correct.
18   Q.  Did you send out the RFP at that time?
19   A.  Yes, we did.
20   Q.  When did you send it out?
21   A.  We sent it out, I believe, in 2003.
22   Q.  How many entities did you send it out

75

1  to?
2    A.  Approximately 10 to 12 different
3  entities.
4    Q.  Did you eventually select an entity
5  from the RFP process?
6    A.  Yes, we did.
7    Q.  Was that Priority?
8    A.  Priority was one of them.
9    Q.  And Caremark is the other?
10   A.  Caremark is the other.
11   Q.  Does Priority and Caremark provide or
12 supply drugs to different groups of providers?
13   A.  Yes.  That's my understanding.
14   Q.  What is the division between the two?
15   A.  Priority, we contract with Priority for
16 MS drugs, hep C, hepatitis C.  We contract with
17 Caremark for drugs for members with hemophilia,
18 so factor products.
19      I should mention we also have one other
20 class of drugs that we contract for as well, and
21 there are three pharmacies involved in that
22 relationship, and that is for fertility

76

1  medications.
2    Q.  All right.
3    A.  Priority is one of them; Village
4  Pharmacy, a local pharmacy, is another; and the
5  third pharmacy is IVP Pharmaceuticals.
6    Q.  Did your selection of Village and IVP
7  come out of this RFP process?
8    A.  Yes, it did.
9    Q.  All right.  So let me see if I have the
10 list complete.  Blue Cross/Blue Shield contracts
11 with specialty pharmacies for the supply of MS
12 drugs, hep c drugs, hemophiliac drugs?  Is that
13 what you said?
14   A.  Well, drugs with members suffering from
15 hemophilia.
16   Q.  Hemophilia?
17   A.  Factor product drugs.
18   Q.  And fertility drugs?
19   A.  Fertility drugs.
20   Q.  What are the factor drugs that are
21 supplied for hemophilia patients?
22   A.  They are factor drugs.  They are called

77

1  factor products.
2    Q.  What types of factors?  There are
3  different types of factors, growth factors.
4    A.  Not for hemophilia.
5    Q.  That is why I am asking.  Is it red
6  blood growth factors?
7    A.  For hemophilia, it is factor 8, factor
8  9, it is a variety of different medications that
9  a hemophilia patient would take to assist in
10 coagulation.
11   Q.  What are the hep c drugs?
12   A.  There is a variety of hep c drugs.  I
13 can't tell you offhand exactly what they are.
14   Q.  Do they fall in any particular class
15 other than hep c drugs?
16   A.  They are drugs that are commonly taken
17 by patients that have hepatitis C.
18   Q.  Antiviral drugs?
19   A.  Yes.
20   Q.  Okay.  What are the MS drugs?
21   A.  Avonex, Betaseron, Copaxone.
22   Q.  Why did Blue Cross/Blue Shield of

Henderson Legal Services
(202) 220-4158

John M. Killion        HIGHLY CONFIDENTIAL        January 6, 2006
Boston, MA

78

1  Massachusetts limit the drugs supplied through
2  the specialty pharmacy vehicle to these four
3  categories of drugs?
4      A.  We haven't.  We're continuing to pursue
5  the specialty pharmacy initiative.  A new RFP is
6  going out, and we are looking at expanding the
7  amount of medications that we include in the
8  specialty pharmacy program beyond these drugs.
9      Q.  Okay.  Why to date has Blue Cross/Blue
10  Shield of Massachusetts only contracted to supply
11  for the supply of these four categories?
12      A.  We have 2.8 million members.  We wanted
13  to stage the implementation of our specialty
14  pharmacy program to make it a smooth transition
15  for our members so that it was a successful
16  implementation.  So the decision was via the NM3
17  committee and the specialty pharmacy committee to
18  make sure we do it in a coordinated fashion
19  without rolling out every individual initiative
20  at all one time.
21      Q.  All right.
22      A.  So it is an ongoing initiative.

79

1      Q.  All right.  How does the specialty
2  pharmacy program work with respect to the supply
3  of drugs to your members?
4      A.  We contract directly with the specialty
5  pharmacy -- well, I should say we contract
6  through ESI, our pharmacy benefit management
7  company, which contracts directly with the
8  specialty pharmacy companies for the delivery of
9  these medications at a discount.  They supply the
10  medications to our members and also provide
11  clinical services to our members as far as phone
12  calls, how is the member doing, what adverse
13  reactions are they having, are they having
14  problems with the medications, are they taking
15  their medications on a routine basis, and so on.
16      Q.  All right.  Do the --
17      MR. HAAS:  Withdraw that.
18      Q.  In connection with this program, is it
19  incumbent upon the members to bring the drugs to
20  the doctors for administration?
21      A.  Not necessarily.
22      Q.  With respect to drugs that are

80

1  physician- administered drugs, are those --
2      MR. HAAS:  Well, withdraw that
3  question.
4      Q.  Does the specialty pharmacy program
5  that Blue Cross/Blue Shield of Massachusetts
6  implemented contemplate the supply of physician-
7  administered drugs?
8      A.  Yes.
9      Q.  Okay.  With respect to those drugs, the
10  first question:  Does the current structure now
11  in place involve the supply of physician-
12  administered drugs to the members of Blue
13  Cross/Blue Shield?
14      A.  The drugs that we contract for today
15  are generally drugs that members have the ability
16  to administer after training by the physician.
17      Q.  Okay.  Are there any drugs currently
18  within the purview of the specialty pharmacy
19  program that must be administered by a physician
20  or under the supervision of a physician?
21      A.  I think the answer to that is it
22  depends upon the physician, but, no, the members

81

1  can be trained to administer these drugs.
2      Q.  Okay.
3          (The witness and Mr. Sullivan
4          conferring off the record.)
5  BY MR. HAAS:
6      Q.  Would you like to supplement your
7  answer?
8      A.  No.
9      Q.  You said that the PBM supplies the
10  drugs to the members at a discounted cost.  What
11  does that mean?
12      A.  I didn't say the PBM supplied the
13  drugs.
14      Q.  I mean the PBM contracts to supply --
15  contracts with the specialty pharmacy to supply
16  the drugs to the members at a discounted cost.
17  When you say "discounted cost," what does that
18  mean?
19      A.  A discount off of what we were
20  originally paying for those drugs, a steeper
21  discount, anywhere from for hemophilia drugs up
22  to a discount off of minus 40 percent off of AWP.

Henderson Legal Services
(202) 220-4158

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

82

1     Q.  Does Blue Cross/Blue Shield of
2  Massachusetts contemplate expanding the specialty
3  pharmacy program to encompass drugs that must be
4  administered by a physician or under the
5  supervision of a physician?
6     A.  Yes.
7     Q.  Okay.
8     A.  As I said before, we have got an RFP
9  that is going out.
10    Q.  In connection with that -- well, what
11  are the drugs that Blue Cross/Blue Shield of
12  Massachusetts is contemplating supplying to the
13  physicians -- specialty pharmacy relationship
14  under that new RFP?
15    A.  We are evaluating all self -- all
16  physician-administered and self- administered
17  drugs.
18    Q.  In connection with the drugs that are
19  physician-administered or self- administered
20  drugs that you contemplate will be included
21  within this expanded role of the specialty
22  pharmacy, does Blue Cross/Blue Shield contemplate

83

1  increasing the servicing fee or administration
2  fee associated with those drugs to the extent
3  that they are supplied through the specialty
4  pharmacy?
5     A.  I think that is something that needs
6  further evaluation and we're continuing to study.
7     Q.  And you have studied that issue
8  already?
9     A.  I can't say that we have fully studied
10  this issue already.  No.
11    Q.  Have you partially studied that issue?
12    A.  We know that -- we certainly pay an
13  administration fee for the delivery of drugs, and
14  we pay for the drugs.
15    Q.  Specifically with respect to whether
16  Blue Cross/Blue Shield of Massachusetts has
17  contemplated or considered whether to increase
18  the administration fee or servicing fee with
19  respect to the drugs that must be administered by
20  a physician that would otherwise be encompassed
21  in the specialty pharmacy program, has Blue
22  Cross/Blue Shield of Massachusetts considered

84

1  that or analyzed that specific issue?
2     A.  There have been discussions about that,
3  yes.
4     Q.  Have any documents been created
5  concerning that specific issue?
6     A.  Not that I'm aware of.
7     Q.  Who have those conversations or
8  communications been had with?
9     A.  Well, not that I'm aware of directly.
10  The conversations would have been had with
11  finance and with a committee within Blue Cross.
12    Q.  And so today you are aware of no
13  documentation whatsoever that addresses that
14  issue?
15    A.  I'm aware of -- if I can back up, I'm
16  aware of one document that looked at the
17  administration cost specific to I believe
18  oncology medications.
19    Q.  All right.  Has that document been
20  produced in this litigation?
21        MR. SULLIVAN:  If you know.
22    Q.  Just if you know.  All of these

85

1  questions are if you know.
2     A.  I don't know.
3     Q.  Do you have a copy of that document in
4  your files?
5     A.  I -- I searched for it.  I did not find
6  a document in my files.
7     Q.  Who is --
8     A.  I didn't produce it.
9     Q.  Who was the author of the document?
10    A.  Mike Mulrey.
11    Q.  Did you receive that document by e-
12  mail?
13    A.  Yes.
14    Q.  Did the document have a title on it?
15    A.  It may have.  I don't -- I don't know
16  what the title would have been.
17    Q.  When did you receive it?
18    A.  I don't know the exact time frame.  I
19  believe it would have been in 2004 when CMS was
20  moving to a new reimbursement structure.
21        MR. HAAS:  Could you mark this?
22        (Two-page Specialty Committee

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

86

1          Meeting marked Exhibit Killion 002
2          for identification.)
3     BY MR. HAAS:
4          Q.   Marked as Deposition Exhibit Killion
5     002 is a document Bates stamped -- not Bates
6     stamped -- it hasn't been produced to us with a
7     Bates stamp -- titled "Blue Cross/Blue Shield of
8     Massachusetts, Specialty Committee Meeting,
9     Specialty Group, Massachusetts Society of
10    Clinical Oncology, parenthetical, MSCO, date June
11    10, 2004.
12          (Handing Exhibit Killion 002 to
13          the witness.)
14         Q.   Mr. Killion, I ask that you take a look
15    at this document and tell me if you recognize it;
16    if so, what it is.
17          (Pause.)
18          (The witness viewing
19          Exhibit Killion 002.)
20         A.   I have read the document.
21         Q.   What is it?
22         A.   It is minutes that were in followup to

87

1     a meeting that we had, Jan Cook and I from Blue
2     Cross/Blue Shield, with the Mass. Society of
3     Clinical Oncology discussing with them our -- two
4     initiatives: one, our discussion around pay for
5     performance and looking at quality cost program
6     as well as a discussion with them in regards to
7     our specialty pharmacy program.
8          Q.   Were you involved at all in the
9     discussions of whether to change the
10    reimbursement methodology of Blue Cross/Blue
11    Shield of Massachusetts from a fee-for-service
12    amount based upon AWP or based upon Medicare to
13    one based upon ASP?
14         A.   I was involved in some of those
15    discussions.
16         Q.   Were you involved in the determination
17    of not to switch the methodology from an AWP-
18    based methodology to an ASP-based methodology?
19         A.   I was not involved in making that
20    decision. I had comment in regards to that
21    decision.
22         Q.   What analysis did you do and commentary

88

1     did you provide in connection thereto?
2          A.   That at that point ASP was not industry
3     standard, and that Blue Cross wanted to wait and
4     further evaluate CMS's methodology before
5     implementing an initiative with our oncologists
6     that wasn't yet industry standard.
7          Q.   Where is that documented?
8          A.   I don't believe that it is documented.
9          Q.   That was your input to the process, but
10    you didn't document it in any way or form?
11         A.   I had discussions.
12         Q.   Who did you have discussions with?
13         A.   Deb Devaux.
14         Q.   Anyone else?
15         A.   I had discussions with Jan Cook about
16    that as well.
17          THE WITNESS:  Can we take a five-minute
18    break?
19          MR. HAAS:  Sure.
20          (Recess taken at 11:32 a.m.)
21          (Recess ended at 11:39 a.m.)
22          MR. HAAS:  Back on the record.

89

1     BY MR. HAAS:
2          Q.   You had mentioned that Blue Cross/Blue
3     Shield had made the determination not to reduce
4     reimbursement under the ASP methodology.  Is it
5     your understanding that the industry standard is
6     to maintain reimbursement at 95 percent of AWP?
7          A.   My understanding is not to -- the
8     industry standard is not to move to ASP at this
9     point in time.
10         Q.   Right.  My question is a little
11    different. Is it your understanding that the
12    industry standard is to maintain reimbursement at
13    95 percent of AWP?
14         A.   For the most part, yes, that's correct.
15         Q.   I have shown you what has been marked
16    as Deposition Exhibit Killion 002, and I'm not
17    sure if we have established the foundation, but
18    what is this document?
19         A.   It was a meeting that we had with
20    MASCO. The date on it is June 10th of 2004.  We
21    are -- we had discussions with them on, well, two
22    things in particular: specialty pharmacy as well

John M. Killion  HIGHLY CONFIDENTIAL  January 6, 2006
Boston, MA

90

1  as the development of a pay-for-performance
2  program with the oncologists.
3      Q.  Who prepared these minutes?
4      A.  I believe Jan Cook did, but there
5  doesn't appear to be an author.
6      Q.  Did you have a copy of these in your
7  files?
8      A.  I'm not aware if I did.
9      Q.  Do you recall reviewing this document?
10     A.  I do not.
11     Q.  Was it common to circulate minutes such
12  as this following a meeting of the --
13     A.  Yes.
14     Q.  Under the heading "Specialty Pharmacy"
15  in the third row of the chart, it refers to
16  communications that apparently were had between
17  the MASCO Society and Blue Cross/Blue Shield of
18  Massachusetts.  Do you recall those
19  conversations?
20     A.  I am sorry.  Where are you referring
21  to?
22         MR. SULLIVAN:  I think he is referring

91

1  to the third --
2          (Counsel pointing.)
3      Q.  The third row.  For the record, I am
4  referring to the third row of the table --
5      A.  Yes.
6      Q.  -- numbered 3, entitled "Specialty
7  Pharmacy," the third column under the heading
8  "Discussion," states, and I will just read for
9  the record so we are clear, "The group does not
10  believe specialty pharmacy, as they have
11  experienced it, will be successful with oncology
12  patients. Barriers to success, A, specialty
13  pharmacy hampers same day administration of
14  drugs; B, specialty pharmacy inhibits changes of
15  doses in realtime; C, specialty pharmacy services
16  are wasteful.  Drugs delivered to members of the
17  group" --
18         MR. SULLIVAN:  "Drugs were."
19         MR. HAAS:  Excuse me.  Thank you.
20     Q.  "Drugs were delivered to members of the
21  group unfit for use.  When they told the
22  specialty pharmacies to dispose of drugs, period.

92

1  D, Harvard Pilgrim instituted a specialty
2  pharmacy program in the past. The group opted out
3  and still was paid."
4      A.  Yes.
5         MR. SULLIVAN:  "And was still paid."
6         MR. HAAS:  "And was still paid."
7      Q.  Do you recall those discussions?
8      A.  Yes, I do.
9      Q.  Now was this meeting held before or
10  after Blue Cross/Blue Shield set up the pharmacy
11  -- the specialty pharmacy relationship?
12     A.  It was after, after we initiated the
13  specialty pharmacy initiative and sent out our
14  RFPs.
15     Q.  That is not my question.  Did this
16  meeting happen before or after the program was
17  put into place and drugs, the four categories of
18  drugs that you previously mentioned, became
19  available for the specialty pharmacy
20  relationship?
21     A.  The relationship with Caremark I
22  believe at that point was in place, but the

93

1  relationship for the other categories at that
2  point I do not believe was in place at that point
3  in time.  We were in the process of looking at
4  categories of drugs that we would implement and
5  again how we would roll those specific
6  therapeutic classes out.
7      Q.  All right.
8      A.  So I believe the only one that we had
9  in place at that time was the relationship with
10  Caremark for hemophilia products, the factor
11  products.
12     Q.  Did Blue Cross/Blue Shield consider
13  these to be valid concerns with respect to the
14  decision of whether to implement a specialty
15  pharmacy relationship?
16         MR. SULLIVAN:  Objection to the form.
17     A.  There were -- there were concerns that
18  we certainly wanted to get feedback on from the
19  oncologists as we shared with them our specialty
20  pharmacy initiative looking at self administered
21  as well as administered drugs by physicians.
22     Q.  All right.  Did Blue Cross/Blue Shield

John M. Killion          HIGHLY CONFIDENTIAL          January 6, 2006
Boston, MA

94

1   of Massachusetts take into account these
2   considerations in deciding whether to implement a
3   specialty pharmacy relationship for the supply of
4   oncology drugs?
5        MR. SULLIVAN: Objection to the form.
6        A.  I would say that in dialogue with MASCO
7   those are issues that we take into consideration
8   as we continue to move forward in evaluating how
9   we will implement specialty pharmacy program
10  relative to oncology meds or any other meds that
11  are administered in physicians' offices.
12       Q.  When the last section, the last
13  sentence of the phrase I read into the record
14  states, "The group opted out and was still paid,"
15  what is your understanding of what that means?
16       A.  My understanding of that is that
17  Harvard Pilgrim implemented a specialty pharmacy
18  program. I'm not clear what that program was
19  relative to oncology.  But that the group, and I
20  don't know if the group refers to a specific
21  group of physicians or all the oncologists, opted
22  not to participate, and Harvard Pilgrim continued

95

1   to pay them in whatever manner they were paying
2   them prior to implementing whatever was the
3   specialty pharmacy program.
4        Q.  All right.  So is it fair to say that
5   the Harvard Pilgrim program to your knowledge was
6   a voluntary program in that the physicians did
7   not have to participate in that program?
8        MR. SULLIVAN: Objection. Form.
9        A.  I don't know how Harvard Pilgrim rolled
10  the program out, whether or not Harvard Pilgrim
11  considered it to be voluntary or mandatory. All
12  I know is that from the minutes and the meeting
13  that physicians chose not to participate, and
14  Harvard Pilgrim apparently made the decision to
15  reimburse them.
16       Q.  What influence, if any, did that
17  consideration have in deciding whether or not
18  Blue Cross/Blue Shield of Massachusetts should
19  implement a specialty pharmacy relationship with
20  oncology or for the supply of oncology drugs that
21  required physicians to participate in the
22  program?

96

1        A.  Sure.  Before we implement almost any
2   type of program, because of the collaborative
3   nature, we engage our physicians in.  We listen
4   and understand and hear their concerns so that we
5   can develop a program that will address those
6   concerns, both on the physicians' side as well as
7   the appropriate delivery of services to our
8   members, so our members aren't caught in the
9   middle, so that we can roll out a program that is
10  both successful physician side, member side, for
11  the plan, and is cost effective.
12       Q.  Right.
13       A.  So those play a role into our decision
14  as we continue to evaluate the direction we are
15  going relative to implementation of such a
16  program.
17       Q.  Sure.  If an oncology group, an
18  oncologist says this specialty pharmacy vehicle
19  is not going to provide the best service to the
20  patients because potentially bad things can
21  happen with the drug or the supply of drugs, that
22  would be something that Blue Cross/Blue Shield

97

1   would take into account; correct?
2        A.  We would take into account, and we
3   would research, and, correct, we would take into
4   account.
5        Q.  Have you researched that particular
6   issue?
7        A.  We again as part of the initiative in
8   rolling out a specialty pharmacy program we
9   elected to identify certain therapeutic classes
10  of drugs that had an opportunity to roll out in a
11  timely fashion that would provide cost savings
12  opportunities and quality benefits to our
13  members, so we are continuing to evaluate that
14  for oncology.
15       Q.  Specifically with oncology, did you
16  study this particular issue that we have been
17  discussing, whether or not there would be adverse
18  consequences with respect to the supply of the
19  drugs to the patients in the event that there was
20  a movement to the specialty pharmacy model?
21       A.  We — we hadn't specifically studied
22  that, because our initiative was to look at other

Henderson Legal Services
(202) 220-4158

John M. Killion        HIGHLY CONFIDENTIAL        January 6, 2006
                              Boston, MA

98

1   therapeutic classes prior to looking at oncology.
2       Q.  But from your perspective, it is an
3   issue worthy of debate?
4           MR. SULLIVAN:  Objection.
5       A.  It is an issue that we would take
6   feedback on and understand their concerns and
7   their issues and then evaluate how best we could
8   roll out a program to address those issues.
9       Q.  Have you solicited any input or
10  information from the pharmaceutical manufacturers
11  with respect to this issue of whether or not the
12  specialty pharmacy model is the more appropriate
13  model?
14      A.  No.
15      Q.  Would you be willing to participate --
16  is that one consideration that you are
17  contemplating involving in the dialogue, the
18  manufacturer's perspective?
19          MR. SULLIVAN:  Objection to form.
20  Beyond the scope.
21          MR. HAAS:  Withdraw that question.
22  BY MR. HAAS:

99

1       Q.  Is Blue Cross/Blue Shield of
2   Massachusetts contemplating involving
3   pharmaceutical manufacturers in the dialogue as
4   to whether or not the specialty pharmacy
5   relationship makes sense?
6       A.  We haven't --
7           MR. SULLIVAN:  Objection. Beyond the
8   scope.
9       Q.  Okay.
10          MR. SULLIVAN:  Go ahead.  You can
11  answer.
12      A.  We haven't discussed that.
13      Q.  And in your view, would it be
14  appropriate for manufacturers to be involved in
15  that process?
16          MR. SULLIVAN:  Objection. Beyond the
17  scope.
18      A.  I am not sure.
19      Q.  Are you aware of whether any
20  manufacturers have studied that issue, whether or
21  not the specialty pharmacy relationship is more
22  proper, appropriate for the administration of

100

1   drugs to particular classes --
2           MR. SULLIVAN:  Objection.
3       Q.  -- of physicians?
4           MR. SULLIVAN:  Beyond -- I am sorry.  I
5   don't mean to interrupt. Objection.  Beyond the
6   scope.
7       A.  Can you repeat that again?  I
8   apologize.
9       Q.  Sure.  Has Blue Cross/Blue Shield of
10  Massachusetts looked into the issue of whether or
11  not pharmaceuticals -- that pharmaceutical
12  manufacturers have studied the issued?
13      A.  Not --
14          MR. SULLIVAN:  Objection. Beyond the
15  scope.
16      A.  Not that I'm aware of.
17      Q.  Has Blue Cross/Blue Shield of
18  Massachusetts given any consideration as to
19  whether a specialty pharmacy program that they
20  are looking to implement with respect to
21  physician-administered drugs would be voluntary
22  or mandatory with respect to the participation of

101

1   the physicians?
2       A.  I don't participate in the specialty
3   pharmacy committee currently, but my
4   understanding is that that is a point that hasn't
5   been discussed yet at this point. Right now the
6   RFP is in the process of going out.
7       Q.  And the current RFP that is in the
8   process of going out, does that include
9   physician- administered drugs?
10      A.  Yes, it does.
11      Q.  Okay.  Does that RFP specify the
12  contemplated volume of physician- administered
13  drugs that would be encompassed in the specialty
14  pharmacy program?
15      A.  There has been analysis looking at all
16  of those drugs as part of the analysis that was
17  done to look at implementing the therapeutic
18  classes I previously mentioned.
19      Q.  Who did that analysis?
20      A.  That was done by the pharmacy
21  department.
22      Q.  Who in particular?

John M. Killion         HIGHLY CONFIDENTIAL         January 6, 2006
Boston, MA

102

1     A. I believe one of the analysts in the
2  pharmacy department.
3     Q. So to the best of your knowledge at
4  this point in time, Blue Cross/Blue Shield of
5  Massachusetts has no intent to make this plan
6  mandatory with respect to the drugs that must be
7  administered in physicians' offices or under the
8  supervision of physicians?
9        MR. SULLIVAN: Objection. Form.
10     A. That is something we will continue to
11  evaluate.
12     Q. I know. But my question specifically
13  is is it your understanding that today there is
14  no intent that the plan be mandatory with respect
15  to participation of physicians with respect to
16  the administration of drugs in offices.
17        MR. SULLIVAN: Objection; beyond the
18  scope. Objection; form.
19        You can go ahead and answer.
20        THE WITNESS: I apologize. Can I have
21  that question again?
22        MR. HAAS: Sure. It was not the best

103

1  question in the world anyway.
2  BY MR. HAAS:
3     Q. The question is are you aware of
4  whether the current intent of Blue Cross/Blue
5  Shield of Massachusetts is to make participation
6  in the specialty pharmacy program mandatory for
7  drugs that are administered in office or
8  administered pursuant to the supervision of a
9  physician.
10        MR. SULLIVAN: The same objections.
11     A. And I'm aware that that has not been
12  defined yet.
13     Q. So based upon your testimony -- let me
14  see if I get this right -- it hasn't been
15  determined whether the program will be mandatory,
16  and it has not been determined whether or not the
17  reimbursement for the servicing and
18  administration fees would be increased to the
19  physicians that choose to participate in the
20  program?
21     A. Correct.
22     Q. And it is your understanding that those

104

1  are both issues being discussed and contemplated
2  currently by the specialty pharmacy committee?
3     A. The specialty pharmacy committee
4  currently is really working on putting together
5  or has -- was putting together, is going out I
6  believe next week, the RFP, so that has really
7  been the focus of the specialty pharmacy
8  committee to date.
9     Q. Is it your understanding that those
10  issues are on the agenda?
11     A. I don't know if those issues have
12  specifically been put on the agenda to date. No.
13  I don't believe so.
14     Q. Is it your understanding that the
15  program will be expanded without addressing those
16  issues?
17     A. No. They will be addressed.
18     Q. They will be addressed prior to any
19  expansion?
20     A. They definitely will.
21     Q. Are you aware of whether Blue
22  Cross/Blue Shield of Massachusetts has a

105

1  formulary with respect to physician-administered
2  drugs? Do you have any knowledge in that regard?
3     A. I am as it relates to fertility
4  medications.
5     Q. What is the formulary as it relates to
6  fertility medications?
7     A. Gonal F.
8     Q. I am sorry. What was that?
9     A. The medication Gonal F, G-O-N-A-L F.
10     Q. What is the particular formulary
11  direction with respect to that drug?
12     A. That that is our preferred drug. That
13  the alternative drug is not on our formulary and
14  needs prior approval.
15     Q. Why did Blue Cross/Blue Shield of
16  Massachusetts implement that formulary
17  restriction with respect to that drug?
18        MR. SULLIVAN: Objection to form.
19     A. Blue Cross/Blue Shield felt -- we as an
20  organization felt that both drugs were comparable
21  and made the decision that Gonal F being equal to
22  Follistim was the medication that would be on our