Exhibit 48

1

Hartman

EXHIBIT NO. 032
1-27-06
(in)

1
                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF MASSACHUSETTS

                    CIVIL ACTION NO.  01CV12257-PBS

3

4    IN RE:  PHARMACEUTICAL

     INDUSTRY AVERAGE WHOLESALE

5    PRICE LITIGATION

6    THIS DOCUMENT RELATES TO:

     ALL ACTIONS

7

8                         **********

9               CONFIDENTIAL DEPOSITION OF

10                      EDWARD LEMKE

11                    JANUARY 11, 2005

12                        **********

13                  TAKEN BY DEFENDANTS

14               AT 500 WEST MAIN STREET

15                 LOUISVILLE, KENTUCKY

16                        **********

17

18          THE DEPOSITION OF EDWARD LEMKE, TAKEN AT

19   500 WEST MAIN STREET, LOUISVILLE, KENTUCKY ON

20   JANUARY 11, 2005; SAID DEPOSITION TAKEN PURSUANT TO

21   NOTICE AND IN ACCORDANCE WITH THE RULES OF CIVIL

22   PROCEDURE.

**Page 2**

```
 1          APPEARANCES
 2   FOR THE PLAINTIFF:
     EDWARD NOTARGIACOMO (TELEPHONICALLY)
 3   HAGENN BERMAN
 4   ONE MAIN STREET, FOURTH FLOOR
     CAMBRIDGE, MASSACHUSETTS  02141
 5   617.482.3700
 6
 7   FOR THE DEFENDANT:
 8   ADEEL A. MANGI
 9   PATTERSON BELKNAP WEBB & TYLER
     1133 AVENUE OF THE AMERICAS
10   NEW YORK, NY  10036-6710
     212.336.2000
11   aamangi@pbwt.com
12   PETER D. ST. PHILLIP, JR.
13   RICHARD W. COHEN
     LOWEY DANNENBERG BEMPORAD & SELINGER
14   ONE NORTH LEXINGTON AVENUE
15   WHITE PLAINS, NY  10601
     914.997.0500
16   rcohen@ldbs.com
17
18   BRADLEY D. WOOD
19   JOYCE R. KING
     WILLIAM K. FLEMING
20   HUMANA INC.
     500 W MAIN STREET
21   LOUISVILLE, KENTUCKY  40202
22
```

**Page 3**

```
 1            INDEX
 2   EDWARD LEMKE
 3                PAGE
 4   EXAMINATION BY MR. MANGI           5
 5   EXAMINATION BY MR. NOTARGIACOMO   197
 6   EXAMINATION BY MR. COHEN          202
 7   EXAMINATION BY MR. MANGI          208
 8
 9         EXHIBITS
10   NO.     DESCRIPTION        PAGE
11
12   Exhibit Lemke 001  List of fee schedules    41
13
14   Exhibit Lemke 002  Amended provider agreement  131
15
16   Exhibit Lemke 003  Contract                147
17
18   Exhibit Lemke 004  Humana/physician group contract  157
19
20   Exhibit Lemke 005  11/92 OIG report        162
21
22   Exhibit Lemke 006  1997 OIG report         168
```

**Page 4**

```
 1
 2   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
 3               PAGE
 4   Does Humana intend to follow suit
 5   or has Humana followed suit in
 6   increasing its service fee schedules?   114
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

**Page 5**

```
 1        COMES EDWARD LEMKE, CALLED BY THE
 2   DEFENDANTS, AND AFTER FIRST BEING DULY SWORN, WAS
 3   DEPOSED AND TESTIFIED AS FOLLOWS:
 4        MR. ST. PHILLIP:  Before we get into
 5   substantive questioning, we are going to designate
 6   the deposition because there is going to be some
 7   competitive information from Humana as a highly
 8   confidential at least in the first instance under
 9   the protective order and than as we understand it,
10   we will have a period of time in which after we
11   review the transcript to modify those designations.
12        MR. MANGI:  No objection.
13        * * * * * *
14         EXAMINATION
15   BY MR. MANGI:
16   Q.  Good morning, Mister Lemke.  As I
17   mentioned when we met, my name is Adeel Mangi from
18   the law firm of Patterson Belknap Webb and Tyler.
19   We represent the defendant drug manufacturers in
20   this case.  Have you ever been deposed before?
21   A.  Yes.
22   Q.  How many times have you been deposed?
```

| | 6 |
|---|---|

1    A.  Just once.
2    Q.  When was that deposition?
3    A.  1991.
4    Q.  What was the context of that deposition?
5    A.  It was in regard to a contract dispute
6  between a hospital system and a physician group.
7    Q.  Since it's been a number of years since
8  your deposition, I'll just run through some of the
9  ground rules of the process.  The first is that you
10  must answer questions verbally, rather than a nod of
11  the head or shrug of the shoulders, so that the
12  reporter can take down your answers.  Okay?
13    A.  Okay.
14    Q.  If at any point a question I ask is
15  unclear, please let me know and I'll do my best to
16  rephrase it.  Okay?
17    A.  Okay.
18    Q.  If at any point during the deposition you
19  would like to take a break, just let me know and we
20  will accommodate that as well.  Okay?
21    A.  All right.
22    Q.  Can you describe for me, please, your

| | 7 |
|---|---|

1  educational background after high school?
2    A.  I have received a Bachelor's of Business
3  Administration, major in Accounting, from the
4  University of Wisconsin Whitewater.
5    Q.  When did you receive that qualification?
6    A.  1971.  And in 1976, I received my Master's
7  Degree in Business Administration with an emphasis
8  in Finance.
9    Q.  When did you start working for Humana or a
10  predecessor to Humana?
11    A.  January of 2000.
12    Q.  Could you describe for me in broad strokes
13  your employment history from the time you graduated
14  through the time you joined Humana?
15    A.  The first year out of graduate school, I
16  work with an Audit Bureau Circulations as an auditor
17  for about one year.  Following that, I was director
18  of finance with a nonprofit organization, Center for
19  Public Representation in Madison, Wisconsin.  And
20  also toward the end of that tenure, I was working
21  part-time with Wisconsin Energy Conservation
22  Corporation, which was also a nonprofit as a

| | 8 |
|---|---|

1  contract manager.  From there, I was assistant
2  director of finance with Bethesda Lutheran Home in
3  Watertown, Wisconsin.
4    Q.  What is the Bethesda Lutheran Home?
5    A.  They are a care agency for the physically
6  and mentally disabled individuals.
7    Q.  What was your title there?
8    A.  Assistant director of finance.
9    Q.  Okay.
10    A.  Following that, I worked with Kurten
11  Medical Group in Racine, Wisconsin as finance
12  director.
13    Q.  Is that a physician practice?
14    A.  Yes, it was a private physician group.
15    Q.  What sort of physicians practice as part
16  of that?
17    A.  Multispecialty.
18    Q.  And what was your title there?
19    A.  Director of finance.
20    Q.  When did you hold that position
21  approximately?
22    A.  1985 through 1990.  Following that, with

| | 9 |
|---|---|

1  the merger of the physician group and the hospital
2  system, became the vice president of operation for
3  All Saints Health Care, which was a health system
4  composed of three hospitals and a 250 group
5  physician group.
6    Q.  Was that multispecialty?
7    A.  Yes.
8    Q.  And what was your title with that
9  organization?
10    A.  Vice president of operations.
11    Q.  And how long did you hold that position?
12    A.  I believe about three years.
13    Q.  Where did you move to after that?
14    A.  I was out in New Jersey with a PHO.  What
15  was the name of it?  The PHO was sponsored by Newton
16  Memorial Hospital in Newton, New Jersey.
17    Q.  What is a PHO?
18    A.  Physician Hospital Organization.
19    Q.  What were you doing with that
20  organization?
21    A.  I was the executive director of the PHO.
22    Q.  Okay.  How long did you remain there?

**10**

1 A. A little less than two years.

2 Q. That took you up to about 1995, is that

3 correct?

4 A. No, I went out there in '97 and I came

5 back here in '99.

6 Q. And after that, you came to Humana, is

7 that correct?

8 A. No, I had a short stint with Bay Care

9 Health Systems in Green Bay.

10 Q. What is Bay Care Health Systems?

11 A. It's a multispecialty physician

12 organization.

13 Q. The what was your position there?

14 A. Director of operations.

15 Q. Now, throughout that time period from the

16 time you graduated from medical school through up to

17 the time you joined Humana, in any of those

18 physicians did you have responsibility for the

19 purchasing of drugs?

20 MR. ST. PHILLIP: I object, based on the

21 question goes beyond the temporal topics of the

22 deposition subjects. You can answer.

**11**

1 THE WITNESS: Not direct purchase, no.

2 BY MR. MANGI:

3 Q. Did you have responsibilities for indirect

4 purchasing the drugs?

5 A. Only financial analysis.

6 Q. Did you have an understanding of the

7 prices at which any of these organizations were

8 purchasing drugs?

9 MR. ST. PHILLIP: I'm going to make the

10 same objection.

11 BY MR. MANGI:

12 Q. You can answer.

13 A. Yes.

14 Q. Did you know those prices -- or rather,

15 did you understand those prices by reference to flat

16 dollar sums, or did you understand them by

17 relationship to any particular pricing benchmarks?

18 A. At that time, direct price.

19 Q. And by "direct price," you mean the dollar

20 sum?

21 A. Yes.

22 Q. When was the first time you became aware

**12**

1 of the term "AWP"?

2 A. I would have -- 1989.

3 Q. And that was while you were working for

4 the Kurten Medical Group; is that right?

5 A. Yes.

6 Q. In what context did you become familiar

7 with that term?

8 A. Under our capitated contracts with payors,

9 we had some subcontract with providers, physicians

10 that we did not have in the group, that part of

11 those contracts provided for the payment of drugs.

12 Q. So if subcontracted physicians were to

13 administer drugs to patients, they would be

14 reimbursed by the Kurten Medical Group; is that

15 correct?

16 MR. ST. PHILLIP: Object to form.

17 BY MR. MANGI:

18 Q. You have to answer verbally.

19 A. We paid for them direct to the provider.

20 Q. So the provider would acquire drugs and

21 administer them to patients, and then Kurten Medical

22 Group would pay the provider; is that correct?

**13**

1 A. That's correct.

2 Q. And the payment was made by reference to a

3 formula incorporating AWP; is that correct?

4 A. Yes.

5 Q. Was the formula a discount off AWP?

6 A. Could have been.

7 Q. Did you have an understanding as to

8 whether those physicians were acquiring drugs at a

9 price that bore any relationship to AWP?

10 A. I would have no knowledge of their

11 purchasing.

12 Q. Are you familiar with the term "WAC" or

13 wholesale acquisition cost?

14 A. Only recently.

15 Q. What's the first time you became -- the

16 first time you heard that term?

17 A. Six months ago.

18 Q. Would it be fair to say that throughout

19 the time period from the time you graduated until

20 the time you arrived at Humana, your only

21 understanding of drug acquisition costs was by

22 reference to flat dollar sums, and not by reference

14

1  to the relationships of those prices to benchmarks?
2      A.  No.
3      MR. ST. PHILLIP:  I'm going to object
4  based on the -- insofar as the question calls for an
5  answer that extends beyond 1991 to the present.
6  BY MR. MANGI:
7      Q.  Go ahead.
8      A.  Restate the question.
9      Q.  Sure.  You testified earlier that for at
10 least part of the time period from the time you
11 graduated until the time that you came to work at
12 Humana, you understood the prices of some of these
13 organizations were paying for drugs by reference to
14 what the dollar signs were, correct?
15     A.  Yes.
16     Q.  Okay.  Was there any time during that time
17 period when you understood that the prices that were
18 being paid for drugs could be expressed by reference
19 to any pricing benchmarks and not just flat dollar
20 sums?
21     A.  Yes.
22     Q.  When was the first time you became aware

15

1  of that?
2      A.  1990 with Kurten Medical Group.  In our
3  contracts with outside providers, we established our
4  payment for drugs based on AWP.
5      Q.  And that was reimbursement from the Kurten
6  Medical Group to the physicians, correct?
7      MR. ST. PHILLIP:  Object to form.
8      THE WITNESS:  We paid the claim.  They
9  came from the provider, yes.
10 BY MR. MANGI:
11     Q.  All right.  But Kurten Medical Group was
12 not purchasing drugs directly from wholesalers or
13 drug manufactures; is that correct?
14     A.  No, that is not correct.
15     Q.  Kurten Medical Group was purchasing drugs
16 directly?
17     A.  Yes.
18     Q.  Do you know what Kurten Medical Group was
19 paying to acquire drugs from wholesalers or drug
20 manufacturers?
21     A.  We paid invoices from the wholesaler.
22     Q.  And those were flat dollar sums?

16

1      MR. ST. PHILLIP:  Objection to form.
2      THE WITNESS:  I would believe they would
3  be flat dollar sums, because it was paid as a result
4  of an invoice, so yes.
5  BY MR. MANGI:
6      Q.  Do you have any understanding as to the
7  relationship between the prices that Kurten Medical
8  Group was paying to acquire drugs and the AWPs of
9  those drugs, if any?
10     A.  No.
11     Q.  Is it your understanding that there was no
12 relationship between the price Kurten Medical Group
13 was paying to acquire those drugs and the AWPs of
14 those drugs?
15     A.  Repeat that again.
16     Q.  Sure.  Is it your understanding that
17 the -- well, I'll withdraw that and rephrase it.
18     Is it your understanding that the price
19 Kurten Medical Group was paying to acquire drugs was
20 something different from the AWPs for those drugs?
21     MR. ST. PHILLIP:  Objection.  Asked and
22 answered.

17

1  BY MR. MANGI:
2      Q.  You can answer.
3      A.  I had no knowledge of that.
4      Q.  Okay.  Would it be fair to say you don't
5  know what the relationship was, if any, between the
6  price Kurten Medical was paying for those drugs and
7  the AWPs of those drugs?
8      A.  That's correct.
9      Q.  Other than with Kurten Medical Group, did
10 you have any other involvement or occasion to use
11 the term "AWP" prior to your arrival at Humana?
12     A.  Yes.
13     Q.  And when was that?
14     A.  With my time with Kurten Medical Group as
15 well as All Saints.  Because part of my
16 responsibility involved an analysis of payor
17 contracts, and many payor contracts at that time,
18 the reimbursement for drugs was based on AWP.
19     Q.  And this is during -- you're referring now
20 to the time that you were at All Saints; is that
21 correct?
22     A.  Yes, Kurten Medical and All Saints.

**18**

1    Q. So your involvement through your
2 involvement with AWP, you understood it to be a
3 benchmark utilized in setting reimbursement for
4 drugs; is that correct?
5    MR. ST. PHILLIP: Objection to form.
6    THE WITNESS: It was -- the majority of
7 the time it was used as a benchmark for measure and
8 comparison of costs.
9 BY MR. MANGI:
10    Q. At any time prior to arrival at Humana,
11 are you aware of any instances where any entity was
12 acquiring drugs at a price at or even close to
13 average wholesale price, or AWP?
14    A. I have no knowledge of that.
15    Q. Now, you arrived at Humana in 2000; is
16 that correct?
17    A. Yes.
18    Q. What was your title at the time that you
19 joined Humana?
20    A. Director of fee schedule management.
21    Q. What is your title today?
22    A. Same title.

**19**

1    Q. Have you held that title continuously
2 since 2000?
3    A. Yes.
4    Q. Do you have the same responsibilities
5 today as you did in 2000, or have they changed over
6 time?
7    A. They have changed over time.
8    Q. What were your responsibilities when you
9 first joined Humana?
10    A. Major responsibility was building a
11 database that would be used for contract
12 negotiation, primarily built off of comparison to
13 Medicare fee levels.
14    Q. Anything else?
15    A. And support of contractors for Humana's
16 Choice Care Network, which is a national PPO
17 network.
18    Q. Anything else?
19    A. Those are the two major responsibilities.
20    Q. Now, how did those responsibilities
21 changed over time?
22    A. The focus has changed away from the --

**20**

1 strictly the PPO Choice Care Network to the entire
2 Humana national contracting.
3    Q. So your responsibilities have expanded,
4 yes?
5    A. Yes.
6    Q. Do you have an understanding as to what
7 Humana was reimbursing physicians in relation to
8 drugs administered in the office prior to 2000?
9    MR. ST. PHILLIP: Objection to the form.
10    THE WITNESS: Only to the extent that I
11 have access to historical information on how a fee
12 schedule was developed or built.
13 BY MR. MANGI:
14    Q. To what extent do you have access to such
15 historical information?
16    A. I have access to all of it that currently
17 exists.
18    Q. How much of it currently exists?
19    A. If I had to make an educated guess, I
20 would say we probably have history on 35 percent of
21 our fee schedules prior to year 2000.
22    Q. If I asked you what methodology or

**21**

1 methodologies Humana was using to reimburse
2 physicians for drugs administered in office back to
3 1991, would you know the answer to that?
4    MR. ST. PHILLIP: Objection to form.
5    THE WITNESS: Intimately, only since 2000.
6 BY MR. MANGI:
7    Q. Okay. Would you know in broad terms what
8 methodologies were used prior to 2000?
9    A. Only based on that history that's
10 available to me, yes.
11    Q. Can you describe for me to the best of
12 your knowledge the reimbursement methodologies that
13 were used by Humana to reimburse physicians for
14 drugs administered in office for the period from
15 1991 to 2000.
16    MR. ST. PHILLIP: Objection.
17    THE WITNESS: Of what I'm aware of, the
18 great majority was based off of Medicare, current
19 Medicare fees for that particular year. And for
20 those not based on Medicare would be based on
21 physician charges known as the HIAA fee schedules.
22    THE REPORTER: HIAA?

22

1        THE WITNESS: HIAA, it's an acronym,
2    H-I-A-A.
3    BY MR. MANGI:
4        Q.  And what does H -- what does HIAA stand
5    for?
6        A.  It's Health Insurance Association of
7    America, I believe. It's been HIAA forever.
8        Q.  Now, you said that some of the fee
9    schedules prior to 2000 were tied to Medicare,
10   right?
11       A.  Yes.
12       Q.  Do you know whether Humana was reimbursing
13   at the same rate as Medicare, or was it a percentage
14   of Medicare?
15       MR. ST. PHILLIP:  Objection.
16       THE WITNESS:  It varied from below
17   Medicare to above Medicare.
18   BY MR. MANGI:
19       Q.  What's the basis for variation?  Would it
20   be contract to contract, or type of plan to type of
21   plan?
22       A.  It's contract to contract, and simply

23

1    based on Medicare being geographic in nature.  It's
2    by region.
3        Q.  What do you mean by that, by Medicare
4    being geographic?
5        A.  Medicare establishes their fee schedules
6    based on geographic areas of the country.  They do
7    not pay the same amount in Louisville, Kentucky as
8    they do in Greensboro, North Carolina.  It's a
9    different amount for the same service, same drug.
10       Q.  But in relation to the amount that
11   Medicare reimburses for drugs administered in
12   physicians' offices, that amount has been set by
13   reference to one formula for some period of time,
14   hasn't it?
15       A.  Yes, Medicare has used AWP for actually up
16   until this year.
17       Q.  Is the variation that you're referring to
18   the time that it takes regional carriers to update
19   their databases?
20       A.  State that one more time.
21       Q.  Sure.  You mentioned earlier that there is
22   geographic variation in the amounts that Medicare

24

1    reimburses in relationship to drugs administered in
2    the office.  My question is, when you refer to that
3    variation, is that grounded in the time it takes
4    Medicare carriers to update their local fee
5    schedules or price databases?
6        MR. ST. PHILLIP:  Objection.
7        THE WITNESS:  The great majority of
8    Medicare fee schedules are established by what is
9    now CMS, used to be HICVA, at the beginning of the
10   year, calendar year.  Very few of the fees in
11   Medicare fee schedules, especially dealings with
12   drugs, were set by local the carriers.  Most of that
13   was retained by HICVA, now CMS.
14   BY MR. MANGI:
15       Q.  Okay.  So insofar as there is variation in
16   the fee schedules that we used to pay particular
17   practices during that time period -- and we're
18   talking now about '91 to 2000.  The primary reason
19   for that variation would be contract negotiations;
20   is that a fair statement?
21       A.  That's a fair statement.
22       Q.  Are you familiar with the contract

25

1    negotiation process prior to 2000?
2        A.  No.
3        Q.  Do you know what factors would have given
4    one practice more bargaining power versus another
5    prior to 2000?
6        A.  Yes.  It's size of the group, control of
7    the market, if you will.  Necessity to have them in
8    the network are the two big factors.
9        Q.  So if a group were a large size
10   multispecialty group, for example, they would have
11   more bargaining power than, say, an individual
12   physician; is that a fair statement?
13       A.  That's a fair statement.
14       Q.  And that sort of a group would be able to
15   negotiate better reimbursement terms from Humana
16   than that individual physician; is that correct?
17       MR. ST. PHILLIP:  Objection to form.
18       THE WITNESS:  Generally, that's correct.
19   BY MR. MANGI:
20       Q.  Okay.  And similarly, if a practice were
21   the only practice of its type in a particular area
22   where Humana's members reside, it would be important

---

**26**

1  to Humana to have that practice within its network,
2  correct?
3      A.  That's correct.
4      Q.  And in those circumstances, similarly,
5  that practice would be able to command better
6  reimbursement rates from Humana than other
7  practices, correct?
8          MR. ST. PHILLIP:  Objection to form.
9          THE WITNESS:  That's generally correct,
10  yes.
11  BY MR. MANGI:
12      Q.  Certainly, in these negotiations Humana
13  also has leverage, correct?
14          MR. ST. PHILLIP:  Objection to form.
15          THE WITNESS:  Yes.
16  BY MR. MANGI:
17      Q.  And the balance will vary, depending on
18  the type of practice that Humana is dealing with,
19  right?
20      A.  Yes, it could.
21      Q.  Now, so it's fair to say that -- sticking
22  now with the period prior to 2000, whether a

---

**27**

1  practice would be paid a percentage above Medicare
2  or a percentage below Medicare would all depend on
3  the individualized contract negotiation process
4  between Humana and that practice; is that a fair
5  statement?
6      A.  Yes.
7      Q.  Do you know what the range of percentages
8  around the Medicare fee schedule was that Humana
9  employed prior to 2000?
10      A.  I could not say with certainty.
11      Q.  Do you have an approximate sense of what
12  the variation was?
13      A.  Based on fee schedules that exist today
14  that existed at that time period, could be as low as
15  70 percent, as high as 200 percent.
16      Q.  And again, the reason for that broad range
17  of variation would be the differential bargaining
18  power of physician practices, correct?
19          MR. ST. PHILLIP:  Objection.
20          THE WITNESS:  That is correct.
21  BY MR. MANGI:
22      Q.  Now, we've been talking about the Medicare

---

**28**

1  fee schedule.  During that period prior to 2000, was
2  Humana reimbursing providers for drugs administered
3  in office by reference to the particular NDC for the
4  drug administered, or was it using J/Codes?
5      A.  Humana was using J/Codes.
6      Q.  And, now, a J/Code can include more than
7  one drug; correct?
8      A.  Only those codes that have been designated
9  as unlisted drugs.  For a listed drug, it has a drug
10  name and an amount.
11      Q.  Okay.  So your understanding is that for
12  listed drugs, Humana would be reimbursing by
13  reference to J/Codes, but each J/Code would
14  correspond to a particular NDC is that correct?
15      A.  Yes, based on the HCPCS.
16          MR. ST. PHILLIP:  Spell that for --
17          THE WITNESS:  HCPCS.  Based on that coding
18  system, and the definitions that define each of the
19  J/Codes.
20  BY MR. MANGI:
21      Q.  And for unlisted drugs, there could be
22  more than one drug within J/Codes; is that correct?

---

**29**

1      A.  Typical example, yes, of J3490 is a
2  unlisted drug code.  And there could be well into
3  the hundreds, if not thousands, that --
4  possibilities, like a particular drug could be
5  billed using that code because it does not fit under
6  an established J/Code.
7      Q.  And those drugs could be branded drugs,
8  generics or a combination of that; is that correct?
9      A.  Yes.
10      Q.  And in those instances where there is an
11  unlisted code being used, Humana would not be
12  reimbursing by reference to any drug's own AWP; is
13  that correct?
14          MR. ST. PHILLIP:  I'm going to object to
15  the extent that the questioning about these drugs
16  goes beyond to the list of drugs that was attached
17  to the subpoena.  With that objection, you can
18  answer.
19          THE WITNESS:  Restate the question.
20          MR. MANGI:  Sure.  Would you mind reading
21  that back?
22          (RECORD READ.)

---

30

1       THE WITNESS: No.
2 BY MR. MANGI:
3     Q. That's not correct?
4     A. That's not correct.
5     Q. Can you explain to me where I'm incorrect,
6 please?
7     A. The decision on payment for an unlisted
8 drug, for instance billed with that code, the Red
9 Book AWP for its data bank, sources like that, would
10 be accessed to find an AWP, average wholesale price,
11 to give claims payment an idea of what the payment
12 should be, level of payment should be.
13     Q. So if a physician submitted a claim for an
14 unlisted drug prior to 2000, reimbursement would not
15 be by reference to just a J/Code that would include
16 a lot of different drugs, but reimbursement would
17 still be by reference to that drug's AWP?
18       MR. ST. PHILLIP: Objection -- I'm sorry,
19 go ahead.
20       THE WITNESS: If it existed.
21 BY MR. MANGI:
22     Q. And by "existed," you mean it was if it

31

1 was reported in a price reporting service?
2     A. That's correct.
3     Q. Do you know whether, prior to 2000, Humana
4 used just one price reporting service or more than
5 one?
6     A. I do not know.
7     Q. Now, sticking with the period prior to
8 2000, at any point prior to 2000, did you become
9 aware of the fact that drug manufacturers provide
10 rebates to pharmacy benefits managers or PBMs?
11       MR. ST. PHILLIP: I'm going to object
12 insofar as the question calls for information that
13 was not ordered to be produced or testimony that was
14 not ordered to be given based on magistrate judge's
15 November 2nd, 2004 order. To the extent that the
16 witness has a response, we will preserve our right
17 to strike the response and allow the witness to
18 testify.
19       MR. MANGI: For the record, we disagree
20 with your interpretation of the order and refer you
21 to categories including 1, 7 and 20, but your
22 objection is noted.

32

1       THE WITNESS: I have no knowledge of that.
2 BY MR. MANGI:
3     Q. When is the first time you became aware of
4 the fact that drug manufacturers do pay a rebate to
5 pharmacy benefits managers or PBMs?
6       MR. ST. PHILLIP: We'll make the same
7 objection.
8       THE WITNESS: I don't believe I've ever
9 had knowledge of that.
10 BY MR. MANGI:
11     Q. So as you sit here today, you have no
12 knowledge as to whether or not drug manufacturers
13 pay rebates to pharmacy benefit managers?
14       MR. ST. PHILLIP: Asked and answered.
15       THE WITNESS: No.
16 BY MR. MANGI:
17     Q. Okay. Incidentally, you referred to Red
18 Book. Coming now to the period where you have been
19 at Humana, post 2000, do you know whether Humana
20 utilizes Red Book?
21     A. It did in the past and still does in
22 certain instances.

33

1     Q. Does Humana also utilize other price
2 reporting services?
3     A. Yes.
4     Q. Which price reporting services does Humana
5 use?
6     A. First Data Bank.
7     Q. What are the circumstances in which Humana
8 uses Red Book instead of First Data Bank and vice
9 versa?
10     A. I can only speak to the use of those
11 sources in developing payment schedules to
12 providers. We exclusively use First Data Bank
13 currently and only refer to Red Book when we cannot
14 get an AWP from First Data Bank, which is very
15 seldom.
16     Q. Are you aware of the fact that First Data
17 Bank lists difference AWPs for some drugs than Red
18 Book?
19     A. Yes.
20     Q. What is your understanding as to the
21 reason for that difference?
22     A. I have no knowledge of the reason for that

34

1 difference.
2    Q. Does Humana presently own any physician
3 groups or hospitals?
4    A. Not to my knowledge.
5    Q. Do you know whether Humana has owned any
6 physician groups or hospitals at any time in the
7 past?
8    MR. ST. PHILLIP: I'm just going to object
9 insofar as the answer calls for some knowledge of
10 the corporate relationships if any, between Humana,
11 Inc. and its subsidiaries. And insofar as the
12 witness is not designated for such topics, Humana
13 does not consent to its testimony concerning that.
14 To the extent that he can answer beyond that, I'll
15 allow him to do so.
16 BY MR. MANGI:
17    Q. You can answer.
18    A. I have no knowledge of those.
19    Q. Now, is Humana a nationwide client, or
20 does it operate in particular areas? Let me
21 rephrase that question. Is Humana a nationwide
22 insurer, or does it operate in particular geographic

35

1 markets?
2    A. I believe it would be a considered
3 national.
4    Q. Would it be fair to say that Humana
5 operates in a highly competitive market?
6    MR. ST. PHILLIP: Objection.
7    THE WITNESS: In some markets, yes.
8 BY MR. MANGI:
9    Q. Would Kentucky be one of those markets?
10    A. I believe so.
11    Q. What other markets do you have in mind
12 when you said "some markets"?
13    A. Chicago, Atlanta, Dallas, Houston.
14    Q. What are the particular factors that make
15 those areas more highly competitive than others?
16    A. The level of our membership.
17    Q. When you say the level of membership, are
18 you referring to the fact that there are other
19 health insurers in those areas with whom Humana is
20 competing for members?
21    A. Yes.
22    Q. Do you currently play, or have you at any

36

1 time since 2000 played any role in relation to
2 Humana's dealings with PBMs or pharmacy benefits
3 managers?
4    MR. ST. PHILLIP: I object insofar as the
5 magistrate judge's November 2, 2004 order explicitly
6 excluded Deposition Subject No. 8, which calls for
7 your client's relationships, if any, with any PBM.
8 We believe that topic has been excluded by the
9 judge's order, and Humana does not consent to have
10 this witness testify concerning Deposition Subject
11 No. 8. We will reserve our right to strike the
12 answer and allow the witness to testify.
13    MR. MANGI: Okay. Again, we disagree with
14 that interpretation. To move things along today,
15 since I suspect this will be coming up a fair bit,
16 would counsel like a standing objection along those
17 terms that you can reference back at any point that
18 you choose?
19    MR. ST. PHILLIP: I would, although some
20 the topics are going to -- some of your questions
21 may or may not relate specifically to some of the
22 subjects that are explicitly excluded, and insofar

37

1 as we have -- I would like the record to reflect
2 that, I'll interpose an objection where necessary,
3 but I thank counsel for a continuing objection to
4 that effect.
5    MR. MANGI: Whatever would help things
6 move along.
7    MR. ST. PHILLIP: All right.
8 BY MR. MANGI:
9    Q. Do you have any involvement in relation to
10 Humana's contracts or dealings with retail
11 pharmacies, or have you had any such relationships
12 since 2000?
13    A. I have not had any and I don't have any
14 presently.
15    Q. So your focus is entirely on the provider
16 side of the business, the physician side of the
17 business; is that a fair statement?
18    A. That's correct.
19    Q. Do you have any involvement with specialty
20 pharmacies?
21    A. No.
22    Q. Do you know whether or not Humana uses

**38**

1  specialty pharmacies to deliver drugs to providers
2  for administration in office?
3    A.  No, I have no personal knowledge of that.
4    MR. ST. PHILLIP:  We've been going almost
5  an hour, so when there's a perfect time to take a
6  break.
7    MR. MANGI:  This is fine.
8    (A SHORT BREAK WAS TAKEN.)
9  BY MR. MANGI:
10    Q.  Now, I believe you mentioned earlier this
11  morning that the first time you heard the acronym
12  WAC, or wholesale acquisition cost, was about six
13  months ago; is that correct?
14    A.  That's correct.
15    Q.  In what context did you first become aware
16  of that term?
17    A.  In correspondence from CMS and their
18  approach to changing their payment model for drugs.
19    Q.  Did you have an understanding as to what
20  WAC is?
21    A.  Only to the extent of what WAC stands for.
22    Q.  Do you know whether or not pharmacies

**39**

1  acquire drugs at a price at or close to WAC?
2    A.  I have no knowledge of pharmacy purchases.
3    Q.  Do you have any knowledge as to the role
4  of WAC in drug acquisition generally?
5    A.  No.
6    Q.  Do you have any knowledge as to the
7  relationship between WAC and AWP?
8    A.  No, and I have not done any analysis on
9  it.
10    Q.  Do you know whether or not the WAC for any
11  particular drug would be higher or lower than its
12  AWP?
13    MR. ST. PHILLIP:  Objection, asked and
14  answered.
15    THE WITNESS:  I have no knowledge of that.
16    (OFF-THE-RECORD DISCUSSION.)
17  BY MR. MANGI:
18    Q.  Okay.  Now, turning to the time period
19  2000 forward when you have been here at Humana, do
20  you know what methodologies Humana has used to
21  reimburse physicians for drugs administered in
22  office?

**40**

1    MR. ST. PHILLIP:  Objection to form.
2    THE WITNESS:  Yes, the methodologies for
3  payment of drugs has been primarily a percent of
4  Medicare reimbursement.
5  BY MR. MANGI:
6    Q.  When you say "primarily," are there other
7  forms of reimbursement that are also used?
8    A.  In some instances, we will have contracts
9  that are a percent of charge across the contracts,
10  so that would include the drugs.  We have some
11  contracts that use what we call our AWP fee schedule
12  that is built outside of Medicare, that we use
13  in-house for contracting.
14    Q.  Anything else?
15    A.  The only other methodology, and it's truly
16  not a methodology, is our payment for drugs is based
17  on leased contracts that we have no authority over
18  the payment level, i.e. we will lease a network in
19  an area where we -- our network is believed to be
20  inefficient -- insufficient, I should say.  And
21  those contracts and fee schedules that come with
22  them are the sole responsibility of the network

**41**

1  we're leasing.
2    Q.  Now, you said that the primary methodology
3  is a percentage of Medicare, right?
4    A.  Yes.
5    Q.  Do you know what percentage of Humana's
6  physician contracts use that form of methodology?
7    MR. ST. PHILLIP:  Currently?
8    MR. MANGI:  That's correct.
9    THE WITNESS:  Currently?
10  BY MR. MANGI:
11    Q.  Yes.
12    A.  About two thirds, about 66, 67 percent.
13    Q.  Let the record reflect the witness is
14  referring to a document there.
15    A.  I guess it would be considered a document.
16  It's a list of our current fee schedules and how
17  we -- how they've been put together.
18    (TENDERED)
19    MR. MANGI:  Thank you.  Okay, why don't we
20  mark this as an exhibit.
21
22    (Exhibit Lemke 001 WAS MARKED FOR

42
1          IDENTIFICATION.)
2     BY MR. MANGI:
3     Q.  So currently, it's about 66 percent,
4  correct?
5     A.  Yes.
6     Q.  Has that percentage changed substantially
7  since 2000?
8     A.  It has increased since 2000 to the present
9  time.
10     Q.  Do you have any idea what the percentage
11  was in 2000?
12     A.  No, I do not have that knowledge.
13     Q.  Would it have been more than 50 percent?
14        MR. ST. PHILLIP:  Objection, asked and
15  answered.
16        THE WITNESS:  I believe it was.
17  BY MR. MANGI:
18     Q.  Now, the second methodology you referenced
19  was the percentage of charge?
20     A.  Yes.
21     Q.  Do you know approximately what proportion
22  of contracts utilize that methodology?

43
1     A.  Less than 1 percent by number of
2  schedules.
3     Q.  Do you have any idea what percentage of
4  physician practices with which Humana contracts that
5  would comprise?
6     A.  I didn't do that calculation. I couldn't
7  tell you.
8     Q.  Well, in those instances Humana will be
9  reimbursing the physician by reference to whatever
10  they charge Humana for drugs administered in office,
11  correct?
12     A.  That's correct.
13     Q.  And when you referred to the 66 percent
14  figure in reference to Medicare, would that
15  66 percent of the fee schedules as opposed to
16  66 percent of practices?
17     A.  Of fee schedules, yes.
18     Q.  The third methodology you talked about was
19  an AWP fee schedule built outside Medicare.
20     A.  Yes.
21     Q.  Now, what are you referring to there?
22     A.  It's a standalone fee schedule that we use

44
1  in the contracting world as what we call a carveout
2  fee schedule, where we'll have a fee schedule like
3  that and maybe numerous others that are developed
4  for either specific providers or specific
5  specialties, or in this case, specific range of
6  codes.
7     Q.  Are those fee schedules -- withdraw that.
8        Do those fee schedules list drugs and
9  those drugs' AWPs, or is it varying percentages of
10  the AWPs?
11     A.  That fee schedule represents 100 percent
12  of the AWP.
13     Q.  Now, is the reason why this fee schedule
14  is needed in addition to the Medicare fee schedule
15  because the Medicare fee schedule is a percentage of
16  AWP?
17     A.  No. The reason behind development of this
18  fee schedule really was designed to also handle CPT
19  codes that dealt with drugs.
20     Q.  What percentage of fee schedules utilize
21  this alternative AWP based methodology?
22        MR. ST. PHILLIP:  Objection to form.

45
1        THE WITNESS:  Less than 1 percent.
2        MR. MANGI:  That answer was less than 1
3  percent.
4  BY MR. MANGI:
5     Q.  Now, in what cases will this fee schedule
6  be used as opposed to a Medicare based fee schedule?
7        MR. ST. PHILLIP:  Objection.  What do you
8  mean by "this fee schedule"?
9  BY MR. MANGI:
10     Q.  This AWP based fee schedule built outside
11  of Medicare.
12     A.  The instances in which this fee schedule
13  would be used is when we do not -- when we are using
14  a Medicare fee schedule as what we refer to as a
15  default fee schedule.  If we used a Medicare fee
16  schedule in a contract, the claims would always hit
17  that fee schedule first.  In the contracting world,
18  we set it up with this carveout fee schedule, the
19  hierarchy of this schedule is to look at this AWP
20  fee schedule first.  If the code is on there, use
21  that payment amount; if not, then it defaults to
22  Medicare.  And originally, this was developed

46

1  because Medicare did not price many of the
2  injections, and especially the vaccinations, and
3  this really emphasis was toward the pediatric world,
4  to begin with.
5      Q.  Is the use of that -- this AWP fee
6  schedule built outside Medicare, when you referred
7  to it as the alternative schedule, just to save a
8  mouthful, is that -- is the use of that alternative
9  schedule currently limited to the pediatric market?
10    A.  No.
11     Q.  Why is it used outside of the pediatric
12  market?
13    A.  Simply because we had expanded that fee
14  schedule to include all of the J/Codes. It was and
15  is being used in contract renegotiations where there
16  is an established full fee schedule, and this fee
17  schedule may be used to put in front of that fee
18  schedule in the negotiation of payment for the
19  drugs.
20     Q.  Okay. What I'm trying to understand is
21  why in the majority of cases there is just the
22  Medicare based fee schedule that's employed, whereas

47

1  in some very small proportion of cases, there is
2  this alternative schedule that's also employed.
3  What is special about those cases that require the
4  use of this fee schedule as well?
5    A.  Most of the time it's the payment level,
6  because AWP currently is higher than what Medicare
7  pays.
8     Q.  Is it the case of the practices, of some
9  practices, negotiate and prefer the use of this fee
10  schedule and therefore it becomes part of some
11  contracts?
12    A.  That's correct.
13     Q.  And they prefer to use this fee schedule
14  because it gets them higher reimbursement rates?
15    A.  Higher reimbursement rates as well as an
16  industry standard that, through lack of a better
17  word, they can trust Humana with. As opposed to
18  Humana just setting its own rates, we can point to a
19  third party produced cost list, price list.
20     Q.  So in this small majority, small
21  percentage of cases, Humana will be reimbursing by
22  reference to drug AWPs, and not a percentage of that

48

1  amount; is that correct?
2    A.  In some instances.
3     Q.  Where the drug is on that schedule?
4    A.  Correct.
5     Q.  And if it's not on that schedule, then it
6  will default to a Medicare based schedule?
7    A.  Yes.
8     Q.  Now, in those cases where payment is by
9  reference to AWP, Humana recognizes that it's paying
10  more in reimbursement than it would if a Medicare
11  based fee schedule were employed, correct?
12    A.  Yes.
13     Q.  Why in those instances does Humana agree
14  to pay that higher sum?
15    A.  Point of clarification. That fee
16  schedule, contractors have the opportunity to pay
17  less than 100 percent of that AWP. So it still
18  comes back down to a negotiated payment between our
19  contractors and the providers as to what they're
20  willing to accept as payment.
21     Q.  Okay. So when the AWP based alternative
22  fee schedule is used, it's not always 100 percent of

49

1  AWP, it could be a percentage of AWP; is that
2  correct?
3    A.  That's correct.
4     Q.  Now, so it's really an alternative
5  benchmark; is that correct?
6    A.  Yes.
7     Q.  In this case, the benchmark employed is
8  the drug's AWP; in other cases, in the majority of
9  cases, the benchmark uses the Medicare amount. But
10  in either case, Humana can negotiate the percentage
11  off those benchmarks to arrive at a contractually
12  negotiated number; is that correct?
13      MR. ST. PHILLIP: Objection to form.
14      THE WITNESS: That's correct.
15  BY MR. MANGI:
16     Q.  Is it fair to say that in either case,
17  regardless of the benchmark that's being used,
18  Humana is looking to get the best deal that it can
19  while maintaining an adequate provider network?
20    A.  That's a fair statement.
21     Q.  Those are Humana's aims across the board,
22  regardless of what benchmark is being employed in

50

1   that particular contract?

2    A.   Yes.

3    Q.   And indeed, those would remain Humana's

4 aims, even if another benchmark were used, a third

5 benchmark, say a WAC plus formula; is that a fair

6 statement?

7      MR. ST. PHILLIP: Objection to form.

8 Calls for speculation.

9 BY MR. MANGI:

10    Q.   You can answer.

11    A.   I would assume so.

12    Q.   And as you mentioned earlier, the AWP

13 based alternate fee schedule can form the basis for

14 negotiation, so based on the individual give and

15 take between Humana and the practice, a given

16 percentage below AWP may be negotiated, correct?

17    A.   It may be.

18    Q.   And if an alternative benchmark were used

19 rather than AWP, since both parties would still be

20 having the same competitive negotiation, it's likely

21 they would arrive at the same sum in the end; is

22 that correct?

51

1      MR. ST. PHILLIP: Objection, calls for

2 speculation.

3      THE WITNESS: One would hope so.

4 BY MR. MANGI:

5    Q.   All right. Because it's a negotiation

6 process where both parties have the same interests

7 and the same aims, and it doesn't matter what

8 starting point you use, the negotiation process

9 should end up in the same place, right?

10      MR. ST. PHILLIP: Same objection.

11      THE WITNESS: Well, it will wind up in the

12 same place providing that the base is the same. It

13 cannot address, you know, what a negotiation would

14 look like or how the price would end up using an

15 alternative without knowing the relationship of that

16 alternative to AWP, because right now AWP, quote,

17 unquote, is the gold standard that we measure

18 everything against. So --

19 BY MR. MANGI:

20    Q.   Right. You would need to know what the

21 benchmark is to be able to assess what the

22 percentage would have to be, right?

52

1      MR. ST. PHILLIP: Were you finished with

2 your answer?

3      THE WITNESS: Yes. You'll have to restate

4 that question. I'm not sure I can answer it.

5 BY MR. MANGI:

6    Q.   Sure. Let me rephrase it entirely.

7      One possible starting point in these

8 negotiations could be the AWP, right?

9    A.   (WITNESS MOVES HEAD UP AND DOWN.)

10    Q.   Another starting point could be a Medicare

11 based schedule, which would be a percentage off AWP

12 for that drug, right?

13    A.   (WITNESS MOVES HEAD UP AND DOWN.)

14    Q.   And then there may be other benchmarks

15 which could be lower than that, or other benchmarks

16 that could be higher than that. My point is,

17 regardless of the benchmark that's used, Humana and

18 the provider will negotiate, and the result of that

19 negotiation is likely to be a dollar sum that's

20 probably the same regardless of what benchmark

21 happens to be employed in that case; is that a fair

22 statement?

53

1      MR. ST. PHILLIP: Objection, calls for

2 speculation. Go ahead.

3      THE WITNESS: The negotiation process will

4 have us arrive at a dollar amount for a particular

5 drug or a particular code. Really only then and

6 after then, if you match it against something, do

7 you have -- and have -- will have known what percent

8 of what base it is.

9 BY MR. MANGI:

10    Q.   The dollar sum is, at the end of the day,

11 the thing that's most important to Humana, right?

12    A.   And the provider, yes.

13    Q.   And the provider, certainly.

14    A.   Right, coming to agreement on a, you know,

15 a payment level for a particular drug or service,

16 right.

17    Q.   And that payment level is what matters.

18 The starting point, the starting benchmark, whatever

19 it may be, eventually the key thing is negotiations

20 starting from that benchmark and moving towards the

21 dollar sum that you end up with, right?

22      MR. ST. PHILLIP: I'm going to object

54

1    again. It calls for speculation. I think sometimes
2    you're asking your next question before the answer
3    gets out so, allow the witness to finish his
4    answers.
5          MR. MANGI: I'm sorry, I thought you were
6    done. If I interrupt you, please let me know.
7          THE WITNESS: Ultimately, we get to a
8    single dollar amount that we are willing to pay for
9    that drug. Where we start and where we, you know,
10   end up is strictly negotiation. But from Humana's
11   standpoint, where we start is that gold standard or
12   that one standard AWP that is now produced by a
13   third party, so that we consider as a basis for, you
14   know, negotiating that cost. I mean, it's -- and
15   yes, any basis would be that, but that's the only
16   one we use right now, so.
17   BY MR. MANGI:
18       Q. Now, when we spoke about the percentage of
19   Medicare methodology, which was the first one we
20   spoke about, am I correct in understanding that
21   there are varying percentages of or in addition to
22   the Medicare amount that are employed using that

55

1    methodology?
2        A. I don't understand that question.
3        Q. Sure. Let me rephrase it. Am I correct
4    in understanding that those 66 percent of fee
5    schedules you referenced, they're not just Medicare,
6    but they're some percentage off the Medicare amount?
7        A. That's correct.
8        Q. And the percentage will vary from contract
9    to contract?
10       A. That's correct.
11       Q. Do you know what the range of percentages
12   is that's been employed by Humana in its contracts
13   over the time period 2000 to present?
14       A. I cannot say accurately, but they
15   generally run as low as 65 percent to as high as
16   200 percent.
17       Q. Now, that's a pretty substantial
18   variation; would you agree?
19          MR. ST. PHILLIP: Objection.
20          THE WITNESS: No.
21   BY MR. MANGI:
22       Q. Okay. Well, would it be fair to say that

56

1    in some cases, a provider would be getting well over
2    twice as much as another provider in reference to
3    the same drug administered in office?
4          MR. ST. PHILLIP: Objection to form.
5          THE WITNESS: There is that possibility.
6    And the reason I say that is the contracting
7    philosophy, when we talk about a percent of
8    Medicare, is not a straight percent of Medicare for
9    the entire Medicare fee schedule. We may well
10   contract with a surgical specialist -- let's
11   use an oncologist. We may contract with an
12   oncologist for 150 percent for the administration of
13   chemotherapy, and 120 percent of Medicare for E and
14   M codes, office visits, but we may only agree to 100
15   percent of Medicare for the drugs.
16   BY MR. MANGI:
17       Q. And what would be the basis for that
18   variation in that example you just gave where Humana
19   would agree to pay 150 percent of Medicare in
20   relation to some drugs and 100 percent in others?
21          MR. ST. PHILLIP: Objection, that was --
22   mischaracterized the testimony.

57

1    BY MR. MANGI:
2        Q. Did I misstate that?
3        A. Yes.
4        Q. Perhaps you can clarify for me. When you
5    said 150, what were you referring to there?
6        A. I was referring to the different types of
7    services that a provider renders.
8        Q. I see. I see. Let me rephrase the
9    question, then. When we say 65 to 200 percent of
10   Medicare, is that also true only in relation to the
11   drug component? Is that range of variation present
12   in relation to reimbursement for drugs specifically?
13       A. No, I do not believe so.
14       Q. Okay. What is the range of variation with
15   reference to drugs that Humana is using in contracts
16   from 2000 to present?
17       A. I do not have exact knowledge, but if I
18   had to estimate, it would be somewhere between 90
19   and 120 percent of Medicare.
20       Q. Okay. Now, so we're clear about this,
21   when a physician administers a drug in office to a
22   Humana member, Humana will reimburse in relation to

**58**

1  the service component or the administration
2  component, and will also make a reimbursement in
3  reference to the drug component; is that a fair
4  statement?
5     A.  If it is billed that way, yes.
6     Q.  When the contract with the provider is a
7  percentage of Medicare, in those instances, does
8  that encompass both a percentage of what Medicare
9  would pay for drugs and a percentage of what
10  Medicare will pay for service?
11     A.  Yes, it can be.
12     Q.  Okay.  And as you testified earlier, there
13  may be variations there, where some services will be
14  reimbursed at 150 percent of what Medicare pays, and
15  other services at another percentage of what
16  Medicare pays, correct?
17     MR. ST. PHILLIP:  Objection.
18     THE WITNESS:  The same contract, same
19  provider, yes..
20     MR. MANGI:  Okay.
21     MR. ST. PHILLIP:  Let me make my
22  objection.

**59**

1     THE WITNESS:  Okay.
2  BY MR. MANGI:
3     Q.  And there may also be variation in
4  reference to reimbursement for the drugs
5  specifically that may be anywhere from 90 percent of
6  what Medicare reimburses to 120 percent of what
7  Medicare is reimbursing, correct?
8     MR. ST. PHILLIP:  Objection, asked and
9  answered.
10     THE WITNESS:  Are you asking that question
11  in the reference of a single contract with a single
12  provider within that contract?
13  BY MR. MANGI:
14     Q.  Well, let's start with that instance.  Can
15  there be variation in the amounts that Humana will
16  reimburse providers for drugs in one contract with
17  one provider?
18     A.  Anything is possible.
19     Q.  Are you aware of any instances where that
20  has happened?
21     A.  I do believe there may be one or two
22  contracts that contain what we refer to as a

**60**

1  carveout for a specific drug for a specific code.
2     Q.  Certainly it's true that that -- there
3  will be variation in contracts with different
4  providers.  One provider may be getting 120 percent
5  of the Medicare reimbursement amount for the drugs,
6  and others may be getting 90 percent; fair
7  statement?
8     A.  Uh-huh.
9     Q.  You have to answer verbally.
10     A.  Yes.
11     Q.  Now, does -- has Humana ever -- withdraw
12  that.
13     The fourth possibility that you referenced
14  was the leased networks?
15     A.  Yes.
16     Q.  In those instances, what methodology has
17  Humana used to reimburse providers for drugs
18  administered in office?
19     A.  It's 100 percent of that network's fee
20  schedule, whatever that may be, and whatever basis
21  they use, however they came up with it, we have no
22  knowledge nor control.  We simply pay as their

**61**

1  contract dictates, i.e. their fee schedule dictates.
2     Q.  Now, in reference to cases where -- the
3  less than 1 percent of fee schedule where Humana
4  reimburses on the basis of percentage of charge,
5  Humana will reimburse a percentage of what the
6  physician charges both in reference to drugs and
7  services?
8     A.  That's correct.
9     Q.  And the third possibility, where there is
10  this alternate of AWP based schedule, in those
11  instances, how will Humana reimburse the service
12  component?
13     A.  That would be based on the negotiated
14  payment schedule that we referred to as the default
15  fee schedule.  Those types of services would not be
16  on the AWP fee schedule, therefore in the claim
17  process system, they would look for it in that fee
18  schedule.  If it's not there, it would default to
19  the fee -- underlying fee schedule that is
20  negotiated as all other fees are.
21     Q.  Would it default to the Medicare based
22  service fee schedule, or is this a different service

62

1　fee schedule?
2　　A.　Could be either one. Depends on the
3　individual contract.
4　　Q.　Now, does Humana -- has Humana ever
5　attempted to study or analyze physicians' overhead
6　costs?
7　　A.　Not to my knowledge.
8　　Q.　Okay. Has Humana ever attempted to assess
9　the costs, overhead or otherwise, that a physician
10　incurs in administering any drugs to patients?
11　　　MR. ST. PHILLIP: Objection.
12　　　THE WITNESS: Not to my knowledge.
13　BY MR. MANGI:
14　　Q.　Does Humana require physicians to disclose
15　their acquisition costs for drugs that are later
16　reimbursed by Humana?
17　　A.　No.
18　　Q.　Does Humana know what those physicians are
19　paying to acquire drugs in relation to which it
20　later reimburses them?
21　　A.　I do not believe so.
22　　Q.　And Humana has never made it a contractual

63

1　term in its contracts with the providers that they
2　must disclose their acquisition costs for drugs; is
3　that correct?
4　　A.　No contracts that I'm aware of.
5　　Q.　Is -- why is that? Why has Humana never
6　attempted to discover what physicians' acquisition
7　costs are?
8　　　MR. ST. PHILLIP: Objection to the extent
9　it calls for a legal conclusion. Mister Lemke is
10　not an attorney. But to the extent that you know
11　otherwise, you can answer.
12　　　THE WITNESS: In my career prior to
13　Humana, in working directly with physician groups,
14　that is something I would never have agreed to in a
15　contract.
16　BY MR. MANGI:
17　　Q.　Okay. But Humana has never attempted to
18　get that information from physicians to the extent
19　that you're aware of; is that correct?
20　　A.　I'm aware of no attempt to --
21　　Q.　Okay. I'm sorry, were you done?
22　　A.　Yes, I'm aware of no attempt to gain that

64

1　type of information.
2　　Q.　Is it fair to say, then, that the amounts
3　that physicians pay to acquire drugs are irrelevant
4　to Humana's consideration of the amount it will
5　reimburse those providers in relation to drugs
6　administered in office?
7　　　MR. ST. PHILLIP: Objection.
8　　　THE WITNESS: That is true, to the extent
9　we do not know what their costs are.
10　BY MR. MANGI:
11　　Q.　Indeed, all reimbursements will be by
12　reference to the operative fee schedule or the
13　billed charge, and never by reference to what the
14　physicians' acquisition costs were, correct?
15　　A.　That's correct.
16　　Q.　So indeed, if Humana were to get suddenly
17　from some source more information about what a
18　particular practice is paying to acquire drugs, that
19　wouldn't change the reimbursement amount to that
20　practice, because that reimbursement amount is set
21　in the fee schedule; is that a fair statement?
22　　　MR. ST. PHILLIP: Objection, calls for

65

1　speculation.
2　　　THE WITNESS: I can only assume if we were
3　to gain the knowledge of a provider's acquisition
4　costs, that we would certainly use that in the
5　negotiation process to try to lower our costs.
6　BY MR. MANGI:
7　　Q.　But certainly it's true that Humana is not
8　aiming to reimburse physicians for drugs
9　administered in their office at their acquisition
10　cost; is that a fair statement?
11　　　MR. ST. PHILLIP: Objection.
12　　　THE WITNESS: I don't even know how to
13　answer that.
14　BY MR. MANGI:
15　　Q.　Let me rephrase it, then. Does Humana
16　understand that physicians are generally acquiring
17　drugs at an amount that's less than that which
18　Humana reimburses them in relation to those drugs?
19　　　MR. ST. PHILLIP: Objection. I think he's
20　testified about his knowledge about the acquisition
21　costs of providers, but to the extent you would like
22　to enhance your answer, please do so.

66

1        THE WITNESS: I think the previous answers
2   cover it.
3   BY MR. MANGI:
4        Q.  Well, with respect, I think this question
5   is a little bit different.  My question is, is it
6   Humana's aim that physicians should break even, or
7   is it Humana's aim that physicians break even at
8   an amount something higher than that which they paid
9   to acquire drugs?
10       MR. ST. PHILLIP:  Same objection.
11       THE WITNESS:  I know of no stated policy
12  within Humana to attempt to limit a provider to its
13  net or exact cost.
14  BY MR. MANGI:
15       Q.  Are you involved at all in negotiations
16  with providers?
17       A.  Only on special occasions.
18       Q.  Do you have knowledge as to the issues
19  that come up in negotiations generally, other than
20  those special cases?
21       A.  Yes.
22       Q.  Would it be fair to say that as part of

67

1   that negotiation process, physicians are seeking to
2   maximize the reimbursement they can get from Humana?
3        MR. ST. PHILLIP:  Objection to form.
4        THE WITNESS:  I could safely say 100
5   percent of the providers are seeking it, yes.
6   BY MR. MANGI:
7        Q.  And at the same time, Humana's aim is to
8   maintain an adequate provider network, right?
9        A.  That is one of the goals of Humana, yes.
10       Q.  And Humana would recognize as part of that
11  negotiating process that if Humana were reimbursing
12  providers at an amount below their acquisition
13  costs, if Humana were causing providers to lose
14  money, they would be unlikely to enter into those
15  contracts; is that a fair statement?
16       MR. ST. PHILLIP:  Objection.
17       THE WITNESS:  I can't say that with
18  certainty.
19  BY MR. MANGI:
20       Q.  Okay.  So is it your understanding that
21  physicians, while seeking to maximize reimbursement,
22  would nonetheless accept reimbursement at an amount

68

1   below their acquisition costs for drugs?
2        MR. ST. PHILLIP:  Objection.
3        THE WITNESS:  I could only answer that
4   from my previous experience in my career from the
5   provider's side, that during negotiation, in the
6   give and take, a provider may well agree to a less
7   than cost reimbursement to gain an advantage in
8   another area, i.e., loss leader.  I will take less
9   for this, but I want this for that.  An internal
10  analysis says when the day is done, if I come out
11  with more dollars in my pocket, it's been a
12  successful negotiation.
13  BY MR. MANGI:
14       Q.  So it's fair to say, then, that during
15  that negotiation process, both Humana and physicians
16  are always keeping an eye on the overall pictures,
17  what's going to be paid in the end and what's going
18  to be received in the end; is that a fair statement?
19       A.  It is definitely from Humana's side.  I
20  can only speculate that on the provider's side,
21  they're doing the same thing.
22       Q.  Now, is Humana aware of submissions and

69

1   studies that have been done by providers groups and
2   trade organizations, referencing the --
3        MR. MANGI:  Let's go off the record for a
4   second.
5        (OFF-THE-RECORD DISCUSSION.)
6   BY MR. MANGI:
7        Q.  Now, is Humana aware of the fact that
8   physicians groups have stated publicly on many
9   occasions that the amounts Medicare reimburses them
10  in relation to services or administrative fees alone
11  are inadequate?
12       MR. ST. PHILLIP:  Objection, it's
13  argumentative.
14       THE WITNESS:  I have no knowledge of that.
15  BY MR. MANGI:
16       Q.  Okay.  Do you have any knowledge as to
17  whether physicians regard Medicare reimbursement for
18  admin fees as sufficient to cover their overhead
19  costs?
20       MR. ST. PHILLIP:  Objection, asked and
21  answered.
22       THE WITNESS:  I really cannot speak to

70

1  that.
2  BY MR. MANGI:
3     Q. Certainly we can agree that since both
4  parties are taking an overall view of the contract,
5  inadequacies, perceived inadequacies in one area of
6  reimbursement, can be made up in other areas of
7  reimbursement; is that a fair statement?
8     A. That's a fair statement.
9     Q. So for example, if a physician felt that
10 the amounts he was being reimbursed in relation to
11 his service fees were inadequate, that could be made
12 up by higher reimbursement for the drug component;
13 is that a fair statement?
14    MR. ST. PHILLIP: Objection. Calls for
15 speculation. Go ahead, if you can answer.
16    THE WITNESS: Well, I can only speculate
17 that a good business practice is that the decision
18 is made on the bottom line, when it all comes
19 together, so.
20 BY MR. MANGI:
21    Q. So did you agree with my statement?
22    MR. ST. PHILLIP: Objection. He answered

71

1  your statement.
2  BY MR. MANGI:
3     Q. You can answer the question.
4     A. That's all I have to say to that question.
5     Q. Okay. Is there any part of my statement
6  that you disagree with?
7     MR. ST. PHILLIP: Objection.
8  BY MR. MANGI:
9     Q. I'm just trying to understand if there's a
10 difference. Would you like it read back?
11    MR. ST. PHILLIP: To the extent you want
12 to badger the witness more, he just answered your
13 question. Go ahead. Do you have anything else to
14 add?
15    THE WITNESS: No, anything further would
16 be pure speculation.
17 BY MR. MANGI:
18    Q. Okay. I'm just trying to -- I'm truly not
19 trying to badger you. I'm trying to understand if
20 there's a difference between what I said and what
21 you said. Is there -- would you like it read back?
22    MR. ST. PHILLIP: He answered your

72

1  question. I think you can move on.
2     MR. MANGI: With respect, I don't think he
3  did.
4     MR. ST. PHILLIP: Let's read the whole
5  colloquy back and see if there's a problem.
6     MR. MANGI: You can read the original
7  statement that I made.
8     (RECORD READ.)
9     MR. MANGI: Okay. We can pause there.
10    MR. ST. PHILLIP: No, we can actually
11 listen to his answer. I would like to hear his
12 answer.
13    MR. MANGI: Sure. I mean, I think we'll
14 have to read it all again, but if counsel wants it,
15 please do.
16    (RECORD READ.)
17 BY MR. MANGI:
18    Q. So my question is, do you agree with my
19 initial statement?
20    A. I neither agree nor disagree. I think my
21 answer indicates that the business practice, you
22 know, drives that type of approach or thinking.

73

1     Q. Okay. As I recall, your answer was that
2  good business would require that any party take a
3  look at the overall deal that's been struck, right?
4     A. Yes.
5     Q. Okay. Now, we've talked about variation
6  in the reimbursement rates that are utilized, and I
7  just wanted to complete some of the percentages we
8  were talking about. Medicare based reimbursement
9  was 66 percent of fee schedules. Percentage of
10 charge was less than 1 percent. The alternative AWP
11 based schedule was less than 1 percent. Is the
12 remainder, the 32 percent, made up of leased
13 networks?
14    A. No. That's part of it, but there is also
15 what we call provider specific fee schedules.
16    Q. Okay. At 32 percent, what proportion are
17 leased networks and what proportion are provider
18 specific fee schedules?
19    A. Leased networks are about 9 percent.
20    Q. Okay.
21    A. What was the other one?
22    Q. Provider specific fee schedule.

---

**74**

1    A. Oh, provider specific. That really
2  makes -- that would make up the difference.
3    Q. Okay. So that's the remaining 22 percent
4  or 23 percent? You have to answer verbally.
5    A. Yes.
6    Q. Now, these provider specific fee
7  schedules, what are these?
8    A. Most generally, they're the fee schedule
9  that is presented to Humana from the provider. So
10  they do not -- they are not originally designed by
11  Humana.
12    Q. All right. Does Humana know what the
13  basis is for those fee schedules or how they're
14  calculated?
15    A. Sometimes.
16    Q. What are some of the bases that you've
17  seen in past fee schedules received from providers?
18    A. They could be built off of higher fee
19  schedules. They could be built off of MDR fee
20  schedules. They could be based off of past or
21  non-current Medicare fee schedules. They could be
22  built off Saint Anthony's RVU system. They could be

---

**75**

1  entirely home grown, based on the provider's charge
2  master.
3    Q. So indeed some of those fee schedules may
4  have nothing to do with AWP; is that a fair
5  statement?
6    MR. ST. PHILLIP: Objection.
7    THE WITNESS: I cannot answer that,
8  because not being intimate with the development of
9  those fee schedules, I do not know what the provider
10  used to establish that fee.
11  BY MR. MANGI:
12    Q. So certainly in relation to these fee
13  schedules, 22 percent or 23 percent, you don't know
14  what the basis is, so you don't know whether or not
15  it's tied to AWP or something else; is that a fair
16  statement?
17    MR. ST. PHILLIP: You mean the provider
18  original schedule or the ultimate determination?
19  BY MR. MANGI:
20    Q. Well, are they one and the same?
21    A. No, by nature of negotiation, they won't
22  be the same.

---

**76**

1    Q. Okay. So the provider will submit a fee
2  schedule that will form the basis for a negotiation?
3    A. That's correct.
4    Q. All right. And the final result, the fee
5  schedule that's agreed upon, since you don't know
6  what the physician's submitted fee schedule was
7  based on, you don't know what that fee schedule was
8  originally based on; would you agree with that?
9    MR. ST. PHILLIP: Objection.
10    THE WITNESS: That's true, we do not know
11  what the provider originally used as a base for
12  their fee schedule.
13  BY MR. MANGI:
14    Q. And it follows that you don't know whether
15  or not they used AWP or something else in generating
16  that fee schedule?
17    A. That's correct.
18    Q. Now, the reimbursement terms or the drug
19  reimbursement fee schedule that's agreed upon in any
20  given contract with the provider, would that vary by
21  provider type? By provider type, I mean the
22  specialty of the provider.

---

**77**

1    A. It's possible.
2    Q. Okay. And as a general statement, is it
3  the case that oncologists as a group would get a
4  different level of reimbursement from, say,
5  nephrologists or urologists, or is it really a case
6  by case, contract by contract negotiation?
7    MR. ST. PHILLIP: What are we talking
8  about, drugs?
9    MR. MANGI: Yes.
10    THE WITNESS: It could be either. The
11  great majority of contracts that result in large
12  costs for drugs almost exclusively would be direct
13  negotiation. For those contracts where one could
14  say that the cost of drugs over a set amount of time
15  is insignificant, those may be set within a market
16  at a set percent of AWP, for example.
17  BY MR. MANGI:
18    Q. Okay. Were you done?
19    A. Yes.
20    Q. Are there some markets where Humana
21  employs a take it or leave it approach, where it
22  will offer physicians a fee schedule and say take it

---

**78**

1  or leave it?
2     A.  Not specifically to a market that I'm
3  aware of, but throughout the country, based on
4  network needs and the market, yes, that's a
5  possibility.
6     Q.  So what you're saying essentially is that
7  in areas where -- or withdraw that.
8        When dealing with providers who have
9  leverage or bargaining power, Humana will end up
10  paying high amounts, and when dealing with providers
11  who have no leverage or very little leverage, Humana
12  will end up paying lower amounts, right?
13     MR. ST. PHILLIP:  Objection.
14     THE WITNESS:  That's a possibility.  It's
15  certainly not mandated, or -- again, until you do an
16  entire analysis of a market, I could not say that
17  that, you know, in fact exists in any particular
18  market that Humana is in.
19  BY MR. MANGI:
20     Q.  Yeah, I'm starting to understand your
21  earlier statement when you said the contracts with
22  high cost to Humana are those that are directly

**79**

1  negotiated.  Did you mean by that that Humana will
2  be paying higher amounts in cases where it is
3  engaging in a back and forth negotiation process
4  with a provider?
5     A.  No.
6     Q.  Okay.  Perhaps you can help me understand
7  what you meant by that.
8     A.  What I meant by that is that for those
9  providers, the fee schedule would be negotiated.
10  Now, whether that's negotiated up or negotiated down
11  as far as the cost and what you measure it against,
12  that technically is immaterial.  The fact that
13  providers where there are high costs in a particular
14  area, we will not leave to chance, if you will, in
15  just throwing out a fee schedule.  It will be
16  negotiated, which in no way dictates or indicates
17  the cost would be higher or the cost would be lower,
18  because you don't -- again, until it's settled and
19  you have something to match it against, you can't
20  make that statement, the costs are higher, the costs
21  are lower.
22     MR. ST. PHILLIP:  It's about 25 after 11,

**80**

1  so we've gone another hour.  So when there's an
2  appropriate time to break, you can do that.
3     MR. MANGI:  Let me finish up this line.
4  BY MR. MANGI:
5     Q.  I think I follow, so just tell me if I'm
6  wrong.  In areas where Humana has historically had
7  high costs, in those areas Humana will engage in
8  direct negotiations and not just leave it to the
9  market; whereas in other areas where there's
10  historically been lower costs, Humana may just put
11  out a standard fee schedule, and that in most cases
12  that will form the basis for reimbursement.  Do I
13  understand that correctly?
14     MR. ST. PHILLIP:  Objection to form.
15     THE WITNESS:  No, that is not the total
16  deciding factor whether there's direct negotiation
17  or there isn't.
18  BY MR. MANGI:
19     Q.  In what proportion of cases would
20  you say there is a negotiation versus a take it or
21  leave it approach?
22     A.  Before I can answer that, we would have to

**81**

1  decide on what your basis is as to how we would
2  measure that, because there are numerous ways to
3  measure and produce an answer to your question.
4     Q.  Okay.  Let me try and clarify it, then.
5  We're talking now specifically about the amount that
6  Humana reimburses physicians in relation to drugs
7  that it administers in office.
8     A.  Okay.
9     Q.  That amount will be set to a fee schedule,
10  right, or it will be based on billed charge per the
11  contract?
12     A.  Yes.
13     Q.  In reference to the cases where we're
14  using a fee schedule, my question is, in what
15  proportion of cases will that fee schedule be
16  negotiated, either as a hole or on a line item
17  basis, versus what proportion of cases will the fee
18  schedule be presented to the provider saying take it
19  or leave it?
20     A.  And I again say, are we looking at that
21  proportion based on number of physicians we have
22  under contract or number of groups we have under

82

1   contract, or number of contracts? Because the
2   number is greatly different if we're talking about
3   individual contracts or if we're talking about
4   number of physicians.
5     Q.   Okay. Let's do it by reference to number
6   of physicians.
7     A.   Yeah, you picked the hard one.
8     Q.   If you know.
9     A.   Without analysis, I really cannot answer
10   that question.
11     Q.   Okay. Can you answer it by reference to
12   percentage of contracts?
13     A.   That would be closer -- probably greater
14   than 50 percent are by negotiation.
15     Q.   Okay. So in more than half the cases,
16   Humana negotiates with providers the amounts that
17   it's going to reimburse them in relation to drugs,
18   and in the remainder of cases it will employ a take
19   it or leave it approach?
20     MR. ST. PHILLIP: Based on his
21   qualifications as to what the denominator is.
22     THE WITNESS: Yes.

83

1     MR. MANGI: That's a good breaking point.
2     (A SHORT BREAK WAS TAKEN.)
3   BY MR. MANGI:
4     Q.   We've been discussing a lot of aspects of
5   negotiation with providers, and I understand that
6   negotiation is one basis for the variation we've
7   seen in Humana's contracts in terms of the amounts
8   that are reimbursed for drugs administered in
9   office. Are there any reasons explaining that
10   variation other than contract negotiation?
11     A.   Only original source.
12     Q.   In cases where the provider wants to
13   supply their own fee schedule to Humana?
14     A.   Correct.
15     Q.   Certainly, even the reimbursement
16   methodology that's used, whether it's a fee schedule
17   from the provider or Medicare based or provider's
18   charge, even that is subject of negotiation,
19   correct?
20     A.   No. I would say the ultimate fee is
21   subject of negotiation.
22     Q.   Okay. So if a provider tells Humana they

84

1   want to supply their own fee schedule as a starting
2   point, that will be accepted in every case?
3     MR. ST. PHILLIP: Objection.
4     THE WITNESS: I don't know of any times
5   when we have not accepted it for starting
6   negotiations.
7   BY MR. MANGI:
8     Q.   Okay. So it's fair to say that to the
9   best of your knowledge, Humana will accept the
10   provider's choice of type of methodology to use as
11   the basis for reimbursement, but will then negotiate
12   the actual amounts to be reimbursed?
13     MR. ST. PHILLIP: Objection.
14   BY MR. MANGI:
15     Q.   Is that a fair statement?
16     A.   That's generally how the process works.
17     Q.   And once the methodology has been
18   selected, Humana will then start a negotiation
19   process with a view on the bottom line, regardless
20   of what the starting point is?
21     A.   That's correct.
22     Q.   And it's that negotiation process that

85

1   will explain the variation in reimbursement rates to
2   different providers?
3     A.   Yes, but not totally.
4     Q.   Okay. What other factors would explain
5   it?
6     A.   Our original basis.
7     Q.   Okay. But regardless of what the original
8   basis is, Humana will then negotiate it to where --
9   its desired end point, right?
10     A.   Yes.
11     Q.   In other words, if a particular provider
12   elects to use a fee schedule that he's used
13   previously as opposed to a Medicare based fee
14   schedule, that's unlikely to affect where Humana
15   ends up after negotiation in terms of the amount it
16   will reimburse, right?
17     A.   I wouldn't say that's a true statement,
18   only in the fact that where you begin does in fact
19   have an effect on the outcome.
20     Q.   Okay. Fair enough. So if we were to list
21   the elements that explain variation, one part of it
22   would be the starting point, because that will

86

1    affect the course of the negotiation, and then
2    there's the negotiation itself?
3        A.   Correct.
4        Q.   Okay.  Now, other than the five basic
5    methodologies we discussed, are there any other
6    methodologies that Humana employs now or has
7    employed in the past that you're aware of?
8            MR. ST. PHILLIP:  Objection to form.
9            THE WITNESS:  Not that I'm aware of.
10   BY MR. MANGI:
11       Q.   With regard to each of those
12   methodologies, is it fair to say that there is a
13   reimbursement amount in relation to the service
14   component, and then a reimbursement amount in
15   relation to the drug component?
16       A.   Within those contracts that employ a fee
17   schedule as part of the contract, that is a true
18   statement.
19       Q.   Are there contracts with providers that do
20   not use fee schedules, other than actual charge,
21   other than contracts that specify actual charge?
22       A.   Yes.

87

1        Q.   What are those contracts?
2        A.   Those would be contracts with a per diem
3    or a fixed all-inclusive fee.
4        Q.   Capitated rate?
5            MR. ST. PHILLIP:  Objection to form.
6            THE WITNESS:  They could be capitated.
7    I'm not in a position to, you know, discuss
8    capitated contracts.
9    BY MR. MANGI:
10       Q.   Well, these contracts that provide for an
11   overall dollar sum payment, be it per diem or set
12   amount or something else, are there contracts with
13   providers that are of that type, or are they only
14   contracts with hospitals?
15       A.   There are a few that I'm aware of with
16   home health agencies.
17       Q.   Are there any contracts with physician
18   practices of that type?
19       A.   None that I'm aware of.
20       Q.   So it's certainly fair to say that in all
21   cases, in relation to reimbursement physician
22   practices, regardless of the methodology that's

88

1    used, there will be a service component and a drug
2    component?
3        A.   That's correct.
4        Q.   Now, focusing more on the negotiation
5    process that we've been talking about, are the terms
6    that are decided upon memorialized in any documents
7    other than the final contract and fee schedule?
8        A.   No.
9            MR. ST. PHILLIP:  Can I confer with the
10   witness for a second?
11           (WITNESS CONFERS WITH COUNSEL.)
12   BY MR. MANGI:
13       Q.   Now, the witness has just conferred with
14   counsel.  Is there anything you need to clarify
15   based on that conversation?
16       A.   Yes, there could be instances when the
17   claim itself and the provider does not make that
18   distinction in the fact that they may, in the case
19   of drugs, bill us, send a claim in for the drug, and
20   it does not reflect a claim for the administration
21   of that drug.  So there is that possibility.  But
22   Humana would not look at it as an all-inclusive as a

89

1    matter of reimbursing, based specifically on what is
2    on the claim form.
3        Q.   Are you referring to instances where the
4    provider inadvertently fails to bill for the service
5    component?
6        A.   I can only assume that was the case.
7        Q.   From Humana's perspective, it receives a
8    claim which is only for a drug component, although
9    the contract would talk about a service component
10   and a drug component?
11       A.   That's correct.
12       Q.   Now, the negotiation process we have been
13   discussing, how does that originate?  Does the
14   provider solicit bids from payors, does Humana
15   solicit bids from providers?
16       A.   It goes both ways.
17       Q.   And what determines which of those options
18   will apply in any given case?
19       A.   There are many situations that exist out
20   there that would drive that.  New providers coming
21   into a market often will contact Humana about
22   joining the network.  We have situations where there

**90**

1  are mergers of provider groups within a market, that
2  the new entity will approach Humana, or Humana may
3  well approach the new entity. There really to my
4  knowledge isn't one thing that drives that decision
5  as who contacts who first.
6      Q.  After a bid has been solicited, either
7  from the payor or from the provider, what steps does
8  that negotiation process then go through before
9  final contract is agreed upon?
10     A.  I can only address specifically the
11 payment portion of the contract. Regardless of who
12 initiates the contact, there will be a, you know, an
13 analysis of the intended payment schedule and
14 knowledge -- or, you know, the results of that
15 analysis sent to the contractor. May have an
16 opinion on it, may not have an opinion on it as to
17 this is good, bad or indifferent.
18     Q.  By "contractor," you're referring to the
19 provider?
20     A.  No, I'm talking the Humana associate that
21 actually does the face-to-face contact with the
22 provider.

**91**

1      Q.  Okay.
2      A.  So we provide the analysis for the
3  negotiation that they need to go back and work on
4  certain areas of the payment schedule. These areas
5  appear to be fine and are, quote, unquote,
6  acceptable, if you will. We render an overall
7  suggestion, opinion, if you will. I mean, it's an
8  analysis given to the contractor. Ultimately, it's
9  the contractor's responsibility to come to an
10 agreement with the provider as to what those
11 ultimate fees are.
12     Q.  Do you know what sort of communications or
13 negotiations take place between the person at
14 Humana, the contractor and the provider, what the
15 back and forth is there?
16     A.  Not intimately, no.
17     Q.  Is negotiation on a line item by line
18 items basis when it comes to drugs?
19         MR. ST. PHILLIP: Objection.
20         THE WITNESS: I don't believe I've ever
21 seen it down to that detail level.
22 BY MR. MANGI:

**92**

1      Q.  So generally it would be the overall
2  methodology, the percentage of Medicare or the
3  percentage in addition to Medicare that would be
4  subject to negotiation?
5      A.  Right.
6      Q.  Or indeed if a different benchmark is
7  used, say a fee schedule submitted by the provider,
8  what discount should be made of that fee schedule?
9         MR. ST. PHILLIP: Objection.
10 BY MR. MANGI:
11     Q.  You have to answer verbally.
12     A.  Yes.
13     Q.  Now, to what extent during the negotiation
14 process is a distinction made between the drug
15 reimbursement component of the contract and the
16 service reimbursement component of the contract?
17         MR. ST. PHILLIP: Objection. In all
18 negotiations or generally speaking?
19         MR. MANGI: Generally.
20         THE WITNESS: Could you repeat that
21 question?
22         MR. MANGI: Sure. Would you like me to

**93**

1  rephrase it or would you like it repeated?
2         THE WITNESS: No, just a repeat of the
3  question.
4         (RECORD READ.)
5         THE WITNESS: I don't believe there's a
6  definitive answer to that question.
7  BY MR. MANGI:
8      Q.  I'm sorry, were you done?
9      A.  It definitely varies from contract to
10 contract, whether it's together, whether it's
11 separate, one before the other. There is no
12 distinction, I mean.
13     Q.  So there's any number of permutations?
14     A.  Yes.
15     Q.  In some cases, a physician may focus on
16 one or the other or both?
17     A.  Yes.
18     Q.  Now, we discussed the range of
19 reimbursements in relation to drugs, is from 90 to
20 120 percent of the amount Medicare is reimbursing,
21 right?
22         MR. ST. PHILLIP: That's --

**94**

1       THE WITNESS: That's very general.
2 BY MR. MANGI:
3       Q. Right?
4       A. Yes.
5       Q. What is the range in relation to the
6 amount Medicare reimburses -- withdraw that.
7       What is the range of Humana's
8 reimbursement in relation to the service component
9 by reference to the amounts that Medicaid reimburses
10 for its services?
11       A. I can only speculate that it would be
12 wider than for the drugs.
13       Q. And the percentage that you gave me
14 earlier, I believe it was 65 to 200 percent. Would
15 that be a good approximation?
16       A. That's probably a wide enough range, yes.
17       Q. Now, that range is obviously larger than
18 the range of variation when it comes to drugs
19 specifically. Why is there a difference between
20 those two?
21       A. I can only speculate that it is driven by
22 the fact that the cost of drugs greatly outweighs

**95**

1 generally the cost of the service.
2       Q. So are you saying that from Humana's
3 perspective, because it's paid more in relation to
4 drugs, it negotiates along a narrower band than it
5 would in relation to services?
6       A. The financial impact will always drive the
7 attention, if you will, to areas of reimbursement.
8 And in the case of drugs, for certain providers,
9 that in fact drives our effort to contain our costs,
10 and they're by nature keeping it in a much narrower
11 range of the base that we use to establish those
12 costs in the first place.
13       Q. Would it be fair to say that another
14 explanation for that variation is the contract
15 negotiation process?
16       MR. ST. PHILLIP: Objection to form.
17       THE WITNESS: Well, I think the nature of
18 the financial impact in fact drives the importance
19 of negotiating those specific areas, yes.
20 BY MR. MANGI:
21       Q. And would it be fair to say that there are
22 instances where the market demands that Humana pay

**96**

1 up to 200 percent of the fee schedule when it comes
2 to services?
3       A. No. It's not the market that drives that.
4       Q. What does drive that?
5       A. The individual provider and their position
6 within the community.
7       Q. Okay. So are there instances where
8 because of a provider's bargaining power and
9 leverage, Humana ends up paying up to 200 percent of
10 the fee schedule when it comes to the service
11 component?
12       A. That's correct.
13       Q. Now, in relation to variations in the drug
14 component, specifically, we spoke earlier about the
15 pre 2000 period, can you tell me now, and in the
16 post 2000 period, from 2000 to present, what sort of
17 factors explain the variation in the ranges of
18 amounts that Humana pays providers in relation to
19 drugs administered in office?
20       MR. ST. PHILLIP: Objection to form.
21       THE WITNESS: Based on the fact that
22 Humana uses a standard basis, if you will, that

**97**

1 being AWP, to establish fees for the costs of drugs,
2 it by nature -- the variation is driven by the
3 negotiating power and position of the two parties
4 involved. That you can never get away from.
5 BY MR. MANGI:
6       Q. That's the key component in determining
7 the amounts that Humana will reimburse providers in
8 relation to drugs administered in office, correct?
9       MR. ST. PHILLIP: What's that?
10       MR. MANGI: The competitive dynamic that
11 you just described.
12       MR. ST. PHILLIP: Objection.
13       THE WITNESS: There's not a yes and no
14 answer to that. I truly believe in the fact that if
15 we had a lower cost basis as our standard, that even
16 with the power, the negotiation coming from one
17 party to the other, that ultimately we would have
18 lower fees. And it's not only drugs, that would be
19 for any services, any component of the fee schedule
20 amounts that we develop, that by nature, you start
21 at a higher base, you're going to wind up with a
22 higher cost than if you started at a lower base.

Page 98

1  BY MR. MANGI:
2      Q.  And what sort of lower basis are you
3  referring to there when you say Humana would end up
4  at a different result?
5      A.  Well, if there was available to Humana a
6  lower base, the psychology of contracting often is
7  getting a percentage greater than 100 percent of
8  something, psychologically that's a win.  So in
9  contracting in a negotiation, if you can achieve
10  allowing 110 percent of a lower base than 100
11  percent of a higher base, and your ultimate cost is
12  lower, you're -- you've had a successful
13  negotiation, and yet the other party psychologically
14  is a win for them, because they got something more
15  than 100 percent.  So it's not all negotiation that
16  drives it, it's where you start, because then --
17  well, I think the basis gives you a better
18  negotiating platform.  So if you start high, you're
19  in trouble right from the beginning.  If you start
20  low, negotiations still play a part of it, but
21  not -- it's not the total -- what's the word I'm
22  looking for?  Not the total deciding factor in where

Page 99

1  a fee winds up.
2      Q.  Well, if that's the case, then why hasn't
3  Humana switched to using another benchmark as a
4  basis for reimbursing its contractors?
5        MR. ST. PHILLIP:  Other than AWP?
6        MR. MANGI:  Or the Medicare fee schedule.
7        THE WITNESS:  There isn't one.
8  BY MR. MANGI:
9      Q.  You said you're familiar with wholesale
10  acquisition costs, weren't you?
11      A.  That's very spotty at best, and nobody to
12  my knowledge -- at least I do not have a resource
13  that would give me an AW -- or a WAC for all the
14  drugs that we deal with.  I mean, it doesn't -- to
15  my knowledge, it doesn't exist.  It may exist, and
16  if it does, Humana is not utilizing it at this time.
17      Q.  What do you mean when you say "spotty"?
18      A.  My understanding of it -- and again, I
19  could be wrong, but my understanding of it is that
20  there is not a wholesale acquisition cost dollar
21  amount for all the drugs being developed.
22      Q.  Are you aware of the fact that Red Book,

Page 100

1  which you mentioned earlier, does list wholesale
2  acquisition costs for drugs, certainly for more
3  drugs than it lists AWPs?
4        MR. ST. PHILLIP:  Objection.
5        THE WITNESS:  No, I'm not aware of that.
6  BY MR. MANGI:
7      Q.  Are you aware of the fact that First Data
8  Bank also lists wholesale acquisition costs or list
9  prices for drugs?
10        MR. ST. PHILLIP:  Objection.
11        THE WITNESS:  I'm not aware of that.
12  BY MR. MANGI:
13      Q.  Are you aware of the fact that those
14  publications have listed wholesale acquisition costs
15  for drugs for many, many years?
16        MR. ST. PHILLIP:  Objection.
17        THE WITNESS:  No, I'm not aware of that.
18        MR. MANGI:  Off the record for a moment.
19        (OFF-THE-RECORD DISCUSSION.)
20        MR. MANGI:  Back on the record.
21  BY MR. MANGI:
22      Q.  If in fact an alternative benchmark did

Page 101

1  exist, we can agree that Humana would be free to
2  start using that in its contracts, correct?
3      A.  Not necessarily.
4      Q.  Why not?
5      A.  Provider knowledge.
6      Q.  What do you mean by that?
7      A.  In negotiating with providers, they are
8  familiar with Medicare, where it is, what it is.
9  Been with them long enough that they have full
10  knowledge of it and understanding and feel
11  comfortable with it, as well as on the drug side,
12  they are well aware of and had experience with and,
13  quote, unquote, have faith in AWP.  If we were to
14  introduce wholesale acquisition costs as part of our
15  negotiation with a provider, there will be all kind
16  of red flags that would go up and say we don't know
17  what that is and we don't want any part of it.
18      Q.  Okay.  So one of the key reasons why AWP
19  is used, then, is because it's a benchmark with
20  which the market is familiar?
21      A.  Very much so.
22      Q.  And therefore, all parties are familiar

102

1   with it and know what it is, and they can then use
2   that as a starting point in the negotiations,
3   correct?
4      A. I would say that's a true statement.
5      Q. And the negotiation can then be for a
6   discount off of it or a percentage in addition to
7   it?
8      A. Yes.
9      Q. Depending on the individual negotiation
10   and the leverage of the provider group at issue?
11      A. That has some bearing on it, yes.
12      Q. Now, what sorts of issues do providers
13   raise during the negotiation process? Or put it
14   another way, what factors do providers raise to try
15   and argue that they should get higher reimbursement?
16      A. By far the greatest objection that they
17   raise is that the amount doesn't cover their costs.
18      Q. When you say the greatest objection they
19   raise, is that the most common complaint that you
20   here?
21      A. That's the only complaint they have.
22      Q. So that is the most frequently cited

103

1   negotiating point from providers?
2      A. Yes.
3      Q. Do you have any reason to doubt the
4   veracity of those statements?
5      A. Yes.
6      Q. What is your reason for doubting the
7   veracity of those statements?
8      A. From my career as a clinic administrator
9   and director of finance in the health care field on
10   the provider's side is that is the only argument you
11   have with the fee schedule. It doesn't cover your
12   costs.
13      Q. Well, that doesn't mean that it's not
14   true, does it?
15      A. Oh, not at all.
16      Q. So my question is, you said that you doubt
17   that those statements are true. What's your basis
18   for doubting that those statements are true?
19      A. If those -- I answered that question, but
20   the answer to the previous statement.
21      Q. Okay. So you're saying that you doubt
22   it's true because you think they raise it because

104

1   it's the only argument they have?
2      A. It is basically the only argument that
3   they have.
4      Q. So it may be true in some cases, but in
5   other cases, you doubt it's true?
6      A. I doubt it's true all the time. As a
7   negotiator, I'll doubt it all the time.
8      Q. So when you doubt that it's true, your
9   understanding is that in fact their costs are
10   covered; is that a fair statement?
11      MR. ST. PHILLIP: Objection.
12      THE WITNESS: Yes, I believe their costs
13   are covered for the simple fact that when we're
14   speaking of drugs, relying on the fact that AWP
15   accurately reflects what their cost is.
16   BY MR. MANGI:
17      Q. What do you mean by that, AWP accurately
18   reflects what their cost is?
19      A. I'm assuming they are purchasing drugs at
20   a wholesale price. And if they are purchasing drugs
21   at a wholesale price, that the average wholesale
22   price that is published accurately or truly reflects

105

1   what their average cost is.
2      Q. What's the basis for your view that AWP is
3   the actual wholesale price that physicians acquire
4   drugs at?
5      A. I can only assume that.
6      Q. And what's the basis for your assumption?
7      A. By the nature of the label "average
8   wholesale price."
9      Q. So you're relying exclusively on your
10   interpretation of the term itself?
11      MR. ST. PHILLIP: Objection.
12      THE WITNESS: Yes. I have no other basis
13   to judge whether or not a published AWP price is in
14   fact an average wholesale price.
15   BY MR. MANGI:
16      Q. Now, I had asked you earlier in the day
17   whether or not you understood providers were
18   acquiring drugs at a price that could be expressed
19   by reference to any particular benchmark, and your
20   answer to that question was no. Are you now
21   changing that testimony?
22      MR. ST. PHILLIP: Objection. Asked and

---

**106**

1  answered, and mischaracterization of the testimony.
2  If you want to go back and read it, we can do that.
3  BY MR. MANGI:
4      Q.  Actually, I have a note here, but please
5  correct me if I'm wrong.
6          MR. ST. PHILLIP:  Okay.
7          THE WITNESS:  Read back that question.
8              (RECORD READ.)
9          THE WITNESS:  No. I have no reason to
10  believe that's the only benchmark that they're using
11  or, you know, anything else.
12  BY MR. MANGI:
13      Q.  Okay.  So is it fair to say that leaving
14  aside whatever you may gauge from the term itself,
15  average wholesale price, you don't know whether or
16  not that's what physicians are actually paying to
17  acquire drugs?
18      A.  No, I do not.
19      Q.  So you would agree with my statement?
20          MR. ST. PHILLIP:  Objection.
21  BY MR. MANGI:
22      Q.  Would you like me to rephrase it?

---

**107**

1      A.  Yes.
2      Q.  Is it fair to say that you don't know
3  whether the price that providers are paying to
4  acquire drugs is AWP or something less than that or
5  something else entirely?
6          MR. ST. PHILLIP:  Objection, asked and
7  answered.
8          THE WITNESS:  I do not know for a fact, I
9  only assume.
10  BY MR. MANGI:
11      Q.  Now, in addition to saying that their
12  costs are not being covered during the negotiation
13  process, do providers threaten to leave the network
14  or say that they will decline to be part of the
15  network at a given rate?
16      A.  It's my understanding that some providers
17  have made such statements.
18      Q.  So how does Humana know when it's arrived
19  at a -- well, withdraw that question.
20          Will the negotiation process be affected
21  by geographic issues or by area of country?
22      A.  Certainly.

---

**108**

1      Q.  In what the ways will geography affect the
2  bargaining process?
3      A.  Purely geography?
4      Q.  Yeah.
5      A.  If it's purely geography, then I have to
6  reanswer that, the fact that purely geography does
7  not have any effect on the negotiating stance.
8      Q.  Is it geography plus something else that
9  will have effect that you were thinking of then?
10      A.  Yes.
11      Q.  And what were you thinking of then?
12      A.  Well, again, it's the provider's position
13  in the market, it's Humana's position in the market
14  are the two major factors that drive a negotiation.
15  Who has the bigger hammer.
16      Q.  And indeed, you referred earlier when we
17  were talking about the pre 2000 period to a number
18  of factors that affect leverage, like whether or not
19  it's a multispecialty clinic, or it's the only one
20  in the area.  All those factors that you referred to
21  are equally applicable in the post 2000 period,
22  correct?

---

**109**

1      A.  Correct.
2      Q.  Now, in terms of fee schedules dealing
3  with the service component, you referenced the
4  possibility earlier of differential rates in one
5  contract.  Do you recall that testimony?
6      A.  Yes.
7      Q.  So oncologists may be paid, to use your
8  example, 150 percent of Medicare service fees in
9  respect to some services, 120 percent in reference
10  to others, and so on?
11      A.  Yes.
12      Q.  In those instances, does Humana accept a
13  physician's desire to have differential rates?
14          MR. ST. PHILLIP:  Objection.
15          THE WITNESS:  It could either come from
16  the provider, or it could come from Humana.
17  BY MR. MANGI:
18      Q.  Okay.  In instances where the provider
19  raises that as something that they want in the
20  contract, is that something that Humana will oppose
21  and seek through the negotiation process to
22  eliminate, or does Humana just accept that?

110

1    A.   It's not directly accepted.  It certainly
2    would be part of the negotiation as a result of, you
3    know, financial analysis that is done as to what
4    that impact would be.
5        Q.   Okay.  So Humana would -- Humana may
6    accept the fact of having a differentiated service
7    fee schedule, but would then negotiate the amount of
8    reimbursement in relation to each part of that
9    schedule; is that a fair statement?
10       MR. ST. PHILLIP:  Objection.
11       THE WITNESS:  If you're saying that the
12   individual parts make up -- and the result of those
13   individuals parts make up the decision on the whole,
14   yes.
15   BY MR. MANGI:
16       Q.   All right.  So going back to what you were
17   saying earlier, there may be tradeoffs on line items
18   that enable the parties to reach an overall
19   agreement?
20       A.   Yes.
21       Q.   Now, how does Humana assess whether or not
22   it's achieving competitive reimbursement levels by

111

1    comparison to what other insurers may be paying to
2    providers?
3        MR. ST. PHILLIP:  Objection, foundation.
4        THE WITNESS:  Humana does do some
5    competitive comparisons in limited areas where we
6    believe to have credible data.
7    BY MR. MANGI:
8        Q.   Okay.  Where is that data derived from?
9        A.   Hewitt & Associates.
10       Q.   Is that a third party consultant?
11       A.   Yes.
12       Q.   Based on that analysis, is it fair to say
13   that Humana seeks to ensure it's not paying more
14   than what its competitors are to providers, as a
15   general statement?
16       MR. ST. PHILLIP:  Objection.
17       THE WITNESS:  Certainly anytime you have
18   competitor data, good business sense tells you you
19   strive to have parity with your competitor in a
20   market.
21   BY MR. MANGI:
22       Q.   Now, when negotiating the reimbursement

112

1    rates with this particular provider, how does Humana
2    know when it's gone too far or whether it hasn't
3    gone far enough when seeking to lower the rates?
4        A.   If I could answer that question, I
5    wouldn't be sitting here talking to you today,
6    because I would be a multimillionaire.  I truly
7    believe that's an unknown.  One never knows whether
8    you left money on the table or you got taken.
9        Q.   Okay.  Well, would it be fair to say that
10   at the one extreme of that spectrum, Humana will
11   know its position is too aggressive when providers
12   refuse to sign contracts at that rate?  Is that a
13   fair statement?
14       A.   That's an obvious statement.
15       Q.   And indeed, part of the way that Humana
16   seeks to get the best deal it can is by testing what
17   the market will bear; is that a fair statement?
18       A.   That's one of the pieces of information we
19   use in decision making, yes.
20       Q.   And indeed, Humana, through conducting
21   many of these negotiations all the time, gets a
22   sense for what level of reimbursement would be too

113

1    low and what the level is at which providers would
2    not be willing to join the network, correct?
3        MR. ST. PHILLIP:  Objection.
4        THE WITNESS:  We get a feel for that
5    level.
6    BY MR. MANGI:
7        Q.   Right.  And certainly it's not a precise
8    point on a line; it's a general sense as to where
9    providers will agree and beyond which they will not
10   agree?
11       A.   As far as Humana is concerned, yes.
12       Q.   Now, are you familiar with the reforms of
13   Medicare that are currently taking place?
14       A.   I have a basic understanding of what
15   Medicare is not only attempting to do, but has put
16   in place for 2005 and beyond.
17       Q.   Are you aware of the fact that Medicare
18   has substantially increased the service component or
19   the administration fees component it pays to
20   physicians?
21       A.   Yes.
22       MR. ST. PHILLIP:  Objection.

114

1  BY MR. MANGI:
2      Q.  Does Humana intend to follow suit or has
3  Humana followed suit in increasing its service fee
4  schedules?
5          MR. ST. PHILLIP: I'm going to object, and
6  actually I don't believe that information is within
7  the scope of the deposition subjects.  It also calls
8  for disclosure of competitive information.  And I'll
9  move for a protective order on that and instruct the
10 witness not to answer.
11         MR. MANGI: Okay.  So is it counsel's
12 position that that information is not protected by
13 the protective orders that are already in place?
14         MR. ST. PHILLIP: It is highly sensitive
15 information that does not have anything to do with
16 the time period at issue in this litigation, and it
17 is our position that it is beyond the scope of the
18 protective order.
19         MR. MANGI: It actually does entirely,
20 given that Humana's fee schedules have been tied to
21 Medicare amounts and any relationship between the
22 two.  Will counsel maintain the instruction not to

115

1  answer?
2          MR. ST. PHILLIP: I will insofar as this
3  deposition does not call for testimony about what is
4  going on in 2005 and this case has nothing to do
5  with anything about what's going on in 2005.  In
6  addition, what Humana's fee schedules are going
7  forward and their strategy about how to price
8  products and its services in the future is highly
9  sensitive information that has nothing to do with
10 this action.
11         MR. MANGI: We disagree, I've seen that
12 not only to the extent to which things that are
13 being considered at present reflect strategies and
14 methods that have been used in the past, but I
15 understand your instruction and your objection, and
16 mark it for a ruling, please.
17 BY MR. MANGI:
18     Q.  Now, providers do not necessarily contract
19 with just one health insurer, correct?
20     A.  I assume that to be the case, yes.
21     Q.  You understand that providers may contract
22 with not just Humana, but also other insurers at the

116

1  same time?
2      A.  To my knowledge, Humana has no exclusive
3  contracts.
4      Q.  Does the fact that a provider may also
5  have contracts and fee schedules with other insurers
6  impact the bargaining process that provider goes
7  through with Humana?
8      A.  It could.
9      Q.  And how could it have that impact, or in
10 what ways could it affect the bargaining process?
11     A.  A provider will often use reimbursement
12 from one payor to analyze the payment of another
13 payor.  Again, that's good standard business
14 practice.
15     Q.  Does Humana ever make tradeoffs in its fee
16 schedules to improve its network adequacy relative
17 to its competitors?
18     A.  There are instances where fee schedule
19 negotiation is somewhat affected by other areas of
20 Humana wishing a provider to be in the network.
21     Q.  What do you mean when you refer to
22 other -- did you say other areas of Humana?

117

1      A.  Sales.
2      Q.  Why would sales want a provider to be in a
3  network?
4      A.  The better your product, the easier it is
5  to make a sale.
6      Q.  So the more comprehensive a network, the
7  better position sales are to market that product?
8      A.  Yes.
9      Q.  Okay.  So indeed, Humana takes an overall
10 business view to its negotiations of fee schedules,
11 correct?
12     A.  In some instances, yes.
13     Q.  So in the instances that you're referring
14 to, Humana may pay a higher fee schedule to some
15 providers so as to improve its network, right?
16     A.  Yes.  That's a possibility.
17     Q.  And the fact that it will have a better
18 network will better position Humana as against its
19 competitors in the insurance business?
20     A.  That is the assumption.
21     Q.  That's a knowing tradeoff that Humana
22 makes because it's paying a little more in

**118**

1    reimbursement, but it enables it to get a little
2    better network?
3        MR. ST. PHILLIP: Objection.
4        THE WITNESS: That is a rationalization
5    that is used in the industry, yes.
6    BY MR. MANGI:
7        Q.  And it's used at Humana specifically?
8        A.  Yes.
9        Q.  Now, are you aware of the fact that
10   providers in some instances have contracts with drug
11   manufacturers?
12       A.  I have no knowledge of that.
13       Q.  Are you aware of the fact that such rebate
14   contracts exist in the market?
15       MR. ST. PHILLIP: Let me make an objection
16   based on the exclusion at the top of No. 14, which
17   includes margins, wholesalers who are -- on drugs
18   over the last decade.  Insofar as rebates deal with
19   that margin relationship, I think that it's beyond
20   the scope of the ordered topics for which Humana has
21   produced a deponent, and therefore Humana is not
22   going to consent to the testimony on that topic.  We

**119**

1    will reserve our rights and allow the witness to
2    answer the question.
3        MR. MANGI: We disagree with your
4    interpretation as far as the question does not
5    address that topic at all and is in fact encompassed
6    by numerous other topics, but please answer the
7    question.
8        MR. ST. PHILLIP: Which topics?
9        MR. MANGI: The wholesalers area of
10   inquiry that you referenced.
11       THE WITNESS: Could I hear the question
12   again?
13       MR. MANGI: Sure.
14       (RECORD READ.)
15       THE WITNESS: Only from the fact that I
16   had personal knowledge of it prior to my employment
17   with Humana.
18       MR. ST. PHILLIP: And we're also going to
19   object insofar as that information may deal with the
20   time period that's before the scope of this
21   subpoena.
22   BY MR. MANGI:

**120**

1        Q.  Certainly we can agree that the existence
2    of those arrangements is not a secret?
3        MR. ST. PHILLIP: Objection.
4        THE WITNESS: I cannot state for a fact
5    that I know they exist.
6    BY MR. MANGI:
7        Q.  I'm sorry, I thought I said [SIC] you knew
8    they existed based from your prior experience; is
9    that what you said?
10       A.  Used to exist.
11       Q.  You're aware of the fact that those
12   arrangements existed in the past?
13       A.  In the past, yes.
14       Q.  And you don't know whether or not they
15   exist in the present?
16       A.  I can't say that for a certainty.
17       Q.  Now, do you know what methodologies Humana
18   uses to reimburse hospitals for drugs administered
19   to patients?
20       A.  Only superficial knowledge.
21       Q.  What is your knowledge of what those
22   methodologies are?

**121**

1        A.  That the great majority of drugs are
2    generally part of an agreed-upon fee for a DRG,
3    which is a diagnostically related group of services.
4    May well be included in the per diem.
5        Q.  Does Humana have an understanding as to
6    whether or not the administration of a drug in a
7    hospital setting is more cost effective to Humana
8    versus its administration in a physician office
9    setting?
10       MR. ST. PHILLIP: I'm going to object --
11       MR. MANGI: I refer you to areas 1 and 2.
12       MR. ST. PHILLIP: I'm not done with my
13   objection. The Deposition Subject No. 15 deals with
14   the distinction between reimbursements between
15   providers and hospitals, which was -- I'm sorry,
16   Deposition Topic No. 18, which was exclusively
17   excluded by Magistrate Judge Bowler in her
18   November 2, 2004 order.  As a result, Humana does
19   not content to have this witness testify concerning
20   this topic and we will therefore preserve our
21   ability to move to strike any answer that Mister
22   Lemke provides.  With that, we will allow Mister

122

1  Lemke to provide an answer.
2      MR. MANGI: I obviously disagree with that
3  interpretation, and the question is encompassed by
4  other subject matters. You can answer.
5      THE WITNESS: I know of no analysis that
6  exists that would indicate that being the case.
7  BY MR. MANGI:
8      Q.  Now, you testified earlier that you don't
9  know what exactly providers are paying to acquire
10 drugs, correct?
11     A.  Correct.
12     Q.  All right. So it's fair to say that you
13 have no particular expectation that there is a given
14 relationship between the amount they paid to acquire
15 drugs and the amount that Humana reimburses for
16 those drugs; is that correct?
17     MR. ST. PHILLIP: Objection, calls for
18 speculation.
19     THE WITNESS: I have no personal knowledge
20 that -- of that.
21 BY MR. MANGI:
22     Q.  And certainly, Humana has no expectation

123

1  that the amount that physicians pay to acquire drugs
2  are 10 percent, 20 percent, 50 percent, 60 percent
3  less than the amounts that Humana reimburses in
4  relation to those drugs; would you agree with that
5  statement?
6      MR. ST. PHILLIP: Objection, objection to
7  form.
8      THE WITNESS: I have no knowledge of that.
9  BY MR. MANGI:
10     Q.  And you have no expectation to that effect
11 either; is that correct?
12     MR. ST. PHILLIP: Objection. Same
13 objection.
14     THE WITNESS: I'm not quite sure what you
15 mean, whether I have an expectation of that.
16 BY MR. MANGI:
17     Q.  Is it Humana's expectation that the
18 amounts that providers pay to acquire drugs are a
19 fixed percentage less than the amount Humana
20 reimburses in relation to those drugs?
21     A.  The expectation that -- first of all, that
22 it's fixed, no. The expectation that good business

124

1  practice and assuming providers that we do business
2  with practice good business practices, is that they
3  would only accept payment that is at or above their
4  costs. That's my only expectation.
5      Q.  And certainly, you have no fixed
6  expectation as to how much higher it would be than
7  their acquisition costs, correct?
8      A.  Correct.
9      Q.  And indeed, that would vary from provider
10 to provider, depending on what they paid to acquire
11 drugs and what Humana reimburses them for drugs?
12     A.  Correct.
13     Q.  The percentage could be 10 percent in one
14 case, 50 in another, 100 in another, correct?
15     MR. ST. PHILLIP: Objection.
16     THE WITNESS: Could be.
17     MR. MANGI: Let's take a look at a few
18 documents. Before that, does anyone need a break?
19     MR. ST. PHILLIP: It's 12:35, let's take
20 one.
21         (A LUNCH BREAK WAS TAKEN.)
22 BY MR. MANGI:

125

1      Q.  Now, Mister Lemke, when we started this
2  morning, I had asked you about your responsibilities
3  as director of fee schedule management, and at
4  first, you had identified was building a database
5  for use in contract negotiations. What's that
6  database you were referring to there?
7      A.  It's an extract of physician claims,
8  provider claims from two of our major claims
9  processing platforms that we enhance the data from
10 the claim to include a Medicare equivalent based on
11 geographic area and CPT or HCPCS code so that we
12 have that data all together in one place to better
13 analyze an individual fee schedule or an individual
14 procedure or market all the way up.
15     Q.  Okay. So it's a database that enables you
16 to compare what you're paying a particular provider
17 as opposed to what he would be getting from
18 Medicare?
19     A.  Correct.
20     Q.  Is that database still in existence?
21     A.  Yes.
22     Q.  What does that database generate by way of

126
1  reports? Does it generate tables, summary reports?
2      A.  Just about anything.  There are some basic
3  standard reports that the contractors and other
4  market people can get from that database.  My shop
5  uses it extensively for ad hoc analysis and ad hoc
6  reporting.  So it's only limited to the data
7  elements that are in there as to what we can do with
8  it.
9      Q.  Now, does that compare the amounts that
10 are being reimbursed, both in relation to drugs and
11 services, to the Medicare reimbursement?
12     A.  It's everything that comes in on a HICVA
13 1500 claims form that for one reason or another
14 hasn't been scrubbed from the database.  Lacking of
15 certain data elements from a claim will eliminate it
16 from the database.  So it's not 100 percent of our
17 claims, but it is a very good representation of
18 what's happening.
19     Q.  And in most cases, that's by reference to
20 reimbursement for both drugs and for service?
21     A.  Yes.
22     Q.  Now, we spoke earlier about the fact that

127
1  physicians who make claims using J/Codes, right?
2      A.  (WITNESS MOVES HEAD UP AND DOWN.)
3      Q.  You have to answer that verbally.
4      A.  Yes.
5      Q.  And as I recall, your testimony was that
6  for a number of drugs, the J/Code will correspond to
7  a specific NDC; is that correct?
8      A.  As a point of clarification, our fee
9  schedules point to -- our AWP fee schedule points to
10 a specific NDC code that we use to get the fee for
11 that fee schedule.
12     Q.  Agreed.  Let's leave aside what we
13 referred to earlier as the alternative AWP schedule,
14 and I'm talking about the Medicare based fee
15 schedules that are 66 percent of fee schedules.
16     A.  Okay.
17     MR. ST. PHILLIP:  Objection.
18 BY MR. MANGI:
19     Q.  In those cases when physicians submit
20 claims, some of them are by reference to J/Codes
21 that reference particular NDCs; is that correct?
22     A.  No.

128
1      Q.  Okay.  What do the claim forms -- what
2  information do those reflect?
3      A.  The J/Code itself, and often the short --
4  what they call the short description, and that's it.
5      Q.  Okay.  In -- I understand your point.  In
6  Humana's fee schedule, however, that J/Code will
7  correspond to a particular NDC?
8      A.  No.
9      Q.  Is that correct?
10     A.  No.
11     Q.  It will not?
12     A.  No.
13     Q.  What will it correspond to?
14     A.  Whatever NDC number CMS uses to price that
15 code.
16     Q.  Okay.  And it's your understanding that in
17 those cases, there would be one NDC that will
18 correspond to one J/Code?
19     MR. ST. PHILLIP:  Objection.
20     THE WITNESS:  I can't answer that.  I
21 don't know how CMS selects the AWP for their fee
22 schedules.

129
1  BY MR. MANGI:
2      Q.  So would it be fair to say, then, that you
3  don't know whether or not Humana's Medicare based
4  fee schedules use AWP based reimbursement at all?
5      MR. ST. PHILLIP:  Objection.
6      THE WITNESS:  I know to the extent that I
7  believe it is common knowledge that Medicare has in
8  the past and continues to 2004 to use AWP as a basis
9  for their fee schedules.
10 BY MR. MANGI:
11     Q.  However, a J/Code can include more than
12 one drug within it; isn't that correct?
13     MR. ST. PHILLIP:  Objection.  I think he's
14 testified about his knowledge to that.
15     THE WITNESS:  A J/Code only addresses the
16 drug itself and the -- what's the proper
17 terminology, the dosage for that particular code.
18 Does not to my knowledge indicate any kind of brand
19 name.  So it is the scientific name of that drug and
20 the dosage.  So the statement is there are many NDC
21 numbers that could be covered by a particular HCPCS
22 code, in this case, a J/Code.

**130**

1 BY MR. MANGI:

2      Q. So that J/Code could cover, for example, a

3 branded drug and generic competitors, correct?

4      A. That's a little more technical than I have

5 knowledge of, but I believe that to be the case,

6 but --

7      Q. Or it could include different branded

8 drugs as well?

9      A. Again, that's a little bit above my

10 technical competency.

11      Q. Is it fair to say that insofar as a J/Code

12 includes more than one drug, Humana's reimbursement

13 is not drug specific, it's J/Code specific?

14      MR. ST. PHILLIP: Objection.

15      THE WITNESS: Humana's fee is drug

16 specific to the extent that Medicare's fee is drug

17 specific.

18 BY MR. MANGI:

19      Q. Because Humana is utilizing the same

20 J/Codes as Medicare?

21      A. Yes.

22      Q. Now, let's take a look at a document, it

**131**

1 bears Bates Nos. HUM-839 to 912, and ask the

2 reporter to mark that as Exhibit Lemke 002 to the

3 deposition.

4      (Exhibit Lemke 002 WAS MARKED FOR

5      IDENTIFICATION.)

6      MR. ST. PHILLIP: Do you want to give Ed

7 the Bates number here?

8      MR. MANGI: I think I just did.

9      MR. ST. PHILLIP: The Bates numbers, okay.

10 Sorry about that.

11      MR. MANGI: No problem.

12 BY MR. MANGI:

13      Q. Now, I realize that's a lengthy document,

14 and I will draw your attention to specific parts of

15 it, but feel free to familiarize yourself, if you

16 will.

17      (WITNESS REVIEWS DOCUMENT.)

18      THE WITNESS: Okay.

19 BY MR. MANGI:

20      Q. Now, looking at the first page of the

21 document, you'll see a number on the bottom right of

22 it. This is an amendment to an agreement between

**132**

1 Humana and a provider group, correct?

2      A. Appears to be, yes.

3      Q. And part of this amendment is replacing an

4 Attachment E, you'll see that at No. 3 on the first

5 page.

6      A. Okay.

7      Q. Now if I may draw your attention to Page

8 HUM-841.

9      A. Uh-huh.

10      Q. You'll see there a new Attachment E.

11      A. Uh-huh.

12      Q. Now, is this one of the Medicare based fee

13 schedules that we've been discussing?

14      MR. ST. PHILLIP: I'm going to object

15 based on the judge's exclusion at the top of No. 25

16 in our November 2nd, 2004 order, which asks for the

17 authentication and knowledge of all documents

18 produced in response to the defendants' subpoena and

19 the extent to which this production is responsive to

20 the defendants' demands. This information, the

21 authentication materials that we provided you was

22 offered in advance of and was offered in exchange

**133**

1 for not providing testimony. Since that offer was

2 rejected by the defendants, we do not consent to

3 authenticate or give testimony concerning our

4 knowledge about these documents.

5      MR. MANGI: Insofar as counsel wishes to

6 argue before the judge that they refuse to

7 authenticate your own document, you're free to do

8 so.

9 BY MR. MANGI:

10      Q. Would you like the question read back?

11      A. Yes, please.

12      Q. Looking at Page HUM-841 and Attachment E,

13 is this one of the Medicare based fee schedules that

14 we have been discussing?

15      A. I do not know.

16      Q. Okay. Have you -- do you look -- have you

17 ever seen a Humana contract with the provider?

18      A. Yes.

19      Q. Do you review contracts in the ordinary

20 course of your employment?

21      A. Not ordinary course.

22      Q. Okay. So you may have occasions on --

**134**

1   only on a sporadic basis to review contracts?
2      A.   Yes.
3      Q.   By looking at a fee schedule such as this
4   one, is it possible to tell whether it's Medicare
5   based or submitted by a provider or something else?
6      A.   No.
7      Q.   And indeed, the only way to know whether
8   or not or what the basis is for a particular fee
9   schedule would be to go back and look at the
10   negotiating process that led up to that fee
11   schedule; is that a fair statement?
12      MR. ST. PHILLIP: Objection.
13      THE WITNESS: That would be one of the
14   ways.
15   BY MR. MANGI:
16      Q.   Okay. So if I wanted to know whether or
17   not -- withdraw that.
18      Could I draw your attention to Page
19   HUM-843, please.
20      A.   Uh-huh.
21      Q.   You'll see that at No. 2, this provides
22   that a number of drugs that are referred to as

**135**

1   unclassified drugs will be reimbursed at rates that
2   are elicited below.
3      A.   Yes.
4      Q.   What do you understand unclassified drugs
5   to mean?
6      A.   It's a drug that has not been identified
7   with a specific J/Code.
8      Q.   Okay. So in these instances, these
9   unclassified drugs are not being reimbursed by
10   reference to AWP; is that correct?
11      MR. ST. PHILLIP: Objection.
12      THE WITNESS: That's not a true statement.
13   BY MR. MANGI:
14      Q.   Okay. If you happen to look at the table
15   above it, which runs from Page 841 to 843, you'll
16   see that there's a J/Code, a description, an AWP,
17   and in some cases an NDC, right?
18      A.   Yes.
19      Q.   Whereas at this table starting on 843,
20   under the heading 2, there is no AWP column; is that
21   correct?
22      A.   That's correct.

**136**

1      Q.   Okay. So is it fair to say that these
2   drugs are being reimbursed by an amount on the fee
3   schedule that has no necessary relationship to AWP?
4      A.   There is no -- in the contract, there's no
5   indication one way or the other.
6      Q.   So there's no way to tell?
7      A.   There's no way to tell.
8      Q.   Turn to Page 845, please. You'll see at
9   the middle of the page there's a section heading
10   Radiation Oncology?
11      A.   Uh-huh.
12      Q.   And in the first full paragraph below
13   that, this section provides that Humana will pay 110
14   percent of this specified fee schedule, or usual and
15   customary charges, whichever is less, right?
16      A.   Yes.
17      Q.   If I wanted to go to a particular
18   transaction or a particular administration of drug
19   to a patient and know whether the basis for
20   reimbursement was the fee schedule or the usual and
21   customary charge, how would I do that?
22      A.   You have to go back to the original

**137**

1   document to see what the hierarchy of the payment
2   schedules are.
3      MR. ST. PHILLIP: Can I confer with the
4   witness for a second?
5      (WITNESS CONFERS WITH COUNSEL.)
6      MR. MANGI: Let the record reflect the
7   witness has conferred with counsel. Do you wish to
8   clarify anything based on your conversation with
9   counsel?
10      THE WITNESS: No.
11   BY MR. MANGI:
12      Q.   Now, to clarify whether the basis for
13   billing in a particular case was the usual and
14   customary charge or the fee schedule, would I have
15   to go back to the claims data?
16      A.   Yeah, because only the claims data would
17   have the customary -- usual and customary charge.
18      Q.   Now, you'll see that the first paragraph
19   we have been looking at provides for 110 percent of
20   the fee schedule or the usual and customary charge
21   as the basis for reimbursement in reference to
22   particular Humana plans and products.

**138**

1    MR. ST. PHILLIP: Where are we?

2    MR. MANGI: We're in the middle of Page

3  845.

4  BY MR. MANGI:

5    Q. Do you see that? It's referring to the

6  commercial HMO, commercial POS, et cetera.

7    A. (WITNESS MOVES HEAD UP AND DOWN.) Right

8  here.

9    Q. Okay. Whereas below that in reference to

10  the Medicare HMO and Medicare POS plans, the agreed

11  upon amount is 100 percent of the fee schedule. Do

12  you see that --

13    A. Yes.

14    Q. -- in the paragraph below? What's the

15  basis for that differentiation by product between

16  110 percent of the fee schedule versus 100 percent

17  of the fee schedule.

18    A. Good negotiating. All I can say is it is

19  not unusual for Humana to negotiate different

20  payment levels for different products. It is in

21  many cases a usual situation.

22    Q. What benefit does Humana get from having

**139**

1  differential rates tied to different products?

2    MR. ST. PHILLIP: Objection.

3    THE WITNESS: Well, the benefit is you try

4  to price the product based on the cost.

5  BY MR. MANGI:

6    Q. Do you mean by that that Humana is

7  attempting to reimburse providers by reference to

8  their actual acquisition costs for drugs?

9    A. No, not at all.

10    Q. Okay. Perhaps you can clarify what you

11  meant by that.

12    A. Typically, in the same market historically

13  we've found as payors, not only Humana, but other

14  payors, that because of the nature of managed care

15  plans, i.e. HMOs, which have the ability to funnel

16  members to specific providers, there has been a

17  concession on price for that advantage to the

18  provider. And ultimately, the payors have priced

19  their products accordingly.

20    Q. So would it be fair to say that where a

21  provider is -- where a payor drives a higher volume

22  of business to a provider, that enables themselves

**140**

1  to negotiate lower reimbursement?

2    A. That can be the case in some instances,

3  yes, but not always.

4    Q. Okay. But essentially, this differential

5  is then just another aspect of the competitive

6  negotiation process leading to variation in

7  contracted rates?

8    MR. ST. PHILLIP: Objection.

9  BY MR. MANGI:

10    Q. Is that correct?

11    A. No, not necessarily.

12    Q. Okay. Is it a combination of the

13  negotiation process and Humana's preferences which

14  it tries to have adopted in the contract?

15    A. I don't understand what you mean by

16  preferences adopted in the contract.

17    Q. Well, other than the negotiation process,

18  and -- what other factors would explain this

19  differentiation?

20    MR. ST. PHILLIP: When you say "this,"

21  just for clarity --

22    MR. MANGI: I'm referring to the

**141**

1  difference between 110 percent in the fee schedule

2  in reference to some clients versus 100 percent in

3  reference to others.

4    MR. ST. PHILLIP: Okay, thank you.

5    THE WITNESS: Well, a good majority of

6  these types of contracts where you have a

7  differential between plans and groups covered is

8  tied back to premium level, whereas any particular

9  market very seldom, if ever, will be able to price a

10  commercial plan less than a Medicare plan. So by

11  nature, the cost for a Medicare plan would have to

12  have been lower than a commercial plan. So the

13  difference is driven because of the type of plan as

14  much as, if not more, than the peer negotiation.

15  BY MR. MANGI:

16    Q. Now, can I ask you to turn to Page 854,

17  please. And I ask you to review Paragraph 5.6,

18  please.

19    (WITNESS REVIEWS DOCUMENT.)

20    THE WITNESS: Okay.

21  BY MR. MANGI:

22    Q. Now, did I understand correctly your