142

1   testimony earlier today that Humana does not have
2   capitated arrangements with provider groups?
3       A.  If I stated that, that was misspoken. We
4   do not to my knowledge have capitated contracts
5   strictly for drugs.
6       Q.  Okay. Does Humana have capitated
7   contracts where the amount paid pursuant to
8   capitation agreements is intended to encompass
9   drugs?
10      A.  I can't answer that specifically, but I
11  believe that does not exist.
12      Q.  Okay. So to the best of your knowledge,
13  in every instance where there is a capitated
14  arrangement with a provider group, there will be a
15  separate provision pertaining to drug reimbursement
16  on top of the capitated rate; is that a fair
17  statement?
18      A.  I believe so.
19      Q.  Can you turn to 864, please, and have a
20  look at Clause 22.2.
21      A.  Okay.
22      Q.  To the best of your knowledge, are these

143

1   sorts of audit provisions standard in Humana's
2   contracts with providers?
3       A.  I cannot speak to that.
4       Q.  Do you know whether Humana has ever
5   exercised its rights pursuant to contract to audit
6   providers?
7       A.  Beyond my purview. I would have no
8   knowledge if they have.
9       Q.  Would you know whether pursuant to such
10  orders Humana could gain access to records showing
11  the amounts providers paid to acquire drugs?
12      MR. ST. PHILLIP: I'm going to object. I
13  cannot find any deposition topic on this list that
14  has to do with audit rights.
15      MR. MANGI: It's encompassed within other
16  subject matters.
17      MR. ST. PHILLIP: So based on that, I'm
18  not going to consent to have the witness testify
19  about when and to what extent we audited physicians'
20  records for purposes of bookkeeping.
21      MR. MANGI: Audits are relevant insofar as
22  information about acquisition costs is obtained,

144

1   information relevant to renegotiations.
2       MR. ST. PHILLIP: Okay, we'll preserve
3   this right. You can answer.
4       MR. MANGI: That's fine.
5       THE WITNESS: I have not been involved
6   with, nor do I have the wherewithal to be commenting
7   on audits and evaluations as contract provisions.
8   That is way outside my purview.
9   BY MR. MANGI:
10      Q.  Well, we can agree that pursuant to this
11  clause, Humana has a right to conduct such an audit,
12  gain such information from the provider?
13      MR. ST. PHILLIP: Objection insofar as it
14  calls for a legal conclusion.
15      THE WITNESS: I have nothing more to add
16  than what that paragraph or that section in and of
17  itself says.
18  BY MR. MANGI:
19      Q.  Okay. Well, we can agree that this allows
20  Humana to conduct audits of physicians, correct?
21      MR. ST. PHILLIP: Objection, asked and
22  answered and it calls for a legal conclusion.

145

1       THE WITNESS: Strictly based on language
2   that I see in this section, I can only assume that
3   Humana may have that right.
4   BY MR. MANGI:
5       Q.  HUM-869, please, clause 29.1. This clause
6   provides Humana with the right to inspect the
7   facilities, books, records and operations of the
8   physician group, correct?
9       MR. ST. PHILLIP: Objection, calls for a
10  legal conclusion. Humana doesn't consent to have
11  this witness testify concerning the interpretation
12  of this contract language.
13      THE WITNESS: Are you waiting on an answer
14  from me?
15      THE REPORTER: Yes.
16      THE WITNESS: Well, this is outside the
17  scope of my responsibilities with Humana, and I do
18  not have the necessary legal expertise to answer
19  your question solely.
20  BY MR. MANGI:
21      Q.  All right. Well, can we agree that the
22  clause states here, "Humana has reasonable access

146

1  and opportunity to fairly examine," and then I will
2  skip some of this language here, "the facilities,
3  books, records and operations of the group." You
4  see that language, right?
5      A.  Yes.
6      Q.  Do you know whether Humana ever exercised
7  its rights pursuant to this clause or similar
8  clauses in other contracts?
9          MR. ST. PHILLIP:  I object.  This requires
10  him to characterize Humana's rights, but to the
11  extent the witness can testify about whether he has
12  or has not obtained the information that's discussed
13  in this paragraph, I'll allow him to answer that.
14         THE WITNESS:  I have no knowledge of
15  Humana ever exercising this right.
16     Q.  Will you turn to page HUM-892, please.
17         MR. NOTARGIACOMO:  Repeat that page
18  number.
19         MR. MANGI:  892.
20  BY MR. MANGI:
21     Q.  You'll see that this refers to a capitated
22  rate, right?

147

1          MR. ST. PHILLIP:  Objection.
2  BY MR. MANGI:
3      Q.  Do you see the heading Flat Capitation?
4      A.  Yes.
5      Q.  So is it your understanding that insofar
6  as capitated rates are provided for in this
7  agreement, there would be a separate reimbursement
8  for drugs in addition to the capitated amounts?
9      A.  Based on this page, there's not enough
10  information to say one way or the other.
11     Q.  Based on your experience, you're not aware
12  of any contracts that provide for capitated rates
13  alone; is that correct?
14     A.  Looking at this specific contract, like I
15  said, it doesn't have enough information.  As a
16  general statement, I don't know.  I don't believe
17  so.
18     Q.  Okay.  Let's look at another document
19  which we'll mark as Exhibit Lemke 003.  This is
20  Bates Number HUM-913 to 929.
21
22         (Exhibit Lemke 003 WAS MARKED FOR

148

1          IDENTIFICATION.)
2
3          MR. ST. PHILLIP:  And again, with respect
4  to any authentication or knowledge question, I'll
5  reiterate my objection based on Paragraph 25.
6          MR. MANGI:  Yeah.  Let me back up a moment
7  and ask counsel, that -- will counsel instruct the
8  witness not to answer questions pertaining to the
9  authenticity of this document or its status in this
10  record?
11         MR. ST. PHILLIP:  As has been my practice
12  all day, I'm preserving the objections based upon
13  the exclusion, and I'm allowing the witness to
14  testify based upon preservation of our right to
15  strike his testimony based on the magistrate judge's
16  order limiting the scope of the deposition.
17         MR. MANGI:  Understood.
18  BY MR. MANGI:
19     Q.  If I could just draw you back to the
20  previous document for a moment.  Is this an
21  authentic copy of a document maintained in Humana's
22  files in the ordinary course of business pursuant to

149

1  document retention policy?
2          MR. ST. PHILLIP:  And I object based on
3  Paragraph 25 of the deposition submission.  You may
4  answer.
5          THE WITNESS:  I can't attest to that,
6  because this document preservation is not part of my
7  duties and responsibilities and have no control of
8  it, so I cannot answer that.
9  BY MR. MANGI:
10     Q.  Can we agree that this is an authentic
11  copy of a document from Humana's files?
12         MR. ST. PHILLIP:  Objection, and the
13  witness just answered the question.
14         MR. MANGI:  I believe he was testifying
15  about retention policies specifically.  I'm asking
16  him a different question.
17         MR. ST. PHILLIP:  Okay, same objection.
18         THE WITNESS:  I have no way to ensure that
19  this is an authentic copy of the agreement between
20  these parties.
21  BY MR. MANGI:
22     Q.  Okay.  Are contracts such as this

150

1 maintained in Humana's file in the ordinary course
2 of business?
3   MR. ST. PHILLIP: Same objection.
4   THE WITNESS: I can only assume they would
5 be.
6 BY MR. MANGI:
7  Q. Now, turning to what we've marked as
8 Exhibit Lemke 003.
9   (WITNESS REVIEWS DOCUMENT.)
10   MR. ST. PHILLIP: Sorry to interrupt you.
11 BY MR. MANGI:
12  Q. And again, feel free to familiarize
13 yourself and draw your attention to specific terms.
14  A. Okay.
15  Q. Now, if you'll take a quick glance at Page
16 923, you'll see there a signature block.
17  A. Okay.
18  Q. So this would appear to be a final signed
19 contract, correct?
20   MR. ST. PHILLIP: Objection.
21   THE WITNESS: It appears to be.
22 BY MR. MANGI:

151

1  Q. And if you turn back to the first page, in
2 the top paragraph, you'll see the agreement is
3 between Humana, and then there's a blank, and then
4 "ancillary provider licensed under the laws of the
5 State of Florida." Do you see that?
6  A. Uh-huh.
7  Q. Is it your understanding that the name of
8 the entity has been redacted from this document?
9   MR. ST. PHILLIP: As Humana's attorney, I
10 can tell you it has.
11   MR. MANGI: Okay. What is the basis for
12 that redaction?
13   MR. ST. PHILLIP: Privileged information.
14   MR. MANGI: I'm sorry, what was that?
15   MR. ST. PHILLIP: It is information that
16 is has competitive pricing with respect to
17 particular plan. We don't believe that there's any
18 necessity to answer the questions listed in the
19 deposition subjects by reference to a particular
20 provider, and as a result, because this could -- the
21 disclosure of this information could damage Humana's
22 competitive place in the market if the information

152

1 was disclosed, we redacted it.
2   MR. MANGI: Are you aware that the names
3 of some contractor providers are redacted, but not
4 others, in Humana's production?
5   MR. ST. PHILLIP: We are aware of that.
6   MR. MANGI: Nonetheless, you maintain that
7 some providers are competitively sensitive and
8 others are not?
9   MR. ST. PHILLIP: Humana may have agreed
10 to waive its rights to protect that information in
11 some cases and not in other cases.
12 BY MR. MANGI:
13  Q. Can I draw your attention to HUM-915,
14 please.
15  A. Okay.
16  Q. You'll see under 7.1, the payment method,
17 there's a reference there to Attachment B, the
18 payment method. Do you see that?
19  A. Uh-huh.
20  Q. I will ask you to turn to Attachment B,
21 which is at HUM-927.
22   (WITNESS REVIEWS DOCUMENT.)

153

1 BY MR. MANGI:
2  Q. Okay?
3  A. Yes.
4   MR. ST. PHILLIP: I also note for the
5 record that 929 is also Attachment B.
6   MR. MANGI: Yes, and it states, "Add to
7 attached price list."
8   MR. ST. PHILLIP: Right.
9 BY MR. MANGI:
10  Q. Sticking with 927, you'll see here that
11 there's on the left column antibiotics, and then AWP
12 minus 15 plus $22 a day for first dose, that's
13 specified as the payment method. Do you see that?
14  A. Yes.
15  Q. Underneath it, there's a handwritten note
16 "Includes IV/IG plus missed categories of drugs."
17 What do you understand IV/IG to mean?
18   MR. ST. PHILLIP: Objection.
19   THE WITNESS: I do not know.
20 BY MR. MANGI:
21  Q. Under Chemotherapy, there is acquisition
22 costs plus a $50 a day dispensing fee.

**154**

1        MR. ST. PHILLIP: And for the record, it
2  says -- stars acquisition costs, and refers down on
3  Page 928 to acquisition costs.
4  BY MR. MANGI:
5     Q. And to follow-up on what counsel just
6  said, I'll read for the record that on Page HUM-928,
7  there is a header, Acquisition Costs, with a star
8  next to it, and underneath it, says, "Shall be
9  defined as net acquisition for products paid by
10  ancillary providers. Providers shall make available
11  to Humana documentation to verify costs upon
12  reasonable request." Do you see that?
13     A. Yes.
14     Q. Now, earlier today, I had asked whether
15  Humana has ever sought to find out from providers by
16  contract or otherwise what their acquisition costs
17  for drugs were, and I believe your answer to that
18  was no. Do you recall that testimony?
19        MR. ST. PHILLIP: Objection.
20        THE WITNESS: I believe my answer is not
21  to my knowledge.
22

**155**

1  BY MR. MANGI:
2     Q. Okay.
3     A. That we do it.
4     Q. Okay. But we can agree, looking at this
5  contract, that there are instances such as this one
6  where Humana does expressly provide for
7  reimbursement by reference to acquisition costs plus
8  a certain amount, right?
9        MR. ST. PHILLIP: Objection insofar as
10  this document talks about chemotherapy and pain
11  management with respect to acquisition costs. I
12  don't know if this discusses drugs, but with that
13  objection, the witness can answer.
14  BY MR. MANGI:
15     Q. Go ahead.
16     A. This is a specific contract with a
17  specific provider for specific services. And as the
18  contract indicates, we could request that
19  information if we so choose.
20     Q. So there are instances where Humana has
21  sought acquisition cost information from providers,
22  but it doesn't do so in the ordinary course to the

**156**

1  best of your knowledge; is that correct?
2        MR. ST. PHILLIP: Objection.
3        THE WITNESS: Humana does in the case with
4  this particular provider, yes.
5  BY MR. MANGI:
6     Q. Okay. But it does not require disclosure
7  of acquisition costs in the majority of contracts to
8  the best of your knowledge; is that correct?
9     A. To the best of my knowledge.
10     Q. It could do so if it chose to do so, as
11  it's done in this contract, right?
12        MR. ST. PHILLIP: Objection.
13        THE WITNESS: Only to the point that it is
14  an agreed-upon practice in the -- or allowable in
15  the contract.
16  BY MR. MANGI:
17     Q. And we can agree that here, even where
18  acquisition cost is expressly used in a formula,
19  Humana still pays an additional amount dispensing
20  fee to the provider, correct? It's not reimbursing
21  it at the flat acquisition cost?
22        MR. ST. PHILLIP: I'm going to object

**157**

1  based upon this witness's interpretation of the
2  contract really is a legal issue, and to the extent
3  he's not an attorney, we don't consent to him giving
4  legal advice to what the terms of the contract do.
5        MR. MANGI: One doesn't have to be an
6  attorney to read the cost plus $50 a day dispensing
7  fee.
8        MR. ST. PHILLIP: With that objection, the
9  witness can answer.
10       THE WITNESS: I believe the question was
11  that we pay for that separately over and above
12  acquisition.
13  BY MR. MANGI:
14     Q. Right.
15     A. In this particular contract, that's the
16  way the contract is written, so the answer is yes.
17     Q. Thank you. We're done with that document
18  for now.
19       (OFF-THE-RECORD DISCUSSION.)
20       MR. MANGI: Let's mark this as an exhibit,
21  please.
22       (Exhibit Lemke 004 WAS MARKED FOR

158

1      IDENTIFICATION.)
2  BY MR. MANGI:
3    Q.  We are looking at HUM-1151 to 1201. Here
4  you go.
5      (DOCUMENT TENDERED.)
6  BY MR. MANGI:
7    Q.  Again, take your time to familiarize
8  yourself. I'll have specific questions on this one.
9      (WITNESS REVIEWS DOCUMENT.)
10     THE WITNESS: Okay.
11  BY MR. MANGI:
12    Q.  Now, this is another contract between
13  Humana and a physician group, right?
14     MR. ST. PHILLIP: I'm going to object
15  based on the exclusion of Deposition Subject No. 25.
16  Humana does not consent to have this witness testify
17  concerning the authentication and knowledge of the
18  documents produced in this litigation consistent
19  with magistrate judge's November 2nd, 2004 order.
20  Preserving our right to move to strike the answer,
21  I'm going to let the witness testify and continue
22  our objections along this line with respect to this

159

1  document.
2     MR. MANGI: Again, we disagree for the
3  reasons stated, but again, to the extent it will
4  make your life easier, if you want to reference a
5  standing objection.
6     MR. ST. PHILLIP: Okay. Let's do that.
7  Let's continue that objection with respect to this
8  and any other documents.
9     MR. MANGI: Any other document on
10  authentication issues?
11     MR. ST. PHILLIP: Yes.
12     MR. MANGI: Understood.
13  BY MR. MANGI:
14    Q.  Could I draw your attention -- I'm sorry,
15  did you answer the previous question? This is an
16  agreement between Humana and a physician group,
17  right?
18    A.  It appears to be.
19    Q.  Okay. I will draw your attention to 1165,
20  please.
21    A.  Okay.
22    Q.  And under Clause 22.1, you'll see that the

160

1  payment arrangement references Attachment E.
2    A.  Yes.
3    Q.  And matter of fact, ask you to turn to
4  Attachment E, which is at 1196.
5    A.  Yes.
6    Q.  And you will see that there are three
7  sections here referencing different plans, but
8  they're the same to the extent that they provide for
9  payment at 80 percent of Humana's Medicare fee
10  schedule or the usual customary charges, but has a
11  separate star star provision stating that drugs are
12  to be reimbursed at AWP less 16 percent. Do you see
13  that?
14    A.  Yes.
15    Q.  Is this an example of the type of plan you
16  referenced earlier that uses what you referred to as
17  the alternative AWP based methodology?
18    A.  Based on my reading of this contract, it
19  certainly appears as so.
20    Q.  Okay. That's all I have for that
21  document. Now, are you familiar with or have you
22  heard of the Office of the Inspector General, the

161

1  OIG?
2    A.  Federal Inspector General?
3    Q.  Yes, the Department of Health and Human
4  Services.
5    A.  Yes, I know of the department.
6    Q.  What is your understanding of what the OIG
7  is?
8     MR. ST. PHILLIP: I'm going to object
9  insofar as the question is about the knowledge of
10  certain functions of government agencies is beyond
11  the scope of the deposition subjects, and with
12  respect to knowledge of reports, studies and
13  communications concerning acquisition costs for
14  drugs with respect to government inquiries has been
15  excluded by Magistrate Judge Bowler in her
16  November 2nd, 2004 order relative to Topic Number
17  24, so Humana does not consent to have this witness
18  testify concerning this information.
19     MR. MANGI: And again, it's relevant to
20  other categories. Would you answer the question,
21  please?
22     THE WITNESS: My knowledge of the OIG is

---

**162**

1 very, very limited, and I really have no answer to
2 that question.
3 BY MR. MANGI:
4     Q.   You're aware it's a government entity,
5 right?
6     A.   I agree it's a government entity.
7          MR. MANGI: Okay. Can we mark this as
8 Exhibit Lemke 005.
9          (Exhibit Lemke 005 WAS MARKED FOR
10 IDENTIFICATION.)
11 BY MR. MANGI:
12     Q.   Now, this is an OIG report from November
13 of 1992. Right, do you see that on the --
14          MR. ST. PHILLIP: I'm going to continue my
15 objection with respect to this document based upon
16 the exclusion of Topic Number 24, which states,
17 "Your client's knowledge of government studies,
18 reports and communications concerning the actual
19 acquisition costs for drugs," so.
20          MR. MANGI: This is encompassed by other
21 areas, and you've already made the objection. Feel
22 free to reiterate it.

---

**163**

1          MR. ST. PHILLIP: I'll continue it with
2 respect to any questions about this study.
3          MR. MANGI: That's fine. You can have a
4 standing objection to that.
5 BY MR. MANGI:
6     Q.   So you can see this is a public document
7 put out by the OIG in November of 1992. Do you see
8 that at the top of the page?
9     A.   Yes.
10     Q.   And I would like to direct you to the
11 second full paragraph, starting with, "Our results
12 indicate."
13     A.   Yes.
14     Q.   You see that? And I'll read that for the
15 record. "Our results indicate that for the
16 physicians surveyed, the 13 chemotherapy drugs can
17 be purchased an amounts below the established
18 average wholesale price, and that AWP is not a
19 reliable indicator of the cost of the drug to
20 physicians." Do you see that language?
21     A.   Yes.
22     Q.   Now, did this knowledge that AWP is not a

---

**164**

1 reliable indicator of the cost of the drug to
2 physicians, does Humana rely upon this information
3 in determining its reimbursement rates at any time
4 between 1992 and the present?
5     A.   I would have no knowledge of that.
6     Q.   But certainly we can agree that this
7 information is in the public domain?
8          MR. ST. PHILLIP: Objection. Is it?
9          MR. MANGI: Yes, it's an OIG report.
10          MR. ST. PHILLIP: Okay.
11 BY MR. MANGI:
12     Q.   Would you like the question read back?
13     A.   No, I presume it is. I have no personal
14 knowledge whether it is or isn't.
15     Q.   Now, are there others at Humana who may be
16 aware of this report and who may have relied upon
17 this in setting reimbursement rates?
18          MR. ST. PHILLIP: Objection.
19          THE WITNESS: Based on the specific date
20 of that document, it was before my employ with
21 Humana. I cannot say whether or not any other
22 individual within the Humana organization would have

---

**165**

1 access to or followed that or use that for any
2 reason.
3 BY MR. MANGI:
4     Q.   Do you know whether anyone at Humana has
5 relied upon this information subsequent to 2000?
6     A.   No, I do not.
7     Q.   May I draw your attention to Appendix 3 to
8 that document, and it's about -- oh, seven or eight
9 pages from the back.
10          MR. ST. PHILLIP: Titled Invoice Costs?
11          MR. MANGI: Yes, expresses a percentage
12 below AWP.
13 BY MR. MANGI:
14     Q.   Have you located that page?
15     A.   Yes.
16     Q.   And I'm going to refer you to the bottom
17 two drugs on that table, vinblastine sulphate and
18 vincristine sulphate. You'll see that for brand
19 name manufacturers, which is the second column, the
20 invoiced costs are 63 percent below AWP for the
21 first and 83 percent below AWP for the second. Do
22 you see that?

---

---

166

1      MR. ST. PHILLIP: I'm going to make
2  another objection so far as it doesn't appear that
3  those two drugs are on the list of the drugs that
4  were provided to us from the defendants as
5  encompassed by the subpoena. So with that
6  objection, I'll allow the witness to answer.
7      THE WITNESS: I do see them on the
8  schedule.
9  BY MR. MANGI:
10    Q. Is Humana aware that as early as 1992, the
11  OIG public report had flagged certain physician
12  administered drugs as being acquired at a percentage
13  from 63 to 83 percent below their AWPs?
14      MR. ST. PHILLIP: Same objection.
15      THE WITNESS: No, I'm not aware of it.
16  BY MR. MANGI:
17    Q. Do you know whether or not this
18  information was considered by Humana in setting its
19  reimbursement methodologies at any time between 1992
20  and the present?
21      MR. ST. PHILLIP: Same objection.
22      THE WITNESS: I have no knowledge of

167

1  Humana using this information.
2  BY MR. MANGI:
3    Q. We can agree that Humana could have
4  utilized this information if it chose to do so,
5  right?
6      MR. ST. PHILLIP: Same objection. Calls
7  for speculation.
8      THE WITNESS: I can only speculate that
9  they may have.
10      MR. MANGI: Okay. Would you mind reading
11  back my question, please.
12      (RECORD READ.)
13  BY MR. MANGI:
14    Q. Just to be clear, my question now is not
15  whether they may have, but slightly different. We
16  can agree that Humana could have utilized this
17  information if it had chosen to do so at any time
18  between 1992 and the present in setting its
19  reimbursement rates for drugs?
20      MR. ST. PHILLIP: And the reason for my
21  objection is you haven't established that this
22  document is publicly available.

168

1  BY MR. MANGI:
2    Q. To the extent that this document is
3  publicly available, can we agree to that?
4    A. Yes, I could agree to that.
5      MR. MANGI: Can we turn to a document
6  we'll mark as Exhibit Lemke 006, please. And Ed,
7  this is a 1997 OIG report. I apologize, I don't
8  have a copy.
9      (Exhibit Lemke 006 WAS MARKED FOR
10      IDENTIFICATION.)
11  BY MR. MANGI:
12    Q. Now, from the cover page, you can see this
13  is a December, 1997 publication from the Office of
14  the Inspector General, correct?
15    A. Correct.
16    Q. Okay. Can I draw your attention to the
17  page numbered small three, Roman three. And I would
18  like to draw your attention to the second paragraph
19  on the bottom, which states, "In this report, we
20  have identified Medicare allowances that were 11 to
21  900 percent greater than the drug prices available
22  to the physician and supplier community." Do you

169

1  see that?
2    A. Yes.
3    Q. Do you know whether or not anyone at
4  Humana relied upon this report and this information
5  in setting reimbursement rates for drugs at any time
6  between 1997 and the present?
7    A. No, I do not.
8    Q. We can certainly agree that Humana could
9  have relied upon this information if it chose to do
10  so, correct?
11      MR. ST. PHILLIP: Objection, foundation.
12      THE WITNESS: If in fact someone at Humana
13  was aware of it and it was a public document, yes.
14      MR. MANGI: Why don't we take a quick
15  break, and then hopefully I should be done soon
16  after that.
17      (A SHORT BREAK WAS TAKEN.)
18
19  BY MR. MANGI:
20    Q. Now, Mister Lemke, we were looking at a
21  number of documents before the break. Exhibits 2 to
22  4 were contracts. Do you recall those documents?

**170**

1    A.  Yes.
2    Q.  Those documents are maintained in Humana's
3  files in the ordinary course of business, correct?
4       MR. ST. PHILLIP:  Objection.
5       THE WITNESS:  I'm not personally
6  responsible for retaining them, but I assume that
7  copies are retained.
8  BY MR. MANGI:
9    Q.  Now, we discussed at the -- in the morning
10  your employment history prior to 2000.  In any of
11  the jobs you had prior to 2000, were you involved in
12  reimbursement for drugs?
13    A.  Yes, I stated earlier.
14    Q.  With which entities were you involved in
15  reimbursement?
16    A.  Kurten Medical Group.
17    Q.  And I believe you testified about
18  reimbursement made by Kurten to subcontracted
19  provider groups?
20    A.  That's correct.
21    Q.  Other than that aspect of your work at
22  Kurten, were there any other jobs you had or any

**171**

1  other roles you played that involved a reimbursement
2  for drugs?
3    A.  Only with Humana.
4       MR. MANGI:  Okay.  Off the record.
5       (OFF-THE-RECORD DISCUSSION.)
6  BY MR. MANGI:
7    Q.  Now, you testified earlier also that
8  you're aware of the fact that manufacturers have
9  rebate contracts with -- have had rebate contracts
10  with providers in the past based on your prior
11  experience, right?
12    A.  I don't recall that.
13    Q.  Okay.  Let's address that topic again.  As
14  I recall, correct me if I'm wrong, as I recall, your
15  testimony was that you're aware, based on your prior
16  jobs, that manufacturers have rebate contracts with
17  providers in relation to some drugs, but that you're
18  not aware whether or not those still exist because
19  you have no involvement with them in your control.
20    A.  That's a correct statement.
21    Q.  Okay.  You recall that testimony?
22    A.  (WITNESS MOVES HEAD UP AND DOWN.)

**172**

1    Q.  You have to answer verbally.
2    A.  Yes.
3       MR. ST. PHILLIP:  Yes, and I believe I
4  also observed insofar as it was beyond the temporal
5  scope of the deposition, so I'll continue that
6  objection.
7  BY MR. MANGI:
8    Q.  Are there others at Humana who would be
9  more knowledgeable as to whether or not those
10  contracts exist post 2000?
11    A.  Clarify which contracts you're referring
12  to.
13    Q.  Manufacturers' contracts with providers.
14    A.  Anyone else at Humana?  I do not know of
15  an individual within Humana that would have that
16  knowledge, no.
17    Q.  Is it fair to say that there may be other
18  individuals who have that knowledge, but you,
19  because of the job functions that you perform, have
20  not come across such agreements post 2000?
21       MR. ST. PHILLIP:  I'm going to object and
22  instruct the witness not to answer this question.

**173**

1  This witness has been proposed as a 30(b)(6) witness
2  and speaks only on behalf of Humana for these
3  topics.  Rule 30(b)(6) does not require the
4  production of anybody who has the most knowledge in
5  a particular category, but only someone who has
6  consented to testify on behalf of the organization
7  with respect to the organization's knowledge.  And
8  Mister Lemke has been told of the way that the
9  30(b)(6) deposition works and has within bounds of
10  reasonableness attempted to gain as much
11  understanding as possible about the topics that have
12  been -- Humana has been ordered to testify
13  concerning.
14  BY MR. MANGI:
15    Q.  Well, Mister Lemke, based upon what
16  counsel just said, have you attempted to educate
17  yourself prior to this deposition as to knowledge
18  that others at Humana may have regarding
19  manufacturers' rebate contracts with providers?
20    A.  Not on that particular topic, no.
21    Q.  So there may be others that may -- that
22  have that knowledge, there may not be, you just

174

1   don't know; is that a true statement?
2     A.  I do not know.
3     Q.  How did you prepare for your deposition
4  today?
5     MR. ST. PHILLIP:  Insofar as just caution
6  the witness insofar as the response to that question
7  calls for you to --
8
9  BY MR. MANGI:
10    Q.  I will modify the question.  Other than
11  conversations with counsel, how did you prepare for
12  your deposition here today?
13    A.  Only the preparation of that document that
14  indicated percentage of methodologies.
15    Q.  Okay.  You prepared that document, did
16  you?
17    A.  Yes, I did.
18    Q.  Could you hand me that document, please.
19  And that's the document that was previously marked
20  as Exhibit Lemke 001 to the deposition today?
21    A.  That's correct.
22    Q.  With your permission, since we only have

175

1  one copy, I would like to come over and point out a
2  few aspects of it to you.
3     MR. ST. PHILLIP:  Sure.
4  BY MR. MANGI:
5    Q.  Looking now at Exhibit Lemke 001, the first
6  column is entitled Methodology.  What is contained within
7  that column?
8    A.  Those are -- what's another word for
9  methodology?  Those are -- indicate the basis on
10  which Humana fee schedules have been and continue to
11  be created.
12    Q.  So these are the different methodologies
13  that Humana uses in reimbursing providers; is that a
14  fair statement?
15     MR. ST. PHILLIP:  Let's go off the record
16  for a second.
17     (OFF-THE-RECORD DISCUSSION.)
18     MR. MANGI:  I'll just read back the
19  question before the break, which was --
20  BY MR. MANGI:
21    Q.  So these are the different methodologies
22  that Humana uses when reimbursing providers in

176

1  relation to drugs administered in office; is that a
2  fair statement?
3    A.  This was probably better titled Basis than
4  Methodology.  These individual items underneath the
5  methodology heading are more the basis for the fee
6  schedule than they are the methodology.  Methodology
7  denotes a percent of something subtracted from
8  something else, added to something else is more a
9  methodology.  These are the basis that was used to
10  create fee schedules.  So.
11    Q.  You're quite right.  So there's a basis,
12  and then there may be negotiation related to that
13  basis, right?
14    A.  That's -- yes.
15    Q.  Now, if you could follow along the first
16  of these, the first entry in the methodology column
17  is Medicare or percentage of Medicare?
18    A.  Yes.
19    Q.  And then we have a column entitled Allowed
20  Amount that has a dollar sum next to it?
21    A.  Yes.
22    Q.  What is that allowed amount?

177

1    A.  Allowed amount is the accumulated or the
2  amount that is stated in a fee schedule.
3    Q.  Well, as it relates to this column, is
4  that the amount that Humana has paid in reimbursing
5  for claims in a particular time period?
6     MR. ST. PHILLIP:  Objection to form.
7     THE WITNESS:  It is the amount that is
8  allowable under a contracted fee schedule with
9  providers in a certain time period.
10  BY MR. MANGI:
11    Q.  Well, the first --
12    A.  It's not paid, it is the allowed amount.
13    Q.  The first column that pertains to a list
14  of a particular dollar sum, like 40,000 -- actually
15  it's 40,802,735?
16    A.  Right.
17    Q.  What does that amount represent?
18    A.  That represents the allowed amount of a
19  certain segment of claims for a time period that the
20  amount that is allowed before benefits are applied
21  to a claim.  That has come from a Medicare or a
22  percent of Medicare fee schedule.

178

1    Q.  Right.  So my question is, what is the
2  time frame?
3    A.  Oh, boy.  It would have been 12 months.
4  Did not indicate on the document as to which 12
5  months, but it would have been a consecutive 12
6  months between 2003, 2004.
7    Q.  Okay.
8    A.  As close as I can give you.
9    Q.  And the percentage of total, is that
10  percentage of the total amount reimbursed or the
11  total number of fee schedules?
12    MR. ST. PHILLIP:  Objection.  Go ahead.
13    THE WITNESS:  The first percentage column
14  here is simply a simple percent of one basis divided
15  by the total on the document.
16  BY MR. MANGI:
17    Q.  So in other words, $40,800,000 and change
18  would represent 45.3 percent of the total amounts
19  that Humana reimbursed during the 12-month period at
20  issue?
21    MR. ST. PHILLIP:  Objection.
22    THE WITNESS:  No.  Because this does

179

1  not -- the total does not represent 100 percent of
2  Humana's business.
3  BY MR. MANGI:
4    Q.  Okay.  What aspects of Humana's business
5  are not reflected on this document?
6    A.  I cannot answer that.
7    Q.  Is that because you don't know the answer?
8    A.  I do not know the answer.
9    Q.  Well, is this intended to be a
10  comprehensive summary of the bases under the common
11  methodology?
12    A.  No, it's designed to be an approximation
13  of the types of fee schedules and the basis of those
14  fee schedules that Humana currently has under
15  contract with providers.
16    Q.  Okay.  And all reimbursement, certainly as
17  far as it involves drugs, is by reference to a fee
18  schedule, correct?
19    MR. ST. PHILLIP:  Objection.
20  BY MR. MANGI:
21    Q.  Or the usual -- or the billed charges?
22    MR. ST. PHILLIP:  Are we just talking

180

1  about providers?
2    MR. MANGI:  Right.
3    THE WITNESS:  Yes.
4  BY MR. MANGI:
5    Q.  Okay.  So my question is, if this amount
6  under Allowed Amounts is not the sum total of
7  reimbursements to providers insofar as drugs are
8  involved, what else is there that's missing from
9  this table?
10    A.  Oh, there's a whole host of things
11  missing.  This again was to be a representative
12  sample of our types of fee schedules.  The dollar
13  amounts that are shown on here include the entire
14  range of services and drugs and supplies and
15  everything else that has been billed to Humana from
16  providers.
17    Q.  Okay.  So in terms of the total
18  reimbursement to providers, would it be fair to say
19  that reimbursement pursuant to a Medicare or
20  percentage of Medicare based contract constitutes
21  45.3 percent of the total reimbursements?
22    MR. ST. PHILLIP:  Objection.

181

1    THE WITNESS:  No.
2    MR. ST. PHILLIP:  Let me confer for just a
3  second.
4    MR. MANGI:  Sure.
5    (WITNESS CONFERS WITH COUNSEL.)
6    MR. MANGI:  The witness has just conferred
7  with counsel.  Would you like to clarify anything
8  based on that conversation?
9    THE WITNESS:  I just want to clarify that
10  on this document, the allowed amount is what is
11  commonly known as the maximum allowable fee and is
12  not the paid amount.
13  BY MR. MANGI:
14    Q.  So you don't know whether the
15  amount that was actually reimbursed was the maximum
16  allowed amount or was something less than that which
17  the physician may have billed?
18    A.  That's correct.
19    Q.  But the percentage, 45.3 is the percentage
20  of the total maximum allowed amount that is
21  calculated by reference to the Medicare based
22  methodologies?

---

**182**

1    A.  Yes.

2    Q.  Okay. Good, thank you. The next column

3  is Number of Schedules, yes?

4    A.  Yes.

5    Q.  And is that the number of schedules that

6  use the bases or the methodology referred to in

7  column one?

8    A.  Yes.

9    Q.  And the next column that doesn't have a

10  heading, is that expressed those number of schedules

11  as a percentage of the total schedules?

12    A.  Yes.

13    Q.  And in terms of the bases or

14  methodologies, first is Medicare, percentage of

15  Medicare; then there's Medicare based or percentage

16  of Medicare fee. What's the difference between

17  those first two bases?

18    A.  The Medicare or percent of Medicare is

19  current Medicare.

20    Q.  Right.

21    A.  The Medicare based could be any year prior

22  to the current Medicare year.

---

**183**

1    Q.  Okay. Would those be old contracts that

2  are still in effect?

3    A.  Yes.

4    Q.  And would those also include contracts

5  where providers put forth an old fee schedule as a

6  basis for reimbursement?

7    A.  Yes.

8    Q.  The third column is Average Wholesale

9  Price Updated Quarterly. Is that the alternative

10  AWP based methodology we discussed this morning?

11    A.  Yes.

12    Q.  Okay. The next column is Medicare

13  based -- I'm sorry, the next row is Medicare based

14  frozen. What does that refer to?

15    A.  Those are fee schedules that are -- can be

16  current or can be past Medicare based fee schedules,

17  that have -- that do not, as we call, do not float

18  with Medicare.

19    Q.  So if Medicare were to change its

20  methodology, or indeed if the AWPs for drugs were to

21  change, the amounts paid pursuant to the contract

22  would not, because they're frozen?

---

**184**

1    A.  That's correct.

2    Q.  The next row is HIAA direct. What does

3  that refer to?

4    A.  That again is HIAA, which is a series of

5  fee schedules produced by HIAA that represent

6  physician charges by regions of the country. So

7  it's a third party produced fee schedule.

8    Q.  Do you know how they generate that fee

9  schedule, what it's based on?

10    A.  It's based on physician claims.

11    Q.  Is it based on physicians' customary

12  charges?

13    A.  Yes.

14    Q.  And that represents -- let's see, what

15  percentage? About 3.3 percent?

16    A.  In total, yes.

17    Q.  The lease schedules are the ones we

18  referred to earlier, where you're leasing a network,

19  and you don't know what the basis is for the

20  methodology, right?

21    MR. ST. PHILLIP: Objection.

22    THE WITNESS: That's correct.

---

**185**

1  BY MR. MANGI:

2    Q.  Then there's HIAA based, where the HIAA

3  fee schedule forms a basis for negotiation; is that

4  correct?

5    A.  Well, ultimately is the base for the fee

6  schedule that is there. Clarifying the difference

7  between HIAA direct and HIAA based, HIAA direct is

8  the fee schedule, the HIAA fee schedule as is and

9  currently is, and as it changes. HIAA based is

10  either current or sometime in the past, the HIAA fee

11  schedule was used to establish or as a base for that

12  fee schedule. So --

13    Q.  So they could -- I'm sorry, were you done?

14    A.  Yes.

15    Q.  So they could be -- through the process of

16  negotiation, the parties could agree upon a certain

17  percentage of the HIAA fee schedule?

18    A.  That's correct.

19    Q.  Now, direct contract negotiation, is that

20  referring to specific providers' specific fee

21  schedules along the lines of one we discussed

22  earlier where provider provides a fee schedule to

---

186

1  Humana that forms a basis for reimbursement?
2      A.   Yes.
3      Q.   And then we have Medicaid or percentage of
4  Medicaid.  Is that referring to state specific
5  schedules that reference a percentage of what
6  Medicaid is reimbursing?
7      A.   Yes.
8      Q.   And then you have "Purchased schedules,
9  unknown method."  What is that referring to?
10      A.   We've bought -- in the process of
11  business, as we lease networks, we have purchased
12  networks, and with those networks come fee schedules
13  that are under our control and still in use.  We
14  purchased them, but I have and Humana has no means
15  of determining what the method was or the basis used
16  to create that fee schedule.
17      Q.   And contracted percent of charge, that's a
18  percentage of what the physician charges?
19      A.   Correct.
20      Q.   Thank you.  Now, there's also a
21  handwritten note, 83 percent.  What is that
22  referring to?

187

1      A.   That must have been a quick summation of
2  something.
3      Q.   Is that a notation you made during the
4  deposition?
5      A.   Yes.  That is not part of the original
6  document, and nor should it be there.  I didn't
7  realize that was going to be an official document.
8      Q.   That's okay.  Now, of these various bases
9  or methodologies listed here, contracted percent of
10  charge, that has nothing to do with AWP, correct?
11      A.   That's correct.
12      Q.   Okay.  The purchase schedules may or may
13  not have anything to do with AWP; there's just no
14  way of knowing?
15      A.   That is correct.
16      Q.   Medicaid or percentage of Medicaid, does
17  that have a relationship to AWP?
18      MR. ST. PHILLIP:  Objection.
19      THE WITNESS:  My knowledge of state
20  Medicaid fee schedules is very limited, and I do not
21  know what the states use to establish a fee for
22  their fee schedules.

188

1  BY MR. MANGI:
2      Q.   Okay.  Direct contract negotiation, that
3  may or may not involve AWP; is that a fair
4  statement?
5      A.   That's true.
6      Q.   There's no way of knowing?
7      A.   No way of knowing.
8      Q.   HIAA based or HIAA direct, that has
9  nothing to do with AWP; is that correct?
10      MR. ST. PHILLIP:  Objection.
11      THE WITNESS:  That is correct.
12  BY MR. MANGI:
13      Q.   And leased schedules, there's no way of
14  knowing whether or not they have anything to do with
15  AWP?
16      A.   That's true.
17      Q.   Okay.  Does Humana have any indemnity
18  plans today?
19      MR. ST. PHILLIP:  I'm going to object.
20  The magistrate on November 2nd, 2004 ordered
21  excluded Topic Number 22, which described, "Your
22  client's relationship with your insured, including

189

1  all methodologies by which you billed your insured
2  directly or indirectly for pharmaceuticals or
3  pharmaceutical dispensing and administration
4  services."  We believe the types and nature of plans
5  are within that exclusion, and therefore Humana
6  doesn't consent to have Mister Lemke testify
7  concerning that topic.  We'll preserve our rights
8  under the objection and allow Mister Lemke to answer
9  your question.
10      MR. MANGI:  The question is actually not
11  relevant to that category at all.  It is relevant to
12  others.
13  BY MR. MANGI:
14      Q.   But could you answer the question, please.
15      A.   Only to the extent that I see that line of
16  business type indicated on claims.
17      Q.   In those cases, would a member pay the
18  physician their bill and then submit an invoice to
19  Humana for reimbursement?
20      A.   I cannot answer that, because I'm not
21  totally educated on the reimbursement process and
22  indemnity plan.

190

1    Q.  Does Humana receive claims only from
2  physicians, or does it also receive them from
3  members in relation to drugs administered in
4  physicians' offices?
5    A.  I do not know.
6    Q.  Have you ever heard AWP referred to as
7  "ain't what's paid"?  Have you ever heard that term?
8    A.  Yes.
9    Q.  When have you heard that term, do you
10  know?
11    A.  Very recent, and probably have not heard
12  that term for a good five or six years since then.
13    Q.  So you heard it about five or six years
14  ago?
15    A.  Yes.
16    Q.  Do you recall in what context you've come
17  across that?
18    A.  Yeah, it was during a discussion with a
19  primary care group in Sussex, New Jersey.
20    Q.  And what focused the conversation around
21  this?
22    A.  It was a conversation around our proposed

191

1  contract with a MSO, management services
2  organization, and relating to a portion of the
3  contract that related to percent of premium
4  capitation.
5    Q.  In what context did someone raise or refer
6  to AWP as "ain't what's paid"?
7    A.  Boy.  I believe it was at the time when
8  there was discussion about what was included in
9  administering a percent of premium contract, and how
10  that related to the individual physicians and their
11  risk, especially on the pharmacy side.
12    Q.  And what did you understand that reference
13  to mean when someone referred to AWP as "ain't
14  what's paid"?
15    A.  That AWP was not an adequate reimbursement
16  level.
17    Q.  Did you understand the use of that term to
18  be referring to the fact that AWP is not what's paid
19  to acquire drugs?
20    MR. ST. PHILLIP:  Objection.
21    THE WITNESS:  No.
22  BY MR. MANGI:

192

1    Q.  Now, earlier you referred to the fact that
2  geography alone, taken in isolation, does not
3  explain variations in reimbursement rates, correct?
4    MR. ST. PHILLIP:  Objection.
5    THE WITNESS:  Does not totally explain.
6  BY MR. MANGI:
7    Q.  So would it be fair to say that say --
8  take Arizona State, for example, there's nothing
9  peculiar about Arizona that would explain variation
10  in rates in Arizona; is that a fair statement?
11    A.  In Arizona itself, that's true, in the
12  fact that we rely a lot on Medicare, and Medicare
13  sees the costs in Arizona differently than it sees
14  the costs in other parts of the country.
15    Q.  Now, we spoke earlier about negotiation
16  and starting points for negotiation.  Do you recall
17  that?
18    A.  Yes.
19    Q.  And I believe you testified your view that
20  the starting point of a negotiation, whether it's
21  higher or lower can affect the end outcome?
22    A.  I believe that to be true.

193

1    Q.  Okay.  What's your basis for that
2  impression?
3    A.  Past negotiations.
4    Q.  Are those negotiations that you have
5  conducted yourself?
6    A.  Yes.
7    Q.  In what context have you been involved in
8  contract negotiations?
9    A.  From the provider side previously to my
10  employment with Humana.
11    Q.  So as I recall your testimony, I believe
12  you said it was a psychological factor that could
13  affect where you ended up?
14    MR. ST. PHILLIP:  Objection.
15    THE WITNESS:  Yes, I believe I said that.
16  BY MR. MANGI:
17    Q.  We can agree, though, that as a matter of
18  theory, you can start -- you can take a higher
19  starting point or a lower starting point and you can
20  negotiate either amounts off the higher point or in
21  addition to the lower point, you can arrive at the
22  same end result, correct?

194

1      MR. ST. PHILLIP: Objection. To the
2 extent it's based on facts, you can testify on
3 facts.
4      THE WITNESS: It's always possible.
5 BY MR. MANGI:
6      Q. And indeed, in a negotiation process, if
7 Humana has a firm sense of where it wants the
8 negotiation to end up, it could arrive at that point
9 by negotiating down from a higher starting point and
10 negotiating up from a lower starting point, correct?
11      MR. ST. PHILLIP: Objection.
12      THE WITNESS: Yes, Humana could.
13 BY MR. MANGI:
14      Q. So indeed, regardless of the benchmark
15 that's used, Humana could, if it so chose, arrive at
16 the same end result by negotiating down from the
17 higher benchmark or up from a lower benchmark,
18 right?
19      A. It could attempt to.
20      Q. In preparation for your deposition today,
21 did you have conversations with anyone other than
22 your counsel?

195

1      A. Yes.
2      Q. Who else did you speak to?
3      A. Suzanne --
4      THE WITNESS: What was her last name,
5 Brad?
6      MR. COHEN: Oh, Corum.
7      THE WITNESS: Suzanne Corum.
8 BY MR. MANGI:
9      Q. Who is Ms. Corum?
10      A. Humana's associate that is somewhat -- or
11 is associated with the government side of our
12 business.
13      Q. What did you discuss with Ms. Corum in
14 relation to your deposition?
15      A. Just briefly went over what that segment
16 of the business did with -- in regard to
17 reimbursement or payment of drugs.
18      Q. And by "the government side of the
19 business," what are you referring to there?
20      A. That's all I know it by.
21      Q. Well --
22      A. HMHS is the acronym.

196

1      MR. ST. PHILLIP: You've got to testify,
2 not me. If you don't know, just say you don't know.
3 BY MR. MANGI:
4      Q. Are you referring -- is it your
5 understanding that Humana serves as a Medicaid
6 carrier?
7      A. A Medicaid carrier?
8      Q. No, a Medicare carrier.
9      A. To my knowledge, Humana doesn't serve as a
10 Medicare carrier.
11      Q. I'm just trying to understand what you're
12 referring to when you mean, "government side of the
13 business," what sort of --
14      A. Tricare.
15      MR. MANGI: Okay. That's all I have for
16 Mister Lemke. Ed, do you have questions?
17      MR. NOTARGIACOMO: I've got a few minutes'
18 worth of questions.
19      MR. ST. PHILLIP: Can we talk with the
20 witness for a little bit?
21      (A SHORT BREAK WAS TAKEN.)
22      * * * * *

197

1
2      EXAMINATION
3 BY MR. NOTARGIACOMO:
4      Q. Mister Lemke, my name is Ed Notargiacomo.
5 As I said earlier today, I represent the plaintiffs
6 in this litigation, or at least the class plaintiffs
7 in this litigation, and I just have a few follow-up
8 questions for you this afternoon. If you don't
9 understand a question, please let me know and I'll
10 rephrase it or repeat it.
11      Do you remember -- well, is it fair to say
12 Mister Manji asked you a series of questions today
13 about how Humana pays providers for drugs injected
14 in their offices?
15      A. Yes.
16      Q. And is it fair to say that the amount
17 Humana pays providers who inject drugs into a Humana
18 insured patient, those amounts are based upon more
19 than simply the price for the drug itself?
20      A. That is correct.
21      Q. In fact, Humana also reimburses physicians
22 for the cost of physically administering the drug,

Edward Lemke                    Confidential                    January 11, 2005
                                Louisville, KY

51 (Pages 198 to 201)

---

198

1   is that correct?
2       A.  That is correct.
3       Q.  And is it fair to say that the AWP or
4   average wholesale price has generally been one
5   component in determining the amount that Humana pays
6   a provider for services which include the injection
7   of drugs?
8           MR. MANGI:  Object to the form, and to the
9   extent it doesn't account for the various other
10  types of methodologies discussed.
11      A.  That is a true statement, it is one of the
12  components.
13      Q.  And do you remember or recall that when
14  Mister Mangi asked you if it was fair to state that
15  Humana's general aim is to get the best deal it can
16  while maintaining an adequate provider network, do
17  you remember what your answer to that question was?
18      A.  I believe it was that that is, you know,
19  the goal of Humana.
20      Q.  Is it equally fair to say that Humana also
21  expects and doctors in its network are to make a
22  living primarily by providing medical treatments to

---

199

1   patients and Humana enrollees and not put a large
2   mark up on prescription drugs?
3           MR. MANGI:  Object to the form.
4       A.  Yes, I agree with that statement.
5       Q.  So is it fair to say that it's your
6   understanding as a general matter that the amount
7   Humana pays providers who administer prescription
8   drugs is intended to reasonably compensate the
9   doctors for their medical services and reimburse
10  them for the appropriate costs of the drug itself?
11      A.  Yes, that's correct.
12      Q.  And is it your understanding as a general
13  matter that AWP, which you I think referred to as a,
14  quote, gold standard, is to reflect a benchmark of
15  the approximate price that a drug is sold to the
16  providers?
17          MR. MANGI:  Object to the form,
18  mischaracterizes the testimony.
19      A.  Yes.
20      Q.  I'm sorry, I sort of spoke over you.  Let
21  me repeat the question and you can repeat your
22  answer.  I'm not sure I heard it.  Is it your

---

200

1   understanding as a general matter that the average
2   wholesale price, the AWP, is supposed to reflect a
3   benchmark of the approximate prices that a drug is
4   sold to providers for?
5       A.  That is correct.
6       Q.  So is it fair to say that it's not
7   irrelevant to Humana if provider reimbursement
8   formulas contain AWP that faultily exaggerate prices
9   at which doctors buy the drug, is that true?
10          MR. MANGI:  Object to the form of the
11  question, and also to the extent Mister Notargiacomo
12  is misrepresenting plaintiff's position in this
13  litigation.
14  BY MR. NOTARGIACOMO:
15      Q.  I will still answer the question, I
16  can repeat it if you need me to.
17      A.  Yes, would you please?
18      Q.  Sure.  Is it fair to state it's not
19  irrelevant to Humana if provider reimbursement
20  formulas contain AWP that falsely exaggerates prices
21  at which the doctors buy the drug?
22          MR. MANGI:  Same objection.

---

201

1       A.  It is greatly relevant.
2       Q.  Can you explain to me why it's relevant?
3           MR. MANGI:  Same objection.
4       A.  The reason it is relevant is because that
5   is the basis on which we establish our cost of the
6   drug to the provider.
7       Q.  So that if the AWP is falsely exaggerated,
8   the payment by Humana to the physicians will be
9   larger than it otherwise would be?
10          MR. MANGI:  Same objections.
11      A.  That is correct.
12          MR. NOTARGIACOMO:  I have no other
13  questions.
14          MR. MANGI:  A clarification.  Ed, for the
15  record, are plaintiffs now reverting to the position
16  that AWP should be an average of actual acquisition
17  costs?
18          MR. NOTARGIACOMO:  I'm not changing
19  plaintiff's position or anything, I was simply
20  asking the witness some questions.
21          MR. MANGI:  Okay, because I was about to
22  put that in a brief.  Fair enough.

---

Edward Lemke        Confidential        January 11, 2005
Louisville, KY

52 (Pages 202 to 205)

---

202

1       MR. ST. PHILLIP:  I think Mister Cohen may
2   have a couple of questions.
3       MR. COHEN:  Let me just add some
4   questions.
5           * * * * * *
6           EXAMINATION
7   BY MR. COHEN:
8       Q.  Mister Mangi asked you about what he
9   called the competitive dynamic when he was asking
10  you about different amounts Humana pays to different
11  providers for services in which the administration
12  of the same drug is involved.  Do you recall that?
13      A.  Yes.
14      Q.  Now, this competitive dynamic, is it
15  reasonable to assume that the competitive dynamic
16  results in -- compels Humana to generally pay say an
17  oncologist in Chicago more for the administration of
18  Zoladex than it might compel them to pay a general
19  practitioner in North Carolina?
20      A.  Yes.
21      Q.  And does that have anything to do with --
22  that differential, does that have anything to do

---

203

1   with the cost of the drug?
2       A.  No, it's not dependent on the cost of the
3   drug.
4       Q.  Does it have to do with the factors of
5   trying to retain the services of the Chicago
6   oncologist who may be more expensive than the GP in
7   North Carolina?
8       A.  Yes.
9       Q.  And when there are variations in what you
10  pay one doctor over another for services which
11  include the administration of Zoladex or Procrit,
12  one of Mister Mangi's clients' drugs, does it -- is
13  generally the difference result from competitive
14  dynamics apart from the cost of the drug?
15      A.  Yes.
16      Q.  How many providers does Humana -- how many
17  doctors does Humana contract with?
18      A.  Somewhere near 330,000.
19      Q.  Is it feasible to negotiate contracts one
20  on one with each of those 300,000 doctors?
21      A.  No, it's not economically feasible.
22      Q.  So do you need certain benchmarks to sort

---

204

1   of clear hurdles of common negotiations across the
2   board with 300,000 doctors?
3       A.  Yes.
4       Q.  Is AWP one of those common benchmarks?
5       A.  Yes, it is.
6       Q.  Mister Mangi asked you certain -- he took
7   you through certain pricing methodologies on Exhibit
8   Lemke 001.  You have Lemke 1 in front of you.  Do you
9   recall going through that with Mister Mangi?
10      A.  Yes.
11      Q.  And do you recall Mister Mangi asking you
12  item by item if this pricing methodology or that
13  pricing methodology had any relationship to AWP.  Do
14  you recall him asking you that?  Did line item three
15  have any --
16      A.  Yes, yes.
17      Q.  And in some of those instances, you
18  answered no.  Do you recall that?
19      A.  Yes.
20      Q.  By so answering no, did you mean to
21  suggest that AWP played no role in how Humana
22  determined what it was willing to pay when it

---

205

1   adopted any particular methodology?
2       A.  No.  The answer to that was not that it
3   doesn't play a role, is that we have no knowledge of
4   what role, if any, it plays in it.  So for those --
5   for instance, contracted percent of charge.  In
6   essence, a fee schedule is the physician's fee
7   schedule that we pay a percent of.  They may well
8   have set their fees and charges for drugs based on
9   AWP, it's just that we are not privy to that
10  information, nor do we know that was the basis.  Not
11  saying it is not the basis, we just don't have
12  knowledge of it.
13      Q.  If you were looking at the contractual
14  amount you were going to pay a general practitioner
15  in North Carolina to administer Drug A and Drug B,
16  and the services entailed an office visit and an
17  injection and drug, the scheduled rate with respect
18  to Drug A, wouldn't you check the AWP as one of the
19  things you would do to try to ascertain why there
20  was such a difference?
21      MR. MANGI:  Object to the form.

---

Edward Lemke                    Confidential                    January 11, 2005
                                Louisville, KY

53 (Pages 206 to 209)

206

1    A.  Yes, we would -- we have often and we'll
2    continue to use AWP as a basis for judgment as to
3    whether we believe a fee is too high.
4    Q.  Would it be relevant to your determination
5    of how much to pay a provider if you were to learn
6    that there was a situation whereby manufacturers
7    were competitively exaggerating their AWP to try to
8    get market share with that doctor at the expense of
9    Humana?
10       MR. MANGI:  Object to the form.
11   A.  Would you repeat the question?
12       MR. ST. PHILLIP:  Read it back.
13           (RECORD READ.)
14       MR. MANGI:  Object to the form, and also
15   it's leading.
16   A.  Yes.
17   Q.  Hypothetically, if you were to learn, for
18   instance, that urologists to whom you were paying
19   $200 for an office visit encompassing an injection
20   of Zoladex, where you paid that same oncologist $100
21   for an office visit without an injection of
22   Zoladex -- withdrawn.  Hypothetically, if you

207

1    learned that you were paying a urologist $500 for an
2    office visit encompassing the injection of Zoladex,
3    where you were only paying $100 for an office visit
4    that didn't encompass any injection, would it be
5    relevant to you to know what the AWP was of the
6    Zoladex that was being given?
7        MR. MANGI:  Object to the form, leading.
8    A.  Yes, it would, because that would -- I
9    mean, that represents the difference between those
10   two claims, if you will.  And thereby by default is
11   to, the only other cost involved in that encounter.
12   So yes, we would want to know how that measures up
13   against AWP or other standards we have.
14   Q.  And if you learned that the AWP for that
15   injection of Zoladex was equal to -- roughly equal
16   to the $400 difference, would you then consider that
17   an acceptable way to explain the difference?
18   A.  Yes.
19   Q.  And if you were to learn that, although
20   the AWP were roughly $400, the doctor was only
21   paying $100, would that affect your future pricing
22   negotiations for that type of service?

208

1        MR. MANGI:  Same objection, form and
2    leading.
3    A.  Absolutely.
4        MR. COHEN:  I have no further questions.
5        MR. MANGI:  I'll have a few more.
6            * * * * * *
7            EXAMINATION
8    BY MR. MANGI:
9    Q.  Now, Mister Lemke, we spent a lot of time
10   today talking about competitive dynamics, bargaining
11   leverage, do you remember that?
12   A.  (WITNESS MOVES HEAD UP AND DOWN.)
13   Q.  You have to answer verbally.
14   A.  Uh-huh, yes.
15   Q.  That bargaining and leverage, those issues
16   apply, not only to a determination of what Humana
17   will pay in relation to services, but also in
18   relation to drugs, correct?
19   A.  In some instances, yes.
20   Q.  And that variation will explain why, in
21   some case, the reference to the Medicare based fee
22   schedules, Humana will be reimbursing for drugs to

209

1    ninety percent Medicare and whereas in other cases,
2    it will be reimbursing at a hundred twenty percent
3    of Medicare, correct?
4    A.  In some case, yes.
5    Q.  Now, if you could turn to Exhibit Lemke 001.
6    There it is.  In relation to some of these rows
7    under methodology, or some of these bases, AWP is a
8    component in the reimbursement methodology, right?
9    A.  Yes.
10   Q.  For example, average wholesale price
11   updated quarterly, AWP is clearly a part of the
12   methodology there, correct?
13   A.  Right.
14   Q.  In relation to the other methodologies
15   that we referenced, be they purchase schedules,
16   contracted percentage of charge, HIAA direct, you
17   have no way of knowing whether or not they have any
18   relationship to AWP, correct?
19   A.  That's correct.  For those types stated,
20   those we would not necessarily know if AWP was the
21   basis.
22   Q.  And indeed, AWP may have formed no part of

Edward Lemke

Confidential
Louisville, KY

January 11, 2005

54 (Pages 210 to 213)

210

1   those?
2       A.  It may or may not, that's true.
3       Q.  We spoke earlier also about how good
4   business sense requires one to take an overall look
5   at a contract, correct?
6       A.  Yes.
7       Q.  Have a sense for what the bottom line is,
8   what you're paying and what you're receiving, right?
9       A.  Yes.
10      Q.  Certainly, from a physician's perspective,
11  if they feel they're being inadequately reimbursed
12  in one area, they can still see as an acceptable
13  overall contract if they're being reimbursed at a
14  higher rate in another area, right?
15      A.  Yes.
16      Q.  For example, if they feel they're being
17  underreimbursed for admin fees, they can still view
18  it as an acceptable contract if they're getting
19  higher reimbursement in relation to drugs, right?
20      A.  They may well view it that way, yes.
21      Q.  Now, Mister Notargiacomo returned to your
22  view as to whether or not AWP represents the prices

211

1   at which drugs are acquired.
2           MR. COHEN: Objection, that
3   mischaracterizes the question. I heard the word
4   approximate.
5           MR. MANGI: In any event --
6           MR. COHEN: Well, rephrase your question.
7           MR. MANGI: Your objection is noted and
8   that's fine, I'll rephrase the question.
9   BY MR. MANGI:
10      Q.  Do I recall correctly, that you testified
11  earlier today that you don't know at what price
12  providers acquire drugs, is that correct?
13      A.  The actual price at which providers
14  acquire drugs, no, I do not know.
15      Q.  And I believe you also testified earlier
16  today that you don't know for a fact whether or not
17  the price providers pay to acquire drugs is AWP or
18  is something else entirely.
19      A.  For a fact, I do not know.
20      Q.  Okay. And your response to Mister
21  Notargiacomo's question was based simply on your
22  personal interpretation of the words "average

212

1   wholesale price" and nothing else, correct?
2       A.  I responded to that that it was an
3   estimate or close proximity, I'm not quite sure the
4   term I used, represented the average price that
5   providers pay for drugs, yes.
6       Q.  But you based that impression solely upon
7   the terms of that phrase.
8       A.  Not solely, no.
9       Q.  Okay. What else do you base it on?
10      A.  Based on the fact that there's always --
11  well, an average is an average which means that
12  there's always going to be instances where you're
13  going to pay less than the average because somebody
14  else is paying more than the average. Depending on
15  how that average was derived, I mean there is a
16  number of things going in it, but also just being in
17  the business world and in the sense one could never
18  say that that is an absolute reflection of -- any
19  average is an absolute reflection of what's actually
20  going on in the market. But I truly, you know, I
21  believe that the average wholesale price did
22  approximate what was being paid out and what was

213

1   being paid for drugs by providers, yes.
2       Q.  Okay. Based on your business experience
3   and leaving aside your average may or may not
4   connote, are you aware of any cases, even one case,
5   where you know for a fact the provider acquired
6   drugs at average wholesale price or even something
7   close to average wholesale price?
8       A.  No, only because I have not been privy to
9   detailed provider, you know, documentation or the
10  financial records that would give me that indication
11  or that knowledge.
12      Q.  So given that you're not privy to that
13  knowledge in your business sense again, you're
14  relying exclusively on the words "average wholesale
15  price," correct?
16          MR. ST. PHILLIP: Objection.
17      A.  Well, not totally. Because one of the
18  other common senses in business is that in this
19  particular instance, if a provider accepts AWP, out
20  of the box, they at least are saying that it covers
21  their costs.
22      Q.  Okay.

Edward Lemke                     Confidential                     January 11, 2005
                                 Louisville, KY

55 (Pages 214 to 217)

214

1    A.  So from the inference that AWP does not
2    represent less than what it is costing them, one can
3    infer that AWP does cover their costs.
4    Q.  Okay.  So that's a slightly different
5    point.  So the point you're making there is that the
6    amounts that physicians pay to acquire drugs, is
7    something less than AWP.  That's your understanding,
8    correct?
9        MR. ST. PHILLIP:  Objection.
10   A.  No, what I said was it at least covers
11   their cost.
12   Q.  Right.  And for it to cover their costs,
13   their costs would have to be less than AWP, right?
14   A.  At.  It wouldn't necessarily have to be
15   less than.
16   Q.  Okay.  There are physicians who Humana
17   reimburses at ninety percent of Medicare, correct?
18   A.  Yes.
19   Q.  And that's ninety percent of
20   eighty-five percent of the AWP, correct?
21   A.  Yes, in some cases.
22   Q.  So in those instances, you understand

215

1    providers would be acquiring drugs at less than that
2    amount, right?
3    A.  That's correct.
4    Q.  Okay.  So you certainly are aware that at
5    least some physicians are acquiring drugs at amounts
6    substantially below AWP itself?
7    A.  No.
8        MR. ST. PHILLIP:  Objection,
9    argumentative.
10   Q.  Didn't you just say that you're aware that
11   they are acquiring drugs at an amount less than
12   ninety percent of eighty-five percent of AWP?
13   A.  No.  I'm aware of the fact that we are
14   paying them for drugs at that rate.
15   Q.  Okay.
16   A.  Not what their cost is.
17   Q.  Okay.  Wasn't your testimony just now that
18   you understood that they were being reimbursed at an
19   amount greater than what they paid to acquire drugs?
20   A.  No.  I said I assume that in the fact that
21   they accepted AWP as a reimbursement level.
22   Q.  And if they accept ninety percent of

216

1    eighty-five percent of AWP, then you assume that
2    they're acquiring drugs at an amount less than that?
3    A.  No.  I would probably assume in those
4    situations that it is such a small part of their
5    business that it's not a bank breaker and they're
6    picking it up someplace else in negotiation of the
7    fee schedule.
8    Q.  And you're basing that upon the words
9    average wholesale price and upon the business
10   experience that you've just described.
11   Q.  Correct?
12   A.  In part, yes.
13   Q.  What else are you relying on?
14   A.  When you get into contract negotiations
15   and fee negotiations, there are so many variables
16   out there that one cannot say definitely without
17   looking at a very, very specific negotiation, a
18   very, very specific provider and a fee schedule, to
19   definitively answer any of the questions you have in
20   regard to what does AWP mean to me or the provider.
21   Q.  Okay.  And with regard to those specific
22   transactions and individual providers, you're not

217

1    aware of any provider in any specific case paying
2    AWP to acquire a drug, as a fact, correct?
3        MR. ST. PHILLIP:  Any of the 330,000
4    contract negotiations?
5        MR. MANGI:  Correct, that's exactly right.
6    A.  I do not know of one absolutely fitting
7    that description, no.
8    Q.  Have you heard of one fitting that
9    description?  What do you mean by absolutely?
10       MR. ST. PHILLIP:  It's argumentative.
11   Q.  No, I'm just trying to understand what you
12   mean.
13   A.  Ninety-nine-point nine percent of the
14   contracts and negotiations do not get down to an
15   individual drug.  We are talking in excess of 300 to
16   400 J/Codes, not addressed individually at a time.
17   So to answer that question, you would have to be
18   looking at a specific drug for a specific provider
19   for a specific time on a specific contract and
20   getting to that level of detail, no, I could not say
21   as though I know that situation exists.
22   Q.  And the reason you don't get down to

Edward Lemke       Confidential       January 11, 2005
Louisville, KY

56 (Pages 218 to 221)

218

1 individual drugs and individual negotiations with
2 these 330,000 providers, is because it wouldn't be
3 practical to do so, right?
4     A.  That's correct.
5     Q.  There are a lot of drugs out there and a
6 lot of providers out there and you couldn't
7 negotiate each drug with each provider, right?
8     A.  Correct.
9     Q.  Okay.  So instead, you utilize AWP as a
10 benchmark that enables you to have a practical
11 system of setting reimbursements, right?
12     A.  Using AWP, that gives us a level of --
13 that gives us a level of confidence that we are at
14 least not grossly overpaying.
15     Q.  Okay.  So indeed if you were aware of or
16 learn of the fact that a provider, one specific
17 provider or providers were getting rebates from
18 manufacturers on specific drugs, that wouldn't
19 change the reimbursement amounts in the contract
20 because you don't get down to a drug by drug level,
21 isn't that correct?
22     A.  If a contractor became aware of a specific

219

1 provider and had that detailed information, I am
2 relatively assured that that information would be
3 used to negotiate with that provider for a lower
4 cost on drugs.
5     Q.  Okay.  And indeed -- well, if that were in
6 one individual case, perhaps that's true.  But if
7 Humana were to become aware that all providers were
8 getting manufacturer rebates on a given basket of
9 drugs, would it then do line item negotiations with
10 respect to each of those drugs with all their
11 providers?
12     MR. ST. PHILLIP:  Objection.
13     A.  I would assume that Humana would approach
14 that as it approaches it now, and that in looking at
15 establishing a new standard or a new basis, for
16 future negotiation of drug costs.
17     Q.  But it hasn't done that to date, correct?
18     MR. ST. PHILLIP:  Objection.  To the
19 extent that the question calls for you to testify
20 about what your current contracting strategies are,
21 I'm going to instruct you not to answer and to move
22 for a protective order because that contains

220

1 competitively sensitive information.
2     MR. NOTARGIACOMO:  Can you speak up? I'm
3 having trouble hearing.
4     MR. ST. PHILLIP:  Also, Ed, could you turn
5 down your microphone? Could you read that back.
6     (RECORD READ.)
7     MR. MANGI:  Upon what time period are you
8 going to allow the witness to answer questions?
9     MR. ST. PHILLIP:  I'm going to allow him
10 to answer questions to anything except for what's
11 happening now.
12     MR. MANGI:  Okay, so yesterday? I mean,
13 give me a cut off time.
14     MR. ST. PHILLIP:  The current strategy,
15 his current strategy.
16     Q.  Right up until the current strategy,
17 whatever that means, is it fair to say that Humana
18 has never changed its reimbursement methodology in
19 the manner that you describe?
20     A.  I can't attest to that.  Never?
21     Q.  Are you aware of Humana having changed its
22 methodology to that effect?

221

1     A.  You're implying that there is a single
2 methodology which there is not so I cannot answer
3 that question.
4     Q.  My question is are you aware of any
5 instances where Humana has done a line item change
6 across all its fee schedules to account for
7 knowledge of manufacturer rebates to providers in
8 relation to particular drugs?
9     A.  I'm not aware of any.
10     Q.  Okay.  Has -- and indeed Humana to date,
11 other than some of the contracts we looked at, has
12 not to your knowledge sought to gain information
13 about providers' acquisition costs for drugs,
14 correct?
15     MR. ST. PHILLIP:  Objection.
16     A.  I'm not aware of any.
17     Q.  And to the best of your knowledge, Humana
18 never adjusted its fee schedules to account for the
19 substantial discounts off AWP that consituted the
20 acquisition costs referenced in the OIG reports we
21 looked at, correct?
22     MR. ST. PHILLIP:  Objection.  To the

Edward Lemke                    Confidential                    January 11, 2005
                              Louisville, KY

57 (Pages 222 to 224)

222

1    extent that you're going to talk about the OIG
2    reports, I would reiterate my objections to topic
3    number 24, which was excluded by Magistrate Judge
4    Bowler.
5         MR. MANGI:  Same response you've given
6    many times today.
7         Q.  But you can answer that question.  Would
8    you like it read back?
9         A.  Yes, please.
10        (RECORD READ.)
11        A.  I can never say never.
12        Q.  To the best of your knowledge?
13        A.  To the best of my knowledge, they have
14   not.
15        Q.  Okay.  Now, Mister Notargiacomo also asked
16   you questions about exaggerated AWPs or inflated
17   AWPs.  When you responded to those questions, were
18   you relying upon your interpretation of average
19   wholesale price using the actual meanings of those
20   words?
21        MR. ST. PHILLIP:  Objection.  You can
22   answer.

223

1         A.  Yes.
2         Q.  All right.
3         MR. MANGI:  Nothing further.  Anything
4    else, Ed?
5         MR. NOTARGIACOMO:  Nothing at this time.
6         MR. ST. PHILLIP:  No questions.
7
8         (WITNESS EXCUSED.)
9         (DEPOSITION CONCLUDED AT 3:25 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22

224

1
2         C E R T I F I C A T E
     STATE OF KENTUCKY    :
                          SS:
3    COUNTY OF JEFFERSON  :
4         I, Kathy Nold, a notary public in and for
5    the State of Kentucky, do hereby certify that prior
     to the giving of his deposition, the within named
6    EDWARD LEMKE was by me first duly sworn to tell the
7    truth, the whole truth, and nothing but the truth;
8    that the foregoing pages constitute a true and
     correct transcript of testimony given at said time
9    and place by said deponent; that said deposition was
10   taken by me in stenotype and transcribed under my
11   supervision; that I am neither a relative of nor
     attorney for any of the parties to this litigation,
12   nor relative of nor employee of any of their
13   counsel, and have no interest whatsoever in the
14   result of this litigation.
15        IN WITNESS WHEREOF, I hereunto set my hand
16   at Louisville, Kentucky this 12TH day of January,
17   2005.
18        MY COMMISSION EXPIRES JULY 20, 2006.
19        KATHY NOLD
20        REGISTERED PROFESSIONAL REPORTER
21        NOTARY PUBLIC, STATE OF KENTUCKY
22

Henderson Legal Services
(202) 220-4158

Edward Lemke
Confidential
Louisville, KY
January 11, 2005

1

| **A** | 222:16 | 110:22 | acronym 22:1 | adequacy |
|---|---|---|---|---|
| aamangi@p... | above 22:17 | acquire 12:20 | 38:11 195:22 | 116:16 |
| 2:11 | 27:1 124:3 | 15:19 16:8 | across 40:9 | adequate |
| ability 121:21 | 130:9 135:15 | 16:13,19 | 49:21 172:20 | 49:19 67:8 |
| 139:15 | 157:11 | 39:1 62:19 | 190:17 204:1 | 191:15 |
| able 25:14 26:5 | absolute | 64:3,18 66:9 | 221:6 | 198:16 |
| 51:21 141:9 | 212:18,19 | 105:3 106:17 | action 1:2 | adjusted |
| about 7:17 | absolutely | 107:4 122:9 | 115:10 | 221:18 |
| 9:12 10:2 | 208:3 217:6 | 122:14 123:1 | ACTIONS 1:6 | admin 69:18 |
| 24:18 27:22 | 217:9 | 123:18 | actual 84:12 | 210:17 |
| 29:15 38:12 | accept 48:20 | 124:10 | 86:20,21 | administer |
| 41:12,12 | 67:22 84:9 | 143:11 | 105:3 139:8 | 12:13,21 |
| 42:3 43:18 | 109:12,22 | 191:19 | 162:18 | 199:7 205:15 |
| 47:3 54:18 | 110:6 124:3 | 211:12,14,17 | 201:16 | administered |
| 54:20 56:7 | 215:22 | 214:6 215:19 | 211:13 | 20:8 21:2,14 |
| 57:20 64:17 | acceptable | 217:2 | 222:19 | 23:11 24:1 |
| 65:20,20 | 91:6 207:17 | acquired | actually 23:15 | 28:2,4 39:21 |
| 73:5,8,19 | 210:12,18 | 166:12 211:1 | 72:10 90:21 | 43:10 56:3 |
| 77:8 79:22 | accepted 84:2 | 213:5 | 106:4,16 | 60:18 64:6 |
| 81:5 82:2,3 | 84:5 110:1 | acquiring 13:8 | 114:6,19 | 65:9 83:8 |
| 88:5 89:9,21 | 215:21 | 18:12 65:16 | 177:14 | 96:19 97:8 |
| 96:14 108:17 | accepts 213:19 | 105:18 215:1 | 181:15 | 120:18 |
| 115:3,5,7 | access 20:11 | 215:5,11 | 189:10 | 166:12 176:1 |
| 125:2 126:2 | 20:14,16 | 216:2 | 212:19 | 190:3 |
| 126:22 | 143:10 | acquisition | ad 126:5,5 | administering |
| 127:14 | 145:22 165:1 | 13:13,21 | add 71:14 | 62:10 191:9 |
| 129:14 | accessed 30:10 | 38:12 39:4 | 144:15 153:6 | 197:22 |
| 131:10 133:4 | accommodate | 62:15 63:2,6 | 202:3 | administers |
| 143:19,22 | 6:20 | 64:14 65:3,9 | added 176:8 | 57:21 81:7 |
| 146:11 | ACCORDA... | 65:20 67:12 | addition 44:14 | administrati... |
| 149:15 | 1:21 | 68:1 99:10 | 54:21 92:3 | 7:3,7 38:2 |
| 155:10 161:9 | accordingly | 99:20 100:2 | 102:6 107:11 | 56:12 58:1 |
| 163:2 165:8 | 139:19 | 100:8,14 | 115:6 147:8 | 88:20 113:19 |
| 170:17 | account 198:9 | 101:14 124:7 | 193:21 | 121:6,8 |
| 173:11 180:1 | 221:6,18 | 139:8 143:22 | additional | 136:18 189:3 |
| 184:15 | Accounting | 153:21 154:2 | 156:19 | 202:11,17 |
| 190:13 191:8 | 7:3 | 154:3,7,9,16 | address 51:13 | 203:11 |
| 192:9,15 | accumulated | 155:7,11,21 | 90:10 119:5 | administrative |
| 197:13 | 177:1 | 156:7,18,21 | 171:13 | 69:10 |
| 201:21 202:8 | accurately | 157:12 | addressed | administrator |
| 202:10 | 55:14 104:15 | 161:13 | 217:16 | 103:8 |
| 208:10 210:3 | 104:17,22 | 162:19 | addresses | adopted |
| 219:20 | achieve 98:9 | 201:16 | 129:15 | 140:14,16 |
| 221:13 222:1 | achieving | 221:13,20 | Adeel 2:8 5:17 | 205:1 |

Henderson Legal Services
(202) 220-4158

Edward Lemke                 Confidential                 January 11, 2005
                            Louisville, KY

2

| | | | | |
|---|---|---|---|---|
| **advance** | 112:11 | 50:4 51:7 | **allowances** | **alternative** |
| 132:22 | **ago** 13:17 | **ain't** 190:7 | 168:20 | 44:21 46:7,8 |
| **advantage** | 38:13 190:14 | 191:6,13 | **allowed** 176:19 | 47:2 48:21 |
| 68:7 139:17 | **agree** 48:13 | **all** 1:6 6:21 9:3 | 176:22 177:1 | 49:4 50:18 |
| **advice** 157:4 | 55:18 56:14 | 15:11 17:15 | 177:12,18,20 | 51:15,16 |
| **affect** 85:14 | 56:19 68:6 | 17:20,22 | 180:6 181:10 | 73:10 100:22 |
| 86:1 108:1 | 70:3,21 | 20:16 27:2 | 181:16,20 | 127:13 |
| 108:18 | 72:18,20 | 37:7 46:14 | **allowing** 98:10 | 160:17 183:9 |
| 116:10 | 76:8 101:1 | 51:5 61:20 | 148:13 | **although** 36:19 |
| 192:21 | 106:19 113:9 | 64:11 66:15 | **allows** 144:19 | 89:8 207:19 |
| 193:13 | 113:10 120:1 | 70:18 71:4 | **all-inclusive** | **always** 45:16 |
| 207:21 | 123:4 144:10 | 72:14 74:12 | 87:3 88:22 | 48:22 68:16 |
| **affected** | 144:19 | 76:4 87:20 | **almost** 38:4 | 95:6 140:3 |
| 107:20 | 145:21 | 92:17 98:15 | 77:12 | 194:4 212:10 |
| 116:19 | 149:10 155:4 | 99:13,21 | **alone** 69:10 | 212:12 |
| **after** 5:2,10 7:1 | 156:17 162:6 | 101:15,22 | 147:13 192:2 | **am** 54:20 55:3 |
| 9:13 10:6 | 164:6 167:3 | 103:15 104:6 | **along** 36:14,16 | 219:1 224:11 |
| 53:6 79:22 | 167:16 168:3 | 104:7 108:20 | 37:6 95:4 | **Amended** 3:14 |
| 85:15 90:6 | 168:4 169:8 | 110:16 | 158:22 | **amendment** |
| 169:16 | 185:16 | 112:21 119:5 | 176:15 | 131:22 132:3 |
| **afternoon** | 193:17 199:4 | 122:12 | 185:21 | **America** 22:7 |
| 197:8 | **agreed** 63:14 | 123:21 | **already** 114:13 | **AMERICAS** |
| **again** 16:15 | 76:5,19 90:9 | 125:12,14 | 162:21 | 2:9 |
| 27:16 36:13 | 127:12 | 129:4 132:17 | **also** 7:20,22 | **amount** 23:7,9 |
| 54:1 72:14 | 138:10 152:9 | 138:18 139:9 | 26:13 33:1 | 23:10,12 |
| 78:15 79:18 | **agreed-upon** | 145:21 | 40:7 44:18 | 28:10 45:21 |
| 81:20 99:18 | 121:2 156:14 | 148:12 | 47:2 57:10 | 48:1 49:9 |
| 108:12 | **agreement** | 160:20 | 58:2 59:3 | 53:4 54:8,22 |
| 116:13 | 3:14 53:14 | 179:16 189:1 | 73:14 100:8 | 55:6 60:5 |
| 119:12 130:9 | 91:10 110:19 | 189:11 | 114:7 115:22 | 64:4,19,20 |
| 148:3 150:12 | 131:22 147:7 | 195:20 | 116:4 119:18 | 65:17 66:8 |
| 158:7 159:2 | 149:19 151:2 | 196:15 219:7 | 153:4,5 | 67:12,22 |
| 159:3 161:19 | 159:16 | 219:10 221:6 | 171:7 172:4 | 77:14 81:5,9 |
| 171:13 | **agreements** | 223:2 | 183:4 186:20 | 85:15 86:13 |
| 180:11 184:4 | 142:8 172:20 | **allow** 31:17 | 190:2 197:21 | 86:14 87:12 |
| 213:13 | **ahead** 14:7 | 34:15 36:12 | 198:20 | 93:20 94:6 |
| **against** 51:18 | 30:19 53:2 | 54:3 119:1 | 200:11 | 99:21 102:17 |
| 53:6 79:11 | 70:15 71:13 | 121:22 | 206:14 | 110:7 122:14 |
| 79:19 117:18 | 155:15 | 146:13 166:6 | 208:17 210:3 | 122:15 123:1 |
| 207:13 | 178:12 | 189:8 220:8 | 211:15 | 123:19 136:2 |
| **agencies** 87:16 | **aim** 66:6,7 | 220:9 | 212:16 220:4 | 138:11 142:7 |
| 161:10 | 67:7 198:15 | **allowable** | 222:15 | 155:8 156:19 |
| **agency** 8:5 | **aiming** 65:8 | 156:14 177:8 | **alternate** 50:13 | 176:20,22 |
| **aggressive** | **aims** 49:21 | 181:11 | 61:10 | 177:1,2,4,7 |

Edward Lemke                    Confidential                    January 11, 2005
                               Louisville, KY

| | | | | |
|---|---|---|---|---|
| 177:12,17,18 | 95:13 99:3 | 166:6 172:1 | 39:8,10 | 126:2 137:8 |
| 177:20 | 102:14 | 172:22 179:6 | 42:10 43:3 | 181:7 187:13 |
| 178:10 180:5 | 116:12 | 179:7,8 | 54:15 59:19 | 188:14 |
| 181:10,12,15 | 124:14,14 | 189:8,14,20 | 62:10 69:16 | 201:19 |
| 181:16,20 | 126:13 140:5 | 198:17 | 71:5 73:2 | 202:21,22 |
| 197:16 198:5 | 147:18 | 199:22 | 76:19 78:17 | 220:10 223:3 |
| 199:6 205:14 | 158:12 166:2 | 200:15 205:2 | 83:9 84:4 | **anytime** |
| 215:2,11,19 | 175:8 203:10 | 208:13 | 86:5 87:17 | 111:17 |
| 216:2 | 210:14 | 216:19 | 88:6 89:18 | **anywhere** 59:5 |
| **amounts** 23:22 | **answer** 4:2 | 217:17 | 93:13 97:19 | **apart** 203:14 |
| 59:15 64:2 | 6:10 10:22 | 219:21 220:8 | 97:19 101:17 | **apologize** |
| 69:9 70:10 | 11:12 12:18 | 220:10 221:2 | 103:3 105:19 | 168:7 |
| 78:10,12 | 14:5 17:2 | 222:7,22 | 108:7 114:21 | **appear** 91:5 |
| 79:2 82:16 | 21:3 29:18 | **answered** | 121:21 | 150:18 166:2 |
| 83:7 84:12 | 34:9,14,17 | 16:22 32:14 | 129:18 141:8 | **appears** 132:2 |
| 94:9 96:18 | 36:12 45:2 | 39:14 42:15 | 143:13 | 150:21 |
| 97:7,20 | 50:10 52:2,4 | 59:9 69:21 | 147:12 148:4 | 159:18 |
| 114:21 123:3 | 54:2 60:9 | 70:22 71:12 | 151:17 159:8 | 160:19 |
| 123:18 126:9 | 63:11 65:13 | 71:22 103:19 | 159:9 163:2 | **Appendix** |
| 143:11 147:8 | 65:22 68:3 | 106:1 107:7 | 164:3,21 | 165:7 |
| 163:17 | 70:15 71:3 | 144:22 | 165:1 166:19 | **applicable** |
| 178:18 180:6 | 72:11,12,21 | 149:13 | 167:17 169:5 | 108:21 |
| 180:13 | 73:1 74:4 | 204:18 | 170:10,22,22 | **applied** 177:20 |
| 183:21 | 75:7 80:22 | **answering** | 182:21 | **apply** 89:18 |
| 193:20 | 81:3 82:9,11 | 204:20 | 188:17 | 208:16 |
| 197:18 | 92:11 93:6 | **answers** 6:12 | 204:13,15 | **approach** |
| 202:10 214:6 | 97:14 103:20 | 54:4 66:1 | 205:1,4 | 38:18 72:22 |
| 215:5 218:19 | 105:20 112:4 | **Anthony's** | 207:4 209:17 | 77:21 80:21 |
| **analysis** 11:5 | 114:10 115:1 | 74:22 | 211:5 212:18 | 82:19 90:2,3 |
| 17:16 39:8 | 119:2,6 | **antibiotics** | 213:4 216:19 | 219:13 |
| 68:10 78:16 | 121:21 122:1 | 153:11 | 217:1,3 | **approaches** |
| 82:9 90:13 | 122:4 127:3 | **any** 6:14,18 | 221:4,9,16 | 219:14 |
| 90:15 91:2,8 | 128:20 | 10:17 11:7 | 224:11,12 | **appropriate** |
| 110:3 111:12 | 142:10 144:3 | 11:17 13:9 | **anybody** 173:4 | 80:2 199:10 |
| 122:5 126:5 | 145:13,18 | 14:16,19 | **anyone** 124:18 | **approximate** |
| **analyze** 62:5 | 146:13 148:8 | 16:6,9 17:5 | 165:4 169:3 | 27:11 199:15 |
| 116:12 | 149:4,8 | 17:10 18:10 | 172:14 | 200:3 211:4 |
| 125:13 | 151:18 | 18:11,11 | 194:21 | 212:22 |
| **ancillary** 151:4 | 154:17,20 | 29:12 31:8 | **anything** 19:14 | **approximately** |
| 154:10 | 155:13 157:9 | 34:2,5,6,10 | 19:18 40:14 | 8:21 42:21 |
| **another** 25:4 | 157:16 | 35:22 36:1,7 | 59:18 71:13 | **approximati...** |
| 50:4 52:10 | 158:20 | 36:7,17 37:9 | 71:15 88:14 | 94:15 179:12 |
| 56:2 58:15 | 159:15 | 37:11,13,13 | 106:11 | **area** 25:21 |
| 68:8 80:1 | 161:20 162:1 | 37:19 39:3,6 | 114:15 115:5 | 40:19 68:8 |

Edward Lemke
Confidential
Louisville, KY
January 11, 2005

4

70:5 79:14
107:21
108:20 119:9
125:11
210:12,14
**areas** 23:6
34:20 35:15
35:19 70:6
78:7 80:6,7,9
91:4,4 95:7
95:19 111:5
116:19,22
121:11
162:21
**argue** 102:15
133:6
**argument**
103:10 104:1
104:2
**argumentative**
69:13 215:9
217:10
**Arizona** 192:8
192:9,10,11
192:13
**around** 27:8
190:20,22
**arrangement**
142:14 160:1
**arrangements**
120:2,12
142:2
**arrival** 17:11
18:10
**arrive** 49:11
50:21 53:4
193:21 194:8
194:15
**arrived** 13:20
18:15 107:18
**ascertain**
205:20
**aside** 106:14
127:12 213:3

**ask** 6:14 131:1
141:16,17
148:7 152:20
160:3
**asked** 16:21
20:22 32:14
39:13 42:14
59:8 69:20
105:16,22
107:6 125:2
144:21
154:14
197:12
198:14 202:8
204:6 222:15
**asking** 54:2
59:10 149:15
201:20 202:9
204:11,14
**asks** 132:16
**aspect** 140:5
170:21
**aspects** 83:4
175:2 179:4
**assess** 51:21
62:8 110:21
**assistant** 8:1,8
**associate** 90:20
195:10
**associated**
195:11
**Associates**
111:9
**Association**
22:6
**assume** 50:11
65:2 89:6
105:5 107:9
115:20 145:2
150:4 170:6
202:15
215:20 216:1
216:3 219:13
**assuming**

104:19 124:1
**assumption**
105:6 117:20
**assured** 219:2
**Atlanta** 35:13
**attached** 29:16
153:7
**Attachment**
132:4,10
133:12
152:17,20
153:5 160:1
160:4
**attempt** 63:20
63:22 66:12
194:19
**attempted** 62:5
62:8 63:6,17
173:10,16
**attempting**
113:15 139:7
**attention** 95:7
131:14 132:7
134:18
150:13
152:13
159:14,19
165:7 168:16
168:18
**attest** 149:5
220:20
**attorney** 63:10
151:9 157:3
157:6 224:11
**audit** 7:16
143:1,5,14
144:11
**audited** 143:19
**auditor** 7:16
**audits** 143:21
144:7,20
**authentic**
148:21
149:10,19

**authenticate**
133:3,7
**authentication**
132:17,21
148:4 158:17
159:10
**authenticity**
148:9
**authority**
40:17
**available** 21:10
98:5 154:10
167:22 168:3
168:21
**AVENUE** 2:9
2:14
**average** 1:4
18:13 30:10
104:21 105:1
105:7,14
106:15
163:18 183:8
198:4 200:1
201:16
209:10
211:22 212:4
212:11,11,13
212:14,15,19
212:21 213:3
213:6,7,14
216:9 222:18
**AW** 99:13
**aware** 11:22
14:22 18:11
21:17 31:9
32:3 33:16
38:15 59:19
63:4,19,20,22
68:22 69:7
78:3 86:7,9
87:15,19
99:22 100:5
100:7,11,13
100:17

101:12
113:17 118:9
118:13
120:11
147:11 152:2
152:5 162:4
164:16
166:10,15
169:13 171:8
171:15,18
213:4 215:4
215:10,13
217:1 218:15
218:22 219:7
220:21 221:4
221:9,16
**away** 19:22
97:4
**AWP** 12:1
13:3,5,9 15:4
17:11,18
18:2,13
23:15 29:12
30:9,10,17
33:14 39:7
39:12 40:11
43:19 44:12
44:16,21
45:10,19
46:5 47:6
48:9,17,21
49:1,1,8
50:12,16,19
51:16,16
52:8,11
54:12 61:10
61:16 73:10
75:4,15
76:15 77:16
97:1 99:5
101:13,18
104:14,17
105:2,13
107:4 127:9

Edward Lemke

Confidential
Louisville, KY

January 11, 2005

5

| | | | | |
|---|---|---|---|---|
| 127:13 | **Bachelor's** 7:2 | 23:1,6 27:13 | 211:21 212:6 | 16:3 17:4 |
| 128:21 129:4 | **back** 10:5 21:2 | 28:15,17 | 212:10 213:2 | 18:2 19:11 |
| 129:8 135:10 | 29:21 36:17 | 31:14 40:16 | **bases** 74:16 | 21:20 22:20 |
| 135:16,20 | 48:18 71:10 | 44:21 45:6 | 179:10 182:6 | 24:9,19 |
| 136:3 153:11 | 71:21 72:5 | 45:10 46:22 | 182:13,17 | 25:14,22 |
| 160:12,17 | 79:3 91:3,15 | 48:6,11,21 | 187:8 209:7 | 26:5 27:1,14 |
| 163:18,22 | 100:20 106:2 | 50:13,14 | **basic** 86:4 | 27:17 28:12 |
| 165:12,20,21 | 106:7 110:16 | 52:11 61:10 | 113:14 126:2 | 28:21 29:2,4 |
| 183:10 | 133:10 134:9 | 61:13,21 | **basically** 104:2 | 29:7,11 |
| 187:10,13,17 | 136:22 | 73:8,11 | **basing** 216:8 | 30:10,12,12 |
| 188:3,9,15 | 137:15 141:8 | 74:20 75:1 | **basis** 22:19 | 30:15,17 |
| 190:6 191:6 | 148:6,19 | 76:7,8 78:3 | 50:13 54:13 | 31:13,14 |
| 191:13,15,18 | 151:1 164:12 | 81:10,21 | 54:15 56:17 | 35:2,4,9 |
| 198:3 199:13 | 165:9 167:11 | 82:20 83:17 | 60:20 61:4 | 36:15 39:11 |
| 200:2,8,20 | 175:18 | 85:13 88:15 | 74:13 75:14 | 40:19 41:15 |
| 201:7,16 | 206:12 220:5 | 89:1 96:21 | 76:2 80:12 | 43:8 45:6,13 |
| 204:4,13,21 | 222:8 | 111:12 | 81:1,17 83:6 | 46:17 47:21 |
| 205:9,19 | **background** | 118:16 120:8 | 84:11 85:6,8 | 49:1 50:16 |
| 206:2,7 | 7:1 | 125:10 | 91:18 96:22 | 50:17,19 |
| 207:5,13,14 | **bad** 90:17 | 127:14 129:3 | 97:15 98:2 | 51:21,22 |
| 207:20 209:7 | **badger** 71:12 | 129:4 132:12 | 98:17 99:4 | 52:8,10,11,14 |
| 209:11,18,20 | 71:19 | 132:15 | 103:17 105:2 | 52:15,16,19 |
| 209:22 | **balance** 26:17 | 133:13 134:5 | 105:6,12 | 52:21 53:19 |
| 210:22 | **band** 95:4 | 137:8 139:4 | 129:8 134:1 | 54:15 55:22 |
| 211:17 | **bank** 30:9 33:6 | 143:17 145:1 | 134:8 136:19 | 56:1,17 |
| 213:19 214:1 | 33:8,12,14,17 | 147:9,11 | 137:12,21 | 57:18 58:11 |
| 214:3,7,13,20 | 100:8 216:5 | 148:5,12,14 | 138:15 | 58:13,13 |
| 215:6,12,21 | **bargaining** | 148:15 149:2 | 151:11 175:9 | 59:3,5,15,21 |
| 216:1,20 | 25:4,11 | 157:1 158:15 | 176:3,5,9,11 | 60:3,4,6,20 |
| 217:2 218:9 | 27:17 78:9 | 160:17,18 | 176:13 | 61:13,15 |
| 218:12 | 96:8 108:2 | 162:15 | 178:14 | 62:2 64:11 |
| 221:19 | 116:6,10 | 164:19 | 179:13 183:6 | 66:7,22 |
| **AWPs** 16:8,13 | 208:10,15 | 171:10,15 | 184:19 185:3 | 67:14 68:17 |
| 16:20 17:7 | **base** 51:12 | 173:15 | 186:1,15 | 68:18 70:6 |
| 33:17 44:9 | 53:8 76:11 | 180:20 181:8 | 193:1 201:5 | 70:11 71:16 |
| 44:10 47:22 | 95:11 97:21 | 181:21 | 205:10,11 | 74:18,19,20 |
| 100:3 166:13 | 97:22 98:6 | 182:15,21 | 206:2 209:21 | 74:21,22 |
| 183:20 | 98:10,11 | 183:10,13,13 | 219:15 | 75:22 77:10 |
| 222:16,17 | 185:5,11 | 183:16 184:9 | **basket** 219:8 | 77:12,15 |
| | 212:9 | 184:10,11 | **Bates** 131:1,7,9 | 79:2,9,15,17 |
| **B** | **based** 10:20 | 185:2,7,9 | 147:20 | 79:17 81:9 |
| **B** 3:9 152:17 | 14:4 15:4 | 188:8 194:2 | **Bay** 10:8,9,10 | 81:10,15,18 |
| 152:20 153:5 | 17:18 21:9 | 197:18 205:8 | **be** 5:6 12:13 | 82:13 84:2 |
| 205:15,18 | 21:18,20,20 | 208:21 | 13:18 14:18 | 84:12 85:22 |

Henderson Legal Services
(202) 220-4158

Edward Lemke                 Confidential                 January 11, 2005
                             Louisville, KY

6

| | | | | |
|---|---|---|---|---|
| 87:2,6,11 | 187:7 191:18 | 219:22 | 98:19 | 5:18 |
| 88:1,16 | 192:7,22 | **become** 12:6 | **behalf** 173:2,6 | **below** 22:16 |
| 90:12 91:5 | 201:8,9,16 | 31:8 38:15 | **behind** 44:17 | 27:2 50:16 |
| 92:1,3,8 | 203:6 206:4 | 219:7 | **being** 5:2 | 67:12 68:1 |
| 94:11,15 | 207:4 208:22 | **becomes** 47:10 | 14:18 23:1,4 | 135:2 136:12 |
| 95:13,21 | 209:2,15 | **been** 5:20,22 | 29:11 46:15 | 138:9,14 |
| 97:18 99:19 | 212:12 | 6:7 13:6 22:7 | 49:17,22 | 163:17 |
| 101:1,15 | 214:13,14 | 23:12 27:22 | 70:10 75:8 | 165:12,20,21 |
| 102:5 104:4 | 215:1 217:17 | 28:8 32:18 | 97:1 99:21 | 166:13 215:6 |
| 105:18 | 218:2 219:2 | 36:8 38:4 | 107:12 | **BEMPORAD** |
| 107:14,20 | **bear** 112:17 | 39:19 40:3 | 115:13 122:6 | 2:13 |
| 109:7 110:2 | **bearing** 102:11 | 41:17 42:13 | 126:10 135:9 | **benchmark** |
| 110:4,17 | **bears** 131:1 | 55:12 68:11 | 136:2 166:12 | 18:3,7 49:5,7 |
| 111:1 112:5 | **became** 9:2 | 69:1 73:3 | 207:6 210:11 | 49:9,17,22 |
| 112:6,9,22 | 11:22 13:15 | 80:10 83:4 | 210:13,16 | 50:4,5,18 |
| 113:2 115:20 | 14:22 32:3 | 84:17 88:5 | 212:16,22 | 51:21 52:17 |
| 116:20 117:2 | 218:22 | 89:12 90:6 | 213:1 215:18 | 52:20 53:18 |
| 121:4 124:6 | **because** 5:6 | 101:9 114:20 | **believe** 9:12 | 53:20 92:6 |
| 124:13,16 | 16:3 17:15 | 115:14 | 16:2 22:7 | 99:3 100:22 |
| 125:17 | 29:5 44:15 | 126:14 | 32:8 35:2,10 | 101:11 |
| 128:17 129:2 | 46:1,13 47:6 | 132:13 | 36:8 38:10 | 105:19 |
| 129:21 130:5 | 47:14 51:5 | 133:14 135:6 | 42:16 57:13 | 106:10 |
| 132:2 134:9 | 51:16 64:20 | 137:19 | 59:21 62:21 | 194:14,17,17 |
| 134:13 135:1 | 75:8 79:18 | 139:16 | 91:20 93:5 | 199:14 200:3 |
| 139:20 140:2 | 81:2 82:1 | 141:12 144:5 | 94:14 97:14 | 218:10 |
| 141:9 142:14 | 85:22 95:3 | 148:11 151:8 | 104:12 | **benchmarks** |
| 144:6 147:7 | 96:8 98:14 | 161:14 173:1 | 106:10 111:6 | 11:17 14:1 |
| 150:5,18,21 | 98:16 101:19 | 173:8,12,12 | 112:7 114:6 | 14:19 49:11 |
| 154:8 157:5 | 103:22,22 | 175:10 178:3 | 129:7 130:5 | 52:14,15 |
| 159:18 | 112:6 117:22 | 178:5 180:15 | 142:11,18 | 203:22 204:4 |
| 160:12 | 130:19 | 187:1 193:7 | 147:16 | **benefit** 32:13 |
| 163:17 | 137:16 | 198:4 213:8 | 149:14 | 138:22 139:3 |
| 164:15 | 139:14 | **before** 5:4,20 | 151:17 | **benefits** 31:10 |
| 167:14 | 141:13 149:6 | 54:2 80:22 | 154:17,20 | 32:5 36:2 |
| 169:15 172:8 | 151:20 | 90:8 93:11 | 157:10 | 177:20 |
| 172:17 | 171:18 | 119:20 | 170:17 172:3 | **BERMAN** 2:3 |
| 173:21,22 | 172:19 | 124:18 133:6 | 189:4 191:7 | **best** 6:15 21:11 |
| 175:11 | 178:22 179:7 | 164:20 | 192:19,22 | 49:18 84:9 |
| 176:12 179:9 | 183:22 | 169:21 | 193:11,15 | 99:11 112:16 |
| 179:12 | 189:20 201:4 | 175:19 | 198:18 206:3 | 142:12,22 |
| 180:11,18 | 201:21 207:8 | 177:20 | 211:15 | 156:1,8,9 |
| 182:21 183:1 | 212:13 213:8 | **begin** 46:4 | 212:21 | 198:15 |
| 183:15,16 | 213:17 218:2 | 85:18 | **believed** 40:19 | 221:17 |
| 185:15 187:6 | 218:20 | **beginning** 24:9 | **Belknap** 2:9 | 222:12,13 |

Edward Lemke                Confidential                January 11, 2005
                           Louisville, KY

| | | | | |
|---|---|---|---|---|
| Bethesda 8:2,4 | 181:17 189:1 | 124:18,21 | 72:14 73:14 | 51:1 53:1 |
| better 25:15 | billing 137:13 | 169:15,17,21 | 78:3 84:11 | 54:1 63:9 |
| 26:5 47:16 | bit 36:15 66:5 | 175:19 | 85:3,7 88:21 | 64:22 70:14 |
| 98:17 117:4 | 130:9 196:20 | 196:21 | 98:20 99:19 | 114:7 122:17 |
| 117:7,17,18 | blank 151:3 | breaker 216:5 | 103:19 104:4 | 144:14,22 |
| 118:2 125:12 | block 150:16 | breaking 83:1 | 106:4 110:7 | 145:9 167:6 |
| 176:3 | board 49:21 | brief 201:22 | 113:15 | 174:7 219:19 |
| between 6:6 | 204:2 | briefly 195:15 | 115:14,22 | CAMBRID... |
| 16:7,12 17:5 | Book 30:9 | broad 7:12 | 118:1 119:6 | 2:4 |
| 27:4 34:10 | 32:18,20 | 21:7 27:16 | 126:17 130:5 | came 10:4,6 |
| 39:7 48:18 | 33:8,13,18 | building 19:10 | 130:6 131:15 | 14:11 15:9 |
| 50:15 57:18 | 99:22 | 125:4 | 139:13 140:3 | 60:21 |
| 71:20 91:13 | bookkeeping | built 19:12 | 140:4 142:10 | can 6:12,22 |
| 92:14 94:19 | 143:20 | 20:12 40:12 | 146:10 152:3 | 10:22 11:12 |
| 114:21 | books 145:7 | 43:19 45:10 | 155:4,12,22 | 17:2 21:11 |
| 121:14,14 | 146:3 | 46:6 74:18 | 156:6 159:3 | 28:6 29:17 |
| 122:14 | bore 13:9 | 74:19,22 | 160:7,10 | 30:5 33:10 |
| 131:22 | both 50:19 | Bureau 7:16 | 164:6 167:15 | 34:14,17 |
| 138:15 141:1 | 51:6 58:8 | business 7:2,7 | 170:6 171:17 | 36:17 47:17 |
| 141:7 149:19 | 61:6 68:15 | 37:16,17 | 172:18 173:5 | 47:18 49:10 |
| 151:3 158:12 | 70:3 89:16 | 70:17 72:21 | 178:5 181:19 | 49:18 50:10 |
| 159:16 164:4 | 93:16 126:10 | 73:2 111:18 | 186:14 | 50:13 52:4 |
| 166:19 | 126:20 | 116:13 | 189:14 | 57:4 58:11 |
| 167:18 169:6 | bottom 70:18 | 117:10,19 | 208:17 212:6 | 59:14 63:11 |
| 178:6 182:16 | 84:19 131:21 | 123:22 124:1 | 212:16,20 | 65:2 67:2 |
| 185:7 207:9 | 165:16 | 124:2 139:22 | 219:6,17 | 68:20 70:3,6 |
| beyond 10:21 | 168:19 210:7 | 148:22 150:2 | 222:7 224:7 | 70:15,16 |
| 14:5 29:16 | bought 186:10 | 170:3 179:2 | buy 200:9,21 | 71:3 72:1,6,9 |
| 34:14 113:9 | bounds 173:9 | 179:4 186:11 | | 72:10 79:6 |
| 113:16 | Bowler 121:17 | 189:16 | ___ C ___ | 80:2,22 |
| 114:17 | 161:15 222:4 | 195:12,16,19 | C 2:1 224:1,1 | 82:11 88:9 |
| 118:19 143:7 | box 213:20 | 196:13 210:4 | calculated | 89:6 90:10 |
| 161:10 172:4 | boy 178:3 | 212:17 213:2 | 74:14 181:21 | 94:11,21 |
| bid 90:6 | 191:7 | 213:13,18 | calculation | 96:15 97:4 |
| bids 89:14,15 | Brad 195:5 | 216:5,9 | 43:6 | 98:9 101:1 |
| big 25:8 | BRADLEY | but 15:11 | calendar 24:10 | 102:1,5 |
| bigger 108:15 | 2:18 | 23:10 28:13 | call 40:11 44:1 | 105:5 106:2 |
| bill 88:19 89:4 | brand 129:18 | 30:16 31:21 | 73:15 115:3 | 112:16 120:1 |
| 189:18 | 165:18 | 37:3 49:9 | 128:4 183:17 | 122:4 126:4 |
| billed 29:5 | branded 29:7 | 54:10,15 | called 5:1 | 126:7 129:11 |
| 30:8 58:5 | 130:3,7 | 55:6,14 | 202:9 | 137:3 138:18 |
| 64:13 81:10 | break 6:19 | 56:14 57:17 | calls 14:4 | 139:10 140:2 |
| 179:21 | 38:6,8 66:6 | 63:10,17 | 31:12 34:9 | 141:16 |
| 180:15 | 80:2 83:2 | 65:7,21 68:9 | 36:6 50:8 | 142:19 144:3 |

| | | | | |
|---|---|---|---|---|
| 144:10,19 | 147:8,12 | 93:15 104:4 | 178:17 | chosen 167:17 |
| 145:2,21 | capitation | 104:5 126:19 | 183:19,21 | Circulations |
| 146:11 | 142:8 147:3 | 127:19 | 218:19 221:5 | 7:16 |
| 149:10 150:4 | 191:4 | 128:17 | changed 19:5,7 | circumstances |
| 151:10 | care 8:5 9:3 | 135:17 | 19:21,22 | 26:4 33:7 |
| 152:13 155:4 | 10:8,10 | 138:21 | 42:6 220:18 | cited 102:22 |
| 155:13 | 19:16 20:1 | 152:11,11 | 220:21 | CIVIL 1:2,21 |
| 156:17 157:9 | 103:9 139:14 | 189:17 209:1 | changes 185:9 | claim 15:8 |
| 162:7 163:3 | 190:19 | 213:4 214:21 | changing | 30:13 61:16 |
| 163:6,16 | career 63:12 | categories | 38:18 105:21 | 88:17,19,20 |
| 164:6 167:3 | 68:4 103:8 | 31:21 153:16 | 201:18 | 89:2,8 |
| 167:8,16 | Carolina 23:8 | 161:20 | characterize | 125:10 |
| 168:3,5,12,16 | 202:19 203:7 | category 173:5 | 146:10 | 126:15 128:1 |
| 169:8 178:8 | 205:15 | 189:11 | charge 40:9 | 177:21 |
| 183:15,16 | carrier 196:6,7 | causing 67:13 | 42:19 43:10 | claims 30:11 |
| 192:21 | 196:8,10 | caution 174:5 | 61:4 64:13 | 45:16 125:7 |
| 193:17,18,18 | carriers 23:18 | Center 7:18 | 73:10 75:1 | 125:8,8 |
| 193:19,21 | 24:4,12 | certain 32:22 | 81:10 83:18 | 126:13,17 |
| 194:2 196:19 | carveout 44:1 | 91:4 95:8 | 86:20,21 | 127:1,20 |
| 198:15 | 45:18 60:1 | 126:15 155:8 | 136:21 | 137:15,16 |
| 199:21 | case 5:20 44:5 | 161:10 | 137:14,17,20 | 177:5,19 |
| 200:15,16 | 47:8 49:7,10 | 166:11 177:9 | 186:17 | 184:10 |
| 201:2 210:12 | 49:16 52:21 | 177:19 | 187:10 205:5 | 189:16 190:1 |
| 210:17 214:2 | 77:3,5,6 84:2 | 185:16 | 209:16 | 207:10 |
| 220:2 222:7 | 88:18 89:6 | 203:22 204:6 | charges 21:21 | clarification |
| 222:11,21 | 89:18 95:8 | 204:7 | 61:6 136:15 | 48:15 127:8 |
| cannot 33:13 | 99:2 115:4 | certainly 26:12 | 160:10 | 201:14 |
| 51:13 55:14 | 115:20 122:6 | 53:13 60:2 | 179:21 184:6 | clarify 57:4 |
| 69:22 75:7 | 124:14 | 65:4,7 70:3 | 184:12 | 81:4 88:14 |
| 82:9 120:4 | 129:22 130:5 | 75:12 78:15 | 186:18 205:8 | 137:8,12 |
| 143:3,13 | 137:13 140:2 | 83:15 87:20 | check 205:19 | 139:10 |
| 149:8 164:21 | 156:3 208:21 | 100:2 107:22 | chemotherapy | 172:11 181:7 |
| 179:6 189:20 | 209:4 213:4 | 110:1 111:17 | 56:13 153:21 | 181:9 |
| 216:16 221:2 | 217:1 219:6 | 113:7 120:1 | 155:10 | Clarifying |
| can't 67:17 | cases 45:5 | 122:22 124:5 | 163:16 | 185:6 |
| 79:19 120:16 | 46:21 47:1,3 | 160:19 164:6 | Chicago 35:13 | clarity 140:21 |
| 128:20 | 47:21 48:8 | 169:8 179:16 | 202:17 203:5 | class 197:6 |
| 142:10 149:5 | 49:8,9 56:1 | 210:10 215:4 | choice 19:16 | clause 142:20 |
| 220:20 | 61:2 66:20 | certainty 27:10 | 20:1 84:10 | 144:11 145:5 |
| capitated 12:8 | 79:2 80:11 | 67:18 120:16 | choose 36:18 | 145:5,22 |
| 87:4,6,8 | 80:19 81:13 | certify 224:5 | 155:19 | 146:7 159:22 |
| 142:2,4,6,13 | 81:15,17 | cetera 138:6 | chose 156:10 | clauses 146:8 |
| 142:16 | 82:15,18 | chance 79:14 | 167:4 169:9 | clear 57:20 |
| 146:21 147:6 | 83:12 87:21 | change 64:19 | 194:15 | 167:14 204:1 |

Edward Lemke                 Confidential                January 11, 2005
                             Louisville, KY

9

clearly 209:11
client 34:19
clients 141:2
  203:12
client's 36:7
  162:17
  188:22
clinic 103:8
  108:19
close 18:12
  39:1 178:8
  212:3 213:7
closer 82:13
CMS 24:9,13
  38:17 128:14
  128:21
code 29:2,5,11
  30:8 45:20
  53:5 60:1
  125:11
  127:10
  128:15
  129:17,22
codes 28:8
  44:6,19
  56:14
coding 28:17
Cohen 2:13 3:6
  195:6 202:1
  202:3,7
  208:4 211:2
  211:6
colloquy 72:5
column 135:20
  153:11
  165:19 175:6
  175:7 176:16
  176:19 177:3
  177:13
  178:13 182:2
  182:7,9
  183:8,12
combination
  29:8 140:12

come 40:21
  66:19 68:10
  91:9 109:15
  109:16
  172:20 175:1
  177:21
  186:12
  190:16
comes 5:1
  48:18 70:18
  91:18 94:18
  96:1,10
  126:12
comfortable
  101:11
coming 32:18
  36:15 53:14
  89:20 97:16
command 26:5
commenting
  144:6
commercial
  138:6,6
  141:10,12
COMMISSI...
  224:18
common
  102:19 129:7
  179:10 204:1
  204:4 213:18
commonly
  181:11
communicati...
  91:12 161:13
  162:18
community
  96:6 168:22
compare
  125:16 126:9
comparison
  18:8 19:12
  111:1
comparisons
  111:5

compel 202:18
compels
  202:16
compensate
  199:8
competency
  130:10
competing
  35:20
competitive
  5:7 35:5,15
  50:20 97:10
  110:22 111:5
  114:8 140:5
  151:16,22
  202:9,14,15
  203:13
  208:10
competitively
  152:7 206:7
  220:1
competitor
  111:18,19
competitors
  111:14
  116:17
  117:19 130:3
complaint
  102:19,21
complete 73:7
component
  57:11 58:1,2
  58:3 61:12
  70:12 86:14
  86:15 88:1,2
  89:5,8,9,10
  92:15,16
  94:8 96:11
  96:14 97:6
  97:19 109:3
  113:18,19
  198:5 209:8
components
  198:12

composed 9:4
comprehensi...
  117:6 179:10
comprise 43:5
concerned
  113:11
concerning
  34:13 36:10
  121:19 133:3
  145:11
  158:17
  161:13,18
  162:18
  173:13 189:7
concession
  139:17
CONCLUD...
  223:9
conclusion
  63:9 144:14
  144:22
  145:10
conduct
  144:11,20
conducted
  193:5
conducting
  112:20
confer 88:9
  137:3 181:2
conferred
  88:13 137:7
  181:6
CONFERS
  88:11 137:5
  181:5
confidence
  218:13
confidential
  1:9 5:8
conote 213:4
consecutive
  178:5
consent 34:13

36:9 118:22
  133:2 143:18
  145:10 157:3
  158:16
  161:17 189:6
consented
  173:6
Conservation
  7:21
consider 54:13
  207:16
consideration
  64:4
considered
  35:2 41:15
  115:13
  166:18
consistent
  158:18
consituted
  221:19
constitute
  224:8
constitutes
  180:20
consultant
  111:10
contact 89:21
  90:12,21
contacts 90:5
contain 59:22
  95:9 200:8
  200:20
contained
  175:6
contains
  219:22
content 121:19
context 6:4
  12:6 38:15
  190:16 191:5
  193:7
continue
  158:21 159:7

Edward Lemke                    Confidential                    January 11, 2005
                             Louisville, KY

10

| | | | | |
|---|---|---|---|---|
| 162:14 163:1 | 179:15 | 87:12,14,17 | 18:16 25:16 | 170:20 |
| 172:5 175:10 | 180:20 | 101:2 112:12 | 25:18 26:2,3 | 171:14,20 |
| 206:2 | 183:21 | 116:3,5 | 26:7,9,13 | 174:21 |
| **continues** | 185:19 188:2 | 118:10,14 | 27:18,20 | 179:18 |
| 129:8 | 191:1,3,9 | 133:19 134:1 | 28:7,14,22 | 181:18 184:1 |
| **continuing** | 193:8 203:17 | 141:6 142:4 | 29:8,13 30:3 | 184:22 185:4 |
| 37:3 | 210:5,13,18 | 142:7 143:2 | 30:4 31:2 | 185:18 |
| **continuously** | 216:14 217:4 | 146:8 147:12 | 37:18 38:13 | 186:19 |
| 19:1 | 217:19 | 149:22 156:7 | 38:14 41:8 | 187:10,11,15 |
| **contract** 3:16 | 218:19 | 169:22 171:9 | 42:4 43:11 | 188:9,11 |
| 3:18 6:5 8:1 | **contracted** | 171:9,16 | 43:12 47:12 | 192:3 193:22 |
| 19:11 22:20 | 140:7 177:8 | 172:10,11,13 | 48:1,4,11 | 194:10 |
| 22:20,22,22 | 186:17 187:9 | 173:19 183:1 | 49:2,3,5,12 | 197:20 198:1 |
| 24:19,22 | 205:5 209:16 | 183:4 203:19 | 49:14 50:16 | 198:2 199:11 |
| 27:3 45:16 | **contracting** | 217:14 | 50:22 54:20 | 200:5 201:11 |
| 46:15 50:1 | 20:2 40:13 | 221:11 | 55:3,7,10 | 208:18 209:3 |
| 55:8,9 56:10 | 44:1 45:17 | **contractual** | 58:16 59:7 | 209:12,18,19 |
| 56:11 58:6 | 56:6 98:6,9 | 62:22 205:13 | 61:8 63:3,19 | 210:5 211:12 |
| 58:18 59:11 | 219:20 | **contractually** | 64:14,15 | 212:1 213:15 |
| 59:12,16 | **contractor** | 49:11 | 76:3,17 | 214:8,17,20 |
| 61:1 62:3 | 90:15,18 | **control** 25:6 | 83:14,19 | 215:3 216:11 |
| 63:15 70:4 | 91:8,14 | 60:22 149:7 | 84:21 86:3 | 217:2,5 |
| 76:20 77:6,6 | 152:3 218:22 | 171:19 | 88:3 89:11 | 218:4,8,21 |
| 81:11,22 | **contractors** | 186:13 | 96:12 97:8 | 219:17 |
| 82:1 83:10 | 19:15 48:16 | **conversation** | 101:2 102:3 | 221:14,21 |
| 86:17 88:7 | 48:19 99:4 | 88:15 137:8 | 106:5 108:22 | 224:8 |
| 89:9 90:9,11 | 126:3 | 181:8 190:20 | 109:1 113:2 | **correctly** 80:13 |
| 92:15,16 | **contractor's** | 190:22 | 115:19 | 141:22 |
| 93:9,10 | 91:9 | **conversations** | 117:11 | 211:10 |
| 95:14 109:5 | **contracts** 12:8 | 174:11 | 122:10,11,16 | **correspond** |
| 109:20 | 12:11 15:3 | 194:21 | 123:11 124:7 | 28:14 127:6 |
| 115:18,21 | 17:17,17 | **copies** 170:7 | 124:8,12,14 | 128:7,13,18 |
| 125:5 133:17 | 37:10 40:8,9 | **copy** 148:21 | 125:19 127:7 | **corresponde...** |
| 136:4 140:14 | 40:11,17,21 | 149:11,19 | 127:21 128:9 | 38:17 |
| 140:16 143:5 | 41:6 42:22 | 168:8 175:1 | 129:12 130:3 | **Corum** 195:6,7 |
| 144:7 145:12 | 43:4 47:11 | **corporate** | 132:1 135:10 | 195:9,13 |
| 147:14 | 55:12 57:15 | 34:10 | 135:21,22 | **cost** 13:13 |
| 150:19 | 59:22 60:3 | **Corporation** | 140:10 | 38:12 47:19 |
| 154:16 155:5 | 63:1,4 67:15 | 7:22 | 144:20 145:8 | 54:14 65:10 |
| 155:16,18 | 77:11,13 | **correct** 10:3,7 | 147:13 | 66:13 68:7 |
| 156:11,15 | 78:21 82:1,3 | 12:15,22 | 150:19 156:1 | 77:14 78:22 |
| 157:2,4,15,16 | 82:12 83:7 | 13:1,3 14:14 | 156:8,20 | 79:11,17,17 |
| 158:12 | 86:16,19,21 | 15:6,13,14 | 168:14,15 | 94:22 95:1 |
| 160:18 | 87:1,2,8,10 | 17:8,21 18:4 | 169:10 170:3 | 97:15,22 |

Edward Lemke                    Confidential                    January 11, 2005
Louisville, KY

11

| | | | | |
|---|---|---|---|---|
| 98:11 99:20 | 219:16 | 88:11,14 | 220:14,15,16 | 99:14 112:16 |
| 104:15,18 | 221:13,20 | 114:22 133:5 | **currently** | 118:18 |
| 105:1 121:7 | **could** 7:12 | 137:5,7,9 | 20:16,18 | 119:19 |
| 139:4 141:11 | 13:6 14:18 | 148:7,7 | 33:13 35:22 | 198:15 |
| 155:21 | 26:20 27:10 | 154:5 173:16 | 41:7,9 42:3 | **dealing** 26:18 |
| 156:18,21 | 27:14 28:21 | 174:11 181:5 | 46:9 47:6 | 78:8,10 |
| 157:6 163:19 | 29:2,4,7 49:1 | 181:7 194:22 | 113:13 | 109:2 |
| 164:1 197:22 | 52:8,10,15,16 | 224:13 | 179:14 185:9 | **dealings** 24:11 |
| 201:5 203:1 | 62:2 67:4 | **counsel's** | **customary** | 36:2 37:10 |
| 203:2,14 | 68:3 70:11 | 114:11 | 136:15,21 | **deals** 121:13 |
| 207:11 | 74:18,19,20 | **country** 23:6 | 137:14,17,17 | **dealt** 44:19 |
| 214:11 | 74:21,22 | 78:3 107:21 | 137:20 | **decade** 118:18 |
| 215:16 219:4 | 77:10,13 | 184:6 192:14 | 160:10 | **December** |
| **costing** 214:2 | 78:16 87:6 | **COUNTY** | 184:11 | 168:13 |
| **costs** 13:21 | 88:16 92:20 | 224:3 | **cut** 220:13 | **decide** 81:1 |
| 18:8 62:6,9 | 99:19 105:18 | **couple** 202:2 | | **decided** 88:6 |
| 62:15 63:2,7 | 109:15,16 | **course** 86:1 | **D** | **deciding** 80:16 |
| 64:9,14 65:4 | 112:4 116:8 | 133:20,21 | **D** 2:12,18 3:1 | 98:22 |
| 65:5,21 | 116:9,10 | 148:22 150:1 | **Dallas** 35:13 | **decision** 30:7 |
| 67:13 68:1 | 119:11 | 155:22 170:3 | **damage** 151:21 | 70:17 90:4 |
| 69:19 77:12 | 124:13,16 | **COURT** 1:1 | **DANNENB...** | 110:13 |
| 79:13,20,20 | 129:21 130:2 | **cover** 66:2 | 2:13 | 112:19 |
| 80:7,10 95:9 | 130:7 134:18 | 69:18 102:17 | **data** 30:9 33:6 | **decline** 107:14 |
| 95:12 97:1 | 143:10 | 103:11 130:2 | 33:8,12,14,16 | **default** 45:15 |
| 99:10 100:2 | 148:19 | 168:12 214:3 | 100:7 111:6 | 48:6 61:14 |
| 100:8,14 | 151:20,21 | 214:12 | 111:8,18 | 61:18,21 |
| 101:14 | 155:18 | **covered** 104:10 | 125:9,12 | 207:10 |
| 102:17 | 156:10 | 104:13 | 126:6,15 | **defaults** 45:21 |
| 103:12 104:9 | 159:14 167:3 | 107:12 | 137:15,16 | **defendant** 2:7 |
| 104:12 | 167:16 168:4 | 129:21 141:7 | **database** 19:11 | 5:19 |
| 107:12 124:4 | 169:8 174:18 | **covers** 213:20 | 125:4,6,15,20 | **defendants** |
| 124:7 139:8 | 176:15 | 214:10 | 125:22 126:4 | 1:13 5:2 |
| 143:22 | 182:21 | **CPT** 44:18 | 126:14,16 | 132:18,20 |
| 153:22 154:2 | 185:13,15,16 | 125:11 | **databases** | 133:2 166:4 |
| 154:3,7,11,16 | 189:14 | **create** 176:10 | 23:19 24:5 | **define** 28:18 |
| 155:7,11 | 193:12 194:8 | 186:16 | **date** 164:19 | **defined** 154:9 |
| 156:7 161:13 | 194:12,15,19 | **created** 175:11 | 219:17 | **definitely** |
| 162:19 | 209:5 212:17 | **credible** 111:6 | 221:10 | 68:19 93:9 |
| 165:10,20 | 217:20 220:4 | **current** 21:18 | **day** 53:10 | 216:16 |
| 192:13,14 | 220:5 | 41:16 182:19 | 68:10 105:16 | **definitions** |
| 199:10 | **couldn't** 43:6 | 182:22 | 148:12 | 28:18 |
| 201:17 | 218:6 | 183:16 | 153:12,22 | **definitive** 93:6 |
| 213:21 214:3 | **counsel** 36:16 | 185:10 | 157:6 224:16 | **definitively** |
| 214:12,13 | 37:3 72:14 | 219:20 | **deal** 49:18 73:3 | 216:19 |

Edward Lemke                Confidential                January 11, 2005
                            Louisville, KY

12

| | | | | |
|---|---|---|---|---|
| **Degree** 7:7 | 97:11 188:21 | 11:14,15,16 | 175:12,21 | **discount** 13:5 |
| **deliver** 38:1 | 216:10 | 12:6,10 13:7 | 202:10,10 | 92:8 102:6 |
| **demands** 95:22 | **description** | 17:9 19:5,20 | 214:4 | **discounts** |
| 132:20 | 3:10 128:4 | 31:8 32:21 | **differential** | 221:19 |
| **denominator** | 135:16 217:7 | 38:15,19 | 27:17 109:4 | **discover** 63:6 |
| 82:21 | 217:9 | 46:1 57:2 | 109:13 139:1 | **discuss** 87:7 |
| **denotes** 176:7 | **designate** 5:5 | 70:21 72:3 | 140:4 141:7 | 195:13 |
| **department** | **designated** | 79:1 100:22 | 202:22 | **discussed** 86:5 |
| 161:3,5 | 28:8 34:12 | 116:22 131:8 | **differentiated** | 93:18 146:12 |
| **depend** 27:2 | **designations** | 141:22 | 110:6 | 170:9 183:10 |
| **dependent** | 5:11 | 159:15 | **differentiation** | 185:21 |
| 203:2 | **designed** 44:18 | 163:22 174:3 | 138:15 | 198:10 |
| **depending** | 74:10 179:12 | 174:11,15,17 | 140:19 | **discusses** |
| 26:17 102:9 | **desire** 109:13 | 178:4 191:5 | **differently** | 155:12 |
| 124:10 | **desired** 85:9 | 191:12,17 | 192:13 | **discussing** |
| 212:14 | **detail** 91:21 | 194:21 195:2 | **direct** 11:1,18 | 83:4 89:13 |
| **Depends** 62:2 | 217:20 | 195:13,16 | 11:19 12:19 | 132:13 |
| **deponent** | **detailed** 213:9 | 204:14,20 | 77:12 80:8 | 133:14 |
| 118:21 224:9 | 219:1 | 212:21 | 80:16 163:10 | **discussion** |
| **deposed** 5:3,20 | **determination** | **didn't** 43:6 | 184:2 185:7 | 39:16 69:5 |
| 5:22 | 75:18 206:4 | 187:6 207:4 | 185:7,19 | 100:19 |
| **deposition** 1:9 | 208:16 | 215:10 | 188:2,8 | 157:19 171:5 |
| 1:18,20 5:6 | **determined** | **diem** 87:2,11 | 209:16 | 175:17 |
| 6:2,4,8,18 | 204:22 | 121:4 | **directly** 15:12 | 190:18 191:8 |
| 10:22 36:6 | **determines** | **difference** | 15:16 63:13 | **dispensing** |
| 36:10 114:7 | 89:17 | 33:17,21 | 78:22 110:1 | 153:22 |
| 115:3 121:13 | **determining** | 34:1 71:10 | 189:2 | 156:19 157:6 |
| 121:16 131:3 | 97:6 164:3 | 71:20 74:2 | **director** 7:17 | 189:3 |
| 143:13 | 186:15 198:5 | 94:19 141:1 | 8:2,8,12,19 | **dispute** 6:5 |
| 148:14 149:3 | **develop** 97:20 | 141:13 | 9:21 10:14 | **distinction** |
| 151:19 | **developed** | 182:16 185:6 | 18:20 103:9 | 88:18 92:14 |
| 158:15 | 20:12 44:3 | 203:13 | 125:3 | 93:12 121:14 |
| 161:11 172:5 | 45:22 99:21 | 205:21 207:9 | **disabled** 8:6 | **DISTRICT** 1:1 |
| 173:9,17 | **developing** | 207:16,17 | **disagree** 31:19 | 1:2 |
| 174:3,12,20 | 33:11 | **different** 16:20 | 36:13 71:6 | **divided** 178:14 |
| 187:4 194:20 | **development** | 23:9 30:16 | 72:20 115:11 | **doctor** 203:10 |
| 195:14 223:9 | 44:17 75:8 | 57:6 60:3 | 119:3 122:2 | 206:8 207:20 |
| 224:5,9 | **diagnostically** | 61:22 66:5 | 159:2 | **doctors** 198:21 |
| **derived** 111:8 | 121:3 | 77:4 82:2 | **disclose** 62:14 | 199:9 200:9 |
| 212:15 | **dictates** 61:1,1 | 85:2 92:6 | 63:2 | 200:21 |
| **describe** 6:22 | 79:16 | 98:4 130:7 | **disclosed** 152:1 | 203:17,20 |
| 7:12 21:11 | **did** 7:5,9 8:20 | 138:19,20 | **disclosure** | 204:2 |
| 220:19 | 9:11,13,22 | 139:1 149:16 | 114:8 151:21 | **document** 1:6 |
| **described** | 10:18 11:3,6 | 160:7 167:15 | 156:6 | 41:14,15 |

Edward Lemke                Confidential                January 11, 2005
                          Louisville, KY

| | | | | |
|---|---|---|---|---|
| 130:22 | 107:18 108:6 | 54:8 87:11 | **dose** 153:12 | 56:3 57:11 |
| 131:13,17,21 | 109:12,22 | 99:20 176:20 | **doubt** 103:3,16 | 57:21 58:3 |
| 133:7 137:1 | 110:21 111:4 | 177:14 | 103:21 104:5 | 60:1 70:12 |
| 141:19 | 112:1 114:2 | 180:12 | 104:6,7,8 | 76:18 86:15 |
| 147:18 148:9 | 114:15,19 | **dollars** 68:11 | **doubting** | 88:1,19,21 |
| 148:20,21 | 115:3 116:4 | 205:18 | 103:6,18 | 89:8,10 |
| 149:1,6,11 | 116:15 119:4 | **domain** 164:7 | **down** 6:12 | 92:14 96:13 |
| 150:9 151:8 | 121:5,18 | **done** 39:8 54:6 | 48:18 52:9 | 101:11 |
| 152:22 | 124:18 | 63:21 68:10 | 52:13 79:10 | 118:10 121:6 |
| 155:10 | 125:22 126:1 | 69:1 77:18 | 91:21 127:2 | 129:12,16,19 |
| 157:17 158:5 | 126:9 129:18 | 93:8 110:3 | 138:7 154:2 | 130:3,12,13 |
| 158:9 159:1 | 138:22 142:1 | 121:12 | 171:22 194:9 | 130:15,16 |
| 159:9 160:21 | 142:6,11 | 156:11 | 194:16 | 135:6 136:18 |
| 162:15 163:6 | 155:6 156:3 | 157:17 | 208:12 | 142:15 |
| 164:20 165:8 | 156:6 158:16 | 169:15 | 217:14,22 | 163:19 164:1 |
| 167:22 168:2 | 161:17 164:2 | 185:13 | 218:20 220:5 | 168:21 |
| 168:5 169:13 | 173:3 177:17 | 219:17 221:5 | **draw** 131:14 | 197:19,22 |
| 174:13,15,18 | 178:22 179:1 | **don't** 17:4 32:8 | 132:7 134:18 | 199:10,15 |
| 174:19 178:4 | 183:14 184:2 | 37:13 41:19 | 148:19 | 200:3,9,21 |
| 178:15 179:5 | 187:16 | 55:2 65:12 | 150:13 | 201:6 202:12 |
| 181:10 187:6 | 188:17 190:1 | 72:2 75:13 | 152:13 | 203:1,3,14 |
| 187:7 | 190:2 192:2 | 75:14 76:5,7 | 159:14,19 | 205:15,15,17 |
| **documentati...** | 192:5 202:21 | 76:14 79:18 | 165:7 168:16 | 205:18,19 |
| 154:11 213:9 | 202:22 203:4 | 84:4 91:20 | 168:18 | 217:2,15,18 |
| **documents** | 203:12,16,17 | 93:5 101:16 | **DRG** 121:2 | 218:7,20,20 |
| 88:6 124:18 | 214:1,3 | 101:17 | **drive** 89:20 | 219:16 |
| 132:17 133:4 | 216:20 | 106:15 107:2 | 95:6 96:4 | **drugs** 10:19 |
| 158:18 159:8 | **doesn't** 51:7 | 114:6 120:14 | 108:14 | 11:4,8 12:11 |
| 169:21,22 | 99:14,15 | 122:8 128:21 | **driven** 94:21 | 12:13,20 |
| 170:2 | 102:17 | 129:3 140:15 | 97:2 141:13 | 13:8 14:13 |
| **does** 4:4 22:4,4 | 103:11,13 | 147:16,16 | **drives** 72:22 | 14:18 15:4 |
| 29:5 32:21 | 145:10 | 151:17 | 90:4 95:9,18 | 15:12,15,19 |
| 33:1,4 34:2 | 147:15 | 155:12 157:3 | 96:3 98:16 | 16:8,9,13,14 |
| 34:13,20,22 | 155:22 157:5 | 168:7 169:14 | 139:21 | 16:19,20 |
| 36:9 48:13 | 166:2 182:9 | 171:12 174:1 | **drug** 5:19 | 17:6,7,18 |
| 58:7 60:11 | 189:6 196:9 | 179:7 181:14 | 13:21 15:13 | 18:4,12 20:8 |
| 62:4,14,18 | 198:9 205:3 | 184:19 196:2 | 15:19 23:9 | 21:2,14 |
| 65:15 74:12 | **doing** 9:19 | 196:2 197:8 | 28:4,7,9,9,22 | 23:11 24:1 |
| 85:18 88:17 | 68:21 | 205:11 | 29:2,4 30:8 | 24:12 28:2,9 |
| 88:20 89:13 | **dollar** 11:16,19 | 211:11,16 | 30:14 31:9 | 28:12,21 |
| 89:13,14 | 13:22 14:14 | 217:22 | 32:4,12 39:4 | 29:7,7,15,16 |
| 90:7,21 96:4 | 14:19 15:22 | 218:20 | 39:11 47:22 | 30:16 33:17 |
| 99:16 100:1 | 16:3 52:19 | **dosage** 129:17 | 48:3 52:12 | 38:1,18 39:1 |
| 103:14 | 53:4,10,21 | 129:20 | 53:5,15 54:9 | 39:21 40:3 |

Henderson Legal Services
(202) 220-4158

Edward Lemke      Confidential      January 11, 2005
Louisville, KY

14

| | | | | |
|---|---|---|---|---|
| 40:10,16 | 166:3,12 | 132:10 | 85:19 108:7 | 54:22 55:12 |
| 43:10 44:8,9 | 167:19 169:5 | 133:12 160:1 | 108:9 123:10 | 86:7 |
| 44:19 46:19 | 170:12 171:2 | 160:4 224:1 | 183:2 220:22 | **employee** |
| 56:15,20 | 171:17 176:1 | 224:1 | **effective** 121:7 | 224:12 |
| 57:12,15 | 179:17 180:7 | **each** 28:13,18 | **effort** 95:9 | **employment** |
| 58:9 59:4,16 | 180:14 | 86:11 110:8 | **eight** 165:8 | 7:13 119:16 |
| 60:5,17 61:6 | 183:20 190:3 | 203:20 218:7 | **eighty-five** | 133:20 |
| 62:10,15,19 | 191:19 | 218:7 219:10 | 214:20 | 170:10 |
| 63:2 64:3,5 | 195:17 | **earlier** 14:9 | 215:12 216:1 | 193:10 |
| 64:18 65:8 | 197:13,17 | 23:21 38:10 | **either** 44:4 | **employs** 77:21 |
| 65:17,18 | 198:7 199:2 | 50:12 58:12 | 49:10,16 | 86:6 |
| 66:9 68:1 | 199:8 203:12 | 78:21 94:14 | 62:2 77:10 | **enable** 110:18 |
| 77:8,12,14 | 205:8 208:18 | 96:14 100:1 | 81:16 90:6 | **enables** 118:1 |
| 81:6 82:17 | 208:22 | 105:16 | 109:15 | 125:15 |
| 83:8 88:19 | 210:19 211:1 | 108:16 109:4 | 123:11 | 139:22 |
| 91:18 93:19 | 211:12,14,17 | 110:17 122:8 | 185:10 | 218:10 |
| 94:12,18,22 | 212:5 213:1 | 126:22 | 193:20 | **encompass** |
| 95:4,8 96:19 | 213:6 214:6 | 127:13 142:1 | **elects** 85:12 | 58:8 142:8 |
| 97:1,8,18 | 215:1,5,11,14 | 154:14 | **elements** 85:21 | 207:4 |
| 99:14,21 | 215:19 216:2 | 160:16 | 126:7,15 | **encompassed** |
| 100:2,3,9,15 | 218:1,5,18 | 170:13 171:7 | **elicited** 135:2 | 119:5 122:3 |
| 104:14,19,20 | 219:4,9,10 | 184:18 | **eliminate** | 143:15 |
| 105:4,18 | 221:8,13 | 185:22 192:1 | 109:22 | 162:20 166:5 |
| 106:17 107:4 | **drug's** 29:12 | 192:15 197:5 | 126:15 | **encompassing** |
| 118:17 | 30:17 49:8 | 210:3 211:11 | **else** 19:14,18 | 206:19 207:2 |
| 120:18 121:1 | **duly** 5:2 224:6 | 211:15 | 40:14 71:13 | **encounter** |
| 122:10,15,16 | **during** 6:18 | **early** 166:10 | 75:15 76:15 | 207:11 |
| 123:1,4,18,20 | 14:16 17:19 | **easier** 117:4 | 87:12 106:11 | **end** 7:20 50:21 |
| 124:11,11 | 24:17 28:1 | 159:4 | 107:5 108:8 | 51:9,14 |
| 126:10,20 | 68:5,14 | **economically** | 134:5 172:14 | 53:10,21 |
| 127:6 130:8 | 92:13 102:13 | 203:21 | 176:8,8 | 54:10 68:17 |
| 134:22 135:1 | 107:12 | **Ed** 131:6 168:6 | 180:8,15 | 68:18 78:9 |
| 135:4,9 | 178:19 187:3 | 196:16 197:4 | 195:2 211:18 | 78:12 85:9 |
| 136:2 139:8 | 190:18 | 201:14 220:4 | 212:1,9,14 | 98:3 192:21 |
| 142:5,9 | **duties** 149:7 | 223:4 | 216:6,13 | 193:22 194:8 |
| 143:11 147:8 | **dynamic** 97:10 | **educate** 173:16 | 223:4 | 194:16 |
| 153:16 | 202:9,14,15 | **educated** 20:19 | **emphasis** 7:7 | **ended** 193:13 |
| 154:17 | **dynamics** | 189:21 | 46:3 | **ends** 85:15 |
| 155:12 | 203:14 | **educational** | **employ** 82:18 | 96:9 |
| 160:11 | 208:10 | 7:1 | 86:16 164:20 | **Energy** 7:21 |
| 161:14 | | **EDWARD** | **employed** 27:9 | **engage** 80:7 |
| 162:19 | **— E —** | 1:10,18 2:2 | 46:22 47:2 | **engaging** 79:3 |
| 163:16 | **E** 2:1,1 3:1,9 | 3:2 5:1 224:6 | 48:11 49:7 | **enhance** 65:22 |
| 165:17 166:3 | 56:13 132:4 | **effect** 37:4 | 49:22 52:21 | 125:9 |

Edward Lemke                    Confidential                    January 11, 2005
                               Louisville, KY

| | | | | |
|---|---|---|---|---|
| **enough** 85:20 | 163:17 | 206:7 | 147:19,22 | 224:18 |
| 94:16 101:9 | 167:21 | **EXAMINAT...** | 150:8 157:20 | **explain** 30:5 |
| 112:3 147:9 | **establishes** | 3:4,5,6,7 | 157:22 162:8 | 85:1,4,21 |
| 147:15 | 23:5 | 5:14 197:2 | 162:9 168:6 | 96:17 140:18 |
| 201:22 | **establishing** | 202:6 208:7 | 168:9 174:20 | 192:3,5,9 |
| **enrollees** 199:1 | 219:15 | **examine** 146:1 | 175:5 204:7 | 201:2 207:17 |
| **ensure** 111:13 | **estimate** 57:18 | **example** 25:10 | 209:5 | 208:20 |
| 149:18 | 212:3 | 29:1 56:18 | **Exhibits** | **explaining** |
| **entailed** | **et** 138:6 | 70:9 77:16 | 169:21 | 83:9 |
| 205:16 | **evaluations** | 109:8 130:2 | **exist** 27:13 | **explanation** |
| **enter** 67:14 | 144:7 | 160:15 192:8 | 89:19 99:15 | 95:14 |
| **entire** 20:1 | **even** 18:12 | 209:10 | 99:15 101:1 | **explicitly** 36:5 |
| 56:9 78:16 | 50:4 65:12 | 210:16 | 118:14 120:5 | 36:22 |
| 180:13 | 66:6 83:15 | **except** 220:10 | 120:10,15 | **expressed** |
| **entirely** 37:15 | 83:18 97:15 | **excess** 217:15 | 142:11 | 14:18 105:18 |
| 52:6 75:1 | 156:17 213:4 | **exchange** | 171:18 | 182:10 |
| 107:5 114:19 | 213:6 | 132:22 | 172:10 | **expresses** |
| 211:18 | **event** 211:5 | **excluded** 36:6 | **existed** 27:14 | 165:11 |
| **entities** 170:14 | **eventually** | 36:8,22 | 30:20,22 | **expressly** |
| **entitled** 175:6 | 53:19 | 121:17 | 120:8,12 | 155:6 156:18 |
| 176:19 | **ever** 5:20 32:8 | 161:15 | **existence** 120:1 | **extends** 14:5 |
| **entity** 18:11 | 60:11 62:4,8 | 188:21 222:3 | 125:20 | **extensively** |
| 90:2,3 151:8 | 91:20 116:15 | **exclusion** | **exists** 20:17,18 | 126:5 |
| 162:4,6 | 133:17 141:9 | 118:16 | 78:17 122:6 | **extent** 20:10 |
| **entry** 176:16 | 143:4 146:6 | 132:15 | 217:21 | 20:14 29:15 |
| **equal** 207:15 | 146:15 | 148:13 | **expanded** 20:3 | 31:15 34:14 |
| 207:15 | 154:15 190:6 | 158:15 | 46:13 | 38:21 63:8 |
| **equally** 108:21 | 190:7 | 162:16 189:5 | **expectation** | 63:10,18 |
| 198:20 | **every** 84:2 | **exclusive** 116:2 | 122:13,22 | 64:8 65:21 |
| **equivalent** | 142:13 | **exclusively** | 123:10,15,17 | 71:11 92:13 |
| 125:10 | **everything** | 33:12 77:12 | 123:21,22 | 115:12 129:6 |
| **especially** | 51:18 126:12 | 105:9 121:16 | 124:4,6 | 130:16 |
| 24:11 46:2 | 180:15 | 213:14 | **expects** 198:21 | 132:19 |
| 191:11 | **exact** 57:17 | **EXCUSED** | **expense** 206:8 | 143:19 |
| **essence** 205:6 | 66:13 | 223:8 | **expensive** | 146:11 157:2 |
| **essentially** | **exactly** 122:9 | **executive** 9:21 | 203:6 | 159:3 160:8 |
| 78:6 140:4 | 217:5 | **exercised** | **experience** | 168:2 189:15 |
| **establish** 75:10 | **exaggerate** | 143:5 146:6 | 68:4 101:12 | 194:2 198:9 |
| 95:11 97:1 | 200:8 | **exercising** | 120:8 147:11 | 200:11 |
| 185:11 | **exaggerated** | 146:15 | 171:11 213:2 | 219:19 222:1 |
| 187:21 201:5 | 201:7 222:16 | **exhibit** 3:12,14 | 216:10 | **extract** 125:7 |
| **established** | **exaggerates** | 3:16,18,20,22 | **expertise** | **extreme** |
| 15:3 24:8 | 200:20 | 41:20,22 | 145:18 | 112:10 |
| 29:6 46:16 | **exaggerating** | 131:2,4 | **EXPIRES** | **eye** 68:16 |

Henderson Legal Services
(202) 220-4158