Exhibit 49

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3              CIVIL ACTION 01-CV-12257-PBS

 4

 5

 6     - - - - - - - - - - - - - - - - - - -

 7     IN RE:                              :

 8     PHARMACEUTICAL INDUSTRY AVERAGE      :

 9     WHOLESALE PRICE LITIGATION           :

10     - - - - - - - - - - - - - - - - - - -

11                    HIGHLY CONFIDENTIAL

12                    Richmond, Virginia

13                    January 5, 2005

14

15          Deposition upon oral examination of

16     DAVID B. MORRIS, taken on behalf of the Defendants,

17     before Heidi L. Jeffreys, RDR, CRR, a Notary Public for

18     the Commonwealth of Virginia at Large, commencing at

19     1:40 p.m. on the 5th day of January, 2005, at the law

20     offices of Anthem, Inc., 2235 Staples Mill Road, Suite

21     401, Richmond, Virginia.

22
```

EXHIBIT

David B. Morris  Highly Confidential  January 5, 2005
Richmond, VA

2 (Pages 2 to 5)

| | 2 |

```
1    Appearances:

2         On behalf of the Plaintiff: (By telephone)
3           ED NOTARGIACOMO, ESQUIRE
4           Hagens Berman
5           One Main Street
             Fourth Floor
6           Cambridge, Massachusetts 02142
7           (617) 482-3700
8
9         On behalf of the Defendants:
10          WILLIAM F. CAVANAUGH, ESQUIRE
11          Patterson, Belknap, Webb & Tyler, LLP
12          1133 Avenue of the Americas
13          New York, New York 10036
14          (212) 336-2000
15
16        On behalf of Anthem, Inc.:
17          JOHN B. NICHOLSON, ESQUIRE
18          2235 Staples Mill Road
19          Suite 401
20          Richmond, Virginia 23230
21          (804) 354-7697
22          In-house counsel
```

| | 3 |

```
1              INDEX
2
3              WITNESS
4    ON BEHALF OF THE DEFENDANTS:  Examination by:   Page
5    D. B. Morris          Mr. Cavanaugh      4
6
7
8              EXHIBITS
9
10   No.        Description          Page
11
12   Exhibit Morris 002  Integrated prescription drug program   18
13        master agreement dated 1-1-98
14
15   Exhibit Morris 003  Integrated prescription drug program   30
16        master agreement dated 1-1-01
17
18
19
20
21
22
```

| | 4 |

```
1              DAVID B. MORRIS, called as a witness,
2    having been first duly sworn, was examined and testified
3    as follows:
4              EXAMINATION
5    BY MR. CAVANAUGH:
6       Q.   Would you state your name.
7       A.   David B. Morris, M-O-R-R-I-S.
8            MR. NICHOLSON:  We'll have the same
9    statement on the record, Bill?
10           MR. CAVANAUGH:  Similar to the earlier
11   deposition, this deposition is being designated by
12   Anthem as highly confidential pursuant to the governing
13   protective order in this case.
14   BY MR. CAVANAUGH:
15      Q.   By whom are you employed, Mr. Morris?
16      A.   Anthem Blue Cross Blue Shield.
17      Q.   When did you join Anthem?
18      A.   I've been with the company 17 years, so,
19   '87, December of '87.
20      Q.   Could you give me, starting back in 1987,
21   the positions you've held within the company and then
22   just a brief summary of your responsibilities in those
```

| | 5 |

```
1    positions?
2       A.   I was a market research analyst for
3    approximately five years, and my responsibilities were
4    initiating market research, reviewing, analyzing market
5    research, conducting focus groups, stuff like that.
6            I moved to a position within health care
7    management.  I was like an operations research analyst.
8    That was doing -- no, sorry.  Outcomes research analyst.
9    I was doing outcomes research within health care
10   management.
11           And then probably about '97 I moved over
12   into my current position, which was within the pharmacy
13   management department, initially as a clinical
14   pharmacist doing things like utilization review,
15   formulary management, prior authorization.
16           I moved into the manager's position within
17   the department about four years ago, so about 2001.  At
18   this point I'm responsible for the entire operations of
19   the department.
20      Q.   And what is the title of the department?
21      A.   It's still pharmacy management.  We're
22   under the health care management division.  We
```

David B. Morris      Highly Confidential      January 5, 2005
Richmond, VA

3 (Pages 6 to 9)

**Page 6**

1    coordinate pharmacy benefits for all of our customers,
2    internal as well as external. That includes customer
3    support, training, managing, again, utilization review,
4    prior authorization, appeals, reconsiderations, the
5    benefit overall.
6        Q.    And you would have held that position since
7    1997 -- well, you would have been in that department
8    since 1997?
9        A.    Roughly.
10       Q.    What group within Anthem is responsible for
11   negotiating the pharmacy networks that are utilized by
12   the various Anthem plans?
13       A.    In '97 it was my department solely
14   responsible -- it was my department's responsibility to
15   do that through our pharmacy benefits manager.
16             Roles and responsibilities have -- you
17   know, it's like a moving target. They have changed over
18   the years, and now it's probably -- it's still my
19   department, but we have input, probably, from the
20   medical director, the chief health care officer, as well
21   as probably product strategy, sales and marketing as
22   well.

**Page 7**

1        Q.    And to whom do you report?
2        A.    I report to a vice president, who reports
3    to the chief health care officer.
4        Q.    Okay. The vice president is responsible
5    for what department or group?
6        A.    He's responsible for pharmacy management
7    department as well as an area called medical informatics
8    Either "infomatics" or "informatics." I've heard it
9    pronounced both ways.
10       Q.    And to whom does that person report?
11       A.    He reports to the chief health care
12   officer.
13       Q.    And who is that?
14       A.    Randy Axelrod.
15       Q.    Okay. Am I correct that over the years
16   Anthem has had contracts with PAID Prescriptions for the
17   establishment of pharmacy networks?
18       A.    I'm sorry. Repeat the first part of the
19   question again.
20       Q.    Well, I'll ask it more simply.
21             Am I correct that over the years Anthem has
22   had contracts with a group known as PAID Prescriptions?

**Page 8**

1        A.    That's correct.
2             MR. NICHOLSON: And, as in the last
3    deposition, "Anthem" refers to the Virginia entity which
4    was previously Trigon and had other names before that,
5    during the time period --
6             MR. CAVANAUGH: When I say "Anthem" I'm
7    referring back to the organization you joined back in
8    1987 to the one that sends you a paycheck today.
9             THE WITNESS: Okay.
10   BY MR. CAVANAUGH:
11       Q.    And is one of the things that PAID
12   Prescriptions provides to Anthem pursuant to those
13   agreements a network of retail pharmacies?
14       A.    Yes.
15       Q.    To what extent over the years have you been
16   involved in the negotiations with PAID over those -- the
17   terms of those agreements?
18             MR. NICHOLSON: Referring to the PBM
19   agreements themselves?
20             MR. CAVANAUGH: Yes.
21             THE WITNESS: There was an existing
22   agreement when I came into the department. I played no

**Page 9**

1    role in the negotiation of those network terms.
2             We did renegotiate the network, and I was
3    involved with that, I think, during the year 2000. We
4    actually went out to bid and PAID -- or Merck-Medco at
5    the time, which is now Medco Health Solutions --
6    basically as part of our contract re-do. You know, we
7    wanted a new network with different terms, and I was
8    involved with that.
9        Q.    Why did you want a new network?
10       A.    Deeper discounts.
11       Q.    Deeper discounts on the reimbursement to
12   the pharmacy?
13       A.    Correct.
14       Q.    Now, as part -- in reviewing these
15   agreements with PAID I've noticed that they also include
16   terms for mail order, they've included terms dealing
17   with rebates. To what extent would you have also been
18   involved in those components of these agreements?
19       A.    You know, certainly aware internally in
20   discussing with internal management, not directly
21   involved with negotiating with the PBM directly.
22             The way it typically worked would be we

David B. Morris          Highly Confidential          January 5, 2005
                              Richmond, VA

4 (Pages 10 to 13)

---

**10**

1  would discuss it internally, and then whoever was the
2  main individual who was dealing in the contract
3  negotiations with the PBM, that individual would go
4  represent the group.
5      Q.    Was it part --
6      A.    It was usually internal pharmacy management
7  staff.
8      Q.    All right. So you have an internal
9  pharmacy -- well, let me ask the different groups that
10  were involved in providing input internally to the
11  ultimate negotiation that you had with the PBM.
12          What were the different groups that were
13  involved in that?
14          MR. NICHOLSON: Can you give a time frame?
15  BY MR. CAVANAUGH:
16      Q.    When you came on board in '97 and moving
17  forward.
18      A.    Corporate finance would play a role, sales
19  and marketing --
20      Q.    What role would sales and marketing play?
21      A.    Really, trying to ensure an adequate
22  network, something that wasn't going to disrupt a lot of

---

**11**

1  business; really more, you know, disseminating the
2  information kind of proactively, really, was kind of how
3  I viewed it. They didn't play a relative role and say,
4  you need to ask for this particular discount or this
5  particular dispensing fee, it's more a collaborative
6  discussion of the issue at hand and then coming to a
7  consensus as a group. And since they've got to go out
8  and sell the product and be able to explain why we did
9  it, impact to our customers, et cetera.
10      Q.    So, corporate finance, sales and marketing.
11  What other groups?
12      A.    Maybe actuarial, but I don't recall
13  actuarial getting involved early on.
14      Q.    What group would be principally responsible
15  for evaluating rebates from the PBM?
16      A.    Probably corporate finance more than
17  pharmacy.
18      Q.    Okay. I mean, did you folks get involved
19  in evaluating, for example, what the split should be;
20  should there be a sharing of rebates, should Trigon or
21  Anthem get a hundred percent, and how that would
22  interact with other terms in the agreement?

---

**12**

1      A.    I really don't know the answer to that
2  question. I probably have been involved on the
3  periphery and have heard some of the kinds of discussion
4  around rebates, but usually I didn't participate in any
5  of those meetings in any kind of detail.
6      Q.    Who would be driving those, the discussions
7  on that issue?
8      A.    Previously it was my former boss in
9  corporate finance.
10      Q.    Who is your former boss?
11      A.    Ron Lyon, L-Y-O-N. He's no longer with the
12  company.
13      Q.    Do you know where he is currently?
14      A.    Yes, I do.
15      Q.    What company is he with now?
16      A.    Towers Perrin.
17      Q.    Okay. Did Towers Perrin also serve as a
18  consultant to Anthem in any of its negotiations?
19      A.    No. Not to my knowledge, no.
20      Q.    Okay. Is it possible it could have been
21  involved and you wouldn't know about it? I saw a
22  document referring to them, which is why I ask the

---

**13**

1  question.
2          MR. NICHOLSON: Object to the form.
3          THE WITNESS: I suppose it's possible, but
4  I don't know, really, what role they would have played
5  in those negotiations.
6  BY MR. CAVANAUGH:
7      Q.    Okay. Well, not necessarily in the
8  negotiations but in providing advice or consultation to
9  Anthem in negotiating with the PBM.
10          MR. NICHOLSON: Same objection.
11          THE WITNESS: I'm 99 percent sure that
12  Towers Perrin was not involved in any kind of
13  negotiation with the PBM.
14  BY MR. CAVANAUGH:
15      Q.    Okay. As I looked through the contracts
16  that have been produced by Anthem, there seems to be an
17  evolution in the names of the various entities with whom
18  Anthem was contracting. It started with PAID
19  Prescription; then a company known as National was
20  involved in providing the mail order component.
21          Does that -- did you have any dealings with
22  National?

---

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

5 (Pages 14 to 17)

14

```
1      A.    That was actually -- yes, I did.
2      Q.    Okay.  And then in 1998 Merck-Medco became
3   involved.  Is that correct?
4      A.    Correct.  And I assume you're just talking
5   about changes in names.
6      Q.    Well, that was my next question.
7            Can you tell me what the relationship was
8   between those three entities that we just talked about?
9      A.    PAID Prescriptions was the original entity,
10  the original PBM that was started -- I don't know --
11  probably 20 years ago, at this point.  Its mail service
12  business was named National RX Services.  I cannot tell
13  you whether that was something PAID -- whether that was
14  a company PAID purchased or whether it was something
15  they built internally, but that's the naming convention
16  they used.
17           At the point Merck acquired PAID
18  Prescriptions it became Merck-Medco, I believe, and then
19  eventually Medco Health Solutions, and now -- I'm not
20  sure what its name is now.
21     Q.    Was there a preexisting Medco entity before
22  the Merck acquisition?
```

15

```
1      A.    There may have been, yes.
2      Q.    Okay.
3      A.    Yeah, I think there probably was, because
4   when Merck bought them that's when they became
5   Merck-Medco.
6      Q.    Do you know what the arrangement was
7   between PAID Prescriptions and Merck-Medco?
8      A.    My assumption was it was one and the same
9   company.
10          MR. NICHOLSON:  I'll just tell you he
11  doesn't want you to assume, and I don't, either, but if
12  you know, you certainly need to answer the question.
13          THE WITNESS:  And by "know" I assume you
14  mean some way I verified on my own, independent of
15  having a discussion with these folks.
16  BY MR. CAVANAUGH:
17     Q.    It depends on the context of the question.
18  It may be something you came to understand by virtue of
19  being in the business many years --
20          MR. NICHOLSON:  There's a basis of fact
21  beyond mere speculation or assumption, so the line is
22  not always black, but I just offer that caution going
```

16

```
1   forward.
2           THE WITNESS:  Okay.
3           MR. CAVANAUGH:  I think the best way to do
4   this is to just work through the agreements.
5           (There was a pause in the proceedings.)
6   BY MR. CAVANAUGH:
7      Q.    Pursuant to the agreements with PAID
8   Prescriptions that you've had over the years, does PAID
9   then, in turn, enter into agreements with individual
10  pharmacies, or pharmacy chains?
11     A.    Yes.
12     Q.    Does Anthem have access to those
13  agreements?
14     A.    No.
15     Q.    Okay.  Does Anthem have any understanding
16  of the relationship between what it has agreed to pay
17  PAID for reimbursement and what PAID, in turn, has
18  negotiated with a particular retail pharmacy or pharmacy
19  chain for reimbursement?
20     A.    Was your question do we know what we're
21  paying PAID and then what PAID is, in return, paying the
22  pharmacy provider?
```

17

```
1      Q.    Yes.
2      A.    Yes, we know what that relationship is.
3      Q.    Okay.  How do you know what PAID is paying
4   the pharmacy provider?
5      A.    I suppose, when I stop and think about it
6   now, I think we really probably don't know what they're
7   paying them.  We know what we asked them to set up as a
8   network in terms of the network discount, but in terms
9   of seeing the check and seeing -- you know, verifying
10  what the pharmacy billed and what they got reimbursed,
11  we do not have knowledge of that.
12     Q.    Okay.  I understand you don't see the
13  checks that are cut, that sort of thing, but my question
14  isn't -- my question is a little different, which is do
15  you have some understanding as to the reimbursement
16  formula that PAID is using with its -- with the pharmacy
17  providers that it contracts with?
18     A.    Yes.  I mean, that's what we specify, you
19  know, PAID to do for us; set up a network with the
20  following terms.
21     Q.    All right.  I just wanted to make sure that
22  I understood.  So, when I look at your contract with
```

David B. Morris                    Highly Confidential                    January 5, 2005
                                   Richmond, VA

6 (Pages 18 to 21)

---

**18**

1 PAID and it says, for example, set up a network where
2 pharmacists are reimbursed at AWP minus 18 and no
3 dispensing fee --
4     A.    Right.
5     Q.    -- it's your understanding, then, that PAID
6 establishes a network with that as the reimbursement
7 formula?
8     A.    Yes.
9     Q.    Okay.
10         MR. CAVANAUGH:  Why don't we mark this as
11 Exhibit Morris 002.
12         (The document was marked as Exhibit Morris 002.)
13         (There was a pause in the proceedings.)
14 BY MR. CAVANAUGH:
15     Q.    We've marked as Anthem VA 002 a document
16 entitled "Integrated Prescription Drug Program Master
17 Agreement" bearing the date entered into as of January
18 1st, 1998.
19     A.    Okay.
20     Q.    Are you familiar with this agreement?
21     A.    Yes.
22     Q.    Now, this is an agreement between PAID

---

**19**

1 Prescriptions, Merck-Medco and Trigon, correct?
2     A.    Correct.
3     Q.    Were you involved in the negotiation of
4 this agreement?
5     A.    No.
6     Q.    Now, you had come into the group in 1997.
7 Why were you not involved in the negotiation of this
8 agreement?
9     A.    I think this agreement was already in the
10 works when I came into the department.  In other words,
11 they had been discussing it for some extensive period of
12 time.  And in my initial role in the department I was a
13 clinical pharmacist first, so I was not directly
14 involved in any kind of management of the business side
15 of the benefit.  This was -- actually, the
16 medical policy director at the time was Larry Colley, if
17 I recall correctly.
18         Yeah.  There's his name right there
19 (indicating).
20     Q.    You're referring to the signature page of
21 the agreement?
22     A.    Yeah -- or this is actually some project

---

**20**

1 status report.
2         MR. NICHOLSON:  It's actually a letter
3 dated November 3, 1998 which is attached.
4 BY MR. CAVANAUGH:
5     Q.    Let me ask you to turn to page 9 of the
6 agreement, page 9, paragraph 6.2, Formulary Rebates.  It
7 states, "Merck-Medco Managed Care, LLC receives
8 formulary rebates from certain drug manufacturers as a
9 result of the inclusion of such manufacturer branded
10 products on the formulary.  PAID will provide Trigon
11 with 70 percent of the formulary rebates received by
12 Medco based on the dispensing of each manufacturer's
13 formulary drugs under Trigon's program."  And it goes on
14 to say, "PAID shall retain 30 percent."
15     A.    Uh-huh.
16     Q.    I understand you weren't involved in the
17 negotiations, but did you come to understand how the
18 parties arrived at that 70/30 split of rebates?
19     A.    No.  I -- no.  Probably standard business
20 practice on the part of the PBM, would be my assumption,
21 but, again, that's an assumption.
22     Q.    Were you aware prior to this agreement that

---

**21**

1 the agreement with PAID provided for a hundred percent
2 of the rebates to go to Trigon -- or Anthem?
3     A.    Am I aware of that?
4     Q.    Yes.
5     A.    No.
6     Q.    Was there a subsequent amendment to this
7 agreement with PAID and with Merck that adjusted the
8 rebates -- adjusted this rebate formula?
9     A.    An amendment to this agreement?
10     Q.    Yes.
11     A.    No, not to my knowledge.
12     Q.    Was there a new agreement entered into with
13 PAID and with Merck that dealt with, among other things,
14 rebates?
15     A.    Yes, there was.
16     Q.    And as part of that agreement did Anthem
17 negotiate for 100 percent of the rebates?
18     A.    No, not technically.
19     Q.    Okay.  Why not?
20     A.    We negotiated a guaranteed amount on a
21 per-claim basis that was really independent of rebates.
22 I think in our mind we were replacing rebates with this

---

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

---

**22**

1  amount, but we more or less told Medco, we don't care
2  what your rebates are, what are you willing to guarantee
3  us so that we can plan and so that we can, you know,
4  give this money back to our customers on an ongoing
5  basis.
6      Q.   And was that the agreement that you
7  negotiated with PAID and with Merck -- with Medco?
8      A.   I was involved with that one, yes.
9      Q.   Okay.  And what you just described to me,
10  was that the outcome of the negotiation?
11     A.   Yes.
12     Q.   Explain to me why Anthem was of the view
13  that it didn't care about the rebates that Medco got; it
14  instead wanted to focus on a guaranteed return to
15  Anthem.
16         MR. NICHOLSON:  Do you want him to expand
17  upon what -- he's already addressed part of that, I
18  believe.
19  BY MR. CAVANAUGH:
20     Q.   Yeah, if you could, just explain to me what
21  Anthem's thinking was in seeking this new type of -- as
22  you saw it, this new type of arrangement.

---

**23**

1      A.   It was a way of eliminating the
2  uncertainty, I guess, or unknown value of rebates on a
3  going-forward basis.  PBMs held all the contracts; PBMs
4  talked with the manufacturers.  We had no way of knowing
5  what the PBM had agreed to with the manufacturer, so we
6  had no way to project going forward what those rebates
7  were going to be.
8         In addition, Medco was notoriously delayed
9  in paying those moneys, so in some cases we were nine to
10  twelve months out from the actual rebate period where
11  the rebates were supposedly earned, and the time value
12  of money being what it is, we wanted those moneys a
13  little quicker than nine to twelve months out.
14         We were in a competitive bid situation,
15  too, so, you know, we threw it out there among two or
16  three different PBMs that we were negotiating with at
17  the time.
18     Q.   What other PBMs were you negotiating with?
19     A.   Express Scrips, and there was another one
20  that eventually got acquired by Medco, I think,
21  actually.  I don't recall the name of it.
22     Q.   The 1998 agreement with Medco, was that

---

**24**

1  also the result of soliciting multiple offers from PBMs?
2      A.   I don't know with absolute certainty, but
3  it was my impression that it was not an RFP process,
4  again, coming into it kind of in the middle or toward
5  the very end of the entire negotiation.
6      Q.   As I look at paragraph 6.3 in the 1998
7  agreement there is a reference to "guaranteed formulary
8  rebates."
9         Could you take a look at that provision and
10  tell me how the provision you negotiated in the
11  subsequent agreement differed?
12         (There was a pause in the proceedings.)
13         MR. NICHOLSON:  Do you want to point us to
14  the language you're looking at?
15  BY MR. CAVANAUGH:
16     Q.   Well, it's more the term "guaranteed
17  formulary rebates," not in the body.  The heading is
18  "Guaranteed Formulary Rebates," and I took from your
19  answer earlier when you referred to the benefits you saw
20  in the 2001 agreement that there were guaranteed
21  payments from Medco to Anthem, so I was wondering how
22  they differed.

---

**25**

1         MR. NICHOLSON:  Let me just object, because
2  I think his prior answer distinguished the 2001
3  methodology from this and explained the benefits.
4         But if you can add to that, please do.
5         THE WITNESS:  As I recall, it is -- it's
6  the language that specifically refers to "branded
7  formulary claims."
8         That's what this guarantee is, and, again,
9  since Medco holds all the contracts, they know what's
10  formulary and what's not formulary from their
11  perspective.  And we didn't always follow their
12  formulary recommendations.
13         So, they may know it's a brand -- I mean,
14  we know, certainly, the difference between a brand and a
15  generic scrip, but we don't know what their formulary
16  consisted of in absolute terms.
17  BY MR. CAVANAUGH:
18     Q.   But as part of this agreement weren't you
19  supposed to adopt the Medco formularies?
20     A.   We were, in large part, but we did not
21  always do that in absolute terms.
22     Q.   I see.

---

David B. Morris                 Highly Confidential                 January 5, 2005
                                   Richmond, VA

8 (Pages 26 to 29)

---

**26**

1     A.    And, again, what this is guaranteeing is
2  those branded formulary claims. The subsequent
3  agreement, as I recall, took that language out and said
4  it's on a per-claim basis. We don't want to have to try
5  and figure out what's formulary versus non-formulary.
6  We want to be able to at the end of the month count our
7  claims and say, you owe us this. So, it was much easier
8  to get to. This, you had to rely on the PBM to tell
9  you, this is what it is, take our word for it.
10    Q.    And the reason you would have to rely on
11 that is that there could be differences between the
12 Medco formulary and the formulary that Anthem actually
13 had decided to utilize for certain plans?
14    A.    Uh-huh. And they're earning moneys on
15 claims, and only they know they're earning it. I mean,
16 they could theoretically -- you know, because we don't
17 know -- withhold parts of those moneys, if they chose.
18    Q.    Did Anthem have the right under these
19 agreements to go in and audit?
20    A.    I'm sure we did.
21    Q.    Did Anthem ever audit?
22    A.    Not for this agreement.

---

**27**

1     Q.    Has Anthem ever --
2     A.    Wait a minute. I take that back. I think
3  maybe we did audit for this agreement.
4     Q.    For the 1998 agreement?
5     A.    I think we did.
6     Q.    Do you remember when you did that audit?
7     A.    I'd be guessing. I mean, it's --
8           MR. NICHOLSON: Don't guess.
9  BY MR. CAVANAUGH:
10    Q.    I don't want you to guess, but was it
11 during the period of time when this agreement was in
12 place?
13    A.    Not when this agreement was in place, no.
14    Q.    So, at some point subsequent -- the 1998
15 agreement ran from 1998 through 2001, when you did the
16 new agreement?
17    A.    Uh-huh.
18          MR. NICHOLSON: You need to say "yes" so
19 she can pick that up.
20          THE WITNESS: Yes.
21 BY MR. CAVANAUGH:
22    Q.    Was the audit of the 1998 agreement done

---

**28**

1  after the new agreement was in place in 2001?
2     A.    Yes.
3     Q.    What were the results of that audit?
4     A.    Paraphrasing at a real high level here,
5  errors both in the positive and the negative, moneys
6  that were not paid that should have been paid, and
7  moneys that were paid but should not have been paid, and
8  the amounts in both a positive and negative direction
9  really kind of netted out to zero.
10          So, the overall assessment was, you know,
11 Medco's got some real problems in terms of how they
12 administer and pay rebate moneys out from a systems and
13 accounting perspective, but we think you got everything
14 that your contract more or less said you were going to
15 get in terms of those rebate moneys.
16    Q.    And were those types of system errors
17 undone by virtue of the 2001 agreement and the system
18 that was used for rebates under that agreement?
19    A.    In my opinion, yes, they probably were.
20    Q.    And that's because you're now working on a
21 guaranteed per-claim --
22    A.    Correct.

---

**29**

1     Q.    How does the per-claim work in conjunction
2  with a formulary?
3     A.    Well, as I recall, without seeing the other
4  agreement -- although I'm sure you have it.
5     Q.    Yeah, I can show it to you if it would help
6  to look at it.
7           MR. NICHOLSON: We can do that right now,
8  if you need to see it.
9           THE WITNESS: As I recall now, based on how
10 the subsequent agreement was worded, we had to agree in
11 large part to attempt to work with Medco to follow their
12 formulary recommendations but, it ultimately gave us the
13 final decision as to whether or not we were going to
14 accept a drug and add it to our formulary. We weren't
15 going to take something, necessarily, that -- here's the
16 thinking behind making that part of the agreement:
17          We weren't going to take something that
18 paid higher rebates just because it paid higher rebates,
19 when it could cost our customers more because it's a
20 more expensive drug.
21          MR. NICHOLSON: If we're going to go
22 through the terms of the contract it may make sense for

---

Henderson Legal Services
(202) 220-4158

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

9 (Pages 30 to 33)

30

1   you to put it in front of him right now.
2           MR. CAVANAUGH: Yeah, I should have it.
3           (There was a pause in the proceedings.)
4           MR. CAVANAUGH: Why don't we mark this as
5   Exhibit Morris 003.
6           We'll mark as Anthem VA Exhibit Morris 003 the
7   Integrated Prescription Drug Program Master Agreement entered
8   into as of January 1st, 2001.
9           (The document was marked as Exhibit Morris 003.)
10          MR. NOTARGIACOMO: Can I get the Bates
11  numbers for that document?
12          MR. CAVANAUGH: A-VA 09010091. And I
13  should probably also put on the record for Anthem VA 002
14  the Bates numbers are A-VA 09010055.
15  BY MR. CAVANAUGH:
16      Q.   You've been referring in your testimony
17  earlier today to a subsequent agreement to the 1998
18  agreement. Is Anthem VA 003 that agreement?
19      A.   Yes, it is.
20      Q.   Why don't you take a moment to look at it
21  to refresh yourself as to how the rebates worked and
22  were different from how the rebates worked under the '98

31

1   agreement.
2           (There was a pause in the proceedings.)
3           THE WITNESS: Just the rebates
4   specifically?
5   BY MR. CAVANAUGH:
6       Q.   Yes.
7       A.   Okay.
8       Q.   Does looking at Anthem VA 003 confirm your
9   recollection that the rebate is on a per-claim basis?
10      A.   Yes.
11      Q.   Where would that language appear?
12      A.   It begins on page 11, 6.3. And if you turn
13  to page 12 those amounts, retail and mail managed,
14  retail and mail non-managed, and the per-claim amounts
15  are to the right of that.
16      Q.   Now, if I look here, the per-claim — per
17  paid claim — is this the rebate amount, the $1.87, the
18  $6.36, the $1.25?
19      A.   Yes.
20      Q.   Why is the mail service rebate so much
21  higher than the retail pharmacy?
22      A.   Well, I mean, by the way the program is

32

1   defined, built, the retail network were typically paying
2   for the 30-day supply. So mail service was roughly
3   paying for the 90-day supply, so roughly three times the
4   amount of drug and cost.
5       Q.   And what would the benefit be to Anthem or
6   to Merck of having the per-claim rebate different for
7   the retail pharmacy managed program versus the retail
8   pharmacy non-managed program?
9       A.   The managed program really was using
10  Medco's formulary and agreeing to use the formulary in a
11  manner as specified in this contract, or, in other
12  words, working with Medco to define our formulary but
13  agreeing to work with them closely in doing so.
14      Q.   And when that was done a higher rebate
15  would be paid to Anthem, correct?
16      A.   Correct.
17      Q.   If I can go back to the '98 agreement for a
18  moment, there was a reference there to a -- in 6.4 to
19  "trend incentives."
20          Can you explain to me what trend incentives
21  are? What's the concept?
22      A.   The concept was if we, working jointly,

33

1   could manage the increase of our drug trend then we were
2   willing to pay Medco some amount of money to do that.
3   In other words, rather than them just paying for claims
4   and collecting rebate moneys and doling those out as
5   they saw fit, you know, if they helped us actually
6   manage the trend, in other words, hold costs down for us
7   and our customers -- that was the intent of this. I
8   mean, I think it was so complex not many people could
9   understand exactly how we were going to get there, and I
10  don't think we even came close to the thresholds. I
11  think Medco just kind of, you know, didn't know what to
12  make of it.
13      Q.   Okay. Were there -- was the trend
14  incentives concept continued in 2001?
15          MR. NICHOLSON: In the contract?
16  BY MR. CAVANAUGH:
17      Q.   In the contract.
18      A.   To the best of my recollection, no.
19      Q.   Sticking with the 1998 agreement, there are
20  references there -- let me take it back. This is
21  paragraph 6.2.
22      A.   Uh-huh.

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

10 (Pages 34 to 37)

---

**34**

1   Q.   There's a reference there to "formulary" --
2      MR. NICHOLSON:  Wait a second.  We may be
3   missing a page.
4      THE WITNESS:  Is there a 6.2?
5      MR. CAVANAUGH:  Yeah.  You were looking at
6   it before.  That's how we got to the 70/30.
7      I'm sorry.  Page 9.
8      MR. NICHOLSON:  It's out of order.  Okay.
9   BY MR. CAVANAUGH:
10   Q.   I referred you earlier in my questions to
11  the initial few sentences dealing with the defined term
12  "formulary rebates," but there's a sentence that follows
13  that states, "Medco also receives and retains additional
14  rebates and/or fees from certain manufacturers which may
15  take into account various factors including the
16  utilization of certain drugs within their expected
17  therapeutic categories for Medco's book of business in
18  aggregate as a result of various commitments, services
19  and programs, including but not limited to formularies."
20      What understanding did you have of other
21  types of rebates and fees that Medco might be securing
22  from one or more manufacturers?

---

**35**

1   A.   We had no direct knowledge of what, if any,
2   moneys they were collecting there.
3   Q.   Were you familiar with a concept known as
4   administrative fees?
5   A.   Internal to a PBM?
6   Q.   Yes.
7   A.   Sure.
8   Q.   And had you heard of the concept of PBMs
9   charging administrative fees to manufacturers?
10   A.   Sure.
11   Q.   Does -- let me ask you when you -- what was
12  your first involvement with PBM contracting such as the
13  '98 and 2001 contract we're talking about?
14      MR. NICHOLSON:  I'm sorry.  Could you give
15  some definition to "involvement"?
16  BY MR. CAVANAUGH:
17   Q.   Sure.  Before you came into the unit in
18  1997 had you had any prior involvement with PBMs and the
19  PBM business in general?
20   A.   No.
21   Q.   Had you had any prior involvement with
22  pharmacy networks?

---

**36**

1   A.   No.
2   Q.   Let me ask you to turn to page 23 of the
3   1998 agreement, Anthem VA Exhibit Morris 002.  And this
4   is entitled "Schedule B, Programming Pricing Terms."
5   A.   Uh-huh.
6   Q.   To what extent were you involved in
7   creating these program pricing terms?
8   A.   For this agreement, not at all.  I was not
9   involved.
10   Q.   So, this is something that would have
11  existed or was well into existence by the time you came
12  into the group?
13   A.   Yes.
14   Q.   As a result of coming into the group did
15  you become familiar with these various reimbursement
16  terms?
17   A.   Yes.
18   Q.   What are each of these groups that are
19  identified on page 23, the Coordinated Care Network II,
20  Coordinated Care Network III, Retail Maintenance
21  Network, Trigon HMO Network?  Can you explain each of
22  those to me and how they differ?

---

**37**

1   A.   They are all pharmacy networks, different
2   pharmacy networks.  Medco owned the Coordinated Care
3   Networks II and III, and they used those nationally for
4   their entire book of business, is what I was told.
5   Q.   When you say they owned them, what do you
6   mean?
7   A.   They owned the contract with the pharmacy,
8   they negotiated the network, they maintained the
9   network.  The terms specified for network participation
10  were, you know, created and maintained by Medco, not by
11  us.
12   Q.   They didn't own the pharmacy?
13   A.   No.
14   Q.   Okay.  But they were the direct contracting
15  party with the pharmacy?
16   A.   Correct.
17   Q.   Okay.  What about Retail -- 1.3, the Retail
18  Maintenance Network?
19   A.   Again, that's another pharmacy network.
20  Medco built that network at our request, and the intent
21  of that network was to allow retail pharmacies -- most
22  specifically in Virginia, but I'm sure if we had some

---

David B. Morris                  Highly Confidential                    January 5, 2005
                                 Richmond, VA

11 (Pages 38 to 41)

---

38

1  outside the state we would have taken those as well --
2  but retail pharmacies in Virginia to dispense a 90-day
3  supply of drug similar to a mail service pharmacy.
4        And the HMO -- Trigon HMO Network was a
5  pharmacy network they built exclusively for us using
6  terms that we specified.
7     Q.   Now, each of these networks have what
8  appear to be different reimbursement terms.  Would you
9  agree with that?
10    A.   Yes.
11    Q.   How are these different terms for each
12 network arrived at?
13         MR. NICHOLSON: Again, you're asking him a
14 question about a contract he was not involved in
15 negotiating.
16 BY MR. CAVANAUGH:
17    Q.   Well, let me ask it -- in 2001, for that
18 contract, was there also a Schedule B for program
19 pricing terms?
20    A.   I'm sure there's something in there about
21 network terms, yes.
22    Q.   And were there multiple networks again?

---

39

1     A.   I'm not sure about that.
2          MR. NICHOLSON: You have the contract
3  there, if you want to look at it.
4  BY MR. CAVANAUGH:
5     Q.   Yeah, why don't we take a look at that.
6          (There was a pause in the proceedings.)
7          THE WITNESS: Yes, there are, Schedule B,
8  page 30.
9  BY MR. CAVANAUGH:
10    Q.   Okay.  And, again, does it appear under the
11 2001 agreement that there are different reimbursement
12 terms?
13    A.   Yes.
14    Q.   What would -- how is it that each of these
15 networks had different reimbursement rates?
16    A.   Developed at different points in time for
17 different lines of business.
18    Q.   Can you give me an example?
19    A.   Prior to us -- prior to us developing an
20 HMO we had a broad network of pharmacies that covered
21 the State of Virginia as well as nationwide, and
22 those -- those lines of business for HMO used the CCN

---

40

1  network.  Originally there was the CCN II, and then my
2  assumption was that Medco built a new network with
3  slightly different terms and called that CCN III,
4  primarily different lines of business and were
5  negotiated at different points in time.
6        And, theoretically, a pharmacy could
7  participate in one or more of these networks.  They
8  could be a CCN II, a CCN III, an HMO network provider.
9     Q.   And how they got reimbursed would depend
10 upon the individual customer's plan?
11    A.   Benefits, right, and eligibility, what
12 group they were loaded with, and --
13    Q.   I see.  Let me draw your attention -- and
14 you can -- we'll look at the 2001 agreement for a
15 moment.
16        Under the Trigon Retail Maintenance Network
17 do you see there's a reference to AWP minus 15 percent
18 with no dispensing fee, but then if you look at
19 Coordinated Care Network III it's AWP minus 13 plus a
20 dispensing fee.
21        Why would you use a dispensing fee for
22 certain networks and not for others?

---

41

1     A.   I have no real idea why it was set up this
2  way, to be different.  I mean, I would -- again, I'm
3  assuming that you're trying to incent some behavior
4  either on the part of the participating provider and/or,
5  you know, the customer.
6     Q.   Would you agree with me that from a
7  pharmacist's standpoint they're going to look at the
8  total reimbursement they're going to get, whether it's
9  in the form of an AWP minus 13 plus a dispensing fee or
10 just an AWP minus 15 percent?
11    A.   They should look at the total amount, yes.
12 Whether they do or not I can't tell you.  I'm always
13 surprised that most of these guys don't even know, you
14 know, what their network terms are.  They sign these
15 agreements and don't look that closely at them,
16 apparently.
17    Q.   But you'd agree with me that a pharmacist
18 looking at what they're going to get paid for dispensing
19 a drug -- they're going to look at the total
20 reimbursement page, no matter whether it's driven by
21 just AWP minus a number or driven by AWP plus a
22 dispensing fee?

---

David B. Morris　　　　　Highly Confidential　　　　　January 5, 2005
Richmond, VA

12 (Pages 42 to 45)

**42**

1　　　　MR. NICHOLSON: I'll object. You're asking
2　him to speculate as to what a pharmacist would do.
3　　　　MR. CAVANAUGH: Well, based upon his
4　experience.
5　　　　THE WITNESS: If they want to make a profit
6　they should look at the total reimbursement of the whole
7　package, and it's not just brands or just generics, it's
8　the combination.
9　BY MR. CAVANAUGH:
10　　Q.　And, certainly, when Anthem is evaluating
11　reimbursement rates it will look at what the total cost
12　to it is going to be?
13　　A.　Yes.
14　　Q.　And it would include, certainly, a
15　dispensing fee as part of that?
16　　A.　Yes.
17　　Q.　Let's talk about how Anthem goes about
18　determining retail reimbursement rates.
19　　A.　Okay.
20　　Q.　Is that something your group is responsible
21　for?
22　　A.　At least in terms of initiating it as a

**43**

1　topic for discussion. I think it's a -- it really is a
2　collaborative kind of discussion here internally and
3　then with the PBM as well. The PBM's experience
4　probably is going to tell them -- you know, they know
5　what other kinds of networks they have and we don't, so
6　they might could tell us, based on the marketplace,
7　here's some things you might consider.
8　　Q.　And how is it that -- strike that.
9　　　　How does Anthem go about calculating costs,
10　the reimbursement cost?
11　　A.　You can take these formulas and simply
12　apply them to the prices of the products.
13　　Q.　Okay. And when you do that do you include
14　the dispensing fee?
15　　A.　Yes, you would.
16　　Q.　Now, if we look at any one of these
17　formulas they tend to provide for reimbursement in an
18　amount equal to the lowest of, one, the pharmacist's
19　usual and customary prices submitted; two, taking Trigon
20　Retail Maintenance Network, for example, AWP minus 15
21　percent with no dispensing fee, or the MAC where
22　applicable with no dispensing fee.

**44**

1　　　　To what extent has Anthem looked at the
2　basis on which pharmacists actually seek reimbursement?
3　　A.　I'm not sure I understand the question.
4　I'm sorry.
5　　Q.　Well, there's a reference to the pharmacy's
6　usual and customary prices submitted. How does Anthem
7　determine usual and customary price?
8　　A.　For example, we may know that pharmacies
9　have what's called loss leaders. They may intentionally
10　price the product below their cost to get traffic in the
11　store. For example, oral contraceptives. I mean, a lot
12　of pharmacies are smart. They know if they can get a
13　young female of childbearing age chances are she's
14　married and with children, and so she's going to buy
15　other things while she's in the store, so they'll sell
16　their oral contraceptives $2 less than what it actually
17　costs them.
18　　　　In those situations we want to allow our
19　customer to take advantage of that competitive situation
20　and get the drug at the lowest possible cost. In other
21　words, not have the calculation kick in with the AWP,
22　but if your birth control pills cost $20 and you're

**45**

1　selling them for $15, that's the price the customer
2　pays, less any co-pays.
3　　Q.　Now, how do you go about determining, for
4　example, using your example of oral contraceptives, that
5　they're selling them for $2 less than it actually costs
6　them to acquire?
7　　A.　Well, we wouldn't up front. I would assume
8　that it's built into Medco's system. They have a
9　pricing file that has AWP costs on it. They could
10　compute it instantaneously with a computer, and, so,
11　they know the price being submitted by the pharmacy at
12　the point of sale is actually higher than or less than
13　that AWP price, so their system, when it's adjudicating
14　the claim, would make that determination, and it would
15　automatically defer to the lower of.
16　　Q.　Okay. Are you familiar with a term known
17　as WAC?
18　　A.　Yes.
19　　Q.　What's your understanding of WAC?
20　　A.　Wholesale acquisition cost is what it
21　stands for, and it's more or less, though not in
22　absolute terms, what most parties who are willing to

David B. Morris                Highly Confidential                January 5, 2005
                                  Richmond, VA

13 (Pages 46 to 49)

---

**46**

1   purchase drugs for retail or resale could acquire the
2   drugs from a wholesaler.
3      Q.   Okay.  And is that -- is WAC typically a
4   published number?
5      A.   I think it is.
6      Q.   Do you have any understanding of the
7   relationship between AWP and WAC?
8      A.   A rough understanding of the relationship.
9      Q.   And what's that rough understanding?
10     A.   In aggregate, looking across the entire
11  market basket of drugs, you know, WAC is somewhere
12  between 20 and 25, 26 percent less than the AWP cost.
13  It's some amount less than average wholesale price.
14     Q.   Okay.  And --
15     A.   It depends on the drug, the market area,
16  et cetera, et cetera.
17     Q.   Sure.  When did you first become familiar
18  with these terms, WAC and AWP?
19     A.   Probably 25 years ago when I was working in
20  pharmacies.  I mean, we would order from a wholesaler,
21  and they would have the wholesale acquisition cost
22  listed and you could decide whether you wanted to order

---

**47**

1   a bottle of 30 or a bottle of a thousand.
2      Q.   And were there such -- were there AWPs at
3   that point in time?
4      A.   As I recall, there were.  I don't think
5   they were listed with the wholesaler, necessarily, but
6   things like Red Book, Blue Book have always been around.
7      Q.   And was there this published difference
8   between AWP and WAC?
9      A.   Again, I would assume that there was, based
10  on the knowledge that I could -- that I had access to
11  the WAC price and that the AWP price was published.  If
12  someone was willing to take the time to figure it out
13  I'm sure you could tell what the differences were.  I
14  never did, but...
15     Q.   This was 25 years ago.  Where were you
16  working at the time?
17     A.   Primarily, hospital pharmacies; a little
18  bit of retail work.
19     Q.   Back then were you aware that hospitals,
20  for example, were able to get steep discounts from
21  manufacturers?
22     A.   Sure.

---

**48**

1      Q.   And, so, if a retailer was paying, 25 years
2   ago, WAC, a hospital would be paying substantially below
3   WAC?
4      A.   Again, depending on the product, depending
5   on the agreements the hospital may or may not have had
6   with a given manufacturer you could have gotten -- if it
7   was a Roche vaccine or something you could get it at a
8   discount if you bought in bulk, and that was a lot
9   different than acquiring it from the wholesaler, sure.
10     Q.   Okay.  I'm talking now about what a
11  hospital would buy at compared to what a retailer would
12  buy at for the same product.
13         If we go back 25 years ago to when you were
14  working in hospital and retail pharmacies, would I be
15  correct that you understood that retailers were paying
16  higher prices than hospitals for the same products?
17     A.   Again, it depends on the size of the
18  entity.  I mean, there were still chains back then, so
19  chains could probably do better than -- chain retail
20  pharmacies could do better than a small local hospital.
21  A large hospital chain like HCA, though, could
22  definitely do better than the mom-and-pop pharmacy down

---

**49**

1   on the corner.
2      Q.   So if a retailer was paying at WAC, quite
3   often a hospital would be paying at a discount off of
4   WAC?
5      A.   Right.
6         MR. NICHOLSON:  Just subject to the market
7   limitations he described in his previous answer.
8         MR. NOTARGIACOMO:  Can we take a short
9   break?
10        MR. CAVANAUGH:  Yeah, sure, Ed.
11        (A recess was taken.)
12  BY MR. CAVANAUGH:
13     Q.   Do you have any -- let me ask it
14  differently.
15        Does Anthem -- or has Anthem over the years
16  you've been with the company ever bought drugs itself?
17     A.   Here in Virginia, no.  Anthem owns its own
18  PBM which is located in Mason, Ohio.  Now, they buy
19  drugs, but this health plan administered in Virginia,
20  no.
21     Q.   Has Anthem ever had a staff model HMO or
22  any type of institution that would directly acquire

---

David B. Morris          Highly Confidential          January 5, 2005
Richmond, VA

14 (Pages 50 to 53)

---

50

1  drugs?
2      A.    No.
3          MR. NICHOLSON:  And just so you know, when
4  he says "Anthem" we're talking about Anthem Virginia,
5  and this is the Virginia entity, not Ohio or anybody
6  else. They've already been deposed.
7  BY MR. CAVANAUGH:
8      Q.    What interaction do you have with other
9  Anthem companies?
10     A.    The non-Virginia --
11     Q.    Yes.
12         MR. NICHOLSON:  Right now he's asking those
13 outside of the state.
14         THE WITNESS:  None, basically.  I have no
15 relation with any of them.
16 BY MR. CAVANAUGH:
17     Q.    Would it be correct, then, that any Anthem
18 company that has negotiated with Medco -- those
19 agreements would be done on a company-by-company basis?
20     A.    If any company did, yes, they would be
21 negotiated on a company-by-company basis.
22         I mean, I assume all the health plans today

---

51

1  are covered up under Anthem's PBM.
2      Q.    Well, I'll get to that.
3          Did there come a time when Anthem moved
4  from contracting for PBM services with an outside
5  company to contracting for PBM services with an
6  Anthem-related company?
7      A.    Yes.
8      Q.    Okay.  And when was that?
9      A.    Sometime during 2003 is when we began
10 talking with APM, Anthem Prescription Management, about
11 integrating up under their model and moving away from
12 Medco.
13     Q.    And did Anthem Virginia do an analysis of
14 the pros and cons of making that switch?
15     A.    Yes.
16     Q.    Did Anthem -- did the Anthem PBM -- well,
17 strike that.
18         Did Anthem Virginia do a request for
19 proposal from multiple PBMs, including the Anthem
20 entity?
21     A.    During 2003?
22     Q.    Yes.

---

52

1      A.    No.
2      Q.    How did you go about evaluating -- well,
3  strike that.
4          Were you part of the group that would have
5  evaluated whether to move to the -- whether to move the
6  pharmacy benefits services from Medco to the Anthem
7  entity?
8      A.    Not directly involved.
9      Q.    Were you indirectly involved?
10     A.    Sporadically, yes.
11     Q.    What input did you provide?
12     A.    You're basically making the business case,
13 you know, cost benefit analysis.  I mean, what's it
14 going to cost compared to what we have today or what we
15 could get in the marketplace, where are we going to gain
16 or potentially lose because it impacts our customers.
17 And, so, doing various analyses of network costs, of the
18 cost of other services.
19     Q.    And what was -- how did the network costs
20 compare?
21     A.    Compared to the 2001 agreement, we actually
22 decided to negotiate a network with a little bit higher

---

53

1  discount off of AWP.  We kept the mail service
2  reimbursement the same.
3      Q.    Now, when you say you negotiated, who did
4  you negotiate with?
5      A.    The Anthem Prescription Management folks,
6  Anthem's internal PBM.
7      Q.    And how much better was the reimbursement
8  versus the Medco agreement on the retail side?
9      A.    The discount was 16 percent off AWP instead
10 of 15.
11     Q.    And what about the dispensing fee?
12     A.    Dispense fees remained the same on the
13 brand.  On the generic we increased it a dollar.  We
14 wanted to try and incent pharmacies to dispense generic
15 drugs -- better value for our customers.
16     Q.    And do you still have under the APM
17 agreement multiple networks, or is it just one network?
18     A.    It's a single network.
19     Q.    So, it's a single network with a single
20 reimbursement formula -- well, one for branded, one for
21 generic?
22     A.    It's fairly complicated because there's not

---

David B. Morris          Highly Confidential          January 5, 2005
                          Richmond, VA

15 (Pages 54 to 57)

**54**

1  one standard agreement. Based on what I've been told,
2  there are market areas across the country where the rate
3  is not 16 percent. So it does vary by market region,
4  but it's based on what the market will bear. If there's
5  a large chain in a given geographic region and you've
6  got to have them in your network and they say, I'm not
7  taking 16, then you negotiate with them and pay them
8  something different, probably a little less steep of a
9  discount, probably what they're willing to agree to, 13,
10 14, 15 percent.
11         MR. NICHOLSON: Again, we have the
12 contract. That may help to give to him to take a look
13 at.
14         THE WITNESS: But for the vast majority of
15 pharmacies in that network it's 16 percent off for
16 brands with a $1.50 dispense fee.
17 BY MR. CAVANAUGH:
18     Q.    Now, would I be correct that the Anthem
19 PBM -- strike that.
20         How does the rebate arrangement with the
21 Anthem PBM differ from the rebate arrangement you had
22 with Medco under the 2001 agreement?

**55**

1     A.    Not seeing that agreement, it's my
2  understanding --
3         MR. NICHOLSON: Well, don't speculate. If
4  you know, you know. If you need to see the agreement,
5  you can see the agreement.
6         THE WITNESS: I don't know. I mean, not
7  for sure. I've not seen the agreement.
8  BY MR. CAVANAUGH:
9     Q.    Okay. What was the -- as you understood
10 it, what was the prime motivation, if there was one, to
11 move from Medco to Anthem's PBM?
12     A.    There's -- you know, the operating income
13 you would derive from a mail service pharmacy business
14 in addition to more control over your benefits, your
15 formulary, your network, rather than dealing with an
16 external company that's governed by a contract you're
17 dealing with a sister company, and hopefully our goals
18 and incentives are all aligned to do what's right for
19 the customer.
20         But, I mean, PBMs exist to process claims.
21 They don't make any money doing that. They collect
22 rebates, and they typically fill mail service claims.

**56**

1  There are pretty good margins in mail service claims, so
2  rather than giving that to another company why not keep
3  it internally. It will help us hold our costs down, and
4  we can pass those savings on to our customers.
5     Q.    In 2001, when you were -- strike that.
6         Am I correct that in 2000 for the new 2001
7  contract Anthem put out an RFP to which multiple PBMs
8  responded?
9     A.    Yes, that's correct.
10     Q.    Was it your sense that the different PBMs
11 were competing for Anthem's business?
12     A.    Yes.
13     Q.    Did your negotiations with multiple PBMs go
14 through a number of rounds of negotiations?
15     A.    Yes.
16     Q.    And during that was there a give and take
17 on various terms within each of the proposals?
18     A.    Yes.
19     Q.    And when you ultimately decided to go with
20 Medco was it because the entire package looked better
21 than what the other companies had been proposing?
22     A.    Yes.

**57**

1         (There was a pause in the proceedings.)
2  BY MR. CAVANAUGH:
3     Q.    I should ask since you mentioned you worked
4  in retail and hospital pharmacy do you have a pharmacy
5  degree?
6     A.    Yes.
7     Q.    And when did you begin working in
8  pharmacies?
9     A.    1979.
10     Q.    And did you work in pharmacies from '79
11 until you joined Anthem in '87?
12     A.    No. I went back to school and got an
13 M.B.A. around the mid '80s.
14     Q.    So, for roughly five years you were working
15 as a pharmacist?
16     A.    Yes.
17     Q.    Where did you get your M.B.A. from?
18     A.    A local college, Virginia Commonwealth
19 University.
20     Q.    Would I be correct that Anthem enters into
21 contracts with customers such as employers and union
22 benefit plans pursuant to which Anthem will provide

David B. Morris                Highly Confidential                January 5, 2005
                                Richmond, VA

## 16 (Pages 58 to 61)

<table>
<tr><td valign="top">

58

1  managed care services?
2     A.   Yes, I think that's a correct assumption.
3     Q.   Does Anthem pay -- strike that.
4         Has Anthem entered into agreements with its
5  customers to provide rebates?
6         MR. NICHOLSON:  You're asking him about the
7  terms of the group contract?
8         MR. CAVANAUGH:  Yeah.
9         THE WITNESS:  I know we do have some groups
10 where it's actually a part of their contract and we
11 actually pay them a hundred percent of earned rebates.
12 I think most of the time, pursuant to the 2001
13 agreement, we're giving them an administrative credit
14 that's a function of that guaranteed rebate amount and
15 we're giving that to them up front as a credit to their
16 administrative cost of doing business with us.
17 BY MR. CAVANAUGH:
18    Q.   Okay.
19    A.   But it's a way of passing that money on to
20 the group on a realtime basis rather than, like rebates,
21 waiting nine to twelve months to collect them and then
22 trying to figure out how to attribute them back to the

</td><td valign="top">

60

1  think that was a new development compared to the old
2  agreement.
3         (There was a pause in the proceedings.)
4  BY MR. CAVANAUGH:
5     Q.   To what extent did -- strike that.
6         When Anthem was paying rebates back to its
7  customers, to what extent did Anthem disclose the
8  details of its arrangement with Merck-Medco?
9     A.   I think the agreements themselves bar us
10 from disclosing any of those terms, so we would not have
11 disclosed such terms.
12    Q.   In the course of negotiations with Medco
13 did Anthem ever seek to gain the right to make such
14 disclosures to its customers?
15    A.   To the best of my knowledge, no.  We did
16 have -- I mean, I mentioned before we paid some
17 customers a hundred percent of all collected rebates,
18 and --
19    Q.   Would that be something that had been --
20 that you would do with some customers and not do with
21 others?
22    A.   It was negotiated on a customer-by-customer

</td></tr>
<tr><td valign="top">

59

1  group and...
2     Q.   Was there a point in time when that's the
3  procedure that Anthem was utilizing?
4     A.   You mean paying actual rebates collected?
5     Q.   Yes.
6     A.   Yes.
7     Q.   And is that something that changed under
8  the '98 agreement with Medco?
9     A.   No.
10    Q.   When did that change?
11    A.   It changed with the 2001 agreement.
12    Q.   Okay.  And in the 2001 agreement did
13 Medco -- was one of the things you negotiated the
14 elimination of an up-front administrative fee that Medco
15 was charging Anthem?
16    A.   Say again?
17    Q.   As part of the 2001 agreement with Medco
18 was one of the things that you negotiated the
19 elimination of an up-front administrative fee?
20    A.   I -- it's my understanding we weren't
21 paying an administrative fee before.  I mean, I know we
22 weren't paying one with the 2001 agreement, but I didn't

</td><td valign="top">

61

1  basis, I think.  It -- you know, we had to rely on the
2  PBM to basically tell us, these are the rebate dollars
3  for this group.
4     Q.   And when you say it was negotiated on a
5  customer-by-customer basis, what would dictate whether a
6  customer would end up getting all or some percentage of
7  rebates?
8         MR. NICHOLSON:  Let me just note an
9  objection that you're asking sales questions of a
10 pharmacy employee, but to the extent you can answer it,
11 please do.
12        THE WITNESS:  I'm not sure how rebates
13 really were disseminated out to groups.  It's my
14 impression that anything that we could attribute back to
15 a group's claims experience, we paid those moneys back
16 to the groups.  And I -- I mean, I think the
17 differences, in my mind, for particularly an ASO
18 account, we would pay a hundred percent of this
19 negotiated 70 percent amount, but for some groups they
20 actually wanted a hundred percent, so we had to make up
21 that difference back to the groups for some of our large
22 accounts, the 30 percent that Medco was withholding.

</td></tr>
</table>

David B. Morris                Highly Confidential                January 5, 2005
                                  Richmond, VA

**62**

1    Q.    Would that be one reason why you would try
2  to eliminate that in the 2001 agreement?
3    A.    And administratively they were problematic,
4  I mean, just to deal with, you know, collecting the
5  administrative things you needed to process rebates and
6  attribute them back to a group's experience. I mean,
7  administratively burdensome.
8    Q.    And, so, do you recall that back in,
9  roughly, the middle of 2001 Anthem went from using this
10  rebate methodology to using a prescription drug
11  administrative credit?
12    A.    Yes.
13    Q.    And from Anthem's perspective what was the
14  benefit of using that administrative credit as opposed
15  to using rebates?
16    A.    It was structured very similarly to the
17  rebate guarantees. In other words, it was an
18  administrative credit on a per-claim basis, or on some
19  lines of business I think it was a PMPM basis I think on
20  both it was either a PMPM or a per-contract by month,
21  but it was designed to where we could calculate it
22  easily because we had the group's eligibility, and, so,

**63**

1  it was something similar to a per-claim basis.
2    Q.    Would I be correct that a customer would
3  not know how much Anthem was getting from Medco in terms
4  of a guaranteed per-claim rebate?
5    A.    You would be correct.
6    Q.    Let's use an example. Let's say, for
7  example, you had your agreement with Medco -- I think we
8  looked at it -- had $1.87 for a per-claim rebate to
9  Anthem.
10    A.    Uh-huh.
11    Q.    Under Anthem's administrative credit
12  arrangement with certain customers, let's assume they
13  gave back -- Anthem gave back a dollar.
14    A.    Okay.
15    Q.    Would I be correct that the customer
16  wouldn't know that there was 87 cents being retained by
17  Anthem?
18    MR. NICHOLSON:  I object to the form of the
19  question.
20    THE WITNESS:  I suppose that's correct.
21  They would not know, and we could not disclose those
22  terms, so there would be no way for them to know, yes,

**64**

1  that's correct.
2  BY MR. CAVANAUGH:
3    Q.    And, to some extent, that would give Anthem
4  an advantage in negotiating with its customers, wouldn't
5  it?
6    A.    It could. I mean, we wanted to use it as a
7  competitive advantage to, again, provide the credit up
8  front. They see it realtime, provide a set amount, it's
9  budgetable, you're not waiting to see what your rebates
10  are going to be nine months from now and hope they're
11  good so it offsets your claims expense. We structured
12  it, in my opinion, in a way that we were trying to use
13  it as a competitive advantage in the marketplace for our
14  customers.
15    Q.    Sure, but it gave Anthem the ability to
16  decide how much of the dollars it was getting back from
17  Medco it wanted to share with its customers.
18    A.    Yes.
19    MR. CAVANAUGH:  If you guys want to stretch
20  your legs, I'm going to look at my notes. I may be
21  close to being done.
22    (There was a pause in the proceedings.)

**65**

1  BY MR. CAVANAUGH:
2    Q.    When did you first become familiar with
3  this concept of PBMs?
4    MR. CAVANAUGH:  Ed, we're back on.
5    MR. NOTARGIACOMO:  That was a quick five
6  minutes, but I'm here.
7    MR. CAVANAUGH:  Yeah, sorry.
8    MR. NOTARGIACOMO:  Go ahead.
9    THE WITNESS:  When did I first become aware
10  of a PBM and the concept of a PBM?
11  BY MR. CAVANAUGH:
12    Q.    Yeah.
13    A.    I know I was aware of it prior to coming
14  into this job around '97, '98. I have to do continuing
15  education to stay abreast, and, so, it's --
16    Q.    Yeah. Did Anthem Virginia ever consider
17  contracting directly with manufacturers for rebates?
18    MR. NICHOLSON:  During his time in the
19  pharmacy area?
20    MR. CAVANAUGH:  Yeah.
21    THE WITNESS:  Yes.
22  BY MR. CAVANAUGH:

David B. Morris                Highly Confidential                January 5, 2005
                                  Richmond, VA

18 (Pages 66 to 69)

---

66

1    Q.    When did your group first consider that?
2    A.    At the same time we were developing the RFP
3    that resulted in this 2001 contract.
4    Q.    Do you know if it was considered back in
5    the '97-'98 time period when you did that initial
6    agreement?
7    A.    That I don't know.  I never heard anything
8    about it, so...
9    Q.    Well, in 2000 when you were developing the
10   RFPs how far did your evaluation get of contracting with
11   manufacturers directly?
12   A.    We actually probably talked to 18 to 20
13   manufacturers about, you know, what they were willing to
14   offer, and we had a pharmacy consultant working with us.
15   Q.    Who was that?
16   A.    It was called The Pharmacy Group -- they're
17   out of Connecticut -- a fellow named Michael Sachs and a
18   fellow named Perry Cohen.
19   Q.    Do you know where they are in Connecticut?
20   A.    Glastonbury.  I mean, it's The Pharmacy
21   Group, and it's just those two guys that came out of
22   California.  They worked for HMOs out in California and

---

67

1    got a lot of experience.
2    Q.    How far did you get in your negotiations
3    with manufacturers?
4    A.    It never really progressed past, you know,
5    the discussion back and forth about each manufacturer's
6    market basket of product and what they were willing to
7    offer in terms of rebates for those products.
8    Q.    What type of -- so, did you get to the
9    point where manufacturers actually said, we'd be willing
10   to give you X amount of rebate?
11   A.    Yeah, for product ABC we'll give you 10
12   percent of your billed amount or, you know, what you're
13   actually paying for.
14        Those contracts are not tied to AWP at all,
15   they are -- you know, it's the discounted ingredient
16   cost.
17   Q.    So, the rebate is based upon a discount off
18   of -- would it be -- off of what?
19   A.    You know, now that I think about it --
20   Q.    Was it based on WAC?
21   A.    I think it was, for the most part.  It
22   seems like we had a couple of companies that were trying

---

68

1    something different or -- it wasn't ingredient cost.  I
2    was mistaken about that.  But it was something else.  It
3    was WAC.
4    Q.    How, in your own mind, do you differ WAC
5    from ingredient cost?
6    A.    Ingredient cost is the network discounted
7    amount.  We said what WAC was earlier.
8         So, whatever the network discount was...
9    Q.    And you're referring there to AWP minus 15
10   plus a $2.25 dispensing fee?
11   A.    Correct.
12   Q.    To what extent did Anthem analyze the cost
13   to a pharmacist compared to the total reimbursement
14   amount being given to a pharmacist in terms of for a
15   particular product?
16   A.    Are you asking, you know, did we look to
17   try and determine what their profit margins were based
18   on our network reimbursement?
19   Q.    Yes.
20   A.    We did not ever do any type of analysis.
21   Q.    Why not?
22   A.    Probably because we didn't want to -- I

---

69

1    mean, we had no access to -- ready access to wholesale
2    acquisition costs or individual pharmacies' agreements
3    with wholesalers or suppliers, and, so, it would have
4    been impossible for us to really accurately have
5    estimated what a pharmacy was paying for its product.
6         You know, at the point you stop having
7    pharmacies participate in your network you know you've
8    gone too far, and we were nowhere close to that, in my
9    opinion, so they were still making money at AWP minus 15
10   or AWP minus 16.
11   Q.    So, would I be correct that the way that
12   you determined what your reimbursement rates would be
13   was not so much based upon what their actual acquisition
14   costs were but based on how you saw pharmacists reacting
15   to the reimbursement rates you put out there?
16   A.    What will the market bear, yes.  I mean...
17        It's all economics 101.  At the point they
18   stop or scream too loudly you know you've gone too far.
19   They tie their reimbursement drugs to things other than
20   cognitive services and counseling, and that's a whole
21   separate topic, but...
22   Q.    And by doing that they've given you the

---

David B. Morris                Highly Confidential                January 5, 2005
                               Richmond, VA

19 (Pages 70 to 73)

---

**70**

1    ability to ratchet down their margins?
2         A.    Correct.  Well, we don't look at it like
3    that.  We're controlling our customers' costs.
4         Q.    It depends on what side of the table you're
5    on?
6         A.    It does.
7         Q.    Let me go back to the manufacturers you
8    were talking to.  What services were you proposing to
9    provide to the manufacturers in consideration for the
10   rebates you were asking for?
11        A.    You have to send them your claims
12   experience and, you know, they do their analysis and
13   determine, you know, what their market share for their
14   product is, and they define their market basket, if you
15   will.  You have to provide them that.  You have to --
16   their agreements basically offer incentives if you're
17   willing to do things like restrict access to competing
18   products.
19              You know, if they're one of -- if they're
20   the only choice within a category they'll pay higher
21   moneys than if they're one of two or one of three.
22        Q.    So, essentially, what you were proposing is

---

**71**

1    in lieu of a pharmacy benefit manager providing
2    formulary, formulary compliance, drug utilization
3    information, Anthem would step into that role.
4         A.    Correct.
5         Q.    And would I be correct, then, that what you
6    did in 2000 is you analyzed the pros and cons of that
7    approach and then the pros and cons of going with any
8    one of the PBMs with whom you were negotiating?
9         A.    Correct.
10        Q.    And the end result was you decided to go
11   with Medco?
12        A.    Correct.
13        Q.    Was it your sense, based upon the rebates
14   that you were getting, the rebate proposals you were
15   getting from manufacturers, that Medco was able to get
16   better deals than Anthem?
17        A.    If you viewed it in total, yes.  I mean, we
18   thought we could, with some level of effort, you know,
19   increase our rebates.  If that was what we were really
20   interested in doing, we could increase them over what
21   they were at that point in time.  It really becomes an
22   issue of, you know, whether you want to actually do

---

**72**

1    that.  Do you want to tighten up your formulary to the
2    point where you're limiting your ability to sell a
3    product in the marketplace?  And most people like
4    choice.  They don't like you telling them, you can have
5    this one lipid drug, or, you can have this one
6    antidepressant.  They like to not be restricted.
7         Q.    And would I also be correct that the
8    greater effort you put into ensuring formulary
9    compliance and providing the service that the
10   manufacturer is looking for in exchange for the rebate
11   it's going to cost Anthem more money to do that?
12        A.    Correct.  And it costs us something in the
13   marketplace as well, and you have to balance the costs
14   against -- you know, it's a cost/benefit analysis,
15   basically.
16              You make your best choice that you have
17   with the facts that you have available to you.  And we
18   didn't think our rebates would come close to what Medco
19   could offer us initially.  There was some period of time
20   where you had to ramp up operations and begin to build
21   the entire --
22        Q.    Infrastructure?

---

**73**

1         A.    Right, that was the word I was trying to
2    think of -- to begin collecting those rebates, but once
3    you did, if you were willing to do certain things to
4    drive utilization to the formulary products, you could
5    do very well in terms of rebates.
6              Ultimately, it was a strategy that we
7    didn't think was worth pursuing, because typically you
8    earn rebates on higher cost drugs, anyway.  That's why
9    manufacturers pay them; they want people to use them.
10   And you're not -- you're not looking out for your
11   customer long term.  You're costing them more, really,
12   even though you're earning higher rebates.
13        Q.    Based upon your participation in this
14   exchange with manufacturers and your evaluation, did you
15   conclude that ultimately you thought Anthem could have
16   earned the same level of rebates as any other
17   third-party PBM?
18        A.    Again, if you're willing to do what it took
19   to maximize those rebate moneys, yes, I think you could
20   have -- I think you could have.
21        Q.    Is the Anthem PBM seeking to maximize its
22   rebates?

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

20 (Pages 74 to 77)

---

74

1    A.    Again --
2          MR. NICHOLSON:  Object to form.
3          THE WITNESS:  I don't think we as a company
4    still believe that chasing rebates is the best thing at
5    the end of the day for the customer.  You're still
6    paying for more expensive drugs, and it's my impression
7    APM doesn't pursue that strategy, either.
8          I mean, I think because, you know, it's a
9    cooperative relationship between the two companies that
10   are held under one parent that they listen to us a
11   little closer, and, so, they're not adding drugs to the
12   formulary just to chase rebates.
13   BY MR. CAVANAUGH:
14   Q.    Does the per-claim -- well, strike that.
15         Did the per-claim rebate that you were
16   getting from Medco -- strike that.
17         Would I be correct that the per-claim
18   rebate that you negotiated from Medco in the 2000
19   agreement would have -- drug costs would have no bearing
20   on that?
21         MR. NICHOLSON:  You mean the 2001
22   agreement?

---

75

1          MR. CAVANAUGH:  Yeah.
2          THE WITNESS:  I think you're correct in
3    that statement.  Drug costs would have no relationship
4    to that per-claim rebate amount that they're paying us.
5    I mean, they weren't tied to anything specifically other
6    than our promise to work with you, Medco, to do what's
7    right for both of us.
8          And that's exactly what we did, we worked
9    through issues that we had where they wanted us to add a
10   drug to the formulary and we said, no, we're concerned
11   about the cost of that drug or that particular category,
12   and, so, we don't want to at this point in time, and
13   then, you know, it was -- we never just told them no and
14   then backed away from the table, it was always an
15   ongoing discussion, and I think it worked fairly well.
16   BY MR. CAVANAUGH:
17   Q.    I mean, at the end of the day Anthem had
18   the ability not to put a drug on its formulary, correct?
19   A.    Correct.  There were certain thresholds.  I
20   mean, if -- I think if a certain amount of our business
21   migrated away from that $15 differential on the --
22   within the managed plans the guarantees were at risk,

---

76

1    and there were a few other things that put the
2    guarantees at risk, but nothing substantive that ever
3    concerned us.  I mean, we always kept an eye on those
4    issues that could have affected those guarantee amounts,
5    but they never came into play at all.
6    Q.    Is there a disincentive for a PBM to put a
7    higher price product in its formulary?
8    A.    Is there a disincentive?
9          (Pause.)
10         MR. NICHOLSON:  Object to form.
11         THE WITNESS:  All other things being equal,
12   efficacy of the drug, safety of the drug, a more
13   expensive product only increases the customer or whoever
14   is paying for that claims cost.  So whether it's us, if
15   we're fully insuring a group, or whether it's a large
16   ASO account, that customer is going to see their claims
17   cost go up.
18   BY MR. CAVANAUGH:
19   Q.    And, so, that creates a disincentive for
20   the PBM when they're out there trying to compete for
21   your business, doesn't it?
22   A.    Yes.

---

77

1    Q.    Because if you look at a formulary that's
2    stocked with high-priced drugs you're going to -- one of
3    the things you would recognize when you're evaluating
4    that formulary is that it's going to produce potentially
5    higher costs for you.
6    A.    Correct, and our customers.
7    Q.    So, when you're negotiating with the PBM
8    one of the things you're looking at -- in fact, at the
9    end of the day what you're looking at is what's the
10   total cost going to be of doing business with this
11   particular PBM and the services and formularies it
12   offers.
13   A.    Correct.  I mean, that's correct, you look
14   at the entire thing.  There are some drugs where you
15   know it's the most expensive in the class.  You maybe
16   don't like that drug, but based on the strength of the
17   manufacturer you know you're not going to be able to
18   take that drug off your formulary or disincent your
19   customers to stop using it, so you kind of weigh that
20   and make a decision about the overall value of the
21   complete package.
22         There's some things where you give up a lot

---

David B. Morris                    Highly Confidential                    January 5, 2005
                                   Richmond, VA

21 (Pages 78 to 79)

78

1   but you get something over here, so it kind of balances
2   out.
3       Q.    And that's from Anthem's perspective,
4   correct?
5       A.    Yes.
6       Q.    And isn't the PBM doing the same thing in
7   terms of balancing; maybe it will get some rebate
8   dollars, but at the same time by putting high-priced
9   drugs in its formulary it's creating a less attractive
10  package for Anthem, correct?
11      A.    Yes.
12          MR. CAVANAUGH:  All right.  I don't think I
13  have any further questions.
14          Ed, do you have anything?
15          MR. NOTARGIACOMO:  Nope, not for this
16  witness.
17          MR. NICHOLSON:  He'll read and sign as
18  well.
19          (The witness did not waive signature.)
20          (The deposition concluded at 3:41 p.m.)
21
22

79

1   COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
        I, Heidi L. Jeffreys, RDR, CRR, a Notary
2   Public for the Commonwealth of Virginia at Large, of
3   qualification in the Circuit Court of the City of
    Norfolk, Virginia, and whose commission expires June 30,
4   2008, do hereby certify that the within deponent,
5   D. B. MORRIS, appeared before me at Richmond, Virginia,
    as hereinbefore set forth, and, after being first duly
6   sworn by me, was thereupon examined upon his oath by
7   counsel; that his examination was recorded in Stenotype
8   by me and reduced to typescript under my direction, and
9   that the foregoing transcript constitutes a true,
10  accurate, and complete transcript.
11          I further certify that I am not related to
12  nor otherwise associated with any party or counsel to
13  this proceeding, nor otherwise interested in the event
14  thereof.
15          Given under my hand and notarial seal at
16  Norfolk, Virginia, this _____ day of _____,
17  2005.
18
19                          _____
20                          Heidi L. Jeffreys, RDR, CRR
21                          Certification No. 0413283
22                          Notary Public

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

1

| A | | | | |
|---|---|---|---|---|
| **ABC** 67:11 | 14:22 45:20 | 63:11 | 26:22 27:3,4 | **although** 29:4 |
| **ability** 64:15 | 46:21 69:2 | **administrati...** | 27:11,13,15 | **always** 15:22 |
| 70:1 72:2 | 69:13 | 62:3,7 | 27:16,22 | 25:11,21 |
| 75:18 | **across** 46:10 | **adopt** 25:19 | 28:1,17,18 | 41:12 47:6 |
| **able** 11:8 26:6 | 54:2 | **advantage** | 29:4,10,16 | 75:14 76:3 |
| 47:20 71:15 | **ACTION** 1:3 | 44:19 64:4,7 | 30:7,17,18,18 | **am** 7:15,21 |
| 77:17 | **actual** 23:10 | 64:13 | 31:1 32:17 | 21:3 56:6 |
| **about** 5:11,17 | 59:4 69:13 | **advice** 13:8 | 33:19 36:3,8 | 79:11 |
| 5:17 12:21 | **actually** 9:4 | **affected** 76:4 | 39:11 40:14 | **amendment** |
| 14:5,8 17:5 | 14:1 19:15 | **after** 28:1 79:5 | 52:21 53:8 | 21:6,9 |
| 22:13 35:13 | 19:22 20:2 | **again** 6:3 7:19 | 53:17 54:1 | **Americas** 2:12 |
| 37:17 38:14 | 23:21 26:12 | 20:21 24:4 | 54:22 55:1,4 | **among** 21:13 |
| 38:20 39:1 | 33:5 44:2,16 | 25:8 26:1 | 55:5,7 58:13 | 23:15 |
| 42:17,17 | 45:5,12 | 37:19 38:13 | 59:8,11,12,17 | **amount** 21:20 |
| 43:9 45:3 | 52:21 58:10 | 38:22 39:10 | 59:22 60:2 | 22:1 31:17 |
| 48:10 50:4 | 58:11 61:20 | 41:2 47:9 | 62:2 63:7 | 32:4 33:2 |
| 51:10 52:2 | 66:12 67:9 | 48:4,17 | 66:6 74:19 | 41:11 43:18 |
| 53:11 58:6 | 67:13 71:22 | 54:11 59:16 | 74:22 | 46:13 58:14 |
| 66:8,13 67:5 | **actuarial** 11:12 | 64:7 73:18 | **agreements** | 61:19 64:8 |
| 67:19 68:2 | 11:13 | 74:1 | 8:13,17,19 | 67:10,12 |
| 75:11 77:20 | **add** 25:4 29:14 | **against** 72:14 | 9:15,18 16:4 | 68:7,14 75:4 |
| **abreast** 65:15 | 75:9 | **age** 44:13 | 16:7,9,13 | 75:20 |
| **absolute** 24:2 | **adding** 74:11 | **aggregate** | 26:19 41:15 | **amounts** 28:8 |
| 25:16,21 | **addition** 23:8 | 34:18 46:10 | 48:5 50:19 | 31:13,14 |
| 45:22 | 55:14 | **ago** 5:17 14:11 | 58:4 60:9 | 76:4 |
| **accept** 29:14 | **additional** | 46:19 47:15 | 69:2 70:16 | **analyses** 52:17 |
| **access** 16:12 | 34:13 | 48:2,13 | **ahead** 65:8 | **analysis** 51:13 |
| 47:10 69:1,1 | **addressed** | **agree** 29:10 | **aligned** 55:18 | 52:13 68:20 |
| 70:17 | 22:17 | 38:9 41:6,17 | **all** 6:1 10:8 | 70:12 72:14 |
| **account** 34:15 | **adequate** | 54:9 | 17:21 23:3 | **analyst** 5:2,7,8 |
| 61:18 76:16 | 10:21 | **agreed** 16:16 | 25:9 36:8 | **analyze** 68:12 |
| **accounting** | **adjudicating** | 23:5 | 37:1 50:22 | **analyzed** 71:6 |
| 28:13 | 45:13 | **agreeing** 32:10 | 55:18 60:17 | **analyzing** 5:4 |
| **accounts** 61:22 | **adjusted** 21:7 | 32:13 | 61:6 67:14 | **and/or** 34:14 |
| **accurate** 79:10 | 21:8 | **agreement** | 69:17 76:5 | 41:4 |
| **accurately** | **administer** | 3:13,16 8:22 | 76:11 78:12 | **another** 23:19 |
| 69:4 | 28:12 | 11:22 18:17 | **allow** 37:21 | 37:19 56:2 |
| **acquire** 45:6 | **administered** | 18:20,22 | 44:18 | **answer** 12:1 |
| 46:1 49:22 | 49:19 | 19:4,8,9,21 | **already** 19:9 | 15:12 24:19 |
| **acquired** 14:17 | **administrative** | 20:6,22 21:1 | 22:17 50:6 | 25:2 49:7 |
| 23:20 | 35:4,9 58:13 | 21:7,9,12,16 | **also** 9:15,17 | 61:10 |
| **acquiring** 48:9 | 58:16 59:14 | 22:6 23:22 | 12:17 24:1 | **Anthem** 1:20 |
| **acquisition** | 59:19,21 | 24:7,11,20 | 30:13 34:13 | 2:16 4:12,16 |
| | 62:5,11,14,18 | 25:18 26:3 | 38:18 72:7 | 4:17 6:10,12 |

David B. Morris          Highly Confidential          January 5, 2005
Richmond, VA

2

7:16,21 8:3,6
8:12 11:21
12:18 13:9
13:16,18
16:12,15
18:15 21:2
21:16 22:12
22:15 24:21
26:12,18,21
27:1 30:6,13
30:18 31:8
32:5,15 36:3
42:10,17
43:9 44:1,6
49:15,15,17
49:21 50:4,4
50:9,17 51:3
51:10,13,16
51:16,18,19
52:6 53:5
54:18,21
56:7 57:11
57:20,22
58:3,4 59:3
59:15 60:6,7
60:13 62:9
63:3,9,13,17
64:3,15
65:16 68:12
71:3,16
72:11 73:15
73:21 75:17
78:10
**Anthem's**
22:21 51:1
53:6 55:11
56:11 62:13
63:11 78:3
**Anthem-rela...**
51:6
**antidepressant**
72:6
**any** 12:4,5,18
13:12,21

16:15 19:14
35:1,18,21
43:16 45:2
46:6 49:13
49:22 50:15
50:17,20
55:21 60:10
68:20 71:7
73:16 78:13
79:12
**anybody** 50:5
**anything** 61:14
66:7 75:5
78:14
**anyway** 73:8
**APM** 51:10
53:16 74:7
**apparently**
41:16
**appeals** 6:4
**appear** 31:11
38:8 39:10
**Appearances**
2:1
**appeared** 79:5
**applicable**
43:22
**apply** 43:12
**approach** 71:7
**approximately**
5:3
**area** 7:7 46:15
65:19
**areas** 54:2
**around** 12:4
47:6 57:13
65:14
**arrangement**
15:6 22:22
54:20,21
60:8 63:12
**arrived** 20:18
38:12
**ask** 7:20 10:9

11:4 12:22
20:5 35:11
36:2 38:17
49:13 57:3
**asked** 17:7
**asking** 38:13
42:1 50:12
58:6 61:9
68:16 70:10
**ASO** 61:17
76:16
**assessment**
28:10
**associated**
79:12
**assume** 14:4
15:11,13
45:7 47:9
50:22 63:12
**assuming** 41:3
**assumption**
15:8,21
20:20,21
40:2 58:2
**attached** 20:3
**attempt** 29:11
**attention** 40:13
**attractive** 78:9
**attribute** 58:22
61:14 62:6
**audit** 26:19,21
27:3,6,22
28:3
**authorization**
5:15 6:4
**automatically**
45:15
**available** 72:17
**Avenue** 2:12
**average** 1:8
46:13
**aware** 9:19
20:22 21:3
47:19 65:9

65:13
**away** 51:11
75:14,21
**AWP** 18:2
40:17,19
41:9,10,21,21
43:20 44:21
45:9,13 46:7
46:12,18
47:8,11 53:1
53:9 67:14
68:9 69:9,10
**AWPs** 47:2
**Axelrod** 7:14
**A-VA** 30:12,14
──────────
**B**
**B** 1:16 2:17 3:5
4:1,7 36:4
38:18 39:7
79:5
**back** 4:20 8:7,7
22:4 27:2
32:17 33:20
47:19 48:13
48:18 57:12
58:22 60:6
61:14,15,21
62:6,8 63:13
63:13 64:16
65:4 66:4
67:5 70:7
**backed** 75:14
**balance** 72:13
**balances** 78:1
**balancing** 78:7
**bar** 60:9
**based** 20:12
29:9 42:3
43:6 47:9
54:1,4 67:17
67:20 68:17
69:13,14
71:13 73:13

77:16
**basically** 9:6
50:14 52:12
61:2 70:16
72:15
**basis** 15:20
21:21 22:5
23:3 26:4
31:9 44:2
50:19,21
58:20 61:1,5
62:18,19
63:1
**basket** 46:11
67:6 70:14
**Bates** 30:10,14
**be** 9:22 11:8,14
11:19,20
12:6 13:16
15:18 20:20
23:7 26:6,11
27:7 32:5,15
34:2,21 38:8
40:8 41:2
42:12,48:2
48:14 49:3
50:17,19,20
54:18 57:20
60:19 62:1
63:2,5,15,22
64:10,20
67:9,18
69:11,12
71:5 72:6,7
74:17 77:10
77:17
**bear** 54:4
69:16
**bearing** 18:17
74:19
**became** 14:2
14:18 15:4
**because** 15:3
25:1 26:16

David B. Morris              Highly Confidential              January 5, 2005
                              Richmond, VA

3

| | | | | |
|---|---|---|---|---|
| 28:20 29:18 | benefits 6:1,15 | 54:16 | 64:15 65:6 | case 4:13 52:12 |
| 29:19 52:16 | 24:19 25:3 | break 49:9 | 68:2 69:14 | cases 23:9 |
| 53:22 56:20 | 40:11 52:6 | brief 4:22 | 69:21 73:2 | categories |
| 62:22 68:22 | 55:14 | broad 39:20 | 76:2,5 77:16 | 34:17 |
| 73:7 74:8 | Berman 2:4 | budgetable | 78:1,8 | category 70:20 |
| 77:1 | best 16:3 33:18 | 64:9 | buy 44:14 | 75:11 |
| become 36:15 | 60:15 72:16 | build 72:20 | 48:11,12 | caution 15:22 |
| 46:17 65:2,9 | 74:4 | built 14:15 | 49:18 | Cavanaugh |
| becomes 71:21 | better 48:19,20 | 32:1 37:20 | | 2:10 3:5 4:5 |
| been 4:2,18 6:7 | 48:22 53:7 | 38:5 40:2 | _____ | 4:10,14 8:6 |
| 8:15 9:17 | 53:15 56:20 | 45:8 | C | 8:10,20 |
| 12:2,20 | 71:16 | bulk 48:8 | calculate 62:21 | 10:15 13:6 |
| 13:16 15:1 | between 14:8 | burdensome | calculating | 13:14 15:16 |
| 19:11 28:6,7 | 15:7 16:16 | 62:7 | 43:9 | 16:3,6 18:10 |
| 30:16 47:6 | 18:22 25:14 | business 11:1 | calculation | 18:14 20:4 |
| 49:16 50:6 | 26:11 46:7 | 14:12 15:19 | 44:21 | 22:19 24:15 |
| 54:1 56:21 | 46:12 47:8 | 19:14 20:19 | California | 25:17 27:9 |
| 60:19 69:4 | 74:9 | 34:17 35:19 | 66:22,22 | 27:21 30:2,4 |
| before 1:17 8:4 | beyond 15:21 | 37:4 39:17 | called 4:1 7:7 | 30:12,15 |
| 14:21 34:6 | bid 9:4 23:14 | 39:22 40:4 | 40:3 44:9 | 31:5 33:16 |
| 35:17 59:21 | Bill 4:9 | 52:12 55:13 | 66:16 | 34:5,9 35:16 |
| 60:16 79:5 | billed 17:10 | 56:11 58:16 | Cambridge 2:6 | 38:16 39:4,9 |
| began 51:9 | 67:12 | 62:19 75:20 | came 8:22 | 42:3,9 49:10 |
| begin 57:7 | birth 44:22 | 76:21 77:10 | 10:16 15:18 | 49:12 50:7 |
| 72:20 73:2 | bit 47:18 52:22 | but 6:19 11:12 | 19:10 33:10 | 50:16 54:17 |
| begins 31:12 | black 15:22 | 12:4 13:3,8 | 35:17 36:11 | 55:8 57:2 |
| behalf 1:16 2:2 | Blue 4:16,16 | 14:15 15:11 | 66:21 76:5 | 58:8,17 60:4 |
| 2:9,16 3:4 | 47:6 | 15:22 17:8 | can 10:14 14:7 | 64:2,19 65:1 |
| behavior 41:3 | board 10:16 | 17:13 20:17 | 22:3,3 25:4 | 65:4,7,11,20 |
| behind 29:16 | body 24:17 | 20:21 22:1 | 27:19 29:5,7 | 65:22 74:13 |
| being 4:11 | book 34:17 | 24:2 25:4,15 | 30:10 32:17 | 75:1,16 |
| 15:19 23:12 | 37:4 47:6,6 | 25:18,20 | 32:20 36:21 | 76:18 78:12 |
| 45:11 63:16 | boss 12:8,10 | 27:10 28:7 | 39:18 40:14 | CCN 39:22 |
| 64:21 68:14 | both 7:9 28:5,8 | 28:13 29:12 | 43:11 44:12 | 40:1,3,8,8 |
| 76:11 79:5 | 62:20 75:7 | 32:12 34:12 | 49:8 55:5 | cents 63:16 |
| believe 14:18 | bottle 47:1,1 | 34:19 37:14 | 56:4 61:10 | certain 20:8 |
| 22:18 74:4 | bought 15:4 | 37:22 38:2 | 72:4,5 | 26:13 34:14 |
| Belknap 2:11 | 48:8 49:16 | 40:18 41:17 | cannot 14:12 | 34:16 40:22 |
| below 44:10 | brand 25:13 | 44:22 47:5 | can't 41:12 | 63:12 73:3 |
| 48:2 | 25:14 53:13 | 47:14 49:19 | care 5:6,9,22 | 75:19,20 |
| benefit 6:5 | branded 20:9 | 54:4,14 | 6:20 7:3,11 | certainly 9:19 |
| 19:15 32:5 | 25:6 26:2 | 55:20 58:19 | 20:7 22:1,13 | 15:12 25:14 |
| 52:13 57:22 | 53:20 | 59:22 61:10 | 36:19,20 | 42:10,14 |
| 62:14 71:1 | brands 42:7 | 61:19 62:21 | 37:2 40:19 | certainty 24:2 |
| | | | 58:1 | |

David B. Morris                Highly Confidential                January 5, 2005
                                Richmond, VA

4

| | | | | |
|---|---|---|---|---|
| **Certification** 79:21 | close 33:10 64:21 69:8 72:18 | 50:20 51:5,6 55:16,17 56:2 74:3 | 29:1 **Connecticut** 66:17,19 | 17:17 23:3 25:9 57:21 67:14 |
| **certify** 79:4,11 cetera 11:9 46:16,16 | closely 32:13 41:15 | **company-by...** 50:19,21 | cons 51:14 71:6,7 | **control** 44:22 55:14 |
| **chain** 16:19 48:19,21 54:5 | closer 74:11 cognitive 69:20 Cohen 66:18 | compare 52:20 compared 48:11 52:14 | consensus 11:7 consider 43:7 65:16 66:1 | **controlling** 70:3 **convention** 14:15 |
| **chains** 16:10 48:18,19 | collaborative 11:5 43:2 | 52:21 60:1 68:13 | consideration 70:9 | **cooperative** 74:9 |
| **chances** 44:13 change 59:10 | collect 55:21 58:21 | compete 76:20 competing | considered 66:4 | **coordinate** 6:1 **Coordinated** |
| **changed** 6:17 59:7,11 | collected 59:4 60:17 | 56:11 70:17 competitive | consisted 25:16 | 36:19,20 37:2 40:19 |
| **changes** 14:5 charging 35:9 59:15 | collecting 33:4 35:2 62:4 73:2 | 23:14 44:19 64:7,13 complete 77:21 | constitutes 79:9 consultant | corner 49:1 corporate 10:18 11:10 |
| **chase** 74:12 chasing 74:4 | college 57:18 Colley 19:16 | 79:10 complex 33:8 | 12:18 66:14 consultation | 11:16 12:9 correct 7:15,21 |
| **check** 17:9 checks 17:13 | combination 42:8 | compliance 71:2 72:9 | 13:8 context 15:17 | 8:1 9:13 14:3 14:4 19:1,2 |
| **chief** 6:20 7:3 7:11 | come 19:6 20:17 51:3 72:18 | complicated 53:22 | continued 33:14 | 28:22 32:15 32:16 37:16 |
| **childbearing** 44:13 | coming 11:6 24:4 36:14 | component 13:20 | continuing 65:14 | 48:15 50:17 54:18 56:6,9 |
| **children** 44:14 choice 70:20 | 65:13 commencing | components 9:18 | contraceptives 44:11,16 | 57:20 58:2 63:2,5,15,20 |
| 72:4,16 chose 26:17 | 1:18 commission | compute 45:10 computer | 45:4 contract 9:6 | 64:1 68:11 69:11 70:2 |
| **Circuit** 79:3 City 79:3 | 79:3 commitments | 45:10 concept 32:21 | 10:2 17:22 28:14 29:22 | 71:4,5,9,12 72:7,12 |
| **CIVIL** 1:3 claim 31:17 | 34:18 Commonwe... | 32:22 33:14 35:3,8 65:3 | 32:11 33:15 33:17 35:13 | 74:17 75:2 75:18,19 |
| 45:14 claims 25:7 | 1:18 57:18 79:1,2 | 65:10 concerned | 37:7 38:14 38:18 39:2 | 77:6,13,13 78:4,10 |
| 26:2,7,15 33:3 55:20 | companies 50:9 56:21 | 75:10 76:3 conclude 73:15 | 54:12 55:16 56:7 58:7,10 | correctly 19:17 cost 29:19 32:4 |
| 55:22 56:1 61:15 64:11 | 67:22 74:9 company 4:18 | concluded 78:20 | 66:3 contracting | 42:11 43:10 44:10,20,22 |
| 70:11 76:14 76:16 | 4:21 12:12 12:15 13:19 | conducting 5:5 confidential | 13:18 35:12 37:14 51:4,5 | 45:20 46:12 46:21 52:13 |
| class 77:15 clinical 5:13 | 14:14 15:9 49:16 50:18 | 1:11 4:12 confirm 31:8 | 65:17 66:10 contracts 7:16 | 52:14,18 58:16 67:16 |
| 19:13 | | conjunction | 7:22 13:15 | |

David B. Morris                 Highly Confidential                 January 5, 2005
Richmond, VA

5

| | | | | |
|---|---|---|---|---|
| 68:1,5,6,12 | creating 36:7 | 79:16 | deposed 50:6 | 59:10,12 |
| 72:11 73:8 | 78:9 | deal 62:4 | deposition | 60:5,7,13,15 |
| 75:11 76:14 | credit 58:13,15 | dealing 9:16 | 1:15 4:11,11 | 65:2,9,16 |
| 76:17 77:10 | 62:11,14,18 | 10:2 34:11 | 8:3 78:20 | 66:1,5,10 |
| costing 73:11 | 63:11 64:7 | 55:15,17 | derive 55:13 | 67:2,8 68:12 |
| costs 33:6 43:9 | Cross 4:16 | dealings 13:21 | described 22:9 | 68:16,20 |
| 44:17 45:5,9 | CRR 1:17 79:1 | deals 71:16 | 49:7 | 71:6 73:3,14 |
| 52:17,19 | 79:20 | dealt 21:13 | Description | 74:15 75:8 |
| 56:3 69:2,14 | current 5:12 | December 4:19 | 3:10 | 78:19 |
| 70:3 72:12 | currently | decide 46:22 | designated | didn't 11:3 |
| 72:13 74:19 | 12:13 | 64:16 | 4:11 | 12:4 22:13 |
| 75:3 77:5 | customary | decided 26:13 | designed 62:21 | 25:11 33:11 |
| cost/benefit | 43:19 44:6,7 | 52:22 56:19 | detail 12:5 | 37:12 59:22 |
| 72:14 | customer 6:2 | 71:10 | details 60:8 | 68:22 72:18 |
| could 4:20 | 41:5 44:19 | decision 29:13 | determination | 73:7 |
| 12:20 22:20 | 45:1 55:19 | 77:20 | 45:14 | differ 36:22 |
| 24:9 26:11 | 61:6 63:2,15 | Deeper 9:10,11 | determine 44:7 | 54:21 68:4 |
| 26:16 29:19 | 73:11 74:5 | Defendants | 68:17 70:13 | differed 24:11 |
| 33:1,8 35:14 | 76:13,16 | 1:16 2:9 3:4 | determined | 24:22 |
| 40:6,8 43:6 | customers 6:1 | defer 45:15 | 69:12 | difference |
| 45:9 46:1,22 | 11:9 22:4 | define 32:12 | determining | 25:11 47:7 |
| 47:10,13 | 29:19 33:7 | 70:14 | 42:18 45:3 | 61:21 |
| 48:6,7,19,20 | 52:16 53:15 | defined 32:1 | Developed | differences |
| 48:21 52:15 | 56:4 57:21 | 34:11 | 39:16 | 26:11 47:13 |
| 61:14 62:21 | 58:5 60:7,14 | definitely | developing | 61:17 |
| 63:21 64:6 | 60:17,20 | 48:22 | 39:19 66:2,9 | different 9:7 |
| 71:18,20 | 63:12 64:4 | definition | development | 10:9,12 |
| 72:19 73:4 | 64:14,17 | 35:15 | 60:1 | 17:14 23:16 |
| 73:15,19,20 | 70:3 77:6,19 | degree 57:5 | dictate 61:5 | 30:22 32:6 |
| 76:4 | customer's | delayed 23:8 | did 4:17 9:2,9 | 37:1 38:8,11 |
| counsel 2:22 | 40:10 | department | 11:8,18 | 39:11,15,16 |
| 79:7,12 | customer-by... | 5:13,17,19,20 | 12:17 13:21 | 39:17 40:3,4 |
| counseling | 60:22 61:5 | 6:7,13,19 7:5 | 14:1 20:17 | 40:5 41:2 |
| 69:20 | cut 17:13 | 7:7 8:22 | 21:16 25:20 | 48:9 54:8 |
| count 26:6 | | 19:10,12 | 26:18,20,21 | 56:10 68:1 |
| country 54:2 | _____ | department's | 27:3,5,6,15 | differential |
| couple 67:22 | D | 6:14 | 34:20 36:14 | 75:21 |
| course 60:12 | D 3:1,5 79:5 | depend 40:9 | 46:17 47:14 | differently |
| Court 1:1 79:3 | date 18:17 | depending | 50:20 51:3 | 49:14 |
| covered 39:20 | dated 3:13,16 | 48:4,4 | 51:13,16,16 | direct 35:1 |
| 51:1 | 20:3 | depends 15:17 | 51:18 52:2 | 37:14 |
| co-pays 45:2 | David 1:16 4:1 | 46:15 48:17 | 52:11,19 | direction 28:8 |
| created 37:10 | 4:7 | 70:4 | 53:3 56:13 | 79:8 |
| creates 76:19 | day 1:19 74:5 | deponent 79:4 | 57:7,10,17 | directly 9:20 |
| | 75:17 77:9 | | | |

David B. Morris          Highly Confidential          January 5, 2005
Richmond, VA

6

| | | | | |
|---|---|---|---|---|
| 9:21 19:13 | disrupt 10:22 | 25:15 26:4 | **E** | 61:6 71:10 |
| 49:22 52:8 | disseminated | 26:16 27:8 | E 3:1 | 74:5 75:17 |
| 65:17 66:11 | 61:13 | 27:10 30:4 | each 20:12 | 77:9 |
| director 6:20 | disseminating | 30:20 33:10 | 36:18,21 | ensure 10:21 |
| 19:16 | 11:1 | 39:5 41:13 | 38:7,11 | ensuring 72:8 |
| disclose 60:7 | distinguished | 41:15 43:5 | 39:14 56:17 | enter 16:9 |
| 63:21 | 25:2 | 47:4 55:3,6 | 67:5 | entered 18:17 |
| disclosed 60:11 | DISTRICT 1:1 | 55:21 66:7 | earlier 4:10 | 21:12 30:7 |
| disclosing | 1:2 | 70:2 72:4 | 24:19 30:17 | 58:4 |
| 60:10 | division 5:22 | 74:3 75:12 | 34:10 68:7 | enters 57:20 |
| disclosures | document | 77:16 78:12 | early 11:13 | entire 5:18 |
| 60:14 | 12:22 18:12 | down 33:6 | earn 73:8 | 24:5 37:4 |
| discount 11:4 | 18:15 30:9 | 48:22 56:3 | earned 23:11 | 46:10 56:20 |
| 17:8 48:8 | 30:11 | 70:1 | 58:11 73:16 | 72:21 77:14 |
| 49:3 53:1,9 | does 7:10 | draw 40:13 | earning 26:14 | entities 13:17 |
| 54:9 67:17 | 13:21 16:8 | drive 73:4 | 26:15 73:12 | 14:8 |
| 68:8 | 16:12,15 | driven 41:20 | easier 26:7 | entitled 18:16 |
| discounted | 29:1 31:8 | 41:21 | easily 62:22 | 36:4 |
| 67:15 68:6 | 35:11 39:10 | driving 12:6 | economics | entity 8:3 14:9 |
| discounts 9:10 | 43:9 44:6 | drug 3:12,15 | 69:17 | 14:21 48:18 |
| 9:11 47:20 | 49:15 54:3 | 18:16 20:8 | Ed 2:3 49:10 | 50:5 51:20 |
| discuss 10:1 | 54:20 58:3 | 29:14,20 | 65:4 78:14 | 52:7 |
| discussing | 70:6 74:14 | 30:7 32:4 | education | equal 43:18 |
| 9:20 19:11 | doesn't 15:11 | 33:1 38:3 | 65:15 | 76:11 |
| discussion | 74:7 76:21 | 41:19 44:20 | efficacy 76:12 | errors 28:5,16 |
| 11:6 12:3 | doing 5:8,9,14 | 46:15 62:10 | effort 71:18 | ESQUIRE 2:3 |
| 15:15 43:1,2 | 32:13 52:17 | 71:2 72:5 | 72:8 | 2:10,17 |
| 67:5 75:15 | 55:21 58:16 | 74:19 75:3 | either 7:8 | essentially |
| discussions | 69:22 71:20 | 75:10,11,18 | 15:11 41:4 | 70:22 |
| 12:6 | 77:10 78:6 | 76:12,12 | 62:20 74:7 | establishes |
| disincent 77:18 | doling 33:4 | 77:16,18 | eligibility | 18:6 |
| disincentive | dollar 53:13 | drugs 20:13 | 40:11 62:22 | establishment |
| 76:6,8,19 | 63:13 | 34:16 46:1,2 | eliminate 62:2 | 7:17 |
| dispense 38:2 | dollars 61:2 | 46:11 49:16 | eliminating | estimated 69:5 |
| 53:12,14 | 64:16 78:8 | 49:19 50:1 | 23:1 | et 11:9 46:16 |
| 54:16 | done 27:22 | 53:15 69:19 | elimination | 46:16 |
| dispensing | 32:14 50:19 | 73:8 74:6,11 | 59:14,19 | evaluated 52:5 |
| 11:5 18:3 | 64:21 | 77:2,14 78:9 | else 50:6 68:2 | evaluating |
| 20:12 40:18 | don't 11:12 | duly 4:2 79:5 | employed 4:15 | 11:15,19 |
| 40:20,21 | 12:1 13:4 | during 8:5 9:3 | employee | 42:10 52:2 |
| 41:9,18,22 | 14:10 15:11 | 27:11 51:9 | 61:10 | 77:3 |
| 42:15 43:14 | 17:6,12 | 51:21 56:16 | employers | evaluation |
| 43:21,22 | 18:10 22:1 | 65:18 | 57:21 | 66:10 73:14 |
| 53:11 68:10 | 23:21 24:2 | | end 24:5 26:6 | even 33:10 |

David B. Morris          Highly Confidential          January 5, 2005
Richmond, VA

7

| | | | | |
|---|---|---|---|---|
| 41:13 73:12 | 76:13 77:15 | 35:4,9 53:12 | 25:7,10,10,12 | function 58:14 |
| event 79:13 | experience | fellow 66:17,18 | 25:15 26:2,5 | further 78:13 |
| eventually | 42:4 43:3 | female 44:13 | 26:12,12 | 79:11 |
| 14:19 23:20 | 61:15 62:6 | few 34:11 76:1 | 29:2,12,14 | |
| ever 26:21 | 67:1 70:12 | figure 26:5 | 32:10,10,12 | ———— G ———— |
| 27:1 49:16 | expires 79:3 | 47:12 58:22 | 34:1,12 | gain 52:15 |
| 49:21 60:13 | explain 11:8 | file 45:9 | 55:15 71:2,2 | 60:13 |
| 65:16 68:20 | 22:12,20 | fill 55:22 | 72:1,8 73:4 | gave 29:12 |
| 76:2 | 32:20 36:21 | final 29:13 | 74:12 75:10 | 63:13,13 |
| everything | explained 25:3 | finance 10:18 | 75:18 76:7 | 64:15 |
| 28:13 | Express 23:19 | 11:10,16 | 77:1,4,18 | general 35:19 |
| evolution | extensive | 12:9 | 78:9 | generic 25:15 |
| 13:17 | 19:11 | first 4:2 7:18 | formulas 43:11 | 53:13,14,21 |
| exactly 33:9 | extent 8:15 | 19:13 35:12 | 43:17 | generics 42:7 |
| 75:8 | 9:17 36:6 | 46:17 65:2,9 | forth 67:5 79:5 | geographic |
| examination | 44:1 60:5,7 | 66:1 79:5 | forward 10:17 | 54:5 |
| 1:15 3:4 4:4 | 61:10 64:3 | fit 33:5 | 16:1 23:6 | get 11:18,21 |
| 79:7 | 68:12 | five 5:3 57:14 | four 5:17 | 26:8 28:15 |
| examined 4:2 | external 6:2 | 65:5 | Fourth 2:5 | 30:10 33:9 |
| 79:6 | 55:16 | Floor 2:5 | frame 10:14 | 41:8,18 |
| example 11:19 | eye 76:3 | focus 5:5 22:14 | from 6:19 | 44:10,12,20 |
| 18:1 39:18 | | folks 11:18 | 11:15 20:8 | 47:20 48:7 |
| 43:20 44:8 | ———— F ———— | 15:15 53:5 | 23:10 24:1 | 51:2 52:15 |
| 44:11 45:4,4 | F 2:10 | follow 25:11 | 24:18,21 | 57:17 66:10 |
| 47:20 63:6,7 | fact 15:20 77:8 | 29:11 | 25:3,10 | 67:2,8 71:15 |
| exchange | factors 34:15 | following | 27:15 28:12 | 78:1,7 |
| 72:10 73:14 | facts 72:17 | 17:20 | 30:22 34:14 | getting 11:13 |
| exclusively | fairly 53:22 | follows 4:3 | 34:22 41:6 | 61:6 63:3 |
| 38:5 | 75:15 | 34:12 | 46:2,20 | 64:16 71:14 |
| Exhibit 3:12 | familiar 18:20 | foregoing 79:9 | 47:20 48:9 | 71:15 74:16 |
| 3:15 18:11 | 35:3 36:15 | form 13:2 41:9 | 51:4,11,19 | give 4:20 10:14 |
| 18:12 30:5,6 | 45:16 46:17 | 63:18 74:2 | 52:6 54:21 | 22:4 35:14 |
| 30:9 36:3 | 65:2 | 76:10 | 55:11,13 | 39:18 54:12 |
| EXHIBITS | far 66:10 67:2 | former 12:8,10 | 57:10,17 | 56:16 64:3 |
| 3:8 | 69:8,18 | formula 17:16 | 60:10 62:9 | 67:10,11 |
| exist 55:20 | fee 11:5 18:3 | 18:7 21:8 | 62:13 63:3 | 77:22 |
| existed 36:11 | 40:18,20,21 | 53:20 | 64:10,16 | given 48:6 54:5 |
| existence 36:11 | 41:9,22 | formularies | 68:5 71:15 | 68:14 69:22 |
| existing 8:21 | 42:15 43:14 | 25:19 34:19 | 74:16,18 | 79:15 |
| expand 22:16 | 43:21,22 | 77:11 | 75:14,21 | giving 56:2 |
| expected 34:16 | 53:11 54:16 | formulary | 78:3 | 58:13,15 |
| expense 64:11 | 59:14,19,21 | 5:15 20:6,8 | front 30:1 45:7 | Glastonbury |
| expensive | 68:10 | 20:10,11,13 | 58:15 64:8 | 66:20 |
| 29:20 74:6 | fees 34:14,21 | 24:7,17,18 | fully 76:15 | go 10:3 11:7 |

David B. Morris          Highly Confidential          January 5, 2005
                         Richmond, VA

8

| | | | | |
|---|---|---|---|---|
| 21:2 26:19 | 59:1 61:3 | 72:20 75:9 | 69:6 | him 22:16 30:1 |
| 29:21 32:17 | 66:1,16,21 | 75:17 | HCA 48:21 | 38:13 42:2 |
| 43:9 45:3 | 76:15 | Hagens 2:4 | he 7:11 12:13 | 54:12 58:6 |
| 48:13 52:2 | groups 5:5 | hand 11:6 | 12:15 15:10 | his 19:18 25:2 |
| 56:13,19 | 10:9,12 | 79:15 | 38:14 49:7 | 42:3 49:7 |
| 65:8 70:7 | 11:11 36:18 | has 7:16,21 | 50:4 | 65:18 79:6,7 |
| 71:10 76:17 | 58:9 61:13 | 16:16,17 | heading 24:17 | HMO 36:21 |
| goals 55:17 | 61:16,19,21 | 27:1 44:1 | health 5:6,9,22 | 38:4,4 39:20 |
| goes 20:13 | group's 61:15 | 45:9 49:15 | 6:20 7:3,11 | 39:22 40:8 |
| 42:17 | 62:6,22 | 49:21 50:18 | 9:5 14:19 | 49:21 |
| going 10:22 | guarantee 22:2 | 58:4 | 49:19 50:22 | HMOs 66:22 |
| 15:22 23:6,7 | 25:8 76:4 | have 4:8 6:6,7 | heard 7:8 12:3 | hold 33:6 56:3 |
| 28:14 29:13 | guaranteed | 6:16,17,19 | 35:8 66:7 | holds 25:9 |
| 29:15,17,21 | 21:20 22:14 | 8:15 9:17 | Heidi 1:17 | hope 64:10 |
| 33:9 41:7,8 | 24:7,16,18,20 | 10:8 12:2,3 | 79:1,20 | hopefully |
| 41:18,19 | 28:21 58:14 | 12:20 13:4 | held 4:21 6:6 | 55:17 |
| 42:12 43:4 | 63:4 | 13:16,21 | 23:3 74:10 | hospital 47:17 |
| 44:14 52:14 | guaranteeing | 15:1 16:12 | help 29:5 | 48:2,5,11,14 |
| 52:15 64:10 | 26:1 | 16:15 17:11 | 54:12 56:3 | 48:20,21 |
| 64:20 71:7 | guarantees | 17:15 26:4 | helped 33:5 | 49:3 57:4 |
| 72:11 76:16 | 62:17 75:22 | 26:10,18 | here 28:4 | hospitals 47:19 |
| 77:2,4,10,17 | 76:2 | 28:6,7 29:4 | 31:16 43:2 | 48:16 |
| going-forward | guess 23:2 27:8 | 30:2 34:20 | 49:17 65:6 | how 11:2,21 |
| 23:3 | 27:10 | 36:10 38:1,7 | 78:1 | 17:3 20:17 |
| gone 69:8,18 | guessing 27:7 | 39:2 41:1 | hereby 79:4 | 24:10,21 |
| good 56:1 | guys 41:13 | 43:5 44:9,21 | hereinbefore | 28:11 29:1,9 |
| 64:11 | 64:19 66:21 | 45:8 46:6,21 | 79:5 | 30:21,22 |
| got 11:7 17:10 | | 47:6 48:5,6 | here's 29:15 | 33:9 34:6 |
| 22:13 23:20 | **H** | 49:13 50:8 | 43:7 | 36:22 38:11 |
| 28:11,13 | had 7:16,22 | 50:14 52:4 | He'll 78:17 | 39:14 40:9 |
| 34:6 40:9 | 8:4 10:11 | 52:14 53:16 | he's 7:6 12:11 | 42:17 43:8,9 |
| 54:6 57:12 | 16:8 19:6,11 | 54:6,11 57:4 | 22:17 50:12 | 44:6 45:3 |
| 67:1 | 23:4,5,6 26:8 | 58:9 60:10 | high 28:4 | 52:2,19 53:7 |
| gotten 48:6 | 26:13 29:10 | 60:16 65:14 | higher 29:18 | 54:20 58:22 |
| governed | 35:1,8,18,18 | 69:3,4 70:11 | 29:18 31:21 | 61:12 63:3 |
| 55:16 | 35:21,21 | 70:15,15 | 32:14 45:12 | 64:16 66:10 |
| governing 4:12 | 37:22 39:15 | 72:4,5,13,16 | 48:16 52:22 | 67:2 68:4 |
| greater 72:8 | 39:20 47:10 | 72:17 73:15 | 70:20 73:8 | 69:14 |
| group 6:10 7:5 | 48:5 49:21 | 73:20,20 | 73:12 76:7 | hundred 11:21 |
| 7:22 10:4 | 54:21 56:21 | 74:19,19 | 77:5 | 21:1 58:11 |
| 11:7,14 19:6 | 60:19 61:1 | 75:3 76:4 | highly 1:11 | 60:17 61:18 |
| 36:12,14 | 61:20 62:22 | 78:13,14 | 4:12 | 61:20 |
| 40:12 42:20 | 63:7,8 66:14 | having 4:2 | high-priced | |
| 52:4 58:7,20 | 67:22 69:1 | 15:15 32:6 | 77:2 78:8 | **I** |

David B. Morris                Highly Confidential                January 5, 2005
Richmond, VA

9

| | | | | |
|---|---|---|---|---|
| **idea** 41:1 | **included** 9:16 | 53:9 | 22:8 36:6,9 | **job** 65:14 |
| **identified** | **includes** 6:2 | **institution** | 38:14 52:8,9 | **JOHN** 2:17 |
| 36:19 | **including** | 49:22 | **involvement** | **join** 4:17 |
| **if** 15:11 19:16 | 34:15,19 | **insuring** 76:15 | 35:12,15,18 | **joined** 8:7 |
| 22:20 25:4 | 51:19 | **Integrated** | 35:21 | 57:11 |
| 26:17 29:5,8 | **inclusion** 20:9 | 3:12,15 | **In-house** 2:22 | **jointly** 32:22 |
| 29:21 31:12 | **income** 55:12 | 18:16 30:7 | **isn't** 17:14 | **June** 79:3 |
| 31:16 32:17 | **increase** 33:1 | **integrating** | 78:6 | **just** 4:22 14:4 |
| 32:22 33:5 | 71:19,20 | 51:11 | **issue** 11:6 12:7 | 14:8 15:10 |
| 35:1 37:22 | **increased** | **intent** 33:7 | 71:22 | 15:22 16:4 |
| 39:3 40:18 | 53:13 | 37:20 | **issues** 75:9 | 17:21 22:9 |
| 42:5 43:16 | **increases** | **intentionally** | 76:4 | 22:20 25:1 |
| 44:12,22 | 76:13 | 44:9 | **its** 12:18 14:11 | 29:18 31:3 |
| 47:11 48:1,6 | **independent** | **interact** 11:22 | 14:20 17:16 | 33:3,11 |
| 48:8,13 49:2 | 15:14 21:21 | **interaction** | 49:17 58:4 | 41:10,21 |
| 50:20 54:4 | **indicating** | 50:8 | 60:6,8,14 | 42:7,7 49:6 |
| 55:3,4,10 | 19:19 | **interested** | 64:4,17 69:5 | 50:3 53:17 |
| 64:19 66:4 | **indirectly** 52:9 | 71:20 79:13 | 73:21 75:18 | 61:8 62:4 |
| 70:14,16,19 | **individual** | **internal** 6:2 | 76:7 78:9 | 66:21 74:12 |
| 70:19,21 | 10:2,3 16:9 | 9:20 10:6,8 | **itself** 49:16 | 75:13 |
| 71:17,19 | 40:10 69:2 | 35:5 53:6 | **I'd** 27:7 | |
| 73:3,18 | **INDUSTRY** | **internally** 9:19 | **I'll** 7:20 15:10 | _____**K**_____ |
| 75:20,20 | 1:8 | 10:1,10 | 42:1 51:2 | **keep** 56:2 |
| 76:14 77:1 | **infomatics** 7:8 | 14:15 43:2 | **I'm** 5:18 7:18 | **kept** 53:1 76:3 |
| **II** 36:19 37:3 | **informatics** | 56:3 | 8:6 13:11 | **kick** 44:21 |
| 40:1,8 | 7:7,8 | **into** 5:12,16 | 14:19 26:20 | **kind** 11:2,2 |
| **III** 36:20 37:3 | **information** | 8:22 16:9 | 29:4 34:7 | 12:5 13:12 |
| 40:3,8,19 | 11:2 71:3 | 18:17 19:6 | 35:14 37:22 | 19:14 24:4 |
| **impact** 11:9 | **Infrastructure** | 19:10 21:12 | 38:20 39:1 | 28:9 33:11 |
| **impacts** 52:16 | 72:22 | 24:4 30:8 | 41:2,12 44:3 | 43:2 77:19 |
| **impossible** | **ingredient** | 34:15 35:17 | 44:4 47:13 | 78:1 |
| 69:4 | 67:15 68:1,5 | 36:11,12,14 | 48:10 54:6 | **kinds** 12:3 |
| **impression** | 68:6 | 45:8 57:20 | 61:12 64:20 | 43:5 |
| 24:3 61:14 | **initial** 19:12 | 58:4 65:14 | 65:6 | **know** 6:17 9:6 |
| 74:6 | 34:11 66:5 | 71:3 72:8 | **I've** 4:18 7:8 | 9:19 11:1 |
| **Inc** 1:20 2:16 | **initially** 5:13 | 76:5 | 9:15 54:1 | 12:1,13,21 |
| **incent** 41:3 | 72:19 | **involved** 8:16 | 55:7 | 13:4 14:10 |
| 53:14 | **initiating** 5:4 | 9:3,8,18,21 | | 15:6,12,13 |
| **incentives** | 42:22 | 10:10,13 | _____**J**_____ | 16:20 17:2,3 |
| 32:19,20 | **input** 6:19 | 11:13,18 | **January** 1:13 | 17:6,7,9,19 |
| 33:14 55:18 | 10:10 52:11 | 12:2,21 | 1:19 18:17 | 22:3 23:15 |
| 70:16 | **instantaneou...** | 13:12,20 | 30:8 | 24:2 25:9,13 |
| **include** 9:15 | 45:10 | 14:3 19:3,7 | **Jeffreys** 1:17 | 25:14,15 |
| 42:14 43:13 | **instead** 22:14 | 19:14 20:16 | 79:1,20 | 26:15,16,17 |

David B. Morris                    Highly Confidential                    January 5, 2005
Richmond, VA

10

| | | | | |
|---|---|---|---|---|
| 28:10 33:5 | leaders 44:9 | LLP 2:11 | 53:1 55:13 | 70:7,9 71:15 |
| 33:11,11 | least 42:22 | loaded 40:12 | 55:22 56:1 | 73:9,14 |
| 37:10 41:5 | legs 64:20 | local 48:20 | main 2:4 10:2 | manufacture... |
| 41:13,14 | less 22:1 28:14 | 57:18 | maintained | 20:12 67:5 |
| 43:4,4 44:8 | 44:16 45:2,5 | located 49:18 | 37:8,10 | many 15:19 |
| 44:12 45:11 | 45:12,21 | long 73:11 | Maintenance | 33:8 |
| 46:11 50:3 | 46:12,13 | longer 12:11 | 36:20 37:18 | margins 56:1 |
| 52:13 55:4,4 | 54:8 78:9 | look 17:22 | 40:16 43:20 | 68:17 70:1 |
| 55:6,12 58:9 | let 10:9 20:5 | 24:6,9 29:6 | majority 54:14 | mark 18:10 |
| 59:21 61:1 | 25:1 33:20 | 30:20 31:16 | make 17:21 | 30:4,6 |
| 62:4 63:3,16 | 35:11 36:2 | 39:3,5 40:14 | 29:22 33:12 | marked 18:12 |
| 63:21,22 | 38:17 40:13 | 40:18 41:7 | 42:5 45:14 | 18:15 30:9 |
| 65:13 66:4,7 | 49:13 61:8 | 41:11,15,19 | 55:21 60:13 | market 5:2,4,4 |
| 66:13,19 | 70:7 | 42:6,11 | 61:20 72:16 | 46:11,15 |
| 67:4,12,15,19 | letter 20:2 | 43:16 54:12 | 77:20 | 49:6 54:2,3,4 |
| 68:16 69:6,7 | let's 42:17 63:6 | 64:20 68:16 | making 29:16 | 67:6 69:16 |
| 69:18 70:12 | 63:6,12 | 70:2 77:1,13 | 51:14 52:12 | 70:13,14 |
| 70:13,19 | level 28:4 | looked 13:15 | 69:9 | marketing |
| 71:18,22 | 71:18 73:16 | 44:1 56:20 | manage 33:1,6 | 6:21 10:19 |
| 72:14 74:8 | lieu 71:1 | 63:8 | managed 20:7 | 10:20 11:10 |
| 75:13 77:15 | like 5:5,7,14 | looking 24:14 | 31:13 32:7,9 | marketplace |
| 77:17 | 6:17 47:6 | 31:8 34:5 | 58:1 75:22 | 43:6 52:15 |
| knowing 23:4 | 48:21 58:20 | 41:18 46:10 | management | 64:13 72:3 |
| knowledge | 67:22 70:2 | 72:10 73:10 | 5:7,10,13,15 | 72:13 |
| 12:19 17:11 | 70:17 72:3,4 | 77:8,9 | 5:21,22 7:6 | married 44:14 |
| 21:11 35:1 | 72:6 77:16 | lose 52:16 | 9:20 10:6 | Mason 49:18 |
| 47:10 60:15 | limitations | loss 44:9 | 19:14 51:10 | Massachusetts |
| known 7:22 | 49:7 | lot 10:22 44:11 | 53:5 | 1:2 2:6 |
| 13:19 35:3 | limited 34:19 | 48:8 67:1 | manager 6:15 | master 3:13,16 |
| 45:16 | limiting 72:2 | 77:22 | 71:1 | 18:16 30:7 |
| | line 15:21 | loudly 69:18 | manager's | matter 41:20 |
| ——— L ——— | lines 39:17,22 | lower-of 45:15 | 5:16 | maximize |
| L 1:17 79:1,20 | 40:4 62:19 | lowest 43:18 | managing 6:3 | 73:19,21 |
| language 24:14 | lipid 72:5 | 44:20 | manner 32:11 | may 15:1,18 |
| 25:6 26:3 | listed 46:22 | Lyon 12:11 | manufacturer | 25:13 29:22 |
| 31:11 | 47:5 | L-Y-O-N | 20:9 23:5 | 34:2,14 44:8 |
| large 1:18 | listen 74:10 | 12:11 | 48:6 72:10 | 44:9 48:5,5 |
| 25:20 29:11 | LITIGATION | | 77:17 | 54:12 64:20 |
| 48:21 54:5 | 1:9 | ——— M ——— | manufacture... | maybe 11:12 |
| 61:21 76:15 | little 17:14 | MAC 43:21 | 20:8 23:4 | 27:3 77:15 |
| 79:1,2 | 23:13 47:17 | mail 9:16 | 34:14,22 | 78:7 |
| Larry 19:16 | 52:22 54:8 | 13:20 14:11 | 35:9 47:21 | me 4:20 10:9 |
| last 8:2 | 74:11 | 31:13,14,20 | 65:17 66:11 | 14:7 20:5 |
| law 1:19 | LLC 20:7 | 32:2 38:3 | 66:13 67:3,9 | 22:9,12,20 |

David B. Morris                    Highly Confidential                    January 5, 2005
Richmond, VA

11

| | | | | |
|---|---|---|---|---|
| 24:10 25:1 | 72:18 74:16 | 32:18 40:15 | 10:16 51:11 | my 5:3,12 6:13 |
| 32:20 33:20 | 74:18 75:6 | mom-and-pop | Mr.3:5 4:5,8 | 6:14,18 12:8 |
| 35:11 36:2 | Medco's 28:11 | 48:22 | 4:10,14,15 | 12:19 14:6 |
| 36:22 38:17 | 32:10 34:17 | money 22:4 | 8:2,6,10,18 | 15:8,14 |
| 39:18 40:13 | 45:8 | 23:12 33:2 | 8:20 10:14 | 17:13,14 |
| 41:6,17 | medical 6:20 | 55:21 58:19 | 10:15 13:2,6 | 19:12 20:20 |
| 49:13 61:8 | 7:7 19:16 | 69:9 72:11 | 13:10,14 | 21:11 24:3 |
| 70:7 79:5,6,8 | meetings 12:5 | moneys 23:9 | 15:10,16,20 | 28:19 33:18 |
| mean 11:18 | mentioned | 23:12 26:14 | 16:3,6 18:10 | 34:10 40:1 |
| 15:14 17:18 | 57:3 60:16 | 26:17 28:5,7 | 18:14 20:2,4 | 55:1 59:20 |
| 25:13 26:15 | Merck 14:17 | 28:12,15 | 22:16,19 | 60:15 61:13 |
| 27:7 31:22 | 14:22 15:4 | 33:4 35:2 | 24:13,15 | 61:17 64:12 |
| 33:8 37:6 | 21:7,13 22:7 | 61:15 70:21 | 25:1,17 27:8 | 64:20 69:8 |
| 41:2 44:11 | 32:6 | 73:19 | 27:9,18,21 | 74:6 79:8,15 |
| 46:20 48:18 | Merck-Medco | month 26:6 | 29:7,21 30:2 | M-O-R-R-I-S |
| 50:22 52:13 | 9:4 14:2,18 | 62:20 | 30:4,10,12,15 | 4:7 |
| 55:6,20 59:4 | 15:5,7 19:1 | months 23:10 | 31:5 33:15 | M.B.A 57:13 |
| 59:21 60:16 | 20:7 60:8 | 23:13 58:21 | 33:16 34:2,5 | 57:17 |
| 61:16 62:4,6 | mere 15:21 | 64:10 | 34:8,9 35:14 | |
| 64:6 66:20 | methodology | more 7:20 11:1 | 35:16 38:13 | _____ |
| 69:1,16 | 25:3 62:10 | 11:5,16 22:1 | 38:16 39:2,4 | N |
| 71:17 74:8 | Michael 66:17 | 24:16 28:14 | 39:9 42:1,3,9 | N 3:1 |
| 74:21 75:5 | mid 57:13 | 29:19,20 | 49:6,8,10,12 | name 4:6 |
| 75:17,20 | middle 24:4 | 34:22 40:7 | 50:3,7,12,16 | 14:20 19:18 |
| 76:3 77:13 | 62:9 | 45:21 55:14 | 54:11,17 | 23:21 |
| Medco 9:5 | might 34:21 | 72:11 73:11 | 55:3,8 57:2 | named 14:12 |
| 14:19,21 | 43:6,7 | 74:6 76:12 | 58:6,8,17 | 66:17,18 |
| 20:12 22:1,7 | migrated | Morris 1:16 | 60:4 61:8 | names 8:4 |
| 22:13 23:8 | 75:21 | 3:5,12,15 4:1 | 63:18 64:2 | 13:17 14:5 |
| 23:20,22 | Mill 1:20 2:18 | 4:7,15 18:11 | 64:19 65:1,4 | naming 14:15 |
| 24:21 25:9 | mind 21:22 | 18:12 30:5,6 | 65:5,7,8,11 | National 13:19 |
| 25:19 26:12 | 61:17 68:4 | 30:9 36:3 | 65:18,20,22 | 13:22 14:12 |
| 29:11 32:12 | minus 18:2 | 79:5 | 74:2,13,21 | nationally 37:3 |
| 33:2,11 | 40:17,19 | most 37:21 | 75:1,16 | nationwide |
| 34:13,21 | 41:9,10,21 | 41:13 45:22 | 76:10,18 | 39:21 |
| 37:2,10,20 | 43:20 68:9 | 58:12 67:21 | 78:12,15,17 | necessarily |
| 40:2 50:18 | 69:9,10 | 72:3 77:15 | much 26:7 | 13:7 29:15 |
| 51:12 52:6 | minute 27:2 | motivation | 31:20 53:7 | 47:5 |
| 53:8 54:22 | minutes 65:6 | 55:10 | 63:3 64:16 | need 11:4 |
| 55:11 56:20 | missing 34:3 | move 52:5,5 | 69:13 | 15:12 27:18 |
| 59:8,13,14,17 | mistaken 68:2 | 55:11 | multiple 24:1 | 29:8 55:4 |
| 60:12 61:22 | model 49:21 | moved 5:6,11 | 38:22 51:19 | needed 62:5 |
| 63:3,7 64:17 | 51:11 | 5:16 51:3 | 53:17 56:7 | negative 28:5,8 |
| 71:11,15 | moment 30:20 | moving 6:17 | 56:13 | negotiate |
| | | | | 21:17 52:22 |

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

12

| | | | | |
|---|---|---|---|---|
| 53:4 54:7 | networks 6:11 | nor 79:12,13 | 23:8 | Okay 7:4,15 |
| negotiated | 7:17 35:22 | Norfolk 79:3 | November | 8:9 11:18 |
| 16:18 21:20 | 37:1,2,3 38:7 | 79:16 | 20:3 | 12:17,20 |
| 22:7 24:10 | 38:22 39:15 | not 9:20 12:19 | now 6:18 9:5 | 13:7,15 14:2 |
| 37:8 40:5 | 40:7,22 43:5 | 13:7,12 | 9:14 12:15 | 15:2 16:2,15 |
| 50:18,21 | 53:17 | 14:19 15:22 | 14:19,20 | 17:3,12 18:9 |
| 53:3 59:13 | never 47:14 | 17:11 19:7 | 17:6 18:22 | 18:19 21:19 |
| 59:18 60:22 | 66:7 67:4 | 19:13 21:11 | 19:6 28:20 | 22:9 31:7 |
| 61:4,19 | 75:13 76:5 | 21:18,19 | 29:7,9 30:1 | 33:13 34:8 |
| 74:18 | new 2:13,13 | 24:3,17 | 31:16 38:7 | 37:14,17 |
| negotiating | 9:7,9 21:12 | 25:10,20 | 43:16 45:3 | 39:10 42:19 |
| 6:11 9:21 | 22:21,22 | 26:22 27:13 | 48:10 49:18 | 43:13 45:16 |
| 13:9 23:16 | 27:16 28:1 | 28:6,7 29:13 | 50:12 53:3 | 46:3,14 |
| 23:18 38:15 | 40:2 56:6 | 33:8 34:19 | 54:18 64:10 | 48:10 51:8 |
| 64:4 71:8 | 60:1 | 36:8,8 37:10 | 67:19 | 55:9 58:18 |
| 77:7 | next 14:6 | 38:14 39:1 | nowhere 69:8 | 59:12 63:14 |
| negotiation 9:1 | NICHOLSON | 40:22 41:12 | number 41:21 | old 60:1 |
| 10:11 13:13 | 2:17 4:8 8:2 | 42:7 44:3,21 | 46:4 56:14 | once 73:2 |
| 19:3,7 22:10 | 8:18 10:14 | 45:21 48:5 | numbers 30:11 | one 2:4 8:8,11 |
| 24:5 | 13:2,10 | 50:5 52:8 | 30:14 | 15:8 22:8 |
| negotiations | 15:10,20 | 53:22 54:3,6 | | 23:19 34:22 |
| 8:16 10:3 | 20:2 22:16 | 55:1,6,7 56:2 | **— O —** | 40:7 43:16 |
| 12:18 13:5,8 | 24:13 25:1 | 60:10,20 | oath 79:6 | 43:18 53:17 |
| 20:17 56:13 | 27:8,18 29:7 | 61:12 63:3 | object 13:2 | 53:20,20 |
| 56:14 60:12 | 29:21 33:15 | 63:21,21 | 25:1 42:1 | 54:1 55:10 |
| 67:2 | 34:2,8 35:14 | 64:9 67:14 | 63:18 74:2 | 59:13,18,22 |
| netted 28:9 | 38:13 39:2 | 68:20,21 | 76:10 | 62:1 70:19 |
| network 8:13 | 42:1 49:6 | 69:13 72:6 | objection | 70:21,21 |
| 9:1,2,7,9 | 50:3,12 | 73:10,10 | 13:10 61:9 | 71:8 72:5,5 |
| 10:22 17:8,8 | 54:11 55:3 | 74:11 75:18 | off 49:3 53:1,9 | 74:10 77:2,8 |
| 17:19 18:1,6 | 58:6 61:8 | 77:17 78:15 | 54:15 67:17 | ongoing 22:4 |
| 32:1 36:19 | 63:18 65:18 | 78:19 79:11 | 67:18 77:18 | 75:15 |
| 36:20,21,21 | 74:2,21 | NOTARGIA... | offer 15:22 | only 26:15 |
| 37:8,9,9,18 | 76:10 78:17 | 2:3 30:10 | 66:14 67:7 | 70:20 76:13 |
| 37:19,20,21 | nine 23:9,13 | 49:8 65:5,8 | 70:16 72:19 | operating |
| 38:4,5,12,21 | 58:21 64:10 | 78:15 | offers 24:1 | 55:12 |
| 39:20 40:1,2 | None 50:14 | notarial 79:15 | 77:12 | operations 5:7 |
| 40:8,16,19 | non-formula... | Notary 1:17 | officer 6:20 7:3 | 5:18 72:20 |
| 41:14 43:20 | 26:5 | 79:1,22 | 7:12 | opinion 28:19 |
| 52:17,19,22 | non-managed | note 61:8 | offices 1:20 | 64:12 69:9 |
| 53:17,18,19 | 31:14 32:8 | notes 64:20 | offsets 64:11 | opposed 62:14 |
| 54:6,15 | non-Virginia | nothing 76:2 | often 49:3 | oral 1:15 44:11 |
| 55:15 68:6,8 | 50:10 | noticed 9:15 | Ohio 49:18 | 44:16 45:4 |
| 68:18 69:7 | Nope 78:15 | notoriously | 50:5 | order 4:13 |

David B. Morris                 Highly Confidential                 January 5, 2005
                                Richmond, VA

13

| | | | | |
|---|---|---|---|---|
| 9:16 13:20 | 69:15 73:10 | 32:15 41:18 | 76:9 | **percent** 11:21 |
| 34:8 46:20 | 76:20 78:2 | 60:16 61:15 | **pay** 16:16 | 13:11 20:11 |
| 46:22 | **outcome** 22:10 | **paragraph** | 28:12 33:2 | 20:14 21:1 |
| **organization** | **outcomes** 5:8,9 | 20:6 24:6 | 54:7 58:3,11 | 21:17 40:17 |
| 8:7 | **outside** 38:1 | 33:21 | 61:18 70:20 | 41:10 43:21 |
| **original** 14:9 | 50:13 51:4 | **Paraphrasing** | 73:9 | 46:12 53:9 |
| 14:10 | **over** 5:11 6:17 | 28:4 | **paycheck** 8:8 | 54:3,10,15 |
| **Originally** | 7:15,21 8:15 | **parent** 74:10 | **paying** 16:21 | 58:11 60:17 |
| 40:1 | 8:16 16:8 | **part** 7:18 9:6 | 16:21 17:3,7 | 61:18,19,20 |
| **other** 8:4 11:11 | 49:15 55:14 | 9:14 10:5 | 23:9 32:1,3 | 61:22 67:12 |
| 11:22 19:10 | 71:20 78:1 | 20:20 21:16 | 33:3 48:1,2 | **percentage** |
| 21:13 23:18 | **overall** 6:5 | 22:17 25:18 | 48:15 49:2,3 | 61:6 |
| 29:3 32:11 | 28:10 77:20 | 25:20 29:11 | 59:4,21,22 | **period** 8:5 |
| 33:3,6 34:20 | **owe** 26:7 | 29:16 41:4 | 60:6 67:13 | 19:11 23:10 |
| 43:5 44:15 | **own** 15:14 | 42:15 52:4 | 69:5 74:6 | 27:11 66:5 |
| 44:20 50:8 | 37:12 49:17 | 58:10 59:17 | 75:4 76:14 | 72:19 |
| 52:18 56:21 | 68:4 | 67:21 | **payments** | **periphery** 12:3 |
| 62:17 69:19 | **owned** 37:2,5,7 | **participate** | 24:21 | **Perrin** 12:16 |
| 73:16 75:5 | **owns** 49:17 | 12:4 40:7 | **pays** 45:2 | 12:17 13:12 |
| 76:1,11 | | 69:7 | **PBM** 8:18 9:21 | **Perry** 66:18 |
| **others** 40:22 | _____**P**_____ | **participating** | 10:3,11 | **person** 7:10 |
| 60:21 | **package** 42:7 | 41:4 | 11:15 13:9 | **perspective** |
| **otherwise** | 56:20 77:21 | **participation** | 13:13 14:10 | 25:11 28:13 |
| 79:12,13 | 78:10 | 37:9 73:13 | 20:20 23:5 | 62:13 78:3 |
| **our** 6:1,15 9:6 | **page** 3:4,10 | **particular** 11:4 | 26:8 35:5,12 | **per-claim** |
| 11:9 21:22 | 19:20 20:5,6 | 11:5 16:18 | 35:19 43:3 | 21:21 26:4 |
| 22:4 26:6,9 | 31:12,13 | 68:15 75:11 | 49:18 51:1,4 | 28:21 29:1 |
| 29:14,19 | 34:3,7 36:2 | 77:11 | 51:5,16 53:6 | 31:9,14,16 |
| 32:12 33:1,7 | 36:19 39:8 | **particularly** | 54:19,21 | 32:6 62:18 |
| 37:20 44:18 | 41:20 | 61:17 | 55:11 61:2 | 63:1,4,8 |
| 52:16 53:15 | **paid** 7:16,22 | **parties** 20:18 | 65:10,10 | 74:14,15,17 |
| 55:17 56:3,4 | 8:11,16 9:4 | 45:22 | 73:17,21 | 75:4 |
| 61:21 64:13 | 9:15 13:18 | **parts** 26:17 | 76:6,20 77:7 | **per-contract** |
| 68:18 70:3 | 14:9,13,14,17 | **party** 37:15 | 77:11 78:6 | 62:20 |
| 71:19 72:18 | 15:7 16:7,8 | 79:12 | **PBMs** 23:3,3 | **PHARMAC...** |
| 75:6,20 77:6 | 16:17,17,21 | **pass** 56:4 | 23:16,18 | 1:8 |
| **out** 9:4 11:7 | 16:21 17:3 | **passing** 58:19 | 24:1 35:8,18 | **pharmacies** |
| 23:10,13,15 | 17:16,19 | **past** 67:4 | 51:19 55:20 | 8:13 16:10 |
| 26:3,5 28:9 | 18:1,5,22 | **Patterson** 2:11 | 56:7,10,13 | 37:21 38:2 |
| 28:12 33:4 | 20:10,14 | **pause** 16:5 | 65:3 71:8 | 39:20 44:8 |
| 34:8 47:12 | 21:1,7,13 | 18:13 24:12 | **PBM's** 43:3 | 44:12 46:20 |
| 56:7 58:22 | 22:7 28:6,6,7 | 30:3 31:2 | **people** 33:8 | 47:17 48:14 |
| 61:13 66:17 | 28:7 29:18 | 39:6 57:1 | 72:3 73:9 | 48:20 53:14 |
| 66:21,22 | 29:18 31:17 | 60:3 64:22 | **per** 31:16 | 54:15 57:8 |

David B. Morris                Highly Confidential                January 5, 2005
Richmond, VA

14

| | | | | |
|---|---|---|---|---|
| 57:10 69:2,7 | please 25:4 | 44:10 45:1 | 55:20 62:5 | 57:22 58:5 |
| pharmacist | 61:11 | 45:11,13 | produce 77:4 | 64:7,8 70:9 |
| 5:14 19:13 | plus 40:19 41:9 | 46:13 47:11 | produced | 70:15 |
| 41:17 42:2 | 41:21 68:10 | 47:11 76:7 | 13:16 | provided 21:1 |
| 57:15 68:13 | PMPM 62:19 | prices 43:12,19 | product 6:21 | provider 16:22 |
| 68:14 | 62:20 | 44:6 48:16 | 11:8 44:10 | 17:4 40:8 |
| pharmacists | point 5:18 | pricing 36:4,7 | 48:4,12 67:6 | 41:4 |
| 18:2 44:2 | 14:11,17 | 38:19 45:9 | 67:11 68:15 | providers |
| 69:14 | 24:13 27:14 | primarily 40:4 | 69:5 70:14 | 17:17 |
| pharmacist's | 45:12 47:3 | 47:17 | 72:3 76:7,13 | provides 8:12 |
| 41:7 43:18 | 59:2 67:9 | prime 55:10 | products 20:10 | providing |
| pharmacy 5:12 | 69:6,17 | principally | 43:12 48:16 | 10:10 13:8 |
| 5:21 6:1,11 | 71:21 72:2 | 11:14 | 67:7 70:18 | 13:20 71:1 |
| 6:15 7:6,17 | 75:12 | prior 5:15 6:4 | 73:4 | 72:9 |
| 9:12 10:6,9 | points 39:16 | 20:22 25:2 | profit 42:5 | provision 24:9 |
| 11:17 16:10 | 40:5 | 35:18,21 | 68:17 | 24:10 |
| 16:18,18,22 | policy 19:16 | 39:19,19 | program 3:12 | Public 1:17 |
| 17:4,10,16 | position 5:6,12 | 65:13 | 3:15 18:16 | 79:2,22 |
| 31:21 32:7,8 | 5:16 6:6 | proactively | 20:13 30:7 | published 46:4 |
| 35:22 37:1,2 | positions 4:21 | 11:2 | 31:22 32:7,8 | 47:7,11 |
| 37:7,12,15,19 | 5:1 | probably 5:11 | 32:9 36:7 | purchase 46:1 |
| 38:3,5 40:6 | positive 28:5,8 | 6:18,19,21 | 38:18 | purchased |
| 45:11 48:22 | possible 12:20 | 11:16 12:2 | Programming | 14:14 |
| 52:6 55:13 | 13:3 44:20 | 14:11 15:3 | 36:4 | pursuant 4:12 |
| 57:4,4 61:10 | potentially | 17:6 20:19 | programs | 8:12 16:7 |
| 65:19 66:14 | 52:16 77:4 | 28:19 30:13 | 34:19 | 57:22 58:12 |
| 66:16,20 | practice 20:20 | 43:4 46:19 | progressed | pursue 74:7 |
| 69:5 71:1 | preexisting | 48:19 54:8,9 | 67:4 | pursuing 73:7 |
| pharmacy's | 14:21 | 66:12 68:22 | project 19:22 | put 30:1,13 |
| 44:5 | prescription | problematic | 23:6 | 56:7 69:15 |
| pick 27:19 | 3:12,15 | 62:3 | promise 75:6 | 72:8 75:18 |
| pills 44:22 | 13:19 18:16 | problems | pronounced | 76:1,6 |
| place 27:12,13 | 30:7 51:10 | 28:11 | 7:9 | putting 78:8 |
| 28:1 | 53:5 62:10 | procedure | proposal 51:19 | p.m 1:19 78:20 |
| Plaintiff 2:2 | Prescriptions | 59:3 | proposals | |
| plan 22:3 | 7:16,22 8:12 | proceeding | 56:17 71:14 | Q. |
| 40:10 49:19 | 14:9,18 15:7 | 79:13 | proposing | qualification |
| plans 6:12 | 16:8 19:1 | proceedings | 56:21 70:8 | 79:3 |
| 26:13 50:22 | president 7:2,4 | 16:5 18:13 | 70:22 | question 7:19 |
| 57:22 75:22 | pretty 56:1 | 24:12 30:3 | pros 51:14 | 12:2 13:1 |
| play 10:18,20 | previous 49:7 | 31:2 39:6 | 71:6,7 | 14:6 15:12 |
| 11:3 76:5 | previously 8:4 | 57:1 60:3 | protective 4:13 | 15:17 16:20 |
| played 8:22 | 12:8 | 64:22 | provide 20:10 | 17:13,14 |
| 13:4 | price 1:9 44:7 | process 24:3 | 43:17 52:11 | 38:14 44:3 |

David B. Morris

Highly Confidential
Richmond, VA

January 5, 2005

15

| | | | | |
|---|---|---|---|---|
| 63:19 | 32:6,14 33:4 | 31:9 33:18 | 17:2 46:7,8 | 37:17,21 |
| **questions** | 54:20,21 | recommenda... | 74:9 75:3 | 38:2 40:16 |
| 34:10 61:9 | 58:14 61:2 | 25:12 29:12 | **relative** 11:3 | 42:18 43:20 |
| 78:13 | 62:10,17 | reconsiderat... | **rely** 26:8,10 | 46:1 47:18 |
| **quick** 65:5 | 63:4,8 67:10 | 6:4 | 61:1 | 48:14,19 |
| **quicker** 23:13 | 67:17 71:14 | **record** 4:9 | **remained** | 53:8 57:4 |
| **quite** 49:2 | 72:10 73:19 | 30:13 | 53:12 | **retailer** 48:1 |
| | 74:15,18 | **recorded** 79:7 | **remember** | 48:11 49:2 |
| _____ | 75:4 78:7 | Red 47:6 | 27:6 | **retailers** 48:15 |
| **R** | **rebates** 9:17 | **reduced** 79:8 | **renegotiate** 9:2 | **retain** 20:14 |
| **ramp** 72:20 | 11:15,20 | **reference** 24:7 | **Repeat** 7:18 | **retained** 63:16 |
| **ran** 27:15 | 12:4 20:6,8 | 32:18 34:1 | **replacing** | **retains** 34:13 |
| **Randy** 7:14 | 20:11,18 | 40:17 44:5 | 21:22 | **return** 16:21 |
| **ratchet** 70:1 | 21:2,8,14,17 | **references** | **report** 7:1,2,10 | 22:14 |
| **rate** 54:2 | 21:21,22 | 33:20 | 20:1 | **review** 5:14 |
| **rates** 39:15 | 22:2,13 23:2 | **referred** 24:19 | **reports** 7:2,11 | 6:3 |
| 42:11,18 | 23:6,11 24:8 | 34:10 | **represent** 10:4 | **reviewing** 5:4 |
| 69:12,15 | 24:17,18 | **referring** 8:7 | **request** 37:20 | 9:14 |
| **rather** 33:3 | 28:18 29:18 | 8:18 12:22 | 51:18 | **re-do** 9:6 |
| 55:15 56:2 | 29:18 30:21 | 19:20 30:16 | **resale** 46:1 | **RFP** 24:3 56:7 |
| 58:20 | 30:22 31:3 | 68:9 | **research** 5:2,4 | 66:2 |
| **RDR** 1:17 79:1 | 34:12,14,21 | **refers** 8:3 25:6 | 5:5,7,8,9 | **RFPs** 66:10 |
| 79:20 | 55:22 58:5 | **refresh** 30:21 | **responded** | **Richmond** |
| **RE** 1:7 | 58:11,20 | **region** 54:3,5 | 56:8 | 1:12,21 2:20 |
| **reacting** 69:14 | 59:4 60:6,17 | **reimbursed** | **responsibilit...** | 79:5 |
| **read** 78:17 | 61:7,12 62:5 | 17:10 18:2 | 4:22 5:3 6:16 | **right** 10:8 |
| **ready** 69:1 | 62:15 64:9 | 40:9 | **responsibility** | 17:21 18:4 |
| **real** 28:4,11 | 65:17 67:7 | **reimbursem...** | 6:14 | 19:18 26:18 |
| 41:1 | 70:10 71:13 | 9:11 16:17 | **responsible** | 29:7 30:1 |
| **really** 10:21 | 71:19 72:18 | 16:19 17:15 | 5:18 6:10,14 | 31:15 40:11 |
| 11:1,2 12:1 | 73:2,5,8,12 | 18:6 36:15 | 7:4,6 11:14 | 49:5 50:12 |
| 13:4 17:6 | 73:16,22 | 38:8 39:11 | 42:20 | 55:18 60:13 |
| 21:21 28:9 | 74:4,12 | 39:15 41:8 | **restrict** 70:17 | 73:1 75:7 |
| 32:9 43:1 | **recall** 11:12 | 41:20 42:6 | **restricted** 72:6 | 78:12 |
| 61:13 67:4 | 19:17 23:21 | 42:11,18 | **result** 20:9 | **risk** 75:22 76:2 |
| 69:4 71:19 | 25:5 26:3 | 43:10,17 | 24:1 34:18 | **Road** 1:20 2:18 |
| 71:21 73:11 | 29:3,9 47:4 | 44:2 53:2,7 | 36:14 71:10 | **Roche** 48:7 |
| **realtime** 58:20 | 62:8 | 53:20 68:13 | **resulted** 66:3 | **role** 9:1 10:18 |
| 64:8 | **received** 20:11 | 68:18 69:12 | **results** 28:3 | 10:20 11:3 |
| **reason** 26:10 | **receives** 20:7 | 69:15,19 | **retail** 8:13 | 13:4 19:12 |
| 62:1 | 34:13 | **related** 79:11 | 16:18 31:13 | 71:3 |
| **rebate** 21:8 | **recess** 49:11 | **relation** 50:15 | 31:14,21 | **Roles** 6:16 |
| 23:10 28:12 | **recognize** 77:3 | **relationship** | 32:1,7,7 | **Ron** 12:11 |
| 28:15 31:9 | **recollection** | 14:7 16:16 | 36:20 37:17 | **rough** 46:8,9 |
| 31:17,20 | | | | |

David B. Morris          Highly Confidential          January 5, 2005
Richmond, VA

16

| | | | | |
|---|---|---|---|---|
| rough·ly 6:9 | 64:8,9 76:16 | should 11:19 | 61:6,19,21 | Staples 1:20 |
| 32:2,3 57:14 | seeing 17:9,9 | 11:20,20 | 62:18 64:3 | 2:18 |
| 62:9 | 29:3 55:1 | 28:6,7 30:2 | 71:18 72:19 | started 13:18 |
| round·s 56:14 | seek 44:2 | 30:13 41:11 | 77:14,22 | 14:10 |
| RX 14:12 | 60:13 | 42:6 57:3 | 78:7 | starting 4:20 |
| _____ | seeking 22:21 | show 29:5 | someone 47:12 | state 4:6 38:1 |
| S | 73:21 | side 19:14 53:8 | something | 39:21 50:13 |
| Sachs 66:17 | seems 13:16 | 70:4 | 10:22 14:13 | statement 4:9 |
| safety 76:12 | 67:22 | sign 41:14 | 14:14 15:18 | 75:3 |
| said 26:3 28:14 | seen 55:7 | 78:17 | 29:15,17 | states 1:1 20:7 |
| 67:9 68:7 | sell 11:8 44:15 | signature | 36:10 38:20 | 34:13 |
| 75:10 | 72:2 | 19:20 78:19 | 42:20 48:7 | status 20:1 |
| sale 45:12 | selling 45:1,5 | similar 4:10 | 54:8 59:7 | stay 65:15 |
| sales 6:21 | send 70:11 | 38:3 63:1 | 60:19 63:1 | steep 47:20 |
| 10:18,20 | sends 8:8 | similarly 62:16 | 68:1,2 72:12 | 54:8 |
| 11:10 61:9 | sense 29:22 | simply 7:20 | 78:1 | Stenotype 79:7 |
| same 4:8 13:10 | 56:10 71:13 | 43:11 | Sometime 51:9 | step 71:3 |
| 15:8 48:12 | sentence 34:12 | since 6:6,8 | somewhere | Sticking 33:19 |
| 48:16 53:2 | sentences | 11:7 25:9 | 46:11 | still 5:21 6:18 |
| 53:12 66:2 | 34:11 | 57:3 | sorry 5:8 7:18 | 48:18 53:16 |
| 73:16 78:6,8 | separate 69:21 | single 53:18,19 | 34:7 35:14 | 69:9 74:4,5 |
| savings 56:4 | serve 12:17 | 53:19 | 44:4 65:7 | stocked 77:2 |
| saw 12:21 | service 14:11 | sister 55:17 | sort 17:13 | stop 17:5 69:6 |
| 22:22 24:19 | 31:20 32:2 | situation 23:14 | specifically | 69:18 77:19 |
| 33:5 69:14 | 38:3 53:1 | 44:19 | 25:6 31:4 | store 44:11,15 |
| say 8:6 11:3 | 55:13,22 | situations | 37:22 75:5 | strategy 6:21 |
| 20:14 26:7 | 56:1 72:9 | 44:18 | specified 32:11 | 73:6 74:7 |
| 27:18 37:5 | services 14:12 | size 48:17 | 37:9 38:6 | Street 2:4 |
| 53:3 54:6 | 34:18 51:4,5 | slightly 40:3 | specify 17:18 | strength 77:16 |
| 59:16 61:4 | 52:6,18 58:1 | small 48:20 | speculate 42:2 | stretch 64:19 |
| 63:6 | 69:20 70:8 | smart 44:12 | 55:3 | strike 43:8 |
| says 18:1 50:4 | 77:11 | solely 6:13 | speculation | 51:17 52:3 |
| Schedule 36:4 | set 17:7,19 | soliciting 24:1 | 15:21 | 54:19 56:5 |
| 38:18 39:7 | 18:1 41:1 | Solutions 9:5 | split 11:19 | 58:3 60:5 |
| school 57:12 | 64:8 79:5 | 14:19 | 20:18 | 74:14,16 |
| scream 69:18 | shall 20:14 | some 12:3 | Sporadically | structured |
| scrip 25:15 | share 64:17 | 15:14 17:15 | 52:10 | 62:16 64:11 |
| Scrips 23:19 | 70:13 | 19:11,22 | staff 10:7 | stuff 5:5 |
| seal 79:15 | sharing 11:20 | 23:9 27:14 | 49:21 | subject 49:6 |
| second 34:2 | she 27:19 | 28:11 33:2 | standard 20:19 | submitted |
| securing 34:21 | she's 44:13,14 | 35:15 37:22 | 54:1 | 43:19 44:6 |
| see 17:12 25:22 | 44:15 | 41:3 43:7 | standpoint | 45:11 |
| 29:8 40:13 | Shield 4:16 | 46:13 58:9 | 41:7 | subsequent |
| 40:17 55:4,5 | short 49:8 | 60:16,20 | stands 45:21 | 21:6 24:11 |

David B. Morris          Highly Confidential          January 5, 2005
                          Richmond, VA

| | | | | |
|---|---|---|---|---|
| 26:2 27:14 | take 24:9 26:9 | 45:22 46:18 | 73:9,9,11 | 76:8,20 |
| 29:10 30:17 | 27:2 29:15 | 56:17 58:7 | 75:13 | 77:14 |
| **substantially** | 29:17 30:20 | 60:10,11 | **themselves** | **thereof** 79:14 |
| 48:2 | 33:20 34:15 | 63:3,22 67:7 | 8:19 60:9 | **thereupon** |
| **substantive** | 39:5 43:11 | 68:14 73:5 | **then** 4:21 5:11 | 79:6 |
| 76:2 | 44:19 47:12 | 78:7 | 10:1,11:6 | **there's** 15:20 |
| **such** 20:9 | 49:8 54:12 | **testified** 4:2 | 13:19 14:2 | 19:18 34:1 |
| 35:12 47:2 | 56:16 77:18 | **testimony** | 14:18 16:9 | 34:12 38:20 |
| 57:21 60:11 | **taken** 1:16 | 30:16 | 16:21 18:5 | 40:17 44:5 |
| 60:13 | 38:1 49:11 | **than** 11:16 | 33:1 40:1,18 | 53:22 54:4 |
| **Suite** 1:20 2:19 | **taking** 43:19 | 23:13 31:21 | 43:3 47:19 | 55:12 77:22 |
| **summary** 4:22 | 54:7 | 33:3 44:16 | 48:18 50:17 | **these** 9:14,18 |
| **suppliers** 69:3 | **talk** 42:17 | 45:5,12,12 | 54:7 58:21 | 15:15 26:18 |
| **supply** 32:2,3 | **talked** 14:8 | 46:12,13 | 71:5,7 75:13 | 36:7,15,18 |
| 38:3 | 23:4 66:12 | 48:9,16,19,20 | 75:14 | 38:7,11 |
| **support** 6:3 | **talking** 14:4 | 48:22 55:15 | **theoretically** | 39:14 40:7 |
| **suppose** 13:3 | 35:13 48:10 | 56:2,21 | 26:16 40:6 | 41:13,14 |
| 17:5 63:20 | 50:4 51:10 | 58:20 69:19 | **therapeutic** | 43:11,16 |
| **supposed** | 70:8 | 70:21 71:16 | 34:17 | 46:18 61:2 |
| 25:19 | **target** 6:17 | 75:6 | **there** 8:21 | **they** 6:17 9:15 |
| **supposedly** | **technically** | **their** 25:10,11 | 11:20 13:16 | 11:3 13:4 |
| 23:11 | 21:18 | 25:15 29:11 | 14:21 15:1,3 | 14:15,16 |
| **sure** 13:11 | **telephone** 2:2 | 34:16 37:4 | 16:5 18:13 | 15:4 17:10 |
| 14:20 17:21 | **tell** 14:7,12 | 41:14 44:10 | 19:18 21:6 | 19:11 24:22 |
| 26:20 29:4 | 15:10 24:10 | 44:16 45:13 | 21:12,15 | 25:9,13 |
| 35:7,10,17 | 26:8 41:12 | 51:11 58:10 | 23:15,19 | 26:15,16,17 |
| 37:22 38:20 | 43:4,6 47:13 | 58:15 68:17 | 24:7,12,20 | 28:11,19 |
| 39:1 44:3 | 61:2 | 69:13,19 | 26:11 30:3 | 33:5,5 35:2 |
| 46:17 47:13 | **telling** 72:4 | 70:1,12,13,13 | 31:2 32:18 | 36:22 37:1,3 |
| 47:22 48:9 | **tend** 43:17 | 70:14,16 | 32:18 33:9 | 37:5,7,8,8,12 |
| 49:10 55:7 | **term** 24:16 | 76:16 | 33:13,19,20 | 37:14 38:5 |
| 61:12 64:15 | 34:11 45:16 | **them** 12:22 | 34:1,4 35:2 | 40:7,9,12 |
| **surprised** | 73:11 | 15:4 17:7,7 | 38:18,20,22 | 41:11,12,14 |
| 41:13 | **terms** 8:17 9:1 | 32:13 33:3 | 39:3,6,7,11 | 42:5,6 43:4,5 |
| **switch** 51:14 | 9:7,16,16 | 37:5 41:15 | 40:1 47:2,2,4 | 43:6,17 44:9 |
| **sworn** 4:2 79:6 | 11:22 17:8,8 | 43:4,12 | 47:7,9 48:18 | 44:12,12 |
| **system** 28:16 | 17:20 25:16 | 44:17 45:1,5 | 51:3 54:2 | 45:8,9,11 |
| 28:17 45:8 | 25:21 28:11 | 45:6 50:15 | 55:10 56:1 | 46:21 47:5 |
| 45:13 | 28:15 29:22 | 54:6,7,7 | 56:16 57:1 | 49:18 50:20 |
| **systems** 28:12 | 36:4,7,16 | 58:11,13,15 | 59:2 60:3 | 54:6 55:21 |
| | 37:9 38:6,8 | 58:21,22 | 63:16,22 | 55:21,22 |
| **T** | 38:11,19,21 | 62:6 63:22 | 64:22 68:9 | 61:19 62:3 |
| **table** 70:4 | 39:12 40:3 | 70:11,15 | 69:15 72:19 | 63:12,21 |
| 75:14 | 41:14 42:22 | 71:20 72:4 | 75:19 76:1,6 | 64:8 66:13 |

David B. Morris            Highly Confidential            January 5, 2005
Richmond, VA

18

| | | | | |
|---|---|---|---|---|
| 66:1 9,22 | 72:18 73:2,7 | time 8:5 9:5 | try 26:4 53:14 | 79:15 |
| 67:6,15 69:9 | 73:19,20 | 10:14 19:12 | 62:1 68:17 | understand |
| 69:17,19 | 74:3,8 75:2 | 19:16 23:11 | trying 10:21 | 15:18 17:12 |
| 70:12,14 | 75:15,20 | 23:17 27:11 | 41:3 58:22 | 20:16,17 |
| 71:21 72:4,6 | 78:12 | 36:11 39:16 | 64:12 67:22 | 33:9 44:3 |
| 73:9 74:10 | thinking 22:21 | 40:5 47:3,12 | 73:1 76:20 | understanding |
| 75:5,9 76:5 | 29:16 | 47:16 51:3 | turn 16:9,17 | 16:15 17:15 |
| they'll 44:15 | third-party | 58:12 59:2 | 20:5 31:12 | 18:5 34:20 |
| 70:20 | 73:17 | 65:18 66:2,5 | 36:2 | 45:19 46:6,8 |
| they're 17:6 | those 4:22 8:12 | 71:21 72:19 | twelve 23:10 | 46:9 55:2 |
| 26:14,15 | 8:16,17 9:1 | 75:12 78:8 | 23:13 58:21 | 59:20 |
| 41:7,8,18,19 | 9:18 12:5,6 | times 32:3 | two 23:15 | understood |
| 45:5 54:9 | 13:5 14:8 | title 5:20 | 43:19 66:21 | 17:22 48:15 |
| 64:10 66:16 | 16:12 23:6,9 | today 8:8 | 70:21 74:9 | 55:9 |
| 70:19,19,21 | 23:12 26:2 | 30:17 50:22 | Tyler 2:11 | undone 28:17 |
| 74:11 75:4 | 26:17 28:15 | 52:14 | type 22:21,22 | union 57:21 |
| 76:20 | 28:16 31:13 | told 22:1 37:4 | 49:22 67:8 | unit 35:17 |
| they've 9:16 | 33:4 36:22 | 54:1 75:13 | 68:20 | UNITED 1:1 |
| 11:7 50:6 | 37:3 38:1 | too 23:15 69:8 | types 28:16 | University |
| 69:22 | 39:22,22 | 69:18,18 | 34:21 | 57:19 |
| thing 17:13 | 44:18 50:12 | took 24:18 | typescript 79:8 | unknown 23:2 |
| 74:4 77:14 | 50:18 56:4 | 26:3 73:18 | typically 9:22 | until 57:11 |
| 78:6 | 60:10 61:15 | topic 43:1 | 32:1 46:3 | up 17:7,19 |
| things 5:14 | 63:21 66:21 | 69:21 | 55:22 73:7 | 18:1 27:19 |
| 8:11 21:13 | 67:7,14 73:2 | total 41:8,11 | | 41:1 45:7 |
| 43:7 44:15 | 73:19 76:3,4 | 41:19 42:6 | **U** | 51:1,11 |
| 47:6 59:13 | though 45:21 | 42:11 68:13 | Uh-huh 20:15 | 58:15 61:6 |
| 59:18 62:5 | 48:21 73:12 | 71:17 77:10 | 26:14 27:17 | 61:20 64:7 |
| 69:19 70:17 | thought 71:18 | toward 24:4 | 33:22 36:5 | 72:1,20 |
| 73:3 76:1,11 | 73:15 | Towers 12:16 | 63:10 | 76:17 77:22 |
| 77:3,8,22 | thousand 47:1 | 12:17 13:12 | ultimate 10:11 | upon 1:15 |
| think 9:3 15:3 | three 14:8 | traffic 44:10 | ultimately | 22:17 40:10 |
| 16:3 17:5,6 | 23:16 32:3 | training 6:3 | 29:12 56:19 | 42:3 67:17 |
| 19:9,15 | 70:21 | transcript 79:9 | 73:6,15 | 69:13 71:13 |
| 21:22 23:20 | thresholds | 79:10 | uncertainty | 73:13 79:6 |
| 25:2 27:2,5 | 33:10 75:19 | trend 32:19,20 | 23:2 | up-front 59:14 |
| 28:13 33:8 | threw 23:15 | 33:1,6,13 | under 5:22 | 59:19 |
| 33:10,11 | through 6:15 | Trigon 8:4 | 20:13 26:18 | us 17:19 22:3 |
| 43:1 46:5 | 13:15 16:4 | 11:20 19:1 | 28:18 30:22 | 24:13 26:7 |
| 47:4 58:2,12 | 27:15 29:22 | 20:10 21:2 | 39:10 40:16 | 29:12 33:5,6 |
| 60:1,9 61:1 | 56:14 75:9 | 36:21 38:4 | 51:1,11 | 37:11 38:5 |
| 61:16 62:19 | tie 69:19 | 40:16 43:19 | 53:16 54:22 | 39:19,19 |
| 62:19 63:7 | tied 67:14 75:5 | Trigon's 20:13 | 59:7 63:11 | 43:6 56:3 |
| 67:19,21 | tighten 72:1 | true 79:9 | 74:10 79:8 | 58:16 60:9 |

Henderson Legal Services
(202) 220-4158

David B. Morris          Highly Confidential          January 5, 2005
Richmond, VA

| | | | | |
|---|---|---|---|---|
| 61:2 66:14 | very 24:5 | way 9:22 15:14 | 56:11 57:14 | 53:3 56:5,19 |
| 69:4 72:12 | 62:16 73:5 | 16:3 23:1,4,6 | 61:13 62:3 | 57:7 59:2,10 |
| 72:19 74:10 | vice 7:2,4 | 31:22 41:2 | 64:12 66:2,9 | 60:6 61:4 |
| 75:4,7,9 76:3 | view 22:12 | 58:19 63:22 | 66:13 67:6 | 65:2,9 66:1,5 |
| 76:14 | viewed 11:3 | 64:12 69:11 | 67:22 68:17 | 66:9 76:20 |
| use 32:10 | 71:17 | ways 7:9 | 69:8,9,14 | 77:3,7 |
| 40:21 63:6 | Virginia 1:12 | Webb 2:11 | 70:8,8,10,22 | where 12:13 |
| 64:6,12 73:9 | 1:18,21 2:20 | weigh 77:19 | 71:8,14,14,19 | 18:1 23:10 |
| used 14:16 | 8:3 37:22 | well 6:2,7,20 | 71:21 73:3 | 31:11 43:21 |
| 28:18 37:3 | 38:2 39:21 | 6:22 7:7,20 | 74:15 75:19 | 47:15 52:15 |
| 39:22 | 49:17,19 | 10:9 13:7 | 75:22 76:1 | 54:2 57:17 |
| using 17:16 | 50:4,5 51:13 | 14:6 24:16 | weren't 20:16 | 58:10 62:21 |
| 32:9 38:5 | 51:18 57:18 | 29:3 31:22 | 25:18 29:14 | 66:19 67:9 |
| 45:4 62:9,10 | 65:16 79:1,2 | 36:11 38:1 | 29:17 59:20 | 72:2,20 75:9 |
| 62:14,15 | 79:3,5,16 | 38:17 39:21 | 59:22 75:5 | 77:14,22 |
| 77:19 | virtue 15:18 | 42:3 43:3 | we'd 67:9 | whether 14:13 |
| usual 43:19 | 28:17 | 44:5 45:7 | we'll 4:8 30:6 | 14:13,14 |
| 44:6,7 | | 51:2,16 52:2 | 40:14 67:11 | 29:13 41:8 |
| usually 10:6 | ___ W ___ | 53:20 55:3 | we're 5:21 | 41:12,20 |
| 12:4 | WAC 45:17,19 | 66:9 70:2 | 16:20 29:21 | 46:22 52:5,5 |
| utilization 5:14 | 46:3,7,11,18 | 72:13 73:5 | 35:13 50:4 | 61:5 71:22 |
| 6:3 34:16 | 47:8,11 48:2 | 74:14 75:15 | 58:13,15 | 76:14,15 |
| 71:2 73:4 | 48:3 49:2,4 | 78:18 | 65:4 70:3 | which 5:12 8:3 |
| utilize 26:13 | 67:20 68:3,4 | went 9:4 57:12 | 75:10 76:15 | 9:5 12:22 |
| utilized 6:11 | 68:7 | 62:9 | We've 18:15 | 17:14 20:3 |
| utilizing 59:3 | Wait 27:2 34:2 | were 5:3 10:10 | whatever 68:8 | 34:14 44:2 |
| | waiting 58:21 | 10:12,12 | what's 25:9,10 | 49:18 56:7 |
| ___ V ___ | 64:9 | 19:3,7 20:22 | 26:5 32:21 | 57:22 |
| VA 18:15 30:6 | waive 78:19 | 21:22 23:7,9 | 44:9 45:19 | while 44:15 |
| 30:13,18 | want 9:9 15:11 | 23:11,14,16 | 46:9 52:13 | who 7:2,13 |
| 31:8 36:3 | 22:16 24:13 | 23:18 24:20 | 55:18 75:6 | 10:2 12:6,10 |
| vaccine 48:7 | 26:4,6 27:10 | 25:20 28:3,6 | 77:9 | 45:22 53:3 |
| value 23:2,11 | 39:3 42:5 | 28:7,14,16,19 | when 4:17 8:6 | 66:15 |
| 53:15 77:20 | 44:18 64:19 | 29:13 30:22 | 8:22 10:16 | whoever 10:1 |
| various 6:12 | 68:22 71:22 | 32:1 33:1,9 | 15:4,4 17:5 | 76:13 |
| 13:17 34:15 | 72:1 73:9 | 33:13 34:5 | 17:22 19:10 | whole 42:6 |
| 34:18 36:15 | 75:12 | 35:2,3 36:6 | 24:19 27:6 | 69:20 |
| 52:17 56:17 | wanted 9:7 | 37:10,14 | 27:11,13,15 | wholesale 1:9 |
| vary 54:3 | 17:21 22:14 | 38:22 40:4 | 29:19 32:14 | 45:20 46:13 |
| vast 54:14 | 23:12 46:22 | 40:12 47:2,2 | 35:11 37:5 | 46:21 69:1 |
| verified 15:14 | 53:14 61:20 | 47:4,5,13,15 | 42:10 43:13 | wholesaler |
| verifying 17:9 | 64:6,17 75:9 | 47:19,20 | 45:13 46:17 | 46:2,20 47:5 |
| versus 26:5 | wasn't 10:22 | 48:13,15,18 | 46:19 48:13 | 48:9 |
| 32:7 53:8 | 68:1 | 52:4,9 56:5 | 50:3 51:3,8,9 | wholesalers |

David B. Morris
Highly Confidential
Richmond, VA
January 5, 2005

20

| | | | | |
|---|---|---|---|---|
| 69:3 | 50:14 54:14 | 48:11,14 | 17:22 18:5 | **$1.25** 31:18 |
| **whom** 4:15 7:1 | 55:6 58:9 | 49:3,22 | 22:2 24:18 | **$1.50** 54:16 |
| 7:10 13:17 | 61:12 63:20 | 50:17,19,20 | 28:14 30:16 | **$1.87** 31:17 |
| 71:8 | 65:9,21 74:3 | 52:4 54:18 | 31:8 35:12 | 63:8 |
| **whose** 79:3 | 75:2 76:11 | 55:13 57:20 | 40:13 42:20 | **$15** 45:1 75:21 |
| **why** 9:9 11:8 | 78:16,19 | 60:10,19,20 | 44:22 45:4 | **$2** 44:16 45:5 |
| 12:22 18:10 | **wondering** | 61:5,6,18 | 45:19 54:6 | **$2.25** 68:10 |
| 19:7 21:19 | 24:21 | 62:1,1 63:2,2 | 55:14,14,15 | **$20** 44:22 |
| 22:12 30:4 | **word** 26:9 73:1 | 63:5,15;21,22 | 56:10,13 | **$6.36** 31:18 |
| 30:20 31:20 | **worded** 29:10 | 64:3 67:18 | 57:17 63:7 | |
| 39:5 40:21 | **words** 19:10 | 69:3,11,12 | 64:9,11,20 | **0** |
| 41:1 56:2 | 32:12 33:3,6 | 71:3,5 72:7 | 66:1,10 67:2 | 002 3:12 18:11 |
| 62:1 68:21 | 44:21 62:17 | 72:18 74:17 | 67:12 68:4 | 18:12,15 |
| 73:8 | **work** 16:4 29:1 | 74:19,19 | 69:7,12 | 30:13 36:3 |
| **will** 20:10 | 29:11 32:13 | 75:3 77:3 | 70:11 71:13 | 003 3:15 30:5,6 |
| 42:11 54:4 | 47:18 57:10 | **wouldn't** 12:21 | 72:1,2,16 | 30:9,18 31:8 |
| 56:3 57:22 | 75:6 | 45:7 63:16 | 73:10,13,14 | **01-CV-1225...** |
| 69:16 70:15 | **worked** 9:22 | 64:4 | 76:21 77:18 | 1:3 |
| 78:7 | 30:21,22 | | 77:18 | 02142 2:6 |
| **WILLIAM** | 57:3 66:22 | **X** | **yourself** 30:21 | 0413283 79:21 |
| 2:10 | 75:8,15 | X 3:1 67:10 | **you'd** 41:17 | 09010055 |
| **willing** 22:2 | **working** 28:20 | | **you're** 14:4 | 30:14 |
| 33:2 45:22 | 32:12,22 | **Y** | 19:20 24:14 | 09010091 |
| 47:12 54:9 | 46:19 47:16 | **Yeah** 15:3 | 28:20 38:13 | 30:12 |
| 66:13 67:6,9 | 48:14 57:7 | 19:18,22 | 41:3 42:1 | |
| 70:17 73:3 | 57:14 66:14 | 22:20 29:5 | 44:22 52:12 | **1** |
| 73:18 | **works** 19:10 | 30:2 34:5 | 55:16 58:6 | 1st 18:18 30:8 |
| **wit** 79:1 | **worth** 73:7 | 39:5 49:10 | 61:9 64:9 | **1-1-01** 3:16 |
| **withhold** 26:17 | **would** 4:6 6:6 | 58:8 65:7,12 | 67:12 68:9 | **1-1-98** 3:13 |
| **withholding** | 6:7 9:17,22 | 65:16,20 | 70:4,16 72:2 | **1.3** 37:17 |
| 61:22 | 10:1,3,18,20 | 67:11 75:1 | 73:10,10,11 | **1:40** 1:19 |
| **within** 4:21 5:6 | 11:14,21 | **year** 9:3 | 73:12,18 | 10 67:11 |
| 5:9,12,16 | 12:6 13:4 | **years** 4:18 5:3 | 74:5 75:2 | 100 21:17 |
| 6:10 34:16 | 20:20 26:10 | 5:17 6:18 | 77:2,3,7,8,9 | 10036 2:13 |
| 56:17 70:20 | 29:5 31:11 | 7:15,21 8:15 | 77:17 | 101 69:17 |
| 75:22 79:4 | 32:5,15 | 14:11 15:19 | **you've** 4:21 | 11 31:12 |
| **without** 29:3 | 36:10 38:1,8 | 16:8 46:19 | 16:8 30:16 | 1133 2:12 |
| **witness** 3:3 4:1 | 39:14 40:9 | 47:15 48:1 | 49:16 54:5 | 12 31:13 |
| 8:9,21 13:3 | 40:21 41:2,6 | 48:13 49:15 | 69:7,18 | 13 40:19 41:9 |
| 13:11 15:13 | 42:2,14 | 57:14 | | 54:9 |
| 16:2 25:5 | 43:15 45:7 | **York** 2:13,13 | **Z** | 14 54:10 |
| 27:20 29:9 | 45:14,14 | **young** 44:13 | **zero** 28:9 | 15 40:17 41:10 |
| 31:3 34:4 | 46:20,21 | **your** 4:6,22 | | 43:20 53:10 |
| 39:7 42:5 | 47:9 48:2,11 | 12:10 16:20 | **$** | 54:10 68:9 |

David B. Morris                Highly Confidential                January 5, 2005
                               Richmond, VA

21

| | | |
|---|---|---|
| **16** 53:9 54:3,7<br>54:15 69:10<br>**17** 4:18<br>**18** 3:12 18:2<br>66:12<br>**1979** 57:9<br>**1987** 4:20 8:8<br>**1997** 6:7,8 19:6<br>35:18<br>**1998** 14:2<br>18:18 20:3<br>23:22 24:6<br>27:4,14,15,22<br>30:17 33:19<br>36:3 | 48:13<br>**26** 46:12<br>_____<br>**3**<br>**3** 20:3<br>**3:41** 78:20<br>**30** 3:15 20:14<br>39:8 47:1<br>61:22 79:3<br>**30-day** 32:2<br>**336-2000** 2:14<br>**354-7697** 2:21 | **97** 5:11 6:13<br>10:16 65:14<br>66:5<br>**98** 30:22 32:17<br>35:13 59:8<br>65:14 66:5<br>**99** 13:11 |
| ___**2**___<br>**20** 14:11 46:12<br>66:12<br>**2000** 9:3 56:6<br>66:9 71:6<br>74:18<br>**2001** 5:17<br>24:20 25:2<br>27:15 28:1<br>28:17 30:8<br>33:14 35:13<br>38:17 39:11<br>40:14 52:21<br>54:22 56:5,6<br>58:12 59:11<br>59:12,17,22<br>62:2,9 66:3<br>74:21<br>**2003** 51:9,21<br>**2005** 1:13,19<br>79:17<br>**2008** 79:4<br>**212** 2:14<br>**2235** 1:20 2:18<br>**23** 36:2,19<br>**23230** 2:20<br>**25** 46:12,19<br>47:15 48:1 | ___**4**___<br>**4** 3:5<br>**401** 1:21 2:19<br>**482-3700** 2:7<br>___**5**___<br>**5** 1:13<br>**5th** 1:19<br>___**6**___<br>**6.2** 20:6 33:21<br>34:4<br>**6.3** 24:6 31:12<br>**6.4** 32:18<br>**617** 2:7<br>___**7**___<br>**70** 20:11 61:19<br>**70/30** 20:18<br>34:6<br>**79** 57:10<br>___**8**___<br>**80s** 57:13<br>**804** 2:21<br>**87** 4:19,19<br>57:11 63:16<br>___**9**___<br>**9** 20:5,6 34:7<br>**90-day** 32:3<br>38:2 | |