Exhibit 50

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*****************************

IN RE: PHARMACEUTICAL                MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE           01CV12257-PBS

PRICE LITIGATION

*****************************         DEPOSITION OF

THIS DOCUMENT RELATES TO:            MICHAEL T. MULREY

ALL ACTIONS                          JANUARY 5, 2006

*****************************

                C O N F I D E N T I A L

DEPOSITION of MICHAEL T. MULREY, a witness called on

behalf of the Defendant Johnson & Johnson pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, Certified LiveNote Reporter, and Notary

Public in and for the Commonwealth of Massachusetts,

at the offices of Robins, Kaplan, Miller & Ciresi,

L.L.P., 800 Boylston Street, Boston, Massachusetts

02199, on Thursday, January 5, 2006, commencing at

1:38 p.m.

Hartman
EXHIBIT NO. 036
2-27-06

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                              Boston, MA

---

**Page 2**

1  APPEARANCES:  HAGENS BERMAN, LLP
2              Edward Notargiacomo, Esquire
3              One Main Street, 4th Floor
4              Cambridge, Massachusetts 02142
5              617-482-3700 / ed@hagens-berman.com
6                on behalf of the Plaintiffs
7
8              ROBINS, KAPLAN, MILLER & CIRESI, LLP
9              James S. Harrington, Esquire
10             800 Boylston Street
11             Boston, Massachusetts 02199-7610
12             617-267-2300 / jsharrington@rkmc.com
13                and
14             STEVEN E. SKWARA, ESQUIRE
15             Associate General Counsel
16             Blue Cross/Blue Shield of Massachusetts
17             401 Park Drive
18             Boston, Massachusetts 02215-3326
19             617-246-3531 / steven.skwara@bcbsma.com
20                Both on behalf of Plaintiff Blue
21                Cross/Blue Shield of Massachusetts
22

---

**Page 3**

1  APPEARANCES (Continued):
2
3              PATTERSON, BELKNAP, WEBB & TYLER, LLP
4              Erik Haas, Esquire
5              Adeel A. Mangi, Esquire
6              1133 Avenue of the Americas
7              New York, New York 10036-6710
8              212-336-2000 / ehaas@pbwt.com /
9              aamangi@pbwt.com
10                On behalf of the Defendant
11                Johnson & Johnson
12
13  Participating via teleconference:
14
15             KELLEY, DRYE & WARREN, LLP
16             Lorianne K. Trewick, Esquire
17             101 Park Avenue
18             New York, New York 10178
19             212-808-7740
20                On behalf of the Defendant Dey,
21                Inc.
22

---

**Page 4**

1                    I N D E X
2  WITNESS                          PAGE
3  MICHAEL T. MULREY
4    Direct Examination by Mr. Haas................. 005
5    Cross Exam by Mr. Harrington.................. 133
6    Redirect Examination by Mr. Haas.............. 137
7
8                  E X H I B I T S
9  NUMBER        DESCRIPTION          PAGE
10 Exhibit Mulrey 001, Group of documents,
11           numbers BCBSMA-AWP-00034
12           through 000181.............. 021
13
14 Exhibit Mulrey 002, Multipage Analysis of CMS
15           Average Wholesale Price
16           Reform, Reimbursement for
17           Part B Drugs................. 096
18
19 Exhibit Mulrey 003, Multipage Excessive
20           Medicare Payments for
21           Prescription Drugs........... 106
22

---

**Page 5**

1               P R O C E E D I N G S
2       MR. HARRINGTON:  At this time by
3  stipulation, this deposition transcript will be
4  designated confidential.
5                   - - -
6       MICHAEL T. MULREY, first having been
7  duly sworn, testified as follows in answer to
8  direct examination by MR. HAAS:
9                   - - -
10     Q.  Please state your name for the record.
11     A.  Mike Mulrey.
12     Q.  Mr. Mulrey, are you currently employed?
13     A.  Yes.
14     Q.  By whom?
15     A.  Blue Cross/Blue Shield of Massachusetts.
16     Q.  What is your current position?
17     A.  Manager.
18     Q.  Manager of what?
19     A.  The provider reimbursement area within
20  the actuarial department at Blue Cross.
21     Q.  You referred to the actuarial?
22     A.  Actuarial, yes.

2 (Pages 2 to 5)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
Boston, MA

---

Page 6

1    Q.  Who is the head of that department?
2    A.  The chief actuary of the department is
3  Rena Vertes.
4    Q.  How do you spell the last name?
5    A.  V-E-R-T-E-S.
6    Q.  Who does she report to?
7    A.  I would probably have to say Alan Maltz,
8  the CFO.
9    Q.  Did you say CFO?
10    A.  Yes.
11    Q.  And who did Mr. Maltz report to?
12    A.  The CEO, which would be Cleve.
13    Q.  Cleve who?
14    A.  Oh, gee. I just had that.
15    THE WITNESS:  Help me with that, Steve,
16  or I am going to die.
17    MR. SKWARA:  It is Killingsworth.
18    THE WITNESS:  Killingsworth.
19    MR. HAAS:  We won't tell him.
20    THE WITNESS:  God, no. Please.
21         (Laughter.)
22    THE WITNESS:  He is new. He just

---

Page 7

1  started. Not new, but new in the CEO position.
2  BY MR. HAAS:
3    Q.  How many people are in the provider
4  relations department?
5    A.  Provider reimbursement department?
6    Q.  Reimbursement.
7    A.  In my group?
8    Q.  Is that different?
9    A.  Yes.
10    Q.  How many people are in the provider
11  reimbursement department?
12    A.  Six.
13    Q.  What does the provider reimbursement
14  department of Blue Cross/Blue Shield of
15  Massachusetts do?
16    A.  We maintain and update the provider,
17  various provider fee schedules on our mainframe
18  systems. We also do analysis work on various fee
19  schedules.
20    Q.  When you say that you maintain and
21  update provider fee schedules, is your department
22  responsible for any negotiation, if any occurs,

---

Page 8

1  between Blue Cross/Blue Shield of Massachusetts
2  concerning provider reimbursement?
3    A.  No.
4    Q.  Is there a separate department that does
5  that?
6    A.  Yes.
7    Q.  What department is that?
8    A.  Provider contracting.
9    MS. TREWICK:  Hello. This is Lorianne
10  Trewick. Is anyone else on the phone?
11    MR. HAAS:  Yes. Can you say your name
12  one more time? I can't catch that.
13    MS. TREWICK:  Lorianne Trewick.
14    MR. HAAS:  Hi, Lorianne. Welcome back.
15    MS. TREWICK:  Okay.
16  BY MR. HAAS:
17    Q.  Who is in charge of the provider
18  contracting department?
19    A.  The senior vice president would be Deb
20  Devaux.
21    Q.  How do you spell the last name?
22    A.  D-E-V-A-U-X.

---

Page 9

1    Q.  Is there a division or department or
2  unit of Blue Cross/Blue Shield of Massachusetts
3  referred to as the network development and
4  management department?
5    A.  Yes.
6    Q.  Is that something different or the same
7  as the provider contracting?
8    A.  It is different.
9    Q.  Okay. What is the responsibility of
10  that department?
11    A.  That group is more the provider
12  relations folks.
13    Q.  And when you say "provider relations,"
14  what do they do?
15    A.  They are the provider reps that go out
16  and work with the hospitals and the physicians to
17  help them, you know, with all of their issues and
18  --
19    Q.  Is it -- does that group respond to
20  provider complaints or inquiries concerning
21  reimbursement?
22    A.  Sometimes they will go through them --

---

3  (Pages 6 to 9)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey      CONFIDENTIAL      January 5, 2006
Boston, MA

| | Page 10 |
|---|---|
| 1 | Q.   Okay. |
| 2 | A.   -- as their first point of contact. |
| 3 | Q.   Which department at Blue Cross/Blue |
| 4 | Shield of Massachusetts is responsible today for |
| 5 | actually drafting and executing contracts with |
| 6 | physicians for the reimbursement of drugs? |
| 7 | A.   Provider contracting. |
| 8 | Q.   Okay.  How long have you been a manager |
| 9 | of the provider reimbursement department? |
| 10 | A.   October of 2000 through present. |
| 11 | Q.   Just stepping back, if you would |
| 12 | describe for the record your post high school |
| 13 | education and then your post high school |
| 14 | employment, leading up to October of 2000. |
| 15 | A.   A graduate of St. Anselm's College, B.A. |
| 16 | degree. |
| 17 | Q.   Any specialty? |
| 18 | A.   Business and economics. |
| 19 | And then what was the second part of |
| 20 | that question again? |
| 21 | Q.   I will follow up.  After getting -- |
| 22 | obtaining your B.A., have you obtained any other |

| | Page 11 |
|---|---|
| 1 | educational degree? |
| 2 | A.   No. |
| 3 | Q.   Have you taken any courses relating to |
| 4 | the reimbursement of physician-administered drugs? |
| 5 | A.   No. |
| 6 | Q.   Have you taken any courses relating to |
| 7 | prescription drugs generally? |
| 8 | A.   No. |
| 9 | Q.   What was your first employment after |
| 10 | graduating from college? |
| 11 | A.   Oh, God. |
| 12 | MR. HARRINGTON:  If you need a minute to |
| 13 | remember back that far, Mike. |
| 14 | THE WITNESS:  It was a while. |
| 15 | (Laughter.) |
| 16 | A.   I am going to say it was probably with |
| 17 | Aetna as a claims examiner in the auto industry |
| 18 | back then. |
| 19 | Q.   Okay.  For what years did you hold that |
| 20 | position approximately? |
| 21 | A.   All right.  Probably '79 to '81. |
| 22 | Q.   What did you do next? |

| | Page 12 |
|---|---|
| 1 | A.   Worked for a company by the name of |
| 2 | Barrow Industries, which is a wholesaler of |
| 3 | drapery and carpeting, I think is what it was, and |
| 4 | that was from probably, oh, '91 -- excuse me -- |
| 5 | not '91 -- what did I say? |
| 6 | Q.   '81? |
| 7 | A.   The first one -- yes, '81.  So that was |
| 8 | from '81 to '87. |
| 9 | Q.   Okay.  What did you do next? |
| 10 | A.   Joined Blue Cross/Blue Shield in 1987. |
| 11 | Q.   What was your initial position? |
| 12 | A.   Senior financial analyst. |
| 13 | Q.   What department were you in? |
| 14 | A.   Finance department. |
| 15 | Q.   What were your responsibilities as a |
| 16 | senior financial analyst in the finance |
| 17 | department? |
| 18 | A.   We maintained all the financial |
| 19 | information for our health centers back in the |
| 20 | early -- late '80s, early '90s. |
| 21 | Q.   What is a health center? |
| 22 | A.   They were the staff model HMOs that Blue |

| | Page 13 |
|---|---|
| 1 | Cross owned through their Medical East/ Medical |
| 2 | West Corporation back in the late '80s, early |
| 3 | '90s. |
| 4 | Q.   When you referred to a staff model HMO, |
| 5 | did Blue Cross/Blue Shield of Massachusetts own |
| 6 | both pharmacies and physician groups as part of |
| 7 | that HMO? |
| 8 | A.   I can tell you there were pharmacies |
| 9 | within the physical buildings themselves, and the |
| 10 | physicians themselves were, as far as I knew, they |
| 11 | were salaried through Blue Cross or through |
| 12 | Medical East/Medical West. |
| 13 | Q.   So were the physicians employees of the |
| 14 | -- |
| 15 | A.   Yes. |
| 16 | Q.   -- clinics? |
| 17 | A.   Yes. |
| 18 | Q.   And those clinics were owned by Blue |
| 19 | Cross/Blue Shield of Massachusetts? |
| 20 | A.   Yes. |
| 21 | Q.   Now I am sorry, was it Medical |
| 22 | East/Medical West you referred to? |

4  (Pages 10 to 13)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey        CONFIDENTIAL        January 5, 2006
Boston, MA

Page 14

1     A.   Yes.
2     Q.   What is that?
3     A.   That was a corporate name under which
4  the staff model HMOs were kind of set up under.
5     Q.   Was Medical East/Medical West a
6  subsidiary of Blue Cross/Blue Shield of
7  Massachusetts?
8     A.   Yes.
9     Q.   A wholly-owned subsidiary?
10    A.   I'm not sure on that.
11    Q.   Do you recall who was in charge of
12 Medical East and West from the late '80s and early
13 '90s?
14    A.   Each health center had its own executive
15 director. I am trying to think. There was a
16 senior group above them. Oh, I want to say it had
17 its own separate kind of president, if you will,
18 for Medical East/Medical West. I just for the
19 life of me can't think of the -- it was a man at
20 the time I was there -- his name.
21    Q.   Did this, the president of Medical East
22 and West, report in to someone in Blue Cross/Blue

Page 15

1  Shield?
2     A.   Yes. As far as I knew, yes.
3     Q.   Do you know who that was?
4     A.   No.
5     Q.   How many health centers were there?
6     A.   There were eight, four in the west, four
7  in the east.
8     Q.   And when you say east and west, are we
9  talking east and west of Massachusetts?
10    A.   Yes. East and west. West of Worcester
11 and east of Worcester, if you will, hence Medical
12 East/Medical West.
13        MR. HARRINGTON: They are from out of
14 town.
15        MR. HAAS: I am thinking Mississippi
16 versus -- actually I grew up in Lexington, so.
17        MR. HARRINGTON: West of Worcester is
18 the west coast here.
19        (Laughter.)
20        THE WITNESS: So he knows where
21 Worcester is.
22 BY MR. HAAS:

Page 16

1     Q.   So what in particular did you do with
2  respect to the maintenance of financial
3  information for the health centers?
4     A.   We compiled, you know, each health
5  center had its own kind of senior financial
6  analyst that was in charge of compiling kind of
7  their financial statements at the close of each
8  month, so your profit and loss statements, your
9  balance sheets and such.
10    Q.   All right. Those P & L's, were they
11 consolidated with Blue Cross/Blue Shield's?
12    A.   Yes. We would send them up to
13 corporate, and somewhere that would happen.
14    Q.   Were you responsible for all of the
15 health centers or particular ones?
16    A.   Just one that I worked out of.
17    Q.   So you actually worked at the site?
18    A.   Yes.
19    Q.   Which one was that?
20    A.   At Braintree.
21    Q.   And what was the nature of that site?
22 Was it a hospital, a pharmacy, a clinic, all

Page 17

1  three?
2     A.   It was physician offices. The pharmacy
3  was in the building as well, a small lab area.
4     Q.   Just to get the time frame down, this is
5  from 1987 until about what time?
6     A.   About '91.
7     Q.   At this time did you move on to another
8  position?
9     A.   Yes.
10    Q.   What was that?
11    A.   I moved on to become a business analyst
12 under the HMO Blue information systems area.
13    Q.   Okay. Did Blue Cross/Blue Shield of
14 Massachusetts spin off, sell, or otherwise disband
15 the staff model HMOs in 1991?
16    A.   Not in '91, no.
17    Q.   Did there come a point in time that they
18 did?
19    A.   Yes.
20    Q.   When was that?
21    A.   I think it was in the time frame of '96-
22 '97.

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
Boston, MA

Page 18

1    Q.   In the 1987 to 1991 time frame when you
2    were the senior financial analyst for the
3    Braintree site, how did the site obtain drugs that
4    were administered in the physician clinics?
5        A.   I don't know.
6        Q.   Do you have an understanding of where
7    they purchased drugs that were sold in the retail
8    pharmacy?
9        A.   No.
10       Q.   As part of your financial analysis that
11   you were doing at Braintree health center, did you
12   incorporate their drug costs into their expenses
13   for the P & L that was consolidated with the Blue
14   Cross/Blue Shield of Massachusetts P & L?
15       A.   I can't recall exactly.
16       Q.   Is it likely that those costs were
17   incorporated?
18       A.   I just can't say for certain.
19       Q.   Was there any process or protocol by
20   which the costs of the parent corporation, Blue
21   Cross/Blue Shield of Massachusetts, were allocated
22   between the corporation and the subsidiaries?

Page 19

1        A.   I don't know.
2        Q.   Do you recall whether there were any
3    shared services?
4        A.   Some of the shared services, I know my
5    time was shared.
6        Q.   All right.
7        A.   Other than that, I can't recall in
8    detail any others.
9        Q.   Do you recall whether the Braintree site
10   had its own purchasing department?
11       A.   It did have a purchasing area, but the
12   purchasing area was more along the lines of
13   supplies for the building.
14       Q.   To your recollection, did the purchasing
15   of the drugs and supplies for the clinics and the
16   pharmacies occur through the parent organization?
17       A.   I'm not sure where that happened.
18       Q.   Okay.  As part of your work at
19   Braintree, did you gain an understanding as to the
20   costs at which physician-administered drugs could
21   be acquired?
22       A.   No.

Page 20

1        Q.   Did you get an understanding of whether
2    or not manufacturers, pharmaceutical
3    manufacturers, gave discounts or rebates to
4    physicians or pharmacies depending upon the volume
5    of drug purchased or the particular leverage of
6    the account?
7        A.   No.
8        Q.   Did there ever come a point in time when
9    you learned -- that you obtained that
10   understanding?
11       A.   Yes.
12       Q.   When was that?
13       A.   It was pretty much at the time when
14   Medicare was reviewing their AWP logic and payment
15   methodology.
16       Q.   And when was that?
17       A.   The 2002-2003 time frame.
18       Q.   Do you recall any discussions in the
19   1999 time frame with respect to the extent that
20   physicians could obtain discounts and rebates and
21   other incentives on their purchases of drugs?
22       A.   In 1999?

Page 21

1        Q.   Yes.
2        A.   No.
3        Q.   Do you recall -- well, we were handed
4    this morning a bunch of documents that we were
5    told were produced from your files.  Do you recall
6    did you produce a number of documents from a file
7    recently --
8        A.   Yes.
9        Q.   -- to your counsel?  I haven't had the
10   opportunity to review them all, but quickly
11   flipping through them, can you tell me generally
12   what the nature of those documents were that you
13   produced?
14       A.   Can I just look at them real quick?
15       MR. HAAS:  I will tell you what.  Why
16   don't I do this.  Let's mark as Deposition Exhibit
17   Mulrey 001 a series of documents that were
18   produced to us this morning.  They are Bates
19   stamped BCBSMA-AWP-00034 through 181.
20       (Group of documents, production
21        numbers BCBSMA-AWP-00034 through
22        000181 marked Exhibit Mulrey 001

6  (Pages 18 to 21)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey             CONFIDENTIAL            January 5, 2006
                              Boston, MA

Page 22

1            for identification.)
2            (Handing Exhibit Mulrey 001 to the
3         witness.)
4    BY MR. HAAS:
5       Q.   Mr. Mulrey, I ask that you take a look
6    at what has been marked as Deposition Exhibit
7    Mulrey 001 and tell me whether you recognize those
8    documents.
9            (Pause.)
10           (The witness viewing
11           Exhibit Mulrey 001.)
12      A.   Yes, I do.
13      Q.   What are they?
14      A.   It is information that came out of a
15   file that I provided to our legal counsel.
16      Q.   What file was that?
17      A.   This one in particular was a file that
18   we had just -- I think the title of it was Chemo,
19   and it had to do with some discussions with a
20   particular oncologist in our network.
21      Q.   What was the subject matter of those
22   discussions?

Page 23

1       A.   Blue Cross' reduction from 100 percent
2    of AWP to 95 percent of AWP.
3       Q.   Did that reduction occur in the 1998
4    time frame?
5       A.   Yes.
6       Q.   And that corresponded to a reduction in
7    the Medicare reimbursement?
8       A.   Yes.
9       Q.   Have you reviewed those documents in
10   preparation for your deposition?
11      A.   I have looked through them.  Yes.
12      Q.   And do you recall those documents
13   discussing whether physicians can obtain discounts
14   and rebates to reduce their acquisition cost to
15   below WAC, or wholesale acquisition cost?
16      A.   I know there was some comments in some
17   e-mails to that effect, yes.
18      Q.   Right.  Do you recall those discussions
19   and comments in e-mails?
20      A.   Me personally?  Once I read this file,
21   yes.
22      Q.   Did it refresh your recollection as to

Page 24

1    the communications at that time?
2       A.   At that time, I wasn't in this position.
3       Q.   Okay.  How is it that you came across
4    this file?
5            MR. HAAS:  Well, withdraw that question.
6       Q.   Did you receive the e-mails that were in
7    this file in the 1998-1999 time frame?
8       A.   No.
9       Q.   Okay.  How is it that you came to be in
10   possession of this file?
11      A.   We were asked to produce discovery
12   materials on any drug-related information.  This
13   happened to be a file that one of my staff members
14   had had historically kept.
15      Q.   So this was not documents produced from
16   your own files, but it was documents --
17      A.   Right.
18      Q.   -- produced from the files of a staff
19   member?
20      A.   Yes.
21      Q.   Who is that staff member?
22      A.   Ellen Thompson.

Page 25

1       Q.   Were you involved at all in the
2    correspondence and communications that are
3    reflected in those e-mails?
4       A.   No.
5       Q.   What was Ms. Thompson's position in the
6    1998-1999 time frame when she was having these
7    communications?
8       A.   She is an analyst in the provider
9    reimbursement group.
10      Q.   Did she report to you at that time?
11      A.   I wasn't in the role at that time.
12      Q.   Do you recall why --
13           MR. HAAS:  Well, withdraw that question.
14      Q.   In the 1996-1997 time frame when Blue
15   Cross/Blue Shield disbanded or otherwise got rid
16   of its staff model HMOs, do you recall why that
17   was?
18      A.   I mean I'm not -- I wasn't directly
19   involved with that decision, so I mean I just
20   think, my opinion, is that they just wanted to get
21   out from under actually delivering care.
22      Q.   After 1991, did you do any work, any

                              7 (Pages 22 to 25)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey         CONFIDENTIAL         January 5, 2006
Boston, MA

---

Page 26

1  analyses, for or in connection with the staff
2  model HMOs?
3      A.  No.
4      Q.  Who was your successor at the Braintree
5  site?
6      A.  I think Walter Hutchinson.
7      Q.  Is he currently with the company?
8      A.  No.
9      Q.  Do you know where he is today?
10     A.  No.
11     Q.  Do you know whether Blue Cross/Blue
12  Shield of Massachusetts received rebates from
13  manufacturers on either the drugs dispensed by the
14  pharmacies that it owned or that were administered
15  by the clinics that it owned?
16     A.  I'm not aware of it.  No.
17     Q.  Did Blue Cross/Blue Shield of
18  Massachusetts sell the HMOs?
19     A.  Yes.
20     Q.  To whom?
21     A.  Med Partners.
22     Q.  What type of company was that?

---

Page 27

1      A.  A company that bought physician groups.
2      Q.  A physician practice group company or a
3  venture capital company?  Do you know?
4      A.  I don't know, no.
5      Q.  What percentage of --
6      MR. HAAS:  Withdraw that question.
7      Q.  From the 1987 to 1991 time frame where
8  you worked at the Braintree site, what percentage,
9  if you know, of Blue Cross/Blue Shield of
10  Massachusetts's members were serviced in this
11  staff model HMOs as compared to outside the staff
12  model HMOs?
13     A.  Just the Braintree site?
14     Q.  No.  All the HMOs, all of the staff
15  model HMOs.
16     A.  I don't recall a percentage.
17     Q.  Was it a majority of the membership --
18     A.  HMOs?
19     Q.  -- that were treated in the staff model
20  HMOs?
21     A.  I really can't recall the total
22  membership on the HMO side, the staff models.

---

Page 28

1      Q.  In the 1987 to 1991 time frame, did you
2  have an understanding as to how Blue Cross/Blue
3  Shield of Massachusetts reimbursed physicians
4  outside the staff model HMO for drugs administered
5  to the members of Blue Cross/Blue Shield of
6  Massachusetts?
7      A.  No.
8      Q.  In 1991 when you became a business
9  analyst in the HMO systems department, --
10     A.  Information systems department.
11     Q.  -- information systems department, what
12  were your responsibilities?
13     A.  My main focus there was working to
14  create a provider credentialing data system.
15     Q.  What is a provider credentialing system?
16  What is that?
17     A.  It is really a database that we could
18  basically track provider credentials and when they
19  needed to be recredentialed.
20     Q.  When you say "credentialed," what does
21  that mean?
22     A.  For our HMO product lines, there are

---

Page 29

1  certain things that we require the providers to
2  maintain, and this information was stored in this
3  database.
4      Q.  Okay.  This is because these physicians
5  were employees of Blue Cross/Blue Shield of
6  Massachusetts, and, therefore, you were required
7  and obligated to maintain this information and
8  maintain their status as credentialed physicians;
9  right?
10     A.  It was also the -- any HMO Blue
11  physician that was outside the staff models, too.
12  We were maintaining their credentials as well.
13     Q.  So does Blue Cross/Blue Shield of
14  Massachusetts have conditions of physician
15  participation in its network which includes a
16  certain level of credentialing?
17     A.  Yes.
18     Q.  Okay.
19     MR. HARRINGTON:  Are you still in the
20  '87 to '91 time frame?
21     MR. HAAS:  I am in the 1991 time frame.
22     MR. HARRINGTON:  Okay.

---

8  (Pages 26 to 29)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey         CONFIDENTIAL             January 5, 2006
                          Boston, MA

Page 30

1       MR. HAAS:  When he was working as a
2  business analyst.
3  BY MR. HAAS:
4       Q.  How long were you in that position?
5       A.  Until '94.
6       Q.  And aside from your work in creating
7  this provider credentialing system, what else did
8  you do in that role, if anything?
9       A.  It was more kind of a support -- a
10 support role between end users and programming
11 staff to work with them on any kind of system
12 enhancements that they felt they needed for our
13 processing systems.
14      Q.  All related to this system that you
15 created?
16      A.  Yes.
17      Q.  As part of that work, did you gain an
18 understanding as to how many physicians were
19 members of the staff model HMO as compared to the
20 number of physicians in Blue Cross/Blue Shield's
21 networks outside the HMO?
22      A.  No.  I mean it wasn't something that I

Page 31

1  was cognizant of.  You were just looking at them
2  as a pool of physicians.
3       Q.  Do you have an understanding of how
4  significant to Blue Cross/Blue Shield of
5  Massachusetts the staff model HMO was in the '91
6  through '96 time frame?
7       A.  In the '91 to '92 time frame, that was
8  when HMO Blue really was kind of evolved or
9  started.  So in the early time frame the
10 membership was, you know, was large. I mean that
11 was basically consolidating all the staff model
12 members as well as members that chose physicians
13 outside the staff models.
14      Q.  So let me just see if I understand it.
15 The 1991 to 1992 time frame, the staff model HMO
16 plan was a significant part of the business of
17 Blue Cross/Blue Shield of Massachusetts?
18      A.  The HMO -- what happened in the '91-'92
19 time frame is the Medical East and Medical West
20 staff models, and we also had a lot of IPA
21 products out there, they combined them all and
22 created HMO Blue.  So those memberships from all

Page 32

1  of those different plans and those staff models
2  were all brought together under the HMO Blue
3  product.
4       Q.  All right.  And I guess what I am trying
5  to ascertain is what the relative portion of the
6  membership that were involved in the plans outside
7  the staff model HMO plan as compared to those in.
8       A.  I don't know that.
9       Q.  You don't know?
10      A.  No.
11      Q.  Okay.  What did you do after 1994?
12      A.  Joined the provider contracting
13 department.
14      Q.  What was your title?
15      A.  Senior contracting analyst.
16      Q.  What were your responsibilities as a
17 senior contracting analyst?
18      A.  I negotiated contractual agreements with
19 a wide host of ancillary providers.
20      Q.  When you referred to "ancillary
21 providers," what are you referring to?
22      A.  Non M.D.s, nonhospital.

Page 33

1       Q.  Would that include pharmacies?
2       A.  No.
3       Q.  Would it include long-term healthcare
4  facilities?
5       A.  I didn't do anything with them.
6       Q.  Nursing homes?
7       A.  Nursing homes, yes.
8       Q.  What other examples are there?
9       A.  Clinical labs, DME providers.
10      Q.  Did the provider contracting department
11 as a whole have any responsibility with pharmacy
12 reimbursement?
13      A.  No.
14      Q.  Okay.  What department of Blue
15 Cross/Blue Shield of Massachusetts was responsible
16 for negotiating contracts with retail pharmacies
17 at that time?
18          MR. HARRINGTON:  I object to the form.
19      Go ahead and answer.
20      Q.  If any.
21      A.  When you are saying retail pharmacies,
22 this is where you go into a CVS?

9  (Pages 30 to 33)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey       CONFIDENTIAL       January 5, 2006
Boston, MA

Page 34

1   Q.  Yes.
2   A.  We used a contract with a pharmacy
3   benefits manager.
4   Q.  Who was it at that time?
5   A.  At what time?
6   Q.  I am talking the 1994 time frame.
7   A.  '94 -- I'm not certain on this.  It
8   could have been Medco, which ended up becoming --
9   there was a name change there.  Maybe not.  I'm
10  not sure.  Medco -- I know Medco was one of -- one
11  of the names.
12  Q.  Okay.  What responsibilities have you
13  had, if any, throughout the course of your career
14  with respect to the reimbursement of pharmacies,
15  either directly or through a PBM network, for
16  drugs dispensed to Blue Cross/Blue Shield of
17  Massachusetts members?
18  A.  I have had none.
19  Q.  Have you had any responsibility with
20  respect to hospital reimbursement?
21  A.  Yes.
22  Q.  What responsibility?

Page 35

1   A.  In one of my future roles we haven't got
2   to yet -- so I don't know if you want to wait.
3   MR. HARRINGTON:  I think we should let
4   the suspense build.
5   (Laughter.)
6   MR. HAAS:  We will let it unfold.  I
7   will get to it.  Okay.
8   BY MR. HAAS:
9   Q.  So in addition to your role of
10  negotiating contracts with ancillary providers,
11  what else did you do as a senior contracting
12  analyst in the provider contracting department in
13  the 1994 time frame?
14  A.  That was pretty much it.  It was
15  negotiating the contracts, the agreements.
16  Q.  How long were you a senior contracting
17  analyst?
18  A.  Until '98.
19  Q.  During that time frame, did your
20  responsibilities change at all?
21  A.  What changed were the different
22  ancillary provider types I might have had to deal

Page 36

1   with.
2   Q.  In 1998, what position did you assume?
3   A.  I left the company.
4   Q.  Where did you go?
5   A.  Harvard Pilgrim Healthcare.
6   Q.  What was your position there?
7   A.  A senior contract analyst.
8   Q.  What were your responsibilities in that
9   position?
10  A.  I negotiated agreements with hospitals
11  and risk groups, physician risk groups.
12  Q.  What is a physician risk group?
13  A.  Large physician practices that would
14  enter into risk arrangements with the different
15  plans.
16  Q.  What is a risk arrangement?
17  A.  It is -- well, what is a simple way of
18  putting it?  You set certain performance levels
19  they have to meet.  If they meet those performance
20  levels, you know, there is money that is shared
21  between the hospitals and the physician groups.
22  Q.  Is this a withhold program?

Page 37

1   A.  Some were withhold programs.
2   Q.  Were they capitated programs?
3   A.  Yes.  Some were capitated programs.
4   Q.  So in the 1998 time frame, Harvard
5   Pilgrim was reimbursing physicians under capitated
6   and withhold programs?
7   A.  Yes.
8   Q.  Did those reimbursements encompass the
9   administration of drugs to the members of Harvard
10  Pilgrim?
11  A.  I don't know.
12  Q.  Did the contracts that you negotiated
13  encompass reimbursement of pharmaceuticals?
14  A.  We didn't get into kind of the fee
15  schedule level of detail.  It was more at a kind
16  of an overall PM/PM level.
17  Q.  Understanding that under the capitated
18  and withhold programs that you would set PM/PM
19  amounts, per patient/per month amounts, was it
20  your understanding that the contract encompassed
21  all the reimbursements to the particular clinics
22  with which you contracted, including drugs?

10  (Pages 34 to 37)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey            CONFIDENTIAL            January 5, 2006
                              Boston, MA

---

Page 38

```
 1      A.  There might have been -- there -- there
 2   might have been variations where certain things,
 3   certain services were excluded from capitated
 4   arrangements.
 5      Q.  And that would be reflected in terms of
 6   a rider to the agreement?
 7      A.  Right.
 8      Q.  And you would be responsible for
 9   negotiating both the contract and the rider?
10      A.  Negotiating what is included as under
11   the cap and what would be excluded in paid fee for
12   service, if you will.
13      Q.  Right.  Sitting here today, can you
14   recall whether any of the capitated and withhold
15   amounts pertained to physician- administered
16   drugs?
17      A.  I can't.
18      Q.  Has Blue Cross/Blue Shield of
19   Massachusetts to your knowledge ever engaged in
20   any capitated reimbursement programs or withhold
21   programs that encompassed physician-administered
22   drugs?
```

Page 39

```
 1      A.  Yes.
 2      Q.  When?  Over what time frame did Blue
 3   Cross/Blue Shield of Massachusetts provide
 4   reimbursement to physicians that -- for physician-
 5   administered drugs under a capitated and/or
 6   withhold plan?
 7      A.  I mean I can only talk of what I know
 8   today.  I don't know how far back some of these
 9   arrangements go today.
10      Q.  All right.
11      A.  There are three that I know today where,
12   one, the drugs are included, and two, the drugs
13   are excluded.
14      Q.  When you say one, are you talking about
15   one capitated plan?
16      A.  One capitated arrangement.
17      Q.  And who is that capitated arrangement
18   with?
19      A.  A physician group by the name of
20   Riverbend.
21      Q.  Do you have an understanding of how long
22   that capitated arrangement for the reimbursement
```

Page 40

```
 1   of physician-administered drugs has been in place?
 2      A.  I don't.
 3      Q.  Historically do you have any
 4   understanding of how long Blue Cross/Blue Shield
 5   of Massachusetts has offered capitated plans for
 6   the reimbursement of physician- administered
 7   drugs?
 8          MR. HARRINGTON:  I object to the form.
 9   But go ahead.  You can answer.
10      A.  The kind of capitated arrangements, risk
11   deals, a lot of them were originally started in
12   the mid '90s, and over the course of these, you
13   know, the past few years, we have very few of
14   these types of arrangements still in place today.
15      Q.  In the mid '90s, what percentage of Blue
16   Cross/Blue Shield's reimbursement of physician-
17   administered drugs were through capitated or
18   withhold plans?
19      A.  I don't know.
20      Q.  Was it a majority of the plans at that
21   time?
22      A.  I don't know.
```

Page 41

```
 1      Q.  In addition to the capitated and
 2   withhold plans, to your knowledge has Blue
 3   Cross/Blue Shield of Massachusetts ever reimbursed
 4   physicians on a percentage-of- charges basis --
 5      A.  No.
 6      Q.  -- for physician-administered drugs?
 7      A.  No.
 8          MR. HARRINGTON:  Erik, when you reach a
 9   convenient point, can we take a short break?
10          MR. HAAS:  Sure.  Right now is fine.
11          MR. HARRINGTON:  Okay.
12          (Recess taken at 2:22 p.m.)
13          (Recess ended at 2:34 p.m.)
14          MR. HAAS:  Back on the record.
15   BY MR. HAAS:
16      Q.  Let's just step back.  What
17   methodologies did Blue Cross/Blue Shield of
18   Massachusetts use to reimburse physicians for
19   drugs administered to its members from the 1991
20   time frame until today?
21          MR. HARRINGTON:  I am just going to
22   object because it is so broad.
```

11  (Pages 38 to 41)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
Boston, MA

Page 42

1    Q.  If you would just list the various
2  methodologies that you're aware of over time from
3  1991 to present, and I will follow up with
4  specific questions about those.
5    A.  What I knew in '91, I didn't know how
6  any of it -- I mean I came into my role in 2000.
7    Q.  All right.
8    A.  From that point forward, I know how we
9  reimburse our physicians, but prior to that, I
10 didn't have any direct knowledge of drug
11 reimbursement to physicians.
12   Q.  I am not limiting it to direct
13 knowledge.
14   A.  Okay.
15   Q.  I am limiting it to -- my question goes
16 to sitting here today what methodologies are you
17 aware of that Blue Cross/Blue Shield of
18 Massachusetts utilized to reimburse physician-
19 administered drugs that were administered to its
20 members from 1991 to today.
21   A.  Average wholesale price.
22   Q.  They reimbursed on the basis of average

Page 43

1  wholesale price?
2    A.  Yes.
3    Q.  That is one methodology?
4    A.  Yes.
5    Q.  Are you aware of another methodology?
6    A.  That Blue Cross reimbursed?  No.
7    Q.  You mentioned before the break that Blue
8  Cross/Blue Shield of Massachusetts reimbursed
9  physicians under capitated programs for drugs?
10   A.  Yes.
11   Q.  So that is a second methodology?
12   A.  Okay.
13   Q.  Capitation; right?
14   A.  Yes.
15   Q.  You also testified that there were
16 withhold plans; correct?
17   A.  Yes.
18   Q.  So that is a third methodology?
19   A.  Okay.
20   Q.  Okay.  Are there any other methodologies
21 utilized by Blue Cross/Blue Shield of
22 Massachusetts or that were from 1991 through

Page 44

1  today?
2    A.  I mean -- no.  I mean AWP, and in my
3  opinion, like a fee-for-service type arrangement.
4  A claim is submitted, and it is paid based on the
5  AWP that we have on file.
6        So when you're talking capitation and
7  risk, those are kind of different ways of
8  reimbursing providers. Fee for service is another
9  way to reimburse providers.  Or fee-for-service
10 reimbursement on drugs is based on AWP.
11   Q.  I understand the point you are trying to
12 make.
13   A.  Okay.
14   Q.  And I understand that Blue Cross/Blue
15 Shield has reimbursed some claims based upon AWP -
16 -
17   A.  Yes.
18   Q.  -- for drugs that were administered in
19 the office, but what I am trying to get an
20 understanding of is what other methodologies it
21 also used.  You have mentioned capitation?
22   A.  Yes.

Page 45

1    Q.  And you mentioned withholds?
2    A.  Yes.
3    Q.  My question is are there any other
4  methodologies that Blue Cross/Blue Shield utilized
5  to reimburse physician- administered drugs that
6  were administered to its members?
7    A.  I'm not aware of any others other than
8  those three.
9    Q.  So we have the fee for service,
10 capitation, withhold, and then the staff model HMO
11 concept that we discussed earlier?
12   A.  Yes.
13   Q.  Okay.  How long were you at Harvard
14 Pilgrim Healthcare?
15   A.  Two years: '98 to 2000.
16   Q.  During that time frame, was your title
17 always senior contract analyst?
18   A.  Yes.
19   Q.  Did your responsibilities change at all
20 over that time frame?
21   A.  No.
22   Q.  What did you do after that?

12 (Pages 42 to 45)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey    CONFIDENTIAL    January 5, 2006
Boston, MA

Page 46

1    A.  Came back to Blue Cross in my current
2    role.
3    Q.  Okay.  Your current role once again is
4    the manager of provider reimbursement?
5    A.  Yes.
6    Q.  Let me back up for a minute.  When you
7    worked as a senior contracting analyst for the
8    provider contracting department in negotiating
9    contracts with ancillary providers, what
10   methodology did Blue Cross/Blue Shield of
11   Massachusetts use to reimburse for drugs that were
12   administered by those entities to its members?
13   A.  By the ancillary providers --
14   Q.  Yes.
15   A.  -- to their --
16   Q.  Yes.
17   A.  There weren't drugs on the ancillary
18   provider fee schedules.
19   Q.  So to the extent that an ancillary
20   provider, i.e., a nursing home, administered drugs
21   to a member of Blue Cross/Blue Shield's plans,
22   they were not reimbursed by Blue Cross/Blue Shield

Page 47

1    for those drugs?
2    A.  I --
3         MR. HARRINGTON:  Objection.  But go
4    ahead.
5    A.  I didn't deal with nursing home
6    contracting during that time frame.
7    Q.  Okay.  I thought you said you had.
8    A.  That was -- I was just giving examples
9    of various ancillary provider types, but that
10   wasn't one that I had any negotiating deals with.
11   Q.  Okay.  Let's be specific.  In 1994 to
12   1998, what ancillary providers did you negotiate
13   reimbursement contracts with?
14   A.  Clinical labs.
15   Q.  I am sorry.  What was that?
16   A.  Clinical laboratories, DME vendors,
17   physiological lab providers, optometrists,
18   radiation oncology, and one or two smaller ones.
19   I want to say chiropractor.
20   Q.  Did the contracts with the radiation
21   oncologists involve the reimbursement of
22   physician-administered drugs?

Page 48

1    A.  No.
2    Q.  Okay.  What are your responsibilities in
3    your current role?
4    A.  We maintain and update the various
5    provider fee schedules, and we do analysis on
6    various fee schedules.
7    Q.  Do you have any involvement in the
8    reimbursement of physician-administered drugs
9    under Blue Cross/Blue Shield's Massachusetts
10   capitated plans?
11   A.  No.
12   Q.  So your work in provider reimbursement
13   is solely related to fee for service?
14   A.  Yes.
15   Q.  What department, division or unit of
16   Blue Cross/Blue Shield of Massachusetts is
17   responsible for Blue Cross/Blue Shield of
18   Massachusetts' capitation plans or withhold plans
19   involving the reimbursement of physician-
20   administered drugs?
21   A.  They would be part of the provider
22   contracting negotiations.

Page 49

1    Q.  To your knowledge, are the claims that
2    are reimbursed under the capitated plans recorded
3    in the TPS claim database of Blue Cross/Blue
4    Shield of Massachusetts?
5    A.  Are the capitated plans?
6    Q.  Yes.
7    A.  Yes, they're recorded.
8    Q.  Are you familiar with that database?
9    A.  I'm familiar with the claims database,
10   yes.
11   Q.  All right.  Do you have an understanding
12   of how one would determine --
13        MR. HAAS:  Withdraw that.
14   Q.  Do you have an understanding of how one
15   could determine from the database which claims
16   that were submitted pertained to capitated claims?
17   A.  Yes.
18   Q.  How would one do that?
19   A.  There is an indicator on the claim that
20   would mark it as an encounter.
21   Q.  Okay.  When you say there is an
22   indicator on the claim, what do you -- on the

13 (Pages 46 to 49)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
Boston, MA

Page 50

1   claim record you are talking about?
2      A.   The claim record.
3      Q.   By an indicator, are you referring to a
4   field?
5      A.   Yes.
6      Q.   And what is the name of that field?
7      A.   I don't know offhand.
8      Q.   And when you say it would mark it as an
9   encounter, what does that mean?
10     A.   Meaning it is not going to have a paid
11  amount on it.  It comes through the system and is
12  processed for utilization purposes, but we're not
13  going to send a check out to the provider.  He has
14  already been paid.
15     Q.   So in the paid amount field, there would
16  be some entry other than a dollar figure?
17     A.   The paid amount field would probably be
18  zero.  The allowed field would have a fee amount.
19     Q.   Okay.  So what is it that you do in
20  order to maintain and update provider fee
21  schedules?
22     A.   We physically create data sets of codes,

Page 51

1   fees, effective dates, and other pertinent
2   information that we need to load to our mainframe
3   systems, our TPS systems.
4      Q.   When you say you physically create these
5   data sets, do you create that in a database
6   format?
7      A.   It's -- yes.  A database format that we
8   have to basically format to upload into the
9   mainframe systems.
10     Q.   All right.  These data sets that you
11  create, do they include reimbursement for both
12  services and fees -- services --
13          MR. HAAS:  Let me withdraw that
14  question.
15     Q.   These data sets that you create, do they
16  encompass reimbursement amounts for both services
17  and drugs administered to Blue Cross/Blue Shield
18  members?
19     A.   That's the mechanism in which we can
20  upload any fee, whether it is a service or a drug
21  fee.
22     Q.   Does Blue Cross/Blue Shield of

Page 52

1   Massachusetts maintain fee schedules on a provider
2   basis or on some other basis?
3      A.   Some other basis.
4      Q.   What is the other basis?
5      A.   Some are by product; some are by
6   provider type and specialty.
7      Q.   When you say "by product," what are you
8   referring to?
9      A.   For physician reimbursement, we have an
10  HMO fee schedule, a PPO fee schedule, an indemnity
11  fee schedule, a Medicare HMO fee schedule.
12     Q.   So when we are referring to product, you
13  are referring to the various benefit plans that
14  Blue Cross/Blue Shield of Massachusetts offers to
15  its members?
16     A.   Yes.
17     Q.   When you are referring to provider type,
18  what are you referring to?
19     A.   There are separate ones, mainly for the
20  ancillary providers, for your clinical lab, for
21  your DME vendors, for your chiros.  They are
22  unique to them, their contract.

Page 53

1      Q.   So with respect to the reimbursement of
2   physician-administered drugs, at any point in time
3   is it then accurate that Blue Cross/Blue Shield
4   has only those --
5          MR. HAAS:  Withdraw that question.
6      Q.   How many fee schedules currently does
7   Blue Cross/Blue Shield of Massachusetts maintain
8   for the fee-for-service reimbursement of
9   physician-administered drugs?
10     A.   Approximately 45.
11     Q.   What determines -- what distinguishes
12  the 45 fee schedules from each other?
13     A.   Again a lot of them are driven by unique
14  provider type, specialty contracts around the
15  ancillary world.  Operationally how we have to
16  point certain claims to certain things within our
17  systems caused us to kind of create two fee
18  schedules in some instances for those five main
19  ones I gave you there or the four main ones.
20  There is an HMO-based fee schedule.  There is also
21  an HMO site-of-service schedule.  There is a
22  indemnity-based fee schedule.  There is an

14  (Pages 50 to 53)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey         CONFIDENTIAL         January 5, 2006
                          Boston, MA

Page 54

1   indemnity site-of-service fee schedule. That is
2   all because of how we reimburse our physician
3   networks.
4       Q.   Let me set that issue aside for a
5   second.
6       A.   Yes.
7       Q.   With respect to the reimbursement for
8   physician-administered drugs in physician offices,
9   --
10      A.   Yes.
11      Q.   -- of those 45 fee schedules, how many
12  of those schedules pertain solely to the
13  reimbursement of physicians for drugs administered
14  in their offices?
15      A.   Those four main ones.
16      Q.   So is it fair to say that with respect
17  to the fee-for-service reimbursement Blue
18  Cross/Blue Shield's policy is to provide the
19  reimbursement terms to physician practices on a
20  take-it-or-leave-it basis?
21      A.   I wouldn't say it is quite that strong.
22  I mean we provide our providers with a contract

Page 55

1   and fee schedules, and it is their decision
2   whether or not they choose to sign it.
3       Q.   What negotiation of the fee schedule
4   amounts does Blue Cross/Blue Shield of
5   Massachusetts engage in with physicians, if any?
6       A.   None.
7       Q.   So there is no variability in the fee
8   schedules at the provider level; is that correct?
9       A.   That's correct.
10      Q.   How long has that been the policy and
11  practice of Blue Cross/Blue Shield of
12  Massachusetts with respect to fee-for- service
13  reimbursement?
14      A.   It goes back to 1995.
15      Q.   What was the impetus of the adoption in
16  1995 of this take-it-or-leave-it or no-
17  negotiation policy?
18      A.   Well, when the fee schedules were based
19  on RBRVS back in '95 and have been ever since.
20      Q.   Now I want to be clear.  When I am
21  talking about fee schedules, I am talking about
22  both the reimbursement for the services as well as

Page 56

1   the reimbursement for the drugs. Okay?
2           Now are there separate fee schedules at
3   Blue Cross/Blue Shield of Massachusetts pertaining
4   to the reimbursement of services versus the
5   reimbursement of drugs?
6       A.   Separate fee schedules?
7       Q.   Yes.
8       A.   For drugs?
9       Q.   Yes.
10      A.   No.
11      Q.   Okay.
12      A.   No.
13      Q.   So when we are talking about fee
14  schedules --
15      A.   Yes.
16      Q.   -- and we have been talking about fee
17  schedules, your understanding of that term is to
18  be the schedule of reimbursements for both drugs
19  and services; correct?
20      A.   Yes.
21      Q.   Okay.
22          MR. HARRINGTON:  This is in the self --

Page 57

1   the physician-administered drug area?
2           MR. HAAS:  Yes.  With respect to
3   reimbursement of physicians.
4       Q.   Prior to 1995, did Blue Cross/Blue
5   Shield of Massachusetts negotiate fee-for-service
6   reimbursement for physician-administered drugs on
7   a provider -- at a provider level?
8       A.   I'm not aware of it.
9       Q.   When you say you are not aware of it,
10  sitting here today, could you say one way or the
11  other whether they did?
12      A.   I can't say.
13      Q.   What is your basis for understanding
14  that there was a change in practice or policy as
15  of 1995?
16          MR. HARRINGTON:  Well, objection.  Go
17  ahead.
18      A.   Prior to that, the fee schedules were
19  usual and customary, and it was felt, you know, to
20  administer those was a burden, so they moved to a
21  more standardized nationally-recognized payment
22  methodology.

                                    15 (Pages 54 to 57)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL              January 5, 2006
                            Boston, MA

Page 58

1     Q.   All right. When you say prior to that
2   the fee schedule was usual or customary, what does
3   that mean?
4     A.   They, in the case of claims being
5   submitted, there would be a provider profile
6   saying, you know, he can get paid up to this
7   level, and we would look against the -- a level
8   two reimbursement, level two being our indemnity
9   reimbursement.  If it fell within that, that was
10  his level of reimbursement.
11    Q.   So prior to 1995, physicians were
12  reimbursed on a charge basis?
13    A.   No. It wasn't charge. It was usual and
14  customary. I mean his charges up to a ceiling, if
15  you will. Right.
16    Q.   All right. And how did Blue Cross/Blue
17  Shield of Massachusetts determine the usual and
18  customary ceiling that it used to determine fee-
19  for-service reimbursement prior to 1995?
20    A.   I can't say for certain. I wasn't, you
21  know, involved at that point.
22    Q.   But it was your understanding that that

Page 59

1   was the methodology --
2     A.   Yes.
3     Q.   -- used before --
4     A.   Yes.
5     Q.   -- the fee schedule reimbursement?
6     A.   Yes.
7     Q.   So that is yet another way of
8   reimbursement, another methodology Blue Cross/Blue
9   Shield of Massachusetts used in the 1990s;
10  correct?
11    A.   Yes.
12    Q.   Okay. So let me just see if I have the
13  going list now. We have usual and customary
14  reimbursement on a fee-for- service basis prior to
15  1995; we have fee schedule reimbursement after
16  1995 for the fee-for-service reimbursement; we
17  have capitation; we have withholding; and we have
18  the staff model concept.
19         Are there any -- is that a comprehensive
20  list to your knowledge of the methodologies used
21  by Blue Cross/Blue Shield of Massachusetts to
22  reimburse physician-administered drugs

Page 60

1   administered to its members in 1991 through today?
2     A.   I would say yes.
3     Q.   Okay. So the shift from usual and
4   customary to the fee schedule was in part due to
5   the administrative simplicity with using fee
6   schedules?
7     A.   Yes.
8     Q.   Now focusing on these four different
9   schedules that you have identified, how do they
10  differ, if at all, with respect to the amounts
11  that are afforded to physicians for the
12  administration of drugs to Blue Cross/Blue Shield
13  of Massachusetts members?
14    A.   The drug fees on all four schedules
15  right now are all equal, the same.
16    Q.   Okay. Currently today what is the
17  amount in the fee schedules that is afforded to
18  physicians for the administration of drugs to Blue
19  Cross/Blue Shield of Massachusetts members?
20    A.   You are asking what the AWP was set at?
21    Q.   Is there a constant methodology utilized
22  for all drugs in each of the fee schedules?

Page 61

1     A.   Right.
2     Q.   And is that methodology for the fee-for-
3   service reimbursement based upon a percentage of
4   AWP?
5     A.   Yes.
6     Q.   And what is that percentage?
7     A.   95 percent.
8     Q.   How long has Blue Cross/Blue Shield of
9   Massachusetts utilized a reimbursement amount of
10  95 percent of AWP to reimburse all drugs on all
11  its fee schedules?
12    A.   Since '98 when Medicare made their
13  change.
14    Q.   Prior to 1998, what methodology did Blue
15  Cross/Blue Shield of Massachusetts use to
16  reimburse -- to determine the reimbursement
17  amounts for drugs on its fee schedules?
18    A.   I don't -- I'm -- let me back this up.
19  What methodology did we use?
20    Q.   When I say methodology, --
21    A.   Yes.
22    Q.   -- you have referred to 95 percent of

16  (Pages 58 to 61)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

---

Page 62

1    AWP --
2       A.  Yes.
3       Q.  -- as the basis for the reimbursement
4    amounts in the fee schedules for drugs, and I'm
5    referring to that as methodology.
6       A.  Okay.
7       Q.  So 95 percent of AWP methodology.
8       A.  Okay.
9       Q.  So let me ask the question.
10          Prior -- from 1995 through 1998, what
11   was the basis by which Blue Cross/Blue Shield of
12   Massachusetts calculated the amounts in its fee
13   schedules for physician-administered drugs?
14      A.  100 percent of AWP.
15      Q.  Starting in 1995, how did Blue
16   Cross/Blue Shield of Massachusetts determine the
17   AWP it used to calculate the amounts in its fee
18   schedules?
19      A.  We basically just used Medicare's AWP.
20      Q.  When you say "Medicare's AWP," what are
21   you referring to?
22      A.  Medicare's AWP fee schedule for their J

Page 63

1    codes.
2       Q.  Okay.  So is it correct that Blue
3    Cross/Blue Shield of Massachusetts did not
4    calculate its own dollar amounts in the fee
5    schedule but simply adopted the amounts that were
6    specified in the Medicare fee schedules?
7       A.  Yes.
8       Q.  Okay.  There came a point in time when
9    that changed; correct?
10      A.  What changed?
11          MR. HAAS:  Well, let me withdraw that
12   question.
13      Q.  Does Blue Cross/Blue Shield of
14   Massachusetts still use Medicare's amounts, dollar
15   amounts, in its fee schedules?
16      A.  No.
17      Q.  What does Blue Cross/Blue Shield of
18   Massachusetts currently do to determine the 95
19   percent of AWP used to calculate -- to determine
20   the amounts in its fee schedule for the
21   reimbursement of physician-administered drugs?
22      A.  We are using a vendor to provide us

Page 64

1    pricing.
2       Q.  Which vendor?
3       A.  R.J. Health.
4       Q.  How to your knowledge does R.J. Health
5    derive its AWPs from?
6       A.  I don't know.
7       Q.  Does R.J. Health calculate a dollar
8    amount which is then provided to Blue Cross/Blue
9    Shield of Massachusetts?
10      A.  Yes.
11      Q.  So Blue Cross/Blue Shield of
12   Massachusetts does not duly calculate 95 percent
13   of AWP --
14      A.  No.
15      Q.  -- for each drug?
16      A.  No.
17      Q.  Is there someone at Blue Cross/Blue
18   Shield of Massachusetts who is familiar with the
19   methodology that R.J. Health actually uses to come
20   up with that number that Blue Cross/Blue Shield of
21   Massachusetts uses in its fee schedule?
22      A.  I'm not sure.

Page 65

1       Q.  When did Blue Cross/Blue Shield of
2    Massachusetts first begin to use R.J. Health as a
3    vendor to determine reimbursement amounts for
4    physician- administered drugs?
5       A.  2005.
6       Q.  And Blue Cross/Blue Shield of
7    Massachusetts started using R.J. Health because
8    Medicare no longer reimbursed for physician-
9    administered drugs on an AWP basis; correct?
10      A.  Yes.
11      Q.  In the 2004 time frame before Medicare
12   switched its reimbursement methodology, did Blue
13   Cross/Blue Shield of Massachusetts give any
14   consideration to revising its reimbursement
15   methodology for physician-administered drugs?
16      A.  Yes.
17      Q.  What involvement, if any, did you have
18   in that process?
19      A.  I completed an analysis.
20      Q.  What analysis was that?
21      A.  An analysis of ASP pricing that Medicare
22   was proposing against our utilization.

17  (Pages 62 to 65)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey                   CONFIDENTIAL                   January 5, 2006
                                    Boston, MA

Page 66

1    Q. When you say "against your utilization"
2  --
3    A. The drug utilization.
4    Q. What is that?
5    A. Drug claims.
6    Q. What was the purpose of that analysis?
7    A. To determine what the financial
8  difference would be to price drugs at ASP versus
9  AWP.
10    Q. All right. And was the purpose of that
11  analysis to determine the financial impact on Blue
12  Cross/Blue Shield of Massachusetts or the
13  providers or both?
14    A. Both.
15    Q. Okay. That analysis that you conducted,
16  what assumptions went into it with respect to the
17  reimbursement that would be afforded by Blue
18  Cross/Blue Shield of Massachusetts with respect to
19  drugs and services in the event it adopted an ASP
20  methodology?
21    A. Could you ask that again? I am sorry.
22    Q. Sure. Your analysis basically involved

Page 67

1  a change in the status quo analysis? You were
2  contemplating what would happen if Blue Cross/Blue
3  Shield of Massachusetts switched to an ASP
4  environment; correct?
5    A. Yes.
6    Q. And in doing so and in developing that
7  analysis, did Blue Cross/Blue Shield of
8  Massachusetts make any assumptions with respect to
9  whether it would change the level of reimbursement
10  provided for its services if it switched to an ASP
11  reimbursement methodology for drugs?
12    A. What do you mean by services, a change
13  in services?
14    Q. A change of the services or fees
15  associated with administering drugs.
16    A. Okay. That was part of the analysis.
17    Q. All right.
18    A. Yes.
19    Q. So your analysis that you did involved
20  an assessment of the financial impact if Blue
21  Cross/Blue Shield increased the servicing fee --
22    A. Yes.

Page 68

1    Q. -- associated with the administration of
2  drugs and decreased the drug reimbursement amount
3  under the ASP methodology; correct?
4    A. Yes.
5    Q. What were the conclusions that you
6  derived from your analysis?
7    A. In total, the level of reimbursement
8  would go down.
9    Q. By how much as a percentage basis?
10    A. Oh, I don't have that in front of me.
11    Q. Was --
12    A. I think it is part of the material you
13  have there.
14    Q. Okay. We will take a look at that in a
15  second. Let me back up for a minute.
16        The reason why you assumed that the
17  reimbursement for the servicing fees would go up
18  was because Medicare likewise in making a switch
19  to ASP was increasing the reimbursement for the
20  services associated with drug reimbursement;
21  correct?
22    A. Yes.

Page 69

1    Q. And that was in part because of the
2  recognition that historically the drug
3  reimbursement under the AWP methodology was used
4  to subsidize inadequate reimbursement on the
5  servicing fees; correct?
6        MR. HARRINGTON: Objection.
7        Go ahead and answer if you know.
8    A. I know now.
9    Q. When you prepared your analysis, --
10    A. We knew.
11    Q. -- you understood that; correct?
12    A. Yes. Because of all the literature that
13  was out there from Medicare, so yes. At that
14  point in time, I knew that.
15    Q. All right. How did you come to learn
16  that?
17    A. It was when Medicare was going down the
18  road of revamping and looking at how they were
19  going to reimburse their drugs.
20    Q. You personally, prior to engaging in
21  this project, did you have an understanding of
22  whether under Medicare it was understood that the

18 (Pages 66 to 69)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey                CONFIDENTIAL                January 5, 2006
                                  Boston, MA

Page 70

1   reimbursement for the servicing fees was
2   inadequate to cover the costs of administering the
3   drugs, and, therefore, the drug reimbursement was
4   set at an amount to provide margin to cover the
5   costs associated with the administration of the
6   drugs?
7          MR. HARRINGTON: Objection. Go ahead.
8      A.  Again it was back at the time when
9   Medicare was doing their analysis that this
10  information was brought, and I started reading
11  about it and understanding AWP reimbursement and
12  the -- and kind of the differences between that
13  and the drug administration reimbursement.
14     Q.  So you personally had no understanding
15  of that prior to the time frame when you were
16  engaged in this project?
17     A.  That's correct.
18     Q.  All right. As at any time in your role,
19  either at Blue Cross/Blue Shield of Massachusetts
20  or at Harvard Pilgrim, did you review studies or
21  surveys or analyses done by the OIG of the HHS
22  with respect to drug costs reimbursement?

Page 71

1      A.  No.
2      Q.  Do you know whether there is any
3   department at Blue Cross/Blue Shield of
4   Massachusetts that does review and monitor OIG and
5   GAO and other government studies pertaining to the
6   reimbursement of drugs?
7      A.  I can't say for certain if there is any
8   one particular area that looks at that stuff.
9      Q.  So at least in the 2004 time frame, you
10  obtained an understanding that Medicare had
11  reimbursed the services associated with --
12         MR. HAAS: Excuse me. Withdraw that.
13     Q.  So in 2004, you learned that Medicare
14  had reimbursed drugs at an amount that was
15  intended to subsidize or cross subsidize, I
16  believe is the term used, --
17         MR. HARRINGTON: Objection.
18     Q.  -- the inadequate reimbursement of the
19  servicing fee; correct?
20         MR. HARRINGTON: Objection.
21     A.  Yes.
22     Q.  And based upon your analysis, you

Page 72

1   determined that following Medicare to the ASP
2   methodology, that would result in a decrease in
3   overall reimbursement afforded to physicians; is
4   that correct?
5      A.  Yes.
6      Q.  And as a consequence of your analysis,
7   is it correct that Blue Cross/Blue Shield of
8   Massachusetts elected not to shift to the ASP
9   reimbursement methodology?
10     A.  At this time, yes.
11     Q.  Okay. And the decision was made not to
12  shift because Blue Cross/Blue Shield of
13  Massachusetts determined that it was not in its
14  best interests to reduce the reimbursement to
15  physicians; correct?
16         MR. HARRINGTON: Objection. Go ahead.
17     A.  I mean we normally follow industry
18  standards, and Medicare has moved to ASP. Right
19  now from our perspective, we don't see that as an
20  industry-acceptable standard just yet.
21     Q.  Isn't it correct that you in fact have
22  followed Medicare's standard since 1995 and

Page 73

1   including this shift in reimbursement from 100
2   percent to 95 percent AWP?
3      A.  That's correct.
4      Q.  So what you did now currently in 2004
5   was a break in your practice of Blue Cross/Blue
6   Shield of Massachusetts's practice in following
7   Medicare; correct?
8      A.  Yes.
9      Q.  What are the factors --
10         MR. HAAS: Withdraw that question.
11     Q.  In deciding not to shift to an ASP-based
12  reimbursement for physician-administered drugs,
13  what input, if any, did Blue Cross/Blue Shield of
14  Massachusetts obtain from physicians with respect
15  to how that change could or would impact their
16  practices?
17     A.  I'm not aware of any direct impact or
18  conversations that were held with any physicians.
19     Q.  Do you have an understanding of whether
20  Blue Cross/Blue Shield of Massachusetts has
21  special committees that it maintains with
22  physician organizations, such as MASCO?

19 (Pages 70 to 73)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                           Boston, MA

Page 74

1    A. Yes. There are -- you know, folks that
2 deal with -- I don't know if it is MASCO, Mass.
3 Medical Society. I mean there are groups within
4 the company that deal with those types of
5 societies on a regular basis.
6    Q. All right. And to your knowledge, did
7 Blue Cross/Blue Shield of Massachusetts solicit
8 the views of those societies in connection with
9 the assessing whether or not to change the
10 reimbursement?
11    A. To my knowledge -- no, I don't know.
12    Q. You don't know?
13    A. No, I don't know.
14    Q. Let's back up then. Who was involved to
15 your knowledge in the decision not to switch to an
16 ASP-based reimbursement methodology for physician-
17 administered drugs?
18    A. When you are saying who was involved,
19 can you clarify what that is? I don't know if you
20 -- a group, a name?
21    Q. Let's start -- yes. I basically want
22 the names of the people that were involved in the

Page 75

1 discussions, deliberations, considerations of
2 whether or not Blue Cross/Blue Shield of
3 Massachusetts should switch its reimbursement
4 methodology for physician-administered drugs from
5 an AWP- based methodology to an ASP-based
6 methodology.
7    A. There is a group that is called provider
8 financial strategy work group.
9    Q. What department, division or unit of the
10 company is that?
11    A. It is a cross functional group of
12 leaders within the company.
13    Q. Who are the members of that group?
14    A. Deb Devaux.
15    Q. What is her title?
16    A. Senior vice president of contracting.
17    Q. Okay. Who else?
18    A. Rena Vertes, chief actuary.
19    Q. Who else?
20    A. Andrana Shandley, vice president,
21 actuary.
22    Q. Who else?

Page 76

1    A. Steve Fox, director, provider relations.
2    Q. Who else?
3    A. Sheila Cizaukas.
4    Q. Can you spell that?
5    A. C-I-Z-A-U-K-A-S.
6        MR. HARRINGTON: Remember I said don't
7 guess.
8        THE WITNESS: Yes.
9    A. She is provider contracting.
10    Q. Who else?
11    A. Chris Collins, provider contracting;
12 Michael Carr, vice president, sales.
13        Let me see if I am missing anybody.
14        (Pause.)
15    A. That's the core group.
16    Q. Did you also -- were you also a member
17 of this work group?
18    A. Yes.
19    Q. Did the work group provide its ultimate
20 conclusion not to switch to an ASP reimbursement
21 methodology to the Blue Cross/Blue Shield of
22 Massachusetts board or executive management

Page 77

1 committee?
2    A. No. The decision was made here.
3    Q. So ultimately the decision was made not
4 to reduce reimbursement in 2005; correct?
5    A. Yes.
6    Q. When was the first time Blue Cross/Blue
7 Shield of Massachusetts learned of this
8 litigation, the AWP litigation?
9    A. If you are asking me, personally?
10    Q. Well, I am asking what you know.
11    A. I don't know -- I mean what I know is
12 when I got a call from Steve Skwara, I mean.
13    Q. How long ago was that?
14    A. I don't know. Six weeks, a month, two
15 months, eight weeks.
16    Q. Prior to that time, had you heard that
17 there was a litigation or any litigations
18 involving AWP?
19    A. No.
20    Q. Do you have an understanding of the term
21 "AWP"?
22    A. Yes.

20  (Pages 74 to 77)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                           Boston, MA

Page 78

1    Q.  How long have you had that
2  understanding?
3    A.  Since I took over the provider
4  reimbursement role and had to maintain, you know,
5  the drug fee schedule.  Since 2000.
6    Q.  2000?
7    A.  Yes.
8    Q.  What did you do at that time to gain an
9  understanding of the term "AWP"?
10   A.  It was more or less, you know, working
11 with my people as they updated the drug fee
12 schedules from the Medicare resource guides and
13 Web sites.
14   Q.  All right.  And reviewing the Web sites,
15 did you run across any correspondence or
16 communications or discussion of the litigations
17 involving AWP?
18   A.  No.
19   Q.  Do you have any understanding of the
20 term -- of the allegations in this action?
21   A.  I'm not quite sure what you are asking.
22   Q.  Do you know what this case is about?

Page 79

1    A.  Yes.
2    Q.  In your view, what is this case about?
3    A.  It is about the overinflation of AWP
4  versus real costs.
5    Q.  What do you understand the term
6  "overinflation" to mean?
7    A.  That the -- there is fat, if you will,
8  in the AWP, AWP prices that are set by drug
9  companies.
10   Q.  Do you understand to what extent there
11 is fat based upon plaintiffs' position in this
12 litigation?
13   A.  No.
14   Q.  Based upon your position as a member of
15 the provider reimbursement department, sitting
16 here today, do you have a view as to whether or
17 not you are misled as to the meaning of AWP?
18   A.  I want to say my opinion is the AWP
19 would be the bottom-line wholesale cost that would
20 be -- providers could buy their drugs at.
21   Q.  That is your view as a -- currently that
22 is your understanding of the -- well --

Page 80

1    A.  Well --
2    Q.  Prior to your --
3        MR. HAAS:  Strike that.
4    Q.  Prior to your learning about this
5  litigation a few weeks ago when you heard from
6  your counsel, is it your position that you
7  believed that the term AWP equalled the -- meant
8  the average of actual wholesale prices paid in the
9  marketplace?
10   A.  No, because in 2004 when the whole
11 Medicare started looking at it is when it started
12 bubbling up then, and I became cognizant of it at
13 that point in time.
14   Q.  So in 2004, you obtained an
15 understanding of the term AWP that differed from
16 your earlier understanding?
17   A.  Yes.
18   Q.  Okay.  Let's back up.  When is the first
19 time you heard the term AWP?
20   A.  Probably in my provider contracting
21 days.
22   Q.  So at sometime around 2000?

Page 81

1    A.  No.  Back in my provider contracting.
2    Q.  Provider contracting?
3    A.  Mid '90s, just knowing AWP is average
4  wholesale price.
5    Q.  Okay.
6    A.  Not knowing any more than that.  Just
7  what the acronym meant.
8    Q.  At that point in time, you didn't have
9  any understanding as to what the term meant other
10 than --
11   A.  Didn't need to know.
12   Q.  Okay.
13   A.  Wasn't in my, you know, my job at that
14 point in time.
15   Q.  Okay.  Did there come a point in time
16 when you obtained a better understanding or an
17 understanding of the term AWP?
18   A.  In 2000 when I started my role as the
19 provider reimbursement manager.
20   Q.  At that time, what was your
21 understanding of the term AWP?
22   A.  That that is the price at which

21  (Pages 78 to 81)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey        CONFIDENTIAL        January 5, 2006
                         Boston, MA

Page 82

1  physicians purchased their drugs.
2      Q.  So it was your understanding at the time
3  that AWP represented an actual average wholesale
4  price at which entities in the marketplace could
5  acquire drugs?
6      A.  Yes.
7      Q.  Okay.  Do you understand that that
8  position is inconsistent with the position that
9  plaintiffs have taken in this litigation?
10     A.  In what way?  I'm not -- no.
11     Q.  Has anyone advised you or do you
12 understand --
13         MR. HAAS:  I withdraw that question.
14     Q.  Do you understand that plaintiffs have
15 taken the position in this litigation that it has
16 long been widely known in the reimbursement
17 industry that AWP did not equal the average of
18 actual wholesale prices that entities purchased
19 the drug in the marketplace?
20         MR. NOTARGIACOMO:  I am going to step in
21 and object.  I may need to look at that question.
22 I think you have something wrong.

Page 83

1          MR. HAAS:  I will take your stipulation
2  on this point.  If it is your position that
3  plaintiffs' view in this litigation is that AWP
4  was understood to mean at any time throughout the
5  1990s the average of actual wholesale prices paid,
6  I will take that stipulation.
7          MR. NOTARGIACOMO:  Now I am confused.
8          MR. HARRINGTON:  I think I am just going
9  to object to the question.  I really don't want to
10 get into a colloquy with anyone.
11         MR. HAAS:  You can interject and give me
12 your position or you can let the witness answer
13 the question, because the question -- or object,
14 and we can move on.
15         My question was, first I had asked the
16 witness what his understanding of the term AWP
17 was.  My understanding of his testimony was that
18 he took the position in 2000, he learned, he came
19 to be aware, that the term AWP meant the average
20 of actual wholesale prices paid.
21 BY MR. HAAS:
22     Q.  Is that correct?

Page 84

1          MR. HARRINGTON:  He testified that was
2  his understanding.
3          MR. HAAS:  Okay.
4  BY MR. HAAS:
5      Q.  And my question of him was whether or
6  not you understand that plaintiffs have taken the
7  position that it was widely known throughout the
8  1990s that AWP did not equal the average of actual
9  wholesale prices.
10         MR. HARRINGTON:  I object to the
11 question.
12         You can answer if you know what the
13 plaintiffs' position is on that issue.
14     A.  I mean I have read some of the
15 documents, so now I know.
16     Q.  Well, really?  What is your view as a
17 member of the named plaintiff in this litigation
18 as to what plaintiffs' position is in this
19 litigation with respect to the meaning of the term
20 -- of what payers understood AWP to mean
21 throughout the 1990s?
22         MR. HARRINGTON:  Objection.  He is

Page 85

1  asking you about the plaintiffs' position in this
2  lawsuit, whether you understand what that is as to
3  the meaning of AWP during the 1990s.
4      A.  I mean I know what I have read.  I guess
5  that's, you know --
6      Q.  Tell me what your interpretation is of
7  what you read.  What is -- let me go back.
8      A.  I thought I already answered.
9      Q.  Let me break it down into pieces.  You
10 didn't.  Let me break it down into pieces.
11         You understand that Blue Cross/Blue
12 Shield of Massachusetts recently has been added to
13 this case as a named plaintiff in this litigation;
14 right?
15     A.  Yes.
16     Q.  And in this case, plaintiffs have made
17 allegations with respect to what payers, including
18 health plans such as Blue Cross/Blue Shield of
19 Massachusetts, understood the term AWP to mean in
20 the 1990s.  You understand that; correct?
21     A.  Yes.
22     Q.  What is your understanding of

22 (Pages 82 to 85)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

---

Page 86

1  plaintiffs' position in this action with respect
2  to payers' understanding of the term AWP
3  throughout the 1990s?
4       MR. HARRINGTON: Objection. Go ahead.
5       A.  Is that it wasn't reflective of the
6  actual costs that physicians purchased drugs.
7       Q.  Okay. Now let me clarify that answer.
8  Is it your understanding that it is plaintiffs'
9  position that the term AWP was understood to mean
10 the average of actual wholesale prices paid?
11      MR. HARRINGTON: Well, objection. By
12 whom?
13      MR. HAAS: By entities in the
14 marketplace.
15      A.  I guess I'm confused now. I am not
16 understanding your question.
17      Q.  Let's back up. We will break it down.
18 I will keep going until we get to an
19 understanding.
20      A.  Yes.
21      Q.  Am I correct that your testimony was
22 that it was your understanding in 2000 that the

---

Page 87

1  term AWP, average wholesale price, meant the
2  average of actual wholesale prices paid? Was that
3  your understanding in 2000?
4       A.  Yes. The fees at which we reimbursed
5  our providers.
6       Q.  Okay. You added something that was
7  inconsistent with my question, so I will ask it
8  again.
9       Was it your understanding in 2000 that
10 the term AWP, average wholesale price, meant the
11 average of actual wholesale prices paid?
12      A.  I guess paid to who? That is where I am
13 --
14      Q.  I am asking what your understanding was.
15 Okay? Let's just start with that point.
16      In 2000, what was your understanding of
17 the term AWP, or average wholesale price?
18      A.  It is the price that we would reimburse
19 our providers, and it was the price at which we
20 felt providers purchased their drugs at.
21      Q.  Okay. So it is your understanding -- it
22 was your understanding in 2000 that it was the

---

Page 88

1  price at which providers purchased their drugs; is
2  that correct?
3       A.  Yes.
4       Q.  So, in other words, it is your position
5  that you understood that Blue Cross/Blue Shield of
6  Massachusetts was reimbursing providers at their
7  average cost?
8       A.  Yes.
9       Q.  Okay. Is it your understanding as a
10 member of Blue Cross/Blue Shield of Massachusetts
11 that the plaintiffs in this litigation have taken
12 the position that you just espoused as to the
13 meaning of AWP throughout the 1990s?
14      MR. HARRINGTON: Well, I am going to
15 object. Plaintiffs haven't taken any position as
16 to what his understanding was in 2000.
17      MR. HAAS: That is not my question.
18 BY MR. HAAS:
19      Q.  I mean you have espoused an
20 understanding that you had in 2000 of the term
21 AWP. My question is whether or not it is your
22 understanding of the allegations in this case that

---

Page 89

1  plaintiffs have taken the position that payers
2  understood throughout the 1990s that the term AWP,
3  average wholesale price, meant the cost providers
4  paid for drugs.
5       MR. HARRINGTON: The same objection.
6      Go ahead and answer if you can.
7       A.  I am just -- I don't know. I am getting
8  confused.
9       Q.  Where is the confusion? I mean it is a
10 simple question. You gave me your understanding
11 of the term in 2000 and --
12      A.  You keep saying what is the plaintiffs'
13 --
14      Q.  Right.
15      A.  -- which is --
16      Q.  Listen. Let me clarify. I am simply
17 asking what your understanding is of plaintiffs'
18 allegations in this action. You are a member of a
19 named plaintiff.
20      A.  Um-hmm.
21      Q.  I am asking --
22      MR. NOTARGIACOMO: Blue Cross/Blue

---

23 (Pages 86 to 89)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                          Boston, MA

---

Page 90

1   Shield. You indicated that the witness was a
2   member of plaintiffs, and I am clarifying that it
3   was Blue Cross/Blue Shield that was a plaintiff.
4   BY MR. HAAS:
5       Q. If you don't know, that is fine.
6       A. All right.
7       Q. I am not trying to put words in your
8   mouth. I am simply trying to get your position.
9   And if you don't know, that is fine. I will move
10  on. Okay?
11       You have told me what your understanding
12  was in 2000 --
13      A. Um-hmm.
14      Q. -- of a term.
15      A. Yes.
16      Q. Now I am trying to seek your
17  understanding of plaintiffs' position in this
18  litigation as to that same term, and what I am
19  trying to get an understanding of is whether or
20  not you understand that your position -- that your
21  understanding of the term in 2000 is the same
22  position that plaintiffs are taking as to what the

---

Page 91

1   payers understood in the marketplace from 1991 to
2   this litigation.
3       MR. HARRINGTON: Objection. Do you have
4   an understanding as to what the plaintiffs, all
5   the people making claims in this lawsuit, have
6   taken as to a position of what they understood
7   during the 1990s AWP represented?
8       THE WITNESS: No. I mean I haven't read
9   --
10      MR. HAAS: Okay.
11  BY MR. HAAS:
12      Q. Then the answer is you don't have an
13  understanding.
14      A. Okay.
15      Q. Let's push on that a little bit. Have
16  you read the Complaint in this matter?
17      A. No.
18      Q. Okay. You have said you have an
19  understanding with respect to the term -- well,
20  let me back up.
21       So in 2000, it was your understanding
22  that the term AWP equalled the average of actual

---

Page 92

1   costs of providers; correct?
2       A. Yes.
3       Q. Did there come a point in time when your
4   understanding of the term, yours, changed?
5       A. Yes.
6       Q. When was that?
7       A. In 2003-2004.
8       Q. In 2003-2004, what new understanding of
9   the term AWP did you acquire?
10      A. Is that providers actually had the
11  ability to purchase drugs less than the AWP.
12      Q. How did you obtain that understanding?
13      A. Through the Medicare kind of review of
14  this, the process that they used to go through
15  their resetting their AWP fee schedules.
16      Q. Is that the understanding of AWP that
17  you have today?
18      A. Is what the understanding?
19      Q. Is the understanding of AWP that you had
20  in 2003-2004 the same understanding of the term
21  that you have today?
22      A. Yes.

---

Page 93

1       Q. Have you had discussions with anyone at
2   Blue Cross/Blue Shield of Massachusetts concerning
3   the meaning of the term AWP?
4       A. No.
5       Q. So in 2003-2004, as a member of the
6   provider reimbursement group, you learned that AWP
7   was no longer, you know, from your perspective an
8   average of actual wholesale costs but indeed was
9   something greater than the costs that doctors paid
10  for drugs; right?
11      A. Yes.
12      Q. At that point did you run to anybody and
13  say, "We now have to reduce reimbursement, because
14  we aren't in fact reimbursing at actual cost"?
15      MR. HARRINGTON: What is the time frame
16  on that question?
17      MR. HAAS: What he just testified to,
18  2003-2004.
19      A. Well, we did that analysis, which was
20  part of, you know, looking at how our drug fees
21  were set.
22      Q. Right. And in connection with that

---

                        24  (Pages 90 to 93)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey                 CONFIDENTIAL                 January 5, 2006
Boston, MA

Page 94

1  analysis, did you say, "Wait a second here. We
2  have to reduce our reimbursement because we are
3  all defrauded and misunderstood the meaning of
4  this term"?
5      MR. HARRINGTON: Objection. Go ahead.
6      A. No.
7      Q. Did you tell anybody, did you have any
8  discussions with anybody at that point in time
9  concerning the fact that for the last four or five
10 years as a member of the provider reimbursement
11 department you were misled as to the meaning of
12 the term AWP?
13     A. I mean when we did the analysis, I think
14 that's when it pretty much came to light as to --
15     Q. My question specifically goes to
16 communications you had.
17     MR. HARRINGTON: Well, let him complete
18 his answer, though.
19     Q. If you have anything to add, go ahead.
20     A. That is when we started scrutinizing the
21 drug reimbursement files that we were getting from
22 Medicare.

Page 95

1      Q. I understand that.
2      A. Yes.
3      Q. My question is whether you had any
4  conversations with anyone at that time in 2003-
5  2004 where you said, "Wait a second here. I have
6  been misled for the last four or five years in
7  connection with setting and determining the
8  reimbursement for physician-administered drugs"?
9      A. No.
10     Q. Were you aware of anybody else who had
11 that type of discussion at Blue Cross/Blue Shield
12 of Massachusetts at this time?
13     A. I was not aware.
14     Q. All right. And indeed, in determining
15 whether to change the reimbursement rates in 2004
16 for 2005, Blue Cross/Blue Shield of Massachusetts
17 didn't decide to reduce reimbursement; they
18 decided to maintain the reimbursement at the
19 current levels; correct?
20     A. Yes.
21     MR. HAAS: Let me just take a five-
22 minute break. Off the record.

Page 96

1      (Discussion off the record,
2  followed by recess taken at
3  3:35 p.m.)
4      (Recess ended at 3:44 p.m.)
5  MR. HAAS: Back on the record.
6  Let's mark this.
7      (Multipage Analysis of CMS Average
8  Wholesale Price Reform, Reimbursement
9  for Part B Drugs marked
10 Exhibit Mulrey 002 for identification.)
11     MR. HARRINGTON: This is Exhibit Mulrey
12 002?
13     MR. HAAS: Yes.
14 BY MR. HAAS:
15     Q. Mr. Mulrey, we have marked as Deposition
16 Exhibit Mulrey 002 a document entitled "Analysis
17 of CMS Average Wholesale Price Reform,
18 Reimbursement for Part B Drugs." It is dated
19 February 7, 2004. It has got handwriting on it.
20 Up in the right-hand corner, it says 2-7-05.
21     I will represent to you that this was
22 produced to us from the plaintiffs. Otherwise,

Page 97

1  that is the extent of my knowledge of the
2  document.
3      Are you familiar with this document?
4      A. Yes.
5      Q. Is this the -- a presentation you
6  prepared?
7      A. Yes.
8      Q. Was this presentation prepared following
9  your analysis that we just discussed?
10     A. Yes.
11     Q. Was this presentation prepared at or
12 around February 7, 2004?
13     MR. HARRINGTON: Well --
14     A. I think it is '05. I think that date is
15 incorrect.
16     Q. All right. Was this presentation shown
17 to the members of the provider financial strategy
18 work group?
19     A. Yes.
20     Q. Was it shown to anyone else?
21     A. I'm not aware if it was shown to anybody
22 else.

25 (Pages 94 to 97)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

Page 98

1    Q.  All right.  Is this your handwriting on
2  the document?
3    A.  Yes, it is.
4    Q.  So this was produced from your files?
5    A.  Yes.
6         MR. HAAS:  Just for the record, there is
7  some sections of this, for example, page 7, page
8  8, that, because it was produced in hard copy
9  format and was copied, that it is illegible.  We
10 request that an electronic version or a legible
11 version be produced.
12        MR. HARRINGTON:  We will see what is
13 available.
14 BY MR. HAAS:
15   Q.  Do you maintain a copy of this document
16 on your system electronically?
17   A.  Yes.  I should probably have a copy
18 someplace.
19   Q.  What does the handwriting on the left-
20 hand side of the cover page say?
21   A.  "D. Devaux feels no real appetite to
22 follow Medicare's lead at this time."

Page 99

1    Q.  That is senior vice president Deb
2  Devaux?
3    A.  Yes.
4    Q.  Was she the ultimate decision-maker on
5  this project?
6    A.  No.
7    Q.  Okay.  And in the upper right-hand
8  corner, it says, "2-7-05 presented to PFSW."  Is
9  that the provider financial strategy work group?
10   A.  Yes.
11   Q.  On page 5 of this, if you would turn
12 with me to page 5.
13        (Witness complying.)
14   Q.  In the first bullet point, it states,
15 "The ASP pricing changes will have adverse effects
16 on physician organizations' profitability in
17 particular oncology/ hematology physician
18 organizations."
19        Do you see that?
20   A.  Yes.
21   Q.  Aside from the source that you cited at
22 the bottom of the page, which is the Committee on

Page 100

1  Ways and Means, did you review any other
2  documentation or materials to obtain an
3  understanding with respect to that point?
4    A.  No.
5    Q.  The second bullet point says, "M.D. fee
6  schedule payments for oncologists and other
7  specialities are increased to accurately pay M.D.s
8  for the cost of administering drugs."
9         What do you mean by that?
10   A.  Coming out of the same source and saying
11 they are going to increase the payment level for
12 the administration side.
13   Q.  They were saying they were doing that in
14 order to compensate for the inadequate, "they"
15 being Medicare --
16        MR. HAAS:  Withdraw that.
17   Q.  The source stated, am I correct, that
18 Medicare was increasing the payments for services
19 associated with administration of drugs because
20 historically they had been inadequate to
21 compensate doctors for those costs; correct?
22        MR. HARRINGTON:  Well, objection.

Page 101

1    A.  That's what the source said, so.
2    Q.  Did you discuss these two points as a
3  group, as a whole?
4    A.  We walked through the whole
5  presentation.
6    Q.  All right.  Did you discuss with the
7  group whether -- what other people's views were
8  with respect to whether ASP pricing would have an
9  adverse effect on physician organizations'
10 profitability?
11   A.  Not directly with anyone.
12   Q.  All right.  So in connection with your
13 group meetings of the financial strategy workshop,
14 no one assessed independently what the impact of
15 the ASP pricing change may or may not have on
16 physician organizations' profitability?
17   A.  You can see from the analysis it was
18 done on a network-wide basis and then broken down
19 by different provider specialties.
20   Q.  This analysis that you did was based
21 upon what information?
22   A.  The analysis was based on Medicare's ASP

26  (Pages 98 to 101)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                              Boston, MA

Page 102

1   pricing and our utilization for the drugs.
2      Q.  All right. Did you or anyone on the
3   financial strategy work group attempt to assess
4   the profitability of providers in connection with
5   determining the impact of this change in
6   reimbursements on that profitability?
7      A.  Are you asking profitability on an
8   individual physician basis?
9      Q.  Or in general. My question is whether
10  or not that was a consideration of the financial
11  work group. I understand that your analysis
12  involved the assessment of essentially the revenue
13  component to the doctors, the reimbursement, which
14  was based upon your data. My question is
15  something different, though. This point goes to
16  physicians' profitability.
17     So my question is: Did anybody in your
18  group, the financial strategy work group, attempt
19  to assess in any way the impact of the change on
20  physicians' profitability?
21     A.  I think that is what this whole analysis
22  gets to is if there is a reduction in payment it

Page 103

1   is going to affect their profitability.
2      Q.  Okay. Let me ask it a different way.
3      Did anyone discuss the extent of the
4   profitability of the clinics and whether or not
5   after the change whether clinics would be
6   underwatered with respect to reimbursement of
7   drugs, for example, or earn less margin?
8      A.  No. Now you are throwing the word
9   "clinic" in there, and you have got me a little
10  confused. That is the health centers. You are
11  talking the physician organizations, a physician?
12     Q.  Yes.
13     A.  Did we look at the profitability of
14  these physicians at a group or at an individual
15  level?
16     Q.  Yes.
17     A.  No.
18     Q.  Okay. For example, Steve Fox was the
19  director of provider relations; right?
20     A.  Yes.
21     Q.  He was a member of the financial
22  strategy work group; right?

Page 104

1      A.  Yes.
2      Q.  Did Mr. Fox communicate in these
3   meetings any views of providers as to how this
4   potential change in reimbursement or in fact
5   change in reimbursement was impacting or would
6   impact the profitability?
7      A.  I mean I can't recall, you know, the
8   exact discussions. This was well over a year ago.
9   But, yes, there was discussion around the table on
10  a lot of different things that were in this
11  analysis.
12     Q.  Okay. Did -- were there minutes taken
13  of these meetings?
14     A.  There might have been. I would have to
15  check. Not every time do meetings -- meeting
16  minutes get produced.
17     Q.  Who was the secretary or who took the
18  minutes?
19     A.  It might have been Michelle McDonough.
20  She is not listed there.
21     Q.  Who is Michelle McDonough?
22     A.  She was just a kind of an analyst that -

Page 105

1   - kind of a coordinator of the meetings and making
2   sure they were on.
3      MR. HAAS:  We would request that those
4   minutes be produced.
5      MR. HARRINGTON:  If they exist, we will
6   examine them and determine if they should be
7   produced for this meeting.
8   BY MR. HAAS:
9      Q.  In connection with this analysis when
10  you had the epiphany with respect to the meaning
11  of AWP and you learned the Medicare's position
12  with respect to the inadequacy of servicing fees,
13  did you go back and review any of the government
14  reports at that time concerning this issue?
15     MR. HARRINGTON:  I object to the form.
16  Go ahead.
17     A.  I read literature, you know. I can't
18  say how far back, you know, some of it was, I
19  mean, but I started reading more about the issue
20  itself.
21     MR. HAAS:  Mark this.
22     (Multipage Excessive Medicare

27 (Pages 102 to 105)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey                CONFIDENTIAL                January 5, 2006
                                  Boston, MA

---

Page 106

1          Payments for Prescription Drugs
2       marked Exhibit Mulrey 003 for
3       identification.)
4    BY MR. HAAS:
5       Q.  We have marked as Deposition Exhibit
6    Mulrey 003 a document titled "Department of Health
7    and Human Services, Office of Inspector General,
8    Excessive Medicare Payments for Prescription
9    Drugs" dated December 1997.
10          (Handing Exhibit Mulrey 003 to the
11      witness.)
12      Q.  Was this one of the documents that you
13   reviewed?
14          (Pause.)
15          (The witness viewing
16      Exhibit Mulrey 003.)
17      A.  I can't recall.
18      Q.  Okay.  Let me see if I can refresh your
19   recollection.  If you would turn to page little i,
20   which is the executive summary page 1, it states
21   as the purpose of this report "to compare Medicare
22   allowances for prescription drugs with drug

---

Page 107

1    acquisition prices currently available to the
2    physician and supplier communities."
3          Do you recall reviewing any survey or
4    study involving a comparison of the Medicare
5    reimbursement allowed amounts with the cost to
6    physicians?
7       A.  No.
8       Q.  Okay.  If you would turn with me to page
9    3 of the report itself.
10          (Witness complying.)
11      Q.  Here it is talking about the methodology
12   followed.  The heading at the bottom of the page
13   says, "Carrier Allowances for Prescription Drugs,"
14   and if you just take a look at the paragraph, it
15   basically says that to determine the allowed
16   amount, the OIG went out to the carriers, the
17   Medicare carriers, to determine the amounts,
18   allowed amounts paid for drugs.
19          Do you see that?
20      A.  What paragraph is that?
21      Q.  It is page 3.
22      A.  Yes.

---

Page 108

1       Q.  At the bottom of the page under the
2    heading "Carrier Allowances for Prescription
3    Drugs."
4       A.  Yes.
5       Q.  First paragraph.
6       A.  Okay.
7          (Pause.)
8          (The witness viewing
9       Exhibit Mulrey 003.)
10      Q.  Once you have reviewed that, the
11   question will be:  Do you recall reviewing at this
12   point in time any documents that concerned studies
13   of Blue Cross/Blue Shield of Massachusetts and
14   involved information from Blue Cross/Blue Shield
15   of Massachusetts concerning the reimbursement of
16   drugs versus the cost of drugs?
17      A.  No.
18      Q.  Turn with me to page 10 of the report.
19          (Witness complying.)
20      Q.  Under the heading "Recommendations," the
21   second sentence states that, quote, "The published
22   AWPs that are currently being used by Medicare-

---

Page 109

1    contracted carriers to determine reimbursement
2    bear little or no resemblance to actual wholesale
3    prices that are available to physicians and
4    suppliers that bill for these drugs," end quote.
5          Do you see that?
6       A.  Yes.
7       Q.  This is dated December 1997.  Do you
8    recall reviewing materials that showed back as
9    early as 1997 or earlier that the government was
10   well aware that AWP bore little or no resemblance
11   to AWP?
12      A.  No.  I'm not aware of it.
13      Q.  Do you recall reviewing any studies
14   similar to this?
15          MR. HAAS:  Withdraw that question.
16      Q.  Do you recall reviewing any studies that
17   made similar findings?
18      A.  Just, you know, what went into this
19   presentation here.
20          (The witness pointing to
21      Exhibit Mulrey 002.)
22      Q.  So what you are referring to is just

---

28  (Pages 106 to 109)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

Page 110

1    what is in this presentation here, are you
2    referring just to the source cited?
3        A.   This is what we used as the basis for
4    the presentation.
5            Did I go back and find this document.
6            (Pointing to Exhibit Mulrey 003.)
7        A.   No.
8        Q.   Let me back up.  I thought you had
9    testified that you reviewed a number of materials
10   in connection with this project?
11       A.   Yes.  But --
12       Q.   Let me ask it this way.  What else did
13   you review?
14       A.   I can't recall.  I mean there was a host
15   of, you know, whether they were Medicare- type
16   reports and other information that was out there
17   that we reviewed.  I mean I don't have any of it
18   here in front of me.
19       Q.   Do you have copies of it in your files?
20       A.   I don't know.  I would have to go back
21   and look.  I don't know that.
22       Q.   Do you have a file that is devoted to

Page 111

1    this particular project, the analysis that you did
2    with respect to the CMS AWP form?
3        A.   Yes.
4        Q.   Okay.
5            MR. HAAS:  We request that that folder
6    and any documentation, including any studies and
7    surveys reviewed, be produced.
8        Q.   Is it your position that Blue Cross/Blue
9    Shield was misled because doctors and
10   manufacturers perceived the marketplace into
11   believing that AWP bore some resemblance to AWPs?
12           MR. HAAS:  Did I say that right?
13           MR. HARRINGTON:  I object to the form.
14           MR. HAAS:  I didn't.  I'm not sure what
15   I said.  I will try it again.
16   BY MR. HAAS:
17       Q.   Is it your position in this litigation
18   that Blue Cross/Blue Shield of Massachusetts was
19   misled by doctors and manufacturers by publishing
20   AWPs that bore little or no resemblance to AWPs?
21           MR. HAAS:  Did I say that right again?
22           MR. NOTARGIACOMO:  You said AWPs to

Page 112

1    AWPs.
2            MR. HAAS:  I did it twice.
3            MR. HARRINGTON:  Objection.
4            MR. HAAS:  It happens late in the day.
5            (Laughter.)
6            MR. HAAS:  Let me try it one more time.
7    Okay.
8    BY MR. HAAS:
9        Q.   Is it your position in this litigation
10   that Blue Cross/Blue Shield of Massachusetts was
11   misled by doctors and manufacturers through the
12   publication of AWPs that bore little or no
13   resemblance to actual acquisition costs at which
14   doctors purchased drugs?
15           MR. HARRINGTON:  Objection.
16       A.   I mean --
17       Q.   I am asking your position.
18       A.   My position?  It is not --
19           MR. HARRINGTON:  If you have one.
20       A.   -- the company's or anything?  Yes.
21       Q.   Okay.  Does the fact that this document
22   that you have just been shown, that is marked

Page 113

1    Deposition Exhibit Mulrey 003, which is a report
2    by the Office of Inspector General of the HHS,
3    which was publicly published in 1997 and that
4    concludes AWPs have little or no resemblance to
5    actual wholesale prices in any way impact your
6    decision or view as to whether or not
7    manufacturers and doctors misled payers such as
8    Blue Cross/Blue Shield of Massachusetts?
9        A.   Say that again.
10       Q.   I just showed you a document.
11       A.   Yes.  I saw it.
12       Q.   Right?
13       A.   Right.
14       Q.   And you looked at it?
15       A.   Right.
16       Q.   And you know who the Office of Inspector
17   General of HHS is?
18       A.   Yes.
19       Q.   And you know that they put these studies
20   up for the world to see?
21       A.   Yes.
22           MR. HARRINGTON:  Objection.

                    29  (Pages 110 to 113)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey    CONFIDENTIAL    January 5, 2006
Boston, MA

---

Page 114

1    Q.  And you know that, having reviewed this,
2  that they concluded in 1997 that they knew full
3  well that AWP did not bear any relationship
4  whatsoever to the actual wholesale prices paid;
5  right?
6    A.  Yes.
7    Q.  Well, does this document impact your
8  view at all as to whether or not Blue Cross/Blue
9  Shield of Massachusetts was in fact misled, say
10  after 1997, with respect to the meaning of the
11  term AWP?
12    MR. HARRINGTON: Objection. Go ahead.
13    A.  Yes.
14    Q.  It does impact your view. How does it
15  impact your view?
16    A.  That what I -- we thought we were paying
17  for physicians' drugs was actually higher than
18  what they could purchase them at.
19    Q.  Is it your view that nobody at Blue
20  Cross/Blue Shield that was responsible for setting
21  reimbursement had any awareness of this publicly-
22  disclosed document?

---

Page 115

1    A.  I can't speak to that.
2    Q.  Okay.  Would it change or impact your
3  view at all if you knew that there were similar
4  reports that were published in 1984 and in 1992 by
5  the Office of Inspector General of the HHS?
6    MR. HARRINGTON: The same objection. Go
7  ahead.
8    A.  I mean I don't know how to --
9    MR. HARRINGTON: Do you understand the
10  question?
11    THE WITNESS: No.
12  BY MR. HAAS:
13    Q.  Would it affect your view that Blue
14  Cross/Blue Shield was misled somehow as to the
15  meaning of the term AWP in believing that it
16  meant the actual average of wholesale prices if
17  the Office the Inspector General of the HHS
18  published studies in 1984 and in 1992 and in 1997,
19  each that concluded that the AWPs published bared
20  no resemblance and are not predictable of the
21  actual average wholesale prices paid by doctors?
22    MR. HARRINGTON: Objection.

---

Page 116

1    Do you understand what he is asking?
2    THE WITNESS:  I think I am -- I am just
3  getting confused.  It is getting late.
4    Could you restate it?  Sorry.
5  BY MR. HAAS:
6    Q.  I am trying to save time --
7    A.  Yes.
8    Q.  -- and rather than show you a bunch of
9  documents, I am asking, trying to cut to the
10  quick, and saying if I showed you more documents,
11  one from 1984, one from 1992, that reach the same
12  conclusion, i.e., that AWP did not bear any
13  predictable relationship to the prices actually
14  paid by doctors, --
15    A.  Um-hmm.
16    Q.  -- if you were shown those documents,
17  would you -- would that in any way impact your
18  view as to whether or not manufacturers and
19  doctors conspired to mislead and that Blue
20  Cross/Blue Shield of Massachusetts -- and that
21  Blue Cross/Blue Shield of Massachusetts was in
22  fact misled by the publication of AWPs?

---

Page 117

1    MR. HARRINGTON: Objection.
2    Q.  Does it impact your view?
3    MR. HARRINGTON: Do you understand what
4  he is asking?
5    THE WITNESS:  Can you help me here?
6    MR. HARRINGTON:  Well, let me try this.
7    Does looking at this Inspector General
8  study or if you looked at other studies that were
9  similar that were earlier in time change your view
10  that you were misled by the doctors' and
11  manufacturers' AWPs?
12    THE WITNESS:  Change my view that AWP is
13  inflated pricing and that doctors can obtain the
14  drugs at a lower dollar value?
15    MR. HAAS:  That Blue Cross/Blue Shield
16  was misled.
17    MR. HARRINGTON:  Right.
18    Does it -- do these documents change
19  your conclusion that you were misled?
20    THE WITNESS:  Yes.
21  BY MR. HAAS:
22    Q.  How so?

---

30 (Pages 114 to 117)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

Page 118

1     A.  We're pricing our claims based off of
2  AWP, which we thought was the cost that physicians
3  purchased drugs, and they are in some instances
4  acquiring the drugs at a lower cost.
5     Q.  So I think the answer which you are
6  taking the position of no, that these documents
7  don't change your position?
8        MR. HARRINGTON:  I think I have confused
9  him as much as you did.
10    Q.  Let me ask you one simple question.  How
11 is it that Blue Cross/Blue Shield of Massachusetts
12 could be misled as to the meaning of AWP and to
13 believing allegedly that AWP equalled the average
14 of actual wholesale costs when it was publicly
15 known and published since 1984 and even earlier
16 that AWP did not bear a predictable relationship
17 or any relationship to the actual prices paid by
18 doctors?
19       MR. HARRINGTON:  Objection.
20    A.  No.  It wouldn't.  I mean we rely on
21 nationally-accepted standards in applying some of
22 our reimbursement.  Utilizing AWP that Medicare

Page 119

1  had out there was one of those source that we
2  could use.
3     Q.  All right.  And my question is how is it
4  that Blue Cross/Blue Shield could be misled if
5  they relied on Medicare, and Medicare in fact knew
6  and it was published publicly that AWP did not
7  equal the average of actual wholesale costs?
8        MR. HARRINGTON:  Well, I am going to
9  object again.  He has already testified that he
10 has no knowledge that anybody at Blue Cross saw
11 any of these.
12       THE WITNESS:  Right.
13       MR. HAAS:  That is going to be my next
14 question, because I asked him if he would change
15 his view if he saw these, and he said no, it
16 wouldn't change his view.  So my followup question
17 is how is that possible.
18 BY MR. HAAS:
19    Q.  How is it in your view, what is your
20 explanation, as to how Blue Cross/Blue Shield of
21 Massachusetts could be misled if it was publicly
22 published that AWP did not equal the average of

Page 120

1  actual wholesale costs?
2        MR. HARRINGTON:  The same objection.
3     A.  I don't know, you know, if anybody
4  realized it at that point in time.
5     Q.  Okay.  So it is your position that if
6  someone at Blue Cross/Blue Shield had in fact read
7  these documents they would have understood that
8  AWP did not equal the average of actual wholesale
9  costs; correct?
10    A.  Potentially, yes.
11    Q.  So the ultimate determination as to
12 whether or not Blue Cross/Blue Shield was misled
13 in your view depends upon whether or not anybody
14 was apprised of this information that was publicly
15 available?
16       MR. HARRINGTON:  The same objection.  Go
17 ahead.
18    A.  Yes.
19       MR. HAAS:  Off the record.
20       (Discussion off the record.)
21       MR. HAAS:  Back on the record.
22 BY MR. HAAS:

Page 121

1     Q.  Let me back up.  We were talking about
2  R.J. Health, and you had testified that R.J.
3  Health set -- now sets the reimbursement amount
4  for physician- administered drugs that are
5  incorporated into the Blue Cross/Blue Shield of
6  Massachusetts fee schedules; correct?
7     A.  Yes.
8     Q.  Okay.  How do you know that R.J. Health
9  calculates that amount as a percentage of AWP?
10    A.  There is some data that they have --
11 they share that shows their -- their I guess
12 calculation, if you will, or how they develop AWP.
13    Q.  They share that information with you?
14    A.  We have, yes.
15    Q.  Does that information show the source of
16 the AWP utilized by R.J. Health?
17    A.  "The source," meaning?
18    Q.  R.J. Health, meaning where do they get
19 it from?
20    A.  Like what compendiums and such?
21    Q.  Yes.
22    A.  Yes.

                    31 (Pages 118 to 121)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL                January 5, 2006
                            Boston, MA

Page 122

1     Q.  What compendia does R.J. Health use to
2  obtain the AWP that Blue Cross/Blue Shield of
3  Massachusetts to calculate --
4          MR. HAAS: Let me withdraw that
5  question.
6     Q.  What compendia does R.J. Health use to
7  get the AWP that is used to calculate the
8  reimbursement amount incorporated into Blue
9  Cross/Blue Shield of Massachusetts' fee schedules?
10    A.  I don't know off the top of my head.
11    Q.  Is that reflected in documents in your
12 files?
13    A.  I don't think those are -- have been
14 produced.
15    Q.  Right.
16    A.  The --
17    Q.  Do you maintain copies of those
18 documents in your files?
19    A.  Of how R.J. Health develops their AWP?
20    Q.  Yes.
21    A.  Yes.
22         MR. HAAS: We request that they be

Page 123

1  produced.
2  BY MR. HAAS:
3     Q.  Okay. The second aspect of your
4  responsibilities that you had mentioned was
5  analysis of various fee schedules. What does that
6  entail?
7     A.  On an annual basis, we look at our
8  reimbursement that we make to physicians for
9  services that are based on RBRVS, so it is not
10 drug related.
11    Q.  What is the purpose of that analysis?
12    A.  It is to update the RVU rates based on
13 the change each year that comes out from Medicare.
14    Q.  In your role, do you have any
15 interaction with physicians?
16    A.  No.
17    Q.  In your role, do you have any
18 involvement in analyses with respect to specialty
19 pharmacies and whether Blue Cross/Blue Shield
20 should adopt a specialty pharmacy model for the
21 reimbursement of physician- administered drugs?
22    A.  No.

Page 124

1     Q.  Have you ever had any involvement with
2  the specialty pharmacy model?
3     A.  We have one, I mean, at Blue Cross.
4     Q.  What involvement, if any, have you had
5  with respect to the specialty pharmacy?
6     A.  Just sit on a work group.
7     Q.  What is that work group?
8     A.  The specialty pharmacy work group.
9     Q.  Okay. What does that group do?
10    A.  I think you probably will get the best
11 information from John Killion.
12    Q.  What is your role in that work group?
13    A.  A support role.
14    Q.  Do you do analyses?
15    A.  No.
16    Q.  Have you attempted to ascertain in
17 connection with your work on the group what the
18 impact the specialty pharmacy model would have on
19 Blue Cross/Blue Shield of Massachusetts' business?
20    A.  Again I default to John to answer those.
21    Q.  I have no problem asking John all the
22 questions --

Page 125

1     A.  Yes.
2     Q.  -- and I have no problem moving past
3  this. What I need to know is what it is exactly
4  that you do so I can ask you about what you do.
5     A.  It is more operation oriented, what he
6  puts in place we can administer through the claims
7  system.
8     Q.  What does that mean?
9     A.  That if he is contracting with a
10 particular provider, that he can set up the
11 provider ID, you know, we get him set up in the
12 system and get his claims through the system
13 appropriately and set up with all the bells and
14 whistles that he needed.
15    Q.  When did Blue Cross/Blue Shield of
16 Massachusetts put into place a specialty pharmacy?
17    A.  You can talk to John. It has been
18 probably two years --
19    Q.  Two years?
20    A.  -- but John would have the definitive
21 date.
22    Q.  Do you have an understanding of how

32  (Pages 122 to 125)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

---

Page 126

1    reimbursement is provided --
2        MR. HAAS: Withdraw that.
3        Q.  Do you have an understanding of the
4    reimbursement that is provided to specialty
5    pharmacies -- to the specialty pharmacy for drugs
6    provided to physicians?
7        A.  A discount off AWP.
8        Q.  What is the amount of that discount?
9        A.  Excuse me?
10       Q.  What is the amount of that discount?
11       A.  I -- again it would vary, I think, by
12   different providers.
13       Q.  Focusing operationally, how is that
14   reimbursement effected?  Is it managed through a
15   fee schedule?  Is it done through some sort of
16   claims submission?  How is it managed?
17       A.  It is done through claims submission and
18   coding in the system that would, you know, take an
19   AWP and reduce it or increase it, whatever the
20   discount it would be reduced.
21       Q.  Where does Blue Cross/Blue Shield of
22   Massachusetts obtain that AWP from?

---

Page 127

1        A.  Talk to John.
2        Q.  What I am struggling with here is to get
3    an understanding of what do you mean when you say
4    you just handled the operations aspects of it.
5        A.  I handle, once he has negotiated his
6    deals, all right, and he has his discounted
7    amount, he turns that over to me.  We will get the
8    providers set up, and we will code the system to
9    say for this particular provider, we're going to
10   apply this discount.
11       Q.  Isn't it -- first of all, who is the
12   specialty pharmacy that Blue Cross/Blue Shield of
13   Massachusetts works with?
14       A.  There are a couple.  I mean they are
15   kind of more -- again can I just let John get into
16   that?  I mean because --
17       Q.  Is he --
18       A.  He -- it is his bailiwick, if you will.
19       Q.  What I am not understanding is what it
20   sounded like you are saying is you are in charge
21   of the operations, but it sounded like you
22   testified that the reimbursement for drugs

---

Page 128

1    administered by physicians that they acquire from
2    the specialty pharmacy is provided to the
3    provider, which is inconsistent with my
4    understanding of how it works.  So that is why I
5    need to probe a little bit.  I apologize.  I know
6    it is late.  I know we are going to talk to him
7    about it, and I don't want to be redundant, but at
8    the same time, you're the operations person, and I
9    need to know how it works.
10       A.  The contracts that I know he has out
11   there today, he has a home infusion contract with
12   a particular provider.  There is a discounted fee
13   schedule for his drug reimbursement.
14       It is not, as far as I know, and John
15   can, you know, because I have been somewhat
16   removed from this for a while, it is not
17   physicians that are getting this.
18       Q.  Fine.
19       A.  All right.
20       Q.  That is an easy way to cut through this.
21       A.  All right.
22       Q.  To your knowledge, does Blue Cross/Blue

---

Page 129

1    Shield of Massachusetts have any relationship with
2    specialty pharmacies to provide drugs to doctors
3    for the administration to --
4        A.  To my knowledge, no, I'm not aware of
5    that.
6        Q.  Okay.
7        MR. HAAS:  Off the record.
8        (Discussion off the record,
9    followed by recess taken at 4:26 p.m.)
10       (Recess ended at 4:32 p.m.)
11       MR. HAAS:  Back on the record.
12   BY MR. HAAS:
13       Q.  We were talking about what has been
14   marked as Deposition Exhibit Mulrey 002, the
15   analysis of the CMS reform, and you indicated that
16   it was not in Blue Cross/Blue Shield of
17   Massachusetts' interest at this time to change to
18   an ASP environment.  Why is that?
19       A.  Our thought process there is that we
20   were waiting to see if this is an industry-
21   acceptable payment methodology.
22       Q.  Does Blue Cross/Blue Shield of

---

33  (Pages 126 to 129)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                           Boston, MA

---

Page 130

1  Massachusetts have the concern that if it reduces
2  reimbursement now it will -- it runs the risk of
3  losing providers from its network?
4      A.   That could be one concern.  Yes.
5      Q.   Is it important for Blue Cross/Blue
6  Shield of Massachusetts to maintain a robust
7  network of physicians?
8      A.   Yes.
9      Q.   And is maintaining a robust network of
10  physicians one way that Blue Cross/Blue Shield of
11  Massachusetts competes with other health plans?
12      A.   Yes.
13      Q.   Who are the major competitors of Blue
14  Cross/Blue Shield of Massachusetts?
15      A.   Harvard Pilgrim Healthcare, Tufts, are
16  the three local plans.
17      Q.   What about Cigna?
18      A.   They are a competitor, but they don't
19  have a big market share in Massachusetts.
20      Q.   Who has the largest market share in
21  Massachusetts?
22      A.   Blue Cross.

---

Page 131

1      Q.   How large is it relative to the other
2  players?
3      A.   I don't know the actual percentage
4  breakdowns.
5      Q.   Have you been involved at all in the
6  process of competing for customers of Blue
7  Cross/Blue Shield of Massachusetts?
8      A.   Have I personally?
9      Q.   Yes.
10      A.   No.
11      Q.   Do you have an understanding of how the
12  process works?
13      A.   No.  Not truly.
14      Q.   Okay.  Has Blue Cross/Blue Shield of
15  Massachusetts always been the dominant player in
16  Massachusetts?
17      A.   I'm not certain.
18      Q.   For the time you were in the company,
19  has it always been important for Blue Cross/Blue
20  Shield to maintain a robust network of providers
21  for competitive purposes?
22      MR. HARRINGTON:  I object to the form.

---

Page 132

1      A.   Yes.
2      Q.   How vigorous is the competition in this
3  marketplace?  Is it significantly competitive?
4      MR. HARRINGTON:  I object to the form.
5      A.   I -- you know, I don't know, I mean it
6  is not my area of expertise.
7      Q.   Okay.  Are you familiar with a
8  litigation pending in Florida referred to as the
9  in re:  Managed Care Litigation or perhaps the
10  Thomas matter?
11      A.   I have heard of the Thomas litigation.
12  Heard of it.
13      Q.   Okay.  What involvement, if any, have
14  you had in the Thomas litigation?
15      A.   None.
16      Q.   Were you aware that in September -- on
17  September 28, 1994, Blue Cross/Blue Shield of
18  Massachusetts paid $2.7 million to the federal
19  government to settle allegations of Medicare
20  fraud?
21      MR. HARRINGTON:  I object to the form.
22      A.   No.

---

Page 133

1      Q.   So you have never had any involvement in
2  that --
3      A.   No.
4      Q.   -- issue?
5      A.   Yes.
6      MR. HAAS:  I have no further questions
7  at this time.
8      MR. HARRINGTON:  I have a few followups.
9  I don't know if the attorney on the phone has any
10  questions.
11      MR. HAAS:  Lorianne?
12      MS. TREWICK:  Yes, I am here.
13      MR. HAAS:  Do you have any followup
14  questions at this point?
15      MS. TREWICK:  No, I don't.  Thank you.
16      MR. HAAS:  I am going to turn it over to
17  plaintiffs.
18      MR. HARRINGTON:  Sure.  This will just
19  take a few minutes.
20      CROSS EXAMINATION
21  BY MR. HARRINGTON:
22      Q.   Let me direct your attention, Mr.

---

34  (Pages 130 to 133)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey        CONFIDENTIAL           January 5, 2006
                          Boston, MA

---

Page 134

1  Mulrey, to page 5 of Exhibit Mulrey 002, which
2  Attorney Haas was asking you some questions about.
3  (Witness complying.)
4      Q.  Did the information that you put on page
5  5 of Exhibit Mulrey 002 come from a committee
6  report of Congress that was prepared in 2004?
7      A.  Yes.
8      MR. HAAS:  Objection to form.
9      Q.  And what was the Congressional committee
10 report that was the basis of the information that
11 is on page 5 of Exhibit Mulrey 002?
12     A.  What was the -- say that one?
13     Q.  Could you tell us what the title or
14 source of the report was that gave you the
15 information that appears on page 5 of Exhibit
16 Mulrey 002?
17     A.  It is footnoted down here.  That is what
18 you are looking for?
19     Q.  Yes.
20     A.  The Committee of Ways and Means,
21 Medicare Prescription Drug, Improvement, and
22 Modern -- I can't say it -- Act of 2003, Chairman

---

Page 135

1  Bill Thomas, 2-26-04.
2      Q.  Okay.  Is it your understanding that as
3  a result of that work of that Congressional
4  committee the recommendation was made that
5  Medicare change its reimbursement structure
6  beginning January 1, 2004, to reimbursement
7  structure?
8      MR. HAAS:  Objection to form.
9      MR. HARRINGTON:  Let me rephrase that.
10 I guess I said reimbursement structure twice.
11     Q.  Is it your understanding that as a
12 result of findings like those on page 5 of Exhibit
13 Mulrey 002 that Medicare made its proposal to go
14 to ASP reimbursement?
15     A.  Yes.
16     MR. HAAS:  Objection to form.
17     Q.  And when you did the analysis of ASP
18 reimbursement with the increase in administration
19 fees that Congress recommended, quote, "to
20 accurately pay M.D.s for the cost of administering
21 drugs," unquote, what was the net effect of the
22 reduction in price from AWP to ASP based and the

---

Page 136

1  increase in administration fees that Congress
2  recommended for accuracy purposes?
3      MR. HAAS:  Objection to form.
4      A.  We are looking at page 7?
5      Q.  Yes.
6      A.  The $6 million.
7      Q.  And what does that $6 million represent?
8      A.  The total reimbursement for drugs and
9  administrative fees.
10     Q.  All right.  And after the decrease in
11 drug reimbursements by going from AWP-based
12 reimbursement to ASP-reimbursement and the
13 increase in administration reimbursements that
14 Congress wanted to create a more accurate
15 reimbursement, would Blue Cross be paying $6
16 million more or $6 million less per year for these
17 total reimbursements?
18     MR. HAAS:  Objection to form.
19     A.  Six million less.
20     Q.  Thank you.
21     MR. HARRINGTON:  That's all I have.
22     MR. HAAS:  I have got a followup

---

Page 137

1  question.  I am just trying to understand. Just
2  give me a second.
3      REDIRECT EXAMINATION
4  BY MR. HAAS:
5      Q.  If I understand your testimony, are you
6  testifying -- have you testified that it was your
7  conclusion based upon your analysis that had Blue
8  Cross/Blue Shield of Massachusetts changed to an
9  ASP methodology it would have saved $6.9 million
10 in 2004?
11     A.  Yes.
12     Q.  Okay.  But Blue Cross/Blue Shield of
13 Massachusetts in fact decided not to change its
14 reimbursement despite the fact that it stood to
15 save 6.9 million; correct?
16     MR. HARRINGTON:  Well, objection.  I
17 think you are misreading the number.
18     MR. HAAS:  I am just asking what he
19 testified.  That is why I asked the first
20 question.
21     Let me back up and do it again.
22 BY MR. HAAS:

---

35 (Pages 134 to 137)

Henderson Legal Services
(202) 220-4158

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey         CONFIDENTIAL         January 5, 2006
                          Boston, MA

---

Page 138

1     Q.  How much, based upon your analysis, did
2  Blue Cross/Blue Shield of Massachusetts stand to
3  gain by switching methodologies?
4     A.  Gain?  It is -- it is -- it is a -- I
5  mean it is a negative.  It wasn't a gain.  It was
6  going to be a decrease in the drugs and an
7  increase in the drug administration --
8     Q.  Oh.
9     A.  -- cost and overall net decrease.  I
10 mean what is missing here again is the titles.
11    Q.  Yes.  That is why I am asking the
12 question.  I can't read because this is blacked
13 off.
14    A.  I can't even recall the titles to be
15 honest with you.
16    Q.  Let me ask it this way.  Did you
17 conclude from your analysis of this switch in
18 reimbursement from AWP to ASP that overall Blue
19 Cross/Blue Shield of Massachusetts would pay more
20 under the ASP regime or less?
21    A.  Less.
22    Q.  Okay.  And even though it would have

---

Page 139

1  paid less, i.e., saved money, Blue Cross/Blue
2  Shield of Massachusetts elected not to switch
3  reimbursement regimes; right?
4     A.  At this time.
5     Q.  Now you were asked a couple of questions
6  with respect to what the impact was under Medicare
7  under the switch to the ASP reimbursement regime
8  and whether or not the overall payments went up or
9  down.  Did you have an understanding of the U. S.
10 -- of Medicare's demonstration project when you
11 answered those questions?
12    A.  Medicare's demonstration?  Can you
13 clarify that?
14    Q.  Well, that is why I am asking the
15 question.
16    A.  All right.
17    Q.  You testified with respect to the impact
18 of the change of reimbursement from 2004 to 2005.
19 A component of that was the demonstration project.
20 So I queried whether or not you are familiar with
21 that project.
22    A.  That Medicare was going to add some

---

Page 140

1  codes and reimburse some oncology?
2     Q.  Right.
3     A.  Yes.
4     Q.  Did you factor that in your analysis in
5  determining what the overall impact was from 2004
6  to 2005 under Medicare?
7     MR. HARRINGTON:  Objection.
8     A.  I want to say no --
9     Q.  All right.
10    A.  -- because the codes didn't exist at the
11 time the analysis was run.
12    MR. HAAS:  No further questions.
13    MR. HARRINGTON:  Thank you.
14    MR. HAAS:  We are off the record.
15    Okay, Lorianne?
16    MS. TREWICK:  Yes.  I am here.  Okay.
17    MR. HAAS:  We are going off the record.
18       (Whereupon, at 4:44 p.m., the
19       deposition was adjourned.)
20
21
22

---

Page 141

1
2
3
4
5               _____
6               MICHAEL T. MULREY
7  Subscribed and sworn to and before me
8  this _____ day of _____, 20____.
9
10
11             _____
12    Notary Public
13
14
15
16
17
18
19
20
21
22

---

36 (Pages 138 to 141)

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey             CONFIDENTIAL             January 5, 2006
                                Boston, MA

Page 142

```
 1              CERTIFICATE
 2   Commonwealth of Massachusetts
 3   Plymouth, ss.
 4        I, Judith McGovern Williams, a Registered
 5   Professional Reporter and Notary Public in and for
 6   the Commonwealth of Massachusetts, do hereby certify:
 7        That MICHAEL T. MULREY, the witness whose
 8   deposition is hereinbefore set forth, was duly sworn
 9   by me and that such deposition is a true record of
10   the testimony given by the said witness.
11        IN WITNESS WHEREOF, I have hereunto set my
12   hand this _____ day of _____, 2006.
13
14
15        Judith McGovern Williams
16        Registered Professional Reporter
17        Certified Realtime Reporter
18        Certified LiveNote Reporter
19        Certified Shorthand Reporter No. 130993
20
21   My Commission expires:
22   April 2, 2010
```

37 (Page 142)

d5b2c624-66e9-441f-8a11-51d382d08c9f