Exhibit 51

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

 2

 3

    IN RE:                          )

 4                                  )

    PHARMACEUTICAL INDUSTRY         )  Civil Action No.

 5  AVERAGE WHOLESALE PRICE         )   01CV12257-PBS

    LITIGATION                      )

 6

 7

 8              HIGHLY CONFIDENTIAL

 9                 DEPOSITION

10               of JOE SPAHN

11

12              Taken at Anthem

13          4361 Irwin Simpson Road

14            Mason, Ohio  45040

15      on November 30, 2004, at 9:12 a.m.

16      Reported by: Rhonda Lawrence, RPR/CRR

17

18

19                  -=0=-

20

21

22
```

EXHIBIT NO. 031
2-27-06

Page 2

1  APPEARANCES:
2
3       Mr. Sean R. Matt
4       HAGENS BERMAN, LLP
5       1301 Fifth Avenue, Suite 2900
6       Seattle, Washington  98101
7       (206) 623-7292
8           on behalf of the Plaintiffs.
9
10      Mr. Adeel A. Mangi
11      PATTERSON, BELKNAP, WEBB & TYLER, LLP
12      1133 Avenue of the Americas
13      New York, NY  10036-6710
14      (212) 336-2000
15          on behalf of the Defendants.
16
17      Mr. Brian J. Thomas
18      ANTHEM, INC.
19      4361 Irwin Simpson Road
        Mason, Ohio  45040
20      (513) 336-4628
21          on behalf of the Deponent.
22          -=0=-

Page 3

1          INDEX OF EXAMINATION
2                           PAGE
3  BY MR. MANGI:              6
4  BY MR. MATT:            167
5
6          INDEX OF EXHIBITS
7
8  EXHIBIT         DESCRIPTION        PAGE
9
10 Exhibit Spahn 001  E-mail from Hoevener with    104
11         attachment
12
13 Exhibit Spahn 002  Agenda, 9-4-03       129
14
15 Exhibit Spahn 003  Minutes, 11-17-03    138
16
17 Exhibit Spahn 004  Letter to Provider from   148
18         Baquet-Simpson, 10-15-04
19
20 Exhibit Spahn 005  Professional Provider   155
21         Agreement
22

Page 4

1            INDEX OF EXHIBITS
2
3  EXHIBIT         DESCRIPTION        PAGE
4
5  Exhibit Spahn 006  Facility Provider Agreement    160
6
7  Exhibit Spahn 007  Facility Provider Agreement    164
8         Addendum for Managed Care
9         Programs
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 5

1            STIPULATIONS
2          It is stipulated by and among
3  counsel for the respective parties that the
4  deposition of JOE SPAHN, the Witness herein,
5  called by the Defendants, under the
6  applicable Rules of Federal Civil Court
7  Procedure, may be taken at this time by the
8  notary pursuant to notice; that said
9  deposition may be reduced to writing in
10 stenotypy by the notary, whose notes
11 thereafter may be transcribed out of the
12 presence of the witness; and that the proof
13 of the official character and qualification
14 of the notary is waived.
15          -=0=-
16
17
18
19
20
21
22

Page 6

1           JOE SPAHN
2  being first duly sworn, as hereinafter certified,
3  deposes and says as follows:
4           EXAMINATION
5  BY MR. MANGI:
6     Q.  Good morning, Mr. Spahn.
7     A.  Good morning.
8     Q.  As I said, my name is Adeel Mangi.
9  I'm from the law firm of Patterson, Belknap,
10 Webb & Tyler.  We represent the defendant
11 drug manufacturers in this case.
12        MR. MANGI:  Before we begin,
13 pursuant to a conversation I just had with
14 counsel for Anthem, we're going to designate
15 this deposition transcript and the
16 transcripts for all Anthem witnesses we'll
17 be taking over the next couple of days as
18 highly confidential pursuant to the
19 protective order.  And we can revisit that
20 as to sections as necessary in the future.
21        MR. THOMAS:  Great.
22     Q.  Mr. Spahn, thank you for taking the

Page 7

1  time to speak with us today.  Have you ever
2  been deposed before?
3     A.  I don't believe so.  I don't ever
4  recall having, like, a court reporter.  So I
5  think the answer's no.
6     Q.  Okay.  Let me just run through some
7  of the standard ground rules for a
8  deposition, then.
9        The first is, it's important that
10 you answer all questions verbally so that
11 the court reporter can take down your
12 answers.  She can't take down a nod of the
13 head or shrug of the shoulders.  Okay?
14    A.  (Indicates affirmatively.)
15    Q.  And you'll have to answer that
16 verbally.
17        MR. THOMAS:  Say okay.
18    A.  Oh.  Okay.
19    Q.  Just so she can write it down.
20        If at any point a question that I
21 ask you is unclear, please stop me and tell
22 me that, and I'll do my best to rephrase it.

Page 8

1     A.  All right.
2     Q.  If at any point during the
3  deposition you'd like to take a break,
4  please let me know, and as soon as possible,
5  we'll take a break.
6     A.  All right.
7     Q.  What is your current job title,
8  Mr. Spahn?
9     A.  My current job title is senior
10 health care consultant.
11    Q.  And who's your employer?
12    A.  Anthem Blue Cross/Blue Shield.
13    Q.  Is your work focused on a particular
14 region?
15    A.  Anthem Midwest.
16    Q.  What states fall within that area of
17 responsibility?
18    A.  Ohio, Kentucky and Indiana.
19    Q.  How long have you been in this
20 position?
21    A.  Since 1992.
22    Q.  And you've held the same title,

Page 9

1  senior health care consultant, since 1992?
2     A.  Yes.
3     Q.  Is that when you joined Anthem?
4     A.  No.
5     Q.  When did you join Anthem?
6     A.  I joined Anthem in April of '87.
7     Q.  We'll go through your employment
8  history from '87 to the present in the
9  moment.
10        But first, perhaps you could
11 describe for me your educational background
12 after high school.
13    A.  I have a bachelor's in accounting
14 and an MBA in finance.
15    Q.  When did you get your bachelor's in
16 accounting?
17    A.  I got my bachelor's in 1972.
18    Q.  Where did you get that
19 qualification?
20    A.  University of Cincinnati.
21    Q.  And the MBA?
22    A.  From Xavier University, in 1982.

Joe Spahn                              Highly Confidential                         November 30, 2004
                                           Mason, OH

| Page 10 | Page 12 |
|---|---|
| 1    Q.  After receiving your bachelor's | 1    responsibility still cost accounting |
| 2    qualification, did you take up full-time | 2    throughout that time period? |
| 3    employment? | 3        A.  Yes. |
| 4        A.  Yes. | 4        Q.  Did National Distillers and Chemical |
| 5        Q.  Where did you start working? | 5    Corporation manufacture or sell any medical |
| 6        A.  My first employment was with Schelle | 6    products? |
| 7    Distillers. | 7        A.  Not that I know of. |
| 8        Q.  How long were you at that company? | 8        Q.  During the time you were employed |
| 9        A.  One year. | 9    there, you received your MBA qualification, |
| 10       Q.  Is that an alcohol -- | 10   correct? |
| 11       A.  Yes. | 11       A.  Yes. |
| 12          MR. THOMAS:  Do you want to spell | 12       Q.  Was that a part-time course of |
| 13    that for the court reporter.  She'll ask you | 13   study? |
| 14    anyway. | 14       A.  Yes.  I went to evening college. |
| 15       A.  I think it's S-c-h-e-l-l-e.  I | 15       Q.  Then in 1987, you left National |
| 16    believe. | 16   Distillers and Chemical Corporation and came |
| 17          MR. THOMAS:  Okay.  I didn't know if | 17   over to Anthem; is that correct? |
| 18    it was Schoenling Brewing Company or | 18       A.  That's correct. |
| 19    Schelle.  Go ahead. | 19          MR. THOMAS:  Can we go off the |
| 20       Q.  They didn't manufacture any medical | 20   record for just one second. |
| 21    products, did they? | 21          (Discussion is held off the record.) |
| 22       A.  No. | 22   BY MR. MANGI: |

| Page 11 | Page 13 |
|---|---|
| 1    Q.  Depending on your definition of | 1    Q.  Let's just clarify.  The entity that |
| 2    medical, I suppose. | 2    you joined in 1987, what was it called at |
| 3       Were you employed there as an | 3    that time? |
| 4    accountant? | 4        A.  Community Mutual Insurance Company. |
| 5        A.  Yes. | 5        Q.  At some point in the future, did the |
| 6        Q.  You left that job in 1973? | 6    name of Community Mutual Insurance Company |
| 7        A.  Yes. | 7    change to something else? |
| 8        Q.  Where did you move to in '73? | 8        A.  Yes. |
| 9        A.  To National Distillers and Chemical | 9        Q.  When did that name change take |
| 10    Corporation. | 10   place? |
| 11       Q.  How long were you employed there? | 11       A.  I believe it was -- I believe it was |
| 12       A.  Until I left there in 1987. | 12   '95 or '96.  I don't know exactly. |
| 13       Q.  What job title did you begin -- did | 13       Q.  Okay.  What did the name change to |
| 14    you start with at National Distillers and | 14   in '95 or '96? |
| 15    Chemical Corporation? | 15       A.  Anthem. |
| 16       A.  I don't know about the job title.  I | 16       Q.  Is that Anthem Blue Cross/Blue |
| 17    worked in cost accounting.  So I was like a | 17   Shield? |
| 18    cost analyst. | 18       A.  Again, I'm not sure if we're |
| 19       Q.  Okay.  Did you remain in that | 19   officially called Anthem Blue Cross/Blue |
| 20    department until 1987? | 20   Shield or if it's Anthem Enterprise or |
| 21       A.  Yes. | 21   Anthem, Incorporated. |
| 22       Q.  Okay.  Was your area of | 22       Q.  You know it as Anthem? |

Henderson Legal / Spherion
(202) 220-4158

Page 14

1  A. Yes.
2  Q. Have there been any subsequent name
3  changes since '95?
4  A. Not that I'm aware of.
5  Q. So in 1987, when you joined
6  Community Mutual Insurance Company, what was
7  your title?
8  A. When I started -- I started in the
9  cost and budgeting department. So I started
10 in the finance department.
11 Q. Okay.
12 A. So I think the title may have been
13 something like cost and budget analyst.
14 Q. Okay. How long did you remain in
15 that position?
16 A. Until '91.
17 Q. What were your responsibilities in
18 that position?
19 A. Basically, we did the -- we did cost
20 analysis. Basically, I did it for the
21 automotive accounts.
22 Q. Anything else?

Page 15

1  A. No. That was -- that was it.
2  Q. Okay. When you refer to cost
3  accounting or cost analysis, what are you
4  referring to there? What are the components
5  that would go into that analysis?
6  A. Well, they looked at the
7  administrative expense and how it was
8  allocated to the auto accounts.
9  Q. By "administrative expense," what do
10 you mean?
11 A. Well, the overhead expenses. This
12 is all the various departments, like how
13 much of the -- what am I trying to say? The
14 claims processing area, how much that got
15 allocated to GM, various other overhead.
16 Q. Okay. Was this limited to analysis
17 of overhead costs?
18 A. Yes.
19 Q. Did any of your analysis involve the
20 study of drug reimbursement costs?
21 A. No.
22 Q. Did any of your analysis include the

Page 16

1  study of drug acquisition costs?
2  A. No.
3  Q. Was there any analysis at all that
4  related to any sort of price or
5  reimbursement amount for drugs?
6  A. No.
7  Q. So you remained in this position
8  until 1991, correct?
9  A. Correct.
10 Q. In 1991, did your position change?
11 A. Yes.
12 Q. What did you move to in 1991?
13 A. I moved to the HMO, the health care
14 organization. It was a division of
15 Community Mutual.
16 Q. Prior to that time, when you were in
17 your cost analysis position, were you
18 studying only automotive insurance?
19 A. Can you say that again?
20 Q. Yeah. I just want to clarify.
21    When you mentioned earlier that you
22 were in the cost and budgeting finance

Page 17

1  department doing cost analysis, did that
2  involve analysis relating to health care
3  products or another type of insurance?
4  A. I'm still not sure if I understand
5  the question.
6  Q. You mentioned that when you were
7  doing cost analysis you were focusing on
8  automotive accounts.
9  A. Right.
10 Q. My question is: Did you mean by
11 that study relating to health care provided
12 to automotive companies or were you talking
13 about car insurance?
14 A. Well, health care insurance.
15 Q. Okay. I just want to make sure I
16 didn't misunderstand you.
17    So in 1991, you moved to the HMO
18 division?
19 A. Right.
20 Q. And what title did you -- or what
21 position did you move into?
22 A. Physician reimbursement analyst.

5 (Pages 14 to 17)

Joe Spahn
Highly Confidential
Mason, OH
November 30, 2004

Page 18

1    Q. How long did that remain your title,
2  physician reimbursement analyst?
3    A. For one year.
4    Q. What were your responsibilities in
5  that position?
6    A. I analyzed the physician fee
7  schedules for the HMO products.
8    Q. What sort of analysis was this?
9    A. Basically, it was cost of care
10  analysis. In other words, what the impact
11  would be if we increase or decrease fees.
12    Q. Did you see this as an
13  accounting-related position?
14    A. I saw it as a financial-related
15  position.
16    Q. So it was financial analysis?
17    A. Yes.
18    Q. Was any component of your analysis
19  there based on physicians' acquisition costs
20  for drugs?
21    A. No.
22    Q. So you were studying only the

Page 19

1  amounts that Anthem reimburses physicians;
2  is that correct?
3    A. Correct.
4    Q. That presumably included
5  reimbursement for services as well as
6  reimbursement for drugs; is that correct?
7    A. It would include drugs that are
8  administered in a physician's office.
9    Q. Okay. So that was included,
10  together with study of service cost?
11    A. Yeah.
12    Q. Now, did the analysis pertain to a
13  general survey of an ongoing survey of
14  options, or was there a specific project
15  that you were with?
16    A. No. It was more like ongoing.
17    Q. And what sort of an impact were you
18  looking at relating to changes in the fee
19  schedule? Was it purely financial?
20    A. Purely financial.
21    Q. So how much more would Anthem pay if
22  it increased fee schedules, something like

Page 20

1  that?
2    A. Correct.
3    Q. During that one year when you were
4  in this position, did you carry out any
5  other kinds of analysis?
6    A. No.
7    Q. In 1992, did you move to another
8  position?
9    A. Well, what happened, the HMO
10  division, which was called HMP, that
11  division was absorbed back into the
12  corporation.
13    Q. Okay. So did your position change
14  or your title?
15    A. Yes, because then they started
16  calling me the senior health care
17  consultant.
18    Q. Did your responsibilities change?
19    A. Yes. Well, they expanded.
20    Q. How long did you remain a senior
21  health care consultant?
22    A. Until present.

Page 21

1    Q. Okay. Have your responsibilities,
2  after the initial expansion -- have they
3  remained the same?
4    A. Yes.
5    Q. So what was that expansion of your
6  responsibilities?
7    A. Well, because I was doing physician
8  fee schedule analysis just for the HMO
9  product, and then after that division was
10  merged back into the corporation, I was
11  doing it for all products, not just HMO
12  products, but all products.
13    Q. And what sorts of products are you
14  referring to there?
15    A. Basically, you have traditional,
16  sometimes called indemnity; you have point
17  of service; preferred provider
18  organizations, PPOs; and then also HMOs.
19    Q. Other than the area of your
20  responsibility being encompassed to these
21  different types of plans, were there any
22  other expansions in your responsibilities in

6 (Pages 18 to 21)

Page 22

1    1992?
2        A.  No.
3        Q.  What about the type of analysis you
4    were being asked to perform, did that remain
5    the same?
6        A.  Yes.
7        Q.  Is that the same sort of analysis
8    you're carrying out today?
9        A.  Yes.
10       Q.  Again, that involves study of the
11   financial impact of Anthem of changes in its
12   fee schedule; is that correct?
13       A.  Correct.
14       Q.  In your current position, since
15   1992, have you carried out any types of
16   analyses other than that studying the
17   financial impact of changes in the fee
18   schedule?
19       A.  No.
20       Q.  Now, in your current position, are
21   you part of a particular department or
22   division within Anthem?

Page 23

1        A.  Yes.  There is a division called
2    health care management, so I'm part of that
3    division.
4        Q.  What is the focus of that division?
5        A.  Health care management is basically
6    involved in contracting with hospitals and
7    physicians, setting reimbursement, cost of
8    care trends.
9        Q.  Anything else?
10       A.  I think that's basically it.
11       Q.  Who do you report to in this health
12   care management division?
13       A.  I report to Flo Buendia.
14       Q.  Could you spell her name for the
15   court reporter, please.
16       A.  I'm sorry.  It's a he.
17       Q.  I'm sorry.
18       A.  It's actually Florentine.  I'm
19   sorry.
20          MR. THOMAS:  B-u-e-n-d-i-a.
21       A.  Yeah.  Buendia is his last name.
22       Q.  And what is his title?

Page 24

1        A.  I guess Flo is manager of
2    contracting and reimbursement.
3        Q.  Do you know who he reports to?
4        A.  Yes.
5        Q.  Who does he report to?
6        A.  He reports to Dave Prugh.
7        Q.  Is that P-r-u?
8        A.  P-r-u-g-h.
9        Q.  And what is Mr. Prugh's position?
10       A.  I'm not sure exactly what his proper
11   title is, but Dave is something like
12   executive director, but I'm not sure
13   exactly.  He's executive director, but I
14   don't know his exact title.
15       Q.  Now, the contracting work that goes
16   on in the health care management department,
17   do you have any involvement with that?
18       A.  I have no involvement with
19   contracting.
20       Q.  Are you knowledgeable about the
21   contracting process?
22       A.  I know something about the process,

Page 25

1    yes.
2        Q.  Are you knowledgeable about the
3    negotiation, if any, that's involved in the
4    contracting process?
5        A.  Somewhat, yes.
6        Q.  How about the setting of
7    reimbursement, are you involved in setting
8    reimbursement rates?
9        A.  Yes.
10       Q.  What is your responsibility in
11   relation to setting of reimbursement rates?
12       A.  I support the health service areas
13   in developing and analyzing the fee
14   schedules and cost trends.
15       Q.  We talked about the work of the
16   health care management department.  We
17   talked about contracting, setting
18   reimbursement and cost trends.
19       A.  Yes.
20       Q.  What did you mean by "cost trends"?
21       A.  Pretty much what it says.  Whether
22   the health care cost trends are going up or

Page 26

1  down or staying even.
2      Q.  Just financial analysis?
3      A.  Yes.
4      Q.  Now, what did you do in preparation
5  for your deposition today?
6      A.  Almost nothing.
7          MR. THOMAS:  Thanks a lot.
8      Q.  Other than conversations with
9  counsel, did you speak to anyone else?
10     A.  No.
11     Q.  Did you review any documents in
12  preparation for your deposition?
13     A.  No.
14     Q.  Okay.  And are you currently a
15  member of any industry associations?
16     A.  No.
17     Q.  Or professional organizations?
18     A.  No.
19     Q.  Do you subscribe to any periodicals
20  that relate to the health care industry?
21     A.  Well, as an employee of Anthem, I
22  subscribe to a few, if that's what you mean.

Page 27

1      Q.  What publications do you subscribe
2  to?
3      A.  We get Part B News, Medicare Part B
4  News.  We have to get the Federal Register.
5  Part B News and the Federal Register is
6  basically it.
7      Q.  Do you review those publications as
8  part of your job responsibilities?
9      A.  Yes.
10     Q.  Both of them?
11     A.  Yes.
12     Q.  Are you familiar with any
13  publications that report drug prices?
14     A.  Yes.
15     Q.  What sort of publications are you
16  familiar with?
17     A.  There's one called RedBook.
18     Q.  Are you familiar with any others?
19     A.  There is the -- I guess I'm not
20  really familiar.  I've heard the term
21  Medi-Span, but I've never used it or looked
22  at it, so I'm not real sure what that is.

Page 28

1      Q.  Are you familiar with the First
2  DataBank?
3      A.  No.
4      Q.  Do you subscribe to RedBook or do
5  you know of others that subscribe to
6  Redbook?
7      A.  I don't personally, but I know the
8  company subscribes to it.
9      Q.  Do you utilize Redbook in your
10  position?
11     A.  No.
12     Q.  Do others in your department use
13  Redbook, that you're aware of?
14     A.  Not that I'm aware of.
15     Q.  Have you ever looked at Redbook?
16     A.  I've seen one, yes.
17     Q.  Do you know what's reported in
18  Redbook?
19     A.  Yes, generally.
20     Q.  What's your understanding of the
21  information that's contained within Redbook?
22     A.  Redbook lists names of drugs, their

Page 29

1  national drug code number, and then they
2  list the size, the dose, doses allowed,
3  et cetera, et cetera, and then they'll list
4  average wholesale price, and often they list
5  the direct price.
6      Q.  I'm sorry, did you say direct price?
7      A.  Direct price.
8      Q.  Anything else that you're aware of?
9      A.  No.
10     Q.  Are you familiar with the term
11  "wholesale acquisition cost" or "WAC"?
12     A.  Yes.
13     Q.  What is your understanding of what
14  WAC is?
15     A.  My understanding of WAC is --
16  generally, represents more what is actually
17  paid for the drug as opposed to, you know,
18  the -- I guess the way it's presented to me,
19  it's sort of like you have the list price,
20  but then the negotiated price, what you
21  actually pay for it.
22     Q.  Do you understand WAC to be the same

8 (Pages 26 to 29)

Joe Spahn                    Highly Confidential                    November 30, 2004
                                 Mason, OH

Page 30

1   as or different from the direct price you
2   referred to in RedBook?
3       A.  I'm not real sure, but my perception
4   is that WAC comes closer to the direct
5   price.
6       Q.  Now, going back to some broader
7   issues.  Does Anthem provide any services
8   other than health insurance?
9       A.  Lord.  I believe so, but I'm -- I'm
10  only involved in the health insurance part.
11      Q.  Is it your understanding that the
12  focus of the insurance business is on health
13  care?
14      A.  Yes.
15      Q.  Do you have an understanding as to
16  how many individuals across the country have
17  insurance through Anthem?
18      A.  No, I don't know that number.
19      Q.  The different types of plans that
20  you referred to, the indemnity plans, the
21  HMO plans, do you have an understanding as
22  to how many different products Anthem offers

Page 31

1   in total?
2       A.  No, I don't know a total.
3       Q.  Okay.  Do individual insureds make
4   co-payments, or does it vary from plan to
5   plan?
6       A.  Can you rephrase --
7       Q.  Sure.  Individuals who get their
8   insurance through Anthem, does -- whether or
9   not they will make a co-payment when
10  visiting a doctor, does that vary from plan
11  to plan?
12      A.  I don't know.
13      Q.  Okay.  These are issues that are
14  outside your area of responsibility?
15      A.  Right.
16      Q.  Do you know whether Anthem owns any
17  physicians' practices?
18      A.  No, I don't.
19      Q.  Do you know whether Anthem owns any
20  pharmacies?
21      A.  I don't -- I mean, there's Anthem
22  Prescription, the mail order pharmacy.

Page 32

1       Q.  Right.
2       A.  I'm not sure exactly what that
3   relationship is.  I'm not sure if Anthem
4   owns it or part of it.  I'm not sure.
5       Q.  Leaving aside the mail order
6   business, do you know if Anthem owns any
7   retail pharmacies?
8       A.  I don't know.
9       Q.  Do you know whether Anthem has
10  ever -- withdraw that.
11          At present, does the amount that
12  Anthem reimburses physicians for drugs that
13  are administered in office vary from area to
14  area or plan to plan, or is it uniform
15  across the country?
16      A.  Across the country?
17      Q.  Right.
18      A.  I don't know about across the
19  country.  I can only talk about Midwest.
20      Q.  Okay.  How about in the Midwest?
21      A.  Yes, it's going to vary, because
22  it's a local --

Page 33

1       Q.  Okay.  Now, at present, in the
2   Midwest, how many different methodologies
3   are used to calculate the amount Anthem will
4   reimburse physicians in relation to drugs
5   administered in office?
6       A.  There's only one.
7       Q.  What is that methodology?
8       A.  Percent of Medicare.
9          MR. MATT:  I'm sorry.  Did you say
10  percent of Medicare?
11         THE WITNESS:  Percent of Medicare's
12  drug fee schedule.
13         MR. MATT:  Thank you.
14      Q.  At present, what is that percentage?
15      A.  It will vary somewhat, but in
16  general, it's going to be in the range of --
17  from 100 percent to -- let me rephrase that.
18  Let's say it's from 90 percent to maybe 120
19  percent.
20      Q.  How long has the percentage of
21  Medicare been the methodology that Anthem
22  uses to calculate the amount it will

9 (Pages 30 to 33)

Page 34

1    reimburse physicians for drugs administered
2    in office?
3        A. Since we -- since we actually first
4    came out with the fee schedule for drugs.
5        Q. Do you know when that was?
6        A. I can tell you it was approximately
7    around '93 or '94.
8        Q. Okay. Now, you're referring here to
9    Anthem Midwest?
10       A. Well, in '93 or '94, there was only
11   Community Mutual Insurance Company.
12       Q. Okay. Are you referring to the
13   Midwest region only?
14       A. Yes. For me, yes.
15       Q. Okay. Is all of your knowledge
16   focused on what's been happening in the
17   Midwest region as opposed to nationally?
18       A. Yes.
19           MR. THOMAS: I'm going to just
20   interject an objection based upon
21   clarification. You're dealing with a very
22   transitional time frame for our company. In

Page 35

1    that time frame, you're dealing with a man
2    who worked solely for Community Insurance,
3    which was local in Ohio, into a
4    national-size corporation within a span of
5    two years. So you need to be very specific
6    about which date you're referring to when
7    you're talking about this.
8            MR. MANGI: Okay.
9        Q. Let's clarify that. Community
10   Mutual introduced a fee schedule in '93 or
11   '94, right?
12       A. Right.
13       Q. And that was based on a percentage
14   of Medicare fee schedule, correct?
15       A. Right.
16       Q. Later, around '95 or '96, Community
17   became Anthem; is that correct?
18       A. Correct.
19       Q. Do you know whether that was simply
20   a name change or did it become part of
21   another organization?
22       A. That might be more of a technical

Page 36

1    question than I can answer.
2        Q. The question is only if you know.
3        A. I don't know.
4        Q. Okay. Is it your understanding that
5    after that transition was complete, the
6    methodology remained a percentage of the
7    Medicare fee schedule?
8        A. Yes.
9        Q. And that's remained the case up
10   until the present; is that correct?
11       A. Yes.
12       Q. Now, the percentage range that you
13   described earlier as being in place today,
14   90 to 120 percent of Medicare fee schedule,
15   has that been the approximate range since
16   1993, or has it changed over time?
17       A. No, it's changed.
18       Q. What was the range in '93?
19       A. It was approximately 130 to 140?
20   I'm sorry. 130 to 140 percent.
21       Q. How would you characterize the
22   changes over time in those percentage

Page 37

1    numbers?
2        A. I'm sorry?
3        Q. Sure. Let me clarify.
4            Were there a series of gradual
5    shifts in those percentages, or were there a
6    few points you can pinpoint when there were
7    large shifts?
8        A. They were gradual shifts.
9        Q. Now, at present, the methodology is
10   a percentage of the Medicare fee schedule.
11   Do you know how the Medicare fee schedule is
12   calculated?
13       A. I know there's been a lot of
14   changes. I believe at one time they paid
15   something like 100 percent of AWP, more or
16   less. I think they actually varied by drug
17   a little bit. I know it was 95 percent --
18   in general -- I think they made exceptions
19   for drugs. In general, it was 95, then it
20   went to 85 percent of AWP.
21           Now they're doing away with AWP, and
22   starting in 2005, they're going to use what

10 (Pages 34 to 37)

Page 38

1  they're calling average sales price plus six
2  percent.
3      Q.  So we're clear here, your
4  understanding is that the Medicare fee
5  schedule has moved from 100 percent of AWP
6  to 95 to 85, and now will transition to an
7  average selling price plus six percent?
8      A.  Yes.  That's correct.
9      Q.  And Anthem's methodology has been a
10  percentage of that amount?
11      A.  That's correct.
12      MR. THOMAS:  When you say "that
13  amount," you're referring back to the
14  Medicare --
15      MR. MANGI:  The Medicare fee
16  schedule.
17      MR. THOMAS:  Just to make sure.
18      Q.  Now, do you know why in '93 or '94
19  Community Mutual decided to peg their
20  reimbursement amount to the Medicare fee
21  schedule?
22      A.  Yes.

Page 39

1      Q.  Why was that?
2      A.  Because prior to that, we used
3  what's generally called UCR, reasonable and
4  customary.  But basically, that means you
5  pay a percent of charge.  If you don't have
6  a fee schedule in place, then you pay a
7  percentage of the bill charged.
8      Q.  That was a percentage of the actual
9  charge that a physician submitted; is that
10  correct?
11      A.  That's correct.
12      Q.  Just to be clear on the methodology
13  there, how would that play out?  An
14  individual would go to a doctor's office,
15  and let's say he'd be administered a drug,
16  who would then bill what to who; do you
17  know?
18      A.  In general, the physician would
19  submit the claim to -- okay -- Community
20  Mutual or to us.
21      Q.  That's fine.  And the amount that
22  the physician would bill in relation to the

Page 40

1  drug that he administered to the patient,
2  that would be the physician's usual and
3  customary charge; is that correct?
4      A.  It would be the physician's bill
5  charge.
6      Q.  By "physician's bill charge," you
7  just mean the amount the physician is
8  billing?
9      A.  Correct.
10      Q.  Do you know how the physicians would
11  calculate the amount that they would bill?
12      A.  No, I don't.
13      Q.  So the system prior to the
14  introduction of this methodology in '93, '94
15  involved the processing of actual invoices
16  received from doctors; is that correct?
17      A.  Correct.
18      Q.  Do you have any sense of how many
19  invoices that would have involved?
20      A.  No, I don't.
21      Q.  Would it be fair to say it would
22  have been a very substantial number of

Page 41

1  invoices?
2      MR. THOMAS:  Clarification.  Over
3  what period of time?
4      Q.  We're talking about the '93 time
5  period here.
6      MR. THOMAS:  On an annualized basis,
7  on a monthly basis?
8      Q.  Any basis that you feel comfortable
9  with.
10      MR. THOMAS:  If you know.
11      A.  I don't know number of invoices.  On
12  the physician reimbursement side, drugs are
13  about three percent of total physician
14  reimbursement.
15      Q.  Now, what were some of the problems
16  with that system that Community Mutual was
17  looking to fix or improve upon by moving to
18  a percentage of the Medicare fee schedule?
19      MR. MATT:  Objection to form.  No
20  foundation.
21      Q.  You can answer.
22      A.  Because we have a responsibility to

11 (Pages 38 to 41)

Joe Spahn                         Highly Confidential                         November 30, 2004
                                      Mason, OH

---

Page 42

1  our members to try and hold their health
2  care cost down, and so you needed something
3  in place that would help control cost care
4  trends.  And you also want to make sure that
5  you're competitive in the marketplace.
6      Q.  Okay.  Perhaps I can try to clarify
7  my question.
8      I had asked you earlier why in 1993
9  Community Mutual moved to this methodology
10  involving a percentage of the Medicare fee
11  schedule, and your answer was that because
12  prior to that time the methodology was a
13  percentage of the actual bill charged.  I'm
14  trying to understand what were the reasons
15  that led to that change from one methodology
16  to another.
17      MR. THOMAS:  Asked and answered.
18      Q.  Now, was it purely a matter of
19  controlling costs, as you just described, or
20  were there other factors?
21      MR. THOMAS:  Asked and answered.  Go
22  ahead.

---

Page 43

1      A.  You guys are confusing me.
2      MR. THOMAS:  Just ignore us.  Unless
3  I tell you to not answer the question, you
4  can just let me make my objection and he can
5  make his.  You can go ahead and answer.
6      A.  It was purely trying to control
7  costs.
8      Q.  Was any part of the decision to
9  change methodologies based on convenience of
10  processing?
11      MR. THOMAS:  Objection.  Asked and
12  answered.
13      A.  No.
14      Q.  Did the change in methodology
15  succeed in lowering or controlling costs?
16      A.  Yes.
17      Q.  Can you quantify the savings that
18  resulted immediately after the
19  implementation of the new methodology?
20      A.  No.  I don't know.
21      Q.  But you are aware that there was a
22  cost savings --

---

Page 44

1      A.  Yes.
2      Q.  -- realized by the change in
3  methodologies?
4      A.  Yes.
5      Q.  Okay.  Now, in '93, you said that
6  the percentage of the Medicare drug fee
7  schedule was 130 to 140 percent, correct?
8      A.  Yes.
9      Q.  And that has gradually moved over
10  time to the current position where it's 90
11  to 120 percent of the Medicare fee schedule,
12  right?
13      A.  Correct.
14      Q.  What are some of the factors that
15  have led to that change?
16      A.  The competitive marketplace.
17      Q.  Would it be fair to say that the
18  percentage discount of the Medicare fee
19  schedule that is applied to determine
20  reimbursement to specific providers is
21  determined entirely by a competitive
22  dynamic?

---

Page 45

1      A.  Okay.  I'm sorry.  Can you say that
2  again?
3      MR. MANGI:  Sure.  Would you mind
4  reading back the question.
5      (Record read as requested.)
6      MR. THOMAS:  I'm going to object.
7  Form and foundation.  Go ahead.
8      A.  I'm going to say yes.
9  BY MR. MANGI:
10      Q.  Now, let's go back again to the '93,
11  '94 time period.  The range of 130 to 140
12  percent of the Medicare fee schedule, what
13  was the basis for the variations within that
14  range?  Do you understand my question?
15      A.  Again, I'm going to -- our fee
16  schedules are local, so it kind of depends
17  on the competitiveness in that market area.
18      Q.  Okay.  When you say "fee schedules
19  are local," what sort of a region does each
20  fee schedule apply to?
21      A.  Today, if I can give -- can I give
22  an example?

---

12 (Pages 42 to 45)

Page 46

1  Q.  Sure.
2      MR. THOMAS:  Yeah, I suppose.  Go
3  ahead.
4      A.  If you take Ohio, for example, Ohio
5  has a fee schedule for the Cincinnati
6  market, the Dayton market, and then there's
7  a fee schedule for -- I'll just say northern
8  Ohio, which is basically Columbus and north.
9  We also -- but the fee schedules also will
10  vary if it's indemnity product or if it's a
11  managed care product.
12      Q.  Let's talk first about the
13  geographical variation.  At present, are
14  there three fee schedules that cover Ohio?
15      A.  Ohio has -- the traditional
16  indemnity schedule is statewide.  Then
17  there's a managed care schedule.  I'm
18  talking about PPO point of service and HMO.
19  There's a managed care schedule for
20  Cincinnati; there's a managed care schedule
21  for Dayton; there's a managed care schedule
22  for northern Ohio.

Page 47

1      Q.  Okay.  Do you have an understanding
2  as to what the different -- how many
3  different fee schedules were in place in
4  Ohio in 1993?
5      A.  In '93, there was only two
6  schedules, because they were statewide.  So
7  you had a traditional schedule and a managed
8  care schedule.
9      Q.  Now, what's the basis for the
10  different fee schedules for the traditional
11  products as opposed to the managed care
12  products?
13      A.  Excuse me.  You say the basis for
14  the difference?
15      Q.  Yeah.  Why are there different fee
16  schedules for those two products?
17      A.  I'm not sure I can answer that one.
18  That's probably more a question for the
19  people who are doing the contracting.
20      Q.  Okay.  Let's go back to the --
21  again, the '93 time schedule and the 130 to
22  140 range that you described.  Is it your

Page 48

1  understanding that there was one type of
2  product at 130 and another at 140, or was
3  there variation falling at different points
4  within that range?
5      A.  No.  It would be by product.
6      Q.  Do you have an understanding as to
7  which product was at 130 and which would be
8  at 140?
9      A.  Traditional would be at 140 and the
10  managed care product would be at 130.
11      Q.  Sticking with '93, was there a
12  process of individualized negotiation with
13  providers, or was it simply a matter of
14  which product their network was associated
15  with?
16      A.  I think it was more which product
17  they were associated with.
18      Q.  And coming back to the present time
19  period, where the range is 90 to 120
20  percent, can you tell me which fee schedules
21  have which percentage along that range?
22      A.  I know the northern Ohio schedule's

Page 49

1  100 percent, and southern Ohio -- the 90 I
2  just -- that may not be the exact number.
3  But southern Ohio is slightly less than
4  northern Ohio.
5      Q.  Okay.  I believe you mentioned
6  earlier that there was one indemnity fee
7  schedule that's in effect statewide at
8  present.
9      A.  Right.
10      Q.  Do you know what the percentage is
11  for the indemnity fee schedule?
12      A.  100 percent.
13      Q.  And there's a PPO and HMO fee
14  schedule; is that correct?
15      A.  Correct.
16      Q.  Let me clarify.  Are there different
17  fee schedules in different regions for those
18  products?
19      A.  For the managed care products?
20      Q.  Uh-huh.
21      A.  Yes.  You have northern Ohio,
22  Cincinnati and Dayton.

13 (Pages 46 to 49)

Page 50

1    Q.  And do you know what the fee
2  schedules are for those regions?
3    A.  As a percent of Medicare?
4    Q.  Right.
5    A.  For the drug piece?
6    Q.  Yeah.
7    A.  Northern Ohio is 100 percent because
8  it's the same as traditional.  Southern
9  Ohio, it's something a little less than 100
10  percent, but I don't know the exact percent
11  number.
12    Q.  And that covers both Dayton and
13  Cincinnati?
14    A.  Yes.  Let me -- just to be sure,
15  Cincinnati and Dayton, they are two separate
16  schedules, but their drug fees are the same.
17    Q.  There's variation in other
18  components of the schedule?
19    A.  There's variations in things like
20  surgeries, codes or office visit fees.
21    Q.  Okay.  Now, given that range of 90
22  to -- I'm sorry.  At present, was it 90 to

Page 51

1  120 percent, did you say, of the Medicare
2  fee schedule?
3    A.  Yes.  But I'm talking Midwest.
4    Q.  Right.
5    A.  So Kentucky and Indiana are paying
6  more than Ohio.
7    Q.  Do you know what's being paid in
8  relation to drugs administered in office in
9  those states?
10    A.  Actually, Kentucky is actually at
11  100 percent of Medicare.  Indiana is the one
12  that's at 120.  Again, just to clarify,
13  those are round numbers.  An individual drug
14  may vary from that.  An individual procedure
15  code -- on the professional side, you don't
16  actually pay by the name of the drug.  You
17  pay by the HCPCS procedure code.  So an
18  individual fee for code may vary, but in
19  general, those percents they gave are just
20  overall average.
21    Q.  Now, on that point, the HCPCS or CPT
22  codes, there are some codes that apply to

Page 52

1  services provided by physicians, correct?
2    A.  (Indicates affirmatively.)
3    Q.  A type of surgery or type of
4  procedure, right?
5    A.  Correct.
6    Q.  There are other codes that apply
7  specifically to drugs, right?
8    A.  Correct.
9    Q.  Do you have an understanding as to
10  whether or not those pertain to specific
11  drugs or just types of drugs?
12    A.  Well, I think they -- specific
13  drugs, but not -- the HCPCS code, which are
14  usually J codes, if you're familiar.
15    Q.  Uh-huh.
16    A.  It could be a blend of four or five
17  manufacturers who are all making that same
18  drug.  So I think it's a blend of both
19  generic and brand.  Different manufacturers,
20  but just generally the same drug.
21    Q.  Okay.  Now, based on the fact that
22  there are a number of payments that Anthem

Page 53

1  makes in the Midwest in relation to drugs
2  administered in office that are at greater
3  than 100 percent of the Medicare fee
4  schedule, right?
5    A.  Yes.
6    Q.  Do you have an understanding as to
7  why in those cases Anthem pays its providers
8  more than Medicare in relation to drugs
9  administered in office?
10    A.  The marketplace.
11    Q.  And by "the marketplace," do you
12  mean the demands of physicians?
13    A.  Correct.  Well, that and the
14  competitiveness of the market.
15    Q.  What sort of competitive factors are
16  in play in the market that lead to that
17  result?
18    A.  I'm not sure if I -- can you give me
19  an example of what you mean?
20    Q.  Sure.  Let me try and clarify.
21  Anthem competes with other health insurers,
22  correct?

Page 54

1    A.  Correct.
2    Q.  Who are some of the major
3  competitors that Anthem faces in the Ohio
4  market?
5    A.  United, Aetna, Humana, Medical
6  Mutual.
7    Q.  And there are similar competitors in
8  Indiana or Kentucky, correct?
9    A.  Yes.
10    Q.  Anthem is looking to maintain a
11  network of providers that will provide a
12  certain level of service to its individual
13  insureds, correct?
14    A.  Correct.
15    Q.  Anthem wants to have an efficient
16  and relatively wide-spread network, right?
17    A.  Correct.
18    Q.  In order to maintain that provider
19  network, does Anthem need to offer
20  reimbursement rates that are sensitive to
21  the market's demands?
22    A.  Yes.

Page 55

1    Q.  So when we're referring to market
2  dynamics and competitive dynamics, what
3  we're really talking about is Anthem's need
4  to maintain an adequate provider network,
5  correct?
6    A.  Correct.
7    Q.  Now, does Anthem at present have an
8  understanding of what physicians pay to
9  acquire drugs?
10    A.  I don't -- I'm not aware of that.
11    Q.  Are there others at Anthem who would
12  know more about that topic?
13    MR. THOMAS:  Object.
14    A.  I'm sorry.  I don't know.
15    Q.  Now, earlier today we spoke about
16  WAC or direct price.  Do you recall that
17  discussion?
18    A.  Yes.
19    Q.  And you testified that you
20  understood WAC to be something close to what
21  is actually paid for drugs; is that correct?
22    A.  Correct.

Page 56

1    Q.  So would it be fair to say that you
2  understand physicians pay something at or
3  close to WAC to acquire drugs?
4    MR. THOMAS:  Objection.  I think he
5  testified he's not aware.  But go ahead and
6  answer if you can.
7    A.  Okay.  Can you restate that?
8    Q.  Yeah.  Earlier you talked about WAC
9  as being something close to what's paid to
10  acquire drugs.  Do you recall that?
11    A.  Correct.
12    Q.  Do you have an understanding as to
13  whether or not physicians pay WAC to acquire
14  drugs or whether they pay something less
15  than that?
16    A.  My understanding is that they pay
17  something less than average wholesale price.
18    Q.  Okay.
19    A.  But exactly what they would pay I
20  don't know.
21    Q.  Okay.  Do you understand that they
22  don't pay AWP?

Page 57

1    A.  In general, I think that they pay
2  something less than AWP.  There may be cases
3  where they have to pay AWP.  I'm not sure.
4    Q.  Do you know of any specific cases of
5  physicians paying AWP?
6    A.  No.
7    Q.  Your general impression is that they
8  pay less than AWP?
9    A.  Yes.
10    MR. MANGI:  Perhaps we can take a
11  quick break.
12    (Recess taken.)
13  BY MR. MANGI:
14    Q.  Now, before we took that break, we
15  were talking about physicians -- what
16  physicians pay to acquire drugs.  Now, do
17  you have an understanding as to whether or
18  not the amounts that physicians pay to
19  acquire drugs are greater or lesser than the
20  amount that Anthem reimburses them for those
21  drugs?
22    MR. THOMAS:  Object.  I think he

15 (Pages 54 to 57)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

1   testified he does not know for certain, but
2   go ahead.
3       A.  I don't know for certain.  I will
4   say this, I think that what we pay them is a
5   fair and reasonable rate, which is our goal.
6   We're not trying to underpay them,
7   certainly.
8       Q.  What do you mean by "a fair and
9   reasonable rate"?
10      A.  Just what it says, that we think
11  it's fair and reasonable, adequate.
12      Q.  Okay.  Is one part of fair and
13  reasonable that Anthem is not paying
14  providers -- is not reimbursing providers an
15  amount in relation to drugs that's less than
16  what they pay to acquire those drugs?
17          MR. MATT:  I'm sorry.  Can I have
18  that question back.
19          (Record read as requested.)
20          MR. MATT:  Object to form.
21          MR. THOMAS:  I'm going to object to
22  foundation, because, again, I believe he

1   already testified he's not certain what
2   physicians pay to acquire drugs.
3           MR. MANGI:  I'm trying to --
4       A.  Well, the way we would look at it,
5   there's more than just -- I don't want to
6   look at just one drug.  You have to look at
7   the entire fee schedule.  I mean, they get
8   paid for the drugs, but you also get paid
9   for office visits, you get paid for
10  administering drugs.  So I don't know.
11          It could be that on one drug maybe
12  our reimbursement is less than it actually
13  costs them, but that's one drug.  We're
14  paying them much more on other things.  So
15  I'd rather look at the total reimbursement
16  rather than one drug.
17      Q.  Okay.  Let's leave aside specific
18  drugs and just talk about drugs generally.
19  To pay a fair and reasonable rate, would
20  Anthem understand that to mean that it's
21  generally paying -- not causing providers to
22  make a loss on drugs that they buy and then

1   administer?
2       A.  I think that's a fair statement,
3   yes.
4       Q.  Okay.  So we can agree, then, that
5   Anthem understands that it's reimbursing
6   providers in relation to drugs they
7   administer at some amount greater than what
8   they pay to acquire those drugs?
9           MR. THOMAS:  I'm going to interpose
10  an objection here only because we moved from
11  what Joe Spahn believes to what Anthem
12  believes on a corporation basis, and I don't
13  think we can make that jump, based upon his
14  testimony.  Foundation objection.
15      Q.  Okay.  Let's back up for a moment.
16  You understand that you're testifying here
17  today as a corporate representative on
18  behalf of Anthem, correct?
19      A.  Yes.
20      Q.  Okay.
21          MR. THOMAS:  That's correct.  But I
22  believe his response to the prior question

1   was I believe we try to pay.  I could be
2   wrong on my recollection, but that's the
3   basis for my objection.
4           MR. MANGI:  That's fine.
5           Could you repeat my prior question,
6   please.  And we can incorporate the same
7   objection.
8           (Record read as requested.)
9       A.  Okay.  I'm sorry?
10      Q.  Let's do it again.
11      A.  Okay.  Let's do it again.
12      Q.  Did you understand that question?
13      A.  No.  Can we do it again, please?
14      Q.  Sure.  We were speaking about fair
15  and reasonable, right?
16      A.  Yes.
17      Q.  And we agreed that, as a general
18  matter, in relation to drugs administered in
19  office, that means that Anthem doesn't
20  expect that the providers are making a loss
21  on those drugs, correct?
22      A.  Correct.

16 (Pages 58 to 61)

Joe Spahn                    Highly Confidential                    November 30, 2004
                             Mason, OH

Page 62

1    Q.  Okay.  So we can agree that Anthem
2  understands that the amounts that it's
3  reimbursing providers in relation to drugs
4  they administer in office is something
5  greater than what they pay to acquire those
6  drugs?
7       MR. MATT:  Objection.
8       MR. THOMAS:  Same objection.
9    A.  The only issue I have with that is I
10 don't know what they actually pay for the
11 drug.  So it's difficult to answer.  But I
12 would assume that we're paying an adequate
13 rate because they stay in the network to not
14 cancel their contract.
15   Q.  By "an adequate rate," you mean a
16 rate that doesn't cause them to make a loss
17 on the drugs, correct?
18      MR. THOMAS:  I'm just going to
19 object to the whole line of testimony.
20   A.  Well, I --
21      MR. THOMAS:  Wait, Joe.  Wait till
22 I'm done with my objection.

Page 63

1       I object to this line of testimony
2  on the grounds that it's pure speculation.
3  Go ahead.
4    A.  You guys crack me up.  Now I lost my
5  train of thought.
6    Q.  Would you like the question read
7  back?
8    A.  Yes, please.
9    Q.  And we can incorporate the same
10 objection.
11      (Record read as requested.)
12   A.  By "an adequate rate," I mean it's a
13 rate that causes them to continue to
14 participate with Anthem as a contracted
15 provider.
16   Q.  Okay.  Would it be fair to say that
17 Anthem, when contracting with providers, is
18 looking to get the best deal that it can,
19 the best financial terms that it can, while
20 ensuring that it maintains an adequate
21 network?
22   A.  We want to pay a rate that is --

Page 64

1  that is fair, reasonable and equitable to
2  the provider, while at the same time
3  controlling cost of care.
4    Q.  And maintaining an adequate network?
5    A.  And maintaining an adequate network,
6  yes.
7    Q.  Okay.  Those goals that you
8  described, were those the same goals that
9  Anthem had in mind prior to 1993?
10   A.  I'm not sure if I can answer that.
11   Q.  Okay.  Well, leaving aside,
12 obviously, the network component, because
13 we're talking about a premanaged care time,
14 is it fair to say that, even prior to 1993,
15 when reimbursement was based on actual bill
16 charges, Anthem, or in that pre-'93 world
17 Community Mutual, was looking to pay
18 providers a fair and reasonable rate in
19 reimbursement?
20   A.  The reason I'm having a hard time
21 answering that, because I wasn't in health
22 care management at that time, so I'm not

Page 65

1  sure what they were thinking.
2    Q.  So you have no understanding of what
3  was happening in that time period?
4    A.  No, I don't.
5    Q.  Let's stick with the present time
6  period, then.  Now, I believe the goals you
7  mentioned that Anthem has when contracting
8  these rates is, one, to pay a fair and
9  reasonable rate, right?
10   A.  Correct.
11   Q.  And, second, to maintain an adequate
12 network?
13   A.  Correct.
14   Q.  Was there a third?
15   A.  I think -- I believe I said
16 controlling cost of care.
17   Q.  There you go.
18      Now, those three goals, would it be
19 fair to say that those are Anthem's goals
20 regardless of the particular reimbursement
21 methodology that it utilizes?
22   A.  Yes.

17 (Pages 62 to 65)

Joe Spahn                                Highly Confidential                      November 30, 2004
                                              Mason, OH

Page 66

1     Q. So, indeed, if Anthem were to use a
2  reimbursement methodology other than
3  percentage of Medicare, those would remain
4  Anthem's goals, right?
5     A. Correct.
6     Q. If, for example, Anthem were to
7  change from a percentage of Medicare to a
8  percentage of AWP, a percentage of WAC, or a
9  percentage of something else, those would
10  remain Anthem's aims, right?
11     A. Yes.
12     Q. Now, we've been talking so far about
13  reimbursement to providers or physicians for
14  drugs administered in office. Are you also
15  involved in reimbursement to hospitals?
16     A. No.
17     Q. Do you have an understanding of how
18  Anthem determines its reimbursement rates to
19  hospitals?
20     A. No, I don't.
21     Q. Do you have any knowledge as to how
22  Anthem reimburses hospitals for drugs

Page 67

1  administered to patients?
2     A. No, I don't.
3     Q. Do you have any understanding as to
4  whether the amount reimbursed for drugs is
5  broken out from general per diem or
6  capitated reimbursement or whether it's just
7  part of a broader reimbursement?
8     A. I'm sorry. I don't know.
9     Q. Your involvement is limited to
10  physician reimbursement?
11     A. Correct.
12     Q. Does Anthem utilize the services of
13  any benefits consultants?
14     A. I don't know.
15     Q. Are you familiar with benefits
16  consultants? Do you know what those are?
17     A. No, I don't.
18     Q. Okay. Does Anthem utilize the
19  services of any consultants in relation to
20  determining its reimbursement rates or
21  methodologies?
22     A. For physician reimbursement?

Page 68

1     Q. For physician reimbursement.
2     A. No.
3     Q. Now, leaving aside physician
4  reimbursement and talking about
5  reimbursement related to pills or other
6  pharmacy-dispensed medications, is it your
7  understanding that that reimbursement is all
8  determined through Anthem Prescription
9  Management?
10     A. If we're talking about prescription
11  drugs --
12     Q. Right.
13     A. -- I would say yes, I think it is.
14     Q. Do you have any responsibility in
15  relation to reimbursement for those drugs?
16     A. No.
17     Q. Now, do you have an understanding of
18  what average wholesale price stands for or
19  what that acronym is? I'm sorry. Withdraw
20  that question.
21       Do you have an understanding of what
22  average wholesale price is?

Page 69

1     A. My understanding is that when a drug
2  comes on the market -- my understanding is
3  that AWP, average wholesale price, is set by
4  the manufacturer. I believe it's originally
5  set when the drug is FDA approved. And
6  apparently they -- the manufacturer can
7  change that AWP through time.
8     Q. What's the basis for your
9  understanding that AWP is set by
10  manufacturers?
11     A. Just from what I've heard, even in
12  our fee schedule meetings, what other people
13  have said.
14     Q. Are you aware that some price
15  reporters publish AWPs for drugs that are
16  different from those they receive from drug
17  manufacturers?
18     A. No.
19     Q. Do you have an understanding as to
20  what, if anything, AWP is used for in the
21  marketplace or in the health care industry?
22     A. I think I'm going to say no.

18 (Pages 66 to 69)

Page 70

1    Q.  Okay.  Do you know whether or not
2    other insurers tie their reimbursement in
3    relation to drugs to a percentage of AWP?
4        A.  I wouldn't know.
5        Q.  Do you know whether or not the
6    amount that Anthem reimburses pharmacies in
7    relation to drugs dispensed at pharmacies is
8    or is not tied to AWP?
9        A.  I don't know.
10       Q.  Do you have any knowledge as to
11   whether or not AWP is used as a
12   reimbursement benchmark?
13       A.  For prescription drugs?
14       Q.  For drugs in general.
15       A.  I don't know.
16       Q.  Have you ever heard AWP referred to
17   as "ain't what's paid"?
18       A.  I think I have heard that, yes.
19       Q.  What do you understand that to mean?
20       A.  My understanding is that's -- my
21   understanding of what that would mean is
22   that's not what the physician pays to

Page 71

1    acquire the drug, even from a wholesaler or
2    from the manufacturer.
3        Q.  Now, in relation to reimbursement to
4    providers, does Anthem Prescription
5    Management play any role in that
6    reimbursement process?
7        A.  Well, "providers," you mean
8    physicians?
9        Q.  Yes.
10       A.  So do they have any role in setting
11   the physician fee schedule?
12       Q.  In setting or in any other aspect of
13   that reimbursement.
14       A.  No.
15       Q.  How about in the processing of
16   claims from physicians?
17       A.  No.
18       Q.  Okay.  How are those claims from
19   physicians processed?
20       A.  Well, I don't work in the claims
21   area, so I don't know for sure, but a
22   professional claim is called a HCFA 1500

Page 72

1    Form.  I mean, I've seen them.  You have the
2    J code, the HIPAA code.  And exactly what
3    the claim shop -- how they process them, I
4    don't know.
5        Q.  But it's your understanding that
6    those claims are processed at Anthem by a
7    department other than Anthem Prescription
8    Management; is that correct?
9        A.  Yes.
10       Q.  Now, do you have an understanding as
11   to what criteria Anthem uses when deciding
12   whether or not to contract with a provider?
13       A.  No, I don't.
14       Q.  Who at Anthem is the person most
15   knowledgeable about that process, the
16   contracting process with providers?
17       A.  Gosh.  I don't know if I can name
18   one person.
19       Q.  Okay.  Could you name more than one?
20       MR. THOMAS:  I think you asked for
21   the most knowledgeable person, so I'm going
22   to object to the follow-up on a form basis.

Page 73

1        Q.  I'm happy to clarify.
2            Would you feel more comfortable
3    naming more than one person who's
4    knowledgeable about that process?
5        A.  Well, I'm not real comfortable
6    naming any person.
7            THE WITNESS:  Can I answer?
8            MR. THOMAS:  You can answer the
9    question.
10       A.  In central contact, there's Jim
11   Tassing.  But the people who actually
12   negotiate with the physicians, if that's the
13   question you're asking, that would be
14   provider relations.
15           MR. THOMAS:  You can name them.
16       A.  The VP of provider relations for
17   southern Ohio is Paul Beckman.  The VP in
18   northern Ohio is John Jesser.
19       Q.  Could you spell his last name.
20       A.  J-e-s-s-e-r.
21           Do you also want Kentucky and
22   Indiana?

19 (Pages 70 to 73)

Page 74

1    Q.  Sure.
2    A.  Kentucky is Mike Lorch.
3    Q.  Is that O-r-c-h?
4    A.  L-o-r-c-h.
5        And Indiana is David Lee, L-e-e.
6    Q.  And these --
7    A.  So those folks and their staffs are
8    the ones who would actually negotiate with
9    the physicians.
10   Q.  Those are provider relations?
11   A.  Correct.
12   Q.  Now, the reimbursement amounts that
13   are paid to physicians in relation to drugs
14   administered in the office, do you know
15   whether or not those amounts vary depending
16   on the physician's area of practice or
17   specialization?
18   A.  No.
19   Q.  Is the answer they do not vary?
20   A.  They do not vary by provider
21   specialty.
22   Q.  Okay.  So the only variation stems

Page 75

1    from the type of plan; is that correct?
2    A.  The geographic region and the type
3    of plan.
4    Q.  Okay.  Now, let's go back and try
5    and clarify a particular point.
6        You mentioned earlier that you
7    understood the Medicare fee schedule to be
8    based on percentages of AWP to date.
9    A.  Correct.
10   Q.  So you understand that if we took a
11   particular drug, that Medicare reimbursed
12   first at 100 percent of the AWP for that
13   drug, and then at 95, and then at 85; is
14   that correct?
15   A.  Correct.
16   Q.  So it's your understanding there
17   that Medicare was reimbursing by reference
18   to the average wholesale price for a
19   particular drug; is that correct?
20   A.  Yes.
21   Q.  Now, turning to Anthem's
22   reimbursement, which is based on a

Page 76

1    percentage of Medicare's reimbursement, is
2    Anthem's reimbursement then also based on a
3    percentage of the AWP for a drug with the
4    Medicare fee schedule acting as an
5    intermediary?  Can you answer my question?
6    A.  Well, when we're setting the fees,
7    AWP doesn't come up.  Because what
8    physicians talk about is -- their benchmark
9    is what Medicare pays and what you pay me as
10   related to Medicare.
11   Q.  Here's what I'm trying to
12   understand.  Earlier on, you referenced the
13   fact that reimbursement is tied to J codes.
14   A.  Correct.
15   Q.  Anthem's reimbursement.
16   A.  Correct.
17   Q.  And a J code can include more than
18   one drug, right?
19   A.  A J code can include more than one
20   manufacturer of a drug.
21   Q.  Okay.
22   A.  Right.  It could have generic and

Page 77

1    brands mixed together.  So there could be
2    multiple NDC numbers in one J code.
3    Q.  Is it your understanding that a J
4    code can include more than one branded drug?
5    A.  I don't know.
6    Q.  Now, changing focus slightly from
7    the amounts that Anthem reimburses for drugs
8    that are administered in office, I'd like to
9    talk now about the amount that Anthem
10   reimburses providers for the administration
11   fees associated with administering those
12   drugs to patients.
13   A.  Okay.
14   Q.  Does Anthem reimburse a separate
15   amount to physicians in relation to the
16   administration fee for infused or injected
17   drugs?
18   A.  Are you asking, did we pay
19   separately for administration as opposed to
20   the drug?
21   Q.  Right.
22   A.  Yes.

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004



Page 78

1    Q.  How does Anthem calculate the
2  amounts that it will pay in relation to that
3  administration?
4    A.  Our fees for administration are
5  based off our RBRVS.
6    Q.  Is it your understanding that the
7  amounts that Anthem reimburses in relation
8  to administration -- providers of
9  administration fees are also tied to the
10  amount that Medicare reimburses?
11    A.  You could calculate it, but when
12  you're setting the fees, you don't really
13  set the fees saying we want to pay 110
14  percent of Medicare.  The fees are set
15  saying we want to use a conversion factor of
16  $40 or $45, whatever it is.
17    Q.  Okay.  Has Anthem ever studied the
18  practice expenses of providers?
19    A.  I'm not aware of that.
20    Q.  Has Anthem ever analyzed the
21  overhead expenses associated with running a
22  physician's practice?

Page 79

1    A.  Not that I am aware.
2    Q.  Does Anthem have an understanding as
3  to whether or not the amounts that it
4  reimburses providers in relation to
5  administrative fees alone, leaving aside the
6  reimbursement for the drug itself, are
7  sufficient to cover the provider's overhead
8  expenses or practice expenses?
9    A.  I'm sorry.  Could you say that
10  again, please.
11    MR. MANGI:  Sure.  Would you mind
12  reading back the question, please.
13    (Record read as requested.)
14    MR. THOMAS:  In your "sufficient to
15  cover the overhead," you're referring to the
16  overhead and cost to administer the specific
17  drug?
18    MR. MANGI:  Right.
19    MR. THOMAS:  Okay.
20    A.  I don't know, because I don't know
21  what their physician's overhead expenses
22  are.

Page 80

1  BY MR. MANGI:
2    Q.  Okay.  To the best of your
3  knowledge, Anthem has never analyzed those
4  expenses?
5    A.  As far as I know, they never
6  analyzed those expenses.
7    Q.  So to the best of your knowledge,
8  Anthem doesn't know whether the
9  administration fees that it pays are
10  sufficient to cover those expenses, right?
11    A.  Yes.  Correct.
12    Q.  Do you know whether or not the
13  administration fees are subject to
14  negotiation?
15    A.  No.  I mean, when you -- when we're
16  setting our schedules, no, they're not
17  subject to negotiation.
18    Q.  Okay.  Has Anthem made -- well, the
19  use of RBRVS in relation to calculating
20  those administration fees, how long has that
21  methodology been in place?
22    A.  Since 1993.

Page 81

1    Q.  And prior to that time, Anthem was
2  paying a percentage of the physician bill
3  charge, correct?
4    A.  Correct.
5    Q.  Was it a percentage of the bill
6  charge or the actual bill charge prior to
7  1993?
8    A.  For physician services, other than
9  drugs, for services like surgeries and
10  administration, et cetera, you pay what's
11  called UCR.  You would pay at a percentile.
12  So you'd pay the 90th percentile or 80th
13  percentile.
14    Q.  What about in relation to drugs?  In
15  determining the amount that Anthem would
16  reimburse prior to '93 for drugs
17  administered in office, was it reimbursing
18  the bill charge from the physician or
19  percentage of the bill charge?
20    A.  No.  It was paying a percentage of
21  the bill charge.
22    Q.  Do you know what that percentage

21 (Pages 78 to 81)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 82

1 was?
2    A.  No, I don't.
3    Q.  Now, we spoke earlier about the
4 competitive dynamic in the market.  Are
5 there particular physicians' practices that
6 are able to individually negotiate their
7 reimbursement rates in relation to drugs and
8 other expenses?
9    A.  Yes.
10    Q.  Okay.  On what basis can individual
11 practices negotiate their own deals?
12    A.  On what basis can they negotiate
13 their own deals?
14    Q.  Yeah.  Do you understand the
15 question or shall I clarify?
16    A.  I think so.
17    Q.  Okay.  Are there circumstances in
18 which one practice or practice group would
19 have greater bargaining power than another?
20    A.  If you have what I would -- if you
21 have, like, a multi-specialty clinic that's
22 out in a rural area, there's no other

Page 83

1 providers available to negotiate with, then
2 I would say they would have more bargaining
3 power.
4    Q.  So in that instance, that practice
5 would be a must-have for Anthem to have an
6 adequate network; is that a fair statement?
7    A.  It might be a must-have.  It kind of
8 depends on how many accounts we have in that
9 area.  If General Motors builds a plant
10 right next to that multi-specialty clinic
11 out in the rural area, they're probably
12 going to be a must-have provider.
13    Q.  Okay.  So the idea is that if
14 there's a practice, a multi-specialty
15 practice in an area where there are not a
16 lot of other options, and Anthem has
17 individual insureds in that area, then it
18 will need that practice to have an adequate
19 network?
20    A.  Correct.
21    Q.  In that situation, that practice
22 would have -- would be in a much stronger

Page 84

1 bargaining position than an individual
2 physician in Cincinnati?
3    A.  Correct.
4    Q.  Now, in that situation, that
5 physician's practice would be able to
6 negotiate to receive a greater amount in
7 reimbursement for drugs that it administers
8 in office?
9        MR. THOMAS:  I'm going to object on
10 the grounds this calls for speculation.
11 You're dealing with a hypothetical practice
12 in a hypothetical environment dealing with
13 hypothetical negotiating physicians.  And
14 I'm going to caution the witness not to
15 speculate.  Go ahead.
16    Q.  Would you like the question read
17 back?
18    A.  No.
19    Q.  Okay.
20    A.  Let me take a stab at answering it.
21 I can tell you what our system -- our claims
22 system has the capability -- we have a

Page 85

1 standard fee schedule.  We have the
2 capability of paying -- we can flex -- it's
3 called flex the provider.  So you can pay
4 provider A 110 percent of the standard
5 schedule.  So the system has the ability to
6 do that.
7    Q.  Okay.  So the system has the ability
8 to adjust the percentage of the fee schedule
9 that we pay to a particular practice?
10    A.  Correct.
11    Q.  Okay.  And that's called flexing the
12 practice, is it?
13    A.  Correct.
14    Q.  Okay.  So you are aware of instances
15 where a particular practice is flexed, so to
16 speak, or is paid a higher percentage of a
17 fee schedule?
18    A.  Yes.
19    Q.  And is it your understanding that
20 that takes place in cases where that
21 practice group has negotiated a higher
22 reimbursement rate?

22 (Pages 82 to 85)

Joe Spahn                          Highly Confidential                November 30, 2004
                                      Mason, OH

Page 86

1    A.  I'm sorry.  Can you say that again?
2    Q.  Sure.  Is it your understanding that
3  that takes place in instances where the
4  practice group at issue has negotiated a
5  higher reimbursement rate?
6    A.  Yes.
7    Q.  Based on factors similar to those
8  that we have been discussing?
9    A.  Yes.
10   Q.  Other than being a major practice in
11  an underserved area, are there other
12  competitive factors that would give one
13  practice greater bargaining power over
14  another?
15   A.  You might have a situation like
16  physicians who work at a children's
17  hospital, and they're doing services on
18  pediatric -- you know, children that no one
19  else does.  So they have more bargaining
20  power.
21   Q.  Any other instances?
22       MR. THOMAS:  I'm just going to

Page 87

1  object to the extent that he's already
2  testified that he's not involved in provider
3  contracting, so you're not getting -- you're
4  getting Joe's opinion on this.
5    Q.  Well, you did testify earlier that
6  you're knowledgeable about some aspects of
7  provider contracting, correct.
8    A.  Yes.
9    Q.  Okay.  Would you like the question
10  read back?
11   A.  I'm sorry.  I thought I answered the
12  question.
13   Q.  Oh, did you?  Perhaps I got confused
14  by the objection this time.
15       MR. THOMAS:  He answered the first
16  one, and then you asked a follow-up
17  question.
18       MR. MANGI:  Would you mind
19  re-reading the follow-up, please.
20       (Record read as requested.)
21  BY MR. MANGI:
22   Q.  We spoke about a multi-specialty

Page 88

1  practice in an underserved area and about a
2  children's hospital instance that you just
3  mentioned.  Other than those sorts of cases,
4  are there other circumstances you know of
5  where one provider or practice would be in a
6  stronger bargaining position than another?
7    A.  No.  I think those are the main
8  ones.
9    Q.  Okay.  Now, I believe you mentioned
10  earlier that conversations with providers
11  about reimbursement tend -- they tend to
12  talk in terms of the Medicare rate.  Do I
13  recall that correctly?
14   A.  Well, my understanding from the
15  meetings I've had with provider relations
16  folks, it seems to be that physicians talk
17  in terms of Medicare's the benchmark and,
18  you know, they tend to compare what everyone
19  pays to what Medicare pays.
20   Q.  Do you have an understanding as to
21  the position that physicians generally take
22  in relation to Medicare reimbursement?  Do

Page 89

1  they insist on an amount greater than it,
2  for example, or something else?
3    A.  It actually varies.  It depends.
4    Q.  What are some of the variations that
5  you're aware of?
6    A.  It could depend on -- I'm not sure
7  if I -- some of the variations?  Can you --
8    Q.  Would you like a clarification?
9    A.  Yes.
10   Q.  Are you aware of different positions
11  that different providers and practices have
12  taken in relation to what their
13  reimbursement should be by reference to the
14  Medicare reimbursement amount?
15   A.  No, I don't think so.
16   Q.  Okay.  Do providers -- do you know
17  whether or not providers insist on the
18  Medicare amount as a baseline amount?
19   A.  Again, going from feedback that I'm
20  getting when I'm in these meetings, I would
21  say that they usually would want -- in
22  general, it seems like that's kind of the

23 (Pages 86 to 89)

Joe Spahn                    Highly Confidential                    November 30, 2004
                                  Mason, OH

Page 90

1   baseline.
2        Q.  Okay.  And since that's the
3   baseline, is it fair to say that, as a
4   general proposition, providers are seeking
5   reimbursement at an amount greater than the
6   Medicare fee schedule?
7        A.  In general, yes.  But there's
8   another component, too, which is volume.
9   You have to -- you know, if Anthem is --
10  drives a lot of volume to that provider, you
11  know, they may be willing to -- because, you
12  know, what they're looking at is their total
13  reimbursement.  You got the -- how much
14  you're paying them for each procedure, but
15  also the number of procedures that they do.
16       So if Anthem has a large membership
17  in an area, they may be willing to take less
18  than the actual fees, but they make more
19  money because of the volume.
20       Q.  So the determination of the
21  reimbursement rate that will be paid to a
22  practice is very much an individualized

Page 91

1   issue focusing on that particular practice,
2   correct?
3        A.  Did you say an individual practice?
4        Q.  Let me clarify the question.
5        We've discussed how there are some
6   competitive factors that give one practice a
7   stronger bargaining practice than another,
8   right?
9        A.  Correct.
10       Q.  And what we just discussed is that
11  volume would also be a factor in determining
12  the reimbursement rates, how much volume
13  Anthem drives towards a particular physician
14  practice?
15       A.  Correct.
16       Q.  So it's fair to say that the
17  determination of the amount that Anthem will
18  reimburse a practice for drugs that are
19  administered in office turns on factors
20  specific to that practice, right?
21       A.  Correct.
22       Q.  Including its competitive bargaining

Page 92

1   power, the amount of volume that's driven to
2   it by Anthem?
3        A.  Correct.
4        Q.  Are there other factors that go into
5   that calculation?
6        A.  I think those are the main ones.
7        Q.  Okay.  Now, do you have an
8   understanding -- well, withdraw that.
9        You know that there are some drugs
10  that can be administered either in a
11  physician's office or in a hospital,
12  correct?
13       A.  I assume there are.  Again, I'm only
14  familiar with the physician side.
15       Q.  Okay.  Do you have an understanding
16  as to whether Anthem regards the
17  administration of drugs in physicians'
18  offices as being more or less cost-effective
19  than the administration of the same drug in
20  a hospital setting?
21       A.  I don't know.  I've never heard
22  anyone talk about that.

Page 93

1        Q.  Okay.  Are you aware of any analysis
2   at Anthem regarding the relative costs of
3   administration of a drug in a physician's
4   office versus a hospital setting?
5        A.  No, I haven't.
6        Q.  Now, you testified earlier that
7   Anthem has -- does not know exactly what
8   providers are paying to acquire drugs,
9   correct?
10       A.  Correct.
11       Q.  That's not something that --
12  withdraw that.
13       Anthem does not require providers to
14  disclose their acquisition costs for drugs
15  as part of their contracts with those
16  providers, correct?
17       A.  Correct.
18       Q.  So providers' acquisition costs for
19  drugs do not form part of Anthem's
20  determination of what it will reimburse them
21  in relation to drugs?
22       A.  Correct.

24 (Pages 90 to 93)

Joe Spahn                          Highly Confidential                    November 30, 2004
                                       Mason, OH

Page 94

1    Q.  The reimbursement is driven entirely
2  by the fee schedule?
3    A.  Correct.
4    Q.  Regardless of what the specific
5  provider's acquisition costs for those drugs
6  may be?
7    A.  Correct.
8    Q.  So if, for example, Anthem were to
9  learn that a particular provider were
10  getting a discount or a rebate on a
11  particular drug that lowered his acquisition
12  costs for that drug, that wouldn't change
13  the amount that Anthem is reimbursing that
14  practice in relation to that drug, right?
15    A.  No.
16    Q.  Because the reimbursement amount is
17  tied to the fee schedule?
18    A.  Right.
19    Q.  And if Anthem were to learn that
20  providers in a region were getting a
21  discount or rebate from a drug manufacturer
22  in relation to a particular drug, again,

Page 95

1  that wouldn't change the amount Anthem
2  reimburses because that's tied to the fee
3  schedule?
4    MR. THOMAS:  Asked and answered.
5    A.  Yes.  That's correct.
6    Q.  Do you know whether Anthem's
7  contracts with providers contain
8  confidentiality clauses?
9    A.  I don't know.
10    Q.  Do you know whether or not -- are
11  you aware of any free sample programs
12  whereby providers can get free samples of
13  drugs from manufacturers?
14    A.  No, I'm not aware.
15    Q.  That's not an area that you deal
16  with?
17    A.  No.
18    Q.  Are you familiar with the major drug
19  wholesalers operating the market today?
20    A.  No.
21    Q.  Do you have an understanding of what
22  wholesalers pay to acquire drugs?

Page 96

1    A.  No, I don't.
2    Q.  Are you familiar with prompt pay
3  discounts?
4    A.  No, I'm not.
5    Q.  You've never heard that term?
6    A.  No, I haven't.
7    Q.  To the best of your knowledge, do
8  you know of any instances where providers
9  have conspired with drug manufacturers to
10  inflate the average wholesale prices for
11  drugs?
12    A.  No.
13    Q.  Are you aware of any instances where
14  pharmacies or pharmacy benefits managers
15  have conspired with any drug manufacturers
16  to inflate any drug's average wholesale
17  prices?
18    A.  No.
19    MR. MATT:  Objection.  No
20  foundation.
21    MR. THOMAS:  I was just going to let
22  it go.

Page 97

1    Q.  Do you know whether Anthem has been
2  involved in any litigations pertaining to
3  average wholesale prices for drugs other
4  than this one here today?
5    A.  No.
6    MR. THOMAS:  Objection.  Foundation.
7    Q.  Do you know of any other litigations
8  that Anthem has been involved in relating to
9  reimbursements to providers for drugs
10  administered in office?
11    A.  No.
12    MR. THOMAS:  Same objection.
13    MR. MANGI:  Let's take another quick
14  break and then we'll look at some documents.
15    (Recess taken.)
16  BY MR. MANGI:
17    Q.  Prior to the break, we were talking
18  about providers' acquisition costs and the
19  fact they're not relevant to Anthem's
20  reimbursement amounts.  Do you recall that
21  testimony?
22    A.  Yes.

25 (Pages 94 to 97)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 98

1    Q.  Okay.  And part of that was that
2  Anthem has no information about what the
3  providers' acquisition costs are, right?
4    A.  Correct.
5    Q.  So it's fair to say that Anthem has
6  no particular expectation that providers'
7  costs would be, you know, 10 percent, 30
8  percent, 50 percent, something more,
9  something less than the amount they're
10  reimbursed in relation to those drugs,
11  right?
12      MR. THOMAS:  Object to form.
13    A.  Yes.
14    Q.  I'd like to just plug a couple of
15  gaps here.
16      Do you know how many states Anthem
17  operates in nationwide?
18    A.  Gosh.  I think it's nine.
19    Q.  Do you know how many regions that's
20  divided into?  One is the Midwest that we've
21  been discussing.
22    A.  You have Mideast, you have Midwest,

Page 99

1  you have West, and you have South,
2  Southeast.  I think Virginia's called the
3  Southeastern region.
4      MR. THOMAS:  It's just East.  It's
5  not Mideast.
6    A.  Did I say Mideast?  Sorry.  East,
7  West, Midwest and Southeast.
8    Q.  So a total of four regions?
9    A.  Four regions.
10    Q.  Do you have an understanding as to
11  whether or not Anthem reimburses providers
12  that are not part of its network if an
13  individual insured is treated by that
14  physician?
15    A.  I'm sorry.  Could you repeat that?
16    Q.  Sure.  You understand that Anthem
17  has contracts with providers, correct?
18    A.  Correct.
19    Q.  And you understand that Anthem's
20  insureds primarily are treated by those
21  providers?
22    A.  Correct.

Page 100

1    Q.  Now, if an Anthem insured visits a
2  doctor that is not part of Anthem's network
3  and is administered a drug by that doctor,
4  do you have an understanding as to whether
5  or not Anthem will reimburse that doctor in
6  relation to that drug?
7    A.  Do I have an understanding?
8    Q.  Right.
9    A.  Yes.
10    Q.  What are the terms of that
11  reimbursement?
12    A.  Well, we wouldn't.  If they're
13  non-par, we wouldn't reimburse.
14    Q.  I'm sorry?
15    A.  If they're not par,
16  non-participating, if they're noncontracted,
17  then we don't -- we wouldn't reimburse them.
18  We'd reimburse the members.
19    Q.  So in that instance, the individual
20  member would pay the physician's full bill
21  and then seek reimbursement from Anthem?
22      MR. THOMAS:  I'm going to object on

Page 101

1  foundation.  We're not talking about any
2  specific product here.  It may vary
3  depending upon product.
4    Q.  Sure.  Let's clarify that.
5      Do you have an understanding as to
6  whether reimbursement for
7  out-of-network-provider visits varies from
8  plan to plan or product to product?
9    A.  No.  It's the same.
10    Q.  Okay.  Now, in those instances, will
11  Anthem reimburse anyone in relation to that
12  office visit?
13    A.  We would repay our fee schedule
14  amount to the member.
15    Q.  So the responsibility for making
16  payments to the physician would rest
17  entirely on the member; is that correct?
18    A.  Correct.
19    Q.  And the member would then seek
20  reimbursement from Anthem?
21    A.  Correct.
22    Q.  And in that instance, when we're

Henderson Legal / Spherion
(202) 220-4158

Joe Spahn
Highly Confidential
Mason, OH
November 30, 2004

Page 102

1 talking about a drug that was administered
2 to the patient specifically, Anthem would
3 reimburse the individual by reference to its
4 fee schedule?
5    A. Correct.
6    Q. So from an individual insured's
7 perspective, is the only difference in
8 visiting an in-network physician versus an
9 out-of-network physician whether or not they
10 pay out of pocket and are reimbursed or
11 whether they only make a co-pay?
12    A. I don't know the benefits. Co-pays
13 and deduct amounts may be different. I
14 don't know.
15    Q. But in relation of reimbursement for
16 the drug, the amount Anthem pays is the
17 same, the only difference is who it pays it
18 to, correct?
19    A. Yes, that's correct.
20    Q. For an out-of-network visit, it will
21 pay the member; for an in-network visit, it
22 will pay the physician?

Page 103

1    A. Correct.
2    Q. Now, the current methodology, which
3 is percentage of the Medicare amount, does
4 Anthem currently have plans to change that
5 methodology?
6    A. I don't know, because that would be
7 at the next fee schedule meetings that would
8 be discussed. I'm not aware of any plans to
9 change it.
10    Q. How often are fee schedule meetings
11 held?
12    A. Annually.
13    Q. Who attends the fee schedule
14 meetings?
15    A. In the Midwest, there are four
16 health service areas, which we talked about
17 before, northern Ohio, southern Ohio,
18 Kentucky, Indiana. Each one of those four
19 has a team, a reimbursement team. So that's
20 the group that meets.
21    Q. Are you part of the reimbursement
22 team?

Page 104

1    A. Yes.
2    Q. For which region, or for all of
3 them?
4    A. Actually, for all of them.
5    Q. And what sorts of issues are
6 discussed at these annual meetings?
7    A. In general, we look at our current
8 schedule, and then decide if we need to make
9 any changes to it, either increases or
10 decreases.
11    Q. Okay. Have there been both
12 increases and decreases made over time?
13    A. Yes.
14             -=0=-
15       (Exhibit Spahn 001 marked.)
16             -=0=-
17    Q. Let's turn now to a document that's
18 been marked as Exhibit Spahn 001. Could you
19 take a moment to review that, and let me
20 know when you're done, please. I realize
21 it's lengthy.
22       MR. THOMAS: Please look at each

Page 105

1 page before you tell him you're ready.
2    Q. Okay?
3    A. Yes.
4    Q. Now, the sender of this e-mail is
5 Amber Hoevener; is that correct?
6    A. Yes, I believe so.
7    Q. Am I pronouncing her name correctly?
8    A. I think so.
9    Q. Do you know who Mrs. Hoevener is?
10    A. I know she works for Paul Beckman.
11    Q. And could you remind me who
12 Mr. Beckman is?
13    A. He's vice president of the southern
14 Ohio health service area.
15    Q. You're one with of the recipients of
16 this e-mail, correct?
17    A. Yes.
18    Q. And the subject is 5/30/4 PDRT
19 Meeting Minutes?
20    A. Yes.
21    Q. What does PDRT mean to you?
22    A. I believe that's professional drug

27 (Pages 102 to 105)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 106

1 reimbursement team.
2    Q.  Are these the same meetings that we
3 were just speaking about before looking at
4 this document?
5    A.  No.
6    Q.  What are these professional drug
7 reimbursement teams?
8    A.  I may not be the best person to ask
9 this.  Paul actually heads up the team.
10    MR. THOMAS:  To the extent you know,
11 you can answer.  If you don't know, you can
12 tell him you don't know.
13    A.  Quite frankly, I'm a little confused
14 as to what goes here.  It seems like they're
15 talking about what they refer to as
16 specialty drugs, and I frankly am not clear
17 as to what is meant by specialty drugs.
18    Q.  Are you part of the professional
19 drug reimbursement team?
20    A.  I don't know formally if I am or
21 not.  I'm often invited or copied on stuff
22 because I work with the fee schedules.

Page 107

1    Q.  Okay.  Do you have a recollection of
2 this e-mail, of receiving this e-mail?
3    A.  Boy, I don't -- this was back in,
4 what, May.  I did not remember until I saw
5 it here.
6    Q.  Okay.
7    MR. MANGI:  Can I ask counsel to
8 clarify whether the redaction is for
9 privilege or for some other reason?
10    MR. THOMAS:  You can ask, but I
11 won't be able to respond.  That was done by
12 counsel in Virginia.  I responded with all
13 the documents and forwarded them to
14 Virginia.
15    Q.  I'd like you to turn to the
16 horizontally-oriented page.  Under
17 Recommendations/Actions, the first entry is,
18 "Develop a Midwest chemotherapy admin fee
19 recommendation and time line."
20    And you're responsible as one of the
21 persons for follow-up.  Do you see that?
22    A.  Yes.

Page 108

1    Q.  Do you recall what this project
2 involved?
3    A.  In simple terms, it was if we change
4 our -- if we change our drug fee
5 reimbursement, what we want to do with our
6 chemotherapy administration fee
7 reimbursement.
8    Q.  So the discussion was that if -- by
9 drug fee reimbursement, you mean
10 administration fees associated with the
11 administration, injection of drugs in
12 physicians' offices?
13    A.  Well, drug fees, I mean the fee for
14 the drug itself.
15    Q.  Okay.  So the discussion here was
16 what to do with the fee schedule in relation
17 to administration expenses if the amount in
18 relation to drugs were changed?
19    A.  Correct.
20    Q.  Okay.  What was the background to
21 this in terms of changing the drug component
22 of the fee schedule?

Page 109

1    A.  Because we were aware that Medicare
2 was going to ASP plus 6, which seemed to be
3 a reduction.  So if we stayed with our
4 current 100 percent of Medicare, that means
5 our drug fees were going to go down.  So the
6 question was, if that happens, do we want to
7 do anything at all with our administration
8 fees.  Example, would we want to leave them
9 the same, or do we want to maybe increase
10 them to offset part of the decrease in the
11 drug fee.
12    Q.  So Anthem recognizes that the
13 administration fees and the reimbursement
14 for the drug are two related components that
15 go together to make up the physician
16 reimbursement, correct?
17    A.  Correct.
18    Q.  And if the amount reimbursed for the
19 drug were to fall, Anthem could raise the
20 amount reimbursed for administration and
21 arrive at a roughly parallel number?
22    A.  Correct.

28 (Pages 106 to 109)

Joe Spahn                         Highly Confidential                    November 30, 2004
                                     Mason, OH

Page 110

1    Q. And indeed, similarly, taking the
2  vice versa angle, if administration fees for
3  drugs were somehow insufficient to cover
4  providers' expenses, a higher reimbursement
5  in relation to the drug could act as a
6  subsidy?
7    MR. MATT: Object to the form.
8    A. Yes. That's correct.
9    Q. Now, the discussion here related
10 only to the Medicare change to an ASP basis,
11 then; is that correct?
12    Let me rephrase the question more
13 clearly. Were there any changes to the
14 amount of reimbursement in relation to drugs
15 that were under discussion here other than
16 the fact that Medicare was moving to an ASP
17 plus six system?
18    A. Well, I don't remember exactly, but
19 from my point, my involvement was, you know,
20 if Anthem decides to change their drug fees
21 for whatever reason -- and the big drive at
22 that point was, since we peg it to Medicare,

Page 111

1  if Medicare goes down, our drug fees go
2  down, the total reimbursement to, say, like
3  oncologists who are big users of drugs, is
4  going to be affected.
5     So is that okay or do we need to
6  possibly increase the administration fees to
7  offset part of the total reduction
8  reimbursement that the oncologists would
9  see.
10    And the other part was time line.
11 Do you want to do it at the same time? Do
12 you want to maybe -- if the drug fees would
13 be reduced, do you want to do something --
14 either increase or leave the same your
15 administration fees at the same time, or do
16 it at a different time.
17    Q. Is there a reason why the discussion
18 here focused on chemotherapy administration
19 fees as opposed to physician administration
20 fees generally?
21    A. Well, in my mind, it's almost the
22 same. It's almost the same thing. The only

Page 112

1  real administration fees you have for drugs
2  are the chemo administration fees. There
3  are some administration fees for injections,
4  but that's really a small piece. This is
5  the -- this is by far the biggest piece of
6  reimbursement, the chemo administration
7  fees.
8    Q. Are you aware of the fact that there
9  are non-chemo drugs that are administered in
10 physicians' offices?
11    A. Yes.
12    Q. And you're aware that some of those
13 are infusion drugs?
14    A. Yes.
15    Q. So is the reason that this project
16 was focused on chemotherapy simply because
17 that's a large component of the
18 physician-administered drug market, or were
19 there other reasons also?
20    A. Well, this might be a slight
21 misnomer here. They're saying chemotherapy
22 administration fee. It's any drug that's

Page 113

1  infused, whether it's technically considered
2  chemo or not. They can still bill this
3  administration fee.
4    Q. So the intention here was to refer
5  to all the admin fees and not just admin
6  fees for chemo drugs?
7    A. Yes, that's correct.
8    Q. Okay. Did you indeed carry out this
9  project?
10    A. Carry it out, meaning that the
11 recommendation was made?
12    Q. Right.
13    A. Well, the final decision is always
14 going to be made by those four reimbursement
15 teams.
16    Q. Right. At the annual meeting?
17    A. At the annual meetings. And those
18 are four separate meetings. It's not like
19 one big meeting.
20    Q. I see. So the teams from the
21 different regions don't get together for one
22 comprehensive meeting --

                                    29 (Pages 110 to 113)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 114

1  A. No.
2  Q. -- but each has its own meeting?
3  A. Correct.
4  Q. Did you develop a Midwest
5  recommendation?
6  A. Well, yes. I mean, the
7  recommendation was that at any time the drug
8  fees -- if the drug fees were to be
9  reduced -- I'm trying to say this. If any
10 HSA decided to reduce the drug fees, that
11 they should make an adjustment to the
12 chemo -- to the administration fees at the
13 same time.
14 Q. What is an HSA?
15 A. Health service area.
16 Q. So that's a region, one of the
17 Anthem regions that you discussed earlier?
18 A. Correct. Well, it's not a region.
19 It's within the Midwest -- the Midwest is a
20 region with Anthem. Within the Midwest,
21 there are four health service areas,
22 northern Ohio, southern Ohio, Kentucky, and

Page 115

1  Indiana.
2  Q. Okay. So the recommendation that
3  you made was that if they were to lower, or
4  if the amounts that they reimbursed in
5  relation to drugs were to fall, then they
6  would need to correspondingly increase the
7  administration fee?
8  A. Correct.
9  Q. Has that recommendation been
10 accepted at these annual meetings yet?
11 A. Yes.
12 Q. When did those annual meetings take
13 place?
14 A. Again, it varies by the HSAs.
15 Usually -- it's not just one meeting. It's
16 usually a series of meetings. But they
17 usually start around mid-summer, like June
18 or July. Then there will be several
19 follow-up meetings.
20     Any time you're going to make a
21 change to your fee schedule, you have to
22 give physicians a 45-day notice. The

Page 116

1  contract says you have to give 45-day
2  notice. So you always are working back from
3  your time line.
4      So, in other words, if you want to
5  change your fee schedule January 1st, you
6  need to have decisions made by November, so
7  you have adequate time to give notice.
8  Q. Has a time line been developed now
9  for the implementation of that
10 recommendation?
11 A. Well, again, everyone's done
12 something slightly different. But, yes, the
13 answer's yes.
14 Q. Now, looking at the second -- the
15 box beneath the one we've been looking at
16 underneath the recommendations and actions
17 column. The next entry there is, "Provide
18 additional analysis regarding the provider's
19 profit margin for chemotherapy drugs that
20 have gone generic."
21     Now, do you have an understanding as
22 to what the background was for this

Page 117

1  particular project?
2  A. No, I don't.
3  Q. Is that something that you were not
4  involved in?
5  A. No, I was not involved in this.
6  Q. We can agree that it does appear
7  that there are others at Anthem that are
8  analyzing providers' profit margins?
9      MR. THOMAS: I'm going to object to
10 foundation and object to form. I don't
11 think you can glean that from that
12 statement.
13     MR. MANGI: Okay.
14 Q. Would you agree with me on that?
15 A. No. I mean, I have to say, I don't
16 know. No one's ever talked to me about it.
17 Q. Who is Beth McCarty?
18 A. She's an Anthem employee. She's a
19 pharmacist based in Indiana.
20 Q. How about Bob Lenza?
21 A. He's also a pharmacist. He's, I
22 think, in New Hampshire.

30 (Pages 114 to 117)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 118

1    Q.  Would you turn to the next page,
2  please.  Under the discussion column, four
3  lines from the bottom -- from the top in the
4  first paragraph.  The sentence, "Additional
5  data has been requested to determine
6  provider's profit margin based on the drugs
7  gone generic."
8        Do you see that?
9    A.  Yes.
10    Q.  Do you have any of idea what that's
11  referring to, what data?
12    A.  No, I don't.
13    Q.  Would Ms. McCarty and Mr. Lenza know
14  that?
15    A.  I don't know.
16    Q.  If you could turn -- do you see at
17  the bottom of the page there are numbers --
18  A-OH and then a number after it?
19    A.  Okay.
20    Q.  Turn a couple pages and get to the
21  page with the number ending 586.  Do you got
22  that?

Page 119

1    A.  Okay.
2    Q.  Do you see the entry, "Enterprise
3  Wide Specialty Rx Strategy Meeting"?
4    A.  Yes.
5    Q.  Could you review the entry there
6  under the discussion column, please.
7    A.  All right.
8    Q.  Now, the second sentence there says,
9  "The team agreed Anthem needs to get to NDC
10  Pricing."
11        Do you see that?
12    A.  Yes.
13    Q.  Do you have an understanding as to
14  what the discussion was here and why the
15  team felt they need to get to NDC pricing?
16    A.  I'm not sure I'm the best one to
17  answer that.
18    Q.  Okay.  Do you know the answer to the
19  question?
20    A.  It would be somewhat of an
21  assumption on my part, if that's all right.
22        MR. THOMAS:  Well, it's qualified

Page 120

1  adequately.
2    Q.  Okay.  Go ahead.
3    A.  The NDC number gets right to the
4  actual -- the drug, the actual manufacturer.
5  It's much more specific than the J code.  It
6  even gets right down to the dose.  Sometimes
7  those J codes, the dose is even confusing.
8  So I think the idea there was that if you
9  wanted to get down to pricing the drug --
10  the actual individual drug per the right
11  dose, per the right manufacturer, you had to
12  get to the NDC level.
13    Q.  Further down, four or five lines
14  down, sentence starting with, "The team
15  would also like to set a common reference
16  pricing for the Anthem regions to follow."
17    A.  Okay.
18    Q.  Do you see that?
19    A.  Yes.
20    Q.  It says, "Each region will be
21  identifying their first and second
22  choice..."

Page 121

1        Were you involved in discussions
2  about this issue?
3    A.  No.
4    Q.  Going to the next paragraph, it
5  says, "The PDRT discussed the various
6  options and agreed that following Medicare
7  was the first choice, recognizing that it
8  has Pros and Cons and AWP was the second
9  choice.  Medicare offers more data and is
10  market friendly..."
11        Do you know what's meant by that,
12  "more data and market friendly"?
13    A.  I don't know what they mean by more
14  data.  Market friendly, my assumption is
15  that they mean if physicians are used to
16  where it's published.  Anybody can go out to
17  Medicare's web site and download their drug
18  fee schedule.
19    Q.  Then it continues, "However, it
20  restricts Anthem's flexibility."
21        What do you understand by that?
22    A.  Again, I'm pretty sure what they're

Henderson Legal / Spherion
(202) 220-4158

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 122

1 going back to is the fact it goes by J code.
2 One J code could have multiple NDC numbers
3 under it. So what could happen is, you
4 know, the fee for that J code is set -- I
5 could give an example -- $100. But you
6 might have a brand name drug that's under
7 there. And if the physician uses the brand
8 name, but he still gets to bill that J code
9 because our system doesn't accept NDC codes,
10 well, he's going to get paid a blended rate
11 of brand and generic. He's not going to get
12 paid specifically for the brand.
13       So, once again, if you can get to
14 the NDC number, you can pay him or her for
15 exactly the exact drug they get. So if they
16 gave a brand, you can pay for a brand, as
17 opposed to paying for like a blend of brand
18 and generics.
19    Q. Then it continues, "Per Bob Lenza.
20 AWP is the easiest way to get to the NDC
21 level."
22       So moving to a reimbursement system

Page 123

1 based on AWP rather than Medicare would
2 provide the advantage of getting directly to
3 that issue?
4       MR. THOMAS: Foundation objection.
5 That's what that says. You're going to ask
6 him.
7    Q. Yeah. Do you agree with that
8 statement? Do you agree with Mr. Lenza?
9    A. You cannot get to -- you can't get
10 to the NDC level through Medicare's current
11 schedule because it goes by J code. So,
12 yes, I would agree.
13    Q. Then it continues, "Additional
14 feedback will be received at the Midwest fee
15 schedule meeting on May 11."
16       Do you recall that meeting? Did you
17 attend that meeting?
18    A. I don't recall.
19    Q. Is this the annual meeting we were
20 discussing earlier?
21    A. I don't think so.
22    Q. Do the annual meetings go by a

Page 124

1 particular name?
2    A. There's not a formal name, no. I
3 would just say there's the northern Ohio
4 meeting, the southern Ohio meeting, the
5 Kentucky meeting, the Indiana meeting.
6    Q. Do you recall any further discussion
7 on this topic at any meetings?
8    A. Just in a general way. I know it
9 continues to be talked about, is there some
10 way we pay drugs by the NDC code instead of
11 by J codes.
12    Q. And is that discussion in relation
13 to all drugs administered in physicians'
14 offices?
15    A. Yes.
16    Q. Why is Anthem interested in getting
17 to that NDC level? To put it another way,
18 what's the advantage to Anthem of getting to
19 that NDC level?
20       MR. THOMAS: Asked and answered, I
21 believe. Go ahead.
22    A. Well, again, it solves the problem

Page 125

1 of paying for the exact drug, manufacture
2 and dose that the provider gave. Again, to
3 go back to that J code example, sometimes
4 the provider will complain, but I gave a
5 brand, and this rate you paid me is for like
6 a blend, brand and generic. And we say, but
7 what can we do. We pay by code. We pay by
8 HCPCS code or J code today. If we went to
9 NDC number, then we could pay them for the
10 brand.
11    Q. So the advantage to the provider
12 would be that they'd be paid a higher
13 reimbursement for a branded drug that's in
14 the same J code as generic drugs, correct?
15    A. Well, the advantage is that they'd
16 be paid for the exact drug that they gave.
17    Q. But the reason why it's an issue for
18 providers is because there are instances
19 where there's a branded drug and generic
20 drugs in the same J code and so the
21 provider's being paid a blended rate that
22 will be lower than the AWP for the branded

32 (Pages 122 to 125)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 126
1  drug, right?
2      A.  Yes, that's correct.
3      Q.  So it's a problem for the provider
4  because they're being paid less under the
5  current system than they would under an AWP
6  reimbursement system?  That's the basis for
7  their complaints, right?
8          MR. MATT:  Objection.
9          MR. THOMAS:  I also object.  I think
10 you changed gears on him.  Go ahead.
11     Q.  Do you understand the question?
12     A.  I'm sorry.  No.  Can you say it
13 again, please?
14     Q.  Sure.  The reason why the current
15 system is unsatisfactory in some instances
16 to providers is because they're being
17 reimbursed at a lower amount for a branded
18 drug when it's in the same J code as generic
19 competitors than they would if reimbursement
20 was paid directly to that drug's AWP,
21 correct?
22     A.  Well, I would say if it was pegged

Page 127
1  to that drug's NDC number.
2      Q.  And the advantage of pegging it to
3  that drug's NDC number is that it would
4  enable reimbursement to be tied to the AWP
5  for that NDC, correct?
6      A.  Well, we may not necessarily tie it
7  to the AWP.  We may have a fee out there for
8  that NDC number.  It may not be AWP.
9      Q.  So reimbursement would be tied to a
10 particular branded drug rather than a
11 blended rate of that drug and other
12 generics?
13     A.  Correct.
14     Q.  Would it be a fair statement that
15 reimbursement for a specific branded drug
16 would generally be higher than the current
17 reimbursement which is for that branded drug
18 and generic competitors?
19     A.  Yes.
20     Q.  So, generally speaking, the concern
21 here that a provider is addressing to Anthem
22 is that under the current system they're

Page 128
1  being paid less than they think they should
2  for that branded drug?
3      A.  Yes.
4      Q.  And the advantage to Anthem of
5  moving to an NDC-based system is that it
6  would enable reimbursement to be tied to
7  that particular drug and thereby alleviate
8  those providers' concerns?
9      A.  Correct.
10     Q.  So that would be an advantage that
11 Anthem recognizes even though it would
12 generally be paying more in relation to
13 those particular branded drugs?
14     A.  Yes.
15     Q.  So Anthem sees that as an example of
16 an advantage that would be associated
17 between reimbursing for a particular drug,
18 be it by reference for AWP or some other
19 pricing point for that particular drug, even
20 though it would be paying more?
21         MR. THOMAS:  I'm going to object to
22 the form.  I'm going to object to the form.

Page 129
1      Q.  Do you understand the question?
2      A.  I guess.  Can you say it again,
3  please.
4          MR. MANGI:  Sure.  Would you mind
5  reading it back, please.
6          (Record read as requested.)
7      A.  I'm sorry.  Can you do it one more
8  time?
9          MR. THOMAS:  Do you need him to
10 rephrase it?
11         THE WITNESS:  Let's just read it one
12 more time.
13         (Record read as requested.)
14         MR. THOMAS:  Same objection.
15     A.  Yes.
16 BY MR. MANGI:
17     Q.  Let's turn to another document,
18 please.  We can mark this as Exhibit Spahn
19 002.
20             -=0=-
21         (Exhibit Spahn 002 marked.)
22             -=0=-

Page 130

1     Q.  Could you please review that and let
2  me know when you're done.
3     A.  All right.
4     Q.  Now, the cover page is an agenda
5  that relates to another professional drug
6  reimbursement team meeting, right?
7     A.  Yes.
8     Q.  And you're one of the attendees at
9  this meeting?
10    A.  Yes.
11    Q.  The first agenda item is
12  Procrit/Aranesp update.  Do you recall what
13  the particular issue was here relating to
14  Procrit/Aranesp?
15    A.  No, I don't.
16    Q.  Okay.  Let's turn to the page with
17  the Bates number, which is the number on the
18  bottom right, 48.  Now, this is an e-mail
19  you sent to Dave Prugh, correct?
20    A.  Yes.
21    Q.  Would you remind me what Mr. Prugh's
22  title was?

Page 131

1     A.  He's an executive director.  I don't
2  know his formal title.
3     Q.  He's an executive director in the
4  provider reimbursement area?
5     A.  In health care management.
6     Q.  Which is the department that you're
7  part of?
8     A.  Yes.
9     Q.  Now, you start this e-mail saying,
10  "Recommended drug pricing formula is WAC
11  plus five percent with a cap."
12        What is the amount of the cap?
13        Now, what is this recommended drug
14  pricing formula that you're referring to?
15    A.  These are new drugs, so the drug
16  wouldn't have a J code.  So it's really not
17  paid on the fee schedule.  They're paid on
18  individual consideration basis.  The
19  question was how the -- what do you pay for
20  these things when they're not paid on the
21  fee schedule.
22    Q.  So what has the -- well, when a new

Page 132

1  drug is introduced and doesn't have a J
2  code, it has a miscellaneous code, correct?
3     A.  I think it says, like, unclassified
4  drug.
5     Q.  What was the reimbursement
6  methodology applied to such drugs prior to
7  2003, which is when this discussion was
8  taking place?
9     A.  I don't know.
10    Q.  What was the methodology used in
11  2003 at the time this discussion was taking
12  place?
13    A.  Again, I don't know, because,
14  remember, these are not paid through the fee
15  schedule, so I wasn't involved.  So I don't
16  know.
17    Q.  Do you know how Anthem currently
18  reimburses for new drugs that don't have the
19  J code?
20    A.  Yes.  We're doing the WAC plus five.
21    Q.  So what you do know is that in 2003,
22  Anthem was assessing what it should

Page 133

1  prospectively reimburse for new drugs that
2  don't have a J code, right?
3     A.  Correct.
4     Q.  Were you in charge of that analysis?
5     A.  In charge of it?  I think I worked
6  up some of the -- I think I worked up some
7  of the figures.
8     Q.  Okay.  And the eventual
9  recommendation for these drugs was WAC plus
10  five percent with a cap, right?
11    A.  Yes.
12    Q.  And that has since been implemented?
13    A.  Not exactly.  The WAC plus five has.
14    Q.  Okay.
15    A.  They're not doing the cap.
16    Q.  Okay.  How did Anthem arrive at the
17  WAC plus five percent formula?
18    A.  I don't know for sure.  You know,
19  really, I don't know.
20    Q.  Okay.  Do you know why Anthem
21  decided to use a WAC plus formula rather
22  than an AWP minus formula or something else?

34 (Pages 130 to 133)

Joe Spahn                          Highly Confidential                          November 30, 2004
                                      Mason, OH

Page 134

1     A.  No.  Because I think it's basically
2  the same thing.
3     Q.  And you say that because you can
4  start with WAC and add a percentage or start
5  with AWP and minus a percentage and get to
6  whatever number you want?
7     A.  Right.
8     Q.  What was the discussion in relation
9  to having the cap?
10     A.  I don't recall.  It had something to
11  do with they thought -- gosh.  I don't
12  remember.
13     Q.  Okay.  In fact, if we go down to the
14  third paragraph, I think that answers one of
15  the questions I had earlier.  "Current drug
16  fees are equal to WAC plus $9.10."
17        And above that we have a handwritten
18  plus 25 percent.
19        Do you see that?
20     A.  Yes.
21     Q.  Is that your handwriting, "plus 25
22  percent"?

Page 135

1     A.  Yes.
2     Q.  Do you understand that the formula
3  prior to the date of this e-mail in relation
4  to new drugs that did not have a J code to
5  be WAC plus 25 percent?
6     A.  No.
7     Q.  Okay.  So what is your understanding
8  as to what that 25 percent there indicates?
9     A.  Well, I think it means this $9.10
10  must be 25 percent above WAC.
11     Q.  Okay.  So that's a calculation in
12  relation to a specific drug?
13     A.  I don't remember, because it doesn't
14  really say.
15     Q.  Well, you continue, "The markup
16  varies greatly by individual drug."
17        Do you see that?
18     A.  Yes.
19     Q.  Now, were you referring to the
20  variation as being in dollar amounts,
21  because the WAC was different, so a
22  percentage of WAC would be different, or

Page 136

1  were you referring to the percentage markup
2  being different?
3     A.  I don't remember.
4     Q.  You continue there, "The range is
5  from a low of $2.67 for Procrit to a high of
6  $128.75 for Lupron Depot."
7        Do you see that?
8     A.  Yes.
9     Q.  Do you know why you used Procrit and
10  Lupron Depot?
11     A.  No.
12     Q.  Is it because Procrit was a low
13  price drug that would be a good example for
14  the lowest costs to Anthem for
15  reimbursement?
16     A.  I don't know.
17     Q.  You continue then, "The break-even
18  point for WAC plus five percent is WAC plus
19  five percent, with a cap of $20."
20        What do you mean by that?
21     A.  I just -- I don't remember.
22     Q.  Okay.  Does reading the rest of that

Page 137

1  paragraph refresh your recollection of what
2  you meant by that, or any of the examples
3  that follow?
4     A.  No.  I don't remember this.
5     Q.  So you have no understanding of what
6  you meant there?
7        MR. THOMAS:  I understand.  Took me
8  a while.
9     A.  I don't know.  I don't remember.  I
10  don't even remember doing this.
11     Q.  Okay.  Just for the record, my
12  question was, do you have an understanding
13  as to what you were referring to here, what
14  you meant by the break-even point in this
15  paragraph?
16     A.  Well, I guess just what it says,
17  that if you capped it at $20, it would be
18  the same thing as WAC plus five.
19     Q.  In relation to these particular
20  drugs?
21     A.  I don't -- I don't remember.
22     Q.  Okay.

Joe Spahn                          Highly Confidential                          November 30, 2004
                                   Mason, OH

Page 138

1              -=0=-
2        (Exhibit Spahn 003 marked.)
3              -=0=-
4        Q.  Let's turn now to this document
5    that's been marked as Exhibit Spahn 003.
6    Please review that and let me know when
7    you're done.
8            Ready?
9        A.  Yes.
10       Q.  Now, this is another professional
11   drug reimbursement team meeting minutes,
12   right?
13       A.  Yes.
14       Q.  It's from November of '03, and
15   you're one of the attendees, correct?
16       A.  Yes.
17       Q.  Under the agenda item
18   Procrit/Aranesp pricing recommendation, do
19   you see an entry for, "The WAC plus ten
20   percent recommendation was shared with all
21   HSAs"?
22           Do you see that?

Page 139

1        A.  Yes.
2        Q.  Do you have an understanding as to
3    why a particular pricing recommendation was
4    being made in relation to Procrit and
5    Aranesp?
6        A.  No.
7        Q.  Is it your understanding that a
8    particular reimbursement formula was being
9    recommended in reference to these two drugs?
10       A.  I'm sorry?  Can you say that again?
11       Q.  Sure.  Is it your understanding,
12   based on what's in the discussion column
13   here, that a particular reimbursement
14   methodology, that's WAC plus ten percent,
15   was being recommended in relation to these
16   two drugs, Procrit and Aranesp?
17       A.  Yes.
18       Q.  Was that suggestion/recommendation
19   implemented?
20       A.  I believe it was.  I'd have to
21   check.  I don't know for sure, but I think
22   so.

Page 140

1        Q.  Is WAC plus ten percent a
2    reimbursement methodology that's currently
3    applied to any drugs other than Procrit and
4    Aranesp?
5        A.  Not that I'm aware of.
6        Q.  Is there any information as to why
7    these drugs are being given this particular
8    treatment?
9        A.  My recollection, best I can recall,
10   is that they wanted -- that they wanted the
11   drugs priced the same.  They wanted the same
12   fee for both.  But I can't remember --
13   something like the dosing is different, so
14   you had to be careful how you priced.
15   Somehow they wanted them priced the same.
16       Q.  Okay.  So you recall that Anthem did
17   want to have the same reimbursement terms or
18   to be paying the same amount in
19   reimbursement for these two drugs?
20       A.  That's my understanding, yes.
21       Q.  And so Anthem decided to recommend a
22   new methodology for these drugs to its HSAs,

Page 141

1    and they, with the exception of Indiana,
2    implemented it?
3        A.  Yes.
4        Q.  Do you know why Indiana was an
5    exception?
6        A.  No, I don't.
7        Q.  Just as Anthem created this special
8    treatment for these two drugs, is it fair to
9    say that Anthem could adjust the
10   reimbursement rates for any of its drugs at
11   any time that it so chose, subject, of
12   course, to existing contracts?
13           MR. MATT:  Objection.  Foundation.
14       A.  Yes.
15       Q.  So, indeed, at any point, Anthem
16   could have or can decide that it will
17   reimburse for a particular drug by reference
18   to WAC-based benchmark here or an AWP-based
19   price or any other methodology that it so
20   chooses, right?
21       A.  Yes.  But when you change the fee,
22   remember, you have to give notice before you

36 (Pages 138 to 141)

Joe Spahn                          Highly Confidential                    November 30, 2004
                                      Mason, OH

Page 142

1   do that.
2      Q.  Right.  Subject to contractual
3   requirements and notice requirements.
4      A.  Right.
5      Q.  So subject to those qualifications,
6   my statement is correct?
7      A.  Yes.
8      Q.  Now, could you turn to the next
9   page, please.  It's Bates number ending 616.
10  And there's an entry for Drug Loading
11  Issues.
12     A.  Yes.
13     Q.  Could you review the discussion
14  column, please.  Let me know when you're
15  done.
16     A.  Okay.
17     Q.  Now, it begins, "Joe Spahn raised
18  some concerns regarding the rate loading of
19  drugs that are billed with the NOC code."
20        What is an NOC code?
21     A.  Not otherwise classified code.
22     Q.  Are these the new drugs that we were

Page 143

1   discussing earlier?
2      A.  They're drugs -- not necessarily new
3   drugs.  The drugs that don't have a specific
4   J code.
5      Q.  Okay.  And what was the concern that
6   you were flagging here?
7      A.  Well, in reading that, I don't know
8   if someone called this to my attention, but
9   apparently, it came to my attention that
10  there are people who price out the NOC
11  codes, and we should have been following a
12  formula of the WAC-plus strategy.  But we
13  also have med review nurses.  And I don't
14  recall, but someone must have brought it to
15  my attention that they were using AWP.
16        The concern was that we were
17  inconsistent in how we were paying these
18  depending on who was pricing them out, what
19  department was pricing them out.
20     Q.  The medical review nurses are Anthem
21  employees?
22     A.  Yes.

Page 144

1      Q.  What is their function?
2      A.  I don't even know if I know for sure
3   what their function is.  Med review, I guess
4   they review medical --
5      MR. THOMAS:  Don't guess.
6      Q.  Let me focus the question for you.
7   What is their role in relation to
8   reimbursement for drugs?
9      A.  Really, I'd almost say they're not
10  involved in the fee schedules.  And I really
11  don't deal with the medical review area.
12  Okay.
13        I mean, I'm going to -- I don't know
14  if you want me to speculate or just say I
15  don't know.
16      MR. THOMAS:  That depends on what
17  the answer is, Joe.  Answer him truthfully.
18  If you don't know, tell him you don't know.
19  If you do know, tell him what you know.  If
20  not, I'm going to tell you not to speculate.
21     A.  Well, I don't know.
22     Q.  Okay.  Well, let me ask you this:

Page 145

1   Prior to this time, had the WAC plus five
2   percent formula that we saw referenced in an
3   earlier exhibit been implemented for drugs
4   that do not have J codes?
5      A.  I believe so.
6      Q.  Okay.  So the concern here was that
7   there was that new methodology was not being
8   consistently applied; is that accurate?
9      A.  Yes.
10     Q.  That's because these medical review
11  nurses were somehow indicating reimbursement
12  would be at an AWP-based percentage?
13     A.  Correct.
14     Q.  You then identified three
15  recommendations.  Do you know which, if any,
16  of those were implemented?
17     A.  No, I don't know.
18     Q.  The third of those arrow points is,
19  "Educate the Medical Review nurses on the
20  revised process which includes reviewing the
21  list of new drugs to determine if WAC plus
22  percent pricing has been applied, if not

37 (Pages 142 to 145)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 146

1  then apply AWP."
2      What's this list that's under
3  discussion here?
4      A.  We have out in Lotus Notes
5  database -- they developed a list of all the
6  drugs that do not have a specific J code and
7  the fee next to it so they can easily
8  reference it without having to look it up
9  every time.
10     Q.  What I'm trying to understand is, if
11  the methodology that was applied was that
12  all drugs that do not have a specific J code
13  will be reimbursed as a WAC plus five
14  percent formula, then what's left?  What
15  would be -- in what cases would AWP be
16  applied, as per this paragraph?
17     A.  Well, as I recall, I think the only
18  drugs that are getting the WAC plus five --
19  I think it first has to be approved by this
20  professional drug reimbursement team.  So if
21  it didn't go through this team, it wouldn't
22  be out on that database.  So they might get

Page 147

1  a claim in with a drug that's not on the fee
2  schedule, it's not on the database.
3      Q.  So was the idea that this was
4  intended to be an across-the-board strategy,
5  but the database took a while to update to
6  make sure that the strategy was applied to
7  all drugs?
8      A.  Yes.
9      Q.  So in instances where the database
10  had not yet been updated, what methodology
11  was being applied for drugs that did not
12  have a J code?
13     A.  Again, I don't know.  I just think
14  it would be an inconsistent.
15     Q.  Was it an AWP-based methodology, per
16  the terms of this paragraph?
17     A.  Well, it would seem like, but I'm
18  not involved with the med review or any
19  pricing of these NOC codes.
20     Q.  So you don't know what percentage
21  off AWP it would have been?
22     A.  No, I don't.

Page 148

1                  -=0=-
2          (Exhibit Spahn 004 marked.)
3                  -=0=-
4      Q.  Let's turn to another document,
5  Exhibit Spahn 004.  Have a look at that,
6  and let me know when you're done, please.
7      A.  Okay.
8      Q.  Who is Ms. Alena --
9          MR. THOMAS:  Baquet-Simpson.
10         MR. MANGI:  Thank you.
11         MR. THOMAS:  No problem.
12     A.  She's the medical director for
13  northern Ohio.
14     Q.  Okay.  Do you understand this to be
15  a standard form letter?
16     A.  It's not a -- I don't know if I'd
17  use the term "standard letter."  But this is
18  the notification -- this is that 45-day
19  notification we talked about.
20     Q.  Okay.  Now, this refers to an update
21  to the fee schedule, and particularly
22  changes that are being made as of December

Page 149

1  1st, day after tomorrow, right?
2      A.  Right.
3      Q.  Do you know whether this letter was
4  actually sent out to providers?
5      A.  Why -- well, I didn't send it, so --
6  I would assume it was.
7      Q.  The first bullet point refers to,
8  "The chemotherapy administrative fees will
9  see a dramatic increase."
10         Do you see that?
11     A.  Yes.
12     Q.  Now, was that increase limited to
13  chemotherapy drugs, or is this a similar
14  misnomer like we discussed earlier, where
15  the intention is to refer to all drugs
16  administered in physicians' offices?
17     A.  All drugs.
18     Q.  So the intention here was to refer
19  to all drugs administered in physicians'
20  offices and to reference the fact that the
21  administration fees are being increased?
22     A.  That's correct.

38 (Pages 146 to 149)

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 150

1    Q.  What's the basis for the increase in
2  administration fees starting on December
3  1st, 2004?
4    A.  Can you define what you mean by
5  "basis"?
6    Q.  Why the admin fees being increased
7  as of the day after tomorrow?
8    A.  Because the drug fees were going to
9  be decreased.
10    Q.  And the drug fees -- what's the
11  change in the drug reimbursement methodology
12  that you understand is leading to a
13  decrease?
14    A.  Because we were going to 100 percent
15  of Medicare.  It says, 100 percent of the
16  June 2004 Medicare drug fees.
17    Q.  So was there a change -- is there a
18  change being implemented as of December 1st
19  in the percentage of the CMS fee schedule
20  that would be reimbursed to providers?
21    A.  Yes.
22    Q.  What is the change?

Page 151

1    A.  Remember, this is northern Ohio.
2  Northern Ohio was paying 105 percent of the
3  January 2002 Medicare drug fees.  And
4  they're going to 100 percent of the June
5  2004.  That's right.  June 2004.
6    Q.  So are the changes that there's a
7  change in the percentage of the Medicare fee
8  schedule that Anthem is reimbursing and also
9  a change in the actual fee schedule?
10    A.  Okay.  Can you say that one again?
11    Q.  Sure.  The percentage of the fee
12  schedule that's being reimbursed in the
13  region to which this letter was sent is
14  being changed --
15    A.  Can I stop you for a second?  When
16  you say "the percentage," that's -- we don't
17  pay a percent of the fee schedule.  We pay
18  the whole fee --
19    Q.  Perhaps I'm using percent loosely.
20  105 percent of the fee schedule was being
21  paid previously.
22    A.  105 percent of Medicare's fee

Page 152

1  schedule was being paid.
2    Q.  Right.  So a fee schedule plus a
3  percentage?
4    A.  The fees that we had loaded were 105
5  percent of Medicare.
6    Q.  Okay.  And that's now being shifted
7  to 100 percent?
8    A.  To 100 percent.  That's correct.
9    Q.  Now, is that change from 105 percent
10  to 100 percent the only reason for this
11  dramatic increase in admin fees?
12    A.  Yes.
13    Q.  There are no other reasons going
14  into it?
15    A.  I don't believe so.
16    Q.  Is it anticipated that there will be
17  further increases in the fee schedule as
18  Medicare moves towards an ASP plus six
19  percent formula?
20    A.  I don't know.
21    Q.  The second bullet there is
22  referencing a point we had been discussing

Page 153

1  earlier, which is new drugs that don't have
2  a J code --
3    A.  Right.
4    Q.  -- will be reimbursed plus five
5  percent?
6    A.  Right.
7      MR. MANGI:  Why don't we take
8  another quick break.
9      (Recess taken.)
10  BY MR. MANGI:
11    Q.  Have you ever seen any of Anthem's
12  contracts with providers?
13    A.  Yes.
14    Q.  Okay.  Do you utilize those
15  contracts in your day-to-day business?
16    A.  No.
17    Q.  In what circumstances have you seen
18  Anthem's contracts with providers?
19    A.  Just in the casual -- kind of a
20  casual way.  But I don't do anything with
21  them or use them.
22    Q.  Do you play any role in the drafting

39 (Pages 150 to 153)

Joe Spahn                    Highly Confidential                    November 30, 2004
                                 Mason, OH

Page 154

1  of those contracts?
2      A.  No.
3      Q.  Do you know whether or not fee
4  schedules are actually appended to those
5  contracts?
6      A.  I don't believe they are.
7      Q.  Do you know whether fee schedules
8  are provided to physicians?
9      A.  On request, yes.
10     Q.  So a physician has to ask for a copy
11  of the fee schedule before it's provided to
12  him?
13     A.  Yes.
14     Q.  Where he does not so request, all
15  the physician receives are the reimbursement
16  that Anthem pays for the claims that he
17  submits?
18     A.  Again, I'm not sure.  That's
19  probably something that management would
20  know.
21     Q.  Are you familiar with a program
22  called the Equality Improvement Program?

Page 155

1      A.  No.
2             -=0=-
3        (Exhibit Spahn 005 marked.)
4             -=0=-
5      Q.  Can you take a moment to acquaint
6  yourself with that, please, and let me know
7  when you're done.
8      The Bates numbers for this document
9  which has been marked as Exhibit Spahn 005 are
10  from A-0H05010559 until 571.
11      Have you ever seen this type of
12  document before?
13     A.  No.
14     Q.  By Professional Provider Agreement,
15  you understand this to be a contract with a
16  physician or physician's group?
17     A.  Yes.
18     Q.  I draw your attention to page 4 of
19  the document.  Do you see 2.13 referring to
20  a Separate Provider Network?
21     A.  Okay.
22     Q.  Do you know how many provider

Page 156

1  networks Anthem has at present?
2      A.  No.
3      Q.  Do you know whether there are
4  specific provider networks that are -- that
5  provide services pursuant to a particular
6  product or plan?
7      A.  No.
8      Q.  Referring to page 5, 3.3, Submission
9  of Claims.  That refers to the submission of
10  claims either approved forms or
11  electronically.
12      Do you see that?
13     A.  Yes.
14     Q.  Do you know whether one or both of
15  those options are currently in use by
16  different providers?
17     A.  Both are.
18     Q.  So some submit hard copy forms and
19  some submit electronically?
20     A.  Yes.
21     Q.  Is there any difference in
22  reimbursement depending on manner of

Page 157

1  submission other than the time period?
2      A.  No.
3      Q.  Turn to page 6, please.  3.12, Blue
4  Cross/Blue Shield Out of Area Program.
5      A.  Yes.
6      Q.  Are you familiar with that program?
7      A.  No.
8      Q.  Do you have an understanding as to
9  whether or not Anthem has any sort of
10  reciprocal or other arrangements with other
11  Blue Cross/Blue Shield plans for
12  reimbursement?
13     A.  Not that I'm aware of.
14     Q.  Turn to page 10, please.  There's a
15  clause there, 8.2, entitled Amendment, which
16  reads, "Anthem retains the right to amend
17  this Agreement, Anthem Rate, the Provider
18  Manual, any attachments or addenda, the
19  Quality Improvement Program or Utilization
20  Management Program, by making a good faith
21  effort to provide notice to Provider..."
22  Then it continues.

Henderson Legal / Spherion
(202) 220-4158

Joe Spahn                         Highly Confidential                    November 30, 2004
                                     Mason, OH

Page 158

1      Are these the notice requirements
2    you were referring to earlier when we spoke
3    about Anthem changing its reimbursement
4    methodologies?
5      A.  Yes.
6      Q.  So provided Anthem complies with
7    these sorts of requirements, it could at any
8    time decide to change its reimbursement
9    methodology from one or more drugs to a
10   WAC-based formula to some other type of
11   formula?
12     MR. THOMAS:  Objection.
13     A.  Yes.
14     Q.  And indeed it could have done so in
15   the past?
16     MR. THOMAS:  Same objection.  Go
17   ahead.
18     A.  Yes.
19     MR. THOMAS:  I have to do it quickly
20   or you're going to answer before I get my
21   objection out.
22     Q.  Are you familiar with professional

Page 159

1    provider agreement manuals?
2      A.  No.
3      Q.  Turning to the last exhibit we just
4    looked at.  Turning back to Exhibit Spahn 005.
5    Do you understand this to be a template for a
6    contract rather than a contract?
7      A.  No, I don't know.
8      Q.  Well, you see that the effective
9    date is blank, and the signature page at the
10   back is also blank; is it not?
11     MR. THOMAS:  I believe it was
12   produced as an exemplar.  I do not believe
13   it was a specific contract.  I can answer
14   that.
15     Q.  Do you have an understanding as to
16   whether or not all professional provider
17   agreements at present have the same terms as
18   this one?
19     A.  I don't know.
20     Q.  So you have no knowledge as to
21   whether or not this contract is
22   representative of all of Anthem's provider

Page 160

1    agreements at present?
2      A.  No, I don't.
3      Q.  Do you have an understanding as to
4    whether or not this form of this contract
5    has changed over time?
6      A.  I don't.
7      MR. MANGI:  Let's mark this exhibit
8    as A-OH05020138 to 5020146.
9             -=0=-
10        (Exhibit Spahn 006 marked.)
11            -=0=-
12     Q.  Would you please take a moment to
13   review that.  Let me know when you're done.
14     A.  All right.
15     Q.  Now, this contract template bears
16   the heading Community Insurance Company.  Do
17   you understand this to be a pre-1995
18   template?
19     A.  I would think so, yes.
20     MR. MANGI:  Okay.  I see counsel is
21   shaking his head.  Would counsel like to
22   represent --

Page 161

1      MR. THOMAS:  I'm not sworn in.  Do
2    you want to go off the record and talk about
3    our corporation history?  I'll be happy to.
4    But I'm not going to talk about it on the
5    record.
6      MR. MANGI:  Sure.  Let's go off the
7    record.
8      (Discussion is held off the record.)
9    BY MR. MANGI:
10     Q.  Turning to page 2 of the contract.
11   Do you see a Clause VB, The CIC Rate?
12     A.  VB?
13     Q.  Right.
14     A.  Yes, I got it.
15     Q.  Now, that seems to imply that the
16   fee schedule is actually attached to these
17   contracts.
18     A.  Well, but this is a hospital, right?
19   This is a facility.
20     Q.  Right.  So for hospitals, fee
21   schedules are attached, and for providers
22   they're not; is that a fair statement?

41 (Pages 158 to 161)

Joe Spahn                            Highly Confidential                        November 30, 2004
                                        Mason, OH

Page 162

1     A.   Again, I don't know, because I don't
2   work in contracts.
3     Q.   Okay.  If you look to Clause D below
4   that, this provides for a renegotiation of
5   the rate.
6         MR. THOMAS:  I'm sorry.  Go ahead.
7     A.   Yes.
8     Q.   And pursuant to this, you, which is
9   the facility, agree to submit financial and
10  other information deemed necessary by
11  Anthem.  Do you see that?
12    A.   Yes.
13    Q.   Do you know whether or not such
14  negotiations have taken place?
15    A.   No, I don't.
16    Q.   Do you have any information as to
17  the type of financial information that
18  Anthem would request in such renegotiations?
19    A.   No.
20    Q.   Does that all pertain to the
21  hospital area which you're not involved
22  with?

Page 163

1     A.   I don't know if all pertains to
2   hospital or not.  I'm not involved with
3   that.
4     Q.   Okay.  Could you turn to page 8,
5   please.  This provides for -- it says the
6   CIC cover rate is blank percent of the
7   following.  And then in relation to IVs,
8   there seems to be a formula for a dollar
9   amount plus a percentage of AWP.  Do you see
10  that?
11    A.   Yes.
12    Q.   Do you know -- if you flip back to
13  page 7, you will see that this -- the
14  exhibit offers this schedule as a part
15  referring to home infusion therapy.
16        MR. THOMAS:  I'm sorry.  Could you
17  restate that?
18    Q.   Yeah.  If you flip back to page 7,
19  which is the previous page, you'll see the
20  heading refers to home infusion therapy
21  providers.
22    A.   Yes.

Page 164

1     Q.   Do you know whether this use of
2   AWP-related formula is limited to that home
3   infusion realm or whether it's applied more
4   generally to facility reimbursement?
5     A.   I don't know.
6             -=0=-
7         (Exhibit Spahn 007 marked.)
8             -=0=-
9     Q.   Take a look at Exhibit Spahn 007, please.
10  Let me know when you're done.  I'll have a
11  very specific question about this document
12  when you're ready.
13    A.   All right.
14    Q.   Now, on the very first page of this
15  document you'll see that Community Insurance
16  Company is referred to as "we" or "us."  Do
17  you see that?
18    A.   Yes.
19    Q.   And the provider or the facility
20  here is referred to as "you."  See that?
21    A.   Yes.
22    Q.   Now, if you could flip over to the

Page 165

1   page marked ADD-B-5.
2     A.   Okay.
3     Q.   At the bottom of the page on fee
4   schedule, it says, "you," meaning the
5   facility, shall provide "us," meaning CIC,
6   with a copy of your fee schedule on an
7   annual basis.
8         Now, this seems to suggest that a
9   fee schedule that's created by the facility
10  is being used rather than a fee schedule
11  created by Anthem.  Can you clarify what
12  that clause is referring to?
13        MR. MATT:  Object to that question.
14  No foundation.
15    A.   No.
16        MR. THOMAS:  He said no, he can't.
17    Q.   Do you have any understanding as to
18  whether Anthem receives fee schedules from
19  facilities?
20    A.   No, I don't.
21    Q.   Do you have any knowledge as to
22  whether Anthem makes any reimbursement to

42 (Pages 162 to 165)

Page 166

1  any entities based on fee schedules other
2  than those that it generates?
3      A.  No, I don't.
4      Q.  Now, earlier we saw an exhibit that
5  was a template for a professional provider
6  agreement.  Do you remember that heading?
7      A.  Yes.
8      Q.  There are other agreements that have
9  been produced by Anthem that are captioned
10  "ancillary provider agreements."
11      Do you have any understanding of the
12  difference between a professional provider
13  and an ancillary provider?
14      A.  Technically, I don't know, but I --
15  ancillary provider is usually more of a
16  facility.  I mean, they usually do a UB92
17  claim form.
18      Q.  So you understand an ancillary
19  provider to be a hospital?
20      A.  I don't think it's necessarily a
21  hospital.
22      Q.  Do you understand it to be something

Page 167

1  other than a physician's office?
2      A.  Yes.
3      Q.  What would it be, if not a hospital?
4      MR. THOMAS:  I'll object to the form
5  of the question.  I think he suggests he's
6  not real clear on what it might be.
7      Q.  If that's the answer, that's the
8  answer.
9      Do you know what sort of facilities
10  would be encompassed by that other than a
11  hospital?
12      A.  No.
13      MR. MANGI:  Okay.  I'm done.
14  Questions, Sean?
15      MR. MATT:  I have a couple follow-up
16  questions, Mr. Spahn, for the record.
17      EXAMINATION
18  BY MR. MATT:
19      Q.  Again, I'm counsel for plaintiffs in
20  this case.
21      Did I hear you earlier state in
22  response to a question that drugs represent

Page 168

1  only three percent of the total physician
2  reimbursement?
3      A.  Correct.
4      Q.  Earlier you had a colloquy with
5  Mr. Mangi regarding the movement for
6  reimbursement based on J code to
7  reimbursement based on NDC.  Do you recall
8  that testimony?
9      A.  Yes.
10      Q.  I believe the testimony was
11  something to the effect a move to AWP would
12  increase the reimbursement amount for a
13  brand name drug because presently the brand
14  name drug, may be reimbursed on J
15  code, may be reimbursed on a blended rate of
16  generics and brand names.  Is that correct?
17      MR. MANGI:  I'll object.
18      A.  I'm sorry.  Can you --
19      Q.  Let me see if I can't answer that
20  question -- or ask that question a little
21  bit more in a logical step-by-step format.
22      J code -- you testified earlier that

Page 169

1  reimbursement based on J code is a blended
2  rate of brand and generic, correct?
3      A.  Correct.
4      Q.  A move to AWP would increase the
5  reimbursement amount for a brand name drug,
6  correct?
7      A.  One more time.
8      Q.  That a move to AWP would increase
9  the reimbursement?
10      MR. MANGI:  Object.
11      MR. THOMAS:  Object to foundation.
12  I don't think he said AWP.  I think he said
13  NDC.
14      MR. MATT:  NDC.  Thank you for the
15  clarification.
16      Q.  NDC would increase the reimbursement
17  amount for the brand name drug, correct?
18      A.  Correct.
19      Q.  Would it also lower the
20  reimbursement amount for the generic drug?
21      A.  It possibly could, but not to the
22  extent it would increase for the brand name.

43 (Pages 166 to 169)

Joe Spahn                    Highly Confidential                    November 30, 2004
                                Mason, OH

Page 170

1     Q.  Okay.  Thank you for that
2  clarification.
3        Under the present reimbursement
4  formula Anthem uses for drugs administered
5  by a physician, if the average wholesale
6  price increases, the cost to Anthem
7  increases, correct.
8        MR. THOMAS:  Foundation.  Go ahead.
9     A.  Well, I'm sorry.  I hate to keep --
10  can you say that one more time?
11    Q.  Sure.  Under the present
12  reimbursement formula, and the regions of
13  Anthem with which you are familiar, if the
14  average wholesale price is increased for a
15  drug, the cost to Anthem of reimbursement
16  increases, correct?
17    A.  None.
18    Q.  Why is that?
19    A.  Because we have a set fee schedule.
20  So it doesn't matter what the AWP does,
21  unless we change our fee.
22    Q.  Unless you change your fee, which

Page 171

1  you do annually, correct?
2     A.  Well, it's reviewed annually.  A
3  decision as to whether they want to
4  change --
5     Q.  If they don't --
6        MR. THOMAS:  Wait.  Are you
7  finished, Joe?  Go ahead, finish your
8  question.
9     A.  It's a decision of the reimbursement
10  teams and the people in network management
11  if they actually want to change them or not.
12  So they can be reviewed and not changed.
13    Q.  Let's take an example of when Anthem
14  makes a decision to maintain the
15  reimbursement percentage of the Medicare
16  schedule.  Let's say it's 100 percent.  If
17  the reimbursement -- if the Medicare
18  reimbursement schedule for a particular drug
19  increases, that increases the cost to
20  Anthem, correct?
21    A.  Not necessarily.  Again, we may --
22  just because Medicare changes the fee,

Page 172

1  doesn't mean we will.
2     Q.  In an instance in which the example
3  I'm pursuing is 100 percent of the fee
4  schedule -- if Anthem has made a decision
5  it's going to reimburse 100 percent of the
6  fee schedule.  If the Medicare fee schedule
7  rate increases, the Anthem rate's going to
8  increase, if Anthem's not made a decision to
9  change, correct?
10    A.  Well, not necessarily.
11       MR. THOMAS:  Off the record just one
12  second.
13       (Discussion is held off the record.)
14  BY MR. MATT:
15    Q.  Let's use the example of a change in
16  the Medicare fee schedule.  Let's say
17  Medicare fee schedule increases the
18  reimbursement for a particular drug from one
19  year to the next.  Anthem doesn't change its
20  reimbursement percentage.  That increases
21  the cost to Anthem, correct?
22    A.  Not necessarily.  No.  Maybe we need

Page 173

1  to be very clear.  We have a fee schedule.
2  So you have the procedure code and a fee.
3  We don't have Medicare's fees loaded and
4  then pay a percent of that Medicare fee.  Do
5  you understand the distinction I'm trying to
6  make?  So if we have a fee for that code of
7  $100, and let's say that $100 is based on
8  100 percent of Medicare's 2003 allowance,
9  come 2004, Medicare increases their fee, we
10  may not change our fee at all.
11       So just because Medicare goes up or
12  down or whatever doesn't necessarily change
13  our fees.
14    Q.  Thank you for the clarification.
15       MR. MATT:  That's all I have.  Thank
16  you.
17       MR. MANGI:  I have nothing further.
18       MR. THOMAS:  We'll read.
19            -=O=-
20       Thereupon, the testimony of
21  November 30, 2004, was concluded at 1:54
22  p.m.

44 (Pages 170 to 173)

Joe Spahn                          Highly Confidential                    November 30, 2004
                                      Mason, OH

Page 174

1              CERTIFICATE
2    STATE OF OHIO      :
3                 SS:
4    COUNTY OF FRANKLIN :
5              I, Rhonda Lawrence, RPR/CRR, a
6    Notary Public in and for the State of Ohio,
7    duly commissioned and qualified, do hereby
8    certify that the within-named JOE SPAHN was
9    first duly sworn to testify to the truth,
10   the whole truth, and nothing but the truth
11   in the cause aforesaid; that the testimony
12   then given was reduced to stenotypy in the
13   presence of said witness, afterwards
14   transcribed; that the foregoing is a true
15   and correct transcript of the testimony;
16   that this deposition was taken at the time
17   and place in the foregoing caption
18   specified.
19
20           I do further certify that I am not
21   a relative, employee or attorney of any of
22   the parties hereto; that I am not a relative

Page 175

1    or employee of any attorney or counsel
2    employed by the parties hereto; that I am
3    not financially interested in the action;
4    and further, I am not, nor is the court
5    reporting firm with which I am affiliated,
6    under contract as defined in Civil Rule
7    28(D).
8            In witness whereof, I have
9    hereunto set my hand and affixed my seal of
10   office at Columbus, Ohio, on this        day
11   of              , 2004.
12
13
14           Rhonda Lawrence, RPR/CRR
15           Notary Public, State of Ohio.
16   My commission expires:  September 25, 2008
17
18
19
20
21
22

45 (Pages 174 to 175)