IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) MDL No. 1456 ) ) Civil Action No. ) ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) Chief Magistrate Judge Marianne B. Bowler ) ) |

## AMGEN INC.'S CORRECTED INDIVIDUAL MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TRACK TWO CLASS CERTIFICATION

### [REDACTED VERSION]

Frank A. Libby, Jr. (BBO No. 299110)
Douglas S. Brooks (BBO No. 636697)
Kelly, Libby & Hoopes, P.C.
175 Federal Street, 8th Floor
Boston, Massachusetts 02110
Telephone: (617) 338-9300
Facsimile: (617) 338-9911

Joseph H. Young
Steven F. Barley
Jennifer A. Walker (BBO No. 651724)
Hogan & Hartson L.L.P.
111 S. Calvert St., Suite 1600
Baltimore, Maryland 21202
Telephone: (410) 659-2700
Facsimile: (410) 539-6981
*Counsel for Amgen Inc.*

In addition to the reasons set forth in the Track Two Defendants' Opposition to Class Certification ("Joint Opposition"), Amgen Inc. ("Amgen") has unique defenses which independently preclude a finding that common issues of law and fact predominate. Moreover, plaintiffs' proposed representatives for Classes 1, 2, and 3 are inadequate as to Amgen.[1]

## I. Amgen Has Unique Defenses That Require Extensive Individualized Inquiries.

Like the "management nightmare" that the Court recognized would have resulted from the certification of a nationwide class of third party payors in the Track 1 case, individual issues relating to Amgen's unique products and their reimbursement overwhelm common issues, rendering the class action inefficient.

### A. Distinguishing between Epogen® and Procrit® Requires Individualized Inquiry.

Epogen® and Ortho Biotech's Procrit® are the same biologic (Epoetin alfa), but are marketed for different indications.[2] The codes assigned to Epoetin alfa distinguish different uses but do not distinguish between the two brands. Thus, an individualized inquiry is required of every payment for Epoetin alfa to determine if the payment was for Epogen® or for Procrit®.[3] Neither drug is commonly referred to in provider statements by brand name, but instead, is typically referred to simply as Epoetin alfa or by one of the J codes. ████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████

---

[1] Amgen joins in the "Joint Opposition" brief and focuses principally on the adequacy of the proposed Amgen Class 1 representatives and issues unique to Amgen in its individual brief. Documents cited herein as "Carter __" or "Aaron __" are annexed, in bates number order, as Exhibit 1 to the accompanying Declaration of Jennifer Walker, dated June 15, 2006 ("Walker Decl."). Transcript pages cited herein as "Carter Tr. ___" or "Aaron Tr. __" are annexed as Exhibit 2 to Walker Decl.
[2] Pursuant to a licensing agreement, Amgen's Epogen® is marketed for use in treating patients with end-stage renal disease while Ortho Biotech's Procrit® is marketed for other indications.
[3] See Exhibit A.

1

█████████████████████████████ to the extent that a determination as to which product was used can be made at all, it can only be made after extensive individualized inquiry.[5]

### B. Epogen's® Medicare Part B Reimbursement Requires Individualized Inquiry.

During the class period, Medicare *did not* reimburse for Epogen® based on its published AWP. Instead, Medicare reimbursement for Epogen® was generally based on a publicly available statutory rate set by Congress or on Procrit's® payment rate.[6] Epoetin alfa, used for dialysis (i.e., Epogen®), is the *only* product in this case for which Medicare Part B's reimbursement was based on a specific statutory rate and not its published AWP.[7] Similarly, Epogen® administered in a physician's office in 2004 (the only year within the class period for Classes 1 and 2 that the plaintiffs allege a class representative took Epogen®)[8] to patients who do not have end stage renal disease ("ESRD") was not reimbursed based on Epogen's® published AWP, but was reimbursed based on *Procrit's*® published AWP.[9] Accordingly, Classes 1 and 2 cannot be certified as to Epogen® because none of the Medicare Part B co-payments of any class representative were based on Epogen's® published AWP. For Class 3, a claim-by-claim inquiry must be undertaken to determine first, which Epoetin alfa was administered, Epogen® or Procrit®, then whether Epogen® was administered in connection with ESRD or was administered in a physician's office for non-ESRD, before analyzing how that indication was reimbursed under the particular third-party payor's contract.

---

████████████████████████████████████████████████████

[5] *See*, for instance, the following references to Epoetin alfa and Amgen/Johnson & Johnson Group in plaintiffs' Complaint and the Declaration of Donald E. Haviland, Jr. in Support of Plaintiffs' Motion to Certify Claims with Respect to Track 2 Defendants ("Haviland Decl."): Fourth AMCC ¶¶ 15, 16, 17, 20, 22 and Haviland Decl. at ¶35. It is painfully clear that it was impossible for even the plaintiffs to determine if the drug the class representatives were administered was Epogen® or Procrit®.

[6] *See* 42 U.S.C. § 1395rr(b)(11)(B) (providing that Epoetin alfa "when provided to a patient determined to have end state renal disease" shall be reimbursed "in an amount equal to $10 per thousand units."); http://www.cms.hhs.gov/HistPartBDrugPricingFiles/03_SDP.asp. *See also* Exhibit A.

[7] Epogen's® statutory rate provides Amgen other unique defenses. Given the public availability of the statutory rate for Epogen®, individualized inquiry must be undertaken of each payment for Epogen® to determine the payor's awareness of the statutory rate and whether they in fact relied on Epogen's® published AWP.

████████████████████████████████████████████████████

[8] *See* http://www.cms.hhs.gov/HistPartBDrugPricingFiles/03_SDP.asp. *See also* Exhibit A.

2

### C. Determining Whether Aranesp® Was Reimbursed Based on Its Published AWP Requires Individualized Inquiry.

Aranesp® administered in the hospital outpatient setting was not reimbursed by Medicare based on its published AWP.[10] Instead, Aranesp® was reimbursed by Medicare in these circumstances based on an estimate of the hospital's costs (i.e., not on any AWP), or on the hospital's cost or published AWP for Ortho Biotech's Procrit®.[11] Thus, Classes 1 and 2 should not be certified for Aranesp® that is administered in a hospital setting—whether inpatient or outpatient—because these co-payments were not based on Aranesp's® published AWP.[12] And, more to the point, an individualized inquiry is required of each administration of Aranesp® (i.e., whether it was inpatient hospital, outpatient hospital, physician office or dialysis facility treatment) to determine whether the payment was based on any AWP, much less Aranesp's® published AWP.

### D. The Timing of Aranesp's® and Neulasta's® Approvals Result in Unique Defenses Requiring Individualized Inquiry.

Aranesp® was not approved by the Food & Drug Administration ("FDA") for any indication until more than a decade *after* the beginning of the class period and only shortly before this case was filed.[13] Neulasta® was not approved by the FDA for any indication until *11 years after* the beginning

---

[10] *See* 66 Fed. Reg. 59855, 59894 (Nov. 30, 2001), 67 Fed. Reg. 66717, 66758-59 (Nov. 1, 2002), 68 Fed. Reg. 63397, 63455 (Nov. 7, 2003), 69 Fed. Reg. 65681, 65796 (Nov. 15, 2004), and 70 Fed. Reg. 68515, 68651-52 (Nov. 10, 2005).
[11] *Id.*
[12] If Aranesp® was administered to an inpatient, it was reimbursed as part of the flat prospective payment for a diagnosis related group ("DRG"). If it was administered to a hospital outpatient, its co-payment, in 2002, was based on an estimate of the hospital's cost. In 2003, it was reimbursed based on Procrit's® cost, and in 2004, it was based on Procrit's® May 1, 2003 published AWP. *Id. See also* Exhibit B.
[13] The original complaint was filed on December 19, 2001. *See Citizens for Consumer Justice v. Abbott Labs.*, No. 1:01-cv-12257-PBS (D. Mass). The FDA first approved the marketing of Aranesp® on September 17, 2001 for the treatment of anemia associated with chronic renal failure. *See* Letter from Jay P. Siegel, Director, Office of Therapeutics Research and Review, Center for Biologics Evaluation and Research, Food and Drug Administration, to George Morstyn, Amgen Inc. (Sept. 17, 2001), *available at* www.fda.gov/cder/foi/appletter/2001/darbamg091701l.pdf. Subsequently, in July 2002, the FDA approved the marketing of Aranesp® for the treatment of anemia in patients with non-myeloid malignancies where anemia is due to the effect of concomitantly administered chemotherapy. *See* Letter from Amy Rosenberg, Director, Division of Therapeutic Proteins, Office of Therapeutics Research and Review, Center for Biologics Evaluation and Research, Food and Drug Administration and Karen D. Weiss, Director, Division of Clinical Trial Design and Analysis, Office of Therapeutics Research and Review, Center for Biologics Evaluation and Research, Food and Drug Administration to Jeffrey N. Fellows, Director, Regulatory Affairs, Amgen Inc. (July 19, 2002), *available at* www.fda.gov/cder/foi/appletter/2002/darbamg071902L.pdf.

of the class period and *after* the case was filed.[14] Consequently, most payments for Aranesp® and all payments for Neulasta® occurred after the filing of this lawsuit in which the class members claimed they were aware of – and were suing the defendants for – the very conduct they assert is fraudulent.[15]

Class members' knowledge of AWP's alleged falsity and their reliance is critical to their fraud claims.[16] Given the timing of Aranesp's® and Neulasta's® approval, Amgen has unique defenses relating to putative class members' knowledge of the alleged falsity of these AWPs and their reliance on them. Consequently, extensive individualized inquiry will be required of each proposed class member alleged to have paid for Aranesp® and Neulasta® based on their published AWPs, including inquiries into when they were administered these products, when they paid for them, and the extent to which those payments related to the filing of this lawsuit.[17]

## II. Class 1 Representatives Are Inadequate As To Amgen.

### A. The Proposed Class 1 Representatives Cannot Establish Essential Elements of Their Claims Against Amgen.

Plaintiffs previously identified four representatives for Class 1 as to Amgen—Estate of Newell, Robert Howe, Estate of Young, and Harold Carter. As to Amgen, only one Class 1 representative from the original list remains: Mr. Carter. The other three were withdrawn, apparently because they were unable to show payment for an Amgen drug based on AWP.[18]

---

[14] The FDA approved the marketing of Neulasta® on January 31, 2002 for the treatment of infection, as manifested by febrile neutropenia, in patients with non-myeloid malignancies. *See* Letter from Jay P. Seigel, Director, Office of Therapeutics Research and Review, Center for Biologics Evaluation and Research, Food and Drug Administration to Jeffrey N. Fellows, Amgen Inc. (Jan. 31, 2002), *available at* http://www.fda.gov/cder/foi/appletter/2002/pegfamg013102L.htm.

[15] Of course, as was clear from the Defendants' Consolidated Motion to Dismiss, the federal government and the state Medicaid agencies had been aware long before the filing of these lawsuits that a product's published AWP is not the same as the provider's acquisition price for the product. And, as the Defendants' Consolidated Opposition to Plaintiffs' Motion for Class Certification and associated expert reports demonstrate, those within the health care industry also had long been aware of this.

[16] Reliance is a required element under the consumer protection acts of the identified class 1 representatives. *See* discussion *infra* § II.A.

[17] For example, each of the proposed class 1 representatives as to Amgen are alleged to have been administered and paid for Amgen's products after this case was filed.

[18] Mr. Howe, who was alleged to have made payments for ▓▓▓▓▓ failed to establish that he made any payment for ▓▓▓▓ based on AWP. Mrs. Young, who was alleged to have made payments for ▓▓▓▓ provided no evidence that she made any payment for any of these drugs or that she was ever administered ▓▓▓▓ Mr. Howe and the Estate of Patricia

4

Plaintiffs seek to add two new representatives as to Amgen: Susan Aaronson - who was previously identified in plaintiffs' complaint but never identified as a class representative against Amgen - and Harold Bean, who was named for the first time in plaintiffs' class certification motion.[19] The fact that plaintiffs were forced to jettison their original list of Class 1 representatives in order to find new representatives is itself demonstrative of the kind of inquiry that must be done of *every* individual to determine whether they made a payment for an Amgen drug based on AWP. Nonetheless, despite their efforts, plaintiffs still have not identified class representatives that can establish essential elements of their claims against Amgen.[20]

Mr. Carter is a resident of Texas.[21] To bring a claim under Texas's consumer protection act ("CPA"),[22] he must show, among other things, that he relied upon Amgen's allegedly false AWPs.[23] Mr. Carter, however, cannot establish the reliance element of his claim. He testified that he was unaware of the term or meaning of AWP until his attorneys in this case explained it to him, and thus did not rely on published AWPs.[24] Moreover, he was repeatedly asked if, and repeatedly denied that, he knew the AWP for any Amgen product he was given.[25]

---

Young, however, remain proposed class representatives against several other manufacturers. The Estate of Newell was withdrawn as a Class 1 representative on March 27, 2006. *See* Ltr. to D. Haviland from K. Scott dated March 27, 2006, attached as Exhibit C.

[19] No discovery has been taken of Mr. Bean. Pursuant to this Court's order, the parties are negotiating a discovery schedule for Mr. Bean. Thus far, plaintiffs have not met their burden of establishing that Mr. Bean paid for an Amgen drug based on AWP. *See* Haviland Declaration, Exhibits M and N.

[20] As the Court recognized at the recent hearing on the Track 1 motions for summary judgment, the class certification stage is the proper time for the Court to address issues relating the adequacy of proposed class representatives, including whether those representatives can bring claims under their state consumer protection act. *See* Track 1 Summary Judgment Hearing in *In re Pharm. Indust. Average Wholesale Price Litig.* at 40-41 ("THE COURT: So the question that I run into is -- the class certification papers were huge, okay? I don't remember this being raised as something that didn't make this gentleman, whose name I forget, atypical.")

[21] *See* FAMCC ¶ 16.

[22] Tex. Bus. & Com. Code Ann. § 17.46 (Vernon 2005).

[23] *See McLaughlin, Inc. v. Northstar Drilling Technologies, Inc.*, 138 S.W.3d 24, 30 (Texas Ct. App. 2004) (holding that in order "for a consumer to maintain an action for [violation of Texas's CPA], the consumer must show that the misrepresentation was a producing cause of his or her damages and that the consumer relied on the misrepresentation to his or her detriment."); *see also Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002) (stating that reliance is an element of Texas' CPA's laundry list of violations). *See* Track 1 Summary Judgment Hearing in *In re Pharm. Indust. Average Wholesale Price Litig.* at 51-52 ("THE COURT: . . . And the reliance question, if we get there, I mean, in other words, actual reliance is not going to happen with any of these, with these classes. That's not part of this case, if there's a requirement of actual reliance like in some of those advertising cases. So we need to figure out from the get-go which cases to just carve off.")

[24] *See* Carter Tr. at 59-61, 68, 69, and 75.

[25] Carter Tr. at 68-69, 85-100, 104-111, 114-126, 130-131, 133, and 137-140.

Mr. Carter also must prove that Amgen's alleged misrepresentation was the "producing cause" of his damages.[26] To do so, Mr. Carter must show that the misrepresentation was both a "cause-in-fact" and a "substantial factor" in bringing about his injuries.[27] Mr. Carter has failed to establish that Amgen's alleged misrepresentation of AWP caused him to pay his providers more than he expected. In fact, Mr. Carter testified that he did not think his doctor was making more than he should.[28]

Ms. Aaronson is a resident of North Carolina.[29] To bring a claim under North Carolina's CPA[30] she must prove that she "suffered *actual injury* as a *proximate result*" of Amgen's allegedly deceptive acts[31] and must prove actual and proximate causation.[32] To prove actual causation, Ms. Aaronson must show that she "detrimentally relied" on Amgen's allegedly fraudulent AWP.[33] She cannot satisfy these elements of her claim. Her husband testified that neither he nor his wife relied upon any AWPs.[34] Indeed, Mr. Aaronson further testified that he was not even sure if his wife's drug charges were based on AWP.[35]

---

[26] Tex. Bus. & Com. Code Ann. § 17.50(a) (Vernon 2005); *McLaughlin*, 138 S.W.3d at 30.
[27] *See Brown v. Bank of Galveston, Nat. Ass'n.*, 963 S.W.2d 511, 514 (Tex. 1998) (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995)).
[28] Carter Tr. at 63.
[29] FAMCC ¶ 15.
[30] N.C. Gen. Stat. § 75-1.1(a).
[31] *See Pearce v. American Defender Life Insurance Co.*, 343 S.E.2d 174, 180 (N.C. 1986) (citing *Ellis v. Smith-Broadhurst, Inc.*, 268 S.E.2d 271, 273-274 (N.C. App. Ct. 1980)).
[32] *See Hageman v. Twin City Chrysler-Plymouth Inc.*, 681 F. Supp. 303, 308 (N.C. Dist. Ct. 1988).
[33] *Id.* at 308-309; *Pearce*, 343 S.E.2d at 180; *Howerton v. Arai Helmet, Ltd.*, 581 S.E.2d 816, 830 (N.C. Ct. App. 2003), *rev'd on other grounds*, 597 S.E.2d 674 (N.C. 2004) (North Carolina's CPA requires proof that plaintiff detrimentally relied upon a deceptive statement or misrepresentation); *see also Forbes v. Par Ten Group Inc.*, 394 S.E.2d 643, 651 (N.C. Ct. App. 1990) *rev. denied*, 402 S.E.2d 824 (N.C. 1991) (recovery under "Chapter 75 is limited to those situations when a plaintiff can show that plaintiff detrimentally relied upon a statement or misrepresentation.") *But see, Stetser v. Tap Pharmaceutical Products, Inc.*, 598 S.E.2d 570, 584 (N.C. Ct. App. 2004) (court states in dicta that "North Carolina's law does not require reliance," but does not provide support for this statement or have the authority to overrule a prior panel's ruling). *See Knight v. Abbott Laboratories*, 628 S.E.2d 258 (N.C. Ct. App. 2006) (citing to *Heatherly v. Industrial Health Council*, 504 S.E.2d 102, 106 (N.C. Ct. App. 1998); *cf. In the Matter of Appeal from Civil Penalty*, 379 S.E.2d 30, 37 (N.C. Ct. App. 1989) ("[w]here a panel of the Court of Appeals has decided the same issue, albeit in a different case, a subsequent panel of the same court is bound by that precedent, unless it has been overturned by a higher court").
[34] *See* Deposition Transcript of D. Aaronson at 89-90 (dated 3/31/06) ("Aaronson Tr.").
[35] *Id.* at 57-59, 74, 75.

To prove proximate causation, Ms. Aaronson must demonstrate that her actual injury was a *proximate* result of Amgen's allegedly false AWP.[36] Again, the Aaronsons have failed to provide evidence of this. No evidence was produced that showed the Aaronsons paid providers more than an expected profit. In fact, Mr. Aaronson testified that he had "no basis for judgment" as to what he or his wife expected providers to charge.[37]

### B.     No Named Plaintiff Is An Adequate Class 1 Representative As To Amgen.

Plaintiffs have also failed to "demonstrat[e] that the proposed class representatives made co-insurance payments (at least in part) based on AWP" for the Part B drugs at issue.[38] Thus, the Court must decline to certify Class 1 as to Amgen.[39]

Mr. Carter is alleged to have made payments based on AWP for ▮▮▮▮ and ▮▮▮▮. Neither the documents produced nor Mr. Carter's testimony establish that he made payments for either product based on AWP. First, there is *no* evidence that Mr. Carter took ▮▮.[40] As for ▮▮, although there is evidence of some payments for ▮▮,[41] Mr. Carter testified that he did not know if these payments were based on AWP.[42] They were based solely on the amount he could afford and negotiate with his ▮▮ center, and were usually in flat amounts (i.e., $100, $400).[43] In fact, for a period of time, Mr. Carter's co-payments were not paid by him, but

---

[36] *Pearce*, 343 S.E.2d at 180; *Wilson v. Blue Ridge Electric Membership Corp.*, 578 S.E.2d 692, 694 (N.C. Ct. App. 2003).
[37] Aaronson Tr. at 57-58.
[38] *In re Pharm. Indust. Average Wholesale Price Litig.*, 230 F.R.D. 61, 81 (D. Mass 2005). Plaintiffs have failed to identify any class representative for Neupogen® or Kineret®, Amgen drugs that were identified as drugs at issue in the FAMCC. Because there is no representative identified for these drugs, plaintiffs have failed to meet the prerequisites of Rule 23(a), and plaintiffs' motion for class certification with respect to these drugs should be denied. Moreover, to the extent that the Court determines that there is no class representative who purchased other Amgen products and to the extent that there is no class representative who purchased those other products based on AWP, a class should not be certified as to those products either.
[39] The Court previously declined to certify Class 1 as to Schering-Plough because the plaintiffs did not demonstrate that any proposed Class 1 representative made an AWP-based payment for a Schering-Plough subject drug. *See* Consolidated Order Re: Motion for Class Certification dated January 30, 2006. A similar situation exists with Amgen.
[40] Mr. Carter testified that ▮▮ is the *only* Amgen drug for which he is seeking damages (Carter Tr. at 65) and, as discussed above, the documents show he was administered ▮▮ and not ▮▮.
[41] None of the post-2005 payments fall within the class definition because those payments were made based on ASP, not AWP. *See* June 15, 2006 Steve Young report ("Young report"), Exhibit 7, ¶ 7.
[42] Carter Tr. at 68-69, 85-100, 104-111, 114-126, 130-131, 133, and 137-140.
[43] Carter Tr. at 42-44, 46, and 88.

by a non-profit organization.[44] For the payments he did make, plaintiffs have failed to produce documents sufficient to demonstrate that Mr. Carter was not reimbursed by his supplemental insurer for those payments.[45]

Ms. Aaronson is alleged to have made payments based on AWP for ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.[46] Neither the documents produced nor her husband's testimony establish that the Aaronsons made any payment for ▮▮▮▮▮ based on that product's AWP. Haviland's declaration in support of plaintiffs' motion for class certification refers to a single supposed payment for ▮▮▮▮▮▮▮ that Ms. Aaronson received at Presbyterian Hospital in August 2004. All charges relating to Ms. Aaronson's August 2004 ▮▮▮▮▮▮ injection, however, were denied by Medicare and the Aaronsons were notified that they were not responsible for any such charges.[47] Presbyterian Hospital's July 7, 2005 bill confirms this, reflecting charges for services provided in August 2004, and showing a $3,373.50 Medicare Payment/Adjustment – the exact amount of the August 2004 ▮▮▮▮▮▮ charge.[48] The Aaronsons' personal payment reflected in check #5618,[49] reflects payments for charges <u>other than</u> for ▮▮▮▮▮▮.[50]

---

[44] *Id.* at 47-50.

[45] *See* Young Report, Exhibit 7, ¶ 9. Even assuming Mr. Carter could establish he made ▮▮▮▮ co-payments based on AWP, Mr. Carter's claims would be atypical of an ▮▮▮▮ class. Mr. Carter testified that he first took ▮▮▮▮ in 2004 (Carter Tr. at 57), approximately two years after the original complaint was filed, making Mr. Carter subject to unique defenses not available against the whole class of ▮▮▮▮ users. See discussion *infra* § I.D.

[46] *See* Haviland Declaration at ¶ ¶ 31-34. Although plaintiffs identify other Amgen drugs ▮▮▮▮▮ in the Complaint for Ms. Aaronson, ▮▮▮▮▮ is the only drug plaintiffs identify in their motion for class certification as a drug Ms. Aaronson paid for based on AWP. *Id.* Moreover, as stated in Mr. Gum's declaration, none of the hospital's charges for the Amgen drugs taken by Ms. Aaronson were based on AWP. *See* June 9, 2006 Gum Declaration, attached as Exhibit D.

[47] *See* Aaron 0086 (citing notes b, l, and r); Aaron 0088 (Medicare's note b stating "You should not be billed for this service. You do not have to pay this amount.")

[48] Aaron 0065.

[49] Aaron 0053.

[50] The amount billed by Presbyterian Hospital to the Aaronsons in August 2004 included a plethora of services and drug administrations. *See* Aaron 0016-17. It is these charges in combination that total the $17,644.15 charge reflected on Aaron 0065, minus the noted Medicare adjustments.

## CONCLUSION

For the foregoing reasons, Amgen respectfully requests that plaintiff's Motion for Class Certification against Amgen be denied.

Respectfully Submitted,

Dated: June 30, 2006

/s/ Jennifer A. Walker
Frank A. Libby, Jr. (BBO No. 299110)
Douglas S. Brooks (BBO No. 636697)
Kelly, Libby & Hoopes, P.C.
175 Federal Street, 8th Floor
Boston, Massachusetts 02110
Telephone: (617) 338-9300
Facsimile: (617) 338-9911

Joseph H. Young
Steven F. Barley
Jennifer A. Walker (BBO No. 651724)
Hogan & Hartson L.L.P.
111 S. Calvert St., Suite 1600
Baltimore, Maryland 21202
Telephone: (410) 659-2700
Facsimile: (410) 539-6981
*Counsel for Amgen Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June 2006, a true and correct copy of AMGEN INC.'S CORRECTED OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [REDACTED VERSION] was served upon all counsel of record via electronic service pursuant to CMO No. 2 by causing a copy to be sent to LexisNexis File & Serve for posting and notification.

/s/ Jennifer A. Walker
Jennifer A. Walker