**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br><br>CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Hon. Patti B. Saris |

**TRACK TWO DEFENDANTS' BRIEF DEMONSTRATING THAT (1) PLAINTIFFS' CLAIMS DO NOT REQUIRE A DEFINITION OF AWP AS USED IN THE MEDICARE STATUTE AND (2) THE COURT IS PRECLUDED BY CONTROLLING FIRST CIRCUIT AUTHORITY FROM UNDERTAKING A PLAIN MEANING ANALYSIS**

The Track Two Defendants respectfully disagree that it is necessary or appropriate for the Court to "define" AWP as the term is used in the Medicare statute. The Plaintiffs seek recovery under state consumer protection statutes, not the Medicare statute, and defining AWP as it is used in the Medicare statute does not advance the decision of the pending summary judgment motions. Indeed, the court is prohibited by controlling First Circuit law from engaging in the "plain meaning" analysis suggested by the Plaintiffs in light of the evidence submitted on the pending summary judgment motions. *See Commonwealth v. Blackstone Valley Elec. Co.*, 67 F.3d 981 (1st Cir. 1995). This Court has already observed that the term "average wholesale price" is inherently ambiguous based on prior expert submissions. *See In Re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 68 (2005) (noting that "'real and understandable' confusion still remains, even within the industry as to what AWP is."). Under these circumstances, the First Circuit has held that "a dispute about a statute's or regulation's proper construction cannot be resolved simply by placing the gloss of 'plain meaning' on one competing interpretation." *Blackstone Valley*, 67 F.3d at 988. The existence of the ambiguity

already found by the Court precludes any finding that the meaning was plain for all to see by simply reading the words of the statute.

Plaintiffs' request for a "plain meaning" construction of "AWP" invites error by ignoring the implications of that construction for the current operation of the market. A "plain meaning" interpretation of the Medicare statutes and regulations is not only unnecessary to resolve the pending motions, but also has the potential to throw the nation's healthcare system into turmoil by upsetting AWP-based reimbursement systems calibrated, on the basis of prior understanding of AWP, to ensure access to medical care. Given the potentially severe effects of an erroneous decision, the absence of any need for a statutory definition of the term AWP to decide the motions currently before the court, and a record that at a minimum presents issues of fact as to the meaning of AWP, the Court should, at the very least, defer decision on any statutory interpretation questions until it has an opportunity to be presented with a full trial record, with live testimony to supplement the documentary and deposition record.

Likewise, this Court is not free to ignore the evidence as to the actual use of the term AWP over several decades in favor of a cut and paste amalgam of dictionary entries. A court cannot simply adopt a purported plain meaning of a term and ignore "persuasive evidence" of a term's accepted use and meaning to the contrary. *Greenwood Trust Co. v. Commonwealth of Massachusetts*, 971 F.2d 818, 825 (1st Cir. 1992), quoting, *Boston Sand & Gravel Co. v. United States*, 278 U.S. 41, 48 (1928) (Holmes, J.). In this case, the evidence of the term's use in the industry, in fact, resolves the ambiguity by establishing that no one ever actually believed AWP was, represented, or signaled an actual acquisition price.

The so-called "plain meaning" definition urged by Plaintiffs four years into this case, and without a shred of evidence in support, is in every sense a new definition previously

unknown in the industry.  For the Court to craft a definition of AWP in this manner would necessarily entail an impermissible rewriting of the statute since it is undisputed that Congress chose not to define AWP and did not provide instructions on how anyone should calculate it. Significantly, Congress *has* articulated specific definitions and calculation instructions with respect to other pricing benchmarks relevant to the drug reimbursement process.  Thus, for example, Congress has specifically stated how an Average Manufacturer Price, an Average Sales Price and a Best Price should be calculated.  As to these prices, Congress has stated what needs to be included or excluded in the calculation and the period of time for the calculation.  These instructions are indispensable and are not evident from the so-called "plain meaning" of the terms "average," "manufacturer," "best," "sales" and "price."  Since those instructions have never existed for AWP, the Court cannot now undertake to invent them and apply them retroactively as this would impermissibly legislate where Congress chose not to act.

Last but certainly not least, Plaintiffs' request for a plain meaning definition invites error by impinging on Defendants' fundamental constitutional rights.  Imposing liability based on a newly minted definition would violate First Circuit precedent concerning retroactive application of court rulings because it would be unfair to apply this after-the-fact definition to the conduct of Defendants who had no prior notice such a ruling was likely.  Neither Congress, the courts, nor any federal or state regulator has ever employed the definition the Plaintiffs wrongly argue is the "plain meaning" of AWP.  Defendants' actions cannot be evaluated against a definition of AWP that has never existed and is completely contrary to the decades-long understanding and use of that term.  The retroactive imposition of liability based on a legal standard that did not exist would be unconstitutional.  *See Crowe v. J.P. Bolduc*, 365 F.3d 86, 93-94 (1st Cir. 2004).

The Court can address the parties' understanding of AWP insofar as it has a bearing on the pending Track One summary judgment motions, by construing the record evidence to determine whether there are triable issues of fact as to how AWP has been used, understood and established by those who report it and those who use it in the reimbursement process. And, should it do so, the Court will find that the overwhelming and uncontested evidence uniformly reflects decades of government and industry acceptance of AWP as a benchmark reported in national compendia that is used by a variety of reimbursing entities to give providers an unspecified margin over acquisition costs. The evidence is also clear and compelling that AWP was never believed to be equal to, or any signal for, the actual acquisition price paid for drugs – and after four years of discovery plaintiffs have offered not a single piece of evidence to the contrary. Indeed, the evidence is so one-sided that no reasonable person could decide that anyone would have been deceived into believing that AWP equaled actual acquisition cost. *Cf. Allen v. Adage, Inc.*, 967 F.2d 695, 698 (1st Cir. 1992). At the very least, the existence of substantial evidence of knowledge and conduct inconsistent with plaintiffs' proposed definition of AWP suggests that the Court should not construe the statutory meaning of AWP before having an opportunity to review live evidence regarding knowledge and other relevant issues at trial.

## ARGUMENT

### I. THE COURT NEED NOT CONSTRUE THE MEDICARE STATUTE AND REGULATIONS IN ORDER TO DECIDE THE PENDING MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs contend that construction of the Medicare statute and regulations is dispositive of the claims in this case. Plaintiffs are wrong. The factual record in this case overwhelmingly establishes that government and private payers were not deceived by published AWPs into thinking they were reimbursing only at acquisition cost, making any interpretation of

the Medicare statutes and regulations irrelevant to deciding Plaintiffs' state consumer protection claims.

The remaining claims against the Track One Defendants in this case are all asserted under various state consumer protection statutes. *See* Consolidated Order re Class Certification (January 30, 2006). Although there are substantial variations among those statutes, all require Plaintiffs to establish at a minimum that (1) Defendants engaged in some act or practice that was either (a) "deceptive" or (b) "unfair," which act or practice (2) was the legal cause of some injury suffered by the Plaintiff. *See, e.g., Tagliente*, 949 F.2d at 7; *Hereshenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 840 N.E.2d 526 (Mass. 2006).

Although Plaintiffs characterize the Track One Defendants' conduct as both "deceptive" and "unfair," this case is really about deception. Plaintiffs have advanced no theory that does not depend on deception, and, to the contrary, have represented that they intend to establish liability in this case by proving intentional fraud. *See In re Pharmaceutical Industry Average Wholesale Price Litig.*, 230 F.R.D. 77, 85 (D. Mass. 2005).

Under state consumer protection law, an "act or practice will be found deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *Commonwealth v. Amcan Enters., Inc.*, 712 N.E.2d 1205, 1209 (Mass. App. 1999). In addition, "proving a causal connection between a deceptive act and a loss to the consumer is an essential predicate for recovery under our consumer protection statute." *Hershenow*, 840 N.E.2d at 528.

The knowledge of the allegedly deceived party is critical to determining whether a particular act is "deceptive" for the purposes of state consumer protection law. To be considered

"deceptive" for the purposes of consumer protection law, a statement or act must "have caused a person to act differently from the way he otherwise would have acted." *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991) (Massachusetts law). In *Tagliente*, the First Circuit held that misrepresentations about certain aspects of a parcel of land were not "deceptive" for the purposes of the Massachusetts consumer protection statute where the purchaser of the land should have been aware of facts preventing the misrepresentations in the case from having any material effects. *Id.* at 8. Because the alleged misrepresentations did not cause the plaintiff to "act differently," they were not actionable under the Massachusetts consumer protection statute.

The court in *Hereshenow* approached a similar issue from the perspective of causation. The plaintiff in that case alleged that certain clauses in the collision insurance offered by Enterprise Rent-A-Car were "unfair" under the terms of the Massachusetts consumer protection statute. 840 N.E.2d at 792. Although agreeing that the insurance clauses constituted "unfair acts," the Massachusetts Supreme Judicial Court denied the claim for failure to prove any injuries causally connected to those acts. The plaintiff in the case was not involved in any collisions, never had to make use of the collision insurance he purchased from Enterprise, and was never faced with a reduction in any insurance benefits as a result of the challenged insurance clauses. Consequently, he had no claim under the Massachusetts consumer protection statute.[1]

---

[1] The *Hereshenow* court distinguished the decision in *Leardi v. Brown*, 474 N.E.2d 1094 (Mass. 1985), on which plaintiffs' relied in their Track 1 summary judgment papers. The *Leardi* case involved a challenge to a lease that contained an illegal clause purporting to prevent lessees from challenging the conditions of their apartments. The court in *Leardi* held that the plaintiff tenants did not need to have suffered monetary loss in order to establish a violation of the Massachusetts consumer protection statute. As the *Hereshenow* court explained, however, the *Leardi* court did not "eliminate the required causal connection between the deceptive act and an adverse consequence or loss. In *Leardi*, the requisite causal connection was established: confronted by unhabitable conditions, the illegal lease terms would deter tenants from exercising their legal rights on pain of loss of their tenancy." *Id.* at 800. Here, the only potential "loss" that could be causally connected to the AWP-based conduct alleged by plaintiffs is having to pay more for prescription pharmaceuticals than they would otherwise pay in the absence of the alleged "deception." The evidence establishes, however, that plaintiffs and members of the class would not have paid more. The

Here, just as in *Tagliente*, Plaintiffs cannot establish that they, or the government, would have done anything differently in the absence of Defendants' allegedly deceptive conduct. To the contrary, the overwhelming evidence in this case establishes that "deception" did not cause governmental or private payers to alter their behavior. It is clear that governmental and private payers understood perfectly well throughout the relevant period that AWP reflected a benchmark which did not signal actual acquisition costs. The evidence is undisputed that payers were aware of "spreads" between published AWPs and acquisition costs of as much as 1000%. *See, e.g.*, Memorandum of Law in Support of Track One Defendants' Joint Motion for Summary Judgment at 2-13.

The government continued to use AWP as a reimbursement benchmark, and continued to require 20% of that benchmark as a co-pay, despite that longstanding knowledge. Beneficiaries have no right to a co-pay based on the provider's acquisition cost. No statutory interpretation of the term "AWP" can change the facts about the government's knowledge; and no statutory interpretation of the term "AWP" can establish as a matter of law either that class members were deceived or were caused legal harm as a result of Defendants' conduct in light of the substantial evidence regarding government knowledge. Construction of the Medicare statute and regulations is therefore unnecessary to resolve the summary judgment motions currently before the Court.

## II. FIRST CIRCUIT LAW PRECLUDES A DEFINITION OF AWP BASED ON THE SO-CALLED "PLAIN MEANING" ANALYSIS PROPOSED BY PLAINTIFFS

Neither Congress nor CMS has ever defined AWP or provided instructions on how to calculate it. No court has ever suggested that there is a controlling definition of AWP.

government fully understood what information published AWPs provided and what information they did not provide, and they reimbursement decisions in the full light of that knowledge.

No state has ever substantively defined the term AWP or directed how it should be calculated . These facts are undisputed.  As the Court previously observed (prior to the pending motions for summary judgment), "confusion still remains, even within the industry, as to what AWP is . . . ." *In Re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 68 (D. Mass 2005).  In the face of this acknowledged ambiguity, this Court may not craft a "plain meaning" definition of AWP or define AWP as a matter of law without regard to the evidence in the record.

In *Commonwealth v. Blackstone Valley Electric Co.*, 67 F.3d 981 (1st Cir 1995), the First Circuit reversed the district court's entry of summary judgment in favor of the plaintiff, Commonwealth of Massachusetts, because the district court wrongly applied a "plain meaning" analysis  where there was a dispute as to the definition of a term in the statutory scheme.  Both sides submitted conflicting affidavits attesting to whether a chemical substance known as ferric ferrocyanide ("FFC") was a cyanide and thus a "hazardous substance" under CERCLA; the district court found for Massachusetts, and held that FFC fell within the plain meaning of the term "cyanides" as it appeared on the EPA's list of hazardous substances.  The First Circuit reversed, holding that the submission of competing expert affidavits that directly contradicted each other on the appropriate classification of FFC meant that there could be no readily ascertainable "plain meaning" that could be derived from the face of the words themselves that would enable the court to conclude on summary judgment that FFC was a "hazardous substance."  67 F.3d at 986.  The same is true here.  Not only are there expert affidavits rejecting Plaintiffs' interpretation of AWP, but the Court's expert, Dr. Berndt, has already opined, and this Court has acknowledged, that confusion remains within the industry as to what AWP is.

As is the case here, the First Circuit held in *Blackstone Valley* that the summary judgment analysis must start by viewing the evidence in the light most favorable to the opponent. Noting the lack of unanimity as to the status of FFC the court held that,

> resolution of the disagreement about whether FFC falls within those fuzzy boundaries requires a value-laden choice from among competing interpretive assumptions, a choice that cannot be made through mere inspection of the term's normal or ordinary usage.

67 F.3d at 987. Concrete evidence in this case establishes that AWP was understood as an industry benchmark. By contrast, Plaintiffs cite no evidence and seek to evade the Track One Defendants' evidence by resorting to dictionary definitions to create an artificial meaning no one has ever acknowledged.

The argument that the Court should craft – for the first time ever – a definition of AWP arrived at by taking the literal definition of the words "average," "wholesale," and "price" and combining them to hold that AWP was required as a matter of law to be some type of calculation of the average of unspecified wholesale prices over unspecified periods of time is meritless. There is no evidence in the record that anyone ever accepted Plaintiffs' contrived interpretation of the term AWP.[2]

## III. THE COURT CANNOT DIRECT A COMPUTATION OF AWP WHERE CONGRESS CHOSE NOT TO DO SO

A "plain meaning" definition of the words "average wholesale price" is meaningless as it would not provide instructions as to which wholesale prices should form the basis for the average (*i.e.*, prices reflecting sales from manufacturers to wholesalers, direct

2 In the *Blackstone Valley* case the Court referred the definition to the EPA who had primary jurisdiction over determining whether FFC was a hazardous substance, holding that the determination could only be made in light of all the evidence. Here, the issue is not one of interpreting agency regulations on which the action is directly based. The inquiry is much more narrow: was the Track One Defendants' conduct deceptive or fraudulent. That can only be determined by the fact finder in light of all the evidence. The so-called "plain meaning" definition urged after-the-fact by Plaintiffs, which is not supported by any evidence, is irrelevant to this question.

prices, or prices offered by wholesalers to retailers).[3] Plaintiffs' proposal – to have the Court derive the meaning of "Average Wholesale Price" from the dictionary definition of its several constituent words illustrates the perils of relying on the dictionary to determine the meaning of words in a complex statutory scheme. *See*, *e.g.*, Clark D. Cunningham, *et al.*, *Plain Meaning and Hard* Cases, 103 Yale L.J. 1561, 1591, 1614-1616 (1993-94). Indeed, Plaintiffs' stringing together the definition of "average," "wholesale" and "price" yields the following definition: "a mean proportion or medial, or typical or usual, amount that intermediaries pay before the reach to the ultimate consumer." (Pl. Mem. at 43). This definition is itself vague: who exactly are the "intermediaries" or the "ultimate consumer"; a "medial sum" is not the same as "typical." Nor do the words indicate if any transactions should be excluded from the calculation. A plain meaning definition also does not supply a critical element of any average: the period over which the average should be calculated. Should the average be calculated on a daily, weekly, monthly, quarterly or a more or less frequent basis? Without instruction as to these details, which are not found in the statute, any plain meaning definition of AWP is simply too ambiguous to function.

Significantly, Congress did define other price terms critical under the Medicare and Medicaid programs and provided direction as to how to calculate them. Average Manufacturer Price ("AMP"), Best Price ("BP") and Average Sales Price ("ASP") are each precisely defined. The statutory language gives step-by-step guidance as to how a manufacturer should arrive at these statutorily defined prices. *See* 42 U.S.C. § 1396r-8(k)(1) (AMP); 42 U.S.C. § 1396r-8(c)(1)(C) (Best Price); 42 U.S.C. § 1395w-3a(b)(3) & (4) (ASP). For example, the statutory definition of AMP enacted in 1990 states:

3 Plaintiffs' reliance in their summary judgment briefing on the OIG Compliance Program Guidance for Pharmaceutical Manufactures, 68 F.R. 23731 (May 5, 2003) (the "Guidance"), is unavailing. Nothing in the Guidance suggests that the OIG believed there was an industry-wide definition or formula for computing AWP or that AWP was based on an actual averaging of prices. Section II(B)(1)(c) specifically addresses "average wholesale price," and does not define the term.

> The term "average manufacturer price" means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts.

42 U.S.C. § 1396r-8(k)(1).  AMP is calculated and reported quarterly.  42 U.S.C. § 1396r-8(k)(8).  Likewise, also in 1990, Congress directed how Best Price is calculated in a lengthy definition that expressly excludes and includes various parameters.  42 U.S.C. § 1396r-8(C)(1)(c).  When Congress decided to change the Medicare reimbursement benchmark from AWP to ASP, it directed how ASP should be calculated with similar details.  42 U.S.C. § 1396w-3a(b)(3)&(4).

Thus, Congress knows how to supply details and specific calculation instructions to provide meaningful definition of terms that are used in the reimbursement process.  Since Congress chose to import into its statute the term "average wholesale price" without a specific definition or calculation, that is the way the statute must remain.  It is axiomatic that a Court cannot write into a statute terms that were specifically excluded and, knowing from the context and history of AWP that it cannot possibly mean an actual of average wholesale prices, the Court cannot accept the plaintiffs' proffered "plain meaning" definition.

Nor can the Court use a plain meaning definition that is contrary to the evidence of the intent behind the decades-long use of AWP as an undiscounted benchmark that does not reflect the actual acquisition costs of the providers being reimbursed.  *See Greenwood Trust Co. v. Commonwealth*, 971 F.2d 818, 825 (1st Cir. 1992) ("Terms in an act whose meaning may appear plain outside the scheme of the statute can take on different meaning when read in their proper context . . . . Hence a court must always hesitate to construe words in a statute according to their apparent meaning if to do so would defeat Congress's discovered intendment.")

Based on the evidentiary record before the Court, it is beyond dispute that AWP is used in order to accomplish the legislative intent of properly paying providers so they voluntarily participate in the federal and state programs. As the Track One Defendants have demonstrated with an extensive evidentiary record, the benchmark AWP is used precisely because it represents a pricing level reported in national compendia that *does not* take into account any of the numerous discounts that exist in the contractual arrangements pertaining to the sales of drugs and *does not* represent, reflect or signal actual acquisition costs.

As the Court knows, AWP continues to be used to this day in numerous reimbursement arrangements. In every instance, AWP is being used on the basis of the understanding of that terms as discussed *supra*. If this Court issued a definition of AWP in 2006 at odds with the evidence of how the benchmark has been understood and continues to be used, the reimbursement for tens of thousands of drugs would be adversely impacted. Attached as Exhibit A is a chart from the CMS website showing the Medicaid reimbursement formulas for each of the 50 states. All but a few states use AWP as an element in the reimbursement formula – the same AWP used by Medicare during the proposed class period – and then make a downward adjustment that was obviously based on the belief that AWP was above acquisition cost. By imposing a "plain meaning" definition of the term "AWP," the Court would be impermissibly intruding into the decisions by all the state legislatures and interfering with the administration of the state Medicaid programs under carefully crafted State Plans developed by the States and approved by CMS. Depending on the definition adopted by the Court, there could be a host of unintended consequences, including reimbursing pharmacies at amounts less than their cost of drugs  The impact of such an abrupt change would, at best, be confusion and, at worst, could be disruption of public health programs nationwide.

## IV. PLAINTIFFS' UNPRECEDENTED DEFINITION WOULD VIOLATE DUE PROCESS

In *Blackstone Valley*, the First Circuit held that citizens have a right to fair notice of their obligations under the law. *See Blackstone Valley*, 67 F.3d at 991(holding that "[a] complicated regulatory regime . . . cannot function effectively unless citizens are given fair notice of their obligations."). If this Court retroactively defines AWP and measures the Track One Defendants' conduct based on Plaintiffs' definition, as if that definition were known and understood in the industry from 1990 to the present, the Track One Defendants would be deprived of due process because the fact finder would be evaluating the Track One Defendants' conduct against a definition that did not exist and was not known to them.

All Plaintiffs' claims are fraud based. They repeatedly urge that Defendants acted "deliberately," and that the "AWPs for these drugs are deliberately false and fictitious and created solely to cause Plaintiffs and the Class Members to overpay for drugs." (FAMCC ¶ 3.) Consistent with the prior notice mandated under *Blackstone Valley*, Plaintiffs' claims must be adjudicated in the context of what Plaintiffs, the Track One Defendants, the regulators and the industry knew at the time. The Track One Defendants cannot be found to have "deliberately" failed to conform their conduct to a definition they never knew about. Reimbursing parties cannot be said to have been deceived, moreover, if there is no evidence that they were told that AWP was an actual price. There is no such evidence.

A three-part inquiry is used to determine whether a judicial decision should not be retroactively applied: (1) does the court's decision announce a new and unexpected rule of law; (2) does the history of the area of law involved, together with the rules new purpose and effect, counsel for or against retroactive application; and (3) would retroactive application "give rise to substantial inequity." *Crowe v. J.P. Bolduc*, 365 F.3d 86, 93 (1st Cir. 2004). A decision

promulgating a definition of AWP based on its so-called "plain meaning" that contradicts the actual, accepted use of the term in the industry would meet all of these criteria.

First, the definition of AWP Plaintiffs urge has not been hinted ay by any prior court decision. During the period that AWP has been published, including the class period, there was no indication that AWP – for decades regarded as nothing more than a benchmark – would be subject to a definition of the sort contemplated here. Thus, a decision by this Court defining AWP would be a decision of first impression the resolution of which was not anticipated.

Second, as the evidence the Track One Defendants submitted demonstrates, Medicare's and third-party payor's utilization of AWP was goal-oriented and ensured, among other things, access to services and ease of negotiations. Retrospective application of a new AWP definition substantially different from its historically accepted meaning would call into question years of now settled transactions. This could inject chaos into the public health system, particularly state Medicaid programs which continue to rely on AWP.

Finally, the result of retrospective application of a 2006 definition of AWP plainly at odds with the historically accepted definition would be substantially inequitable to Track One Defendants who, if they reported an AWP at all, reported that AWP with the accepted industry definition in mind. It would not be fair to conclude that Track One Defendants committed fraud for years, based on a 2006 definition, when the particulars of that definition were not foreseeable by Track One Defendants and not expected by Track One Defendants' customers or others who utilized published AWPs.

**CONCLUSION**

For the foregoing reasons, the Court cannot and should not adopt a purported "plain meaning" construction of AWP. Rather, for the reasons set forth in the Track One Defendants' motion for summary judgment, the Court should hold that there is no triable issue of fact as to the understanding of AWP during the entire class period as nothing more than a benchmark used by a variety of reimbursing entities to accomplish the objective of compensating providers.

Dated: July 3, 2006

Respectfully submitted,

KELLEY DRYE & WARREN LLP

By:________________________

William A. Escobar (*Pro Hac Vice*)
Neil Merkl (*Pro Hac Vice*)
Christopher C. Palermo (*Pro Hac Vice*)
Philip D. Robben (*Pro Hac Vice*)

101 Park Avenue
New York, New York 10178
Telephone: (212) 808-7800
Facsimile: (212) 808-7897

*Attorneys for Dey, Inc. on behalf of the Track Two Defendants*

**CERTIFICATE OF SERVICE**

       I certify that a true and correct copy of the foregoing was delivered on July 3, 2006 to all counsel of record in Civil Action No. 01-CV-12257-PBS by electronic means via LexisNexis File & Serve, pursuant to Paragraph 11 of Case Management Order No. 2.

       /s Philip D. Robben
       Philip D. Robben