Tab 25

Greg Keighley          HIGHLY CONFIDENTIAL          July 20, 2005
                          New York, NY

172

1    resources known, resources are available, that is
2    different than saying, here's the policy?
3            MR. TRETTER:  I think the problem
4        is you want to use the word policy,
5        although the witness hasn't used that
6        word.  If you want to talk about what
7        the general practice was, that's fine.
8        If you're asking for was something said
9        in particular in an e-mail or voice
10       mail, that's fine.
11       Q    I think the last question was, was
12   there something specific communicated to you or
13   other sales reps concerning whether you should or
14   should not discuss reimbursement issues with your
15   clients?
16       A    Once, again, it was a reactive
17   setting.  We can't say, "I don't know" to a
18   physician that's bringing the issue up.  It was
19   my policy, I can only speak myself, in that I was
20   not going out there proactively seeking it out.
21           If an office had literally a
22   handful of times where this was the issue of

Henderson Legal Services
(202) 220-4158

Edwards 3/15/06
Declaration Exhibit
G - Keighley

Greg Keighley         HIGHLY CONFIDENTIAL         July 20, 2005
                          New York, NY

173

1   the day for a physician, we're talking over a
2   hundred calls, four, five times a physician
3   brought this up, you know, it being a resource
4   I would try to say these are the people you
5   need to talk to.  It was responding to a
6   customer's need.
7              The issue didn't raise itself by
8   going to an office and saying, do you have any
9   questions about this.  It was not a proactive
10  concern on my part over any amount of time.
11             And that, I believe is due to
12  the information I received over time from
13  management, whether it was verbal or otherwise
14  that that's how I was supposed to do my job
15  function.  I cannot relate you to an e-mail,
16  saying, yes, we got an e-mail -- there had to
17  be some formal documentation or some informal
18  voice mail by management saying, yes, we recall
19  this.  There was a way I felt this is the way
20  the company wants me to account, and this is to
21  respond in a reactive setting to where I feel
22  I'm knowledgeable, but do not be proactive in

Greg Keighley        HIGHLY CONFIDENTIAL        Edwards 3/15/06
                     New York, NY               Declaration Exhibit
                                                G - Keighley
                                                July 20, 2005

174

1   the setting.  And that's the message I felt I
2   received over numerous meetings, over numerous
3   contacts with people in those situations of
4   people in authority.
5           Q    Were you ever made aware of
6   anyone -- is there some disciplinary procedure in
7   place if a sales rep did something untoward or
8   against company policy?
9           A    There's a variety of steps.
10  You're put on probation.  There's a first step,
11  there has to be a series of events that have led
12  to the next time this happens.  There are some
13  issues that are distinctly forbidden, that one
14  instance you have you're gone, you've signed off
15  on that.  Our company is very cautious, we're
16  very conservative with, you read this, you sign
17  this, your job is on the line.  We know exactly
18  where.  It's black and white on almost every
19  portion of our job description and up to
20  termination is part of a many scenarios that if
21  we do this or that activity your job is at stake.
22          Q    Was using margin, the margin we've