c) At ¶ 8 of that same September 3, 2004 Declaration in Support of Class Certification, I state:

"This scheme or course of conduct [in this litigation] is alleged to have been effectuated as follows. Defendant Drug Manufacturers artificially inflated the AWPs of their relevant drug products, which in turn increased and inflated the reimbursement rates earned by the market entities capable of 'moving market share' – distributors, intermediaries (PBMs) and/or providers – since reimbursement rates are formulaically related to AWP (or its equivalent, the Wholesale Acquisition Cost or WAC). At the same time, Defendant Drug Manufacturers offered price offsets, discounts, rebates and/or off-invoice incentive payments to the market entities capable of 'moving market share.'

- When the price offsets and other incentives *were paid directly to providers and/or distributors*, the actual acquisition costs (AAC) of the drugs were lowered to these entities and the resulting 'spread' (or 'Return to Practice (RTP)' as the spread was called in the Lupron litigation) increased.

- When the price offsets, rebates and off-invoice price incentives *were paid to market intermediaries such as PBMs (rather than the actual providers),* the financial considerations were reflected in a lower manufacturer average sale price (ASP) and an inflated AWP."

Throughout my testimony, I have consistently opined that the ASP is less than WAC for both self-administered and physician administered drugs; hence **I have always opined that ASP is less than AWP.**[68]

d) Perhaps Dr. Addanki's misunderstanding stems from confusion between the yardsticks for a finding of causation and liability (when the AWP exceeds the ASP by 30%) and the yardsticks for damages, once liability has been determined. Such a confusion is difficult to explain, given that I have developed the liability yardsticks in great detail in ¶¶ 50-60 of my December 15, 2005 Declaration on

---

[68] This analytic point of departure is obvious for physician-administered drugs from the *Lupron Sentencing Memorandum* (see footnote 18 of the September 3, 2004 Declaration). For self-administered drugs, see ¶ 42 of my December 16, 2004 Rebuttal Declaration where I agree with Defendants' Expert Mr. Young: "Mr. Young still finds (at ¶ 134) that 'payors expressed their pharmacy reimbursement based on formulas that included a discount off of AWP between 14% and 18% to provide pharmacies margin on the drugs dispensed to their members, **understanding that (a) pharmacies typically acquire self-administered brand name drugs [orals] at or around WAC and (b) the AWP on brand name drugs generally is stated at 20% to 25% markup over WAC** (or the equivalent  16.7% or 20.0% discount off of AWP, respectively)'" (emphasis added). See also portions of footnote 60 to my December 15, 2005 Declaration on Liability and Calculation of Damages, where I cite Dr. Gaier's endorsement of Dr. Schondelmeyer's analysis: "Dr. Schondelmeyer (Schondelmeyer Declaration, p. 37; *Emphasis added*) ... writes:

'For most brand name products that are still covered by patent or exclusivity terms, the price relationship between list prices (AWP and WAC) and actual transaction prices (actual acquisition cost or average selling price) for a given class of trade is *reasonably predictable*. That is, the WAC is equal to, or close to (+ or - *5%)* the actual acquisition cost for the community pharmacy class of trade and the AWP, at present, is typically 20 to 25 percent above the WAC, or alternatively, WAC is 16.67 or 20 percent below AWP. *In such cases, a payment policy using AWP as a benchmark (e.g., usually AWP minus a certain percent) may be relatively accurate.*'"

Liability and Calculation of Damages. Upon a finding of liability, I rely upon the relevant Medicare Statute regarding reimbursement as being the **lower of the AWP (or the relevant percentage of AWP**[69]**) and the EAC,** which is discussed in great detail in ¶¶ 63-65 of the December 15, 2005 Declaration. Neither analysis requires or assumes that AWP should equal ASP.

e) Dr. Addanki's assertion "that the manufacturers' average selling prices ('ASPs') [is] the price paid by wholesalers" (the 2nd bullet point in ¶ 28 above) is completely erroneous. The WAC (or WLP) is the price paid by wholesalers; the ASP is the transaction price received by manufacturers after all relevant negotiated price offsets to all relevant parties are netted out.[70] Likewise, Dr. Addanki's assertion that Plaintiffs allege "AWP should represent … prices charged by wholesalers" is completely erroneous. My position on AWP could not be clearer; see ¶¶ 5, 6, 9, and 29.a)-.c) above.

f) Dr. Addanki attempts to further explicate this erroneous assertion in his ¶ 20, stating "The AWP, according to the plaintiffs, is meant to represent the average *wholesale* price, the price *received* by wholesalers." This characterization is incorrect. I have never made it; neither the Court nor Dr. Berndt has ever attributed it to me.

g) The last two bullets in Dr. Addanki's ¶ 7 (see above) derive directly from the flawed analysis in his ¶¶ 20-24. Of course, "the [a]ssumption of [e]quality of AWP and 'ASP' [l]eads to [a]bsurd [r]esults" (the heading to his Section B on page 10), absurd results that he discusses in his ¶¶ 25-26. That is why I never make such an assumption.

### B. Dr. Addanki's Analysis of the Median AWP for Generic Drugs is Distorted

30.   To further elaborate on Section II.E above, I discuss in detail Dr. Addanki's incorrect analysis of the median AWP. The charts he produces are incorrect and misleading.[71] The wide range of AWP prices he depicts is erroneous.

a) Attachment E presents the data Dr. Addanki presents in his Figures 2 and 3, which grossly overstate the real variation in the generic AWPs. His analysis also distorts the calculated median.

- My analysis indicates that contrary to his claims,[72] in many cases the Warrick AWP price is the median as shown in Attachment E.

---

[69] See footnote 13 of my December 15, 2005 Declaration on Liability and Calculation of Damages.

[70] Calculation of the overall ASPs would net out **all price offsets** to wholesalers, retailers, PBMs, providers and TPPs. For purposes of the damage calculations in the December 15, 2005 Declaration, I calculated the ASP = EAC of providers. I therefore did not net out PBM/TPP rebates, since they were not received by providers.

[71] Addanki Declaration, Figures 2 (Exhibit 4A) and Figure 3 (Figure 4B) found on pages 18 and 19, respectively.

b) Once Dr. Addanki's inappropriate observations are removed as explained in Attachment E, the corrected dispersion of generic AWPs is much tighter than he admits. However, still remaining in this set of generics is a number of repackagers.[73] It appears to be appropriate to include them for the purpose of calculating the Medicare reimbursement rate. However, repackagers add some value, and repackaged formulations are strictly not identical to the original branded version. Hence, analysis of strategic AWP-pricing behavior of manufacturers of bioequivalent formulations should focus on those generic presentations that are not repacked or unit-dosed. I do so in Attachment E, where I present the dispersion of generic AWPs excluding all repackaged presentations. The result is an even tighter cluster of generic AWPs. This clustering pattern of generic AWPs is observed commonly for pharmaceutical products once generic launch occurs.

c) While Dr. Addanki is correct when he states (¶ 40), "no individual manufacturer has any incentive to attempt to 'inflate' its AWP," it is true **all** generic manufacturers of a given drug have the incentive to maintain the median AWP as high as possible, in order to increase the spreads of all manufacturers relative to potential alternative therapeutic competitors. The tight cluster of prices that is therefore observed appears to reveal a tacit Nash equilibrium in generic AWPs, all grouped close to the branded AWP for which the generics are equivalent. See Attachment E.[74] This Nash equilibrium is not unlike that noted by Dr. Berndt with regard to the observed similar relationship between AWP and WAC over most branded drugs.[75]

d) Again, as noted in ¶ 21.d) above, this Nash equilibrium dispersion of generic AWP and the median AWP used for Medicare reimbursement are themselves all artificially inflated to the extent that the branded AWP against which the generic AWPs are set, is artificially inflated.

**C.   Dr. Bell Claims that the Alleged AWP Inflation Scheme is Standard Business Practice**

31.   As noted in Section II.F above, Dr. Bell argues that BMS pricing procedures reflect standard economic behavior. He asserts (at ¶ 7.b), "The BMS list prices are

---

[72] At his ¶ 39, he asserts "Indeed, the AWPs for Warrick's albuterol products are at the lower end of the range of AWPs," certainly implying that they are below the median. At ¶ 43, he asserts "The AWPs for these [Warrick's] albuterol products are generally at or below the median of the prices of products with a similar product description."

[73] Repackagers are companies that take drugs out of their original manufacturer packaging and put them into new packaging for resale. At times, repackagers may use non-standard package sizes.

[74] The Schering Plough Concise Statement of Undisputed Material Facts supports the Nash clustering behavior. At ¶35, Schering Plough states "When Warrick was the first to introduce a generic product, it generally set AWP at 10-20% below the equivalent brand product's AWP. Weintraub Decl. ¶ 11; see also Weintraub Dep. Tr. at 31; Sherman Dep. Tr. at 31, 41, 56." See also footnote 50 above.

[75] Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, February 9, 2005, p. 10.

---

determined in a manner that is consistent with standard economic behavior. ...   BMS establishes a list price at launch based on an assessment of the market conditions, ... BMS may implement list price increases on a regular basis ... based on ... market conditions. ... Once ... generic competition [occurs], BMS generally does not implement further list price increases."

Having thus set list prices, BMS may offer discounts and rebates off of the list prices, but "BMS does not include discounts or rebates in the list price, and that is consistent with common business practice; a list price, typically by definition, does not include discounts or rebates" (¶ 24).

These practices, as described by Dr. Bell, are standard economic practices. For example, most consumers understand that manufacturers set list prices or "suggested prices;" that manufacturers offer rebates and discounts to retailers and consumers; that consumers gather information on those discounts and rebates offered, in order to make an informed purchase; and as a result, consumers can negotiate transaction prices below the suggested list prices.   Some consumers even think of the difference between the suggested list price and the transaction price they pay as the **spread** earned by the manufacturer and retailer.   Indeed, this is the paradigm that I use as the basis for my formulaic analysis of liability and damages.

While discussing this paradigm, Dr. Bell fails to address the allegations in this matter using the paradigm.  Specifically, Plaintiffs allege that while it is well understood that discounting off list price occurs in this market (and in many other markets and is reflected in standard economic theories), liability has arisen in this matter because Defendants have exploited market expectations regarding **the usual** amount of the discounts generally offered by offering substantially greater (and surreptitious) price offsets and **surreptitiously increasing the AWP relative to the resulting ASP.**  The result has been spreads well in excess of what the market understood, expected, and upon which price negotiations were based.  The fraud is not that Defendants offered discounts off of list prices.  The alleged fraud is that the size of the discounts relative to fixed and/or increased AWPs was large, in excess of consumer expectations and unknown to consumers.  The reimbursement rates paid were therefore well in excess of what they should have been absent the fraud.

32.    In his ¶¶ 68-70, Dr. Bell critiques my analysis of "market expectations" using Taxol as an example.  He asserts (at ¶ 70) "Any payor would expect more price competition when there is generic competition.  Accordingly, if one were to advance a theory of 'market expectations' regarding the difference between acquisition cost and AWP, one must account for the evolution of competition, requiring that the 'market expectations' adjust by product over time.  Dr. Hartman does not appear to put forth such a theory."

Dr. Bell correctly notes that market expectations regarding the relationship between acquisition costs and AWP have adjusted over time.  I also explicitly noted this in my September 3, 2004 Declaration in Support of Class Certification with respect to self-administered generics.[76]  However, much of the survey information that I discussed

---

[76]  See ¶¶ 29 and 30 of the Declaration and ¶ 21 of Attachment D to that Declaration.

regarding market expectations in the face of generic launch that exists has focused upon self-administered generic drugs, with insufficient specific survey information on a broad cross-section of multi-source physician-administered drugs to effectively inform payers of the extent of the spreads that were occurring with Taxol.[77]  Hence, while I admit to the possibility raised by Dr. Bell, I conclude with Dr. Berndt[78] that insufficient survey information exists to have informed changing "price expectations" for multi-source physician-administered drugs over time.

### D.   Data Issues Raised in Defendants' Expert Reports

#### *Dr. Bell Incorrectly Claims that the Use of a Particular AWP Publisher will Affect My Allegation of Liability*

33.     At his ¶ 8.a) Dr. Bell faults my analysis, asserting that "An allegation of liability may result from using a pricing publication that calculates its AWP as 125 percent of WLP but not from using a pricing publication that calculates its AWP as 120 percent of WLP.  As the pricing publications are independent of BMS, use of Dr. Hartman's methodology leads to a capricious determination of alleged liability and damages that would not appear to be an appropriate foundation for expert opinion."  He expands upon this criticism in his ¶¶ 73-75, asserting that the source of AWP reporting (Red Book versus First DataBank (FDB)) will provide different AWPs and different measures of spread.

His **criticisms fail** for the following reasons:

a)   My liability threshold makes no assumptions about WAC (or WLP) and its relationship to AWP.  Those spreads are based upon BMS's strategic decisions, the practices of the price reporting services and BMS's monitoring of the price reporting services.

b)   If Dr. Bell will closely examine ¶¶ 57-60 of my December 15, 2005 Declaration on Liability and Calculation of Damages, he will find that in developing my threshold for liability, I examined spreads calculated **using both** Red Book and FDB.  The threshold of liability was made high enough so that use of one reporting service instead of another would not bias the determination of liability.

c)   My liability and damage analyses **use Red Book AWPs** almost exclusively.  I make use of FDB only when Red Book AWPs were not available.  It is well known that prior to 2001-2002, Red Book and FDB AWPs were generally identical; when they differed, FDB AWPs were sometimes higher than those of Red Book.  During and certainly after 2001-2002, FDB AWPs were more

---

[77] See Section II.C above.  The most complete survey information for multi-source physician-administered drugs was for albuterol.

[78] See ¶ 60 and footnote 63 of my December 15, 2005 Declaration on Liability and Calculation of Damages.

frequently higher than Red Book AWPs, because FDB raised its spread relative to WAC from 20% to 25%.

Hence, my consistent reliance on Red Book provided, for the most part, conservative estimates of the AWP-ASP spreads for all drugs. The Red Book AWP was, for the most part, either less than or equal to the FDB AWP.[79]

### Data Issues Raised by Dr. Bell

34.     Finally, Dr. Bell raises factual issues that can only be resolved once the supporting materials for his declaration are received and analyzed. He also raises legal issues that can only be resolved by the Court. Issues raised by Dr. Bell include the following.

   a) At his ¶ 8, he faults my Supplemental Declaration because it "uses data on sales to hospitals and other classes of trade that are not subject to this litigation." As I stated in ¶ 2 of my February 3, 2006 Supplemental Declaration on Liability and Calculation of Damages, I performed the supplemental calculation for several reason, one being that "the Court [could] adopt a different approach to the definition of ASP." Inclusion of hospitals and other classes of trade were part of that "different approach to the definition of ASP." I understand that the appropriate entities to be included in the calculation of the relevant ASP will be determined as a matter of law.

   It should be noted however, that the "inclusion of hospitals and other classes of trade" only go to the calculation of the ASP. Units sold to "hospitals and those other classes of trade" are not included in the units subject to the damage calculation.

   b) At his ¶ 8.b), Dr. Bell refers to my "failure to exclude purchases by customers of BMS that are not class members and by those aware of acquisition costs" (this latter group he addresses more fully in his ¶ 72).

   • In my December 15, 2005 Declaration on Liability and Calculation of Damages, I made use of the electronic data provided by BMS and all descriptive materials provided. The descriptive materials allowed my staff to implement (as described in the Attachments to that Declaration) the appropriate calculation of the relevant units subject to damages and the ASPs

---

[79] Note also that Dr. Bell argues that if a price change occurs in the middle of a year, my analysis may find liability if the annual ASPs are compared to the higher end-of-year AWP rather than the lower beginning-of-year AWP. He concludes that "Had Dr. Hartman properly accounted for the change in AWP during 1993 [for Paraplatin, as an example], I do not believe that he would have found liability" (¶ 75).

When developing my formulaic methodology, I considered implementing it monthly, quarterly or annually. I analyzed the pattern of spreads involved with each choice. I found that the spreads deviated considerably when calculated monthly or quarterly, because manufacturer incentive payments (discounts and rebates and other incentives) vary arbitrarily and inconsistently by month and quarter. The most reasonable results occurred with the annual measures I have used. While Dr. Bell's suggestion might lead to his hypothesized result for Paraplatin, it could also lead to the opposite results for another BMS drug. In any case, the overall results should be *de minimis*.

relevant to the damage calculations. To the extent that Dr. Bell is referring to hospitals and those classes of trade reflected in the ASP calculations in my February 3, 2006 Supplemental Declaration, I understand that this assertion must be subjected to judicial scrutiny.

- In light of my refutation of Dr. Gaier's analysis and his assertion that direct purchasers were more informed payors able to negotiate reimbursement rates reflecting ASPs rather than AWPs (see ¶¶ 12-17 above), Dr. Bell's assertion that I should exclude such payors fails.

c) At his ¶¶ 78-79, Dr. Bell cites my use of NAMCS data for the apportionment of sales of Cytoxan and Taxol but faults me for not using NAMCS data for all other BMS drugs. As I stated in my December 15, 2005 Declaration on Liability and Calculation of Damages (¶ 61), I made use of NAMCS data if available for a given manufacturer. If such NAMCS data were not available, I arbitrarily but explicitly apportioned units sold to Medicare and non-Medicare as 50%/50%. I had asked each Defendant for IMS data that is comparable to the NAMCS data, so that I could be more exact.[80] However, Defendants did not respond to these data requests for inclusion in my reports.[81]

d) At his ¶ 69, Dr. Bell asserts that I "[speculate] with respect to missing data," referring apparently to my extrapolation of damages to those years for which **BMS did not provide me with necessary data**: 1991, 1992, 2003 and 2004 (see his ¶¶ 80-81.). In extrapolating damages to those years, I made use of standard economic methods.

In summary, as I have stated above in Section II.H, Dr. Bell's analyses are insufficient to cause me to change my opinions regarding my formulaic methodologies or the process of calculating damages based on those methodologies.

### Additional Issues Raised by Mr. Dukes

35.    Mr. Dukes' "pattern" analysis misstates my testimony and leads to a false conclusion. He states, "I am advised that Dr. Hartman has testified that, in his opinion, one indicia of whether a manufacturer is illegally manipulating a product's AWP is the 'pattern' of its 'spread' over time." He goes on to state that, in his opinion, he does not see "any discernable pattern."[82] A pattern may be one indicia of manipulating AWP and marketing the spread, but it is not the only one. As is clearly evident in my formulaic methodology, any spread that exceeds the 30% threshold meets liability and generates damages. Furthermore, among all Procrit NDCs, there are multiple instances of exceeding the threshold over time. This pattern is unique to this drug, and results in calculated damages.

---

[80]  The relevant data are the NDTI data; see footnote 65 of the December 15, 2005 Declaration.

[81]  Since submitting my December 15, 2005 Declaration and my February 3, 2006 Supplemental Declaration, I have been informed by Counsel that BMS asserts that it does not subscribe to the NDTI product from IMS.

[82]  Dukes Declaration, ¶ 60.

36.     Mr. Dukes also presents a managed care rebate analysis for Remicade (at his ¶¶ 54-56).  The data used by Mr. Dukes were not provided to me until after my Declarations were completed, and I have not fully analyzed these new data.  Nevertheless, I cannot agree with Mr. Dukes' analysis.  There are several analytic flaws evident upon cursory review.  First, Mr. Dukes has provided no economic theory, analysis or discussion regarding the appropriateness of reducing the spread by the rebate amounts received by TPPs.  These rebates clearly do not contribute to the "return to practice" for physicians prescribing Remicade.  Nor has Mr. Dukes discussed whether it is appropriate to use his methodology when determining liability.  Furthermore, he has not conducted an analysis of how these rebates may have been applied in the but-for world as well, thus possibly offsetting any "benefits" Mr. Dukes calculates in the actual world.  Regardless, Mr. Dukes appears to have improperly included rebates to PBMs in his analysis of TPP rebates.  There is no evidence that PBMs pass on all or any particular portion of the rebates they receive on injectable drugs to their TPP clients, and Mr. Dukes provides no information to the contrary.  Therefore, rebates to PBMs should not be included, and Mr. Duke's inclusion of such rebates is incorrect.

I declare under penalty of perjury that this Declaration is true and correct.

Executed on April 6, 2006

Raymond S. Hartman

**Attachment A**

**Attachment A:  Materials Cited**

**Bates Numbered Documents:**

- BMS/AWP/01406365
- BMSAWP/0011245-8

**Legal Documents:**

Addanki, Sumanth, Declaration of Sumanth Addanki, Ph.D., *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

AstraZeneca Pharmaceuticals LP's Memorandum of Law in Support of its Motion for Summary Judgment, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Bell, Gregory K., Merits Report and Declaration of Gregory K. Bell, Ph.D., *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Berndt, Ernst R., Report of  Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, February 9, 2005

Concise Statement of Undisputed Material Facts in Support of Schering-Plough Corporation's and Warrick Pharmaceuticals Corporation's Motion for Summary Judgment, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

DeMaina, Denise, Deposition, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, January 5, 2006.

Dukes, Jayson S., Declaration of Jayson S. Dukes in Support of the Johnson & Johnson Defendants' Motion for Summary Judgment As to Class 1 and Class 2, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Farias, Robert C., Deposition, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, October 20, 2004.

Gaier, Eric M., Declaration of Eric M. Gaier, Ph.D., In Support of Track 1 Defendants' Joint Motion for Summary Judgment,  *In Re Pharmaceutical Industry Average Wholesale Price*

*Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Hartman, Raymond S., Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, September 3, 2004.

Hartman, Raymond S., Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, December 15, 2005.

Hartman, Raymond S., Deposition, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, February 27, 2006.

Hartman, Raymond S., Rebuttal Declaration of Dr. Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257-PBS, December 16, 2004.

Hartman, Raymond S., Supplemental Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages: Addendum, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, Civil Action No. 01-CV-12257-PBS, February 3, 2006.

Memorandum and Order re:  Motion for Class Certification, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257.

Memorandum in Support of GSK's Motion for Summary Judgment as to all Claims asserted by Plaintiffs David and Susan Ruth Aaronson and Certain Claims Asserted by Classes 1 and 2, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Memorandum in Support of Schering-Plough Corporation's and Warrick Pharmaceuticals Corporation's Motion for Summary Judgment as to Class 2 Claims, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Memorandum of Law in Support of Track 1 Defendants' Joint Motion for Summary Judgment, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Mulrey, Michael T., Deposition, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, January 5, 2006.

Navarro, Robert P., Declaration of Robert P. Navarro in Opposition to the Plaintiffs' Motion for Class Certification, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257.

Rosenthal, Meredith, Liability Report of Dr. Meredith Rosenthal, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257-PBS, December 15, 2005.

The BMS Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

The Johnson & Johnson Defendants' Memorandum in Support of their Motion for Summary Judgment as to Class 1 and Class 2, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, March 15, 2006.

Third Amended Master Consolidated Class Action Complaint, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, October 17, 2005.

Sentencing Memorandum of the United States, *United States of America v. TAP Pharmaceutical Products, Inc.*, United State District Court for the District of Massachusetts, Eastern Division, Criminal Action, No. 01-CR-10354-WGY.


**Other Materials:**

1991 Medicare Statutory Revision, 56 FR 59621 Nov. 25, 1991, Code of Federal Regulations, Title 42, Volume 2, Parts 400 to 429, Revised as of October 1, 1996, From the U.S. Government Printing Office via GPO Access.

Alpert, Bill, "Hooked on Drugs:  Why Do Insurers Pay Such Outrageous Prices for Pharmaceuticals?" *Barron's*, June 10, 1996.

Borenstein, Severin, Richard Gilbert and A. Colin Cameron, "Do Gasoline Prices Respond Asymmetrically to Crude Oil Price Changes?" Quarterly Journal of Economics, Vol. 112, No. 1, February 1997.

Department of Health and Human Services, Centers for Medicare and Medicaid Services, CMS Manual System, Pub. 100-04 Medicare Claims Processing, Transmittal 397, December 16, 2004.

Department of Health and Human Services, Office of Inspector General, "A Comparison of Albuterol Sulfate Prices," OEI-03-94-00392, June 1996.

Department of Health and Human Services, Office of Inspector General, "Are Medicare Allowances for Albuterol Sulfate Reasonable?" OEI-03-97-00292, August 1998.

Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Payments for Prescription Drugs," OEI-03-97-00290, December 1997.

Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Reimbursement for Albuterol," OEI-03-01-00410, March 2002.

Department of Health and Human Services, Office of Inspector General, "Medicare Payments for Nebulizer Drugs," OEI-03-94-00390, February 1996.

Department of Health and Human Services, Office of Inspector General, "Medicaid Pharmacy – Actual Acquisition Cost of Brand Name Prescription Drug Products," A-06-00-00023, August 2001.

Department of Health and Human Services, Office of Inspector General, "Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products," A-06-01-00053, March 2002.

Department of Health and Human Services, Office of Inspector General, "Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products," A-06-02-00041, September 2002.

Department of Health and Human Services, Office of Inspector General, "Medicare Reimbursement of Albuterol," OEI-03-00-00311, June 2000.

Department of Health and Human Services, Office of Inspector General, "Medicare Reimbursement of Prescription Drugs," OEI-03-00-00310, January 2001.

Department of Health and Human Services, Office of Inspector General, "Physicians' Costs for Chemotherapy Drugs," A-02-91-01049, November 1992.

Department of Health and Human Services, Office of Inspector General, "Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs," A-06-96-00030, April 1997.

Department of Health and Human Services, Office of Inspector General, "Medicare Reimbursement for Lupron," OEI-03-03-00250, January 2004.

Department of Health and Human Services, Office of Inspector General, "Suppliers' Acquisition Costs for Albuterol Sulfate," OEI-03-94-00393, June 1996.

Department of Health and Human Services, Office of Inspector General, "Update: Excessive Medicare Reimbursement for Albuterol," OEI-03-03-00510, January 2004.

Department of Health and Human Services, Office of Inspector General, "Semiannual Report, April 1, 1997 – September 30, 1997."

Federal Register, August 20, 2003, 42 CFR 405, pp. 50428-52.

Federal Register, January 7, 2004, 42 CFR 405 and 414, pp.1084-267.

Gencarelli, Dawn M, "Average Wholesale Price for Prescription Drugs: Is There a More Appropriate Pricing Mechanism," National Health Policy Forum Issue Brief No. 775, George Washington University, June 7, 2002.

Gray, Tom, "Construction Ahead," Homecare, October 1, 2002 (http://homecaremag.com/mag/medical_construction_ahead/).

"Health Care Reform – Prescription for Quality Health Care – The Average Wholesale Price (AWP) Litigation," MASSPIRG (http://masspirg.org/MA.asp?id2=5310&id3=MA&).

"Hearing: Medicaid and AWP Hearing: Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much," December 7, 2004 (http://globalag.igc.org/health/us/2004/toomuch.pdf).

Jacobson, M., A. J. O'Malley, C. C. Earle, J. Pakes, P. Gaccione and J. P. Newhouse, "Does Reimbursement Influence Chemotherapy Treatment for Cancer Patients?" *Health Affairs*, Mar/Apr 2006, 25, 2, pp. 437-443.

Kleinke, J.D., "Re-Naming and Re-Gaming: Medicare's Doomed Attempt to Reform Reimbursement for Injectable Drugs," *Health Affairs*, December 8, 2004.

Letter from Nancy-Ann Min DeParle, Department of Health and Human Services, Health Care Financing Administration, September 8, 2000.

Letter from Z. Bently, Ven-A-Care to Dr. Bruce Vladeck, HCFA, In Re Excessive Reimbursements for Certain Pharmaceuticals by the Medicare and Medicaid Programs, October 2, 1996.

"Medicaid's Reimbursements to Pharmacies for Prescription Drugs," Congressional Budget Office, December 2004 (http://www.cbo.gov/showdoc.cfm?index=6038&sequence=1).

"Medicare Chemotherapy Payments: New Drug and Administration Fees Are Closer to Providers' Costs," United States Government Accountability Office, December 1, 2004, GAO-05-142R.

Medicare Payment Advisory Commission (MedPAC), "Report to the Congress: Variation and Innovation in Medicare," June 2003.

"Medicare: Payment for Covered Outpatient Drugs Exceed Providers' Cost," United States General Accounting Office, Report to Congressional Committees, September 2001, GAO-01-1118.

Office of Inspector General, "Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program," A-06-89-00037, October 1989.

Pear, Robert, "Administration Plans Cuts in Some Drug Payments," *The New York Times*, August 6, 2000.

"Prescription Drugs: Changes in Prices for Selected Drugs," United States General Accounting Office, Report to Congressional Requesters, August 1992.

Reeb, George, Assistant Inspector General, Centers for Medicare and Medicaid Audits, Department of Health and Human Services. Testimony to the House Committee on Ways and Means Subcommittee on Health, October 3, 2002.

Reeb, George, Assistant Inspector General, Centers for Medicare and Medicaid Audits, Office of Inspector General, U.S. Department of Health and Human Services. Testimony to the House Committee on Energy and Commerce Subcommittee on Oversight and Investigations, December 7, 2004.

"Reform of the Medicare Payment Methods for Cancer Chemotherapy," American Society of Clinical Oncology, May 2001 (http://www.asco.org/asco/downloads/MedicarePaymentReform ASCOWhitePaper.pdf).

Rozek, Richard P. and Ruth Berkowitz, "The Costs to the U.S. Health Care System of Extending Marketing Exclusivity for Taxol," *Journal of Research in Pharmaceutical Economics*, Vol.9(4): 21-41, 1999.

Spears, James M. and Jeff Pearlman, "Using Litigation to Regulate Drug Prices: The Assualt on 'AWP,'" Washington Legal Foundation, Critical Legal Issues, Working Paper Series No. 107, February 2002.

**Attachment B**



**Attachment B.1**

**Comparison of BCBS-MA Reimbursement Amounts for Vepesid (J9181) with AWP and ASP**

Note: NDC 00015-3061-20 is used
for the AWP and ASP.

Privileged and Confidential



**Attachment B.2**

**Comparison of BCBS-MA Reimbursement Amounts for Zofran (J2405) with AWP and ASP**

Note: NDC 00173-0442-00 is used
for the AWP and ASP.



Privileged and Confidential



**Attachment B.3**

**Comparison of BCBS-MA Reimbursement Amounts for Procrit (Q0136) with AWP and ASP**

Note: NDC 59676-0302-01 is used for the AWP and ASP.

Privileged and Confidential

Attachment B.3



**Attachment B.4**

**Comparison of BCBS-MA Reimbursement Amounts for Kytril (J1626) with AWP and ASP**

Note: NDC 00029-4149-01 is used for the AWP and ASP.

Privileged and Confidential

Attachment B.4



**Attachment B.5**

**Comparison of BCBS-MA Reimbursement Amounts for Kytril (Q0166) with AWP and ASP**

Note: NDC 00029-4151-05 is used
for the AWP and ASP.

Privileged and Confidential

Attachment B.5



**Attachment B.6**

**Comparison of BCBS-MA Reimbursement Amounts for Blenoxane (J9040) with AWP and ASP**

Note: NDC 00015-3010-20 is used for the AWP and ASP.

Privileged and Confidential

Attachment B.6



**Attachment B.7**

**Comparison of BCBS-MA Reimbursement Amounts for Zoladex (J9202) with AWP and ASP**

Note: NDC 00310-0960-36 is used
for the AWP and ASP.

Privileged and Confidential





Attachment B.8

Comparison of BCBS-MA Reimbursement Amounts for Taxol (J9265) with AWP and ASP

Note: NDC 00015-3475-30 is used
for the AWP and ASP.

Privileged and Confidential

Attachment B.8



Attachment B.9

Comparison of BCBS-MA Reimbursement Amounts for Remicade (J1745) with AWP and ASP

Note: NDC 57894-0030-01 is used for the AWP and ASP.

Privileged and Confidential

Attachment B.9

**Notes to Attachment B**
**Blue Cross Blue Shield of Massachusetts Electronic Data Calculation Notes**

**File List:**
(AWP Track 1 data with Mem ID's.mdb: BCBS Track 1 claims data[1])

**Sources:**
Deposition of Denise M. DeMaina (Blue Cross Blue Shield of Massachusetts), January 5,
2006.

**Data Processing:**

- The data were exported to a tab delimited format ("BCBS data.txt"), and then
  imported into SAS.
- Records where the claim number begins with '25' or '30' were flagged as
  Medigap. According to the DeMaina deposition (pp. 119-121), these represent
  some, but not all, Medigap payments.
- Records where ALLOWED_AMT or PAID_AMOUNT equal zero were excluded
  from this analysis.
- Records where SERV_PROV begins with '0000' followed by a letter, followed
  by five numbers were identified as physician providers (pp. 88-89 of DeMaina
  deposition). All other records (non-physician providers) were excluded from this
  analysis.
- For non-Medigap payments, average reimbursement was calculated as
  ALLOWED_AMT/NUMBER_SERVICES where NUMBER_SERVICES does
  not equal zero. It is assumed that NUMBER_SERVICES is in terms of number
  of J-code billing units.
- For Medigap payments, average reimbursement was calculated as
  5*(PAID_AMOUNT/NUMBER_SERVICES) where NUMBER_SERVICES
  does not equal zero. It is assumed that NUMBER_SERVICES is in terms of
  number of J-code billing units.
- Annual AWP data were merged from Hartman's December 15, 2005 Declaration,
  using the NDCs indicated in each figure. Average reimbursement was adjusted
  from the fundamental billing unit for each J Code to the appropriate units for each
  NDC.
- For 1998 – 2003, adjusted AWP is calculated as 0.95*AWP. Before 1998,
  adjusted AWP is equal to AWP.
- Records not flagged as Medigap, where the average reimbursement (based on
  PAID_AMOUNT) is between 17 and 23 percent of adjusted AWP (inclusive), are
  assumed to represent Medigap payments not identifiable using the claim number

---

[1] Note that these data do not include the Pipefitters Union (group number 002225284) or the Sheet Metal
Workers Union (group number 002229789), which were provided separately. These two groups account
for fewer than 200 records and therefore would not change the results of this analysis in any substantial
way.

(see DeMaina Deposition, pp. 119-121). For these records, the average reimbursement is calculated as 5*(PAID_AMOUNT/NUMBER_SERVICES).

- Records where the average reimbursement is less than 10% of adjusted AWP or greater than 200% of adjusted AWP (exclusive) are excluded from this analysis.
- A total dollar amount is calculated for each record as the product of NUMBER_SERVICES and the average reimbursed amount. Dollars are tabulated by J code by year.
- Units are calculated by tabulating NUMBER_SERVICES by J code by year.
- Average reimbursement by J code by year is calculated as Dollars/Units.
- Average reimbursement is graphed, with AWP, adjusted AWP and ASPs from selected NDCs in Hartman's December 15, 2005 Declaration.

**Attachment C**

# Attachment C.1: Review of Industry Reports Cited in Dr. Addanki's Footnote 16

| # | ✓ | Report Author | Report Title | Report | Report Date | Spread | Methodology of Spread Calculation | Type of Drug(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | ✓ | OIG | Use of AWP in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program | OIG | October 1989 | AWP and ASP | Obtained prices from drug wholesalers and compared to "national drug pricing authorities" including Medispan and the Blue Book. Average discount for single and multi-source drugs was 15.5% | Sample of fifty-five single and multi-source drugs purchased by pharmacies. |
| 2 | ✓ | GAO | Prescription Drug: Changes in Prices for Selected Drugs | GAO A-02-91-01049 | August 1992 | Dollar Based | Comparison of AWP and other prices to determine changes in prices in relation to industry CPIs | Prescription drugs purchased by pharmacies |
| 3 | ✓ | OIG | Physicians' Costs for Chemotherapy Drugs | OIG | November 1992 | AWP Based | Expressed as the invoice costs' percentage below the AWP | Chemotherapy drugs |
| 4 |  | OIG | Medicare Payments for Nebulizer Drugs | OEI-03-94-00390 | February 1998 | Dollar Based | Suggests that Medicare should use EAC for reimbursement of nebulizer drugs rather than AWP | Nebulizers (Albuterol Sulfate and others) |
| 5 | ✓ | OIG | Suppliers' Acquisition Costs for Albuterol Sulfate | OEI-03-94-00393 | June 1996 | Dollar Based | Comparison of Medicare reimbursement amounts and estimated acquisition/supplier costs | Albuterol |
| 6 | ✓ | OIG | A Comparison of Albuterol Sulfate Prices | OEI-03-94-00392 | June 1996 | Medicare Price (AWP) Based | Comparison of Medicare reimbursement amounts and estimated acquisition/supplier costs | Albuterol |
| 7 | ✓ | Bill Alpert | Hooked on Drugs: Why Do Insurers Pay Such Outrageous Prices for Pharmaceuticals | Barron's | June 1996 | AWP Based | Comparison of AWP and wholesale prices of about 300 drug forms. Article highlights a select number of drugs. | PA Medicare Part B generic and single-source drugs |
| 8 |  | OIG | Medicaid Pharmacy - Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs | A-06-96-00030 | April 1997 | AWP Based | Invoice price as a percentage below AWP | Medicaid-covered brands sold at pharmacies |
| 9 | ✓ | OIG | Semiannual Report, April 1, 1997 - September 30, 1997 | OIG (DHHS) | April-Sept 1997 | AWP Based | Based on OIG Reports, EAC percentage discount for brand and generic drugs off of AWP | Medicaid-covered brands sold at pharmacies |
| 10 | ✓ | OIG | Excessive Medicare Payments for Prescription Drugs | OEI-03-97-00290 | December 1997 | ASP Based | Reported as the Medicare allowed amount as a percentage above the average acquisition cost | Twenty-two of the top thirty Medicare Part B drugs with the highest total Medicare payments in 1995 |
| 11 | ✓ | OIG | Are Medicare Allowances for Albuterol Sulfate Reasonable? | OEI-03-97-00292 | August 1998 | ASP Based | Medicare allowed up to 333% more than acquisition costs for albuterol | Albuterol |
| 12 |  | Rozek and Berkowitz | The Crisis in the US Health Care System of Economizing Marketing Exclusivity for Taxol | Journal of Research in Pharm Econ | 1999 | AWP Based | Calculated as the percentage ratio of manufacturer price over the AWP | Taxol and a few other cancer drugs |
| 13 | ✓ | OIG | Medicare Reimbursement of Albuterol | OEI-03-00-00311 | June 2000 | Medicare Price (AWP) Based | Difference between the prices, divided by the Medicare reimbursement price | Albuterol |
| 14 | ✓ | Robert Pear | Drug Companies Getting Cuts in Some Drug Payments | The New York Times | August 6, 2000 | EAC/ASP Based | Describes the markups received by doctors as a percentage over their cost (up to 700%). Cites a 1997 DHHS cost based report. | PA Medicare Part B oncology drugs. Report cited 1997 DHHS study of 22 drugs |
| 15 |  | DHHS | Letter from Nancy-Ann Min DeParle | DHHS (HCFA) | September 8, 2000 | Dollar Based | DOJ-collected pricing data compared to AWP's in Redbook. Dollar spread reported for only one example. | Medicaid-covered brands sold at pharmacies |
| 16 | ✓ | OIG | Medicare Reimbursement of Prescription Drugs | OEI-03-00-00310 | January 2001 | AWP Based | Comparison to within Medicare and to VA and Medicaid Reimbursement, not comparing to ASP | Twenty-four of the top thirty Medicare Part B drugs with the highest total Medicare payments in 1999 |
| 17 |  | ASCO | Reform of the Medicare Payment Methods for Cancer Chemotherapy | ASCO | May 2001 | Dollar Based | Spreads calculated based on difference between wholesaler prices and AWP for Medicare reimbursement | Oncology drugs |
| 18 | ✓ | OIG | Medicaid Pharmacy - Actual Acquisition Cost of Brand Name Prescription Drug Products | A-06-00-00023 | August 2001 | AWP Based | The discount below AWP at which pharmacies purchase brand-name drugs | Medicaid-covered brands sold at pharmacies |
| 19 | ✓ | GAO | Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost | GAO-01-1118 | September 2001 | AWP Based | The discount below AWP at which providers and physicians are acquiring the drugs | PA Medicare Part B drugs |
| 20 |  | MASSPIRG | Health Care Reform - Prescription for Quality Health Care - The AWP Litigation | MASSPIRG Washington Legal Foundation | December 20, 2001 | AWP Based | Cites discounts off of AWP. This is a press release from the PAL, describing the AWP litigation and cites the complaint. | Refers generally to drugs in this litigation. |
| 21 | ✓ | Speers and Pearlman | Using Litigation to Regulate Drug Prices: The Assault on AWP | Washington Legal Foundation | February 2002 | AWP Based | Cites the May 1992 OIG report, which is AWP based | Chemotherapy drugs |
| 22 | ✓ | OIG | Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products | A-06-01-00053 | March 2002 | AWP Based | The discount below AWP at which pharmacies purchase generic drugs | Medicaid-covered generics sold at pharmacies |
| 23 | ✓ | OIG | Excessive Medicare Reimbursement for Albuterol | OEI-03-01-00410 | March 2002 | Medicare Price (AWP) Based | Calculated as the percentage below the Medicare Allowable Amount, or as a ratio vs. the VA price | Albuterol |
| 24 | ✓ | Dawn M. Gencarelli | AWP for Prescription Drugs: Is There a More Appropriate Pricing Mechanism | National Health Policy Forum Issue Brief | June 7, 2002 | AWP Based | Based on GAO-01-1118. The discount below AWP at which providers and physicians are acquiring the drugs | PA Medicare Part B drugs |
| 25 | ✓ | OIG | Medicaid Pharmacy - Additional Analysis of the Actual Acquisition Cost of Prescription Drug Products | A-06-02-00041 | September 2002 | Dollar Based | The discount below AWP at which pharmacies purchase generic drugs | Medicaid-covered generics sold at pharmacies |
| 26 | ✓ | George Reeb | Testimony of George Reeb | CMS | October 2002 | AWP Based | Prices are compared, but no percentages are calculated | Generic and brand pharmacy drugs |
| 27 | ✓ | Tom Gray | Construction Ahead | Homecare | October 1, 2002 | Medicaid Price Ratio (AWP) EAC, VA, Medicare Based | Refers to a previously published OIG report. Ratio to the VA price. Medicare is more than 5x higher than the VA price and higher than EAC. | Albuterol and Ipratropium Bromide |
| 28 | ✓ | MedPAC | Report to Congress: Variation and Innovation in Medicare | MedPAC | June 2003 | AWP Based | Reports provider costs as a percentage of AWP | Medicare and Medicaid drugs |
| 29 | ✓ | Federal Register | Fed Reg 42 CFR 405 and 414 | Fed Reg | August 20, 2003 | AWP Based | Cites the Nov. 1992 OIG report, which is AWP based | Chemotherapy drugs |
| 30 |  | OIG | Medicare Reimbursement for Lupron | OEI-03-03-00250 | January 2004 | Dollar Based | Prices are compared, but no percentages are calculated | Lupron and Zoladex |
| 31 | ✓ | OIG | Update: Excessive Medicare Reimbursement for Albuterol | OEI-03-03-00510 | January 2004 | AWP Based | Spreads are not calculated. Cites to the OIG and GAO reports | Albuterol |
| 32 | ✓ | Federal Register | Fed Reg 42 CFR 405 and 414 | Fed Reg | January 7, 2004 | None | Spreads are not calculated. Cites to the OIG and GAO reports | None |
| 33 | ✓ | CBO | Medicaid's Reimbursements to Pharmacies for Prescription Drugs | CBO | December 2004 | AWP Based | The difference between what Medicaid pays a pharmacy and the cost of acquiring the drug from the manufacturer, divided by Medicaid's payment | Medicaid-covered generics and brands |
| 34 | ✓ | GAO | Medicaid Drug Reimbursement: New Drug and Administration Fees are Closer to Providers' Costs | GAO-05-142R | December 2004 | AWP Based | Spreads are calculated based on difference between oncologist EAC and Medicare reimbursement | Chemotherapy drugs |
| 35 | ✓ | George Reeb | Testimony of George Reeb | CMS | December 2004 | AWP Based | Percentage below AWP | Generic and brand pharmacy drugs |
| 36 | ✓ | Hearing | Medicaid and AWP Hearing: Medicaid Prescription Drug Reimbursement: Why the Government Pays Too Much | Federal Hearing | December 7, 2004 | AWP and ASP Based | Hearing discusses both; markup over the acquisition cost and the discount off of AWP. | Medicaid-covered generics sold at pharmacies |

Note: the "✓" symbol denotes reports referenced in Dr. Addanki's footnote 16 and cited in his Exhibit 2

## Attachment C.2: Review of Industry Reports Cited in Dr. Addanki's Footnote 16 by Type of Report

### A. Medicare Part B and Physician Administered Drugs

| # | ✓ | Report Author | Report Title | Report | Report Date | Spread | Methodology of Spread Calculation | Type of Drug(s) |
|---|---|---|---|---|---|---|---|---|
| 3 | ✓ | OIG | Physicians' Costs for Chemotherapy Drugs | A-02-91-01049 | November 1992 | AWP Based | Expressed as the invoice costs / percentage below the AWP | Chemotherapy drugs |
| 7 | ✓ | Bill Alpert | Hooked on Drugs: Why Do Insurers Pay Such Outrageous Prices for Pharmaceuticals | Barron's | June 1996 | AWP Based | Comparison of AWP and wholesale prices of about 300 dose forms.  Article highlights a select number of PA drugs. | Twenty-two of the top thirty Medicare Part B generic and single-source drugs |
| 10 | ✓ | OIG | Excessive Medicare Payments for Prescription Drugs | OEI-03-97-00290 | December 1997 | ASP Based | Reported as the Medicare allowed amount as a percentage above the average acquisition cost | Twenty-two of the top thirty Medicare Part B drugs with the highest total Medicare payments in 1995 |
| 14 | ✓ | Rezek and Berkowitz | The Costs to the US Health Care System of Extending Marketing Exclusivity for Taxol | Journal of Research in Pharm Econ | 1999 | AWP Based | Calculated as the percentage ratio of manufacturer price over the AWP | Taxol and a few other cancer drugs |
| 14 | ✓ | Robert Pear | Administration Plans Cuts in Some Drug Payments | The New York Times | August 6, 2000 | EAC/ASP Based | Describes the markups received by doctors as a percentage over their cost (up to 700%). Cites a 1997 DHHS cost based report. | PA Medicare Part B oncology drugs.  Report cited 1997 DHHS study of 22 drugs |
| 16 | ✓ | DHHS | Letter from Nancy-Ann Min DeParle | DHHS (HCFA) | September 8, 2000 | Dollar Based | DOJ-collected pricing data compared to AWPs in Redbook.  Dollar spread reported for only one example. | Reference to about 400 NDCs of 49 Medicare covered drugs |
| 16 | ✓ | OIG | Medicare Reimbursement of Prescription Drugs | OEI-03-00-00310 | January 2001 | Dollar Based | Comparison is within Medicare and to VA and Medicaid Reimbursement, not comparing to ASP | Twenty-four of the top thirty Medicare Part B drugs with the highest total Medicare payments in 1999 |
| 17 | ✓ | ASCO | Reform of the Medicare Payment Methods for Cancer Chemotherapy | ASCO | May 2001 | AWP Based | Spreads calculated based on difference between wholesaler prices and AWP for Medicare reimbursement | Oncology drugs |
| 19 | ✓ | GAO | Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost | GAO-01-1118 | September 2001 | AWP Based | Cites the hollow AWP at which providers and physicians are acquiring the drugs | PA Medicare Part B drugs |
| 20 | ✓ | MASSPIRG | Health Care Reform - Prescription for Quality Health Care - The AWP Litigation | Washington Legal Foundation | December 20, 2001 | AWP Based | Cites discounts off of AWP.  This is a press release from PAL, discussing this AWP litigation and cites the complaint. | Refers generally to drugs in this litigation. |
| 21 | ✓ | Spears and Pearlman | Using Litigation to Regulate Drug Prices: The Assault on AWP | National Health Policy Forum Issue Brief | February 2002 | AWP Based | Cites the Nov 1992 OIG report, which is AWP based | Chemotherapy drugs |
| 24 | ✓ | Dawn M. Gencarelli | AWP for Prescription Drugs: Is There a More Appropriate Pricing Mechanism | National Health Policy Forum Issue Brief | June 7, 2002 | AWP Based | Based on GAO-01-1118. The discount below AWP at which providers and physicians are acquiring the drugs | PA Medicare Part B drugs |
| 28 | ✓ | MedPAC | Report to Congress: Variation and Innovation in Medicare | MedPAC | June 2003 | AWP Based | Reports provider costs as a percentage of AWP | Medicare and Medicaid drugs |
| 29 | ✓ | Federal Register | Fed Reg 42 CFR 405 and 414 | Fed Reg | August 20, 2003 | AWP Based | Cites the Nov. 1992 OIG report, which is AWP based | Chemotherapy drugs |
| 30 | ✓ | OIG | Medicare Reimbursement for Lupron | OEI-03-03-00250 | January 2004 | Dollar Based | Prices are compared, but no percentages are calculated | Lupron and Zoladex |
| 34 | ✓ | GAO | Medicare Chemotherapy Payments: New Drug and Administration Fees are Closer to Providers' Costs | GAO-05-142R | December 2004 | AWP Based | Spreads are calculated based on difference between oncologists' EAC and Medicare reimbursement | Chemotherapy drugs |

### B. Albuterol Sulfate

| # | ✓ | Report Author | Report Title | Report | Report Date | Spread | Methodology of Spread Calculation | Type of Drug(s) |
|---|---|---|---|---|---|---|---|---|
| 4 | ✓ | OIG | Medicare Payments for Nebulizer Drugs | OEI-03-94-00390 | February 1996 | Dollar Based | Suggests that Medicare should use EAC for reimbursement of nebulizer drugs rather than AWP | Nebulizers (Albuterol Sulfate and others) |
| 5 | ✓ | OIG | Suppliers' Acquisition Costs for Albuterol Sulfate | OEI-03-94-00393 | June 1996 | Dollar Based | Comparison of Medicare reimbursement amounts and estimated acquisition/supplier costs | Albuterol |
| 6 | ✓ | OIG | A Comparison of Albuterol Sulfate Prices | OEI-03-94-00392 | June 1996 | AWP Based | Comparison of Medicare reimbursement amounts and estimated acquisition/supplier costs | Albuterol |
| 11 | ✓ | OIG | Are Medicare Allowances for Albuterol Sulfate Reasonable? | OEI-03-97-00292 | August 1999 | ASP Based | Medicare allowed up to 333% more than acquisition costs for albuterol | Albuterol |
| 13 | ✓ | OIG | Medicare Reimbursement of Albuterol | OEI-03-00-00311 | June 2000 | Medicare Price (AWP) Based | Difference between the prices, divided by the Medicare reimbursement price | Albuterol |
| 23 | ✓ | OIG | Excessive Medicare Reimbursement for Albuterol | OEI-03-01-00410 | March 2003 | Medicare Price (AWP) Based | Calculated as the percentage below the Medicare Allowable Amount, or as a ratio vs. the VA price | Albuterol |
| 27 | ✓ | Tron Gray | Construction Ahead | Homecare | October 1, 2002 | EAC, WAC, VA Based | Refers to a previously published OIG report. Ratio to the VA price. Medicare is more than 5x higher than the VA price and higher than EAC. | Albuterol and Ipratropium Bromide |
| 31 | ✓ | OIG | Update: Excessive Medicare Reimbursement for Albuterol | OEI-03-03-00510 | January 2004 | Dollar Based | Prices are compared, but no percentages are calculated | Albuterol |

# Attachment C.2: Review of Industry Reports Cited in Dr. Addanki's Footnote 16 by Type of Report

## C. Brand and Generic Drugs Sold at Retail

| # | ✓ | Report Author | Report Title | Report | Report Date | Spread | Methodology of Spread Calculation | Type of Drug(s) |
|---|---|---|---|---|---|---|---|---|
| 1 | ✓ | OIG | Use of AWP in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program | OIG | October 1989 | AWP and ASP | Obtained prices from drug wholesalers and compared to "national drug pricing authorities" including Medispan and the Blue Book. Average discount for single and multi-source drugs was 15.5% | Sample of fifty-five single and multi-source drugs purchased by pharmacies. |
| 2 | ✓ | GAO | Prescription Drugs: Changes in Prices for Selected Drugs | GAO | August 1992 | Dollar Based | Comparison of AWP and other prices to determine changes in prices in relation to industry CPIs | Generic and brand drugs sold at pharmacy |
| 8 | | OIG | Medicaid Pharmacy - Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs | A-06-96-00020 | April 1997 | AWP Based | Invoice price as a percentage below AWP. Based on OIG Reports, EAC percentage discount for brand and generic drugs off of AWP | Medicaid-covered brands sold at pharmacies |
| 9 | ✓ | OIG | Semiannual Report, April 1, 1997 – September 30, 1997 | OIG (DHHS) | April-Sept 1997 | AWP Based | | Medicaid-covered brands sold at pharmacies |
| 18 | ✓ | OIG | Medicaid Pharmacy - Actual Acquisition Cost of Brand Name Prescription Drug Products | A-06-00-00023 | August 2001 | AWP Based | The discount below AWP at which pharmacies purchase brand-name drugs | Medicaid-covered brands sold at pharmacies |
| 22 | ✓ | OIG | Medicaid Pharmacy - Actual Acquisition Cost of Generic Prescription Drug Products | A-06-01-00053 | March 2002 | AWP Based | The discount below AWP at which pharmacies purchase generic drugs | Medicaid-covered generics sold at pharmacies |
| 25 | ✓ | OIG | Medicaid Pharmacy - Additional Analysis of the Actual Acquisition Cost of Prescription Drug Products | A-06-02-00041 | September 2002 | AWP Based | The discount below AWP at which pharmacies purchase generic drugs | Medicaid-covered generics sold at pharmacies |
| 26 | ✓ | George Reeb | Testimony of George Reeb | CMS | October 2002 | AWP Based | The discount below AWP at which pharmacies purchase generic and brand drugs | Generic and brand drugs sold at pharmacy |
| 32 | ✓ | Federal Register | Fed Reg 42 CFR 405 and 414 | Fed Reg | January 7, 2004 | None | Spreads are not calculated... Cites to the OIG and GAO reports | None |
| 33 | ✓ | CBO | Medicaid's Reimbursements to Pharmacies for Prescription Drugs | CBO | December 2004 | Medicaid Price Ratio (AWP) | The difference between what Medicaid pays a pharmacy and the cost of acquiring the drug from the manufacturer, divided by Medicaid's payment | Medicaid-covered generics and brands |
| 35 | ✓ | George Reeb | Testimony of George Reeb | CMS | December 2004 | AWP Based | Percentage below AWP | Generic and brand drugs sold at pharmacy |
| 36 | ✓ | Hearing | Medicaid and AWP Hearing; Medicaid Prescription Drug Reimbursement, Why the Government Pays Too Much | Federal Hearing | December 7, 2004 | AWP and ASP | Hearing discusses both; markup over the acquisition cost and the discount off of AWP. | Medicaid-covered generics sold at pharmacies |

Note: the "✓" symbol denotes reports referenced in Dr. Addanki's footnote 16 and cited in his Exhibit 2

Privileged and Confidential

Attachment C

**Attachment D**

**Attachment D:  Definition of Spread**

At ¶ 20 of my August 31, 2004 Declaration in Support of Class Certification, I introduce the notion of spread for the analysis of liability and damages as follows:

> "To the extent that the alleged AWP scheme was effectuated by Defendants, they would reveal themselves in 'excessively' large spreads or deviations between the inflated AWP and the transaction price (ASP) for which the AWP is taken as a signal. These spreads can be measured as (AWP − ASP), (AWP/ASP), (AWP − ASP)/AWP or (AWP − ASP)/ASP; the precise measure used will depend upon the analytic needs of the formulaic models."

I make use of the {(AWP − ASP)/ASP} definition of spread primarily because this is the formulation that business entities normally use to express profitability (i.e., the mark-up above cost, or (price − cost)/cost).

In his ¶¶ 33-36, Dr. Addanki asserts that this manner of calculating "'spreads' is, at the very least, misleading" (¶ 33). **It is not misleading, as the following hypothetical demonstrates.**

Suppose that the facts for drug NDC = X are the following: AWP = \$100 and ASP = \$20.  In this case, $Spread_{asp}$ = (AWP − ASP)/ASP = (\$100 - \$20)/\$20 = 400%; $Spread_{awp}$ = (AWP − ASP)/AWP = (\$100 − \$20)/\$100 = 80%.  Therefore,

- According to my liability threshold of 30% (Liability Threshold $Spread_{asp}$ = 30%), drug X has revealed a *mega-spread* relative to that liability threshold. Damages are calculated as put forward in my earlier Declaration.

- According to Dr. Addanki's liability threshold of 23% (Liability Threshold $Spread_{awp}$ = 23%), drug X has revealed a *mega-spread* relative to the liability threshold.  Damages are calculated as put forward in my earlier Declaration.

- Hence, under both liability threshold spreads, AWP inflation has been found by the fact evidence, regardless of how the spread is calculated.

Somehow, the fact that the actual spread measured as $Spread_{asp}$ is 400% while the actual spread measured as $Spread_{awp}$ is 80% seems to have significance to Dr. Addanki. Apparently, he believes that the number 400% somehow confuses the Court into believing an AWP inflation scheme injured the Class while the number 80% suggests economic behavior and facts less injurious to or less inflationary for the Classes. However, either number represents a mega-spread of equal magnitude.

While 80% is less than 400%, **the economic behavior and facts relevant to liability and damages are identical.** As a result, the finding of liability and the calculation of damages will be identical using either AWP or ASP as the basis for the spread, as I now demonstrate.[1]

---

[1]  Indeed, Figures 1.A-1.C of my December 15, 2005 Declaration, which graphically summarize the damage calculations I have performed, remain the same and the conclusions drawn from them remain the same, regardless of whether one expresses the spread relative to $AWP_{ai}$ or ASP.

### A. Both Yardsticks Lead to Identical Finding of Liability

Using the Liability Threshold Spread$_{asp}$ = (AWP − ASP)/ASP = 30% = 0.30, if an AWP < 1.30*ASP, that AWP is a *reasonably reliable* list price from which one (Medicare, HCFA and/or any private TPP) can gather a "reasonably predictable"[2] understanding of the underlying EAC (ASP). Stated alternatively, this AWP is not inflated if ASP > (1/1.30) AWP = .77*AWP.

Using the Liability Threshold Spread$_{awp}$ = (AWP − ASP)/AWP = 23%, if an ASP > .77*AWP, that AWP is a *reasonably reliable* list price from which one can gather a *reasonably predictable* understanding of the underlying EAC (ASP).[3] Stated alternatively, this AWP is not inflated if AWP < (1/0.77)*ASP = 1.30*ASP.

Hence, both liability yardsticks lead to **exactly the same threshold relationship between ASP and AWP.** Using either spread definition would lead to a finding of liability for Drug X.

### B. Calculation of Damages for Non-Medicare Sub-Class 3

Suppose that the amount allowed (AA) for reimbursement under private sector TPP reimbursement is AWP − 15% = 0.85*AWP. Given that AWP = $100, AA = $85. Using the Liability Threshold Spread$_{asp}$, AWP$_{bf}$ = 1.30*ASP = 1.30*$20 = $26. AA$_{bf}$ = 0.85*$26 = $22.10. Economic Damage on a unit reimbursed is therefore $85 − $22.10 = $62.90.

Using the Liability Threshold Spread$_{awp}$, ASP = .77*AWP and AWP$_{bf}$ = 1.30*ASP, the same calculation as under Liability Threshold Spread$_{asp}$. Hence, Economic Damage on a unit reimbursed is $85.00 − $22.10 = $62.90.

### C. Damage Calculation for Medicare Sub-Classes 1 and 2

Under **both** liability threshold spreads, Drug X is found to have inflated the AWP. Specifically, while AWP = $100, the greatest AWP "reasonably predictable" from an ASP of $20 is AWP$_{bf}$ = $26.00. Put alternatively, under both liability threshold spreads, if the AWP is $100 and it were not inflated, Medicare, HCFA and private TPPs should be able to "reasonably predict" the EAC = ASP = $77.00. However, the liability threshold spreads, have demonstrated liability and we know that EAC = ASP = $20. In this case, according to the Medicare Statutes, damages are calculated as z%*AWP − EAC, where z% is determined by the year of statutory revision as put forward in footnote 13 of my December 15, 2005 Declaration on Liability and Calculation of Damages.

---

[2] See footnote 60 of my December 15, 2005 Declaration on Liability and Calculation of Damages. Note, (AWP − ASP)/ASP < 30% = 0.30; AWP/ASP − 1 < 0.30; AWP < 1.30*ASP.

[3] Note, (AWP − ASP)/AWP < 23% = 0.23; 1 − ASP/AWP < 0.23; 0.77 < ASP/AWP; ASP > 0.77*AWP.

**Attachment E**



## Attachment E.1.a: Range of Generic AWPs with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.5%

|  | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highest AWP | 1.1845 | 1.1845 | 4.6800 | 4.6800 | 4.6800 | 4.6800 | 4.6800 | 4.6800 | 4.6800 | 4.6800 | 4.6800 |
| Lowest AWP | 0.6225 | 0.6225 | 0.6225 | 0.5345 | 0.5345 | 0.4495 | 0.4495 | 0.4990 | 0.5345 | 0.5345 | 0.5345 |
| Median Generic AWP | 0.6853 | 0.6975 | 0.7325 | 0.7325 | 0.7495 | 0.7410 | 0.7495 | 0.7495 | 0.7495 | 0.7695 | 0.7795 |
| ● Warrick AWP | 0.6250 | 0.6975 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 |

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 2 and Exhibit 4A.
Notes: This graph is a recreation of Dr. Addenki's Figure 2 with the addition of the Median Generic AWP.
Median generic AWPs have been averaged where Dr. Addanki reported two median AWP values.

Privileged and Confidential

Attachment E

Attachment E



**Attachment E.1.b: Range and Distribution of Generic AWPs with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.5%**

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 2 and Exhibit 4A.
Notes: Median generic AWPs have been averaged where Dr. Addanki reported two median AWP values.
Each "X" on the graph represents the yearly price of one NDC as it appears in Dr. Addanki's Exhibit 4A. All other graphical elements are consistent with Attachment E.1.a.

Privileged and Confidential



## Attachment E.1.c: Range of Generic AWPs with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.5% (Excluding Xactdose)

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highest AWP | 1.1845 | 1.1845 | 1.1845 | 1.1845 | 1.1845 | 1.1845 | 1.1845 | 1.1845 | 1.1845 | 1.1845 | 1.1845 |
| Lowest AWP | 0.6225 | 0.6225 | 0.6225 | 0.5345 | 0.5345 | 0.4495 | 0.4495 | 0.499 | 0.5345 | 0.5345 | 0.5345 |
| Median Generic AWP | 0.6853 | 0.6975 | 0.7288 | 0.7288 | 0.7325 | 0.7325 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7625 |
| Warrick AWP | 0.6250 | 0.6975 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 |

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 2 and Exhibit 4A.
Notes: Median generic AWPs have been averaged where Dr. Addanki reported two median AWP values.
Xactdose NDCs included in Dr. Addanki's analysis have been omitted from this graph.

Privileged and Confidential



**Attachment E.1.d: Range of Generic AWPs with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.5% (Excluding Repackagers)**

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highest AWP | 0.7325 | 0.7930 | 0.8240 | 0.8240 | 0.8250 | 0.8500 | 0.8500 | 0.8500 | 0.9000 | 0.9000 | 1.1320 |
| Lowest AWP | 0.6225 | 0.6225 | 0.6225 | 0.5345 | 0.5345 | 0.4495 | 0.4495 | 0.5345 | 0.5345 | 0.5345 | 0.5345 |
| Median Generic AWP | 0.6613 | 0.6975 | 0.7028 | 0.7140 | 0.7140 | 0.7080 | 0.7288 | 0.7325 | 0.7495 | 0.7495 | 0.7495 |
| Warrick AWP | 0.6250 | 0.6975 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 | 0.7495 |

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 2 and Exhibit 4A.
Notes: Median generic AWPs have been averaged where Dr. Addanki reported two median AWP values.
In addition to Xactdose NDCs, all NDCs identified as repackagers and included in Dr. Addanki's analysis have been omitted from this graph.

Privileged and Confidential

Attachment E

## Attachment E.2.a: Range of Generic AWPs
## with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.083%



| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highest AWP | 0.4509 | 0.4509 | 1.6667 | 1.6667 | 1.6667 | 0.6967 | 0.6967 | 0.6967 | 0.6967 | 0.6967 | 0.6967 |
| Lowest AWP | 0.3067 | 0.4000 | 0.1763 | 0.2739 | 0.2460 | 0.2460 | 0.1895 | 0.1895 | 0.2667 | 0.2667 | 0.2099 |
| Median Generic AWP | 0.4045 | 0.4149 | 0.4061 | 0.4033 | 0.4033 | 0.4033 | 0.4066 | 0.4092 | 0.4065 | 0.4067 | 0.4061 |
| ● Warrick AWP | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 |

Unit AWP

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 3 and Exhibit 4B.
Notes: This graph is a recreation of Dr. Addanki's Figure 3 with the addition of the Median Generic AWP.
Median generic AWPs have been averaged where Dr. Addanki reported two median AWP values.

Privileged and Confidential

Attachment E



**Attachment E.2.b: Range and Distribution of Generic AWPs
with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.083%**

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 3 and Exhibit 4B.
Notes: Median generic AWPs have been averaged where Dr. Addanki reported two median AWP values.
Each "X" on the graph represents the yearly price of one NDC as it appears in Dr. Addanki's Exhibit 4B.  All other graphical elements are consistent with Attachment E.2.a.

Privileged and Confidential

Attachment E

## Attachment E.2.c: Range of Generic AWPs with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.083% (Excluding Major Pharm.)



**Unit AWP**

| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highest AWP | 0.4509 | 0.4509 | 0.6967 | 0.6967 | 0.6967 | 0.6967 | 0.6967 | 0.6967 | 0.6967 | 0.6967 | 0.6967 |
| Lowest AWP | 0.3067 | 0.4000 | 0.1763 | 0.2739 | 0.2460 | 0.2460 | 0.1895 | 0.1895 | 0.2667 | 0.2667 | 0.2099 |
| Median Generic AWP | 0.4045 | 0.4149 | 0.4061 | 0.4033 | 0.4033 | 0.4033 | 0.4066 | 0.4092 | 0.4065 | 0.4067 | 0.4061 |
| ● Warrick AWP | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 |

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 3 and Exhibit 4B.
Notes: Median generic AWPs have been averaged where Dr. Addanki reported two median AWP values.
To correct for an apparent error by Dr. Addanki, Major Pharm. NDC 00904-7731-17 has been adjusted in this graph.

Privileged and Confidential

Attachment E

## Attachment E.2.d: Range of Generic AWPs with the Warrick AWP and Median Generic AWP for Albuterol Sulfate 0.083% (Excluding Repackagers)



| | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Highest AWP | 0.4333 | 0.4378 | 0.4378 | 0.4333 | 0.4333 | 0.4333 | 0.4333 | 0.4333 | 0.4333 | 0.4333 | 0.4333 |
| Lowest AWP | 0.3067 | 0.4000 | 0.4000 | 0.3480 | 0.3480 | 0.3480 | 0.3480 | 0.3480 | 0.2667 | 0.2667 | 0.2667 |
| Median Generic AWP | 0.4033 | 0.4065 | 0.4045 | 0.4033 | 0.4033 | 0.4033 | 0.4061 | 0.4067 | 0.4056 | 0.4065 | 0.4045 |
| Warrick AWP | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 | 0.4033 |

Source: Report of Sumanth Addanki, Ph.D., March 15, 2006, Figure 3 and Exhibit 4B.
Notes: Median generic AWP's have been averaged where Dr. Addanki reported two median AWP values.
In addition to the Major Pharm. correction, all NDCs identified as repackagers and included in Dr. Addanki's analysis have been omitted from this graph.

Privileged and Confidential

Attachment E

**Notes to Attachment E**
**Analysis of Dr. Addanki's Figures 2 and 3 and Exhibits 4A and 4B**

**Source:**

Declaration of Sumanth Addanki, Ph.D., *In re Pharmaceutical Industry Average Wholesale Price Litigation*, March 15, 2006.

**Description of Data Analysis by Graph:**

**Attachment E.1.a**

- This graph is a recreation of Dr. Addanki's Figure 2 from 1994-2004.
- The graph incorporates data for all generic manufacturers and repackagers of Albuterol Sulfate 0.5% as reported in Dr. Addanki's Exhibit 4A.
- In addition to the Warrick AWP (red circle), the median generic AWP is included in the graph (blue square).
- The median generic AWP is calculated from data presented in Dr. Addanki's Exhibit 4A. In years where Dr. Addanki finds an even number of AWP observations, he has reported two "median" AWP values. For purposes of this graph, the median generic AWP is calculated as the simple average of the two.
- A data table is presented showing the following prices reported by Dr. Addanki for each year: the max AWP, the min AWP, the median generic AWP (calculated as described in previous bullet), and the Warrick AWP.

**Attachment E.1.b**

- This graph contains the data from Attachment E.1.a with the following addition:
  - Unit AWPs are graphed ("X") for each NDC reported in Dr. Addanki's Exhibit 4A.

**Attachment E.1.c**

- This graph contains data described in the notes to Attachment E.1.a. above with the following adjustment:
  - Three NDCs reported in Dr. Addanki's Exhibit 4A for the repackager Xactdose Inc. have been excluded from this analysis.
  - These three Xactdose NDCs are repackaged products that are not consistent with the common packaging and dosage of Albuterol 0.5% solution (see Medicare citation in footnote 48 of this Declaration).

**Attachment E.1.d**

- This graph contains data described in the notes to Attachment E.1.a. above with the following adjustment:

    ▫   All NDCs reported in Dr. Addanki's Exhibit 4A identified as repackagers have been excluded from this analysis.

## Attachment E.2.a

- This graph is a recreation of Dr. Addanki's Figure 3 from 1994-2004.
- The graph incorporates data for all generic manufacturers and repackagers of Albuterol Sulfate 0.083% as reported in Dr. Addanki's Exhibit 4B.
- In addition to the Warrick AWP (red circle), the median generic AWP is included in the graph (blue square).
- The median generic AWP is calculated from data presented in Dr. Addanki's Exhibit 4B.  In years where Dr. Addanki finds an even number of AWP observations, he has reported two "median" AWP values.  For purposes of this graph, the median generic AWP is calculated as the simple average of the two.
- A data table is presented showing the following prices reported by Dr. Addanki for each year: the max AWP, the min AWP, the median generic AWP (calculated as described in previous bullet), and the Warrick AWP.

## Attachment E.2.b

- This graph contains the data from Attachment E.2.a with the following addition:
  - ▫  Unit AWPs are graphed ("X") for each NDC reported in Dr. Addanki's Exhibit 4B.

## Attachment E.2.c

- This graph contains data described in the notes to Attachment E.2.a. above with the following adjustment:
  - ▫  Dr. Addanki reports a unit AWP of $1.6667 for Major Pharmaceutical's NDC (00904-7731-17) for the years 1996-1998.  In previous and later years, Dr. Addanki reports a unit AWP of $0.4067 for the same Major Pharmaceutical NDC (00904-7731-17).
  - ▫  To correct for an apparent error in the data reported by Dr. Addanki, the unit AWP for Major Pharmaceutical's NDC (00904-7731-17) for the years 1996-1998 has been adjusted to $0.4067.
  - ▫  This adjustment is consistent with the AWPs reported in other available pharmaceutical price compendia, including both the RedBook and First DataBank.

## Attachment E.2.d

- This graph contains data described in the notes to Attachment E.2.a. above with the following adjustment:
  - ▫  In addition to the correction of Major Pharmaceutical's AWP for 1996-1998, all NDCs reported in Dr. Addanki's Exhibit 4B identified as repackagers have been excluded from this analysis.

**Attachment F**

**Attachment F: Deposition Quotes**

*Mulrey: Quote 1*

> Q.  What is your basis for understanding that there was a change in practice or policy as of 1995?
>
> MR. HARRINGTON: Well, objection. Go ahead.
>
> A.  Prior to that, the fee schedules were usual and customary, and it was felt, you know, to administer those was a burden, so they moved to a more standardized nationally-recognized payment methodology. (p. 57).
>
> ...
>
> Q.  Okay. So the shift from usual and customary to the fee schedule was in part due to the administrative simplicity with using fee schedules?
>
> A.  Yes. (p 60).

*Mulrey Quote 2*

> Q.  Based upon your position as a member of the provider reimbursement department, sitting here today, do you have a view as to whether or not you are mislead as to the meaning of AWP?
>
> A.  I want to say my opinion is the AWP would be the bottom-line wholesale cost that would be – providers could buy their drugs at. (p. 79.)
>
> ...
>
> Q.  So in 2004, you obtained an understanding of the term AWP that differed from your earlier understanding?
>
> A.  Yes. (p. 80).
>
> ...
>
> Q.  So in 2003-2004, as a member of the provider reimbursement group, you learned that AWP was no longer, you know, from your perspective an average of actual wholesale costs but indeed was something greater than the costs that doctors paid for drugs; right?
>
> A.  Yes. (p. 93).

*Mulrey Quote 3*

> Q.  As part of your financial analysis that you were doing at Braintree health center [i.e., the staff HMO unit], did you incorporate their drug costs into their expenses for the P & L that was consolidated with the Blue Cross/Blue Shield of Massachusetts P & L"
>
> A.  I can't recall exactly. (p. 18).
>
> ...

Q. Okay.   As part of your work at Braintree, did you gain an understanding as to the costs at which physician-administered drugs could be acquired?

A. No.

Q. Did you get an understanding of whether or not manufacturers, pharmaceutical manufacturers, gave discounts or rebates to physicians or pharmacies depending upon the volume of drug purchased or the particular leverage of the account?

A. No.

Q. Did there ever come a point in time when you learned – that you obtained that understanding?

A. Yes.

Q. When was that?

A. It was pretty much at the time when Medicare was reviewing their AWP logic and payment methodology.

Q. And when was that?

A. The 2002-2003 time frame. (pp. 19-20).

*Farias Quote 1*

Q.  Let's suppose that a physician receives a free sample, administers it to a patient who's a Harvard Pilgrim member … and then charges Harvard Pilgrim for that drug that the doctor received free and administered to the patient … would Harvard Pilgrim think it relevant in determining whether to reimburse the doctor for that drug that the doctor got it for free?

...

Q.  Would Harvard Pilgrim consider that relevant in determining whether to pay the doctor for the drug cost or not?

...

A.  No, we wouldn't -- we wouldn't factor that in.  We wouldn't do that level of exploration.

Q.   Again, though, Mr. Farias, I understand that you wouldn't do that level of exploration, but I'm asking you to assume that the doctor got the drug for free.  Would you reimburse the doctor, based on AWP minus 5 percent, even though the doctor got it for free?  Would that be relevant to you that the doctor got it for free?

...

A.   If the provider submitted a claim in conformance with his contract, provider submitted a claim for a covered service, Harvard Pilgrim would reimburse for that service under the terms of the contract.

Q. For the service.  And when you say, "the service," you mean, as well, the drug?

A.  Right.

Q. And is that because you assume that the doctor, in submitting that bill, paid for the drug?

...

A. Not -- again, not at that level of detail. We would be assuming that the provider is performing under the terms of his contract or her contract with Harvard Pilgrim.

Q. Okay. So, when you give me that answer, you really think about it in terms of at the level of the claims submission?

A. That's correct (pp. 135-137).

### Farias Quote 2

Q. You're coming to the end of a contract period --

A. Yes.

Q. -- you learn that the physician pays only 10 percent of the cost that you, Harvard Pilgrim, have been reimbursing them all along for a drug --

A. Uh-huh, right.

Q. -- and that they're getting a 90 percent profit on the drug --

A. Uh-huh.

Q. -- when you turn to renegotiate that contract, would the fact that the doctor pays only 10 percent of what you are reimbursing --

A. We don't but --

Q. -- influence your judgment?

A. We talked about before, we don't negotiate our physician -- our drug fee schedule.

Q. And that's because you rely on the Medicare AWP.

...

A. Well, no, that's not because. We do use AWP as a basis, yes. But that's not the reason why we don't negotiate it. We, as I said before, we don't negotiate it because we want standardization across the network. (pp. 140-141.)