# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br>Judge Patti B. Saris<br>**[FILED UNDER SEAL]** |

## REPLY DECLARATION OF RAYMOND S. HARTMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1.  I am one of the expert witnesses for Plaintiffs in this action and have previously set forth my qualifications. I have analyzed the Defendants' opposition to Plaintiffs' motion for summary judgment and offer the following opinions.

## I. AstraZeneca Pharmaceuticals LP's Individual Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment

2.  At pages 5-7, AstraZeneca (AZ) addresses "Plaintiffs' Plain Language 'Construction' of AWP," making a variety of assertions, the basis of which is not disclosed. At page 5, AZ asserts that "Plaintiffs' heretofore unexplained theory why the phrase 'average wholesale price' supposedly means, 'by statute,' the average sales price of Part B drugs is based on a flawed assumption." There is no reference to the source of this "Plaintiffs' heretofore unexplained theory." If AZ is simply repeating the incorrect assertions made by BMS discussed below, AZ's assertion fails for the same reasons. If AZ is not making that assertion, it is unclear what it is referring to. **Plaintiffs simply have never said that AWP should equal ASP by statute.** For further clarification see ¶¶ 5-9 of my April 6, 2006 Declaration in Opposition to Defendants' Motions for Summary Judgment (April 6, 2006 SJ Declaration).

3.  At page 6, AZ continues, asserting that "Plaintiffs' proffered 'statutory construction' would lead to a result Congress would find stupid – substantially increased costs to the Medicare system."

4.  Again, it is not clear what AZ is referring to by the term "heretofore unexplained theory." If AZ is referring to my liability and damage analyses, their assertion is fundamentally flawed. The use of the term average wholesale price = AWP, in and of itself does not lead to substantially increased costs to Medicare. AWP leads to substantially increased costs to Medicare only when it is artificially inflated, as alleged in this matter.

5. And AZ continues: "Beginning in 1998, with the ... BBA amendments to the Medicare statute, [under "Plaintiffs' proffered 'statutory construction'"] doctors would receive nothing to cover the costs of staff, carrying inventory, and the like" (p. 6). In my opinion AZ is simply incorrect. There is nothing in the Medicare statutes that prevents providers from recovering the costs of providing the necessary services to administer drugs. The same is true for contracts between private payors and providers. Furthermore, as clarified in footnotes 13 & 14 to my December 15, 2005 Declaration on Liability and Calculation of Damages, under the BBA amendments, beginning in 1998 providers should have been reimbursed the lesser of the actual charge the providers paid (interpreted as the acquisition cost (EAC)) and reported on the Medicare claim form or 95%*AWP. If providers were reimbursed at 95%*AWP, they were being reimbursed more than their acquisition costs (see Attachment K of my December 15, 2005 Declaration on Liability and Calculation of Damages) and if providers were reimbursed at EAC, they were being reimbursed at their acquisition costs.

6. Furthermore, as discussed below (see BMS, Section II), legal and economic reasons exist deterring providers from cross-subsidizing other services through fraudulent overcharges on physician-administered drugs.

7. Finally, AZ asserts (pages 6-7) that because of "Plaintiffs' proffered 'statutory construction'" (p. 6), "doctors would receive nothing to cover the costs of staff, carrying inventory, and the like, ... Rather than participate in administering these drugs, every rational doctor would be expected to cease, thereby requiring that Part B drugs to be administered to Medicare beneficiaries in hospitals. Doing so would be much more costly for Medicare, as the Court's expert [Dr. Berndt] observed."

8. The logic and discussion are confused and the conclusions are extremely convoluted. AZ cites Dr. Berndt at 18-19 and 50-51, without clarifying whether they are referencing paragraph numbers or page numbers. I have reviewed pages and paragraphs 18-19 and 50-51 of the Berndt report and find nothing that supports AZ's assertion concerning Dr. Berndt's agreement with their conclusions.

## II. The BMS Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment

9. At p. 9 BMS incorrectly asserts:

> "As noted above, BMS did not report AWPs; it reported list prices. (Kaszuba Aff. ¶¶ 1-2.) For the BMS drugs at issue in the case, the list prices were the prices that appeared on invoices to wholesalers, and there were substantial sales at list price. (Szabo Decl. ¶¶ 2, 11; Bell BMS Decl. Exhs. D and E.) BMS did not control the mark-up factor that publications used to calculate AWPs, and it could not change what the publications did. (Kaszuba Aff. ¶¶ 2-3; Morgan Dep. Tr. 230, annexed to Edwards Decl. as Exh. D.) Plaintiffs do not dispute these facts, except they contend that BMS 'controlled' AWPs."

10. I have rebutted this assertion in my April 6, 2006 SJ Declaration (¶¶ 26-27).

11. At pages 22-23, BMS makes several incorrect assertions and mischaracterizations of Plaintiffs' theory.

12. First BMS asserts:

> "At bottom, plaintiffs contend that BMS should have adjusted its list prices to produce AWPs that were either equal to average sale prices ('ASPs') or only exceeded ASPs by a predictable amount (according to plaintiffs' expert, Dr. Hartman, that amount should not have been greater than 30%). ... Even if the permissible spread were 30%, as Dr. Hartman would have it, that would give BMS only 5% to 10% of 'headroom' off of list price in which to offer discounts."

13. At ¶¶ 5-9 of my April 6, 2006 SJ Declaration, I make clear that I have never interpreted Plaintiffs' allegations or theory to be that AWP = ASP.

14. Throughout all of my declarations, it is my opinion that AWP has been taken to signal a *reasonable expectation* of provider acquisition costs (of EAC = ASP). I initially made this clear in my September 3, 2004 Declaration in Support of Class Certification as follows.

> "Given the lack of pricing transparency in this industry as discussed in Attachment C and given the widespread use of AWP as a pricing reference point, market expectations about the manufacturers' ASPs and thus providers' and other intermediaries AACs have been determined by a drug's AWP. ... That is, they have expected that AWP is larger than ASP by *a reasonably predictable amount*" (¶ 10.b).

> "Exercise of market power, or power to move market share, by [Providers moving market share of physician-administered drugs] is facilitated by the overall lack of transparency of pricing signals in this industry. ... [T]he incentives to move market share are enhanced by a manufacturer *secretly increasing the spread between AWP and ASP (or AAC)*. The spread must be increased secretly, because if such spreads were understood to exist, competitors would behave to eliminate them" (Attachment C, ¶ 35).

15. In order to quantify the upper bound of that *reasonable expectation*, I undertook yardstick analyses, as summarized in ¶¶ 57-59 of my December 15, 2005 Declaration on Liability and Calculation of Damages. That upper bound was 30% for single-source physician-administered drugs, and my rationale is as follows:

- Single-source innovator drug manufacturers who did not need to compete on spread set AWP approximately 15-25% above ASP.

- Given these spreads, the 30% yardstick threshold gives BMS and any manufacturer of single-source physician-administered drugs 5-15% "'headroom' off of list price in which to offer discounts." This range of "headroom" reflects payors' expectations of the difference between AWP and EAC = ASP.

- I based this finding on analysis of comparator drugs and surveys.

- Those survey results that have found significantly larger spreads for physician-administered drugs for the most part have put forward anecdotal information on multi-source drugs.

- I agree with Dr. Berndt that insufficient survey data exists to inform the market concerning a reliable expectation specifically for spreads of multi-source physician-administered drugs (see ¶ 60 of my December 15, 2005 Declaration on Liability and Calculation of Damages and ¶ 229 of the February 9, 2005 Report of Professor Ernst Berndt), and that the market therefore would rely upon the only available expectation – the upper bound 30% yardstick for single-source physician-administered drugs.

16. Second, BMS incorrectly asserts:

"[P]laintiffs' theory is totally at odds with economic concepts and industry practices. The practices in this industry are the product of literally thousands of decisions and compromises that were designed to achieve an appropriate balance between the goal of providing cost effective healthcare for millions of Americans and providing adequate compensation for providers such as oncologists. Plaintiffs' theory would alter that balance by reducing or eliminating the profits or 'spread' that providers could earn on physician-administered drugs without regard to the effect of that change on such issues as whether providers would continue to operate independent clinics and whether providers would insist on additional compensation for services."

17. I have addressed this issue in several Declarations.[1] In addition, BMS is wrong as follows:

- It is true that providers supply a variety of goods and services as part of the administration of the drugs at issue.

- It is true that all of these services are reimbursed as a bundle.

- It is true that when payors negotiate with providers regarding reimbursement for both physician-administered drugs and the services required to administer these drugs, the negotiations make use of "offer sheets" summarizing unit costs for the variety of services offered.

---

[1] See my December 16, 2004 Rebuttal Declaration at ¶¶ 71-73 and December 15, 2005 Declaration on Liability and Calculation of Damages at ¶ 35.

- Since payors' negotiating positions rely upon their expectations regarding the costs of all the goods and services bundled into the physician-administered service, the total reimbursement will reflect the sum of those expectations.

- Given the AWP inflation scheme, the fact that payor negotiations were based upon AWPs that fraudulently overstated one of the components of the service, i.e., the physician-administered drug, the overall reimbursement for the bundle of goods and services was inflated.

18. I understand that as a matter of law, Defendants cannot fraudulently inflate the cost invoiced for one component of the service at issue in order to cross subsidize some other component of the service.

19. Moreover, payors would not rationally intend to over-pay for a particular type of therapy to meet provider profitability constraints (i.e., to ensure a sufficiently generous contract to maintain participation) because of the well-known distortionary effects of doing so (see, for example, Jacobson, *et al.* 2006; cited in full in footnote 46 of my April 6, 2006 SJ Declaration).

20. The practices alleged by Plaintiffs are certainly not "at odds with economic concepts and industry practices," as Defendants incorrectly assert. BMS appeals to the "literally thousands of decisions and compromises that were designed to achieve an appropriate balance" for the reimbursement rates for physician-administered drugs and services, as if this fact mitigates fraudulent behavior. While the markets for pharmaceuticals and physician services are complex, they are no more complex than many other markets where fraud has been alleged, approved for classes and the subject of compensable damages.[2]

21. Likewise, Plaintiffs have not alleged that discounts are anti-competitive. Discounts are pro-competitive, *but only if* they are competitively passed on to consumers. This does not occur with spread competition. The benefits of the drug price reductions do not redound to consumers/payors, who continue to reimburse at rates related to AWP. The

---

[2] See ¶¶ 39-45 of my December 16, 2004 Rebuttal Declaration in Support of Class Certification.

discounted ASPs/EACs enrich providers who are willing to move market share, *at the expense of consumers and third-party payors.*

22. Third, BMS incorrectly asserts:

> "[P]laintiffs' theory would result in higher, not lower, prices. If spreads were eliminated, prices would go up because providers would be indifferent to the cost of drugs and manufacturers would have no incentive to discount. If spreads could not exceed 30%, then providers would prefer higher priced drugs because 30% of a higher number would result in greater provider profits."

23. This assertion is at best poorly stated and at worst junk science. It certainly does not make clear whether it refers to manufacturer prices or consumer/payor prices.

24. Nothing in this market or analogous high R&D market suggests that competition among manufacturers raises prices (ASPs) or eliminates the incentive for manufacturers to discount products (that is, to lower their ASPs). The drug manufacturers currently compete aggressively on price (ASP); they would continue to compete on price in the but-for world.

25. Competition currently exists to discover and bring to market new single-source physician-administered drugs, which launch at ASPs and AWPs that produce spreads less than 30%, since these drugs compete on clinical profiles.

26. Therapeutic competitors to previously unique single-source drugs have certainly been willing to compete on price (ASP = EAC) at launch, and the incumbent single-source manufacturers have certainly been willing to meet that price competition. They already do so in order to compete on spread.[3] If spread competition were not available to them, they would still compete on price, as do competitors in all other markets, including those involving products with equally complex R&D requirements. Normal price competition turns into spread competition in

---

[3] See ¶ 59 and Attachment F of my December 15, 2005 Declaration on Liability and Calculation of Damages. See also the Liability Declaration of Professor Meredith Rosenthal.

this market because of the historical lack of any transparency between the basis for reimbursement (list price = AWP) and competitive ASPs.[4] Sufficient information is finally accumulating to force providers to pass along manufacturer price competition; for example, see the Medicare Prescription Drug Improvement and Modernization Act.

27. Generic competitors compete very aggressively on price and the incumbent single-source manufacturers have been willing to meet that price competition. If spread competition were not available to them, they would still compete on price. However, as long as reimbursement is related to the AWP of the first several generics or the median of the AWPs of all generics, which do not decline with generic manufacturer price competition, price competition benefits providers and not consumers/payors.

28. Manufacturer price reductions are not reflected in AWPs because they understand the non-transparency that exists with reimbursement and strategically respond to take advantage of that. If greater transparency existed; if consumers/payors therefore better understood the

---

[4] As quoted by me in ¶ 53.a) of my December 15, 2005 Declaration on Liability and Calculation of Damages, the MedPAC Report has stated (**emphases added**):

> "In percentage terms, the biggest difference between the listed AWP for drugs and actual prices paid by physicians and suppliers tends to occur with generic drugs or brand name drugs for which there are alternatives available in the same therapeutic class. **For these drugs, manufacturers compete to increase their market share.** This competition can take two forms. **A manufacturer may raise the AWP for its product without changing the price charged to purchasers.** Although the manufacturer's profit per dose will not increase with the rise in the listed price, **the bigger difference between providers' acquisition costs and Medicare payment leads to higher profits for providers when they choose the manufacturer's product over its competitor.** At the same time, coinsurance payments charged to beneficiaries will rise as the AWP increases. A hearing before the House Energy and Commerce Subcommittee on Health highlighted this outcome on September 21, 2001. One chemotherapy drug, Vincasar, which had an AWP of $740, was sold to physicians for $7.50 per dose. The beneficiary's copayment (about $150) was about 20 times providers' acquisition cost. Possibly in response to increasing scrutiny of drug pricing practices by the courts, some manufacturers have adopted an alternative marketing strategy. **They leave the AWPs at existing levels, and offer larger discounts directly to physicians who choose their drugs over products offered by competitors. In this case, the manufacturers' profit per unit dose will be less, but overall profits increase if the discounts result in increased market share.** On May 5, 2003, the Office of Inspector General (2003) issued voluntary compliance guidelines for pharmaceutical manufacturers. If a manufacturer manipulates the AWP to increase federal payments to its customers, the federal antikickback statute is implicated. In other words, it is illegal for a manufacturer knowingly to establish or maintain an AWP if one purpose is to manipulate the spread to induce customers to purchase its products."

spreads and could respond to them; and if manufacturers therefore would not benefit from inflated AWPs, manufacturers would lower the AWPs to reflect the ASPs, competing on both wholesale and end-payor prices. Competition would continue to put downward pressure on ASPs, as discussed above. More importantly, AWPs and related reimbursement rates paid by consumers/payors would decline, passing the benefits of competition on to consumers rather than providers.

### III. The Johnson & Johnson Defendants' Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Against All Track 1 Defendants

29. At pages 8-9 (and in the pages leading up to that point), J&J states that reliance upon a 30% cutoff is absurd for a finding of liability. Their assertion fails for the following reasons.

30. If it is impossible to set a bright line for interpretation of liability, then any spread must be legal, whether those mentioned in my report or those found in the *Lupron Sentencing Memorandum*.

31. The Courts have not found this to be the case, with regard to spreads on these drugs (e.g., the *Lupron Sentencing Memorandum*) or with regard to other measures of market behavior, conduct or equilibrium. For example, in the *Merger Guidelines*, an antitrust market is defined by the hypothetical monopolist test – Can a 5% price increase for a non-transitory period of time (1 year) be profitable for a hypothetical monopolist. If yes, then the products assumed for that hypothetical monopolist constitute an antitrust market. If no, the market is larger and the hypothetical monopolist test is used again, until the product/geographical market is defined.

- Is the 5% bright line or the 1 year bright line arbitrary? Yes.
- Could it be 6%? Yes.

- Could it be 9 months? Yes.
- It's not. Thresholds need to be set.

The *Merger Guidelines* thresholds are not considered absurd, as a matter of policy or economics. Neither is my threshold, which was chosen to be conservative.

32. My threshold is forgiving in the following sense. For non-Medicare reimbursements, if the actual spread is only slightly above the threshold, the damages are *de minimis* (as noted in their footnote 3 citing my deposition testimony).

IV. **Schering-Plough Corporation's and Warrick Pharmaceutical Corporation's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment Against All Track 1 Defendants**

33. At pages 1-2, Schering/Warrick incorrectly assert:

> "Schering and Warrick had no incentive to affect the median, virtually no ability to affect it, and in fact did nothing to affect it. Given these truly indisputable facts regarding the vast bulk of the accused drugs, it is entirely illogical, and indeed pure fantasy, to suggest that the evidence compels the conclusion that Schering and Warrick 'purposefully manipulated and marketed spreads,' including those they had no incentive or ability or activity to affect."

34. Schering/Warrick's hyperbole fails. There is nothing "truly indisputable" about the supposed "facts" to which Schering and Warrick appeal; there is nothing "illogical" or "pure fantasy" in Plaintiffs' interpretation of the evidence.

35. The facts demonstrate the following, as discussed in ¶¶ 19-21 of my April 6, 2006 SJ Declaration:

   a) Contrary to the flawed analysis put forward by Schering/Warrick's expert, Dr. Addanki, almost all generics launch at AWPs clustering together in a range that may include or be slightly below the AWP of the related branded drug. This

is certainly true of generic albuterol, the drug that receives such mischaracterized attention by Dr. Addanki, which I correct in Figures 1-3 of my April 6, 2006 SJ Declaration.

b)   While it is true that no individual generic manufacturer can independently affect the median AWP to any degree, it is also certainly true that

   (i)   **All** generic manufacturers of a given drug jointly have the incentive to maintain the median AWP as high as possible, thereby increasing the spreads of all those generic manufacturers relative to potential **alternative therapeutic competitors**.

   (ii)  **All** generics launch with an AWP fairly close to the AWP of the related branded drug (by NDC). In most cases, the generic AWP is some 5-25% below the branded AWP, although in some cases, a generic AWP may be greater than the branded AWP.

   (iii) Once the generic manufacturers set their AWPs, they generally maintain them at constant levels.

   (iv)  The result seems to be a tacit Nash equilibrium in the dispersion of generic AWPs, which are fairly similarly discounted off of the branded AWP for which the generics are equivalent, a Nash equilibrium not unlike that noted by Dr. Berndt (page 10 of his February 2005 Report) with regard to the observed similar relationship between AWP and WAC over most branded drugs.

   (v)   The apparent Nash equilibrium in the dispersion of generic AWPs is linked to the AWP of the branded drug for which those generics are bioequivalent. Hence, the entire dispersion, including the median, is artificially inflated to the extent that the branded AWP is artificially inflated. This observation is certainly relevant to the dispersion and median of the AWPs for albuterol, since they have been set relative to Proventil's AWP. To the extent that the median is thereby inflated, the spreads of generic albuterol will be further inflated relative to any ASP.

c)   Once the dispersion and the median are set, the generic manufacturers compete amongst themselves on spread through the reduction of their ASPs.

36.   Given these facts, the above quoted assertions of Schering/Warrick are incorrect.

a) Plaintiffs' allegations and theories are neither fantasy nor illogical, as a matter of economics or the business practice in this industry.

b) **It is in the economic self interest** of all generics of a given molecule (say albuterol) to set their AWPs such that the median is as high as possible, relative to other therapeutic alternative molecules.

c) Each generic manufacturer **does have the economic incentive** to support the Nash AWP equilibrium set off of and around the branded AWP.

d) Schering and Warrick **did purposefully manipulate and market spreads** by reducing the ASPs, once the median AWP was set, to providers to move market share.

37. At pages 2-4 (Section I.A), Schering/Warrick incorrectly assert and somewhat inexplicably argue that Plaintiffs have "changed their theory of the case." They frame the "changed ... theory" as follows:

a) First, "Plaintiffs have spent several years arguing that AWPs should have been more closely related than they were to the actual costs paid by the physicians and pharmacies that administer or dispense the drugs. Their theory has been that the Defendants inflated AWPs to create and/or increase 'spreads' between AWPs and providers' costs to give providers an incentive to purchase the drugs with the most inflated AWPs" (p. 2).

b) Second, "Plaintiffs now argue that AWPs should have been more closely related to the *manufacturer's* price, which is *not* the provider's cost because a manufacturer's price necessarily excludes the mark-ups of the wholesalers or

other intermediaries who purchase the drugs from the manufacturers and re-sell them to the providers."

c) They characterize the juxtaposition of these two Plaintiffs' positions as "This sleight-of-hand [which] is significant because Plaintiffs do not and cannot quantify the wholesaler mark-ups, *i.e.*, they do not have evidence of providers' costs" (pp. 2-3).

38. In making this assertion, **Schering/Warrick reveals a complete lack of understanding of pricing practices in the industry.**

39. Schering/Warrick (S-W) have correctly characterized Plaintiffs' theory in 37(a) above. In the damage analysis I conducted, I implemented that theory by taking Schering/Warrick data and calculating *manufacturer prices* to providers by accounting for **gross invoice amounts and all price offsets *to providers only*.** I did so by identifying and netting out any related chargebacks to wholesalers paid by S-W that were related to physician-administered drugs, thereby taking into account the important differences between wholesale prices and contract prices to providers. I did so by also identifying all other price offsets offered to providers. Since a substantial portion of Part B drugs are sold directly to providers, many of the price offsets to intermediaries are not relevant for physician-administered drugs. I labeled this final calculation as the *manufacturer price* (ASP). However, I made it clear that it was the *manufacturer price to providers*, which **is their acquisition cost.** All price offsets documented in the S-W accounting/invoice data, for which Plaintiffs were given appropriate interpretive information, have been accounted for. To the extent that there are some wholesaler mark-ups on that small portion of Part B drugs that may be distributed through

wholesalers not reflected in S-W invoice data, those mark-ups are known to be paper thin and *de minimis* for the purposes here.

40. Hence, **there is no sleight-of-hand on Plaintiffs' part;** there is no contradiction between bullet one and bullet two. **If there is any sleight-of-hand, it is S-W's attempt** (feebly) to suggest that there is some difference between (or change in) Plaintiff's original theories of liability and my implementation of the damage calculation.[5]

41. In Section I.A, pages 2-4, S-W counsel continue to make assertions seemingly in search of logic. For example, they state

> "By suggesting that AWPs were statutorily defined as prices less than the prices paid by providers, Plaintiffs suggest that providers were expected to take a loss each time they prescribed or dispensed an accused drug" (p. 4).

42. Plaintiffs have never made such a suggestion. Plaintiffs have never stated AWP is less than ASP or EAC. **Quite the contrary**; Plaintiffs have consistently asserted that AWP > WAC > ASP (= EAC properly defined). Throughout my declarations it is clear that public and private payors take the AWP as determined and set by manufacturers. Given the manufacturers' AWPs, Medicare statutes regarding reimbursement set provider reimbursement at the lesser of AWP (or some percentage of AWP) or EAC. Since AWP is always greater than EAC, the Medicare statutes merely state that providers should be able to recover the cost of the physician-administered drug. Plaintiffs **never** "suggest that providers were expected to take a loss each time they prescribed or dispensed an accused drug."

43. Likewise, in Section I.A, S-W asserts:

> "Plaintiffs seek to obscure the inconsistencies in their arguments by filing a 125-page brief in which they never once say precisely what they mean while, at the same time, repeatedly seeking to

---

[5] Counsel for S-W seem to be repeating the same errors found in the testimony of Dr. Addanki.

support their arguments regarding the 'definition' of AWP by relying on citations and quotations addressed to other issues entirely" (p. 4).

44. This assertion is wrong. Plaintiffs' have been completely explicit about the definition of AWP, its meaning in the industry; its relationship to ASP, and its role in spreads, both actual spreads and yardstick spreads for liability. The ASPs I calculated are calculated as the acquisition costs to providers (their EACs); they have been explicitly calculated using detailed invoice data from S-W.

45. For purposes of liability and damages, **I calculated ASPs as the acquisition costs of providers (AACs)**; hence, there is no difference between these two prices.

46. S-W asserts:

> "Notably, Dr. Hartman's 'expectations' are measurements of AWP – ASP, whereas the law measures proximity in terms of AWP-AAC, according to Plaintiffs. Thus, Dr. Hartman's 'expectations' are legally irrelevant to Plaintiffs' theory. ... [P]rovider acquisition cost is central to the case they plead in all of their complaints and to their theory of Defendants' alleged wrongdoing, as it is to the conduct that the HHS-OIG argues against. Without that information, which they disclaim, they have no case, and they certainly have no argument for summary judgment" (p. 6).

47. Apparently, S-W counsel and expert have not read Plaintiffs' Expert Declarations closely enough. As stated above, in all of my analyses for the purpose of certifying Class, demonstrating liability and calculating damages, **I use detailed S-W invoice data to calculate ASPs that are equal to the acquisition costs of providers (AACs)**; hence, there is no difference between these two prices.

*/s/ Raymond S. Hartman*
Raymond S. Hartman
April 27, 2006