1

```
          UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF MASSACHUSETTS

-------------------------------x

IN RE PHARMACEUTICAL INDUSTRY)  MDL NO. 1456

AVERAGE WHOLESALE PRICE      )  CIVIL ACTION:

LITIGATION,                  )  01-CV-12257-PBS

-------------------------------x  JUDGE PATTI B. SARIS

                                  CHIEF MAGISTRATE JUDGE

                                  MARIANNE B. BOWLER
```

VIDEOGRAPHED DEPOSITION OF MEREDITH ROSENTHAL, a witness called on behalf of the Defendants, pursuant to the provisions of the Massachusetts Rules of Civil Procedure, before Jill Shepherd, Registered Professional Reporter and Notary Public, in and for the Commonwealth of Massachusetts, at the offices of Hagens, Berman, Sobol & Shapiro, LLP, One Main Street, 4th Floor, Cambridge, Massachusetts, on Wednesday, February 22, 2006, commencing at 9:30 a.m.

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

```
                                      2
 1  APPEARANCES:
 2  SPECTOR, ROSEMAN & KODROFF
 3      (By John A. Macoretta, Esquire)
 4      1818 Market Street, Suite 2500
 5      Philadelphia, Pennsylvania 19103
 6      Tel: 215.496.0300
 7      Fax: 215.496.6611
 8      E-mail: jmacoretta@srk-law.com
 9         On Behalf of the Plaintiffs.
10
11  PATTERSON, BELKNAP, WEBB & TYLER, LLP
12      (By William F. Cavanaugh, Jr., Esquire)
13      (By Adeel A. Mangi, Esquire)
14      1133 Avenue of the Americas
15      New York, New York 10036-6710
16      Tel: 212.336.2000
17      Fax: 212.336.2222
18      E-mail: wfcavanaugh@pbwt.com
19         On Behalf of the Defendant,
20         Johnson & Johnson.
21
22  (CONTINUED)
```

```
                                      3
 1  APPEARANCES: (CONTINUED)
 2  COVINGTON & BURLING
 3      (By Ronald G. Dove, Jr.)
 4      1201 Pennsylvania Avenue NW
 5      Washington, D.C., 20004-2401
 6      Tel: 202.662.5685
 7      Fax: 202.778.5685
 8      E-mail: rdove@cov.com
 9         On Behalf of the Defendant,
10         GlaxoSmithKline.
11
12  DAVIS, POLK & WARDWELL
13      (By Michael S. Flynn, Esquire)
14      450 Lexington Avenue
15      New York, New York 10017
16      Tel: 212.450.4766
17      Fax: 212.450.3766
18      E-mail: michael.flynn@dpw.com
19         On Behalf of the Defendant,
20         AstraZeneca.
21
22  (CONTINUED)
```

```
                                      4
 1  APPEARANCES: (CONTINUED)
 2  HOGAN & HARTSON, LLP
 3      (By Steven M. Edwards, Esquire)
 4      875 Third Avenue
 5      New York, New York 10022
 6      Tel: 212.918.3506
 7      Fax: 212.918.3100
 8      E-mail: smedwards@hhlaw.com
 9         On Behalf of the Defendant,
10         Bristol-Meyers Squibb.
11
12  SHOOK, HARDY & BACON, LLP
13      (By James P. Muehlberger, Esquire)
14      2555 Grand Boulevard
15      Kansas City, Missouri 64108-2613
16      Tel: 816.474.6550
17      Fax: 816.421.5547
18      E-mail: jmuehlberger@shb.com
19         On Behalf of the Defendant,
20         Aventis Pharmaceuticals.
21
22  (CONTINUED)
```

```
                                      5
 1  APPEARANCES: (CONTINUED)
 2  ROPES & GRAY
 3      (By Kim B. Nemirow, Esquire)
 4      (By Brien T. O'Connor, Esquire)
 5      One International Place
 6      Boston, Massachusetts 02110-2624
 7      Tel: 617.951.7049
 8      Fax: 617.951.7050
 9      E-mail: kim.nemirow@ropesgray.com
10         On Behalf of the Defendants, Warrick
11         Pharmaceuticals and Schering Corp. and
12         Schering-Plough.
13
14  KIRKLAND & ELLIS, LLP
15      (By Helen E. Witt, Esquire)
16      200 East Randolph Drive
17      Chicago, Illinois 60601-6636
18      Tel: 312.861.2148
19      Fax: 312.861.2200
20      E-mail: hwitt@kirkland.com
21         On Behalf of the Defendant, Roxane.
22  (CONTINUED)
```

Page 6

```
 1   APPEARANCES: (CONTINUED)
 2
 3   ALSO PRESENT:
 4      Timothy S. Snail, Principal
 5      CRA INTERNATIONAL
 6      John Hancock Tower
 7      200 Clarendon Street, T-33
 8      Boston, Massachusetts 02116-5092
 9      Tel: 617.425.3000
10      Fax: 617.425.3132
11
12      Don Dal Cielo, Videographer
13
14   By Telephone:
15      Joseph Hank Young, Esquire
16      Hogan & Hartson, LLP
17      111 South Calvert Street
18      Baltimore, Maryland  21202
19
20
21              * * * * *
22
```

Page 7

```
 1              INDEX
 2   WITNESS:                          PAGE
 3   MEREDITH ROSENTHAL
 4     Examination by Mr. Cavanaugh.................... 010
 5
 6           EXHIBITS
 7   NUMBER        DESCRIPTION           PAGE
 8   Exhibit Rosenthal 001, REPORT..................... 010
 9   Exhibit Rosenthal 002, AMCC....................... 061
10   Exhibit Rosenthal 003, WRITTEN TUTORIAL........... 078
11   Exhibit Rosenthal 004, PRESCRIPTION DRUG STUDY.... 088
12   Exhibit Rosenthal 005, DEPOSITION OF J. SPAHN.... 136
13   Exhibit Rosenthal 006, DEPOSITION OF K. ELLSTON.. 139
14   Exhibit Rosenthal 007, DEPOSITION OF J. RUSSELL
15            HAILEY.................... 151
16   Exhibit Rosenthal 008, DEPOSITION OF KAREN DOBSON 158
17   Exhibit Rosenthal 009, DEPOSITION OF JAMES KENNEY 161
18   Exhibit Rosenthal 010, OIG REPORT (11/6/92)...... 169
19   Exhibit Rosenthal 011, "Hooked On Drugs"......... 179
20   Exhibit Rosenthal 012, OIG Report................ 180
21
22
```

Page 8

```
 1              PROCEEDINGS
 2
 3      THE VIDEOGRAPHER: This is videographer,
 4   Don Dal Cielo, of G & M Court Reporters. Today's
 5   date is February 22, 2006. The time is 9:31 a.m.
 6      We're here at Hagens & Berman, located at
 7   One Main Street, Cambridge, Massachusetts. We're
 8   here to take the videotape deposition of Ms.
 9   Meredith Rosenthal. This is in the matter of
10   Pharmaceutical Industry Average Wholesale Price
11   Litigation in the United States District Court for
12   the District of Massachusetts.
13      I will ask counsel at this time to please
14   voice identify yourselves and state whom you
15   represent.
16      MR. MACORETTA: Good morning, John
17   Macoretta from Spector, Roseman & Kodroff. Here for
18   the plaintiffs.
19      MR. CAVANAUGH: Bill Cavanaugh of
20   Patterson, Belknap, Webb & Tyler on behalf of
21   Johnson & Johnson.
22      MR. MANGI: Adeel Mangi of Patterson,
```

Page 9

```
 1   Belknap, Webb & Tyler on behalf of Johnson &
 2   Johnson.
 3      MR. DOVE: Ron Dove of Covington &
 4   Burling, for GlaxoSmithKline.
 5      MR. FLYNN: Michael Flynn of Davis, Polk &
 6   Wardwell on behalf of AstraZeneca.
 7      MR. SNAIL: Tim Snail from CRA
 8   International, also present.
 9      MR. EDWARDS: Steve Edwards, Hogan &
10   Hartson, Bristol-Myers Squibb.
11      MR. MUEHLBERGER: James Muehlberger,
12   Shook, Hardy & Bacon, Aventis Pharmaceuticals.
13      MR. O'CONNOR: Brian O'Connor of Ropes &
14   Gray for Schering-Plough and Warrick.
15      MS. NEMIROW: Kim Nemirow of Ropes & Gray,
16   also for Schering-Plough Corp.
17      MS. WITT: Helen Witt, Kirkland & Ellis
18   for Roxane in the Connecticut case.
19      THE VIDEOGRAPHER: The court reporter
20   today is Jill Shepherd, and I will ask the court
21   reporter at this time to please swear in the
22   witness.
```

**Page 10**

```
 1          * * * * *
 2          MEREDITH ROSENTHAL, a witness, having
 3  been satisfactorily identified and duly sworn, was
 4  called for examination by counsel for the
 5  Defendants, was examined and testified as follows:
 6          * * * * *
 7          EXAMINATION BY MR. CAVANAUGH
 8     Q.  Good morning, Dr. Rosenthal.
 9     A.  Good morning, Mr. Cavanaugh.
10     Q.  Let's start by marking your report.
11          MR. CAVANAUGH: If you could mark this as
12  Exhibit Rosenthal 001.
13          (Exhibit Rosenthal 001 marked.)
14     Q.  Doctor, can you identify Exhibit Rosenthal
15  001?
16     A.  Exhibit Rosenthal 001 is my liability
17  report.
18     Q.  And is that your signature on the
19  signature page of the document?
20     A.  Yes, it is.
21     Q.  Did you prepare the initial draft of this
22  report?
```

**Page 11**

```
 1     A.  Yes, I did.
 2     Q.  And did you read the final report before
 3  you signed it?
 4     A.  Yes, I did.
 5     Q.  Do you believe it's an accurate
 6  representation of your opinions?
 7     A.  Yes, I do.
 8     Q.  Since that time, have you had an
 9  opportunity to have further discussions with counsel
10  for the plaintiffs regarding your opinions in this
11  case?
12     A.  My opinions have not changed since filing
13  this document.
14     Q.  Is there any research or additional work
15  you're presently undertaking in connection with this
16  case?
17     A.  I have reviewed a number of documents in
18  preparation for today, but there's not additional
19  work that I am doing with regard to this analysis.
20     Q.  Now, did you have any communications with
21  counsel -- any of the counsel for the plaintiffs in
22  the course of preparing this report?
```

**Page 12**

```
 1     A.  Did I have any communications?
 2     Q.  Yes.
 3     A.  Yes.
 4     Q.  And did you discuss the substance of the
 5  opinions set forth in your report with counsel for
 6  plaintiffs?
 7     A.  I apprised them of what I was writing,
 8  yes.
 9     Q.  Did they provide any input on any of the
10  drafts?
11     A.  No.
12     Q.  Did they provide you with any of the
13  materials you relied on in connection with your
14  report?
15     A.  Absolutely, the discovery documents.
16     Q.  Who selected the materials that you relied
17  upon in your report?
18     A.  In some cases I asked for specific
19  materials. I reviewed a wide variety of materials
20  that were provided in this case.
21     Q.  Attached to this, to your report, is an
22  appendix -- I'm sorry, Attachment B, I believe it
```

**Page 13**

```
 1  is, entitled, "Documents Relied Upon." Is this a
 2  complete list of the documents you relied upon in
 3  connection with the opinions set forth in your
 4  report?
 5     A.  These documents refer to specific places
 6  where I found it necessary to refer to an individual
 7  document to make a point. I reviewed a wide variety
 8  of materials that were made available through
 9  discovery.
10     Q.  But at the end of the day, these are the
11  principal materials you relied upon in connection
12  with your opinion, correct?
13     A.  That's correct.
14     Q.  Were there any particular lawyers that you
15  worked with in connection with the preparation of
16  your report?
17     A.  No particular lawyers.
18     Q.  What lawyers did you work with?
19     A.  From time to time --
20     Q.  Let's say during the period of time in
21  which your report was being prepared, what lawyers
22  for the plaintiffs were you interacting with?
```

**14**

A. I interacted with Mr. Wexler, Mr. Sobol, Mr. Berman, Mr. Notargiacomo, and probably others, but I would say those are the primary.

Q. During the course of preparing your report, did you have any interaction with Dr. Hartman?

A. I certainly had conversations with Dr. Hartman.

Q. Did you have conversations with Dr. Hartman regarding the opinions set forth in your report?

A. I guess I'm not entirely clear what you mean by that.

Q. Okay. I will ask it more broadly. Did you have discussions with Dr. Hartman regarding your report?

A. Dr. Hartman provided, as far as I know, very little input to my report. Did we have discussions while I was writing the report related to matters of AWP? Yes, but he did not provide any specific discussions about what I wrote in this report.

**15**

Q. Can you describe for me -- well, how many discussions did you have with Dr. Hartman?

A. I can't say.

Q. More than a dozen, less than a dozen?

A. Maybe around a dozen.

Q. Were these at group meetings or telephone calls or both?

A. Both.

Q. All right. How many face-to-face meetings did you have with Dr. Hartman during the time period in which your report was being prepared?

A. I can't say, but I can't really say the exact number. I haven't recorded those.

Q. Why don't you give me your best estimate of what that would be.

A. I guess I would estimate two or three, at most.

Q. And were these meetings at which attorneys for the plaintiffs were also in attendance?

A. No.

Q. What subjects did you discuss with Dr. Hartman during these meetings?

**16**

A. I can't really say. I really didn't take notes of those meetings. They were project meetings. Maybe, again, one or two, and I don't know the range of topics that we discussed.

Q. You say you know you discussed AWP.

A. Right.

Q. Can you be any more specific than that as to the subjects you were discussing?

A. I really can't. I'm not trying to be difficult, but --

Q. That's fine.

A. -- there were issues, perhaps documents that we discussed, but nothing that comes to mind specifically. But the kind of issues that were relevant to the work that we were both doing.

Q. Would it be fair to say that in your discussions with Dr. Hartman you also discussed the opinions he intended to set forth in his report?

A. We didn't specifically discuss his opinions, but, again, we may have discussed issues that were addressed in his report or issues that were addressed in my report.

**17**

Q. Did you read his report?

A. I have looked at his report, yes.

Q. Did you see any drafts of his report?

A. Good question. I probably saw an earlier draft of his report.

Q. Did you provide any comments either to him or to anyone else regarding the draft report that you saw?

A. I have provided technical advice on matters of health care institutions, matters of health economics, and not directly suggesting anything that he wrote in his report, but he may have used some of that technical information that I provided him for his report.

Q. Can you give me an example of the type of technical information that you provided to him.

A. For example, sharing my understanding of the reimbursement system, my understanding of how these drugs are delivered, so how the delivery system is organized.

Q. Let me stop on reimbursement system. Are you referring to technical information you provided

18

1  with respect to private payor reimbursement?
2    A.  We may have reviewed that. More about
3  issues -- for example, how supplemental insurance
4  works.
5    Q.  And by "supplemental insurance," are you
6  referring to what's often referred to as Medigap
7  insurance?
8    A.  Medigap is one form of supplemental
9  insurance. There is supplemental insurance that's
10 purchased on the individual market and there is
11 employer-sponsored supplemental insurance, and,
12 then, of course, there is Medicaid that also acts as
13 a secondary payor.
14   Q.  What type of questions did Dr. Hartman
15 have as to the technical aspects of these
16 reimbursement systems as it relates to supplemental
17 insurance?
18   A.  I can't remember specifically what kinds
19 of questions he had, but you can imagine that these
20 -- a clear understanding of these issues was
21 important for his analysis.
22   Q.  What other technical issues do you recall

19

1  discussing with Dr. Hartman?
2    A.  I can't recall anything specifically.
3  Again, my expertise relates to the delivery system
4  and the reimbursement system, and those would be the
5  principal topics that we were going to share
6  information with him on.
7    Q.  When you say "the delivery system," can
8  you explain to me what you mean by that.
9    A.  So for example, how oncologists are
10 organized often in clinical practice and how
11 hospital outpatient departments provide care in a
12 similar way to these clinics.
13   Q.  How many hours do you think you spent on
14 your report?
15   A.  I don't have that number.
16   Q.  Can you give me an estimate?
17   A.  I really couldn't say. I could get that
18 number, if you wish.
19   Q.  In connection with your preparation of
20 this report, did you go out and interview any
21 parties?
22   A.  No, I did not personally interview.

20

1  Excuse me, I did have one telephone conversation
2  with one of the third-party payor representatives.
3    Q.  What third-party payor did you speak to?
4    A.  Good question. I'd have to look it up.
5  One of the Taft-Hartley plans.
6    Q.  Can you describe for me the substance of
7  your conversation with this individual.
8    A.  The substance was about -- it was about
9  specific methods of claims payment; how they arrange
10 for claims payment.
11   Q.  Why was that relevant, if at all, to your
12 report?
13   A.  We were interested in understanding how
14 the third-party payors use -- what adjudication
15 rules they use.
16   Q.  Explain to me what you mean by that, "what
17 adjudication rules they use."
18   A.  Algorithms they use for paying claims,
19 but, in fact, this payor delegated that.
20   Q.  To whom did they delegate it?
21   A.  Blue Cross plan.
22   Q.  Did you then follow up with the Blue Cross

21

1  plan to determine what algorithm they used?
2    A.  No.
3    Q.  Why not?
4    A.  We were unable to get in contact.
5    Q.  Do you understand that one of the class
6  representatives in this case is a Blue Cross?
7    A.  I do.
8    Q.  Did you make an effort to contact that
9  Blue Cross organization?
10   A.  Yes.
11   Q.  And that Blue Cross organization declined
12 to assist you?
13   A.  I don't know why it didn't work out. I
14 don't know.
15   Q.  Why did you need to determine what
16 adjudication method was used in connection with your
17 report?
18   A.  Just another piece of information to
19 validate some of what we looked at.
20   Q.  Well, how did it play into your -- how did
21 you anticipate that information would play into the
22 opinions that you were intending to offer?

**Page 22**

1  A. I am not sure --
2  Q. Okay. I will ask it more simply. Why was
3  it relevant?
4  A. We were interested -- we had been looking
5  at some claims data and we were interested in
6  understanding how the claims were processed.
7  Q. What claims data were you looking at?
8  A. There were data produced by defendants'
9  experts, Gaier -- I believe the data came from
10 Gaier's report.
11 Q. And what was it about the information
12 produced by Dr. Gaier that led you to want to do
13 this to determine the adjudication method used by
14 any given third-party payor?
15 A. We had examined the data and really were
16 just trying to verify that we understood how the
17 data were used so that our analysis made sense.
18 Q. Based on your inability to get contact,
19 were you able to draw any conclusions with respect
20 to how, as you put it, Dr. Gaier had used the data?
21 A. Based -- looking at the data themselves
22 and Dr. Gaier's analysis, we were satisfied that we

**Page 23**

1  understood the data.
2  Q. Do you understand that Dr. Hartman has
3  submitted a supplemental report?
4  A. Yes, I do.
5  Q. Have you had an opportunity to review
6  that?
7  A. I have looked at it briefly.
8  Q. Is there anything in the supplemental
9  report that would cause you to alter any of the
10 opinions or assumptions you have made in your
11 initial report?
12 A. No.
13 Q. Do you have any understanding as to how
14 Dr. Hartman's initial report differs from his
15 supplemental report?
16 A. I do. Perhaps not a complete
17 understanding but...
18 Q. Why don't you tell me what your
19 understanding is.
20 A. My understanding is that counsel asked him
21 to submit a supplemental report with a different
22 calculation for the average sales price, the ASP,

**Page 24**

1  and this new ASP was included in a number of classes
2  of trades that were not included in the original ASP
3  calculation. That is my understanding.
4  Q. Did you ask anyone on behalf of the
5  plaintiffs why this different calculation was being
6  done?
7  A. My understanding is that it was by
8  direction from counsel.
9  Q. I understand that, but did you then ask
10 counsel, "Well, why is Dr. Hartman changing his
11 calculation of ASP?"
12 A. No, I did not.
13 Q. Were you curious as to why it was being
14 changed?
15 A. No.
16 Q. Do you have an opinion as to whether for
17 purposes of this case it's appropriate to calculate
18 ASP by including prices paid by other classes of
19 trades?
20    MR. MACORETTA: I'm going to object to
21 that. That's beyond the scope of her report.
22 Q. You can answer the question.

**Page 25**

1  A. Excuse me. I have not reached an opinion.
2  I have not been asked to reach an opinion on those
3  matters, so I do not have an opinion.
4  Q. In your report you make a number of
5  references to Dr. Hartman's report and you base
6  certain assumptions on Dr. Hartman's report; is that
7  fair?
8  A. It's true. The reports do relate to one
9  another.
10 Q. To what extent does Dr. Hartman's change
11 in his methodology for calculating ASP influence any
12 of the opinions or assumptions you have made in your
13 report?
14 A. It has no effect on my opinions. My
15 opinions are broadly about the economics of the
16 case, the economics of the health care industry and
17 looking at incentives for physicians and
18 manufacturers, and this change in ASP calculation
19 has no effect on those opinions.
20 Q. Now, as I understand it, you have some
21 affiliation with Graylock McKinnon Associates.
22 A. That's correct.

Page 26

1   Q.  They are a consulting and litigation
2   support firm?
3   A.  That's correct.
4   Q.  Are you an owner of that -- partial owner
5   of that firm?
6   A.  No, I'm not.
7   Q.  You simply have some sort of affiliation?
8   A.  That's correct.
9   Q.  Do you have a financial arrangement with
10  them?
11  A.  They process my billing, if that's what
12  you mean by "financial arrangement."
13  Q.  And do they share in any part of your
14  billings?
15  A.  I don't actually know the answer to that
16  question.  In the past, it was true, and I don't
17  believe it is any more, but I may be wrong.
18  Q.  Are they a profit maximizing company based
19  on your experience with them?
20  A.  I would assume so.
21  Q.  Have you disclosed to plaintiffs the
22  people that -- to whom you or GMA your bills, your

Page 27

1   financial arrangement with GMA?
2   A.  Yes, they know my financial arrangement.
3   Q.  Who submits the bills to the plaintiffs,
4   GMA or you?
5   A.  GMA.
6   Q.  What is your current billing arrangement
7   with the plaintiffs?
8   A.  I don't actually know what the current
9   rate is.  I send hours to Graylock McKinnon and they
10  send the bills.  I could find that out for you, but
11  that has changed over time and I don't know the
12  answer.
13  Q.  Do you have some agreement with GMA as to
14  what rate your time should be charged?
15  A.  We do not have a written agreement.  My
16  understanding is that different clients have
17  different -- are billed at different rates for my
18  time and I am paid based on whatever GMA's agreement
19  is with the client.  And I don't know --
20  Q.  Would it be fair to say GMA engages in a
21  form of price discrimination?
22  MR. MACORETTA:  Objection.

Page 28

1   Q.  Not in a pejorative way, but price
2   discrimination, as an economist, you know is simply
3   the ability to charge different prices to different
4   customers, correct?
5   A.  As far as I know, that's what they do, but
6   I don't have direct knowledge.
7   Q.  Who negotiated your billing rate with the
8   plaintiffs?
9   A.  I don't know who would have done that.
10  Q.  That would have been someone from GMA?
11  A.  I believe so.
12  Q.  And you receive back from GMA some portion
13  of whatever the billing rate is that they charge the
14  plaintiffs?
15  A.  Which may be 100 percent, I am not sure.
16  Q.  At some point did you know it was less
17  than 100 percent?
18  A.  That's correct.
19  Q.  Do you see the bills that GMA submits to
20  plaintiffs?
21  A.  I do not.
22  Q.  So would it be fair to say that you don't

Page 29

1   know -- as you sit here today, you don't know what
2   GMA is charging the plaintiffs for your time?
3   A.  I don't.  That's correct.
4   Q.  Is your compensation contingent in any way
5   on the outcome of this case?
6   A.  No, it's not.
7   Q.  When were you first contacted by counsel
8   in connection with this case?
9   A.  I don't know the precise date.
10  Q.  Now, I know you have also served as an
11  expert in connection with the Lupron litigation.
12  A.  That's correct.
13  Q.  Were you first retained in the Lupron
14  litigation and then retained in this litigation?
15  A.  When you say "retained" --
16  Q.  When you began working with the
17  plaintiffs.
18  A.  I did work on the Lupron case, not as a
19  named expert.  I provided, again, the same kind of
20  information about the institutions in the health
21  care industry that were relevant to that case prior
22  to this case.

Page 30

1   Q. Prior to the Lupron case, had you worked
2   with any of the same plaintiffs' counsel you are
3   working with in this case?
4   A. Yes, I did.
5   Q. And who was that?
6   A. Tom Sobol.
7   Q. What case had you worked on with Mr.
8   Sobol?
9   A. Originally the tobacco litigation that led
10  to a master settlement agreement. That was the
11  first.
12  Q. And what role did you play in that case?
13  A. I provided supporting analysis, so, again,
14  just on a consulting basis.
15  Q. So you were a nontestifying consultant?
16  A. I was a doctoral student.
17  Q. What other cases have you worked on with
18  Mr. Sobol besides Lupron, tobacco and this case?
19  A. Because I work through GMA, I think I
20  would like to check with them to see because I don't
21  always know which case is attributed to which firm.
22  Q. I see. Well, what other cases have you

Page 31

1   had interaction with Mr. Sobol or someone from
2   Hagens Berman?
3   A. Really, primarily Lupron and AWP. Those
4   are the two that I recall for certain. There may be
5   others.
6   Q. Now, you provided a tutorial for the Court
7   in connection with this case?
8   A. That's correct.
9   Q. Who prepared that tutorial?
10  A. I prepared that tutorial.
11  Q. And did you do it under the same
12  arrangement that you had with GMA and whatever
13  arrangement GMA had with the plaintiffs?
14  A. I believe so.
15  Q. Now, in connection with that tutorial, did
16  you interview any parties?
17  A. I don't believe so, no.
18  Q. Have you ever sat down with any of the
19  class members in this case?
20  A. No.
21  Q. Have you ever had any conversation with
22  any members of any of the classes in this case

Page 32

1   regarding their thoughts, expectations, regarding
2   drug reimbursement?
3       MR. MACORETTA: Let me object. You mean
4   the class representatives or --
5       MR. CAVANAUGH: No, no.
6       MR. MACORETTA: So that means any Medicare
7   beneficiary across America, any third-party payor in
8   Massachusetts?
9       MR. CAVANAUGH: Yeah, in connection with
10  this case.
11  A. In my work, I interact often with third-
12  party payors and I talk to them about reimbursement
13  issues. Have I discussed AWP specifically with
14  those third-party payors? No, because I didn't
15  believe it was relevant to my conclusions.
16  Q. Why didn't you think a discussion about
17  AWP would be relevant to your conclusion?
18  A. Economists generally try to draw
19  collection aggregate data rather than interviewing
20  individual market participants. So, for example, we
21  will observe equilibrium price in the market. It's
22  not necessary to talk to every buyer of a Hershey

Page 33

1   bar to find out what their willingness to pay is for
2   the Hershey bar. We observe the price and that's --
3   Q. And another way of collecting aggregate
4   data is to conduct surveys; is it not?
5   A. That's correct.
6   Q. Have you collected any surveys in this
7   case?
8   A. I have relied on a couple of surveys.
9   Q. What surveys were those?
10  A. There's a survey connected by Dyckman
11  Associates reported in the MedPAC, M-E-D-P-A-C,
12  report, and there's also a similar survey conducted
13  by the University of Chicago that was also
14  referenced in that report.
15  Q. Any other surveys that you have relied
16  upon?
17  A. Those are the two that I can think of.
18  Q. Have you had any discussions with Dr.
19  Hartman about the appropriateness of conducting any
20  surveys of payors in connection with either your
21  work or his work in this case?
22  A. I have not.

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL        February 22, 2006
Cambridge, MA

**34**

 1  Q. Now, in looking at your report and
 2  Attachment B, which lists the materials, documents,
 3  relied upon, I didn't see any reference to any
 4  deposition testimony. Did you review any deposition
 5  testimony?
 6     A. I reviewed a wide variety of discovery
 7  documents. And these -- again, these are specific
 8  citations to documents that I felt were pertinent
 9  and are mentioned specifically in my report. But I
10  reviewed certainly Gaier and Young's deposition
11  testimony.
12     Q. What about deposition testimony of third-
13  party payors in this case?
14     A. I may have looked at some of that.
15     Q. Would it be fair to say you are not
16  relying upon any of that testimony in connection
17  with the opinions set forth in your report?
18     A. That's correct.
19     Q. Did you review any deposition testimony
20  which appeared to contradict or conflict with any of
21  the opinions that either you or you understood Dr.
22  Hartman were giving in this case?

**35**

 1     A. Certainly not.
 2     Q. Do you understand that internal documents
 3  have been produced by various third-party payors in
 4  this case?
 5     A. I do.
 6     Q. And am I correct that there are no such
 7  documents listed in your -- in Attachment B, which
 8  is a comprehensive list of the documents you are
 9  relying upon in connection with your report?
10     A. In my report, I feel it appropriate to
11  make reference to any of those specific documents,
12  but my understanding is that it's been disclosed
13  that I reviewed a wide variety of discovery
14  documents in addition to these specific documents
15  that were pertinent.
16     Q. But would it be fair to say that you are
17  not relying upon any internal documents from any
18  third-party payor in connection with the opinions
19  you have offered?
20     A. My opinions are based on an another set of
21  of information that this information that you refer
22  to is not specifically part of what my opinions rest

**36**

 1  on.
 2     Q. Now, I will represent to you that there
 3  have been literally millions of pages of documents
 4  produced in this case. Would it be fair to say you
 5  haven't reviewed all of the documents produced in
 6  this case?
 7     A. That would be true.
 8     Q. How did you go about the process of
 9  determining what documents to review?
10     A. Graylock McKinnon provided me with sets of
11  documents, and my understanding is that they were
12  able to search -- use a searchable database to look
13  for specific kinds of documents, and I directed them
14  as to the kinds of documents that would be useful.
15     Q. What types of documents did you tell them
16  you thought would be useful?
17     A. For this report, really, looking for
18  defendants in their own writing in memos,
19  presentations, about the strategic issues related to
20  AWP in particular.
21     Q. Did you ask them to look for internal
22  documents from third-party payors with respect to

**37**

 1  their understanding of AWP, WAC or any of the other
 2  materials we've talked about in this case?
 3     A. No, I did not. I didn't think that was
 4  relevant.
 5     Q. Did you ask the GMA or any of the
 6  plaintiffs' attorneys to provide you with testimony
 7  from third-party payors with respect to their
 8  understanding of various terms such as AWP, WAC or
 9  any other terms that are at issue in this case?
10     A. No.
11     Q. And, again, you didn't do that because you
12  didn't think it was relevant to the opinions you are
13  offering here?
14     A. That's correct.
15     Q. In your CV you identify having worked in
16  the -- in connection with the In re: Augmentin
17  antitrust litigation.
18     A. That's correct.
19     Q. Were you a testifying expert in that case?
20     A. I was. And that would have involved Mr.
21  Sobol, too. Again, I'm afraid my memory is not
22  great on these cases.

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                February 22, 2006
Cambridge, MA

38

1   Q. No problem.
2   A. Yes, but the case settled.
3   Q. Did you provide an expert report in that
4   case?
5   A. Nothing was filed.
6   Q. Okay. Did you give a deposition?
7   A. I did not.
8   Q. What was the subject matter of your
9   anticipated testimony?
10  A. This was a Hatch-Waxman case.
11  Q. Okay. What was your specific area of
12  expertise in the case?
13  A. The same as it is here; it's the economics
14  of health care. But I would have been -- does that
15  answer your question?
16  Q. Well, no. Actually, you have used the
17  phrase a couple of times, "economics of health
18  care."
19  A. Um-hum.
20  Q. I guess my question is: When you use that
21  term, what do you mean?
22  A. Economics is a defined discipline that has

39

1   been around for 30 or 40 years. Because health care
2   markets don't function like other markets, there's a
3   particular set of theories and empirical strategies
4   that have really been developed for analyses in
5   health care.
6   Q. Now, you say "health care markets don't
7   function like other markets." Can you explain to me
8   what you mean by that.
9   A. Absolutely. There are a series of what we
10  call "market failures" in economics that relate to
11  health care, and the biggest set of these is
12  captured under the umbrella "asymmetric
13  information." So physicians have more information
14  about diagnoses and treatments than patients.
15  Patients know more about their own health behavior,
16  and, in many cases, their own health conditions
17  than, for example, than insurers do, which leads to
18  problems in the health insurance market, and
19  problems interacting between physicians and
20  patients. So these kinds of market failures -- and
21  that's sort of just the beginning of the list.
22  Externalities are another kind of market failure in

40

1   addition to asymmetric information. That most
2   importantly means that competition does not imply
3   Pareto efficiency as it does in other markets.
4       MR. CAVANAUGH: I'm sorry. Can you read
5   back the last part of that answer. I got
6   distracted. I apologize.
7       (Answer read.)
8   Q. And what is "Pareto efficiency"?
9   A. "Pareto efficiency" essentially means that
10  there is no waste in the outcome. So when
11  economists look at markets, the whole reason we have
12  antitrust bodies to try to make sure that markets
13  function in a competitive way is that there's a set
14  of theories in economics that suggest that
15  competition will lead to the best possible outcomes
16  in terms of the productivity of the economy. That's
17  the sort of general meaning of Pareto efficiency
18  here. We're saying that production is optimally
19  done without waste. And if competition does not lead
20  to Pareto efficiency, that suggests a particular
21  role for public policy.
22  Q. Now, lack of perfect competition in the

41

1   health care market is not unique to health care, is
2   it?
3   A. That's not the point. And I think often
4   this is a very nuanced part of this theory, but it's
5   not that there's just a lack of competition. It's
6   that even if competition were perfect, then the
7   implications are not the same as they are in other
8   markets. And so it's not necessarily ideal to
9   promote competition. So that's the important
10  linkage there. It's that the competition does not
11  lead to Pareto efficiency --
12  Q. What other markets operate in a Pareto
13  efficient manner?
14  A. We think most commodities are supplied in
15  that manner. But, again, it's not a question of
16  whether competition is perfect, but whether perfect
17  competition should be the goal from a welfare
18  perspective, and so in other markets there are
19  certain conditions that need to hold for -- this is
20  called a "second fundamental theorem of welfare
21  economics."
22  Q. Now, would you agree with me, you function

Page 42

1   -- at least part of your time -- in the market of
2   providing economic consulting services to third
3   parties, correct?
4       A.  I do spend part of my time doing that.
5       Q.  Does that market operate in a Pareto
6   efficient manner?
7       A.  I don't have an opinion on that. That's a
8   difficult question to answer.
9       Q.  Does the fact that GMA is able to engage
10  in price discrimination suggest to you that it does
11  not operate in a Pareto efficient manner?
12      A.  I wouldn't draw that conclusion
13  necessarily.
14      Q.  Are there -- now, you mentioned the
15  commodities -- certain commodity markets may operate
16  in a Pareto efficient manner. Are there
17  noncommodity markets other than health care that do
18  not operate in a Pareto efficient manner?
19      A.  I'm not sure what you are trying to get
20  at. Because, really, again, the issue is the welfare
21  implications of competition. And so these other
22  markets tend to be more competitive. Whether or not

Page 43

1   they are Pareto efficient depends on a lot of
2   factors, and I certainly couldn't evaluate that.
3       Q.  All right. Let me follow up then on your
4   point about the welfare implications of health care.
5       A.  Yes.
6       Q.  Explain to me what you mean by that.
7       A.  So, for example, the insurance market is a
8   nice place to look at this because of asymmetric
9   information there. So, in particular, consumers
10  know more about their health risks than insurers.
11  There are state laws generally that protect
12  consumers from having a lot of information collected
13  from them and used in rating. And so insurers are -
14  - consumers are in a position to self-select
15  insurance plans -- sorry. Consumers are in a
16  position to self-select based on their health
17  status. This is called "adverse selection."
18          So perfect competition among health
19  insurance plans leads to a whole lot of people not
20  getting insurance because the plans are indeed
21  competing to avoid the sickest patients; whereas,
22  the consumers are trying to self-select into the

Page 44

1   most favorable plan for them, so competition there
2   leads to something that's less than efficient. We
3   don't have as much insurance coverage as we'd like
4   to. And individuals aren't getting as much as they
5   would be willing to pay for. So that's the
6   inefficiency there.
7       Q.  But what do you mean by the "welfare
8   implications"? I mean, I understand your point
9   about the inefficiency and that's an example of
10  asymmetric information. But what do you mean by the
11  term "welfare implications"?
12      A.  "Welfare implications" relate to that
13  inefficiency. So welfare in economics terms has to
14  do with, generally, with the demand curve, or, more
15  broadly, the willingness to pay for a particular
16  good or service. It has to do with waste and
17  production, but in this case the willingness to pay
18  issue.
19      Q.  Now, in your CV you list a major research
20  interest as financial incentives for physicians.
21      A.  That's correct.
22      Q.  What -- and I looked through your

Page 45

1   publications. What publications do you have on the
2   subject of financial incentives for physicians?
3       A.  My most recent paper -- I believe it's the
4   most recent paper -- published in the Journal of the
5   American Medical Association, October 12th, looks at
6   pay for performance, and these are incentives to
7   improve the quality of care.
8           I have a couple of earlier papers looking
9   at payment systems in behavioral health care.
10  There's a Journal Of Health Economics paper and
11  Health Affairs paper, and there are a number of
12  other papers there, including another Health Affairs
13  paper that examines financial incentives in medical
14  groups in California.
15      Q.  Have you done any academic research on the
16  issue of reimbursement of physician-administered
17  drugs?
18      A.  No, I have not.
19      Q.  If we could look at your report, the first
20  page, your first sentence says, "I have been
21  retained by counsel for the classes of consumers and
22  third-party payors who paid for drugs based on AWP

Page 46

and payment...and the AWP was inflated."
    You then on -- at least on the first page, as I see it, have a number of references to the term "AWP inflation."
    What do you mean when you refer to "AWP inflation"?
    A.  Meaning, in this report that the list price is inflated above this -- above a benchmark in terms of its expected relationship to the average sales price.
    Q.  Now, in order for there to be an expected relationship, it has to be from the perspective of someone has to have that expectation. Whose expectation are you referring to in that definition?
    A.  A marketwide average expectation.
    Q.  And to what extent have you done any analysis of marketwide average expectations?
    A.  I have reviewed several relevant pieces of information.
    Q.  Tell me what those relevant of pieces of information are.
    A.  One would be the data reported in that

Page 47

MedPAC report which looks at the actual discounts that third-party payors use to reimburse physicians for physician-administered drugs.
    Q.  Anything else?
    A.  And the other is a series of government reports that were produced about the actual spreads and related -- there's another report by ASCO. There's some other publicly available documents that examine the difference between acquisition costs and AWP.
    Q.  Well, how does the fact that there is a difference between acquisition costs and the reported AWP tell you what the expectation was?
    A.  That information, those reports, were informing the market's expectation about what AWP's relationship was to ASP.
    Q.  Well, that can tell you the fact of what the relationship was. How did that tell you what the expectation was of any given participant in the market as to the relationship?
    A.  That was the available information corroborated against the information of what

Page 48

discounts third-party payors were actually negotiating. That's information that, again, as I said before when we were talking about looking at markets, we observe a price and that contains information about unobservable things like preferences.
    Q.  Now, do you have an opinion as to what the relationship was or what -- strike that. Do you have an opinion as to what the expectation was by the "market" as to a relationship between AWP and acquisition cost?
    A.  I have not been asked to provide a specific opinion on that, no.
    Q.  Do you understand Dr. Hartman to have provided an opinion on that subject?
    A.  I do.
    Q.  What do you understand his opinion to be?
    A.  I understand his opinion -- the yardstick that he used as an upper bound for the expected spread was 30 percent.
    Q.  So that would be -- 30 percent would be acquisition cost or AWP less 30 percent?

Page 49

    A.  That's a good question. I'd have to check the report to make sure I've got that correct.
    Q.  What's your current understanding?
    A.  I'd just like to check.
    Q.  Go ahead.
    A.  Why don't I do that. I believe that's in my report as well, a reference to that number.
        (Pause.)
    A.  So it's as a percentage of ASP. In my charts you will see it's relative to the ASP.
    Q.  Now, would I be correct that under Dr. Hartman's expectation theory, AWP is recognized not to be an actual price that anyone is paying?
    A.  That's correct.
    Q.  If it's not an actual price, then how can it be inflated?
    A.  Let me make sure I understand what you are asking. Actual price, it's a list price. It's a number that's made available to the market and that number is used in the transaction systems to reimburse these drugs. And so, in that sense it's an actual price, but it's not an actual acquisition

**Page 50**

1  price perhaps, but the list price is inflated
2  relative to what the third-party payors believe that
3  its relationship to acquisition costs...
4  Q. Let me just break that down to make sure
5  we understand one another. You'd agree with me that
6  under Dr. Hartman's expectation theory, AWP is not
7  an actual price paid by any customer or -- correct?
8  A. I'm not sure what you mean by "under Dr.
9  Hartman's theory," but I would agree with you that
10 AWP is not acquisition cost.
11 Q. And there was an expectation that AWP was
12 not acquisition cost, correct?
13 A. My understanding is that the market
14 understood that AWP was not the same thing as
15 acquisition cost.
16 Q. And do you have an opinion as to what the
17 market understood AWP to be?
18 A. I have not been asked to come to an
19 opinion on that.
20 Q. Have you made any assumptions in your
21 report as to what the market understood AWP to be?
22 A. I have been asked to assume Dr. Hartman's

**Page 51**

1  liability analysis, correct.
2  Q. And what did you do to assess the
3  reasonableness of that assumption you were asked to
4  make?
5  A. I examined his methods and these data
6  sources I described earlier, the MedPAC report, as
7  well as these public government reports.
8  Q. And would I be correct, you didn't think
9  it was relevant to go and look at what individual
10 payors may have testified in their case their
11 expectation was or was not?
12 A. I was not asked to do that. That's not
13 within the scope of what I was asked to do.
14 Q. Do you think that would have been a
15 relevant data point to look at in making that
16 determination?
17 A. I believe that I had all the information
18 that I needed to follow this assumption.
19 Q. Right. So you didn't think it was
20 necessary for you to determine the reasonableness of
21 this assumption to go and look at what actual payors
22 were testifying under oath their expectations were

**Page 52**

1  with respect to what AWP was, what its relationship
2  might be to acquisition cost, if any?
3  MR. MACORETTA: Objection. Asked and
4  answered.
5  A. It was not necessary for me to do that.
6  Q. Why not?
7  MR. MACORETTA: Same objection.
8  A. I reviewed the approach Dr. Hartman took
9  to this yardstick. I was not asked to separately
10 develop my own yardstick. I was asked to assume
11 that his analysis -- to rely as necessary on his
12 analysis.
13 Q. Now, am I correct that as an economist you
14 often have to make assumptions in your work?
15 A. That's correct.
16 Q. And one of the things you also do as an
17 economist is you look at the reasonableness of those
18 assumptions, correct?
19 A. That's correct.
20 Q. But, in this instance, you didn't think it
21 was necessary to judge the reasonableness of the
22 assumption --

**Page 53**

1  A. No, that's not what I would say.
2  Q. -- let me finish my question -- by looking
3  at what actual payors said in this case with respect
4  to their expectations?
5  MR. MACORETTA: Objection.
6  A. Excuse me for interrupting you.
7  Q. No, that's okay.
8  A. I didn't think that information was
9  relevant, and let me just say a few words about
10 self-reported data.
11 Economists rarely use self-reported data.
12 There are a number of biases that are known to exist
13 with self-reported data. For one thing, these
14 depositions took place many years after the point at
15 which these payors may have had these expectations.
16 And so whatever they said in deposition, I would not
17 regard as relevant to judging the reasonableness of
18 the yardstick.
19 In addition, of course, the individual
20 deposed may not be the right individual within the
21 organization who made the determination about how
22 reimbursement should be set and there's really no

**Page 54**

1  way of knowing that. Presumably, these depositions
2  were taken strategically in the interest of those
3  who are setting them up.
4     MR. MACORETTA: Bill, we have been going
5  about an hour. Whenever you want to take a break.
6     MR. CAVANAUGH: Yeah, now would be fine.
7  We can take a break.
8     MR. MACORETTA: Can whoever is on the
9  phone identify yourselves?
10    (NO AUDIBLE RESPONSE.)
11    MR. MACORETTA: Okay. I guess not.
12    (Pause.)
13    THE VIDEOGRAPHER: The time is 10:27.
14  Going off the record.
15    (Short recess.)
16    THE VIDEOGRAPHER: The time is 10:48 a.m.
17  We're back on the record.
18  Q. Dr. Rosenthal, did third-party payors know
19  the actual prices being paid by physicians for
20  physician-administered drugs?
21  A. To my knowledge, third-party payors were
22  aware of a variety of list prices, but they did not

**Page 55**

1  know the actual prices paid.
2  Q. Then if they didn't know the actual prices
3  being paid, then how would a study of actual prices
4  being paid inform you as to what their expectation
5  was?
6  A. The studies that I looked at that related
7  to actual prices paid were public information, and
8  so, while they provide general information about a
9  set of drugs, a set of physicians, they inform those
10 expectations. They were in the public domain.
11 Q. And did you take any steps to ask any
12 third-party payors whether those two data sources
13 you cite to inform them as to their expectation?
14 A. No, I did not.
15 Q. And just so we're clear, do you list those
16 two data sources in your documents relied upon?
17 A. I think in fact the references to the
18 MedPAC report which relates to those two documents -
19 - I don't see the report referred to separately --
20 but it's referenced in the MedPAC report so...
21 Q. And the MedPAC report is where in your
22 list of documents relied upon?

**Page 56**

1  A. Right. It should be in there. I guess
2  the Dyckman report is separate. I will have to
3  check it. It should be -- it incorporates the
4  Dyckman report information. It says "The Dyckman
5  Associates --
6  Q. And --
7  A. -- for the Medicare Payment Advisory
8  Commission" -- excuse me -- so that's the report.
9  Q. And what year was that report published?
10 A. This Dyckman report was published in 2003.
11 Q. So you have just told me that the
12 relationship between expectation and this report is
13 that these actual price -- this actual price
14 information was available to third-party payors,
15 and, therefore, may inform them as to their
16 expectation.
17 A. Excuse me. I may have been incomplete in
18 my answer. I'm also talking about the reports that
19 were produced by the Office of the Inspector
20 General, of Health & Human Services, the General
21 Accounting Office -- I know the acronym has changed
22 over time; I believe at the time it was the General

**Page 57**

1  Accounting Office, the GAO -- other reports that
2  were produced in the 1990s, as well as position
3  papers put out by the American Society of Clinical
4  Oncologists as Medicare reform was developing.
5  Q. And so all of those, in your view, would
6  go to inform -- would go to create, in your view,
7  relevant information as to payor expectation?
8  A. That's correct.
9  Q. Did you check with any payors as to the
10 extent to which any of these publications informed
11 them -- had a bearing on their expectation with
12 respect to actual prices being paid by physicians
13 for physician-administered drugs?
14 A. No, I did not.
15 Q. You are familiar with the term "WAC"?
16 A. Yes, I am.
17 Q. What is "WAC"?
18 A. "WAC" is another list price. It's the
19 wholesaler acquisition cost is my understanding what
20 the acronym stands for.
21 Q. And do you have an opinion as to whether
22 there was any expectation among third-party payors

Page 58

1  as to the relationship between AWP and WAC?
2      A.  WAC is a list price, like AWP, as I
3  mentioned, that has a formulaic relationship to AWP
4  set -- as borne out by the publications that
5  disseminate those manufacturing prices.
6      Q.  And by formulaic relationship, you mean
7  that if you went through lists of drugs, you would
8  see typically the same relationship, same percentage
9  relationship, between WAC and AWP?
10     A.  For an individual manufacturer, my
11 understanding is there's a standard mark-up.
12     Q.  And what, if anything, was the expectation
13 among third-party payors as to what WAC represented
14 beyond, as you say, another list price?
15     A.  My understanding is that, again, that's a
16 list price that had some historical relationship to
17 what the wholesalers paid.
18     Q.  Do you have any opinion as to whether the
19 formulaic relationship between AWP and WAC bears any
20 relationship to what wholesalers paid or charged for
21 drugs?
22     A.  Wholesalers -- could you repeat the

Page 59

1  question, just to make sure I understand.
2      Q.  Yeah.
3          MR. CAVANAUGH: Why don't you repeat it.
4      A.  Yeah, thank you.
5          (Question read.)
6      A.  My understanding is the WAC bears some
7  relationship. Again, it's a list price, so it is
8  not computed from actual transaction price data, but
9  that does have some relationship to what the
10 wholesalers paid. This is really about self-
11 administered drugs, for the most part.
12     Q.  Do you know of any physician-administered
13 drugs where physicians pay WAC?
14     A.  I don't have that information so I don't
15 know that it's true or not.
16     Q.  If you learned of a drug where physicians
17 paid WAC, would you agree with me that there would
18 be no inflation of either the WAC or the AWP?
19     A.  I guess I wouldn't be prepared to offer
20 that opinion. That's a hypothetical so...
21     Q.  Are you familiar with the drug, Remicade?
22     A.  I -- yes.

Page 60

1      Q.  Do you know if physicians paid WAC for
2  Remicade?
3          MR. MACORETTA: Objection. You can
4  answer.
5      A.  I have seen the ASP data and I have seen
6  the spreads for Remicade and those spreads are
7  larger than 20 to 25 percent. I would conclude
8  looking at those data that they did not pay WAC,
9  that the rebates and discounts that were relevant to
10 the ASP calculation [sic].
11     Q.  And is that because your assumption is
12 that that ASP calculation is based simply on sales
13 to physicians?
14     A.  The -- my -- I am looking at an ASP that -
15 - the ASPs in my report --
16     Q.  Yes.
17     A.  -- were from the December report, and
18 those ASPs are based on a restricted class of trade
19 that included physicians, clinics, nursing homes.
20     Q.  Did you ever do anything to double-check
21 the reliability of that data?
22     A.  I examined the methodology for putting it

Page 61

1  together.
2      Q.  Were you aware that there's public health
3  service sales in there?
4      A.  I can't say that right now. Certainly, I
5  have to look at it.
6      Q.  Okay.
7          MR. CAVANAUGH: Let's mark this as Exhibit
8  Rosenthal 002.
9          (Exhibit Rosenthal 002 marked.)
10     Q.  Dr. Rosenthal, we've marked as Exhibit
11 Rosenthal 002 a copy of what's referred in this case
12 as the "AMCC," the Amended Master Consolidated
13 Complaint. Are you familiar with this document?
14     A.  I have seen it, yes.
15     Q.  Right. If you turn to page 5 of your
16 report, paragraph 7, you state -- am I correct, you
17 are assuming the allegations in the Complaint are
18 true?
19     A.  That's correct. Those that were then
20 related to the certified classes, so the
21 intersection.
22     Q.  Now, what have you done to independently

**Page 62**

1  assess whether or not the allegations in the AMCC
2  are true?
3      A.  Well, I would say because I said I assume
4  they were true, I moved forward on the basis of this
5  assumption. I examined documents, I have examined
6  data and I have applied my training and expertise in
7  health economics to this matter, all of which relate
8  to examining the economic foundations of the
9  allegations.
10     Q.  Now, who directed you to assume the
11 allegations of AMCC to be true?
12     A.  Counsel.
13     Q.  And would I be correct that that was the
14 starting point in your analysis?
15     A.  That's correct.
16     Q.  Let me ask you to turn to the first page
17 of the AMCC, paragraph 2. And it states there as
18 follows: "For the last decade, the defendant drug
19 manufacturers have conspired with others in the
20 pharmaceutical distribution chain, including, but
21 not limited to, physicians and hospitals, pharmacy
22 benefit managers and various publishing entities to

**Page 63**

1  collect inflated prescription drug payments from
2  plaintiffs and the class."
3      What have you done to test the
4  reasonableness of your assumption that that
5  statement is true?
6      MR. MACORETTA: I'm going to object to
7  that. Her assumption relates to the certified
8  classes, which are different than what you just read
9  in paragraph 2, among other things. But go ahead.
10     A.  So for the pieces of that that are
11 relevant to the subject of my report, again, I have
12 examined the economic literature, both theory and
13 empirical evidence, as well as a wide variety of
14 discovery materials and used those to develop
15 economic conclusions that, in effect, relate to
16 those assumptions.
17     Q.  Well, the statement here is that the
18 defendant manufacturers conspired with others, and
19 then it goes on to list. What have you done to
20 assess the reasonableness of your assumption that
21 it's a true statement that there's a conspiracy
22 between drug manufacturers and a host of physicians,

**Page 64**

1  hospitals, PBMs and publishing entities?
2      MR. MACORETTA: Same objection.
3      A.  I have not done anything in particular to
4  examine conspiracy, but I should note that the
5  conclusions of my report don't rely on the existence
6  of a conspiracy per se.
7      Q.  Paragraph 3, there's a statement. It's
8  the second sentence, "The AWPs for these drugs are
9  deliberately false and fictitious and created solely
10 to cause plaintiffs and the class members to overpay
11 for drugs."
12     What did you do to determine the
13 reasonableness of your assumption that that
14 statement was true?
15     A.  Again, this is a legal matter that relates
16 to a legal notion of fraud is my understanding, and
17 I have not independently validated that. But that
18 notion -- again, my report does not rely on that
19 notion.
20     Q.  Now, you entitled your report a liability
21 report. Does that mean you have drawn a conclusion
22 with respect to liability?

**Page 65**

1      A.  My conclusions are with respect to the
2  economic incentives for physicians in this market
3  and other providers of physician-administered drugs
4  as covered by the current claim with regard to the
5  economic incentives for pharmaceutical manufacturers
6  to pursue AWP inflation and whether or not acting
7  under those incentives in a profit maximizing way,
8  the class would have been harmed. So I concluded
9  that those actions harm the class. I would call
10 that liability, but I'm not a lawyer.
11     Q.  Now, when you say "a profit maximizing
12 way," can you describe -- tell me what you mean by
13 that term.
14     A.  As I described in my report, I looked at
15 how the reimbursement system is set up, the
16 information available to everyone in the market, and
17 then examined the economic incentives, and those
18 economic incentives assume certain behavioral
19 patterns among physicians, other clinicians and
20 pharmaceutical manufacturers. And that is
21 essentially the neoclassical economic framework.
22     Q.  What economic incentives does it assume

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                    February 22, 2006
                          Cambridge, MA

Page 66

1   with respect to physicians?
2       A.  That they -- facing reimbursement that
3   rewards them for selecting drugs with higher AWP,
4   lower ASP or acquisition cost, all things equal,
5   that that provides them incentives to select those
6   drugs.
7       Q.  And what profit maximizing incentives
8   exist among manufacturers?
9       A.  Manufacturers face a similar kind of
10  problem.  Of course, they are a supplier.  They are
11  trading off gross margin against market share, and,
12  in this case, the trade-offs are much more favorable
13  by raising AWP than by lowering acquisition cost, so
14  they have a strategic incentive to raise the AWP.
15      Q.  When you say raising the AWP, explain to
16  me what you mean by that.
17      A.  Well, it's either setting at some point an
18  AWP, it may not change from launch; or subsequently
19  raising it or not lowering it as the acquisition
20  cost declines.
21      Q.  The AMCC uses the phrase "accurate AWP."
22  Do you have an opinion as to what an "accurate AWP"

Page 67

1   is?
2       A.  I don't -- I don't have an opinion as to
3   what they intended by the use of that term.
4       Q.  Well, do you have an opinion as to what
5   the AWP should have been?
6       A.  In this matter I have been asked to use
7   the yardstick developed by Dr. Hartman.
8       Q.  So you do not have an independent opinion
9   as to what AWPs should have been reported or
10  published?
11      A.  I was not asked to provide that opinion,
12  no.
13      Q.  I just want to go back to your point about
14  competition and profit maximizing behavior.
15      A.  Um-hum.
16      Q.  Are you saying that competition would
17  motivate manufacturers to create an increase of the
18  spread?
19      A.  Competition, not of the kind you and I
20  generally think about for end customers, but
21  competition for provider attention.  So just like a
22  promotional effort that a manufacturer might do;

Page 68

1   they are trying to get the provider's attention as
2   opposed to the payors.
3       Q.  From a manufacturer's perspective, is the
4   physician considered the end payor -- considered the
5   end user?
6       A.  Physicians clearly play a very important
7   role in selection of the drug.  I'm not sure if that
8   -- what you just said would be the right way, but
9   that's how I would say it.
10      Q.  Would you agree with me that manufacturers
11  tend to focus on influencing physician prescribing
12  behavior as their primary method of competing with
13  other manufacturers?
14      A.  I'm not sure if that would be absolutely
15  true.  Clearly, physicians play a very important
16  role here.  And manufacturers also compete to be on
17  formularies, for example.  Excuse me.
18      Q.  But competing to be on a formulary is just
19  an incorrect way of influencing physician
20  prescribing behavior, isn't it?
21      A.  I'm not sure if I would agree with that.
22      Q.  Well, the purpose of getting your drug on

Page 69

1   a formulary is so that the physician will prescribe
2   it for the members of a particular third-party plan
3   that are subject to that formulary, correct?
4       A.  It seems to me it would be a way of
5   circumventing the physician's role.
6       Q.  If you turn to page -- if you go back to
7   your report, page 6, paragraph 10, you state, "Dr.
8   Hartman has also applied a minimum standard of
9   liability to exclude several drugs from further
10  analysis based upon the expected magnitude of their
11  impact on the subclasses.  For purposes of my
12  report, I focus on the allegations of AWP inflation
13  with respect to this latter set of drugs listed in
14  table 1 below."
15          Now, am I correct that by the latter set
16  of drugs, you focused on drugs that exceeded Dr.
17  Hartman's liability threshold?
18      A.  As of his December report, that's correct.
19      Q.  Let me just go back to a point you made
20  with respect to formularies.  Am I correct that
21  there typically are physician involvement in
22  formulary determinations?

Page 70

1  A. I'm not sure what you mean by that. What
2  kinds of physicians?
3  Q. Well, maybe a physician that works for a
4  third-party plan, correct?
5  A. Certainly some people on the formulary
6  plan are likely to be physicians.
7  Q. And many third-party plans have advisory
8  boards that comprise of physicians; do they not?
9  A. It's true.
10  Q. So there is physician input in formulary
11  determinations; is there not?
12  A. That would be generally true. May I just
13  add that it's not necessarily the case that the
14  physicians on those formulary committees are
15  informed about acquisition costs for physician-
16  administered drugs. You can imagine if they were
17  internists, they may have no experience with these
18  drugs.
19  Q. Well, in connection with this work, did
20  you go and interview any physicians who work for
21  third-party payors to find out what they knew about
22  physician-administered drugs?

Page 71

1  A. It was not relevant to my analysis.
2  Q. We have gone over this to some extent, but
3  I just want to make sure we're on the same page. Is
4  Dr. Hartman's -- your understanding of Dr. Hartman's
5  minimum standard of liability based on his views as
6  to what payors expected the difference to be between
7  AWP and physician acquisition prices?
8  A. I don't feel really qualified to have an
9  opinion about what -- you know, what the theoretical
10  basis is for his opinion. I know that, as I
11  mentioned before, a number of pieces of information
12  that he used, including the publicly available
13  information on spreads as well as the actual
14  reimbursement discounts themselves. I'm just not
15  sure if that's what you are looking for.
16  Q. Well, no. I mean, I'm asking you what
17  your understanding is of his "minimum standard of
18  liability."
19  A. My understanding is that it relates in
20  some way to the knowledge and expectation of payors.
21  Q. And he uses a 30 percent threshold?
22  A. That's correct.

Page 72

1  Q. So would I be correct that if the spread
2  is 29 percent under Dr. Hartman's theory, there's no
3  liability, and if it's 31 percent, there is
4  liability?
5  A. For the purposes of calculating damages,
6  yes, that's correct.
7  Q. Well, isn't that also for purposes of
8  determining liability, because it's a minimum
9  standard of liability; is it not?
10  A. My understanding is that he does use that
11  30 percent as a bright-line cutoff.
12  Q. And does that bright line seem reasonable
13  to you, that at 29 percent there's no liability and
14  at 31 percent there is?
15  MR. MACORETTA: I'm going to object to the
16  extent you are asking for her opinion on Dr.
17  Hartman's report.
18  Q. You can answer.
19  A. I have not been asked to develop an
20  opinion about that.
21  Q. I understand that, but as an economist
22  looking at this, does this type of bright-line test,

Page 73

1  at 29 percent you are not liable and at 31 percent
2  you are, in the context of this case, does that seem
3  to make sense to you?
4  MR. MACORETTA: Objection. It's beyond
5  the scope of her report. You are asking her for an
6  opinion that simply is not part of what she gave an
7  opinion on and nothing she relies on.
8  Q. Go ahead.
9  A. I reviewed Dr. Hartman's methods. I
10  believe his approach is soundly based on economics
11  and the data available.
12  Q. So you do think it's reasonable to have at
13  29 percent, there's no liability, and at 31 percent
14  there is?
15  MR. MACORETTA: Same objection.
16  A. I don't have an opinion about that
17  specifically.
18  Q. What if the spread went from 31 percent to
19  30.5 percent, is there liability or not liability?
20  MR. MACORETTA: Same objection.
21  A. That information is not relevant to what I
22  have provided opinions.

Meredith Rosenthal, Ph.D.   HIGHLY CONFIDENTIAL   February 22, 2006
Cambridge, MA

**Page 74**

1   Q. Do you round off? If it gets to 30.6,
2   does it become liability, but if it's 30.4, there's
3   no liability?
4      MR. MACORETTA: Same objection.
5   A. Again, I don't really have an opinion on
6   that.
7   Q. Let's turn to page 7 of your report, your
8   table. Well, let me ask you: In the discussions
9   you had with Dr. Hartman as the two of you were
10  preparing your report, did you ever ask him whether
11  this 30 percent bright-line cutoff made sense?
12  A. When you say "discussions," we prepared
13  our reports independently. We had some discussions
14  about technical issues that perhaps affected both of
15  us. I certainly never discussed why he came to his
16  opinions or questioned him about that, no.
17  Q. Now, in your -- you have a list of drugs
18  here. Are these drugs somehow different from other
19  physician-administered drugs?
20     MR. MACORETTA: Object. You can answer.
21  A. These are the drugs that as of the
22  December report I was asked to address specifically

**Page 75**

1   in my report, although my report relates to a broad
2   category of drugs.
3   Q. Did you -- and am I correct that you have
4   looked at Dr. Hartman's calculations regarding the
5   spreads for these drugs?
6   A. That's correct. I have examined those.
7   Q. Did you ever go and look at the
8   relationship of the spreads for these drugs compared
9   to drugs which are not the subject of -- physician-
10  administered drugs which are not the subject of this
11  lawsuit?
12  A. In some cases where there were earlier
13  drugs in the class, I have seen other spreads. But
14  in terms of being able to make specific comparisons,
15  those data are not generally available. I have
16  requested data on comparative drugs, but none was
17  provided.
18  Q. Who did you ask that?
19  A. That request went through GMA, so...
20  Q. And why did you want comparative data?
21  A. Again, as one piece of evidence. As I
22  showed you these -- well, we'll talk about that

**Page 76**

1   within the analysis that I did. Another piece of
2   evidence might come from other drugs.
3   Q. And let me be clear, when you are talking
4   about comparative data, you are talking about
5   comparative data for physician administered --
6   sorry. I lost my train of thought. Strike the
7   question.
8      When you refer to comparative data, are
9   you referring to data for physician-administered
10  drugs that are not the subject of this lawsuit?
11  A. That might be one piece of information
12  that one would look at, yeah.
13  Q. But when you -- you said you asked
14  specifically for comparative data. Is the
15  comparative data you are asking for data on the
16  spreads for physician-administered drugs which were
17  not the subject of this lawsuit?
18  A. And other drugs as well. Not just
19  physician-administered.
20  Q. I just want to be clear on your prior
21  testimony. Am I correct that you have relied on and
22  assumed the accuracy of Dr. Hartman's analysis?

**Page 77**

1   A. For this report, absolutely.
2   Q. Okay. And is it your testimony that
3   having relied upon it and assumed it to be true, in
4   your discussions with Dr. Hartman, you never asked
5   him why he reached the conclusions he did as to
6   creating this minimum liability threshold?
7   A. I think maybe the way you are asking the
8   question -- let me just say exactly, I looked at the
9   approach he took, the data he used, I examined that
10  as my own judgment of reasonability of his analysis.
11  I did not ask him particularly why this and not
12  another number, no.
13  Q. So you did draw a conclusion whether it
14  was reasonable to have a threshold, a minimum
15  liability threshold, where a spread of 29 percent,
16  there would be no liability, and a spread of 31
17  percent, there would be liability?
18  A. I reviewed the reasonableness of the
19  approach and I felt comfortable making the
20  assumption based on Dr. Hartman's analysis.
21  Q. What about my specific example, do you
22  think that's reasonable?