78

1    A.  I don't have an opinion on that.
2        (Exhibit Rosenthal 003 marked.)
3    Q.  Doctor, we have marked as Exhibit
4  Rosenthal 003 the Written Tutorial you submitted in
5  connection with this case, and I want to refer you
6  to page 3.  You state in this footnote, "The fact
7  that for 99 percent of prescription drugs AWP works
8  and is not being challenged highlights why AWP is an
9  accepted pricing benchmark and further highlights
10  why there was no widespread knowledge of the abuse
11  alleged in the AMCC."
12        How did you go about determining that AWP
13  works for 99 percent of prescription drugs?
14    A.  That footnote specifically is a statement
15  about the drugs for which -- and, of course, this
16  was the earlier class -- for which allegations were
17  being made relative to all the drugs in the market.
18  And, again --
19    Q.  I understand it includes self-administered
20  drugs, but my point is:  How did you go about
21  determining that AWP works for 99 percent of the
22  drugs and it doesn't work for 1 percent of the

79

1  drugs?
2    A.  No allegations were being made with regard
3  to spread outside of the drugs identified in the
4  original complaint.
5    Q.  So your determination as an economist as
6  to whether AWP worked depended on whether the
7  plaintiffs in their lawsuit had challenged AWP as to
8  that drug or had not challenged AWP as to a drug,
9  correct?
10    A.  My working assumption, again, were the
11  allegations were true, and that's the basis of this.
12    Q.  Well, you didn't say "assumption."  You
13  said "the fact" that for 99 percent of prescription
14  drugs AWP works.  So you were telling the Court that
15  as a fact, AWP works for 99 percent of the drugs,
16  correct?
17        MR. MACORETTA:  Objection.
18    A.  The fact, if you will read on, it is not
19  being challenged.
20    Q.  So your determination of whether AWP
21  worked depends on whether the plaintiffs had suit
22  with respect to that drug?

80

1    A.  That was the basis for this statement.
2    Q.  Now, with respect to physician-
3  administered drugs on which the plaintiffs have sued
4  and those as to which they have not sued, have you
5  done a comparison of the spreads?
6    A.  I have examined data where they were
7  available, but I have not specifically produced a
8  systematic comparison and provided that in my
9  opinion, no.
10    Q.  Well, okay.  Even if you didn't do it
11  systematically, did you go back and say, "Gee, I
12  wonder if the spreads, you know, on average are
13  different for the drugs that they've sued on and the
14  drugs that they haven't sued on?"
15    A.  Those data were not available to me.
16    Q.  Okay.  But that's the type of data you
17  asked GMA to provide to you?
18    A.  As one alternative analysis.  Again, the
19  analyses that I provided in my report were
20  sufficient to draw my conclusions.
21    Q.  Were there any particular physician-
22  administered drugs that were not the subject of this

81

1  lawsuit that you were interested in looking at the
2  spreads?
3    A.  Nothing in particular comes to mind.
4    Q.  If you go back to your report on page 16.
5    A.  (Witness complies.)
6    Q.  Now, am I correct, what follows in this
7  section is a number of charts with respect to the
8  relationship between AWP and ASP?
9    A.  That's correct.
10    Q.  And this is all data you have taken from
11  Dr. Hartman, correct?
12    A.  That's correct.
13    Q.  Have you done any independent analysis of
14  the data?
15    A.  I examined the methodology with respect to
16  how those numbers were calculated and then I created
17  these charts from the calculated ASP and AWP.
18    Q.  Well, but did you ever go back for example
19  to look at any of the underlying data?  Let me take
20  you to page 19.  Let's take Remicade, for example.
21    A.  Okay.
22    Q.  You understand that Dr. Hartman has

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

82

1  calculated ASP here with respect to what he believes
2  are physician and clinic purchases?
3      A.  That's my understanding, yes.
4      Q.  And based upon that calculation, he comes
5  up with spreads of 31 and 34 percent.
6      A.  That's correct.
7      Q.  So we have violated his bright-line
8  minimum threshold of liability standard by one and
9  four percent, correct?
10     A.  That's correct.  And let me note, in the
11 case of Remicade where it's a $1,000 drug, one and
12 four percent are substantial.
13     Q.  And you did not go back to look at the
14 underlying data to see if his spreads were based on
15 in fact the inclusion of sales to the government?
16     A.  I was asked to provide input on classes of
17 trades; so I have seen, in the case of these
18 manufacturers, customer lists and tried to sort
19 through those.
20     Q.  Did you go through the customer list for
21 Remicade?
22     A.  I -- the customer lists were from the

83

1  entire -- manufacturers.  They were aggregated.
2      Q.  I see.  Would you agree with me to the
3  extent that rebates are provided to third-party
4  payors, that would actually go to reduce the cost to
5  the third-party payor of reimbursement?
6      A.  This is a subject outside of what my
7  report covers, so the calculation of ASP to which
8  you refer...
9      Q.  But I'm asking you as a general principle,
10 would you agree with me to the extent a manufacturer
11 provides a rebate to the third-party payor, they are
12 reducing the net reimbursement cost to the third-
13 party payor?
14     A.  That's correct.
15     Q.  And so in calculating these spreads, would
16 one -- would it be appropriate to include in here
17 rebates paid to third-party payors?
18     A.  If one were attempting to calculate
19 acquisition cost to provider, that would not be
20 included.
21     Q.  Would you agree with me that it has been a
22 widespread practice in the pharmaceutical market to

84

1  pay rebates to entities that can affect market
2  share?
3      A.  That's my understanding, yes.
4      Q.  For example, drug manufacturers will pay
5  rebates to third-party payors that have formularies
6  which will influence physician prescribing
7  decisions, correct?
8      A.  That's correct.
9      Q.  Manufacturers will pay rebates to pay
10 staff model HMOs because of their ability to
11 influence the prescribing decisions of the
12 physicians they employ, correct?
13     A.  That's correct.
14     Q.  And hospitals have long gotten rebates and
15 discounts on their purchase of prescription drugs;
16 haven't they?
17     A.  I believe they are principally discounts
18 and not rebates.
19     Q.  And that discount to hospitals goes back
20 many, many decades to probably the '60s at least,
21 doesn't it?
22     A.  I don't have specific knowledge about

85

1  discounts in the 1960s.  My understanding is that
2  it's common practice now.
3      Q.  Okay.  But it's been common practice for a
4  long time, hasn't it?
5      A.  You know, I can't say specifically, but I
6  would conclude that those discounts have been
7  around.
8      Q.  And would it have been reasonable for a
9  third-party payor, having recognized that they were
10 getting rebates because of their ability to
11 influence physician prescribing behavior, that
12 physicians themselves would get rebates and
13 discounts on physician-administered drugs because
14 the physicians themselves have the greatest control
15 over what drugs they administer?
16     MR. MACORETTA:  Object to that.  It calls
17 for an opinion way beyond the scope in her report.
18     A.  My understanding is that there was a
19 belief that there were some rebates and discounts
20 that were offered to physicians, in general terms.
21     Q.  Well, as a student of health care
22 economics and understanding how the health care

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                    February 22, 2006
Cambridge, MA

---

**86**

1  market works, it would make sense to you, would it
2  not, that physicians would be particularly well-
3  suited to extract discounts from manufacturers for
4  physician-administered drugs?
5      MR. MACORETTA:  Same objection.
6      A.  There are a number of factors.  One is the
7  extent of control.  The other is the size of the
8  individual buyer.  And individual physicians, of
9  course, are very small buyers relative to the total
10  units sold.
11      Q.  But that -- assuming competitive products
12  in a market, that individual physician would have
13  enormous influence on what drugs he or she decided -
14  - physician-administered drugs he or she decided to
15  administer, correct?
16      A:  I guess I don't want to buy into a
17  particular adjective "enormous," but I would say
18  physicians play a key role in decision making about
19  prescription drugs of all kinds.
20      Q.  But let's focus on physician-administered
21  drugs, because there, they have enormous -- they
22  have significant influence as to which drugs they

---

**87**

1  decide to use in their own practice; do they not?
2      A.  To the extent that they are administering
3  them in their practice, yes.
4      Q.  And the more crowded and competitive a
5  therapeutic category may be, the greater leverage a
6  physician have in their ability to extract
7  lower prices from a manufacturer on a physician-
8  administered drug, correct?
9      MR. MACORETTA:  Same objection as before.
10  Go ahead.
11      A.  I do think the amount of therapeutic
12  competition in terms of the effects of the drugs and
13  side effects would be a factor in that kind of
14  discounting.
15      Q.  It would increase the leverage of the
16  physician in extracting discounts from a given
17  manufacturer, correct?
18      A.  That's correct.  It would also increase
19  the incentive to inflate the AWP, as I discussed in
20  my report.
21      Q.  Let me read you a statement and ask you if
22  you agree with it describing the prescription

---

**88**

1  drug market.
2      "The least elastic demanders are the
3  pharmacies because they must stock a full range of
4  drugs in order to be able to fill prescriptions.
5  They can, therefore, be expected to be charged the
6  highest prices.  In contrast, the hospital, nursing
7  home or HMO or other managed care enterprise has a
8  more elastic demand because it can influence, for
9  example, through a formulary, a list of approved or
10  recommended drugs, the physician's choice of which
11  brand or no brand, a generic, to prescribe."
12      A.  Again, as we discussed before, those --
13  the ability to influence market share will be a
14  factor in affecting those discounts.  So that
15  statement rings true.
16      (Exhibit Rosenthal 004 marked.)
17      Q.  We have marked as Exhibit Rosenthal 004 a
18  Prescription Drug Study dated April 1994; a report
19  to the Minnesota legislature on the prescription
20  drug market.  Are you familiar with this document?
21      A.  I don't recall having reviewed this
22  particular document.

---

**89**

1      Q.  Do you know Professor Shondelmayer?
2      A.  I am aware of his existence.  I know who
3  he is.  We have not met personally.
4      Q.  All right.  Have you reviewed any of his
5  work with respect to prescription drugs?
6      A.  Yes.
7      Q.  Are you familiar were the PRIME Institute
8  which he headed at one point?
9      A.  I have heard of it.
10      Q.  Let me ask you to turn to page 46 of the
11  document.
12      A.  (Witness complies.)
13      Q.  Have you seen this chart before?
14      A.  I don't believe I have seen the chart, no.
15      Q.  The chart, would you agree with me,
16  appears to show estimates of drug prices to various
17  classes of prescription drug purchasers taken in
18  1991, and it shows that this price estimate all
19  based as discounts off of AWP.
20      A.  I see that.
21      Q.  So would you agree with me that someone
22  looking at this chart in 1991 or 1994 certainly

---

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

---

90

1  would have recognized that different classes of
2  trade pay vastly different prices within -- for the
3  same prescription drugs?
4      MR. MACORETTA:  Objection.
5      A.  I believe there's no dispute about the
6  fact that there are discounts off of AWP and they
7  vary.  As you know, this chart doesn't include
8  anything about physicians or clinics.
9      Q.  And someone familiar with the prescription
10  drug business would understand that the reason
11  managed care and long-term care would be able to get
12  these discounts would be because of their ability to
13  control or influence physician prescribing
14  decisions, correct?
15      MR. MACORETTA:  Objection.
16      A.  I can't say what one would come to.
17  Again, I believe based on my training and my reading
18  of the literature that volume matters and the
19  ability to affect clinical decisions about drug
20  choice matters as per the amount of discount.
21      Q.  Now, as someone who has studied this, when
22  it came to physician-administered drugs, would you

---

91

1  expect that the pricing -- strike that.
2      Do you have an opinion as to how someone
3  looking at this data back in the early 1990s would
4  have understood the relationship of this data to
5  prices being paid by physicians for physician-
6  administered drugs?
7      MR. MACORETTA:  Objection.
8      A.  I don't have an opinion.  Again, I think
9  there are many factors.
10      Q.  And what are those factors?
11      A.  I think the two most important have to do
12  with volume and the ability to influence decision
13  making.  And I think a reasonable person would not
14  know how that might play out in terms of these data
15  for individual physicians or clinics.
16      Q.  Well, certainly, as to physicians, for
17  physician-administered drugs -- on the second point,
18  the ability to influence the prescribing decision --
19  that would be something that would weigh in favor of
20  the ability to extract lower prices; would it not?
21      A.  That would be one piece of information,
22  yes.

---

92

1      Q.  And would you agree with me that the
2  ability of any particular class of trade to extract
3  lower prices -- where different prices from another
4  class of trade is dependent upon the particular
5  characteristics of that class of trade?
6      A.  I guess in terms of how they relate to the
7  factors that I mentioned before, that's true.
8      Q.  Now, do you understand -- I think we
9  talked about this earlier, that Dr. Hartman went
10  from -- initially, in his initial report, he based
11  his average selling price calculation on what he
12  understood physician and clinics to be paying.  But
13  he's now changed that approach to include a broader
14  class of -- other classes of trade.
15      MR. MACORETTA:  Objection.  It misstates
16  what Dr. Hartman did, but go ahead.
17      A.  My understanding is he was asked in
18  February to provide a second calculation of ASP,
19  including a broader set of classes of trade.
20      Q.  Did you call him up and ask him why he had
21  done that?
22      A.  No, I did not.

---

93

1      Q.  Did you ask him -- well, did you consider
2  whether it was appropriate to consider -- to come up
3  with an average selling price by mixing together
4  different classes of trades with different
5  characteristics?
6      A.  I did not.
7      Q.  So you have no opinion as to the
8  reasonableness of that?
9      A.  No.
10      Q.  If we were going to express the numbers on
11  figure 2.10 in this 1994 report as a "spread" in
12  percentage terms using Dr. Hartman's approach, what
13  would the spreads be?
14      MR. MACORETTA:  Wait.  Are you just asking
15  her to do the math?
16      MR. CAVANAUGH:  Yes, I am.
17      MR. MACORETTA:  Okay.
18      A.  I can start from the right and do the easy
19  one.
20      Q.  Go ahead.
21      A.  100 percent.
22      Q.  Okay.

---

Henderson Legal Services
(202) 220-4158

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

94

1    A.  And then 67 percent.  You are going to
2  tell me you're going to challenge my --
3    Q.  You can do the math -- I'm confident you
4  can do the math better and quicker than I can, so...
5    A.  Something in the order of 50 percent for
6  long-term care, but then, yeah, a little less than
7  that for mail order and about 30 percent for managed
8  care -- for managed care about 30 percent, and,
9  again, clinical climbing down to about 25 percent
10  and on up to something on the order of 15 to 18
11  percent for independent pharmacies.
12      I would like to note that as you look
13  across this chart, we're talking about very
14  different sets of drugs across these.  Clearly, the
15  independent chain pharmacies are not purchasing any
16  physician-administered drugs, long-term care has a
17  very specific set of drugs, so these discounts are
18  cutting across not only the classes of trade, but
19  also the types of products we're talking about.
20    Q.  Now, when you were talking about how you
21  went through -- how you went about informing
22  yourself as to what payor expectations might have

95

1  been, you were talking about available published
2  data.
3    A.  Um-hum.
4    Q.  Would you agree with me that during the
5  class period this was available data?
6    A.  I don't believe these data are relevant
7  because they don't look at the clinics and
8  physicians and the subset of drugs that we were
9  talking about.
10    Q.  Well, is Dr. Hartman -- do you understand
11  Dr. Hartman in determining his expectation looking
12  at only data reported on physician-administered
13  drugs?
14    A.  I don't want to characterize Dr. Hartman's
15  analysis fully here, but he uses a lot of publicly
16  available information, including, I believe, some
17  reports that are broader.
18    Q.  Is there any -- I mean, we have just done
19  what the spreads are here between AWP and the
20  estimated prices listed here for various classes of
21  trade.  Is there any reason to believe that as
22  therapeutic categories got more crowded and more

96

1  competitive that these spreads could easily increase
2  due to greater competition and lower prices?
3    A.  I think it would depend on the
4  circumstances of competition, but, certainly, in
5  theory the spread might increase, the discounts
6  might increase.
7      MR. MACORETTA:  Bill, it's about 10 to
8  12:00.  We've been going for an hour.  Do you want
9  to take a break?  I don't know where you are with
10  lunch as well.
11      MR. CAVANAUGH:  Well, I'm happy to take a
12  five-minute break.  I'm not happy to take a 20-
13  minute break.
14      MR. MACORETTA:  That's fine.  That's fine.
15  And then what do you want to do about lunch?
16      MR. CAVANAUGH:  Why don't we break around
17  a quarter to 1:00, if that works.
18      MR. MACORETTA:  So we'll go for another
19  hour.  That's fine.
20      THE VIDEOGRAPHER:  The time is 11:49.
21  Going off the record.
22      (Short recess.)

97

1      THE VIDEOGRAPHER:  The time is 11:59.
2  We're back on the record.
3    Q.  Dr. Rosenthal, what is a case study?
4    A.  A case study is a research approach,
5  methodology, that involves looking at sort of a
6  single set of circumstances.
7    Q.  Have you utilized the case study approach
8  in your academic world?
9    A.  I have.
10    Q.  And have you written a number of papers in
11  which you have utilized a case study?
12    A.  I have certainly written at least one
13  paper using the case study approach.  It's a useful
14  way to generate hypotheses.
15    Q.  Have you ever used a case study approach
16  in order to validate or give you further insight on
17  broader market data that you've looked at?
18    A.  I guess, I think the case study approach
19  is usually the first step to get the questions
20  right.  It can be used as insight into broader
21  phenomena.
22    Q.  Do you have an opinion here as to whether

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

98

1  any of the manufacturers had an intent to deceive
2  anyone?
3      A.  I don't have an opinion on that.  My
4  opinion, per se, relates to whether they had the
5  incentives to do so, whether they had the ability to
6  do so and whether doing so would have affected the
7  class.
8      Q.  And would you agree with me that putting
9  aside the question of deception or intent to
10  deceive, that the competitive forces existed which
11  created an incentive to offer discounts and rebates
12  to physicians on physician-administered drugs?
13      A.  That was a long sentence.  Can I have that
14  again?
15      Q.  Sure.
16         MR. CAVANAUGH:  You can read it back.
17         (Question read.)
18      A.  I would agree that part of the basis for
19  competition among manufacturers was discounting.
20  Another part was setting the AWP.
21      Q.  Well, so you would agree with me that
22  putting aside the issues of intent to deceive,

99

1  deception, competitive forces existed in the
2  marketplace that provided incentives to
3  manufacturers to both provide discounts on
4  physician-administered drugs and to increase the
5  AWP?
6      A.  The competitive forces led to provide
7  those discounts and AWP, I would agree.
8      Q.  Independent of anything Dr. Hartman has
9  said, do you have an opinion as to whether payors
10  were actually deceived?
11      A.  My opinion is that looking at the
12  available data on how they contracted that, that
13  those don't reflect the magnitude of the spreads
14  that we see in these data.  So this notion that
15  their contracting behavior revealed what they
16  understood to be the discounts -- and those two
17  things are not inconsistent.  So I would say that
18  their behavior reveals that they did not understand
19  that spreads of 100, 200 percent or spreads larger
20  than 30 percent were available.
21      Q.  Well, you covered a big gamut.  You said
22  spreads larger than 100 and 200 percent and then you

100

1  went down to 30 percent.  So do you have an opinion
2  that -- I thought you told me earlier today you
3  don't have an opinion as to what the actual payor
4  expectation was as to the relationship between
5  acquisition price and AWP.
6      A.  That's right.  As I mentioned, I rely on
7  Dr. Hartman's analysis for my report, so I
8  referenced his benchmark.
9      Q.  So you don't have an independent opinion
10  as to whether payors were actually deceived as to
11  the relationship between AWP and actual acquisition
12  prices by physicians?
13      A.  In my report I conclude that payors did
14  not have that information and that that was the
15  basis for the manufacturer incentive to manipulate
16  AWP in this way.  But, again, I assume that the
17  allegations in the complaint are true.
18      Q.  Well, when you say payors did not have the
19  information, what information are you talking about?
20      A.  About physician acquisition costs,
21  specifically for specific drugs for specific
22  physicians.

101

1      Q.  Was there anything that prevented third-
2  party payors from implementing a reimbursement
3  system where they insisted on receiving actual
4  acquisition costs before providing reimbursement?
5      A.  Third-party payors reimburse a large
6  volume of claims across a large network of
7  providers, pharmacies, if they contract directly or
8  through their PBM with pharmacies.
9      Q.  Let's stick with physician-administered
10  drugs.
11      A.  Okay.
12      Q.  Which you would agree with me is a small
13  category of drugs; is it not?
14      A.  It is, but it should be seen in the
15  context of third-party payors' larger role in
16  reimbursing claims, and this is done electronically
17  and needs to be done in an automated fashion.  And
18  so fee schedules are generally set in advance and
19  fee schedules for physician-administered drugs is
20  set based on AWP.
21      Q.  Well, my question was a little more basic.
22  Was there anything that prevented a third-party

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                February 22, 2006
Cambridge, MA

---

**102**

1  payor from saying, "We're going do it differently.
2  I want actual acquisition cost"?
3      A.  I think two things:  One, as I was trying
4  to suggest, and perhaps I was not clear enough, is
5  feasibility, that getting actual acquisition costs
6  from all these different providers and programming
7  that into a claims adjudication system would be
8  difficult.  And it's not clear that any one third-
9  party payor has the market power to basically change
10  the nature of the game.
11      Q.  And by "market power," you are referring
12  to the ability of any particular third-party payor
13  to require a physician group to agree to a
14  reimbursement system based upon actual acquisition
15  cost?
16      A.  That's correct.
17      Q.  You do have an opinion as to whether
18  payors wanted to reimburse at actual acquisition
19  cost?
20      A.  I do not.
21      Q.  I want to make sure I understood your two
22  reasons.  One was feasibility?

---

**103**

1      A.  Yes.
2      Q.  And the second was the inability of any
3  particular third-party payor to essentially extract
4  a concession from physicians to be reimbursed based
5  upon actual acquisition cost?
6      A.  To change the way that they build the
7  health plan, so that involves not just a concession
8  to provide information, but to change office
9  operations so that billing for this one plan was
10  going to be different from billing for all the other
11  plans.
12      Q.  Are you aware of any effort by third-party
13  payors individually or collectively to move to an
14  acquisition cost system for physician-administered
15  drugs?
16      A.  I do not have that information, no.
17      Q.  Now, this lawsuit was filed initially in
18  2002, correct?
19      A.  I would take your word for it.  I'm
20  terrible with dates.
21      Q.  So the case has been pending for four
22  years. And as I understand it, you, as someone who

---

**104**

1  watches health care economics, are not aware of any
2  effort by third-party payors to move to an actual
3  acquisition cost system of reimbursement for
4  physician-administered drugs?
5      A.  I have not endeavored to seek out that
6  information.
7      Q.  As far as you know, are most -- are many
8  third-party plans still working under an AWP system?
9      A.  As far as I know.
10      Q.  Given the issues you have identified in
11  your report, do you have an opinion as to why third-
12  party payors would continue to utilize an AWP
13  system?
14      A.  I believe my two points before continue to
15  this day.  There's a feasibility concern. Third-
16  party payors are always concerned about making
17  changes to their claims systems.  These are rigid
18  systems often programmed in Cobol, and there's no
19  living Cobol programmer in the world -- there's no
20  person who knows how to change these claims systems.
21  It's very arduous to change claims systems to adapt
22  to a new set of information.

---

**105**

1          So I think the feasibility concern
2  remains.  And, again, can an individual payor in a
3  market change the way they contract with physicians
4  when all the other payors continue to reimburse on a
5  different basis?
6      Q.  And that system continues to exist
7  notwithstanding publicly available information,
8  including this lawsuit, that there have been
9  significant spreads between AWP and actual
10  acquisition cost, correct?
11      MR. MACORETTA:  Objection. You can
12  answer.
13      A.  I don't have specific data that would tell
14  me today which payors are doing this and which are
15  not.
16      Q.  But your sense is you haven't seen any
17  movement away from an AWP reimbursement system
18  notwithstanding all of the points you make in your
19  report, the publicity about this lawsuit, correct?
20      A.  I have no specific knowledge to contradict
21  that, but I simply don't know.
22      Q.  Are you aware of changes made by third-

---

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

---

**106**

1  party payors with respect to the level of
2  reimbursement for physician-administered drugs over
3  the past, let's say, year?
4      A.   Again, I don't have those data.
5      Q.   So as far as you know, sitting here today,
6  third-party payors are continuing to, one, utilize
7  an AWP reimbursement system and, two, continuing to
8  reimburse for physician-administered drugs at the
9  same levels that they have historically reimbursed
10 at?
11     A.   I can't -- I can neither contradict nor
12 support that statement.  I really don't have data on
13 that.
14     Q.   Well, as someone who studies health care
15 economics, if that were a widespread occurrence
16 within the market, isn't that something that would
17 most likely come to your attention?
18     A.   Well, it's not altogether clear.  These
19 contractual rates tend to be private information and
20 the academic literature really has no access to
21 this.  It's only in the context of these studies
22 that have been done for the government really that

---

**107**

1  individuals have been able to get access to that
2  information.  And should a study have been launched
3  in the last couple of years, it's not clear that it
4  would now be available.
5      Q.   Have you suggested to plaintiffs' counsel
6  or to Dr. Hartman, that, you know, should really
7  look at whether there have been changes in private
8  reimbursement as a result of, you know, a greater
9  awareness of the existence of spreads between AWP
10 and actual acquisition costs?
11     A.   No, I have not.
12     Q.   Are there differences in billing
13 procedures among third-party payors?
14     A.   Let me just clarify what you mean.  Do
15 they have different claims payments or do they
16 generally use the same approach?
17     Q.   Well, are there differences in claims data
18 procedures?
19     A.   I am sure there are differences.
20     Q.   Are there differences in levels of
21 reimbursement?
22     A.   Certainly.

---

**108**

1      Q.   And with the existence of those
2  differences, would you agree with me that certain
3  third-party payors have been able to gain market
4  share at the expense of others?
5      A.   I'm sorry, were you asking me whether
6  there's a causal relationship between the
7  differences in the market share?
8      Q.   No.  My question is:  Given the existence
9  of those differences, has that nonetheless allowed
10 one or more third-party payors to gain market share?
11     A.   Again --
12          MR. MACORETTA:  I object.
13     A.   -- I don't understand what the causal
14 relationship is between the first clause and the
15 second clause.
16     Q.   Okay.  Well, there may not be.
17     A.   There are differences.
18     Q.   There are differences.  And would you
19 agree with me that over time various third-party
20 payors have grown and taken market share away from
21 other third-party payors?
22     A.   Yes.

---

**109**

1      Q.   With the -- for the drugs that -- the
2  physician-administered drugs that you looked at in
3  connection with this case, did you find your
4  relationship between the size of the spread and the
5  level of competition in the therapeutic category in
6  which a drug is found?
7      A.   I examined cases where as you see in my
8  report, a case for example, where Kytril entered the
9  market and, therefore, there was some additional
10 competition in the therapeutic class, and noted that
11 that resulted or was associated with an increase in
12 the spread for Zofran, Z-O-F-R-A-N.
13     Q.   And was the increase in the spread a
14 function of an increase in further discounting by
15 the manufacturer to physicians?
16     A.   The increase in the spread was a function
17 both of increase in the AWP and a decrease in the
18 ASP.  So the discounts, an increase in discounts.
19     Q.   And when you say an increase in the AWP,
20 was that a function of an increase in price of WAC
21 by the manufacturer?
22     A.   The published AWP may in some cases be

---

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                    February 22, 2006
Cambridge, MA

110

1  based on a reported WAC that's marked up and in
2  other cases based on a reported AWP. The difference
3  is immaterial to my analysis. There's an AWP that
4  results in either case.
5      Q.  And did you look at what relationship that
6  increase in AWP bore to, for example, the increase
7  in, you know, prices under the consumer price index?
8      A.  No, I did not. The consumer price index
9  isn't particularly relevant here.
10     Q.  Why not?
11     A.  It captures price inflation broadly in the
12 market. It's not a very good indicator in price
13 inflation in medical care, and, indeed, some studies
14 have shown that prices are going down, if you adjust
15 for quality. So I would not use the CPI as an
16 adjustment.
17     Q.  Well, did you look at the rate of increase
18 in reported AWP versus any published yardstick?
19     A.  In any event, if you were going to compare
20 the price changes compared to a yardstick, you would
21 make the same comparison on the AWP and the ASP,
22 and, therefore, it would not affect this analysis.

111

1      If you were going to deflate the AWP by
2  some factor, why not deflate the ASP by the same
3  factor?
4      Q.  Well, if the ASP is going down, then --
5      A.  Then it's going down even faster relative
6  to inflation.
7      Q.  I see your point. Okay. So your point is
8  that the price decrease is actually greater when one
9  takes inflation into account?
10     A.  If one were to -- and again, those
11 deflators that are publicly available through the
12 CPI tend to have serious problems in health care.
13 They are not widely relied upon.
14     Q.  Let me go back to your point that it's not
15 feasible for payors to implement an actual
16 acquisition cost system for physician-administered
17 drugs.
18     Have you discussed that issue with any
19 third-party payor?
20     A.  I have not.
21     Q.  Have you done any survey of third-party
22 payors as to the level of difficulty that would be

112

1  associated with such a move?
2      A.  I have not.
3      Q.  Are you familiar with the ASP system of
4  reimbursement that was introduced in 2005 with
5  respect to Medicare Part B?
6      A.  I am.
7      Q.  Do you have any opinions as to whether
8  that is a better reimbursement system than an AWP
9  based system?
10     A.  I think the -- excuse me -- the ASP based
11 system is intended to come much closer to what --
12 the original acquisition cost notion. And so it's
13 certainly subject to different problems than the AWP
14 system, but not to the AWP inflation, of course.
15     Q.  Let's talk about those different problems
16 that exist with an ASP system, and am I correct that
17 one of the problems that exists within an ASP system
18 is that it provides a natural incentive to
19 physicians to use a more expensive product?
20     A.  In terms -- when you say "more expensive,"
21 in terms of the ASP as opposed to in terms of the
22 AWP. So I think compared to the AWP based system,

113

1  it's not altogether clear that that's true. If the
2  spreads are larger for expensive products, then that
3  incentive existed under the AWP based system.
4      Q.  Let me put it differently. Does there
5  continue to be under an ASP system a natural
6  incentive, economic, to use a higher-
7  priced drug?
8      A.  A drug with a higher ASP because there's a
9  market that's a function of that, yes, but a payor
10 in that case has the information with regard to what
11 that ASP is and there may be other mechanisms to
12 control therapeutic choice.
13     Q.  Have you examined to what extent payors
14 have adopted an ASP system and have abandoned an AWP
15 system?
16     A.  Private third-party payors?
17     Q.  Yes.
18     A.  Again, I have not.
19     Q.  Do you have any understanding as to
20 whether third-party payors have been adopting ASP
21 reimbursement systems?
22     A.  I don't.

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                February 22, 2006
Cambridge, MA

114

1    Q.  When you learned that the government was
2  going to adopt an ASP system, did you expect that
3  there would be rapid adoption by third-party payors
4  of an ASP system?
5    A.  When I learned that they were going to
6  adopt the ASP system, I thought that the ASPs might
7  be confidential like the AMP data are, if you are
8  familiar with the Medicaid rebate program.
9    Q.  Um-hum.
10   A.  So I didn't have such an expectation
11  because I wasn't aware that they would be public.
12   Q.  Well, when you learned that they were
13  public, did you expect that that would then lead to
14  rapid adoption by third-party payors of an ASP
15  system?
16   A.  I didn't have a particular expectation
17  with regard to whether the third-party payors would
18  adopt or not.
19   Q.  If you were advising a third-party payor,
20  would you advise them to adopt an ASP system as
21  opposed to an AWP system?
22   A.  I think I would need to know more about

115

1  what that would mean for them; how many providers
2  they would need to collect the data from and how
3  they would use that information and what it would
4  cost for them to implement such a system, as well
5  as, of course, their relative size of the market.
6    Q.  Would you agree with me that the size of
7  rebates and discounts that can exist within a
8  particular class of trade will vary based upon the
9  particular attributes of a member of that class of
10  trade?
11   A.  I agree that there are some factors as we
12  discussed earlier that will affect the size of the
13  discount.
14   Q.  And would that also be true -- if we take
15  the physician or clinic class of trade, would that
16  also be true that the size of rebates or discounts
17  that a particular clinic or physician group might
18  receive would be dependent upon the particular
19  characteristics of that clinic or group?
20   A.  That may be true.
21   Q.  Is that something you've -- have you
22  looked at the variability of discounting, rebating

116

1  within the physician administered class of trade?
2    A.  I have not particularly looked at
3  variability.  My analysis really relies on an
4  aggregate estimate and a variation around that.
5  It's not relevant for examining these issues.
6    Q.  Why wouldn't you be interested in looking
7  at the variability within the physician and clinic
8  class of trade?
9    A.  Because the average is really what is in
10  question here in terms of the issues related to the
11  spread.  Really looking at the average is how
12  economists -- again, sort of instead of looking at
13  individual data points, we look at marketwide
14  averages.
15   Q.  You also look at things like medians,
16  don't you?  Do you not?
17   A.  For some types of analysis.
18   Q.  Have you seen any sort of -- have you
19  considered any sort of analysis of the scattering of
20  pricing within the physician administered class of
21  trade?
22   A.  I have seen the defendants' experts'

117

1  analyses that look somewhat at that.  Are you
2  familiar with the exhibits that I am talking about?
3    Q.  Right.
4    A.  That look at some pricing differences for
5  examining aggregate impact, which is the ultimate
6  goal here; really, the mean is the important piece
7  of information.
8    Q.  Let me ask you:  Let's turn to
9  reimbursement under Medicare Part B as it existed in
10  the 1990s.
11       Do you understand Dr. Hartman to be using
12  in effect a zero spread for liability purposes for
13  Medicare Part B?
14   A.  My understanding is that the Court has in
15  its opinion indicated that the analysis for Medicare
16  be based on statute.
17   Q.  And do you have understanding as to
18  whether the Court has decided what that
19  interpretation should be?
20   A.  I'm not sure that I understand completely.
21  This is my understanding of the basis for that.
22   Q.  And do you understand that Dr. Hartman has

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                    February 22, 2006
Cambridge, MA

---

**118**

1  -- I want you to assume for the moment that the
2  Court has not decided what that interpretation
3  should be.
4      A.  Okay.
5      Q.  Do you understand that Dr. Hartman has
6  made either an assumption or offered an opinion as
7  to what the appropriate spread between reported AWP
8  and acquisition cost -- and average selling price
9  should be with respect to Medicare Part B? .
10     A.  I understand that, yes, he has a Medicare
11  yardstick that's different from the third-party
12  yardstick -- that he had a different yardstick for
13  Medicare and for the third-party payors.  That's my
14  understanding.
15     Q.  And those are two different yardsticks
16  with respect to liability, correct?
17     A.  That's my understanding.  I may have it
18  wrong.
19     Q.  No, I think you have it right.  So there
20  are two minimum standards of liability under Dr.
21  Hartman's approach?
22     A.  There are two yardsticks that he uses to

---

**119**

1  figure out which drugs should be included in his
2  overcharge calculations; if that's what you are
3  calling a standard of liability, then, yes, I agree
4  with that.
5      Q.  Well, I mean, you're the one who used the
6  term at page 6, paragraph 10 of your report, "Dr.
7  Hartman has also applied a minimum standard of
8  liability."  So I'm picking up on your phraseology.
9      A.  Okay.
10     Q.  Now, I just want to explore this and make
11  sure we understand one another.  In applying these
12  two different yardsticks of minimum standards of
13  liability, would I be correct that what Dr. Hartman
14  has done here is that the AWP -- let me start
15  differently.
16         As far as you know, manufacturers reported
17  -- or there was only one AWP reported for a drug,
18  correct?
19     A.  As far as I know, correct.
20     Q.  Therefore, would I be correct that if
21  there is one AWP reported for a drug, and under Dr.
22  Hartman's assumption that under Medicare B, AWP was

---

**120**

1  supposed to reflect average selling price, right?
2      A.  It's supposed to reflect -- have a
3  relationship to average selling price, not be equal
4  to it.  Is that what you are implying?
5      Q.  Well, I thought under Dr. Hartman's zero
6  spread theory, if there's zero spread, then AWP has
7  to --
8      A.  Excuse me.  Can I just get a drink of
9  water? Thank you.
10     Q.  -- then doesn't AWP have to equal actual
11  selling price?
12     A.  My understanding of the zero spread issue
13  is this is an issue that relates to the Medicare
14  statute and this is a legal issue.
15     Q.  I understand that.  But I'm trying to
16  explore the logic of the approach that Dr. Hartman
17  has taken and you have assumed for purposes of your
18  report.
19         Would I be correct that under the zero
20  spread approach that the published AWP for Medicare
21  Part B purposes was supposed to reflect average
22  selling price?

---

**121**

1      A.  Again, my understanding is that I wouldn't
2  necessarily draw an economic implication. My
3  understanding is this is purely a matter of the law.
4  And so I guess I'm not clear. I don't want to say
5  that necessarily reflects beliefs or...
6      Q.  I mean, it's an assumption that Dr.
7  Hartman has made. So let's just go with his
8  assumption.
9      A.  Okay.
10     Q.  And can we just agree on the implications
11  of that assumption?  If there is a zero spread,
12  doesn't that mean that the published AWP was
13  supposed to reflect the average selling price of the
14  drug?
15     A.  For the purposes of government
16  reimbursement.
17     Q.  Right.  Now, if that were true, wouldn't
18  that mean that there were physicians who were being
19  reimbursed at less than their cost of the drug under
20  Medicare Part B?
21     A.  That may be true. I mean, average, it
22  includes some numbers -- some above and some below.

---

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

122

1    Q.  Does that strike you as a workable
2  reimbursement system?
3        MR. MACORETTA:  Object.  Again, it calls
4  for an opinion way beyond her report.
5    A.  Really.  And I just don't have the number
6  on that.
7    Q.  Doctor, you are a health care economist
8  and you have studied health care issues.  Do you
9  think a reimbursement system would have worked where
10  some large percentage of physicians were being
11  reimbursed at less than they were actually paying to
12  acquire the drug?
13        MR. MACORETTA:  Same objection.
14    A.  I would say two things:  One, if you set -
15  - setting reimbursement, fixed reimbursement, is a
16  way to drive cost competition at the next level.  So
17  you might, for example, if you are paying physicians
18  by capitation, you take the average per capita
19  spending and you pay that, and that, of course,
20  implies that some physicians will lose money unless
21  they figure out how to treat their patients at lower
22  cost.

123

1    Q.  Now, you have studied the history of the
2  evolution of Medicare Part B.  Did you see anything
3  suggesting that the setting of -- the use of the
4  term AWP was in effect an effort at capitation?
5    A.  That's not my implication.  My implication
6  is that you might, and in fact many payors do, set
7  payments at the average knowing that means that
8  some below the average retrospectively would have
9  lost money.  There's a dynamic process.  This is a
10  way of encouraging cost control.  That's the way
11  it's used in other parts of the reimbursement
12  system.  So I would not say ex ante that it's an
13  unreasonable way to pay.
14    Q.  Well, the AWP, reimbursement of AWP, under
15  Medicare Part B stayed in effect for how many years?
16    A.  Reimbursement under AWP, well, there is a
17  regime between '92 and '98 and then obviously '98
18  until the latest provisions.
19    Q.  So let's stick with the period '92 to '98.
20  Over that period of time, do you think it would have
21  been a workable reimbursement system for AWP to have
22  reflected average selling price such that that there

124

1  would be a significant number of physicians
2  acquiring drugs and being reimbursed at less than
3  the cost they were paying?
4    A.  I think you're thinking --
5        MR. MACORETTA:  Objection.  Go ahead.
6        THE WITNESS:  Sorry.
7    A.  Well, you are thinking about AWP as being
8  something that stands still, and in fact for many
9  drugs it changes.  And so this is, again, it's a
10  dynamic thing we're looking at.  We're not saying
11  that those physicians who now pay above the ASP are
12  stuck paying above the ASP forever.
13    Q.  But if the AWP is, as we have assumed for
14  purposes of this discussion, supposed to be a
15  reflection of the ASP then throughout the period
16  there -- because it's an average, there continue to
17  be physicians who are buying -- who are being
18  reimbursed at less than their cost of the drug.
19  Does that strike you as a workable reimbursement
20  system?
21        MR. MACORETTA:  Same objection.
22    A.  Again, there are other elements of the

125

1  reimbursement.  First of all, I do think the dynamic
2  process is important.  But in addition, there are
3  other elements of a reimbursement system.  There are
4  -- you know, it would not be necessarily unworkable.
5    Q.  Now, as I understand Dr. Hartman, his view
6  was that with respect to private payors there was --
7  AWP meant something different than he's assuming it
8  meant under Medicare Part B.
9    A.  Again --
10        MR. MACORETTA:  I object to that.  I don't
11  -- what's the question?  Does she agree with your
12  statement?
13        MR. CAVANAUGH:  Yes.
14    A.  Again, I don't think that the dichotomy
15  there that he's making is one necessarily of a
16  different set of assumptions about the economic
17  environment, but with regard to Medicare, that -- my
18  understanding is that the yardstick he uses there is
19  based on a legal argument.
20    Q.  Yeah.  I'm trying to understand the
21  economic soundness of that approach, of assuming
22  that there were essentially two different meanings

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL
Cambridge, MA

February 22, 2006

**126**

1  to the term AWP.  Isn't that the implication of Dr.
2  Hartman's approach?
3        MR. MACORETTA:  Objection.  Same
4  objection.  You are now asking her to interpret Dr.
5  Hartman's approach.
6        A.  I don't think so.
7        Q.  Well, why not?  If AWP, for purposes of
8  Medicare Part B, was supposed to reflect average
9  selling price under Part B, but with respect to
10  private payors AWP was supposed to have some
11  relationship within 30 percentage points of average
12  selling price, isn't that two different concepts?
13        A.  Again, my understanding is that this is
14  driven entirely by statute and so I would not draw
15  that implication --
16        Q.  Let's assume for the moment that that is
17  Dr. Hartman's opinion, that that is what Medicare
18  Part B required.  I want to talk about the economic
19  soundness of such a system where, would you agree
20  with me, essentially AWP means two different things;
21  it means one thing under Part B and it means another
22  thing with respect to Dr. Hartman's theory, the

**127**

1  expectation of private payors?
2        MR. MACORETTA:  Same objection. You are
3  now asking her to give opinions on Dr. Hartman's
4  report which are not part of our report.
5        A.  I don't think the issue is as you suggest.
6        Q.  Why not?
7        A.  I just -- I don't believe that economic
8  soundness is what Dr. Hartman is trying to evaluate
9  in the case of this system.  And in my report I am
10  talking about the systems and what their
11  implications are.
12        Q.  Let me ask you this:  If you had a
13  reimbursement system where there's one published AWP
14  and it meant one thing under one system of
15  reimbursement and something different under another
16  system of reimbursement, could you see that creating
17  problems?
18        MR. MACORETTA:  Same objection.
19        A.  I don't really -- I don't really have an
20  opinion about that.
21        Q.  Would you agree with me that there are
22  commercial Medigap insurers who are also third-party

**128**

1  payors under commercial plans?
2        A.  Yes.
3        Q.  Did you try to determine whether those
4  entities that are both Medigap insurers and third-
5  party payors under commercial plans, whether they
6  had different expectations as to what AWP meant for
7  purposes of Part B and for purposes of their
8  commercial plans?
9        A.  I did not.
10        Q.  Have you done -- let me go back to Part B
11  for a moment, and one of my colleagues reminds me,
12  the statute refers to "EAC"; does it not?
13        A.  I believe so.
14        Q.  What do you understand "EAC" to be?
15        A.  My understanding is that it's a survey-
16  based acquisition cost.
17        Q.  And do you know whether the government
18  conducted any such surveys in order to arrive at
19  EACs for any physician-administered drugs for which
20  reimbursement is provided under Part B?
21        A.  To my knowledge, it did not.
22        Q.  Why not?

**129**

1        A.  I can't say.
2        Q.  Would you agree with me that an average
3  selling price that includes prices paid over
4  multiple classes of trade would not be the same
5  thing as the average selling price to a physician
6  class of trade?
7        A.  In your statement, certainly those sound
8  like two different things to me.
9        MR. MACORETTA:  Bill, we're at quarter of
10  1:00 now. I don't know what your thinking is on
11  lunch.
12        MR. CAVANAUGH:  This will be a good time
13  to break.  Take an hour?
14        MR. MACORETTA:  That's fine. Any guidance
15  on how late you want to go today or where you are --
16        MR. CAVANAUGH:  5 o'clock is fine. I'm
17  moving along.
18        MR. MACORETTA:  Okay.
19        THE VIDEOGRAPHER:  The time is 12:47.
20  Going off the record.
21        (Lunch recess.)
22        THE VIDEOGRAPHER:  The time is 1:51.

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                February 22, 2006
Cambridge, MA

---

130

1   We're back on the record.
2         THE WITNESS: I just wanted to note one
3   thing. The earlier discussion about which cases I
4   had worked with these lawyers and my 37-year-old
5   senility was setting in. I'm currently working on a
6   case. It's off the table for a moment, Neurontin.
7       Q.  Okay.  Let me just follow-up on a few
8   things from this morning.
9         At one point you described a formulary as
10  possibly a way of a circumventing the physician's
11  role in prescribing decisions. Is that because the
12  formularies can limit physician choices as a
13  practical matter?
14      A.  As a practical matter, it's a separate
15  influence on what the patient will end up getting.
16  But, of course, the physician can always prescribe a
17  nonformulary drug, but it wouldn't be covered.
18      Q.  But most formularies are open, are they
19  not?
20      A.  Generally, I believe that's true, that
21  most formularies today are open.
22      Q.  And the approach this day is to have more

---

131

1   tiered copays as a way to deal with formulary
2   selection and preference; is it not?
3       A.  That's the common approach during the last
4   five years, yes.
5       Q.  And when we come to physician-administered
6   drugs, how prevalent is the use of formulary
7   controls?
8       A.  My understanding for most of these drugs,
9   particularly the oncology drugs, they are not easily
10  therapeutically substitutable, and, therefore,
11  formularies tend to be less restrictive, less common
12  that there will be a drug eliminated for its status.
13  And of course tiered formularies are part of the
14  pharmacy benefit design and these drugs are paid for
15  under medical benefits.
16      Q.  All right.  Do clinical guidelines on
17  selection of drugs limit physician choice?
18      A.  Do they limit physician choice?
19      Q.  Yeah.
20      A.  No.  I mean, there are certainly clinical
21  guidelines, as I think of them, maybe guidelines put
22  out by the oncology association.  These are pieces

---

132

1   of information guidelines.
2       Q.  Can you turn to page 10 of your report.
3       A.  (Witness complies.)
4       Q.  You refer in paragraph 17 to the amendment
5   to Part B reimbursement such that it provided for
6   reimbursement based on the lower of the bill charge
7   or 95 percent of AWP.
8       A.  That's right.
9       Q.  You go on to say that, "In practice, this
10  has meant that the majority of reimbursement has
11  been undertaken using the AWP."
12        How did you go about determining that the
13  majority of reimbursements has been undertaken using
14  the AWP?
15      A.  That's my understanding, the conclusion I
16  drew, from reading for example the OIG report,
17  Office of the Inspector General, and other publicly
18  available reports.
19      Q.  Would I be correct that there are a
20  certain percentage of physicians who set their own
21  fee schedules and it may well be based upon their
22  bill charge?

---

133

1       A.  I guess I don't understand what you mean
2   by "set their own fee schedules."  The Medicare fee
3   schedules --
4       Q.  Let me ask it differently.  Are there some
5   number of physicians who submit for reimbursement
6   under Medicare Part B based on the bill charge?
7       A.  My understanding is that physicians submit
8   to Medicare based on AWP and their bill charge is
9   with reference to the AWP.
10      Q.  Are you aware of any physicians who do not
11  utilize AWP, but instead submit based upon what they
12  have actually paid for the drug?
13      A.  I am not aware of any information to
14  substantiate that.
15      Q.  Did you ever look at that issue?
16      A.  I did not look at individual physicians,
17  no.
18      Q.  Did you look at the extent to which
19  physicians set their fee schedule, not based on AWP
20  but based upon what they are actually paying for a
21  drug?
22      A.  I'm sorry.  Sounded to me that was the

---

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                February 22, 2006
Cambridge, MA

---

134

1  same question.
2      Q.  Well, it was a little different.  It went
3  to their fee schedule.  Are you aware of physicians
4  who set their fee schedule for drug reimbursement
5  based on what their actual acquisition cost as
6  opposed to AWP?
7      A.  Perhaps you are using the term "fee
8  schedule" differently.  The Medicare fee schedule
9  applies to all physicians who participate in
10  Medicare.  Physicians themselves don't set a fee
11  schedule.  They may put a billing amount on the
12  claim.  Is that what you are referring to?
13      Q.  Yeah.  And that billing amount may be
14  based upon what internal fee schedule they use in
15  their practice and that internal fee schedule could
16  be based upon actual acquisition costs; could it
17  not?
18      A.  I'm not aware of that practice, no.
19      Q.  And to what extent have you looked into
20  the prevalence or lack of prevalence of that
21  practice?
22      A.  Again, I rely on the published data that

---

135

1  suggests that physicians bill based on AWP.
2      Q.  Have you looked into the extent to which
3  copays under Medicare Part B go uncollected?
4      A.  There's a study by the OIG -- and you will
5  forgive me if I forget which one it is -- that
6  specifically looked at that issue, and I could find
7  that site for you with a little bit of time.  They
8  found, generally, that it was a nonissue.  I will
9  try to find that reference.
10      Q.  When you say it was a "nonissue," what do
11  you mean?
12      A.  Well, physicians are required to collect
13  the co-payments, that's part of their participation
14  agreement.  And so there was an estimate about --
15  when the OIG was looking into whether the physicians
16  were being underpaid, there was concern about bad
17  debt, and so those are the uncollected co-payments
18  and their conclusion was that it was negligible.
19      Q.  And by "negligible," can you give me a
20  percentage, less than 5 percent?
21      A.  Less than 1 percent.
22      Q.  Less than 1 percent.  All right.

---

136

1      Are you aware of any studies showing any
2  higher percentage of bad debt?
3      A.  I'm not aware of any other studies.
4         (Exhibit Rosenthal 005 marked.)
5      Q.  We've marked as Exhibit Rosenthal 005 the
6  deposition taken of Joe Spahn, November 30, 2004.
7      Dr. Rosenthal, you have indicated that --
8  am I correct, that you have not reviewed testimony
9  given by any third-party payors in this case?
10      A.  I have not systematically reviewed that.
11  I reviewed -- looking through discovery materials
12  for other things I was aware of that there had been
13  depositions, and in Dr. Gaier's report, Dr. Young's
14  report, in many cases they make reference to those,
15  so I have certainly seen those references.
16      Q.  Okay.  Let me ask you to turn to page 97
17  of this deposition.  And, actually, why don't you,
18  so you have some idea, turn to page 8.
19      A.  Okay.
20      Q.  And I'll just refer you to page 8, which
21  gives some discussion of Mr. Spahn's job.  Do you see
22  he's a senior health care consultant for Anthem Blue

---

137

1  Cross Blue Shield?  Are you familiar with Anthem
2  Blue Cross Blue Shield?
3      A.  I am.
4      Q.  Would you consider them a large,
5  sophisticated third-party payor?
6      A.  I can't speak to their sophistication.
7  They are indeed large.  I believe with their current
8  merger, they are the largest national plan.
9      Q.  Do you have any reason to believe they are
10  not a sophisticated third-party payor?
11      A.  I have no information on that point.  Can
12  you tell me, senior health care consultant is his
13  job title, do you know what that means?
14      Q.  I ask you to turn to page 97.
15      A.  (Witness complies.)
16      Q.  I'll ask you to read from line 17 to page
17  98, line 13.
18      Q.  Line 17, page 97?
19      A.  Yeah.
20      A.  Okay.
21      Q.  To page 98, line 13.
22      A.  To myself or aloud?

---

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL      February 22, 2006
Cambridge, MA

---

138

1    Q.  Yes, that's fine.
2    A.  Okay.  (Witness reading.)  So just onto
3  page 98?
4    Q.  Yes.
5    A.  Okay.
6    Q.  Do you see Mr. Spahn is testifying that
7  Anthem had no particular expectation as to provider
8  costs for drugs?
9    A.  I see that that's what he said, yes.
10   Q.  Did you take this testimony into
11  consideration in forming any of your opinions in
12  this case?
13   A.  As I mentioned before, the reliability of
14  an individual self-report within an organization, I
15  just don't know what to make of these data.
16   Q.  Well, did you in any way go -- you
17  understand a lot of third-party payors were deposed
18  in this case?
19   A.  I understand that there have been, yes.
20   Q.  Did you go through in any systematic way
21  their testimony to do any sort of reality check on
22  assumptions that were being made with respect to

---

139

1  payor expectations?
2    A.  As I suggested before, I don't think those
3  data are relevant.
4        (Exhibit Rosenthal 006 marked.)
5    Q.  Let me ask you a question with respect to
6  the prior testimony which I showed you.  Would you
7  agree with me that Mr. Spahn's testimony is
8  certainly inconsistent with Dr. Hartman's opinion,
9  that there is such a thing as an average expectation
10  among payors?
11   A.  I would not agree with that.  I would say
12  that his testimony is unrelated to Dr. Hartman's
13  theory with respect to expectations.  I don't know
14  what his job is in the company and what relationship
15  he has for setting reimbursement.
16   Q.  Let me ask you a hypothetical.  If there
17  is a payor who testified we did not have an
18  expectation as to what range of acquisition prices
19  were for physicians, would you agree with me that
20  that testimony would be inconsistent with Dr.
21  Hartman's average expectation theory?
22   A.  Again --

---

140

1        MR. MACORETTA:  Objection.  Go ahead.  You
2  can answer.
3    A.  I just don't see the relevance of that
4  piece of information.  I think the information
5  doesn't reflect how the organization works
6  operationally.  It's impossible to know from these
7  depositions what role these people had in setting
8  reimbursement.  And self-report, again, has a number
9  of biases.
10   Q.  Well, I'd ask you to assume that these
11  witnesses were produced by their companies as
12  corporate representatives, as people knowledgeable
13  on these subjects.  Is it your opinion that if you
14  were faced with a flood of testimony from third-
15  party payors that they just did not have an
16  expectation, that that would not be relevant to Dr.
17  Hartman's assessment of average payor expectation?
18       MR. MACORETTA:  Objection.  Go ahead.
19   A.  I can't say how Dr. Hartman would or would
20  not use that information.  In my view, the
21  information that AWP is the basis for reimbursement,
22  and in fact how the third-party payors use that

---

141

1  information, is sufficient for me because I -- I
2  would not find that information to overturn my
3  opinions.
4    Q.  So, regardless, if payor after payor came
5  in and said, "Look.  We didn't have access to
6  acquisition costs, so we didn't have an expectation
7  as to what the physicians were actually paying for
8  this," that to you would not be relevant to a
9  determination of some average expectation among
10  third-party payors?
11       MR. MACORETTA:  Objection.  You can
12  answer.
13   A.  Just to be clear, I believe that it would
14  be impossible to collect that kind of information in
15  a valid and reliable way.
16   Q.  So you must have undertaken some sort of
17  effort whether that information could be derived by
18  survey or otherwise?
19   A.  Based on my training as an economist and
20  experience doing research, I know that that approach
21  has many problems.  It would not be the set of
22  approaches that I would use to determine the

---

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

142

1  problem.
2      Q.  So if Dr. Hartman said that he did intend
3  to do surveys to determine payor expectation, you
4  would have advised him that he was on a fool's
5  errand?
6      A.  That did not happen, and I am certain it
7  would not be the methodology that I would choose.  I
8  can't speak to what Dr. Hartman would do.
9      Q.  You have read the AMCC?
10     A.  Correct.  Yes.
11     Q.  And your report assumes the allegations
12  set forth in there are true?
13     A.  That's correct.
14     Q.  Do you understand the plaintiffs in this
15  case are alleging that third-party payors were
16  defrauded; do you understand that?
17     A.  I understand that.
18     Q.  And I'm not asking you as a lawyer, but
19  when you think of the term "fraud," that's someone -
20  - do you understand that that involves someone being
21  misled; they assume one thing and it turns out
22  something else is true?

143

1          MR. MACORETTA:  Objection.
2      A.  I understand that to be the general
3  meaning of the term "fraud" from a layperson's
4  perspective.
5      Q.  And would you agree with me that it would
6  seem to you relevant to considering the issue of
7  fraud to look at what the expectations were of
8  third-party payors?
9          MR. MACORETTA:  Objection.
10     A.  My point is not whether in the ideal world
11  one could measure those things, whether it would be
12  relevant, but that you cannot measure that through
13  this kind of research, and that looking at revealed
14  actions is a better way to examine what the
15  expectations were at the time.
16     Q.  So your view is asking someone to swear
17  under oath as to what their expectation was is
18  simply not a relevant piece -- is simply not an
19  appropriate approach because it would not produce
20  relevant information?
21         MR. MACORETTA:  Objection.
22     A.  Again, I'm not implying that they are

144

1  perjuring themselves.  Rather, that they may not
2  have been in the position that -- of a person who
3  had the information and was actually making the
4  corporate decisions and they are subject to recall
5  by us.
6      Q.  That would require you then to go back and
7  look at the depositions and start to make judgments
8  as to whether these were appropriate individuals to
9  be making determinations as to what their company's
10  expectations were, right?
11         MR. MACORETTA:  Objection.
12     A.  That would be one factor.  As I mentioned
13  before, retail bias would apply to everyone.
14     Q.  Did you go back and undertake that type of
15  determination?
16     A.  I did not believe this information was
17  going to be relevant for my analysis.
18     Q.  Let me go back to my question earlier,
19  which is:  If we can't look to what the payors are
20  saying under oath their expectations were and they
21  didn't know what the actual acquisition costs were,
22  how in the heck do you determine what their

145

1  expectations were?
2      A.  In the way that standard economic analysis
3  is done, by looking at the market behavior of the
4  participants.
5      Q.  Okay.  And the market behavior was what?
6      A.  Discounting off of AWP.
7      Q.  No, that was the behavior of the
8  manufacturers.
9      A.  No, no.
10     Q.  I'm talking about the --
11     A.  Sorry.
12     Q.  Go ahead.
13     A.  Discounting off of AWP in their
14  reimbursement systems.
15     Q.  Okay.  And you look at the level at which
16  they were discounting -- strike that.  You were
17  looking at the level at which the third-party payors
18  were paying off of AWP --
19     A.  Yes.
20     Q.  -- to determine your expectation?
21     A.  Yes.
22     Q.  Is that how you understand Dr. Hartman

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

146

1 determined the expectation?
2     A.  I can't really make a judgment on Dr.
3 Hartman's analysis.
4     Q.  Because if I look at what payors are
5 providing -- strike that.  If I look at how payors
6 are going about trying to determine what their -- a
7 level of reimbursement, all I'm coming up with is a
8 reimbursement model.  Why does that necessarily tell
9 me what the relationship or what the expectation was
10 as to cost?
11     A.  How they actually contracted reveals
12 something about what they understood the acquisition
13 cost to be.
14     Q.  Why?
15     A.  Because -- why would they be discounting 5
16 percent off of AWP if the spreads were 50 percent?
17     Q.  Perhaps they wanted -- perhaps they didn't
18 consider that to be -- acquisition costs for
19 physicians to be a particularly important
20 consideration.
21     MR. MACORETTA:  Objection.  Is that a
22 question?

147

1     MR. CAVANAUGH:  Yes.
2     Q.  Did you consider to what extent third-
3 party payors took into consideration in determining
4 their reimbursement levels what actual acquisition
5 costs were?
6     A.  Economically speaking, one consideration
7 payors use is how much margin to allow the
8 individual providers in the market.
9     Q.  And how did you go about determining to
10 what extent third-party payors were deciding what
11 margin of profit to allow?
12     A.  Again, this is based on economic theory,
13 economic research and what we have observed, the way
14 they pay providers here and elsewhere.
15     Q.  But if they don't know the acquisition
16 cost, how can you assume that they had an
17 expectation as to what that acquisition would be?
18     A.  That's the basis for AWP, that payors
19 expected that this list price was related in some
20 systematic way to acquisition cost and they could
21 allow a reasonable margin by basing their
22 reimbursement relative to that AWP with this notion

148

1 that that would leave some room for profit.
2     Q.  And how did you go about determining what
3 third-party payors considered to be a reasonable
4 margin?
5     A.  Again, this goes back to the public
6 information that was available at the time and
7 looking at the actual reimbursement -- I won't use
8 the term discount.  I don't mean to be confusing --
9 the actual reimbursement rate relative to the AWP.
10     Q.  And what information was there that was
11 publicly available as to actual acquisition cost?
12     A.  The publicly available information are the
13 OIG reports, these other public reports, the ASCO
14 report, the GAO report.
15     Q.  And how do you know to what extent third-
16 party payors relied upon any of the information that
17 was in an OIG report?
18     A.  Again, economic analysis doesn't really go
19 to the individual market participants and ask them
20 what their preferences are, what their knowledge is.
21 We observe their behavior.  And, again, I observed
22 the actual reimbursement behavior of the third-party

149

1 payors in this market.  Knowledge of these spreads
2 would be inconsistent with their reimbursement
3 behavior.
4     Q.  But knowledge of the spreads reported in
5 the OIG reports would be consistent with their
6 behavior?
7     A.  The spreads reported in those OIG reports
8 as they sequence through the '90s became sort of
9 more general information that there were spreads.
10 The early information suggested the spreads were in
11 the range of 20, 25 percent, depending on the subset
12 of drugs looked at.  And so this kind of information
13 was in the public domain and, therefore, likely to
14 be factored into payment systems.
15     Q.  But you have made no attempt to
16 systematically determine the extent to which this
17 information was in fact utilized by third-party
18 payors to determine reimbursement rates, correct?
19     A.  No.  That's correct.
20     Q.  Now, would you agree with me that if
21 third-party payors knew from these reports what the
22 providers' margins were, then they could determine

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL                    February 22, 2006
Cambridge, MA

---

150

1  the actual spreads; could they not?
2      A.  The information in these reports is
3  general information.  It relates to a subset of
4  providers for a subset of drugs, so it wouldn't
5  allow an individual plan to go to Dr. Jones and say,
6  "I know you are buying this at $131."  So that
7  information I would expect informed them about the
8  average magnitude of the spreads and would have been
9  used in some way in their contract.
10     Q.  But, again, you have made no attempt to
11 determine whether in fact it was used?
12     A.  No, I have not.
13     Q.  As I understood your testimony, if there
14 is deposition testimony from witnesses that it was -
15 - that acquisitions costs were not taken into
16 consideration, you would not consider that
17 information to be relevant here?
18     A.  You understand correctly.
19     Q.  Now, you mentioned that there has been an
20 evolution in information.  What did you mean by
21 that?
22     A.  An accumulation of information over time.

---

151

1      Q.  And has that accumulation of information
2  led to a change in third-party payor behavior?
3      A.  I don't have the data to establish that.
4      Q.  So as far as you know, sitting here today,
5  it has not led to a change in behavior, correct?
6      A.  As far as I know, I don't have the data to
7  establish that, so, yes, I don't know to the
8  contrary or I can't provide information to support
9  it.
10     Q.  So could you have -- do you have any basis
11 to say that had the evolution of information been
12 more rapid or had more information been available
13 earlier, that the level of reimbursement would have
14 been any different than it is today?
15     A.  I don't have specific data to look at that
16 question.
17     Q.  Are you familiar with Coventry Health
18 Care?
19     A.  I have heard of them.
20     Q.  Let me show you -- let me have that piece
21 of deposition.
22         (Exhibit Rosenthal 007 marked.)

---

152

1      Q.  We have marked as Exhibit Rosenthal 007
2  deposition testimony of J. Russell Hailey.  If you
3  turn to page 6, you will see that Mr. Hailey is the
4  chief pharmacy officer and vice president of
5  pharmaceutical services for Coventry Health Care,
6  Inc.  Do you see that?
7      A.  I do see that.
8      Q.  Did you review at all Mr. Hailey's
9  testimony in this case?
10     A.  I believe it was cited in the Gaier or
11 Young reports.  I believe I have seen pieces of it
12 cited.
13     Q.  Let me ask you to turn to page 151, line
14 10, the testimony of the vice president of
15 pharmaceutical services for Coventry Health Care.
16         MR. MACORETTA:  What page is that?
17         MR. CAVANAUGH:  151.
18         MR. MACORETTA:  Thank you.
19     Q.  Let's start with line 3.  He was asked the
20 following question:
21         "In connection with that process of
22 setting up that reimbursement amount, does Coventry

---

153

1  take into consideration the amounts that the
2  physicians actually pay to get the drug?
3         "Answer: No.
4         "Question: From Coventry's perspective,
5  is it at all relevant to their determination of the
6  rate at which reimburse the doctors the amount
7  that the physician actually paid to purchase the
8  drug?
9         "Answer: No.
10        "Question:  Similarly, does Coventry take
11 into consideration the amount, a margin, that a
12 doctor could make on a drug in assessing the amount
13 that it will reimburse the doctor for the drug?
14        "Answer: No."
15        Doctor, would you agree with me that that
16 testimony is flatly inconsistent with Dr. Hartman's
17 theory with respect to average expectation?
18        MR. MACORETTA:  Objection.
19     A.  Again, I don't believe this information is
20 relevant to Dr. Hartman's analysis.  A piece you
21 skipped there said -- where the witness says, "I'm
22 not involved at all with the hospital contracting

---

Henderson Legal Services
(202) 220-4158

Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL          February 22, 2006
Cambridge, MA

---

154

1  piece." I don't believe that this relates to the
2  expectations that were operationalized by these
3  organizations.  What he's saying, in my view, is
4  that Coventry bases reimbursement on AWP, and in
5  that sense does not take account of the acquisition
6  cost.
7        Q.  Well, the answer you are referring to was
8  in response to a question, a different question:
9  "What methodology does Coventry use to reimburse
10  hospitals for drugs administered to patients?"  And
11  the witness said he was not involved in hospital
12  contracting.
13        Would you agree with me that the prior
14  questions turn on reimbursing physicians?
15        A.  That may be correct.  It doesn't change my
16  judgment with regard to the usefulness of this
17  information.
18        Q.  But would you agree with me, regardless of
19  whether you think it's useful or not -- the jury may
20  disagree with you -- would you agree with me --
21        MR. MACORETTA:  Objection.
22        Q.  -- that it's inconsistent with Dr.

---

155

1  Hartman's expectation theory?
2        MR. MACORETTA:  Objection.
3        A.  I can't agree.  I don't believe that this
4  information relates.  I don't believe it's relevant.
5        Q.  So the fact that a payor comes in and
6  says, "We didn't take into consideration the amount
7  paid by the physician or the margin that the
8  physician made," that's not inconsistent with Dr.
9  Hartman -- with any of the opinions that Dr. Hartman
10  or you are putting forward in this case?
11        MR. MACORETTA:  Objection.
12        A.  I believe this statement is not a reliable
13  piece of information for what you are trying to get
14  at.
15        Q.  Whether it's reliable or not, let's let
16  the judge, a jury, decide how reliable it is. Just
17  taking the statements made by this witness, would
18  you agree with me that they are inconsistent with
19  the notion that payors had some expectation as to
20  acquisition costs?
21        MR. MACORETTA:  Objection.
22        A.  No.  I can't agree.  Based on exactly what

---

156

1  I have said before, this information is not a
2  reliable indicator and so it can't contradict
3  anything.
4        Q.  You testified before that one of the
5  reasons why you didn't think that this testimony
6  from these witnesses was particularly reliable, I
7  think you used a term "strategic selection."  Were
8  you talking about strategic selection by the
9  defendant, the manufacturers, as to who to depose?
10        A.  Presumably, those deponents were selected.
11        Q.  Well, were you aware of that it's the
12  third-party payors who selected the particular
13  witnesses to produce as corporate representatives?
14        A.  I don't have any awareness of how this
15  process works.
16        Q.  Would you think that a third-party payor
17  would want to produce someone who would accurately
18  provide information regarding the corporation's
19  position with respect to how they go about setting
20  their reimbursement rates?
21        MR. MACORETTA:  Objection.
22        A.  I can't say what they were thinking, no.

---

157

1        Q.  Well, just using your common sense, do you
2  think that a third-party payor would want to put up
3  someone who would accurately testify regarding the
4  company's position as to how it determines their
5  reimbursement rates?
6        MR. MACORETTA:  Objection.
7        A.  I'm not sure what to answer other than
8  what I have already said.
9        Q.  No, I think you can take a shot at that
10  question.
11        MR. MACORETTA:  I think she just did.
12        A.  I really have no basis to know what they
13  were thinking in selecting this deponent.
14        Q.  So you have no reason to believe that they
15  would not select an appropriate knowledgeable
16  witness who would accurately provide information as
17  to how Coventry goes about determining its
18  reimbursement for physician-administered drugs?
19        A.  I have no reason to believe.
20        MR. CAVANAUGH:  I am reminded that I
21  should designate the transcript as "highly
22  confidential," and I do so designate.

---