Meredith Rosenthal, Ph.D.  HIGHLY CONFIDENTIAL         February 22, 2006
Cambridge, MA

### Page 158

1   (Exhibit Rosenthal 008 marked.)
2   Q. We have marked as Exhibit Rosenthal 008
3   testimony of a deposition of a Karen Dobson of Blue
4   Cross Blue Shield of Wyoming, and if you look at the
5   page 4, Doctor, you will see that Ms. Dobson is the
6   chief operating officer for Blue Cross Blue Shield
7   of Wyoming.
8   A. Yes. Thank you. I see that.
9   Q. Now, let me ask to you turn to page 8.
10  lines 9 to 19, the question is asked:
11      "Is it at all relevant to you, to Blue
12  Cross Blue Shield of Wyoming, when reimbursing
13  physician for drugs administered to its members,
14  what the acquisition costs are?
15      "Answer: No.
16      "Question: Has Blue Cross Blue Shield of
17  Wyoming ever made any effort to determine what the
18  acquisition costs are of physicians that dispense --
19  administer drugs to its members?
20      "Answer: No."
21      Does it surprise you to learn -- well, let
22  me ask this first: You are familiar with the Blue

### Page 159

1   Cross Blue Shield organizations throughout the
2   United States; are you not?
3   A. Yes, I am.
4   Q. Would you consider them large,
5   sophisticated third-party payors?
6   A. Again, they tend to be large in their
7   individual markets. I can't speak to their
8   sophistication.
9   Q. Do you have any reason to believe that
10  they are not sophisticated businesses?
11  A. I have no reason to believe.
12  Q. Okay. Are you -- does it surprise you to
13  learn that Blue Cross Blue Shield has never made any
14  attempt to determine what acquisition costs are for
15  the physicians for physician-administered drugs?
16  A. As I read this, it suggests to me that
17  they rely on the AWP to convey all the information
18  they need. That seems to me what she's saying.
19  Q. Out of the testimony I just read to you,
20  where is there any mention of the word "AWP"?
21  A. In the question I guess I was looking at,
22  they -- she talked about reimbursement, and it's

### Page 160

1   clearly based on AWP as we know, and so, no, she's
2   not made any attempt to get acquisition costs.
3   There's no reason to. There's a belief out there
4   that AWP is sufficient.
5   Q. Now, she gave this testimony in 2004. You
6   talked earlier about the evolution of knowledge
7   regarding AWP. By 2004, would you agree with me
8   that there certainly was a great deal of public
9   information out there about the spreads that exist
10  between AWP and actual acquisition costs?
11  A. There certainly is general information in
12  the public that, again, accumulates over the period
13  with regard to the existence of these spreads.
14  Q. Okay. Despite that, would you agree with
15  me that it appears that Blue Cross of Wyoming still
16  had made no attempt to determine what actual
17  acquisition costs were?
18  A. That's my understanding, yes.
19  Q. Did you ever seek to understand why
20  despite all of this publicly available information
21  third-party payors such as Blue Cross Blue Shield of
22  Wyoming still as of late 2004 had never attempted to

### Page 161

1   determine what their actual acquisition costs were -
2   - what physician actual acquisition costs were of
3   physician-administered drugs?
4       I will start over. Have you ever sought
5   to ascertain why a large third-party payor like Blue
6   Cross Blue Shield of Wyoming, presumably
7   sophisticated, had not as of late 2004 undertaken to
8   determine what the acquisition costs were for
9   physicians utilizing physician-administered drugs
10  and seeking reimbursement from Blue Cross Blue
11  Shield?
12  A. No.
13  Q. Are you familiar with Harvard Pilgrim
14  Health Care?
15  A. I am. I'm a member. Does that make me
16  conflicting?
17  Q. I don't know. Depends. After I show you
18  the testimony you might be conflicted.
19      (Exhibit Rosenthal 009 marked.)
20  Q. Does Harvard Pilgrim Health Care also
21  maintain a staff model HMO?
22  A. Not at this time.

**162**

1  Q. Did it at one point in time?
2  A. At one point they did.
3  Q. Do you know whether Harvard Pilgrim Health
4  Care receives discounts, rebates, from manufacturers
5  of brand-named drugs?
6  A. Generally, do they receive rebates, I'm
7  certain that they do.
8  Q. Now, does Harvard Pilgrim Health Care also
9  reimburse members -- reimburse physicians for the
10 administration of physician-administered drugs?
11 A. Yes.
12 Q. Let me ask you to turn to page 12. Well,
13 first I want you to identify -- let's identify the
14 witness.
15    If you see on page 5 and 6, the witness is
16 Mr. Kenney who's been employed by Harvard Pilgrim
17 Health Care for 24 years.
18 A. I see that, yes.
19 Q. If you would turn to page 12. Do you see
20 on page 12 Mr. Kenney indicates that Harvard Pilgrim
21 Health Care would receive discounts off of WAC for
22 brand-named drugs in the range of anywhere from 2

**163**

1  percent to 50 percent?
2  A. I do see that.
3  Q. Now, if we were then to express that as --
4     MR. MACORETTA: Let me just object to
5  that. I don't think he's limiting that to brand-
6  named drugs.
7     MR. CAVANAUGH: If you go to page 12, line
8  11 where it says "with respect to brand-named
9  drugs."
10    MR. MACORETTA: The 2 to 60 [sic] percent
11 is the question above, right?
12    MR. CAVANAUGH: All right.
13 Q. Page 12, line 11, "With respect to brand-
14 named drugs -- let's stick with brand-named drugs
15 for a moment" --
16    MR. MACORETTA: Okay.
17 Q. -- "what was the percentage mark-up or
18 discount off of WAC that Harvard Pilgrim acquired
19 drugs from manufacturers for its staff model HMO?
20    "Answer: The branded discount was 2
21 percent to 50 percent."
22 A. I see that.

**164**

1  Q. All right. And that's when Harvard
2  Pilgrim is acting as a staff model HMO buying drugs
3  to administer -- for dispensing to Harvard Pilgrim
4  members such as yourself.
5     Now, if we were to express this as a
6  percentage off of AWP, the percentage would be even
7  larger than 50 percent; would it not?
8  A. 50 percent of a smaller number would make
9  a bigger denominator. It would be a bigger
10 percentage.
11 Q. Sure. If the relationship between AWP and
12 WAC is, let's say, 20 percent and we have a 50
13 percent -- this is going to be a math question at
14 the end of this -- and the discount off of WAC is 50
15 percent, what is our -- what's our spread between
16 AWP and the discounted price?
17 A. The spread as we have been -- let's say
18 the 50 percent of WAC example, nice round numbers.
19 So at 50 percent of WAC discount essentially will
20 bring you down to an ASP of -- I guess, if you want
21 to express that as a percentage of AWP so --
22 Q. Yes.

**165**

1  A. So AWP is higher, so it would be less than
2  50 percent.
3  Q. How much more?
4  A. It would be less than 50 percent.
5  Q. Oh, less than 50 percent.
6  A. We're taking --
7  Q. Okay. Would Harvard Pilgrim have any
8  reason to believe that on physician-administered
9  drugs the discounts would be any different?
10 A. Absolutely. You, Mr. Cavanaugh, are
11 sophisticated and have spent a lot of time with this
12 case, but to Harvard Pilgrim thinking about
13 individual physicians in the marketplace, they are
14 small and powerless, and so I would expect Harvard
15 Pilgrim to assume that they get much, much lower
16 discounts than a large integrated health plan.
17 Q. So you believe that physicians -- so when,
18 for example, oncology groups are negotiating with
19 third-party payors over reimbursement rates, are
20 they small and powerless?
21 A. Again, it's not my expectation as an
22 expert health economist here. We're asking what the

**166**

plan is, and in this case, this example you have chosen, Harvard Pilgrim not only has control over the clinical decisions because it owns its own dispensary in this era, but also has volume, so they have a large population of covered enrollees. And their discounts -- my conclusion would be that they would assume their discounts would be much larger than an individual physician who only has one of those two mechanisms for moving the market basically.

Q. Well, in terms of moving the market, they have -- the ability to make the decision as to what drug to use is certainly the important characteristic; is it not?

A. Again, the important -- they are both important characteristics, and it takes a sophisticated analysis to understand that physician decision making may be more or less important than volume. I think that's a sophisticated analysis that I wouldn't attribute necessarily to the payors.

Q. Because if I buy $10 worth of the product but have the ability to take you down to zero, I'm

**167**

certainly a more powerful buyer than someone who buys $20 of product but only has the ability to take you down to $15 of sales, right?

A. In your hypothetical example, yes.

Q. And so a physician group, having a choice between two competitive products could in many instances, regardless of the size of the practice, say to one drug company or the other, "I'm going to use your product" or "I'm going to use your product"; do they not?

A. A physician practice could say that.

Q. And that would give them a fair amount of leverage, would it not, in extracting discounts?

A. Again, that would be a piece of leverage. If they only had three patients, that would be much less important.

Q. Well, let's take a large oncology practice. Wouldn't a large oncology practice have the ability with respect to certain physician-administered drugs to say, "We're going to use Lupron" or "We're going to use Zoladex"?

A. I think the fact of their leverage, I

**168**

would not dispute. The question is: Does Harvard Pilgrim think their leverage is as much as a large staff model organization? And, clearly, that organization is not as large as Harvard Pilgrim.

Q. Now, that would require determining what Harvard Pilgrim's expectations were regarding the ability of physician groups to leverage discounts from manufacturers, right?

A. I'm sorry. When you say that would require, could you please explicate what you mean by that?

Q. You were referring to what Harvard Pilgrim's expectation would be as to the ability of a physician's group to secure discounts from manufacturers, right?

A. I believe you asked me what their expectation would be and I was trying to address that question.

Q. Okay. How do you know what their expectation would be without asking them?

A. I don't know what their expectation would be. And, again, I observe their behavior in the

**169**

marketplace and that's how I understand what their knowledge is.

Q. Okay.

MR. CAVANAUGH: If you want to take a short break, this will actually be a pretty good time to take a break.

THE VIDEOGRAPHER: The time is 2:46. Going off the record.

(Short recess.)

(Exhibit Rosenthal 010 marked.)

THE VIDEOGRAPHER: The time is 3:10 p.m. We're back on the record.

Q. Dr. Rosenthal, we have marked as Exhibit Rosenthal 010, a November 6, 1992 OIG report. Are you familiar with this report?

A. Yes, I am.

Q. Is this one of the reports you were referring to in your earlier testimony with respect to OIG reports that may have influenced third-party payor expectations?

A. Yes, that's correct.

Q. Let me ask you to turn to the top of page

Page 170

2.
A. I'm there. Thank you.
Q. At the top of page 2, the Office of Inspector General states, "Our results indicate that for the physicians surveyed, the 13 chemotherapy drugs can be purchased at amounts below AWP and that AWP is not a reliable indicator of the cost of a drug to physicians."
A. I see that.
Q. Now, this was in 1992. If the OIG is saying that AWP is not a reliable indicator of the cost to physicians, how could one then determine that AWP less some percentage would be a reliable indicator of cost?
A. My interpretation -- I don't know their intent of the term "reliable," but there's specific information here on the actual prices paid and that suggests to me some information about the difference between AWP and acquisition cost that would have been used -- this term "not reliable," I'm not really clear how that would have been interpreted, so I'm not exactly sure about your question.

Page 171

Q. Well, from the perspective of a -- you agree with me that a third-party payor reading this would see that the OIG has concluded that the AWP published in Red Book or any pricing service is not a reliable indicator of a cost of a drug to physicians?
A. It's not a good representation. AWP is not the same as acquisition cost is how I read that, yes.
Q. Are there any statements in here in which OIG says, "While it's not a reliable indicator, while AWP is not a reliable indicator, we think a reliable indicator of actual cost would be the following average discount off of AWP"?
A. I don't believe it says that anywhere in here.
Q. All that's provided in here are particular discounts off of AWP for particular drugs, correct?
A. That's correct.
Q. And those range up to -- if you turn to Appendix 3 -- range up to 83 percent; do they not?
A. Let me catch up with you. Right, for the

Page 172

generic drugs, yes.
Q. And so one looking at this would conclude that the numbers are that the cost to physician is going to be highly dependent upon the particular drug, correct?
A. One would conclude that there's variation across drugs.
Q. And would you agree with me that based upon taking what OIG says, that AWP is not a reliable indicator and the fact that we have cost to physicians all over the place on Appendix 3, nothing in this document would inform a third-party payor as to what they should expect the average cost to be to a physician for a particular physician-administered drug?
A. This report, of course, is written for Medicare and not to private third-party payors; just so we're clear who they are speaking to. But my understanding is they do talk about averages and they talk about the distribution, sort of where the majority of drugs fall, and that that information would have been part of, again, the publicly

Page 173

available information about the expected difference between AWP and acquisition cost, and in statistical terms, the expectation is simply the means.
Q. And if you run these numbers, what is the mean?
A. I've not actually run those numbers and, of course, it would be weighted by how often the drug shows up.
Q. Wouldn't it also -- if you were -- let's explore that. This concept of coming up with an average expectation across a range of drugs, does that have to be volume weighted?
A. An average, I would view it that way. Doesn't have to be. An average could be unweighted.
Q. If I look at a collection of oncology drugs, in order to come up with my -- as a third-party payor, in order to come up with my expectation, I would need to know the relative volume of sales of each of those drugs, correct?
A. I don't know what a third-party payor would do. If I were looking at this to look at the average spread, I would look at it by volume.

**174**

1  Q. And just so we're clear on volume, you
2  would look at if there's one drug here that is the
3  largest seller by many-fold, you would give that
4  increase in volume weight in coming up with your
5  average?
6  A. That's the way I would look at it.
7  Q. Is there any information here as to the
8  relative sales volumes of the 13 drugs that are
9  listed here?
10  A. Not in this report, to my knowledge. Do
11  you see something that I don't see?
12  Q. No.
13  A. I don't see it in this report.
14  Q. Do you agree with me there's nothing in
15  this document suggesting there is a predictable
16  relationship between the published AWP and the
17  actual average selling price to physicians for
18  physician-administered drugs?
19  A. They do not draw that conclusion in this
20  report.
21  Q. And wouldn't you agree with me that this
22  report actually suggests the opposite, that there is

**175**

1  no predictable relationship?
2  A. I'm not sure what you mean by
3  "predictable." It appears there are different
4  spreads across the drugs that they looked at. Is
5  that what you mean by "predictable"?
6  Q. Yes.
7  A. Then there are indeed different spreads
8  across the different drugs.
9  Q. And that would lead to you conclude that
10  there is no -- no one could draw a predictable
11  relationship here as to AWP and ASP across this
12  range of physician-administered drugs?
13  A. Well, you might look at the average, and
14  you said, again, as an expression of the
15  expectation, so even when there's variability, if
16  there's some other drug, we would expect it comes
17  out of the average.
18  Q. Do you know of any third-party payor who
19  actually did what you have just described?
20  A. No, I do not.
21  Q. I ask you to turn to the page before the
22  chart starts. It has the heading, "Red Book."

**176**

1  A. Appendix 2?
2  Q. Appendix 2.
3  A. Yes, I see it.
4  Q. Would you just read to yourself the last
5  paragraph.
6  A. (Witness complies.) I see it.
7  Q. I want to draw your attention to the
8  second sentence in which OIG states, "We found that
9  such costs were not only generally significantly
10  less than AWP, but that there can be a wide variety
11  of AWPs for a given drug depending upon the
12  manufacturers and the form of the drug."
13  A. I see that.
14  Q. And go on to, "Considering that we also
15  found that there is no single discount rate which
16  can be applied to the AWP to provide a reasonably
17  consistent estimate of the physician's acquisition
18  cost, we do not feel that AWP provides a useful
19  measure of the acquisition cost for a drug to
20  physicians."
21       I want to focus you on the language, "we
22  also found that there is no single discount rate

**177**

1  which can be applied to the AWP to provide a
2  reasonably consistent estimate of the physician's
3  acquisition cost."
4       Would you agree with me that what OIG is
5  saying here is that there is no predictable
6  relationship between AWP and the actual acquisition
7  costs for physician-administered drugs?
8  A. I believe that is what they are saying
9  there.
10  Q. And that information was available to
11  third-party payors in 1992; was it not?
12  A. This information was made public in 1992.
13  Q. And it certainly would have been available
14  to the United States Congress in their deliberations
15  with respect to Medicare Part B?
16       MR. MACORETTA: Objection.
17  A. My understanding is that this report was
18  submitted to the government.
19  Q. Would you also agree with me that the
20  ability of a particular physician group to acquire
21  drugs at certain prices can vary greatly?
22  A. I believe we discussed earlier that there

Page 178

1  might be different ability to move market share and
2  volume that would result in that, yes.
3      Q. And would you agree with me that when a
4  third-party payor sat down to negotiate
5  participating -- strike that.
6          Would you agree with me that a third-party
7  payor when sitting down with a physicians group to
8  discuss the group participating in a plan would be
9  aware of that variability that could exist among
10 different physician groups in terms of their ability
11 to extract discounts, differing levels of discounts,
12 from manufacturers?
13     A. I'm not entirely sure what a plan would be
14 aware of in terms -- I imagine when you sit down and
15 contract with a physician group, they are thinking
16 mostly contracting for medical services, but it may
17 be true that they are aware of variability.
18     Q. Have you had any discussions with any
19 third-party payors as to what role reimbursement for
20 physician-administered drugs played in their
21 negotiations with individual physician groups
22 regarding participating in a plan?

Page 179

1      A. No, I have not.
2              (Exhibit Rosenthal 011 marked.)
3      Q. We have marked as Exhibit Rosenthal 011,
4  an article from Barron's entitled, "Hooked on
5  Drugs," from a Barron's publication June 10, 1996.
6      A. Do you have a microscope to go with it?
7      Q. Well, are you familiar with this article?
8      A. I believe it was cited by the defendants'
9  experts. I don't believe I have read it, but I do
10 believe I have read the name.
11     Q. Let me try to draw your attention to the
12 columns providing information on particular drugs.
13 And do you see the reference to percentage under
14 AWP?
15     A. You are in the center columns?
16     Q. Yes.
17     A. Okay. Just give me a minute to scan.
18     Q. Sure.
19     A. In the table?
20     Q. Yes.
21     A. Oh, sorry. In the table?
22     Q. Yes.

Page 180

1      A. Yes, I do. I was looking for it in the
2  text. Yes.
3      Q. Did you take this article into
4  consideration in determining the -- in any analysis
5  you have done with respect to the reasonableness of
6  Dr. Hartman's payor expectation range?
7      A. I have not. No, as I mentioned, I don't
8  believe I reviewed this article and I don't really
9  know the basis for this analysis. So I don't know
10 where the data come from. Sorry.
11     Q. Well, regardless of the source of the
12 data, would you agree with me that anyone reading
13 this, reading the table which appears in this 1996
14 article, would see that at least this reporter was
15 showing percentage discounts for drugs ranging from
16 72 to 93 percent?
17     A. I certainly see those figures reported in
18 this table. I'm not sure what conclusion to draw
19 from the report, because I just don't know the basis
20 of the analysis or what another person would draw
21 from it. But I can see those numbers.
22             (Exhibit Rosenthal 012 marked.)

Page 181

1      Q. Doctor, let me follow-up on the question
2  and the answer you gave a moment ago with respect to
3  the Barron's article.
4          Is it your opinion that third-party payors
5  would only rely on information if they knew the
6  information were reliable?
7      A. I didn't mean to suggest that there was a
8  particular criterion. I'm not sure -- since I can't
9  read this article fully, I'm not sure exactly what
10 it's saying and where the data comes from. And I
11 would expect someone reading it would take that into
12 account. Reliability may be a different issue.
13     Q. While we're on the subject of reliability,
14 you, I believe, expressed some concern about self-
15 reported surveys.
16     A. In the context of this question about
17 something nuanced like expectations in the past, um-
18 hum.
19     Q. Do you think self-reported survey
20 responses are inherently unreliable?
21     A. I think it depends on whether you are
22 asking something factual or something more like a

### Page 182

1  belief.
2      Q. Is it your view that if it's asking a
3  belief, it has a tendency to be more unreliable?
4      A. I believe that -- yes, and that's my view.
5      Q. Okay.
6      A. It's not only my view, it's -- there's a
7  nice recent paper analyzing self-reported data from
8  the perspective of economic analysis, talks about
9  this.
10     Q. What was the conclusion of that paper?
11     A. The conclusion is that there are a lot of
12 problems with self-report having to do with
13 individuals' behavioral tendencies to not want to
14 report something negative. That kind of thing.
15     Q. Would you view inquiring whether someone
16 utilized acquisition costs in determining physician
17 reimbursement rates for a self-administered drug to
18 be seeking a fact or a belief?
19     A. I think you are asking about sort of the
20 conceptual behaviors for the negotiating strategy,
21 and that's what I don't believe -- I don't think
22 it's -- it's not purely factual: Did you wear black

### Page 183

1  pants yesterday, but what was in your mind when you
2  were doing something?
3      Q. You think asking someone if they took a
4  particular piece of information into consideration
5  would be eliciting some sort of subjective state of
6  mind?
7      A. My understanding of the way these
8  questions are posed is not, did you have information
9  on acquisition costs in front of you when you were
10 negotiating, but, conceptually, was your impression
11 about acquisition cost relevant to a certain
12 decision you made. And I don't believe that that's a
13 black and white fact.
14     Q. We have marked as Exhibit Rosenthal 011, I
15 believe --
16     A. 12, I believe.
17     Q. -- 12, a December 1997 OIG report. Are
18 you familiar with this report?
19     A. Yes, I am.
20     Q. And when you were referring in your
21 earlier testimony to OIG reports, was this one of
22 the reports that you were referring to?

### Page 184

1      A. Yes, that's correct.
2      Q. You have referred earlier in your
3  testimony to an evolution in thinking with respect
4  to -- or information with respect to AWP.
5          In your view, does this 1997 report
6  provide an evolution in thinking from the 1992
7  report?
8      A. It's another piece of information, an
9  accumulation. Again, whether that's an evolution,
10 but certainly these reports were sequenced and
11 provided yet another piece of information for the
12 market.
13     Q. Would you agree with me that the tenor of
14 this report is entirely consistent with the tenor of
15 the 1992 OIG report that we talked about?
16     A. They both suggest that AWP exceeds
17 acquisition costs by a substantial amount, yes.
18     Q. As you have already testified, the 1992
19 report concluded that AWP was not a reliable
20 indicator of acquisition cost.
21         Would you agree with me that this report
22 draws that same conclusion?

### Page 185

1      A. Let me just have another look at the
2  conclusions to see exactly.
3      Q. Yeah.
4      A. (Witness reading.)
5      Q. Let me draw your attention to page 2 of
6  the executive summary.
7      A. Okay.
8      Q. Under the heading "Recommendations."
9      A. Yes.
10     Q. Where it states, "The published AWPs that
11 are currently being used by Medicare contracted
12 carriers to determine reimbursement bear little or
13 no resemblance to actual wholesale prices that are
14 available to the physician and supplier communities
15 that bill for these drugs."
16     A. Right. Again, AWP is not equal to the
17 acquisition cost.
18     Q. Well, aren't they going further and saying
19 as they did in 1992 that it's simply not a reliable
20 indicator of the cost at which physicians -- at the
21 price at which physicians are actually purchasing
22 these drugs?

Page 186

1  A. I believe they go on to suggest that maybe
2  a larger discount would be warranted. Isn't that
3  correct? And that suggests that one of the options
4  in this report that they talk about is a larger
5  discount. They don't use the same language that you
6  just used. They really say that it bears no
7  resemblance which, to me, sounds like equality.
8  They look -- in particular, they talk about savings
9  from using a different discounting strategy,
10 correct?
11 Q. Let me draw your attention to page 2.
12 A. Page 2, again? Sorry, 2 of the document.
13 Q. Yes, 2 of the document.
14 A. I'm sorry. I'm with you now.
15 Q. Am I correct that on page 2 that a change
16 of Medicare reimbursement for prescription drugs,
17 there is a discussion about an alternative
18 methodology that would be based on actual
19 acquisition cost?
20 A. Right. I see that.
21 Q. And that proposal was not adopted by
22 Congress, correct?

Page 187

1  A. That's correct.
2  Q. And Congress made that determination in
3  the face of evidence that AWP was not a reliable
4  indicator of acquisition costs for physician-
5  administered drugs, correct?
6      MR. MACORETTA: Objection.
7  A. Certainly, information was publicly
8  available. I don't know if it affected Congress's
9  decision.
10     Again, as we had a conversation earlier,
11 the factors about changing reimbursement systems
12 would also have to do with the cost of implementing
13 that and the political feasibility.
14 Q. Can you turn to page 8.
15 A. I'm there.
16 Q. Under the table that appears -- can you
17 explain to me what you understand the table on page
18 8 to be showing.
19 A. The table on page 8 looks like it's
20 showing -- sorry -- the percentage, the relative
21 percentage, of the AWP compared to the actual
22 wholesale price. So it's a relative index as

Page 188

1  opposed to a spread percentage. It's a ratio.
2  Q. Would it be appropriate to express -- how
3  would one express -- for example, there's a 900
4  percent figure in this table on page 8. How would
5  one express that 900 percent difference, between
6  what and what?
7  A. So the suggestion the AWP is nine times as
8  large as acquisition cost. I believe that they keep
9  using this wholesale term, but I believe it's
10 acquisition cost.
11 Q. Referring to physician acquisition cost?
12 A. I believe that's a -- I could look at the
13 report just to be sure, but they say acquisition
14 costs, and I am going to guess that was physician
15 acquisition costs. Let me have a quick look.
16 (Witness reading.) It's the group purchasing
17 organization's cost of the drugs as opposed to the
18 individual physicians, but...
19     So essentially that would be -- these are
20 the ratios instead of looking at the spread
21 percentages, but they --
22 Q. And if you turn to page 9, at the top,

Page 189

1  there's a statement, "Based on the difference
2  between Medicare allowed amounts and actual
3  wholesale prices, it is apparent that the current
4  Medicare reimbursement methodology is based upon an
5  significantly inflated AWP statistic which bears
6  little resemblance to actual wholesale prices
7  available in the market."
8  A. I see that.
9  Q. Would you agree with me that essentially
10 the OIG is again saying that AWP is not a reliable
11 indicator of cost?
12     MR. MACORETTA: Objection.
13 A. So the OIG in this report is saying that -
14 - I mean, they say it doesn't resemble. So
15 "reliable," I'm not sure what you mean by the use of
16 that term, but it is clearly much higher than the
17 acquisition cost.
18 Q. And looking at the data that appears on
19 page 8 --
20 A. Yes.
21 Q. -- does it provide any predictable
22 relationship between AWP and average acquisition

190

1  cost across multiple drugs?
2      A. Any predictable relationship? Is it equal
3  cross the drugs? No, there's variables across the
4  drugs.
5      Q. But when you look at the variability here,
6  is there any predictable -- can one draw any
7  conclusions from this data that there is in fact a
8  predictable relationship between AWP and actual
9  acquisition costs by physicians?
10     A. For this subset of drugs, there seems to
11 be very wide variability and clearly the AWP exceeds
12 the acquisition costs by these large amount. But if
13 you are going to say is there a predictable
14 relationship, in any statistical sense, you'd want
15 to look at -- in a broader sense, may be there is a
16 predictable relationship among these drugs. It's not
17 apparent.
18     Q. Well, is there anything here to suggest
19 that you looked at a different set of drugs, you
20 would find some predictable relationship?
21     A. There's nothing here that talks about
22 drugs outside of this set.

191

1      Q. Can you point me to anything published in
2  the 1990s that suggested that there was in fact any
3  sort of predictable relationship between AWP and the
4  actual acquisition costs by physicians of physician-
5  administered drugs?
6      A. I can't point to a specific report that
7  looks at an average relationship as you talked
8  about. It's providing pieces of data that inform us
9  about the distribution, but whether there's an
10 analysis of the type that I just described that
11 says, "Across all the drugs, what's the
12 relationship, I'm not aware of any study that shows
13 that.
14     Q. Would you agree with me that, conversely,
15 the available published data shows that there is no
16 reliable relationship between AWP and actual
17 acquisition cost for physician-administered drugs?
18     A. There's no relationship evidence in these
19 OIG reports that you have shown me.
20     Q. And you are not aware of anything showing
21 of -- anything published showing that there was any
22 reliable relationship between AWP and actual

192

1  acquisition costs?
2      A. Not in the way you are describing it, no.
3      Q. Let me take you back to your report. Turn
4  to page 14. In paragraph 29 you state that "the
5  competition among drug manufacturers will occur
6  along nonfinancial dimensions of a product." Can
7  you describe what you mean by that?
8      A. Absolutely. So it's what health
9  economists refer to as "therapeutic competition."
10 So a manufacturer in developing a drug made to a
11 certain niche market, a place where they don't need
12 to compete head to head with other products because
13 they offer either a new therapy for which there was
14 nothing previously on the market or a new strategy
15 for caring for a disease, side effects would also be
16 part of therapeutic competition; developing a drug
17 that had fewer side effects such as the newer anti-
18 depressant or anti-psychotic drugs.
19     Q. And you go on to note that there are also
20 for physician-administered drugs financial
21 implications of a product choice?
22     A. That's correct.

193

1      Q. And do you have an opinion as to whether
2  financial implications of product choice influenced
3  the sales of any physician -- of any physician-
4  administered drugs at issue in this case?
5      A. It's my opinion based on economic theory
6  and the empirical literature that physicians do --
7  are influenced in their therapeutic decisions by the
8  profit implications of those choices.
9      Q. Do you have an opinion as to any of the
10 physician-administered drugs in this case that their
11 sales -- strike that.
12         Do you have an opinion with regard to any
13 of the physician-administered drugs in this case
14 that there are drugs that have inferior clinical
15 profile that nonetheless outsold drugs with a
16 superior clinical profile because of financial
17 implications?
18     A. That question was not relevant to my
19 analysis, so I don't have an opinion about that.
20     Q. Okay. And have you done any analysis of
21 the degree to which the financial implications of a
22 product choice -- I'm going to strike that.

194

1   Have you done any analysis of the degree
2   to which the financial implications of a product
3   choice bore any relationship to the ultimate
4   prescribing decision?
5       A. The economic theory in evidence to which I
6   point look at whether financial incentives affect
7   decision at the margin. So all else equal, what
8   happens if there's a change in the reimbursement
9   mechanism? So, for example, my paper's on
10  behavioral -- all else equal, same set of patients
11  suddenly payment goes from fee-for-service to case
12  rate, a fixed payment, and what happens to treatment
13  patterns, and, in fact, treatment patterns change.
14  This is the basic underlying theory of physician
15  agency which takes into accountant physicians'
16  concerns about profits as well as the therapeutic
17  issues.
18      And, again, not to suggest that the
19  therapeutic issues are not important, but at the
20  margin well-positioned to change a decision based on
21  financial implication, and the answer is yes.
22      Q. What do you mean by "at the margins"?

195

1       A. "At the margin," it's sort of an economic
2   term. It suggests that if a physician is looking at
3   a patient for whom this treatment is just neutral
4   with respect to cost and benefits, all the things
5   that physicians thinking about, what happens if we,
6   in this case, raise the AWP by a dollar, will there
7   be an effect on treatment for that marginal patient?
8   That's essentially...
9       Q. And that would result in, what, the
10  decision to utilize the drugs as opposed to an
11  equally efficacious drugs?
12      A. As opposed to whatever the next best
13  alternative happens to be.
14      Q. Now, to what extent have you studied that
15  issue particular in this case? You just gave me an
16  example of physician decision making in fee-for-
17  service versus some other compensation setting.
18      To what extent have you looked at this
19  issue in particular in this case?
20      A. Well, in this case, the data about
21  individual treatment patterns are not available, but
22  the economic evidence for this kind of behavior is

196

1   very strong in the literature and economic analysis
2   here is one of looking at the particular incentives
3   and applying to that the economic models that
4   predict the behavior.
5       Q. So you are predicting behavior based upon
6   what you have perceived physician behavior to be in
7   different circumstances?
8       A. It's not my perception alone. It's the
9   body of health economics literature.
10      Q. But you have done no study of the extent
11  to which the financial implications of choosing one
12  physician-administered drug versus another
13  influenced prescribing decisions?
14      A. I have not looked at individual
15  prescribing decisions, yes, that's correct.
16      Q. But even looking on a macro level, how
17  have you gone about studying the extent to which, if
18  at all, the financial implications of a particular
19  product choice drove prescribing decisions?
20      A. I was not asked to connect that analysis.
21  So, as you see, there are other analyses in the
22  report.

197

1       Q. Let me take you in your report to -- I
2   will take you back to the Remicade table.
3       Do you have any opinion as to what the
4   level of utilization of Remicade would have been had
5   the spreads here been 29 percent instead of 31
6   percent?
7       A. I don't have the data to conduct that kind
8   of an analysis, but you would have to take an
9   equilibrium view of it because these spreads are
10  subject to competition presumably there were other
11  factors that would change if Remicade changed its
12  spread.
13      Q. What was Remicade's competition in 1998?
14      A. There are presumably other therapies,
15  maybe not pharmaceutical, there's also the option of
16  no treatment. But for Crohn's Disease or for
17  rheumatoid arthritis?
18      Q. Either.
19      A. My understanding is there are other
20  treatments for rheumatoid arthritis that involve
21  chemotherapeutic drugs, but I'm not a clinical
22  expert, so...

198

1   Q. Remicade was certainly the preferred
2   method of treatment, was it not, for RA as opposed
3   to utilizing chemotherapy?
4   A. I can't say actually.
5   Q. So you have not made any assessment of the
6   relative clinical benefits of one drug versus
7   another drug with regard to any of the drugs that
8   you've looked at in this case?
9   A. I have examined some information about the
10  drugs. I know the -- I have reviewed in each case
11  what the drugs treat and -- but I am not a clinical
12  expert. So I am not in a position to talk about
13  their relative effectiveness, nor is it relevant for
14  my analysis.
15  Q. When you say you have looked at the drugs,
16  all you have basically looked at is the fact that
17  they might have the same indication, correct?
18  A. I have looked at the product information
19  for the drugs.
20  Q. And what has the product information told
21  you about the relative efficacy of differing methods
22  of treatment?

199

1   A. That it doesn't refer to relative efficacy
2   and it's not relevant to my analysis.
3   Q. Okay. So let me go back to my question.
4   Have you done any determination as to what the
5   relative utilization of Remicade would have been had
6   the spread been 29 percent?
7   A. No, I did not.
8   Q. As opposed to 31 percent as reported here?
9   A. No.
10  Q. Okay. Do you have any reason to believe
11  the level of utilization would have been any
12  different?
13  A. Do I have any reason to believe? The
14  economic theory suggests that the higher spread, all
15  else equal, would lead to larger utilization. "All
16  else" is never equal in the market. We would expect
17  -- assume there will be some competitive response to
18  the extent at that time they are competitors -- I
19  don't have the full data available to do that
20  analysis for Remicade or for other drugs in the
21  class.
22  Q. Have you made any attempt to quantify the

200

1   effect of the financial implications of product
2   choice?
3   A. I'm sorry, the financial implications for
4   whom?
5   Q. Of a particular product choice.
6   MR. MACORETTA: I object. If you
7   understand the question, go ahead.
8   Q. I can rephrase it.
9   A. Yes. Thank you.
10  Q. Have you made any attempt to quantify the
11  effects of what you've referred to as the financial
12  implications on relative level of sales?
13  A. I believe it's the question that I just
14  addressed, but maybe I'm wrong. Have I run a
15  regression that looks at the effect of the spread --
16  Q. Yes.
17  A. -- on quantity? No, I have not run that
18  regression.
19  Q. Okay. Did you ever discuss with either
20  Dr. Hartman or any of the plaintiffs' lawyers
21  running such a regression?
22  A. Not in my recollection. That was not in

201

1   the scope of what I was asked to look at.
2   Q. Let me ask you to turn to page 14 of your
3   report. You say in the middle, "This means that is
4   true in other markets, that manufacturers can
5   increase their market share by reducing the cost of
6   their product to physicians through discounts or
7   rebates."
8       To what extent have you looked at whether
9   any particular manufacturer in this case was able to
10  increase their market share by virtue of granting a
11  discount or rebate?
12  A. I did not look, again, at the effects of
13  particular discounts on quantity or market share.
14  Q. Am I correct that as a result of the
15  testimony you have just given me that you are not
16  opining that utilization for any drug in this case
17  would have been different if the spreads had been
18  different?
19  A. Let me just be clear. My opinions cover
20  the following issues, that there existed incentives
21  for the manufacturers to inflate the AWP; there
22  exists incentives for the physicians to select those

**Page 202**

1  drugs based on the difference between the AWP and
2  the acquisition cost, and that this -- all this in
3  turn would have injured the class if the allegations
4  are correct.
5       And so one of those opinions is in fact
6  that in the sense of all other things equal, the
7  spread does drive quantity or the manufacturers
8  wouldn't do it. But that doesn't mean necessarily
9  that if all the spreads go away in the equilibrium,
10 because no one is competing on the spread, there's
11 just too many factors to be able to say in any given
12 case what would be the equilibrium result in terms
13 of quantities. So I haven't done that analysis. My
14 opinion certainly relates to the fact that spread
15 changes treatment behavior.
16      Q. So is the answer to my question that you
17 don't know whether utilization for any given drug
18 would have been different if the spreads had been
19 different?
20      A. My opinion, based on health economics,
21 based on economics that price and quantity have a
22 relationship. That is essentially what translates

**Page 203**

1  here.
2       Q. I understand your general opinion that
3  there's a relationship between price and quantity.
4  My question is: To what extent have you studied
5  that that in fact occurred with respect to the drugs
6  at issue in this case?
7       A. I didn't have the data to do those
8  analyses, no.
9       Q. Did you speak with any physicians with
10 respect to whether financial implications
11 incentivize them to utilize a particular drug more
12 than another drug?
13      A. Again, those data would not be relevant.
14 What physician is going to admit to making treatment
15 decisions based on financial incentives? In that
16 case, there's a very clear reason for not using
17 self-reported data.
18      Q. Did you make any attempt to test out that
19 hypothesis?
20      A. I did not.
21      MR. MACORETTA: Bill, we have been going
22 about an hour. Do you want to take a break?

**Page 204**

1       MR. CAVANAUGH: Sure.
2       MR. MACORETTA: Is it a good time?
3       THE WITNESS: It's up to you.
4       MR. CAVANAUGH: That's fine.
5       THE VIDEOGRAPHER: The time is 4:05 p.m.
6  Going off the record.
7       (Short recess.)
8       THE VIDEOGRAPHER: The time is 4:17.
9  We're back on the record.
10      Q. Doctor, would you look at page 6 of your
11 report.
12      A. Yes. I'm on page 6.
13      Q. Second bullet point, you say,
14 "Manufacturers, in turn, could increase their unit
15 sales not only by discounting their products, but
16 also by raising their reported AWPs. Moreover,
17 raising the AWP would be the more profitable
18 strategy in that it could be expected to increase
19 the number of units sold, but would have no negative
20 impact on the manufacturer's profit margins."
21      If that's the case, why did manufacturers
22 engage in discounting? Why not simply increase the

**Page 205**

1  AWP?
2       A. There's a limitation to which they could
3  increase the AWP presumably at some level.
4       Q. Why?
5       A. It would cause problems with the payors
6  who see the AWPs. It would look bad to have these
7  AWPs that were steeply increasing.
8       Q. So to what extent have you analyzed the
9  degree to which any manufacturer looked at whether
10 to increase AWP or engaged in discounting and the
11 relative percentage of each to do?
12      A. I have examined discovery materials that
13 talk about both of those strategies. Have I done a
14 quantitative analysis of that trade-off, no.
15      Q. Have you looked at whether the amount of
16 spread that exists is -- for any given drug -- is
17 more a function of discounting or of increasing the
18 AWP?
19      A. Well, it's a little hard to say. So if
20 you are talking about you are taking a perspective
21 that discounting can be observed in one direction,
22 so we see the ASP dropping. Now, do you count that

206

1  as raising the AWP if the AWP does not follow it
2  down? It's really sort of a matter of --
3      Q.  Do you --
4      A.  -- perspective. I think it's AWP
5  inflation. If the APS is declining, even if the AWP
6  stays flat, it is not following the ASP.
7      Q.  Okay. So your opinion is that there
8  should be a relationship between AWP and ASP such
9  that if ASP decreases, AWP should have been reduced?
10     A.  That would be the meaning of the fact that
11 there's a systematic relationship.
12     Q.  Okay. Well, let me ask you: If that's
13 your depiction of how the world should have
14 operated, how often should manufacturers have -- or
15 how often should pricing services put out new AWPs?
16     A.  I don't have an opinion with regard to
17 what the optimal timing of that is.
18     Q.  Would you agree with me that ASP could
19 change as much on a daily basis or certainly a
20 weekly basis?
21     A.  I think there would be a feasibility
22 constraint, surely.

207

1      Q.  Let's assume for the moment ASP changes
2  every week.
3      A.  Okay.
4      Q.  Is it your opinion that the pricing
5  services, manufacturers or someone should have
6  published a new AWP every week?
7      A.  I haven't reached that opinion.
8  Certainly, my opinion is that -- well, my opinion in
9  this document doesn't really relate to this at all,
10 but the notion is that these things would track
11 generally over time, whether it's by week, by month,
12 by quarter, I can't really say.
13     Q.  We have talked about feasibility from a
14 third-party payor perspective. Have you looked at
15 the feasibility of publishing new AWP numbers on a
16 weekly, monthly, quarterly basis?
17     A.  My understanding is that these publishers
18 offer electronic data, and certainly my view would
19 be that sending a letter to change a number
20 electronically would not be highly unfeasible or
21 highly costly.
22     Q.  Okay. And so do you have an opinion as to

208

1  when this would be done or should have been done?
2      A.  Again --
3          MR. MACORETTA: Objection.
4      A.  -- I don't have a specific opinion as to
5  exactly what the timing should be.
6      Q.  You said a moment ago that your view is
7  that one reason why manufacturers didn't simply
8  increase AWP as opposed to discounting was that it
9  might create problems with payors. What's your basis
10 for making that statement?
11     A.  I would understand if there's a large
12 increase in the list price that that would raise red
13 flags with payors or with regulators.
14     Q.  Why do you believe that?
15     A.  I believe that payors notice something
16 like a very, very, large increase in one of these
17 expensive drugs. It's something they can observe,
18 AWP is available in the public domain.
19     Q.  So you'd agree with me that at some level
20 payors can detect AWP -- what you would call AWP
21 inflation?
22     A.  At some level they can track the AWP. So

209

1  AWP inflation is relative to the ASP, so they can
2  certainly track the path of the AWP itself.
3      Q.  And do you have any opinions as to whether
4  the track of AWP increases for any of the drugs in
5  this case as you say raised any red flags with any
6  third-party payors?
7      A.  No, I don't know.
8      Q.  Now, you have referred to ASP. We have
9  talked about the term "ASP" today, and in your
10 methodology where there's some relationship between
11 ASP and AWP, how is ASP determined?
12     A.  Well, in my report, I don't calculate
13 ASPs. I rely on the calculations that Dr. Hartman
14 uses.
15     Q.  Was there any standard methodology in the
16 1990s for determining ASP?
17     A.  Standard methodology?
18     Q.  Yeah. Was there any widely accepted
19 criteria as to what goes into calculating ASP?
20     A.  Not that I know of in this context. Of
21 course there are, were, average prices that were
22 calculated; for example, the methodology for AMP

**Page 210**

1  might be one way of thinking about it, but not to my
2  knowledge was there a standard that one could look
3  at in the '90s.
4      Q.  Okay.  So one could have easily had ASP
5  numbers being reported by different manufacturers
6  that had -- that utilized very different criteria,
7  correct?
8      A.  ASP numbers were not reported to my
9  knowledge.
10     Q.  No.  I'm talking about your world where
11 there's a relationship between ASP and AWP.  If
12 there's no standard criteria for how you determine
13 ASP, isn't the result that you could have different
14 parties calculating ASP very different ways?
15         MR. MACORETTA:  Objection.  Again, this is
16 not her world.  If anybody's, it's Dr. Hartman's
17 world.
18         MR. CAVANAUGH:  Okay.
19     A.  With regard to the notion of what these
20 prices may be tracking, I think there's a general
21 notion of acquisition costs.  Could there be a
22 different understandings of what that means?  I

**Page 211**

1  can't imagine that it wouldn't be true.  There could
2  be different understandings of what acquisition
3  costs means in a very technical sense.
4      Q.  Well, if a manufacturer's thinking of its
5  average selling price, do you think it would be
6  inclined to include rebates that it's providing to a
7  third-party payor?
8      A.  I can't really say.
9      Q.  And that could certainly be a different
10 calculation than a physician's acquisition
11 correspond; could it not?
12     A.  It could be.
13     Q.  And do you know if there was any accepted
14 view of how administrative fees to GPOs might be
15 treated in calculating ASP?
16     A.  I do not know that that would have been
17 developed during the '90s.  For what purpose, I
18 don't know.
19     Q.  Would you agree with me that the
20 information that there was a formulaic difference
21 between published AWPs and published WACs was
22 something that was widely recognized in the 1990s?

**Page 212**

1      A.  I believe that the publishers provided
2  that information, that there was a formulaic
3  relationship.
4      Q.  And if one were to go to any of the
5  pricing services, both pieces of information were
6  provided, the AWP and the WAC, correct?
7      A.  Both list price -- my understanding is one
8  of the publishers provided WAC and one didn't.  I
9  may have that incorrect.
10     Q.  Do you want to identify it as list price;
11 is that what you are referring to?
12     A.  That may be -- called it something -- I
13 thought that one of the publishers only supplied
14 AWP.  In any case, I am aware that WAC was available
15 from at least one publisher.
16     Q.  Is there anything wrong, in your view,
17 with physicians negotiating discounts and rebates
18 from manufacturers for physician-administered drugs?
19     A.  Is there anything ethically wrong with
20 negotiating discounts?
21     Q.  Yeah.
22     A.  I don't have an opinion on that.

**Page 213**

1      Q.  Okay.  As a matter of economics, do you
2  see anything wrong with it?
3      A.  As a matter of economics, no.  I mean,
4  there -- no.
5      Q.  Same question with respect to
6  manufacturers providing discounts and rebates to
7  physicians on physician-administered drugs.
8      A.  I don't think the discounting piece of
9  this, no.
10     Q.  And are the discounts and rebates that are
11 provided on physician-administered drugs picked up
12 in any sense in any reporting of prices to the
13 federal government?
14     A.  Now you are talking about best price and
15 AMP?
16     Q.  Anything.
17     A.  During what time period?
18     Q.  1990s.
19     A.  During the 1990s, I'm not entirely sure
20 what's included in the AMP calculation.
21     Q.  Let's talk about best price first.
22     A.  Okay.

Meredith Rosenthal, Ph.D.   HIGHLY CONFIDENTIAL                February 22, 2006
Cambridge, MA

214

1  Q. Were best price pickup discounts, rebates
2  being provided to physicians on physician-
3  administered drugs?
4  A. In the aggregate, those classes of trade I
5  understand to be included in best price.
6  Q. Under the FSS, would that pick up -- what
7  discounts and rebates would be picked up on the FSS?
8  A. No, I'd have to look specifically at --
9  these regulations are somewhat detailed. I know the
10 FSS, in some cases they have competitive bidding so
11 not everything is based on a best price model. In
12 some cases they have these competitive bidding
13 arrangements, and I guess it varies by drug.
14 Q. And if there are competitive bidding
15 arrangements, would you agree with me that by a
16 competitive bidding arrangement, the federal agency
17 involved would meet your two criteria for being able
18 to extract large discounts: lots of volume, and by
19 virtue of competitive bidding arrangement, the
20 ability to influence which drug is utilized?
21 A. That may be true for the federal supply
22 schedule. Of course, as you know, Medicare doesn't

215

1  rely on the federal supply schedule.
2  Q. But that information was publicly
3  available; was it not?
4  A. You know, I'm not sure what aspects of the
5  federal supply schedule are publicly available.
6  Q. If that information were publicly
7  available, we were talking earlier about information
8  available to our amorphous third-party payors, that
9  would be another piece of information would be out
10 there; would it not?
11 A. The information in the federal supply
12 schedule would be, to my view, evidence of what
13 kinds of discount the VA could obtain on these drugs
14 and whether I would expect or a third-party payor
15 would expect that to generalize to an oncologist in
16 office practice, is altogether unclear.
17 Q. But it would certainly be one indication
18 of the degree to which a manufacturer was prepared
19 to offer discounts and rebates off of its list price
20 or AWP, correct?
21 A. It's one piece of information. It doesn't
22 seem particularly salient to me.

216

1  Q. Do health insurers consider economic
2  factors when deciding what drugs to cover on their
3  formulary and what preferred status to give them on
4  a formulary?
5  A. That's my understanding, is that formulary
6  committees do use that information in some way.
7  Q. So they use both economic and therapeutic
8  information in arriving at formulary decisions?
9  A. I can't say that every formulary works
10 that way, but it's my understanding that some of
11 them do.
12 Q. Let's talk about increasing AWP, and I
13 will take you to the Remicade example --
14 A. Okay.
15 Q. -- again.
16 A. I'm noticing a pattern.
17 Q. Stay with the one who took you to the
18 dance.
19     Now, you show an increase in AWP here.
20 A. Yes.
21 Q. Do you know whether there was a
22 corresponding increase in WAC?

217

1  A. My understanding is they are related by
2  formula and so there would be a corresponding
3  increase in WAC. I have not --
4  Q. Did you look at to what extent there was
5  some group of customers who were paying WAC?
6  A. I did not look at subgroups of customers.
7  As I mentioned before, I reviewed the customer lists
8  and the methodology for putting the ASPs together.
9  Q. Would you agree with me that if a
10 manufacturer has the ability to engage in price
11 discrimination that it has an incentive to increase
12 its WAC if there is some percentage of patients who
13 are willing to pay that price?
14 A. Are you suggesting --
15     MR. MACORETTA: Objection. Go ahead.
16 A. Could you repeat a second, and just a
17 clarify so there's some patients by which you meant
18 third-party payors?
19 Q. I'm sorry. I meant physicians. So let me
20 start all over.
21 A. Thank you.
22 Q. Would you agree with me that if a

Henderson Legal Services
(202) 220-4158

Page 218

1  manufacturer has the ability to engage in price
2  discrimination, it has an incentive to raise its
3  list price, its WAC, if there are a percentage of
4  customers willing to pay that price?
5     A. If those customers -- it would depend on
6  their elasticity, that is their responsiveness to a
7  change in the price. If they were completely
8  unresponsive, then the answer is clear. Generally,
9  monopolists -- in this case, again, not a derogatory
10 term, but there is pricing -- a monopolist has to
11 tradeoff unit -- market share unit declines against
12 this margin increase, and that's why this
13 discounting issue is more complicated than raising
14 the AWP. It might have an incentive. It might not.
15 If it had set the price optimally to begin with,
16 then the incentive at the margin is -- presumably,
17 and not to increase the price because otherwise the
18 market share decline would outweigh that.
19    Q. And have you looked at the degree to which
20 manufacturers have been able to optimally set their
21 price at the outset; i.e. the introduction of a new
22 drug?

Page 219

1     A. Did I examine whether there was optimal
2  monopoly pricing in this case? I certainly didn't
3  have those data available to do that.
4     Q. Well, does a manufacturer have an
5  incentive to raise its list price to the highest
6  list price that any given customer will pay?
7     A. The list price, you are suggest --
8     Q. Or -- let's say its WAC.
9     A. And you are saying that the providers are
10 actually paying formulaically based on WAC?
11    Q. I am saying physicians -- some percentage
12 of physician are purchasing at WAC.
13    A. Okay.
14    Q. They are relatively inelastic, so they are
15 prepared to pay higher prices.
16    A. Okay.
17    Q. Doesn't that create an incentive to raise
18 WAC?
19    A. Certainly there's an incentive there to
20 set WAC to maximize profits, and the change over
21 time is just a somewhat different context. It begs
22 the question of what was wrong with the original

Page 220

1  WAC.
2     Q. And then the manufacturer can deal with
3  physicians or other customers who are more or less
4  in demand by offering discounts off of that WAC,
5  correct?
6     A. That's the basics of price discrimination,
7  yes.
8     Q. Okay. And did you observe to what extent
9  that occurred with respect to the physician-
10 administered drugs that you studied in this case?
11    A. Did I disaggregate the discounts by class
12 of trade, no.
13    Q. Well, even within a class of trade, did
14 you try to determine to what extent was there a
15 percentage of physician groups that were prepared to
16 and did in fact pay WAC?
17    A. I did not do that analysis. Again, I have
18 relied on these average numbers.
19    Q. And you would agree with me that if there
20 is a percentage -- certainly, that if there's a
21 percentage of physicians who are prepared to pay
22 WAC, that it would be in a manufacturer's best

Page 221

1  interest to increase that WAC to the highest
2  possible point?
3        MR. MACORETTA: Let me object. But, I
4  mean...
5     A. I have agreed that there are -- that a
6  monopolist in this situation would have incentives
7  to raise the price to the point where the trade-offs
8  against market share were neutral. This, of course,
9  does not obviate the other piece of the argument
10 that suggests that there's also this issue related
11 to other buyers in terms of WAC obviously has an
12 effect on AWP and that will make the size of the
13 spread larger for other buyers.
14    Q. Well, let's take -- are you familiar with
15 the drug Procrit?
16    A. I am familiar with it.
17    Q. It's sold at retailers and it's also sold
18 to physicians; is it not?
19    A. Yes, that's my understanding. There would
20 be indices.
21    Q. And retailers typically pay WAC, don't
22 they?

222

1   A. Retailers typically pay RAC, which is
2  close to WAC. Something like that. RAC, retail
3  acquisition costs, which is very close to WAC.
4   Q. And the reason it's very close to WAC is
5  wholesalers operate on roughly about a 1 percent
6  margin?
7   A. That's my understanding. It's 1 to 2
8  percent.
9   Q. And it's gone down over time, hasn't it?
10   A. I believe that's true.
11   Q. So let's just stick with WAC for a --
12   A. Okay.
13   Q. -- for present purposes. If you assume
14  that retailers are purchasing at WAC, would it be in
15  Johnson & Johnson's best interest to increase the
16  WAC over time for Procrit while offering discounts
17  to the more elastic physician segment of the market?
18   A. Well, again, it's not altogether clear.
19  Depending on where if they set the WAC optimally,
20  why would that need to change over time? There's
21  sort of a trade-off that they make at time zero when
22  the drug launches, where they decide what's a

223

1  reasonable place to set. Because, of course, we
2  know -- I'm a little uncomfortable mixing up the
3  pharmacy with the physician.
4   Q. Well, one of drugs you have studied in
5  this case is Procrit and it's sold both at retail
6  and at physician, so you have dealt with this issue,
7  haven't you?
8   A. But there's no arbitrage across those two
9  --
10   Q. And that's what the provides the
11  manufacturer with an even greater incentive to
12  increase its WAC at retail because there's no
13  arbitrage, right?
14   A. Again, that makes -- no arbitrage makes it
15  possible to price discriminate. It's not altogether
16  clear that raising WAC would be the best strategy
17  given that you set your price optimally in the first
18  place.
19   Q. Are you assuming that every manufacturer
20  when they introduce a drug is never going to
21  increase the list price of that drug because you
22  presume they have optimally set the price upon

224

1  introduction?
2   A. I think I said somewhat the opposite of
3  that, which is that it may be over time that that's
4  the right thing to do, but it's not obvious because
5  it's not costless to raise the WAC. There are
6  quantity effects that must be taken into account.
7  So whether or not that would be a justification
8  would depend on the particular situation.
9   Q. Let me ask you the extent to which you
10  have studied whether increasing the WAC of Procrit
11  had any impact on utilization of the product through
12  retail?
13   A. I have not looked at any utilization
14  numbers for products for these --
15   Q. I think you told me already, you have done
16  no price quantity analysis?
17   A. That's correct.
18   Q. Now, if a manufacturer has set its WAC at
19  the highest level a customer will pay, would you
20  expect that manufacturer to then lower WAC if ASP
21  went down?
22   A. I'm sorry. Could you restate that,

225

1  please?
2   Q. Let me state it a little differently. I
3  think we have agreed that the manufacturer has an
4  incentive to set WAC at the highest level a customer
5  will pay and then price discriminate, to the extent
6  it can, with respect to other customers.
7   A. I guess, again, I wouldn't have described
8  monopoly pricing in that way. It's not the highest
9  level that anyone will pay. It's the level at which
10  the tradeoff of margin against units lost from
11  having a price too high is equal.
12   Q. Let's assume that a manufacturer has
13  reached that optimal point in its WAC where it has a
14  customer base prepared to pay WAC and it is not as a
15  result of where it set its WAC losing units,
16   A. Okay.
17   Q. Okay. Would you agree with me that given
18  you have that set of customers willing to pay that
19  WAC, if ASP goes down because of discounting in
20  other segments or to other customers, there still
21  exists no incentive on the manufacturers' part to
22  reduce that WAC, correct?

**226**

1   A. I guess I'm not really sure. I mean, this
2   scenario I hadn't really -- let me just think about
3   it for a minute.
4   Q. Okay.
5   A. So if there's a segment of the market
6   that's formulaically paying WAC -- a provider
7   segment that's formulaically paying WAC, does it
8   make sense --
9   Q. Let me stop you. What do you mean by
10  "formulaically paying WAC"?
11  A. Well, when you raise the WAC, what they
12  pay goes up.
13  Q. Oh, okay.
14  A. So there's -- it's not that they are
15  paying $100, that it's the WAC today, and tomorrow
16  they expect to pay $100. In fact, what they pay for
17  the drug follows -- changes in the published WAC
18  price.
19  Q. Right.
20  A. And so if the manufacturer felt they could
21  push WAC up higher and the gains and gross margin
22  would outweigh the losses in sales, would they do

**227**

1   so? Well, that would certainly -- I mean, that's
2   one piece of -- I mean, that would still, of course,
3   effect the third-party payors who are paying AWP
4   which is a function of that published WAC.
5   Q. Okay.
6   A. Right. And would they then increase their
7   discounts? I guess the question is: If suddenly
8   over time they are able to push WAC up, why could
9   they not push ASP up?
10  Q. Because there may well be a customer
11  segment that are more elastic and, hence, not
12  willing to pay higher prices.
13  A. I guess, it seems to me you are making a
14  restrictive set of assumptions that are this: That
15  over time, the inelastic segment is getting more
16  inelastic and the elastic segment is getting more
17  elastic, and for both -- if both of those things
18  held, then perhaps your scenario would play out.
19  Q. Well, my scenario was, if you -- I want to
20  make sure we understand one another -- that as a
21  result of the increase in WAC but an increase in
22  discounting to other segments produces a lower ASP,

**228**

1   would you agree that there's no incentive on the
2   manufacturer's part to lower its WAC?
3   A. Yes, but I guess, again, it's what -- you
4   are saying a discount more to these very responsive
5   customers -- let's call them the responsive segment.
6   Q. Let's say Kaiser.
7   A. A discount more to Kaiser than --
8   Q. Then retail pharmacies -- than retail
9   pharmacies are prepared to pay --
10  A. So then WAC would stay where it is. So,
11  again, you are sort of proposing a model where they
12  both have to be moving in opposite directions and
13  that would require restrictive assumptions, and,
14  again, you're increasing your discounts to Kaiser
15  because they are becoming more price sensitive and
16  you are decreasing your discounts to Joe Oncology
17  Group because they are becoming less price
18  sensitive, that -- just the time series set of
19  assumptions.
20  Q. Let's assume I was be discounting to them
21  at all.
22  A. Okay.

**229**

1   Q. I have simply increased my price to them.
2   A. Well, right, you have increased your price
3   at WAC. You have increased your WAC. Why did you
4   increase WAC? Because the economic justification
5   that we have just been discussing is because they
6   just became less price sensitive and so your optimal
7   monopoly price for them has increased. So in the
8   scenario in which you would like me to believe that
9   the price in the sensitive group is becoming more
10  insensitive and the price sensitive group is
11  becoming more sensitive, that would be the case,
12  both of those things would need to hold for that
13  kind of wedge to be opened up as you describe it.
14  Q. Okay. Now, why do we have to become more
15  sensitive? Well, let me put it differently. Your
16  assumption that they have to become more sensitive
17  is based upon the concept that I have optimally set
18  my WAC in the first instance, right?
19  A. That's correct.
20  Q. Because I may well set my price at $100,
21  but over time, I find that there is a segment of
22  customers that I can on a fairly regular basis

230
1  increase my price.
2      A.  I assume you are increasing your price
3  because you can, and because the quantity trade-offs
4  are such that it's the right thing for you to do.
5  And, again, this is the model that you have
6  presented, that at the same time that you have
7  greater ability to push price up on this insensitive
8  group, you have less ability to deal with the
9  sensitive group and you have to offer them bigger
10 discounts.
11         (Pause.)
12         MR. CAVANAUGH:  It's actually five minutes
13 to 5:00 and I'm about to start a different subject,
14 so why don't we just --
15         MR. MACORETTA:  You are not going to get
16 any objection from us.
17         MR. CAVANAUGH:  -- call it a day.
18         MR. MACORETTA:  We'll start at 9 o'clock
19 tomorrow.
20         MR. CAVANAUGH:  Yes.
21         MR. MACORETTA:  Great.
22         THE WITNESS:  Great.

231
1          THE VIDEOGRAPHER:  The time is 4:54.
2  Going off the record.
3          (Whereupon the deposition was
4          suspended at 4:56 p.m.)
5               * * * * *
6
7
8
9
10
11         _____
12              MEREDITH ROSENTHAL
13
14 Subscribed and sworn to and before me
15 this _____ day of _____, 20____.
16
17
18 _____
19     Notary Public
20
21
22

Meredith Rosenthal, Ph.D.   HIGHLY CONFIDENTIAL                February 22, 2006
                            Cambridge, MA

1

| A | | | | |
|---|---|---|---|---|
| **abandoned** 113:14 | **accurately** 156:17 157:3,16 | **ACTION** 1:5 | 86:15 158:19 164:3 | **aggregated** 83:1 |
| **ability** 28:3 84:10 85:10 87:6 88:13 90:12,19 91:12 91:18,20 92:2 98:5 102:12 166:12,22 167:2 167:19 168:7,13 177:20 178:1,10 214:20 217:10 218:1 230:7,8 | **acquire** 122:12 177:20 | **actions** 65:9 143:14 | **administered** 59:11 70:16 75:10 76:5 80:3 80:22 87:8 91:6 116:1,20 154:10 158:13 167:20 187:5 191:5 193:4 214:3 220:10 | **ago** 181:2 208:6 |
| | **acquired** 163:18 | **acts** 18:12 | | **agree** 41:22 50:5,9 59:17 68:10,21 83:2,10,21 87:22 89:15,21 92:1 95:4 98:8,18,21 99:7 101:12 102:13 108:2,19 115:6,11 119:3 121:10 125:11 126:19 127:21 129:2 139:7,11 139:19 143:5 149:20 153:15 154:13,18,20 155:3,18,22 160:7,14 171:2 172:8 174:14,21 177:4,19 178:3,6 180:12 184:13,21 189:9 191:14 206:18 208:19 211:19 214:15 217:9,22 220:19 225:17 228:1 |
| | **acquiring** 124:2 | **actual** 47:1,6 49:13 49:15,18,22,22 50:7 51:21 53:3 54:19 55:1,2,3,7 56:13,13 57:12 59:8 71:13 100:3 100:11 101:3 102:2,5,14,18 103:5 104:2 105:9 107:10 111:15 120:10 134:5,16 144:21 147:4 148:7,9,11 148:22 150:1 160:10,16 161:1 161:2 170:17 171:13 174:17 177:6 185:13 186:18 187:21 189:2,6 190:8 191:4,16,22 | | |
| | **acquisition** 47:9,12 48:11,22 49:22 50:3,10,12,15 52:2 57:19 66:4 66:13,19 70:15 71:7 83:19 100:5 100:11,20 101:4 102:2,5,14,18 103:5,14 104:3 105:10 107:10 111:16 112:12 118:8 128:16 134:5,16 139:18 141:6 144:21 146:12,18 147:4 147:15,17,20 148:11 154:5 155:20 158:14,18 159:14 160:2,10 160:17 161:1,2,8 170:19 171:8 173:2 176:17,19 177:3,6 182:16 183:9,11 184:17 184:20 185:17 186:19 187:4 188:8,10,11,13,15 189:17,22 190:9 190:12 191:4,17 192:1 202:2 210:21 211:2,10 222:3 | | **administering** 87:2 | |
| **able** 22:19 36:12 42:9 75:14 88:4 90:11 107:1 108:3 201:9 202:11 214:17 218:20 227:8 | | | **administration** 162:10 | |
| | | | **administrative** 211:14 | |
| | | | **admit** 203:14 | |
| | | | **adopt** 114:2,6,18 114:20 | |
| **absolutely** 12:15 39:9 68:14 77:1 165:10 192:8 | | | **adopted** 113:14 186:21 | |
| | | | **adopting** 113:20 | |
| **abuse** 78:10 | | | **adoption** 114:3,14 | |
| **academic** 45:15 97:8 106:20 | | | **advance** 101:18 | |
| | | | **adverse** 43:17 | |
| **accepted** 78:9 209:18 211:13 | | **adapt** 104:21 | **advice** 17:9 | |
| | | **add** 70:13 | **advise** 114:20 | **agreed** 221:5 225:3 |
| **access** 106:20 107:1 141:5 | | **addition** 35:14 40:1 53:19 125:2 | **advised** 142:4 | **agreement** 27:13 27:15,18 30:10 135:14 |
| | | **additional** 11:14 11:18 109:9 | **advising** 114:19 | |
| **account** 111:9 154:5 181:12 224:6 | | | **advisory** 56:7 70:7 | |
| | | **address** 74:22 168:17 | **Affairs** 45:11,12 | **ahead** 49:5 63:9 73:8 87:10 92:16 93:20 124:5 140:1,18 145:12 200:7 217:15 |
| **accountant** 194:15 | | | **affect** 84:1 90:19 110:22 115:12 194:6 | |
| **Accounting** 56:21 57:1 | | **addressed** 16:21,22 200:14 | | |
| | | **Adeel** 2:13 8:22 | **affiliation** 25:21 26:7 | |
| **accumulates** 160:12 | | **adjective** 86:17 | | **algorithm** 21:1 |
| | | **adjudication** 20:14 20:17 21:16 22:13 102:7 | **afraid** 37:21 | **Algorithms** 20:18 |
| **accumulation** 150:22 151:1 184:9 | | | **agency** 194:15 214:16 | **allegations** 61:17 62:1,9,11 69:12 78:16 79:2,11 100:17 142:11 202:3 |
| | | **acquisitions** 150:15 | | |
| **accuracy** 76:22 | | **acronym** 56:21 57:20 | **adjust** 110:14 | **aggregate** 32:19 33:3 116:4 117:5 214:4 |
| **accurate** 11:5 66:21,22 | | **adjustment** 110:16 | | |
| | | **acting** 65:6 164:2 | **administer** 85:15 | | |