232

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MDL NO. 1456

CIVIL ACTION: 01-CV-12257-PBS

JUDGE PATTI B. SARIS

IN RE PHARMACEUTICAL INDUSTRY

AVERAGE WHOLESALE PRICE

LITIGATION

- - - - - - - - - - - - - - - - -

THIS DOCUMENT RELATES TO ALL

CLASS ACTIONS


C O N F I D E N T I A L

- - - - - - - -

Deposition of Meredith Rosenthal, Ph.D.

Thursday, February 23, 2006

9:13 a.m.

Hagens Berman Sobol Shapiro

One Main Street

Cambridge, Massachusetts

Reporter:   Deborah Roth, RPR/CSR

Meredith Rosenthal, Ph.D. CONFIDENTIAL              February 23, 2006
Cambridge, MA

```
                                    233
 1  PRESENT:
 2
 3  John A. Macoretta, Esq.
 4  Spector Roseman & Kodroff
 5  1818 Market Street, Suite 2500
 6  Philadelphia, Pennsylvania 19103
 7  For the Plaintiffs
 8
 9  William F. Cavanaugh, Jr., Esq.
10  Apeel Mangi, Esq.
11  Patterson Belknap Webb & Tyler, LLP
12  1133 Avenue of the Americas
13  New York, New York 10036
14  For Johnson & Johnson
15
16  Michael S. Flynn, Esq.
17  Davis Polk & Wadwell
18  450 Lexington Avenue
19  New York, New York 10017
20  For AstraZeneca
21
22
```

```
                                    235
 1  PRESENT:
 2  Steven M. Edwards, Esq.
 3  Hogan & Hartson, LLP
 4  875 Third Avenue
 5  New York, New York 10022
 6  For Bristol-Myers Squibb
 7
 8  Ronald G. Dove, Jr., Esq.
 9  Covington & Burling
10  1201 Pennsylvania Avenue, NW
11  Washington, DC 20004
12  For GlaxoSmithKline
13
14  James P. Muehlberger, Esq.
15  Shook Hardy & Bacon, LLP
16  2555 Grand Boulevard
17  Kansas City, Missouri 64106
18  For Aventis Pharmaceuticals
19
20  ALSO PRESENT:
21  Peter Rankin, CRA
22  Adam Cook, Videographer
```

```
                                    234
 1  PRESENT:
 2
 3  Brien T. O'Connor, Esq.
 4  Kim B. Nemirow, Esq.
 5  Ropes & Gray, LLP
 6  One International Place
 7  Boston, Massachusetts 02110
 8  For Schering Corp., Schering-Plough Corp.
 9  and Narrick Pharm.
10
11  Jason Baranski, Esq.
12  Morgan Lewis & Bockius, LLP
13  1701 Market Street
14  Philadelphia, Pennsylvania 19101
15  For Pharmacia Corporation
16
17  Helen E. Witt, Esq.
18  Kirkland & Ellis, LLP
19  200 East Randolph Drive
20  Chicago, Illinois 60601
21  For Roxane Conwichicut Case
22
```

```
                                    236
 1  INDEX
 2  WITNESS: Meredith Rosenthal, Ph.D.
 3  EXAMINATION      DIRECT      CROSS
 4  By Mr. Cavanaugh    237, 413
 5  By Mr. Flynn              350
 6  By Mr. Edwards            372
 7  By Mr. Dove               407
 8  By Mr. Macoretta          410
 9
10  EXHIBITS                       PAGE
11  Exhibit Rosenthal 013  Attachment G.5:
12           Schering-Plough    291
13
14  Exhibit Rosenthal 014  Managed Healthcare
15           Executive          345
16
17  Exhibit Rosenthal 015  BMS AWP 0011214
18           through 235        373
19
20  Exhibit Rosenthal 016  Attachment G.2   379
21
22
```

**Page 237**

1  P-R-O-C-E-E-D-I-N-G-S
2    MEREDITH ROSENTHAL, Ph.D.,
3    having been satisfactorily identified
4  by the production of her driver's license, and
5  duly sworn by the Notary Public, was examined and
6  testified as follows:
7    DIRECT EXAMINATION
8  BY MR. CAVANAUGH:
9    Q. Good morning, Dr. Rosenthal.
10   A. Good morning.
11     MR. CAVANAUGH: Let me just put on
12  the record that because of some sort of an
13  administrative foul-up we are starting without a
14  videographer, but we have an agreement with
15  plaintiffs and all the parties that we will not
16  -- the fact that a portion of this deposition
17  will not be videotaped will not provide an
18  objection to the utilization of those portions
19  which have been videotaped and the use of that
20  videotape.
21     MR. MACORETTA: That's correct.
22  BY MR. CAVANAUGH:

**Page 238**

1    Q. Dr. Rosenthal, you would you agree with me
2  that there is nothing wrong per se with price
3  increases?
4    A. Could you please just be a clear what you
5  mean by "wrong"?
6       Legally? Ethically?
7    Q. As far as you know, there is nothing
8  economically, legally, ethically wrong with a
9  price increase by a supplier?
10   A. In that general statement, there is
11  nothing wrong with price increases.
12   Q. Would you also agree with me that price
13  increases happen frequently in markets?
14   A. Certainly.
15   Q. When you go to the store and pay for
16  groceries, you're paying more for items than you
17  did five years ago, right?
18   A. Yes. That's true.
19   Q. And suppliers will increase their prices
20  for a variety of reasons, correct?
21   A. Yes, that's certainly true.
22   Q. To keep up with inflation, correct?

**Page 239**

1    A. That may be true, yes.
2    Q. To keep up with rising costs?
3    A. Those two things I would consider the same
4  thing, yes.
5    Q. Because of a determination that the
6  supplier can increase its profitability by
7  increasing price because it won't have a
8  corresponding sacrifice in terms of the sales of
9  numbers of units?
10   A. As we were discussing yesterday, if there
11  was change in the responsiveness of demand to
12  price, there might be a reason for a price
13  increase, as you suggest.
14   Q. Is there any economic principle of which
15  you are aware that requires that published list
16  prices and actual selling prices to track one
17  another?
18   A. There are few markets that we can look at
19  where there is a third-party payer paying off one
20  of those prices and an intermediate buyer paying
21  off another one of those.
22      So is there an economic principle? I

**Page 240**

1  think this has not really been looked at in an
2  economic model that I know of saying that there
3  should be a relationship there.
4      There are few contacts where we have
5  this situation where there is a list price paid by
6  one end payer and the intermediate price.
7    Q. Can you give me some examples?
8    A. Well, you know, what I would like to
9  suggest is that this is very different from other
10  places where we see list prices.
11     For example, what has come up is the
12  notion of a sticker price for an automobile, for
13  example, but it's the same buyer who faces that
14  sticker price and the potential discounting there.
15     Whereas, it's a very different kind of
16  market where the sticker price is the only
17  information available to a third-party payer who
18  is the ultimate payer, and then this discounted
19  price is concealed from that payer.
20   Q. Would you agree with me that in the market
21  you've just described that the ultimate payer was
22  aware that the intermediaries' actual acquisition

Meredith Rosenthal, Ph.D. CONFIDENTIAL    February 23, 2006
Cambridge, MA

241

1  price was unknown to the ultimate payer?
2     A. The third-party payers knew that they
3  didn't know the acquisition price?
4     Q. Yes.
5     A. Yes.
6     Q. So, for example, let me stick with your
7  analogy about a sticker price.
8        When I, as a purchaser, see a sticker
9  price, for example, for an electronic item, I
10 don't know what the intermediate seller's actual
11 acquisition price is, do I?
12    A. I think this is a very different scenario
13 than the one you are talking about.
14       So I would say the scenario is more
15 like this: You need to buy some electronics for
16 the purpose of your job, and there is a sticker
17 price, and you go and the seller gives you a
18 receiver with the sticker price on it, but also
19 gives you a discount.
20       You go and expense that item, and it
21 gets expensed at the higher rate, you get
22 reimbursed at that higher rate, knowing the

242

1  supplier continues to raise that sticker price and
2  offer you under-the-table discounts.
3     Q. What if the entity to which I am
4  submitting my reimbursement is well aware that
5  they don't know what my -- what I actually paid
6  for the item?
7     A. When you say "well aware," I think that
8  covers a lot of territory.
9        Knowing that you don't know the
10 absolute price, as you may not know about these
11 discounts, mail-in discounts that happen
12 subsequently in some way that aren't observable to
13 your employer reimbursing you, you may have an
14 expectation of what the magnitude of what those
15 discounts may be.
16       That's not the same as saying I have
17 no information whatsoever. You don't know the
18 actual number.
19    Q. Third-party payers were certainly aware
20 that discounts were occurring?
21    A. My knowledge is, yes, they were aware.
22    Q. They were aware that they didn't know what

243

1  the actual acquisition price is as a result of
2  those discounts, correct?
3     A. They had fairly -- based on looking at the
4  contracts that were written in this market -- they
5  had a fairly narrow defined set of expectations
6  about what those discounts were.
7        Contracts don't vary widely, as we've
8  seen in the Dyckman survey, these other surveys.
9     Q. And, again, can you just review for me
10 your data sources for defining the expectation of
11 a range of acquisition costs?
12    A. The data sources are primarily the survey
13 information that was reported in the MedPAC report
14 that looked at what payers were actually allowing
15 in terms of a percentage of AWP that they
16 reimbursed to the providers.
17       In addition, some public reports about
18 the range of discounts, including ASCO, that we
19 talked about yesterday, that said discounts are
20 typically on the order of 20 percent and other
21 records similar to that.
22    Q. You would include the OIG reports that we

244

1  talked about yesterday?
2     A. Those are all pieces of information.
3     Q. Let me ask you to turn to page --
4     A. Is this my stack?
5     Q. Yes. Page 17 of your report.
6     A. Okay. I am here.
7     Q. Paragraph 37. You're discussing the ASP
8  for Zoladex.
9     A. Yes.
10    Q. You say, quote, "The ASP for Zoladex began
11 to decline rapidly and at the same time the AWP
12 was raised."
13       Did you look at the extent to which
14 any physicians or clinics were purchasing Zoladex
15 at WAC?
16    A. With standard economic practice, I am
17 looking at the average here in terms of the ASP,
18 the average which is the expected value. So I'm
19 not looking at other parts of the distribution.
20    Q. So the answer to my question would be, no,
21 you did not look at whether any customers were
22 paying WAC for Zoladex?

Page 245

1   A. It was not necessarily for my analysis to
2   do. So I did not do so.
3   Q. For there to be, in your view, an inflated
4   AWP, what elements are required?
5   A. Essentially the inflation of the AWP here
6   is defined as a divergence of the AWP from ASP
7   beyond the market expectation.
8   Q. If ASP declines, but AWP stays steady, is
9   there AWP inflation, in your view?
10  A. In my view, yes.
11  Q. That is because in your view the
12  manufacturer should have reduced the published
13  AWP?
14  A. Yes.
15  Q. Now, we talked about that a little
16  yesterday, and I want to go back to some
17  testimony you gave.
18      You indicated that there were no
19  standard conventions that you are aware of in
20  terms of the frequency with which AWP could be
21  revised to keep it in some relationship to an
22  evolving ASP, correct?

Page 246

1   A. I believe we were talking about the ideal
2   frequency. Is that what you mean?
3   Q. Yes.
4   A. As opposed to the publishers releasing
5   their data on a regular schedule, but we were
6   talking about the ideal.
7   Q. I believe you agreed with me that ASP
8   could change -- ASP on a particular drug or in a
9   particular NDC could change on a daily or weekly
10  basis, certainly?
11  A. It certainly could do so.
12  Q. Now, you indicated at one point that it
13  would not be, from your perspective, particularly
14  difficult to change published AWPs based upon
15  changing ASPs because all you are talking about
16  is electronically changing numbers, correct?
17  A. It is certainly in the current period my
18  understanding those numbers are disseminated in
19  electronic form, generally speaking.
20  Q. Now, that wasn't always true?
21  A. I am sure that wasn't always true.
22  Q. And would you agree with me that to the

Page 247

1   extent that pricing services were not doing this
2   all electronically, it would certainly be far
3   more difficult to do the type of system that you
4   are talking about?
5   A. It would certainly be more difficult. I
6   can't tell you what the exact cost would be.
7   Q. And you have done nothing to study the
8   feasibility of that type of system, have you?
9   A. No, I have not. No, that's not the scope
10  of my report.
11  Q. And you haven't done it with respect to an
12  electronic system, or certainly in an earlier
13  period, a paper system?
14  A. No, I have not.
15  Q. And just so we're clear, we talking about
16  a system that would require, with certain
17  frequency, changing AWPs to reflect changes in
18  ASP, correct?
19  A. We had now been talking about updating AWP
20  to reflect changes in ASP, correct.
21  Q. Now, how many prescription drugs are there
22  currently on the market?

Page 248

1   A. I believe in terms of NDC codes, it's on
2   the order of 60,000, 50,000.
3   Q. So what you would be talking about here
4   is, with some frequency, changing the reported
5   AWPs on 50 to 60 thousand NDC codes?
6   A. To the extent that the ASP changes.
7   Q. Have you talked to any of the pricing
8   services about the ability to every day, every
9   week, every month, change published AWPs on
10  something of the order of 50,000 to 60,000 drugs?
11  A. No, I have not.
12      But let me remind you, as we look at
13  this data, that I remember annual averages that
14  show the -- divulge your presumption that daily
15  updates would be required, I think has -- as we
16  discussed, we have found no basis for that.
17  Q. Well, no. I am asking -- it's your
18  position, am I correct, that there should be,
19  with some frequency, a revision of AWP based upon
20  changing ASP, correct?
21      MR. MACORETTA: I object.
22  A. That's correct.

**249**

1  Q. And are you offering an opinion as to how
2  frequently that should have occurred, in your
3  view?
4  A. As I said before, I don't really have the
5  basis for that opinion, but I don't have the basis
6  for suggesting that it's daily.
7     That's all I am saying. You are the
8  one that is talking about daily.
9  Q. Well, you've indicated to me that it would
10 not surprise you if the ASP, the actual average
11 selling price for a drug could change on a daily
12 basis?
13 A. That's correct.
14 Q. So I'm trying to explore with you under
15 your theory that there should have been some
16 change in reporting of AWPs based upon changes in
17 ASP how frequently do you think it should have
18 happened?
19 A. I don't have the information to give you
20 an opinion on that.
21 Q. Have you seen any reimbursement rates that
22 are in excess of a hundred percent of AWP?

**250**

1  A. I'm sorry, any reimbursement rates that
2  are in excess -- oh, that's physician
3  reimbursement rates?
4  Q. Yes.
5  A. Yes. In the survey data, some were in
6  excess of a hundred percent of AWP.
7  Q. And what is your understanding as to why a
8  third-party provider would provide a
9  reimbursement rate in excess of a hundred
10 percent?
11 A. Oh, I -- I can't certainly get into any
12 one provider's head, but I would say there are two
13 factors based on economic theory: One would be
14 market power of the entities, the payer, on the
15 one hand, and the provider, on the other.
16    There would be the expectation about
17 what -- at what discounts off of the AWP the
18 provider was able to acquire the drug. Those two
19 factors.
20 Q. Would you agree with me that certain
21 physician or clinic groups may have, well, market
22 power in their negotiations with third-party

**251**

1  providers?
2  A. Certainly.
3  Q. Would that market power give them the
4  ability to extract higher reimbursement rates for
5  services or for drugs from a third-party
6  provider?
7  A. That would be, more or less, the
8  definition of market power, yes.
9  Q. Have you studied, if, at all, the degree
10 of market power among physician groups with
11 respect to their ability to extract higher
12 reimbursement rates from third-party providers?
13 A. In my report I believe I cite some studies
14 that physicians do have market power as well as
15 it's certainly well-known that if you take as an
16 index of that market power the level of income of
17 specialist physicians. Of course, some has to do
18 with training as well.
19 Q. In your view, has the market power of
20 physician groups contributed to the reimbursement
21 rates that they receive for fees and services
22 from third-party providers?

**252**

1  A. Certainly, all things equal, providers
2  with greater market power will be paid at a higher
3  rate than providers with less.
4  Q. Now, you say "all things being equal."
5  Why are you providing that caveat?
6  A. Well, I think it's important to note that
7  we may be talking about differences across
8  providers in, for example, the percentage of AWP
9  that they are reimbursed, but at the same time
10 they may all be earning what is called rents as a
11 result of this higher AWP relative to an unseen
12 acquisition costs.
13 Q. What do you mean by "earning rents"?
14 A. Profits, excess profits.
15 Q. And to what extent did you studied whether
16 those -- to what extent those excess profits are
17 attributable to the market power of physicians?
18 A. I have not examined that question
19 carefully. It is not relevant to my analysis.
20 Q. And why wouldn't it be relevant to your
21 analysis to determine to what extent the
22 reimbursement rates earned by providers from

253

1  third -- from physicians -- strike that. Start
2  all over again.
3      Why is it not relevant to your inquiry
4  here to determine to what extent the market power
5  of physicians have contributed to the
6  reimbursement rates that they have negotiated
7  with third-party providers?
8      A. Again, my analysis uses a standard
9  economic approach, where we are looking at the
10 margin: what is the incremental effect of a
11 change in the spread on payments by third-party
12 payers and these other factors that may affect the
13 underlying levels, just as we talked about
14 yesterday, the therapeutic relationships of these
15 drugs, they are in that all-else-equal category.
16     So the question is -- we could talk
17 about many factors here, but they are not relevant
18 to looking at the incremental effect of AWP
19 inflation on what third-party payers pay. They
20 are underlying factors in the market.
21     Q. Well, did you do any regressions to
22 attempt to address the issue of -- to what extent

254

1  the market power of physicians contributed to the
2  reimbursement rates that they earned --
3      A. That analysis would not be relevant to my
4  findings. So I did not.
5      Q. Let me ask you to turn to Page 1 of your
6  report.
7      In the second bullet point you refer
8  to "empirical clues in the invoice data supplied
9  by the defendants that suggest AWP inflation."
10     What empirical clues are you referring
11 to?
12     A. These are the data that I examined that
13 you see in those charts association with the entry
14 of Kytril as well as the change in reimbursement
15 for Zoladex in which Zoladex -- Lupron
16 reimbursement became tied to Zoladex.
17     Q. Let's stick with the Lupron and Zoladex.
18     Why is that an empirical clue as to
19 AWP inflation?
20     A. A change.
21     Looking for a change in the incentive,
22 and for the response to that change as a test of

255

1  this theory that AWP inflation is a competitive
2  device in the context of the reimbursement
3  incentive of the AWP-based reimbursement system.
4      Q. What is the incentive to which you are
5  referring?
6      A. So the incentive at baseline was
7  competition based on the spread between Zoladex
8  and Lupron.
9      When the least costly alternative
10 policy went into place, Lupron -- some of the gain
11 from AWP did not accrue to Lupron because they are
12 selling at the same AWP at that point.
13     Q. Again, was there a change in the
14 competitive environment as a result of the two
15 drugs sharing the same AWP?
16     A. The change in this case is in the
17 incentives that are brought about by the
18 reimbursement system.
19     Q. What effect did that change in incentives
20 have?
21     A. The effect was for the AWP of Zoladex to
22 remain at its current level.

256

1      Q. Did you look to see to what extent that
2  had an impact on physician utilization of either
3  drug?
4      A. I didn't need to. That wasn't necessary
5  for me to draw these conclusions.
6      Q. Now, after LCA was implemented, did
7  AstraZeneca raise its AWP?
8      A. Not in these data.
9      Q. Wouldn't it have been profit-maximizing
10 for AstraZeneca to raise its AWP after LCA?
11     A. Why would you say that?
12     If they raise their AWP, the amount
13 that the spread increases for Zoladex is the same
14 amount by which the spread increases for Lupron,
15 because Lupron is now being compensated based on
16 the same AWP; and if the reason for raising the
17 AWP was competition against Lupron, then there is
18 no longer incentive to do that.
19     Q. And what AstraZeneca could do is raise its
20 AWP, and then different could you see --
21     A. There is no reason to raise the AWP.
22 There is no gain from raising the AWP. It could

257

1  discount more.
2      Q. Well, by doing both, would they not have
3  been creating more spread for a physician?
4      A. They would be creating the same additional
5  spread for a physician choosing Lupron because
6  when they -- their AWP, their spread, also raises
7  for Lupron.
8      Q. But if AstraZeneca then also increases the
9  discount, it would then have, according to your
10 theory, an advantage over Lupron, would it not?
11     A. If it discounts, indeed, it could compete
12 on the discount, but there is -- when you say --
13 there is no reason to raise the AWP at the same
14 time.
15         So, again, what I looked at here was
16 there was a steady increase in AWP until the LCA
17 policy comes in, and there may have been an
18 incentive to discount at that point, but there was
19 no incentive to raise the AWP.
20     Q. You also referred to in this same --
21 strike that.
22         In your report you refer to patterns

258

1  of price changes. Can you tell me what, when you
2  use that phrase, what you are referring to?
3      A. Could you just give me an example so it is
4  in context.
5      Q. I am actually looking for the page in
6  which you make that reference.
7          It is on Page 1.
8      A. Okay. Thank you.
9      Q. In the paragraph beginning, "I conclude."
10     A. Okay.
11     Q. "Moreover, my analysis of manufacturer
12 invoice data demonstrates patterns of price
13 changes in response to changes in the competitive
14 environment that are consistent with the
15 allegation."
16         What do you mean by "patterns of price
17 changes"?
18     A. In particular, that first Kytril and
19 Zofran example and also to the Zoladex example,
20 which price changes ceased with the LCA policy.
21     Q. For each of the defendants, have you
22 looked at the deposition testimony from the

259

1  companies as to the reasons for any price
2  changes?
3      A. As part of my review, I examined some
4  depositions, but I don't rely on them specifically
5  in my report. So I'm not sure exactly how to
6  answer that.
7      Q. Well, let me take you to the two Johnson &
8  Johnson drugs, Remicade or Procrit.
9          Have you examined the reason for any
10 increases in WAC or AWP with respect to those two
11 drugs?
12     A. Not specifically at specific points in
13 time, trying to map the deposition to the changes.
14     Q. Well, whether it is based on internal
15 documents or deposition testimony, do you have an
16 opinion as to why there were increases in WAC and
17 AWP for Remicade or for Procrit?
18     A. I have seen some strategic documents in a
19 number of examples for the defendants --
20     Q. No. I am talking about Johnson & Johnson
21 and the two drugs Remicade and Procrit.
22         Why were the prices increased at any

260

1  point in time for those two drugs?
2      A. I don't have a specific cite that has any
3  reference to that information. So I don't think I
4  can answer that question.
5      Q. Do you have, as you sit here today, have
6  an opinion as to why there were price increases
7  for Remicade?
8      A. My opinion is that there may have been
9  many reasons for price increases, but one
10 overriding reason is the ability to drive market
11 share by increasing the spread.
12     Q. Can you cite me to any document or any
13 internal deposition testimony -- any deposition
14 testimony from anyone from Johnson & Johnson that
15 supports that opinion?
16     A. No, I cannot.
17     Q. Do you have any opinion as to any -- the
18 reason for any price increase as to Procrit?
19     A. I cannot point you to a specific cite.
20         My analysis relies on some economic
21 analysis of the incentives that are shared by all
22 of these drugs, and therefore, would apply to

**Page 261**

1 those drugs as well.
2     It relies on looking at the spreads
3 themselves, and it relies also on some strategic
4 documents, a number of documents that show that
5 they were well aware that AWP was a strategic
6 device for driving market share.
7     Q. Let me refer you to the documents you
8 relied upon in your report. The only reference I
9 see to internal company documents are on the
10 first page of your list of documents relied upon.
11     There is a heading, "Discovery
12 Documents."
13     A. Uh-huh, right.
14     Q. Would you agree with me that there are no
15 Johnson & Johnson documents identified there?
16     A. That's correct.
17     Q. And this is a list of the discovery
18 documents that you relied upon in formulating the
19 opinions set forth in your report, correct?
20     A. These are the ones that I cite in my
21 report, that's correct.
22     Q. You don't cite any deposition testimony

**Page 262**

1 from any witness for any of the manufacturer
2 defendants, including Johnson & Johnson, correct?
3     A. These are the strategic documents I cite.
4     Q. No. My question was: You don't cite in
5 your report any deposition testimony from any
6 witness from a manufacturer defendant, correct?
7     A. That is correct.
8     Q. You understood in preparing the list of
9 documents that you were relying on that you were
10 required to put forward a complete list of the
11 materials that you were relying upon to -- in
12 support of the opinions that are set forth in
13 your report?
14     MR. MACORETTA: Objection.
15     A. These are the documents that I referenced,
16 specifically with regard to forming these
17 opinions, as disclosed earlier.
18     Certainly I reviewed -- as you
19 mentioned yourself, there are a million documents
20 in this case. I have reviewed them broadly, and
21 these are the ones specifically that I used to
22 build this economic case, to suggest that AWP

**Page 263**

1 inflation took place and impacted the class.
2     Q. In the section of your report that
3 contains the various charts with ASP -- I may
4 have asked you this yesterday and I apologize if
5 I did -- would I be correct that you are relying
6 solely on Doctor -- the numbers calculated by
7 Dr. Hartman with respect to ASP?
8     A. Yes, that's correct.
9     Q. Are you familiar with the phrase "an
10 events study"?
11     A. Yes.
12     Q. What is an events study?
13     A. An events study is an evaluation of a
14 natural experiment, something happens in the
15 economy, for whatever reason, and an events study
16 looks to identify some effect by examining before
17 and after that event, and it's a way of looking at
18 a short time horizon, to hold other things
19 constant.
20     Q. Did you conduct an events study of any of
21 the drugs that you discuss in your report?
22     A. The Zoladex Kytril and Zofran examples are

**Page 264**

1 events studies.
2     There is a change in the environment
3 in the short period of time to look at the events
4 and all other economic variables are assumed to be
5 equal.
6     Q. Would be I correct that your analysis did
7 not -- your event study did not incorporate just
8 things such as whether there were additional
9 indications for any of these products?
10     A. An event studies, the basic design of an
11 event studies is generally that one looks at a
12 short time period, as we have here, and all those
13 other variables are assumed to be equal.
14     There is no reason to believe that a
15 change in indication would have happened precisely
16 at the time that Kytril entered, for example.
17     Q. Did you look at that?
18     A. That's not what one generally does in an
19 events study.
20     Q. So the answer is you did not look at
21 whether there was a change in indications?
22     A. No. I did not look at that.

265

1  Q. Did you look at whether there was a change
2  in competitive conditions within this therapeutic
3  class?
4  A. Other than the one I was examining?
5  Q. Yes.
6  A. No, I did not.
7  Q. How did you go -- would I be correct that
8  under your events -- under the analysis that you
9  did you kept all other things the same and only
10 focused on the single event that you've
11 identified in your chart?
12 A. That's the identifying assumption, yes.
13 Q. So you did not seek to determine to what
14 extent other events may have impacted the ASPs or
15 AWPs for the drugs you studied?
16 A. Again, as I mentioned, this is a standard
17 economic research approach and that is not part of
18 it.
19     The general model is to look before or
20 after, within a short time period, and those other
21 variables are assumed to be equal.
22 Q. Do the lower ASPs that you show in your

266

1  report provide any benefit to consumers?
2  A. Do the lower ASPs provide any benefit to
3  consumers? Consumers are not paying ASP. I can't
4  see how they would.
5  Q. Do physicians earn more profits when ASPs
6  are lower?
7  A. That's the underlying assumption, yes,
8  always.
9  Q. And would the additional profitability to
10 physicians provide any consumer benefit?
11 A. I can't think of any.
12 Q. Would the additional profitability to
13 physicians as a result of lower acquisition costs
14 produce any corresponding lowering of fees
15 charged to providers or consumers, third-party
16 providers or consumers?
17 A. The third-party providers are paying based
18 on AWP, correct? So I think the underlying model
19 is that third-party providers don't receive the
20 benefits of the reductions in ASP.
21 Q. Do you know to what extent the reductions
22 in ASP put less price pressure on administration

267

1  fees, for example?
2  A. I can't say what those cross-elasticities
3  are, no.
4  Q. You didn't look at that?
5  A. No.
6  Q. Would you agree with me that there is
7  evidence in the record, for example, with respect
8  to Part B, that there was not recognition of a
9  cross-subsidization between reimbursement for
10 drug costs and administrative fees?
11 A. I understand that the physicians claimed
12 that there was such a cross-subsidization.
13     As you know, the cross-subsidization
14 that they claimed adapted specifically well when
15 these spreads are several hundred dollars.
16 Q. Have you looked at to what extent the
17 spread would support a cross-subsidization
18 argument?
19     MR. MACORETTA: I object, but go
20 ahead.
21 A. I certainly have run across that argument
22 in this case. As far as I can tell, it's a claim

268

1  by the physicians.
2      Could there theoretically be a cross-
3  subsidization? I can't really say. It's not
4  particularly relevant to my analysis, either.
5  Q. My question is: Have you looked at or
6  studied the extend to which lower ASPs put less
7  pressure, demands for higher fees for
8  administration or other services provided by
9  physicians?
10 A. No. I did not because it was not
11 relevant.
12 Q. And why wouldn't be it relevant?
13 A. Why would it be relevant to the question
14 of whether AWP inflation adversely affected the
15 class? Do these cross-subsidies accrue to the
16 same people?
17     You are suggesting that those cross-
18 subsidies might accrue to consumers. I am not
19 sure it would be relevant.
20 Q. For example, when Aetna negotiates with a
21 physician group, are they negotiating on a broad
22 range of fees and services?

Page 269

1. A. Certainly.
2. Q. Do you think that there is any
3. interrelationship between the fees and -- between
4. the fees and services which are being negotiated?
5. A. Well, I think it's unclear.
6. These fee schedules for other services
7. are set independently, to my knowledge. There is
8. no direct relationship, direct tradeoff, that I
9. know of, in negotiations.
10. Q. Do you think that there is any
11. interrelationship between the various fees that
12. are negotiated between a third-party provider and
13. a physician group?
14. A. I think the question is really: Is there
15. any important interrelationship that wouldn't
16. really affect this? And the magnitudes of the
17. overcharges with regard to the inflated AWP are so
18. substantial that I cannot believe that this would
19. be important, and I therefore did not believe it
20. was important to look into.
21. Q. Well, if they are so substantial, then you
22. must have evidence that third-party providers

Page 270

1. have completely abandoned the system which
2. produced them?
3. MR. MACORETTA: Objection.
4. Q. Do you have such evidence?
5. A. I do not.
6. Q. Let me take you back to the events study
7. we were talking about.
8. As you understand it, the purpose of
9. an events study is to look at a short time frame;
10. am I correct?
11. A. That's correct.
12. Q. And you were looking at a -- attempting to
13. look at a single effect, were you not?
14. A. That's the idea, yes.
15. Q. And how did you go about assuring yourself
16. that nothing else changed during the time frame
17. that you were talking about?
18. A. Again, as a standard economic practice,
19. one looks at a market and examines a change in
20. short time periods.
21. The assumption of all else is equal is
22. essentially part of the research design, and we

Page 271

1. know there may be other factors, but they -- the
2. only assumption that is required is they are
3. uncorrelated with this particular timing of the
4. events that you are studying, which is not a very
5. difficult assumption to make. Would there have
6. been other changes simultaneous to the entry of
7. Kytril, for example, that would have operated in a
8. way to bias the results?
9. Q. At a minimum, don't you need to determine
10. whether there were any significant events, other
11. events during that time frame which might well
12. impact on the single effect that you are
13. studying?
14. A. To my knowledge, there were none.
15. Q. Are you familiar with the AstraZeneca drug
16. Pulmicort?
17. A. I am.
18. Q. I see nothing in your expert report with
19. respect to that drug; is that true?
20. A. That was not one the examples I chose, no.
21. Q. Do you have any opinions with respect to
22. Pulmicort?

Page 272

1. A. As part of this litigation, my opinions
2. are generalized to all of the drugs in the
3. litigation.
4. Q. What specific opinions do you have with
5. respect to Pulmicort?
6. A. Economic incentives to the providers of
7. Pulmicort, which my understanding is, in most
8. cases, were DME suppliers, other distributors of
9. nebulizer drugs had the incentive to select those
10. drugs based on the spread between the AWP and the
11. ASP, the manufacturer of Pulmicort had the
12. incentive to increase the spread in order to
13. increase its sale.
14. Q. Have you done any analysis of Pulmicort
15. data to determine whether any of those things
16. occurred?
17. A. I have examined the ASPs and AWPs.
18. Q. And what opinions do you have with respect
19. to Pulmicort?
20. A. All the drugs that are summarized in Table
21. 1 --
22. Q. Will you agree Pulmicort is not in Table

**273**

1  1?
2  A. Right. We examined all of these drugs
3  early on.
4      Excuse me. Since this was a change.
5  I don't have all of the drugs memorized, but I did
6  certainly look at data for Pulmicort and the ASPs
7  and AWPs.
8      Q. But would I be correct that you have no
9  specific opinions with respect to Pulmicort?
10  A. That's not involved in my report. I did
11  not. Excuse me for the mistake.
12      Q. You have to keep your voice up.
13  A. I have trouble keeping track of the drugs.
14      Q. Would I be correct, then, that the
15  opinions set forth in your report are limited to
16  the drugs that are listed on Table 1?
17  A. My conclusion about the economic incentive
18  existence really is a general conclusion about
19  what the reimbursement environment creates.
20      The report is aimed at looking at
21  these particular drugs for which these incentives
22  appear to have had an effect.

**274**

1      So I think it's fair to say that my
2  opinions are restricted to the drugs that remain
3  in the case; and as you know, there was a
4  subsequent report by Dr. Hartman that changed the
5  list of drugs in February, but my conclusions
6  really generalize the drugs.
7      MR. MACORETTA: Bill, we have been
8  going for an hour. Do you mind if we take a
9  break?
10      MR. CAVANAUGH: Sure.
11      (A recess was taken.)
12      THE VIDEOGRAPHER: Stand by, please.
13  We are now recording and on the record.
14      My name is Adam Cook. I am a legal
15  video specialist for national video reporter.
16  Our business address is 58 Batterymarch Street,
17  Suite, 243 Boston, Massachusetts 02110.
18      Today is February 23, 2006, and the
19  time is 10:42 a.m.
20      This is day two in the deposition of
21  Meredith Rosenthal in the matter of In Re
22  Pharmaceutical Industry Average Wholesale Price

**275**

1  Litigation in the U.S. District Court for
2  District of Massachusetts number 01-CV-12257-PBS.
3      This deposition is being taken at One
4  Main Street, Cambridge, Massachusetts.
5      BY MR. CAVANAUGH:
6      Q. Dr. Rosenthal, could you turn to Page 19
7  of your report.
8  A. I'm on Page 19.
9      Q. Let me draw your attention to the chart on
10  Remicade, which we talked about briefly
11  yesterday.
12      Would you would you agree with me that
13  the chart shows ASP generally running in line
14  with AWP?
15  A. The chart shows ASP ranging from 31
16  percent below AWP, the markup being 31 percent
17  relative to AWP, up to 34 percent.
18      Q. And that's over a five-year period?
19  A. That's correct.
20      Q. Would you agree with me that a variation
21  of three percentage points over a five-year
22  period is quite small?

**276**

1  A. I am not sure what you mean by "quite
2  small." I think three percentage points is three
3  percentage points.
4      It's relative -- the dollar amounts
5  there, you'll notice the AWP ranges from 600 to
6  700 dollars.
7      So three percentage points is not an
8  insignificant number.
9      Q. Is would be -- so what would three percent
10  be of --
11  A. Three percent of $600, for example --
12      Q. Yes.
13  A. -- would be $18.
14      Q. In the scope of the issues we are talking
15  about in this case, would you consider that
16  difference to be of any significance?
17  A. Yes, I do think it is of significance.
18      I am not sure what criterion you are
19  using. That's the amount for a given NDC.
20      This is a drug to treat a chronic
21  problem, and so I don't think it's possible to say
22  sort of looking at one unit, the spread, whether

277

1  it is significant or not.
2      Q. Do you have any opinion as to whether that
3  difference in the spread from 31 to 34 percent
4  over a five-year period is significant?
5      A. I don't have an opinion about that.
6      Q. Your opinion is basically three percent is
7  three percent?
8      A. That's correct.
9      Q. You do not -- am I correct that you do not
10 have a chart reflecting -- let me just stick with
11 Remicade for a moment.
12         Am I correct that under Dr. Hartman's
13 minimum standard of liability, if on -- if the
14 spread here were 30 percent instead of 31
15 percent, there would be no liability?
16     A. You are correct that Dr. Hartman's
17 standard is 30 percent. I believe it's a hard,
18 greater than 30 percent. So I think that would be
19 correct.
20     Q. Just so we are clear, the dollar
21 difference that we are talking about on 30
22 percent as opposed to 31 percent in the period

278

1  1998 through 1999 would be how many dollars?
2      A. If you were talking about one percentage
3  point difference, again, on the order of $6.
4      Q. Actually, it would be less because we are
5  talking about a -- well, it's a little less than
6  $6. So in the neighborhood of $3?
7      A. What percentage are you taking there?
8      Q. The 31. The difference between 30 percent
9  and 31 percent?
10     A. As a percentage of the ASP?
11     Q. Yes.
12     A. So if the ASP is $500 --
13     Q. Right.
14     A. -- so that one percent would be $5, yes.
15     Q. Did you analyze to what extent a
16 difference of one percentage point influenced
17 physician utilization of Remicade?
18     A. There's no reason to believe based on
19 economic theory and evidence that there is a
20 threshold at which a difference doesn't matter.
21         We look at marginal incentive. It's a
22 continuous notion. So why should there be a

279

1  discontinuous notion of point at which it doesn't
2  matter?
3      Q. Well, did physicians have an incentive to
4  utilize Remicade when there was a 30 percent
5  spread?
6      A. Physicians had an incentive to utilize
7  Remicade in part as a function of the fact that
8  there was a 30 percent spread to AWP and ASP.
9      Q. Did they have an incentive to use Remicade
10 if it had 29 percent spread?
11     A. I am not going to offer an opinion on the
12 what the appropriate yardstick is here.
13         As I've mentioned in my report, I --
14 one of the assumptions I make is to look at drugs
15 for which Dr. Hartman has established they meet
16 his yardstick for liability in the case.
17     Q. But you have offered opinions about
18 financial incentives that exist. So that's the
19 subject I am trying to explore.
20         Would you agree with me that -- do you
21 believe there was a financial incentive to
22 utilize Remicade at a spread of AWP minus 30?

280

1      A. I don't have any reason to believe -- to
2  form an opinion about a threshold level.
3          Again, I was not asked to look at
4  determining a threshold level at which the spread
5  would indicate liability.
6      Q. So would I be correct that you don't have
7  an opinion that there was any difference in --
8  from a physician's perspective, as to the
9  utilization of Remicade, whether it had a spread
10 of 30 percent or 31 percent?
11     A. You are correct, I don't have an opinion
12 as to that.
13     Q. Let's turn to Procrit.
14         Have you provided any information in
15 your report with respect to Procrit?
16     A. I have not detailed any data with respect
17 to Procrit, no.
18     Q. Why didn't you do a -- let me ask this:
19 Why did you do a chart on Remicade and not on
20 Procrit?
21     A. In my report, I used some examples to
22 illustrate the incentives and their effects, and

Meredith Rosenthal, Ph.D. CONFIDENTIAL                February 23, 2006
Cambridge, MA

**281**

1  it was not necessary to show every drug in the
2  class.
3      Q. Why did you choose Remicade instead of
4  Procrit?
5      A. Remicade was an example I chose because
6  the spreads are there, and it's a very expensive
7  drug, with chronic-use implications, and so it's
8  likely to be important to the class.
9      Q. Is Procrit an expense drug?
10     A. Procrit is also an expensive drug, yes.
11     Q. Did you look at its spreads?
12     A. I examined the ASPs and AWPs for all of
13 the drugs.
14     Q. How did its spreads compare to Remicade
15 spreads?
16     A. I don't have it memorized.
17         If you would like to show me some
18 data, I would be happy to look at it.
19     Q. Do you have any specific opinions with
20 respect to Procrit?
21     A. My opinions generalize to all the drugs in
22 this case.

**282**

1       They are with regard to common
2  reimbursement that exists for all of the drugs
3  with regard to common conditions among physicians
4  in this market who administer the drugs.
5         So these opinions generalize to
6  Procrit, yes.
7      Q. Have you analyzed the rebates and
8  discounts to physicians on Procrit?
9      A. Have I separately analyzed them?
10        Again, I examined these data, in
11 general terms, to examine the methodology by which
12 the ASP was put together, but I have not looked at
13 the detailed variation in rebates and discounts.
14        Is that your question?
15     Q. Yes.
16     A. Okay.
17     Q. Did you compare the rates of rebates and
18 discounts to the rate of price increases and
19 compare the two?
20     A. I compared the changes in AWP relative to
21 the ASP, which accounts for those factors.
22     Q. What did it show?

**283**

1      A. Again, I don't have that information
2  memorized. I would need to look at the charts or
3  the spreadsheets, if you have them.
4      Q. Are you aware that Procrit is sold through
5  retail?
6      A. Yes, I'm aware that some forms of Procrit
7  are sold through retail.
8      Q. Do you know what percentage of Procrit
9  sales are through retail?
10     A. I do not.
11     Q. In calculating ASP, do you believe it's
12 appropriate to include retail sales of Procrit?
13     A. To the extent that these drugs are subject
14 to the litigation in this matter, those, it is my
15 understanding, were included in the ASP.
16        So I don't have a separate opinion
17 about that.
18     Q. Let me ask you, do you understand that
19 Dr. Hartman's initial report in calculating ASP
20 solely on -- or attempted to calculate ASP based
21 solely on sales to physicians in clinics?
22     A. That was my understanding.

**284**

1      Q. And do you understand in his supplemental
2  report that he included -- he has calculated ASP
3  by including multiple other classes of trade?
4      A. That is also my understanding.
5      Q. Do you have an opinion as to which is the
6  better approach --
7      A. I do not.
8      Q. -- to calculate ASP?
9         MR. MACORETTA: Objection.
10     A. I do not have an opinion about which is
11 the better approach.
12     Q. Let me ask you to turn to Page 20 of your
13 report.
14     A. Okay. I am on Page 20.
15     Q. Let's talk about Intron for a moment.
16     A. Okay.
17     Q. I believe your discussion of it begins on
18 Page 19.
19        You say the chart below shows the
20 steady increase in both AWP and the spread for
21 one NDC of the Schering-Plough drug Intron?
22     A. I see that.

Meredith Rosenthal, Ph.D. CONFIDENTIAL                February 23, 2006
Cambridge, MA

285

1  Q. Now, you go on to state that "AWP
2  inflation was a deliberate competitive strategy."
3       What is your basis for saying that
4  there was a deliberate -- that AWP was a
5  deliberate competitive strategy with respect to
6  Intron?
7     A. For all of the drugs, my conclusions are
8  based on a standard economic analysis of the
9  economic incentives that were present for all of
10 these drugs, as well as looking at places, among
11 the drugs, where one could do an events study, as
12 we discussed earlier.
13      Those findings have implications for
14 all of the drugs.
15     Q. I am asking you specifically with respect
16 to Intron, what is your evidence that there was a
17 competitive -- a competitive strategy -- a
18 deliberate competitive strategy to inflate AWP?
19     A. The evidence that I use, again, is the
20 examination of economic theory and the
21 institutions that generate these incentives,
22 including the reimbursement system and the

286

1  organization of the delivery system.
2     Q. Would I be correct that if I look at the
3  documents that you rely upon, you are not relying
4  upon any internal sharing documents or testimony
5  from anyone from Schering, correct?
6     A. I believe that's correct. I could check
7  that note for you.
8        That appears to be correct, yes.
9     Q. What effort did you make to determine what
10 Schering's internal thinking was with respect to
11 any price changes that they made with respect to
12 Intron from the period 1991 through 2004?
13    A. It was not necessary to my analysis to do
14 that.
15       As an economic expert, I rely on
16 economic theory, as well as looking at these event
17 studies, to confirm the theory, and it wasn't
18 necessary to go and look for every individual
19 piece of information about that strategic use of
20 the AWP.
21    Q. With respect to Johnson & Johnson and the
22 drugs Remicade and Procrit, to what extent did

287

1  you attempt to investigate Johnson & Johnson's
2  decisions with respect to price changes for those
3  two drugs?
4     A. Again, it was not necessary for my
5  conclusions to do that analysis. So I did not.
6     Q. Well, would I be correct with respect to
7  other defendants you do cite internal documents?
8     A. I do cite internal documents because they
9  are good examples of the recognition by the
10 manufacturers.
11       I did -- it was not intended to be
12 used as a survey in any way. These were examples
13 of the manufacturers' recognition of AWP as a
14 competitive instrument.
15    Q. So would it be fair to say that when you
16 thought you found documents that supported your
17 position you utilized them, and if you didn't
18 find documents for a company that were consistent
19 with your opinion, you ignored them?
20       MR. MACORETTA: Objection.
21    A. I think it would not be fair to say that.
22       As part of supporting my argument that

288

1  competitive strategy is the reason for AWP
2  inflation, I used the defendants' own words to
3  state those strategies.
4        I did not look for -- to find an
5  inclusive set of those statements.
6     Q. What if for a particular defendant you
7  found internal documents that contradicted your
8  theory, wouldn't that be important for you to
9  look at?
10    A. I found no such documents.
11    Q. Well, you said you didn't look for
12 documents from Johnson & Johnson and Schering,
13 for example, as to why they set AWPs where they
14 did, where they took -- why they took particular
15 price increases, correct?
16    A. That's correct. I used these documents to
17 illustrate a point.
18    Q. So for all you know, there are documents
19 from particular manufacturers which contradict
20 your opinions?
21    A. I have no awareness of such documents.
22    Q. Well, if you didn't look for them, how

**289**

1  would you know whether they exist?
2      A. Is that a question?
3      Q. Yes.
4      A. Again, I have no knowledge of documents
5  that would contradict this theory.
6      Q. Well, did you ask plaintiffs' counsel for
7  each of the defendant companies: Show me the
8  internal documents where they're discussing with
9  why they took price increases, why they set the
10 AWP where they were?
11     A. I examined those documents where I could
12 -- where I could find them, and again, these are
13 the examples that I used to illustrate.
14     Q. And as you sit here today, you can't tell
15 me why Johnson & Johnson took a particular price
16 increase on Remicade or Procrit, can you?
17     A. As an economist, I conclude from the
18 reimbursement environment and the incentives
19 available to Johnson & Johnson that these price
20 increases were, in part, driven by competitive
21 concerns and the use of the spread between AWP and
22 ASP.

**290**

1      Q. But you did not look at the internal
2  Johnson & Johnson documents to see what their
3  thinking was with respect to taking a price
4  increase on Remicade or Procrit, correct?
5      A. That's correct.
6      Q. Am I correct that the chart on Page 20
7  with respect to Intron shows an increase of the
8  spread from 30 percent to 36 percent?
9      A. Yes, that's correct.
10     Q. Now, the 30 percent would fall under
11 Dr. Hartman's minimum standard of liability; is
12 that correct?
13     A. Again, I am not absolutely certain whether
14 he used the less than or equal to or a strictly
15 greater than 30 percent.
16        Do you know the answer to that
17 question?
18     Q. Do you have an opinion as to what would be
19 the right approach?
20     A. I do not.
21        MR. CAVANAUGH: Why don't we just go
22 off the record for two minutes.

**291**

1         THE VIDEOGRAPHER: The time is 11:03.
2  We are off the record.
3         (Exhibit Rosenthal 013 for
4         identification)
5         THE VIDEOGRAPHER: The time is 11:05.
6  We are back on the record.
7         MR. CAVANAUGH:
8      Q. We have marked as Exhibit Rosenthal 013 an
9  attachment from Dr. Hartman's report G.5 to -- Mr.
10 Hartman's liability and calculation of damages report
11 with respect to Intron.
12        MR. MACORETTA: Is this the
13 supplemental report or the initial report you are
14 showing us?
15        MS. NEMIROW: I don't know what copy
16 you have there, but I believe it was from the
17 original.
18        MR. O'CONNOR: The original, December
19 15.
20     Q. I am correct that the chart you prepared
21 on Page 20 is based upon Mr. Hartman's initial
22 report?

**292**

1      A. Yes, it is.
2      Q. Now, you show the spread going from 30 to
3  36 percent in your chart; do you not?
4      A. I do.
5      Q. Now, if we look at the actual numbers from
6  '91 to 2004 --
7      A. Okay.
8      Q. -- would I be correct that the spread in
9  1991 is 29.9?
10     A. I'm sorry, where do you see the spread --
11 which page are you on, sorry?
12     Q. I'm sorry.
13     A. That's okay.
14     Q. If you go to one, two, three, four, five,
15 six --
16        MR. MACORETTA: G.5.C.
17     A. Right. These are the spread percentages.
18     Q. Right.
19     A. Right. I'm sorry. Okay.
20     Q. Now, let's just make sure we have the
21 corresponding -- do we have the right --
22     A. Right.

293

1  Q. -- NDC?
2  A. I think I have it, yes.
3  Q. Now, in 1991, the spread was 29.9, which
4  would be below Dr. Hartman's minimum standard of
5  liability?
6  A. That's my understanding.
7  Q. The following year it goes up to 41.6,
8  that would be above Dr. Hartman's minimum
9  standard of liability, correct?
10  A. Correct.
11  Q. Now, the next year it goes down to 32.7;
12  does it not?
13  A. It does, yes.
14  Q. Now, that would still be above his minimum
15  standard of liability, but below -- moving in a
16  less than favorable trend to support the theory
17  of the manufacturer having an incentive to
18  increase the spread, correct?
19  A. I'm sorry, could you restate that?
20  Q. Sure. That was a mangled question. I
21  apologize.
22  A. That's okay.

294

1  Q. Am I correct that in 1992 -- from 1992 to
2  1993, the spread actually got smaller?
3  A. That's correct.
4  Q. So there was less of a financial incentive
5  for physicians to utilize this drug in 1993 than
6  there was in 1992, according to your opinion?
7  A. All things equal, according to my opinion,
8  that's true.
9  Q. And then in 1994, there was even less
10  financial incentive because the spread was down
11  to 28 percent, which is below Dr. Hartman's
12  minimum standard of liability, correct?
13  A. That's correct.
14  Q. And then the following year, even less
15  financial incentive because the spread has
16  dropped now to 22.3 percent, correct?
17  A. That's correct.
18  Q. And that it continues in the range of
19  below Dr. Hartman's minimum standard of liability
20  for another one, two, threes, four, five years,
21  right?
22  A. That's correct.

295

1  Q. And then in 2001, it goes up to 34
2  percent?
3  A. I see that, yes.
4  Q. And then it goes back down again in 2002
5  to below the minimum standard of liability?
6  A. Yes, that's correct.
7  Q. And then it goes back above his minimum
8  standard of liability in 2003 and for the first
9  quarter of 2004, correct?
10  A. That's correct.
11  Q. All right. So would you agree with me
12  that this hardly shows a picture of a
13  manufacturer having an intent to increase --
14  consistently inflate AWP?
15  A. I would not agree with that.
16  Q. You would not? Even though you see the
17  spreads going down for periods, long periods of
18  time, five- and six-year periods of time below
19  Dr. Hartman's minimum standard of liability, it
20  is your opinion looking over this 14-year --
21  13-year period of time we are seeing a consistent
22  effort to inflate AWP?

296

1  A. These spreads show there are clearly
2  periods during which the AWP is inflated with
3  regard to ASP.
4  Q. Well, let's go back to what you said in
5  your report.
6      You say, "The chart below shows the
7  steady increase in both the AWP and the spread
8  for one NDC of the Schering-Plough drug Intron
9  A."
10      That is not an accurate statement, is
11  it, Dr. Rosenthal?
12  A. I believe it is accurate.
13  Q. Show me the steady increase that you see
14  from 1994 -- from 1993 through the year 2000?
15      Over that seven-year period, do we see
16  a steady increase?
17  A. It's a not monotonic increase.
18      What I said about the increase between
19  '91 and 2004 was that it was an upward trend, a
20  steady upward trend. I didn't suggest that it
21  never reversed direction.
22  Q. Well, actually, if I look at your --

**297**

1  strike that.
2      So by "steady increase," are you
3  referring to the fact that you can take a point
4  in 1991 and you can then look at it in -- 13
5  years later, and if there has been an increase,
6  regardless of what has happened in the interim,
7  to you, that's a, quote, steady increase?
8      MR. MACORETTA: Objection.
9      A. What I meant to imply there is that indeed
10 the trend is upward sloping.
11     Q. The trend is upward sloping regardless of
12 what happens in the interim period, is that your
13 opinion?
14     A. That is -- my opinion was that the trend
15 was increasing over the period.
16     Q. Regardless of what actually happened
17 during the interim period?
18     A. Again, my opinion with regard to this
19 trend is that it shows an upward trend; and if you
20 want to say "regardless," the data, as they are, I
21 would interpret as an upward trend.
22     Q. Let me ask you this: What significance do

**298**

1  you attach to the fact that in 1994 the spread
2  was 28 percent, in 1995 the spread was 22
3  percent, in 1996 the spread was 21 percent, in
4  1997 the spread was 24 percent, all of which are
5  lower than the 30 percent -- the 29.9 percent
6  figure that you started out with in 1991?
7      A. Again, over the time period, there is an
8  increase.
9      Q. Would you agree with me that at least
10 during the period 1994 through the year 2000,
11 over that six-year period, it certainly does not
12 appear that Schering had an intent to inflate
13 AWP?
14     A. Over that short period --
15         MR. MACORETTA: Objection.
16     A. Over that short period that you pulled
17 out, those numbers are below Dr. Hartman's
18 threshold.
19     Q. Dr. Rosenthal, do you really consider six
20 years to be a small period of time?
21         MR. MACORETTA: Objection.
22     A. As compared to the entire time period?

**299**

1      It's not the entire time period, and I
2  was looking at over this entire time period there
3  was an increase in the spread.
4      Q. It's close to half the time period,
5  correct?
6         MR. MACORETTA: Objection.
7      A. That may be true.
8      Q. Well, if you think that's a short period
9  of time, when you did your events studies, what
10 period of time were you studying there?
11     A. I was looking at small changes there from
12 year to year.
13     Q. And if we wanted to do an events study on
14 Intron, what you would see looking from year to
15 year is you would not see an effort to inflate
16 AWP, correct?
17        MR. MACORETTA: Objection.
18     A. Which years are you talking about?
19     Q. Well, if you took the movement from 1992
20 to 1993, if you took the moment from 1993 to
21 1994, from '94 to '95, from '96 to '97, in none
22 of those years you would see a -- doing an events

**300**

1  study looking from year to year, you would not be
2  seeing a -- any attempt to inflate AWP, correct?
3      A. If you were positing that some event took
4  place during that time, then you would find, using
5  Dr. Hartman's threshold, that those spreads did
6  not meet the level of threshold that he has put
7  forward.
8      Q. Let me ask you this question: If you see
9  the spread getting smaller over a period of time,
10 is that evidence of a lack of AWP inflation?
11     A. I would -- is it evidence of a lack of AWP
12 inflation?
13        It's less inflation. If there is less
14 spread, it is less inflation, yes.
15     Q. You've made reference a number of times to
16 the MedPAC study. Do we also refer to that as
17 the Dyckman study?
18     A. It incorporates many of the Dyckman
19 results.
20     Q. Now, that was -- am I correct that the
21 Dyckman study was based on a telephone survey?
22     A. I believe that's true.

**301**

1  Q. And we talked yesterday about self-
2  reporting bias and that type of thing.
3       Who did the surveys, the telephone
4  surveys?
5  A. Researchers from the Dyckman association,
6  is my understanding.
7  Q. And do you know what the script was?
8  A. I do not.
9  Q. Do you know what the actual responses
10 were?
11 A. I do not.
12 Q. Do you know how many responses were
13 solicited?
14 A. The sample size, I believe, is included in
15 the report.
16      I would want to check it before I gave
17 that number off the top of my head.
18 Q. Do you recall that there were roughly 33
19 responses?
20 A. That sounds like the right order of
21 magnitude.
22 Q. And how many people or entities were

**302**

1  actually contacted?
2  A. I don't know.
3       You mean the sample size originally?
4  Q. Yes.
5  A. I don't know the answer to that. I
6  believe that's also in the report.
7  Q. Was it roughly 180?
8  A. That might be true. I would have to
9  check.
10 Q. Am I also correct that 29 out of the 33
11 responses were all Blue Cross entities?
12 A. I will take your word for that.
13 Q. Do you think that created any sample bias?
14 A. I have no reason to believe the Blue Cross
15 plans are different, given that it seems that all
16 the plans use the same system.
17 Q. Well, Blue Cross plans could certainly be
18 different from other plans, non-Blue Cross plans?
19 A. They could be. I am not sure why they
20 would be different in the way that they reimburse
21 physician-administered drugs.
22 Q. That's not something you looked at?

**303**

1  A. These are the data that are available, and
2  they were protected in the normal research
3  strategy.
4  Q. Let me ask you: Yesterday you were very
5  concerned about, and actually found irrelevant,
6  sworn testimony given by providers under oath,
7  but you're much more comfortable relying on a
8  telephone survey done of 33 folks where you don't
9  know what the questions were that were asked; is
10 that a fair --
11      MR. MACORETTA: Objection.
12 A. No. I don't think that's fair. So --
13 Q. Why?
14 A. -- let me tell you again yesterday a
15 couple of things I mentioned, in particular,
16 fact-based survey research has much -- is much
17 less prone to bias than asking individuals what
18 the basis of their actions were in the prior
19 period, and so asking a health plan what their --
20 how their contracts are written, which is
21 essentially what the Dyckman survey asks --
22 Q. Do you know what particular question was

**304**

1  asked?
2  A. I know that they asked what was the basis
3  for reimbursement for a physician-administered
4  drug. This is a factual question.
5  Q. And do you know what the actual responses
6  were?
7  A. I do not know that.
8  Q. Would you agree with me that there lots of
9  ways to answer that question?
10 A. I'm not sure what you mean by "lots of
11 ways."
12 Q. Well, someone could say. "We consider
13 AWP." Someone could say, "You know, we don't use
14 AWP." Someone could say, "AWP may be a factor."
15      Are all of those possible responses?
16 A. In a survey done for MedPAC, which is a
17 very important advisory body to Medicare, the
18 researchers, I am sure, used valid research
19 methods.
20      This is important data source. So I
21 would not assume that they asked the questions in
22 an open-ended ways to solicit those kinds of

Meredith Rosenthal, Ph.D. CONFIDENTIAL                    February 23, 2006
Cambridge, MA

305

1   responses.
2       Q. So it's your opinion that open-ended
3   questions were not utilized?
4       A. I don't know. As I mentioned before, I
5   don't know the precise questions.
6       Q. Okay. We talked yesterday briefly about
7   market failures that exist in medical care
8   markets.
9           Have you measured the economic effects
10  of these market failures on prices over the class
11  period?
12      A. Have I measured the economic effects of
13  imperfect information on prices?
14          No, I have not.
15      Q. Would you agree with me -- now, you say on
16  Page -- turn to Page 13.
17      A. Of my report?
18      Q. Yes.
19      A. Okay. I'm on Page 13.
20      Q. You say, "Payers are unable to make
21  apples-to-apples comparisons."
22          Do you see that?

306

1       A. Yes, I do.
2       Q. Would you agree with me that the payers of
3   purchased drugs have knowledge of their own
4   acquisition prices?
5       A. To the extent that a payer buys
6   directly --
7       Q. Yes.
8       A. -- as we were talking about yesterday,
9   certainly to the extent that a payer buys
10  directly, it would have knowledge of what it paid
11  for those direct purchases.
12      Q. And did you undertake any study of the
13  extent to which third-party payers looked to
14  their acquisition prices in determining actual
15  acquisition costs for physicians?
16      A. As we discussed yesterday, I did not do
17  that study, and I don't believe it's relevant
18  because payers are much more substantial buyers of
19  those drugs than the physicians would be.
20          I would not believe that they would
21  assume that the physicians receive as large
22  discounts as they do.

307

1       Q. So that's an assumption that you are
2   making, correct?
3       A. That's assumption based on economic theory
4   and evidence.
5       Q. What did you do to test that assumption?
6       A. It was not relevant to my report to test
7   that assumption here.
8       Q. Well, wouldn't you want to test to see to
9   what extent payers take into consideration their
10  acquisition costs in determining what other
11  purchasers in the market might be paying?
12      A. No.
13      Q. You go on to say on Page 13, Paragraph 17,
14  "Payers have great difficulty in excluding
15  physicians from their network on the basis of
16  price and thus are weak negotiators."
17      A. I see that.
18      Q. What's your support for that assertion?
19      A. It's well-known in the U.S. healthcare
20  market that managed care networks are large and
21  overlapping and tend to be not very exclusive,
22  particularly with regard to the specialists, of

308

1   whom there may be only a few in the market or only
2   a few organizations thereof.
3       Q. Do you cite -- any of the documents that
4   you cite in your appendix support that
5   proposition?
6       A. I don't provide specific cites about that
7   negotiating power element.
8           The chapter by Tom Maguire on
9   physician agency deals with this notion of the
10  unobservable ability of physician actions and the
11  applications for contract --
12      Q. Can you give me that again?
13      A. There is chapter Tom Maguire that is cited
14  on physician agency. It's in The Handbook of
15  Health Economics.
16          Essentially, that -- it reviews and
17  integrates the literature on contracting with
18  physicians.
19      Q. Is it your opinion that all payers are
20  weak negotiators with physicians?
21      A. In relative terms, it's my opinion that
22  this problem of asymmetric information makes