Meredith Rosenthal, Ph.D. CONFIDENTIAL                    February 23, 2006
Cambridge, MA

### 309

1  payers relatively weak negotiators.
2      Q. Would there be -- let me make sure I
3  understand what you mean by the term "weak
4  negotiator."
5      A. Yes. Let me be a little clearer.
6      Q. Sure.
7      A. I mean that in the sense that there are
8  likely to be rents, profits in all these
9  contracts, that payers are not able to drive
10 physician reimbursement down to cost.
11     Q. Now, when you say "weak negotiators," are
12 you referring -- are you isolating the issue of
13 negotiation of reimbursement for physician-
14 administered drugs? Are you speaking more
15 broadly in terms of the overall negotiation
16 between physicians and third-party providers on
17 reimbursement for all fees and services?
18     A. What I am talking about here is really
19 about negotiating for these physician-administered
20 drugs.
21     Q. How can you isolate that when the
22 third-party providers are negotiating an entire

### 310

1  range of services with a physician?
2      A. I have not been asked to provide an
3  opinion about that negotiation.
4          Are you asking me --
5      Q. Yes.
6      A. -- whether I think physician make profits
7  on other goods and services?
8      Q. Right.
9      A. Certainly, but those -- the nature of the
10 transactions for something like open-heart surgery
11 may be very different from the nature of the
12 transactions related to these physician-
13 administered drugs, and I have not examined and
14 pulled together the information on all these other
15 services.
16     Q. Does the fact that they make profits --
17 strike that.
18         Why does the fact that they make
19 profits make the third-party providers
20 necessarily weak negotiators?
21     A. My use of the term was to imply that they
22 could not use negotiation to drive reimbursement

### 311

1  down to cost, and therefore, dissipate the effects
2  of the spread.
3          An important piece of this overall
4  story is that there are margins for physicians
5  here. If there were no margins --
6      Q. Physicians wouldn't provide the services?
7      A. Presumably. Because they are
8  oligopolists.
9      Q. Why are physicians oligopolists?
10     A. Because of licensure. There is a guild.
11 It's called the Medical Association. Physicians
12 have restricted entry.
13         There are a large number of reasons
14 why the physician market is not competitive,
15 including my earlier statement, as you were
16 reading about the inability of patients to easily
17 trade off one physician against the other.
18     Q. You indicated earlier in your testimony
19 that third-party providers tend to come up with a
20 rate schedule.
21         Is that rate schedule then, in your
22 experience, typically provided to all members of

### 312

1  the network?
2      A. My understanding, typically, the way fee
3  schedules work is there is a fee schedule and
4  providers may have different multipliers off that
5  schedule.
6          It may be possible that some providers
7  negotiate different multipliers for different
8  subsets of services.
9      Q. Would you agree with me that the leverage
10 of a -- the leverage in a negotiation between a
11 physician or physicians group and a third-party
12 provider will vary from provider to provider and
13 physician group to physician group?
14     A. I would agree with you that there may be
15 variation and market power on both sides.
16     Q. And are there instances which the
17 third-party provider has market power?
18     A. Certainly.
19     Q. So, for example, if you had a third-party
20 provider with a significant market share in a
21 relatively large urban area, that would -- those
22 types of factors would tend to give the third-

```
                                                313
1    party provider market power; would it not?
2       A. A third-party payer would have greater
3    market power to the extent that they covered a
4    larger share of the patients in an area, but I
5    think it's important to note, again, that I
6    wouldn't expect that to drive reimbursement of
7    cost for physicians.
8       Q. And you wouldn't expect it drive down cost
9    because the physicians still have some degree of
10   leverage?
11      A. That's correct.
12      Q. Turn to Page 13 of your report.
13      A. I am on Page 13.
14      Q. Paragraph 26, the last sentence.
15      A. Okay. Yes.
16      Q. You say, "In the Medicare context, these
17   negotiations take the form of Congressional
18   action in an environment of intense lobbying by
19   specialty societies, but have a largely similar
20   outcome to the private process."
21         When you referring to the intense
22   lobbying by specialty societies, what you are
```

```
                                                314
1    referring to?
2       A. In this particular case, the lobbying that
3    we've observed by the American Society of Clinical
4    Oncologists is particularly what I had in mind.
5       Q. How would you characterize that lobbying?
6       A. They issued numerous reports and
7    communicated with Congress about their concern for
8    oncologists losing money on Medicare, essentially.
9       Q. And how would you -- do you think that
10   lobbying has been effective?
11      A. I do think that lobbying has been
12   effective.
13      Q. And has that lobbying resulted in levels
14   of -- in the levels of reimbursement under
15   Medicare Part B that have been observed over
16   time?
17      A. I'm sure that lobbying is a factor, and
18   again, the ability of physicians broadly to
19   maintain profitability in these kinds of
20   negotiations, yes.
21      Q. Would you agree with me that -- strike
22   that.
```

```
                                                315
1       Do you have an opinion of whether
2    lobbying by the specialty societies you've
3    identified resulted in the reimbursement levels
4    for physician-administered drugs under Part B
5    that were in place during the class period?
6       A. Again, there are numerous factors that are
7    likely to have affected the final level that was
8    set.
9          I believe that lobbying would have
10   been a factor would have influenced it.
11      Q. Page 13, Paragraph 27, there is a
12   discussion of barriers to entry.
13      A. Yes.
14      Q. You say, "Barriers to entry allow current
15   market participants to enjoy excess profits."
16         What market participants are you
17   talking about?
18      A. Specialist physicians, in particular, I am
19   talking about here.
20      Q. And when you refer to the excess profits,
21   are you referring to economic profits?
22      A. That's correct.
```

```
                                                316
1       Q. What's your working definition of economic
2    profits?
3       A. Well, working definition? I mean, perhaps
4    it's not fair to say I was being precise about
5    economic profits, which would include opportunity
6    costs, and so the notion of profits here I am
7    talking about, again, relates to the reimbursement
8    levels that exceed, in this case, acquisition
9    costs for the drug.
10      Q. Assuming for the moment you use the term
11   "profits" here to refer to economic profits, did
12   you -- would you include in there the cost of the
13   physician operating his or her business?
14      A. That would certainly be part of the
15   economic costs.
16      Q. And would you include opportunity costs in
17   that?
18      A. It would certainly be part of the economic
19   costs.
20      Q. And to what extent did you try to
21   calculate economic profits?
22      A. It was not necessary for my conclusions to
```

**317**

1  calculate it.
2     It was a well-known fact in health
3  economics that competition does not lead -- there
4  is no perfect competition in healthcare, as we
5  talked about very early on yesterday, and
6  therefore, the conclusion is that there is excess
7  profits among providers.
8     Q. So I want to make sure I understand your
9  point.
10    A. Yes.
11    Q. Your point is excess profits exist in a
12 market where there is less than perfect
13 competition?
14    A. Where these physicians have market power,
15 and therefore, do not -- do not compete in the
16 sense of offering pricing at their cost, then
17 that's true, there are excess profits.
18    Q. I just want to understand your principle,
19 taking it outside --
20    A. Okay.
21    Q. -- the specifics of this case.
22    A. Okay.

**318**

1     Q. When you refer to "excess profits," are
2  you referring to those profits which are
3  generated by market participants where there is
4  less than perfect competition?
5     A. I'm sorry, could you restate it again? I
6  want to make sure.
7     Q. I will try and say it more directly.
8     A. Okay. Thank you.
9     Q. Is it your opinion where there is less
10 than perfect competition, there will be, by its
11 nature, excess profits?
12    A. What I am referring to here is the
13 situation where there is not perfect competition.
14 There is market power on the part of physicians.
15 Therefore, they do not compete, and therefore,
16 they retain excess profits.
17    Q. So am I correct that it is your view that
18 the in absence of perfect competition in a market
19 the market will generate excess profits?
20       MR. MACORETTA: Objection. Go ahead.
21    A. For the market participants who are
22 exhibiting oligopoly behavior, yes.

**319**

1     Monopolist competition is more
2  appropriate for physicians.
3     Q. Have you measured the effects of the
4  barriers to entry to which you refer on physician
5  economic profits?
6     A. I have noted, I believe, in my earlier
7  report, that oncologists' income is considerably
8  higher than other physicians.
9        If you mean that measuring -- that's a
10 measure of again the profitability looking at the
11 profitability as a measure of the lack of
12 competition.
13    Q. And what conclusion do you draw from the
14 fact that oncologists have higher incomes than
15 other physician groups?
16    A. Well, in that particular case, these were
17 oncologists that practiced in clinics and a large
18 share of their income was maintained through
19 reimbursement for injectable drugs, and I
20 concluded that they had the ability to reap those
21 profits despite whatever competition there was on
22 the health plan side.

**320**

1     Q. Am I correct that it is your opinion that
2  excess profits exist because of physician market
3  power?
4        MR. MACORETTA: Objection. Go ahead.
5     A. In this case, market power clearly has a
6  role to play.
7        Excess profits among the oncologists
8  that we see I also attribute to the claim that we
9  are discussing here, that AWP was inflated.
10       Clearly that contributes to some of
11 their excess income, that ability to hide these
12 additional profits, but is market power a factor
13 in their profitability? Absolutely.
14    Q. To what extent have you determined the
15 degree to which market power as opposed to
16 anything else have contributed to the excess
17 profits which you describe?
18    A. The analysis doesn't rely on quantifying
19 that.
20       Dr. Hartman's analysis quantifies the
21 extent of the overcharge, as you know, and my
22 analysis looks at the mechanisms and examines

Meredith Rosenthal, Ph.D. CONFIDENTIAL        February 23, 2006
Cambridge, MA

**321**

1  evidence that those mechanisms were in play.
2      I can establish my conclusions without
3  specifically quantifying the effect of market
4  power on profits.
5      Q. Would I be correct that neither you nor
6  Dr. Hartman have determined the extent to which
7  any spread that exists is a function of physician
8  market power?
9      A. I cannot say what went into Dr. Hartman's
10 calculations in terms of the conceptual basis for
11 those.
12     Q. Let me take you to -- let's go to -- turn
13 to Page 19. Let's use the Remicade chart as
14 illustrative.
15     We are showing a 31 percent spread.
16     A. Okay.
17     Q. What part of that spread is attributable
18 to physician market power?
19     A. Let me say, again, in Dr. Hartman's
20 analysis, my understanding of the but-for world is
21 represented by his yardstick, and so in the
22 but-for world, the difference according to his

**322**

1  yardstick would be one percent.
2      Q. So I am clear, as you read Dr. Hartman's
3  report, 30 percent of the spread would be
4  attributable to physician market power and one
5  percent would be attributable to other factors?
6      A. No. I'm sorry. Perhaps I wasn't clear.
7      Q. Okay.
8      A. I am saying the identified amount that,
9  according to his yardstick, is identified with the
10 alleged fraud, is that amount over the yardstick.
11     The rest may be due to market power,
12 other factors, and again, it's not -- I have not
13 identified, quantified the amount of market power
14 that goes into that spread.
15     Q. So let me try to restate --
16     A. Okay.
17     Q. As you read Dr. Hartman's report, as an
18 economist, what you see him saying is that --
19 using the example of Remicade -- a spread of 30
20 percent would be attributable to physician market
21 power or other factors and the one percent to get
22 us to 31 percent would be attributable to the

**323**

1  conduct alleged here in the complaint?
2      MR. MACORETTA: Objection. Go ahead.
3      A. My interpretation is a comment of what a
4  but-for scenario is intended to look at, which is
5  again a marginal analysis, and that here the
6  marginal analysis suggests what could be
7  contributed to the alleged fraud is the one
8  percent, and therefore, everything else is
9  attributable to the something else.
10     Q. And if we look at the spread in 2003 in
11 your chart, it's 34 percent.
12     So the amount attributable to the
13 alleged fraud would be four percent?
14     A. That's my understanding of the way the
15 yardstick is used.
16     MR. CAVANAUGH: Why don't we take a
17 short break.
18     MR. MACORETTA: Sure.
19     THE VIDEOGRAPHER: 11:47. We are off
20 the record.
21     (A recess was taken.)
22     THE VIDEOGRAPHER: Stand by, please.

**324**

1  The time is 12:07 p.m. We are back on the
2  record.
3      MR. MACORETTA: Bill, I think
4  Dr. Rosenthal wants to supplement one of her
5  earlier answers before you go any further.
6      A. Thank you. I will be brief.
7      I had the opportunity to look at the
8  Dyckman survey while we were breaking, and to
9  refresh my memory about the methods there, I just
10 wanted note a couple of things, if you have a
11 copy, I could read the questions for you.
12     Q. I actually don't.
13     A. I left mine back in the office, but let me
14 tell you a couple of brief things about that.
15     Q. Sure.
16     A. The survey respondents covered
17 approximately 45 million lives, which is about a
18 quarter of the commercially insured population of
19 the U.S. I know that was one of your questions,
20 was the representative of the survey.
21     The questions were of an open-ended
22 form. The question, in particular, with regard to

Meredith Rosenthal, Ph.D. CONFIDENTIAL                     February 23, 2006
Cambridge, MA

325

1  physician-administered drugs -- and I don't have
2  word for word, I was going to read it to you --
3  but, essentially, how do you reimburse for
4  physician-administered drugs? And the answers as
5  tabulated by the researchers all were a numerical
6  percentage of AWP.
7        So it leaves little ambiguity that
8  they understood the question and were able to
9  respond to it.
10    Q. All right. Let me be clear.
11        Am I correct that the Dyckman studies
12  utilized open-ended questions?
13    A. That's correct.
14    Q. And would you agree with me that the
15  utilization of open-ended questions can lead to
16  difficulties in collecting -- strike that.
17        Would you agree with me that utilizing
18  open-ended questions in a survey can be
19  problematic?
20    A. In some context, where there are a wide
21  range of ideas that might be captured by the
22  question, that could be problematic.

326

1        Again, looking at this particular
2  survey and the responses, I do not have questions
3  about that.
4    Q. Do you know what the narrative responses
5  were by these 29 individuals?
6    A. The researcher?
7    Q. 33.
8    A. They do not provide that information.
9    Q. So your reliance -- in ascertaining what
10  the actual responses were, you are relying on the
11  numerical tabulation done by the researchers?
12    A. Yes, I am.
13    Q. You don't know what assumptions or
14  judgments were made by the researchers in taking
15  the narrative responses provided by the 33
16  respondents and conforming that to the numerical
17  tabulations that appear in the report?
18    A. Given that the tabulation represents
19  percentages of AWP, my judgment is that very few
20  assumptions would need to be made there.
21        Thank you.
22    Q. If you could turn to Paragraph 45 of your

327

1  report, which is on Page 21.
2    A. Yes, I have found it.
3    Q. You go on to talk about why payer
4  knowledge would not have dissipated the impact of
5  the AWP inflation.
6        Are you saying there that if payers
7  knew actual acquisition costs there still would
8  have been AWP inflation?
9    A. Excuse me, could you repeat the question
10  again?
11    Q. I will re-ask it more broadly.
12        Is it your opinion that even if there
13  was payer knowledge of physician actual
14  acquisition costs that there nonetheless would
15  have been AWP inflation?
16    A. The point that I was trying to make here
17  was that payers had not sought out information on
18  the acquisition costs, and therefore, because of
19  -- excuse me -- not "therefore." It goes in the
20  other direction.
21        Payers did not seek out this
22  information because these specialty drugs were

328

1  among a number of concerns they had, and given the
2  costs of seeking that information that we talked
3  about yesterday, they relied on AWP as a benchmark
4  for reimbursement.
5    Q. Now, do you have an opinion as to how
6  difficult it would have been to determine the
7  types of acquisition costs that physician were
8  paying for the drugs at issue in this case?
9    A. It's my opinion that it was of sufficient
10  cost that payers did not obtain that information.
11  So some degree of difficulty.
12    Q. Did you attempt to determine how feasible
13  it would have been to gather information about
14  actual acquisition costs?
15    A. I reviewed the available data sources,
16  including IMS and Verispan and found that publicly
17  available data to get to acquisition cost was not
18  available, and that would have been used --
19  considered by third-party payers.
20    Q. Can you look at Exhibit Rosenthal 003, which
21  was the Barons article from 1996.
22    A. Okay. Yes.

Meredith Rosenthal, Ph.D. CONFIDENTIAL
Cambridge, MA
February 23, 2006

**329**

1  MR. MACORETTA: Exhibit Rosenthal 011.
2  THE WITNESS: Thank you. I have it.
3  Who could forget?
4  Q. And as we talked about yesterday, does
5  this article report on spreads between AWP and
6  actual costs and express them as percentages?
7  A. That's my understanding of what it shows,
8  yes.
9  Q. And would you agree with me that the
10 percentages expressed here are certainly outside
11 the range of Dr. Hartman's AWP-minus-30-
12 expectation theory?
13 A. That's what it appears to me.
14     I can't entirely see these numbers,
15 but they appear to be in the range of about 60
16 percent below AWP, which is a somewhat different
17 benchmark, but, yes, 60, 70.
18 Q. There's a couple of nineties.
19 A. Yes. I see that. Okay. So, yes.
20 Q. Well, in doing your work in this case, did
21 you consider how it was that a Barons reporter
22 was able to get this information and how

**330**

1  difficult it would have been for some of the
2  largest insurance companies in the world to get
3  comparable information?
4     MR. MACORETTA: Objection.
5  A. My conclusion was that insurers are
6  looking to gather -- if they were to try to gather
7  acquisition costs on all their providers for all
8  of the drugs at multiple points in time, that that
9  would indeed be costly.
10     This is a single point in time, and I
11 can't read the sample, but it looks like there
12 were a half a dozen suppliers.
13 Q. So your opinion is that no insurer would
14 have any incentive to do some sort of snapshot to
15 see -- to look at real market conditions, real
16 acquisition price at any point in time?
17 A. It is my opinion that the payers actually
18 relied on AWP, and my conclusion is that the costs
19 of obtaining acquisition costs directly from
20 providers, if that were even possible, were
21 excessively high.
22 Q. How would it have cost Aetna to do a

**331**

1  survey of acquisition costs in 1996?
2  A. I did not examine that.
3  Q. Do you think they could have afforded the
4  research effort that was undertaken by this
5  reporter at Barons?
6  A. My judgment is that a single-point-in-time
7  survey for a few providers would not have been the
8  actionable information that one could use to
9  change the reimbursement system and move it to a
10 basis of acquisition cost.
11 Q. So if I understand you correctly, your
12 opinion is that if a large insurer such as Aetna
13 or Cigna or any of the others had gotten
14 information on actual acquisition costs at any
15 given point in time they would not have taken any
16 action?
17     MR. MACORETTA: Objection.
18 A. No. That's not my opinion.
19 Q. Okay. What is your opinion?
20 A. My opinion is that they did not seek out
21 that information because of its cost and because
22 of the general expectation that AWP -- and

**332**

1  discounting off of AWP. So that AWP was not
2  equivalent to acquisition costs, but that it
3  reasonably represented average acquisition costs.
4  Q. You are an economist. You just used the
5  term "cost."
6     So please tell me everything you did
7  to determine what the cost would have been for
8  them to undertake that effort?
9  A. I did not estimate. I did not attempt to
10 quantify the cost.
11     I observed their behavior, their
12 continued use of AWP.
13 Q. And based on that, you are making the
14 assumption that they concluded that it would have
15 been too costly to acquire actual acquisition
16 information?
17 A. That is one of the conclusions that I draw
18 from that, and that's the purpose of this
19 paragraph, is to point that out.
20 Q. But you are not saying it would have been
21 too costly for them to undertake the type of
22 effort that is reflected in this Barons article?

Meredith Rosenthal, Ph.D. CONFIDENTIAL                    February 23, 2006
                        Cambridge, MA

333

1    A. I am suggesting that the kind of effort
2    that is represented in this Barons article small
3    snapshot, and that it would not have been useful
4    for changing the basis of the reimbursement
5    system.
6         I don't know what the work in the
7    Barons article cost.
8    Q. And what is the basis for an opinion that
9    a snapshot of actual acquisition costs would not
10   have been sufficient to alter payer behavior?
11   A. The basis of my opinion is my
12   understanding about how claims payment systems
13   work; and the way claims payment systems work
14   currently, there is an AWP that is referenced to
15   generate a threshold level of the allowed amount,
16   that's the nature of reimbursement.
17        If you were going to move your system
18   to acquisition cost, it would need to put that
19   information in.
20   Q. So. Doctor, if you acquired actual
21   acquisition prices and you determined there was
22   significant variation between your AWP-based

334

1    reimbursement and actual acquisition costs,
2    couldn't insurers have adjusted the AWP-based
3    reimbursement?
4    A. They could have. I think we are talking
5    about the use of acquisition cost for
6    reimbursement.
7    Q. No. I'm talking about acquiring actual
8    acquisition information, and then the range of
9    options that are then available to a payer.
10        Would you agree with me that there
11   would be a range of options available to a payer?
12   A. If a payer conducted a survey of its own
13   providers, could it have used that information in
14   some way? Certainly.
15        Again, we know they continued to
16   discount off of AWP.
17   Q. And had they chosen, they could have
18   altered the AWP reimbursement rate, correct?
19   A. Perhaps that's true.
20   Q. Did you inquire of any third-party
21   providers whether they did any snapshot surveys?
22   A. I did not.

335

1    Q. Would you agree with me that insurance
2    companies -- strike that.
3         Do you have an opinion as to whether
4    any of the third-party payers that are members of
5    the class here are sophisticated?
6    A. I do not have an opinion with regard to
7    whether they are sophisticated.
8    Q. So you have no opinion as to whether a
9    health insurer such as Aetna is a sophisticated
10   company?
11   A. Sophistication is not a measurement I am
12   used to taking. So I cannot tell you that.
13        If you want me to tell you that Aetna
14   is a large company, I can tell you that.
15   Q. You have no opinion as to the degree of
16   sophistication or knowledge of any of the third-
17   party plans in this case other than to say they
18   are large- or small- or medium-sized?
19   A. I can tell you whether they are
20   not-for-profit or for-profit if I exam them.
21        I can tell you what their
22   profitability is, but sophistication, I don't know

336

1    had what you mean by that, nor would I know how to
2    quantify it.
3    Q. In proffering your opinions here, have you
4    made any assumptions regarding the internal
5    decision-making processes of any of the
6    third-party payers?
7    A. In my report --
8    Q. Yes.
9    A. -- do I rely on any assumptions about the
10   third-party payers?
11        My principal assumption is that they
12   can't observe the acquisition costs of the
13   physicians.
14   Q. They --
15   A. I'm sorry, they cannot observe the
16   acquisition costs.
17   Q. Do you make any assumptions of their
18   conduct based on that -- on that assumption?
19   A. If I understand you correctly --
20   Q. Strike that.
21        What assumptions do you draw from your
22   assertion that payers did not have access to

**337**

1 actual acquisition costs?
2    A. My conclusions are drawn on the basis of
3 the notion that third-party payers were forced to
4 contract, as they do in many cases, on the basis
5 of imperfect information.
6       They don't have access, in this case,
7 to the acquisition costs. So they used what they
8 believed to be a signal for that, the AWP, and
9 that that was the basis for contracting -- so
10 that's the behavior that I examined based on that
11 assumption that they could not use the physicians'
12 actual acquisition costs for contracting purposes.
13    Q. You note at one point that, "It is
14 possible to quantify the importance of variation
15 in payer knowledge of the spread using Dr.
16 Hartman's revealed preference approach."
17       Can you explain to me what you mean by
18 that?
19    A. An outer-bounds notion of the amount of
20 that variation could be observed in the actual
21 percentages of AWP that were used for
22 reimbursement.

**338**

1    Q. What do you mean by "revealed
2 preferences"?
3    A. Again, the notion -- it's modeled after
4 the general economic theory where we observe the
5 market equilibrium, and rather than observing
6 individual preferences, we see what happens in the
7 market, and we infer from that something about
8 preferences.
9    Q. Is a revealed preference essentially
10 determining what choices are being made by market
11 participants?
12    A. So the standard way of thinking about
13 revealed preference is we observe choices and that
14 reveals information about the preferences.
15    Q. What are the choices that you considered
16 payers made with respect to the utilization of
17 AWP?
18    A. The payers reimbursed physicians for these
19 drugs as a percentage of AWP, which ranged -- the
20 outer bounds -- plus or minus 15 percent, and the
21 majority of the data in that Dyckman survey are
22 between 90 and a hundred percent of AWP.

**339**

1    Q. Do you have an opinion as to whether
2 payers wished to reimburse physicians at cost?
3    A. I'm not sure what you mean by "wished."
4    Q. In choosing the reimbursement rates that
5 they did, did payers intend to reimburse
6 physicians at cost?
7    A. I don't know what their intentions were.
8       Again, we talked about the existence
9 of market power.
10    Q. Do you see any revealed preference from
11 the utilization of AWP reimbursement rates with
12 regard to the amount, if any, of physician profit
13 that third-party providers were willing to allow?
14    A. What I observe in those reimbursement
15 rates is generally that -- across that range,
16 there's evidence that profits were being allowed
17 there, yes. Is that what you are asking me?
18    Q. Yes.
19    A. So it's clear that the reimbursement
20 allows for some profits, and there is a variation
21 in that amount of profits, but again that the
22 variation was, in my view, relatively narrow.

**340**

1    Q. Is it your testimony that preferences are
2 really the same as expectation?
3    A. No, not at all.
4       "Preference" is a term we usually use
5 about individuals rather than firms.
6       Using the term "revealed preference"
7 was an attempt to make an analogy, and so the
8 actions of a firm, in this case, under asymmetric
9 information, will be based, in part, on what they
10 believe the distribution of the underlying costs
11 to be, what they believe the mean to be.
12       If that's what you mean by
13 "expectations," yeah.
14    Q. Let me go back to your prior answer with
15 respect to payers permitting physicians to profit
16 on reimbursement for drugs.
17       Do you have an opinion to whether
18 payers had made a decision as to the amount of
19 profit to allow?
20    A. I conclude that they made some decision
21 about that.
22       Do I know that exactly? What decision

341
1  was made? I do not.
2     Q. What decision do you think they made with
3  respect to physician profit?
4     A. Coming up with that particular threshold
5  was not the subject of my report. So I have not
6  tried to quantify exactly how much profit they
7  were allowing, they were intending to allow
8  physicians.
9     Q. Let me ask you to turn to Page 14 of your
10 report.
11    A. Okay. I am with you.
12    Q. Your opening sentence refers to physicians
13 as the key decision-makers for most therapies,
14 including those that are the subject of the
15 allegations in this matter.
16       Would you agree with me that that
17 would not be true with respect to the selection
18 of a particular generic form of a drug?
19    A. That would be true. A physician may
20 choose to write a brand name prescription or a
21 generic form, but that is true, they do not choose
22 the particular generic.

342
1     Q. So is there any economic incentive to
2  pharmaceutical manufacturers with respect to
3  incentiving doctors as it relates to generics?
4     A. As it relates to the generics, it is for
5  the retailer, not for the physician.
6     Q. So your opinions with respect to
7  manufacturer financial incentive -- manufacturer
8  incentives and physician incentives would not be
9  applicable to generic drugs?
10    A. Actually let me amend for a second.
11    Q. Sure.
12    A. If a physician is carrying a particular
13 drug and distributing out of his or her office,
14 then the selection of the generic to have in the
15 office would still pertain to that physician's
16 decision.
17       If the physician is ordering a drug
18 that is then filled elsewhere, they can't select
19 the generic; but if I am delivering an injection
20 in my office, I choose which of the generics to
21 carry, right. So it would depend.
22    Q. You note in your report that generic drugs

343
1  such as albuterol were reimbursed, not based on
2  their AWP, but rather the median AWP?
3     A. That's correct.
4     Q. What's your understanding of the term
5  "median"?
6     A. If you rank the drugs based on the price
7  and you take the one where there is 50 percent
8  above and 50 below, you split the difference, if
9  it is in the middle, it's the middle in terms
10 ranking of price, 50 percentile.
11    Q. If we assume that reimbursement is based
12 on a median, then what particular incentive
13 exists for a physician to utilize a particular
14 generic?
15    A. So a physician, again chooses a generic,
16 relative to that median AWP, will seek the generic
17 with the lowest acquisition cost.
18       Do we agree?
19    Q. How does the physician know what the
20 median is going to be for purposes of determining
21 the reimbursement?
22    A. Physician billing software has some

344
1  assumption built into it. When they bill, they
2  know how much to bill for these drugs.
3     Q. Did you do any effort to study the extent
4  to which physicians were looking at their
5  acquisition costs for the particular generic they
6  might utilize and what the median -- what the
7  reimbursement was based upon some median of AWP
8  for a range of generics?
9     A. Did I look at individual physician billing
10 systems? I did not. I am certainly familiar with
11 the office billing software.
12    Q. Let me just make sure we are on the same
13 page here as to the application of median in this
14 case?
15    A. Sure.
16    Q. If I have a data range of let's say $1,
17 $3, $5, $7 and $10, the median would be $5,
18 right?
19    A. I agree with you.
20    Q. If I am a generic manufacturer selling at
21 $3 and I lower my price to $1, the median stays
22 at $5, right?

345

1    A. That's correct.
2    Q. So would I be correct that to the extent
3 that a manufacturer lowered their price from $3
4 to $1, they would not be altering the
5 reimbursement rate for that particular -- for
6 those generic drugs?
7    A. All other things equal, that would be
8 true.
9        If there is a competitive response to
10 the generic manufacturer lowering their price,
11 then the median might move, but all other things
12 equal, that's true.
13   Q. In your report, you refer to the class
14 being economically injured.
15       What do you mean by "economically
16 injured"?
17   A. They paid more for these drugs than they
18 would have in the but-for world.
19       (Exhibit Rosenthal 014 was marked
20        (for identification)
21   Q. We have marked as Exhibit Rosenthal 014 a
22 document from Managed Healthcare Executive entitled

346

1 "New MNA Methodology For Drug Prices is a Big Change
2 For Many Payers."
3    A. I see this. Thank you.
4    Q. Are you familiar with this article?
5    A. I am not familiar with this particular
6 article.
7    Q. We had -- I asked you some questions
8 yesterday about bad debt on co-pays for
9 physicians.
10   A. Yes, you did.
11   Q. And you indicated to me that you had seen
12 a report that indicated it was a negligible
13 amount.
14       Was it well below one percent, what
15 you were recalling?
16   A. I mentioned this was an OIG report, and I
17 don't have the numbers in front of me.
18       My recollection was that they believed
19 it to be negligible, and my estimate was that it
20 couldn't have been more than one percent for them
21 to say that.
22   Q. And do you remember when that OIG report

347

1 was from?
2    A. I don't remember the date of it, no.
3    Q. Have you looked at any recent data on bad
4 debt associated with Medicare Part B co-pays?
5    A. I have not.
6    Q. Let me ask you to look at the bottom
7 paragraph on the first page. If you'd just read
8 that paragraph.
9    A. I see that.
10   Q. There is a sentence there, "Today
11 physician providers collect about one-half of the
12 drug-related co-pay."
13   A. I see that.
14   Q. Did you take that into consideration in
15 formulating your opinions here?
16   A. Well, as I mentioned, I haven't seen these
17 data, but that would not affect my opinions.
18   Q. Well, would you agree with me that an
19 individual who did not make their drug co-pay
20 under Part B certainly was not injured by any AWP
21 inflation?
22   A. I'm not sure I would agree with that. I

348

1 would have to give that some thought.
2    Q. Well, if they didn't pay, how could they
3 have overpaid?
4    A. I guess that would be the conclusion, but
5 an individual in every case didn't pay, I am not
6 sure what this half of drugs -- so it may be an
7 individual didn't pay on some event, not others,
8 but in theory, if there is no payment, it's hard
9 to disagree with you.
10   Q. When we were talking earlier about
11 economic profits, would you agree with me that in
12 trying to determine what physician economic
13 profits were on reimbursement for physician-
14 administered drugs one would need to take into
15 consideration the degree of bad debt on co-pays?
16   A. If there is a valid estimate out there,
17 and we are trying to assess the impact on
18 consumers -- of course this is with regard to
19 consumers -- there is no implication that the
20 supplemental insurer Medigap plans also didn't
21 pay. That, I would be surprised to hear, because
22 they are contractual obligated to pay.

Meredith Rosenthal, Ph.D. CONFIDENTIAL                February 23, 2006
Cambridge, MA

**349**

1  So one might need to take that
2  information into account in looking at the
3  individual consumers which represent about 15
4  percent of the Medicare population, that's right.
5     Q. When you say 15 percent, are you saying
6  then that 85 percent are covered by Medigap?
7     A. 15 percent is the most recent number that
8  I have available that don't have supplemental
9  insurance.
10    All that would have changed with the
11 new drug benefit, in an unknown direction, because
12 of course we are talking about coverage for
13 co-insurance here.
14    Q. Now, your 15 percent was from a point in
15 time before the change -- the recent changes to
16 Medicare drug reimbursement?
17    A. Right. So the existence of an outpatient
18 drug benefit may have actually decreased the
19 amount of supplemental coverage for co-insurance.
20 Those things were linked in the past.
21    MR. CAVANAUGH: All right.
22    Doctor, I don't have any further

**350**

1  questions.
2     THE WITNESS: That's the best news
3  I've heard all day.
4     MR. FLYNN: I am going to be ten
5  minutes.
6     MR. MACORETTA: I don't think lunch
7  is here.
8     THE WITNESS: That's fine.
9     CROSS-EXAMINATION
10 BY MR. FLYNN:
11    Q. Okay. We are still on.
12    Dr. Rosenthal, good afternoon, and my
13 name is Michael Flynn. I represent AstraZeneca.
14 I have a couple of follow-up questions from the
15 questions Mr. Cavanaugh asked you.
16    I think we established before, I'm I
17 correct, that Pulmicort is not mentioned in your
18 report at all; is that correct?
19    A. That's correct. It was in the earlier
20 complaint, but it is not in my report.
21    Q. You have rendered no opinions with respect
22 to Pulmicort, correct?

**351**

1     A. That's correct.
2     My opinions generalize to marketplace,
3  but I have rendered no opinions specifically with
4  respect to Pulmicort.
5     Q. And the backup data that you provided,
6  that was produced to defendants in this case
7  supporting your analyses, includes no data with
8  respect to Pulmicort; is that correct?
9     A. That's correct.
10    Q. Doctor, if you turn to your report Page
11 17, I believe, and you were talking in response
12 to a couple of questions by Mr. Cavanaugh earlier
13 about the implications of the implementation of
14 LCA.
15    Do you remember that?
16    A. Yes, I do.
17    Q. And you have on the chart on Page 17 of
18 your report, a little box at the top of that
19 chart that says, "Most carriers implement LCA
20 policy by January 1, 1999."
21    Do you see that?
22    A. Yes, I do.

**352**

1     Q. What do you mean by "most"?
2     A. We looked at the distribution of states
3  over time and more than half of them had
4  implemented by this point.
5     Q. And I don't see anything in your report
6  that supports that conclusion.
7     What did you rely on to support the
8  "most" conclusion that you draw with respect to
9  the implementation of LCA?
10    A. The existence of the LCA policy is of
11 public record.
12    It's The Center For Medicare, now,
13 currently. It was HCFA at the time.
14    The Center of Medicare and Medicaid
15 Services implemented this policy, and the carriers
16 adopted it.
17    Q. I guess what I was getting at is the
18 timing of the implementation of LCA.
19    You say by January 1, 1999, most
20 carriers had implemented LCA.
21    What is your support for that timing
22 conclusion?

**353**

1   A. That information comes from The Center For
2   Medicare and Medicaid Services. If you need a
3   particular link, I could provide that.
4       Q. Is it referenced as the materials you rely
5   upon in Exhibit B to your report at all?
6       A. I don't believe it is, no.
7       Q. You drop a footnote on Page 17 that --
8   Note 36 -- "The LCA policy was adopted by HCFA
9   carriers beginning in May 1997 with South
10  Carolina and was ultimately used by almost all
11  states."
12          Do you see that?
13      A. Yes, I do.
14      Q. Did you do any analysis of the number of
15  units covered by LCA or the number of covered
16  lives covered by LCA since the first adoption of
17  LCA by any state?
18      A. I didn't do that for this chart, which
19  again, was sort of looking at a specific point in
20  time. So, no, I did not.
21      Q. Can you tell me today how many covered
22  lives were implicated by the LCA adoption by

**354**

1   carriers prior to January 1, 1999 as opposed to
2   after?
3       A. I can't quantify that, no.
4       Q. And you can't tell me how many units of
5   Zoladex and/or Lupron were affected by LCA either
6   before or after January 1, 1999; is that correct?
7       A. It wasn't necessary to quantify that for
8   my analysis. So, no, I can't.
9       Q. The answer is no?
10      A. The answer is no.
11      Q. Dr. Rosenthal, if I understand your
12  testimony correctly, you cite two Zoladex
13  documents in your report that were produced by my
14  client AstraZeneca, for an illustrative purposes,
15  to show the incentives that were facing
16  AstraZeneca in connection with its price
17  decisions as to Zoladex is that correct?
18      A. That's correct.
19      Q. And because you are assuming that the
20  allegations of the fraud in this case are true,
21  you are not citing those documents as support for
22  the conclusion that fraud was committed by

**355**

1   AstraZeneca in this case; is that correct?
2       A. I am citing those documents as support
3   that the model that I have offered here of
4   competitive strategy in an environment where costs
5   are unobservable physicians are making decision,
6   that that document suggests that competitive
7   strategy was the reason for AWP inflation.
8       Q. So those documents -- I misunderstood your
9   testimony then. I thought you said that those
10  documents were illustrative of what you observed
11  by looking at the economic data as to the
12  incentives facing AstraZeneca or the other
13  manufacturers in the case.
14          MR. MACORETTA: Objection.
15          You can answer.
16      A. I believe that I said the same thing.
17  Maybe it's just a matter of language.
18          Those documents are additional support
19  for the economic analysis I did of the incentives.
20          They corroborate my economic analysis.
21  They look at strategic incentives from the words
22  of the defendants themselves.

**356**

1       Q. But because you are not opining on whether
2   or not fraud was committed in this case, you are
3   not citing those documents as support for the
4   conclusion that the plaintiffs' allegations are
5   correct; is that right?
6       A. I am not making a legal opinion about
7   fraud. Is that the basis for your --
8       Q. Just that anyone was misled or deceived,
9   whether or not it's a legal conclusion or not,
10  you are not opining on whether or not anyone was
11  misled in this case, correct?
12          MR. MACORETTA: Objection.
13          Go ahead.
14      Q. Your opinions don't go to whether or not a
15  particular member of the class or the class in
16  general was misled; is that right?
17      A. My opinion is that the health plans relied
18  on AWP and -- as a signal of acquisition cost, and
19  it was not.
20          In layman's terms, I would consider
21  that to be misled, but it sound to me like you are
22  using a very specific legal connotation for that.

Meredith Rosenthal, Ph.D. CONFIDENTIAL                    February 23, 2006
Cambridge, MA

357

1    Q. No. I am just trying to get at your
2  testimony before and in your report.
3         You are assuming the truth of the
4  allegations. You're not changing that testimony;
5  is that correct?
6    A. That's correct.
7    Q. And in referencing the AstraZeneca
8  document in specific, the two that you referenced
9  related to Zoladex, tell me again how you picked
10 those documents?
11   A. I examined -- looked for strategic
12 documents. I asked for strategic documents that
13 mention AWP, and these were examples that
14 illustrated the point that I was trying to make
15 that the manufacturers understood AWP could be
16 used to increase sales.
17   Q. And whom did you ask to find those
18 documents?
19   A. The staff at Greylock McKinnon.
20   Q. And did you consider specific Zoladex
21 strategic plans in your analysis?
22   A. Did I consider specific strategic plans --

358

1    Q. Are you aware of AstraZeneca had strategic
2  plans throughout the class period as to Zoladex
3  and its marketing and its pricing?
4    A. It is my understanding that pharmaceutical
5  companies have these strategic plans for all of
6  their products.
7    Q. You didn't see any of those with respect
8  to the Zoladex, particularly in rendering your
9  opinions in this case?
10   A. I did not rely on those particularly.
11   Q. Did you review any of them?
12   A. Again, I looked at a variety of the
13 discovery materials.
14       The ones I relied on are cited here.
15 So I don't believe I saw any strategic plans.
16   Q. So you picked two documents out of -- do
17 you know the number of how many Zoladex-related
18 documents were produced in this case?
19       MR. MACORETTA: Objection.
20   A. I do not.
21   Q. You didn't check, did you, the deposition
22 testimony of any AstraZeneca witnesses as to the

359

1  very documents you selected, did you, in
2  rendering your opinions in this case?
3    A. I did not.
4        MR. MACORETTA: Objection.
5    Q. You didn't check to see what they said
6  about the context of those documents?
7    A. That was not what I was asked to do in
8  this case. I did not.
9    Q. You didn't check as to whether or not
10 those documents were signed off on by -- the
11 documents you cite in your report signed off by
12 decision-makers at AstraZeneca, correct?
13   A. That's correct.
14   Q. In your academic -- you testified in
15 response to some of Mr. Cavanaugh's questions
16 that you don't quantify or are not familiar with
17 the term "sophistication" in your economic
18 analysis.
19       In any of your academic or expert work
20 have you ever observed that an entity was either
21 sophisticated or not sophisticated?
22   A. I certainly can't say -- have you ever

360

1  used that term?
2    Q. I am wondering, you said that you were not
3  familiar with how one would go about analyzing
4  whether someone was sophisticated or not.
5        I was wondering, in your other
6  academic or expert work, have you ever made
7  observations relative to sophistication?
8        MR. MACORETTA: Objection.
9    A. I may have.
10   Q. Going back to the chart on Page 17, again,
11 you posit a theory, which I believe you
12 characterize as an events study that the
13 implementation of LCA by a date certain that you
14 have picked changed the incentives for
15 AstraZeneca relative to what you characterize as
16 AWP inflation; is that right?
17   A. That's right.
18   Q. And I think in response to questions by
19 Mr. Cavanaugh you acknowledge that after that
20 date under your theory AstraZeneca could have
21 still inflated AWP, to use your words, by
22 providing greater discounts; isn't that correct?

Meredith Rosenthal, Ph.D. CONFIDENTIAL         February 23, 2006
Cambridge, MA

**361**

1    MR. MACORETTA: Objection.
2    Q. You can answer.
3    A. I think I did say that they might continue
4 to compete by offering additional discounts and
5 that might increase the spread.
6    Q. If you look at your chart, am I correct
7 that after your January 1, 1999 date, in the data
8 you have here, the AWP for Zoladex does not go
9 down?
10   A. That's correct. It appears to be flat.
11   Q. So there is no additional AWP inflation,
12 under your theory, after January 1, 1999; is that
13 correct?
14   A. There is no -- there is no additional AWP
15 inflation. I think it's a fact, yes.
16   Q. And by that you mean, as you mentioned in
17 responding to Mr. Cavanaugh's questions, that AWP
18 inflation could include leaving AWP steady, but
19 giving greater discounts that had the effect of
20 reducing ASP, correct?
21   A. In theory, the spread can be driven in
22 either way.

**362**

1    I should note there is a spread,
2 nonetheless, of nearly 150 percent during that
3 time period. So there is no change in the spread.
4    Q. There is no additional inflation after
5 that point?
6    A. There is no incremental inflation, no.
7    Q. In looking at your events study, as you
8 characterize it, regarding LCA, did you check any
9 AstraZeneca-specific company documents regarding
10 why it made various pricing decisions as to
11 Zoladex after January 1, 1999?
12   A. As I mentioned earlier, the model of
13 research design for an events study is to look at
14 a point in time, and all those other factors are
15 assumed equal, or at least not confounding with
16 the particular timing of this event.
17   Q. And how would you know whether specific
18 issues being addressed by decision-makers at
19 AstraZeneca are confounding to your theory
20 without looking to see what their reasons were
21 for making price decisions on Zoladex?
22   A. As in standard economic research, those

**363**

1 are assumptions of the research design.
2    Q. So your quote-unquote events study is just
3 assuming your theory and not trying to determine
4 whether or not there are any confounding factors
5 in the evidentiary record in this case, correct?
6    A. No. In fact, it's a way of testing the
7 theory by looking at a point in time over a short
8 period of time and examining whether the data
9 conform with that theory.
10   Q. But there is -- you don't have any
11 knowledge as to whether or not people at
12 AstraZeneca believe that they would not either
13 increase AWP or provide additional discounts
14 because of the implementation, by your
15 conclusion, that most carriers to implement LCA,
16 correct?
17   MR. MACORETTA: Objection.
18   A. That's correct, I did not look for those
19 data.
20   Q. Okay. They are not relevant to your
21 analysis?
22   A. It is not relevant to my analysis.

**364**

1    Q. I think you said in response to
2 Mr. Cavanaugh's questions yesterday that in
3 reaching your conclusions in this case with
4 respect to Zoladex, you did not consider the fact
5 that there was publicly available data with
6 respect to the acquisition cost of Zoladex that
7 showed discounts greater than Dr. Hartman's
8 minimum standard of liability, correct?
9    A. I'm sorry, there is lot of statements in
10 that sentence.
11   Could you repeat or perhaps could she
12 read it back.
13   Q. I could repeat it.
14   I think you said yesterday you didn't
15 consider in reaching your conclusions in this
16 case that the IMS schedule, for example, showed
17 discounts of greater than 30 percent with respect
18 to Zoladex at various points in time in the class
19 period; is that right?
20   A. No. That's right. I didn't consider
21 those federal discounts, no.
22   Q. You didn't consider whether or not

Page 365

1 publicly available data sources such as IMS
2 demonstrate that the acquisition costs of Zoladex
3 throughout the class period was at significant
4 discounts to AWP; is that right?
5     A. My understanding is those data were not
6 complete, that they did not provide a complete
7 picture of the discounts that you see here in the
8 calculation of ASP.
9     Q. Could you answer my question?
10       You didn't consider that --
11       MR. MACORETTA: Objection.
12     Q. -- publicly available data showed
13 discounts off of AWP that physicians were
14 receiving in acquiring Zoladex, right?
15       MR. MACORETTA: Objection.
16       Go ahead.
17     A. I certainly considered what the available
18 information was, and I concluded that the third-
19 party payers had insufficient information to
20 understand the acquisition costs that their
21 physicians were getting for Zoladex.
22     Q. Did you look at IMS data?

Page 366

1     A. Did I look at IMS data for Zoladex?
2       I looked at the data behind these
3 calculations, which are invoice data.
4     Q. So, no, you didn't look at publicly
5 available IMS data?
6       MR. MACORETTA: Objection.
7     A. Yeah, I didn't look at IMS data, but IMS
8 data don't have rebates in them.
9     Q. Do they have any discount information
10 them?
11     A. They do have discount information.
12     Q. And do you know, can you tell me at any
13 particular point in the class period what
14 discounts off of AWP were reflected for Zoladex
15 in the IMS data?
16     A. I could not tell you that right now.
17     Q. And that wasn't part of your analysis?
18     A. No.
19     Q. Have you -- looking at the chart again on
20 Page 17, just focusing you on the period from
21 1991 to 1994, you see there in the data that you
22 used that the spread for Zoladex AWP versus ASP

Page 367

1 is 25 percent, and it appears to in 1994 go up --
2 I'm sorry -- strike that -- it appears in 1994
3 the AWP for Zoladex goes up, but so does the ASP.
4     Do you see that?
5     A. I do see that, yes.
6     Q. Can you explain to me why Dr. Hartman
7 finds damages for Zoladex in 1994, but he doesn't
8 in 1991 to 1993?
9       MR. MACORETTA: Objection.
10     A. I cannot explain Dr. Hartman's
11 conclusions, no..
12     Q. You talked about LCA.
13       Are you familiar with an OIG report
14 from 2004 which concluded that Medicare and its
15 beneficiaries in 10 jurisdictions would have
16 saved approximately $40 million per year had they
17 reimbursed based on Zoladex AWP as opposed to
18 Lupron?
19     A. I am not sure which report you are
20 referring to.
21       Do you have a copy of it?
22     Q. I don't.

Page 368

1       Are you familiar with the fact that
2 for Medicare and its beneficiaries the savings as
3 a result of the adoption of LCA and the use of
4 Zoladex was in the millions of dollars per year?
5       MR. MACORETTA: Objection.
6     A. I am not aware of that particular
7 quantification.
8       I am certainly aware that the LCA
9 policy was designed to save money because
10 Zoladex's price was below that of Lupron.
11     Q. In reaching your conclusions, whatever the
12 data turns out to be, you didn't take into effect
13 -- into consideration the fact that your
14 conclusions as to the harm to the class -- that
15 the LCA saved Medicare and its beneficiaries
16 whatever the number turns out to be, millions of
17 dollars, did you?
18       MR. MACORETTA: Objection.
19     A. That would not be relevant to my
20 conclusion.
21     Q. You didn't consider that at all?
22       MR. MACORETTA: Objection.

Meredith Rosenthal, Ph.D. CONFIDENTIAL                February 23, 2006
Cambridge, MA

**369**

1  A. It would not be appropriate to consider
2  that, no.
3  Q. In rendering your opinions as to the
4  pricing of Zoladex and your opinion as to the
5  harm to the class, did you do any analysis of the
6  level of orchiectomies prior to the introduction
7  of Lupron and Zoladex?
8  A. No.
9  Q. Any comparison of the types of preferences
10 that patients have with respect to orchiectomies
11 relative to Zoladex treatment or Lupron
12 treatment?
13      MR. MACORETTA: Objection.
14 A. That analysis would not be relevant for my
15 conclusions.
16 Q. You didn't take that into account at all
17 in rendering the opinion that the class was
18 harmed in this case, correct?
19 A. The definition of "harm" is a legal matter
20 and confined -- does not include these effects
21 that you want to discuss about tradeoffs between
22 surgery and drug treatment.

**370**

1  Q. When you say the word "harm" is a legal
2  matter, you use the word that the class was
3  harmed in this case.
4       You weren't rendering a legal opinion
5  there, I take it?
6  A. But I was asked to look at economic harm
7  in terms of the overpayments.
8  Q. Do you correlate economic harm with legal
9  harm?
10      MR. MACORETTA: Objection.
11 A. Again, I was asked to look at a specific
12 nature of impact here.
13 Q. And it was economic, in terms of dollars
14 and cents, but it didn't take into account
15 patient preferences or the resulting savings from
16 use of physician treatment in offices as opposed
17 to surgical intervention?
18      MR. MACORETTA: Objection.
19      Asked and answered.
20 A. That's correct.
21      MR. MACORETTA: Argumentative.
22      MR. FLYNN: I think that's all I

**371**

1  have.
2       MR. MACORETTA: Why don't we take a
3  break for lunch now, which I believe is here.
4       THE VIDEOGRAPHER: The time is 1:03
5  p.m. This is the end of cassette number one. We
6  are off the record.
7       (A lunch recess was taken.)

**372**

1       AFTERNOON SESSION
2       THE VIDEOGRAPHER: The time is 2:03
3  p.m. This is the beginning of cassette number
4  two in the deposition of Meredith Rosenthal. We
5  are on the record.
6       CROSS-EXAMINATION
7  BY MR. EDWARDS:
8  Q. Good afternoon, Dr. Rosenthal.
9  A. Good afternoon.
10 Q. I am Steve Edwards. I represent
11 Bristol-Myers Squibb. I would like to ask you a
12 few questions.
13      Do you have a copy of your report?
14 Can you put that in front of you?
15 A. Yes, I do.
16 Q. I want to direct your attention to
17 Paragraph 29.
18 A. Paragraph 29, yes.
19      Yes I found it. Thank you.
20 Q. In Paragraph 29, at the end of the
21 paragraph you say, "The unique and perverse
22 feature of this market is that pharmaceutical

Meredith Rosenthal, Ph.D. CONFIDENTIAL                February 23, 2006
Cambridge, MA

373

1  manufacturers can also increase market share
2  through raising their AWP, since this list price
3  is the basis for third-party reimbursement.
4  Unlike offering big discounts to physicians,
5  raising the AWP relative to the acquisition cost
6  to the physician does not reduce profit margins
7  on the drug in question."
8      A. Profit margins for the manufacturer, yes.
9      Q. And then you give examples of how this may
10 have happened; is that correct?
11     A. That's correct.
12     Q. And the first example you give in
13 Paragraph 30 relates to a BMS document?
14     A. Yes, it does.
15     Q. And what I want to do is mark as an
16 exhibit -- this would be Exhibit Rosenthal 015 a copy
17 of a document entitled "Etopophos Launch Plan."
18         MR. STEVENS: The Bates numbers are
19 BMS AWP 0011214 through 235.
20         (Exhibit Rosenthal 015 was marked
21         (for identification)
22     A. Thank you. I have the document.

374

1      Q. Is this the document that you are
2  referring to in Paragraph 30 of your report?
3      A. I do believe this is the document. It
4  looks familiar and the Bates numbers seem
5  consistent with the ones I have, yes.
6      Q. And you cite a particular page which is
7  1121 -- I'm sorry, 11221 --
8      A. Yes. I see --
9      Q. -- or Page 6 of the document; is that
10 correct?
11     A. That's correct.
12     Q. And you have that page in front of you?
13     A. I do.
14     Q. In Paragraph 30 of your report you say in
15 the last two sentences, "The document explicitly
16 references using the disparity between AWP and
17 actual acquisition cost as a 'financial
18 incentive' to physicians. The document then
19 explores 'strategies' to provide 'adequate
20 financial incentive' for physicians to use
21 Vepesid." Is that correct?
22     A. That's correct.

375

1      Q. If you look at this document, this
2  document talks about Etopophos, doesn't it?
3      A. That's correct.
4      Q. It talks about providing adequate
5  financial incentive for the use of Etopophos; is
6  that correct?
7      A. That's correct.
8      Q. Do you think perhaps you meant to say
9  "Etopophos" instead of "Vepesid" in your report?
10     A. My understanding is that both of those
11 drugs are referenced here, and that the
12 competition with regards to the spread would apply
13 to both of them.
14         I see that you're correct that it is
15 talking about changing Etopophos relative to
16 Vepesid, but it references both of them with
17 regard to the financial incentive.
18     Q. But the document actually says -- and I am
19 reading from the second paragraph on Page 6 --
20 "To provide adequate financial incentive for the
21 use of Etopophos the following strategies could
22 be employed." Correct?

376

1      A. That does say that there, and in the
2  previous sentence I made reference to the
3  physician practices can take advantage of the
4  growing disparity. That's the first part of what
5  I reference here.
6      Q. And it proposes two alternative
7  strategies, correct?
8      A. That's correct.
9      Q. One strategy would be a reduction of the
10 Vepesid AWP; is that correct?
11     A. That's correct.
12     Q. And the other strategy would be to
13 establish a premium list price for Etopophos,
14 correct?
15     A. That's correct. Right.
16         So these two drugs are competing with
17 one another. My understanding is that they are
18 therapeutic substitutes, to some extent, and the
19 relative position of the two ASPs is the subject
20 here.
21     Q. Right. Do you know whether either of
22 these strategies were pursued?

Meredith Rosenthal, Ph.D. CONFIDENTIAL            February 23, 2006
Cambridge, MA

**Page 377**

1   A. At this particular point in time, I can't
2   say.
3   Q. It didn't occur to you that it would be
4   important to determine whether either of these
5   strategies were pursued before you referenced
6   this document as an example that supports your
7   theory?
8   A. This document was referenced to illustrate
9   the notion that manufacturers recognized that the
10  spread could be an important mechanism for
11  shifting market share.
12      Whether or not that was implemented at
13  this point in time, it was not relevant to my
14  conclusion that the manufacturers recognize the
15  importance of the spread as a financial incentive.
16  Q. So what you are saying in your report,
17  then, is that it could happen? You are not
18  saying that it did happen?
19  A. I concluded in my report that the class
20  was harmed because these incentives were present.
21      I observed the spread in the data. So
22  I conclude it did happen.

**Page 378**

1   Q. How can you conclude that the class was
2   harmed by these strategies, either of these
3   strategies, without inquiring as to whether they
4   were even implemented?
5   A. Again, I examined the actual spreads.
6   Q. Okay. Well, let's look at the actual
7   spreads.
8       Do you know whether BMS reduced the
9   AWP of Vepesid?
10  A. Following this particular event, I do not.
11  Q. Did it occur to you to look at
12  Dr. Hartman's report to see if the data in
13  Dr. Hartman's report supported your theory?
14  A. Comparing this to Dr. Hartman's report was
15  not necessary, again, for -- I drew my conclusion
16  from an economic analysis of the incentives, from
17  examination those natural experiments, where I
18  could easily see cause and effect, and again,
19  using this information to illustrate the knowledge
20  by the manufacturers of this financial incentive.
21      I did not attempt to do exactly what
22  you described.

**Page 379**

1       MR. STEVENS: Let me mark as Exhibit
2   Rosenthal 016 an excerpt from Attachment G of Dr.
3   Hartman's report. This is Attachment G.2 relating to
4   Bristol-Myers Squibb to Dr. Hartman's report of
5   December 15, 2005.
6       (Exhibit Rosenthal 016 was marked
7       (for identification)
8   Q. Do you have Exhibit Rosenthal 016 in front of you?
9   A. I do. Thank you.
10      I'm sorry, which page again?
11  Q. Well, take a look at Attachment G.2.B --
12  A. Okay.
13  Q. -- which purports to reflect Bristol-Myers
14  Squibb annual ASPs.
15      Do you see that?
16  A. I do see that.
17  Q. And if you look at the second page, you
18  have the ASPs for Vepesid, correct?
19  A. I see that. I do.
20  Q. Just so we're clear here, the particular
21  NDC of Vepesid that I believe we are talking
22  about is the second-to-last one --

**Page 380**

1   A. Okay.
2   Q. -- 9520.
3   A. That's the one that is referenced in the
4   strategic memo? 9520? I am just looking.
5       I do see 9520. I don't see it in this
6   text, but...
7   Q. I will ask you to assume for the moment,
8   to save time, that the particular NDC of Vepesid
9   that is being compared in this document is 9520.
10      And can you tell me by looking at
11  Dr. Hartman's Attachment G.2.B whether there was
12  any change in the AWP for Vepesid after the date
13  of this document, which is September 6, 1995?
14  A. I do not see any change in the AWP there.
15  Q. Now, using Dr. Hartman's attachment, can
16  you tell me whether the other aspect of the
17  strategy proposed in Exhibit Rosenthal 015 was
18  carried out?
19  A. Whether there was a change?
20  Q. Establishing a premium list price for
21  Etopophos.
22  A. Well, excuse me. The first data point

Henderson Legal Services
202-220-4158

Page 381

1    that I have for Etopophos is 1996.
2         Would it be correct to assume that's
3    the launch date of Etopophos?
4         Q. I believe the product was launched in late
5    '95 or early '96.
6         A. So a premium launch price, I guess, I
7    assume -- I would read a premium launch price as
8    being relative to the ASP in terms of the spread
9    that it offered.
10        Q. Let me see if I can help you out here
11   little bit.
12        A. Yeah.
13        Q. You see strategy 2 --
14        A. Yeah.
15        Q. -- it says, "Establish a premium list
16   price for Etopophos" --
17        A. Right.
18        Q. -- etoposide phosphate for injection. A
19   list price of $120.54 would represent a 15
20   percent premium over the current Vepesid."
21        Is it your understanding that the term
22   "list price" at BMS refers to the equivalent of

Page 382

1    what I think you have called WAC?
2         A. I am not sure what it refers to here. It
3    says, "the direct list price."
4         Q. Do you see --
5         A. Yeah, a list price of $120 would represent
6    a 15 percent premium over the current Vepesid for
7    -- for injection -- direct list price.
8         I am not sure what those terms convey
9    here. I would have -- I would have thought that
10   the $120 -- the list price would be the AWP.
11        Q. If you look at the first paragraph --
12        A. Certainly.
13        Q. -- of this page, it talks about the
14   disparity between Vepesid's list price and
15   subsequently the average wholesale price.
16        A. Okay.
17        Q. Does that suggest to you that the list
18   price and the average wholesale price are two
19   different things?
20        A. It does seem that way.
21        So if you tell me it is the WAC, I am
22   certainly prepared to accept that --

Page 383

1         Q. I think another way you can verify that is
2    by looking at Page 19 of this document, which
3    Exhibit Rosenthal 015. You'll see that there is a
4    reference there to the wholesale list price --
5         A. I see that.
6         Q. -- and the wholesale list price for
7    Vepesid is $109.19?
8         A. I see that.
9         Q. And if you look at the AWP for Vepesid in
10   Exhibit Rosenthal 016 the AWP was $136.49, correct?
11        A. I see that.
12        Q. So $109.19 was the equivalent of the WAC
13   and $136.49 was the AWP, correct?
14        A. That's what it appears to be, yes.
15        Q. So the proposal in this document for a
16   premium list price for Etopophos of $125.57 would
17   relate to the WAC, not the AWP?
18        A. I see that. Yes.
19        Q. Can you tell from Dr. Hartman's Exhibit
20   Hartman 016 what list price was actually selected for
21   Etopophos?
22        A. Right. It would appear that the actual

Page 384

1    Etopophos price is lower than that suggested in
2    this document by $20 or $30, something like that.
3         Q. Right. If the AWP for Etopophos was
4    $124.14, then the list price -- I will tell you I
5    have done the math -- would have been $99.31?
6         A. It sounds very reasonable.
7         Q. The alternative strategy of establishing a
8    premium list price for Etopophos was not
9    implemented either, correct?
10        A. Not as described in this document, no.
11        Q. Now, do you have any understanding of the
12   extent to which BMS in fact discounted below the
13   list price for Etopophos?
14        A. I have reviewed all these ASPs.
15        I don't have all of them committed to
16   memory. I would be happy to look at it with you.
17        Q. Okay. Why don't we do that. I think if
18   you look at Attachment G.2.A of Exhibit Rosenthal 016.
19        A. Okay.
20        Q. You have Dr. Hartman's calculation of
21   those numbers.
22        A. I see that.

Meredith Rosenthal, Ph.D. CONFIDENTIAL                     February 23, 2006
Cambridge, MA

---

**385**

1   Q. And in 1996 he calculates an ASP of
2   $91.42, correct?
3   A. That's correct.
4   Q. And that would be compared to a wholesale
5   list price of $99.31, correct.
6   A. Excuse me, compared to the WAC, if it is
7   okay if I use that term, yes.
8   Q. Do you want to use that term?
9   A. Okay. Yes.
10   Q. So that's a discount of less than 10
11   percent?
12   A. Off of the WAC?
13   Q. Yes.
14   A. Okay. Yes.
15   Q. And then for the subsequent years, the
16   prices range from $97.74 to $99.26, correct?
17   A. I see that, yes.
18   Q. Very little discounting, correct?
19   A. There's less and less over time, yes.
20   Q. So Etopophos would not be a good example
21   of what you have characterized as AWP inflation;
22   is that fair?

**386**

1   A. Etopophos, my understanding, meets
2   Dr. Hartman's theory, yardstick theory for
3   liability here.
4      I have not been asked to separately
5   make a judgment about what the liability threshold
6   should be.
7      So since I have assumed his liability
8   threshold, then it certainly meets that.
9   Q. Well, do you have any independent opinion
10   based on the information I have provided you as
11   to whether Etopophos is a good example of what
12   you have characterized as AWP inflation?
13   A. There were certainly spreads in those
14   earlier years.
15      I am not sure what you are getting at.
16   There are spreads.
17   Q. So, in your view, there can be AWP
18   inflation even where there is no increase in the
19   AWP?
20   A. Where there is no increase in the AWP over
21   time --
22   Q. Yes.

**387**

1   A. -- to be clear? Yes.
2   Q. Okay. And, in your view, there can be AWP
3   inflation even where the discount below list
4   price is less than two percent?
5   A. Again, I have not been asked to separately
6   establish a threshold.
7   Q. Do you know for which years Dr. Hartman
8   found that his liability yardstick was exceeded
9   for Etopophos?
10   A. I could look at that.
11   Q. Why don't you.
12   A. It looks like just 1996.
13   Q. 1996 was the year in which Dr. Hartman
14   calculated an average sales price of $91.42,
15   correct?
16   A. Yes, that's correct.
17   Q. Do you know why the ASP was $91.42 in
18   1996?
19   A. Do I know separately where those rebates
20   come from or discounts? No, I do not.
21   Q. Do you care why it was $91.42 in 1996?
22   A. I examined the methodology for calculating

**388**

1   that ASP and understood what Dr. Hartman included.
2      Do I care? I am not sure what you
3   mean by that.
4   Q. Isn't it possible that the reason there
5   was an ASP of $91.42 in the initial year after
6   the product's introduction, is that BMS was
7   offering an introductory discount in order to get
8   people to buy product?
9   A. That -- it is certainly possible they were
10   offering discounts.
11      The question is why the AWP didn't
12   reflect those introductory discounts. That's the
13   question that I would say is being addressed here.
14   Q. So if a manufacturer sets a list price and
15   then offers an introductory discount in order to
16   get people to buy the product, in your view, that
17   is fraudulent behavior?
18   A. My understanding, in this context where
19   the third-party payers are paying the list price
20   and the discounts accrue only to the providers,
21   that is the behavior that we are -- that's the
22   allegations we are considering here. That's