1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

_____

In re:  PHARMACEUTICAL                )

INDUSTRY AVERAGE WHOLESALE            )

PRICE LITIGATION                      )

_____            )

THIS DOCUMENT RELATES TO:             )

ALL ACTIONS                           )

_____            )

HIGHLY CONFIDENTIAL

VIDEOTAPED DEPOSITION OF SHEILA R. CIZAUSKAS

800 BOYLSTON STREET

BOSTON, MASSACHUSETTS

FRIDAY, 10 MARCH, 2006

9:38 AM

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL    March 10, 2006
Boston, MA

**2**

1        VIDEOTAPED DEPOSITION of SHEILA R.
2 CIZAUSKAS, called as a witness by and on behalf of
3 Johnson & Johnson, pursuant to the applicable
4 provisions of the Federal Rules of Civil Procedure,
5 before P. Jodi Ohnemus, Notary Public, Certified
6 Shorthand Reporter, Certified Realtime Reporter,
7 and Registered Merit Reporter, within and for the
8 Commonwealth of Massachusetts, at the offices of
9 Robins, Kaplan, Miller & Ciresi, L.L.P., 800
10 Boylston Street, Boston, Massachusetts, on Friday,
11 10 March, 2006, commencing at 9:38 a.m.
12
13
14
15
16
17
18
19
20
21
22

**4**

1 APPEARANCES: (CONT'D)
2
3       BLUE CROSS BLUE SHIELD
4       OF MASSACHUSETTS
5       BY: Steven E. Skwara, Esq.
6       Landmark Center
7       401 Park Drive
8       Boston, MA  02215-3326
9       617 246-3531
10      For Blue Cross Blue Shield of
11      Massachusetts
12
13
14      PATTERSON, BELKNAP, WEBB &
15      TYLER, LLP
16      BY: Adeel A. Mangi, Esq.
17      1133 Avenue of the Americas
18      New York, NY  10036-6710
19      212 336-2000
20      Aamangi@pbwt.com
21      For Johnson & Johnson
22

**3**

1 APPEARANCES:
2
3       HAGENS, BERMAN, SOBOL,
4       SHAPIRO, LLP
5       BY: Edward Notargiacomo, Esq.
6       One Main Street
7       Fourth Floor
8       Cambridge, MA  0242
9       617 482-3700
10      Ed@hbsslaw.com
11      For the Plaintiffs
12
13      ROBINS, KAPLAN, MILLER
14      & CIRESI, L.L.P.
15      BY: Stephen L. Coco, Esq.
16      800 Boylston Street
17      25th Floor
18      Boston, MA  02199-7610
19      617 267-2300
20      Slcoco@rmkc.com
21      For Blue Cross Blue Shield
22      of Massachusetts

**5**

1 APPEARANCES: (CONT'D)
2
3
4      SHOOK, HARDY & BACON, L.L.P.
5      BY: Nicholas P. Mizell, Esq.
6      2555 Grand Boulevard
7      Kansas City, MO  64108-2613
8      816 474-6550
9      Nmizell@hb.com
10     For Aventis Pharmaceuticals
11
12
13 ALSO PRESENT:
14
15      George Libares, Videographer
16
17
18
19
20
21
22

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL    March 10, 2006
Boston, MA

6

1           I N D E X
2  TESTIMONY OF:
3  SHEILA R. CIZAUSKAS
4
5  (By Mr. Mangi)                      009
6  (By Mr. Mizell)                     228
7
8
9           E X H I B I T S
10 EXHIBIT        DESCRIPTION            PAGE
11
12 Exhibit Cizauskas 001 BCBSMA-AWP 13002-13011    159
13 Exhibit Cizauskas 002 "Analysis of CMS Average
14              Wholesale Price Reform,
15              2/7/04          181
16 Exhibit Cizauskas 003 BCBSMA-AWP 12501       187
17 Exhibit Cizauskas 004 BCBSMA 005188-5239     193
18 Exhibit Cizauskas 005 BCBSMA-AWP 12593-12609   197
19 Exhibit Cizauskas 006 BCBSMA-AWP 12496       200
20 Exhibit Cizauskas 007 BCBSMA-AWP 000173-000175  205
21 Exhibit Cizauskas 008 BCBSMA-AWP 12496-12500   206
22

7

1          VIDEO OPERATOR:  We are now recording and
2  on the record.  My name is George Libares.  I'm a
3  certified legal video specialist for Henderson
4  Legal Service.  Our business address is 1120 G
5  Street Northwest, Suite 1010, Washington, DC 20005.
6          Today's date is March 10th, 2006, and the
7  time is 9:38 a.m. This is the deposition of Sheila
8  Cizauskas, in re:  The pharmaceutical industry
9  average wholesale price litigation.  This
10 deposition is being taken at 800 Boylston Street,
11 Boston, Massachusetts.  The court reporter is Jodi
12 Ohnemus.  Counsel will now state their appearances,
13 and the court reporter will administer the oath.
14         MR. MANGI:  Adeel Mangi, Patterson,
15 Belknap, Webb & Tyler, for Johnson & Johnson.
16         MR. MIZELL:  Nicholas Mizell, Shook, Hardy
17 & Bacon, for Aventis Pharmaceuticals.
18         MR. COCO:  Steven Coco from Robins,
19 Kaplan, Miller & Ciresi, for Blue Cross Blue Shield
20 of Massachusetts.
21         MR. NOTARGIACOMO:  Ed Notargiacomo from
22 Hagens, Berman, Sobol & Shapiro, for class

8

1  Plaintiffs.
2          MR. SKWARA:  Steve Skwara for Blue Cross
3  Blue Shield of Massachusetts.
4          MR. MANGI:  Good morning, Ms. Cizauskas.
5          MS. CIZAUSKAS:  Good morning.
6          SHEILA R. CIZAUSKAS,
7          having first been duly sworn,
8          testified as follows to
9          direct interrogatories.
10         MR. COCO:  Before you start, one of the
11 things that we forgot to do on the record yesterday
12 was to designate yesterday's transcript as highly
13 confidential.  I had a conversation with the court
14 reporter after you had left yesterday, asking her
15 to put that designation on that transcript.  I just
16 wanted to memorialize that for the record.
17         MR. MANGI:  I sent Ed an e-mail on the
18 topic.  That's fine.
19         MR. COCO:  Okay.  And I believe, based on
20 what I expect the topics to be for this transcript,
21 that we will also be designating this as highly
22 confidential.

9

1          MR. MANGI:  No objection.
2  BY MR. MANGI:
3    Q.  Now, sorry for so much formality so early
4  in the day.
5          Ms. Cizauskas, could you please tell me
6  your current job title.
7    A.  Senior director of provider contracting,
8  Blue Cross & Blue Shield of Massachusetts.
9    Q.  How long have you held that title?
10   A.  Since May of 2003.
11   Q.  And how long have you been at Blue Cross
12 Blue Shield of Massachusetts?
13   A.  Since May of 2003.
14   Q.  So, you've held one title throughout your
15 time at the company?
16   A.  Yes.
17   Q.  Going back a bit further in time, could
18 you describe for me, please, your educational
19 background after high school.
20   A.  Graduated from high school and went to
21 nursing school for a Licensed Practical Nurse
22 degree and then many years later, received my

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL    March 10, 2006
Boston, MA

| 10 | 12 |
|---|---|
| 1   bachelor of science degree and then a master of | 1   relation to ordering of supplies, financial |
| 2   business administration degree. | 2   responsibilities around accounting, things like |
| 3       Q.  Now, when you went to nursing school, did | 3   that? |
| 4   you complete the course of study you had started? | 4       A.  No. |
| 5       A.  Yes. | 5       Q.  In 1974, I believe you mentioned you had a |
| 6       Q.  And what qualification did you receive? | 6   child? |
| 7       A.  Licensed Practical Nurse. | 7       A.  Yes. |
| 8       Q.  When did you receive that qualification? | 8       Q.  Okay.  Did you stop working then for a |
| 9       A.  1970. | 9   period of time? |
| 10      Q.  After qualifying as a nurse, did you work | 10      A.  Yes, I did. |
| 11  as a nurse? | 11      Q.  How long did you -- how long before you |
| 12      A.  Yes. | 12  next started working again? |
| 13      Q.  Okay.  Where did you work? | 13      A.  I believe that child was in high school, |
| 14      A.  I worked at a nursing home in Waterbury, | 14  and I worked part-time job at a technical high |
| 15  Connecticut; and then after I was married, I worked | 15  school running a banking program, and ran the -- |
| 16  for a -- an oral surgeon in East Hartford, | 16  ran a bank in the high school for the Hudson |
| 17  Connecticut, and then another oral surgeon in West | 17  National Bank. |
| 18  Hartford, Connecticut; and I worked for a | 18      Q.  Did you get your bachelor's degree before |
| 19  hematologist and cardiologist in Hartford, | 19  or after you started that high school -- |
| 20  Connecticut. | 20      A.  After. |
| 21      Q.  Now, in each of those positions, were you | 21      Q.  So, let's go in chronological order then. |
| 22  working as a nurse? | 22      A.  Okay. |

| 11 | 13 |
|---|---|
| 1       A.  Yes. | 1       Q.  So, you started working at the high school |
| 2       Q.  And what was the total time period for | 2   sometime around -- in the mid '80s? |
| 3   which you were working as a nurse? | 3       A.  Yes. |
| 4       A.  Five years. | 4       Q.  Okay.  Do you know when -- what year that |
| 5       Q.  1970 to 1975? | 5   was? |
| 6       A.  Well, actually, 1969 -- so, I sort of -- | 6       A.  I can't remember exactly what year.  It |
| 7   before I received my -- my license, and then to | 7   was -- it was mid '80s, though.  And then I left |
| 8   1974 when my first child was born. | 8   that job in '89 to attend undergrad school full |
| 9       Q.  Now, in any of those positions when you | 9   time. |
| 10  were working as a nurse, did you have any | 10      Q.  Where did you attend undergraduate school? |
| 11  responsibilities related to the manner in which the | 11      A.  Framingham State College. |
| 12  nursing home or the doctors for whom you were | 12      Q.  Was that a four-year program? |
| 13  working acquired drugs? | 13      A.  It was, and I completed it in three years. |
| 14      A.  No. | 14      Q.  And that was a BSC degree, right? |
| 15      Q.  Were your responsibilities entirely | 15      A.  Yes. |
| 16  clinical? | 16      Q.  What were your areas of study? |
| 17      A.  Some administrative. | 17      A.  Business, economics, finance, my major was |
| 18      Q.  What sort of administrative work did you | 18  in business administration, some -- a minor in |
| 19  do? | 19  psychology. |
| 20      A.  Making appointments, calling patients to | 20      Q.  So, you completed that degree in -- |
| 21  remind them of appointments, things like that. | 21      A.  '91. |
| 22      Q.  Did you have any responsibilities in | 22      Q.  '91.  What did you do after that? |

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

14

1    A.   Then I went to Clark University Graduate
2    School of Management for an MBA.
3    Q.   You went directly from your bachelor's
4    degree to the MBA program?
5    A.   Yes.
6    Q.   Was that a two-year MBA?
7    A.   Yes.
8    Q.   Did you complete that in '93?
9    A.   Completed it in the spring of '93.
10   Q.   What did you do after receiving your
11   master's degree?
12   A.   Well, the -- the summer before I graduated
13   I did an internship with CIGNA, and then when I
14   graduated, CIGNA hired me as a consultant for some
15   project work, and then I went to work for Private
16   Health Care Systems full time.
17   Q.   Well, let's stick with CIGNA for a moment.
18   A.   Uh-huh.
19   Q.   They hired you in '93.  How long did you
20   remain at CIGNA?
21   A.   About a year.
22   Q.   And were you working as a consultant for

15

1    that entire period?
2    A.   Yes.
3    Q.   Did you have any particular title while
4    you were at CIGNA?
5    A.   No.
6    Q.   What projects were you tasked with
7    handling for CIGNA?
8    A.   Originally, I was -- I developed an early
9    discharge program for OB patients.  It was a
10   voluntary program that gave incentives to mothers
11   if they went home early.  At that point in time it
12   was a longer length of stay that was customary, and
13   there was some desire to provide incentives for a
14   shorter length of stay.
15        And so, I developed the program and
16   visited the OB offices to introduce it to the -- to
17   the physicians.
18   Q.   All right.
19   A.   And then the next project I had was to
20   develop a network in Maine for a particular account
21   up there -- Pratt & Whitney -- and to develop a
22   physician and hospital network for CIGNA.

16

1    Q.   Any other projects?
2    A.   There was a very short period where I was
3    tasked with exploring a -- a worker's comp network
4    in Massachusetts, but that was abandoned quickly.
5    Q.   Anything else?
6    A.   That's it.
7    Q.   Now, the second project you mentioned,
8    developing the physician and hospital network in
9    Maine, did CIGNA not have a network in Maine at
10   that time?
11   A.   That's right.  They had -- it was either
12   very limited or not at all.  So, it was my task to
13   -- to bring that online.
14   Q.   And was the impetus for developing that
15   network the fact that CIGNA had a new client --
16   A.   Yes.
17   Q.   -- with a presence in that area?
18   A.   Yes.
19   Q.   And that was Pratt & Whitney?
20   A.   Right.  Maybe they were called United
21   Technologies at that time.  I'm not sure.
22   Q.   How did you go about developing a network

17

1    in Maine?
2    A.   I received a list of physicians and a map
3    and visited offices.  It was really, you know, a
4    lot of fieldwork and knocking on doors and meeting
5    with physicians and their office staff, describing
6    the managed care product, and following up to get
7    signatures on the -- on the contracts.
8    Q.   In that time period, '93, were the
9    physicians in Maine generally familiar with managed
10   care?
11   A.   They were familiar with it.  They were not
12   organized at the time in large groups, so it was
13   all individual discussions for the most part.
14   Q.   Were there other health insurers already
15   active in Maine with their own provider network?
16   A.   Yes.
17   Q.   What other insurers had a presence?
18   A.   I can't really -- I can't really remember.
19   No, I can't remember.
20   Q.   Did the physicians you visited already
21   have contracts with other health insurers?
22   A.   Some did.  Some did not.

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

---

**18**

1    Q.  Were the majority of them already
2  contracted or not contracted?
3    A.  I would say, to the best of my
4  recollection, not.  It was a very new marketplace
5  for managed care.
6    Q.  Did there -- did whether or not they
7  already had other contracts with other insurers
8  affect their willingness or readiness to contract
9  with CIGNA?
10   A.  Not really.
11   Q.  What were some of the issues that
12 physicians were interested in discussing with you
13 prior to making a decision about whether or not to
14 join the CIGNA network?
15   A.  How much membership CIGNA was
16 representing, and whether or not their patients
17 would be -- their current patients who were part of
18 the United Technologies or Pratt & Whitney account,
19 and how much money was currently running through
20 those patients, and what the fee schedule was.
21   Q.  What do you mean when you say how much
22 money is currently running through those patients?

---

**19**

1  Were you referring to the CIGNA -- to the --
2    A.  No, the United technologies.  So I would
3  have a list of patients that were using the
4  particular doctor I was seeing and what their --
5  you know, what their utilization was or how often
6  they visited that doctor.  And so, it was -- the
7  discussion was, you know, that these patients would
8  need to use a CIGNA doctor, and that, if they were
9  not part of the network, then the patient may need
10 to change doctors.  And so, there was value to the
11 doctor in participating in the network.
12   Q.  And when they wanted to know how many
13 members CIGNA had, were they inquiring about the
14 plan generally or about in their area?
15   A.  In their area.
16   Q.  So, they were interested in knowing how
17 many additional patients they might expect to see
18 if they joined?
19   A.  Yes.
20   Q.  Now, you also mentioned they were
21 interested in fee schedules.  Did they want to know
22 how much they'd be paid for services rendered to

---

**20**

1  patients?
2    A.  Yes.
3    Q.  Okay.  How was the CIGNA -- well, withdraw
4  that.  At that point for Maine, did CIGNA have one
5  fee schedule or more than one fee schedule?
6    A.  One fee schedule.
7    Q.  Did that fee schedule encompass both
8  services and drugs administered in office?
9    A.  I don't remember the specifics of the fee
10 schedule.  Mostly I was showing a market basket of
11 fees that were relevant to that particular doctor.
12   Q.  Now, the network that you were trying to
13 set up there in Maine, was this a primary care
14 network, or did it include different specialties?
15   A.  It included different specialties and
16 primary care.
17   Q.  Was it intend to be -- intended to be a
18 comprehensive network?  In other words, doctors
19 from every major specialty?
20   A.  Yes.
21   Q.  Do you know what methodology CIGNA was
22 using at that time to reimburse physicians for the

---

**21**

1  drugs that they administered in their offices?
2    A.  No.
3    Q.  Do you recall any discussion with
4  physicians in relation to what amount they would be
5  reimbursed for drugs administered in office?
6    A.  No.
7    Q.  So, when you refer to discussions about
8  fee schedules, were the discussions that you recall
9  only about services?
10   A.  Mostly about office visits and services
11 that would be unique to the specialty.  So, cardiac
12 services for the cardiologist, and so forth.
13   Q.  How were -- how were the amounts that
14 CIGNA was paying for services determined at that
15 time?
16   A.  I don't know.
17   Q.  So, the sample -- the market basket fee
18 schedules that you were showing --
19   A.  Uh-huh.
20   Q.  -- providers, were those expressed just as
21 flat dollar sums?
22   A.  Yes.

---

Henderson Legal Services
(202) 220-4158

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

22

1    Q.   And so, there would be a particular
2  procedure code, its description, and then a dollar
3  amount --
4    A.   Correct.
5    Q.   -- associated with it.
6    A.   Correct.
7    Q.   Was the effort to set up a network in
8  Maine successful?
9    A.   Yes.
10   Q.   How large was the Maine network that you
11 set up?
12   A.   It covered southern Maine from Portland
13 south.  So, it -- it didn't go any further north
14 than that.  And I can't remember the number of
15 doctors.  I know that the major hospitals were
16 included, and the network of doctors was adequate
17 to provide access to the membership.
18   Q.   Did you have any responsibilities in
19 relation to the Maine network after the initial
20 push towards contracting?
21   A.   I was responsible for making sure that the
22 information about the doctor was entered into the

23

1  system and that the credentialing of the physicians
2  occurred, and I followed through on, you know,
3  making sure all of the elements of credentialing
4  were collected.
5    Q.   Were the terms that CIGNA offered to
6  physicians in Maine uniform, or was there
7  individualized variation?
8    A.   They were uniform for the physicians, and
9  there were individual variations at the hospitals.
10   Q.   When you say, "uniform for physicians,"
11 was that uniform across specialties?
12   A.   There was a fee schedule, and there was no
13 deviation on the fee schedule.  So, it was a
14 comprehensive fee schedule.
15   Q.   So, for physicians, that one fee schedule
16 applied equally to a rheumatoid arthritis -- I
17 forgot what they're called -- it applied equally to
18 a rheumatologist as it did to an oncologist?
19   A.   Yes.
20   Q.   And that same fee schedule applied equally
21 to Oncologist A as it did to Oncologist B?
22   A.   Yes.

24

1    Q.   Okay.  Now, why was there a variation in
2  the terms offered to hospitals but not physicians?
3    A.   I wasn't directly involved with most of
4  the hospital negotiations, but it was generally a
5  negotiation on rates at the hospitals.
6    Q.   Why was there a need to negotiate rates
7  with hospitals but not with physicians?
8    A.   I can't speak to the CIGNA days, but just
9  in general, it usually depends on the underlying
10 cost structure of a hospital.
11   Q.   What do you mean by that?
12   A.   A tertiary hospital may have a higher cost
13 structure than a community hospital.
14   Q.   So, if a hospital has a different set of
15 costs versus another hospital, they would expect to
16 receive different reimbursement that takes account
17 of the fact that they have --
18   A.   Right.
19   Q.   -- different costs.  Is that principle
20 generally applicable in the marketplace?  In other
21 words, when you're contracting with an entity for
22 reimbursement, if their costs are different, that

25

1  may be a basis for them seeking different amounts
2  of reimbursement.
3    MR. COCO:  Objection.  You may answer.
4    A.   It's one of many components in a
5  negotiation.
6    Q.   Now, after you completed your stint at
7  CIGNA in 1994, where did you go next?
8    A.   Private Health Care Systems.
9    Q.   What was Private Health Care Systems?
10   A.   It's a national PPO organization that's --
11 at that time was owned by a consortium of
12 individual insurance companies, and it provided the
13 network and the utilization review services to
14 those insurance companies.
15   Q.   How long did you work for Private Health
16 Care Systems?
17   A.   Three years.
18   Q.   So, approximately '94 to '97?
19   A.   Yes.
20   Q.   Now, can you help me understand what a
21 national PPO organization is?  What is its function
22 in the marketplace of managed care?

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL         March 10, 2006
Boston, MA

---

26

1       A.  It develops networks across the country.
2   Private Health Care Systems at that time had four
3   regional -- regions and many regional offices
4   throughout the country and had a staff in each
5   regional office that was responsible for developing
6   a network and negotiating hospital rates and
7   physician fee schedules and offering it to the
8   owner insurance companies for their products.
9       Q.  Now, are there other entities in the
10  market that develop -- similarly develop networks
11  which are not owned by insurance companies?
12      A.  Say that again, please.
13      Q.  Sure.  Are there other entities in the
14  market that develop physician networks --
15      A.  Uh-huh.
16      Q.  -- which are independent commercial
17  entities not owned by health insurers?
18          MR. COCO:  Objection.
19      A.  I'm -- I'm not sure.
20      Q.  Okay.  In this instance, the -- did --
21  which insurers owned Private Health Care Systems?
22      A.  I'm not going to remember all of them, but

---

27

1   Great -- Great West, Guardian -- oh, let's see.  I
2   -- I can't remember some of the smaller ones, but
3   there were maybe nine or ten.  Great West stands
4   out because it -- the representative from Great
5   West was chairman of the board.  Guardian I
6   remember because I -- I visited them.  I can't
7   remember offhand.  I could probably look it up for
8   you.
9       Q.  Why -- why did these health plans band
10  together to set up Private Health Care Systems
11  rather than just setting up their own networks?
12      A.  I think it was economy of scales.
13      Q.  What do you mean by that?
14      A.  Well, I mean that they -- probably
15  wouldn't be economically feasible for each of them
16  to duplicate the network, and they had national
17  business and needed a national network.
18      Q.  Would the difficulties in setting up their
19  own network that you're referring to be purely
20  administrative, or are you thinking of something
21  else as well?
22      A.  I'm thinking that they'd each have to have

---

28

1   a staff to -- to develop and manage the network,
2   and it would be a duplication of efforts; that
3   Private Health Care Systems provided the same
4   network to everyone.
5       Q.  Would banding together in this manner to
6   negotiate contracts with providers give these
7   insurers greater leverage in the marketplace than
8   they may have had if they went in alone?
9           MR. COCO:  Objection.
10      A.  Yes.
11      Q.  So, that greater leverage would enable
12  them to negotiate better reimbursement terms and
13  save money in the amounts they were paying in
14  reimbursement.
15          MR. COCO:  Objection.
16      A.  I'm not sure that it -- I'm not sure that
17  that was the case, except that it provided more
18  membership in a particular market.
19      Q.  Okay.  Well, as a general matter, when
20  health insurers and providers come together to
21  negotiate the terms of reimbursement, the health
22  insurers are trying to pay the lowest amount they

---

29

1   can, while still paying enough to get a stable and
2   adequate network, right?
3           MR. COCO:  Objection.
4       A.  Yes.
5       Q.  Okay.  Whereas, from the provider's side,
6   the provider, among other things, is looking to
7   maximize the amount of reimbursement that they can
8   get from the health insurance side, right?
9           MR. COCO:  Objection.
10      A.  I can't speak for the provider.  I think
11  there are a number of values that an insurer will
12  bring to the provider, that being one of them.
13      Q.  So, that will be one of the -- one of
14  other -- one of many goals that a provider may have
15  when entering into a negotiation with an insurer.
16          MR. COCO:  Objection.
17      A.  Yes.
18      Q.  Now, when the parties would come together
19  in that negotiation dynamic with these different
20  and competing goals, to some extent, would the fact
21  that Private Health Care Systems was a --
22  represented a consortium of nine or ten insurers --

---

Henderson Legal Services
(202) 220-4158

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL    March 10, 2006
Boston, MA

30

1  give them greater bargaining power at the table
2  than, say, Great West may have had on its own?
3      MR. COCO:  Objection.
4      A.  Yes.
5      Q.  What was your role at Private Health Care
6  Systems?
7      A.  Originally, my role was a managed care
8  coordinator, and I was responsible for building a
9  network in Connecticut.
10     Q.  How long did you hold the title of managed
11 care coordinator?
12     A.  Less than a year, and then I was recruited
13 to work in the finance area, and my title was
14 senior analyst.
15     Q.  How long did you hold that position?
16     A.  Less than a year.  And then I was asked to
17 take a position in Manhattan to manage the New
18 York, northern New Jersey, and Connecticut markets
19 and then --
20     Q.  What was your title in that role?
21     A.  And then I was director of managed care.
22     Q.  When you were in Manhattan as manager of

31

1  those networks, what was your --
2      A.  Director of managed care.
3      Q.  Was there more than one director of
4  managed care?
5      A.  There was a director of managed care for
6  each region, and so, that was the region that I
7  managed.
8      Q.  Now, the first role you had as managed
9  care coordinator, was this a similar job to what
10 you had done for CIGNA in Maine?
11     A.  Yes.
12     Q.  Did you approach the task in the same way?
13     A.  Yes.
14     Q.  So, you went out and met with physicians
15 and hospitals to try and build up a network?
16     A.  Mostly physicians, and yes.
17     Q.  Okay.  Now, turning back to the global
18 structure of Private Health Care Systems, Private
19 Health Care Systems itself entered into contracts
20 with providers, right?
21     A.  At that time there was a single contract,
22 with individual signatures from each of the

32

1  entities that owned the organization.
2      Q.  I see.  So, there was one master contract,
3  but Private Health Care Systems was just the -- the
4  intermediary that worked to set it up.  The actual
5  contract was between each insurer and the physician
6  practice?
7      A.  Correct.
8      Q.  Okay.  Did -- were there ever instances
9  where the various insurers that made up Private
10 Health Care Systems negotiated different deals with
11 the same doctor?
12     A.  I don't think so.
13     Q.  Were there ever instances where not all of
14 the health insurers that made up Private Health
15 Care Systems signed or joined the contract with a
16 particular provider?
17     A.  Not that I can remember.
18     Q.  Okay.  So, as far as you know, it was
19 always uniform in the sense that all of the
20 insurers making up Private Health Care Systems
21 would be signatories to every contract with every
22 physician?

33

1      A.  As far as I can remember, yes.
2      Q.  Were the terms of the contracts determined
3  by people at the individual insurance companies
4  working together, or by a full-time staff at
5  Private Health Care Systems?
6      A.  At Private Health Care Systems.
7      Q.  And did Private Health Care Systems'
8  contracting staff coordinator liaise with
9  contracting staff at the constituent insurance
10 companies?
11     A.  No.
12     Q.  So, the insurance companies delegated the
13 contracting task entirely to the staff at Private
14 Health Care Systems?
15     A.  Private Health Care staff did the
16 contracting.  I don't know about the word
17 "delegation," if that's a formal word, but you
18 know, yes.
19     Q.  It wasn't intended to be.
20     A.  Okay.
21     Q.  Let me rephrase it so there's no
22 confusion.  The private insurance companies that

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

---

34

1  made up Private Health Care Systems allowed the
2  staff at Private Health Care Systems to make their
3  own decisions as to what terms should be included
4  in the contracts that they would negotiate with
5  providers.
6      A.  Yes.
7      Q.  Okay.  Now, in this time period when you
8  were a managed care coordinator responsible for
9  building the network in Connecticut, was there one
10 fee schedule applicable to Connecticut or more than
11 one?
12     A.  I think there was two.
13     Q.  What was the variation between the two
14 contracts?
15     A.  One was the Fairfield County, and the
16 other was the rest of Connecticut -- best of my
17 memory.
18     Q.  Why was there a distinction between
19 Fairfield versus the rest of Connecticut?
20     A.  I don't know.
21     Q.  Do you know whether one fee schedule
22 contained higher rates than the other?

---

35

1      A.  Yes.
2      Q.  Which one was higher?
3      A.  Fairfield County.
4      Q.  Is Fairfield County a -- does that include
5  the big cities in Connecticut, or is that a largely
6  rural area?
7      A.  It's a suburb of New York, so it's
8  Greenwich and communities close to New York.
9      Q.  Was there a greater concentration of
10 physicians in the Fairfield area or in the rest of
11 Connecticut area?
12     A.  I don't know.
13     Q.  In Fairfield did the one fee schedule
14 govern all different specialties?
15     A.  Yes.
16     Q.  And similarly, did the rest of Connecticut
17 -- in the rest of Connecticut, did the one fee
18 schedule cover all specialties?
19     A.  Yes.
20     Q.  Was there any individualized negotiation
21 with provider groups in either area?
22     A.  Not on the fee schedule, but the -- there

---

36

1  were meetings and -- and attempt to bring
2  individual provider groups in.
3      Q.  Okay.  Were -- was there a negotiation of
4  terms of the contracts other than the fee
5  schedules?
6      A.  No.
7      Q.  Okay.  So, there were meetings -- when you
8  say there were meetings, were those designed to try
9  and explain the contract and the terms to the
10 providers?
11     A.  Yes.
12     Q.  Okay.
13     A.  And we're talking about physicians.
14     Q.  Yeah, physicians.
15     A.  Yes.
16     Q.  But there would be no changes from the
17 form contract that was offered.
18     A.  No.
19     Q.  Now, both at CIGNA and at Private Health
20 Care Systems, do you have any idea how the amounts
21 that were set in the fee schedules were determined?
22     MR. COCO:  Objection.

---

37

1      A.  At CIGNA, I don't know.  At Private Health
2  Care Systems, there was a point in time, and I
3  don't remember when, when the Medicare
4  methodology -- RBRVS -- was adopted, and I don't
5  know when that was.
6      Q.  Did Private Health Care Systems pay at the
7  same rate as Medicare, or did they use RBRVS
8  methodology but then apply a multiplier or in any
9  other way change the amounts specified?
10     A.  They did -- they used the Medicare
11 methodology and had a different conversion factor
12 that would change the amount.
13     Q.  Were the amounts that Private Health Care
14 Systems was reimbursing for services at greater
15 than or lesser than the amounts Medicare was
16 reimbursing for the same services?
17     A.  Greater than.
18     Q.  Why was Private Health Care Systems paying
19 amounts greater than Medicare?
20     A.  It was necessary to have contracts with
21 the physicians to pay at a level higher than
22 Medicare.

---

Sheila R. Cizauskas      HIGHLY CONFIDENTIAL            March 10, 2006
Boston, MA

---

38

1    Q.  It's a function of market demand and
2  supply?
3    A.  Yeah.
4    Q.  In other words, the market would not
5  accept Medicare rates, and if Private Health Care
6  Systems offered those rates, it wouldn't be able to
7  sign up an adequate --
8    A.  Correct.
9      MR. COCO:  Objection.
10   Q.  Now, what about in relation to drugs
11 administered in physicians' offices, what
12 methodology was Private Health Care Systems using
13 as regards that reimbursement?
14   A.  Don't know.
15   Q.  Do you know whether or not the fee
16 schedules that you were negotiating with these
17 providers had sections dealing with drugs
18 administered in office?
19   A.  I don't know.
20   Q.  Were all of the contracts that you
21 negotiated on behalf of Private Health Care Systems
22 fee-for-service contracts?

---

39

1    A.  Yes.
2    Q.  There were no other methodologies used?
3    A.  On the physician side, I believe they were
4  all fee-for-service contracts.
5    Q.  Then in the '95, '96 period you were a
6  senior analyst in the finance department.
7    A.  Yes.
8    Q.  What were your responsibilities in that
9  role?
10   A.  I did some reporting to accounts and did
11 reporting on their utilization trends from one year
12 to the next.
13   Q.  Were you analyzing the utilization trends
14 of specific physician offices or on a global level?
15   A.  It was a -- more of a regional level --
16   Q.  Okay.
17   A.  -- or an account-specific level.
18   Q.  Did your analysis focus on services
19 rendered by those -- by physicians in those
20 regions, or did you also look at -- well, withdraw
21 that.  Did -- were you focused on services?
22   A.  High level.  Inpatient, physician

---

40

1  services, but high level.
2    Q.  When you say, "inpatient physician
3  services --"
4    A.  Inpatient or physician service, two
5  different --
6    Q.  I see.  Did you perform any analysis
7  relating to drug usage or drug costs?
8    A.  I don't remember do -- having any analysis
9  in that category.
10   Q.  Then in '96, '97 you became director of
11 managed care, right?
12   A.  Yes.
13   Q.  What were your responsibilities as a
14 director of managed care?
15   A.  I managed the Manhattan office, and it was
16 intended to be a very short assignment.  The -- my
17 predecessor had been let go unexpectedly, and I was
18 asked to fill in temporarily until they found a
19 permanent replacement, but it ended up lasting over
20 a year, and -- until they moved the office to New
21 Jersey.  And my responsibility was to manage and
22 enhance and develop the northern New Jersey

---

41

1  network, the New York State, Manhattan network, and
2  Connecticut.
3    Q.  The managed care in your title, director
4  of managed care, was that a reference to the fact
5  that you were an entity contracting with providers?
6    A.  I'm not sure what the reference to
7  "managed care" was, but that's what I did.  I -- I
8  was on the provider side -- on the network side.
9    Q.  The reason I'm -- I asked for
10 clarification is, generally people who have had
11 that title are responsible for dealing with managed
12 care.  In other words, dealing with health
13 insurers.  But that wasn't the case here.  Do I
14 understand correctly?
15   A.  My -- my responsibilities here really were
16 managing the provider networks.
17   Q.  How was your -- how were your
18 responsibilities in this position different from
19 what you had done as a managed care coordinator in
20 Connecticut?
21   A.  I was managing a staff of managed care
22 coordinators; and then there was another level --

---

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL     March 10, 2006
Boston, MA

---

42

1   and I can't remember the title -- that handled a
2   higher level of negotiations, and that staff was
3   located in both New York and Waltham,
4   Massachusetts.
5       Q.  Now, by this time, '96, '97, was Private
6   Health Care Systems in the New York, New Jersey,
7   Connecticut market still using an RBRVS methodology
8   in reimbursing physicians for services?
9       A.  Yes.
10      Q.  And were they still applying a multiplier
11  such that they paid an amount higher than Medicare?
12      A.  Yes.
13      Q.  And by this time had you gained an
14  understanding of how Private Health Care Systems
15  was reimbursing physicians for drugs administered
16  in office?
17      A.  No.  It was not in my consciousness at the
18  time.
19      Q.  Okay.  In 199 -- by the way, sticking with
20  that period, was there -- were the terms of the
21  contracts that were offered still take it or leave
22  it, or was there individualized negotiation?

---

43

1       MR. COCO:  Objection.
2       A.  The physician fee schedules were
3   established by region.  But within the region, they
4   were uniform.
5       Q.  So, there was variation by region?
6       A.  Yes.
7       Q.  By this point, had you gained an
8   understanding as to why there was variation by
9   region?
10      A.  Again, I believe it was market dynamics in
11  the region.
12      Q.  And what do you mean by "market dynamics"?
13      A.  What was necessary to obtain a viable
14  network.
15      Q.  In other words, the physicians in some
16  areas expected a higher rate of reimbursement than
17  others.
18      MR. COCO:  Objection.
19      A.  I'm not sure if it -- it basically was,
20  you know, what the organization -- and this was
21  done in a unit outside of my responsibility --
22  determined was the appropriate level of

---

44

1   reimbursement in that area.
2       Q.  Well, when you say, "market power," do you
3   mean that in certain areas, in order to get and
4   attract a stable and adequate network, it was
5   necessary to offer a higher rate of reimbursement
6   than it was in others?
7       A.  Yes.
8       Q.  In 1997, did you change jobs?
9       A.  Yes.
10      Q.  Okay.  Where did you go in 1997?
11      A.  Harvard Pilgrim Health Care.
12      Q.  How long were you at Harvard Pilgrim?
13      A.  Until April of 19 -- 2003.
14      Q.  And that's when you came to BCBS of
15  Massachusetts.
16      A.  Correct.
17      Q.  Okay.  During your six-odd years at
18  Harvard Pilgrim, how many different job titles did
19  you hold?
20      A.  Trying to think.  I can't remember if it
21  was two or three.  I think it was two.
22      Q.  Okay.  What was the first job title that

---

45

1   you held?
2       A.  Manager of the northern region.
3       Q.  How long was that your title?
4       A.  Couple of years.
5       Q.  And what were you managing as manager of
6   the northern region?
7       A.  I was managing the region north of Boston,
8   Massachusetts, both provider relations and
9   contracting, and managed the staff that covered
10  those two areas.
11      Q.  And what was your second title at Harvard
12  Pilgrim?
13      A.  Director of contracting.
14      Q.  How long did you hold that position?
15      A.  Three or four years.
16      Q.  So, that was from 1999 till you left the
17  company?
18      A.  Yes.
19      Q.  What entities were you responsible for
20  contracting with as director of contracting?
21      A.  Hospitals and large -- risk units they
22  were called, physician risk units.

---

Henderson Legal Services
(202) 220-4158

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL    March 10, 2006
Boston, MA

---

46

1    Q.  Let's talk about the first role you held
2  as -- as manager of the -- of the northern region.
3  Were you responsible for managing networks that had
4  already been set up, or were you creating new
5  networks?
6    A.  I was managing networks that had already
7  been established.
8    Q.  What methodology was Harvard Pilgrim using
9  at this time to reimburse physicians for services
10  that they rendered?
11    A.  Fee schedules and risk -- risk
12  arrangements.
13    Q.  Okay.  Now, by "risk arrangements," are
14  you referring to contracts whereby the providers
15  held the risk?
16    A.  There was shared risk between the provider
17  and the health plan.
18    Q.  What structure did the risk arrangements
19  that Harvard Pilgrim was utilizing take?
20    A.  There were a couple of methodologies.  One
21  was a budgeted capitation, it was called.  So, the
22  entity received a budget -- they were paid fee for

---

47

1  service during the year, and then, at the end of
2  the term, there was a settlement calculation based
3  on the budget that had been established.
4          And there was a capitation model where the
5  entity received a fixed amount to provide services
6  to a -- a group of patients.
7    Q.  Okay.  Were there any withhold
8  arrangements?
9    A.  Yes.
10    Q.  Any other types of risk arrangements?
11    A.  No.
12    Q.  Okay.  So, there was budget capitation,
13  there was capitation models, and there was -- and
14  there were withholds.
15    A.  The withhold and the budgeted capitation
16  were the same method -- methodology.
17    Q.  And the fee schedule reimbursement, that
18  was fee-for-service reimbursement?
19    A.  Yes.
20    Q.  At this point, what proportion of Harvard
21  Pilgrim's physician contracts were fee schedule
22  based, fee-for-service based, as opposed to risk

---

48

1  based?
2      MR. COCO:  Objection.
3    A.  I couldn't give you a number, but the
4  majority of the arrangements were risk.
5    Q.  When -- what were the factors that
6  determined whether Harvard Pilgrim entered into a
7  fee schedule or fee-for-service arrangement versus
8  a risk-based arrangement with any given physician
9  practice?
10      MR. COCO:  Objection.
11    A.  The risk arrangement was generally offered
12  to groups of physicians that had an
13  infrastructure -- centralized infrastructure -- and
14  a membership that would be suitable for sharing
15  risk level of membership -- a level of membership
16  that was suitable for sharing risk.
17    Q.  By "level of membership," do you mean that
18  a certain minimum number of members were necessary
19  before --
20    A.  Yes.
21    Q.  -- risk sharing became viable?
22    A.  Yes.

---

49

1    Q.  Now, on the fee schedule, fee-for-service
2  side of Harvard Pilgrim's contracting at this time,
3  what was the methodology used to determine the
4  amount in the fee schedules?
5    A.  It was an RBRVS -- well, let me correct
6  that.  It had ultimately -- conveniently gone to
7  RBRVS, but originally, at this time, it was a
8  homegrown fee schedule, Harvard Pilgrim-developed
9  fee schedule.
10    Q.  When did Harvard Pilgrim transition from
11  its homegrown fee schedule to RBRVS fee schedules?
12    A.  I can't -- I don't know the exact time
13  frame, but I would say it's towards the late '90s.
14    Q.  Okay.  It was during your tenure?
15    A.  Yes.
16    Q.  The homegrown schedule that was used
17  earlier, do you know how that was developed?
18    A.  No.
19    Q.  Do you know whether or not it was related
20  to physician's bill charges in any way?
21    A.  I don't know.
22    Q.  When the RBRVS methodology was adopted,

---

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL    March 10, 2006
Boston, MA

---

50

1 were you involved in that transition?
2    A.  Yes.
3    Q.  What were your responsibilities in
4 relation to that transition?
5    A.  Mostly just understanding what RBRVS was,
6 learning more about how it -- what it was and the
7 relativities between services.
8    Q.  And by this time you were already familiar
9 with RBRVS because of your experience with Private
10 Health Care Systems, right?
11    A.  Yes.
12    Q.  So, were you providing advice to others in
13 the group based on your experience with RBRVS?
14    A.  Yes.
15    Q.  Did Harvard Pilgrim move to an RBRVS
16 methodology where they reimbursed at the same rate
17 as Medicare, or did they adopt a multiplier?
18    A.  I -- I wouldn't call it a multiplier.
19 When you say, "multiplier," it's a conversion
20 factor that's applied to the -- to the weights.
21    Q.  Can you help me understand what the
22 difference is between a multiplier versus a

---

51

1 conversion factor.
2    A.  In my mind -- and this may not be the --
3 you know, the -- anyone else's -- but a conversion
4 factor is the number that's applied to the weights,
5 and it establishes a fee schedule, and then, you
6 know, if -- if there's a multiplier applied to
7 that, on top of that.  So, it would be, across the
8 board, a multiplier.  Within the fee schedule there
9 may be different conversion factors or one
10 conversion factor.
11    Q.  Okay.  So, Harvard Pilgrim applied -- did
12 it apply one conversion factor to the fee --
13 Medicare fee schedule or were they different?
14    A.  They were different.  There were -- I
15 can't remember how many, but there were a number of
16 multiple -- conversion factors.
17    Q.  As a general matter, though, across the
18 board, was Harvard Pilgrim paying more than
19 Medicare in relation to services?
20    A.  Yes.
21    Q.  And similar to Private Health Care
22 Systems, was that because the market demanded

---

52

1 higher rates than what Medicare was paying for
2 services?
3       MR. COCO:  Objection.
4    A.  Yes.
5    Q.  Now, were you personally involved in
6 setting conversion factors?
7    A.  No.
8    Q.  But do you know why different conversion
9 factors were applied to different sections of the
10 fee schedule?
11    A.  One of the elements was the -- in the
12 transition from the homegrown fee schedule to the
13 RBRVS fee schedule, the organization looked at how
14 that would impact individual specialties, and if an
15 individual specialty was impacted greater than some
16 threshold, then the conversion factor was set at a
17 level that would minimize that impact.
18    Q.  What sort of impact are you -- are you
19 talking about there?  When you say, "impact," what
20 do you mean?
21    A.  Moving from the homegrown fee schedule to
22 the RBRVS fee schedule, if a specialty would have a

---

53

1 large reduction in their reimbursement.
2    Q.  Was the goal in that transition to keep
3 the amounts of reimbursement in dollar terms
4 stable, but -- while shifting the underlying
5 methodology?
6       MR. COCO:  Objection.
7    A.  Could you repeat that.
8    Q.  Sure.  I understand that Harvard Pilgrim
9 was moving from a homegrown fee schedule to an
10 RBRVS methodology.
11    A.  Uh-huh.
12    Q.  Right?
13    A.  Yes.
14    Q.  My question is, was -- in applying
15 conversion factors, was Harvard Pilgrim trying to
16 ensure that the amount it reimbursed to different
17 specialties in dollar terms remained about the same
18 as that which they had been reimbursing using the
19 homegrown fee schedules?
20       MR. COCO:  Objection.
21    A.  They were -- there were two pieces to
22 that:  One was the aggregate payments that Harvard

---

Henderson Legal Services
(202) 220-4158

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

54

1  Pilgrim was making to physicians and managing that
2  to a certain level; and then, within that, managing
3  the impact of any particular specialty so that it
4  wouldn't be a hardship for that specialty, but it
5  didn't mean that the payments would be equal to the
6  previous methodology.
7      Q.  Was the goal to keep them relatively close
8  to each other?
9          MR. COCO:  Objection.
10     A.  No.  It was to not have an unmanageable
11 impact, so --
12     Q.  Yeah.  What I'm trying to understand is,
13 what would -- what would qualify as an unmanageable
14 impact?  In other words, what would be an
15 acceptable impact?
16     A.  Uh-huh.
17     Q.  And what would be an unacceptable impact
18 necessitating the use of a conversion factor?
19         MR. COCO:  Objection.
20     A.  There was a threshold established -- I
21 don't remember what it was -- and that was
22 determined to be the acceptable impact, and if it

55

1  exceeded that, then the conversion factor was
2  manipulated.
3      Q.  Now I follow you.  Was it a percentage
4  threshold?
5      A.  Yes.
6      Q.  Okay.  And was it a -- a -- was the
7  percentage at the aggregate level?
8      A.  It was a -- it was looking at a specialty
9  category.
10     Q.  Okay.  So, let's take oncologists, for
11 example.  If oncologists' income would fall by an
12 amount greater than a certain predetermined
13 percentage as a result of the transition, that
14 would qualify as an unacceptable impact and a
15 conversion factor would then be applied.
16         MR. COCO:  Objection.
17     A.  I don't remember oncologists specifically.
18     Q.  I merely use it as an example.
19     A.  Uh-huh.  Yes, although I don't believe
20 that oncologists were in that category.
21     Q.  I'm happy to rephrase.
22     A.  Okay.

56

1      Q.  Let's do it so the record is clear.  I'm
2  trying to understand how the methodology worked.
3  So, if Specialty X, if their income in
4  reimbursements was going to fall by more than a
5  certain predetermined percentage, that would then
6  qualify as an unacceptable impact, and a conversion
7  factor would be applied to increase their
8  reimbursement.
9          MR. COCO:  Objection.
10     A.  Yes, but the predetermined percentage
11 would not necessarily be the same for every
12 specialty.
13     Q.  Vary from specialty to specialty?
14     A.  Yes.
15     Q.  Okay.  Do you know what the basis was for
16 varying the threshold impact percentage from
17 specialty to specialty?
18     A.  No.
19     Q.  Do you know for which specialties a higher
20 impact was acceptable than for others?
21     A.  I don't remember.
22     Q.  Now, we've talked about reimbursement for

57

1  services.  How was Harvard Pilgrim reimbursing
2  providers for drugs that they administered in
3  office?
4      A.  I don't -- at some point along the way,
5  Harvard Pilgrim contracted with a specialty drug
6  organization, and I don't know the details of it.
7  It was not my area of responsibility.
8      Q.  Did you have an understanding as to
9  whether or not the specialty provider was
10 responsible for all injectable or infused drugs, or
11 were they responsible for a specific subset of
12 drugs?
13     A.  A specific subset.
14     Q.  Did you gain an understanding at any point
15 as to whether providers were required to use the
16 specialty distributor to acquire
17 physician-administered drugs, or was it optional?
18     A.  It was -- I don't remember how it ended
19 up.  I think the -- the original concept was that
20 it would be required, but it became controversial,
21 and I don't remember how it ended up.
22     Q.  Why did it become controversial?

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

58

1    A.  To the -- my extent of understanding was
2  that providers were -- were not that accepting of
3  having to use a particular vendor.
4    Q.  Did you get an understanding as to why
5  providers were resistant?
6    A.  No.
7    Q.  At any point -- well, when you say
8  resistant to using a vendor, were the concerns
9  specific to the specialty vendor in use, or were
10  concerns related to the use of a specialty pharmacy
11  method?
12    A.  I can't say that I had firsthand knowledge
13  of what it was.  I remember that, you know, that
14  there was an objection to just the administrative
15  burden that it placed on the provider.  That was
16  one -- one thing that I do remember.
17    Q.  Any concerns other than administrative
18  burden that you recall?
19    A.  Some -- there was some concern about the
20  shelflife of some drugs.
21    Q.  Anything else?
22    A.  Nothing else that I can remember.  I'm

59

1  sure there were other things, but I was not a party
2  to that discussion.
3    Q.  Were any concerns expressed that you're
4  aware of regarding a reimbursement, a margin, or
5  any issues of that kind?
6    A.  In the -- in the context of the specialty
7  drug vendor, not that I know.
8    Q.  Now, other than the specialty distribution
9  channel, did you have an understanding as to any
10  other methodologies that Harvard Pilgrim used in
11  relation to reimbursing for drugs administered in
12  office?
13    A.  I believe that there -- there was J-codes
14  that were used as a method of reimbursing on the
15  claim, but I have very limited knowledge as to how
16  that all worked.
17    Q.  Do you know how the reimbursement in
18  relation to any particular J-Code was determined?
19    A.  No, not at that point.
20    Q.  Okay.  Do you have a familiarity in
21  general with what J-codes are, what HCPCS codes
22  are?

60

1    MR. COCO:  Objection.
2    A.  Limited knowledge.  It's just a -- you
3  know, a code that's put on a bill to describe what
4  the drug was or the service that was administered.
5    Q.  Do you understand that a J-Code can apply
6  to a drug or to a service?
7    MR. COCO:  Objection.
8    A.  I don't know that to be true.  I always
9  thought they applied to drugs.
10    Q.  Okay.  Now, in relation to drugs, do you
11  know whether or not every drug has its own
12  individual J-Code?
13    MR. COCO:  Objection.
14    A.  I don't know.
15    Q.  Now, after your time as manager of the
16  northern region, you became director of
17  contracting.
18    A.  Yes.
19    Q.  You mentioned earlier that your
20  responsibilities were hospitals and large physician
21  risk units.
22    A.  Correct.

61

1    Q.  What did you mean by -- by "large
2  physician risk units"?
3    A.  That would be physician groups or a
4  combination of a physician group with a hospital
5  that would have a -- an overlying agreement with
6  the health plan around sharing risk in one of the
7  models that I described, either withhold and a
8  budgeted cap, or global capitation.
9    Q.  Did the various risk-sharing arrangements
10  that Harvard Pilgrim had with physician practices
11  during the time you were there -- '97 to '03 --
12  include or exclude drugs administered in office?
13    A.  I don't remember that that -- it excluded
14  drugs.
15    Q.  So far as -- so, as far as you knew, the
16  capitated payments that were provided encompassed
17  all medical benefits, services, and drugs.
18    MR. COCO:  Objection.
19    A.  For the -- for the global capitation, yes.
20    Q.  Okay.  And in the budgeted capitation
21  model, all medical benefits -- the services and the
22  drugs -- would be part of the analysis used to

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

62

1  determine the numbers at the end of the day -- at
2  the end of the year.
3       MR. COCO: Objection.
4       A.  There may have been some that had
5  exclusions for retail drugs or for mental health
6  services, but that's the only exclusions that I can
7  remember.
8       Q.  Physician-administered drugs would have
9  been included.
10      A.  I believe so.
11      Q.  Now, you testified that when you were
12  manager of the northern region, the majority of
13  Harvard Pilgrim's contracts were these risk
14  arrangements.
15      A.  Yes.
16      Q.  Okay.  Did that remain true when you were
17  director of contracting?
18      A.  Yes.
19      Q.  So, throughout your time at Harvard
20  Pilgrim, from '97 to '03, in relation to physician
21  providers, the majority of the contracts that you
22  were responsible for negotiating and implementing

63

1  were risk sharing, as opposed to fee for service.
2       A.  I didn't do any fee-for-service
3  contracting.  My responsibility was the
4  risk-sharing contracting.
5       Q.  Okay.  So, let me rephrase it then.  For
6  the period '97 to '03 when you were at Harvard
7  Pilgrim Health Care, you were responsible for
8  risk-sharing contracts, but you understood that
9  those risk-sharing contracts constituted the
10  majority of Harvard Pilgrim's total physician
11  contracts.
12      A.  Yes.
13      MR. COCO: Objection.
14      Q.  And those risk-sharing contracts included
15  physician-administered drugs.
16      MR. COCO: Objection.
17      A.  As far as I can remember, yes.
18      Q.  Now, in 2003, you then made a transition
19  to Blue Cross Blue Shield of Massachusetts, right?
20      A.  Yes.
21      Q.  What were the reasons why you moved from
22  Harvard Pilgrim to BCBS of Massachusetts?

64

1       A.  I live in Westborough, and they
2  transferred my unit to Quincy.  And so, ultimately,
3  the commute became untenable for me, and I had been
4  recruited by Blue Cross and accepted the position.
5       Q.  Okay.  And you came to Blue Cross as
6  senior director of provider contracts.
7       A.  Correct.
8       Q.  Now, who is the provider in provider
9  contracts?
10      A.  Hospitals and risk and incentive contracts
11  with physicians' groups.  And when I say
12  "hospitals," I mean acute care hospitals.
13      Q.  Now, you said risk incentive contracts.
14      A.  Risk and incentive contracts.
15      Q.  That was my question.  Now, are some --
16  when you say, "incentive contracts," do both --
17  does that include both fee-for-service contracts
18  and risk-sharing contracts?
19      A.  When I say, "incentive contracts," I mean
20  it's a -- it's an overlay on a fee-for-service --
21  individual fee-for-service contractsthat provides
22  incentives to a group of physicians -- upside.

65

1       Q.  Now, for the period you've been at BCBS,
2  the last three-odd years, what proportion of
3  physician contracts generally have been plain fee
4  for service without incentives?
5       A.  This is a guess, and I'm thinking 50
6  percent, and our goal is to increase the -- those
7  -- those with incentives.
8       Q.  Okay.  So, the fee-for-service contracts,
9  roughly half are without incentive structures, and
10  the other half are with incentive structures?
11      A.  If you're talking about when I began with
12  Blue Cross, I -- I would guess that would be
13  the breakdown.  And then --
14      Q.  And has that changed over the last three
15  odd years?
16      A.  Yes.  Yes.
17      Q.  Okay.  What's the rough percentage now
18  between the two?
19      A.  I would say about 80 percent with
20  incentives or some sort of shared risk or
21  incentive.
22      Q.  Well, do the risk contracts ever have an

Henderson Legal Services
(202) 220-4158

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL         March 10, 2006
Boston, MA

| 66 | 68 |
|---|---|
| 1 incentive component? | 1 that's up to about 80 percent, right, roughly? |
| 2    MR. COCO: Objection. | 2    A. (Witness nods.) Incentives or risk. |
| 3    A. Do the risk contracts have an incentive -- | 3    Q. Okay. |
| 4    Q. Let me withdraw that. I see your concern. | 4    A. So -- |
| 5 The -- the particular incentive programs that are | 5    Q. Let's -- let's talk about that now. When |
| 6 applied to fee-for-service contracts, are those | 6 you -- when you refer to incentive programs, are |
| 7 same incentive programs ever applied to risk model | 7 you referring to, for example, the PCPIP program? |
| 8 contracts? | 8    A. That's one -- one incentive program, yes. |
| 9    A. There may be a -- an incentive component | 9    Q. Okay. And for the record, what does that |
| 10 that's applied to the individual physicians within | 10 stand for? |
| 11 a risk contract. So, we have a PCP incentive | 11    A. Primary Care Incentive -- Primary Care |
| 12 that's offered to PCPs, and they also make -- the | 12 Physician Incentive Program. |
| 13 PCPs may also be part of a risk contract. | 13    Q. What other incentive programs are you |
| 14    Q. Okay. Let's try and look at it a slightly | 14 familiar with? |
| 15 different way then. When you started in 2003, what | 15    A. Today? |
| 16 proportion -- leaving the incentive component aside | 16    Q. Yeah. |
| 17 for a moment -- what proportion of contracts with | 17    A. There's a tertiary physician incentive |
| 18 physicians were fee for service versus risk model | 18 model; there's a group in -- group physician -- |
| 19 contracts? | 19 Group Performance Incentive Program, and that's for |
| 20    MR. COCO: Objection. | 20 groups that include PCPs and specialists. |
| 21    A. I really couldn't make a guess. | 21    Q. Is that -- |
| 22    Q. Okay. Were -- do you have an | 22    A. And there's a hospital incentive program. |

| 67 | 69 |
|---|---|
| 1 understanding as to whether the majority of | 1    Q. Okay. Is the Group Performance Incentive |
| 2 contracts were fee for service or -- or risk? | 2 Program referred to by the acronym GPIP? |
| 3    MR. COCO: Objection. | 3    A. Yes. |
| 4    A. I believe fee for service was a larger | 4    Q. Okay. So, you described four incentive |
| 5 component than I had been used to at Harvard | 5 programs. Is that the sum total of incentive |
| 6 Pilgrim, I'd say. | 6 programs currently in place? |
| 7    Q. Was the proportion of risk contracts still | 7    A. Yes, and there's variations around the |
| 8 substantial, or was it really nominal? | 8 GPIP program. |
| 9    MR. COCO: Objection. | 9    Q. Okay. Have there been other programs in |
| 10    A. I wouldn't call it substantial. | 10 place during your time at BCBS of Massachusetts |
| 11    Q. Has that relative division between fee for | 11 which are not in place at the moment? |
| 12 service and risk changed over the last three years? | 12    A. No. |
| 13    A. Not the relative difference between fee | 13    Q. Was the -- did the PCPIP program |
| 14 for service and -- and risk, no. | 14 previously go by a different name? |
| 15    Q. Okay. So, this was a substantial | 15    A. Not to my knowledge. |
| 16 difference from what you had seen at Harvard | 16    MR. MANGI: We can take a quick break now, |
| 17 Pilgrim in terms of the proportion of risk | 17 if you like. |
| 18 contracts to fee-for-service contracts, right? | 18    VIDEO OPERATOR: The time is 10:51. We're |
| 19    A. Yes. | 19 off the record. |
| 20    Q. Now, let's get to the incentive part of | 20    (Recess was taken.) |
| 21 it. On the fee-for-service contracts, I understand | 21    VIDEO OPERATOR: The time is 11:09 a.m. |
| 22 in 2003 about half of them had incentives, and now | 22 We're on the record. |

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL    March 10, 2006
Boston, MA

---

70

1    Q.  Now, earlier in the day we were talking
2   about your time at Harvard Pilgrim, and we
3   discussed how you had been involved in Harvard
4   Pilgrim's transition from using homegrown fee
5   schedules to an RBRVS-based methodology.
6    A.  Yes.
7    Q.  Do you recall that testimony?
8    A.  Yes.
9    Q.  Okay.  I'd like to talk about that a
10  little bit more.  Can you describe for me in terms
11  of process how that transition was organized and
12  took place?
13   A.  Senior leadership requested that the
14  organization look at an industry standard fee
15  schedule.
16   Q.  When did that take place?
17   A.  I -- I don't remember --
18   Q.  Okay.
19   A.  -- the dates.
20   Q.  Sometime in the late '90s?
21   A.  Yes.
22   Q.  Okay.

---

71

1    A.  And a committee was formed,
2   cross-functional team with analysts and systems
3   people and payment policy people, and -- and I was
4   a member of the team.  And I wasn't necessarily a
5   constant member of the team, but attended the team
6   meetings from time to time.  And a lot of analysis
7   was done on payments -- current payments and -- and
8   what it would look like if it transitioned to the
9   industry standard fee schedule.
10   Q.  Did the team have any particular name?
11   A.  Not that I remember.
12   Q.  What happened after the analysis was done?
13   A.  There was a lot of paper generated, and
14  different members of the team looked at the results
15  from the perspective of their own departments, and
16  over time, there was a -- a fee schedule that sort
17  of grew out of that process.
18   Q.  Who made the final decision as to whether
19  or not to proceed with the transition?
20   A.  I don't know ultimately, but my boss
21  indicated to me that the -- that the decision had
22  been made to transition.  So, I don't know if it

---

72

1   came from higher down to her or where -- where it
2   came from.
3    Q.  Did the team with which you were involved
4   in studying the transition provide a recommendation
5   as to whether or not the transition should take
6   place at any point?
7    A.  No.
8    Q.  Okay.  Well, was the team's mandate --
9   original mandate from senior management -- to
10  assess the viability of transitioning, or was it to
11  transition?
12   A.  I don't know what the -- what the original
13  mandate was.
14   Q.  Okay.
15   A.  It was to look at an industry standard fee
16  schedule and to -- and to analyze the impact of
17  moving from what was in place to the industry
18  standard.
19   Q.  Approximately how long was it from the
20  time when senior leadership gave the instruction to
21  start looking at this issue up until the time when
22  your boss told you that the transition was going to

---

73

1   take place?
2    A.  I don't know.
3    Q.  Okay.  Are we talking a matter of days --
4    A.  No.
5    Q.  -- weeks, months, years?
6    A.  I -- I don't know for sure, but it's not
7   days, weeks, or months.  It's more.
8    Q.  Okay.  So, it would be a -- a few years?
9    A.  It would be at least a year.
10   Q.  Okay.  Now, after the decision was made to
11  go ahead with the actual transition, in other
12  words, after all the discussion was complete, the
13  analysis was done, and the decision was made, okay,
14  we're going to make the transition, how long was
15  it, approximately, from that point until the
16  systems were updated and the new methodology was
17  ready for use?
18   MR. COCO:  Objection.
19   A.  That's just outside of my area of
20  expertise, that -- that time frame.
21   Q.  Do you have an understanding as to how
22  long it was before you were able to negotiate and

---

Sheila R. Cizauskas    HIGHLY CONFIDENTIAL        March 10, 2006
Boston, MA

74

1  start signing contracts utilizing the new fee
2  schedule?
3      A.  I don't believe there were contracts
4  negotiated and signed using the new fee schedule.
5  There was a fee schedule update that was produced
6  to the network.
7      Q.  Well, at that point when Harvard Pilgrim
8  signed a fee-for-service contract, was a fee
9  schedule appended to the contract?
10         MR. COCO:  Objection.
11     A.  I didn't handle individual physician
12  fee-for-service contracts, so the paper that a
13  provider would sign, I never saw.
14     Q.  But you do know that the transition was
15  accomplished, right?
16     A.  Yes.
17     Q.  Do you know whether that transition -- so,
18  after the analysis was done and just the
19  implementation phase, do you know whether that was
20  a matter of days, weeks, or months?
21     A.  Let me back up just for a second on the
22  transition, because I'm -- I'm remembering that

75

1  there were some providers that did not transition.
2  So, it didn't -- it did not happen across the
3  board.
4      Q.  Well, let's talk about that first.  Why --
5  why did some providers transition and not others?
6      A.  I -- I believe it was a negotiation at --
7  at a large physician group, multi-specialty group
8  level.
9      Q.  So, physicians -- withdraw that.  Were
10  physicians aware that Harvard Pilgrim was
11  implementing this transition?
12     A.  Yes.
13         MR. COCO:  Objection.
14     Q.  How did they become aware of the fact that
15  Harvard Pilgrim was implementing the transition?
16     A.  I can only speak for the physicians that I
17  made aware, and that would be through a
18  conversation or a negotiation at a higher level.
19     Q.  Were these ad hoc, sporadic conversations,
20  or did you set out to inform all of the clients for
21  whom you were responsible of the transition?
22     A.  There was a generalized communication to

76

1  the network.
2      Q.  Was there a standard letter that was sent
3  out?
4      A.  I -- I don't know what the mechanism was.
5  There might have been multiple mechanisms --
6      Q.  Okay.
7      A.  -- for communication.
8      Q.  But the goal was to make all providers
9  aware of the fact that the transition was taking
10  place?
11     A.  Yes.
12     Q.  Okay.  Do you recall what the time frame
13  was between when your boss told you that the
14  transition -- that the decision's been made to
15  proceed with the transition and when you started
16  communicating to providers that the transition was
17  now in process?
18         MR. COCO:  Objection.
19     A.  Can't remember the time frame.
20     Q.  Do you know if it was a matter of weeks or
21  months?
22         MR. COCO:  Objection.

77

1      A.  I don't know.
2      Q.  Okay.  Was the transition complete prior
3  to 2000?
4      A.  I can't say for sure.  It was right around
5  in that time frame.
6      Q.  The physicians that did not -- withdraw
7  that.  You described a process of negotiation
8  related to the transition.  Did that process take
9  place at the same time for all plans, or did it
10  take place whenever contracts came up for renewal?
11     A.  Did it take place for all plans?
12         MR. COCO:  Objection.
13     A.  If you could just repeat the question.
14     Q.  Sure.  Did the -- you mentioned earlier
15  that some provider -- that there was a process of
16  negotiation between Harvard Pilgrim and providers
17  related to the transition.  My question is, were --
18  or did those negotiations all take place at the
19  same time, or were they staggered in order of
20  whenever a provider's contract came up for renewal,
21  the discussion would take place at that time?
22         MR. COCO:  Objection.

Sheila R. Cizauskas     HIGHLY CONFIDENTIAL     March 10, 2006
Boston, MA

---

78

1     A.   When you say, "provider," my
2  responsibility was with large provider groups, not
3  individual providers --
4     Q.   Okay.
5     A.   -- and so, to that extent, for a large
6  provider group, it would be upon renewal of the
7  contract.
8     Q.   Were these generally contracts that came
9  up for renewal every year or on a different time
10 frame?
11    A.   It depended on the particular group.
12    Q.   What was the minimum duration of any of
13 these contracts?
14    A.   A year.
15    Q.   The maximum duration?
16    A.   Unlimited.
17    Q.   Well, when did you raise the issue of the
18 transition for -- with entities that had
19 unlimited-time-duration contracts?
20    A.   There may have been a -- sometimes when
21 there's unlimited -- and what I mean by that is it
22 automatically rolls over each year, unless one of

---

79

1  the parties asks to sit down and negotiate; and so,
2  that would have been what Harvard Pilgrim did in
3  those cases.
4     Q.   Eventually, did all physician practices
5  transition over to the new RBRVS-based methodology?
6     A.   When I left Harvard Pilgrim, there were
7  still some that had not.
8     Q.   Now, after the decision was made to
9  proceed with the transition, what groups were
10 responsible for implementing that transition?
11    MR. COCO:  Objection.
12    A.   You mean departments of the organization?
13    Q.   Yeah.
14    A.   Well, there would need to be a claim --
15 the claims system needed to be updated to properly
16 pay claims, and that would have been the
17 implementation.
18    Q.   Any other departments?
19    MR. COCO:  Objection.
20    A.   To implement -- and when you say,
21 "implement," I'm thinking you mean to put in place
22 the appropriate system to pay correctly.

---

80

1     Q.   I'm -- I'm referring to any logistical
2  mechanical task that had to be performed to make
3  the transition a reality after the decision had
4  been made to go ahead and transition.
5     MR. COCO:  Objection.
6     A.   Tasks that would include something beyond
7  the actual paying of the claim?
8     Q.   Well, let's -- let's -- let's list some of
9  the areas.  The claims system needed to be updated.
10 That's one --
11    A.   Uh-huh.
12    Q.   -- area you mentioned.  And it needed to
13 be updated in the sense of all payment methods and
14 amounts had to be changed, right?
15    A.   Correct.
16    Q.   So, it wasn't so much an update as it was
17 a change in the payment methodologies and amounts
18 in -- throughout the claim system.
19    A.   It would have been the implementation of a
20 new fee schedule.
21    Q.   Okay.
22    A.   But it wouldn't -- there would be multiple

---

81

1  fee schedules already in the system.
2     Q.   Was there another department responsible
3  for fee schedules, or was that handled by the same
4  department that handled the claims system?
5     MR. COCO:  Objection.
6     A.   There was a reimbursement department that
7  was responsible for giving the claims department
8  the appropriate information.
9     Q.   Any other departments that became involved
10 in that process that you're aware of?
11    A.   In the process of implementing -- not that
12 I'm aware of.
13    Q.   Now, did you -- oh, were there any
14 particular problems or challenges that emerged in
15 the course of that transition, as far as you're
16 aware?
17    MR. COCO:  Objection.
18    A.   What -- what do you mean by "challenges"?
19    Q.   Well, let me -- let me rephrase it then.
20 Were -- did the transition -- once it -- withdraw
21 that.  Once the decision had been made to proceed
22 with the transition, did things proceed smoothly,

---

82

1    or were there any major bumps and problems along
2    the way?
3        MR. COCO:  Objection.
4        A.  I can't recall any specific problems that
5    I would have dealt with.
6        Q.  Did you hear of any problems that you
7    weren't involved in dealing with?
8        MR. COCO:  Objection.
9        A.  I wouldn't call it a problem -- any
10   problems, except that there were discussions with
11   some of the large groups that wanted to negotiate.
12       Q.  So, leaving aside the willingness of
13   providers to make the transition, you're not aware
14   of any difficulties that Harvard Pilgrim
15   encountered, logistically, in making the transition
16   from one methodology to another?
17       MR. COCO:  Objection of it, no.
18       A.  I'm not aware of it, no.
19       Q.  Now, we talked a bit later this morning
20   about the different incentive programs that are in
21   use at BCBS of Massachusetts.
22       A.  Uh-huh.

83

1        Q.  The first one you mentioned is the PCPIP.
2        A.  Yes.
3        Q.  Can you help me understand what that
4    program is.
5        A.  I don't manage the program, but I'm
6    certainly aware of what it is, and it's a -- it's a
7    program that provides additional revenue to primary
8    care physicians based on their performance in
9    certain quality goals and technology goals.
10       Q.  What are the goals that ground the
11   granting of a performance incentive?
12       A.  I don't remember specifically all of them,
13   but they fall in the categories of HEDIS goals
14   around, I think -- I think this year we have
15   diabetes measures, and in the past we had, you
16   know, mammography and Pap smears.
17       Q.  Would it be fair to say that the incentive
18   programs relate principally to success in
19   implementing preventative care regimes?
20       A.  That would be a part of it, yes.
21       Q.  Okay.  What else is involved other than
22   preventative care?

84

1        A.  Utilizing electronic technologies like
2    eRx.
3        Q.  What is eRx?
4        A.  So, that's electronic prescription
5    writing, handheld devices.
6        Q.  Anything else?
7        A.  I think that's -- you know, quality and
8    safety are the general guiding principles for
9    PCPIP.
10       Q.  How are quality and safety assessed?
11       A.  How are they assessed?
12       Q.  How are they assessed?
13       A.  Well, we use industry standard HEDIS
14   reports for quality; and so, the eRx would fall
15   into a safety category, and that would be assessed
16   by the usage of how many prescriptions a provider
17   writes using the electronic prescription writing.
18       Q.  The second program you referred to is the
19   tertiary physician model.
20       A.  Yes.
21       Q.  What is the tertiary physician model?
22       A.  It's a new model that was implemented in

85

1    January of '06 for certain groups of physicians
2    that are affiliated with tertiary hospitals, and
3    it's an incentive model that incents -- provides
4    additional revenue based on performance in quality,
5    efficiency, and technology goals.
6        Q.  What are tertiary hospitals?
7        A.  The tertiary -- the tertiary -- what's the
8    definition of a tertiary hospital --
9        Q.  Yeah.
10       A.  -- or specifically -- who are they?
11       Q.  No, what is a tertiary hospital?
12       A.  The definition?  It's a hospital that
13   provides, you know, a higher level of services,
14   like transplants and -- there's a criteria, and I
15   can't say all of the pieces of the criteria, but it
16   differentiates a hospital from a community-level
17   hospital that provides a different set of services.
18       Q.  Are the incentives under the tertiary
19   physician model going to the hospital or to the
20   physicians practicing in the hospital?
21       A.  To the physicians affiliated with the
22   hospital.

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL   March 10, 2006
Boston, MA

**86**

1    Q.  Is the contract signed between BCBS of
2   Massachusetts and the physician or the hospital?
3    A.  Physician group.
4    Q.  So, these are contracts with physician
5   practices where the physicians have an affiliation
6   with the hospital.
7    A.  It's a contract with an organized group of
8   physicians that have a centralized infrastructure
9   and -- and a centralized authority to negotiate on
10   their behalf.
11    Q.  Okay.  Now, does this incentive program
12   have any connection with preventative care goals,
13   like the PCPIP?
14    A.  There is some of that.
15    Q.  The eTechnology component, I assume, is
16   the same as the PCPIP, to promote the use of
17   technology?
18    A.  It may be that.  It may be an electronic
19   medical record, but there would be a goal that
20   would be connected to some technology.
21    Q.  Are there any goals that fund incentive
22   payments under the tertiary physician model that

**87**

1   we've not previously discussed in connection with
2   the PCPIP?
3    A.  There would be some efficiency goals that
4   may look at appropriate utilization for radiology.
5    Q.  Are you referring to the use of
6   radiotherapy in general or drugs associated with
7   radiotherapy?
8      MR. COCO:  Objection.
9    A.  It would be radiology services like CT
10   scans, MRIs.
11    Q.  Oh, I see.  The third model you mentioned
12   is the Group Performance Incentive Program.  What
13   does that program involve?
14    A.  That is a beat-the-trend model, and
15   basically the underlying structure is a physician
16   group that beats a network trend; that does better
17   than the network trend, and there would be some
18   opportunity for incentives based on their
19   performance.
20    Q.  What sort of trends are being measured?
21    A.  Medical cost trends.
22    Q.  Does medical cost include the cost of

**88**

1   services as well as drugs?
2    A.  It includes the cost of all medical
3   expenses.  And that model has evolved over time and
4   now only includes some subsets of the medical
5   expenses.
6    Q.  Is it a second cousin to a withhold
7   program?
8      MR. COCO:  Objection.
9    A.  I don't know what you mean by "second
10   cousin."
11    Q.  Was it --
12    A.  I think of my second cousins.  I don't
13   know.
14    Q.  It wasn't a legalistic question.  Let me
15   -- let me ask it again.  Does the Group Performance
16   Incentive Program have a similar structure to a
17   withhold program in the sense that, if total
18   payments are contained within a certain range, that
19   can be the basis for the granting of an additional
20   financial sum?
21      MR. COCO:  Objection.
22    A.  There is no withhold in this program.

**89**

1    Q.  Okay.  So, it's merely -- it's a -- it's
2   an additional sum that becomes available as a bonus
3   incentive payment if cost containment goals were
4   met?
5    A.  Cost containment and other goals,
6   including safety and technology.
7    Q.  Okay.  Now, you said some elements are
8   included and some are now excluded from the
9   measurement of medical cost.  What was the change
10   that you were referring to there?
11    A.  I'm sorry.  They are all still included,
12   but now they are seg -- separated into categories.
13    Q.  So, they're measured separately?
14    A.  Yes.
15    Q.  Okay.  What are the categories that are
16   measured now?
17    A.  Lab -- let's see if I can remember them --
18   lab, radiology, retail pharmacy, and all other.
19    Q.  In the retail pharmacy category, what is
20   being measured there?
21    A.  Trend.
22    Q.  Well, is -- is -- does the retail pharmacy

Sheila R. Cizauskas   HIGHLY CONFIDENTIAL         March 10, 2006
Boston, MA

90

1  measure the cost to the plan of scripts that the
2  doctors write for drugs that patients then fill at
3  retail pharmacies?
4      A.  Yes.
5      Q.  Now, in those situations, the doctor will
6  write a prescription, the patient will fill it,
7  say, at a CVS or an Eckerd's, and BCBS will then
8  make reimbursement to that pharmacy, correct --
9      A.  Uh-huh.  Yes.
10     Q.  -- via Express Scripts, which is the PBM?
11     A.  Yes.
12     Q.  In those situations reimbursement does not
13 flow through the doctor.
14     A.  Correct.
15     Q.  But nonetheless, this program seeks to
16 measure the cost to BCBS of Massachusetts of
17 reimbursing in relation to prescriptions that the
18 doctor writes.
19     A.  Correct.
20     Q.  And that then becomes part of the analysis
21 of whether or not the doctor can achieve an
22 incentive under the GPIP.

91

1      A.  Yes.
2      Q.  Where in the structure that we described
3  is the cost measured of drugs administered in
4  office?
5      A.  It would have to be in the "all other"
6  category.
7      Q.  Do you have any idea how much BCBS of
8  Massachusetts pays each year in reimbursement to
9  physicians for drugs administered in office?
10     A.  No.
11     Q.  How long has the GPIP program been in
12 place?
13     A.  Four years is my -- it was in place before
14 I arrived.  So, I've been there three years, and I
15 think it was in place a year before I got there.
16     Q.  Now, the GPIP program applies to both
17 primary care doctors and specialists?
18     A.  Yes.
19     Q.  Does it apply to specialists in a variety
20 of different fields?
21     A.  Yes.
22     Q.  Are any types of specialists excluded from

92

1  the GPIP?
2      A.  No, not -- well, it really would be a
3  function of the group that -- that the contract is
4  with.  So, if they have only certain specialties,
5  then -- then the others would not be included.
6      Q.  To put my question another way, am I
7  correct in understanding BCBS of Massachusetts has
8  not made any sort of a policy decision to exclude
9  any particular specialties from the scope of the
10 GPIP program -- GPIP --
11     A.  When you say, "specialties," I'm not sure
12 if you're including some of the ancillary
13 categories, like, you know, nurse practitioners
14 and --
15     Q.  I'm not.  I'm referring to specialties in
16 terms of areas in which physicians specialize --
17 rheumatologists, oncologists, hematologists,
18 nephrologists.
19     A.  None of them have been explicitly
20 excluded.
21     Q.  And the PCPIP program, how long has that
22 been in place?

93

1      A.  I don't know.  It's been there for many
2  years prior to my arrival.  I don't know the number
3  of years.
4      Q.  Now, the fourth incentive program we
5  talked about is the hospital incentive program.
6      A.  Yes.
7      Q.  What does that program involve?
8      A.  That program is -- has been a program that
9  measures -- it's evolved over time, and it started
10 measuring process -- some of the JHACO core
11 measures.  And then it's evolved to measure
12 outcomes through -- I'm going to use acronyms that
13 I probably won't be able to tell you what they
14 mean -- AHRQ, A-H-R-Q, it's a national reporting of
15 outcomes; and -- and then the next generation will
16 include some -- some new processes and patient
17 experience -- patient satisfaction and technology.
18     Q.  Now, the first part of that you referred
19 to is measuring J-codes?
20     A.  JHACO.  It's a-- it's an acronym.  JHACO,
21 J-H-A-C-O, I think.
22     Q.  What is -- what is that?

Henderson Legal Services
(202) 220-4158