1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456

C.A. No. 01-CV-12257-PBS

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

IN RE:  PHARMACEUTICAL INDUSTRY            \*

AVERAGE WHOLESALE PRICE LITIGATION         \*

———————————————————————————               \*

THIS DOCUMENT RELATES TO ALL ACTIONS       \*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

VOLUME I


DEPOSITION OF JAN L. COOK, M.D., a witness called on

behalf of Johnson & Johnson, pursuant to the Federal

Rules of  Civil Procedure, before Jessica L.

Williamson, Registered Merit Reporter, Certified

Realtime Reporter and Notary  Public in and for the

Commonwealth of  Massachusetts, at the Offices of

Robins,  Kaplan, Miller & Ciresi L.L.P., 800 Boylston

Street, Boston, Massachusetts, on Wednesday, March 6,

2006, commencing at 9:37 a.m.

Jan L. Cook, M.D.                CONFIDENTIAL                 March 6, 2006
                                   Boston, MA

---

**2**

```
 1          A P P E A R A N C E S
 2
 3    HAGENS BERMAN SOBOL SHAPIRO LLP
 4      (By Edward Notargiacomo, Esq.)
 5      One Main Street
 6      Fourth Floor
 7      Cambridge, Massachusetts  02142
 8      (617) 482-3700
 9      ed@hbsslaw.com
10      Counsel for the MDL Plaintiffs
11
12    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
13      (By Stephen L. Coco, Esq.)
14      800 Boylston Street
15      25th Floor
16      Boston, Massachusetts  02199-7610
17      (617) 267-2300
18      slcoco@rmkc.com
19      Counsel for Blue Cross/Blue Shield
20
21
22      (CONTINUED)
```

---

**4**

```
 1          A P P E A R A N C E S, Continued
 2
 3    ROPES & GRAY
 4      (By Adam Wright, Esq.)
 5      One International Place
 6      Boston, Massachusetts  02110-2624
 7      (617) 951-7956
 8      adam.wright@ropesgray.com
 9      Counsel on behalf of Schering and Warrick
10
11    SHOOK, HARDY & BACON L.L.P.
12      (By Elizabeth S. Rowe, Esq.)
13      2555 Grand Boulevard
14      Kansas City, Missouri  64108-2613
15      (816) 474-6550
16      erowe@shb.com
17      Counsel for Aventis Pharmaceuticals
18
19
20
21
22
```

---

**3**

```
 1    A P P E A R A N C E S, Continued
 2
 3    BLUE CROSS/BLUE SHIELD OF MASSACHUSETTS
 4      (By Steven E. Skwara, Esq.)
 5      Landmark Center
 6      401 Park Drive
 7      Boston, Massachusetts  02215-3326
 8      (617) 246-3531
 9      steven.skwara@bcbsma.com
10      Counsel for Blue Cross/Blue Shield of
11      Massachusetts
12
13    PATTERSON BELKNAP WEBB & TYLER LLP
14      (By Adeel A. Mangi, Esq.)
15      1133 Avenue of the Americas
16      New York, New York  10036-6710
17      (212) 336-2000
18      aamangi@pbwt.com
19      Counsel for Johnson & Johnson
20
21
22      (CONTINUED)
```

---

**5**

```
 1                I N D E X
 2    DEPONENT                          PAGE
 3    JAN L. COOK, M.D.
 4      Examination By Mr. Mangi.................... 007
 5      Examination By Mr. Coco...................... 273
 6
 7              E X H I B I T S
 8    NUMBER        DESCRIPTION              PAGE
 9
10    Exhibit Cook 001, Document Bates- numbered
11              BCBSMA-AWP-12120 - 12146....... 037
12    Exhibit Cook 002, Document Bates- numbered
13              BCBSMA-AWP-12489 - 12492....... 202
14    Exhibit Cook 003, Document Bates- numbered
15              BCBSMA-AWP-12613 - 12614....... 213
16    Exhibit Cook 004, Document Bates- numbered
17              BCBSMA-AWP-10592 - 10604....... 226
18    Exhibit Cook 005, Document Bates- numbered
19              BCBSMA-AWP-12679 - 12680....... 236
20    Exhibit Cook 006, Document Bates-numbered
21              BCBSMA-AWP-10608............... 244
22      (CONTINUED)
```

---

Jan L. Cook, M.D.             CONFIDENTIAL             March 6, 2006
                                Boston, MA

---

**6**

1           EXHIBITS (CONTINUED)
2    NUMBER          DESCRIPTION          PAGE
3
4    Exhibit Cook 007, Confidential document headed
5              "Analysis of CMS Average
6              Wholesale Price Reform
7              Reimbursement for Part B
8              Drugs," no Bates stamp......... 249
9    Exhibit Cook 008, Document Bates- numbered
10             BCBSMA-AWP-12576 - 12587....... 258
11   Exhibit Cook 009, Document Bates- numbered
12             BCBSMA-AWP-12589 - 12590....... 261
13   Exhibit Cook 010, Document Bates- numbered
14             BCBSMA-AWP-10609 - 10610....... 267
15
16
17
18
19   Note:  Original Cook Exhibits 1 - 10 were retained by
20   the court reporter and forwarded to Henderson Legal
21   Services, Inc. for distribution.
22

---

**7**

1           PROCEEDINGS
2
3          JAN L. COOK, M.D., a witness called
4    on behalf of the Johnson & Johnson, having first
5    been duly sworn, was deposed and testifies as
6    follows:
7
8          DIRECT EXAMINATION
9    BY MR. MANGI:
10   Q.  Morning, Dr. Cook.  As I mentioned when
11   we met, my name is Adeel Mangi from Patterson
12   Belknap Webb & Tyler.  I represent Johnson &
13   Johnson, which is one of the defendants in this
14   litigation.  Could you please state your full name
15   for the record?
16   A.  Jan Lorraine Cook.
17   Q.  Have you ever been deposed before?
18   A.  Once before.
19   Q.  What sort of a case was that?
20   A.  It was a malpractice case.
21   Q.  And when was that?
22   A.  In the early '90s.

---

**8**

1    Q.  It's been a while --
2    A.  Yes.
3    Q.  -- so let me just run through some of
4    the procedural points on the deposition.
5    A.  Uh-huh.
6    Q.  If any questions I ask you are unclear,
7    please feel free to tell me that, and I'll do my
8    best to rephrase, okay?
9    A.  Okay.
10   Q.  You also need to answer questions
11   audibly rather than nodding or shrugging so that
12   the reporter can take those answers down, okay?
13   A.  Okay.
14   Q.  And if at any point you need to take a
15   break, just let me know and we'll do so, all
16   right?
17   A.  All right.
18   Q.  Can you describe for me, please, your
19   educational background after high school?
20   A.  Okay.  I've got a bachelor's degree in
21   psychology from the Southern Illinois University.
22   I have after that --

---

**9**

1    Q.  When did you receive that qualification?
2    A.  In 1978.
3    Q.  Okay.
4    A.  '77.  Sorry, '77.
5          And I have a bachelor's degree from
6    Washington University in biology, and that was
7    1980.  Then I have an MD from the University of
8    Chicago, and that was 1984.  And I have a master's
9    in public health from Harvard, and that was 1993.
10   Q.  Did you get the MPH as part of a full-
11   time course of study?
12   A.  Yes.
13   Q.  And how long did it take to get that
14   qualification?
15   A.  Nine months.
16   Q.  So for about nine months in '92, '93 you
17   were a full-time student?
18   A.  Correct.
19   Q.  Before you got your MD were there any
20   periods of time when you were working full time?
21   A.  No.  I think I was always a student.  I
22   was always a student in some capacity.

---

Jan L. Cook, M.D.     CONFIDENTIAL        March 6, 2006
Boston, MA

**10**

1    Q.  After you got your MD in 1984 where did
2  you start working?
3         (Ms. Rowe entered deposition room.)
4    A.  Yes, I did a residency in 1984.
5    Q.  Where did you do your residency?
6    A.  Washington University at St. Louis,
7  Missouri, Barnes Hospital.
8    Q.  How long did that residency take?
9    A.  Three years.
10   Q.  So that was '84 to '87?
11   A.  Correct.
12   Q.  Was that a residency in a particular
13  field?
14   A.  Internal medicine.
15   Q.  After you completed your residency, did
16  you do a specialization or fellowship?
17   A.  No.
18   Q.  Did you start practicing medicine?
19   A.  I did.
20   Q.  Where did you practice medicine?
21   A.  Missouri Baptist Hospital in St. Louis,
22  Missouri.

**11**

1    Q.  How long did you work at the Missouri
2  Baptist Hospital?
3    A.  The summer of 1987 until the end of the
4  summer of 1989.
5    Q.  And was your area of practice internal
6  medicine?
7    A.  Intensivist.  I worked in a surgical
8  ICU.
9    Q.  I'm sorry, did you say an intensivist?
10   A.  Intensivist.
11   Q.  What sort of doctor is an intensivist?
12   A.  Worked with people who were
13  postoperative, had surgery, vascular surgery
14  mostly, and I was a physician in charge of -- for
15  the shift I was on, in charge of the surgical ICU.
16   Q.  Were you a full-time employee of the
17  hospital?
18   A.  Yes.
19   Q.  So you were paid a salary by the
20  hospital?
21   A.  Yes.
22   Q.  After 1989 did you change your

**12**

1  positions?
2    A.  Yes.
3    Q.  Okay.  And where did you go in 1989?
4    A.  To Medical East in Braintree,
5  Massachusetts.
6    Q.  Did you go to Medical East as a
7  physician or in another capacity?
8    A.  As a physician.
9    Q.  How long were you employed at Medical
10  East?
11   A.  Until the summer of 1992.
12   Q.  For that period from 1989 to 1992 were
13  you working continuously as a physician?
14   A.  Yes.
15   Q.  And what sort of medicine were you
16  practicing at that time?
17   A.  Primary care.
18   Q.  Were you a full-time salaried employee
19  of Medical East?
20   A.  Yes.
21   Q.  In 1992 did you change your positions or
22  employers?

**13**

1    A.  I went to public health school.
2    Q.  All right.  And you were there for nine
3  months getting your MPH?
4    A.  Correct.
5    Q.  After you completed your MPH, what did
6  you do next?
7    A.  I went back to Braintree Medical
8  Associates, and I started working corporately for
9  Blue Cross/Blue Shield.
10   Q.  Now, you referred to it earlier as
11  Medical East in Braintree and now as Braintree
12  Medical Associates.  Is that the same entity or
13  different entities?
14   A.  Same entity.
15   Q.  And you came back now to work not as a
16  physician but in another capacity?
17   A.  I worked at Braintree Medical
18  Associates.  I worked as a physician part time,
19  and then I worked for the corporate Blue
20  Cross/Blue Shield Massachusetts part time.
21   Q.  For the part of the time when you were
22  working as a physician, what sort of medicine were

Jan L. Cook, M.D.                 CONFIDENTIAL                March 6, 2006
                                     Boston, MA

---

**14**

1   you practicing then?
2       A.   Braintree Medical Associates -- I was
3   practicing urgent care, and I was to an extent
4   during the practice essentially seeing people for
5   physicals and any kind of urgent care problems.
6       Q.   And, again, you were a salaried
7   employee?
8       A.   Correct.
9       Q.   So for a period of time you were wearing
10  two hats or working in two different capacities;
11  is that correct?
12      A.   Uh-huh.  Uh-huh.
13      Q:   Okay.  And just a reminder, you have to
14  answer --
15      A.   Oh, sorry.
16      Q.   -- verbally.
17      A.   Sorry.  Yes.
18      Q.   The answer was yes?
19      A.   Yes.
20      Q.   How long did you keep working at those
21  two different positions?
22      A.   Until 1995.  I was at Braintree Medical

---

**15**

1   Associates until 1995.  I think -- I don't quite
2   remember.  I think it was the early part of the
3   year I quit working there.
4       Q.   After 1995 have you worked exclusively
5   on the corporate side?
6       A.   No.  In 1997 I worked as medical
7   director for the Mind Body Medical Institute in
8   Boston.
9       Q.   Okay.  Well, let's back up a minute
10  then.  Going back to the period from 1993 to 1995,
11  what work were you doing or what was your title in
12  relation to the corporate role you were
13  fulfilling?
14      A.   I was the medical director of clinical
15  design.  I believe that was my title.  I've had a
16  lot of different titles --
17      Q.   Sure.
18      A.   -- but I believe that was the title.
19      Q.   Okay.  Now, let me follow through first
20  on your -- on the physician side of both of your
21  experiences.
22          From '93 to '95 you were part time

---

**16**

1   practicing as a physician.  After that, is the
2   next period of time when you practiced medicine in
3   the '97 time period?
4       A.   Clinical medicine, correct.
5       Q.   Okay.  And how long were you in the
6   position you described in 1997?
7       A.   Until 1999.
8       Q.   And I'm sorry, you mentioned that
9   before, but could you tell me what that position
10  was?
11      A.   Medical director of the Mind/Body
12  Medical Institute.
13      Q.   What is the Mind/Body Medical Institute?
14      A.   It's a not-for-profit institute devoted
15  to the advancement of mind/body medicine.
16      Q.   Where is that based?
17      A.   Boston.
18      Q.   And what sort of medicine were you
19  practicing at the Mind/Body Institute?
20      A.   Internal medicine.
21      Q.   Were you a salaried employee?
22      A.   Correct.

---

**17**

1       Q.   After -- well, in 1999 did you change
2   employers or positions?
3       A.   I changed positions at Blue Cross/Blue
4   Shield of Massachusetts.
5       Q.   Now, is the Mind/Body Medical Institute
6   part of or affiliated with Blue Cross/Blue Shield
7   of Massachusetts? .
8       A.   No.
9       Q.   So from '97 to '99 you were not involved
10  or affiliated with BC/BS of Massachusetts, right?
11      A.   I was.
12      Q.   Okay.
13      A.   I was part time at Blue Cross/Blue
14  Shield of Massachusetts.  I was part time at the
15  Mind/Body Medical Institute.
16      Q.   I see.  So the medical director position
17  at the Mind/Body Medical Institute was a part-time
18  position?
19      A.   Correct.
20      Q.   And you completed that -- you finished
21  working there in 1999?
22      A.   As a medical director.

---

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                              Boston, MA

18

1    Q.  Right.  Okay.  Now, after that did you
2  practice clinical medicine again at any point?
3    A.  No.
4    Q.  Okay.  So in terms of the practice of
5  medicine, you had a residency followed by a period
6  at the Missouri Baptist Hospital, and then you
7  worked for Medical East, and then you had your
8  stint at the Mind/Body Medical Institute, correct?
9    A.  Correct.
10    MR. COCO:  Objection.
11    Q.  Now, in any of those positions or with
12  any of those companies were you involved in the
13  purchasing of prescription drugs?
14    A.  No.
15    Q.  Now, I assume in some of those positions
16  you did administer injectable or infused drugs to
17  patients; is that correct?
18    A.  No.
19    Q.  Even as a primary care physician?
20    A.  I don't believe so.
21    Q.  Okay.  Did you have, at that time, any
22  information as to how your employers acquired

19

1  drugs?
2    A.  No.
3    MR. COCO:  Objection.
4    Q.  Did you have any information as to the
5  prices or rates at which any of those employers
6  acquired drugs?
7    MR. COCO:  Objection.
8    Q.  You can answer.
9    A.  No.
10    Q.  Now I would like to turn to your work on
11  the corporate side that we've been talking about.
12  In 1993 you started working on the corporate side
13  for the first time in a part- time position;
14  correct?
15    A.  Correct.
16    Q.  Now, your title then was the medical
17  director of clinical design?
18    A.  I believe so.
19    Q.  Okay.  What were your responsibilities
20  in that position?
21    A.  Clinical guideline development.
22    Q.  What does that mean?

20

1    A.  Helping the company come up with a
2  policy for establishing clinical guidelines for
3  its clinical network.
4    Q.  Now, did the clinical guidelines pertain
5  to standards in physician care, choice of
6  prescription drugs?  What sort of specific areas
7  did it cover?
8    A.  Standards in physician care.
9    Q.  And what sort of standards are you
10  talking about there?
11    A.  Preventive standards, paps, mammograms,
12  things like that.
13    Q.  Okay.  Now, at that time you were
14  working for Medical East or Braintree Medical
15  Associates, right?
16    A.  Yes.
17    Q.  Okay.  What was that entity, or what is
18  that entity?
19    A.  I don't understand.
20    Q.  Well, is it a physician practice?  Is it
21  a hospital?  What is it?
22    A.  It was a staff model HMO owned by Blue

21

1  Cross/Blue Shield of Massachusetts.
2    Q.  Now, in 1995 your position changed; is
3  that correct?
4    A.  It could have.  I was still clinically
5  and corporately working for Blue Cross/Blue Shield
6  of Massachusetts.  I can't quite remember if I had
7  a job change at that particular time.
8    Q.  Okay.  Did you remain at Braintree
9  Medical Associates post-1995?
10    A.  No.
11    Q.  Who did you go to work for in 1995,
12  which entity?
13    A.  I was still at Blue Cross/Blue Shield of
14  Massachusetts corporately.  I've been with Blue
15  Cross/Blue Shield of Massachusetts corporately
16  part time since 1993.
17    Q.  Now, when you were work at Braintree
18  Medical Associates you were based, I assume, at a
19  facility in Braintree?
20    A.  Correct.
21    Q.  Did you move to a different facility in
22  1995?

Jan L. Cook, M.D.             CONFIDENTIAL                     March 6, 2006
                              Boston, MA

22

1      A. No. I was still -- I still had my
2   corporate office at Blue Cross/Blue Shield. I was
3   just not working at Braintree Medical Associates
4   anymore.
5      Q. Okay. What sort of work did you do post
6   1995 even if you do not recall the specific title?
7      A. You mean at Blue Cross/Blue Shield of
8   Massachusetts?
9      Q. Right.
10     A. I worked in the clinical quality
11  department, and I did a variety of things. I
12  worked in charge of corporate credentialing. I
13  supervised a variety of different areas, clinical
14  areas.
15     Q. How long did you -- were those your job
16  responsibilities?
17     A. Well, it varied for each one.
18     Q. Okay. Well, let me ask you this: From
19  1995 up until 1997 --
20     A. Okay.
21     Q. -- do you know whether you had one title
22  or was it many titles?

23

1      A. I could have had a couple of titles.
2      Q. For that period, '95 to '97, were you
3   full time or part time?
4      A. Part time.
5      Q. Okay. What were you doing the remainder
6   of the time, if anything?
7      A. I have three children.
8      Q. Fair enough.
9      A. I had a son at that point in time.
10     Q. Okay. Now, for that period you
11  mentioned clinical -- you were in the clinical
12  quality department.
13     A. Correct.
14     Q. One aspect of that was corporate
15  credentialing?
16     A. (No verbal response.)
17     Q. Is that correct?
18     A. Yes.
19     Q. What is corporate credentialing?
20     A. It was credentialing professional
21  providers that are in the Blue Cross/Blue Shield
22  of Massachusetts managed care networks.

24

1      Q. By professional providers, are you
2   referring to physicians?
3      A. Physicians, nurse practitioners,
4   chiropractors, et cetera.
5      Q. And what were your responsibilities in
6   terms of checking their credentials? What sort of
7   credentials were you looking at?
8      A. Licensure, malpractice history, site of
9   employment, things like that.
10     Q. Other than corporate credentialing, did
11  you have any other responsibilities in that time
12  period?
13     A. Isn't it terrible not to remember this
14  stuff? At one point in time there I was a
15  supervisor of provider audit. I think between the
16  quality, the credentialing and provider audit,
17  that pretty much covers that time frame. I may be
18  forgetting something, but...
19     Q. Now, let's talk about the provider audit
20  role. What were you auditing?
21     A. I was supervising a group of nurses who
22  were doing hospital audits.

25

1      Q. And what were they auditing?
2      A. Hospital cases.
3      Q. Can you describe for me a typical audit?
4   I mean, were they checking clinical procedures,
5   claim forms? What exactly was being examined?
6      A. They were checking medical records to
7   see if they were consistent with coding.
8      Q. So could one example be checking medical
9   records to see what drugs were administered and
10  matching that up against a claim form seeking
11  reimbursement in relation to a drug?
12     A. No.
13     Q. Okay.
14     A. We were auditing DRG payments.
15     Q. Okay. So since the DRG encompasses the
16  entire stay, they would be checking to ensure that
17  the ailment and the patient's condition and the
18  code assigned to it was consistent with the
19  amounts that were billed and reimbursed by Blue
20  Cross/Blue Shield of Massachusetts; is that
21  correct?
22        MR. COCO: Objection. They were

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

26

1   auditing the coding of the hospital admission
2   against the medical record.
3       Q.   To ensure that they were consistent?
4       A.   Correct.
5       Q.   Anything else involved in the audit?
6       A.   Not that I'm aware of, or can remember.
7       Q.   Did any part of the audit process
8   examine financials of the hospital or the provider
9   in relation to drug acquisition?
10      A.   No.
11      Q.   Now, in 1997 you started working for a
12  period of time at the Mind/Body Medical Institute?
13      A.   Correct.
14      Q.   While you were working there were you
15  also working anywhere else?
16      A.   Blue Cross/Blue Shield of Massachusetts.
17      Q.   Now, your Mind Body Medical Institute
18  position was part time, correct?
19      A.   Correct.
20      Q.   What were you doing for BC/BS of
21  Massachusetts the rest of the time?
22      A.   1997, I was in charge of a position

27

1   review unit at Blue Cross/Blue Shield of
2   Massachusetts.
3       Q.   And how long did you remain in charge of
4   the physician review unit?
5       A.   Until 1999.
6       Q.   What were your responsibilities in that
7   position?
8       A.   Supervising the physicians who worked in
9   that unit.
10      Q.   Okay.  What did the physicians in that
11  unit do?
12      A.   They're responsible for denying any
13  clinical activity like hospitalization or
14  outpatient surgery.
15      Q.   When you say "they're responsible for
16  denying clinical activity," are these procedures
17  that were subject to pre-authorization?
18      A.   Sometimes.
19      Q.   And in cases where the procedure -- were
20  they cases where the procedure had already been
21  performed before the claim was brought to the
22  attention of the physician review unit?

28

1       A.   Sometimes.
2       Q.   So the issue was whether to allow a
3   procedure to take place or whether or not to make
4   payment in relation to a procedure that had taken
5   place; is that a fair statement?
6       A.   I believe so.
7       Q.   How many physicians worked in the
8   physician review unit?
9       A.   I would say -- and I'm guessing.  I
10  can't remember.  I would say about 10.  They were
11  all part time.
12      Q.   Now let me ask you that question more
13  generally:  Do you have a sense for how many MDs
14  work in or for Blue Cross/Blue Shield of
15  Massachusetts at the present time?
16      A.   I have a sense.
17      Q.   Okay.
18      A.   I would say less than 20, full and part
19  time.
20      Q.   Okay.  What areas do those MDs work in?
21      A.   The physician review unit, the behavior
22  health unit, regional medical director supporting

29

1   contracting, quality medical directors working in
2   the quality department, medical director
3   supporting disease management, medical director
4   supporting corporate account analysis.
5       Q.   Anything else?
6       A.   There -- yeah, I mean, that's -- I may
7   be missing one or two, but...
8       Q.   Okay.  Now, one of the categories you
9   mentioned was medical director supporting
10  corporate account analysis?
11      A.   Correct.
12      Q.   What does that department do?
13      A.   That's a relatively new position, and it
14  supports account reporting, so when we go out to
15  make sales, sometimes a physician will go out to
16  talk about the experience, you know, if it's a
17  resale or experience that account has had in terms
18  of claims history with our company.  Sometimes if
19  a new sale, they just talk about general
20  activities we do in medical management.
21      Q.   Are any of the physicians employed by
22  Blue Cross/Blue Shield of Massachusetts, to your

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.             CONFIDENTIAL             March 6, 2006
                              Boston, MA

30

1    knowledge, oncologists?
2        A.   Not to my knowledge.
3        Q.   Any rheumatologists?
4        A.   I don't know.
5        Q.   Do you know whether any of the doctors
6    employed by Blue Cross/Blue Shield of
7    Massachusetts have had personal experience buying
8    and billing for drugs when practicing medicine?
9        A.   I don't know.
10       Q.   And just so the record is clear, do you
11   have an understanding as to what I mean when I use
12   the term "buying and billing"?
13       A.   Explain.
14       Q.   So you understand I'm referring to a
15   situation where a physician will acquire a drug,
16   administer it to a patient and then seek
17   reimbursement from a payer; correct?
18       A.   Okay.  Correct.
19       Q.   So you described now your work in the
20   physician review unit from '97 to '99. After --
21   or, rather, in 1999, did you start working in
22   different areas?

31

1        A.   Correct.
2        Q.   Okay.  And what areas did you move to in
3    1999?
4        A.   I was medical director of clinical
5    coordination.
6        Q.   Was that a full-time or a part-time
7    position?
8        A.   Part-time.
9        Q.   Were you working in any other positions
10   while doing that?
11       A.   The Mind/Body Medical Institute.
12       Q.   Now, when did you start work at the
13   Mind/ Body Medical Institute?
14       A.   I believe 2000.
15       Q.   Did your title there change in 1999?
16       A.   Correct.
17       Q.   What did your title become in 1999?
18       A.   I think I was -- I think the title was
19   reimbursement specialist.
20       Q.   Now, you were a reimbursement specialist
21   at the Mind/Body Institute from '99 to 2000. And
22   the other position that you had as medical

32

1    director of clinical coordination, how long did
2    you hold that position?
3        A.   For a year.
4        Q.   And that was for BC/BS of Massachusetts;
5    correct?
6        A.   Correct.
7        Q.   And what were your responsibilities in
8    the first position of medical director of clinical
9    coordination?
10       A.   To oversee the case management, disease
11   management area, to oversee the physician review,
12   utilization management areas.
13       Q.   In that role did you get involved in
14   issues pertaining to reimbursement?
15           MR. COCO:  Objection.
16       A.   Not directly.
17       Q.   When you say "not directly," was there
18   something indirect that you were thinking of?
19       A.   When we were talking about the physician
20   review unit who could deny payment --
21       Q.   Right.
22       A.   -- and that's what I meant in that

33

1    sense.
2        Q.   Now, in terms of your other position at
3    that time as a reimbursement specialist at the
4    Mind/Body Institute, what were your
5    responsibilities in that position?
6        A.   Basically helping the group understand
7    how they could organize their activities and
8    helping them to come in compliance with the CMS
9    kind of charting activities --
10       Q.   Okay.
11       A.   -- medical recordkeeping sort of things,
12   medical record documentation.
13       Q.   Now, when you say "help the group," what
14   group are you referring to?
15       A.   The Mind/Body medical group, clinical
16   group.
17       Q.   So you were helping the clinical group
18   at the institute --
19       A.   Yeah.
20       Q.   -- in terms of their recordkeeping
21   procedures?
22       A.   Correct.

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
Boston, MA

**34**

1    Q.  Now, in 2000 what positions did you move
2  to?
3    A.  Quality medical director, Blue
4  Cross/Blue Shield of Massachusetts.
5    Q.  Was that a part-time position also?
6    A.  Correct.
7    Q.  Were you working anywhere else at that
8  time?
9    A.  No.
10    ·Q.  And how long did you remain the quality
11  medical director?
12    A.  For a year.
13    Q.  And how about in that position, what
14  responsibilities did you have?
15    A.  Responsible for the clinical quality
16  department, Blue Cross/Blue Shield of
17  Massachusetts.
18    Q.  What does the clinical quality
19  department do?
20    A.  Design programs to help the company
21  become in compliance with NCQA accreditation, the
22  URAC accreditation.

**35**

1    Q.  What is NCQA?
2    A.  National Committee for Quality
3  Assurance.
4    Q.  Is this a position related to
5  credentialing?
6    A.  No.  Credentialing is one of the
7  standard -- but this was more managed care
8  organizations.  It's sort of like the good seal
9  of, you know, housekeeping -- showing my age -- of
10  approval but it's like our J codes for hospitals,
11  joint commission for hospitals.  It's essentially
12  our accreditation by that says that the managed
13  care company was doing everything they should, and
14  I was responsible for the elements related to
15  clinical quality.
16    Q.  So that brings us up to about 2001;
17  correct?
18    A.  Correct.
19    Q.  What position did you move to at that
20  time?
21    A.  Regional medical director.
22    Q.  Now, what were your responsibilities in

**36**

1  that position?
2    A.  To support provider contracting,
3  provider services at Blue Cross/Blue Shield of
4  Massachusetts, and initially in the northern part
5  of the state.
6    Q.  How long did you hold that position?
7    A.  I'm still in that position.
8    Q.  Your title has not changed?
9    A.  Not really, no.  Regional medical
10  director.
11    Q.  Have the areas of the country for which
12  you have responsibility changed?
13    A.  Correct.  So I'm now responsible for the
14  central and western part of the state.
15    Q.  When did that change occur?
16    A.  I think 2002, 2003.  I'm not quite -- I
17  don't quite remember when exactly.
18    Q.  And you've been employed in that
19  position continuously from 2001 till the present
20  time?
21    A.  Correct.
22    Q.  Are you still a part-time employee?

**37**

1    A.  Correct.
2    Q.  And you've been part time throughout
3  that period of time?
4    A.  Correct.
5    Q.  But throughout that period of time this
6  is the only position you've been working in, you
7  haven't also had another job; is that correct?
8    A.  Correct.
9    Q.  Let me show you a document, and we'll
10  mark this as Exhibit Cook 001?
11        (Exhibit Cook 001, Document Bates-
12  numbered BCBSMA-AWP-12120 - 12146, marked for
13  identification.)
14    Q.  Now, if you could turn to the second
15  page of that document, which is the BC/BS
16  organization page?
17    A.  Okay.
18    Q.  Is this the current -- does this reflect
19  the current structure of the organization?
20    A.  No.
21    Q.  Okay.  How has the organization changed?
22    A.  Well, the chairman and chief executive

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
                                 Boston, MA

---

**38**

1    officer is no longer William Van Faasen.
2       Q.  Okay.  Who is the current CEO?
3       A.  Cleve Killingsworth.
4       Q.  Okay.
5       A.  And in general, I'm not really sure
6    exactly -- there isn't a chief operating officer
7    anymore, and I'm not really sure who reports
8    exactly directly to Mr. Killingsworth.
9       Q.  Now, what is the BCBSMA Foundation?
10      A.  It's a not-for-profit foundation
11   dedicated to improving healthcare access to the
12   people of Massachusetts.
13      Q.  Now, how long has Mr. Killingsworth been
14   the CEO of the company?
15      A.  Since the middle of the -- I think it
16   was 2004, say June 2004.
17      Q.  And Mr. Van Faasen, how long was he the
18   CEO before Mr. Killingsworth?
19      A.  I believe at least 10 years.
20      Q.  Now, Mr. Killingsworth, is his
21   background in the health insurance industry?
22      A.  I believe so.

---

**39**

1       Q.  Do you know how long he's worked at Blue
2    Cross/Blue Shield of Massachusetts?
3       A.  I believe since sometime in 2003.
4       Q.  Do you know where he worked prior to
5    coming to BC/BS?
6       A.  I should, but I can't remember.
7    Midwest.
8       Q.  Is that a health plan?
9       A.  I believe so, at the time he was working
10   at health -- in a health plan, yes.
11      Q.  Now, if you could turn to the next page,
12   please, which is headed "COO Organization."
13      A.  Uh-huh.
14      Q.  Towards the left of the page is an entry
15   for Sharon Smith.  Do you see that?
16      A.  Yes.
17      Q.  Do you know whether Ms. Smith is still
18   in that position?
19      A.  She's not.
20      Q.  What is Ms. Smith's current position?
21      A.  At Blue Cross?
22      Q.  Is she still at Blue Cross?

---

**40**

1       A.  No.
2       Q.  Is she retired?
3       A.  Yes.
4       Q.  Do you know whether she's working
5    anywhere else at the moment?
6       A.  No.
7       Q.  By the way, Mr. Van Faasen, is he also
8    retired?
9       A.  From Blue Cross in that capacity, yes.
10   He's the chairman of the board.
11      Q.  Now, are you aware whether or not Ms.
12   Smith played a role in relation to the staff model
13   HMO that BC/BS of Massachusetts used to have?
14      A.  I believe so.
15      Q.  What's your understanding of the role
16   she played in relation to the staff model?
17      A.  I'm not 100 percent sure exactly what
18   she did.  She was responsible, I believe, for
19   helping to develop HMO Blue, so I don't know what
20   their direct responsibilities -- and since that
21   was HMO Blue, that managed care model came -- that
22   staff model HMO came up under that.  I'm assuming

---

**41**

1    she had some relationship, but I don't know
2    exactly what she did.
3       Q.  Now, help me understand.  What is the
4    relationship between HMO Blue and the staff model
5    HMO?
6       A.  They both came up at about the same
7    point in time.
8       Q.  Now, is HMO Blue a product, or is it a -
9    - or is it something else?
10      A.  It's a product, and it may be
11   corporately some sort of separate entity, which I
12   don't quite -- I can't quite tell you that.
13      Q.  Okay.  What I'm trying to understand is
14   was HMO a type of health plan or a type of health
15   insurance product?
16      A.  Yes.
17      Q.  Okay.  And did people who had health
18   coverage through HMO Blue, did they receive their
19   treatment at the staff model HMO?
20      A.  Not exclusively.
21      Q.  That was one of the potential sites of
22   care?

---

Jan L. Cook, M.D.            CONFIDENTIAL            March 6, 2006
                              Boston, MA

---

42

1       A.  Yes.
2       Q.  Are there any other links between HMO
3  Blue and the staff model HMO?
4       A.  Not that I know of.
5       Q.  Were there other BC/BS of Massachusetts
6  health insurance products whose members also got
7  treatment at the staff model clinics?
8       A.  I believe so.
9       Q.  Now, for what period of time did BC/BS
10 of Massachusetts have a staff model HMO?
11      A.  That, I don't know.
12      Q.  Do you know when it ceased to exist or
13 when BC/BS of Massachusetts ceased to own it?
14      A.  Sometime in the '90s, mid-'90s --
15      Q.  All right.
16      A.  -- late '90s.
17      Q.  Now, if I could ask you to turn to -- do
18 you see at the bottom right of the pages there is
19 a stamp?  We call it Bates number.  Turn to the
20 page numbered 12137, please.  Let me know when
21 you're there.
22      A.  12137.

---

43

1       Q.  It's a page entitled "Health Care
2  Services Organization."
3       A.  Yes.  I'm there.
4       Q.  Now, at the bottom right of that page is
5  a date stamp February of 2004.  Now, at the far
6  left the chief medical officer is John Fallon.
7  He's no longer at the company; is that correct?
8       A.  He's still at the company.
9       Q.  Oh, he's still at the company?
10      A.  (No verbal response.)
11      Q.  Is he in a different position?
12      A.  He's the chief physician executive.
13 That's how I sense the position.  This isn't -- I
14 guess you could call him the chief medical officer
15 but I think his official title has always been
16 chief physician executive.
17      Q.  Do you know what kind of a doctor Mr.
18 Fallon is --
19      A.  An internist.
20      Q.  -- or Dr. Fallon?  Sorry.
21      A.  That's okay.
22      Q.  What are the responsibilities as a chief

---

44

1  physician executive?
2       A.  He's responsible for the oversight of
3  the clinical part of the -- well, good question.
4  He provides oversight currently to the physicians
5  that work at Blue Cross/Blue Shield of
6  Massachusetts.
7       Q.  Now, when you say "oversees the
8  physicians working at BC/BS," are those the group
9  of approximately 20 physicians we spoke about
10 earlier?
11      A.  Correct.  Except for Dr. Robert Mandel.
12      Q.  Okay.  Now, I got the impression that
13 those 20 physicians worked in a number of
14 different areas; is that correct?
15      A.  Correct.
16      Q.  But Dr. Fallon somehow has
17 responsibility for all of them; is that accurate?
18      A.  Yes.
19      Q.  Okay.  So he oversees the work of all of
20 those physicians in the different capacities that
21 they work in?
22      A.  They report up to him.  It's a reporting

---

45

1  relationship.
2       Q.  Now, you said all the physicians except
3  for Dr. Mandel?
4       A.  Correct.
5       Q.  What does Dr. Mandel do?
6       A.  He's in charge of our community
7  transformation initiative.
8       Q.  We'll come to that a little bit later.
9  Sticking with this chart for the moment another
10 entry there is for Mr. Vincent Plourde who works
11 in provider service?
12      A.  Correct.
13      Q.  Is he still in that position?
14      A.  Yes.
15      Q.  And what does the provider service
16 division do?
17      A.  He's responsible for overseeing the
18 provider service area which is responsible for
19 dealing with provider inquiries and also the
20 provider managers who go out into the field and
21 work with physicians.  And he may have other
22 responsibilities of which I'm unaware.

---

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

46

1    Q.  Now, when you say "provider inquiries,"
2  what are you referring to there?
3    A.  Why this billed and pay, why is that?  I
4  want to know how to do X, Y and Z, anything that
5  would have to do with a physician inquiry to
6  our...
7    Q.  Now, if a physician had a complaint
8  relating to the amount of reimbursement they were
9  receiving, would that be directed to Mr. Plourde's
10 group?
11   A.  It could be.
12   Q.  Where else could that complaint be
13 directed?
14   A.  Directed to the regional medical
15 directors.
16   Q.  That's your position, correct?
17   A.  Yes.
18   Q.  Anywhere else?
19   A.  Yes, but a lot of times it gets directed
20 to whoever, you know, people sent letters to et
21 cetera, but -- so anywhere could hear about it,
22 but the majority of the time it would be provider

47

1  services or the regional medical directors.
2    Q.  And if someone else were to receive a
3  complaint, would they then direct it to either
4  provider services or a medical director for
5  further attention?
6    A.  Usually.
7    Q.  Okay.  Now, there's also an entry here
8  for contracted health services for which Kim Olson
9  is the vice president.  Is that a Mr. or a Ms.?
10   A.  Ms.
11   Q.  Now, what does the contracted health
12 services department do?
13   A.  She's no longer in that role.
14   Q.  Okay.  Who is in that role now; do you
15 know?
16   A.  No, I don't exactly.  I'm not even sure
17 that exactly exists anymore.
18   Q.  Do you know what that department did do?
19   A.  I think they were responsible for
20 contracting our vendor -- some of our vendor
21 relationships.
22   Q.  What sort of vendors are you talking

48

1  about there?
2    A.  Disease management.  I'm also -- they
3  may have been responsible for our PBM -- I'm not
4  sure -- contract.
5    Q.  Did the contracted health services
6  department have any role in contracting with
7  physicians?
8    A.  No.
9    Q.  Now, if you could turn the page to Page
10 12138, which is entitled "Chief Medical Office,"
11 now, this is your department, correct?
12   A.  Correct.
13   Q.  Now, this chart is again from Feb. of
14 '04.  How has that structure changed, if at all?
15   A.  A lot.  John Fallon is listed -- as the
16 chief physician executive, he reports to Mr.
17 Killingsworth directly.  I'm not the medical
18 director of the south.  I've never been the
19 medical director of the south.  And -- I'm central
20 west.  Dr. Zallen is the medical director for the
21 north.
22   Q.  What sort of a doctor is Dr. Zallen?

49

1    A.  Pediatrician.
2    Q.  Did he practice pediatrics?
3    A.  Yes.
4    Q.  Do you know what settings he practiced
5  in?
6    A.  Pardon?
7    Q.  Do you know whether he practiced in a
8  hospital or in a private practice?
9    A.  I believe he's practiced in a hospital,
10 and he practiced in a staff model HMO.
11   Q.  Okay.
12   A.  And I don't know what else he did.
13   Q.  Okay.
14   A.  I think he practiced in other sites too.
15   Q.  Any other changes to the structure?
16   A.  Dr. Kleinman is no longer there.
17   Q.  Who has replaced Dr. Kleinman?
18   A.  Dr. Jeff Simmons.
19   Q.  What sort of a doctor is Dr. Simmons?
20   A.  He's a psychiatrist.  It's Jeffrey
21 Simmons.  Did I say Robert?  Jeffrey Simmons.
22   Q.  Okay.

Jan L. Cook, M.D.      CONFIDENTIAL      March 6, 2006
Boston, MA

---

50

1    A. And also in the current model David
2 Brumley reports to John Fallon directly. He's the
3 medical director in charge of disease management.
4    Q. Is he also a medical doctor?
5    A. Yes.
6    Q. What sort of doctor is he?
7    A. Family practitioner.
8    Q. Okay.
9    A. Karen Boudreau, and she's a family
10 practitioner, and she reports to him. She's the
11 medical director of quality.
12    Q. Okay.
13    A. Dr. Tom Hawkins. -- these are all on a
14 direct line -- he's the medical director of
15 informatics and account reporting.
16    Q. What sort of doctor is he?
17    A. I think he's an internist. I'm not 100
18 percent sure on that.
19    Q. Okay.
20    A. And let's see. Who am I forgetting?
21 And Dr. Lee Steingisser.
22    Q. What sort of doctor is that?

---

51

1    A. He's an internist. He's the medical
2 director of medical policy administration.
3    Q. Okay.
4    A. And Andreas Mang, who is the director of
5 something called Blue Compass.
6    Q. Blue Compass?
7    A. Yeah.
8    Q. What is Blue Compass?
9    A. It's a reporting system that we're
10 working on, provider reporting kind of
11 methodology.
12    Q. Okay. What do you mean when you refer
13 to a "provider reporting"?
14    A. Reports that look at the activities of
15 our providers. It's in development.
16    Q. Well, activities of providers, what are
17 you referring to there?
18    A. Hospital providers. It collects -- he's
19 working on a software system that sort of collects
20 what we know around the company about hospitals
21 that we contract with, like are they accredited,
22 how do they do on their accreditation, how many

---

52

1 beds do they have, that kind of thing.
2    Q. So it's an information repository about
3 the entities that you're dealing with?
4    A. Yes. Hospitals right now, just
5 hospitals. And let's see if I forgot -- how many
6 do you have now?
7    Q. A fair enough. What about Dr. Goldbach,
8 is he still there?
9    A. He's still there and he's the regional
10 director of the south.
11    Q. And what sort of doctor is Dr. Goldbach?
12    A. Pulmonologist.
13    Q. Do you know whether he practiced in a
14 physician office setting at any point?
15    A. He may have. I'm not sure.
16    Q. By the way, are you aware of a more
17 recent organizational chart?
18    A. Not offhand. Blue Cross/Blue Shield
19 isn't really great at organizational charts, so
20 there may be one. We don't usually circulate them
21 very much, and this is old.
22    Q. Okay.

---

53

1    A. So there should be about eight people
2 reporting to him, seven or eight, to Dr. Fallon.
3    Q. Does Dr. Fallon have any
4 responsibilities at present other than the
5 supervisory role in relation to all the physicians
6 that work at the company?
7    A. Well, he's the chief physician
8 executive, so he's basically the physician face
9 for the company in terms of representing the
10 company from a clinical perspective. And I'm
11 being nebulous, but his responsibilities are
12 somewhat, you know, nebulous, and he sort of fills
13 in when -- I mean, he does a lot of things at the
14 behest of the CEO.
15    Q. How long has he been at the company?
16    A. Since sometime in 2004, I think the
17 spring of 2004, or late winter.
18    Q. Do you know where he worked before that?
19    A. In New York. I believe it's SUNY.
20    Q. In a medical role or --
21    A. Administrative role. I don't really
22 remember exactly what his title was. He was a

---

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.       CONFIDENTIAL       March 6, 2006
Boston, MA

---

**54**

1  physician administrator.

2      Q.  Do you know whether he worked in a

3  health- insurance-related capacity at SUNY?

4      A.  It wasn't. It was for the hospital

5  system in the university.

6      Q.  Do you know whether or not his work at

7  BC/BS of Massachusetts is his first involvement in

8  the insurance industry?

9      A.  I think so, but I'm not sure.

10     Q.  Okay.  Now, if you could turn to Page

11  12142, please.  This is the physician review and

12  appeals unit.  Is Mr. Picken still --

13     A.  No.

14     Q.  -- in the role?

15     A.  No.

16     Q.  Has he left the company?

17     A.  He has.

18     Q.  Who's in his position now?

19     A.  Dr. Lee Steingisser.

20     Q.  And we spoke about Dr. Steingisser

21  before?

22     A.  Correct.

**55**

1      Q.  What are the --

2     A.  Can I -- he's in his role in terms of

3  supervising these physicians, but he's not titled

4  the clinical coordination medical director.  So he

5  has a different role, but he supervises the

6  physicians you have on this org. chart.

7     Q.  Now, one of the subentries here is BC65

8  operations.  What is BC65?

9     A.  Blue Care 65.  It was our HMO Medicare

10  product.

11     Q.  Now, you said "was," is that product no

12  longer in existence?

13     A.  Not by that name anymore.

14     Q.  What is it called now?

15     A.  I believe it's Managed Medicare Blue or

16  Blue Managed Medicare or something to that effect.

17     Q.  Now, when you say it's a Medicare

18  product, what do you mean?

19     A.  It was one of the HMO products that CMS

20  encouraged insurers to develop for Medicare

21  patients.

22     Q.  Was it a product designed to provide

**56**

1  supplemental insurance designed to cover co-

2  insurance payments?

3     A.  It was an HMO product.  In lieu of

4  standard Medicare, you could enroll in this.  It

5  was a Part C product.

6     Q.  To your knowledge, does BC/BS of

7  Massachusetts have any supplemental insurance

8  products which would cover the co-insurance

9  obligations of Medicare beneficiaries?

10     A.  Yes.

11     Q.  Is that one product or numerous

12  products?

13     A.  Numerous.

14     Q.  Okay.  Do you know approximately how

15  many products those are?

16     A.  No.

17     Q.  Okay.  Are we talking dozens of them or

18  a handful of them?

19     A.  There's some -- a handful of main

20  product, but if you talk about things that are

21  specifically written, there might be more, so...

22     Q.  Okay.  Do you know how long Blue

**57**

1  Cross/Blue Shield of Massachusetts has had Medigap

2  or supplemental insurance products?

3     A.  No, I don't.

4     Q.  Have they had those -- how long have you

5  been aware of the existence of those products?

6     MR. COCO:  Objection.

7     A.  Since maybe the late '90s.

8     Q.  Now, is it fair to say that when

9  deciding whether or not to offer a supplemental

10  insurance product, Blue Cross/Blue Shield of

11  Massachusetts would go through the same commercial

12  analysis that it would perform in relation to any

13  other insurance product?

14     A.  I don't --

15     MR. COCO:  Objection.

16     A.  I don't know.

17     Q.  Okay.  Are you involved at all in the

18  supplemental insurance products in any way?

19     A.  Not directly.

20     Q.  Okay.  In your dealings with providers

21  do you field any queries or concerns relating to

22  the supplemental insurance plans?

---

Jan L. Cook, M.D.      CONFIDENTIAL      March 6, 2006
Boston, MA

| 58 |
|---|
| 1      A. Occasionally. |
| 2      Q. What sort of queries or concerns do you |
| 3   deal with in that regard? |
| 4      A. Usually related to the benefit |
| 5   structure. |
| 6      Q. What are you referring to when you say |
| 7   "the benefit structure"? |
| 8      A. Insurance plans have -- whatever the |
| 9   insurance plan covers is considered to be the |
| 10   benefit structure, so, you know, hospitalizations |
| 11   or whatever. |
| 12      Q. Do you receive queries from physicians |
| 13   pertaining to the reimbursement rates that they |
| 14   are paid in relation to share involvement in |
| 15   supplemental insurance plans? |
| 16      A. Occasionally. |
| 17      Q. Do you recall specific instances where |
| 18   you received queries of that kind? |
| 19      A. Occasionally the oncologists have talked |
| 20   to us about a certain subset of patients who are |
| 21   receiving services in their offices, and I've |
| 22   dealt with that a couple of times. |

| 59 |
|---|
| 1      Q. What sort of issues have the physicians |
| 2   raised in relation to the patients receiving |
| 3   services in their offices? |
| 4      A. Trying to understand what the |
| 5   supplemental insurance covers and what it doesn't |
| 6   cover. |
| 7      Q. Other than queries pertaining to the |
| 8   extent of coverage, are there any other queries |
| 9   that you recall in relation -- receiving in |
| 10   relation to those products? |
| 11      A. No. It's usually related about, you |
| 12   know, does the health plan cover this, and if -- I |
| 13   would think that's the majority. I may have -- |
| 14   there may have been some other, but not that I can |
| 15   recall off the top of my head. |
| 16      Q. Okay. Now, we've talked about aspects |
| 17   of this, but let me ask you the question directly: |
| 18   In your capacity as a regional medical director, |
| 19   could you itemize your responsibilities in the |
| 20   areas in which you work? |
| 21      A. Responsible for assisting provider |
| 22   contracting in the central and western part of the |

| 60 |
|---|
| 1   state and provider service managers in that part |
| 2   of the state. I'm the chair of the professional |
| 3   credentialing and the institutional credentialing |
| 4   committees. I assist ancillary contracting, and I |
| 5   also assist the pharmacy team. And I chair the |
| 6   Blue Cross/Blue Shield P&T committee. |
| 7      Q. How long have you been the chair of the |
| 8   P&T committee? |
| 9      A. I don't remember exactly when, but I |
| 10   believe since 2003, sometime in 2003, maybe late |
| 11   2002. |
| 12      Q. How many people are on the P&T |
| 13   committee? |
| 14      A. About 10 out -- well, 10, 12 outside |
| 15   clinicians, pharmacists, and then there's a bunch |
| 16   of Blue Cross/Blue Shield staff support. I'm not |
| 17   quite sure of the exact number. |
| 18      Q. The BC/BS employees who are on that |
| 19   committee, is it more than 10 or less than 10? |
| 20      A. Less than 10. |
| 21      Q. Okay. Do you know if it's -- are we |
| 22   talking about two or three or eight or nine, if |

| 61 |
|---|
| 1   you know? |
| 2      A. Well, they're non-voting members, so |
| 3   maybe six, seven. |
| 4      Q. Are there any -- amongst the BC/BS of |
| 5   Massachusetts employees are there other physicians |
| 6   other than yourself, or MDs? |
| 7      A. Dr. Goldbach, Dr. Fallon, occasionally |
| 8   Dr. Brumley. |
| 9      Q. Now, the outside clinicians you |
| 10   mentioned, are these individuals who have no |
| 11   employment relationship with Blue Cross/Blue |
| 12   Shield of Massachusetts? |
| 13      A. There's one who is part time -- he has a |
| 14   part-time employment with us. The rest are not. |
| 15   They're in our provider networks. |
| 16      Q. Now, does the -- is there any sort of a |
| 17   document or memorandum, an analysis, a procedure |
| 18   document that describes how the P&T process |
| 19   functions at Blue Cross/Blue Shield of |
| 20   Massachusetts? |
| 21      A. There may be. |
| 22      Q. Okay. Are you aware of any such |

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
                                    Boston, MA

62

1    documents?
2        A.  Not off the top of my head.
3        Q.  Can you describe for me how the P&T
4    committee does function?
5        A.  In terms of?
6        Q.  Well, how often does the P&T committee
7    meet?
8        A.  About four -- four to five times a year.
9        Q.  Now, in preparation for those meetings,
10   is there any sort of analysis or strategy work
11   that's done?
12       A.  Yes.
13       Q.  Who's responsible for coordinating that
14   work?
15       A.  Matt Connell.
16       Q.  What is Mr. Connell's position?
17       A.  He's the director of the pharmacy
18   program. And the people who work for him obviously
19   do the actual stuff?
20       Q.  What sort of analysis of strategy work
21   is performed typically in advance of the P&T
22   meeting?

63

1            MR. COCO:  Objection.
2        A.  Usually it's looking at whatever drugs
3    that we're going to bring onto the formulary and,
4    you know, looking at -- you know, getting the
5    clinical information together in terms of the
6    discussion.
7        Q.  Anything else?
8        A.  I'm assuming that there's -- that the
9    PBM does some work with the pharmacy team in terms
10   of pricing or in terms of information regarding
11   that.
12       Q.  Now, when you refer to "pricing," are
13   you referring to the cost of the drug?
14       A.  To Blue Cross, yes.
15       Q.  Okay.  In other words the amount that
16   Blue Cross will have to pay out in reimbursement
17   for that drug?
18       A.  Correct.
19           MR. COCO:  Objection.
20       Q.  Now, is there also analysis performed
21   around the amount of rebates that Blue Cross may
22   receive in relation to those drugs --

64

1            MR. COCO:  Objection.
2        Q.  -- from manufacturers?
3        A.  I don't know.
4        Q.  Do you know whether or not Blue
5    Cross/Blue Shield of Massachusetts contracts with
6    manufacturers to receive rebates in relation to
7    formulary placement of drugs?
8        A.  I don't know for 100 percent, but I
9    don't believe so.
10       Q.  Now, in relation to the pricing of drugs
11   which you referred to as the cost to BC/BS of
12   Massachusetts for reimbursement, what sort of
13   analysis is performed in advance of P&T meetings?
14           MR. COCO:  Objection.
15       A.  I don't know.
16       Q.  Do you ever see that analysis?
17           MR. COCO:  Objection.
18       A.  Occasionally.
19       Q.  What sort of analysis do you recall
20   having reviewed?
21       A.  The pricing of various drugs on the
22   formulary tiers.

65

1        Q.  Now, why is that analysis relevant to
2    the P&T committee's work?
3            MR. COCO:  Objection.
4        A.  It's not.
5        Q.  Okay.  If the work is not relevant to
6    the P&T committee's work, why is it performed in
7    advance of P&T meetings?
8            MR. COCO:  Objection.
9        A.  It's not necessarily formed in advance
10   as it's part of the business process that goes on
11   around the formulary selections.
12       Q.  Well, when you say "it's part of the
13   business process that goes around formulary
14   selections," are you nonetheless saying that it
15   has no relevance or no connection to the formulary
16   process?
17           MR. COCO:  Objection.
18       A.  The P&T focuses on the clinical
19   evaluation of the medications up for discussion
20   and talks about them in terms of clinical
21   effectiveness and safety.  It is not a business
22   discussion, and it isn't generally focused on cost

Jan L. Cook, M.D.　　　CONFIDENTIAL　　　March 6, 2006
Boston, MA

66

1    of or pricing.
2        Q.  I understand that the focus is clinical.
3        A.  Yes.
4        Q.  My question is, once the clinical merits
5    have been fully evaluated, is there any
6    consideration at all of economic issues or the
7    cost of a drug in relation to decisions on
8    formulary placement?
9        A.  Yes.
10       Q.  What sort of consideration is given to
11   those issues?
12       A.  Internal business processes after the P
13   and T's recommendation.
14       Q.  Can you help me understand how that
15   process works?  In other words, can you take me
16   through the steps from when a drug is first
17   considered to when a final decision is made on
18   formulary placement?
19       A.  There is usually a post P&T meeting
20   where the clinical recommendations are reviewed,
21   and then there's a series of meetings after that,
22   usually one or two, where the business aspects of

67

1    the decisions are evaluated.
2        Q.  So if I understand correctly, at the
3    actual meeting of the P&T committee, the focus is
4    entirely clinical; is that correct?
5        A.  We try very hard.
6        Q.  Okay.  And a recommendation is then made
7    as to the clinical merits of the drug at issue,
8    right?
9        A.  Correct.
10       Q.  There are then follow-up meetings where
11   the economic issues pertaining to that drug are
12   considered further; is that correct?
13       A.  Correct.
14       Q.  And after that clinical input has been
15   taken into consideration, after economic input has
16   been taken into consideration, the final decision
17   is then made as to formulary placement; is that a
18   fair statement?
19       MR. COCO:  Objection.
20       A.  Yes.
21       Q.  Now, the second part of that process
22   where the economic issues are considered, who is

68

1    involved in that stage of the process?
2        A.  A lot of people.
3        Q.  All right.  Is it a specific committee,
4    or is it a working group?
5        A.  There are several committees.
6        Q.  Can you list the committees, please, to
7    the extent you recall the names?
8        A.  There's an executive pharmacy committee,
9    and there may be one other committee which the
10   name escapes me.
11       Q.  Do you know how many people sit on the
12   executive pharmacy committee?
13       A.  Maybe 10, 12, something like that.
14       Q.  Now, again just returning to the process
15   part of this, after the P&T committee has met,
16   does it advance or forward a recommendation to the
17   executive pharmacy committee?
18       A.  Yes.
19       Q.  Is that recommendation in writing?
20       A.  It's based on the notes of that meeting.
21       Q.  Are formal notes or minutes kept of all
22   the P&T meetings?

69

1        A.  Yes, yes, to the best of my knowledge.
2        Q.  Who maintains those notes?
3        A.  Pharmacy department.
4        Q.  Is there someone in particular?
5        A.  I believe Paul Cutroni.
6        Q.  What is Mr. Cutroni's position?
7        A.  He's a clinical pharmacist.
8        Q.  Now, I understand that the focus at
9    those meetings is clinical.  Is there ever any
10   economic discussion at the P&T meeting itself?
11       A.  Occasionally.
12       Q.  In what context does that -- do those
13   issues come up at the P&T meeting itself as
14   opposed to the later meetings?
15       A.  It's if the membership of the committee
16   would say that something in regards to some sort
17   of knowledge they had about, you know, there's
18   already a generic in this field, why -- you know,
19   which is more cost- effective.  Why would we add
20   the branded drug, that kind of thing.  It's only
21   outpatient pharmacy that they're talking about.
22       Q.  Is there anything in the procedural

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
                                   Boston, MA

---

**70**

1   rules or the traditions of the committee that
2   would render that inappropriate, or is that fine?
3        MR. COCO:  Objection.
4        A.   We try -- we start each meeting saying
5   that the focus of the meeting is on the clinical
6   merits of the medication being discussed and that
7   we will try to maintain our discussions on that
8   piece.
9        Q.   So the aim is to preserve a clinical
10  focus at that piece and leave the economic
11  analysis for the executive pharmacy committee
12  meeting that follows; is that a fair statement?
13       A.   Correct.
14       Q.   Now, have there been instances, to your
15  knowledge, where the P&T committee does recommend
16  the inclusion of a drug on the formulary, but the
17  executive pharmacy committee then provides input
18  as a result in which the drug is not placed on
19  formulary?
20       A.   Not that I can recall.
21       Q.   Is the BC/BS of Massachusetts formulary
22  tiered?

---

**71**

1        A.   Yes.
2        Q.   Are there any instance -- well, does the
3   -- withdraw that.
4            Does the P&T committee make a
5   recommendation simply as to inclusion or
6   exclusion, or does it also recommend a tier
7   position?
8        A.   Generally not -- we don't generally
9   discuss tiering.
10       Q.   Now, as the chair of the -- you are the
11  chair of the P&T committee; is that correct?
12       A.   Correct.
13       Q.   As the chair of the P&T committee, do
14  you think there's anything at all inappropriate
15  about the fact that the P&T committee
16  recommendations are then subject to review by the
17  executive pharmacy committee?
18       MR. COCO:  Objection.
19       A.   No.
20       Q.   Why not?
21       MR. COCO:  Objection.
22       A.   Separate function.

---

**72**

1        Q.   When you say a "separate function," what
2   are you referring to here?
3        A.   It's a clinical evaluation versus a
4   business decision.
5        Q.   And would it be fair to say that both of
6   those aspects, the clinical analysis and the
7   business function, are relevant to BC/BS's
8   decision as to whether or not or what formulary
9   position to give to a particular drug?
10       MR. COCO:  Objection.
11       A.   In my opinion, yes.
12       Q.   In other words, after BC/BS has fully
13  evaluated the clinical merits of a particular
14  drug, it sees it as only appropriate to also then
15  consider the economic impact to its business of
16  using one drug versus another or giving a drug a
17  certain tier placement versus another?
18       MR. COCO:  Objection.
19       Q.   Is that a fair statement?
20       A.   I mean, I don't know what to say to
21  that.
22       Q.   Would you like me to rephrase the

---

**73**

1   question?
2        A.   Please.
3        Q.   Okay.
4        MR. COCO:  Just before you do, we've be
5   going for a while, so if you can get to a point
6   where we can take a break, I would appreciate it.
7        MR. MANGI:  Sure.  We can do that in a
8   couple of minutes.
9        Q.   We've talked now about different aspects
10  of the P&T and formulary process, right?
11       A.   Yes.
12       Q.   Okay.  We discussed one aspect of it
13  which is the P&T meeting itself where the focus is
14  principally economic, right?
15       A.   No.
16       Q.   I'm sorry, withdraw that.  That came out
17  wrong.
18           We discussed the first aspect of the
19  process which is the P&T meeting where the focus
20  is primarily on the clinical merits of the drugs
21  at issue, right?
22       A.   Correct.

---

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.             CONFIDENTIAL             March 6, 2006
                              Boston, MA

| | 74 |
|---|---|

1        MR. COCO:  Objection.

2        Q.   And then we discussed the executive

3   pharmacy committee process where economic issues

4   are among those considered in relation to drug

5   placement on formulary, right?

6        MR. COCO:  Objection.

7   A.  Yes.

8        Q.   Okay.  So my question is:  Is it fair to

9   say that, in your view as the chair of the P&T

10  committee, it's only appropriate that after the

11  clinical merits of drug selection and placement

12  have been fully considered, some attention also be

13  given to the economic impact of choosing one drug

14  versus another; is that a fair statement?

15       MR. COCO:  Objection.

16  A.  It's a separate business process.

17       Q.   Oh, I understand that.  I don't doubt

18  it's a separate business process.  My question is

19  simply:  Would it be fair to say that both aspects

20  of the process, in other words, considering the

21  clinical process and the economic process, are

22  necessary and appropriate parts of the final

| | 75 |
|---|---|

1   decision on formulary placement?

2        MR. COCO:  Objection.

3        Q.   Is that a fair statement?

4        MR. COCO:  Objection.

5   A.  Yes.

6        MR. MANGI:  We can take a five-minute

7   break.

8        (Recess taken.)

9        Q.   So, Dr. Cook, before the break we were

10  talking about the P&T process.

11  A.  Yes.

12       Q.   I would like to ask you a few more

13  questions about that.

14       The executive pharmacy committee, I

15  believe you commenced there may be other

16  committees that are involved in that economic

17  analysis of the formulary decisions, but you don't

18  recall what they are; is that correct?

19  A.  Correct.

20       Q.   Okay.  Are we talking of one committee,

21  or is there more than one committee?

22  A.  I'm thinking of one committee.

| | 76 |
|---|---|

1        Q.   Do you recall any of the individuals who

2   are on that committee, if not the name of the

3   committee itself?

4   A.  It's pretty much the same.  It's like a

5   -- there's the P&T committee, and then there's

6   another meeting and there's -- there's like a prep

7   for the final, and the pharmacy executive is the

8   final committee.

9        Q.   I would like to get a better

10  understanding of the documents that are generated

11  throughout that process.  Now we've spoken about

12  the analysis that's done prior to meetings, and

13  we've discussed the fact that minutes or notes are

14  kept of the P&T meetings themselves, right?

15  A.  Correct.

16       Q.   And those notes are then forwarded onto

17  the executive pharmacy committee and any other

18  committees that are involved in the economic

19  analysis stage?

20  A.  Correct.

21       Q.   Are there any other documents that are

22  forwarded to the executive pharmacy committee for

| | 77 |
|---|---|

1   use in its deliberations?

2   A.  Usually a document from our PBM looking

3   at the various formulary options in terms of

4   pricing and sometimes a number of people using

5   certain medications that are on our formularies.

6        Q.   The document from the PBM looking at the

7   formulary options, is -- the current PBM which

8   BC/BS of Massachusetts is Express Scripts; is that

9   correct?

10  A.  Correct.

11       Q.   Now, does Express Scripts manage the

12  BC/BS of Massachusetts formulary, or does it

13  merely provide input into the process?

14       MR. COCO:  Objection.

15  A.  What do you mean by "manage"?

16       Q.   Well, let's break it down.  In terms of

17  -- do I recall correctly you said you don't know

18  whether or not BC/BS of Massachusetts has rebate

19  contracts with manufacturers?

20  A.  I said I don't believe so, but I don't

21  know 100 percent.

22       Q.   Okay.  In terms of the -- all decisions

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
Boston, MA

78

1    pertaining to the formulary, in other words, what
2    gets on, what gets off, what's on what tier of the
3    formulary, are those all decisions that are made
4    by BC/BS of Massachusetts employees?
5         A.   To the best of my knowledge.
6         Q.   With input from the outside persons you
7    described earlier sitting on the P&T committee?
8         A.   And other outside physicians and
9    clinicians.
10        Q.   Okay.  Does Express Scripts play any
11   role in the formulary process other than providing
12   the analysis you just described to the executive
13   pharmacy committee?
14        A.   That's my understanding of their role.
15        Q.   Now, the pricing analysis you described
16   that they do provide to the committee, what is
17   that?  What is that you look at?
18        MR. COCO:  Objection.
19        A.   It looks at the typical price of a
20   typical prescription fill, so whatever -- you
21   know, 30-day supply of some sort of medication, it
22   looks at that pricing.

79

1         Q.   Does BC/BS of Massachusetts contract
2    directly with retail pharmacies, or are all of
3    those contracts through the PB network?
4         A.   I don't believe we contract directly
5    with the pharmacies.
6         Q.   Does BC/BS of Massachusetts currently
7    have physician administered drugs on formulary?
8         A.   No.
9         Q.   So the only drugs that are subject to
10   formulary control at the present time are self-
11   administered drugs; is that correct?
12        A.   Medications that you would be getting in
13   a retail pharmacy.
14        Q.   Pills and patches and so on?
15        A.   Pills and -- pills and maybe some
16   injectables if it's something you self- inject.
17        Q.   So in relation to physician-administered
18   drugs, a physician is free to prescribe any drug
19   he chooses to a BC/BS of Massachusetts member, and
20   that drug will be covered by BC/BS of
21   Massachusetts; is that correct?
22        MR. COCO:  Objection.

80

1         A.   There are medical policies that would
2    influence -- that would relate to clinical
3    appropriate use of those types of medications.
4         Q.   Now, those medical policies, what sort
5    of areas -- what issues do those deal with?
6         A.   What do you mean by that?
7         Q.   Well, you said there are medical
8    policies pertaining to appropriate use of the
9    product.  And I'm trying to understand what
10   factors are considered in determining whether or
11   not a use is appropriate.
12        MR. COCO:  Objection.
13        A.   It's pretty much along the FDA
14   guidelines with input from the clinical community
15   in terms of, you know, what, you know, is common
16   practice, but usually they pretty much follow FDA
17   guidelines.
18        Q.   Is the focus there purely clinical, or
19   are there any other issues involved?
20        MR. COCO:  Objection.
21        A.   What do you mean by any other issues?
22        Q.   Well, in terms of determining whether or

81

1    not the use of a drug is appropriate in a given
2    condition, is the analysis limited to the medical
3    or clinical efforts of using a drug given a
4    particular patient's condition, or is there
5    anything else that's considered?
6         A.   It's clinical.
7         MR. COCO:  Objection.
8         Q.   So assuming a doctor's use of a drug is
9    clinically appropriate, consistent with FDA
10   guidelines, any physician administered drug he
11   chooses to administer to a patient will then be
12   covered and reimbursed by Blue Cross/Blue Shield
13   of Massachusetts; is that correct?
14        MR. COCO:  Objection.
15        A.   If it meets our medical policy
16   guidelines and it meets the subscriber benefit
17   package, yeah.
18        Q.   By the way, we spoke earlier about the
19   economic -- I'm sorry, about the analyses that is
20   done in advance of the P&T meetings which may
21   include some economic analysis. Is that package
22   also what's before the executive pharmacy

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

82

1    committee?
2        A.   There is an economic analysis that's
3    done that sometimes occurs before the committee
4    some -- P&T committee sometimes after, but that's
5    the business piece that that group looks at.
6        Q.   Now, after the executive pharmacy
7    committee makes their decision, are there
8    decisions memorialized in any particular form?
9        A.   Minutes.
10       Q.   So what happens after their meeting is
11   concluded and the minutes have been generated?
12       MR. COCO:  Objection.
13       A.   You mean process-wise?
14       Q.   Yes.
15       A.   Depending on whatever decisions were
16   made, then they're implemented by the pharmacy
17   team.
18       Q.   Then those minutes are implemented by
19   the pharmacy team who move into an implementation
20   phase?
21       A.   Correct.
22       Q.   Are there any other documents generated

83

1    in the process that are part of what's sent to the
2    implementation team?
3        A.   Not that I'm aware of.
4        Q.   Now, what did you do in preparation for
5    your deposition today?
6        A.   I -- as requested, I reviewed my files,
7    my paper files and my e-mail files to see if any
8    kind of information that I had on the subject
9    matter, and I submitted them to Mr. Skwara, and
10   then I had a pre-meeting just to discuss with
11   counsel this deposition.
12       Q.   Okay.  When did you have a pre-meeting
13   with counsel?
14       A.   Friday.
15       Q.   And who was present at that meeting?
16       A.   These gentlemen.
17       Q.   All three of them?
18       A.   All three of them.
19       Q.   And how long was that meeting for?
20       A.   Half hour, 45 minutes?  I can't remember
21   exactly.
22       Q.   Now, when you reviewed your files, what

84

1    were the parameters of what you were looking for?
2        A.   Anything basically having to do with AWP
3    or pricing on any kind of physician -- medications
4    administered in physicians' offices.
5        Q.   When you say "pricing," what are you
6    referring to there?
7        A.   I mean, AWP -- I mean, anything having
8    to do with -- basically anything having to do with
9    drugs that were administered in a physician's
10   office, anything with the word "AWP" in it.
11       Q.   Okay.  Did you look for any documents in
12   subject areas that did not have the actual phrase
13   "AWP"?
14       A.   Anything that I thought would be
15   relevant to that topic, which was the broader
16   topic about pharmaceuticals used in physicians'
17   offices.
18       Q.   Now we spoke earlier about the fact that
19   physicians who want to raise issues about
20   reimbursement will sometimes come to the medical
21   director, such as yourself.  Did you look for
22   those communications?

85

1        A.   I looked through my files, yes.
2        Q.   And did you locate any such
3    communications?
4        A.   I don't believe so specifically on that.
5    Or I might -- you know, I honestly can't remember
6    what I gave Mr. Skwara, because I gave it to him
7    so long ago.  There may have been something like
8    that, but I did look at whatever I could find.
9        Q.   When you say you provided that material
10   a long time ago, when did you provide it?
11       A.   I started -- well, mommy dementia.  I
12   started, I think, at the end of last year looking.
13       Q.   Okay.  And when did you actually provide
14   the materials to Mr. Skwara?
15       A.   I think most of it towards the, you
16   know, like December -- November, December 2005.
17       Q.   Okay.  Between December of '05 and today
18   have you searched your files for any documents
19   generated in that time frame or that you received
20   in that time frame?
21       A.   I haven't, but I'm not aware that I
22   received anything.

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                            Boston, MA

86

1     Q.   Now, in addition to your work for BC/BS
2  of Massachusetts, do you currently sit on any
3  boards or hold any memberships?
4     A.   Mind Body Medical Institute, I sit on
5  the board.
6     Q.   What are your responsibilities on an
7  ongoing basis as a board member?
8     A.   I'm a clerk, theoretically, of the
9  board.
10    Q.   Do you mean by that you maintain minutes
11 of meeting or --
12    A.   I'm listed as the clerk. I don't
13 personally maintain the minutes. I see the
14 minutes, I look at them, but I don't personally
15 maintain the minutes.
16    Q.   Any other responsibilities there?
17    A.   Just normal board member kind of stuff.
18    Q.   Now, you mentioned you were searching
19 your files for, including other things, documents
20 relating to AWP. When is the first time you heard
21 that phrase "AWP," if you recall?
22    A.   I don't recall exactly when.

87

1     Q.   Was it within the last five years or
2  more than that?
3     A.   I really don't recall.
4     Q.   Okay. Are you familiar with the term
5  "W-A-C," or "WAC"?
6     A.   No.
7     Q.   You've never heard that term?
8     A.   Not that I can remember.
9     Q.   I'll represent to you WAC stands for
10 wholesale acquisition cost. Have you ever heard
11 that phrase or phrase or term?
12    A.   Maybe, but it doesn't really ring a big
13 bell.
14    Q.   Now, do you subscribe to any industry
15 periodicals or publications to keep abreast of
16 developments in your industry?
17    A.   What industry?
18    Q.   The healthcare industry, the drug
19 pricing industry.
20    A.   The healthcare industry, New England
21 Medical -- you know, the journal of New England
22 Medical journal, and I get a journal from JAMA,

88

1  from AMA, and I get the journal from the American
2  College of Internal Medicine.
3     Q.   Are you familiar with Red Book or First
4  DataBank?
5     A.   I've heard the names.
6     Q.   Do you have an understanding as to what
7  those are?
8     A.   Not clearly, no.
9     Q.   Okay. In what context have you heard
10 those names?
11    A.   In some of the pharmacy discussion of
12 Blue Cross/Blue Shield.
13    Q.   Are you aware that these are price
14 reporting services?
15    A.   I may be aware of that. I couldn't tell
16 you the details of it, but I -- yeah.
17    Q.   Do you know what's reported in those
18 services?
19    A.   No. It's more like you have to check
20 the Red Book level of -- yeah, I don't know what
21 the elements are of the reporting.
22    Q.   Have you ever actually seen a

89

1  publication or printout from either of those
2  services?
3     A.   Not that I am aware of.
4     Q.   Now, does BC/BS of Massachusetts
5  currently -- well, withdraw that.
6          Are you familiar with the term
7  "indemnity plan"?
8     A.   Yes.
9     Q.   What's your understanding of an
10 indemnity plan?
11    A.   It's a type of insurance.
12    Q.   And what are the characteristics of an
13 indemnity plan?
14    A.   Well, it's not very popular anymore. It
15 tends to have less benefit structure than some of
16 the managed care plans, and it's a diminishing
17 product -- I would, in our portfolio.
18    Q.   Now, do you have an understanding as to
19 what a physician would submit to Blue Cross/Blue
20 Shield of Massachusetts when seeking reimbursement
21 pursuant to an indemnity plan?
22    A.   Not specifically, no.