Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

---

**90**

1    Q.  Do you have an understanding as to
2  whether -- let's focus on drugs administered in
3  physicians' offices.  Do you have an understanding
4  as to whether the amount -- how the amount that a
5  physician would submit for reimbursement pursuant
6  to an indemnity plan would be calculated or
7  listed?
8      MR. COCO:  Objection.
9    A.  Not specifically, no.
10   Q.  Do you have an understanding as to
11 whether or not members submit their actual charges
12 for reimbursement when seeking reimbursement
13 pursuant to an indemnity plan?
14     MR. COCO:  Objection.
15   A.  Members?
16   Q.  I'm sorry, providers.
17     MR. COCO:  Objection.
18   A.  Not specifically for indemnity plans,
19 no. I'm not sure what the -- no, not specifically
20 for indemnity plans.
21   Q.  Now, does BC/BS of Massachusetts still
22 have indemnity plans?

---

**91**

1    A.  Yes.
2    Q.  Is it one plan or more than one?
3    A.  I suspect more than one plan.
4    Q.  Do you know who is knowledgeable
5  regarding those plans?
6      MR. COCO:  Objection.
7    A.  Not offhand, no, I don't.
8    Q.  Do you have an understanding as to how
9  many members currently receive health from BC/BS
10 of Massachusetts pursuant to an indemnity plan?
11   A.  I think roughly somewhere around
12 200,000.
13   Q.  And what is the total number of
14 individuals who receive coverage through BC/BS of
15 Massachusetts?
16   A.  Close to 3 million.
17   Q.  Do you know how the proportion receiving
18 coverage through indemnity plans has changed over
19 time?
20   A.  It has diminished over time.
21   Q.  Do you have a sense as to how fast or
22 slow the rate of diminishment has been?

---

**92**

1    A.  Not really.
2    Q.  Now we've talked about employees at
3  BC/BS of Massachusetts who are MDs.
4    A.  Uh-huh.
5    Q.  I would like to ask you now about
6  employees of the company who have previously been
7  employed by drug manufacturers.  Do you know of
8  any individuals who at some point have worked for
9  drug manufacturers?
10   A.  Not offhand.
11   Q.  Now, what is the Blue Cross/Blue Shield
12 Association?
13   A.  It's a business association of Blue
14 Cross/Blue Shield plans across the United States.
15   Q.  What is the relationship between the
16 different Blues plans throughout the country?
17   A.  I believe we're sort of a loose
18 affiliation. And I don't mean that in a technical
19 sense. I mean, I don't know what the business
20 relationship is, but the Blues plans are
21 independent subsidiaries, so they're not all owned
22 by the same business entity.

---

**93**

1    Q.  Does Blue Cross/Blue Shield of
2  Massachusetts have communications with other Blues
3  plans around the country?
4      MR. COCO:  Objection.
5    A.  I believe so, but I don't know for sure.
6    Q.  Do you know what sorts of issues are
7  subject to communications between the different
8  Blues plans?
9      MR. COCO:  Objection.
10   A.  They have, like, annual meetings where
11 they talk about, you know, the best in Blues. They
12 talk about what, you know, people are doing in
13 medical management, disease management, et cetera.
14   Q.  To your knowledge, does Blue Cross/Blue
15 Shield of Massachusetts receive any reports from
16 the BC/BS Association?
17   A.  I don't know for sure.
18   Q.  To your knowledge, does BC/BS of
19 Massachusetts process claims for any other Blues
20 entities?
21   A.  Yes, I believe we do.
22   Q.  In what circumstances does BC/BS of

---

Jan L. Cook, M.D.      CONFIDENTIAL      March 6, 2006
Boston, MA

---

94

1 Massachusetts process claims for another Blues
2 plan?
3     A. Something called Blue Card.
4     Q. Okay. What is the Blue Card?
5     A. Boy, you ask good questions. The Blue
6 Card, it's a program where people can have -- you
7 can -- let's say you work for an employer whose
8 main corporate headquarters is in California and
9 you buy Blue Cross/Blue Shield of California for
10 your employees, but you have an office in
11 Massachusetts, and those people would have that
12 type of insurance, healthcare insurance from Blue
13 Cross/Blue Shield of California, but they would be
14 living in Massachusetts, and they would be seeing
15 Massachusetts providers. And so in those
16 circumstances we would process those claims for
17 Blue Cross/Blue Shield of California.
18     Q. Now, taking -- sticking with your
19 example, in that situation how would the rate at
20 which the Massachusetts physicians are reimbursed
21 be determined?
22      MR. COCO: Objection.

---

95

1     A. I'm not 100 percent sure, but I believe
2 it's -- they use our contracted rates, because
3 they have to use our networks.
4     Q. Okay. So in the situation you've
5 described the entity in California that's
6 contracting with BC/BS of California will get
7 access to the BC/BS of Massachusetts network for
8 its members who are in Massachusetts to use, but
9 they will then be subject to the reimbursement
10 rates that BC/BS of Massachusetts has negotiated
11 with its network?
12     A. I believe so.
13      MR. COCO: Objection.
14     Q. Now, do you have an understanding as to
15 whether the rates that BC/BS of Massachusetts
16 negotiates are different or the same as those of
17 other Blues plans?
18      MR. COCO: Objection.
19     A. Don't know.
20     Q. Now, we spoke about your time at the
21 Braintree site, Medical East. Do you have an
22 understanding as to how that staff model HMO was

---

96

1 structured?
2     A. Meaning?
3     Q. Well, in terms of the organization was
4 there one side, were there many sides, how did
5 they come together, what was the length of BC/BS,
6 general organization. There were many sites that
7 were owned by Blue Cross/Blue Shield of
8 Massachusetts? Do you know how many sites there
9 were?
10     A. I can't remember anymore. I think I
11 knew at one time.
12     Q. Now, do you have an understanding as to
13 how the organization was structured in terms of
14 personnel? Was there a particular group or person
15 in charge of the staff model HMO?
16     A. There was a chief administrator I
17 believe at each site, but I'm not really sure what
18 the super organization was about that.
19     Q. Do you know whether or not the chief
20 administrators at each site reported to a specific
21 person or a committee?
22     A. That, I don't know.

---

97

1     Q. Do you know who the chief administrator
2 was at the Braintree site when you worked there?
3     A. Maureen Coneys.
4     Q. And how do you spell her last name?
5     A. C-O-N-E-Y-S.
6     Q. Is Ms. Coneys still with BC/BS of
7 Massachusetts?
8     A. Yes, she is.
9     Q. What is her current title?
10     A. Good question.
11     Q. Is she on the --
12     A. She's on the org. chart here, guys.
13     Q. Okay.
14     A. Hang on. I saw her name somewhere in
15 here.
16      (Witness reviews document.)
17     A. Woops, there it is on 137.
18     Q. So this is the page entitled "Healthcare
19 Services Organization"?
20     A. Correct.
21     Q. And she is the healthcare quality and
22 cost senior vice president?

---

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

98

1    A.  Correct.
2    Q.  Okay.  What does the health care quality
3  and cost department do?
4    A.  I believe responsibilities cover the
5  clinical service area that does utilization
6  management, disease management, case management
7  and she probably had some other responsibilities
8  of which I'm not aware of.
9    Q.  Now, how long was Ms. Coneys the chief
10  administrator at the Braintree site?
11    A.  That, I don't know.
12    Q.  No.  How long were you aware of her
13  being in that position?
14    A.  I believe she was in that position for
15  the entire time that I was there.
16    Q.  Okay.  Which was in '92?
17    A.  '89 to sometime in -- like through '94.
18  I believe she was.  I could be wrong about that.
19    Q.  Now, do you have an understanding as to
20  how the staff model HMO or the Braintree site went
21  about acquiring drugs?
22    A.  No.

99

1    Q.  Do you know who at the staff model HMO
2  on the Braintree site would have knowledge of that
3  issue?
4    A.  No, I mean, not offhand.  Maureen might
5  have, but I mean, I would assume somebody in
6  administration did, but I don't know particularly
7  anybody.
8    Q.  But Ms. Coneys was the person in charge
9  of that particular site; is that correct?
10    A.  Correct.
11    Q.  How many people worked at that site when
12  you were there?
13    A.  I don't really know.  I would guess 40,
14  50.
15    Q.  Are you including medical professionals
16  in that?
17    A.  Yes.
18    Q.  Okay.  How many people who worked there
19  when you take out the medical professionals, the
20  doctors, the nurses?
21    A.  All -- you mean, like nurses and nursing
22  assistants and things like that?

100

1    Q.  I'm trying to find out how many people
2  were working on the administrative or corporate
3  side.
4    A.  Maybe a handful.  There could have been
5  more, but I would say maybe a small number, I
6  think.
7    Q.  Less than five?
8    A.  Yeah.  I don't know for sure.
9    Q.  Of whom Ms. Coneys was one?
10    A.  Yes.
11    Q.  And she was the person in charge?
12    A.  Yes.
13    Q.  Now, in that time period, early to mid-
14  '90s, do you know what proportion of BC/BS of
15  Massachusetts membership was serviced through the
16  staff model?
17    A.  If you knew, I don't remember.
18    Q.  Are you familiar with Gary Kerr?
19    A.  No.
20    Q.  No?  How about a Mark Rubino?
21    A.  Doesn't ring a bell.
22    Q.  Now, shifting gears, who are the BC/BS

101

1  of Massachusetts main competitors in the market
2  where it operates?
3    A.  Harvard Pilgrim Health plan, Tufts and -
4  -
5    Q.  Any others?
6    A.  Fallon Health Plan.  Those are the big
7  ones, Health New England.
8    Q.  I'm sorry, which one?
9    A.  Health New England.
10    Q.  How big is Health New England?
11    A.  Not very big.
12    Q.  Are there smaller --
13    A.  It's the western part of the state.  And
14  Fallon Health Plan is the central part of the
15  state.  So the big ones are Harvard Pilgrim and
16  Tufts Community Health Plan, and then I guess
17  Neighborhood Health.
18    Q.  Okay.  Does BC/BS of Massachusetts
19  operate only in Massachusetts, as the name would
20  imply?
21    A.  Yes.  To the best of my knowledge, yeah.
22    Q.  Does it cover the entire state?

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

**102**

1    A.  Yes, to the best of my knowledge.
2    Q.  Now, would you consider Massachusetts to
3  be a competitive market in terms of health
4  insurance products?
5        MR. COCO:  Objection.
6    A.  What do you mean by "competitive"?
7    Q.  Well, is it a market where health
8  insurers, Tufts, Fallon, Neighborhood, BC/BS of
9  Massachusetts, compete vigorously for clients?
10        MR. COCO:  Objection.
11        THE WITNESS:  You need caffeine.
12    A.  In my perspective, yes.  I think we are
13  competitive.
14    Q.  Now, what sort of entities are the
15  clients who these different plans are competing
16  for?
17    A.  Business, business entities.
18    Q.  So one type of entity would be
19  everything from a law firm to a GE, any corporate
20  entity that employs individuals, right?
21    A.  Correct.
22    Q.  And those individuals would then, if

**103**

1  BC/BS gets the employer as a client, get their
2  coverage through BC/BS of Massachusetts?
3    A.  That's correct.
4    Q.  Okay.  Are other types of clients health
5  and welfare funds?
6    A.  What do you mean, "health and welfare"?
7    Q.  Are you familiar with the term "health
8  and welfare"?
9    A.  Not really.
10    Q.  What about unions; are there any unions
11  that are clients?
12    A.  Could be, I guess.
13    Q.  Now, is it fair to say that the majority
14  of the clients with whom you're personally
15  familiar are the employers or employment groups?
16    A.  I guess so.  I don't have any real
17  direct contact usually with employers or accounts.
18  I'm usually -- my direct contact was provider
19  community.
20    Q.  What sort of -- well, who does have the
21  direct contact with clients?
22        MR. COCO:  Objection.

**104**

1    Q.  What department or individual?
2    A.  Sales and marketing department, I would
3  say, probably has the most direct.
4    Q.  And who's currently in charge of that
5  department?
6    A.  Let me look.  Okay.  So at least Steve
7  Booma.
8    Q.  Do you know how long he's been in charge
9  of sales?
10    A.  No, not exactly.
11    Q.  Now, do you know what factors clients
12  consider when choosing between the different
13  health insurance in the Massachusetts area?
14        MR. COCO:  Objection.
15    A.  Not directly.  I mean, I think -- we
16  hope quality and price, and that's what I think,
17  but I don't know too much more about it than that.
18    Q.  Yeah.  Well, sticking at that level of
19  generality, when you say "price," what are you
20  referring to?
21    A.  Health --
22        MR. COCO:  Objection.

**105**

1    A.  Healthcare premium.
2    Q.  Now, what sort of factors go in to
3  determination of what the premium is that BC/BS of
4  Massachusetts would charge to its clients?
5        MR. COCO:  Objection.
6    A.  It's really complex, and I really don't
7  know all the -- how all that is determined.  It
8  has to -- you know, it's a big part of our company
9  is actuary and pricing.  So I can't tell you all
10  the elements that they look at.
11    Q.  Okay.  Certainly we can agree that one
12  of the elements that will go into determining
13  premium rates are the costs to BC/BS of
14  Massachusetts of reimbursing providers?
15        MR. COCO:  Objection.
16    A.  I think you could say claims cost, yes.
17  If you want to say claims cost, yes.
18    Q.  Sure.
19    A.  I would think that that would be one of
20  the things.
21    Q.  And by claims costs I think you're
22  referring to, -- I think we're talking about the

Jan L. Cook, M.D.          CONFIDENTIAL                    March 6, 2006
                              Boston, MA

106
1   same thing which is the amount that BC/BS pays in
2   reimbursing for claims submitted by providers?
3        MR. COCO: Objection.
4        A. It's medical -- the payments we pay for
5   medical services rendered, yes.
6        Q. Okay. And that is related to the area
7   in which you worked as the medical director,
8   right?
9        MR. COCO: Objection.
10       A. I don't understand that.
11       Q. Okay. Well, part of your job
12  responsibilities involves liaising with the
13  provider community; is that correct?
14       A. That is correct.
15       Q. So when providers have complaints --
16  have complaints about their reimbursement or the
17  amount they're being reimbursed, one of the people
18  they could come to talk to about that is you,
19  right?
20       MR. COCO: Objection.
21       A. Correct.
22       Q. Okay. So in that capacity or in that

107
1   role you are involved in liaising with providers
2   in relation to reimbursement issues?
3        MR. COCO: Objection.
4        A. On that level, yes.
5        Q. Okay. And those reimbursement issues or
6   those amounts that are paid in relation to those
7   claims are one of the many factors that then go
8   into the process of premium set; would that be a
9   fair statement?
10       MR. COCO: Objection.
11       A. You know, I don't directly know what
12  goes into premium setting, but it would be my
13  understanding that medical claim costs would
14  factor into that.
15       Q. Now, what does BC/BS of Massachusetts do
16  towards assessing or analyzing the amounts that it
17  is paying providers in relation to services and
18  drugs that they provide?
19       A. I don't know.
20       MR. COCO: Objection.
21       Q. What department would deal with that
22  issue?

108
1        A. I would assume the actuary department
2   would.
3        Q. Approximate and who's in charge of the
4   actuary department?
5        A. Rina Vertes.
6        Q. Well, in your role in liaising with
7   providers when reimbursement issues do come up,
8   what are the interests that BC/BS of Massachusetts
9   looks to maintain when dealing with providers on
10  those issues?
11       A. Can you restate that?
12       Q. Sure. When a provider makes a
13  complaint, let's say a provider comes in and says,
14  "I'm not being reimbursed enough in relation to
15  this service or this drug," what are some of the
16  considerations that you look to in deciding how to
17  respond to that provider?
18       MR. COCO: Objection.
19       A. You know, I don't have the
20  responsibility for setting payment policy. My
21  role really is to respectfully listen, to gather
22  information and to forward it on. I may

109
1   participate in a discussion, but I don't have the
2   ability to change or set or alter payment policy
3   personally.
4        Q. Are you responsible for responding to
5   the physician in response to a communication
6   you've received from them?
7        MR. COCO: Objection.
8        A. A lot of times, yes.
9        Q. So what you're saying is you're not the
10  one that actually sets the policy, but you are the
11  conduit through which complaints are received and
12  then responses are given?
13       A. A lot of the times, yes.
14       Q. Now, in terms of the responses that you
15  do provide on those issues, do you have an
16  understanding as to what some of the
17  considerations are that factor into responses?
18       MR. COCO: Objection.
19       A. That's pretty broad. What do you mean
20  by that?
21       Q. Well, do you recall any specific
22  instances where you received complaints from

Jan L. Cook, M.D.          CONFIDENTIAL                    March 6, 2006
                            Boston, MA

110

1  providers about the amount of reimbursement that
2  they provide?
3      A.  Sometimes yes, okay.  An example could
4  be we would hear from a surgeon who says that "I
5  think that this surgery was more complex and the
6  reimbursement for the surgery -- you know, I think
7  I should have gotten paid more for that."
8      Q.  Okay.
9      A.  And that would be the kind of issue that
10 might come to me and then I might forward to
11 another area of the company to look at that and
12 see if that was reasonable or not.
13     Q.  And what is the range of responses that
14 you might receive to a complaint of that sort?
15         MR. COCO:  Objection.
16     A.  You mean from the people I talk to?
17     Q.  Right.
18     A.  Our fee schedules are pretty
19 standardized, so we really don't customize or
20 deviate from them in general.  There is always
21 individual consideration, let's say, on the
22 surgeries.  There is a department that would look

111

1  at the operative notes and say that something
2  unusual happened here or something that was beyond
3  normal, and I believe that area has the ability to
4  say to it adjusts -- like the surgery went on for
5  extra long or there was -- complicated in some way
6  that the quoting wasn't clear about elucidating,
7  that that area could look at it, say, okay,
8  you know, the standard fee is X and maybe we'll
9  give you a little bit more because it took 12
10 hours.
11     Q.  So is there a department that gives
12 individualized consideration to concerns or
13 complaints of the type we've discussed?
14     A.  In terms of like --
15         MR. COCO:  Objection.  Sorry.
16         THE WITNESS:  Sorry.
17     A.  In terms of like the surgery thing,
18 sure, there is.
19     Q.  Okay.  What department is that?
20     A.  That's individual consideration and
21 provider services.
22     Q.  How many people work in that department?

112

1      A.  That, I don't know.
2      Q.  But that's -- if you received a
3  complaint of that sort, you would forward it on to
4  that department; is that correct?
5      A.  Yes.
6      Q.  And they would then look at it, assess
7  it and respond through you to the physician?
8      A.  Sometimes through me, and sometimes they
9  directly respond to the physician.
10     Q.  Now, would it be fair to say that BC/BS
11 of Massachusetts by implementing this
12 individualized assessment process is looking to
13 give a fair hearing to any complaint that a
14 provider may have?
15         MR. COCO:  Objection.
16     A.  I think a more accurate description
17 would be that Blue Cross/Blue Shield of
18 Massachusetts likes to listen to its providers and
19 likes to be -- you know, understand what their
20 concerns are, and we like to feel that they felt
21 that they've been heard.
22     Q.  But of course at the same time Blue

113

1  Cross/ Blue Shield of Massachusetts also wants to
2  make a decision that takes account of its own cost
3  concerns and the amounts that it would be paying
4  out in reimbursement?
5         MR. COCO:  Objection.
6      A.  I wouldn't say that as much as saying --
7  I would say that our fee schedules tend to be
8  standardized.  We really don't -- in terms of like
9  the physician fee schedules, we don't negotiate
10 with individual physicians, individual fee
11 schedules.  And so I think what you're hearing
12 more is that we're willing to listen and in some
13 cases, some sort of extraordinary situation we
14 will make a slight adjustment.  I think --
15 particularly I'm thinking of surgeries that might
16 happen.
17     Q.  Where the complaints are received of the
18 type that we've been discussing, would it be fair
19 to say that one consideration is whether or not
20 the physician's claim has merit, whether or not
21 it's fair enough that he should be entitled to
22 more on account of the specific circumstances?

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                            Boston, MA

---

**114**

1        MR. COCO:  Objection.
2      A.  You know, I don't know exactly what the
3  -- since I don't do the considerations, I don't
4  know exactly what people look at when they do
5  them.
6      Q.  Okay.  How many people are involved in
7  that individualized adjudication process?
8      A.  That, I don't know exactly.
9      Q.  But there is a department within the
10 provider services that does that?
11     A.  Correct.
12     Q.  Does BC/BS of Massachusetts seek to --
13 well, withdraw that.  In terms of the analysis
14 that's performed on the variations that's made to
15 reimbursement amounts in these individualized
16 circumstances, do you know whether that's tracked
17 or analyzed in any form?
18     A.  I don't --
19        MR. COCO:  Objection.
20     A.  I don't know.
21     Q.  If it were analyzed, would it be within
22 that same provider services department?

---

**115**

1        MR. COCO:  Objection.
2      A.  I don't know that, either.
3      Q.  Okay.  Other than the provider services
4  department, are there any other individuals or
5  departments who are involved in responding to any
6  complaints that may be received from providers?
7      A.  Well, provider services in area in
8  general deals with complaints.  There's the area,
9  the physician review unit.  It's not -- it would
10 be more like an appeal, not a complaint.  That's a
11 different unit -- would maybe look at those and
12 appeal on a determination or appeal on a medical
13 policy, that area.  So there's an individual
14 consideration in medical policy.  And then I say
15 that, provider service.  Provider relations
16 representatives would probably -- they'd hear
17 about current issues with the provider community.
18 I think that pretty much covers it.
19     Q.  So let me see if I understand the
20 structure.  If a provider has a complaint about
21 reimbursement he's getting, he can contact his
22 provider relations rep; that's one avenue open to

---

**116**

1  him?
2      A.  Correct.
3        MR. COCO:  Objection.
4      Q.  Or he can contact you as a medical
5  director; that's another avenue open to him --
6        MR. COCO:  Objection.
7      Q.  -- is that correct?
8      A.  Correct.
9      Q.  The complaint will then be subject to a
10 process of consideration and adjudication within
11 the provider services department; is that correct?
12        MR. COCO:  Objection.
13     A.  It depends on what the complaint is, and
14 it depends on how far it goes and I mean -- I
15 don't mean to be vague, but there's a lot of
16 things that people could complain about, so...
17     Q.  Are there some complaint that is don't
18 reach that stage?
19     A.  It could be depending on what the
20 complaint is.  I mean, people can complain about a
21 lot of different things, right?  So it could be
22 something that's not going to go to that stage for

---

**117**

1  whatever reason.
2      Q.  Okay.  Do you ever make the decision
3  yourself as to not passing on a complaint any
4  further?
5      A.  Generally I pass on pretty much
6  everything I get so that I can -- since I'm not
7  the decision-maker in that capacity, I -- yeah, I
8  pass it on.
9      Q.  And this process that we've described --
10 well, withdraw that.
11        And after an initial decision is made by
12 the provider services department when it does
13 reach them, there's then also an appeals process
14 that you've described; is that correct?
15        MR. COCO:  Objection.
16     A.  If it's -- I mean, we're kind of mixing
17 apples and oranges here.  There's a lot of
18 different things.  If you were going to appeal a
19 medical policy.
20     Q.  Well, let me focus the question again.
21     A.  Okay.
22     Q.  Let's focus the physician complaining

---

Jan L. Cook, M.D.　　　CONFIDENTIAL　　　March 6, 2006
Boston, MA

**118**

1　about the amount of reimbursement he's received in
2　relation to a service performed or a drug
3　administered.
4　　　MR. COCO: Objection.
5　　　A.  If it's a complaint that -- it was a
6　surgical issue where you receive an individual
7　consideration.  If it's a complaint about the fee
8　schedule, that isn't necessarily going to -- there
9　is a committee that looks at physician payment
10　review that could, you know, look at that
11　complaint and sort of in a broad class and should
12　we change our payment policy, that could happen.
13　　　But it wouldn't be an individual -- that
14　committee could make a determination, but
15　generally they don't make it on an individual
16　basis.  The individual consideration is pretty
17　much reserved for, let's say, the nebulous surgery
18　area, but in general, our fee schedule is as
19　stated and, you know, we don't negotiate with
20　individual physicians the fee schedule.
21　　　Q.  Now, when you say you don't negotiate
22　the fee schedule, are you referring to fee

**119**

1　schedules dealing with drugs or administered to
2　patients in office or fee schedules pertaining to
3　services or both?
4　　　MR. COCO: Objection.
5　　　A.  To the best of my knowledge, both.
6　　　Q.  Now, how long has BC/BS of Massachusetts
7　have a policy whereby it does not negotiate either
8　the drug or the service fee schedule?
9　　　MR. COCO: Objection.
10　　　A.  I don't know.
11　　　Q.  How long were you aware of that policy
12　having been in place?
13　　　MR. COCO: Objection.
14　　　A.  Since I started my current role in the
15　2000s.
16　　　Q.  Is there one master fee schedule that
17　covers all providers with relation to drugs and
18　services?
19　　　MR. COCO: Objection.
20　　　A.  You mean -- I mean, there are all kinds
21　of providers.  You mean like a physician payment
22　schedule; is that what you mean, or --

**120**

1　　　Q.  When I say "providers" I'm referring to
2　physicians.
3　　　A.  Okay.  Physicians.  There is a physician
4　fee schedule, and that something that -- yes,
5　there is a physician fee schedule.
6　　　Q.  And that schedule covers both drugs and
7　services?
8　　　MR. COCO: Objection.
9　　　A.  You know, I don't know that.  It covers
10　services.
11　　　Q.  Do you know whether there is only one
12　physician fee schedule or is there more than one?
13　　　MR. COCO: Objection.
14　　　A.  There is a physician fee schedule.
15　Sometimes on contractual negotiations with certain
16　groups there may be multipliers applied to that
17　fee schedule for additional performance like pay
18　for performance, risk contracts, but there is a
19　basic fee schedule.
20　　　Q.  Let's talk about that, multipliers that
21　are multiplied for payer performance contracts.
22　Are there any circumstances in which there's

**121**

1　variation from the master fee schedule other than
2　what you've just referred to, multipliers or
3　payment performance contracts?
4　　　MR. COCO: Objection.
5　　　A.  Not that I can think of offhand.
6　　　Q.  Now, what are pay for performance
7　contracts?
8　　　A.  Certain services are outcomes that we
9　think as a business entity are valuable for our
10　members like percentage of women getting
11　mammograms or pap tests, percentage of diabetics
12　who are receiving the needed care they're supposed
13　to have against industry standards, those kinds of
14　activities.  There might be a contract with a
15　group that if they meet certain targets, they
16　might be eligible for additional funding.
17　　　Q.  What sort of targets are you talking
18　about?
19　　　A.  Well, a mammography, like, let's say a
20　mammography rate.  You know, if you have -- if you
21　get 90 percent of your women -- if the network
22　rate is 85 and you would get as a group 90 percent

Jan L. Cook, M.D.              CONFIDENTIAL                    March 6, 2006
                                 Boston, MA

**122**

1  of your women to have mammograms, then there would
2  be additional monies paid for you helping them to
3  achieve that preventive target.
4      Q.  And is -- okay.  Other than incentives
5  for attaining certain levels of preventative care,
6  are there other actions that lead to a multiplier
7  being applied?
8          MR. COCO:  Objection.
9      A.  Not that I'm aware of offhand, no.
10     Q.  Okay.  So all of the multipliers that
11 you are aware of apply only to cases where
12 physician practices reach targets in relation to
13 preventative care?
14     A.  It's not physician practices, it's
15 larger. It's like delivery systems.  It would be
16 like a -- it wouldn't be like just a large
17 physician practice.  It would be like an IPA.  And
18 could they have other targets besides quality
19 targets?  Sometimes there's efficiency targets,
20 but it's a large group. It's a large group,
21 usually large group contracting like that or large
22 entity contracting.

**123**

1      Q.  Do any of those -- are those pay for
2  performance contracts offered to any entity in the
3  marketplace that chooses to enter one?
4          MR. COCO:  Objection.
5      A.  You know, I don't know.
6      Q.  Is that something that the provider
7  contracting department would know more about?
8      A.  Yes.
9      Q.  Do you deal at all with the actual
10 physical contracts between BC/BS of Massachusetts
11 and providers?
12     A.  Not really.
13     Q.  Do you have any role in the drafting or
14 signing of those contracts?
15     A.  Sometimes I get involved in the
16 negotiation of clinical elements like we talked
17 about quality targets.  I would be involved in the
18 negotiation of what that target would become, but
19 that's the extent of my involvement.  Something
20 that would be related to clinical piece.
21     Q.  Do you see contracts after they're
22 actually signed and entered into?

**124**

1      A.  Usually not.
2      Q.  Now, what is your understanding of the
3  methodology that is applied to determine the
4  amounts that are set and the fee schedule in
5  relation to drugs administered in office?
6          MR. COCO:  Objection.
7      A.  I'm not quite sure what you mean by
8  that.
9      Q.  Sure.  Part of the fee schedules covers
10 drugs that are administered by physicians to their
11 patients and in their offices, right?
12     A.  I guess --
13         MR. COCO:  Objection.
14     A.  You know, I don't think it's -- I'm not
15 sure there's a separate fee schedule for that.  I
16 think that's just a payment policy related to
17 that.
18     Q.  Okay.  What is the payment policy that
19 you're aware of?
20     A.  The payment policy for a physician that
21 -- the drug administration physicians' office is
22 AWP minus 5 percent, is what I'm aware of.

**125**

1      Q.  Are you aware that there are also other
2  methodologies that BC/BS of Massachusetts
3  utilizes?
4          MR. COCO:  Objection.
5      A.  The only thing that I'm aware of -- no,
6  I guess that would be the same methodology. No, I
7  think that's the only one I'm aware of.
8      Q.  Are you aware of any capitation
9  arrangements between Blue Cross/Blue Shield of
10 Massachusetts and physician practices?
11     A.  In terms of that kind of -- you mean in
12 terms of physician -- drugs in the physicians'
13 offices?
14     Q.  I'm referring to a capitation
15 arrangement that includes drugs.
16     A.  You know, I'm aware of outpatient
17 pharmacy drugs.  I'm not aware that capitation --
18 they're negotiated -- I'm not familiar with
19 physician office drugs.
20     Q.  Are you familiar with a physician
21 practice called Riverbend?
22     A.  Yes.

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
                                    Boston, MA

---

126

1    Q.  Do you have an understanding as to what
2    reimbursement methodologies exist between Blue
3    Cross/Blue Shield of Massachusetts and Riverbend?
4    A.  Not real clear right now because I think
5    it's in transition.
6    Q.  Do you know what it's moving towards or
7    what it's coming from?
8    A.  It was, I believe, a capitated
9    arrangement and I believe it's moving towards a
10   fee for service arrangement.
11   Q.  Are you aware that a -- did you review
12   any deposition transcripts in preparation for your
13   deposition today?
14   A.  No.
15   Q.  Are you aware that a previous witness
16   has testified that the Riverbend arrangement was
17   capitated, including drugs administered in
18   physicians' offices?
19       MR. COCO:  Objection.
20   A.  No, I'm not aware of that.
21   Q.  Do you have any understanding as to why
22   the Riverbend arrangement was capitated or was

---

127

1    treated differently from other physician
2    practices?
3    A.  Not really.  You mean, why they accepted
4    a capitated arrangement versus a fee for service
5    before or what --
6    Q.  Why there was such an arrangement or why
7    BC/BS of Massachusetts agreed to a certain
8    arrangement with this practice versus others?
9        MR. COCO:  Objection.
10   A.  No, I don't.
11   Q.  Did you have an understanding as to why
12   Riverbend is now being moved to a fee for service
13   methodology?
14   A.  Not directly, no.
15   Q.  Does Riverbend fall within the region
16   that you're responsible for?
17   A.  That's correct.
18   Q.  Are you involved at all in the process
19   of moving them from their capitated arrangement to
20   a fee for service arrangement?
21   A.  Extremely peripherally.
22   Q.  Who is involved in that process more

---

128

1    directly?
2    A.  You mean, in terms of like contracting
3    or --
4    Q.  In terms of, yeah, negotiating the
5    contract and the transition to a different
6    methodology.
7        MR. COCO:  Objection.
8    A.  Provider contracting.
9    Q.  Is there a particular person in provider
10   contracting responsible for the relationship with
11   Riverbend?
12   A.  I believe it's Steven Moorehead.
13   Q.  Do you have any idea how much money
14   BC/BS of Massachusetts spends every year in
15   relation to reimbursing for drugs administered in
16   physicians' offices?
17   A.  No.
18   Q.  Do you have an understanding as to
19   whether it's in the thousands or the millions or
20   the tens of millions?
21   A.  Well, I think it's more than that.
22   Q.  Okay.  So it's fair to say something in

---

129

1    the millions of dollars?
2        MR. COCO:  Objection.
3    A.  I would assume, but I don't know if it
4    is for sure.
5    Q.  Do you know whether or not BC/BS of
6    Massachusetts takes any steps towards monitoring
7    or analyzing its expenditure on physician-
8    administered drugs?
9        MR. COCO:  Objection.
10   A.  I don't know directly of any steps.
11   Q.  Are you aware of the fact that BC/BS of
12   Massachusetts considered whether or not it should
13   move to an ASP methodology in the 2004 and early
14   2005 time period?
15   A.  I know that certain people talked about
16   it.
17   Q.  Well, there was in fact a committee
18   tasked with looking at that issue, wasn't there?
19   A.  That, I don't know.
20   Q.  Were you one of the people involved in
21   consideration of that issue?
22   A.  Not in terms of -- I don't remember

---

Jan L. Cook, M.D.       CONFIDENTIAL       March 6, 2006
Boston, MA

---

**130**

1  being on any committee looking at that.
2      Q.  Do you recall seeing any of the
3  analytical work that was generated as part of that
4  project?
5      A.  No, I don't.
6      Q.  Now, does BC/BS of Massachusetts have a
7  department or individuals who are tasked with
8  keeping abreast of developments in the market in
9  terms of coverage in the press or the issuance of
10 reports from the government, testimony in
11 Congress, things of that kind?
12      MR. COCO:  Objection.
13      A.  There is a group that -- well, I guess
14 legislative affairs that looks at some things.  I
15 don't know what the breadth of their -- breadth of
16 what they look at, but they, you know, look at
17 some legislation, things like that.
18      Q.  Is it your understanding that if there
19 were to be a debate in Congress pertaining to
20 health insurance, drugs, prices or if there were
21 to be reported issues by the government pertaining
22 to the same issues, is it your understanding that

---

**131**

1  that department would be responsible for
2  monitoring such proceedings?
3      MR. COCO:  Objection.
4      A.  I don't know because I don't really know
5  what the breadth of their responsibilities are.
6      Q.  Okay.  Do you personally keep track of
7  reports issued by the government or press coverage
8  that's relevant to the areas in which you work?
9      A.  Some of it.
10      Q.  Do you keep abreast of legal
11 developments such as filing of lawsuits pertaining
12 to drug prices or drug reimbursement?
13      A.  Usually not.
14      Q.  Now, do you have an understanding as to
15 what is at issue in the lawsuit in relation to
16 which you are being deposed here today?
17      A.  Sort of a real high level understanding.
18      Q.  Do you understand that Blue Cross/Blue
19 Shield of Massachusetts is a plaintiff in this
20 case?
21      A.  Yes, I do understand that.
22      Q.  And you understand that Blue Cross/Blue

---

**132**

1  Shield of Massachusetts is a named class
2  representative and that this is a class action
3  proceeding?
4      A.  I've heard that.
5      Q.  What is your understanding as to the
6  allegation that Blue Cross/Blue Shield of
7  Massachusetts is making in this case?
8      A.  My understanding was that it had to do
9  with what the AWP meant and what kinds of pricing
10 considerations that physicians were actually
11 receiving in regards to the AWP.
12      Q.  Now, one part of it, of what you just
13 described is you said you understand the
14 allegation is about what AWP meant.
15      A.  Yeah.
16      Q.  Specifically what is your understanding
17 as to what AWP was supposed to mean, what it did
18 mean?
19      MR. COCO:  Objection.
20      A.  In my understanding -- I just -- I
21 thought it was a price.  I thought it was the
22 average wholesale price.  I thought it was a

---

**133**

1  number.
2      Q.  Now, when you say you thought it was an
3  average wholesale price, what do you mean by that?
4      A.  I mean, I thought it was a number --
5  just -- I thought it was a number, a number.
6      Q.  Well, it is a number, isn't it?
7      A.  I think so.
8      Q.  You're aware that the average wholesale
9  price is a number that's publicly published and
10 available in price reporting services?
11      A.  Yes.  It's got to be a number that's
12 available, because people use that for payment.
13      Q.  Okay.
14      A.  So there is a number that is available
15 for a drug.  It's called the AWP, and there's a
16 number.
17      Q.  Right.  That's listed as the AWP?
18      A.  Yes.
19      Q.  So it certainly is a number?
20      A.  Yes.
21      Q.  My question is, what did you think that
22 number was supposed to represent, if anything?

---

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                              Boston, MA

134

1     A.   What it said it was supposed to --
2          MR. COCO: Objection.
3     Q.   So you thought the AWP is supposed to be
4    an actual average of wholesale prices; is that
5    correct?
6     A.   Well, I actually didn't think about it a
7    whole lot.  I thought it was a number -- yeah, I
8    guess I thought it was the wholesale price, the
9    average wholesale price.
10    Q.   So you understand it to be an actual
11   average of the prices at which entities in the
12   market could purchase drugs from wholesalers?
13         MR. COCO: Objection.
14    A.   I didn't give it that much thought.  I
15   think I thought it was just -- you know, if you
16   say that, I guess -- well, I just didn't give it
17   that much thought.  I thought it was a number.  In
18   my world it's a number that people pay a
19   percentage of.
20    Q.   Now, when you say it's a number that
21   people pay a percentage of --
22    A.   Yes.

135

1     Q.   -- you're referring to AWP's use as a
2    reimbursement benchmark; is that correct?
3     A.   Yes.  Correct.
4     Q.   In other words, health plans will
5    reimburse at a percentage discount off AWP?
6     A.   Well, Medicare did and we did too.
7     Q.   Now, did BC/BS of Massachusetts
8    reimburse both pharmacies and physicians at the
9    same methodology or a different methodology?
10    A.   I don't know.
11         MR. COCO: Objection.
12    Q.   You only deal with physicians?
13    A.   Correct.
14    Q.   Okay.  Now, how long has BC/BS of
15   Massachusetts reimbursed physicians at 95 percent
16   of AWP?
17    A.   I don't know that.
18    Q.   Would it be fair to say that since
19   Medicare adopted 95 percent of AWP as its
20   methodology?
21         MR. COCO: Objection.
22    A.   I really don't know.

136

1     Q.   Well, that methodology was in place when
2    you became aware of it in the 2000 time period?
3     A.   Yes.
4     Q.   Okay.  Now, if you were aware that Blue
5    Cross/Blue Shield of Massachusetts is reimbursing
6    at 95 percent of AWP, how did you reconcile that
7    with thinking that AWP was an actual average of
8    wholesale prices to physicians; in other words,
9    putting both of your understandings together how
10   you assume that all physicians are being
11   reimbursed below their acquisition cost?
12         MR. COCO: Objection.
13    A.   I really didn't think about it very
14   much.  I think that it was the pricing methodology
15   that we adopted that was what we had -- Medicare
16   was doing, and, you know, it's just a pricing
17   methodology.  I didn't give it a lot of thought.
18    Q.   Well, let's think about it now.  Can we
19   agree that the natural implication of the
20   positions that you've described would be, if true,
21   that all physicians were being reimbursed below
22   their cost?

137

1          MR. COCO: Objection.
2     A.   No, that doesn't make sense because if
3    it was an average wholesale price, there would be
4    people above and below, right?
5     Q.   Fair enough.  So the natural implication
6    of your position is that there would be a segment
7    of providers who were being reimbursed below their
8    cost, correct?
9          MR. COCO: Objection.
10    A.   But I really didn't think about it.  I
11   mean, to be fair, you're asking me to think about
12   it now --
13    Q.   Right.
14    A.   -- but it's a pricing methodology.  And
15   I didn't think about what the actual acquisition
16   cost was.
17    Q.   That's fair.  I understand that you
18   didn't think about it at the time.
19    A.   Yeah.
20    Q.   But I'm asking you the question right
21   now.
22    A.   Yeah, yeah.

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

138

1    Q.  Is it fair to say that if the natural
2  implication of your position would be, if true,
3  that all physicians were being reimbursed at a
4  rate that was below the average of their
5  acquisition costs for drugs?
6        MR. COCO:  I'm going to object to this
7  whole line of questioning.  The witness is here as
8  a fact witness.  You are entitled to probe her
9  knowledge about facts.  Asking her to sit here in
10  the deposition today and try and elicit some
11  opinion from her about topics which she has
12  already testified she did not consider and has not
13  considered and try to elicit what is the
14  equivalent of opinion testimony from her is
15  inappropriate. Obviously you can pursue the line
16  of questioning, but just so that you know, our
17  position will be that none of this is relevant,
18  admissible or even appropriate.
19        MR. MANGI:  You've made your objection.
20  With respect I would ask that you limit your
21  interruptions to making the objection rather than
22  a speaking objection.

139

1    Q.  In any event, would you like the
2  question read back?
3    A.  Yeah.
4    Q.  You may have forgotten it.  Let me put
5  it to you again.  You've testified that you
6  understood the reimbursement rate was 95 percent
7  of AWP, right?
8    A.  Yes, correct.
9    Q.  You've testified that you thought the
10  AWP was the natural average of wholesale prices,
11  right?
12    A.  Well, actually I thought it was a
13  number. It was a pricing -- a price number.
14    Q.  Okay.  But what did you think that
15  number represented was my earlier question?
16        MR. COCO:  Objection, asked and
17  answered.
18    Q.  Right.
19    A.  I think it was a number.  I really
20  didn't think about what -- how they got up -- I
21  assume -- it was a number.  I assumed there was a
22  standard formula for a number.  It was a number.

140

1    Q.  Are you aware that there is a standard
2  formula and that AWP is generally 20, 25 or
3  sometimes 30 percent above WAC or wholesale
4  acquisition cost?
5        MR. COCO:  Objection.
6    A.  I don't know that.
7    Q.  Let me ask you a simple question then:
8  Is it your understanding that you thought AWP was
9  a natural average of wholesale prices, or is it
10  your position that you knew AWP was a number, but
11  you weren't sure what, if anything, it
12  represented?
13        MR. COCO:  Objection.
14    A.  I think that I thought it was the
15  average wholesale -- I thought it was a number.  I
16  really honestly thought it was a number.  I didn't
17  give a lot of thought about -- I just didn't think
18  about it a lot.  It wasn't a big part of my
19  business, and it's just -- it's a number.
20    Q.  So would it be fair to say that you
21  thought AWP was a number?
22    A.  Yeah.

141

1    Q.  But beyond that you didn't know what, if
2  anything, it represented?
3        MR. COCO:  Objection.
4    Q.  Would that be a fair statement?
5    A.  I think it's fair to say that, yes.
6    Q.  Now, are you aware that the plaintiffs
7  in this litigation of which BC/BS is the named
8  class representative have taken the position that
9  payers such as BC/BS of Massachusetts have long
10  known that AWP is not an actual of average
11  wholesale prices?
12        MR. COCO:  Objection.
13    A.  Try that again -- can you say that
14  again?
15    Q.  Sure.
16        MR. MANGI:  Would you mind reading the
17  question back?
18        (Record read.)
19        MR. COCO:  Objection.
20    A.  Not said that way, no.
21    Q.  Are you aware of the fact that the
22  plaintiffs in this case have long -- have taken

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                            Boston, MA

---

142

1  the position that it's been long known that
2  acquisition prices for drugs and the actual
3  average wholesale prices for drugs are different
4  things?
5       MR. COCO:  Objection.
6       A.  I don't know what they've said.
7       Q.  So let's go back to my initial question,
8  which is, BC/BS of Massachusetts is a plaintiff in
9  this case, you're the medical director -- one of
10 the medical directors for BC/BS of Massachusetts
11 and the chair of the P&T committee.  What is your
12 understanding as to what BC/BS of Massachusetts is
13 alleging the defendants did wrong?
14      MR. COCO:  Objection.
15      A.  I have a very high level understanding
16 of this in terms of the fact that there was --
17 that the price -- there's an issue with AWP
18 pricing.  I really don't know the details.  I
19 really haven't and it's not really connected
20 with my daily business concerns.
21      Q.  Okay.  Now, your daily business concerns
22 involve dealing with providers; is that correct?

---

143

1       A.  That's true.
2       Q.  And those providers are reimbursed in
3  relation to AWP; is that correct, the majority of
4  them?
5       MR. COCO:  Objection.
6       A.  Not the majority.  I mean, you mean --
7  if you're talking about physicians in offices --
8       Q.  Right.
9       A.  -- that you're administering like drugs
10 in their offices, yes, that's my understanding.
11      Q.  Now, leaving aside whatever positions
12 plaintiffs have taken in this case --
13      A.  Yeah.
14      Q.  -- do you personally --
15      A.  Yeah.
16      Q.  -- have a view as to whether you have
17 been misled by anything that drug manufacturers
18 have done or not done in relation to AWP?
19      MR. COCO:  Objection.
20      A.  I don't know enough about it to say.
21      Q.  Now, when I asked you originally what
22 your understanding of the allegations was, you

---

144

1  said one part of it is what AWP meant?
2       A.  Yes.
3       Q.  And you also said you understood it
4  referred to pricing considerations.  Now, what
5  were you referring to when you used the term
6  "pricing considerations"?
7       A.  My -- you know, I said my level --
8  understanding is very high level.  I understand
9  that there was some issues around what AWP meant
10 and what pricing or what monies the physicians
11 were receiving -- or, you know, what -- basically
12 that whole interaction about what the AWP is and
13 what drugs are available at.  I mean, that's the
14 about the level of my understanding of this.
15      Q.  Okay.
16      THE WITNESS:  Can we take a break pretty
17 soon?
18      MR. COCO:  Sure.
19      THE WITNESS:  I'm tired.
20      MR. MANGI:  Sure.  Let's take a break.
21      (Recess taken.)
22      MR. MANGI:  Back on the record.

---

145

1       Q.  Now, before the break, Doctor, we were
2  talking about the relationship between pricing
3  which providers acquire drugs and the rate with
4  which they're reimbursed by BC/BS of
5  Massachusetts.  Based on your experience in
6  dealing with providers and fielding provider
7  complaints, how do you think providers would react
8  if they were being reimbursed below their
9  acquisition costs for reimbursement?
10      MR. COCO:  Objection.
11      A.  How do I think they would react if they
12 were -- personally I think that they probably
13 wouldn't deliver those services, but not everybody
14 does.
15      Q.  So let's postulate a world in which
16 doctors were being reimbursed at an average of
17 their acquisition costs.  As you mentioned
18 earlier, in that situation some doctors below the
19 average, above the average were being reimbursed
20 below their cost, right?
21      MR. COCO:  Objection.
22      A.  I mean, I don't -- you know, I have -- I

---

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

146

1  seriously have not thought about that. I have no
2  idea what -- I would assume that people who -- if
3  you -- just from a business perspective if your
4  costs aren't being met, you wouldn't continue
5  doing something, but, you know...
6      Q.  So, in other words, from a standard
7  business perspective, if doctors were being
8  reimbursed below their cost for drugs by any
9  payer, they would stop administering those drugs
10 in their offices, right?
11     MR. COCO:  Objection.
12     A.  Not necessary -- I mean, they also get
13 other -- they also get other fees, though.  So I
14 mean, they get a technical component, they get
15 office visits, so I mean, you would have to
16 understand the whole business proposition on, you
17 know, what their -- you know, what they're getting
18 paid for delivering a bunch of services.
19     Q.  Let's talk about that issue for a moment
20 now.  Are you familiar with the term "cross-
21 subsidization"?
22     MR. COCO:  Objection.

147

1      A.  Yes.
2      Q.  What is your understanding of that term?
3      A.  I mean, from my personal understanding I
4  would think that certain things -- it means that
5  certain things subsidized -- paid for other
6  things.
7      Q.  Do you have an understanding as to how,
8  if at all, that term has been used in relation to
9  reimbursement to providers?
10     MR. COCO:  Objection.
11     A.  Broadly, no.  I mean -- no.
12     Q.  Now, BC/BS of Massachusetts
13 traditionally until recently followed Medicare in
14 terms of reimbursing for drugs at the same rate as
15 Medicare, right?
16     A.  Correct.
17     Q.  Did BC/BS of Massachusetts also follow
18 Medicare in terms of the rate it reimbursed for
19 services?
20     MR. COCO:  Objection.
21     A.  Blue Cross/Blue Shield of Massachusetts
22 tends to be Medicare-like in its reimbursement.

148

1  And we don't necessarily follow Medicare rates, we
2  follow a lot of them but not always their
3  methodology for rate reimbursement.
4      Q.  Okay.  Well, Medicare determines the
5  rates at which it would reimburse for services,
6  incidental drug administration, and it's through
7  the RBRES scheduling process, right?
8      A.  Yeah.
9      Q.  Did a Blue Cross/Blue Shield of
10 Massachusetts apply the same process and pay at
11 the same rate as Medicare for drugs administered
12 in office?
13     MR. COCO:  Objection.
14     A.  You know, we don't necessarily pay the
15 same rate as Medicare, but we usually follow the
16 same -- we use the RVUs methodology in a lot of
17 our reimbursement strategies.
18     Q.  Okay.  Do you know whether the amount at
19 which Blue Cross/Blue Shield of Massachusetts
20 reimburse providers in relation to services was
21 more or less than the amount Medicare reimbursed
22 in relation to the same services?

149

1      A.  I think that, you know, it varies and
2  we're talking about a lot of services, and I think
3  --
4      Q.  Let's focus on services incident to drug
5  administration.
6      A.  I don't know what the reimbursement
7  level is compared on that topic.
8      Q.  Are you aware that providers and
9  provider groups have argued for many years that
10 the amount Medicare reimbursed in relation to
11 services alone was insufficient to cover
12 providers' costs?
13     MR. COCO:  Objection.
14     A.  Medicare reimburse -- could you state
15 that last piece?
16     Q.  Sure.  Well, you deal with provider
17 groups such as MASCO, don't you?
18     A.  Yes.
19     Q.  Are you aware that provider groups of
20 that type and providers had long taken the
21 position that the amount Medicare reimburses
22 physicians in relation to services incident to

Jan L. Cook, M.D.             CONFIDENTIAL             March 6, 2006
                              Boston, MA

---

150

1  drug administration is insufficient to cover those
2  providers' costs?
3        MR. COCO:  Objection.
4        A.  It would -- I mean, whew, I think that I
5  am aware that they had some concerns about the new
6  methodology that Medicare had put in place.  That,
7  I was aware of because they called that to our
8  attention, that they thought that that methodology
9  was going to be evolving.
10       Q.  Okay.  I understand.  My question's
11  going to be a little bit different.
12       A.  Okay.
13       Q.  My question goes to the pre-ASP period.
14       A.  Okay.
15       Q.  In that period --
16       A.  Yeah.
17       Q.  -- are you aware that providers and
18  provider groups took the position that the amounts
19  being reimbursed for services alone were
20  insufficient to cover costs?
21       MR. COCO:  Objection.
22       Q.  And just to be clear, my question is:

---

151

1  Are you aware that they took that position?
2        MR. COCO:  Objection.
3        A.  Not quite the way you're saying it.  I
4  will say in general that I think that most
5  providers think that Medicare is not a generous
6  payer, and that I am aware of.  And that most
7  people think that it isn't the most generous of
8  payment payer, so that I can say that fairly.
9        Q.  Have you ever heard of providers,
10  provider groups or anyone else making the
11  argument, making the point that the amount
12  reimbursed by Medicare in relation to drugs
13  administered in office acts as a subsidy to help
14  cover the physician's costs of administering the
15  drugs?
16       MR. COCO:  Objection.
17       A.  I can't recall anybody specifically ever
18  saying it quite like that, or saying that in
19  general.  I'm trying to think of if I ever heard
20  anybody say it like that.  I can't recall.
21       Q.  Well, let me ask you this:  You're aware
22  that Medicare has now moved to an ASP plus six

---

152

1  methodology; is that correct?
2        A.  Yes, I am aware of that.
3        Q.  And ASP is intended to more closely
4  approximate the average of actual acquisition
5  costs for physicians, right?
6        MR. COCO:  Objection.
7        A.  Can you say that again?
8        Q.  Sure.  Well, let me ask it another way.
9        A.  Yeah.
10       Q.  Do you know what ASP is?
11       A.  I heard average sale price.
12       Q.  And what is your understanding as to
13  what average sale price means?
14       A.  Average sale price.  Okay, I mean --
15       Q.  Beyond what the acronym stands for, do
16  you have an understanding as to what that means in
17  the marketplace?
18       A.  No, I don't.
19       Q.  Do you have an understanding as to
20  whether or not average sales price numbers are
21  higher or lower than AWP?
22       MR. COCO:  Objection.

---

153

1        A.  You know, I don't think I know for sure,
2  no.
3        Q.  Are you aware that when Medicare moved
4  to an ASP-based methodology, it made upward
5  revisions in the amounts it was being reimbursed
6  in relation to services incident to drug
7  administration?
8        A.  You mean, the technical component?  Is
9  that what you're asking?
10       Q.  What do you mean by "technical
11  component"?
12       A.  That's what I'm trying to think, is that
13  what you mean.  It's the administration fee is
14  that what you're saying like for the fee for
15  administering a drug itself?  Is that what you're
16  asking me?
17       Q.  Well, let's focus the query.  When
18  physicians bill in relation to drugs that they
19  administer in office they use pixfix (phonetic)
20  codes, right?
21       A.  Okay.
22       Q.  Are you familiar with pixfix codes?

---

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                            Boston, MA

154

1      A.  I would say J codes.
2      Q.  That's fine.
3      A.  Okay.
4      Q.  And you aware that there are some J
5  codes that pertain to drugs?
6      A.  Yes.
7      Q.  And there are some J codes that pertain
8  to services?
9      A.  There is a service code like for
10  administration of a drug.
11     Q.  Sure.
12     A.  Okay.
13     Q.  Now, those service codes pertain to
14  services that the physician provides that are
15  related to an incident to the drug administration?
16     A.  Right.
17     Q.  Which may involve the infusion or
18  injection or other related services?
19     A.  Right.  It's related to the
20  administration of the drug, right?
21     Q.  Okay.  So that's what I'm referring to
22  when I say "services incident to drug

155

1  administration."
2      A.  Okay.
3      Q.  Now, using that definition, are you
4  aware that when Medicare moved to an ASP-based
5  methodology, it substantially revised the amounts
6  of the reimbursed buyers in relation to services
7  incident to drug administration?
8      MR. COCO:  Objection.
9      A.  I know that they were looking at
10  revising that, and I heard -- I don't know if they
11  actually revised it.  I know that they were doing
12  cost studies related to that.  I was told that by
13  the provider groups and that they also did like a
14  -- I want to say a demonstration fee.  I don't
15  know if that's exactly what it was called, but the
16  idea was that there was an amount of money that
17  was given while -- the period while the costs were
18  being -- there was some question about what how
19  much it cost to administer the drug in the office
20  and things like that.
21     Q.  The demonstration project is a separate
22  issue, and I will come to that later.

156

1      A.  Okay.
2      Q.  But sticking with the services incident
3  to drug administration, are you aware that based
4  on Blue Cross/Blue Shield of Massachusetts's own
5  analysis some service fees were increased by
6  Medicare by almost 400 percent?
7      A.  I wasn't --
8      MR. COCO:  Objection.
9      A.  I wasn't aware of that.
10     Q.  Has the upward revision in
11  administration fees by Medicare attendant to the
12  move to ASP something -- is that something that
13  providers have raised with you in relation to
14  discussing BC/BS of Massachusetts reimbursements?
15     A.  Not recently.  I mean, they haven't -- I
16  mean, in terms of are we increasing the
17  reimbursements or is Medicare?
18     Q.  Have they raised them in any context?
19     A.  The only context that I really had the
20  discussions with was MASCO in terms of what they
21  were doing with Medicare on that piece. I haven't
22  had other providers talk to me about it.

157

1      Q.  What discussion did you have with
2  Medicare on that issue?
3      A.  Excuse me --
4      MR. COCO:  MASCO.
5      Q.  With MASCO, I apologize.
6      A.  MASCO.  Simply that they were saying
7  that the methodology was changing.  They were
8  concerned about the methodology that was being
9  changed, that they wanted to -- they thought that
10  what Medicare was doing was a changing thing
11  because I think they thought that the original
12  proposal was not adequate, that cost studies were
13  being done to look at the actual costs in the
14  office, and in the meantime that they were
15  receiving a fee or a demonstration project fee for
16  what they were doing.
17     Q.  And were your communications with MASCO
18  on this topic in connection with BC/BS of
19  Massachusetts's consideration as to whether or not
20  to move to an ASP-based methodology?
21     MR. COCO:  Objection.
22     A.  No, it was in conjunction -- they wanted

**158**

1   to know what we were going to do. They were
2   concerned because a lot of times we are very
3   Medicare-like and we had been following Medicare-
4   like reimbursement methodology, and they wanted to
5   engage us to see what were we going to do.
6        Q.   Now, what time frame was this in?
7        A.   That, you know, I didn't look at -- I
8   can't remember when those -- it's been in the last
9   several years. I can't tell you how -- I can't
10  tell you how far back that went, but it's not been
11  -- you know, it's been since I've been in my
12  current position, and it's been a couple years
13  that I was in that current position that we
14  started talking about these.
15       Q.   Now, you're aware that Blue Cross/Blue
16  Shield of Massachusetts did not move to any based
17  methodology and currents to reimburse amount AWP
18  minus 5 percent?
19       A.   Yes, I am aware of that.
20       Q.   What is your understanding as to your
21  reasons why -- well, withdraw that.
22            Up until recently Blue Cross/Blue Shield

**159**

1   of Massachusetts always reimbursed -- always
2   followed Medicare in terms of setting its
3   reimbursement rates for drugs administered in
4   office, right?
5            MR. COCO:  Objection.
6        A.   Well, not always but we were following a
7   Medicare-like thing, yes.
8        Q.   Well, you were always reimbursing at the
9   same percentage of AWP as Medicare, right,
10  throughout the 1990s?
11       A.   That, I don't know.
12       Q.   Okay. It's your understanding that the
13  reimbursement rate was somehow tied or connected
14  to the Medicare reimbursement rate in relation to
15  drugs?
16       A.   Not -- no. My understanding was like a
17  lot of our payment policies, we are Medicare-like
18  because they're one of the largest payers; we do
19  things like them. So their pricing in the 2000s
20  was like what Medicare was doing. That
21  methodology was alike.
22       Q.   Are you aware that other Blue Cross/Blue

**160**

1   Shield of Massachusetts witnesses have testified
2   that right up until Medicare moved up to ASP Blue
3   Cross/Blue Shield of Massachusetts always followed
4   Medicare precisely in terms of its reimbursement
5   methodology for drugs administered in office?
6        A.   I'm not --
7            MR. COCO:  Objection.
8        A.   I'm not aware of what they said.
9        Q.   Do you have any reason to think that's
10  incorrect?
11           MR. COCO:  Objection.
12       A.   I don't know one way or the other.
13       Q.   Now, you do understand that Blue
14  Cross/Blue Shield of Massachusetts considered
15  whether or not to move to ASP in the 2004 time
16  period; is that correct?
17       A.   I think that my understanding is that we
18  had discussions about what Medicare had done. I
19  was involved in some discussions.
20       Q.   Okay. Are you aware that Blue
21  Cross/Blue Shield of Massachusetts analyzed the
22  financial implications attendant on a move to ASP?

**161**

1        A.   I may be -- I'm trying to think it's
2   been a while. I was sure -- I think that probably
3   something was done to look at that.
4        Q.   Are you aware that Blue Cross/Blue
5   Shield of Massachusetts concluded in 2004 that it
6   could save approximately $6 million a year if it
7   did move to an ASP-based methodology, even
8   accounting for an increase in administration fees?
9            MR. COCO:  Objection.
10       A.   I'm not aware of that number, but I
11  think I'm aware that they thought there was a cost
12  saving, but I don't know if that's the right
13  number.
14       Q.   But you're aware that Blue Cross/Blue
15  Shield of Massachusetts decided nonetheless not to
16  make the shift?
17       A.   At that -- what I am aware of is at that
18  time that they didn't decide to make the shift,
19  no, at that time.
20       Q.   And since that time has a different
21  decision been made on that topic?
22       A.   What I'm aware of is that I'm assuming

Jan L. Cook, M.D.          CONFIDENTIAL                    March 6, 2006
                            Boston, MA

162

1  that at some point in time we will make that shift
2  when things are more -- you know, I'm peripheral
3  to a certain extent to these discussions, but my
4  knowledge stems from the fact that people tell me
5  things to tell providers like MASCO and that one
6  of the things that, you know, when we get more
7  information about the cost studies, when we are
8  sure that Medicare is not going to change their
9  methodology again, we have other kinds of pricing
10 in place, then I think that we would entertain
11 that again.
12     Q.  But to date certainly there's been no
13 decision to move away from the current
14 methodology; correct?
15     A.  There's been no decision on a timeframe
16 to move away, but I would say that I think people
17 are expecting that we will move away from the
18 methodology.
19     Q.  Now, what were the reasons why Blue
20 Cross/ Blue Shield of Massachusetts did not move
21 to an ASP methodology when the issue was first
22 considered in 2004?

163

1      MR. COCO:  Objection.
2      A.  You know, I don't know why the company
3  didn't, but from the piece that I know I think --
4  I relate back that there was some concerns from a
5  provider group like MASCO that they thought that
6  the methodology -- the Medicare methodology, was
7  not -- may continue to evolve.  They were
8  concerned about how things were being set because
9  they didn't think that price -- the actual costs
10 of the office were known well.  And I think that they
11 also, at that point in time, were talking quite
12 vocally, internally and externally, about how they
13 were going to be treating Medicare patients and
14 whether they were going to continue to take care
15 of them in their offices.
16     Q.  Now, would it be fair to say that the
17 concern that groups such as MASCO providers were
18 voicing partly through you directly was that the
19 amount that they would be reimbursed under an ASP
20 regime would be insufficient in their eyes?
21     MR. COCO:  Objection.
22     A.  I think they were just concerned about

164

1  the whole methodology.  I mean, I'm not sure if it
2  was the ASP or it was the technical component or
3  whatever.  They were concerned that the
4  methodology was not sufficient for them to
5  continue their operations.
6      Q.  In other words, they took the position
7  that after Medicare's shift in its methodology and
8  all of the aspects of that shift, they would not
9  be making a sufficient amount of money to enable
10 them to continue treating Medicare patients --
11     MR. COCO:  Objection.
12     Q.  -- is that correct?
13     A.  I think that the position they took
14 about -- I don't know if it was a sufficient
15 amount of money they would be making, but I don't
16 think that they thought -- they were concerned
17 would they be able to continue to offer -- to
18 afford to offer those services in their office.
19     Q.  Okay.  And whether or not they would be
20 able to afford it --
21     A.  Yeah.
22     Q.  -- would be a function of what this

165

1  differential was between their costs and their
2  reimbursement, right?
3      MR. COCO:  Objection.
4      A.  I think that they related something to
5  that effect.
6      Q.  Okay.  And the concern was that with the
7  shift they might stop treating Medicare patients
8  because the reimbursement terms did not meet with
9  their approval; is that correct?
10     MR. COCO:  Objection.
11     A.  I think that that's what they conveyed
12 to us and they conveyed to a lot of people.
13     Q.  And they also conveyed to you that if
14 Blue Cross/Blue Shield of Massachusetts made a
15 similar shift in methodology, they may stop
16 treating Blue Cross/Blue Shield of Massachusetts
17 patients for the same reasons --
18     MR. COCO:  Objection.
19     Q.  -- is that correct?
20     A.  I don't know if they ever quite came out
21 and said it, but certainly --
22     Q.  That was the implication?

Jan L. Cook, M.D.         CONFIDENTIAL         March 6, 2006
                          Boston, MA

166

1    A.  I think the implication was that they
2  were saying they thought the methodology was
3  evolving.  They weren't sure that they were going
4  to be able to continue to do this in the offices,
5  that if -- that, you know, if we adopted that
6  methodology, that they had concerns about it, the
7  way it was -- methodology was stated at that time.
8    Q.  The implication was that with the -- if
9  Blue Cross/Blue Shield of Massachusetts were to
10 make a shift similar to what Medicare was
11 contemplating, they would no longer be able to
12 participate in the network; is that a fair
13 statement?
14    MR. COCO:  Objection.
15    A.  They never went that far, okay?  It
16 never was -- I don't think it was ever that
17 explicitly said.
18    Q.  Was that the implication?
19    MR. COCO:  Objection.
20    A.  I think my opinion was that they were
21 gravely concerned about what was happening to
22 their reimbursement levels and they wanted to

167

1  express that concern to us.  Whether or not what
2  they would have done, I don't know if they would
3  have really done it, but -- what they succeeded in
4  saying was that they were concerned, and they were
5  -- you know, they were very concerned and they
6  wanted to engage us in talking about what we were
7  going to be doing.
8    Q.  Now, why did that matter to Blue
9  Cross/Blue Shield of Massachusetts?
10    MR. COCO:  Objection.
11    A.  Well, I can't talk about -- I can only
12 talk about Blue Cross/Blue Shield of Massachusetts
13 in terms of I'm one of their associates, and why
14 it matters to me is that we tried to work
15 collaboratively with the providers, both facility
16 and clinical providers in our networks because we
17 believe that leads to the best healthcare delivery
18 for our members.  So we have sort of a
19 collaborative -- we try not to be adversarial.  We
20 try to be respectful and collaborative when we
21 engage with our providers.
22    Q.  And part of the reason why maintaining

168

1  those good relations is important is because Blue
2  Cross/Blue Shield of Massachusetts needs a network
3  of physicians to provide treatment to its members,
4  right?
5    MR. COCO:  Objection.
6    A.  Well, not really because we would have
7  it anyway because pretty much, you know, we're a
8  very large payer and I think people -- I think we
9  do it more because we think that together we can
10 achieve more.  We're very community-minded.  I
11 think we think that we can achieve better delivery
12 systems if we're all working together.  So I don't
13 think it ever comes down to they're many payers
14 who are not very collaborative with their
15 providers, but people still take their money.
16    What we're looking for is a higher level
17 of -- we're trying to deliver a better product, so
18 we're looking for innovation. We're looking for
19 better health outcomes. We're looking for better
20 delivery systems.
21    Q.  So what you're saying is, if I
22 understand you correctly, it's not just a matter

169

1  of paying enough so that physicians will remain in
2  the network.  Blue Cross/Blue Shield of
3  Massachusetts wants to go beyond that; is that
4  correct?
5    MR. COCO:  Objection.
6    A.  We want to -- no.  It's the payment --
7  payment has to be affordable.  Things have to be
8  affordable for our membership.  What I'm saying to
9  you, I guess, is the spirit.  In terms of we like
10 to have a collaborative spirit and we like to work
11 versus being in a collaborative relationship
12 versus an adversarial, and we don't always say yes
13 to people.  In fact, most of the time we don't.
14 It's more of the fact of listening and being
15 respectful.  And listening, that's really
16 important.
17    Q.  Right.  And part of that relationship or
18 that ethic when it came to these issues and
19 whether or not to shift to ASP was that you wanted
20 to give a full and a fair hearing to what the
21 providers' concerns were; is that a fair
22 statement?

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

| | 170 |
|---|---|

1          MR. COCO:  Objection.
2          A.  We wanted to -- we wanted to listen to
3    what they had to say and we wanted to validate to
4    them that we valued them and their participation
5    and their taking care of our members.
6          Q.  It's fair to say, isn't it, that the
7    providers' concern around this shift was not just
8    specific to the ASP part or the technical part or
9    the demonstration part, their concern was related
10   to the overall reimbursement they would be
11   receiving under the new medication regime?
12          MR. COCO:  Objection.
13          Q.  Is that a fair statement?
14          A.  I don't know if it was that broad.  I
15   mean, I don't know what -- how far or how deep
16   their concern was in that regard.
17          Q.  Well, my -- perhaps my question wasn't
18   clear.  As I understood your earlier testimony,
19   the providers' concern was not how the number is
20   calculated, in other words, whether it's ASP plus
21   something or AWP minus something, their concern
22   was that with the shift in Medicare's

| | 171 |
|---|---|

1    reimbursement methodologies, the dollar sums that
2    they would be reimbursed would be insufficient to
3    enable them to continue doing what they had been
4    doing?
5          MR. COCO:  Objection.
6          A.  I'm not so sure that it was insufficient
7    as less.
8          Q.  Okay.  Well, let me put it that way
9    then:  So their concern -- withdraw that.
10          So the providers and MASCO's concern
11   around the time when Medicare was contemplating a
12   shift in methodology was not, you know, what is
13   the methodology or what is the benchmark or what
14   are the different components of it.  The concern
15   came down to the fact that the dollar sum they
16   would be getting at the end of the day was less
17   than what they had been getting before?
18          MR. COCO:  Objection.
19          Q.  Is that a fair statement?
20          A.  You know, I can't say what -- I can only
21   say what they expressed to me.
22          Q.  Sure.

| | 172 |
|---|---|

1          A.  And I think what they expressed to me
2    was that was what they were concerned about, okay?
3          Q.  That's fine.  I'm not trying to, you
4    know, pose a trick question.
5          A.  Yeah.
6          Q.  So you understood -- let me phrase it
7    that way so we're clear.
8          The concern that you understood they
9    were expressing to you was that with the shift in
10   methodology that Medicare was implementing from an
11   AWP-base system to an ASP-based system, the
12   overall amount of reimbursement they would receive
13   in dollar terms would be less than what they were
14   getting before, right?
15          MR. COCO:  Objection.
16          A.  I think -- and I want to broaden that.
17   I think the whole change in methodology, and it's
18   not unusual, but whenever significantly changing a
19   methodology for reimbursement it's not unusual for
20   people will be concerned, am I getting less?  I
21   don't think if they thought they would be getting
22   a lot more they would have been as concerned but

| | 173 |
|---|---|

1    of course they want to ensure that they are
2    getting enough -- they want to ensure that they
3    were getting what they were getting before, or
4    they were worried that they would be getting less.
5          Q.  And that concern is one of the factors
6    that BC/BS of Massachusetts would have considered
7    in making its decision not to follow Medicare in
8    moving to an ASP-based methodology, correct?
9          MR. COCO:  Objection.
10          A.  I think that we listen, but we wouldn't
11   have done that solely because they -- you know, I
12   think we listen to them, but I don't think that
13   that's what I -- we didn't make that shift in that
14   methodology.
15          Q.  My question is:  Was that one of the
16   factors that BC/BS of Massachusetts would have
17   considered in making its decision not to shift
18   methodologies?
19          MR. COCO:  Objection.
20          A.  I would have considered it, but I don't
21   know -- I wasn't part of the decision making body
22   on that, so I don't know if they considered it or

Jan L. Cook, M.D.                    CONFIDENTIAL                    March 6, 2006
                                       Boston, MA

174

1    not. ·
2        Q.   Are you aware that previous BC/BS of
3    Massachusetts witnesses have testified that you
4    were part of the group that was analyzing whether
5    or not to move to an ASP?
6        A.   No, I'm not aware that they said that.
7        Q.   Would that be inaccurate?
8        A.   It's inaccurate in the sum that you said
9    there was a committee or a group that was looking
10   at it.  I think specifically that was like the
11   call to the committee.  You know --
12       Q.   Well, let's not make it that formal
13   then.
14       A.   Okay.
15       Q.   Forget about a committee or a group.
16       A.   Yeah.
17       Q.   My question is:  There were people that
18   were looking at this issue and their input
19   factored into the eventual decision.  Were you one
20   of those people?
21       A.   I was involved in conversations about
22   this topic.

175

1        Q.   Okay.
2        A.   I'm not sure who eventually made the
3    decision, but I don't remember sitting around a
4    table and everybody said raise your hand in you're
5    in favor -- I wasn't -- that wasn't in that level.
6    I certainly was involved in talking about what I
7    had learned and what I thought about this topic.
8        Q.   And is one of the things that you
9    conveyed about this topic the concerns we've
10   discussed from MASCO and providers that they would
11   be making less?
12       MR. COCO:  Objection.
13       A.   What I conveyed is what we had heard in
14   our discussions with MASCO.
15       Q.   Okay.  Now, after taking those
16   considerations into account, Blue Cross/Blue
17   Shield of Massachusetts decided not to shift
18   methodologies, right?
19       MR. COCO:  Objection.
20       A.   I don't know if that -- I don't know if
21   that was the reason, and I don't think that was
22   the reason they decided not to shift.

176

1        Q.   But had -- I'm sorry go ahead?
2        A.   I don't think that was the sole reason
3    or maybe even the main reason watch.  Do I think
4    that people heard that?  Yes, I think that people
5    heard that.
6        Q.   My question was:  Was it one of the
7    factors that was provided to the group for
8    consideration?
9        MR. COCO:  Objection.
10       A.   I talked about that to people that have
11   been in involved in the decision making but since
12   I don't really know who exactly made the decision,
13   I can't really tell you that was the case, okay?
14       Q.   Do you know what other factors that may
15   have gone into that?  Were there other factors
16   that were discussed?
17       MR. COCO:  Objection.
18       A.   In the discussions that I had, one of
19   the things that was discussed was that other kinds
20   of pricing that we had, because you're talking
21   about -- there are a lot of different places that
22   those types of drugs can be given.  You know,

177

1    they're infusions is what we're talking about for
2    the most part, but not always.  And infusions can
3    be given in the hospital, they can be given in the
4    outpatient department of hospitals, they can be
5    given in physicians' offices, they can be given in
6    home settings.  And those, I think, are the big
7    ones that I can think of off the top of my head.
8        And one of the things that we talked
9    about is the different pricing in the different
10   areas of the company in regards to where those
11   drugs could be given.  And that was one of the
12   things that was discussed.
13       Q.   Well, how is the presence of alternative
14   sites of care relevant to the decision of whether
15   or not to shift methodologies?
16       MR. COCO:  Objection.
17       A.   From my perspective it could be relevant
18   if you were thinking about alternative sites --
19   well, I mean, those are all -- those are four
20   sites I told you where care could be delivered and
21   not all types of drugs would be delivered in those
22   sites.  But, you know, if you were looking at

Jan L. Cook, M.D.      **CONFIDENTIAL**      March 6, 2006
Boston, MA

**178**

1  places where things could be alternatively
2  delivered, let's say if there was a shift of care,
3  if care wasn't going to be delivered in one but
4  maybe we delivered in another site, well, what
5  would -- that was what the discussion was about.
6       Q.  Do you have an understanding as to
7  whether or not it costs Blue Cross/Blue Shield of
8  Massachusetts more if a drug is administered to a
9  patient in a hospital versus a physician's office?
10       A.  Well, if it's delivered during a
11  hospital stay, for the majority of the time most
12  of that's under the DRG payments, that is
13  different.  But you mean like an outpatient --
14       Q.  (No verbal response.)
15       A.  Okay.  It was a different pricing
16  methodology.  It wasn't -- from the most part and
17  I'm just being very general now.  My understanding
18  was that in most of the hospital contracts, or a
19  lot of them they're all very different, that the
20  pricing wasn't AWP minus 5 percent in the
21  outpatient setting, and a lot of those it was
22  percent of charges.

**179**

1       Q.  Well, my question is a bit broader than
2  that:  In terms of the overall reimbursement
3  related to a drug administration or to drug
4  component and the service component, as a general
5  matter, would it cost Blue Cross/ Blue Shield of
6  Massachusetts more or less if a drug was
7  administered in a hospital outpatient department
8  versus a physician's office?
9       MR. COCO:  Objection.
10       A.  I would say that -- I don't have -- I've
11  never seen numbers that would support that.  I
12  think -- what I think and what I thought is that
13  it's probably more expensive to give something in
14  a hospital setting just in general than it would
15  be in other settings.
16       Q.  Do you know whether or not that general
17  fact played any role in Blue Cross/Blue Shield of
18  Massachusetts's determinations of the amounts
19  reimbursed in physician office settings?
20       MR. COCO:  Objection.
21       A.  Can you clarify what you mean by that?
22       Q.  Well, let me put it another way:  Do you

**180**

1  know whether or not Blue Cross/Blue Shield of
2  Massachusetts, in dealing with particular
3  physicians, considers or is concerned about the
4  fact that if a provider stops treating their
5  patients for any reason, those patients will then
6  go to a hospital outpatient department to get
7  their drug and it'll cost Blue Cross/Blue Shield
8  of Massachusetts more?
9       MR. COCO:  Objection.
10       A.  I don't think we think about that in
11  terms of individual physicians.  I mean, I don't
12  think you would look at it quite that way, but I
13  do think that we think that usually any kind of
14  services delivered in a hospital versus, you know,
15  in a doctor's office tend to be more expensive.
16       Q.  We can agree as a general matter it's in
17  Blue Cross/Blue Shield of Massachusetts's interest
18  that patients be -- receive their drugs in a
19  physician office setting versus in a hospital
20  setting, both for financial reasons and also for
21  the patient's own comfort?
22       MR. COCO:  Objection.

**181**

1       A.  Actually, I disagree with that.  I would
2  tell you I think that my understanding as an
3  associate of the company, as a physician I would
4  hope people would receive the drug in the most
5  clinically appropriate place and not, you know,
6  all medications are alike and equal, and some of
7  them are more dangerous than others, and some of
8  them are more safe.  And, you know, we talked about
9  outpatient.  We talked about, you know, home, et
10  cetera.  So the most safe -- the best place for the
11  patient is where I would hope somebody would
12  receive a medication.
13       Q.  Let's assume that we're talking about
14  drugs where is the patient's clinical interests
15  are equally serviced, whether they would be
16  getting the drug in a hospital outpatient
17  department or in a physician office setting. I'll
18  ask you to assume that for purposes of this
19  question.
20       A.  Okay.
21       Q.  All right.  In that setting with that
22  assumption can we agree that it's in Blue

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

182

1    Cross/Blue Shield of Massachusetts's interests
2    financially that the patient receive the care in
3    the physician's office setting rather than the
4    hospital outpatient's setting?
5        MR. COCO:  Objection.
6        A.  I don't know about that.  I mean, I
7    don't mean to be vague with you but I'm not so
8    sure about that.  I think that -- I look at that
9    more as a patient -- a place of patient
10   preferences and I have not seen the cost studies
11   between the two of them, between the outpatient
12   setting -- I told you a generalization of
13   something I believe that a hospital -- and a
14   physician's office but there's more than just
15   cost.
16       There's also quality concerns, so, you
17   know, I would tell you that I think my
18   understanding of this issue is that we would --
19   that as a company we would hope the people would
20   receive it in the safest place that they would
21   receive it and sometimes for people the safest
22   place or the place they feel more comfortable is

183

1    in a physician's office.  But, you know, I mean, I
2    think that's -- we didn't think about this a whole
3    lot.  We really weren't thinking about this a
4    whole lot.
5        Q.  Okay.  What do you mean when you say you
6    weren't thinking about this a whole lot?
7        A.  I mean, you're asking me a lot of
8    questions in terms of -- I don't think this is
9    really high on -- in my personal perspective on
10   the radar screen about, you know, people actively
11   directing.  I'm not aware that we were directing
12   people to certain sites of service or really even
13   -- we just, you know, we weren't really -- I'm not
14   aware that we did that kind of thing or we were
15   thinking about that kind of thing or I certainly
16   wasn't thinking about that kind of thing.
17       Q.  So are you saying you're not aware of
18   any efforts to incentivize any site of care versus
19   another one?
20       MR. COCO:  Objection.
21       A.  No.  I guess what I'm saying is that I'm
22   not aware that -- I'm just not thinking this was

184

1    something that people were spending a lot of time
2    thinking about.
3        Q.  My question was a little bit different.
4        A.  Yeah.
5        Q.  My question was:  Are you saying you're
6    not aware of any efforts by Blue Cross/Blue Shield
7    of Massachusetts to incentivize one site of care
8    versus another?
9        MR. COCO:  Objection.
10       A.  Well, "incentivized" is kind of a broad,
11   you know, vague term, but I'm not aware that we
12   were actively directing care one way or the other.
13   And that's how I can answer that, and that's what
14   I meant by that.
15       MR. COCO:  When you get to a good
16   breaking point, it might be --
17       MR. MANGI:  Lunch?  Yeah, let's do it
18   now.
19       MR. COCO:  Okay.
20       (Lunch recess taken.)
21
22

185

1        AFTERNOON SESSION
2
3        MR. NOTARGIACOMO:  Before we begin, I
4    just wanted to designate the transcript as
5    confidential under the applicable protective order
6    that's been placed in this litigation.
7        (JAN L. COOK, M.D., Resumed.)
8
9        DIRECT EXAMINATION, Continued
10   BY MR. MANGI:
11       Q.  Now, Dr. Cook, in the morning session
12   you mentioned at one point the transformation
13   initiative that Dr. Mandel, I believe, is working
14   on.  What is the transformation initiative?
15       A.  The transformation initiative, in 25
16   words or less, okay, it's actually a corporate
17   initiative to try to improve the health and well-
18   being of the citizens of Massachusetts.  That's
19   sort of the lofty high goal.  And the idea is, you
20   know, what can we do as a company to try to
21   stimulate, you know, safer, higher quality, more
22   affordable healthcare in Massachusetts.  And so