Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

| 186 | 188 |
|---|---|
| 1 there's a series of action steps related to that. | 1 initiatives. It's sort of broad based -- the |
| 2    Q.  What are some of those action steps? | 2 American College of, you know, Physicians. I |
| 3    A.  Things like helping to fund or promote | 3 mean, they've been looking at recertification. |
| 4 electronic medical records, helping to -- I'm | 4 Should we be adding some sort of funding or extra |
| 5 trying to think of what other kinds of things | 5 bonus point force doing that, that kind of stuff. |
| 6 we're doing.  You know, trying to change some of | 6    Q.  How would a change of reimbursement |
| 7 our payment systems to reward more on quality and | 7 methodologies impact any of those goals? |
| 8 outcomes, not just on, you know, volume, you know, | 8    A.  Because it would encourage people to |
| 9 things like that. | 9 maybe try to work to achieve them.  All right. |
| 10    Q.  Does the transformation initiative | 10 Let's put it this way:  It wouldn't discourage |
| 11 include examining reimbursement methodologies at | 11 them, you know, if you gave someone a bonus for, |
| 12 all? | 12 you know, getting bridges to excellence |
| 13    A.  I think so. | 13 certification in diabetes, you could maybe pay |
| 14    Q.  What aspects of reimbursement | 14 them extra monies because they had achieved that, |
| 15 methodologies are under study as part of the | 15 because hopefully they would be taking better care |
| 16 transformation issue? | 16 of their diabetic patients. |
| 17    A.  I'm not aware of the entire breadth of | 17    Q.  Well, when I ask about reimbursement |
| 18 it. The part that I've heard about, like | 18 methodologies I'm referring specifically to the |
| 19 reimbursement to physicians in terms of like | 19 formula used in determining the amount of |
| 20 office visits. | 20 reimbursement.  In other words, for drugs, 95 |
| 21    Q.  Do you know what specifically is being | 21 percent of AWP, for services and fee schedule |
| 22 considered in terms of office visits? | 22 amounts does the transformation initiative include |

| 187 | 189 |
|---|---|
| 1    A.  All provider groups -- instead of -- you | 1 an analysis of whether or not changes should be |
| 2 know, right now we reimburse for, you know, how | 2 made to those reimbursement methodologies? |
| 3 many people do you see?  Every time you see | 3       MR. COCO:  Objection. |
| 4 somebody you get X amount of dollars depending on | 4    A.  I don't know. |
| 5 how you code.  It would be moving a certain part | 5    Q.  Now, earlier in the day I asked you |
| 6 of your payment based on the clinical outcome.  So | 6 whether a change in the methodology moving to an |
| 7 you get paid for seeing people, but you would also | 7 ASP methodology would or would not impact |
| 8 get additional monies if you met certain clinical | 8 physicians' willingness to be part of the network. |
| 9 targets like all your diabetics were getting eye | 9 Do you recall those questions? |
| 10 exams, you know, foot exams, whatever things that | 10    A.  Yes, I do. |
| 11 have been proven by the literature to improve | 11    Q.  I believe your answer was that BC/BS is |
| 12 health outcomes.  So we're looking at how could we | 12 sufficiently large that they would probably |
| 13 align methodology to people thinking more about | 13 contract anyway; is that correct? |
| 14 health outcomes. | 14       MR. COCO:  Objection. |
| 15    Q.  What methodologies are under | 15    A.  To the extent that -- that's not quite |
| 16 consideration? | 16 what I said.  I think what I said was I think that |
| 17    A.  More looking at all kinds of physician, | 17 in terms of AS -- in terms of ASP pricing, that we |
| 18 you know, incentives and they're looking at | 18 didn't -- we weren't considering doing it or not |
| 19 bridges to excellence, you know, that GE puts out. | 19 doing that because we were afraid that people |
| 20 That's something we should be funding.  You know, | 20 wouldn't contract with us.  That's what I meant in |
| 21 we've given some money to the IH an institute of | 21 that context. |
| 22 healthcare improvement, to their hospital | 22    Q.  In other words, people would contract |

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
                                  Boston, MA

190

1  regardless of whether or not a move was made; is
2  that what you were saying?
3       MR. COCO: Objection.
4       A. Well, I mean, that's speculation in
5  terms -- and I can't speculate to that extent, but
6  -- and that's sort of taken out of context of what
7  we were talking about.
8       Q. Well, let me pose the question to you
9  then.
10      A. Okay.
11      Q. If BC/BS were to change its
12 reimbursement methodology and lower the actual
13 amount you were paying in reimbursement, would
14 that affect providers' willingness to enter into
15 contracts with BC/BS of Massachusetts?
16      MR. COCO: Objection.
17      A. You know, I mean, that's a difficult
18 question to answer. I think reimbursement's
19 important, but we also have a fair amount of
20 market share in this state. And so I think that,
21 you know, people a lot of times will -- that isn't
22 the only reason people would choose to or not to

191

1  contract with us.
2       Q. If one were to suggest to you that in
3  the health plan provider or contracting dynamic
4  all of the leverage lies with the provider rather
5  than with Blue Cross/Blue Shield of Massachusetts,
6  would you agree or disagree with that statement?
7       MR. COCO: Objection.
8       A. In my opinion, I would disagree.
9       Q. Are you aware that's one of the
10 positions that's been put forward by plaintiffs'
11 expert in this case?
12      MR. COCO: Objection.
13      A. I'm not aware.
14      Q. Would it be fair to say that in
15 Massachusetts Blue Cross/Blue Shield of
16 Massachusetts has relatively strong leverage when
17 negotiating or contracting with providers?
18      MR. COCO: Objection.
19      A. In my opinion, I think it varies.
20      Q. Okay. What are some of the factors that
21 effect relative leverage?
22      MR. COCO: Objection.

192

1       A. You mean in terms of or how much
2  business position we would have with a certain
3  group?
4       Q. No. I mean, you said leverage varies.
5       A. Right.
6       Q. So my question is: What causes it to
7  vary?
8       MR. COCO: Objection.
9       A. You know, in things that I've
10 experienced, maybe size of the group, location of
11 the group, you know, percent membership in that
12 community. I mean, there's a variety of business
13 issues and attributes in any kind of negotiations
14 that would affect, you know, that kind of
15 negotiation or relationship. And I'm basically
16 saying one size doesn't fit all.
17      Q. So, for example, a specialist in a rural
18 area where BC/BS of Massachusetts has resident
19 members and she is the only specialist in that
20 area would have more leverage than, say, you know,
21 one of many oncologists in the City of Boston?
22      MR. COCO: Objection.

193

1       Q. Would you agree with that?
2       A. What I would agree with is that it's --
3  I would agree that that is definitely an
4  interesting business situation. Whether or not
5  that would affect anything is a whole other issue
6  in terms of --
7       Q. Well, does it affect anything? In other
8  words, does the relative leverage of providers
9  result in any differences in the amounts they're
10 reimbursed?
11      A. I think potentially sometimes it can.
12      Q. Okay. What are some of those instances?
13      MR. COCO: Objection.
14      A. I think that some of the large teaching
15 hospitals that we feel are important to our
16 network have -- are in a better position for
17 negotiation than, you know, people who are not in
18 those teaching hospitals.
19      Q. So will those teaching hospitals be able
20 to negotiate higher reimbursement rates than other
21 facilities?
22      MR. COCO: Objection.

Jan L. Cook, M.D.     CONFIDENTIAL     March 6, 2006
Boston, MA

194

1    A.  Well, I don't actually do the
2  contracting. I don't actually do the dollars, so I
3  would tell you that I don't know that for sure. I
4  would tell you philosophically from what I've
5  heard and from my perspective is that people -- we
6  have one fee schedule and that people who has get
7  paid more. It's based on performance of other
8  kinds of guarantees or other kinds of additional
9  value brought to a relationship.
10    Q.  However, when you described the use of
11  those multipliers earlier --
12    A.  Yes.
13    Q.  -- correct me if I'm wrong, but I
14  thought you divorced that from importance of that
15  entity to the network and said that was merely a
16  function of whether or not they implement
17  preventive care programs?
18    MR. COCO: Objection.
19    A.  Well, I mean, that -- I mean, it takes a
20  large entity -- that's not exactly what I said. I
21  mean, I understand -- I mean, this is a different
22  context. You're asking me what people -- I would

195

1  say from my perspective, what I understand about
2  contracts, people enter a variety of contractual
3  relationships with them. If people are getting
4  more monies in a standardized fee schedule, you've
5  agreed to do more services or deliver something
6  more than somebody who has not. And sometimes
7  that could be a strategic partner, sometimes that
8  could be a large delivery system. I mean, it's a
9  variety...
10    Q.  Well, here's my question.
11    A.  Okay.
12    Q.  Regardless of them providing something
13  more. Let's assume they're providing the same
14  service as another plan. Does the mere importance
15  of a particular facility or practice to the
16  network result in them being able to negotiate
17  higher reimbursement?
18    MR. COCO: Objection.
19    A.  No, I don't have any direct knowledge of
20  that.
21    Q.  Now, in terms of physician practices, I
22  believe you testified earlier that there is no

196

1  variation in terms of the amounts they're
2  reimbursed; is that correct?
3    MR. COCO: Objection.
4    A.  My understanding, again, is just what I
5  just told you is it would have to be performance-
6  based; that it would be some sort of -- you would
7  be in some sort of arrangement that had a
8  performance component to it that would allow for
9  additional funds.
10    Q.  Well, I would like you to leave aside
11  for the moment the multipliers that relate to
12  participation and attainment of preventative care.
13    A.  Okay.
14    Q.  My question is simply in terms of the
15  relative leverage of different plans that we've
16  been discussing. Are some plans -- or different
17  practices -- are different practices able to
18  negotiate higher reimbursement rates than others?
19    MR. COCO: Objection.
20    A.  I don't know because I'm not in the
21  contract area, and I don't know what the final
22  rates are.

197

1    Q.  Now, are you familiar with Bay State
2  Health?
3    A.  Bay State hospital -- there's a BayPO,
4  IPA, a Bay Care IPA, which --
5    Q.  Are you familiar with an entity called
6  Bay State Health which was at one point affiliated
7  with Blue Cross/Blue Shield of Massachusetts?
8    A.  Do you mean -- are you talking about a
9  provider? Are you talking about a payer?
10    Q.  Health insurance -- a payer.
11    A.  A payer. There was in the '90s, and
12  that's not the right name. Bay State -- what was
13  it? I guess it was just called Bay State, okay,
14  yeah.
15    Q.  What was Bay State?
16    A.  My brief understanding, it was a
17  healthcare plan. I think it was physician-run. I
18  don't know who owned it or anything like that.
19  And I believe that they merged with them in the
20  early '90s. But, again, I'm telling you I'm not
21  sure about this. I mean, that's kind of my
22  recollection.

Jan L. Cook, M.D.      CONFIDENTIAL      March 6, 2006
Boston, MA

198

1     Q. Are you aware that for a period of time
2 Blue Cross/Blue Shield of Massachusetts acted as a
3 Medicare carrier?
4     A. Medicaid or Medicare?
5     Q. Medicare.
6     A. Yes, I am.
7     Q. For what period of time was Blue
8 Cross/Blue Shield of Massachusetts a Medicare
9 carrier?
10     A. That, I don't know.
11     Q. Did you have any involvement in the
12 carrier side of the business?
13     A. No, I did not.
14     Q. Do you know of any individuals who were
15 involved in the carrier side of the business were
16 still at the company?
17     A. And by "carrier side" you mean?
18     Q. Who worked on Blue Cross/Blue Shield of
19 Massachusetts work as a Medicare carrier.
20     A. Okay. I don't think so. I mean, I'm
21 sure they're still around. That was quite a few
22 years ago before we had our managed care for

199

1 Medicare. And I'm trying to think of who -- I
2 know there's got to be people, but I'll be darned
3 if I can tell you exactly who they are.
4     Q. Okay.
5     A. It's been too long ago. I can't
6 remember.
7     Q. Now, are you familiar with the
8 litigation referred to as the In Re: Managed Care
9 litigation or the Thomas litigation?
10     A. I've heard briefly about the Thomas
11 litigation.
12     Q. What is your understanding of the Thomas
13 litigation?
14     A. I've heard of the Thomas litigation. I
15 really don't have an understanding. The limit of
16 my understanding is it has something to do with
17 coding, and that's about the limit. I'm really
18 not involved with that at all.
19     Q. Are you aware that that was a lawsuit
20 brought by providers against health plans,
21 including Blue Cross/Blue Shield of Massachusetts?
22     A. Maybe, yeah.

200

1     Q. Were you involved at all in that
2 litigation in terms of producing documents?
3     A. I could have been.
4     Q. Do you recall anything more about the
5 substance of that case other than that it's about
6 coding?
7     A. No, because no one ever really directly
8 -- no, I've never really been directly involved in
9 that case, as far as I know.
10     Q. Now, are you aware that in 1994 Blue
11 Cross/ Blue Shield of Massachusetts paid the
12 government $2.75 million to settle allegations
13 that the company submitted false Medicare reports
14 in processing Medicare claims?
15       MR. COCO: Objection.
16     A. When was that?
17     Q. 1994.
18     A. For Medicare claims?
19     Q. (No verbal response.)
20     A. No, I'm not aware of that.
21     Q. Is there the first time you're hearing
22 about that?

201

1     A. I think about Medicare claims, yes.
2     Q. Are you familiar with other settlements
3 with the federal government?
4     A. No. What I was -- what you're hearing
5 me kind of reflect on is we had some issues about
6 our managed care product, Blue Care 65, initially.
7 There were some problems with the government
8 related to signatures on some documentation, and
9 that's what I thought you were referring to.
10     Q. Now, in your dealings with providers,
11 have you ever had any discussions directly with
12 providers pertaining to the prices that they pay
13 to acquire drugs?
14     A. No.
15     Q. Do you have any information regarding
16 prices that they pay to acquire drugs?
17       MR. COCO: Objection.
18     A. I don't believe so.
19     Q. Okay. And, again, this is you
20 personally?
21     A. Yes.
22     Q. What is your understanding of the

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

202

1  relationship between the price at which they
2  acquire drugs and the amounts they reimburse, if
3  any?
4        MR. COCO:  Objection.
5     A.  I'm only aware of what our payment
6  policy is.  I'm not aware of what people in
7  general are paying for their drugs.
8     Q.  So is the answer to my question that you
9  have no understanding or expectation as to the
10 relationship between the price that they pay to
11 acquire drugs and the amount that they're
12 reimbursed for drugs?
13       MR. COCO:  Objection.
14    A.  Yeah.
15    Q.  Now, let me mark a document.  This will
16 be Exhibit Cook 002.
17       (Exhibit Cook 002, Document Bates-
18 numbered BCBSMA-AWP-12489 - 12492, marked for
19 identification.)
20       (Discussion off the record.)
21    Q.  Now, there are a number of e-mails on
22 this chain.  I'll draw your attention to specific

203

1  parts of them, but please take your time to
2  familiarize yourself and let me know when you're
3  ready.
4        (Witness reviews document.)
5        MR. MANGI:  Off the record.
6        (Discussion off the record.)
7        MR. MANGI:  Okay.  Back on the record.
8     Q.  I would like to draw your attention
9  first to the last e-mail in the chain which starts
10 on Page 12493.  Do you have that?
11    A.  Yes.
12    Q.  Now, this e-mail that is sent to you
13 from vdulong@mms.org?
14    A.  Uh-huh.
15    Q.  Who is that?
16    A.  That's Virginia or Ginny Dulong at the
17 Mass. Medical Society.
18    Q.  What is your relationship between the
19 Mass. Medical Society and MASCO, if any?
20    A.  I don't know what the, like, official --
21 I mean, if they're part of the organization or the
22 Massachusetts Medical Society offers them support.

204

1  Ginny at the time in 2002 was sort of like the
2  administration liaison for MASCO.  And I am not
3  really sure who employed her, was it the Mass.
4  Medical Society or the group employed her, but...
5     Q.  Now I would like you to turn to -- well,
6  first of all, her e-mail is listing a number of
7  specific issues and seeking an update from you as
8  to where things stand as to those issues, right?
9     A.  Yes.
10    Q.  I would like you the turn to No. 6,
11 please.  And the topic is "Inadequate chemo
12 reimbursement:"  And the question is, has anyone
13 at BC/BS had a chance to review the articles that
14 Dr. Goldstein provided about inadequate
15 chemotherapy reimbursement?  Now, who is Dr.
16 Goldstein?
17       MR. COCO:  I'm sorry, new question?  You
18 said my question is this, and then you asked who's
19 Dr. Goldstein?  So you just want an answer to
20 who's Dr. Goldstein?
21       MR. MANGI:  I thought that was the only
22 question that I posed.

205

1     Q.  But you can answer that.  Go ahead.
2     A.  You know, I don't know -- I don't
3  remember this e-mail, so I don't know if that --
4  offhand I'm thinking is that one of the
5  oncologists?  It could have been one of the
6  oncologists -- is there a Michael Goldstein?  I
7  can't remember if that's who that is.
8     Q.  Do you know what articles are being
9  referred to?
10    A.  I don't offhand.  I don't remember.
11    Q.  Do you recall the Mass. Medical Society
12 or MASCO forwarding you articles from time to time
13 dealing with reimbursement issues generally?
14    A.  No.  They generally didn't send
15 articles, and I don't think if I -- in this case I
16 look at this and it looks like this was the action
17 items off of a meeting.  I wonder if he gave us
18 articles at that meeting.  I don't think -- they
19 don't generally send articles to us.
20    Q.  Do you have any recollection as to what
21 these articles were addressing?
22    A.  No, I don't, not offhand, I don't.  It's

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
Boston, MA

---

**206**

1   been a long time ago.
2        Q.   Let me ask you to turn to the previous
3   page on the next e-mail up, which is your response
4   to Ms. Dulong.  And if you have a look at No. 6
5   there, "Inadequate chemo reimbursement:", your
6   response is "We reimburse as Medicare does AWP
7   minus 5 percent.  We understand that in some
8   situations this is very favorable to practitioners
9   and in others it may be less advantageous.  In
10  general we feel that this process evens itself
11  out.  If this isn't the case, we would be glad to
12  continue to discuss this with you."
13       Do you recall sending that e-mail?
14       A.   No.
15       Q.   Okay.
16       A.   But it says it was from me, so yes.
17       Q.   Okay.  Now, what did you mean when you
18  said you understand that in some situations it's
19  favorable and in others it's less advantageous?
20       MR. COCO:  Objection.
21       (Witness reviews document.)
22       A.   Well, I'm assuming -- I mean, I don't

**207**

1   remember writing this e-mail, but if I read it
2   now, I assume what I'm saying is what I said that
3   sometimes it's more favorable to others, then
4   sometimes it's not.
5        Q.   Well, my question is:  In what respect
6   is it favorable or not favorable?
7        MR. COCO:  Objection.
8        A.   I think that, you know, not everybody --
9   and I'm trying to remember that time, and I don't
10  remember clearly, but not everybody gives
11  chemotherapy in their office and that I think that
12  people who -- there's a lot of reasons why people
13  would choose to do that and not choose that.  I
14  think that I think at times that if you were
15  giving a lot of medications in your office, that
16  you might be getting some sort of volume discount.
17  Sometimes it was more favorable to you than not
18  because not everybody would do this practice.
19       Q.   Okay.  So you were -- withdraw that.
20       So your understanding was that
21  oncologists who did administer chemo in their
22  offices may be able to get volume discounts that

**208**

1   would lower their acquisition costs for the drugs;
2   is that correct?
3        MR. COCO:  Objection.
4        A.   I wouldn't tell you that was my
5   understanding, because nobody ever exactly said
6   that to me, but my assumption was that might have
7   been the -- that somehow that why doesn't
8   everybody do this, okay?  So my assumption was
9   that somehow somebody was -- something was
10  happening to that effect maybe.
11       Q.   And your assumption was also that the
12  amount of the discount would vary from provider to
13  provider depending in part on their volume of use?
14       MR. COCO:  Objection.
15       A.   Well, I don't think I thought about it
16  that much, but I think what I thought was that you
17  might if you -- I really didn't think about it
18  that much in terms of I think I thought that if
19  you might get something on volume if you did a lot
20  of volume.  But I didn't really think, well, you
21  only did -- I mean, nobody ever said to me, Jan,
22  you get X amount when you do X, Y and Z.  So I

**209**

1   have no idea, but I assume that somehow, because
2   some people did it and some people didn't, that
3   they might get something like that.
4        Q.   Well, I'm trying to understand
5   specifically what you mean when you refer to the
6   fact that they may be different situations, you
7   know, less favorable in some, more favorable in
8   others.  Were you assuming there that the
9   acquisition cost for drugs would vary from
10  provider to provider, meaning the rates would be
11  more favorable for some providers and less
12  favorable for other providers?
13       MR. COCO:  Objection.
14       A.   I think I was assuming pretty much what
15  I've told you, I mean, that, you know, I think
16  that -- I think that -- you know, pretty much what
17  I told you, that maybe somebody -- some things if
18  you prescribed a lot of medications, that you got
19  a better deal.  But I mean, I didn't think a whole
20  lot more about that than that.
21       Q.   Now, could I ask you to turn to the very
22  first page of the exhibit, and turning now to the

Jan L. Cook, M.D.   CONFIDENTIAL   March 6, 2006
Boston, MA

210

1  second e-mail in the chain, which is from Nancy
2  Marotta to Colleen Fournier.  Do you see that?
3  It's on the very first page of the exhibit, the
4  second e-mail?
5      A.  Oh, this one here (indicating)?  Bottom?
6      Q.  This one right here (indicating).
7      A.  Oh, this --
8      Q.  So the top one is the one-line e-mail.
9      A.  Okay.  All right.
10      Q.  Now, by this point in the e-mail chain
11  you were no longer part of the chain, right?
12      A.  It looks like that.
13      Q.  Who is Nancy Marotta?
14      A.  Nancy, I believe, works in provider
15  services.
16      Q.  And Colleen Fournier?
17      A.  I think Colleen -- I think works in the
18  claim area, but I'm not 100 percent sure of that.
19      Q.  Okay.  Now, if you turn to the fourth
20  paragraph of that e-mail where it starts -- well,
21  it reads, "If we receive a paper claim and the
22  invoice is attached then price the drug to pay

211

1  whichever is less AWP minus 5 percent or the
2  amount on the invoice."
3      A.  Are you still on the second one or...
4      Q.  Yeah.
5      MR. COCO:  Right here (indicating).
6      A.  If you --
7      MR. COCO:  Can you read that again?  She
8  was on the wrong page.
9      MR. MANGI:  Sure.
10      Q.  "If you receive a paper claim and the
11  invoice is attached then price the drug to pay
12  whichever is less AWP minus 5 percent or the
13  amount on the invoice."
14      Do you see that?
15      MR. COCO:  It's this paragraph
16  (indicating).
17      A.  Okay.
18      Q.  Now, is that reflective generally of
19  what BC/BS of Massachusetts' reimbursement policy
20  is with regards to drugs administered in office?
21      MR. COCO:  Objection.
22      A.  I don't know if you would say that's in

212

1  general.  I don't know if I can say that.  I think
2  in this situation that's what they suggested that
3  they do.
4      Q.  Well, in general, is the reimbursement
5  amount paid to physicians in relation to drugs
6  administered in office 95 percent of AWP without
7  exception, or is it, in general, 95 percent of AWP
8  or the bill charge, whichever is less?
9      MR. COCO:  Objection.
10      A.  No.  I think the policy is the AWP minus
11  5 percent.  I think that what they were talking
12  about and if I remember what the issue was on
13  this, was about some drug that didn't have a J
14  code yet.  And those can't -- if they don't have a
15  J code, then they have to be manually processed.
16  I think that's what that is.  I don't know.  I
17  think that's what they're talking about.
18      Q.  Well, this e-mail was then forwarded to
19  you --
20      A.  Yeah.
21      Q.  -- amongst other people, correct?
22      A.  So it says.

213

1      Q.  Okay.  Do you recall receiving this e-
2  mail?
3      A.  Not this particular e-mail, but I recall
4  this discussion with MASCO.
5      Q.  Okay.  And the discussion was about
6  drugs that do not have an assigned J code; is that
7  correct?
8      A.  I believe so.
9      Q.  Okay.
10      (Pause.)
11      MR. MANGI:  Let's mark another document.
12  We'll mark this Exhibit Cook 003.
13      (Exhibit Cook 003, Document Bates-
14  numbered BCBSMA-AWP-12613 - 12614, marked for
15  identification.)
16      Q.  Again, I'll draw your attention to a
17  specific part of the document, but please take
18  your time.
19      A.  Okay.
20      Q.  Let me know when you're ready to
21  proceed?
22      A.  That's okay.

Jan L. Cook, M.D.         CONFIDENTIAL         March 6, 2006
Boston, MA

214

1    Q.  Now, this is a memo to you from James
2  Fanale; is that correct?
3    A.  That's correct.
4    Q.  Do you recall writing this memo?
5    A.  No, but it looks like something I wrote.
6    Q.  Now, I would like to draw your attention
7  first to the second arrowed point entitled
8  "Multiple co-pays for cancer patients undergoing
9  chemotherapy."  Do you see that?
10   A.  Yeah.
11   Q.  Now, it starts with "MASCO's doctors are
12  concerned that patients may be foregoing
13  chemotherapy in the office set because of multiple
14  co-pays."  And then the action item at the end of
15  that paragraph is "Robert to look into BC/BS MA
16  waiving co-pays for outpatient chemotherapy."
17       Do you see that?
18   A.  Yes.
19   Q.  Do you recall that discussion with
20  MASCO?
21   A.  Yes, I do.
22   Q.  What was the issue that was under

215

1  discussion?
2    A.  The issue under discussion, they were
3  concerned that people -- sometimes in cancer
4  therapy somebody would come into the office, let's
5  say five days in a row to receive chemotherapy,
6  something like that, and they were saying that
7  every time they came in, that they were receiving
8  a co-pay, and they thought that that might be --
9  they would have to pay a co-pay and that might be
10  detrimental to them continuing to have
11  chemotherapy.
12   Q.  Well, why would their having to pay a
13  co-pay be detrimental to their getting
14  chemotherapy?
15   A.  Well, their feeling was that because in
16  a lot of cases people think that if people have to
17  pay money, they may make a decision, say I have to
18  pay $25.  Am I going to go or not?  And they were
19  just concerned that people were having a lot of
20  out-of-pocket expenses in regards to their
21  chemotherapy.
22   Q.  And what was -- well, who did MASCO

216

1  communicate that concern to?
2    A.  I think they communicated that concern
3  to me and to Steve Fox and whoever else was at
4  that meeting.  Do I put the attendees of that
5  meeting?  That was at the meeting that was
6  discussed.
7    Q.  And why was this a concern for BC/BS of
8  Massachusetts?
9    A.  Do you mean why are we concerned that
10  they were concerned about that?
11   Q.  Uh-huh.
12   A.  I think we looked into it because
13  obviously we want our members to receive
14  chemotherapy if it's necessary for them.  And we
15  were looking at there a potentially an undue
16  burden in the delivery system if people were
17  having to pay a co-pay for that kind of service.
18   Q.  Now, who is the Robert mentioned in the
19  action item?
20   A.  That's Robert Mandel.
21   Q.  Do you know whether Dr. Mandel did look
22  into waiving co-pays?

217

1    A.  Yes, I believe he did.
2    Q.  And now it says waiving co-pays for
3  outpatient chemotherapy.  What is being referred
4  to there?  Are we talking about a physician office
5  or are we talking about hospital outpatient?
6    A.  I think we were talking all, we were
7  talking all of them.
8    Q.  So the question was whether or not to
9  waive co-pays for chemotherapy regardless of what
10  the site of care is?
11   A.  Correct.
12   Q.  And what was the outcome of that
13  analysis?
14   A.  I think we actually looked into it, and
15  we found out the reason that they were being
16  billed a co-pay was because they were being
17  charged an office visit, and they wouldn't have
18  been charged -- if they weren't charged an office
19  visit, they wouldn't have been billed a co-pay.
20  So I believe, if I'm correct in my memory, that
21  was what it was.  And I can't -- I'm trying to
22  remember if he finally got it okayed that on a

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
                                    Boston, MA

---

**218**

1   Level 1 visit, that -- I can't quite remember the
2   outcome -- that we would waive the co-pay or not
3   for chemotherapy.
4        I don't really quite remember how that
5   came down, the final end, but he was looking at --
6   I think the thing that surprised us was no it
7   wasn't the fact that we were requesting a co-pay
8   for the chemotherapy itself, it was because they
9   were charging an additional office visit they were
10  getting the co-pay.  So that was sort of a
11  different story.
12       Q.  But you don't know what the final
13  conclusion was?
14       A.  I'm trying to remember.  And I can't
15  remember if he got that waived -- if we got it
16  waived for a Level 1 visit or not.  To be honest
17  with you, I just can't remember if it worked out
18  or not.  I know it was a lot of discussion about
19  it.
20       Q.  Okay.  Would you turn to the next page
21  of that document, please --
22       A.  Yeah.

---

**219**

1        Q.  -- paragraph entitled "Pharmacy."
2        A.  Uh-huh.
3        Q.  The third sentence, "MASCO voiced
4   dissatisfaction with AWP minus 5 percent for
5   chemoRX."
6        A.  Uh-huh.
7        Q.  Do you recall this discussion with
8   MASCO?
9        A.  You know, I actually don't on that
10  piece.  I mean, I recall the rest of -- I'm trying
11  to recall what they would have said about that.
12       Q.  Do you know whether this is referring to
13  a general concern, or is it specific to Zometa,
14  which is one of the drugs discussed here.
15            (Witness reviews document.)
16       A.  I can't remember.  I think Zometa --
17  what's this one to this one?  I think Zometa was
18  one of the drugs that they had an issue with and I
19  can't remember if it was more outside -- talking
20  just in general or it was about Zometa and the
21  fact -- you know, this e-mail looks like it
22  followed this (indicating) in that time frame.

---

**220**

1            I think we were working with them on the
2   fact that there were drugs that would become
3   available, and they didn't have J codes available
4   yet and they found that very cumbersome not to
5   have a J code available because it was a lot of
6   manual work.  And they weren't sure about that
7   process, but I believe that was what -- I mean, I
8   really don't remember if it was broader than that
9   or not.
10       Q.  What do you understand the term
11  "chemoRx" to be?
12       A.  Chemotherapy.
13       Q.  So MASCO voiced dissatisfaction with AWP
14  minus 5 percent for chemotherapy?
15       A.  Right.
16       Q.  Okay.  Do you recall having any general
17  discussions with MASCO about whether the AWP minus
18  five rate was sufficient for chemotherapy
19  specifically?
20       A.  You know, I don't recall if we -- I'm
21  smiling because in general everybody always thinks
22  they're underreimbursed, okay?  So I'm trying to -

---

**221**

1   - I really don't recall the specific -- I'm sorry,
2   guys, I don't recall a specific discussion.  I
3   don't know if they thought we should be paying
4   AWP, what they thought.  That might be my
5   suspicion, but I don't recall the exact discussion
6   about what the issue was about the AWP minus 5
7   percent.
8        Q.  It continues, "discussed MASCO
9   participation at P&T committee where appropriate."
10       A.  Yeah.
11       Q.  Do you recall that discussion?
12       A.  Yes.
13       Q.  What was discussed in that call?
14       A.  What was discussed when drugs come up
15  are, like oral agents that you can get in the
16  outpatient setting like some of the oral
17  antiemetics, that they wanted to have some input,
18  and we thought that was appropriate that we would
19  ask them, which we do, when cancer drugs come up,
20  that we would go out to the outpatient pharmacy
21  benefit.  We sort of ask them, "What do you
22  clinically think of this medication?  Do you think

---

Jan L. Cook, M.D.　　　CONFIDENTIAL　　　March 6, 2006
Boston, MA

---

**222**

1 it adds anything?", et cetera?  So we do to this
2 day ask the clinical opinion on new medications
3 that come for outpatient formulary.
4 　　Q.  Does MASCO have a formal role in the P&T
5 process now?
6 　　A.  No.
7 　　Q.  Are any of the outside individuals --
8 you mentioned you sit on the P&T committee --
9 representatives of MASCO?
10 　　A.  I don't believe so.  I don't think we
11 have any oncologists on the committee right now.
12 　　Q.  Have there been oncologists in the
13 committee in the past?
14 　　A.  I can only speak in my tenure.  In my
15 tenure I don't believe so.
16 　　Q.  The outside input that's listed in the
17 P&T process, is that limited to the actual P&T
18 meeting, or does that also carry over into the
19 pharmacy executive committee stage of the process?
20 　　MR. COCO:  Objection.
21 　　A.  What do you mean by that?
22 　　Q.  Well, we discussed earlier that the

---

**223**

1 formulary process has a few stages, right?
2 　　A.  Uh-huh.
3 　　Q.  There's the P&T meeting itself --
4 　　A.  Right.
5 　　Q.  -- and then were the focus clinical, and
6 then there's the pharmacy committee where there's
7 consideration of economic impact. And you had
8 mentioned that at the P&T meeting itself there are
9 some outside doctors who participate, right?
10 　　A.  Correct.
11 　　MR. COCO:  Objection.
12 　　Q.  My question is, is their participation
13 limited to the P&T meeting, or do they also
14 participate in the pharmacy committee meeting that
15 follows?
16 　　MR. COCO:  Objection.
17 　　A.  It's a separate process.  Their input,
18 though -- you know, the minutes of the meeting are
19 used in the second meeting, but people -- like
20 they don't come in live person or they don't call
21 in or anything like that.
22 　　Q.  Okay.  Now, going back to this document,

---

**224**

1 under "Action Item" it says, "Steve to work with
2 Gary Shramek and Kim Olson on AWP issue."
3 　　A.  Yes.
4 　　Q.  Who's the Steve there?
5 　　A.  That's Steve Fox.
6 　　Q.  All right.
7 　　A.  And Gary Shramek was the clinical
8 director of pharmacy at the time.
9 　　Q.  Kim Olson?
10 　　A.  And Kim Olson, I think by that org.
11 chart was probably -- I think she was the director
12 of pharmacy program -- I mean, in terms of she was
13 the person that they all reported up to.
14 　　Q.  What is the AWP issue that they were
15 going to be working on?
16 　　A.  I suppose, looking at this -- and I
17 seriously don't remember the discussion.  It was
18 what we said above, that they were dissatisfied
19 with the pricing for chemotherapy and I'm assuming
20 that Gary was going to talk to Kim about that in
21 terms of what that was.
22 　　Q.  Were you involved in the follow-up?

---

**225**

1 　　A.  I don't remember because I don't
2 remember this discussion, and I was -- I suspect
3 that, you know, what we told them was we, you
4 know, in many cases follow Medicare and this is
5 what Medicare does and this is what we'll do, but
6 I don't remember specifically talking to Kim about
7 that.
8 　　Q.  Okay.
9 　　MR. MANGI:  Let's take a quick break.
10 Off the record.
11 　　(Recess taken.)
12 　　Q.  Are you familiar with the term
13 "specialty pharmacy"?
14 　　A.  Yes, I am.
15 　　Q.  What is your understanding of what a
16 specialty pharmacy does?
17 　　A.  My understanding is that a specialty
18 pharmacy is a pharmacy that might specialize in
19 the delivery of certain types of drugs. And a lot
20 of times they have kind of cool programs
21 associated with them in terms of like waste
22 management, member education, things like that.

---

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

226

1    Q.  Are you aware that BC/BS of
2  Massachusetts implemented a specialty pharmacy
3  program in the 2003/2004 time frame; is that
4  correct?
5    A.  I know Blue Cross/Blue Shield have a
6  specialty pharmacy program, but I don't know when
7  it was implemented.
8    Q.  Let me show you a document, and we'll
9  mark this as Exhibit Cook 004.
10         (Exhibit Cook 004, Document Bates-
11  numbered BCBSMA-AWP-10592 - 10604, marked for
12  identification.)
13    Q.  Take a look at that document, and let me
14  know when you're ready.
15         (Witness reviews document.)
16    Q.  Again, I'll draw your attention to
17  specific portions, but let me know when you're
18  ready.
19         (Witness reviews document.)
20    A.  Okay.
21    Q.  Have you ever seen this document before?
22    A.  I don't remember this specific document,

227

1  no.
2    Q.  Okay.  Do you know when this document
3  was generated?
4    A.  No, I don't.
5    Q.  Let's see if we can figure that out.  If
6  we take a look at Page 10 of the document.
7    A.  Yeah, Page 10.
8    Q.  You'll see that this reflects data from
9  the period January 1st, '02 until 10/31/02?
10    A.  Yes, I see that.
11    Q.  So it would be fair to assume that this
12  document was generated after that time period,
13  right?
14    A.  Pardon?  What?
15    Q.  It's fair to assume this document was
16  generated after that time period since it reflects
17  data for that time period?
18         MR. COCO:  Objection.
19    A.  I don't know.
20    Q.  Well, have a look at Page 13 of the
21  document.  This is a time line.  Do you see that?
22    A.  Yes.

228

1    Q.  And the task list starts with "Establish
2  Specialty Rx Steering Committee," and the target
3  date there is March of 2003, right?
4    A.  Correct.
5    Q.  Okay.  So it's fair to assume this
6  document was generated sometime prior to that,
7  right?
8         MR. COCO:  Objection.
9    A.  I don't know when it was documented
10  because it would have been documented later, too.
11    Q.  Well, you were on this specialty
12  committee at Blue Cross/Blue Shield of
13  Massachusetts, weren't you?
14    A.  I have supported a variety of those
15  committees, yes.
16    Q.  When Blue Cross/Blue Shield of
17  Massachusetts first decided to enter into
18  specialty pharmacy relationships, it had a
19  committee that considered what vendors to contract
20  with and what the parameters of the program would
21  be, correct?
22         MR. COCO:  Objection.

229

1    A.  It has -- can you restate that one more
2  time again?
3    Q.  Sure.  When Blue Cross/Blue Shield of
4  Massachusetts decided to implement a specialty
5  pharmacy program, it had a group of people or a
6  committee that looked at the issue, decided what
7  the parameters of the program would be and who
8  they would contract with, right?
9    A.  I think they had a variety of committees
10  that looked at that topic.
11    Q.  Is there a specific committee tasked
12  with the specialty pharmacy implementation?
13    A.  Implementation?
14    Q.  Strategizing and then implementation.
15         MR. COCO:  Objection.
16    A.  I don't remember, but I suspect there
17  was.
18    Q.  Are you aware that prior witnesses have
19  testified there was a committee and you were on
20  it?
21    A.  No, I'm not aware that they testified
22  that.

Jan L. Cook, M.D.      CONFIDENTIAL      March 6, 2006
Boston, MA

230

1    Q.  Do you know what the eventual decision
2  was in terms of what drugs would be supplied
3  through specialty pharmacies and what drugs would
4  not?
5    A.  Am I aware that what drugs were to be
6  supplied to specialty?  Yes, I am.
7    Q.  Is it correct that -- am I correct that
8  the eventual decision that was reached was to
9  exclude physician-administered drugs from the
10  parameters of the specialty pharmacy program that
11  was initially implemented?
12    A.  I think -- I'm not -- I don't think that
13  -- I don't know if that was exactly what the
14  decision was made.  I think the decision was made
15  to look at -- I think it was more complex than
16  that, and I'm not sure --
17    Q.  Well, perhaps I can assist by rephrasing
18  the question.
19    A.  Yeah.
20    Q.  Am I correct that when a specialty
21  pharmacy was first implemented, physician-
22  administered drugs were not subject to it?

231

1    A.  I believe so.
2    Q.  Now, I would like you to turn to Page --
3  well, the Page Bates-numbered 10598.  The page is
4  entitled "Specialty Pharmacy, Categories of
5  Injectables."  Do you have that page?
6    A.  Uh-huh.
7    Q.  The bottom bullet says "Physician
8  Administered Oncology Medications Examples:.
9  Chemotherapy, Antiemetics."  The subbullet says
10  "1/26 New York Times article - Physicians are able
11  to obtain discounts as high as 86 percent on
12  medications.  Plan reimbursement to providers for
13  medication is in the range of AWP minus 5
14  percent."
15    Do you see that?
16    A.  Yes, I do.
17    Q.  Now, it's fair to say since this is part
18  of the documentation generated in considering the
19  specialty pharmacy issue, that Blue Cross/Blue
20  Shield of Massachusetts was aware of this at the
21  time that it decided to exclude a specialty
22  pharmacy -- physician- administered from the ambit

232

1  of its specialty pharmacy program?
2    MR. COCO:  Objection.
3    Q.  Do you agree with that?
4    A.  I don't know.  I can't say what Blue
5  Cross/ Blue Shield of Massachusetts was aware of.
6    Q.  Well, this is a Blue Cross/Blue Shield
7  of Massachusetts document, isn't it?
8    A.  It looks like it.
9    MR. COCO:  Objection.
10    Q.  Assuming that it is a Blue Cross/Blue
11  Shield of Massachusetts document since someone at
12  the company generated it, they were aware of this
13  information, right?
14    MR. COCO:  Objection.
15    A.  You know, I don't know who -- this
16  doesn't have any of the markings of -- I don't
17  know who generated this document, and I don't know
18  -- I mean, you're asking me something I don't
19  know.
20    Q.  Okay.  Let me make it easier.
21    A.  Okay.
22    Q.  I'll ask you to assume that this

233

1  document has been produced by the files of Blue
2  Cross/Blue Shield of Massachusetts, okay? Assuming
3  that to be true, we can agree, can't we, that at
4  the time the specialty pharmacy program was being
5  planned, this document was generated, someone at
6  Blue Cross/Blue Shield of Massachusetts was aware
7  of the facts reflected in this document?
8    MR. COCO:  Objection.
9    Q.  We can agree about that, can't we?
10    MR. COCO:  Objection.
11    A.  I think somebody prepared this document.
12  How's that?  But I don't remember this specific
13  document, and I can't say -- but if this comes
14  from Blue Cross/Blue Shield, obviously somebody
15  prepared this document.
16    Q.  And I'm correct, aren't I, that the --
17  that physician-administered drugs were not made
18  part of this scope of the specialty pharmacy
19  program?
20    MR. COCO:  Objection.
21    A.  The specialty pharmacy program is sort
22  of an ongoing program, and so --

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                              Boston, MA

234

1      Q.  To date have physician-administered
2  drugs been suggested to the specialty pharmacy
3  program?
4      A.  I don't believe so.
5      Q.  Now, turning over the next page, which
6  is Page 8 of the document, the page entitled
7  "Chronic Disease states and examples of some of
8  the leading pharmaceutical treatments." And there
9  are a number of physician- administered drugs
10 listed here, such as Remicade.  Do you see that?
11     A.  I see Remicade.
12     Q.  So Blue Cross/Blue Shield of
13 Massachusetts did consider the range of physician-
14 administered drugs that are being administered in
15 the market, including Medicaid -- including
16 Remicade, right?
17         MR. COCO:  Objection.
18     A.  I think these drugs can be -- they can
19 be administered in more than one setting, so I
20 wouldn't call them -- but they did consider
21 Remicade, yes.
22     Q.  I mean, let's stick with the example we

235

1  have.  Are you aware that Remicade is exclusively
2  physician-administered and not a self-administered
3  drug?
4      A.  It's not self-administered, but it can
5  be administered in a hospital or an outpatient,
6  you know, clinic.  It could even be potentially
7  home infusion.
8      Q.  And let me ask you to turn also to Page
9  Bates numbered 10601.
10     A.  10601.
11     Q.  Which is the data analysis?
12     A.  Look like this (indicating)?
13     Q.  Yeah.  Now, this is pharmacy claims for
14 all products.  Does this reflect the relative
15 percentages of the total drug span on specialty
16 drugs for Blue Cross/Blue Shield of Massachusetts?
17         MR. COCO:  Objection.
18     A.  I don't know because I didn't produce
19 this data.
20     Q.  My question is, looking at this, do you
21 know what this data is?
22         MR. COCO:  Objection.

236

1      A.  If I look at it, I see what it says.
2  Specialty pharmacy data analysis.
3      Q.  Okay.
4      A.  But I don't know if that is the total
5  sum of all -- I don't know.
6      Q.  Okay.  Based on your own experience in
7  dealing with providers who are in Blue Cross/Blue
8  Shield of Massachusetts network, do you have any
9  way of assessing whether or not these figures
10 would accurately reflect the percentages of those?
11         MR. COCO:  Objection.
12     A.  I don't know.
13     Q.  For the record, I would ask that the
14 custodian of this document be identified.
15         MR. MANGI:  Let's mark another document.
16 This is going to be Exhibit Cook 005.
17         (Exhibit Cook 005, Document Bates-
18 numbered BCBSMA-AWP-12679 - 12680, marked for
19 identification.)
20     Q.  Now, what is the specialty committee
21 that's referred to in "Specialty Committee
22 Meeting" in the heading?

237

1          MR. COCO:  Objection.
2      A.  What is the specialty committee?
3      Q.  Right.
4      A.  You mean, what is the specialty
5  committee meeting?
6      Q.  Was this a -- by "specialty committee,"
7  is it a committee dealing with a particular
8  experiment, or is it something else?
9          MR. COCO:  Objection.
10     A.  It's a -- this was a meeting -- the
11 regional medical directors have meetings with
12 various specialty groups.
13     Q.  Okay.
14     A.  And that is sort of like a generic term
15 for identifying this type of meeting.
16     Q.  Okay.  And it says here that this is a
17 follow-up to the routine spring specialty meeting?
18     A.  Yes.
19     Q.  So were there annual meetings with
20 MASCO, which is the group at issue here?
21         MR. COCO:  Objection.
22     A.  We try to touch base and -- at least

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

238

1  this was -- we try to touch base like once or
2  twice a year to see what's going on.
3      Q.  Now, under "Specialty Pharmacy" this
4  minutes says, "The group does not believe
5  specialty pharmacy, as they have experienced it,
6  will be successful with oncology patients."  And
7  then it goes on to list certain barriers that the
8  group perceived.
9      Do you see that paragraph?
10     A.  Yes, I do.
11     Q.  Were these some of the considerations
12 that Blue Cross/Blue Shield of Massachusetts
13 factored in to its decision in determining the
14 parameters of the specialty pharmacy program?
15     MR. COCO:  Objection.
16     A.  I think that what the oncologists had to
17 say was taken into account for oncology medication
18 and what some of the things that would have to be
19 addressed by a specialty pharmacy program in
20 oncology.
21     Q.  Do you recall any specific discussions
22 at Blue Cross/Blue Shield of Massachusetts as to

239

1  whether or not an oncology drug should be included
2  in the specialty pharmacy program?
3      MR. COCO:  Objection.
4      A.  I think in the specialty pharmacy
5  program we've talked about all kinds of
6  medications, including oncology medications,
7  urology medications.
8      Q.  Why was a decision made not to include
9  oncology physician-administered drugs within the
10 parameters of the program?
11     MR. COCO:  Objection.
12     A.  Well, I don't know why the decision was
13 made, but I can tell you what I contributed to the
14 discussion.
15     Q.  Okay.
16     A.  And that would be these points that
17 would have to have been addressed and discussed.
18 Because these were the concerns that -- if as far
19 as MASCO at that point in time -- if one was to do
20 a specialty pharmacy program with them, these are
21 the things that we would have to be able to
22 address with a specialty pharmacy program.  So

240

1  that was one piece, I think of the decision
2  making.
3      Q.  Okay.  So one piece of the decision was
4  communications of concerns from MASCO and other
5  provider oncology groups, right?
6      MR. COCO:  Objection.
7      A.  I think people heard their input.  I
8  don't know how much that weighed into the decision
9  -- you know, what the weight that went into the
10 decision not to do it at that point in time.
11     Q.  It was one of the factors into the
12 decision?
13     A.  I think it was one of the factors
14 discussed.
15     Q.  Were there other factors that went into
16 that decision?
17     MR. COCO:  Objection.
18     A.  I think one of the things that people
19 discussed as being important would be because, as
20 we said before, our pricing was different across
21 the network in terms of that, you know, we talked
22 about this methodology, the AWP minus 5 percent

241

1  for physicians' offices, that the pricing in the
2  hospital outpatient setting was different. And so
3  one of the things that -- I think that was
4  something that was discussed in terms of
5  implementing these -- implementing specialty
6  pharmacy programs for the physician-based
7  medications, particularly the oncology-based
8  medications.
9      Q.  Well, why does that -- why was that
10 difference relevant to the continuation of
11 specialty pharmacies?
12     MR. COCO:  Objection.
13     A.  You mean, why were we discussing that?
14     Q.  Well, my question was -- well, withdraw
15 that.
16     I just asked you to describe the other
17 factors that were involved in the decision not to
18 include oncology drugs within the scope of this
19 program, right?
20     A.  Yes. Yeah.
21     Q.  And your answer pointed to the fact that
22 there are different reimbursements in hospital

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

242

1  outpatient departments --
2      A.  Right.
3      Q.  -- versus physicians' offices?
4      A.  Right.
5          MR. COCO:  Objection.
6      Q.  My question was, why was that difference
7  relevant?  How was it pertinent to the decision
8  whether or not to implement -- include these drugs
9  in the scope of the specialty pharmacy program?
10         MR. COCO:  Objection.
11     A.  We felt it was relevant, because if you
12 notice on the last thing that they -- indeed that
13 the group in the past -- that Harvard Pilgrim, one
14 of the other payers, had put in a specialty
15 program and it hadn't been successful.  And what
16 happened was that the care -- I'm not really sure
17 in that case if they continued to deliver the care
18 that -- for temporarily care was moved back into
19 the hospital setting.  But one of the things --
20 thoughts would be that if one was going to do
21 specialty pharmacy, one of the things to be
22 considered was all the site of service that

243

1  chemotherapeutic care could be given and trying to
2  make sure that the pricing was somewhat similar
3  across those sites of service.
4      Q.  So the concern was that if the program
5  were implemented in the form that was being
6  considered, the patients may be moved from the
7  physician office to hospital outpatient
8  departments?
9          MR. COCO:  Objection.
10     A.  I think because the group -- just
11 relating these conversations we had, had such a
12 negative experience in the past with specialty
13 pharmacies, the discussion was that these issues
14 would have to be addressed and if they said we
15 choose not to participate in those specialty
16 pharmacy initiatives, then care would be delivered
17 in the hospital setting.  And so we wanted to make
18 sure that the pricing in the hospital setting was
19 going to be -- you know, would be reasonable to --
20 or it would be on par to have care delivered in
21 that site.
22     Q.  Okay.  So that was another concern that

244

1  was put forward in terms of the consideration of
2  this issue?
3          MR. COCO:  Objection.
4      A.  It was another thing that was discussed.
5      Q.  Right.  Anything else?
6      A.  I think those are -- I think the big
7  concern was -- I think those were the big concerns
8  that basically the group's experience in these
9  issues, which are reasonable issues to be
10 addressed, you know, same side of -- you know,
11 same day administration, wastage, et cetera, and
12 then the issue about the hospitals.
13     Q.  Let me show you another document.
14         MR. MANGI:  We'll mark this as Exhibit
15 Cook 006.
16         (Exhibit Cook 006, Document Bates-
17 numbered BCBSMA-AWP-10608, marked for
18 identification.)
19     Q.  Now, this is -- these are minutes from
20 the provider financial strategy work group where
21 you're listed -- actually, you're not listed as an
22 attendee, you're discussed in the text in the

245

1  bottom paragraph.  Do you see that?
2          (Witness reviews document.)
3      A.  Yes, I see that.
4      Q.  Okay.  Now, what's being discussed here
5  is whether BC/BS of Massachusetts would follow
6  Medicare's lead and implement the same change for
7  BC65.  What is that issue?
8      A.  BC65 was Blue Care 65.  That was our
9  managed Medicare product.  I wasn't at this
10 meeting, so reading from this minutes it says that
11 they would think about following Medicare -- this
12 proposal on AWP for the Blue Care 65 products.
13     Q.  It says here that "Deb will discuss this
14 issue with Jan Cook" --
15     A.  Yeah.
16     Q.  -- "to determine if Jan has committed to
17 a dialogue with oncologists prior to the external
18 communication of this change."
19         Do you recall having that discussion
20 with Deb?
21     A.  No, not this -- no, not particularly.
22     Q.  And the Deb at issue there is Deb

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                              Boston, MA

---

246

1   Deveaux, right?
2       A.  Yes, I believe so.
3       Q.  Do you recall whether or not the change
4   was implemented for the BC65 program?
5       A.  I don't believe it was.
6       Q.  So the reimbursement rate for the BC65
7   program, which is the managed Medicare program,
8   remained at 95 percent of AWP even when Medicare
9   moved to 85 percent of AWP; is that correct?
10      A.  I believe so.
11      Q.  Has it remained at that rate today?
12      A.  The product doesn't exist anymore, so...
13      Q.  When did the product cease to exist?
14      A.  Good question.  It recently changed, I
15  would say, in 2005.  I'm not sure of the date. The
16  product is no longer.  It's changed names, and
17  because of Medicare Part D, you know, a lot of
18  this has changed in terms of that.
19      Q.  Why was the reimbursement rate not
20  changed for BC65 product?
21      A.  That, I don't know particularly.  I
22  mean, I don't know what the discussion they had in

---

247

1   regards to that.  I wasn't privy to that, why they
2   decided not to do that.
3       Q.  Well, one of the issues that it's saying
4   Deb is going to talk to you about is dialogue with
5   oncologists, right?
6       A.  Correct.
7       Q.  Okay.  Was dialogue with oncologists
8   part of the consideration?
9           MR. COCO:  Objection.
10      A.  I don't know what they discussed,
11  because they didn't invite me to this discussion,
12  so I don't know what they --
13      Q.  Do you know whether or not Deb did speak
14  to you?
15      A.  I don't remember her -- Deb speaks to me
16  all the time.  I don't remember her speaking --
17  for me for this meeting, no, not particularly.
18      Q.  Do you recall conveying any input to Deb
19  or anyone else in the PFSW as to whether or not
20  BC65 should or should not move from 95 to 85
21  percent for AWP?
22      A.  John Fallon listed on this is my boss,

---

248

1   and I surely would have said to him that -- I
2   would have communicated the concerns expressed in
3   this memo, but no one -- I don't believe anybody
4   asked me specifically --
5       Q.  Which concerns are you referring to?
6       A.  This (indicating).
7       Q.  Well, the concerns listed there are in
8   relation to specialty pharmacy programs, aren't
9   they?
10      A.  Yeah.  Okay.  I would have talked to
11  them about what my relationship -- my boss knew
12  what my relationship was with this MASCO, what we
13  were talking about, what we were communicating
14  with.  We did commit to them to have ongoing
15  discussions with them in terms of informing them
16  of anything that we were going to do prior to
17  doing it.
18      Q.  Well, I mean, the issue under
19  consideration here is changing the BC65 rate from
20  95 to 85 percent of AWP, right?
21          MR. COCO:  Objection.
22      A.  I mean, that's what it says in here,

---

249

1   this document.
2       Q.  Do you recall providing -- conveying any
3   input from MASCO oncologists as to that issue?
4       A.  About Blue Care 65?
5       Q.  Right.
6       A.  No.
7       Q.  Or about the move from 95 to 85 percent
8   of AWP?
9       A.  No, I don't recall that.
10          MR. MANGI:  Let's mark another document.
11  This is going to be Exhibit Cook 007.
12          (Exhibit Cook 007, Confidential
13  document headed "Analysis of CMS Average Wholesale
14  Price Reform Reimbursement for Part B Drugs," no
15  Bates stamp, marked for identification.)
16      Q.  Take a look, and let me know when you're
17  ready to proceed.
18          (Witness reviews document.)
19          MR. NOTARGIACOMO:  Just while she's
20  reviewing it, I notice that this one wasn't Bates
21  stamped.
22          MR. MANGI:  Yeah this one was produced

---

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

---

250

1  electronically on a CD. It was printed out
2  without Bates numbers.
3      MR. NOTARGIACOMO: The CD was labeled
4  private and confidential, correct?
5      MR. MANGI: I'm not sure, but I'm happy
6  to take your word for it.
7      MR. SKWARA: Okay. But we would like to
8  have this deemed confidential.
9      MR. MANGI: Off the record.
10 BY MR. MANGI:
11     Q. Okay. Are you familiar with this
12 document, Dr. Cook?
13     A. No, I'm not.
14     Q. Do you have -- you have no recollection
15 of ever having seen this before?
16     A. I don't recall this specific document.
17     Q. I'm going to ask you to turn to Page 12
18 of the document?
19     A. Which Page 12?
20     Q. The pages are on the right-hand side?
21     A. You mean the page, not the drug -- you
22 mean the front part?

---

251

1      Q. Where it says "Option 1."
2      A. Yeah.
3      Q. You'll see on that page and then the
4  succeeding pages there are four different options
5  that are discussed?
6      A. Yes.
7      Q. I understand that you haven't seen this
8  document before, but do you recall discussion
9  about these options?
10     A. I remember discussed -- not necessarily
11 organized quite like this, but I remember people
12 discussing these options.
13     Q. Well, Option 1 is "Move to CMS ASP with
14 changes in Admin. Fees," right? That's at the top
15 of the page?
16     A. That's what it says, yes.
17     Q. Now there's a listing here of cons. Is
18 it your understanding that these are some of the
19 factors that were weighed in deciding whether or
20 not to adopt this option?
21     MR. COCO: Objection.
22     A. I don't know because I don't think I was

---

252

1  at this meeting. I can just tell you what it says
2  here.
3      Q. I'm asking you, based on the general
4  discussions that you did have around this topic,
5  do you recall these being issues that were
6  discussed?
7      A. I think these were some of the issues
8  that were discussed at the time.
9      Q. One of the issues that was discussed was
10 a resistance to the change by network, right? And
11 that corresponds to some of the concerns you
12 described earlier that were voiced by MASCO,
13 right?
14     MR. COCO: Objection.
15     A. Well, I don't know what it means because
16 -- I don't know what it means in terms of is it
17 just specific to MASCO or was it to other network
18 concerns.
19     Q. What's your understanding of the next
20 bullet, which is "Potential shift to facility
21 setting (Oncologists)"?
22     MR. COCO: Objection.

---

253

1      A. That's what you and I were discussing
2  before that if the oncologists decided not to
3  deliver chemotherapy in their office, that where
4  would these folks receive chemotherapy.
5      Q. Do you know which of these options was
6  implemented, which of these four options, if any?
7      A. I think -- I think that now -- well, I
8  think that now we're still at Option 3, but I
9  don't know if that was -- you know, if that was a
10 temporary --
11     Q. Are you familiar with an entity called
12 R.J. Health?
13     A. I may have vaguely heard of that name
14 before.
15     Q. Do you know whether or not Blue
16 Cross/Blue Shield of Massachusetts purchases AWP
17 schedules from R.J. Health?
18     A. I don't know.
19     Q. So is the answer that you think it was
20 Option 3, but you're not sure?
21     A. If you asked me what our current -- I
22 can tell you what I think our current policy is,

---

Jan L. Cook, M.D.            CONFIDENTIAL            March 6, 2006
                              Boston, MA

254

1  and our current policy is 3. So I don't know what
2  the discussion at -- if this discussion, because I
3  wasn't at this meeting, was tabled, if there was a
4  future plan made. What I can only tell you is
5  what today -- what's happening today.
6      Q.  Well, are you aware that that's
7  inconsistent with testimony from prior BC/BS
8  witnesses who indicated that BC/BS of
9  Massachusetts' new purchasing fee schedules that
10 are AWP- based from R.J. Health?
11     MR. COCO:  Objection.
12     A.  How is that inconsistent?
13     Q.  Well, if you look at Option 3, the
14 option is maintaining current 95 percent off 2004
15 AWPs?
16     A.  Oh, okay.
17     Q.  And the cons are stagnant -- include
18 stagnant drug fees, in other words, reimbursement
19 would be frozen?
20     A.  Then I made an error because I wasn't
21 focusing on the 2004. What I was speaking to was
22 that I think we're still paying 95 percent of AWP.

255

1  On which fee schedule or what AWP listing, that I
2  don't know.
3      Q.  Now, looking at these options, is it
4  fair to say that Blue Cross/Blue Shield of
5  Massachusetts did not consider shift -- pulling
6  Medicare to the AWP-based methodology but not also
7  increasing administration fees? That wasn't
8  something that was even considered, right?
9      MR. COCO:  Objection.
10     A.  I don't know if that was considered or
11 not.
12     Q.  Okay. Well, I mean, let's look at the
13 options. Option 1 is changing the admin. fees and
14 moving to ASP, right?
15     A.  Right. That's what it says.
16     Q.  Option 2 is a budget neutral change
17 which would involve applying a multiplier to the
18 CMS ASP fees so that the change would be budget
19 neutral, so that there would be no change in the
20 overall amount reimbursed. Do you see that?
21     A.  I see that.
22     Q.  Okay. And there would be no changes to

256

1  the admin. fee, but the drug reimbursement would
2  be multiplied, right? And that's at the top of
3  the page?
4      MR. COCO:  Objection.
5      A.  Okay.
6      Q.  The third option is the one we discussed
7  which is frozen rates, right?
8      MR. COCO:  Objection.
9      Q.  Do you see that?
10     A.  I see Option 3.
11     Q.  And the fourth option is getting J codes
12 from an outside vendor. Do you see that?
13     A.  I see that.
14     MR. COCO:  Objection.
15     Q.  Okay. Now, are you aware of any options
16 that were discussed other than these four?
17     MR. COCO:  Objection.
18     MR. MANGI:  What's the basis for the
19 objection to that?
20     MR. COCO:  She's -- first of all, lacks
21 foundation. She's previously testified that she
22 was not present at the meeting in which this

257

1  document you're referring to was generated.
2  Second, your question was, Are you aware of
3  discussions? You have not specified discussions
4  with who.
5      MR. MANGI:  That's not the question.
6      Q.  The question was, are you aware of any
7  options other than these four that were
8  contemplated?
9      MR. COCO:  Excuse me, could you go back
10 to the record to read his previous question to
11 which I objected, please?
12     MR. MANGI:  I'm happy to do that if
13 you're happy to have the witness stick around
14 after 3:50. Why don't we do it after the
15 deposition's done.
16     Q.  Let me rephrase the question: Are you
17 aware of any discussion of any options other than
18 these four you've listed here?
19     MR. COCO:  Objection.
20     A.  No, but I'm also not aware of all these
21 options, either.
22     Q.  Okay. Do you know who was responsible

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

258

1  for making the ultimate decision as to whether or
2  not to shift methodologies?
3      A.  No, I do not.
4      Q.  Okay.
5          MR. MANGI:  Let's mark the next
6  document.
7          (Exhibit Cook 008, Document Bates-
8  numbered BCBSMA-AWP-12576 - 12587, marked for
9  identification.)
10     Q.  Now, this is a -- the cover page is an
11 e-mail from John Killion?
12         MR. NOTARGIACOMO:  Do you have an extra
13 copy?
14         MR. MANGI:  Oh, sorry.
15     Q.  From John Killion to you dated Feb. 7 of
16 '05.
17         (Witness reviews document.)
18     A.  Okay.
19     Q.  So you did receive this presentation
20 from Mr. Killion on Feb. 7th, 2005, correct?
21     A.  I don't remember receiving it.
22     Q.  Okay.  Now, I note that the date on the

259

1  attachment to this e-mail, December 15th, 2004,
2  which is on the attached analysis, do you see
3  that?
4      A:  Huh?  I don't --
5      Q.  December 15th, '04?
6      A.  Oh, yeah, December 15th, 2004.
7      Q.  You see that's different from the date
8  on the version of this that we've marked as the
9  previous exhibit?
10     A.  Okay.
11     Q.  That's Feb. 7th, '04, right?
12     A.  Previous exhibit was February 7th, 2004,
13 and this one is December 15th, 2004.
14     Q.  Right.  Do you know whether or not this
15 analysis was ongoing throughout the period from
16 February to December of 2004?
17     A.  I don't know.
18     Q.  Do you know whether discussions
19 pertaining to this issue were ongoing throughout
20 that period?
21     A.  I don't directly know, no.
22     Q.  Do you recall in what period this issue

260

1  was being discussed?
2      A.  I think that -- I could say that we're
3  always talking about specialty pharmacy drugs, and
4  I think we're always talking sort of ongoing.
5      Q.  So the discussion was and remains
6  ongoing as to consideration of different
7  methodologies in light of all the information
8  that's available?
9          MR. COCO:  Objection.
10     A.  I would say periodically this is
11 discussed, specialty pharmacy's an ongoing
12 consideration.  Whether people are talking about
13 this every day or periodically.
14     Q.  Well, the issue there is not specialty
15 pharmacies, the issue there is moving to an ASP-
16 based methodology, correct?
17     A.  I don't -- yeah, I don't know when the
18 last time we've talked about this exactly was.  I
19 don't remember.
20     Q.  Well, when you said it's an ongoing
21 discussion, are you aware of that discussion
22 continuing?

261

1      A.  Personally, no.
2          MR. MANGI:  Let's mark Exhibit Cook 009.
3          (Exhibit Cook 009, Document Bates-
4  numbered BCBSMA-AWP-12589 - 12590, marked for
5  identification.)
6      Q.  Take a look at that, and let me know
7  when you're read did to proceed, please.
8      A.  Okay.
9      Q.  Now, do you recall this e-mail?
10     A.  No, I don't.
11     Q.  What's the issue that's under discussion
12 in that e-mail?
13     A.  The issue under discussion is the
14 prescription drug bill that the federal government
15 passed reimbursing physicians for drugs
16 administered in their office.
17     Q.  Okay.  Now, the bottom e-mail is a
18 communication from a urologist to Dr. Fallon; is
19 that correct?
20     A.  Correct.
21     Q.  And the urologist is expressing concern
22 about the change in the government's methodology

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                              Boston, MA

262

1   and urging BC/BS of Massachusetts to, quote "Leave
2   your policy as is and continue to reimburse us at
3   the same schedule as before," right?
4       A.  You're reading that, yes.
5       Q.  Right.  Now, when Dr. Fallon forwards
6   this on to you, he says "yet another Sunday night
7   e-mail."  Do you see that?
8       A.  Yeah, he's going to love that.  Yes.
9       Q.  What was he referring to when he said he
10  had another Sunday night e-mail?
11      A.  My boss has a wonderful sense of humor,
12  and as you all do, he works a lot, all the time.
13  And physicians will e-mail him seven days a week.
14  So I think he was sharing some humor with me and
15  saying, "Jan, I have just another e-mail here."
16      Q.  When he says "yet another Sunday night
17  e-mail," is he referring to the fact that it's
18  just another e-mail he got on a Sunday, or is he
19  referring to it being yet another communication
20  from a physician on this topic?
21      MR. COCO:  Objection.
22      A.  I don't know.

263

1       Q.  Do you recall communications of this
2   kind, other than this one?
3       A.  No, I don't.
4       Q.  Okay.  So this is the only communication
5   you're aware of from a physician directly to Blue
6   Cross/Blue Shield of Massachusetts urging the
7   company not to follow CMS moving to ASP?
8       MR. COCO:  Objection.
9       A.  Oh, I didn't see that.
10      Q.  Are you aware of other communications
11  from physicians to Blue Cross/Blue Shield of
12  Massachusetts urging them not to move to an ASP-
13  based methodology?
14      A.  No, not directly, no.
15      Q.  So this is the only communication of
16  this kind that you've seen?
17      A.  If you phrase it that way, yes.
18      Q.  Okay.  Are there communications dealing
19  with this issue you're familiar with in a
20  different form or a different format?
21      A.  Do you mean -- are you meaning would
22  physicians be talking to us about this issue in a

264

1   different format, particularly?
2       Q.  Yeah.
3       A.  I would suspect -- I don't remember any
4   specific communications, but people call us and
5   talk to us on the phone, people talk to us on the
6   street, so in general, people -- there are a lot
7   of different ways people communicate with us.  I
8   don't remember any specific communication,
9   specific letters or specific e-mails, but the
10  reference is in here that -- he references in here
11  that he saw in our newsletter that communication
12  that we had sent out.
13      Q.  Where were you referring to that?
14      A.  In the second paragraph where he said --
15  boy, that's bad grammar -- "I read through your
16  newsletters that you are trying to decide what to
17  do with your own policy."
18      Do you see that?
19      Q.  Now, do you recall any conversations,
20  oral conversations or phone conversations, with
21  physicians dealing with similar issues?
22      MR. COCO:  Objection.

265

1       A.  The only phone conversation I recall
2   which was striking to me was someone called me to
3   tell me they couldn't find a drug at the ASP price
4   in Massachusetts.  A physician did.  That was in
5   the last year or so.
6       Q.  "Couldn't find a drug at the ASP price,"
7   what do you mean by that?
8       A.  Yes, that's exactly what they said.
9       Q.  Well, did they mean by that they
10  couldn't find what the ASP was, or did they mean
11  that they couldn't find a drug available for
12  purchase at that rate?
13      A.  My assumption was what you just said,
14  the latter.
15      Q.  Okay.  So the physician was saying that
16  they could not purchase the drug at the ASP rate?
17      A.  That's correct.
18      Q.  What was your response to that?
19      A.  We don't use ASP.  We pay AWP minus 5
20  percent.
21      Q.  Okay.  Who was that communication from?
22      A.  It was a physician that called me, and I

Jan L. Cook, M.D.                    CONFIDENTIAL                    March 6, 2006
                                      Boston, MA

---

266

1  don't remember his name.
2      Q.  Were concerns of the type expressed by
3  this urologist part of the factors that were
4  considered in deciding whether or not to move to
5  an ASP-based methodology?
6          MR. COCO:  Objection.
7      A.  I didn't make the decision, so I don't
8  know how things were weighted.  Are you asking --
9      Q.  I'm asking, was it one of the factors
10 that was considered?
11         MR. COCO:  Objection.
12     A.  I don't know what was considered, since
13 I didn't make the decision.
14     Q.  Let me phrase it another way.
15     A.  Okay.
16     Q.  Was this communication part of what you
17 discussed with others at the company as
18 potentially relevant to the determination as to
19 whether or not to move to ASP?
20     A.  You mean this communication or any
21 communication -- like MASCO or anything?
22     Q.  Both.

---

267

1      A.  Sure.
2          MR. MANGI:  Let's mark this document
3  Exhibit Cook 010.
4          (Exhibit Cook 010, Document Bates-
5  numbered BCBSMA-AWP-10609 - 10610, marked for
6  identification.)
7      Q.  Would you take a look at that document,
8  please, and let me know when you're ready.
9          (Witness reviews document.)
10     A.  Okay.
11     Q.  Now, what is the provider financial
12 strategy workgroup in general?
13     A.  It's a corporate committee with folks
14 from all different departments who sit and talk
15 about various financial issues that affect our
16 provider payments.
17     Q.  Do you ever participate in that work
18 group's meetings?
19     A.  I may have on one or two occasions sat
20 in for one of my bosses, but I'm not a standing
21 member of this committee.
22     Q.  Now, if you look at the second entry for

---

268

1  universal fee schedule?
2      A.  Correct.  Okay.
3      Q.  The second entry, "Sales (Steve Booma)
4  suggested that we would benefit from having
5  strategic negotiations by entity and geographic
6  location because that way we would not be leaving
7  money on the table."
8          Do you see that?
9      A.  I see that.
10     Q.  Do you have an understanding as to what
11 the issue is that Mr. Booma is referring to there?
12     A.  No, I don't.
13     Q.  Okay.  Do you know whether or not there
14 has been any strategic negotiation with specific
15 providers since this meeting was held in April of
16 2004?
17     A.  No, I don't.
18     Q.  Is it your understanding that there has
19 been no provider-specific negotiation?
20         MR. COCO:  Objection.
21     A.  I don't know anything about -- I don't
22 really get involved with provider negotiations, so

---

269

1  I don't know what they've been -- what they
2  specifically have been doing.  Let's put it this
3  way:  My role is very limited in any kind of
4  provider negotiations, but I don't know direct
5  knowledge of that.
6      Q.  You said earlier one of your
7  responsibilities is supporting provider
8  contracting, right?
9      A.  That's correct.
10     Q.  What do you mean by that?
11     A.  When -- provider contract is negotiating
12 with a hospital.  That's usually what it would be,
13 a hospital entity.  Sometimes they -- or maybe
14 even like a large group, they might ask me to
15 participate in a small portion of the discussions
16 that are relevant around clinical issues.
17     Q.  Okay.
18     A.  So if there was something clinical like
19 performance metric on the table or there was a
20 clinical issue the group brought in, the
21 contracting team might ask me to come in and
22 discuss that issue.

---

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

270

1    Q.  Okay.  So is your only involvement with
2  the provider contracting in relation to dealing
3  with clinical issues?
4    A.  Pretty much so.
5    Q.  Do you ever get involved in
6  reimbursement- related issues?
7    MR. COCO:  Objection.
8    A.  Reimbursement as it might relate to a
9  clinical issue?
10    Q.  Well, do you ever get involved in
11  discussions as to the amount of reimbursement?
12    A.  I always hear about the amount of
13  reimbursement, but I mean, somebody might -- a
14  clinical group or let's say a hospital might say
15  we don't think -- we think that this procedure or
16  this device should be covered outside the DRG.  I
17  mean, I would be involved --
18    Q.  Well, let me focus you on physician
19  practices.
20    A.  Okay.
21    Q.  Do you ever get involved in discussions
22  with physician practices as to the amount of

271

1  reimbursement that they received?
2    A.  The only time I get involved -- not on a
3  practice level per se, no.
4    Q.  And was it your testimony that you have
5  no understanding as to what Mr. Booma is referring
6  to here when he talks about not leaving money on
7  the table?
8    MR. COCO:  Objection.
9    A.  I didn't hear this conversation, so I'm
10  not going to speculate about what he was talking
11  about.
12    Q.  Well, my question is, do you understand
13  what he's talking about, regardless of whether you
14  were involved in the discussion or not?
15    MR. COCO:  Objection.
16    A.  Frankly, no, I don't know what he was
17  talking about.
18    Q.  Okay.
19    A.  I know what it means to leave money on
20  the table, but I don't know what he meant in that
21  situation.
22    MR. MANGI:  Let's take just a minute or

272

1  two, and I'll try and dig up what else we have
2  left to get you out in time.
3    THE WITNESS:  Thank you.  I appreciate
4  that.
5    (Recess taken.)
6    Q.  Now, do you know Lisa Gorman?
7    A.  Yes, I do.
8    Q.  Okay.  What is your understanding of Ms.
9  Gorman's role at the company?
10    A.  She's a provider relations manager.
11    Q.  Did she deal with a particular provider
12  or particular region?
13    A.  I'm sure she does, but I'll be darned --
14  I'm trying to think if she's in charge of the
15  south.  Her job's changed over the year, so I'm
16  not exactly sure.  I think she's in the South.
17    Q.  How long has she been with the company?
18    A.  I don't know.
19    Q.  How long are you aware of her having
20  been at the company?
21    A.  Since the 2000s.
22    Q.  And she works for Steve Fox; is that

273

1  correct?
2    A.  That would be correct.
3    Q.  Are you familiar with a group called
4  Dyckman & Associates?
5    A.  Pardon?
6    Q.  Are you familiar with a group called
7  Dyckman & Associates?
8    A.  Doesn't sound familiar.
9    Q.  Do you have any familiarity with a
10  survey performed by Dyckman & Associates for
11  MedPac?
12    A.  Not offhand.
13    Q.  Do you know whether or not BC/BS of
14  Massachusetts participated in that survey?
15    A.  Not offhand.
16    MR. MANGI:  Nothing further.
17    MR. COCO:  I just have one question, or
18  maybe two.
19
20    CROSS EXAMINATION
21  BY MR. COCO:
22    Q.  If you recalled earlier you were asked a

Henderson Legal Services
(202) 220-4158

Jan L. Cook, M.D.                CONFIDENTIAL                March 6, 2006
Boston, MA

274

1   serious of questions concerning the P&T committee?
2       A.   Correct.
3       Q.   During your tenure on the P&T committee,
4   did that committee discuss physician- administered
5   drugs, or make recommendations with respect to
6   physician-administered drugs?
7           MR. MANGI:  Objection to the form,
8   leading.
9       A.   The P&T committee works on formulary,
10  and the formulary is for drugs that are -- can be
11  purchased in pharmacies, outpatient pharmacy
12  benefit.
13      Q.   Would that include physician-
14  administered drugs or --
15      A.   No.
16      Q.   It would not?
17      A.   No.  They might occasionally look at a
18  medical policy about that, but they would not
19  discuss those drugs.  They wouldn't be discussing
20  those drugs.
21          MR. COCO:  Okay.  That's all.
22          MR. NOTARGIACOMO:  Before we go off the

275

1   record I just want to clearly designate Exhibit
2   Cook 007 as highly confidential under the
3   protective order.  The exhibit that was used is
4   not Bates stamped and does not have that
5   designation I just want to make sure on the record
6   that it is designated as such.
7           MR. MANGI:  Anything else?  Okay.  Off
8   the record.
9           (Whereupon the deposition was
10  concluded at 3:45 p.m.)
11
12
13
14      _____
15           JAN L. COOK, M.D.
16
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20____.
19
20
21  _____
22      Notary Public

276

1   United States District Court
2   For the District of Massachusetts
3       I, Jessica L. Williamson, Registered,
4   Merit Reporter, Certified Realtime Reporter
5   and Notary Public in and for the
6   Commonwealth of Massachusetts, do hereby
7   certify that JAN L. COOK, M.D., the witness
8   whose deposition is hereinbefore set forth,
9   was duly sworn by me and that such
10  deposition is a true record of the testimony
11  given by the witness.
12      I further certify that I am neither
13  related to or employed by any of the parties
14  in or counsel to this action, nor am I
15  financially interested in the outcome of
16  this action.
17      In witness whereof, I have hereunto set
18  my hand and seal this 7th day of March,
19  2006.
20          Jessica L. Williamson, RMR, RPR, CRR
21          Notary Public, CSR No. 138795
22          My commission expires: 12/18/2009

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
Boston, MA

1

**A**

aamangi@pbwt....
   3:18
ability 109:2 111:3
able 164:17,20
   166:4,11 193:19
   195:16 196:17
   207:22 231:10
   239:21
abreast 87:15
   130:8 131:10
accepted 127:3
access 38:11 95:7
account 29:4,10,14
   29:17 50:15
   113:2,22 175:16
   238:17
accounting 161:8
accounts 103:17
accreditation
   34:21,22 35:12
   51:22
accredited 51:21
accurate 44:17
   112:16
accurately 236:10
achieve 122:3
   168:10,11 188:9
achieved 188:14
acquire 30:15
   145:3 201:13,16
   202:2,11
acquired 18:22
   19:6
acquiring 98:21
acquisition 26:9
   87:10 136:11
   137:15 138:5
   140:4 142:2
   145:9,17 152:4
   208:1 209:9
acronym 152:15

acted 198:2
action 132:2 186:1
   186:2 205:16
   214:14 216:19
   224:1 276:14,16
actions 1:9 122:6
actively 183:10
   184:12
activities 29:20
   33:7,9 51:14,16
   121:14
activity 27:13,16
acts 151:13
actual 62:19 67:3
   84:12 90:11
   123:9 134:4,10
   136:7 137:15
   141:10 142:2
   152:4 157:13
   163:9 190:12
   222:17
actuary 105:9
   108:1,4
Adam 4:4
adam.wright@r...
   4:8
add 69:19
adding 188:4
addition 86:1
additional 120:17
   121:16 122:2
   187:8 194:8
   196:9 218:9
address 239:22
addressed 238:19
   239:17 243:14
   244:10
addressing 205:21
adds 222:1
Adeel 3:14 7:11
adequate 157:12
adjudication 114:7

116:10
adjustment 113:14
adjusts 111:4
admin 251:14
   255:13 256:1
administer 18:16
   30:16 81:11
   153:19 155:19
   207:21
administered 25:9
   79:7,11 81:10
   84:4,9 90:2 118:3
   119:1 124:5,10
   126:17 128:15
   129:8 148:11
   151:13 159:3
   160:5 178:8
   179:7 211:20
   212:6 230:22
   231:8,22 234:9
   234:14,14,19
   235:5 261:16
   274:4,14
administering
   143:9 146:9
   151:14 153:15
administration
   51:2 99:6 124:21
   148:6 149:5
   150:1 153:7,13
   154:10,15,20
   155:1,7 156:3,11
   161:8 179:3
   204:2 244:11
   255:7
administrative
   53:21 100:2
administrator 54:1
   96:16 97:1 98:10
administrators
   96:20
admissible 138:18

admission 26:1
adopt 251:20
adopted 135:19
   136:15 166:5
advance 62:21
   64:13 65:7,9
   68:16 81:20
advancement
   16:15
advantageous
   206:9,19
adversarial 167:19
   169:12
affairs 130:14
affect 190:14
   192:14 193:5,7
   267:15
affiliated 17:6,10
   197:6
affiliation 92:18
afford 164:18,20
affordable 169:7,8
   185:22
afraid 189:19
AFTERNOON
   185:1
age 35:9
agents 221:15
ago 85:7,10 198:22
   199:5 206:1
agree 105:11
   136:19 180:16
   181:22 191:6
   193:1,2,3 232:3
   233:3,9
agreed 127:7 195:5
ahead 176:1 205:1
ailment 25:17
aim 70:9
align 187:13
alike 159:21 181:6
allegation 132:6,14

allegations 143:22
   200:12
alleging 142:13
allow 28:2 196:8
alter 109:2
alternative 177:13
   177:18
alternatively 178:1
AMA 88:1
ambit 231:22
American 88:1
   188:2
Americas 3:15
amount 46:8 63:15
   63:21 90:4,4
   106:1,17 110:1
   118:1 148:18,21
   149:10,21 151:11
   155:16 158:17
   163:19 164:9,15
   172:12 187:4
   188:19 190:13,19
   202:11 208:12,22
   211:2,13 212:5
   255:20 270:11,12
   270:22
amounts 25:19
   107:6,16 113:3
   114:15 124:4
   150:18 153:5
   155:5 179:18
   188:22 193:9
   196:1 202:2
analyses 81:19
analysis 6:5 29:4
   29:10 57:12
   61:17 62:10,20
   63:20 64:13,16
   64:19 65:1 70:11
   72:6 75:17 76:12
   76:19 78:12,15
   81:2,21 82:2