1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

_____

In re:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )

_____ )

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS                     )


        DEPOSITION of DEBORAH DEVAUX, called as a

witness by and on behalf of Johnson & Johnson,

pursuant to the applicable provisions of the Federal

Rules of Civil Procedure, before P. Jodi Ohnemus,

Notary Public, Certified Shorthand Reporter,

Certified Realtime Reporter, and Registered Merit

Reporter, within and for the Commonwealth of

Massachusetts, at the offices of Robins, Kaplan,

Miller & Ciresi, L.L.P., 800 Boylston Street,

Boston, Massachusetts, on Thursday, 9 March, 2006,

commencing at 9:35 a.m.

Deborah Devaux                                          March 9, 2006
                        Boston, MA

|  | 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 |  |
| 3 | HAGENS, BERMAN, SOBOL, |
| 4 | SHAPIRO, LLP |
| 5 | BY: Edward Notargiacomo, Esq. |
| 6 | One Main Street |
| 7 | Fourth Floor |
| 8 | Cambridge, MA  02142 |
| 9 | 617 482-3700 |
| 10 | Ed@hbsslaw.com |
| 11 | For the Plaintiffs |
| 12 |  |
| 13 |  |
| 14 | ROBINS, KAPLAN, MILLER |
| 15 | & CIRESI, L.L.P. |
| 16 | BY: Stephen L. Coco, Esq. |
| 17 | 800 Boylston Street |
| 18 | 25th Floor |
| 19 | Boston, MA  02199-7610 |
| 20 | 617 267-2300 |
| 21 | Slcoco@rmkc.com |
| 22 | For Blue Cross Blue Shield |

|  | 4 |
|---|---|
| 1 | APPEARANCES: (CONT'D) |
| 2 |  |
| 3 | SHOOK, HARDY & BACON, L.L.P. |
| 4 | BY: Nicholas P. Mizell |
| 5 | 2555 Grand Boulevard |
| 6 | Kansas City, MO  64108-2613 |
| 7 | 816-474-6550 |
| 8 | Nmizell@hb.com |
| 9 | For Aventis Pharmaceuticals |
| 10 |  |
| 11 | ALSO PRESENT: |
| 12 |  |
| 13 | George Libares, Videographer |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |

|  | 3 |
|---|---|
| 1 | APPEARANCES: (CONT'D) |
| 2 |  |
| 3 | BLUE CROSS BLUE SHIELD |
| 4 | OF MASSACHUSETTS |
| 5 | BY: Steven E. Skwara, Esq. |
| 6 | Landmark Center |
| 7 | 401 Park Drive |
| 8 | Boston, MA  02215-3326 |
| 9 | 617 246-3531 |
| 10 | For Blue Cross/Blue Shield of |
| 11 | Massachusetts |
| 12 |  |
| 13 |  |
| 14 | PATTERSON, BELKNAP, WEBB & |
| 15 | TYLER, LLP |
| 16 | BY: Adeel A. Mangi, Esq. |
| 17 | 1133 Avenue of the Americas |
| 18 | New York, NY  10036-6710 |
| 19 | 212 336-2000 |
| 20 | Aamangi@pbwt.com |
| 21 | For Johnson & Johnson |
| 22 |  |

|  | 5 |
|---|---|
| 1 | I N D E X |
| 2 | TESTIMONY OF:                    PAGE |
| 3 |  |
| 4 | DEBORAH L. DEVAUX |
| 5 | (By Mr. Mangi)                     009 |
| 6 | (By Mr. Mizell)                    296 |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |

Deborah Devaux

March 9, 2006

Boston, MA

6

1           E X H I B I T S

2    EXHIBIT          DESCRIPTION              PAGE

3

4    Exhibit Devaux 001    "Analysis of CMS Average

5                  Wholesale Price Reform,

6                  2/7/04, with handwriting  155

7

8    Exhibit Devaux 002    "Analysis of CMS Average

9                  2/7/04              155

10

11   Exhibit Devaux 003    Memo, 11/6/92      220

12

13   Exhibit Devaux 004    "Hooked on Drugs"     230

14

15   Exhibit Devaux 005    Prescription Drug Study,

16                  April 1994          237

17

18   Exhibit Devaux 006    BCBSMA-AWP 12496-12500   263

19

20   Exhibit Devaux 007    BCBSMA-AWP 12611-12612   273

21

22   Exhibit Devaux 008A   BCBSMA-AWP 005188-005205  278

7

1

2    Exhibit Devaux 008B   BCBSMA-AWP 005206-5222   279

3

4    Exhibit Devaux 008C   BCBSMA-AWP 005223-5239   279

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

8

1       VIDEO OPERATOR:  We are now recording and

2    on the record.  My name is George Libares.  I'm a

3    Certified Legal Video Specialist for Henderson

4    Legal Service.  Today is March 9th, 2006, and the

5    time is 9:36 a.m.

6          This is the deposition of Deborah Devaux,

7    in re:  The pharmaceutical industry average

8    wholesale price litigation, in the United States

9    District Court, District of Massachusetts, Case No.

10   01CV12257-PBS.

11         This deposition is being taken at 800

12   Boylston Street, in Boston, Massachusetts.  The

13   court reporter is Jodi Ohnemus.  Counsel will now

14   state their appearances and the court reporter will

15   administer the oath.

16       MR. MANGI:  Adeel Mangi from Patterson,

17   Belknap, Webb & Tyler Patents for Johnson &

18   Johnson.

19       MR. COCO:  Steven Coco from Robins,

20   Kaplan, Miller & Ciresi for Blue Cross Blue Shield

21   of Massachusetts.

22       MR. NOTARGIACOMO:  Ed Notargiacomo from

9

1    Hagens, Berman, Sobol & Shapiro for the class

2    Plaintiffs.

3       MR. SKWARA:  Steve Skwara for Blue Cross

4    Blue Shield of Massachusetts.

5       DEBORAH L. DEVAUX,

6          having first been duly sworn,

7          testified as follows to

8          direct interrogatories

9    BY MR. MANGI:

10    Q.  Ms. Devaux, could you state your full name

11   for the record, please.

12    A.  Yes.  It's Deborah Devaux.

13    Q.  Are you currently employed?

14    A.  Yes.

15    Q.  Who do you work for?

16    A.  Blue Cross Blue Shield of Massachusetts.

17    Q.  And what is your current title?

18    A.  Senior vice president for health care

19   contract management.

20    Q.  How long have you held that position?

21    A.  I've been at Blue Cross for five and a

22   half years.  I can't remember exactly when I was

Deborah Devaux                                              March 9, 2006

Boston, MA

---

**10**

1    promoted to senior vice president.
2        Q.  How many titles have you held during your
3    tenure at Blue Cross Blue Shield?
4        A.  Three.
5        Q.  Can you describe the two titles you held
6    prior to becoming senior VP for health care
7    contract management.
8        A.  Yes.  I was first senior director for
9    provider contracting.  Second, vice president for
10   provider contracting; and then my third title is
11   the current one.
12       Q.  Do you know approximately how long you
13   held each position?
14       A.  First position, about six months; second
15   one, I'm not sure exactly.  I guess this shows I
16   don't care too much about titles.  I'm not sure
17   exactly when the break occurred between the other
18   two -- probably a couple of years each, and I've
19   now been there a total of five and a half.
20       Q.  I'd like to ask you about your background.
21           (Attorney Mizell entered the room.)
22       Q.  Could you describe for me your education

---

**11**

1    after high school.
2        A.  Yes, I received a bachelor's, and then a
3    master's in health care services.
4        Q.  When did you receive your bachelor's
5    degree?
6        A.  When?  1979.
7        Q.  And where was that degree from?
8        A.  Western Michigan University.
9        Q.  Was it a BA or a BSC?
10       A.  It was a BA.
11       Q.  What was your area of study?
12       A.  Sociology and education, a double major.
13       Q.  Did you go straight to a master's degree
14   after your bachelor's, or did you work for a while?
15       A.  I worked for one year.
16       Q.  Where did you work in between your two
17   degrees?
18       A.  The American Cancer Society.
19       Q.  What did you do at the American Cancer
20   Society?
21       A.  Public education.
22       Q.  What areas did the public education work

---

**12**

1    you were involved with cover?
2        A.  Smoking cessation, breast
3    self-examination, cancer awareness.
4        Q.  So, it was a public education geared
5    towards preventative care?
6        A.  Preventative and support of patients who
7    had been diagnosed, particularly in the area of
8    breast cancer.
9        Q.  Were you based out of the Cancer Society's
10   own facilities?
11       A.  Yes.
12       Q.  Did you have occasion to work with
13   oncologists in that role?
14       A.  Yes.  I'm sure I did.
15       Q.  Okay.  Were you based for any period of
16   time in oncologists' offices?
17       A.  Never.
18       Q.  After your stint at the American -- by the
19   way, what was your title at the American Cancer
20   Society?
21       A.  I don't remember.
22       Q.  Okay.  Were you -- were you a paid

---

**13**

1    employee or a volunteer?
2        A.  Yes, I was a paid employee.
3        Q.  Okay.  You then went to take a master's
4    degree, right?
5        A.  Yes.
6        Q.  What was your area of study in your
7    master's degree?
8        A.  Health care administration.
9        Q.  Where did you study health care
10   administration?
11       A.  University of Michigan.
12       Q.  And when did you get that qualification?
13       A.  1982.
14       Q.  That was a two-year master's?
15       A.  Yes.
16       Q.  What were some of the substantive areas
17   that you studied in the health care administration
18   field?
19       A.  Economics, epidemiology, the -- health
20   care law, management principles, statistics -- it's
21   a long time ago.
22       Q.  That's fine.  Did you study the history

---

Deborah Devaux

March 9, 2006

Boston, MA

**14**

1  and evolution of the health insurance industry?
2      A.  Yes.
3      Q.  At that point in '82, managed care was not
4  yet on the scene, right?
5      A.  Right.
6      Q.  Okay.  So, what sort of -- what evolution
7  did you -- did you study in terms of the growth of
8  the industry?
9      A.  The -- the major event was the
10  introduction of Medicare and Medicaid coverage and
11  how that affected access to health care services.
12      Q.  Anything else that comes to mind?
13      A.  No.
14      Q.  Did you study, as part of your analysis of
15  the Medicare system, the extent to which Medicare
16  covers drugs administered to patients in doctors'
17  offices?
18      A.  Not that I recall.
19      Q.  As part of your study of the industry, did
20  you study or analyze drug distribution channels?
21      A.  No.
22      Q.  As part of your study of the economics of

**15**

1  the industry, did you study drug pricing?
2      A.  No.
3      Q.  After receiving your master's degree in
4  1982, what did you do next?
5      A.  I was an administrative fellow for the
6  Veterans' Administration nationally.
7      Q.  How long did you hold that position?
8      A.  Two years.
9      Q.  What were your responsibilities as an
10  administrative fellow?
11      A.  I was the project manager for probably
12  four different national projects for the VA, which
13  sounds like a bigger title than it was.  It's
14  actually translated as gopher.
15      Q.  What were the four projects?
16      A.  Let's see.  One was a project around
17  staffing standards for the VA nationally; one was a
18  project around how to provide care to women
19  veterans; another was an analysis of the use of the
20  DRG payment system, and I'm trying to remember what
21  the last one was.  I think there were another
22  couple of projects, and I'm just not remembering

**16**

1  what they were, but those were the three major
2  areas during that period.
3      Q.  If, as we go through the deposition, the
4  others pop into your head, just throw up your hand
5  and let me know, okay?
6      A.  Okay.
7      Q.  Now, the project involving analysis of DRG
8  payments, what were the parameters of that
9  analysis?
10      A.  It was really looking at the use of a
11  common reimbursement standard across the VA system.
12      Q.  What was the -- well, withdraw that.  At
13  -- when you refer to "reimbursement system," what
14  are you referring to there in the VA context?
15      A.  Allocation of resources within the VA
16  nationally.  So, how the VA decides to allocate its
17  resources among the various health care facilities
18  that are part of the VA.
19      Q.  Now, the VA owns and operates its own
20  health care facilities, correct?
21      A.  Exactly.
22      Q.  All right.  So, it's not a situation where

**17**

1  a physician is rendering services to a veteran and
2  then submitting a claim for reimbursement.
3      A.  Correct.
4      Q.  Okay.  Rather, the patient is going to a
5  VA facility, getting treatment, and the VA pays for
6  that because it owns the facility.
7      A.  Exactly.
8      Q.  Okay.  So, in that context, when you refer
9  to "reimbursement," you're not really talking about
10  a --
11      A.  (Witness nods.)
12      Q.  -- a health care provider being
13  reimbursed in the insurance sense; rather, you're
14  talking about how the VA would allocate the money
15  that it had?
16      A.  Right.  "Reimbursement" really isn't an
17  accurate way of referring to it.  You're right.
18      Q.  I understand.
19      A.  It's really revenue allocation, budget
20  allocation.
21      Q.  Now, at that time in 1982 to 1984, were
22  you aware that the VA buys drugs at a rate

Deborah Devaux

March 9, 2006

Boston, MA

**18**

1  negotiated by the federal government?
2      A.  I wasn't involved with pharmacy services
3  at all.
4      Q.  Okay.  Are you aware of that fact now?
5      A.  That the VA -- can you repeat it?  That
6  the VA buys --
7      Q.  Sure.  That the VA purchases drugs which
8  are then given to its patients or administered to
9  its patients at a rate negotiated by the federal
10  government.
11      A.  I don't know how the federal government
12  pays for pharmaceuticals.
13      Q.  All right.  Have you ever heard of the
14  term "Federal Supply Schedule" or FSS?
15      A.  No.
16      Q.  Okay.  Have you ever heard that the
17  federal government negotiates deep discounts on all
18  drugs that it purchases and is able to do so
19  because of its market power?
20          MR. COCO:  Objection.
21      A.  I -- I don't know anything about how the
22  federal government purchases pharmaceutical

**19**

1  products.
2      Q.  Now, after your stint at the VA from '82
3  to '84 --
4      A.  Uh-huh.
5      Q.  -- what did you do next?
6      A.  Next I worked for Fallon Community Health
7  Plan, which is an insurance organization in
8  Worcester, Massachusetts.
9      Q.  For what period of time did you remain
10  employed at Fallon?
11      A.  Four years.
12      Q.  And during those four years, how many
13  different positions did you hold?
14      A.  I believe two.
15      Q.  What was the first position you held at
16  Fallon?
17      A.  I don't remember the title.
18      Q.  Do you remember the --
19      A.  But it was in the planning and development
20  area.
21      Q.  What specifically were you planning and
22  developing?

**20**

1      A.  Expanding the health centers that Fallon
2  Community Health Plan and the Fallon Clinic, which
3  was its physician affiliate, owned and operated.
4      Q.  Now, at that time Fallon had a -- what we
5  now call a staff model HMO, is that correct?
6      A.  Exactly.  Well, it was with a contract
7  separate for-profit physician organization called
8  the "Fallon Clinic."  So the physicians were not
9  employees or staff of the health plan, but it was
10  an exclusive relationship with the Fallon Clinic to
11  provide services to its members.
12      Q.  Now, was -- were the Fallon Clinic's
13  compensation determined by the contract, or
14  were there ongoing reimbursement claims submitted?
15      A.  The Fallon Clinic's payment was determined
16  by a contract between the Fallon Clinic and the
17  Fallon Community Health Plan.
18      Q.  Okay.  And did that contract -- do you
19  know what -- on what basis that contract determined
20  the amount of payment to the Fallon Clinic?
21      A.  I know that it was a capitated contract.
22  I don't know the terms and wasn't involved in the

**21**

1  negotiation of it.
2      Q.  Now, did that capitated contract include
3  new drugs that may be administered to patients in
4  the course of their visit to a physician's office?
5      A.  The capitated contract included all
6  services.
7      Q.  And you said that as -- in your role in
8  planning and development, you were working on
9  expanding health centers.
10      A.  Yes.
11      Q.  Now, are you referring -- by "health
12  centers," are you referring to the Fallon Clinic
13  facilities?
14      A.  Yes.
15      Q.  Okay.  How many facilities were in --
16      A.  I'm not sure.  I was involved in
17  identifying the sites and planning for -- for new
18  facilities.  I don't remember how many facilities
19  exactly existed at the time.
20      Q.  And after your role in planning and
21  development, what was the second title or role that
22  you held at Fallon?

Deborah Devaux

March 9, 2006

Boston, MA

---

**22**

1    A.   Director of planning and development.
2    Q.   Now, was that a promotion within the same
3  department?
4    A.   Yes.
5    Q.   Did your responsibilities also change?
6    A.   I had managerial responsibilities, and I
7  was not limited to just planning new sites. I was
8  involved in any new program that was developed by
9  Fallon Community Health Plan.
10    Q.   Do you recall any new programs that you
11  worked on in your role as director of planning and
12  development?
13    A.   We worked on a relationship with
14  Massachusetts Medicaid to offer services to
15  Medicaid beneficiaries; we worked on a project to
16  look at access for members, waiting times, phone
17  answering, you know, sort of classic access issues.
18  We -- let me think of some other big ones. Memory
19  fades. Sorry.
20    Q.   Okay.
21    A.   I'll let you know if it comes back to me.
22    Q.   Okay. The project you mentioned in

---

**23**

1  relation to Mass. Medicaid, what did that involve?
2    A.   Yeah. It involved structuring a
3  relationship to provide services to Medicaid
4  beneficiaries, which we previously had not
5  provided. So, working with the state to contract
6  with them for a payment level. I don't remember
7  whether it was a capitated payment level or a
8  reimburse per service. And then our -- the
9  physicians at the Fallon Clinic participated in
10  Medicaid.
11    Q.   Now, during your time at Fallon from '84
12  to '88, did you at any point gain an understanding
13  as to how and at what rates the Fallon Clinic
14  acquired drugs?
15    A.   No.
16    Q.   What did you do after leaving Fallon in
17  1988?
18    A.   I went to work for Rhode Island Group
19  Health Association, which is another health plan
20  that no longer exists. It was acquired by Harvard
21  Community Health Plan while I was there.
22    Q.   How long were you at the Rhode Island

---

**24**

1  Group Health Association and then Harvard
2  Community?
3    A.   And then Harvard Community Health Plan,
4  approximately four years.
5    Q.   So, from around about 1988 to 1992?
6    A.   Yes.
7    Q.   What year was the acquisition in?
8    A.   '90, '91, something like that.
9    Q.   How many titles did you hold during your
10  time at Rhode Island and Harvard Community?
11    A.   I believe just one. I was a director, and
12  I can't remember exactly what the description of it
13  -- of the job was, but it included both planning
14  and -- planning and contract management.
15    Q.   Now, this period, '88 to '92, that's right
16  about the time when managed care was starting to
17  come into the market and grow, isn't it?
18    A.   I'd say managed care really started to
19  take hold a couple of years earlier than that.
20    Q.   Okay. In your role at the Rhode Island
21  Group Health Association, how did the -- how were
22  the functions you were performing affected by the

---

**25**

1  change in the industry models?
2    A.   Well, Rhode Island Group Health
3  Association had been founded around managed care,
4  was founded by the unions in Rhode Island, so, it
5  did not evolve from a traditional fee-for-service
6  insurance company to a managed care organization.
7  It was founded as a managed care organization.
8    Q.   Okay. What were your responsibilities in
9  your role as director of planning and contract
10  management?
11    A.   My responsibilities included contracting
12  for all services except pharmacy, which was a
13  separate department for the care that was provided
14  to our members by hospitals, physicians, ancillary
15  providers, etcetera, and then planning and
16  development of new programs.
17    Q.   Now, when you say, "except pharmacy," are
18  you excluding contracts between the health plan and
19  retail pharmacies?
20    A.   Yes.
21    Q.   Okay. So, in other words, you had
22  responsibility for contracting with health care

---

Henderson Legal Services
202-220-4158

Deborah Devaux

March 9, 2006

Boston, MA

---

**26**

1  providers, the doctors and the hospitals and
2  related facilities, but pharmacy -- retail
3  pharmacies -- were handled by a separate
4  department.
5      A.  Exactly.
6      Q.  What methodologies did the Rhode Island
7  Group Health Association -- then Harvard Community
8  Health Plan -- use to reimburse physicians for care
9  they rendered to patients in their offices in the
10  '88 to '92 time period?
11      A.  There were two primary methodologies.  One
12  was capitation, and the other was fee for service.
13      Q.  Do you know approximately what proportion
14  of physician contracts were capitated versus fee
15  for service in that time period?
16      A.  I don't, but the majority was capitated.
17      Q.  The fee-for-service component, how were
18  the fees determined?
19      A.  I don't remember.
20      Q.  Were fee schedules in use by that time?
21      A.  Fee schedules were in use, but I don't
22  remember what the basis of the fee schedule was,

---

**27**

1  whether it was homegrown or Medicare based or -- I
2  don't remember what the basis of it was.  But, yes,
3  a fee schedule was in use.
4      Q.  Now, sticking with the capitated contracts
5  for a moment, did those contracts also encompass
6  and include any drugs that physicians administered
7  to patients while treating them in their offices?
8      A.  They were all-inclusive contracts, yes.
9      Q.  And in relation to the fee-for-service
10  component, did -- was there also a fee schedule
11  component dealing with drugs that were administered
12  during patient visits to physician' offices?
13      A.  I don't remember that level of detail.
14      Q.  Do you -- do you know what methodology
15  generally was used by the Rhode Island Group Health
16  Association to reimburse physicians in relation to
17  drugs administered in office on the fee-for-service
18  side of contracting?
19      A.  I don't.  I don't.
20      Q.  When Harvard Community Health Plans
21  acquired the Rhode Island Group Health Association,
22  did your responsibilities or your job change in any

---

**28**

1  way?
2      A.  The responsibilities did not change.  The
3  reporting relationship did.  So, I reported to
4  someone at Harvard Community Health Plan, rather
5  than to the CEO of our local entity.
6      Q.  Did Harvard Community Health Association
7  have a larger network than Rhode Island Group
8  Health Association had at the time of the
9  acquisition?
10      A.  They did not have a larger network in
11  Rhode Island, but they did have a network in
12  Massachusetts at that time, and the Rhode Island
13  plan did not have a network in Massachusetts.  So,
14  they were completely complementary, let's say.
15  They weren't overlapping.
16      Q.  Were the networks merged into one network
17  or did they remain two geographic networks?
18      A.  They remained two geographic networks.
19      Q.  And your responsibility was limited to the
20  Rhode Island network?
21      A.  Yes.
22      Q.  After your tenure at Harvard Community in

---

**29**

1  1992, what did you do next?
2      A.  I then went to New England Medical Center,
3  and my first job there was as the project director
4  for a PEW -- P-E-W -- charitable trust sponsored
5  grant to develop patient-focused care.
6      Q.  How long were you employed at the New
7  England Medical Center?
8      A.  About three and a half years.
9      Q.  That's roughly '92 to '95?
10      A.  Yes.
11      Q.  What is the New England Medical Center?
12      A.  The New England Medical Center is the
13  hospital and physician affiliate of Tufts Medical
14  School.  So, it's an academic medical center, and
15  there's also a very large physician practice.
16      Q.  Now, this first role you described as a
17  project director, what was the specific
18  patient-focused care issue or issues that you were
19  studying?
20      A.  We were trying to break down the barriers
21  for patients in receiving efficient, effective
22  care.  There was a hypothesis that at the

---

Deborah Devaux                                          March 9, 2006

Boston, MA

30

1  boundaries of care -- so, for example, when
2  patients move from inpatient to outpatient or from
3  physician to physician, that there were
4  communication or coordination issues that arose
5  that could affect the quality of the care. So, the
6  idea was to look at how to build a system around
7  the patient so that those breakdowns did not occur
8  in two key areas: Cardiology and oncology.
9      Q.  How long did you remain in that role as a
10 project director working on that project?
11     A.  I remained in that role during the entire
12 time that I was at New England Medical Center, but
13 I also was given a second job, which was vice
14 president for managed care after about the first
15 maybe year, year and a half. So, I held two -- two
16 positions after that point.
17     Q.  Now, New England Medical Center itself was
18 not serving as a health insurer, was it?
19     A.  Exactly right.  They were a provider of
20 health care services -- hospital and physician
21 services.
22     Q.  So, perhaps you can help me understand the

31

1  role of VP for managed care.  Was your
2  responsibility to liaise with managed care?
3      A.  Yes, my responsibility was to lead the
4  contracting function with the different health
5  plans that we contracted with.
6      Q.  Now, you mentioned earlier that the New
7  England Medical Center was associated with Tufts.
8      A.  Yes.
9      Q.  Were you referring to the university or
10 the health plan?
11     A.  Well, actually, both.  I was referring to
12 the Tufts Medical School, they're their principle
13 teaching an affiliate, but they were also a
14 founding member of Tufts Health Plan.
15     Q.  When was Tufts Health Plan founded?
16     A.  I don't know.
17     Q.  Were you involved in that process at all?
18     A.  No.
19     Q.  Was it before you joined New England
20 Medical Center?
21     A.  Yes.
22     Q.  Now, given that the New England Medical

32

1  Center had this involvement with the founding of
2  Tufts Health Plan, can you help me understand why
3  it also had relationships with other health
4  insurers?
5      A.  It had relationships with other health
6  insurers in order to be able to accept patients for
7  volume purposes.  If their relationship was just
8  limited to Tufts Health Plan, they wouldn't have
9  access to enough patients to be viable.
10     Q.  I understand.  What were the other health
11 plans that the New England Medical Center
12 contracted with at that time?
13     A.  It contracted with -- beyond, of course,
14 Medicare and Medicaid, which I guess aren't really
15 -- commercial health plans, that included Harvard
16 Pilgrim Health Care, Blue Cross Blue Shield of
17 Massachusetts, and then the various national plans.
18 So, Aetna, CIGNA -- I don't remember about United,
19 but it contracted with a range of plans.  I think
20 we had contracts with about 15 or 20 health plans.
21 The major relationship was with Tufts Health Plan.
22     Q.  Now, in that capacity, did your

33

1  responsibilities include negotiating the contracts
2  with these different health plans?
3      A.  I supervised people that negotiated the
4  contracts, but, yes, I was ultimately responsible.
5      Q.  Did you also supervise people involved in
6  drafting or amending drafts of contracts?
7      A.  Yes.
8      Q.  In other words, you were the person -- you
9  were the senior person overall in charge of that
10 contracting function --
11     A.  That's right.
12     Q.  -- for the New England Medical Center.
13     A.  That's right.
14     Q.  Now, when you entered into a negotiation
15 with a health plan, what were some of the goals
16 that you brought to the process from the New
17 England Medical Center perspective?
18     A.  Achieving reasonable reimbursement,
19 understanding administrative requirements,
20 understanding products and our role in those
21 products.  Those are the major areas of focus.
22     Q.  Now, the contracts that you entered into

Deborah Devaux                                    March 9, 2006
                        Boston, MA

---

**34**

1   for the New England Medical Center, were there
2   separate contracts for the hospital facilities with
3   health plans and separate contracts for the
4   physician office facilities?
5       A.  Yes.
6       Q.  And were you responsible for both?
7       A.  I was, although in the case of the
8   hospital, the hospital CFO was a major
9   decision-maker, and in the case of the physician
10  groups, and there were two physician organizations,
11  the administrator for each of those two
12  organizations was a key decision-maker.
13      Q.  What were the two physician groups?
14      A.  Pratt Medical Group and TMCA.  What did
15  that stand for?  There was a surgical group and a
16  medical group.  The surgical group was TMCA, but I
17  don't exactly remember what the initials stood for
18  anymore.
19      Q.  Were the physicians in these medical
20  groups salaried employees of the New England
21  Medical Center?
22      A.  They were salaried employees of the

---

**35**

1   groups.  So, the physician entities were affiliated
2   but not owned by the hospital, and the physicians
3   were salaried employees of those groups.
4       Q.  And by "groups," you're referring to the
5   Pratt Medical Center and TMCA?
6       A.  Exactly, Pratt Medical Group and TMCA.
7       Q.  Okay.  What was the relationship between
8   Pratt Medical Center and TMCA and the New England
9   Medical Center?
10      A.  They were affiliated -- so, Pratt and TMCA
11  were not affiliated directly, but both
12  organizations were affiliated with New England
13  Medical Center.
14      Q.  What was the benefit to these groups and
15  to the New England Medical Center of being
16  affiliated to each other?
17      A.  The physicians all primarily practiced at
18  the hospital, so -- so one aspect of the
19  relationship was that the hospital and the
20  physicians were completely tied in terms of, you
21  know, any decision that the hospital made affected
22  the physician practice and vice versa.

---

**36**

1       Q.  So, is it --
2       A.  And they jointly ran a teaching program
3   for Tufts between the hospital and physicians and
4   research programs.
5       Q.  So, the surgical group, for example, would
6   be able to use the medical center's operating
7   theaters, things like that?
8       A.  Absolutely.  And all of their offices were
9   on the campus of the medical center.
10      Q.  Was one of the benefits to the medical
11  groups of being affiliated with the New England
12  Medical Center the ability to have the services of
13  your group in negotiating their contracts with
14  managed care?
15      A.  Yes.  Administrative services -- providing
16  administrative services to the groups was a -- was
17  a benefit to them on most days, I think.
18      Q.  In addition to getting the administrative
19  support, did having access to the services of your
20  group provide these groups with greater leverage in
21  negotiating with health plans than they would have
22  if they tried to enter into those negotiations

---

**37**

1   independently?
2           MR. COCO:  Objection.
3       A.  I don't know.
4       Q.  Have you ever had the opportunity to
5   consider that question?
6       A.  I had not thought about that question.
7       Q.  Did leverage play a role generally in
8   negotiations that you carried out for the New
9   England Medical Center with health plans?
10      A.  I think that the plans and the providers
11  needed each other equally.  You know, we were
12  important to the health plan.  They were important
13  to us.  So, there was not a -- there was not at
14  that time a feeling on my part that leverage was a
15  driving -- that leverage was a driving theme.
16      Q.  Well, the terms that were negotiated --
17  reimbursement terms -- were those the same for all
18  of the 15 to 20 health plans the New England
19  Medical Center contracted with, or was there
20  variation?
21      A.  There was variation, both in structure and
22  type of reimbursement.

---

Deborah Devaux

March 9, 2006

Boston, MA

---

**38**

1    Q.   Was there also variation in the amount of
2  reimbursement?
3    A.   Yes.
4    Q.   What explained the variation?  Why was
5  there variation?
6    A.   There was variation due to the structure
7  of the contract.  The structure with Tufts, for
8  example, was to manage to an overall budget.  So,
9  what the hospital or physician earned was dependent
10  on performance.  Whereas with, I think, every other
11  plan, the structure was fee for service.
12    Q.   How about in relation to the variation in
13  the amounts of reimbursement, what explained those
14  variations?
15    MR. COCO:  Objection.
16    A.   The -- the health plans had different
17  structures of payment, and they represented
18  different -- different types of members.  So, for
19  example, Medicaid contracted for certain types of
20  services and not others, or Medicare similarly.
21  So, it was what the purchaser was accessing, what
22  services they were accessing at the hospital.

---

**39**

1    Q.   Did the skill of your department in
2  negotiating the different contracts play any role
3  in the variation in the amounts of reimbursement
4  achieved?
5    A.   We had a -- we determined what we felt a
6  reasonable reimbursement range was, and then we
7  achieved that in all of the contracts but not
8  necessarily in exactly the same structure.
9    Q.   In other words, where you would -- you
10  determine in advance that this is the range within
11  which we want to fall, and you took that into the
12  negotiation, right?
13    A.   Yes.
14    Q.   And where within that range you would end
15  up would be, at least partly, a function of the
16  negotiating dynamic between your team and your
17  counterparts from the various health plans.
18    A.   Yes.
19    Q.   Now, I'd like to turn for a moment to what
20  you described earlier in terms of the variation in
21  the structures of contracts.
22    A.   Uh-huh.

---

**40**

1    Q.   You said that the -- the Tufts contract
2  had performance incentives.
3    A.   Yes.
4    Q.   Was this a capitated contract?
5    A.   Not exactly, but it functioned similarly.
6  In other words, when I think of a capitated
7  contract, there was actually a dollar amount paid
8  to an entity per month and transmitted.  That was
9  not the case.  It was a budgeted per member per
10  month, and then the reimbursement was based on a
11  fee-for-service payment, but then at the end of the
12  year, there was a reconciliation around performance
13  against that budgeted.  And depending on that
14  reconciliation, there were withholds in place that
15  were either retained by the plan or paid back to
16  the providers.
17    Q.   And did that arrangement apply to the
18  contracts between the physician practices
19  associated with the New England medical group and
20  Tufts as well?
21    A.   Yes.  There were -- there was a three-way
22  relationship between the health plan, the hospital,

---

**41**

1  and the physicians that was all tied.
2    Q.   Okay.  So, the same terms governed all the
3  relationships.
4    A.   Right.
5    Q.   Now, the other option that was utilized in
6  contracts with other firms -- with other health
7  insurers in terms of structure was fee for service,
8  right?
9    A.   Yes.
10    Q.   What was the range of fee-for-service
11  methodologies that existed in the various contracts
12  New England Medical Center had with health
13  insurers?
14    A.   I don't remember how many plans used a
15  Medicare RBRVS-based fee schedule system, but
16  certainly that was one form that the fee schedules
17  took, and then some other plans had their own
18  homegrown fee schedule.  So, part of the reason for
19  variation was that we needed to evaluate those fee
20  schedules against our -- what we determined to be
21  reasonable rates of payment, and then negotiate in
22  those areas where the fee schedules varied.

---

Deborah Devaux                                          March 9, 2006
Boston, MA

---

42

1    Q.  Now, the plans that used the RBRVS
2  methodology --
3    A.  Uh-huh.
4    Q.  -- were they paying at the Medicare rates,
5  or did they apply multipliers variation using RBRVS
6  as a part of the methodology?
7    A.  I don't remember.  I don't remember.
8    Q.  Well, at the time from the New England
9  Medical Center's perspective was Medicare
10  considered a generous payer or were -- was it
11  considered a payer whose rates you wanted health --
12  private health insurers to beat?
13    MR. COCO:  Objection.
14    A.  It varied by type of physician specialty.
15    Q.  Well, did any of the doctors at the Pratt
16  Medical Group or TMCA work in oncology?
17    A.  Yes.
18    Q.  Okay.  Was there any view that you held in
19  negotiating on their behalf for reimbursement as to
20  whether or not the amounts Medicare reimbursed for
21  services to oncologists in physician offices were
22  adequate or inadequate to cover their costs?

---

43

1    A.  I don't know specifically about
2  oncologists what our position was at that time.
3    Q.  Were there any specific services for which
4  you felt that Medicare's reimbursement was
5  inadequate?
6    A.  Not -- I don't remember the specific
7  services.  I think there was variation in how we
8  viewed Medicare's reimbursement in different areas,
9  but I don't remember the specific services that at
10  that time were considered high or low or positive
11  or negative.
12    Q.  Okay.  But you recall there were some that
13  were considered adequate -- some where the
14  reimbursement was considered inadequate, but you
15  just don't remember what exactly they were.
16    MR. COCO:  Objection.
17    A.  Right.
18    Q.  Now, you mentioned that other health plans
19  used homegrown fee schedules.
20    A.  Yeah.
21    Q.  When New England Medical Center was
22  entering into a negotiating process, were fee

---

44

1  schedules typically provided by the health insurer?
2    A.  I don't remember.  We certainly got some
3  information about fees.  I don't remember if they
4  were full fee schedules or sample fees.
5    Q.  So, it may have been a sample, or it may
6  have been a communication of methodology?
7    A.  Right.
8    Q.  Okay.  What I'm trying to understand is
9  did the New England Medical Center ever go into
10  negotiations saying, Here's what we want; here's a
11  sample; here are the fees; or Here is the
12  methodology, or was its position reactive where you
13  would get a proposal from the health insurer and
14  then provide your views on it?
15    MR. COCO:  Objection.
16    A.  Generally, the health plans had systems
17  for reimbursement and presented those to us, but in
18  most cases, existing relationships were in place.
19  So, it wasn't a new -- you know, in other words,
20  you're describing a situation where a new
21  relationship was being developed and the health
22  plan was proposing that.  In most circumstances --

---

45

1  I can't think of an exception -- when I got to New
2  England Medical Center there were agreements in
3  place.  So, we weren't considering a new health
4  plan and starting from scratch.
5    Q.  So, the existing agreement would serve as
6  the starting point?
7    A.  Starting point, exactly.
8    Q.  Now, turning to reimbursement for drugs,
9  as part of your role in negotiating for the Pratt
10  Medical Group and TMCA --
11    A.  Yeah.
12    Q.  -- did you also negotiate provisions in
13  their contracts that determined what they would be
14  reimbursed in relation to drugs administered to
15  patients during visits to their physician' offices?
16    A.  I'm sure that drugs were included.  I
17  don't remember how they were negotiated for.  They
18  weren't a major component of the negotiations at
19  that time.
20    Q.  Was that because in that time period there
21  weren't as many physician-office administered drugs
22  as there are today?

---

Deborah Devaux

March 9, 2006

Boston, MA

---

**46**

1  A. I don't know.
2  Q. Now, do you know what any of the
3  methodologies were that were utilized to reimburse
4  the Pratt Medical Group or TMCA for drugs that they
5  administered in their offices in that time period?
6  A. I don't.
7  Q. As part of your role in negotiating
8  reimbursement on their behalf, did you acquire any
9  information as to what those physician practices
10  were paying to acquire drugs that they administered
11  to patients in their offices?
12  A. No information on that topic.
13  Q. Was that information that you ever
14  considered may be relevant to your role in
15  negotiating reimbursement in relation to those
16  drugs?
17  A. Not at that time. As I say, the pharmacy
18  component was not a major area of focus in the
19  negotiations.
20  Q. What was the structure in general of the
21  Pratt Medical Group? What types of doctors were
22  affiliated with that group?

---

**47**

1  A. They were medical doctors, so physicians
2  with a medical-rather-than-surgical area of focus.
3  So --
4  Q. I'm sorry. Go ahead.
5  A. Cardiologists, oncologists,
6  pulmonologists, internists.
7  Q. How many doctors were part of the Pratt
8  Medical Group?
9  A. I don't remember. Hundreds.
10  Q. Was Pratt Medical Group located at one
11  site or were there multiple sites?
12  A. All of their offices were on the New
13  England Medical Center campus, but they were in
14  various buildings.
15  Q. And TMCA, that was a surgical group,
16  right?
17  A. Exactly.
18  Q. And did it also have surgeons from
19  different specialties?
20  A. Yes.
21  Q. And how many surgeons were part of TMCA?
22  A. Again, I don't remember exactly, but it

---

**48**

1  was hundreds.
2  Q. Now, we spoke earlier about the goals that
3  you had when you entered into these negotiating
4  processes for New England Medical Center. You said
5  one of the goals was understanding the products?
6  A. Yes.
7  Q. What did you mean by that?
8  A. Understanding what our responsibilities
9  were in providing services to members. So, for
10  example, in an HMO product, the primary care
11  physician that the member selected had the
12  responsibility for coordinating care. So, one
13  issue would be, what was that responsibility? What
14  did the physician need to provide to the Plan in
15  order to be authorized for referring services?
16  What were the access requirements? So, you know,
17  having their panels open or closed. Those sorts of
18  -- those sorts of structural components.
19  Q. So, in other words, you wanted to
20  understand what the specific product was so that
21  you would know what your obligations were or what
22  obligations you were accepting?

---

**49**

1  A. Exactly.
2  Q. You said another goal was understanding
3  the administrative requirements.
4  A. Yes.
5  Q. What did you have in mind there?
6  A. When did we need to get authorization for
7  services? What rules pertain to submitting bills?
8  What information needed to be included on the
9  bills? Anything that enabled us to interact with
10  the Plan in supporting the process of providing
11  care to the members.
12  Q. By the way, the New England Medical
13  Center, was that a not-for-profit facility or a --
14  A. Yes.
15  Q. -- commercial facility?
16  A. It's a not-for-profit academic medical
17  center.
18  Q. Okay. Now, the third goal you mentioned
19  was a reasonable reimbursement.
20  A. Yes.
21  Q. What did you mean by "reasonable"?
22  A. We each year evaluated what our costs for

---

Deborah Devaux

March 9, 2006

Boston, MA

50

1   services were and developed a budget, and then
2   tried to target our negotiations to be able to
3   cover those costs, plus a reasonable margin.
4   Q.  Now, given that the New England Medical
5   Center was a not-for-profit facility, as opposed
6   to, you know, any standard, commercial, say, an
7   oncologist's practice --
8   A.  Yes.
9   Q.  -- why was the New England Medical Center
10  still seeking to get a reasonable margin on top of
11  its costs for --
12  A.  In order to be able to continue to invest
13  in capital and to fund salary increases for
14  employees, primarily.  So, to continue to remain a
15  viable entity.
16  Q.  If the New England Medical Center had not
17  been able to earn a reasonable margin and had only
18  been reimbursed purely at cost, would it have
19  remained a viable entity?
20      MR. COCO:  Objection.
21  A.  I don't know.
22  Q.  What would have been some of the --

51

1   withdraw that.  When you refer to a reasonable
2   margin as the goal in the negotiating process, how
3   did you quantify what would be reasonable as a
4   margin?
5   A.  I don't remember what was considered
6   reasonable at that time.  I don't remember what
7   kind of cost of living raises or capital
8   investments were being made at that time.
9       Today about a third of the hospitals in
10  Massachusetts are not earning a margin; about a
11  third of the hospitals are earning somewhere
12  between a zero and 2 percent margin, and about a
13  third are earning above a 2 percent margin.  It's
14  very, very rare for a hospital to earn more than a
15  4 to 5 percent margin in our market.
16  Q.  And do you attribute that to the use of
17  DRGs in hospital reimbursements?
18  A.  I'm sure there are a lot of factors.  I
19  don't know what the major drivers are.
20  Q.  Now, you remained at the New England
21  Medical Center up until 1995, right?
22  A.  Roughly, yes.

52

1   Q.  Okay.  Where did you move to in 1995?
2   A.  I moved to Ernst & Young's health care
3   consulting practice in Boston.
4   Q.  How long were you employed at Ernst &
5   Young?
6   A.  A little over three years.
7   Q.  Did you hold one title during that time or
8   more than one?
9   A.  Yes, senior manager.
10  Q.  Now, who were the clients for whom you
11  performed work while at Ernst & Young?
12  A.  Primarily providers, meaning hospitals and
13  physicians, but we did have some health plan
14  clients.
15  Q.  All right.  Did you have any drug
16  manufacturers as clients?
17  A.  No.
18  Q.  Any PBMs?
19  A.  No.
20  Q.  Any --
21  A.  Ernst & Young may have.  I did not work on
22  any clients that were pharmacy related.

53

1   Q.  Any drug wholesalers?
2   A.  No.
3   Q.  Now, what sort of projects did you work on
4   during your time at Ernst & Young?
5   A.  We generally worked on projects that
6   helped to structure the relationship either between
7   hospitals and physicians or hospitals, physicians
8   and health plans, usually advising the -- either
9   the provider or the plan on approaches to working
10  productively together.
11  Q.  Anything else?
12  A.  I did -- I did one project building a
13  Medicaid plan for a hospital in Boston -- setting
14  up a Medicaid -- Medicaid contract and plan for
15  them.
16  Q.  Okay.  Anything else?
17  A.  No.
18  Q.  Now, the work that you did on projects
19  helping to structure the relationships between
20  providers and health plans, when you use the term
21  "structuring relationships," are you referring to
22  negotiating contracts?

Deborah Devaux

March 9, 2006

Boston, MA

---

**54**

1    A.   Yes, although we weren't necessarily
2  involved in the negotiation itself, but advising
3  the providers on issues to consider.
4    Q.   On issues to consider when going through
5  the contracting process and negotiation.
6    A.   (Witness nods.) Right.
7    Q.   Okay.  You have to answer audibly so the
8  reporter can take it down.
9    A.   Yes, yes.
10   Q.   Now, did those -- what sort of issues were
11 you working on with providers and with health
12 insurers in terms of the contracting process?
13   A.   The primary issues related to risk
14 contracts at that time where providers were
15 entering into risk arrangements with the health
16 plans and trying to understand what the
17 implications would be of entering into those
18 relationships.
19   Q.   Anything else?
20   A.   That was the primary focus.
21   Q.   And by "risk arrangements," are you
22 referring to things like capitated arrangements,

---

**55**

1  withhold arrangements?
2    A.   Both, yes.
3    Q.   Any other types of risk arrangements?
4    A.   No.
5    Q.   Now, in your role at Ernst & Young, you
6  had clients who were on both sides of those
7  negotiations, right?
8    A.   Right.
9    Q.   What were the goals of the providers on
10 the one hand -- and let's talk about physician
11 offices -- physician practices, and health insurers
12 on the others as they came into that negotiating
13 process?
14   A.   For health plans, generally, it was
15 establishing a stable network with predictable fair
16 rates of reimbursement.  So, for the health plans,
17 it was generally around what models could they
18 offer that would lend themselves to long-term,
19 predictable, fair reimbursement.
20        And for -- I didn't ever work for a
21 physician group alone, but for the provider
22 entities; it was usually either just hospitals or

---

**56**

1  hospitals and physicians -- it was around
2  determining what a reasonable rate of reimbursement
3  was and how to function under those contracts.
4    Q.   Now, when -- you referred to the provider
5  groups you were working with.
6    A.   Uh-huh.
7    Q.   Were those entities like the New England
8  Medical Center, the hospitals and also
9  independent-but-affiliated physician practices?
10   A.   Yes, generally.
11   Q.   You advised -- the advice you provided
12 included how those independent physician practices
13 should contract with health insurers?
14   A.   Yeah.  I don't remember working for a
15 physician practice that was independent as a
16 client, but we worked for hospital systems that
17 included physician practices.
18   Q.   Similar to the New England Medical Center.
19   A.   Yes.
20   Q.   Okay.  Now, when these -- let's talk about
21 it from the health insurer side first.
22   A.   Uh-huh.

---

**57**

1    Q.   You said one of their goals was a stable
2  network.  Why is that important to a health
3  insurer?
4    A.   Don't want to disrupt the membership.
5  Once members have selected a plan, and they usually
6  do so based on providers that are available to them
7  in that plan, they don't want to disrupt that with
8  -- for its implications, both to the member and to
9  their relationship with their employer, who's
10 usually purchasing the care on their behalf.
11   Q.   Okay.  And the additional goal you
12 mentioned for the health plan was arriving at a
13 predictable and fair rate of reimbursement?
14   A.   Right.
15   Q.   What did you mean by "predictable"?
16   A.   The health plans generally set their rates
17 that they're going to charge for their premiums
18 well in advance of the year in which the premiums
19 are going to occur, and so, the more they can know
20 and predict the payments that they'll make to
21 providers in that prospective period, the more
22 viable the health plan becomes.  Their expected

---

Deborah Devaux

March 9, 2006

Boston, MA

---

**58**

1  costs are less likely to deviate from the costs
2  that they assumed when they developed the premium.
3      Q.  And you said their goal was a predictable
4  and fair rate of reimbursement.  What did you have
5  in mind when you referred to "a fair rate of
6  reimbursement"?
7      A.  The health plans that we worked with
8  generally wanted to be thought of as paying a fair
9  rate of reimbursement so that the providers wasn't
10  -- a sense that the providers did not like
11  participating in that health plan.  On the other
12  hand, the plans need to balance that with what will
13  enable them to offer an affordable premium that's
14  competitive in the marketplace.
15      So, by "fair," it's, you know, balancing
16  the provider need for covering their reasonable
17  cost with the employer need for an affordable
18  premium, and with the Plan's need to compete
19  against other plans in that marketplace and not
20  wanting to be offering a product that's, you know,
21  priced out of the market.
22      Q.  And part of the competition between

---

**60**

1  plan.  One was the cost plus margin and how that
2  overall amount should be determined, right?
3      A.  Reasonable cost.
4      Q.  Yeah, reasonable cost.  Let's -- let's
5  start again so -- so we're clear.  I just want to
6  make a list of the factors --
7      A.  Yeah.
8      Q.  -- that a health insurer would consider in
9  this process.
10      A.  Yeah.
11      Q.  One factor would be reasonable cost and
12  margin.
13      A.  Yes.
14      Q.  A second factor would be ensuring that
15  they can have a stable network.
16      A.  Yes.
17      Q.  A third factor would be ensuring that they
18  have competitive premiums.
19      A.  Yes.
20      Q.  And a fourth factor is seeking to have
21  predictable rates of reimbursement for purposes of
22  their own financial planning.

---

**59**

1  different health plans would be having a stable
2  network, right?
3      MR. COCO:  Objection.
4      A.  Absolutely.
5      Q.  Okay.  Now, you referred to the fact that
6  in fair reimbursement they would want to ensure
7  they were covering providers' costs.  Would fair
8  reimbursement from a health plan's perspective
9  involve just covering cost, or would it also
10  involve providing an element of margin?
11      MR. COCO:  Objection.
12      A.  It's a very complicated question, because
13  the key is, what is a reasonable cost?  And my
14  belief is that if health plans simply covered
15  whatever costs the provider decided to charge, that
16  health care would not be affordable.  So, I think
17  there's a balance between paying a reasonable cost
18  plus a reasonable margin, and understanding that
19  the -- that that's not -- that's not always easily
20  determined.  In fact, it's never easily determined.
21      Q.  So, we've discussed now a few different
22  factors that would be considered by the health

---

**61**

1      A.  Yes.
2      Q.  Now, it's also fair to say, isn't it, that
3  these factors would have to be balanced against
4  each other?
5      MR. COCO:  Objection.
6      A.  I'm not sure what you mean.
7      Q.  Well, let me explain.  If a health insurer
8  were to have a low -- a very low rate of
9  reimbursement --
10      A.  Uh-huh.
11      Q.  -- in other words, were not to fully cover
12  costs or were to provide a very low margin, that
13  would make it difficult for them to find an
14  adequate and a stable network, right?
15      MR. COCO:  Objection.
16      A.  Depends on the market.
17      Q.  Okay.  Yeah, absolutely.  I mean, that's
18  really -- really my focus.  Let's say you're in a
19  market where a health plan is offering a
20  reimbursement rate that's below providers' costs
21  and is below the rates offered by other health
22  insurers in the same market.  In that setting, it

---

Deborah Devaux

March 9, 2006

Boston, MA

**62**

1  would be difficult for them to get and acquire a
2  stable and adequate network, right?
3      MR. COCO:  Objection.
4      A.  I haven't had that experience, so I don't
5  know.
6      Q.  Okay.  Well, from your -- from your
7  background in consulting with these entities and
8  your knowledge of the industry, would that seem a
9  likely result?
10      MR. COCO:  Objection.
11      A.  I wouldn't want to speculate.  So, I -- I
12  don't know.  There -- you know, there's such
13  complex relationships between the health plans and
14  the providers, it's hard to predict what exactly
15  would happen under a different set of
16  circumstances, and I haven't had that exact
17  experience.
18      Q.  Okay.  Now, if a -- let's take the -- the
19  other end of the equation.
20      A.  Uh-huh.
21      Q.  Are you familiar with situations or did
22  you deal with situations where different insurers

**63**

1  would be offering different reimbursement rates in
2  the market?
3      A.  Yes.
4      Q.  Okay.  Now, did the differences in their
5  reimbursement rates play any role in affecting
6  their ability to attract and maintain adequate and
7  stable networks?
8      A.  I don't recall a situation where a health
9  plan that I interacted with was offering rates that
10  prevented them from getting a stable network.
11      Q.  Because that would commercially be suicide
12  for a health plan, wouldn't it?
13      MR. COCO:  Objection.
14      A.  You're saying if -- if a health plan
15  wasn't paying a reasonable rate, the providers
16  might not contract with them?
17      Q.  Right.
18      A.  I don't know.  Yeah, I mean, it depends on
19  the circumstance of that plan and what the provider
20  situation is.
21      Q.  So, it would be a function of the relative
22  leverage between the plan and providers.

**64**

1      MR. COCO:  Objection.
2      A.  I think that's one factor.
3      Q.  In other words, if a health plan were the
4  only health plan in a particular area, then
5  providers would be in a relatively weak position
6  and may have to accept a lower rate from that plan
7  than they would if they had a choice of plans to
8  contract with.
9      MR. COCO:  Objection.
10      A.  I haven't had that experience either.  I
11  have not been in a market where there was a plan
12  that was the only health plan or had the -- that
13  kind of market share.
14      Q.  Okay.  Well, I'm trying to understand or
15  to think of situations where a provider may be
16  willing to contract with a health plan who's
17  offering a -- a rate of reimbursement that doesn't
18  even cover their costs.  That was the only example
19  I could think of, far-fetched though it is.
20      Are there any other examples that you're
21  aware of where that might occur?
22      MR. COCO:  Objection.

**65**

1      A.  I'm not aware through direct -- direct
2  experience.
3      Q.  It's fair to say though in your experience
4  in the actual work that you did do at Ernst & Young
5  and other places, generally health insurers will
6  offer a rate that enables them to get a network and
7  will then negotiate variations within that range of
8  reasonable reimbursements.
9      MR. COCO:  Objection.
10      A.  Generally, the plans are offering rates
11  that the providers have contracted with in this --
12  in this market in Massachusetts, yes.
13      Q.  Okay.  Now, while offering rates that will
14  enable them to get adequate and stable networks,
15  commercial health insurers also need to balance
16  that against ensuring that they can maintain
17  competitive premiums, right?
18      MR. COCO:  Objection.
19      A.  I've never worked -- when you say a
20  "commercial health insurer," you mean a for-profit?
21      Q.  Yeah.
22      A.  I've never worked for a for-profit plan.

66

1    Q.   Uhm.  What were the -- the plans that you
2  were working with while at Ernst & Young?
3    A.   I worked with Kaiser Health Plan.  And I
4  worked with the Santa Rosa Health Plan, which was
5  also a not-for-profit; I worked with the Blue Cross
6  plan in New York, which was not-for-profit at that
7  time, Blue Cross plan in Vermont, which was
8  not-for-profit; I coincidentally have not had
9  experience with for-profit plans.
10    Q.   Well, not-for-profit plans also pay
11  careful attention to their finances, right?
12       MR. COCO:  Objection.
13    A.   Yes.
14    Q.   Indeed, they have legal obligations to do
15  so, even if not a commercial incentive to make
16  money.
17       MR. COCO:  Objection.
18    A.   Yes, health plans have to manage finances.
19    Q.   So, when -- let's take the example of a
20  not-for-profit plan, they want to pay a cost or a
21  margin that will enable them to have an adequate
22  and a stable network, but they don't want to pay

67

1  more than they have to, right?
2       MR. COCO:  Objection.
3    A.   I'm not sure what you mean by "more than
4  they have to."
5    Q.   Sure.  I mean, it -- would it be fair to
6  say that a health plan -- a commercial or
7  not-for-profit -- would go into a negotiation of
8  the types we've been discussing with the aim of
9  achieving the best deal that it can financially,
10  while still meeting its goals of having a stable
11  network and predictable rates of reimbursement?
12       MR. COCO:  Objection.
13    A.   I think health plans have to decide their
14  own -- I don't think there's a general approach
15  that's taken by all health plans.  I think each
16  individual plan has its own contracting strategy.
17    Q.   Well, my -- my question is, wouldn't it be
18  fair to say that all of these plans enter into a
19  contracting process and a negotiating process
20  looking to achieve a final result that they see is
21  commercially acceptable to them?
22       MR. COCO:  Objection.

68

1    Q.   That's a statement -- a general statement
2  you can agree to, right?
3       MR. COCO:  Objection.
4    A.   I think I'd be going beyond my knowledge
5  to comment on all health plans.
6    Q.   Okay.
7    A.   My knowledge isn't that broad.
8    Q.   Let's focus on the health plans that you
9  worked with while you were at Ernst & Young.
10    A.   Yeah.
11    Q.   So, the Kaiser, Santa Rosa, the BCBS
12  plans.
13    A.   Yeah.
14    Q.   Would it be fair to say that those health
15  plans entered into the negotiating process with the
16  goals of, you know, having reasonable cost plus
17  margin, getting a stable network, ensuring that
18  they can have competitive premium rates,
19  predictable rates of reimbursement, and balancing
20  all of that or weighing all of that together with
21  the need to achieve the best commercial deal that
22  they can in the marketplace?

69

1       MR. COCO:  Objection.
2    A.   I didn't really discuss it in that way
3  with the clients at that time.  We were generally
4  working on a more specific area of focus, not their
5  general contracting strategy or approach or
6  their --
7    Q.   Uh-huh.
8    A.   -- complete philosophy and thinking about
9  the market.
10    Q.   Okay.
11    A.   So, generally, it was around an individual
12  relationship and what was reasonable in that
13  relationship.
14    Q.   Let's focus then on -- let's talk about
15  those specifics.
16    A.   Yeah.
17    Q.   One of the goals you mentioned is -- is
18  competitive premiums --
19    A.   Yes.
20    Q.   -- right?  What did you mean by that?
21    A.   Premium that enables the plan to sell its
22  product in its marketplace.

70

1    Q.   Because health plans need to compete with
2  other health plans for the same clients, right?
3    A.   Right.
4    Q.   Now, one of the factors that determines
5  what premiums a plan can offer is the costs it's
6  incurring for reimbursement, right?
7    A.   That is one of the factors.
8    Q.   All right. So, in other words, if a plan
9  can achieve a -- a low rate of reimbursement while
10 still maintaining an adequate network, that will
11 help it offer more competitive premiums.
12     MR. COCO:  Objection.
13   A.   Not necessarily.  I mean, there are other
14 factors that go into what the premium is, including
15 the volume of services used, the mix of services
16 used --
17   Q.   For --
18   A.   -- etcetera, so, I don't think there's a
19 one-to-one correlation.
20   Q.   Fair enough.  As someone who has studied
21 economics, let's do what economists do and say --
22   A.   Don't give that too much credit.  If you

71

1  studied economics -- I sort of vaguely remember my
2  class in economics, but that's --
3    Q.   Well, let's adopt the economics precept as
4  saying all other things remaining equal.
5    A.   Yeah.
6    Q.   So, all other things remaining equal, if a
7  health plan is able to negotiate a relatively low
8  rate of reimbursement, that will enable them to
9  achieve more competitive premium rates in the
10 market, right?
11     MR. COCO:  Objection.
12   A.   Never been in a situation where all other
13 things remained equal.
14   Q.   I understand that.
15   A.   So, I'd be --
16   Q.   In that --
17   A.   I'd be hypothesizing beyond my experience.
18   Q.   I understand that.  But in that situation,
19 based on your -- the experience that you do have,
20 would you agree with me that, all other things
21 remaining equal, if a health plan is able to
22 achieve lower rates of reimbursement, that will be

72

1  one factor that will assist it in offering more
2  competitive premiums?
3      MR. COCO:  Objection.
4    A.   It is one factor that would go into
5  creating a lower premium.  Whether it would be more
6  competitive or not depends on what the other health
7  plans are doing.  It's never a static situation.
8    Q.   Now, we spent some time talking about the
9  goals of the health plan clients you had at Ernst &
10 Young --
11   A.   Yes.
12   Q.   -- and this negotiating process.  Now,
13 let's talk about the provider side.  What --
14     MR. COCO:  Adeel, if -- we've been going
15 about an hour and a half.  Is this a good break
16 or --
17     MR. MANGI:  Yeah.  Why don't we go up till
18 11, if that's okay with you, then we'll finish off
19 this line, and then move to something else.
20     THE WITNESS:  All right.  Sure.
21   Q.   Now, what about the provider entities that
22 you consulted with, what were their goals as they

73

1  entered into these negotiating --
2    A.   Really some, more on the mirror side of
3  it.  They wanted to understand the -- their revenue
4  stream, the adequacy of it, the predictability of
5  it.  They wanted to understand the nature of the
6  relationship with the plan.  Generally, the
7  providers also wanted to have stable relationships
8  for similar reasons to the health plans.  They
9  didn't want to disrupt the members.
10      I think, you know, different providers are
11 in different circumstances in terms of their
12 current capital needs, which is a greater concern
13 for providers than it is for health plans, because
14 they're having to project what they're going to
15 need to invest in in buildings, I think, in a much
16 more significant way than health plans do.  So,
17 they're generally trying to -- to make sure that
18 they're adequately planning for what they're going
19 to need to invest in capital going forward in a way
20 that's -- puts a little bit different twist on it
21 than it does for the health plans.
22   Q.   How about in terms of the rates of

Deborah Devaux                                    March 9, 2006
Boston, MA

---

74

1   reimbursement versus costs and margin?  What were
2   the goals of the providers in regards of those
3   issues when negotiating with health insurers?
4       A.   Yeah.  Again, I don't exactly remember at
5   that time what the margins were, and this was in
6   different marketplaces around the country, and as
7   I'm sure you know, in some markets, the margins
8   that are achieved by providers are, in general,
9   lower than others.
10      So, in California, I think people were
11  just trying to survive.  In Vermont, probably the
12  margins were above cost.  But as I mentioned, I
13  think in general, the hospital and physician
14  industry has been a very low margin.  Those have
15  been very low-margin industries, as have the health
16  plan industry.
17      In general, the providers are first trying
18  to meet the goal of covering costs, and then, you
19  know, some -- some margin above that.  As I said,
20  probably a third in the 1 to 2 percent range, and
21  then, in any given market it differs, but probably
22  another 20, 30 percent that are above a 2 percent

---

75

1   range.
2       Q.   Okay.  And these are hospital clients that
3   you're referring to?
4       A.   Hospitals, yeah.  Physicians, I don't know
5   as much about the -- the margins.  I think it's
6   harder to calculate exactly what the physician
7   costs include.
8       Q.   Were the provider entities you were
9   consulting with while at Ernst & Young commercial
10  entities or not-for-profits?
11      A.   I believe they were all not-for-profits.
12  Some of the physician entities within the systems
13  may have been for profit.  The hospitals, I
14  believe, were all not-for-profit.
15      Q.   Okay.  Given the -- the nature of the
16  market as you've described it, would it be fair to
17  say that their goal was to cover all of their
18  reasonable costs and then earn whatever margin they
19  would be able to negotiate with the health insurer?
20      MR. COCO:  Objection.
21      A.   It certainly was to cover their costs.  I
22  don't know exactly what the goals were around

---

76

1   margin.  There was certainly an implicit
2   understanding that they needed to cover reasonable
3   costs.
4       Q.   Okay.  Well, let me ask the question more
5   broadly.  Was one of their goals in the negotiating
6   process to maximize the amount of reimbursement
7   that they could achieve?
8       A.   You know, we're talking about different
9   clients in different markets with different
10  parameters and boundaries.  I think it's -- if
11  you're -- if you're really asking me to make a
12  global characterization about, in general, how do
13  providers want to come out of a negotiation, they
14  want to be -- they want to feel that they're being
15  paid fairly relative to other providers in that
16  market; that they're not being disadvantaged; and
17  that they can cover their costs, plus some margin.
18  And what the variation is in terms of what
19  different providers think that margin should be,
20  I'm not really -- I'm not an expert on.
21      Q.   Well, that's fair enough, because the --
22  the perceptions of what would be an appropriate

---

77

1   margin will vary from provider to provider, right?
2       A.   Yeah.  I think, again, going back to what
3   their past history has been around capital,
4   investment, and you know, circumstances that have
5   occurred at the hospital, it might vary, even for
6   any hospital, over a period of time.
7       Q.   Now, we've spoken about the goals of your
8   health plan clients; we've spoken about the goals
9   of your provider clients, I assume you never
10  represented both sides of a negotiation, right --
11  of the same negotiation?
12      A.   That's right.
13      Q.   Okay.  But you've had insight into what
14  some of the considerations are for parties on
15  either side of that divide through your work at New
16  England Medical Center and then at Ernst & Young.
17      A.   Yes.
18      Q.   Okay.  Now, when these two sides come
19  together to negotiate, each with their own set of
20  goals and priorities, as we've discussed, what are
21  the factors that determine what is the eventual
22  deal that results?

---

Deborah Devaux

March 9, 2006

Boston, MA

---

**78**

1      MR. COCO:  Objection.
2      A.  Boy, I think it varies a lot under
3  different circumstances.
4      Q.  Absolutely.  And I'd like to get an
5  understanding as to what those circumstances are
6  that result in variation.  In other words --
7      A.  Okay.
8      Q.  -- what are the factors that will impact
9  the terms that are achieved in that negotiation?
10      MR. COCO:  Objection.
11      A.  You know, I've tended to focus on an
12  individual negotiation and not globalizing it to
13  what the factors are that would apply to all of
14  them, so I really haven't given that issue a lot of
15  thought.
16      Q.  Well, you can certainly think about it --
17  approach it from the perspective of individual
18  situations that you did deal with.  Okay.
19      A.  Well --
20      Q.  Can you give me examples to help me
21  understand what are the factors that will determine
22  the eventual terms reached.

---

**79**

1      MR. COCO:  Objection.
2      A.  I just, you know, I sort of can't
3  formulate on the fly what I think those factors
4  are.  I'd have to focus on an individual situation,
5  and I haven't really thought about it in that way.
6      Q.  Well, let's -- let's think about it at a
7  level of generality, then that may make it easier
8  to consider.  All of these negotiations with which
9  you were involved --
10      A.  Yeah.
11      Q.  -- at your time at Ernst & Young, these
12  were all free market, arm's-length negotiations,
13  right?
14      A.  With Ernst & Young, I wasn't exactly
15  involved in the negotiations themselves.
16      Q.  Fair enough.  Let me --
17      A.  But --
18      Q.  -- rephrase the question.
19      A.  Yeah.
20      Q.  During your time at Ernst & Young, you
21  provided advice to health plans and providers that
22  they eventually utilized when approaching contract

---

**80**

1  negotiations, right?
2      A.  Yes.
3      Q.  Okay.  And the contract negotiations that
4  you were advising them in contemplation of --
5      A.  Uh-huh.
6      Q.  -- these were all free market,
7  arm's-length negotiations between independent
8  entities?
9      A.  Yes.
10      Q.  Okay.  At a level of generality, would it
11  be fair to say that the eventual deal that was
12  struck or the terms that resulted were a function
13  of the free market dynamic, two parties coming to a
14  negotiation with their own goals, and then arriving
15  at a deal through a process of negotiation?
16      MR. COCO:  Objection.
17      A.  Yeah, I don't know what the word "free
18  market" means when it's provide -- when it's
19  applied to health care.
20      Q.  Okay.
21      A.  'Cause within any given market where a
22  plan and a provider exist, there isn't necessarily

---

**81**

1  an option for the health plan to find another
2  provider in that same geography or for the provider
3  to find another health plan with that group of
4  members.  So, I'm not really sure I know what "free
5  market" means in that context.
6      Q.  Perhaps my phraseology was inelegant.  Let
7  me try that question again then.  Would it be fair
8  to say that when these health plans and provider
9  groups come together to negotiate a contract --
10  each with their own priorities and goals in the
11  process -- the end result, the deal that they would
12  eventually reach, will be a function of that
13  negotiating dynamic between the two of them.
14      MR. COCO:  Objection.
15      A.  Yeah, I'm just not sure what you're trying
16  to get at.  They will negotiate and they will come
17  to a conclusion, and the conclusion is a result of
18  the negotiation, yeah.
19      Q.  Now, these health plans that you were
20  advising --
21      A.  Uh-huh.
22      Q.  -- were they using different methodologies

---

Deborah Devaux                                                    March 9, 2006

Boston, MA

82

1   to reimburse providers?
2      A.  Yes.
3      Q.  Some risk sharing, some fee for service --
4      A.  Yes.
5      Q.  So --
6      A.  Yes.
7      Q.  Would it be fair to say that the
8   contracting process that we've described, the
9   negotiating leverage that results in a deal, those
10  dynamics apply equally, regardless of whether
11  you're talking about a structure that's fee for
12  service or a structure that's risk sharing or
13  anything else?
14     MR. COCO:  Objection.
15     A.  In my experience, the structure of the
16  arrangement doesn't necessarily -- it does not have
17  a one-to-one correlation with a particular
18  negotiation process.  So, it's not that all
19  fee-for-service negotiations follow one negotiation
20  process or dynamic and all risk arrangements follow
21  another or that they're necessarily related.
22     Q.  Okay.  In other words, the -- the same

83

1   dynamics that apply in any negotiation, competitive
2   negotiation, will apply to a fee-for-service-based
3   negotiation or a capitated-based negotiation or any
4   other negotiation.
5      MR. COCO:  Objection.
6      A.  I don't think that identical dynamics
7   apply in any situational relationship, whether it's
8   between a health plan and a provider or any other
9   circumstance.
10     Q.  I'm not suggesting that they do.
11     A.  Yeah.
12     Q.  My point is simply that the competitive
13  dynamic -- the fact that there is a competitive
14  dynamic; the fact that there is negotiation that
15  results in a deal --
16     A.  Yes.
17     Q.  -- that process exists and takes place,
18  regardless of what specific methodology you're
19  talking about, right?
20     MR. COCO:  Objection.
21     A.  The negotiation needs to take place
22  regardless.

84

1      Q.  Now --
2      A.  Whether -- what that negotiation consists
3   of, I think, is not -- you can't generalize.
4      Q.  Okay.
5      MR. MANGI:  Let's take a break now.
6      THE WITNESS:  Okay.
7      VIDEO OPERATOR:  The time is 11:05.  We're
8   off the record.
9      (Recess was taken.)
10     VIDEO OPERATOR:  The time is 11:23 a.m.
11  We're on the record.
12     Q.  Now, Ms. Devaux, before the break we made
13  our way up to 1998.  In 1998, did you leave Ernst &
14  Young?
15     A.  Yes.  I went back to the successor
16  organization for Harvard Community Health Plan
17  which at that time was Harvard Pilgrim Health Care.
18  They acquired Harvard Community Health Plan.
19     Q.  How long did you remain at Harvard
20  Pilgrim?
21     A.  Let's see.  So, I went there in 199 --
22  what did we come up with?

85

1      Q.  '8?
2      A.  -- '8, we're saying?  Must be off by a
3   year here and there over the course of time, 'cause
4   I was there for about three years before I came to
5   Blue Cross in July of 2000.  That's the only clear
6   date in my mind.  Before that it's all a little
7   hazy.  So, I may have given you six months here or
8   there wrong on the other job, but I stayed there,
9   again, for, like, roughly three years.  So, I must
10  be a little off on some of the other numbers.
11     Q.  In -- in your time at Harvard Pilgrim --
12     A.  Yes.
13     Q.  -- how many positions did you hold?
14     A.  One.
15     Q.  And what was that position?
16     A.  Director of contracting.
17     Q.  Who were you responsible for contracting
18  with?
19     A.  I was responsible for contracting with all
20  providers, with the exception of behavioral health
21  and pharmacy.
22     Q.  Behavioral health, are those psychiatric

Deborah Devaux

March 9, 2006

Boston, MA

---

86

1  facilities?
2      A.  Yes, psychiatric facilities and
3  professionals.
4      Q.  Now, was your work as director of
5  contracting informed in any way by your experience
6  at Ernst & Young advising providers?
7      A.  I'm sure I learned something.
8      Q.  All right.  And so, was it informed by
9  your experience at the New England Medical Center
10  negotiating contracts on behalf of that provider?
11      A.  Yes, I think that my world view at that
12  time was probably influenced by all of my previous
13  experiences.
14      Q.  Could you help me understand some of the
15  respects in which your earlier roles give you
16  insight or knowledge that was useful to you in your
17  role at Harvard Pilgrim?
18      A.  I think one thing that was clear to me is
19  that the health plans don't have -- that health
20  plans in general do not have a full understanding
21  of all of the complexities of running provider
22  organizations and vice versa, and there often tends

---

87

1  to be -- it tends to be helpful to have an exchange
2  about the challenges and the complexities of each
3  organization in developing the relationships.
4      Q.  Anything else?
5      A.  I think the other major learning over the
6  course of my career is that in a -- in a long-term
7  relationship, it doesn't benefit either party to
8  have -- to have the view that by -- that by holding
9  back on an understanding of the facts that it will
10  ultimately benefit the long-term relationship.
11      Q.  Anything else?
12      A.  No.
13      Q.  Okay.  Let's talk about the first point
14  you mentioned, that -- you said it would be -- you
15  understood that it would be helpful to have an
16  exchange about the challenges and the complexities
17  that each side faces.
18      A.  Right.
19      Q.  In your role as director of contracting at
20  Harvard Pilgrim, did you take any steps to have
21  such exchanges?
22      A.  Yes.

---

88

1      Q.  All right.  What sort of steps did you
2  implement?
3      A.  I'd say the major one was that, in most
4  negotiations, I encouraged the people in my group
5  to start the discussions with getting a clear
6  understanding of what the provider that we were
7  working with, what their current issues were, both
8  in general, and in our relationship, and to do the
9  same from our perspective, so that each party had a
10  general understanding of the -- the issues that
11  were of importance to the other.
12      Q.  Was that -- were these a -- was this an
13  emphasis that you placed on something to be done at
14  the start of the negotiating process, or was it
15  some sort of structured series of meetings
16  independent of the negotiating process?
17      A.  As I recall, it generally occurred as part
18  of the negotiating process, because that was
19  generally when we were interacting with the
20  providers.  So, we weren't responsible -- my group
21  wasn't responsible for all of the interactions
22  between the plan and the provider, but there

---

89

1  certainly were times where we had meetings with the
2  provider outside of the negotiation to talk about
3  what their circumstances were or where the
4  contracts played out differently than the providers
5  had planned, so they came back in to talk with us
6  about it.
7      Q.  Okay.  Now, focusing on -- well, in the
8  course of -- withdraw that.  In the course of those
9  initial exchanges where you would try to get a
10  clear understanding of the complexities, did you
11  also encourage your staff to implement the second
12  lesson that you identified, which is to have a full
13  and frank disclosure of information?
14      A.  Yes.
15      Q.  Now, focusing on physicians, physician
16  practices --
17      A.  Yes.
18      Q.  -- and leaving aside hospitals for the
19  moment --
20      A.  Yes.
21      Q.  -- when you or your team at Harvard
22  Pilgrim entered into these negotiations and had

---