Kelly Ellston         Highly Confidential        November 23, 2004
                        Washington, DC

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - - x

 4    In re:  PHARMACEUTICAL         :MDL DOCKET NO.

 5    INDUSTRY AVERAGE WHOLESALE      :CIVIL ACTION

 6    PRICE LITIGATION                :01CV12257-PBS

 7    - - - - - - - - - - - - - - x,

 8                          Tuesday, November 23, 2004

 9                          Washington, D.C.

10

11              HIGHLY CONFIDENTIAL

12

13       Deposition of KELLY ELLSTON, commencing at

14    9:59 a.m., held at the offices of Morgan, Lewis &

15    Bockius, 1111 Pennsylvania Avenue, N.W., Washington,

16    D.C., before Keith Wilkerson, a notary public in and

17    for the District of Columbia.

18

19

20

21

22
```

Kelly Ellston

Highly Confidential
Washington, DC

November 23, 2004

2 (Pages 2 to 5)

<table><tr><td colspan="2">

**Page 2**

1    APPEARANCES OF COUNSEL
2  Attorneys for Johnson & Johnson:
3     Patterson, Bellknap, Webb & Tyler
4     1133 Avenue of the Americas
5     New York, New York  10036
6     (212) 336-2000
7  BY:  ADEEL A. MANGI, ESQ.
8
9  Attorney for the Plaintiffs:
10    Hoffman & Edelson
11    45 West Court Street
12    Doylestown, Pennsylvania  18901
13    (215) 230-8043
14  BY:  ALAN V. KLEIN, ESQ.
15    (Via telephone.)
16
17  Attorney for the Witness:
18    ULLICO Inc.
19    1625 Eye Street, N.W.
20    Washington, D.C.  20006
21    (202) 682-0900
22  BY: PATRICK MCGLONE, ESQ.

</td><td>

**Page 4**

1         PROCEEDINGS
2   Whereupon,
3         KELLY ELLSTON
4  was called for examination by counsel for Johnson &
5  Johnson and, after having been duly sworn by the
6  notary public, was examined and testified as follows:
7    EXAMINATION BY COUNSEL FOR JOHNSON & JOHNSON
8       BY MR. MANGI:
9    Q.  Good morning, Ms. Ellston.  As I said
10  when we just met, my name is Adeel Mangi with the law
11  firm of Patterson, Bellknap, Webb & Tyler.  We
12  represent Johnson & Johnson in this action.  Have you
13  ever been deposed before?
14    A.  Not in a deposition.  I have testified in
15  a hearing.
16    Q.  Some of these ground rules will be
17  familiar to you, then, but I'll run through them
18  anyway.  One is please make an effort to answer all
19  questions verbally because the court reporter can't
20  take down a nod of the head or shrug of the
21  shoulders.  Okay?
22    A.  Okay.

</td></tr><tr><td>

**Page 3**

1      INDEX OF EXAMINATIONS
2  WITNESS                    PAGE
3  KELLY ELLSTON
4  By Mr. Mangi              4, 92
5  By Mr. Klein                91

</td><td>

**Page 5**

1    Q.  If at any point during the deposition
2  you'd like to take a break, please let me know, and
3  we'll do that.  Okay?
4    A.  Yes.
5    Q.  If at any point a question I ask is
6  unclear, please stop me and tell me that, and I'll do
7  my best to rephrase it.  Okay?
8    A.  Okay.
9       MR. KLEIN:  Can I ask everybody to speak
10  near the speaker box so it's easier for me to hear?
11       MR. MANGI:  Are you able to hear right
12  now?
13       MR. KLEIN:  Yes.
14       (Discussion off the record.)
15       BY MR. MANGI:
16    Q.  Could we start with some background,
17  please?  Could you describe for me your educational
18  background?
19    A.  I am a registered nurse with an
20  associate's degree from Harford Community College.  I
21  also have an MBA in international business from
22  Loyola College of Maryland.

</td></tr></table>

Kelly Ellston                    Highly Confidential              November 23, 2004
                                 Washington, DC

6

1   Q.  The associates, is that your first
2   education after high school?
3   A.  That's correct.
4   Q.  When did you get that degree?
5   A.  1982.
6   Q.  Did you then go into full time
7   employment?
8   A.  Yes.  I was a registered nurse in
9   intensive care, cardiothoracic surgery.
10  Q.  And when did you start working as a
11  registered nurse?
12  A.  Washington Hospital Center.
13  Q.  When did you start that job?
14  A.  1982, right after school.
15  Q.  How long did you remain a nurse in the
16  intensive care unit?
17  A.  I worked as an intensive care nurse
18  through 1987.
19  Q.  During the time that you worked as a
20  nurse, did you have any role in drug purchasing or
21  reimbursement?
22  A.  None.

7

1   Q.  In '87 did you move into a different
2   position?
3   A.  Yes, I did.
4   Q.  What position did you move into?
5   A.  I began to work in utilization review for
6   what is now CareFirst.  It was a different
7   corporation at the time.
8   Q.  That's a health insurer, isn't it?
9   A.  It was an HMO.
10  Q.  What was it called at the time?
11  A.  I think it was HCA CareFirst.  It was
12  owned by a holding company.
13  Q.  So you went straight from the position as
14  a nurse in the intensive care unit to the position at
15  CareFirst.  Is that correct?
16  A.  That's correct.
17  Q.  How long did you remain at CareFirst?
18  A.  For a year.
19  Q.  So until 1988?
20  A.  Yes.
21  Q.  What were your responsibilities at
22  CareFirst?

8

1   A.  I was an on site reviewer at a hospital
2   looking at the appropriateness of care and level of
3   care for the HMO.
4   Q.  What was your title?
5   A.  Utilization review coordinator.
6   Q.  Was your focus there just on the
7   selection of drugs, or were you also looking at the
8   prices of drugs?
9   A.  Not at all about drugs.  I was looking at
10  the care that was being provided for the whole
11  patient and whether the level of care was appropriate
12  for the setting as well as for the outcome, the
13  quality.
14  Q.  Did you have any role relating to the
15  pricing or reimbursement for drugs?
16  A.  No.
17  Q.  Were you based at one particular hospital
18  or more than one hospital?
19  A.  For the most part Bayview Medical Center,
20  but I did have assignments to other hospitals on a
21  rotating basis at times.
22  Q.  And do you know what Bayview or any other

9

1   hospitals you worked at paid to acquire drugs?
2   A.  No.
3   Q.  Do you know the methodology that
4   CareFirst used to reimburse those hospitals in
5   relation to drugs administered to patients?
6   A.  No.
7   Q.  In '88 did you move to a different
8   position?
9   A.  I worked for United Health Care as a
10  supervisor of case management and quality assurance.
11  Q.  Returning for a moment to your position
12  at CareFirst, would you characterize your
13  responsibilities as focusing on the analysis of
14  clinical care being provided to members?
15  A.  Yes.
16  Q.  Would the same be true of your work at
17  United?
18  A.  Yes.
19  Q.  How long did you remain at United?
20  A.  A year.
21  Q.  That's through 1989?
22  A.  Yes.

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                    Washington, DC

4 (Pages 10 to 13)

---

**10**

1    Q.  And what were your responsibilities while
2   at United?
3       A.  I was responsible for supervising a case
4   management team of professional nurses who were
5   responsible for evaluating high cost, high intensity
6   patients.  I was also responsible for quality
7   assurance, which was that the nurses were doing what
8   they should do at the right time, and they were
9   referring things for medical advice as appropriate.
10      Q.  Were you based at a hospital?
11      A.  No.  It was a national firm.  We had
12  primarily self-insured clients, and it was all over
13  the country, the clients that we served.
14      Q.  Did you have any role in the pricing of
15  drugs or the reimbursement for drugs?
16      A.  No.
17      Q.  Where did you move to in 1989?
18      A.  I went to work as the manager of
19  utilization management and case manager for Johns
20  Hopkins Health Plan.
21      Q.  Were you based in Baltimore?
22      A.  Yes.

---

**11**

1       Q.  What were your responsibilities in that
2   position?
3       A.  I was responsible for managing the
4   utilization review nurses, case managers, referral
5   unit, which is people to make sure that patients
6   actually got to the doctors that they needed to for
7   what was then primarily a Medicaid HMO, owned and
8   operated by the Johns Hopkins health system.
9       Q.  How long did you remain at the John
10  Hopkins Health Plan?
11      A.  I think it was four years.  Four or five
12  years.  I don't remember exactly.
13      Q.  So until sometime in '94?
14      A.  Yes.
15      Q.  While at that job at Johns Hopkins, did
16  you have any responsibility for reimbursement for
17  drugs or anything relating to the pricing of drugs?
18      A.  No.  We had a separate pricing program.
19      Q.  Do you know what methodology Johns
20  Hopkins used to reimburse either hospitals or
21  pharmacies for drugs?
22      A.  The only recollection I have is that for

---

**12**

1   the most part it was a capitated model at the time,
2   and I believe they were probably, and this is not a
3   lot of knowledge, a capitated model.
4       Q.  In 1994 did you then leave Johns Hopkins
5   and move to another job?
6       A.  I did.
7       Q.  Where did you go in 1994?
8       A.  I worked for the University of Maryland
9   physician faculty practice at the School of Medicine.
10  I was the director of network development and
11  operations.
12      Q.  Now, the University of Maryland physician
13  faculty practice, did you say?
14      A.  Yes.
15      Q.  What is that institution?
16      A.  It is the private practice of the doctors
17  who are part of the School of Medicine of the
18  University of Maryland.
19      Q.  And what were your responsibilities
20  there?
21      A.  I ran the family practice office.  I was
22  responsible for building a primary care network for

---

**13**

1   the university in a joint venture between the
2   hospital and the doctors in their primary delivery
3   area, mainly focusing on Medicaid primary care
4   delivery.
5       Q.  When you say you were responsible for
6   building a network, what do you mean by that?
7       A.  I was responsible for locating
8   facilities, the architecture, the actual physical
9   plant, setting up the billing and scheduling system,
10  AP system, hiring people, the entire entity.  And in
11  fact, we created an entity called University Care
12  LLC, which was a joint venture between the hospital
13  and the doctors, and I ran that.
14      Q.  Can we refer to the University of
15  Maryland physician faculty practice as the University
16  of Maryland short form?
17      A.  I would call it UPI, and they would call
18  it UPI.
19      Q.  Fair enough.  Did UPI function as a
20  health insurer?
21      A.  UPI did not.  There was, as part of the
22  University Care LLC program a self-insured product

---

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                 Washington, DC

5 (Pages 14 to 17)

14
1   that was built to support the employees of the
2   hospital and of the faculty practices, so in effect
3   there was a plan that was created out of that entity.
4       Q.  What was that plan called?
5       A.  I don't remember.  It was something like
6   University Care.  It has university in it.  I don't
7   remember the specific -- I don't remember.
8       Q.  Did you have any responsibilities in
9   relation to that plan?
10      A.  I was on the implementation team to the
11  extent that part of the plan focus was to help to
12  have a way of the employees being incented or helped
13  to get services within the university system.  And so
14  to the extent I was responsible for the delivery
15  system, I was responsible to make sure the
16  through-put activities could occur.
17      Q.  What sort of incentives were put in
18  place?
19      A.  You had less of a copay if you went to
20  the actual faculty practice and the doctor or the
21  hospital, the members did.
22      Q.  Other than members of that self-insured

15
1   plan for employees of the university, were other
2   patients also being served by the network that you
3   had set up?
4       A.  Yes.
5       Q.  Were those other patients only Medicaid
6   patients, or were they also privately insured?
7       A.  Privately insured and Medicaid and
8   Medicare.
9       Q.  Were you responsible for the contracting
10  between the physicians' practices and these other
11  commercial insurers?
12      A.  I was not.
13      Q.  Who was responsible for that?
14      A.  We had an office, a managed care office,
15  that worked again for both the hospital and for UPI
16  to contract directly with the payers.
17      Q.  So is it fair to say that you were
18  responsible for contracting between UPI and the
19  practices, and then someone else handled contracting
20  agreements between insurers?
21      A.  In fact UPI was a partial owner of those
22  practices, so that was an owner relationship in

16
1   effect.  What we were is actually the doctors'
2   offices that provided services that said if this
3   member is assigned to this office, you have a place
4   to go and you're able to see them.
5       Q.  Now, I believe you mentioned you had some
6   responsibilities for billing.  Is that correct?
7       A.  I had responsibilities for billing for
8   the visits that people would have in the doctors'
9   offices.
10      Q.  And that would be -- those bills would be
11  sent to private insurers as well as other entities?
12      A.  That's correct.  For the most part,
13  because of the way the structure was, the billing --
14  most of our clientele were paid to us on a capitated
15  basis, so for the most part our billing was encounter
16  based, where we were just sending back to the payer
17  what was done so that they could look against our
18  capitation to see what was delivered.  There was not
19  very much fee for service billing that was done.
20      Q.  Did the capitated amounts paid include
21  any drugs administered in the physicians' offices?
22      A.  It would have included most that would be

17
1   considered part of the course of the primary care,
2   such as immunizations, allergy injections, even
3   things like IV solutions if someone was dehydrated.
4   For the most part that's included.
5       Q.  What about other injectable and infusible
6   drugs?
7       A.  For the most part those were not
8   delivered within our centers and were either -- there
9   was an occasional drug that was a prescription drug
10  the person would pick up at the pharmacy and bring
11  back and we would administer it.  And because we were
12  a family practice and not high-tech, we were not
13  doing any chemotherapeutic agents or anything like
14  that.  For the most part it was the normal run of the
15  mill capitated copay drugs.
16      Q.  Was this network exclusively family
17  practice?
18      A.  Yes.
19      Q.  There were no other specialties?
20      A.  Not in the area I was responsible for.
21      Q.  And how long did you remain at UPI?
22      A.  Until 2000.

Kelly Ellston                 Highly Confidential                 November 23, 2004
                              Washington, DC

6 (Pages 18 to 21)

| 18 | 20 |
|---|---|
| 1    Q.  Do you know whether UPI or the | 1   fee schedules were generated, what the methodology |
| 2  university, for that matter, was purchasing drugs | 2   was? |
| 3  directly at any point? | 3       A.  At Coventry? |
| 4       A.  I have no idea. | 4       Q.  Yes. |
| 5       Q.  Where did you move to in 2000? | 5       A.  Multiple ways.  And because there were -- |
| 6       A.  I worked for Coventry Health Care. | 6   Coventry is organized around regional health plans. |
| 7       Q.  What was your position there? | 7   The regional health plans have the direct contracts |
| 8       A.  I was director of customer service | 8   with the doctors. Each one, depending on their area, |
| 9  operations for one of their customer service centers. | 9   there were different methodologies for reimbursement. |
| 10      Q.  How long did you remain at Coventry? | 10      Q.  Were any of those AWP based formula for |
| 11      A.  For a year. | 11  reimbursement? |
| 12      Q.  Was that your position throughout? | 12      A.  I don't know. |
| 13      A.  Yes. | 13      Q.  Do you know what any of the specific |
| 14      Q.  What were your responsibilities in that | 14  formulae were for any regions? |
| 15  position? | 15      A.  Not specifically.  I know in general some |
| 16      A.  I was responsible for claims and customer | 16  different concepts of the types of ways it's done, |
| 17  service for health plans within the southeast region, | 17  but I don't know specifically which ones where. |
| 18  approximately 500,000 lives. | 18      Q.  Are you aware that reimbursement is often |
| 19      Q.  When you say claims and customer service, | 19  tied to pricing benchmarks? |
| 20  were you interacting with individual insureds or with | 20      A.  They can be. |
| 21  physician practices? | 21      Q.  Are you aware of any particular |
| 22      A.  Both. | 22  benchmarks that are used in reimbursement? |

| 19 | 21 |
|---|---|
| 1      Q.  Was this a hot line? | 1        MR. MCGLONE:  Let me object to the form |
| 2       A.  It's a call center, yes. | 2   of the question as overbroad.  If you understand, you |
| 3       Q.  And who calls the center?  Is it both | 3   can answer. |
| 4  patients and doctors? | 4        THE WITNESS:  As I said before, in any |
| 5       A.  Yes. | 5   contracting arena there are everything from discounts |
| 6       Q.  What sort of issues would patients bring | 6   to capitation to all kinds of different ways, so |
| 7  to the hot line? | 7   since 1987-1988 I've seen a bazillion different ways |
| 8       A.  Claims weren't paid, claims weren't paid | 8   people can get paid. |
| 9  correctly, it took too much copay, charged them as | 9        BY MR. MANGI: |
| 10  out of network when they should have been in network. | 10      Q.  And indeed, health plans are free to use |
| 11      Q.  And how about physicians? | 11  any reimbursement methodology that they choose when |
| 12      A.  It took too much copay, we're in network, | 12  reimbursing physicians for drugs administered in |
| 13  out of network, didn't pay on time, didn't pay per | 13  office.  Correct? |
| 14  fee schedule. | 14      A.  I believe so.  Again, on the physician |
| 15      Q.  During your time at Coventry did you gain | 15  side, based on different laws and regulations about |
| 16  an understanding of how Coventry reimbursed | 16  what they are allowed to do and allowed to bill, yes. |
| 17  physicians' practices for drugs administered in their | 17      Q.  And to quote back your testimony, there |
| 18  offices? | 18  are a bazillion different ways in which they can do |
| 19      A.  It was based on contracting and fee | 19  it.  Correct? |
| 20  schedules, and that was a different area of Coventry. | 20      A.  There are, yes. |
| 21  Our responsibility was to pay. | 21      Q.  Now, you were at Coventry from 2000 to |
| 22      Q.  Do you have an understanding about how | 22  2001.  Right? |

Kelly Ellston                 Highly Confidential                 November 23, 2004
                              Washington, DC

22

1     A.  That's correct.
2     Q.  In 2001 did you move to a different job?
3     A.  Yes.  I moved to Union Labor Life.
4         MR. KLEIN:  Can you repeat that?
5         THE WITNESS:  I moved to Union Labor Life
6   Insurance Company.
7         MR. KLEIN:  Thank you.
8         BY MR. MANGI:
9     Q.  And that's where you're still employed.
10  Correct?
11    A.  That's correct.
12    Q.  Have you been continuously employed by
13  Union Labor Life since 2001?
14    A.  That's correct.
15    Q.  What position did you come to at Union
16  Labor Life?
17    A.  The assistant vice president for claims
18  and care management.
19    Q.  How long did you remain in that position?
20    A.  I'm still in that position.
21    Q.  So your title is currently assistant VP
22  for claims and care management?

23

1     A.  That's right.
2     Q.  Who do you report to?
3     A.  The VP of insurance operations.
4     Q.  And who is that?
5     A.  Jim Tillotson.
6     Q.  Now, are you familiar with ULLICO?
7     A.  Yes.
8     Q.  Is ULLICO the same thing as Union Labor
9   Life Insurance Company or is it a subsidiary?
10    A.  Union Labor Life Insurance Company is a
11  subsidiary of ULLICO, I believe, Inc.
12    Q.  And you work for the subsidiary, Union
13  Labor Life Insurance Company?
14    A.  I believe so.  I'm not trying to hedge
15  that one.  It's just our family of companies is a
16  little bit complicated.  I believe my employer is
17  Union Labor Life.
18    Q.  Now, just to get our terminology
19  straight, does ULLICO stand for Union Labor Life
20  Insurance Company also?
21    A.  Union Labor Life Insurance Company is an
22  entity.  ULLICO is an overarching entity that

24

1   includes other product lines and other divisions, so
2   it may somewhat stand for it, but they're two
3   different things.
4     Q.  For purposes of today's deposition, when
5   I'm referring to the parent company, I'll call it
6   ULLICO, and when I'm referring to the subsidiary I'll
7   refer to Union Labor Life.
8     A.  That's how we do it generally.
9     Q.  Now, are you familiar with Zenith
10  Administrators?
11    A.  Yes, I am.
12    Q.  What is Zenith Administrators?
13    A.  Zenith Administrators is a third party
14  administrator that is owned by ULLICO, Inc.  It
15  provides administrative services to Taft-Hartley
16  trust funds and health and welfare funds.
17    Q.  Other than both being subsidiaries of
18  ULLICO, is there a relationship between Zenith
19  Administrators and Union Labor Life?
20    A.  To the extent that Zenith Administrators
21  actually provides claims payment services for some of
22  our insured business.

25

1     Q.  Does Zenith function purely as a claims
2   processing entity?
3     A.  Not that I understand.  They also provide
4   eligibility administration and pension
5   administration, I believe.  I'm not fully familiar
6   with all the product lines they deliver.
7     Q.  Now, are you familiar with USA Health
8   Services?
9     A.  I believe that was a company that was
10  around a long time ago, but not really.
11    Q.  Do you know what if any the relationship
12  is between Union Labor Life and USA Health Services?
13    A.  No.
14    Q.  How about between USA Life and Zenith
15  Administrators?
16    A.  No.
17    Q.  At the position you've held at Union
18  Labor Life since 2001, what were your
19  responsibilities as assistant VP of claims and care
20  management?
21    A.  I was initially responsible for running a
22  service center and multiple claim offices for Union

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                    Washington, DC

8 (Pages 26 to 29)

26

1  Labor Life that were providing care management and
2  claims and customer service for insured and
3  self-funded clients. As of May 10th of 2004, we
4  outsourced the actual delivery of those services to
5  Amalgamated Life Insurance Company.
6        The services are still being delivered
7  within the same location and substantially by the
8  same people. However, our relationship now and my
9  responsibility is to do oversight and management of
10  Amalgamated Life as a service delivery vendor for our
11  membership.
12      Q. Now, when you started off you said you
13  were responsible for running a service center.
14      A. Yes.
15      Q. What did the service center do?
16      A. The service center is located in King of
17  Prussia, Pennsylvania. It is the location where
18  utilization management and case management services
19  were delivered, as well as claims processing and
20  customer service. At that time we also had a claims
21  processing office in Braintree, Massachusetts, and
22  also one in Washington, D.C.

27

1        Q. And when you said you were responsible
2  for running the service center, what were your
3  day-to-day responsibilities?
4        A. I was responsible for personnel
5  management, hiring, firing, managing the facilities,
6  managing the activities within the facilities,
7  working with the clients, representing the company.
8        Q. Now, I believe the phrase you used was
9  service center and claims offices. Are those the
10  offices you just referred to in Braintree,
11  Massachusetts and D.C.?
12      A. Yes.
13      Q. Now, I believe you said that those
14  offices provided case management.
15      A. Correct.
16      Q. When you say case management, are you
17  referring to the claims processing and utilization
18  review?
19      A. No. Case management is a program that is
20  designed to intensively manage patients and members
21  that have high cost, high utilization diagnoses or
22  require specialized management for both cost

28

1  management as well as quality outcomes.
2        Q. So is it fair to say that the service
3  center and claims offices that you were responsible
4  for provided a number of different services, one of
5  which was case management?
6        A. That's correct.
7        Q. Now, I believe you said you provided
8  those services for self-insured entities.
9        A. Both self-insured and fully insured.
10      Q. All of whom were clients of Union Labor
11  Life?
12      A. That's correct.
13      Q. Now, the claims processing that you
14  referred to, is that the processing of claims from
15  both pharmacies and physicians' offices?
16      A. For the most part it was processing
17  claims from physician offices. On a rare occasion we
18  would have a client where they had a program where we
19  would pay members for pharmaceuticals that they would
20  obtain in a pharmacy.
21      Q. In most instances is it fair to say that
22  pharmacy claims processing would be handled by PBMs?

29

1        A. That's correct.
2        Q. And those are PBMs with which Union Labor
3  Life had contracts. Correct?
4        A. Correct, or, depending on the client,
5  whoever they had contracted with, so there's not a
6  one for one that we do case management for every one
7  that we had pharmacy.
8        Q. Do you have any role in relation to Union
9  Labor Life's dealings with PBMs?
10      A. No.
11      Q. Now, in addition to processing and
12  handling claims from physicians' offices, did you or
13  do you play a role in relation to reimbursement to
14  hospitals?
15      A. Yes.
16      Q. So you also process claims from the
17  hospital setting. Is that correct?
18      A. That's correct.
19      Q. In May of '04 what of the tasks we've
20  been discussing was outsourced to Amalgamated Life
21  Insurance?
22      A. The delivery of utilization management

Kelly Ellston

Highly Confidential
Washington, DC

November 23, 2004

9 (Pages 30 to 33)

---

**30**

1   and case management, processing of claims, and
2   customer service.
3       Q.  What do you mean by the term delivery
4   when you say delivery of case management and
5   utilization management?
6       A.  That means they are providing the nurses,
7   the doctors, the systems, the time that is required
8   to provide that service.
9       Q.  Now, I know you said that that service
10  involves a focus on patients who have a lot of
11  expenses, but what does the actual service involve?
12  What do these doctors and nurses do?
13      A.  The nurses will -- it begins with the
14  nurse generally.  Based on a referral from -- a claim
15  comes in for high dollar, a doctor calls for help, a
16  patient calls for help, the nurse will interview the
17  member who has the issues, will discuss it with their
18  physician, will talk to hospitals, physical
19  therapists, anybody that's providing care and the
20  family, and prepare a plan of care with those
21  different supporters of that member that will help to
22  reduce the cost and maximize the amount of benefits

---

**31**

1   that the member receives.
2       Q.  How about the doctors?
3       A.  The doctors on staff are responsible that
4   if there is a -- the nurses work from a criteria
5   based set.  If a patient does not remember or does
6   not meet a specific criteria or appears to be getting
7   services that don't appear to be the standard of
8   care, the case is then referred to a physician, and
9   the physician will at times talk to the treating
10  physician, make determinations about recommendations
11  for coverage and make a determination of whether the
12  plan of care is appropriate.
13      Q.  So the delivery of case management and
14  utilization review and the processing of claims have
15  now been outsourced to Amalgamated Life Insurance.
16  Is that right?
17      A.  That's right.
18      Q.  Now, are there any services that Union
19  Labor Life was providing prior to that time which
20  we've just discussed that Union Labor Life retained
21  after that transition?
22      A.  Oversight, regulatory compliance, direct

---

**32**

1   management of our clients and issues, so for the most
2   part vendor management.
3       Q.  Now, the physicians that provide services
4   to Union Labor Life's members, do they have contracts
5   with Union Labor Life?
6       A.  No.  The physicians who provide direct
7   patient care services for which we receive bills, not
8   the advisors for case management, do not have direct
9   contracts with Union Labor Life.
10      Q.  How does Union Labor Life go about
11  setting up or getting a network of physicians to
12  provide services to its members?
13      A.  We contract with preferred provider
14  organizations.
15      Q.  How many preferred provider organizations
16  does Union Labor Life currently contract with?
17      A.  I don't know the exact number.  It's
18  multiple.  It could be between 20 and 30.
19      Q.  Is ppoNEXT one of those entities?
20      A.  I don't believe so.
21      Q.  Do you refer to those entities as PPOs?
22      A.  Correct.

---

**33**

1       Q.  Do the PPOs set the terms of
2   reimbursement that Union Labor Life will pay to the
3   physicians' practices that they bring?
4       A.  Yes.
5       Q.  Are there uniform terms of reimbursement
6   or do they vary from PPO to PPO?
7       A.  There is no uniform form of
8   reimbursement.
9       Q.  Does it vary from PPO to PPO?  Can there
10  be variations within one PPO?
11      A.  It varies from PPO to PPO and it varies
12  within PPOs.
13      Q.  Now, I'm trying to just get a sense of
14  what the relationships are here.  Correct me if I'm
15  wrong here, but a PPO will sign up its own network of
16  physician practices.  Is that correct?
17      A.  That's correct.
18      Q.  And the PPO will then enter into a
19  contract with Union Labor Life.  Correct?
20      A.  With Union Labor Life or with the actual
21  client.  It could be either way.
22      Q.  So it could be with Union Labor Life or

---

Kelly Ellston                    Highly Confidential                November 23, 2004
                                    Washington, DC

10 (Pages 34 to 37)

| 34 |
|---|
| 1   with Union Labor Life's client, which could be a |
| 2   Taft-Hartley fund or a self-insured employer? |
| 3       A.  Yes. |
| 4       Q.  Any other types of clients? |
| 5       A.  No.  And for the most part it's |
| 6   Taft-Hartley funds. |
| 7       Q.  Now, pursuant to the terms of that |
| 8   contract, be it with Union Labor Life or its client, |
| 9   the PPO makes one or more networks of physicians |
| 10   available to Union Labor Life or its client's |
| 11   members.  Is that correct? |
| 12       A.  That's correct. |
| 13       Q.  Now, the terms pursuant to which Union |
| 14   Labor Life or the client will reimburse providers in |
| 15   a particular network, are those contained in the |
| 16   contract between the PPO and Union Labor Life? |
| 17       A.  I don't know.  I don't believe so, but I |
| 18   don't know.  I believe it will outline how we are to |
| 19   pay the providers.  I don't believe it has a |
| 20   granularity to say what are the methodologies because |
| 21   there was variance even within one particular PPO. |
| 22       Q.  Is there a process of negotiation between |

| 35 |
|---|
| 1   the PPO and Union Labor Life or its client pursuant |
| 2   to which the reimbursement rates or methodologies are |
| 3   determined? |
| 4       A.  No.  The way that we contract with PPOs, |
| 5   Union Labor Life, and I can't speak to the clients |
| 6   because that's their unique contract, we go to a PPO, |
| 7   we say we have a population in a certain area, they |
| 8   provide us information about what types of discounts |
| 9   we may receive for a subset of the total amount of |
| 10   CPT codes that exist, and I believe it's maybe three |
| 11   to five hundred out of thousands, and at that point |
| 12   we look at what type of savings we can anticipate |
| 13   based on that. |
| 14           For that, for the most part, we pay the |
| 15   PPO an access fee that allows our members to use the |
| 16   PPO.  For the most part that's at a per member per |
| 17   month rate, and there are some contracts where we may |
| 18   also pay at a percentage of discounts that we |
| 19   actually get. |
| 20       Q.  Now, in the instances where Union Labor |
| 21   Life's client contracts with the PPO, does Union |
| 22   Labor Life play any role in that process? |

| 36 |
|---|
| 1       A.  Our responsibility in that is, if we are |
| 2   paying the claims on behalf of the client, we are |
| 3   responsible to follow the rule of that PPO on how to |
| 4   reimburse their physicians.  It is either via a fee |
| 5   scheduled loading that occurs or a repricing process. |
| 6       Q.  So when a client enters into a contract |
| 7   directly with a PPO, Union Labor Life will be given |
| 8   the information needed for it to process claims. |
| 9       A.  That's correct. |
| 10       Q.  Now, the payments that Union Labor Life |
| 11   makes to PPOs when it's contracting directly, you |
| 12   referred to those as access fees.  Correct? |
| 13       A.  Correct. |
| 14       Q.  Now, the access fees I'd like to focus on |
| 15   for a moment.  One possibility you mentioned is a per |
| 16   member per month capitated payment. |
| 17       A.  That's correct. |
| 18       Q.  And the second is a percentage of |
| 19   discounts. |
| 20       A.  Savings. |
| 21       Q.  Can you help me understand what you mean |
| 22   by that, percentage of savings? |

| 37 |
|---|
| 1       A.  I'll use a hospital as an example.  If a |
| 2   hospital bills $100,000 for an admission, and because |
| 3   we have access to a PPO contract we pay $60,000, |
| 4   therefore we have a 40 percent savings from billed to |
| 5   what we pay.  There is a methodology where we would |
| 6   reimburse the PPO a certain portion of that savings |
| 7   as our way of getting access to that contract. |
| 8       Q.  Now, the networks that the PPOs provide |
| 9   to Union Labor Life, are those physicians' practices |
| 10   and hospitals? |
| 11       A.  Generally, yes. |
| 12       Q.  Does Union Labor Life contract directly |
| 13   with any hospitals outside of these PPO arrangements? |
| 14       A.  No, we do not. |
| 15       Q.  So it's fair to say that all Union Labor |
| 16   Life's contracts with physicians' practices or |
| 17   hospitals at present are through PPOs? |
| 18           MR. MCGLONE:  Let me object to the form |
| 19   of that question. |
| 20           BY MR. MANGI: |
| 21       Q.  Let me rephrase the question.  Am I |
| 22   correct in stating that Union Labor Life has no |

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                    Washington, DC

38
1  direct contracts at present with hospitals or
2  physicians' practices?
3      A.  That is correct.
4      Q.  And its access to hospitals or
5  physicians' practices is all through PPOs?
6      A.  PPOs or networks.  I don't want to use
7  PPO as broadly as there are different types of
8  networks that we contract with that are not what you
9  would call a PPO.
10     Q.  So there are entities other than PPOs
11 that give Union Labor Life access to pre-established
12 networks of physicians and hospitals.
13     A.  That's correct.
14     Q.  What sort of entities do you have in mind
15 there?
16     A.  Most specifically we have a contract with
17 an entity that provides us access to Transplant
18 Centers of Excellence, and that entity is not a PPO.
19 They go to all the transplant centers, and we pay
20 them at the point someone needs to have an organ
21 transplant.  And it is an access fee which is a
22 pretty high access fee, but it's only at the point of

39
1  need.
2      Q.  Now, other than the claims processing and
3  delivery of case management review you spoke about
4  earlier, does Amalgamated Life Insurance currently
5  play any role in relation to Union Labor Life's
6  dealings with PPOs or other entities providing
7  networks?
8      A.  Only to the extent that they are
9  responsible to process claims or deliver services per
10 the terms of our contract with the PPO, much like we
11 are when our client has a direct contact with the
12 PPO.
13     Q.  Now, given that the payments from Union
14 Labor Life to these PPOs or other entities providing
15 networks are per member per month or percentage of
16 savings, does the processing of individual claims
17 result in any actual payments?
18     A.  To the PPO?
19     Q.  To physicians.
20     A.  Oh, yes.
21     Q.  So in addition to the fee that's paid to
22 the PPO or the other entity for providing a network,

40
1  Union Labor Life is also making payments directly to
2  physicians.  Correct?
3      A.  Correct.
4      Q.  And those payments relate to services
5  provided by the physicians to members of Union Labor
6  Life.
7      A.  That's correct.
8          MR. MCGLONE:  Can I just make a
9  suggestion?  You refer in your questions to members
10 of Union Labor Life.  I'm happy for you to use that
11 terminology if we just have an understanding that
12 we're really referring to members of Union Labor
13 Life's clients.
14         MR. MANGI:  Perhaps you're right.  I was
15 using the term expansively to refer to individuals
16 who obtain insurance through Union Labor Life.
17         THE WITNESS:  And one of the things,
18 then, if you're saying insurance, then we do have
19 individuals that receive services that are not
20 insured by Union Labor Life.  There's an important
21 distinction.
22         BY MR. MANGI:

41
1      Q.  What sort of services are those?
2      A.  The same service we describe as insured.
3  The differential is that the client of ours is
4  self-funded, and so is not insured by Union Labor
5  Life.
6      Q.  I'll be more clear in my terminology.
7  But certainly my questions to date were intended to
8  encompass those individuals as well as individuals
9  insured by Union Labor Life.
10         MR. MCGLONE:  I don't have a problem with
11 your saying Union Labor Life's members as a shorthand
12 as long as we know we're really not talking about our
13 members, we're talking about health plans.
14         BY MR. MANGI:
15     Q.  Just to clarify, when I use that phrase
16 I'm referring to all of those individuals.  Was that
17 your understanding as I was asking the questions
18 earlier today?
19     A.  I believe so, but I think it is an
20 important distinction.
21         MR. MANGI:  Why don't we take a five
22 minute break?

Kelly Ellston          Highly Confidential          November 23, 2004
                        Washington, DC

12 (Pages 42 to 45)

42
1        (Recess.)
2        BY MR. MANGI:
3        Q.  Now, Ms. Ellston, before the break we
4   spoke about the fact that in addition to access fees
5   that are paid by Union Labor Life to PPOs or other
6   entities providing networks, there are also payments
7   made by Union Labor Life to physicians.  Right?
8        A.  Correct.
9        Q.  And those payments are grounded in the
10  claims processing that we spoke about earlier.
11  Correct?
12       A.  Correct.
13       Q.  Which is now run by Amalgamated Life
14  Insurance.
15       A.  Correct.  I need to make one
16  clarification.  When we speak about what Amalgamated
17  is paying, we're speaking about a subsection of our
18  clients where they're providing the administrative
19  services.  Just as I spoke about Zenith does some
20  administration, we have claims payment in various
21  locations by entities, just to make sure it's clear
22  it's not just Amalgamated that provides claims

43
1   payment.
2        Q.  So if I understand that correctly,
3   Amalgamated did not take over all of the claims
4   processing from Union Labor Life, it took over a
5   chunk of it.  Is that correct?
6        A.  It took over a portion, that's correct,
7   of Union Labor Life insured or self-funded clients.
8        Q.  Do you have a sense of what sort of
9   percentage that is of the total claims processing
10  volume?
11       A.  No.  It's moved too many times to have a
12  reasonable answer.
13       Q.  Are we talking about a very small
14  proportion, 5 to 10 to 15 percent?
15       A.  No.  It's somewhere -- it could be up to
16  50, so it's not small, but it's not all.
17       Q.  The services that Union Labor Life
18  performed internally in the service centers and the
19  claims processing offices, those services are still
20  being provided by Union Labor Life.  Correct?
21       A.  That's being provided by Union Labor Life
22  through the contract with Amalgamated.

44
1        Q.  Well, just so I'm clear, Amalgamated took
2   over a proportion of the claims processing work.
3   Right?
4        A.  A proportion of all claims for all of the
5   company, yes, but they took over all claims that the
6   company directly was processing.
7        Q.  So they took over all claims that Union
8   Labor Life was processing.
9        A.  That's correct.
10       Q.  But some clients were earlier having
11  claims processed by other entities?
12       A.  Like Zenith.
13       Q.  Were there any clients that were having
14  claims processed by non-ULLICO entities?
15       A.  Yes.
16       Q.  And those arrangements also remain in
17  place?
18       A.  Yes, but those arrangements are between
19  the client and the entity, not between Union Labor
20  Life and the entity.
21       Q.  The access fees that are paid by Union
22  Labor Life to PPOs and other entities providing

45
1   networks, are those retained entirely by the PPO or
2   the network?
3        A.  I don't understand your question.
4        Q.  Does the PPO take that money for itself,
5   or does it then distribute it amongst the physicians
6   that make up the networks that it provides?
7        A.  I have no idea.
8        Q.  Let's talk, then, about the claims that
9   Union Labor Life pays.  I'd like to focus for now on
10  claims relating to drugs administered in physicians'
11  offices.  Okay?
12       A.  Okay.
13       Q.  What methodology or methodologies does
14  Union Labor Life currently use to determine how much
15  it will pay a physician in relation to a drug
16  administered in the physician's office?
17       A.  We pay based on the PPO contract, and we
18  also pay based on claims processing guidelines as far
19  as very often the drug price and the actual
20  administration of the drug are bundled into the code
21  that's being billed for the service.
22       Q.  Now, let's take those one by one.  First

Henderson Legal / Spherion
(202) 220-4158

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                    Washington, DC

46

1   of all, the contract. And when you say a PPO
2   contract, referring to a contract with the PPO or
3   another type of entity that provides a network, is
4   that correct?
5       A.  That's correct.
6       Q.  Now, typically will that contract specify
7   the amount that will be paid to a physician for a
8   drug administered in the physician's office?
9       A.  It generally does not get down to that
10  level of granularity. The two ways that we reimburse
11  physicians for services utilizing what is really the
12  parameters of their contract with the PPO is that
13  PPOs will send us periodic fee schedules that outline
14  the fees that are to be paid for specific CPT codes
15  or HCPCS codes, or we send the claims to the PPO for
16  repricing or the claim goes directly to the PPO for
17  repricing before it comes to us to be paid.
18      Q.  Now, does Union Labor Life have access to
19  the contracts between PPOs and physicians?
20      A.  No.
21      Q.  Of the different possibilities you
22  specified, the first was fee schedules.

47

1       A.  That's correct.
2       Q.  Now, would the case there be that the
3   contract between the PPO or other entities providing
4   networks and Union Labor Life would make reference to
5   a fee schedule?
6       A.  Yes, it would.
7       Q.  And would say that all payments would be
8   based off a fee schedule or something like that?
9       A.  Yes.
10      Q.  Now, the fee schedule would contain a CPT
11  or HCPCS code and a dollar amount that pertains to
12  that code. Is that right?
13      A.  Generally, yes.
14      Q.  And these will be periodically updated.
15  Correct?
16      A.  Yes.
17      Q.  Do different PPOs have different fee
18  schedules?
19      A.  Yes.
20      Q.  Is there a consistent methodology whereby
21  dollar amounts are generated for those fee schedules?
22      A.  I have no idea.

48

1       Q.  Now, there are certain CPT or HCPCS codes
2   that pertain to drugs alone. Correct?
3       A.  Correct.
4       Q.  And those are drugs that are administered
5   in office.
6       A.  That's correct.
7       Q.  Do you know the basis for any fee
8   schedules -- withdraw that.
9           Do you know how any of the fee schedules
10  that Union Labor Life currently uses calculate the
11  dollar amounts that are being paid in relation to
12  those drug codes specifically?
13      A.  I do not, because that again is delivered
14  by the PPO.
15      Q.  Do you have an understanding as to
16  whether those amounts are or are not typed to AWP in
17  any cases?
18      A.  I have no specific knowledge. I imagine
19  some probably are.
20      Q.  Now, the second possibility you mentioned
21  is that the physicians could send their bills to the
22  PPO for repricing. Is that correct?

49

1       A.  That's correct.
2       Q.  And what does that repricing process
3   involve?
4       A.  Either on paper using a standard claim
5   form, the claims are forwarded to the PPO. They look
6   at the codes and the amount billed and calculate what
7   they will be reimbursed. Or more recently and more
8   prominently, an electronic claim is sent to the PPO
9   that interprets the codes, translates that into a
10  total amount to be paid, and then sends it to us to
11  actually cut the check.
12      Q.  Now, does the price to be paid change at
13  some point during that change?
14      A.  It could.
15      Q.  Where does the term repricing come from
16  if it's just a transmission of prices?
17      A.  It's an industry term. That's what's
18  always used when it just basically means somebody
19  comes in and looks at the bill charges and changes
20  it.
21      Q.  Is it your understanding that the PPO
22  will increase the amount between what's billed by the

Kelly Ellston                      Highly Confidential              November 23, 2004
                                     Washington, DC

14 (Pages 50 to 53)

---

**Page 50**

1  physician and what's billed to Union Labor Life?
2      A.  I don't believe so.  As far as taking
3  something off the top before they send it?
4      Q.  Right.
5      A.  Not to my knowledge.
6      Q.  So it's your understanding that PPOs will
7  receive bills from the physicians and then just
8  forward those on to Union Labor Life?
9      A.  Either forward the actual bill or forward
10  a repriced bill.  From an electronic standpoint it's
11  really taking the original and changing it and
12  sending it.
13      Q.  What I'm having difficulty understanding
14  is if reprice refers to an industry standard that
15  refers to a change in the price, where is the price
16  changing in this situation?
17      A.  I think it's important not to really say
18  they're changing the price.  The price never changes.
19  So the bill charge, which is the term we generally
20  use, is the bill charge.  That's what the doctor's
21  system says that he's charging for it.
22          What the function is is that the PPO will

---

**Page 51**

1  calculate the discount that should be reimbursed to
2  the doctor and will indicate that.  So I think
3  repricing, even though it's an industry term, could
4  be misconstrued.  There is no change in the original
5  bill charge.  That stays the same.
6      Q.  So the amount of the bill charge stays
7  the same, but the amount that Union Labor Life has to
8  pay can actually be lower based on the negotiated
9  discount.
10      A.  Generally it should be lower.  It's
11  possible it could be higher.
12      Q.  In what circumstances could it be higher?
13      A.  Just if for some reason the physician's
14  billing system is outdated to what they've negotiated
15  with the PPO, so they bill less than they actually
16  are entitled to.  It's rare, but it happens.
17      Q.  So we've spoken now about two
18  possibilities.  One is where the contract refers to a
19  fee schedule that's provided by the PPO to Union
20  Labor Life.  A second is where the physicians send
21  their bills to their PPO which reprices and sends it
22  on to Union Labor Life.

---

**Page 52**

1      A.  Correct.
2      Q.  In that second instance, does the
3  contract make any reference, the contract between
4  Union Labor Life and the PPO, does that make any
5  reference to the system or what system will be used
6  for determining payments?
7      A.  I don't believe it's that specific
8  because, especially with technology, the changes in
9  technology really change the process of how the
10  information is passed.  The process of getting fee
11  schedules to each insurance company is shrinking, and
12  more and more PPOs are providing either access to
13  things on the web or electronic payment.  What I
14  believe our contract or the PPO would delineate is
15  that we would continue to work with them in the
16  methodology mutually agreed upon.
17      Q.  When a contract would refer to a fee
18  schedule, would the current fee schedule be attached
19  to that contract?
20      A.  No.
21      Q.  Now, other than these two possibilities
22  we've discussed, the fee schedules or repricing from

---

**Page 53**

1  physicians to the PPO to Union Labor Life, are there
2  other payment systems or methodologies?
3      A.  There's also a system where Union Labor
4  Life receives the claim, does not have the fee
5  schedule, and forwards the claim back to the PPO for
6  repricing.  There's also a situation where the PPO
7  provides a secure access via web and Union Labor Life
8  goes on to that system and reprices it on line.
9  There's another way, and this occurs very often with
10  hospital claims, that there is a percentage of bill
11  charges that is paid rather than a fee schedule.
12      Q.  Anything else?
13      A.  Not that I can think of.
14      Q.  Well, let's look at that third
15  possibility.  What are the circumstances in which
16  Union Labor Life would get the bill and then send it
17  back to the PPO for repricing?
18      A.  When the PPO doesn't provide fee
19  schedules and that's the process that they've set up
20  and they don't have a web system.
21      Q.  So the PPO would then reprice and send
22  the amount back to Union Labor Life?

---

Kelly Ellston                 Highly Confidential              November 23, 2004
                               Washington, DC

54

1    A.  Correct.
2    Q.  So it's essentially the same or similar
3  methodology to what we spoke about earlier, only
4  there's an extra step in the process?
5    A.  Correct.
6    Q.  Then we spoke about the secure access web
7  based method.  In those instances did you say that
8  Union Labor Life will go on the website and reprice
9  itself?
10   A.  Yes.
11   Q.  Is that because the PPO has loaded on to
12 the website all the appropriate discounts?
13   A.  Yes.
14   Q.  So the website is essentially providing
15 an automated method of repricing?
16   A.  Yes.
17   Q.  And Union Labor Life can administer that
18 system.  Is that a fair characterization?
19   A.  It's a tool, so instead of a fee
20 schedule -- as a function of the claim system, it's
21 like that.  I clarify again Union Labor Life isn't
22 paying claims.  It's Amalgamated on our behalf.

55

1    Q.  After --
2    A.  May 10th.
3    Q.  May 10th of 2004.
4    A.  Right.
5    Q.  So after May 10th of 2004, the entity
6  that's carrying out all of these functions, being it
7  receiving repriced claims from the PPO or going on to
8  the website, would be Amalgamated?
9    A.  That is correct.
10   Q.  Now, the fifth possibility you referenced
11 discusses hospitals.  Let's talk about hospitals for
12 a moment.  Do you have an understanding of how the
13 amounts that will be reimbursed hospitals in relation
14 to drugs specifically is calculated?
15   A.  I don't know.
16   Q.  Is it also by reference to CPT or HCPCS
17 codes?
18   A.  No.  Hospital charges are by revenue
19 codes.
20   Q.  Did you say revenue codes?
21   A.  Yes.
22   Q.  Are those codes generated by individual

56

1  hospitals?
2    A.  Yes.
3    Q.  Where the hospital or network of
4  hospitals is made available by a PPO, would the PPO
5  provide those revenue codes or would the individual
6  hospitals provide them?
7    A.  The repricing activity for hospitals, the
8  revenue codes are how hospitals bill.  It's
9  standardized Medicare based for all intents and
10 purposes.  The reimbursement for the services are
11 generally not paid at the revenue code level in a PPO
12 contract.  There are multiple ways that they are
13 paid.  It can be by a per diem fee for how long
14 someone stays in a hospital, discounted bill charges
15 for the entire stay, and at times a percentage of
16 savings.
17   Q.  Now, do you know what the relationship is
18 between revenue codes and Medicare billing?
19   A.  Revenue codes, just like CPT codes or
20 HCPCS codes, are the standard methodology that all
21 payers utilize as a way to know what was delivered in
22 the hospital, whether it's a charge for a bed, a

57

1  charge for a drug, a charge for OR time.  That is the
2  standard.
3    Q.  Is there a relationship between a revenue
4  code and a DRG?
5    A.  A DRG is calculated in a much more
6  complicated way than a revenue code.  It's a function
7  of everything from the type of bed, how many days in
8  the bed, the diagnosis, the way the person's
9  admitted, the condition the person's in when they get
10 discharged.  A DRG is very complicated.
11   Q.  When Union Labor Life is reimbursing a
12 hospital, does it have a demarcation between the
13 amount it's reimbursing for drugs administered to
14 patients as against amounts being paid for
15 operations, procedures, hospital stay and so forth?
16   A.  Generally not.
17   Q.  So generally it would be an overall bill
18 received in relation to a billing process that would
19 be processed and paid?
20   A.  That is correct.
21   Q.  Do you have an understanding of what
22 providers, be they hospitals or physicians, pay to

Henderson Legal / Spherion
(202) 220-4158

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                    Washington, DC

16 (Pages 58 to 61)

---

58

1  acquire drugs?
2      A.  I do not.
3      Q.  Do you know whether or not the amounts
4  they paid to provide drugs can be expressed by
5  referencing particular benchmarks?
6      A.  I do not.
7      Q.  Are you familiar with the term average
8  wholesale price?
9      A.  I am.
10     Q.  Are you familiar with the term wholesale
11  acquisition cost?
12     A.  Just in general terms.
13     Q.  You're aware that average wholesale price
14  is referred to as AWP?
15     A.  Yes.
16     Q.  And is referred to by the acronym WAC or
17  WAC?
18     A.  Yes.
19     Q.  Do you know whether the amounts that
20  physicians or hospitals pay to acquire drugs can be
21  expressed by reference to AWP or WAC?
22     A.  I don't have personal knowledge.  I

---

59

1  imagine it can.
2      Q.  Do you know whether or not there is a
3  relationship between the WAC and the AWP for any type
4  of drug?
5      A.  I don't.
6      Q.  Are you familiar with any publications
7  that publish drug prices?
8      A.  There are publications on the web.
9  There's everything from, you know, drugs.com.
10  There's a bunch of different things all over the
11  place.
12     Q.  Are you aware of pricing compendia such
13  as Red Book and First Data Bank?
14     A.  Yes.
15     Q.  Have you heard of Medi-Span also?
16     A.  No.
17     Q.  Have you ever seen actual publications or
18  electronic forms of First Data Bank or Red Book?
19     A.  I have not.
20     Q.  You don't utilize those documents in the
21  course of your work?
22     A.  We do not.

---

60

1      (Recess.)
2      BY MR. MANGI:
3      Q.  Now, going back for a moment to, leaving
4  aside the fee schedule possibility and talk about
5  instances where the PPO reprices claims, do you have
6  an understanding as to how the amount that's billed
7  in relation to a drug administered in a physician's
8  office, what the basis is for determining the amount
9  that pertains to that repriced claim?
10     A.  I do not.
11     Q.  Do the repriced claims break out the
12  amount to be paid in relation to a drug administered
13  in office versus other components of the bill?
14     A.  Only to the extent that it's a direct
15  code that refers just to the actual medication, such
16  as a HCPCS code would be or J code would equal the
17  amount of the medication.
18     Q.  So it's possible that in a repriced claim
19  there would be a HCPCS code with a dollar sum by it?
20     A.  That's correct.
21     Q.  But you don't know how the dollar sum is
22  calculated.  Is that correct?

---

61

1      A.  That's correct.
2      Q.  Do you know whether or not that dollar
3  amount bears any relation to the drug's AWP or WAC?
4      A.  I don't know.
5      Q.  Now, the amount that is on the fee
6  schedule or the amount that is to be paid to the
7  network pursuant to repricing, does that vary from
8  PPO to PPO and network to network?
9      A.  Yes.
10     Q.  Is that something that is subject to
11  negotiation between Union Labor Life and the PPO or
12  the entity providing the network?
13     A.  The actual fee schedule?
14     Q.  Right.
15     A.  No.  It is not a negotiated number.
16     Q.  Does Union Labor Life analyze the
17  applicable fee schedules or the basis on which claims
18  would be repriced prior to entering into contracts
19  with PPOs?
20     A.  On a macro basis we have a process where
21  we have a set of approximately 300 CPT codes that we
22  ask the PPO to give us information about what would

---

Henderson Legal / Spherion
(202) 220-4158

**62**

1  be reimbursement levels that we could expect. It's
2  then put into our actuarial model that our actuaries
3  look at, based on the population, what could we see
4  as discounts and savings.
5      And depending on those savings, the
6  penetration of access, meaning the amount of doctors
7  that are able to be available to our members and
8  things like that, and the amount they want to charge
9  us for an access fee is how we would determine it.
10  But that's 300 codes out of 11,000 or so.
11      Q.  Would it be fair that you analyze a
12  sample to get an idea of how reimbursement would look
13  from one PPO to another?
14      A.  That's correct.
15      Q.  If the results of that analysis are such
16  that Union Labor Life does not feel comfortable with
17  them and does not want to enter into a contract with
18  a PPO on that basis would it just decline or would
19  the numbers then be subject to negotiation?
20      A.  The fee schedules are not subject to
21  negotiation.  The access fee would be subject to
22  negotiation.  So that we'd say your prices aren't

**63**

1  giving us the discount we want so we don't want to
2  pay you as much to access your network.
3      Q.  So would it be fair to say that Union
4  Labor Life is looking at the overall bundle, and if
5  one component is not favorable it will look for that
6  to be made up in another component of the bundle?
7      A.  That's correct.
8      Q.  And so if the amount that has to be paid
9  in reimbursement seems too high to Union Labor Life,
10  it will insist on a lower access fee.
11      A.  It could happen.  The other function
12  that's very important is how many doctors of what
13  type does that PPO have in relationship to where the
14  members live and obtain services.
15      Q.  Union Labor Life will look at what it's
16  getting for its money.
17      A.  That's correct.
18      Q.  When you refer to fee schedules, are you
19  referring there both to the instances where Union
20  Labor Life is actually given a fee schedule and to
21  the instances where there's repricing?
22      A.  I can only speak to it as when we are

**64**

1  given a fee schedule.  I would expect that a fee
2  schedule exists at the reprice level, but I don't
3  have knowledge as to how they do their repricing.
4      Q.  Well, here's my question.  That sample
5  process we just discussed, you can certainly carry it
6  out when there's a fee schedule.  But what about how
7  do you sample from a PPO that is not going to provide
8  a fee schedule?
9      A.  When sampling -- at the point at which
10  we're contracting with PPOs, regardless if they're
11  going to give us a fee schedule or not, they have to
12  give us the information on those 300 codes.  So
13  whether it's through fee schedule or whatever, that
14  is a requirement pre-contracting.
15      Q.  So regardless of whether they provide a
16  fee schedule or they provide the information that's
17  used at the repricing point, they have to give you
18  the base information you need for the sampling
19  process.
20      A.  That's correct.
21      Q.  And when you referred to fee schedule
22  earlier, you were referring both to an actual fee

**65**

1  schedule and information provided in some other form.
2      A.  I would like to keep fee schedule as
3  specific to a group of codes or amounts that we
4  receive from a PPO to pay.  I think we need to keep
5  that separate from the contracting pricing.
6      Q.  Let's just try and clarify one point,
7  which is when Union Labor Life is considering whether
8  or not to enter into a contract with a PPO, it will
9  carry out a sample to determine how much it's likely
10  to pay in reimbursement for claims.  Right?
11      A.  That's correct.
12      Q.  And that sample can in some cases be
13  based on an actual fee schedule.  Correct?
14      A.  It's based on whatever the PPO provides.
15      Q.  So it will be based on either a fee
16  schedule or some other document or information that
17  contains similar information.
18      A.  Again, it's whatever's provided by the
19  PPO through whatever means they decide to do it.
20      Q.  And those amounts are not themselves
21  subject to negotiation.  Is that right?
22      A.  Not to my knowledge.

Kelly Ellston                    Highly Confidential                November 23, 2004
                                 Washington, DC

18 (Pages 66 to 69)

| | 66 |
|---|---|
| 1 | Q. But if those amounts seem too high or |
| 2 | unreasonable, then Union Labor Life may negotiate the |
| 3 | amount of the access fee. |
| 4 | A. That's generally the way we would look at |
| 5 | it. |
| 6 | Q. And certainly it will also consider in |
| 7 | every such evaluation what it's getting in return. |
| 8 | A. That's correct. |
| 9 | Q. Now, do you have an understanding as to |
| 10 | whether or not the amounts that providers pay to |
| 11 | acquire drugs are lower than the amounts that they're |
| 12 | reimbursed for drugs? |
| 13 | A. I have no idea. |
| 14 | Q. Do you have any knowledge of what |
| 15 | providers, be they hospitals or physicians, pay to |
| 16 | acquire drugs? |
| 17 | A. I don't. |
| 18 | Q. That's not something that Union Labor |
| 19 | Life requires providers or PPOs to disclose. |
| 20 | Correct? |
| 21 | A. I don't believe so. |
| 22 | Q. It's certainly not part of the contracts |

| | 67 |
|---|---|
| 1 | between Union Labor Life and PPOs. |
| 2 | A. I don't believe so. |
| 3 | Q. Union Labor Life does not in any way |
| 4 | insist on receiving information regarding providers' |
| 5 | acquisition costs for drugs. Correct? |
| 6 | A. Not to my knowledge. |
| 7 | Q. Now, if Union Labor Life were to gain |
| 8 | more information about what providers are actually |
| 9 | paying to acquire drugs, that would not change the |
| 10 | amounts that it's reimbursing. Correct? |
| 11 | MR. MCGLONE: Objection. Calls for |
| 12 | speculation. You can answer if you can. |
| 13 | THE WITNESS: Can you repeat it again? |
| 14 | BY MR. MANGI: |
| 15 | Q. Sure. The amounts that Union Labor Life |
| 16 | will reimburse for claims that pertain to drugs |
| 17 | administered in physicians' offices, those are based |
| 18 | on fee schedules. Correct? |
| 19 | A. Fee schedules or direction of the PPO. |
| 20 | Q. So it will either be based on fee |
| 21 | schedules or the other terms that go into repricing |
| 22 | and so on. Is that correct? |

| | 68 |
|---|---|
| 1 | A. That's correct. |
| 2 | Q. But in the end, Union Labor Life will |
| 3 | receive a claim for a specific dollar sum and it will |
| 4 | pay. Correct? |
| 5 | A. That's correct. |
| 6 | Q. Union Labor Life does not know what |
| 7 | providers are paying to acquire drugs. Right? |
| 8 | A. That's correct. |
| 9 | Q. Now, if it learned what the providers |
| 10 | were paying to acquire drugs, that would not change |
| 11 | the amounts that it's reimbursing, which are set |
| 12 | based on fee schedules or on the repricing. Correct? |
| 13 | MR. MCGLONE: Same objection. |
| 14 | THE WITNESS: I'd say generally yes. In |
| 15 | the way that you're talking about it, it would not |
| 16 | change how we'd reimburse. |
| 17 | BY MR. MANGI: |
| 18 | Q. So when you say yes, you mean that you're |
| 19 | agreeing with my statement. |
| 20 | A. Yes. |
| 21 | Q. If for example Union Labor Life were to |
| 22 | learn that a particular physician was getting a |

| | 69 |
|---|---|
| 1 | rebate or a discount on a particular drug that |
| 2 | lowered his acquisition cost for that drug, that |
| 3 | would not change the amount that Union Labor Life |
| 4 | would be reimbursing that provider in relation to |
| 5 | that drug. Correct? |
| 6 | A. That is correct. |
| 7 | Q. Do you have an understanding as to |
| 8 | whether or not the fee schedules that PPOs utilize |
| 9 | bear any relation to the amounts Medicare reimburses |
| 10 | for drugs administered in physicians' offices? |
| 11 | A. I don't know specifically. That's one |
| 12 | method of how negotiations with doctors generally |
| 13 | happen. |
| 14 | Q. Which negotiations and which doctors are |
| 15 | you referring to? |
| 16 | A. The PPO to the physicians. |
| 17 | Q. Does Union Labor Life have any knowledge |
| 18 | of or visibility of that process of negotiation |
| 19 | between PPOs and physicians that make up their |
| 20 | network? |
| 21 | A. No, we do not. |
| 22 | Q. Does Union Labor Life have any |

Kelly Ellston

Highly Confidential
Washington, DC

November 23, 2004

70

1  involvement with that negotiation process?
2     A. No, we do not.
3     Q. There are certain drugs, injectable or
4  infusible drugs, that can be administered both in
5  providers' offices or in hospitals. Correct?
6     A. That's correct.
7     Q. Does Union Labor Life have a preference
8  as to which setting should be utilized where both are
9  clinically interchangeable?
10     A. That would be -- on a macro basis, no.
11  In a case by case basis, in utilization management or
12  case management, there may be a preference for a
13  specific patient.
14     Q. Speaking generally, does Union Labor Life
15  have any knowledge as to whether it would pay more in
16  relation to a specific injected or infused drug if it
17  were administered in a physician's office versus in a
18  hospital?
19     A. It depends on the hospital. It depends
20  on the drug. It depends on what is included in that
21  actual administration of the drug.
22     Q. Do you have any dealings with drug

71

1  wholesalers?
2     A. No.
3     Q. Do you have any understanding as to what
4  drug wholesalers pay to acquire drugs?
5     A. I do not.
6     Q. Have you ever heard AWP referred to as
7  ain't what's paid?
8     A. No, I haven't.
9     Q. Do you agree with that?
10     A. I don't know. It's a funny way of
11  putting it, though.
12     Q. Other than this litigation, do you know
13  whether Union Labor Life has been involved in any
14  other litigation pertaining to AWP or drug pricing
15  generally?
16     A. Not to my knowledge.
17     Q. Are you a member of any industry
18  professional associations?
19     A. As a company or as an individual?
20     Q. You personally.
21     A. No.
22     Q. In the course of your employment do you

72

1  attend any seminars or conferences that pertain to
2  the health care industry?
3     A. Yes.
4     Q. Do you recall any particular seminars
5  that pertain to drug pricing?
6     A. No.
7     Q. Any that pertain to reimbursement?
8     A. For drugs?
9     Q. Right.
10     A. No.
11     (Recess.)
12     BY MR. MANGI:
13     Q. Let me jump around a little bit and try
14  and cover a few areas. You do understand that your
15  deposition -- at your deposition here today you've
16  been speaking as a corporate representative on behalf
17  of ULLICO. Correct?
18     A. Yes, I do.
19     Q. What did you do by way of preparation for
20  your deposition today?
21     A. I took a look at our claim processing
22  guidelines and reviewed a few contracts.

73

1     Q. Anything else?
2     A. That's it. I spoke to counsel.
3     Q. Are you aware that Mr. Messenger has
4  previously been deposed in this case?
5     A. Yes, I do.
6     Q. And did you have any conversations with
7  him about his experience?
8     A. No, I didn't.
9     Q. Now, earlier, when we were speaking about
10  reimbursement, do you recall we spoke about five
11  different ways in which the reimbursement chain could
12  function?
13     A. Yes.
14     Q. In talking generally about that process
15  you'd said that the things that go into it are the
16  contract with the PPO and also claims processing
17  guidelines.
18     A. That's correct.
19     Q. What do you mean by claims processing
20  guidelines?
21     A. There are general standards of payment
22  that are followed on how to pay a claim. Our company

Kelly Ellston                 Highly Confidential                 November 23, 2004
                              Washington, DC

20 (Pages 74 to 77)

74

1  utilizes Trilogy, which is a published set of claim
2  guidelines that is updated every quarter, and that is
3  our foundation for how we would pay, say, do you pay
4  a code separate for a drug and the administration or
5  if it's bundled and that type of thing.
6      Q.  So those guidelines pertain to the
7  technical aspects of billing and reimbursement.  Is
8  that correct?
9      A.  It's the technical aspects of claim
10 processing.
11     Q.  Those guidelines do not affect the actual
12 amounts paid.  Is that correct?
13     A.  That is correct.
14     Q.  Other than conversations with Mr.
15 McGlone, did you have conversations with anyone else
16 in preparation for your deposition today?
17     A.  No.  Other counsel.
18     Q.  Were those counsel for ULLICO?
19     A.  That's correct.
20     Q.  Are you familiar with Towers Perrin?
21     A.  Just in general.
22     Q.  Do you understand Towers Perrin to be a

75

1  benefits consultant?
2      A.  I think that's one thing they do.
3      Q.  What else do you understand Towers Perrin
4  to do?
5      A.  Nothing.  I have no specific experience
6  with them.
7      Q.  Do you know whether or not Towers Perrin
8  has any relationship with ULLICO or its subsidiaries?
9      A.  I have no idea.
10     Q.  Do you know whether any such relationship
11 has existed at any time in the past?
12     A.  I have no knowledge.
13     Q.  Does ULLICO or any of its subsidiaries
14 purchase drugs directly from any manufacturer or
15 wholesaler?
16     A.  Not that I know of.
17     Q.  Does ULLICO or do any of its subsidiaries
18 own any pharmacies?
19     A.  Not that I know of.
20     Q.  How about hospitals?
21     A.  No, not that I know of.
22     Q.  Physicians' practices?

76

1      A.  Not that I know of.
2      Q.  And has that been true since 1991, as far
3  as you know?
4      A.  I believe so.
5      Q.  Now, the five options in terms of
6  reimbursement that we discussed, do you know how long
7  those have been in place?
8      A.  I don't know specifically.  It's been a
9  long time.
10     Q.  Do you know how long Union Labor Life has
11 been contracting with PPOs or other entities
12 providing networks?
13     A.  I would imagine a long time.  I don't
14 know.
15     Q.  When is the first time you're aware --
16 what's the first time period since you aware -- that
17 you knew Union Labor Life had those arrangements?
18     A.  Since I joined the company.
19     Q.  And that's 2000?
20     A.  2001.
21     Q.  Do you know whether at any point in the
22 past Union Labor Life has contracted directly with

77

1  physicians or hospitals?
2      A.  I don't know.
3      Q.  To the best of your knowledge they have
4  not?
5      A.  I couldn't be that broad.  I don't know.
6  There's all types of things that could have occurred.
7  I can't speculate.  Not that I know of.
8      Q.  Do you know for a fact that since 2001,
9  when you've been at the company, Union Labor Life has
10 not contracted with any providers directly?
11     A.  I know that on a very occasional basis
12 for a specific case for a provider who is not in a
13 network on behalf of a member that there has been a
14 letter of agreement at times signed between the
15 company and a direct provider, but that's only if
16 they don't have a PPO contract and it's on a very
17 rare basis that it occurs.
18     Q.  What would be the basis for that type of
19 contract?
20     A.  That we have a participant or member who
21 lives in a rural area, has a provider who doesn't
22 participate with anyone, and because of that the

Kelly Ellston                    Highly Confidential                    November 23, 2004
                                 Washington, DC

21 (Pages 78 to 81)

78

1   person's benefits would be reduced and they would
2   have a lot of out of pocket, and we would go directly
3   to that provider and request that they take less in
4   order to be able to support the member's coverage.
5       Q.   And that could be any type of a provider?
6       A.   It could, yes.
7       Q.   Would those direct contracts contain
8   provisions regarding reimbursement for drugs
9   administered in office?
10      A.   It would not -- I would not believe so.
11  The way that we have done it to my knowledge is a
12  letter of agreement. It is specific to a person, an
13  episode, and a particular treatment, that type of
14  very, very narrow agreement, and to my knowledge it
15  has not ever dealt with drugs specifically or
16  exclusively.
17      Q.   Would those agreements layout a specific
18  dollar sum that would be paid in relation to that
19  particular individual?
20      A.   It could, or it could be a discount
21  amount. It depends on the particular instance.
22      Q.   What are the possible mechanisms that

79

1   would be utilized to determine reimbursement in
2   relation to drugs administered in office?
3       A.   If there were specific drugs in that
4   instance, and again, I don't have any knowledge of
5   it, we would utilize our pharmacy team as a resource
6   for what would be an expected reimbursement level.
7       Q.   And the methodology that the pharmacy
8   team would then communicate -- the methodology that
9   the pharmacy team would then communicate, would that
10  form part of the contract with the original provider?
11      A.   No. The methodology would be an amount,
12  not how the amount was derived, just an amount.
13      Q.   So it would be a set dollar sum in
14  relation to a particular drug rather than a
15  percentage of AWP or WAC or something like that?
16      A.   Correct. We don't have access to what
17  AWP or WAC is, so a percentage of that would have no
18  relevance.
19      Q.   How often are these direct contracts
20  entered into?
21      A.   Very rarely. Maybe ten a year. It's
22  very rare.

80

1       Q.   Are those contracts -- who drafts those
2   contracts?
3       A.   Our compliance department. I would say
4   it's a letter of agreement. I understand that's
5   probably a contract, but it is not a very broad
6   document and it's very narrow in what the
7   expectations are.
8       Q.   Can you state with confidence that those
9   contracts do not include methodologies for drug
10  reimbursement in relation to drugs administered in
11  office and only contain specific dollar sums?
12      A.   I can't answer that broadly. To my
13  knowledge, it hasn't and it wouldn't. It doesn't
14  make any sense why it would, but I can't speak with
15  personal knowledge that it never could have.
16      Q.   Now, as we discussed earlier, there are
17  some codes that pertain to drugs specifically.
18  Right?
19      A.   Yes.
20      Q.   And there are other codes that pertain to
21  the administration costs of infusing or injecting a
22  drug. Correct?

81

1       A.   Correct.
2       Q.   Does Union Labor Life have an
3   understanding as to whether the administration fees
4   that it pays, alone, taken in isolation, are
5   sufficient to cover doctors' overhead expenses?
6       A.   I have no idea.
7       Q.   And that's because you have no knowledge
8   of providers' economics, is that correct, practice
9   economics?
10      A.   I have no knowledge of practice economics
11  as it relates to Union Labor Life's contracts.
12      Q.   Do you have knowledge of practice
13  economics from another source?
14      A.   I have knowledge of practice economics
15  because I ran a physician practice, so in my past
16  that was one of my responsibilities.
17      Q.   Now, what are you referring to there?
18      A.   The University of Maryland running the
19  practice office and the network.
20      Q.   In that role, and I'm sure I asked you
21  this before, but I hope you will indulge me, were you
22  involved in the billing of drugs administered in

Kelly Ellston                   Highly Confidential              November 23, 2004
                                  Washington, DC

22 (Pages 82 to 85)

<table>
<tr><td>

82

1  those offices?
2      A.  Was I involved in billing?
3      Q.  The commercial insurers in relation to
4  drugs that were administered.
5      A.  Yes.
6      Q.  But those were family practice only.  Is
7  that correct?
8      A.  Yes.
9      Q.  So in those instances payments would have
10  been based on a capitated rate?
11      A.  For the most part capitated.
12      Q.  So when you refer to practice economics
13  or your familiarity with practice economics, that
14  does not include knowledge about the purchase and
15  then billing for injected or infused drugs
16  administered in physicians' offices.  Is that
17  correct?
18      A.  That is correct.  In my practice we
19  received the drugs or injectables directly from the
20  University of Maryland pharmacy, and then we passed
21  that expense to the payer.
22      Q.  Are you familiar with the term specialty

</td><td>

84

1      Q.  Now, we spoke earlier about your
2  knowledge or lack of knowledge pertaining to
3  providers' acquisition costs.  Do you recall that
4  testimony?
5      A.  Yes.
6      Q.  And you testified that gaining more
7  information about what providers were paying to
8  acquire drugs would not change the amounts that Union
9  Labor Life reimburses in relation to drugs
10  administered in office.  Correct?
11      A.  Correct.
12      MR. KLEIN:  Objection to that question.
13  I think it mischaracterizes her testimony, but go
14  ahead.
15      BY MR. MANGI:
16      Q.  You agreed with my statement.  Right?
17      A.  Can you restate it?
18      (The record was read by the reporter.)
19      THE WITNESS:  I remember this as being
20  one of those difficult to answer unequivocally.  I
21  don't remember exactly how I answered.
22      BY MR. MANGI:

</td></tr>
<tr><td>

83

1  pharmacy?
2      A.  Yes.
3      Q.  What's your understanding of a specialty
4  pharmacy?
5      A.  Pharmacies that are focused on production
6  and delivery of mostly high cost low utilization
7  drugs.
8      Q.  Does Union Labor Life utilize the
9  services of any specialty pharmacies?
10      A.  Not to my knowledge.  It could happen in
11  the course of case management services.
12      Q.  And those would be specific instances
13  pertaining to specific patients whose costs are
14  higher than the norm.  Correct?
15      A.  That's correct.
16      Q.  Do you know whether Union Labor Life has
17  contracts with any specialty pharmacies?
18      A.  I don't know.
19      Q.  Certainly Union Labor Life does not make
20  general use of specialty pharmacies beyond those
21  specific cases.
22      A.  That is correct.

</td><td>

85

1      Q.  Well, let's revisit the topic.  The
2  amounts that Union Labor Life reimburses in relation
3  to drugs administered in office are determined by fee
4  schedules or the amounts billed by PPOs after
5  repricing.  Correct?
6      A.  Correct.
7      Q.  Those amounts are fixed dollar sums.
8  Correct?
9      A.  Or percentages of billed charges.
10      Q.  In paying those claims, Union Labor Life
11  has no information regarding what providers pay to
12  acquire those drugs.  Is that right?
13      A.  That is correct.
14      Q.  And indeed, if it learned more about what
15  they were paying to acquire those drugs, that
16  wouldn't change the amounts that it's reimbursing.
17  Correct?
18      MR. MCGLONE:  Objection.  Calls for
19  speculation.  You may answer.
20      THE WITNESS:  One factor, and I can't
21  answer that as no, and the reason I can't answer no
22  because if for some reason a physician were to bill

</td></tr>
</table>

Kelly Ellston                 Highly Confidential              November 23, 2004
                                Washington, DC

23 (Pages 86 to 89)

86

1  $5,000 for an immunization which is beyond anything
2  that would be expected, say 10 percent you'd be
3  paying, that would be something we would investigate
4  to say what would be reasonable and acceptable.
5        So in those instances, if there is an
6  outlier that doesn't make sense, we would research
7  it, and it's possible. We probably would not
8  understand what they paid for it, but we would
9  definitely benchmark it against what should be
10 acceptable.
11       BY MR. MANGI:
12       Q.  So if a particular physician were to bill
13 an extraordinary sum in relation to an immunization,
14 then that may form the basis for an investigation.
15 Correct?
16       A.  It would be a flag, just like we have
17 flags for fraud and abuse and we have reviews for
18 different dollar amounts. There are many steps in
19 the claims process that look to making sure that
20 things make sense.
21       Q.  It would be a flag of some sort of
22 overbilling.

87

1        A.  Yes.
2        Q.  And the basis for that flag would be a
3  comparison to the amount that Union Labor Life would
4  ordinarily pay in relation to a similar immunization.
5  Is that correct?
6        A.  Or what would be, again possibly using
7  our pharmacy team, what would be the expected amount
8  that should be reimbursed.
9        Q.  Does Union Labor Life have a particular
10 benchmark of what are common reimbursement amounts
11 for all drugs?
12       A.  I don't know. That would be in the
13 pharmacy area, whatever tools or methods they use to
14 get information.
15       Q.  Well, in relation to paying claims to
16 physicians in relation to drugs that are not
17 immunizations, other injectable and infusible drugs,
18 how will Union Labor Life determine whether or not
19 the amount that it's paying is subject to a flag or
20 not subject to a flag?
21       A.  For the most part it is by the amount.
22 We have thresholds of review, and it's not just

88

1  specific to a drug. We have thresholds of review for
2  a provider claim over a thousand dollars for office
3  visits, hospital claims over 5,000, 10,000, 25,000.
4  So we have different points at which there's a review
5  just to make sure that things are adding up.
6        Q.  Now, leaving aside those specific
7  instances where there's a suspicion that a physician,
8  a particular physician is overbilling or there's some
9  other concern about fraud or something like that,
10 leaving those instances aside, if Union Labor Life
11 were to gain more information generally about what
12 physicians in the market are paying to acquire drugs,
13 that wouldn't change the amount they would pay as
14 reimbursement. Correct?
15       MR. MCGLONE:  Same objection.
16       THE WITNESS:  In our current structure,
17 because we are guided and utilizing the PPO
18 contracts, it would not, because that's part of the
19 negotiation that the PPO and the provider have.
20       BY MR. MANGI:
21       Q.  And indeed, Union Labor Life is not
22 involved in that negotiation process.

89

1        A.  That's correct, between the PPO and the
2  provider.
3        Q.  Now, based on the fact that Union Labor
4  Life does not know what physicians' acquisition costs
5  are, is it fair to say that Union Labor Life does not
6  know how much money physicians are or are not making
7  in relation to drugs they administer in office?
8        A.  That's correct.
9        Q.  Union Labor Life does not know how much
10 of a loss they're taking or how much of a profit
11 they're making?
12       A.  That's correct.
13       Q.  And it would be fair to say that Union
14 Labor Life certainly does not have a particular
15 percentage expectation of the amount of profit that a
16 physician may be making. Correct?
17       A.  No.
18       Q.  It would be impossible to say that Union
19 Labor Life expects that they'll make a percentage
20 profit of 5 percent, 10 percent, 20 percent, 30
21 percent, 40 percent?
22       A.  That's not in our calculations.

24 (Pages 90 to 93)

**90**

1     Q. That's something that is entirely
2 irrelevant to Union Labor Life's calculations of the
3 amounts that it's going to reimburse. Is that
4 correct?
5     A. Correct.
6     Q. Now, we spoke about instances where
7 billing is a percentage of charges.
8     A. Yes.
9     Q. I just want to be clear here. Do
10 physicians bill based on a fee schedule or on a
11 percentage of bill charges or either?
12     A. It could be either.
13     Q. Do you have any knowledge as to how
14 physicians would arrive at the amounts billed when
15 they're not using a fee schedule?
16     A. Well, generally the physician doesn't
17 derive what they bill based on percentage of savings
18 or fee schedules. To my knowledge, the physician's
19 billing is completely up to how they decide to set
20 their prices. It's how they're reimbursed is the
21 percentage of savings or the fee schedule. Billing,
22 they can charge what they charge.

**91**

1     MR. MANGI: Nothing further. Do you have
2 any questions, Alan?
3     MR. KLEIN: I do have a couple of
4 questions.
5     EXAMINATION BY COUNSEL FOR PLAINTIFFS
6     BY MR. KLEIN:
7     Q. My first question is: To what degree
8 were you involved in the negotiation between Union
9 Labor Life and the PPOs?
10     A. I was not.
11     Q. And to what degree do you know what
12 factors those that did negotiate on behalf of Union
13 Labor Life, what factors they considered in
14 negotiating with the PPOs?
15     A. My understanding is when we have
16 proposals or we are looking at new PPOs we have a
17 team of -- a multi-disciplinary team, that goes over
18 the process. And in that team, discussions of the
19 codes for amount, CPT codes that are looked at,
20 access fees that are derived, and scope and
21 responsibility of the contracts are discussed.
22     Q. And have you ever taken part in these

**92**

1 discussions?
2     A. Yes.
3     Q. And do you normally take part in these
4 discussions?
5     A. Yes.
6     MR. KLEIN: I have no further questions.
7     MR. MCGLONE: I have a request to make
8 that we record on the record what I think is an
9 understanding, and if not, I hope it will be one,
10 that the deposition transcript will be designated
11 highly confidential pursuant to the protective order
12 in place in this case.
13     MR. MANGI: We have no objection to that.
14 Alan, I trust you have no objection to that.
15     MR. KLEIN: I have no objection.
16     EXAMINATION BY COUNSEL FOR JOHNSON & JOHNSON
17     BY MR. MANGI:
18     Q. Just a quick bit of follow-up. In
19 relation to the factors that are considered in
20 deciding whether or not to enter into a contract with
21 a PPO which you were just questioned about, is it
22 fair to say that the amount of profit or loss that

**93**

1 physicians in a particular network will make when
2 reimbursed for drugs in office is not one of the
3 factors that's considered by Union Labor Life?
4     A. I would say that's correct. Our factor
5 is what will it cost us to provide health care
6 services to our membership or our clients at a more
7 macro level.
8     Q. And in that regard, Union Labor Life is
9 always looking, based on a competitive dynamic, to
10 get the best and most price efficient deal that it
11 can. Correct?
12     A. That's correct.
13     Q. And as we discussed before, Union Labor
14 Life has no expectation of what sort of profit
15 physicians may be making in relation to drugs
16 administered in office, be it 20 percent, 30 percent,
17 40 percent, or something more than that.
18     A. We don't get to that level of
19 granularity, and we're looking at the overall cost of
20 health care.
21     Q. That's something that's irrelevant to
22 Union Labor Life's determination of the amounts that