1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

_____

In re: PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE       )

PRICE LITIGATION                 )

_____)

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS                      )

_____)

DEPOSITION of STEVEN J. FOX, called as a witness by and on behalf of the Johnson & Johnson, pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before P. Jodi Ohnemus, Notary Public, Certified Shorthand Reporter, Certified Realtime Reporter, and Registered Merit Reporter, within and for the Commonwealth of Massachusetts, at the offices of Robins, Kaplan, Miller & Ciresi, L.L.P., 800 Huntington Avenue, Boston, Massachusetts, on Wednesday, 8 March, 2006, commencing at 9:35 a.m.

Steven J. Fox                                                             March 8, 2006

Boston, MA

**Page 2**

```
 1   APPEARANCES:
 2
 3   HAGENS BERMAN SOBOL SHAPIRO LLP
 4     (By Edward Notargiacomo, Esq.)
 5     One Main Street
 6     Fourth Floor
 7     Cambridge, Massachusetts  02142
 8     (617) 482-3700
 9     ed@hbsslaw.com
10     Counsel for the MDL Plaintiffs
11
12   ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
13     (By Stephen L. Coco, Esq.)
14     800 Boylston Street
15     25th Floor
16     Boston, Massachusetts  02199-7610
17     (617) 267-2300
18     slcoco@rmkc.com
19     Counsel for Blue Cross/Blue Shield
20
21
22   (CONTINUED)
```

**Page 3**

```
 1   APPEARANCES, Continued
 2
 3   BLUE CROSS/BLUE SHIELD OF MASSACHUSETTS
 4     (By Steven E. Skwara, Esq.)
 5     Landmark Center
 6     401 Park Drive
 7     Boston, Massachusetts  02215-3326
 8     (617) 246-3531
 9     steven.skwara@bcbsma.com
10     Counsel for Blue Cross/Blue Shield of
11     Massachusetts
12
13   PATTERSON BELKNAP WEBB & TYLER LLP
14     (By Adeel A. Mangi, Esq.)
15     1133 Avenue of the Americas
16     New York, New York  10036-6710
17     (212) 336-2000
18     aamangi@pbwt.com
19     Counsel for Johnson & Johnson
20
21
22   (CONTINUED)
```

**Page 4**

```
 1   APPEARANCES, Continued
 2
 3   SHOOK, HARDY & BACON L.L.P.
 4     (By Elizabeth S. Rowe, Esq.)
 5     2555 Grand Boulevard
 6     Kansas City, Missouri  64108-2613
 7     (816) 474-6550
 8     erowe@shb.com
 9     Counsel for Aventis Pharmaceuticals
```

**Page 5**

```
             INDEX
TESTIMONY OF:                              PAGE
STEVEN J. FOX
  (By Mr. Mangi).............................. 007
  (By Mr. Coco)............................... 362

           EXHIBITS
NUMBER       DESCRIPTION                     PAGE
Exhibit Fox 001, Subpoena....................... 063
Exhibit Fox 002, Memo, 11/6/92.................. 155
Exhibit Fox 003, "Analysis of CMS Average
                 Wholesale Price Reform"........ 187
Exhibit Fox 004, BCBSMA-AWP 10605-10607......... 236
Exhibit Fox 005, BCBSMA-AWP 10608............... 238
Exhibit Fox 006, BCBSMA-AWP 10609-10610......... 248
Exhibit Fox 007, BCBSMA-AWP 000048-00051........ 263
Exhibit Fox 008, BCBSMA-AWP 12489-12494......... 271
Exhibit Fox 009, BCBSMA-AWP 00054............... 281
Exhibit Fox 010, "Hooked on Drugs".............. 285
Exhibit Fox 011, BCBSMA-AWP 12613-12614......... 303
Exhibit Fox 012, Group Primary Care Physician
                 Agreement...................... 309
```

**Page 6**

```
EXHIBITS (CONTINUED)
NUMBER      DESCRIPTION                              PAGE
Exhibit Fox 013, Group Primary Care Physician
                Agreement, 2000................. 330
Exhibit Fox 014, Group Primary Care Physician
                Agreement, 2002................. 334
Exhibit Fox 015, Non Fee Services Comparison..... 336
Exhibit Fox 016, BCBSMA-AWP 00047................ 342
Exhibit Fox 017, BCBSMA-AWP 10002-10005.......... 343
```

**Page 7**

PROCEEDINGS

STEVEN J. FOX, having first been duly sworn, testified as follows to direct interrogatories

BY MR. MANGI:

Q. Mr. Fox, my name is Adeel Mangi. I represent Johnson & Johnson at this litigation. Have you ever been deposed before?

A. I have.

Q. And how many times have you been deposed?

A. Once.

Q. When was that?

A. 2005.

Q. What was the context for that deposition?

A. Thomas litigation.

Q. Now, what were the issues at play in the Thomas litigation?

A. I was being deposed based on my role in

**Page 8**

managing the provider network for Blue Cross Blue Shield.

Q. Do you have an understanding as to what the Thomas case was about?

A. Generally.

Q. Okay. Can you describe for me your understanding of the Thomas litigation.

A. My understanding is that it's essentially brought forward a class action lawsuit. A group of physicians in Florida named a lot of health plans across the country, named Blue Cross plans across the country, and we were one plan, so we were also named as part of the class, and it had to do with how transparency of reimbursement and communication of -- reimbursement essentially.

Q. What issues specifically were the plaintiffs in that case raising as regards transparency and communication of reimbursement?

MR. COCO: Objection.

A. I don't know how -- I don't know what they were raising in general with the case. I

**Page 9**

mean, most of my testimony had to do with how was our network structured. How did we communicate to physicians. All of my testimony essentially is around my role, how we work with physicians, how I communicate with physicians. And most of what we did and do at Blue Cross Blue Shield is -- didn't -- my view, it didn't apply to the case.

Q. Why do you say that?

A. Again, based on what we do, we communicate with physicians, we work with our physicians. It just didn't seem like a lot of what they were talking about in the case applied to us.

Q. Well, I'm trying to understand what you mean by that. What are the things that you thought they were talking about that didn't apply to you?

A. Do you tell physicians what the fee schedules are? Do you communicate with physicians? Are your policies and procedures available, and things like that?

Q. Well, let's take the first of those, do

**Page 10**

1  you tell physicians what the fee schedules are?
2  Why did you think that issue does not apply to
3  BCBS of Massachusetts?
4      A.  Because we -- we do.  We disclose our
5  reimbursement rates to our physicians.  My
6  understanding is that some of the other defendants
7  in that case -- maybe they did not.  I -- I don't
8  know.  Can't speak for them.
9      Q.  The second issue that was raised was how
10 do you communicate with physicians?
11     A.  Uh-huh.
12     Q.  Again, why did you think that didn't
13 apply to BCBS of Massachusetts?
14     A.  I mean, we do -- we do a lot of -- we do
15 a lot of communication around lots of things.
16 Again, my understanding of the case, a lot of the
17 things that were mentioned just didn't apply.
18     Q.  Now, other than communicating generally
19 and communicating fee schedules, were there other
20 issues raised in that litigation that you recall?
21     A.  Not that I recall.  Primarily that.
22     Q.  Do you know what the eventual resolution

**Page 11**

1  was as regards BCBS of Massachusetts in the Thomas
2  litigation?
3      A.  I don't.
4      Q.  Do you know whether the case was settled
5  or not?
6      A.  I don't believe the case has been
7  settled.
8      Q.  You understand the case is ongoing?
9      A.  My understanding is that it is.
10     Q.  Now, the two issues you raised, first
11 being telling physicians what the fee schedules
12 are, does BCBS append fee schedules to all
13 contracts that it enters into with physicians?
14     A.  When you say, "BCBS," are you talking
15 about BCBS of Mass. or --
16     Q.  Yes.
17     A.  -- in general?
18     Q.  You're right.  I should -- I should --
19     A.  Okay.
20     Q.  -- rephrase that.  Does BCBS of
21 Massachusetts append fee schedules to all
22 contracts that it enters into with physicians?

**Page 12**

1      A.  Does it append fee schedules to all
2  contracts it enters into?  No.  Our fee schedule -
3  - no, the answer is no.
4      Q.  When BCBS of Massachusetts enters into a
5  contract with a physician, is the physician
6  informed in any way what the fee schedule rates
7  are?
8      A.  Usually, yes.
9      Q.  Okay.  How is that communication made?
10     A.  Could be a couple of ways.  I mean,
11 typically, if it's a physician who's brand new,
12 never -- just out of medical school, we will
13 essentially give them what we call a sample fee
14 schedule.  It's the top -- I believe it's 100
15 codes that that physician specialty bills, and we
16 will provide that to them, along with the
17 appropriate contract and application.
18         We don't wait for them to ask for it.
19 We typically give it to them.  There -- there can
20 be also physicians can just question us.  There
21 may be codes outside of that that they want to
22 know.  So, they'll ask us or they'll give us a

**Page 13**

1  list of codes, and we'll give them what the
2  reimbursement is for those codes.
3      Q.  Now, what about a physician who's not
4  typically -- who's not fresh out of medical school
5  but was not previously part of the network?  Would
6  such a physician, signing a contract with BCBS of
7  Massachusetts for the first time, also get a copy
8  -- a copy of the sample fee schedule?
9      A.  I mean, they should.  I've not ever run
10 across a physician who wants to come in our
11 network that doesn't ask about fees.  So, one way
12 or the other, they -- they either have it -- they
13 ask for it.  That's typically what happens.  We --
14 I've not ever seen a physician sign a contract and
15 have no understanding of fees.
16     Q.  So, other -- the only physicians who are
17 given the sample fee schedule as a matter of
18 course without them asking for it are new doctors
19 who are fresh out of medical school, is that
20 right?
21         MR. COCO:  Objection.
22     A.  I didn't say that.

**14**

1  Q. Okay. Perhaps you can help me. Perhaps
2  I misunderstood. I understood you to say that the
3  doctors who are fresh out of medical school are
4  given the fee schedule as a matter of course.
5  Whereas, other doctors are not given it as a
6  matter of course by BCBS, but typically will ask
7  for it, so will receive it. What -- did I
8  misunderstand any part of that?
9      MR. COCO: Objection.
10  A. Typically, again, I think what I said is
11 typically, a physician who is -- is coming into --
12 brand new, typically, as a matter of course we
13 will give them the fee schedule. All of our
14 contracts allow physicians to get the fees upon
15 request. They ask for it; they get it. So, we
16 could take the position that we will just wait and
17 ask them all to ask for it, but the way we do
18 business is we will -- we'll provide it if we know
19 that this is somebody who probably doesn't know
20 it.
21      A physician who is already here or new
22 to the area but not a "new physician," again, same

**15**

1  standard would apply. The contract says you get
2  the fee schedule upon request. But, again, we'll
3  make it available. We don't -- so, I think that's
4  -- I think that's what I said.
5      Q. So, the fee schedules are available to
6  all physicians on request, and for new physicians,
7  you go an extra mile and give them a copy
8  regardless.
9      MR. COCO: Objection.
10     Q. Is that correct?
11     A. Typically, but it's not -- again, the
12 contract says -- technically, the contract -- I
13 don't have to give them anything. I can just give
14 them a contract and application. We will
15 typically, for a physician coming in, provide
16 that. But I -- certainly not in all cases.
17     Q. Okay. So, it's -- it's not a rule or a
18 standard policy, but it's a frequent practice.
19     MR. COCO: Objection.
20     A. I didn't say frequent. I just said
21 typically we would do it.
22     Q. Okay. Are you -- are you making a

**16**

1  distinction between something that happens
2  frequently and something that happens typically?
3      A. Yeah, I am.
4      Q. Okay. What is the distinction that
5  you're drawing there?
6      A. Well, frequently, to me, means it's a
7  general business practice, that we do it more
8  oftentimes than we not. Typically means, to me,
9  that we -- we do it, but we not -- it's not a
10 standard practice. We don't do it all the time.
11     Q. Okay. I think I understand the
12 distinction you're trying to draw there. Now, the
13 other issue that you mentioned from the Thomas
14 litigation was communicating with physicians, and
15 you said you did a lot of communications around a
16 lot of things. What sort of communications were
17 you referring to there?
18     MR. COCO: Objection.
19     A. Everything that we produce out of Blue
20 Cross that goes to a physician comes out of my
21 area. We communicate about a lot of things.
22     Q. All right. Could you give me some

**17**

1  examples.
2      A. We send newsletters. We send product
3  updates. Things like that.
4      Q. Now, are there opportunities for
5  physicians to communicate to you, as opposed to
6  newsletters and product updates that you're
7  sending to them?
8      A. Sure.
9      Q. Okay. Now, I assume they can write or
10 call your department. That's one option, right?
11     A. Sure. Yes.
12     Q. Other than them calling or writing, are
13 there any other avenues open to them to raise any
14 issues or concerns with BCBS of Massachusetts?
15     A. You said the -- you said, "the
16 department." When you say, "the department," what
17 do you mean by, "the department"?
18     Q. Provider relations.
19     A. Individuals in the department or the
20 department as provider relations, 'cause I'm -- I
21 make a distinction.
22     Q. Okay. What's the distinction that

**Page 18**

1  you're making there?
2     A.  Because we have no official -- there is
3  no mailbox title "provider relation," so mail
4  doesn't come into a provider relations mailbox.
5  Physicians, if they're going to write, will either
6  write directly to an individual or they'll write
7  to me.
8     Q.  Okay.  Well, let me -- let me rephrase
9  the question then.  If a physician wishes to
10 communicate a concern or a question to BCBS of
11 Massachusetts --
12    A.  Right.
13    Q.  -- other than writing or calling, what
14 other avenues of communication are available to
15 them?
16    A.  Meetings.
17    Q.  Anything else?
18    A.  I guess electronic -- e-mail.
19    Q.  Anything else?
20    A.  Not that I'm aware of.
21    Q.  Okay.  Is there any formalized system of
22 regular meetings, or would these be on an ad hoc

**Page 19**

1  basis?
2        MR. COCO:  Objection.
3     A.  With me -- with us, it's ad hoc.
4     Q.  Are there any -- is there a regular
5  schedule of meetings with provider organizations,
6  if not with individual providers?
7        MR. COCO:  Objection.
8     A.  Say that again.
9     Q.  Sure.  Well, there are certain groups
10 that represent providers, such as MASCO, for
11 example, or the Mass Medical Society, right?
12    A.  (Witness nods.)
13    Q.  You have to answer verbally so the
14 reporter can take it down.
15    A.  Yes.
16    Q.  Now, I understand that there are no
17 formal recurring meetings with individual
18 physicians.  Those are ad hoc, right, as we just
19 discussed?
20       MR. COCO:  Objection.
21    A.  Yes.
22    Q.  My question is, with these societies

**Page 20**

1  like MASCO, Mass. Medical Society, and other
2  provider organizations like them, does BCBS of
3  Massachusetts have regular ongoing meetings with
4  them?
5        MR. COCO:  Objection.
6     A.  No.
7     Q.  So, those are also on an ad hoc basis as
8  issues come up?
9     A.  Yes, ad hoc.
10    Q.  How about -- withdraw that.  Does BCBS
11 of Massachusetts conduct any advisory boards with
12 -- including physicians?
13       MR. COCO:  Objection.
14    A.  There -- there is an advisory council, a
15 Physician Advisory Council.
16    Q.  What is the Physician Advisory Council?
17    A.  It's a group of physician leaders pulled
18 together probably three times a year, really
19 through the medical side of our house, our medical
20 directors and meeting to -- just to essentially
21 have a dialog -- physician relations.
22    Q.  Who's in charge of that process from

**Page 21**

1  BCBS of Massachusetts?
2     A.  The Physician Advisory Council, that
3  would be Dr. John Fallon.
4     Q.  And he's the chief medical officer,
5  right?
6     A.  He's the chief physician executive.
7     Q.  Now, I'd like to explore that a bit more
8  in a minute, but going back to the practices we
9  discussed with regard to disclosure of fee
10 schedules, how long have those been BCBS of
11 Massachusetts' practices?
12       MR. COCO:  Objection.
13    A.  I don't know how long.  I can only tell
14 you that we've been doing it since -- since I've
15 been there, so --
16    Q.  And how long is that?
17    A.  15 years.
18    Q.  Now, the Physician Advisory Council, how
19 many doctors are on that council?
20    A.  I don't know.
21    Q.  Do you know if it's more than ten or
22 less than ten?

### 22

1   A.  I don't know.
2   Q.  Okay. Do you know how many people from
3   BCBS of Massachusetts are on that council?
4   A.  On the council?
5   Q.  Right.
6   A.  None. It's external.
7   Q.  Okay. So, it's -- the council itself is
8   entirely made up of outside physicians.
9   A.  Yes.
10  Q.  When they -- when that council meets --
11  withdraw that. This council is something that's
12  been created by BCBS of Massachusetts, right?
13      MR. COCO:  Objection.
14  A.  Created? It's a meeting that we've had
15  for as long as I can remember.
16  Q.  Okay. Let me try and rephrase it. It's
17  not intended to be a trick question.
18  A.  Sure.
19  Q.  I'm trying to understand whether this is
20  an organization that exists independent of BCBS of
21  Massachusetts --
22  A.  Oh.

### 23

1   Q.  -- or is it a group that BCBS of
2   Massachusetts has brought together?
3   A.  No. No. It's a group that we've --
4   Blue Cross Blue Shield of Massachusetts has
5   brought together.
6   Q.  Okay.
7   A.  We have lots of meetings with lots of
8   physicians in our role as a health insurer. This
9   is one of them.
10  Q.  Now, when did BCBS of Massachusetts
11  bring this group together for the first time?
12  A.  I don't know. Like I said, it's been
13  around for -- in different forms and led by
14  different individuals -- for many years.
15  Q.  When's the first time you're aware of
16  this council or one of its predecessors being in
17  existence?
18  A.  Again, in my whole career, there has
19  been this or other meetings that have occurred.
20  So, 15 years. Not all named the same thing, but -
21  -
22  Q.  Okay. Do you recall some of the

### 24

1   previous names that the Physician Advisory Council
2   went by?
3   A.  Physician Advisory Board. I can't
4   remember any others.
5   Q.  Other than Dr. John Fallon, do you know
6   of anyone else from BCBS of Massachusetts who's
7   involved in working with the Physician Advisory
8   Council?
9   A.  Prior to Doctor Fallon, it would have
10  been Dr. Jim Fanale.
11  Q.  And who is Doctor -- could you spell the
12  name for the record, please.
13  A.  Dr. Jim Fanale.
14  Q.  Oh.
15  A.  F-a-n-a-l-e.
16  Q.  And Doctor Fanale had held the same
17  position that Doctor Fallon holds now, correct?
18  A.  I think his title was chief medical
19  officer.
20  Q.  Now, what sorts of physicians are part
21  of the Physician Advisory Council?
22  A.  Say that again. What source --

### 25

1   Q.  Yeah, what types of physicians? In
2   other words, are these all doctors from a
3   particular specialty? Are they from different
4   specialties? What sort of doctors are there?
5   A.  The doctors on this council are
6   physician leaders in Massachusetts. They come
7   from all different specialties.
8   Q.  And when you say, "physician leaders,"
9   what are you referring to there?
10  A.  Physicians who are leaders of their
11  group or organization.
12  Q.  I see. Do you mean by that that they
13  are the heads of particular practices, or do you
14  mean that they're physicians who are influential
15  in their field?
16  A.  Can be both.
17  Q.  Is the criteria for membership on the
18  council leadership of a large practice or
19  influence in the field, or can it be either?
20      MR. COCO:  Objection.
21  A.  Well, there's no membership per se, so
22  there is no membership. It's -- they're asked to

**Page 26**

1  sit on it, and they can be either. They can
2  either be head of a group -- I wouldn't use the
3  word "influential." I would just say respected by
4  their peers.
5      Q. Who makes a decision as to what doctors
6  should be invited to participate in the Physician
7  Advisory Council?
8      A. The council -- it's a meeting held by
9  the senior physician executive at Blue Cross Blue
10 Shield of Mass. So, it would be that individual.
11 But I know that they also get recommendations from
12 probably some of their medical directors, I would
13 imagine.
14     Q. Is the ultimate decision Doctor Fallon's
15 as to who should be invited to sit on the council?
16        MR. COCO: Objection.
17     A. I don't know what -- I don't know who
18 makes the ultimate decision.
19     Q. Now, meetings are held -- did you say
20 three times a year -- of the Physician Advisory
21 Council?
22     A. I think so.

**Page 27**

1      Q. Do you participate in any of those
2  meetings?
3      A. I have attended.
4      Q. Have you attended all meetings in the
5  recent past or just a few?
6      A. Define "recent past."
7      Q. Well, let's take the last two years to
8  begin with.
9      A. I've attended probably most.
10     Q. For how many years would you say that's
11 been your practice to attend most of the meetings?
12     A. Again, in my role, I'm responsible for
13 the physician network. So, if these meetings have
14 occurred and I've been in town or able to attend,
15 I've attended.
16     Q. Would that be true for the full 15-year
17 period that you've been at the company?
18     A. Not for the -- no, I haven't had the
19 same role for all 15 years, so --
20     Q. Okay. I'm just trying to get a sense
21 for how long this has been your practice to attend
22 as many meetings as you can with your schedule.

**Page 28**

1      A. For many years, I couldn't give you --
2      Q. Sure. Are we talking about between one
3  and three years, or are we talking about between
4  ten and 12 years? I'm just trying to get a
5  ballpark sense.
6      A. Ten years would be a good ballpark.
7      Q. Now, what are the sorts of issues that
8  are discussed at the Physician Advisory Council
9  meetings?
10     A. Typically, these meetings are
11 essentially a way for the plan to have a dialog
12 with physicians. So, they could be wide ranging,
13 just current events, updates on what's happening
14 at Blue Cross. In recent years, they've been more
15 clinically focused. You know, best practices in
16 certain types of treatments and conditions and
17 things like that. It's not a -- that's
18 essentially it.
19     Q. Okay. What issues are discussed other
20 than clinical concerns?
21     A. If we're going to launch a new product,
22 we'll probably get their feedback on stuff like

**Page 29**

1  that.
2      Q. By "new product," are you referring to a
3  new health insurance plan?
4      A. A new product offering by the plan to
5  employers, correct.
6      Q. Why -- why is that something that BCBS
7  of Massachusetts would discuss with physicians, as
8  opposed to potential clients?
9        MR. COCO: Objection.
10     A. We have those conversations with all
11 constituencies. They'll have them with accounts
12 with potential employers. Physicians are our
13 constituent base, and we -- this group is -- we
14 will try to let them know what the market looks
15 like, what's coming down the road from our
16 perspective just so that we can essentially give
17 them some idea of what they might see from us.
18     Q. Now, is there any discussion in the
19 Physician Advisory Council or its predecessors
20 about reimbursement issues?
21        MR. COCO: Objection.
22     A. Reimbursement issues, I'd say no. I

**Page 30**

1 mean, based on the mix of physicians in the room,
2 it would be tough to have those conversations.
3     Q. In the late 1990s, BCBS of Massachusetts
4 moved from reimbursing drugs administered at
5 physicians' offices at 100 percent of AWP to 95
6 percent of AWP, right?
7     A. I don't know when that occurred.
8     Q. Okay.
9     A. My understanding is it was AWP minus 5
10 percent.
11     Q. You're aware of fact that there was a
12 shift in reimbursement from AWP to AWP minus 5
13 percent.
14     A. Yes.
15     Q. Now, was there any discussion of that
16 issue in Physician Advisory Council meetings?
17     A. I don't know. Not that I can recall.
18     Q. More recently, BCBS of Massachusetts
19 contemplated shifting from an AWP-based
20 methodology to an ASP-based methodology. You're
21 familiar with that, correct?
22     A. I'm aware of that.

**Page 31**

1     Q. Was there any discussion of that issue
2 in Physician Advisory Council meetings?
3     A. No.
4     Q. Has there ever been discussion in a
5 Physician Advisory Council meeting around the
6 issue of physicians' acquisition costs for drugs?
7     A. No.
8     Q. Has there ever been discussion in
9 Physician Advisory Council meetings around the
10 issue of physician margins?
11     A. No.
12     Q. What do you understand the term
13 "physician margins" to mean?
14     A. Taken at its face, a physician margin,
15 essentially, profit.
16     Q. A distinction between what their costs
17 are and what their reimbursement is.
18         MR. COCO: Objection.
19     Q. To the extent that's profit.
20         MR. COCO: Objection.
21     A. Well, I wouldn't -- again, to me, if you
22 say a margin, to me, margin means profit.

**Page 32**

1     Q. Okay. Well, let's focus on drugs that
2 are administered by physicians in their offices.
3 You understand, of course, that physicians acquire
4 those drugs, administer them to patients, and then
5 seek reimbursement from payers, right?
6     A. Yes.
7     Q. Now, in relation to those -- well, are
8 you familiar with the term "buy and bill"?
9     A. No.
10     Q. Okay. Well, in relation to the types of
11 arrangements that we just discussed where a
12 physician buys a drug, administers it, and then
13 seeks reimbursement, do you have an understanding
14 of how the term "margin" is used referring to a
15 physician with that type of a practice?
16         MR. COCO: Objection.
17     A. I don't have those conversations with
18 physicians. I may have heard it in the industry,
19 but I'm not -- I've not used it, and it's not
20 conversations that, in my role, I would have with
21 a physician.
22     Q. Okay. What have you heard in the

**Page 33**

1 industry around that issue?
2         MR. COCO: Objection.
3     A. On that issue?
4     Q. Uh-huh.
5     A. Nothing. Just I've heard the term
6 "margin" used.
7     Q. My question is, have you heard the term
8 "margin" used in the context I just described?
9         MR. COCO: Objection.
10     A. No.
11     Q. What did you mean then when you said,
12 I've heard about that in the industry?
13     A. Just physicians talk about just -- like
14 any business talks about a margin and needing to
15 pay their overhead and margin, profit.
16     Q. As the -- your current title is director
17 of the provider relations department, is that
18 correct?
19     A. It's senior director of provider
20 relations, communications, and eHealth.
21     Q. Senior director of provider relations,
22 communications, and eHealth?

**Page 34**

1  A. Correct.
2  Q. Okay. Well, now, we were talking about
3  the Physician Advisory Council. Other than the
4  Physician Advisory Council, are there any other
5  advisory boards, bodies, or committees that you're
6  aware of that involve similar interactions, where
7  physicians get together with people from BCBS of
8  Massachusetts to discuss issues?
9      MR. COCO: Objection.
10 A. Specialty committees, groups of
11 physicians that would meet with our medical
12 directors in a similar vein, just to -- again, in
13 a smaller group -- have conversations about
14 similar issues.
15 Q. Now, is a specialty committee -- we were
16 -- withdraw that. Were you there describing two
17 different things, or is it the same thing? In
18 other words, is a specialty committee a group of
19 physicians who meet with the medical director?
20 A. Yes.
21 Q. Now, why is that called a specialty
22 committee?

**Page 35**

1  A. Typically, it's a group of the same
2  specialty recognized by the Mass. Medical Society
3  as a specialty organization. These are not groups
4  that we created. These are groups that exist.
5  They meet with all payers, and we're another plan
6  that these groups meet with.
7  Q. So, for example, it could be a group of
8  oncologists or an organization of oncologists who
9  could have meetings with medical directors. That
10 would be a specialty committee meeting.
11 A. That could be a group.
12 Q. How often are specialty committee
13 meetings held?
14 A. They're -- I'd classify them as ad hoc.
15 They're not on a regularly-scheduled basis. They
16 may occur quarterly. They may occur once a year.
17 It depends on the size, and frankly, the
18 committee's willingness to want to meet with the
19 plan.
20 Q. Do you participate in any of those
21 meetings?
22 A. I have.

**Page 36**

1  Q. What proportion of those meetings do you
2  attend at the present time?
3  A. At the present time? None.
4  Q. Okay. But you've attended them in the
5  past, is that correct?
6  A. I have.
7  Q. All right. In the last five years,
8  could you estimate what proportion of specialty
9  committee meetings you would have attended?
10 A. Very small. I've only attended a few
11 meetings of the -- of a couple of different
12 societies just to -- for my own, just to
13 understand what some of the -- these are clinical.
14 I mean, these are meetings to talk about clinical
15 issues, and I just want to have an understanding
16 or wanted to know what some of the issues were.
17     I also have a relationship with the
18 Mass. Medical Society for the plan. So, again,
19 I'm a liaison many times with the medical society.
20 And so, in my role there, it would also be to
21 understand what -- what the general business
22 issues are.

**Page 37**

1  Q. Are there ever discussions in specialty
2  committee meetings of issues other than purely
3  clinical?
4  A. There may be. We discourage it. But
5  they -- we can't stop people from having
6  conversations. But this is not the forum to engage
7  in those conversations. That's not what the
8  forums are intended to be.
9  Q. Why do you disparage it?
10 A. Because we have -- we -- we're happy to
11 have those conversations at an individual-
12 physician level. If a physician has an issue
13 that's other than a clinical issue, we'd rather
14 deal with them directly.
15     When these committee meetings or these
16 specialty societies are having meetings with us,
17 we really like to keep those conversations more at
18 the clinical level. But, again, we don't script
19 them. We can't tell them what to say.
20 Q. Do you recall any specialty committee
21 meetings where there was discussion of
22 reimbursement issues?

                                                          38
1    A.  I -- I recall -- I recall a meeting or
2    two where concepts were discussed, yes.
3    Q.  Okay. What meetings and what concepts
4    are you referring to there?
5    A.  The meeting I was at was probably the
6    specialty of clinical oncologists.
7    Q.  Now, was the group of clinical
8    oncologists you're referring to, did they go by a
9    particular name or was it just a collection of
10   oncologists?
11   A.  No, the group was MASCO. Yeah,
12   Massachusetts Association of something --
13   clinical. MASCO.
14   Q.  Clinical oncologists, perhaps?
15   A.  Yeah, probably right. Lots of acronyms
16   in our business.
17   Q.  When was this meeting that you're
18   referring to?
19   A.  I couldn't even give you the date. It
20   was a few years ago.
21   Q.  Within the last five years?
22   A.  Within the last five years.

                                                          39
1    Q.  Within the last three years?
2    A.  I couldn't tell you.
3    Q.  What was the issue under discussion at
4    this MASCO meeting?
5    A.  Well, again, I think there were lots of
6    issues being discussed. We had -- we had not
7    previously met with this group, as I recall. And
8    again, it's just part of wanting to have a dialog,
9    really trying to understand what the issues were
10   for clinical oncologists in our network.
11       The only issue that really came up that
12   I can recall that really wasn't a pure clinical
13   issue was, I think, the concept of trying to
14   understand how Blue Cross Blue Shield of
15   Massachusetts dealt with reimbursing drugs that
16   had not come to market yet.
17       So, in other words, the issues that they
18   were raising were when drugs were approved by the
19   FDA but not yet had been assigned a code by CPT
20   for a code, how should they instruct their
21   colleagues to bill the plan? I seem to remember
22   that really being the gist of the conversation.

                                                          40
1    Q.  What was the resolution of that issue?
2    A.  As I recall, we built a process with the
3    network where they could essentially bill those
4    new what we call J-codes. They could just bill
5    them to us in a classification called NOC Code, N-
6    O-C. The NOC code essentially is a CPT code that
7    essentially says, There's no code for this and I'm
8    billing it. So they could -- they could bill that,
9    along with a copy of -- probably a copy of the
10   invoice. That's my understanding.
11   Q.  Other than that particular issue, do you
12   recall any other issues that have been discussed
13   of specialty meetings that are not purely
14   clinical?
15   A.  Not that I can recall. Again, I didn't
16   attend every meeting, but the meetings I was at,
17   no.
18   Q.  Do you receive minutes from specialty
19   committee meetings?
20       MR. COCO: Objection.
21   A.  I would receive minutes if I was there.
22   Q.  Okay.

                                                          41
1    A.  If there were. I can't say that there
2    were always minutes at every -- these were not --
3    these were not -- these weren't those -- these
4    were meetings, I mean, if there were action items
5    or things to be followed up, there would be notes
6    taken at a meeting just so that parties in the
7    room would know what was discussed and what the
8    resolution was.
9    Q.  Okay. What about the Physician Advisory
10   Council meetings, are minutes kept at those
11   meetings?
12   A.  I don't know.
13   Q.  Have you ever seen minutes from those
14   meetings or notes from those meetings?
15   A.  They're not -- I've not. They're not
16   that type of meeting. It's not a meeting. It's a
17   discussion. It's -- it's a dinner and
18   conversation with -- it's not a meeting under
19   Roberts Rules of Order. So, it's not that type of
20   meeting.
21   Q.  At the Physician Advisory Council
22   meetings that you did attend -- by the way, are

### Page 42

1  they all dinners?
2  A.  Yes.  In the past there may have been
3  breakfast meetings, but typically, it's a meal and
4  a meeting.
5  Q.  Now, at the meetings that you do recall,
6  how many people, approximately, were present?
7  A.  They could -- ten, 15.
8  Q.  And how many people -- how many of those
9  ten to 15 people were employees of BCBS of
10 Massachusetts?
11 A.  Well, I would say ten to 15 were ex --
12 were not employees of Blue Cross Blue Shield.  I'd
13 say the attendees from Blue Cross Blue Shield
14 typically would be myself, potentially people on
15 my staff, and regional medical directors that
16 worked for either the chief medical officer or the
17 chief physician executive.  So, there could be
18 four, five, six.
19 Q.  Who from your staff would -- I forget
20 now how you defined typically versus frequently,
21 but who would regularly attend those meetings from
22 your staff?

### Page 43

1  A.  The only attendees would be my direct
2  reports that were -- had regional responsibility.
3  Again, it was an opportunity for them to interact
4  with the physicians that they work with.  So,
5  there were four -- or there are four regional
6  directors, and those are typically the ones who
7  would attend.
8  Q.  Lisa Gorman is one of those, right?
9  She's one of the people in that position?
10 A.  Lisa is, yes.
11 Q.  Now, I'd like to ask you about your
12 background.  Can you tell me what your education
13 is after high school, please.
14 A.  Four years of college.
15 Q.  What did you study in college?
16 A.  I have a bachelor's of -- bachelor of
17 science in communication and a double major in
18 communication and psychology.
19 Q.  Did you -- withdraw that.  Do you have
20 any formal educational qualifications after your
21 bachelor's degree?
22 A.  I've received certificates from a couple

### Page 44

1  of different programs, just continuing education.
2  Q.  What sort of programs have you taken as
3  part of continuing education?
4  A.  Northeastern University, health care
5  management; Harvard, negotiation and conflict
6  resolution.  That's it.  And then just industry,
7  you know, seminars and training, things like that.
8  Q.  The health care management course at
9  Northeastern, when did you take that?
10 A.  I don't know the year.  It was in the
11 '90s.  I honestly don't know.
12 Q.  Was that a weekend, a month?  How long -
13 -
14 A.  No, it was a -- it was a year.  It was a
15 year.
16 Q.  Was it full-time study or part-time?
17 A.  No, it was a couple of evenings a week.
18 And it's just a -- it's just a certificate.  It
19 was not a -- it's not a degree.  It's not an
20 associate's or anything like that.
21 Q.  Okay.  What were the issues that you
22 studied there in that course?

### Page 45

1  A.  Very broad, just -- it was just how
2  health plans were built.  It was a lot of history,
3  a lot of marketing, things like that.
4  Q.  Did you study, for example, how managed
5  care came about?
6  A.  I guess, as part of the history, the
7  history of managed care, sure.
8  Q.  Did you study the move from indemnity or
9  charge-based plans to where it's HMO-type plans
10 and other managed care type plans?
11 A.  Briefly.  It really was -- the course
12 was not -- it wasn't a beginner's course.  It's
13 assumed that you already have that knowledge.  It
14 was, again, more an opportunity to connect with
15 other people in the industry and further your own
16 knowledge.  For me, it was taken more to get a
17 better understanding of how the marketing side of
18 health plans worked, how products were sold, and
19 things like that.
20 Q.  Did you study, as part of that course,
21 the structure of the health care industry?  For
22 example, role of wholesalers, specialty

Page 46

1  distributors, PBMs, entities of that sort.
2       MR. COCO:  Objection.
3       A.  No.  No.
4       Q.  Did you study at all the distribution
5  channel for drugs in the health care industry?
6       A.  No.
7       Q.  Now, you mentioned you've also taken a
8  number of industry-specific courses.  What sort of
9  courses did you have in mind there?
10      A.  Specific to what I do.  It would be
11 communication, business strategy, contract
12 negotiation, things like that.
13      Q.  Other than these skills courses,
14 communication, negotiation, things like that --
15      A.  Yeah.
16      Q.  -- did you take any courses that
17 involved substantive study of the health care
18 industry?
19      A.  No.
20      Q.  When did you receive your bachelor's
21 degree?
22      A.  May of 1990.

Page 47

1       Q.  And where did you get that qualification
2  from?
3       A.  University of Miami, Coral Gables,
4  Florida.
5       Q.  After graduating in 1990, what did you
6  do next?
7       MR. COCO:  Objection.
8       A.  Lived with my parents like all college
9  graduates.  I don't know.  I came north looking
10 for work.
11      Q.  Did you start working?
12      A.  After a period of self realization, yes,
13 I did.
14      Q.  Where did you start working?
15      A.  I think -- I don't know, I think my
16 first job was at -- at the time, the prior Fleet -
17 - prior BankBoston, so, BayBank.  You know, just a
18 low-paying -- low-paying job.
19      Q.  And that was in 1990?
20      A.  That was in -- that was probably the
21 fall of 1990 --
22      Q.  Okay.

Page 48

1       A.  -- if I had to guess.
2       Q.  How long did you work for the bank?
3       A.  Not even a -- probably a year.
4       Q.  What did you do next?
5       A.  I then took at job at Bay State Health
6  Care.
7       Q.  So, that was around 1991?
8       A.  That was in February of 1991.
9       Q.  Now, Bay State Health Care is a health
10 insurer, right?
11      A.  It was.  It was an HMO that was later
12 acquired by Blue Cross Blue Shield.
13      Q.  And it's -- withdraw that.  What was
14 your initial role at Bay State Health Care?
15      A.  I was hired in the claims department.  I
16 reviewed hospital claims.
17      Q.  What sort of issues were you reviewing
18 in terms of those hospital claims?
19      A.  I literally was just a -- I would review
20 fields on the claim form, make sure they were
21 submitted.  Essentially, that was it.  It was just
22 a claims reviewer and then kind of a quality

Page 49

1  assurance.  So, when -- after the claims were
2  keyed into our system, I would be responsible for
3  going in and making sure that the claims were
4  being processed.
5       Q.  Were those inpatient claims, outpatient
6  claims, or both?
7       A.  Both.
8       Q.  Was -- how was -- what methodology was
9  Bay State Health Care using to reimburse hospitals
10 for drugs that were administered to patients in
11 that 1991 time frame?
12      MR. COCO:  Objection.
13      A.  I have no idea.
14      Q.  When you saw the claim, did it reflect
15 just a flat dollar sum?
16      A.  I wouldn't -- the claims that I saw were
17 billed on UB claim forms, and all I would really
18 care to look at is what was the date of admission,
19 what was the revenue code, and then make sure the
20 fields were filled in.  But at that part of my
21 career I had no understanding of what the -- the
22 detail was.

**50**

1    Q. Okay. How long did you remain in the
2  claims processing role?
3    A. Six months.
4    Q. Okay. What was the next position that
5  you moved to?
6    A. I would have brought a copy of my
7  resume. I think the next position I had, I then
8  left to go into what was then called "professional
9  relations" as a coordinator. So, essentially,
10 that was where I began my career working with
11 physicians.
12   Q. And that was in the fall of '91?
13   A. Well, six months after that. So,
14 probably -- I think I actually landed in that role
15 -- it was probably by then 1992. So, whatever
16 that -- not exactly sure of the time frames, but -
17 -
18   Q. Okay. Somewhere in the '91, '92 period?
19   A. Yeah. Yeah.
20   Q. Now, how long did you remain in the
21 professional relations coordinator role?
22   A. I was probably a coordinator for a

**51**

1  couple of years, just responsible for taking phone
2  calls and assisting what we called provider
3  representatives. So, individuals from our company
4  that would go out and meet with physicians.
5  Again, I was kind of an internally-based person.
6  And then I stayed in that role for probably a
7  couple of years, and then I later took a job as
8  the external provider relations representative.
9    Q. Now, when you were in the coordinator
10 role, were you taking calls only from the field
11 reps or also from physicians directly?
12   A. No, I took calls from physicians
13 directly. I was the person they called if they had
14 an issue or things like that.
15   Q. Now, while you were in that role, BCBS
16 of Massachusetts acquired Bay State Health Care,
17 is that correct?
18   A. That's correct.
19   Q. When was that acquisition?
20   A. I think it was October of 1992.
21   Q. Now, Bay State Health Care also had a
22 staff model HMO in the early '90s, is that

**52**

1  correct?
2      MR. COCO: Objection.
3    A. No, I don't think -- I don't think we
4  did.
5    Q. Do you understand what I mean when I use
6  the term "staff model HMO"?
7    A. I do.
8    Q. What is your understanding of that term?
9    A. A group of employed physicians that were
10 owned and operated by the health plan, but I don't
11 -- our Bay State did not -- to my knowledge --
12 didn't own or employ physicians and did not have a
13 clinic-based practice.
14   Q. Are you aware that other witnesses have
15 testified that Bay State did, indeed, have a staff
16 model HMO in the early '90s?
17     MR. COCO: Objection.
18   A. I'm not aware that they have.
19   Q. Well --
20   A. In my role, again, if there was, I had
21 no involvement with it. So, my understanding is
22 that there wasn't.

**53**

1    Q. Is it possible that there was a staff
2  model HMO and you weren't aware of it?
3      MR. COCO: Objection.
4    A. No.
5    Q. So, you're absolutely certain that there
6  was no staff model HMO, and anyone who testified
7  to the contrary is wrong?
8      MR. COCO: Objection.
9    A. They have reason to obviously give you
10 testimony based on what they know. If you're
11 asking me if Bay State had a staff model HMO, to
12 the best of my knowledge, the answer is no.
13   Q. Now, did BCBS of Massachusetts acquire
14 Bay State Health Care -- well, withdraw that. Are
15 you familiar with an entity called "Bay State
16 Health System"?
17   A. Yes.
18   Q. Okay.
19   A. No relation.
20   Q. What is Bay State Health System?
21   A. Bay State Health System is a health
22 system in western Massachusetts -- Springfield --

**Page 54**

1  made up of several hospitals.
2      Q. How long has Bay State Health System
3  been in existence, to your knowledge?
4      A. I have no idea.
5      Q. Now, is it a -- is it a group of
6  hospitals only, or are there also physician
7  practices involved with Bay State Health System?
8      A. Bay State Health System has -- has
9  hospitals, and it also has a group called Bay
10 State Affiliated Physicians Organization or a
11 group called BAPO, and that is a group of
12 physicians. They may have other holdings, but I
13 don't know what they are.
14     Q. Was -- to your knowledge, was there ever
15 an entity affiliated with Bay State Health Care
16 known as Bay State Health Systems?
17     A. When you say -- what do you mean by
18 "affiliated"?
19     Q. Well, connected in any way.
20        MR. COCO: Objection.
21     A. Not -- no, unless there was a contract
22 with them as a provider. But again, as I said

**Page 55**

1  earlier, Bay State Health Care didn't own or
2  operate physicians. It was not the model. We
3  were not a staff model HMO similar to other staff
4  models that were in existence at the time. I
5  don't even think we had a contract with Bay State
6  Health System even when I was there.
7      Q. When you were at Bay State Health Care?
8      A. Correct.
9      Q. Are you aware that in the early '90s,
10 Bay State Health Care was purchasing drugs
11 directly from drug manufacturers?
12        MR. COCO: Objection.
13     A. No.
14     Q. If Bay State did not have a staff model
15 HMO, are there any other facets of Bay State
16 Health Care's business that you're aware of, that
17 would explain its purchases of drugs?
18        MR. COCO: Objection.
19     A. No. I wasn't -- I wasn't -- again, my
20 role was pretty limited when I was working there.
21 So, in my role in working with physicians, I had
22 no knowledge or really understanding of that.

**Page 56**

1      Q. But you are able to state categorically
2  that there was no staff model HMO.
3        MR. COCO: Objection.
4      A. Again, you're asking me -- my
5  recollection is that there wasn't -- I had no
6  dealings with an entity, and I don't recall that
7  there was.
8      Q. Well, that's a little different from --
9  from what I had asked you earlier. I mean, let me
10 rephrase the question to you so it's clear. Are
11 you saying that you don't know if a staff model
12 HMO -- there may have been one, there may not have
13 been one, or are you saying that you know for a
14 fact there was no staff model HMO?
15        MR. COCO: Objection.
16     Q. Which of those two is it?
17        MR. COCO: Objection.
18     A. I'm saying, from my perspective, there
19 wasn't. Again, you're -- I'm going back to 1991.
20     Q. Uh-huh.
21     A. My understanding is that there wasn't.
22     Q. So, we were talking about your role as a

**Page 57**

1  professional relations coordinator at Bay State
2  Health Care, '91 or '92 to '94. The calls that
3  you were getting from physicians at that time,
4  what sort of issues were they -- were they
5  bringing to you?
6      A. Wide-ranging. I'd just say it was just
7  essentially, did you pay my claim? Did you not?
8  I need a contract. Essentially, anything that
9  they -- we took all the calls that a physician
10 could potentially have any question about the
11 health plan. We were not in the claims
12 department, so we typically did not take claims
13 calls. But we would take calls -- just general
14 calls about physician practices.
15     Q. Did you receive -- well, withdraw that.
16 At the time you were at Bay State Health Care
17 prior to its acquisition by BCBS of Massachusetts,
18 did you ever gain an understanding as to what
19 methodology Bay State used to reimburse physicians
20 for drugs administered in their offices?
21      - MR. COCO: Objection.
22     A. No.

**Page 58**

1  Q. Now, after BCBS of Massachusetts
2  acquired Bay State Health Care in October of '92,
3  did your title change?
4  A. I think -- yeah. Well, we went from
5  professional relations to -- we had several
6  department names. I think we were called "network
7  development & management, network planning and
8  development, provider relations." So -- but my
9  role was essentially the same. I was a field
10 representative responsible for working with
11 physicians, and that then later expanded to be
12 hospitals after the acquisition.
13 Q. Well, when did you go from being the
14 coordinator taking calls to being a field
15 representative?
16 A. Probably right around the acquisition.
17 Right around there.
18 Q. So, sometime around --
19 A. Actually, it might have even been right
20 before.
21 Q. Okay.
22 A. I don't remember. It was sometime in

**Page 59**

1  1992, '93 probably.
2  Q. And as a field rep, what sort of issues
3  were you dealing with physicians on?
4  A. Largely administrative, largely
5  administrative issues.
6  Q. What do you mean when you refer to
7  "administrative issues"?
8  A. Can't get claims paid, need to enroll in
9  a health plan, questions about benefits and
10 eligibility, technology issues, things like that.
11 Q. How long did you remain a field rep?
12 A. Probably several years, then went from a
13 provider representative to then being a network
14 manager responsible for a large -- larger
15 delivery-system-type providers, and that was
16 probably in 1995, '96.
17 Q. When you -- when you say, "larger
18 delivery-system providers," what are you referring
19 to?
20 A. I took on responsibility for what was
21 then Mass. General, Brigham & Women's -- it became
22 Partners Health Care. So, I had responsibility

**Page 60**

1  for that. Again, just being that -- managing that
2  relationship, if you will.
3  Q. Are you referring to hospitals now?
4  A. Physicians and hospitals.
5  Q. So, you had responsibility for
6  hospitals, but also for physician practices
7  unrelated to hospitals?
8  A. Correct.
9  Q. As a network manager, were you
10 responsible for handling all aspects of the
11 relationship with the entity?
12     MR. COCO: Objection.
13 A. Not all, not by far.
14 Q. Okay. What aspects of the relationship
15 were you responsible for?
16 A. Again, it was just -- it was essentially
17 -- customer relationship management is the term I
18 would use. It was really working with them to get
19 them enrolled, get them credentialed, be their
20 interface to the plan, help them understand
21 different issues, maybe what some of our clinical
22 policies were. That was essentially it -- get

**Page 61**

1  involved in some of the contracting work at the
2  time, and things like that; new product launches -
3  - products that we were offering to employers.
4  Q. When was the first time that you became
5  aware of the methodology used by BCBS of
6  Massachusetts to reimburse physicians for drugs
7  administered in office?
8     MR. COCO: Objection.
9  A. When was the first time? I don't even
10 know. First time I ever heard the term "AWP" was
11 probably in the late '90s.
12 Q. What was the context in which you first
13 heard the term?
14 A. Again, I think it was just in, you know,
15 How are physicians reimbursed for drugs? And once
16 I understood what types of things they were and
17 how they were, you know, what -- what they were,
18 then, you know, I probably would have heard it in
19 that context of, The reimbursement is AWP minus 5
20 percent.
21 Q. When you say you understood what they
22 were, are you referring to what the terms of

**Page 62**

1  reimbursement were?
2    A.  No, just the fact that, again, in my
3  business, just working with physicians, if you
4  work with enough physicians, sooner or later
5  you'll bump into an oncologist, and sooner or
6  later they will want to know what your methodology
7  is for reimbursing injectable drugs, and that
8  would then lead you to research it and understand
9  that the methodology is AWP minus 5 percent.
10   Q.  When you first became aware of the
11 methodology that BCBS used, what was it?
12   A.  I don't understand.
13   Q.  In other words, when you first became
14 aware of what methodology BCBS of Massachusetts
15 used to reimburse physicians --
16   A.  Uh-huh.
17   Q.  -- for drugs administered in office,
18 what was the formula in use at that time?
19       MR. COCO:  Objection.
20   A.  It was either AWP or AWP minus 5
21 percent. I don't remember. I don't remember which
22 one it would have been.

**Page 63**

1    Q.  Okay. But you're aware of fact that
2  both of those methodologies have been used in the
3  past.
4    A.  Yes.
5        MR. COCO:  We've been going about an
6  hour. Is this a good time to break or --
7        MR. MANGI:  Sure.
8        (Recess was taken.)
9        (Subpoena marked Exhibit Fox 001.)
10   Q.  Now, Mr. Fox, let me show you a
11 document. Please take a look at that document, and
12 I'm going to draw your attention to a specific
13 part of it. Have you ever seen this document
14 before?
15   A.  I think I have.
16   Q.  Did you see this document in the course
17 of preparing for your deposition today?
18   A.  I have.
19   Q.  I'd like you to turn to Page 12 of the
20 document, please, which is listed "Deposition
21 Topics," and ask you to review Nos. 2, 3, 7, and
22 8, which is on the next page.

**Page 64**

1    A.  (Witness reviews document.) Okay.
2    Q.  Now, are you knowledgeable regarding
3  these four topics?
4    A.  Yes.
5    Q.  Do you understand that you've been
6  designated by Blue Cross Blue Shield of
7  Massachusetts to speak for it as a corporate
8  representative on these four topics?
9    A.  Yes, I do.
10   Q.  Okay. We'll come back to those in a
11 couple of minutes. Now, let me ask you about the
12 methodologies that BCBS of Massachusetts has used
13 over time to reimburse physicians for drugs
14 administered in office. Now, we talked a bit
15 earlier about what you knew at the time as you
16 held different roles. Have you done anything to
17 educate yourself about different reimbursement
18 methodologies that BCBS of Massachusetts has used
19 over time in preparation for your deposition?
20   A.  Not in preparation for the deposition.
21 I just -- I worked with these methodologies for a
22 number of years, so I'm familiar with them.

**Page 65**

1    Q.  Well, prior to the late '90s, you didn't
2  know what the methodologies were, isn't that your
3  testimony earlier today?
4    A.  Prior to the late '90?
5        MR. COCO:  Objection.
6    A.  No, I don't think I said that.
7    Q.  Okay. Let me try and parse the issue
8  out a bit then. I believe you testified a bit
9  earlier today that the first time you heard of AWP
10 was in the late '90s.
11   A.  That's correct.
12.  Q.  Prior to that time and hearing about AWP
13 at that time, did you know what methodologies BCBS
14 of Massachusetts was using to reimburse physicians
15 for drugs administered in office?
16.  A.  The answer --
17       MR. COCO:  Objection.
18   A.  The answer to that question is no. But
19 when you say, "methodologies," I'm thinking of
20 payment methodologies, because that's what my area
21 of expertise is, and I'm very familiar with
22 physician reimbursement methodologies. AWP --

Steven J. Fox                                                                                    March 8, 2006
Boston, MA

**Page 66**

1  when you're talking about physician methodologies,
2  AWP doesn't -- I'm not thinking AWP when you say
3  that.
4      Q.  Okay.  Let's explore that a bit.  What
5  are you referring to when you use the term
6  "payment methodology"?
7          MR. COCO:  Objection.
8      A.  The manner in which Blue Cross
9  reimburses physicians.
10     Q.  Okay.  Well, let me ask you this:  At
11 the present time how is the amount that Blue Cross
12 Blue Shield of Massachusetts reimburses physicians
13 determined?
14         MR. COCO:  Objection.
15     A.  How is it determined?
16     Q.  Yeah.  How is the amount set?
17     A.  Well, we use a -- for physician
18 reimbursement, we start with an RBRVS-based
19 methodology, which is methodology set by CMS.  We
20 then take that methodology and determine how we
21 want to use that, essentially, and we'll reimburse
22 physicians essentially using that methodology, but

**Page 67**

1  we don't pay the Medicare rates.  We set our own
2  payments based on that methodology, and we
3  reimburse physicians accordingly.  But we've used
4  RBRVS-based reimbursement since 1995.
5      Q.  Now, when you're referring to the RBRVS
6  methodology, you're referring there to
7  reimbursement to physicians for services that they
8  render in treating patients, right?
9      A.  That's correct.
10     Q.  Now, that methodology has been in use at
11 BCBS of Massachusetts since 1995?
12     A.  '94, '95.  But '95, I believe, is when
13 we started using it.
14     Q.  From 1995 up until 2005, did BCBS of
15 Massachusetts reimburse for services -- withdraw
16 that.  From 1995 to 2005, did BCBS reimburse
17 physicians for services rendered in treating
18 patients in office at the same rate as Medicare or
19 at a different rate?
20         MR. COCO:  Objection.
21     A.  At the same rate as Medicare?
22 Physicians services, no, not at the same rate.

**Page 68**

1  The same methodology, but not the same rate.
2      Q.  In other words, you used the RBRVS
3  methodology in calculating the rates, but the
4  dollar sums that BCBS of Massachusetts paid were
5  different from the dollar sums that Medicare paid.
6          MR. COCO:  Objection.
7      A.  In most instances, yes.  In some
8  instances, we actually may have carried forward
9  some Medicare -- there may be services where it
10 was appropriate to pay Medicare, and so, we made a
11 decision to carry some of those rates forward.  I
12 don't -- I don't know specifically what, but not
13 every case is different from Medicare.
14     Q.  So, in most cases, BCBS of Massachusetts
15 set its own rate, but using the RBRVS methodology.
16         MR. COCO:  Objection.
17     A.  Using the methodology.  Remember, the
18 methodology is essentially creating buckets of
19 services and applying and doing -- doing lots of
20 things that we can't do as a local health plan.
21 So, in that instance, yes.
22     Q.  Now, how did -- since 1995, how has BCBS

**Page 69**

1  of Massachusetts determined the actual dollar sums
2  that it will pay physicians with respect to
3  services they render in treating patients in their
4  offices?
5      A.  Well, each year we will -- we will look
6  at what the -- we'll start with the Medicare
7  reimbursement.  What is the Medicare
8  reimbursement? What is the calculations?  What's
9  the methodology?
10         We will then take a look at our mix of
11 services, our utilization, based on the physicians
12 in our network; we will take a look at the
13 available pool of money which is available to
14 adjust the fee schedule; we will let the RBRVS
15 methodology apply.  They apply all kinds of
16 different factors to services; they weigh things;
17 we will take that, and then we will come up with a
18 disbursement model that we then calculate and
19 communicate.
20     Q.  Now, are there any other sources of
21 information that factor into the process, other
22 than what you just described?

**70**

1  A. What do you mean by "sources of
2  information"?
3  Q. Does BCBS collect input, solicit views
4  from anyone in the market when performing this
5  process, other than just internally looking at
6  utilization and the pool of money and running a
7  RBRVS schedule?
8      MR. COCO: Objection.
9  A. Collect, no. We don't collect -- no.
10 We might look at CPI or DRI as kind of inflation
11 factors, but we're not soliciting input. We're
12 just -- we may collect that information as part of
13 our due diligence.
14 Q. Okay. Other than CPI, are there any
15 other indices or public sources of information
16 that BCBS of Massachusetts utilizes in that
17 process?
18     MR. COCO: Objection.
19 A. No.
20 Q. Now, are the -- or does BCBS of
21 Massachusetts -- well, withdraw that. Since 1995,
22 are you aware of any instances in which physicians

**71**

1  have communicated to BCBS of Massachusetts their
2  view as to whether or not the amounts they're
3  reimbursed in relation to services rendered
4  treating patients in office are adequate?
5  A. Am I aware? I mean, physicians always
6  will communicate with the health plan to let them
7  know they're not happy with reimbursement. Sure,
8  that happens a lot.
9  Q. And that's nothing new. That's been
10 true since at least the early '90s.
11     MR. COCO: Objection.
12 A. I can't say as to when it's been true.
13 I can just tell you it's a -- it happens a lot.
14 Q. I'm asking based on your own experience.
15 I picked the '90s because that's when you started
16 working with providers. And has that been true
17 throughout the period of time when you have been
18 involved in working with providers, since 1992?
19 A. They're -- given the system of
20 reimbursement that we have, there are going to be
21 some physicians who do better than others. So, in
22 years where some physicians do better, we probably

**72**

1  won't hear from those physicians. And in some
2  years when they don't do as well, we'll hear from
3  those physicians as to being concerned about the
4  rate of payment, sure.
5  Q. Now, are those concerns expressed by
6  physicians one factor that BCBS of Massachusetts
7  considers when determining the rates it's going to
8  pay physicians for services that they render in
9  treating patients in office?
10     MR. COCO: Objection.
11 A. I wouldn't say it's a factor. I would
12 say it's a source of input. I wouldn't say it's a
13 factor.
14 Q. Can you help me understand the
15 distinction you're drawing between a source of
16 input and a factor that's considered?
17 A. Sure. A physician calls and says, I'm
18 not happy with my reimbursement. You take that
19 in. That's input. That's a doctor telling you
20 they're -- you know, if we have a large specialty
21 group that comes to us and shows us errors in
22 calculations, or if the national medical body

**73**

1  comes back and says, We believe X and Y -- we
2  worked with the OB/GYN physicians, for example,
3  because of their malpractice issues.
4      They came to us as an organized group
5  and said, Can you do something here, because our
6  reimbursement rates are out of control compared to
7  our malpractice rates?
8      We took that as a factor. So, I
9  distinguish it being that was a factor in the
10 decision we made to adjust the reimbursement made
11 to OB/GYNs. Again, Medicare reimbursement doesn't
12 really apply when you're talking about an OB/GYN
13 physician. So, we -- I took -- I draw that as a
14 distinction between a factor versus an individual
15 doctor that calls and says, I'm not happy with my
16 reimbursement.
17 Q. Well, when an individual doctor calls in
18 with that sort of a concern, is it something
19 that's given no consideration in the process of
20 setting rates?
21     MR. COCO: Objection.
22 A. I wouldn't say it -- well, is it given