154

1  that and -- there is a difference between that and
2  then what physicians are getting for that. You
3  know, in my word, I'm using -- my word is
4  "inflated," but clearly in the context --
5       Q.  Well, you said --
6       A.  -- that you're picking it out of the
7  transcript, I'm not -- it's probably not the best
8  choice of words.
9       Q.  I want you to be comfortable with your
10 testimony.
11      A.  Sure. Sure.
12      Q.  Let me back up then. Based on what you
13 just said --
14      A.  Uh-huh.
15      Q.  -- you understand that there's a
16 difference between AWP and what a physician pays
17 to acquire a drug, right?
18          MR. COCO: Objection.
19      A.  I would say, again, back to when we --
20 before the break.
21      Q.  Just that there's a difference?
22      A.  A reasonable difference.

                                                            155

1       Q.  Fine.
2       A.  Because that's a difference.
3       Q.  Okay. My first -- my question, and
4  this, I think, is a yes-or-no question, do you
5  understand there to be a difference? In other
6  words, do you understand that physicians are not
7  paying AWP to acquire drugs?
8           MR. COCO: Objection.
9       A.  A reasonable difference, yes.
10      Q.  How long have you known that physicians
11 are not paying AWP to acquire drugs?
12          MR. COCO: Objection.
13      A.  I couldn't put dates around this.
14 Again, it were -- I don't know.
15      Q.  Are you familiar with publicly-published
16 documents dealing with this topic?
17          MR. COCO: Objection.
18      A.  I'm -- no, not specifically, no.
19      Q.  Let me show you a document that we'll
20 mark as Exhibit Fox 002.
21          (Memo, 11/6/92 marked Exhibit Fox
22 002.)

                                                            156

1       Q.  Now, are you familiar, Mr. Fox, with the
2  Department of Health and Human Services?
3       A.  I am.
4       Q.  And are you familiar with the OIG or the
5  Office of the Inspector General within that
6  department?
7       A.  I am.
8       Q.  You are aware that the OIG studies
9  certain issues for The Department of Health and
10 Human Services and puts out reports dealing with
11 those issues?
12      A.  I'm not -- I mean, I don't follow their
13 work directly. So, I don't know what it is
14 specifically they do.
15      Q.  Okay. But you are familiar with the
16 existence --
17      A.  Of the OIG?
18      Q.  Yes.
19      A.  Oh, yes.
20      Q.  Okay. Now, this memo is dated November
21 6th, 1992. Do you see that?
22      A.  I do.

                                                            157

1       Q.  That's about the same time you were
2  starting to work with providers, right?
3       A.  Roughly.
4       Q.  Now, I'd like you to turn to the second
5  full paragraph on that first page which states,
6  "Our results indicate that, for the physicians
7  surveyed, the 13 chemotherapy drugs can be
8  purchased at amounts below the established average
9  wholesale price."
10          Now, just sticking with that for the
11 moment, that's the same thing you just said,
12 right? You understand physicians don't pay AWP to
13 acquire drugs.
14          MR. COCO: Objection.
15      A.  Well, I'm reading this -- I mean, I'm --
16 I'm reading this for the first time. I have not
17 seen this document before.
18      Q.  My question is, do you understand that
19 sentence to have the same meaning as what you just
20 said; that physicians do not pay AWP to acquire
21 drugs?
22          MR. COCO: Objection.

**158**

1   A.   I don't know that it's the same.
2   Q.   Okay. What's the difference?
3        MR. COCO: Objection.
4   A.   Again, I'm reading something that's been
5   -- that's in writing in this document, which is
6   different than what my understanding is in
7   conversations in general with physicians, so --
8   Q.   Okay. That's the issue. You're saying
9   it's different. How is it different?
10       MR. COCO: Objection.
11  A.   Again, you know, I'm -- I'm just making
12  a statement that my understanding would be that
13  there is a difference, you know -- I don't know
14  what the person who wrote this memo -- I have no
15  idea --
16  Q.   Okay. Well --
17  A.   -- what the context of the memo is or
18  what the rest of it is for.
19  Q.   Well, let me ask you a question.
20       MR. COCO: Adeel, I know you're trying
21  to get to your next question, but you really need
22  to let him finish this question.

**159**

1   Q.   Were you finished? Were you still
2   speaking,
3   A.   Well, no, I was saying that --
4   Q.   Okay.
5   A.   -- you know, you're asking me to read a
6   memo that I don't even know what the subject is
7   from somebody who I don't know.
8   Q.   That's fine.
9   A.   That's 15 years ago.
10  Q.   The subject is, "Physicians' Costs For
11  Chemotherapy Drugs." You see that at the top,
12  right?
13  A.   I do.
14  Q.   It's from the OIG. You know who the OIG
15  are, right?
16  A.   I do.
17  Q.   Now, my question is, this survey -- this
18  publicly-published report from 1992 says, "Our
19  results indicate that for the physicians surveyed,
20  the 13 chemotherapy drugs can be purchased at
21  amounts below the average wholesale price."
22       Now, my question is --

**160**

1   A.   Uh-huh.
2   Q.   -- isn't that the same point that you
3   just made, that physicians can buy drugs at an
4   amount less than average wholesale price?
5        MR. COCO: Objection.
6   A.   I -- I would say -- I would say it's not
7   necessarily the same point.
8   Q.   Okay. What's the difference? That's
9   what I'm trying to understand.
10       MR. COCO: Objection.
11  A.   Well, the difference, first of all, is
12  this is in writing, and I don't know -- again, I'm
13  not -- I'm not aware of this particular document.
14  Q.   I'm not addressing the form of it.
15  A.   Right.
16  Q.   I'm addressing the substance of it.
17  What's the substantive difference between this and
18  your understanding --
19       MR. COCO: Objection.
20  Q.   -- that we just discussed?
21  A.   Well, to me, the difference would be
22  what my personal understanding, not based on

**161**

1   anything that I'm reading and not having a
2   document in front of me that -- that concurs with
3   what I'm saying, versus reading something that
4   someone wrote in a document which I've not seen.
5   Q.   Okay.
6   A.   There's a difference between my
7   believing or my understanding of something versus
8   having documented proof that something exists, if
9   you will.
10  Q.   That's axiomatic. My question is,
11  aren't you and this document saying the same
12  thing, that drugs -- chemotherapy drugs can be
13  purchased at amounts below the average wholesale
14  price?
15       MR. COCO: Objection.
16  A.   No, I think you're drawing -- no, I
17  don't think --
18  Q.   Let me ask you a different question.
19       MR. COCO: Adeel, again, let him finish
20  his answer completely.
21  Q.   Go ahead. Are you done?
22  A.   I would say -- well, I was finishing. I

162

1  don't think it's the same, because in what I'm
2  reading here, I mean, there's lots of things that
3  are going into this document, which I have no idea
4  what they are. He's talking about things, and I
5  don't know specifically what they're referencing.
6  I just happened to -- I just made a statement to
7  you about what my understanding is based on my
8  understanding of physician reimbursement.
9     Q. Okay.
10    A. So, I'm not going to -- I cannot draw --
11 and I will not draw -- any conclusion between the
12 document that I didn't write and I didn't read,
13 versus something that I understand from 15 years
14 ago. I guess that's my point.
15    Q. I asked you earlier today can physicians
16 buy drugs at amounts lower than the average
17 wholesale price. You agreed with that, right?
18       MR. COCO: Objection.
19    Q. Regardless of this document.
20       MR. COCO: Objection.
21    A. I don't know what I said. I'd have to
22 read the testimony.

163

1     Q. Well, let me ask you again. To your
2  knowledge, do physicians pay AWP to acquire drugs
3  they administer in office, or do they pay
4  something less than AWP?
5        MR. COCO: Objection.
6     A. Again, I would -- my answer would be
7  that the AWP is -- is the price that we're all
8  using as the reference point, and they -- if
9  they're paying something different -- they may be;
10 they may be paying something different. Have I
11 seen evidence of that? I guess the answer would
12 be no.
13       I would assume that if -- and again, I
14 would assume it to be -- I keep going back to the
15 word I use, which is "reasonable." If there is a
16 difference, that it would be reasonable. And
17 since you keep circling around my statement, I
18 just want that part clarified that that's what I'm
19 meaning.
20    Q. Okay.
21    A. I understand the question.
22    Q. Now, let's go back to your term that you

164

1  would understand the difference to be reasonable.
2     Q. What do you mean by that?
3        MR. COCO: Objection.
4     A. I think we talked about it before. I
5  don't have a numeric number in my mind. I just
6  know it -- reasonable.
7     Q. Well, tell me generally, without a
8  numeric number, what do you mean by "reasonable"?
9  What would be reasonable, and what -- what are we
10 talking about?
11       MR. COCO: Objection.
12    A. Our reimbursement methodology in
13 general, we want to pay cost and be reasonable in
14 any margin that is generated. That's typically
15 what our methodology is. Whether it's a physician
16 or some other group, we would expect a reasonable
17 margin.
18    Q. Okay.
19    A. But, again -- so when you -- so, I don't
20 have a definition of what that means. What that
21 would mean is that since we're talking about
22 services that our customers pay, we would expect

165

1  that number to be reasonable. I wouldn't expect
2  it to be unreasonable.
3     Q. Okay. I'm not disputing that. Okay.
4  Let me just be clear.
5     A. Sure.
6     Q. I understand what you're saying. You
7  expect it to be reasonable. And that's fine. I'm
8  not trying to move you off that.
9     A. Sure.
10    Q. I'm just trying to understand what you
11 mean by it. Okay.
12    A. Sure.
13    Q. Now, let me ask you a question: When
14 you say -- let me see if I understood you
15 correctly. Your understanding is that the amount
16 you reimburse is -- approximates the cost plus a
17 reasonable margin, right, to the physician?
18       MR. COCO: Objection.
19    A. In general, for services in general.
20    Q. And for drugs.
21       MR. COCO: Objection.
22    A. Well, again, I'm -- again, I gave you --

**166**

1  our methodology in general is to pay and be
2  reasonable if there is -- if there is a margin
3  there. I -- you know, for most medical services,
4  I don't think there is a margin there. I think
5  there -- if anything, it's probably just a cost.
6  I don't know specific for pharmaceuticals or for
7  physician -- I think we're talking about the
8  nonretail stuff here. Again, if there is a
9  margin, then I would expect it to be reasonable.
10         I don't have -- I don't have fee
11 schedules or price information in front of me
12 where you're pointing out numbers, but again, just
13 in general terms.
14     Q. Okay. Let me ask you specifically about
15 drugs administered by physicians in office.
16     A. Uh-huh.
17     Q. Is it Blue Cross Blue Shield of
18 Massachusetts' intention to pay cost plus a
19 reasonable margin --
20         MR. COCO: Objection.
21     Q. -- when reimbursing a physician?
22     A. I think, in general, consistent with our

**167**

1  policy, we should pay -- we should pay cost. And
2  if -- and again, but see, here's the difference.
3  When we say, "reasonable margin -- reasonable
4  physician margin," the physician is passing on to
5  us. I'm not making any other assumptions in that
6  as to, you know, how they got whatever they got
7  and what they paid for it.
8          So, I'm just saying that that's what I
9  mean by "reasonable."
10     Q. Well, what do you mean when you say --
11 well, margin is referring to the difference
12 between what the physician paid and what he's
13 being reimbursed, right?
14     A. In this instance, yes.
15     Q. Okay. So -- okay. Now, when you say
16 that you expect there to be a reasonable margin,
17 are you assuming that the AWP has some fixed
18 relationship to the acquisition price the
19 physician is paying to acquire the drug?
20         MR. COCO: Objection.
21     A. Say that again.
22     Q. When you say you expect there to be a

**168**

1  reasonable margin, my question is, are you
2  expecting the AWP to bear some fixed relationship
3  to the amount the physician paid to acquire the
4  drug?
5          MR. COCO: Objection.
6      A. I'm assuming, again, we're -- I'm not --
7  I don't get into that kind of specifics. So, you
8  know, I don't know. I guess what I'm saying is
9  that AWP is the number, and acquisition cost is a
10 number, and if there is a difference, then there
11 is a reasonable difference. I guess, I mean,
12 that's what I -- that's what I'm saying.
13     Q. Okay. That difference is the margin,
14 right?
15         MR. COCO: Objection.
16     A. I don't know if that's what -- what -- I
17 don't know if that's how anyone would define it,
18 as a margin.
19     Q. Well, when you were talking about margin
20 earlier in relation to drugs administered in
21 office, what were you referring to?
22         MR. COCO: Objection.

**169**

1      A. I think I'm referring specifically to
2  what we're reimbursing versus what they're paying
3  for that drug.
4      Q. Okay. So, you're talking about the
5  difference between the reimbursement rate, which
6  is the AWP-based rate, and the physician's
7  acquisition cost for the drug.
8      A. That's right.
9          MR. COCO: Objection.
10     Q. All right. Now, is it your expectation
11 or understanding -- I understand you think that
12 the relationship will be reasonable -- but do you
13 understand that there would be a fixed
14 relationship or an identifiable consistent
15 relationship between those two numbers?
16         MR. COCO: Objection.
17     A. I would have no way to -- I don't have
18 an opinion on that. I wouldn't know.
19     Q. Is there a reasonably-predictable
20 relationship between all physicians' acquisition
21 cost for all drugs and AWP?
22         MR. COCO: Objection.

**170**

1   A. Again, outside the realm of my
2   knowledge. I wouldn't know that.
3   Q. Okay. So, you personally have no such
4   expectation, is that a fair statement?
5       MR. COCO: Objection.
6   A. No, I'm saying I don't know.
7   Q. So, you have no expectation.
8       MR. COCO: Objection.
9   A. I don't know the answer. So whether I
10  have or have not, I just -- I'm saying that's not
11  a part of the business that I'm involved in, so I
12  don't know.
13  Q. Let me turn you back to Exhibit Fox 002,
14  and look at the next part of the sentence that we
15  were reading.
16  A. Uh-huh.
17  Q. And that, "AWP is not a reliable
18  indicator of the cost of a drug to physicians."
19  Do you see that?
20  A. I see it.
21  Q. Okay. What do you understand that to
22  mean?

**171**

1       MR. COCO: Objection.
2   A. I'm reading the same thing you're
3   reading, so I have not seen that in writing
4   before, so I'm just reading what it says.
5   Q. Okay. Well, my question is, when this
6   report uses the term as "not a reliable indicator
7   --"
8   A. Uh-huh.
9   Q. -- what do you understand that to mean
10  as you read it today?
11      MR. COCO: Objection.
12  A. Again, I -- I understand this is a
13  document that you're saying is a publicly-
14  available document. I've not read it, so I can't
15  tell you what someone in 1992 meant when they say
16  it. I'm reading what you're -- I'm reading the
17  sentence the same as you, but I'm not going to
18  impute what I think someone else meant.
19      I'm reading the statement, and I
20  understand the statement as it's written.
21  Q. Well, that's my -- that's my question.
22  I'm not asking you to --

**172**

1   A. Sure.
2   Q. -- get into the mind of the author.
3   A. Sure.
4   Q. My question is, as you read this, what
5   is your understanding as to what the author is
6   saying? Do you understand my question?
7       MR. COCO: Objection.
8   Q. Go ahead.
9   A. I'm not -- I'm reading the same
10  sentence, "AWP is not a reliable indicator of the
11  cost of a drug to physicians." Whether I agree
12  with that or whether I know it, again, I've not
13  seen this in writing before. I don't have this as
14  a basis of any of my information, so I can't -- if
15  you're asking me to agree with a statement that
16  someone else wrote, I can't do it.
17  Q. No, I'm asking you what do you
18  understand it to mean?
19  A. I don't understand it to mean anything
20  what it says. I don't know if I'm missing
21  something.
22  Q. Okay. You're saying it's self-evident

**173**

1   in what it means.
2       MR. COCO: Objection.
3   A. Again, I read the same thing that you're
4   reading, and I don't draw any conclusion from it,
5   other than what it says -- no different than any
6   other document that's put out by The Department of
7   Health and Human Services.
8   Q. Now, what do you understand -- you
9   understand that Blue Cross Blue Shield of
10  Massachusetts is a Plaintiff in this case, right?
11  A. I do.
12  Q. What do you understand Blue Cross Blue
13  Shield of Massachusetts is alleging the Defendants
14  did wrong in this case?
15  A. My understanding is that there is a --
16  not a reasonable difference between the average
17  wholesale price and the acquisition costs that a
18  physician pays, and, therefore, the reimbursement
19  that we're providing to the physician is not a
20  reasonable margin. I mean, boiling that down into
21  my basis.
22  Q. Now, when you say that you expect there

Page 174

1  to be a reasonable relationship, though, you're
2  not willing to put a number on it, are you,
3  assuming that the AWP provides some indication of
4  what the physician is paying to acquire drugs?
5      MR. COCO: Objection.
6      A. I'm saying -- AWP is -- is an industry
7  indice that was used. So, it's the basis for
8  comparison. It's a place that we should look to
9  start.
10     Q. I agree -- I don't disagree with any of
11 that. I think that's all self-evident. It
12 doesn't really answer my question.
13     A. Uh-huh.
14     Q. My question is, when you use the term
15 "reasonable," are you assuming that AWP -- are you
16 assuming that AWP does bear -- does provide some
17 indication of what the cost of a drug is to
18 physicians?
19     MR. COCO: Objection.
20     A. I mean, that's some deal that I wouldn't
21 know.
22     Q. Well, if you're not making that

Page 175

1  assumption, then what's your basis for thinking
2  the differential would be reasonable?
3      MR. COCO: Objection.
4      A. Again, just like -- I mean, for services
5  that a plan reimburses, if we start with a number,
6  and we assume that there's a reasonable margin
7  built into that, again, standard with our
8  methodology, standard with -- with the industry, I
9  would not expect there to be an unrealistic
10 relationship between that number and a number that
11 a physician is paying to get that, implicitly
12 implying that when they bill the payer, that there
13 is lots of money to be paid.
14     Q. Well, when you said you assumed there's
15 a reasonable margin --
16     A. Uh-huh.
17     Q. -- as we discussed earlier, when you
18 used the term "margin," you're referring to the
19 difference between AWP and acquisition, right?
20     A. Yes.
21     MR. COCO: Objection.
22     Q. So, when you say, "reasonable margin,"

Page 176

1  you're saying you expected there to be a
2  reasonable difference between the AWP and the
3  acquisition, right?
4      MR. COCO: Objection.
5      A. If any.
6      Q. Okay. And so, when you say a reasonable
7  -- and you don't know what the physician is paying
8  to acquire drugs, right? You don't know what the
9  specific number is?
10     A. That's right.
11     Q. Okay. But you do know what the AWP is,
12 'cause that's published.
13     MR. COCO: Objection.
14     Q. Right?
15     A. I don't particularly -- I don't
16 personally, but yes.
17     Q. You understand that AWPs are published.
18     A. Yes. Correct.
19     Q. So, when you assume that -- there to be
20 a reasonable margin, and the only information that
21 you have is the AWP, aren't you axiomatically
22 taking the position that AWP provides some

Page 177

1  indicator of the cost of the drug to physicians?
2      MR. COCO: Objection.
3      A. I don't -- I mean, that's a level of
4  detail that I don't get involved in. If there
5  were no other factors involved, but clearly the
6  physician -- AWP is the -- is a price the
7  physician is paying for a drug. The drug is
8  supplied. The drug is billed to the insurer.
9      Q. You said AWP is a price a physician is
10 paying?
11     A. AWP is an index. It's a price. It's
12 out there. It -- I don't know if that's the price
13 the physician is paying. I'm -- I don't know
14 that. There is a -- there is -- clearly, there is
15 an AWP price that is set by the industry as the
16 wholesale price. There is then a price that the
17 physician pays to get that drug, and there is then
18 a price that the insurer, some third party, pays
19 the physician for administering that drug. The
20 numbers can't all be the same.
21     Q. Let me ask you this: Here's a report
22 from 1992 which says, "AWP is not a reliable

Steven J. Fox    March 8, 2006
Boston, MA

178

1  indicator of a drug to physicians -- of the cost
2  of the drug to physicians." Do you see that on
3  Exhibit Fox 002?
4      A.  I see it. I saw it for the first time
5  when you gave it to me.
6      Q.  Okay. Now, if someone at BCBS of
7  Massachusetts had seen this report when it was
8  published in 1992, they would have understood, as
9  you do reading it now, that AWP is not a reliable
10 indicator of the cost of a drug to physicians,
11 right?
12         MR. COCO: Objection. That is so far
13 out of bounds as far as the question goes.
14         MR. MANGI: You can make an objection.
15 Please don't speak.
16     Q.  Go ahead.
17     A.  I can't make -- I'm -- you're asking me
18 to get into the mind of two different people, the
19 person who wrote this, and someone at Blue Cross
20 in 1992. I can do neither.
21     Q.  If someone at BCBS had seen this
22 statement in 1992, would it have changed the

179

1  reimbursement rates that were offered throughout
2  the 1990s?
3         MR. COCO: Objection.
4      A.  Again, I would have no way to know that.
5      Q.  Well, when it says, "AWP is not a
6  reliable indicator of the cost of a drug," doesn't
7  that mean that the margin will vary from drug to
8  drug?
9      A.  I don't know.
10         MR. COCO: Objection.
11     A.  I don't know.
12     Q.  You don't know?
13     A.  No. I'm just reading the sentence here.
14 I don't see anything in this sentence that says
15 that it's a different margin in drugs. I just see
16 that it says, "AWP is not a reliable indicator."
17     Q.  Okay. When it says it's not a reliable
18 indicator of the cost, and this goes back to when
19 I was asking if you understood what was meant by
20 that term, when it says AWP is not a reliable
21 indicator of the cost of a drug, that means the
22 relationship between the cost and the AWP will

180

1  vary, right?
2         MR. COCO: Objection.
3      A.  I --
4      Q.  That's not how you understand the
5  sentence?
6      A.  It's not a level of detail that I get
7  into in my job. So, I'm giving you what I've got,
8  which is -- I mean, I don't read any of that into
9  this, and so, I wouldn't -- I wouldn't know that
10 to be the case.
11     Q.  I'm not asking you about the level of
12 detail you get into in your job. I'm asking you
13 to read this --
14     A.  Uh-huh.
15     Q.  -- here and now and reconcile it with
16 the testimony you've given in this case this
17 morning. My question is, when it says, "AWP is not
18 a reliable indicator of the cost of a drug to
19 physicians," doesn't that mean that the
20 relationship of AWP to cost will vary from drug to
21 drug?
22         MR. COCO: Objection.

181

1      A.  No. Again, I don't know that to be the
2  case. I -- I hear what you're saying, and I'm
3  reading what's here, but I'm not -- I'm not
4  reconciling those.
5      Q.  Let me ask you to turn to Appendix 2 of
6  the document, which is a page entitled "Redbook."
7  If you flip from the back, you should come to it.
8      A.  Okay.
9      Q.  Now, you're familiar with Redbook,
10 aren't you?
11     A.  Not directly. I mean, I'm familiar with
12 the term.
13     Q.  Okay. You know Redbook is a pricing
14 compendia that publishes pricing for drugs?
15     A.  I am.
16     Q.  Okay. You know Redbook publishes AWPs
17 for drugs, among other things, right?
18     A.  That's my understanding.
19     Q.  Okay. Now, turn to the bottom paragraph
20 of this page, please, and read along with me.
21 "Since the Redbook does not represent its AWP as a
22 measure of the physician's acquisition cost for

**182**

 1  drugs, we compared physicians' invoice cost to
 2  Redbook AWP." All right. So, you understand
 3  there what the -- what the methodology was that
 4  the authors of this report were adopting, right?
 5       MR. COCO: Objection.
 6       A. I don't know that I understand it. I'm
 7  reading what you're reading, but --
 8       Q. Okay. Well, you understand that they
 9  compared physicians' invoice cost to the AWP,
10  right?
11       MR. COCO: Objection.
12       A. That's what it says.
13       Q. Okay. Now, looking at the last full
14  sentence now of that paragraph, "Considering that
15  we also found that there is no single discount
16  rate which can be applied to the AWP to provide a
17  reasonably-consistent estimate of the physicians'
18  acquisition cost, we do not feel that AWP provides
19  a useful measure of the acquisition cost for a
20  drug to physicians." Do you see that?
21       A. I see it.
22       Q. Now, isn't that statement inconsistent

**183**

 1  with the position that you've adopted today in
 2  terms of your expecting there to be a reasonable
 3  relationship?
 4       MR. COCO: Objection.
 5       A. No, because again, I've not ever read
 6  this. So, I would have nothing to change my
 7  opinion.
 8       Q. That's not my question.
 9       A. That's my answer.
10       Q. My question is -- my question is, isn't
11  it inconsistent with what you said?
12       MR. COCO: Objection.
13       A. I don't know. I don't know that. I
14  don't know. I'm reading this and I'm not -- I
15  don't know what's consistent or inconsistent. I'm
16  just telling you that that's my understanding.
17  I'll let you determine if it's inconsistent or
18  not.
19       Q. Well, do you read this sentence as being
20  consistent with your position?
21       MR. COCO: Objection.
22       A. I'm just taking what it says here at its

**184**

 1  words. I read it. It's interesting. I've not
 2  seen it before. And I'm not going to say if it's
 3  consistent or inconsistent. That's my
 4  understanding of what I believe, and this is a
 5  document that was written in 1992. So, I don't --
 6  I don't draw the parallel between the two.
 7       Q. And you think there's no relationship
 8  between the position you've adopted today and what
 9  this document is addressing?
10       MR. COCO: Objection.
11       A. I don't work for OIG or The Department
12  of Health and Human Services, so I can't -- I
13  can't draw a parallel, I guess, is what I'm
14  saying.
15       Q. Okay. Let me ask you this: When the
16  author says, "We do not feel that AWP provides a
17  useful measure of the acquisition cost for a drug
18  to physicians," today, with the knowledge that you
19  have as an individual who's worked in this area,
20  do you think that's correct or incorrect?
21       MR. COCO: Objection.
22       A. I don't change what I believe.

**185**

 1       Q. Well, that's not my question. My
 2  question is, do you think that is a correct
 3  statement or an incorrect statement?
 4       MR. COCO: Objection.
 5       A. I don't even remember -- what are we
 6  talking about?
 7       Q. This sentence here, "We do not feel that
 8  AWP provides a useful measure of the acquisition
 9  cost for a drug to physicians." Okay. Do you
10  agree with that statement today, or do you
11  disagree with that statement?
12       A. I --
13       MR. COCO: Objection.
14       A. I don't have an opinion, because I don't
15  have to agree or disagree with what the OIG says.
16  It's their position, and it's their opinion. I
17  don't have knowledge to agree or disagree with
18  that.
19       Q. Okay. So, you have no position as to
20  whether or not AWP provides a useful measure of
21  the acquisition cost of a drug to physicians.
22       MR. COCO: Objection.

Q. Is that your testimony?
A. No. What you're asking me to do is to read this statement and draw that conclusion into what I'm saying.
Q. I'm not. I'm not. I'm asking you to either -- to tell me if you agree with this statement, disagree with this statement, or have no view as to whether the statement is correct or incorrect, and no basis for assessing whether it's correct or not.
MR. COCO: Objection.
A. Again, I would say that there has to be a reasonable relationship between acquisition cost and AWP, irrespective of what's here. I mean, that's -- so --
Q. Okay. So, that's your position as you've previously stated, and that remains your position, regardless of anything the OIG may have said in 1992.
MR. COCO: Objection.
A. Yeah, I would say that's accurate, because I'm -- again, I'm not going to -- there's

been a lot that's happened since 1992 to current. I can't trend this statement to today. If you had asked me that question in 1992, based on what I believed, I could reconcile to the document. But I can't reconcile that statement to this document, absent no other written communication that you're putting in front of me that's more recent than 1992.
Q. Well, what if you had seen the statement in 1992? Would that have changed your views?
MR. COCO: Objection.
A. I -- I can't answer the question. I don't know what I would have thought in 1992. I probably wouldn't be sitting here if it was 1992.
Q. Okay. Let me show you another document.
MR. MANGI: Mark this as Exhibit Fox 003.
("Analysis of CMS Average Wholesale Price Reform" marked Exhibit Fox 003.)
Q. Have you ever seen this document before?
MR. NOTARGIACOMO: Do you have another copy?

MR. MANGI: You know, I do, but I'm a little low on that. This is the same document we were looking at yesterday.
A. I don't know -- I don't know if I've ever seen this. Just give me a minute. I just want to --
Q. Sure. Take your time.
A. (Witness reviews document.) Okay. I have, okay.
Q. Okay.
A. Yeah, I have.
Q. Have you ever seen this document before?
A. I've seen pieces. I don't know if I've seen the entire document, but I have seen -- there's sections of this that I have seen, yes.
Q. Okay. Now, you mentioned earlier in the day that at one point Blue Cross Blue Shield of Massachusetts had considered changing to an AWP-based methodology. Does this document pertain to that analysis?
A. Consider changing to an AWP methodology?
Q. To an ASP-based methodology.

A. That's not what you said.
Q. Okay. I misspoke.
A. Yes. This was what I was -- yeah, this is what I would have recollected.
Q. Okay. And this was in February -- at least this document was generated in February of 2004, right?
MR. COCO: Objection.
A. That's what it says.
Q. Now, were you involved in consideration of this issue, whether or not to shift to an ASP-based methodology?
MR. COCO: Objection.
A. Well, I was in meetings where it was discussed, but there was -- I wasn't part of a group. No, I don't believe I was.
Q. Are you aware that Michael Mulrey previously identified you as part of the core group that was responsible for dealing with this issue and making a decision about it?
MR. COCO: Objection.
A. Obviously, I'm not aware of that, but it

**190**

1  may have been discussed at a meeting that I was
2  at, but I don't --
3      Q.  Okay.  Are you familiar with the
4  Provider Financial Strategy, that work group?
5      A.  Oh, yes.
6      Q.  Okay.  What is the Provider Financial
7  Strategy Work Group?
8      A.  That is a work group that looks to --
9  essentially, looks to set the reimbursement policy
10 based on that pool of money I described earlier,
11 so --
12     Q.  And you're part of that work group,
13 right?
14     A.  Yes, I am.
15     Q.  Okay.  Now, Mr. Mulrey testified that
16 this issue was considered and the decisions on it
17 were made by the Provider Financial Strategies
18 Work Group.  Is that your understanding as well?
19     A.  That would have been the place where it
20 was discussed, yes.
21     Q.  Okay.  So, you're one part of the group
22 that considered this issue.

**191**

1      A.  Yes, yeah.
2      Q.  Now, I'd like you to turn to the second
3  page of that document.  That lists "Reasons For
4  Reform."
5      A.  Uh-huh.
6      Q.  The first one is, "Physicians benefit
7  from the spread between AWP and acquisition cost,
8  creating an overpayment for drugs and costs for
9  Medicare."  Do you see that?
10     A.  I do.
11     Q.  Okay.  So, this is one of the reasons --
12 knowledge of this fact was one of the reasons why
13 BCBS of Massachusetts was considering whether or
14 not a change should be made, right?
15         MR. COCO:  Objection.
16     A.  Well, I -- I'm reading it, so, it's on
17 that page.
18     Q.  Yeah.  Do you recall discussions of this
19 issue?
20     A.  Not -- I mean, again, my recollection, I
21 mean, again, this is -- I go to a lot of meetings.
22 I remember having the conversation on AWP versus

**192**

1  ASP.  I don't really remember a lot of the detail
2  as to what we talked about.
3      Q.  Okay.
4      A.  So, I'm reading it, but you know, I
5  don't -- I don't vividly remember having a dialog
6  about that point is, I guess, what I'm saying.
7      Q.  Okay.  But looking at this document
8  here, you can see that was one of the reasons for
9  a change that was being contemplated.
10        MR. COCO:  Objection.
11     A.  I read that in the document.
12     Q.  And similarly, the third bullet says,
13 "In 2002, oncologists collected approximately $600
14 million in overpayments."  That was another factor
15 that was considered, right?
16        MR. COCO:  Objection.
17     A.  I see that in there.
18     Q.  Okay.  Now, what was the eventual
19 decision as to whether or not BCBS should move
20 from its AWP-based methodology to an ASP-based
21 methodology?
22        MR. COCO:  Objection.

**193**

1      A.  You know, we -- we haven't moved to it
2  yet.  And I don't really -- again, it's a -- it's
3  not a huge part of what I do, so there's --
4  there's not a lot of this where I may have run --
5  well, no, I'm up to speed on where we are.  We
6  haven't implemented it.  Why we haven't
7  implemented it, I think, was for a host of
8  reasons, some of them operational in just
9  implementing it.  You know, communicating it, you
10 know, I don't know exactly why we decided not to
11 do it.
12     Q.  Are you aware that Mr. Mulrey testified
13 that one of the reasons it was not implemented is
14 because ASP was not the industry standard?
15        MR. COCO:  Objection.
16     A.  I'm not aware of his testimony, and I'm
17 not aware of that.
18     Q.  Does that refresh your recollection as
19 to whether or not that was a reason?
20     A.  Not particularly.  I don't recall that.
21     Q.  Now, when -- when BCBS of Massachusetts
22 moved from 100 percent of AWP to 95 percent of AWP

Page 194

1  in the '90s, did that raise any particular
2  operational concerns?
3      MR. COCO: Objection.
4      A. I'm -- I'm not in the operations area,
5  but I'm not aware of.
6      Q. Well, you just referred to the
7  possibility of operational concerns.
8      A. Uh-huh.
9      Q. So, when the previous change was made in
10 methodology, my question is, did that raise any
11 operational problems?
12     A. I don't know. As with any change, when
13 you're changing fee schedules or reimbursement,
14 there are operations to actually put those in
15 place. So, I don't know.
16     Q. Let me ask you to turn to Page 6 of the
17 document.
18     A. Uh-huh.
19     Q. Now, this reflects the changes in drug
20 administration fees that CMS was going to make
21 when moving from an AWP-based system to an ASP-
22 based system, right?

Page 195

1      A. I mean, I read that -- I'm reading that.
2      Q. Yeah. Now, you'll see that some of the
3  increases in administration fees -- for example,
4  take the procedure code 90782, which is seven from
5  the top --
6      A. Yeah.
7      Q. -- that was increased by 385 percent.
8  Do you see that?
9      A. I see that, yeah.
10     Q. Okay. And take a look down at the
11 bottom there, 96520, second from the bottom --
12     A. Uh-huh.
13     Q. -- that was increased by 392 percent.
14 Do you see that one?
15     A. Yeah.
16     Q. What is your understanding as to why CMS
17 was increasing administration fees when moving
18 from an AWP to an ASP-based methodology?
19     MR. COCO: Objection.
20     A. I really don't know, to be honest with
21 you.
22     Q. You have no understanding as to why that

Page 196

1  was done?
2      MR. COCO: Objection.
3      A. No. No, I don't, actually.
4      Q. At the footnote it says, "The estimate
5  does not take into account the applicable BCBSMA
6  conversion factor yet to be determined." What's
7  the conversion factor that's being referred to
8  there?
9      A. That is what I referred to earlier where
10 our fee schedule has a -- the RBRVS methodology;
11 we get the methodology, we then apply. Medicare
12 has its conversion factor, we have our conversion
13 factor, so fees are then -- there is a multiplier
14 that is used in calculating the final payment.
15     Q. The next page, on Page 7 this reflects
16 that, "If BCBS of MA were to follow CMS in
17 changing both its drug and administration fees in
18 line with CMS's, its total savings would be in
19 excess of $6 million," right? Do you see that?
20     MR. COCO: Objection.
21     A. Is negative a savings? Or is that a --
22 I'm not in finance, as you can tell, so, sometimes

Page 197

1  I don't know if --
2      Q. Well, let's, -- let's take a look at it.
3  Look at "Drug Supplies Total" first. Do you see
4  that, the first row?
5      A. Yes.
6      Q. The current Blue Cross level is $38
7  million and change.
8      A. I see that.
9      Q. The Medicare reform level would be 28
10 million.
11     A. Uh-huh.
12     Q. So, if BCBS were to make the change, it
13 would save over $10 million?
14     A. I see that.
15     Q. Right?
16     A. I see that.
17     Q. So, for administration fees, it would
18 increase the amount it was paying, so it would pay
19 about $4 million more per year. Do you see that?
20     A. I see that.
21     Q. And the third row is the difference
22 between the two, the total savings to BCBS

198

1    following CMS would be in excess of $6 million.
2        A.   I see that.
3            MR. COCO:  Objection.
4        Q.   Do you recall that being discussed at
5    the time?
6        A.   I -- just at a high level, just under --
7    just the difference between the drug supply versus
8    the drug administration, but I don't remember
9    specific details per se.
10       Q.   Okay.  Have a look at the next page.
11   Now, this reflects the impact of the change to
12   different specialty types.  Do you see that?
13       A.   Uh-huh.
14       Q.   For example, oncology would see a
15   difference of 23 percent in their reimbursement.
16   Do you see that?
17       A.   I do.
18       Q.   Okay.  Why was this sort of analysis
19   relevant to the Provider Financial Strategy Work
20   Group's analysis?
21       A.   Again, the group, this is just one piece
22   of the reimbursement picture, so, we look at -- in

199

1    that group, and, again, I'm there 'cause of my
2    role in working with physicians -- we look at all
3    of the factors that go into making a decision on
4    what our methodology is going to be.  So, I
5    imagine this must have been at a point in time
6    where we were, you know, evaluating fee schedules
7    and looking at -- looking at that stuff, but I
8    don't know specifically.
9        Q.   My question is, why does it matter?
10       A.   Well, that group looks at -- anything
11   that affects reimbursement, that group could look
12   at it, things that are going on in the industry --
13       Q.   Well, this is a specific issue, isn't
14   it? This is whether or not to move to ASP under
15   consideration here.
16       A.   Uh-huh.
17       Q.   Why is the fact that oncologists would
18   see a difference of minus 23 percent in their
19   reimbursement amount relevant to consideration of
20   whether or not to move to ASP?
21       A.   Well, I think -- I mean, I didn't
22   produce the report.  I can't tell you what.

200

1        Q.   But you were part of the group analyzing
2    the report, right?
3        A.   No, I was part of a group that was
4    looking at the issue.  I think that any time we
5    make a change in policy, as I said to you earlier,
6    I mean, we want to know who could potentially be
7    impacted by any change of policy that we're
8    making.  So, it would be -- that's probably why
9    we're looking at this is to see who would -- who
10   would be impacted by any change that was being
11   considered.
12       Q.   And is -- is who would be impacted by a
13   change considered one of the factors that was
14   considered by the Provider Financial Strategies
15   Work Group in deciding whether or not to move to
16   ASP?
17       A.   You know, I don't -- I don't recall that
18   conversation.  I think -- it could be one factor,
19   in addition to numerous other factors.  But it
20   would be -- it would be something that we would
21   consider.
22       Q.   Okay.  Let me ask you to turn to Page 12

201

1    of the document.  Option 1 there is, "Move to CMS
2    ASP with change in admin fees."  Do you see that?
3        A.   Uh-huh.
4        Q.   Why was Blue Cross Blue Shield of
5    Massachusetts contemplating changing its admin
6    fees while moving to CMS ASP admin fees?
7        A.   I don't know.  That's a little outside
8    the realm of my world.
9        Q.   Well, if it had been decided that this
10   was the option that BCBS wanted to adopt, how long
11   would it have taken to implement that?
12           MR. COCO:  Objection.
13       A.   Again, I -- I have no idea what the
14   detail is behind this page.  I couldn't answer
15   that.  It depends -- depends on what the changes
16   are.
17       Q.   Okay.  Who would know the answer to that
18   question?
19       A.   Mike Mulrey, person you mentioned, I
20   think, is probably one, and -- yeah, Mike.  I
21   mean, Mike administers the fee schedule, so Mike
22   would know how long it would take.

Steven J. Fox						March 8, 2006
Boston, MA

---

**202**

1  Q. Would Deb Devaux know the answer to that
2  question?
3  A. I have no reason to -- if I don't know
4  the answer. I don't know that Deb would know the
5  answer. I think Mike is the best person for that,
6  because Deb Devaux is not managing the fee
7  schedule.
8  Q. Now, the cons listed here are "High
9  impact to certain provider types, i.e., oncology."
10 That's listed as a con. Now, from your
11 perspective in provider relations, is that a
12 factor that you considered relevant to this
13 analysis?
14     MR. COCO: Objection.
15 A. Any time we're making a change that
16 affects provider types, it's relevant for me,
17 because it affects what I do, sure. May not be
18 relevant for a lot of other people, but for me it
19 is.
20 Q. So, the fact that there would be a
21 significant impact on oncologists was one of the
22 factors that was a con associated with a shift to

**203**

1  ASP, right?
2  A. I see that. But again, I think --
3  Q. That -- go ahead.
4  A. I think we would have taken -- I think
5  then this conversation is in isolation. We then
6  would have to look at the rest of our -- we're
7  talking about a real narrow piece of their
8  reimbursement. We'd have to look at what the
9  impact is across the board for all of their
10 reimbursement, but reading this con, yes.
11 Q. Another con listed as, "Potential shift
12 to facility setting (oncologists.)"
13 A. Uh-huh.
14 Q. What is that referring to?
15 A. My understanding would be that -- if I -
16 - if I recall this -- that if the oncologists
17 didn't agree or, you know, weren't -- weren't
18 satisfied with this level of reimbursement, that
19 they could potentially not provide the service in
20 their office and send patients to the hospital.
21 Q. Why is that a con?
22     MR. COCO: Objection.

**204**

1  A. Well, I don't think it's real convenient
2  for patients to have to go to the hospital.
3  Q. So, patients would prefer to be treated
4  in a physician's office rather than a hospital?
5  A. Wouldn't you?
6  Q. I certainly would. I'm asking if you
7  would agree with that.
8  A. I would agree.
9  Q. Okay. Any other reasons why that's a
10 con?
11     MR. COCO: Objection.
12 A. No, I mean, no, I mean, I think that's -
13 - that's the primary reason.
14 Q. Would there be a different cost to Blue
15 Cross Blue Shield of Massachusetts in terms of the
16 amounts it reimburses if these drugs were
17 delivered in a hospital outpatient department
18 versus a physician's office?
19 A. Sure.
20 Q. Which is higher?
21 A. Hospital. I'd say the hospital
22 reimbursement would definitely be higher.

**205**

1  Q. So, if oncologists were to stop treating
2  patients in their offices -- withdraw that. If
3  oncologists were to stop administering drugs to
4  patients in their offices and were to instead send
5  them to a hospital outpatient department --
6  A. Uh-huh.
7  Q. -- that would end up costing BCBS of
8  Massachusetts more, is that correct?
9  A. It could.
10 Q. Well, would it?
11 A. Again, I mean, I -- without having
12 hospital contracts in front of me and looking at
13 reimbursement rates, I mean, in a hypothetical
14 situation, hypothetically, it could.
15 Q. I'm not asking --
16 A. Yeah.
17 Q. -- about, you know, specific contracts.
18 A. Yeah.
19 Q. I'm asking as a general matter based on
20 your understanding of the difference.
21 A. Yes. Yes. In general, it would. And
22 that would be -- again, I think that would be

Henderson Legal Services
(202) 220-4158

Page 206

1  another factor we'd look at.
2      Q. Another reason -- another -- withdraw
3  that. Take a look at Option 2, which is, "To move
4  to the ASP basis without a change in the service
5  fees." Do you see that?
6      A. Uh-huh. I do.
7      Q. Okay. Now, here the subbullet says,
8  "The option would include adopting the CMS ASP
9  drug fee methodology while applying a multiplier
10 to the fees. This option would allow BCBSMA to
11 adopt the CMS ASP methodology without reducing the
12 total payments for drugs on a networkwide basis."
13 Do you recall this being an option that was
14 discussed at the time?
15     A. Again, at a high level, I know there
16 they were options. I don't remember. There's
17 lots of things we talked about at that meeting. I
18 don't remember the specific conversation.
19     Q. Well, by "budget neutral," what was
20 being contemplated here was shifting to ASP, but
21 then applying a multiplier so the total
22 reimbursement would not change, is that accurate?

Page 207

1      A. That looks to be right.
2      Q. The third option is to "Maintain the
3  current 95 percent of 2004 ASPs."
4      A. Uh-huh.
5      Q. But again, the problem noted there as a
6  con would be that those drug fees would be
7  stagnant because CMS would no longer be using the
8  AWPs, right?
9          MR. COCO: Objection.
10     A. I just see "Stagnant drug fees." I
11 don't know what that means, but --
12     Q. Okay. Well, compare Option 3 to Option
13 4. Option 4 is, "Find drug vendors who can supply
14 AWPs on a J-Code level." And the pro is, "Can
15 maintain current 95 percent of AWP methodology
16 level." What was the difference between Options 3
17 and Options 4?
18     A. Now, you're outside of my realm. I --
19 you'd have to ask -- well, you'd have to ask the
20 folks that produced the report what they meant by
21 the options. Again, I participate in the
22 conversations. There's lots of things that we

Page 208

1  discuss where I don't have a detailed knowledge,
2  because I really don't need it. So, I don't
3  really know what the differences are between those
4  options. I'm reading the same thing you are.
5      Q. Do you recall any options that were
6  considered by the Provider Financial Strategies
7  Work Group other than the four options that we
8  have discussed here?
9      A. Not particularly, no. I don't.
10     Q. So, the provider financial strategies
11 never contemplated -- well, withdraw that. Did
12 the Provider Financial Strategies Work Group ever
13 contemplate simply following CMS -- well, I should
14 withdraw that. At the next page of this document,
15 under "Next Steps --"
16     A. Uh-huh.
17     Q. "Does BC 65 have to follow CMS's drug
18 payment methodology?" What is BC 65?
19     A. Blue Care 65, which would have been a
20 Medicare Advantage plan, Medicare Plus Choice at
21 the time.
22     Q. Okay. What is a Medicare Advantage

Page 209

1  plan?
2      A. Medicare Advantage is an HMO contract
3  that the plan enters into with CMS to provide over
4  65 beneficiaries with direct and group coverage
5  for services.
6      Q. Did BC 65 reimbursements follow CMS's
7  payment methodology?
8      A. Blue Care 65, because it's funded --
9  essentially, we use the Medicare fee schedule for
10 most of the -- for most reimbursement. Yeah, we
11 do.
12     Q. So, did Blue Care 65's reimbursement
13 methodology move from 95 to 85 percent of AWP when
14 CMS moved?
15     A. I don't know. I don't know that.
16     Q. Did Blue Care 65's reimbursement
17 methodology move to an ASP-based methodology when
18 Medicare moved?
19     A. No. No, I don't think it did.
20     Q. So, Blue Care 65 continues to reimburse
21 at an AWP level?
22     A. I can't answer that for certain, because

Steven J. Fox                                                    March 8, 2006
Boston, MA

**210**

1  again, I'm not in that -- I'm not operations area.
2  But that would be -- there are other examples than
3  Blue Care 65 where we, for operational reasons, we
4  can't follow the Medicare pricing model, so we've
5  had to create our methodologies.
6      We're not mandated to follow Medicare
7  policy, but based on the way the product is
8  funded, it's easier to follow Medicare. But we
9  don't -- it's not a hundred percent across the
10 board. There are lots of other examples where
11 we're not doing that.
12     Q.  So, it would be easier to follow
13 Medicare but Blue Care 65 is not --
14     A.  No, I don't think I said that.
15         MR. COCO: Objection.
16     A.  I said it the way the product is funded,
17 it's funded from CMS at a fixed cost to the plan.
18 If the Plan wants to essentially take that
19 reimbursement and have that product just pass that
20 cost directly through, it can follow the Medicare
21 guidelines and policies. It doesn't have to.
22 It's not a requirement. In instances where it

**211**

1  makes sense, we do. In others where it's
2  operationally difficult, we don't.
3      Q.  Let me ask you a couple of quick things,
4  and then we'll take lunch.
5      A.  Sure.
6      Q.  Does -- do you, in your current role,
7  ever review or analyze contracts between BCBS of
8  Massachusetts and physician practices?
9      A.  Well, I guess "analyze," what do you
10 mean by "analyze"? I mean, am I involved in
11 contracts with physicians?
12     Q.  Do you -- are you involved in the
13 drafting of those contracts?
14     A.  I am. I can be.
15     Q.  Are you familiar with the terms of those
16 contracts?
17     A.  Not everything, but some of them, sure.
18 The ones I'm involved in, I am.
19     Q.  At some point in the last few years BCBS
20 of Massachusetts implemented a specialty pharmacy
21 program. Are you aware of that?
22     A.  I'm not aware of the details. I'm not -

**212**

1  - I don't have responsibility for specialty
2  pharmacy, but --
3      Q.  Are you aware that that was done?
4      A.  Yeah.
5      Q.  Do you -- did you play any role in that
6  process or provide any input to the determination
7  to what the parameters of what the specialty
8  pharmacy program would be?
9      A.  Not that I can recall, no.
10     Q.  Did -- were you involved in any meetings
11 where the specialty pharmacy program was
12 discussed?
13     A.  I can't recall that I have been, no.
14         MR. MANGI: Okay. This is a good time
15 to take lunch.
16         (Whereupon the deposition recessed
17 at 1:21 p.m.)

**213**

1           AFTERNOON SESSION (2:06 p.m.)
2
3           (Attorneys Notargiacomo and Skwara
4  not present.)
5      Q.  Now, Mr. Fox, before the break we were
6  looking at Exhibit Fox 003, and there were four
7  different options listed there. Do you recall
8  that?
9      A.  I do.
10     Q.  Which of those options, if any, was
11 implemented?
12     A.  Give me a minute. (Witness reviews
13 document. I don't know that we actually -- I
14 don't know that we actually made a decision on
15 this. If we did, it's Option 3, because we're
16 still at 95 percent of AWP. So, I would say that
17 that's -- since that's one of the options that
18 listed there, we either didn't do anything or we
19 picked that as the option.
20     Q.  Well, 95 percent of AWP is also Option
21 4, isn't it?
22     A.  I don't believe we did that.

**Page 214**

1  Q. Okay. Are you familiar with R J health?
2  A. With who?
3  Q. RJ Health?
4  A. No, I'm not.
5  Q. Previous BCBS of Massachusetts witnesses
6  have testified that RJ Health is a vendor that
7  BCBS of Massachusetts has hired to supply AWPs on
8  a J-code level. Do you have any reason to think
9  that's incorrect?
10 A. No.
11 Q. Okay.
12 A. It's not my -- it's not my world, so --
13 Q. Okay. Well, you are a part of the work
14 group that made the decision on what to implement,
15 right?
16 A. Correct.
17 Q. Okay. So, it's part of your world to
18 that extent. Now, taking a look at Option 3 and
19 4, as part of the Provider Financial Strategy Work
20 Group, do you understand these to be the same
21 thing or is there a difference between them?
22 A. (Witness reviews document.) By

**Page 215**

1  definition, they're not the same. I don't -- I
2  don't know the details behind what is, you know,
3  obviously, given that I'm not even aware that we
4  have a vendor doing it, so, I -- you know, they
5  look to be different. I couldn't tell you what
6  the specific differences are. That would not have
7  been discussed at a meeting I was at.
8  Q. Now, would you turn back a moment to
9  Exhibit Fox 001?
10 A. Which was the subpoena.
11 Q. Turn back to Topic No. 2, please. It's
12 on Page 12 of the document. Let me know when
13 you're there.
14 A. Yeah.
15 Q. Okay. Now, you see that one of the
16 parts of that deposition topic is the use of
17 specialty pharmacies?
18 A. Correct.
19 Q. Okay. So, you've been designated as a
20 knowledgeable witness to speak about Blue Cross
21 Blue Shield of Massachusetts' use of specialty
22 pharmacies, right?

**Page 216**

1  A. To the extent that we use them, so, I
2  would say yes.
3  Q. Well, before the break I understood from
4  your testimony that you were not knowledgeable
5  about what was considered and whether to use
6  specialty pharmacies, what the parameters of the
7  program would be.
8  A. Sure.
9  Q. Did I understand that correctly?
10 A. I'm not -- I do not do the contracting
11 for specialty pharmacies. Certainly, from a
12 reimbursement perspective, I certainly understand
13 what reimbursement methodologies are. Again, to
14 the extent that we're working with physicians
15 here, but I'm not -- I don't work directly with
16 specialty pharmacies.
17 Q. And you have no understanding as to why
18 physician-administered drugs were excluded from
19 the scope of the specialty pharmacy programs that
20 Blue Cross Blue Shield of Massachusetts
21 implemented.
22 A. No, I do not.

**Page 217**

1  Q. Did you see any of the documents that
2  were generated as part of the process of
3  considering those issues?
4  A. Which process are we talking about?
5  Q. Did you see -- let me rephrase the
6  question. Have you seen or did you see any of the
7  documents that were generated at Blue Cross Blue
8  Shield of Massachusetts in connection with efforts
9  to determine the appropriate scope for the
10 specialty pharmacy program, specifically whether
11 or not it should include physician-administered
12 drugs?
13 A. I don't believe so.
14 Q. Okay. Now, I'd like to turn to a
15 different topic, which is the clients of Blue
16 Cross Blue Shield of Massachusetts. Who are the
17 health plan's clients?
18    MR. COCO: Objection.
19 A. What do you mean by "clients"?
20 Q. Well, do you have an understanding of
21 the meaning of the term "client"?
22 A. Well, client could mean an account, a

218

1  broker, customer.
2     Q. Okay. Who do you understand to be Blue
3  Cross Blue Shield of Massachusetts' customers?
4     A. Accounts --
5        MR. COCO: Objection.
6     A. -- brokers.
7     Q. Okay. What sort of entities are you
8  thinking of when you say, "accounts"?
9     A. I'm not thinking of any particular
10 account.
11    Q. Okay.
12    A. I'm just thinking of accounts in
13 general.
14    Q. Let me rephrase the question. Are
15 employers -- companies that employ individuals --
16 clients of Blue Cross Blue Shield of
17 Massachusetts?
18    A. I would agree with that definition.
19    Q. Similarly, then do the clients of Blue
20 Cross Blue Shield of Massachusetts include health
21 and welfare funds?
22    A. They should.

219

1     Q. Unions?
2     A. Anyone who's contracted with us for
3  services could include any of those.
4     Q. Now, when -- let's take -- let's take a
5  specific example. Are you familiar with the Pipe
6  Fitters Local 537 Trust Fund?
7     A. Not specifically.
8     Q. Okay. But you're aware that that's one
9  of the trust funds -- one of the types of entities
10 we're talking about? Are you familiar with the
11 entity?
12    A. (Witness nods.)
13       MR. COCO: Objection.
14    Q. Never heard of it?
15    A. No.
16    Q. Okay. Well, let's talk about any
17 generic health and welfare fund then. Let's call
18 it Customer X. When Customer X, a health and
19 welfare fund, comes to Blue Cross Blue Shield of
20 Massachusetts seeking to obtain coverage for its
21 members, does it enter into a contract with Blue
22 Cross Blue Shield of Massachusetts?

220

1     A. I'm not -- I'm not on the sales side of
2  the house, but that's -- my understanding is that
3  they do.
4     Q. Do the clients of Blue Cross Blue Shield
5  of Massachusetts, by contracting with Blue Cross
6  Blue Shield of Massachusetts, then get access to
7  Blue Cross Blue Shield of Massachusetts' provider
8  networks?
9     A. Yes.
10    Q. Do any of Blue Cross Blue Shield of
11 Massachusetts' clients have their own networks?
12    A. I'm not aware that this exists.
13    Q. So, as far as you know, all of them use
14 networks provided by Blue Cross Blue Shield of
15 Massachusetts?
16    A. As far as I'm aware, yes.
17    Q. The terms -- because they're using Blue
18 Cross Blue Shield of Massachusetts' network, the
19 terms of reimbursement are then determined by
20 what's been agreed between Blue Cross Blue Shield
21 of Massachusetts and the provider, right?
22       MR. COCO: Objection.

221

1     A. Repeat this -- just repeat the question.
2     Q. Sure. Well, when a client comes to Blue
3  Cross Blue Shield of Massachusetts -- a health and
4  welfare fund, for example -- they enter into a
5  contract with Blue Cross Blue Shield of
6  Massachusetts that gets them access to Blue Cross
7  Blue Shield of Massachusetts' provider network,
8  right?
9     A. That's correct.
10    Q. Now, Blue Cross Blue Shield's contract
11 with the providers, the contract that sets out the
12 network, that provides for what the payment terms
13 to the provider will be, right?
14       MR. COCO: Objection.
15    A. Our contract with our provider sets the
16 payment terms.
17    Q. So, Blue Cross Blue Shield of
18 Massachusetts' clients are not directly involved
19 in negotiating the amount that will be paid to the
20 provider in reimbursement, is that correct?
21       MR. COCO: Objection.
22    A. They -- they may not be directly, but

**222**

1  they -- we are -- in our role, we are actually --
2  the whole point of entering into those
3  negotiations and the whole point of those
4  reimbursements is essentially to pass on any of
5  those savings to our accounts.
6      Q. You're acting on behalf of your clients
7  in contracting with the providers.
8         MR. COCO: Objection.
9      A. That's correct.
10     Q. Are you familiar with the Teamsters?
11     A. I know who they are.
12     Q. All right.
13     A. I know they're an account.
14     Q. Are you aware that Teamsters Local
15 Health and Welfare Fund are clients of Blue Cross
16 Blue Shield of Massachusetts?
17     A. Yes, I am.
18     Q. The facts that we just discussed in
19 terms of the networks of relationships, those
20 apply, I believe, to the Teamsters, that's one
21 example of the type of customer that would have
22 these relationships?

**223**

1         MR. COCO: Objection.
2      A. I can't speak to the Teamsters' contract
3  with us, I -- again, at a high level, our networks
4  are available to our accounts.
5      Q. I use Teamsters as an example of one of
6  the types of funds we've been talking about.
7         MR. COCO: Objection.
8      Q. Now, other than Blue Cross Blue Shield
9  of Massachusetts, are there any other entities
10 that have their own provider networks in
11 Massachusetts?
12     A. Are there other entities? Other health
13 plans?
14     Q. More broadly, any other entities you're
15 aware of that have their own networks of
16 providers.
17     A. Well, I mean, "network" is a pretty
18 broad term. Pharmacies have a network of
19 pharmacies, chains --
20     Q. I'm talking about networks of providers,
21 of physicians.
22     A. I don't -- I mean, I just don't think I

**224**

1  understand what your question is.
2      Q. Blue Cross Blue Shield of Massachusetts
3  has contracts with providers -- has set up a
4  provider network, right?
5      A. That's correct.
6      Q. Okay. Other health plans, the CIGNAs,
7  the Fallons, the Neighborhoods, they similarly
8  have their own networks of physicians, right?
9      A. They have -- they have their own
10 networks. They're largely the same.
11     Q. Now, other than these entities, the
12 health plans that we've talked about, do you know
13 of any other entities in the marketplace that have
14 networks of contracted physicians in
15 Massachusetts?
16     A. There may be disease management vendors,
17 but I'm not -- I mean, I'm not aware specifically.
18 I'm not sure what you're thinking of, but I can't
19 think of anything.
20     Q. Are you aware of any employer plans in
21 Massachusetts, including unions' health and
22 welfare funds, that maintain their own provider

**225**

1  networks?
2      A. I'm not aware of any that maintain their
3  own.
4      Q. Are you aware of any employer plans --
5  including health and welfare funds -- that
6  negotiate reimbursement rates with physicians
7  directly?
8      A. I'm not aware of that.
9      Q. Now, earlier in the day we were running
10 through your employment history at the company,
11 and we got up to the period '95/'96 when you were
12 a network manager. Do you recall the --
13     A. Yeah.
14     Q. -- we were talking about that?
15     A. Yes.
16     Q. What was your next position after
17 network manager?
18     A. Would be regional director.
19     Q. When did you move into that position?
20     A. It was probably -- probably right after
21 that, '97.
22     Q. How long did you stay in that position?

**226**

1    A. I would say '97 to 2000.
2    Q. What were your responsibilities as a
3    regional director?
4    A. Just -- I mean --
5    Q. I'm sorry. Withdraw that for a second.
6    Was that a regional director in a particular
7    department?
8    A. Regional director of provider relations.
9    Q. Okay. Now, what were your
10   responsibilities in that position?
11   A. The responsibilities were to coordinate
12   the activities of staff and essentially -- it
13   becomes largely an internally-based role, versus
14   in the previous roles, which are more externally-
15   based. You get more involved in management and
16   administration and representing kind of a
17   particular region, and just -- instead of having a
18   knowledge or relationship of a particular group of
19   providers, you become knowledgeable around a
20   larger group, more at a regional level.
21   Q. Were you still dealing directly with
22   provider groups?

**227**

1    A. Sure. I maintained some relations out
2    there, but -- yeah.
3    Q. Was that a smaller proportion of your
4    time than it had been previously?
5    A. Yes. Yes. Definitely.
6    Q. What proportion of your time was spent
7    in direct contact?
8    A. Probably less than 25 percent.
9    Q. Now, after the regional director stint
10   from '97 through 2000, what was your next
11   position?
12   A. Director.
13   Q. Director of provider relations?
14   A. Director of provider relations, and then
15   I took on communications as well.
16   Q. How long was your title just director of
17   provider relations?
18   A. It wasn't. It was when I took on the
19   director of provider relations, with that came the
20   other department, which was a separate department.
21   Q. And remind me, what was the full title?
22   A. At that time it was provider relations

**228**

1    and communications.
2    Q. Okay. So, how long was your title,
3    director of provider relations and communications?
4    A. Till a year ago, February of 2005.
5    Q. And what did it change to in February of
6    '05?
7    A. Senior director of provider relations,
8    communications, and eHealth.
9    Q. Now, is provider relations and
10   communications the same thing, or is it two
11   separate tasks in that title?
12   A. It's two different departments.
13   Q. Okay. What's the function of provider
14   relations, and what's the function of provider
15   communications?
16   A. Provider relations is responsible for
17   the external administrative relationships. I
18   think I may have mentioned -- I mentioned in my
19   other -- earlier we talked about the role. It's
20   working with physicians, doing a lot of education,
21   training, you know, helping them to understand how
22   to work with the plan. It also is involved in

**229**

1    implementing contracts that were executed under --
2    you know, so physicians knew what the terms were,
3    etcetera.
4         The communications side of -- is
5    communications strategy. All of the external
6    provider communications that the Plan produces
7    come out of this shop, all the newsletters,
8    organization of meetings, things like that.
9    Q. In the communications role, does that
10   focus on communications from BCBS to physicians,
11   as opposed to the communications?
12   A. Correct.
13   Q. Okay. So, the focus is on mailings and
14   things like that which are being sent out to
15   physicians?
16   A. That's correct.
17   Q. Insofar as this communication going the
18   other way from the physician to BCBS of
19   Massachusetts, that would be part of the provider
20   relations department rather than provider
21   communications department?
22   A. That's accurate.

230

1  Q. Okay. Now, if Feb of '05, title changed
2  from director to senior director. Was that just a
3  promotion?
4  A. It was more at a responsibility level.
5  I took on an additional area of eHealth, so by
6  getting the department and really, just more of an
7  external -- because now I'm spending a lot more
8  time externally than before. So, it's just a --
9  it's a distinction the company is making, because
10 you have director levels, and there are senior
11 director levels. So, they've made the
12 distinction.
13 Q. And what is the eHealth component that
14 was added to your responsibilities?
15 A. It's working with physicians -- well,
16 it's actually working with providers on adopting
17 and implementing electronic technology. So, it
18 could be electronic medical records and things
19 like that.
20 Q. Okay. Does that include claims
21 processing-related issues?
22 A. No, not typically.

231

1  Q. Is it a focus on record keeping?
2     MR. COCO: Objection.
3  A. No.
4  Q. Okay. So, what other than medical
5  records is part of that -- the focus?
6  A. It's really around changing the
7  physician -- essentially, getting physicians to
8  adopt technology to make their office more
9  efficient, but not on a billing side. So, it
10 would be things like getting them to adopt medical
11 records, getting them to use handheld for
12 electronic prescribing; it will get them to take a
13 look at clinical decision-making, things like
14 that.
15    So, it's really that component. And
16 since that group is responsible for working with
17 physicians, it made sense to pull them into my
18 area.
19 Q. And that senior director is still your
20 title today, right?
21 A. At least it was when I left.
22 Q. Now, who do you currently report to?

232

1  A. I report to -- I report directly to
2  Vincent Plourde.
3  Q. And Mr. Plourde is a VP director?
4  A. That's correct.
5  Q. What is the VP for?
6  A. He is responsible for provider services.
7  Most of his -- I've got responsibility for my
8  whole area. When I took the role in 2000 -- I
9  think it was with him since 2001, 2002, probably
10 in that time frame. He has -- his responsibility
11 is the claims processing area, really just -- the
12 call center, if you will -- when people have
13 problems with their claims, they call in. And so,
14 he had responsibility for that entire side of the
15 house.
16    And so, they put us together, but I
17 certainly have a lot more detailed -- he doesn't
18 work with physicians in the field. I do, so --
19 Q. So, what are his responsibilities? What
20 areas does he deal with?
21 A. He has -- well, again, he's internally-
22 based, largely. And he is responsible for

233

1  representing the -- really, the provider
2  operations side of the house up into senior
3  management.
4  Q. Okay. Well, one of the areas he has
5  oversight over is provider relations and
6  communications, right?
7  A. That's correct.
8  Q. What are the other areas he has
9  oversight over?
10 A. Provider services, as I mentioned, is
11 the other area. I think it -- provider support,
12 which includes a lot of -- more of a system,
13 understanding how -- how our system is configured.
14 But not IT, more from a claim perspective. And he
15 also has the provider audit area. So, he's
16 responsible for hospital audit.
17 Q. How long has he been in his current
18 position, do you know?
19 A. He was elevated to vice president when -
20 - probably in 2001.
21 Q. And you've reported to him since that
22 time?