Steven J. Fox                                                                         March 8, 2006

Boston, MA

**234**

1    A.  That's right.
2    Q.  And who does Mr. Plourde report to?
3    A.  Today, that is -- that changed. So,
4  today it's Andrew Dreyfus.
5    Q.  What is Mr. Dreyfus --
6    A.  He's the executive vice president.
7    Q.  What is he the executive vice president
8  of?
9    A.  He's the executive vice president of
10  health care services.
11    Q.  And who does Mr. Dreyfuss report to?
12    A.  He reports to -- who does he report to?
13  Today he reports to the CEO.
14    Q.  And that's Mr. Killingsworth?
15    A.  That's correct.
16    Q.  Now, what areas does Mr. Dreyfus have
17  oversight over, in addition to everything Mr.
18  Plourde has oversight over?
19    A.  Well, he's only been in the role since -
20  - he has only been in that role since this past
21  fall. So, he's just taken it on relatively
22  recently. He has responsibility for provider

**235**

1  services, which is Vin's organization. He has
2  oversight for provider contracting and also health
3  care -- health care management.
4    Q.  Who was in the executive VP of health
5  care services position before him?
6    A.  Sharon Smith.
7    Q.  Do you know how long she was in that
8  position?
9    A.  I don't know when she was an EVP, but
10  she was a senior vice president prior to that.
11  Essentially, she -- in 2001 there was a big
12  organizational change, and so, that's when Sharon
13  came into that role. She was given that title and
14  took on the provider side of the house. Prior to
15  that, Sharon was in a different side of our
16  business.
17    Q.  What side of the business was she in?
18    A.  Customer, customer relations -- we call
19  member services.
20    Q.  And where was Mr. Dreyfus before he came
21  to this role?
22    A.  He wasn't with the company. He was with

**236**

1  a separate foundation, Blue Cross Blue Shield
2  Foundation, and then prior to that, he was with --
3  I don't actually know where he was prior to that.
4    Q.  Now, let's go to some more documents.
5        (BCBSMA-AWP-10605-10607 marked
6  Exhibit Fox 004.)
7    Q.  Now, I'd like to draw attention to the
8  third page of that document, please. So, this is
9  a memo to physicians that are part of the BC 65
10  network, right?
11    A.  Yeah, that's what it says.
12    Q.  Now, in the second paragraph it says,
13  "We plan to update our Blue Care 65 physician fee
14  schedules effective March 1st, 2004 to reflect
15  Medicare's 2004 fee schedule changes." Do you see
16  that?
17    A.  Yes.
18    Q.  And it says, "Because Medicare's 2004
19  update increased physician payments by 1.5
20  percent, our Blue Care 65 physician fee schedules
21  will reflect the same increase." Do you have an
22  understanding as to which parts of the Medicare

**237**

1  physician payment schedule that's referring to?
2    A.  Not specifically. We enter -- we issue
3  this communication every year at around the same
4  time. So, whatever changes have been made on the
5  physician fee schedule side for Medicare, to the
6  extent that they apply to our business, we send
7  notice and make those changes.
8    Q.  Well, have a look at the next paragraph.
9  The first sentence notes that, "Medicare has said
10  it's going to reduce its payment on office-
11  administered drugs from 95 to 85 percent of AWP."
12  Do you see that?
13    A.  I do.
14    Q.  And then it says, "We will also follow
15  Medicare's lead on increasing the fees for
16  infusion, injection, and chemotherapy admin
17  codes." Now, my question is, was Blue Cross Blue
18  Shield of Massachusetts just increasing the admin
19  fees following Medicare, or was it also reducing
20  the drug reimbursement?
21        MR. COCO: Objection.
22    A.  I have no idea. We just produce the

**238**

1 communication. I don't always have the underlying
2 detail to what it is specifically.
3    Q. Well, you see the first page of this
4 document reflects that this is from or related to
5 a Provider Financial Strategy Work Group Steering
6 Committee meeting.
7    A. Lots of communications are brought to
8 that work group before they go out.
9    Q. Do you recall this issue being discussed
10 in any meetings in which you participated?
11    A. I don't recall that specific issue, no.
12    Q. Who would know the answer as to whether
13 or not the BC 65 reimbursement was changed from 95
14 percent of AWP?
15    A. Mike. I'd say Mike Mulrey. Mike is who
16 I would call.
17    Q. Anyone else?
18    A. No. Mike is all things fee schedule.
19       MR. MANGI: Let's mark this next exhibit
20 as Exhibit Fox 005.
21          (BCBSMA-AWP 10608 marked Exhibit
22 Fox 005.)

**239**

1    Q. Now, Exhibit Fox 005 are minutes from
2 another meeting of the Provider Financial Strategy
3 Work Group from January 19, '04.
4    A. That's what it looks like.
5    Q. And you'll see that you are one of the
6 people attending that as listed on this document.
7    A. That is what it says.
8    Q. Now, I'd like you to review, please, the
9 paragraph entitled "Emergency Medicine Physician
10 Recontracting," and let me know when you're done.
11    A. (Witness reviews document.) Sure. I'm
12 familiar with that.
13    Q. Do you recall this issue?
14    A. Yes, I do.
15    Q. What was this issue, and how did it come
16 up before the Provider Financial Strategy Work
17 Group?
18    A. We -- this -- emergency medicine
19 physicians typically, as a specialty, did not
20 contract with health plans, in particular because
21 for the services they rendered, since they were
22 emergent services not subject to referrals or

**240**

1 prior authorizations, lots of these physicians
2 would not have a contract, and health plans would
3 have to pay them charges. And over time, as we
4 started to make changes in our fee schedule, we
5 felt it was the right opportunity to really go
6 after the segment and really try to understand why
7 they weren't participating and try to get the
8 payment levels to a place where they were
9 competitive. That's what this is.
10    Q. Okay. Now, what do you mean when you
11 said you wanted to get payment levels to a point
12 where they were competitive?
13    A. Well, the physicians would tell us that
14 our rates were very low compared to other health
15 plans, compared to other markets, and they, you
16 know, they were looking for us to be more
17 competitive with our fees.
18    Q. So, they were unwilling to contract at
19 the levels that were currently being offered and
20 were referring to -- were pointing to other health
21 plans paying a better rate as saying that's what
22 they wanted to contract?

**241**

1       MR. COCO: Objection.
2    A. One factor.
3    Q. What was the -- what was the resolution
4 of that issue?
5    A. Well, I mean, there were several. There
6 were changes that came along in Medicare as far as
7 the RBRVS methodology changed a bit to recognize
8 the specialty. We better understood their
9 malpractice issues. So, we did create a
10 multiplier for this specialty to really better
11 recognize the mix of services that they were
12 doing. So, we made some fee schedule increases,
13 again, targeted to this specialty, as we talked
14 about earlier, and we proceeded to get more of the
15 physicians into our plan.
16    Q. What was the multiplier that was
17 applied?
18    A. I couldn't even remember that. I don't
19 know.
20    Q. Looking at Exhibit Fox 005, the Provider
21 Financial Strategy Work Group decided to increase
22 the fee schedule by 20 percent, right, in June of

242

1  '04?
2      A.  I see that, so that might have been
3  right.
4      Q.  And then there was another schedule to
5  be considered later that year. Was a further
6  increase carried out?
7      A.  I don't recall specifically, but I know
8  there -- I mean, this is -- there were a couple of
9  adjustments made specifically for emergency
10 medicine physicians, but I -- I don't remember --
11 I don't know if -- I don't know specifically what
12 we did after this, but --
13     Q.  To what extent is this or similar themes
14 present in negotiations with other specialty
15 groups? Specifically, to what extent do they
16 raise the rates that other health plans are paying
17 them as a basis for negotiating terms?
18         MR. COCO: Objection.
19     A.  Frequently. I mean, again, it's a --
20 they're -- they're looking -- I mean, physicians
21 are looking -- well, first of all, they want to
22 get reimbursement that they think is fair, and

243

1  they also have an interest in -- well, they have
2  an interest in having fair reimbursement. So, it
3  is not atypical for a physician to come to a
4  health plan and say the other guys are paying me
5  more. I want you to pay me more. It doesn't mean
6  it's always right. And we certainly take it as
7  one factor.
8      Q.  Do these various physician groups
9  provide specific information on what other plans
10 are paying them?
11     A.  Not directly.
12     Q.  Presumably that would implicate
13 confidentiality concerns in their relations with
14 other health plans, right?
15         MR. COCO: Objection.
16     A.  I don't know what their relations are
17 with other health plans, but if they took our fee
18 schedule and gave it to another health plan, that
19 wouldn't be -- that wouldn't be acceptable.
20     Q.  Now, when a physician group makes this
21 sort of a common complaint to BCBS of
22 Massachusetts, how does BCBS of Massachusetts

244

1  determine what's the right amount of increase?
2          MR. COCO: Objection.
3      A.  There is no -- I mean, there's no
4  science to it. I mean, I think there are a couple
5  of things. We may see -- they may give us blinded
6  information where they say, here's Health Plan A;
7  here's Health Plan B. We could ask for an
8  independent third party to review and validate
9  those on a confidential basis so that someone else
10 is verifying those terms. We could do that. We
11 could look at industry data.
12         We could look at, you know, different
13 points of reference in the -- whether it's
14 inflation, whether it's, you know, different
15 segments of the economy to see if there's any --
16 anything that we could draw from that. But it's
17 difficult, so you do the best you can with the
18 information that you have.
19     Q.  And after a change has been made using
20 the various inputs that you describe, how does
21 BCBS of Massachusetts determine whether or not
22 it's hit upon the right formula?

245

1          MR. COCO: Objection.
2      A.  Again, I don't think there's a big
3  science to it. I think it's just if -- if whoever
4  is raising those issues feels that the steps that
5  we've taken are sufficient, then they'll typically
6  tell us. And if they feel that they're not,
7  they'll typically tell us that, also.
8      Q.  Is one factor that reflects whether or
9  not the changes has been suitable whether or not
10 physicians then join the network at that rate?
11     A.  It depends on -- it depends. It could.
12 In the instance that we're talking here, this
13 emergency medicine group, clearly, it did. But
14 they also had control, if you will, of a set of
15 services that were probably putting them in a
16 different situation than another group of
17 physicians who had less -- less ability to direct
18 patient volume than others.
19         Because we did this for this group, this
20 is certainly not typical of our strategy.
21     Q.  What's not typical? I'm sorry. I lost
22 your chain for a moment.

### Page 246

1    A. To take a group of physicians and to do
2 something specific for that group of physicians,
3 to change their methodology for reimbursement, to
4 apply a different factor is not typically what we
5 do.
6        What we typically do is apply a standard
7 conversion factor across the board, unless we're
8 negotiating a group-specific contract.
9    Q. In the case of the emergency medicine
10 physicians, do you recall -- I understand you
11 don't know whether or not a further price change
12 was made -- but do you know whether or not the
13 problem was resolved?
14    MR. COCO: Objection.
15    A. I don't know if the problem was
16 resolved, but our participation rates are higher,
17 and so, I would say that the factors that they
18 raised apparently have been solved to their
19 satisfaction.
20    Q. Now, I believe that is an entry for "BC
21 65 Drug Change Impact." And the second sentence
22 of that says, "If BCBSMA were to follow Medicare's

### Page 247

1 lead and implement the same changes for BC 65, the
2 changes would effectively decrease physician
3 payments by approximately $200,000 annually. Deb
4 will discuss this issue with Jan Cook to determine
5 if Jan has committed to a dialog with oncologists
6 prior to external communication of the change."
7        Do you recall this issue being discussed
8 in the Provider Financial Strategy Work Group?
9    A. I remember the conversation, yeah.
10    Q. Why was the input of oncologists being
11 considered as or sought as part of this
12 evaluation?
13    A. Again, I think, as I said earlier,
14 anything that we do that negatively affects any
15 group of physicians in our network, our position
16 is to go out and talk to that group. So, if we're
17 going to affect their payment, it would be good to
18 have a conversation with them prior to doing that.
19 We're not required to do it, but --
20    Q. And that would be true of this BC 65?
21 Similarly, it would also be true of the
22 contemplated move to ASP we looked at in Exhibit

### Page 248

1 Fox 003?
2    MR. COCO: Objection.
3    A. Not specific. It doesn't have to be
4 specific -- those specific items. It could be at
5 a higher level. So, whether we did or didn't, I
6 mean, I'm not aware of those conversations.
7    MR. MANGI: Let's mark Exhibit Fox 006.
8        (BCBSMA-AWP-10609-10610 marked
9 Exhibit Fox 006.)
10    Q. Now, this is another Provider Financial
11 Strategy Work Group meeting minutes from April
12 26th, 2004 where you're one of the people
13 attending, right?
14    A. That's what it says.
15    Q. Now, I'd like you to look at the second
16 paragraph titled "Universal Fee Schedule." It
17 says, "Currently, all physicians except Children's
18 and Partners get paid off of one of BCBSMA's fee
19 schedule (Children's has a separate fee schedule;
20 Partners has a multiplier of our fee schedule with
21 a withhold.)" Now, we've spoken about multipliers
22 earlier in the context of individualized

### Page 249

1 negotiations. What is the separate fee schedule
2 for Children's that is being referred to here?
3    A. For groups like this where they are
4 large, they have a particular command of a segment
5 of the provider population, they typically do not
6 -- they do not accept standard fee schedules from
7 any payer. And so, what they will typically do is
8 negotiate specific rates or methodologies that
9 apply in general to their population. Not at the
10 specific code level, but just in general. If our
11 multiplier is 10, then they'll negotiate some
12 number that's different than that, for example.
13    Q. What is Children's?
14    A. Children's -- well, Children's is a
15 hospital in our network.
16    Q. What is the full name of that hospital?
17    A. It's Children's Medical Center.
18 Children's Hospital.
19    Q. Now, what was the separate fee schedule
20 that Children's had? Is that something that it
21 provided to BCBS of Massachusetts?
22    A. Well, in this context they're talking

**Page 250**

1  about the Children's Physician -- which is a
2  physicians' foundation -- it's a foundation of
3  physicians. So, this was a negotiation that we
4  entered into with Children's. It's a contract.
5  We have a contractual relationship across our
6  entire book of business, and they negotiate the
7  payment parameters for their physicians.
8      Q. Now, are these physicians practicing in
9  a hospital setting, or is this a physician office
10 setting?
11     A. Both.
12     Q. What is the basis on which -- withdraw
13 that. Is their separate fee schedule, does that
14 also differ from the standard drug reimbursement
15 methodology that BCBS applies to all its
16 physicians?
17     A. It would be the same. So, if we -- if
18 we include or exclude drugs, then it would be the
19 same. It would just be at a different rate.
20     Q. What is the rate specified for drugs at
21 the Children's facility?
22     A. I don't know that there's a separate

**Page 251**

1  negotiated rate for drugs. We just have an
2  overall payment multiplier for Children's, and it
3  applies for all services that they bill.
4      Q. Is it just a multiplier, or is it a
5  separate fee schedule?
6      A. Well, it's -- it's a separate multiplier
7  which creates -- if you want to call it a new fee
8  -- we -- I mean, you're talking internal language
9  of the plan. We call it a separate fee schedule,
10 because it's not a standard fee schedule. But all
11 that we're doing is taking our standard fee
12 schedule, negotiating a multiplier, and that then
13 creates another fee schedule.
14     Q. Maybe it's just inartful language in the
15 minutes, but it appears to me when this says,
16 "Children's has a separate fee schedule; and
17 Partners has a multiplier of our fee schedule,"
18 the minutes seem to suggest those are two separate
19 things. Is it your testimony they are actually
20 the same thing?
21     A. Well, they may be different. They may
22 be different, but the net effect is the same.

**Page 252**

1  Children's has a separate fee schedule. The way
2  it was built on our system was a multiplier which
3  creates different rates.
4      Q. So, both of them are multipliers?
5      A. Yeah. I'd call it that.
6      Q. It's not a situation where Children's
7  provides an entirely different fee schedule or
8  negotiates an entire different fee schedule with
9  Blue Cross Blue Shield of Massachusetts?
10     A. Well, they have different rates, clearly
11 -- they have different rates, but the basis is
12 largely the same.
13     Q. Now, it continues, "Our major
14 competitors do not pay a flat schedule, but rather
15 make strategic differentials five to ten times a
16 year."
17     A. Uh-huh.
18     Q. What are these strategic differentials
19 that are being described there?
20     A. Similar to what we just talked about
21 with emergency medicine. We decided to do
22 something strategically different with that group

**Page 253**

1  of providers. Other health plans may decide to do
2  something similar, or they may decide to go after
3  a particular group in a particular region for
4  their own reason. But I mean, largely, we all
5  have the same physicians in our network, so --
6      Q. So, "strategic differential" means
7  treating a particular group of physicians
8  differently --
9           MR. COCO: Objection.
10     Q. -- is that correct?
11     A. Well, I don't think -- I don't think I
12 said that. I think it -- are you saying specific
13 to Blue Cross or the -- I can't speak to the other
14 payers.
15     Q. I'm trying to understand what the term
16 "strategic differentials" means --
17     A. Sure.
18     Q. -- as a lawyer with little
19 understanding.
20     A. It would -- I would read that to say a
21 strategic differential would mean that they will
22 want to work with a particular doctor or groups of

Page 254

```
 1  physicians to change their reimbursement for their
 2  own strategic purposes.
 3       Q.  Okay.
 4       A.  So, again, since we all have the same
 5  physicians in our network, and we largely all
 6  reimburse the same way, there may be a plan that
 7  wants to treat one group different than others,
 8  for some strategic reason.
 9       Q.  How far back in time have Blue Cross
10  Blue Shield of Massachusetts competitors been
11  making strategic differentials?
12           MR. COCO:  Objection.
13       A.  Again, I can't speak to that. I don't
14  know. Don't know.
15       Q.  Based on your -- how far back are you
16  aware of competitors making such a "strategic
17  differentials"?
18       A.  I tell you, until I've read it in the
19  minutes, I've not really even heard it referred to
20  as that. So, I'm going to say that I don't know,
21  because I've not really heard it discussed in that
22  context.
```

Page 255

```
 1       Q.  Now, how often does Blue Cross Blue
 2  Shield of Massachusetts update its own fee
 3  schedule?
 4       A.  That's typically annually.
 5       Q.  And what's the process whereby that
 6  update is carried out?
 7       A.  As I may have mentioned earlier, we will
 8  understand what the Medicare -- or what the
 9  methodology is that's out there. RBRVS, what is
10  it? When is it available? Then we will take it
11  in house and understand the things I mentioned
12  before, what's the impact on the CPI or DRI or
13  different clinical medical indices? And then we
14  will look at the available pool of money that we
15  have to fund fee schedule changes, and we will run
16  some modeling scenarios, and we'll bring them to
17  this group, take a look at it, and communicate it.
18       Q.  Now, it seems to me there are two
19  separate stages that you're describing. There's
20  the analytical stage, and then there's the
21  implementation stage. Is that a fair statement?
22           MR. COCO:  Objection.
```

Page 256

```
 1       A.  I don't know that I'd separate them.
 2  Its really all tied together. We can't --
 3       Q.  I understand that. I'm merely trying to
 4  --
 5       A.  Sure.
 6       Q.  -- get an understanding as to what's
 7  involved. They may overlap, but there's a process
 8  of analysis, and there's a process of
 9  implementation, right?
10           MR. COCO:  Objection.
11       A.  I would say in between that there is an
12  analysis, there is a decision that needs to be
13  made based on the analysis, and then there's an
14  implementation.
15       Q.  Fair enough. Now, in this annual update
16  process, how much time is typically devoted to the
17  analysis stage?
18       A.  I can't --
19           MR. COCO:  Objection.
20       A.  I can't speak to that, because I'm not
21  doing the analysis. So, I'm typically -- I see
22  the results of the analysis, so I wouldn't even
```

Page 257

```
 1  know.
 2       Q.  Who's involved in the analytical stage?
 3       A.  Some of the documents that you shared
 4  earlier are some of the folks that we've already
 5  talked about would typically bring the analysis
 6  forward. People like Mike and his group that
 7  would kind of value -- since, again, they're
 8  responsible for the fee schedule, then they would
 9  typically do that analysis.
10       Q.  Is that something that's done out of the
11  Provider Financial Strategy Work Group?
12       A.  Well, the work group isn't a body. It's
13  just a group of individuals. No, it's done out of
14  our finance area.
15       Q.  And after the decision is made -- well,
16  withdraw that. Who makes the actual decision then
17  on what changes to implement?
18       A.  The Provider Financial Strategy Work
19  Group makes the recommendation. That
20  recommendation then goes to senior management,
21  essentially, but this work group is really cross-
22  representative of different areas in the company.
```

**258**

1  So, there's really not a lot of discussion that
2  goes on once it leaves this group. So, it goes up
3  to senior management for their -- for their view,
4  and we then implement it.
5      Q. And after the decision is made, how long
6  does the implementation take?
7      A. Well, there's a couple of things that
8  happen. There's the actual updating of our
9  system, and there are lots of operational issues
10 and challenges with that. So, there's lots of
11 people that are involved in that and doing all of
12 that. And then we -- my area's responsible for
13 generating the communications and explaining it
14 and talking to physicians about it.
15     Q. And by "updating the systems," you're
16 talking about implementing changes to the fee
17 schedule and things like that, right?
18     A. Yeah.
19     Q. Claims processing system, essentially?
20     A. Well, it wouldn't -- it's the actual --
21 it's actually updating the rates on our system of
22 tables or things like that.

**259**

1      Q. How long does that process take?
2      A. It -- well, I mean, we typically -- we
3  allow -- we allow 90 days in general for -- we
4  communicate these changes 90 days in advance of
5  them. In some instances, longer than that. It
6  could be six months in advance, because it
7  sometimes can take that long to update thousands
8  of codes.
9      Q. Now, the changes that are done on an
10 annual basis, these involve some changes to
11 specific codes where there are individualized
12 negotiations, is that correct?
13         MR. COCO: Objection.
14     A. Not typically, no. It's typically just
15 the -- no. It's the updating of multipliers. It
16 could be -- there might be codes which are not
17 based on RBRVS which need to be reviewed. I mean,
18 it's really a lot of operations, because our
19 products -- the way our system is configured, I
20 guess.
21     Q. Well, the multipliers stem from
22 different negotiated arrangements, right?

**260**

1          MR. COCO: Objection?
2      A. No, the multipliers are, largely stated
3  -- as I mentioned before -- the multipliers are
4  across our entire book of business. And then if
5  we have any negotiated differences off of that,
6  those would be implemented separate. But that's a
7  small portion of our --
8      Q. Are those implemented as part of the
9  same process?
10     A. Not necessarily. They might be on
11 different time frames. They may not be. They
12 might not be tied to when these updates go in.
13     Q. The general timeline is approximately 90
14 days for that updating phase?
15         MR. COCO: Objection.
16     A. At least. I mean, in many instances,
17 it's longer than that.
18     Q. But that's a process that's carried out
19 on an annual basis.
20     A. There is -- from decision -- let me back
21 up. From decision to implementation is longer
22 than 90 days. From decision to implementation

**261**

1  could be six months. We provide notice not less
2  than 90 days in advance. And again, so that we
3  build enough time to actually do all of the
4  changes.
5      Q. But my question was, the process that we
6  have been talking about, updating the fee
7  schedules, making these changes is, this is done
8  on an annual basis.
9      A. That's correct.
10     Q. Okay. How long has it been done on an
11 annual basis?
12     A. Changing our fee schedule?
13     Q. Uh-huh.
14     A. The -- we review and update the fee
15 schedule since we've gone to the RBRVS methodology
16 in 1995. Not every year have we actually
17 increased the fee schedule. There may have been
18 years where we didn't. But we've reviewed it on
19 an annual basis.
20     Q. Now, does Blue Cross Blue Shield of
21 Massachusetts have the ability to ask providers
22 what they're paying to acquire physician-

**262**

1  administered drugs?
2      MR. COCO: Objection.
3   A. Say that again. Do we --
4   Q. Have the ability to ask providers what
5  they're paying to acquire physician-administered
6  drugs?
7      MR. COCO: Objection.
8   A. Well, having the ability versus --
9  versus do we ask, I think, are different
10 questions.
11  Q. They are. I am asking you do you have
12 the ability?
13  A. I don't know. I don't know that we have
14 the ability to. I mean, I have the ability to ask
15 a physician anything I want, but I don't know that
16 it would come up in the normal course of business.
17  Q. Well, my question is, is there anything
18 that you're aware of preventing you from asking a
19 physician what he pays to acquire drugs, if you
20 wanted to gather that information?
21      MR. COCO: Objection.
22  A. I don't know that that's, frankly, in

**263**

1  the scope of our relationship with a physician to
2  ask what they're purchasing. I don't ask a
3  physician what they're paying for durable medical
4  equipment that's in their office. So, I don't
5  know that I would do the same there.
6   Q. Are you aware that your department has
7  done so in the past?
8      MR. COCO: Objection.
9   A. No.
10  Q. Let me show you a document.
11     (BCBSMA-AWP-00048-51 marked Exhibit
12 Fox 007.)
13  Q. Now, if you look at the second e-mail on
14 this page, that's from Lisa Gorman. Do you see
15 that?
16  A. Yeah, I do.
17  Q. Lisa Gorman is one of the people who
18 works for you, right, in the provider relations
19 department?
20  A. She is.
21  Q. Do you see the date on that e-mail is
22 August 23rd, 1999?

**264**

1   A. Yeah.
2   Q. Okay. Now, I'd like you to look at the
3  second paragraph there. It says, "Secondly, I was
4  not shy in my meeting with Doctor Kagan about
5  discussing how much he's really paying for the
6  chemo drugs." Now, does this refresh your
7  recollection as to whether or not you have the
8  ability to ask providers what they pay to acquire
9  drugs?
10     MR. COCO: Objection.
11  A. No. I mean, first of all, I've not seen
12 this document before. I'm not on this e-mail.
13 You know, I can't -- at this time -- I don't even
14 think Lisa was a director at this time. Lisa was
15 provider relations manager in the field during
16 this time. During conversations that -- in fact,
17 I don't even know that Lisa was working for me at
18 the time, but she may have been in my role as
19 director. But conversations that my staff have
20 with physicians, you know, I don't tell them what
21 to say.
22  Q. Well, we can agree, looking at this,

**265**

1  can't we, that at least one person in your
2  department has had a conversation with the
3  physician where they were not shy about asking the
4  doctor what they're paying for chemo drugs.
5      MR. COCO: Objection.
6   A. I'm reading the e-mail that you're
7  looking at. So, again, this is the first time
8  I've seen it. I'm not going to -- I can't tell
9  you what Lisa was thinking or what she did or
10 didn't do.
11  Q. Well, do you have any reason to think
12 she's lying in this e-mail?
13     MR. COCO: Objection.
14  A. No, I don't think anybody would be
15 lying. But again, I'm not going to try to read
16 Lisa's mind as to what she meant when she was
17 writing this -- writing this e-mail.
18  Q. Okay. Let me ask you to assume for the
19 moment that she's telling the truth in this e-mail
20 about the conversation that she had with Doctor
21 Kagan. Would her asking the doctor what he was
22 paying for chemo drugs be something that would be

**266**

1  contrary to any BCBS of Massachusetts policy that
2  you're aware of?
3      MR. COCO: Objection.
4   A. I think you should ask Lisa that
5  yourself.
6   Q. Well, you're her boss, so I'm asking
7  you.
8      MR. COCO: Objection.
9   A. Again, there is not a policy in place at
10 Blue Cross and Blue Shield to engage physicians in
11 discussing payment rates.
12  Q. That's not my question. My question is,
13 is there a policy at Blue Cross Blue Shield of
14 Massachusetts prohibiting people in your
15 discussion, such as Ms. Gorman, from having a
16 conversation with a doctor asking them what
17 they're paying to acquire drugs?
18     MR. COCO: Objection.
19  Q. Are you aware of any such a policy?
20  A. These things aren't -- there are no
21 policies for these things.
22  Q. Okay.

**267**

1   A. These are conversations that people have
2  with physicians every day.
3   Q. Now, earlier in that e-mail -- I'd like
4  you to read the first paragraph and let me know
5  when you're done.
6   A. (Witness reviews document.) Yeah,
7  that's it.
8   Q. Now, Ms. Gorman here says, "I wanted to
9  emphasize the fact that Doctor Kagan," who is the
10 oncologist being discussed here "-- may be paying
11 a different rate than his colleagues and vice
12 versa." What do you understand Ms. Gorman to be
13 referring to?
14     MR. COCO: Objection.
15  A. I have no idea. Lisa's got a
16 relationship with these physician. I'm not aware
17 of these conversations. I don't know what she's
18 referring to. No, I don't.
19  Q. Well, let me ask you this: Are you
20 aware of the fact Ms. Gorman recounts here that
21 different doctors may be paying different rates
22 for drugs?

**268**

1      MR. COCO: Objection.
2   A. It's not my understanding.
3   Q. Is it your understanding that all
4  doctors pay exactly the same price for drugs?
5   A. It wouldn't be my -- it wouldn't be my
6  understanding that there would be different rates
7  that were being paid.
8   Q. Okay. So, as a consequence, it's your
9  understanding that all doctors pay exactly the
10 same rate for drugs?
11     MR. COCO: Objection.
12  A. No, I mean, it's hard to make those
13 statements, because not all fees are the same for
14 all services. So I --
15  Q. I'm not asking about reimbursement.
16  A. Yeah.
17  Q. I'm not asking about Fee For Service.
18 The question's a simple one. Ms. Gorman says that
19 Doctor Kagan may be paying a different rate than
20 his colleague and wants to emphasize that fact?
21  A. Uh-huh.
22  Q. My question is, is it your

**269**

1  understanding, like Ms. Gorman, that doctors paid
2  different rates to acquire drugs, or is it your
3  understanding that all doctors pay the same to
4  acquire drugs?
5      MR. COCO: Objection.
6   A. No, it's not -- my understanding is that
7  physicians are paying the same amount.
8   Q. What's the basis for your understanding
9  that all physicians are paying the same amount to
10 acquire drugs?
11  A. The absence of anything contrary to
12 that.
13  Q. So, you're saying you haven't seen any
14 evidence that would cause you to think otherwise.
15     MR. COCO: Objection.
16  A. No. No. This is the first time I've
17 seen this e-mail, so --
18  Q. What about the OIG report that we looked
19 at earlier, does that give you cause to think
20 maybe otherwise?
21     MR. COCO: Objection.
22  A. No, because prior to today, I hadn't

**270**

1  seen that report either.
2      Q. Okay. But you've seen it now. Does it
3  give you cause to think otherwise now?
4          MR. COCO: Objection.
5      A. No, not at all. There's lots of things
6  that come out of OIG that I wouldn't agree with.
7      Q. When the OIG is saying that AWP is not a
8  reliable indicator of the cost of a drug to
9  physicians, is that one of the things that come
10 out of OIG that you don't agree with?
11         MR. COCO: Objection.
12     A. I have no opinion on it. Again, I read
13 it this morning, I understand what it says, I'll
14 process that information.
15     Q. Can we agree that what Ms. Gorman is
16 emphasizing here is different to your own
17 understanding?
18         MR. COCO: Objection.
19     A. I would say it's different than my
20 understanding.
21     Q. And we can agree that your view and Ms.
22 Gorman's views are inconsistent with each other?

**271**

1          MR. COCA: Objection.
2      A. I would say that Lisa has her opinion,
3  and I have mine.
4      Q. I understand that.
5      A. And it's okay to disagree.
6          MR. COCO: We've been going about an
7  hour. Is this a good time?
8          MR. MANGI: Let's mark this as Exhibit
9  Fox 008.
10             (BCBSMA-AWP-12489-12494 marked
11 Exhibit Fox 008.)
12     Q. Now, the top left of Exhibit Fox 008 has
13 your name written at the top of the page, right?
14     A. Yeah.
15     Q. So, this is something that's been
16 printed out from your e-mail system?
17     A. Presumably.
18     Q. Would you turn -- can you see the
19 numbers on the bottom right that starts with
20 BCBSMA-AWP?
21     A. Yes.
22     Q. We refer to those as Bates numbers. I'd

**272**

1  like you to turn to the page Bates numbered 12493,
2  please. You'll see an e-mail for which the header
3  actually starts on Page 12492.
4      A. Uh-huh.
5      Q. You'll see it's from Jan Cook, dated
6  July 19, 2002 to V. DuLong at MMS Document, and
7  you're one of the cc e-mails. Do you see that e-
8  mail?
9      A. Yes.
10     Q. MMS is one of the societies, right?
11     A. MMS is Mass. Medical, yes.
12     Q. I'd like you to turn to No. 6 and Ms.
13 Cook's e-mail, the subject is "Inadequate Chemo
14 Reimbursement: We reimburse, as Medicare does,
15 AWP minus 5 percent. We understand in some
16 situations this is very fair to practitioners, and
17 in others, it may be less advantageous. We
18 generally feel this process evens itself out."
19 What was your understanding of what Ms. Cook was
20 saying when you received this e-mail?
21         MR. COCO: Objection.
22     A. Well, I don't think I received the e-

**273**

1  mail. I think I was copied on it. I'm on this e-
2  mail. One, I mean, I've gone to meetings at MASCO
3  but two, I think -- you're pointing out -- I'm
4  looking at other bullets where this would be
5  particular to me about how we would communicate to
6  physicians. So, I mean, I don't have any
7  recollection of this particular statement, and I
8  don't think I had conversations with Jan about it.
9      Q. Okay. Well, let me ask you to read it
10 now, and tell me what's your understanding of it.
11     A. As I said earlier, I'm not going to put
12 myself in someone else's shoes.
13     Q. I'm not asking you to. I'm asking you
14 what's your understanding of this e-mail of which
15 you were copied and of which you received a copy?
16         MR. COCO: Objection.
17     A. I don't -- I have -- my understanding of
18 all these other bullet points that I'm looking at,
19 which is probably what I would have focused on.
20     Q. Well, respectfully, let me rephrase the
21 question. I'm asking you to look at No. 6. I'm
22 asking you to read it now. And I'm asking you to

**274**

1  tell me what you understand it to mean.
2       MR. COCO: Objection.
3       A. (Witness reviews document.) I read it
4  and I see what Jan is saying. I don't know that
5  I'm the "we" in "we." Just 'cause I'm copied on
6  the e-mail doesn't mean I'm "we."
7       Q. "We" is the Blue Cross Blue Shield of
8  Massachusetts, isn't it?
9       A. Right. But what I'm saying -- I
10 understand what it says.
11      Q. Okay. Since you understand what it says
12 --
13      A. Yeah.
14      Q. -- let me ask you this: It says, "In
15 some situations, AWP minus 5 is very favorable to
16 practitioners --"
17      A. Sure.
18      Q. "-- and in others, it's less
19 advantageous."
20      A. Uh-huh.
21      Q. What do you understand that to mean?
22      MR. COCO: Objection.

**275**

1       A. At a global -- at a global level, yeah,
2  that the reimbursement -- well, no, actually --
3  (Witness reviews document.) I'm not even going to
4  speculate, because I don't -- to be honest with
5  you, as I read this, I don't even know.
6       Q. So, when you said earlier you understood
7  what this meant, are you now changing that
8  testimony?
9       A. Yeah, I'm actually rereading the last
10 sentence: "In general, we feel that this process
11 ... If this isn't the case --" I don't know if she
12 means AWP reimbursement or if she's talking -- I
13 don't know what she means by "In some instances
14 it's advantageous, and in other instances --" I
15 don't know specifically what she's referring to in
16 that bullet.
17      Q. Well, let's follow her logic. She says
18 that, "We reimburse as Medicare does at AWP minus
19 5 percent." Do you see that?
20      A. I do.
21      Q. Now, how would that be more favorable to
22 a physician in one setting and less favorable to

**276**

1  another physician?
2       MR. COCO: Objection.
3       A. Yeah, I don't know.
4       Q. Isn't the only way in which that would
5  be true if the physicians were acquiring the drug
6  at different prices?
7       MR. COCO: Objection.
8       A. I wouldn't necessarily draw that
9  conclusion.
10      Q. Well, would that conclusion be
11 consistent with what Ms. Cook is saying here?
12      MR. COCO: Objection.
13      A. Well, I would suggest that you ask
14 Doctor Cook. I'm not going to --
15      Q. I did that. But I'm asking you now.
16      A. I'm not going to --
17      MR. COCO: Objection. Sorry.
18      A. I don't know.
19      Q. Okay. Do you have another explanation
20 for what this paragraph means?
21      MR. COCO: Objection.
22      A. No, I don't. And I would probably have

**277**

1  been focusing -- my issues really would have been
2  more focused on the top set of bullets than the
3  bottom, 'cause they really apply to what I'm
4  doing.
5       Q. When communications are sent in to Blue
6  Cross Blue Shield of Massachusetts from providers,
7  is that -- do those communications come to your
8  department?
9       A. Where are you reading that or are you --
10      Q. No, I'm asking you.
11      A. Oh. Well, they could come into
12 individuals in my department, sure.
13      Q. Well, let me ask you to turn to the
14 front page of the e-mail.
15      A. Uh-huh.
16      Q. In the second e-mail from Nancy Marotta,
17 it says towards the middle of the e-mail, "If you
18 receive a paper claim, and the invoice is
19 attached, then price the drug to pay, whichever is
20 less, AWP minus 5 or the amount of the invoice."
21 Is that generally true of BCBS Massachusetts
22 reimbursement, i.e., is it the lesser of 95 of AWP

Steven J. Fox                                                    March 8, 2006
Boston, MA

**Page 278**

1  or the bill charge, or is this a unique situation
2  that's being referred to?
3      MR. COCO: Objection.
4      A. I don't know. I mean, I'm not -- again,
5  I'm not in the claims department, so I don't know.
6  Nancy was in the claims area, so --
7      Q. Well, it says above that, "Steve has
8  volunteered to take care of the communication to
9  the oncologists." Do you see that?
10     A. I do.
11     Q. So, presumably you understood what you
12 were supposed to communicate to the oncologists,
13 right?
14     MR. COCO: Objection.
15     A. I think what I was asked to communicate
16 to the oncologists is that if there's not a code
17 listed for the drug that they're billing, then
18 they have to tell us what they're billing for so
19 we'd know what to pay them.
20     Q. And you weren't communicating any of the
21 other points in the e-mail below?
22     MR. COCO: Objection.

**Page 279**

1      A. I don't know. I'd have to see what we
2  ultimately produced. But again, my view of this
3  would have just been, what do you want me to
4  communicate? Tell me what you want me to
5  communicate, and we communicate it.
6      Q. Have you searched your files for
7  documents relative to this litigation?
8      A. Yes, I think this is actually one of
9  mine, because that's my writing (indicating).
10     Q. What did you search for?
11     A. I searched for every file. I did a
12 search on my system, and I did a search in my
13 files for all of these subjects.
14     Q. Which subjects?
15     A. Whatever we were asked to look for, AWP,
16 pricing, a bunch of different things like that. I
17 -- so, we did a search on the system, pulled off
18 any communications we had, and then, you know,
19 searched through files and looked at anything that
20 I would have had in my file, to the best of my
21 knowledge.
22     Q. Did you provide any -- collect

**Page 280**

1  communications from providers going to the amount
2  of reimbursement that did not specifically mention
3  the word "AWP"?
4      MR. COCO: Objection.
5      A. I looked for every -- if it's a paper
6  communication, then I would have gone through all
7  my files to find paper communications that I could
8  put my hands on. I mean, again, I have thousands
9  of files. And I've been working there a long
10 time, so it's --
11     Q. Did you go through all those files?
12     A. I went through all my files.
13     Q. My question was, did you look for
14 communications from oncologists complaining about
15 the amount of reimbursement that did not
16 specifically mention the word "AWP"?
17     MR. COCO: Objection.
18     A. I would have looked -- if I had a file
19 that was an oncologist file, then I would have
20 handed that file over to counsel.
21     MR. MANGI: Let's mark this document as
22 Exhibit Fox 008.

**Page 281**

1      MR. COCO: I really do need to take a
2  break.
3      MR. MANGI: We can do that now. Exhibit
4  Fox 009. I'm sorry.
5      (BCBSMA-AWP-00054 marked Exhibit
6  Fox 009.)
7      (Recess was taken.)
8      Q. Now, Exhibit Fox 009 is -- Exhibit Fox
9  009 is a series of e-mails. I'd like to draw your
10 attention to the middle e-mail, which is from Mary
11 Powers to Anne Meneghetti, dated August 18, 1999.
12 Do you see that?
13     A. I see it.
14     Q. Who is Ms. Powers?
15     A. Mary worked for us in medical policy
16 administration.
17     Q. Did she report to you?
18     A. No. She reported to Anne, I think.
19     Q. And what was Anne's title at that time?
20     A. Anne was one of our medical directors.
21     Q. And Ms. Powers here says to Ms.
22 Meneghetti at the end of that e-mail, "I always

**282**

1  thought that the oncologists bought in bulk for
2  most drugs and therefore received a discounted
3  charge from the pharmaceutical companies. Maybe
4  not. Thanks." Do you see that?
5      A.  I do.
6      Q.  Now, is that consistent or inconsistent
7  with your understanding of what oncologists pay to
8  acquire drugs?
9      A.  I don't -- I mean, I don't know -- I
10 have not seen this before. I don't know what
11 Mary's referring to, but -- I mean, I understand
12 that physicians don't buy drugs one at a time.
13 So, I assume that physicians are buying more than
14 one drug at a time. I don't know -- I mean, I
15 wouldn't get -- this is Mary's world more than
16 mine. Her terms, "bought in bulk --" I wouldn't
17 take it all the way further, but I would assume
18 physicians buy drugs more than one at a time. I
19 would agree with that.
20     Q.  Referring to where she says, "I always
21 thought that oncologists bought in bulk for most
22 drugs, and therefore, received a discounted charge

**283**

1  --"
2      A.  Uh-huh.
3      Q.  -- that's the section that I am focusing
4  on. Is that consistent or inconsistent with your
5  understanding of the prices at which oncologists
6  buy drugs?
7      A.  I'm not -- I'm not aware of that last
8  statement. I don't have anything that -- I don't
9  have anything that would lead me to believe that.
10     Q.  Well, you testified earlier that you
11 thought all oncologists buy drugs at the same
12 price, right?
13     A.  Yeah. Yeah.
14     Q.  And that is inconsistent with the idea
15 of there being volume-related discount, right?
16     A.  Yeah, I would agree.
17     Q.  So, we can agree that Ms. Powers'
18 position as stated in this e-mail is inconsistent
19 with what you stated earlier in the day.
20         MR. COCO: Objection.
21     A.  Well, I -- again, I know what I said. I
22 don't know what goes into her -- you know, it's

**284**

1  hard to read people's mind in e-mails that are six
2  or seven years old. I wouldn't agree or disagree.
3  I'd just say it's different. Again, I'm not on
4  this e-mail chain, so I don't know what they're
5  trying to get at.
6      Q.  Now, if Blue Cross Blue Shield -- and
7  we're done with that document. If Blue Cross Blue
8  Shield of Massachusetts decided that it wanted to
9  get more information on what the physicians are
10 paying to acquire drugs that they administer in
11 their offices, would it have the means to do so?
12         MR. COCO: Objection.
13     A.  Well, I don't know what you mean by
14 would we have the means to do so? What is that?
15     Q.  Can you do it?
16         MR. COCO: Objection.
17     A.  I have no idea.
18     Q.  Do you know if there are any ways in
19 which to get that information?
20         MR. COCO: Objection.
21     A.  I'm -- there's not -- there's no manual
22 I can go to that says, Here's how it -- you know,

**285**

1  no. I mean, I don't know how you'd do that.
2      Q.  Well, let me show you another document.
3         MR. MANGI: Let's mark this as Exhibit
4  Fox 010.
5             ("Hooked on Drugs" marked Exhibit
6  Fox 010.)
7      Q.  Are you familiar with the publication
8  Barron's?
9      A.  I mean, know it's an -- I mean, I know
10 what it is. I don't read it, but I'm not
11 tremendously familiar with it.
12     Q.  You know it's a publication?
13     A.  It's a publication.
14     Q.  You'll see the date on this article is
15 June 10, 1996.
16     A.  I see that.
17     Q.  Okay. Now I'd like to draw your
18 attention to the table that's situated in the
19 bottom of the middle columns and the heading is,
20 "AWP, ain't what's paid." Do you see that?
21     A.  I can't really read it. If that's what
22 you say it says, then I'll --

**286**

1  Q. Let me show you where I'm reading.
2  Right there (indicating).
3  A. Okay. Yeah.
4  Q. And have you ever heard AWP referred to
5  as "ain't what's paid" before?
6  A. No, I've never heard of it. Oh, AWP,
7  ain't what's paid. I get it. No, I haven't.
8  Q. It says below that, "A sample of drugs
9  whose published average wholesale price is wildly
10 above the wholesale price available to almost any
11 buyer." Do you see that?
12  A. Now, where are you?
13  Q. It's directly under what we just looked
14 at.
15     MR. COCO: Right here. The first
16 sentence (indicating).
17  A. Oh, "sample of -- is wildly above --"
18 okay.
19  Q. You'll see in the table underneath, as
20 that line would suggest, there are different drugs
21 listed, their use, their maker, AWPs, wholesale
22 prices, and the percentage of which the actual

**287**

1  prices are under the AWPs. Do you see that?
2  A. I do.
3  Q. Okay. Now, I'd like to draw your
4  attention the fourth column, which is a column all
5  the way on the right, and the first full
6  paragraph, it says, "For about 300 dose forms of
7  the drugs, Barron's got the AWPs from the Redbook
8  and the Bluebook. Then we collected current
9  quotes from price lists from several leading
10 wholesalers specializing on sales to doctors, HMO
11 health firms, nursing HMOs, and hospitals." Do
12 you see that?
13  A. Yeah, I see it.
14  Q. So, you understand looking at that in
15 the table how Mr. Bill Alpert, who is the Barron's
16 reporter who wrote this article, went about
17 collecting this information, right?
18     MR. COCO: Objection.
19  A. No, I would say no. One, I've not ever
20 seen this. I've not read -- you've given me lots
21 of good reading material that I'll follow up on,
22 but I would have to spend time reading this entire

**288**

1  article to understand what it is he's trying to
2  say.
3  Q. Okay. Let me ask you to assume that the
4  way in which Mr. Alpert collected the information
5  that he lists on the table is using the
6  methodology he describes at Column 4, which is to
7  collect current quotes and price lists, okay?
8  A. Okay.
9  Q. I'm going to ask you to assume that.
10  A. Okay.
11     MR. COCO: I'll object.
12  Q. Would that sort of an inquiry be
13 something BCBS of Massachusetts could do if it
14 chose to do so?
15     MR. COCO: Objection.
16  A. Not necessarily.
17  Q. Why not?
18  A. I mean, I -- one, you know, I'm not
19 going to -- I can't speak for everybody in the
20 corporation. So, whether -- you know, an article
21 printed in 1996, there's lots of articles printed
22 in publications that we could refer to. So, I

**289**

1  mean, I'm not going to assume that we could take
2  this and do our own analysis similar to this. I
3  don't know that we could.
4  Q. Well, respectfully, you haven't really
5  answered my question. I'm asking about you as
6  someone in the provider relations department.
7  A. Could I have done this?
8  Q. Right.
9  A. No.
10     MR. COCO: Objection.
11  Q. Why not?
12  A. I don't have a Redbook. I don't know
13 what a Bluebook is. It's not what I would do in
14 my job.
15  Q. Okay. Let me ask you this: If you had
16 -- are you aware that Redbook is publicly
17 available; that it's a subscription service you
18 can buy?
19  A. Vaguely.
20  Q. Let me ask you to assume that to be
21 true.
22     MR. COCO: Objection.

**290**

1    A. Okay.
2    Q. You assume Redbook is publicly
3  available. If you wanted to know what the actual
4  acquisition costs were for drugs, is there any
5  reason why you couldn't make the same phone calls
6  and obtain the same price lists as a reporter from
7  Barron's did in 1996?
8        MR. COCO: Objection.
9    A. No, and this part of our reimbursement
10 is miniscule compared to a lot of the other
11 reimbursement work that I would do. So, I would
12 say no, because I wouldn't necessarily -- I mean,
13 first of all, I wouldn't -- I wouldn't know that
14 Redbook is publicly available. You are telling me
15 that now.
16   Q. Okay. Respectfully, you still haven't
17 answered my question. My question is, if you
18 wanted to collect this information, is there any
19 reason -- is there any reason why you could not
20 have done the same thing this reporter did by
21 collecting price quotes from price lists? Is
22 there any reason you couldn't have done that?

**291**

1        MR. COCO: Objection.
2    A. It's not something -- no. I mean, is
3  there any reason? I would say there is no reason
4  that I would do that, because that's not in the
5  scope of my responsibility, so there would be no
6  reason for me to do that. That's like asking me
7  if I would also, you know, practice medicine if I
8  read a couple of books. No.
9    Q. It's not because -- well, are you saying
10 that the acquisition costs for drugs are not
11 relevant to your job responsibilities?
12       MR. COCO: Objection.
13   A. No, I didn't say that either. What I'm
14 saying -- I'm answering your question, which is,
15 you're asking me to read an article from ten years
16 ago on a document that I had not seen and make a
17 bunch of assumptions which I'm not willing to
18 make.
19   Q. My question to you was, is there any
20 reason why you couldn't go out and do what this
21 reporter did? Your answer to me was that there's
22 no reason for you to do that, because this is not

**292**

1  relevant to your job. And since this is about
2  acquisition costs for drugs, my question is, are
3  acquisition costs for drugs relevant to your job?
4        MR. COCO: Objection.
5    A. Average wholesale price is what's
6  relevant to my job.
7    Q. What about acquisition costs for drugs,
8  are those relevant to your job?
9        MR. COCO: Objection.
10   A. No.
11   Q. So, you don't care what providers pay to
12 acquire drugs. You're focused only on the AWP.
13       MR. COCO: Objection.
14   A. I would say it's not that I don't care.
15   Q. Let me put it another way. It's not
16 relevant to you in your work in provider relations
17 what providers pay to acquire drugs.
18       MR. COCO: Objection.
19   Q. Is that your testimony?
20   A. It's relevant only to the extent that
21 there's a reason that I should be concerned about
22 it. Again --

**293**

1    Q. Is there --
2    A. -- as I said before, I'm assuming that
3  all of these are reasonable rates that are paid.
4  Okay. And if I felt that they weren't reasonable,
5  then I would probably want to go out and do the
6  work that you're referencing here, because there
7  would be a reason for me to want to explore this
8  further. But there really isn't.
9    Q. Well, if you had read this article in
10 1996 saying, "Published average wholesale prices
11 is wildly above the wholesale price available to
12 almost any buyer," would that have supplied a
13 reason for you to investigate acquisition costs
14 further, if you had read it at the time?
15       MR. COCO: Objection.
16   A. I don't know what I would have done at
17 the time.
18   Q. And similarly, if you had read the 1992
19 OIG report saying AWP is not a reliable indicator
20 of the cost of a drug to physicians, would that
21 have provided a reason for you to inquire into the
22 acquisition cost for drugs?

Steven J. Fox                                                        March 8, 2006
Boston, MA

**294**

1  MR. COCO: Objection.
2  A. I think as I said earlier, I don't -- I
3  don't know what I would have done in 1992 had I
4  read that. I didn't read it. So, I know that I
5  didn't -- you know, I'm not -- I can't read today
6  with a lens -- I can't read a document that old
7  with today's lens. It's just not relevant.
8  Q. Let me ask you another question. Are
9  you familiar with WAC or wholesale acquisition
10 cost?
11 A. No.
12 Q. You've never heard that term?
13 A. WAC, W-A-C?
14 Q. Right, wholesale acquisition cost.
15 A. No, not that term.
16 Q. Are you aware that wholesale acquisition
17 cost is another pricing number that's published in
18 the Redbook?
19     MR. COCO: Objection.
20 A. I don't -- no, I don't read the Redbook,
21 so I wouldn't know what's in it.
22 Q. Let me ask you about a specific drug

**295**

1  now. Are you familiar with the drug Remicade?
2  A. I don't know what the specifics are. I
3  think it's -- actually, I'm not sure if it's to
4  treat arthritis or something.
5  Q. Yeah, Remicade is an arthritis drug
6  that's manufactured by Centocor, which is a
7  subsidiary of Johnson & Johnson,
8  A. Okay.
9  Q. Now, I would ask you to assume that both
10 the wholesale acquisition cost, which is the WAC,
11 and the AWP for that drug are published in price
12 reporting services such as Redbook, okay?
13     MR. COCO: Objection.
14 A. I'm not going to --
15 Q. I'm asking you to assume it as a basis
16 for a question.
17     MR. COCO: Objection.
18 A. I can't assume it, because it's not -- I
19 don't -- I can't assume that.
20 Q. You can't assume anything?
21 A. If you're telling me that that's --
22 Q. I'm telling you.

**296**

1  A. If you are telling me that, then okay.
2  Q. I'm telling you, and I'm asking you.
3  A. I have no knowledge of that.
4  Q. I'm telling you, and I'm asking you to
5  assume that to be true.
6  A. Okay.
7     MR. COCO: Objection.
8  Q. Okay.
9  A. Okay.
10 Q. Now, I'll represent to you that
11 physicians purchase Remicade at a price that's at
12 or around the wholesale acquisition cost, which is
13 a published number, and reimbursement, when it's
14 tied to AWP, that AWP is also a published number.
15 My question is what -- well, let me give you
16 another piece of information: The AWP for
17 Remicade is 30 percent above the wholesale
18 acquisition cost for Remicade, okay?
19     MR. COCO: Objection.
20 A. If you're telling me that.
21 Q. Yeah.
22 A. Okay.

**297**

1  Q. So, the differential between the price
2  at which payers acquire -- withdraw that. The
3  differential between the price at which physicians
4  acquire Remicade and the price that they are
5  reimbursed for Remicade is approximately 30
6  percent, okay?
7     MR. COCO: Objection.
8  A. Okay.
9  Q. In that situation, is that a
10 differential or a margin that you would consider
11 reasonable or unreasonable?
12     MR. COCO: Objection.
13 A. I have no basis to know whether that is
14 or not.
15 Q. Well, you're aware, aren't you, that
16 you're the director of provider relations for a
17 company that's accusing Centocor and Johnson &
18 Johnson of having committed fraud in relation to
19 its pricing of Remicade. So, my question is, do
20 you have any position as to whether or not the
21 pricing of Remicade is fraudulent?
22     MR. COCO: Objection.

Steven J. Fox                                       March 8, 2006
Boston, MA

**298**

1    A. Our -- again, my knowledge would be the
2    AWP price, and in a -- and can go on from there.
3    You're introducing a term that I'm not familiar
4    with around this WAC.
5    Q. Let me ask you --
6    A. So --
7    Q. -- to then simply understand that the
8    actual acquisition costs are 30 percent below the
9    AWP --
10   A. Uh-huh.
11   Q. -- for Remicade, and that that number,
12   the acquisition price, is actually publicly
13   available. It's published.
14   A. Uh-huh.
15   Q. In that situation, is Centocor
16   committing fraud, in your opinion?
17        MR. COCO: Objection.
18   A. I'm not a lawyer. I can just tell you
19   that we expect fair and reasonable reimbursement.
20   Q. Okay. Expecting --
21        MR. COCO: Again --
22   Q. I'm sorry. I thought you were done.

**299**

1    Are you not?
2         MR. COCO: Adeel, let me complete my
3    sentence as well. The record doesn't reflect it,
4    but there are times when you start getting on a
5    roll with your questions, and you are cutting off
6    the witness before he has completed a sentence --
7         MR. MANGI: I strongly disagree with
8    that, but I'm happy to wait for the witness to
9    complete his answer.
10        MR. COCO: And you just did it now.
11        MR. MANGI: I did it to you, but I
12   haven't done it to the witness.
13        MR. COCO: For the record, I would just
14   ask that you pause to make sure that the witness
15   is done completing his answer before you proceed
16   to the next question.
17        MR. MANGI: That's fine. I interpreted
18   from the witness's pause that he was done. If he
19   wasn't done, I apologize.
20   Q. Were you done?
21   A. The point I was going to finish with is,
22   separate and apart from numbers which are, you

**300**

1    know, is this reasonable, is this not reasonable,
2    this is a business that we're in where 1 percent
3    margin, 2 percent margin that people are making is
4    make or break between staying in business and
5    going out of business. So, in that context,
6    again, what's reasonable? Reasonable is in the
7    eyes of beholder. And in the context of drug or
8    drug prices, I don't know if that's reasonable or
9    not. I'm not qualified to make a determination in
10   my role as director on the reasonableness of that
11   question.
12   Q. Do you personally, as the director of
13   provider relations, feel misled about anything
14   Centocor did around the pricing of Remicade?
15        MR. COCO: Objection.
16   A. If you're asking me personally, a 30
17   percent differential would not seem to be
18   reasonable. Again, 1 to 2 percent, 3 percent
19   margins that we're talking about in the business
20   that we're in is different than a double-digit.
21   Q. Now, so -- and a double-digit margin
22   you're saying would be unreasonable whereas 1, 2,

**301**

1    3, 4 percent would be reasonable?
2         MR. COCO: Objection.
3    A. I'm not going to qualify it. I'm just -
4    - in the example that you're using, given the
5    difference in the pricing that you're talking
6    about, that, again, I don't have direct knowledge
7    of, just answering your assumptions.
8    Q. Are you aware that the position you just
9    stated is flatly inconsistent with the position
10   that the Plaintiffs', Blue Cross Blue Shield of
11   Massachusetts, and others have taken in this
12   litigation? Are you aware of that fact.
13        MR. COCO: Objection.
14   A. I would have no knowledge of what's in
15   the --
16   Q. Are you aware that the Plaintiffs in the
17   litigation --
18        MR. COCO: Again, he did not finish.
19        MR. MANGI: He was clearly done with
20   that answer.
21   Q. Were you -- did you have something more
22   to say?

**302**

1  A. No.
2  Q. Okay. Now, are you aware that the
3  Plaintiffs in this litigation have taken the
4  position that the market has long known that there
5  is a differential between acquisition cost and
6  AWP? Are you aware of that fact?
7      MR. COCO: Objection.
8  A. Am I aware of what fact that --
9  Q. That the Plaintiffs have taken the
10 position that it's been long known in the
11 marketplace that there is a difference between the
12 price at which providers acquire drugs and AWP?
13     MR. COCO: Objection.
14 A. Not of the specific details, but I can -
15 -
16 Q. Are you --
17 A. -- I understand what you're -- I
18 understand.
19 Q. Are you aware of the fact that they've
20 taken that position?
21     MR. COCO: Objection.
22 A. Unless I -- no, not specifically.

**303**

1  Q. Are you aware of the fact that
2  Plaintiffs have taken the position that any
3  spread, up to and including 30 percent, is fully
4  within the market's expectations and is not
5  misleading or fraudulent?
6      MR. COCO: Objection.
7  Q. Are you aware that they've taken that
8  position?
9  A. No, not aware. Not aware.
10 Q. Does that cause you to reconsider any of
11 the testimony you've given so far?
12 A. Absolutely not.
13     MR. COCO: Objection.
14     MR. MANGI: Let's mark the next
15 document. What are we up to?
16     COURT REPORTER: Exhibit Fox 011.
17     (BCBSMA-AWP-12613-12614 marked
18 Exhibit Fox 011.)
19 Q. Take a look at that document and let me
20 know when you're ready.
21 A. (Witness reviews document.) I'm
22 familiar with this.

**304**

1  Q. All right. Now, this is a memo in which
2  you are a cc, right?
3  A. That's right.
4  Q. The second page of it under "Action
5  Items," it says, "Steve to work with Gary Shramek
6  and Kim Olson on AWP issue." What is that
7  referring to?
8      MR. COCO: Objection.
9  A. I don't know, actually, the only issue
10 that I would have worked on were drugs that did
11 not have assigned value because they were recently
12 FDA approved. That really would have been the
13 only thing I would have been tasked with.
14 Q. If you have a look at the paragraph to
15 which this action item pertains, you'll see it's
16 titled "Pharmacy."
17 A. Yes.
18 Q. One of the entries there says MASCO
19 voiced a dissatisfaction with AWP minus 5 percent
20 for chemo RX." Do you see that?
21 A. I see that, yes.
22 Q. Was that related to the AWP issue you

**305**

1  were tasked with working on?
2  A. No. My issue would have been, again,
3  prior to that, "Discuss new drug process," the
4  feeling was that if a new agent is listed in the
5  compendium, it should be reimbursed. Our policy
6  at the time was not to pay those claims because
7  they did not have an assigned value. It then says
8  -- the one that you're referencing says, "Also
9  discussed yearly development and reimbursement and
10 MASCO voiced dissatisfaction with that." That's
11 not necessarily my action item.
12 Q. Are you aware that for a period of time
13 Blue Cross Blue Shield of Massachusetts served as
14 a Medicare carrier for Massachusetts?
15 A. I am aware of it.
16 Q. Did you have any involvement with Blue
17 Cross Blue Shield of Massachusetts' work as a
18 Medicaid carrier?
19 A. No, I did not.
20 Q. Do you know who was in charge of the
21 carrier operations for Blue Cross Blue Shield of
22 Massachusetts?

**306**

1  A. What year are you referring to?
2  Q. Well, for what period of time was it the
3  carrier, as far as you know?
4  A. 1967? I mean, Medicare was formed in
5  1967. We've been working with Medicare -- I mean,
6  that's what I'm saying is we were a carrier in the
7  '80s, you know, early '90s. But I don't know who
8  was responsible for it. It was not my area. It
9  was a different division.
10 Q. Do you know when BCBS of Massachusetts
11 ceased to be a Medicare carrier for Massachusetts?
12 A. Sometime in the '90s. I don't remember
13 exactly when it was.
14 Q. Do you know of any current employees at
15 BCBS of Massachusetts who did have responsibility
16 for work on the carrier side of the business?
17 A. No.
18 Q. Do you know of any former employees who
19 had responsibility for that side of the business?
20 A. No.
21 Q. Are you aware that Blue Cross Blue
22 Shield of Massachusetts had a staff model HMO at a

**307**

1  point in time?
2  A. Yes.
3  Q. That was called Medical East Medical
4  West, right?
5  A. Yes.
6  Q. For what period of time did BCBS of
7  Massachusetts have that staff model HMO?
8  A. I don't know how long. Again, I came on
9  board when the staff models were in existence.
10 They were in existence from the '80s.
11 Q. When?
12 A. I don't know specific years and dates.
13 Q. When did BCBS of Massachusetts cease to
14 have a staff model HMO?
15 A. That was -- we spun off the health
16 centers as a separate corporation probably around
17 19 -- well, it's ten years. So, it's 1996,
18 probably 1997.
19 Q. Do you know who at BCBS of
20 Massachusetts, be it current or former employee,
21 would be knowledgeable as to how and/or what
22 prices staff model HMO acquired drugs?

**308**

1  A. I would have no idea.
2  Q. Do you know whether or not Blue Cross
3  Blue Shield of Massachusetts contracts with drug
4  manufacturers for rebates pertaining to formulary
5  replacement?
6  A. Manufacturers?
7  Q. Yeah.
8  A. We have a pharmacy benefit manager that
9  does our contracting, but --
10 Q. Okay. Is that Express Script?
11 A. That's correct.
12 Q. Does ESI contract on BCBS of
13 Massachusetts' behalf with manufacturers for
14 rebates?
15    MR. COCO: Objection.
16 A. I have no idea what their relationship
17 is or what they do.
18 Q. Okay. Do you know whether or not,
19 directly or indirectly, BCBS does contract with
20 manufacturers for formulary rebates?
21    MR. COCO: Objection.
22 A. Again, we don't contract with

**309**

1  manufacturers, so I wouldn't have any of that
2  knowledge. We contract with Express Scripts. I
3  don't know what Express Scripts does.
4  Q. Okay. How many employees does BCBS of
5  Massachusetts currently have?
6  A. Employees?
7  Q. Uh-huh. Do you know how many people
8  make up the organization?
9  A. Over 3,000.
10 Q. Do you know how many employees worked on
11 the carrier business before it was spun off?
12 A. No idea.
13 Q. Do you know whether it was a handful of
14 people or dozens of people?
15 A. I have no frame of reference. Again,
16 had little to no involvement with that side of our
17 business.
18    MR. MANGI: Let's mark the next
19 document.
20    (Group Primary Care Physician
21 Agreement marked Exhibit Fox 012.)
22 Q. Now, Exhibit Fox 012 is a boilerplate

Steven J. Fox                                                    March 8, 2006
Boston, MA

**310**

1  contract template, right?
2     A. Yes.
3     Q. Now, this particular template says,
4  "Entered into between BCBS --" then there are some
5  more words there "-- on behalf of the Plan's HMO
6  Blue products." Do you see that?
7     A. Yeah.
8     Q. Now, were there different templates for
9  different products?
10    A. Yes.
11    Q. And how many products does BCBS have in
12 total?
13    A. I don't know how many products. There
14 are 16 different templates.
15    Q. There are 16 different templates in
16 existence at the present time?
17    A. There's probably more than that, but the
18 boilerplate -- 16 boilerplates. Again, largely
19 the same, just different between primary care
20 physicians and specialists, group versus
21 individual, PPO, HMO, indemnity products.
22    Q. How often do those boilerplates change?

**311**

1     A. Not frequent.
2     Q. When you say 16 templates, are you
3  including within that hospital templates?
4     A. No, just physician.
5     Q. Just physicians?
6        MR. MANGI: For the record, we called
7  for the production of 16 templates. We've only
8  received about five.
9     Q. I'd like you to -- by the way, I asked
10 you earlier -- perhaps you can remind me --
11 there's only network correct BCBS only has one
12 physician network?
13    A. I would classify, again, one network.
14    Q. Turn to clause -- the Section 2.3 of
15 that contract, please. It's on Pages 5 and 6.
16    A. Uh-huh.
17    Q. Now, I'd like you to turn over to Page
18 6, and I'm looking at the last ten sentences of
19 that clause, "Moreover, the group understands and
20 accepts that some or all of the new offerings may
21 involve limited networks."
22    A. Right.

**312**

1     Q. What are limited networks?
2     A. It means in the future we could decide
3  to offer -- a product could be developed that did
4  not require all physicians participating in a
5  given network. So, this boilerplate contemplates
6  the future product offerings.
7     Q. And has a limited network ever been
8  developed, to your knowledge?
9     A. No, it has not.
10    Q. Turn to Section 1.9, please. Page 2.
11    A. And just for the last point, since you
12 made the reference about the number of
13 boilerplates, the reason that you don't is because
14 the recent changes in Medicare Advantage laws
15 required us to create separate boilerplates for
16 our Medicare business. So, several templates are
17 Medicare Advantage, so, just --
18    Q. Are those included within the 16?
19    A. Yes.
20    Q. How long have there been 16 standard
21 templates?
22    A. Probably just fairly recently. Fairly

**313**

1  recently.
2     Q. Last three years?
3     A. Last two years, yeah.
4     Q. How many templates were there in
5  existence before that time?
6     A. There should just be -- boilerplates?
7  It's largely -- it's this same language, just with
8  different headers. It should be one, two, three -
9  - there should really be four. Again, if you want
10 to say that HMO Blue products, PPO products, and
11 indemnity products are different then, again, four
12 contracts, but there could just be different words
13 at the top. But true boilerplates, there's really
14 only four. The additional ones are really recent.
15 So, I'm sorry. You were asking me to look at what
16 section now?
17    Q. Actually, I may be able to short-circuit
18 that. I'm asking you to turn to 4.15.
19    A. 4. what?
20    Q. 4.15 on Page 6.
21    A. Okay. Yeah.
22    Q. Now, this clause describes two types of