compensation available to physicians.
A. Uh-huh.
Q. There is the Fee For Service, and then the Member Management Fee program, right?
A. Uh-huh, yes.
Q. Now, the Fee For Service compensation is based on the lesser of the physician's charges or the amount listed in the fee schedule, minus any applicable copayment, right?
A. Yes.
Q. Okay. Now, in what percentage of cases are the physicians' bill charges lower than the amount on the fee schedule?
A. Physicians' billed charges lower than the fee schedule? I'm not aware of specific examples. We have 26,000 physicians in our network.
Q. Okay. Well, let me ask you to take a look at Clause 1.19, which is on Page 4 in connection with what we were talking about.
A. Uh-huh.
Q. It says -- it defines physician payment

benefit as, "The lesser of the charge for the covered service or the amount listed on the fee schedule," right?
A. Uh-huh.
Q. Now, how long has that lesser-of methodology been used in BCBS of Massachusetts contracts?
A. I don't know how long. I mean, it's -- I don't know specifically.
Q. If I wanted to look at claims data, for example, and figure out which claims were paid at the fee schedule rate, which ones were paid at the bill charge, how would I know which is which?
A. You wouldn't. You -- I mean, you wouldn't.
Q. So, there would be no way for me to figure that out?
A. No way that I --
MR. COCO: Objection.
A. No.
Q. Now, if you turn to Clause 4.15.4, please, which is on Page 17.

A. Uh-huh.
Q. This clause provides for 90 days written notice, right?
A. Yes.
Q. Okay. Now, other than the annual updates that we spoke about earlier, how often are fee schedules revised, in part or in total?
A. Once a year.
Q. So, the annual update is the only revision.
A. Yes.
Q. Now, and that update incorporates any negotiated variations, as well as any overall increases in reimbursement, right?
MR. COCO: Objection.
A. I mean, this is standard language in all of our agreements. So, there, again, this is an evergreen contract. There is no start and stop date to this. So, if we enter into a negotiation, they may have different dates and terms, but the language would be the same.
Q. What happens if a provider disagrees

with a change made by BCBS of Massachusetts to the fee schedule?
A. What happens if they disagree? I suppose they could let us know. If they don't, they could terminate their contract if they were that aggrieved by our rates.
Q. Now, sticking with this Section 4.15, we looked earlier at the Member Management Fee program, right?
A. Uh-huh.
Q. And that's described further at Appendix B to the contract --
A. Uh-huh.
Q. -- which is at Page 34 of the document. Do you see that?
A. Yeah.
Q. Now, are you generally familiar with the Member Management Fee program?
A. Yes.
Q. Okay. Describe it for me. What is that program?
A. It is an incentive program that is in

                                                          place for our primary care physicians that essentially can give physicians $1 to $3 per member per month based on clinical -- largely clinical HEDIS process measures.

Q. You lost me there with HEDIS process measures. What are those?

A. The measures are things like how many patients of yours were screened for cholesterol? How many patients are diabetic? How many patients are, you know, kids with asthma? And so, there are national standards, physicians need to hit those standards, we'll measure performance, and then there is an incentive that is reimbursed on top of their Fee For Service.

Q. Is this focused on meeting targets in relation to preventative care?

A. Prevent -- largely. Largely.

Q. And what are the goals of the MMF program?

A. The goals are to align physician incentives with ours; essentially to provide, again, in a largely fee-for-service environment,

to provide some additional earnings for physicians who take care of our patients -- our members.

Q. And what was the -- the additional compensation you referred to that's available, is that -- how is that calculated?

A. How is it calculated? It's calculated on an annual basis, and it's paid out twice a year.

Q. Is it a flat dollar sum --

A. Yes.

Q. -- related to -- if you meet the target, you get it, if you don't, you don't.

A. That's right.

Q. What faction of providers participated in the MMF program?

A. What time frame are we talking about?

Q. Let's start with -- for what time period are you aware of the MMF program having been in place?

A. The program was essentially created in 1999/2000, and we began paying physicians in 2000, and we pay physicians today. But it's -- when we

implemented this to today, it's very different.

Q. Did the name of the program change at one point?

A. No. It's been Primary Care Physician Incentive Program.

Q. So, from 2000 to the present time, what proportion of physicians have participated in the MMF program?

A. Well, there's -- this program specifically is -- well, there's 3,600 physicians that are in this program out of probably 5,600, 5,700 primary care physicians. So -- and then what we did is recently in the last few years what we've done is we've taken these measures and applied them into some of the other contracts that you referred to earlier. So, we don't call it the same thing, but we'll build quality and preventative measures in all of our contracts.

So, as a percentage, today, I would say that this program defined this way and also applied in other contracts, represents probably 90 percent of our reimbursement to primary care

physicians are in this model.

Q. Now, the contract says that Medicare-related products are not part of the MMF program. Why were those products excluded?

A. Why were they -- I'm sorry.

Q. Why were those products excluded from the --

A. This product only applies to our HMO book of business.

Q. Was there a strategic reason why it was limited to the HMO book of business?

A. I don't know that there was a strategic reason. I just think we limited it to this product line. We -- no, there's no strategic reason.

Q. The contract also describes two accounts that were held for purposes of the MMF program: The primary care physician account, the primary care team account.

A. Correct.

Q. Are you familiar with those accounts?

A. Well, they're not accounts.

Q. Well --
A. They're terms.
Q. Right.
A. Yes.
Q. That's a better way of putting it. What are those -- what are those, the primary care physician account and the primary care team account?
A. At the time it -- and we've since eliminated this -- the operations of it this way, but essentially, what it meant is that an individual primary care physician was responsible for services up to a certain pool or threshold, and then dollars were then rolled into a group-level account, if you will, so that the concept of primary care team, for lack of a better word.
When the program was -- when the program was created, I think we contemplated care being provided at an individual level, care being provided at a group level, but all of our payments are made at an individual level.
This specifically only applies to stop

loss or services in excess of $1,500.
Q. Let me ask you to turn now to Clause 4.12, which is on Page 11.
A. Uh-huh.
Q. It's "Compliance with the medical management and quality program." Do you see that?
A. Yeah.
Q. All right. The provision says, "The group shall allow the Plan to inspect and copy member records and shall comply with the Plan's request to provide copies of records. All information, records, and documents required shall be provided within a reasonable period of time and without cost to the plan." Do you see that?
A. Yeah.
Q. What fraction of actual signed contracts included this term?
A. This is standard language in all of our agreements.
Q. How often did Blue Cross Blue Shield of Massachusetts access member records pursuant to this clause?

MR. COCO: Objection.
A. I have no idea. We are -- on an annual basis, for purposes of what we call HEDIS or the Health Employer Data Information Set, we may be asked to verify information in the physician's medical record, and so, we are -- or some other group could be asked to pull medical records, so it happens. I don't know when, how often, or the number.
Q. Pursuant to this clause, would BCBS of Massachusetts have access to the providers' financial records?
A. No. This is limited to clinical.
Q. Would this include information on drug purchases by the physician?
A. No.
Q. Have you ever obtained or received a legal opinion as to whether or not BCBS can access doctors' drug acquisition records pursuant to this clause?
MR. COCO: And without saying what that opinion might be, you can answer yes or no.

A. Well, the answer is, I haven't asked, and again, this is in the section called "Medical Management," so there would be no reason for me to go down that line of thinking in this section. This is a really narrow, defined purpose for this language.
Q. And you're testifying based on your own understanding of the terms of that clause.
A. Yes.
Q. Section 4.12.4, "Primary Care Physician Utilization Levels."
A. Yes.
Q. It says, "The Plan shall monitor on a regular basis utilization levels of members." Is this also a standard clause in all of the contracts BCBS enters into with physicians?
A. I believe it is.
Q. What's the goal of monitoring physician utilization levels?
A. This is standard language so that in the event that we see a particular area where we're concerned about utilization, we have an

opportunity to notify the physician of that.

Q. What sort of concern would pique your interest?

MR. COCO: Objection.

A. No idea, because I've never implemented this section, so I couldn't tell you what it would be.

Q. Do you have an understanding as to who performs utilization level of review pursuant to these contracts?

A. It would be the Plan, capital P. So, it could be any area in the company that could do that.

Q. I understand it's the Plan. My question was, do you know who does it?

A. Not specifically, no. There is no -- there are no people in the company specifically looking at -- I mean, there's lots of people looking at lots of different utilization in lots of different areas. There's not really one area tasked with that work.

Q. Well, does BCBS of Massachusetts

monitor, on a regular basis, utilization levels of members pursuant to this clause?

A. Not at a -- not at a detailed -- not at a physician level. We look at it, as I think I said earlier, we're interested in looking at utilization patterns on a cross-service category basis. What this language allows us to do is that in the event we decided to go down to the physician level, we have the ability to do that. We don't typically do that.

Q. I'm sorry. What was the last part of that?

A. We don't typically do that.

Q. The section continues, "The Plan may terminate the group primary care physician's participation in accordance with this agreement if such utilization levels are deemed by the Plan to be outside of acceptable levels." Do you see that at the end of the clause?

A. I do, yes.

Q. Now, has BCBS of Massachusetts ever terminated a physician from the network as a

result of the utilization levels?

A. Not to my knowledge, no.

Q. Clause 4.13.1 now, this says that, "If the Plan requires copies or information from medical records or reports or patient account information maintained by the group," then provides the reason why that could be sought. "These shall be provided by the group promptly and without cost." Do you see that clause?

A. Yes.

Q. When the clause refers to "patient account information," what information is included within that?

A. This is a standard phrase. It's meant to include -- (Witness reviews document.) Essentially, the medical record. It could be the claim record. I mean, this is a generic term. It's not defined, and it's not meant to be specific. It's meant to include anything that could be patient account information if we needed to pull it.

Q. And what does "authorized research" mean

in that clause?

A. Where are you looking? Oh, I see it. Okay. (Witness reviews document.) I don't know. I haven't really focused on that sentence.

Q. Clause 7.2.1, please.

A. Say again.

Q. 7.2.1, please, which is on Page 28.

A. Yeah.

Q. Now, this provides for termination without cause on 90 days notice by the provider or BCBS of Massachusetts, right?

A. Correct.

Q. Now, what -- is this -- is this also a standard clause that's contained in all of the BCBSMA contracts?

A. It is.

Q. Are you aware of any instances where BCBS of Massachusetts has terminated provider contracts pursuant to this clause?

A. Which clause, with or without cause?

Q. Without cause, the clause we're in now.

A. I'm not aware of. There may have been

instances for peer review if a physician -- I'm sure there were. Physicians lose their license or they're convicted of a felony is grounds for immediate termination, and I know that's occurred. Sure.

Q. Well, that would be termination for a cause, wouldn't it?

A. I'm sorry. Without a cause? Have we -- I'm not aware that we've terminated a physician without cause.

Q. Are you aware of any instances in which BCBS of Massachusetts has terminated a physician's contract for reasons other than credentialing-related reasons?

A. I'm not aware. No.

Q. Now, let's take a look at another contract.

(Group Primary Care Physician Agreement, 2000, marked Exhibit Fox 013.)

Q. Now, this is another boilerplate template, right?

A. Correct.

Q. This is from 2000?

A. Correct.

Q. Now, this contract indicates that the Physician Incentive Program was changed to a program called the Primary Care Physician Incentive Program or PCIP?

A. PCPIP. No, that should have been the same as this one, yeah, same thing.

Q. Is the -- well, in the previous contract we looked at, there was a different name to the incentive program.

A. Oh, okay. Yeah. Member Management Fee program. I understand. Okay. The Member Management Fee program was a program in place, and as I mentioned to you, then -- I thought that was actually what I was looking at, because the language is largely the same. But we actually created a new program in 2000 -- was created in '99, we changed it in 2000 -- to be the Primary Care Physician Incentive Program, which is the program that's in effect today.

Q. So, it was a successor to the previous

program?

A. Correct.

Q. What were the differences between the MMF program and the PCPIP program?

A. The MMF program was created in the '90s, and it was -- it was probably more of a cost-based program for -- it was an incentive program, but it was based more on cost, less on quality. We really didn't implement it well. It was very difficult to explain. It was not -- it was hard to create reporting. And so, we transitioned off of that to this program, the PCPIP program.

Q. What do you mean when you say, "It was based more on cost"?

A. It was an attempt for us to have physicians be more aware of the cost of services, but it wasn't effective, because it just -- we had a grand idea for the program, but it really was not effective.

Q. So, how did the program change?

A. We essentially eliminated the cost component of the program and really focused more

on quality and quality-based measures, process measures, as I defined before. Whereas, the other program looked to measure a physician's performance against budgets and to reconcile and do things that were difficult to do at the individual or group level.

Q. Did the goal remain to incentivize preventative care?

A. The goal is to incent preventative care, yeah.

Q. And that remained a goal, even through the --

A. Correct.

Q. -- though the logistics of the program changed?

A. Correct.

Q. Now, is there a similar incentive program in place for specialists?

A. No, there's not.

Q. So, both the MMF and the PCPIP are only specific to primary care physicians?

A. That's correct.

334

Q. Let's look at one more contract.
(Group primary care physician agreement, 2002, marked Exhibit Fox 014.)
Q. Now, this is yet another template contract, right?
A. The template is different. I mean, you'll see the footers change over time as new provisions come in and out, but we do not repaper our network, so, the contract stays on the contract they're on. So, there have definitely been versions throughout the years. We just carry forward the boilerplate language. And if a law changes or if a covered term changes, we'll just amend it.
Q. This one's from 2002, right?
A. Yes.
Q. Okay. Now, if you take a look at Clause 7.2.1, please, which is on Page 24.
A. Uh-huh.
Q. This states, "This agreement may not be terminated without cause at any time by the Plan or the group."

335

A. Correct.
Q. Now, that's a change from the previous template we looked at that provided for termination without cause, right?
A. Yes, as a result of managed care reform in the State of Massachusetts, the law changed preventing termination without cause between plans and providers. So, we had to amend our boilerplates accordingly.
Q. Which legal requirement specifically are you referring to?
A. I don't know the chapter and verse. It's Managed Care Reform Act. I don't know what the -- what it is specifically.
Q. Is it your understanding that this is a Massachusetts statute?
A. It is.
Q. And that mandated this change?
A. That did.
Q. Did all Blue Cross Blue Shield of Massachusetts preexisting contracts also become subject to change as a result?

336

A. Again, we changed the language in the boilerplate so that any new physician would be subject to this language. We would send -- on that type of change, we would have sent a notice out to the entire network informing them that, while we could take the position that their other contract is still in place, because the law doesn't predate their contracts, operationally, that didn't make any sense; that we were going to essentially treat all physicians the same way and, you know, operationalize it exactly as it is here.
MR. MANGI: This is a good breaking point. Why don't we take a few minutes.
THE WITNESS: Okay.
(Non Fee Services Comparison marked Exhibit Fox 015.)
Q. Familiarize yourself with that document, please, Mr. Fox and let me know when you're done.
MR. COCO: Do you have an extra copy?
MR. MANGI: Yeah, sorry.
A. I have not seen this before. So, I'm not sure what it is, but what year -- oh, 1999.

337

Okay.
Q. Have a look at the second page of the document. Do you see a table there entitled "Milton Hospital"?
A. Yes.
Q. And you see there's an entry for "Redbook AWP," do you see that?
A. First column, yeah.
Q. And then there's an entry for "Acquisition," which is listed as "1999 AWP minus 35 percent."
A. I see that.
Q. Now, in 1999, Blue Cross Blue Shield of Massachusetts understood in this document that Milton Hospital was acquiring these drugs at AWP minus 35 percent, right?
MR. COCO: Objection.
A. I've never seen this document, so I'm not going to agree to that, 'cause I don't know what --
Q. How do you interpret this document?
MR. COCO: Objection.

A. I'm not going to interpret it, because I honestly don't know -- prior to today, I have not seen this. So, I read it. I'm reading the same thing you're reading.

Q. Well, you understand that you're testifying here as a corporate representative.

A. I do.

Q. So, my question to you is, as a corporate representative, what is your understanding of what this Blue Cross Blue Shield of Massachusetts document is listing?

MR. COCO: Objection. What is this top document in respect to and what are you asking him as a corporate representative?

Q. You can answer the question.

MR. COCO: No, I'm asking you for a clarification.

MR. MANGI: I'm referring to Categories, 2, 3, 7, and 8, the ones that you designated.

MR. COCO: I do not believe that that question is within the scope, and therefore, I object to your characterization that he is

testifying with respect to that question as a corporate representative. But you may answer.

Q. Go ahead. You can answer.

A. Yeah, I -- again, I'm not in the professional audit department, don't have responsibility for it. I see the columns on the paper, but again, I've not ever seen this. So, I don't know who would have produced it or what their knowledge of this would be. I don't want to put myself in their shoes.

Q. Now, as a matter of simple mathematics, you can see that the first column and second column, there's a difference of 35 percent between them.

MR. COCO: Objection.

A. It might be simple math for you. It is not for me. So, I see that there is a different price in the column. Whether that's 35 percent or 10 percent, I don't know.

Q. Let me ask you to assume that the difference is 35 percent, which is what the document suggests. Is it your testimony that you

have no understanding whatsoever what could possibly be meant by the word "acquisition" in this document?

MR. COCO: Objection.

A. I have not ever seen this and --

Q. That wasn't my --

A. -- it would not be in the scope of my knowledge. So, no, I don't know what they're meaning by "acquisition." I mean, I could assume lots of things, but I wouldn't assume anything.

Q. Okay. Again, just so we're clear. I'm not asking you what your job responsibilities are. I'm not asking if you've ever seen this document before. My question is, as you look at it now, is it your testimony that you have no idea what's meant by the use of the word "Acquisition" in the second column of this table?

A. Why I'm saying no is because this is a hospital, and you know, my knowledge or understanding on a physician side, I don't know how it could possibly apply on the hospital side. I don't work with hospital pricing. So, I'm not

going to assume. I don't know what that "Acquisition" means.

Q. If hospitals were getting discounts on their purchases of drugs, wouldn't you be interested in knowing that because it may impact what discounts physicians can get on drugs?

MR. COCO: Objection.

A. No, I wouldn't be interested at all. The physician reimbursement and hospital reimbursement are not the same.

Q. I'm talking about acquisition. Wouldn't the fact that hospitals are getting discounts on acquiring drugs be relevant to you? Would you be interested to know that because it may reflect on the fact that physicians could also be getting discounts in acquiring drugs?

MR. COCO: Objection.

A. Not to me, no. This is not -- you're in a really narrow area of services. I would not sit in a room and have dialog about acquisition cost. And so, no, I would say it wouldn't occur to me, because I don't recall having those conversations

342

in general.
Q. So, even if others at BCBS knew that hospitals were getting discounts in the region of AWP minus 35 percent on certain drugs, that would be of no interest to you as someone who works in the provider relations department.
MR. COCO: Objection.
A. That would be of no interest.
Q. And indeed, if hospitals were getting other kinds of discounts or discounts at different rates, none of that would be of interest to you, because these are hospitals and you're concerned only with physicians.
MR. COCO: Objection.
A. Yeah, that's accurate.
(BCBSMA-AWP 00047 marked Exhibit Fox 016.)
Q. Have you ever seen this document before?
A. I have not ever seen this. No, I don't even know where it comes from. So, I don't know. No.
Q. Do you know whether or not any analysis

343

was performed at BCBS of Massachusetts when contemplating whether or not to move from 95 to 100 percent of AWP?
A. I haven't been involved in those conversations, so, no.
MR. MANGI: Okay.
(BCBSMA-AWP 10002-10005 marked Exhibit Fox 017.)
Q. Now, we'll turn to Exhibit Fox 017 in just a minute. Let me ask you a more general question first. You recall when we looked earlier today at the 1992 OIG report?
A. Today. I saw it today, yes.
Q. And you recall we also looked at a 1996 Barron's article, right?
A. Yes.
Q. And I believe one of your objections to the questions I was posing regarding those documents was that -- being they had not been -- you had not seen them before, and you didn't know whether anyone at BCBS of Massachusetts had seen them before, right?

344

A. I know I haven't seen them. I don't know if other people have or not. I know I haven't.
Q. Now, this is an extract from a document named "POS Outcomes." And it says, "It's the newsletter for pharmacy benefit plan manager," dated January 2002. Do you see that?
A. I see that.
Q. Are you familiar with this publication?
A. I've never seen it before.
Q. Now, draw your attention to the second column, and the last paragraph, second sentence of that states, "Physicians buy injectable drugs at lower costs than the charges submitted to health plans for reimbursement." Do you see that?
A. I see that.
Q. Do you agree or disagree with that statement?
MR. COCO: Objection.
A. As I said earlier, I have -- again, I'm reading this for the first time. I don't know. It's not my -- it's not my understanding.

345

Q. So, you disagree with it?
A. No, I'm not agreeing or --
MR. COCO: Objection.
A. -- disagreeing. It just says physicians buy injectable drugs at lower cost. I have -- prior to today, have no data to understand if that's true or not. I just don't --
Q. Well, you say -- I'm sorry. Were you done?
A. Yes.
Q. You said, "That's not my understanding." My follow-up was asking what do you mean when you say, "That's not my understanding"?
MR. COCO: Objection.
A. What's the -- now I don't even know what you're asking me.
Q. I read out this sentence, and I asked you if you agreed with it. You said, "That's not my understanding." What I'm asking is, are you saying that you have an understanding that's different from what's stated here, or are you saying that you have no opinion as to whether

346

that's true or not?
A. Yes. So, now I understand the question. No, I have no opinion. I read the statement, but I have no opinion on it.
Q. Let me ask you to turn to the last page of that document. You see that this newsletter was addressed to Gary Shramek, who was a director of pharmacy programs at Blue Cross Blue Shield of Massachusetts?
A. That's what it says, yeah.
Q. Do you know Mr. Shramek?
A. I don't know him personally. I know who he was, sure.
Q. Is he still the director of pharmacy programs?
A. No.
Q. When did he retire or move to a different position?
A. Within the last few years.
Q. Did he retire or move to a different position?
A. No, he didn't retire. He left. Left

347

the company. I don't know what he's doing now. I just know he left the company.
Q. Is the fact that the director of pharmacy program at Blue Cross Blue Shield of Massachusetts received information in 2002 that physicians buy injectable drugs at lower cost than the charges submitted for reimbursement, is that something that would have any bearing on BCBS's determination of what it reimburses?
MR. COCO: Objection.
A. Just because it was received doesn't mean it was read. I get hundreds of these communications a month, and I don't read half of them.
Q. Okay. If it was read.
A. I wouldn't --
MR. COCO: Objection.
A. I really wouldn't know. I don't know how important this is in the bigger scheme of things, and I have no idea what Gary would or wouldn't have been thinking. Gary wasn't involved in meetings that I was in, so I couldn't give you

348

an opinion on that really.
Q. Now, earlier in the day you said you understood AWP as a sticker price. Do you recall that testimony?
A. Yeah.
MR. COCO: Objection.
Q. Now, is that a phrase that you came up with in response to my question, or is that something you've heard elsewhere?
A. No. Actually, I came up with it as you asked the question. I was trying of think of my own -- what would I refer to it as? But it's not something I've heard and certainly not something I've heard out in the field or anything like that.
Q. Well, help me understand your thought process there. What were you thinking about when you used that -- when you came up with that analogy?
A. Just the fact that that's a number. It's posted. It's an index. It's a reference. I suppose I could have just said it's a reference. I think a sticker price or something to that

349

respect, just for me, it's more of an understanding of what it is.
Q. And when you say, "sticker price," were you analogizing to the sticker price on a car?
A. Yeah, I think I did. Again, just as the fact that that may or may not be the final price.
Q. Now, carrying that analogy forward, when you purchase a car, I believe you said -- you referred to the fact that, well, there is a sticker price, and then there is an invoice price, and then there's the real price. Do you recall that?
MR. COCO: Objection.
A. Yeah, I think I used that, yeah.
Q. Now, when you're buying a car, the real price will vary from car to car, right?
MR. COCO: Objection.
A. I'm not here to talk about car manufacturers and I'm not an expert in that field. I only know about the cars I buy, and I'm not a very good negotiator so --
Q. As an adult in the American car-loving

350

society, the -- we can certainly -- though we haven't agreed on much today, we can agree that cars have different prices, right?
A. They may.
Q. A Mercedes has a different price from a Skoda.
A. I would agree with that.
Q. Now, for all cars there is the analogy we talked about where there is a sticker price and then there is an invoice price and then there is a real price, right?
MR. COCO: Objection.
A. There is -- I understand.
Q. Okay. So, you agree with that.
MR. COCO: Objection.
A. I agree that there is a price and then there is a final price, and how you get from one to the other is not relevant.
Q. And if you were buying a car, you'd get from one to the other through a process of negotiation, right?
A. Among other means.

351

MR. COCO: Objection.
Q. As well as research?
MR. COCO: Objection.
A. It depends what you mean by "research."
Q. Well, to use the example you gave earlier, you would try to find out what the invoice price for the car is, right?
MR. COCO: Objection.
A. Today, I probably would.
Q. Go to Edmonds.com. Now, for different cars, the Mercedes versus the Kia, the relationship between the real price that you end up with and the sticker price will vary from car to car, right?
MR. COCO: Objection.
A. I don't know. If it does, it -- you know it shouldn't vary by all that much or else it would be irrelevant.
Q. But it will vary because you're individually negotiating your purchase price, right?
MR. COCO: Objection.

352

A. Again, I don't -- if you want to talk about cars, we can talk about cars. I don't see what that has to do with --
Q. Let's talk about cars.
MR. COCO: Well, there are --
Q. You can note your objection.
MR. COCO: Even though in depositions there are objections to relevance --
MR. MANGI: That's correct. There are. So, let's go ahead.
MR. COCO: -- there does become a point where you are so far afield that you're outside the scope of discovery.
MR. MANGI: We're not. We're following an analogy the witness came up with. You've made your objections. That's fine. Now I'd like an answer, please.
MR. COCO: I'm going to put my objection on the record --
MR. MANGI: You already did that.
MR. COCO: -- which is that, to the extent that you're trying to then take this

353

analogy for an improper purpose, that I believe that is outside the scope of discovery and improper use of deposition time.
MR. MANGI: Okay. Now, respectfully, I would ask that you make your objections and not make speaking objections.
Q. Now, let's carry forward the analogy we're discussing. When you're buying a Mercedes and you're negotiating a price, you may be able to negotiate a different discount off the sticker price than you'd be able to negotiate for a Kia, right?
MR. COCO: I don't mean to interrupt, but can I just have a standing object to the wholesale car analogy so I don't have to interrupt you?
MR. MANGI: Sure. Done.
A. Say again.
MR. MANGI: Would you mind repeating my question.
(Question read back.)
A. I suppose.

Q. Okay. Be able to negotiate a certain percentage off on your Mercedes and a different percentage off on your Kia?

A. I suppose.

Q. It will vary from car to car, from buyer to buyer, from dealer to dealer, right?

A. The price of the car may vary, but the relationship between the price of the car and what I pay, though the numbers may be different, the relationship between them shouldn't be different.

Q. Okay. What should the relationship be?

A. There should be some relationship between that -- if there's no relationship between the sticker price and what I pay, then what's the point of having a sticker price on the car in the first place?

Q. It's a starting point for negotiations, isn't it?

A. Does it say it on the sticker price -- I have not walked into a car dealership where they say, Here's the starting point of our negotiation. It's the advertised price of the car.

Q. Right. I mean, they don't see that, because otherwise, it would be difficult for them to negotiate. But my question is, isn't it understood by you, as a buyer and by the dealer that the sticker price is a starting point for negotiation?

A. Well, if you use -- want to take the car analogy, on my car I paid the sticker price for my car. Maybe I'm a fool, or maybe that's the car I wanted, and there was no negotiation. So, if you're asking me to take that analogy, I'd say in my case, the sticker price became the price I paid. And there was no difference, and there was no difference between the sticker price, the invoice price, and what I paid.

Q. Okay. Now, let's get back to when you made this analogy to the sticker price to drugs.

A. Uh-huh.

Q. For a car, as you said, there is the sticker price, there is the invoice price, and there is the real price. By analogy were you saying that for drugs, similarly, the AWP is the

sticker price and then there is a different price that's the real price?

MR. COCO: Objection.

A. I think I was trying to say that AWP is the price, and I -- I'm saying that that's the price. That's the price that's posted. That's the price that we're seeing, and that there could be differences between that and what's ultimately paid by us to the physician. I'm not getting into the -- I'm not getting into all of the granularities between how it gets to the physician and how -- I'm just talking about what we reimburse them in relation to what they're being reimbursed from the drug manufacturer.

Q. So, like the sticker price, the AWP price is a starting point or a benchmark from which you discount the amount you're going to pay in reimbursement to physicians.

MR. COCO: Objection.

A. Not necessarily, because it's not -- again, our methodology is AWP minus 5 percent.

Q. That's the discount --

A. We don't have AWP minus 5, 10, 15, 30. It's one number. So it's -- if the numbers are different, then it would make the standard of comparison very difficult to --

Q. Let me ask you this: If physicians actually purchase drugs at AWP and you reimbursed all physicians at 95 percent of AWP, wouldn't all physicians be losing money?

MR. COCO: Objection.

A. I guess you'd have to ask them.

Q. Well, isn't that obvious in --

MR. COCO: Objection.

A. It's not obvious to me.

Q. Okay. If all physicians purchased drugs at AWP and Blue Cross Blue Shield of Massachusetts reimbursed them at 95 percent of AWP, which is 5 percent less than what they are paying to buy their drugs, how can -- how would there be any other conclusion, looking at that, other than the fact that they're losing money?

MR. COCO: Objection.

A. Because we pay different amounts for

services.
Q. I'm focusing on the drugs only.
A. And I'm saying that I'm not drawing that analogy, because physicians don't get reimbursed from health plans their charges. And so, are they losing money every time they see one of our members, because we're paying them at a rate that's different than their charges? So, I can't follow your analogy, because I don't have a basis to compare it on.
Q. Are you saying that one would have to consider the overall reimbursement, and that one aspect of reimbursement could offset another, such as service reimbursement could offset drug reimbursement?
MR. COCO: Objection.
A. No, I don't think I said that.
Q. Well, you said you also have to look at services. What did you mean by that?
MR. COCO: Objection.
A. No. What I'm saying is that when you asked the statement, wouldn't you agree that a

physician is losing money, what I'm saying is I couldn't -- I have a basis of comparison, because in a separate set of circumstances, physicians have services rendered to their patients, they bill insurance companies, and they receive a rate. The rate is not their billed charge. The rate is something less. But there is an understanding that there is some relationship between the rate and what they're billing. So, again, I mean, there is not this detail level of -- I'm not at this incredibly detailed level that you are, because it's not part of a -- I don't have these day-to-day conversations.
Q. So, you're saying there is some relationship but you're unable to define that relationship other than to say it should be reasonable.
A. Yes.
MR. COCO: Objection.
A. It should be reasonable.
Q. And when you referred to AWP as inflated also earlier in the day -- well, withdraw that.

When you say there is a relationship and that relationship should be reasonable, the whole understanding that you just described, how long have you had that understanding of AWP?
MR. COCO: Objection.
A. I think I answered it this afternoon. I mean, I don't -- I don't have dates. I don't know. It's just been my understanding.
Q. Has it been your understanding since you worked in this area?
A. My understanding since I've worked in this area is that we reimburse physician drugs on an AWP model. The AWP model then changed to different percentages. I did not have a detailed working knowledge of the relationship between all of those prices. That's what I'm saying.
Q. And now, when you use the word "inflated," referring to AWP, how does that relate to the sticker price analogy that you presented --
MR. COCO: Objection.
Q. -- earlier today?
A. I don't know if it -- I don't know how

it does relate other than the price. Well, again, I think, as I said earlier, maybe "inflated" isn't the right word.
Q. Okay. What is the right word?
A. That AWP is an index. And it's an index from the industry that we use.
Q. What do you mean when you say, "index"?
A. It is a price point. It is something that is taken -- I take AWP as -- AWP as coming from the industry, and that's what we use. There's not conversation that I'm involved in where -- let's break down what we mean by AWP. I mean, I'm not in those conversations. AWP is a number. Whether it's the right number, whether it's high, low, it's the number that I have as a reference point. Whether I believe it's right or wrong or whether physicians have referred to it in different ways, AWP is the index.
Q. So, whether it's high, low, or whether - - however the industry has referred to it, that's not relevant to you?
MR. COCO: Objection.

A. Prior to today, no.
MR. MANGI: I have no further questions.
MS. ROWE: No.
MR. COCO: Just one. Hopefully, just one.

EXAMINATION
BY MR. COCO:

Q. Following up on sort of this general topic, during your deposition testimony today at various points you've been asked to consider specific percentages relating acquisition costs and AWP. Do you recall that testimony?
A. Yes, I do.
Q. Prior to today, had you considered this topic in terms of any specific numbers or percentage ratios?
A. Not -- not ever.
MR. COCO: That's all.
MR. MANGI: Okay. We're done.
(Whereupon the deposition ended at 5:03 p.m.)

__________________________
STEVEN J. FOX

Subscribed and sworn to and before me this _______ day of _________________, 20____.

______________________________
Notary Public

Commonwealth of Massachusetts
Middlesex, ss.

I, P. Jodi Ohnemus, Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that there came before me on the 8th day of March, 2006, the deponent herein, who was duly sworn by me; that the ensuing examination upon oath of the said deponent was reported stenographically by me and transcribed into typewriting under my direction and control; and that the within transcript is a true record of the questions asked and answers given at said deposition.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition is taken; and, further, that I am not a relative or employee of any attorney or financially interested in the outcome of the action.

IN WITNESS WHEREOF I have hereunto set my hand and affixed my seal of office this 8th day of March, 2006, at Waltham.

_______________________
_______________________

P. Jodi Ohnemus, RPR, RMR, CRR
Notary Public,
Commonwealth
of Massachusetts
My Commission Expires: 4/21/2007

A

**aamangi@pbwt....** 3:18
**ability** 245:17 261:21 262:4,8 262:12,14,14 264:8 327:9
**able** 27:14 56:1 313:17 353:9,11 354:1
**absence** 269:11
**absent** 187:6
**absolutely** 53:5 303:12
**accept** 249:6
**acceptable** 243:19 327:18
**accepts** 311:20
**access** 220:6 221:6 323:21 324:11,18
**account** 196:5 217:22 218:10 222:13 321:18,19 322:7,8,15 328:5 328:12,20
**accounts** 29:11 82:19,19 218:4,8 218:12 222:5 223:4 321:16,21 321:22
**accurate** 112:13 114:3 124:13 134:21 142:10 150:13 151:11 152:1,16 153:2,5 153:8 186:21 206:22 229:22 342:15
**accurately** 101:18
**accusing** 297:17
**achieved** 106:22
**acknowledging** 142:5
**acquire** 32:3 53:13 130:18 135:16,21 137:6,20 138:2,6 139:2,15 142:17 152:17 154:17 155:7,11 157:13 157:20 163:2 167:19 168:3 174:4 176:8 261:22 262:5,19 264:8 266:17 269:2,4,10 282:8 284:10 292:12,17 297:2,4 302:12
**acquired** 48:12 51:16 58:2 307:22
**acquiring** 276:5 337:15 341:13,16
**acquisition** 31:6 51:19 57:17 58:12,16 136:3 136:12 140:20 143:7,13 145:2 145:22 146:9 148:11 149:2 167:18 168:9 169:7,20 173:17 175:19 176:3 181:22 182:18,19 184:17 185:8,21 186:13 191:7 290:4 291:10 292:2,3,7 293:13 293:22 294:9,14 294:16 295:10 296:12,18 298:8 298:12 302:5 324:19 337:10 340:2,9,16 341:2 341:11,20 362:12
**acronyms** 38:15
**Act** 335:13
**acting** 222:6
**action** 8:9 41:4 304:4,15 305:11 364:11,13
**ACTIONS** 1:10
**activities** 226:12
**actual** 69:1 130:6 130:17 257:16 258:8,20 286:22 290:3 298:8 323:16
**ad** 18:22 19:3,18 20:7,9 35:14
**added** 230:14
**addition** 200:19 234:17
**additional** 230:5 313:14 319:1,3
**addressed** 346:7
**addressing** 160:14 160:16 184:9
**Adeel** 3:14 7:8 158:20 161:19 299:2
**adequate** 71:4 75:21
**adjust** 69:14 73:10
**adjustments** 242:9
**admin** 201:2,5,6 237:16,18
**administer** 32:4 163:3 284:10
**administered** 30:4 32:2 49:10 57:20 61:7 62:17 64:14 65:15 85:12 86:5 87:13 89:22 111:14,18 112:8 114:19 117:9 118:11,15,18 119:8 121:16 123:3,19 124:3 125:17 141:10 166:15 168:20 237:11 262:1
**administering** 177:19 205:3
**administers** 32:12 85:21 201:21
**administration** 194:20 195:3,17 196:17 197:17 198:8 226:16 281:16
**administrative** 59:4,5,7 228:17
**admission** 49:18
**adopt** 201:10 206:11 231:8,10
**adopted** 183:1 184:8
**adopting** 182:4 206:8 230:16
**adult** 349:22
**advance** 259:4,6 261:2
**Advantage** 208:20 208:22 209:2 312:14,17
**advantageous** 272:17 274:19 275:14
**advertised** 354:22
**advisory** 20:11,14 20:15,16 21:2,18 24:1,3,7,21 26:7 26:20 28:8 29:19 30:16 31:2,5,9 34:3,4,5 41:9,21
**affect** 247:17
**affiliated** 54:10,15 54:18
**affixed** 364:14
**afield** 352:12
**afternoon** 213:1 360:6
**agent** 305:4
**aggregate** 81:15
**aggrieved** 317:6
**ago** 38:20 112:17 159:9 162:14 228:4 291:16
**agree** 74:21 87:10 87:17 88:8 101:1 102:20 138:11 148:16,18 149:16 149:20 172:11,15 174:10 185:10,15 185:17 186:6 203:17 204:7,8 218:18 264:22 270:6,10,15,21 282:19 283:16,17 284:2 337:19 344:17 350:2,7 350:14,16 358:22
**agreed** 162:17 220:20 345:18 350:2
**agreeing** 345:2
**agreement** 5:22 6:4 6:6 120:17 309:21 327:16 330:19 334:3,20
**agreements** 316:17 323:19
**ahead** 94:1,3 120:8 123:17 144:14 161:21 172:8 178:16 203:3 339:3 352:10
**ain't** 285:20 286:5 286:7
**align** 318:20

**alleging** 173:13
**allow** 14:14 206:10
  259:3,3 323:9
**allowed** 102:2
**allows** 327:7
**Alpert** 287:15
  288:4
**amend** 334:14
  335:8
**American** 349:22
**Americas** 3:15
**amount** 66:11,16
  87:14 92:18
  132:1 139:13,15
  140:16,17 141:6
  141:8,11 160:4
  165:15 168:3
  197:18 199:19
  221:19 244:1
  269:7,9 277:20
  280:1,15 314:8
  314:13 315:2
  356:17
**amounts** 71:2
  75:20 77:17 79:5
  81:5,9 86:22
  95:22 109:3
  157:8 159:21
  161:13 162:16
  204:16 357:22
**analogize** 135:11
**analogizing** 349:4
**analogy** 348:18
  349:7 350:8
  352:15 353:1,7
  353:15 355:8,11
  355:17,21 358:4
  358:9 360:19
**analysis** 5:11 89:21
  90:2,19 187:18
  188:20 198:18,20
  202:13 256:8,12

256:13,17,21,22
  257:5,9 289:2
  342:22
**analysts** 90:15
**analytical** 255:20
  257:2
**analyze** 86:22 89:9
  211:7,9,10
**analyzing** 200:1
**Andrew** 234:4
**and/or** 307:21
**Anne** 281:11,18,20
**Anne's** 281:19
**annual** 256:15
  259:10 260:19
  261:8,11,19
  316:5,9 319:7
  324:2
**annually** 247:3
  255:4
**answer** 12:3 19:13
  53:12 65:16,18
  74:1 78:21 94:1
  105:3,4,6 144:11
  150:9,12 151:10
  161:20 163:6,11
  170:9 174:12
  183:9 187:12
  201:14,17 202:1
  202:4,5 209:22
  238:12 291:21
  299:9,15 301:20
  324:22 325:1
  338:15 339:2,3
  352:17
**answered** 289:5
  290:17 360:6
**answering** 291:14
  301:7
**answers** 364:9
**anybody** 115:21
  265:14

**anyone's** 94:16
**apart** 299:22
**apologize** 299:19
**apparently** 246:18
**APPEARANCES**
  2:1
**appears** 251:15
**append** 11:12,21
  12:1
**Appendix** 181:5
  317:11
**applicable** 1:14
  196:5 314:9
**application** 12:17
  15:14
**applied** 9:12 88:14
  101:20 102:17
  103:2 108:4
  144:22 182:16
  241:17 320:15,21
**applies** 250:15
  251:3 321:8
  322:22
**apply** 9:7,16 10:2
  10:13,17 15:1
  69:15,15 73:12
  124:22 196:11
  222:20 237:6
  246:4,6 249:9
  277:3 340:21
**applying** 68:19
  206:9,21
**approaches** 88:12
**appropriate** 12:17
  68:10 88:5 217:9
**approved** 39:18
  304:12
**approximately**
  42:6 86:7 192:13
  247:3 260:13
  297:5
**approximates**

165:16
**April** 248:11
**area** 14:22 16:21
  65:20 75:18
  76:10,14 91:12
  129:9 130:5
  184:19 194:4
  210:1 230:5
  231:18 232:8,11
  233:11,15 257:14
  278:6 306:8
  325:21 326:12,20
  341:19 360:10,12
**areas** 87:20 232:20
  233:4,8 234:16
  257:22 326:20
**area's** 258:12
**argue** 131:11
**argument** 75:13
  79:5
**arguments** 80:9
**arrangement**
  108:11 120:2
  122:13
**arrangements**
  32:11 121:10,14
  259:22
**arthritis** 295:4,5
**article** 285:14
  287:16 288:1,20
  291:15 293:9
  343:15
**articles** 288:21
**asked** 25:22 56:9
  105:2,5 131:14
  150:11 162:15
  187:3 278:15
  279:15 311:9
  324:5,7 325:1
  345:17 348:11
  358:22 362:11
  364:9

**asking** 13:18 53:11
  56:4 71:14
  148:18 159:5
  171:22 172:15,17
  178:17 179:19
  180:11,12 186:2
  186:5 204:6
  205:15,19 262:11
  262:18 265:3,21
  266:6,16 268:15
  268:17 273:13,13
  273:21,22,22
  276:15 277:10
  289:5 291:6,15
  295:15 296:2,4
  300:16 313:15,18
  338:13,16 340:12
  340:13 345:12,16
  345:19 355:11
**ASP** 117:16 189:11
  192:1 193:14
  194:21 199:14,20
  200:16 201:2,6
  203:1 206:4,8,11
  206:20 247:22
**aspect** 358:13
**aspects** 60:10,14
  91:7
**ASPs** 207:3
**ASP-based** 30:20
  188:22 192:20
  195:18 209:17
**assessing** 186:9
**assigned** 39:19
  304:11 305:7
**assisting** 51:2
**associated** 202:22
**associate's** 44:20
**Association** 38:12
**assume** 17:9 121:5
  139:17 141:16
  142:3 145:8,11

146:17 163:13,14 175:6 176:19 265:18 282:13,17 288:3,9 289:1,20 290:2 295:9,15 295:18,19,20 296:5 339:20 340:9,10 341:1
**assumed** 45:13 175:14
**assuming** 121:8 132:18 138:17 139:13 140:15,22 142:1,1,8 145:3 145:14 167:17 168:6 174:3,15 174:16 293:2
**assumption** 128:16 140:14 142:11,19 143:9,12,14 145:13 175:1
**assumptions** 140:13 142:16,18 142:21 143:2 144:4,8 167:5 291:17 301:7
**assurance** 49:1
**asthma** 318:10
**attached** 139:5,6 139:10 277:19
**attained** 127:22
**attempt** 98:14 332:15
**attend** 27:11,14,21 36:2 40:16 41:22 42:21 43:7
**attended** 27:3,4,9 27:15 36:4,9,10
**attendees** 42:13 43:1
**attending** 239:6 248:13

**attention** 63:12 87:12 236:7 281:10 285:18 287:4 344:11
**attorney** 364:10,13
**Attorneys** 213:3
**attractive** 78:13
**attributed** 107:17
**atypical** 243:3
**audit** 233:15,16 339:5
**August** 263:22 281:11
**author** 172:2,5 184:16
**authorizations** 240:1
**authorized** 328:22
**authors** 182:4
**available** 9:21 15:3 15:5 18:14 69:13 69:13 130:17 171:14 223:4 255:10,14 286:10 289:17 290:3,14 293:11 298:13 314:1 319:4
**Aventis** 4:9
**Avenue** 1:21 3:15
**avenues** 17:13 18:14
**average** 1:6 5:11 114:8 127:6 128:17 157:8 159:21 160:4 161:13 162:16 173:16 187:18 286:9 292:5 293:10
**aware** 18:20 23:15 30:11,22 34:6 52:14,18 53:2

55:9,16 61:5 62:10,14 63:1 70:22 71:5 78:14 78:21 82:13 94:9 94:15 111:22 112:1,6,14 113:11 114:17 115:2,16 116:10 117:14,18,19 118:16 119:3,7 120:14 121:8,14 123:1,22 124:12 138:4 156:8 160:13 189:17,22 193:12,16,17 194:5 211:21,22 212:3 215:3 219:8 220:12,16 222:14 223:15 224:17,20 225:2 225:4,8 248:6 254:16 262:18 263:6 266:2,19 267:16,20 283:7 289:16 294:16 297:15 301:8,12 301:16 302:2,6,8 302:19 303:1,7,9 303:9 305:12,15 306:21 314:15 319:18 329:17,22 330:9,11,15 332:16
**AWP** 30:5,6,9,12 30:12 61:10,19 62:9,20,20 65:9 65:12,22 66:2,2 79:7 111:20 112:2,7,21 113:1 113:7,11,13,15 114:4,5,8,14,15 115:7,18 116:6,7

116:14,15,22,22 117:1 118:13,15 121:15 122:4,5 122:10 123:4 124:2 125:3,7,11 125:22 126:1,9 126:12,14 127:14 127:18 128:6,12 128:13 129:1,3 129:10,12,12 130:13 131:8 132:6,7,12,21 133:2,18 134:4,6 134:15,19 136:17 139:20 140:7,8 140:19 141:11 142:5,5,22 143:18,19,22 145:2 146:1 148:11 149:2 150:12,22 151:8 151:10 152:1,15 153:1,19 154:16 155:7,11 157:12 157:20 163:2,4,7 167:17 168:2,9 169:21 170:17 172:10 174:3,6 174:15,16 175:19 176:2,11,21,22 177:6,9,11,15,22 178:9 179:5,16 179:20,22 180:17 180:20 181:21 182:2,9,16,18 184:16 185:8,20 186:14 188:18,21 191:7,22 193:22 193:22 195:18 207:15 209:13,21 213:16,20 237:11 238:14 270:7

272:15 274:15 275:12,18 277:20 277:22 279:15 280:3,16 285:20 286:4,6 292:12 293:19 295:11 296:14,14,16 298:2,9 302:6,12 304:6,19,22 337:7,10,15 342:4 343:3 348:3 355:22 356:4,15,21 357:1,6,7,15,16 359:21 360:4,13 360:13,18 361:5 361:9,9,12,13,18 362:13
**AWPs** 176:17 181:16 207:8,14 214:7 286:21 287:1,7
**AWP's** 116:10
**AWP-based** 30:19 117:9 169:6 192:20 194:21
**axiomatic** 161:10
**axiomatically** 176:21
**a.m** 1:22

**B**
**B** 5:7 6:1 244:7 317:12
**bachelor** 43:16
**bachelor's** 43:16 43:21 46:20
**back** 21:8 56:19 64:10 73:1 81:2 99:15,15,18 109:20 111:15 112:5 113:2 135:5 137:2,2

140:2 148:4
151:2,9 152:7
153:14 154:12,19
163:14,22 170:13
179:18 181:7
215:8,11 254:9
254:15 260:20
353:21 355:16
**background** 43:12
**BACON** 4:3
**ballpark** 28:5,6
**bank** 48:2
**BankBoston** 47:17
**BAPO** 54:11
**Barron's** 285:8
   287:7,15 290:7
   343:15
**base** 29:13 101:14
**based** 7:22 9:9 30:1
   53:10 67:2 69:11
   71:14 80:9 89:6
   95:7 99:16 101:2
   110:14,15 121:7
   122:8,10 125:12
   128:21 132:18
   143:3 145:5
   154:12 160:22
   162:7 187:3
   188:19 189:12
   190:10 194:22
   205:19 210:7
   226:15 232:22
   254:15 256:13
   259:17 314:7
   318:3 325:7
   332:8,14
**basing** 122:20
**basis** 19:1 20:7
   35:15 81:21 92:4
   96:8,9 98:5,22
   100:5 112:2,7
   124:10 125:3

129:4 131:7,8,12
139:17 140:15,22
145:13 172:14
173:21 174:7
175:1 186:9
206:4,12 242:17
244:9 250:12
252:11 259:10
260:19 261:8,11
261:19 269:8
295:15 297:13
319:7 324:3
325:14 327:1,7
358:9 359:2
**basket** 81:18
**Bates** 271:22 272:1
**Bay** 48:5,9,14 49:9
   51:16,21 52:11
   52:15 53:11,14
   53:15,20,21 54:2
   54:7,8,9,15,16
   55:1,5,7,10,14,15
   57:1,16,19 58:2
**BayBank** 47:17
**BC** 208:17,18
   209:6 236:9
   238:13 246:20
   247:1,20
**BCBS** 10:3,13 11:1
   11:12,14,15,20
   12:4 13:6 14:6
   17:14 18:10 20:2
   20:10 21:1,10
   22:3,12,20 23:1
   23:10 24:6 29:6
   30:3,18 34:7 42:9
   51:15 53:13
   57:17 58:1 61:5
   62:11,14 64:12
   64:18 65:13
   67:11,14,16 68:4
   68:14,22 70:3,16

70:20 71:1 72:6
75:16,19 76:2
77:7,10,14 80:12
81:4,8 86:21
87:11 90:18
91:17 92:5 93:13
101:4 110:16
111:16 114:20
124:3 125:20
132:1,5 136:4
178:6,21 191:13
192:19 193:21
196:16 197:12,22
201:10 205:7
211:7,19 214:5,7
229:10,18 243:21
243:22 244:21
249:21 250:15
266:1 277:21
288:13 306:10,15
307:6,13,19
308:12,19 309:4
310:4,11 311:11
315:6 317:1
324:10,18 325:16
326:22 327:21
329:11,18 330:12
342:2 343:1,21
**BCBSMA** 196:5
   206:10 246:22
   329:15
**BCBSMA's** 248:18
**BCBSMA-AWP**
   5:13,14,15,16,17
   5:18,20 6:8,9
   238:21 271:20
   342:16 343:7
**BCBSMA-AWP-...**
   263:11
**BCBSMA-AWP-...**
   281:5
**BCBSMA-AWP-...**

236:5
**BCBSMA-AWP-...**
   248:8
**BCBSMA-AWP-...**
   271:10
**BCBSMA-AWP-...**
   303:17
**BCBS's** 347:8
**bear** 82:18 168:2
   174:16
**bearing** 347:8
**began** 50:10 319:21
**beginner's** 45:12
**beginning** 97:15
   114:6,9
**behalf** 1:13 222:6
   308:13 310:5
**beholder** 300:7
**beliefs** 144:6
**believe** 11:6 12:14
   65:8 67:12 73:1
   85:15 114:2
   117:5,13 135:9
   142:6 144:3
   184:4,22 189:16
   213:22 217:13
   222:20 246:20
   283:9 325:17
   338:20 343:17
   349:8 353:1
   361:16
**believed** 143:5
   187:4
**believing** 161:7
**BELKNAP** 3:13
**benchmark** 78:6
   114:18 115:8,18
   118:14 127:10
   134:11 356:16
**Bend** 119:1,2,3,9
   119:20 120:17,21
   121:6 122:7

123:4
**beneficiaries** 209:4
**benefit** 85:17,22
   87:1 88:15 191:6
   308:8 315:1
   344:6
**benefits** 59:9 85:9
**BERMAN** 2:3
**best** 28:15 53:12
   95:1 154:7 202:5
   244:17 279:20
**better** 45:17 71:21
   71:22 126:14
   240:21 241:8,10
   322:5,16
**big** 235:11 245:2
**bigger** 347:19
**bill** 32:8 39:21 40:3
   40:4,8 137:9
   142:9,13 175:12
   251:3 278:1
   287:15 314:12
   315:13 359:5
**billed** 49:17 85:16
   93:7,9,10 94:12
   177:8 314:14
   359:6
**billing** 40:8 135:7
   231:9 278:17,18
   359:9
**billion** 80:22 83:11
   83:13 84:1,20
   85:3 86:7
**billion-dollar**
   85:13
**bills** 12:15 129:17
   140:9
**bit** 21:7 64:14 65:8
   65:8 66:4 102:5
   105:17 137:3
   241:7
**blanket** 80:21

124:7
**blinded** 244:5
**Blue** 2:19 3:3,10 8:1,1,11 9:6,6 16:19 23:4,4 26:9 26:9 28:14 39:14 39:14 42:12,12 42:13,13 48:12 48:12 64:6,6 66:8 66:11,12 94:9,9 112:12 115:16,16 119:4,4,9,9 120:15,15 127:17 132:17 134:3 137:4,4,15,16,22 137:22 138:7,7 140:17,18 141:9 141:9 146:10,10 166:17,17 173:9 173:9,12,12 178:19 188:17,17 197:6 201:4,4 204:14,15 208:19 209:8,12,16,20 210:3,13 215:20 215:21 216:20,20 217:7,7,15,16 218:2,3,16,16,19 218:20 219:19,19 219:21,22 220:4 220:4,5,6,7,7,10 220:10,14,14,17 220:18,20,20 221:2,3,5,5,6,7,10 221:10,17,17 222:15,16 223:8 223:8 224:2,2 236:1,1,13,20 237:17,17 252:9 252:9 253:13 254:9,10 255:1,1 261:20,20 266:10 266:10,13,13 274:7,7 277:5,6 284:6,6,7,7 301:10,10 305:13 305:13,16,17,21 305:21 306:21,21 308:2,3 310:6 313:10 323:20,20 335:20,20 337:13 337:13 338:10,10 346:8,8 347:4,4 357:15,15
**Bluebook** 287:8 289:13
**board** 24:3 81:19 98:13 99:21 102:1 203:9 210:10 246:7 307:9
**boards** 20:11 34:5
**bodies** 34:5
**body** 72:22 257:12
**boilerplate** 309:22 310:18 312:5 330:20 334:12 336:2
**boilerplates** 310:18 310:22 312:13,15 313:6,13 335:9
**boiling** 132:11 173:20
**book** 98:3 143:3 250:6 260:4 321:9,11
**books** 291:8
**boss** 266:6
**Boston** 1:21 2:16 3:7
**bottom** 181:19 195:11,11 271:19 277:3 285:19
**bought** 282:1,16,21
**Boulevard** 4:5
**bounds** 178:13
**Boylston** 2:14
**brand** 12:11 14:12
**break** 63:6 82:3 148:7 150:4,6 154:20 213:5 216:3 281:2 300:4 361:12
**breakfast** 42:3
**breaking** 336:12
**Briefly** 45:11
**Brigham** 59:21
**bring** 23:11 255:16 257:5
**bringing** 57:5
**broad** 45:1 223:18
**broadly** 223:14
**broker** 218:1
**brokers** 218:6
**brought** 8:9 23:2,5 50:6 238:7
**bucket** 88:16
**buckets** 68:18
**budget** 107:11 118:9 206:19
**budgeted** 107:8,20
**budgets** 333:4
**build** 142:11 261:3 320:17
**built** 40:2 45:2 175:7 252:2
**bulk** 282:1,16,21
**bullet** 192:12 273:18 275:16
**bullets** 273:4 277:2
**bump** 62:5
**bunch** 122:2 279:16 291:17
**business** 14:18 16:7 33:14 36:21 38:16 46:11 55:16 62:3 74:6 98:3 104:7 138:14 144:4 170:11 235:16,17 237:6 250:6 260:4 262:16 300:2,4,5,19 306:16,19 309:11 309:17 312:16 321:9,11
**buy** 32:8 141:12 160:3 162:16 282:12,18 283:6 283:11 289:18 344:13 345:5 347:6 349:20 357:17
**buyer** 286:11 293:12 354:5,6 355:4
**buying** 130:7 282:13 349:15 350:19 353:8
**buys** 32:12

**C**

**C** 3:1 4:1 7:1
**calculate** 69:18 75:2,3 96:17
**calculated** 92:7 93:4 96:1,7 115:9 132:13 319:5,6,6
**calculating** 68:3 196:14
**calculation** 75:8
**calculations** 69:8 72:22
**call** 12:13 17:10 40:4 126:15 219:17 232:12,13 235:18 238:16 251:7,9 252:5 320:16 324:3
**called** 1:13 34:21 40:5 50:8 51:2,13 53:15 54:9,11 58:6 74:5 307:3 311:6 325:2 331:5
**calling** 17:12 18:13 121:22
**calls** 51:2,10,12 57:2,9,13,13,14 58:14 72:17 73:15,17 290:5
**Cambridge** 2:7
**cap** 94:13
**capital** 326:11
**capitate** 118:2
**capitated** 117:20 118:1 119:5,7,21 120:18,22 122:7 122:13
**capitation** 107:5,19 108:11 118:20 119:17 120:10 122:9
**car** 127:8 130:7,16 131:1 135:12 349:4,8,15,16,16 349:18 350:19 351:7,13,14 353:15 354:5,5,7 354:8,15,20,22 355:7,8,9,9,19
**care** 5:21 6:3,5 44:4,8 45:5,7,10 45:21 46:5,17 48:6,9,14 49:9,18 51:16,21 53:14 54:15 55:1,7,10 57:2,16 58:2 59:22 90:10,11 98:18,19 113:19 208:19 209:8,12

209:16,20 210:3
210:13 234:10
235:3,3,5 236:13
236:20 278:8
292:11,14 309:20
310:19 318:1,16
319:2 320:4,12
320:22 321:18,19
322:6,7,12,16,18
322:19 325:10
327:15 330:18
331:5,20 333:8,9
333:21 334:2
335:5,13
**career** 23:18 49:21
    50:10 112:15
    114:6,10
**Care's** 55:16
**carried** 68:8 242:6
    255:6 260:18
**carrier** 305:14,18
    305:21 306:3,6
    306:11,16 309:11
**carry** 68:11 334:11
    353:7
**carrying** 90:19
    349:7
**cars** 349:20 350:3,8
    351:11 352:2,2,4
**carving** 88:18
**car-loving** 349:22
**case** 8:4,18,22 9:7
    9:12 10:7,16 11:4
    11:6,8 68:13 78:8
    115:11 120:13
    122:10 124:12
    173:10,14 180:10
    180:16 181:2
    246:9 275:11
    355:12
**cases** 15:16 68:14
    77:10,13,15

314:11
**categorically** 56:1
**categories** 87:20
    88:1,3,22 89:4
    109:5 338:18
**categorizing** 83:18
**category** 327:6
**cause** 17:20 75:19
    176:12 199:1
    269:14,19 270:3
    274:5 277:3
    303:10 329:10,20
    329:21 330:7,8
    330:10 334:21
    335:4,7 337:19
**cc** 272:7 304:2
**cease** 307:13
**ceased** 306:11
**center** 3:5 232:12
    249:17
**centers** 307:16
**Centocor** 295:6
    297:17 298:15
    300:14
**CEO** 234:13
**certain** 19:9 28:16
    53:5 95:18 98:12
    144:8 156:9
    202:9 209:22
    322:13 342:4
    354:1
**certainly** 15:16
    86:13,19 97:4
    106:20 204:6
    216:11,12 232:17
    243:6 245:20
    348:13 350:1
**certificate** 44:18
**certificates** 43:22
**Certified** 1:16,17
**certify** 364:4,10
**chain** 245:22 284:4

**chains** 223:19
**challenges** 258:10
**change** 58:3 75:5
    103:14,16 105:13
    116:17 153:18
    183:6 184:22
    191:14 192:9
    194:9,12 197:7
    197:12 198:11
    200:5,7,10,13
    201:2 202:15
    206:4,22 228:5
    235:12 244:19
    246:3,11,21
    247:6 254:1
    310:22 317:1
    320:2 332:20
    334:7 335:2,18
    335:22 336:4
**changed** 101:3
    178:22 187:10
    230:1 234:3
    238:13 241:7
    331:4,19 333:15
    335:6 336:1
    360:13
**changes** 194:19
    201:15 236:15
    237:4,7 240:4
    241:6 245:9
    247:1,2 255:15
    257:17 258:16
    259:4,9,10 261:4
    261:7 312:14
    334:13,13
**changing** 188:18
    188:21 194:13
    196:17 201:5
    231:6 261:12
    275:7
**channel** 46:5
**chapter** 335:12

**characterization**
    338:22
**characterizing**
    101:18
**charge** 20:22 82:18
    95:12 126:16
    278:1 282:3,22
    305:20 315:1,13
    359:6
**charged** 151:6
**charges** 93:7,10
    94:6,13 95:7
    99:16 100:6
    127:8 144:21
    151:4 240:3
    314:7,12,14
    344:14 347:7
    358:5,8
**charge-based** 45:9
    151:3
**chemo** 264:6 265:4
    265:22 272:13
    304:20
**chemotherapy**
    157:7 159:11,20
    161:12 237:16
**chief** 21:4,6 24:18
    42:16,17
**Children's** 248:17
    248:19 249:2,13
    249:14,14,17,18
    249:20 250:1,4
    250:21 251:2,16
    252:1,6
**choice** 154:8
    208:20
**cholesterol** 318:8
**chose** 288:14
**CIGNAs** 224:6
**circling** 163:17
**circumstances**
    359:3

**Ciresi** 1:20 2:12
**City** 4:6
**Civil** 1:15
**claim** 48:20 49:14
    49:17 57:7
    105:11 139:5
    142:14 233:14
    277:18 328:17
**claiming** 79:5
**claims** 48:15,16,18
    48:22 49:1,3,5,6
    49:16 50:2 57:11
    57:12 59:8 99:1
    230:20 232:11,13
    258:19 278:5,6
    305:6 315:10,11
**clarification**
    105:15 338:17
**clarified** 163:18
**clarify** 84:6 114:1
**class** 8:9,13
**classification** 40:5
**classify** 35:14
    311:13
**clause** 311:14,19
    313:22 314:19
    315:21 316:2
    323:2,22 324:10
    324:20 325:8,15
    327:2,19 328:3,9
    328:11 329:1,5
    329:14,19,20,21
    334:17
**clear** 56:10 118:13
    165:4 340:11
**clearly** 154:4 177:5
    177:14 245:13
    252:10 301:19
**client** 217:21,22
    221:2
**clients** 29:8 217:15
    217:17,19 218:16

218:19 220:4,11
221:18 222:6,15
**climbed** 86:18
**climbing** 86:11,14
**clinical** 28:20 36:13
36:14 37:3,13,18
38:6,7,13,14
39:10,12 40:14
60:21 231:13
255:13 318:3,4
324:13
**clinically** 28:15
**clinic-based** 52:13
**close** 83:2
**closest** 76:4
**CMS** 5:11 66:19
187:18 194:20
195:16 196:16
198:1 201:1,6
206:8,11 207:7
208:13 209:3,14
210:17
**CMS's** 196:18
208:17 209:6
**COCA** 271:1
**Coco** 2:13 5:5 8:20
13:21 14:9 15:9
15:19 16:18 19:2
19:7,20 20:5,13
21:12 22:13
25:20 26:16 29:9
29:21 31:18,20
32:16 33:2,9 34:9
40:20 46:2 47:7
49:12 52:2,17
53:3,8 54:20
55:12,18 56:3,15
56:17 57:21
60:12 61:8 62:19
63:5 65:5,17 66:7
66:14 67:20 68:6
68:16 70:8,18
71:11 72:10
73:21 74:20 76:7
77:19 78:19
79:10 80:6 81:11
83:17 85:6,14
86:8 87:3,16
88:17 89:12 90:3
90:21 91:5,22
93:8,18,22 94:14
98:9 100:10,15
100:18 101:16
102:10,19 103:8
103:12 104:10,21
105:21 106:5,10
106:18 107:1
108:6,12,16
109:10 112:4,9
113:4,8 114:22
115:13,20 116:3
116:12 117:11,22
118:19 119:11
120:3,19 121:11
121:17 122:15,17
123:6,13,17,21
124:6,19 125:8
125:14 127:13
128:9 129:11
130:8,19 132:4,9
133:16,22 134:17
135:13,17,22
136:6,11 137:7
138:3,10 139:3,8
139:16,21 140:21
141:2,14 143:1
143:17 144:10
145:15 146:2,13
146:19 147:2,6
147:18 148:3,14
148:20 149:5,10
149:19 150:20
151:15 152:4,18
152:22 153:10
154:18 155:8,12
155:17 157:14,22
158:3,10,20
160:5,10,19
161:15,19 162:18
162:20 163:5
164:3,11 165:18
165:21 166:20
167:20 168:5,15
168:22 169:9,16
169:22 170:5,8
171:1,11 172:7
173:2 174:5,19
175:3,21 176:4
176:13 177:2
178:12 179:3,10
180:2,22 182:5
182:11 183:4,12
183:21 184:10,21
185:4,13,22
186:11,20 187:11
189:8,13,21
191:15 192:10,16
192:22 193:15
194:3 195:19
196:2,20 198:3
201:12 202:14
203:22 204:11
207:9 210:15
217:18 218:5
219:13 220:22
221:14,21 222:8
223:1,7 231:2
237:21 241:1
242:18 243:15
244:2 245:1
246:14 248:2
253:9 254:12
255:22 256:10,19
259:13 260:1,15
262:2,7,21 263:8
264:10 265:5,13
266:3,8,18
267:14 268:1,11
269:5,15,21
270:4,11,18
271:6 272:21
273:16 274:2,22
276:2,7,12,17,21
278:3,14,22
280:4,17 281:1
283:20 284:12,16
284:20 286:15
287:18 288:11,15
289:10,22 290:8
291:1,12 292:4,9
292:13,18 293:15
294:1,19 295:13
295:17 296:7,19
297:7,12,22
298:17,21 299:2
299:10,13 300:15
301:2,13,18
302:7,13,21
303:6,13 304:8
308:15,21 315:19
316:15 324:1,21
326:4 336:19
337:17,22 338:12
338:16,20 339:15
340:4 341:7,17
342:7,14 344:19
345:3,14 347:10
347:17 348:6
349:13,17 350:12
350:15 351:1,3,8
351:15,22 352:5
352:7,11,18,21
353:13 356:3,19
357:9,12,21
358:16,20 359:19
360:5,20 361:22
362:4,8,19
**code** 39:19,20 40:5
40:6,6,7 49:19
80:5 81:14 82:1
195:4 249:10
278:16
**codes** 12:15,21
13:1,2 82:2 89:3
237:17 259:8,11
259:16
**coinsurance** 99:22
**cold** 74:1
**colleague** 268:20
**colleagues** 39:21
267:11
**collect** 70:3,9,9,12
279:22 288:7
290:18
**collected** 192:13
287:8 288:4
**collecting** 287:17
290:21
**collection** 38:9
**college** 43:14,15
47:8
**column** 287:4,4
288:6 337:8
339:12,13,18
340:17 344:12
**columns** 285:19
339:6
**come** 13:10 18:4
20:8 25:6 39:16
64:10 69:17
75:12 76:21
102:15 181:7
229:7 239:15
243:3 262:16
270:6,9 277:7,11
334:8
**comes** 16:20 72:21
73:1 74:14
139:11 219:19
221:2 342:20