1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456

C.A. No. 01-CV-12257-PBS

* * * * * * * * * * * * * *

IN RE:   PHARMACEUTICAL INDUSTRY              *

AVERAGE WHOLESALE PRICE LITIGATION            *

                                              *
_____

THIS DOCUMENT RELATES TO ALL ACTIONS           *

* * * * * * * * * * * * * *


VOLUME I


DEPOSITION OF LISA M. GORMAN, a witness called on

behalf of Johnson & Johnson, pursuant to the Federal

Rules of Civil Procedure, before Jessica L.

Williamson, Registered Merit Reporter, Certified

Realtime Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Offices of

Robins, Kaplan, Miller & Ciresi L.L.P., 800 Boylston

Street, Boston, Massachusetts, on Tuesday, March 7,

2006, commencing at 9:00 a.m.

Lisa M. Gorman  HIGHLY CONFIDENTIAL  March 7, 2006
Boston, MA

Page 2

```
 1              APPEARANCES
 2
 3  HAGENS BERMAN SOBOL SHAPIRO LLP
 4     (By Edward Notargiacomo, Esq.)
 5     One Main Street
 6     Fourth Floor
 7     Cambridge, Massachusetts  02142
 8     (617) 482-3700
 9     ed@hbsslaw.com
10     Counsel for the MDL Plaintiffs
11
12  ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
13     (By Stephen L. Coco, Esq.)
14     800 Boylston Street
15     25th Floor
16     Boston, Massachusetts  02199-7610
17     (617) 267-2300
18     slcoco@rmkc.com
19     Counsel for Blue Cross/Blue Shield
20
21
22  (CONTINUED)
```

Page 3

```
 1  APPEARANCES, Continued
 2
 3  BLUE CROSS/BLUE SHIELD OF MASSACHUSETTS
 4     (By Steven E. Skwara, Esq.)
 5     Landmark Center
 6     401 Park Drive
 7     Boston, Massachusetts  02215-3326
 8     (617) 246-3531
 9     steven.skwara@bcbsma.com
10     Counsel for Blue Cross/Blue Shield of
11     Massachusetts
12
13  PATTERSON BELKNAP WEBB & TYLER LLP
14     (By Adeel A. Mangi, Esq.)
15     1133 Avenue of the Americas
16     New York, New York  10036-6710
17     (212) 336-2000
18     aamangi@pbwt.com
19     Counsel for Johnson & Johnson
20
21
22  (CONTINUED)
```

Page 4

```
 1  APPEARANCES, Continued
 2
 3  ROPES & GRAY
 4     (By Adam Wright, Esq.)
 5     One International Place
 6     Boston, Massachusetts  02110-2624
 7     (617) 951-7956
 8     adam.wright@ropesgray.com
 9     Counsel on behalf of Schering and Warrick
10
11  SHOOK, HARDY & BACON L.L.P.
12     (By Elizabeth S. Rowe, Esq.)
13     2555 Grand Boulevard
14     Kansas City, Missouri  64108-2613
15     (816) 474-6550
16     erowe@shb.com
17     Counsel for Aventis Pharmaceuticals
18
19
20
21
22
```

Page 5

```
 1              INDEX
 2  DEPONENT                                   PAGE
 3  LISA M. GORMAN
 4     Examination By Mr. Mangi....................007
 5
 6              EXHIBITS
 7  NUMBER         DESCRIPTION                 PAGE
 8  Exhibit Gorman 001, Document Bates-numbered
 9         BCBSMA006225 and 000106...... 027
10  Exhibit Gorman 002, Document Bates-numbered
11         BCBXMA-AWP-00073 - 00074..... 030
12  Exhibit Gorman 003, Document Bates-numbered
13         BCBSMA-AWP-00048 - 00051..... 075
14  Exhibit Gorman 004, Congressional Record, no
15         Bates stamp.................. 084
16  Exhibit Gorman 005, Document Bates-numbered
17         BCBSMA-AWP-00078 - 00079..... 107
18  Exhibit Gorman 006, Document Bates-numbered
19         BCBSMA-AWP-00045............. 119
20  Exhibit Gorman 007, Document Bates-numbered
21         BCBSMA-AWP-12942............. 121
22  (CONTINUED)
```

Henderson Legal Services
(202) 220-4158

Page 6

```
 1        EXHIBITS (CONTINUED)
 2   NUMBER        DESCRIPTION              PAGE
 3   Exhibit Gorman 008, Document Bates-numbered
 4              12942 - 12945................ 124
 5   Exhibit Gorman 009, Document Bates-numbered
 6              BCBSMA-AWP-00057 - 00058..... 156
 7
 8
 9   Note: Original Gorman Exhibits 1 - 9 were
10   retained by the court reporter and forwarded
11   to Henderson Legal Services, Inc. for
12   distribution.
```

Page 7

```
 1           PROCEEDINGS
 2
 3        LISA M. GORMAN a witness called by
 4   counsel for the Johnson & Johnson, being first
 5   duly sworn, was examined and testified as follows:
 6
 7           DIRECT EXAMINATION
 8   BY MR. MANGI:
 9       Q. Good morning, Ms. Gorman.
10       A. Good morning.
11       Q. As I mentioned when we met, my name's
12   Adeel Mangi. I represent Johnson & Johnson in
13   this litigation. Have you ever been deposed
14   before?
15       A. No.
16       Q. Okay. I'll just run through some of the
17   basics of the deposition.
18       A. Okay.
19       Q. If I ask you any questions that are
20   unclear, please just tell me that, and I'll do my
21   best to rephrase them, okay?
22       A. (No verbal response.)
```

Page 8

```
 1       Q. You also need to answer all questions
 2   verbally, because the reporter can't take down a
 3   nod of the head or a shrug of the shoulders, okay?
 4       A. Okay.
 5       Q. And if at any point you would like to
 6   take a break, just let me know. I'll finish the
 7   line of questioning and we'll do that, okay?
 8       A. Okay.
 9       Q. Now, are you currently employed?
10       A. Yes.
11       Q. Where are you employed?
12       A. At Blue Cross/Blue Shield of
13   Massachusetts.
14       Q. What is your current title?
15       A. My current title is regional director of
16   the metro north provider relations team.
17       Q. What regions does metro north cover?
18       A. Metro north covers half of Boston, all
19   physicians and hospitals north of Boston all the
20   way over to the center of the state.
21       Q. Does it include any parts of Boston
22   itself?
```

Page 9

```
 1       A. South of Boston?
 2       Q. No, does it include Boston itself?
 3       A. Yes.
 4       Q. Okay. So it's the north part of Boston
 5   --
 6       A. Yes.
 7       Q. -- as well as everything to the center
 8   of the state?
 9       A. Yes.
10       Q. Is that a -- forgive my lack of
11   geography, but is that a mix of rural and urban
12   areas?
13       A. Yes.
14          MR. COCO: I'm sorry. Is there truly
15   anything rural in the northeast?
16          MR. MANGI: Massachusetts.
17          MR. COCO: Just Massachusetts.
18          MR. MANGI: I'm from Jersey. You should
19   try that.
20       Q. Now, can you please describe for me your
21   educational background after high school.
22       A. After high school, I graduated from
```

**Page 10**

1  Southeastern Massachusetts University, which is
2  now UMass Dartmouth, in 1990 with a bachelor's
3  degree in marketing.
4    Q.  Do you have any formal education
5  qualifications after your bachelor's degree?
6    A.  No.
7    Q.  After you got your bachelor's degree in
8  1990, did you start working?
9    A.  Yes.
10   Q.  Where did you start working in 1990?
11   A.  I started working for an HMO called Bay
12 State Healthcare.
13   Q.  What was your position at Bay State
14 Healthcare when you first began?
15   A.  My first position was a member service
16 representative.
17   Q.  How long did you hold that title?
18   A.  Nine months.
19   Q.  What were your responsibilities in that
20 role?
21   A.  My responsibilities as a member service
22 rep was to answer an 800 line to service members

**Page 11**

1  of Bay State Healthcare, an average of, you know,
2  90, 100 calls a day.
3    Q.  What sort of concerns or questions were
4  the members calling with?
5    A.  The members would call on benefit
6  information, are they eligible, is this covered,
7  is that covered, why did my claim deny, those sort
8  of questions.
9    Q.  Were you tasked with actually answering
10 the phone calls and responding to their concerns?
11   A.  Yes.
12   Q.  Did that phone line receive any calls
13 from healthcare providers?
14   A.  No.
15   Q.  Only members?
16   A.  Only members.
17   Q.  What was your next job transition after
18 your role as a member service rep?
19   A.  After that I took a position as a
20 provider relations coordinator.
21   Q.  How long did you hold that position?
22   A.  I'm estimating a year and a half.

**Page 12**

1    Q.  So about '91 to somewhere in '92?
2    A.  Yes, yeah.
3    Q.  And this is still at Bay State
4  Healthcare, right?
5    A.  Yes.
6    Q.  Now, what were your responsibilities in
7  that role?
8    A.  In that role was similar to a member
9  service representative, but we took calls from
10 providers.
11   Q.  What was the call volume you were
12 dealing with?
13   A.  It was much less.  It was probably 20
14 calls a day.
15   Q.  Did you have any responsibilities other
16 than responding to phone calls in that position?
17   A.  Yes.
18   Q.  What were those?
19   A.  I was responsible for supporting the
20 provider relations -- field representatives, they
21 were called -- any work that they requested of me
22 in terms of getting from providers out in the

**Page 13**

1  field, they would bring back to the coordinator to
2  resolve.
3    Q.  Now, at this point in '91 how -- what
4  methodology did Bay State use to reimburse
5  physicians for drugs that they administered in
6  their offices?
7         MR. COCO:  Objection.
8    A.  I don't remember.
9    Q.  Okay.  Do you know whether it was a flat
10 dollar sum or tied to any particular benchmark?
11   A.  I don't remember.
12   Q.  Did you field any calls in that position
13 pertaining to reimbursement issues?
14   A.  Yes.
15   Q.  Okay.  What sort of reimbursement issues
16 would providers bring to you?
17   A.  They would -- if they were questioning a
18 claim, they would say, "Did the claim pay
19 appropriately?"
20   Q.  Anything else?
21   A.  I don't think so, no.
22   Q.  Did providers contact you in that

**Page 14**

1  position regarding the amount of reimbursement as
2  opposed to the logistics of claims processing?
3      MR. COCO: Objection.
4      A.  In the coordinator role, no, no. I was
5  merely a support person and would not get to that
6  level of discussion.
7      Q.  And you said you also had a role
8  supporting provider relations field reps?
9      A.  Uh-huh.
10     Q.  What did that involve?
11     A.  What did my support of the reps involve?
12     Q.  (No verbal response.)
13     A.  It would -- what I described in terms of
14 any work that they received from physicians out in
15 the field, they would bring back to the office
16 because they were 80 percent out on the road in
17 the physician offices. They would bring back any
18 work or issues or problems to resolve.
19     Q.  And were they the same sorts of issues
20 and problems that you described physicians calling
21 you about?
22     A.  Sometimes.

**Page 15**

1      Q.  Okay. Were there any issues that they
2  brought back pertaining to the amount of
3  reimbursement?
4      A.  I don't remember.
5      Q.  Do you recall any other issues that they
6  would bring back, other than what we've discussed?
7      A.  No.
8         MR. MANGI: Off the record for just a
9  moment.
10        (Discussion off the record.)
11        MR. MANGI: Back on the record.
12     Q.  So in 1992 when you transitioned out of
13 the provider relations coordinator role, what
14 position did you move to?
15     A.  I moved to -- it was called at the time
16 provider relations representative, which was the
17 field or external representative of the plan for
18 the south region.
19     Q.  So the field reps who we mentioned
20 earlier who would sometimes bring you issues, you
21 then became one of them?
22     A.  Yes.

**Page 16**

1      Q.  Now, what region did you deal with as a
2  provider relations rep?
3      A.  I had south of Boston.
4      Q.  Were you actually calling on physician
5  offices?
6      A.  Yes. I was responsible for them.
7      Q.  And who did you call on in physician
8  offices?
9      A.  Can you rephrase that, what you --
10     Q.  Sure. When you went to physician
11 offices, were you going to meet with the doctor,
12 the office manager, a reimbursement person? Who
13 were you meeting with?
14     A.  It was any of those; either the
15 physician, the office manager, the billing
16 manager, the receptionist.
17     Q.  Okay. And other than issues pertaining
18 to the logistics of claims processing, what sorts
19 of issues were discussed at these meetings?
20     A.  There was a lot of educational sessions
21 educating offices on how to submit referrals,
22 educating on the benefits of the plan, really, you

**Page 17**

1  know, any type of educational training that a
2  provider would need to do business with the plan.
3      Q.  Okay. Anything other than educational
4  training?
5      A.  There would be problem solving, you
6  know, if they had either major claims issues or,
7  you know, any other type of issues having to do
8  business with a plan that they needed resolution
9  to. That role would be the contact person.
10     Q.  What would qualify as a major claims
11 issue?
12     A.  Sometimes a provider would have claims
13 they felt should be paid and weren't for a
14 particular reason, and we would problem solve to
15 see if it was a valid concern or not.
16     Q.  Now, how long were you in your position
17 as a provider relations rep?
18     A.  I was in that role from '92ish probably
19 for a year, in which case I assumed the same role
20 at Blue Cross/Blue Shield of Massachusetts.
21     Q.  Now, in 1993 was there some sort of a
22 corporate affiliation or relationship that emerged

**18**

1  between Bay State and Blue Cross/ Blue Shield?
2      A.  Yes.
3      Q.  Okay.  What was that?
4      A.  Blue Cross/Blue Shield of Massachusetts
5  acquired Bay State Healthcare.
6      Q.  Do you know when that took place in
7  1993?
8      A.  It was probably -- what I remember is
9  it's the latter part of '93.
10     Q.  So after the acquisition you stayed in
11 the same role, but now your employer was Blue
12 Cross/Blue Shield of Massachusetts, correct?
13     A.  That's correct.
14     Q.  And how long did you remain a provider
15 relations rep now with Blue Cross/Blue Shield of
16 Massachusetts?
17     A.  From '93 -- and that role was called
18 provider relations manager.  From '93 through
19 2001.
20     Q.  Now, in the period you were working for
21 Bay State, in other words, before the acquisition
22 --

**19**

1      A.  Uh-huh.
2      Q.  -- at any point did you gain an
3  understanding as to what methodology Bay State was
4  using to reimburse physicians for drugs
5  administered in their offices?
6      A.  I don't remember.
7      Q.  Did you ever get an understanding as to
8  whether it was flat dollar sums or tied to any
9  particular benchmark?
10     A.  I don't remember.
11     Q.  Do you understand what I mean when I
12 refer to the term "benchmark"?
13     A.  Do I understand what "benchmark" means?
14     Q.  Right.
15     A.  Yes.
16     Q.  What are some of the benchmarks you're
17 familiar with to which reimbursement can be tied?
18         MR. COCO:  Objection.  And to clarify,
19 as of today, or are you still back at Bay State?
20     Q.  Go ahead.  You can answer.
21     A.  So I guess I'm unclear of the question.
22     Q.  Sure.

**20**

1      A.  So can you rephrase it?
2      Q.  Sure.  My question regarding Bay State
3  was whether you knew if the reimbursement for
4  drugs administered in office was, you know, a flat
5  dollar sum or whether it was pegged to a
6  particular benchmark.  I just want to make sure
7  you understand what I mean when I say "benchmark."
8  And I'm referring to a benchmark such as AWP or
9  WAC.  Are you familiar with those terms?
10     A.  Somewhat.
11     Q.  Are you aware of what role, if any, they
12 play in reimbursement methodologies?
13     A.  Somewhat.
14     Q.  Okay.  What is your understanding of
15 benchmark reimbursement?
16     A.  I can tell you from my current role I
17 know that we reimbursed physician office-based
18 drugs at a percentage of AWP.
19     Q.  Okay.  When did you first become aware
20 of any methodology used by Bay State or by BC/BS
21 of Massachusetts to reimburse physicians for drugs
22 administered in office?

**21**

1      A.  I don't remember.
2      Q.  You know that the current methodology is
3  95 percent of AWP, right?
4      A.  Yes.
5      Q.  When did you first become aware of that?
6      A.  When, as in a year?  I guess in maybe
7  '99 or 2000.
8      Q.  Are you aware of any other methodologies
9  that BC/BS of Massachusetts has used at any time
10 to reimburse physicians for drugs administered in
11 office?
12     A.  No.
13     Q.  Are you familiar with any Of the
14 capitation arrangements that BC/BS has entered
15 over time?
16         MR. COCO:  Objection.
17     A.  Yes.
18     Q.  Are you familiar with any of the
19 capitated arrangements with physician practices
20 that have included drugs?
21     A.  I don't know.
22     Q.  Okay.  Are you familiar with a physician

**Page 22**

1  practice called Riverbend?
2      A. I know who they are.
3      Q. Okay. Are you aware that the contract
4  between BC/BS of Massachusetts and Riverbend
5  provides for capitated reimbursement rather than
6  reimbursement pegged to AWP?
7      A. My knowledge of Riverbend is that it was
8  a capitated arrangement.
9      Q. Is -- I'm sorry, were you done?
10     A. Yeah.
11     Q. Is Riverbend one of the practices that
12 falls within your area --
13     A. No.
14     Q. -- of responsibility?
15        Who is responsible for Riverbend in your
16 department?
17     A. The person who has my same role? It's a
18 gentleman by the name of John O'Brien.
19     Q. Now, we were going through your
20 employment chronology. From '93 to '01 you said
21 you were a provider relations manager. Now, after
22 the acquisition by BC/BS of Massachusetts, your

**Page 23**

1  title went from rep to manager, provider
2  relations. Was that a promotion or just a change
3  of the formal title?
4      A. It was a change of the formal title.
5      Q. Did your responsibilities change in any
6  way?
7      A. No.
8      Q. Were you dealing with the same regions
9  and the same entities?
10     A. I'm trying to think of the flow of
11 things. Yes, it was all south up until 2001.
12     Q. Okay. Now, after 2001 did your title
13 change again?
14     A. Yes.
15     Q. Okay. What position did you move to in
16 '01?
17     A. I moved to the regional director of the
18 metro south region, so you're going to have to...
19     Q. Regional director of the metro south
20 region, was that still in the provider relations
21 department?
22     A. Yes.

**Page 24**

1      Q. How long did you hold that position?
2      A. 2001 to 2004.
3      Q. And in '04 did you move to the regional
4  director for metro north?
5      A. Yes.
6      Q. And that's the position that you
7  currently hold?
8      A. Yes.
9      Q. Now, in both of the regional director
10 positions have you had the same responsibilities,
11 albeit for different regions?
12     A. Yes.
13     Q. Okay. What are your responsibilities as
14 a regional director in the provider relations
15 department?
16     A. My responsibilities are to oversee a
17 team of provider relations manager, which are the
18 external field presence, three provider relations
19 coordinators and administrative assistants. And
20 so I oversee the activities as I described earlier
21 of those positions.
22     Q. Of those positions, did you say?

**Page 25**

1      A. Of those roles, yes.
2      Q. Of those roles, right?
3      A. Yeah.
4      Q. Now, the provider relations managers,
5  how many are there at the moment in the department
6  as a whole?
7      A. Eight.
8      Q. And how many of those do you oversee?
9      A. Eight.
10     Q. I'm sorry, go ahead.
11     A. Did you mean in my department?
12     Q. Yeah. Well, let me try and fine-tune
13 the question a bit. The provider relations
14 managers who you oversee, are those only the -- at
15 the present time. Are those only the managers who
16 have responsibility for the north?
17     A. Yes.
18     Q. Okay. So there are eight provider
19 relations managers who deal with the north?
20     A. Yes.
21     Q. How many are there in total in the full
22 provider relations department?

26

1   A.   18.
2   Q.   You also oversee three provider
3   relations coordinators, right?
4   A.   Yes.
5   Q.   How many of those are there in the full
6   department?
7   A.   Nine.
8   Q.   Now, we've spoken about provider
9   relations manager. That was your prior role.
10  What about provider relations coordinators; what
11  do they do?
12  A.   The coordinators are responsible for
13  answering the provider relations 800 line, and
14  similarly to, as I described earlier, they support
15  the provider relations manager with any work
16  that's given to them.
17  Q.   So that's similar to your role as a
18  provider relations coordinator at Bay State in the
19  '91/92 time period?
20  A.   Yes.
21  Q.   Now, let me show you a document.
22       MR. MANGI: We will mark this as Exhibit

27

1   Gorman 001.
2        (Exhibit Gorman 001, Document
3   Bates- numbered BCBSMA006225 and 000106, marked
4   for identification.)
5   Q.   Now, this is an org. chart that was
6   produced to us by Blue Cross/Blue Shield of
7   Massachusetts. I would like you to look to the
8   first page, please. You'll see towards the left
9   you're listed as a regional director, provider
10  relations for metro south?
11  A.   Uh-huh.
12  Q.   Do you see that?
13  A.   Yes.
14  Q.   So this would be from somewhere in the
15  period '01 to '04?
16  A.   Yes.
17  Q.   Now, according to this org. chart, in
18  this time period you reported to Steve Fox. Do
19  you still report to Steve Fox?
20  A.   Yes.
21  Q.   And he's still in this position as a
22  director of provider relations and communications?

28

1   A.   Yes.
2   Q.   Okay. Does he still report in to
3   Vincent Plourde?
4   A.   Yes.
5   Q.   Now, one of the position listed here is
6   that of Laurie Moore, who's the director of
7   provider audit. Is she still in the department?
8   A.   No.
9   Q.   Is there someone else who's now the
10  director of provider audit?
11  A.   It's Cynthia Winston.
12  Q.   What does the provider audit department
13  do?
14       MR. COCO: Objection.
15  A.   Provider audit does primarily a lot of
16  the hospital DRG validations and validations of
17  payment made to the hospitals.
18  Q.   Does provider audit deal with physicians
19  or physician practices at all?
20  A.   Yes.
21  Q.   What sort of work do they do in the
22  relation to physician practices?

29

1   A.   I guess I can't -- I don't know. I
2   don't know.
3   Q.   Now, how long has Mr. Fox been in his
4   role; do you know?
5   A.   He's been in -- in his current role?
6   Q.   Yes.
7   A.   I would say '95 or '96.
8   Q.   And do you know how long he's been with
9   Blue Cross/Blue Shield of Massachusetts?
10  A.   15 years.
11  Q.   There is also a department here as --
12  listed as provider support. Do you see that?
13  A.   Uh-huh.
14  Q.   Tanya Trombly is the director?
15  A.   Uh-huh.
16  Q.   Is Tanya Trombly still the director?
17  A.   Yes.
18  Q.   What is the provider support department
19  tasked with?
20       MR. COCO: Objection.
21  A.   I'm not sure.
22  Q.   If you could turn to the second page of

**Page 30**

1  that document, please. Under your entry for
2  regional director there are a number of names.
3  Are those the provider relations managers we
4  discussed earlier?
5      A.  Some.
6      Q.  Okay. And are others provider relations
7  coordinators?
8      A.  Some.
9      Q.  Is there anyone listed underneath you
10 who's not a coordinator or a manager?
11     A.  Yes.
12     Q.  And what are their positions?
13     A.  Administrative assistant.
14     Q.  Anyone else?
15     A.  No.
16     Q.  Okay.
17         MR. MANGI: Let's mark the next
18 document, which is going to be Exhibit Gorman 002.
19         (Exhibit Gorman 002, Document
20 Bates- numbered BCBXMA-AWP-00073 - 00074, marked
21 for identification.)
22     Q.  Lisa, take your time and review that

**Page 31**

1  document.
2      A.  Okay.
3      Q.  Let me know when you're ready.
4         (Witness reviews document.)
5      A.  Okay.
6      Q.  Do you remember having seen this
7  document before?
8      A.  No. No.
9      Q.  Well, if you turn to the bottom of the
10 first page, you will see there is an August 17,
11 1999 e-mail from you to a group of people?
12     A.  Uh-huh.
13     Q.  Do you recall sending this e-mail?
14     A.  Do I recall? It jogs my memory reading
15 it.
16     Q.  Do you have a recollection of having
17 dealt with the issues that are discussed in this
18 e-mail?
19     A.  On a high level, yes.
20     Q.  Okay. Now, the -- in the 2 line of this
21 e-mail there are a few people I would like to ask
22 you about.

**Page 32**

1      A.  Uh-huh.
2      Q.  The first is Ellen Thompson. Who is Ms.
3  Thompson, and is she -- what was her role in 1999?
4      A.  In 1999 she was in our pricing unit.
5      Q.  Okay. Is she still with the company?
6      A.  Yes.
7      Q.  What does she do now?
8      A.  I'm not sure.
9      Q.  And what was the pricing unit's job in
10 1999?
11     A.  To maintain the physician/hospital fee
12 schedule.
13     Q.  Anne Meneghetti?
14     A.  She was at the time a medical director
15 of medical policy.
16     Q.  Is she a regional medical director?
17     A.  No.
18     Q.  Is she still with the company?
19     A.  No.
20     Q.  Is she retired?
21     A.  No.
22     Q.  Do you know where she works now?

**Page 33**

1      A.  No.
2      Q.  Mary Powers, who is Ms. Powers?
3      A.  She at the time was the manager of
4  medical policy.
5      Q.  Is she still with the company?
6      A.  No.
7      Q.  And Christopher Ditunno?
8      A.  She was a lawyer.
9      Q.  And Mark Rishell?
10     A.  He's the comptroller.
11     Q.  Is he still the comptroller?
12     A.  No.
13     Q.  And finally, we have Wendy Monroe?
14     A.  Wendy Monroe was in contracting.
15     Q.  Okay. How about the cc's there, Mrs.
16 Zackman?
17     A.  Roberta, who was at the time the --
18 Steve's role -- the region -- the statewide
19 director.
20     Q.  Of provider relations?
21     A.  Yes.
22     Q.  And Lee Ann Mitchell?

**34**

1  A. She was the regional director of metro
2  south.
3  Q. So you sent this e-mail to a broad
4  cross-section of people from different
5  departments; is that a fair statement?
6  A. Yes.
7  Q. Now, why were you sending this e-mail to
8  this broad group of people?
9  A. I was relaying concerns raised to me by
10 a physician.
11 Q. Now, the physician is Dr. Walter Kagan,
12 right?
13 A. Yes.
14 Q. Was Dr. Kagan one of the physicians in
15 your region for whom you had responsibility?
16 A. Yes.
17 Q. What was the concern that Dr. Kagan had
18 communicated to you?
19 A. From what I remember reading, the
20 document, his concern was our change in policy for
21 reimbursement of office-based chemotherapy drugs,
22 and we made a change from 100 percent to 95

**35**

1  percent.
2  Q. Okay. Now, we discussed earlier the
3  different methodologies that have been used over
4  time. Does this document refresh your
5  recollection as to previous methodology that was
6  used by BC/BS of Massachusetts?
7  A. No.
8  Q. Was the previous methodology 100 percent
9  of AWP, as this would suggest?
10 A. Yes.
11 Q. Okay. Now, in the first paragraph you
12 say, "Thank you all for a very lively discussion
13 in preparation for my meeting. It helped to get
14 everyone's opinion on the subject prior to my
15 visit with you."
16    Do you recall this meeting or
17 preparations for the meeting?
18 A. No.
19 Q. The physician practice that Dr. Kagan is
20 representing, Commonwealth Hematology & Oncology,
21 was that a significant practice to the BC/BS of
22 Massachusetts network?

**36**

1  MR. COCO: Objection.
2  A. I'm not sure what you mean by
3  "significant."
4  Q. Well, was it, you know, one of many
5  interchangeable practices, the presence or absence
6  of which wouldn't make much of a different to the
7  network, or was it a practice that was important
8  to BC/BS of Massachusetts to keep within the
9  network?
10    MR. COCO: Objection.
11 Q. You can answer.
12 A. I think it was important, but I can't
13 comment whether or not it was essential.
14 Q. Okay. What factors made it an important
15 practice to the network?
16 A. It was important because it represented
17 almost 20 oncologists south of Boston, and north.
18 Q. I'm sorry, what was the last word?
19 A. And north.
20 Q. Okay. Now, you itemize, then, on the
21 second page of the document some of the specific
22 concerns that Dr. Kagan raised. Do you recall

**37**

1  having a conversation with Dr. Kagan where he
2  communicated these concerns to you?
3  A. As I mentioned previously, this e-mail
4  jogs my memory, and so I remember on a high level
5  the conversation.
6  Q. Okay. The first issue that he raised to
7  you is "BCBSMA did not notify me of these changes
8  within the contractual obligations of 90 days'
9  advance notice (like Medicare did) nor did I agree
10 to accept these new rates."
11    Do you recall Dr. Kagan raising that
12 issue with you?
13 A. Again, as reading, I don't recall the
14 conversation, but it's, you know, jogging my
15 memory from my e-mail.
16 Q. Do you remember, just looking at this
17 now, what the resolution was on that issue?
18 A. No.
19 Q. Do you understand that Medicare changed
20 its payment rate for drugs administered physicians
21 in office from 100 percent of AWP to 95 percent of
22 AWP in the mid- to late 1990s?

**Page 38**

1  A. Is your question do I remember?
2  Q. Are you aware of the fact that Medicare
3  made that change?
4  A. I don't know.
5  Q. Looking at the second bullet point, Dr.
6  Kagan told you that "he did not agree to the rate
7  reduction for Medicare but feels he doesn't have a
8  choice but to accept them, unlike other contracts
9  like ours, which he feels he does have a choice."
10     Do you see that?
11  A. Uh-huh. Yes.
12  Q. Do you recall having that conversation
13  with Dr. Kagan?
14  A. No.
15  Q. Do you have any recollection as to --
16  well, withdraw that.
17     I would like to have a look at the third
18  issue, then. "He is not looking to make money on
19  these drugs at all -- the 5 percent reduction in
20  payment will cost him money in the long run."
21     What did you understand Dr. Kagan to be
22  referring to there?

**Page 39**

1     MR. COCO: Objection.
2  A. I don't remember.
3  Q. Do you have an understanding as to how -
4  - well, withdraw that.
5     Are you familiar with the term "buy and
6  bill"?
7  A. No.
8  Q. Are you aware of the fact that some
9  physicians purchase drugs, administer them to
10 patients and then seek reimbursement from payers?
11 A. Yes.
12 Q. Now, physicians who do purchase drugs to
13 administer to patients, do you have any
14 information as to how they go about acquiring
15 those drugs?
16    MR. COCO: Objection.
17 A. No.
18 Q. And do you know whether they purchased
19 them from wholesalers, specialty distributors,
20 direct from manufacturers?
21    MR. COCO: Objection.
22 A. No.

**Page 40**

1  Q. Do you have any information as to the
2  amount they pay to acquire those drugs?
3  A. No.
4     MR. COCO: Objection.
5  Q. Well, Dr. Kagan here is referring to the
6  fact that the 5 percent reduction in payment will
7  cost him money in the long run. So he was
8  referring to the difference between the amount
9  that he would pay to acquire drugs and the amount
10 that he would be reimbursed for those drugs,
11 right?
12    MR. COCO: Objection.
13 A. I don't remember.
14 Q. Well, you wrote this e-mail, right?
15 A. I did.
16 Q. Reading your own words, what's your
17 understanding as to what this third bullet point
18 is conveying?
19    MR. COCO: Objection.
20 A. I honestly don't remember the intent of
21 that bullet.
22 Q. Okay. Well, if a physician were to tell

**Page 41**

1  you today that he's afraid a change in payment
2  terms will -- in relation to reimbursement for
3  drugs administered in office -- will cost him
4  money, to use the phrase in the e-mail, what would
5  you understand that to mean?
6     MR. COCO: Objection.
7  A. I would ask for more of an explanation
8  of what he means by that. So what do you mean by
9  that?
10 Q. Okay. Let's take -- we'll come back to
11 that issue in a moment. Let's take a look at the
12 fourth bullet point.
13 A. Uh-huh.
14 Q. "Tufts pays 100 percent of AWP plus a
15 facility fee for the administration of chemo in
16 the office and HPHC patients no longer have the
17 privilege of receiving chemo in his office due to
18 HPHC's lack of quick claims turn around and
19 competitive fee schedule."
20    Now, what is HPHC?
21 A. HPHC is Harvard Pilgrim Health Care.
22 Q. Do you have an understanding as to the

42

1  issue being referred to here with reference to
2  Harvard Pilgrim Health Care?
3      A. No.
4      Q. What do you understand you meant when
5  you used the term competitive -- "lack of a
6  competitive fee schedule"?
7          MR. COCO: Objection.
8      A. I don't remember.
9      Q. If one were to use the phrase "lack of a
10 competitive fee schedule" to you today in
11 referring to another insurance provider, what
12 would you understand that to mean?
13         MR. COCO: Objection.
14     A. I again would ask to clarify what you
15 mean by that.
16     Q. Well, you're aware that health plans
17 compete with each other for business, right?
18     A. Yes.
19     Q. Okay. Harvard Pilgrim, Fallon,
20 Neighborhood, these were competitors of Blue
21 Cross/Blue Shield of Massachusetts, right?
22     A. Yes.

43

1      Q. They compete with each other for
2  clients, right?
3      A. Yes.
4      Q. Such as employment groups or health and
5  welfare funds, union, things of that kind --
6      A. Uh-huh.
7      Q. -- right?
8      A. Yes.
9      Q. And they also compete with each other
10 for providers to have better networks, right?
11         MR. COCO: Objection.
12     A. Yes.
13     Q. Now, if one health plan has a payment
14 methodology that's more generous than another
15 health plan's payment methodology, that would be
16 more attractive to providers, right?
17         MR. COCO: Yes.
18     A. Yes.
19     Q. Okay. So a provider would consider a
20 health plan that has a more generous fee schedule
21 to be at a competitive advantage versus a
22 healthcare insurer that has a less competitive fee

44

1  schedule, right?
2          MR. COCO: Objection.
3      A. Yes.
4      Q. Now, when Dr. Kagan here told you that
5  he was not going to administer chemo to Harvard
6  Pilgrim Health Care's patients because of Harvard
7  Pilgrim Health Care's lack of a competitive fee
8  schedule, would it be fair to say he was saying
9  they were not paying him enough, so he would not
10 be treating their patients in his office? Is that
11 a fair reading of your e-mail?
12         MR. COCO: Objection.
13     A. Honestly, I don't remember.
14     Q. I understand that you don't remember the
15 issue.
16     A. Yeah.
17     Q. It was 1999. That's fair. My question
18 to you is, reading your own e-mail from that time
19 period, is what I just said a fair representation
20 of what the issue was?
21         MR. COCO: Objection.
22     A. I don't know.

45

1      Q. So reading this e-mail, is it your
2  testimony that you are unable to understand what
3  you meant when you referred to a competitive fee
4  schedule?
5          MR. COCO: Objection.
6      A. Yes.
7      Q. Well, let's look at the next sentence
8  then, "Dr. Kagan made a business decision that he
9  could not afford to administer chemo in his office
10 for these Harvard Pilgrim Health Care patients."
11         Does that help shed any light on what
12 the previous sentence was referring to when he
13 complained about how the -- Pilgrim's lack of a
14 competitive fee schedule?
15     A. Honestly, I don't remember.
16     Q. So, again, is it your testimony that by
17 reading your e-mail today you're unable to
18 understand what you meant by that sentence?
19         MR. COCO: Objection.
20     A. That's true.
21     Q. Okay. Now, the fifth point says, "The
22 MASCO group feels this is and will continue to be

**Page 46**

1  an ongoing discussion."
2       What's the MASCO group?
3       A. From one -- I know it's a group of
4  oncologists that have formed from different
5  private groups that form as an oncology
6  representation in the state.
7       Q. When you refer to the MASCO group, are
8  you referring to MASCO itself, or are you
9  referring to a group of people dealing with MASCO?
10      MR. COCO: Objection.
11      A. Are you asking in No. 5 or --
12      Q. Yeah.
13      A. Can you repeat the question?
14      Q. Sure. When you refer to the MASCO
15 group, are you referring to the entity MASCO and
16 its members, or are you referring to a group of
17 people at BC/BS who were responsible for dealing
18 with MASCO?
19      A. MASCO itself.
20      Q. Do you recall having discussions with
21 MASCO about the issue under consideration here?
22      A. No.

**Page 47**

1       Q. The fifth point continues. "However,
2  Dr. Kagan has initiated his own proposal (via the
3  meeting with me) of how he wants this issue
4  handled for his group, Commonwealth
5  Hemo/Oncology."
6       Do you recall Mr. Kagan initiating his
7  own proposal while meeting with you?
8       A. Yes.
9       Q. Okay. And that's the proposal that's
10 discussed in the next paragraph, right?
11      A. Right.
12      Q. And Dr. Kagan said he wants to be paid
13 100 percent of AWP for chemotherapy drugs?
14      A. Yes.
15      Q. Okay. And he continues, "His
16 alternative is that, if not, he will have no
17 choice than to send these patients to a hospital-
18 based/ clinic setting for these services," right?
19      A. Yes.
20      Q. Now, why would that be a problem for
21 BC/BS of Massachusetts?
22      A. It would be a problem from a --

**Page 48**

1       MR. COCO: Objection, sorry.
2       Q. Go ahead.
3       A. It would be a problem from a member
4  satisfaction perspective. The members would
5  prefer to have services rendered in a physician
6  office setting versus a hospital/ clinic setting.
7  And I believe there was a question of whether or
8  not financially it would be a problem.
9       Q. Now, let's talk about the first issue.
10 Can you help me understand why members would
11 prefer to receive their injected or infused drug
12 in a physician office setting rather in a hospital
13 outpatient department?
14      MR. COCO: Objection.
15      A. Well, I've never been a member in that
16 situation, thank God, but to speculate I think
17 it's a sensitive time in someone's life, and
18 members have told us that they would prefer to
19 have that type of service in a more comfortable
20 setting like a physician office versus at a
21 hospital/clinic setting.
22      Q. You said "members have told us." In

**Page 49**

1  what forum have members conveyed those --
2       A. I may have misspoke. I meant kind of
3  anecdotally. I don't have any member satisfaction
4  information that proves that, just anecdotally
5  from our member service team it was told to us
6  that members would prefer that setting.
7       Q. Now, the second point you raised, then,
8  is of financial -- there's a question as to which
9  setting would be financially more advantageous for
10 BC/BS of Massachusetts, right?
11      A. Yes.
12      Q. What was the concern there?
13      A. The concern would be that potentially
14 Blue Cross could pay out more money in services --
15 in medical expenses for those same services
16 rendered at the hospital versus an office-based
17 setting.
18      Q. And that would be the case even if it
19 were paying 100 percent of AWP to Dr. Kagan; the
20 concern would be it would pay even more than that
21 if the treatment were administered in a hospital
22 outpatient department?

Lisa M. Gorman          HIGHLY CONFIDENTIAL          March 7, 2006
                            Boston, MA

                                                                50
1       MR. COCO: Objection.
2    A. There was a question of whether or not
3    that would be the case, yeah.
4    Q. Was that question ever examined or
5    resolved?
6       MR. COCO: Objection.
7    A. I don't remember.
8    Q. Do you recall ever being tasked with
9    examining that issue?
10   A. What jogs my memory reading the e-mail
11   is that I know that that was one of the follow-
12   ups, but to answer your question, I don't remember
13   what the end result was.
14   Q. Okay. Have you been asked to search
15   your files for documents in connection with this
16   litigation?
17   A. Yes.
18   Q. Have you, in fact, searched your files?
19   A. I have.
20   Q. What did you search your files for?
21   A. I searched my files for any type of
22   physician communication related to AWP or

                                                                51
1    reimbursement of office-based drugs.
2    Q. Did you look for any documents other
3    than physician communications?
4    A. Well, that would be the only thing I
5    would -- physician-related would be what I would
6    have, so...
7    Q. Did you search your electronic files and
8    e-mails as well as hard copy files?
9    A. I personally checked my electronic
10   files, and I no longer am in the area with paper
11   files but did request those.
12   Q. And were those files obtained and
13   searched?
14   A. No.
15   Q. Why were they not obtained and searched?
16   A. They were purged since I left south.
17   And material was purged if it was too old and not
18   in use.
19   Q. When were those materials purged?
20   A. I'm guessing, you know, probably around
21   the time that I went to north, which was '04, and
22   that team changed locations.

                                                                52
1    Q. Have you seen any notices requiring you
2    to preserve documents related to this litigation?
3       MR. COCO: Objection.
4    A. Can you repeat that?
5    Q. Sure. Have you seen any -- have you
6    received any notices requiring that you preserve
7    all documents in your files that may be relevant
8    to this litigation?
9       MR. COCO: Objection.
10   A. Before, before --
11   Q. Yeah, recently.
12   A. Recently.
13   Q. In the last six months or a year.
14   A. I was asked to check my electronic files
15   and check my paper files for what we just
16   described.
17   Q. I understand that.
18   A. Okay.
19   Q. My question's a little different.
20   A. Okay.
21   Q. Have you received any sort of a
22   notification asking you to preserve all documents

                                                                53
1    that may be relevant to this litigation?
2    A. Yes, yes.
3       MR. COCO: Objection.
4    Q. When did you receive that notification?
5    A. I guess I'm confused about the question.
6    Are you asking if someone at Blue Cross told me to
7    -- are you asking, told me to --
8    Q. No. I'm not asking about these specific
9    documents.
10   A. Okay.
11   Q. I'm not asking about the search that you
12   performed --
13   A. Okay.
14   Q. -- relating to your documents.
15   A. Okay.
16   Q. My question is more general.
17   A. Okay.
18   Q. My question is, have you received any
19   sort of notice in writing, e-mail or even orally
20   telling you to hold and preserve and not destroy
21   any documents that may be relevant to this
22   litigation?

**Page 54**

1      MR. COCO: Objection.
2      A. I don't know how to answer that question
3   honestly, because I still am unclear about what
4   you're asking.
5      Q. Okay. Have you received any form of a
6   communication telling you there is a litigation
7   going on involving AWP --
8      A. Yes.
9      Q. -- preserve all of your documents --
10     A. Yes.
11     Q. -- that may be related to that --
12     A. Yes.
13     Q. -- and don't throw them away or destroy
14  them?
15     A. Yes.
16     Q. Okay. When did you receive that
17  notification?
18     A. Four weeks ago, five weeks ago.
19     Q. How did you receive that communication?
20  Was it by e-mail?
21     A. By e-mail.
22     Q. Who did you receive that from?

**Page 55**

1      A. From Steve Skwara.
2      Q. Now, when you searched your files, did
3   you look specifically for any documents -- and
4   we're turning back now to Exhibit Gorman 002. Did
5   you search your files for any documents related to
6   this issue that's under discussion in this e-mail?
7      A. Related to the Dr. Kagan issue?
8      Q. Right.
9      A. I searched by a search -- AWP search
10  word for any e-mails with that in the body of it.
11     Q. AWP/word, did you say?
12     A. No. It's just a search function in the
13  e-mail that you can put in -- I put in AWP to pull
14  up any e-mail that would have AWP in it.
15     Q. Okay. Well, other than merely searching
16  e-mails --
17     A. Okay.
18     Q. -- did you look for any -- for example,
19  let's look at a specific issue. Did you look for
20  the follow-up that you had done or been tasked
21  with in relation to whether or not a hospital
22  setting would be more expensive than a physician

**Page 56**

1   office setting?
2      A. Did I look for that information?
3      Q. Right.
4      A. Not specifically, no.
5      Q. When you searched your e-mails, did you
6   come across this particular e-mail that we're
7   discussing now?
8      A. No.
9      Q. Have you had the same e-mail system and
10  same e-mail address since 1999?
11     A. I have.
12     Q. Okay. Do you maintain folders in your -
13  - do you use Outlook?
14     A. I do.
15     Q. Okay. Do you maintain folders in your
16  Outlook in which you file e-mail messages?
17     A. Yes.
18     Q. Do you know why this e-mail did not show
19  up in the search that you ran?
20     A. Probably for two reasons. I am no
21  longer responsible for kind of south, so anything
22  I would have -- from a paper file would have

**Page 57**

1   stayed south. And there's only a certain capacity
2   on e-mail where company-wide we have to delete
3   what's not used. And I certainly don't have any
4   e-mails related to any subject back to 1999.
5      Q. How long do you maintain your e-mails
6   for?
7      A. I try and keep it under a year.
8      Q. So you delete any e-mails as a matter of
9   regular practice --
10     A. I try to.
11     Q. -- that are older than a year?
12     A. I try to.
13     Q. Do you know whether or not Blue
14  Cross/Blue Shield of Massachusetts has a document
15  retention policy?
16     A. I don't know.
17     Q. Now, do you have electronic files on
18  your computer other than e-mail?
19     A. Yes.
20     Q. Do you have files containing Word
21  documents, Excel documents, PowerPoint documents,
22  things like that?

Lisa M. Gorman        HIGHLY CONFIDENTIAL        March 7, 2006
                       Boston, MA

**58**

1    A.  Yes.
2    Q.  Do you maintain those documents on your
3  hard drive, or is there a company-wide document
4  management system?
5    A.  It's on my hard drive.
6    Q.  Did you search those files for documents
7  related to this issue?
8    A.  I did.
9    Q.  Including any documents pertaining to
10 the hospital versus physician office setting?
11   A.  Not specifically, but just in general of
12 the subject.
13   Q.  Now, your paper files that stayed -- you
14 said stayed south --
15   A.  Yes.
16   Q.  -- where are those files at present?
17   A.  Well, they've been -- my old files have
18 been destroyed from a purging perspective.
19      MR. COCO: Adeel, we've been going about
20 an hour.
21      MR. MANGI: Yeah.
22      MR. COCO: Is this a good time to take a

**59**

1  break?
2       MR. MANGI: Yeah. Why don't I just
3  finish up this document. For the record, we ask
4  that Ms. Gorman's files be searched specifically
5  for any follow-up pertaining to the analysis
6  discussion.
7       MR. COCO: Yeah, you had made a request
8  similar to that yesterday with respect to Jan
9  Cook, and I think it makes more sense to just send
10 a separate letter on those.
11      MR. MANGI: We'll memorialize all the
12 requests in writing. I just mentioned them now --
13      MR. COCO: Okay. Fair enough.
14      MR. MANGI: -- given the expedited
15 schedule. We can get going.
16      MR. COCO: Sure.
17 BY MR. MANGI:
18   Q.  Now, referring to Exhibit Gorman 002,
19 after the -- you have the paragraph "Where do we
20 go from here." Do you see that towards the middle
21 of the second page?
22   A.  Yes.

**60**

1    Q.  And that discusses -- and the first
2  point there discusses the option that we just
3  talked about. "We can either go back to paying
4  100 percent of AWP for Chemo Drugs (either
5  statewide or uniquely for Dr. Kagan's group),"
6  that's the option we just discussed, right?
7       MR. COCO: Objection.
8    A.  Yes.
9    Q.  "Thank him for his attention to this
10 matter, but continue to pay him 95 percent of AWP
11 and see if he really makes a business decision to
12 send these patients to the Hospital."
13      And then you have your recommendation.
14 Reading this, do you recall -- and does this
15 refresh your recollection as having analyzed this
16 issue and made a recommendation?
17      MR. COCO: Objection.
18   A.  Based on what I wrote, it looks as if I
19 at the time had a recommendation.
20   Q.  Okay. And you -- and these are some of
21 the issues that we have discussed. The first was
22 you suggested the running of data to see what the

**61**

1  financial implications would be, right?
2    A.  Correct.
3    Q.  And second you talked about trying to
4  measure member satisfaction levels in Dr. -- if
5  Dr. Kagan's group no longer provided these
6  services. Do you recall whether any follow-up
7  analysis was done regarding that second point?
8    A.  I do not.
9    Q.  Your bottom line is that if the hospital
10 setting would cost more, member satisfaction would
11 be affected as well. You would recommend paying
12 him 100 percent of AWP as he requested, right?
13      MR. COCO: Objection.
14   A.  That's what I wrote.
15   Q.  And then you sought any input or
16 thoughts from the group --
17   A.  Correct.
18   Q.  -- right?
19      Okay. We'll continue with the responses
20 after the intermission.
21   A.  Okay.
22      (Recess taken.)

**62**

1　Q.　Ms. Gorman, before the break, we were
2　talking about Exhibit Gorman 002. I would like to
3　turn back to that, please.
4　A.　Yeah.
5　Q.　On the first page of that exhibit, the
6　second e-mail from the bottom, this is from Anne
7　Meneghetti responding to your e-mail. Do you see
8　that?
9　A.　Yeah.
10　Q.　And Anne Meneghetti was the medical
11　director, right?
12　A.　Right.
13　Q.　Okay. Now, she says, "This is certainly
14　a challenging issue. While reimbursement is not
15　my area of accountability, I am uncomfortable with
16　unique arrangements. My vote is for a standard
17　approach to all providers."
18　　　Now, do you recall any discussion in
19　this time period around this issue about whether
20　or not BC/BS of Massachusetts should have
21　individualized arrangements with providers as
22　against one take it or leave it approach for

**63**

1　everyone?
2　　　MR. COCO: Objection.
3　A.　I don't remember.
4　Q.　Do you know at the present time whether
5　or not BC/BS of Massachusetts does negotiate
6　reimbursement terms with individual providers?
7　A.　Yes.
8　Q.　Okay. Does it?
9　A.　Sometimes.
10　Q.　How long has there been individualized
11　negotiation with providers?
12　A.　I don't know.
13　　　MR. COCO: Objection.
14　Q.　How long have you been aware of that
15　negotiation having taken place?
16　　　MR. COCO: Objection.
17　A.　I would guess in the last couple of
18　years.
19　Q.　Okay. Do you get -- what is your
20　involvement with any such individualized
21　negotiations?
22　　　MR. COCO: Objection.

**64**

1　A.　My involvement today is not to negotiate
2　any of the unique arrangements but play a
3　supportive role in that setting.
4　Q.　Who is tasked with negotiating the
5　specific terms?
6　A.　Provider contracting.
7　Q.　Who's in charge of provider contracting?
8　A.　Deb Deveaux.
9　Q.　Now, you say you're on a list to play a
10　supporting role? What do you mean by that?
11　A.　We play a role in which we support
12　provider contracting in terms of ensuring that
13　what is negotiated can be operationalized
14　internally.
15　Q.　What do you mean, "operationalized"?
16　A.　Meaning any -- are we able to implement
17　-- whether it would be systematically or manually
18　within the company -- can we implement any of the
19　terms of the contract that they're negotiating.
20　Q.　And how is that a provider relations
21　issue as opposed to a fee schedule management
22　issue?

**65**

1　A.　Well, just to clarify, we do -- we're
2　one of many that play a supporting role in the
3　negotiations, and in terms of our relationship
4　with providers and knowing what we can and cannot
5　do in terms of implementing any type of contracts,
6　you know, we use our knowledge base to say whether
7　or not we can do what's being negotiated.
8　Q.　Okay. What specific implementation
9　issues do you provide input on as a provider
10　relations person?
11　A.　Do you want examples?
12　Q.　Sure.
13　A.　Let's see. If a provider is requesting
14　unique terms, turnaround times for claims
15　payments. If they are requesting unique terms,
16　you know, for, you know, expectations of any other
17　type of business transactions, we would review to
18　ensure whether or not we can do that, we can
19　implement what they're requesting.
20　Q.　Is your role one of assisting in
21　liaising with the provider as a provider relations
22　-- as a person in the provider relations

**Page 66**

1  department? I'm just trying to understand what
2  specifically you do in that process.
3       MR. COCO: Objection.
4    Q. Go ahead.
5    A. We're certainly the provider advocates
6  internally at the plan, and so we act and behave
7  in that setting as if, you know, thinking with the
8  provider hat on how does all of this play out,
9  affect providers. But obviously we work for the
10 plan, but we try and advocate for providers in
11 that setting.
12   Q. Now, in what circumstances is there
13 individualized negotiation?
14      MR. COCO: Objection.
15   A. It's not the normal contracting
16 protocol.
17   Q. Well, will there be individualized
18 negotiation whenever a physician demands it, or
19 are there certain set precursors to BC/BS agreeing
20 to individually negotiate?
21   A. Provider contracting has the criteria.
22   Q. Okay. Do you know what they are?

**Page 67**

1    A. No.
2    Q. Do you know what proportion of physician
3  reimbursement arrangements are individually
4  negotiated?
5    A. No.
6    Q. Is it -- do you know if it's more than
7  10 percent or less than 10 percent?
8    A. I couldn't guess.
9    Q. Do you know whether it's a majority of
10 arrangements or a minority of arrangements?
11      MR. COCO: Objection.
12   A. Again, I can't guess.
13   Q. You have no idea?
14   A. No idea.
15   Q. Focusing specifically on reimbursement
16 for drugs administered in office, is there
17 negotiation, individualized negotiation, around
18 that reimbursement rate?
19   A. To my knowledge, no. It's -- the
20 negotiations are never on a CPT-by-CPT level or
21 specific level. It's kind of in generality
22 reimbursement discussion.

**Page 68**

1    Q. So when BC/BS of Massachusetts does
2  engage in individualized negotiations, it's never
3  at a line item level; it's always at an overall
4  reimbursement level. Is that a fair statement?
5    A. That's correct.
6    Q. And the issue that's discussed and
7  negotiated is what will be the overall dollar sum
8  reimbursed for drugs, services and never what will
9  be reimbursed for this specific drug or this
10 specific service?
11      MR. COCO: Objection.
12   A. That's right.
13   Q. Now, turning back to Exhibit Gorman 002,
14 the next e-mail in the chain is from James Fanale.
15 And that's dated August 18, 1999. Do you see
16 that?
17   A. Yes.
18   Q. And he recommends that the analysis you
19 suggested be performed, right?
20   A. It looks that way, yes.
21   Q. Now, did you -- what was Mr. Fanale's
22 role in 1999?

**Page 69**

1    A. He was the chief medical officer.
2    Q. Did you report to him in any way
3  directly or indirectly?
4    A. No.
5    Q. If you were to be tasked with doing a
6  particular task, could Mr. Fanale give you an
7  assignment, or would it have to go through someone
8  else?
9       MR. COCO: Objection.
10   A. He could give me an assignment.
11   Q. Do you recall whether or not he did give
12 you this assignment?
13   A. I don't remember.
14   Q. Now, Mr. Fanale also says in this 1999
15 e-mail towards the middle of the paragraph "Also,"
16 do you see the sentence starting with "Also"?
17   A. Yes.
18   Q. "Also, I would ask him to provide us
19 information on how it is costing him money. I'm
20 not sure I believe him."
21      Were you involved in any communications
22 with Dr. Kagan asking him what he was paying to

Lisa M. Gorman   HIGHLY CONFIDENTIAL   March 7, 2006
Boston, MA

Page 70

1  acquire drugs?
2     A.  Not that I remember.
3     Q.  It's fair to say that's what -- we can
4  agree that's what Dr. Fanale is suggesting BC/BS
5  do, right?
6         MR. COCO:  Objection.
7     A.  Based upon what he wrote in this e-mail,
8  yes.
9     Q.  So it's fair to say that BC/BS of
10 Massachusetts certainly understood that it could
11 ask providers to reveal their acquisition costs
12 for drugs if it wanted to, right?
13        MR. COCO:  Objection.
14    A.  I'm not sure how -- what information we
15 would ask for.
16    Q.  Well, that's not my question.  Let me --
17    A.  Okay.
18    Q.  -- phrase it again.
19        My question is, reading this e-mail
20 about this issue that you were involved with in
21 1999, we can agree, can't we, that BC/BS of
22 Massachusetts was free to ask providers to provide

Page 71

1  information about their acquisition cost for drugs
2  if it wanted to?
3         MR. COCO:  Objection.
4     A.  I guess I wouldn't conclude that from
5  reading this e-mail, and whether or not we did at
6  the time, I don't remember.
7     Q.  Okay.  What is there about this e-mail
8  that you think is inconsistent with the
9  proposition that I stated?
10        MR. COCO:  Objection.
11    A.  I guess in reading the e-mail Jim says -
12 - or requests, "I would ask him to provide
13 information on how it is costing him money." And
14 what I'm saying is I'm not quite sure what the
15 information is we would ask him for, nor do I
16 remember.
17    Q.  Okay.  Well, it's information on how it
18 would be costing him money, right?  That much is
19 clear?
20        MR. COCO:  Objection.
21    A.  Right.
22    Q.  And for it to cost him money, it would

Page 72

1  obviously be about the difference between the
2  amount he's paying, his cost, and the amount he's
3  being reimbursed, right?  That's the only possible
4  interpretation of costing him money?
5         MR. COCO:  Objection.
6     A.  I guess so.  I mean --
7     Q.  Okay.  So BC/BS of Massachusetts knows
8  one part of that equation, right?  It knows what
9  it's paying in reimbursement --
10    A.  Right.
11    Q.  -- right?
12    A.  Yeah.
13    Q.  So the only other part of that equation
14 is what the acquisition cost for the drugs is,
15 right?  We can agree on that, right?
16        MR. COCO:  Objection.
17    A.  I guess that would be -- I mean, I don't
18 have information to say the acquisition cost is
19 what we would ask him for.  I don't know.  I don't
20 know what we would ask him for.
21    Q.  I understand.  I'm asking you for your
22 understanding of this e-mail which you received

Page 73

1  from Dr. Fanale --
2     A.  Okay.
3     Q.  -- responding to your e-mail.
4     A.  My understanding of that statement is
5  Jim is saying in the e-mail that he would like to
6  ask him for information, and I'm saying I don't
7  know what information he would ask, whether or not
8  we asked it.
9     Q.  My question is --
10    A.  Okay.
11    Q.  -- based on what we've just discussed --
12    A.  Okay.
13    Q.  -- about what the term "costing him
14 money" means --
15    A.  Okay.
16    Q.  -- is it the natural implication of Dr.
17 Fanale's statement that he was saying, "Ask the
18 doctor what it's costing him to acquire drugs"?
19        MR. COCO:  Objection.
20    A.  I'm not Jim Fanale.  I don't know what
21 his intent was.
22    Q.  I'm asking for your understanding of his