**74**

1  e-mail to you.
2      A. My understanding --
3      MR. COCO: Objection, asked and
4  answered.
5      THE WITNESS: Do I answer it?
6      MR. COCO: Uh-huh.
7      Q. Yes.
8      A. Again, my understanding of that sentence
9  is that Jim Fanale is requesting that we ask Dr.
10 Kagan for information on how it is costing money,
11 but I cannot -- I don't remember. I don't have
12 information on what exactly he would ask Dr. Kagan
13 for.
14     Q. Okay. Well, let me ask you this
15 question, in 1999 would you have felt comfortable
16 in meeting with Dr. Kagan asking him about what
17 he's paying for chemotherapy drugs?
18     MR. COCO: Objection.
19     A. No, it wouldn't be something that I
20 would ask. No.
21     Q. So your testimony is that you would not
22 in any circumstances ask Dr. Kagan what he was

**75**

1  paying to acquire chemotherapy drugs in 1999?
2      MR. COCO: Objection.
3      A. I don't remember if I asked him. I
4  don't think I would have asked him, but I don't
5  remember, so --
6      Q. Why do you say you don't think you would
7  have asked him that?
8      MR. COCO: Objection.
9      A. I guess it's not something that I would
10 normally ask in that setting.
11     Q. Okay. Let's mark another document.
12     MR. MANGI: This is Exhibit Gorman 003.
13     (Exhibit Gorman 003, Document
14 Bates- numbered BCBSMA-AWP-00048 - 00051, marked
15 for identification.)
16     Q. Please take a look at that document and
17 let me know when you're ready to proceed.
18     (Witness reviews document.)
19     Q. And take your time with it, but I'll
20 draw you to specific parts of the e-mail.
21     (Witness reviews document.)
22     Q. Ready?

**76**

1      A. Almost.
2      (Witness reviews document.)
3      A. Okay.
4      Q. Now, on Exhibit Gorman 003 --
5      A. Yeah.
6      Q. -- there's an e-mail on the first page
7  from you to a group, including James Fanale, dated
8  August 23rd, 1999, which is a continuation of the
9  e-mail chain discussed in Exhibit Gorman 002. In
10 the second paragraph you state, "Secondly, I was
11 not shy in my meeting with Dr. Kagan about
12 discussing how much he's really paying for the
13 chemo drugs."
14     Do you see that?
15     A. Yes.
16     Q. Okay. Does this refresh your
17 recollection as to having had a conversation with
18 Dr. Kagan about his acquisition cost for drugs?
19     A. It doesn't.
20     Q. Okay. Do you recall sending this e-
21 mail?
22     A. Do I recall? I mean, I don't -- I mean,

**77**

1  it re -- I don't remember sending the e-mail, no.
2      Q. Do you have any reason to doubt that you
3  sent this e-mail?
4      A. I don't have any reason to doubt, no.
5      Q. Looking at Exhibit Gorman 003, the
6  second paragraph, it's clear certainly that you
7  did have a meeting with Dr. Kagan where you
8  discussed how much he's really paying for the
9  chemo drugs, right?
10     MR. COCO: Objection.
11     A. It looks like based upon what I wrote at
12 the time, that's true.
13     Q. And there's nothing inappropriate about
14 that, right? That's something that you were asked
15 to do by Dr. Fanale?
16     MR. COCO: Objection.
17     A. That's correct.
18     Q. So it's certainly fair to say, and we
19 can agree, can't we, that in 1999 you were able to
20 and indeed did go to a provider and ask them what
21 they're paying to acquire chemotherapy drugs,
22 right?

**Page 78**

1    MR. COCO: Objection.
2    A. Based upon what I wrote in this e-mail,
3    I mean, reading it, then yes.
4    Q. And there's no reason to think that was
5    anything new or revolutionary? From Dr. Fanale's
6    e-mail it's clear that BC/BS always thought it had
7    the right to make that inquiry, and this is one
8    example of a situation where it did make that
9    inquiry through you, right?
10       MR. COCO: Objection.
11   A. I wouldn't make that conclusion, no.
12   Q. Is there any reason to think this was a
13   unique or a new situation?
14       MR. COCO: Objection.
15   A. I think it was a unique situation, yes.
16   Q. Is there any reason to think this was
17   the first time BC/BS ever asked any provider what
18   their acquisition costs for drugs were?
19   A. Personally in my role I don't remember
20   any other situations. It wasn't a normal course
21   of business, no.
22   Q. Okay. You weren't involved in any other

**Page 79**

1    situations of this kind, that you recall, right?
2    A. Not that I remember.
3    Q. But you have no reason to know whether
4    this was a first time, the last time or whether it
5    had happened many times before; you just don't
6    know?
7    A. I don't know, yeah.
8    Q. But looking at Dr. Fanale's e-mail of
9    August 1999, which is Exhibit Gorman 002, there is
10   nothing here to suggest to you that he was asking
11   you to do something new and unprecedented, right?
12       MR. COCO: Objection.
13   A. Again, I have not talked to Fanale, so I
14   don't know.
15   Q. My question is, there's nothing there
16   that suggested to you that he was asking you to do
17   something new and unprecedented?
18       MR. COCO: Objection.
19   A. I don't know. I don't know.
20   Q. But certainly in 1999, going back to
21   Exhibit Gorman 003, you had this communication
22   with Dr. Kagan, right?

**Page 80**

1    A. Yes.
2    Q. And, in fact, as you say here, you were
3    not shy in your meeting about asking him what he's
4    really paying for chemo drugs, right?
5        MR. COCO: Objection.
6    A. That's what I wrote, yes.
7    Q. Now, let's turn back to Exhibit Gorman
8    002. The top e-mail in that chain is from Mark
9    Rishell. Do you see that?
10   A. Yes.
11   Q. And Mr. Rishell was the statewide
12   director of provider relations; is that right?
13   A. No. Mark Rishell was the comptroller.
14   Q. Mark Rishell was the comptroller?
15   A. Yes.
16   Q. Now, Mr. Rishell responds to the e-mail
17   chain saying, "We're trying to determine how MASCO
18   purchases chemo drugs and what discount they
19   receive." And you're one of the recipients on
20   that e-mail, right? Do you see that?
21   A. Yes.
22   Q. Did you have an understanding in 1999 as

**Page 81**

1    to whether or not MASCO was purchasing drugs?
2    A. I don't remember, although what I wrote
3    in this e-mail says that MASCO themselves as a
4    society does not purchase the drugs.
5    Q. Okay. Well, let's look at Exhibit
6    Gorman 002 for a moment.
7    A. Okay. Yeah.
8    Q. Mr. Michelle -- I'm sorry, Rishell says,
9    "If we purchase the drugs through our PBM, we
10   would benefit from the discount we had negotiated.
11   It is possible that MASCO is purchasing the drugs
12   through a clinical license which would result in a
13   greater discount than we receive."
14       Do you recall receiving that e-mail?
15   A. No.
16   Q. Okay. Well, looking at it now, it's
17   certainly fair to say, isn't it, that as of 1999
18   the comptroller, Mr. Rishell, recognized that if
19   BC/BS were to purchase the drugs, it would get a
20   discount on the price, right?
21       MR. COCO: Objection.
22   A. If that's what he writes.

**Page 82**

1   Q. And that is what he writes, isn't it --
2       MR. COCO: Objection.
3   Q. -- in this e-mail that he sent to you?
4   A. I'm not sure.
5   Q. Okay. Well, I don't mean to pose a
6   trick question. I thought it was a pretty
7   straightforward, but help me understand how you
8   interpret the sentence, "If we purchase the drugs
9   through PBM, we would benefit from the discount
10  we've negotiated."
11      Doesn't that mean that BC/BS of
12  Massachusetts could purchase drugs at a discount?
13      MR. COCO: Objection.
14  A. It sounds like that that's his intent,
15  but I'm not sure.
16  Q. Okay. Would you interpret this e-mail
17  that you've received in any different way?
18      MR. COCO: Objection.
19  A. No.
20  Q. And he then continues to say that if
21  MASCO were purchasing the drugs, that could result
22  in a greater discount than BC/BS could get, right?

**Page 83**

1       MR. COCO: Objection.
2   A. That's what he writes.
3   Q. Okay. So Mr. Rishell is recognizing
4   that different players in the market could
5   purchase drugs at different prices, right?
6       MR. COCO: Objection.
7   Q. That's what he's saying in this e-mail?
8       MR. COCO: Objection.
9   A. Are you asking me that?
10  Q. Yeah.
11  A. You know, I don't know if that's what
12  he's assuming, but, again, this isn't from me, so
13  I'm not quite sure what you're asking.
14  Q. Based on your experience in the industry
15  since 1990, that's certainly something that's
16  well-known and non-controversial, isn't it, that
17  different entities can purchase drugs at different
18  prices?
19      MR. COCO: Objection.
20  A. I guess from my perspective and my lens,
21  to do my job, I don't need to have that knowledge
22  base. You know, I -- if you're telling me that

**Page 84**

1   that happens, then I have no reason not to believe
2   you, but...
3   Q. Well, don't take my word for it. Let's
4   have a look at a document.
5       MR. COCO: Please don't.
6       MR. MANGI: Let's mark this as Exhibit
7   Gorman 004.
8       (Exhibit Gorman 004, Congressional
9   Record, no Bates stamp, marked for
10  identification.)
11  Q. Now, I'll draw your attention to -- now,
12  this is an excerpt from the Congressional Record,
13  no less. Do you see that?
14  A. Uh-huh.
15  Q. And you see on the first page the date
16  is 1989, right?
17  A. (No verbal response.)
18  Q. Now, I'll represent to you that at the
19  end of this document which is the stapled part of
20  Exhibit Gorman 004, you'll see on the last two
21  pages there is a chart in the text.
22  A. Okay.

**Page 85**

1   Q. And right at the end the document
2   clipped to it is a chart that we typed up which
3   just contains the same information in a slightly
4   more legible format.
5   A. Okay.
6   Q. Now, I would like you to turn to Page 6
7   of the document. And you'll see the page numbers
8   are at the top right.
9   A. Okay.
10  Q. And so here we are reading from the
11  Congressional Record in 1989, and I'm looking at
12  the third paragraph from the bottom. It says,
13  "Mr. President, here in the United States, the
14  price you pay for a prescription drug depends on
15  who you are and what kind of deal you can strike
16  with the manufacturer. Hospitals and Veterans'
17  Administration get the best prices, and Medicare"
18  -- "Medicaid, Medicare, and the public buying at
19  pharmacies get the worst prices, because the
20  pharmacies have to pay high prices." And then
21  going down to the last paragraph, it says, "It
22  comes down to this: for the same bottle of

86
1  prescription drugs, different buyers buy" -- "pay
2  dramatically different prices."
3      Do you see that?
4    A. Yeah.
5    Q. Okay. And if you have a look at the
6  chart that's contained at the end of this exhibit,
7  you'll see that there are drugs listed. Do you
8  see that the rows are each a different type of a
9  drug?
10   A. Yes.
11   Q. And then there is a listing of the
12 average wholesale price for that drug. Do you see
13 that?
14   A. Yeah.
15   Q. And then you see estimates of the prices
16 actually paid by different market entities. Do you
17 see those?
18   A. Okay.
19   Q. It's easier if you actually look at the
20 typed up version on the very last page.
21   A. Okay.
22   Q. Okay? And it's clear both from the text

87
1  of this Congressional Record and the table that
2  different entities in the market are buying drugs
3  at, to quote the record, dramatically different
4  prices, right?
5      MR. COCO: Objection.
6    A. That's what it shows.
7    Q. Okay. Now turning back to Mr. Rishell's
8  e-mail from August 20th, '99, which is part of
9  Exhibit Gorman 002, he's making the same point,
10 right? He's saying that different entities can
11 purchase drugs at different prices, right?
12     MR. COCO: Objection.
13   A. I guess you can make that assumption.
14   Q. Okay. Would you read this -- would you
15 agree with that reading of his e-mail to you?
16     MR. COCO: Objection.
17   A. I guess I would probe and ask him if
18 that was the intent.
19   Q. Well, reading the e-mail that you
20 received, is that how you would read the e-mail?
21     MR. COCO: Objection.
22   A. Yes, but I would confirm with him about

88
1  his intent.
2    Q. Now let's go to Exhibit Gorman 003.
3  Now, pages 3 and 4 of this chain have the same e-
4  mail from you from August 17 that we've talked
5  about already, right?
6    A. Yes.
7    Q. And similarly, Page 2 of the e-mail has
8  the e-mails from Ms. Meneghetti, Dr. Fanale and
9  Mr. Rishell that we talked about already, right?
10   A. That's right.
11   Q. Okay. Above those is the first new e-
12 mail from James Fanale dated August 20th, and he's
13 agreeing -- he says, "I agree" in response to Mr.
14 Rishell's e-mail, right?
15     MR. COCO: Objection.
16   Q. And that's the e-mail we were just
17 talking about. Do you see that?
18   A. Yeah.
19   Q. Now, he says, "Lisa, we need to figure
20 out how to close the loop and who should meet with
21 them, et cetera. Just let me know your thoughts.
22 JF."

89
1      Does that refresh your recollection as
2  to whether or not you were tasked with doing
3  follow-up with regards to this project?
4    A. I don't remember.
5    Q. I'll ask you to turn -- flip over to
6  Page 1 of the document. And this is the e-mail
7  from you to the same group, Dr. Fanale, Mr.
8  Rishell, Ms. Meneghetti and others dated August
9  23rd, 1999, right?
10   A. Yes.
11   Q. And here at the first -- you say, "Just
12 as a point of clarification: MASCO, as a society,
13 does not purchase the drugs -- the independent
14 physician offices (who make up MASCO) purchase the
15 drugs through their individual physician
16 practices."
17     Do you see that?
18   A. Yes.
19     MR. NOTARGIACOMO: Objection. You
20 misread the record. It's the "independent
21 physician offices." You read "the individual
22 physician offices."

Page 90

1    MR. MANGI: Thank you for the
2    correction.
3    Q. Now, that's still your understanding
4    today, right? MASCO doesn't buy drugs; individual
5    practices buy drugs?
6    A. I guess I don't have an opinion today,
7    because I don't really -- I don't service the
8    group, nor do I have any current information on
9    MASCO today.
10   Q. Well, you knew that in 1999, right?
11       MR. COCO: Objection.
12   A. Well, it sounds like I did based upon
13   what I wrote in this e-mail.
14   Q. Because you were correcting the
15   comptroller no less, right?
16   A. That's what I wrote, yes.
17   Q. Now, why was -- why were you making this
18   point? What was the relevance of the fact that
19   individual physician practices buy drugs rather
20   than MASCO buying drugs?
21   A. Again, I don't remember the specifics,
22   but reading what I write in the following sentence

Page 91

1    -- and just to read it, I write, "But I wanted to
2    emphasize the fact that Dr. Kagan may be paying a
3    different rate than his colleagues."
4    Q. And by "his colleagues" you're referring
5    to other physician practices?
6    A. I think what I meant was others in
7    MASCO.
8    Q. Okay. And MASCO is made up of --
9    A. Other oncologists.
10   Q. -- other physicians with independent
11   practices, right?
12   A. Yes.
13   Q. So you were saying that although Dr.
14   Kagan is one of the people in MASCO, he may be
15   paying a different rate than other doctors who may
16   be part of MASCO to acquire drugs, right?
17   A. That's what I wrote, yes.
18   Q. So certainly as of 1999 you understood
19   that different doctors can buy drugs at different
20   prices, right?
21       MR. COCO: Objection.
22   A. That's what the e-mail implies, yes.

Page 92

1    Q. Now, we then talk about -- we come to
2    this paragraph that we spoke about earlier where
3    you say, "I was not shy in my meeting with Dr.
4    Kagan about discussing how much he's really paying
5    for the chemo drugs. In my pre-discussions with
6    both Anne and Ellen" -- now, who are Anne and
7    Ellen that you are referring to there?
8    A. It sounds like it's Anne Meneghetti and
9    Ellen Thompson.
10   Q. So your e-mail states, "In my pre-
11   discussions with both Anne and Ellen they told me
12   that Dr. Kagan is most likely receiving a
13   negotiated rate for the drugs, which is probably
14   less than 95 percent."
15       What was your understanding -- well,
16   withdraw that.
17       Do you recall having these pre-
18   discussions with Anne and Ellen?
19   A. No.
20   Q. Do you recall having any discussions
21   with anyone at BC/BS of Massachusetts in this time
22   period about what physicians were paying to

Page 93

1    acquire drugs?
2    A. Honestly, I don't remember.
3    Q. But just looking at the e-mail, you
4    understood that it was an individually negotiated
5    rate?
6        MR. COCO: Objection.
7    A. That's what I wrote in the e-mail.
8    Q. And continuing on towards the end of
9    that paragraph, you recognized the fact that there
10   are certain overhead costs associated with
11   physicians purchasing and administering drugs,
12   such as drugs that have to be thrown away due to
13   their shelf life, right?
14       MR. COCO: Objection.
15   A. That's what I wrote, yes.
16   Q. In your role as a physician advocate,
17   you were conveying this information to the larger
18   group at BC/BS, right?
19   A. That's what it looks like, yes.
20   Q. Now, in the next paragraph you say,
21   "It's my opinion that we should not publicly
22   question the fact that Dr. Kagan is losing money

**94**

1  on administering chemo in his office. He has
2  clearly demonstrated his business sense and would
3  take offense if we challenged his research."
4      Now, why would it be a problem for BC/BS
5  if you did publicly question that fact?
6      MR. COCO: Objection.
7      A. Why would it be a problem today, are you
8  asking?
9      Q. 1999, at the time you wrote this e-mail.
10     MR. COCO: Objection.
11     A. I mean, I'm guessing, you know, at the
12 time, you know, Dr. Kagan was an influential
13 physician, and it sounds as if I felt that it
14 would not be appropriate to challenge his word.
15     Q. Well, why would the fact that he was an
16 influential physician matter?
17     A. It matters from a relationship
18 perspective.
19     Q. Does it matter in terms of the
20 relationship with him individually, or is it a
21 broad -- does it have a broader impact?
22     A. I mean, it matters in terms of the

**95**

1  relationship that he has with the plan.
2      Q. My question is, when you refer to him as
3  an "influential physician," were you referring to
4  his influence in the physician community?
5      A. Somewhat. I think I meant that he, you
6  know, is part of a larger MASCO group and can
7  represent his own Commonwealth hematology group as
8  well as the MASCO group, and so collectively they
9  would be influential. But as I answered the
10 question previously, they're not necessarily
11 essential to the network.
12     Q. Okay. But the concern -- so the concern
13 that you were flagging in this particular
14 paragraph was that Dr. Kagan was a physician with
15 influence in the physician community, and BC/BS
16 should consider that fact when dealing with his
17 concerns about reimbursement?
18     MR. COCO: Objection.
19     A. Yes.
20     Q. Now, in -- later in this paragraph you
21 say, "But he has to be able to maintain a thriving
22 practice in order to see those" -- "these

**96**

1  patients."
2      Do you see that?
3      A. Where are you, in the --
4      Q. I'm --
5      A. -- "In my opinion" paragraph?
6      Q. Yeah.
7      (Witness reviews document.)
8      A. Okay. Yeah.
9      Q. What do you mean by that, that he has to
10 maintain a thriving practice in order to continue
11 to see these patients?
12     A. I don't remember.
13     Q. Well, reading your own e-mail from 1999
14 today, which you're in the best position to
15 interpret, what's your understanding of what you
16 meant when you made that statement?
17     MR. COCO: Objection.
18     A. Honestly, I don't remember.
19     Q. Oh, I understand you don't remember.
20     A. Okay.
21     Q. My question was, what's your
22 understanding of what you said, reading it today?

**97**

1      MR. COCO: Objection.
2      A. I don't know.
3      Q. Okay. So you're unable to understand
4  what you meant when you wrote that sentence; is
5  that your testimony?
6      A. My testimony --
7      MR. COCO: Objection.
8      A. I'm testifying that I'm not sure what I
9  meant by that sentence.
10     Q. Okay. Are you familiar with the word
11 "thriving"?
12     A. Yes.
13     Q. Okay. What's your understanding of the
14 meaning of the word "thriving"?
15     MR. COCO: Objection.
16     A. To keep alive.
17     Q. Okay.
18     A. To flourish.
19     Q. Okay. To flourish. Now when you refer
20 to a thriving practice, or to use the synonym of a
21 flourishing practice, is it fair to say -- and you
22 can certainly agree, I would hope, with this --

Page 98

1  that you're referring to a practice that's making
2  money?
3      MR. COCO: Objection.
4  A. I think that's one criteria.
5  Q. Okay. What are the other criteria?
6      MR. COCO: Objection.
7  A. I think serving the community, you know,
8  seeing -- you know, having a high patient
9  population, seeing a lot of members, because I
10 think you can have a thriving community practice
11 and it's not making money.
12 Q. So with reference to an oncology
13 practice like Dr. Kagan's, for him -- for Dr.
14 Kagan to be able to maintain a thriving practice,
15 some of the criteria that you've described would
16 be making money, serving the community, and seeing
17 a lot of BC/BS of Massachusetts members, right?
18     MR. COCO: Objection.
19 A. Yes.
20 Q. And if those criteria were not
21 satisfied, then, as you state in your sentence, he
22 would not be seeing those patients, the BC/BS of

Page 99

1  Massachusetts patients, right?
2      MR. COCO: Objection.
3  A. Can you say that again?
4  Q. Sure. If these -- if he were not able
5  to maintain a thriving practice -- in other words,
6  if Dr. Kagan were not able to satisfy the criteria
7  you've described, including making money through
8  his practice, then he would not be able to
9  continue seeing BC/BS of Massachusetts patients,
10 right? That's what you were saying in this
11 sentence we're looking at?
12     MR. COCO: Objection.
13 A. Let me think about it for a minute.
14 Q. Sure. And it's not intended to be a
15 trick question. If you would like to have it read
16 back, we can do that.
17 A. I just want to understand what you're
18 asking me because I write in this sentence, "But
19 he has to be able to maintain a thriving practice
20 in order to continue to see his patients." And
21 I'm testifying I'm not quite sure what I meant by
22 that sentence.

Page 100

1  Q. Well, we've discussed the meaning, as
2  you understand it today, of the thriving practice,
3  right? It's the criteria we just talked about,
4  right, which included making money, serving the
5  community and seeing members?
6      MR. COCO: Objection.
7  A. A lot of members.
8  Q. Yeah. Seeing a lot of members. So my
9  question's really a simple one.
10 A. Okay.
11 Q. Doesn't it flow from this sentence that
12 you certainly understood in '99 that if he were
13 not able to maintain a thriving practice, he would
14 not, quote, "continue to see his patients"?
15     MR. COCO: Objection.
16 A. So you're asking me if it's my opinion
17 if he's not able to maintain a thriving practice,
18 he wouldn't be able to continue seeing patients?
19 Q. Right.
20 A. I think that's a possibility.
21 Q. Okay. Now, more generally --
22 A. Okay.

Page 101

1  Q. -- we can certainly agree that doctors
2  are in business, at least partly, to make a
3  living, right?
4      MR. COCO: Objection.
5  A. I'm not a doctor, so...
6  Q. I agree -- I appreciate that, but you
7  are someone who works with doctors --
8  A. I am.
9  Q. -- on a daily basis --
10 A. Yes.
11 Q. -- in the provider relations department?
12 A. Yes.
13 Q. And indeed you've been in provider
14 relations for the better part of 15 years now,
15 right?
16 A. Yes.
17 Q. So my question is, based on all of your
18 experience dealing with providers in the context
19 of reimbursement, we can certainly agree, can't
20 we, that providers expect to make money; they
21 expect to be able to make a living through
22 pursuing their vocation?

**Page 102**

1    MR. COCO: Objection.
2    A. Yes, providers make a living practicing
3    medicine.
4    Q. And if providers did not make money, the
5    implication is certainly a substantial proportion
6    of them would not be able to continue to see
7    patients?
8        MR. COCO: Objection.
9    A. Right.
10   Q. Now, you continue in this sentence,
11   "Please trust my judgment of Dr. Kagan -- Anne and
12   I would both agree that as well as being a well-
13   respected physician, he is reasonable, and values
14   the relationship he has with us (BC/BS of
15   Massachusetts)."
16       Did you continue dealing with Dr. Kagan
17   after this particular issue?
18   A. I most likely would have, yes.
19   Q. Do you remember dealing with Dr. Kagan
20   at any point?
21   A. We work with thousands of physicians, so
22   if he was in my region, then I would have worked

**Page 103**

1    with him, yes.
2    Q. You then say, "Keeping the corporation's
3    and Dr. Kagan's best interests in mind, let's
4    gather the data that we previously discussed and
5    make a decision on how to respond."
6        Do you see that?
7    A. Yes.
8    Q. In the next sentence you say, "Once we
9    have the data gathered, I will analyze and develop
10   a strategy to respond."
11   A. Uh-huh.
12   Q. And does that refresh your recollection
13   as to whether you did analyze and develop the
14   strategy to respond?
15   A. I mean, it sounds like that was the
16   intent, but I don't remember what the conclusion
17   of that was, honestly.
18   Q. Okay. Have you spoken to anyone else
19   who was involved in this discussion to ascertain
20   whether they were involved in the analysis and
21   strategy that you may have performed?
22       MR. COCO: Objection.

**Page 104**

1    A. Recently?
2    Q. Yeah.
3    A. No.
4    Q. In the context of collecting your
5    documents, did you seek to inquire as to whether
6    or not this analysis and strategy was in anyone
7    else's possession?
8    A. No.
9    Q. You then say, "Mary Powers, Ellen, and I
10   are meeting today to clarify what data we need,
11   who will be responsible for what, and the
12   timelines for completion." And then you invite
13   all of them to join that session. You say you will
14   keep them posted.
15       What was Mary Powers' position at this
16   time?
17   A. She was the manager of medical policy.
18   Q. When you were meeting with Mary Powers
19   and Ellen -- that's Ellen Thompson, right?
20   A. Yes.
21   Q. Was there a hierarchy in that meeting?
22   Were you reporting to them?

**Page 105**

1    A. No.
2    Q. Okay. So it was just a meeting of
3    people from different departments to work on the
4    project?
5    A. Yes.
6    Q. Reading this e-mail, do you have any
7    recollection as to who, if anyone, was in charge
8    of this particular project? Who has the ultimate
9    responsibility?
10       MR. COCO: Objection.
11   A. I don't remember.
12   Q. Now, sticking with Exhibit Gorman 002 --
13   A. Exhibit Gorman 002?
14   Q. I'm sorry, is this Exhibit Gorman 003?
15       MR. WRIGHT: Exhibit Gorman 003.
16   Q. Yeah, Exhibit Exhibit Gorman 003. Now,
17   we talked earlier about the first sentence, "Dr.
18   Kagan may be paying a different rate than his
19   colleagues," right?
20   A. Are you on the first page?
21   Q. Yeah.
22   A. Yeah.

**106**

1  Q. Okay. Now, earlier in the day you also
2  testified that you don't know as a general matter
3  what exactly physicians paid to acquire drugs,
4  right?
5  A. Yes. It's not part of my job
6  responsibility.
7  Q. Okay. So you do have an understanding
8  here that different doctors may have paid
9  different rates, but your testimony is that you
10 don't know what the rates are that any doctors pay
11 to acquire drugs?
12 A. That's true, yeah.
13 Q. So you have no understanding or
14 expectation, then, as to what the relationship is
15 between doctors' acquisition prices for drugs and
16 the amounts that they are reimbursed for drugs?
17     MR. COCO: Objection.
18 A. I don't know, no.
19 Q. So your answer is that you have no such
20 understanding or expectation?
21 A. I don't, yeah.
22     MR. MANGI: Let's mark the next

**107**

1  document. It's going to be Exhibit Gorman 005.
2      (Exhibit Gorman 005, Document
3  Bates- numbered BCBSMA-AWP-00078 - 00079, marked
4  for identification.)
5      MR. COCO: It's been about 50 minutes.
6  Does it make sense to break now?
7      MR. MANGI: Sure, any time you want.
8      (Recess taken.)
9  Q. Now, Ms. Gorman during the break, did
10 you have a discussion with counsel?
11 A. Yes.
12 Q. Did you have a -- or did you discuss
13 during the break the testimony that you were
14 giving before the break?
15 A. We -- yes.
16 Q. Okay. What did you discuss?
17 A. We just talked about some of the
18 questions that you were asking and some of my
19 responses.
20 Q. Okay. What did counsel ask about, and
21 what did you respond in relation to the answers
22 you were giving earlier?

**108**

1      MR. COCO: Objection. And I'll instruct
2  you not to answer.
3      MR. MANGI: You'll instruct her not to
4  answer that question?
5      MR. COCO: Yes.
6      MR. MANGI: On what basis?
7      MR. COCO: It's attorney/client
8  privilege.
9      MR. MANGI: No, it's not. It's well
10 established in federal courts around the country
11 and in this district that questions about the
12 substance of examination are not privileged and
13 are the proper scope for examination. Moreover,
14 your firm has a precedent where you have
15 previously recognized that and allowed questioning
16 of that type through your colleague, Mr. Sullivan,
17 at the deposition of Mr. Killion.
18     MR. COCO: Can we take a break?
19     MR. MANGI: Sure.
20     (Recess taken.)
21 Q. Okay. On the record. May we have the
22 last question read back, please.

**109**

1      (Record read.)
2      MR. COCO: Objection. Instruct the
3  witness not to answer.
4      MR. MANGI: Okay. We'll have to call
5  the magistrate judge. We'll do that at the end of
6  this session when we take a lunch break.
7      MR. COCO: And for the record, the
8  witness is not changing testimony. The witness is
9  not giving any indication that there was any
10 discussion about changes to the testimony. And if
11 you were simply inquiring as to, you know,
12 generally what attorneys discuss with a witness
13 about the deposition and what's been happening and
14 does not reflect any changes or any alteration of
15 previous testimony, then it is our position that
16 you are not entitled to --
17     MR. MANGI: I understand your position.
18     MR. COCO: -- go into those.
19 BY MR. MANGI:
20 Q. Now, Ms. Gorman, can you turn to -- oh,
21 you don't have it anymore -- the exhibit that
22 we've marked as Exhibit Gorman 005.

**110**

1    A. Okay.
2    Q. Again, this is a further continuation of
3  the e-mail chain we've been discussing, but it has
4  some added e-mails included. You'll see the last
5  e-mail on the exhibit is Dr. Fanale's e-mail of
6  August 18, '99. Do you see that?
7    A. Yes.
8    Q. And that's an e-mail that we've
9  previously looked at, right?
10   A. Yes.
11   Q. Okay. Now, Ms. Meneghetti then forwards
12 that e-mail to Mary Powers as an FYI. Do you see
13 that?
14   A. Yes.
15   Q. And then Ms. Powers' response to Ms.
16 Meneghetti, right?
17   A. Yes.
18   Q. And this e-mail chain was subsequently
19 forwarded on to you?
20   A. Yes.
21   Q. Okay.
22   A. Yeah.

**111**

1    Q. Now, in Ms. Powers' e-mail to Ms.
2  Meneghetti she starts saying that when the
3  analysis is done, consideration should be given to
4  the fact that there are reimbursements for
5  services as well as drugs. Do you see that?
6    A. Yes. Yes.
7    Q. And then she says, "I always thought
8  oncologists bought in bulk for most drugs and
9  therefore received a discounted charge from the
10 pharmaceutical companies."
11       Do you see that?
12   A. Yes.
13   Q. And that again reflects the same
14 discussion we've had earlier that's reflected in
15 your earlier e-mail that different doctors can buy
16 drugs at different prices, correct?
17       MR. COCO: Objection.
18   A. But she also says "but maybe not," so
19 she was unsure.
20   Q. She was unsure?
21   A. Yeah.
22   Q. But she was reflecting something of

**112**

1  which you did have knowledge, as we saw in the
2  previous exhibit, right?
3        MR. COCO: Objection.
4    A. Yes.
5    Q. Now, further up in the e-mail chain we
6  have the e-mail from Dr. Fanale dated Thursday,
7  August 19, '99 at 7:27 a.m.?
8    A. Uh-huh.
9    Q. Do you see that?
10   A. Yes.
11   Q. And it says, "Ok. Need to pull some
12 claims for this doc and see if they are billing
13 this way."
14       You are one of the cc's on that e-mail,
15 right?
16   A. Yes.
17   Q. What does that mean, "see if they are
18 billing this way"?
19       MR. COCO: Objection.
20   A. I'm not sure.
21   Q. Well, you were one of the people
22 involved in carrying out this project, right?

**113**

1        MR. COCO: Objection.
2    A. I was involved in the situation, yes.
3    Q. And you were receiving this e-mail from
4  the chief medical officer, who was one of the
5  people involved in supervising the project, right?
6        MR. COCO: Objection.
7    A. Yes.
8    Q. So when he sent you this e-mail saying,
9  "Need to pull some claims from this doc and see if
10 they are billing this way," what was your
11 understanding of that?
12       MR. COCO: Objection.
13   A. I don't remember specifically, but
14 reading this e-mail today, it sounds as if he
15 meant -- and, again, I'm not Jim -- but it sounds
16 like he's asking to pull claims to look to see if
17 there's other payments like the administration
18 office visits and other chemo services.
19   Q. Okay. Then it says, "Also, can Fred
20 help re: reimbursement versus cost for these
21 drugs?"
22       Now, is the Fred referred to there Fred

**Page 114**

1  Polsky, who is a cc to the e-mail?
2  A. Yes.
3  Q. Okay. Who is Mr. Polsky?
4  A. He was at the time head of the pharmacy
5  unit. Actually, he was a physician, as I
6  remember. He was a physician as well. He was an
7  endocrinologist, but he oversaw the pharmacy
8  department.
9  Q. Okay. In his role as head of the
10  pharmacy unit, how would he be able to provide
11  information on reimbursement versus cost?
12  A. That was his expertise. That was his
13  role. Anything to do with pharmacy was his role.
14  Q. Is Dr. Polsky still at the company?
15  A. No.
16  Q. Has he retired or moved to another
17  company?
18  A. I don't know.
19  Q. Do you know when he left the company?
20  A. I couldn't even guess. It's been a long
21  time.
22  Q. And then Mr. Fanale says, "Mary, can you

**Page 115**

1  and Lisa coordinate this review, or do you need
2  me?"
3  Do you see that?
4  A. Yes.
5  Q. Does that refresh your recollection as
6  to who was coordinating this review?
7  A. It sounds like Mary and I were.
8  Q. But you have no recollection of having
9  worked on this project at all?
10  A. I don't remember the details of the
11  project, no.
12  Q. Well, do you remember having worked on
13  the project?
14  A. What do you mean by work?
15  Q. Do you remember having performed the
16  analysis that you were being asked to perform?
17  A. No, I don't. And it wouldn't have been
18  under my job responsibility to do the actual
19  analysis. I'm not a numbers person. My role in
20  this was to bring the issue internally. That was
21  the extent of it.
22  Q. Well, you were being tasked with some

**Page 116**

1  sort of follow-up; isn't that clear from these e-
2  mails? In other words, having raised the issue
3  was not the end of your involvement?
4  MR. COCO: Objection.
5  A. No.
6  Q. Okay. And when you say no, you're
7  agreeing with my statement?
8  MR. COCO: Objection.
9  Q. Let's do it again. I said raising the
10  issue was not the end of your involvement. Can
11  you agree with that?
12  A. I agree with that, yes.
13  Q. So what was your further involvement
14  based on your reading of these e-mails and your
15  recollection?
16  MR. COCO: Objection.
17  A. Well, it would have been -- and again I
18  remember the situation on a high level -- but it
19  would have been relaying the provider issue
20  internally, getting the appropriate people
21  internally at Blue Cross together to make a
22  decision, and then relaying that position back to

**Page 117**

1  the provider.
2  Q. Would you have been involved in actually
3  collecting the data, collecting information about
4  payments?
5  A. No.
6  Q. Well, let's have a look at the next e-
7  mail above.
8  A. Yeah.
9  Q. Mary Powers says, "I'll pull a provider
10  summary and an inform report for Dr. Kagan." And
11  then it says, "Lisa, can you get the payments for
12  an OPD clinic visit, chemo pharmacy, and a
13  professional visit?"
14  MR. COCO: Objection.
15  A. I personally -- I don't remember pulling
16  any data. I don't have access to data. I may
17  have requested it from somebody else internally.
18  Q. Okay. Who would you have requested it
19  from?
20  MR. COCO: Objection.
21  A. That, I don't remember.
22  Q. Do you know what department you

**118**

1  requested it from?
2     A.  That, I don't remember.
3     Q.  And then it says, "We can get together
4  and see how best to compare dollars." Do you
5  recall whether or not there was an eventual
6  meeting in which a comparison was done or data
7  analyzed?
8     A.  Honestly, I don't. I don't remember
9  whether or not the analysis was ever performed,
10 whether there was results. I don't remember the
11 end result of this conversation.
12    Q.  In the next e-mail up that you're
13 sending the group, you request a meeting to
14 discuss what information's needed, who would take
15 responsibility, and the time line for completion,
16 right?
17    A.  Right.
18    Q.  Does that refresh your recollection as
19 to whether you were coordinating this project?
20    A.  Again, I wasn't coordinating any of the
21 data. I was just getting people together, as the
22 e-mail alludes to, to come to a decision on what

**119**

1  our Blue Cross position is.
2         MR. MANGI: Let's mark the next
3  document.
4         (Exhibit Gorman 006, Document
5  Bates- numbered BCBSMA - AWP-00045, marked for
6  identification.)
7     Q.  The e-mails that we've been looking at
8  are from August of 1999, right?
9     A.  Yes.
10    Q.  This e-mail is approximately -- the
11 lower e-mail on Exhibit Gorman 006 is possibly a
12 month later than September of '99, right?
13    A.  Yes.
14    Q.  And you're sending it to the same group
15 of people that were involved in some of the
16 earlier communications. The subject is "Chemo
17 reimbursement issue/Walt Kagan, M.D."
18        Do you see that?
19    A.  Yes.
20    Q.  And you say, "Jim and I met with Dr.
21 Walter Kagan this morning" -- Who's the Jim? Is
22 that Dr. Fanale?

**120**

1     A.  Yes.
2     Q.  -- "regarding his concerns about our
3  reimbursement of chemotherapy drugs (95 percent
4  AWP versus 100 percent). (No, this issue has not
5  died!)"
6     A.  Okay.
7     Q.  Do you recall sending this e-mail in
8  September of 1999?
9     A.  No.
10    Q.  Do you recall the issue that's under
11 discussion?
12        MR. COCO: Objection.
13    A.  The issue as mentioned in this e-mail?
14    Q.  Uh-huh.
15    A.  I mean, I guess I would assume it's the
16 global issue that we were just all talking about.
17    Q.  Well, it continues, "Both Jim and I are
18 still undecided about how we should/want to
19 respond to Dr. Kagan and would like to analyze all
20 the data gathered as a cross- functional group."
21        Now, do you know whether or not by
22 September 15 the analysis we have been discussing

**121**

1  had been completed?
2     A.  I don't, no.
3     Q.  Do you know whether there was then a
4  meeting such as that you propose here and which
5  the next paragraph says "Sandy will be scheduling
6  to discuss this issue"?
7     A.  I don't remember, honestly.
8     Q.  And you have no recollection as to what
9  the eventual resolution was with regards to Dr.
10 Kagan?
11    A.  I don't, no.
12        (Pause.)
13        MR. MANGI: Let's mark the next exhibit.
14        (Exhibit Gorman 007, Document
15 Bates- numbered BCBSMA-AWP-12942, marked for
16 identification.)
17    Q.  This is a document that we've marked as
18 Exhibit Gorman 007. Let's take a look at that,
19 and let me know when you're ready to proceed.
20    A.  Okay.
21    Q.  Now, I would like to draw your attention
22 here to the e-mail from you to Janet Ross. This is

**Page 122**

1    April 4, 2005, correct?
2        A.  Yes.
3        Q.  Who is Ms. Ross?
4        A.  She's a provider manager on my team,
5    metro north team.
6        Q.  You state in your e-mail to her,
7    "Office- based drugs billed by a physician are
8    paid 85 percent of AWP, with no exceptions (?) I
9    believe."
10           Now, first of all, when you state the
11   office billed drugs "are paid at 85 percent of
12   AWP," is that an accurate statement?
13       A.  No.
14       Q.  What is the current rate?
15       A.  It's 95.
16       Q.  Do you have an understanding as to what
17   the basis was for your statement in this e-mail?
18       A.  I think it was a matter of not being
19   asked the question in quite a long time and just
20   trying to -- I knew it was, you know, 85 or 95 but
21   wasn't quite sure. And I say in the e-mail I'm
22   not sure, but ask this expert, they'll be able to

**Page 123**

1    tell you. So I didn't want to confirm that I knew
2    what the price was.
3        Q.  And the expert you're referring to the
4    Mike Mulrey?
5        A.  That's correct.
6        Q.  And above this is an area that's been
7    redacted. Do you see that?
8        A.  Yeah.
9        Q.  Now, is this one of the e-mails that you
10   gathered when you searched your files?
11       A.  Yes.
12       Q.  Without telling me what was written in
13   the e-mail above, do you know who the e-mail above
14   was from or to?
15       A.  I don't remember. Well, I would have
16   sent it to Steve Skwara because he asked me for
17   it, so I'm thinking --
18           MR. COCO:  For the record, the redaction
19   is the transmittal of the e-mail string from Lisa
20   to Steve Skwara. Basically, my understanding is
21   that it was a forward function, and therefore
22   you're going to have the transmittal information

**Page 124**

1    on there. Nothing apart from that.
2            MR. MANGI:  Thank you.
3        Q.  Why were you forwarding this e-mail to
4    Mr. Skwara?
5        A.  Because he asked me for any information
6    or any conversations that I had related to
7    reimbursement of office-based drugs.
8        Q.  Is that in connection with your
9    collecting documents for this case or something
10   else?
11       A.  It was recently when he asked me for
12   documents for this case.
13           (Exhibit Gorman 008, Document
14   Bates- numbered 12942 - 12945, marked for
15   identification.)
16           (Witness reviews document.)
17       A.  Okay.
18       Q.  Now, let's turn first to the end of
19   this, to Page 3. The first e-mail is going from
20   Susan Holmes, who is the billing manager at
21   Northeast Hematology/Oncology Associates?
22       A.  Yes.

**Page 125**

1        Q.  And that's going to Janet Ross, who you
2    just testified is someone in your department?
3        A.  Yes.
4        Q.  Does Ms. Ross report to you?
5        A.  She does.
6        Q.  Is Northeast Hematology/Oncology one of
7    the practices that you're responsible for?
8        A.  Yes.
9        Q.  Now, the first line of this e-mail says,
10   "We are also having problems with drug fee
11   schedule changes, and we are not notified. We
12   discovered this when posting Blue Shield
13   payments."
14       A.  Uh-huh.
15       Q.  "Is there a possibility you could notify
16   us of any drug fee schedule changes as they
17   occur."
18           Now, when BC/BS of Massachusetts enters
19   into a contract with a physician practice, are fee
20   schedules provided to that practice?
21       A.  If they're new to Blue Cross, we give
22   them a general fee schedule specific to their

**Page 126**

1  specialty, and if they request -- and this is all
2  CPT codes, not specifically anything to do with
3  drug fee schedules. And then as physicians enter
4  our network, we give them an updated general fee
5  schedule every September.
6      Q.  Okay. So once annually they receive an
7  updated fee schedule?
8      A.  Yes, yeah.
9      Q.  How long has that been the practice at
10 BC/BS of Massachusetts?
11     A.  How long has it been September 1st or
12 annually?
13     Q.  How long has it been a practice of
14 providing updated fee schedules to providers on an
15 annual basis?
16     A.  Since I can remember.
17     Q.  And how far back does your memory take
18 you?
19     A.  I don't know, six or seven years.
20     Q.  Now, if that's the case, why was
21 Northeast Hematology/Oncology complaining about
22 not being notified about changes to the fee

**Page 127**

1  schedule?
2      A.  Because when we send -- every September
3  of every year we tell physicians what the
4  aggregate increase will be on aggregate, not
5  specialty-specific. And then on follow-up to that
6  we send each specialty what we call an ample
7  sample of fee schedules, which typically don't
8  have this type of detail in it. So we tell them
9  fees are going up by X amount. Here's your most
10 commonly billed codes, and here's what the new
11 fees are. And then it's up to them to inquire if
12 they want more detail. But we do our due
13 diligence in terms of notifying physicians of the
14 overall increase or decrease in the fee schedule.
15     Q.  How many fee schedules does BC/BS of
16 Massachusetts maintain at any given time?
17     A.  How many do we maintain? Well, there's
18 -- I would say a handful.
19     Q.  What do you mean, then, when you say you
20 send them a sample of fee schedules rather than
21 the fee schedule on which they're actually paid?
22     A.  What I mean by that is for those

**Page 128**

1  physicians who do not have a unique payment
2  arrangement, we send them the network-wide fee
3  schedule and what we call an ample sample, which
4  list their top billed codes, and the fee schedule
5  for those codes.
6      Q.  So are you saying that for physicians
7  who have not individually negotiated their own
8  rate, you will send them the generally applicable
9  rate, which is the rate that they're reimbursed
10 on?
11     A.  Yes.
12     Q.  So it's not really a sample as much as
13 it's the standard fee schedule that their
14 reimbursements are pegged to, right?
15        MR. COCO: Objection.
16     A.  We call it a sample because it's their
17 most commonly billed codes. It's not every single
18 code that they bill for.
19     Q.  I see. So you don't send them the full
20 fee schedule?
21     A.  No.
22     Q.  You send them their most commonly billed

**Page 129**

1  codes?
2      A.  That's right.
3      Q.  And are those generated on a practice-
4  by- practice level?
5      A.  No.
6      Q.  So are they the most commonly billed
7  codes by some group of practices?
8      A.  It's by their specialty.
9      Q.  So hematology/oncology associates would
10 get a list of all the most commonly billed
11 hematology/oncology codes?
12     A.  Yes, yeah.
13     Q.  Now --
14     A.  CPT codes.
15     Q.  Sure. If that is the practice, why were
16 they complaining about not being notified about
17 fee schedules?
18     A.  Because in the -- because of what I just
19 said. We get -- we give them the CPT codes. It
20 doesn't get down to the individual -- any J codes
21 or any other type of supply codes that they may
22 bill for. It just -- it's the service CPT codes

**130**

1  that we give them the reimbursement for.
2      Q.  So you give them the codes that are --
3  the J codes that are service-specific but not the
4  codes that are drug-specific?
5      A.  No, we --
6          MR. COCO:  Objection.
7      A.  We give them a list of their most
8  commonly billed CPT codes.
9      Q.  Well, you differentiated between a CPT
10 code and a J code; is that correct?
11     A.  In my mind, I do.
12     Q.  Okay.  What's your understanding of the
13 distinction between the two?
14     A.  In my mind, the distinction of the two
15 is the CPT describes a service that the physician
16 is billing for.  Then in the J code, they're
17 billing for a supply -- or a Q code or they're
18 billing for a supply, so...
19     Q.  And by "supply," you're referring to
20 either a drug or some other equipment that's used
21 in delivering medical services?
22     A.  Yes.

**131**

1      Q.  So as I understand it, you understood
2  this practice was complaining because they did get
3  an update as to services, but did not get an
4  update as to drugs or supplies?  Is that the issue
5  being discussed here?
6      A.  Right.  That's correct.
7      Q.  Now, are practices ever notified of
8  changes to the fee schedule that pertains to drugs
9  or supplies?
10     A.  I don't know.  I don't know.
11     Q.  Is it fair to say you're not aware of
12 any mechanism whereby providers are updated or
13 notified of changes to the fee schedule regarding
14 drugs?
15     A.  That's correct.
16         MR. COCO:  Objection.
17     Q.  Now, Janet Ross then responds to the
18 billing manager at Northeast Hematology/Oncology
19 saying, "As far as I know, we pay 85 percent of
20 AWP."
21         Do you see that?
22     A.  Yes.

**132**

1      Q.  Now, is that an accurate statement?
2      A.  No.
3      Q.  So Ms. Ross was making the same mistake
4  that you had made in the e-mail we looked at
5  earlier; is that correct?
6      A.  That's correct.
7      Q.  Now, Ms. Homes then forwards that to a
8  D. C-A-I-O-L-A, who appears to be part of the same
9  practice.  Do you know who that is?
10     A.  She is the office manager for the
11 practice.
12     Q.  That's Diane Caiola who's listed in the
13 e-mail above, right?
14     A.  Yes.
15     Q.  And she's responding to Ms. Ross's
16 request for specific codes to be able to provide
17 more information, right?
18     A.  Yes.
19     Q.  And Ms. Ross sends that on to Nancy
20 Cook.  Who's that?
21     A.  Nancy is the manager of our pricing.
22     Q.  And Ms. Cook responds that the allowed

**133**

1  amount for the drug code that was being questioned
2  -- that they were querying about had gone from
3  $15.38 to $4.64, right?
4      A.  Yes.
5      Q.  Now, what was the explanation -- rather,
6  in the next e-mail Ms. Ross then asks you "Did I
7  miss something, or were we advised that some codes
8  were being drastically reduced"?
9      A.  Yes.
10     Q.  Did you eventually ascertain the reason
11 for that?
12         MR. COCO:  Objection.
13     A.  Only through the knowledge of this e-
14 mail.
15     Q.  So, in other words, the rate that Ms.
16 Cook had listed in her e-mail of October 31st at
17 7:17 was reflecting -- the $15.38 was an AWP-based
18 rate, and the $4.64 was an ASP- based rate,
19 correct?
20         MR. COCO:  Objection.
21     A.  I guess I can't -- I mean, I'm not
22 familiar with that terminology.  We kind of stayed

Case 1:01-cv-12257-PBS   Document 2879-2   Filed 07/14/06   Page 16 of 20

Lisa M. Gorman          HIGHLY CONFIDENTIAL          March 7, 2006
                             Boston, MA

**Page 134**

1  focused on just really what the fee is, so I can't
2  allude to what she meant by those two fees.
3      Q. Well, she had asked you what the
4  explanation was for the difference in the numbers,
5  right?
6      A. Jan did.
7      Q. Right.
8      A. Yes.
9      Q. And did you get an understanding through
10 these e-mails as to what the explanation was?
11     A. Yes. I sent it along as the e-mail
12 follows.
13     Q. Right.
14     A. Yes.
15     Q. So what was the understanding that you
16 gained as to the explanation for the difference in
17 those two numbers?
18     A. The understanding as it states from
19 Elaine Newell. You know, I can read what it says,
20 but it says that Medicare changed their --
21     Q. I'm sorry, I don't mean to interrupt
22 you.

**Page 135**

1      A. Yeah.
2      Q. I know what it says. My question is,
3  what was your understanding as to the explanation
4  for the difference?
5      A. I have to read it to refresh my memory.
6      Q. Please do.
7      A. So I can read it and then interpret it
8  if you want.
9      Q. Sure.
10         (Witness reviews document.)
11     A. Okay. So she explains that we're not
12 following Medicare and that we're going to
13 continue to pay office-based drugs at 95 percent
14 of AWP. She then states that the pricing file was
15 not updated for a year's period of time and
16 indicates that we now have a vendor giving us the
17 correct AWP for drug reimbursements quarterly, and
18 then we'll get quarterly updates of AWP.
19         So it sounds as if the file was not
20 updated with the correct AWP for a year's period
21 of time.
22     Q. Did you get an understanding as to how

**Page 136**

1  the $4.64 number in Ms. Cook's e-mail was
2  calculated?
3      A. Just reading Elaine's explanation of
4  $4.64 would be reflective of 95 percent of the
5  current AWP.
6      Q. That would be the $4.64?
7      A. Right.
8      Q. And what would the $15.48 be?
9      A. The $15.48, based upon what Elaine is
10 stating, would be 95 percent of an older AWP.
11     Q. Now, earlier when I asked you a question
12 about this paragraph from Ms. Newell you said, "I
13 don't understand the terms being used." What
14 terms were you referring to?
15     A. I meant that comment in the scope of
16 kind of ASP, AWP, because I in my role at Blue
17 Cross really don't get involved in terms of that
18 terminology. And ASP was news to me, you know, as
19 I received this e-mail.
20     Q. Do you know whether or not Blue
21 Cross/Blue Shield of Massachusetts considered at
22 any point shifting from an AWP-based reimbursement

**Page 137**

1  methodology to an ASP-based reimbursement
2  methodology?
3      A. I have no idea.
4      Q. Now, are you familiar with Blue
5  Cross/Blue Shield of Massachusetts' specialty
6  pharmacy programs?
7      A. Somewhat, yes.
8      Q. What is your understanding of a
9  specialty pharmacy program?
10     A. A specialty pharmacy program is a vendor
11 that we would have negotiated special rates and
12 would prefer that providers use a certain
13 specialty pharmacy vendor.
14     Q. Do you know when Blue Cross/Blue Shield
15 of Massachusetts first implemented the specialty
16 pharmacy programs?
17     A. I don't remember, no.
18     Q. Are you aware of the fact that Blue
19 Cross/Blue Shield of Massachusetts excluded
20 physician-administered drugs from the scope of its
21 specialty pharmacy programs?
22         MR. COCO: Objection.

Henderson Legal Services
(202) 220-4158

Lisa M. Gorman                HIGHLY CONFIDENTIAL                March 7, 2006
                                   Boston, MA

**138**

1    A. I wasn't aware of that, no.
2    Q. Do you recall any discussions within the
3  provider relations department as to whether or not
4  specialty pharmacy programs should be implemented
5  and what drugs they should encompass?
6    A. No. No detail around that, no.
7    Q. Okay.
8    MR. MANGI: Do you want to take a lunch?
9    MR. COCO: Sure.
10    (Lunch recess taken.)

**139**

1    AFTERNOON SESSION
2
3    (Mr. Wright did not return after
4  lunch.)
5    MR. MANGI: Ms. Gorman, before we
6  continue, I'm just going to make a statement for
7  the record addressed to your counsel --
8    THE WITNESS: Okay.
9    MR. MANGI: -- which is, during the
10  break I did go back and locate for your
11  convenience the relevant sections from Mr.
12  Killion's transcript, which is Page 130, Line 14
13  to Page 134, Line 5, which, if you'll review,
14  you'll note pertains to questioning about
15  conversations with witness during the break
16  pertaining to testimony prior to the break. There
17  is no issue of the witness having changed or
18  amended the previous answer. In fact, he states
19  he has not, but nonetheless, BC/BS of
20  Massachusetts through its counsel, Mr. Sullivan,
21  properly allows the questioning and concedes that
22  it is not privileged, and the defendants reserve

**140**

1  the right to raise this inappropriate instruction
2  at an appropriate time in an appropriate forum.
3
4    (LISA M. GORMAN, Resumed.)
5
6    DIRECT EXAMINATION, Continued
7  BY MR. MANGI:
8    Q. Ms. Gorman, in the morning we spoke
9  briefly about your time about Bay State
10  Healthcare. Do you recall that testimony?
11    A. Yes.
12    Q. And you told me that in late 1993 Bay
13  State Healthcare was acquired by Blue Cross/Blue
14  Shield of Massachusetts?
15    A. Yes.
16    Q. My question is, are you familiar with an
17  entity called Bay State Health System or Health
18  Systems?
19    A. I believe -- yes.
20    Q. What is it -- is it Health System or
21  Health Systems?
22    A. I'm not quite sure.

**141**

1    Q. Okay. What is or was Bay State Health
2  System?
3    A. If you're referring to Bay State Health
4  Systems, I think today it's a system -- a hospital
5  and a physician group out in the western part of
6  the state, if that's what you're referring to.
7    Q. Okay. It's a physician practice?
8    A. I believe. It's vaguely familiar. I
9  know the name, Bay State Health System, and I know
10  that it's out West.
11    Q. And that's at the present time?
12    A. Yes, yeah.
13    Q. Was there an entity called Bay State
14  Health System that was affiliated with Bay State
15  Healthcare when you worked there?
16    A. Not that I'm aware of, no.
17    Q. So the only Bay State Health System
18  you're aware of is a physician practice unrelated
19  to Bay State Healthcare; is that correct?
20    A. Yes.
21    Q. Now, in the morning session we also
22  spoke about the extent to which there is

### Page 142

1  individualized negotiation.
2     A. Uh-huh.
3     Q. And I believe you testified that you had
4  a role in the implementation of changes after the
5  individualized rate had been negotiated by the
6  contracting department, correct?
7        MR. COCO: Objection.
8     A. That's correct.
9     Q. Go ahead.
10    A. That's correct.
11    Q. Now, when those changes are -- withdraw
12 that.
13       When an individual rate is negotiated,
14 what sort of logistical operational changes have
15 to be made to account for that?
16       MR. COCO: Objection.
17    A. You're asking how do we implement a rate
18 that's negotiated, a unique rate?
19    Q. That's correct.
20    A. We send a message with all the facts to
21 our pricing unit and instruct them how to set up
22 the fee schedule.

### Page 143

1     Q. Anything else?
2     A. No.
3     Q. And the pricing unit will then make the
4  negotiated changes to the fee schedules, right?
5     A. That's correct.
6     Q. How long does that process generally
7  take?
8     A. Depends on the number of physicians that
9  you're updating.
10    Q. Okay. Can you recall any specific
11 instances where changes have been made and how
12 long they took?
13    A. Yeah, I mean, from a business
14 perspective, that unit requires at least a 30-day
15 notification to allow for time to update the
16 system.
17    Q. Would it be fair to say that generally
18 within 30 days the unit -- the pricing unit is
19 able to make changes to the fee schedule to
20 reflect individually negotiated rates?
21       MR. COCO: Objection.
22    A. Yes.

### Page 144

1     Q. Now, I know you play a role in
2  supporting contracting.
3     A. Yeah.
4     Q. Do you ever actually see contracts
5  between BC/BS of Massachusetts and providers?
6     A. Yes, I do.
7     Q. In what context do you review actual
8  contracts?
9     A. Again, as part of the team of Blue Cross
10 associates, that means with the provider I'm to go
11 over a particular contract, reviewing language as
12 well as rate changes. So I see the contract
13 evolve through that process.
14    Q. Is Mr. Fox also involved with the
15 contracting process?
16    A. To the extent that I am and maybe a
17 little bit more. He's who I work for.
18    Q. Do the contracts that BC/BS of
19 Massachusetts enters into with physicians
20 typically append fee schedules?
21    A. Typically what?
22    Q. Do they have fee schedules attached to

### Page 145

1  them?
2        MR. COCO: Objection.
3     A. Boilerplate physician agreements do not,
4  and then if there's anything unique that's
5  negotiated related to the fee schedule, then that
6  terminology is in the body of that unique
7  contract.
8     Q. In situations where there is no
9  individualized negotiation, the provider signs a
10 contract, gets a copy of the contract but does not
11 receive the fee schedule; is that a fair
12 statement?
13       MR. COCO: Objection.
14    A. It's not attach -- it's not a party to
15 the contract. It's a separate request, and we
16 give it to them separately.
17    Q. Do they receive the fee schedule as a
18 matter of course if they don't specifically
19 request it?
20       MR. COCO: Objection.
21    A. They receive it, as I mentioned
22 previously, in September they received the ample

Lisa M. Gorman     HIGHLY CONFIDENTIAL     March 7, 2006
Boston, MA

**146**

1  sample. And then if they request a full fee
2  schedule, then we could give it to them.
3      Q. But my question is not regarding
4  updates, but specific to the time when a contract
5  is entered into --
6      A. Yeah.
7      Q. -- at that point as a matter of course
8  does a contracting physician receive a copy of the
9  fee schedule?
10     A. Yes.
11     Q. Okay. How do they -- and do they
12 receive that copy of the fee schedule regardless
13 of whether they're requested or not?
14     A. No, no.
15     Q. Do they only receive the fee schedule if
16 they specifically request it?
17     A. Yes. If someone's brand new, they
18 always request it, so...
19     Q. So a contracting party will only get a
20 fee schedule if they request it, but new parties
21 generally do request it. Is that your testimony?
22     A. Yeah.

**147**

1      MR. COCO: Objection.
2      A. Yes.
3      Q. Now, do you know of any Blue Cross/Blue
4  Shield of Massachusetts current employees who are
5  oncologists?
6      A. Current employees that have an oncology
7  specialty? Let me see, Peter... No.
8      Q. Do you know of any current employers who
9  formerly worked for drug manufacturers?
10     A. Not that I'm aware of, no.
11     Q. And do you know whether or not Blue
12 Cross/Blue Shield of Massachusetts contracts with
13 drug manufacturers to receive rebates?
14     MR. COCO: Objection.
15     A. I think it's out of my scope of what I
16 know. I'm not sure. I don't know.
17     Q. Now, are you aware that in the past Blue
18 Cross/Blue Shield of Massachusetts served as the
19 Medicare carrier for Massachusetts?
20     A. Medicare carrier?
21     Q. Uh-huh.
22     A. Years ago?

**148**

1      Q. (No verbal response.)
2      A. Years ago, yes.
3      Q. What time period are you aware of that
4  the carrier was...
5      A. Well, I guess when I think of Medicare,
6  I think of offering a Medicare product, but are
7  you asking me whether or not if I knew Blue Cross
8  was the Medicare plan for the --
9      Q. Whether it was the carrier --
10     A. The carrier for --
11     Q. -- for Medicare in the region.
12     MR. COCO: Objection.
13     A. Not just one carrier, just the carrier?
14 So it took the place of Medicare?
15     Q. Right, it was the entity charged with
16 administering Medicare in the region.
17     MR. COCO: Objection.
18     A. And so you're asking me whether or not I
19 knew that. And I just testified that I did, but I
20 was thinking as it -- I was thinking that you
21 asked whether or not we offered a Medicare
22 product, so...

**149**

1      Q. So as you now understand my question, do
2  you know whether or not Blue Cross/Blue Shield of
3  Massachusetts --
4      A. I do not know, no.
5      Q. So you do not know whether or not it
6  served as the Medicare carrier?
7      A. No.
8      Q. Are you familiar with the term "staff
9  model HMO"?
10     A. Yes.
11     Q. What is your understanding of the term
12 "staff model HMO"?
13     A. Staff model HMO is a group of physicians
14 that are salaried by a plan that render services
15 to their membership.
16     Q. Did Bay State Healthcare have a staff
17 model HMO when you worked there?
18     A. Yes.
19     Q. Did you play any role in relation to the
20 staff model HMO at Bay State when you worked there
21 in the early '90s?
22     A. No.

**Page 150**

1  Q. Are you aware that Blue Cross/Blue
2  Shield of Massachusetts had a staff model HMO in
3  the past?
4  A. Yes.
5  Q. That entity was called Medical
6  East/Medical West, correct?
7  A. Correct, right.
8  Q. For what period of time did Blue
9  Cross/Blue Shield of Massachusetts have that staff
10 model HMO?
11 A. It was in existence when Bay State
12 merged with Blue Cross or when I assumed the same
13 role at Blue Cross, and it was dismantled, I'm
14 guessing, '96.
15 Q. Now, did the Bay State staff model merge
16 with the BC/BS staff model when BC/BS of
17 Massachusetts acquired Bay State in '93?
18 A. I'm not sure. I don't know.
19 Q. Do you know at what rates BC/BS of
20 Massachusetts staff model or the Bay State staff
21 model acquired drugs for their staff model HMOs?
22 A. I don't know, no.

**Page 151**

1  Q. Who at BC/BS of Massachusetts would be
2  familiar with that issue?
3      MR. COCO: Objection.
4  A. Today?
5  Q. Uh-huh.
6  A. I'm not sure. Because you're asking who
7  works at Blue Cross today would be familiar with
8  that arrangement with the health centers back in
9  the early '90s, payment arrangement?
10 Q. Let me rephrase the question.
11 A. Okay.
12 Q. Do you know if anyone working at BC/BS
13 of Massachusetts today would have an understanding
14 of the process of prices whereby a staff model HMO
15 acquired drugs who was here when it was in
16 existence?
17 A. I don't know. I'm not sure.
18 Q. Do you know of anyone who worked on or
19 was associated with a staff model HMO when it was
20 in existence?
21 A. That is still at Blue Cross?
22 Q. (No verbal response.)

**Page 152**

1  A. No.
2  Q. Do you know of anyone who would have
3  knowledge of those issues who is no longer at
4  BC/BS of Massachusetts?
5      MR. COCO: Objection.
6  A. No. I don't know who would have did
7  that then.
8  Q. Are you aware that in 1994 Blue
9  Cross/Blue Shield of Massachusetts settled
10 allegations with the Federal Government that it
11 had submitted false claims in relation to
12 Medicare?
13     MR. COCO: Objection.
14 A. No.
15 Q. You never heard of that?
16 A. No.
17 Q. Are you familiar with the litigation
18 referred to as the Thomas litigation or the In Re:
19 Managed Care litigation?
20 A. Just by name.
21 Q. Okay. What's your understanding of what
22 that case is about?

**Page 153**

1  A. I can't say that I have a huge knowledge
2  base about it. I know that, in my opinion, the
3  litigation had to do with the release to providers
4  of medical-policy-type, claim- processing-type
5  edits, and that's the extent of what I know.
6  Q. Okay. What was the issue that you're
7  aware of in relation to those medical policy
8  documents?
9  A. I don't know of an issue. I just know
10 in generality on a high, high level it had to do
11 with releasing information, all information the
12 plan used in terms of processing claims and claim
13 edits and that sort of thing, medical policy. And
14 that may or may not be true. I mean, that's my
15 understanding.
16 Q. Are you aware that BC/BS of
17 Massachusetts was a defendant in that litigation?
18 A. I knew they were involved. I didn't
19 know what -- yes.
20 Q. Do you know how that litigation was
21 resolved, if it was resolved?
22 A. I believe there was a settlement.