```
                                                                  93
1              IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MASSACHUSETTS
2
                        - - - -
3
   In Re: PHARMACEUTICAL          )  MDL DOCKET NO.
4  INDUSTRY AVERAGE WHOLESALE     )  Civil Action #
   PRICE LITIGATION               )  01CV12257-PBS
5  _____)
                                  )
6  THIS DOCUMENT RELATES TO ALL   )
   ACTIONS                        )
7  _____)
8                       - - - -
9           DEPOSITION OF:  RAEANN MAXWELL
10                    VOLUME II
11                      - - - -
12               September 10, 2004
13               Friday, 1:30 p.m.
14
15          DEPOSITION OF RAEANN MAXWELL,
16  a witness, called by the Defendants for examination,
17  in accordance with the Federal Rules of Civil
18  Procedure, taken by and before Claire Gross, CRR,
19  RDR, a Court Reporter and Notary Public in and for
    the Commonwealth of Pennsylvania, at the offices of
20  UPMC, One Chatham Center, 112 Washington Place,
    Pittsburgh, Pennsylvania, on Friday, September 10,
21  2004, commencing at 1:30 p.m.
22
                        - - - -
```

Raeann Maxwell  September 10, 2004
Volume II  Pittsburgh, PA

2 (Pages 94 to 97)

```
                                          94
 1   APPEARANCES:
 2
 3       FOR THE PLAINTIFFS:
 4   Ed Notargiacomo, Esq.
 5   HAGENS BERMAN, LLP
 6   1 Main Street
 7   Fourth Floor
     Cambridge, Massachusetts  02142
 8   617-482-3700
 9
10       FOR THE DEFENDANTS:
11   Erik Haas, Esq.
12   Jessica Golden Cortes, Esq.
13   PATTERSON BELKNAP WEBB & TYLER, LLP
14   1133 Avenue of the Americas
15   New York, New York  10036-6710
16   212-336-2222
17
18       FOR UPMC HEALTH PLAN:
19   Daniel Vukmer, Esq.
20   UPMC HEALTH PLAN
     One Chatham Center, Suite 600
21   112 Washington Place
     Pittsburgh, Pa  15219
22   412-454-5618
```

```
                                          95
 1            * I N D E X *
 2   Examination by Mr. Haas ---------- 96, 159
 3   Examination by Mr. Notargiacomo ------ 144
 4
 5   Certificate of Court Reporter --------- 63
 6
 7         * INDEX OF EXHIBITS *
 8   Exhibit Maxwell 002 -------------- 102
 9
10   Exhibit Maxwell 003 -------------- 105
11
12   Exhibit Maxwell 004 -------------- 105
13
14   Exhibit Maxwell 005 -------------- 108
15
16   Exhibit Maxwell 006 -------------- 117
17
18   Exhibit Maxwell 007 -------------- 129
19
20   Exhibit Maxwell 008 -------------- 138
21
22   Exhibit Maxwell 009 -------------- 141
```

```
                                          96
 1              RAEANN MAXWELL,
 2       having been previously sworn,
 3    was examined and testified as follows:
 4                  - - - -
 5               EXAMINATION
 6                  - - - -
 7   BY MR. HAAS:
 8   Q.  Does UPMC disclose to its competitors the
 9       rates that it reimburses doctors, pharmacies
10       or hospitals for the drugs administered to
11       its members?
12   A.  No.
13   Q.  Does UPMC consider the rates that it
14       reimburses pharmacies, doctors, physicians
15       and hospitals trade secret, confidential
16       information?
17   A.  Yes.
18   Q.  In your opinion, would UPMC be competitively
19       disadvantaged if it was compelled to disclose
20       the rates at which it reimburses doctors,
21       hospitals, physicians?
22   A.  Yes, I do believe that.
```

```
                                          97
 1   Q.  Is it UPMC's position that manufacturers are
 2       obligated and should disclose publicly
 3       rebates and discounts they offer to doctors,
 4       pharmacists, PBMs or managed care entities?
 5   A.  Yes, because that's their data to disclose if
 6       they so desire.
 7   Q.  Let me ask the question is it your position
 8       that they are obligated to?
 9   A.  Personally, yes.
10   Q.  What is the basis of that obligation, in your
11       opinion?
12   A.  I think that's just free information to the
13       public to be a well-informed consumer.
14   Q.  At the same time would you then conclude that
15       the rates that UPMC provides to its --
16       provides to pharmacies -- strike that.  Along
17       the same vein why wouldn't it be your
18       position therefore that UPMC should disclose
19       to the public the rates that it reimburses
20       doctors, pharmacies, hospitals?
21   A.  Due to the competition in the industry it
22       would disadvantage us to permit that.
```

**Page 98**

1  Q.  Would you agree a manufacturer disclosing of
2      its effective price, its net rebates, net
3      price after rebates and discounts, would
4      effectively comprise its competitive position
5      with the manufacturers with who it competes?
6  A.  Potentially.
7  Q.  So what I'm struggling with here is why on
8      the one hand it would be your position that
9      it would be UPMC's position that it is under
10     no obligation and should not be compelled to
11     disclose its reimbursement rates with
12     doctors, pharmacies and physicians but at the
13     same time take the position that
14     manufacturers should be compelled to disclose
15     the discounts and rebates that they offer on
16     their drugs?
17 A.  In one respect I'm speaking on behalf of UPMC
18     and on the other I'm speaking on behalf of my
19     personal -- from a consumer standpoint, so
20     that is why the different positioning.
21 Q.  Let me ask it this way, is it UPMC's position
22     that manufacturers are obligated to and

**Page 99**

1      should be compelled to disclose the rebates
2      and discounts they provide to doctors,
3      pharmacists, PBMs or managed care members?
4  A.  I can't speak on behalf of how UPMC stands on
5      that issue.
6  Q.  UPMC does not require any doctor or pharmacy
7      to disclose as a condition of reimbursement
8      the discounts or rebates they receive on
9      drugs; right?
10 A.  Not that I'm aware of.
11 Q.  As a pharmacy director responsible for
12     sending reimbursements on a going forward
13     basis for UPMC is it your intention to
14     condition reimbursement to pharmacies or
15     providers under disclosure of the discounts
16     and rebates they receive from manufacturers?
17 A.  I'm not sure I understand the question.
18 Q.  On a going forward basis in setting
19     reimbursement for pharmacies and physicians.
20     For example, do you intend to condition the
21     payment of reimbursement to the pharmacies or
22     physicians on the disclosure by the

**Page 100**

1      pharmacies or the physicians of the discounts
2      or rebates they may receive from
3      manufacturers?
4  A.  That they may receive?
5  Q.  Yes.
6  A.  I have not thought about that.
7  Q.  So currently at this time there is no
8      intention by UPMC to require that disclosure
9      as a condition of reimbursement?
10 A.  Correct.
11 Q.  Yesterday we discussed the Curascript
12     contract which we marked as UPMC Deposition
13     Exhibit No. 1. Is that contract contained in
14     the files of UPMC in the regular course of
15     business?
16 A.  Yes.
17 Q.  Similarly UPMC has produced to defendants in
18     this action a number of contracts with PBMs,
19     pharmacies, physicians and its customers.
20     Are all the contracts that have been produced
21     to defendants in this matter maintained in
22     the regular course of UPMC's business?

**Page 101**

1  A.  Yes.
2  Q.  Are all those documents maintained pursuant
3      to a regular document retention policy?
4  A.  I am unaware of a particular policy around
5      document storage for the system at this time.
6  Q.  Are those contracts maintained in the
7      centralized contract files?
8  A.  The pharmacy ones are maintained currently in
9      the pharmacy operational department and
10     copies of the Curascript policy are also
11     there but not the original.
12 Q.  Where are the other contracts maintained?
13 A.  Through legal.
14 Q.  Who are the custodians of those pharmacy
15     contracts that you mentioned?
16 A.  It is Keisha Jeter who put those together for
17     this deposition.
18 Q.  What is her position?
19 A.  She is an analyst for the pharmacy
20     department.
21 Q.  Who is responsible for maintaining those
22     files on a day-to-day basis?

**Page 102**

1  A.  Keisha is under the directions of Sheila
2      Brown, who is her direct supervisor.
3  Q.  What is Sheila's Brown's title?
4  A.  Operations manager.
5  Q.  Let's turn to the physician reimbursement
6      under the UPMC health plans. It is correct
7      that all the UPMC health plans provide
8      coverage for drugs administered to its
9      members in network doctors' offices?
10 A.  Correct.
11 Q.  For the record, we will mark as Deposition
12     Exhibit No. 2 a composite exhibit consisting
13     of three contracts that were produced
14     together with a cover sheet entitled
15     Physician Practice Type, Bates stamped UPMC
16     2776 through 2825.
17         - - - -
18     (Exhibit Maxwell 002 marked for identification.)
19         - - - -
20     MR. NOTARGIACOMO: For the record,
21     I'm looking at the same contract and mine
22     ends UPMC 2794. Is that correct or not?

**Page 103**

1      MR. VUKMER: No.
2      MR. HAAS: No. What are the last
3      pages --
4      MR. VUKMER: That's the first
5      document.
6      MR. HAAS: You're looking at the
7      first document, Ed. There is a series of
8      three documents that were produced together
9      under a cover memo that has three bullet
10     points on it.
11     MR. NOTARGIACOMO: I've got it. They
12     were just in a different order.
13 BY MR. HAAS:
14 Q.  Ms. Maxwell, I ask that you take a look at
15     what's been marked as Deposition Exhibit
16     No. 2 and tell me if you can identify what
17     those are.
18 A.  They are agreements for physicians
19     participating with UPMC Health Plan or UPMC
20     Health Benefits.
21 Q.  Are those the contracts that govern the
22     reimbursement to various doctor groups for

**Page 104**

1      the services and drugs administered to UPMC
2      members?
3  A.  Yes, but this is the first time I've ever
4      seen these.
5  Q.  So it's your understanding that UPMC produced
6      a representative sample of their contracts
7      with physician practices?
8  A.  Yes.
9  Q.  Do you have an understanding of whether those
10     contracts make any express reference to AWP?
11 A.  No, I do not know that.
12 Q.  Aside from turning the pages and flipping
13     through the documents could you tell me one
14     way or another based upon your knowledge of
15     UPMC's reimbursement practices as to whether
16     these contracts would have a reference to
17     AWP?
18 A.  I am unfamiliar with how UPMC contracts with
19     the physician groups.
20 Q.  Are you familiar with documents referred to
21     as product descriptions that are referenced
22     in the physician contracts that UPMC

**Page 105**

1      executes --
2  A.  No, I'm not.
3  Q.  For the record, we'll mark so we'll have
4      available two additional exhibits. The first
5      is a document that was produced with a cover
6      sheet that says Oncology Contract, Bates
7      stamped UPMC 2826 through 2840. That will be
8      marked as Deposition Exhibit No. 3.
9          - - - -
10     (Exhibit Maxwell 003 marked for identification.)
11         - - - -
12 Q.  For the record, Ms. Maxwell, I'll ask you to
13     take a look at Deposition Exhibit No. 3 and
14     tell me whether you're familiar with that
15     document.
16 A.  No, I am not familiar with this document.
17 Q.  I'm marking a composite exhibit as Deposition
18     Exhibit No. 4 a series of three documents
19     entitled Product Description, Bates stamped
20     UPMC 2841 through 2876.
21         - - - -
22     (Exhibit Maxwell 004 marked for identification.)

**Page 106**

1      ----
2   Q.  For the record, Ms. Maxwell, I ask you if you
3       would take a look at those and tell me if
4       you're familiar with those documents.
5   A.  No, I'm not familiar with these.
6   Q.  Do you have any understanding of whether or
7       not UPMC reimburses physicians' practices
8       for drugs dispensed to UPMC members based on
9       a formula that includes a reference to AWP?
10  A.  No, I do not know that.
11  Q.  Do you have any understanding with respect to
12      how UPMC reimburses hospitals for drugs
13      administered to UPMC members?
14  A.  No, I do not.
15  Q.  Are you familiar with UPMC's contract with
16      its PBM?
17  A.  I have seen a contract to Argus.
18  Q.  Based upon your experience in your current
19      position and experience throughout the UPMC
20      organization do you have any understanding of
21      the relationship between UPMC and its PBMs
22      prior to its contracting with Argus?

**Page 107**

1   A.  No, I do not.
2   Q.  Well, you testified yesterday you were aware
3       that UPMC had contracted with Medco; is that
4       correct?
5   A.  I know that due to the fact that I was a UPMC
6       Health System employee who was offered mail
7       order and knew of which PBM that mail order
8       was offered through, but I do not know any of
9       the details of how that PBM was derived or
10      what the agreement was between UPMC Health
11      Plan and that PBM at the time.
12  Q.  Do you have any understanding of when UPMC
13      entered into a contract with Medco?
14  A.  No, I do not.
15  Q.  Do you have any understanding whether under
16      the contract or under the relationship with
17      Medco UPMC was able to avail itself of a
18      pharmacy network created by Medco?
19  A.  I do not know that.
20  Q.  Do you have any understanding of when UPMC
21      first created its own pharmacy network?
22  A.  No.

**Page 108**

1   Q.  It is true, in fact, that UPMC currently has
2       its own pharmacy network; right?
3   A.  Correct.
4   Q.  For the record, we'll mark as Deposition
5       Exhibit No. 5 a document entitled
6       Prescription Benefit Management Agreement,
7       Plan Contract Administrator, Bates stamped
8       UPMC 2728 through 2761, and with this same
9       exhibit we'll add the amendments to the
10      agreement which are Bates stamped UPMC 2762
11      through 2775.
12      ----
13      (Exhibit Maxwell 005 marked for identification.)
14      ----
15  Q.  Ms. Maxwell, I ask you to take a look at that
16      document and tell me if you know what it is.
17  A.  Based on reading what it is it is an
18      agreement for a PBM management through
19      Provantage Health Service, Inc.
20  Q.  Do you have any understanding of what
21      Provantage Health Service, Inc. is or what it
22      is?

**Page 109**

1   A.  It is a PBM.
2   Q.  That's correct that Provantage was the PBM
3       that administered the pharmacy claims on
4       behalf of UPMC starting sometime in February
5       2000?
6   A.  Yes.
7   Q.  If you would turn with me to page UPMC 2734.
8       It's the signature page of this document. It
9       shows that on behalf of UPMC Health Plan and
10      UPMC Health Benefits, Inc. it's executed by
11      one Patricia A. Liebman, CEO. Is Ms. Liebman
12      still with the company?
13  A.  No, she is not.
14  Q.  When did she leave?
15  A.  October of 2003.
16  Q.  Do you know where she currently is employed?
17  A.  No, I do not.
18  Q.  Do you have any understanding of why UPMC
19      replaced Medco with Provantage in and around
20      February of 2000?
21  A.  Only due to the fact that I worked within
22      UPMC I had heard Provantage had been bought

Raeann Maxwell                                          September 10, 2004
Volume II                    Pittsburgh, PA

6 (Pages 110 to 113)

### Page 110

1  by Merck.
2  Q. Do you have any understanding -- let me back
3     up. The question was do you have any
4     understanding of why UPMC elected to replace
5     Medco with Provantage, not replace Provantage
6     with Argus?
7  A. No.
8  Q. Do you have any understanding of the process
9     by which UPMC selected Provantage as a PBM?
10 A. No, I do not.
11 Q. Do you know whether as of 2000 UPMC had its
12    own network of pharmacy --
13 A. No, I'm sorry. I do not.
14 Q. If you turn a couple pages over to UPMC 2736.
15    Am I correct that this is the page that
16    detailed the reimbursement that you and UPMC
17    agreed to provide to Provantage for claims
18    made by pharmacies for drugs dispensed to
19    UPMC members?
20 A. Yes, based on what I'm reading.
21 Q. Under the heading Branded Drugs the contract
22    states and I will it sets out a formula which

### Page 111

1     provides that the drugs will be represented
2     at less of AWP minus 12 percent plus a
3     dispensing fee an amount determined by the
4     Provantage discount price program plus a
5     dispensing fee or the pharmacy's usual and
6     customary charge as submitted.
7         My question is, sitting here today,
8     is there any way that we could determine
9     which of the variables of that formula were
10    the basis for the reimbursement for any
11    particular drug claim that was made on UPMC?
12 A. I cannot, no.
13 Q. Would it be disclosed in any of the claims
14    data that UPMC has or can obtain which of
15    those variables were utilized to determine
16    the reimbursement for any particular claim?
17 A. Yes.
18 Q. Absent a review of the claims data is there
19    any other way that it can determine which of
20    these variables provided the basis for the
21    reimbursement that UPMC provided to any
22    particular claim?

### Page 112

1  A. Not that I'm aware of.
2  Q. Are you familiar with the particular claim
3     fields and files that are maintained in the
4     UPMC data base?
5  A. Minimal.
6  Q. The formula refers to the Provantage Discount
7     Price Program. Do you see that?
8  A. Yes.
9  Q. The Provantage Discount Price Program
10    provides that select manufacturers will be
11    paid at the lesser of the AWP discount
12    indicated above or the manufacturers's direct
13    price plus five percent. Do you see that?
14 A. Yes.
15 Q. Do you have any understanding of whether that
16    aspect of this agreement was implemented?
17 A. No, I do not.
18 Q. From UPMC's perspective does it make a
19    difference whether a reimbursement rate is
20    expressed in terms of WAC plus or AWP minus?
21 A. Not that I'm aware of.
22 Q. That's basically because AWP is set as a

### Page 113

1     fixed markup over WAC, and therefore it's
2     just mathematics as to whether or not a rate
3     is set as a percentage above WAC or a
4     percentage below AWP; is that right?
5  A. That's correct.
6  Q. The formula for the branded drugs refers to
7     the pharmacies' usual and customary charge.
8     Do you see that?
9  A. Yes.
10 Q. What is the usual and customary charge, to
11    your knowledge? What does that term refer
12    to?
13 A. What the pharmacy believes to be the charge
14    for that particular product. And my
15    understanding is they can override what the
16    system would put in.
17 Q. Is the usual and customary charge a charge
18    that the pharmacy will typically charge its
19    cash-paying retail customers?
20 A. My understanding of that is yes.
21 Q. Do you have an understanding of whether that
22    amount is determined based upon AWP or is it

**114**

1           just an amount set by the pharmacy?
2   A.   I don't know that.
3   Q.   From UPMC's perspective would it expect the
4           usual and customary charge to incorporate an
5           element of margin above the pharmacy's drug
6           cost?
7   A.   Yes.
8   Q.   To your knowledge, does UPMC today reimburse
9           pharmacies at usual and customary charges
10          ever?
11  A.   Yes.
12  Q.   In UPMC's perspective the usual and customary
13          charge component of reimbursement formulas is
14          a real and important aspect of the
15          reimbursement formula?
16  A.   Yes.
17  Q.   If you turn to the page to UPMC 2737, at the
18          top of the page it refers to generic products
19          and the generic product reimbursement
20          formula, and it states that Provantage will
21          be reimbursed at the lesser of Provantage's
22          maximum allowable cost or 80 percent of the

**115**

1           AWP. Do you see that?
2   A.   Yes, I do.
3   Q.   As well as the lower of the usual and
4           customary charges. Do you have any
5           understanding of how Provantage calculated
6           its maximum allowable cost?
7   A.   No, I do not.
8   Q.   What is a maximum allowable cost, to your
9           knowledge?
10  A.   That's the maximum cost that a product can be
11          dispensed at. And there is a variety of ways
12          WAC can be derived as well as the federal
13          government has a MAC pricing that could be
14          used as well.
15  Q.   From UPMC's perspective is it accurate that
16          the federal MAC amounts are derived from a
17          number of factors that the government at its
18          discretion takes into consideration in coming
19          up with a MAC?
20  A.   Yes.
21  Q.   As a general matter are MAC amounts used for
22          setting reimbursement for generic drugs?

**116**

1   A.   Yes.
2   Q.   I'm sorry if I got an answer to this. Do you
3           have any understanding of how Provantage
4           calculated its MAC?
5   A.   No, I do not know.
6   Q.   Is it fair to say that Provantage, UPMC and
7           other health plans and PBMs calculate MAC in
8           a variety of different ways?
9   A.   Correct.
10  Q.   When UPMC -- back up. Is it, in fact,
11          correct that UPMC itself has calculated MAC
12          prices?
13  A.   To my knowledge we use federal MAC.
14  Q.   Based on your understanding of the
15          relationship between UPMC and Provantage, is
16          it correct that UPMC retained the right to
17          negotiate rebates with manufacturers for the
18          drugs administered by Provantage?
19  A.   That is my understanding.
20  Q.   Is it your understanding that UPMC could have
21          delegated to Provantage the negotiating and
22          subcontracting with manufacturers for rebates

**117**

1           on the drugs it administered but instead UPMC
2           simply elected to do that itself?
3   A.   That is my understanding.
4   Q.   We'll mark for the record as UPMC Deposition
5           Exhibit No. 6 a document Bates stamped UPMC
6           2678 through 2726. It's a document entitled
7           Management Services Agreement that's followed
8           by a document entitled Addendum to Management
9           Services Agreement both dated June 1, 2001.
10                  - - - -
11          (Exhibit Maxwell 006 marked for identification.)
12                  - - - -
13  Q.   Before we get into that I want to clarify one
14          thing that came up yesterday. Yesterday you
15          testified -- correct me if I'm wrong -- that
16          you understood -- UPMC understood that AWP
17          was a reimbursement benchmark that set a
18          fixed amount over WAC for brand name drugs
19          that was typically 20 to 25 percent?
20  A.   Correct.
21  Q.   But you also mentioned and I wrote it down
22          after I looked at the transcript last

Raeann Maxwell  September 10, 2004
Volume II  Pittsburgh, PA

8 (Pages 118 to 121)

**Page 118**

1  night -- you also mentioned that, quote, it
2  can be surveyed across a variety of
3  wholesalers and then averaged to be an AWP.
4  That was on page 71, I believe, or 72 of the
5  draft transcript for the record.
6      I want to be sure that I understood
7  your point because I thought we had agreed
8  and I thought you had testified that it was
9  your understanding that wholesalers make
10 margins that are thin on drugs, basically the
11 2 percent prompt pay; is that correct?
12 A.  Correct.
13 Q.  So my question is when you referred to a
14 survey of wholesalers, did you mean that you
15 understood that some reporters may have
16 surveyed wholesalers to determine what the
17 wholesalers were listing as AWP versus an
18 actual markup they were charging?
19 A.  My understanding for Argus, they utilize
20 First Data Bank which is a group that
21 publishes AWP pricing. How they derive their
22 AWP pricing is by going and surveying

**Page 119**

1  national wholesalers and then averaging those
2  numbers to come up with what they report as
3  the AWP that Argus utilizes in their system.
4  Q.  And it's your understanding that the numbers
5  that they are requiring are these benchmark
6  AWPs, whatever the wholesalers have on their
7  system?
8  A.  Yes.
9  Q.  So the record is clear, it is your
10 understanding that those average -- the
11 average of those amounts derived from
12 wholesalers are benchmark prices set at some
13 percentage above WAC but don't represent the
14 amount that the wholesalers are charging
15 pharmacies; is that correct?
16 A.  Correct.
17 Q.  Or physicians?
18 A.  Correct.
19 Q.  Let me ask you this, what is your basis of
20 your understanding of how First Data Bank
21 determines the AWPs that it publishes?
22 A.  Just as I have said, what I have read of how

**Page 120**

1  First Data Bank gathers their data is they
2  survey --
3  Q.  My question is what was your basis? I think
4  you just said that it's what you read.
5  A.  I have read.
6  Q.  So my follow-up question is what is it that
7  you have read that indicated how it is that
8  First Data Bank calculated the AWPs that they
9  publish?
10 A.  For me as I was looking at our contract when
11 I first came here to understand what First
12 Data Bank did since I was unfamiliar with the
13 group I went and looked at their web site,
14 and they have frequently asked questions, and
15 one of them stated this is how they calculate
16 their AWP.
17     But it had nothing to do with this
18 course of action, it was just me trying to
19 understand what First Data Bank is and does
20 since I had never dealt with them before.
21 Q.  Okay. Aside from what First Data Bank has
22 posted on its web site, is there any other

**Page 121**

1  source of information that you have obtained
2  that provides you insight on how they
3  calculate AWP?
4  A.  No.
5  Q.  When was it that you looked at the website?
6  A.  Probably back in end of May, June as I was
7  coming on board.
8  Q.  June 2004?
9  A.  Yes.
10 Q.  At the time did you talk to anybody in here
11 about the meeting of AWP -- when I say in
12 here, I mean in UPMC -- regarding the meeting
13 of AWP.
14 A.  The only thing I ever asked for was to look
15 at the Argus training book, and in there it
16 has AWP as defined by First Data Bank which
17 is what led me to go and see how they did
18 that.
19 Q.  Okay.
20 A.  Again, to be familiar with the entry system,
21 the claims processing.
22 Q.  Based on your experience is it common for

**Page 122**

1 reimbursement contracts to define AWP by
2 simply referencing that which is published by
3 First Data Bank?
4 A. Usually how I see AWP is AWP minus some
5 percentage, and they may define whether it's
6 First Data Bank. I've also seen in
7 literature saying that it's based on redbook
8 AWP. I am unfamiliar how redbook derives
9 their AWP, but I do know that is another
10 source for pharmacies to use for referencing
11 what an AWP for a drug is.
12 Q. Let's turn to the current PBM agreement, as I
13 understand it, between Argus and UPMC. I
14 ask, Ms. Maxwell, that you take a look at
15 what's been marked as Deposition Exhibit
16 No. 6 and tell me if you know what it is.
17 A. This is the current agreement between UPMC
18 Health Plan and Argus Health Systems, Inc.
19 which is currently our PBM.
20 Q. So this is the contract as well as with the
21 addendum that governs the provision of PBM
22 services from Argus Health Systems, Inc. to

**Page 123**

1 UPMC; is that correct?
2 A. That is correct.
3 Q. Now, under this agreement Argus agreed to
4 process claims submitted by pharmacies for
5 drugs dispensed to UPMC's members?
6 A. Correct.
7 Q. Is it correct that Argus did not assume any
8 insurance risk in connection with this
9 agreement?
10 A. I am unaware of that.
11 Q. Let me ask it differently. Under this
12 agreement did Argus agree to accept as
13 reimbursement from UPMC for drugs dispensed
14 to UPMC members the same amount of
15 reimbursement that Argus paid to the
16 pharmacies that dispensed those drugs?
17 A. That is my understanding.
18 Q. So, in other words, to your knowledge, Argus
19 does not retain any spread on the
20 reimbursement of drugs dispensed by
21 pharmacies to UPMC members?
22 A. That's correct.

**Page 124**

1 Q. The compensation that Argus receives under
2 this agreement for the services rendered are
3 fees; is that correct?
4 A. Yes.
5 Q. And those fees are expressed on a per
6 transaction basis?
7 A. Yes.
8 Q. If you turn with me to the addendum to the
9 management service agreement.
10   MR. VUKMER: Could you provide a page
11 number?
12 Q. UPMC 2714. What is your understanding of the
13 purpose of this addendum?
14 A. I don't know.
15 Q. Do you have any understanding of whether this
16 addendum sets forth the amounts at which UPMC
17 agreed to reimburse pharmacies in the Argus
18 network that dispensed drugs to UPMC members?
19 A. I'm unaware of that.
20 Q. It is, in fact, correct, is it not, that
21 Argus has created its own network of
22 pharmacies?

**Page 125**

1 A. That is correct.
2 Q. And as part of the PBM relationship between
3 Argus and UPMC UPMC has the right to avail
4 itself of that pharmacy network?
5 A. Correct. For national presence, yes.
6 Q. If you turn with me to page Bates stamped
7 UPMC 2723. It is entitled Schedule A, Argus
8 Network Agreements. Do you have any
9 understanding of what these rates disclosed
10 on the pages 2723 through 2726 are?
11 A. No, I do not.
12 Q. Do you have any understanding of how UPMC
13 reimburses Argus for claims made by
14 pharmacies in the Argus network for drugs
15 distributed to UPMC members?
16 A. No.
17 Q. Is it correct that UPMC elected to include
18 under the purview of their PBM contract with
19 Argus certain of their pharmacy networks and
20 not others?
21 A. I'm not aware of what they permitted or not.
22 My understanding of why we went into the

Raeann Maxwell  September 10, 2004
Volume II  Pittsburgh, PA

10 (Pages 126 to 129)

**Page 126**

1 national network for Argus was to provide to
2 our members a way to obtain medications when
3 they were outside of our network on vacation
4 that they could fill their prescriptions.
5 Q. Under the agreement with Argus is it your
6 understanding that Argus is reimbursed for
7 generic drugs dispensed by its pharmacies at
8 a MAC or at a formula including MAC as one of
9 the variables?
10 A. I'm not aware of that.
11 Q. I apologize. I may have asked this
12 yesterday, but would you agree that with
13 respect to generics, the AWP for many
14 generics is typically set as a percentage of
15 the AWP of the branded drugs, if you know?
16 A. I do not know that.
17 Q. As a general matter is it your understanding
18 that the pricing for generic drugs is done
19 very differently than brand name drugs?
20 A. Yes.
21 Q. Are you familiar at all with the debate
22 between Congress and HIKVA, now CMS, over the

**Page 127**

1 last decade concerning whether to use AWP as
2 a basis for setting reimbursement under
3 Medicare?
4 A. Minimally as I've come into this new job.
5 Q. Have you seen or heard in the public record
6 that Congress and HIKVA have known through
7 the 1990s that the published AWPs for brand
8 name drugs were not the averages of actual
9 prices but were, in fact, a benchmark set at
10 a fixed markup over WAC?
11 A. Only due to some local newspaper articles,
12 things of that nature.
13 Q. Are you aware, based upon your new position,
14 that Congress has recently changed the
15 methodology on a going forward basis that
16 it -- that CMS will reimburse drugs under
17 part B of the Medicare program?
18 A. I am familiar, somewhat familiar, with that
19 act, yes.
20 Q. What is your understanding of the change in
21 the reimbursement in the Medicare going
22 forward generally?

**Page 128**

1 A. I know generally it's going to be less than
2 what it previously has been, but I don't know
3 the specific formula that they are proposing,
4 the details.
5 Q. Do you have an understanding that Medicare on
6 a going forward basis will reimburse drugs
7 under part B on an ASP plus basis rather than
8 an AWP minus basis?
9 A. ASP, define that.
10 Q. Average sales price as determined by the
11 statute of regulations.
12 A. I have heard that but again I can't speak on
13 it.
14 Q. Has UPMC given any consideration of whether
15 to shift to an acquisition cost plus
16 methodology for reimbursing prescription
17 drugs dispensed by pharmacies or administered
18 by physicians?
19 A. Not currently. We have not thought of that.
20 Q. And from your perspective would it make any
21 difference as to the amount of reimbursement
22 whether or not UPMC calculated that

**Page 129**

1 reimbursement on an ASP plus basis rather
2 than AWP minus basis?
3 A. Not to my knowledge.
4 - - - -
5 (There was a discussion off the record.)
6 - - - -
7 Q. For the record, we'll mark as UPMC Deposition
8 Exhibit No. 7 a document Bates stamped UPMC
9 2351 through 2371 titled Participating
10 Pharmacy Agreement as between UPMC and Giant
11 Eagle, Inc.
12 - - - -
13 (Exhibit Maxwell 007 marked for identification.)
14 - - - -
15 Q. Ms. Maxwell, I ask you that take a look at
16 what has been marked as Deposition Exhibit
17 No. 7 and tell me whether you're familiar
18 with that document.
19 A. I am somewhat familiar with this document,
20 yes.
21 Q. What is that document?
22 A. This is a document with an agreement between

**Page 130**

1 UPMC Health Plan and Giant Eagle who is our
2 chain provider for our network of pharmacies
3 locally.
4 Q. When you say they are the chain provider for
5 your network, what does that mean?
6 A. They are the chain. Like a CVS, like an
7 Eckerd, we utilize Giant Eagle.
8 Q. If you would turn with me to Section 3.8
9 which is entitled Adjustment and Payment.
10 It's at 2357. Am I correct that this section
11 provides for adjustments in the
12 reimbursements that Giant Eagle otherwise
13 obtains under the agreement?
14 A. Yes.
15 Q. And is it accurate that this adjustment
16 described in Section 3.8 provides that,
17 generally speaking, Giant Eagle will receive
18 greater reimbursement to the extent that the
19 Giant Eagle network is not utilized to the
20 level that is anticipated?
21 A. That is correct.
22 Q. In other words, UPMC negotiated a lower

**Page 131**

1 reimbursement rate with Giant Eagle in
2 exchange for its commitment to direct a
3 specified volume of customers to Giant Eagle?
4 A. That is my understanding.
5 Q. If you turn with me to Section 3.9 titled
6 Reimbursement Adjustments For Drugs Priced
7 Below Cost, and again I'll generalize here
8 but is it correct that this section provides
9 that the reimbursement for generic drugs may
10 be adjusted to the extent the reimbursement
11 does not cover the drug's acquisition cost?
12 A. That is correct.
13 Q. And mid-way down in the paragraph it provides
14 that if the generic is being reimbursed at
15 AWP minus 30 percent and that the
16 reimbursement is not covering generic costs,
17 then Giant Eagle may be reimbursed at the
18 lesser of acquisition cost plus 2 percent or
19 AWP minus 18 percent? Do you see that?
20 A. Yes.
21 Q. Now, is it accurate that the intent of that
22 provision of this paragraph was intended to

**Page 132**

1 ensure that Giant Eagle earns on average at
2 least a 2 percent margin on the generics
3 dispensed?
4 A. As I read that, that would be my
5 understanding.
6 Q. And the AWP minus 18 percent component of
7 that formula, does that reflect the
8 understanding that the AWP for most drugs is
9 set at 20 percent markup over WAC, therefore,
10 by providing reimbursement at AWP minus 18
11 percent UPMC is intended to provide
12 approximately a 2 percent margin on average?
13 A. That would be my understanding.
14 Q. If you would turn with me to the Schedule A
15 which is Bates stamped UPMC 2367. Tell me if
16 you have an understanding of what this
17 schedule shows.
18 A. This is the cost schedule that is utilized to
19 reimburse Giant Eagle on brand and generic
20 products for the various lines of business,
21 the commercial, Medicare and Medicaid that we
22 spoke of yesterday.

**Page 133**

1 Q. And under Reimbursement there is a heading A
2 and B. The first is Primary Commercial
3 Product and subsection B is Secondary
4 Commercial Product. What is your
5 understanding of the meaning of primary
6 commercial product versus secondary
7 commercial product?
8 A. My understanding is if a member has only our
9 commercial product, it is the primary
10 commercial product pricing that is utilized;
11 if they have another insurer, and we are
12 their secondary, that the secondary one is
13 utilized.
14 Q. And, again, does the AWP minus 18 percent
15 reimbursement rate for brand name drugs in
16 the primary commercial product category
17 reflect an understanding that for the AWP for
18 most drugs is set at about 20 percent over
19 WAC, and therefore since pharmacies tend to
20 buy it above WAC the reimbursement rate will
21 provide on average a 2 percent margin to
22 Giant Eagle?

**134**

1  A.  That is my understanding of that, yes.
2  Q.  If you go down to Section 2 it's titled MAC
3      Pricing. Is it correct that the generics
4      that are dispensed by the Giant Eagle
5      pharmacies will be reimbursed at MAC plus
6      expensing fee under this agreement?
7  A.  Yes.
8  Q.  Under subsection B it refers to the MAC
9      pricing for multi-source generic drugs. What
10     are multi-source generic drugs?
11 A.  My understanding of that is there is more
12     than one manufacturer of that product
13     permitting competitive marketing.
14 Q.  Now, this subsection B appears to set forth a
15     formula for calculating MAC pricing that has
16     five variables, and I'll read them for the
17     record, the first being the CMS MAC, the
18     second the average generic price which it
19     clarifies as PBM calculated price. The third
20     is the customary price. The fourth is the
21     submitted price and the fifth is AWP minus 51
22     percent. Is that your understanding?

**135**

1  A.  From reading that, yes.
2  Q.  Do you have an understanding of what the
3      average generic price is as used in this
4      formula?
5  A.  It would be whatever is utilized by our PBM,
6      which would be Argus.
7  Q.  So by the reference to average generic price
8      is, in essence, the MAC price calculated by
9      Argus? Is that your understanding?
10 A.  That would be my understanding.
11 Q.  And based upon the way this formula reads is
12     it correct that UPMC's understanding is that
13     Argus' MAC price would be different than the
14     CMS MAC price?
15 A.  Yes.
16 Q.  What is your understanding of the difference
17     between a customary price and a submitted
18     price as used in this formula?
19 A.  I don't know what the difference would be.
20 Q.  How would we determine sitting here today
21     which one of these five elements of the MAC
22     pricing formula ultimately was used as the

**136**

1      basis for providing reimbursement for generic
2      drug under the Giant Eagle contract?
3  A.  Whichever of these end up being the lesser.
4      It's the lesser logic that is utilized.
5  Q.  My question is if we wanted to determine
6      whether the CMS MAC was used, the average
7      generic price was used, the customary price
8      was used, the submitted price or the AWP
9      minus 51 percent amount was used, is there a
10     way to determine, sitting here today, which
11     element of the formula was, in fact, utilized
12     in reimbursing for generic drugs under this
13     agreement?
14 A.  My understanding would be to go and review
15     claims and determine which had been enacted
16     upon.
17 Q.  To your understanding would the claims data
18     show which component of the formula was, in
19     fact, utilized for reimbursement or would it
20     just show the ultimate reimbursement amount,
21     to your knowledge?
22 A.  To my knowledge, it should have the

**137**

1      reimbursement amount.
2  Q.  Would it have the reimbursement amount --
3      would the claims data show in addition to how
4      much was reimbursed which one of these
5      elements was used to calculate that amount?
6  A.  To my understanding of the fields that would
7      be present, yes, it is conceivable that would
8      be there.
9  Q.  So it's your understanding they would have an
10     amount for the CMS MAC, an amount for the
11     average generic price, amount for customary
12     price, amount for the submitted price and the
13     amount for the AWP minus 51 percent amount.
14     Then there would also be a separate field
15     that would say here is the amount we actually
16     reimbursed?
17 A.  Correct.
18 Q.  And what you would do if you go back and
19     match it up to see which of the two fields
20     matched?
21 A.  Correct.
22 Q.  Aside from looking at the claims data and

Page 138

1  doing that analysis is there any other way to
2  determine how and at what basis the generic
3  drugs were reimbursed under this agreement?
4  A. No.
5  Q. For the record, we'll mark as Deposition
6  Exhibit No. 8 UPMC 2624 through UPMC 2631.
7  It's a document entitled Participating
8  Pharmacy Agreement and it purports to be an
9  agreement between Wal-Mart and Giant Eagle
10 dated November 3, '99.
11      - - - -
12 (Exhibit Maxwell 008 marked for identification.)
13      - - - -
14 Q. Ms. Maxwell, I ask that you take a look at
15 this agreement and tell me if you have any
16 understanding of what it is.
17 A. Only on reading the title it is an agreement
18 between UPMC, Giant Eagle and Wal-Mart
19 stores.
20 Q. In acting as a contract administrator on
21 UPMC's behalf did Giant Eagle retain any
22 spread, and by that I mean did they get

Page 139

1  reimbursed under its contract with UPMC at
2  amounts that were greater than the amounts it
3  reimbursed the particular pharmacies in its
4  network?
5  A. I do not know that.
6  Q. Do you have any understanding today of
7  whether or not Giant Eagle retains any spread
8  with respect to the contracting it does on
9  behalf of -- let me withdraw that question.
10 Do you have any understanding of the terms of
11 the agreements between Giant Eagle and its
12 network pharmacists?
13 A. No.
14 Q. To your understanding, is Wal-Mart still a
15 member of the Giant Eagle network?
16 A. Not that I'm aware of.
17 Q. Wal-Mart only has currently its own retail
18 pharmacy network?
19 A. Yes.
20 Q. Is Wal-Mart self-insured with respect to its
21 prescription drug benefits offered to its
22 employees?

Page 140

1  A. I don't have that knowledge.
2  Q. Do you have any understanding of Wal-Mart's
3  current contractual relationship with UPMC?
4  A. We have some of their stores in our network
5  for our Medicaid product as a willing
6  participant or willing provider.
7  Q. Aside from Wal-Mart's participation in the
8  Medicaid plan, do Wal-Mart and UPMC have any
9  other relationship, to your knowledge?
10 A. I believe they utilize us as one of their
11 insurance products to their employees.
12 Q. Do you have any understanding of what
13 insurance product is offered to the employees
14 of Wal-Mart?
15 A. No, I do not.
16 Q. Are you familiar at all with the contract
17 between Rite-Aid and UPMC governing the
18 reimbursement of drugs dispensed by Rite-Aid
19 to members of the UPMC health plans?
20 A. Again, I understand that they are part of our
21 network and primarily for our Medicaid
22 population.

Page 141

1  Q. For the record, we'll mark as Deposition
2  Exhibit No. 9 a document Bates stamped 1772
3  through 1785. It's a document entitled
4  Participating Pharmacy Agreement, and it
5  purports to be an agreement between Rite-Aid
6  and UPMC.
7      - - - -
8  (Exhibit Maxwell 009 marked for identification.)
9      - - - -
10 Q. Ms. Maxwell, I ask you that you just turn to
11 page UPMC 1784 of this agreement which is the
12 Schedule A, Pharmaceutical Service Cost
13 Schedule, and you will note that under the
14 reimbursement for brand name drugs it's AWP
15 minus 16 percent plus $1 dispensing fee.
16     Do you have any understanding of why
17 the reimbursement rate for Rite-Aid is
18 greater than the reimbursement rate for Giant
19 Eagle?
20 A. No, I do not know.
21 Q. Is it likely because UPMC cannot commit to
22 the same volume targets with Rite-Aid that it

**Page 142**

1        could for Giant Eagle?
2 A.   That's possible.
3 Q.   What are the five largest customers of UPMC?
4 A.   Customers as far as employer groups?
5 Q.   However you define it, your customers, your
6        employer groups, your union benefit funds or
7        whatever.
8        MR. VUKMER: To the extent you know.
9 A.   UPMC Health System, University of Pittsburgh,
10        City of Pittsburgh, Allegheny County. Those
11        are the ones that I know.
12 Q.   What are the types of services that UPMC
13        offers to those five customers?
14 A.   Medical as well as pharmacy benefits.
15 Q.   Does UPMC act as an insurance company with
16        respect to those entities or as a claims
17        administrator?
18 A.   Insurance company.
19 Q.   Are any of those entities self-insured with
20        respect to the benefits they offer their
21        employees?
22 A.   I am unaware.

**Page 143**

1 Q.   To your knowledge, has any pharmacy conspired
2        with any drug manufacturer to inflate a
3        drug's AWP?
4 A.   Not that I'm aware of.
5 Q.   To your knowledge, has any doctor conspired
6        with the drug manufacturer to inflate any
7        drug --
8 A.   Not that I'm aware of.
9 Q.   To your knowledge, has any PBM conspired with
10        any drug manufacturer to inflate a drug's
11        AWP?
12 A.   Not that I'm aware.
13 Q.   Is it your position that -- is it UPMC's
14        position that drug manufacturers have
15        defrauded UPMC by publishing AWPs?
16 A.   Not to my knowledge.
17 Q.   In your experience in the pharmaceutical
18        industry do you have an understanding of how
19        drugs were reimbursed in the 1980s?
20 A.   No, I do not.
21        MR. HAAS: I'm going to turn it over
22        to Ed Notargiacomo. I reserve my right to

**Page 144**

1        ask follow-up questions so you'll have an
2        opportunity to ask your questions, so why
3        don't you go ahead, Ed.
4        MR. NOTARGIACOMO: Actually, I'm
5        wondering if it makes sense to break here. I
6        need about five minutes just to collect my
7        notes.
8        MR. HAAS: Okay.
9        MR. NOTARGIACOMO: Does that make
10        sense?
11        MR. HAAS: That's fair.
12        - - - -
13 (There was a recess in the proceedings.)
14        - - - -
15        EXAMINATION
16        - - - -
17 BY MR. NOTARGIACOMO:
18 Q.   My name is Ed Notargiacomo. As I said at the
19        beginning of the deposition, I represent the
20        plaintiffs, and I'll be asking you a few more
21        questions today.
22        I guess from yesterday's testimony

**Page 145**

1        you made reference to claims that are --
2        maybe you were asked questions about claim
3        data. Do you know has UPMC produced claim
4        data to defendants in the case?
5 A.   It is my understanding, yes, we have.
6        MR. NOTARGIACOMO: Eric, to my
7        knowledge -- it may be lack of information on
8        my part -- I don't know if we received copies
9        of that claim data.
10        MR. HAAS: You have. If for some
11        reason you don't have it, lost it or whatever
12        the case, we'll be happy to give you another
13        one, but we've provided you with everything
14        we have.
15 Q.   Ms. Maxwell, can you describe for me the
16        Medicare product that UPMC makes available?
17 A.   Again, it is a medical benefit as well as a
18        pharmacy benefit. And there is an HMO
19        product with it as well as a PPO product with
20        it.
21 Q.   Are you familiar with Medicare Part B and how
22        the drugs are reimbursed under that program?

**Page 146**

1  A.  Not a great amount of detail, no, I'm not.
2  Q.  Do you know how or whether reimbursement for
3      drugs that are covered by Medicare Part B is
4      made through the HMO product that you just
5      described?
6  A.  It's according to the contracts that we have
7      with the pharmacies which is an AWP minus
8      some percentage plus a dispensing fee.
9  Q.  I guess my question goes to drugs that are
10     covered by Medicare Part B, which is my
11     understanding is those drugs are primarily
12     injectible drugs administered by a physician
13     in an office setting.
14 A.  Those would be the specialty products, and
15     that would come through on the medical side
16     through a J code.
17 Q.  Is that the J code that you described earlier
18     in your deposition yesterday?
19 A.  Yes, it is.
20 Q.  How familiar are you with the -- we talked a
21     little bit in today's deposition or you
22     talked a little bit about a claims data on

**Page 147**

1      the pharmacy side noninjectible.
2          How familiar are you with the layout
3      of claims data by UPMC with relation to those
4      services bundled under the J code?
5  A.  Not very -- the J code can consist of a
6      variety of services provided it can be for
7      the drug, it could be for the physician, it
8      could be for a lab, it could be a bundling of
9      all of those, but I'm not familiar with as to
10     whether it breaks it out by line item.
11 Q.  So your testimony is that it doesn't break it
12     out, it's just that you don't know whether it
13     does or not?
14 A.  Correct.
15 Q.  Do you know who at UPMC would know the answer
16     to that question or how we could figure out
17     the answer to that question?
18 A.  It may be in the claims data that you have
19     received from UPMC or it would come through
20     somebody who would work on the reimbursement
21     side, but I could not give you a specific
22     name.

**Page 148**

1  Q.  Is there a specific department? You just
2      mentioned a reimbursement side.
3  A.  The reimbursement department.
4  Q.  Is that where the claims data originated, if
5      you know?
6  A.  I believe so.
7  Q.  Do you know who was responsible for putting
8      the claims data that was provided together?
9  A.  No, I do not.
10 Q.  What interaction do you have with
11     reimbursement of pharmaceuticals by UPMC?
12 A.  From which standpoint?
13 Q.  What interaction do you have with people in
14     the reimbursement department at UPMC?
15 A.  Our claims are adjudicated at point of
16     service, so when a member comes to a pharmacy
17     and needs their medication, they provide the
18     pharmacist with a prescription. The
19     pharmacist fills it. The patient pays their
20     copay. That transaction is electronically
21     sent to Argus, and that adjudication goes
22     through online, and that's the extent of it.

**Page 149**

1  Q.  I guess my question is a little bit
2      different. My question is is that what you
3      just testified to, is that the extent of your
4      knowledge about how the drugs are reimbursed?
5  A.  At the point of service, yes.
6  Q.  I guess what I'm trying to get at, at UPMC
7      are there others who are more knowledgeable
8      about the reimbursement system than yourself?
9          MR. HAAS: Objection to form.
10 Q.  You can still answer the question.
11 A.  There could be.
12 Q.  Toward the end of today's deposition I think
13     the last question was whether or not you had
14     knowledge about how UPMC reimbursed drugs in
15     the 1980s, and I think you said you did not;
16     is that correct?
17 A.  That is correct.
18 Q.  Do you have knowledge about how UPMC
19     reimbursed drugs in the nineties other than
20     your own experience at the psychiatric
21     facility that you worked at as part-time?
22 A.  No, I do not.

**Page 150**

1  Q.  I think one of the last exhibits to your
2      deposition today by defendants was the
3      contract between UPMC and Rite-Aid, and part
4      of that, I think, Mr. Haas pointed out a
5      schedule on page UPMC 1784.
6          That indicated that brand drugs are
7      reimbursed to Rite-Aid at AWP minus 16
8      percent plus a $1 fee and generics were
9      reimbursed at max of $1.75.
10         Sort of to cut to the quick, is it
11     true that every contract that UPMC has with a
12     pharmacy in its network has a contract that
13     includes AWP as a component of the
14     reimbursement to the department?
15 A.  To my knowledge, that is correct,
16     reimbursement to the pharmacy.
17 Q.  Do you know -- let's take Rite-Aid for
18     instance. Do you know what Rite-Aid is
19     paying for the drugs for which UPMC is
20     reimbursing it?
21 A.  No, I do not.
22 Q.  Are you aware of what rebates, if any,

**Page 151**

1      Rite-Aid may be getting from pharmaceutical
2      manufacturers with products it purchases?
3  A.  No, I would not.
4  Q.  Does that answer hold true for all of the
5      pharmacies in UPMC's network?
6  A.  Yes.
7  Q.  There was discussion a little bit yesterday,
8      again today, about whether or not -- let's
9      take the Rite-Aid contract, for example. On
10     page UPMC 1769, which I think is the original
11     Schedule A for that contract, amongst other
12     documents that we have seen in your
13     deposition there is some explanation about
14     what MAC pricing -- what constitutes MAC
15     pricing under the contract, and there are a
16     number of different bases upon which the MAC
17     price might be determined for -- for instance
18     under the Rite-Aid contract the single source
19     generic drug -- and I'm quoting now from UPMC
20     1769 -- the price is determined by comparing
21     submitted costs, customary price and AWP
22     minus 30 percent the lowest reflected as the

**Page 152**

1      MAC price.
2          It was your testimony that with
3      respect to generic drugs -- I think today
4      your testimony was that the claims debt
5      analysis of the -- the analysis of the claims
6      data for any transaction would allow one to
7      determine whether the reimbursement was made
8      based on which of them, based on one of those
9      criteria; is that accurate?
10 A.  To my knowledge, yes.
11 Q.  And it would allow you to determine which
12     criteria was used to create the MAC of that
13     transaction?
14 A.  Correct, if those fields are present in the
15     claims data. Yes.
16 Q.  Do you know whether, in fact, they are
17     present?
18 A.  No, I do not for sure.
19 Q.  Do you know whether -- my question just
20     related to generic drugs. Do you know
21     whether for brand drugs the claims data
22     indicates whether AWP or something else is

**Page 153**

1      the basis of the payment made?
2  A.  Yes. It would be based off of AWP as stated
3      in the contract.
4  Q.  Again my question is a little bit different.
5      It's about the -- if you didn't have the
6      contract in front of you right now, and all
7      you had was the claims data, do you know
8      whether the claims data would include -- we
9      talked about generic. Let's talk about name
10     brand drugs. Do you know whether the claims
11     data with respect to the name brand drug
12     would indicate whether AWP was the basis of
13     the payment?
14 A.  Yes.
15         MR. HAAS: As compared to usual and
16     customary.
17 Q.  Someone mentioned usual and customary. Do
18     you know how often usual and customary is
19     used as a basis for payment by UPMC?
20 A.  No. I do not know the volume of that.
21 Q.  Do you have any knowledge as to the relative
22     frequency with which it's used versus AWP?

```
                                                    154
1   A.   No.
2   Q.   Earlier in the deposition Mr. Haas asked you
3        about your knowledge concerning controversy
4        in the last decade or so concerning the use
5        of AWP as a reimbursement mechanism, and he
6        asked you about your knowledge concerning
7        more recent legislation to use ASP as opposed
8        to AWP.
9              He asked you whether from UPMC's
10       perspective it mattered whether as a
11       reimbursement basis one used an AWP minus
12       some percentage or ASP above some percentage,
13       and you said not to my knowledge, I believe.
14       Is that accurate?
15  A.   That is correct -- that is accurate.
16  Q.   Would it make a difference to UPMC if UPMC
17       knew that -- in the answer to the question
18       would it make no difference to UPMC if UPMC
19       was aware that AWP, the average wholesale
20       price, for a particular drug was grossly
21       inflated and was not related to the actual
22       sales prices for that drug but it knew that

                                                    155
1        the ASP was a true average of the actual
2        sales price? Given that knowledge would it
3        make a difference to UPMC as to which basis
4        was used for reimbursement or payment?
5              MR. HAAS: Objection to form,
6        characterization of the benchmarks, but you
7        can answer if you can understand it.
8   Q.   Were you able to follow that question?
9   A.   Basically you're saying that -- let me
10       paraphrase and see if I understand what you
11       were trying to get across, that you're
12       stating AWP is potentially inflated versus
13       ASP which would be a truer benchmark?
14  Q.   Basically yes.
15             MR. HAAS: I will object on form and
16       foundation and characterization, among other
17       things.
18             MR. VUKMER: This is Dan Vukmer. Let
19       me talk to my client for just one second, if
20       you wouldn't mind.
21             ----
22       (There was a discussion off the record.)

                                                    156
1              ----
2   A.   No, it shouldn't matter which that we would
3        potentially use.
4   Q.   Why is that?
5   A.   Because regardless of which number that you
6        utilize and you do whatever percentage minus
7        you should still come up close to a
8        negotiated reimbursement price to your
9        provider which would be a pharmacy or
10       physician.
11  Q.   Well, the instance where -- does that assume
12       that in the negotiation -- I don't know that
13       the negotiation you just posited -- does that
14       assume in that negotiation you understand
15       that AWP is, in fact, an inflated number?
16             MR. HAAS: Objection, foundation,
17       form, speculative.
18  A.   I don't know how to answer that question.
19  Q.   Your testimony was it didn't matter whether
20       you used an AWP minus or an AWP plus system
21       because you would negotiate to a particular
22       point of reimbursement?

                                                    157
1   A.   Potentially, yes.
2   Q.   Would you reach the same point of
3        reimbursement if you did not understand that
4        AWP was an inflated number?
5              MR. HAAS: Objection, ambiguous.
6        What does that mean?
7   Q.   All right. That AWP, in fact, did not
8        reflect or, put it this way, grossly
9        misrepresented what the actual sales prices
10       were in the market?
11             MR. HAAS: Objection. She testified
12       she didn't believe it did.
13  Q.   You can answer the question if you understand
14       it.
15  A.   I don't understand.
16  Q.   Let me ask you why wouldn't it matter -- let
17       me see if I have time to get back to this.
18       Under the contract with Argus, which I
19       believe was Exhibit 6 to your deposition, at
20       least for those pharmacies that are in the
21       Argus network as opposed to the UPMC network,
22       with their being reimbursed Argus is being
```