**Page 74**

1  handle them manually.
2  Q. Was this -- you mentioned earlier
3  that the AWP-10% formula was implemented in
4  1999, correct?
5  A. Yes.
6  Q. Was this E-mail chain before or
7  after that was implemented?
8  A. This is after.
9  Q. This E-mail starts with, "For
10 Managed Care, Sue loaded AWP-10%." The Sue
11 referred to there is you, correct?
12 A. Yes.
13 Q. And Mr. Cogen continues, "I'm not
14 sure, however, if that was 98 AWP or 99 AWP."
15 What is he referring to there?
16 A. He's asking at this time what did
17 we load for the reimbursement for the oncology
18 drugs.
19 Q. And by '98 or '99 AWP he's
20 referring to the fact that the AWPs for some of
21 the drugs being discussed may have changed
22 between 1998 and 1999?

**Page 75**

1  A. He's referring to files we received
2  from Micronetics for AWP.
3  Q. What is Micronetics?
4  A. Micronetics is the company that we
5  purchased the Red Book AWP allowances from.
6  Q. So he's referring to the
7  possibility that the Red Book, that the AWPs
8  purchased by Red Book will have changed by 1998
9  and 1999?
10 A. He's referring to those sources.
11 Q. He then continues, "A number of
12 oncologists are complaining that we are
13 reimbursing them at a rate below their cost, as
14 Marie's E-mail notes."
15     Do you know what E-mail he's
16 referring to there?
17 A. I don't know.
18 Q. Then he says, "Tomorrow I am
19 meeting with a Dr. Woo who does a lot of
20 oncology in the north to discuss this issue.
21 He has already begun referring his chemo cases
22 to the outpatient departments of hospitals

**Page 76**

1  because of unsatisfactory reimbursement."
2      So Horizon certainly recognized as
3  of 1999 that if the reimbursement to providers
4  offices was inadequate, providers would stop
5  administering the drugs. Is that correct?
6      MS. LIGHTNER: Objection to form.
7  You can answer.
8  A. I don't know how the reimbursement,
9  how they were reimbursed, because there was no
10 reimbursement on the claim engines. So it was
11 up to the -- to reimburse the drugs, the
12 methodology, I wouldn't know what it was.
13 Q. What do you mean, there was no
14 reimbursement?
15 A. For these oncology drugs, we didn't
16 have reimbursement rates for these. Claims
17 were pending to Ray Cogen's department and they
18 were pricing them.
19 Q. Well, let me understand then. If
20 prior to this time Horizon had determined on a
21 reimbursement methodology of AWP-10%, why was
22 it not reimbursing in relation to oncology

**Page 77**

1  drugs?
2  A. Prior to this time?
3  Q. Yeah.
4  A. Prior to this time, it wasn't in
5  the claim engines.
6  Q. Let's back up. As I understood
7  your testimony, the decision to move to AWP-10%
8  had been made before this E-mail chain was
9  generated, correct?
10 A. Just two months before.
11 Q. So it had not yet been
12 implemented. Is that correct?
13 A. It was implemented as of this
14 E-mail, yes.
15 Q. But it had not yet been implemented
16 for oncology drugs?
17 A. Well, the problem stemmed in 1998,
18 and that's when the work group was created
19 because of the oncology providers who were not
20 satisfied with our reimbursement.
21 Q. And on what basis were they being
22 reimbursed in 1998?

Page 78

1  A. The reimbursement allowances were
2  not being handled by my department, the pricing
3  department. They were being handled by
4  utilization management who were taking the
5  claims that were pending for pricing and
6  reimbursing them based on their methodology,
7  which I do not know what that was.
8  Q. So you know that prior to this
9  E-mail oncologists were complaining about their
10 reimbursement rate from Horizon, but you don't
11 know what that reimbursement rate was?
12 A. I do not.
13 Q. But you do understand from Mr.
14 Cogen's E-mail that if doctors' providers
15 considered the reimbursement rate to be
16 unsatisfactory, they would refer their
17 chemotherapy cases certainly to hospital
18 outpatient department instead, correct?
19 A. That's correct.
20 Q. And sticking with page 397, you'll
21 see a sentence reading, that's on the second
22 line, "This is a big issue since our hospital

Page 79

1  outpatient discount off charges methodology
2  results in total payments far in excess of what
3  we pay in the office."
4      Do you see that?
5  A. Yes.
6  Q. So certainly as of 1999 Horizon
7  recognized that it would pay more for drugs if
8  they were administered in hospitals' outpatient
9  departments versus providers' offices, correct?
10     MS. LIGHTNER: Object to form.
11     MR. MACORETTA: Objection to form.
12     MS. LIGHTNER: You can answer.
13 Q. Is that correct?
14 A. Yes.
15 Q. Do you know whether Horizon
16 recognized that fact at any time prior to 1999,
17 the date of this E-mail?
18 A. I'm sure there were people here at
19 Horizon that did know that, yes.
20 Q. Would it be fair to say that
21 Horizon has been aware of that fact, say, back
22 to 1990?

Page 80

1  A. Yes.
2     MR. MACORETTA: Objection to form.
3  Q. The E-mail continues, "It's hard to
4  believe that doctors would refer these cases to
5  the hospital if there was any margin from
6  delivering the service in the office. That
7  would be irrational if we are underpaying in
8  the office and causing doctors to refer to the
9  hospital. Because of that we are cutting off
10 our noses," et cetera, et cetera, et cetera.
11     What do you understand Mr. Cogen to
12 mean by saying, "we are cutting off our noses"?
13 A. Reimbursement for a professional in
14 his office is much, is less harmful to
15 Horizon's bottom line than if he has to be
16 referred to a hospital and incur all the
17 charges from the hospital.
18 Q. And Mr. Cogen says in this E-mail
19 that doctors would not be referring the cases
20 to hospitals if there was a margin from
21 delivering the service in their offices,
22 correct?

Page 81

1  A. That's correct.
2  Q. So you understand Mr. Cogen to be
3  saying here that providers should be afforded a
4  margin for administration in their offices, so
5  that they won't refer patients to the hospital
6  outpatient department, correct?
7  A. I see that, yes.
8  Q. Now, going back to page 396. You
9  responded to Mr. Cogen's E-mail saying,
10 "Effective 1/1/99 we moved to the
11 reimbursement rate of 1998's Mean of AWP-10%,"
12 and you provided some figures.
13     What do you mean by, "We moved the
14 reimbursement rate of 1998's Mean of AWP"?
15 A. We received a file from Micronetics
16 for the average wholesale price. And since we
17 don't have the capabilities in our claim
18 engines to reimburse by NDC, we then take the
19 generic drugs and the brand drugs and we
20 develop a Mean of AWP.
21 Q. Well, let's start with brand drugs
22 there. Let's say a branded drug goes through

**82**

1  two price actions in the course of a given
2  year. Does Horizon change the amount it's
3  reimbursing at each price change in the course
4  of a given year?
5     A.   Horizon changes as the CPT codes
6  changes, not specific to the brand versus
7  nonbrand.
8     Q.   Right. Well, let's only talk about
9  brands here. See, I'm trying to understand
10 what you mean by Mean of AWP.
11    A.   Well, the Mean of AWP represents
12 the brand and generics, it's everything rolled
13 into one. I don't have the NDC code. It would
14 allow me to price a generic versus a brand.
15 Since I don't have that capability, I only have
16 one CPT code for ten NDC codes, I have to come
17 up with one reimbursement rate. So it's the
18 mean of everything that will roll up to that
19 CPT code.
20    Q.   So if a given drug has generic
21 competitors, and say the branded version is
22 administered in office, the amount that Horizon

**83**

1  reimburses for it, will that be AWP-10% of the
2  branded drugs AWP?
3     A.   It will be the Mean of AWP for the
4  CPT code which is inclusive of the brand versus
5  nonbrand.
6     Q.   Is that true across-the-board?
7     A.   For a professional reimbursement,
8  we don't have the capability to reimburse by
9  NDC code. We only have reimbursement by CPT.
10    Q.   So the answer to my question is,
11 yes, that is across-the-board?
12    A.   Yes.
13    Q.   Does Horizon generate these meaned
14 AWPs for each CPT code?
15    A.   We purchase it from Micronetics.
16    Q.   So Micronetics will provide a Mean
17 of AWPs for all the drugs under a particular
18 CPT code and give that to Horizon, correct?
19    A.   That's correct.
20    Q.   And that will be the Mean of the
21 AWPs of the branded drugs and all the generic
22 drugs that are in that CPT, correct?

**84**

1     A.   That's correct.
2     Q.   Horizon will then reimburse for all
3  of the drugs within that CPT at the Mean of the
4  AWP of all those drugs minus ten percent?
5     A.   Yes.
6     Q.   Has that been the case since 1999?
7     A.   Yes. Anything that Micronetics
8  does not provide, we price at AWP-10%.
9     Q.   So when Horizon started using AWP
10 in 1999, it never used the AWP of specific
11 drugs, it always used the Mean of AWP for all
12 drugs in the CPT. Is that correct?
13    A.   We use both. Anything that we're
14 using, Red Book, where we have to physically
15 look up the codes, we use the AWP-10%.
16    Q.   Okay.
17    A.   Micronetics doesn't provide us an
18 allowance for every single drug code that's out
19 there.
20    Q.   When would you use the Mean AWP of
21 all the drugs in the CPT as against using the
22 AWP for an individual drug?

**85**

1     A.   We use mean for AWP for all drugs
2  provided by Micronetics. Anything Micronetics
3  does not supply, we would utilize Red Book.
4     Q.   Now, for the drugs that Micronetics
5  does supply, if a drug has no generic
6  competitors but has other branded competitors,
7  will Horizon reimburse at the mean AWP of all
8  the branded competitors minus ten percent?
9     A.   Micronetics does the calculation,
10 but you'll see in the database that they
11 provide to us the competitors and the brand
12 versus nonbrand.
13    Q.   Yeah. Well, I'm talking about a
14 situation where there are no branded drugs.
15    A.   And we're looking the code up in
16 the Red Book.
17    Q.   Well, let me put the question to
18 you again. Let's say there are only branded
19 competitors in a particular class and there are
20 no generic drugs. Can a CPT code include
21 different branded drugs, but no generic drugs?
22    A.   Are you asking me the question is

**86**

1  it something Micronetics is providing to me?
2  Q. Well, I'm asking whether you know.
3  A. If Micronetics is providing it to
4  us, then, yes, it's inclusive of all the
5  brands.
6  Q. Are there circumstances where a
7  Micronetics will provide you with -- well,
8  withdraw that.
9      Are there circumstances in which
10 Horizon will reimburse for branded drugs that
11 have no generic competitors using a mean AWP
12 for that drug and its other branded
13 competitors?
14 A. Yes.
15 Q. So there are circumstances where a
16 drug that has no generic competition will be
17 reimbursed not on the basis of its own AWP, but
18 on the basis of the Mean of its AWP and its
19 competitors?
20 A. That's correct.
21 Q. Let's go back to what we marked
22 earlier as Exhibit 1. That was HRZ 404 to

**87**

1  407. Perhaps you can refresh your recollection
2  about that document.
3  A. I'm fine.
4  Q. What's the issue being discussed in
5  this E-mail chain?
6  A. The Zoladex versus the
7  reimbursement that Medicare had derived saying
8  that the Zoladex and Lupron were reimbursed,
9  should be reimbursed at the exact rate.
10 Q. And Horizon subsequently decided to
11 track Medicare's least cost alternative
12 policies and reimburse Lupron at the same rate
13 as Zoladex. Is that correct?
14 A. That's correct.
15 Q. My question is: Why was that
16 necessary, if Horizon was already reimbursing
17 at a mean AWP rather than the AWP for Lupron
18 alone?
19 A. Because the AWP for one or the
20 other drug was exorbitant.
21 Q. Well, let's get this right. Is it
22 your understanding that Lupron and Zoladex are

**88**

1  a part of the same CPT code?
2  A. They are not.
3  Q. So in the specific case of Lupron
4  and Zoladex, the Mean of AWP, that would be,
5  the basis for reimbursement was not the Mean of
6  those two drugs?
7  A. That's correct.
8  Q. Were there any other drugs that
9  were within the same CPT code as Lupron?
10 A. There may have been. I do not
11 know.
12 Q. Do you know whether or not -- well,
13 when did Horizon start reimbursing for Lupron
14 at the rate of Zoladex?
15 A. August 1st, 2001.
16 Q. Prior to August 1st of 2001, was
17 Horizon reimbursing for Lupron on the basis of
18 Lupron's AWP-10%?
19 A. Yes.
20 Q. And how do you know that -- put it
21 another way. How do you know that you were
22 reimbursing at Lupron's AWP as against a mean

**89**

1  AWP that would have included Lupron and other
2  drugs in the same CPT code?
3  A. I don't know.
4  Q. So when you just said that, yes, in
5  response to my question as to whether Lupron
6  was being reimbursed on the basis of its own
7  AWP, that was incorrect?
8  A. Yes.
9  Q. So you so you don't know whether
10 prior to 2001 Horizon was reimbursing Lupron
11 based on its AWP or not. Is that correct?
12 A. I do not know if there were other
13 competitors that were all up to that CPT code
14 other than -- I don't know if there's more than
15 one manufacturer.
16 Q. If there's more than one
17 manufacturer?
18 A. If there's competitors that roll up
19 to this CPT code.
20 Q. But if there were other competitors
21 that rolled up to that CPT code, then Lupron
22 would have been reimbursed not on the basis of

```
                                                  90
1   its own AWP, but on the Mean AWP of all of the
2   drugs?
3       A.   That's correct.
4            MS. LIGHTNER: Are you okay? Want
5   to take a break or anything.
6            THE WITNESS: No.
7            MS. LIGHTNER: Okay.
8       Q.   Let's say I wanted to go to a
9   particular drug. And if I can figure out
10  whether Horizon has reimbursed for that drug
11  based on its own AWP or based on a mean AWP,
12  how would I determine that?
13      A.   Could you rephrase that.
14      Q.   Sure. Let's take the example of,
15  you know, any specific drug, and I want to know
16  whether, at any given point in time, let's say
17  in 1999, that drug was being reimbursed by
18  reference to its own AWP or by reference to a
19  mean AWP that included that and other drugs.
20  How do I determine which of those was true for
21  any given drug?
22      A.   We would have all the files in our
```

```
                                                  91
1   department housed in our department.
2       Q.   And those -- what do those files
3   consist of?
4       A.   They're the Micronetics tapes that
5   are passed to us.
6       Q.   And those would reveal for which
7   drugs Micronetics had provided a Mean AWP and
8   for which drugs it hadn't, correct?
9       A.   That's correct.
10      Q.   And for drugs in relation to which
11  Micronetics does not provide a Mean AWP,
12  Horizon reimburses based on the Red Book AWP of
13  that drug itself, correct?
14      A.   That's correct.
15      Q.   So the only way to determine
16  whether Horizon is reimbursing based on the AWP
17  of a drug itself or a mean of all the drugs in
18  a particular class, is to look at those
19  Micronetics' files that Horizon maintains,
20  correct?
21      A.   Yes.
22      Q.   Now let's stick to that same E-mail
```

```
                                                  92
1   chain, which is at HRZ 396, marked as Exhibit
2   2, I believe. And I'd like you to go there to
3   the top E-mail. That's an E-mail from Terry
4   Leach, correct?
5       A.   That's correct.
6       Q.   And who is Terry Leach?
7       A.   He was the Director of Pharmacy.
8       Q.   And that was his position in 1999?
9       A.   Yes.
10      Q.   That's a position that's not held
11  by Margaret Johnson. Is that correct?
12      A.   It is.
13      Q.   And, by the way, while we're on
14  that topic, what is Raymond Cogen's title, or
15  what was it '99?
16      A.   He was the Medical Director for
17  Managed Care products.
18      Q.   Is he still with the company?
19      A.   He's not.
20      Q.   And these other people who are on
21  the cc list of your E-mail, are they all also
22  all medical directors?
```

```
                                                  93
1       A.   Marie Hatam, Nicholas Bonvicino and
2   Stephen Gordin are all medical directors.
3       Q.   And what are the other people?
4       A.   Donna Celestini is the VP. John
5   Sweeney is the Director of Finance. David
6   Quillen, he was provider rep.
7       Q.   So let's go up to the top E-mail
8   there. Can you review Mr. Leach's E-mail,
9   please, and just let me know when you're
10  ready.
11      A.   Yes, I'm ready.
12      Q.   The second sentence says, "The
13  physician may purchase the oncology drugs from
14  HomeCall currently." Are you familiar with
15  HomeCall?
16      A.   I am not.
17      Q.   The E-mail continues, "and will
18  soon be able to purchase from the major
19  oncology providers through us."
20           Do you know what Mr. Leach was
21  referring to there?
22      A.   I do not know.
```

**94**

1  Q. Was there ever a situation in which
2  Horizon itself purchased drugs and then
3  provided those to providers?
4  A. I'm not privy to that information.
5  Q. It continues, "Physicians are
6  likely to be upset because they have been
7  making a tremendous amount of money off
8  chemotherapy for many, many years."
9      Do you see that?
10 A. Yes.
11 Q. When he says, "physicians are
12 likely to be upset," what is he referring to
13 there?
14     MS. LIGHTNER: Objection. Calls
15 for speculation.
16 Q. Is there something in this E-mail
17 chain that he's referring to when he says,
18 "physicians will be upset"?
19 A. I do not know.
20 Q. Okay.
21 A. I don't know the content.
22 Q. Certainly, as of the date of this

**95**

1  E-mail in 1999, we can see that Mr. Leach was
2  aware that physicians have been making
3  tremendous amount of money off chemotherapy for
4  many, many years, correct?
5  A. That's true.
6  Q. Was Horizon aware of that fact
7  prior to 1999?
8  A. I'm not aware of the fact.
9  Q. So you don't know when Horizon
10 first became aware of that fact?
11 A. I do not know.
12 Q. Horizon certainly was aware prior
13 to 1999 that physicians are making some margin
14 on the drugs, correct?
15 A. Yes.
16     MS. LIGHTNER: Object to form.
17 Q. Now, Mr. Leach's E-mail continues,
18 "We have not set it up that they can receive
19 some financial benefit between their purchase
20 price and our reimbursement. I think this is
21 very fair."
22     Now, do you know whether -- is that

**96**

1  a typo when he says, "we have not set it up"?
2      MR. MACORETTA: Objection.
3  A. I'm not familiar with what he's
4  referring to.
5  Q. Well, he sent this E-mail to you,
6  correct, cc'd to a few other people?
7  A. He sent it to me, but he's talking
8  to everybody else on the E-mail.
9  Q. Well, what's your understanding of
10 what he was saying to you in this E-mail?
11 A. Probably just the first sentence,
12 that we're reimbursing appropriately a Mean of
13 AWP-10%.
14 Q. You understood that appropriate
15 rate included some margin to the physicians,
16 correct?
17 A. Yes.
18 Q. So when Mr. Leach says in this
19 sentence, "we have not set it up that they can
20 receive some financial benefit between their
21 purchase price and our reimbursement," does
22 that make sense?

**97**

1      MR. MACORETTA: Objection.
2      MS. LIGHTNER: Same objection.
3  A. Me reading it today?
4  Q. Does it make sense to you?
5  A. Today, I'm referring it to
6  HomeCall, but I have no idea what this E-mail
7  is about.
8  Q. So if he was saying here that
9  Horizon has not set it up so providers can make
10 a margin, you would understand that to be
11 incorrect, right?
12     MS. LIGHTNER: Objection.
13 A. I have no knowledge of this E-mail.
14 Q. Well, leaving aside this E-mail,
15 you just testified that you understood
16 providers were making a margin on drugs
17 administered in office --
18     MR. MACORETTA: Objection.
19 Q. -- prior to 1999, correct?
20 A. That's right.
21 Q. Has Horizon ever engaged in any
22 studies addressing the relative costs to

**98**

1  Horizon of drugs when they're administered in
2  physicians' offices versus hospital outpatient
3  departments?
4      A.   I'm not aware of it.
5      Q.   You're not aware if any such
6  studies or analyses have taken place?
7           MR. MACORETTA: Objection.
8      A.   No.
9           MR. MANGI: Why don't we take a
10 quick break. Off the record.
11          (A recess is taken at 12:00 p.m.)
12     Q.   Ms. Mengert, before the break, we
13 discussed the fact that in August of 2001
14 Horizon started reimbursing for Lupron by
15 reference to the AWP for Zoladex, correct?
16     A.   Yes.
17     Q.   Did Horizon, at that time, adopt
18 similar policies in relation to any other
19 drugs?
20     A.   Not that I'm aware.
21     Q.   Has Horizon ever adopted similar
22 policies in relation to any other drugs?

**99**

1      A.   No, not that I'm aware.
2      Q.   Do you know whether Horizon has
3  ever considered adopting these in relation to
4  other drugs?
5      A.   I don't know.
6      Q.   But if Horizon did elect to adopt
7  similar policies in relation to others, it
8  could do so, correct?
9      A.   Yes.
10     Q.   And, indeed, Horizon could have
11 done so at any time, correct?
12     A.   That's correct.
13     Q.   And that would be true certainly
14 back to 1990, correct?
15     A.   Yes.
16     Q.   Do you know whether or not drug
17 manufacturers contract with hospitals?
18     A.   I don't know.
19     Q.   Do you know whether or not drug
20 manufacturers' contract with providers?
21     A.   I don't know.
22     Q.   Are you aware that individuals on

**100**

1  the pharmacy side at Horizon are aware of such
2  contracts?
3           MS. LIGHTNER: Objection. Go
4  ahead.
5      A.   I don't know.
6      Q.   Let's turn to another document.
7  We'll mark this as Mengert Exhibit 3. And this
8  is a document Bates numbered H5 to H29.
9           (Exhibit Mengert 003 is marked.)
10     Q.   Feel free to take a look at that.
11 I'm going to have a very simple question about
12 it. Are you familiar with this document?
13     A.   I've seen it, yes.
14     Q.   This appears to be a template of an
15 agreement between Medigroup of New Jersey and a
16 physician, correct?
17     A.   Yes.
18     Q.   What is Medigroup of New Jersey?
19     A.   Medigroup was Horizon Healthcare's
20 Managed Care name.
21          MR. MACORETTA: Could you read it
22 back.

**101**

1           (The answer is read back by the
2  court reporter:
3           "ANSWER: Medigroup was Horizon
4  Healthcare's Managed Care name."
5      Q.   What are the circumstances in which
6  you've seen this contract before?
7      A.   I don't recall.
8      Q.   Do you review such contracts on a
9  regular basis?
10     A.   No.
11     Q.   I'd like to turn your attention to
12 the page Bates numbered H 13, which is page
13 nine of the document. The third paragraph down
14 starts with, "You may qualify for a bonus."
15          Do you see that?
16     A.   Yes.
17     Q.   That sentence says, "You may
18 qualify for a bonus based on inclusion in
19 Medigroup's Physician Performance Incentive
20 Plan."
21          Do you know what the Physician
22 Performance Incentive Plan was?

**102**

1   MS. LIGHTNER: I'm going to state
2   my objection now, that this is going a little
3   beyond the scope of the subpoena. I'll give
4   you a little leeway, but it's beyond the scope.
5   Q.   I appreciate that.
6   A.   For the PCPs, they had a Physician
7   Performance Incentive Plan if they performed
8   within the criteria that Horizon had set with
9   their providers.
10   Q.   And the criteria pertained to
11   controlling costs. Is that correct?
12   A.   That was one of the criterias, yes.
13   Q.   What were the other criteria?
14   A.   Membership panel. This doesn't
15   pertain to the professional reimbursement
16   department, so I don't have a lot of knowledge.
17   Q.   Well, were drug costs part of the
18   cost control element?
19   A.   I don't know.
20   Q.   Do you know whether or not
21   providers could qualify for the Physician
22   Performance Incentive by prescribing some drugs

**103**

1   over others?
2   A.   I don't know.
3   Q.   Who was in charge of the Physician
4   Performance Incentive Plan?
5   A.   The Director of Provider Affairs.
6   Q.   And what is that person's name?
7   A.   Ann Sylvestro.
8   Q.   Is the Physician Performance
9   Incentive Plan still in place?
10   A.   I don't know.
11   Q.   Do you know when that plan started?
12   A.   I don't know.
13   Q.   Do you know whether or not that
14   plan was in place as of 1990?
15   A.   I don't know.
16   Q.   Do you know whether the plan is
17   offered to all providers?
18   A.   I don't know.
19   Q.   I'm done with that document. Thank
20   you. I'll show you an another document, which,
21   if you'll mark as Mengert Exhibit 4. And this
22   is Bates numbers HRZ 1664 to 1674.

**104**

1        (Exhibit Mengert 004 is marked.)
2   Q.   Let's take a look at that and let
3   me know when you're done.
4   A.   Yes.
5   Q.   Now, as I understood your earlier
6   testimony, prior to 1999, reimbursement for
7   drugs was not tied to AWP. Is that correct?
8   A.   That's correct.
9   Q.   Now, if you have a look at this
10   contract, this is a Home Infusion Therapy
11   Provider Agreement, dated February 1st, 1994.
12   And that's between Horizon and a provider of
13   Home Infusion Therapy Services, right?
14   A.   Yes.
15   Q.   Now, I'd like you to turn to page
16   HRZ 1673.
17   A.   Yes.
18   Q.   Now, it appears that here
19   reimbursement is tied to AWP. Is that correct?
20   A.   Yes.
21   Q.   Do you have an understanding as to
22   what sort of arrangement this contract

**105**

1   pertained?
2   A.   No.
3   Q.   Okay.
4   A.   It did not come through my
5   department.
6   Q.   So is it fair to say that prior to
7   1999 there were some instance in which
8   reimbursement did include an AWP based element?
9   A.   Yes.
10   Q.   I'd like to show you another
11   document, please. Just mark that as Mengert
12   Exhibit 5. This is Bates numbers HRZ 393 to
13   395?
14        (Exhibit Mengert 005 is marked.)
15   Q.   Now, this is an E-mail exchange
16   between you and John Sweeney with a number of
17   other people copied on the E-mails, correct?
18   A.   That's correct.
19   Q.   Just want to be clear again. Did
20   you look at the center E-mail on 393 that
21   starts with, "I don't have any issue," below
22   that is your name?

**106**

1  A. Yes.
2  Q. But your name actually refers to
3  the E-mail below that, correct?
4  A. That's correct.
5  Q. And that E-mail that starts with,
6  "I don't have any issue" from John Sweeney?
7  A. That's correct.
8  Q. Now, this attachment which is at
9  395, that's something that was attached to your
10 E-mail which is at the bottom of 393, correct?
11 A. Yes.
12 Q. And this is a document that you
13 generated?
14 A. Yes.
15 Q. Okay.
16 A. It appears so.
17 Q. Now, this is from 1998, so this is
18 before Horizon started using AWP as a basis for
19 reimbursement or AWP-10%, correct?
20 A. Yes.
21 Q. Now, can you describe to me what
22 you were trying to show in this attachment,

**107**

1  which is at 395?
2  A. There was a need to -- there were
3  complaints regarding our admin allowances,
4  which had not changed since 1/1 of '94. David
5  Benditch (phn), one of our medical directors,
6  recommended a $5 admin fee, which he proposed
7  to Nick Bonvicino and Steve O'Cormick, the
8  other medical doctors at Horizon.
9  Q. So as of 1998, at this time period
10 Horizon recognized that the admin fees they
11 were paying to providers were insufficient. Is
12 that correct?
13 A. That's correct.
14    MS. LIGHTNER: Object to form.
15 Q. Looking again at the table that's
16 at 395, can you describe for me what these
17 various columns are. First of all, the first
18 two columns have a caption, "Loaded to HSII."
19 Do you see that? It's right up here.
20 A. "Loaded to HSII" is our claim
21 engine. HSII was a claim engine.
22 Q. And "Unknown Source" from 1/1/94,

**108**

1  what is that referring to?
2  A. Means there was an allowance in the
3  system, for example, for 90700 for $32.80. I
4  didn't know what the source was.
5  Q. So that's the amount that was being
6  reimbursed to providers between 1994 and 1998
7  for drugs under that CPT code, correct?
8  A. That's correct.
9  Q. Did that include an administration
10 fee?
11 A. Not that I'm aware of, no.
12 Q. So between '94 and '98 for CPT
13 90700, the total amount reimbursed to providers
14 was the 32.80 figure, right?
15 A. That's correct.
16 Q. Then there's the RBRVS figure, with
17 a 10/1/98 date. Now, as of the date of this
18 E-mail, was the amount that was being
19 reimbursed still that, from the unknown source?
20 A. No, it doesn't appear so.
21 Q. So what was being reimbursed on the
22 date of this E-mail?

**109**

1  A. RBRVS 10/1/98.
2  Q. So as of 10/1/98, the amount that
3  Horizon was reimbursing moved from the earlier
4  32.80 figure, in this particular example, to
5  the RBRVS figure of 29. Is that correct?
6  A. Yes.
7  Q. Was there any administration fee
8  that was being paid in addition to that $29
9  figure?
10 A. I don't know if there was a
11 separate CPT code that represented the admin.
12 Q. Then your next column is the
13 proposed addition of a $5 admin fee?
14 A. Yes.
15 Q. Now, you just referred to a
16 separate code for the admin fee?
17 A. Yes.
18 Q. How would that interplay with the
19 addition of a $5 admin fee to this CPT?
20 A. If there was a separate CPT code
21 that the provider could bill under, he would
22 get that reimbursement in addition to the

**110**

1  actual drug.
2  Q.  And here you were proposing adding
3  a $5 admin fee to the amount reimbursed for the
4  drug itself, correct?
5  A.  Yes.
6  Q.  So if there was a separate code for
7  administration, the physician would get both
8  that amount, plus this admin fee of $5, plus
9  the RBRVS amount. Is that correct?
10 A.  That's correct.
11 Q.  Then along to the right you have
12 the two columns with the heading, "average
13 wholesale price." Why did you include those
14 columns in the spreadsheet?
15 A.  I can't say today why. I don't
16 know.
17 Q.  Okay.
18 A.  Just comparison purposes.
19     MR. MACORETTA: I'm sorry. I
20 couldn't hear any of that answer.
21 A.  I don't know the answer. I don't
22 know why the AWP was on there, with the

**111**

1  exception it would be for comparison purposes
2  to allow Horizon to know where they stand with
3  AWP.
4  Q.  You see there are two columns
5  there, mean for all product and median for all
6  products?
7  A.  Yes.
8  Q.  Do you understand the distinction
9  between those two?
10 A.  Yes.
11 Q.  What is the distinction between
12 those two?
13 A.  The information that we purchased
14 from Micronetics has a mean, median, as well as
15 the actual cost by drug or by brand or
16 nonbrand. And what I wanted to show the folks
17 apparently is what it was for the mean or
18 medium on your averages.
19 Q.  And you'll see here in almost all
20 of these example the mean of all products under
21 average wholesale price is lower than the RBRVS
22 figure. Is that correct?

**112**

1  A.  Yes.
2  Q.  And this would, in fact,
3  demonstrate why, when the next year you
4  switched to an AWP-based formula, that actually
5  saved Horizon a substantial sum of money. Is
6  that right?
7  A.  That's correct.
8  Q.  Now, if we turn to page 393, HRZ
9  393?
10 A.  Yes.
11 Q.  I'd like to draw your attention
12 first to the bottom E-mail, which is from you
13 to Nick Bonvicino.
14 A.  Yes.
15 Q.  The first paragraph of that it says
16 towards the middle of it, "Prior to the
17 implementation of the 10/1/98 RBRVS fees,
18 immunization codes had not been updated since
19 1/1/94. Attached to the cost of the
20 immunization was a $15 administrative fee."
21 A.  Yes.
22 Q.  In the next paragraph it says, "We

**113**

1  would like to establish an overall
2  administrative fee," and the proposed fee there
3  is $5.
4     Now, was the administrative fee
5  being offered being reduced?
6  A.  I don't know at this time.
7  Q.  Well, this is an E-mail that you
8  sent out, correct?
9  A.  Yes.
10 Q.  So were you communicating here that
11 prior to 1998 there was a $15 administrative
12 fee paid in addition to the amount reimbursed?
13 A.  I don't know what the admin fee was
14 prior to 1998.
15 Q.  Well, what do you understand this
16 reference to mean, "attached to the costs of
17 the immunization was a $15 administrative fee"?
18 A.  I don't know.
19 Q.  Well, you testified earlier that
20 this E-mail chain was in relation to providing
21 additional, increasing administrative fees,
22 correct?

**114**

1  A.  Well, increasing the reimbursement
2  for the drug with an additional. The chart was
3  to take the cost of the drug and add an
4  additional $5 to it.
5  Q.  So is it your testimony that you
6  don't know whether administrative fees were
7  increased or decreased?
8  A.  I don't know here in 2004 if there
9  were admin fees at this time.
10  Q.  You mean prior to 1998?
11  A.  I don't know if Medicare had
12  specific CPT codes for admin. I don't know
13  when they published them.
14  Q.  The E-mail that's above, which is
15  from John Sweeney, says, "I don't have an issue
16  with the $5 admin fee."
17      Then he asks you, "Are we also
18  looking at moving to AWP or AWP less ten
19  percent."
20      Did that prestage the change that
21  was made the following year to AWP-10%?
22  A.  Yes.

**115**

1  Q.  To your knowledge, is this the
2  first time that the possibility of that
3  transition was addressed?
4  A.  No.
5  Q.  When is the first time that you
6  recall that transition being addressed?
7  A.  I was only involved in the
8  discussion of ADP at the end of 1998. However,
9  there was a work group that consisted of Ray
10  Cogen and the utilization department discussing
11  moving to AWP.
12  Q.  When was that work group set up?
13  A.  In 1998, I believe.
14  Q.  You understand that to have been
15  prior to December of '98, which is when this
16  E-mail was sent?
17  A.  Yes.
18  Q.  Now, on the top E-mail, which is
19  from you, I'd like to draw your attention to
20  the paragraph starting with, "My issue at this
21  moment --"
22  A.  Yes.

**116**

1  Q.  You say, "My issue at this moment
2  is to get an admin fee attached to the 10/1/98
3  RBRVS fees which are already loaded on the
4  system."
5      So it's fair to say that your focus
6  here was to insure that the reimbursement was
7  increased with the $5 administration fee being
8  added to the RBRVS, correct?
9      MS. LIGHTNER: Objection to form.
10      MR. MACORETTA: Objection to form.
11  A.  Yes.
12  Q.  Then you say, "Out of 24 CPT codes,
13  the physicians are only complaining about two,
14  Flu and Cholera. Reason being, these are the
15  only two codes that decreased when moving to
16  RBRVS."
17  A.  That's correct.
18  Q.  So you understood here that the way
19  to compensate physicians for a decrease from
20  the, in the amount that was being reimbursed
21  for the drug itself was to provide a higher
22  admin fee. Is that correct?

**117**

1      MS. LIGHTNER: Object to form.
2      MR. MACORETTA: Objection to form.
3  A.  Yes.
4  Q.  Indeed, the opposite of that would
5  also be true, wouldn't it, that physicians who
6  have inadequate administration fees could
7  compensate them by increasing the drug
8  reimbursement amount. Is that correct?
9      MS. LIGHTNER: Object to form.
10      MR. MACORETTA: Objection to form.
11  A.  We could increase the drug
12  reimbursement, yes.
13  Q.  We referred earlier to the change
14  that was made in relation to the reimbursement
15  for Lupron. Do you recall that testimony?
16  A.  Yes.
17  Q.  And the reimbursement for Lupron
18  was then tied to Zoladex, correct?
19  A.  Yes.
20  Q.  Did that change result in any
21  communications with providers regarding that
22  reimbursement?

**118**

1  A.  I don't know.
2      MR. MACORETTA: Objection.
3      MR. MANGI: Let's mark another
4  document, please.
5      (Exhibit Mengert 006 is marked.)
6  Q.  That's Mengert Exhibit 6. Take a
7  look at that and let me know when you're done.
8  This is Bates numbered HRZ 519 to 524. I'll
9  note that the copy we received on the CD
10 appeared to be missing 523.
11     Familiarize yourself with that
12 document and let me know when you're done,
13 please.
14 A.  Okay.
15 Q.  Now, as I mentioned, we
16 unfortunately are missing a page from the
17 production, but if I turn your attention to HRZ
18 522.
19 A.  Yes.
20 Q.  Now, this is a Complaint from a
21 doctor to the New Jersey Division of Insurance
22 regarding Horizon, correct?

**119**

1  A.  Yes.
2  Q.  At the bottom of page 522, the
3  doctor appears to be complaining about the
4  reimbursement for Lupron having been reduced,
5  correct?
6  A.  Yes.
7  Q.  And based on the time frame he's
8  referring to, the change in reimbursement he's
9  complaining about was Horizon's decision to
10 reimburse for Lupron by reference to AWP of
11 Zoladex minus ten percent, correct?
12     MR. MACORETTA: Objection to form.
13 A.  Yes.
14 Q.  Now, turning to page 519. This is
15 a response from Horizon to the doctor, correct?
16 A.  Yes.
17 Q.  Are you involved at all in these
18 sorts of communications with physicians?
19 A.  No.
20 Q.  You'll see towards the bottom of
21 page 519, there's a paragraph starting with,
22 "We noted your concern"?

**120**

1  A.  Yes.
2  Q.  And in that paragraph, Horizon is
3  communicating to the doctor the fact that it
4  had tied reimbursement for Lupron to Zoladex
5  and had communicated the same already, correct?
6  A.  Yes.
7  Q.  In the following paragraph, this
8  letter to the doctor from Horizon says, "As
9  discussed, we have identified a provider
10 HomeCall Rx that offers physicians a 17%
11 discount from the AWP."
12     Do you see that?
13 A.  Yes.
14 Q.  And Horizon then provides contact
15 information for HomeCall Rx to the provider,
16 correct?
17 A.  Yes.
18 Q.  So Horizon here was telling a
19 provider that the provider could acquire the
20 drug at 17% below AWP, correct?
21 A.  Yes.
22     MR. MACORETTA: Object to form.

**121**

1      MS. LIGHTNER: Objection to form.
2  Q.  And, indeed, Horizon was providing
3  contact information for where the provider
4  could purchase the drug at that rate, correct?
5  A.  Yes.
6  Q.  So although you testified earlier
7  that you yourself don't know the rates at which
8  providers can acquire drugs, there are
9  certainly others at Horizon who are aware of
10 that, correct?
11 A.  Yes.
12     MR. MACORETTA: Objection to form.
13 Q.  As reflected in this letter?
14 A.  Yes.
15     MR. MACORETTA: Objection.
16     MR. MANGI: What's the basis?
17     MR. MACORETTA: Argumentative.
18 Misstates her prior testimony.
19     MR. MANGI: Well, she agreed with
20 it.
21 Q.  Now, I'd like to show you another
22 document. This was, in fact, marked at

| Susan Mengert | Highly Confidential<br>Newark, NJ | October 5, 2004 |
|---|---|---|

32 (Pages 122 to 125)

**Page 122**

1  Ms. Johnson's deposition, but for clarify let's
2  just mark it again.
3      (Exhibit Mengert 007 is marked.)
4    Q.   This is Mengert Exhibit 7. This
5  bears Bates numbers H00102 to H00141. I'm
6  going to draw your attention to a specific part
7  of this document. You can certainly look at it
8  further, if you please.
9      MS. LIGHTNER: Just so that the
10 record is clear, this document is confidential
11 to Horizon, so I'm going to limit the witness
12 to only looking at the provision that you --
13 she can look at the front page to see what it
14 is.
15     MR. MANGI: I only intend to ask
16 her a specific about question about it.
17     MS. LIGHTNER: But I'm going to
18 limit the witness to the specific provision
19 that you intend to question her on.
20     MR. MACORETTA: What are the Bates
21 numbers?
22     MR. MANGI: It's H104 -- no, I'm

**Page 123**

1  sorry, actually, they're a bit different.
2      MS. LIGHTNER: It's H102 to H141.
3  What page are you referring the witness to?
4    Q.   Let's just start with page 104.
5  Are you familiar with the term pharmacy
6  benefits management?
7    A.   No.
8    Q.   Are you familiar with the acronym
9  PBM?
10   A.   Yes.
11   Q.   You understand this to be a
12 contract between Horizon and one of its PBMs
13 dated 1998, correct?
14   A.   No.
15   Q.   If you look at page H104 right at
16 the top paragraph starting with, "This
17 agreement is entered into"?
18   A.   Yes.
19   Q.   When you have a look at that
20 paragraph, let me know when you're done.
21   A.   Yes.
22   Q.   So you see this is an agreement

**Page 124**

1  entered into in 1998, correct?
2    A.   Yes.
3    Q.   And you see it's an agreement
4  between Horizon and a PBM, right?
5    A.   Yes.
6    Q.   I'd like to turn your attention to
7  page H126.
8    A.   Yes.
9    Q.   You see a number four on the
10 heading, "specialty drug claims"?
11   A.   Yes.
12   Q.   Can you review that paragraph and
13 let me know when you're done, please.
14   A.   Yes.
15   Q.   This provides for a particular
16 payment rate from Horizon to the PBM in
17 relation to specialty drugs, correct?
18   A.   Yes.
19   Q.   And it provides those payments will
20 be on a cost pass-through basis. Do you see
21 that?
22   A.   Yes.

**Page 125**

1    Q.   What's your understanding of that
2  provision?
3    A.   I don't have an understanding.
4    Q.   Are you familiar with the term,
5  "specialty drugs"?
6    A.   Yes.
7    Q.   What's your understanding of that
8  term?
9    A.   They're drugs that we are going to
10 reimburse through special, through a specialty
11 pharmacy.
12   Q.   Does Horizon currently reimburse
13 for drugs to a specialty pharmacy?
14   A.   They may. I don't know.
15   Q.   You don't know?
16   A.   I don't know.
17   Q.   Do you know whether Horizon was
18 ever reimbursed for any drugs through a
19 specialty pharmacy?
20   A.   I don't know.
21   Q.   Let me turn to your attention to
22 page H136 that contains the "Schedule G"

**126**

1  referred to at page 126, which is a list of
2  specialty drugs?
3     A.  Yes.
4     Q.  Do you have any knowledge as to the
5  basis on which these drugs were selected for
6  this list?
7     A.  I do not know.
8     Q.  And flipping back then to page
9  H126.
10    A.  Yes.
11    Q.  You'll see four lines down in the
12 paragraph the sentence starting with, "Upon
13 request from Horizon." It's four lines down in
14 the paragraph.
15    A.  Okay.
16    Q.  "Upon request from Horizon."
17       So it says, "The PBM and Horizon
18 will jointly negotiate with suppliers in
19 respect of specialty drug products."
20       Do you have any knowledge as to
21 whether or not that ever occurred?
22    A.  No, I don't have knowledge.

**127**

1     Q.  Do you know whether or not Horizon
2  uses a different reimbursement methodology for
3  which it would refer to as specialty drugs?
4     A.  For a profession?
5     Q.  Right.
6     A.  I don't.
7     Q.  You testified earlier that you
8  didn't know whether or not Horizon utilizes
9  specialty pharmacies. Is that correct?
10    A.  Right.
11    Q.  Your testimony is that, even if
12 Horizon were to use specialty pharmacies, it
13 would still reimburse physicians based on the
14 same methodology?
15    A.  From my professional reimbursement,
16 these drugs are also priced in my area, so I
17 don't have a differential reimbursement for
18 them.
19    Q.  I'll show you another document
20 that's also been previously marked, but if
21 you'll mark it again.
22       (Exhibit Mengert 008 is marked.)

**128**

1     When your counsel is done, could
2  you please take a look at that.
3        MS. LIGHTNER: This has no Bates
4  number on it.
5        MR. MANGI: That document was not
6  produced by Horizon.
7        MS. LIGHTNER: Oh, okay. Oh, I
8  know what this is.
9        MR. MANGI: I'm sorry. If I could
10 just have it for a moment.
11       John, this is a document entitled,
12 "Survey of Health Plans Concerning Physician
13 Fees and Payment Methodology, A study conducted
14 by Dyckman & Associates for the Medicare
15 Payment Advisory Commission."
16       Take a look at that document. Feel
17 free to look a through it, but I'll have a
18 specific question pertaining mainly to the
19 study itself.
20       Have you ever seen -- withdraw
21 that.
22       Are you familiar with this

**129**

1  document?
2     A.  I've never received the document.
3     Q.  Have you heard of this document?
4     A.  Yes.
5     Q.  In what context have you heard of
6  this document?
7     A.  We contracted with Dyckman to take
8  a look at our reimbursement methodology versus
9  our competitors and supply Horizon information
10 where we could improve.
11    Q.  Is it your understanding that this
12 report was generated in response to that
13 request from Horizon?
14    A.  We participated in this study.
15    Q.  Who was the principal point of
16 contact at Horizon in relation to this study?
17    A.  I don't know.
18    Q.  How did you come to hear about this
19 study taking place?
20    A.  I provided Dyckman our
21 reimbursement allowances for the CPT codes in
22 question.

## Page 130

1  Q.  So you communicated that
2  reimbursement by Horizon was at the Mean AWP of
3  all drugs and the CPT code minus ten percent.
4  Is that correct?
5  A.  I did not provide that.
6  Q.  What did you provide?
7  A.  It wasn't just for drugs. It was
8  for all CPT codes. They didn't ask questions
9  on how we reimbursed.
10  Q.  Well, let's break it down. When
11  were you first contacted in relation to this
12  study?
13  A.  I don't recall.
14  Q.  Do you recall who contacted you?
15  A.  Yes. Mary Garcia, director under
16  Donna Celestini.
17  Q.  What directions did you receive
18  from Ms. Mary Garcia?
19  A.  That they were looking for our
20  reimbursement allowances for our Managed Care
21  in traditional products in New Jersey for a
22  specific time period.

## Page 131

1  Q.  And what did you understand that to
2  mean, reimbursement allowances?
3  A.  Our allowances that we reimburse.
4  Q.  So you understood that to mean the
5  actual dollar amounts that were being
6  reimbursed?
7  A.  Yes.
8  Q.  And what information did you
9  communicate then to the authors of that study?
10  A.  I provided them what they
11  requested.
12  Q.  Did you provide them with a table?
13  A.  Yes.
14  Q.  Did you provide them with anything
15  other than a table?
16  A.  No.
17  Q.  Do you recall what the columns were
18  in that table?
19  A.  It would have been CPT modifier and
20  fee.
21        MR. MACORETTA: If you could speak
22  up.

## Page 132

1  A.  CPT modifier and fee.
2  Q.  What was in the modifier column?
3  A.  It would denote the modifier for
4  the CPT. So it would be the full professional
5  technical rental.
6  Q.  So that's a code that related to
7  the CPT?
8  A.  Yes.
9  Q.  And the fee column, what did
10  that --
11  A.  That's our allowance. That's one
12  of the claim engines.
13  Q.  So that was an actual dollar
14  amount?
15  A.  Yes.
16  Q.  Now, the CPT codes that you
17  provided in this table, did those, were those
18  codes that pertained to procedures, or were
19  they codes that pertained to drugs?
20  A.  Both.
21  Q.  So there were some codes that
22  pertained to specific drugs, and then there

## Page 133

1  were other codes that pertained to specific
2  procedures, correct?
3  A.  That's correct.
4  Q.  And in relation to the codes that
5  pertained to drugs, the fee amount that was
6  listed was a flat dollar sum. Is that correct?
7  A.  Yes.
8  Q.  And that dollar sum was the AWP off
9  -- I'm sorry, the Mean AWP of all the drugs in
10  that CPT code minus ten percent, correct?
11  A.  That's correct, or AWP-10%.
12  Q.  Right. Depending on whether or not
13  the vendor had supplied you with a mean for the
14  CPT codes for that particular code, correct?
15  A.  Yes.
16  Q.  But the table that you provided did
17  not explain which it was, correct?
18  A.  That's correct.
19  Q.  So in some cases it may have been
20  the AWP of a specific drug minus ten percent,
21  if it was the only drug or the CPT or drug that
22  was not included in the information from the

Susan Mengert        Highly Confidential        October 5, 2004
                     Newark, NJ

35 (Pages 134 to 137)

### Page 134

1  vendor, correct?
2   A.  Yes.
3   Q.  And in other cases that $5 sum
4  would have been the Mean of the AWPs of all the
5  drugs under a particular CPT code minus ten
6  percent, correct?
7   A.  Yes.
8   Q.  But that information was not
9  communicated in the table. All the table had
10 were flat dollar sums pertaining to CPT codes?
11  A.  Yes.
12  Q.  How did you communicate that
13 information to the authors of the Dyckman
14 study?
15  A.  The information was communicated to
16 Dyckman through Drew Thraen, who's the director
17 under my boss John Sweeney. And they collected
18 the information and passed it to Dyckman.
19  Q.  So you provided that table to
20 Mr. Thraen?
21  A.  Yes.
22  Q.  Do you still maintain a copy of

### Page 135

1  that table in your files?
2   A.  Yes.
3   Q.  Were there any associated documents
4  or was it just a table?
5   A.  That I supplied?
6   Q.  Right.
7   A.  It was just the tables.
8   Q.  Do you know whether Horizon
9  provided anything to Dyckman other than the
10 tables that you put together?
11  A.  Horizon supplied many things to
12 Dyckman.
13  Q.  What other information did Horizon
14 supply to Dyckman?
15  A.  They supplied them our claim
16 information.
17  Q.  Okay.
18  A.  And that's all I'm aware of that
19 Horizon supplied.
20  Q.  By claim information, are you
21 referring to transaction specific claims data?
22  A.  Yes.

### Page 136

1   Q.  In electronic form?
2   A.  Yes.
3       MR. MACORETTA: I'm having a lot of
4  trouble hearing you. If you could just speak
5  up.
6   A.  We passed them our utilization.
7   Q.  Do you know whether Horizon ever
8  communicated to Dyckman its reimbursement
9  methodology?
10  A.  I don't recall.
11  Q.  Are you familiar what major drug
12 wholesalers operate in the market today?
13  A.  I'm sorry?
14  Q.  Are you familiar with the major
15 drug wholesalers operating in the market today?
16  A.  No.
17  Q.  Do you have any knowledge regarding
18 the price at which wholesalers purchase drugs
19 from manufacturers?
20  A.  No.
21  Q.  Do you have an understanding as to
22 whether or not the price at which wholesalers

### Page 137

1  purchase drugs from manufacturers is tied to
2  wholesale acquisition costs?
3   A.  No.
4   Q.  To the best of your knowledge, has
5  Horizon been involved in any litigations
6  pertaining to AWP other than this one?
7   A.  I'm not aware.
8   Q.  Do you know whether or not Horizon
9  has been involved in a litigation with the
10 caption in Ray Lupron marketing and sales
11 practices in litigation?
12  A.  I'm not aware.
13      MR. MANGI: If we can take another
14 quick break. I'm just going to use the men's
15 room.
16      MS. LIGHTNER: Just so you know,
17 this room turns into a pumpkin again at two
18 o'clock, so we would have to move. So if you
19 have --
20      MR. MANGI: I'll be done very
21 promptly after the break.
22      MS. LIGHTNER: Because I know

**138**

1  plaintiff's counsel may have questions, too.
2      MR. MACORETTA: I don't think it
3  will be a problem.
4      MS. LIGHTNER: Okay.
5      MR. MANGI: So let's take five
6  minutes.
7      (Recess is taken.)
8      MR. MANGI: John, are you with us?
9      MR. MACORETTA: Yeah, I'm here.
10  Q.  Back on the record.
11      Now, you testified earlier that
12  Horizon's current reimbursement methodology to
13  providers, which is Mean of AWP-10% or AWP-10%
14  was first adopted in 1999, correct?
15  A.  Yes, for Managed Care products.
16  Q.  Right. The individuals who were
17  responsible for making that decision are those
18  who are listed on the E-mail we discussed
19  earlier. Is that correct?
20  A.  That's correct.
21  Q.  Do you know whether any documents
22  were generated or analyses as a part of that

**139**

1  transition?
2  A.  I don't recall.
3  Q.  Other than the savings of costs, do
4  you know of any other factors that went into
5  that decision?
6  A.  I don't.
7  Q.  Do you have an understanding as to
8  why Horizon decided to use the mean of all the
9  AWPs of drugs in a particular CPT minus ten
10  percent as opposed to the AWPs of specific
11  drugs minus ten percent?
12  A.  It would be easier to explain to
13  the provider community that we have taken all
14  of the generic versus brand into consideration
15  versus just pricing on brand, generic, which
16  would be a lower reimbursement rate, versus the
17  brand, which is a higher reimbursement rate.
18  Q.  What do you mean, it would be
19  easier to communicate to providers?
20  A.  You need to communicate to the
21  provider. When they ask how you're
22  reimbursing, you need to provide a good

**140**

1  explanation on a reimbursement methodology.
2  Q.  And the current methodology applies
3  across-the-board to generic drugs and branded
4  drugs, correct?
5  A.  Yes.
6  Q.  Any other factors that went into
7  that decision?
8  A.  No.
9  Q.  Prior to that time 1999, Horizon
10  was using the RBRVS as a basis for
11  reimbursement to providers, correct?
12  A.  Yes.
13  Q.  When did Horizon start using the
14  RBRVS as a basis for reimbursing providers?
15  A.  1996.
16  Q.  What was Horizon using prior to
17  1996?
18  A.  Some form of Medicare.
19      MR. MACORETTA: I'm sorry. I
20  didn't hear your answer.
21  A.  A form of Medicare.
22  Q.  What do you mean by a form of

**141**

1  Medicare?
2  A.  I believe the Managed Care products
3  was reimbursing at 110% of Medicare prior to
4  1996.
5  Q.  And was that the case all the way
6  back to 1990?
7  A.  I don't know what the methodology
8  was prior to 1990, back to 1990.
9  Q.  What was the basis for the decision
10  to move from that Medicare related
11  reimbursement to RBRVS in 1996?
12  A.  RBRVS has a methodology to gap fill
13  the codes that are not filled by Medicare which
14  Horizon needs for their reimbursement.
15  Q.  So RBRVS enabled Horizon to process
16  claims in relation to more drugs than had been
17  the case previously. Is that correct?
18      MS. LIGHTNER: Object to form.
19      MR. MACORETTA: Objection.
20  A.  RBRVS gaps fills all procedures
21  that Medicare is not reimbursing for not
22  specific to drugs.

Susan Mengert  Highly Confidential  October 5, 2004
Newark, NJ

37 (Pages 142 to 145)

**142**

1  Q.  Well, let's focus specifically on
2  reimbursement for drugs. What's your
3  understanding of the reimbursement methodology
4  that Horizon used in relation to drugs
5  specifically, prior to 1996?
6  A.  They were at 110% of Medicare.
7  Q.  When the change was made to RBRVS
8  in 1996, did the amount that Horizon was
9  reimbursing for drugs increase or decrease?
10 A.  It decreased because they dropped
11 their percentage from 110 down to, I believe,
12 105.
13 Q.  Were you involved in that change?
14 A.  No.
15 Q.  Do you know who was involved with
16 that change?
17 A.  No.
18 Q.  On what do you base your knowledge
19 regarding that change in 1996?
20 A.  The information I have at my hands.
21 Q.  Is that information that's been
22 communicated to you by other people?

**143**

1  A.  It's documentation, yes.
2  Q.  Is that documentation that's
3  maintained in your files?
4  A.  Yes.
5  Q.  What kind of documentation are you
6  referring to?
7  A.  It's either E-mails or project
8  notes, that type of thing.
9       MR. MANGI: Now, Counsel, at this
10 point, we can put an oral stipulation on the
11 record regarding the documents that have been
12 produced by Horizon pursuant to subpoena. I'll
13 read for the record that the documents that
14 have been produced bear Bates numbers HRZ 1 to
15 HRZ 8469 and H1 to H231.
16      I'd like to ask counsel to
17 stipulate on the record that these are
18 authentic copies of documents produced from
19 Horizon's files and they're business records
20 within the meaning of the Rules of Evidence.
21      MS. LIGHTNER: That's correct.
22      MR. MANGI: John, do you have any

**144**

1  questions for the witness?
2       MR. MACORETTA: I do.
3       MR. MANGI: Fire away.
4          EXAMINATION
5  BY MR. MACORETTA:
6  Q.  Ms. Mengert, good afternoon.
7  A.  Hello.
8  Q.  I introduced myself. I'm John
9  Macoretta here on behalf of the plaintiffs.
10 Just a few minutes worth of questions for you.
11 I think a minute ago you said prior to '96
12 Horizon was reimbursing for drugs at 110% of
13 Medicare, right?
14 A.  Yes.
15 Q.  I'm sorry, I didn't hear your
16 answer.
17 A.  Yes.
18 Q.  I still didn't hear.
19      MR. MANGI: She said, yes.
20      MR. MACORETTA: Could you move the
21 phone.
22      MS. LIGHTNER: She's right on top

**145**

1  of it. Maybe we'll take a second because there
2  may be feedback between the feedback. So take
3  a second before you answer the question.
4  Q.  So your answer to that question was
5  yes?
6  A.  Yes.
7  Q.  Do you have an understanding of how
8  Medicare was calculating its reimbursement
9  amount prior to '96?
10 A.  No, I don't.
11 Q.  Do you know whether or not Medicare
12 was using AWP as a basis for its reimbursement?
13 A.  I don't know that.
14 Q.  When you say Medicare, are we
15 talking about Medicare part B or part A?
16 A.  Medicare part B.
17 Q.  And the RBRVS system, do you know
18 how drug costs or drug reimbursement amount is
19 calculated under that?
20 A.  Do I know?
21      MR. MANGI: Object to the form.
22 A.  Do I know what RVUs are associated

### Page 146

1  with it?
2  Q.  Under the -- I'm not sure -- I'm
3  not. No, let me try it this way. Under the
4  RBRVS system for certain drugs, the doctor pays
5  a set amount, right?
6  A.  Yes, once we calculate the
7  reimbursement rate.
8  Q.  And how is that amount calculated?
9  A.  Every CPT code has a work practice
10 and malpractice adjustment to it. The RVUs are
11 applied an overall conversion factor for that
12 particular year.
13 Q.  I think a minute ago you said when
14 you switched to RBRVS it caused your drug
15 reimbursement to drop to 105% of Medicare. Is
16 that right?
17 A.  I believe we -- in 1996, I believe
18 our Managed Care products moved from 110% of
19 RBRVS, 110% of Medicare to 105% of RBRVS.
20 Q.  Oh, okay. I heard. And that
21 caused a reduction in your overall drug costs?
22 A.  That's correct.

### Page 147

1  Q.  And I want to talk to you for a
2  second about the claims or payment data that
3  Horizon has. For the various drugs that
4  Horizon paid for, do you have claims data
5  telling you the specific amount you would have
6  paid for those drugs going back some period?
7  A.  Would you restate that.
8  Q.  Sure.
9      Do you have somewhere at Horizon
10 data that would tell you how much you paid for
11 specific drugs over some period of time?
12 A.  Yes.
13 Q.  How far back does that data go?
14 A.  I'm not -- I do not know that
15 information. It would be up to our claim
16 engines how much they would house the
17 information.
18 Q.  But if you wanted to go seek data
19 for, say, Zoladex, could you go somewhere in
20 the computer system and see a listing of every
21 Zoladex claim you paid and how much you paid
22 for it?

### Page 148

1       MS. LIGHTNER: What do you mean by
2  you? Do you mean her, or do you mean Horizon?
3       MR. MACORETTA: I mean Horizon.
4       MS. LIGHTNER: Okay.
5  A.  Horizon could, as long as they have
6  all the information. I don't know if the
7  information is archived, is what I'm saying.
8  Q.  Well, I presume you have some kind
9  of written document retention policy over there
10 at Horizon, right?
11 A.  I don't know. That's out of my
12 realm.
13 Q.  If you could take a look at Exhibit
14 5 again, which is the 12/7/98 E-mail.
15 A.  Yes.
16 Q.  And I'm interested in the bottom
17 E-mail on the first page, the paragraph that
18 says, "Going forward, we would like to
19 establish an overall administrative fee that we
20 can apply to the immunizations."
21     Do you see that sentence?
22 A.  Yes.

### Page 149

1  Q.  So am I correct that this series of
2  E-mails and the chart attached to it all relate
3  to immunization codes?
4  A.  It appears that way, yes.
5  Q.  I mean, this discussion of a $5
6  administrative fee versus a ten, a $15
7  administrative fee, didn't apply to all codes,
8  right?
9  A.  It doesn't appear that way.
10 Q.  Well, do you have some memory as to
11 whether or not it applied to all the codes?
12 A.  No.
13     MR. MANGI: I'm sorry. What was
14 that? No, you don't have a memory?
15 A.  No, I don't have any memories. I
16 don't recall.
17 Q.  AWP. Do you have an understanding
18 as to what that term means?
19 A.  Average wholesale price.
20 Q.  What does that mean? I mean, do
21 you understand what, when we say the AWP for a
22 drug is X, what does that price represent?

**150**

1    MR. MANGI: Object to the form.
2    A.  I don't know. I don't know what
3  you're trying to get.
4    Q.  Well, the acronym AWP stands for
5  average wholesale price. Is it your
6  understanding that average wholesale price in
7  that context means the average of the wholesale
8  prices charged for that drug?
9    MR. MANGI: Object to the form.
10   A.  Yes.
11   Q.  All right. Is it your view that
12 calculating reimbursement for drugs at some
13 discount from AWP is a reasonable way to
14 reimburse physicians for drugs?
15   A.  Yes.
16   Q.  You believe that AWP is a reliable
17 pricing benchmark from which to determine the
18 cost of drugs to physicians?
19   MR. MANGI: Object to the form.
20   A.  It's one methodology.
21   Q.  Well, do you believe it's a
22 reasonable methodology?

**151**

1    A.  Up until -- we are currently
2  looking to pursue other avenues.
3    Q.  Fair enough. Okay. Fair enough.
4  And when Mr. Mangi was talking to you about the
5  profits physicians may make on reimbursement
6  for drugs, does Horizon have some understanding
7  as to how much profit a physician is going to
8  make for the reimbursement of the drug?
9    A.  I have no knowledge of how much a
10 provider would make.
11   Q.  Well, was it Horizon's -- does
12 Horizon intend for a physician to make a
13 certain amount of profit when reimbursement?
14   MR. MANGI: Object to the form.
15   A.  I don't know what Horizon's intent
16 was.
17   Q.  But you understood that the amount
18 you were reimbursing the physician did not
19 exactly equal what he paid for the drug in all
20 cases?
21   A.  That's correct.
22   Q.  Did Horizon understand that the

**152**

1  physician was making a substantial amount of
2  profit, meaning the amount he was paying was
3  substantially less than what you were
4  reimbursing him?
5    MR. MANGI: Object to the form.
6    A.  I don't know what Horizon knew or
7  didn't know on how much a provider was getting
8  overpaid or underpaid.
9    MR. MACORETTA: Those are all the
10 questions I have.
11   MR. MANGI: I have some brief
12 follow-up then.
13
14        EXAMINATION
15 BY MR. MANGI:
16   Q.  Mr. Macoretta asked you about
17 whether or not you can express the amount, the
18 price at which physicians acquire drugs by
19 reference to AWP. And I'd like to draw your
20 attention back to a document HRZ 519.
21        Perhaps you can help me with the
22 exhibit number.

**153**

1    MS. LIGHTNER: It's Exhibit 6.
2    Q.  Exhibit 6. And as we discussed in
3  relation to that document Horizon here was
4  telling providers they could obtain drugs at a
5  17% discount of AWP, correct?
6    MR. MACORETTA: Objection.
7    A.  Yes.
8    Q.  And, indeed, you can look at a
9  price either by reference to the list price
10 plus or minus a percentage, or an AWP plus or
11 minus a percentage, and you can get to any
12 price you want, correct?
13   A.  Yes.
14   MR. MACORETTA: Objection.
15   Q.  Now, Mr. Macoretta also asked you
16 about what you understood average wholesale
17 price to mean. Now, you're aware that the
18 acronym stands for average wholesale price,
19 right?
20   A.  Yes.
21   Q.  Now, Mr. Macoretta asked you
22 whether you understood that to mean the average