1

1       IN THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MASSACHUSETTS

3       CIVIL ACTION 01-CV-12257-PBS

4

5

6   - - - - - - - - - - - - - - - - - -

7   IN RE:                  :

8   PHARMACEUTICAL INDUSTRY AVERAGE    :

9   WHOLESALE PRICE LITIGATION        :

10  - - - - - - - - - - - - - - - - - -

11            HIGHLY CONFIDENTIAL

12           Richmond, Virginia

13            January 5, 2005

14

15       Deposition upon oral examination of

16  TIMOTHY J. MILLER, taken on behalf of the Defendants,

17  before Heidi L. Jeffreys, RDR, CRR, a Notary Public for

18  the Commonwealth of Virginia at Large, commencing at

19  10:18 a.m. on the 5th day of January, 2005, at the law

20  offices of Anthem, Inc., 2235 Staples Mill Road, Suite

21  401, Richmond, Virginia.

22

Timothy J. Miller          Highly Confidential          January 5, 2005
                            Richmond, VA

2 (Pages 2 to 5)

2

1  Appearances:
2
3      On behalf of the Plaintiff:  (By telephone)
4          ED NOTARGIACOMO, ESQUIRE
5          Hagens Berman
6          One Main Street
7          Fourth Floor
8          Cambridge, Massachusetts  02142
9          (617)  482-3700
10
11  On behalf of the Defendants:
12          WILLIAM F. CAVANAUGH, ESQUIRE
13          Patterson, Belknap, Webb & Tyler, LLP
            1133 Avenue of the Americas
14          New York, New York  10036
15          (212)  336-2000
16
17  On behalf of Anthem, Inc.:
18          JOHN B. NICHOLSON, ESQUIRE
            2235 Staples Mill Road
19          Suite 401
20          Richmond, Virginia  23230
21          (804)  354-7697
22          In-house counsel

3

1              I N D E X
2
3              WITNESS
4  ON BEHALF OF THE DEFENDANTS:   Examination by:   Page
5  T. J. Miller          Mr. Cavanaugh     4, 91
6                        Mr. Notargiacomo    82
7
8              EXHIBITS
9  No.        Description        Page
10
11  Exhibit Miller 001  Letter dated 1-14-00      71
12          Bates No. A-VA 04010014
13
14
15
16
17
18
19
20
21
22

4

1          Deposition upon oral examination of
2  TIMOTHY J. MILLER, taken on behalf of the Defendants,
3  before Heidi L. Jeffreys, RDR, CRR, a Notary Public for
4  the Commonwealth of Virginia at Large, commencing at
5  10:18 a.m. on the 5th day of January, 2005, at the law
6  offices of Anthem, Inc., 2235 Staples Mill Road, Suite
7  401, Richmond, Virginia.
8
9          TIMOTHY J. MILLER, called as a witness,
10  having been first duly sworn, was examined and testified
11  as follows:
12              EXAMINATION
13  BY MR. CAVANAUGH:
14      Q.    Could you state your name for the record.
15      A.    Timothy J. Miller.
16      Q.    Mr. Miller, by whom are you employed?
17      A.    Anthem Blue Cross Blue Shield.
18      Q.    And when did you join Anthem Blue Cross
19  Blue Shield?
20      A.    That would be May, 1985.
21      Q.    Can you walk me through your career at
22  Anthem Blue Cross Blue Shield and give me the title and

5

1  then just a short description of what your
2  responsibilities were in that capacity?
3      A.    Okay.  I was hired in May, 1985 as an
4  internal auditor for our corporate audit department,
5  served two years in that capacity; then was hired as
6  a -- geez, what was the position -- a program director
7  for a surveillance and utilization tool that lasted for
8  about two years; served for about five years in our
9  fraud and abuse unit.
10     Q.    What types of frauds and abuses would you
11  be investigating in that capacity?
12     A.    These were primarily medical cases.
13          Following that I was promoted to manager
14  over provider profiling, served in that capacity for
15  about five years, and then was promoted to director of
16  reimbursement strategies in November, 1998.  That is my
17  current job capacity.
18     Q.    Explain to me what your responsibilities
19  are as the director of reimbursement strategies.
20     A.    I'm responsible for development of our
21  strategy -- reimbursement strategy, development of
22  actual fees that are reimbursed to physicians, and

Timothy J. Miller                Highly Confidential                January 5, 2005
                                   Richmond, VA

---

6

1   development of the reimbursement rules around the
2   procedures that are billed by physicians.
3       Q.    Would that include reimbursement for
4   physician-administered drugs?
5       A.    That is correct.
6       Q.    And has that been part of your
7   responsibility since November of 1998?
8       A.    That would be correct.
9       Q.    Okay.
10          MR. CAVANAUGH:  Let me just note that
11   counsel for Anthem has advised me that they wish to
12   designate this transcript as highly confidential under
13   the governing protective order in this litigation.
14          MR. NICHOLSON:  Thank you.
15   BY MR. CAVANAUGH:
16       Q.    In your capacity as manager of provider
17   profiling what were your responsibilities?
18       A.    What we did there was essentially develop
19   report cards on physician utilization practice patterns
20   relative to their peers within a given specialty.  It is
21   what we refer to as economic profiling; simply looking
22   at the cost of care relative to a peer norm.

---

7

1       Q.    How do you develop the peer norm -- or how
2   would you have developed the peer norm?
3       A.    We would extract claims information from
4   our claims database.  Depending on the metrics, you come
5   up with an average for all individual doctors in a given
6   peer group.  That becomes the average, and then each
7   physician's individual performance is measured against
8   that average.
9       Q.    As part of this economic modeling did you
10   include the utilization of drugs?
11       A.    Yes, that was included.
12       Q.    Can you explain to me how it was included?
13       A.    Well, physician-administered drugs are
14   billed on a claim form, just as any other medical
15   service, such as an office visit or surgery, so it was
16   captured as part of the overall claims extract.
17       Q.    And would that be on the report card?
18   Would there be a space on the report card with a
19   corresponding grade or some information with respect to
20   utilization of physician-administered drugs?
21       A.    I don't recall whether that category of
22   claim expense was broken out on the report.  We do not

---

8

1   do economic profiling any longer.
2       Q.    When did you discontinue doing that?
3       A.    Well, I haven't been --
4       Q.    When did Anthem discontinue doing that?
5       A.    I don't recall.  I haven't worked in the
6   unit for the last six years.
7       Q.    Were they still doing it when you left the
8   unit in '98?
9       A.    Yes, they were.
10       Q.    Can you give me your best sense of when
11   they discontinued the practice after you left in
12   November of '98?
13       A.    I really don't know.
14       Q.    To whom do you report as the director of
15   reimbursement strategies?
16       A.    I report to Collin Drozdowski.  He's vice
17   president of provider network management.
18       Q.    Who else reports directly to
19   Mr. Drozdowski?
20       A.    There are four regional directors who are
21   responsible for physician contracting.  There are four
22   geographic regions here in Virginia.  Do you need to

---

9

1   know the name?
2       Q.    Yeah -- actually, I don't need the names.
3   Why don't you tell me the breakdown of those four
4   regions, generally.
5       A.    Eastern region, northern region, southern
6   region, and western region.
7          Okay.  There's also a director of hospital
8   contracting.  There's also a director of specialty
9   programs.
10       Q.    Would that include specialty pharmacies?
11       A.    No, it does not.  It is special clinical
12   and alternative reimbursement.
13       Q.    Can you give me an example of what you mean
14   by "alternative reimbursement"?
15       A.    Rather than standard or base fee schedule
16   reimbursement, these would be programs which involve
17   some portion of their reimbursement being on a capitated
18   basis, as well as for the indirect portion of the
19   reimbursement, which would be things that they would
20   have indirect control over such as hospitalization.
21   There were targets set, and if those targets were met or
22   exceeded there would be some sharing of the delta with

---

Timothy J. Miller               Highly Confidential                January 5, 2005
                                    Richmond, VA

4 (Pages 10 to 13)

10

1    the physician.
2            They take on -- there's huge variability in
3    how those programs are set up.
4        Q.    What percentage of your physicians that
5    participate in Anthem programs in Virginia participate
6    in specialty programs?
7        A.    This was only in our HMO business, and I do
8    not know what percentage within the HMO business that
9    would even represent.
10           There's also additional reports to Collin
11   Drozdowski.
12       Q.    Sure.  Why don't you tell me the other
13   ones.
14       A.    There's also a manager of hospital
15   reimbursement.  There's also a director of provider
16   network operations, and --
17       Q.    What are the responsibilities of that
18   individual?
19       A.    That individual sets up provider contracts,
20   assigns provider numbers for new providers participating
21   with Anthem.
22       Q.    How would this individual's

11

1    responsibilities differ from those of the regional
2    directors'?
3        A.    The directors actually meet face to face
4    with physicians, handle day-to-day service issues, as
5    well as obtain the signed participating agreements.
6        Q.    Would these be the individuals who actually
7    go out and meet with physicians to try to encourage them
8    to participate in the Anthem network?
9        A.    That would be correct.
10           And then, lastly, there is a manager
11   over -- I don't know what the title is, but who
12   primarily handles financial accounting for Collin's
13   department.
14       Q.    Okay.  All right.
15           Let's work -- we worked our way down.  Now
16   let's work our way up so we have some understanding of
17   the structure.
18           What is Mr. -- what is Collin's department?
19       A.    Provider network management.
20       Q.    And you are a member of that department?
21       A.    That is correct.
22       Q.    To whom does Mr. Drozdowski report?

12

1        A.    That would be Randy Axelrod, M.D.
2        Q.    And what is Mr. Axelrod's -- Dr. Axelrod's
3    title?
4        A.    I believe he is senior vice president and
5    chief medical officer for Anthem here in the southeast.
6        Q.    Does Collin's provider network management
7    group manage provider networks outside of Virginia?
8        A.    No.  No, we do not.  We only manage
9    provider networks within the areas that we are licensed
10   to do business.
11       Q.    And what areas are those?
12       A.    It is primarily Virginia.
13       Q.    When you say "primarily" does it include
14   anything outside of Virginia?
15       A.    There are contiguous -- any county that is
16   contiguous to Virginia would be included.
17           MR. NICHOLSON:  And just so you know,
18   there's actually a portion of Northern Virginia that we
19   cannot service which we can provide detail on, but
20   there's a line of demarcation in Fairfax County.
21           MR. CAVANAUGH:  Okay.
22           THE WITNESS:  It's Route 123.

13

1    BY MR. CAVANAUGH:
2        Q.    That's the demarcation line, Route 123?
3        A.    (The witness nodded head.)
4        Q.    Okay.  The reimbursement -- strike that.
5            Would I be correct that, therefore, the
6    reimbursement issues that you deal with are strictly
7    within Virginia and the contiguous counties?
8        A.    That is correct.
9        Q.    To what extent do you interact with other
10   Anthem organizations with respect to reimbursement
11   issues?
12           MR. NICHOLSON:  I just object to form.
13           When you say "Anthem organizations" do you
14   mean other Anthem health care plans in other states?
15           MR. CAVANAUGH:  Yes.
16           MR. NICHOLSON:  Okay.
17           MR. CAVANAUGH:  Well, first I mean that,
18   and then we'll see if there's anything else internally.
19           THE WITNESS:  I would characterize my
20   interactions as very rare and mostly inquiry only.  What
21   is done in another state would not impact what we do
22   here in Virginia, because each state has different

Timothy J. Miller　　　　　Highly Confidential　　　　January 5, 2005
Richmond, VA

5 (Pages 14 to 17)

14

1  provider demographics, different market forces.
2  BY MR. CAVANAUGH:
3  　　Q.　And does that result in different
4  reimbursement formulas and rates utilized from state to
5  state?
6  　　A.　To the extent that I'm aware, yes.
7  　　Q.　Are there also different demographics
8  within the State of Virginia?
9  　　A.　Absolutely.
10  　　Q.　And is that one reason why Anthem has this
11  regional setup within the State of Virginia?
12  　　A.　No, the regional setup is more along the
13  line of splitting the workload equally.
14  　　Q.　Do the differences in demographics within
15  the State of Virginia produce different reimbursement
16  formulas and amounts of reimbursement within the state?
17  　　　　MR. NICHOLSON:　Just so we're clear,
18  provider demographics is what we're talking about.　Is
19  that right?
20  　　　　MR. CAVANAUGH:　Yes, talking about provider
21  demographics.
22  　　　　THE WITNESS:　We have a standard fee

15

1  schedule here in Virginia.
2  BY MR. CAVANAUGH:
3  　　Q.　Uh-huh.
4  　　A.　Actually, there are two separated
5  geographically; one for the majority of the state, and
6  then a second base fee schedule for the extreme northern
7  part of the state around the D.C. area.　It is a three-
8  to four-county area immediately outside of Washington,
9  D.C.
10  　　Q.　And why are there two different standard
11  fee schedules?
12  　　A.　That particular three- to four-county area
13  has a higher cost of living.　That particular fee
14  schedule is higher by about 8 percent.
15  　　Q.　Would it be 8 percent across the board, or
16  are you just -- is that the average looking at
17  variations in different reimbursement fees?
18  　　A.　It is not across the board.　When you break
19  down individual types of medical expenses, medical,
20  diagnostic, surgical are all subject to the higher fee
21  allowances.　Lab, injectable drugs, DME are some of the
22  categories that would not have a differential.

16

1  　　Q.　How did you determine -- what was the basis
2  for not applying a differential to injectable drugs but
3  providing a differential on the medical or diagnostic
4  side?
5  　　A.　We view injectable drugs, lab, things like
6  that, as purchased commodities.　If you look at the
7  providers who supply those types of services, they're
8  generally national companies.　You know, we take into
9  account -- our decisions with respect to reimbursement
10  are more around what our -- we're looking at
11  participation rates with our providers, so essentially
12  we're going to be guided by -- we want to ensure that
13  the highest number of physicians participate with us.
14  　　　　We also take into account, you know,
15  what -- it's essentially what we can pay and still keep
16  the highest percentage of our physicians participating
17  with us.
18  　　Q.　Is that the balance?　Would I be correct
19  that the balance you're trying to strike is driving your
20  costs down while at the same time trying to have an
21  acceptable participation rate?
22  　　A.　Absolutely.

17

1  　　Q.　And when you say you want the highest
2  possible participation rate, can you explain to me what
3  you mean?
4  　　A.　Well, for the benefit of our members, those
5  who purchase coverage with Anthem, we want to afford
6  them the greatest or largest network possible which
7  ensures access to the most physicians.
8  　　Q.　But isn't one of the ways to drive down
9  your costs to be more selective in providing physicians
10  access to your network?
11  　　A.　I don't know that that -- that we share
12  that belief, and I don't know that there's ever been a
13  study to show that that happens -- conclusive study to
14  show that that works.
15  　　Q.　Does Anthem want physicians to compete
16  among one another for access to the Anthem network?
17  　　　　MR. NICHOLSON:　Let me just object to form
18  along the lines of what's in that e-mail.　When you're
19  asking him to opine what Anthem as an entity knows or
20  believes I think that's problematic.
21  　　　　MR. CAVANAUGH:　Based on his experience,
22  certainly.

Timothy J. Miller                 Highly Confidential                 January 5, 2005
Richmond, VA

6 (Pages 18 to 21)

| 18 |
|---|
| 1  THE WITNESS: Well, I think we're |
| 2  getting -- the question is getting more into the |
| 3  contracting piece and away from my area of expertise, |
| 4  which is a reimbursement setting. |
| 5  BY MR. CAVANAUGH: |
| 6      Q.   But would I be correct you work closely |
| 7  with the contracting people because the reimbursement |
| 8  level that you set is what creates incentives or |
| 9  disincentives for physicians to participate? |
| 10     A.   I work closely only in the sense of knowing |
| 11  from the four regional directors what groups are |
| 12  potentially sensitive to price differentials.  However, |
| 13  the methodology or process that we go through to |
| 14  establish fees -- the provider piece is just one input. |
| 15     Q.   How do you ascertain provider input in the |
| 16  process of developing reimbursement schedules? |
| 17     A.   The regional directors -- well, first of |
| 18  all, we know which particular providers are potential |
| 19  what we would call jeopardy providers; those that have |
| 20  voiced displeasure with our current fee schedules.  To |
| 21  the extent that that list is large, that may, from an |
| 22  input standpoint, mean that our fee schedules may |

| 19 |
|---|
| 1  need -- you know, in terms of an increase we simply have |
| 2  to weigh that as one of the inputs. |
| 3      If the jeopardy list is small it probably |
| 4  does not play much -- or it has very little emphasis or |
| 5  weight in terms of my decision making. |
| 6      Q.   Okay.  Is there an actual jeopardy list? |
| 7      A.   There is.  It changes monthly. |
| 8      Q.   And how is the jeopardy list created? |
| 9      A.   Physicians will typically write letters to |
| 10  the regional directors indicating the fact that they are |
| 11  not satisfied with the current rates and wish to have a |
| 12  face-to-face discussion and/or they would threaten to |
| 13  terminate from the network. |
| 14     Q.   And would I be correct that Anthem, on a |
| 15  monthly basis, maintains such a jeopardy list of |
| 16  physicians? |
| 17     A.   I don't know the exact -- how often it's |
| 18  distributed.  I don't maintain that list. |
| 19     Q.   Who maintains that list? |
| 20     A.   That would be Collin Drozdowski's |
| 21  secretary. |
| 22     Q.   Who is responsible for creating and |

| 20 |
|---|
| 1  updating the list? |
| 2      A.   Well, the regional directors would supply |
| 3  input. |
| 4      Q.   I understand how a physician would get on |
| 5  the jeopardy list, and you mentioned that the list |
| 6  fluctuates. |
| 7      How would one get off the list? |
| 8      A.   Well, despite the fact that we have a base |
| 9  fee schedule -- or two base fee schedules; one for a |
| 10  majority of the state and one for the northern region -- |
| 11  there are provider groups who do have leverage |
| 12  geographically with Anthem and, thus, we do negotiate |
| 13  in a small number of cases what is called a special |
| 14  deal. |
| 15     Q.   Are there certain specialty groups that |
| 16  have greater leverage than others, in your experience? |
| 17     A.   Hospital-based physicians.  That would be |
| 18  anesthesiologists, radiologists, emergency room doctors, |
| 19  and pediatric -- not pediatric -- neonate -- |
| 20     Q.   Pediatric neonatologists? |
| 21     A.   Yes. |
| 22     Q.   Are there oncology groups that have |

| 21 |
|---|
| 1  negotiated special deals with Anthem? |
| 2      A.   I do not know the answer to that question. |
| 3      Q.   From time to time have oncology groups |
| 4  objected to one or more fees set by Anthem? |
| 5      A.   I wouldn't personally know.  The regional |
| 6  directors would know that information.  I don't deal |
| 7  with the providers face to face on a day-to-day basis. |
| 8      MR. NICHOLSON:  I would tell you that John |
| 9  Syer, who you are deposing tomorrow, would be in a |
| 10  better position to address that question.  That may save |
| 11  some time today. |
| 12     MR. CAVANAUGH:  That's fine. |
| 13  BY MR. CAVANAUGH: |
| 14     Q.   What involvement, if any, do you have in |
| 15  determining what the adjusted fee will be for a |
| 16  physician or physician group that's being given a |
| 17  special deal? |
| 18     A.   I am consulted only on occasion.  The |
| 19  special deal terms are the responsibility of the |
| 20  regional directors. |
| 21     Q.   Are they subject to -- are there any |
| 22  guidelines or restrictions on the degree to which they |

Timothy J. Miller                  Highly Confidential                  January 5, 2005
                                   Richmond, VA

7 (Pages 22 to 25)

22

1  can depart from the basic fee schedule in negotiating a,
2  quote, "special deal"?
3      A.    We have -- and John Syer would be in a
4  better position to address this, because there are
5  special deal templates that define sort of what we can
6  and what we cannot administer.
7          The special deal itself can take many
8  forms. It can be an adjustment to a single code or an
9  adjustment to many codes.
10     Q.    And are those adjustments based on
11 negotiations between the regional managers and the
12 particular physician group?
13     A.    That would be correct.
14     Q.    How do you go about, in your capacity as
15 director of reimbursement strategies, arriving at a
16 basic fee schedule?
17     A.    Well, the methodology that we have
18 traditionally used for most procedure codes is to
19 utilize the RBRVS methodology. It's resource based
20 relative value scale. It is widely used in the
21 industry.
22         Each procedure code has a value which is

23

1  referred to as the relative value unit or RVU. In its
2  simplest terms, an average office visit would have an
3  RVU of 1.0, and let's say a colonoscopy would have a
4  value of 16.0, and you multiply that RVU times a dollar
5  conversion factor to arrive at a fee.
6      Q.    How do you arrive at your dollar conversion
7  factor?
8      A.    Again, there are a lot of inputs. One, we
9  would look at what Medicare's conversion factor is.
10 Number two, we would look at, to the extent we have it,
11 competitor information. Number three, we would look at
12 the provider landscape.
13     Q.    What do you mean by "the provider
14 landscape"?
15     A.    Getting back to, again, the jeopardy list,
16 that sort of thing.
17         Number four, we would look at the history
18 of increases in prior fee schedules. Number five, we
19 would look at medical inflation. Those are some of the
20 inputs.
21     Q.    Okay.
22     A.    And, lastly, it's -- you know, one of the

24

1  other factors is what can -- because what we pass along
2  in terms of the fee schedule increase must be built into
3  our premium rate increases, so that's a consideration as
4  well.
5      Q.    And would I be correct that your group does
6  this analysis to arrive at a basic fee schedule for --
7  well, two basic fee schedules for Virginia?
8      A.    That is correct.
9      Q.    To what extent do you look at fee schedules
10 developed by other Anthem companies responsible for
11 other states?
12     A.    Seldom to never. I've never seen a full
13 fee schedule from another Anthem state.
14     Q.    Are they considered confidential as between
15 one Anthem company to another?
16     A.    No, they would not be considered
17 confidential from one state to another, but, again, each
18 state -- and the provider demographics and the market
19 forces are different in each state so things are
20 different here in Virginia than they would be in the
21 west, in Colorado and Nevada, so it's really futile for
22 me to try and compare what's going on in Nevada to

25

1  what's going on here in Virginia.
2      Q.    So, would I be correct that for your
3  purposes you wouldn't consider it particularly relevant
4  what the fee schedules are in Colorado or Nevada or
5  South Carolina?
6      A.    That's correct.
7      Q.    Now, you explained the methodology that
8  you've generally used within your reimbursement strategy
9  group since you joined in November of 1998. Was that
10 methodology the same as had been used prior to you
11 joining the group, as best you know?
12     A.    Yes. Anthem Blue Cross Blue Shield here in
13 the southeast adopted RBRVS in July of 1992.
14         RBRVS also only applies to medical and
15 surgical procedures.
16         MR. NICHOLSON: Just for the record,
17 there's a corporate history. There were several name
18 changes between then and now, and it wasn't Anthem then,
19 but I take it you're fine with that.
20 BY MR. CAVANAUGH:
21     Q.    Right. I should have asked for the record
22 at what point did your organization become known as

Timothy J. Miller            Highly Confidential            January 5, 2005
                                Richmond, VA

8 (Pages 26 to 29)

26

1    Anthem?
2        MR. NICHOLSON: I can tell you the closing
3    date was August 1, 2002, and then the name changes
4    followed thereafter and didn't happen effective that
5    date, but..
6    BY MR. CAVANAUGH:
7        Q.    What was the name of the company that hired
8    you in 1985?
9        A.    Blue Cross and Blue Shield of Virginia.
10       Q.    And did there come a point in time when the
11   name of the company that employed you changed?
12       A.    Yes.
13       Q.    When was that?
14       A.    I do not know the date, but when we became
15   a publicly traded company under the name of Trigon.
16       Q.    And then at some point did the company
17   name -- when did Blue Cross and Blue Shield of Virginia
18   go public, to the best of your recollection? I don't
19   need a specific date.
20       A.    1998.
21       Q.    Okay.
22       MR. NICHOLSON: Just so we're clear,

28

1    uses to develop its medical surgical fee schedule.
2        Q.    Okay. You mentioned competitors a moment
3    ago. Does Anthem compete with other health care
4    insurers for physician participation in networks?
5        A.    We don't compete with them for physicians
6    because another carrier can also have that physician
7    participate with them. We compete for the members.
8        Q.    Okay. Do you look at or attempt to
9    estimate participation rates of physicians with other
10   carriers against whom you compete?
11       MR. NICHOLSON: Just as to form, when you
12   say "you" you're asking for --
13       MR. CAVANAUGH: Anthem.
14       MR. NICHOLSON: But Tim in his job as an
15   employee of Anthem?
16       MR. CAVANAUGH: Yes.
17       THE WITNESS: I have never seen competitor
18   participation rates.
19   BY MR. CAVANAUGH:
20       Q.    I understand you may never have -- is that
21   something that Anthem attempts to estimate internally or
22   assess internally, anyway?

27

1    throughout the deposition when you say "Anthem" now
2    we're referring to Anthem Virginia and predecessor
3    companies that operated within the state?
4        MR. CAVANAUGH: Yes.
5    BY MR. CAVANAUGH:
6        Q.    And when I've used the term "Anthem" have
7    you understood that I'm referring back to the
8    organization that you joined in 1985 to this point?
9        A.    Yes.
10       Q.    Okay. Am I correct that the -- and I
11   always get the abbreviation wrong -- the RB --
12       A.    RVS.
13       Q.    -- the RBRVS doesn't provide the dollar
14   value; it simply provides one piece of the formula,
15   which is the relative value code?
16       A.    That's correct.
17       Q.    All right. Determining the dollar value to
18   assign to the formula is a function of looking at all of
19   the different factors that you described for me a moment
20   ago?
21       A.    That's correct, all of those inputs are
22   used to arrive at a dollar conversion factor that Anthem

29

1        A.    I don't know the answer to that question.
2        Q.    Here in Virginia who are your major
3    competitors?
4        A.    Well, we have the leading market share in
5    Virginia. Our other competitors would be a regional
6    competitor, Sentara, Sentara Health Plans, and that is
7    primarily limited to the eastern region only. In the
8    northern region it would be MAMSI, which is now a part
9    of United Health Care. And every other competitor would
10   have less than an 8 percent market share.
11       Q.    What --
12       A.    Cigna.
13       Q.    What is Anthem's estimated market share
14   here in Virginia?
15       A.    Based on premium dollars, I believe it is
16   close to 40 percent.
17       Q.    Who is your next nearest competitor in
18   terms of market share?
19       A.    I do not know. I am not sure who that
20   would be.
21       Q.    It would either be Sentara or now United
22   Health Care?

Henderson Legal Services
(202) 220-4158

Timothy J. Miller               Highly Confidential               January 5, 2005
Richmond, VA

9 (Pages 30 to 33)

30

1    A.    I don't know.
2    Q.    Okay.  Let's talk about
3  physician-administered drugs.
4         Would you agree with me that the category
5  of physician-administered drugs is made up of more than
6  simply injectables?
7    A.    That would be correct.  There are also what
8  are called infusible drugs.
9    Q.    Are there also drugs that are inhaled that
10  can be administered within a physician's office?
11    A.    Clinically I'm not familiar, but I do
12  believe I have seen coding or codes, J codes, that
13  represent inhaled drugs.
14    Q.    When you assumed responsibility as the
15  director of reimbursement strategies in November of 1998
16  how did you become familiar with the
17  physician-administered drug business, if you did?
18    A.    Well, I don't recall when I took over that
19  I sat down and systematically looked at each area of
20  reimbursement, medicine, medical surgical, lab, DME.  It
21  has been over the years learning the various intricacies
22  of each of them.

31

1    Q.    When you think of the job for which you're
2  responsible and you break it down into the five
3  categories you just gave me?  I think there were five.
4  There was medical, surgical --
5    A.    Yes, medical/surgical, there's a specific
6  methodology, RBRVS, which we've mentioned --
7    Q.    Right.
8    A.    -- there's lab, a different methodology,
9  there's DME --
10    Q.    What is DME?
11    A.    Durable medical equipment.
12    Q.    Uh-huh.
13    A.    -- different methodology, injectable
14  drug -- and I use the term "injectable drug" to include
15  injectables and infusibles.
16    Q.    You do.  I was going to ask you that.
17    A.    In other words, an injectable drug would be
18  any HCPCS code that would suggest an infusible or
19  injectable drug.
20    Q.    You just used the term "HCPCS."
21    A.    HCPCS, Health Care -- HCPCS is a published
22  manual of procedure codes that are considered standard

32

1  code sets within the industry, as is CPT, which is
2  another published manual that is also considered a
3  standard code set that is used by physicians to bill
4  managed care organizations.
5    Q.    Okay.  We've talked about the medical and
6  surgical methodology.  What methodology do you use -- or
7  have you used for lab, for example?
8    A.    That has changed over the years.  We
9  currently reimburse 100 percent of the published
10  Medicare lab fee schedule for Virginia.
11    Q.    How has it changed?
12         MR. NICHOLSON:  I object to form.  Do you
13  want to give him a time frame you're looking at, or are
14  you asking for a continuum of how it evolved over time?
15  BY MR. CAVANAUGH:
16    Q.    Yes, if you understand -- if there's been
17  an evolution could you describe it for us?
18    A.    When I took over in 1998 I believe we were
19  paying above Medicare, and I don't recall the exact
20  percentage.
21    Q.    Do you remember what formula you were
22  using, if you were using one?

33

1    A.    It was Medicare plus a percentage, and
2  within -- it was either in 1998, when I took over, or
3  shortly thereafter, 1999, that the methodology went to a
4  hundred percent of Medicare.
5    Q.    And do you know for how long before you
6  took over in November of 1998 Anthem had been using a
7  Medicare-plus system?
8    A.    I do not recall how long that would have
9  been in place.
10    Q.    DME -- what is the -- what's the
11  reimbursement strategy on DME?
12    A.    Again, understand that there are multiple
13  lines of business here at Anthem.  We have a traditional
14  product line, we have a PPO product line, we have an HMO
15  product line.  It's going to differ depending on the
16  product line.
17    Q.    I'm sorry.  It was traditional --
18    A.    Traditional, PPO, and HMO.
19    Q.    Okay.  That's a fair point, and I should
20  have asked that earlier, because I know there's an
21  interplay between all of this.
22         Can you describe for me what you mean by

Timothy J. Miller                Highly Confidential                January 5, 2005
                                 Richmond, VA

10 (Pages 34 to 37)

34

1   "traditional"?
2       A.    Traditional coverage -- and there's very
3   little of it left today, and when you ask me to describe
4   it, from a benefit perspective or a reimbursement
5   perspective?
6       Q.    Let's do it from a benefit perspective
7   first.
8       A.    Well, from a benefit perspective I'm not
9   equipped to respond to that.
10      Q.    When I think of traditional insurance I'm
11  thinking about the traditional indemnity insurance.  Are
12  we talking about the same thing?
13      A.    That would be it.
14      Q.    And for these indemnity policies how is
15  reimbursement handled?
16      A.    Well, again, we have a set fee schedule for
17  our indemnity business which is going to be the highest
18  fee schedule that we would reimburse.
19      Q.    Now, is this -- when you told me earlier
20  that you have two basic fee schedules --
21      A.    Geographically.
22      Q.    Geographically?

35

1       A.    And then within those two you have these
2   three lines of business.
3       Q.    I understand.  So, if I were to look at
4   your basic fee schedule for most of Virginia, there
5   would be within that three different types of basic fee
6   schedules, depending upon the type of insurance that was
7   involved?
8       A.    That's correct.
9       Q.    Okay.  And then a further layer onto that
10  would be any special deals that had been negotiated with
11  particular physician groups within each of those lines
12  of coverage?
13      A.    That would be correct.
14      Q.    And could you have a physician group that
15  is both providing PPO services -- or services under a
16  PPO agreement and under an HMO agreement?
17      A.    Absolutely.
18      Q.    Okay.  And you could have for each of those
19  physicians special deals within the PPO context and/or
20  in the HMO context?
21      A.    Yes, it can be an "and" or an "or"
22  situation.

36

1       Q.    Okay.  The traditional fee schedule you
2   said would be the highest, the physician reimbursement
3   rates would be the highest.  Is that because the
4   premiums for traditional indemnity are higher than you
5   would see for PPO or HMO?
6       A.    I don't know if it's because the premiums
7   are higher, but the premiums are higher because our fees
8   are higher.  It's the other way around.
9       Q.    Okay.  What percentage of Anthem's business
10  in Virginia is still indemnity?
11      A.    I don't know.  If I --
12            MR. NICHOLSON: Well, don't guess.
13  BY MR. CAVANAUGH:
14      Q.    Don't guess, but give me your best estimate
15  of...
16      A.    It would be less than 20 percent.
17      Q.    Now, if I took you back to 1995, what would
18  the percentage have been?
19      A.    Higher, but I do not know the percentage.
20      Q.    Okay.  How are physician-administered drugs
21  reimbursed under a traditional indemnity policy?
22      A.    We have always used Medicare-published fees

37

1   for injectable drugs and applied a percentage to that
2   published fee.
3       Q.    When you say "applied a percentage" can you
4   explain to me what you mean?
5       A.    Medicare-published fee times 95 percent.
6             And what is the time frame?
7             MR. NICHOLSON: Let me just be clear.
8   You're using that as an example, the 95 percent?
9   BY MR. CAVANAUGH:
10      Q.    I understand it's been a different
11  percentage at different points in time.
12      A.    That's correct -- well, let me clarify.
13      Q.    Sure.
14      A.    It has been 95 percent of Medicare for as
15  long as I have been director of reimbursement
16  strategies.
17      Q.    Now, let me make sure I understand what you
18  mean by "the Medicare-published fee."
19            Are you talking about a publication issued
20  by Medicare which provides a fee for a corresponding
21  J code?
22      A.    That would be correct.

Henderson Legal Services
(202) 220-4158

Timothy J. Miller                Highly Confidential                January 5, 2005
                                    Richmond, VA

---

**38**

1     Q.    And is that fee what Medicare actually
2  pays?
3     A.    Yes.
4     Q.    So, for example, if Medicare were paying
5  AWP minus 95 percent, what's published in this book is
6  the actual fee that Medicare pays, as you understand it?
7     A.    That would be correct.
8     Q.    Does the fee that is paid by Medicare
9  that's published in this book include any co-payment
10  paid by any individual or co-insurance payment paid by
11  any individual or entity?
12     A.    Can you repeat the question?
13     Q.    Sure. Would I be correct that in many
14  instances Medicare will pay 80 percent of 95 percent,
15  leaving a co-insurance or co-payment amount to be paid
16  by the patient or some other insurer?
17     A.    I don't know Medicare's benefit structure;
18  thus, I don't know what --
19     Q.    Okay.
20     A.    The fee that Medicare publishes would be
21  their allowed fee, and benefit -- Medicare's benefit
22  structure would determine co-pays and co-insurance.

---

**39**

1     Q.    I understand.
2           MR. NICHOLSON: Bill, at a convenient time
3  can we take a break? It's been about an hour.
4           MR. CAVANAUGH: Sure. This is a fine time.
5           (A recess was taken.)
6  BY MR. CAVANAUGH:
7     Q.    We were talking about the different types
8  of insurance and the impact that they can have on
9  reimbursement. Can you explain to me -- we've talked
10  about traditional. The next category you gave me was
11  PPO?
12     A.    PPO.
13     Q.    Can you just explain to me what PPO -- what
14  the PPO benefit is?
15           MR. NICHOLSON: Let me make one quick
16  point.
17           In the areas of designation that were
18  e-mailed there's some categories that could be
19  interpreted to deal with plan design revenues, and we
20  raised this with Jessica and whether or not she wants
21  somebody in sales and marketing, and she said, no, just
22  so you know. Tim is not as proficient in these topics

---

**40**

1  as they would be, but --
2           MR. CAVANAUGH: I accept that, and I'm
3  really not asking for the nitty-gritty of plan detail.
4  I just want to have on the record the differences
5  between traditional PPO and HMO.
6           MR. NICHOLSON: To the extent you know.
7           MR. CAVANAUGH: I think I know what they
8  are, but --
9           THE WITNESS: PPO is a preferred provider
10  organization, is a discounted fee for service
11  reimbursement. Relative to our traditional
12  reimbursement, we reimburse our PPO at 89 percent of the
13  traditional level.
14  BY MR. CAVANAUGH:
15     Q.    How do you arrive at the 89 percent?
16     A.    It's always -- well, it hasn't always been.
17  It was actually 85 percent for many years. We bumped up
18  the reimbursement, again, just to respond to, you know,
19  the market.
20     Q.    And when did you do that bump-up?
21     A.    My guess is 2000.
22     Q.    So, if I were to look at the reimbursement

---

**41**

1  schedule for -- the basic reimbursement schedule for
2  PPO, would those fees be 89 percent of the fees on your
3  fee schedule for traditional insurance?
4     A.    Yes, but only for medical/surgical
5  services, things that -- where there is physician time
6  and effort involved. Commodities, things that are
7  purchased, are not subject to that methodology.
8     Q.    And can you describe for me the HMO
9  product?
10     A.    Again, from a reimbursement standpoint, the
11  HMO product, depending on the region in Virginia, can be
12  reimbursed anywhere from 88 percent to 95 percent of our
13  PPO rates. And, again, those decisions on the
14  percentage are based on the market conditions in the
15  various regional areas.
16     Q.    What is the -- from a physician standpoint,
17  what would be the benefit of participating in the HMO
18  program, as opposed to the PPO program?
19     A.    Well, if you don't --
20           MR. NICHOLSON: Object to form to the
21  extent you're asking him to speculate as to how
22  physicians analyze these things, but --

---

42

1  BY MR. CAVANAUGH:
2      Q.    What is Anthem's perception of why it's in
3  a physician or physician group's interest to participate
4  in the HMO program, as opposed to PPO program?
5      A.    I don't look at it as an and/or. If
6  there's a large patient population in a given area, the
7  physician would want to have access to participate in
8  those patients.
9      Q.    So would I be correct that what Anthem does
10  is offer to customers a PPO plan or an HMO plan, and
11  customers decide which plans to accept?
12      A.    That's correct.
13      Q.    And the premium dollars will differ for PPO
14  versus HMO, correct?
15      A.    That's correct.
16      Q.    We were talking about DMEs, durable medical
17  expenses --
18      A.    Equipment.
19      Q.    Equipment. What generally comes under that
20  category?
21      A.    Things like wound supplies, diabetic
22  supplies, ostomy supplies, orthotics, prosthetics,

43

1  urinary catheters, things like that.
2      Q.    And how does Anthem -- or how has Anthem
3  set reimbursement to physicians for DMEs?
4          MR. NICHOLSON: I just object to the form.
5  Can you give us a time period?
6  BY MR. CAVANAUGH:
7      Q.    Well, let's deal with the period of time in
8  which you've been responsible for reimbursement
9  strategy, so November of '98 to the present.
10      A.    For our indemnity and PPO business, we
11  reimburse 100 percent of the published Medicare fees.
12          Now, let me also add that we don't -- we
13  don't -- we don't update our fees every year. Medicare
14  does; we don't. So, in some cases the last time we
15  would have updated our fees might have been two years
16  ago, and Medicare would have had a new fee schedule that
17  they published, but we do not automatically change our
18  fees with Medicare on DME.
19      Q.    Okay. What leads you to change your fees
20  on DME?
21      A.    The market.
22      Q.    In your experience, does that -- if

44

1  Medicare is going to publish new fees are the fees
2  typically higher?
3      A.    I would not use the word "typically." It
4  varies from year to year. There have been -- if I look
5  at the last five years, I believe there has -- there was
6  one year where Medicare fees -- their conversion factor
7  actually decreased. But the Medicare fee is not just
8  the conversion factor, it's the RVU, and the RVUs change
9  each year.
10      Q.    Did the conversion factor go up in the
11  other four years? You said it went down in one year.
12  Did it go up in the other four?
13      A.    Medicare's conversion factor?
14      Q.    Yes.
15      A.    It has.
16      Q.    And, if I understand your testimony
17  correctly, you say Anthem doesn't follow that year in
18  and year out, making those types of adjustments?
19      A.    That's correct, with the exception of some
20  categories.
21      Q.    Within DME?
22      A.    Not within DME.

45

1      Q.    So, if -- all right. Let's turn to drugs.
2      A.    Okay.
3      Q.    Physician-administered drugs. What is
4  the -- what reimbursement approach has Anthem used in
5  the period during which you've been the director of
6  reimbursement strategies?
7      A.    The methodology has been the
8  Medicare-published fee times 95 percent.
9      Q.    And was that a methodology that was being
10  utilized before you joined the group?
11      A.    That's correct.
12      Q.    Do you know for how far back that had been
13  utilized?
14      A.    I do not know.
15      Q.    When Medicare annually updates their
16  published fee schedule does Anthem update its fee
17  schedule?
18          MR. NICHOLSON: Referring to injectable
19  drugs?
20          MR. CAVANAUGH: Yes.
21          THE WITNESS: Yes. Our contracts with our
22  providers specifically state that when the -- when

Timothy J. Miller       Highly Confidential       January 5, 2005
Richmond, VA

13 (Pages 46 to 49)

---

**46**

1 Medicare updates its published fees that Anthem will
2 also update, based on the formula, Medicare times 95
3 percent.
4 BY MR. CAVANAUGH:
5      Q.    Okay.
6      A.    In some years Medicare has updated on a
7 quarterly basis, and in other years -- in 2004, for
8 instance, primarily there was just the January 1st fee
9 schedule update by Medicare, and then throughout the
10 year there are occasionally a few codes that they will
11 come back and update. But they did not do quarterly
12 updates last year.
13      Q.    Over the past six years or so that you've
14 been in reimbursement strategies have you participated
15 in discussions about the advisability of sticking with
16 following Medicare on injectable drugs?
17      A.    Repeat the question. Discussions with
18 whom?
19      Q.    Within Anthem.
20      A.    And repeat the question.
21      Q.    Have you participated in discussions within
22 Anthem on the advisability with respect to injectable

---

**47**

1 drugs of staying with Medicare's -- the Medicare
2 formula?
3      A.    The only discussions I've had have been
4 with Collin Drozdowski, since I report to him.
5      Q.    Uh-huh.
6      A.    I determine the direction that we're going
7 with respect to reimbursement. It has been -- it was my
8 decision that we would continue to follow Medicare;
9 however, our percentage has changed for 2005.
10      Q.    How did you change your percentage?
11      A.    From 95 percent to a hundred percent.
12      Q.    And what led you to decide to go from 95
13 percent to a hundred percent of Medicare?
14      A.    Well, we knew that based on information
15 from the CMS Web site that Medicare would be switching
16 to a new methodology.
17      Q.    Uh-huh.
18      A.    We did not know how that methodology would
19 compare to the prior methodology, although we believed
20 it would be lower than the prior methodology, resulting
21 in lower fees, thus we came off our 95 percent and
22 decided to go to 100 percent.

---

**48**

1      Q.    When you say "lower fees" that raises a
2 question. Would I be correct that under Anthem's
3 reimbursement schedules there is a reimbursement for the
4 drug? Is there also a separate reimbursement for the
5 administration?
6      A.    There is.
7         MR. NICHOLSON: Just so the record is
8 clear, when you were referring to "fees" in your last
9 answer you were referring to reimbursement for the drug?
10         THE WITNESS: Correct.
11 BY MR. CAVANAUGH:
12      Q.    Would you also agree with me that it's
13 certainly Anthem's perception that a physician will be
14 looking at both components, reimbursement for the drug
15 and reimbursement for administration, in looking at
16 the -- in analyzing the economics of administering the
17 drug to a particular patient?
18      A.    Yes, we look at -- I mean, both of those,
19 the drug and the administration, are -- we look at those
20 as independent -- well, we look at them independently,
21 but we also look at them in aggregate.
22      Q.    And you look at them in aggregate, would

---

**49**

1 you agree with me, because there's certainly a
2 relationship between the two?
3      A.    That's correct.
4      Q.    The administration of a drug -- how do you
5 go about determining reimbursement rates for that?
6      A.    RBRVS.
7      Q.    And, so, that component of the drug
8 reimbursement would be subject to all of the inputs that
9 we talked about in the context of reimbursement for a
10 medical procedure?
11      A.    That's correct. And it would not be
12 specific to just those codes. We look at the entire
13 universe of codes and use those inputs supplied to the
14 entire universe of codes. We have one conversion factor
15 for each line of business.
16      Q.    When you say you look at it in the
17 aggregate, the drug reimbursement and the administration
18 of the drug reimbursement, how do you actually go about
19 doing that?
20      A.    The process that we go through with respect
21 to a fee schedule update is very different here in
22 Virginia than in other Anthem states or any other state,

---

Timothy J. Miller          Highly Confidential          January 5, 2005
                           Richmond, VA

14 (Pages 50 to 53)

---

**50**

1  period. Because of fair business legislation here in
2  Virginia, we have to disclose our contract amendment,
3  which includes our fee schedules for each individual
4  specialty, 150 days prior to the effective date.
5      Q.   You have to disclose to whom?
6      A.   The physicians.
7          So, if we have to have it out 150 days
8  prior to the effective date, to actually prepare the fee
9  schedule means that we have to do forecasting much
10 earlier than 150 days prior to the effective date.  So
11 here in Virginia, here at Anthem, I'm usually developing
12 fee schedules almost a full year prior to the effective
13 date.
14          What we do is we use the best -- we use our
15 current fee schedule times a three- to four-month period
16 of utilization for each code --
17     Q.   Uh-huh.
18     A.   -- and compare that to what our projected
19 fee schedule might look like, times that same
20 utilization to give us a look at what the impacts to
21 each specialty and in aggregate are going to be.  We go
22 through that modeling process multiple iterations,

---

**51**

1  changing assumptions, changing conversion factors and
2  again looking at the impacts to each specialty.  And,
3  again, as I mentioned in one of the prior questions, you
4  know, we take into account the jeopardy list, what
5  particular specialties are going to be impacted the
6  greatest, and that is one of the inputs in terms of how
7  we ultimately arrive at our final conversion factor.
8          So in the case of administration plus drug
9  that's all factored in, with the exception of this
10 year -- well, actually, it's with the exception of every
11 year, because we don't know what the future
12 Medicare-published fee is going to be.  If I'm working a
13 full year ahead of schedule I don't know what the impact
14 of that is going to be.
15     Q.   So, how do you deal with that variable in
16 doing your forecasting?
17     A.   Well, the only thing we knew roughly twelve
18 months ago was that Medicare would be changing its
19 methodology.  We could have stuck with the 95 percent
20 methodology that we used, 95 percent of the published
21 Medicare fee --
22     Q.   Uh-huh.

---

**52**

1      A.   -- but we essentially took a safer road and
2  said -- we went to a hundred percent because we felt
3  that there was a likelihood that Medicare's new
4  methodology would result in a lower fee.
5          If we had kept 95 percent we were concerned
6  that that would have an extremely negative impact on our
7  physicians.
8      Q.   What did you do with respect to the
9  administration fees?
10     A.   The administration fees are based on the --
11 rephrase your question.  What did we do with the
12 administration fees for the --
13     Q.   For 2005.
14     A.   All right.
15         MR. NICHOLSON:  Administration of the
16 injectable drugs, you're talking about?
17         MR. CAVANAUGH:  Or infusible drugs.
18         MR. NICHOLSON:  Well, as he's defined
19 injectable drugs?
20         MR. CAVANAUGH:  Right.
21         THE WITNESS:  The fee schedule update that
22 is now in effect 1-1-05 that we developed twelve months

---

**53**

1  ago was based on the 2004 RBRVS relative values.
2  BY MR. CAVANAUGH:
3      Q.   Okay.  Do you --
4      A.   So, you know, again, we followed that
5  methodology of its RVU times conversion factor, plus
6  there is an unknown as to what's going to happen to the
7  drug.
8      Q.   Do you understand as part of the change in
9  Medicare reimbursement, moving to a different
10 reimbursement formula for the drug, Medicare is also
11 adjusting the administration reimbursement?  Do you
12 understand that?
13     A.   That's correct, I do.
14     Q.   And have you looked at the adjustments that
15 Medicare is making on the administration side in coming
16 to your 2005 reimbursement fees?
17     A.   Well, what Medicare has done is created new
18 procedure codes for 2005.
19     Q.   Right.
20     A.   They still have the existing procedure
21 codes for administration.  They did not delete those as
22 of 12-31-04, so we have two sets of codes that

---

Timothy J. Miller          Highly Confidential          January 5, 2005
                            Richmond, VA

54

1  essentially represent infusion administration and
2  injectable administration.
3      Q.   Uh-huh.
4      A.   The new codes for 1-1-05 that Medicare has
5  created, we set those up -- any new codes, we set those
6  up using the most current RBRVS values when they're
7  established. So for 1-1, 2005 the new Medicare codes
8  for infusion and injection are -- the fees for those are
9  established using our methodology, but it's the 2005
10 RVUs times our existing conversion factor to establish
11 fees for new codes.
12     Q.   I'm not sure I understand.
13     A.   Okay.
14     Q.   Does that mean that the new procedure codes
15 implemented by Medicare for 2005 will be utilized as
16 part of your reimbursement?
17     A.   Well, they're required to be on our fee
18 schedule. We have to allow -- I mean, it's part of
19 HIPAA regulations. All new codes have to be established
20 on your fee schedule.
21         Our contracts with our providers state that
22 any new code that is added that we will establish a fee

55

1  based on the new RVU that's established for that code,
2  times our existing conversion factor that we used to set
3  up our current fee schedule.
4      Q.   I see. Has Medicare come up with new
5  conversion factors for these new procedure codes?
6      A.   For 2005?
7      Q.   Yes.
8      A.   We have a new conversion factor --
9      Q.   You do. All right.
10     A.   -- for all procedures. In other words --
11 again, we mentioned this previously. Medicare updates
12 RVUs and their conversion factor every year on January
13 1st, but Anthem does not update its fee schedule every
14 year. We do add new codes every year.
15     Q.   So, would I be correct that you're using
16 your 2004 conversion factor for these new procedure
17 codes?
18     A.   That is correct.
19     Q.   All right. When you first came on the job
20 in reimbursement strategies in November, 1998 did you
21 assess the advisability of continuing to follow Medicare
22 reimbursement for injectable drugs?

56

1          MR. NICHOLSON: I'll object to form in that
2  he testified they didn't strictly follow Medicare's
3  allowance schedule.
4          But answer the question.
5          THE WITNESS: Repeat the question, please.
6  BY MR. CAVANAUGH:
7      Q.   When you came on the job in November of '98
8  as head of reimbursement strategies did you assess the
9  advisability of continuing to use Medicare's
10 reimbursement fees for Anthem's reimbursement?
11     A.   Every time we contemplate a new update to
12 our fee schedule we assess every methodology that we
13 use, but, again, a lot of our action is guided by market
14 conditions, physician participation rates. So the
15 answer would be every time -- yes, every time we
16 consider an update we go through a process of evaluating
17 whether our methodologies should change or stay the
18 same.
19     Q.   At any point in time since you've been head
20 of reimbursement strategies have you ever sought to
21 determine actual physician acquisition costs for
22 injectable drugs?

57

1      A.   I have never undergone a study to attempt
2  to find what the true acquisition cost is for drugs.
3      Q.   Is that something you ever considered doing
4  as head of reimbursement strategies?
5      A.   I never considered it because the only way
6  to do that would be to get invoices from physicians, and
7  that would be -- most physicians are not willing to
8  share that information.
9      Q.   When did you determine that physicians were
10 not willing to provide actual invoice information?
11     A.   I occasionally get sent a complaint from a
12 physician where the physician alleges that we are not
13 covering his costs of acquisition. My normal response
14 is, "let me see an invoice."
15         In a lot of cases they will not share their
16 invoices with us. In some cases they have.
17     Q.   When they declined to provide you with an
18 invoice what conclusion do you draw from that -- or did
19 you draw from that?
20     A.   I don't know that I arrived at any
21 conclusion. For me, it's an inquiry, and my response to
22 the field representative from Anthem is, "I cannot help

Timothy J. Miller          Highly Confidential          January 5, 2005
                              Richmond, VA

16 (Pages 58 to 61)

58

1  answer or respond to the physician's inquiry without
2  seeing this information." So, if they didn't supply the
3  invoice, generally speaking, the inquiry was dropped.
4      Q.    Based on that refusal to supply an invoice
5  did you suspect that the physician's cost was actually
6  lower than was being suggested by the letter?
7      A.    I don't ever suspect anything. I am a
8  fact-driven individual with respect to my decisions, and
9  without facts I don't make any assumptions.
10     Q.    Would I be correct, then, that in your job
11 as head of reimbursement strategies you have not made
12 assumptions regarding actual physician acquisition
13 costs?
14     A.    (Pause.)
15          Repeat the question.
16     Q.    Would I be correct, then, that in your
17 capacity as head of reimbursement strategies you have
18 not made assumptions regarding actual physician
19 acquisition costs of physician-administered drugs?
20          MR. NICHOLSON:  Object to form.
21          THE WITNESS:  I can't make assumptions
22 about acquisition costs because I don't know the source

59

1  that each physician uses to acquire drugs. I don't know
2  the size of the physician's practice; whether they have
3  specific purchasing power. There are a lot of factors
4  that go into determining what acquisition costs would be
5  for a physician, and I would not know the particulars of
6  each physician's situation.
7  BY MR. CAVANAUGH:
8      Q.    Do you believe that physicians have certain
9  bargaining power in dealing with manufacturers on
10 physician-administered drugs?
11     A.    I wouldn't know that because, again, I
12 don't know -- in each particular -- in each case, each
13 drug, how much they dispense within their practice.
14 That is going to determine -- you know, again, to the
15 extent that they dispense a lot of a particular drug,
16 that could influence how much of a discount they would
17 receive. I don't have access to that information.
18     Q.    Would you concede that if two manufacturers
19 have competing drugs and they're competing for a
20 physician's business that a physician would be able to
21 leverage discounts from those manufacturers?
22          MR. NICHOLSON:  Object in that it calls for

60

1  him to speculate.
2          But you can answer the question, if you
3  can.
4          THE WITNESS:  It depends. Clinically, one
5  drug may be superior to another. That could influence
6  the ability to obtain a discount.
7  BY MR. CAVANAUGH:
8      Q.    Assuming these are drugs approved in the
9  same -- they're in the same therapeutic category,
10 they're both good drugs, can you envision a physician to
11 be able to leverage discounts from one manufacturer as
12 opposed to another in order to get that physician to
13 utilize one manufacturer's drug versus another?
14          MR. NICHOLSON:  Same objection.
15          THE WITNESS:  You're asking me to
16 speculate, and I don't know the practices of the
17 physician, which drugs they may use, which brand of
18 drug, because I don't get invoices from the physicians'
19 practices.
20          The J codes that are used to bill drugs do
21 not specify a particular brand or a generic version.
22 BY MR. CAVANAUGH:

61

1      Q.    Has Anthem ever sought to establish a --
2  well, let me ask it this way:
3          Are you generally aware on the pharmacy
4  side of the business with respect to self-administered
5  drugs that there are such things as formularies?
6      A.    Yes, I'm aware of that.
7      Q.    And are you also aware that formularies are
8  used by management care companies to influence which
9  drugs are utilized?
10     A.    I am aware of that.
11     Q.    And one of the ways formularies will
12 determine drug utilization is by influencing physician
13 prescribing choices, correct?
14     A.    I understand that to be the case.
15     Q.    Has Anthem ever considered implementing any
16 sort of formulary for physician-administered drugs?
17     A.    I personally have not.
18     Q.    Have you ever heard that discussed within
19 the company?
20     A.    I have not.
21     Q.    Can you think of anything that would have
22 prevented Anthem from implementing a formulary for

Timothy J. Miller                Highly Confidential                January 5, 2005
                                 Richmond, VA

17 (Pages 62 to 65)

---

62

1   physician-administered drugs?
2            MR. NICHOLSON:  Object to form.
3            THE WITNESS:  Repeat the question, please.
4   BY MR. CAVANAUGH:
5       Q.   Based on your experience, can you think of
6   anything -- strike that.
7            Based on your experience as head of
8   reimbursement strategies, can you think of anything that
9   would have prevented Anthem from implementing a
10  formulary for physician-administered drugs?
11           MR. NICHOLSON:  Same objection.
12           THE WITNESS:  From my perspective and what
13  I know best -- and that is not the clinical side; it is
14  the operational side -- the only thing I can think of is
15  administrative burdens or obstacles.
16  BY MR. CAVANAUGH:
17      Q.   When you've been contacted by an Anthem
18  field representative or directly by a physician with
19  respect to reimbursement for a particular
20  physician-administered drug do you look at both the
21  reimbursement for the drug and the reimbursement for the
22  administration?

---

63

1       A.   No, I simply look at the reimbursement for
2   the drug, because I don't -- the physician would not
3   normally share what he billed in terms of administration
4   codes along with the drug.  The inquiries are usually
5   this particular -- I billed for this particular drug,
6   your reimbursement was X, it cost me more to acquire
7   that drug.
8       Q.   Okay.  Has Anthem ever sought to implement
9   a system where physician reimbursement for
10  physician-administered drugs would be based upon the
11  disclosure of acquisition costs?
12           MR. NICHOLSON:  By the providers?
13  BY MR. CAVANAUGH:
14      Q.   By the provider, the physician provider.
15      A.   Not to my knowledge.
16      Q.   Is that something you've ever discussed
17  internally doing?
18      A.   (Pause.)
19           Where the physician discloses his
20  acquisition costs?
21      Q.   Yes.
22      A.   Have we ever talked about that?

---

64

1       Q.   Yes.
2       A.   Not to my knowledge.
3       Q.   Was there someone other than you that held
4   the position of director of reimbursement strategies
5   prior to November of 1998?
6       A.   Yes, there was.
7       Q.   Who was that?
8       A.   Mason Child.
9       Q.   Is Mr. Child still with the company?
10      A.   He is not.
11      Q.   Do you know where he's currently employed?
12      A.   I do not.
13      Q.   Do you know where he currently lives?
14      A.   Henrico County.
15      Q.   Did he retire from Anthem --
16      A.   No.
17      Q.   -- or he moved on?
18           MR. NICHOLSON:  Let him finish his question
19  before you answer, just to make her life easier.
20  BY MR. CAVANAUGH:
21      Q.   When did he leave Anthem?
22      A.   I don't know.

---

65

1       Q.   Do you know how long he had been director
2   of reimbursement strategies?
3       A.   I don't know exactly how long.
4       Q.   Do you know who had the job before him?
5       A.   (Pause.)
6            I do, but I can't think of the name.
7       Q.   Okay.  Well, if it comes to you, please let
8   me know.
9            What percentage of your total costs on the
10  provider's side are attributable to
11  physician-administered drugs?
12           MR. NICHOLSON:  I ask for a clarification.
13  Are you including provider fees and administration costs
14  in that question?
15           MR. CAVANAUGH:  That's a fair objection.
16           THE WITNESS:  I don't know, because the
17  actuarial reports that I've looked at do not break that
18  out.  The actuarial reports that I've looked at do not
19  break that out.
20  BY MR. CAVANAUGH:
21      Q.   You gave me five categories; medical,
22  surgical, lab, DME, injectable drugs.  Do you get

---

Timothy J. Miller                Highly Confidential                January 5, 2005
                                 Richmond, VA

18 (Pages 66 to 69)

66

1 reports that give you a breakdown of your costs based on
2 those five segments?
3      A.    I don't get specific reports that break
4 that down. I get reports on every procedure code in the
5 universe, but I have never broken it out into
6 categories.
7      Q.    Have you ever sought to determine what
8 percentage of your costs are attributable to
9 reimbursement or drugs, putting aside the administration
10 fee?
11      A.    Physician-reimbursed?
12      Q.    Yes.
13      A.    Recently I can't -- I don't want to say,
14 no, I've never done that, but I can't think of any
15 reports that I have currently in my possession where I
16 would have done that breakdown.
17      Q.    Do you have a sense of what percentage of
18 your costs are attributable to injectable drugs?
19          MR. NICHOLSON: Object. You're asking for
20 speculation.
21          Answer it if you can.
22          THE WITNESS: I do not.

67

1 BY MR. CAVANAUGH:
2      Q.    Do you have a sense of what is your
3 largest -- within the five -- based on the five segments
4 that you gave me, which of the five is the largest as
5 among medical, surgical, lab, DME, and injectable drugs?
6      A.    Medical/surgical together or
7 medical/surgical, each individual --
8      Q.    Do you tend to break them out?
9      A.    I think of medical/surgical as a single
10 category.
11      Q.    Okay. So, then --
12      A.    That would be the largest category.
13      Q.    Do you have any sense of what percentage
14 that is of your total costs?
15      A.    No, I do not.
16          MR. NICHOLSON: And, then, we're talking
17 about total costs of the universe of the total of
18 physician reimbursement?
19          MR. CAVANAUGH: Yes.
20 BY MR. CAVANAUGH:
21      Q.    When you look at your physician
22 reimbursement costs do you ever break it down by 40

68

1 percent, 50 percent, 60 percent are my medical/surgical
2 costs, 5 percent are my lab, 8 percent are my DME? Do
3 you ever get those types of reports or do that type of
4 analysis?
5      A.    My unit does not get any sort of regular
6 reporting like that.
7      Q.    Whether it's regular or not, have you seen
8 such information generated over the years?
9      A.    I probably have, through our actuarial Web
10 site.
11      Q.    And based on that information do you have
12 any sense of what the percentage is of the breakdown?
13      A.    I do not, and I do not wish to speculate.
14      Q.    Okay. Has Anthem ever considered
15 establishing a system by which Anthem would acquire
16 physician-administered drugs and then provide them to
17 physicians for administration to a patient?
18      A.    Repeat the question, please.
19      Q.    Has Anthem, to your knowledge, ever
20 considered establishing a system by which Anthem or some
21 entity would acquire physician-administered drugs and
22 then provide them to your provider physicians for

69

1 administration to patients?
2      A.    Consideration in a formal sense or
3 consideration as a discussion outside of an office?
4      Q.    Just any type of consideration.
5      A.    Yes.
6      Q.    Okay. Is that something you've talked
7 about within your group?
8      A.    No. I've had one discussion with an
9 individual on that subject.
10      Q.    Who was that individual?
11      A.    Jason Ferguson.
12      Q.    And who is Mr. Ferguson?
13      A.    Jason works in our -- formerly worked in
14 our pharmacy management area.
15      Q.    And what would -- can you tell me the
16 nature of the discussion you had with him?
17      A.    Just -- I don't recall the full
18 conversation. It was just -- I think possibly we had
19 read an article on the subject and discussion ensued.
20      Q.    Are you aware of carriers that have
21 implemented systems where they acquire
22 physician-administered drugs and then provide them to

Timothy J. Miller          Highly Confidential          January 5, 2005
                           Richmond, VA

70

1  physicians within their networks to administer to
2  patients?
3      A.   I am personally not aware of any.
4      Q.   Have you ever heard of anyone ever
5  mentioning such systems evolving to you?
6          MR. NICHOLSON:  Beyond the discussion he's
7  already --
8          MR. CAVANAUGH:  Yeah, beyond the discussion
9  with Mr. Ferguson.
10         THE WITNESS:  I've never heard of another
11 plan using that methodology.
12         MR. CAVANAUGH:  John, why don't we take a
13 break and I'll look over my notes.
14         (There was a discussion off the record.)
15         MR. CAVANAUGH:  Let's take a five-minute
16 break now and just see where I am.
17         (There was a discussion off the record.)
18         (A recess was taken.)
19         MR. CAVANAUGH:  Let's go back on the
20 record.
21         Mr. Nicholson, as we discussed off the
22 record earlier this morning, Anthem has produced a

71

1  number of documents pursuant to our request.  Can we
2  have a stipulation from Anthem that these are documents
3  that were maintained in the ordinary course of business
4  by Anthem and constitute business records of Anthem?
5          MR. NICHOLSON:  That's correct, except to
6  the extent there are redactions for non-responsive
7  sections or privilege, those are the documents
8  maintained in the normal course of business.
9          MR. CAVANAUGH:  Thank you.  Can we mark
10 this as --
11         Ed, it's Bill.  Do you know how we've been
12 marking documents at third-party depositions?
13         MR. NOTARGIACOMO:  It's usually with the
14 name of the organization, but I think we've got a number
15 of Anthem depositions so I don't think that -- maybe
16 Anthem VA 001.
17         MR. CAVANAUGH:  That's fine.  We're marking
18 a letter dated January 14th, 2000, Bates number A-VA
19 04010014.
20         (The document was marked as Exhibit Miller 001.)
21 BY MR. CAVANAUGH:
22     Q.   Mr. Miller, I've handed you a letter from

72

1  Brent Rawlings to Tom Gallo, administrator of Hematology
2  Oncology Associates, dated January 14th, 2000.
3          The letter appears to be a response to a
4  letter from someone at Hematology Oncology Associates
5  regarding chemotherapy administration and injectable
6  infusion pharmaceutical fees and concern about those
7  fees being insufficient.
8          MR. NICHOLSON:  I'm sorry.  Did you say a
9  letter from Hematology Oncology or to?
10         MR. CAVANAUGH:  This is a letter to in
11 response to a letter dated November 29, 1999.
12         MR. NICHOLSON:  Okay.  Fine.
13 BY MR. CAVANAUGH:
14     Q.   The third paragraph goes on to -- states as
15 follows, "Trigon is in the process of considering
16 implementation of a number of options that could have a
17 positive effect on the overall reimbursement that you
18 receive for the delivery of office based chemotherapy
19 services."
20         What were those options that were being
21 considered in January of 2000 by Trigon?
22     A.   I have no idea.  The -- this seems to

73

1  suggest that -- well, one of the things, if I go back to
2  RBRVS, many procedures have what is called a site of
3  service differential, meaning that the service can be
4  done both in the physician's office as well as the
5  facility setting, but if it's done in the physician's
6  office there's obviously a higher cost associated with
7  that, because the physician has specific practice
8  expenses that he would not otherwise incur if he went to
9  the facility setting.
10     Q.   When you say "facility setting" are you
11 referring to a hospital?
12     A.   Hospital, that's correct.
13     Q.   Okay.
14     A.   And, so, since 1992 every year you see more
15 and more codes where the RVUs are now different; there's
16 a higher relative value unit associated with the service
17 being rendered in an office-based setting, as opposed to
18 a facility-based setting.
19         I can't really comment on the options
20 because I don't know which specific codes are referenced
21 here, whether they -- maybe there was a misunderstanding
22 on the part of Mr. Rawlings, who I don't even recall.

Timothy J. Miller                Highly Confidential                January 5, 2005
                                 Richmond, VA

20 (Pages 74 to 77)

74

1    I'm trying to think back.  I don't recall him, ever
2    working with him.  But I don't know whether the codes in
3    question, the chemotherapy administration codes --
4    whether they already had site of service differentials
5    at this point in time, whether they were -- maybe this
6    was a situation where, if this was January 14th, the fee
7    schedule that we were under was based on prior year's
8    RVUs and we knew when we updated the fee schedule at our
9    next scheduled amendment update that there would be site
10   of service differentials, and maybe this is a -- maybe
11   we were considering giving them the site of service
12   differentials early.  I don't know.
13       Q.    Okay.  Do you know how this was resolved?
14       A.    No.
15       Q.    Whether they were given site of service --
16   a site of service differential?
17       A.    I do not know.  There are no specific codes
18   referenced here.  I would have to go back in history and
19   look to see the RVU values at the time this letter was
20   written versus the RVU values at the next -- at our next
21   fee schedule update.
22       Q.    Have you done -- in your capacity as

75

1    director of reimbursement strategies have you sought to
2    do any analysis of the cost to Trigon of the
3    administration of drugs within a physician office as
4    compared to in a hospital setting?
5        A.    I've never done that analysis simply
6    because the utilization numbers that I get indicate that
7    most of it is done in the office setting.
8        Q.    When you say "utilization numbers" what
9    kind of utilization information are you talking about
10   that you get?
11       A.    Number of occurrences for given time frames
12   of a particular procedure code.
13       Q.    Now, what information would you get on a
14   regular basis with respect to hospital administration --
15   or administration within a hospital setting of a drug?
16       A.    Billed by whom, the hospital or the
17   physician?
18       Q.    Well, that was my point.
19             Do you get information as to billings by
20   hospitals for administration of drugs that can also be
21   administered in a physician's office?
22       A.    I do not get any information regarding

76

1    hospital-billed injectable drugs.  The only information
2    that I get is -- I referenced this earlier -- a listing
3    of every CPT or HCPCS code and the number of occurrences
4    and dollars allowed on a quarterly basis.
5        Q.    And when you get those hits would those
6    include hospital billings?
7        A.    No, these are physician billings only.
8        Q.    I see.  If a physician administers a drug
9    in a hospital setting would I be correct that you would
10   receive a claim from the physician for the drug -- for a
11   drug administration reimbursement but the cost of the
12   drug would be handled under a hospital policy?
13       A.    If the hospital supplied the drug.
14       Q.    Are there instances in which physicians
15   administer the drug in the hospital but bill both for
16   the administration of the drug and for the drug itself?
17       A.    The physician may only bill for the drug
18   itself if they supply the drug.
19       Q.    Regardless of where they administer it?
20       A.    That's correct.
21       Q.    Is that something that occurs with any
22   frequency; that the administration occurs in the actual

77

1    hospital but it's the physician charging for acquisition
2    of the drug?
3        A.    I think I just answered that in a previous
4    question.
5              Most administration is done in the
6    physician's office.  It does occasionally occur in the
7    facility setting.
8        Q.    And how would you know where it's
9    occurring?
10       A.    Based on the place of treatment that's
11   billed on the claim.
12       Q.    I see.  Are you familiar with the drug
13   Remicade?
14       A.    I'm familiar with the name of that drug.  I
15   don't know all of the chemical properties of the drug.
16       Q.    To your knowledge, has anyone in Anthem
17   ever done an analysis of the relative cost of
18   administration of the drug Remicade within a hospital
19   setting or within an office setting?
20       A.    I personally have not.
21       Q.    Do you know of anyone at Anthem who has
22   done such an analysis?

Timothy J. Miller                Highly Confidential                January 5, 2005
                                   Richmond, VA

21 (Pages 78 to 81)

78

1    A.    I do not know of anybody.
2    Q.    Does Anthem have a preference with regard
3  to drugs that can be administered by physicians as to
4  whether those are administered within an office setting
5  or within a hospital setting?
6         MR. NICHOLSON: Object to form.
7         THE WITNESS:  From the -- from a standpoint
8  of physician reimbursement only -- I'm sorry.  Repeat
9  the question.
10  BY MR. CAVANAUGH:
11    Q.    Sure.  And I think I see how I might be
12  confusing you with my question.
13         What I'm trying to get at is has Anthem
14  done, to your knowledge, any analysis of, here's what
15  it's going to cost us to have these drugs administered
16  in doctors' offices, and if hospitals are doing it
17  here's what it's going to cost us?
18    A.    I've never done those types of analyses.
19  My general comment would be, depending on the terms, the
20  reimbursement terms at a particular hospital -- and
21  those differ from hospital to hospital -- it could be
22  more expensive; it could be less expensive.

79

1    Q.    Okay.  You would need to look at a
2  particular -- at the particular contract you have with a
3  particular hospital?
4    A.    You would have to look at the particular
5  contract with the hospital, what the -- what we pay for
6  the administration, and what are the terms for payment
7  of the drug, versus what we would pay for the
8  administration and what we would pay for the drug to the
9  physician.
10    Q.    Have you ever seen any sort of -- that type
11  of analysis done internally here at Anthem?
12    A.    I personally have not seen any analysis on
13  that subject.
14         (There was a pause in the proceedings.)
15  BY MR. CAVANAUGH:
16    Q.    How does Anthem go about determining that
17  its fee schedules are competitive with those being
18  offered by other managed care plans?
19         MR. NICHOLSON: And you mean other managed
20  care plans within the state, our competitors?
21         MR. CAVANAUGH:  Yeah, with whom Anthem
22  competes.

80

1         THE WITNESS:  The competitive information
2  that I get is generally brought to me by the provider
3  network management regional directors.  To the extent
4  that they can get that information, my -- I request the
5  regional directors to attempt to get that information at
6  every opportunity.
7         That would be my only source for
8  competitive information, is to get it from one of our
9  participating physicians.
10  BY MR. CAVANAUGH:
11    Q.    Have you succeeded in doing that in the
12  past?
13    A.    We have some competitive information, but
14  it's very limited in terms of certain ranges of codes.
15  We do not have any of your competitors' entire fee
16  schedules.
17    Q.    But from time to time one of your field
18  salespeople will be able to get from a physician some
19  portion of a competitor's fee code?
20    A.    That's correct.
21    Q.    Have you ever sought to compare your fee
22  schedules for injectable drugs with fee schedules for

81

1  any of your competitors?
2         MR. NICHOLSON: I'm sorry.  Acquisition
3  costs or professional fees?
4         MR. CAVANAUGH:  Either.
5         THE WITNESS:  For injectable drugs?
6  BY MR. CAVANAUGH:
7    Q.    Yeah.
8    A.    To the extent that I have received that
9  information, I have compared it.
10    Q.    Okay.
11    A.    Generally speaking, I don't get a lot of
12  information on injectable drugs.  Typically what I
13  receive is the codes that tend to be billed with the
14  highest frequency.
15         (There was a pause in the proceedings.)
16  BY MR. CAVANAUGH:
17    Q.    Since becoming head of reimbursement
18  strategies have you ever investigated how -- to the
19  extent you utilize Medicare fee schedules, how Medicare
20  arrived at those fee schedules?
21    A.    Well, Medicare I don't need to investigate.
22  Medicare has published how they arrived at their fee

Timothy J. Miller          Highly Confidential          January 5, 2005
                              Richmond, VA

22 (Pages 82 to 85)

---

82

1   schedules.
2          (There was a pause in the proceedings.)
3          MR. CAVANAUGH: Okay. I don't think I have
4   any further questions.
5          Ed, I don't think I have any further
6   questions at this point.
7          MR. NOTARGIACOMO: I just have a few
8   follow-up questions.
9          EXAMINATION
10  BY MR. NOTARGIACOMO:
11     Q.   Mr. Miller, good afternoon. My name is Ed
12  Notargiacomo. I represent the plaintiffs in this
13  litigation. I have a bit of a cold, so if I phase out
14  at any point let me know if you don't hear me.
15         MR. NICHOLSON: Ed, this is John. You may
16  want to speak up. Tim is gradually craning down to the
17  phone closer and closer.
18         MR. NOTARGIACOMO: Thanks. I'll try to do
19  that.
20         MR. NICHOLSON: Thanks.
21  BY MR. NOTARGIACOMO:
22     Q.   We talked at the beginning of your

---

83

1   deposition this morning about the two fee schedules. I
2   think you said there was a main fee schedule and then a
3   separate fee schedule that applied to three or four
4   counties in Northern Virginia close to Washington, D.C.
5          Do you recall that?
6      A.   Yes.
7      Q.   Now, those fee schedules in no way capture
8   what Anthem Virginia pays for physician -- reimburses
9   for physician-administered drugs. Is that correct?
10         MR. NICHOLSON: I'm sorry. I don't
11  understand your question. I'll object to form.
12  BY MR. NOTARGIACOMO:
13     Q.   The fee schedules that we were talking
14  about earlier -- let me see if I can come up with the
15  exact reference.
16         (There was a pause in the proceedings.)
17  BY MR. NOTARGIACOMO:
18     Q.   Well, I believe you were asked originally
19  about the methodology for determining reimbursements to
20  physicians, and we went on at some length about the
21  RB --
22     A.   RBRVS.

---

84

1      Q.   -- RBRVS, and the analysis that you went
2   through using the RBRVS resulted in a fee schedule
3   that's used for reimbursement to physicians. Is that
4   accurate?
5      A.   Yes. We use the RBRVS methodology for most
6   medical/surgical procedure codes.
7      Q.   And are -- and the resulting fee
8   schedule -- there are actually two fee schedules, one
9   main fee schedule used for most of Virginia and a
10  separate fee schedule used for some smaller subset of
11  counties. Is that correct?
12     A.   That is correct. There are two geographic
13  territories in Virginia, with the Northern Virginia fee
14  schedule being higher to reflect higher practice costs
15  in the Northern Virginia region.
16     Q.   But those fee schedules that we're
17  referring to in no way apply to the -- they do not
18  capture the amount that's being reimbursed for
19  physician-administered drugs?
20         MR. CAVANAUGH: Objection.
21         THE WITNESS: The drug itself or the
22  administration?

---

85

1   BY MR. NOTARGIACOMO:
2      Q.   The drug itself.
3      A.   The drug itself -- the fees for drugs are
4   the same across all of Virginia, regardless of the
5   geographic area.
6      Q.   Okay. And is that true regardless of the
7   type of insurance that the member has, whether they have
8   traditional insurance or whether they're covered by a
9   PPO or --
10     A.   That is correct. We have a single fee for
11  drugs across all geographic regions, across all lines of
12  business.
13     Q.   Until the most recent change, the formula
14  for reimbursement to the physicians for the cost of the
15  drug, not administration, was 95 percent of what
16  Medicare published, if allowable?
17     A.   That's correct.
18     Q.   Where does Anthem get the information for
19  Medicare's allowable amount?
20     A.   We pull that -- we download that from the
21  CMS Web site.
22     Q.   I see. That's obtained in an electronic

---

Timothy J. Miller          Highly Confidential          January 5, 2005
                              Richmond, VA

23 (Pages 86 to 89)

**86**

1  format from CMS?
2      A.   Yes, and/or from the local Medicare
3  intermediary here in Virginia.
4      Q.   At the very end of the previous line of
5  questions you were asked whether you had done any
6  investigation as to how Medicare arrives at its fee
7  schedule. You said you didn't have to do an
8  investigation; they publish how they arrive at their fee
9  schedule. And the next logical question would be what
10 is your understanding of what Medicare does...
11     A.   Ed, you're breaking up, and I didn't hear
12 the full question.
13     Q.   Okay. I apologize.
14          MR. NICHOLSON: We heard the preamble. You
15 can go straight to the question.
16 BY MR. NOTARGIACOMO:
17     Q.   The question is what is your understanding
18 of how Medicare arrives at the fee schedules that they
19 publish on their Web site?
20     A.   Medicare uses -- well, what is the time
21 frame?
22     Q.   Let's say up until January -- well, up

**87**

1  through December 31st, 2004.
2          MR. NICHOLSON: Going back how long?
3  BY MR. NOTARGIACOMO:
4      Q.   As long as you've been in your current
5  position.
6      A.   Well, from the time I took over as director
7  of reimbursement strategies until January 1st of 2004
8  Medicare's methodology was 95 percent of AWP. And I
9  want to qualify that.
10          Of their AWP, and their AWP is defined as
11 follows: The lesser of, number one, the median of all
12 generic versions or, number two, the lowest brand AWP.
13 So, it's the lesser of those two items, either the
14 median generic or lowest brand. The lower of those two
15 becomes Medicare's AWP, and then Medicare takes 95
16 percent of that, and that becomes their published fee.
17          Now, beginning January 1st, 2004, it was
18 their same definition of AWP, but for many drugs the
19 methodology changed to 85 percent of their AWP, and that
20 was for the calendar year 2004.
21     Q.   And the formula that you just described to
22 me, the two choices that define Medicare's AWP up until

**88**

1  January 1, 2004, does that apply to generic drugs and
2  brand name drugs or just to one?
3      A.   Well, remember that drugs are billed using
4  standard code sets, and, for example, a particular drug
5  may be coded as J 2000, and there may be six generic
6  versions of the drug and three brand versions of the
7  drug, but they all are billed using J 2000, so -- did
8  that answer your question?
9      Q.   I do understand, yes. Let me just --
10     A.   So, Medicare's pricing is not each specific
11 version of a drug specific, it is specific to, really,
12 the chemical name of the drug and the dosage.
13     Q.   What about in a situation where there is no
14 generic competition and there is just a name brand drug?
15     A.   Well, then -- well, again, I can't
16 speculate how they would handle that, but all I know is
17 the formula that I just gave you. So if there's a
18 single -- if there's a single drug, a sole-source drug,
19 if they used the formula, then it sounds like the AWP
20 for that particular drug would be Medicare's AWP.
21     Q.   And as far as the AWP, do you understand
22 how Medicare arrives at the AWP to plug into the formula

**89**

1  that you just described to me?
2          MR. NICHOLSON: Object. I think he's
3  already answered that.
4          MR. CAVANAUGH: Objection.
5  BY MR. NOTARGIACOMO:
6      Q.   I'm asking a different question.
7      A.   Well, I explained the formula.
8      Q.   And, to recap, you said it's the lesser of,
9  number one, the median of all generic AWPs, or, number
10 two, the lower brand AWP.
11          My question is the AWPs that get plugged
12 into that formula to come up with Medicare's AWP, do you
13 know where they derive that information?
14     A.   I don't know where they obtain that
15 information. I don't know if there's some industry
16 standard source or whether they go directly to the
17 manufacturers.
18     Q.   One of the -- when you were being asked
19 about your responsibilities as someone who sets
20 reimbursement rates for physicians you said that one of
21 your goals is to balance between, you know, lowering the
22 cost to Anthem and maintaining satisfactory physician

Timothy J. Miller               Highly Confidential               January 5, 2005
                                 Richmond, VA

24 (Pages 90 to 93)

| | 90 |
|---|---|

1  participation. Is that accurate?
2      A.   That is correct. We want to -- we want to
3  lower our costs but also pay fair and reasonable amounts
4  that will enable us to keep our participation rate at a
5  maximum.
6      Q.   And, so, striking that balance between
7  lowering your costs and keeping physician participation
8  at a maximum, putting aside you had acquisition costs
9  for physician-administered drugs, would the information
10  about what physicians' actual acquisition costs are for
11  physician-administered drugs be a helpful piece of
12  information to know when you're setting those
13  reimbursements rates?
14      MR. CAVANAUGH: Objection.
15      MR. NICHOLSON: Objection.
16      You can answer, if you can.
17      THE WITNESS: As a general proposition, in
18  reimbursement strategy we want to pay for physician
19  time, effort, and judgment, their face-to-face time with
20  patients. For commodities we want to pay as close to
21  acquisition costs as possible. To the extent --
22  BY MR. NOTARGIACOMO:

| | 91 |
|---|---|

1      Q.   So -- I'm sorry. Go ahead.
2      A.   To the extent I knew what the acquisition
3  cost was, that would be helpful in terms of setting our
4  fees for those particular types of services.
5      MR. NOTARGIACOMO: That's all the questions
6  I have.
7      MR. CAVANAUGH: Let me just follow up.
8          FURTHER EXAMINATION
9  BY MR. CAVANAUGH:
10      Q.   Would it be correct, Mr. Miller, that,
11  notwithstanding what you just said, in the five to six
12  years that you've been head of reimbursement strategies
13  Anthem has not sought to establish a system where
14  physicians had to provide actual acquisition costs to
15  Anthem?
16      A.   That is correct.
17      Q.   To implement such a system would impose
18  significant added costs on Anthem, would it not?
19      MR. NICHOLSON: Object.
20  BY MR. CAVANAUGH:
21      Q.   Well, let me ask it this way:
22      It could impose added administrative costs

| | 92 |
|---|---|

1  on you, could it not?
2      MR. NICHOLSON: Object to speculation, but
3  answer it if you can.
4      THE WITNESS: Yes, it would add
5  administrative costs.
6  BY MR. CAVANAUGH:
7      Q.   Physicians might also object to such a
8  system?
9      MR. NICHOLSON: Same objection.
10      THE WITNESS: Physicians might object to
11  such a system.
12  BY MR. CAVANAUGH:
13      Q.   Counsel for plaintiffs raised a question
14  with respect to generics, and I never asked you
15  specifically about generics when we were talking about
16  physician-administered drugs.
17      How does Anthem handle reimbursement for
18  physician-administered drugs with respect to generics?
19      MR. NICHOLSON: I think it's been asked and
20  answered, but go ahead, if you can.
21      THE WITNESS: Again, the billing
22  methodology is to use a standard code. The standard

| | 93 |
|---|---|

1  code does not distinguish between generic versus brand;
2  thus, it is up to the physician to decide whether he
3  wants to use a generic or brand, but the fee will be the
4  same.
5  BY MR. CAVANAUGH:
6      Q.   And then for -- if a generic is utilized it
7  would be subject to the Medicare formula that you gave
8  us earlier?
9      A.   That is correct.
10      MR. CAVANAUGH: Okay. I don't have
11  anything further. Thank you.
12      MR. NOTARGIACOMO: Thank you.
13      MR. NICHOLSON: Okay. He will read and
14  sign.
15      (The witness did not waive signature.)
16      (The deposition concluded at 12:54 p.m.)
17
18
19
20
21
22

Timothy J. Miller          Highly Confidential          January 5, 2005
                            Richmond, VA

25 (Page 94)

94

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:
         I, Heidi L. Jeffreys, RDR, CRR, a Notary
2    Public for the Commonwealth of Virginia at Large, of
3    qualification in the Circuit Court of the City of
4    Norfolk, Virginia, and whose commission expires June 30,
     2008, do hereby certify that the within deponent,
5    T. J. MILLER, appeared before me at Richmond, Virginia,
6    as hereinbefore set forth, and, after being first duly
     sworn by me, was thereupon examined upon his oath by
7    counsel; that his examination was recorded in Stenotype
8    by me and reduced to typescript under my direction, and
9    that the foregoing transcript constitutes a true,
10   accurate, and complete transcript.
11        I further certify that I am not related to
12   nor otherwise associated with any party or counsel to
13   this proceeding, nor otherwise interested in the event
14   thereof.
15        Given under my hand and notarial seal at
16   Norfolk, Virginia, this _____ day of _____,
17   2005.
18
19        _____
20        Heidi L. Jeffreys, RDR, CRR
21        Certification No. 0413283
22        Notary Public

Henderson Legal Services
(202) 220-4158

Timothy J. Miller                Highly Confidential                January 5, 2005
Richmond, VA

1

| **A** | | | | |
|---|---|---|---|---|
| **abbreviation** 27:11 | 68:21 69:21 | 22:10 44:18 | 41:10,13 | 17:18 24:1 |
| **ability** 60:6 | **acquisition** | 53:14 | 51:2,3 53:4 | 63:4 |
| **able** 59:20 | 56:21 57:2 | **administer** | 55:11 56:13 | **already** 70:7 |
| 60:11 80:18 | 57:13 58:12 | 22:6 70:1 | 59:11,14 | 74:4 89:3 |
| **about** 5:8,8,15 | 58:19,22 | 76:15,19 | 88:15 92:21 | **also** 9:7,8 |
| 14:18,20 | 59:4 63:11 | **administered** | **against** 7:7 | 10:10,14,15 |
| 15:14 22:14 | 63:20 77:1 | 30:10 75:21 | 28:10 | 14:7 16:14 |
| 30:2 32:5 | 81:2 90:8,10 | 78:3,4,15 | **aggregate** | 25:14 28:6 |
| 34:11,12 | 90:21 91:2 | **administering** | 48:21,22 | 30:7,9 32:2 |
| 37:19 39:3,7 | 91:14 | 48:16 | 49:17 50:21 | 43:12 46:2 |
| 39:10 42:16 | **across** 15:15 | **administers** | **ago** 27:20 28:3 | 48:4,12,21 |
| 46:15 49:5,9 | 15:18 85:4 | 76:8 | 43:16 51:18 | 53:10 61:7 |
| 49:18 52:16 | 85:11,11 | **administrati...** | 53:1 | 75:20 90:3 |
| 58:22 63:22 | **action** 1:3 | 48:5,15,19 | **agree** 30:4 | 92:7 |
| 67:17 69:7 | 56:13 | 49:4,17 51:8 | 48:12 49:1 | **alternative** |
| 72:6 75:9 | **actual** 5:22 | 52:9,10,12,15 | **agreement** | 9:12,14 |
| 79:16 83:1 | 19:6 38:6 | 53:11,15,21 | 35:16,16 | **although** 47:19 |
| 83:14,19,20 | 56:21 57:10 | 54:1,2 62:22 | **agreements** | **always** 27:11 |
| 88:13 89:19 | 58:12,18 | 63:3 65:13 | 11:5 | 36:22 40:16 |
| 90:10 92:15 | 76:22 90:10 | 66:9 68:17 | **ahead** 51:13 | 40:16 |
| 92:15 | 91:14 | 69:1 72:5 | 91:1 92:20 | **am** 21:18 |
| **above** 32:19 | **actually** 9:2 | 74:3 75:3,14 | **all** 7:5 11:14 | 27:10 29:19 |
| **Absolutely** | 11:3,6 12:18 | 75:15,20 | 15:20 18:18 | 58:7 61:10 |
| 14:9 16:22 | 15:4 38:1 | 76:11,16,22 | 27:17,18,21 | 70:3,16 |
| 35:17 | 40:17 44:7 | 77:5,18 79:6 | 33:21 45:1 | 94:11 |
| **abuse** 5:9 | 49:18 50:8 | 79:8 84:22 | 49:8 51:9 | **amendment** |
| **abuses** 5:10 | 51:10 58:5 | 85:15 | 52:14 54:19 | 50:2 74:9 |
| **accept** 40:2 | 84:8 | **administrative** | 55:9,10,19 | **Americas** 2:13 |
| 42:11 | **actuarial** 65:17 | 62:15 91:22 | 77:15 85:4 | **among** 17:16 |
| **acceptable** | 65:18 68:9 | 92:5 | 85:11,11 | 67:5 |
| 16:21 | **add** 43:12 | **administrator** | 87:11 88:7 | **amount** 38:15 |
| **access** 17:7,10 | 55:14 92:4 | 72:1 | 88:16 89:9 | 84:18 85:19 |
| 17:16 42:7 | **added** 54:22 | **adopted** 25:13 | 91:5 | **amounts** 14:16 |
| 59:17 | 91:18,22 | **advisability** | **alleges** 57:12 | 90:3 |
| **account** 16:9 | **additional** | 46:15,22 | **allow** 54:18 | **analyses** 78:18 |
| 16:14 51:4 | 10:10 | 55:21 56:9 | **allowable** | **analysis** 24:6 |
| **accounting** | **address** 21:10 | **advised** 6:11 | 85:16,19 | 68:4 75:2,5 |
| 11:12 | 22:4 | **afford** 17:5 | **allowance** 56:3 | 77:17,22 |
| **accurate** 84:4 | **adjusted** 21:15 | **after** 8:11 94:6 | **allowances** | 78:14 79:11 |
| 90:1 94:10 | **adjusting** | **afternoon** | 15:21 | 79:12 84:1 |
| **acquire** 59:1 | 53:11 | 82:11 | **allowed** 38:21 | **analyze** 41:22 |
| 63:6 68:15 | **adjustment** | **again** 23:8,15 | 76:4 | **analyzing** |
| | 22:8,9 | 24:17 33:12 | **almost** 50:12 | 48:16 |
| | **adjustments** | 34:16 40:18 | **along** 14:12 | **and/or** 19:12 |

Timothy J. Miller

Highly Confidential
Richmond, VA

January 5, 2005

2

| | | | | |
|---|---|---|---|---|
| 35:19 42:5 | 68:20 70:22 | 2:1 | 89:6 | **A-VA** 3:12 |
| 86:2 | 71:2,4,4,15 | **appeared** 94:5 | **assess** 28:22 | 71:18 |
| **anesthesiolo...** | 71:16 77:16 | **appears** 72:3 | 55:21 56:8 | **a.m** 1:19 4:5 |
| 20:18 | 77:21 78:2 | **applied** 37:1,3 | 56:12 | |
| **annually** 45:15 | 78:13 79:11 | 83:3 | **assign** 27:18 | **B** |
| **another** 13:21 | 79:16,21 | **applies** 25:14 | **assigns** 10:20 | **B** 2:18 |
| 17:16 24:13 | 83:8 85:18 | **apply** 84:17 | **associated** 73:6 | **back** 23:15 |
| 24:15,17 | 89:22 91:13 | 88:1 | 73:16 94:12 | 27:7 36:17 |
| 28:6 32:2 | 91:15,18 | **applying** 16:2 | **Associates** | 45:12 46:11 |
| 60:5,12,13 | 92:17 | **approach** 45:4 | 72:2,4 | 70:19 73:1 |
| 70:10 | **Anthem's** | **approved** 60:8 | **assumed** 30:14 | 74:1,18 87:2 |
| **answer** 21:2 | 29:13 36:9 | **area** 15:7,8,12 | **Assuming** 60:8 | **balance** 16:18 |
| 29:1 48:9 | 42:2 48:2,13 | 18:3 30:19 | **assumptions** | 16:19 89:21 |
| 56:4,15 58:1 | 56:10 | 42:6 69:14 | 51:1 58:9,12 | 90:6 |
| 60:2 64:19 | **any** 7:14 8:1 | 85:5 | 58:18,21 | **bargaining** |
| 66:21 88:8 | 12:15 21:14 | **areas** 12:9,11 | **attempt** 28:8 | 59:9 |
| 90:16 92:3 | 21:21 31:18 | 39:17 41:15 | 57:1 80:5 | **base** 9:15 15:6 |
| **answered** 77:3 | 35:10 38:9 | **around** 6:1 | **attempts** 28:21 | 20:8,9 |
| 89:3 92:20 | 38:10,11 | 15:7 16:10 | **attributable** | **based** 17:21 |
| **Anthem** 1:20 | 49:22 54:5 | 36:8 | 65:10 66:8 | 22:10,19 |
| 2:17 4:6,17 | 54:22 56:19 | **arrive** 23:5,6 | 66:18 | 29:15 41:14 |
| 4:18,22 6:11 | 57:20 58:9 | 24:6 27:22 | **audit** 5:4 | 46:2 47:14 |
| 8:4 10:5,21 | 61:15 66:14 | 40:15 51:7 | **auditor** 5:4 | 52:10 53:1 |
| 11:8 12:5 | 67:13 68:5 | 86:8 | **August** 26:3 | 55:1 58:4 |
| 13:10,13,14 | 68:12 69:4 | **arrived** 57:20 | **automatically** | 62:5,7 63:10 |
| 14:10 17:5 | 70:3 75:2,22 | 81:20,22 | 43:17 | 66:1 67:3 |
| 17:15,16,19 | 76:21 78:14 | **arrives** 86:6,18 | **Avenue** 2:13 | 68:11 72:18 |
| 19:14 20:12 | 79:10,12 | 88:22 | **average** 1:8 | 74:7 77:10 |
| 21:1,4 24:10 | 80:15 81:1 | **arriving** 22:15 | 7:5,6,8 15:16 | **basic** 22:1,16 |
| 24:13,15 | 82:4,5,14 | **article** 69:19 | 23:2 | 24:6,7 34:20 |
| 25:12,18 | 86:5 94:12 | **ascertain** | **aware** 14:6 | 34:5,4 41:1 |
| 26:1 27:1,2,6 | **anybody** 78:1 | 18:15 | 61:3,6,7,10 | **basis** 9:18 16:1 |
| 27:22 28:3 | **anyone** 70:4 | **aside** 66:9 90:8 | 69:20 70:3 | 19:15 21:7 |
| 28:13,15,21 | 77:16,21 | **ask** 31:16 34:3 | **away** 18:3 | 46:7 75:14 |
| 33:6,13 42:9 | **anything** 12:14 | 61:2 65:12 | **AWP** 38:5 | 76:4 |
| 43:2,2 44:17 | 13:18 58:7 | 91:21 | 87:8,10,10,12 | **Bates** 3:12 |
| 45:4,16 46:1 | 61:21 62:6,8 | **asked** 25:21 | 87:15,18,19 | 71:18 |
| 46:19,22 | 93:11 | 33:20 83:18 | 87:22 88:19 | **be** 4:20 5:11 |
| 49:22 50:11 | **anyway** 28:22 | 86:5 89:18 | 88:20,21,22 | 6:8 7:17,18 |
| 55:13 57:22 | **anywhere** | 92:14,19 | 89:10,12 | 9:16,19,22 |
| 61:1,15,22 | 41:12 | **asking** 17:19 | **AWPs** 89:9,11 | 11:6,9 12:1 |
| 62:9,17 63:8 | **apologize** | 28:12 32:14 | **Axelrod** 12:1 | 12:16 13:5 |
| 64:15,21 | 86:13 | 40:3 41:21 | **Axelrod's** 12:2 | 15:15 16:12 |
| 68:14,15,19 | **Appearances** | 60:15 66:19 | 12:2 | 16:18 17:9 |

Timothy J. Miller          Highly Confidential          January 5, 2005
                           Richmond, VA

| | | | | |
|---|---|---|---|---|
| 18:6 19:14 | 50:1 51:11 | 32:18 44:5 | 87:14 88:2,6 | 74:2 76:11 |
| 19:20 20:17 | 52:2 57:5 | 59:8 83:18 | 88:14 89:10 | 76:15 77:1 |
| 21:9,15 22:3 | 58:22 59:11 | **believed** 47:19 | 93:1,3 | 80:13,17 |
| 22:8,13 24:2 | 60:18 63:2 | **believes** 17:20 | **break** 15:18 | 84:16 87:18 |
| 24:5,16,20 | 65:16 73:7 | **Belknap** 2:13 | 31:2 39:3 | 88:7,16 90:3 |
| 25:2 29:5,8 | 73:20 75:6 | **benefit** 17:4 | 65:17,19 | 92:2,20 93:3 |
| 29:20,21 | **become** 25:22 | 34:4,6,8 | 66:3 67:8,22 | |
| 30:7,10 | 30:16 | 38:17,21,21 | 70:13,16 | **C** |
| 31:17 34:13 | **becomes** 7:6 | 39:14 41:17 | **breakdown** | **calendar** 87:20 |
| 34:17 35:5 | 87:15,16 | **Berman** 2:5 | 9:3 66:1,16 | **call** 18:19 |
| 35:10,13,21 | **becoming** | **best** 8:10 25:11 | 68:12 | **called** 4:9 |
| 36:2,3,16 | 81:17 | 26:18 36:14 | **breaking** 86:11 | 20:13 30:8 |
| 37:7,22 38:7 | **been** 4:10 6:6 | 50:14 62:13 | **Brent** 72:1 | 73:2 |
| 38:13,15,20 | 8:3 17:12 | **better** 21:10 | **broken** 7:22 | **calls** 59:22 |
| 39:18 40:1 | 25:10 30:21 | 22:4 | 66:5 | **Cambridge** 2:8 |
| 41:2,11,17 | 32:16 33:6,9 | **between** 22:11 | **brought** 80:2 | **came** 47:21 |
| 42:9 47:15 | 35:10 36:18 | 24:14 25:18 | **built** 24:2 | 55:19 56:7 |
| 47:20 48:2 | 37:10,14,15 | 33:21 40:5 | **bumped** 40:17 | **can** 4:21 7:12 |
| 48:13 49:8 | 39:3 40:16 | 49:2 89:21 | **bump-up** | 8:10 9:13 |
| 49:11 50:21 | 43:8,15 44:4 | 90:6 93:1 | 40:20 | 12:19 16:15 |
| 51:5,12,14,18 | 45:5,7,12 | **beyond** 70:6,8 | **burdens** 62:15 | 17:2 22:1,5,7 |
| 54:15,17,19 | 46:14 47:3,7 | **bill** 32:3 39:2 | **business** 10:7,8 | 22:8 24:1 |
| 55:15 56:15 | 56:19 62:17 | 60:20 71:11 | 12:10 30:17 | 26:2 28:6 |
| 57:6,7 58:10 | 65:1 71:11 | 76:15,17 | 33:13 34:17 | 30:10 33:22 |
| 58:16 59:4 | 87:4 91:12 | **billed** 6:2 7:14 | 35:2 36:9 | 35:21 37:3 |
| 59:20 60:5 | 92:19 | 63:3,5 75:16 | 43:10 49:15 | 38:12 39:3,8 |
| 60:11 61:14 | **before** 1:17 4:3 | 77:11 81:13 | 50:1 59:20 | 39:9,13 41:8 |
| 63:10 67:12 | 33:5 45:10 | 88:3,7 | 61:4 71:3,4,8 | 41:11 43:5 |
| 72:3 73:3 | 64:19 65:4 | **billing** 92:21 | 85:12 | 60:2,3,10 |
| 74:9 75:20 | 94:5 | **billings** 75:19 | **but** 11:11 | 61:21 62:5,8 |
| 76:9,12 78:3 | **beginning** | 76:6,7 | 12:19 16:2 | 62:14 66:21 |
| 78:11,19,21 | 82:22 87:17 | **bit** 82:13 | 17:8 18:6 | 69:15 71:1,9 |
| 78:22 80:7 | **behalf** 1:16 2:3 | **Blue** 4:17,17 | 24:17 25:19 | 73:3 75:20 |
| 80:18 81:13 | 2:11,17 3:4 | 4:18,19,22,22 | 26:5,14 | 78:3 80:4 |
| 86:9 88:5,5 | 4:2 | 25:12,12 | 28:14 30:11 | 83:14 86:15 |
| 88:20 90:11 | **being** 9:17 | 26:9,9,17,17 | 36:7,14,19 | 90:16,16 |
| 91:3,10 93:3 | 21:16 45:9 | **board** 15:15,18 | 40:1,8 41:4 | 92:3,20 |
| 93:7 | 58:6 72:7,20 | **book** 38:5,9 | 41:22 43:17 | **cannot** 12:19 |
| **became** 26:14 | 73:17 79:17 | **both** 35:15 | 44:7 46:11 | 22:6 57:22 |
| **because** 13:22 | 84:14,18 | 48:14,18 | 48:21 52:1 | **can't** 58:21 |
| 18:7 22:4 | 89:18 94:6 | 60:10 62:20 | 54:9 55:13 | 65:6 66:13 |
| 24:1 28:6 | **belief** 17:12 | 73:4 76:15 | 56:4,13 60:2 | 66:14 73:19 |
| 33:20 36:3,6 | **believe** 12:4 | **brand** 60:17 | 65:6 66:5,14 | 88:15 |
| 36:7 49:1 | 29:15 30:12 | 60:21 87:12 | 71:14 73:5 | **capacity** 5:2,5 |

Timothy J. Miller                 Highly Confidential                 January 5, 2005
Richmond, VA

4

| | | | | |
|---|---|---|---|---|
| 5:11,14,17 | 28:16,19 | 13:19 | 30:12,12 | **company** |
| 6:16 22:14 | 32:15 36:13 | **charging** 77:1 | 31:22 46:10 | 24:15 26:7 |
| 58:17 74:22 | 37:9 39:4,6 | **chemical** 77:15 | 49:12,13,14 | 26:11,15,16 |
| **capitated** 9:17 | 40:2,7,14 | 88:12 | 53:18,21,22 | 61:19 64:9 |
| **capture** 83:7 | 42:1 43:6 | **chemotherapy** | 54:4,5,7,11 | **compare** 24:22 |
| 84:18 | 45:20 46:4 | 72:5,18 74:3 | 54:14,19 | 47:19 50:18 |
| **captured** 7:16 | 48:11 52:17 | **chief** 12:5 | 55:5,14,17 | 80:21 |
| **card** 7:17,18 | 52:20 53:2 | **Child** 64:8,9 | 60:20 63:4 | **compared** 75:4 |
| **cards** 6:19 | 56:6 59:7 | **choices** 61:13 | 73:15,20 | 81:9 |
| **care** 6:22 | 60:7,22 62:4 | 87:22 | 74:2,3,17 | **compete** 17:15 |
| 13:14 28:3 | 62:16 63:13 | **Cigna** 29:12 | 80:14 81:13 | 28:3,5,7,10 |
| 29:9,22 | 64:20 65:15 | **Circuit** 94:3 | 84:6 | **competes** |
| 31:21 32:4 | 65:20 67:1 | **City** 94:3 | **coding** 30:12 | 79:22 |
| 61:8 79:18 | 67:19,20 | **CIVIL** 1:3 | **cold** 82:13 | **competing** |
| 79:20 | 70:8,12,15,19 | **claim** 7:14,22 | **Collin** 8:16 | 59:19,19 |
| **career** 4:21 | 71:9,17,21 | 76:10 77:11 | 10:10 19:20 | **competition** |
| **Carolina** 25:5 | 72:10,13 | **claims** 7:3,4,16 | 47:4 | 88:14 |
| **carrier** 28:6 | 78:10 79:15 | **clarification** | **Collin's** 11:12 | **competitive** |
| **carriers** 28:10 | 79:21 80:10 | 65:12 | 11:18 12:6 | 79:17 80:1,8 |
| 69:20 | 81:4,6,16 | **clarify** 37:12 | **colonoscopy** | 80:13 |
| **case** 51:8 59:12 | 82:3 84:20 | **clear** 14:17 | 23:3 | **competitor** |
| 61:14 | 89:4 90:14 | 26:22 37:7 | **Colorado** | 23:11 28:17 |
| **cases** 5:12 | 91:7,9,20 | 48:8 | 24:21 25:4 | 29:6,9,17 |
| 20:13 43:14 | 92:6,12 93:5 | **clinical** 9:11 | **come** 7:4 26:10 | **competitors** |
| 57:15,16 | 93:10 | 62:13 | 46:11 55:4 | 28:2 29:3,5 |
| **categories** | **certain** 20:15 | **Clinically** | 83:14 89:12 | 79:20 80:15 |
| 15:22 31:3 | 59:8 80:14 | 30:11 60:4 | **comes** 42:19 | 81:1 |
| 39:18 44:20 | **certainly** 17:22 | **close** 29:16 | 65:7 | **competitor's** |
| 65:21 66:6 | 48:13 49:1 | 83:4 90:20 | **coming** 53:15 | 80:19 |
| **category** 7:21 | **Certification** | **closely** 18:6,10 | **commencing** | **complaint** |
| 30:4 39:10 | 94:21 | **closer** 82:17,17 | 1:18 4:4 | 57:11 |
| 42:20 60:9 | **certify** 94:4,11 | **closing** 26:2 | **comment** | **complete** 94:10 |
| 67:10,12 | **change** 43:17 | **CMS** 47:15 | 73:19 78:19 | **component** |
| **catheters** 43:1 | 43:19 44:8 | 85:21 86:1 | **commission** | 49:7 |
| **Cavanaugh** | 47:10 53:8 | **code** 22:8,22 | 94:4 | **components** |
| 2:12 3:5 4:13 | 56:17 85:13 | 27:15 31:18 | **commodities** | 48:14 |
| 6:10,15 | **changed** 26:11 | 32:1,3 37:21 | 16:6 41:6 | **concede** 59:18 |
| 12:21 13:1 | 32:8,11 47:9 | 50:16 54:22 | 90:20 | **concern** 72:6 |
| 13:15,17 | 87:19 | 55:1 66:4 | **Commonwe...** | **concerned** |
| 14:2,20 15:2 | **changes** 19:7 | 75:12 76:3 | 1:18 4:4 94:1 | 52:5 |
| 17:21 18:5 | 25:18 26:3 | 80:19 88:4 | 94:2 | **concluded** |
| 21:12,13 | **changing** 51:1 | 92:22 93:1 | **companies** | 93:16 |
| 25:20 26:6 | 51:1,18 | **coded** 88:5 | 16:8 24:10 | **conclusion** |
| 27:4,5 28:13 | **characterize** | **codes** 22:9,18 | 27:3 61:8 | 57:18,21 |

Timothy J. Miller          Highly Confidential          January 5, 2005
                           Richmond, VA

5

| | | | | |
|---|---|---|---|---|
| **conclusive** 17:13 | 18:7 | **corresponding** 7:19 37:20 | 38:10,15,22 | **dealing** 59:9 |
| **conditions** 41:14 56:14 | **contracts** 10:19 45:21 54:21 | **cost** 6:22 15:13 57:2 58:5 | **co-payment** 38:9,15 | **deals** 21:1 35:10,19 |
| **confidential** 1:11 6:12 24:14,17 | **control** 9:20 **convenient** 39:2 | 63:6 73:6 75:2 76:11 77:17 78:15 | **co-pays** 38:22 **CPT** 32:1 76:3 **craning** 82:16 | **December** 87:1 **decide** 42:11 47:12 93:2 |
| **confusing** 78:12 | **conversation** 69:18 | 78:17 85:14 89:22 91:3 | **created** 19:8 53:17 54:5 | **decided** 47:22 **decision** 19:5 47:8 |
| **consider** 25:3 56:16 | **conversion** 23:5,6,9 | **costs** 16:20 17:9 56:21 | **creates** 18:8 **creating** 19:22 | **decisions** 16:9 41:13 58:8 |
| **consideration** 24:3 69:2,3,4 | 27:22 44:6,8 44:10,13 | 57:13 58:13 58:19,22 | **Cross** 4:17,18 4:22 25:12 26:9,17 | **declined** 57:17 **decreased** 44:7 |
| **considered** 24:14,16 31:22 32:2 | 49:14 51:1,7 53:5 54:10 55:2,5,8,12 | 59:4 63:11 63:20 65:9 65:13 66:1,8 | **CRR** 1:17 4:3 94:1,20 | **Defendants** 1:16 2:11 3:4 4:2 |
| 57:3,5 61:15 68:14,20 72:21 | 55:16 **corporate** 5:4 25:17 | 66:18 67:14 67:17,22 68:2 81:3 | **current** 5:17 18:20 19:11 50:15 54:6 | **define** 22:5 87:22 **defined** 52:18 87:10 |
| **considering** 72:15 74:11 | **correct** 6:5,8 11:9,21 13:5 | 84:14 90:3,7 90:8,10,21 | 55:3 87:4 **currently** 32:9 64:11,13 | **definition** 87:18 |
| **constitute** 71:4 **constitutes** 94:9 | 13:8 16:18 18:6 19:14 22:13 24:5,8 | 91:14,18,22 92:5 **could** 4:14 | 66:15 **customers** 42:10,11 | **degree** 21:22 **delete** 53:21 |
| **consulted** 21:18 | 25:2,6 27:10 27:16,21 | 32:17 35:14 35:18 39:18 | | **delivery** 72:18 **delta** 9:22 |
| **contacted** 62:17 | 30:7 35:8,13 37:12,22 | 51:19 59:16 60:5 72:16 | ——————— **D** ——————— | **demarcation** 12:20 13:2 |
| **contemplate** 56:11 | 38:7,13 42:9 42:12,14,15 | 78:21,22 91:22 92:1 | **D** 3:1 **database** 7:4 | **demographics** 14:1,7,14,18 |
| **context** 35:19 35:20 49:9 | 44:19 45:11 48:2,10 49:3 | **counsel** 2:22 6:11 92:13 | **date** 26:3,5,14 26:19 50:4,8 | 14:21 24:18 **depart** 22:1 |
| **contiguous** 12:15,16 13:7 | 49:11 53:13 55:15,18 | 94:7,12 **counties** 13:7 | 50:10,13 **dated** 3:11 | **department** 5:4 11:13,18 11:20 |
| **continue** 47:8 **continuing** 55:21 56:9 | 58:10,16 61:13 71:5 73:12 76:9 | 83:4 84:11 **county** 12:15 12:20 64:14 | 71:18 72:2 72:11 **day** 1:19 4:5 | **depending** 7:4 33:15 35:6 |
| **continuum** 32:14 | 76:20 80:20 83:9 84:11 | **course** 71:3,8 **Court** 1:1 94:3 | 94:16 **days** 50:4,7,10 **day-to-day** | 41:11 78:19 **depends** 60:4 |
| **contract** 50:2 79:2,5 | 84:12 85:10 85:17 90:2 | **coverage** 17:5 34:2 35:12 | 11:4 21:7 **deal** 13:6 20:14 | **deponent** 94:4 **deposing** 21:9 |
| **contracting** 8:21 9:8 18:3 | 91:10,16 93:9 **correctly** 44:17 | **covered** 85:8 **covering** 57:13 **co-insurance** | 21:6,17,19 22:2,5,7 39:19 43:7 51:15 | **deposition** 1:15 4:1 27:1 83:1 93:16 |

Timothy J. Miller          Highly Confidential          January 5, 2005
                              Richmond, VA

6

| | | | | |
|---|---|---|---|---|
| **depositions** 71:12,15 | 44:12 46:11 47:10,18 | 11:2,3 18:11 18:17 19:10 | 43:20 44:21 44:22 65:22 | 17:11,12 19:17,18 |
| **derive** 89:13 | 52:8,11 | 20:2 21:6,20 | 67:5 68:2 | 21:6 26:18 |
| **describe** 32:17 | 53:21 55:20 | 80:3,5 | **DMEs** 42:16 | 28:5 29:1 |
| 33:22 34:3 | 56:8 57:9,18 | **disclose** 50:2,5 | 43:3 | 30:1,18 |
| 41:8 | 58:5 64:15 | **discloses** 63:19 | **doctors** 7:5 | 32:19 36:6 |
| **described** | 64:21 72:8 | **disclosure** | 20:18 78:16 | 36:11,12,14 |
| 27:19 87:21 | 88:7 93:15 | 63:11 | **document** | 38:17,18 |
| 89:1 | **didn't** 26:4 | **discontinue** | 71:20 | 41:19 42:5 |
| **description** 3:9 | 56:2 58:2 | 8:2,4 | **documents** | 43:12,13,13 |
| 5:1 | 86:7,11 | **discontinued** | 71:1,2,7,12 | 43:14 51:11 |
| **design** 39:19 | **differ** 11:1 | 8:11 | **does** 9:11 | 51:13 57:20 |
| **designate** 6:12 | 33:15 42:13 | **discount** 59:16 | 11:22 12:6 | 58:7,9,22 |
| **designation** | 78:21 | 60:6 | 12:13 14:3 | 59:1,12,17 |
| 39:17 | **differences** | **discounted** | 17:15 19:4 | 60:16,18 |
| **despite** 20:8 | 14:14 40:4 | 40:10 | 24:5 28:3 | 63:2 64:22 |
| **detail** 12:19 | **different** 13:22 | **discounts** | 38:8 42:9 | 65:3,16 66:3 |
| 40:3 | 14:1,3,7,15 | 59:21 60:11 | 43:2,14,22 | 66:13 69:17 |
| **determine** 16:1 | 15:10,17 | **discussed** | 45:16 54:14 | 70:12 71:15 |
| 38:22 47:6 | 24:19,20 | 61:18 63:16 | 55:13 68:5 | 73:20,22 |
| 56:21 57:9 | 27:19 31:8 | 70:21 | 77:6 78:2 | 74:1,2,12 |
| 59:14 61:12 | 31:13 35:5 | **discussion** | 79:16 85:18 | 77:15 81:11 |
| 66:7 | 37:10,11 | 19:12 69:3,8 | 86:10 88:1 | 81:21 82:3,5 |
| **determining** | 39:7 49:21 | 69:16,19 | 92:17 93:1 | 82:14 83:10 |
| 21:15 27:17 | 53:9 73:15 | 70:6,8,14,17 | **doesn't** 27:13 | 89:14,15 |
| 49:5 59:4 | 89:6 | **discussions** | 44:17 | 93:10 |
| 79:16 83:19 | **differential** | 46:15,17,21 | **doing** 8:2,4,7 | **dosage** 88:12 |
| **develop** 6:18 | 15:22 16:2,3 | 47:3 | 49:19 51:16 | **down** 11:15 |
| 7:1 28:1 | 73:3 74:16 | **disincentives** | 57:3 63:17 | 15:19 16:20 |
| **developed** 7:2 | **differentials** | 18:9 | 78:16 80:11 | 17:8 30:19 |
| 24:10 52:22 | 18:12 74:4 | **dispense** 59:13 | **dollar** 23:4,6 | 31:2 44:11 |
| **developing** | 74:10,12 | 59:15 | 27:13,17,22 | 66:4 67:22 |
| 18:16 50:11 | **direction** 47:6 | **displeasure** | **dollars** 29:15 | 82:16 |
| **development** | 94:8 | 18:20 | 42:13 76:4 | **download** |
| 5:20,21 6:1 | **directly** 8:18 | **distinguish** | **done** 13:21 | 85:20 |
| **diabetic** 42:21 | 62:18 89:16 | 93:1 | 53:17 66:14 | **Dr** 12:2 |
| **diagnostic** | **director** 5:6,15 | **distributed** | 66:16 73:4,5 | **draw** 57:18,19 |
| 15:20 16:3 | 5:19 8:14 9:7 | 19:18 | 74:22 75:5,7 | **drive** 17:8 |
| **did** 4:18 6:18 | 9:8 10:15 | **DISTRICT** 1:1 | 77:5,17,22 | **driving** 16:19 |
| 7:9 8:2,4 | 22:15 30:15 | 1:2 | 78:14,18 | **dropped** 58:3 |
| 16:1 25:22 | 37:15 45:5 | **DME** 15:21 | 79:11 86:5 | **Drozdowski** |
| 26:10,16,17 | 64:4 65:1 | 30:20 31:9 | **don't** 7:21 8:5 | 8:16,19 |
| 30:16,17 | 75:1 87:6 | 31:10 33:10 | 8:13 9:2,3 | 10:11 11:22 |
| 40:20 44:10 | **directors** 8:20 | 33:11 43:18 | 10:12 11:11 | 47:4 |

Timothy J. Miller               Highly Confidential               January 5, 2005
                                  Richmond, VA

7

| | | | | |
|---|---|---|---|---|
| **Drozdowski's** 19:20 | 81:12 83:9 84:19 85:3 | **effort** 41:6 90:19 | **establishing** 68:15,20 | **exceeded** 9:22 **except** 71:5 |
| **drug** 30:17 31:14,14,17 | 85:11 87:18 88:1,2,3 90:9 | **either** 29:21 33:2 81:4 | **estimate** 28:9 28:21 36:14 | **exception** 44:19 51:9 |
| 31:19 48:4,9 48:14,17,19 | 90:11 92:16 92:18 | 87:13 **electronic** | **estimated** 29:13 | 51:10 **Exhibit** 3:11 |
| 49:4,7,17,18 51:8 53:7,10 | **duly** 4:10 94:6 **durable** 31:11 | 85:22 **else** 8:18 13:18 | **evaluating** 56:16 | 71:20 **EXHIBITS** |
| 59:13,15 60:5,13,18 | 42:16 **during** 45:5 | **emergency** 20:18 | **even** 10:9 73:22 | 3:8 **existing** 53:20 |
| 61:12 62:20 62:21 63:2,4 | **D.C** 15:7,9 83:4 | **emphasis** 19:4 **employed** 4:16 | **event** 94:13 **ever** 17:12 | 54:10 55:2 **expense** 7:22 |
| 63:5,7 75:15 76:8,10,11,12 | | 26:11 64:11 **employee** | 56:20 57:3 58:7 61:1,15 | **expenses** 15:19 42:17 73:8 |
| 76:13,15,16 76:16,17,18 | **E** **E** 3:1 | 28:15 **enable** 90:4 | 61:18 63:8 63:16,22 | **expensive** 78:22,22 |
| 77:2,12,14,15 77:18 79:7,8 | **each** 7:6 13:22 22:22 24:17 | **encourage** 11:7 | 66:7 67:22 68:3,14,19 | **experience** 17:21 20:16 |
| 84:21 85:2,3 85:15 88:4,6 | 24:19 30:19 30:22 35:11 | **end** 86:4 **ensued** 69:19 | 70:4,4 74:1 77:17 79:10 | 43:22 62:5,7 **expertise** 18:3 |
| 88:7,11,12,14 88:18,18,20 | 35:18 44:9 49:15 50:3 | **ensure** 16:12 **ensures** 17:7 | 80:21 81:18 **every** 29:9 | **expires** 94:4 **explain** 5:18 |
| **drugs** 6:4 7:10 7:13,20 | 50:16,21 51:2 59:1,6 | **entire** 49:12,14 80:15 | 43:13 51:10 55:12,13,14 | 7:12 17:2 37:4 39:9,13 |
| 15:21 16:2,5 30:3,5,8,9,13 | 59:12,12,12 67:7 88:10 | **entity** 17:19 38:11 68:21 | 56:11,12,15 56:15 66:4 | **explained** 25:7 89:7 |
| 36:20 37:1 45:1,3,19 | **earlier** 33:20 34:19 50:10 | **envision** 60:10 **equally** 14:13 | 73:14 76:3 80:6 | **extent** 13:9 14:6 18:21 |
| 46:16 47:1 52:16,17,19 | 70:22 76:2 83:14 93:8 | **equipment** 31:11 42:18 | **evolution** 32:17 | 23:10 24:9 40:6 41:21 |
| 55:22 56:22 57:2 58:19 | **early** 74:12 **easier** 64:19 | 42:19 **equipped** 34:9 | **evolved** 32:14 **evolving** 70:5 | 59:15 71:6 80:3 81:8,19 |
| 59:1,10,19 60:8,10,17,20 | **eastern** 9:5 29:7 | **ESQUIRE** 2:4 2:12,18 | **exact** 19:17 32:19 83:15 | 90:21 91:2 **extract** 7:3,16 |
| 61:5,9,16 62:1,10 | **economic** 6:21 7:9 8:1 | **essentially** 6:18 16:11 | **exactly** 65:3 **examination** | **extreme** 15:6 **extremely** 52:6 |
| 63:10 65:11 65:22 66:9 | **economics** 48:16 | 16:15 52:1 54:1 | 1:15 3:4 4:1 4:12 82:9 | **e-mail** 17:18 **e-mailed** 39:18 |
| 66:18 67:5 68:16,21 | **Ed** 2:4 71:11 82:5,11,15 | **establish** 18:14 54:10,22 | 91:8 94:7 **examined** 4:10 | |
| 69:22 75:3 75:20 76:1 | 86:11 **effect** 52:22 | 61:1 91:13 **established** | 94:6 **example** 9:13 | **F** **F** 2:12 **face** 11:3,3 |
| 78:3,15 80:22 81:5 | 72:17 **effective** 26:4 50:4,8,10,12 | 54:7,9,19 55:1 | 32:7 37:8 38:4 88:4 | 21:7,7 **face-to-face** |

Henderson Legal Services
(202) 220-4158

Timothy J. Miller          Highly Confidential          January 5, 2005
                              Richmond, VA

8

| | | | | |
|---|---|---|---|---|
| 19:12 90:19 | 50:12,15,19 | **first** 4:10 13:17 | 89:7,12 93:7 | 87:6 |
| **facility** 73:5,9 | 51:12,21 | 18:17 34:7 | **formularies** | **full** 24:12 |
| 73:10 77:7 | 52:4,21 | 55:19 94:6 | 61:5,7,11 | 50:12 51:13 |
| **facility-based** | 54:17,20,22 | **five** 5:8,15 | **formulary** | 69:17 86:12 |
| 73:18 | 55:3,13 | 23:18 31:2,3 | 61:16,22 | **function** 27:18 |
| **fact** 19:10 20:8 | 56:12 66:10 | 44:5 65:21 | 62:10 | **further** 35:9 |
| **factor** 23:5,7,9 | 74:6,8,21 | 66:2 67:3,3,4 | **formulas** 14:4 | 82:4,5 91:8 |
| 27:22 44:6,8 | 79:17 80:15 | 91:11 | 14:16 | 93:11 94:11 |
| 44:10,13 | 80:19,21,22 | **five-minute** | **forth** 94:6 | **futile** 24:21 |
| 49:14 51:7 | 81:19,20,22 | 70:15 | **four** 8:20,21 | **future** 51:11 |
| 53:5 54:10 | 83:1,2,3,7,13 | **Floor** 2:7 | 9:3 18:11 | |
| 55:2,8,12,16 | 84:2,7,8,9,10 | **fluctuates** 20:6 | 23:17 44:11 | _____ |
| **factored** 51:9 | 84:13,16 | **follow** 44:17 | 44:12 83:3 | **G** |
| **factors** 24:1 | 85:10 86:6,8 | 47:8 55:21 | **Fourth** 2:7 | **Gallo** 72:1 |
| 27:19 51:1 | 86:18 87:16 | 56:2 91:7 | **four-county** | **gave** 31:3 |
| 55:5 59:3 | 93:3 | **followed** 26:4 | 15:8,12 | 39:10 65:21 |
| **facts** 58:9 | **fees** 5:22 15:17 | 53:4 | **four-month** | 67:4 88:17 |
| **fact-driven** | 18:14 21:4 | **following** 5:13 | 50:15 | 93:7 |
| 58:8 | 36:7,22 41:2 | 46:16 | **frame** 32:13 | **geez** 5:6 |
| **fair** 33:19 50:1 | 41:2 43:11 | **follows** 4:11 | 37:6 86:21 | **general** 78:19 |
| 65:15 90:3 | 43:13,15,18 | 72:15 87:11 | **frames** 75:11 | 90:17 |
| **Fairfax** 12:20 | 43:19 44:1,1 | **follow-up** 82:8 | **fraud** 5:9 | **generally** 9:4 |
| **familiar** 30:11 | 44:6 46:1 | **forces** 14:1 | **frauds** 5:10 | 16:8 25:8 |
| 30:16 77:12 | 47:21 48:1,8 | 24:19 | **frequency** | 42:19 58:3 |
| 77:14 | 52:9,10,12 | **forecasting** | 76:22 81:14 | 61:3 80:2 |
| **far** 45:12 88:21 | 53:16 54:8 | 50:9 51:16 | **from** 7:3 11:1 | 81:11 |
| **fee** 9:15 14:22 | 54:11 56:10 | **foregoing** 94:9 | 14:4 18:3,11 | **generated** 68:8 |
| 15:6,11,13,20 | 65:13 72:6,7 | **form** 7:14 | 18:21 19:13 | **generic** 60:21 |
| 18:20,22 | 81:3 85:3 | 13:12 17:17 | 21:3 22:1 | 87:12,14 |
| 20:9,9 21:15 | 91:4 | 28:11 32:12 | 24:13,17 | 88:1,5,14 |
| 22:1,16 23:5 | **felt** 52:2 | 41:20 43:4 | 34:4,6,8 | 89:9 93:1,3,6 |
| 23:18 24:2,6 | **Ferguson** | 56:1 58:20 | 41:10,12,16 | **generics** 92:14 |
| 24:7,9,13 | 69:11,12 | 62:2 78:6 | 44:4 47:11 | 92:15,18 |
| 25:4 28:1 | 70:9 | 83:11 | 47:12,15 | **geographic** |
| 32:10 34:16 | **few** 46:10 82:7 | **formal** 69:2 | 57:6,11,18,19 | 8:22 84:12 |
| 34:18,20 | **field** 57:22 | **format** 86:1 | 57:22 59:21 | 85:5,11 |
| 35:4,5 36:1 | 62:18 80:17 | **formerly** 69:13 | 60:11,18 | **geographically** |
| 37:2,5,18,20 | **final** 51:7 | **forms** 22:8 | 61:22 62:9 | 15:5 20:12 |
| 38:1,6,8,20 | **financial** 11:12 | **formula** 27:14 | 62:12 64:15 | 34:21,22 |
| 38:21 40:10 | **find** 57:2 | 27:18 32:21 | 71:2,22 72:4 | **get** 20:4,7 |
| 41:3 43:16 | **fine** 21:12 | 46:2 47:2 | 72:9 76:10 | 27:11 57:6 |
| 44:7 45:8,16 | 25:19 39:4 | 53:10 85:13 | 78:7,7,21 | 57:11 60:12 |
| 45:16 46:8 | 71:17 72:12 | 87:21 88:17 | 80:8,17,18 | 60:18 65:22 |
| 49:21 50:3,8 | **finish** 64:18 | 88:19,22 | 85:20 86:1,2 | 66:3,4 68:3,5 |
| | | | | 75:6,10,13,19 |

Timothy J. Miller          Highly Confidential          January 5, 2005
Richmond, VA

9

| | | | | |
|---|---|---|---|---|
| 75:22 76:2,5 | 82:16 | 37:14 43:2 | 61:21 62:9 | **held** 64:3 |
| 78:13 80:2,4 | **greater** 20:16 | 44:5,15 45:4 | 63:22 66:5,7 | **help** 57:22 |
| 80:5,8,18 | **greatest** 17:6 | 45:7 46:6 | 66:15,16,17 | **helpful** 90:11 |
| 81:11 85:18 | 51:6 | 47:7,9 53:17 | 67:2,13 68:7 | 91:3 |
| 89:11 | **group** 7:6 12:7 | 54:4 55:4 | 68:9,11 | **Hematology** |
| **getting** 18:2,2 | 21:16 22:12 | 61:1,15 63:8 | 69:20 70:4 | 72:1,4,9 |
| 23:15 | 24:5 25:9,11 | 68:14,19 | 71:2 72:16 | **Henrico** 64:14 |
| **give** 4:22 8:10 | 35:14 45:10 | 70:22 73:7 | 72:22 73:2 | **her** 64:19 |
| 9:13 32:13 | 69:7 | 77:16,21 | 74:18,22 | **here** 8:22 12:5 |
| 36:14 43:5 | **groups** 18:11 | 78:13 81:22 | 75:1 77:20 | 13:22 15:1 |
| 50:20 66:1 | 20:11,15,22 | 85:7 91:13 | 78:2,15 79:2 | 24:20 25:1 |
| **given** 6:20 7:5 | 21:3 35:11 | **hasn't** 40:16 | 79:4,10,12 | 25:12 29:2 |
| 21:16 42:6 | **group's** 42:3 | **have** 7:2 9:20 | 80:11,13,15 | 29:14 33:13 |
| 74:15 75:11 | **guess** 36:12,14 | 11:16 14:22 | 80:21 81:8,9 | 49:21 50:1 |
| 94:15 | 40:21 | 15:22 16:20 | 81:18 82:3,5 | 50:11,11 |
| **giving** 74:11 | **guided** 16:12 | 18:19 19:1 | 82:7,13 85:7 | 73:21 74:18 |
| **go** 11:7 18:13 | 56:13 | 19:11 20:8 | 85:10 86:7 | 79:11 86:3 |
| 22:14 26:18 | **guidelines** | 20:11,16,22 | 91:6 93:10 | **hereby** 94:4 |
| 44:10,12 | 21:22 | 21:3,14 22:3 | **haven't** 8:3,5 | **hereinbefore** |
| 47:12,22 | | 22:17 23:2,3 | **having** 4:10 | 94:6 |
| 49:5,18,20 | ——————— | 23:10 25:21 | **HCPCS** 31:18 | **here's** 78:14,17 |
| 50:21 56:16 | **H** | 27:6 28:6,17 | 31:20,21,21 | **he's** 8:16 52:18 |
| 59:4 70:19 | **had** 25:10 33:6 | 28:20 29:4 | 76:3 | 64:11 70:6 |
| 73:1 74:18 | 35:10 43:16 | 29:10 30:12 | **he** 12:4 56:2 | 89:2 |
| 79:16 86:15 | 45:12 47:3 | 32:7 33:8,13 | 63:3 64:10 | **higher** 15:13 |
| 89:16 91:1 | 52:5 65:1,4 | 33:14,14,20 | 64:13,15,17 | 15:14,20 |
| 92:20 | 69:8,16,18 | 34:16,20 | 64:21 65:1 | 36:4,7,7,8,19 |
| **goals** 89:21 | 74:4 86:5 | 35:1,14,18 | 73:8,8 93:2 | 44:2 73:6,16 |
| **goes** 72:14 | 90:8 91:14 | 36:18,22 | 93:13 | 84:14,14 |
| **going** 16:12 | **Hagens** 2:5 | 37:15 39:8 | **head** 13:3 56:8 | **highest** 16:13 |
| 24:22 25:1 | **hand** 94:15 | 40:4 42:7 | 56:19 57:4 | 16:16 17:1 |
| 31:16 33:15 | **handed** 71:22 | 43:15,15,16 | 58:11,17 | 34:17 36:2,3 |
| 34:17 44:1 | **handle** 11:4 | 44:4 46:14 | 62:7 81:17 | 81:14 |
| 47:6 50:21 | 88:16 92:17 | 46:21 47:3 | 91:12 | **highly** 1:11 |
| 51:5,12,14 | **handled** 34:15 | 49:14 50:2,5 | **health** 13:14 | 6:12 |
| 53:6 59:14 | 76:12 | 50:7,7,9 | 28:3 29:6,9 | **him** 17:19 |
| 78:15,17 | **handles** 11:12 | 51:19 52:6 | 29:22 31:21 | 32:13 41:21 |
| 87:2 | **happen** 26:4 | 53:14,20,22 | **hear** 82:14 | 47:4 60:1 |
| **good** 60:10 | 53:6 | 54:18,19 | 86:11 | 64:18 65:4 |
| 82:11 | **happens** 17:13 | 55:8 56:20 | **heard** 61:18 | 69:16 74:1,2 |
| **got** 71:14 | **has** 6:6,11 | 57:1,16 | 70:4,10 | **HIPAA** 54:19 |
| **governing** 6:13 | 13:22 14:10 | 58:11,17 | 86:14 | **hired** 5:3,5 |
| **grade** 7:19 | 15:13 19:4 | 59:2,8,17,19 | **Heidi** 1:17 4:3 | 26:7 |
| **gradually** | 22:22 30:21 | 61:17,18,20 | 94:1,20 | **his** 17:21 28:14 |
| | 32:8,11 | | | |

Timothy J. Miller                Highly Confidential                January 5, 2005
                                 Richmond, VA

10

| | | | | |
|---|---|---|---|---|
| 57:13 63:19 | 77:8 78:11 | **implement** | 38:11 50:3 | 65:22 66:18 |
| 64:18 94:6,7 | 79:16 81:18 | 63:8 91:17 | 58:8 67:7 | 67:5 72:5 |
| **history** 23:17 | 81:19,22 | **implementat...** | 69:9,10 | 76:1 80:22 |
| 25:17 74:18 | 86:6,8,18 | 72:16 | **individuals** | 81:5,12 |
| **hits** 76:5 | 87:2 88:16 | **implemented** | 11:6 | **injectables** |
| **HMO** 10:7,8 | 88:22 92:17 | 54:15 69:21 | **individual's** | 30:6 31:15 |
| 33:14,18 | **however** 18:12 | **implementing** | 10:22 | **injection** 54:8 |
| 35:16,20 | 47:9 | 61:15,22 | **industry** 1:8 | **input** 18:14,15 |
| 36:5 40:5 | **huge** 10:2 | 62:9 | 22:21 32:1 | 18:22 20:3 |
| 41:8,11,17 | **hundred** 33:4 | **impose** 91:17 | 89:15 | **inputs** 19:2 |
| 42:4,10,14 | 47:11,13 | 91:22 | **inflation** 23:19 | 23:8,20 |
| **hospital** 9:7 | 52:2 | **Inc** 1:20 2:17 | **influence** | 27:21 49:8 |
| 10:14 73:11 | _____ | 4:6 | 59:16 60:5 | 49:13 51:6 |
| 73:12 75:4 | **I** | **incentives** 18:8 | 61:8 | **inquiries** 63:4 |
| 75:14,15,16 | **idea** 72:22 | **include** 6:3 | **influencing** | **inquiry** 13:20 |
| 76:6,9,12,13 | **if** 9:21 13:18 | 7:10 9:10 | 61:12 | 57:21 58:1,3 |
| 76:15 77:1 | 16:6 19:3 | 12:13 31:14 | **information** | **instance** 46:8 |
| 77:18 78:5 | 21:14 30:17 | 38:9 76:6 | 7:3,19 21:6 | **instances** |
| 78:20,21,21 | 32:16,16,22 | **included** 7:11 | 23:11 47:14 | 38:14 76:14 |
| 79:3,5 | 35:3 36:6,11 | 7:12 12:16 | 57:8,10 58:2 | **insufficient** |
| **hospitalization** | 36:17 38:4 | **includes** 50:3 | 59:17 68:8 | 72:7 |
| 9:20 | 40:22 41:19 | **including** | 68:11 75:9 | **insurance** |
| **hospitals** 75:20 | 42:5 43:22 | 65:13 | 75:13,19,22 | 34:10,11 |
| 78:16 | 44:4,16 45:1 | **increase** 19:1 | 76:1 80:1,4,5 | 35:6 39:8 |
| **Hospital-bas...** | 50:7 51:12 | 24:2 | 80:8,13 81:9 | 41:3 85:7,8 |
| 20:17 | 52:5 58:2 | **increases** | 81:12 85:18 | **insurer** 38:16 |
| **hospital-billed** | 59:18 60:2 | 23:18 24:3 | 89:13,15 | **insurers** 28:4 |
| 76:1 | 65:7 66:21 | **incur** 73:8 | 90:9,12 | **interact** 13:9 |
| **hour** 39:3 | 73:1,5,8 74:6 | **indemnity** | **infusible** 30:8 | **interactions** |
| **how** 7:1,1,12 | 76:8,13,18 | 34:11,14,17 | 31:18 52:17 | 13:20 |
| 10:3,22 16:1 | 78:16 82:13 | 36:4,10,21 | **infusibles** | **interest** 42:3 |
| 18:15 19:8 | 82:14 83:14 | 43:10 | 31:15 | **interested** |
| 19:17 20:4,7 | 85:16 88:17 | **independent** | **infusion** 54:1,8 | 94:13 |
| 22:14 23:6 | 88:18,19 | 48:20 | 72:6 | **intermediary** |
| 30:16 32:11 | 89:15 90:16 | **independently** | **inhaled** 30:9 | 86:3 |
| 32:14 33:5,8 | 92:3,20 93:6 | 48:20 | 30:13 | **internal** 5:4 |
| 34:14 36:20 | **immediately** | **indicate** 75:6 | **injectable** | **internally** |
| 40:15 41:21 | 15:8 | **indicating** | 15:21 16:2,5 | 13:18 28:21 |
| 43:2,2 45:12 | **impact** 13:21 | 19:10 | 31:13,14,17 | 28:22 63:17 |
| 47:10,18 | 39:8 51:13 | **indirect** 9:18 | 31:19 37:1 | 79:11 |
| 49:4,18 51:6 | 52:6 | 9:20 | 45:18 46:16 | **interplay** |
| 51:15 59:13 | **impacted** 51:5 | **individual** 7:5 | 46:22 52:16 | 33:21 |
| 59:16 65:1,3 | **impacts** 50:20 | 7:7 10:18,19 | 52:19 54:2 | **interpreted** |
| 71:11 74:13 | 51:2 | 15:19 38:10 | 55:22 56:22 | 39:19 |

Timothy J. Miller          Highly Confidential          January 5, 2005
                           Richmond, VA

| | | | | |
|---|---|---|---|---|
| **into** 16:8,14 18:2 24:2 31:2 51:4 59:4 66:5 88:22 89:12 **intricacies** 30:21 **investigate** 81:21 **investigated** 81:18 **investigating** 5:11 **investigation** 86:6,8 **invoice** 57:10 57:14,18 58:3,4 **invoices** 57:6 57:16 60:18 **involve** 9:16 **involved** 35:7 41:6 **involvement** 21:14 **In-house** 2:22 **isn't** 17:8 **issued** 37:19 **issues** 11:4 13:6,11 **items** 87:13 **iterations** 50:22 **its** 23:1 28:1 45:16 46:1 51:18 53:5 55:13 79:17 86:6 **itself** 22:7 76:16,18 84:21 85:2,3 **I'll** 56:1 70:13 82:18 83:11 **I'm** 5:20 14:6 | 27:7 30:11 33:17 34:8 34:10 40:2 50:11 51:12 54:12 61:6 72:8 74:1 77:14 78:8 78:13 81:2 83:10 89:6 91:1 **I've** 24:12 27:6 47:3 65:17 65:18 66:14 69:8 70:10 71:22 75:5 78:18 ——————— **J** **J** 1:16 3:5 4:2,9 4:15 30:12 37:21 60:20 88:5,7 94:5 **January** 1:13 1:19 4:5 46:8 55:12 71:18 72:2,21 74:6 86:22 87:7 87:17 88:1 **Jason** 69:11,13 **Jeffreys** 1:17 4:3 94:1,20 **jeopardy** 18:19 19:3,6,8,15 20:5 23:15 51:4 **Jessica** 39:20 **job** 5:17 28:14 31:1 55:19 56:7 58:10 65:4 **John** 2:18 21:8 22:3 70:12 82:15 **join** 4:18 | **joined** 25:9 27:8 45:10 **joining** 25:11 **judgment** 90:19 **July** 25:13 **June** 94:4 **just** 5:1 6:10 7:14 12:17 13:12 14:17 15:16 17:17 18:14 25:16 26:22 28:11 31:3,20 37:7 39:13,21 40:4,18 43:4 44:7 46:8 48:7 49:12 64:19 69:4 69:17,18 70:16 77:3 82:7 87:21 88:2,9,14,17 89:1 91:7,11 ——————— **K** **keep** 16:15 90:4 **keeping** 90:7 **kept** 52:5 **kind** 75:9 **knew** 47:14 51:17 74:8 91:2 **know** 8:13 9:1 10:8 11:11 12:17 16:8 16:14 17:11 17:12 18:18 19:1,17 21:2 21:5,6 23:22 25:11 26:14 29:1,19 30:1 33:5,20 36:6 | 36:11,19 38:17,18 39:22 40:6,7 40:18 45:12 45:14 47:18 51:4,11,13 53:4 57:20 58:22 59:1,5 59:11,12,14 60:16 62:13 64:11,13,22 65:1,3,4,8,16 71:11 73:20 74:2,12,13,17 77:8,15,21 78:1 82:14 88:16 89:13 89:14,15,21 90:12 **knowing** 18:10 **knowledge** 63:15 64:2 68:19 77:16 78:14 **known** 25:22 **knows** 17:19 ——————— **L** **L** 1:17 4:3 94:1 94:20 **lab** 15:21 16:5 30:20 31:8 32:7,10 65:22 67:5 68:2 **landscape** 23:12,14 **large** 1:18 4:4 18:21 42:6 94:1,2 **largest** 17:6 67:3,4,12 **last** 8:6 43:14 44:5 46:12 | 48:8 **lasted** 5:7 **lastly** 11:10 23:22 **law** 1:19 4:5 **layer** 35:9 **leading** 29:4 **leads** 43:19 **learning** 30:21 **leave** 64:21 **leaving** 38:15 **led** 47:12 **left** 8:7,11 34:3 **legislation** 50:1 **length** 83:20 **less** 29:10 36:16 78:22 **lesser** 87:11,13 89:8 **let** 6:10 17:17 37:7,12,17 39:15 43:12 57:14 61:2 64:18 65:7 82:14 83:14 88:9 91:7,21 **letter** 3:11 58:6 71:18,22 72:3,4,9,10 72:11 74:19 **letters** 19:9 **let's** 11:15,16 23:3 30:2 34:6 43:7 45:1 70:15 70:19 86:22 **level** 18:8 40:13 **leverage** 20:11 20:16 59:21 60:11 **licensed** 12:9 **life** 64:19 **like** 16:5 42:21 |

Timothy J. Miller          Highly Confidential          January 5, 2005
                           Richmond, VA

12

| | | | | |
|---|---|---|---|---|
| 43:1 50:19 | 53:14 65:17 | 8:17 11:19 | 74:10,10 | medical/surg... |
| 68:6 88:19 | 65:18 | 12:6 61:8 | me 4:21,22 | 31:5 41:4 |
| likelihood 52:3 | looking 6:21 | 69:14 80:3 | 5:18 6:10,11 | 67:6,7,9 68:1 |
| limited 29:7 | 15:16 16:10 | manager 5:13 | 7:12 8:10 9:3 | 84:6 |
| 80:14 | 27:18 32:13 | 6:16 10:14 | 9:13 10:12 | Medicare |
| line 12:20 13:2 | 48:14,15 | 11:10 | 17:2,17 | 32:10,19 |
| 14:13 33:14 | 51:2 | managers | 24:22 27:19 | 33:1,4 37:14 |
| 33:14,15,16 | lot 23:8 56:13 | 22:11 | 30:4 31:3 | 37:20 38:1,4 |
| 49:15 86:4 | 57:15 59:3 | manual 31:22 | 33:22 34:3 | 38:6,8,14,20 |
| lines 17:18 | 59:15 81:11 | 32:2 | 34:19 36:14 | 43:11,13,16 |
| 33:13 35:2 | lower 47:20,21 | manufacturer | 37:4,7,12,17 | 43:18 44:1,6 |
| 35:11 85:11 | 48:1 52:4 | 60:11 | 39:9,10,13,15 | 44:7 45:15 |
| list 18:21 19:3 | 58:6 87:14 | manufacture... | 41:8 43:12 | 46:1,2,6,9,16 |
| 19:6,8,15,18 | 89:10 90:3 | 59:9,18,21 | 48:12 49:1 | 47:1,8,13,15 |
| 19:19 20:1,5 | lowering 89:21 | 89:17 | 57:14,21 | 51:18,21 |
| 20:5,7 23:15 | 90:7 | manufacture... | 60:15 61:2 | 53:9,10,15,17 |
| 51:4 | lowest 87:12 | 60:13 | 63:6 65:8,21 | 54:4,7,15 |
| listing 76:2 | 87:14 | many 22:7,9 | 67:4 69:15 | 55:4,11,21 |
| litigation 1:9 | | 38:13 40:17 | 80:2 82:14 | 81:19,19,21 |
| 6:13 82:13 | **M** | 73:2 87:18 | 82:14 83:14 | 81:22 85:16 |
| little 19:4 34:1 | made 30:5 | mark 71:9 | 87:22 88:9 | 86:2,6,10,18 |
| lives 64:13 | 58:11,18 | marked 71:20 | 89:1 91:7,21 | 86:20 87:15 |
| living 15:13 | main 2:6 83:2 | market 14:1 | 94:5,6,8 | 88:22 93:7 |
| LLP 2:13 | 84:9 | 24:18 29:4 | mean 9:13 | Medicare's |
| local 86:2 | maintain 19:18 | 29:10,13,18 | 13:14,17 | 23:9 38:17 |
| logical 86:9 | maintained | 40:19 41:14 | 17:3 18:22 | 38:21 44:13 |
| long 33:5,8 | 71:3,8 | 43:21 56:13 | 23:13 33:22 | 47:1 52:3 |
| 37:15 65:1,3 | maintaining | marketing | 37:4,18 | 56:2,9 85:19 |
| 87:2,4 | 89:22 | 39:21 | 48:18 54:14 | 87:8,15,22 |
| longer 8:1 | maintains | marking 71:12 | 54:18 79:19 | 88:10,20 |
| look 16:6 23:9 | 19:15,19 | 71:17 | meaning 73:3 | 89:12 |
| 23:10,11,17 | major 29:2 | Mason 64:8 | means 50:9 | Medicare-plus |
| 23:19 24:9 | majority 15:5 | Massachusetts | measured 7:7 | 33:7 |
| 28:8 35:3 | 20:10 | 1:2 2:8 | median 87:11 | Medicare-pu... |
| 40:22 42:5 | make 37:17 | maximum 90:5 | 87:14 89:9 | 36:22 37:5 |
| 44:4 48:18 | 39:15 58:9 | 90:8 | medical 5:12 | 37:18 45:8 |
| 48:19,20,21 | 58:21 64:19 | may 4:20 5:3 | 7:14 12:5 | 51:12 |
| 48:22 49:12 | making 19:5 | 18:21,22 | 15:19,19 | medicine 30:20 |
| 49:16 50:19 | 44:18 53:15 | 21:10 28:20 | 16:3 23:19 | meet 11:3,7 |
| 50:20 62:20 | MAMSI 29:8 | 60:5,17 | 25:14 28:1 | member 11:20 |
| 63:1 67:21 | manage 12:7,8 | 76:17 82:15 | 30:20 31:4 | 85:7 |
| 70:13 74:19 | managed 32:4 | 88:5,5 | 31:11 32:5 | members 17:4 |
| 79:1,4 | 79:18,19 | maybe 71:15 | 42:16 49:10 | 28:7 |
| looked 30:19 | management | 73:21 74:5 | 65:21 67:5 | mentioned |

Timothy J. Miller

Highly Confidential
Richmond, VA

January 5, 2005

13

| | | | | |
|---|---|---|---|---|
| 20:5 28:2<br>31:6 51:3<br>55:11<br>**mentioning**<br>70:5<br>**met** 9:21<br>**methodologies**<br>56:17<br>**methodology**<br>18:13 22:17<br>22:19 25:7<br>25:10 31:6,8<br>31:13 32:6,6<br>33:3 41:7<br>45:7,9 47:16<br>47:18,19,20<br>51:19,20<br>52:4 53:5<br>54:9 56:12<br>70:11 83:19<br>84:5 87:8,19<br>92:22<br>**metrics** 7:4<br>**might** 43:15<br>50:19 78:11<br>92:7,10<br>**Mill** 1:20 2:18<br>4:6<br>**Miller** 1:16 3:5<br>3:11 4:2,9,15<br>4:16 71:20<br>71:22 82:11<br>91:10 94:5<br>**minus** 38:5<br>**misundersta...**<br>73:21<br>**modeling** 7:9<br>50:22<br>**moment** 27:19<br>28:2<br>**monthly** 19:7<br>19:15<br>**months** 51:18<br>52:22 | **more** 14:12<br>16:10 17:9<br>18:2 21:4<br>30:5 63:6<br>73:14,15<br>78:22<br>**morning** 70:22<br>83:1<br>**most** 17:7<br>22:18 35:4<br>54:6 57:7<br>75:7 77:5<br>84:5,9 85:13<br>**mostly** 13:20<br>**moved** 64:17<br>**moving** 53:9<br>**Mr** 3:5,6 4:13<br>4:16 6:10,14<br>6:15 8:19<br>11:18,22<br>12:2,17,21<br>13:1,12,15,16<br>13:17 14:2<br>14:17,20<br>15:2 17:17<br>17:21 18:5<br>21:8,12,13<br>25:16,20<br>26:2,6,22<br>27:4,5 28:11<br>28:13,14,16<br>28:19 32:12<br>32:15 36:12<br>36:13 37:7,9<br>39:2,4,6,15<br>40:2,6,7,14<br>41:20 42:1<br>43:4,6 45:18<br>45:20 46:4<br>48:7,11<br>52:15,17,18<br>52:20 53:2<br>56:1,6 58:20<br>59:7,22 60:7 | 60:14,22<br>62:2,4,11,16<br>63:12,13<br>64:9,18,20<br>65:12,15,20<br>66:19 67:1<br>67:16,19,20<br>69:12 70:6,8<br>70:9,12,15,19<br>70:21 71:5,9<br>71:13,17,21<br>71:22 72:8<br>72:10,12,13<br>73:22 78:6<br>78:10 79:15<br>79:19,21<br>80:10 81:2,4<br>81:6,16 82:3<br>82:7,10,11,15<br>82:18,20,21<br>83:10,12,17<br>84:20 85:1<br>86:14,16<br>87:2,3 89:2,4<br>89:5 90:14<br>90:15,22<br>91:5,7,9,10<br>91:19,20<br>92:2,6,9,12<br>92:19 93:5<br>93:10,12,13<br>**much** 19:4<br>50:9 59:13<br>59:16<br>**multiple** 33:12<br>50:22<br>**multiply** 23:4<br>**must** 24:2<br>**my** 5:16 13:19<br>18:3 19:5<br>40:21 47:7<br>57:13,21<br>58:8 62:12<br>63:15 64:2 | 66:15 68:1,2<br>68:2,5 70:13<br>75:18 78:12<br>78:19 80:4,7<br>82:11 89:11<br>94:8,15<br>**M.D** 12:1<br>———————<br>**N**<br>**N** 3:1<br>**name** 4:14 9:1<br>25:17 26:3,7<br>26:11,15,17<br>65:6 71:14<br>77:14 82:11<br>88:2,12,14<br>**names** 9:2<br>**national** 16:8<br>**nature** 69:16<br>**nearest** 29:17<br>**need** 8:22 9:2<br>19:1 26:19<br>79:1 81:21<br>**negative** 52:6<br>**negotiate**<br>20:12<br>**negotiated**<br>21:1 35:10<br>**negotiating**<br>22:1<br>**negotiations**<br>22:11<br>**neonate** 20:19<br>**neonatologists**<br>20:20<br>**network** 8:17<br>10:16 11:8<br>11:19 12:6<br>17:6,10,16<br>19:13 80:3<br>**networks** 12:7<br>12:9 28:4<br>70:1<br>**Nevada** 24:21 | 24:22 25:4<br>**never** 24:12,12<br>28:17,20<br>57:1,5 66:5<br>66:14 70:10<br>75:5 78:18<br>92:14<br>**new** 2:14,14<br>10:20 43:16<br>44:1 47:16<br>52:3 53:17<br>54:4,5,7,11<br>54:14,19,22<br>55:1,4,5,8,14<br>55:16 56:11<br>**next** 29:17<br>39:10 74:9<br>74:20,20<br>86:9<br>**Nicholson** 2:18<br>6:14 12:17<br>13:12,16<br>14:17 17:17<br>21:8 25:16<br>26:2,22<br>28:11,14<br>32:12 36:12<br>37:7 39:2,15<br>40:6 41:20<br>43:4 45:18<br>48:7 52:15<br>52:18 56:1<br>58:20 59:22<br>60:14 62:2<br>62:11 63:12<br>64:18 65:12<br>66:19 67:16<br>70:6,21 71:5<br>72:8,12 78:6<br>79:19 81:2<br>82:15,20<br>83:10 86:14<br>87:2 89:2<br>90:15 91:19 |

Timothy J. Miller          Highly Confidential                January 5, 2005
                           Richmond, VA

14

| | | | | |
|---|---|---|---|---|
| 93:13 | 66:22 67:15 | 72:16 75:11 | 69:3 72:18 | 73:1 80:8,17 |
| **nitty-gritty** | 68:5,7,13,13 | 76:3 87:11 | 73:4,6 75:3,7 | 84:8 87:11 |
| 40:3 | 70:3 73:8 | 87:12 89:9,9 | 75:21 77:6 | 88:2 89:9,18 |
| **nodded** 13:3 | 74:17 75:22 | **numbers** 10:20 | 77:19 78:4 | 89:20 |
| **non-responsi...** | 77:20 78:1 | 75:6,8 | **officer** 12:5 | **ones** 10:13 |
| 71:6 | 79:12 80:15 | —————— | **offices** 1:20 4:6 | **only** 10:7 12:8 |
| **nor** 94:12,13 | 84:17 85:15 | **O** | 78:16 | 13:20 18:10 |
| **Norfolk** 94:4 | 88:10 91:13 | **oath** 94:6 | **office-based** | 21:18 25:14 |
| 94:16 | 91:18 92:1 | **object** 13:12 | 73:17 | 29:7 41:4 |
| **norm** 6:22 7:1 | 93:1,15 | 17:17 32:12 | **often** 19:17 | 47:3 51:17 |
| 7:2 | 94:11 | 41:20 43:4 | **Okay** 5:3 6:9 | 57:5 62:14 |
| **normal** 57:13 | **Notargiacomo** | 56:1 58:20 | 9:7 11:14 | 76:1,7,17 |
| 71:8 | 2:4 3:6 71:13 | 59:22 62:2 | 12:21 13:4 | 78:8 80:7 |
| **normally** 63:3 | 82:7,10,12,18 | 66:19 78:6 | 13:16 19:6 | **onto** 35:9 |
| **northern** 9:5 | 82:21 83:12 | 83:11 89:2 | 23:21 26:21 | **operated** 27:3 |
| 12:18 15:6 | 83:17 85:1 | 91:19 92:2,7 | 27:10 28:2,8 | **operational** |
| 20:10 29:8 | 86:16 87:3 | 92:10 | 30:2 32:5 | 62:14 |
| 83:4 84:13 | 89:5 90:22 | **objected** 21:4 | 33:19 35:9 | **operations** |
| 84:15 | 91:5 93:12 | **objection** | 35:18 36:1,9 | 10:16 |
| **not** 7:22 9:11 | **notarial** 94:15 | 60:14 62:11 | 36:20 38:19 | **opine** 17:19 |
| 10:8 12:8 | **Notary** 1:17 | 65:15 84:20 | 43:19 45:2 | **opportunity** |
| 13:21 15:18 | 4:3 94:1,22 | 89:4 90:14 | 46:5 53:3 | 80:6 |
| 15:22 16:2 | **note** 6:10 | 90:15 92:19 | 54:13 63:8 | **opposed** 41:18 |
| 19:4,11 | **notes** 70:13 | **obstacles** 62:15 | 65:7 67:11 | 42:4 60:12 |
| 20:19 21:2 | **notwithstan...** | **obtain** 11:5 | 68:14 69:6 | 73:17 |
| 24:16 26:14 | 91:11 | 60:6 89:14 | 72:12 73:13 | **options** 72:16 |
| 29:19,19 | **November** | **obtained** 85:22 | 74:13 79:1 | 72:20 73:19 |
| 30:11 33:8 | 5:16 6:7 8:12 | **obviously** 73:6 | 81:10 82:3 | **oral** 1:15 4:1 |
| 34:8 36:19 | 25:9 30:15 | **occasion** 21:18 | 85:6 86:13 | **order** 6:13 |
| 39:20,22 | 33:6 43:9 | **occasionally** | 93:10,13 | 60:12 |
| 40:3 41:7 | 55:20 56:7 | 46:10 57:11 | **oncology** 20:22 | **ordinary** 71:3 |
| 43:17 44:3,7 | 64:5 72:11 | 77:6 | 21:3 72:2,4,9 | **organization** |
| 44:22 45:14 | **now** 11:15 25:7 | **occur** 77:6 | **one** 2:6 14:10 | 25:22 27:8 |
| 46:11 47:18 | 25:18 27:1 | **occurrences** | 15:5 17:8,16 | 40:10 71:14 |
| 49:11 53:21 | 29:8,21 | 75:11 76:3 | 18:14 19:2 | **organizations** |
| 54:12 55:13 | 34:19 36:17 | **occurring** 77:9 | 20:7,9,10 | 13:10,13 |
| 57:7,10,12,15 | 37:17 43:12 | **occurs** 76:21 | 21:4 23:8,22 | 32:4 |
| 58:11,18 | 52:22 70:16 | 76:22 | 24:15,17 | **originally** |
| 59:5 60:21 | 73:15 75:13 | **off** 20:7 47:21 | 27:14 32:22 | 83:18 |
| 61:17,20 | 83:7 87:17 | 70:14,17,21 | 39:15 44:6 | **orthotics** 42:22 |
| 62:13 63:2 | **number** 16:13 | **offer** 42:10 | 44:11 49:14 | **ostomy** 42:22 |
| 63:15 64:2 | 20:13 23:10 | **offered** 79:18 | 51:3,6 60:4 | **other** 7:14 |
| 64:10,12 | 23:11,17,18 | **office** 7:15 | 60:11,13 | 10:12 13:9 |
| 65:17,18 | 71:1,14,18 | 23:2 30:10 | 61:11 69:8 | 13:14,14 |

Timothy J. Miller

Highly Confidential
Richmond, VA

January 5, 2005

15

| | | | | |
|---|---|---|---|---|
| 24:1,10,11 | 32:14,18 | **particulars** | 47:11,13,13 | 42:3,7 48:13 |
| 28:3,9 29:5,9 | 33:2,6 46:13 | 59:5 | 47:21,22 | 56:14,21 |
| 31:17 36:8 | 68:8 70:13 | **party** 94:12 | 51:19,20 | 57:12,12 |
| 38:16 44:11 | 87:6 | **pass** 24:1 | 52:2,5 68:1,1 | 58:12,18 |
| 44:12 46:7 | **overall** 7:16 | **past** 46:13 | 68:1,2,2 | 59:1,5,20 |
| 49:22,22 | 72:17 | 80:12 | 85:15 87:8 | 60:10,12,17 |
| 55:10 64:3 | | **patient** 38:16 | 87:16,19 | 61:12 62:18 |
| 79:18,19 | **P** | 42:6 48:17 | **percentage** | 63:2,9,14,19 |
| **others** 20:16 | **Page** 3:4,9 | 68:17 | 10:4,8 16:16 | 67:18,21 |
| **otherwise** 73:8 | **paid** 38:8,10 | **patients** 42:8 | 32:20 33:1 | 73:7 75:3,17 |
| 94:12,13 | 38:10,15 | 69:1 70:2 | 36:9,18,19 | 76:7,8,10,17 |
| **our** 5:4,8,20 | **paragraph** | 90:20 | 37:1,3,11 | 77:1 78:8 |
| 7:4 10:7 | 72:14 | **patterns** 6:19 | 41:14 47:9 | 79:9 80:18 |
| 11:15,16 | **part** 6:6 7:9,16 | **Patterson** 2:13 | 47:10 65:9 | 83:8 89:22 |
| 16:9,10,11,16 | 15:7 29:8 | **pause** 58:14 | 66:8,17 | 90:7,18 93:2 |
| 17:4 18:20 | 53:8 54:16 | 63:18 65:5 | 67:13 68:12 | **physicians** |
| 18:22 24:3 | 54:18 73:22 | 79:14 81:15 | **perception** | 5:22 6:2 10:4 |
| 29:5 34:17 | **participate** | 82:2 83:16 | 42:2 48:13 | 11:4,7 16:13 |
| 36:7 40:11 | 10:5,5 11:8 | **pay** 16:15 | **performance** | 16:16 17:7,9 |
| 40:12 41:12 | 16:13 18:9 | 38:14 79:5,7 | 7:7 | 17:15 18:9 |
| 43:10,13,15 | 28:7 42:3,7 | 79:8 90:3,18 | **period** 43:5,7 | 19:9,16 |
| 43:17 45:21 | **participated** | 90:20 | 45:5 50:1,15 | 20:17 28:5,9 |
| 45:21 47:9 | 46:14,21 | **paying** 32:19 | **personally** | 32:3 35:19 |
| 47:21 50:2,3 | **participating** | 38:4 | 21:5 61:17 | 41:22 43:3 |
| 50:14,18 | 10:20 11:5 | **payment** 38:10 | 70:3 77:20 | 50:6 52:7 |
| 51:7 52:6 | 16:16 41:17 | 79:6 | 79:12 | 57:6,7,9 59:8 |
| 54:9,10,17,21 | 80:9 | **pays** 38:2,6 | **perspective** | 60:18 68:17 |
| 54:21 55:2,3 | **participation** | 83:8 | 34:4,5,6,8 | 68:22 70:1 |
| 56:12,13,17 | 16:11,21 | **pediatric** 20:19 | 62:12 | 76:14 78:3 |
| 68:9 69:13 | 17:2 28:4,9 | 20:19,20 | **pharmaceuti...** | 80:9 83:20 |
| 69:14 71:1 | 28:18 56:14 | **peer** 6:22 7:1,2 | 1:8 72:6 | 84:3 85:14 |
| 74:8,20 | 90:1,4,7 | 7:6 | **pharmacies** | 89:20 90:10 |
| 79:20 80:8 | **particular** | **peers** 6:20 | 9:10 | 91:14 92:7 |
| 90:3,4 91:3 | 15:12,13 | **people** 18:7 | **pharmacy** 61:3 | 92:10 |
| **out** 7:22 11:7 | 18:18 22:12 | **percent** 15:14 | 69:14 | **physician's** 7:7 |
| 44:18 50:7 | 35:11 48:17 | 15:15 29:10 | **phase** 82:13 | 30:10 58:1,5 |
| 65:18,19 | 51:5 59:12 | 29:16 32:9 | **phone** 82:17 | 59:2,6,20 |
| 66:5 67:8 | 59:15 60:21 | 33:4 36:16 | **physician** 6:19 | 73:4,5 75:21 |
| 82:13 | 62:19 63:5,5 | 37:5,8,14 | 8:21 10:1 | 77:6 |
| **outside** 12:7,14 | 75:12 78:20 | 38:5,14,14 | 20:4 21:16 | **physician-ad...** |
| 15:8 69:3 | 79:2,2,3,4 | 40:12,15,17 | 21:16 22:12 | 6:4 7:13,20 |
| **over** 5:14 9:20 | 88:4,20 91:4 | 41:2,12,12 | 28:4,6 35:11 | 30:3,5,17 |
| 11:11 30:18 | **particularly** | 43:11 45:8 | 35:14 36:2 | 36:20 45:3 |
| 30:21 32:8 | 25:3 | 46:3 47:11 | 41:5,16 42:3 | 58:19 59:10 |

Timothy J. Miller   Highly Confidential   January 5, 2005
Richmond, VA

16

| | | | | |
|---|---|---|---|---|
| 61:16 62:1 62:10,20 63:10 65:11 68:16,21 69:22 83:9 84:19 90:9 90:11 92:16 92:18 **Physician-re...** 66:11 **piece** 18:3,14 27:14 90:11 **place** 33:9 77:10 **Plaintiff** 2:3 **plaintiffs** 82:12 92:13 **plan** 39:19 40:3 42:10 42:10 70:11 **plans** 13:14 29:6 42:11 79:18,20 **play** 19:4 **please** 56:5 62:3 65:7 68:18 **plug** 88:22 **plugged** 89:11 **plus** 33:1 51:8 53:5 **point** 25:22 26:10,16 27:8 33:19 39:16 56:19 74:5 75:18 82:6,14 **points** 37:11 **policies** 34:14 **policy** 36:21 76:12 **population** 42:6 **portion** 9:17 | 9:18 12:18 80:19 **position** 5:6 21:10 22:4 64:4 87:5 **positive** 72:17 **possession** 66:15 **possible** 17:2,6 90:21 **possibly** 69:18 **potential** 18:18 **potentially** 18:12 **power** 59:3,9 **PPO** 33:14,18 35:15,16,19 36:5 39:11 39:12,13,14 40:5,9,12 41:2,13,18 42:4,10,13 43:10 85:9 **practice** 6:19 8:11 59:2,13 73:7 84:14 **practices** 60:16 60:19 **preamble** 86:14 **predecessor** 27:2 **preference** 78:2 **preferred** 40:9 **premium** 24:3 29:15 42:13 **premiums** 36:4 36:6,7 **prepare** 50:8 **prescribing** 61:13 **present** 43:9 **president** 8:17 | 12:4 **prevented** 61:22 62:9 **previous** 77:3 86:4 **previously** 55:11 **price** 1:9 18:12 **pricing** 88:10 **primarily** 5:12 11:12 12:12 12:13 29:7 46:8 **prior** 23:18 25:10 47:19 47:20 50:4,8 50:10,12 51:3 64:5 74:7 **privilege** 71:7 **probably** 19:3 68:9 **problematic** 17:20 **procedure** 22:18,22 31:22 49:10 53:18,20 54:14 55:5 55:16 66:4 75:12 84:6 **procedures** 6:2 25:15 55:10 73:2 **proceeding** 94:13 **proceedings** 79:14 81:15 82:2 83:16 **process** 18:13 18:16 49:20 50:22 56:16 72:15 **produce** 14:15 | **produced** 70:22 **product** 33:14 33:14,15,16 41:9,11 **professional** 81:3 **proficient** 39:22 **profiling** 5:14 6:17,21 8:1 **program** 5:6 41:18,18 42:4,4 **programs** 9:9 9:16 10:3,5,6 **projected** 50:18 **promoted** 5:13 5:15 **properties** 77:15 **proposition** 90:17 **prosthetics** 42:22 **protective** 6:13 **provide** 12:19 27:13 57:10 57:17 68:16 68:22 69:22 91:14 **provider** 5:14 6:16 8:17 10:15,19,20 11:19 12:6,7 12:9 14:1,18 14:20 18:14 18:15 20:11 23:12,13 24:18 40:9 63:14,14 65:13 68:22 80:2 | **providers** 10:20 16:7 16:11 18:18 18:19 21:7 45:22 54:21 63:12 **provider's** 65:10 **provides** 27:14 37:20 **providing** 16:3 17:9 35:15 **public** 1:17 4:3 26:18 94:2 94:22 **publication** 37:19 **publicly** 26:15 **publish** 44:1 86:8,19 **published** 31:21 32:2,9 37:2 38:5,9 43:11,17 45:16 46:1 51:20 81:22 85:16 87:16 **publishes** 38:20 **pull** 85:20 **purchase** 17:5 **purchased** 16:6 41:7 **purchasing** 59:3 **purposes** 25:3 **pursuant** 71:1 **putting** 66:9 90:8 **p.m** 93:16 ___ **Q** **qualification** 94:3 |

Timothy J. Miller          Highly Confidential          January 5, 2005
Richmond, VA

**qualify** 87:9
**quarterly** 46:7
46:11 76:4
**question** 18:2
21:2,10 29:1
38:12 46:17
46:20 48:2
52:11 56:4,5
58:15 60:2
62:3 64:18
65:14 68:18
74:3 77:4
78:9,12
83:11 86:9
86:12,15,17
88:8 89:6,11
92:13
**questions** 51:3
82:4,6,8 86:5
91:5
**quick** 39:15
**quote** 22:2

___
**R**
**radiologists**
20:18
**raised** 39:20
92:13
**raises** 48:1
**Randy** 12:1
**ranges** 80:14
**rare** 13:20
**rate** 16:21 17:2
24:3 90:4
**rates** 14:4
16:11 19:11
28:9,18 36:3
41:13 49:5
56:14 89:20
90:13
**Rather** 9:15
**Rawlings** 72:1
73:22
**RB** 27:11

83:21
**RBRVS** 22:19
25:13,14
27:13 31:6
49:6 53:1
54:6 73:2
83:22 84:1,2
84:5
**RDR** 1:17 4:3
94:1,20
**RE** 1:7
**read** 69:19
93:13
**really** 8:13
24:21 40:3
73:19 88:11
**reason** 14:10
**reasonable**
90:3
**recall** 7:21 8:5
30:18 32:19
33:8 69:17
73:22 74:1
83:5
**recap** 89:8
**receive** 59:17
72:18 76:10
81:13
**received** 81:8
**recent** 85:13
**Recently** 66:13
**recess** 39:5
70:18
**recollection**
26:18
**record** 4:14
25:16,21
40:4 48:7
70:14,17,20
70:22
**recorded** 94:7
**records** 71:4
**redactions**
71:6

**reduced** 94:8
**refer** 6:21
**reference**
83:15
**referenced**
73:20 74:18
76:2
**referred** 23:1
**referring** 27:2
27:7 45:18
48:8,9 73:11
84:17
**reflect** 84:14
**refusal** 58:4
**regard** 78:2
**regarding**
58:12,18
72:5 75:22
**regardless**
76:19 85:4,6
**region** 9:5,5,6
9:6 20:10
29:7,8 41:11
84:15
**regional** 8:20
11:1 14:11
14:12 18:11
18:17 19:10
20:2 21:5,20
22:11 29:5
41:15 80:3,5
**regions** 8:22
9:4 85:11
**regular** 68:5,7
75:14
**regulations**
54:19
**reimburse**
32:9 34:18
40:12 43:11
**reimbursed**
5:22 36:21
41:12 84:18
**reimbursem...**

5:16,19,21
6:1,3 8:15
9:12,14,16,17
9:19 10:15
13:4,6,10
14:4,15,16
15:17 16:9
18:4,7,16
22:15 25:8
30:15,20
33:11 34:4
34:15 36:2
37:15 39:9
40:11,12,18
40:22 41:1
41:10 43:3,8
45:4,6 46:14
47:7 48:3,3,4
48:9,14,15
49:5,8,9,17
49:18 53:9
53:10,11,16
54:16 55:20
55:22 56:8
56:10,10,20
57:4 58:11
58:17 62:8
62:19,21,21
63:1,6,9 64:4
65:2 66:9
67:18,22
72:17 75:1
76:11 78:8
78:20 81:17
84:3 85:14
87:7 89:20
90:18 91:12
92:17
**reimbursem...**
83:19 90:13
**reimburses**
83:8
**related** 94:11
**relationship**

49:2
**relative** 6:20
6:22 22:20
23:1 27:15
40:11 53:1
73:16 77:17
**relevant** 25:3
**remember**
32:21 88:3
**Remicade**
77:13,18
**rendered**
73:17
**repeat** 38:12
46:17,20
56:5 58:15
62:3 68:18
78:8
**rephrase** 52:11
**report** 6:19
7:17,18,22
8:14,16
11:22 47:4
**reporting** 68:6
**reports** 8:18
10:10 65:17
65:18 66:1,3
66:4,15 68:3
**represent** 10:9
30:13 54:1
82:12
**representative**
57:22 62:18
**request** 71:1
80:4
**required** 54:17
**resolved** 74:13
**resource** 22:19
**respect** 7:19
13:10 16:9
46:22 47:7
49:20 52:8
58:8 61:4
62:19 75:14

Timothy J. Miller    Highly Confidential    January 5, 2005
Richmond, VA

18

| | | | | |
|---|---|---|---|---|
| 92:14,18 | 44:8 53:5 | 35:4 36:1 | segments 66:2 | setup 14:11,12 |
| respond 34:9 | 55:1 74:19 | 41:1,1,3 | 67:3 | several 25:17 |
| 40:18 58:1 | 74:20 | 43:16 45:16 | Seldom 24:12 | share 17:11 |
| response 57:13 | RVUs 44:8 | 45:17 46:9 | selective 17:9 | 29:4,10,13,18 |
| 57:21 72:3 | 54:10 55:12 | 49:21 50:9 | self-administ... | 57:8,15 63:3 |
| 72:11 | 73:15 74:8 | 50:15,19 | 61:4 | sharing 9:22 |
| responsibilit... | ——————— | 51:13 52:21 | senior 12:4 | she 39:20,21 |
| 5:2,18 6:17 | **S** | 54:18,20 | sense 8:10 | Shield 4:17,19 |
| 10:17 11:1 | safer 52:1 | 55:3,13 56:3 | 18:10 66:17 | 4:22 25:12 |
| 89:19 | said 36:2 39:21 | 56:12 74:7,8 | 67:2,13 | 26:9,17 |
| responsibility | 44:11 52:2 | 74:21 83:2,3 | 68:12 69:2 | short 5:1 |
| 6:7 21:19 | 83:2 86:7 | 84:2,8,9,10 | sensitive 18:12 | shortly 33:3 |
| 30:14 | 89:8,20 | 84:14 86:7,9 | sent 57:11 | should 25:21 |
| responsible | 91:11 | scheduled 74:9 | Sentara 29:6,6 | 33:19 56:17 |
| 5:20 8:21 | sales 39:21 | schedules | 29:21 | show 17:13,14 |
| 19:22 24:10 | salespeople | 15:11 18:16 | separate 48:4 | side 16:4 53:15 |
| 31:2 43:8 | 80:18 | 18:20,22 | 83:3 84:10 | 61:4 62:13 |
| restrictions | same 16:20 | 20:9 23:18 | separated 15:4 | 62:14 65:10 |
| 21:22 | 25:10 34:12 | 24:7,9 25:4 | served 5:5,8,14 | sign 93:14 |
| result 14:3 | 50:19 56:18 | 34:20 35:6 | service 7:15 | signature |
| 52:4 | 60:9,9,14 | 48:3 50:3,12 | 11:4 12:19 | 93:15 |
| resulted 84:2 | 62:11 85:4 | 79:17 80:16 | 40:10 73:3,3 | signed 11:5 |
| resulting 47:20 | 87:18 92:9 | 80:22,22 | 73:16 74:4 | significant |
| 84:7 | 93:4 | 81:19,20 | 74:10,11,15 | 91:18 |
| retire 64:15 | sat 30:19 | 82:1 83:1,7 | 74:16 | simplest 23:2 |
| revenues 39:19 | satisfactory | 83:13 84:8 | services 16:7 | simply 6:21 |
| Richmond | 89:22 | 84:16 86:18 | 35:15,15 | 19:1 27:14 |
| 1:12,21 2:20 | satisfied 19:11 | seal 94:15 | 41:5 72:19 | 30:6 63:1 |
| 4:7 94:5 | save 21:10 | second 15:6 | 91:4 | 75:5 |
| right 11:14 | say 12:13 | secretary | set 9:21 10:3 | since 6:7 25:9 |
| 14:19 25:21 | 13:13 17:1 | 19:21 | 18:8 21:4 | 47:4 56:19 |
| 27:17 31:7 | 23:3 27:1 | sections 71:7 | 32:3 34:16 | 73:14 81:17 |
| 45:1 52:14 | 28:12 37:3 | see 13:18 36:5 | 43:3 54:5,5 | single 22:8 |
| 52:20 53:19 | 44:17 48:1 | 55:4 57:14 | 55:2 94:6 | 67:9 85:10 |
| 55:9,19 | 49:16 66:13 | 70:16 73:14 | sets 10:19 32:1 | 88:18,18 |
| road 1:20 2:18 | 72:8 73:10 | 74:19 76:8 | 53:22 88:4 | site 47:15 |
| 4:6 52:1 | 75:8 86:22 | 77:12 78:11 | 89:19 | 68:10 73:2 |
| room 20:18 | scale 22:20 | 83:14 85:22 | setting 18:4 | 74:4,9,11,15 |
| roughly 51:17 | schedule 9:15 | seeing 58:2 | 73:5,9,10,17 | 74:16 85:21 |
| Route 12:22 | 15:1,6,14 | seems 57:22 | 73:18 75:4,7 | 86:19 |
| 13:2 | 20:9 22:1,16 | seen 24:12 | 75:15 76:9 | situation 35:22 |
| rules 6:1 | 24:2,6,13 | 28:17 30:12 | 77:7,19,19 | 59:6 74:6 |
| RVS 27:12 | 28:1 32:10 | 68:7 79:10 | 78:4,5 90:12 | 88:13 |
| RVU 23:1,3,4 | 34:16,18 | 79:12 | 91:3 | six 8:6 46:13 |

Timothy J. Miller            Highly Confidential            January 5, 2005
                              Richmond, VA

| | | | | |
|---|---|---|---|---|
| 88:5 91:11 | speak 82:16 | 24:13,17,18 | subject 15:20 | system 33:7 |
| size 59:2 | speaking 58:3 | 24:19 27:3 | 21:21 41:7 | 63:9 68:15 |
| small 19:3 | 81:11 | 45:22 49:22 | 49:8 69:9,19 | 68:20 91:13 |
| 20:13 | special 9:11 | 54:21 79:20 | 79:13 93:7 | 91:17 92:8 |
| smaller 84:10 | 20:13 21:1 | states 1:1 | subset 84:10 | 92:11 |
| sole-source | 21:17,19 | 13:14 24:11 | succeeded | systematically |
| 88:18 | 22:2,5,7 | 49:22 72:14 | 80:11 | 30:19 |
| some 7:19 9:17 | 35:10,19 | stay 56:17 | such 7:15 9:20 | systems 69:21 |
| 9:22 11:16 | specialties 51:5 | staying 47:1 | 19:15 61:5 | 70:5 |
| 15:21 21:11 | specialty 6:20 | Stenotype 94:7 | 68:8 70:5 | |
| 23:19 26:16 | 9:8,10 10:6 | sticking 46:15 | 77:22 91:17 | **T** |
| 38:16 39:18 | 20:15 50:4 | still 8:7 16:15 | 92:7,11 | T 3:5 94:5 |
| 43:14 44:19 | 50:21 51:2 | 36:10 53:20 | suggest 31:18 | take 10:2 16:8 |
| 46:6 57:16 | specific 26:19 | 64:9 | 73:1 | 16:14 22:7 |
| 68:20 80:13 | 31:5 49:12 | stipulation | suggested 58:6 | 25:19 39:3 |
| 80:18 83:20 | 59:3 66:3 | 71:2 | Suite 1:20 2:19 | 51:4 70:12 |
| 84:10 89:15 | 73:7,20 | straight 86:15 | 4:6 | 70:15 |
| somebody | 74:17 88:10 | strategies 5:16 | superior 60:5 | taken 1:16 4:2 |
| 39:21 | 88:11,11 | 5:19 8:15 | supplied 49:13 | 39:5 70:18 |
| someone 64:3 | specifically | 22:15 30:15 | 76:13 | takes 87:15 |
| 72:4 89:19 | 45:22 92:15 | 37:16 45:6 | supplies 42:21 | talk 30:2 |
| something | specify 60:21 | 46:14 55:20 | 42:22,22 | talked 32:5 |
| 28:21 57:3 | speculate | 56:8,20 57:4 | supply 16:7 | 39:9 49:9 |
| 63:16 69:6 | 41:21 60:1 | 58:11,17 | 20:2 58:2,4 | 63:22 69:6 |
| 76:21 | 60:16 68:13 | 62:8 64:4 | 76:18 | 82:22 |
| sorry 33:17 | 88:16 | 65:2 75:1 | sure 10:12 | talking 14:18 |
| 72:8 78:8 | speculation | 81:18 87:7 | 29:19 37:13 | 14:20 34:12 |
| 81:2 83:10 | 66:20 92:2 | 91:12 | 37:17 38:15 | 37:19 39:7 |
| 91:1 | splitting 14:13 | strategy 5:21 | 39:4 54:12 | 42:16 52:16 |
| sort 22:5 23:16 | standard 9:15 | 5:21 25:8 | 78:11 | 67:16 75:9 |
| 61:16 68:5 | 14:22 15:10 | 33:11 43:9 | surgery 7:15 | 83:13 92:15 |
| 79:10 | 31:22 32:3 | 90:18 | surgical 15:20 | targets 9:21,21 |
| sought 56:20 | 88:4 89:16 | Street 2:6 | 25:15 28:1 | telephone 2:3 |
| 61:1 63:8 | 92:22,22 | strictly 13:6 | 30:20 31:4 | tell 9:3 10:12 |
| 66:7 75:1 | standpoint | 56:2 | 32:6 65:22 | 21:8 26:2 |
| 80:21 91:13 | 18:22 41:10 | strike 13:4 | 67:5 | 69:15 |
| sounds 88:19 | 41:16 78:7 | 16:19 62:6 | surveillance | templates 22:5 |
| source 58:22 | Staples 1:20 | striking 90:6 | 5:7 | tend 67:8 |
| 80:7 89:16 | 2:18 4:6 | structure | suspect 58:5,7 | 81:13 |
| South 25:5 | state 4:14 | 11:17 38:17 | switching | term 27:6 |
| southeast 12:5 | 13:21,22 | 38:22 | 47:15 | 31:14,20 |
| 25:13 | 14:4,5,8,11 | stuck 51:19 | sworn 4:10 | terminate |
| southern 9:5 | 14:15,16 | study 17:13,13 | 94:6 | 19:13 |
| space 7:18 | 15:5,7 20:10 | 57:1 | Syer 21:9 22:3 | terms 19:1,5 |

Timothy J. Miller          Highly Confidential          January 5, 2005
                            Richmond, VA

20

| | | | | |
|---|---|---|---|---|
| 21:19 23:2 | 35:9 46:9 | 25:17 31:5,8 | 16:5 24:19 | 88:6 |
| 24:2 29:18 | 58:10,16 | 31:9 32:16 | 41:5,6,22 | **through** 4:21 |
| 51:6 63:3 | 67:11,16 | 33:20 34:2 | 42:21 43:1 | 18:13 49:20 |
| 78:19,20 | 68:16,22 | 39:18 42:6 | 61:5 73:1 | 50:22 56:16 |
| 79:6 80:14 | 69:22 83:2 | 49:1 73:6,15 | **think** 17:20 | 68:9 84:2 |
| 91:3 | 87:15 88:15 | 88:17,18 | 18:1 31:1,3 | 87:1 |
| **territories** | 88:19 93:6 | 89:15 | 34:10 40:7 | **throughout** |
| 84:13 | **therapeutic** | **these** 5:12 9:16 | 61:21 62:5,8 | 27:1 46:9 |
| **testified** 4:10 | 60:9 | 11:6 34:14 | 62:14 65:6 | **thus** 20:12 |
| 56:2 | **there** 6:18 7:18 | 35:1 39:22 | 66:14 67:9 | 38:18 47:21 |
| **testimony** | 8:20,21 9:21 | 41:22 55:5 | 69:18 71:14 | 93:2 |
| 44:16 | 9:22 11:10 | 55:16 60:8 | 71:15 74:1 | **Tim** 28:14 |
| **than** 9:15 | 12:15 14:7 | 71:2 76:7 | 77:3 78:11 | 39:22 82:16 |
| 20:16 24:20 | 15:4,10 19:6 | 78:15 | 82:3,5 83:2 | **time** 16:20 |
| 29:10 30:5 | 19:7 20:11 | **they** 6:11 8:7,9 | 89:2 92:19 | 21:3,3,11 |
| 36:4,16 | 20:15,22 | 8:11 9:19 | **thinking** 34:11 | 26:10 32:13 |
| 47:20 49:22 | 21:21 22:4 | 10:2 19:10 | **third** 72:14 | 32:14 37:6 |
| 50:10 58:6 | 23:8 25:17 | 19:12 21:21 | **third-party** | 37:11 39:2,4 |
| 64:3 | 26:10 30:7,9 | 21:22 24:14 | 71:12 | 41:5 43:5,7 |
| **Thank** 6:14 | 31:3,4 33:12 | 24:16,20 | **those** 9:3,21 | 43:14 56:11 |
| 71:9 93:11 | 35:4 41:5 | 39:8 40:1,7 | 10:3 11:1 | 56:15,15,19 |
| 93:12 | 44:4,5,5 46:8 | 43:17 46:10 | 12:11 16:7 | 74:5,19 |
| **Thanks** 82:18 | 46:10 48:3,4 | 46:11 53:20 | 17:4 18:19 | 75:11 80:17 |
| 82:20 | 48:6 52:3 | 53:21 56:2 | 22:10 23:19 | 80:17 86:20 |
| **their** 6:20 9:17 | 53:6 59:3 | 57:15,16,17 | 27:21 35:1 | 87:6 90:19 |
| 38:21 44:6 | 61:5 64:3,6 | 58:2 59:2,13 | 35:11,18 | 90:19 |
| 45:15 55:12 | 70:14,17 | 59:15,16 | 41:2,13 42:8 | **times** 23:4 37:5 |
| 57:15 59:13 | 71:6 73:21 | 60:17 69:21 | 44:18 48:18 | 45:8 46:2 |
| 70:1 81:22 | 74:9,17 | 73:21 74:4,5 | 48:19 49:12 | 50:15,19 |
| 86:8,19 | 76:14 79:14 | 74:15 76:18 | 49:13 53:21 | 53:5 54:10 |
| 87:10,10,16 | 81:15 82:2 | 76:19 80:4 | 54:5,5,8 | 55:2 |
| 87:18,19 | 83:2,16 84:8 | 81:22 84:17 | 59:21 66:2 | **Timothy** 1:16 |
| 90:19 | 84:12 88:5 | 85:7 86:8,8 | 68:3 71:7 | 4:2,9,15 |
| **them** 11:7 17:6 | 88:13,14 | 86:18 88:7 | 72:6,20 76:5 | **title** 4:22 11:11 |
| 28:5,7 30:22 | **thereafter** 26:4 | 88:16,19 | 76:5 78:4,18 | 12:3 |
| 48:20,21,22 | 33:3 | 89:13,14,16 | 78:21 79:17 | **today** 21:11 |
| 67:8 68:16 | **therefore** 13:5 | **they're** 16:7 | 81:20 83:7 | 34:3 |
| 68:22 69:22 | **thereof** 94:14 | 54:6,17 | 84:16 87:13 | **together** 67:6 |
| 74:11 | **thereupon** | 59:19 60:9 | 87:14 90:12 | **told** 34:19 |
| **then** 5:1,5,15 | 94:6 | 60:10 85:8 | 91:4 | **Tom** 72:1 |
| 7:6 11:10 | **there's** 9:7,8 | **thing** 23:16 | **threaten** 19:12 | **tomorrow** 21:9 |
| 13:18 15:6 | 10:2,10,14,15 | 34:12 51:17 | **three** 15:7,12 | **took** 30:18 |
| 25:18,18 | 12:18,20 | 62:14 | 23:11 35:2,5 | 32:18 33:2,6 |
| 26:3,16 35:1 | 13:18 17:12 | **things** 9:19 | 50:15 83:3 | 36:17 52:1 |

Timothy J. Miller          Highly Confidential          January 5, 2005
                           Richmond, VA

| | | | | |
|---|---|---|---|---|
| 87:6 | 85:7 | **universe** 49:13 | 25:8,10 27:6 | 41:15 |
| **tool** 5:7 | **types** 5:10 | 49:14 66:5 | 27:22 31:20 | **version** 60:21 |
| **topics** 39:22 | 15:19 16:7 | 67:17 | 32:3,7 36:22 | 88:11 |
| **total** 65:9 | 35:5 39:7 | **unknown** 53:6 | 45:4 51:20 | **versions** 87:12 |
| 67:14,17,17 | 44:18 68:3 | **until** 85:13 | 55:2 60:20 | 88:6,6 |
| **traded** 26:15 | 78:18 91:4 | 86:22 87:7 | 61:8 84:3,9 | **versus** 42:14 |
| **traditional** | **typescript** 94:8 | 87:22 | 84:10 88:19 | 60:13 74:20 |
| 33:13,17,18 | **typically** 19:9 | **up** 7:5 10:3,19 | **uses** 28:1 59:1 | 79:7 93:1 |
| 34:1,2,10,11 | 44:2,3 81:12 | 11:16 30:5 | 86:20 | **very** 13:20 |
| 36:1,4,21 | | 40:17 44:10 | **using** 32:22,22 | 19:4 34:2 |
| 39:10 40:5 | ───── **U** ───── | 44:12 54:5,6 | 33:6 37:8 | 49:21 80:14 |
| 40:11,13 | **Uh-huh** 15:3 | 55:3,4 82:16 | 54:6,9 55:15 | 86:4 |
| 41:3 85:8 | 31:12 47:5 | 83:14 86:11 | 70:11 84:2 | **vice** 8:16 12:4 |
| **traditionally** | 47:17 50:17 | 86:22,22 | 88:3,7 | **view** 16:5 |
| 22:18 | 51:22 54:3 | 87:22 89:12 | **usually** 50:11 | **Virginia** 1:12 |
| **transcript** 6:12 | **ultimately** 51:7 | 91:7 93:2 | 63:4 71:13 | 1:18,21 2:20 |
| 94:9,10 | **under** 6:12 | **update** 43:13 | **utilization** 5:7 | 4:4,7 8:22 |
| **treatment** | 26:15 35:15 | 45:16 46:2,9 | 6:19 7:10,20 | 10:5 12:7,12 |
| 77:10 | 35:16 36:21 | 46:11 49:21 | 50:16,20 | 12:14,16,18 |
| **Trigon** 26:15 | 42:19 48:2 | 52:21 55:13 | 61:12 75:6,8 | 13:7,22 14:8 |
| 72:15,21 | 74:7 76:12 | 56:11,16 | 75:9 | 14:11,15 |
| 75:2 | 94:8,15 | 74:9,21 | **utilize** 22:19 | 15:1 24:7,20 |
| **true** 57:2 85:6 | **undergone** | **updated** 43:15 | 60:13 81:19 | 25:1 26:9,17 |
| 94:9 | 57:1 | 46:6 74:8 | **utilized** 14:4 | 27:2 29:2,5 |
| **try** 11:7 24:22 | **understand** | **updates** 45:15 | 45:10,13 | 29:14 32:10 |
| 82:18 | 20:4 28:20 | 46:1,12 | 54:15 61:9 | 35:4 36:10 |
| **trying** 16:19 | 32:16 33:12 | 55:11 | 93:6 | 41:11 49:22 |
| 16:20 74:1 | 35:3 37:10 | **updating** 20:1 | | 50:2,11 83:4 |
| 78:13 | 37:17 38:6 | **upon** 1:15 4:1 | ───── **V** ───── | 83:8 84:9,13 |
| **turn** 45:1 | 39:1 44:16 | 35:6 63:10 | **VA** 71:16 | 84:13,15 |
| **twelve** 51:17 | 53:8,12 | 94:6 | **value** 22:20,22 | 85:4 86:3 |
| 52:22 | 54:12 61:14 | **urinary** 43:1 | 23:1,4 27:14 | 94:1,2,4,5,16 |
| **two** 5:5,8 15:4 | 83:11 88:9 | **us** 16:13,17 | 27:15,17 | **visit** 7:15 23:2 |
| 15:10 20:9 | 88:21 | 32:17 43:5 | 73:16 | **voiced** 18:20 |
| 23:10 24:7 | **understanding** | 50:20 57:16 | **values** 53:1 | |
| 34:20 35:1 | 11:16 86:10 | 78:15,17 | 54:6 74:19 | ───── **W** ───── |
| 43:15 49:2 | 86:17 | 90:4 93:8 | 74:20 | **waive** 93:15 |
| 53:22 59:18 | **understood** | **use** 31:14 32:6 | **variability** | **walk** 4:21 |
| 83:1 84:8,12 | 27:7 | 44:3 49:13 | 10:2 | **want** 16:12 |
| 87:12,13,14 | **unit** 5:9 8:6,8 | 50:14,14 | **variable** 51:15 | 17:1,5,15 |
| 87:22 89:10 | 23:1 68:5 | 56:9,13 | **variations** | 32:13 40:4 |
| **Tyler** 2:13 | 73:16 | 60:17 84:5 | 15:17 | 42:7 66:13 |
| **type** 35:6 68:3 | **United** 1:1 | 92:22 93:3 | **varies** 44:4 | 82:16 87:9 |
| 69:4 79:10 | 29:9,21 | **used** 22:18,20 | **various** 30:21 | 90:2,2,18,20 |

Timothy J. Miller                Highly Confidential                January 5, 2005
                                    Richmond, VA

22

| | | | | |
|---|---|---|---|---|
| **wants** 39:20 | 25:17 31:3 | 62:17 64:21 | 77:21 89:19 | 12:22 13:3 |
| 93:3 | 32:18,21,22 | 67:21 73:10 | **WHOLESA...** | 13:19 14:22 |
| **Washington** | 35:3 38:4 | 74:8 75:8 | 1:9 | 18:1 28:17 |
| 15:8 83:4 | 39:7,17 | 76:5 89:18 | **whom** 4:16 | 40:9 45:21 |
| **wasn't** 25:18 | 40:22 42:16 | 90:12 92:15 | 8:14 11:22 | 48:10 52:21 |
| **way** 11:15,16 | 48:8,9 52:5 | **where** 41:5 | 28:10 46:18 | 56:5 58:21 |
| 36:8 57:5 | 57:9 71:3 | 44:6 57:12 | 50:5 75:16 | 60:4,15 62:3 |
| 61:2 83:7 | 72:20,20 | 63:9,19 | 79:21 | 62:12 65:16 |
| 84:17 91:21 | 74:5,7,11,15 | 64:11,13 | **whose** 94:4 | 66:22 70:10 |
| **ways** 17:8 | 83:13,18 | 66:15 69:21 | **why** 9:3 10:12 | 78:7 80:1 |
| 61:11 | 86:5 89:18 | 70:16 73:15 | 14:10 15:10 | 81:5 84:21 |
| **Web** 47:15 | 92:15 | 74:6 76:19 | 42:2 70:12 | 90:17 92:4 |
| 68:9 85:21 | **west** 24:21 | 77:8 85:18 | **widely** 22:20 | 92:10,21 |
| 86:19 | **western** 9:6 | 88:13 89:13 | **will** 19:9 21:15 | 93:15 |
| **Webb** 2:13 | **we'll** 13:18 | 89:14 91:13 | 38:14 42:13 | **word** 44:3 |
| **weigh** 19:2 | **we're** 14:17,18 | **whether** 7:21 | 46:1,10 | **words** 31:17 |
| **weight** 19:5 | 16:10,12 | 39:20 56:17 | 48:13 54:15 | 55:10 |
| **well** 7:13 8:3 | 18:1 26:22 | 59:2 68:7 | 54:22 57:15 | **work** 11:15,16 |
| 9:18 11:5 | 27:2 47:6 | 73:21 74:2,4 | 61:11 80:18 | 18:6,10 |
| 13:17 17:4 | 67:16 71:17 | 74:5,15 78:4 | 90:4 93:3,13 | **worked** 8:5 |
| 18:1,17 20:2 | 84:16 | 85:7,8 86:5 | **WILLIAM** | 11:15 69:13 |
| 20:8 22:17 | **we've** 31:6 | 89:16 93:2 | 2:12 | **working** 51:12 |
| 24:4,7 29:4 | 32:5 39:9 | **which** 9:16,19 | **willing** 57:7,10 | 74:2 |
| 30:18 34:8 | 71:11,14 | 12:19 17:6 | **wish** 6:11 | **workload** |
| 34:16 36:12 | **what's** 17:18 | 18:4,18 | 19:11 68:13 | 14:13 |
| 37:12 40:16 | 24:22 25:1 | 21:22 22:22 | **wit** 94:1 | **works** 17:14 |
| 41:19 43:7 | 33:10 38:5 | 27:15 29:8 | **within** 6:20 | 69:13 |
| 47:14 48:20 | 53:6 | 31:1,6 32:1 | 10:8 12:9 | **would** 4:20 |
| 51:10,17 | **when** 4:18 8:2 | 34:17 37:20 | 13:7 14:8,11 | 5:10 6:3,8 |
| 52:18 53:17 | 8:4,7,10 | 42:11 43:8 | 14:14,16 | 7:2,3,17,18 |
| 54:17 61:2 | 12:13 13:13 | 45:5 50:3 | 25:8 27:3 | 9:10,16,19,19 |
| 65:7 73:1,4 | 15:18 17:1 | 60:17,17 | 30:10 32:1 | 9:22 10:9,22 |
| 75:18 81:21 | 17:18 26:10 | 61:8 67:4 | 33:2 35:1,5 | 11:6,9 12:1 |
| 83:18 86:20 | 26:13,14,17 | 68:15,20 | 35:11,19 | 12:16 13:5 |
| 86:22 87:6 | 27:1,6 28:11 | 73:20 76:14 | 44:21,22 | 13:19,21 |
| 88:3,15,15 | 30:14,18 | **while** 16:20 | 46:19,21 | 15:15,22 |
| 89:7 91:21 | 31:1 32:18 | **who** 8:18,20 | 59:13 61:18 | 16:18 18:6 |
| **went** 33:3 | 33:2 34:3,10 | 11:6,11 16:7 | 67:3 69:7 | 18:19 19:12 |
| 44:11 52:2 | 34:19 37:3 | 17:5 19:19 | 70:1 75:3,15 | 19:14,20 |
| 73:8 83:20 | 40:20 45:15 | 19:22 20:11 | 77:18,19 | 20:2,4,7,17 |
| 84:1 | 45:22,22 | 21:9 29:2,17 | 78:4,5 79:20 | 21:6,8,9 22:3 |
| **were** 5:2,12 | 48:1,8 49:16 | 29:19 64:7 | 94:4 | 22:13 23:2,3 |
| 6:17 8:7,9 | 54:6 55:19 | 65:4 69:10 | **without** 58:1,9 | 23:9,10,11,17 |
| 9:21,21 | 56:7 57:9,17 | 69:12 73:22 | **witness** 3:3 4:9 | 23:19 24:5 |

Henderson Legal Services
(202) 220-4158

Timothy J. Miller            Highly Confidential            January 5, 2005
Richmond, VA

23

| | | | | |
|---|---|---|---|---|
| 24:16,20 | **Y** | 80:15,17,21 | **1133** 2:13 | **3** |
| 25:2 29:5,8,9 | **Yeah** 9:2 70:8 | 81:1 82:22 | **12-31-04** 53:22 | **30** 94:4 |
| 29:20,21 | 79:21 81:7 | 83:11 86:10 | **12:54** 93:16 | **31st** 87:1 |
| 30:4,7 31:17 | **year** 43:13 | 86:17 87:4 | **123** 12:22 13:2 | **336-2000** 2:15 |
| 31:18 33:8 | 44:4,4,6,9,11 | 88:8 89:19 | **14th** 71:18 | **354-7697** 2:21 |
| 34:13,18 | 44:17,18 | 89:21 90:7 | 72:2 74:6 | |
| 35:5,10,13 | 46:10,12 | **you're** 16:19 | **150** 50:4,7,10 | **4** |
| 36:2,3,5,16 | 50:12 51:10 | 17:18 25:19 | **16.0** 23:4 | **4** 3:5 |
| 36:17 37:22 | 51:11,13 | 28:12 31:1 | **1985** 4:20 5:3 | **40** 29:16 67:22 |
| 38:7,13,20,22 | 55:12,14,14 | 32:13 37:8 | 26:8 27:8 | **401** 1:21 2:19 |
| 40:1 41:2,17 | 73:14 87:20 | 41:21 52:16 | **1992** 25:13 | 4:7 |
| 42:7,9 43:15 | **years** 5:5,8,8 | 55:15 60:15 | 73:14 | **482-3700** 2:9 |
| 43:16 44:3 | 5:15 8:6 | 66:19 86:11 | **1995** 36:17 | |
| 47:8,15,18,20 | 30:21 32:8 | 90:12 | **1998** 5:16 6:7 | **5** |
| 48:2,12,22 | 40:17 43:15 | **you've** 25:8 | 25:9 26:20 | **5** 1:13 68:2 |
| 49:8,11 | 44:5,11 46:6 | 43:8 45:5 | 30:15 32:18 | **5th** 1:19 4:5 |
| 51:18 52:4,6 | 46:7,13 68:8 | 46:13 56:19 | 33:2,6 55:20 | **50** 68:1 |
| 55:15 56:15 | 91:12 | 62:17 63:16 | 64:5 | |
| 57:6,7 58:10 | **year's** 74:7 | 69:6 87:4 | **1999** 33:3 | **6** |
| 58:16 59:4,5 | **York** 2:14,14 | 91:12 | 72:11 | **60** 68:1 |
| 59:16,18,20 | **your** 4:14,21 | | | **617** 2:9 |
| 61:21 62:9 | 5:1,18 6:6,16 | **0** | **2** | |
| 63:2,10 | 6:17 8:10 | **001** 3:11 71:16 | **20** 36:16 | **7** |
| 66:16 67:12 | 10:4 16:19 | 71:20 | **2000** 40:21 | **71** 3:11 |
| 68:15,21 | 17:9,10 | **01-CV-1225...** | 71:18 72:2 | |
| 69:15 73:8 | 20:16 22:14 | 1:3 | 72:21 88:5,7 | **8** |
| 74:9,18 | 23:6 24:5 | **02142** 2:8 | **2002** 26:3 | **8** 15:14,15 |
| 75:13 76:5,9 | 25:2,8,22 | **04010014** 3:12 | **2004** 46:7 53:1 | 29:10 68:2 |
| 76:9,12 77:8 | 26:18 29:2 | 71:19 | 55:16 87:1,7 | **80** 38:14 |
| 78:19 79:1,4 | 29:17 35:4 | **0413283** 94:21 | 87:17,20 | **804** 2:21 |
| 79:7,8 80:7 | 36:14 41:2 | | 88:1 | **82** 3:6 |
| 86:9 88:16 | 43:19,22 | **1** | **2005** 1:13,19 | **85** 40:17 87:19 |
| 88:20 90:9 | 44:16 47:10 | **1** 26:3 88:1 | 4:5 47:9 | **88** 41:12 |
| 91:3,10,17,18 | 48:8 51:16 | **1st** 46:8 55:13 | 52:13 53:16 | **89** 40:12,15 |
| 92:4 93:7 | 52:11 53:16 | 87:7,17 | 53:18 54:7,9 | 41:2 |
| **wouldn't** 21:5 | 54:16,20 | **1-1** 54:7 | 54:15 55:6 | |
| 25:3 59:11 | 55:16 58:10 | **1-1-05** 52:22 | 94:17 | **9** |
| **wound** 42:21 | 58:16 62:5,7 | 54:4 | **2008** 94:4 | **91** 3:5 |
| **write** 19:9 | 63:6 65:9 | **1-14-00** 3:11 | **212** 2:15 | **95** 37:5,8,14 |
| **written** 74:20 | 66:1,8,18 | **1.0** 23:3 | **2235** 1:20 2:18 | 38:5,14 |
| **wrong** 27:11 | 67:2,14,21 | **10:18** 1:19 4:5 | 4:6 | 41:12 45:8 |
| | 68:19,22 | **100** 32:9 43:11 | **23230** 2:20 | 46:2 47:11 |
| **X** | 69:7 74:22 | 47:22 | **29** 72:11 | 47:12,21 |
| **X** 3:1 63:6 | 77:16 78:14 | **10036** 2:14 | | 51:19,20 |
| | | | | 52:5 85:15 |

Timothy J. Miller                Highly Confidential                January 5, 2005
                                   Richmond, VA

24

| 87:8,15 98 8:8,12 43:9 56:7 | | | | |
|---|---|---|---|---|
| | | | | |