1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

| | |
|---|---|
| In re: PHARMACEUTICAL | MDL DOCKET NO. |
| INDUSTRY AVERAGE WHOLESALE | CIVIL ACTION |
| PRICE LITIGATION | 01CV12257-PBS |

_____/

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/


D E P O S I T I O N

DEPONENT: Bruce M. Niebylski, M.D.

DATE:     Friday, June 30, 2006

TIME:     9:49 a.m.

LOCATION: Feikens, Stevens, Kennedy & Galbraith, P.C.

          First National Building

          660 Woodward Avenue, Suite 700

          Detroit, Michigan  48226

REPORTER: Michele E. French, CSR-3091, RMR, RPR, CRR

**Page 2**

```
 1   APPEARANCES:
 2   Appearing via telephone on behalf of the Plaintiffs:
 3       WILLIAMS LAW FIRM
 4       BY: KENT WILLIAMS, ESQ.
 5       1300 Godward Street, N.W.
 6       Minneapolis, Minnesota  55413
 7       (651) 633-9000
 8
 9   Appearing on Behalf of Johnson & Johnson
10       PATTERSON BELKNAP WEBB & TYLER, LLP
11       BY: ADEEL A. MANGI, ESQ.
12       1133 Avenue of the Americas
13       New York, New York  10036-6710
14       (212) 336-2000
15
16   Appearing on behalf of Health Alliance Plan:
17       FEIKENS, STEVENS, KENNEDY & GALBRAITH, P.C.
18       BY: LEE A. STEVENS, ESQ.
19       700 First National Building
20       660 Woodward Avenue
21       Detroit, Michigan  48226
22       (313) 962-5909
```

**Page 3**

```
 1              TABLE OF CONTENTS
 2   WITNESS                                       PAGE
 3   BRUCE NIEBYLSKI, M.D.
 4   Examination Mr. Mangi............................ 005
 5   Recess - 10:41 a.m. to 10:49 a.m................. 044
 6   Recess - 11:51 a.m. to 12:02 p.m................. 092
 7   Recess - 12:31 p.m. to 12:46 p.m................. 114
 8   Recess - 01:41 p.m. to 01:48 p.m................. 153
 9
10            INDEX OF NIEBYLSKI EXHIBIT
11   EXHIBIT         DESCRIPTION             PAGE
12   Exhibit Niebylski 001  Curriculum Vitae of
13                Bruce M. Niebylski, M.D........... 009
14   Exhibit Niebylski 002  Schedule B Deposition
15                Topics............................ 044
16   Exhibit Niebylski 003  9-18-03 Fee Schedule
17                Committee minutes................. 106
18   Exhibit Niebylski 004  8-18-03 Fee Schedule
19                Committee minutes................. 111
20   Exhibit Niebylski 005  HAP of MI - HFMG, HAPMI56 -
21                HAPMI183.......................... 115
22
```

**Page 4**

```
 1   Exhibit Niebylski 006  9-1-03 Health Alliance Plan
 2                letter to physician............... 117
 3   Exhibit Niebylski 007  1-8-04  Provider
 4                Reimbursement Committee mins...... 126
 5   Exhibit Niebylski 008  1-29-04 Provider
 6                Reimbursement Committee mins...... 131
 7   Exhibit Niebylski 009  8-3-04  Provider
 8                Reimbursement Committee mins...... 133
 9   Exhibit Niebylski 010  8-26-04 Provider
10                Reimbursement Committee mins...... 135
11   Exhibit Niebylski 011  3-23-05 letter to HAP
12                Provider Relations................ 144
13   Exhibit Niebylski 012  PRC Rate Proposal
14                Worksheet......................... 147
15   Exhibit Niebylski 013  CDC Vaccine Price
16                List.............................. 151
17   Exhibit Niebylski 014  3-2-05 Jennifer letter
18                to HAP............................ 153
19   Exhibit Niebylski 015  Kapil, M.D. Letter,
20                "To Whom It May Concern".......... 153
21
22
```

**Page 5**

```
 1                    * * * * *
 2        BRUCE NIEBYLSKI, M.D., was thereupon called
 3   as a witness herein, and after having first been
 4   duly sworn to testify to the truth, the whole truth
 5   and nothing but the truth, was examined and
 6   testified as follows:
 7              EXAMINATION
 8   BY MR. MANGI:
 9        Q.  Doctor, as I mentioned before we started,
10   my name is Adeel Mangi.  I represent Johnson &
11   Johnson in this litigation.
12            Are you currently employed?
13        A.  Yes.
14        Q.  Who do you work for?
15        A.  Health Alliance Plan in Detroit, Michigan.
16        Q.  What is your current title?
17        A.  I'm the Senior Associate and Medical
18   Director.
19        Q.  How long have you held that position?
20        A.  Eight and a half years.
21        Q.  Since 1998?
22        A.  March '98, yeah.
```

**Page 6**

1  Q. How long have you worked at Health
2  Alliance Plan of Michigan?
3  A. Eight and a half, since then.
4  Q. Okay. Now, I'd like to go a bit further
5  back in time and just get your background. Could we
6  start with your educational background. Could you
7  describe it for me after high school?
8  A. Sure. I graduated with a B.S. at the
9  University of Notre Dame, graduated in '75. Went to
10 medical school, Wayne State University School of
11 Medicine, graduated in '79, and did a residency at
12 William Beaumont Hospital in Royal Oak, Michigan,
13 where I finished my training there in '82.
14 Q. Was your residency in any particular area
15 of medicine?
16 A. In internal medicine.
17 Q. What did you do after completing your
18 residency in 1982?
19 A. I became employed at the -- with the Henry
20 Ford Medical Group and practiced internal medicine
21 at their Dearborn satellite clinic.
22 Q. How long did you work in that capacity?

**Page 7**

1  A. I worked at Ford for about 12 years, in a
2  variety of roles. I not only practiced but I also
3  was part of their -- started getting involved in
4  committees and then administration, became Medical
5  Director and physician in charge of various sites.
6  Q. Perhaps we can break that down a bit.
7  A. Oh, sure.
8  Q. You were there in total from 1982 to 1994?
9  A. '93.
10 Q. '93, okay. Now, how long were you
11 practicing only as a doctor in internal medicine?
12 A. Probably, where I just practiced, about
13 three years.
14 Q. Okay. And can you describe in as much
15 specificity as you can recall now what your
16 transitions were after that time?
17 A. I immediately, actually, started -- 1982
18 was a time the economy in Detroit was not good, so I
19 knew I needed to make myself as valuable to the
20 institution as possible because there were fears of
21 layoffs and things, and so I started joining
22 committees.

**Page 8**

1  They also needed someone to essentially be
2  the Medical Director at a state-run facility for the
3  developmentally disabled. So I started doing that
4  in '82, and I did that until 1991, I believe, and
5  helped me get accustomed to State regulations,
6  working with the Medicaid population and all the
7  rules and things that the State Government required
8  in terms of documentation and authorizations.
9  Q. Was that a facility owned by the Henry
10 Ford Medical Group?
11 A. No, no. It was a state-run facility.
12 Q. So it was entirely independent of the
13 Henry Ford Group?
14 A. Correct.
15 Q. Okay.
16 A. Became a physician in charge in 1985 of
17 the Henry Ford Southland Center, and that was my
18 first administrative title. Did that for four
19 years.
20 Q. What were your responsibilities as a
21 physician in charge?
22 A. Essentially was the -- I acted as the

**Page 9**

1  owner and manager of a 5,000 square foot, seven-
2  physician multi-specialty primary care practice. I
3  wasn't the owner, Henry Ford owned it, but they
4  essentially gave me the keys and let me hire all the
5  people, set policies or at least implement Henry
6  Ford policies.
7  Q. What was your title in that role?
8  A. Physician in charge.
9  Q. Okay. And you were in that position from
10 '85 to about '89?
11 A. Correct. Somewhere in there, '88, I
12 believe, '88, '89, I was elected to the Board of
13 Governors of the Henry Ford Medical Group.
14     MR. STEVENS: I would offer, if you like,
15 some biographical curriculum vitae information.
16     MR. MANGI: Sure, that would be very
17 helpful. Thank you. Why don't we mark this as
18 Exhibit Niebylski 001 to the deposition.
19     (Exhibit Niebylski 001 was marked.)
20 BY MR. MANGI:
21 Q. Dr. Niebylski, are you familiar with the
22 document that's been marked as Exhibit Niebylski

Page 10

```
1   001?
2       A. Yes.
3       Q. Is this a copy of your CV?
4       A. That's a -- yes, that's a portion of it.
5   The basic roles and responsibilities.
6       Q. Is this current and up-to-date?
7       A. Yes. Pretty much, yes.
8       Q. And this is a document that you prepared?
9       A. Yes.
10      Q. Now, this will enable us to short-circuit
11  some of the questioning. Let me ask you a few
12  specific questions.
13      A. Sure.
14      Q. It says here from '89 to '93, you were the
15  Associate Medical Director of the primary care
16  programs for the Henry Ford Medical Group in the
17  western region.
18      A. Yes.
19      Q. Okay. What were your responsibilities in
20  that position?
21      A. I was responsible for the primary care
22  clinics of the western region; pediatrics, emergency
```

Page 11

```
1   room, OB/GYN, and internal medicine and family
2   practice. And so I met with the division heads of
3   each of those specialties and made policies, tried
4   to improve productivity, improve clinical outcomes.
5   In general made sure that the doctors were -- were -
6   - helped facilitate the care that they provided,
7   make sure that if there were any problems that were
8   occurring that we helped fix any leaky faucets or
9   what have you.
10      Q. And then in 1993 you left the Henry Ford
11  Medical Group; is that correct?
12      A. Correct.
13      Q. And you then moved to the Sinai Hospital
14  as the Ambulatory Services Division Vice President?
15      A. Correct.
16      Q. Now, sticking for a moment with the time
17  you spent with the Henry Ford Medical Group, did you
18  have any responsibilities in any of the positions
19  you held for the purchases of drugs?
20      A. No.
21      Q. Okay. Now, as a doctor, I am sure you are
22  familiar with there are certain drugs that are
```

Page 12

```
1   administered to patients by physicians in their
2   offices in the forms of injections or infusions;
3   right?
4       A. Correct.
5       Q. Drugs such as some oncology drugs, some
6   antiemetics, things like that?
7       A. Correct.
8       Q. How did the Henry Ford Medical Group go
9   about acquiring such drugs, physician-administered
10  drugs, during the period of time that you worked
11  there?
12      A. All -- all purchases, whether it was
13  toilet paper, drugs, or patient gowns, were all done
14  at Central Purchasing within the Henry Ford Health
15  System.
16      Q. Okay. So, for example, when you were the
17  physician in charge of the Taylor Medical Center,
18  you said --
19      A. Correct.
20      Q. -- drugs would be purchased by the central
21  organization and then sent to your location?
22      A. When our inventory was low of things we
```

Page 13

```
1   thought we needed, we would just put in a
2   requisition form to have more delivered.
3       Q. Okay. During your period at Henry Ford
4   Medical Group, did you ever gain an understanding as
5   to what prices were being paid for drugs?
6       A. I'd see the sheets as to how much things
7   were costing, but I had no idea, really -- well, I
8   would see what we were paying.
9       Q. Now, the sheets you referred to, what are
10  those?
11      A. They're our basic budget sheets, how much
12  did we pay for this B-12 vial, how much did we pay
13  for that IV.
14      Q. Were the -- did those budget sheets
15  express the costs of individual drugs as dollar
16  sums?
17      A. Yes.
18      Q. Okay. Were the prices also expressed by
19  reference to any particular pricing benchmark, such
20  as --
21      A. No.
22      Q. Are you familiar with the term wholesale
```

**Page 14**

1  acquisition cost, or WAC?
2  A. I have heard of it, yes.
3  Q. Okay. Were the prices expressed by
4  reference to WAC?
5  A. No.
6  Q. Are you familiar with the term average
7  wholesale price, or AWP?
8  A. Yes.
9  Q. Were the prices expressed by reference to
10 AWP?
11 A. No.
12 Q. When is the first time you heard the term
13 WAC, or W-A-C?
14 A. Probably in the last 15 years or so I had
15 to have heard it initially.
16 Q. Okay. So you first heard WAC I guess
17 sometime around '91?
18 A. Probably, yeah.
19 Q. And what is your understanding -- withdraw
20 that.
21    What was your understanding when you first
22 heard the term in '91 of what WAC is?

**Page 15**

1  A. That it was -- my understanding was that
2  it was just the average price that a particular drug
3  was bought for.
4  Q. And did you have an understanding of who
5  was paying WAC to purchase these drugs?
6  A. No, I had no idea.
7  Q. Okay. Do you recall what context you
8  first heard the term WAC in?
9  A. Probably reading it in a journal.
10 Q. Do you recall whether you first became
11 familiar with the term WAC in relation to physician-
12 administered drugs, self-administered drugs, by
13 which I mean pills and so on, or just generally?
14 A. No, I -- you're stretching my memory as it
15 is, so, no.
16 Q. Okay. Now, how about the term average
17 wholesale price or AWP? Do you recall when you
18 first heard that term?
19 A. Probably about the same time.
20 Q. And you understand that AWP stands for
21 average wholesale price?
22 A. Correct.

**Page 16**

1  Q. But in that time period '91, when you
2  first heard this term, did you get an understanding
3  as to what, if anything, AWP is?
4  A. Again, it's -- I thought it was the
5  average that -- average cost of a drug, just like
6  the average cost of gasoline is 2.90.
7  Q. So in 1991, was it your understanding that
8  AWP represented an actual average of wholesale
9  prices?
10 A. That was my understanding.
11 Q. Okay. Did that understanding change at
12 any point?
13 A. No.
14 Q. Do you have an understanding as to what
15 the relationship is between WAC and AWP?
16 A. No.
17 Q. Do you know whether those two numbers are
18 the same or different?
19 A. I -- they only confuse me, so, no, I
20 don't. I have no idea what the difference is
21 between the two.
22 Q. Have you ever heard AWP referred to as

**Page 17**

1  ain't what's paid?
2  A. No, I haven't.
3  Q. Now, we were talking about your
4  background. We veered off. What was your
5  responsibilities as VP of the Ambulatory Services
6  Division at Sinai Hospital?
7  A. I ran the employed practices of Sinai
8  Hospital, so Sinai had something like 30 or so
9  employed practices, about 120, 110, 120 physicians
10 practicing out of those offices. And my
11 responsibility was to be sure that, again, they were
12 all meeting budget, improving productivity,
13 improving clinical outcomes, practicing in a manner
14 that was best for them and their patients.
15 Q. Is the Sinai Hospital an independent
16 entity or was it affiliated with any other group?
17 A. At that time it was an independent entity.
18 Since then, and the reason I left there, they were
19 purchased by the Detroit Medical Center and have
20 since torn it down.
21 Q. Now, in 1994, you also started the
22 position as a Medical Director of Sinai Care PHO?

**Page 18**

1  A. Correct.
2  Q. And that position overlapped for a year
3  with your position as VP of the Ambulatory Services
4  Division at Sinai Hospital; correct?
5  A. Correct.
6  Q. So you were serving in both roles at the
7  same time?
8  A. Yeah. The PHO had no contracts until it
9  was 1994, and so at that point I -- once they had a
10 contract, they needed a Medical Director, so....
11 Q. Now, Sinai Care PHO, was that a health
12 insurer?
13 A. No. It was a physician/hospital
14 organization. It was a joint venture, I guess you
15 would call it, between the physicians on staff at
16 Sinai Hospital and the hospital to contract with
17 health plans.
18     MR. STEVENS: Independent delivery group?
19     THE WITNESS: It was a PHO.
20     MR. STEVENS: Yeah, okay.
21 BY MR. MANGI:
22 Q. Was Sinai Care PHO affiliated with the

**Page 19**

1  Sinai Hospital?
2  A. Sinai was a 50 percent investor in it.
3  The other 50 percent was the physicians on staff at
4  the hospital.
5  Q. Okay. And what were your responsibilities
6  as Medical Director?
7  A. To -- I helped negotiate the contracts
8  with health plans and to credential physicians who
9  were joining the PHO, insure appropriate utilization
10 by the physicians on behalf of the patients.
11 Q. Now, was this the first time you had
12 worked on the negotiation of contracts with health
13 plans from the provider perspective?
14 A. Yes.
15 Q. That was never part of your
16 responsibilities while at the Henry Ford Medical
17 Group?
18 A. No.
19 Q. Now, what were some of the goals that you
20 brought to that project from Sinai Care's
21 perspective when entering into a negotiation with a
22 health insurer?

**Page 20**

1  A. Because I was in charge of the employed
2  practices, one goal was to ensure that we get as
3  much business for the physicians as possible. So we
4  were really looking to contract with health plans so
5  that they would have -- the physicians would have
6  more patients.
7  Q. Okay. Any other goals?
8  A. We had fiduciary responsibility to the
9  owners of our PHO that we provided care in an
10 economically feasible as well as quality manner.
11 Q. What do you mean by that?
12 A. Well, we wanted to make sure that we were
13 not being exorbitant in the way we took care of our
14 patients. We weren't getting total body scans on
15 everybody every week, kind of thing. And so really
16 we wanted to make sure we made budget, financial
17 responsibility, and also made sure that the patients
18 were getting their care in the right place at the
19 right time by the proper specialist.
20 Q. And what do you mean when you refer to
21 economically feasible?
22 A. That's probably not the best phrasing.

**Page 21**

1  Just making sure we make budget.
2  Q. Okay. Now, was Sinai Care PHO a not-for-
3  profit entity or a for-profit entity?
4  A. You know, I'm not sure. I can't remember.
5  Q. In negotiations with health insurers over
6  reimbursement rates, was there negotiation over the
7  actual amount that would be reimbursed?
8  A. There was negotiation over a fee screen,
9  as to what the physicians would be paid for a
10 service.
11 Q. When you refer to fee screen, is that the
12 same thing as a fee schedule?
13 A. Yes.
14 Q. Now, was there negotiation only in
15 relation to amounts that would be reimbursed for
16 particular services or was there also negotiation
17 around the amounts that would be reimbursed for
18 particular drugs that may be administered in the
19 course of physician office visits?
20 A. I...I'm trying to remember exactly, you
21 know, what the negotiated points were, but
22 basically, yeah, I'm sure they must have negotiated

**Page 22**

1  price, as well.
2       There wasn't much of a negotiation at that
3  point. We didn't have any contracts, and we wanted
4  contracts. And so when a health plan showed us a
5  fee screen, fee schedule, we said, "Looks great,"
6  and that was the end of the negotiation. So we took
7  whatever they offered us.
8       Q. Because at that time the priority was to
9  get as many patients as possible by having as much -
10 - as many insurance contracts as possible?
11      A. Correct.
12      Q. Did that change at any point during your
13 tenure at Sinai Care PHO?
14      A. No.
15      Q. Now, in 1997, you left Sinai Care PHO and
16 became the Medical Director for Beacon LLC; correct?
17      A. Correct.
18      Q. And that's in Chicago?
19      A. Correct.
20      Q. What is Beacon LLC?
21      A. Beacon LLC was an MSO, managed service
22 organization, that was a for-profit entity in

**Page 23**

1  Chicago, designed to essentially run physicians'
2  offices for them so physicians didn't have to worry
3  about staffing their office or negotiating managed
4  care contracts or, you know, even purchasing things
5  for their offices.
6       It was a subsidiary or at least partially
7  owned by Rush. And the idea was that if physicians
8  invested in Beacon LLC that they could buy things at
9  a better price, they could hire people at a better
10 price for lower wage or -- yeah, lower wage. They
11 could get advertising done for them.
12      It was essentially acting as the business
13 office for a private physician office so that the
14 doctor only had to worry about taking care of
15 patients rather than worrying about the business
16 aspects of their office.
17      Q. Now, when you refer to purchasing, does
18 that include things like office supplies?
19      A. Yes.
20      Q. Does it include drugs?
21      A. I'm sure it did.
22      Q. What were your responsibilities as the

**Page 24**

1  Medical Director there?
2       A. At that time, Beacon was solely in a
3  start-up phase and my responsibilities really were
4  trying to recruit physicians to join the MSO.
5       Q. While Medical Director of Beacon, did you
6  have any responsibilities in relation to negotiating
7  with managed care or health plans?
8       A. No.
9       Q. So your only responsibility was focused on
10 getting doctors to join the group?
11      A. Correct.
12      Q. Do you know who -- was there a department
13 or a person at Beacon who was responsible for drug
14 purchases on behalf of the organization?
15      A. I believe Beacon -- and I don't know this
16 for absolute fact because it's stretching my memory.
17 I believe Beacon had a contract with Rush to be able
18 to use the Rush buying power from the Rush system.
19      Q. What do you mean when you refer to buying
20 power in the context of drug purchases?
21      A. The Rush system was Rush-Presbyterian-St.
22 Luke's Hospital and nine other hospitals across

**Page 25**

1  south -- northeast Illinois. And they were all
2  affiliated together, and they had essentially the
3  buying power of ten large medical centers to be able
4  to buy things at discount prices.
5       Q. I see. So you understood certainly as of
6  this period in the mid 1990s that groups that were
7  large and had buying power would be able to purchase
8  drugs at a better price with more discounts,
9  rebates, than other entities in the market?
10      A. Well, I don't know that for sure. I have
11 no idea how the drugs were purchased. I know we
12 could get toilet paper for a cheaper price, so....
13      Q. Well, in relation to drugs, was it your
14 assumption that Rush, by virtue of its buying power,
15 would be able to obtain discounts?
16      A. Again, I don't know specifically for
17 drugs, but I knew that we could buy -- they could
18 buy in bulk at a better price whatever they were
19 purchasing.
20      Q. Okay. Now, after your stint at Beacon,
21 you became Director of Primary Care for the Rush
22 Primary Care Institute from '97 to '98?

**26**

1   A. Well, that was -- they were all
2   overlapping. I had many roles at Rush.
3   Q. Oh, I see.
4   A. Yeah.
5   Q. Well, what were your roles as the Director
6   of Primary Care?
7   A. I ran the employed practices of Rush-
8   Presbyterian-St. Luke's.
9   Q. Now, were you able to hold both positions
10  because of Rush's relationship to Beacon?
11  A. I actually was -- they were both
12  synergistic. By running the employed practices,
13  certainly one of the main -- some of the early
14  people to join Beacon, some of the physicians to
15  join Beacon were the employed practices of Rush.
16  Q. I see. Did you have one office or two
17  separate offices for these two separate roles?
18  A. One office. I had many offices but my
19  computer was in one office.
20  Q. Now, after your stint as Director of
21  Primary Care -- actually, there's a third role that
22  overlapped at the same time period. You were also

**27**

1   the Director of Practice Management; is that
2   correct?
3   A. Correct.
4   Q. Now, what were your responsibilities in
5   that position?
6   A. Well, that was also running the practices.
7   Rush Primary Care Institute, I think that was not
8   only helping recruit physicians to Rush, but also we
9   had some quality projects where we were getting
10  grants to improve asthma care, diabetes care, those
11  sorts of things.
12  Q. Okay. And your CV also lists another
13  overlapping position from the '96 to '98 time
14  period, which is Vice President of Physician Network
15  Development for the Rush System for Health. What
16  was that role?
17  A. That was essentially going out to all
18  these ten hospitals across northeast Illinois and
19  meeting with physicians, trying to find out if there
20  were common problems amongst the physicians that as
21  a system we could solve where individually they may
22  not have been able to solve them.

**28**

1   So it was essentially a fact-finding by
2   meeting with groups of physicians and finding out
3   what they could -- what we as a system could do to
4   help them out better.
5   The worry was in those day and age physicians
6   were jumping from hospital to hospital where they
7   would practice out of, and the hospitals all wanted
8   to make themselves as attractive as possible for
9   physicians to come and practice there, so they hired
10  me to find out what it was that they were looking
11  for and possibly finding that.
12  As an example, three of these hospitals
13  wanted to have a bone marrow transplant program.
14  Didn't make sense for each one to create their own
15  program, so we got a group together to create a
16  program that would work out of the three hospitals.
17  Q. What other issues were you looking at
18  there in terms of what physicians were looking for?
19  A. Finding out what their specialty needs
20  were, did they need -- I knew the services that were
21  available at the main hospital downtown, Rush-
22  Presbyterian-St. Luke's, and they had many sub sub

**29**

1   specialists. There was a medical school there.
2   So I would essentially go out to these outer
3   hospitals out in the suburbs and find out if they
4   knew about the services at Rush, essentially being a
5   marketeer for those services and finding out what
6   was available, see if they needed any of these
7   physicians who were downtown to actually come out to
8   their hospitals to practice as well.
9   Q. Okay. Now, after that, in 1999, you
10  joined Health Alliance Plan of Michigan; right?
11  A. '98.
12  Q. Okay. I see. Now, in 1998, you joined as
13  Senior Associate Medical Director; correct?
14  A. Correct.
15  Q. Your CV lists that role from '98 to
16  present, and says you're also the owner of a part-
17  time practice of internal medicine in Dearborn
18  Heights, in Michigan, and have been in that role
19  since 2002.
20  A. That's true but that actually has ended.
21  I practiced on the side. Part of my agreement with
22  Health Alliance Plan is they have to let me

Page 30

1  practice. And so since my role at HAP includes me
2  working with physicians across the community, I felt
3  that I needed to continue to practice medicine to
4  understand the issues that they were facing.
5      I worked at Henry Ford Medical Group, then,
6  from '98, '99 'til 2002. 2002 they laid off anybody
7  that was part-time, and so I then essentially
8  started a private practice. I rented some space out
9  of a family practitioner office in Dearborn Heights
10 and did that for two years, at which time
11 malpractice basically forced me not to do that
12 anymore because I was having to pay full-time
13 malpractice rates yet I was only working half a day
14 a week, so I just couldn't afford the malpractice
15 anymore, plus rent on top of that.
16     And so things were better financially over at
17 Henry Ford, so I started back seeing patients at
18 Henry Ford. It's been I believe a year now.
19     Q. Now, throughout the 1990s and the period
20 we discussed in reference to your CV, did you
21 maintain a role treating patients and practicing
22 medicine?

Page 31

1      A. Not in Illinois.
2      Q. Okay. So throughout the time you were in
3  the Michigan area, in addition to the roles we have
4  discussed, you were also practicing medicine?
5      A. Correct.
6      Q. And that was for the Henry Ford Medical
7  Group?
8      A. Henry Ford, at Sinai. I practiced for
9  Sinai.
10     Q. Okay. Other than the time period 2002 to
11 2004, did you ever practice medicine in an
12 independent physician practice setting?
13     A. Just the Dearborn Heights experience.
14     Q. Now, in the practice of internal medicine,
15 do you ever have occasion to administer a drug to
16 patients in the course of their visits to your
17 offices?
18     A. Yes.
19     Q. What sort of drugs do you administer to
20 patients?
21     A. Occasionally antibiotics, B-12, cortisone,
22 methyltestosterone. Those are the major ones. IVs

Page 32

1  for dehydration.
2      Q. How did your practice in Dearborn Heights
3  go about acquiring these drugs which were
4  administered to patients?
5      A. You know, I'm not sure, and the reason is
6  all I did, my rent -- I paid rent and then they
7  supplied me with whatever supplies I needed, whether
8  it was staff, billing, what have you. And then I --
9  whatever they collected, they kept 50 percent and I
10 got 50 percent. So I knew no details on how or what
11 was purchased other than if I needed B-12, they had
12 it in the cupboard.
13     Q. And in terms of reimbursement from
14 insurance companies, was that contracting function
15 also handled by the practice on your behalf?
16     A. Correct.
17     Q. Did you ever get involved in that issue?
18     A. No.
19     Q. Now, in the period up until 1998, when you
20 joined Health Alliance Plan of Michigan, am I
21 correct that all of your roles and jobs were for
22 provider groups in terms of hospital groups or

Page 33

1  physician practice groups?
2      A. Correct.
3      Q. And Health Alliance Plan was the first
4  health insurance company for whom you had worked?
5      A. Correct.
6      Q. Other than the budget sheets we discussed
7  that you saw when you were at the Henry Ford Medical
8  Group as the physician in charge, relating to the
9  prices paid for drugs, did you ever in the period up
10 until 1998 learn more or gain more information as to
11 what was being paid by providers for drugs?
12     A. I've known how much drugs cost in terms of
13 in the medical literature you see, you know,
14 pricings. We create formularies with price tags, as
15 far as whether something is costly or cheap.
16     In my role as Medical Director at HAP, Senior
17 Associate Medical Director at HAP, we do a lot of
18 education of physicians to try to steer them towards
19 using generics and letting them know at least the
20 cost of care that they're providing.
21     Q. Okay. Well, when you're referring to
22 formularies, you're referring to formularies at HAP?

**Page 34**

1  A. Correct.
2  Q. Let me just ask you, before we talk about
3  HAP, to focus on the pre-HAP period --
4  A. Okay.
5  Q. -- pre '98. And in that timeframe, did
6  you gain any more information about what was being
7  paid by physicians to acquire drugs, other than
8  having seen the budget sheets at Henry Ford Medical
9  Group?
10  A. Well, yeah, from 1990 to '93, when I left
11  HAP, that was an era where the --
12  Q. I'm sorry, you said when you left HAP.
13  Did you mean --
14  A. When I was at the Henry Ford Medical
15  Group. '90 to '93 was an era where pharmaceutical
16  costs were booming across America, and so the
17  literature in all of the medical journals as well as
18  the lay press, whether it's the Wall Street Journal
19  or Time magazine, what have you, had all sorts of
20  stories about what was going on with the cost of
21  drugs and the new drugs that were available and the
22  new indications for all of these drugs.

**Page 35**

1  And so I gained an incredible amount of
2  knowledge in terms of at least the pricing -- not
3  pricing, the cost of what drugs were; whereas, when
4  I first started in practice I had no idea how much
5  an Amoxicillin prescription cost, but certainly by
6  the mid '90s you knew that Amoxicillin was 5 bucks
7  and Keflex was 30 bucks and Zithromax was 45 bucks.
8  Q. All right. When you refer to medical
9  literature, what sort of literature are you talking
10  about there?
11  A. Any of the medical journals, New England
12  Journal of Medicine, the Annals of Internal
13  Medicine, you know, all the throw-away journals that
14  we get on a regular basis.
15  Q. In this period, the '90 to '93 time period
16  that we're talking about, was it your impression
17  that all entities in the market pay the same price
18  for drugs or that different entities can purchase
19  drugs at different prices?
20  A. I didn't know there was a difference. You
21  know, it would make logical sense that the bigger
22  you are, the better price you could command, but I

**Page 36**

1  didn't know if that was legal or what. I didn't
2  know the detail on that sort of thing.
3  Q. Other than this information you got from
4  public sources and the budget sheets you have
5  reviewed, were there any other sources of
6  information you had or things you learned about
7  prices for drugs up until the time you joined HAP?
8  A. No.
9  Q. Now let's talk about your time at HAP.
10  First of all, what is Health Alliance Plan of
11  Michigan?
12  A. Health Alliance Plan of Michigan is a --
13  it's a health plan that's predominantly got an HMO
14  product, although we also have PPO, point of
15  service, TPA, third-party administrator type plans
16  or products.
17  It's the largest HMO in Michigan with close
18  to 500,000 members. It was created by the UAW,
19  Walter Reuther, in the early '60s, modeled after the
20  health plans that were predominant on the West
21  Coast, started by the dock workers, Kaiser.
22  Q. Now, are you familiar with the term staff

**Page 37**

1  model HMO?
2  A. Yes.
3  Q. And you're aware that Kaiser, for example,
4  operates as a staff model HMO?
5  A. Correct.
6  Q. Which means that Kaiser owns physician
7  practices and employs the physician to work there --
8  A. Correct.
9  Q. -- and acquires all their supplies?
10  A. Correct.
11  Q. Does Health Alliance Plan of Michigan have
12  a staff model HMO at the present time?
13  A. No. It started out that way and it's
14  evolved over the years into a network model HMO.
15  Q. Now, you mentioned that Health Alliance
16  Plan of Michigan started in the 1960s?
17  A. I believe it was 1960.
18  Q. Okay. And when it started, was it
19  exclusively a staff model HMO?
20  A. Yes.
21  Q. When did Health Alliance Plan of Michigan
22  transition from being a staff model HMO to having a

**Page 38**

1  different product?
2      A. 1981 or '82, they contracted with the
3  Henry Ford Medical Group to be another network
4  besides their staff model.
5      Q. Okay.
6      A. So when patients joined HAP, they could
7  either be seen at their staff model, which was
8  called the Metro Medical Group, or they could be
9  seen at Henry Ford. And Metro Medical used the
10 specialists and sub specialists at Henry Ford for
11 their tertiary care.
12     Q. Okay.
13     A. Eventually, and I'm not sure of the exact
14 date, I believe it was around 1990, '93, somewhere
15 in that range, Metro Medical Group merged into the
16 Henry Ford Medical Group.
17     HAP still remained as an independent HMO with
18 a board that was predominantly UAW administrators --
19     MR. STEVENS: You're going beyond the
20 question.
21     THE WITNESS: Okay.
22 BY MR. MANGI:

**Page 39**

1      Q. Well, when that transition occurred, when
2  Metro Medical merged into the Henry Ford Medical
3  Group, did HAP still own any physician practices or
4  hospitals or was that the end of its staff model
5  HMO?
6      A. That was the end of them owning anything.
7      Q. So from 1960 until approximately 1993, HAP
8  operated as a staff model HMO?
9      A. Correct.
10     Q. And throughout that time period was called
11 the Metro Medical Group?
12     A. Correct.
13     Q. For that time period, 1960 to 1993, was
14 HAP purchasing drugs for its staff model HMO?
15     A. I don't know.
16     Q. But you are aware that HAP owned physician
17 practices and employed the physicians working --
18     A. They owned the particular group. I don't
19 know who did the purchasing for them at the time.
20     Q. After 1993, has HAP ever gone back to a
21 staff model HMO or owned any physician practices?
22     A. No.

**Page 40**

1      Q. Do you know whether HAP retained any of
2  the documents relating to its staff model HMO?
3      A. I don't know.
4      Q. Now, you mentioned that HAP has about --
5  covers about 500,000 lives. Is that only the HMO
6  products or is that in total?
7      A. Well, in total it's around 550,000. The
8  HMO was about 450,000.
9      Q. Are all of the individuals for whom HAP
10 provides health insurance based in Michigan?
11     A. Yes.
12     Q. Now --
13     MR. STEVENS: Can we take one step?
14     MR. MANGI: Sure.
15     MR. STEVENS: How long do you think this
16 will take in total, roughly?
17     MR. MANGI: It's a little hard to estimate
18 -- well, we can do this off the record.
19     (Discussion off the record.)
20     MR. MANGI: Could you read back the last
21 question before the break.
22     (Record read as follows:

**Page 41**

1      QUESTION: "Are all of the individuals for
2  whom HAP provides health insurance based in
3  Michigan?
4      ANSWER: Yes.")
5  BY MR. MANGI:
6      Q. Now, are you familiar with -- withdraw
7  that.
8      As the Senior Associate Medical Director,
9  which is a role you held from '98 to present, what
10 have been your responsibilities?
11     A. I have been responsible for the
12 utilization and quality of care provided to the
13 membership of Health Alliance Plan.
14     Q. Okay. Anything else?
15     A. That's pretty much everything.
16     Q. Okay. Now, you've also held a second role
17 that overlapped with this one for a couple of years,
18 which was Chief Medical Officer and Acting Medical
19 Director from 1999 to 2000. What was that role?
20     A. Yes, for a year -- I was hired by the
21 Chief Medical Officer in '98, and then he left in
22 '99, and so I became the Acting Chief Medical

**42**

1  Officer for that eight-month, nine-month time
2  period.
3    Q.  What were your responsibilities in that
4  role as Chief Medical Officer and Acting Medical
5  Director?
6    A.  Pretty much the same. I represent HAP in
7  public forums.
8    Q.  When you say you represented HAP in public
9  forums, what sort of forums are you referring to?
10   A.  HAP is a member of the Michigan
11 Association of Health Plans, and so I would go to
12 their monthly meetings. If there were interviews
13 with media, I would do those.
14      HAP is a member of the Henry Ford Health
15 Systems, so I would represent HAP in different
16 committees for the system, Quality Committee and
17 those sort of things.
18   Q.  Now, when describing your responsibilities
19 as the Senior Associate Medical Director, you said -
20 - part of what you said is that you're responsible
21 for utilization.
22   A.  Yes.

**43**

1    Q.  What are you referring to when you refer
2  to utilization?
3    A.  Hospitalizations, office visits, pharmacy
4  cost, diagnostic costs, emergency room costs.
5    Q.  And to break that down further, when
6  you're responsible for cost, does that mean you
7  analyze the costs? Does that mean you negotiate the
8  contracts that determine those costs? What exactly
9  is your responsibility?
10   A.  I analyze the cost and just determine
11 whether there was an inordinate underuse or overuse.
12   Q.  All right. You also said you were
13 responsible for the quality of care provided to
14 members.
15   A.  Yes.
16   Q.  What do you mean by that?
17   A.  As part of our -- we're reviewed by
18 regulatory agencies on a regular basis to assure
19 that we are providing the best of care for our
20 members and we're paying for the best of care for
21 our members. And as such, we have several measures
22 of quality, such as what's our immunization rates,

**44**

1  what's our -- how many of our diabetics are getting
2  an eye exam annually, those sort of things.
3      And so we have committees and project
4  managers to assure that we are not only measuring
5  how that -- how much of that care is provided but
6  what can we do to improve it or increase the amount
7  of care that's provided.
8    Q.  Okay. Now, you understand that Health
9  Alliance Plan of Michigan has produced you as a
10 witness today in response to a subpoena?
11   A.  Correct.
12   Q.  You understand that you are here today
13 speaking on behalf of Health Alliance Plan of
14 Michigan?
15   A.  Yes.
16      MR. MANGI: Let's mark another document as
17 Exhibit Niebylski 002 to the deposition.
18      (Exhibit Niebylski 002 was marked.)
19      MR. MANGI: Why don't we take a break.
20      (Recess at 10:41 a.m. to 10:49 a.m.)
21 BY MR. MANGI:
22   Q.  Doctor, before the break we marked a

**45**

1  document as Exhibit Niebylski 002 to the deposition.
2  Have you seen that document before?
3    A.  Yes.
4    Q.  And did you review that document in the
5  course of preparing for this deposition?
6    A.  Yes.
7    Q.  You understand that you have been
8  designated by HAP to testify on these 20 topics?
9    A.  Yes.
10   Q.  What did you do to prepare for your
11 deposition today?
12   A.  Reviewed over the questions.
13   Q.  I take it you reviewed the questions when
14 meeting with your counsel?
15   A.  Correct.
16   Q.  Other than meeting with Mr. Stevens, did
17 you do anything else to prepare for this deposition?
18   A.  No.
19   Q.  Did you speak to anyone else at Health
20 Alliance Plan of Michigan to prepare for the
21 deposition?
22   A.  No.

**Page 46**

1   MR. STEVENS: Just for clarity, I did have
2   him review some of the materials we produced in
3   response to the subpoena.
4   MR. MANGI: Okay. Thank you.
5   BY MR. MANGI:
6   Q. Now, Doctor, can you tell me what
7   methodologies Health Alliance Plan of Michigan has
8   used to reimburse physicians for drugs administered
9   in their offices to HAP members since 1990?
10  A. We pay -- physician sends a claim in and
11  we pay 5 percent below AWP.
12  Q. How long has HAP paid at 95 percent of
13  AWP?
14  A. As long as anyone can remember.
15  Q. Does that extend back to 1990?
16  A. Well, I've been at HAP since '98, and that
17  was the policy then, and I've asked people who were
18  at HAP prior to '98 and they said it's always been
19  that way as long as they have been there.
20  Q. Do you have a sense as to how far back
21  that extends based on how long those individuals
22  have been at the company?

**Page 47**

1   A. At least 18, 20 years.
2   Q. Okay. Now, are you aware that Medicare
3   did not adopt 95 percent of AWP as its reimbursement
4   methodology until the late 1990s?
5   A. No, I didn't know that.
6   Q. Do you know --
7   MR. WILLIAMS: I'll object to the form of
8   that last question.
9   BY MR. MANGI:
10  Q. Do you know whether Health Alliance Plan
11  of Michigan's reimbursement methodologies have been
12  pegged to Medicare?
13  A. For the most part, yes.
14  Q. Now, other than 95 percent of AWP, has
15  Health Alliance Plan of Michigan used any other
16  reimbursement methodologies since 1990?
17  MR. WILLIAMS: Objection to the form.
18  THE WITNESS: We have a fee schedule.
19  That's it. That's the major way. If something
20  wasn't on the fee schedule, I believe we paid 95
21  percent of charges.
22  BY MR. MANGI:

**Page 48**

1   Q. Now, does Health Alliance Plan of Michigan
2   reimburse in relation to charges in any other
3   circumstances or is it only when something doesn't
4   appear on a fee schedule?
5   A. We have contractual -- we have contracts
6   with many different entities, hospitals, and for the
7   most part hospitals, that we pay various things as a
8   percentage of charges.
9   Q. Now, does HAP reimburse hospitals for
10  drugs administered to HAP members on an AWP basis in
11  any circumstances?
12  A. If the hospital is providing outpatient
13  care, yes.
14  Q. So in an outpatient setting, does HAP
15  reimburse at an AWP-based number?
16  A. Yes.
17  Q. Is that also 95 percent of AWP?
18  A. Yes.
19  Q. Okay.
20  MR. MANGI: Off the record for a second.
21  (Discussion off the record.)
22  BY MR. MANGI:

**Page 49**

1   Q. Has 95 percent of AWP been the methodology
2   utilized in relation to hospital outpatient
3   department reimbursement since 1990?
4   A. For medications?
5   Q. (Nodding head.)
6   A. Yeah, as far as I know.
7   Q. Now let's talk about physician offices
8   specifically, excluding for a moment hospitals.
9   Other than 95 percent of AWP, are there any other
10  reimbursement methodologies that HAP has used since
11  1990 to reimburse physician offices for drugs
12  administered to its members?
13  A. We increased our -- recently increased in
14  the last two years our -- or changed our
15  reimbursement for immunizations to be 105 percent of
16  Medicare.
17  Q. When did that change occur?
18  A. Within the last two years, I think. I
19  believe January '04.
20  Q. We'll come back and talk about that in a
21  bit.
22  A. We also in 2004 created a program for

Page 50

1  biotech drugs whereby we would not reimburse
2  physicians for certain drugs because we were
3  purchasing them for 15 percent below AWP from
4  Bioscripts.
5      Q. Is that a specialty pharmacy?
6      A. Yes.
7      Q. Anything else?
8      A. That's all I know right now.
9      Q. Has HAP ever reimbursed physician offices
10 at a capitated rate?
11     A. We capitate some of our networks, yes.
12     Q. Do those capitated rates include any drugs
13 that may be administered to members or are those
14 billed separately?
15     A. Those are all included in the capitation.
16     Q. So there's some physician practices that
17 receive a capitated rate that covers all the
18 services they may provide to members as well as
19 drugs administered?
20     A. Yeah. It wouldn't be the physician
21 offices, it would be the network.
22     Q. Are those situations where HAP contracts

Page 51

1  with a network which in turn is comprised of
2  different physician practices?
3      A. Correct.
4      Q. Does HAP utilize withholds in any of its
5  reimbursements to physician offices?
6      A. Yes.
7      Q. What is your understanding of how a
8  withhold arrangement functions?
9      A. Our majority withhold type contract is a
10 10 percent withhold. So when the physician sends us
11 a claim for, say a hundred dollars, we will pay them
12 $90 and put $10 in a -- or 10 percent in a withhold
13 account. Then at the end of the year, there's a
14 reconciliation as to how that -- what's to happen
15 with that withhold.
16     Q. Okay. If a particular physician office
17 has a withhold arrangement with HAP, does AWP play
18 any role in their reimbursement?
19     A. No.
20     Q. Now --
21     A. We have certain things we don't take a
22 withhold on and there's a list of those things, so

Page 52

1  immunizations I know is one thing we don't take a
2  withhold on.
3      Q. Let's say a physician practice has a
4  withhold arrangement and a physician in that
5  practice administers a drug to a patient in office.
6  How will that physician bill HAP in relation to that
7  drug administration?
8      A. Physician bills us for the drug.
9      Q. Okay.
10     A. And just uses the code number for that
11 drug.
12     Q. Does a physician come up with their own
13 bill charge?
14     A. No. They just bill us for the code and
15 they accept the fee screen that we have.
16     Q. And for physicians who have a withhold
17 arrangement, is that -- how is the amount on that
18 fee screen or fee schedule determined?
19     A. For the most part, there's no medications
20 on the withhold list, or of the things on the don't-
21 take-a-withhold list, it's mostly medications.
22     Q. Okay.

Page 53

1      A. So we understand doctors have to pay for
2  these things and so we don't take a withhold on it.
3      Q. Well, let me go back to my question, then.
4  What I'm trying to understand is if a physician has
5  a withhold arrangement with HAP, they administer a
6  drug to the patient, how is the amount that they're
7  reimbursed in relation to that drug determined?
8      A. It's -- they would get reimbursed 95
9  percent below AWP.
10     Q. Now, we have identified the 95 percent of
11 AWP methodology. We have talked about recent
12 increases to fees to 105 percent of Medicare for
13 immunizations, and we have talked about specialty
14 pharmacy program, we have talked about capitated and
15 withhold arrangements.
16     Other than those categories, has HAP since
17 1990 used any other methodologies to determine
18 reimbursements to physicians for drugs administered
19 in the office?
20     A. Not that I know of.
21     Q. Now, what proportion of physician
22 practices with whom HAP contracts are reimbursed on

Page 54

1  a capitated basis at the present time?
2      A.  Approximately 40 to 45 percent of our
3  membership is taken care of by capitated networks.
4      Q.  Now, is the decision as to whether a
5  particular physician practice is reimbursed at a
6  capitated rate versus the fee schedule rate
7  determined by HAP, by the practice, or is it the
8  subject of negotiation?
9      A.  It's -- it's the network decision.
10     Q.  Are networks or practices free to elect
11 one option versus the other?
12     A.  Correct.
13     Q.  Has HAP performed any analysis as to the
14 financial impact on HAP of capitated contracts
15 versus fee-for-service contracts?
16     A.  No, not really.  We know that they both
17 have their strengths and weaknesses.
18     Q.  You may have answered this before, but is
19 HAP a for-profit entity?
20     A.  It's a not-for-profit.
21     Q.  Now, strengths and weakness, let's start
22 about the fee for service side first.  What are the

Page 55

1  strengths and weaknesses you're referring to there?
2      A.  Our goal is for patients to be seen,
3  accessibility to care --
4          MR. STEVENS:  I'm going to object.  This
5  is way off the deposition topics that were listed
6  for which he was provided.  None of those 20
7  questions address HAP's view of strengths and
8  weaknesses in the various models of paying for care
9  to physicians.
10         MR. MANGI:  Actually, respectfully it
11 does.  Number one of the deposition topics talks
12 about all methodologies utilized or considered; and
13 two talks about rationale, information, and factors
14 considered in deciding whether or not to adopt the
15 methodology.
16         So we would submit that strengths and
17 weaknesses are encompassed, but your objection has
18 been recorded.
19         THE WITNESS:  Our goal is to have
20 accessibility to care, and fee for service
21 methodology tends to elicit more utilization,
22 therefore, more use.  And in terms of accessibility

Page 56

1  to care, that the more use you get, the better.
2  BY MR. MANGI:
3      Q.  Okay.  Now, why does fee for service
4  generate more accessibility than capitation?
5      A.  When you're capitated, you've been paid up
6  front and so you've already got the money.
7  Providing the service, in theory, once you've
8  already got the money, is -- may take away from time
9  that you have to get another fee for service.
10     Q.  So the higher use and therefore the
11 greater accessibility of fee for service, that's
12 something that HAP considers to be a strength of fee
13 for service model?
14     A.  Yes.
15     Q.  That's one strength.  Any others?
16     A.  That's it.
17     Q.  Okay.  Now, how about weaknesses on the
18 fee for service model?
19     A.  You may end up, if something is very
20 highly reimbursed, getting overuse, misuse, or
21 abuse.
22     Q.  What sort of things are you referring to

Page 57

1  there?
2      A.  Nuclear medicine.  Stress testing gets
3  reimbursed at a very high amount yet there are
4  better tests, more accurate tests to use that are
5  reimbursed at a third of what the nuclear studies
6  are done.  They're much better tests but they're
7  much less used.
8      Q.  Now, how about -- well, withdraw that.
9          Any our weaknesses on the fee for service
10 side?
11     A.  No.
12     Q.  Then let's talk about capitation.  What
13 are the strengths and weaknesses that you are
14 referring to there?
15     A.  Capitation, there's no fee for service.
16 You're getting the money up front and so hopefully
17 you will decrease your chance for overuse, misuse,
18 abuse.
19     Q.  Okay.  That's a strength.  And weaknesses?
20     A.  Weakness is you may decrease utilization
21 or accessibility.
22     Q.  Okay.  Now, sticking with the fee for

**Page 58**

1  service side, the 95 percent of AWP methodology we
2  have discussed, is that subject to negotiation or is
3  that applied across the board without exception?
4      A. It's applied across the board.
5      Q. Are there any exceptions to that that
6  you're aware of?
7      A. Not that I know of.
8      Q. Other than immunizations, of course.
9      A. Correct.
10     Q. Now, are you familiar with the term
11 average selling price or ASP?
12     A. I've heard it.
13     Q. What is your understanding of ASP?
14     A. I understand that Medicare went from using
15 an AWP methodology to an ASP methodology recently.
16     Q. Do you have an understanding as to why
17 Medicare changed its reimbursement methodology from
18 AWP based to ASP based?
19     A. My understanding was that there was a
20 difference in how much -- there was a difference
21 between the two, and it appeared to me like Medicare
22 could save money if they went to the ASP.

**Page 59**

1        MR. WILLIAMS: I'll object to the last
2  question as calling for speculation.
3  BY MR. MANGI:
4      Q. You understand that -- well, do you
5  understand ASP to be lower than AWP?
6      A. For the most part.
7      Q. Did HAP consider also following Medicare
8  from AWP to ASP?
9      A. Yes.
10     Q. When was that issue considered by HAP?
11     A. It was considered at our Provider
12 Reimbursement Committee.
13     Q. Do you know when that issue was
14 considered?
15     A. Within the last year, year and a half.
16     Q. What is the role of the Provider
17 Reimbursement Committee?
18     A. To set the fee schedule and policies and
19 procedures for payment.
20     Q. Who sits on that committee?
21     A. I'm on it, one of our other -- one of my
22 Associate Medical Directors. I'm the Senior

**Page 60**

1  Associate Medical Director. One of the Associate
2  Medical Directors. Contracting people, claims
3  payment people, finance people. That's the majority
4  of it.
5      Q. So it's a cross-section of people from
6  different fields but all of whom work in the
7  physician reimbursement area?
8      A. Correct.
9      Q. How was the issue of a possible shift to
10 ASP reimbursement first raised in the Physician
11 Reimbursement Committee -- I'm sorry, the Provider
12 Reimbursement Committee?
13     A. We were apprised by our finance area that
14 Medicare was going to be changing their methodology.
15     Q. Do you recall who in finance raised that
16 issue?
17     A. One of our directors.
18     Q. Was the issue of whether HAP should follow
19 suit discussed at one meeting or was it considered
20 over a period of time?
21     A. It was considered over several meetings.
22 The issue was brought up by physicians who were

**Page 61**

1  contracted with in regards to immunizations.
2      Q. Did HAP generate any documents reflecting
3  its consideration of this issue or analysis relating
4  to this issue?
5      A. Yeah. We have minutes from those
6  committee meetings.
7      Q. Okay. Any other documents?
8      A. No.
9      Q. I'm sorry, you have to answer --
10     A. Not that I know of.
11     Q. Okay. Were there any presentations,
12 spreadsheets, or other analytical pieces generated
13 concerning a potential shift?
14     A. Just some basic sheets that showed the
15 difference between AWP and ASP for some basic drugs.
16     Q. Was the purpose of those sheets to show
17 the difference in the amounts that HAP would pay in
18 reimbursement if it followed Medicare versus staying
19 at 95 percent of AWP?
20     A. Correct. And it was really the
21 immunizations that we were looking at.
22     Q. Did those spreadsheets reflect -- did they

Page 62

1  only reflect the dollar differences for particular
2  drugs or were there also estimates in terms of
3  periodic savings or annual savings that would be
4  associated with the shift to ASP?
5      A.  No, just the dollar value of the drug, AWP
6  versus ASP.
7      Q.  Now, what were the issues that were
8  discussed in the committee in relation to the pros
9  and cons of following Medicare on an ASP-based
10 methodology?
11     A.  Our goal is to immunize as many people as
12 we possibly can.  We wanted to do whatever we could
13 to be sure that the physicians would provide
14 immunizations as frequently as possible, or as
15 accessibly as possible.  And so we wanted to be sure
16 that we weren't going to be reimbursing at a price
17 that they couldn't purchase the drug for.
18     So our conclusion was to pay as much as we
19 possibly could for immunizations to be sure that
20 they would provide them as much as possible, or as
21 often as possible.
22     Q.  What was the eventual decision as to

Page 63

1  whether or not to follow Medicare on an ASP-based
2  methodology?
3      A.  The debate was really AWP, ASP, Medicare.
4  There were three choices.
5      Q.  Oh --
6      A.  We decided to go 5 percent above Medicare.
7      Q.  Now, when you refer to Medicare, are you
8  referring to 106 percent of ASP?
9      A.  Whatever Medicare was doing.
10     Q.  Are you aware that Medicare has had
11 different reimbursement rates at different times?
12     A.  That's why we decided to just go with
13 Medicare.
14     Q.  So let me see if I understand this.  One
15 option that was being considered was to stick with
16 the current methodology of 95 percent of AWP?
17     A.  Or to increase the percentage, whether
18 it's 95 or 100 or 105 percent of Medicare.
19     Q.  I see.  So one option was an AWP-based
20 methodology?
21     A.  Correct.
22     Q.  Second option was ASP or a percentage of

Page 64

1  ASP?
2      A.  Percentage of ASP.
3      Q.  And a third option was a percentage of
4  Medicare?
5      A.  Since Medicare seemed to be going back and
6  forth that to just go with Medicare, and the reason
7  was operationally we don't get AWP, we don't get
8  ASP; we get what Medicare pays.
9      Q.  Okay.
10     A.  And so it was easiest for our claims
11 payment people, when Medicare would send a new
12 electronic transmission as to what they are paying
13 for various things, we just needed to load that into
14 our system.
15     Q.  So was the eventual decision to follow
16 Medicare --
17     A.  Correct.
18     Q.  -- to whatever reimbursement methodology
19 it applies now?
20     A.  Yes.
21     Q.  When was that change implemented?
22     A.  Sometime in the last two years.

Page 65

1      Q.  Now, are you aware that Medicare at the
2  present time does not reimburse by relation to AWP?
3      A.  No.  All I know is we're paying Medicare.
4      Q.  Is HAP paying the same rate as Medicare?
5      A.  For immunizations, we're paying 5 percent
6  above Medicare.
7      Q.  Other than immunizations?
8      A.  We're paying 95 percent of Medicare.
9      Q.  Okay.
10     A.  Except for the Bioscripts drugs.
11     Q.  So -- well, withdraw that.
12     Drugs that are subject to the specialty
13 pharmacy arrangement, are those only available to
14 physicians participating in HAP's network through
15 the specialty pharmacy or do they have a choice as
16 to whether or not to participate?
17     A.  No, they don't have a choice.  We will not
18 reimburse a physician if they bill us for one of
19 these what we call our Bioscript drugs.  If they
20 send us a claim for it, we will not pay it.  The
21 only way they can deliver it, the medication, is to
22 get it from Bioscripts.

**Page 66**

1  Q. Okay. So at the present time,
2  immunizations are subject to a special rate, other
3  biotech drugs are through the specialty pharmacy
4  vendor, and whatever is left is reimbursed at 95
5  percent of Medicare?
6  A. Yes.
7  Q. And that's 95 percent of Medicare's
8  current rate; is that correct?
9  A. Yes.
10  Q. Okay. Now, let's talk about Bioscript --
11  well, withdraw that for a moment.
12    When the decision was made to move these
13  reimbursements to 95 percent of Medicare, so we're
14  talking about other than immunizations and Bioscript
15  drugs, was -- does that mean that HAP moved to
16  follow Medicare not only in relation to drug
17  reimbursement but also service reimbursement?
18  A. No.
19  Q. Okay. So HAP changed its drug
20  reimbursement methodology but not its service
21  methodologies; is that correct?
22  A. Correct.

**Page 67**

1  Q. Are you aware that when Medicare moved to
2  an ASP-based methodology it substantially increased
3  administration fees associated with drugs?
4  A. Correct.
5  Q. And HAP made a purposeful decision that it
6  would follow suit with the change to drug
7  reimbursement but not the service fee reimbursement?
8  A. We did the service fee reimbursement, too.
9  Q. Okay.
10  A. My answer to your other question is in
11  reference did we change reimbursement to cardiac
12  caths, did it for upper GI endoscopies, what have
13  you.
14  Q. I see. Let me be more precise in my
15  question. When I refer to services now I am focusing
16  entirely on services that are incident to drug
17  administration.
18  A. What Medicare did is allowed certain codes
19  to be used for the administration of the biotech
20  drugs, and we -- we allow our physicians to use
21  those codes to be reimbursed.
22  Q. Okay. Now, let's talk about the Bioscript

**Page 68**

1  arrangement. When did HAP first consider the use of
2  a specialty pharmacy?
3  A. 2003.
4  Q. Do you know who was in charge of looking
5  at that issue, the desirability of entering into a
6  specialty pharmacy arrangement?
7  A. Me.
8  Q. How did the issue first come up?
9  A. I had read that there were these very
10  expensive medications coming down the pipe, and my
11  concern was that they were very exciting
12  medications. They looked very, very promising for
13  treating certain diseases; however, my concern was
14  that their use would be uncontrolled, that they
15  would be used for a variety of things, not just the
16  diseases for which they were approved.
17    And so, number one, I had a concern regarding
18  appropriateness. That was our major reason for
19  wanting to get involved with Bioscripts, so that we
20  could apply guidelines from an independent source.
21  It was our guidelines but they were applied by an
22  independent source to assure that there was an

**Page 69**

1  objective person doing approvals and denials of
2  appropriateness. And so that's when I engaged
3  Bioscripts.
4  Q. Okay. Other than the concern over
5  appropriateness, were there any other issues that
6  led you to consider the use of a specialty pharmacy
7  arrangement?
8  A. There was a concern that because our
9  reimbursement methodology was to pay 5 percent below
10  AWP, that if the physicians could buy the medication
11  at a cheaper price that they would -- they could
12  have potentially a huge margin of profit just for
13  giving a drug, just because the drug was very
14  expensive and we paid a lot for it, and it was not
15  reflective of their skills or time or effort, it was
16  only reflected by the price of the drug.
17    If a drug was $5,000 a dose and they made 10
18  percent, they would make $500; whereas if the drug
19  was $5 a dose, like B-12, they would make 50 cents,
20  and so -- even though it was the same amount of
21  effort. And so it didn't seem fair to reimburse
22  such a large amount for no extra skill.

**Page 70**

1  Q. Was it your understanding that physicians'
2  acquisition prices for drugs that generated these
3  potential margins were the same for all drugs or
4  varied from drug to drug?
5  A. I knew it was different than what AWP was
6  and I really didn't care how much different because
7  for the most part we were reimbursing for IVs and
8  things like that where we would pay, say, a hundred
9  dollars, and if they were making an extra 10 or $20
10 per IV bag, and I thought that's fine. I'm all for
11 physicians trying to make a living.
12    When the cost of a drug in some cases is
13 $10,000, making a thousand dollars for a half hour
14 of work didn't seem fair.
15 Q. Well, was it your impression that the
16 percentage of margin was the same in every case or
17 that the percentage was different?
18 A. I just figured it depended on where the
19 physician was buying the drug from.
20 Q. In other words, in some instances
21 physicians could get a different discount or rebates
22 versus other --

**Page 71**

1  A. I had no idea what they were able to buy
2  for. I just assumed that -- I had no idea what kind
3  of margin they were making, only I heard that they
4  were making a margin.
5  Q. Did you have and have you at any time at
6  HAP had any particular expectation as to what
7  physicians' acquisition cost for drugs are in
8  relation to reimbursement?
9  A. I don't know. That's -- that hasn't been
10 a concern of mine.
11 Q. Okay. So if one were to say that, well,
12 your expectation is that acquisition costs will be
13 20 percent, 30 percent, 50 percent, something more,
14 something less, a specific number in relation to
15 reimbursement amounts, would that be inaccurate?
16    MR. WILLIAMS: Objection to form.
17    THE WITNESS: I haven't had any
18 expectations what their margin would be.
19 BY MR. MANGI:
20 Q. When you considered the use of specialty
21 pharmacies in this 2003 time period, were you
22 looking at only Bioscript or did you consider

**Page 72**

1  different vendors?
2  A. I had asked our PBM, physician benefit
3  manager, is MedImpact in San Diego, and I had asked
4  them if they could do some utilization controls for
5  us. They said no, but they got me in touch with
6  Bioscripts as a vendor that they had heard good
7  things about.
8  Q. Does MedImpact contract with retail
9  pharmacies on HAP's behalf in relation to self-
10 administered drugs?
11 A. No. All MedImpact does is pay our claims
12 to the pharmacies. They don't negotiate or anything
13 else.
14 Q. Now, they put you in touch with Bioscript.
15 Did you talk to any other specialty pharmacy vendors
16 or just Bioscripts?
17 A. No, just Bioscripts.
18 Q. Were you the person in charge of those
19 initial discussions with Bioscript?
20 A. Yes.
21 Q. And what was Bioscript offering?
22 A. They were offering delivery of the

**Page 73**

1  medication within one business day to either the
2  physician office or to the patient home, and in
3  return they were asking for reimbursement of 15
4  percent below AWP.
5  Q. Was -- was the arrangement that HAP would
6  pay Bioscript 15 percent below AWP?
7  A. Yes.
8  Q. And did HAP have an understanding as to
9  what Bioscript was paying to acquire those drugs?
10 A. No.
11 Q. So, in other words, it would be safe to
12 say you assumed they were getting the drugs for less
13 than you were paying them?
14 A. They were probably making some money in
15 this whole thing.
16    MR. STEVENS: Bruce, would you do this.
17 While it is normally in conversation that you
18 respond, because you know what he's asking midway
19 through, her fingers are going to fall off if we do
20 this all day and we're both talking at the same
21 time, so if you would just give a beat once he
22 finishes.