1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456

C.A. No. 01-CV-12257-PBS

* * * * * * * * * * * * *

IN RE:  PHARMACEUTICAL INDUSTRY          *

AVERAGE WHOLESALE PRICE LITIGATION       *

                                         *

THIS DOCUMENT RELATES TO ALL ACTIONS     *

* * * * * * * * * * * * *


VOLUME I


VIDEOTAPED DEPOSITION OF VINCENT D. PLOURDE, a witness called on behalf of Johnson & Johnson, pursuant to the Federal Rules of Civil Procedure, before Jessica L. Williamson, Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Robins, Kaplan, Miller & Ciresi L.L.P., 800 Boylston Street, Boston, Massachusetts, on Thursday, April 13, 2006, commencing at 9:35 a.m.

Vincent D. Plourde    HIGHLY CONFIDENTIAL    April 13, 2006
Boston, MA

2 (Pages 2 to 5)

Page 2

```
 1  APPEARANCES:
 2  ROBINS, KAPLAN, MILLER & CIRESI LLP
 3     (by Stephen L. Coco, Esq.)
 4     800 Boylston Street, 25th Floor
 5     Boston, Massachusetts 02199-7610
 6     slcoco@rmkc.com
 7       For Plaintiff, Blue Cross Blue Shield
 8
 9  BLUE CROSS BLUE SHIELD OF MASSACHUSETTS
10     (by Steven E. Skwara, Esq.)
11     Landmark Center
12     401 Park Drive
13     Boston, Massachusetts 02215-3326
14       For Plaintiff, Blue Cross Blue Shield
15       of Massachusetts
16
17  PATTERSON BELKNAP WEBB & TYLER LLP
18     (by Adeel A. Mangi, Esq.)
19     1133 Avenue of the Americas
20     New York, N.Y. 10036-6710
21     aamangi@pbwt.com
22       For Defendants, Johnson & Johnson
```

Page 3

```
 1  APPEARANCES: (CONTINUED)
 2
 3  SHOOK, HARDY & BACON LLP
 4     (by Nicholas P. Mizell, Esq.)
 5     2555 Grand Boulevard
 6     Kansas City, Missouri 64108-2613
 7     nmizell@shb.com
 8       For Defendant, Aventis Pharmaceuticals
 9
10  ALSO PRESENT:
11
12     Ralph Scopa, Videographer
```

Page 4

```
 1              INDEX
 2  DEPONENT                              PAGE
 3  VINCENT D. PLOURDE
 4     Examination By Mr. Mangi.............. 006
 5     Examination By Mr. Mizell............. 143
 6
 7              EXHIBITS
 8  NUMBER         DESCRIPTION            PAGE
 9  Exhibit Plourde 001 - Document headed "Non-Fee
10              Services Comparison"....... 109
```

Page 5

```
 1              PROCEEDINGS
 2       THE VIDEOGRAPHER: Good morning. We are
 3  now recording and on the record. My name is Ralph
 4  Scopa. I'm a legal video specialist for G & M Court
 5  Reporters, Ltd. Our business address is 42 Chauncy
 6  Street, Suite 1A, Boston, Mass. 02111.
 7       Today's date is April 13th, 2006. The
 8  time is 9:35. This is the deposition of Vincent D.
 9  Plourde in the matter of In Re: Pharmaceutical
10  Industry Average Wholesale Price Litigation, U.S.
11  District Court, District of Massachusetts, Civil
12  Action No. 01-CV-12257-PBS.
13       This deposition is being taken at Robins,
14  Kaplan, 800 Boylston Street, Boston. The court
15  reporter is Jessica Williamson. Counsel will state
16  their appearances, and the court reporter will
17  administer the oath.
18       MR. MANGI: Adeel Mangi, Patterson Belknap
19  Webb & Tyler, for Johnson & Johnson on behalf of the
20  track one defendants.
21       MR. MIZELL: Nicholas Mizell, Shook, Hardy
22  & Bacon, for Aventis Pharmaceuticals.
```

**Page 6**

1  MR. SKWARA: Steve Skwara, Blue Cross/Blue
2  Shield of Massachusetts.
3  MR. COCO: Stephen Coco, Robins, Kaplan,
4  Miller & Ciresi, representing Blue Cross/Blue Shield
5  of Massachusetts.
6
7  VINCENT D. PLOURDE,
8  a witness called on behalf of Johnson & Johnson,
9  having first been duly sworn, was deposed and
10 testifies as follows:
11
12      DIRECT EXAMINATION
13 BY MR. MANGI:
14 Q. Morning, Mr. Plourde.
15 A. Good morning.
16 Q. Have you ever been deposed before?
17 A. I have.
18 Q. How many times have you been deposed?
19 A. Once that I can recall.
20 Q. When was that deposition?
21 A. I believe it was September of 2004.
22 Q. What kind of case was that?

**Page 7**

1  A. I believe it was the Thomas/Solomon case.
2  Q. You are currently employed by Blue
3  Cross/Blue Shield of Massachusetts, correct?
4  A. Correct.
5  Q. What is your title?
6  A. Vice president of the provider services
7  division.
8  Q. How long have you held that position?
9  A. Since 2002.
10 Q. Your deposition in the Thomas litigation,
11 was that a one-day deposition?
12 A. It was.
13 Q. What's your understanding as to what that
14 litigation was about?
15 A. It was about some alleged improprieties
16 that were believed to have taken place between Blue
17 plans and limiting information that was accessible
18 to providers.
19 Q. What sort of improprieties and limiting
20 information are you aware of?
21      MR. COCO: Objection.
22 A. I'm sorry, what type of --

**Page 8**

1  Q. Let me rephrase the question. In terms of
2  the allegations that you've just mentioned --
3  A. Yeah.
4  Q. -- what specifically was being alleged in
5  terms of improprieties or ways of limiting
6  information?
7  A. What was -- what was asked of me?
8  Q. Or your general understanding of what the
9  case was about.
10 A. I think it was generally around physicians
11 not knowing how exactly specific edits are applied
12 to claims processing. I think that was the general
13 gist, that there was -- they were unaware of
14 information that was being used to make claim
15 payment decisions.
16 Q. Anything else that you're aware of that
17 was at issue in that case?
18 A. There was concern about the kinds of
19 disclosures of information to physicians around
20 those claim edits, and I think there were -- I'm
21 trying to think -- again, just general disclosures
22 of information, were providers aware that there were

**Page 9**

1  edits applied to claims processing?
2  Q. Was one of the issues in that case
3  disclosure of the actual rates at which
4  reimbursement is made, fee schedules and such, as
5  opposed to edits that are made to the designated
6  rates?
7  A. I'm not sure I understand your question.
8  Q. You're aware that there are fee schedules
9  and base payment for providers that are in fee-for-
10 service --
11 A. Correct.
12 Q. -- contracts, right?
13 A. (No verbal response.)
14 Q. Was one of the issues in the Thomas
15 litigation whether or not those fee schedules were
16 given to providers?
17 A. I believe that may have been part of the
18 issue, yes.
19 Q. Was that an issue that you were questioned
20 on at your deposition?
21 A. No.
22 Q. Do you have an understanding as to whether

**Page 10**

1  or not BC/BS of Massachusetts does provide providers
2  with fee schedules?
3      A. We do.
4      Q. Are those fee schedules given to providers
5  on a routine basis?
6      A. They are.
7      Q. You mentioned edits that are applied
8  during the claims process. What are you referring
9  to there?
10     A. What -- they're referred to as claim check
11 edits, edits that review claims to see whether or
12 not certain procedures are incidental to other
13 procedures, whether or not claims have been
14 unbundled so that in -- so that a single procedure
15 appears like multiple procedures were performed.
16     Q. Anything else?
17     A. That's basically what those edits are --
18 yes.
19     Q. Now, why were you deposed in your position
20 as VP of the provider services division in that
21 case?
22     A. I was deposed --

**Page 11**

1        MR. COCO: Objection. Go ahead.
2     Q. Go ahead.
3     A. I was deposed for two reasons -- actually,
4  three reasons: A, I was the last person deposed, so
5  I think I was -- since I had a general knowledge of
6  a number of different areas, they wanted me there to
7  answer any follow-up questions or any clarification
8  questions. I was also asked to be there because the
9  people who maintain those claim check edits reported
10 in to my organization, and then thirdly, since I
11 also have accountability for the provider relations
12 and provider communications area, they wanted to
13 again clarify what information -- how we communicate
14 information to physicians today.
15    Q. That segues us conveniently into your
16 current position, and what are your
17 responsibilities, broadly speaking, as the VP of the
18 provider services division?
19    A. They are to oversee a large provider
20 service center that we operate that's responsible
21 for handling all telephone and written inquiries
22 handling -- responding to claims that may need to be

**Page 12**

1  adjusted. Also, I'm responsible for an area that
2  does all physician credentialing activities,
3  performs all credentialing activities.
4       I'm also responsible for an area that puts
5  the providers up on our provider file and maintains
6  that information. I'm also responsible for an
7  institutional provider audit team that audits
8  hospital records and also have a small e-Health
9  initiatives team that I oversee.
10      And then lastly, I oversee a small
11 provider support team that is basically accountable
12 for working with providers on the HIPAA
13 requirements, making sure that we're able to
14 implement those appropriately, and the most recent
15 piece of that being the national provider identifier
16 implementation.
17    Q. Step back for a moment, please, to the
18 Thomas litigation. What is your understanding as to
19 the current status of that case?
20    A. I'm not sure I can answer that because of
21 client -- attorney/client privilege.
22    Q. Well, do you have an understanding as to

**Page 13**

1  whether or not the case is ongoing?
2     A. It is an ongoing discussion, yes. I don't
3  know the -- I can't tell you the status at this
4  moment.
5     Q. Okay. Do you know whether the case has
6  been settled or whether it's continuing through the
7  legal process?
8     A. I do not know whether -- I do not know
9  that, whether it's been settled or continuing
10 through the legal process. As of my last
11 understanding, it was not settled.
12    Q. Stepping somewhat further back in time,
13 could you please describe your educational
14 background after high school.
15    A. Okay. I attended the University of
16 Massachusetts at Dartmouth where I received my
17 Bachelor of Science in management, and then I
18 attended the University of Rhode Island where I
19 received my master's in business administration.
20    Q. When did you receive your bachelor's?
21    A. I graduated in 1980.
22    Q. And your master's degree?

**Page 14**

1  A. I received that at the end of 1981.
2  Q. Did you go directly from your bachelor's
3  program to the master's program?
4  A. I did.
5  Q. After completing your master's program,
6  what did you do next?
7  A. I started working with Blue Cross/Blue
8  Shield of Massachusetts.
9  Q. So that was in 1981?
10 A. 1982.
11 Q. 1982.
12 A. Uh-huh.
13 Q. What position did you start in at BC/BS of
14 Massachusetts?
15 A. Supervisor of the inpatient claims unit
16 and hospital claims.
17 Q. Have you been continuously employed at
18 BC/BS of Massachusetts since 1982?
19 A. I have.
20 Q. How long were you in your position as
21 supervisor of patient claims and hospital claims --
22 inpatient claims and hospital claims?

**Page 15**

1  A. One year.
2  Q. What were your responsibilities in that
3  position?
4  A. Oversee a unit that processed inpatient
5  claims.
6  Q. And by "inpatient claims" you are
7  referring to patients who are admitted to hospitals?
8  A. Correct.
9  Q. Was inpatient claims and hospital claims,
10 are they both referring to the same thing?
11 A. No. Inpatient is a type of claim within a
12 hospital. There were separate departments that
13 dealt with different types of claims.
14 Q. So the hospital claims component of your
15 job also included hospital outpatient departments?
16 A. No.
17 Q. Okay. What sections of hospital claims
18 did that cover other than inpatients?
19 A. Only inpatient claims.
20 Q. Okay. What I'm trying to understand is
21 whether inpatient claims and hospital claims
22 suggests two different areas of responsibility or

**Page 16**

1  whether it's just a redundant phrase.
2  A. It's a -- inpatient is a component of
3  hospital. There are multiple components of
4  hospital. I was responsible for the inpatient
5  component.
6  Q. Understood. What was the methodology that
7  BC/BS used in '82/83 to reimburse claims related to
8  inpatient treatment?
9  A. Back in 1982 I believe it was patient on
10 account factor -- a payment on account factor,
11 rather.
12 Q. What does that mean, "patient (sic) on
13 account factor"?
14 A. That we would pay a percentage of charges.
15 Q. Now, the percent of bill charge
16 methodology, did that apply both to services and to
17 drugs?
18 A. It applied to every service that was
19 provided on an inpatient claim, that was billed on
20 an inpatient claim, yes.
21 Q. So it would include, for example, a drug
22 that was administered to an inpatient while they

**Page 17**

1  were in the hospital?
2  A. It would.
3  Q. Was there a standard percentage of the
4  bill charge that was paid, or did it vary from
5  service to service and drug to drug?
6  A. It varied from department to department
7  and hospital to hospital.
8  Q. What was the basis for that variation?
9  A. I have no idea. A financial area in the
10 company would calculate what the payment factor was.
11 It was negotiated, and that is what was loaded into
12 the system.
13 Q. And the actual phrase "account factor," is
14 that referring to the percent applied to the bill
15 charge from that account?
16 A. No. It's our terminology for applying a
17 percentage of charges.
18 Q. Okay. As the supervisor of these claims,
19 what did you do on a day-to-day basis?
20 A. Oversee the production of the unit, you
21 know, made sure that, you know, claims inventories
22 were being managed appropriately, looked at claims,

**18**

1  would suspend for various reasons, made sure that
2  the turnaround time on various suspense reasons were
3  maintained at appropriate levels, supported other
4  department -- other departments within the -- within
5  the department, for example, you know, would loan
6  people to support the data entry area if they needed
7  it, but pretty much so the bulk of our work was
8  really managing suspended claims.
9      Q.  In this time period, 1982/83, was there
10  any electronic or computerized role to the process?
11     A.  Are you -- providers did submit claims
12  electronically.  We --
13     Q.  Would --
14     A.  We processed claims on a computer system,
15  so, yes, there were electronic means being used.
16     Q.  Must have been a big computer.
17     A.  Multiple computers.
18     Q.  Was there any manual processing of claims
19  at that time, or was it all done through this
20  computer system?
21     A.  Definitely manual processing of claims as
22  well.

**19**

1      Q.  In what instances would there be manual
2  processing versus claims going through the computer
3  system?
4      A.  Manual processing.  Again, we're talking
5  about 24 years ago.  My recollection was there were
6  certain claims that could not go through the
7  computer system and be priced systematically, so
8  someone would have to review those claims, request
9  supporting documentation, and arrive at an
10  appropriate price.
11     Q.  Did the fact that the percentage and the
12  bill charges varied from hospital to hospital and
13  sometimes from department to department give rise to
14  any administrative logistical challenges in terms of
15  claims processing?
16     A.  Not necessarily.  Not necessarily.  They
17  were all codified in the computer system.  I mean,
18  obviously if everyone was paid one flat fee, it
19  would be less variation and potential errors, but
20  everything was codified within the system and was
21  processed accordingly.
22     Q.  How many people did you supervise in your

**20**

1  position as supervisor of inpatient claims?
2      A.  I had probably about 20 people, 18 to 20
3  people.
4      Q.  And that staff was dedicated to the
5  inpatient claims; is that correct?
6      A.  Correct.
7      Q.  Was that the only group dealing with
8  inpatient claims?
9          MR. COCO:  Objection.
10     A.  I don't recall.  My recollection is that
11  there were probably -- based on the structure that
12  was in place at the time, there were probably a few
13  small departments that did some specialized
14  inpatient claims processing, but it certainly
15  represented the majority of claims that were
16  processed.
17     Q.  Now, in addition to your inpatient claims
18  group, how many other groups were there working in
19  the claims processing area at that time?
20     A.  I would guess probably maybe 180
21  associates.
22     Q.  And how were they divided up?  What were

**21**

1  the departments other than your inpatient claims
2  department?
3      A.  Well, there was an outpatient claims
4  department.  There was an approvals unit that would
5  work with the hospitals for new admissions.  There
6  were some national units that, again, had some
7  specialized arrangements.  There were -- there was a
8  mail area, a microfilm area that retrieved records
9  and archived information, and there was lastly a
10  provider service department that answered hospital-
11  related inquiries.
12     Q.  Was there a department that dealt with the
13  processing of claims from physicians' offices?
14     A.  There was -- there was in the company, not
15  in my department.
16     Q.  The group that dealt with outpatients, I
17  assume you're referring there to hospital outpatient
18  departments?
19     A.  Correct.
20     Q.  Do you know what methodology BC/BS of
21  Massachusetts used in 1982/1983 to reimburse
22  hospital outpatient departments?

**Page 22**

1  A. I believe that was also payment on account
2  or percentage.
3  Q. And that applied both to services and to
4  drugs administered to patients?
5  A. I don't have any specific knowledge. I
6  would presume, but I don't have exact knowledge.
7  Q. At that time do you know what
8  methodologies were being used to reimburse
9  physicians for services and drugs they administered
10 in their offices?
11 A. I do not.
12 Q. The bill charges that -- a percentage of
13 which was reimbursed towards hospitals, do you know
14 how those bill charges were calculated in this time
15 frame?
16 A. I do not.
17 Q. What was your next position after
18 supervisor of inpatient claims and hospital claims?
19 A. It was assistant to the director of Blue
20 Cross claims.
21 Q. How long did you hold that position?
22 A. One year.

**Page 23**

1  Q. Who was the director of Blue Cross claims
2  at that time?
3  A. Rick Commander.
4  Q. And what were your responsibilities as
5  assistant director of Blue Cross claims?
6  A. Basically his staff person maintained
7  inventory reporting for the entire division, chased
8  down -- you know, worked on special projects as
9  assigned, basically helped facilitate information
10 for the director.
11 Q. Do you recall what sorts of special
12 projects you were assigned within that time period?
13 A. There was one project where we were
14 selling a new product that had both Blue Cross -- a
15 combined Blue Cross and Blue Shield deductible
16 called ICBM. I couldn't even remember the acronym,
17 but it was ICBM, and it was a new type of benefit
18 design.
19    In the past Blue Cross had its own
20 deductibles, Blue Shield had its own deductibles.
21 They were two separate companies, and this was a
22 product that had shared deductibles.

**Page 24**

1  Q. Any other special projects that you
2  recall?
3  A. No.
4  Q. Now, did the director of Blue Cross claims
5  have responsibility for the claims processing area,
6  or was it something else?
7  A. He did. He had responsibility for the
8  claims processing area.
9  Q. In your role as assistant to the director,
10 did you gain any understanding as to the
11 methodologies that were being used to reimbursement
12 claims from physician offices?
13 A. I did not.
14 Q. What was your next position after that?
15 A. Assistant manager of hospital claims.
16 Q. How long did you hold that position?
17 A. For about a year as well.
18 Q. That takes us up to about 1985?
19 A. '80 -- yeah, '84, '85, yeah.
20 Q. In this position were you responsible for
21 all hospital claims or a subset of them?
22 A. I was responsible for a portion of

**Page 25**

1  hospital claims.
2  Q. What portion were you responsible for?
3  A. I had local claims.
4  Q. What do you mean by "local claims"?
5  A. Non-national claims.
6  Q. Are you referring to claims stemming from
7  hospitals in a particular area?
8  A. Claims submitted by -- claims submitted by
9  local hospitals for Blue Cross of Massachusetts
10 members.
11 Q. What other claims were being processed by
12 Blue Cross/Blue Shield of Massachusetts at that
13 time; in other words, there were claims submitted by
14 local hospitals for members which you were
15 responsible for. What other types of claims were
16 they?
17 A. They would have been claims submitted by
18 subscribers.
19 Q. Okay. Who were the -- who were
20 subscribers?
21 A. Blue Cross/Blue Shield members.
22 Q. Those would be instances where the member

**Page 26**

1 received treatment, paid the bill and then asked for
2 reimbursement?
3     A. Correct.
4     Q. Any other types of claims?
5     A. I'm trying to think who else would have
6 been -- I think certain DME providers, but, again,
7 it wasn't in my area of expertise, so...
8     Q. Now, in this time period, 1984/1985, did -
9 - first of all, was the entity called Blue
10 Cross/Blue Shield of Massachusetts at that time?
11     A. I'm sorry, during what period?
12     Q. '84/85.
13     A. They were two separate companies.
14     Q. Okay. Which company were you working for?
15     A. Blue Cross.
16     Q. Did Blue Cross of Massachusetts in 1984/85
17 have any contracts with hospitals?
18     A. Yes.
19     Q. Did those contracts pertain to
20 reimbursement?
21     A. Yes.
22     Q. Did the contracts specify particular

**Page 27**

1 reimbursement rates?
2     A. Yes.
3     Q. And the methodology that was specified in
4 these contracts was still a percentage of bill
5 charge?
6     A. I believe so.
7     Q. When a claim was -- when a subscriber or a
8 member went to a hospital and received payment --
9 received treatment, paid the bill, which he later
10 submitted for reimbursement, was that member charged
11 the same amount by the hospital as a hospital would
12 have sought reimbursement from BC/BS if doing so
13 directly?
14     A. I honestly don't remember.
15     Q. When a member did seek reimbursement, did
16 those claims come through your department or through
17 another department?
18     A. It would come through another department
19 called Extended Benefits.
20         (Discussion off the record.)
21     Q. The Extended Benefits Department, was that
22 a separate department that you were not responsible

**Page 28**

1 for?
2     A. That was.
3     Q. Do you have an understanding as to what
4 determined whether a member would have to make
5 payment, then seek reimbursement versus the hospital
6 seeking reimbursement directly?
7     A. For the most part, it would be if a member
8 again was -- didn't identify themselves or was out
9 of -- didn't identify themselves to a hospital as a
10 Blue Cross/Blue Shield member or they were out of
11 state and received services from an out of state
12 hospital, but generally, they were more I think
13 maybe some out-of-state physician claims or in-state
14 drug claims.
15     Q. Why were in-state drug claims subject to
16 the system where the member made payment then sought
17 reimbursement?
18     A. That was the system that was in place.
19 All drug claims were subscriber-submitted.
20     Q. Now, did that apply both to drugs
21 administered to patients in a hospital setting as
22 well as self-administered drugs?

**Page 29**

1     A. I don't know.
2     Q. When you say all drug claims were
3 submitted through that process, what were you
4 thinking of? What types of drugs did you have in
5 mind?
6     A. A member goes to CVS, picks up a
7 prescription, pays for it, then submits receipts
8 after the fact.
9     Q. If a drug were administered to a patient,
10 if he got an injection or an infusion in a hospital,
11 do you know one way or another whether that claim
12 was submitted by the hospital to BC -- to Blue Cross
13 of Massachusetts versus a patient submitting it?
14     A. If it was submitted -- if it was performed
15 in a Massachusetts hospital and the member
16 identified themselves as a Blue Cross of Mass.
17 patient, yeah, that would have come through like any
18 other inpatient claim.
19     Q. And do I recall your testimony correctly
20 that you don't know whether the amount charged to a
21 member as opposed to the amount in a claim submitted
22 to Blue Cross of Massachusetts would be the same?

Page 30

1  A. Yeah, I don't have any recollection of
2  that.
3  Q. Okay. What was your next position after
4  assistant manager of hospital claims?
5  A. That was operations manager of hospital
6  claims.
7  Q. How long did you hold that position?
8  A. I believe I held that position for a year
9  as well.
10 Q. How did your responsibilities change when
11 you went from a system manager to operations
12 manager?
13 A. I assumed responsibility for a second
14 location, so I had employees based in Boston as well
15 as employees based in Braintree.
16 Q. Did your substantive responsibilities
17 change in any way?
18 A. Yes. I had significantly more associates.
19 Q. Did the type of work you were doing change
20 in any way, other than supervising more people in
21 more areas?
22 A. No. I think the work was the same type of

Page 31

1  work, it was just a larger department.
2  Q. More responsibility?
3  A. More responsibility.
4  Q. What came next after that role?
5  A. I believe it was director of hospital
6  claims.
7  Q. And how long did you hold that position?
8  A. For a couple years.
9  Q. Now, what did you do in that position?
10 A. Again, same type of work, just a larger
11 scale of responsibility.
12 Q. Okay. Do you have an understanding as to
13 how long the percentage of bill charge methodology
14 remained in use in relation to hospital inpatient
15 claims?
16    MR. COCO: Objection.
17 A. I do not remember. I know it was in
18 effect for a while before we converted over to
19 different payment methodologies, but I couldn't tell
20 you when one started and one other ended.
21 Q. What are the other methodologies that you
22 are thinking of?

Page 32

1  A. We did move to a -- I believe we moved to
2  a DRG-based system, which is the system that's in
3  place today.
4  Q. Okay.
5  A. And there were some, I think, hospital
6  contracts that had per diem arrangements as well, I
7  believe, but, again, I have very limited knowledge
8  about what those unique hospital arrangements were.
9  Q. Okay. I understand you don't know when
10 exactly those changes happened. Do you have a
11 general sense in terms of late '80s, early '90s as
12 to when those changes occurred?
13 A. I don't have a good sense of when those
14 changes took place.
15 Q. What about hospital outpatient
16 departments; do you know when the methodology used
17 to reimburse hospital outpatient departments
18 changed?
19 A. Those were primarily payment on account
20 factor till probably maybe three or four years ago,
21 and they still are some combination of payment on
22 account factor arrangements as well as some fee

Page 33

1  schedule arrangements.
2  Q. Were you involved at all in that
3  transition?
4  A. I was not.
5  Q. Now, you were director of hospital claims
6  until sometime around 1988; is that correct?
7  A. I think it was '80 -- yeah, '88 or --
8  yeah, '88, I think, yes, yes.
9  Q. Okay. What was your next position after
10 that?
11 A. Director of national claims. And that was
12 from 1989 to 1991.
13 Q. What were your responsibilities in that
14 position?
15 A. Had many of the same hospital claim
16 accountabilities but now took on some larger
17 national account business. The most significant
18 large account was the FEP program.
19 Q. FTP?
20 A. FEP, Federal Employees Program.
21 Q. What was the Federal Employees Program?
22 A. It's a Blue Cross/Blue Shield health plan

**Page 34**

1  that we administer.
2    Q. Okay. And I take it that provides for
3  treatment for federal employees in return for a rate
4  paid by the government?
5    A. Correct.
6    Q. Is that product still in existence?
7    A. It is.
8    Q. What's the structure of that product; in
9  other words, is it premium-based, is it cost-based?
10 How is that product set up?
11   A. I believe it's a cost-based product. We
12 are reimbursed from the FEP OPM office, Office of
13 Personnel Management, and I believe it's basically
14 like an ASC-type product where they pick up all the
15 cost.
16   Q. What is an ASC-type product?
17   A. Administrative services contract versus a
18 premium contract where we're bearing all the risk.
19   Q. So BC/BS of Massachusetts is essentially
20 acting as a claims processor in relation to that
21 program?
22   A. Correct. And member service functions and

**Page 35**

1  provider service functions as well.
2    Q. Now, when a -- under the FEP -- is it
3  called an FEP product? Does the product have a
4  particular name?
5    A. I'm sure it's got a name. I could not
6  tell you what the name is.
7    Q. Okay. Well, under the Federal Employees
8  Program the patient goes to a hospital and receives
9  treatment. Do I understand correctly that that
10 hospital will then submit a claim to BC/BS of
11 Massachusetts for reimbursement? That's the first
12 part, right?
13   A. Correct.
14   Q. BC/BS will then process the claim and
15 figure out how much should be paid to the hospital,
16 right?
17   A. Correct.
18   Q. Will BC/BS of Massachusetts then make the
19 payment to the hospital?
20   A. Yes.
21   Q. And BC/BS of Massachusetts will then seek
22 reimbursement for that amount from the federal

**Page 36**

1  government?
2    A. Correct.
3    Q. Now, in addition to recovery of that cost
4  and recovery of the amount that's reimbursed, does
5  BC/BS of Massachusetts also receive a payment in
6  consideration of the service that it's providing?
7    A. Yes. Yes.
8    Q. Is that a lump sum, you know, a flat
9  dollar amount?
10   A. I have no idea.
11   Q. Okay. Do you know whether or not that
12 amount is related in any way to the dollar sums
13 reimbursed in relation to claims?
14   A. I would suspect not.
15   Q. Now, are you familiar with the FSS, the
16 Federal Supply Schedule?
17   A. I am not.
18   Q. I take it you're familiar with the VA
19 program?
20   A. I am -- I know of the VA.
21   Q. Okay. Are you aware that when the federal
22 government purchases drugs, it does so at particular

**Page 37**

1  negotiated discounted rates?
2        MR. COCO: Objection.
3    A. I am not aware of that.
4    Q. Okay. Do you know how the amounts that
5  hospitals seek reimbursement for under the FEP are
6  determined?
7    A. I do not.
8    Q. Okay. Do you know what methodology is
9  used in generating those claims submitted to the
10 FEP?
11   A. I do not.
12   Q. Okay. Who would know -- who is familiar
13 with the FEP program or would know the answers to
14 those questions?
15   A. I would say Deb Maroney is the person who
16 leads the FEP program.
17   Q. How long has she been in that position?
18   A. I would guess a couple of years.
19   Q. Can individuals who have coverage under
20 the FEP, would they seek treatment at physician
21 offices as well as in hospitals?
22   A. Absolutely.

Page 38

1  Q. Do you have an understanding as to what
2  methodology is used to reimburse physician offices
3  who submit claims under the FEP?
4  A. I do not.
5  Q. And let me ask you specifically in
6  relation to drugs that may be administered to
7  members of the FEP in a physician office or in a
8  hospital setting, do you have any knowledge as to
9  what methodologies are used to reimburse claims in
10 relation to those physician-administered drugs?
11 A. I do not.
12 Q. You mentioned that as director of national
13 claims you have responsibility for some national
14 accounts, the hospitals you were dealing with
15 before, and the FEP. Did you have responsibilities
16 for any other programs?
17 A. I'm trying to think back then. No, I
18 think -- FEP is an example of a national account.
19 There are other national accounts. Stone & Webster
20 was a national account. Any large major national
21 accounts I was responsible for overseeing the claims
22 processing and the account servicing of those as

Page 39

1  well.
2  Q. What is Stone & Webster?
3  A. Is a Blue Cross customer.
4  Q. Is that a company or an employer?
5  A. It's a company, an engineering firm, I
6  believe.
7  Q. And they're a customer who uses BC/BS of
8  Massachusetts to provide health insurance for its
9  employees?
10 A. Correct.
11 Q. Now, as director of national claims did
12 you have responsibility only for hospital claims or
13 also for physician office claims?
14 A. 1989, I think at that point -- I think all
15 claims, I think hospital and physician claims at
16 that point.
17 Q. Now, at that point did you -- had you
18 gained an understanding as to the methodology that
19 BC/BS of Massachusetts used to reimburse physicians
20 for treatment provided to members?
21 A. Generally speaking, fee for service, yes.
22 Q. Now, in that time period, 1989 to 1991,

Page 40

1  was fee-for-service the only methodology that was
2  utilized?
3  A. I do not know.
4  Q. Do you know whether there were any risk-
5  sharing plans, capitation, withholds, anything of
6  that kind?
7  A. At that time -- I know I've heard of risk
8  arrangements, I've heard of capitation arrangements.
9  I can't tell you at what point in time they were in
10 effect.
11 Q. Do you know in this time period, '89 to
12 '91, what methodologies were used to generate the
13 reimbursement amounts paid under the fee- for-
14 service plans?
15 A. I'm not -- I'm sorry, I don't understand
16 the question.
17 Q. Okay. Let's break it down. When a
18 physician were to submit a claim in that '89 to '91
19 time period, one part of the claim could be a claim
20 in relation to a particular service rendered, right?
21 A. Right.
22 Q. Do you know -- well, that claim would then

Page 41

1  be processed by reference to the fee specified in
2  relation to that particular service, right?
3  A. Uh-huh.
4  Q. Do you know how that fee would be
5  generated or calculated?
6  A. I do not.
7  Q. Now, another part of a claim could be a
8  claim in relation to a drug administered to a member
9  in the physician's office, right?
10 A. Uh-huh.
11 Q. Okay. And -- you'll need to answer
12 questions verbally so the reporter can take them
13 down, please.
14 A. Yes.
15 Q. Thank you. Do you know how the amount
16 calculated for reimbursement in relation to that
17 drug component of a claim would be generated or
18 arrived at?
19 A. I do not.
20 Q. Now, as director of national claims what
21 were your responsibilities on a day-to-day basis?
22 What did you do in relation to claims from these

**Page 42**

1 national accounts?
2    A. Again, oversee the general operations of
3 all of the areas, monitoring claim inventories, you
4 know, providing account service, back then providing
5 provider service as well, you know, meeting with
6 accounts, addressing their issues or concerns.
7    Q. Okay. Now, you used the phrase "claims
8 inventories" a few times this morning. What does
9 that mean?
10   A. Those are the claims that are -- that have
11 not yet been adjudicated.
12   Q. Okay. So by -- when you refer to managing
13 claim inventories, are you referring to generally
14 ensuring that claims are processed in a timely way?
15   A. Correct. Correct. That they're entered
16 into the system in a timely way, that if they do
17 suspend out of the system for review or correction,
18 that they're adjudicated, if there are any claims
19 that need to be manually priced, those are done on a
20 timely basis.
21   Q. Now, you also mentioned part of your
22 responsibility was addressing account concerns or

**Page 43**

1 issues. In this time period, '89 to '91, what sorts
2 of account concerns or issues were you dealing with?
3    A. It was really more focused around service
4 delivery, you know, excuse me, how quickly claim
5 phone calls were answered, how quickly claims were
6 turned around, what were financial accuracy rates on
7 claims processed.
8    Q. Anything else?
9    A. Implementation of new programs. Very
10 often an account would want a unique benefit or a
11 new program. We would work with them to understand
12 what it was they wanted us to deliver and try to
13 accommodate them.
14   Q. Were any of the concerns or issues that
15 you dealt with as director of national accounts in
16 the '89 to '91 time period related to the amount of
17 reimbursement that was being provided by BC/BS of
18 Massachusetts?
19   A. No.
20   Q. Okay. Would those -- would any concerns
21 or issues of that kind have been submitted to you,
22 or would they have gone somewhere else in the

**Page 44**

1 organization?
2    A. I'm not sure I follow the question.
3    Q. Let me rephrase it.
4    A. Please.
5    Q. Let's say I am a provider in 1990 --
6    A. Provider or an account?
7    Q. Well, are you referring -- you're
8 referring -- by "account" you're referring to
9 customers, right?
10   A. Correct.
11   Q. Okay. I'm referring to providers as in
12 hospitals or physicians. By the way, when you refer
13 to concerns and issues, you were dealing only with
14 customers?
15   A. I was dealing with providers as well as
16 customers.
17   Q. Okay. The concerns that you addressed
18 earlier in terms of calls answered, turnaround times
19 and so on, were those concerns expressed by accounts
20 or by providers?
21   A. Mainly by accounts.
22   Q. Okay. What sort of concerns did you deal

**Page 45**

1 with from providers?
2    A. They may call and have issues with --
3 their biggest issue was -- at the time would be
4 really either claims inventory that they felt claims
5 weren't processing quick enough or that they felt
6 they were being underpaid on a particular claim.
7    Q. In what circumstances would this concern
8 of underpayment come up?
9    A. In the normal course of business
10 providers, billing staff would review claims, and if
11 they felt on a particular claim that they should
12 have been reimbursed more, they would either pick up
13 the phone and call or write.
14   Q. Now, were these generally circumstances
15 where there was a disagreement as to what aspects of
16 service should be counted in a claim or what aspects
17 of a service should be reimbursed, or were these
18 concerns about the amount specified in reimbursement
19 for a particular service?
20      MR. COCO: Objection.
21   A. It was more the former.
22   Q. Okay. Do you recall --

**46**

1  A. You know, they would be under the
2  impression that we paid the claim at an incorrect
3  level, a claim line was miscalculated or not applied
4  or that type of thing.
5  Q. Do you recall dealing with any instances
6  involving the latter situation where the concern was
7  about the amount specified in reimbursement for a
8  particular service or drug?
9  A. No, I didn't deal with any hospital
10 contracting or physician contracting issues.
11 Q. So getting back now to the question I
12 asked you earlier, if a provider had a concern in
13 1990 about the amount he was being reimbursed for a
14 particular service or drug, would you be the person
15 to bring that to as director of national claims, or
16 would there be another department that had staff to
17 deal with that?
18 A. There would have been another department
19 in provider contracting that would deal with that
20 compliant.
21 Q. And who in this time period, 1989 to '91,
22 was in charge of provider contracting, if you

**47**

1  recall?
2  A. I honestly don't remember.
3  Q. Okay. After your role as director of
4  national claims, what was your next position?
5  A. Medex, the director of the Medex CBU.
6  Q. Medex CBU?
7  A. CBU, Client Business Unit.
8  Q. How long did you hold that position?
9  A. From, I believe, 1991 to about 1995, I
10 believe.
11 Q. Now, what was the Medex Client Business
12 Unit?
13 A. It was the first time that we had put --
14 first time we had aligned the business by specific
15 customers, so in one shop, in this CBU environment,
16 we had all claims processing related to Medex, all
17 provider servicing related to Medex, all member
18 service relating to Medex, all account issues
19 relating to Medex all housed in one area. So
20 essentially all servicing aspects for products were
21 in this new model.
22 Q. Was Medex a product or an account?

**48**

1  A. Medex was a product -- several products,
2  type of products.
3  Q. What types of products was Medex?
4  A. Medicare supplemental product.
5  Q. Now, was -- did Medex include a Medigap
6  product?
7  A. Medex is our Medigap product.
8  Q. So if a Medicare patient had Medex
9  coverage, that would take care of their co-insurance
10 obligations, correct?
11 A. Co-insurance, deductible, correct.
12 Q. I believe you mentioned earlier that Medex
13 was an umbrella that included several products. Did
14 I understand that correctly, or was it just one
15 product?
16 A. Oh, Medex was a name for several -- there
17 were several different Medex products, yes.
18 Q. So there were several different types of
19 Medigap products?
20 A. Levels of coverage.
21 Q. Levels of coverage, okay.
22 Now, as director of the Medex Client

**49**

1  Business Unit, were you the person in charge of that
2  entire unit, or was there someone above you tasked
3  specifically with the Medex unit?
4  A. I had a boss I reported to.
5  Q. Okay. Did your boss have responsibility
6  for areas other than Medex, or was he also or she
7  also focused on Medex?
8  A. She had responsibilities for Medex and
9  other products as well.
10 Q. Who was your boss at that time?
11 A. Eleanor Socholitzky.
12    MR. COCO: Can you spell that?
13    THE WITNESS: I might be able to. S-O-C-H-
14 O-L-I-T-Z-K-Y.
15 Q. Hey, almost got it right.
16 A. Close.
17 Q. Do you know what her position was at that
18 time?
19 A. She was vice president of regulated
20 products.
21 Q. Now, as director of the Medex Client
22 Business Unit did you acquire an understanding as to

Page 50

1   the methodologies that Medicare was using to
2   reimburse hospitals or physicians for treatment
3   rendered to Medicare beneficiaries?
4       A. Very generally.
5       Q. Let's talk about physician offices to
6   begin with. Did you get an understanding as to how
7   Medicare calculated the amounts it would reimburse
8   physicians for services that they provided to
9   Medicare beneficiaries?
10      A. Not necessarily. What we would do is our
11  responsibility was to pick up the balance so we
12  didn't readjudicate or reevaluate how Medicare
13  processed a claim. We took -- every claim that we
14  got always had either a Medicare remittance attached
15  or it was crossed over from the Medicare processor
16  with that Medicare information in there. So all we
17  basically did was pick up the balance between what
18  the Medicare allowed amount was, what Medicare paid
19  and we picked up the balance.
20      Q. I understand that that's how the -- that's
21  what the Medex product was structured towards. My
22  question, though, is a little broader. Given that

Page 51

1   you were picking up a portion of the general
2   Medicare charge, did you get an understanding as to
3   how the Medicare charge was calculated?
4       A. I did not.
5       Q. Okay. Are you familiar with the term
6   "RBRVS"?
7       A. I am.
8       Q. What is RBRVS?
9       A. I believe it stands for Relative Value-
10  Based Resource System or something like that.
11      Q. Do you know what RBRVS is used for?
12      A. It is used for arriving at the value of a
13  claim.
14      Q. Do you understand that RBRVS is a
15  methodology that is used to calculate the value of
16  claims relating to services?
17      A. Correct.
18      Q. Okay. When did you first become familiar
19  with RBRVS?
20      A. I would have to say maybe 1998 or so.
21      Q. During the period when you were director
22  of the Medex Client Business Unit you were not

Page 52

1   familiar with RBRVS?
2       A. May have heard the term, never used it.
3       Q. During that time period, '91 to '95, did
4   you know how Medicare determined the amount to
5   reimburse physicians for drugs that they
6   administered in their offices?
7       A. I did not.
8       Q. At some point subsequently did you gain an
9   understanding as to how Medicare reimbursed for
10  drugs administered in physicians' offices?
11      A. I did not.
12      Q. Okay. So as you sit here today, do you
13  have any idea how Medicare currently reimbursed for
14  drugs administered in physicians' offices or how
15  it's done so at any point in the past?
16      A. I have a general knowledge that they
17  process a percentage off the AWP, but that's the
18  extent of what I could tell you.
19      Q. During the time period you were the
20  director of the Medex unit, did you have an
21  understanding as to how Medicare calculated amounts
22  it would reimburse hospitals, inpatients or

Page 53

1   outpatients, for services and drugs?
2       A. Not specifically, no.
3       Q. What was your next position after your
4   role as director of the Medex Client Business Unit?
5       A. 1995 through 1998 I was the director of
6   the claims division.
7       Q. Let me turn back for a moment to the FEP
8   product. At the time that you first gained
9   responsibility for that product when you were
10  director of national claims, was that product
11  already in existence?
12      A. I believe so. I honestly don't know. I
13  believe so.
14      Q. And was it something that was launched
15  while you were the director of national claims, that
16  you recall?
17      A. I don't recall.
18      Q. Okay. Do you know if that -- that product
19  is still in existence today, correct?
20      A. A product, an FEP product is still in
21  place today, yes.
22      Q. Has there been an FEP product in existence

**54**

1  continuously from 1989 to the present time?
2      A. I believe there -- I believe there has.
3      Q. Now, in '95 you became director of the
4  claims division?
5      A. Correct.
6      Q. How is this different from your previous
7  role as director of national claims?
8      A. This was the first time that all claims
9  processing, both Blue Cross and Blue Shield were all
10 under one environment, so we consolidated claims
11 processing units throughout the state, brought them
12 all together, relocated them in Quincy and put them
13 in one organization.
14     Q. Now, what was the -- can you help me
15 understand the distinction in that time period
16 between the Blue Cross entities and the Blue Shield
17 entities and what was happening that they were
18 coming together?
19     A. The companies were merged becoming one
20 entity. And prior to -- I couldn't tell you the
21 date that the actual merger happened, but we were no
22 longer Blue Cross of Massachusetts and Blue Shield

**55**

1  of Massachusetts, but we became one entity.
2         As we made that transition we were
3  operating on -- each company was operating on its
4  own -- multiple of its own claims processing
5  systems. So as we brought more of those activities
6  together we were not only consolidating locations,
7  but we were also consolidating systems.
8      Q. Now, prior to the merger do I understand
9  correctly these were independent, unrelated
10 companies?
11     A. That's my understanding, yes.
12     Q. Okay. Did the -- did Blue Cross of
13 Massachusetts and Blue Shield of Massachusetts have
14 different methodologies that they used for
15 reimbursing claims prior to the merger?
16     A. I believe they did.
17     Q. So when the merger took place, it was not
18 just a matter of merging locations and systems, but
19 the amounts set for reimbursement also had to go
20 through a process of reconciliation and revision,
21 correct?
22     A. Correct.

**56**

1      Q. As director of the claims division did you
2  play a role in that merger process, that revision
3  and reconciliation process?
4      A. I'm trying to think. I think by that time
5  that merger had already happened.
6      Q. Okay.
7      A. We were going through a different
8  conversion during 1995. We were converting -- we
9  were wrapping up the conversion to our new computer
10 system, TPS. We started that conversion, I believe,
11 in 1992, and we were completing -- so that all Blue
12 Cross and -- all Blue Cross and Blue Shield claims
13 were all going to be processed on one same -- a
14 single system.
15     Q. Now, the new system, that is referred to
16 as TPA, did you say?
17     A. TPS.
18     Q. TPS. What does that stand for?
19     A. Total Processing System.
20        MR. MANGI: Off the record for a second.
21        (Discussion off the record.)
22        MR. MANGI: We've be going about an hour.

**57**

1  Do you want to take a break?
2         MR. COCO: Yeah, that's fine.
3         THE VIDEOGRAPHER: The time is 10:37.
4  We're off the record.
5         (Recess taken.)
6         THE VIDEOGRAPHER: We're on the record at
7  10:49.
8  BY MR. MANGI:
9      Q. Mr. Plourde, before the break we discussed
10 the couple of different transitions. One was the
11 Blue Cross and Blue Shield organizations and their
12 systems coming together, and then there was this
13 movement to the TPS system. I would like to ask you
14 about those one at a time. When the Blue Cross and
15 Blue Shield companies merged and their different
16 reimbursement rates had to be revised, reconciled
17 and consolidated into one rate, were there any
18 particular problems or challenges that emerged, that
19 you're aware of?
20     A. None that come to mind. When the areas
21 merged, you know, they basically remained separate
22 components, so let me just elaborate for a moment.

**58**

When we brought pricing files over, it's not like we took the Blue Shield pricing files and necessarily melded them with the Blue Cross pricing files. It's simply a separate table. So whatever Blue Shield provider rates that were in effect before were housed in one part of the system and whatever Blue Cross rates that were in effect were housed in a different part of the system, but it didn't -- there wasn't an activity to take a professional rate and meld it with the Blue Cross system to come up with a new melded rate.

Q. At some point thereafter, after that initial process of bringing all the rates into one system had been complete, did such a process take place of combining them to arrive at one set of payment rates?

A. I would have to say no. I mean, we today still -- it's a -- we paid based on a number of different arrangements. We pay fee-for- service, we pay I'm sure in some select arrangements charges, we pay payment on account factor. So we use all of those different variables. We pay DRG, we pay per

**59**

diem.

Q. There's no -- there's no distinction today between Blue Cross rates and Blue Shield rates in the system, right?

A. There are -- there are -- no, there are inpatient and outpatient payment on account factors --

Q. Right.

A. -- that are employed. And to answer your question, I honestly can't tell you whether or not -- whether or not I would presume that if the same service were rendered in a hospital versus in an outpatient clinic, that those in fact -- I mean, in a physician's office, that those services in fact wouldn't be paid the same rates because they're two different settings.

Q. I didn't quite follow your last -- your last statement.

A. I guess I'm trying to clarify the statement that you made or the question that you asked around, you know, these rates somehow being the same. And what I'm saying is I'm not sure that

**60**

if a particular procedure is performed, if that procedure is performed in a hospital versus that same procedure being performed in a physician's office. What I'm saying is my sense is those rates of reimbursement are not the same. There's different overhead in a hospital setting to render care than there is in a physician's office.

Q. I didn't intend to raise that issue, but it's an interesting issue, so let's talk about it a bit. Do I understand correctly the point you are making is that there are different payment rates for hospitals versus physicians' offices in part due to the fact that they have different overheads?

A. Correct. Correct.

Q. Do you have an understanding as to which setting is more expensive to Blue Cross/Blue Shield of Massachusetts?

A. My --

MR. COCO: Objection.

A. My sense, and it would just be to my sense, that intuitively I would think that the services rendered in a hospital setting would be

**61**

more expensive.

Q. And that would include a hospital outpatient department as opposed to a physician clinic?

A. Correct.

Q. Okay. Now, what is the basis for the intuitive understanding? In other words, what makes you think that?

A. The fact that the hospital has much more overhead. They have a staff of nurses, they have hospital beds, they have all kinds of other fixed costs that a physician practicing in an office does not have. Now, whether that's reflected in a payment rate or it's differentiated through some type of, you know, multiplier, I have no idea.

Q. Now, let's turn back to the issue I was trying to address earlier which pertains to the coming together of Blue Cross and Blue Shield systems. I understand that when the merger first took place there were just the different components housed in the same system. Today, however, as we discussed, they're not separate Blue Cross rates

**Page 62**

1  versus separate Blue Shield rates, right?
2      A.  I don't know that I can make that
3  statement.
4      Q.  Okay.  Throughout the time period you were
5  director of the claims division from '95 to '98 were
6  those separate Blue Cross versus Blue Shield rates
7  in existence?
8      A.  I believe, yes, that those -- there were
9  separate rates.
10     Q.  And do I understand correctly that you
11 just don't know what happened thereafter, whether or
12 not they were brought together or stayed separate?
13     A.  Correct.  I have no idea if they've -- how
14 they've been --
15     Q.  Okay.
16     A.  -- combined.
17     Q.  Now let me ask you about the other
18 transition that you mentioned, which is the move to
19 the Total Processing System.  What was the system
20 that was in place prior to that?
21     A.  For which organization?
22     Q.  Well, was the Total Processing System --

**Page 63**

1  when was the Total Processing System implemented?
2      A.  Began in 1992.
3      Q.  And when it began in 1992, had the merger
4  between Blue Cross and Blue Shield taken place yet?
5      A.  I believe it had already started, yes.
6      Q.  What was the system that was in use prior
7  to the Total Processing System at Blue Cross of
8  Massachusetts?
9      A.  We had our own homegrown system.
10     Q.  What was that system called?
11     A.  I believe it was UCS.
12     Q.  What did that stand for?
13     A.  Unified Claim System.
14     Q.  And do you know what system was used prior
15 to 1992 at Blue Shield of Massachusetts?
16     A.  It was an EDS-based system.  I don't know
17 the name of the system.
18     Q.  What does EDS stand for?
19     A.  Electronic Data Systems.  They're a vendor
20 that we purchased that system from.
21     Q.  Now, in 1992 did -- after the merger both
22 systems were transitioned to the TPS system --

**Page 64**

1      A.  Correct.
2      Q.  -- or Total Processing System?
3      A.  Correct.
4      Q.  What were the reasons for the transition
5  being made?
6      A.  The most simple reason was just to
7  streamline the process and achieve greater economies
8  of scale rather than maintaining two separate -- and
9  when I say "two separate," you know, I'm being kind.
10 I'm sure there were several separate -- the main
11 processing system was UCS, but I'm sure there were
12 half a dozen other minor processing systems.  So the
13 goal was to move -- to shut down those many systems
14 and migrate to one core system.
15     Q.  Was there a reason why an entirely new
16 system was used as opposed to the Blue Shield
17 systems being folded into UCS or the Blue Cross
18 systems being folded into EDS?
19     A.  They were totally different systems,
20 incompatible systems.  The EDS system didn't have --
21 at that time didn't have the ability to process
22 inpatient and outpatient, and the UCS system didn't

**Page 65**

1  process professional claims.
2      Q.  So the move to the TPS system was required
3  entirely as a result of the merger; is that correct?
4      A.  I wouldn't say it was required by the --
5  it wasn't required by the merger.  I think we chose
6  to consolidate operations to, again, gain greater
7  economies of scale, improve productivity, reduce
8  cost.
9      Q.  Okay.  Did you play a role in the
10 transition to the TPS system?
11     A.  I did.
12     Q.  Okay.  Now, at the time the transition
13 took place you were director of the Medex CBU,
14 correct?
15     A.  I was.
16     Q.  Was the transition complete by the time
17 you became director of the claims division?
18     A.  Yes.
19     Q.  So as director of the Medex CBU, what was
20 your role in relation to the transition to the TPA --
21 - TPS?
22     A.  TPS.  My responsibility was to make sure

Vincent D. Plourde     HIGHLY CONFIDENTIAL                April 13, 2006
Boston, MA

18 (Pages 66 to 69)

---

Page 66

1  that we were able to successfully migrate off two
2  separate standalone systems that we had that were
3  altogether different than the other systems to this
4  Total Processing System.
5      Q. By we are you referring to the Medex CBU?
6      A. I'm sorry?
7      Q. When you say "ensure successful migration
8  of the two systems we had," is the "we" in that the
9  Medex Client Business Unit?
10     A. Me and my staff, my staff and I.
11     Q. I'm trying to understand, though, if
12 you're referring to your staff in the Medex Client
13 Business Unit?
14     A. Yes, yes, yes.
15     Q. Okay.
16     A. It was our task in the Medex Business Unit
17 to migrate off to -- actually, I think it may have
18 been actually three separate standalone systems to
19 this last phase of TPS. So we were the last
20 implementation event to happen.
21     Q. Okay.
22     A. And to make sure that all of the claims

---

Page 67

1  history, excuse me, all the claims history and
2  appropriate information was converted from old
3  systems to new systems.
4      Q. Were there any particular challenges or
5  problems that emerged in the course of that
6  transition?
7      A. Just the usual kinds of problems you
8  expect with a conversion. We had to retrain every
9  associate in the department, probably about 250
10 associates that needed to be completely retrained on
11 an entirely new system. And we needed to do that at
12 the same time that we were processing on the old
13 system. So basically we had to backfill an
14 additional bunch of positions so that we could
15 gradually phase in the processing on the new system
16 and migrate our trained associates from the old
17 system, move them over to the new system.
18     Q. How long did that entire transition
19 process take?
20     A. I would guess it would -- it probably took
21 about six months, six or seven months from start to
22 finish.

---

Page 68

1      Q. Are you referring there to the entire move
2  to the TPS, or are you referring to the Medex Client
3  Business Unit --
4      A. Just the Medex component.
5      Q. Okay. Do you know how long the overall
6  transition took?
7      A. I believe it started in '92 and finished
8  in '95 when we finished. So it was about a three-
9  year transition.
10     Q. Okay. Now, during the time period when
11 you were director of the claims division, were there
12 any other system changes or migrations that you're
13 aware of?
14     A. During what -- I'm sorry, which time
15 frame?
16     Q. When you were director of the claims
17 division from '95 to '98.
18     A. Were there any other migrations going on?
19 I'm sure there were. None come to mind.
20     Q. Okay. Now --
21     A. We've evolved -- I mean, we were
22 continuous -- like any business, continually trying

---

Page 69

1  to evolve the business to get to fewer claim
2  systems. At one time we probably had about 12
3  different small claim systems. So over time we kept
4  trying to streamline that to get down to one central
5  processing system.
6          The USC system and the EDS-based system
7  may have been responsible for 80 percent combined of
8  all the claims, but there were probably another 20
9  percent that were in these other ancillary systems
10 that we needed to migrate over.
11     Q. So by 1995 had those ancillary systems
12 been incorporated into TPS, or was that an ongoing
13 process when you became director?
14     A. I'm trying to think. Was there anything
15 else? I honestly can't remember. I honestly can't
16 remember.
17     Q. Okay.
18     A. My sense is that most of the conversion
19 work, though, was completed in '95, the big piece.
20 Medex was the last, most complex piece to go in.
21     Q. Okay. Did Medex go in after the ancillary
22 systems, or was that the last of --

**Page 70**

1   A. No. It was the last major component to go
2 in. So the other systems would have been migrated
3 over during that time, before TPS -- before Medex,
4 rather.
5   Q. Was Medex -- prior to that time was Medex
6 a standalone ancillary system, or was it part of --
7   A. It was -- it was part of three. I think I
8 mentioned earlier there were three separate Medex
9 processing systems.
10   Q. Okay. Well, were they part of the -- did
11 Blue Cross have the EDS system or the -- Blue Cross
12 had the UCS system, right?
13   A. Correct.
14   Q. Were the Medex products part of the UCS
15 system, or were they among the --
16   A. No.
17   Q. -- ancillary systems you mentioned?
18   A. Three ancillary systems.
19   Q. Now, turning back again to reimbursement
20 for drugs administered in physicians' offices, are
21 you aware that through the '90s or the latter part
22 of the '90s Blue Cross/Blue Shield of Massachusetts

**Page 71**

1 followed Medicare in the amount it reimbursed
2 physicians for drugs administered in office?
3   A. I'm not aware of what the precise pricing
4 methodology was in that time frame, no.
5   Q. Are you aware of a transition that took
6 place in that time frame in Blue Cross/Blue Shield
7 of Massachusetts' reimbursement methodology for
8 drugs administered in physicians' offices from 100
9 percent of AWP to 95 percent of AWP?
10   A. I am not aware of that.
11   Q. Okay. If and when such a transition took
12 place, would you as director of the claims division
13 have been informed about it or played a role in
14 updating systems as a result?
15   A. No. I mean, people in the -- in our IT
16 organization or staff people several levels below
17 would have taken care of that.
18   Q. So when it came to changes in
19 reimbursement rates, be it for individual codes or
20 across the board, that would be handled by technical
21 staff?
22   A. Could be handled by technical staff, yes.

**Page 72**

1   Q. In 1998 what position did you move to?
2   A. 1998 I moved to provider enrollment and
3 services. That was from '98 to I believe about
4 2002.
5   Q. Was that the role you held immediately
6 prior to your present role?
7   A. Correct.
8   Q. And what was your title in that --
9   A. It was vice president of provider
10 enrollment and services.
11   Q. What were your responsibilities in that
12 capacity?
13   A. It was to improve the service levels in a
14 poorly performing area and to consolidate activities
15 that were done in multiple places in the
16 organization and pull those together all in one
17 central location so that basically providing kind of
18 front-to-end accountability for provider servicing.
19 It included things like, again, managing a large
20 call center that handled telephone and written
21 inquiries. It involved moving a credentialing
22 function which reported elsewhere in the company

**Page 73**

1 into this organization. And it also entailed moving
2 a pro -- the provider call center was moving from
3 another division to our division, but, again --
4   Q. Anything else?
5   A. -- the major issue, it was poorly
6 performing.
7   Q. Now, when you say "it was poorly
8 performing," what were you referring to?
9   A. The service levels that that area was
10 providing were not where we wanted them to be.
11   Q. Let's break down the services that we're
12 talking about there.
13   A. Okay.
14   Q. One service is the call center?
15   A. Correct.
16   Q. Another service is the credentialing
17 division?
18   A. Credentialing area, yeah.
19   Q. Were there any other components to that
20 poorly performing service?
21   A. Yeah, provider enrollment was the last
22 component.