**74**

1  Q. Which is a total of three areas?
2  A. Correct.
3  Q. Now let's first talk about those one by
4  one.
5  A. Okay.
6  Q. What was the role of the call center?
7  A. Again, to resolve telephone and written
8  inquiries from any type of provider. If it was a
9  hospital, physician, ancillary provider, DME, any
10 type of provider, that inquiry would come into that
11 department to be resolved.
12 Q. What sort of inquiries were coming in?
13 A. All kinds of inquiries, inquiries about
14 "Is this individual a covered member?", questions
15 about, you know, "This claim paid at this level. I
16 would have expected it to pay at a different level.
17 Can you explain to me why?", claim overpayments, any
18 type of -- even a claim that hadn't been resolved
19 yet, that call would come in.
20      So if a provider had submitted a claim and
21 hadn't heard or received payment yet, they would
22 call my area for status and say, "Do you know what

**75**

1  the status is?"
2  Q. Did providers ever write in as opposed to
3  calling in?
4  A. They did.
5  Q. And if they wrote in, did those letters
6  come to the same group that ran the call center?
7  A. It came to a -- it came to a different
8  group within the call center. There was a dedicated
9  correspondence team.
10 Q. Okay. Was the correspondence team tasked
11 with both hard copy correspondence as well as
12 electronic correspondence with providers?
13 A. Mainly -- mainly hard copy. They recently
14 are doing some electronic communications, but the
15 vast majority is hard copy.
16 Q. Okay. Earlier in relation to one of your
17 previous positions I had asked you about queries or
18 calls from providers regarding the amount of
19 reimbursement they were getting --
20 A. Uh-huh.
21 Q. -- in relation to particular services or
22 drugs. Did this call center or the correspondence

**76**

1  team deal with queries or concerns of that kind?
2  A. Absolutely.
3  Q. What sort of queries or concerns would
4  they receive in that regard?
5  A. They would get a call, and a provider
6  would say, "I got reimbursed $90 on this claim. I
7  think I should have been reimbursed $95. Can you
8  explain to me why this particular line item was
9  disallowed?", or "The claim rejected in total. I
10 don't understand why it rejected. Can you please
11 explain to me this reject message?"
12 Q. Okay. Anything else?
13 A. Oh, a thousand different reasons, but...
14 Q. Now, similar to a distinction that I drew
15 earlier, do I understand correctly that one set of
16 complaints would be about how a particular claim was
17 processed, whether a line item was disallowed,
18 whether it should be properly processed under one
19 code versus another, and that was a number of the
20 queries that were received, right?
21 A. Correct.
22 Q. Now, separately did you receive queries,

**77**

1  calls, concerns about the amount of reimbursement
2  that was specified in the system, in the fee
3  schedules for particular services or drugs?
4  A. No. I want to make sure I'm clear on
5  this. If they were asking -- if a provider was
6  calling saying, "I don't like the fact that I only
7  get $25 for Procedure Code 99111," they wouldn't
8  call my area on that.
9  Q. Okay. And let's take a drug-specific
10 example. Let's say a provider had a concern over
11 the amount he was reimbursed for a particular drug
12 that he administered to a patient in his office,
13 say, for example, he was concerned about the
14 reimbursement not covering his cost for the drug.
15 Would that be something that he would contact the
16 call center or the correspondence team about?
17 A. He would.
18     MR. COCO: Objection.
19 A. He would.
20 Q. Is that -- are those types of issues,
21 queries, concerns things that you dealt with in your
22 role as the VP of provider enrollment and services?

**Page 78**

1  A. No. They are things my staff dealt with.
2  Q. Were queries of that kind received by your
3  staff?
4  A. I have no specific knowledge of those
5  queries being received.
6  Q. Okay. Have you ever heard of,
7  anecdotally, such inquiries or issues being raised
8  by providers?
9  A. Not specifically. Not specifically. But,
10 again, providers call every day. I get $10,000
11 calls a day where providers are unhappy about
12 something about a claim. I can't tell you what
13 they're calling about.
14 Q. Okay. When these -- in the '98-2002 time
15 period when you were working on consolidating these
16 various services, was there a system in place
17 already for logging or memorializing the content of
18 calls received from providers?
19 A. Back in 1995 through 1998?
20 Q. Well, '98 -- I was thinking '98 to '02
21 when you were the VP of provider enrollment --
22 A. Yes, there were -- yes, yes, there was a

**Page 79**

1  contact reporting system in place.
2  Q. Okay. Now, prior to your coming on board
3  as the VP of provider enrollment and services, do
4  you know whether there was a system in place?
5  A. I do not know whether there was a system
6  in place.
7  Q. Okay. After you came on board as the VP,
8  what system was in place?
9  A. We developed a call recording system, or
10 purchased a call recording system.
11 Q. Okay. Were all calls recorded?
12 A. I believe yes, yes, all calls were
13 recorded, and we would sample from those calls for
14 quality assurance purposes.
15 Q. Other than maintaining audio recordings,
16 was there any system whereby the contents of these
17 calls were written down in memos, in an electronic
18 system, in a database? Was there any sort of data
19 entry that ran along with the calls?
20     MR. COCO: Objection.
21 A. I would say there was some reporting that
22 came out of -- but no -- you know, the kind of

**Page 80**

1  reporting that would come out of the system would be
2  we got -- today we got 2400 eligibility calls. It
3  wouldn't say of those 2400 eligibility calls here's
4  a listing of each call and, you know, why each
5  person was calling, but it would just aggregate up.
6      So there was a simple phone ticking system
7  that would allow an associate at the end of the call
8  to categorize the call, to say what type of call was
9  this, was it regarding claim status, was it
10 regarding claim benefits and eligibility? And we
11 had about seven or eight different categories of
12 claims --
13 Q. Was there --
14 A. -- inquiries, rather.
15 Q. Was there another miscellaneous category?
16 A. There was no way to deal with it on the
17 phone system.
18 Q. Okay. So there was no space in that
19 system for a free text entry?
20 A. No.
21 Q. Okay.
22 A. No. Again, I want to make sure I'm clear

**Page 81**

1  on the time frame. What time frame are you
2  referring about the free text?
3  Q. Okay. Well, my understanding is prior to
4  1998 you don't know what systems were in place, if
5  any, right?
6  A. Correct.
7  Q. Okay. So I'm talking now about '98 to
8  2002 when you were the VP --
9  A. Okay.
10 Q. -- of provider enrollment services?
11 A. Right.
12 Q. Do I understand correctly that during this
13 time period the system allowed an associate to check
14 one of seven or eight boxes --
15 A. Correct.
16 Q. -- regarding the general subject?
17 A. Correct.
18 Q. And there was no area for text entry to
19 describe the substance of the call?
20 A. Correct.
21 Q. Okay. Do you recall what all of the
22 categories were?

**82**

1    A. I do not.
2    Q. Okay. Other than the ones that you've
3  just mentioned, do you recall any other categories?
4    A. Claim status, adjustment. I think
5  eligibility and benefits were two separate
6  categories, and there may -- those are the ones I
7  can remember.
8    Q. Okay. Other than the checked box system
9  regarding the general subject area and the audio
10 recording, was there any other record kept or report
11 generated regarding the types of issues that
12 physicians were calling about?
13   A. I don't believe so at this time -- at that
14 time.
15   Q. Okay. Now let's go beyond the 2002 time
16 period. In your current position do I recall
17 correctly that you continue to be responsible for
18 the call center?
19   A. I do.
20   Q. Okay. Has the technology used for
21 memorializing the substance of calls changed?
22   A. (No verbal response.)

**83**

1    Q. And for the court reporter you have to
2  answer verbally.
3    A. I'm waiting for you to finish the
4  question. I haven't heard the question.
5    Q. That's my question. Has the technology --
6    A. Oh, has --
7    Q. -- changed?
8    A. Has it changed? Yes, it has changed.
9    Q. Okay. When did it change?
10   A. I do not know.
11   Q. Was it sometime after 2002?
12   A. I would suspect, yes, sometime after 2002.
13   Q. What was the change that took place?
14   A. We enhanced the call recording
15 capabilities to be able to capture additional data
16 about each call. So to your earlier comment there's
17 some type of -- there's an area for an associate to
18 indicate some type of comments on a call.
19   Q. Okay. Is this system or database -- does
20 it go by any particular name or designation?
21   A. Today we call it Blue Serve Connect. I
22 don't know -- it's probably had several iterations

**84**

1  of names. It may have been -- I think it was LUCI
2  at one point, L-U-C-I, but it's now -- we've
3  migrated to Blue Serve Connect.
4    Q. Can you describe for me, please, the
5  system that has been implemented that is currently
6  in place from the perspective of an associate who's
7  dealing with a provider call?
8    A. Okay. As there are -- as they're
9  initiating a call they create an open item or work
10 item as they're handling the call, and as they are
11 helping the customer they indicate something in this
12 Blue Serve Connect database that helps us identify
13 trends, you know, what types of call, claim status,
14 but also provides for the capability to put some
15 comments fields in there as well, and I believe
16 perhaps the ability -- I think it also includes the
17 ability to route a piece of work to -- a worksheet
18 to another associate.
19   Q. In what circumstances would they need to
20 route a call to another associate?
21   A. If they weren't able to adjust that claim,
22 if it was beyond their scope of knowledge.

**85**

1    Q. Now, leaving aside for a moment the free
2  text field for comments, what are the other fields
3  that associates do deal with? First let me ask you,
4  structurally are these check boxes, drop-down menus
5  or something else?
6    A. I believe it's drop-down menu.
7    Q. Okay. And do you know how many drop-down
8  menus an associate fills in for each call?
9    A. I have no idea.
10   Q. Okay. Do you know generally what the --
11 what are the subject areas that are encompassed by
12 the drop-down menus?
13   A. Generally, I think it's the type of
14 product that the provider is -- obviously captures
15 the provider that's calling so we know who called.
16   Q. Is the provider ID a drop-down menu?
17   A. No, the provider is actually asked to
18 enter that before they get into the call system.
19   Q. Okay.
20   A. So when they're waiting in queue, it
21 prompts them to enter their provider number so that
22 when an associate gets presented with that call, it

**86**

1  already has that information populated.
2  Q. Okay. I'm sorry I interrupted you. You
3  were describing the types of information provided by
4  drop-down menus?
5  A. I'm trying to think. Drop-down, where did
6  I leave off?
7  Q. Type of product.
8  A. Oh, type of product, type of inquiry that
9  if there were specifics regarding, you know, a
10 particular patient or number of patients, they would
11 indicate those, this is a call regarding eligibility
12 for John Doe, member No. 12345 type of thing. And,
13 again, there's a categorization box that says, you
14 know, what type of inquiry is this? Is it
15 eligibility, benefits, call status, whatever? And
16 then there's a comments area.
17 Q. Do you know how much free text the
18 comments area permits?
19 A. I have no idea.
20 Q. Okay. Do you know with what frequency the
21 comments area is actually filled out?
22 A. I have no idea.

**87**

1  Q. Does the system permit a search across the
2  comment areas?
3  A. I have no idea.
4  Q. Okay. Who would know the answer to that
5  question?
6  A. One of my technical staff.
7  Q. Anyone in particular?
8  A. Probably Steve Akeley.
9  Q. And what is Mr. Akeley's position?
10 A. He is director of provider services.
11     MR. MANGI: And for the record, we'll
12 memorialize this in writing per request, but we
13 would seek the answer to the question of whether the
14 comments field can be text-searched.
15 Q. When we started talking about the call
16 center, we began from a position of talking about
17 what were the poorly performing areas that you were
18 working on improving. What were the problems with
19 the call center at the time that you became VP of
20 provider enrollment and services?
21 A. The most significant problems were just
22 poor service levels, poorly organized work flows,

**88**

1  again, lack of adherence to established targets that
2  we had, internal targets that we had established.
3  Q. What did you do to remedy these problems?
4  A. We essentially replaced the entire
5  leadership team. We instituted a number of controls
6  and reports, inventories, more closely monitoring
7  staff as to what was going on, and we also added
8  staff to this area as well.
9  Q. What are you referring to when you talk
10 about adding reports?
11 A. I'm sorry, adding -- what I mean when I
12 referred to adding reports?
13 Q. Right.
14 A. Creating reports to manage the
15 inventories. The reports may have existed in the
16 past, no one was using them, so we changed work
17 flows so that front line leaders were getting TPS-
18 type reports, that they were able to then monitor
19 what was going on in the departments and evaluate,
20 you know, who was really performing and who wasn't.
21 Q. Did those reports deal with work flow and
22 resource allocation as opposed to the substance of

**89**

1  calls and things of that kind?
2  A. It was the former, yes.
3  Q. Okay.
4  A. We also implemented some call center
5  reporting capabilities, and it's really call center
6  forecasting capabilities, software tools that allow
7  you to better manage resources in a call center
8  environment. We -- so that you can basically predict
9  every half hour of every day how many calls you're
10 going to get in each area and what your staffing
11 needs need to be in that area.
12     We also -- I just had it here. I lost the
13 thought. Sorry. It'll come back to me.
14 Q. Okay. Now, the second area that you
15 mentioned that had been poorly performing and --
16 A. Uh-huh.
17 Q. -- calls for credentialing, what were the
18 issues around credentialing?
19 A. It was an area -- the problems between
20 credentialing are very much so similar to the
21 problems that we had in provider enrollment, so this
22 third area that we're going to talk about, the

**90**

1  problems were very similar, again, poorly organized
2  work flow, horrific service levels, not good service
3  levels, poorly managed staff, poorly documented work
4  flows, as a matter of fact, in some cases circular
5  work flows, so pieces would just move around from
6  one desk to the next without ever being resolved.
7      Q. Okay. And did those same -- do I
8  understand correctly that those same problems also
9  afflicted the provider enrollment area?
10     A. Correct. Correct.
11     Q. Now, what was the provider enrollment
12  area? What does that --
13     A. Entail?
14     Q. Yeah.
15     A. They're responsible -- they work very
16  closely with the credentialing area. When a
17  provider sends -- providers generally send in a
18  couple of kinds of maintenance to us throughout the
19  course of the year. If they're a new provider, they
20  send us contract work that allows us to set them up
21  in the system, identify what their specialty is,
22  PCP, whatever, link them to the appropriate group,

**91**

1  that group structure that they belong to, and also
2  work with the credentialing team to make sure that
3  they have been properly credentialed so that they
4  can treat patients.
5      Q. Is this a logistical section that deals
6  with what happens after a provider has joined the
7  network as opposed to having to do with how many
8  people should be in a network and enrolling people
9  in the network?
10     A. Correct. It's the latter. It's after
11  provider contracting and provider relations have
12  negotiated with the group or negotiated with an
13  individual physician to join the network, that's
14  when that contract would come into my provider
15  enrollment area who would review the contract, make
16  sure everything's appropriate, then begin to set
17  that provider up on a provider file.
18     Q. Does provider enrollment play any role in
19  identifying areas where the network is insufficient
20  or where more physicians are needed?
21     A. Provider enrollment does not. Network --
22  provider relations does.

**92**

1      Q. When you were the VP of provider
2  enrollment and services, did provider relations fall
3  within your areas of responsibility?
4      A. No.
5      Q. In your current role does provider
6  relations fall within?
7      A. Correct.
8      Q. We'll come to that in a minute.
9      A. Yeah. The thought I lost before -- I want
10  to just finish the thought on credentialing. The
11  other issue that we had was we engaged a consultant
12  to help us redesign the work flows.
13     Q. Who was the consultant?
14     A. A consulting firm called SCA. I couldn't
15  tell you what SCA stands for.
16     Q. Okay. Now, other than dealing with the
17  call center credentialing and provider enrollment,
18  did you have any other responsibility as the VP of
19  provider enrollment and services?
20     A. I did not.
21     Q. Now, you said that in addition to
22  improving service levels in these areas, you also

**93**

1  had a consolidation goal as VP of provider
2  enrollment and services. What was that
3  consolidation goal?
4      A. It was what we just spoke of. It was
5  consolidating provider enrollment and credentialing
6  and provider services all in one organization.
7  Previously they had been -- those three activities
8  resided in three different areas of the company, and
9  no one individual was accountable for the whole
10  process.
11     Q. And in the new structure you as the VP
12  were accountable for the entire process?
13     A. Correct. And we relocated all of that
14  operation to Rockland.
15     Q. Is that a -- was that a new venue or new
16  office space?
17     A. We -- yes, we had a -- we relocated -- we
18  previously had Rockland servicing the sales team,
19  and we moved the sales team out of Rockland and
20  moved the provider enrollment and services division
21  folks in there.
22     Q. Was anyone else housed in that same site

Page 94

1  other than the group you were responsible for?
2      A. Yes, FEP is also housed in that space.
3      Q. And that's the Federal Employees Program
4  we spoke about --
5      A. Correct.
6      Q. -- earlier?
7      A. Correct.
8      Q. How many people work for that program?
9      A. The FEP program?
10     Q. Yeah.
11     A. Currently there are probably 90, maybe 90
12 to 100 associates in that area.
13     Q. I believe you told me this already, but to
14 save me looking through my notes who was the person
15 in charge of the FEP?
16     A. Deborah Maroney.
17     Q. That's right. And she's a VP, correct?
18     A. No. I believe she's a director of FEP.
19     Q. Do you know, what are the -- what's the
20 organizational structure into which these 90 to 100
21 associates are divided?
22     A. I do not.

Page 95

1      Q. How many people work for the provider
2  services and enrollment group?
3      A. Currently we have probably about 330, 335
4  associates in the Rockland operation, just provider
5  enrollment and services.
6      Q. Is anyone housed in that facility other
7  than provider enrollment and services and FEP?
8      A. Yes. Yes. There's one small group --
9  actually, two additional groups are in there.
10 There's a pharmacy operations group, and there's
11 also a provider relations team that's housed in that
12 space.
13     Q. What does the pharmacy operations group
14 do?
15     A. My sense is -- again, I'm not close to it.
16 My sense is I believe they mainly are there to deal
17 with calls -- again, it's my understanding that they
18 are there to handle calls for prior authorization
19 drugs, drugs that require step therapy paperwork. I
20 think any type of drug that requires some type of
21 prior authorization or approval I believe is treated
22 in that team.

Page 96

1      Q. And there's also a provider relations team
2  based there?
3      A. There's also a provider relations team
4  based there.
5      Q. Is that a team that deals with physicians
6  or hospitals?
7      A. It deals with physicians and hospitals.
8      Q. Now, is there any sort of interaction
9  between the various departments that are housed in
10 this facility?
11         MR. COCO: Objection.
12     A. Yeah, I would have to say -- yes, there is
13 interaction between some of these departments --
14     Q. Okay.
15     A. -- some departments more than others.
16     Q. Okay. What sort of interaction takes
17 place?
18     A. For example, the provider relations team
19 that's there represents -- it's the team
20 representing the southern part of Massachusetts, and
21 in the course of doing their work, you know, they
22 may become aware of issues or problems that they

Page 97

1  would then communicate to the provider services team
2  and ask them to research further. Also, there's a
3  relationship between the provider services team and
4  the FEP staff in that the FEP provider servicing
5  components are handled within the provider services
6  organization.
7          THE VIDEOGRAPHER: Five minutes left on
8  tape.
9      Q. What do you mean by the last part of what
10 you just said?
11     A. So that -- so there's a team of I'm going
12 to say maybe 10 to 12 FEP provider service
13 associates that do not physically -- are not
14 physically aligned or are not organizationally
15 aligned with the FEP team, Deb Maroney's area.
16 There's a pod of FEP provider service associates
17 that report into my organization that have a dotted
18 line reporting matrix relationship to FEP.
19     Q. In other words, they're a provider -- I'm
20 sorry, are those provider relations people or
21 provider service people?
22     A. Provider service people, provider service

Vincent D. Plourde   HIGHLY CONFIDENTIAL   April 13, 2006
Boston, MA

26 (Pages 98 to 101)

**Page 98**

1  people.
2  Q. So do --
3  A. So --
4  Q. Go ahead.
5  A. They'd be -- associates would be taking
6  phone calls from FEP -- from providers regarding FEP
7  members or FEP questions. They would take those
8  calls.
9  Q. And what about provider relations people;
10 does FEP have its own provider relations staff?
11 A. I don't believe they do. I don't believe
12 they do. I think if there were a -- if there were
13 an FEP issue that a provider would raise, it would
14 be raised to their provider relations staff.
15 Q. Is the provider relations team that's
16 housed in the Rockland facility tasked with
17 responsibility for the FEP physicians as well?
18     MR. COCO: Objection.
19 A. They would be responsible for any type of
20 provider inquiry.
21 Q. Okay. So that could --
22 A. So they service -- they service a provider

**Page 99**

1  regardless of the issue. They don't make a
2  distinction and say, "You can't ask me that question
3  because you're -- that's an FEP question." They'll
4  take that question back -- they may hand it off to
5  the FEP team for further work, but they'll be --
6  they'll be responsible for intake of that issue.
7      MR. MANGI: This is a good time to break
8  so the videographer can change his tape.
9      THE WITNESS: Sure.
10     THE VIDEOGRAPHER: The time is 11:39.
11 This is the end of Cassette No. 1. We are off the
12 record.
13     (Recess taken.)
14     THE VIDEOGRAPHER: The time is 11:51.
15 This is the beginning of Cassette No. 2 in the
16 deposition of Vincent Plourde. We are on the record.
17 BY MR. MANGI:
18 Q. Slowly but surely we have made our way up
19 to your present position, which is the VP for the
20 provider services division?
21 A. Division, correct.
22 Q. Now, you've held this position since 2002,

**Page 100**

1  correct?
2  A. Correct.
3  Q. Okay. Now, I'd asked you earlier to
4  itemize your responsibilities. I made a list, and I
5  would like to ask you about some of those areas.
6  A. Sure.
7  Q. You mentioned that one of your tasks is to
8  oversee the telephone and written inquiries from
9  providers. That's the same call center and
10 correspondence team you've spoken about, right?
11 A. Correct.
12 Q. In your current role do you have any
13 responsibilities in relation to that group other
14 than what we've already discussed?
15 A. No.
16 Q. And the second area you mentioned is
17 dealing with claims that need adjusting. What did
18 you mean by that?
19 A. That is an activity that's performed in
20 the provider services area. So as a result of phone
21 calls or written correspondence, it may be necessary
22 to adjust a claim.

**Page 101**

1  Q. So going back to what we spoke about
2  earlier, if a provider says that his claim was
3  processed under one code and should have been
4  another, if BC/BS agrees, then that's when this
5  claims adjusting function comes into play?
6  A. Correct.
7  Q. Okay. So it's a support role that comes
8  into play when responding to provider queries?
9  A. Correct.
10 Q. Credentialing is another area we've
11 already spoken about. Do you have any
12 responsibilities in relation to that area other than
13 what we've discussed?
14 A. No, I can't think of any.
15 Q. Now, the fourth area you mentioned is
16 provider file maintenance. What did you mean by
17 that?
18 A. It's actually provider enrollment, was the
19 area, and part of the activity in that task is to
20 maintain the provider file data.
21 Q. Now, is this similar to the provider
22 enrollment work that we've already discussed?

**102**

1  A. Correct.
2  Q. And similar to that work, is this all
3  after determinations have been made by contracting
4  as to areas of network deficiency, who should be
5  contracted with and so on?
6  A. Correct.
7  Q. In other words, after a contract has been
8  signed, that's when your department becomes
9  responsible for maintaining the file?
10 A. Correct.
11 Q. Now, the -- what is contained in the
12 actual provider files?
13 A. All kinds of data regarding that provider,
14 things like provider name, provider billing address,
15 where he or she would like payments remitted to, if
16 they're a specialist, what type of specialist are
17 they, that kind of information.
18 Q. Are these physical files, or are these
19 electronic files?
20 A. Electronic files.
21 Q. Now, are they maintained on some sort of a
22 database?

**103**

1  A. They are.
2  Q. Okay. What's that database called?
3  A. There are multiple databases. Huron is
4  the primary database, and PNS is a separate
5  database.
6  Q. What does PNS stand for?
7  A. Provider Network System.
8  Q. What's the division of labor between Huron
9  and PNS?
10 A. I have no idea.
11 Q. Do the provider files contain any
12 information regarding calls a provider may have made
13 to the call center?
14 A. They do not.
15 Q. If a provider sends in written
16 correspondence rather than calling in, is that
17 correspondence then kept in that provider's file?
18 A. No.
19 Q. Where is the written correspondence
20 stored?
21 A. It is stored in a paper file for a period
22 of time before it's destroyed.

**104**

1  Q. Is that scanned or imaged in any way?
2  A. It is imaged.
3  Q. Is that correspondence electronically
4  searchable?
5  A. Yes, it is searchable.
6  Q. What about responses to the written
7  correspondence; if a provider writes in rather than
8  calls in, does the correspondence team then send a
9  written response?
10 A. They do.
11 Q. Are those responses also maintained with -
12 - filed with the provider correspondence?
13 A. They're filed with the original
14 correspondence piece.
15 Q. So both the provider's letter and the
16 response are filed together, imaged and
17 electronically searchable?
18 A. Correct.
19    MR. COCO: Objection.
20 Q. Where are these, the correspondence and
21 the responses, electronically maintained? Are they
22 on a database of some kind?

**105**

1  A. They are.
2  Q. Okay. Does that database have a name?
3  A. I do not know. I -- I don't know. I'm
4  sure it does.
5  Q. Who is familiar with or deals with that
6  database?
7     MR. COCO: Objection.
8  A. People in the provider enrollment area. I
9  think the name of the system might be VIPS.
10 Q. V-I-P-S?
11 A. I believe.
12 Q. Do you know of a particular person in
13 provider enrollment who's knowledgeable regarding
14 the VIPS system?
15 A. I'm sure there are several people that are
16 knowledgeable. I don't know a point person, but
17 several people are knowledgeable about that system.
18 Q. Okay. Can you name any particular people
19 that come to mind?
20 A. I honestly can't.
21 Q. Now, the fifth area that you mentioned was
22 provider audit teams. Now, what are provider audit

**Page 106**

1  teams?
2      A. They're actually -- it's actually a
3  hospital audit team, and what they do is they do
4  chart reviews based on inpatient claims -- I'm
5  sorry, inpatient and outpatient claims. They do
6  chart reviews and go out on-site, pull the records
7  and then see what the claim was actually billed for.
8      Q. What do you mean when you say they see
9  what the claim was billed for?
10     A. They look at the chart and see what
11 services were documented in that chart, what
12 services were rendered, and then they look at the
13 bill that the provider -- that the hospital
14 submitted to us and say do these -- do these
15 services in fact tie back to the charges that we
16 were submitted?
17     Q. So they cross-check the actual medical
18 records against the submitted claim to ensure they
19 are consistent?
20     A. I wouldn't say medical records, I would
21 say chart. They look at the billing chart that's
22 prepared.

**Page 107**

1      Q. Can you help me understand -- I'm trying
2  to understand the types of documents that they are
3  looking at. What is the billing chart, and is it
4  something distinct from the medical records?
5      A. It is.
6      Q. Okay.
7      A. It is. It's basically an amalgamation of
8  all of their itemized records, all of their itemized
9  bills that result in the production of a claim.
10     Q. And where is that billing record
11 maintained?
12     A. At the hospital.
13     Q. Do the provider audit teams go out to the
14 hospitals to carry out these audits?
15     A. They do.
16     Q. How many audit teams does BC/BS of
17 Massachusetts currently have?
18     A. I do not know.
19     Q. Do you know how many people work in the
20 provider audit area?
21     A. In my area, I would say probably about 20
22 associates.

**Page 108**

1      Q. Do they deal exclusively with hospitals,
2  or do they also deal with physician offices?
3      A. They do -- they deal primarily with
4  hospital. They currently don't do any physician.
5  They do look at DME providers as well.
6      Q. Are there any groups within BC/BS of
7  Massachusetts that do audit physician groups?
8      A. Yes, I believe there are.
9      Q. What department are those teams housed
10 within?
11     A. They would be housed in the law
12 department.
13     Q. Is there a particular person or group in
14 charge of those efforts?
15     A. I'm guessing it might be Steve Skwara.
16        MR. MANGI: Would you like to be sworn,
17 Mr. Skwara?
18     Q. The hospital audit team that we have been
19 talking about, how long have these teams been in
20 existence?
21     A. I don't know.
22     Q. When's the earliest time period when

**Page 109**

1  you're aware of hospital audit teams being in
2  existence?
3      A. I would say I probably became aware of the
4  fact that there was this team in 2000.
5      Q. Okay. Let me show you a document.
6        (Exhibit Plourde 001, Document headed
7  "Non-Fee Services Comparison," marked for
8  identification.)
9      Q. And if you would take a look at this
10 document, please, which has been marked as Exhibit
11 Plourde 001, and let me know when you're ready to
12 proceed.
13       (Witness reviews document.)
14     Q. Have you ever seen this document before?
15     A. I have not.
16     Q. The footer of this document states on each
17 page "The Professional Audit Department"?
18     A. Correct.
19     Q. Are you familiar with a department by that
20 name?
21     A. I'm guessing that is the -- what I
22 referred to today as the hospital audit department.

**Page 110**

1  Q. Okay. So this would be something
2  generated by the provider audit teams that we've
3  been talking about?
4       MR. COCO: Objection.
5  A. Correct.
6  Q. Now, I understand you haven't seen this
7  particular document before. Have you seen documents
8  of this kind, of this type?
9  A. I have not.
10 Q. Okay. On the first page of this document
11 there's some references -- if you look at the first
12 example, South Shore Hospital, in the table under
13 "S/W Carl Holland Director of Reimbursement" there
14 are entries for "Mark-up," "General Drug Services,"
15 "Acquisition times 3" and so on.
16      Do you have an understanding as to what
17 this is referring to?
18      MR. COCO: Objection.
19 A. I do not.
20 Q. Okay. Do you know what S/W stands for?
21 A. I do not.
22 Q. Turning to the next page of this document,

**Page 111**

1  you see there are columns in relation to Milton
2  Hospital, which is the first example there,
3  particular drugs, "99 Red Book AWP" and then
4  "Acquisition," which is -- in parentheses under that
5  is "99 AWP minus 35 percent," and there's "Mark-Up."
6       Are you familiar with any analyses of this
7  type that have been performed by the audit teams?
8  A. I am not.
9  Q. Who would have been in charge of the audit
10 function for hospitals around the time this document
11 was generated in the fall of 1999?
12 A. I believe it reported in to Kim Olson.
13 Q. And what was Ms. Olson's title at that
14 time?
15 A. It was either director or vice president
16 of pharmacy operations, perhaps. I'm not sure of
17 her exact title.
18 Q. Are you aware of any work by the audit
19 teams that now report in to you that assess the
20 prices that hospitals pay to acquire drugs?
21 A. I am not.
22 Q. Okay. Do you know whether the audit teams

**Page 112**

1  have access to information about drug acquisition
2  when they carry out audits at hospitals?
3  A. I do not.
4  Q. Leaving aside the work of the audit team
5  specifically, do you have any understanding, as you
6  sit here today, as to the prices that different
7  entities in the market pay to acquire drugs?
8  A. I do not have knowledge about what
9  entities pay for drugs, no.
10 Q. Do you know, for example, whether or not
11 there are discounts and rebates that are available
12 to different entities on their drug purchases?
13 A. I have heard that there are deduct -- that
14 there are rebates and discounts.
15 Q. Okay. In what context -- withdraw that.
16      Which entities are you aware of who can
17 get discounts and rebates in the market on their
18 purchases?
19 A. Generally providers.
20 Q. And by "providers" you're referring to
21 hospitals and physicians?
22 A. Correct.

**Page 113**

1  Q. What's the basis for your understanding
2  that there are discounts and rebates available to
3  providers?
4  A. The fact that in the -- in my days in
5  Medex we outsourced drug claim processing to a
6  vendor, a PBM, and the basis of that decision to
7  outsource those claims was in part due to the fact
8  that they, the PBM, could get a better price on
9  those drugs off of the AWP price.
10 Q. Now, going back to your Medex days, what
11 was the -- in what context was BC/BS of
12 Massachusetts -- well, withdraw that.
13      Was BC/BS of Massachusetts actually
14 purchasing drugs either directly or then through
15 this PBM?
16      MR. COCO: Objection.
17 A. I do not believe so.
18 Q. Okay. So what was -- what relevance did
19 it have to Medex's business that PBMs can get
20 rebates and discounts on drug purchases?
21 A. They would have -- they, the PBM, would
22 have a contract with pharmacies and providers where

**114**

1  they would apply these discounts. So if a provider
2  wanted to be part of this net -- of the PCS network,
3  which was the vendor at the time, then they had to
4  accept the terms of that contract.
5      Q. Now, your Medex time was -- could you
6  remind me what the time period was when you were in
7  charge of Medex?
8      A. 1991 through 1995.
9      Q. And when did you outsource some of this
10 work to a PBM?
11     A. I'm not sure.
12     Q. Okay.
13     A. I would -- I would guess 1994.
14     Q. Do you know which PBM that was?
15     A. PCS.
16     Q. Okay. So in the early '90s you understood
17 that PCS could get discounts and rebates on the
18 rates it reimbursed for drugs?
19         MR. COCO: Objection.
20     A. Correct.
21     Q. Did you also understand that PCS could get
22 rebates and discounts on drugs that it purchased,

**115**

1  say, for its mail order division?
2         MR. COCO: Objection.
3      A. I don't have any specific knowledge about
4  their mail order.
5      Q. Okay. But based on the fact that PCS as a
6  PBM could get discounts and rebates, you also
7  understood that other entities in the market like
8  physicians and hospitals would be able to get
9  discounts and rebates on drugs that they purchased?
10         MR. COCO: Objection.
11     A. I don't have any specific knowledge to
12 that.
13     Q. Okay. Well, earlier you mentioned that
14 when -- that you understand that providers can get
15 discounts and rebates on drugs. I'm trying to
16 understand your basis for that knowledge.
17     A. The statement I made that PCS, the PBM
18 vendor that we worked with, was able to deliver to
19 us a price less than AWP.
20     Q. Okay. Do I understand correctly that in
21 that '91 to '95 time period you understood that
22 providers can also get discounts and rebates on

**116**

1  their drug acquisitions?
2         MR. COCO: Objection.
3      A. I do not know. I did not know that they
4  could get, no. I know we got a discount.
5      Q. Okay. Well, here's what I'm trying to
6  understand. Did I understand correctly your earlier
7  testimony that today, as you sit here now, you do
8  understand that providers can get rebates and
9  discounts on drug purchases?
10     A. I do.
11         MR. COCO: Objection.
12     Q. Okay. How long have you been aware of
13 that fact?
14     A. Maybe a year.
15     Q. Okay. How did you come by that knowledge?
16     A. Just reading information in journals, Web
17 stories, you know.
18     Q. Okay. What sort of stories or journals
19 are you thinking of?
20     A. Just the fact that there are these, you
21 know, discounts available.
22     Q. Now, is it your understanding that the

**117**

1  discounts and rebates that are available to
2  hospitals and physicians are all -- are uniform,
3  there's a particular discount or a particular rebate
4  available across the board, or do you understand
5  there to be variable rates of discounts and rebates?
6      A. My understanding would be that there are
7  variable discounts.
8      Q. Okay. Is it your understanding that those
9  rebates and discounts fall within a particular range
10 or a particular band or that they vary widely?
11         MR. COCO: Objection.
12     A. I do not have a particular percentage in
13 mind.
14     Q. Okay. So you have no particular
15 expectation as to what the range of discounts and
16 rebates would be, although you know that rebates and
17 discounts exist?
18     A. Correct. Correct.
19     Q. Are there any particular journals or
20 stories that you've read that you are thinking of?
21     A. No, just different Web services that I
22 subscribe to, i-Health Beat, different trade

**118**

1  journals, that type of thing.
2      Q. Do you view the existence of those rebates
3  and discounts and the fact that they are variable as
4  being relevant in any way to your work as VP of the
5  provider services division?
6      A. No.
7      Q. Do you view the existence of those
8  variable rebates and discounts as being relevant in
9  any way to what amounts BC/BS reimburses or should
10 reimburse for drugs?
11     MR. COCO: Objection.
12     A. I would say yes.
13     Q. Okay. In what sense would you consider
14 them relevant?
15     A. I think that we should have a common
16 agreement of what those re -- what those true costs
17 for those drugs are.
18     Q. Now, given that you've been aware of the
19 existence of discounts and rebates for about a year,
20 what steps, if any, have you taken towards acting on
21 those -- on that knowledge?
22     A. None.

**119**

1      Q. And why haven't you taken any steps
2  towards acting on that knowledge?
3      A. I don't negotiate contracts.
4      Q. Well, if I understood your view correctly,
5  you think the existence of those rebates and
6  discounts is something that the contracting
7  department should consider and act on, correct?
8      A. Correct.
9      Q. Have you communicated the information
10 you've gathered to the contracting department and
11 asked them to act on it?
12     A. I have not.
13     Q. Why not?
14     A. My understanding is that they're generally
15 aware. They know more about this provider
16 contracting industry than I do.
17     Q. Do you have any specific knowledge as to
18 their awareness of, say, rebates and discounts in
19 the market?
20     A. I do not.
21     Q. Have you had any discussions with anyone
22 in contracting regarding your knowledge of rebates

**120**

1  and discounts?
2      A. I have not.
3      Q. Do you know whether the contracting
4  department has taken any steps or considered taking
5  any steps stemming from the existence of rebates or
6  discounts in the marketplace?
7      A. I do not know of any specific actions
8  they've taken, no.
9      Q. Are you aware of any specific actions
10 they've contemplated?
11     MR. COCO: Objection.
12     A. I can't think of any off the top of my
13 head.
14     Q. Are you aware that in the 2004 time period
15 BC/BS of Massachusetts contemplated moving from an
16 AWP-based reimbursement methodology to physicians
17 for drugs administered in office to an ASP-based
18 methodology?
19     A. I am not aware.
20     Q. Now, you're a member of the provider
21 financial strategies work group, correct?
22     A. I do participate.

**121**

1      Q. Okay. Now, I've seen a number of minutes
2  from meetings of that work group, and I mean no
3  aspersion when I ask, you appear to be listed as
4  absent from a number of those meetings.
5      A. Correct.
6      Q. Is there a reason for that?
7      A. The person who represents me on that group
8  is Steve Fox. I attend periodically.
9      Q. Now, does Mr. Fox report in to you?
10     A. He does.
11     Q. So although you're formally a member of
12 that group, when Mr. Fox attends, you generally do
13 not attend; is that accurate?
14     A. No, that's not accurate.
15     Q. Okay. What is the determining factor as
16 to whether or not you will attend?
17     A. Whether or not my schedule allows.
18     Q. What proportion of meetings of the
19 provider financial strategies work group do you
20 attend?
21     A. I would say maybe 30 percent.
22     Q. And at the remainder of those meetings

**Page 122**

1  you're represented by Mr. Fox?
2    A. Correct.
3    Q. Now, going back to the Exhibit Plourde 001
4  that we looked at earlier, on the second page of it
5  there was a reference to Red Book, the 1999 Red Book
6  AWP. And do you know what the Red Book is?
7    A. I do not.
8    Q. Are you familiar with First DataBank or
9  Medispan?
10   A. I have heard the terms "First DataBank"
11 and "Medispan." I do not know what they are.
12   Q. Now, that is -- document is listing the
13 AWPs for drugs in 1999. How long -- when's the
14 first time that you heard the term "AWP" used?
15   A. I would say it was around that time frame
16 when we outsourced drug processing to the PBM, and I
17 learned that they were able to negotiate a rate less
18 than AWP on pharmacy claims.
19   Q. So you understood that they would
20 reimburse at AWP minus a certain percentage --
21   A. That I -- yes.
22   Q. So you understood that AWP was a benchmark

**Page 123**

1  that they used in negotiating a discount off that
2  would then serve as the reimbursement rate?
3    MR. COCO: Objection.
4    A. That's what the PBM used as a benchmark.
5    Q. Okay. Now, what was your understanding at
6  that time as to what, if anything, AWP actually
7  represented or was?
8    MR. COCO: Objection.
9    A. I really didn't have a good understanding
10 of what AWP was. I was familiar with the term, but
11 I couldn't tell you what it was composed of.
12   Q. Okay. So your only understanding of it
13 was as a benchmark used by the PBM in negotiating a
14 discount off of reimbursement?
15   A. Correct.
16   Q. Did you gain a better understanding as to
17 what AWP is at any point after that?
18   A. No, not particularly.
19   Q. Okay. So as you sit here today, is your
20 only knowledge about AWP that it's used as a
21 benchmark in reimbursement for negotiating
22 discounts?

**Page 124**

1    A. That it is.
2    Q. Are you familiar with the term "WAC" or
3  "wholesale acquisition cost," W-A-C?
4    A. I have heard the term.
5    Q. When's the first time you heard that term?
6    A. Probably in the same time frame that we
7  outsourced to PBM.
8    Q. What was your understanding of that term?
9    A. I know what the words mean, wholesale
10 acquisition cost. You know, I have no -- can't tell
11 you anything beyond that.
12   Q. Okay. In what context did WAC come up in
13 relation to outsourcing work to the PBM?
14   A. It just would be used in different
15 meetings when people were talking about pricing
16 pharmacy claims. Someone would say, "Oh, it's a
17 formula based off ASP," someone else would say,
18 "It's a formula off WAC," so just two different
19 benchmarks.
20   Q. Now, you just said ASP. Did you mean to
21 say AWP?
22   A. AWP.

**Page 125**

1    Q. Okay. Was the methodology being expressed
2  as either AWP minus a percentage or WAC plus a
3  percentage?
4    A. I couldn't remember.
5    Q. Did you gain at that point an
6  understanding as to what relationship there was, if
7  any, between WAC and AWP?
8    A. I did not.
9    Q. Have you subsequently gained a better
10 understanding as to what WAC is?
11   A. I have not.
12   Q. Have you subsequently gained a better
13 understanding as to the relationship between WAC and
14 AWP?
15   A. I have not.
16   Q. Have you gained at any point an
17 understanding as to the relationship between WAC and
18 actual drug acquisition costs paid by providers?
19   A. I have not.
20   Q. But you are now aware of the fact that
21 there are rebates and discounts available?
22   MR. COCO: Objection.

**126**

1  A. There are some, yes.
2  Q. Another issue that was discussed in the
3  provider financial strategies work group was
4  transitioning hospital outpatient departments from a
5  percentage of bill charge methodology, and I'm
6  talking now about drugs administered to patients in
7  hospital outpatient departments. My sentence has
8  become long, so let me start the question again.
9      Another issue that's been discussed in the
10 provider financial strategies work group is
11 transitioning hospital outpatient departments from a
12 reimbursement methodology that uses percentage of
13 bill charge in relation to drugs administered to
14 members to a methodology that uses 95 percent of
15 AWP. Are you familiar with that transition?
16 A. I have heard that term discussed. I'm not
17 familiar with the outcome.
18 Q. Okay. When you say, "I've heard that term
19 discussed," what term are you referring to?
20 A. What you just said, that we -- you know,
21 taking a look at outpatient charges as today being
22 adjudicated at a percent of charges and considering

**127**

1  whether or not they should be instead reimbursed at
2  some percentage of AWP.
3  Q. So you were saying that you're familiar
4  with the issue, you weren't referring to any
5  particular phrase that I used?
6  A. I'm familiar with the issue --
7  Q. Okay.
8  A. -- right.
9  Q. Okay. Did you participate in provider
10 financial strategy work group meetings where that
11 issue was discussed?
12 A. I may have been in attendance at meetings
13 where that was discussed.
14 Q. Did you participate in any of the
15 discussions regarding that transition?
16 A. I did not.
17 Q. Did you consider it at all relevant to
18 those discussions that you are aware of the
19 existence of rebates and discounts on drug
20 acquisitions for providers?
21     MR. COCO: Objection.
22 A. I did not.

**128**

1  Q. Okay. Why not?
2  A. I didn't see the connection.
3  Q. Well, if what was being contemplated was
4  moving from a percentage of bill charges to an AWP-
5  based methodology and you're aware of the fact that
6  providers purchased drugs at a discount and get
7  rebates off them, wouldn't you consider that
8  relevant to a determination of whether or not an AWP
9  methodology should be adopted?
10     MR. COCO: Objection.
11 A. I'm not following the question.
12 Q. Okay. In moving from a percentage of bill
13 charges to an AWP-based methodology for hospital
14 outpatient departments, did you consider it relevant
15 to the issue what those hospital outpatient
16 departments were actually paying to buy the drugs?
17 A. I did not.
18 Q. Now, another area that you mentioned
19 responsibility for is e-Health initiatives?
20 A. Correct.
21 Q. Can you describe for me what that is
22 about?

**129**

1  A. It's essentially supporting a number of
2  pilot programs to put new technologies out in the
3  physician offices to help them improve the quality
4  of care delivered to patients.
5  Q. And what sort of initiatives or
6  technologies?
7  A. E-Prescribing -- we launched an e-
8  Prescribing pilot. We launched a couple of EMR and
9  Medical Decision Support pilots, those kinds of
10 activities.
11 Q. And the seventh area you mentioned was
12 working with provider support teams?
13 A. Correct.
14 Q. What are the provider support teams?
15 A. They're the folks that are responsible for
16 making sure that providers are able to pass us
17 HIPAA-compliant claims and make sure that as we
18 begin the migration to this national provider
19 identifier system, that we're able to process the
20 claims and that the providers are able to get them
21 to us.
22 Q. Is the focus of those teams primarily on

**130**

1  HIPAA compliance, or are there other aspects to
2  their work?
3      A.  It's primarily HIPAA compliance, it's
4  primarily HIPAA.
5      Q.  Now, other than the seven specific areas
6  we've just spoken about, do you have any other areas
7  of responsibility as the VP for the provider
8  services division?
9      A.  The only other activity that we spoke of
10 was the fact that I have a group of people that
11 maintain the claim check tables.
12     Q.  Okay. What are claim check tables?
13     A.  Those are the tables that we mentioned
14 earlier that are responsible for comparing claims to
15 determine whether or not one service was incidental
16 to another service, whether services are mutually
17 exclusive, so on and so forth.
18     Q.  Anything else?
19     A.  No. That's...
20     Q.  Now, are you familiar with specialty
21 pharmacies?
22     A.  I've heard the term "specialty

**131**

1  pharmacies." I'm not familiar with them.
2      Q.  Have you been involved at all in Blue
3  Cross and Blue Shield of Massachusetts'
4  contemplation of utilizing specialty pharmacies or
5  in decisions about the parameters of specialty
6  pharmacy programs that have been implemented?
7      A.  I am not.
8      Q.  Are you familiar at all with the BC65
9  product, Blue Care 65 product?
10     A.  I am.
11     Q.  Are you aware of any of the changes in
12 reimbursement methodology that have been
13 contemplated by BC/BS of Massachusetts in relation
14 to that product?
15     A.  I am not.
16     Q.  Now, are you aware of what the
17 reimbursement methodology is that's used for
18 reimbursing physicians for drugs administered in
19 office for members who carry the BC65 product?
20         MR. MANGI:  I am not.
21         MR. COCO:  Why don't we take a quick
22 break. Off the record.

**132**

1          THE VIDEOGRAPHER:  The time is 12:28. We
2  are off the record.
3          (Recess taken.)
4          THE VIDEOGRAPHER:  Back on the record at
5  12:38.
6  BY MR. MANGI:
7      Q.  Now, Mr. Plourde, in addition to the eight
8  areas of responsibility that we've talked about that
9  you have in your current position, Ms. Cook
10 testified -- Ms. Jan Cook testified about your
11 having another area that I would just like to
12 confirm if she was right or not. She said that you
13 were responsible for the provider managers who go
14 out into the field and work with physicians. Is that
15 accurate?
16     A.  That is, and that's the provider relations
17 activity.
18     Q.  That's the provider support team you
19 talked about --
20     A.  No.
21     Q.  -- is it?
22     A.  Provider relations area.

**133**

1      Q:  Now, I don't have a provider relations
2  area on my list. We talked about --
3      A.  At one point -- we can certainly go back
4  and --
5      Q.  Sure. Was that part of the call center?
6      A.  No. It was when I took on the new role,
7  you asked me what additional accountabilities I took
8  on. One of those additional accountabilities was
9  the provider relations team. So in 2002 I
10 maintained what I had with the provider enrollment
11 and service division, but I added provider audit,
12 the hospital audit team that I spoke about, I added
13 the claim check staff that we spoke about, I added
14 the provider support people that we spoke about, and
15 I also picked up the provider relations and provider
16 education team.
17     Q.  Okay. Now, what is your responsibility of
18 the provider relations team?
19     A.  It's their job to work with physicians,
20 office managers, hospitals, any hospital or
21 physician provider other than ancillary or
22 behavioral health, because there's a separate area

**134**

1  that deals with those. Those people are out in the
2  field working with them, sharing reports, educating
3  them, answering questions.
4      Q. Now, are you aware of -- do all the
5  provider relations team members report in to you?
6      A. No. They report in to different leaders
7  who report in to Steve Fox, who reports in to me.
8      Q. Okay. Are you aware of any interactions
9  between physicians and provider relations personnel
10 where physicians have raised concerns or issues
11 regarding the amount of reimbursement that they
12 receive for drugs administered in their offices?
13     A. I am not.
14     Q. Any concerns relating to the reimbursement
15 they receive for services incident to drug
16 administration?
17     A. I am not.
18     Q. Are you aware of any concerns providers
19 have raised in relation to the possible
20 implementation of specialty pharmacy programs?
21     A. I am not.
22     Q. Are you aware of any concerns or issues

**135**

1  providers have raised in relation to possible
2  changes in reimbursement methodologies?
3      A. You need to be more specific.
4      Q. Okay. Are you aware of any concerns
5  providers have raised in relation to changes in the
6  reimbursement methodologies that are used to
7  calculate the amounts reimbursed to them for drugs
8  administered in their offices?
9      A. I am not.
10     Q. Okay. Now, do you know whether or not
11 BC/BS of Massachusetts contracts with any drug
12 manufactures?
13     A. I am not aware.
14     Q. Do you know whether or not BC/BS of
15 Massachusetts receives any rebates from
16 manufacturers in relation to formulary placement?
17     A. I am not aware.
18     Q. Are you familiar with Medicaid or
19 government shortfall payments?
20         MR. COCO: Objection.
21     A. I am aware of the general concept from
22 reading the Boston Globe that there are Medicare and

**136**

1  Medicaid shortfalls, but that's the extent of my
2  knowledge.
3      Q. What are the articles that you're
4  referencing?
5      A. Articles that have appeared in the Boston
6  Globe.
7      Q. Okay. And what did they say in relation
8  to Medicare?
9      A. Their comments have been that there are
10 shortfalls that providers are not able to cover the
11 full cost of the care that's being provided to
12 Medicaid and Medicare patients.
13     Q. And by "providers," does that include both
14 physicians and hospitals?
15         MR. COCO: Objection.
16     A. I can't say when I read the article
17 whether it was clear whether it treated them
18 separately or differently.
19     Q. In what time period did you see the
20 articles that you are referring to?
21     A. In the past year.
22     Q. Are you aware of any articles discussing

**137**

1  those issues prior to the last year?
2      A. No.
3      Q. Are you familiar with the term "ASP"?
4      A. I'm familiar with a term "ASP."
5      Q. Okay. What is your understanding of ASP?
6      A. It stands -- my term, the recognition is
7  it stands for average semi-private.
8      Q. Okay. What is average semi-private?
9      A. It's the rate that Blue Cross pays for an
10 average semi-private room.
11     Q. Ah, okay.
12         MR. MANGI: Off the record.
13         (Discussion off the record.)
14     Q. Are you aware of any other ASPs other than
15 average semi-private?
16     A. I became aware of the average sales price
17 only in the context of preparation with my attorneys
18 before the meeting, but prior to that I really
19 hadn't -- ASP meant average semi-private in my
20 world.
21     Q. Did the articles that you mentioned from
22 the Globe discuss or deal with ASP, as far as you

**Page 138**

1  recall?
2  A. No.
3  Q. And by "ASP" in that context I'm referring
4  to average sales price.
5  A. Correct. No.
6  Q. Other than your understanding of
7  shortfalls in the context of that article -- those
8  articles, are you aware that BC/BS of Massachusetts
9  makes payments to hospitals at the present time that
10 they refer to as either Medicaid shortfall payments
11 or government shortfall payments?
12 A. I am not sure what that mechanism is, so
13 I'm -- I'm aware that there's an uncompensated care
14 pool, but I don't know if that's the mechanism that
15 you are referring to.
16 Q. Okay. What is the uncompensated care
17 pool?
18 A. It's a state assessment on all health
19 plans to pay for the Medicaid and Medicare
20 shortfalls, I believe. It's for bad debt,
21 uncompensated care pool for bad debt.
22 Q. Is it your understanding that that's an

**Page 139**

1  amount that BC/BS of Massachusetts is obligated to
2  pay to the state by law?
3  A. I believe it's by law.
4  Q. Okay. And your understanding is that's an
5  amount that's paid to the state?
6  A. That's an amount paid to the state that
7  the state administers a fund.
8  Q. Is that the only --
9  A. That's the only knowledge --
10 Q. -- that you're aware of?
11 A. -- that I have of that subject.
12 Q. Now, in 1994 you were working as director
13 of the Medex --
14 A. Correct.
15 Q. -- Client Business Unit, correct?
16 A. Correct.
17 Q. Are you aware that in 1994 BC/BS of
18 Massachusetts settled with the federal government
19 allegations that the company had submitted false
20 Medicare reports in processing Medicare claims?
21 A. I am aware of that.
22 Q. Now, were you aware of that at the time,

**Page 140**

1  or is that something you've learned about
2  subsequently?
3  A. I was aware of that at the time.
4  Q. Okay. Can you describe for me what the
5  issue was that was being addressed in this
6  government investigation?
7  A. My understanding was the allegation was
8  that correspondence documents were being
9  inappropriately date-stamped so that they would
10 appear that they were meeting turnaround standards
11 that were prescribed by the Medicare program and in
12 fact, you know, we were not achieving those
13 turnaround standards.
14 Q. Anything else?
15 A. No.
16 Q. Okay. Is it your understanding that the
17 allegations in that case were limited to date --
18 inappropriate date-stamping?
19 A. That was -- yes, that's my understanding,
20 that it was -- I'm only aware of the date-stamping
21 issue.
22 Q. Okay. And when the Department of Justice

**Page 141**

1  refers to "false Medicare reports," is it your
2  understanding that those were inappropriately date-
3  stamped?
4  A. Yes. There are turnaround time reports
5  that had to be submitted to Medicare indicating how
6  many claims or how many pieces of correspondence
7  were resolved in a time frame, and those are the
8  reports that they're referring to.
9  Q. Do you have an understanding as to what
10 the outcome was of that investigation?
11 A. My understanding was that there was a
12 settlement that was reached.
13 Q. And do you know what the terms of that
14 settlement were?
15 A. I do not know the terms of that
16 settlement. Let me correct -- I know -- I think part
17 of that settlement required greater employee
18 education around compliance activities, but other
19 than that, I don't know what the specific terms of
20 the deal were.
21 Q. Okay. I'm reading from a Department of
22 Justice press release regarding the settlement which

**142**

1  states that "The suit alleged that BC/BS
2  misrepresented and inflated the number of claims and
3  reviews it processed in periodic reports submitted
4  to HCFA."
5      Now, is your understanding that that is
6  inaccurate?
7      A. No, I believe --
8      MR. COCO: Objection.
9      A. I don't know what they're referring to.
10 It's -- my understanding is what I shared with you,
11 that they were claim inventory -- there were
12 turnaround time reports that dates were manipulated
13 with.
14     Q. Are you aware of any allegations regarding
15 misrepresentation or inflations of numbers of claims
16 in reviews submitted to the government?
17     A. I am not aware of that.
18     Q. Now, are you aware as part of the
19 settlement BC/BS of Massachusetts agreed to hire
20 more workers to detect and investigate allegations
21 of fraud and abuse by Medicare providers?
22     A. I'm sure they did. I'm not specifically

**143**

1  aware of those people being hired.
2      Q. Now, after your role as director of the
3  Medex unit in 1995, you became -- you took on a
4  claims role, didn't you?
5      A. Correct.
6      Q. What was your title in 1995?
7      A. Director of claims.
8      Q. That's right. As director of claims were
9  you responsible for or familiar with any staff who
10 had been hired pursuant to this settlement who were
11 working on detecting or investigating allegations of
12 fraud and abuse by Medicare providers?
13     A. Not to my knowledge.
14     MR. MANGI: Mr. Plourde, I have no further
15 questions for you, but I believe my colleague may
16 have a couple.
17     THE WITNESS: Sure.
18
19     CROSS EXAMINATION
20 BY MR. MIZELL:
21     Q. I have a few questions about the Medex
22 Client Business Unit.

**144**

1      A. Uh-huh.
2      Q. You mentioned there were various levels of
3  coverage offered. Could you just explain some of
4  the different products that were available? These
5  are different Medigap policies?
6      A. These were different -- these were
7  different Medigap policies. It was a Bronze product
8  which was -- offered comprehensive coverage but did
9  not offer a drug benefit. There was Medex Gold that
10 offered a drug benefit that was the same program as
11 Bronze, but it has the additional benefit of a drug
12 benefit.
13     There were probably at one point probably
14 eight or ten different variations of Medex products
15 with different components. You know, one had a
16 deductible, one didn't have a deductible, all
17 variations of the same theme.
18     Q. Would participants in Blue Care 65, to the
19 extent they wanted supplemental Medigap-type
20 coverage, would they get a Medex product, or would
21 they get a supplement on the Blue Care 65 side?
22     A. The Blue Care 65 is the Medicare

**145**

1  supplement for HMO members. So they're -- Medex and
2  Blue Care 65 are competing products, if you will.
3      Q. But they're both offered by Blue
4  Cross/Blue Shield?
5      A. Correct.
6      Q. Did you -- while director of the Medex
7  Client Business Unit did you gain any understanding
8  of the factors that were considered in setting the
9  premiums for these products?
10     A. I -- no, no, I was not involved in that.
11     Q. Who was involved?
12     A. Eleanor Socholitzky.
13     Q. That was who you reported to?
14     A. Correct.
15     Q. She was vice president of regulated
16 products?
17     A. Correct.
18     Q. Okay. When you were the director of this
19 Medex Client Business Unit, did you ever discuss
20 with anyone in the department any expectations about
21 margins that providers were -- providers might be
22 earning, the difference between acquisition costs

**146**

1  and reimbursement rates for drugs administered in
2  the office?
3      A.  No.
4      Q.  Any conversations along those lines with
5  anyone when you were director of the claims
6  division?
7      A.  No.
8      Q.  Or in your current position?
9      A.  No.
10     Q.  Okay. In these three different roles
11 you've had with Blue Cross/Blue Shield, have you
12 ever had such an expectation about the margins that
13 physicians might be earning on drugs administered in
14 their offices?
15     A.  No.
16     Q.  So you never had an expectation that these
17 margins might be the same for all physicians?
18     A.  I had no idea, and I have no knowledge
19 about it.
20     Q.  Okay. Did you have an expectation that
21 these margins would be uniform for all physicians
22 for all drugs administered in their offices?

**147**

1      A.  I had no expectations.
2      Q.  So you would have had no expectation that
3  these margins would remain static over time for the
4  same drug for the same doctor?
5      A.  No knowledge on any of it.
6      Q.  Okay.
7      A.  Whether they were variable by doctor,
8  fixed over time, again, beyond my scope.
9      Q.  Okay. Not aware of any investigation into
10 these physician margins by anybody at Blue
11 Cross/Blue Shield?
12     A.  No. No.
13         MR. MIZELL:  Okay. That's all I have.
14         MR. COCO:  No follow-up, so we're done.
15         THE VIDEOGRAPHER:  The time is 12:55.
16 This deposition is concluded. This is the end of
17 Cassette 2. We are off the record.
18         (Whereupon the deposition was
19 concluded at 12:55 p.m.)
20
21
22

**148**

1          SIGNATURE OF WITNESS
2
3
4
5  _____
6          VINCENT D. PLOURDE
7
8  Subscribed and sworn to and before me
9  this _____ day of _____, 20____.
10
11
12 _____
13         Notary Public
14
15
16
17
18
19
20
21
22

**149**

1  United States District Court
2  For the District of Massachusetts
3
4      I, Jessica L. Williamson, Registered, Merit
5  Reporter, Certified Realtime Reporter and Notary Public
6  in and for the Commonwealth of Massachusetts, do hereby
7  certify that VINCENT D. PLOURDE, the witness whose
8  deposition is hereinbefore set forth, was duly sworn by
9  me and that such deposition is a true record of the
10 testimony given by the witness.
11
12     I further certify that I am neither related to or
13 employed by any of the parties in or counsel to this
14 action, nor am I financially interested in the outcome
15 of this action.
16
17     In witness whereof, I have hereunto set my hand
18 and seal this 19th day of April, 2006.
19
20     Jessica L. Williamson, RMR, RPR, CRR
21     Notary Public, CSR No. 138795
22     My commission expires: 12/18/2009

Vincent D. Plourde    HIGHLY CONFIDENTIAL    April 13, 2006
Boston, MA

1

**A**
aamangi@pb... 2:21
ability 64:21 84:16,17
able 12:13 49:13 66:1 83:15 84:21 88:18 115:8,18 122:17 129:16 129:19,20 136:10
absent 121:4
Absolutely 37:22 76:2
abuse 142:21 143:12
accept 114:4
access 112:1
accessible 7:17
accommodate 43:13
account 16:10 16:10,13 17:13 17:15 22:1 32:19,22 33:17 33:18 38:18,20 38:22 42:4,22 43:2,10 44:6,8 47:18,22 58:21 59:6
accountabilities 33:16 133:7,8
accountability 11:11 72:18
accountable 12:11 93:9,12
accounts 38:14 38:19,21 42:1 42:6 43:15 44:19,21
accuracy 43:6
accurate 121:13 121:14 132:15
achieve 64:7
achieving 140:12
acquire 49:22 111:20 112:7
acquisition 110:15 111:4 112:1 124:3,10 125:18 145:22
acquisitions 116:1 127:20
acronym 23:16
act 119:7,11
acting 34:20 118:20 119:2
action 5:12 149:14,15
actions 1:9 120:7,9
activities 12:2,3 55:5 72:14 93:7 129:10 141:18
activity 58:9 100:19 101:19 130:9 132:17
actual 9:3 17:13 54:21 102:12 106:17 125:18
added 88:7 133:11,12,13
adding 88:10,11 88:12
addition 20:17 36:3 92:21 132:7
additional 67:14 83:15 95:9 133:7,8 144:11
address 5:5
61:17 102:14
addressed 44:17 140:5
addressing 42:6 42:22
Adeel 2:18 5:18
adherence 88:1
adjudicated 42:11,18 126:22
adjust 84:21 100:22
adjusted 12:1
adjusting 100:17 101:5
adjustment 82:4
administer 5:17 34:1
administered 16:22 22:4,9 28:21 29:9 38:6 41:8 52:6 52:10,14 70:20 71:2,8 77:12 120:17 126:6 126:13 131:18 134:12 135:8 146:1,13,22
administers 139:7
administration 13:19 134:16
administrative 19:14 34:17
admissions 21:5
admitted 15:7
adopted 128:9
afflicted 90:9
aggregate 80:5
ago 19:5 32:20
agreed 142:19
agreement
118:16
agrees 101:4
Ah 137:11
ahead 11:1,2 98:4
Akeley 87:8
Akeley's 87:9
aligned 47:14 97:14,15
allegation 140:7
allegations 8:2 139:19 140:17 142:14,20 143:11
alleged 7:15 8:4 142:1
allocation 88:22
allow 80:7 89:6
allowed 50:18 81:13
allows 90:20 121:17
altogether 66:3
amalgamation 107:7
Americas 2:19
amount 27:11 29:20,21 35:22 36:4,9,12 41:15 43:16 45:18 46:7,13 50:18 52:4 71:1 75:18 77:1,11 134:11 139:1,5,6
amounts 37:4 40:13 50:7 52:21 55:19 118:9 135:7
analyses 111:6
ancillary 69:9 69:11,21 70:6
70:17,18 74:9 133:21
anecdotally 78:7
answer 11:7 12:20 41:11 59:9 83:2 87:4 87:13
answered 21:10 43:5 44:18
answering 134:3
answers 37:13
anybody 147:10
appear 121:3 140:10
appearances 2:1 3:1 5:16
appeared 136:5
appears 10:15
applied 8:11 9:1 10:7 16:18 17:14 22:3 46:3
apply 16:16 28:20 114:1
applying 17:16
appropriate 18:3 19:10 67:2 90:22 91:16
appropriately 12:14 17:22
approval 95:21
approvals 21:4
April 1:22 5:7 149:18
archived 21:9
area 11:12 12:1 12:4 17:9 18:6 20:19 21:8,8 24:5,8 25:7 26:7 47:19