```
                                                                    1
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3

 4     IN RE PHARMACEUTICAL          )

 5     INDUSTRY AVERAGE WHOLESALE    )   MDL No. 1456

 6     PRICE LITIGATION              )   Civil Action: 01-CV-12257-PBS

 7     THIS DOCUMENT RELATES TO      )

 8     ALL CLASS ACTIONS             )

 9

10          Deposition of CAROL SIDWELL, taken before

11     GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

12     pursuant to the Federal Rules of Civil Procedure for

13     the United States District Court pertaining to the

14     taking of depositions, at Suite 300, 1630 Fifth

15     Avenue, in the City of Moline, Illinois, commencing

16     at 10:38 o'clock a.m., on the 17th day of September,

17     2004.

18

19

20

21

22
```

**Page 2**

1  PRESENT:
2
3  HEINS, MILLS & OLSON, P.L.C., by
4  MS. SUSAN E. MacMENAMIN (via telephone)
5  3550 IDS Center
6  80 South Eighth Street
7  Minneapolis, Minnesota 55402
8  (612) 338-4605
9  E-mail: esmacmenamin@heinsmills.com
10         On behalf of the Plaintiffs;
11
12 PATTERSON, BELKNAP, WEBB & TYLER, LLP, by
13 MR. ERIK HAAS
14 1133 Avenue of the Americas
15 New York, New York 10036-6710
16 (212) 336-2117
17 E-mail: ehaas@pbwt.com
18         On behalf of the Defendants;

**Page 3**

1  MS. LAURA J. KNOLL
2  1300 River Drive, Suite 200
3  Moline, Illinois 61265
4  (309) 765-1365
5  E-mail: KnollLauraJ@JohnDeere.com
6         On behalf of the Witness.
7  Also Present: Mr. Michael Beaderstadt.

**Page 4**

1                INDEX
2  September 17th, 2004
3  CAROL SIDWELL
4                                          PAGE
5  Examination by Mr. Haas .................... 6
6  Examination by Ms. MacMenamin .............. 58
7  Further Examination by Mr. Haas ............ 76
8  Further Examination by Ms. MacMenamin ...... 78
9  Further Examination by Mr. Haas ............ 80
10
11            DEPOSITION EXHIBITS
12 NUMBER      DESCRIPTION               PAGE
13 Exhibit Sidwell 002 Managed Health Care System   24
14      Agreement, RESTAT, Bates labeled
15      JDH 001602 through 001617
16
17 Exhibit Sidwell 003 Network Provider Agreement   47
18      between John Deere Health Care,
19      Inc., and Contracting Provider,
20      Bates labeled JDH 003434 through
21      003460

**Page 5**

1
2         DEPOSITION EXHIBITS (CONTINUED)
3  NUMBER     DESCRIPTION               PAGE
4
5  Exhibit Sidwell 004 Network Provider Agreement   50
6       between John Deere Health Plan,
7       Inc. and Contracting Provider,
8       Bates labeled JDH 003491 through
9       003522
10
11 Exhibit Sidwell 005 Network Provider Agreement   51
12      between John Deere Health Care,
13      Inc. and Contracting Provider,
14      Bates labeled JDH 003461 through
15      3490

Page 6

1  MS. KNOLL: Erik, Carol has not been sworn
2  in.
3       MR. HAAS: Can you swear in Carol.
4       (Witness sworn.)
5            CAROL SIDWELL
6  after being first duly sworn, testified as follows:
7            EXAMINATION
8  BY MR. HAAS:
9  Q.  Ms. Sidwell, would you please state your
10 full name for the record.
11 A.  Carol Sidwell.
12 Q.  And what is your current position?
13 A.  Manager of provider relations.
14 Q.  And as manager of provider relations, you
15 report to Michael Beaderstadt, correct?
16 A.  Beaderstadt, yes.
17 Q.  Beaderstadt. I'm going to walk through
18 with you the same background that we walked through
19 with Michael, and I apologize for putting you
20 through it.
21      But if you would, could you starting with
22 post high school just quickly describe for me your

Page 7

1  employment and educational experience.
2  A.  Okay. After graduating from high school,
3  I went to the University of Iowa, graduated from
4  there in 1981 with a degree in pharmacy. During
5  that time there were miscellaneous jobs including
6  restaurant and lifeguarding and non-drug-related
7  experiences.
8  Q.  Me too, both of those.
9  A.  After graduating in '81, I worked for a
10 retail pharmacy chain for about nine months or so as
11 a staff pharmacist filling prescriptions, billing
12 insurance claims.
13      MS. MacMENAMIN: I'm sorry, the phone
14 seems to be cutting out a little bit. I don't know
15 if the speaker is too far away from the witness.
16      MR. HAAS: I'll turn up the volume too and
17 see if that helps out at all.
18 BY MR. HAAS:
19 Q.  Okay. The witness testified that she
20 worked for a retail pharmacy chain as a staff
21 pharmacist and filling prescriptions.
22      Is that correct?

Page 8

1  A.  Correct. From there I started working at
2  a hospital pharmacy reviewing the physician orders,
3  overseeing injections, filling of the medication
4  carts, being a resource to the physician within the
5  hospital pharmacy environment.
6  Q.  What is the time frame that you worked in
7  the hospital?
8  A.  I would have to check for exact dates on
9  that, but I believe I started there in '82 or '83,
10 and I worked there for about a three-year time
11 frame, and I left there to then go back in retail
12 pharmacy working for a different chain as a pharmacy
13 manager in one of their retail locations. I worked
14 with that organization in various functions managing
15 pharmacies until 1993, when I became to John Deere
16 Health.
17 Q.  And how have your responsibilities and
18 titles changed from 1993 to date while at John Deere
19 Health?
20 A.  When I first came to John Deere Health, I
21 don't remember the exact title. I believe it was a
22 pharmaceutical care representative where I would go

Page 9

1  out and work with physicians, talk with them about
2  their prescribing habits, their formulary
3  utilization, generic utilization, trying to use
4  first line agents.
5       I was then involved in some special
6  projects putting together a preferred drug list for
7  our TennCare product, the Tennessee Medicaid
8  product, and then went on to other special projects
9  working with what we refer to as the health center
10 or our clinic, our staff model HMOs. As we were
11 building new facilities, I was responsible for
12 designing the pharmacy, hiring the pharmacy staff,
13 getting the licensure, setting up the purchasing
14 agreements for those clinics.
15      And then I went to the provider
16 contracting area where I became responsible for
17 pharmacy contracting and pharmaceutical manufacturer
18 contracting for rebates, as well as the customer
19 service provider service aspects of pharmacy, the
20 claims processing, authorizations, implementation of
21 the drug benefit, interactions with the claims
22 processor.

Page 10

1  Q. Okay.
2  A. And then I added some additional
3  responsibilities to that for provider relations,
4  communications and working with physicians,
5  hospitals and other providers in addition to
6  pharmacy, and as Mike described, most recently this
7  year I've become responsible for our national
8  contracts for DME, home health, vision, chiro,
9  mental health, specialty pharmacy programs and some
10 of our other vendors.
11 Q. Okay. Going back to the time that you
12 were a pharmacy manager for a retail pharmacy chain,
13 what chain was that?
14 A. The first time out of college?
15 Q. No, from 1983 to 1993.
16 A. I worked for Osco Drug, part of American
17 Stores.
18 Q. And part of your responsibilities as a
19 pharmacy manager, did that involve at all
20 contracting with health plans?
21 A. That wasn't part of my direct
22 responsibility. The corporate office handled those

Page 11

1  contracts. I was involved in some of the
2  discussions, but it wasn't a direct responsibility.
3  Q. When you say you were involved in
4  discussions, what did those discussions entail?
5  A. As John Deere Health was sending out
6  requests for participation in a preferred product at
7  that time, I worked with some of our corporate
8  entities to discuss various reimbursement rates and
9  what we would want to propose.
10 Q. And in coming up with the amount of
11 reimbursement rates that the pharmacies wanted to
12 propose, the pharmacy you were working for wanted to
13 propose, did you build in an element of margin above
14 the drug cost to the pharmacy?
15 A. Yes.
16 Q. Typically what was the range of margin
17 that Osco would propose as a reimbursement rate?
18 A. I don't feel that I would be able to
19 represent what Osco would propose.
20 Q. Fair enough. Let me ask this question.
21    When you were at Osco as a pharmacy
22 manager from 1983 to 1993, did you have an

Page 12

1  understanding of the rates at which -- withdraw
2  that.
3     While a pharmacy manager at Osco from 1983
4  to 1993, did you have an understanding of the prices
5  at which Osco could acquire drugs from wholesalers?
6  A. I knew what costs my particular store was
7  paying for those drugs that we acquired.
8  Q. Did you also gain an understanding at that
9  time of what the pharmacy industry generally was
10 paying wholesalers for drugs? And by that --
11 A. I would say that I'm aware of an average
12 discount that we were able to purchase drugs for
13 depending on whether it was a brand or a generic
14 item, and depending on your manufacturer, certainly
15 in the range of 15 to 20, 25 percent discount on the
16 brand items, and much greater than that on the
17 generic items.
18 Q. When you're talking in terms of the
19 discount, you're talking in terms of the discount
20 off of what?
21 A. Discount from AWP or average wholesale
22 price.

Page 13

1  Q. From the pharmacy's perspective at that
2  time and pharmaceutical industry based on your
3  experience at that time, were the drug acquisition
4  costs at which the pharmacies acquired the drugs
5  from wholesalers typically expressed in terms of
6  discounts off of AWP or of amounts based upon WAC?
7  A. I was familiar with both references. The
8  pricing that I actually saw in the pharmacy wasn't
9  represented as a discount or anything. There were
10 just two different pricing codes on the bottles, so
11 one was what we paid for it and one was an AWP
12 price.
13 Q. At that time, in the 1993 time frame let's
14 say, is it correct there that the pharmacies were
15 able to purchase most brand name drugs at an amount
16 at or around WAC?
17 A. Yes.
18 Q. Was it your understanding at that time
19 therefore that wholesalers tended to earn a very
20 thin margin on the drugs sold to pharmacies?
21 A. I'm certain that they earned a margin. I
22 don't know that I would be able to define thin.

14
1  Q. Just based on your general understanding
2  from the perspective of a pharmacist at that time,
3  was it your understanding that wholesalers basically
4  earned their margin on the prompt pay discount they
5  received from manufacturers?
6     A. They received that, and then there was
7  also what appeared to be a markup between what they
8  actually purchased the drug for and what they were
9  reselling it to me at a wholesale cost or a
10 discounted wholesale cost.
11    Q. And what would you -- what was your
12 perspective of the range of that markup at that
13 time?
14    A. I believed it to be in the range of 2 to
15 3 percent, but I have no specific documentation on
16 that.
17    Q. Okay. So then when you started at
18 John Deere, you initially were the pharmacy care
19 representative, and then you were involved with a
20 special project that involved developing a preferred
21 drug list for Tennessee; is that correct?
22    A. TennCare. It's the Medicaid program in

15
1  Tennessee.
2     Q. What did that project involve? When you
3  say developing a preferred drug list, what does that
4  mean?
5     A. Working with our clinical pharmacists and
6  identifying which items we would like to promote or
7  prefer, what you would probably call now a formulary
8  listing. At that point we referred to it as a
9  preferred drug list, and it was probably more
10 expansive than what you see in formularies today.
11    Q. When faced with a situation where you had
12 functionally equivalent drugs, how did John Deere
13 determine which drug to put on the preferred drug
14 list at that time?
15    A. There are several steps in the process.
16 I'm familiar with most of those. We looked at the
17 clinical aspects of the drug, if it created the same
18 outcomes. We looked at side effects, interactions,
19 many components of the clinical side of it. If we
20 believed from a clinical standpoint that the two
21 were interchangeable, then we looked at the cost
22 components of the drug and looked at which one we

16
1  could obtain at a lower cost.
2     We also looked at dosing frequency and
3  compliance and other aspects of it.
4     Q. At that time was John Deere receiving
5  rebates on drugs from manufacturers?
6     A. Yes.
7     Q. In assessing which of the drugs was the
8  lowest cost drug and therefore would otherwise
9  obtain a preferred formulary listing over a
10 functionally equivalent drug, did John Deere
11 incorporate into that consideration the amount of
12 rebates it would get from manufacturers?
13    A. Yes.
14    Q. So from John Deere's perspective, this
15 preferred drug list and subsequent formulary list
16 were a means to control costs?
17    Let me withdraw that question because
18 that's not a fair question.
19    One of the purposes of the preferred drug
20 list and the later formularies were to control
21 costs; is that correct?
22    A. Yes.

17
1     Q. Has John Deere ever delegated that
2  formulary determination function to any third party?
3     A. Not to my knowledge. We basically act as
4  our own PBM, or pharmacy benefit manager.
5     Q. Has John Deere to your knowledge ever
6  received proposals from any PBM that they take over
7  the formulary management function?
8     A. Yes.
9     I guess let me back up to that other
10 question. There was a period of time where we did
11 work with an outside PBM, Diversified Pharmacy
12 Services, for part of our population in Tennessee.
13    Q. What period of time was that?
14    A. I believe it was '93 to '95 or somewhere
15 in there for the TennCare population.
16    Q. During that time frame, did the
17 Diversified Pharmacy Services PBM handle the rebate
18 function for John Deere?
19    A. I believe so. I don't have the exact
20 materials on that.
21    Q. So from John Deere's perspective, it had
22 the option to either manage the formulary process

**18**

1  and the rebating process internally or alternatively
2  delegate that function to a PBM, right?
3     A.  Yes.
4     Q.  Why is it that John Deere elected to do
5  that internally?
6     A.  My perspective on that is that we felt we
7  were in a good position to evaluate the clinical
8  quality of the drugs and make those decisions
9  ourselves.  We felt that we could avoid middlemen in
10 that process and better manage the activities going
11 on.
12    Q.  So from just the economic viewpoint, was
13 it John Deere's perspective that it was more
14 efficient for them to manage the rebating process
15 internally?
16    A.  Yes.
17    Q.  Has John Deere done any studies to
18 determine whether or not it could obtain greater
19 rebates by outsourcing the manufacturer rebating
20 function to a PBM?
21    A.  We have evaluated that on several
22 situations.

**19**

1     Q.  How did you evaluate that?
2     A.  By looking at proposals from other PBMs as
3  far as what they would offer us.  Some of them would
4  offer guaranteed rebates per prescription or
5  different sharing arrangements on the rebates, as
6  well as looking at the net cost of the drugs and
7  then looking at our staffing and our time and our
8  involvement in putting those lists together.
9     Q.  And was the ultimate conclusion you
10 reached that the John Deere rebates were competitive
11 with the rebates that could be obtained from the
12 PBMs?
13    A.  I believe that we found that our rebates
14 were substantially higher than what we could obtain
15 from using a PBM.
16    Q.  When John Deere utilized Diversified
17 Pharmacy Services, did it also avail itself of any
18 of the networks that Diversified Pharmacy Services
19 had created with pharmacies?
20    A.  That was actually our purpose for using
21 them.  Because of language in some of the Tennessee
22 pharmacy contracts that we referred to as our most

**20**

1  favored nation clause, Diversified was able to get
2  more favorable reimbursement for pharmacies than
3  what we were able to get.
4     Q.  From John Deere's perspective, what are
5  the functions that a PBM could provide that
6  John Deere currently does provide?
7     A.  I don't know that I can give you an
8  all-inclusive list, but I would start with the
9  network pieces, providing service to the pharmacies,
10 customer service questions, reviewing
11 authorizations, drug utilization, medical necessity
12 review, monitoring for inappropriate use, rebate
13 contracting, promoting formulary items and
14 appropriate use of drugs to the physicians.
15     I'm sure there are many more.  Claims
16 processing we currently outsource, but that's
17 certainly a function of the PBMs.
18    Q.  Is there an element of risk acceptance
19 that PBMs provide or have offered to provide to
20 John Deere?
21    A.  Is there a what?
22    Q.  Do you understand?

**21**

1     A.  No.
2     Q.  Let me ask the question differently.
3      Have any of the PBM proposals that you
4  received offered to accept some of the insurance
5  risk with respect to reimbursing pharmacies that
6  John Deere currently has?
7     A.  I wouldn't refer to it as insurance risk
8  for reimbursing pharmacies.  To me that means for
9  the actual prescriptions and getting into what we do
10 as an insurer.
11     Certainly some of the PBM contracts would
12 give us a flat rate of reimbursement for all of the
13 drugs that for some pharmacies they may pay that
14 pharmacy more or less than that amount, and there
15 may be some risk within that.
16    Q.  So based upon what I heard you say, is it
17 correct -- withdraw that.
18    A.  I don't know if I mentioned formulary in
19 my list.
20    Q.  What I'm trying to do is try to summarize
21 your testimony and see if we're on the same page.
22     Would it be fair to say that from

Page 22

1  John Deere's perspective the functions that a PBM
2  could provide that John Deere currently does provide
3  are, one, a claims processing function; two, a cost
4  control function, and that would include prior
5  authorizations, generic substitution, formulary
6  management; third, a network function; and fourth, a
7  reimbursement management function in that John Deere
8  would pay a fixed amount for reimbursement rather
9  than a variable amount depending upon the rates that
10 the particular pharmacies incurred?
11     A.  We don't provide that today.
12     Q.  But it would be fair to say that all else
13 being equal, each of those are functions that a PBM
14 could provide for John Deere?
15     A.  Yes.  Customer service would be another
16 one, the formulary management piece, the rebate
17 contracting piece, all of those.  Claims processing
18 we do not do internally.  That's that services
19 bureau that Mike talked about.  We outsource the
20 actual processing of the claims to a different
21 entity.  We do all the setup in the system as far as
22 building the benefit and entering the

Page 23

1  authorizations, entering the reimbursement.
2     Q.  Okay.  And how long has it been that
3  you've been using ProCare?
4     A.  1999.
5     Q.  Prior to ProCare?
6     A.  We used Argus.
7     Q.  And you used Argus solely as a claims
8  administrator?
9     A.  Yes.
10    Q.  I saw in the production a document that
11 was a RESTAT, an agreement with the company I
12 believe referred to as RESTAT, R-E-S-T-A-T.
13    A.  I'd forgotten about that one.
14    Q.  What is that?
15    A.  RESTAT is another agent like a PBM, and we
16 will use them for part of our business.  I believe
17 it was in Kentucky when we were working with an
18 indemnity product in Kentucky.
19       That particular entity did all of the PBM
20 functions, including the rebate contracting and
21 networking and other pieces of that customer service
22 center.

Page 24

1     MR. HAAS:  I'm digging through the
2  documents now for a document that's Bates stamped
3  JDH 1602 through 1616.  It's the RESTAT agreement
4  dated 1997, September 29th, 1997, between John Deere
5  Health Care, Inc., and RESTAT.
6     MS. MacMENAMIN:  I've got it.
7     MR. HAAS:  Okay.  For the record, we will
8  mark as John Deere Deposition Exhibit Number 2 the
9  document I just referred to.
10        (Exhibit Sidwell 002 marked as
11        requested.)
12 BY MR. HAAS:
13    Q.  Ms. Sidwell, I ask that you take a look at
14 the document that's been marked as John Deere
15 Deposition Exhibit Number 2 and tell me whether
16 that's the RESTAT agreement we were talking about.
17    A.  It appears to be so.
18    Q.  If you would turn with me to the page
19 Bates stamped JDH 1612, 1611 is the first page of
20 the two-page Schedule A, schedule of RESTAT services
21 and prices.
22       Do you see that?

Page 25

1     A.  Yes.
2     Q.  And if you would turn with me to Page 2,
3  what is your understanding of what this page shows?
4     A.  Do you want me to start at the top?
5     Q.  No, just in general terms if you can
6  describe it for the record.
7     A.  This would be some of the various services
8  that RESTAT would have performed for us and the
9  associated charges for reimbursement levels
10 associated with it.
11    Q.  Now, near the bottom, it refers to the
12 pharmacy reimbursement for brand and generic, and it
13 sets forth a formula which is the lesser of U&C or
14 AWP minus 13 plus a $2.50 dispensing fee for brand
15 drugs and the lesser of U&C AWP minus 20 percent or
16 MAC plus a $2.50 dispensing fee for generic drugs.
17       Do you see that?
18    A.  Yes.
19    Q.  Do you have any understanding of how those
20 rates were determined at the time?  In other words,
21 how was it for brand name drugs that John Deere came
22 up with a reimbursement rate for RESTAT of AWP minus

Page 26

1  13 percent?
2     A.  In 1997, that was generally our
3  reimbursement rate for our pharmacies with some
4  exceptions to that. I assume that this was a
5  proposal from RESTAT as far as what they felt they
6  could provide to us that would give us an adequate
7  network. Certainly it's in line of what our other
8  reimbursement was.
9     Q.  And the use of the variable U&C in that
10 formula for brand and generic reimbursement, does
11 that refer to in your understanding the usual and
12 customary cost of the pharmacy?
13    A.  I wouldn't say usual and customary cost.
14 I would say usual and customary charge.
15    Q.  Okay. How would you define the usual and
16 customary charge as used in this agreement?
17    A.  I don't know if there is a specific
18 definition in this agreement without looking through
19 it. How I would define usual and customary would be
20 the price that that pharmacy would charge a
21 cash-paying customer for that drug.
22    Q.  And from your perspective, the amount a

Page 27

1  pharmacy would charge a cash-paying customer would
2  include an element of margin above the pharmacy's
3  acquisition cost of the drug, correct?
4     A.  Yes.
5     Q.  Now, from John Deere's perspective, did
6  the U&C variable in these formulas and in the
7  pharmacy contract formulas constitute a real
8  limitation on the amount of drug reimbursement that
9  was afforded?
10    A.  I'm not sure what you mean by real
11 limitation.
12    Q.  Let me ask it differently then.
13    A.  Okay.
14    Q.  Why did John Deere include in its
15 reimbursement contracts the term U&C as a limit on
16 drug reimbursement?
17    A.  Sometimes the charge for a cash-paying
18 customer would be less than AWP minus 13 or the
19 other rates identified here. Frequently a pharmacy
20 when pricing items would have a narrower margin on
21 some items than others, or they may have loss
22 leaders where they would actually sell things below

Page 28

1  cost.
2         We wanted to never pay more than what they
3  would charge a cash-paying customer.
4     Q.  Is it fair to say that John Deere included
5  that usual and customary charge limitation in all
6  its pharmacy contracts?
7     A.  To the best of my knowledge, yes. That
8  was certainly our intent.
9     Q.  Sitting here today, how would I determine
10 or how would anyone determine whether or not a
11 particular transaction was reimbursed at the usual
12 and customary charge amount or an AWP-based amount?
13    A.  Within the processing system, it would
14 look at -- there's various fields in there.
15 Depending upon what the pharmacy requested for
16 reimbursement, there's a submitted price.
17 There's -- typically the pharmacy has the ability to
18 submit a usual and customary price, and then there's
19 also our calculated price based upon the
20 reimbursement that we built in the system.
21        So as a claim process, you can determine
22 to see which one of those amounts was paid.

Page 29

1     Q.  So is it fair to say in order to determine
2  for any particular transaction what the basis was
3  for the amount reimbursed to the pharmacy, one would
4  have to look at the claims data?
5     A.  Claims data or aggregate of the claims
6  data. There were some reporting available that
7  would show us a percentage of claims that were paid
8  at U&C versus paid at submitted versus paid at our
9  contracted rate.
10    Q.  And does John Deere maintain that
11 documentation going back to 1991?
12    A.  I'm sure that there were probably various
13 reports of that throughout the time. I don't -- I
14 wouldn't say that I would have consistent access to
15 that.
16    Q.  Let me ask it differently.
17        Is the report you're referring to, is that
18 something that is generated in the regular course of
19 business on a routine basis?
20    A.  It's something that would be reviewed more
21 on an ad hoc basis from time to time. There were
22 some standard reports that we had included that in

Page 30

1  more recently in the past several years.
2     Q. From the time frame from 1991 through
3  2002, September 2002, is it fair to say that there
4  is no regular reporting in the aggregate of the
5  percentage of claims that were paid at U&C versus an
6  AWP-based amount?
7     A. I would say I don't have those physical
8  reports available, that the data is probably there
9  and could be gathered and produce those, and that
10 from time to time along that way there probably were
11 reports produced to look at that.
12    Q. And just to be clear, when you say the
13 data is available, you're referring to the claims
14 data?
15    A. Uh-huh.
16    Q. So in order to determine what amount of
17 claims were paid U&C versus what amount were paid
18 AWP, we would have to look at the claims data?
19    A. Yes.
20    Q. Now, speaking more broadly, is it fair to
21 say that in providing reimbursement to pharmacies
22 directly or through a PBM that John Deere utilized a

Page 31

1  formula that included a number of variables,
2  including some discount off of AWP throughout the
3  1990s?
4     A. Yes.
5     Q. In doing so, what was your understanding
6  of the term average wholesale price or AWP?
7     A. Average wholesale price was in my mind a
8  reference price, sort of like a sticker price on a
9  car that we could use to at least consistently apply
10 formulas for reimbursement. Previous to that we had
11 tried to use acquisition costs, and acquisition cost
12 was something that you couldn't easily define and
13 wasn't consistent pharmacy to pharmacy, so this
14 provided a reference pricing source for us.
15    Q. In providing reimbursement to the
16 pharmacies throughout the 1990s based on some
17 discount off of AWP, was it John Deere's intent to
18 or understanding that they were providing
19 reimbursement at an amount that would provide some
20 margin to pharmacies over their acquisition costs?
21    A. Yes.
22    Q. When you say that it was a difficult thing

Page 32

1  to determine the acquisition price and therefore use
2  it as a reimbursement basis, does that mean it's
3  just logistically and administratively difficult to
4  do that on a programmatic basis?
5     A. That and it would be difficult for me to
6  validate what that pharmacy actually paid for that
7  drug on a given prescription at a given location.
8     Q. Well, let me ask it this way.
9        Has John Deere ever given any
10 consideration to requiring pharmacies as a condition
11 of reimbursement to disclose acquisition costs?
12    A. I'm not aware of that language in any of
13 our contracts. Prior to my time, there may have
14 been some of that when it was presumably based on an
15 acquisition cost.
16    Q. Given the variability in acquisition costs
17 and how that may vary acquisition by acquisition,
18 from John Deere's perspective, does it make more
19 sense administratively and logistically when using a
20 claims processing system to use a benchmark?
21    A. Certainly. We use a benchmark for most of
22 our reimbursing.

Page 33

1     Q. Does using a benchmark also allow
2  John Deere in the event that it wants to raise or
3  lower the amount of reimbursement it provides to all
4  pharmacies a logistically simple way of doing that
5  simply by adjusting the benchmark?
6     A. Yes, or adjusting our discount from the
7  benchmark.
8     Q. Now, throughout your time at John Deere
9  when you were involved in the reimbursement of
10 pharmacies, you understood that pharmacies received
11 in some instances discounts or rebates from
12 manufacturers; is that correct?
13    A. I'm aware that they received discounts
14 from manufacturers. Most of our rebate contracts,
15 the manufacturer did not want to provide rebates to
16 me and rebates to the pharmacy, so for drugs
17 purchased for our members, we retained the rights
18 for rebates to or for those products.
19    Q. Are you referring to the staff model HMO
20 purchases at that point or more generally for all
21 drugs?
22    A. More generally. They may have received

**34**

1  rebates. I'm not aware of the named rebate, per se,
2  for the pharmacy. Certainly they received
3  discounts, incentives.
4      Q. When you refer to AWP as a benchmark, was
5  it your understanding and was it your understanding
6  throughout the 1990s that the AWP for brand name
7  drugs was set at typically 20 to 25 percent over WAC
8  for those drugs?
9      A. Yes. For certain manufacturers, I believe
10 it was 16 and two-thirds percent.
11     Q. 16 and two-thirds percent is actually the
12 discount --
13     A. Discount.
14     Q. -- off of the AWP versus the markup over
15 WAC?
16     A. Yes.
17     Q. Took me a while to understand that.
18         What is your understanding of the term
19 wholesale acquisition price or WAC?
20     A. WAC would more accurately reflect in my
21 opinion what a wholesaler was able to purchase the
22 drugs for. Again, I would say that it is somewhat

**35**

1  of a reference price, that there are probably people
2  that pay more than WAC and certainly those that pay
3  less than WAC.
4      Q. Does John Deere use the term WAC or
5  wholesale acquisition price in any of its contracts?
6      A. Within our rebate contracts with the drug
7  manufacturers, yes, not within our provider
8  contracts.
9      Q. Do any of the contracts, rebate contracts
10 that John Deere has with manufacturers set the
11 contract price as a discount above or below AWP?
12     A. I believe we have some that still
13 reference AWP. I would need to look at the specific
14 documents for that. I know that we have some that
15 reference WAC.
16     Q. From John Deere's perspective, does it
17 make a difference whether AWP or WAC is used in the
18 contract since they are just mathematically related
19 terms?
20     A. No.
21     Q. Now going back to this agreement that we
22 marked as Deposition Exhibit Number 2, for the

**36**

1  generic drugs, it refers to the reimbursement amount
2  is the lesser of U&C AWP minus 20 percent or MAC.
3          What is your understanding of the term
4  MAC?
5      A. MAC would be a maximum allowable charge or
6  maximum allowable cost. It's an upper limit on what
7  RESTAT in this case would pay for a generic drug on
8  a per-unit basis.
9      Q. Again, speaking generally, has
10 John Deere's contracts with pharmacies for the
11 reimbursement of pharmacies for drugs dispensed to
12 John Deere's members included an amount of
13 reimbursement for generic drugs that is capped at
14 MAC?
15     A. Yes.
16     Q. Now, in using that term in John Deere's
17 contracts, are they referring to a MAC that
18 John Deere has created internally or a MAC list that
19 John Deere has created, or are the contracts
20 referring to a MAC some other entity created?
21     A. During my time at John Deere Health, it's
22 been a proprietary MAC list that John Deere Health

**37**

1  maintains, creates and adjusts.
2      Q. What are the factors or considerations
3  that go into coming up with the MAC amount for
4  generic drugs?
5      A. We use several sources of data. One of
6  them is a HCFA MAC price. We look to see if there
7  are -- if more than one generic is available, more
8  than one source of that generic I guess is available
9  so that it should be available to pharmacies. We
10 look to see if it's A rated or not. We looked at
11 competitive pricing. We look at a baseline price
12 that's also provided by First Data Bank that
13 provides AWP and look at all those various factors
14 to look at what we want to set for a MAC price.
15     Q. When you referred to the baseline price
16 that is provided by First Data Bank that references
17 AWP, is that a baseline that pertains to generic
18 drugs rather than brand name drugs? What are you
19 referring to?
20     A. There's a price within First Data Bank
21 that -- my understanding of it, and it may not be
22 technically the understanding, but it looks at all

**38**

1  of the items available, all of the drugs available
2  within that given entity and what a -- I'll call it
3  an average or what an average price would be looking
4  at brands and generics available.
5      Q.  Is it your understanding that the MAC
6  price that John Deere develops as a proprietary
7  price will differ from the MAC price that other
8  health plans use?
9      A.  Certainly.
10     Q.  And is it fair to say that AWP is not the
11 basis for the MAC price that John Deere has
12 developed?
13     A.  Absolutely.  It is used as one of our
14 benchmarks in looking at determining a MAC price,
15 where we would like to achieve at least a certain
16 percentage discount, but it certainly is not the
17 biggest factor.
18     Q.  During the course of your tenure at
19 John Deere, has John Deere done any studies or costs
20 of provider or pharmacy costs of acquisition of
21 drugs to your knowledge?
22     A.  I wouldn't say we have done any formal

**39**

1  studies of that.  Certainly information is available
2  through journals and through other means to allow us
3  to know that our reimbursement for pharmacies and
4  for physicians does include a margin in there.
5          On occasion, if a pharmacist would request
6  that we change a MAC price or change a reimbursement
7  for a drug, they do have the opportunity to submit
8  their acquisition cost in there.
9      Q.  Okay.  When you referred to the sources of
10 information about drug costs, is there anything that
11 particularly comes to mind that you've reviewed over
12 the last decade?
13     A.  Some of it comes from the various
14 manufacturers.  Some of it is a claim review from a
15 pharmacy where they didn't feel that the
16 reimbursement was enough and were willing to provide
17 information.  Some of it is drug topics or some of
18 your journals, conferences such as the Academy of
19 Managed Care Pharmacy, some of the networking
20 opportunities there.
21         On occasion some pharmacies have or
22 physicians have provided a copy of an invoice to us

**40**

1  to demonstrate what their cost was.
2      Q.  To sort of reiterate the conclusion you
3  just made, it's fair to say that in providing
4  reimbursement to pharmacies and doctors, John Deere
5  understood that it was providing an element of
6  margin to the physicians and the pharmacies; is that
7  correct?
8      A.  That is correct, yes.
9      Q.  Now, you also mentioned that you were
10 involved in the development of John Deere's staff
11 model HMO.
12     A.  Of the pharmacy pieces of that, yes.
13     Q.  Okay.  And did that staff model HMO have a
14 particular name?
15     A.  John Deere Family Health Plan.
16     Q.  Family.  And is it correct that that HMO
17 was in operation from 1993 to 1999, to the best of
18 your recollection?
19     A.  Those dates sound close.  I'm not sure
20 when it actually ceased operation.
21     Q.  Describe for me once again what exactly
22 your involvement was with the HMO.

**41**

1      A.  I was involved with -- we had one HMO, one
2  staff model that was up and running at that point,
3  another one that was under development, and we were
4  looking at opening some additional sites.
5          So I was responsible for getting the
6  licensure for the facility, working with the
7  architects and other people as far as the layout of
8  the pharmacy, the actual design of the pharmacy,
9  hiring a staff, setting up arrangements with the
10 wholesalers and with the various buying groups, some
11 involvement with the manufacturer contracts for own
12 use purchasing at that point, and pharmacy systems,
13 basically getting the pharmacy up and ready to run.
14     Q.  Were you involved at all in the
15 negotiation or contracting for drugs that were going
16 to be dispensed by the staff model pharmacies or
17 administered by the staff model physicians?
18     A.  Some of the agreements were already in
19 place when I came on board because we had pharmacies
20 in operation, but we did extend those to other
21 facilities.
22     Q.  Were those contracts with wholesalers or

**42**

1  were the contracts with manufacturers or both?
2     A.  Both, and buying groups through the
3  wholesalers.
4     Q.  To your recollection, were those
5  contracts -- withdraw that question.
6         To your recollection, how were the price
7  of goods, drugs, expressed in those contracts?  Was
8  it in terms of a benchmark, or was it an absolute
9  amount, to your recollection?
10    A.  Which part of the contracts I guess?  With
11 the drug manufacturers?
12    Q.  Well, I was asking both, but if you want
13 to break it down, that's fine.
14        Let me ask a better question then.
15        With respect to the contracts between the
16 staff model HMO and manufacturers, how were the
17 price terms for drugs expressed?
18    A.  In the arrangement between the pharmacy in
19 the staff model HMO and John Deere Health, we
20 reimbursed them as we would reimburse other
21 pharmacies, to my recollection.  The purchasing of
22 the drugs by the pharmacy were separate contracts to

**43**

1  that, and we negotiated up-front discounts on the
2  pricing of the drugs, discounts from the wholesale
3  price or discounts from AWP, and for those items
4  that were used in the facilities for own use
5  agreements, we did not then as an HMO get rebates on
6  them, so it was basically an up-front discount for
7  the items.
8     Q.  Two questions.  The first question, to
9  your recollection, were those contracts expressed as
10 a discount off of AWP or a discount off of WAC or
11 some other basis, to your recollection?
12    A.  I don't know that I totally recall what
13 they were based on.  Some of them were a -- it ended
14 up being a per-unit price.  I'm not sure if it was a
15 discount off AWP or a discount off WAC, but it was a
16 discounted price for us.
17    Q.  And it's your understanding that that
18 discounted price reflected the amount of rebate that
19 John Deere would otherwise be able to obtain from
20 manufacturers for drugs that were administered to
21 its members?
22    A.  I wouldn't say that I would think that

**44**

1  there would be a straight exchange between the two.
2  I believe that they were able to purchase it at a
3  price less than, creating a bigger difference, so
4  there was still a margin in there for the pharmacy.
5     Q.  Did the reimbursement agreements between
6  the pharmacists then and John Deere that you just
7  mentioned also have an adjusted reimbursement amount
8  to reflect the lower acquisition costs?
9     A.  At that time I don't believe we had a
10 contract with them because they were part of our
11 organization, so I'm not aware of a contract between
12 the pharmacies and John Deere Health Care or
13 John Deere Health Plan.  They were part of it.
14    Q.  They were part of the staff HMO.  That's
15 what I would expect.  I thought you had testified
16 that there was a contractual relationship between
17 the pharmacies.
18    A.  There is now that they are a separate
19 entity.
20    Q.  Okay.
21    A.  And in our reimbursement to them in our
22 adjudication system, we have them set up as if they

**45**

1  were another pharmacy, a regular pharmacy.
2     Q.  In that adjudication system, was the staff
3  model pharmacy before 1999 reimbursed at cost in the
4  system, or was it reimbursed -- were the claims
5  tracked at some --
6     A.  The claims were tracked at a discounted
7  AWP as they were for any other pharmacy.
8     Q.  And that discounted AWP amount, was it the
9  same amount that John Deere would generally
10 calculate with respect to independent pharmacies, or
11 was it some discounted amount, further discounted
12 amount?
13    A.  It would be comparable to what John Deere
14 Health paid other independent and chain pharmacies
15 within the same area for the same product.
16    Q.  After 1999 when the group became
17 independent, did John Deere continue to purchase
18 drugs for the group?
19    A.  The group purchased the drugs themselves
20 directly, and then we have a contract with them as
21 we would any other pharmacy for reimbursement.
22        MR. HAAS:  Got it.  Off the record.

Page 46

1        (Whereupon, a lunch recess was
2        taken.)
3        MR. HAAS: Back on the record.
4   BY MR. HAAS:
5        Q. Ms. Sidwell, do the terms of John Deere's
6   reimbursement to pharmacies vary on a
7   contract-by-contract basis depending upon the
8   competitive relationship between John Deere and the
9   various pharmacies?
10       A. That's one of the variables, yes.
11       Q. What are the other variables?
12       A. Competitive within the community, not
13  necessarily between the pharmacies and John Deere
14  Health but within a community, whether it's an urban
15  area or a rural area, and then in some states there
16  are what I'll refer to as the most favored nation
17  clause that impact our ability to be able to get
18  lower reimbursement rates.
19       So if the pharmacy were to accept lower
20  reimbursement from us, they would also need to
21  accept lower reimbursement from other payers such as
22  state agencies.

Page 47

1        Q. Is another factor that impacts the amount
2   of reimbursement provided to a particular pharmacy
3   the amount of volume that John Deere can direct to
4   that pharmacy in terms of a closed or open network?
5        A. Yes. By directing people to certain
6   networks, we're able to get better discounts.
7        Q. To that point, let me mark as Deposition
8   Exhibit Number 3 a document Bates stamped JDH 3434
9   through 3460.
10       It's a document entitled Network Provider
11  Agreement effective July 1st, 2004.
12       (Exhibit Sidwell 003 marked as
13       requested.)
14       MR. HAAS: For the record, I will be
15  asking about Exhibit A, which is the rate
16  attachment, and in the rate attachment, there's a
17  table that breaks the rates down between pharmacy
18  network standard, pharmacy network open and mail
19  order, and my questions are going to go to the rows
20  pharmacy network standard and pharmacy network open
21  where there is a reimbursement rate of AWP less
22  15 percent for branded drugs for the standard

Page 48

1   network and a reimbursement rate of AWP less
2   13 percent for branded drugs in the open network.
3        And without further inquiry into the
4   document other than what I've just described, Susan,
5   are you okay with me going forward?
6        MS. MacMENAMIN: Yes, I'm okay with you
7   going forward.
8        As it is right now, do you guys have
9   access to a fax machine if it came to be something
10  in more detail that I would need to see the
11  document?
12       MR. HAAS: Yes, we probably could find
13  that.
14       MS. MacMENAMIN: Go on for the moment.
15  BY MR. HAAS:
16       Q. Ms. Sidwell, I'll ask that you take a look
17  at this document and first tell me if you're
18  familiar with it, and if so, tell me what it is.
19       A. Yes, I'm familiar with it. It's the
20  contracts that we updated language and sent out to
21  many of our providers starting this year.
22       Q. Now, with respect to the two rows of the

Page 49

1   rate attachment table that I described, do you know
2   why there is a lower reimbursement amount provided
3   or afforded by this agreement to the pharmacy under
4   the standard network than there is under the open
5   network?
6        A. The open network is basically every
7   pharmacy that is willing to contract with us and
8   willing to accept those rates. Standard is another
9   option where we have perhaps fewer pharmacies that
10  are willing to accept that rate and participate, so
11  as fewer pharmacies participate, we would expect
12  them to be funneled more volume. In addition to
13  these two rates, there are other networks that are
14  more restrictive than this that would get into
15  deeper discounts from the pharmacy.
16       Q. And to the same point, I'm going to mark
17  two other contracts. And, Susan, tell me whether
18  you have these.
19       The first is a document with a Bates stamp
20  range JDH 3491 through 3522. It's a provider
21  agreement that purports to be effective as of
22  March 13th, 2004, between John Deere and looks like

Carol Sidwell                                                            September 17, 2004
Moline, IL

14 (Pages 50 to 53)

Page 50

1  Lowell Grizzle, G-r-i-z-z-l-e -- excuse me, on the
2  previous page, Page 16, it clarifies the pharmacy as
3  P&S Pharmacy.
4      MS. MacMENAMIN: I do not have it. My
5  Bates ranges end at JDH 2500, so whatever the
6  reason, I don't know where the confusion was from
7  the documents, but that's where my Bates ranges end
8  is 2500.
9      MR. HAAS: Okay. I'll do the same thing.
10 I have the same type of question on this document,
11 so I'll just describe just in very general terms the
12 rate schedule for the record, and if you require
13 further clarification, we will fax it to you.
14     MS. MacMENAMIN: Okay.
15     MR. HAAS: So we will mark that as
16 Deposition Exhibit Number 4.
17     And as Deposition Exhibit Number 5, we
18 will mark another agreement Bates stamped JDH 3461
19 through 3490, and this is an agreement effective
20 April 1st, 2004, between John Deere and Walgreens.
21     (Exhibit Sidwell 004 marked as
22      requested.)

Page 51

1      (Exhibit Sidwell 005 marked as
2      requested.)
3      MR. HAAS: And for the record, I'll
4  describe the pages of the document that I will be
5  referring to. The first is with respect to Exhibit
6  Number 4, it's the page JDH 3509, which is
7  Exhibit A, rate attachment, and this page has a
8  table which has three columns, the service, the
9  rate, and initial fee acceptance of service.
10     My questions are directed at a comparison
11 between the amounts reflected in the rate column
12 under this contract with the rates reflected in a
13 similar schedule in the contract marked Exhibit 5,
14 and that is at JDH 3478.
15     And for the record, the tables are very
16 similar in format and differing with respect to the
17 rate, the reimbursement rate reflected on the
18 contracts, and also with respect to some of the
19 language that goes to the networks covered by the
20 reimbursement rates.
21 BY MR. HAAS:
22  Q. But let me step back for a moment and ask

Page 52

1  you, Ms. Sidwell, having reviewed these documents if
2  you're familiar with what they are.
3   A. Yes.
4   Q. Okay. What are they?
5   A. The first one is a provider contract with
6  a pharmacy that we have in Tennessee for products
7  available in there. The other one is a pharmacy
8  contract with Walgreens that contains more
9  restrictive networks in Iowa but also our national
10 rates with Walgreens.
11  Q. And it is correct, is it not, that the
12 reimbursement rate for branded drugs and generic
13 drugs under the Walgreens contract is less than the
14 reimbursement rates reflected in the P&S Pharmacy
15 contract; is that correct?
16  A. Yes.
17  Q. For example, for brand name drugs under
18 the Walgreens contract, the first row is titled
19 Retail Pharmacy. It provides for a reimbursement of
20 AWP less 20 percent or U&C, while in the
21 P&S Pharmacy contract under the same row it provides
22 for a reimbursement rate for branded drugs of AWP

Page 53

1  less 14.5 percent or the U&C; is that correct?
2   A. Yes.
3   Q. The question is, what is the explanation
4  for the different rates reflected in these two
5  contracts?
6   A. Our competitive rates in Tennessee are
7  much different than in the Iowa and Illinois area as
8  is our distribution of membership, so we were able
9  to because of our volume, because of our
10 longstanding business relationship get a more
11 favorable reimbursement from Walgreens than what we
12 are from a pharmacy in Tennessee.
13  Q. What does John Deere do, if anything, to
14 monitor its prescription drug program costs?
15  A. We monitor claims processed on a daily
16 basis. We have weekly, monthly, quarterly reporting
17 that looks at our claim volume, our cost per claim,
18 brand generic utilization, formulary. We have
19 various employer group reporting, various segments
20 of our population looking at trends.
21     It would be easier to say what we don't do
22 to monitor it.

**Page 54**

1  Q. All right. We will move on.
2     I think I asked this question earlier, but
3  I'm not sure if I asked it of you.
4     What has John Deere done, if anything, to
5  analyze the relative cost to John Deere of drug
6  administration in hospitals versus in doctors'
7  offices?
8  A. We're certainly aware of our different
9  levels of reimbursements for the various providers.
10 That was one of the reasons that we looked at
11 directing more volume through the pharmacy
12 processing areas instead of through the physician
13 offices. It's one of the reasons we looked at the
14 specialty pharmacy program, looked at alternative
15 arrangements to be able to provide these drugs to
16 members at lower costs.
17 Q. So all else being equal, the costs of
18 administering drugs in the hospital setting is
19 greater than in the in-office setting; is that
20 correct?
21 A. Certainly there are additional expenses
22 associated with the hospital setting. We would like

**Page 55**

1  to get to the most appropriate setting. Whether you
2  look at the drug costs being actually more expensive
3  in the hospital, I think it's all the associated
4  services that go along with that.
5  Q. From a healthcare -- from a health plan
6  perspective, would you say that your reimbursement
7  costs typically are greater when a drug is
8  administered in the hospital setting even in the
9  outpatient setting as compared to when administered
10 in-office?
11 A. I would say that in an outpatient setting,
12 that is correct. Within the hospital, typically the
13 drug costs are rolled into the other services,
14 either as a per diem charge or a DRG charge, so they
15 aren't specifically identified in there.
16    Certainly I'd like to provide it in the
17 most appropriate setting, and it's less expensive
18 for me as a whole in an outpatient.
19 Q. Right. And that would be one of the
20 things you would consider, where is the patient
21 going to get the best treatment, would it be in the
22 outpatient setting or in-office setting?

**Page 56**

1  A. Uh-huh.
2  Q. Right. Now, I've shown you a couple of
3  the documents that have been produced in this case,
4  but we haven't walked through each and every one of
5  them.
6     In order to authenticate the documents, I
7  now want to ask you a few questions with respect to
8  your knowledge about how they were collected in
9  order to establish that they are documents that are
10 maintained in the regular course of business.
11    So to that end, are you familiar with how
12 the documents that were produced in this litigation
13 to defendants pursuant to their subpoena were
14 collected?
15 A. The majority of them, yes.
16    MS. KNOLL: I want to clarify, Erik,
17 before you go any farther that Carol was involved
18 with gathering basically the provider contracts and
19 the pharmacy contracts, not the stuff having to do
20 with the McKesson project nor the stuff having to do
21 with the arbitration. And there may be some other
22 things that Tamara is more familiar with what was

**Page 57**

1  actually produced than I am.
2     MR. HAAS: To the extent that you want to
3  supplement her testimony or clarify, that's fine.
4  We will take your representations.
5     MS. KNOLL: That will do.
6  BY MR. HAAS:
7  Q. And focusing then on the contracts that
8  were produced, were you involved in the collection
9  of the contracts that were produced to the
10 defendants in this matter?
11 A. Yes.
12 Q. Are those documents, those contracts,
13 maintained in John Deere's files in the regular
14 course of business?
15 A. Yes.
16 Q. Are the documents maintained pursuant to a
17 document retention policy?
18 A. Yes, but the documents are maintained in
19 different places. Some are at the home office, like
20 pharmacy contracts. The other contracts are out in
21 the operation site.
22 Q. Are the documents maintained by a document

**58**

1  custodian whose obligation it is to maintain the
2  documents in the regular course of business?
3      A. I would defer to Mike and Laura on that.
4  I'm not aware of a formal custodian.
5      Q. Are all these documents documents that
6  were produced and generated in the normal course of
7  business at John Deere?
8      A. The ones that I'm familiar with, yes.
9          MR. HAAS: Susan, I am going to turn it
10 over to you now to ask whatever questions you may
11 have, reserving my right to follow up.
12         MS. MacMENAMIN: Sure. Why don't we
13 continue on with Ms. Sidwell since she has already
14 been testifying, and then we will skip later to
15 Mr. Beaderstadt.
16              EXAMINATION
17 BY MS. MacMENAMIN:
18     Q. As I said earlier, my name is
19 Susan MacMenamin, and I represent the plaintiffs in
20 this action, and I'm going to ask you a few
21 questions, jumping around to and from some of the
22 questions that Mr. Haas has already asked of you.

**59**

1          Now, you testified earlier that U&C or
2  usual and customary is a term that appears in all of
3  your pharmacy contracts.
4          What about the term average wholesale
5  price, is AWP a component of all your pharmacy
6  contracts as well?
7      A. It's certainly a part of our template
8  language. I would expect it to be in there. It's
9  referenced as a national pricing index and them
10 needing to supply an NDC number that then
11 corresponds to that AWP pricing.
12     Q. So is it fair to say that AWP would appear
13 in all of your contracts, your pharmacy contracts?
14     A. To the best of my knowledge, it's in
15 there. I'm trying to think of exceptions and not
16 coming up with any right now.
17     Q. And how about with respect to your PBM
18 contracts that you've had over the years, was AWP a
19 component of those PBM contracts?
20     A. You're referring to the RESTAT and the DPS
21 contracts?
22     Q. Yes, exactly.

**60**

1      A. I believe it was in both of those, yes.
2  It was certainly in the RESTAT one.
3      Q. U&C, usual and customary, do you know, is
4  there any link between usual and customary figures,
5  is there any link to average wholesale prices or
6  AWP, meaning is U&C ever a function of AWP?
7          MS. KNOLL: If you know.
8          THE WITNESS: U&C is really defined by the
9  individual pharmacy or the pharmacy chain, so I
10 don't know that I would be in the best position to
11 define that.
12         Certainly for generic items my answer
13 would be no.
14 BY MS. MacMENAMIN:
15     Q. Okay. During your earlier testimony, you
16 did say that there exists some claims data that
17 would show us whether AWP or U&C was paid for brand
18 name drugs?
19     A. Correct.
20     Q. And you said that we'd be able to tell
21 from that claims data how often U&C versus AWP was
22 paid.

**61**

1          Can you give us, just sitting here now in
2  your experience, can you give us an estimate or a
3  ballpark figure how often U&C is paid versus AWP is
4  paid?
5          MR. HAAS: Objection, form.
6          You can answer.
7          THE WITNESS: I don't know that I have an
8  exact percentage, and the percentage does vary on
9  the pharmacies. Even though we request the pharmacy
10 to submit a U&C, they don't always do that, and many
11 of them in going through our reviews appear to have
12 set a predetermined discount instead of actually
13 providing us with a U&C amount.
14         Recall from probably six or more years ago
15 was that it was in the range of 2 to 4 percent of
16 the prescriptions were coming in at a U&C price. I
17 believe it may be closer to 4 percent now, but my
18 recollection is a little fuzzy on the exact number.
19 BY MS. MacMENAMIN:
20     Q. Okay. Was it ever greater than 4 percent
21 in your experience?
22     A. Certainly on generic items it is. On an

Page 62

1  overall percentage, it may have been.
2      Q. Okay. And talking now exclusively of
3  brand name drugs here, was it ever 4 percent, just a
4  ballpark estimate?
5      A. I don't feel prepared to answer that
6  without the facts and data. Certainly I would
7  expect it to be in about that range.
8      Q. Okay. You also testified as to your
9  understanding of AWP or average wholesale price and
10 that you believed it was something of a sticker
11 price, like an MSRP on a car.
12     A. Yes.
13     Q. Exploring your understanding of AWP a
14 little further, do you know who determines the AWP?
15     A. My understanding is that it's set by the
16 manufacturers, sometimes in conjunction with other
17 entities, that there isn't really an AWP. For
18 example, if I use First Data Bank, who I use in my
19 pharmacy processing as my source for AWP, it is
20 different than if I use Redbook as my source for
21 AWP.
22         I don't know the various components that

Page 63

1  go into who sets the specific AWP level.
2      Q. Okay. Now, can you explain a little
3  further, just focusing on the terms AWP, average
4  wholesale price, what do you understand it to be
5  representative of?
6         MR. HAAS: Objection to form.
7         THE WITNESS: My understanding of AWP is
8  that it's strictly a reference price. I don't know
9  that I would say that it's representative of -- I
10 don't have a good definition of that. It's my
11 reference price that I use as a benchmark to price
12 drugs from that.
13 BY MS. MacMENAMIN:
14     Q. Okay. Now, you testified that wholesale
15 acquisition cost as you understand it is a price
16 paid by wholesalers to manufacturers.
17        Now, you understand AWP, average wholesale
18 price, to be a price charged by wholesalers or an
19 average of prices charged by wholesalers?
20        MR. HAAS: Objection to form.
21        THE WITNESS: I don't believe that my
22 wholesale -- I guess I would like to refer back to

Page 64

1  my testimony on that and what I truly said I thought
2  the wholesale acquisition cost was. It more closely
3  resembles what a wholesaler may pay to a
4  manufacturer. I'm not sure that it is an exact
5  replication of that.
6  BY MS. MacMENAMIN:
7      Q. Okay. Extrapolating from that, would you
8  say that average wholesale price more closely
9  resembles an average of wholesale prices charged by
10 wholesalers?
11     A. Absolutely not. In my experience, when I
12 purchased a drug from a wholesaler, my book would
13 contain an average wholesale price and then would
14 contain another list price or another reference
15 there that would be what I actually reimbursed for
16 the drug or what I was charged for the drug.
17     Q. Okay. You stated earlier that in your
18 pharmacy contract negotiations you formerly used
19 acquisition cost?
20     A. Before my time here, I believe that they
21 had requested acquisition cost be submitted.
22     Q. Okay. But then, and fill me in if I'm

Page 65

1  misrepresenting your testimony, but you said you
2  switched to AWP as a benchmark because you needed a
3  consistent price?
4      A. A consistent reference that we could build
5  into our systems to be able to adjudicate the claims
6  consistently, to be able to be predictable in our
7  pricing, to be able to automatically know what we
8  were going to pay without having to go back and
9  audit what each particular pharmacy purchased a
10 given drug for.
11     Q. So is it fair to say that you used AWP to
12 replace actual acquisition cost as a reference price
13 in your negotiation process?
14        MR. HAAS: Objection to form.
15        THE WITNESS: We used it as a benchmark to
16 discount our reimbursement from. The actual
17 acquisition cost, and this is predating my
18 involvement at John Deere Health, that was used as a
19 reimbursement, but it wasn't -- the actual
20 acquisition cost wasn't supposed to be a reference
21 price. It was supposed to be your actual
22 acquisition cost.

**66**

BY MS. MacMENAMIN:
Q. Okay. You also testified as to your belief that the pharmacies had a reasonable margin built into the reimbursement that they received from you?
    MR. HAAS: Objection to form.
    THE WITNESS: Yes.
BY MS. MacMENAMIN:
Q. Can you give us a ballpark guess as to what that reasonable margin might have been?
    MR. HAAS: Objection to form.
    THE WITNESS: I don't know that I know their specific margin. I do know that even at AWP minus 20 that they were still able to cover their operating expenses without losing money, so whatever their operating costs would be, their margin was still there to cover that along with the dispensing fee component that we pay.
BY MS. MacMENAMIN:
Q. Okay.
A. If you look at a pharmacy, in the data that I've seen, it looks like the average cost to

**67**

dispense a prescription used to be 6 something. I think it's 7 or 8 something per prescription now. And if I'm paying them as in some of these contracts $1.75 or $1.49 per prescription, there has to be additional margin in the drug cost for them to be able to continue to be in business.
Q. Okay. From what you're saying, I understand that you find AWP to be a useful benchmark in place of actual acquisition cost?
    MR. HAAS: Objection to form.
    THE WITNESS: Yes. It's an industry standard.
BY MS. MacMENAMIN:
Q. And would you say that it's a useful benchmark because it has a relation to some kind of real world price?
    MR. HAAS: Objection to form.
    THE WITNESS: I would say that it's useful because it is a benchmark, because it is an industry norm that then I can apply discounts to to get consistent adjudication of claims.
BY MS. MacMENAMIN:

**68**

Q. Are you aware of any other benchmarks that are available for use in reimbursing pharmacies?
A. Certainly like the HCFA MAC would be a benchmark price. That's one that I don't -- we don't use in our business to implement it. We use it as one of the things in compiling our own MAC pricing.
Q. Is the HCFA MAC exclusive to generic products?
A. I believe so. It doesn't include all generics.
Q. So just speaking of brand name drugs here exclusively, are you aware of any other benchmarks available for use in reimbursing pharmacies?
    I'm sorry, I didn't hear your answer if you did answer.
A. I'm still thinking. I'm not aware of any easily definable other benchmark out there. Certainly there are different sources of AWP than what we use today.
Q. So if you learned that AWP did not have a relation to any sort of real world prices, would

**69**

that affect your negotiations with pharmacies in using AWP as a benchmark?
    MR. HAAS: Objection to form.
    THE WITNESS: I guess I already understand that AWP is not necessarily a direct linear relationship to the cost or the price that that pharmacy pays for the drug, so since I know that today, I'm not sure that it would change the way I'm doing business or the way I'm contracting with my pharmacies.
BY MS. MacMENAMIN:
Q. In your negotiations with manufacturers for rebates and discounts, are those negotiations also based on the benchmarks AWP and WAC?
A. Those are certainly two of the things that are used to calculate the various levels of rebates.
Q. Can you tell me of any other benchmarks that are available?
A. I look at the other costs of drugs in that class based on AWP, based on WAC, and based on the rebate amounts that the other manufacturers are willing to offer to get down to a net price.

**70**

1    So regardless of -- to me it's a
2    mathematical calculation of what is the lowest net
3    cost. Whether it's a lower AWP and then a lower
4    rebate or whether it's a higher AWP and a bigger
5    rebate, we're worried about the net cost line.
6        Q. Okay. You just said earlier that most of
7    your negotiations with manufacturers are based on
8    WAC and that some of them are based on AWP, and in
9    conjunction with your testimony that WAC is somewhat
10   representative of the price wholesalers pay to
11   manufacturers, my question is, if you found out and
12   if you learned that wholesalers paid significantly
13   less than WAC, would that affect your negotiations
14   for rebates with manufacturers?
15       A. Again, I believe that wholesale
16   acquisition cost is a reference point. I'm not sure
17   it's exactly what wholesalers purchase their drugs
18   for. I'm sure there are other margins in there.
19       But no, it's not going to impact the way
20   that I negotiate with manufacturers.
21       Q. My question was that it being a reference
22   point, if you found out that WAC was significantly

**71**

1    lower and, in fact, did not have a relation to the
2    price that wholesalers paid manufacturers for drugs,
3    would that affect your negotiations for rebates
4    using the term WAC?
5        MR. HAAS: Objection to form, asked and
6    answered, and speculation.
7        THE WITNESS: No, because in my mind it's
8    all about net cost. So whether you base it on --
9    even if your WAC price was 2,000 percent of what the
10   wholesaler paid, I'm still looking at a discount off
11   something or something to arrive at a price per unit
12   that -- a rebate per unit that the manufacturer is
13   going to give me.
14       So even if it's a discount off AWP or a
15   discount off WAC or a discount off whatever, what it
16   ends up being to me is what is my rebate per tablet
17   or per milligram or per whatever on a drug.
18   BY MS. MacMENAMIN:
19       Q. Is it your understanding that AWPs and
20   WACs are flexible prices that change?
21       A. Yes.
22       Q. So are you able to determine what your

**72**

1    rebate amount will be off of AWP or WAC when WAC and
2    AWP are terms that change, prices that change?
3        A. In our agreements, we typically state the
4    AWP or the WAC or whatever reference price we're
5    using that was in effect on a certain date in the
6    contract. Whether it's the beginning of the quarter
7    or the end of the quarter or whatever, we tie that
8    specifically down in the contract so that we know
9    what we can expect to receive.
10       Q. I want to go now to your understanding of
11   MAC or more specifically the John Deere MAC.
12       Is it fair to say that based on your
13   testimony that John Deere's MAC is based at least in
14   some part on AWP?
15       A. AWP is one of the reference points that we
16   use to see what type of discounting we're getting as
17   compared to what we would pay for the brand name
18   item, and since the brand name is reimbursed at a
19   discounted AWP, it's drawn into that equation, but
20   the basic calculation is what am I paying for the
21   brand name, what am I able to pay for the generic.
22       Q. Okay. At a certain point you said that or

**73**

1    Mr. Haas asked you if you had performed any studies
2    on pharmacy acquisition costs, and you referred to
3    some source as a publication, and I just didn't
4    understand your answer actually.
5        Could you explain more about that, studies
6    that you performed on pharmacy acquisition costs?
7        A. I'm not aware that we did any formal
8    studies on acquisition cost. In the process of
9    doing a claim review, frequently a pharmacy will
10   tell us what their acquisition cost is on a certain
11   item, especially if they feel their reimbursement
12   isn't high enough.
13       In many of the publications, it will refer
14   to discounted AWP pricing, such as Drug Topics and
15   some of the -- that's just one example of a
16   publication that's out there.
17       As I've gone to various meetings in
18   different forums, certainly there are people there
19   that give presentations on discounted pricing and
20   operations of a pharmacy or operations of a PBM and
21   some of the associated margins and things in there.
22       Q. I want to ask a few more questions now