# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

## PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY CLAIMS WITH RESPECT TO TRACK 2 DEFENDANTS

### [REDACTED VERSION]

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT IN RESPONSE TO DEFENDANTS' "COMMON" ASSERTIONS......... 4

    A.    Plaintiffs Will Rely On Common Evidence Demonstrating That Defendants' Acts and Practices Had the Capacity to Deceive Classes 2 and 3................................... 4

    B.    Plaintiffs Will Demonstrate Injury and Aggregate Damages Using Common Proof ................................................................................................................................. 7

        1.    Hartman's methodology is sound ............................................................... 7

        2.    The proposed individual damages phase is manageable........................... 11

    C.    An Individual Inquiry Is <u>Not</u> Necessary to Determine the Basis of the Reimbursement Payment for Each Transaction.................................................... 14

        1.    Common evidence demonstrates that Class 2 and Class 3 reimbursements were predominantly based on AWP ......................................................... 14

        2.    The use of J-codes for reimbursement of multi-source drugs does not render class-wide analysis impossibly complex ....................................... 17

        3.    The Track 2 Defendants themselves have acknowledged that AWP is the basis for reimbursement for PADs, including generics ............................. 20

        4.    Defendants' remaining arguments are Strawmen, as implicitly recognized by the Court in certifying the Track 1 Classes.......................................... 22

    D.    State Law Variations Do Not Preclude Class Treatment...................................... 24

    E.    Certification Is Proper Under Rule 23(b)(2)........................................................ 27

III.  PLAINTIFFS HAVE STANDING AND CLAIMS THAT ARE TYPICAL OF OTHER CLASS MEMBERS, AND THEY ARE ADEQUATE CLASS REPRESENTATIVES 29

    A.    All Track 2 Multi-Source Manufacturers have Participated in an AWP Inflation Scheme that has Affected the Median, thereby Injuring all Plaintiffs and Class Members Reimbursing for a Particular J-Code Encounter................................... 30

    B.    Defendants Know to Whom They Have Sold Subject Drugs................................ 33

C.  Sheet Metals Is an Adequate Representative and Has Claims Typical of the
    Members of Classes 2 and 3 .................................................................... 36

    1.  Sheet Metals made reimbursements for beneficiaries residing in
        Massachusetts ................................................................................. 36

    2.  Other Responses Related to Sheet Metals .................................... 37

        a.  Abbott ..................................................................................... 37

        b.  Aventis .................................................................................... 39

        c.  Baxter ...................................................................................... 40

        d.  Dey .......................................................................................... 40

        e.  Fujisawa .................................................................................. 40

        f.  Pharmacia ................................................................................ 41

        g.  Watson ..................................................................................... 41

D.  Pipefitters Is an Adequate Representative and Has Claims Typical of the
    Members of Class 3 ................................................................................. 43

    1.  Pipefitters is not subject to "unique defenses" .......................... 43

    2.  There is no inherent conflict among members of Class 3 .......... 45

    3.  Pipefitters' interests are identical to the consumers in Class 3 ... 45

    4.  Other Responses Related to Pipefitters ...................................... 46

        a.  Aventis .................................................................................... 46

        b.  Fujisawa .................................................................................. 46

E.  Each Individual Plaintiff Is an Adequate Representative and Has Claims Typical
    of the Members of Classes 1 and 3 ......................................................... 47

    1.  "We didn't sell to that provider" ................................................ 47

    2.  "We stopped selling the drug on a date certain" ........................ 47

    3.  "Not our drug" ............................................................................. 48

    4.  "We didn't sell *that* drug" ........................................................ 49

5.      "Plaintiffs can't represent their deceased spouse's estate" ........................ 49

6.      "If the doctors didn't charge AWP, the Plaintiffs didn't pay AWP" ........ 50

7.      "Plaintiffs have not shown they were not reimbursed" ............................ 52

8.      "Plaintiffs' can't prove the merits of their case under state consumer laws" ................................................................................................................ 52

9.      "The Plaintiff made a flat co-payment" .................................................... 53

10.     "Amgen has unique defenses" ................................................................... 53

IV.     CONCLUSION ................................................................................................ 56

## TABLE OF AUTHORITIES

**PAGE**

### CASES

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)........................................................................................6

*Aspinall v. Philip Morris Cos., Inc.,*
    442 Mass. 381, 813 N.E.2d 476 (2004)....................................................4, 5, 11

*Bell Atl. Corp. v. AT&T Corp.,*
    339 F.3d 294 (5th Cir. 2003) ............................................................................8

*Bennett v. Visa U.S.A., Inc.,*
    E2005-00659-C, 2006 Tenn. App. Lexis 203 (Tenn. Ct. App. Mar. 27, 2006).................36

*Blake v. Abbott Labs., Inc.,*
    C.A. NO. 03A01-9509-CV-00307, 1996 Tenn. App. Lexis 184
    (Tenn. Ct. App. Mar. 27, 1996) .......................................................................36

*In re Catfish Antitrust Litig.,*
    826 F. Supp. 1019 (N.D. Miss. 1993)................................................................12

*Chase v. Roy,*
    363 Mass. 402, 294 N.E.2d 336 (1973) ............................................................33

*Clean Harbors, Inc. v. John Hancock Life Ins. Co.,*
    64 Mass. App. Ct. 347, 833 N.E.2d 611 (2005) ................................................44

*In re Commercial Tissue Prods. Antitrust Litig.,*
    183 F.R.D. 589 (N.D. Fla. 1998) .....................................................................12

*Conley v. Boyle Drug Co.,*
    570 So. 2d 275 (Fla. 1990)..............................................................................31

*In re Copley Pharm., Inc.,*
    161 F.R.D. 456 (D. Wyo. 1995) ......................................................................25

*Cullen v. Valley Forge Life Ins. Co.,*
    589 S.E.2d 423 (N.C. Ct. App. 2003) ..............................................................56

*DeVaux v. Am. Home Assurance Co.,*
    444 N.E.2d 355 (Mass. 1983) .........................................................................44

*Deadwyler v. Volkswagen of America, Inc.*,
    1986 U.S. Dist. Lexis 28449 (W.D.N.C. Mar. 7, 1986) ....................................................25

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)...........................................................................................................8

*Eubanks v. Billington*,
    110 F.3d 87 (D.C. Cir. 1997) ..........................................................................................28

*Garner v. Healy*,
    184 F.R.D. 598 (N.D. Ill. 1999)......................................................................................25

*Griffin v. Burns*,
    570 F.2d 1065 (1st Cir. 1978)..........................................................................................27

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ........................................................................................25

*Henry Schein, Inc. v. Stromboe*,
    102 S.W.3d 675 (Tex. 2002).............................................................................................51

*Kansallis Fin. Ltd. v. Fern*,
    421 Mass. 659, 659 N.E.2d 731 (1996) ..........................................................................46

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004) .....................................................................................8, 9

*Leardi v. Brown*,
    394 Mass. 151, 474 N.E.2d 1094 (1985) ...........................................................................4

*In re Linerboard Antitrust Litig.*,
    305 F.3d 145 (3d Cir. 2002)..............................................................................................8

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    205 F.R.D. 369 (D.D.C. 2002)........................................................................................25

*In re Lupron® Mktg. & Sales Practices Litig.*,
    228 F.R.D. 75 (D. Mass. 2005)..................................................................................13, 14

*In re Lupron® Mktg. & Sales Practices Litig.*,
    345 F. Supp. 2d 135 (D. Mass. 2004) .............................................................................13

*Mahar v. Hanover House Indus.*,
    5 Mass. L. Rep. 234, 1995 Mass. Super. Lexis 1 (Super. Ct. 1995)............................31, 32

*Marshall v. CSX Transp. Co.*,
    916 F. Supp. 1150 (M.D. Ala. 1995) ...............................................................................35

*Martin v. Abbott Labs.*,
    689 P.2d 368 (Wash. 1984).....................................................................................32, 33

*Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.*,
    403 Mass. 722, 532 N.E.2d 660 (1989) ...............................................................................6

*McCormack v. Abbott Labs.*,
    617 F. Supp. 1521 (D. Mass. 1985) .....................................................................31, 32, 33

*Morris v. Parke, Davis & Co.*,
    667 F. Supp. 1332 (C.D. Cal. 1987) ...............................................................................31

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ...................................................................................12

*O'Connor v. Raymark Indus., Inc.*,
    401 Mass. 586, 518 N.E.2d 510 (1988) .............................................................................33

*Payton v. Abbott Labs*,
    386 Mass. 540, 437 N.E.2d 171 (1982) .............................................................................31

*Pearce v. American Defender Life Insurance Co.*,
    343 S.E.2d 174 (N.C. 1986).............................................................................................56

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)................................................................................ *passim*

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    233 F.R.D. 229 (D. Mass. 2006)......................................................................................36

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) ................................................................................25, 26

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    148 F.3d 283 (3d Cir. 1998).......................................................................................25, 26

*Purity Supreme, Inc. v. Attorney Gen.*,
    380 Mass. 762, 407 N.E.2d 297 (1980) ...............................................................................4

*Remco Enters., Inc. v. Houston*,
    677 P.2d 567 (Kan. App. 1984) .......................................................................................27

*Russo v. Material Handling Specialities Co.*,
    4 Mass. L. Rep. 288, 1995 Mass. Super. Lexis 436 (Super. Ct. 1995)..................31, 32, 33

*In re School Asbestos Litig.*,
    789 F.2d 996 (3d Cir. 1986)...............................................................................................25

*Shaw v. Toshiba Am. Info. Sys.*,
    91 F. Supp. 2d 942 (E.D. Tex. 2000).................................................................................25

*Simon v. Philip Morris*,
    124 F. Supp. 2d 46 (E.D.N.Y. 2000) .................................................................................26

*Sindell v. Abbott Labs.*,
    607 P.2d 924 (Cal. 1980) ..................................................................................................33

*Smith v. Cutter Biological, Inc.*,
    823 P.2d 717 (Haw. 1991) .................................................................................................32

*Spencer v. Baxter Int'l, Inc.*,
    163 F. Supp. 2d 74 (D. Mass. 2001) ......................................................................31, 32, 33

*Stetser v. TAP Pharm. Prods. Inc.*,
    598 S.E.2d 570 (N.C. Ct. App. 2004) ...............................................................................56

*In re Sugar Indus. Antitrust Litig.*,
    73 F.R.D. 322 (E.D. Pa. 1976)..........................................................................................12

*In re Telectronics Pacing Sys.*,
    221 F.3d 870 (6th Cir. 2000) .............................................................................................26

*In re Telectronics Pacing Sys., Inc.*,
    172 F.R.D. 271 (S.D. Ohio 1997) ...............................................................................25, 26

*In re Terazosin Hydrochloride Antitrust Litig.*,
    203 F.R.D. 551 (S.D. Fla. 2001).......................................................................................12

*Tucker v. Sierra Builders*,
    180 S.W.3d 109 (Tenn. Ct. App. 2005) ............................................................................36

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001)............................................................................................8, 9

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004)...............................................................................................25

*Waste Mgmt. Holdings, Inc. v. Mowbray,*
    208 F.3d 288 (1st Cir. 2000) ................................................................................................8

*Weitzel v. Barnes,*
    691 S.W.2d 598 (Tex. 1985) ...............................................................................................51

## CODES AND STATUTES

84 Okl. St. § 213(B) ................................................................................................................50

940 C.M.R. § 3.04 ....................................................................................................................4

940 C.M.R. § 3.05 (1) ...............................................................................................................4

Tex. Bus. & Com. Code Ann. § 17.50 .....................................................................................51

## MISCELLANEOUS

*Restatement (Second) of Torts*, § 433(B)(3) ...................................................................32, 33

7A WRIGHT & MILLER, FEDERAL PRAC. AND PROC., § 1759 (3d ed. 2005) .....................................8

## I.    INTRODUCTION

Ignoring almost two years of class certification proceedings, the Track 2 Defendants have filed 130 pages of briefs containing several hundred footnotes and citations, new expert reports and boxes of exhibits.  Yet this avalanche of information – most of which constitutes a slicker and often misleading repackaging of the precise arguments raised by the Track 1 Defendants and already rejected by the Court – does nothing to detract from the Court's decision to certify claims against the Track 1 Defendants.[1/2]  The Court has exhaustively examined and decided these same class certification issues in promulgating its detailed August 16, 2005 Memorandum and Order Re: Motion for Class Certification (the "Memorandum") and January 30, 2006 Consolidated Order Re: Motion for Class Certification (the "Class Order").[3]  The Court did so after a full multi-day hearing with tutorial experts testifying and filing reports on the distribution and payment for pharmaceutical drugs, a report by a court-appointed independent expert, Defendants' submission of over 100 boxes of exhibits, and enough briefing to fill most judicial chambers.  Against this backdrop of careful and deliberate analysis, the Track 2 Defendants are

---

[1] CMO No. 24, directing Plaintiffs (and by logic Defendants) to address adequacy and typicality, established a procedure to follow after issuance of the Court's main opinion.  Nonetheless, the preponderance of the Track 2 Defendants' main opposition addresses common questions, which were briefed in Track 1 with abundance and reviewed in the Court's Memorandum, and repeats arguments already extensively briefed regarding the purported need for "individual determinations," *even citing to the Young and Bell depositions and declarations before the Court and addressed in the Track 1 motion*.  The brief then moves to a section entitled "common issues and superiority" (*see* p. 20), delving into the very same state law issues already extensively addressed in the Track 1 process.  It is not until page 32 that the Track 2 Defendants have a section that addresses typicality.  Thus, in flagrant disregard of the Court's wishes, only eight pages of Defendants' 40-page opposition responds to the matters identified in CMO No. 24.

[2] Because many of the Track 2 Defendants made similar arguments in their individual briefs, Plaintiffs have consolidated their response thereto in this single brief.  CMO No. 24 authorized Plaintiffs to file a 20-page response to Defendants' joint brief, and responses of three pages each to each of Defendants' 13 individual briefs.  Hence, CMO No. 24 authorized Plaintiffs to file 59 pages of briefing, and this consolidated pleading is within that aggregate page limitation.  Per a stipulation agreed to by the Court, Defendants are not authorized to file sur-replies.

[3] Plaintiffs incorporate by reference all of the class certification briefing they submitted during the Track 1 class certification proceedings.

unable to raise a convincing argument that the Court's Track 1 class certification decisions should not also apply to Track 2.

Defendants first attempt to distinguish the Track 1 certification by claiming the Track 2 drugs are physician-administered drugs ("PADs") and therefore "unlike" the drugs at issue during the Track 1 certification proceedings. Defs. Br. at 1. This assertion is brazenly false, as the Court's Memorandum extensively discussed PADs[4] and ultimately certified Classes against the Track 1 Defendants involving 27 PADs with 190 NDCs. Moreover, the Court's Memorandum carefully considered each element of Rule 23 and made industry-wide findings concerning, among other issues, the use of AWP (pp. 7-11), and an analysis of how drugs are reimbursed in each of the relevant markets (pp. 12-30).[5] The Court used these findings, which cited to exhibits, expert reports and Dr. Berndt, in applying the Rule 23 standards (pp. 31-87). None of these findings were specific to any single Defendant; rather, they focused on the industry as a whole and all Defendants.

The bulk of Defendants' briefing seeks to overturn the Court's findings regarding the predominance of common issues and superiority prongs of Rule 23. But the Track 2 Defendants fail to show why the use of AWP in the physician-administered markets in which they also operate is not subject to the same Rule 23 findings that have already been made *vis-à-vis* the Track 1 Defendants.

Nor can Defendants defeat certification based on challenges to the typicality and adequacy of the Plaintiffs – the issues the Court asked the parties to address. The multi-source

---

[4] *See In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 69-71 (D. Mass. 2005) ("*In re AWP*") (discussing Medicare Part B coverage for PADs) at 75-76 (discussing the private reimbursement system for PADs), 78-92 (discussing certification of PAD classes).

[5] The Berndt Report also discusses the PAD market at length.

-2-

manufacturing Defendants challenge each Plaintiff's standing, claiming that no single company can be held liable for drugs reimbursed via a standardized J-code because no single company's AWP was used as the sole basis for reimbursement. But the fact that Medicare used a standardized or median AWP for multi-source prescription medications makes claims based on those products more, not less, appropriate for class certification.

All generic manufacturers have the incentive to maintain the median AWP as high as possible in order to increase the spreads of all manufacturers relative to potential alternative therapeutic competitors; all generics launch with an AWP fairly close to the AWP of the related branded drug and stay relative constant; and then generic manufacturers compete amongst themselves on spread through a reduction in their ASPs. All such manufacturers therefore affect the median AWP at which multi-source drugs are reimbursed. And because the standardized AWPs used by Medicare for multi-source drugs were calculated from all AWPs for that drug, each Defendant who submitted an inflated AWP is liable for every reimbursement that was based on the standardized AWP, regardless of whose particular brand of the multi-source drug ultimately was purchased by the Plaintiffs.

As to Defendants' challenges to each individual Plaintiff, those challenges are based on a selective review of only partial data and/or a mischaracterization of the record evidence submitted to the Court. A careful and complete review of the totality of the evidence demonstrates that each Plaintiff not only has standing, but is an adequate representative of each class for which the Plaintiff is proffered and has claims typical of those of other class members.

-3-

## II.    ARGUMENT IN RESPONSE TO DEFENDANTS' "COMMON" ASSERTIONS

### A.    Plaintiffs Will Rely On Common Evidence Demonstrating That Defendants' Acts and Practices Had the Capacity to Deceive Classes 2 and 3

Like the Track 1 Defendants before them, the Track 2 Defendants cite varying levels of sophistication and knowledge amongst TPPs and argue that a myriad of individual issues of proof precludes certification of Classes 2 and 3. Defs. Br. at 5-14. But the Court has already rejected such arguments, and rightly so.

As a threshold issue, Defendants ignore the fact that varying levels of sophistication and knowledge amongst insurers are not relevant to deciding whether Defendants have committed deceptive acts in violation of Chapter 93A.[6] An act or practice is deceptive if it possesses a capacity or tendency to deceive the general public. *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 396, 394, 813 N.E.2d 476 (2004); *Leardi v. Brown*, 394 Mass. 151, 156, 474 N.E.2d 1094 (1985). This standard includes "'that vast multitude which includes the ignorant, [the] unthinking, and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions.'" *Aspinall*, 442 Mass. at 395 (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 618 n.11 (3d Cir. 1976)). Importantly, the standard for deception is an *objective* one that does not depend on an inquiry into the individual

---

[6] *See also* 940 C.M.R. § 3.04 ("No claim or representation shall be made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value or the past, present, common or usual price of a product, or as to any reduction in price of a product, or as any saving relating to a product."); 940 C.M.R. § 3.05(1) ("No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect."). These Attorney General regulations have the force of law, and violations of them constitute violations of G.L. ch. 93A. *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 775, 407 N.E.2d 297 (1980). "In determining whether an act or practice is deceptive, 'regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have upon the general public.'" *Leardi*, 394 Mass. at 156 (quoting *P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950)). The plaintiff need not prove that the defendant intended to deceive the plaintiff. *Aspinall*, 442 Mass. at 394. Nor is proof of reliance required, or even knowledge on the part of the defendant that the representation was false. *Id.*

circumstances of each class member. In *Aspinall*, a false advertising case under Ch. 93A

challenging Philip Morris's representations that "light" cigarettes delivered "lowered tar and

nicotine," defendants argued – in a refrain similar to that espoused by the Track 2 Defendants

here – that a class could not be certified given the need to make causation inquiries into each

smoker's individual smoking habits. 442 Mass. at 393-94. The court rejected this analysis,

explaining that "[w]hether conduct is deceptive is initially a question of fact, *to be answered on*

*an objective basis and not by the subjective measure argued by the defendants*." *Id.* at 394

(emphasis added). Thus, the capacity or tendency to deceive test focuses on the effect that the

challenged practice may reasonably be expected to have *on the general public. Id.*

Turning next to the issues of class injury, the court explained that an appropriate model

under Ch. 93A encompasses demonstrating that, as a result of defendants' deception, all

consumers paid more than they otherwise would have. *Id.* at 398-99. And the Court carefully

differentiated between proving actual injury and individual damages, commenting that the two

concepts should not be confused. *Id.* at 402. Injury can be demonstrated via common impact,

even if individual damages are more complex:

> Difficult issues with respect to determining the appropriate amount
> of actual or statutory damages to be awarded in a class action, or
> potential difficulties with the distribution of the aggregate damages
> award, do not preclude class certification when all other
> requirements are met. [*Id.*]

These principles support certification here. Whether Defendants committed unfair and

deceptive acts or practices in violation of Ch. 93A will turn on evidence that is common to all

class members and not on the idiosyncratic and subjective model advanced by Defendants at

pages 6-14 of their brief. The focus of this inquiry will be on issues common to all class

members, to wit, Defendants' reporting of inflated WACs and AWPs and their promotion of the

-5-

spreads created at the expense of the Classes. Even if there were varying levels of knowledge and sophistication amongst market participants, the fact remains that the entire reimbursement landscape was infected by Defendants' misrepresented AWPs; this is the impact on the general public. Whether a particular insurer was sufficiently sophisticated to realize the full extent of the secret spreads at issue here is therefore not the proper inquiry, notwithstanding the fact that there is no evidence that a single TPP ever had such a realization. Holding otherwise would eviscerate the purpose of Ch. 93A and turn back the clock to when consumers were required to prove all the elements of common law fraud in order to remedy unfair and deceptive acts.[7]

Moreover, Plaintiffs' approach to injury comports with the model approved in *Aspinall*. Simply put, Plaintiffs will demonstrate common injury, that is, as a result of Defendants' AWP inflation scheme, all class members paid more than they otherwise would have paid for Defendants' medicines. This is a classic approach to damages under both consumer fraud and unfair competition laws.[8]

Not surprisingly, in certifying Class 2 in Track 1, the Court appropriately recognized that common issues predominate, noting that "***the reimbursement rate is set by statute, not negotiation***," thereby minimizing "factual differences with respect to reliance or causation." *In re AWP*, 230 F.R.D. at 86 (emphasis added).[9] Indeed, the Court also properly concluded that,

---

[7] Defendants' reliance on *Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.*, 403 Mass. 722, 532 N.E.2d 660 (1989), is misplaced. *See* Defs. Br. at 6-7. In the court's evaluation of the Ch. 93A claim there, the plaintiff's prior knowledge was relevant because, unlike here, the court was examining a disputed term in an agreement between the two parties marked by an extensive, multi-year course of dealing. Examination of the plaintiff's belief in this regard was therefore necessary. No effect on the general public was even at issue.

[8] Given the prevalence of such a classic approach under these laws, the Supreme Court has observed that "[p]redominance is a test readily met in certain cases involving consumer . . . fraud or violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

[9] Thus, there is no "expectation" theory at play given that TPPs were required to reimburse based on statutory reimbursement regime.

"[f]rom a superiority point of view, . . . management issues are not insuperable because damages are formulaic: TPPs paying MediGap-type supplemental insurance paid some or all of the 20% copayment, which in turn was based on AWP." *Id.* (citing *Klay v Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004)). The same conclusion applies here for Track 2.

Turning to Class 3, the Court has already rejected the defense mantra that "individual factual and legal issues predominate over common ones because (1) each TPP had a different level of knowledge regarding the spread; and (2) each TPP negotiated separate agreements with doctors or groups of doctors." *Id.* at 87. The Court found that Plaintiffs' approach "may demonstrate average injury to the class and aggregate damages." *Id.* at 91. Moreover, the Court's findings did not depend solely on Dr. Hartman's analysis. As the Court acknowledged, Plaintiffs' proof of satisfying Rule 23 came from industry-wide contracts uniformly specifying the use of AWP, as well as documents showing aggressive marketing of the spread to doctors. *Id.* at 88. That evidence applies with equal vigor here in Track 2.

Furthermore, the Court did not shy away from difficult issues or, as the Track 2 Defendants put it, sweep any issues "under the judicial rug." Defs. Br. at 27. To the contrary, the Track 1 certification was the result of a trial-like process in which each side presented written and oral testimony, subject to vigorous cross-examination. In sum, the Court considered a colossal record in certifying the Track 1 Classes and *already* expressly rejected the arguments advanced here by the Track 2 Defendants.

## B. Plaintiffs Will Demonstrate Injury and Aggregate Damages Using Common Proof

### 1. Hartman's methodology is sound

The Track 2 Defendants repeat the Track 1 Defendants' attack on Dr. Hartman's methodology, Defs. Br. at 27-31, demanding a rigorous *Daubert*-like inquiry at this class

-7-

certification stage (Defs. Br. at 30-31), yet the Court has already rejected that approach in favor of a widely-embraced legal standard that is less stringent. Relying on authorities from four different circuits,[10] the Court properly concluded that its role was not to weigh whether the proffered expert testimony was persuasive or to resolve conflicting expert testimony, but instead to find whether Plaintiffs' expert testimony offers Plaintiffs a means to prove the Class claims with common evidence. *In re AWP*, 230 F.R.D. at 87-88, 90. Although reserving the option to re-address Dr. Hartman's approach in the individual damages phase, the Court found that Dr. Hartman's testimony provided grounds for satisfying Rule 23(b)'s predominance requirement. *Id.* at 91.

Importantly, the Track 1 Defendants' attempt to appeal this single issue was rebuffed by the First Circuit and for good reason. Rule 23 bars courts from conducting a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974). "[I]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) (quoting *Eisen*, 417 U.S. at 178). Any disputes that Defendants may have with Plaintiffs' evidence, therefore, have little relevance to the Court's determination of class certification.[11] Rather, courts decline to address the

---

[10] *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124 (2d Cir. 2001); *In re Linerboard Antitrust Litig.*, 305 F.3d 145 (3d Cir. 2002); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294 (5th Cir. 2003); *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004).

[11] *In re Visa Check*, 280 F.3d at 135 n.4 ("[t]he question for the district court at the class certification stage is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive"); *see also* 7A WRIGHT & MILLER, FEDERAL PRAC. AND PROC., § 1759, at 119-20 (3d ed. 2005) (under "[t]he clear weight of authority... requiring a showing on the merits of the claims is inappropriate when making the decision whether the action should be certified under Rule 23").

-8-

admissibility of an expert declaration or opinion on class certification unless it is "so flawed that it would be inadmissible as a matter of law." *E.g., In re Visa Check*, 280 F.3d at 135 (citation omitted); *see also Klay*, 382 F.3d at 1259 ("so insubstantial as to amount to no method at all"). The Track 2 Defendants provide no convincing reason for the Court to abandon its prior approach.

The Track 2 Defendants, like the Track 1 Defendants before them, also argue that a host of "knowledge" inquiries into each member of Class 2 and 3 is necessary and, therefore, demonstrates that Plaintiffs cannot prove liability on a common basis. Defs. Br. at 8-14. This is untrue. As Plaintiffs explained exhaustively in moving to certify the Track 1 classes, Dr. Hartman's economic analysis shows that, although some Class members knew that AWP was greater than acquisition cost, "no one knew that the AWPs were grossly inflated" relative to such costs.[12] Defendants' tutorial expert admitted as much when, confronted with examples of specific spreads of 300% to 700% during cross-examination, he could not identify any Class members with knowledge of such spreads.

Tellingly, after five years of litigation, and hundreds of depositions, the Track 2 Defendants utterly fail to show meaningful knowledge of the spreads or spread marketing practices. Defendants have simply conjured by an "expectation or knowledge defense," without ever once asking any witnesses the $64,000 dollar question: Did you know the spread on Pharmacia's Doxorubicin was 632%, and Etoposide 1,565%; or Abbott's vincristine injection

---

[12] Dec. 16, 2004 Hartman Decl., ¶¶ 50-57, 60 and pp. 63-68, 70. *See also* Plaintiffs' Appendix of Summary Charts in Support of Class Certification submitted during the Track 1 proceedings Apps. 1(d) (summarizing testimony of Class members' lack of knowledge of actual spreads) and App. 1(f) (lack of knowledge of extent of rebates and discounts and other offsets).

was 1104% or Amgen's Neupogen 33%? This list could be repeated for every Track 2 Defendant. All Defendants have shown is a uniform lack of knowledge of their real misconduct.

In any event, Dr. Hartman has provided a "methodology that accounts for variability" and allows accurate calculation for class-wide liability, causation and damages." Dec. 16, 2004 Hartman Decl., ¶ 39, p. 50. All of the "variations" put forth by Defendants have produced in reality a tight bond – discounts of 14% to 18% of AWP. Such variations are not only minimal, they are typical of any market. If such variations precluded class certification and trumped the use of standard formulaic methodologies, few classes would be certified. Proper economic analysis demonstrates that AWP and reimbursement are linked. Dr. Hartman found that there is an "obvious demonstrable positive relationship between reimbursement rates and AWP" for PADs,[13] and provides a method for doing so on a class-wide basis.

Furthermore, as to Class 2, as the Court has noted, "expectations" and/or "negotiations" were nonexistent, as reimbursement was based by statute on AWP. As to Class 3, Dr. Hartman establishes a benchmark beyond which the AWP was inflated. This is not a subjective standard as Defendants portray it. Rather, that benchmark is based on evidence and techniques relied upon by economists (which Mr. Young is not) and is an objective standard based on quantitative analysis.[14] Purchases at prices above that benchmark establish impact for all members of Class 3 reimbursing that specific drug at a price deemed to be inflated by Dr. Hartman's model. Where behavior artificially raises the price of a product that is used throughout an industry, courts have allowed proof of liability and damage on a class-wide basis.[15]

---

[13] Dec. 16, 2004 Hartman Decl., ¶ 34(c), pp. 46-47, Attachment D.

[14] Dec. 16, 2004 Hartman Decl., ¶ 45(b), p. 58 (method follows standard economic methods).

[15] *See* summary of cases cited in Appendix A attached to Corrected Plaintiffs' Reply Memorandum in Support of Class Certification during the Track 1 proceedings.

Thus, Plaintiffs can prove on a class-wide basis the predominance of AWP as an element of pricing, the common question of what the price would have been but for the AWP scheme, and the impact of the scheme on the Classes on a defendant-by-defendant, drug-by-drug basis.[16]

### 2. The proposed individual damages phase is manageable

The Track 2 Defendants claim that individual issues "may not be swept under the judicial rug by reliance on averages and statistical extrapolations," and that individualized inquiries into each Medicare Part B payor's payment history vitiates class treatment here. Defs. Br. at 27-30. Yet the Court has already appropriately rejected such "sky is falling" generalizations in certifying the Track 1 Classes, finding that where "'common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain' for 'the individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).'" *In re AWP*, 230 F.R.D. at 81 (quoting *Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 40 (1st Cir. 2003), and citing *Tardiff v. Knox County*, 365 F.3d 1, 6-7 (1st Cir. 2004); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004)); *see also Aspinall*, 442 Mass. at 395 (holding that difficult issues in determining individual damages or distributing an aggregate damages award do not preclude class certification). In quoting *Smilow*, the Court properly found that "'where common issues otherwise predominated, courts have usually certified Rule 23(b)(3) classes even though individual issues were present in one or more affirmative defenses,' for 'if . . . evidence later shows that an affirmative defense is likely to bar claims against at least some class members, then a court has available adequate procedural mechanisms.'" *In re AWP*, 230 F.R.D. at 81

---

[16] Dec. 16, 2004 Hartman Decl., ¶¶ 53-58, pp. 64-70.

(quoting *Smilow*, 323 F.3d at 39-40, and citing *Mowbray*, 208 F.3d at 296; *Tardiff*, 365 F.3d at 5); *Visa Check*, 280 F.3d at 137-39).[17]

Moreover, the Court has recognized that Plaintiffs' proposed two-phase trial plan effectively rebuts the Track 2 Defendants' claims of undue complexity:

> Plaintiffs provided the Court with a brief summary of the issues to be decided at each phase. The Court is satisfied that as to the Medicare Part B beneficiary class, a class action is a superior method to resolve the dispute. Defendants have not identified any plausible individual issues that will arise with regard to these class members other than their proofs of damages, which may entail reviewing documents to determine whether each patient was required to pay a percentage-based co-pay and whether each has supplemental insurance. These damages calculations will be largely formulaic. Even if some corroboration and individualized attention is necessary, it is unrealistic to expect millions of beneficiaries across the nation to repeatedly prove these claims. The number of drugs at issue in the Medicare Part B context is limited to about seventeen, so even if deciding spreads by individual NDCs is necessary, it would not be unmanageable.

*In re AWP*, 230 F.R.D. at 85.[18] **The Track 2 Defendants have not submitted any evidence or argument to change this conclusion.**

The First Circuit has endorsed the Court's approach, noting that the Court can "fine-tune its class certification order . . . if necessary, as the case progresses," including, if necessary,

---

[17] Individualized damage proceedings are common in class actions. *See, e.g.*, *In re Terazosin Hydrochloride Antitrust Litig.*, 203 F.R.D. 551, 559 (S.D. Fla. 2001) ("The fact the jury will also have to consider some individualized evidence in rendering individual damage calculations hardly precludes class certification."); *In re Commercial Tissue Prods. Antitrust Litig.*, 183 F.R.D. 589, 596 (N.D. Fla. 1998) ("individual questions of damages are often encountered in antitrust actions, and they are rarely a barrier to certification"); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 522 (S.D.N.Y. 1996) ("Courts have allowed the plaintiffs to establish the measure of damages at trial, and this measure is then applied to the individual transactions (typically in a second bifurcated proceeding following trial on the common issues)."); *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1043-44 (N.D. Miss. 1993) (Individual damages questions are typical in class actions, rarely bar certification, and – if they did – "there would be little if any place for the class action device in the adjudication of antitrust claims."); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 354 (E.D. Pa. 1976) (If computing damages on an individual basis precluded certification, "it would be tantamount to encouraging wrongdoers to commit great antitrust violations on many consumers in small amounts so as to raise the spectre of unmanageability to defeat a class action.").

[18] The Court's endorsement of Plaintiffs' proposed trial plan dispenses with the Track 2 Defendants' odd claim that Plaintiffs have refused to offer a trial plan. *See* Defs. Br. at 10 & n.48.

-12-

decertification of the class after the liability and aggregate damages phase if the Court ultimately

concludes that individualized damage inquiries cannot be handled on a class basis.  Reply

Declaration of Steve W. Berman in Support of Plaintiffs' Reply Memorandum in Further

Support of Motion to Certify Claims with Respect to Track 2 Defendants ("Berman Decl.") Ex. 1

(Nov. 25, 2005 Docket Sheet Judgment at 77 (quoting *Mowbray*, 208 F.3d at 294)).

The certification order in *In re Lupron® Mktg. & Sales Practices Litig.*, 228 F.R.D. 75

(D. Mass. 2005), demonstrates how the individualized proceedings Defendants hypothesize will

not in fact happen in this case.  Judge Stearns approved a proof of claim requesting basic

information evidencing payment for Lupron®, including a written prescription, receipt, EOB

form, cancelled check, physician letter or notarized statement.  *In re Lupron® Mktg. & Sales*

*Practices Litig.*, 345 F. Supp. 2d 135, 142-43 (D. Mass. 2004).  This claim form eliminates the

"individualized" process Defendants proffer as necessary for each of the individual elderly class

members in this case.  When the claim form is properly completed, there is no basis to conclude

that individualized proceedings are needed because common proof will already have been

presented that all prices have been inflated.[19]  If a Class member paid for a Part B drug, then he

or she paid at an inflated price.  Indeed, as Judge Stearns noted with respect to individual payors:

> The superiority analysis dovetails with the predominance analysis.
> The issue here is one that lies at the very heart of the invention of
> the class action as a litigation vehicle:  few, if any, members of the
> settlement class have incurred damages in an amount sufficient to
> justify the costs of pursuing an individual action.  That fact alone
> makes a class action the only means by which most class members
> can obtain redress.  Even if the claims could be prosecuted
> individually, their sheer number would make it unlikely that any
> significant number would be resolved during the lifetimes of the
> consumer class members.  The court finds that under the

---

[19] If Amgen's Neupogen had a "reported AWP" of $207.50 the "Real AWP" was $149.60 (Fourth Amended Complaint ¶ 233A), there is no "individualized" inquiry to be conducted on a Part B beneficiaries' knowledge.

circumstances, a class action is superior to any other mechanism
for adjudicating this case (including joinder).

*In re Lupron*, 228 F.R.D. at 92.

**C.    An Individual Inquiry Is <u>Not</u> Necessary to Determine the Basis of the
Reimbursement Payment for Each Transaction**

The Track 2 Defendants claim that PAD reimbursement is not based on AWP and that

certification is precluded by variations in the methods by which maximum allowable

reimbursement rates are set for drugs.  Defs. Br. at 15-19.  This is a tired argument already raised

by the Track 1 Defendants, rejected by the Court and squarely rebutted by the record evidence

adduced to date.

**1.    Common evidence demonstrates that Class 2 and Class 3 reimbursements
were predominantly based on AWP**

In a stunning mischaracterization of the record evidence, the Track 2 Defendants attempt

to reargue the Court's proper conclusion that "AWP was the basis for drug reimbursement under

Medicare Part B for most of the proposed class period."  *In re AWP*, 230 F.R.D. at 70.

Principally relying on the Dyckman Declaration, Defendants assert that an individual inquiry is

necessary to determine the basis of the reimbursement payment for each transaction, Defs. Br. at

15-17, that CMS and Medicare Part B carriers employed different methods to determine

reimbursement amounts, Defs. Br. at 15, and that reimbursement by TPPs varied based on the

lower of the provider's submitted charge or some percentage of AWP, Defs. Br. at 17.  The

record resoundingly demonstrates that Medicare Part B and TPPs reimbursed based on AWP.

Moreover, this demonstration is based on evidence common to all class members, obviating an

individual inquiry into millions-upon-millions of individual drug transactions.

Before Dyckman began working for Defendants, the MedPAC Report prepared by

Dyckman & Associates in 2002 unequivocally concluded that Medicare pricing was based on

AWP and that most plans used an AWP-based pricing formula.[20] In another study, Dyckman concluded that "few Medicare claims are actually paid at billed amounts that are below the fee schedule amounts," which themselves are AWP-based. Hartman Track 2 Dyckman Rebuttal, ¶ 24. As Dr. Hartman explains:

> Clearly, in his MedPAC study, Dr. Dyckman has concluded that reimbursement rates under Medicare and for private TPPs are based upon AWPs, some average percentage of AWPs or that a relationship to AWP can be characterized satisfactorily. This is the maximum allowed rate under Medicare reimbursement. These conclusions contradict the assertions he makes in his current declaration . . . .

*Id.* at ¶ 25. It is clear that Dyckman is now disavowing his pre-litigation findings now that he is highly paid by the Track 2 Defendants – money talks and integrity walks. Consequently, the Court should view Dyckman's sudden reversal with a very jaundiced if not disbelieving eye.

But we do not need to rely on Dyckman's pre-litigation reports to confirm that Class 2 and Class 3 reimbursements were predominantly based on AWP, because other supporting evidence abounds. As reviewed by Dr. Hartman, countless OIG and GAO and academic studies demonstrate the ubiquity of basing reimbursements on AWP;[21] Dr. Berndt agrees, as does Young,[22] Defendants' own documents[23] and TPP testimony.[24] Moreover, Dr. Hartman's review of *actual claims data*, including 1.2 million Medicare claims from 1999, confirms that both

---

[20] Dyckman Study 2 at 2-4; Declaration of Raymond S. Hartman in Response to Track II Defendant Expert Dr. Dyckman ("Hartman Track 2 Dyckman Rebuttal"), ¶ 23. (In support of this reply and in rebuttal to the newly-filed Dyckman and Young Track 2 declarations, Dr. Hartman submits two new declarations (one in response to each of Dyckman and Young.)

[21] Hartman Track 2 Dyckman Rebuttal, ¶¶ 26-29, 39.

[22] *Id.* at ¶¶ 30-31

[23] *Id.* at ¶ 33 and Attachment C (citing documents); Dec. 15, 2005 Hartman Decl., Attachment F.

[24] Hartman Track 2 Dyckman Rebuttal, ¶ 34.

Medicare and TPPs, including BCBS of Massachusetts, pay most claims at AWP.[25]  As

Dr. Hartman concludes, "public and private health plans . . . reimburs[e] at the AWP-based

maximum allowed amount *precisely because* most provider charges are equal to or greater than

the maximum allowable amount.  This is confirmed by actual claims analysis, it is supported by

countless OIG studies, deposition testimony and discovery materials . . . ."  *Id.* at ¶ 43.

Moreover, while noting that Dyckman failed to provide any data or analysis regarding the

frequency with which physicians purportedly failed to charge the maximum allowable amount,

Dr. Rosenthal explains that economic models and empirical evidence both "strongly support the

common sense notion that substantially all physician-administered drug claims are reimbursed at

the maximum allowance."  Declaration of Meredith Rosenthal in Response to Track II Defendant

Expert Dr. Dyckman ("Rosenthal Track 2 Decl."), ¶¶ 8-11.  Indeed, of the 1,225,794 claims

reviewed,

> [f]or 1,070,000 (87.3%), the billed charge submitted by the
> physician was greater than the Medicare allowance.  For 155,794
> claims (12.7%), the billed charge submitted by the physician was
> equal to the Medicare allowance.

*Id.* at Attachment B.  Hence, Dyckman's new-found conclusion that physicians are

systematically failing to recover the revenue allowed them by Medicare is inconsistent with the

claims data that Dr. Rosenthal has reviewed.  *See also id.* at ¶ 19.

Simply put, AWP-based reimbursement is the industry standard.  As was explained when

Plaintiffs moved to certify classes against the Track 1 Defendants, Plaintiffs can prove this

industry standard through deposition testimony[26] and the introduction of contracts at every level

---

[25] *Id.* at ¶¶ 40-42.

[26] *See* Plaintiffs' Appendix of Summary Charts in Support of Class Certification submitted during the Track 1
proceedings, Apps. 1(a) and 1(b) (summarizing deposition testimony regarding the reliability of AWP and its use as

of the distribution chain that uniformly use AWP as the basis for payment.[27] This evidence comports with Dr. Hartman's opinion that AWP is the "single publicly available list price that is the basis for the preponderance of all negotiations."[28] All of this common evidence applies to the Track 2 Defendants.

### 2. The use of J-codes for reimbursement of multi-source drugs does not render class-wide analysis impossibly complex

Relying on Young, the Track 2 Defendants argue, as did the Track 1 Defendants, that the use of J-Codes makes Plaintiffs' claims "much less amenable to class treatment" for multi-source drugs because a purported "complex and document-intensive analysis is required to identify the source of the drug and determine whether payments for the drug were based on its AWP." Defs. Br. at 16. Young also posits that, because multi-source drugs are reimbursed at the same level, is impossible for any source to use AWP to obtain a higher reimbursement than its competitors; that individual manufacturers cannot manipulate AWP; and that a source cannot effect higher reimbursement than its competitors for a multi-source drug. Declaration of Steven J. Young in Support of the Track 2 Defendants' Opposition to Class Certification ("Young Track 2 Decl."), ¶¶ 12, 13 and 39. Defendants and Mr. Young are wrong.

Dr. Hartman addressed this issue at length in his December 15, 2005 declaration submitted with the Track 1 summary judgment briefing. Noting Dr. Berndt's suggestion that "cross-walking" between J-Codes and NDCs is more likely feasible and reliable for PADs

---

a reimbursement benchmark). *See also* Reply Declaration of Steve W. Berman submitted in support of certification of Track 1 classes ("BRD") Ex. 5 (Testimony of David Joyner, Executive Vice President of Caremark, one of the major PBMs. "███████████████████████████████████████ ███," cited in Dec. 16, 2004 Hartman Decl., ¶ 25(a), p. 31).

[27] *See* BRD Exs. 2-3 (summary charts of typical contract language confirming the ubiquity of AWP).

[28] Dec. 16, 2004 Hartman Decl., ¶ 17(d), p. 15; *see also* Plaintiffs' Appendix of Summary Charts in Support of Class Certification submitted during the Track 1 proceedings App. 1(m) at 1-12 (citing testimony omitted from Young materials regarding use of AWP by Class members).

introduced after 2000, Dr. Hartman focused his analysis on cross-walking prior to 2000, finding

that "the cross-walk can be readily performed for both single-source and multi-source drugs."

Hartman Track 2 Young Rebuttal, ¶ 19; Dec. 15, 2005 Hartman Decl., ¶¶ 43-48.  He was able to,

for any given J-Code for a period in time, "identify those generic and brand name NDCs

included, the prices appearing in the Red Book and implement the Medicare statutory allowed

amount[,]" thus disproving Young's assertion that it was not feasible to crosswalk J-Codes for

multi-source drug encounters to the specific course of the associated AWP.  Moreover,

Dr. Hartman found it

> possible to identify all relevant branded and generic prices to
> identify the 'lower-of' level of Medicare allowed reimbursement.
> This median and lowest branded drug price can be calculated and
> the "lower of" the two prices identified, *regardless the degree of*
> *variability of the AWPs* used in the calculation of the median and
> the lowest brand price across all multi-source presentations.  I did
> so in my damage calculations for the Track 1 Defendants, which
> included multi-source drugs.  I will do the same in my damage
> calculations for the Track 2 Defendants.

Hartman Track 2 Young Rebuttal, ¶ 21.

Furthermore, the Track 2 Defendants' contention that generic manufacturers do not have

any incentive to inflate AWPs because generic reimbursement is based on median AWPs is

easily countered.  All generic manufacturers have the incentive to maintain the median AWP as

high as possible in order to increase the spreads of all manufacturers relative to potential

alternative therapeutic competitors; all generics launch with an AWP fairly close to the AWP of

the related branded drug and stay relative constant; and then generic manufacturers compete

amongst themselves on spread through a reduction in their ASPs.  Apr. 6, 2006 Hartman Decl.,

¶ 21.  Dr. Hartman concludes that the "result seems to be a tacit Nash equilibrium in the

dispersion of generic AWPs, which are fairly similarly discounted off of the branded AWP for

which the generics are equivalent, a Nash equilibrium not unlike that noted by Dr. Berndt with regard to the observed similar relationship between AWP and WAC over most branded drugs." Hartman Track 2 Young Rebuttal, ¶ 30.[29]

Further still, if Young's assertions were really true, and multi-source manufacturers could not affect the median AWP and did not engage in spread marketing, the United States would not have brought its recent suit against Abbott, which targets only Abbott's multi-source drugs. Among other things, the government alleges that Abbott: (i) reported false list prices and direct prices from which AWPs were calculated (¶ 59[30]); (ii) knew the mark-up factors applied by the publishers to derive the AWPs, that those mark-up factors remained constant, and that Abbott's list prices and direct prices controlled the AWP reported by the publishers (¶¶ 60, 63); (iii) with very few exceptions, reported increasingly higher prices from 1991 through 2001, while the prices that Abbott actually charged to customers decreased or remained the same (¶ 65); (iv) knew that the prices it reported to the publishers directly affected reimbursement amounts paid by government programs (¶ 66); and (v) "actively marketed the government-funded profits or 'spreads' on its drugs created by its false price representations" (¶ 37).

In sum, the multi-source drug issues that Defendants attempt to force are not complex and do not detract from the predominance of common issues.

---

[29] Hartman also explains that the "apparent Nash equilibrium in the dispersion of generic AWPs is linked to the AWP of the branded drug for which those generics are bioequivalent. Hence, the entire dispersion, including the median, is artificially inflated to the extent that the branded AWP is artificially inflated." *Id.*

[30] These paragraph references are to the United States' Complaint in intervention against Abbott, attached as Ex. 2 to the Berman Decl.

### 3. The Track 2 Defendants themselves have acknowledged that AWP is the basis for reimbursement for PADs, including generics

Defendants studied how the physician-administered market operated on a macro level and concluded that physicians were paid based upon AWP and that creating spreads was necessary to move product. For example, in a lawsuit brought by Dey against *First DataBank* and *Medi-Span* for purportedly publishing independently-derived AWPs for Dey generics instead of those reported by Dey, Dey acknowledged that private payors utilize AWP in their reimbursements for Dey's generic drugs, including albuterol, cromolyn sodium and ipratropium bromide. *See* Berman Decl., Ex. 3 (citing ¶ 13 of Dey Complaint). Indeed, the Dey complaint recognizes a "***direct relationship*** between the level of reimbursement ... and the reported AWPs of these drugs." *Id.* (quoting ¶ 38 of Dey Complaint) (emphasis added).

On a drug-by-drug level, Defendants often prepared marketing documents that compared how their drug made physicians more money based on the spread. These marketing documents make it clear that doctors administering drugs to patients who are Medicare Part B patients or covered by insurance are paid based on AWP in either instance. Of course, if AWP was not the basis for physician reimbursement, Defendants would not have created such documents.

For example, Abbott anticipated that the spread between AWP and cost might be eliminated by legislative changes in 1997. Accordingly, Abbott looked for ways to maximize the profit spread immediately. In one internal memorandum about a third party's pricing product, Abbott states:





Berman Decl., Ex. 4 (ABT AWP/MDL 072162-63) (Highly Confidential) (emphasis added).  In

another memorandum about this same product, Abbott states:



Berman Decl., Ex. 5 (ABT AWP/MDL 072164) (Highly Confidential).  In yet another

memorandum about this same product, Abbott states:



*Id.* at Ex. 6 (quoting document ABT0206384-86) (Highly Confidential) (emphasis added).[31]

     Similarly, Defendant Fujisawa adjusted AWPs for its generic drugs to help its marketing

efforts, as evidenced by the following memorandum:

---

[31] These Abbott memos echo GeriMed's Request for Proposal, which states that "[c]ontract pricing will be evaluated on lowest price and/or best spread between AWP and the contract price *for multisource products*." *Id.* at Ex. 6 (ABT206379-414, at ABT206401 (emphasis added) (Highly Confidential)).  If multisource products were not reimbursed on the basis of AWP, GeriMed would not have crafted this section in this manner.

███████████

AMCC, ¶ 368 (quoting document FY-MDL 005668-69) (Confidential).

Immunex also recognized the benefits obtained from inflating AWPs for its leucovorin

calcium and methotrexate generic drugs: "███████████

███████████" *Id.* at Ex. 7 (IAWP051149-52)

(Highly Confidential). A PBI pricing summary for Immunex products, including the multi-

source drugs leucovorin calcium and methotrexate sodium, sets AWPs and drastically lower PBI

contract prices. *Id.* at Ex. 8 (IAWP025848-55) (Confidential).

Lastly, the American Society of Clinical Oncology, in a letter to CMS Administrator

Thomas Scully, also refutes Defendants' claims about the reimbursement market. The Society,

comprised of doctors who administer drugs, wrote that "AWP is used as a benchmark for

reimbursement by virtually all public and private insurance programs, both for drugs

*administered in physicians' offices* and for drugs obtained at retail pharmacies. *See*

http://www.asco.org/asco/downloads/101003_Alert_-_ASCO_Comments.pdf. This letter,

coming from the physicians' trade association, an organization obviously knowledgeable on this

issue, completely refutes the assertions of both Young and Bell on this topic.[32]

### 4. Defendants' remaining arguments are Strawmen, as implicitly recognized by the Court in certifying the Track 1 Classes

The Track 2 Defendants also claim – like the Track 1 Defendants before – that a

purported "cross-subsidization" between drug administration costs and the drug costs themselves

defeat certification. Defs. Br. at 13. Dyckman posits that there is a negative, one-to-one

---

[32] This again points to the danger accepting any of Young's assertions. Young is not a doctor nor an economist and not expert at anything. What he has performed here is pseudo-science. He summarizes data (frequently inaccurately) and makes advocacy-type conclusions for which he is not qualified. For the whopper of his mistakes *see* Section III.C.2.a, *infra.*

relationship between PAD reimbursement and payments related to the administration of those

drugs such that if one is decreased, the other must increase by the same amount, meaning that the

Class could not be injured because overall Class payments would be the same.  Expert Report of

Zachary Dyckman in Support of Track 2 Defendants' Opposition to Class Certification

("Dyckman Track 2 Decl."), ¶ 44.  Although Defendants assert that cross-subsidization has a

"long and well-known history," this is simply untrue.  Defendants cite almost no evidence of this

purported phenomenon and ignore countervailing evidence.[33]  Moreover, as Dr. Rosenthal

explains, Defendants' theory is belied by closer analysis of the actual numbers:

> The notion of a "cross-subsidy" suggests a rough equality between
> the two sources of funds.  In reality, the overpayment related to the
> physician-administered drugs is disproportionately large compared
> to the underpayment on the administration fees.  For 1999, the OIG
> estimated that Medicare overpaid for Part B drugs relative to the
> actual acquisition cost by $761 million . . .; in contrast, the
> Government Accountability Office (GAO) estimated that the
> magnitude of underpayment for administration services was $51
> million. . . .  Even if the underpayment were ten times more than
> the GAO calculated, the "cross-subsidy" would be out of balance
> by a quarter of a billion dollars.  This alone suggests that Medicare
> (and private payers likewise) was misled about the magnitude of
> overpayment.

Rosenthal Track 2 Decl., ¶ 16 (footnotes omitted).

Furthermore, Defendants' theory is inconsistent with rational economic theory.  The

"argument requires the assumption that payers are economically irrational, since cross-

subsidization in this manner would be expected to lead to inefficient practice patterns – under

provision of under-reimbursed services such as patient counseling and over-provision of high-

---

[33] *See, e.g.,* BRD Ex. 8 (Bearderstadt (John Deere) Dep. at 81) ("we didn't want the use of injectable drugs to be
a profit center.... We want to cover the reasonable cost of providing care, but we don't look for those things to be a
profit center."); BRD Ex. 9 (Romasko (BCBS MT) Dep. at 70) ("We'd ideally like to pay what the pharmaceutical
cost.  To me it doesn't make sense to make a profit on the drug itself, but on the service rendered.").

AWP drugs." *Id.* at ¶ 21. In any event, to the extent that any cross-subsidization occurs (which

has not been established), it hardly defeats certification as damage to the Class nonetheless

remains, as Dr. Hartman explains:

> In determining if proposed and negotiated reimbursement rates are
> reasonable, payors must look to signals for the costs of each of the
> factors and services required. If, during negotiations or
> determinations of maximum allowed amounts, incomplete or
> incorrect signals are given for individual components of the
> medical service to be provided, the total reimbursement rate
> allowed for the medical benefit will be incorrect. If the signal is
> inflated for the actual costs of a given component, payors will be
> overcharged.

Hartman Track 2 Young Rebuttal, ¶ 14; *see also* Dec. 16, 2004 Hartman Decl., ¶¶ 71-73; Dec.

15, 2005 Hartman Decl., ¶ 35 and Attach. K.[34/35]

## D.    State Law Variations Do Not Preclude Class Treatment

The Court in CMO No. 24 did not invite another round of briefing on state law issues.

Nonetheless, the Track 2 Defendants repeat the same arguments regarding state law variations

that were exhaustively advanced previously by the Track 1 Defendants (in three different rounds

of briefing) and rejected by the Court in certifying Class 1. Defs. Br. at 21-26. While the Court

recognized that differences exist between the consumer-protection laws of the set of states that

do not have notice requirements, *In re AWP*, 230 F.R.D. at 84, such variations do not necessarily

---

[34] Dyckman also speculates that a significant share of Medicare beneficiaries failed to pay their coinsurance and therefore did not sustain any injury. Dykman Track 2 Decl, ¶ 49. Dykman's sole "support" for this proposition is a non-peer-reviewed article appearing in an industry newsletter. As Dr. Rosenthal explains, the article provides no data sources. Moreover, Dyckman rejects without explanation the OIG's finding that Medicare Part B "bad debt" represented less than 1% of physician revenues in the oncology practices profiled. Rosenthal Track 2 Decl., ¶¶ 12-14. In any event, this is a merits issue that does not impact class certification.

[35] Defendants also suggest that the existence of capitated contracts cut against certification, yet contracts not based on AWP are, by definition, not included in the class.

-24-

defeat certification.[36] The variations must be (i) significant and material to the issues contested in the case, and (ii) cannot otherwise be addressed efficiently through the creation of subclasses or the use of jury instructions and special verdict forms. *In re Telectronics Pacing Sys.*, 172 F.R.D. at 292; *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 525 (D.N.J. 1997). Many courts thus have certified nationwide classes under laws of various states, including actions alleging overpayment for prescription drugs and even some product defect actions.[37] Many of the certifications involved tort causes of action that can have a higher degree of variation from state-to-state than the relatively more uniform consumer-protection acts.[38]

Plaintiffs submitted to the Court a comprehensive survey of state consumer protection statutes.[39] The Court found that variations between the statutes here were "unlikely to be material." *In re AWP*, 230 F.R.D. at 85. Any variation in scienter standards, for example, would not be material because Plaintiffs assert claims for Class 1 based on intentional misrepresentations. *Id.*[40] Such variations thus would not present individual issues at trial. *Id.* Likewise, the particular context of the certified claims made variations in legal standards for

___

[36] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529-30 (3d Cir. 2004). To defeat class certification, those variations must be material. *E.g., Shaw v. Toshiba Am. Info. Sys.*, 91 F. Supp. 2d 942, 956-57 (E.D. Tex. 2000); *Garner v. Healy*, 184 F.R.D. 598, 602 (N.D. Ill. 1999); *In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997); *In re Copley Pharm., Inc.*, 161 F.R.D. 456, 465 (D. Wyo. 1995).

[37] *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 530 ("variations in the rights and remedies available to injured class members under the various laws of the fifty states … does not defeat commonality and predominance"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998); *Shaw*, 91 F. Supp. 2d at 956-57; *Deadwyler v. Volkswagen of America, Inc.*, 1986 U.S. Dist. Lexis 28449 (W.D.N.C. Mar. 7, 1986) (certifying a near-nationwide class of car purchasers under pendent unfair or deceptive trade practices acts; case was tried to verdict).

[38] *See, e.g., In re Telectronics*, 172 F.R.D. 271; *In re Copley Pharm.*, 161 F.R.D. at 465; *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998); *In re School Asbestos Litig.*, 789 F.2d 996, 1010 (3d Cir. 1986).

[39] Plaintiffs' September 3, 2004 Memorandum in Support of Class Certification, Appendix B.

[40] Intent is not needed to succeed on Plaintiffs' Class 2 and 3 § 93 claims.

reliance and causation irrelevant: "where consumers (elderly people with cancer or another serious disease) make a percentage co-payment based on the stated AWP, there is no indication that different definitions of reliance and causation will matter or cannot be resolved as a matter of law prior to trial." *Id.* And, in any event, very few of the statutes even require a reliance showing.

In the absence of such material variations, courts can employ devices such as subclasses to manage differences in state law. *In re Prudential Ins. Co. Am. Sales Practices Litig. Agent Actions*, 148 F.3d at 315 ("[c]ourts have expressed a willingness to certify nationwide classes on the ground that relatively minor differences in state law could be overcome at trial by grouping similar state laws together and applying them as a unit"); *In re Prudential*, 962 F. Supp. at 525; *Simon v. Philip Morris*, 124 F. Supp. 2d 46, 77 (E.D.N.Y. 2000) (using subclasses to accommodate variations in state law "is fair and routine"; citing cases); *In re Telectronics Pacing Sys.*, 172 F.R.D. at 292.[41] After reviewing state law variations and considering voluminous briefing in Track 1, including a follow-on round of briefing after the Court issued its Memorandum, the Court filtered out certain consumer statutes and certified Class 1 under the statutes of 41 states. Furthermore, the Court has recently indicated that it will use jury instructions to further group the statutes.

The Track 2 Defendants do not advance any arguments supporting a reversal of course for Track 2. Defendants' principal authorities, which are the same as those advanced by the Track 1 Defendants, are distinguishable. They involved ***defective products*** that invoke subsidiary concepts of duty of care, foreseeability, and complex medical/scientific causation

---

[41] The Sixth Circuit later reversed certification of a no-opt-out settlement class on constitutional considerations, *In re Telectronics Pacing Sys.*, 221 F.3d 870 (6th Cir. 2000), but left intact Judge Spiegel's rationale for nationwide certification.

-26-

issues, which lead to legal inquiries that can vary substantially from state to state.[42]  In contrast,

the present case is a consumer fraud, market-wide *pricing* action involving standardized conduct

by Defendants and not the variety of individual fact and legal issues associated with products-

liability actions.  Consequently, Defendants' cases are not persuasive.[43]

## E.    Certification Is Proper Under Rule 23(b)(2)

Defendants claim that the Court cannot certify under Rule 23(b)(2), Defs. Br. at 37-39,

but they are incorrect.  Defendants overstate the challenges of certification pursuant to Rule

23(b)(2), which provides that a class action is maintainable when "the party opposing the class

has acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a

whole."  *Griffin v. Burns*, 570 F.2d 1065, 1072 (1st Cir. 1978) (quoting the rule).

In Track 1, the Court certified Class 3 pursuant to Rule 23(b)(2), ruling that Pipefitters,

BCBSMA, and Health Care for All each were proper class representatives.[44]  This approach

neutralizes Defendants' contention that "Rule 23(b)(2) certification is . . . not appropriate

because Plaintiffs seek predominantly monetary damages."  *See* Def. Br. at 38.  As the court in

---

[42] *See* Defs. Br. at 22-26 (citing, *inter alia, Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1019 (7th Cir. 2002) (too many questions surrounding whether and why tires failed made case unmanageable); *Castano v. American Tobacco Co.*, 84 F.3d 734, 743 (5th Cir. 1996); *In re Am. Med. Sys.*, 75 F.3d 1069, 1085-86 (6th Cir. 1996); *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995); *In re N. Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig.*, 693 F.2d 847, 850 (9th Cir. 1982); *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998)).

[43] Citing *Remco Enters., Inc. v. Houston*, 677 P.2d 567 (Kan. App. 1984), Defendants claim that Plaintiffs' "novel, excess-provider-profit" claim will require inquiry into whether each state statute permits "excess profit" theories of recovery. Defs. Br. at 26. But this is a classic red-herring. *Remco* involved an unconscionability inquiry into procedural abuses arising out of contract formation or relating to the contract terms and, more specifically, whether it was unconscionable to charge a total of $1,768 in installment payments for a television that had a retail value of $850. *Id.* at 572. *Remco* does not apply here; nor does the inquiry proposed by Defendants. This is not an "excess profits" case but, rather, one challenging Defendants' unfair and deceptive acts in publishing phony AWPs and then marketing the spread in order to game the system.

[44] It also certified Class 3 pursuant to Rule 23(b)(3).

*Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997), noted, a court may adopt a "hybrid approach" where "a (b)(2) class seeks monetary as well as injunctive or monetary relief." *Id.* Thus, a court can exercise its discretion properly by "certifying a (b)(2) class as to claims for declaratory or injunctive relief, and a (b)(3) class as to claims for monetary relief, effectively granting (b)(3) protections including the right to opt out to class members at the monetary relief stage." *Id.* (citations omitted).

As for Defendants' contention that Plaintiffs require no prospective injunctive relief because of the Medicare Modernization Act, the fact is that Class 3 TPPs continue to reimburse on the basis of AWP. Injunctive relief, and monitoring by the Court for compliance with its eventual order, is as necessary now as ever.

On a final note, Defendants' contention that Health Care For All ("HCFA") has no knowledge that its members have been injured as a result of the alleged AWP scheme is inaccurate. Def. Br. at 38. An HCFA representative testified that, given the sweeping breadth of the alleged scheme and the size and makeup of their membership, it was her understanding that their members had been directly affected.[45] Defendants have also misinterpreted HCFA's testimony concerning injury to HCFA itself. Defendants claim that HCFA testified that it had not been injured by Defendants' scheme, when in fact the testimony given indicated that HCFA had not suffered any "damages."[46] As used in the context of the deposition at issue, the term "damages" was used repeatedly to refer to monetary damages, not the general concept of "injury."[47]

---

[45] Berman Decl., Ex. 9 (May 23, 2006 Deposition of Melissa Shannon at 184).

[46] *Id.* at 181:16-18.

[47] *Id.* at 57:12-20, 64:16-21.

-28-

### III.   PLAINTIFFS HAVE STANDING AND CLAIMS THAT ARE TYPICAL OF OTHER CLASS MEMBERS, AND THEY ARE ADEQUATE CLASS REPRESENTATIVES

Defendants advance several arguments in support of their claim that Plaintiffs have failed to establish that they have standing and otherwise challenge their adequacy and typicality under Rule 23(a). Defs. Br. at 32-37. As demonstrated below, none of those arguments withstand scrutiny.[48] Defendants use the generic concept of "standing" to engage in an inappropriate foray into the merits of the claims of the proposed Track 2 class representatives. Defendants' attacks on the claims of these class representatives should be rejected because the Medicare Part B beneficiaries proffered as Track 2 Class representatives all suffered from cancer,[49] all received a host of cancer and other medications covered under Medicare part B, and all "made . . . or incurred an obligation enforceable at the time of judgment to make, a co-payment based on AWP for a Medicare Part B covered Subject Drug . . . that was manufactured" by one or more Track 2 Defendants. Class Order at 1-2 (footnote omitted). Similarly, the proposed Class 2 representatives "made reimbursements for drugs purchased in Massachusetts, or . . . made reimbursements for drugs and have their principal place of business in Massachusetts, based on AWP for a Medicare Part B covered Subject Drug . . . ." Class Order at 4-5. Accordingly, these Plaintiffs should be approved as adequate representatives of the Track 2 Classes.

---

[48] In addition to the arguments rebutted below, Defendants also claim that Plaintiffs did not give Defendants notice of their claims. Defs. Br. at 32. Plaintiffs have done so. *See* Berman Decl., Ex. 10. Plaintiffs also incorporate herein their Response in Opposition to Aventis Motion for Summary Judgment for Failure to Provide Mass. G.L. Chap. 93(a) Demand and Motion for Leave to File an Amended Complaint.

[49] Unfortunately, three of the individual plaintiffs have passed away, two during the pendency of this case.

A.      **All Track 2 Multi-Source Manufacturers have Participated in an AWP Inflation Scheme that has Affected the Median, thereby Injuring all Plaintiffs and Class Members Reimbursing for a Particular J-Code Encounter**

A centerpiece of the Track 2 Defendants' attack on class certification is their contention that, because CMS reimbursed these drugs with a standardized J-code, no single company can be held liable for these products, because no single company's AWP was used as the sole basis for reimbursement. However, as discussed *supra* in Section II.C.2, the fact that Medicare used a standardized or median AWP for multi-source prescription medications makes claims based on those products more, not less, appropriate for class certification.

Even in those instances where an individual Plaintiff's reimbursement for a multi-source Subject Drug cannot be traced with certainty to a particular Track 2 Defendant, that Plaintiff nonetheless has standing because he or she has been injured by the Track 2 Defendants. All generic manufacturers have the incentive to maintain the median AWP as high as possible in order to increase the spreads of all manufacturers relative to potential alternative therapeutic competitors; all generics launch with an AWP fairly close to the AWP of the related branded drug and stay relatively constant; and then generic manufacturers compete amongst themselves on spread through a reduction in their ASPs. Apr. 6, 2006 Hartman Decl., ¶ 21. All such manufacturers therefore affect the median AWP at which multi-source drugs are reimbursed.[50] Thus, for all Track 2 Defendants that report inflated AWPs and play the "spread game" (and they all do), they have injured all Plaintiffs who have reimbursed for a drug encounter within the J-Code. In other words, because the standardized AWPs used by Medicare for multi-source drugs were calculated from all AWPs for that drug, each Defendant who submitted an inflated AWP is

---

[50] And this occurs even if in those few instances where the manufacturer's reported AWP is less than the median; as long as that AWP is inflated (and it is), the median is impacted.

liable for every reimbursement that was based on the standardized AWP, regardless of whose particular brand of the multi-source drug ultimately was purchased by the Plaintiffs. Moreover, the existence of one standardized, formulaic AWP for a drug with multiple sources lends itself easily to a common methodology for classwide proof of damages with respect to such drugs.

This approach comports with long-recognized theories of alternate and market-share liability, where the Massachusetts Supreme Court has acknowledged the relaxation of "traditional identification requirement in appropriate circumstances so as to allow recovery against a negligent defendant" the portion of a plaintiff's damages represented by that defendant's market share. *Payton v. Abbott Labs*, 386 Mass. 540, 574, 437 N.E.2d 171 (1982) (rejecting any relaxation of requirement under the particular facts of the case); *see also Mahar v. Hanover House Indus.*, 5 Mass. L. Rep. 234, 1995 Mass. Super. Lexis 1, at *3 (Super. Ct. 1995).[51]  Because "[c]onsumers may be harmed by a product not traceable to a specific producer," various federal and state courts around the country reason that the "traditional tests of liability are insufficient to govern the obligations of manufacturer to consumer in such situations, and some adaptation of the rules of causation and liability seems appropriate." *McCormack v. Abbott Labs.*, 617 F. Supp. 1521, 1525 (D. Mass. 1985); *see also Spencer v. Baxter Int'l, Inc.*, 163 F. Supp. 2d 74 (D. Mass. 2001).  Several jurisdictions thus find that a market-share-liability theory is appropriate in certain products-liability cases where identifying the specific wrongdoer is impossible. *See, e.g., Morris v. Parke, Davis & Co.*, 667 F. Supp. 1332, 1342 (C.D. Cal. 1987) (applying market-share liability where harm caused by DPT vaccine); *Conley v. Boyle*

---

[51] Underlying this flexibility is the notion that "tort law is a continually expanding field" in which it becomes necessary to "adopt[] new rules of causation, for otherwise innocent plaintiffs would be left without a remedy." *Russo v. Material Handling Specialities Co.*, 4 Mass. L. Rep. 288, 1995 Mass. Super. Lexis 436, at *15 (Super. Ct. 1995) (quoting *Smith v. Cutter Biological, Inc.*, 823 P.2d 717, 724 (Haw. 1991)).

*Drug Co.*, 570 So. 2d 275, 283 (Fla. 1990) (applying market-share liability where cancer caused by DES); *Smith v. Cutter Biological, Inc.*, 823 P.2d 717, 727 (Haw. 1991) (applying theory where blood product contained HIV virus).

A plaintiff unable to meet the traditional identification requirement can nonetheless establish standing by demonstrating: (i) that the plaintiff used the product; (ii) that the product caused the plaintiff's subsequent injuries; (iii) that the defendant produced or marketed the type of product used by the plaintiff; and (iv) the defendant acted negligently in producing or marketing the product. *Russo v. Material Handling Specialties Co.*, 1995 Mass. Super. Lexis 436, at \*16; *McCormack*, 617 F. Supp. at 1526; *Martin*, 689 P.2d at 382; *Mahar v. Hanover House Indus.*, 1995 Mass. Super. Lexis 1, at \*3-4. Analogous factors apply here, as each Plaintiff reimbursed for a specific J-Code encounter marketed by the Defendants in question, and Defendants caused the injury complained of given each Defendant's participation in the AWP inflation and spread marketing scheme.[52]

The policy factors cited by the *McCormack* court also apply here. In that DES case, the court emphasized that the plaintiff was not at fault for the lack of identification evidence because the drug was produced in a generic form, drug companies and pharmacies did not keep or were unable to locate pertinent records, and the delay in the drug's effect "played a significant role in

---

[52] For similar reasons "alternative" liability also applies and shifts the burden of proof of the causation-in-fact element to multiple defendants who have acted independently when only one of them caused harm to the plaintiff and it is impossible to identify the specific wrongdoer. *Russo*, 1995 Mass. Super. Lexis 436, at \*20 (citing *Summers v. Tice*, 199 P.2d 1, 4 (Cal. 1948); *Restatement (Second) of Torts*, § 433B(3) (1965)). Under this doctrine, a plaintiff unable to meet the traditional identification requirement must prove that (i) all the defendants have acted tortiously; (ii) defendants' conduct was substantially simultaneous and of the same character, and created substantially the same risk of harm; (iii) the plaintiffs have been harmed by the conduct of one of the defendants and have brought all possible defendants before the court; and (iv) the plaintiffs, after the exercise of due diligence and through no fault of their own, cannot identify which defendant caused the injury. *Spencer v. Baxter Int'l, Inc.*, 163 F. Supp. 2d at 79; *Russo*, 1995 Mass. Super. Lexis 436, at \*22; *Restatement (Second) of Torts*, § 433(B)(3). If these four requirements are satisfied, the burden of proof shifts to each defendant to show through a preponderance of the evidence that it did not manufacture the product that harmed the plaintiff. *Id*. Defendants who fail to meet their burden of proving that they did not cause harm are jointly and severally liable to the plaintiff. *Russo*, 1995 Mass. Super. Lexis 436, at \*20.

the unavailability of proof." 617 F. Supp. at 1525. Furthermore, the court recognized that all the

defendants shared a degree of culpability in producing and marketing an allegedly defective drug

that posed a risk of injury to the public. *Id.* The court additionally found that drug companies

are in a better position to absorb the cost of injury than the plaintiff, who would otherwise bear

the burden alone. *Id.* at 1526; *see also Sindell v. Abbott Labs.*, 607 P.2d 924, 936 (Cal. 1980);

*Martin v. Abbott Labs.*, 689 P.2d 368, 381-82 (Wash. 1984).[53]

**B.      Defendants Know to Whom They Have Sold Subject Drugs**

In claiming that Plaintiffs' proposed classes are not ascertainable, Defendants claim that

"[d]etermining whether any consumer or TPP made a payment based upon AWP for a subject

drug sold by a Track 2 Defendant is a difficult, complex and fact-intensive process requiring

third-party discovery." Defs. Br. at 39. Defendants are wrong.

Defendants' arguments are belied by papers filed by certain individual Track 2

Defendants who, in order to prove that they allegedly did not sell their subject drugs to providers

identified in the records of Class 1 and Class 2 plaintiffs, searched *their own sales records* to

make this determination. Notably, Young claims to have conducted individual analysis of

Abbott's direct and indirect sales data to determine that Abbott did not sell gentamicin sulfate to

Oregon Urology Specialists in Springfield, Oregon, where Mr. Howe, a proposed Track 2 Class

1 representative (and already a representative in Track 1), was administered the drug.

---

[53] The policy rationales underpinning alternative liability also apply. Under this theory, courts prevent "the injustice of permitting proved wrongdoers, who among them have inflicted an injury upon the entirely innocent plaintiff, to escape liability merely because the nature of their conduct and the resulting harm has made it difficult or impossible to prove which of them has caused the harm." *Russo*, 1995 Mass. Super. Lexis 436, at *21; *Spencer*, 163 F. Supp. 2d at 78; *Restatement (Second) of Torts*, § 433(B)(3) cmt. f (1965). Massachusetts courts have demonstrated a willingness to shift the burden of proof to multiple defendants where an innocent plaintiff would otherwise be left remediless. *See, e.g., O'Connor v. Raymark Indus., Inc.*, 401 Mass. 586, 518 N.E.2d 510, 513 (1988) (applying joint-and-several-liability doctrine to shift burden of proof of causation to multiple defendants whose several acts concurrently caused plaintiff's indivisible injuries); *Chase v. Roy*, 363 Mass. 402, 408, 294 N.E.2d 336, 340 (1973).

Declaration of Steven J. Young Related to Track 2 Class Certification on Behalf of Abbott Laboratories, Inc ("Young Abbott Decl."), ¶ 14 and n.8.  In addition, Mr. Sellers opines that "[t]he sales data produced to the plaintiffs in this case for Abbott Subject Drugs formerly sold by Abbott's Products Division reflects the customers purchasing products from Abbott.  Based on a search of that data, one could determine whether Abbott sold a particular drug product to a particular customer."  Affidavit of Michael W. Sellers, ¶ 6 (attached to Young Abbott Decl.).

Similarly, as part of its argument that it allegedly did not manufacture the Solu-Cortef administered to Mr. Young, another proposed Track 2 Class 1 representative (and already a representative in Track 1), Defendant Pharmacia determined that no chargebacks had been issued to the Oklahoma Arthritis Center, the provider that administered the drug to Mr. Young.  *See* Pharmacia Br. at 4 n.4 (citing Decl. of Steven Roh, ¶ 3).  Pharmacia also claims that it did a "thorough search" of its sales and chargeback records to determine that it allegedly never sold the products in question to two providers identified in Sheet Metals' sample claims data.  *Id.* at 5 (citing Roh Decl. ¶¶ 4-5).  Indeed, in order to administer the chargeback system under which Defendants reimburse wholesalers for the difference between the price at which they purchased Defendants' drugs and the contract price (and in some cases outside a contracting context) at which they sold them to providers, the Track 2 Defendants must know to what providers their products are sold.  *See*, *e.g.*, Declaration of Jennifer Fountain Connolly In Further Support of Plaintiffs' Motion to Certify Claims With Respect to Track 2 Defendants ("Connolly Decl."), ¶ 3 (citing Sellers Dep. Tr. at 140 ("We were not able to track the ultimate price the wholesaler may have charged a customer.  But we were able to track that the sale was made and to which customer it was made and that the chargeback was made to the Rx-Link price.") (Highly Confidential)).

Thus, while the Track 2 Defendants claim that extensive third party discovery would be required in order to determine whether they manufactured the version of a multi-source drug administered to a patient, in reality it would only involve a simple search of the Track 2 Defendants' own internal data and records.  However, the Track 2 Defendants, like the Track 1 Defendants before them, have either refused to provide this data or have refused to provide Plaintiffs with the means of interpreting the data that Defendants have actually provided so that Plaintiffs can verify Defendants' purported "thorough searches."  *See* Declaration of Donald E. Haviland, Jr. Esquire in Support of Plaintiffs' Reply Memorandum in Further Support of Motion to Certify Claims With Respect to Track 2 Defendants ("Haviland Reply Decl.") at ¶¶ 84, 88. As the Court implicitly recognized during the Track 1 class certification proceedings, if Defendants refuse to produce this data – or the means to interpret it – they cannot complain that Plaintiffs have failed to uncover the information elsewhere.  In the face of such clear proof that Defendants hold the keys to the door into product identification, at a minimum, this Court should permit the proffered Plaintiffs to proceed as Class representatives, absent some further showing by the manufacturer defendants that they did not sell to Plaintiffs' providers.[54]

---

[54] While Class Plaintiffs could not locate case law directly on point, there is precedent in other contexts for courts accepting plaintiffs' allegations of fact as true in the absence of definitive proof to the contrary by defendants where defendants were in a better position than plaintiffs to ascertain the facts. *See, e.g. Marshall v. CSX Transp. Co.,* 916 F. Supp. 1150, 1152 (M.D. Ala. 1995) (citing *Lacy v. ABC Ins. Co.,* 1995 WL 688786, at \*3 E.D. La. Nov. 17, 1995) (allowing federal court to consider the citizenship of fictitious defendant on remand because "the fact that the defendant was in a better position than the plaintiff to ascertain the citizenship of the non-diverse defendant at the commencement of the action in state court is a factor that weighs in favor of considering a fictitious defendant's citizenship for diversity purposes").

C.     **Sheet Metals Is an Adequate Representative and Has Claims Typical of the Members of Classes 2 and 3**

   1.     **Sheet Metals made reimbursements for beneficiaries residing in Massachusetts**

Citing the Court's choice of law analysis for Class 1, Defendants claim that Sheet Metals

cannot be a representative for Class 2 because it only has claims under Tennessee, and not

Massachusetts, law. Defs. Br. at 33 (citing *In re AWP*, 230 F.R.D. at 82). But the Court made

clear that its Class 1 choice of law analysis did not apply to Medigap payors such as Sheet

Metals. Class 2 membership includes "[a]ll Third-Party Payors who made reimbursements for

drugs purchased in Massachusetts, or who made reimbursements for drugs and have their

principal place of business in Massachusetts, based on AWP for a Medicare Part B covered

Subject Drug that was manufactured by [Track One Defendants]." *In re Pharm. Indus. Average*

*Wholesale Price Litig.*, 233 F.R.D. 229, 231 (D. Mass. 2006). Defendants not only fail to

dispute the fact that this definition includes Sheet Metals, but also ignore this Court's ruling

already appointing Sheet Metals as a Class 2 representative with regard to Plaintiffs' claims

against the Track 1 Defendants based on Sheet Metals' reimbursements for claims of its

beneficiaries who during the class period resided in Massachusetts. *See id.*[55] Accordingly, the

---

[55] Even if Defendants are correct that Sheet Metals' claim must be analyzed under Tennessee law, they incorrectly review the Tennessee Consumer Protection Act ("TCPA"). As even Defendants concede, *Tucker v. Sierra Builders*, 180 S.W.3d 109 (Tenn. Ct. App. 2005), only arguably stands for the proposition that class actions are prohibited under the TCPA. Yet, there have been at least ten decisions in Tennessee addressing proposed class actions brought under the TCPA. *See, e.g., Blake v. Abbott Labs., Inc.*, C.A. NO. 03A01-9509-CV-00307, 1996 Tenn. App. Lexis 184 (Tenn. Ct. App. Mar. 27, 1996) (reversing entry of motion to dismiss proposed class action). Likewise, *Bennett v. Visa U.S.A., Inc.*, E2005-00659-COA-R9CV, 2006 Tenn. App. Lexis 203 (Tenn. Ct. App. Mar. 27, 2006), merely held that a tying arrangement, typically remedied as an anti-competitive action under antitrust law, could not be challenged under the TCPA. Because Defendants have not argued that Plaintiffs are fundamentally challenging anti-competitive conduct, *Bennett* does not apply.

Court should reject the Track 2 Defendants' attempt to apply to this Court's Class 1 choice of law analysis to Sheet Metals' claim.[56]

## 2.    Other Responses Related to Sheet Metals

With the exception of Watson, each Track 2 Defendant referenced below conducted only an incomplete review of the drug encounters for which Sheet Metals reimbursed. Rather than analyzing the *complete* claims data made available by Sheet Metals on a rolling basis from December 30, 2005 to February 8, 2006, these Defendants analyzed only the *sample* data attached to the Affidavit of Glenn Randle, submitted as Exhibit 2 to plaintiffs' motion for class certification, representing about 10% of the data produced by Sheet Metals. *See* Connolly Decl., ¶¶ 2, 6-13. A full analysis of all of the data either reveals critical flaws in each Defendant's assertions or will after a more complete review is conducted.

### a.    Abbott

Abbott claims that Sheet Metals' reimbursement of vancomycin falls outside the class period. On the contrary, documents produced by Sheet Metals clearly show that Sheet Metals reimbursed for the administration of this drug in 2004. *See* Connolly Decl., ¶ 2. Likewise, Abbott also incorrectly asserts that Sheet Metals did not reimburse for heparin sodium and A-Methapred (methylprednisolone sodium) during the class period. However, documents

---

[56] In arguing that this Court cannot certify Class 2 because of the purported variations in expectations of Medigap payors, Track 2 Defendants grossly distort the testimony of Sheet Metals' trustee, Glenn Randle. Defendants imply that Sheet Metals did not investigate how its Medicare Part B co-payments were calculated and instead passed on increases caused by Defendants' conduct to its members. Defs. Br. at 8. First, Defendants' argument is irrelevant. Because by statute Sheet Metals (and every other member of proposed Class 2) had to pay 20% of AWP, no amount of "investigation" would have prevented Sheet Metals from paying an overcharge. Second, Mr. Randle never testified that Sheet Metals could or did pass on Defendants' overcharges to its members. Instead, Mr. Randle generally testified that "[t]hese [Sheet Metals beneficiaries] are fixed-income people [and] their cost to this Fund is dependent upon our expense." Defs. Br. Ex. 49 (Randle Dep., at 138).

produced by Sheet Metals show reimbursements for heparin sodium in 1998 and 2001. *See* Connolly Decl., ¶ 4.

Young's claim that Sheet Metals' reimbursements for leucovorin calcium were not based on AWP because they were based on Hospital OPPS methodology is false. Leucovorin calcium was approved as a pass-through drug under the OPPS system and was therefore, ***contrary to Young's claims***, not bundled with other services under an Ambulatory Payment Classification (APC), but was reimbursed at 95% of AWP. *See* Connolly Decl., ¶ 15.[57] Moreover, in claiming that Sheet Metals' reimbursements for Abbott's Subject Drugs were not based on AWP, Young simply assumes that Abbott "primarily" sells to hospitals because he wholeheartedly adopts the Affidavit of Michael Sellers. However, the statement in Mr. Sellers' overbroad Affidavit is clarified by his more specific deposition testimony in this case as well as his testimony in a parallel AWP case pending in West Virginia, both of which make clear that not all sales from Abbott's "Hospital Products Division" are to hospitals. In his Affidavit, Sellers neglects the fact that Abbott's "Hospital" Products group had an entire "Alternate Site" division dedicated to selling to entities other than hospitals and whose reimbursements were often based on AWP, such as nursing homes and oncology clinics. As Mr. Sellers testified in his deposition, "alternate site was actually a business sector that encompassed several business units aimed at non-hospital customer base." Connolly Decl., ¶ 3 (citing Sellers Dep. taken in *West Virginia v. Abbott Labs., Inc.* (Oct. 28, 2004), at 21 (ABTAWP/MDL 071437)); *see also id.* (citing Dec. 20, 2005 Sellers

---

[57] Young makes this assertion on many drugs throughout his submission. As made clear by the objective evidence, Young is dead wrong. *See* Connolly Decl., ¶ 15. Again, Young is not an expert and his opinions are either the result of sloppy work or deliberate distortion. Frankly, his errors are so egregious that he and/or Defendants should be sanctioned.

-38-

Dep. Tr. at 25-56 (describing, drug-by-drug, the target markets, including customers other than hospitals, for the Abbott drugs at issue in this case)).[58]

Abbott next claims that Sheet Metals' reimbursements could not have been Abbott's version of those drugs because, as set forth in the Affidavit of Joseph Fiske submitted in support of Abbott's Opposition, Abbott no longer sells the vast majority of its Hospital Products Division products. Although Mr. Fiske fails to say this, Abbott no longer sells those products because it spun off its Hospital Products Division as a separate company called Hospira, and Hospira now sells those products. However, the products at issue in this case were not transferred from Abbott to Hospira until May 2004. *See* Connolly Decl., ¶ 5. Sheet Metals reimbursed for heparin sodium and A-Methapred injections in August and October of that same year (2004). *Id.* Because many injectable drugs have shelf lives of a year or more, the fact that Sheet Metals' reimbursements occurred only months after the Hospira spinoff proves nothing. In addition, because the inflated AWPs submitted by Abbott prior to spinning off Hospira helped "rise the tide" that inflated the standardized AWP used by CMS for reimbursement during those years, Abbott can and should be held liable for its conduct with regard to those drugs.

      **b.**    **Aventis**

Aventis claims that Sheet Metals' reimbursement for Anzemet was based on the Hospital OPPS system. To the contrary, documents produced by Sheet Metals clearly show Part B reimbursement for Anzemet administered in an oncology clinic. *See* Connolly Decl., ¶ 6.

---

[58] In addition, Mr. Sellers claims that all of the Abbott Subject Drugs are multi-source drugs. Sellers Aff. ¶ 5. However, Calcijex is a brand drug. *See* Connolly Decl., ¶ 3 (Sellers Dep. Tr. at 40).

### c.  Baxter

Baxter asserts that heparin sodium was reimbursed under the hospital OPPS system. However, documents produced by Sheet Metals clearly show Part B reimbursement for the drug in a doctor's office and an oncology clinic. *See* Connolly Decl., ¶ 7.

### d.  Dey

Dey claims that Sheet Metals' only reimbursements for albuterol sulfate and ipratropium bromide were made outside the class period. But documents produced by Sheet Metals show the administration of both drugs in 2003. *See* Connolly Decl., ¶ 8.

### e.  Fujisawa

Fujisawa claims that the dexamethasone sodium phosphate and fluororacil for which Sheet Metals reimbursed were administered after May 31, 1998, the date it sold its interest in generic drugs to American Pharmaceutical Products. Fujisawa fails to consider, however, that these drugs were administered in July and August of 1998, less than three months later. Because fluorocil and dexamethasone sodium phosphate are capable of having shelf lives of 16 months and three years, respectively, it is certainly likely these drugs were manufactured by Fujisawa and administered several months later. *See* Connolly Decl., ¶ 9.

Fujisawa also asserts that Sheet Metals reimbursed for Fujisawa's branded Prograf (where there are not the multi-source issues discussed above) in a transaction where, although the Sheet Metals beneficiary resided in Massachusetts, the drugs were rendered in Pennsylvania and supplied from Illinois. *See* Connolly Decl., Ex. 14 (SMWMASS 000352-54). Fujisawa claims this means that the drugs at issue were not "purchased in Massachusetts." However, Fujisawa's position runs counter to the Court's "conclusion that the home state of the consumer has a more significant relationship to the alleged fraud . . . ." *In re AWP*, 230 F.R.D. at 82-83.

-40-

For this reason, Fujisawa's argument about where the drugs were "purchased" and "rendered" are irrelevant.

### f.  Pharmacia

Pharmacia claims that it did not sell Adrucil to any providers Sheet Metals reimbursed for those drugs. However, since Pharmacia did not analyze Sheet Metals' full claims data, this assertion must be rejected. Sheet Metals reimbursed several additional providers for those drugs. *See* Connolly Decl., ¶ 11.[59]

### g.  Watson

Although Watson is the sole Track 2 Defendant who examined Sheet Metals' entire Massachusetts production rather than the sample attached to the Affidavit of Glenn Randle, Watson's claims still fail. Watson concludes that, based on its analysis of IMS data, "it is highly unlikely or virtually impossible that any of the generic drugs listed [in Sheet Metals' claims data] were manufactured or distributed by Watson or any of its affiliates." Watson Br. at 5. However, Watson's analysis is based upon its sales volume (according to IMS data) and is not based on the particular Sheet Metals transactions at issue. While Watson clearly could have searched its own sales data to determine whether Watson distributed its products to the providers to whom Sheet Metals paid reimbursements for Watson drugs, it has not done so. Because Watson is in sole possession of the data that could satisfy whether Sheet Metals' reimbursements were made for a Watson drug, its argument must be rejected.

---

[59] For the three drugs for which Sheet Metals reimbursed reflected in the *samples* attached to Mr. Randle's affidavit, Adriamycin, Neosar and Adrucil, Pharmacia has already searched its records and purportedly determined that Pharmacia did not sell those drugs to the provider identified in the sample attached to Mr. Randle's declaration. For Plaintiffs to do the same analysis for the full and complete Sheet Metals data Plaintiffs provided to Defendants, Plaintiffs would need the information Pharmacia clearly has but has refused to produce.

Watson challenges Sheet Metals' INFeD reimbursements on the basis that the drugs were administered outside of Massachusetts even though the Sheet Metals beneficiary resided in Massachusetts. As explained above in response to Fujisawa's arguments, Watson's argument concerning where the drugs were administered is irrelevant under the Court's class certification order.

Watson also claims that Sheet Metals has not submitted any documentation of actual payment or reimbursement. To the contrary, simply because no EOB appeared in Sheet Metals' paper claims data does not mean that Sheet Metals did not pay for those drugs. *See* Connolly Decl., ¶ 14.

Finally, Watson claims that Plaintiffs have submitted no evidence that INFeD for which Sheet Metals reimbursed was in fact manufactured by Watson because that product's J-Code is shared with Dexferrum. However, as Plaintiffs explained above, Watson has the information necessary to establish whether Sheet Metals reimbursed for a drug manufactured by Watson, and Watson has refused to produce it. Therefore, proving Sheet Metals' reimbursement was for Watson's INFeD would not require "exhaustive, transaction-by-transaction inquiry into the medical records of each patient who received iron dextran," (Watson Br. at 8); it would instead only require that the Track 2 Defendants search their purchase records for this information.

Watson further claims that Sheet Metals has not set forth any evidence that the version of the iron dextran product for which Sheet Metals reimbursed was not the version marketed by American Regent Laboratories, Inc., a competitor of Watson's. However, as with the multi-

source issue, Watson is in possession of this information, not Plaintiffs, but it has refused to provide it.[60]

## D.    Pipefitters Is an Adequate Representative and Has Claims Typical of the Members of Class 3

### 1.    Pipefitters is not subject to "unique defenses"

In both their omnibus memorandum and in some of their individual briefs, Defendants claim that Pipefitters is an inadequate class representative by virtue of the fact that Pipefitters' contracts with BCBSMA to process its pharmaceutical claims. Defendants claim that BCBSMA had knowledge of the prices available for subject drugs below AWP and that Pipefitters is charged with that same knowledge. Defs. Br. at 34; Abbott Br. at 5. Defendants' arguments are without merit.

As an initial matter, Defendants' claim that BCBSMA was aware of the general availability of prices for subject drugs below AWP is inaccurate.[61] Even the fact that BCBSMA at one point purchased, by contract, some of the subject drugs directly from some Defendants does not support the contention that BCBSMA knew the drugs were available to *all* providers at prices below AWP. The purchases analyzed by Defendants were made by a separate subsidiary of BCBSMA for use in various staff model HMOs in the mid-90's. Defendants have provided no facts to support the contention that those responsible for purchasing for the staff model HMOs at the time had any contact with the BCBSMA entity responsible for setting reimbursement for

---

[60] Watson also claims that "if the drug administered to the patient was Watson's drug, it would prove that the provider had not purchased based on the spread between the acquisition price and AWP because the margin on the competitive iron detran product was greater than on Watson's product." Simply because a competitor offered a *larger* spread than Watson does not mean that Watson itself was not marketing the spread of its product.

[61] *See* Deposition of Deborah Devaux, Senior Vice President for Healthcare Contract Management for BCBSMA ("Devaux Dep.") at 217:1-21, 256:9-20 (Berman Decl. Ex. 11); *see also* Declaration of Raymond S. Hartman in Opposition to Defendants' Motion for Summary Judgment at 12-17.

pharmaceuticals under their insurance products. Even if BCBSMA was aware of the fact that the staff-model HMO was able to purchase drugs at a discount off of AWP, BCBSMA could not assume that the discount price available to BCBSMA, a very large provider of health care at the time, would be available to all independent physicians in their insurance network. BCBSMA's reimbursement policy needed to adequately reimburse all physicians in their network. Their reimbursements were set at AWP ████████████████████████

████████████████████████████████████ [62]

Even if the Court finds that BCBSMA was in fact sophisticated and had knowledge of the general availability of subject drugs at prices below AWP, it is not proper to impute this knowledge to Pipefitters. Defendants' own authorities make plain that only when an agent "acquires knowledge *in the scope of her employment* . . . is [the principal] held to have constructive knowledge of that information." *DeVaux v. Am. Home Assurance Co.*, 444 N.E.2d 355, 358 (Mass. 1983) (emphasis added) (citations omitted); *Clean Harbors, Inc. v. John Hancock Life Ins. Co.*, 64 Mass. App. Ct. 347, 833 N.E.2d 611, 623 n.13 (2005) ("knowledge *possessed or obtained by a business's agent in relation to a transaction* is imputed to its principal") (emphasis added) (citation omitted). Defendants, including Abbott, which writes separately on the issue, do not contend that BCBSMA obtained the supposed pricing knowledge they wish to impute to Pipefitters in the course of performing the administrative duties for which Pipefitters contractually engaged it. In fact, there is no evidence to support any such contention. Accordingly, even if BCBSMA had any such pricing knowledge, Pipefitters could not be charged with it.

---

[62] *See* Berman Decl., Ex. 11 (Devaux Dep. at 129:3-20; *Id.*, Ex. 12 (Deposition of Michal T. Mulrey, Manager of Provider Reimbursement for BCBSMA ("Mulray Dep.") at 87:14-20, 88:4-8).

### 2.     There is no inherent conflict among members of Class 3

Defendants again attack Pipefitter's adequacy as a Class 3 representative by virtue of its contractual relationship with BCBSMA by claiming it creates an inherent conflict among Class 3 members.  As stated above, Defendants' initial premise, that BCBSMA was aware that subject drugs were available generally at prices well below AWP, is a faulty one.  Defendants use this false premise to then claim that Pipefitters is an inadequate class representative because it has a claim against BCBSMA, creating an inter-class conflict.  Defs. Br. at 35.  Defendants' contention is incorrect because their initial premise is incorrect.  However, even if the Court accepts the premise that BCBSMA had such knowledge, it does not create an insurmountable obstacle to certification of Class 3 or to Pipefitters as a representative of Class 3.  Defendants fail to recognize that this Court has already resolved these issues in the context of Track 1 Defendants and found Pipefitters to adequately represent Class 3.

### 3.     Pipefitters' interests are identical to the consumers in Class 3

Defendants claim that Pipefitters cannot adequately represent consumers in Class 3 because they have different economic interests, citing this Court's decision in *In Re AWP*, 230 F.R.D. at 80.  Defs. Br. at 34.  However, in that decision the Court addressed the question of whether TPPs were adequate representatives of the Medicare Part B consumers, and the Court concluded that they were not – in part because of a potential conflict of interest.  In the context of Class 3, a conflict does not exist between TPPs and consumers.  The payments the class seeks to recover on behalf of consumers are, by definition, a percentage of the payments made by the TPPs in Class 3.  Pipefitters' interest and motivation to prove up liability and maximize recovery is identical and not in conflict with the interests of consumers in Class 3.

-45-

Defendants also cite the differences between M.G.L ch. 93A, § 11 and § 9 as a basis for the claim that Pipefitters cannot represent consumers. Defs. Br. at 34-35. Although 93A, §§ 9 and 11 are distinct because the former grants a cause of actions to consumers, whereas the latter grants a cause of action to those in trade or commerce, courts have recognized that "principles establishing §9 cases often apply to §11 cases." *Kansallis Fin. Ltd. v. Fern*, 421 Mass. 659, 671 n.10, 659 N.E.2d 731 (1996).

### 4. Other Responses Related to Pipefitters

#### a. Aventis

Aventis' claim that Pipefitters has not provided adequate and admissible proof of its purchases is not true. Aventis Br. at 6-7. Plaintiffs made available and produced to Defendants all purchase information in BCBSMA's purchase records electronically. Those records include all of the pertinent information, in electronic form, about Pipefitter's purchases of Subject Drugs. Additionally, the Track 2 Defendants had notice of and the ability to attend the depositions of BCBSMA personnel who maintain Pipefitters' purchase records and who were responsible for producing identifying Pipefitter's purchase data as well as the deposition of Pipefitters.

#### b. Fujisawa

Fujisawa's claim that the one drug encounter evidenced by Plaintiffs' moving papers was a purchase made after May 31, 1998, the date Fujisawa sold its interest in all generic drugs, is countered by additional drug encounters for Fujisawa's products that were recently identified by a further search of Pipefitters' purchase data.[63] The chart of these additional encounters indicates

---

[63] *See* Chart of Additional Pipefitters Drug Encounters Related to Defendant Fujisawa attached as Ex. 13 to the Berman Declaration.

that Pipefitters purchased the drug Aristocort (triamcinolone) as early as October of 1997, well before Fujisawa claims to have stopped selling the drugs at issue.

### E.   Each Individual Plaintiff Is an Adequate Representative and Has Claims Typical of the Members of Classes 1 and 3

Apart from the general J-Code issue discussed above, Defendants' attacks on the individual class representations should be rejected.  Plaintiffs respond below by defense assertion.[64]

#### 1.   "We didn't sell to that provider"

Abbott contends that it did not sell gentamicin sulfate *directly* to Mr. Howe's provider, and therefore cannot be held liable for any damages.  *See* Abbott Br. at 3.  But, as explained above, Abbott is still liable if, as Plaintiffs contend, CMS utilized Abbott's inflated AWP to calculate a standard AWP for the drug, regardless of whether Abbott sold directly to the provider.

#### 2.   "We stopped selling the drug on a date certain"

Fujisawa claims that, because it stopped selling gentamicin sulfate after 1998, it should not be held liable for the Howes' purchases of the drug in 2000 and 2001.  *See* Fujisawa Br. at 3.  But, as Plaintiffs will show at trial, the inflated AWPs submitted by Fujisawa prior to Mr. Howe's purchases helped "raise the tide" that inflated the standardized AWP used by CMS for reimbursement in later years, including 2000 and 2001.  Fujisawa can and should be held liable for all of the effects of its unfair and deceptive conduct, including the effects that lasted after Fujisawa's conduct allegedly ended.

---

[64] The specifics relating to the individual Plaintiffs' evidentiary proffer in reply to the Track 2 Defendants' arguments are detailed in the Haviland Reply Declaration filed contemporaneously herewith.

Similarly, Immunex and its expert assert that because Immunex has not marketed or sold

Novantrone since 2003, it should not be held liable for Robert Howe's purchase of the drug in

December 2005. *See* Young, ¶ 78; Immunex Br. at 3-4. It also contends that this purchase is

atypical because it does not fit within the class period, which the Court previously ruled (as to

the Track 1 Defendants) would end on January 1, 2005, when CMS began reimbursing based on

ASP, rather than AWP. *See id.* As Plaintiffs pointed out in their opening papers, however, the

CMS reimbursement for the Howes' 2005 purchase of Novantrone was not based on the

prevailing ASP, but appears to have been based upon the earlier 2003 AWP for the drug – an

inflated AWP that was set by Immunex. Therefore, the Howes' claim is typical of all other

consumers who were charged an AWP-based price for Novantrone, and as for the notion that

Immunex should not be held liable for an inflated 2003 Novantrone AWP since it stopped selling

Novantrone in 2003, Plaintiffs' response is the same as in the preceding paragraph respecting the

similar argument made by Fujisawa, *i.e.* that the Defendants still may be held liable for having

caused harm to the Howes (and the Track 2 Class they seek to represent) by raising the tide that

inflated the AWP-based price paid by Plaintiffs.

### 3.    "Not our drug"

Larry Young submitted evidence that his late wife, Patricia Young, ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was

evidently not Pharmacia's, because it allegedly was not reimbursed based on Pharmacia's AWP

for the drug. *See* Young, ¶ 78. In this particular instance, however, the provider's billing records

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮  *See* Young 0061, attached as part of Haviland Decl., Ex. E in Plaintiffs' opening

-48-

papers (the "Original Haviland Decl."). Consequently, Pharmacia cannot overcome the clear

evidence from the provider that it was Pharmacia's drug that was administered to Plaintiff

Young.[65]  In any event, Pharmacia is liable regardless of who manufactured the product, because

it submitted an inflated AWP used to calculate a standard formulaic AWP.

### 4.      "We didn't sell *that* drug"

Mr. Young (the class representative) submitted documents clearly showing that Mrs.

Young ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬, which is manufactured by

both Aventis and Fujisawa. The Original Haviland Declaration, however, mistakenly refers to

the product as "triamcinolone acetate." *See* Haviland Reply Decl., ¶ 17. Aventis,

Aventis/Behring and their expert seize upon this typographical error and claim that because

Aventis did not sell or manufacture "triamcinolone acetate," it cannot be held liable. *See* Young,

¶ 78; Aventis Br. at 4; Aventis Behring Br. at 3. The Court should not follow Aventis' invitation

to ignore the underlying documentary evidence.[66]

### 5.      "Plaintiffs can't represent their deceased spouse's estate"

Aventis alone seeks to resurrect an issue plainly put to rest during the briefing and

argument on Track 1 class certification: whether the spouses of deceased patients may advance

the joint claims of the couple for drug overcharges.[67]  This Court previously rejected efforts to

---

[65] It is also noteworthy that Pharmacia does not deny that it sold ▬▬▬▬▬▬▬▬▬▬
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ In the face of Pharmacia's own evidence that it can determine such fact,
Pharmacia's silence on the subject should speak volumes as to the issue. *See* Pharmacia Br. at 4 (wherein Pharmacia
simply contends, based upon the analysis of its data by an employee of its law firm, that "Pharmacia as no records of
chargebacks provided to the Oklahoma Arthritis Center for Solu-Cortef").

[66] Unlike Aventis – which disingenuously seeks to capitalize on the error – co-defendant Fujisawa noted the
discrepancy and responded regarding triamcinolone acetonide, the drug referenced in the documentary evidence.
*See* Fujisawa Br. at 3 & n.2.

[67] *See* Aventis Br. at 5 (challenging Larry Young's representation of his wife). The lack of unanimity amongst
the Defendants on the right of a spouse to represent estates is evidenced by the fact that, *inter alia*, Fujisawa accepts
both Larry Young and "the Clarks" as proposed representatives (Fujisawa Br. at 3-4), Immunex accepts "Joyce

capitalize on the unfortunate deaths of certain of the Medicare Part B beneficiaries in this case –
now counting three[68] – to defeat the proper joint claims of the elderly couples who have suffered
as a result of the drug companies' fraudulent marketing and sales practices. The Court has
allowed *both spouses* to act as representative plaintiffs for their joint claims in light of the
declining health condition of the patients, and it has not found the surviving spouse to be
inadequate after the patient who took the Subject Drugs has passed away. *See, e.g.*, Transcript
and Order approving Larry Young and Joyce Howe. Moreover, the Court already has certified
Mr. Young and Mrs. Howe as class representatives for Track 1 Defendants. Patricia Young died
intestate, and under Oklahoma law, her interest in property jointly owned with her surviving
spouse (including her claim against Defendants) passed to him. *See* 84 Okl. St. § 213(B). In any
event, Mr. Young was a joint payor with Mrs. Young, and he brings claims in his own name as
well as that of his late wife.

### 6.    "If the doctors didn't charge AWP, the Plaintiffs didn't pay AWP"

Amgen, like other Defendants, refers to the Plaintiffs' lack of knowledge as to whether
their providers' charges were based on Amgen's AWP to support their position that the charges
allegedly were not based on AWP. Amgen Br. at 7. This argument completely misses the mark:
the issue is not whether a doctor's *charges* were based on AWP, it is whether the Plaintiff's
*payments* were based on AWP, in whole or in part. *See, e.g.*, Class Order at 1-2 (certifying a
Track 1 Class 1 of "[a]ll natural persons who made . . . a co-payment based on AWP"). While
Plaintiffs gladly accept Amgen's concession that there is no "knowledge defense" pertaining to

---

Howe, individually and on behalf of the Estate of Robert Howe." (Immunex Br. at 3), and Pharmacia accepts "[t]he
claims of Larry Young...based on two prescriptions given to his wife, Patricia Young, without challenge on this
basis" (Pharmacia Br. at 2).

[68] The decedents include Mrs. Young, Mr. Clark and Mr. Howe (the last two of which died in the last year
during the pendency of class certification proceedings in this case).

Mr. Carter due to his lack of knowledge of Amgen's inflated AWP for Aranesp®, Amgen skirts the broader issue that, regardless of what Mr. Carter was being billed by his doctor, his 20% co-insurance payment under Medicare was based on AWP, due to the clear statutory mandate that covered Mr. Carter's treatment.[69]   Amgen (and others) seek to deflect the Court's attention from AWP-based payments under Medicare to random provider charges in excess of AWP. However, no matter how much higher than AWP provider charges were, these charges were irrelevant to the actual amount allowed by Medicare and, in turn, billed to patients like Mr. Carter and paid by them. The record is clear that Mr. Carter's 20% co-payments under Medicare were based on AWP. *See generally* Haviland Reply Decl., ¶¶ 45-47.[70]



[69]  [redacted] As discussed in the Original Haviland Declaration, [redacted] Moreover, the portions of the deposition transcript upon which Amgen relies, *see* Amgen Br. at 7 n.43, demonstrate that these round amounts were on-going monthly payments " [redacted] " Carter Dep. Tr. at 43, 46. [redacted] *See* Amgen Br. at 7-8.

---

[70]  Amgen also argues that Mr. Carter cannot himself maintain an action under Texas's consumer protection act because, according to Amgen, "he must show, among other things, that he relied upon Amgen's allegedly false AWPs." Amgen Br. at 5. But only if a plaintiff seeks to bring a so-called "laundry list" claim under Texas's CPA must he or she prove reliance. Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(A)-(B); *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693 (Tex. 2002). There is also a cause of action available under the Texas CPA for "any unconscionable action or course of action by any person." Tex. Bus. & Com. Code Ann. § 17.50(a)(3). That statutory cause of action does *not* contain a reliance requirement. *Id.*; *see also Weitzel v. Barnes*, 691 S.W.2d 598, 600 (Tex. 1985) (explaining that a general reliance requirement was rejected by the legislature). This nullifies Amgen's cynical questioning of an elderly cancer patient about the intricacies of its own false, misleading, and deceptive pricing scheme.

### 7.     "Plaintiffs have not shown they were not reimbursed"

Amgen, in a "double-negative" assertion,[71] claims that "█████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████" Amgen Br. at 8.  Amgen is
wrong. ██████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████[72]  That
is all this Court has required for adequacy.

### 8.     "Plaintiffs' can't prove the merits of their case under state consumer laws"

Amgen and others lodge premature attacks on the ability of Plaintiffs to succeed on the

merits of their claims under various state consumer laws.  For instance, Amgen attacks

Mr. Carter's adequacy by claiming he cannot establish the elements of his claim under the law of

Texas where he resides (*i.e.* reliance, knowledge, causation).  *See* Amgen Br. at 5-6.  Because

these arguments go to the merits of the case, they are premature at this stage of the litigation and

should be ignored by the Court.[73]

---

[71] Rather than Amgen itself providing this Court with affirmative proof ████████████████
███████████████ Amgen seeks to shift to Plaintiffs the more difficult task of
proving that they were not otherwise reimbursed by some collateral source after making AWP-based payments for
their drugs.  Plaintiffs suspect that the reason for this is that Amgen tried, but failed, ████████████
█████████████

[72] The Original Haviland Declaration cites Mr. Carter's testimony, which states that ███████████████
████████████████████  *See* Original Haviland Declaration at ¶ 19.  The Haviland Reply Decl.
provides further evidence Mr. Carter paid.  *See id.* at ¶¶ 45-47.

[73] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

### 9.     "The Plaintiff made a flat co-payment"

Dey's central but misguided assertion is that Mr. Walters paid "flat co-payments" for his Dey albuterol received from his respiratory medication mail order provider, Med4Home, pursuant to Med4Home's financial assistance program for indigent persons.[74]  Dey Br. at 1.  The evidence, however, unambiguously demonstrates that Mr. Walters is an adequate Class 1 representative whether or not the purported financial assistance program was effective as to him at the time of his receipt of and payment for Dey's product.[75]  *See* Haviland Reply Decl., ¶¶ 48-62.

### 10.     "Amgen has unique defenses"

Amgen claims that individual issues relating to its unfair and deceptive trade practices will so overwhelm common issues as to render a class action inefficient, but Amgen is wrong. Amgen repeats arguments about the statutory payment scheme for Epogen ESRD uses that it made to no avail in its serial motions to dismiss.  In some instances, reimbursement for Epogen occurred outside the statutory-payment framework.  Exhibit A, attached to Amgen's Brief,



[75] There is no issue as to product identification relating to Dey's albuterol product.  Dey does not dispute that Mr. Walters received Dey's albuterol pursuant to prescriptions filled and sent by Med4Home on December 10, 2003 and January 7, 2004, or that these prescriptions were the first of the respiratory medications provided by Med4Home to Mr. Walters.

illustrates that Medicare reimbursed for Epogen administered in a physician's office, and for hospital outpatient, non-ESRD administrations, based on AWP. *See also* Amgen Br. at 2. While Amgen argues that reimbursement was made on the basis of Procrit's AWP, as long as there was a published AWP upon which reimbursement for a given drug was based, it was possible for any Defendant to effect the scheme of which Plaintiffs complain simply by lowering actual acquisition costs for that given drug in the face of that known AWP. That method of amplifying a spread is as effective as increasing the AWP while leaving acquisition costs alone, or increasing the AWP while simultaneously effecting lower net acquisition costs.[76]

As for Aranesp, Amgen concedes that certain uses during the class period were based on AWP. Amgen Br. at 3 & Ex. B. The only "individual inquiry" that needs to be made to ascertain where and when the drug was administered will be a simple matter of reviewing the documentation to be provided at the time of claims submittals. Regarding Amgen's contention that in one setting, at one time period, reimbursement was made on the basis of Procrit's AWP, again, the critical fact is that reimbursement was made on the basis of a known AWP.



---

[76] Moreover, the published AWPs for Epogen and Procrit in 2004 were remarkably similar. *See* Haviland Reply Decl., ¶ 27 & Ex. D.

-54-





Haviland Reply Decl., ¶¶ 66-68 and Ex. N.  Accordingly, Mr.

Bean qualifies as yet another Class 1 representative.

## IV.    CONCLUSION

For the foregoing reasons, in addition to those appearing in Plaintiffs' opening

memorandum, the Court should certify the Track 2 class claims.

DATED: July 19, 2006.

By____/s/ Steve W. Berman_____
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

---

[77] Claiming that reliance is a required element of North Carolina's CPA, Amgen also cites to the Aaronsons' understandable failure to comprehend all of the details of Amgen's deceptive pricing scheme. But that statute does not require reliance. *See Stetser v. TAP Pharm. Prods. Inc.*, 598 S.E.2d 570, 584 (N.C. Ct. App. 2004) (AWP drug case similar to the instant case); *Cullen v. Valley Forge Life Ins. Co.*, 589 S.E.2d 423, 431 (N.C. Ct. App. 2003) (citing *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 622 (N.C. 1980), *overruled in part on other grounds, Boyd v. Drum*, 501 S.E.2d 91 (N.C. Ct. App. 1998); *Poor v. Hill*, 530 S.E.2d 838, 845 (N.C. Ct. App. 2000)). *Pearce v. American Defender Life Insurance Co.*, 343 S.E.2d 174, 180 (N.C. 1986), a state supreme court case cited by Amgen and relied on by other lower-court cases that Amgen cited, states only that "the second requisite to making out a claim under this statute is *similar* to the detrimental reliance requirement under a fraud claim. It must be shown that the plaintiff suffered actual injury as a proximate result of defendants' deceptive statement or misrepresentation." *Id.* (emphasis added). Saying that one concept is *similar* to another is not to say that the two concepts are identical, especially where the court went on to say exactly what it meant.

[78] Amgen concedes that reimbursement for Epogen administered in 2004 in a physician's office to non-ESRD patients was based on Procrit's AWP. Amgen Br. at 2. As discussed above, the fact that reimbursement was made, and co-payments were assessed, based on Procrit's published AWP permitted Amgen to effect its unfair and deceptive pricing scheme as surely as if the basis had been Epogen's own published AWP. *See also* n.76, *supra*.

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
Wexler Toriseva Wallace LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

-58-

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on July 19, 2006, I caused copies of **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO CERTIFY CLAIMS WITH RESPECT TO TRACK 2 DEFENDANTS** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

/s/ Steve W. Berman
Steve W. Berman

001534-16 120211 V1