UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION** | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris |
| **THIS DOCUMENT RELATES TO:** | |
| STATE OF NEVADA V. ABBOTT LABORATORIES, INC., ET AL., CA NO. CV-02-00260-ECR (Nevada I) | Chief Magistrate Judge Marianne B. Bowler |
| STATE OF NEVADA V. AMERICAN HOME PRODUCTS, ET AL., CA NO. 02-CV-12086-PBS (Nevada II) | **ORAL ARGUMENT REQUESTED** |

**DEFENDANTS' JOINT MEMORANDUM IN SUPPORT OF DEFENDANTS'
JOINT MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE**

Pursuant to Case Management Order No. 2 ("CMO No. 2"), FED. R. CIV. P. 37, and the

Court's inherent management powers, the Nevada II Defendants ("Defendants") respectfully

request that this Court redress the spoliation of evidence by the Plaintiff State of Nevada (the

"State" or "Nevada") by deeming the State to admit the facts, set forth in Exhibit A hereto, that

destroyed evidence likely would have documented.  In disregard of its legal obligations and

CMO No. 2, Nevada failed for years, until it was too late, to order its employees to preserve

evidence that would have belied the State's allegations of fraud by demonstrating knowledge of

information of which Nevada claims to have been ignorant.  The remedy requested – preventing

Nevada from denying what the destroyed evidence likely would have shown – places the parties

in the position they likely would have occupied if the State had simply complied with its

obligations and CMO No. 2, with uncertainty on that point resolved against the party who caused

it.  Anything less would allow Nevada to gain advantage from its disregard of law.

## INTRODUCTION

Nevada alleges that it understood AWP (Average Wholesale Price) "to be a national average of list prices charged by wholesalers to pharmacies and, with few exceptions, [to] constitute the manufacturer's suggested list price for a wholesaler to charge a pharmacy for a drug." Dkt. Entry No. 922, at ¶ 97. Based on this purported understanding of AWP, Nevada asserts that the Defendants defrauded, deceived, and misled the State by publishing "overstated" AWPs that "bore little relationship to the drugs' pricing in the marketplace." *See id*. at ¶ 136.

Defendants' deny the State's allegation that it was defrauded, deceived, or misled regarding AWP. To the contrary, Nevada's Medicaid pharmacy program knew that AWPs did not approximate provider acquisition costs, was not by any stretch of anyone's imagination a suggested price for any transactions, and instead served simply as a benchmark for price negotiations. Persons responsible for the design, implementation and administration of Nevada's Medicaid pharmacy program have testified that they had this knowledge, and deny the ignorance that Nevada now attributes to them. They also testified to having received OIG Reports from the federal government and reports from their own pharmacy consultants detailing spreads for the drugs in question comparable to those that the State alleges comprise the same fraudulent scheme that is the core of its case. Yet virtually all of those reports and other documents have been lost from the State's files or destroyed because Nevada took no action to preserve them. Despite contemplating litigation as of May 2000 *at the latest*, litigating this case for over three years since it was filed in 2002, and being subject to a July 2002 court-ordered mandate to preserve its documents, the State failed *until 2005* to notify any of its key employees – including the Medicaid program staff, the Nevada Medicaid Administrator, or the head of the Department of Health and Human Services – of this litigation or their obligation to preserve relevant records. In

fact, a hold on the destruction of relevant documents was not put into place until November 2005, by which time much of value to the Defendants had been lost or destroyed.

Certain documents, which confirm the State's knowledge of matters it denies in court, have been identified in depositions of State officials and through third-party discovery as having likely been in Nevada's possession during the relevant time period, including:

> U.S. HHS-OIG Reports, including the January 1997, February 1997, April 1997, August 1997, November 2001, December 2001, February 2002, March 2002, and September 2002, reports, and other federal government publications discussing the meaning of AWP and the substantial differences between AWP and actual acquisition costs for drugs;

> A late 1980s study by Keith MacDonald, the former Chief of Nevada Medicaid, regarding drug costs, which existed in Nevada's files at some point during the 2001-2005 time period;

> Internal documents discussing Nevada's assessment of the 2002 margin analysis that was created and produced to Nevada by Myers & Stauffer LC ("Myers & Stauffer") in the context of the State's 2002 pharmacy reimbursement rate change, and stated pharmacies were acquiring a class of generic drugs at AWP-83%;

> Communications with other state Medicaid programs, other Nevada state agencies, and the Defendants regarding the meaning of AWP and the substantial differences between AWP and actual acquisition costs, examples of which are set forth herein; and

> Documents reflecting internal discussions regarding the above-referenced documents in the context of changes and/or assessments of Nevada's Medicaid reimbursement rate.

These documents can no longer be found in the State's files, likely owing to Nevada's three-year-plus-thirty-day document retention policy.  Because Nevada's failure to preserve documents for *five and a half years* is prejudicial given its much shorter document retention policy, Defendants submit that nothing less than the preclusion order requested could make them whole.

## BACKGROUND AND PROCEDURAL HISTORY

Nevada's obligation to preserve documents relevant to this litigation began in May 2000. In that month, L. Timothy Terry, Esq., the senior attorney in the Medicaid Fraud Control Unit of Nevada's Office of Attorney General and then President of the National Association of Medicaid Fraud Control Units ("NAMFCU"), sent letters to Defendants that made clear Nevada was contemplating litigation.  *See* Ex. B.  The Defendants' responses expressly disavowed that AWP was a market price.  *See* Ex. C.[1]  Importantly, Nevada made no efforts to notify key employees of the coming litigation so that they could preserve relevant documents.  *See, e.g.,* Deposition of Charles Duarte, Vol. I, 121-22, 129-30 (November 15, 2005), attached at Ex. Q with other deposition excerpts cited herein; *see also* Deposition of John Liveratti, 54 (November 17, 2005).

Throughout this litigation, Nevada has known the importance of OIG Reports, reports of its own pharmacy consultants, and other documents discussing the meaning of AWP to the central issue in the case – whether responsible Nevada officials knew of the spreads between AWP and provider acquisition cost.  On January 17, 2002, Nevada filed its initial complaint. Following removal of the Nevada cases to this Court and consolidation with Civil Action No. 01-12257-PBS in October 2002, Nevada became subject to CMO No. 2, which states that, "[a]ll parties acknowledge their responsibilities to take reasonable steps to comply with the law regarding preservation of documents."  Dkt. Entry No. 135, ¶ 9.  The Defendants, who already alerted the State to the fact that its knowledge of AWP was going to be an issue as early as 2000

---

[1] While these letters represent the first communication between Mr. Terry and certain Defendants relating to Nevada's investigation, the Plaintiff had known about its claims long before this date.  In June 1999, the U.S. Department of Justice ("DOJ") and NAMFCU made presentations to states concerning a nationwide investigation they had been conducting into the reporting of AWP.  Because Mr. Terry was President of NAMFCU during this time period, he surely knew of the Plaintiff's claims at this time, nearly a year before he sent the letters to Defendants, if not prior to the June 1999 meeting.

in responses to Mr. Terry's letters, reiterated their position in motions to dismiss, answers, and discovery requests. *See, e.g.*, Dkt. Entry Nos. 523, 897, 902-03, 905-07, 910, 913, 915, 924.

In response to Defendants' discovery requests, the State produced the Nevada Division of Health Care Financing and Policy's ("DHCFP") records retention policy ("Retention Policy"). DHCFP administers Nevada's Medicaid program. As Michael Willden, the Director of the Nevada Department of Health and Human Services and person ultimately responsible for Nevada's Medicaid program, testified, the Retention Policy calls for maintaining hard copy documents for "three years and thirty days" unless a longer period is specifically identified for a category of documents in the Retention Policy. *See* Deposition of Michael Willden, 48 (March 21, 2006). When faced with litigation, Nevada's Retention Policy requires that a "disposition hold" be put into place in order to stop the destruction of records pertaining to the lawsuit until resolution of the case. *See* Ex. D.[2]

In November 2005, Defendants deposed Charles Duarte, the Medicaid Director from 2000 to the present, Mel Rosenberg, an Information Systems Manager at Nevada Medicaid from 2003 to the present, and John Liveratti, DHCFP's Chief Compliance Officer from 2003 to the present. They testified that they were not aware of any "disposition hold" in effect at DHCFP as of the date of their depositions, which occurred *five and a half years after* Mr. Terry's letters to the Defendants. *See* Relevant Excerpts from Duarte, Rosenberg, and Liveratti Depositions, attached at Ex. Q. Following these depositions, on November 30, 2005, Mr. Duarte put a "disposition hold" in place and sent a document preservation notice to DHCFP employees *for the first time*. *See* Deposition of Coleen Lawrence, Vol. III, 488-93 (March 23, 2006).

---

[2] Importantly, the Retention Policy does not apply to electronic documents, which are only maintained for several months unless an individual, on his or her own initiative, chooses to archive a specific document on his or her computer. *See* Duarte Deposition, Vol. I at 129; *see also* Deposition of Mel Rosenberg, 24-25 (November 15, 2005).

In December 2005, the Defendants filed an emergency motion requesting that this Court: (1) hold Nevada in contempt for failure to comply with its document preservation obligations; and (2) order that Nevada take immediate steps to preserve relevant documents, determine the extent of the relevant documents lost through Nevada's failure to comply with its obligations, and make an accounting to the Court regarding documents destroyed. *See* Dkt. Entry No. 1941. While Defendants have been able to obtain a limited accounting of lost or destroyed relevant documents from State employees through depositions, there are likely many more such documents that Defendants cannot identify because information necessary for such an undertaking lies solely in Nevada's possession. As a result, Defendants encourage the Court to grant the relief requested in that motion in addition to the relief requested here.

Despite this filing, further depositions of non-Medicaid employees, which were ordered by this Court in March 2006, and taken the week of May 22, 2006, revealed that representatives of these agencies – who clearly had relevant documents at one time – had *never* been asked to retain documents. *See* Deposition of Michael Hillerby, 20-21, 179-85 (May 23, 2006); *see also* Deposition of Donna Lopez, 157 (May 25, 2006); Deposition of Steven. J. Abba, 134-35 (June 27, 2006); Deposition of Emmanuel Ebo, M.D., 128-29 (June 28, 2006).[3]

As the record shows, Nevada understood: (i) its obligation to preserve documents; (ii) the documents that were relevant to this case; and (iii) the employees who would have such documents. It simply waited over five years to live up to its obligations.

---

[3] Michael Hillerby worked for the Governor of Nevada as deputy chief of staff and then chief of staff from March 2001, through February 2006, and stated in his deposition that the production of documents from his office made by Nevada represented only approximately 15%-20% of the documents relating to pharmacy reimbursement that passed through his office from March 2001, to February 2006. *See* Hillerby Deposition at 184-85. Donna Lopez works for Nevada's Public Employee Benefits Services, Mr. Abba is an employee of the Nevada Legislative Counsel Bureau, and Dr. Ebo works for Southern Nevada Adult Mental Health Services.

## ARGUMENT

It is well settled that a party to litigation has a duty to preserve potentially relevant documents.  *See McGuire v. Acufex Microsurgical, Inc.*, 175 F.R.D. 149, 152-53 (D. Mass. 1997); *see also Vazquez-Corales v. Sea-Land Servs., Inc.*, 172 F.R.D. 10, 11 (D. P.R. 1997). This duty arises once litigation becomes reasonably foreseeable, or upon the filing of a complaint.  *See McGuire*, 175 F.R.D. at 153 (holding that duty to preserve arises when party on notice that documents may be relevant to potential litigation); *see also Wm. T. Thompson Co. v. Gen. Nutrition Corp., Inc.*, 593 F. Supp. 1443, 1455 (C.D. Cal. 1984); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D. N.Y. 2003).  Courts have held that litigation is reasonably foreseeable under this analysis where circumstances suggest that a party should anticipate litigation or where a party engages in actions consistent with having an awareness that a lawsuit is forthcoming.  *See McGuire*, 175 F.R.D. at 153; *see also Dahoda v. Switches, Inc.*, No. 99-01272, 2005 WL 3591990, *5 (N.D. N.Y. Dec. 30, 2005).[4]

This litigation was reasonably foreseeable to Nevada in May 2000 *at the latest*.  When Mr. Terry sent letters to the Defendants evidencing clear knowledge of the claims in this action, Nevada had a duty to (i) preserve potentially relevant evidence; (ii) notify relevant employees of the State's preservation obligations; (iii) establish a "disposition hold"; and (iv) preserve its electronic documents.  *See Zubulake*, 229 F.R.D. at 432-41.  Despite this obvious duty and the reminders provided by the filing of the complaints, CMO No. 2, and the motion practice and discovery requests referenced above, Nevada disregarded its obligations until November 30, 2005.  *See* Duarte Deposition, Vol. III at 62-75; *see also* Lawrence Deposition, Vol. III at 488-

---

[4] *See also Fire Ins. Exch. v. Zenith Radio Corp.*, 103 Nev. 648, 651-52, 747 P.2d 911, 913-14 (1987) (holding that a "litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant" to potential litigation).

93. As a result, relevant documents were routinely destroyed under the three-year-thirty-day Retention Policy, depriving the Defendants of relevant evidence.

## I.   Nevada's Disregard of the Law and CMO No. 2 Should Be Redressed To Avoid Harm to the Defendants.

There can be no doubt that redress is required where, as here, a plaintiff disregards its duty to preserve documents for *five and a half years* and the dereliction of its duty deprives the defendants of favorable evidence.  Pursuant to its inherent powers,[5] this Court may impose a preclusion order against a party that fails to preserve relevant documents when litigation is reasonably foreseeable in circumstances such as these.  *See McGuire*, 175 F.R.D. at 153; *see also Wm. T. Thompson*, 593 F. Supp. at 1455.  In determining whether such an order is appropriate for spoliation of evidence, courts consider the following:  (1) whether spoliation of evidence relevant to a claim occurred; (2) whether a duty to preserve relevant evidence existed at the time it was destroyed; (3) whether the spoliating party willfully destroyed evidence or did so in bad faith; and (4) whether the moving party suffered prejudice.  *See McGuire*, 175 F.R.D. at 154; *Kelley v. United Airlines, Inc.*, 176 F.R.D. 422, 427-28 (D. Mass. 1997); *Computer Assocs. Int'l, Inc. v. American Fundware, Inc.*, 133 F.R.D. 166, 168-70 (D. Colo. 1990).[6]

The cases of *Computer Assocs. Int'l, Inc.* and *Wm. T. Thompson Co.* are illustrative.  In *Computer Assocs. Int'l, Inc.*, a defendant followed a retention practice, common in the software industry, whereby it maintained only the most recent source codes for software programs.  *See Computer Assocs. Int'l, Inc.*, 133 F.R.D. at 168.  The defendant continued this practice despite:

---

[5] Pursuant to Rule 37(b)(2) and Rule 37(d) of the Federal Rules of Civil Procedure, courts are also authorized to sanction parties for failure to comply with court orders or discovery obligations after litigation has commenced.  *See* Fed. R. Civ. P. 37(b)(2), (d); *see also National Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 641-43 (1976) (ordering sanctions for spoliation pursuant to Rule 37); *McGuire*, 175 F.R.D. at 153 (recognizing ability to sanction under Rule 37).

[6] While bad faith is an appropriate consideration in cases such as this one, it is not an essential prerequisite for sanctions.  *See Kelley*, 176 F.R.D. at 427.  Carelessness or negligence is sufficient for the purposes of this analysis.  *See id.*

(1) knowing of, and attempting to resolve, the plaintiff's concern that it had violated the relevant software agreement; (2) the filing of the complaint; (3) service of a request for documents; and (4) the filing of a motion to compel relevant evidence. *See id*. at 168-69. The Court found that the destruction of the source code occurred after defendant became subject to preservation obligations, and that the defendant acted willfully by intentionally destroying documents under its retention policy after the duty to preserve arose despite clear notice and reminders of its obligations. *See id*. at 169-70. Because the destroyed documents constituted the best evidence relating to the key issues in the litigation, the court held that the plaintiff was "seriously prejudiced" and entered default judgment against the defendants. *See id*. at 170.

In *Wm. T. Thompson Co.*, the defendant failed to retain certain documents and "did not instruct its employees to preserve the [relevant records] or make any other efforts reasonably calculated to ensure that those records would be preserved." *Wm. T. Thompson Co.*, 593 F. Supp. at 1445-47. The defendant's document destruction occurred despite pre-litigation correspondence between counsel, the filing of the complaint, service of discovery requests by the plaintiff, depositions, and the filing of a motion for a preliminary injunction. *See id*. Based on these actions, the court found that the defendant acted in bad faith, violated local rules, likely violated court orders, and prejudiced the plaintiff. *See id.* at 1447-54. The court then entered default against the defendant and dismissed its related complaint. *See id*. at 1456.

Nevada's failures to preserve documents went on for approximately 57 months longer than in *Computer Assocs. Int'l, Inc.* and at least 18 months longer than in *Wm. T. Thompson Co. See Computer Assocs. Int'l, Inc.*, 133 F.R.D. at 170; *see also Wm. T. Thompson Co.*, 593 F. Supp. at 1443-54. The State's blatant disregard of its obvious preservation obligations despite constant reminders constitutes willfulness under the analysis above. Moreover, Nevada's actions

have caused the destruction of documents, described below, that almost certainly would have further established that the State knew AWP was not based on actual prices during the relevant period and was also aware of the large spreads that existed, especially regarding generics.  To be sure, Defendants believe their case is strong and that the Court should grant its forthcoming summary judgment motion even without a preclusion order in place.  Nevada's failure to preserve documents, however, has deprived Defendants of relevant evidence relating to the State's knowledge and decision-making process.  As a result, Nevada should be precluded from taking advantage of gaps in the record created by its own misdeeds.

## II.    Nevada's Disregard of Its Preservation Obligations Has Prejudiced the Defendants.

This Court should redress the prejudice suffered by the Defendants.  *See Headley v. Chrysler Motor Corp.*, 141 F.R.D. 362, 365-66 (D. Mass. 1991); *see also McGuire*, 175 F.R.D. at 156.[7]  When a party's destruction of evidence deprives another of important support for its claims or defenses, severe actions are warranted.  *See Computer Assocs. Int'l, Inc.*, 133 F.R.D. at 169-70 (entering default judgment as sanction for spoliation of evidence pursuant to document retention policy); *see also Wm. T. Thompson Co.*, 593 F. Supp. at 1455-57 (entering default judgment and dismissing claims as sanction for spoliation of evidence); *G-K Properties v. Redevelopment Agency of San Jose*, 577 F.2d 645, 647-48 (9th Cir. 1978) (affirming lower court's dismissal with prejudice, noting that it "encourage[d] such orders"); *Coleman Parent Holdings, Inc. v. Morgan Stanley & Co., Inc.*, No. 03-5045, 2005 WL 674885, *9-*10 (Fla. Cir.

---

[7] The spectrum of sanctions considered by courts for spoliation of evidence generally includes: (1) attorneys' fees and costs; (2) an adverse inference relating to the destroyed evidence; (3) an order establishing facts for the purposes of the litigation based on the subject matter of the destroyed documents; (4) an order precluding the submission of evidence by the offending party; and/or (5) dismissal/default judgment.  *See* Jamie S. Gorelick, et al., DESTRUCTION OF EVIDENCE, § 3.16 (1989); *see also McGuire*, 175 F.R.D. at 156 (stating that sanctions for spoliation can "involve exclusion of evidence or permitting inferences to be drawn against the culpable party").

Ct., March 23, 2005) (ordering certain facts established for all purposes in case as sanction for egregious discovery abuses).

The facts here compel the imposition of the requested preclusion order so that the Defendants can be made whole.  In order to put the Defendants in the position they would have been absent Nevada's failure to preserve these documents, the Court should order that the facts that would have been established by the existence of these documents in Nevada's files – i.e., that Nevada was aware of the meaning of AWP as reflected in these documents and considered this fact in setting and/or assessing its Medicaid pharmacy reimbursement rate – are deemed admitted and established for all purposes in this litigation.  The admissions set forth below are the natural and logical consequences of Nevada's possession of the documents it has failed to produce, with any uncertainty resolved against the party that caused it.  These documents, which were identified through Defendants' discovery, are as follows.

     **A.**    **Federal Government Reports Discussing AWP**

         *1.*    *OIG Reports Discussing AWP*

Through depositions of Nevada's representatives, the Defendants have established that Medicaid employees received and reviewed OIG Reports relating to drug reimbursement during the relevant time period.  With two exceptions from October 2003, and June 2005, Nevada has not kept any of these OIG Reports.  The following are <u>examples</u> of such reports, a complete list of which can be found at Ex. E attached hereto:

> ➢ *September 2002 OIG Report re:  Medicaid Pharmacy – Additional Analyses of the Actual Acquisition Cost of Prescription Drug Products*: Based on a review of data from certain states, estimated that pharmacies, on average, purchased single source innovator drugs at AWP-17.2%, drugs without FULs at AWP-27.2%, multiple source drugs without FULs at AWP-44.2%, and multiple source drugs with FULs at AWP-72.1%.

> ➢ *August 1997 OIG Report re:  Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products*:  Based on a statistical sampling of

pricing information from pharmacies in eleven states, estimated that pharmacies pay an average of AWP-42.5% for generic drugs.

➢ *April 1997 OIG Report re:  Medicaid Pharmacy – Actual Acquisition Cost of Prescription Drug Products for Brand Name Drugs*: Based on a statistical sampling of pricing information from pharmacies in eleven states, estimated that pharmacies pay an average of AWP-18.3% for brand name drugs.

Several employees of DHCFP have testified that they received and/or considered these types of OIG Reports during the relevant time period.  For example, Laurie Squartsoff, a Pharmacy Consultant for DHCFP from approximately 1989 through 2001, stated that it was her practice to review OIG Reports and other publications related to drug reimbursement that came across her desk.  *See* Deposition of Laurie Squartsoff at 36, 59-60 (March 6, 2006).[8]  April Townley, the Deputy Administrator of Nevada Medicaid from 1987 through 1997 and Deputy Administrator of DHCFP from 1997 through 1999, also stated that Nevada received "95 percent" of the documents sent by HCFA, would likely have received OIG Reports from the federal government, and would have filed them under "action transmittals" and by each document's number.  *See* Deposition of April Townley, 34-36, 59-60, 73-74.[9]

In addition to the testimony of Ms. Squartsoff and Ms. Townley, Mr. Duarte stated that he reviewed OIG Reports and HCFA/CMS communications relating to prescription drug reimbursement issues during his tenure at DHCFP.  *See* Duarte Deposition, Vol. I at 60-61. When asked where these federal government reports were kept, he testified that the State retained them in either "our administrative office files or in the archive, or they're destroyed after

---

[8] Ms. Squartsoff confirmed that, if reports or correspondence relating to prescription drugs were received by the State during her employment, these documents would have been sent to her along with a tracking sheet listing anyone else who had reviewed the documents.  *See* Squartsoff Deposition at 63-64, 132-33. Moreover, she identified a red or blue binder containing correspondence between the federal government and the Plaintiff regarding the Plaintiff's drug rebate program, which has not been produced to the Defendants.  *See id*. at 61-63.

[9] In the case of both Ms. Squartsoff and Ms. Townley, a "disposition hold" in May 2000 would have ensured that relevant documents from *at least* April 1997 to the present were preserved.  As the Appendix makes clear, this time period encompassed most of the OIG Reports central to this case.

the holding period." Duarte Deposition, Vol. II at 46-47.  Mr. Duarte also stated that he

received, and subsequently deleted, electronic versions of OIG Reports.  *See* Duarte Deposition,

Vol. III at 19-22.[10]

Not only were the OIG Reports purged or lost, but Nevada has not produced internal

documents discussing them.  The Montana production of documents is illustrative of what one

might expect to have found if Nevada had not destroyed its internal correspondence.  In an

October 1995 internal memorandum, Terry Krantz, a supervisor at Montana Medicaid, wrote to

the program's administrator to inform her of an OIG study comparing AWP to pharmacy

acquisition costs.  Mr. Krantz acknowledged in his memorandum that pharmacy invoice prices

were 42.45% below AWP for generics.  *See* Ex. F.  He then stated that "[w]hile AWP is a

national standard it is apparent from the results of the [OIG] survey that it has little to do with the

acquisition cost of pharmacy products[,]" and suggested that this fact should be taken into

account with respect to that state's reimbursement rate.  *Id.*  In 2002, both Shannon Marr,

Montana's Pharmacy Consultant, and Maggie Bullock, Montana's Administrator of Health

Policy & Services Division, acknowledged in memoranda an OIG study showing that in 1999,

pharmacies were purchasing generic drugs for AWP-65.37% and brand name drugs for AWP-

19.71%.  *See* Ex. G.  Moreover, both memoranda show that despite this difference between

actual acquisition cost and AWP, the state decided to set reimbursement at AWP-15% because it

was concerned that lower reimbursement rates could lead to pharmacies leaving the Montana

Medicaid program.  *See id.*

---

[10] Another current employee, Coleen Lawrence, a Social Services Chief with Nevada's Medicaid
Program from approximately 2001 through the present, testified that the State regularly received
documents from OIG, CMS, and the Government Accounting Office ("GAO").  *See* Deposition of Coleen
Lawrence, Vol. I at 94-96 (August 12, 2005).  Such documents would be sent to her on occasion, and
certain hard copies would be maintained in her file cabinet.  *See id.* at 96.

It is reasonable to expect that similar correspondence existed in Nevada.  However, Nevada has not retained the OIG Reports, related internal documents, or the e-mail account of Ms. Squartsoff, its pharmacy consultant from 1989-2001.  Accordingly, the Defendants request that the Court order the following facts established for all purposes in this litigation:

> Nevada had a practice of maintaining OIG Reports relating to pharmacy reimbursement and circulating them among employees with responsibilities for the Medicaid pharmacy reimbursement rate during the time period relevant to this litigation.  Nevada also had knowledge of the contents of the OIG Reports dated April 1996,[11] through the present relating to AWP and pharmacy reimbursement, and considered these documents in setting and/or assessing its Medicaid pharmacy reimbursement rate.  *See* Relevant OIG Reports, attached hereto at Ex. E.

### 2.    *Other Federal Government Reports Relating to AWP*

As explained by Ms. Lawrence, Ms. Townley, Ms. Squartsoff, Mary Wherry, and Christopher Thompson, Nevada also received CCH publications and federal government reports during the relevant time and considered certain of these reports.[12]  Despite this fact, it has not produced any such publications to the Defendants.  The State's disregard of its preservation obligation has deprived the Defendants of documents showing that Nevada was aware AWP was not an average of wholesale prices and exceeded actual acquisition costs by large amounts.  *See, e.g.,* OIG-RPT, MED-GUIDE ¶45,926, OIG Report on Excessive Medicare Payment for

---

[11] Defendants request that this Court deem Nevada's knowledge as described in this fact admission, and others below, established starting in April 1996, in order to take into account possible delay on the State's part in destroying documents after the expiration of the three-year-thirty-day retention requirement.  *See* Duarte Deposition, Vol. III at 72 (stating that it "assumes a great deal of efficiency in [Nevada's] records retention area" to say that relevant documents were disposed of upon the expiration of the three-year-thirty-day retention requirement); *see also* Squartsoff Memoranda at Ex. H.

[12] Critical OIG Reports were published and distributed by CCH as well as by HHS.  *See, e.g.*, OIG-RPT, MED-GUIDE ¶45,559, Medicaid Pharmacy:  Actual Acquisition Cost of Generic Prescription Drug Products (Aug. 4, 1997), attached hereto at Ex. I.1.  Ms. Townley and Ms. Squartsoff testified that DHCFP received and considered CCH.  *See* Townley Deposition at 42-44, 65-66; *see also* Squartsoff Deposition at 65.  Ms. Lawrence stated Nevada also received publications and correspondence from CMS and the Government Accounting Office, which would have been filed in her filing cabinet.  *See* Lawrence Deposition, Vol. I at 95-96.   The testimony of Ms. Wherry, a Deputy Administrator of Nevada Medicaid from 1999 through the present, and Mr. Thompson, a former chief of Nevada Medicaid, also suggests that the Plaintiff received CCH.  *See* Deposition of Mary Wherry, 106-07 (March 21, 2006); *see also* Deposition of Christopher Thompson, 35-36 (January 6, 2006).

Prescription Drugs (Dec. 1, 1997) (finding that AWP "bear[s] little or no resemblance to actual wholesale prices that are available to the physician and supplier communities that bill" for drugs), attached hereto at Ex. I.2.  Based on Nevada's failure here, the Defendants request that the Court order the following facts established for all purposes in this litigation:

> Nevada had a practice of maintaining CCH and federal government publications relating to pharmacy reimbursement issues and circulating them among employees with responsibilities for the State's Medicaid pharmacy reimbursement rate during the relevant time period.  Nevada also had knowledge of the contents of CCH publications and federal government reports, such as GAO Reports, dated April 1996,[13] through the present, relating to AWP and pharmacy reimbursement, and considered these documents in setting and/or assessing its Medicaid pharmacy reimbursement rate.  *See* Relevant CCH publications and GAO Reports, attached hereto at Ex. I.

### B.     Documents Relating to Changes in and Assessments of Nevada's Reimbursement Formula

During the time relevant to this litigation, Nevada changed its Medicaid pharmacy reimbursement rate twice, in 1988 and 2002, and likely reassessed the rate on other occasions. Defendants are aware from both witness testimony and document discovery that these decisions and assessments were based on information that existed in Nevada's files when this litigation was initiated and has subsequently been destroyed.  For example, Ms. Lawrence, one of Nevada's Rule 30(b)(6) witnesses testified that Keith MacDonald, the former chief of Nevada Medicaid, did a study relating to drug costs while he held this position in the late 1980s.  *See* Lawrence Deposition, Vol. I at 137-38.  Mr. MacDonald, a practicing pharmacist, was at the Medicaid office around the time of the 1988 rate change.  *See* Deposition of Keith MacDonald at 13-18 (March 24, 2006).  He testified that he was aware that AWP was not a market price in the 1980s.  *See id*. at 32-34, 36-39.  In fact, Mr. MacDonald stated that he knew the difference between AWP and actual acquisition cost, and referred to AWP as "artificial wholesale price." *See id*.  Ms. Lawrence saw documents relating to Mr. MacDonald's study in the State's files

---

[13] *See* Section II(A)(1), *supra*, at 14, n.11.

sometime between 2001 and 2005.  *See* Lawrence Deposition, Vol. I at 137.  Yet Nevada's

counsel has represented that the MacDonald study could not be located.[14]  *See* Ex. L.1.

Accordingly, the Defendants request that the Court order the following facts established for all

purposes in this litigation:

> The study done by Keith MacDonald in the late 1980s and viewed in Nevada's files by
> Coleen Lawrence at some point between 2001 to August 2005, is (i) deemed to reflect
> Mr. MacDonald's deposition testimony that AWP was not based on actual market prices
> and exceeded acquisition costs in the late 1980s by 17%-18%; and (ii) the MacDonald
> study is deemed to have been considered by Nevada as part of all changes and/or
> assessments of its Medicaid pharmacy reimbursement rate from 1988 through the present.

Moreover, when Nevada Medicaid changed its reimbursement formula in 2002 from

AWP-10% to AWP-15%, it hired a consultant, Myers & Stauffer, to advise it regarding the price

at which pharmacists acquired drugs.  Myers & Stauffer advised the State that pharmacies

acquired brand name drugs at AWP-18.3%, generic drugs (with no FUL) at AWP-35.1%, and

generic drugs (with FUL) at AWP-83.1%.  *See* Myers & Stauffer Margin Analysis, attached

hereto as Ex. J.  Testimony has made clear that this margin analysis was received by Nevada,

modified by the State, *see* Lawrence Deposition, Vol. III at 470-72; *see also* Deposition of Allan

Hansen at 122-24 (March 1, 2006), and heavily relied upon in its decision to reduce its

reimbursement rate from AWP-10% to AWP-15% in 2002.  *See* Lawrence Deposition, Vol. III at

408-10, 470-72, 480-83.  But Nevada has only produced two versions of this margin analysis, a

memorandum from Myers & Stauffer discussing it, and a few other related documents.  It has not

produced any internal documents discussing its assessment of the findings in the Myers &

---

[14] Similarly, Ms. Squartsoff testified that as DHCFP's Pharmacy Consultant, she conducted
periodic surveys in order to compare the Plaintiff's Medicaid reimbursement rates with those of other
states, other Nevada agencies, and/or third-party payers in order to make sure they were similar.  *See*
Squartsoff Deposition at 88-93.  The Plaintiff has produced two 1995 documents that show the results of
two surveys that Ms. Squartsoff conducted for this purpose.  *See* Ex. H.2, H.3.  Other than a 1992
memorandum comparing the Medicaid reimbursement rate to the rate charged by certain pharmacies for
drugs, *see* Ex. H.1, no other internal assessments by Ms. Squartsoff of the Plaintiff's reimbursement rates
dated prior to 2002 have been produced to the Defendants.

Stauffer survey, potentially obscuring the State's rational for lowering its reimbursement rate to AWP-15% when its own consultants said that pharmacists were acquiring certain drugs at, in some cases, AWP-83.1%.[15]  Because of these deficiencies, the Defendants request that the Court order the following facts established for all purposes in this litigation:

> Nevada had knowledge of the information set forth in the Myers & Stauffer margin analysis, specifically that pharmacies were acquiring brand name drugs at AWP-18.3%, generic drugs (with no FUL) at AWP-35.1%, and generic drugs (with FUL) at AWP-83.1%, and considered this information in setting its reimbursement rate in 2002.

## C.   Communications Between Nevada and Others Relating to AWP

Nevada also communicated with representatives from other state Medicaid programs regarding Medicaid pharmacy reimbursement.[16]  However, very few of these communications have been produced.  In discovery from Montana, Defendants have obtained examples of such communications, on which Nevada Medicaid representatives were copied.  For example, a representative from Arizona Medicaid sent an e-mail to several state representatives, including Janice Wright, the Nevada Medicaid Administrator at the time, in January 2000, stating that Arizona Medicaid was "proposing a two-tiered reimbursement policy for pharmacy---would pay chains with 11 or more locations . . . a fee of $5.51 plus AWP less 17.3 %."  Ex. K.  The Plaintiff

---

[15] Documents produced by Myers & Stauffer prove that there were internal meetings and discussions within the State relating to this margin analysis in the context of the 2002 change in its reimbursement formula, including a January 2003, meeting with the Governor.  *See, e.g.,* E-Mail from Ms. Lawrence to Kevin Londeen re:  AWP Analysis, attached hereto as Ex. M.  Nevada may produce some of these documents when it finally completes its electronic document production, but has not produced such documents to date.  In general, the State has produced very few internal memoranda, e-mails, meeting notes, or other communications that relate to internal analyses, assessments, or discussions of the Plaintiff's reimbursement formula prior to 2002.  *See, e.g.*, 1995 Squartsoff Memoranda at Ex. H.2, H.3.  Testimony regarding the process followed by the State in 2002 strongly suggests, however, that such analyses, assessments, and discussions occurred as part of earlier assessments of Nevada's pharmacy reimbursement rate.  *See, e.g.,* Willden Deposition at 65-66, 107-09, 148-49; Wherry Deposition at 81; Squartsoff Deposition at 199-200 (external discussions); Duarte Deposition, Vol. II at 92-94, 96-99; Duarte Deposition, Vol. III at 43-44, 45-46, 50-53 56-58.

[16] In addition to other states, Defendants have obtained documents from third parties relating to reimbursement, such as e-mails from the Comprehensive Cancer Centers of Nevada involving communications with Nevada Medicaid officials, which would have informed the Plaintiff's understanding of AWP during the relevant time period.  *See, e.g.,* Ex. N.

has represented that it does not have any e-mail sent to Ms. Wright.  *See* Ex. L.2-3.[17]  Ex. O lists

other examples of documents produced by Montana and received by Nevada since January 1999,

that discuss prescription drug reimbursement and, in some cases, AWP-based reimbursement

formulas, and should have been retained by Nevada.[18]  Accordingly, the Defendants request that

the Court order the following facts established for all purposes in this litigation:

> Nevada had knowledge of, and considered in setting and/or assessing its Medicaid
> pharmacy reimbursement rate, all of the reimbursement rates used from January 1999, to
> the present by the Medicaid programs for the states and jurisdictions that participated in
> the e-mail list identified in documents produced by the state of Montana in related
> litigation against the Defendants.

In addition to communicating with other state Medicaid programs, DHCFP also

conducted studies for the purpose of comparing the reimbursement rates of, *inter alia*, other

Nevada agencies to the DHCFP reimbursement rate, and had discussions with other State

agencies that purchased drugs.  In 1995, Ms. Squartsoff created a memorandum that set forth the

reimbursement rates for the Nevada State Industrial Insurance System ("SIIS"), Nevada workers'

compensation program, and third-party payors.  *See* Ex. H.3.  As the document reflects, brand

name drugs were being reimbursed by SIIS at AWP-10% and generics at AWP-40% in 1995.

*See id*.  No documents reflecting subsequent discussions of this study have been produced to the

Defendants.  Ms. Townley also testified that Ms. Squartsoff compared the prices at which other

Nevada agencies purchased drugs to the price at which DHCFP was reimbursing pharmacies and

providers for such drugs.  *See* Townley Deposition at 128-29.  Moreover, Ms. Squartsoff stated

---

[17] Ms. Squartsoff also participated in an e-mail listserve with other state pharmacy consultants,
*see* Squartsoff Deposition at 57-59, but Plaintiff's counsel stated that it does not have e-mail from Ms.
Squartsoff's account.  *See* Ex. L.2-3.

[18] As a result of this Court's March 29, 2006, order, the Plaintiff was required to produce e-mail
as soon as possible.  On June 7, 2006, Nevada began producing e-mail.  Although it is possible that some
of the e-mails discussed above might have been archived, the Plaintiff had no document retention policy
for e-mail and none of the relevant DHCFP employees were informed about the litigation until 2005.
Moreover, the Plaintiff no longer retains any e-mail from a number of key individuals including Ms.
Wright, Ms. Squartsoff, and Mr. Thompson.  *See* Breckenridge Letter at Ex. L.3.

that she may have had discussions with individuals at the Nevada Department of Corrections, the

Nevada state hospital, and the Southern Nevada Adult Mental Health Department about

prescription drug acquisition or reimbursement issues.  *See* Squartsoff Deposition at 116-19.

Despite this testimony, Nevada has not produced any studies or internal communications relating

to any such comparison or discussions other than those referenced above.  As a result, the

Defendants request that the Court order the following facts established for all purposes in this

litigation:

> Nevada Medicaid had knowledge as to how all other Nevada pharmacy programs,
> including SIIS, the Department of Corrections, the State Hospital, the Department of
> Mental Health (MMCAP), Public Employee Benefits, and Senior Rx, acquired and/or
> reimbursed drugs from April 1996,[19] through the present, and considered this information
> in setting and/or assessing its Medicaid pharmacy reimbursement formula during this
> time period.

> Similarly, *many of the Defendants*, including Warrick Pharmaceuticals Corp.

("Warrick"), Schering-Plough Corp. ("Schering-Plough"), AstraZeneca Pharmaceuticals PLC

("AstraZeneca"), and Bayer Corporation ("Bayer") were reporting their sales prices to the

Plaintiff before and during this litigation.  The implications of these documents are obvious as

Nevada could not have been defrauded, deceived, or misled to believe that AWP was equivalent

to a pharmacist's acquisition cost when it was receiving sales price data from the Defendants for,

in some cases, more than five years.[20]  Despite the importance of these documents, Nevada did

not retain many of these pricing letters and has produced no correspondence discussing them.

Based on this fact, the Defendants request that the Court order the following facts established for

all purposes in this litigation:

> Nevada received and considered in setting and/or assessing its Medicaid pharmacy
> reimbursement rate the actual sales price information from the manufacturers from 2001
> through the present and understood that these reported prices were different from AWP.

---

[19] *See* Section II(A)(1), *supra*, at 14, n.11.

[20] In Montana, evidence shows that state employees compared sales prices to AWPs.  *See* Ex. P.

**III.**    **<u>Nothing Less Than The Requested Fact Admissions Will Rectify the Situation<br>Created By Nevada's Failure to Preserve Documents.</u>**

The requested fact admissions do no more than put the Defendants in the position they would have been in if the State had complied with its preservation obligations when they arose in May 2000, and prevent Nevada from reaping benefit from any doubt created by its failure to preserve documents.  In addition, case law teaches and several recent high profile cases reinforce that sanctions serve a punitive purpose.  Nevada was under a duty to preserve documents for at least *five and a half years* and subject to CMO No. 2 for *over three years*, but did not institute a litigation hold, notify key employees of its preservation obligations, or monitor compliance with these obligations.  Defendants are not aware of any published opinion in which a court was clearly faced with a continuous refusal to preserve documents for a commensurate length of time.  *See, e.g.*, *Zubulake v. UBS Warburg LLC, et al*., 229 F.R.D. 422, 425-40 (S.D. N.Y. 2004) (confronting failure to preserve documents for, at most, a two-year and nine-month period); *Wm. T. Thompson Co.*, 593 F. Supp. at 1443-54 (confronting failure to preserve documents for approximately three and a half years).  Moreover, several cases involving shorter time periods have resulted in outright dismissal, and this case is directly analogous to those cases.  *See Computer Assocs. Int'l, Inc.*, 133 F.R.D. at 169-70; *see also Wm. T. Thompson Co.*, 593 F. Supp. at 1455-57.  This Court should take whatever steps it deems appropriate to address Nevada's violation of CMO No. 2 and its obligations under the discovery rules.

Nevada's total disregard of its preservation duty and the prejudice this has caused the Defendants warrants strong action by this Court.  For as one court counsels, "[d]estruction of evidence cannot be countenanced in a justice system whose goal is to find the truth through honest and orderly production of evidence under established discovery rules."  *Computer Assocs. Int'l, Inc.*, 133 F.R.D. at 170.

*Respectfully submitted,*


    /s/ Ryan M. DiSantis
John T. Montgomery (BBO# 352220)
Brien T. O'Connor (BBO# 546767)
Christopher R. Dillon (BBO# 640896)
Ryan M. DiSantis (BBO# 654513)
ROPES & GRAY LLP
One International Place
Boston, MA  02110
(617) 951-7000

*Attorneys for Schering-Plough Corp. &*
*Warrick Pharmaceuticals Corp. on behalf*
*of the Defendants in Nevada II*

Dated:  July 21, 2006

## CERTIFICATE OF SERVICE

I, Ryan M. DiSantis, hereby certify that a true copy of the foregoing document was served upon all counsel of record in Nevada I and Nevada II electronically pursuant to Fed. R. Civ. P. 5(b)(2)(D) and CMO No. 2 on this 21st day of July, 2006, by causing a copy to be sent to LexisNexis File & Serve for posting and notification to all counsel of record.


    /s/ Ryan M. DiSantis
Ryan M. DiSantis