UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) | |
| AVERAGE WHOLESALE PRICE ) | MDL No. 1456 |
| LITIGATION ) | Civil Action:  01-CV-12257-PBS |
| ) | |
| THIS DOCUMENT RELATES TO ALL ) | Hon. Patti B. Saris |
| CLASS ACTIONS ) | |
| ) | **FILED UNDER SEAL** |

**LOCAL RULE 56.1 STATEMENT OF UNDISPUTED
MATERIAL FACTS IN SUPPORT OF TRACK 1 DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT  WITH RESPECT TO CLASS 3**

Pursuant to Local Rule 56.1, the Track 1 Defendants hereby submit this statement

of undisputed material facts in support of their Motion for Summary Judgment with Respect to

Class 3.

1.      From before the start of the class period until sometime in the late 1990s, BCBS/MA

owned and operated a staff model HMO called Medical East/Medical West.[1]

2.      This staff model HMO gave BCBS/MA ownership of a network of physician clinics and

BCBS/MA purchased Track 1 and other physician-administered drugs for use in its physician

clinics at discounts below AWP. [2]

---

[1] *See* Supporting Declaration of Andrew D. Schau ("Schau Decl.") Ex. 1 (April 14, 2006 deposition of
Sharon Smith (hereafter "Smith Tr.")) at 21:7-22:5 and 41:19-42:3; Schau Decl. Ex. 2 (April 12, 2006
deposition of Maureen Coneys (hereafter "Coneys Tr.")) at 39:9-16.

[2] *See* Coneys Tr. 42:14-43:5; 50:18-21; Declaration of Eric. M. Gaier in Support of the Track 1
Defendants' Joint Motion for Summary Judgement With Respect to Class 3 dated July 14, 2006 ("Gaier
7/14/06 Decl."); Declaration of Eric. M. Gaier in Support of Track 1 Defendants' Joint Motion for
Summary Judgement dated March 15, 2006 ("Gaier 3/15/06 Decl.").  *C.f.* Schau Decl. Ex. 3 (non-Bates

3.      BCBS/MA received discounts on its purchases of drugs at issue sold by the Track 1

defendants as high as 92.67% below AWP (a "spread" of 1,265%).[3]

4.      There was no apparent or fixed relationship between AWP and the prices paid by

BCBS/MA to acquire drugs.[4]

5.      The discounts that BCBS/MA obtained on its drug purchases varied from drug to drug

and year to year.[5]

6.      BCBS/MA purchased several drugs at prices that were close to the average selling prices

calculated by Dr. Hartman.[6]

7.      Dr. Hartman acknowledges that Class 3 payors who purchase drugs directly "would have

more information" and consequently should be excluded from any damages analysis.[7]

8.      John Killion, BCBS/MA's Senior Director for Ancillary Services, testified that he

understood as early as 1994, when he worked at Tufts Health Plans, that AWP was "an artificial

price" that "didn't bear a relationship to the [drug] acquisition cost[s]."[8]

---

numbered self administered drug purchase agreement between BCBS/MA and SmithKline Beecham
dated June 6, 1992, marked as Exhibit 1 to the deposition of Sharon Smith).

[3] *See* Gaier 7/14/06 Decl. at 15.  *See also* Reply Declaration of Jessica V. Barnett in Support of the Reply
Memorandum of Law in Further Support of Track 1 Defendants' Joint Motion for Summary Judgment
(Apr. 28, 2006) ("Barnett Decl.") at Ex. 6 (listing maximum and median spreads on purchases made by
BCBS/MA and other Massachusetts payors).

[4] *See* Gaier 7/14/06 Decl.; Barnett Decl. Ex. 6.

[5] *See* Gaier 7/14/06 Decl.; Barnett Decl. Ex. 6.

[6] *See* Gaier 7/14/06 Decl.

[7] See Schau Decl. Ex. 6 (28 February, 2006 deposition of Raymond Hartman) at 1013-19.

[8] *See* Schau Decl. Ex. 7 (January 6, 2006 deposition of John Killion (hereafter "Killion Tr.")) at 6:15-17
(reflecting his title), 119:4-22, and 122:18-22.  *See also* Killion Tr. 24:12-22 (providing dates for the time
period Mr. Killion was testifying with regard to).

9.      Mr. Killion also testified that he understood and it was *common knowledge* in the industry at that time *why* this was the case, *viz*:  that manufacturers of brand name drugs frequently offer rebates and discounts in response to competition, and generic drugs are typically sold at discounts even higher than on branded drugs.[9]

10.     IHC Health Plans, CIGNA and Harvard Pilgrim Health Care testified to similar knowledge that competition leads to greater spreads.[10]

11.     Mr. Killion testified as follows:

> Q.      When you said and used the term "artificial price" in that answer, what did you mean by the term "artificial price"?
>
> A.      Artificial price meaning a – a price that – that was referred to as it ain't what you pay, or the acronym AWP, ain't what you pay, used commonly at Tufts Health Plan.
>
> *                *                *
>
> Q.      So you understood that by that phrase, "ain't what's paid," that AWP was not in fact the actual average of wholesale prices; correct?
>
> A.      That's correct.
>
> Q.      And you understood at this time and it was discussed at Tufts that AWP bore no predictable relationship to the actual cost as paid; right?
>
> A.      Correct.[11]

12.     Steven Fox, BCBS/MA's Senior Director of Provider Relations, Communications and eHealth, testified as follows:

> A.      …And so, again, I think, as I've been involved in physician reimbursement, I think we had a general understanding that that number was largely inflated.  And so, we could take a percentage off

---

[9] *See* Killion Tr. 119:13-122:22.

[10] Schau Decl. Ex 8 (September 13, 2004 deposition of Eric Cannon of IHC Health Plans) at 35:16-36:18; Schau Decl. Ex. 9 (January 14, 2005 deposition of Jill Herbold of CIGNA (hereafter "Herbold Tr.")) at 85:21-86:11; Schau Decl. Ex. 10 (September 20, 2004 deposition of James Kenney of Harvard Pilgrim Health Care (hereafter, "Kenney Tr.")) at 12:1-13:7, 15:2-17.

[11] Killion Tr. 136:20-137:5, 138:17-139:5 (Objections omitted).

and negotiate it like we negotiate other numbers.

Q.  Now, for as long as you've been involved in reimbursement, you understood that number was largely inflated.  What did you – what do you mean when you say, "largely inflated"?

A.  I think it was known in the – again, in my dealings with physicians and my understanding of physician reimbursement – that the average wholesale price is much like a sticker price of a car, much like the charges in a hospital.  It's a price with which you start.  And again, it's an industry benchmark, and we go from there.[12]

13.  Mr. Fox has been "involved in physician reimbursement" since 1992.[13]

14.  Mr. Fox's pricing knowledge of the difference between AWP and acquisition price was based, in part, on "conversations I've had with physicians."[14]

15.  Defendants deposed 14 witnesses from BCBS/MA dealing with different aspects of physician reimbursement.[15]

16.  Jan Cook, a Regional Medical Director for BCBS/MA, testified that she understood that doctors who "were giving a lot of medications … might be getting some sort of volume discount."[16]

17.  Ms. Cook testified as follows:

Q.  So is the answer to my question that you have no understanding or expectation as to the relationship between the price that they pay to acquire drugs and the amount that they're reimbursed for drugs?

A.  Yeah.[17]

---

[12] Schau Decl. Ex. 11 (March 8, 2006 deposition of Steven Fox (hereafter "Fox Tr.")) at 228:7-8 (reflecting his title) and 126:16-127:10.

[13] *See* Fox Tr. 50:4-19.

[14] *See* Fox Tr. 151:9-19.

[15] Schau Decl. ¶ 3.

[16] *See* Schau Decl. Ex. 12 (March 6, 2006 deposition of Jan Cook (hereafter "Cook Tr.")) at 36:8-10 (reflecting her title) and 207:14-16.

18.    Lisa Gorman, a Regional Director on the BCBS/MA Provider Relations Team, testified as follows:

> Q.    Okay.  So you do have an understanding here that different doctors may have paid different rates, but your testimony is that you don't know what the rates are that any doctors pay to acquire drugs?
>
> A.    That's true, yeah.
>
> Q.    So you have no understanding or expectation, then, as to what the relationship is between doctors' acquisition prices for drugs and the amounts that they are reimbursed for drugs?
>
> A.    I don't know, no.
>
> Q.    So your answer is that you have no such understanding or expectation?
>
> A.    I don't, yeah.[18]

19.    Vincent Plourde, BCBS/MA's Vice President of the Provider Services Division, testified that he also knew that providers could receive variable rebates and discounts on their drugs purchases.[19]

20.    Mr. Plourde testified as follows:

> Q.    Okay.  Is it your understanding that those rebates and discounts fall within a particular range or a particular band or that they vary widely?
>
> A.    I do not have a particular percentage in mind.
>
> Q.    Okay.  So you have no particular expectation as to what the range of discounts and rebates would be, although you know that rebates and discounts exist?
>
> A.    Correct.  Correct.[20]

---

[17] Cook Tr. at 202:8-14 (objections omitted).

[18] *See* Schau Decl. Ex. 13 (March 7, 2006 deposition of Lisa Gorman (hereafter "Gorman Tr.")) at 8:15-16 (reflecting her title) and 106:7-21 (objections omitted).

[19] *See* Schau Decl. Ex. 14 (April 13, 2006 deposition of Vincent Plourde ("Plourde Tr.")) at 7:5-7 (reflecting his title); 116:5-10; 116:22-117:7.

[20] Plourde Tr. 117:6-18 (objections omitted).

21.     Not *a single witness* from BCBS/MA articulated plaintiffs' theory that payors somehow expected that AWP would not exceed acquisition price by more than 30%.

22.     BCBS/MA witness Steven Fox did testify that he expected there to be a "reasonable" relationship between AWP and acquisition costs, but even he did not equate "reasonable" with 30%.[21]

23.     Mr. Fox testified that "I have no preconceived notion of what reasonable is.  I am not going to give you one because I don't have one in my mind."[22]

24.     Later in the deposition, after he had the opportunity to confer with counsel, he said he thought that a 30% margin would not be reasonable in his opinion, but that margins of 1%, 2% or 3% might be.[23]

25.     When asked who at BCBS/MA was knowledgeable about AWP, Deborah Devaux, the BCBS/MA Senior Vice President for Health Care Contract Management, immediately identified John Killion as the person she would call.[24]

26.     BCBS/MA had access to the vast body of public literature – including the 1996 *Barron's* article and numerous government reports – that discussed the difference between AWP and acquisition cost.[25]

---

[21] Fox Tr. 146:7-150:3.

[22] Fox Tr. 149:22-150:3.

[23] *See* Fox Tr. 300:12-20.

[24] *See* Schau Decl. Ex. 15 (March 9, 2006 deposition of Deborah Devaux (hereafter "Devaux Tr.")) at 9:17-19 (reflecting her title), 134:4-13.

[25] *See* Declaration of Lucy Fowler (March 15, 2006) Exs. 1-89 (submitted in connection with the Track 1 motion for summary judgment as to Classes 1 and 2).

27.     Moreover, drug-specific data reflecting deep discounts to providers was publicly available for purchase from IMS Health, a well-known third party data provider.[26]

28.     In 2003 and 2004, in the wake of the changes in physician reimbursement under Medicare Part B, BCBS/MA considered whether to jettison AWP-based reimbursement in favor of ASP-based reimbursement. [27]

29.     BCBS/MA prepared a presentation in which it recounted the allegations relating to AWP and listed the following as "Reasons for Reform":

- Physicians benefit from the "spread" between AWP and acquisition cost creating an overpayment for drugs and costs for Medicare.

- According to GAO and CMS, in 2001 Medicare overpaid Part B drugs by over $1 billion.

- In 2002, Oncologists collected approximately $600 million in overpayments.

- Patients who pay a coinsurance are adversely affected by the inflated AWP.[28]

30.     Deborah Devaux, BCBS/MA's Senior Vice President for Health Care Contract Management, testified that she understood that Medicare switched to ASP because it had a

---

[26] *See* http://www.imshealth.com/ims/portal/front/indexC/0,2773,6599_77075636_0,00.html (last visited on July 13, 2006) (describing IMS's National Sales Perspectives database as "the most comprehensive, national-level prescription sales database.  The National Sales Perspectives tracks sales activity for all pharmaceutical distribution channels, including major retail food stores and chains, mass merchandisers, independent pharmacies, mail service pharmacies, hospitals, clinics, closed-wall HMOs, long-term care, home health care, and prisons/universities.  Sales information is compiled from more than 100 pharmaceutical manufacturers and more than 300 wholesaler and chain warehouses.").

[27] *See* Schau Decl. Ex. 16 ("Analysis of CMA Average Wholesale Price Reform – Reimbursement for Part B Drugs" dated February 7, 2004 produced electronically on CD bearing Bates number BCBS/MA-AWP 11598A (hereafter "BCBS/MA Shift to ASP Analysis").

[28] *See id.* at 2.

"concern about the reasonableness of the – the pricing – the AWP relative to the acquisition cost."[29]

31.     In considering whether to make a change, BCBS/MA identified and considered four reimbursement options:  (1) to follow CMS' lead by moving to ASP and increasing the administration fees paid to the physicians, (2) to move to an ASP-based methodology without changing administration fees but keep the overall physician reimbursement amount constant by applying multipliers to the CMS reimbursement rate, (3) to reimburse at 95% of 2004 AWPs without future updating, or (4) to stay with the current 95% of AWP methodology and get updated AWPs by J-code (instead of by NDC) from a vendor going forward since CMS would no longer be using or making AWP-based J-code reimbursement values available.[30]

32.     BCBS/MA recognized that when CMS adopted ASP-based reimbursement it increased physician administration fees by as much as 392%.[31]

33.     These four options, together with an underlying analysis of each option, were presented at a meeting of BCBS/MA's Provider Financial Strategies Workgroup ("the PFS Workgroup").[32]

34.     The PFS Workgroup "walked through the whole presentation" and "there was discussion around the table on a lot of different things that were in this analysis."[33]

---

[29] Devaux Tr. 161:14-19; 171:17-22.

[30] *See* Schau Decl. Ex. 16, BCBS/MA Shift to ASP Analysis at 12-15.

[31] See BCBS/MA Shift to ASP Analysis at 6.

[32] Devaux Tr. 162:9-18.

[33] Schau Decl. Ex. 17 (January 5, 2006 deposition of Michael Mulrey (hereafter "Mulrey Tr.")) at 101:4-5; 104:9-11.

35.     BCBS/MA's analysis indicated that a move to ASP-based reimbursement might reduce its overall annual reimbursement costs by more than $6 million, even after accounting for increased administration fees.[34]

36.     After full deliberation, the PFS Workgroup decided to stick with AWP for the following reasons:

- High impact to certain provider types (i.e. Oncology)

- Resistance to changes by network

- Potential shift to facility setting (Oncologists)

- Uncertain future of CMS continuing with this payment methodology[35]

37.     Ms. Devaux testified that BCBS/MA wanted to avoid a "shift to facility setting" because it did not want patients treated in the higher cost hospital setting instead of physicians' offices.[36]

38.     Vista Health Plan, CIGNA and Horizon Health Care similarly testified they used spreads to encourage physician to treat patients in office rather than send them to hospitals.[37]

39.     Ms. Devaux testified as follows:

> Q.   Let me rephrase it.  In making the decision in February of 2004 not to move at that time, you weighed those concerns against the concerns with the AWP benchmark that were described by other members of the

---

[34] *See* BCBS/MA Shift to ASP Analysis at 7.

[35] *See* BCBS/MA Shift to ASP Analysis at 12.

[36] Devaux Tr. 176:15-177:8.  *See also* Coneys Tr. 17:7-18:7 and 19:4-8 (testifying she has been aware since 1979 that the hospital site of care is more expensive than treatment in physician's offices); Killion Tr. 67:10-22 ("reimbursement in the hospital setting is a more expensive setting than in the physician office" and this is something BCBS/MA has "looked at"); Plourde Tr. 60:10-61:15 (same).

[37] *See e.g.*, Schau Decl. Ex. 18 (September 20, 2004 deposition of Hal Goldman of Vista Health Plan) at 58:19-60:4; Herbold Tr. at 75:21-76:16; Schau Decl. Ex. 19 (October 5, 2004 deposition of Susan Mengert of Horizon Health Care) at 78:13-81:7.

group and are reflected in this documents.

A. I considered all of those factors.

Q. And you decided that, on balance, Option 4 was the best decision for that time.

A. I decided not to change our practice at the moment, or I felt we should decide not to change our practice, and the group agreed.[38]

40.     Payors such as BCBS/MA have a ready alternative to reimbursing physicians under the "buy and bill" model whereby the doctor purchases the drug and then seeks reimbursement from the patient's insurer.  Payors can circumvent the model entirely by choosing to supply the physician from a contracted specialty pharmacy.  These pharmacies purchase drugs and ship them to doctors for administration to their patients.  The doctor never takes title to the drug and the pharmacy bills the insurer directly at a contracted rate.

41.     In 2001, BCBS/MA asked for and received specialty pharmacy proposals from vendors.[39]

42.     A year later, in the summer of 2002, BCBS/MA's director of pharmacy, Gary Shramek, attended or obtained materials from a conference sponsored by the Blue Cross Blue Shield Association called the "Specialty Pharmaceutical National Partnership Showcase." [40]

43.     Materials presented at the conference showed  – in sections circled by hand on Mr. Shramek's copy – that physicians sometimes earned a substantial margin under the buy-and-bill model.  Indeed, a conference program entitled "Physician Purchasing Reality" explained that "U.S. Oncology can purchase drugs for anywhere from 18%-40% off AWP [a "spread" of 22%-

---

[38] Devaux Tr. 193:6-19 (objections omitted).

[39] *See e.g.*, Schau Decl. Ex. 20 (BCBS/MA-AWP 17406-17433).

[40] See Schau Decl. Ex. 21 (BCBS/MA-AWP 17372-86 at 17376); Schau Decl. Ex. 22 (June 19, 2006 letter from Stephen Coco to Adeel Mangi identifying document custodian) Schau Decl. Ex. 44 (May 25, 2006 from Stephen Coco to Adeel Mangi listing document custodian's title).

67%]."  The program materials also noted that "[w]e're reimbursing pediatricians at AWP-5% and they're able to buy at much lower – even 60% to 70% off [a "spread" of 150% to 233%]."[41]

44.    In 2003, BCBS/MA formed a Specialty Pharmacy Committee for the purpose of assessing and possibly implementing a specialty pharmacy program.[42]

45.    The person responsible for the project was John Killion.[43]

46.    The Specialty Pharmacy Committee weighted the potential benefits of moving away from the buy-and-bill model, including the potential cost savings that could be achieved if a specialty pharmacy program could be successfully imposed on the participating physicians.[44]

47.    Its analysis showed that, for physician-administered oncology drugs, the move to specialty pharmacies might yield considerable savings.[45]

48.    In considering the use of specialty pharmacies, BCBS/MA also reviewed materials that referred to press reports on the discounts available to doctors on physician-administered oncology medications:

> 1/26 NY Times Article – Physicians are able to obtain discounts as high as 86% on medications [a "spread" of 616%].  Plan reimbursement to providers for medication is in the range of AWP-5%.[46]

---

[41] *Id.*

[42] Killion Tr. 47:1-13; 65:15-66:1.

[43] Killion Tr. 10:11-14; 59:18-20.

[44] Coneys Tr. 126:17-128:6.

[45] *Id.*

[46] *See* Schau Decl. Ex. 23 (BCBS/MA-AWP 17182-17197) at 17191.

49.     Nevertheless, after deliberation, BCBS/MA decided to exclude physician-administered drugs from the scope of its specialty pharmacy program.[47]

50.     One reason was BCBS/MA's concern that physicians, unless they received a sufficient margin over their acquisition cost, would stop administering drugs in their offices.[48]

51.     In that event, patients would be forced to obtain drugs in a hospital setting, which would be more expensive to BCBS/MA.[49]

52.     Mr. Killion testified that "[w]e were concerned, continue to be concerned, in regards to being overcharged for oncology medications but wanted to make sure we roll out a program that benefits our members and also addresses concerns that the oncologists have raised in a thoughtful manner."[50]

53.     In the past, BCBS/MA reimbursed for drugs administered in hospital out-patient departments based on a percentage of the hospital's "billed charges."[51]

54.     BCBS/MA recently decided to scrap this methodology in favor of reimbursing hospitals at 95% of AWP.[52]

55.     BCBS/MA has calculated that the change to AWP-based reimbursement will result in savings of about $3.9 million per year at one hospital group alone.[53]

---

[47] Killion Tr. 80:9-81:1, 109:19-110:7.

[48] Coneys Tr. 138:9-138:18.

[49] Killion Tr. 67:10-22.

[50] Killion Tr. 119:19-110:17.

[51] *See* Schau Decl. Ex. 24 (March 10, 2006 deposition of Sheila Cizauskas ("Cizauskas Tr.")) at 124:5-19.

[52] Cizauskas Tr. 124:20-126:16.

56.     BCBS/MA transitioned the first set of hospitals in October 2005, some four years after this litigation started.[54]

57.     In early 2006 – after BCBS/MA joined this litigation as a named plaintiff – BCBS/MA decided to transition all hospitals with contracts coming up for renewal in 2006.[55]

58.     BCBS/MA anticipates that it will continue to transition hospitals to AWP-based reimbursement until 2011, by which time all of its hospitals will be reimbursed based on AWP.[56]

59.     Final approval to proceed with the transition to AWP-based reimbursement came from the PFS Workgroup, the same committee that decided in 2004 not to adopt ASP-based reimbursement for physicians.[57]

60.     At least five of the eight to ten members of the committee have been members since 2003.[58]

61.     Members of the PFS Workgroup testified that in choosing AWP as the basis for reimbursing hospitals they did not consider how much hospitals were paying to acquire drugs, because they did not think hospital acquisition costs were relevant.[59]

---

[53] Cizauskas Tr. 136:12-137:2; 139:7-140:19; 202:8-22.

[54] Cizauskas Tr. 123:22-124:4.

[55] See Cizauskas Tr. 150:8-17. *See also* CMO 19.

[56] Cizauskas Tr. 147:10-148:8.

[57] Cizauskas Tr. 152:13-15.

[58] Cizauskas Tr. 180:21-181:3; 186:18-187:2.

[59] Cizauskas Tr. 183:12-18; Plourde 127:17-128:2.

62.     They also decided to make this shift to AWP even though they had become aware CMS was shifting to ASP based reimbursement in hospitals out patient departments, because "there didn't seem to be any reason to change our direction….."[60]

63.     Four of the five major Massachusetts health insurers (BCBS/MA, Harvard Pilgrim Health Care, Inc., CIGNA Healthcare of Massachusetts, Inc., and Fallon Community Health Plans) purchased drugs directly through staff model HMOs.[61]

64.     Together with BCBS/MA, these plans cover some 70% of the covered lives in Massachusetts.[62]

65.     The discounts available to these payors, like the discounts available to BCBS/MA, were often substantial.  CIGNA's HMO made purchases at spreads of up to 2,320%.  Fallon Community Health Plan obtained spreads as high as 2,241%.  Harvard Pilgrim's HMO purchased drugs at prices yielding a spread of 1,275%.[63]

66.     Robert Farias, Director of Planning and Administration at Harvard Pilgrim, testified as follows:

> Q.  So, indeed, if providers' acquisition costs for drugs were to change, that would not alter the amount that Harvard Pilgrim is reimbursing them for drugs, is that correct?
>
> A.  That's correct.
>
> Q.  And indeed, if Harvard Pilgrim were to learn more information about what providers paid to acquire drugs, that would not change the amount that Harvard Pilgrim is reimbursing for drugs.  Is that a fair statement?

---

[60] Cizauskas Tr. 173:18-178:13.

[61] Gaier 7/14/06 Decl. at p.3 *et seq.*

[62] *Id.*

[63] Gaier 7/14/06 Decl. at pp. 18, 21, and 24;  Barnett Decl., Ex. 6.

A.   That's a fair statement.[64]

67.     Defendants have not been permitted to complete discovery of other Massachusetts payors because class plaintiffs and these insurers' motions for protective orders barring discovery were granted.[65]

68.     Mr. Killion of BCBS/MA testified that the industry standard for reimbursement remains 95% of AWP.[66]

69.     Edward Lemke, Director of Fee Schedule Management for Humana, testified as follows:

Q.   Is it Humana's expectation that the amounts that providers pay to acquire drugs are a fixed percentage less than the amount Humana reimburses in relation to those drugs?

A.   The expectation that – first of all, that it's fixed, no.  The expectation that good business practice and assuming providers that we do business with practice good business practices, is that they would only accept payment that is at or above their costs.  That's my only expectation.

Q   And certainly, you have no fixed expectation as to how much higher it would be than their acquisition costs, correct?

A.   Correct.

Q.   And indeed, that would vary from provider to provider, depending on what they paid to acquire drugs and what Humana reimburses them for drugs?

A.   Correct.

Q.   The percentage could be 10 percent in one case, 50 in another, 100 in another, correct?

---

[64] See Schau Decl. Ex. 25 (October 20, 2004 deposition of Robert Farias) at 21:3-5 (reflecting his title); 43:4-16 (objections omitted).

[65] See Chief Magistrate Judge Bowler's ECF order dated February 4, 2006 granting motions for protective orders filed by class plaintiffs, Tufts Associated Health Maintenance Organization, Inc.., Harvard Community Health Care, Neighborhood Health Plan, Inc and Fallon Community Health Plan, Inc.  Defendants filed objections to that order, which the Court has not yet been ruled upon.  See Objections by Abbott Laboratories, Dey, Inc. To the Order of Chief Magistrate Judge Bowler Issued On February 4, 2006 Pursuant to Fed. R. Civ. P. Rule 72(a) (Entered: 02/16/2006), Docket Number 2140

[66] Killion Tr. 89:10-14.

A.   Could be.[67]

70.    Joseph Spahn, Senior Health Care Consultant For Anthem Blue Cross Blue Shield,

testified as follows:

Q.   Prior to the break, we were talking about providers' acquisition costs
and the fact they're not relevant to Anthem's reimbursement amounts.
Do you recall that testimony?

A.   Yes.

Q.   Okay.  And part of that was that Anthem has no information about what
the providers' acquisition costs are, right?

A.   Correct.

Q.   So it's fair to say that Anthem has no particular expectation that
providers' costs would be, you know, 10 percent, 30 percent, 50
percent, something more, something less than the amount they're
reimbursed in relation to those drugs, right?

A.   Yes.[68]

71.    Kelly Ellston, Assistant Vice President of Claims and Care Management for Union Labor

Life Insurance Co., Inc. testified as follows:

Q.   It would be impossible to say that Union Labor Life expects that they'll
make a percentage profit of 5 percent, 10 percent, 20 percent, 30
percent, 40 percent?

A.   That's not in our calculations.

Q.   That's something that is entirely irrelevant to Union Labor Life's
calculations of the amounts that it's going to reimburse.  Is that correct?

A.   Correct.[69]

72.    Scott Wert, Vice President of Trade Relations For Health Net, testified as follows:

Q.   So it's fair to say, isn't it, that the relationship between any individual

---

[67] See Schau Ex. 26 (January 11, 2005 deposition of Edward Lemke) at 18:18-22 (reflecting his title);
123:17-124:16 (objections omitted).

[68] See Schau Ex. 27 (November 30, 2004 deposition of Joe Spahn) at 8:7-10 (reflecting his title); 97:17-
98:13 (objections omitted).

[69] See Schau Ex. 28 (November 23, 2004 deposition of Kelly Ellston) at 22:21-23:1 (reflecting her title);
89:18-90:5.

entity's acquisition cost for drugs and the AWP for that drug will vary depending on the amount of rebates or discounts that that entity is getting, right?

A.  Right.

Q.  Indeed, there will be no settled percentage differential between the two of those numbers, the actual acquisition costs on the one hand and the AWP for that drug on the other, right?

A.  Right.

Q.  Will vary from entity to entity, drug to drug depending on the leverage that those entities have and their ability to exact differential rebates and discounts from drug manufacturers, right?

A.  Yes.

Q.  And certainly Health Net has no fixed expectation or has no expectation that there is, in fact, a fixed relationship between actual acquisition and AWP, correct?

A.  Correct.

Q.  In other words, Health Net recognizes that the relationship between the actual acquisition cost for a drug and the AWP for a drug will vary widely depending on the amounts of rebates or discounts that the purchasing entity can get from the manufacturer?

A.  Right.

Q.  So certainly, if one were to say that, well, you know Health Net expects that there will be a fixed relationship of, say, 20 percent or 30 percent or 40 percent, there would be absolutely no foundation for that, correct?

A.  Correct.

Q.  That would be simply an inaccurate assumption that lacks any foundation whatsoever, right?

A.  Yes.[70]

73.    Additional witnesses from other health plans provided similar testimony.[71]

---

[70] *See* Schau Ex. 29 (February 1, 2006 deposition of Scott Wert) at 7:2-3 (reflecting his title); 35:17-37:17 (objections omitted).

[71] *See e.g.*, Schau Ex. 30 (September 17, 2004 deposition of Mike Beaderstadt of John Deere Health Care) at 72:17-73:5 ("I don't believe [AWP] has any relationship [to actual acquisition cost] that is a consistent relationship"); Schau Decl. Ex. 31 (March 9, 2005 deposition of Mickey Brown of Blue Cross/Blue Shield of Mississippi) at 127:7-14 (testifying that he did not "have an expectation one way or the other" as to the relationship between acquisition cost and AWP); Schau Ex. 32 (June 30, 2006 deposition of Bruce Niebylski of Health Alliance Plan of Michigan) at 71:5-18 (denying specific

74.     Throughout the class period, Pipefitters has used BCBS/MA to provide health insurance to its members.[72]

75.     Charles Hannaford, the Fund Administrator for Pipefitters, testified that he was "entirely dependant" on BCBS/MA and had "no independent knowledge" on issues relating to that coverage.[73]

76.     He did not know if any of Pipefitters' members were administered drugs from the Track 1 defendants.[74]

77.     He had no independent basis to verify whether or not BCBS/MA was using AWP or how much of a discount off of AWP they were using.[75]

78.     He testified that Pipefitters selected BCBS/MA because he thought that BCBS/MA, because of its size and sophistication, would "be able to exact a better discount for [the Fund]" than Pipefitters could on its own.[76]

79.     BCBS/MA's Senior Director of Provider Relations similarly testified that BCBS/MA's fund clients all rely on networks provided by BCBS/MA, never negotiate directly with providers, and only use rates determined by the contracts between BCBS/MA and providers.[77]

---

percentage expectations and stating that "I haven't had any expectations what [physicians'] margin would be.")

[72] Schau Ex. 33 (December 29, 2005 of Charles Hannaford (hereafter "Hannaford Tr.")) at 13:20-14:10.

[73] Hannaford Tr. at 156:8-21.

[74] Hannaford Tr. at 156:8-21.

[75] Hannaford Tr. 159:15-18.

[76] Hannaford Tr. at 133:4-11.

[77] Fox Tr. 220:10-222:9, 224:20-225:8

80.     Health Care For All is a membership-based association that was added to this lawsuit for the first time in this Court's Class Certification Order dated January 30, 2006.[78]

81.     Until plaintiffs named this association in their proposed class certification order, it had never appeared in any pleadings, or been subject to any discovery.

82.     Thereafter, on March 10, 2006, plaintiffs amended the Complaint to add a new paragraph in which they alleged that "[d]uring the Class Period, HCF[]'s members have been billed for and paid charges for AWPIDs outside of the Medicare Part B context based on published AWPs."[79]

83.     The corporate representative produced by Health Care For All could not confirm the accuracy of plaintiffs' allegation.[80]

84.     She said that her organization does not know whether any of its members have been injured as a result of the alleged AWP scheme.[81]

85.     She admitted that the association itself has not been injured by the alleged AWP scheme.[82]

86.     She testified that her organization agreed to serve as a class plaintiff after receiving a $10,000 "grant" through plaintiffs' law firm.[83]

---

[78] *See* Class Cert. Order at 6.

[79] *See* Schau Decl. Ex. 34 (Notice of Errata to the Fourth Amended Master Consolidated Class Action Complaint to Comply With the Court's Class Certification Order dated March 10, 2006).

[80] Schau Ex. 35 (May 23, 2006 deposition of Melissa Shannon (hereafter "Shannon Tr.")) at 53:14-55:2, 60:10-61:1.

[81] Shannon Tr. 53:12-54:6.

[82] Shannon Tr. 181:10-20.

[83] Shannon Tr. 97:12-98:15; 104:11-21.

87.     BCBS/MA's contracts with physicians do not expressly us[e] AWP as a pricing standard.

88.     Counsel for BCBS/MA stated the following in a letter to counsel for defendants:

>       Indeed, the initial three boxes of contracts (that will be produced shortly) appear not to contain a single reference to reimbursement methodologies for physician-administered drugs at issue in this case even though the providers associated with these contracts administered the bulk of the office-based physician-administered drugs paid for by BCBS/MA.[84]

89.     BCBS/MA has utilized, and continues to utilize, other reimbursement methodologies besides AWP, including withholds and contracted capitation arrangements.[85]

90.     Prior to 1995 BCBS/MA did not use AWP at all – it reimbursed physician-administered drugs based on billed charges up to a "usual & customary" cap.[86]

91.     BCBS/MA's physician contracts typically state only that reimbursement will be at "[t]he lesser of the charge for the covered service or the amount listed on the fee schedule."[87]

92.     BCBS/MA fee schedules list dollar sums for specific drug codes, but they make no reference to AWP.[88]

93.     BCBS/MA's corporate representative Steven Fox testified that there is no way to tell from BCBS/MA's claims data whether a given claim was paid based on the billed charge or a fee schedule.[89]

---

[84] *See* Schau Ex. 41 (June 8, 2006 Letter from Stephen L. Coco to Adeel A. Mangi)

[85] Mulrey Tr. 43:7-19.

[86] Mulrey Tr. 57:13-58:15.

[87] *See* Fox Tr. 314:18-315:4; 309:22-310:2; *see also* Schau Decl. Ex. 42 (Non-Bates numbered template contract produced by BCBS/MA electronically on CD bearing Bates number BCBS-AWP 0005, and marked as Fox Deposition Ex. 12, at ¶1.19).

[88] *See* Schau Decl. Ex. 43 (BCBSMA fee schedule extract).

94.     The prices at which Massachusetts health insurers with staff model HMOs purchased the

Track 1 defendants' drugs at issue in this litigation are accurately described in Gaier 7/14/06

Decl.[90]


Dated:  July 14, 2006                    /s/ William F. Cavanaugh, Jr.
                                         William F. Cavanaugh, Jr.
                                         Andrew D. Schau
                                         Erik Haas
                                         Adeel A. Mangi
                                         **PATTERSON BELKNAP WEBB & TYLER LLP**
                                         1133 Avenue of the Americas
                                         New York, New York  10036-6710
                                         (212) 336-2000

                                         *Attorneys for the Johnson & Johnson Defendants on*
                                         *behalf of all Track 1 Defendants*

---

[89] Fox Tr. 314:18-315:20.

[90] Gaier 7/14/06 Decl.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on July 14, 2006 via Federal Express to counsel for plaintiffs.

/s/ Andrew D. Schau
Andrew D. Schau