# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---------------------------------------------------------

)
IN RE PHARMACEUTICAL INDUSTRY  )
AVERAGE WHOLESALE PRICE        )      MDL NO. 1456
LITIGATION                     )      Civil Action No. 01-12257-PBS
---------------------------------------------------------)
)      Hon. Patti B. Saris
THIS DOCUMENT RELATES TO       )
ALL CLASS ACTIONS              )      **FILED UNDER SEAL**
---------------------------------------------------------)


## THE TRACK 1 DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO CLASS 3

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF FACTS ....................................................................................... 3

I.   BCBS/MA Embraced AWP-Based Reimbursement With Full Knowledge
     That It Bore No Predictable Relationship To Provider Acquisition Costs ......................... 3

     A.   BCBS/MA Knew About Spreads In Excess Of 30% Because It
          Purchased Drugs For Its Staff Model HMO At Substantial
          Discounts Resulting in Spreads Up To 1,265% ......................................... 3

     B.   BCBS/MA's Corporate Representatives Testified That They Knew
          That AWP Bears No Predictable Relationship To Acquisition Cost ...................... 6

     C.   No BCBS/MA Witness Endorsed Plaintiffs' Theory That Payors
          Expected That AWP Would Not Exceed Acquisition Cost By
          More Than 30% ......................................................................... 8

     D.   BCBS/MA Had Access To Additional Information Regarding
          Doctors' Drug Acquisition Costs .................................................. 10

II.  BCBS/MA Has Purposefully Chosen To Continue Using AWP and
     Has Even Expanded Its Use of AWP Despite Knowing That AWP
     Can Exceed Acquisition Cost By More Than 30% ......................................... 11

     A.   BCBS/MA Considered But Decided Not To Adopt ASP-Based
          Reimbursement In Lieu Of AWP-Based Reimbursement ................................ 11

     B.   BCBS/MA Considered But Decided Not To Reimburse
          Physician-Administered Drugs Under Its Specialty Pharmacy
          Program As An Alternative to AWP ................................................. 14

     C.   BCBS/MA Embraced AWP-Based Reimbursement In 2005
          And 2006 By Adopting Its Use In Lieu of Other Reimbursement
          Methods In The Hospital Out-Patient Setting ...................................... 16

III. Other Massachusetts Insurers Also Embraced AWP With Full Knowledge
     That It Exceeded Acquisition Cost ................................................... 17

IV. Pipefitters Delegates All Its Health Insurance Responsibilities to BCBS/MA ................24

V. Health Care For All Knows Nothing About This Suit ........................................................24

ARGUMENT .............................................................................................................................26

I.   Defendants Should Be Granted Summary Judgment Against BCBS/MA
     Because It Is Not A Member Of Any Certified Class ........................................................26

II.  Defendants Should Be Granted Summary Judgment Against Health Care
     For All Because It Lacks Standing To Sue ........................................................................29

III. Defendants Should Be Granted Summary Judgement Against All
     Third-Party Payors in Class 3 Because They Cannot Establish
     Causation Under Chapter 93A As A Matter Of Law ..........................................................30

     A.   BCBS/MA Cannot Establish Causation As a Matter of Law ...............................33

     B.   BCBS/MA's Knowledge Must be Imputed to Pipefitters .....................................34

     C.   Class 3 Cannot Establish Causation As a Matter of Law ......................................35

IV.  The Claims of Third-Party Payors in Class 3 Are Barred In Part
     By the Statute of Limitations ............................................................................................36

V.   Class 3's Damages Claims Are Barred By Their Failure To Mitigate .............................41

CONCLUSION .........................................................................................................................44

# TABLE OF AUTHORITIES

## CASES

*Albrecht v. Clifford*,
　　436 Mass. 706, 767 N.E.2d 42 (Mass. 2002).............................................................37

*Aspinall v. Philip Morris Companies, Inc.*,
　　813 N.E.2d 476 (Mass. 2004) ..................................................................................31

*In re Bloom*,
　　222 Mass. 434 (Mass. 1916) ....................................................................................34

*Bowen v. Eli Lilly & Co.*,
　　204, 557 N.E.2d 739 (Mass. 1990) ..........................................................................38

*Diamond v. Charles*,
　　476 U.S. 54, 62 (1986).............................................................................................30

*Cambridge Plating Co., Inc. v. NAPCO, Inc.*,
　　85 F.3d 752 (1st Cir. 1996)......................................................................................42

*Cathay Pac. Airways, Ltd. v. Fly & See Travel, Inc.*,
　　3 F. Supp. 2d 443 (S.D.N.Y. 1998)..........................................................................33

*Catrone v. Thoroughbred Racing Assocs. of North America, Inc.*,
　　929 F.2d 881 (1st Cir. 1991) ....................................................................................37

*DiVenuti v. Reardon*,
　　637 N.E.2d 234 (Mass. App. 1994) ..........................................................................41

*Dinjian v. Dinjian*,
　　495 N.E.2d 882 (Mass. App. Ct. 1986) ....................................................................32

*Duco Assocs., Inc. v. Lipson*,
　　416 N.E.2d 555 (Mass. App. Ct. 1981) ....................................................................38

*Frank Cooke, Inc. v. Hurwitz*,
　　406 N.E.2d 678 (Mass App. Ct. 1980) ................................................................38, 40

*Friedman v. Jablonski*,
　　358 N.E.2d 994 (Mass. 1976)..........................................................................37, 38, 39, 40

*Geo. Knight & Co., Inc. v. Watson Wyatt & Co.*,
    170 F.3d 210 (1st Cir. 1999)....................................................38

*Hanson Hous. Auth. v. Dryvit Sys., Inc.*,
    560 N.E.2d 1290 (Mass. App. Ct. 1990) ....................................38

*Hershenow v. Enterprise Rent-A-Car Co. of Boston*,
    840 N.E.2d 526 (Mass. 2006) ...................................................31

*Hunt v. Washington State Apple Adver. Comm'n*,
    432 U.S. 333 (1977)..................................................................29

*Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*,
    90 F.3d 737 (3d Cir. 1996)........................................................33

*Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*,
    560 N.E.2d 122 (Mass. App. Ct. 1990) ......................................37

*John Beaudette, Inc. v. Sentry Ins. A Mut. Co.*,
    94 F. Supp. 2d 77 (D. Mass. 1999) ...........................................37

*Keane, Inc. v. Swenson*,
    81 F. Supp. 2d 250 (D. Mass. 2000) .........................................37

*Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*,
    72 F.3d 190 (1st Cir. 1995)......................................................41

*Lawrence Sav. Bank v. Levenson*,
    59 Mass. App. Ct. 699 (Mass. App. Ct. 2003).............................34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)..................................................................29

*Madan v. Royal Indem. Co.*,
    532 N.E.2d 1214 (Mass. App. Ct. 1989) ....................................32

*Maggio v. Gerard Freezer & Ice Co.*,
    824 F.2d 123 (1st Cir. 1987)...................................36, 37, 39, 40

*Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*,
    518 N.E.2d 519 (Mass. App. Ct. 1988) ......................................31

*Markarian v. Connecticut Mut. Life Ins. Co.*,
    202 F.R.D. 60 (D. Mass. 2001)..................................................31

iv

*Mass. Farm Bureau Fed'n v. Blue Cross of Mass.*,
    532 N.E.2d 660 (Mass. 1989) ...................................................................................31

*Oliveira v. Amoco Oil. Co.*,
    776 N.E.2d 151 (Ill. 2002) .......................................................................................33

*Reading Cycles v. Bradley*,
    No. CIV. A89-2490, 1992 WL 93221 (D. Mass. April 13, 1992) ..............................37

*Reynolds v. East Dyer Dev. Co.*,
    882 F.2d 1249 (7th Cir. 1989) ..................................................................................33

*S. Bay Chevrolet v. GM Acceptance Corp.*,
    85 Cal. Rptr. 2d 301 (Cal. Ct. App. 1999) ................................................................32

*Salois v. Dime Sav. Bank of New York*, *FSB*,
    Civ. A 95-11967 (PBS), 1996 WL. 33370626 (D. Mass. Nov. 13, 1996).............37, 40

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*,
    319 F.3d 205 (5th Cir. 2003) ....................................................................................33

*Estate of Sarocco v. Gen. Elec. Co.*,
    939 F. Supp. 91 (D. Mass. 1996) ..............................................................................38

*Savers Property & Casualty Ins. Co. v. Admiral Ins. Agency, Inc.*,
    807 N.E.2d 842 (Mass. App. 2004) ...........................................................................41

*Sea Shore Corp. v. Sullivan*,
    158 F.3d 51 (1st Cir. 1998).......................................................................................29

*Shannon v. Boise Cascade Corp.*,
    805 N.E.2d 213 (Ill. 2004) ...........................................................................32, 34, 35

*Solomon v. Bell Atl. Corp.*,
    9 A.D.3d 49, 55 (N.Y. App. Div. 2004) ....................................................................32

*Summit Properties, Inc. v. Hoechst Celanese Corp.*,
    214 F.3d 556 (5th Cir. 2000) ....................................................................................33

*Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky &
    Fitzgerald, P.C.*,
    679 N.E.2d 540 (Mass. 1997) ......................................................................33, 34, 35

*Swift Freedom Aviation LLC v. Aero*,
    No. 1:04 CV-90, 2005 WL 2246256 (E.D. Tenn. Sept. 13, 2005) .............................32

*Systems Management, Inc. v. Loiselle*,
    303 F.3d 100 (1st Cir. 2002) ...................................................................35

*Tagliente v. Himmer*,
    949 F.2d 1 (1st Cir. 1991) .................................................................31, 37

*United States v. AVX, Corp.*,
    962 F.2d 108 (1st Cir. 1992) ..................................................................30

*USM Corp. v. Arthur D. Little Sys., Inc.*,
    546 N.E.2d 888 (Mass. App. Ct. 1989) ...................................................32

*Valente v. Sofamor, S.N.C.*,
    48 F. Supp. 2d 862 (E.D. Wis. 1999) ..........................................32, 34, 35

*Warth v. Seldin*,
    422 U.S. 490 (1975) .................................................................................29

*White v. Peabody Constr. Co.*,
    434 N.E.2d 1015 (Mass. 1982) ...............................................................40

*Wise v. Hubbard*,
    769 F.2d 1 (1st Cir. 1985) .........................................................32, 38, 39, 40

*Xchange Inc. Sec. Litig.*,
    Civ. A. No. 00-10322, 2002 WL 1969661 (D. Mass. Aug. 26, 2002) .............................38

*Zekman v. Direct Am. Marketers, Inc.*,
    695 N.E.2d 853 (Ill. 1998) ......................................................................32

## STATUTES

Fed. R. Civ. P. Rule 72(a) .............................................................................20

Mass. Gen. Laws. Ch. 93A, § 11 .............................................................. 30-32

Mass. Gen. Laws. Ch. 260, § 12 ..................................................................38

Mass. Gen. Laws Ch. 260, § 5A ..................................................................35

The Track 1 defendants respectfully submit this Memorandum of Law in Support of their

Motion for Summary Judgement With Respect to Class 3.

## PRELIMINARY STATEMENT

In his February 2005 Report, Professor Berndt explained that "knowledgeable industry

observers" have long known that AWP is not an average of acquisition prices:

> To knowledgeable industry observers, it has long been widely
> known that in the US pharmaceutical industry the term "average
> wholesale price" (hereafter, AWP) is a misnomer:  it is not a
> measure of prices generally paid by wholesalers to manufacturers,
> it is not a measure of prices frequently paid by retail or mail order
> pharmacies or wholesalers, nor is it some average of these.

The Class 3 discovery record proves unequivocally that Dr. Berndt's assessment is correct.  The

members of Class 3, which consists mainly of large sophisticated insurance companies, know

exactly what AWP is, and they know what it is not.  They know that AWP is a reimbursement

benchmark, not an average of provider acquisition costs.  They know that AWP is higher than

the price paid by the provider, that it frequently exceeds the provider's cost by more than 30%,

and that it bears no predictable relationship to acquisition price.  They used AWP – and continue

to use AWP – because they have concluded that AWP-based reimbursement better serves their

interests than other reimbursement methods.  They were not duped or deceived.

Although there is an overwhelming factual record proving that Class 3's use of AWP was

knowing and deliberate, the Court need focus on only a few simple and undisputed facts that

compel summary judgment for defendants:

> ▪ First, the provider contracts produced by Blue Cross Blue Shield of
> Massachusetts ("BCBS/MA") do not "expressly use" AWP as a
> pricing standard, which this Court required in the class definition
> in order to make class members readily ascertainable.
> *Accordingly, BCBS/MA is not a member of Class 3.*

> ▪ Second, Class 3 payors, including BCBS/MA, were not deceived
> by "mega-spreads" because they knew that spreads on physician-

administered drugs could vastly exceed 30%. In fact, BCBS/MA was a direct purchaser of drugs at prices that reflected spreads as high as 1,265%. Other Class 3 payors received similar discounts. *Accordingly, plaintiffs cannot prove that Class 3 payors based their reimbursement decisions on the "expectation" that AWP did not exceed acquisition cost by more than 30%.*

- Third, despite clear knowledge that AWP could exceed acquisition cost by more than 30%, BCBS/MA continued to reimburse physicians based on AWP. In fact, BCBS/MA deliberately rejected the use of alternatives to AWP, including ASP. *Accordingly, plaintiffs cannot prove that the publication of allegedly "inflated" AWPs was a "but for" or "proximate" cause of BCBS/MA's alleged overpayments.*

- Fourth, the testimony of Class 3 payors uniformly contradicts plaintiffs' theory that class members expected AWP not to exceed acquisition cost by more than 30%. *Accordingly, plaintiffs cannot prove that Class 3 payors were deceived because they expected that physician spreads would not exceed 30%.*

- Fifth, Pipefitters Local 537 Trust Funds ("Pipefitters") and Health Care For All, cannot prove that they were injured by the alleged AWP scheme. Pipefitters has no independent basis for suit as it delegated all of its health insurance responsibilities to BCBS/MA. Health Care For All does not have standing to sue because it admittedly does not know whether any of its members sustained injury.

Class 3 payors were not victims of the AWP system. They directly purchased drugs throughout the class period at steeply discounted prices. They chose to use AWP knowing that it provided an indeterminate but often substantial margin over acquisition cost. BCBS/MA, at least, considered and rejected alternative methods of reimbursement. In the end, Class 3 reimbursed physician-administered drugs at the rate the market would bear. Defendants are entitled to summary judgment on all of Class 3's claims.

## STATEMENT OF FACTS

The Court certified three named class representatives for Class 3.[1]  BCBS/MA is a health insurance company.  Pipefitters is a fund that delegates all its health insurance responsibilities to BCBS/MA.  Health Care For All is an advocacy group that seeks a declaratory judgement only.

**I.     BCBS/MA Embraced AWP-Based Reimbursement With Full Knowledge That It Bore No Predictable Relationship To Provider Acquisition Costs**

   **A.     BCBS/MA Knew About Spreads In Excess Of 30% Because It Purchased Drugs For Its Staff Model HMO At Substantial Discounts Resulting in Spreads Up To 1,265%**

BCBS/MA did not begin using AWP until 1995.[2]  It adopted AWP knowing that spreads frequently exceed 30%.  In fact, from the beginning of the class period, BCBS/MA was purchasing drugs with spreads that were vastly greater than 30%.  Because BCBS/MA at all times had direct knowledge of spreads in excess of 30%, it could not have been deceived.

---

[1] Consolidated Order Re: Motion for Class Certification dated January 30, 2006 ("Class Cert. Order") at 6.  Class 3 is defined as follows:  "All natural persons who made or who incurred an obligation enforceable at the time of judgment to make a payment for purchases in Massachusetts, all Third-Party Payors who made reimbursements based on contracts expressly using AWP as a pricing standard for purchase in Massachusetts, and all Third-Party Payors who made reimbursements based on contracts expressly using AWP as a pricing standard and have their principal place of business in Massachusetts, for a physician-administered Subject Drug that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.), the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.), SmithKline Beecham corporation d/b/a GlaxoSmithKline, the Johnson  & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.), or the Schering Plough Group (Schering-Plough Corporation and Warrick Pharmaceuticals Corporation).  Included within this Class are natural persons who paid coinsurance (i.e., co-payments proportional to the reimbursed amount) for a Subject Drug purchased in Massachusetts, where such coinsurance was based upon use of AWP as a pricing standard.  Excluded from this Class are any payments or reimbursements for generic drugs that are based on MAC and not AWP."  *See* Class Cert. Order at pp. 5-6.

[2] *See* Schau Decl. Ex. 17 (January 5, 2006 deposition of Michael Mulrey (hereafter "Mulrey Tr.")) at 57:13-59:6.

From before the start of the class period until sometime in the late 1990's, BCBS/MA owned and operated a staff model HMO called Medical East/Medical West.[3] This gave BCBS/MA ownership of a network of physician clinics.  BCBS/MA purchased Track 1 and other physician-administered drugs for use in its physician clinics at substantial discounts below AWP.[4]

BCBS/MA has not produced contracts or data relating to its purchases of physician-administered drugs for its staff model HMO.[5]  Nevertheless, based on the Track 1 defendants' own pricing data, defendants have been able to establish that BCBS/MA purchased Track 1 defendants' drugs at discounts as high as 92.67% below AWP (a "spread" of 1,265%).[6] Moreover, there was no apparent or fixed relationship between AWP and the prices paid.  The discounts that BCBS/MA obtained varied dramatically from drug to drug and year to year.[7]

The following charts relating to three specific Track 1 drugs are illustrative of BCBS/MA's purchases.  Notably, several purchases were made at prices that were close to the

---

[3] *See* Supporting Declaration of Andrew D. Schau ("Schau Decl.") Ex. 1 (April 14, 2006 deposition of Sharon Smith (hereafter "Smith Tr.")) at 21:7-22:5, 41:19-42:3; Schau Decl. Ex. 2 (April 12, 2006 deposition of Maureen Coneys (hereafter "Coneys Tr.")) at 39:9-16.

[4] *See* Coneys Tr. 42:14-43:5; 50:18-21; Declaration of Eric. M. Gaier in Support of the Track 1 Defendants' Joint Motion for Summary Judgement With Respect to Class 3 dated July 14, 2006 ("Gaier 7/14/06 Decl."); Declaration of Eric. M. Gaier in Support of Track 1 Defendants' Joint Motion for Summary Judgement dated March 15, 2006 ("Gaier 3/15/06 Decl.").  *C.f.* Schau Decl. Ex. 3 (non-Bates numbered self administered drug purchase agreement between BCBS/MA and SmithKline Beecham dated June 6, 1992).

[5] BCBS/MA initially refused to produce any documents relating to its staff model HMO in this litigation. Defendants then filed a motion to compel the production of these documents, which was granted in part by Magistrate Judge Bowler on May 9, 2006.  *See* Schau Decl. Ex. 4 (Hearing Transcript) at 31-39. BCBS/MA was ordered to produce all contracts relating to drug purchases by its staff model HMO.  *Id.* BCBS/MA has now represented by letter that it has been unable to locate any contracts relating to its staff model HMO drug purchases.  *See* Schau Decl. Ex. 5.

[6] *See* Gaier 7/14/06 Decl. at 15.  *See also* Reply Declaration of Jessica V. Barnett in Support of the Reply Memorandum of Law in Further Support of Track 1 Defendants' Joint Motion for Summary Judgment (Apr. 28, 2006) ("Barnett Decl.") at Ex. 6 (listing maximum and median spreads on purchases made by BCBS/MA and other Massachusetts payors).

[7]  *See* Gaier 7/14/06 Decl.; Barnett Decl. Ex. 6.

4

average selling prices calculated by Dr. Hartman.[8]  Thus, it is undisputed that BCBS/MA knew

about and expected the very spreads that plaintiffs say were secret and concealed.

**VEPESID prices to BCBS/MA[9]**



**ALBUTEROL (NDC 59930150008) prices to BCBS/MA[10]**



---

[8] *See* Gaier 7/14/06 Decl.  Notably, Dr. Hartman acknowledges that Class 3 payors who purchase drugs directly "would have more information" and consequently should be excluded from any damages analysis.  *See* Schau Decl. Ex. 6 (Feb. 28, 2006 deposition of Raymond Hartman) at 1013-19.

[9] Gaier 7/14/06 Decl. at p. 7, Figure 1.

[10] Gaier 7/14/06 Decl. at p. 33, Figure 20.

PROCRIT (NDC 59676031001) prices to BCBS/MA[11]



### B. BCBS/MA's Corporate Representatives Testified That They Knew That AWP Bears No Predictable Relationship To Acquisition Cost

John Killion, BCBS/MA's Senior Director for Ancillary Services, testified that he understood as early as 1994, when he worked at Tufts Health Plans, that AWP was "an artificial price" that "didn't bear a relationship to the [drug] acquisition cost[s]."[12] He also testified that he understood and it was *common knowledge* in the industry at that time *why* this was the case, *viz*: that manufacturers of brand name drugs frequently offer rebates and discounts in response to competition, and generic drugs are typically sold at discounts even higher than on branded drugs.[13] Thus, Mr. Killian understood that AWP was not an actual average of wholesale prices, and he knew that AWP bore no predictable relationship to the physician's acquisition price:

---

[11] Gaier 7/14/06 Decl. at p. 33, Figure 19.

[12] *See* Schau Decl. Ex. 7 (January 6, 2006 deposition of John Killion (hereafter "Killion Tr.")) at 6:15-17 (reflecting his title), 119:4-22, and 122:18-22. *See also* Killion Tr. 24:12-22 (providing dates for the time period Mr. Killion was testifying with regard to).

[13] *See* Killion Tr. 120:13-122:22. Numerous other health plans testified to similar knowledge that competition leads to greater spreads. *See e.g.*, Schau Decl. Ex 8 (September 13, 2004 deposition of Eric

6

Q.   When you said and used the term "artificial price" in that answer, what did you mean by the term "artificial price"?

A.   Artificial price meaning a – a price that – that was referred to as it ain't what you pay, or the acronym AWP, ain't what you pay, used commonly at Tufts Health Plan.

                    *        *        *

Q.   So you understood that by that phrase, "ain't what's paid," that AWP was not in fact the actual average of wholesale prices; correct?

A.   That's correct.

Q.   And you understood at this time and it was discussed at Tufts that AWP bore no predictable relationship to the actual cost as paid; right?

A.   Correct.[14]

Another BCBS/MA executive, Steven Fox, BCBS/MA's Senior Director of Provider Relations, Communications and eHealth, testified that he also knew that AWP was a "largely inflated" number that was used as a starting point in negotiations:

A.   …And so, again, I think, as I've been involved in physician reimbursement, I think we had a general understanding that that number was largely inflated.  And so, we could take a percentage off and negotiate it like we negotiate other numbers.

Q.   Now, for as long as you've been involved in reimbursement, you understood that number was largely inflated.  What did you – what do you mean when you say, "largely inflated"?

A.   I think it was known in the – again, in my dealings with physicians and my understanding of physician reimbursement – that the average wholesale price is much like a sticker price of a car, much like the charges in a hospital.  It's a price with which you start.  And again, it's an industry benchmark, and we go from there.[15]

---

Cannon of IHC Health Plans) at 35:16-36:18; Schau Decl. Ex. 9 (January 14, 2005 deposition of Jill Herbold of CIGNA (hereafter "Herbold Tr.")) at 85:21-86:11; Schau Decl. Ex. 10 (September 20, 2004 deposition of James Kenney of Harvard Pilgrim Health Care (hereafter, "Kenney Tr.")) at 12:1-13:7, 15:2-17.

[14] Killion Tr. 136:20-137:5, 138:17-139:5 (Objections omitted).

[15] Schau Decl. Ex. 11 (March 8, 2006 deposition of Steven Fox (hereafter "Fox Tr.")) at 228:7-8 (reflecting his title) and 126:16-127:10.

7

Mr. Fox has been "involved in physician reimbursement" since 1992.[16]  His pricing knowledge of the difference between AWP and acquisition price was based, in part, on "conversations I've had with physicians."[17]

> **C.** **No BCBS/MA Witness Endorsed Plaintiffs' Theory That Payors Expected That AWP Would Not Exceed Acquisition Cost By More Than 30%**

Defendants deposed 14 witnesses from BCBS/MA dealing with different aspects of physician reimbursement.[18]  As noted, some witnesses, including Mr. Killion, were intimately familiar with AWP and its role as a reimbursement benchmark.  Other witnesses were less well versed in AWP, but they uniformly repudiated plaintiffs' claim that payors "expected" that AWP would not exceed acquisition cost by more than 30%.  In fact, they stated that they had *no specific expectation* concerning the relationship between acquisition cost and AWP.

For example, Jan Cook, a Regional Medical Director for BCBS/MA, testified that she understood that doctors who "were giving a lot of medications … might be getting some sort of volume discount."[19]  Ms. Cook expressly disavowed any expectation as to the relationship between the acquisition price and the reimbursement amount:

> Q.   So is the answer to my question that you have no understanding or expectation as to the relationship between the price that they pay to acquire drugs and the amount that they're reimbursed for drugs?
>
> A.   Yeah.[20]

---

[16] *See* Fox Tr. 50:4-19.

[17] *See* Fox Tr. 151:9-19.

[18] Schau Decl. ¶ 3.

[19] *See* Schau Decl. Ex. 12 (March 6, 2006 deposition of Jan Cook (hereafter "Cook Tr.") at 36:8-10 (reflecting her title) and 207:14-16.

[20] Cook Tr. at 202:8-14 (objections omitted).

Lisa Gorman, a Regional Director on the BCBS/MA Provider Relations Team, made the same point:

> Q.   Okay.  So you do have an understanding here that different doctors may have paid different rates, but your testimony is that you don't know what the rates are that any doctors pay to acquire drugs?
>
> A.   That's true, yeah.
>
> Q.   So you have no understanding or expectation, then, as to what the relationship is between doctors' acquisition prices for drugs and the amounts that they are reimbursed for drugs?
>
> A.   I don't know, no.
>
> Q.   So your answer is that you have no such understanding or expectation?
>
> A.   I don't, yeah.[21]

Vincent Plourde, BCBS/MA's Vice President of the Provider Services Division, said he also knew that providers could receive variable rebates and discounts on their drugs purchases,[22] but he had no particular expectation as to the magnitude of the discounts:

> Q.   Okay.  Is it your understanding that those rebates and discounts fall within a particular range or a particular band or that they vary widely?
>
> A.   I do not have a particular percentage in mind.
>
> Q.   Okay.  So you have no particular expectation as to what the range of discounts and rebates would be, although you know that rebates and discounts exist?
>
> A.   Correct.  Correct.[23]

In contrast, *not a single witness* testified in support of plaintiffs' theory that payors somehow expected that AWP would not exceed acquisition price by more than 30%.  One

---

[21] *See* Schau Decl. Ex. 13 (March 7, 2006 deposition of Lisa Gorman (hereafter "Gorman Tr.")) at 8:15-16 (reflecting her title) and 106:7-21 (objections omitted).

[22] *See* Schau Decl. Ex. 14 (April 13, 2006 deposition of Vincent Plourde ("Plourde Tr.")) at 7:5-7 (reflecting his title); 116:5-10; 116:22-117:7.

[23] Plourde Tr. 117:8-18 (objections omitted).

carefully-prepared BCBS/MA witness did testify that he expected there to be a "reasonable" relationship between AWP and acquisition costs, but even he did not equate "reasonable" with 30%.[24]   Rather, he emphasized that "I have no preconceived notion of what reasonable is.  I am not going to give you one because I don't have one in my mind."[25]

### D.   BCBS/MA Had Access To Additional Information Regarding Doctors' Drug Acquisition Costs

BCBS/MA witnesses readily acknowledged that they had access to information about AWP.  And they certainly knew who to contact if they wanted to learn more.  When asked who at BCBS/MA was knowledgeable about AWP, Deborah Devaux, the BCBS/MA Senior Vice President for Health Care Contract Management, immediately identified John Killion as the person she would call.[26]

Of course, BCBS/MA also had access to the vast body of public literature – including the 1996 *Barron's* article and numerous government reports – that discussed the difference between AWP and acquisition cost.[27]   Moreover, drug-specific data reflecting deep discounts to providers was publicly available for purchase from IMS Health, a well-known third party data provider.[28]

---

[24] Fox Tr. 146:7-150:3.

[25] Fox Tr. 149:22-150:3.  Later in the deposition, after he had the opportunity to confer with counsel, he said he thought that a 30% margin would not be reasonable in his opinion, but that margins of 1%, 2% or 3% might be.  *See* Fox Tr. 300:12-20.  Regardless, it is clear that BCBS/MA did not base its reimbursement decisions on the expectation that spreads did not exceed 30%.

[26] *See* Schau Decl. Ex. 15 (March 9, 2006 deposition of Deborah Devaux (hereafter "Devaux Tr.")) at 9:17-19 (reflecting her title), 134:4-13.  *See also* pp. 6-7 *supra*.

[27] *See* Declaration of Lucy Fowler (March 15, 2006) Exs. 1-89 (submitted in connection with the Track 1 motion for summary judgment as to Classes 1 and 2).

[28] *See* http://www.imshealth.com/ims/portal/front/indexC/0,2773,6599_77075636_0,00.html (last visited on July 13, 2006) (describing IMS's National Sales Perspectives database as "the most comprehensive, national-level prescription sales database.  The National Sales Perspectives tracks sales activity for all pharmaceutical distribution channels, including major retail food stores and chains, mass merchandisers, independent pharmacies, mail service pharmacies, hospitals, clinics, closed-wall HMOs, long-term care, home health care, and prisons/universities.  Sales information is compiled from more than 100 pharmaceutical manufacturers and more than 300 wholesaler and chain warehouses.").

**II.     BCBS/MA Has Purposefully Chosen To Continue Using AWP and Has Even Expanded Its Use of AWP Despite Knowing That AWP Can Exceed Acquisition Cost By More Than 30%**

BCBS/MA is admittedly satisfied with its use of AWP as a reimbursement benchmark.  It has twice considered adopting alternative reimbursement methodologies, but on both occasions it decided to continue using AWP.  In fact, BCBS/MA is so enamored with AWP that it is currently in the process of extending its use of AWP to hospital out-patient clinics, a setting where AWP-based reimbursement was not used previously.

**A.     BCBS/MA Considered But Decided Not To Adopt ASP-Based Reimbursement In Lieu Of AWP-Based Reimbursement**

In 2003 and 2004, in the wake of the changes in physician reimbursement under Medicare Part B, BCBS/MA considered whether to jettison AWP-based reimbursement in favor of ASP-based reimbursement.  In so doing, BCBS/MA did not overlook the fact that AWP had been the subject of criticism.  It prepared a presentation in which it recounted the allegations relating to AWP and listed the following as "Reasons for Reform":

- Physicians benefit from the "spread" between AWP and acquisition cost creating an overpayment for drugs and costs for Medicare.

- According to GAO and CMS, in 2001 Medicare overpaid Part B drugs by over $1 billion.

- In 2002, Oncologists collected approximately $600 million in overpayments.

- Patients who pay a coinsurance are adversely affected by the inflated AWP.[29]

---

[29] *See* Schau Decl. Ex. 16 ("Analysis of CMA Average Wholesale Price Reform – Reimbursement for Part B Drugs" dated February 7, 2004 produced electronically on CD bearing Bates number BCBS/MA-AWP 11598A (hereafter "BCBS/MA Shift to ASP Analysis") at 2.

11

BCBS/MA was also familiar with the CMS's reasons for moving away from AWP.  Ms. Devaux, the Senior Vice President for Health Care Contract Management, testified that she understood that Medicare switched to ASP because it had a "concern about the reasonableness of the – the pricing – the AWP relative to the acquisition cost."[30]  Indeed, BCBSMA had extensive knowledge about the extent and variability of spreads based, among other things, on its staff model HMO purchases, its own employees' familiarity with AWP's lack of a predictable relationship to acquisition costs, and the publicly available information concerning spreads.

In considering whether to make a change, BCBS/MA identified and considered four reimbursement options:  (1) to follow CMS' lead by moving to ASP and increasing the administration fees paid to the physicians,[31] (2) to move to an ASP-based methodology without changing administration fees but keep the overall physician reimbursement amount constant by applying multipliers to the CMS reimbursement rate, (3) to reimburse at 95% of 2004 AWPs without future updating, or (4) to stay with the current 95% of AWP methodology and get updated AWPs by J-code (instead of by NDC) from a vendor going forward since CMS would no longer be using or making AWP-based J-code reimbursement values available.[32]

These four options, together with an underlying analysis of each option, were presented at a meeting of BCBS/MA's Provider Financial Strategies Workgroup ("the PFS Workgroup").[33] The PFS Workgroup "walked through the whole presentation" and "there was discussion around the table on a lot of different things that were in this analysis."[34]  BCBS/MA's analysis indicated

---

[30] Devaux Tr. 171:17-22.  *See also* Devaux Tr. 161:14-19.

[31] BCBS/MA recognized that when CMS adopted ASP-based reimbursement it increased physician administration fees by as much as 392%.  *See* Schau Decl. Ex. 16. BCBS/MA Shift to ASP Analysis at 6.

[32] *See* BCBS/MA Shift to ASP Analysis at 12-15.

[33] Devaux Tr. 162:9-18.

[34] Mulrey Tr. at 101:4-5; 104:9-11.

that a move to ASP-based reimbursement might reduce its overall annual reimbursement costs by more than $6 million, even after accounting for increased administration fees.[35]

After full deliberation, the PFS Workgroup decided to stick with AWP.  It concluded that the "cons" associated with the proposed changes outweighed the benefits.  Its reasons for not changing to ASP-based reimbursement included:

- High impact to certain provider types (i.e. Oncology)

- Resistance to changes by network

- Potential shift to facility setting (Oncologists)

- Uncertain future of CMS continuing with this payment methodology[36]

Notably, one of BCBS/MA's concerns was a fear that a move to ASP-based reimbursement would yield too little profit for the physicians, causing them to stop administering drugs to patients in their offices, resulting in patients being sent for treatment to hospitals where the cost of reimbursement to BCBS/MA would be higher.[37]  Accordingly, the PFS Workgroup decided that it was in BCBS/MA's interests to continue using AWP:

> Q.   Let me rephrase it.  In making the decision in February of 2004 not to move at that time, you weighed those concerns against the concerns with the AWP benchmark that were described by other members of the group and are reflected in this documents.

---

[35] *See* BCBS/MA Shift to ASP Analysis at 7.

[36] *See* BCBS/MA Shift to ASP Analysis at 12.

[37] Devaux Tr. 176:15-177:8.  *See also* Coneys Tr. 17:7-18:7 and 19:4-8 (testifying she has been aware since 1979 that the hospital site of care is more expensive than treatment in physician's offices); Killion Tr. 67:10-22 ("reimbursement in the hospital setting is a more expensive setting than in the physician office" and this is something BCBS/MA has "looked at"); Plourde Tr. 60:10-61:15 (same).  BCBS/MA is not alone – numerous health plans testified they used spreads to encourage physician to treat patients in office rather than send them to hospitals.  *See e.g.*, Schau Decl. Ex. 18 (September 20, 2004 deposition of Hal Goldman of Vista Health Plan) at 58:19-60:4; Schau Decl. Ex. 19 (October 5, 2004 deposition of Susan Mengert of Horizon Health Care) at 78:13-81:7; Herbold Tr. at 75:21-76:16.

A.   I considered all of those factors.

Q.   And you decided that, on balance, Option 4 was the best decision for that time.

A.   I decided not to change our practice at the moment, or I felt we should decide not to change our practice, and the group agreed.[38]

**B.    BCBS/MA Considered But Decided Not To Reimburse Physician-Administered Drugs Under Its Specialty Pharmacy Program As An Alternative to AWP**

Payors such as BCBS/MA have long had a ready alternative to reimbursing physicians under the "buy-and-bill" model whereby the doctor purchases the drug and then seeks reimbursement from the patient's insurer.  Payors can circumvent the model entirely by choosing to supply the physician from a contracted specialty pharmacy.  These pharmacies purchase drugs and ship them to doctors for administration to their patients.  The doctor never takes title to the drug and the pharmacy bills the insurer directly at a contracted rate.

BCBS/MA has investigated the potential savings it might achieve if it supplied physician-administered drugs through specialty pharmacies rather than the current buy-and-bill system.  In 2001, it asked for and received specialty pharmacy proposals from vendors.[39]  A year later, in the summer of 2002, BCBS/MA's then Director of Pharmacy Gary Shramek attended or obtained materials from a conference sponsored by the Blue Cross Blue Shield Association called the "Specialty Pharmaceutical National Partnership Showcase."  Materials presented at the conference showed – in sections circled by hand on Mr. Shramek's copy – that physicians sometimes earned a substantial margin under the buy-and-bill model.  Indeed, a conference program entitled "Physician Purchasing Reality" explained that "U.S. Oncology can purchase drugs for anywhere from 18%-40% off AWP [a "spread" of 22%-67%]."  The program materials

---

[38] Devaux Tr. 193:6-19 (objections omitted).

[39] *See e.g.*, Schau Decl. Ex. 20 (BCBS/MA-AWP 17406-17433).

also noted that "[w]e're reimbursing pediatricians at AWP-5% and they're able to buy at much lower – even 60% to 70% off [a "spread" of 150% to 233%]."[40]

In 2003, BCBS/MA formed a Specialty Pharmacy Committee for the purpose of assessing and possibly implementing a specialty pharmacy program.[41]  The person responsible for the project was John Killion, the same individual who testified he had been aware since at least the mid 1990's that AWP bore no predictable relationship to acquisition cost.[42]

The Specialty Pharmacy Committee weighed the potential benefits of moving away from the buy-and-bill model, including the potential cost savings that could be achieved if a specialty pharmacy program could be successfully imposed on the participating physicians.[43]  Its analysis showed that, for physician-administered oncology drugs, the move to specialty pharmacies might yield considerable savings.[44]  In considering the use of specialty pharmacies, BCBS/MA also reviewed materials that referred to press reports on the discounts available to doctors on physician-administered oncology medications:

> 1/26 NY Times Article – Physicians are able to obtain discounts as high as 86% on medications [a "spread" of 616%].  Plan reimbursement to providers for medication is in the range of AWP-5%.[45]

---

[40] See Schau Decl. Ex. 21 (BCBS/MA-AWP 17372-86 at 17376); Schau Decl. Ex. 22 (June 19, 2006 letter from Stephen Coco to Adeel Mangi identifying document custodian) Schau Decl. Ex. 44 (May 25, 2006 from Stephen Coco to Adeel Mangi listing document custodian's title).

[41] Killion Tr. 47:1-13; 65:15-66:1.

[42] Killion Tr. 10:11-14; 59:18-20.  *See also* pp. 6-7 *supra*.

[43] Coneys Tr. 126:17-128:6.

[44] *Id.*

[45] *See* Schau Decl. Ex. 23 (BCBS/MA-AWP 17182-17197) at 17191.

Nevertheless, after deliberation, BCBS/MA decided to exclude physician-administered drugs from the scope of its specialty pharmacy program.[46]  Again, one of BCBS/MA's concerns was that physicians, unless they received a sufficient margin over their acquisition cost, would stop administering drugs in their offices and instead send patients to the hospital.[47]  Mr. Killion explained, "[w]e were concerned, continue to be concerned, in regards to being overcharged for oncology medications but wanted to make sure we roll out a program that benefits our members and also addresses concerns that the oncologists have raised in a thoughtful manner."[48]

### C.   BCBS/MA Embraced AWP-Based Reimbursement In 2005 And 2006 By Adopting Its Use In Lieu of Other Reimbursement Methods In The Hospital Out-Patient Setting

BCBS/MA is currently in the process of expanding its use of AWP to the hospital out-patient department setting.  In the past, BCBS/MA reimbursed for drugs administered in hospital out-patient departments based on a negotiated percentage of the hospital's "billed charges."[49] BCBS/MA recently decided to scrap this methodology in favor of reimbursing hospitals at 95% of AWP.[50]  BCBS/MA has calculated that the change to AWP-based reimbursement will result in savings over the prior charge-based system of about $3.9 million per year at one hospital group alone.[51]

BCBS/MA transitioned the first set of hospitals in October 2005, some four years after this litigation started.[52]  In early 2006 – *after BCBS/MA joined this litigation as a named plaintiff*

---

[46] Killion Tr. 80:9-81:1, 109:19-110:7.

[47] Coneys Tr. 138:9-18.

[48] Killion Tr. 109:19-110:17.

[49] *See* Schau Decl. Ex. 24 (March 10, 2006 deposition of Sheila Cizauskas ("Cizauskas Tr.")) at 124:5-19.

[50] Cizauskas Tr. 124:20-126:16.

[51] Cizauskas Tr. 136:12-137:2; 139:7-140:19; 202:8-22.

[52] Cizauskas Tr. 123:22-124:4.

– BCBS/MA decided to transition all hospitals with contracts coming up for renewal in 2006.[53]

BCBS/MA anticipates that it will continue to transition hospitals to AWP-based reimbursement

until 2011, by which time all of its hospitals will be reimbursed based on AWP.[54]

Final approval to proceed with the transition to AWP-based reimbursement came from

the PFS Workgroup, the same committee that decided in 2004 not to adopt ASP-based

reimbursement for physicians.[55]  Indeed, at least five of the eight to ten members of the

committee have been members since 2003.[56]  Members of the PFS Workgroup testified that in

choosing AWP as the basis for reimbursing hospitals they did not consider how much hospitals

were paying to acquire drugs, because they did not think hospital acquisition costs were

relevant.[57]  They also decided to make this shift to AWP even though they knew that CMS was

shifting to ASP-based reimbursement in hospital out-patient departments, because "there didn't

seem to be any reason to change our direction…."[58]

### III.    Other Massachusetts Insurers Also Embraced AWP With Full Knowledge That It Exceeded Acquisition Cost

Other Massachusetts payors also knew that AWP exceeded acquisition cost and bore no

predictable relationship to acquisition cost.  In fact, four of the five major Massachusetts health

insurers (BCBS/MA, Harvard Pilgrim Health Care, Inc., CIGNA Healthcare of Massachusetts,

Inc., and Fallon Community Health Plans) purchased drugs directly through staff model

---

[53] *See* Cizauskas Tr. 150:8-17. *See also* CMO 19.

[54] Cizauskas Tr. 147:10-148:8.

[55] Cizauskas Tr. 152:13-15.  *See also* pp. 11-14 *supra*.

[56] Cizauskas Tr. 180:21-181:3; 186:18-187:2.

[57] Cizauskas Tr. 183:12-18; Plourde 127:17-128:2.

[58] Cizauskas Tr. 173:18-178:13.

HMOs.[59]  Together with BCBS/MA, these plans cover some 70% of the covered lives in Massachusetts.[60]

The discounts available to these payors, like the discounts available to BCBS/MA, were often substantial.  CIGNA's HMO made purchases at spreads of up to 2,320%.  Fallon Community Health Plan obtained spreads as high as 2,241%.  Harvard Pilgrim's HMO purchased drugs at prices yielding a spread of 1,275%.[61]

The following three charts are illustrative of prices secured by these Massachusetts payors:

**ZOLADEX (NDC 00310096130) prices to Fallon[62]**



---

[59] Gaier 7/14/06 Decl. at 3 *et seq.*

[60] *Id.*

[61] Gaier 7/14/06 Decl. at pp. 18, 21, and 24;  Barnett Decl., Ex. 6.

[62] Gaier 7/14/06 Decl. at p. 43, Figure 39.

**CYTOXAN (NDC 00015054841) prices to CIGNA**[63]



**PROVENTIL (NDC 00085020901) prices to Harvard Pilgrim**[64]



Defendants have not been permitted to complete discovery of Massachusetts payors other than BCBS/MA because class plaintiffs and these insurers' motions for protective orders barring

---

[63] Gaier 7/14/06 Decl. at p. 37, Figure 28.

[64] Gaier 7/14/06 Decl. at p. 56, Figure 65.

discovery were granted.[65]  Nevertheless, as evidenced by the varying spreads on their HMO

purchases, the payors that used AWP did so knowing that it bore no predictable relationship to

acquisition cost.  Indeed, as Mr. Killion of BCBS/MA pointed out, despite this litigation, and

despite the fact that Medicare has moved to ASP, and despite the reams of public information

regarding AWP's lack of a predictable relationship to acquisition costs, the industry standard for

reimbursement remains 95% of AWP.[66]

Moreover, as was the case with BCBS/MA, other third-party payors testified that they

would not have changed their method of reimbursement even if they had more information about

specific drug acquisition costs – a fact confirmed by the payors' continued use of AWP.  For

example, Robert Farias, Director of Planning and Administration at Harvard Pilgrim, testified as

follows:

> Q.  So, indeed, if providers' acquisition costs for drugs were to change, that
> would not alter the amount that Harvard Pilgrim is reimbursing them for
> drugs, is that correct?
>
> A.  That's correct.
>
> Q.  And indeed, if Harvard Pilgrim were to learn more information about
> what providers paid to acquire drugs, that would not change the amount
> that Harvard Pilgrim is reimbursing for drugs.  Is that a fair statement?
>
> A.  That's a fair statement.[67]

---

[65] *See* Chief Magistrate Judge Bowler's ECF order dated February 4, 2006 granting motions for protective orders filed by class plaintiffs, Tufts Associated Health Maintenance Organization, Inc., Harvard Community Health Care, Neighborhood Health Plan, Inc. and Fallon Community Health Plan, Inc. Defendants filed objections to that order, which the Court has not yet ruled upon.  *See* Objections by Abbott Laboratories and Dey, Inc. To the Order of Chief Magistrate Judge Bowler Issued On February 4, 2006 Pursuant to Fed. R. Civ. P. Rule 72(a) (Entered: 02/16/2006), Docket Number 2140.

[66] Killion Tr. 89:2-14.

[67] *See* Schau Decl. Ex. 25 (October 20, 2004 deposition of Robert Farias) at 21:3-5 (reflecting his title); 43:4-16 (objections omitted).

Plaintiffs' liability theory fares no better with payors based outside Massachusetts. This is significant, because although plaintiffs' claims were limited by this Court's certification order, they continue to claim a nationwide fraud. Many dozens of payors across the country were deposed or produced documents in this case. *Not a single payor witness or document* supports plaintiffs' theory that payors expected that AWP would not exceed acquisition cost by more than 30%. Indeed, numerous payors testified that they did not have any such expectation.

For example, Edward Lemke, Director of Fee Schedule Management for Humana, testified as follows:

> Q.  Is it Humana's expectation that the amounts that providers pay to acquire drugs are a fixed percentage less than the amount Humana reimburses in relation to those drugs?
>
> A.  The expectation that – first of all, that it's fixed, no. The expectation that good business practice and assuming providers that we do business with practice good business practices, is that they would only accept payment that is at or above their costs. That's my only expectation.
>
> Q   And certainly, you have no fixed expectation as to how much higher it would be than their acquisition costs, correct?
>
> A.  Correct.
>
> Q.  And indeed, that would vary from provider to provider, depending on what they paid to acquire drugs and what Humana reimburses them for drugs?
>
> A.  Correct.
>
> Q.  The percentage could be 10 percent in one case, 50 in another, 100 in another, correct?
>
> A.  Could be.[68]

---

[68] *See* Schau Ex. 26 (January 11, 2005 deposition of Edward Lemke) at 18:18-22 (reflecting his title); 123:17-124:16 (objections omitted).

Joseph Spahn, Senior Health Care Consultant For Anthem Blue Cross Blue Shield, made

a similar point:

> Q.  Prior to the break, we were talking about providers' acquisition costs
> and the fact they're not relevant to Anthem's reimbursement amounts.
> Do you recall that testimony?
>
> A.  Yes.
>
> Q.  Okay.  And part of that was that Anthem has no information about what
> the providers' acquisition costs are, right?
>
> A.  Correct.
>
> Q.  So it's fair to say that Anthem has no particular expectation that
> providers' costs would be, you know, 10 percent, 30 percent, 50
> percent, something more, something less than the amount they're
> reimbursed in relation to those drugs, right?
>
> A.  Yes.[69]

Kelly Ellston, Assistant Vice President of Claims and Care Management for Union Labor

Life Insurance Co., Inc. testified that she did not have any set expectation either:

> Q.  It would be impossible to say that Union Labor Life expects that they'll
> make a percentage profit of 5 percent, 10 percent, 20 percent, 30
> percent, 40 percent?
>
> A.  That's not in our calculations.
>
> Q.  That's something that is entirely irrelevant to Union Labor Life's
> calculations of the amounts that it's going to reimburse.  Is that correct?
>
> A.  Correct.[70]

Scott Wert, Vice President of Trade Relations For Health Net, was even more emphatic:

> Q.  So it's fair to say, isn't it, that the relationship between any individual
> entity's acquisition cost for drugs and the AWP for that drug will vary
> depending on the amount of rebates or discounts that that entity is

---

[69] *See* Schau Ex. 27 (November 30, 2004 deposition of Joe Spahn) at 8:7-12 (reflecting his title); 97:17-98:13 (objections omitted).

[70] *See* Schau Ex. 28 (November 23, 2004 deposition of Kelly Ellston) at 22:21-23:1 (reflecting her title); 89:18-90:5.

getting, right?

A.   Right.

Q.   Indeed, there will be no settled percentage differential between the two of those numbers, the actual acquisition costs on the one hand and the AWP for that drug on the other, right?

A.   Right.

Q.   Will vary from entity to entity, drug to drug depending on the leverage that those entities have and their ability to exact differential rebates and discounts from drug manufacturers, right?

A.   Yes.

Q.   And certainly Health Net has no fixed expectation or has no expectation that there is, in fact, a fixed relationship between actual acquisition and AWP, correct?

A.   Correct.

Q.   In other words, Health Net recognizes that the relationship between the actual acquisition cost for a drug and the AWP for a drug will vary widely depending on the amounts of rebates or discounts that the purchasing entity can get from the manufacturer?

A.   Right.

Q.   So certainly, if one were to say that, well, you know Health Net expects that there will be a fixed relationship of, say, 20 percent or 30 percent or 40 percent, there would be absolutely no foundation for that, correct?

A.   Correct.

Q.   That would be simply an inaccurate assumption that lacks any foundation whatsoever, right?

A.   Yes.[71]

Additional witnesses from other health plans provided similar testimony.[72]

---

[71] *See* Schau Ex. 29 (February 1, 2006 deposition of Scott Wert) at 7:2-3 (reflecting his title); 35:17-37:17 (objections omitted).

[72] *See e.g.*, Schau Ex. 30 (September 17, 2004 deposition of Mike Beaderstadt of John Deere Health Care) at 72:17-73:5 ("I don't believe [AWP] has any relationship [to actual acquisition cost] that is a consistent relationship"); Schau Decl. Ex. 31 (March 9, 2005 deposition of Mickey Brown of Blue Cross/Blue

## IV. Pipefitters Delegates All Its Health Insurance Responsibilities to BCBS/MA

Throughout the class period, Pipefitters has used BCBS/MA to provide health insurance to its members.[73]  Charles Hannaford, the Fund Administrator for Pipefitters, testified that he was "entirely dependant" on BCBS/MA and had "no independent knowledge" on issues relating to that coverage.[74]  He did not know if any of Pipefitters' members were administered drugs from the Track 1 defendants.[75]  He had no independent basis to verify whether or not BCBS/MA was using AWP or how much of a discount off of AWP it was using.[76]  He testified that Pipefitters selected BCBS/MA because he thought that BCBS/MA, because of its size and sophistication, would "be able to exact a better discount for [the Fund]" than Pipefitters could on its own.[77]  BCBS/MA's Senior Director of Provider Relations testified that all of BCBS/MA's fund clients rely on networks provided by BCBS/MA, that they never negotiate directly with providers, and they only use rates determined by the contracts between BCBS/MA and providers.[78]

## V. Health Care For All Knows Nothing About This Suit

Health Care For All is a membership-based association.  It was added to this lawsuit for the first time in this Court's Class Certification Order dated January 30, 2006.[79]  Until plaintiffs named this association in their proposed class certification order, it had never appeared in any

---

Shield of Mississippi) at 127:7-14 (testifying that he did not "have an expectation one way or the other" as to the relationship between acquisition cost and AWP); Schau Decl. Ex. 32 (June 30, 2006 deposition of Bruce Niebylski of Health Alliance Plan of Michigan) at 71:5-18 (denying specific percentage expectations and stating that "I haven't had any expectations what [physicians'] margin would be.")

[73] Schau Ex. 33 (December 29, 2005 of Charles Hannaford (hereafter "Hannaford Tr.")) at 13:20-14:10.

[74] Hannaford Tr. at 25:4-6 (reflecting his title), 156:8-21.

[75] Hannaford Tr. at 156:8-21.

[76] Hannaford Tr. 159:15-18.

[77] Hannaford Tr. at 133:4-11.

[78] Fox Tr. 220:10-222:9, 224:20-225:8

[79] *See* Class Cert. Order at 6.

24

pleadings, or been subject to any discovery.  Thereafter, on March 10, 2006, plaintiffs amended the Complaint to add a new paragraph in which they alleged that "[d]uring the Class Period, HCF[]'s members have been billed for and paid charges for AWPIDs outside of the Medicare Part B context based on published AWPs."[80]

The corporate representative produced by Health Care For All could not confirm the accuracy of plaintiffs' allegation.[81]  She said that her organization does not know whether any of its members have been injured as a result of the alleged AWP scheme.[82]  She admitted that the association itself has not been injured by the alleged AWP scheme.[83]  She testified that her organization agreed to serve as a class plaintiff after receiving a $10,000 grant through plaintiffs' law firm.[84]

---

[80] *See* Schau Decl. Ex. 34 (relevant excerpts from Notice of Errata to the Fourth Amended Master Consolidated Class Action Complaint to Comply With the Court's Class Certification Order dated March 10, 2006).

[81] Schau Ex. 35 (May 23, 2006 deposition of Melissa Shannon (hereafter "Shannon Tr.")) at 53:14-55:2, 60:10-61:1.

[82] Shannon Tr. 53:14-54:6.

[83] Shannon Tr. 181:10-20.

[84] Shannon Tr. 97:12-98:15; 104:11-21.

## ARGUMENT

As discussed below, the defendants are entitled to summary judgment on all Class 3 claims because (1) Class 3 payors cannot prove causation under Massachusetts law, (2) the claims accruing prior to 1997 are barred by the statute of limitations, and (3) the Class 3 payors failed to mitigate their alleged damages by continuing to use AWP in lieu of other alternatives after learning of the alleged fraud.  In addition, the claims of BCBS/MA and Healthcare For All should be dismissed for narrower reasons that are specific to these two plaintiffs.  These specific grounds are addressed first.

**I.      Defendants Should Be Granted Summary Judgment Against BCBS/MA Because It Is Not A Member Of Any Certified Class**

Prior to 1995 BCBS/MA did not reimburse physician-administered drugs based on AWP. Rather, its reimbursement was based on physicians' billed charges up to a "usual & customary" cap.[85]  Thus, BCBS/MA was not a class member and does not have a claim arising out of reimbursements made prior to 1995.

After 1995, BCBS/MA did make some use of AWP.  Nevertheless, it did not become a member of Class 3 because its reimbursement contracts do not expressly reference AWP.  The absence of an express contractual reference to AWP is fatal to BCBS/MA's claim.

In order to be a member of Class 3 as certified by the Court, a payor's contracts must *expressly* use AWP as a pricing standard:

> … all Third-Party Payors who made reimbursements *based on contracts expressly using AWP as a pricing standard* for purchase in Massachusetts, and all Third-Party Payors who made reimbursements *based on contracts expressly using AWP as a pricing standard* and have their principal place of business in

---

[85] Mulrey Tr. 57:13-59:6.

Massachusetts, for a physician-administered Subject Drug that was manufactured by [the Track 1 defendants]." (Emphasis added).[86]

The Court's use of the emphasized language was not accidental. The language was proposed by plaintiffs in their original proposed order in September 2004, and it was repeated by plaintiffs in every one of the subsequent orders that they proposed thereafter.[87] Plaintiffs assured the Court that the presence of this language in the order meant that individual issues relating to the ascertainability of class members and typicality concerns could be overcome. In fact, they predicted that it would be easy to identify contracts that expressly used AWP as a pricing standard. *See* Schau Decl. Ex. 39 (Plaintiffs' Reply Memorandum in Support of Class Certification) at 2 ("Defendants' claims of complicating individual factual issues fade upon examination. In order to be included in the Class, these private reimbursements must be based on a contract using AWP as a benchmark. All parties have shown great ease in identifying these AWP-based contracts.").[88]

As it turns out, BCBS/MA is not a member of Class 3 because its contracts do not "expressly us[e] AWP as a pricing standard." In fact, counsel for BCBS/MA concedes that the provider contracts it produced in discovery do not mention any reimbursement method, let alone a method that expressly references AWP:

---

[86] Class Cert. Order at 5-6.

[87] *See* Schau Decl. Ex. 36 ([Proposed] Order Granting Plaintiffs' Motion for Class Certification served on September 3, 2004) at ¶ 2; Schau Decl. Ex. 37 ([Proposed] Order Granting Plaintiffs' Amended Motion for Class Certification served on December 17, 2004) at ¶ 2; Schau Decl. Ex. 38 (Plaintiffs' [Modified and Corrected Proposed Version 1] Consolidated Order re Motion for Class Certification served on January 26, 2006) at ¶ 3(a).

[88] *See also* Schau Decl. Ex. 40 (Plaintiffs' Memorandum in Support of Class Certification) at 23 ("The Plaintiffs' contracts' use of AWP as a pricing standard is typical of the Third Party/Co-Payor Class member's use of AWP and Plaintiffs and Third Party Payor class members are thus perfectly aligned in this regard. First, the proposed Class by definition includes only those entities whose "contracts" used AWP as a pricing standard.").

27

> Indeed, the initial three boxes of contracts (that will be produced shortly) appear not to contain a single reference to reimbursement methodologies for physician-administered drugs at issue in this case even though the providers associated with these contracts administered the bulk of the office-based physician-administered drugs paid for by BCBS/MA.[89]

BCBS/MA's contracts typically state only that reimbursement will be at "[t]he lesser of the charge for the covered service or the amount listed on the fee schedule."[90]  The fee schedules in turn list dollar sums for specific drugs or drug codes, but they make no reference to AWP.[91]

To be sure, BCBS/MA's witnesses have testified its fees schedules are based on AWP. But this is not always the case and the contracts and fee schedules do not themselves reference AWP.  This is important because BCBS/MA has utilized, and continues to utilize, other reimbursement methodologies besides AWP, including withholds and contracted capitation arrangements.[92]  To compound the problem even further, BCBS/MA's corporate representative testified that there is no way to tell from BCBS/MA's claims data whether a given claim was paid based on the billed charge or a fee schedule.[93]  In other words, the tangle created by BCBS/MA's contracts highlights the very problems the Court wished to avoid when it accepted plaintiffs' proposal to limit the class to payors with contracts that "expressly" use AWP as a pricing standard.

---

[89] *See* Schau Decl. Ex. 41 (June 8, 2006 Letter from Stephen L. Coco to Adeel A. Mangi)

[90] *See* Fox Tr. 314:18-315:4; 309:22-310:2; *see also* Schau Decl. Ex. 42 (Non-Bates numbered template contract produced by BCBS/MA electronically on CD bearing Bates number BCBS-AWP 0005, and marked as Fox Deposition Ex. 12) at ¶1.19.

[91] *See* Schau Decl. Ex. 43 (BCBSMA fee schedule extract).

[92] Mulrey Tr. 43:7-19.

[93] Fox Tr. 314:18-315:20.

28

## II.    Defendants Should Be Granted Summary Judgment Against Health Care For All Because It Lacks Standing To Sue

Health Care For All lacks standing to sue.  An association lacks standing unless it can allege and prove "that its members, or any of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Stated another way, an association may assert standing on behalf of its members only if at least one of its members possesses standing to sue in his or her own right.  *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998).  Thus, for HCFA to have Article III standing, at least one of its members must demonstrate an "injury-in-fact" – that is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted); *Sea Shore Corp.*, 158 F.3d at 55.  In addition, the member must demonstrate that there is "a causal connection between the injury and the conduct complained of – the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'"  *Lujan*, 504 U.S. at 560 (citations and internal quotation marks and alterations omitted); *Sea Shore Corp.*, 158 F.3d at 55.  Finally, the member must show that it is likely that the injury will be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560; *Sea Shore Corp.*, 158 F.3d at 55.

As set forth above, see pp. 24-25 *supra*, Health Care For All does not know, and therefore cannot prove, whether any of its members has been injured as a result of the alleged AWP scheme. Absent proof of injury, it lacks standing to sue.[94]

### III. Defendants Should Be Granted Summary Judgment Against All Third-Party Payors in Class 3 Because They Cannot Establish Causation Under Chapter 93A As A Matter Of Law

The factual record establishes that Class 3 (1) did not have an "expectation" that AWP bore a "predictable" relationship to acquisition cost, (2) knew throughout the class period that spreads could vastly exceed 30%, and (3) made informed choices to continue using AWP in preference to other reimbursement mechanisms such as ASP and specialty pharmacy programs. These undisputed facts are fatal to Class 3's claims under Massachusetts Gen. Laws Ch. 93A ("Chapter 93A"), because they firmly establish that Class 3 payors did not base their reimbursement practices on the erroneous belief that spreads did not exceed 30%. In other words, defendants' alleged deceptions were not a "but for" or "proximate" cause of Class 3's alleged injuries.

Chapter 93A provides that "[a]ny person who . . . suffers any loss . . . *as a result of* the use or employment . . . of an unfair or deceptive act or practice . . . may . . . bring an action . . . for damages." Mass. Gen. Laws Ann. ch. 93A, § 11 (West 2006) (emphasis added). Taking these words at face value, the Massachusetts Supreme Court has recently emphasized that "proving a causal connection between a deceptive act and a loss . . . is an essential predicate for

---

[94] Health Care For All's status as a "consumer health advocacy organization" does not create an exception. A general interest in healthcare policy does not create standing. "A mere interest in an event – no matter how passionate or sincere the interest and no matter how charged with public import the event – will not substitute for an actual injury." *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992); *see also Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements.").

recovery" in a Chapter 93A claim. *Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 840

N.E.2d 526, 528 (Mass. 2006) (discussing the intent of the Massachusetts Legislature); *see also*

*Aspinall v. Philip Morris Companies, Inc.*, 813 N.E.2d 476, 491 n.19 (Mass. 2004); *Makino,*

*U.S.A., Inc. v. Metlife Capital Credit Corp.*, 518 N.E.2d 519, 523-24 (Mass. App. Ct. 1988).  To

establish a causal connection, plaintiffs must prove that the allegedly deceptive conduct was both

the "but for" and the "proximate caus[e]" of plaintiff's loss. *See Markarian v. Connecticut Mut.*

*Life Ins. Co.*, 202 F.R.D. 60, 68-69 (D. Mass. 2001) (citation omitted).

      Knowledge of the truth eliminates any possible causal connection between the alleged

deception and the alleged injury under Chapter 93A.  *See Mass. Farm Bureau Fed'n v. Blue*

*Cross of Mass.*, 532 N.E.2d 660, 665 (Mass. 1989) (holding that no "causal relationship" existed

between the alleged deception and the alleged loss because plaintiff knew that failure to renew

its insurance would result in defendant's transfer of the money at issue).  As a matter of law and

logic, when a plaintiff knew or should have known about a defendant's allegedly deceptive

conduct and nevertheless elects to enter into a transaction, plaintiff's decision to continue with

the transaction, rather than defendant's deceptive conduct, is the cause of the alleged loss.  *See,*

*e.g., Tagliente v. Himmer*, 949 F.2d 1, 3, 8 (1st Cir. 1991).

      For example, in *Tagliente v. Himmer,* the First Circuit affirmed the dismissal of a Chapter

93A claim brought by a land purchaser alleging that the seller misrepresented the extent of

wetlands present on the property and the governmental regulations to which the property was

subject.  *See* 949 F.2d at 3, 8.  The court held that there was no causal connection between the

alleged deception and the alleged loss, because the buyer "knew of the existence of . . . wetlands

on the property throughout the transaction" and was "aware of the regulation of the wetlands by

the government."  *Id.* at 7-8.  Significantly, the court further indicated that any causal connection

between the alleged misrepresentation and the alleged loss is broken where the plaintiff *should* have known the truth. *Id.* at 8 (holding that the land purchaser should have known about the wetlands on the property, because "[t]he extent of the accessibility and visibility of the parcel of land . . . was an easily attainable fact").

Numerous other Massachusetts courts have dismissed Chapter 93A claims on the ground that plaintiff's knowledge precluded any deception. *See, e.g., Madan v. Royal Indem. Co.*, 532 N.E.2d 1214, 1218 (Mass. App. Ct. 1989) (holding that defendant's conduct was not unfair or deceptive because plaintiff was "experienced" and had knowledge of defendant's conduct and the transaction); *USM Corp. v. Arthur D. Little Sys., Inc.*, 546 N.E.2d 888, 898 (Mass. App. Ct. 1989) (rejecting 93A claim where plaintiff was aware of purportedly withheld information and "was not misled by any of the [defendant's] financial reports"); *Dinjian v. Dinjian,* 495 N.E.2d 882, 888 (Mass. App. Ct. 1986) (rejecting 93A claim because defendants' failure to disclose their financial interest in a transaction "is of dubious weight where the [plaintiffs] already understood that [the defendants] had a financial interest in the loan").  Courts outside of Massachusetts have likewise dismissed consumer protection[95] and other fraud claims[96] because plaintiffs' knowledge broke the causal chain between the alleged deception and the alleged injury.

---

[95] *See, e.g., S. Bay Chevrolet v. GM Acceptance Corp.*, 85 Cal. Rptr. 2d 301, 310 (Cal. Ct. App. 1999) (dismissal of consumer fraud claim because plaintiff "knew, understood, agreed, and expected" the transaction and the formula for calculating interest involved in the transaction); *Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213, 219 (Ill. 2004) (affirming dismissal of a consumer protection claim where "deception was not the cause of [plaintiffs] damages because they knew" the truth); *Zekman v. Direct Am. Marketers, Inc.*, 695 N.E.2d 853, 861 (Ill. 1998) (affirming summary judgment in favor of defendant on consumer fraud claim for lack of causation where extensive evidence established the extent of plaintiff's knowledge); *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 55 (N.Y. App. Div. 2004) (noting that when plaintiff has "full knowledge of the facts" but elects to continue the transaction there is a "bar[] to recovery"); *Swift Freedom Aviation LLC v. Aero*, No. 1:04 CV-90, 2005 WL 2246256, at *18 (E.D. Tenn. Sept. 13, 2005) (granting summary judgment on a consumer fraud claim where plaintiffs "had actual knowledge of the truth behind at least the alleged misrepresentations" and thus "have not shown those practices caused their injuries") (emphasis in original); *Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862, 874 (E.D. Wis. 1999) (dismissing a consumer fraud claim because plaintiffs "cannot show a causal

A.      **BCBS/MA Cannot Establish Causation As a Matter of Law**

The record affirmatively shows that when BCBS/MA began using AWP in 1995 it did

not believe or expect that the spreads between provider acquisition cost and AWP were less than

30%.  Indeed, there is no genuine dispute that BCBS/MA knew that AWP did not bear *any*

predictable relationship to provider acquisition costs.  Its executives testified that they

understood AWP was an "artificial price" that bore no predictable relationship to actual prices

paid by providers.  They expressly acknowledged the existence of rebates and discounts to

providers and, as a result, disclaimed any specific expectation as to the relationship between

provider cost and AWP.  BCBS/MA was purchasing physician-administered drugs at deep

discounts off AWP, resulting in "spreads" between BCBS/MA's acquisition costs and AWP as

high as 1,265%.  Even after CMS began publishing ASPs, BCBS/MA chose to continue using

AWP in its private reimbursement contracts, despite its participation in this class action.  In the

face of this record, BCBS/MA simply cannot establish that its decision to adopt and continue to

use AWP was based on a mistaken belief that AWP did not exceed ASP by more than 30%.

---

connection between the defendants' alleged[ly deceptive] conduct [misrepresenting the quality of a medical product] and any . . . loss").

[96] *See, e.g., Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 218-19 (5th Cir. 2003) ("Knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the 'but-for' cause of the damages."); *Summit Properties Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 561 n.19 (5th Cir. 2000) ("If the relevant decision makers knew the limitations on the product but would have bought it anyway . . . , the fraud would not have been a 'but-for' cause of the plaintiffs' damages."); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 746-47 (3d Cir. 1996) (affirming dismissal of a RICO fraud claim because of plaintiff's knowledge of the truth); *Reynolds v. East Dyer Dev. Co.*, 882 F.2d 1249, 1253 (7th Cir. 1989) ("[A] person who discovers the truth may not claim that a defendant's misrepresentation or omission of information harmed him."); *Cathay Pac. Airways, Ltd. v. Fly & See Travel, Inc.*, 3 F. Supp. 2d 443, 452-53 (S.D.N.Y. 1998) (finding plaintiff's decision to voluntarily pay defendant's bills despite knowledge of alleged deception was an "intervening factor in the causation of [plaintiff's] damages"); *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 163-64 (Ill. 2002) (holding that, although Illinois's consumer protection statute did not require reliance, plaintiff could not prove causation if he was not deceived by the alleged representations).

**B.      BCBS/MA's Knowledge Must be Imputed to Pipefitters**

Pipefitters, the other third party payor representative for Class 3, relied entirely on BCBS/MA as its agent to manage drug reimbursement for its members and beneficiaries.  *See* pp. 23-24 *supra*.  It is well established in Massachusetts that where a principal-agent relationship exists, such as the one between Pipefitters and BCBS/MA, knowledge of the agent will be imputed to the principal.  *See e.g.  Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 679 N.E.2d 540, 543 (Mass., 1997) ("When an agent acquires knowledge in the scope of [his] employment, the principal . . . is held to have constructive knowledge of that information.") (citing *DeVaux v. American Home Assur. Co.*, 444 N.E.2d 355 (Mass. 1983)); *see also Lawrence Sav. Bank v. Levenson*, 59 Mass. App. Ct. 699, 704-705 (Mass. App. Ct. 2003) (stating the general principal that knowledge of an agent is imputed to the principal); *In re Bloom*, 222 Mass. 434, 436-437 (Mass. 1916) (a "reason for the rule is that it is the duty of the agent to disclose to his principal all material facts so coming to his knowledge, and the presumption is that he has discharged that duty").

Moreover, Courts have refused to grant summary judgment where parties claiming to have relied on third parties have failed to show that those third parties were indeed deceived.  *See Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213 (Ill. 2004) (affirming grant of summary judgment against home buyers who claimed misrepresentation by siding manufacturers because home buyers did not show that they were directly deceived or that the builders, architects and other third party intermediaries upon whom they relied had been deceived); *see also Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862 (E.D. Wis. 1999) (where claimants, users of medical devices, alleged that manufacturer made false representations to third-party doctors, the Court

34

granted summary judgment against claimants because claimants failed to produce evidence that the third-party doctors relied upon representations made by the manufacturers).[97]

As discussed above, there is no evidence in the record that BCBS/MA based its decision to use AWP as a reimbursement benchmark on the expectation that spreads did not exceed 30%. In fact, there can be no genuine dispute that BCBS/MA knew that AWP did not bear a predictable relationship to provider acquisition cost. As a matter of law, that knowledge is imputed to Pipefitters. *See Sunrise Properties, Inc.,* 425 Mass. at 66. As such, Pipefitters cannot establish causation as a matter of law.

### C.    Class 3 Cannot Establish Causation As a Matter of Law

The record is no different with respect to other Massachusetts third party payors in Class 3. In fact, much like BCBS/MA, the major Massachusetts insurers, including Harvard Pilgrim Health Care, Inc., CIGNA Healthcare of Massachusetts, Inc., and Fallon Community Health Plans, purchased physician-administered drugs throughout the class period at deep discounts off AWP, resulting in "spreads" between their acquisition cost and AWP as high as 2,320%.[98] For example, these class members purchased Zoladex (AstraZeneca), Vepesid (BMS), Procrit (Johnson & Johnson), and Intron (Schering-Plough) at prices at or close to the ASPs calculated by Dr. Hartman.[99] Moreover, an executive at Harvard Pilgrim testified that Harvard Pilgrim would not have adjusted its AWP-based reimbursement rates even if it had

---

[97] By the same principle, the consumers in Class 3 cannot establish causation under Chapter 93A. These consumers, in effect, rely on the insurer to negotiate the best terms with the provider, including the reimbursement and co-payment amounts for medicines prescribed to the consumer. Accordingly, if the insurers were not deceived, the consumers cannot establish causation. *See Shannon*, 805 N.E.2d 213; *Valente*, 48 F. Supp. 2d 862; *cf. Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 103 (1st Cir. 2002) (holding that plaintiff established causation because "but for [the] false representations" another party in the causal chain would have taken action that avoided the harm).

[98] Gaier 7/14/06 Decl. at 18.

[99] *See* Gaier 7/14/06 Decl.; Gaier 3/15/06 Decl.

additional information about provider acquisition costs.  *See* p. 20 *supra*.  Again, there is simply no evidence in the record supporting plaintiffs' contention that third party payors based their reimbursement decisions on an expectation that AWP did not exceed provider acquisition costs by more than 30%.

## IV.    The Claims of Third-Party Payors in Class 3 Are Barred In Part By the Statute of Limitations

Class 3's claims are also barred, in part, by the statute of limitations.  As detailed above, throughout the class period, Class 3 made purchases at or below Dr. Hartman's ASPs and, as such, had actual knowledge of spreads greater than 30%.  But actual knowledge is not required under Massachusetts law.  It is enough that a plaintiff "should have known" the factual basis for its claims.  It is beyond dispute that Class 3 should have known that spreads could exceed 30%.  In fact, it is beyond dispute that they did know.

A four-year statute of limitations applies to plaintiffs' claims under Chapter 93A.  Mass. Gen. Laws Ch. 260, § 5A.  Thus, unless accrual of the statute is tolled, all claims of the Class 3 plaintiffs under the Act are barred prior to October 1997, which is four years from the filing of the first Complaint in this MDL.  No tolling is appropriate because, as set forth above, Massachusetts payors knew, or should have known, prior to October 1997, that AWP was not equivalent to physicians' acquisition cost for physician-administered drugs.

In Massachusetts, a tort action normally accrues at the time of the plaintiffs' injury.  *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 130 (1st Cir. 1987).  However, if plaintiff can show that his injury was "inherently unknowable," a "discovery rule" type of exception applies under which the action accrues "when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action."  *Maggio*, 824 F.2d at 130.  The "inherently unknowable" wrong must be incapable of detection by the wronged

party through the exercise of reasonable diligence.  *Tagliente*, 949 F.2d at 5; *Keane, Inc. v. Swenson*, 81 F. Supp. 2d 250, 255 (D. Mass. 2000); *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 221, 560 N.E.2d 122, 126 (Mass. App. Ct. 1990).

The reasonable diligence standard is an objective one and the cause of action accrues "when the injured party reasonably should have known the factual basis for the cause of action." *Tagliente*, 949 F.2d at 4 (internal quotations omitted).  The burden is on the plaintiff to establish he could not have known in the exercise of due diligence the facts leading to discovering the claim within the statute.  *Tagliente*, 949 F.2d at 5 ("The burden is on the plaintiff to prove that in the exercise of reasonable diligence she could not have known of the misrepresentation within the statute of limitations."); *Maggio.*, 824 F.2d at 130 (If plaintiff had "exercised a reasonable degree of diligence" he would have discovered his claim prior to the statute running); *Albrecht v. Clifford*, 436 Mass. 706, 715, 767 N.E.2d 42, 49-50 (Mass. 2002); *John Beaudette, Inc. v. Sentry Ins. A Mut. Co.*, 94 F. Supp. 2d 77, 111 n. 40 (D. Mass. 1999) (granting summary judgment against Chapter 93A plaintiff and holding that plaintiff bears the burden of presenting evidence to withstand a statute of limitations argument); *Salois v. Dime Sav. Bank of New York, FSB*, No. Civ. A 95-11967 (PBS), 1996 WL 33370626, at *8 (D. Mass. Nov. 13, 1996), *aff'd*, 128 F.3d 20 (1st Cir. 1997); *Friedman v. Jablonski*, 371 Mass. 482, 486-87, 358 N.E.2d 994, 997-98 (Mass. 1976).[100]  Plaintiffs here have made no showing whatsoever of due diligence.

---

[100] Of course, actual knowledge of the claim by plaintiff precludes any application of the discovery rule. *Catrone v. Thoroughbred Racing Assocs. of North America, Inc.*, 929 F.2d 881, 886 (1st Cir. 1991) (granting summary judgment for plaintiff and holding that discovery rule did not apply where plaintiff "had actual knowledge" of the injury); *Reading Cycles v. Bradley*, 1992 WL 93221, *2 (D. Mass. April 13, 1992) (granting summary judgment for defendant and finding that plaintiff's 93A claim was barred by the statute of limitations where it was "evident that [plaintiff] knew of the injury").

Plaintiffs have obligations of reasonable inquiry and the decision whether any misrepresentation should reasonably have been uncovered has to be made in light of what a reasonable inquiry would have disclosed. *Geo. Knight & Co., Inc. v. Watson Wyatt & Co.*, 170 F.3d 210, 213 (1st Cir. 1999) (an action accrues when an injured party "in the exercise of reasonable diligence, should have known the factual basis of the cause of action"); *Bowen v. Eli Lilly & Co.*, 408 Mass. 204, 206, 557 N.E.2d 739, 741 (Mass. 1990) (discussing *Friedman v. Jablonski*). Where the plaintiff "had the means at its disposal to learn" of the facts regarding his injury, the claim is not "unknowable." *Hanson Hous. Auth. v. Dryvit Sys., Inc.*, 29 Mass. App. Ct. 440, 443, 560 N.E.2d 1290, 1292-93 (Mass. App. Ct. 1990), *rev. den.*, 409 Mass. 1101, 565 N.E.2d 792 (1991); *Xchange Inc. Sec. Litig.*, No. CIV.A.00-10322, 2002 WL 1969661, at *2 (D. Mass. Aug. 26, 2002) (widely publicized accounting controversy accrued claim for fraud); *Estate of Sarocco v. Gen. Elec. Co.*, 939 F. Supp. 91, 97 (D. Mass. 1996) (ongoing public debate in community put plaintiff on notice). Thus, if the facts disclosing the fraud are publicly available, a plaintiff without personal knowledge of those facts will be charged with those facts. *Wise v. Hubbard*, 769 F.2d 1, 2-3 (1st Cir. 1985) ("Under Massachusetts law, a fact is not inherently unknowable when it is a matter discoverable by examination of public records."); *Friedman*, 371 Mass. at 486, 358 N.E.2d at 997; *Duco Assocs., Inc. v. Lipson*, 11 Mass. App. Ct. 935, 935, 416 N.E.2d 555, 556 (Mass. App. Ct. 1981) (Following *Friedman* and holding claim was barred where information regarding plaintiff's claim was available for public inspection); *Frank Cooke, Inc. v. Hurwitz*, 10 Mass. App. Ct. 99, 107-08, 406 N.E.2d 678, 684 (Mass App. Ct. 1980).

In *Friedman v. Jablonski*, the Supreme Judicial Court of Massachusetts found that plaintiffs' claim for deceit relating to a purported right of way, which defendants falsely represented provided access to the property plaintiffs purchased, was barred by the statute of

limitations.  371 Mass. at 486, 358 N.E.2d at 997.  The Court found that by the time of sale, the plaintiffs could have determined the falsity of the representation about the right of way by conducting a title search or having an attorney do so on their behalf.  *Id*.  Their failure to do so meant that the action accrued at the time of sale, thus barring their claim.[101]

There is no doubt that Class 3 payors, in the exercise reasonable diligence, should have known that AWP could exceed acquisition cost by more than 30%, and bore no predicable relationship to acquisition cost.  As catalogued by the Track 1 Defendants' in their summary judgment submissions pertaining to Classes 1 and 2, there was a vast public record consisting of numerous government reports, the *Barron's* [102] article, and other publicly-available materials in the 1980s and 1990s that clearly demonstrate that AWP could far exceed the providers' acquisition costs.  Under the law, the third party payors are charged with knowledge of that publicly-available information.

In any event, the Class 3 plaintiffs' claims were not "unknowable."  Plaintiffs could have discovered their claims no later than September 1997 by simply reviewing the government reports and other publicly-available materials regarding AWP.  The statute of limitations, therefore, applies to bar all claims prior to October, 1997.

Finally, plaintiffs' allegations of fraudulent concealment do not toll the running of the statute of limitations.  The applicable statute, Mass. Gen. Laws. Ch. 260, § 12, has been interpreted to require that plaintiff show an affirmative act of fraudulent concealment by the defendant.  *Maggio*, 824 F.2d at 130-31; *Wise*, 769 F.2d at 3-4 (holding that in the absence of a

---

[101] In contrast, the *Friedman* Court found that plaintiffs' claim regarding an artesian well that defendants falsely represented existed on the property could not be discovered until nearly a year after the sale, and was not barred. 371 Mass. at 487, 358 N.E.2d at 998.

[102] Which plaintiffs refer to in the TAMCC (¶ 152) at the same time they conclusorily claim they had no knowledge of the AWP fraud.

fiduciary duty there must be a "positive act of concealment" to constitute fraudulent concealment); *Salois*, 1996 WL 33370626, at *9; *Hurwitz*, 10 Mass. App. Ct. at 109, 406 N.E.2d at 685. Plaintiffs have not pointed to any such "affirmative acts." In the absence of a fiduciary relationship, which does not exist here, silence cannot constitute fraudulent concealment. *Friedman*, 371 Mass. at 486, n.3, 358 N.E.2d at 997, n.3.

Moreover, the undisputed record shows that Massachusetts payors knew that AWPs did not reflect acquisition cost or, by the exercise of reasonable diligence, should have known. In these circumstances, the Massachusetts statute does not toll the statute of limitations. As the First Circuit said in *Maggio*:

> Section 12 tolls the statute of limitations only if the wrongdoer …
> keeps from the person injured knowledge of the facts giving rise to
> a cause of action *and the means of acquiring knowledge of such
> facts*.

824 F.2d at 131 (emphasis in original); *Wise*, 769 F.2d at 4 (holding that Section 12 was inapplicable because plaintiff could have discovered cause of action after "issuance and recordation of a patent") (quoting *Burbridge v. Bd. of Assessment of Lexington*, 11 Mass. App. Ct. 546, 549-50, 417 N.E.2d 477, 480 (1981)); *White v. Peabody Constr. Co.,* 386 Mass. 121, 133, 434 N.E.2d 1015, 1022 (Mass. 1982) ("'(A) cause of action is not concealed from one who has knowledge of the facts that create it.'") (quoting *Stetson v. French*, 321 Mass. 195, 198, 72 N.E.2d 410, 412 (Mass. 1947)). Here, nothing the defendants did prevented the Massachusetts payors (including BCBS/MA) from discovering the truth about the relationship between AWP and acquisition costs and their claims against defendants. Indeed, the publicly-available reports and information relating to providers' acquisition costs preclude any claim by plaintiffs that they diligently pursued their claims. The Class 3 third party payors claims, therefore, are barred by the statute of limitations.

**V.      Class 3's Damages Claims Are Barred By Their Failure To Mitigate**

Defendants' causation argument, see Point III *supra*, establishes that Class 3's claims are defeated by Class 3's continuous and unbroken knowledge throughout the class period that AWP could exceed ASP by more than 30%. They themselves were purchasing drugs at steep discounts. Even after ASP figures were published by CMS, they decided to continue using AWP. Since it is clear that there is no time period during which Class 3 payors used AWP because they unwittingly believed that it did not exceed physician acquisition cost by more than 30%, there is no causation. Hence, there is no liability.

But even if Class 3's liability claim were somehow sustained, Class 3's damages claim would still be barred by the failure to mitigate. Armed with the knowledge that AWP could exceed ASP by more than 30%, Class 3 payors had an obligation to act promptly to mitigate any alleged damages resulting from this discrepancy. Indeed, in cases brought under Chapter 93A, "[t]he general principle is well settled that a party cannot recover for harms that its own reasonable precautions would have avoided." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 204-05 (1st Cir. 1995) (imposing duty to mitigate in case with 93A claims). *See also DiVenuti v. Reardon*, 637 N.E.2d 234, 236 (Mass. App. 1994) ("Chapter 93A of the General Laws 'is not designed or intended to throw out all concepts of reasonableness and mitigation or to allow injured parties to turn their backs on reasonable, probable, and practical dispute resolution so they can conduct a prolonged quest for the mother lode.'") (quoting trial judge); *Savers Property & Cas. Ins. Co. v. Admiral Ins. Agency, Inc.,* 807 N.E.2d 842, 849-850 (Mass. App. 2004) (affirming imposition of duty to mitigate when plaintiff was on notice of potential liability and "had a duty to investigate the matter further, plan a course of action . . . [and] should have spurred [the plaintiff] into immediate action.").

The First Circuit's decision in *Cambridge Plating Co., Inc. v. NAPCO, Inc*., 85 F.3d 752 (1st Cir. 1996), provides an good illustration of a plaintiff's failure to mitigate. Plaintiff in that case claimed damages under Chapter 93A based on defendant's fraudulent nondisclosure that a waste water treatment system it sold to plaintiff in 1984 was missing a critical component needed to make the system work. After the system was installed, plaintiff worked diligently to discover the source of the problem but its efforts were unsuccessful. Eventually, in February 1989, a consultant hired by the plaintiff discovered that the problem was caused by a missing component part known as a "static mixer." Had this component been installed as defendant had promised, the system would have performed as it should have.

Despite learning about the missing component in February 1989, plaintiff waited 15 months before it installed the missing component. The installation took one day. System performance improved immediately.

The district court recognized plaintiff's failure to mitigate its damages. *Cambridge Plating*, 85 F.3d at 772 ("Once Moleux informed Cambridge Plating that the System was missing a vital part . . . [t]he obvious next step was to buy and install a mixer immediately.") (quoting district court opinion). Nevertheless, the district court sustained the jury's verdict awarding plaintiffs' lost profits for 1990 and 1991, and it failed to account for plaintiff's failure to mitigate in its order of remittitur.

The First Circuit vacated and remanded the damages award based on plaintiff's "wrongful conduct in failing to mitigate." *Cambridge Plating*, 85 F.3d at 773. Nevertheless, because defendant admitted that plaintiff's lost profits would continue to accrue for six months after the date it should have installed the missing component, the First Circuit allowed plaintiff to

recover lost profits through November 1989.  Damages occurring after November 1989, however, were disallowed.  *Id.*

As noted above, Class 3 payors have known throughout the class period that AWP could exceed acquisition cost by substantially more than 30%.  Despite this knowledge, they stood by AWP and chose not to implement alternative reimbursement methodologies.  Class 3's knowing and continuing embrace of AWP not only defeats liability, but it also constitutes a clear failure to mitigate that precludes the award of damages.

43

**CONCLUSION**

For the above-stated reasons, the Track 1 defendants respectfully ask that the Court enter an order granting defendants summary judgement with respect to plaintiffs' Class 3 claims.

Dated:  July 14, 2006                    /s/ William F. Cavanaugh, Jr.
                                         William F. Cavanaugh, Jr.
                                         Andrew D. Schau
                                         Erik Haas
                                         Adeel A. Mangi
                                         **PATTERSON BELKNAP WEBB & TYLER** LLP
                                         1133 Avenue of the Americas
                                         New York, New York  10036-6710
                                         (212) 336-2000

                                         *Attorneys for the Johnson & Johnson Defendants on behalf of all Track 1 Defendants*

44

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was delivered on July 14, 2006 via electronic service to counsel for plaintiffs.

/s/ Andrew D. Schau
Andrew D. Schau

45