UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) | |
| AVERAGE WHOLESALE PRICE ) | MDL NO. 1456 |
| LITIGATION ) | Civil Action No. 01-12257-PBS |
| ) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL ) | |
| CLASS ACTIONS ) | **FILED UNDER SEAL** |
| ) | |

## DECLARATION OF ANDREW D. SCHAU

ANDREW D. SCHAU, declares as follows:

1.     I am a member of the law firm of Patterson Belknap Webb & Tyler LLP, attorneys for Johnson & Johnson, Centocor, Inc. and Ortho Biotech Products, L.P.  I submit this declaration in support of the Track 1 Defendants' Motion for Summary Judgement With Respect to Class 3.

2.     Attached hereto are true and correct copies of the following exhibits:

| Designation | Description |
|---|---|
| Exhibit 1 | Relevant excerpts from the April 14, 2006 deposition of Sharon Smith |
| Exhibit 2 | Relevant excerpts from the April 12, 2006 deposition of Maureen Coneys |
| Exhibit 3 | Non-Bates numbered drug purchase agreement between BCBSMA and SmithKline Beecham dated June 6, 1992 marked as Exhibit 1 to the deposition of Sharon Smith (not produced by BCBSMA in this litigation) |
| Exhibit 4 | Relevant excerpts from the transcript of the May 9, 2006 hearing before Chief Magistrate Judge Bowler |
| Exhibit 5 | Letter from Stephen L. Coco to Adeel A. Mangi dated June 30, 2006 |

| Designation | Description |
|---|---|
| Exhibit 6 | Relevant excerpts from the 28 February, 2006 deposition of Raymond Hartman |
| Exhibit 7 | Relevant excerpts from the January 6, 2006 deposition of John Killion |
| Exhibit 8 | Relevant excerpts from the September 13, 2004 deposition of Eric Cannon |
| Exhibit 9 | Relevant excerpts from the January 14, 2005 deposition of Jill Herbold |
| Exhibit 10 | Relevant excerpts from the September 20, 2004 deposition of James Kenney |
| Exhibit 11 | Relevant excerpts from the March 8, 2006 deposition of Steven Fox |
| Exhibit 12 | Relevant excerpts from the March 6, 2006 deposition of Jan Cook |
| Exhibit 13 | Relevant excerpts from the March 7, 2006 deposition of Lisa Gorman |
| Exhibit 14 | Relevant excerpts from the April 13, 2006 deposition of Vincent Plourde |
| Exhibit 15 | Relevant excerpts from the March 9, 2006 deposition of Deborah Devaux |
| Exhibit 16 | Presentation titled "Analysis of CMA Average Wholesale Price Reform – Reimbursement for Part B Drugs" dated February 7, 2004 produced by BCBSMA electronically on CD bearing Bates number BCBSMA-AWP 11598A |
| Exhibit 17 | Relevant excerpts from the January 5, 2006 deposition of Michael Mulrey |
| Exhibit 18 | Relevant excerpts from the September 20, 2004 deposition of Hal Goldman |
| Exhibit 19 | Relevant excerpts from the October 5, 2004 deposition of Susan Mengert |
| Exhibit 20 | Document produced by BCBSMA bearing Bates Nos. BCBSMA-AWP 17406-17433 |
| Exhibit 21 | Document produced by BCBSMA bearing Bates Nos. BCBSMA-AWP 17372-86 |
| Exhibit 22 | June 19, 2006 letter from Stephen L. Coco to Adeel A. Mangi |
| Exhibit 23 | Document produced by BCBSMA bearing Bates Nos. BCBSMA-AWP 17182-17197 |

| Designation | Description |
|---|---|
| Exhibit 24 | Relevant excerpts from the March 10, 2006 deposition of Sheila Cizauskas |
| Exhibit 25 | Relevant excerpts from the October 20, 2004 deposition of Robert Farias |
| Exhibit 26 | Relevant excerpts from the January 11, 2005 deposition of Edward Lemke |
| Exhibit 27 | Relevant excerpts from the November 30, 2004 deposition of Joe Spahn |
| Exhibit 28 | Relevant excerpts from the November 23, 2004 deposition of Kelly Ellston |
| Exhibit 29 | Relevant excerpts from the February 1, 2006 deposition of Scott Wert |
| Exhibit 30 | Relevant excerpts from the September 17, 2004 deposition of Mike Beaderstadt |
| Exhibit 31 | Relevant excerpts from the March 9, 2005 deposition of Mickey Brown |
| Exhibit 32 | Relevant excerpts from the June 30, 2006 deposition of Bruce Niebylski |
| Exhibit 33 | Relevant excerpts from the December 29, 2005 of Charles Hannaford |
| Exhibit 34 | Relevant excerpts from the Notice of Errata to the Fourth Amended Master Consolidated Class Action Complaint to Comply With the Court's Class Certification Order dated March 10, 2006 |
| Exhibit 35 | Relevant excerpts from the May 23, 2006 deposition of Melissa Shannon |
| Exhibit 36 | [Proposed] Order Granting Plaintiffs' Motion for Class Certification served on September 3, 2004 |
| Exhibit 37 | [Proposed] Order Granting Plaintiffs' Amended Motion for Class Certification served on December 17, 2004 |
| Exhibit 38 | Plaintiffs' [Modified and Corrected Proposed Version 1] Consolidated Order re Motion for Class Certification served on January 26, 2006 |
| Exhibit 39 | Relevant Excerpts from Plaintiffs' Reply Memorandum in Support of Class Certification |
| Exhibit 40 | Relevant Excerpts from Plaintiffs' Memorandum in Support of Class Certification |
| Exhibit 41 | Letter from Stephen L. Coco to Adeel A. Mangi dated June 8, 2006 |

| Designation | Description |
|---|---|
| Exhibit 42 | Non-Bates numbered template contract produced by BCBSMA electronically on CD bearing Bates number BCBS-AWP 0005, and marked as Fox Deposition Ex. 12 |
| Exhibit 43 | Representative extracts from BCBSMA fee schedules produced by BCBSMA electronically on CD bearing Bates number BCBSMA-AWP 0001 |
| Exhibit 44 | Letter from Stephen L. Coco to Adeel A. Mangi dated May 25, 2006 |

3.　　　In the course of discovery, defendants deposed 14 witnesses from Blue Cross Blue Shield of Massachusetts dealing with different aspects of physician reimbursement.

4.　　　Appended hereto are copies of the unreported decisions cited in The Track 1 Defendants' Memorandum Of Law In Support Of Their Motion For Summary Judgment With Respect To Class 3.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:　July 14, 2006　　　　　　　　　　/s/ Andrew D. Schau
　　　　　　　　　　　　　　　　　　　Andrew D. Schau

# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3     ------------------------------------X

 4     IN RE: PHARMACEUTICAL INDUSTRY     ) Civil Action

 5     AVERAGE WHOLESALE PRICE LITIGATION ) No. 01-12257-PBS

 6     ------------------------------------X

 7     THIS DOCUMENTS RELATES TO:          ) MDL NO. 1456

 8     THE MASTER CONSOLIDATED             )

 9     CLASS ACTION                        )

10     ------------------------------------X

11

12                   HIGHLY CONFIDENTIAL

13

14     VIDEOTAPED DEPOSITION OF SHARON L. SMITH, called as a

15     witness on behalf of the Defendants, pursuant to the

16     applicable provisions of the Federal Rules of Civil

17     Procedure, before Jeanette N. Maracas, Registered

18     Professional Reporter and Notary Public in and for

19     the Commonwealth of Massachusetts, at the Offices of

20     Robins, Kaplan, Miller & Ciresi, LLP, 800 Boylston

21     Street, Boston, Massachusetts, on Friday, April 14,

22     2006, commencing at 10:18 a.m.
```

Page 18

1   involve in relation to your role as director of
2   Medicare Part B?
3       A.   This was only doctors, and they would call
4   in about claims or they might call about
5   eligibility, whether someone was eligible for the
6   program.
7       Q.   At any point during your tenure as
8   director of Medicare Part B, did you gain an
9   understanding as to what methodology Medicare was
10  then using to reimburse physicians for drugs
11  administered in their offices?
12      A.   No.
13      Q.   At some point thereafter, did you gain an
14  understanding as to what methodology Medicare was
15  using for reimbursement?
16      A.   No.
17      Q.   Do I understand correctly that throughout
18  your career at BC/BS of Massachusetts, you had no
19  information as to what methodology Medicare used to
20  reimburse physicians for drugs administered in their
21  offices?
22      A.   That's correct.

Page 19

1       Q.   How about services incident to drug
2   administration?  At any point did you get an
3   understanding as to what methodology Medicare used
4   to calculate the amount it reimbursed physicians for
5   services incident to drug administration?
6       A.   No.
7       Q.   Now, after you completed your tenure as
8   director of Medicare Part B, what did you do next?
9       A.   I became the assistant vice president of
10  Medicare Part B.
11      Q.   How long did you hold that position?
12      A.   Four years.
13      Q.   Up until 1992?
14      A.   No.  It must have been two years, until
15  1990.
16      Q.   Did your responsibilities change from
17  those you had as director of Medicare Part B?
18      A.   I oversaw Medicare Part B in Massachusetts
19  and also oversaw Part B in Maine and New Hampshire
20  and Vermont, I think.  I'm not sure about that, but
21  I think so.
22      Q.   Did you have responsibility for any areas

Page 20

1   other than the claims customer inquiries and
2   provider relations?
3       A.   No.  The functions in the other states
4   were exactly the same as the ones in Massachusetts.
5       Q.   Also for purposes of having a clear
6   record, I ask you to let me finish the question
7   before responding and I'll try to do the same before
8   posing another question.
9            In 1990, then, you completed your work as
10  assistant VP of Medicare Part B, what was your next
11  position?
12      A.   Vice president of network delivery
13  management.
14      Q.   What were your responsibilities in that
15  position?
16      A.   I oversaw the Medical East/Medical West.
17  My main responsibility was to build HMO Blue and I
18  also oversaw the existing IPA HMOs that were
19  operating at that time.
20      Q.   How long were you in that position?
21      A.   Two years.
22      Q.   Now --

Page 21

1       A.   May have been three.  Either late in the
2   two years or early in the three.  I don't remember
3   the exact month.
4       Q.   So you were there until approximately 1993
5   sometime?
6       A.   Yes.
7       Q.   Now, Medical East/Medical West was a staff
8   model HMO owned by BC/BS of Massachusetts, correct?
9       A.   Yes.
10      Q.   When was Medical East/Medical West first
11  set up?
12      A.   I don't remember the date.
13      Q.   When is the first time period for which
14  you were aware of it being in existence?
15      A.   Sometime in the '80s, but I don't remember
16  when.
17      Q.   Can you be any more specific in terms of
18  early '80s, mid '80s or late '80s?
19      A.   I don't know for a fact.  I don't know.
20      Q.   Are you aware that at some point in the
21  '80s, BC/BS Massachusetts did have the staff model
22  HMO?

6 (Pages 18 to 21)

Page 22

1    A.   Yes.
2    Q.   Now, did Medical East/Medical West consist
3   of physician offices, hospitals, pharmacies or all
4   of them?
5    A.   Physician offices and pharmacies.
6    Q.   Were those physician offices referred to
7   as community health centers?
8    A.   No.
9    Q.   What were community health centers?
10    A.   Community health centers were -- I don't
11   know what they were, but they weren't Medical East
12   and Medical West.
13    Q.   Now, as the VP of network delivery
14   management, were you the person in the company with
15   overall responsibility for the operation of the
16   staff model HMO?
17    A.   Yes.
18    Q.   Who did you report into when you held that
19   position?
20    A.   Joe Avalone.
21    Q.   What was Mr. Avalone's position?
22    A.   I don't remember the title of it.

Page 23

1    Q.   Did Mr. Avalone have responsibility for
2   areas other than just the staff model HMO?
3    A.   Yes.
4    Q.   He was the senior-most executive with
5   focused responsibility in that area?
6    A.   Yes.
7    Q.   Can you describe, please, the structure of
8   the staff model HMO in the 1990 to 1992 time period?
9         MR. COCO:  Objection.  You may answer.
10    A.   It was in two sections, Medical East and
11   Medical West.  There were I don't remember how many
12   centers in the East and there was one or two in the
13   West.  There was a person who directed Medical East
14   and a person that directed Medical West.
15    Q.   Do you recall who the directors were for
16   Medical East and Medical West in that time period?
17    A.   Medical East was Ron Davie and Medical
18   West was Ron Himmelgarn, H I M M E L G A R N, I
19   think.
20    Q.   Do you know how long Mr. Davie was the
21   director of the Medical East?
22    A.   No.

Page 24

1    Q.   Do you know how long Mr. Himmelgarn was
2   the director of Medical West?
3    A.   No.
4    Q.   Now, did Mr. Davie and Mr. Himmelgarn both
5   report directly to you?
6    A.   Yes.
7    Q.   What was the structure below Mr. Davie and
8   Mr. Himmelgarn?
9    A.   The only structure I remember is that they
10   had a medical director and a person in charge of
11   each of the sites, though in Medical West Ron
12   Himmelgarn played that role.
13    Q.   Which role did Mr. Himmelgarn play?
14    A.   The administrator for the site.
15    Q.   Were there more sites in the East than the
16   West?
17    A.   Yes.
18    Q.   Was there a medical director for each site
19   or was there one medical director overseeing all
20   sites?
21    A.   There was a medical director for each
22   site, but there was a medical director for Medical

Page 25

1   East and one for Medical West.
2    Q.   The medical directors who were responsible
3   for the East and the West as a whole, did they
4   report into Mr. Davie and Mr. Himmelgarn?
5    A.   Yes, they did.
6    Q.   So --
7    A.   Actually, that's not true.  They were
8   peers.  They reported to me.  You're talking about
9   the one over Medical East and over Medical West?
10    Q.   That's right.
11    A.   They reported to me.
12    Q.   What were the responsibilities of the
13   medical directors, and we're talking now about the
14   ones who had overall responsibilities for East and
15   the West?
16    A.   They were responsible for the medical care
17   that was delivered in the centers.
18    Q.   So they were responsible for overseeing
19   the doctors and nurses and so on?
20    A.   Jointly with their administrator.  It was
21   a pairing, so there was a doctor and an
22   administrator who were jointly responsible for each

Page 38
1  you weren't, who was?
2       MR. COCO:  Objection.
3       A.  I was not responsible for ensuring that
4  the terms were acceptable, and I don't remember who
5  was.
6       Q.  Did you ever play a role in negotiating
7  the terms of any contracts related to drug
8  purchases?
9       A.  No.
10      Q.  Do you know of anyone else who played a
11 role in relation to negotiating contracts for drug
12 purchases?
13      A.  I don't remember any names.
14      Q.  Do you recall any departments and
15 divisions that were involved in that process?
16      A.  I don't remember the names.
17      Q.  Do you know how many people in total
18 worked, reported directly to you in your role as VP
19 of network delivery management?
20      A.  Approximately 1,700.
21      Q.  I assume the 1,700 did not all report
22 directly to you, right?  That was the total size of

Page 39
1  the division?
2       A.  That was the total size of the division.
3       Q.  Now, Mr. Davie and Mr. Himmelgarn were two
4  of the people who reported directly to you?
5       A.  That's correct.
6       Q.  Other than Mr. Davie and Mr. Himmelgarn,
7  do you know how many other people reported directly
8  to you?
9       A.  Two others that I remember.
10      Q.  Who were they?
11      A.  Sue Babin.
12      Q.  Could you spell that for the record.
13      A.  Susan Babin, B A B I N, and Claude Carle.
14      Q.  Carle with a K?
15      A.  C A R L E.  Both of them are deceased.
16      Q.  What was Ms. Babin's position?
17      A.  She was responsible for the non-health
18 center, the IPA HMOs.
19      Q.  And Mr. Carle, what was his area of
20 responsibility?
21      A.  IT, information technology.
22      Q.  What was the role of the non-health center

Page 40
1  IPA HMOs?  Where did they fit in the organization?
2       A.  They reported to me through Sue Babin.
3       Q.  What proportion of BC/BS Massachusetts
4  members received treatment in the 1990 to 1992 time
5  period at the Medical East/Medical West facilities?
6       A.  Just less than five percent.
7       Q.  So the vast majority of members, the 95
8  percent received treatment through these IPA HMOs?
9       A.  No.  That was about another three percent.
10 The vast majority of Blue Cross members received
11 treatment through other products that didn't have to
12 do with HMOs.
13      Q.  What were those products?  Do you recall
14 any examples?
15      A.  An indemnity product and a preferred
16 provider, PPO.
17      Q.  Did you have any responsibilities in
18 relation to the indemnity product?
19      A.  No.
20      Q.  Did you have an understanding as to how
21 the reimbursement amounts that were paid to
22 physicians under the indemnity products were

Page 41
1  structured?
2       A.  No.
3       Q.  Did you have an understanding as to
4  whether the indemnity products involved physicians
5  submitting actual charges which were then reimbursed
6  by BC/BS of Massachusetts?
7       A.  No.  I had no exposure to the other
8  products. I came directly from government
9  contracting to HMO.
10      Q.  Now, the five percent of BC/BS of
11 Massachusetts members who received treatment through
12 Medical East/Medical West in the 1990 to 1992 time
13 period, do you have a sense of approximately how
14 many individuals annualized it was?
15      A.  I don't know the exact number.
16      Q.  Can you approximate it in terms of
17 100,000?
18      A.  It was less than 100,000, I believe.
19      Q.  Do you know when BC/BS of Massachusetts
20 ceased owning and operating Medical East/Medical
21 West?
22      A.  I don't remember the exact date.

11 (Pages 38 to 41)

Page 42

1    Q.   Do you understand it to be in the late
2  1990s?
3    A.   Yes.
4    Q.   From 1990 up until that time when Medical
5  East/Medical West was sold, did that percentage
6  remain constant at about five percent or did it
7  change?
8    A.   I don't know.  It didn't grow
9  dramatically.  It may have even decreased.  Very
10  possible it decreased.
11    Q.   Now, if I were to show you other contracts
12  that you signed relating to drug purchases, would
13  your answer in relation to the substantive terms of
14  those contracts be the same, that you signed them
15  but don't know --
16    A.   Absolutely, yes.
17    Q.   So we have a clear record, let me just
18  repeat the question.  That you signed them but do
19  not know and are not familiar with the terms that
20  were negotiated?
21    A.   That's correct.
22    Q.   Now, in your responsibility in relation to

Page 43

1  the budgeting process for the staff model HMO, can
2  you describe the process that led up to the
3  calculation and presentation of an annual budget?
4    A.   My only involvement was when Ron Davie and
5  Ron Himmelgarn would present their overall budget.
6  I did not review it in detail.  I was looking at the
7  bottom-line amount and how it fit into the budget
8  for my whole area.
9    Q.   Now, what were the budgets that Mr. Davie
10  and Mr. Himmelgarn were presenting to you?
11    A.   Mr. Davie presented the budget for all of
12  Medical East and Mr. Himmelgarn presented the budget
13  for all of Medical West.
14    Q.   And what was the entire area that you were
15  responsible for budgeting?
16    A.   I was responsible for budgeting for
17  building HMO Blue and for the IPAs, the non-staff
18  model HMOs.
19    Q.   Now, did the budgets for Medical East and
20  Medical West include all expenditures associated
21  with the operation of those facilities?
22    A.   Yes.

Page 44

1    Q.   For example, did they include salaries of
2  employees?
3    A.   Yes.
4    Q.   And maintenance and upkeep of the
5  facilities?
6    A.   Yes.
7    Q.   What about drug purchases?
8    A.   Actually, I don't know that.
9    Q.   Were there any aspects of the operation of
10  Medical East and Medical West that you know were
11  carved out of this budgeting process that were
12  handled through a separate department at the
13  organization?
14    A.   I don't remember.
15    Q.   In what format did Mr. Davie and Mr.
16  Himmelgarn present their budgets for Medical East
17  and Medical West to you?
18    A.   I don't remember.
19    Q.   Were these presentations or written
20  submissions?
21    A.   I don't remember.  I remember discussing
22  it in a staff meeting, but I don't remember what

Page 45

1  they had with them.
2    Q.   What was the budgeting process that you
3  went through for your own department, the overall
4  budget that you were preparing?
5    A.   I received the budgets from each of my
6  direct reports and then I presented it to my boss.
7    Q.   Do you recall the format in which you
8  presented the overall budget to your boss?
9    A.   No.
10    Q.   Do you recall whether it was in the form
11  of spreadsheets, accounting ledgers, presentations,
12  anything like that?
13    A.   It wouldn't have been spreadsheets or
14  accounting ledgers.  It would have been something
15  more succinct.
16    Q.   Did you have anyone on your own staff who
17  was responsible for financial analysis or financial
18  calculation work?
19    A.   I did later when we were building HMO
20  Blue, but I don't think I did before then.
21    Q.   In relation to the budgeting process,
22  analyzing the budgets you got from your reports,

12 (Pages 42 to 45)

# EXHIBIT 2

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3

 4                   NO. 01CV12257-PBS

 5    ----------------------------------------X

 6    IN RE:  PHARMACEUTICAL INDUSTRY AVERAGE  )

 7    WHOLESALE PRICE LITIGATION               )

 8    ----------------------------------------X

 9    THIS DOCUMENT RELATES TO:                )

10    ALL ACTIONS                              )

11    ----------------------------------------X

12

13    VIDEOTAPED DEPOSITION of MAUREEN CONEYS, called as a

14    witness by and on behalf of the Defendant, pursuant to

15    the Federal Rules of Civil Procedure, before Teresa E.

16    Costello, Registered Professional Reporter, Certified

17    Shorthand Reporter No. 1452S98, and Notary Public

18    within and for the Commonwealth of Massachusetts, at

19    the offices of Robins, Kaplan, Miller & Ciresi, 800

20    Boylston Street, Boston, Massachusetts, on Wednesday,

21    April 12, 2006, commencing at 9:38 a.m.

22
```

Maureen Coneys                                                                      April 12, 2006
                              Boston, MA

Page 14

1      Q.   The fee schedule that was used to
2   reimburse physicians for their services, do you know
3   how the amounts in that fee schedule were calculated
4   in this time period?
5      A.   I do not.
6      Q.   What were the circumstances in which you
7   left Blue Cross Blue Shield of Massachusetts in 1979
8   to go to Bay State?
9      A.   An opportunity to do something different.
10     Q.   That was to be the manager of utilization
11  review programs?
12     A.   Yes.
13     Q.   Was this a more senior position as
14  compared to your position at BCBS?
15     A.   Yes.
16     Q.   What were your responsibilities in that
17  position at Bay State?
18     A.   At Bay State at the time was a start-up
19  HMO, and I was hired to begin to develop programs,
20  utilization review programs for the HMO.
21     Q.   I'm sorry, did you say was a staff --
22     A.   A start-up.

Page 15

1      Q.   A start-up.  Were the utilization review
2   programs you were tasked with at Bay State similar
3   in structure to the programs you described earlier
4   at BCBS?
5      A.   Not really.
6      Q.   Can you describe what the utilization
7   review programs that you worked on at Bay State
8   consisted of?
9      A.   The programs at Bay State were related to
10  reviewing patients who were being admitted to the
11  hospital for appropriateness of admission and then
12  also reviewing referrals from primary care
13  physicians to specialists to determine
14  appropriateness of those referrals as well.
15     Q.   Did you deal with any aspects of
16  utilization review other than reviewing the
17  appropriateness of admissions to hospitals and
18  referrals to specialists?
19     A.   I also dealt with emergency room
20  utilization.
21     Q.   Anything else?
22     A.   Behavioral health utilization and various

Page 16

1   other kinds of outpatient services, physical
2   therapy.
3      Q.   Anything else?  I'll just remind you that
4   you need to answer audibly so the reporter can take
5   it down.  The answer to your last question was no?
6      A.   No.
7      Q.   Now the various aspects of utilization
8   review that you've just described that you worked on
9   while at Bay State from 1979 to 1981, did any of
10  these involve assessment of the cost of drugs?
11     A.   No.
12     Q.   And by drugs, again, I'm referring to both
13  self-administered and physician-administered drugs?
14     A.   No.
15     Q.   In 1981 did your position change?
16     A.   Yes.
17     Q.   What did your position become in 1981?
18     A.   It became the director of operations.
19     Q.   Sticking with the '79 to '81 time period
20  for a moment, did any aspect of your work in
21  utilization review involve consideration of the
22  relative costs of treatment in hospitals versus

Page 17

1   physicians' offices?
2      A.   Yes.
3      Q.   In what situations or circumstances did
4   that issue come up?
5      A.   In determining the appropriateness for
6   admission to the hospital.
7      Q.   In that time period, 1979 to 1981, did Bay
8   State Health Care have an understanding as to
9   whether treatment in the hospital was more or less
10  expensive to Bay State than treatment in a
11  physician's office?
12         MR. COCO:   Objection.  You may answer.
13     A.   The understanding was that treatment in a
14  hospital was more expensive.
15     Q.   Are you aware of any studies or analyses
16  that were performed by Bay State that grounded that
17  conclusion?
18     A.   Yes.
19     Q.   Can you describe, please, the studies that
20  you're aware of regarding that issue?
21     A.   We would look at the cost of treating
22  certain conditions in a hospital setting versus

Henderson Legal Services
(202) 220-4158

Maureen Coneys                                                                    April 12, 2006
Boston, MA

Page 18

1    treating those in an outpatient setting like a
2    hospital outpatient department or a physician's
3    office.
4        Q.   Did you ever consider the relative cost of
5    treatment in hospital outpatient departments versus
6    physician offices?
7        A.   Yes.
8        Q.   Can you describe for me, please, the
9    studies you're aware of comparing the cost for
10   treatment and those two sites of care?
11       A.   I don't remember any specific studies that
12   we did.
13       Q.   Do you recall whether or not your
14   department analyzed and looked at the relative costs
15   of treatment in those two sites of care?
16       A.   Yes.
17       Q.   Do you recall what the conclusions were of
18   that analysis?
19       A.   Not specifically.
20       Q.   Do you know whether or not Bay State, in
21   that time period, '79 to '81, regarded the physician
22   office as a more cost-effective site of care versus

Page 19

1    a hospital outpatient department?
2        MR. COCO:  Objection.
3        A.   Yes.
4        Q.   Just so the record is clear, did Bay State
5    view the physician office as more cost-effective
6    than a hospital outpatient department?
7        MR. COCO:  Objection.
8        A.   Yes.
9        Q.   Do you recall what -- withdraw that.  What
10   steps did Bay State take, if any, based on those
11   findings?
12       A.   Bay State tried to encourage physicians to
13   use the least invasive appropriate setting for care.
14       Q.   How did Bay State go about encouraging
15   physicians to use the least invasive appropriate
16   setting for care?
17       A.   Both from education as well as through
18   utilization review programs.
19       Q.   Can you describe how utilization review
20   programs were used toward that end?
21       A.   When a physician was planning to admit a
22   patient to the hospital, he or she had the

Page 20

1    responsibility to notify Bay State of that admission
2    prior to admitting the patient and then Bay State
3    would review the admission against guidelines to
4    make a decision whether the patient's condition
5    warranted admission to the hospital.
6        Q.   Was it a feature of Bay State's plans that
7    Bay State had to approve an admission before it took
8    place?
9        A.   Yes.
10       Q.   How did Bay State, if at all, use
11   utilization review programs to incentivize the
12   physician office site of care versus treatment in a
13   hospital outpatient department?
14       A.   I'm sorry.  I don't understand that
15   question.
16       Q.   Sure.  You mentioned earlier that
17   utilization review programs was one means used to
18   ensure treatment where appropriate was in the
19   physician office versus a more expensive hospital
20   setting, right?
21       MR. COCO:  Objection.
22       A.   Right.

Page 21

1        Q.   You described the prior authorization
2    requirement for hospital admissions as one means
3    that was used to ensure treatment in the physician
4    office setting, right?
5        MR. COCO:  Objection.
6        Q.   My question is leaving aside actual
7    hospital admissions and focusing now on the hospital
8    outpatient department, how, if at all, did Bay State
9    use utilization review programs to incentivize
10   treatment in physician offices versus hospital
11   outpatient departments leaving aside for a moment
12   hospital inpatient treatment?
13       A.   There were certain outpatient procedures
14   that also required the plan's approval prior to
15   using the hospital outpatient setting.
16       Q.   Do you recall any examples?
17       A.   Surgical day care.
18       Q.   Anything else?
19       A.   No.
20       Q.   Do you recall whether any of the analysis
21   in comparing the costs of one side of care versus
22   another included comparisons of the relative costs

6 (Pages 18 to 21)

Maureen Coneys                                                                                          April 12, 2006
Boston, MA

Page 38

1  employees of Blue Cross Blue Shield of Massachusetts
2  and did not have practices outside of the health
3  center.
4        The physicians who were contracted
5  physicians were not employed by Blue Cross Blue
6  Shield and had practices outside of the health
7  center and then contracted with the health center to
8  come into the building and see patients who were
9  members of the staff model.
10    Q.  Was there any particular reason for using
11  both avenues to get physicians to treat members?
12    A.  Many of the physicians that were under
13  contract weren't needed on a full-time basis.
14    Q.  Did the contract physicians include any
15  oncologists?
16    A.  No.
17    Q.  You stated earlier that the community
18  health center you were responsible for was part of
19  Medical East, is that correct?
20    A.  That's correct.
21    Q.  What is Medical East?
22    A.  Medical East was Blue Cross Blue Shield

Page 39

1  part of its staff model organization.
2    Q.  There was also a medical West
3  organization, correct?
4    A.  That's correct.
5    Q.  Did Medical East deal with the eastern
6  part of the state and Medical West the western part
7  of the state?
8    A.  That's correct.
9    Q.  Did Medical East and Medical West form one
10  entity or were they separate groups?
11    A.  It was one entity that was actually called
12  Medical West.  Then there were the two divisions,
13  the East and the West.
14    Q.  So the staff model HMO was called Medical
15  West as a whole?
16    A.  Yes.
17    Q.  But Medical West actually had two parts,
18  one of which was Medical West, but the other was
19  Medical East?
20    A.  That's correct.
21    Q.  I wonder who thought of that.  When you
22  joined the BCBS of Massachusetts staff model HMO in

Page 40

1  1988, was it just getting started, or had it already
2  been in existence for some time?
3    A.  It had been in existence for some time.
4    Q.  Do you know when that organization was
5  created?
6    A.  I don't remember exactly.
7    Q.  Do you know whether it was in the late
8  '80's, early '80's, '70's?
9    A.  I don't remember.
10    Q.  How many health centers did the staff
11  model HMO consist of at the time you first joined it
12  in 1988?
13    A.  Medical East had a location in Braintree
14  at New England Deaconess, Norwood, Peabody and
15  Methuen, and then Medical West had three or four
16  locations, I don't remember exactly.
17    Q.  How long did you work for the staff model
18  HMO organization?
19    A.  Until 1991.
20    Q.  By 1981 had the number of facilities
21  increased, decreased or stayed the same?
22        MR. COCO:  You said '81.  Can you --

Page 41

1        MR. MANGI:  Sorry.
2    Q.  By 1991.
3    A.  The number had decreased.
4    Q.  To what extent had the number decreased by
5  1990?
6    A.  The location at New England Deaconess was
7  closed and, you know, I can't remember exactly.  The
8  Norwood location was also closed, but I don't
9  remember whether that was -- it was right around the
10  1991 time frame.  I can't remember whether it was
11  some time after '91 or still -- or before.
12    Q.  Are all of the facilities that you
13  described earlier, the five for Medical East and the
14  three or four for Medical West, were those all
15  physicians' offices?
16    A.  Yes.
17    Q.  Did Medical East or Medical West also own
18  any hospitals?
19    A.  No.
20    Q.  What happened when a patient who came for
21  treatment to one of these staff model HMO physician
22  office sites needed hospital treatment?

11 (Pages 38 to 41)

Maureen Coneys                                                            April 12, 2006
Boston, MA

Page 42

1      A.   They would be referred to a hospital that
2   the health center had a contract with.
3      Q.   Did Medical East, Medical West own any
4   retail pharmacies?
5      A.   No.
6      Q.   So if a physician needed a self-
7   administered drug, it would be given a prescription
8   and would fill it at an outside retail pharmacy?
9      A.   The health centers did have pharmacies,
10  but they were not the retail pharmacies.  They were
11  used solely for the members of the health plan.
12     Q.   Where were those pharmacies housed?
13     A.   Within the health centers.
14     Q.   So if a patient went to a health center,
15  got a prescription, he would then fill it at a
16  pharmacy within the same facility?
17     A.   That's correct.
18     Q.   If a doctor needed to administer a drug to
19  a patient in the course of an office visit, how
20  would the doctor get the drug?
21     A.   It would be supplied by the pharmacy.
22     Q.   By the pharmacy, you're referring to the

Page 43

1   same pharmacy within the facility owned by the staff
2   model HMO?
3      A.   That's correct, unless it was a drug that
4   wasn't carried by that pharmacy and had to come from
5   an outside source.
6      Q.   We spoke earlier about the number of
7   physicians employed at the Braintree site, around
8   about 25 plus six or seven contracted doctors.  Were
9   all the health centers of approximately the same
10  size?
11     A.   No, the health centers in the East were
12  smaller.  Braintree was the largest health center in
13  the East.
14     Q.   What was the smallest health center in the
15  East?
16     A.   It was either Norwood or New England
17  Deaconess.
18     Q.   Approximately how many physicians were
19  employed at those facilities?
20     A.   Three or four.
21     Q.   Now Braintree was the largest size for
22  Medical East, but was Braintree still smaller than

Page 44

1   all the sites at Medical West?
2      A.   It was smaller than some of the sites in
3   the West.
4      Q.   What was the largest site in the West?
5      A.   I believe it was the Chicopee location.
6      Q.   Do you know how many physicians were
7   employed at the Chicopee location?
8      A.   I do not.
9      Q.   Can you approximate the size of the
10  Chicopee's facility relative to Braintree?  Was it
11  twice as big, three times as big?
12     A.   It was at least twice as big.
13     Q.   Your position as executive director for
14  the Braintree site, how long did you hold that
15  title?
16     A.   Until 1991.
17     Q.   Where did you move to in 1991?
18     A.   I became, still within Blue Cross, the
19  regional executive director for HMO Blue.
20     Q.   After 1991 did you work directly at any
21  sites owned by staff model HMO?
22     A.   My office was not located in the staff

Page 45

1   model any longer.
2      Q.   But, of course, as the regional executive
3   director for HMO you still dealt with the staff
4   model HMO?
5      A.   That's correct.
6      Q.   We'll get to that in a minute.  Let me
7   state first with this '88 to '91 time period can you
8   describe for me, please, the structure of the
9   Braintree site?
10          I understand you were the executive
11  director, and I understand there were 25 employed
12  physicians, contract physicians.  Who else worked at
13  that site?
14     A.   There was a medical director who was a
15  physician who I worked closely with in terms of the
16  clinical aspects of the practice.  There were also
17  administrative people in terms of finance, human
18  resources, health center operations, you know,
19  maintenance, those kinds of activities, and then
20  there were a variety of medical disciplines
21  including nurses, psychologists, social workers,
22  physical therapists and then people who did, you

12 (Pages 42 to 45)

Page 50

1    Q.   If you had to, in the '88 to '91 time
2   period, identify the one person who had overall
3   responsibility for the staff model HMO's, would it
4   be Mr. Schlag?
5    A.   Yes.
6    Q.   Is Mr. Schlag still with the company?
7    A.   No, he's not.
8    Q.   Do you know when Mr. Schlag left the
9   company?
10    A.   He left in the early '90's. I don't
11   remember exactly when.
12    Q.   Do you know who Mr. Schlag reported to?
13    A.   I don't remember.
14    Q.   How did the pharmacies within the staff
15   model HMO community health centers go about
16   acquiring drugs?
17    A.   I don't know.
18    Q.   Did the pharmacies at each health center
19   deal with drug acquisition independently, or was it
20   done on some group level?
21    A.   It was done on a group level.
22    Q.   Do you know what person or department was

Page 51

1   responsible for acquiring drugs for the community
2   health centers?
3    A.   I don't remember.
4    Q.   Was there a department or division within
5   the organization that dealt with contracts with drug
6   wholesalers or manufacturers?
7    A.   That's how I remember it.
8    Q.   Do you know what that department was
9   called?
10    A.   I don't.
11    Q.   Do you recall the names of any individuals
12   who dealt with or worked in that department?
13    A.   I don't remember.
14    Q.   At the Braintree site you mentioned that
15   part of the staff included financial people?
16    A.   Yes.
17    Q.   What were their responsibilities?
18    A.   They kept financial statements for their
19   individual health center and were also responsible
20   for the accounting function in terms of accounts
21   receivable and accounts payable, those kinds of
22   general accounting activities.

Page 52

1    Q.   Did you have a role in reviewing that
2   financial analysis?
3    A.   Yes.
4    Q.   Do you know whether or not that financial
5   analysis included the operation of the pharmacy?
6    A.   It included aspects of the pharmacy.
7    Q.   Did that analysis include the costs of
8   acquiring drugs for the pharmacies?
9    A.   No.
10    Q.   Was it limited to the overhead costs of
11   running the pharmacy after drugs were excluded,
12   things like electricity and staffing and things like
13   that?
14    A.   Yes.
15    Q.   Was it your understanding that the
16   financial analysis related to drug acquisition was
17   done at some higher level outside of the Braintree
18   site?
19    A.   Yes.
20    Q.   Did you have any understanding as to where
21   that financial analysis was performed?
22    A.   No.

Page 53

1       MR. COCO:  We've been going for about an
2   hour.  Whenever is convenient for you.
3       MR. MANGI:  Sure.  This is a good time.
4       (Brief Recess.)
5    Q.   Miss Coneys, before the break we were
6   talking about the '88 to '91 time period you worked
7   at the Braintree site.  Do you know whether BCBS of
8   Massachusetts had, at that time, a pharmacy
9   department?
10    A.   There was an area that handled the drugs
11   for the health centers.
12    Q.   Do you know whether that group was the
13   same as the pharmacy department at BCBS of
14   Massachusetts?
15    A.   I do not know.
16    Q.   Do you know whether or not at that time
17   BCBS of Massachusetts had a pharmacy director?
18    A.   I do not know.
19    Q.   Do you know whether there was anyone in
20   charge of the pharmacy area at BCBS of
21   Massachusetts, be it a VP or director or anyone?
22    A.   I do not know.

14 (Pages 50 to 53)

Maureen Coneys                                                                      April 12, 2006
Boston, MA

Page 126

1        MR. COCO:  Objection.
2     A.  How much was being spent, we were
3  analyzing for specialty drugs that are considered to
4  be specialty drugs.  How much we spend as a health
5  plan both in aggregate and on per member basis.
6     Q.  By spent, are you referring though to the
7  amounts that are reimbursed to the health care
8  providers who administer those drugs to members?
9     A.  Yes.
10    Q.  And what are you referring to when you
11 talk about benchmarking?
12    A.  Looking at how other plans in the industry
13 are providing these services, whether they're
14 contracting on an exclusive basis with a vendor or
15 multiple vendors or how they're providing the
16 services.
17    Q.  Was any analysis performed of the amounts
18 that were currently being spent reimbursing
19 providers for specialty drugs versus the amount that
20 would be spent under a specialty pharmacy program?
21    A.  Yes.
22    Q.  Do you recall who performed that analysis?

Page 127

1     A.  I believe again it was performed by
2  actuarial in conjunction with John Killion's area.
3     Q.  Do you recall what the conclusions were of
4  that analysis?
5     A.  That there were potential savings, but I
6  don't remember any specific numbers in terms of how
7  much could be saved through specialty pharmacy
8  contracting.
9     Q.  Now was that analysis of potential savings
10 broken up?  In other words, was it we could save X
11 number if these drugs were subject to specialty
12 pharmacy programs, or was it if we moved all
13 specialty drugs to special pharmacy programs, here's
14 how much we'd save?
15    A.  We looked at specific categories and kinds
16 of drugs.
17    Q.  And within specific categories was the
18 amount of potential savings calculated?
19    A.  There were estimates calculated.
20    Q.  Do you recall whether oncology drugs were
21 one category that was assessed?
22    A.  Yes.

Page 128

1     Q.  Do you recall what the conclusions were of
2  that analysis in relation to oncology drugs?
3     A.  I do not.
4     Q.  Do you recall whether the analysis
5  revealed the potential net savings?
6     A.  Yes, it did.
7     Q.  Do you recall whether that potential net
8  savings on annualized basis was hundreds of dollars,
9  thousands of dollars, millions of dollars?
10    A.  I don't recall.
11    Q.  Do you maintain copies of any of this
12 financial analysis around the specialty pharmacy
13 issue in your files?
14    A.  I do not.
15       MR. MANGI:  For the record, would call for
16 the production of the analysis that's been the
17 subject of this testimony pertaining to specialty
18 pharmacy products and contemplation of potential
19 savings.
20       MR. COCO:  And we request that you put
21 that request in a separate letter.
22       MR. MANGI:  While we're on the topic, I'll

Page 129

1  also put this in the letter to reiterate the request
2  made at a previous deposition for custodian
3  information as in Exhibit Coneys 001.
4        MR. COCO:  I'm sorry?
5        MR. MANGI:  Did you not hear any of it or
6  all of it?
7        MR. COCO:  You were talking softly.  I
8  didn't understand.
9        MR. MANGI:  I'll repeat a request we made
10 at an earlier deposition for custodian information
11 regarding the document that's been marked as Exhibit
12 Coneys 001.
13       MR. COCO:  And could you put that in a
14 follow-up letter?
15       MR. MANGI:  We would be happy also to put
16 that in a follow-up letter.
17       MR. COCO:  Okay.
18    Q.  Could you turn, please, to -- if you look
19 at Exhibit Coneys 001 you'll see on the bottom left
20 there is a number starting with BCBSMA-AWP on the
21 left-hand side of the page?
22    A.  Ah-hah.

33 (Pages 126 to 129)

Maureen Coneys                                                                                      April 12, 2006
Boston, MA

Page 138

1    programs would be?
2          MR. COCO:  Objection.
3      A.  No.
4      Q.  Was patient disruption a concern in
5    relation to physician-administered drugs?
6          MR. COCO:  Objection.
7      A.  I don't remember discussing physician
8    administered drugs.
9      Q.  Do you recall any discussion of a concern
10   that if specialty pharmacy programs were implemented
11   across the board to all specialty drugs, then
12   physicians may stop administering drugs in their
13   offices, patients would have to go to hospitals or
14   other sites of care?
15     A.  I do remember some discussion around that.
16     Q.  Was that a concern to BCBS of
17   Massachusetts?
18     A.  Yes.
19         MR. COCO:  Objection.
20     Q.  Was that a concern for the same reasons
21   you mentioned earlier that patients become
22   comfortable with getting their care in a particular

Page 139

1    setting?
2      A.  Yes.
3      Q.  Since the original determination as to the
4    scope of the specialty pharmacy program was made by
5    the NM3 committee, has the issue of specialty
6    pharmacies been revisited by the committee?
7      A.  It has not been revisited by NM3.  It's
8    being handled elsewhere in the company.
9      Q.  What group or committee is currently
10   tasked with specialty pharmacy issues?
11     A.  I believe it's within the pharmacy
12   management area.
13     Q.  Do you know who's in charge of that area?
14     A.  It's under Deb Devaux.
15     Q.  Do you know whether anyone in Miss
16   Devaux's department, in particular, is responsible
17   for considering issues relating to specialty
18   pharmacies?
19     A.  It used to be John Killion.  I don't know
20   that he, for sure, whether he is still responsible.
21   The last time I dealt with specialty drugs he was.
22     Q.  Could I ask you to turn back to Exhibit

Page 140

1    Coneys 001 to page six of that document, please?
2    There's a section there entitled, "Special Handling,
3    Dosing and Patient Support Requirements." If you
4    take a moment to review that and let me know when
5    you're ready to proceed, please.
6          Do you recall any discussion of these
7    issues relating to specialty drugs in the NM3
8    committee?
9      A.  Yes.  These were some of the issues that
10   were discussed in terms of patient disruption.
11     Q.  How were these issues considered relevant
12   to patient disruption?
13         MR. COCO:  Objection.
14     A.  Because as it says in here, the specialty
15   drug companies provide clinical support and, as I
16   understand it, the patients become accustomed to
17   dealing with certain people and turning to certain
18   people with questions about their drugs or about the
19   administration or dosage and so forth of the drugs.
20     Q.  When you were the executive director of
21   the Braintree site, do you recall your physicians or
22   your site having to deal with some of these special

Page 141

1    handling requirements around specialty drugs?
2      A.  I do not.
3      Q.  Do you know whether there were any
4    particular resources or amounts spent on handling
5    specialty drugs by the Braintree site?
6      A.  I don't know.
7      Q.  But as part of your NM3 committee
8    consideration, you did have an understanding of this
9    document that there are particular handling
10   requirements unique to specialty drugs?
11         MR. COCO:  Objection.
12     A.  At least certain specialty drugs.
13     Q.  And those particular handling
14   requirements, if left with a doctor, would impose a
15   higher cost from the doctor, correct?
16     A.  I don't know that.
17     Q.  Well, there's a higher handling cost and
18   someone has to pay, is that a fair statement?
19         MR. COCO:  Objection.
20     A.  Again, I don't -- I don't know what you're
21   asking me.
22     Q.  Okay.  Well, let me try and break it down

36 (Pages 138 to 141)

# EXHIBIT 3

# SB

## SmithKline Beecham
### Pharmaceuticals



June 6, 1992

Ms. Sharon Smith
Vice President of Delivery Network
Management
Blue Cross/Blue Shield of Massachusetts, Inc.
Medical West Community Health Plan, Inc.
492 Old Connecticut Path
Framingham, MA  01701

*price increase*
*ng 5% (to WAC)*
*eff: 4/1/93*

Dear Ms. Smith:

SmithKline Beecham Pharmaceuticals and Blue Cross/Blue Shield of Massachusetts, Incl/Medical West Community Health Plan, Inc., hereby establish the following contract conditions for Tagamet under the terms and conditions below.

I.  **Contract Period:**  Commencing April 1, 1992 until July 30, 1994.  This Agreement replaces and supersedes the current Agreement dated December 17, 1990.

II.  **PRICING:**

*No price rebate due – receiving pricing from wholesaler via C/B*

A.  Tagamet

| NDC# 0108 | Product Description | Contract Price |
|---|---|---|
| 501220 | 200 mg tablets 100's | $59.56  *+5%* |
| 501320 | 300 mg tablets 100's | $62.32 |
| 501321 | 300 mg tablets SUP 100's | $63.36 |
| 502618 | 400 mg tablets 60's | $62.04 |
| 502621 | 400 mg tablets SUP 100's | $104.68 |
| 502713 | 800 mg tablets 30's | $54.95 |
| 502721 | 800 mg tablets SUP 100's | $184.75 |
| 501410 | 300 mg/5 ml liquid SUP 10's | $17.28 |
| 501448 | 300 mg/5 ml liquid 240 ml | $70.12 |

B.  It is understood that the prices quoted above will be offered to any SB authorized wholesaler approved by Blue Cross/Blue Shield of Massachusetts, Inc./Medical West CHP (BC/BS).  The actual invoice price to BC/BS will be determined solely by BC/BS and the wholesaler(s) selected.

* on behalf of HMO Blue and only in respect to the Staff/Group model sites listed
on the attached sheet  *BAC 7-21-92*

*n. K. 7-28-92*

Ms. Sharon Smith
Page 2
June 6, 1992

    C. SB reserves the right to increase the 'Tagamet' prices quoted above after the first
       twelve (12) months of this Agreement by an amount not to exceed seven (7)
       percent.

    D. Blue Cross/Blue Shield of Massachusetts, Inc./Medical West Community Health
       Plan, Inc., will receive a rebate on all Tagamet purchases if it achieves the
       following Internal Market Share requirements:

| Internal Market Share | Rebate % |
|---|---|
| >=35% | 8% |
| >=40% | 10% |
| >=45% | 11% |
| >=50% | 12% |
| >=55% | 13% |
| >=60% | 14% |
| >=65% | 15% |

    E. "Internal Market Share" is defined as the percentage of Tagamet purchases as
       compared to total, H2 Receptor Antagonist purchases measured in units converted
       to days of therapy."Internal Market Share" is defined as the percentage of Tagamet
       purchases as compared to total, H2 Receptor Antagonist purchases measured in
       units converted to days of therapy.

    F. Performance incentives will be paid based on the contract price of Tagamet in
       effect at the time of purchase.

III. SmithKline Beecham Conditions

    A. SmithKline Beecham will provide access to our Regional Medical Associates to
       review all literature, make presentations, and discuss relevant clinical issues on a
       group-by-group basis.

IV. Blue Cross/Blue Shield of Massachusetts, Inc./Medical West Conditions

    A. Blue Cross/Blue Shield of Massachusetts, Inc./Medical West Community Health
       Plan, Inc., agrees to communicate the 'Tagamet' agreement to participating
       Medical West Community Health Plan, Inc., providers within 30 days of contract
       execution.

* on behalf of HMO Blue and only in respect to the Staff/Group model sites listed
on the attached sheet ᗷᗩᑕ 7-2-ᡕᖇ

ᗪᛕ - 7 - ᎧᏮ - 9ᒐ

Ms. Sharon Smith
Page 3
June 6, 1992

    B. Blue Cross/Blue Shield of Massachusetts, Inc.*/Medical West Community Health
       Plan, Inc., agrees to grant Tagamet unrestricted formulary access.

V.  General Conditions

    A. Blue Cross/Blue Shield of Massachusetts, Inc.*/Medical West Community Health
       Plan, Inc., agrees to provide SmithKline Beecham Laboratories with relevant H₂
       receptor antagonist data on a semi-annual basis. SmithKline Beecham
       Laboratories reserves the right to audit all usage data submitted by Blue
       Cross/Blue Shield of Massachusetts, Inc.*/Medical West Community Health Plan,
       Inc. Final determination of acceptability of usage data will be at the sole discretion
       of SmithKline Beecham Laboratories.

    B. Payments of all monies specified in this contract will be made to Blue Cross/Blue
       Shield of Massachusetts, Inc.*/Medical West Community Health Plan, Inc., semi-
       annually and within 60 days of receipt of acceptable proof of 'Tagamet' prescription
       data by SmithKline Beecham Laboratories.

    C. It is understood that the terms of this contract extend only to those purchases made
       by patient members of Blue Cross/Blue Shield of Massachusetts, Inc.*/Medical
       West Community Health Plan, Inc., whose healthcare costs are not reimbursed
       under Medicaid and through those pharmacies which are owned by or contracted
       by Blue Cross/Blue Shield of Massachusetts, Inc.*/Medical West Community
       Health Plan, Inc., to provide pharmacy services for its members.

    D. Blue Cross/Blue Shield of Massachusetts, Inc.*/Medical West Community Health
       Plan, Inc., will comply with applicable provisions of 42 U.S.C. 1320a-7b prohibiting
       illegal remunerations (including any kickback, bribe or cost incentive) by properly
       disclosing and appropriately reflecting the discounts described in this Agreement in
       the costs claimed or the charges made under the Medicaid programs.   .

    E. Rebates paid and Market Share calculated pursuant to this Agreement shall not
       include Medicaid outpatients.

    F. This contract supersedes any existing agreements between SmithKline Beecham
       and Blue Cross/Blue Shield of Massachusetts, Inc.*/Medical West Community
       Health Plan, Inc., for 'Tagamet'.

* on behalf of HMO Blue and only in respect to the Staff/Group model sites listed
  on the attached sheet  BWC 7-21-92

                    NK - 7/28/92

Ms. Sharon Smith
Page 4
June 6, 1992

G.   The parties will maintain the existence of this Agreement, its terms and
conditions, and the negotiations pertaining to it confidential and will not
disclose same for a period of one year following the termination date of this
Agreement.

H.   This contract may be cancelled with 30 days written notice.

I.   Products purchased by Blue Cross/Blue Shield of Massachusetts, Inc./Medical
West Community Health Plan, Inc., members under the provisions of this
Agreement are offered solely for those institutions' own use as this term is
understood in Abbott Laboratories vs. Portland Retail Druggist Association,
Inc., 425 U.S. 1 (1976).

J.   Blue Cross/Blue Shield of Massachusetts, Inc./Medical West Community
Health Plan., Inc., and SmithKline Beecham shall review this Agreement prior
to the anniversary date of this Agreement. Based on that review, Blue
Cross/Blue Shield of Massachusetts, Inc./Medical West Community Health
Plan, Inc., and SmithKline Beecham reserve the right to renegotiate the terms
and conditions of this Agreement. If the parties cannot agree to the revised
terms prior to 30 days before the anniversary date of this Agreement, this
Agreement shall be null and void on the anniversary date.

Agreement to the above may be indicated by signing below.


_____          _____
Nancy M. Kuhn          Date              Sharon Smith          Date
Senior National Accounts Manager         Vice President of Delivery Network Management
SmithKline Beecham Pharmaceuticals       Blue Cross/Blue Shield of Massachusetts, Inc./
                                         Medical West Community Health Plan, Inc.



_____
Contract Manager          Date
SmithKline Beecham Pharmaceuticals

* on behalf of HMO Blue and only in respect to the Staff/Group model sites listed
  on the attached sheet [illegible handwriting] 7-21-92
                        M. K 7-28-92

BC/BSMWCHPTG

# EXHIBIT 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


Docket No.   01-12257-PBS

CITIZENS FOR CONSUME, et al      .
        Plaintiffs              .
                                .      BOSTON, MASSACHUSETTS
        v.                      .      MAY 9, 2006
                                .
ABBOTT LABORATORIES, et al      .
        Defendants              .
                                .
. . . . . . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Class Plaintiffs:  Edward Notargiacomo, Esquire, Hagens
Berman Sobol Shapiro, LLP, One Main Street, 4th Floor, Cambridge,
MA  02142, (617) 482-3700.

For AmeriSource Bergen Corp.:  Paul Weiner, Esquire, Buchanan,
PC, 1835 Market Street, 14th Floor, Philadelphia, PA  19103.

For Aventis Pharmaceuticals:  Michael DeMarco, Esquire, Foley &
Lardner, LLP, 3000 K Street, N.W., Suite 500, Washington, DC
20007, (617) 951-9111; Attorney Aimee Bierman, Nick Mizell,
Esquire, Shook, Hardy and Bacon (DC), 600 14th Street, NW,
Hamilton Square, Suite 800, Washington, DC  20005-2004.

For NHIC:  Benjamin Wattenmaker, Esquire, Shipman & Goodwin LLP
One Constitution Plaza, Hartford, CT 06103, 860-251-5786.

For J&J:  Adeel Mangi, Esquire, Patterson, Belknap, Webb &
Tyler, 1133 Avenue of the Americas, New York, NY 10036, (212)
336-2546.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

1  representing Blue Cross Blue Shield of Massachusetts.

2           THE COURT:  Thank you.

3           MR. MANGI:  Your Honor, on this motion, this is not

4  the first time I've been here arguing a Motion to Compel

5  against BCBS of Massachusetts.  In the fall of last year, we

6  had a Motion to Compel against them as a third party.  At that

7  time, BCBS came before Your Honor and said well the defendants

8  should seek the discovery they want from the named plaintiffs,

9  not from us.  Well now BCBS of Massachusetts is a named

10 plaintiff and the discovery we're seeking from them pursuant to

11 this motion are documents falling into five categories.  I'll

12 address them one by one if that would meet with Your Honor's

13 approval.

14          THE COURT:  We'll do them, I'll hear from you on each

15 section and then we'll go back and forth and I'll make the

16 rulings as I go.

17          MR. COCO:  Thank you, Your Honor.

18          THE COURT:  All right.

19          MR. MANGI:  Thank you, Your Honor.  Now the first

20 category of documents are not only the most important category

21 of documents in this motion, but perhaps the most important

22 category of documents sought through discovery from BCBS in

23 this case, these are documents pertaining to Blue Cross Blue

24 Shield of Massachusetts staff model HMO, which we know was in

25 existence from sometime in the 80's through up until about

1    1997.   Now the plaintiffs' entire theory of liability in
2    this case turns on the views advanced by their expert, Dr.
3    Hartman.   Dr. Hartman says that payers such as BCBS expected
4    there to be a relationship between the process at which drugs
5    were available in the market and their AWP's of 30 percent or
6    less.   If the differential was greater, in other words, if
7    prices were lower than he says they expected, Dr. Hartman says
8    there's fraud, and damages should accrue.   Well, the presence
9    of a staff model HMO fundamentally has a potential to undermine
10   that theory.   And the reason is, when a health insurer has a
11   staff model HMO, that means it owns pharmacies, it owns
12   physician clinics, and the health insurer itself is then
13   purchasing drugs.   So it's not just reimbursing as in other
14   situations, it's actually a drug purchaser, which means it has
15   first hand knowledge of the prices at which drugs are available
16   in the market.   If in fact those prices, prices at which it
17   purchased drugs, are below what Dr. Hartman says the market
18   expected, plaintiffs' theory has taken a fundamental, indeed a
19   crippling blow.   Judge Saris recognized this exact point.   A
20   critical part of her ruling denied class certification as to
21   self-administered drugs, was her finding that health plans had
22   purchased those drugs.   She said in her August 16, 2005 order
23   in deciding that she would perceive in certifying a physician-
24   administered class, but there's no evidence that third party
25   pairs purchased physician-administered drugs, or know of the

1    mega spreads that exists for those drugs.  Now we submit

2    that it's precisely this type of evidence, the staff model HMO

3    evidence that will prove that point and establish these issues.

4    Well, that's the relevance in why we need these documents.

5    What's BCBS' response?  Well, BCBS--

6            THE COURT:  Well, let's go right to the categories.

7            MR. MANGI:  Certainly, Your Honor.  This is the fist

8    category--

9            THE COURT:  All right.

10           MR. MANGI:  --of document, which are staff model HMO

11   documents.

12           THE COURT:  Okay.

13           MR. MANGI:  They're requests 9 and 17.  And the only

14   response from BCBS has been that well we have an index, this is

15   the index here, and you should choose what you want and then

16   we'll consider it.  The problem is this index is vague to the

17   point of being useless.  The descriptions we have are things

18   like HMOB microfiche, 18 out of 67 and other meaningless

19   acronyms or numbers.  The only way to know what's responsive,

20   what's in these documents is for BCBS to go through them, or to

21   make them available.  Now the law is crystal clear on what

22   happens on when there is an inadequate index, or inadequate

23   record keeping.  We've cited, reported in our papers, the

24   *Koslowski (ph)* case, and the--

25           THE COURT:  Well, have you--

1    MR. MANGI: --and the *Riddell (ph)* case.

2    THE COURT: --sat down with him and said these are

3  the things that we can't understand? These are the things that

4  need better definition?

5    MR. MANGI: Your Honor, we have had a conversation

6  with BCBS about this index, but they've conceded to us, and

7  indeed it's the reason for their posture here today, that they

8  agree from this index, one can't tell what's responsive.

9  Someone would have to go through these boxes to find the

10  relevant and responsive documents. So we're in a situation

11  where because of their inadequate index, someone does have to

12  go through these documents to find what's responsive.

13    THE COURT: And what are we talking about in volume?

14    MR. MANGI: BCBS has represented to us that they're

15  approximately 2,000 boxes of documents. However, we would

16  submit, Your Honor, that that issue, and the burden that's

17  associated with that review must be considered in the context

18  of this case. This is perhaps the largest pricing and

19  reimbursement litigation in the country, and defendants when

20  they were asked to produce documents to plaintiffs, had to take

21  account of that fact. Shering, for example, one of the Track 1

22  defendants, had to bring on an army of 60 lawyers just to

23  review documents. J&J had to bring in 36 lawyers for a more

24  extended period of time. DMS spent over five million dollars

25  on that similar process, and we would submit that given the

I-35

1   case law on indexing in this Court, BCBS as party that has

2   chosen to come to this litigation as a plaintiff, voluntarily,

3   has an obligation to assume and invest at least the same level

4   of resources as those that plaintiffs demanded of defendants

5   when we were making our productions.  If they invest indeed a

6   fraction of the same resources, these documents can be

7   reviewed.  I'm confident that when these boxes are cracked

8   open, it'll soon become apparent what's relevant and what's

9   not, and the documents can be produced quickly.

10          One final point, Your Honor, on the staff model HMO

11  documents.  We've also asked for deposition testimony to see if

12  there is some way to get around this, to get the testimony we

13  seek.  BCBS has represented to us that though it's been months,

14  they're unable to find anyone who can testify knowledgeably on

15  these topics.  So these documents it appears represent the only

16  way we have of getting to these documents about drug purchases,

17  which are at the core of plaintiffs' case.

18          THE COURT:  Well, Mr. Coco, is there a reasonable

19  approach to this?

20          MR. COCO:  I believe there is, Your Honor.  First,

21  with respect to Mr. Mangi's comments concerning the deposition,

22  it's not been briefed.  There are a number of issues dealing

23  with the outstanding 30(b)(6) topics.  And his representation

24  as to what we have told him about our searches are inaccurate.

25  We continue to look.  We're having difficulty because the

1  people who are involved are former employees. We have been

2  trying to contact one individual who we think may have the

3  information, for the past two, two and a half weeks. He has a,

4  a night job, unavailable during the day. It's difficult to

5  even get him on the phone. We're looking. And, but that's a

6  separate issue. Your Honor, relying on Mr. DeMarco again, they

7  looked through 120 boxes. It took them three days. We've got

8  2,000, 15 times the number, would be 45 days. If you have to

9  go through and search the substance of the documents, there is

10  a practical solution. I agree with Mr. Mangi, if you just were

11  opening the boxes and are saying okay, does this box contain

12  contracts between the staff model HMO and the defendants

13  related to drugs? Relatively easy to identify. Does the box

14  contain data about drug pricing, drug purchasing? Relatively

15  easy to determine. Once you decide that a box has that

16  information, then you take the box and you look through it in

17  more detail and make sure that you know there isn't anything

18  else that--

19              THE COURT: What's wrong--

20              MR. COCO: --might be responsive.

21              THE COURT: --with that approach?

22              MR. COCO: Then the problem, just to finish, the

23  problem that we have had is that, I have to agree with counsel

24  for Oxford, which is every time you make a suggestion or try to

25  make a suggestion, there is no assurance given that okay, once

1   you do that, that's it.  And I understand Mr. Mangi doesn't

2   want to have that position in front of the Court here.  The

3   problem we're having and we'll have this with a number of the

4   topics here is the reason you need to draw a line, the reason

5   we end up coming in front of the Court on a Motion to Compel is

6   because you make a proposal and you're never assured okay, once

7   we do that that's it.  And the example here is we've had 13

8   individual Blue Cross Blue Shield witnesses deposed.  In

9   response to those depositions, I now have 38 individual

10  requests in three separate letters asking for follow up.  And

11  so, you know, I don't want to create the misimpression that

12  we're trying to, you know, be obstructive on discovery here.

13  We're, we're not.  We are trying to help and be cooperative and

14  work out compromises, but at some point you have to draw a

15  line.  You know, in looking at this issue, you know, we're

16  willing to, to--

17          THE COURT:  What do--

18          MR. COCO:  --go to the effort.

19          THE COURT:  --you propose?

20          MR. COCO:  If I can go to the storage site where

21  these 2,000 boxes and look for drug contracts and drug pricing

22  data, that, I think is a doable task.

23          THE COURT:  Why isn't that acceptable?

24          MR. MANGI:  Your Honor, that's close to being

25  acceptable, although we seek a couple of additional categories

1    of documents in our requests.

2              THE COURT:  Okay, Mr. Coco, listen to what else he

3    wants here.

4              MR. MANGI:  Certainly in terms of request number 17,

5    what we're seeking are transaction records for contracts

6    pertaining to drug purchases.  In relation to request number 9,

7    we're also seeking documents that show the organizational

8    structure, organizational charts for example--

9              THE COURT:  Well, that's not tough, Mr. Coco, to--

10             MR. COCO:  That--

11             THE COURT:  --include.

12             MR. COCO:  --that's fine

13             MR. MANGI:  And additionally, Your Honor, there's

14   been testimony from BCBS witnesses that in addition to serving

15   BCBS members, the staff model HMO was also serving cash paying

16   patients and patients from other health plans.  So we seek the

17   fee schedules that those witnesses reference or other documents

18   showing how BCBS, the staff model HMO billed those cash paying

19   patients or those other health plans for physician-administered

20   drugs.  In short, Your Honor, what we're seeking here is--

21             THE COURT:  Is that doable, Mr. Coco?

22             MR. COCO:  I don't, I don't see how it could be, Your

23   Honor.

24             THE COURT:  Okay.

25             MR. COCO:  I--

1          THE COURT:  That's a tougher one.

2          MR. COCO:  --I apologize.  I just, the billing, my

3   understanding is that there would be no way to segregate, that

4   you're going to find just massive, from what I've seen in the

5   boxes, you just have massive tapes--

6          THE COURT:  Okay.  I'm going to allow it as to the

7   categories that Blue Cross Blue Shield has agreed to up to that

8   last one at this time.

9          MR. MANGI:  Thank you, Your Honor.  I'll then move

10  onto the second category of documents, which are final signed

11  contracts.  These are pursuant to request number 2 in the

12  subpoena that's at issue.  Now so far, Your Honor, what we have

13  from BCBS of Massachusetts are templates, boilerplate blank

14  contracts as well as a handful of actual contracts which are

15  either from another litigation file or had been produced ad hoc

16  as they've come up in the course of depositions and have been

17  the subject of testimony.  What we're seeking through this

18  motion is a comprehensive production of their contracts, given

19  that here they're a named plaintiff and not a third party.

20  That comprehensive production is necessary for the following

21  reasons; first, this is a class that BCBS purports to represent

22  that is defined expressly in terms of contracts.  The class

23  definition refers to pairs that made reimbursement based on

24  contracts expressly using AWP as a pricing standard.  Now from

25  BCBS witnesses, we've had testimony about BCBS using a variety

# EXHIBIT 5

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

Stephen L. Coco
(617) 859-2731

June 30, 2006

**Via Facsimile and Overnight Mail**

Adeel A. Mangi, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:     *In Re Pharmaceutical Industry Average Wholesale Price Litigation,*
        MDL No. 1456, Civil Action No. 01-12257-PBS
        Our File No.: 072188-0000

Dear Adeel:

I am writing to provide you with an update on BCBSMA's discovery efforts.

## I.     Provider Contracts

As we have previously informed you, attempting to identify, locate and copy provider contracts is a time consuming and burdensome process. BCBSMA hopes to have the next batch of contracts ready to produce next week.

## II.    Staff Model HMO documents

We had identified roughly 1800 boxes of documents that potentially contained documents related to the staff model HMO. We have done an initial review of all but roughly 120 boxes and are completing our initial review of the remaining boxes today. In our initial review, we have identified only a very small percentage of documents that might even be considered responsive. For example, we have identified a few "organizational" charts and no contracts for physician administered drugs with drug companies. There are some documents that appear to contain some information concerning drug costs. I am sending you the first box by overnight mail (BCBSMA-AWP-29648 – BCBSMA-AWP-33063). We will continue to review the remaining materials to determine whether they contain any additional responsive documents and hope to produce any remaining documents next week or early in the week of July 10th.

We have also used the documents to attempt to identify individuals who may have information concerning the acquisition of physician administered drugs. For example, we have

BN1 35032371.1

Adeel A. Mangi, Esq.
Page 2
June 30, 2006

spoken with Ed Curran, who is mentioned in some of the documents and whom you had previously identified, but he was involved with retail pharmacy drugs, not physician administered drugs. He did identify a couple of individuals who may possess information concerning physician administered drugs, but we have been unable to locate them to date (although we will continue our efforts).

## III.   Financial Information

There was a miscommunication between me and BCBSMA concerning the type of information we were going to produce, as I believe the Court's ruling limited our obligation to documents that would provide overall claims data, which the defendants could use to assess the amount of claims for physician administered drugs versus total claims. Accordingly, I am sending you by overnight mail a disc that has a number of BCBSMA annual reports which contain this information (BCBSMA-AWP-33064), and expect to supplement that shortly for as many years as BCBSMA has such reports.

## IV.   Claims Data

BCBSMA is close to finishing a response to the questions concerning the claims data, and expects to get the information to you next week.

Please contact me if you have any additional questions.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI, LLP

Stephen L. Coco

SLC
cc:   Edward. Notargiacomo, Esq.

BN1 35032371.1