# EXHIBIT 6

Raymond S. Hartman, Ph.D.                 CONFIDENTIAL                 February 28, 2006
                                            Boston, MA

Page 905

1            THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3       * * * * * * * * * * * * * * * * * * * * * * * * * * *

4   IN RE:  PHARMACEUTICAL           MDL DOCKET NO.

5   INDUSTRY AVERAGE WHOLESALE       01CV12257-PBS

6   PRICE LITIGATION

7       * * * * * * * * * * * * * * * * * * * * * * * * * *     FEBRUARY 28, 2006

8   THIS DOCUMENT RELATES TO:        VOLUME: IV

9   ALL ACTIONS                      PAGES: 905-1168

10      * * * * * * * * * * * * * * * * * * * * * * * * * *

11              C O N F I D E N T I A L

12   CONTINUED VIDEOTAPED DEPOSITION OF RAYMOND S.

13   HARTMAN, PH.D., called as a witness by and on behalf

14   of the Defendants, pursuant to the applicable

15   provisions of the Federal Rules of Civil Procedure,

16   before P. Jodi Ohnemus, Notary Public, Certified

17   Shorthand Reporter, Certified Realtime Reporter, and

18   Registered Merit Reporter, within and for the

19   Commonwealth of Massachusetts, at the offices of Dwyer

20   & Collora, LLP, 600 Atlantic Avenue, Boston,

21   Massachusetts, on Tuesday, 28 February, 2006,

22   commencing at 9:33 a.m.

Raymond S. Hartman, Ph.D.                    CONFIDENTIAL                    February 28, 2006
                                              Boston, MA

Page 1010

1    the marketplace for the drugs? Answer: Yes."
2        A.  Okay.  Can I --
3        Q.   Does that affect your opinion that there's
4    no evidence that payers expected that the spreads
5    for generics and multi-source would be any different
6    than the spreads for single source?
7        A.  I'm -- I'm looking back to see the context
8    of whether this is self-administered, whether this
9    is all drugs, whether this is focused on physician-
10   administered per se.  (Witness reviews document.)
11   So, so far I'm seeing that these are all self-
12   administered drugs that they're talking about.  I'm
13   seeing pharmacies and the use of PBMs and all of
14   which did affect MAC pricing and was more aggressive
15   for the self-administered drugs.
16       So, I'm seeing your -- the citations that
17   you're -- the quotes that you're getting at are
18   really not even directed to our group of drugs since
19   PBMs generally are uninvolved with -- with
20   physician-administered drugs and the pharmacies are
21   generally uninvolved with physician-administered
22   drugs.

Page 1011

1        So, I don't know what this tells me about
2    what -- some knowledge about self-administered
3    drugs, because, as I said, that's a much different
4    kettle of fish than has been recognized by this
5    court and recognized generally by students of the --
6    of the industry.
7        Q.  Well, the witness in that answer doesn't
8    distinguish between self-administered drugs and
9    physician-administered drugs, does he?
10       A.  Well, if you go back, I mean, that's why I
11   went back to -- to the preceding pages, and I went
12   back to Page 120 and he -- they're talking about --
13   you had discussions with other individuals at Tufts
14   at that time regarding the fact that AWP was
15   artificial.  And then the answer -- "we had concerns
16   with regards to AWP as the price in which we
17   reimbursed for drugs at the retail pharmacy and
18   encouraged our physicians to utilize generics."
19       Now I see that as pharmacy-related stimuli
20   to physicians to move drugs, and then the mention of
21   the PBMs is on Page 125, and all of this is in the
22   context of PBMs and pharmacy decisions, and I -- so

Page 1012

1    I -- I don't see where this -- I mean, it -- you may
2    be able to contextually relate it prior to Page 121.
3    And this set of Q&A as I see it just focused on
4    self-administered.
5        Q.   So, are you now changing your testimony
6    and saying that a self-administered drug would not
7    be a good comparator for a physician-administered
8    drug?
9        A.  No.
10           MR. NOTARGIACOMO:  Objection.
11       A.  I looked at self-administered drugs of
12   innovator drugs, single source unique drugs.  We're
13   talking about generic competition in self-
14   administered drugs.  That's not -- that's orthogonal
15   to my opinions that I've put forward.
16       Q.  Would you agree with me that after the
17   introduction of generic drugs the prices of generic
18   drugs follow a predictable trajectory from the pre-
19   generic launch brand name price toward variable
20   production cost as more generics come into the
21   market?
22       A.   That sounds like a -- like a -- a very-

Page 1013

1    well crafted sentence.
2        Q.  So you would agree with that sentence.
3        A.  I would.  But I would -- I would qualify
4    it for self-administered drugs.  There's not much
5    evidence available for physician-administered drugs
6    that I am aware of or that Doctor Berndt is aware of
7    to make characterizations that I would -- that I --
8    for which I agree with that.
9        Q.   Certainly payers who purchase drugs
10   directly from manufacturers would be knowledgeable
11   about spread-based competition, depending on the
12   extent to which there are alternatives for a
13   particular drug.  Would you agree?
14       A.   And are we -- to try and give specificity
15   to this, are we talking to -- about staff model
16   HMOs, something like Kaiser, or is that what you're
17   asking about, someone like Kaiser?
18       Q.  Sure.
19       A.   Yes.  They would -- they would have more
20   information, and I would point out that we've
21   excluded -- I've excluded those sales to those
22   entities from the damage analysis.

Page 1014

1    Q.  Well, those entities are also third-party
2    payers, correct?
3    A.  They're third -- a Kaiser is both -- deals
4    with insurance and deals with the administration of
5    the drug, and they were not considered part of the
6    class as being indirect -- indirect payers and the -
7    - as I have -- when -- when we were doing the
8    analysis of the units that were subject to damages,
9    sales to those types of entities, I asked my staff
10   to exclude, and they did the best they could given
11   the interpretation of the customer names and the
12   classes of trade codes that were found in
13   Defendant's data.
14   Q.  So, let me make sure I understand what
15   you're saying.  You understand that many third-party
16   payers also own their own HMOs, correct?
17   A.  I know that -- that some third-party
18   payers are affiliated with H -- with -- do you mean
19   PBMs or what --
20   Q.  No.  I'm talking about HMOs or hospitals.
21   A.  The precise affil -- set of affiliations
22   between payers and how many are integrated with

Page 1015

1    hospital, I have not done sufficient analysis of to
2    really comment on.
3    Q.  Well, a payer that owns an HMO or a
4    hospital and purchases drugs directly from a
5    manufacturer would know about spread-based
6    competition, correct?
7    A.  A third-party payer that -- one of whose
8    subsidiaries buys drugs directly hopefully should be
9    informed by those subsidiaries to the --
10   Q.  Okay.  So, in the case of Kaiser
11   Permanente or other payers like that, you're not
12   simply excluding the sales to the HMO from your
13   damage calculation.  You're excluding all
14   reimbursements made by that payer, correct?
15   A.  What I have done in my declaration and
16   asked my staff to implement in the damage
17   calculation is to identify those sales -- unit sales
18   -- to clinics, to oncology groups, to GPOs that are
19   unaffiliated with payers, that are essentially
20   providers.
21   Q.  So --
22   A.  That are -- that are then going to submit

Page 1016

1    the reimburse -- claims for reimbursement to third-
2    party payers.
3    Q.  So, you only exclude from your damage
4    calculation then the sales to the provider operation
5    of that payer.  You don't exclude all reimbursements
6    by that payer, correct?
7    A.  I'm not quite sure I understand.  If -- if
8    a given -- if -- say Kaiser is one example.  We
9    exclude all sales to Kaiser and we exclude all sales
10   to any hospital, even though we know some of them
11   will be subject to reimbursement by third-party
12   payers in an outpatient context.  It -- precisely to
13   avoid some issues of -- to be conservative.
14   Q.  Well, let's take Blue Cross Blue Shield of
15   Massachusetts.  Did you understand that for a period
16   of time Blue Cross Blue Shield of Massachusetts
17   owned an HMO?
18   A.  I know there was an issue.  It is my
19   recollection that there was an issue about -- about
20   that and which years it -- that was relevant, but I
21   forget the details at the moment.
22   Q.  So, assuming your staff carried out your

Page 1017

1    instructions properly and they had adequate
2    information, they should have excluded from the
3    damage calculation the sales to that HMO, correct?
4    A.  If there were sales to what we've
5    classified and -- and I asked the staff to -- as --
6    as staff model HMOs like a Kaiser, they attempted to
7    do so as best they could with the -- with the names
8    that -- the data that was given to us.
9    Q.  And the reason you excluded those sales is
10   because, as a direct purchaser from a manufacturer,
11   that HMO would know about the spreads.  In fact,
12   that HMO would be one of the entities out there
13   getting the discounts that create the spreads,
14   correct?
15   A.  The -- the guiding decision, and I'm
16   looking back here at the class definition, was to
17   focus, in my recollection, it's not stated here
18   specifically, on indirect payers.  And so by
19   definition, a Kaiser is a direct purchaser and -- in
20   a staff model HMO.  I think correct.
21       Now, I don't see that as being stated here
22   within this Subclass.  And so I should perhaps go

Raymond S. Hartman, Ph.D.

CONFIDENTIAL
Boston, MA

February 28, 2006

Page 1018

1    back and look at the earlier complaint to see
2    whether my understanding is consistent with that.
3         Q.   Isn't it inconsistent to exclude the sales
4    to the HMO but include all of the reimbursements by
5    the same company?  In other words, let's take Blue
6    Cross Blue Shield of Massachusetts.  Let's take a
7    particular drug.  My client, BMS, Vepesid, and let's
8    assume that BMS sold a million dollars worth of
9    Vepesid to the Blue Cross Blue Shield of
10   Massachusetts HMO and Blue Cross Blue Shield of
11   Massachusetts also reimbursed providers for $100
12   million in sales of Vepesid.  You would exclude the
13   million dollars paid by the HMO from your
14   calculation, but you would include the $100 million
15   paid as a third-party payer in your damage
16   calculation, correct?
17        MR. NOTARGIACOMO:  Objection.
18        A.   I would -- in situations of that sort --
19   you've -- you've identified one more type of payer
20   that has some information -- maybe it's more, maybe
21   it's less than what's -- what appears in Medicare,
22   but the fact that it its reimbursement schedules are

Page 1019

1    based on revealed negotiations from an earlier
2    period of time and a revealed understanding of what
3    the relationship between AWP and transactions costs
4    were, and there is some information here that that's
5    to Blue Cross Blue Shield of Massachusetts but that
6    they haven't acted on it, it means that
7    institutionally they have yet to assimilate that and
8    -- and be able to have moved to insulate themselves
9    from the -- the abuse alleged in the matter.
10        Q.   Let's take some additional examples of
11   this.
12        MR. EDWARDS:  What I want to do is mark as
13   Exhibit Hartman 048 an excerpt from the BMS charge-
14   back database for Customer Code 26.
15        (Excerpt marked Exhibit Hartman 048.)
16        Q.   Did you exclude sales to Customer Code 26
17   from your damage calculation?
18        A.   This is for BMS?
19        Q.   Right.
20        A.   (Witness reviews document.)  Yes, I did.
21        Q.   And Customer Code 26 would include CIGNA,
22   HIP of greater New York --

Page 1020

1         A.   Well it's CIGNA pharmacies in Los
2    Alamitos, California.  It's -- in Arizona and
3    Florida.  Are you saying CIGNA overall or.
4         Q.   Well three of the CIGNA plans.
5         A.   Okay, right.
6         Q.   Right?
7         A.   Right.
8         Q.   Lots of HIP --
9         A.   Right.
10        Q.   -- entities.  Do you want to go through
11   them all?
12        A.   No.  No.  No.  I'm --
13        Q.   Okay.
14        A.   The --
15        Q.   And indeed you've got HMO Blue at GMA,
16   correct?
17        A.   Hey.
18        Q.   And Humana?
19        A.   We made it.  God.  We're right there with
20   --
21        Q.   And Kaiser?
22        A.   Right.  Can I keep this?

Page 1021

1         Q.   Sure.
2         A.   No, I'm just kidding.
3         Q.   You exclude direct sales to all of these
4    entities from your damage calculation, but you don't
5    exclude these entities from the third-party payer
6    class, correct?
7         A.   We exclude certainly the direct sales and
8    then the charge-back related data, but that is true
9    to the extent that there are indirect reimbursements
10   to these entities, they are included.
11        Q.   You include them in the class, even though
12   they were obviously knowledgeable about the spreads?
13        MR. NOTARGIACOMO:  Objection.
14        A.   Well, it --
15        MR. NOTARGIACOMO:  You can answer the
16   question.
17        A.   There's -- they purchased these drugs and
18   to the extent -- I can't -- until I see that they
19   have either responded to it with the contract
20   change, such as MAC, or they've responded to it
21   institutionally and said we're going to just ignore
22   this, I have no information that whatever kind of --

30 (Pages 1018 to 1021)

# EXHIBIT 7

Page 1

```
 1           THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3     ****************************

 4     IN RE:  PHARMACEUTICAL          MDL DOCKET NO.

 5     INDUSTRY AVERAGE WHOLESALE      01CV12257-PBS

 6     PRICE LITIGATION

 7     ****************************    DEPOSITION OF

 8     THIS DOCUMENT RELATES TO:       JOHN M. KILLION

 9     ALL ACTIONS                     JANUARY 6, 2006

10     ****************************

11       H I G H L Y   C O N F I D E N T I A L

12     DEPOSITION of JOHN M. KILLION, a witness called on

13     behalf of the Defendant Johnson & Johnson pursuant to

14     the Federal Rules of Civil Procedure, before Judith

15     McGovern Williams, Certified Shorthand Reporter,

16     Registered Professional Reporter, Certified Realtime

17     Reporter, Certified LiveNote Reporter, and Notary

18     Public in and for the Commonwealth of Massachusetts,

19     at the offices of Robins, Kaplan, Miller & Ciresi,

20     L.L.P., 800 Boylston Street, Boston, Massachusetts

21     02199, on Friday, January 6, 2006, commencing at

22     9:41 a.m.
```



John M. Killion                    HIGHLY CONFIDENTIAL                    January 6, 2006
                                        Boston, MA

Page 6
1          PROCEEDINGS
2             - - -
3          JOHN M. KILLION, first having been duly
4    sworn, testified as follows in answer to direct
5    examination by MR. HAAS:
6             - - -
7    Q.   Please state your name for the record.
8    A.   John Killion.
9    Q.   Mr. Killion, are you currently
10   employed?
11   A.   Yes, I am.
12   Q.   By whom?
13   A.   Blue Cross/Blue Shield of
14   Massachusetts.
15   Q.   What is your current position?
16   A.   I am senior director, ancillary
17   services.
18   Q.   What is ancillary services?
19   A.   Responsibility for contracting with all
20   provider types with the exception of acute care
21   hospitals and physicians, so I have
22   responsibility for contracting with provider

Page 7
1    types, such as ambulance, radiology, laboratory,
2    physical therapy, occupational therapy, speech
3    therapy, approximately a little over 40 or so
4    different provider types other than M.D.s or
5    acute care hospitals.
6    Q.   Does any of your contracting with these
7    various ancillary entities involve contracting
8    for the reimbursement of physician-administered
9    drugs?
10   A.   No.
11   Q.   Do you have an understanding that
12   physician-administered drugs are the drugs at
13   issue?
14   A.   Yes.
15   Q.   Who at Blue Cross/Blue Shield of
16   Massachusetts has the analogous position to yours
17   but that is in charge of reimbursement of
18   physician-administered drugs?
19   A.   That would be my peer, Sheila
20   Cizauskas, who is the senior director for
21   hospital physician contracting.
22   Q.   I am sorry. I didn't catch that name?

Page 8
1    A.   C-I-Z-A-U-S-K-A-S.
2    Q.   What was her first name?
3    A.   Sheila.
4        MR. HAAS: Off the record.
5        (Discussion off the record.)
6        MR. HAAS: We again had our morning
7    difficulties with the call-in number, so we just
8    started, just, about five minutes into it. So we
9    are just going to continue with the background of
10   the witness.
11   Q.   What is Ms. Cizauskas' title?
12   A.   She is senior director for hospital
13   contracting.
14   Q.   Is she also responsible for contracting
15   with physician groups and physicians?
16   A.   She is, along with one other
17   individual.
18   Q.   Who is that other individual?
19   A.   Steve Fox.
20   Q.   What is Mr. Fox's title?
21   A.   Senior director, provider relations.
22   Q.   Who do you report to?

Page 9
1    A.   Deb Devaux.
2    Q.   What is her title?
3    A.   Senior vice president, contracting.
4    Q.   In your current --
5        MR. HAAS: Withdraw that question.
6    Q.   When did you start at Blue Cross/Blue
7    Shield of Massachusetts?
8    A.   2001.
9    Q.   What was your initial position?
10   A.   Director, ancillary services.
11   Q.   At any time from 2001 to the current
12   time frame, have you had any responsibilities
13   with respect to the negotiation or contracting of
14   reimbursement with physicians for drugs
15   administered to Blue Cross/Blue Shield of
16   Massachusetts members?
17   A.   Can you repeat that again?
18   Q.   Sure. At any time from 2001 to today -
19   -
20   A.   Yes.
21   Q.   -- have you had any responsibilities
22   with respect to contracting for the reimbursement

3 (Pages 6 to 9)

Page 10

1  or the negotiation of reimbursement with
2  physicians for drugs that have been administered
3  to Blue Cross/Blue Shield of Massachusetts
4  members?
5      A.  Not directly.
6      Q.  When you say "not directly," have you
7  been indirectly involved in the contracting or
8  negotiation of reimbursement for physician-
9  administered drugs?
10     A.  Yes.
11     Q.  What is the indirect role that you have
12 had?
13     A.  In 2003, responsibility for
14 implementation of specialty pharmacy programs.
15     Q.  Does Blue Cross/Blue Shield of
16 Massachusetts have a specialty pharmacy program
17 that is used to supply drugs to physicians for
18 administration of drugs to the patients -- to the
19 members of Blue Cross/Blue Shield of
20 Massachusetts?
21     A.  Can you repeat that again?
22     Q.  Sure.  Does Blue Cross/Blue Shield of

Page 11

1  Massachusetts have a specialty pharmacy program
2  that involves the provision of drugs to
3  physicians for the administration to members of
4  Blue Cross/Blue Shield of Massachusetts?
5      A.  We have a specialty pharmacy program.
6  It doesn't provide the drugs directly to the
7  physicians.  No.
8      Q.  Do you have a specialty pharmacy
9  program that involves at all the supply of drugs,
10 either to the physician or to the patient, which
11 are thereafter administered under the supervision
12 of physicians or their staff?
13     A.  Yes, we do.
14     Q.  Okay.  When was that program
15 implemented?
16     A.  In 2004 and 2005.
17     Q.  What is the name of that program?
18     A.  It is our specialty pharmacy program.
19     Q.  Does Blue Cross/Blue Shield of
20 Massachusetts have its own specialty pharmacy, or
21 does it contract with a specialty pharmacy?
22     A.  Contract.

Page 12

1      Q.  What is the specialty pharmacy or
2  pharmacies?
3      A.  Priority Healthcare.
4      Q.  Any other one?
5      A.  Caremark.
6      Q.  Any others?
7      A.  No.
8      Q.  Is there a division of Priority
9  Healthcare that is actually the specialty
10 pharmacy?
11     A.  Yes.
12     Q.  Which division?
13     A.  Priority Healthcare is a specialty
14 pharmacy.
15     Q.  A physicians' supply company; right?
16     A.  It is a specialty pharmacy company that
17 supplies high-cost injectables.
18     Q.  Right.  Is there a particular division
19 of Priority Healthcare that you work with, or is
20 it just the Priority entity?
21     A.  Priority.
22         MR. SULLIVAN:  Erik, before we got

Page 13

1  started, maybe it was due to the telephone or
2  whatnot, I just want to make sure that the entire
3  transcript is designated as highly confidential.
4         MR. HAAS:  Sure.
5  BY MR. HAAS:
6      Q.  Aside from your involvement with the
7  implementation of the specialty pharmacy program
8  you just described, have you had any other
9  involvement, directly or indirectly, with the
10 contracting for the reimbursement of physician-
11 administered drugs or the negotiation of such
12 contracts?
13     A.  No.
14     Q.  When did you switch positions from
15 director of ancillary contracting to senior
16 director?
17     A.  I didn't -- oh, switch positions from?
18 I am sorry.  Director of ancillary to senior
19 director?
20     Q.  Yes.
21     A.  That was in late 2004, I believe.
22     Q.  So you held your position as the

Page 22

1    A.  I have not graduated yet from Suffolk.
2    Q.  When did you start taking courses at
3  Suffolk?
4    A.  Let's see.  Approximately 15 years ago,
5  I would say.
6    Q.  When was the last time you took a
7  course at Suffolk?
8    A.  Thirteen years ago.
9    Q.  So it is fair to say you didn't
10  complete your degree?
11    A.  That's correct.
12    Q.  Have you taken any other courses or
13  studies involving the healthcare system since
14  then?
15    A.  No.
16    Q.  Have you taken any training or courses
17  involving prescription drugs?
18    A.  No.
19    Q.  Please review for the record your
20  employment history after graduating from
21  Providence in 1985.
22    A.  I actually worked a year at Blue

Page 23

1  Cross/Blue Shield of Massachusetts.
2    Q.  What was your position at that time?
3    A.  I was in the benefit department.
4    Q.  And when you say "benefit department,"
5  what was that?  What were the responsibilities of
6  that department?
7    A.  Responding to member-related benefit
8  issues.
9    Q.  So you held that position from 1985 to
10  1986?
11    A.  That's correct.
12    Q.  What did you do next?
13    A.  I left Blue Cross/Blue Shield of
14  Massachusetts and went to Tufts Health Plan.
15    Q.  What was your position at Tufts?
16    A.  I was a manage in the ancillary
17  services department.
18    Q.  What were your responsibilities as a
19  manager in the ancillary services department?
20    A.  Contracting with the ancillary network.
21    Q.  Did any of that responsibility or work
22  involve contracting for the reimbursement of

Page 24

1  physician-administered drugs?
2    A.  No.
3    Q.  How long did you hold that position?
4    A.  I held that position for approximately
5  until '94, '95.
6    Q.  During your time at Tufts from 1986 to
7  1994 or '95, did you gain an understanding as to
8  the methodologies Tufts used to reimburse
9  physicians for drugs administered to its members?
10    A.  Can you rephrase -- say that time
11  period again?  I am sorry.
12    Q.  You said 1986 to 1994 or '95 while you
13  were a manager in the ancillary services
14  department?
15    A.  Yes.
16    Q.  Did you gain an understanding how Tufts
17  reimbursed physicians for drugs administered to
18  its members?
19    A.  No, I did not.
20    Q.  What did you do next?
21    A.  I became the manager of pharmacy
22  operations at Tufts.

Page 25

1    Q.  What were your responsibilities in that
2  role?
3    A.  I was responsible for managing the
4  relationship with our pharmacy benefit manager.
5    Q.  Who was the PBM at the time?
6    A.  It was PCS, Prescription Card Services.
7    Q.  And when you say "managing the
8  relationship," what in particular did you do?
9    A.  Contract responsibility and program
10  development.
11    Q.  In connection with your work as the
12  manager of the pharmacy operations of Tufts, were
13  you involved at all with the contracting of
14  pharmacies themselves?
15    A.  No.
16    Q.  Is it fair to say that Tufts utilized
17  the network of PCS?
18    A.  That's correct.
19    Q.  So your contract was with PCS?
20    A.  Correct.
21    Q.  When you said -- when you referred to
22  program development, what programs are you

HIGHLY CONFIDENTIAL
Boston, MA

Page 46

1    A.   Correct.
2    Q.   You have no understanding as to how in
3  particular Medicare derived the exact numbers in
4  its fee schedule; right?
5    A.   Off of AWP.
6    Q.   What is your basis for the
7  understanding of that point?
8    A.   That AWP is the -- or AWP is the
9  industry standard in regards to reimbursement for
10  drugs.
11    Q.   Do you have an understanding of what
12  the actual calculation was that Medicare used to
13  derive the numbers in its fee schedule?
14    A.   Not directly, no.
15    Q.   Do you have of any AWP they used?
16    A.   I believe it was Redbook.
17    Q.   Do you have an understanding of whether
18  all the carriers followed the same process in
19  reimbursing for physician-administered drugs
20  under Medicare?
21    A.   I'm not aware if they all followed the
22  same practice or not.

Page 47

1    Q.   How in 2003-2004 did you obtain an
2  understanding as to how Blue Cross/Blue Shield of
3  Massachusetts reimbursed for physician-
4  administered drugs on a fee-for- service basis?
5    A.   Through the specialty pharmacy
6  committee that was put in place.
7    Q.   Who was on the specialty pharmacy
8  committee?
9    A.   I don't recall all the individuals, but
10  it was a cross-section of various individuals
11  from different departments, including pharmacy,
12  clinical, medical directors, people on my staff,
13  member services.
14    Q.   Okay. If you could for me for the
15  record list the individuals that you do recall
16  and their titles.
17    A.   Pam Mortland.
18    Q.   What was her title?
19    A.   I believe she was manager of pharmacy
20  operations.
21    Q.   Who else?
22    A.   Joe Guianta, G-U-I-A-N-T-A.

Page 48

1    Q.   What was his position?
2    A.   Pharmacy analyst.
3    Q.   Who else?
4    A.   Matt Connell.
5    Q.   What was his position?
6    A.   Director of pharmacy operations; Jan
7  Cook, medical director; Laurie Liscio, manager,
8  ancillary services; Janis Pochini, contract
9  manager, ancillary; David Lynch, pharmacy
10  analyst; Tim Fitzgibbons, analyst in the actuary
11  department; Paula Choquette, clinical case
12  manager; Heather Cooke, contract specialist in
13  the ancillary department; while not a full-time
14  member, Karen Jackson -- Wells-Jackson, and I
15  don't know her exact role, but she worked in
16  pharmacy.
17    Q.   Was there anyone from provider
18  reimbursement or provider contracting?
19    A.   Provider reimbursement, I believe Mike
20  Mulrey participated in some of the meetings.
21    Q.   Anybody else from the provider side?
22    A.   Not that I recall.

Page 49

1    Q.   Was it common at Blue Cross/Blue Shield
2  of Massachusetts to have these cross- functional
3  committees?
4    A.   Very common.
5    Q.   So it was common to have people from
6  the pharmacy side of the business with people on
7  the provider side of the business?
8    A.   Depending upon the initiative.
9    Q.   Who did the committee report to?
10    A.   The committee reported to the new
11  medical management model committee.
12    Q.   The new management medical model?
13    A.   New medical management model.
14    Q.   Medical?
15    A.   Yes. Acronym, NM3. I should say that
16  is where I reported into.
17    Q.   What is the new medical management
18  model?
19    A.   It is a committee of senior level
20  individuals within the company that review major
21  initiatives we're looking to implement.
22    Q.   Who is on the committee?

13 (Pages 46 to 49)

Page 58
1  satisfaction levels that we negotiate with
2  physicians in their contracts.
3      Q.  All right.
4      A.   There are measures in regards to
5  management of, consistent with those quality
6  programs, management of medical services within a
7  defined parameter, financial parameter, and the
8  opportunity for physicians to share in
9  compensation for meeting those performance goals.
10     Q.  You are referring to the primary care
11  physician incentive program?
12     A.  That's right.
13     Q.  Previously --
14     A.  Well, actually that is one program.
15  The program I was referring to was a program we
16  refer to as the GPIP program, which is the Group
17  Physician Incentive Program.
18     Q.  I am sorry.  What was the name of that
19  program?
20     A.  It is GPIP, Group Physician Incentive
21  Program.
22     Q.  Is it fair to say that the overall

Page 59
1  level of compensation that a physician receives
2  depends in part upon the achievement of the
3  metrics set forth in these programs?
4      A.  Correct.
5      Q.  Now just at a very general level, is it
6  that the physician receives more incentives if it
7  meets the metrics, or is it that it receives less
8  incentives than it would otherwise receive if it
9  does not?
10     A.  They receive more incentive if they
11  meet the metrics.
12     Q.  So it is an additional amount that they
13  could shoot for on top of what they would
14  otherwise be reimbursed?
15     A.  That's correct.
16     Q.  What --
17         MR. HAAS:  Withdraw that question.
18     Q.  Who was it that was responsible for the
19  formation of the specialty pharmacy committee?
20     A.  I was.
21     Q.  Did the concept of the specialty
22  pharmacy committee arise out of your

Page 60
1  participation and discussions in the special
2  committee meetings that you held with the
3  Massachusetts Society of Clinical Oncology?
4      A.  No.
5      Q.  Okay.  Was that part of the rationale
6  for putting together the specialty pharmacy
7  committee?
8      A.  No.  Those meetings came after the
9  formation of the specialty pharmacy committee.
10     Q.  What is the oncology MASCO specialty
11  committee?
12     A.  I am sorry.  I didn't get your
13  question.
14     Q.  What is the oncology MASCO specialty
15  committee?
16     A.  I am familiar with the Massachusetts
17  Association of Clinical Oncologists or
18  Massachusetts Society of Clinical Oncologists,
19  MASCO.
20     Q.  Yes.
21     A.  My understanding is that is a committee
22  of oncologists that meet.  I'm not sure of the

Page 61
1  frequency of their meetings.
2      Q.  Who is on the committee to your
3  knowledge?
4      A.  I don't know all of the members of the
5  committee, but having participated in discussions
6  with MASCO, Theresa Mulvey, who, I believe, is
7  the president of MASCO; Dr. Wisch, who is an
8  oncologist; Dr. Kagan, who is an oncologist; and
9  I'm not familiar with the -- I am not recalling
10  the other names of the oncologists that were part
11  of that committee.
12     Q.  And who participates in the specialty
13  committee with MASCO on behalf of Blue Cross/Blue
14  Shield of Massachusetts?
15     A.  When you say specialty committee with
16  MASCO, --
17     Q.  Yes.
18     A.  -- I am not familiar with what you are
19  referring to.
20         MR. HAAS:  Mark this.
21         (Two-page memorandum dated May 1,
22         2002, to Dr. Fanale from Dr. Cook,

16 (Pages 58 to 61)

John M. Killion                                HIGHLY CONFIDENTIAL                                January 6, 2006
                                                    Boston, MA

Page 62

1              production numbers BCBSMA-AWP-0003
2              and 0004 marked Exhibit Killion 001
3              for identification.)
4    BY MR. HAAS:
5        Q.   We are marking as Deposition Exhibit
6    Killion 001 a document Bates stamped BCBSMA-AWP-
7    0003 to 0004.
8              (Handing Exhibit Killion 001 to
9              the witness.)
10       Q.   This is a document dated May 1, 2002,
11   from Jan Cook, M.D., to James Fanale, M.D., and
12   you will see on the subject line it refers to
13   Oncology, bracket, MASCO, Special Committee
14   Minutes, April 29, 2002.
15             Do you see that?
16       A.   Yes.
17       Q.   Let me ask it this way.  Are you
18   familiar with a committee referred to as the
19   oncology MASCO specialty committee?
20       A.   No.  I am familiar with MASCO.
21   Although I am aware that Jan Cook had regular
22   meetings with MASCO.

Page 63

1        Q.   Were you aware that Jan Cook had
2    regular meetings with other physician societies?
3        A.   Yes.
4        Q.   What other physician societies?
5        A.   She participated in meetings with the
6    Mass. Arthrometric Society, the Mass.
7    Chiropractic Society, and a variety of other
8    medical societies.
9        Q.   Who is James Fanale, M.D.?
10       A.   James Fanale was our chief medical
11   officer.
12       Q.   And Steve Fox was the director of
13   provider relations?
14       A.   That's correct.
15       Q.   Who is Robert Mandel?
16       A.   Robert Mandel I believe at the time was
17   vice president for provider services.
18       Q.   He is no longer with the company?
19       A.   He left the company.  He is now back
20   with the company.
21       Q.   What is his current position?
22       A.   He is responsible for the

Page 64

1    transformation initiative.
2        Q.   What is the transformation initiative?
3        A.   It is an initiative where -- how best
4    to describe the transformation initiative? It is
5    a major initiative that Blue Cross/Blue Shield is
6    looking at in regards to having an impact on how
7    the -- the way in which healthcare is delivered
8    within the Commonwealth of Massachusetts.
9        Q.   And you say it is a major initiative to
10   have impact.  What does that mean?
11       A.   It is a priority for our company in
12   2006 and beyond.
13       Q.   I am trying to get an understanding of
14   what the initiative is.
15       A.   It is looking at a variety of different
16   issues with the healthcare system and how we as a
17   major player in the marketplace can be a leader
18   in addressing a number of those issues.
19       Q.   What are those issues?
20       A.   The uninsured pool; quality; misuse of
21   healthcare; underuse, overuse of healthcare; e-
22   health initiatives related to medical records.

Page 65

1        Q.   Do any of the initiatives involve
2    reimbursement issues?
3        A.   I'm not aware at this point
4    specifically. The committee is just forming.
5        Q.   Are you a member of that committee?
6        A.   Not as of yet.  Again the committee is
7    just forming.
8        Q.   To your understanding as of today,
9    given its early phase, does the committee
10   nevertheless have reimbursement for physician-
11   administered drugs as part of its agenda?
12       A.   I'm -- I'm not aware of one way or the
13   other whether or not that is part of the overall
14   agenda.
15       Q.   So turning back to what we have marked
16   as Deposition Exhibit Killion 001, when to your
17   knowledge was the first time that you
18   participated in any meeting of the MASCO
19   specialty committee?
20       A.   It would have been after we initiated
21   the specialty pharmacy committee at Blue
22   Cross/Blue Shield, which would have been, I

17 (Pages 62 to 65)

Page 66
1  believe, sometime in 2003.
2      Q.   If you would look at that page, the
3  second arrow in the middle talks about "multiple
4  co-pays for cancer patients undergoing
5  chemotherapy."  For the record, it says, "MASCO
6  doctors are concerned that payments may be
7  foregoing chemotherapy in the office" --
8          MR. SULLIVAN:  I think it said
9  "patients."
10         MR. HAAS:  Is that what I said?  Let me
11  read it again for the record so we are clear.
12 BY MR. HAAS:
13     Q.   "MASCO's doctors are concerned that
14  patients may be foregoing chemotherapy in the
15  office set because of multiple co-pays," close
16  quote.
17         And down at the bottom under "Action
18  Item," it says, quote, "Robert to look into
19  BCBSMA waiving co-pays for outpatient
20  chemotherapy.  Report back in one month."
21         Were you involved at all in any of your
22  work at Blue Cross/Blue Shield in any initiatives

Page 67
1  designed to ensure that patients were
2  administered drugs in physicians' offices rather
3  than in the hospital?
4      A.   No.
5      Q.   Do you have any understanding of
6  whether it was an agenda of Blue Cross/Blue
7  Shield to encourage the administration of drugs
8  in office versus in the hospital setting?
9      A.   No.
10     Q.   Are you aware of any studies or
11  analyses of whether the costs of administering
12  drugs in office is less to Blue Cross/Blue Shield
13  of Massachusetts than administering drugs in the
14  hospital setting?
15     A.   Yes.
16     Q.   What are you aware of?
17     A.   That reimbursement in the hospital
18  setting is a more expensive setting than in the
19  physician office.
20     Q.   That is something that Blue Cross/Blue
21  Shield of Massachusetts studies or tracks?
22     A.   It is something we have looked at.

Page 68
1      Q.   In what context has Blue Cross/Blue
2  Shield of Massachusetts looked at that?
3      A.   In understanding an analysis, what our
4  -- what our reimbursement is in the hospital
5  setting versus the office setting.
6      Q.   Were there studies done?
7      A.   I can't say there were specific studies
8  done, no.
9      Q.   Were there cost analyses done?
10     A.   I don't remember specific cost analyses
11  that were done.
12     Q.   What is the basis for your
13  understanding that Blue Cross/Blue Shield of
14  Massachusetts analyzed this?
15     A.   I know we had looked at reimbursement
16  specific to how hospitals were reimbursed for
17  medications, not only oncology, but medications,
18  versus how our reimbursement was structured in
19  the physician setting.
20     Q.   Did Blue Cross/Blue Shield have any
21  programs or plans or initiatives designed to
22  encourage the administration of drugs in office

Page 69
1  because it was cheaper to Blue Cross/Blue Shield
2  of Massachusetts as well as the healthcare system
3  as a whole?
4      A.   No.  Not that I'm aware of.
5      Q.   What was the outcome of this analysis
6  that you are aware of which concluded that it's
7  less costly to administer the drugs in office
8  than in the hospital setting?
9      A.   The outcome of the analysis was looking
10  at how we reimburse in the hospital setting and
11  changing that reimbursement methodology.
12     Q.   Were you aware of any programs that
13  were put into place to waive the co-payments for
14  patients in the in-office setting in order to
15  encourage the administration of drugs in office?
16     A.   No.
17     Q.   Why is it that Jan Cook had these
18  meetings with or has these meetings with these
19  physician societies?
20     A.   There are three regional medical
21  directors.  Each of them are assigned specific
22  medical societies to work with and meet with.

John M. Killion                    HIGHLY CONFIDENTIAL                    January 6, 2006
                                        Boston, MA

Page 78

1   Massachusetts limit the drugs supplied through
2   the specialty pharmacy vehicle to these four
3   categories of drugs?
4       A.   We haven't.  We're continuing to pursue
5   the specialty pharmacy initiative.  A new RFP is
6   going out, and we are looking at expanding the
7   amount of medications that we include in the
8   specialty pharmacy program beyond these drugs.
9       Q.   Okay.  Why to date has Blue Cross/Blue
10  Shield of Massachusetts only contracted to supply
11  for the supply of these four categories?
12      A.   We have 2.8 million members.  We wanted
13  to stage the implementation of our specialty
14  pharmacy program to make it a smooth transition
15  for our members so that it was a successful
16  implementation.  So the decision was via the NM3
17  committee and the specialty pharmacy committee to
18  make sure that we do it in a coordinated fashion
19  without rolling out every individual initiative
20  at all one time.
21      Q.   All right.
22      A.   So it is an ongoing initiative.

Page 79

1       Q.   All right.  How does the specialty
2   pharmacy program work with respect to the supply
3   of drugs to your members?
4       A.   We contract directly with the specialty
5   pharmacy -- well, I should say we contract
6   through ESI, our pharmacy benefit management
7   company, which contracts directly with the
8   specialty pharmacy companies for the delivery of
9   these medications at a discount.  They supply the
10  medications to our members and also provide
11  clinical services to our members as far as phone
12  calls, how is the member doing, what adverse
13  reactions are they having, are they having
14  problems with the medications, are they taking
15  their medications on a routine basis, and so on.
16      Q.   All right.  Do the --
17          MR. HAAS:  Withdraw that.
18      Q.   In connection with this program, is it
19  incumbent upon the members to bring the drugs to
20  the doctors for administration?
21      A.   Not necessarily.
22      Q.   With respect to drugs that are

Page 80

1   physician- administered drugs, are those --
2          MR. HAAS:  Well, withdraw that
3   question.
4       Q.   Does the specialty pharmacy program
5   that Blue Cross/Blue Shield of Massachusetts
6   implemented contemplate the supply of physician-
7   administered drugs?
8       A.   Yes.
9       Q.   Okay.  With respect to those drugs, the
10  first question:  Does the current structure now
11  in place involve the supply of physician-
12  administered drugs to the members of Blue
13  Cross/Blue Shield?
14      A.   The drugs that we contract for today
15  are generally drugs that members have the ability
16  to administer after training by the physician.
17      Q.   Okay.  Are there any drugs currently
18  within the purview of the specialty pharmacy
19  program that must be administered by a physician
20  or under the supervision of a physician?
21      A.   I think the answer to that is it
22  depends upon the physician, but, no, the members

Page 81

1   can be trained to administer these drugs.
2       Q.   Okay.
3          (The witness and Mr. Sullivan
4          conferring off the record.)
5   BY MR. HAAS:
6       Q.   Would you like to supplement your
7   answer?
8       A.   No.
9       Q.   You said that the PBM supplies the
10  drugs to the members at a discounted cost.  What
11  does that mean?
12      A.   I didn't say the PBM supplied the
13  drugs.
14      Q.   I mean the PBM contracts to supply --
15  contracts with the specialty pharmacy to supply
16  the drugs to the members at a discounted cost.
17  When you say "discounted cost," what does that
18  mean?
19      A.   A discount off of what we were
20  originally paying for those drugs, a steeper
21  discount, anywhere from for hemophilia drugs up
22  to a discount off of minus 40 percent off of AWP.

Page 86

1    Meeting marked Exhibit Killion 002
2         for identification.)
3    BY MR. HAAS:
4    Q.   Marked as Deposition Exhibit Killion
5    002 is a document Bates stamped -- not Bates
6    stamped -- it hasn't been produced to us with a
7    Bates stamp -- titled "Blue Cross/Blue Shield of
8    Massachusetts, Specialty Committee Meeting,
9    Specialty Group, Massachusetts Society of
10   Clinical Oncology, parenthetical, MSCO, date June
11   10, 2004.
12        (Handing Exhibit Killion 002 to
13        the witness.)
14   Q.   Mr. Killion, I ask that you take a look
15   at this document and tell me if you recognize it;
16   if so, what it is.
17        (Pause.)
18        (The witness viewing
19        Exhibit Killion 002.)
20   A.   I have read the document.
21   Q.   What is it?
22   A.   It is minutes that were in followup to

Page 87

1    a meeting that we had, Jan Cook and I from Blue
2    Cross/Blue Shield, with the Mass. Society of
3    Clinical Oncology discussing with them our -- two
4    initiatives:  one, our discussion around pay for
5    performance and looking at quality cost program
6    as well as a discussion with them in regards to
7    our specialty pharmacy program.
8    Q.   Were you involved at all in the
9    discussions of whether to change the
10   reimbursement methodology of Blue Cross/Blue
11   Shield of Massachusetts from a fee-for-service
12   amount based upon AWP or based upon Medicare to
13   one based upon ASP?
14   A.   I was involved in some of those
15   discussions, yes.
16   Q.   Were you involved in the determination
17   of not to switch the methodology from an AWP-
18   based methodology to an ASP-based methodology?
19   A.   I was not involved in making that
20   decision.  I had comment in regards to that
21   decision.
22   Q.   What analysis did you do and commentary

Page 88

1    did you provide in connection thereto?
2    A.   That at that point ASP was not industry
3    standard, and that Blue Cross wanted to wait and
4    further evaluate CMS's methodology before
5    implementing an initiative with our oncologists
6    that wasn't yet industry standard.
7    Q.   Where is that documented?
8    A.   I don't believe that it is documented.
9    Q.   That was your input to the process, but
10   you didn't document it in any way or form?
11   A.   I had discussions.
12   Q.   Who did you have discussions with?
13   A.   Deb Devaux.
14   Q.   Anyone else?
15   A.   I had discussions with Jan Cook about
16   that as well.
17        THE WITNESS:  Can we take a five-minute
18   break?
19        MR. HAAS:  Sure.
20        (Recess taken at 11:32 a.m.)
21        (Recess ended at 11:39 a.m.)
22        MR. HAAS:  Back on the record.

Page 89

1    BY MR. HAAS:
2    Q.   You had mentioned that Blue Cross/Blue
3    Shield had made the determination not to reduce
4    reimbursement under the ASP methodology.  Is it
5    your understanding that the industry standard is
6    to maintain reimbursement at 95 percent of AWP?
7    A.   My understanding is not to -- the
8    industry standard is not to move to ASP at this
9    point in time.
10   Q.   Right.  My question is a little
11   different.  Is it your understanding that the
12   industry standard is to maintain reimbursement at
13   95 percent of AWP?
14   A.   For the most part, yes, that's correct.
15   Q.   I have shown you what has been marked
16   as Deposition Exhibit Killion 002, and I'm not
17   sure if we have established the foundation, but
18   what is this document?
19   A.   It was a meeting that we had with
20   MASCO.  The date on it is June 10th of 2004.  We
21   are -- we had discussions with them on, well, two
22   things in particular:  specialty pharmacy as well

John M. Killion                    HIGHLY CONFIDENTIAL                    January 6, 2006
                                        Boston, MA

Page 106

1    formulary.
2        Q.   And having determined that they were
3    functionally equivalent, did they make a
4    formulary decision based upon the economics of
5    the administration of the drugs?
6        A.   Yes.  That went into the decision.
7        Q.   To your knowledge is Blue Cross/Blue
8    Shield of Massachusetts receiving any rebates on
9    Gonal F or any other physician- administered
10   drug?
11       A.   Not to my knowledge.
12       Q.   I started asking you before we switched
13   topics what your litigation experience was, so
14   let's get back to that.  When have you been
15   deposed previously?
16       A.   I was deposed when I was at Harvard
17   Pilgrim on two occasions.
18       Q.   What was the nature of those
19   depositions? What was the nature of the issue,
20   the litigation that you were deposed concerning?
21       A.   We had developed a relationship, a
22   contract relationship, with a pharmacy for

Page 107

1    fertility medications.  After I left Tufts, Blue
2    Cross/Blue Shield terminated that relationship.
3    The provider's assertion was that the agreement
4    couldn't be terminated; it went into perpetuity.
5        MR. SULLIVAN:  Excuse me.  You said in
6    your answer "Blue Cross/Blue Shield."  Did you
7    mean to say Tufts?
8        THE WITNESS:  Tufts.  I apologize.
9    BY MR. HAAS:
10       Q.   Were those two depositions in
11   connection with the same matter?
12       A.   Yes.
13       Q.   Have you been deposed in any other
14   action?
15       A.   No.
16       Q.   Have you otherwise had any
17   participation or involvement in any other
18   litigation?
19       A.   There was one incident at Tufts Health
20   Plan.
21       Q.   What was that incident?
22       A.   It was in regards to a member who was

Page 108

1    trying to contact their primary care physician
2    relative to OB services, was unable to contact
3    their primary care physician.  We outreached to
4    the physician to contact the member.  The
5    physician apparently did not contact the member.
6    The member had a bad experience and sued the
7    physician.
8        Q.   When you began in Blue Cross/Blue
9    Shield of Massachusetts in 1985, did the company
10   have in place a staff model at that time?
11       A.   I don't recall.
12            (Discussion off the record.)
13   BY MR. HAAS:
14       Q.   Getting back to what has been marked as
15   Deposition Exhibit Killion 002, did you have any
16   conversations or communications with any
17   associations other than -- concerning the
18   specialty pharmacy issue other than that that is
19   reflected in this, the minutes of this meeting?
20       A.   Other associations other than MASCO?
21       Q.   Yes.
22       A.   No.

Page 109

1        Q.   Did you have subsequent communications
2    with MASCO concerning this issue?
3        A.   I was involved in more than one
4    communication with MASCO.  I'm not clear of the
5    dates, so whether or not there were meetings
6    prior to this meeting or after this meeting, I
7    would need to see copies of minutes.
8        Q.   But it is your recollection there were
9    other specialty committee meetings with MASCO
10   that involved the question of whether to
11   implement a specialty pharmacy model for the
12   supply of oncology drugs?
13       A.   There were -- yes.  There were other
14   meetings with -- let me clarify that. Yes.  There
15   were other meetings with MASCO to discuss our
16   specialty pharmacy program in general and any
17   concerns or issues that MASCO wanted to raise in
18   regards to the delivery of oncology medications.
19       Q.   Were there any individuals on the
20   specialty pharmacy committee that was
21   specifically looking at the issue of whether to
22   implement a specialty pharmacy model for oncology

28 (Pages 106 to 109)

Page 110

1    drugs?
2        A.   We made the decision not to implement
3    at that point in time and to further evaluate
4    when we rolled out the specific therapeutic
5    classes that I previously discussed.
6        Q.   Okay.  Now you said the decision was
7    not to implement the model with respect to
8    oncology drugs at that time.  Why was that?
9        A.   Part of it was because we were looking
10   at CMS and the reimbursement methodology,
11   understanding that at that point it wasn't
12   industry standard.  We were concerned, continue
13   to be concerned, in regards to being overcharged
14   for oncology medications but wanted to make sure
15   we roll out a program that benefits our members
16   and also addresses concerns that the oncologists
17   have raised in a thoughtful manner.
18       Q.   Okay.  Who was involved in that
19   analysis specifically dealing with oncology
20   drugs?
21       A.   Mike Mulrey was.
22       Q.   Anyone else?

Page 111

1        A.   Not that I'm aware of.
2        Q.   Yesterday Mr. Mulrey testified the only
3    involvement he had was implementing your
4    strategy.  Is that incorrect testimony?
5        A.   Mike Mulrey had done an analysis
6    looking at the impact of moving to AWP minus 15.
7        Q.   Right.  But right now I'm talking about
8    whether the -- whether Blue Cross/Blue Shield of
9    Massachusetts --
10           MR. HAAS:  Withdraw that question.
11   The issue we're addressing, talking
12   about now is Blue Cross/Blue Shield's decision to
13   defer implementing the specialty pharmacy model
14   for oncology drugs.
15       A.   Um-hmm.
16       Q.   So the question, number one, is what
17   involvement, if any, did Mike Mulrey have in that
18   decision-making process?
19       A.   When you say implementing oncology for
20   specialty pharmacy, do you mean utilizing a
21   specialty pharmacy vendor for the oncology
22   program?

Page 112

1        Q.   Yes.
2        A.   We didn't contemplate doing that.  We
3    contemplated looking at a change in reimbursement
4    methodology to our oncologists but not
5    implementing a specialty pharmacy program at that
6    point in time.
7        Q.   All right.  I understand that Blue
8    Cross/Blue Shield of Massachusetts engaged in an
9    analysis of whether to move from AWP or fee
10   schedule based methodology to ASP. I understand
11   that.
12       A.   And that is Mike Mulrey's analysis that
13   I refer to.
14       Q.   Aside from that, with respect to the
15   question of whether or not Blue Cross/Blue Shield
16   of Massachusetts contemplated implementing a
17   specialty pharmacy model for the supply and
18   administration of oncology drugs, question number
19   one, did Blue Cross/Blue Shield of Massachusetts
20   contemplate implementing a specialty pharmacy
21   model for oncology drugs?
22       A.   We deferred a decision to implement

Page 113

1    until we had more time to evaluate CMS
2    methodology.
3        Q.   Okay.  CMS doesn't have a specialty
4    pharmacy reimbursement model, does it?
5        A.   CMS has a reimbursement model.  When
6    you -- when you mean specialty pharmacy, do they
7    use a specialty pharmacy vendor to --
8        Q.   Right.
9        A.   Not that I'm aware of.  I believe it is
10   something that CMS is looking at.
11       Q.   My immediate question, though, is what
12   Blue Cross/Blue Shield considered in 2004. Did
13   Blue Cross/Blue Shield of Massachusetts give any
14   consideration, do any analysis of whether to
15   implement a specialty pharmacy model with respect
16   to oncology drugs at that time?
17       A.   No.  We decided to defer.
18       Q.   Did you decide to defer the analysis or
19   the decision?
20       A.   The decision as to when we would
21   implement the program.
22       Q.   Okay.  So let me move back to my

John M. Killion                          HIGHLY CONFIDENTIAL                          January 6, 2006
                                              Boston, MA

Page 118
1   AWP was set, if you had any understanding?
2       A.   That the manufacturers had a lot of
3   involvement in regards to AWP.
4       Q.   My question is what was your
5   understanding as to how -- I understand your
6   position in this litigation, but my specific
7   question was what was your understanding as to
8   how AWP was calculated.
9           MR. SULLIVAN:  That is a different
10  question.
11          MR. HAAS:  Well, it is not. What I said
12  was "set."
13  BY MR. HAAS:
14      Q.   But go ahead.
15      A.   That it -- again that it was -- it was
16  a fee that was established for the price of drugs
17  and that manufacturers had a large role in
18  dictating what that fee was.
19      Q.   How did you determine that
20  manufacturers had a large role in determining
21  what that fee was?
22      A.   That was my understanding.

Page 119
1       Q.   How did you get that understanding?
2       A.   In -- in working in retail pharmacy at
3   that time.
4       Q.   What communication did you have that
5   reinforced or established that understanding at
6   that time?
7       A.   I think there were discussions
8   internally within the company in regards to AWP
9   and people referring to AWP as a -- as an
10  artificial price but a price that the industry
11  used in regards to establishing reimbursement off
12  of.
13      Q.   So when you were working in retail
14  pharmacy, you understood that AWP was an
15  artificial term, an artificial price?
16      A.   Yes.  That it was a -- correct.
17      Q.   Okay.  And you had discussions with
18  other members of Blue Cross/Blue Shield at that
19  time?
20          MR. SKWARA:  Objection.
21      Q.   Right?
22      A.   That was Tufts Health Plan.

Page 120
1       Q.   Excuse me.  You had discussions with
2   other individuals at Tufts Health Plan at that
3   time regarding the fact that AWP was an
4   artificial price; correct?
5           MR. SULLIVAN:  Objection. Beyond the
6   scope.
7       Q.   You can answer.
8       A.   We had concerns at Tufts Health Plan in
9   regards to AWP, although we used AWP as the price
10  in which we reimbursed for drugs at the retail
11  pharmacy and encouraged our physicians to utilize
12  generics.
13      Q.   And what were your concerns with the
14  use of AWP at that time given that you knew that
15  it was an artificial price?
16      A.   Well, one of our major initiatives was
17  to move physicians to generic medications,
18  knowing that they were much more cost effective
19  than the price that was set for brand
20  medications.
21      Q.   So what did your knowledge that AWP was
22  an artificial price have to do with that

Page 121
1   initiative?
2       A.   Moving physicians to generic
3   medications produced the result of providing a
4   more cost effective retail pharmacy program.
5       Q.   That is because you understood at the
6   time that generic drugs were discounted much more
7   heavily than brand name drugs; right?
8       A.   That's right.
9       Q.   That is common knowledge in the
10  industry; right?
11      A.   Maximum allowable cost.
12      Q.   Well, my question is isn't it common
13  knowledge or wasn't it common knowledge --
14      A.   Yes, it was.
15      Q.   -- at the time frame in 1998 when you
16  were in the retail pharmacy department of Tufts
17  that generic drugs were discounted heavily as
18  compared to brand name drugs?
19      A.   Yes.
20          MR. SULLIVAN:  Objection. Beyond the
21  scope.
22      A.   Yes.  That was my knowledge.

Henderson Legal Services
(202) 220-4158

HIGHLY CONFIDENTIAL
Boston, MA

Page 122

1    Q.   Was it also your understanding at the
2  time that when competition came into the market
3  for brand name drugs, i.e., multisource
4  competition, there were also discounts and
5  rebates that were provided on those drugs?
6        MR. SULLIVAN:  Objection. Beyond the
7  scope.
8    A.   That's correct.
9    Q.   So typically -- so it was your
10 understanding then in the 1998 time frame that
11 when a brand name drug first came to market there
12 typically were no incentives associated with the
13 drug, but then as competition entered the market,
14 first multisource, and then with generics, more
15 incentives were provided for the drug; correct?
16       MR. SULLIVAN:  Objection.
17   A.   Correct.
18   Q.   And that is what led to your
19 understanding that AWP was an artificial price
20 because it didn't bear a relationship to the
21 acquisition cost; correct?
22   A.   Correct.

Page 123

1    Q.   Now in 1998 when you had this
2  understanding, how did that impact the
3  reimbursement policies of Tufts at this time?
4        MR. SULLIVAN:  Objection. Beyond the
5  scope.
6    A.   Tufts put in place a pharmacy risk
7  program to encourage the utilization of generic
8  medications and formulary medications at this
9  point in time.
10   Q.   And what was the reimbursement
11 methodologies that Tufts put in place in order to
12 address its understanding that generic drugs were
13 cheaper?
14   A.   Can you repeat that question?
15   Q.   I am just trying to close a loop.  What
16 was the particular pharmacy risk program that
17 Tufts put into place?
18   A.   I am sorry.  Your question was what was
19 the particular pharmacy risk program that Tufts
20 put into place?
21   Q.   Yes.  You had testified that Tufts put
22 into place a pharmacy risk program.

Page 124

1    A.   That's correct.
2    Q.   My question simply is what was that
3  program.
4    A.   As I stated before, Tufts had a budget
5  per IPA, PHO, in regards to pharmacy expense,
6  provided reports to physicians in regards to
7  generic brand name utilization and encouraged the
8  use of generic utilization in our network along
9  with formulary utilization and other preferred
10 plans that we put in place where there was prior
11 authorization for high-cost brand name drugs.
12   Q.   Now we were discussing your knowledge
13 while at Tufts in 1998 that acquisition costs
14 varied based upon the competition for the drugs
15 in the marketplace.  When did you first obtain
16 that understanding?
17       MR. SULLIVAN:  Objection.  I think that
18 mischaracterizes what the witness' testimony was.
19       MR. HAAS:  I disagree.
20 BY MR. HAAS:
21   Q.   But you can clarify.
22       MR. SULLIVAN:  Do you understand the

Page 125

1  question?
2        THE WITNESS:  No.
3    Q.   My question is when did you first
4  obtain the understanding that you have testified
5  to that in 1998 you understood that the
6  acquisition cost of drugs varied depending upon
7  whether it was branded, multisource or generic,
8  and the level of competition in the marketplace?
9    A.   Through our PBM and the discounts that
10 we were able to achieve through multisource drugs
11 versus brand name drugs --
12   Q.   All right.
13   A.   -- and the competition in the
14 marketplace.
15   Q.   All right.  Did you have that
16 understanding before coming to Tufts or while
17 working at Tufts?
18   A.   While working in Tufts.
19   Q.   So you obtained that understanding in
20 the 1998 time frame?
21   A.   Correct.
22   Q.   Was it your understanding that that was

32 (Pages 122 to 125)

Page 134

1      A.   My understanding of, again, of AWP as
2   it relates to acquisition cost.
3      Q.   As you testified in the record prior to
4   the break?
5      A.   That's correct.
6          MR. HAAS:  I have no further questions
7   at this time.
8          MR. NOTARGIACOMO:  In general or about
9   that subject?  Your examination is concluded?
10         MR. HAAS:  It is concluded at this
11  time.
12         MR. NOTARGIACOMO:  I just have a few, a
13  very few questions in --
14         MR. HAAS:  You are providing the cross
15  on behalf of plaintiffs?
16         MR. SULLIVAN:  Yes.
17         MR. NOTARGIACOMO:  Yes.
18         MR. HAAS:  Okay.
19             CROSS EXAMINATION
20  BY MR. NOTARGIACOMO:
21     Q.   When you -- do you remember when you
22  were discussing with Attorney Haas your

Page 135

1   employment at Tufts Healthcare prior to the
2   break?
3      A.   Yes.
4      Q.   And there was a discussion about
5   average wholesale price and its relationship to
6   the actual acquisition prices; do you recall
7   that?
8          MR. HAAS:  Objection --
9      A.   Yes.
10         MR. HAAS:  -- to form.
11     Q.   And Mr. Haas asked you about your use
12  or -- he asked you about your understanding about
13  what AWP was?
14         MR. HAAS:  Objection to form.
15     Q.   Do you recall that?
16     A.   I do.
17     Q.   And do you recall saying that AWP was
18  an artificial price?
19         MR. HAAS:  Objection to form.
20     A.   I do.
21     Q.   And prior to the break, Mr. Haas asked
22  you -- Attorney Haas asked you whether it was

Page 136

1   your understanding that AWP was an artificial
2   price because it did not bear a relationship to
3   actual prices.  Do you remember agreeing to that
4   statement?
5          MR. HAAS:  Objection to form.
6      A.   I do.
7      Q.   Do you have an understanding -- well,
8   actually in 1998 when you were employed at Tufts,
9   do you have an understanding of how AWP was
10  calculated?
11         MR. HAAS:  Objection to form.
12     A.   No.  Not how it was calculated.
13     Q.   Do you have -- did you have an
14  understanding as to the relationship between AWP
15  and the actual prices that were paid by
16  physicians for physician- administered drugs?
17     A.   No.
18         MR. HAAS:  Objection to form.  The
19  record speaks for itself.
20     Q.   When you said and used the term
21  "artificial price" in that answer, what did you
22  mean by the term "artificial price"?

Page 137

1          MR. HAAS:  Objection to form.
2      A.   Artificial price meaning a -- a price
3   that -- that was referred to as it ain't what you
4   pay, or the acronym AWP, ain't what you pay, used
5   commonly at Tufts Health Plan.
6      Q.   Did you have an understanding -- are
7   you using that term, "it ain't what it pays," is
8   it your understanding that AWP was not the
9   arithmetic actual average of wholesale prices?
10     A.   That --
11         MR. HAAS:  Objection to form.  Leading
12  question.
13     A.   That's correct.
14     Q.   Did you understand what the
15  relationship was between average wholesale price
16  and as published or as --
17         MR. NOTARGIACOMO:  Strike that.
18     Q.   Did you have an understanding about
19  what average wholesale price was in relationship
20  to the prices that physicians were paying for
21  those drugs?
22     A.   No, I did not.

35 (Pages 134 to 137)

John M. Killion                                     HIGHLY CONFIDENTIAL                                     January 6, 2006
                                                         Boston, MA

Page 138

1        MR. HAAS:  Objection to form.  The
2  record speaks for itself.
3        MR. NOTARGIACOMO:  I have no further
4  questions.
5        REDIRECT EXAMINATION
6  BY MR. HAAS:
7     Q.   Just to clarify, you testified after
8  the break following your conversations with
9  counsel that it was commonly discussed at Tufts
10  Plan in the 1998 time frame that AWP properly
11  stood for "ain't what's paid"; is that correct?
12        MR. SULLIVAN:  Objection.  Form.
13     A.   That term had been used.  Correct.
14     Q.   And I believe you just testified that
15  you had --
16        MR. HAAS:  I withdraw that question.
17     Q.   So you understood that by that phrase,
18  "ain't what's paid," that AWP was not in fact the
19  actual average of wholesale prices; correct?
20     A.   That's correct.
21     Q.   And you understood at this time and it
22  was discussed at Tufts that AWP bore no

Page 139

1  predictable relationship to the actual cost as
2  paid; right?
3        MR. SULLIVAN:  Objection to form;
4  compound.
5     A.   Correct.
6     Q.   Okay.
7        MR. HAAS:  I have no further questions.
8        MR. NOTARGIACOMO:  I think we are done.
9        MR. SULLIVAN:  Okay.  Thank you.
10        (Whereupon, at 1:13 p.m., the
11        deposition was adjourned.)
12
13
14
15        _____
16             JOHN M. KILLION
17  Subscribed and sworn to and before me
18  this _____ day of _____, 20____.
19
20
21  _____
22        Notary Public

Page 140

1                  CERTIFICATE
2  Commonwealth of Massachusetts
3  Plymouth, ss.
4        I, Judith McGovern Williams, a Registered
5  Professional Reporter and Notary Public in and for the
6  Commonwealth of Massachusetts, do hereby certify:
7        That JOHN M. KILLION, the witness whose
8  deposition is hereinbefore set forth, was duly sworn
9  by me and that such deposition is a true record of the
10  testimony given by the said witness.
11        IN WITNESS WHEREOF, I have hereunto set my
12  hand this _____ day of _____ , 2006.
13
14
15        Judith McGovern Williams
16        Registered Professional Reporter
17        Certified Realtime Reporter
18        Certified LiveNote Reporter
19        Certified Shorthand Reporter No. 130993
20
21  My Commission expires:
22  April 2, 2010

36 (Pages 138 to 140)

# EXHIBIT 8

Page 1

1            IN THE DISTRICT OF MASSACHUSETTS

2

3                          -O-

4

5    IN RE:                    :

6    PHARMACEUTICAL INDUSTRY        MDL No. 1456

7    AVERAGE WHOLESALE PRICE    :   01-CV-1225

8    LITIGATION

9

10         30(b)(6) DEPOSITION OF:  IHC HEALTH PLANS

11

12                     ERIC CANNON

13

14                          -O-

15

16              Place:      IHC Health Plans

17                          4646 West Lake Park Blvd.

18                          Salt Lake City, Utah 84120

19              Date:       September 13, 2004

20                          9:40 a.m.

21              Reporter:   Vickie Larsen, CSR/RPR

22                          -O-

Eric Cannon
30(b)(6)

Highly Confidential
Salt Lake City, UT

September 13, 2004

Page 34

1    Q.    And did the prices paid to providers for
2  prescription drugs ever changed as a result of these
3  informal discussions?
4    A.    Yes, they did.
5    Q.    Are you aware of any specific examples
6  where prices changed?
7    A.    I cannot think of any specific examples.
8    Q.    Were prices usually decreased as a result
9  of the discussions?
10   A.    As many times as prices were decreased I
11  would imagine we also increased them.  It goes both
12  ways.
13   Q.    Okay.  In your current job as the
14  director of pharmacy services is it important to you
15  to keep up to date on prescription drug pricing
16  issues?
17   A.    Yes, it is.
18   Q.    And what do you do to keep up to date on
19  those issues?
20   A.    In order to keep up to date on pricing
21  issues we first of all load into our system on a
22  weekly basis databases from either First Data Bank or

Page 36

1  then begins to drop.
2    Q.    Are you familiar with the term "AWP" or
3  "average wholesale price" in the context of
4  prescription drugs?
5    A.    Yes, I am.
6    Q.    And you mentioned that you subscribe to
7  First Data Bank and/or Medispan databases; is that
8  correct?
9    A.    Yes.
10   Q.    Are AWPs published in those?
11   A.    Yes.
12   Q.    Are AWPs for generic products also
13  published?
14   A.    Yes.
15   Q.    In your experience does the AWP for a
16  generic product tend to decrease when additional
17  sellers of generic products enter the market?
18   A.    No, it does not.
19       MR. EVERETT:  Let's go off the record.
20       (There was a break taken.)
21       MR. EVERETT:  Let's go back on the
22  record.

Page 35

1  Medispan that include pricing information.  We talk
2  with vendors about pricing changes, price increases.
3  We receive from manufacturers notification when prices
4  are raised.
5        We track closely the number of
6  manufacturers that may be selling a generic product
7  that would indicate price competition in a specific
8  category.  We monitor communications that may take
9  place through newsletter groups or journal articles or
10  internet or wherever information -- wherever we can
11  find information, we'll take it.
12   Q.    One of the things that you mentioned is
13  that you keep track of the number of companies selling
14  generic products?
15   A.    Yes.
16   Q.    Why is the number of companies selling a
17  generic product important?
18   A.    The number of companies selling a generic
19  product is important to us in that as the number of
20  companies selling a particular product increases, so
21  does competition.  Generally speaking as price or as
22  competition increases within a category, the price

Page 37

1    Q.    When we went off the record we were
2  talking about things that you do as director of
3  pharmacy to keep up to date on drug pricing issues.
4  And you mentioned that you read a newsletter groups
5  and journal articles.  What newsletter groups does IHC
6  Health Plan subscribe to or receive?
7    A.    We receive The Pink Sheet.  We get a
8  newsletter called Generic Line.  We belong to a group
9  that provides updates on injectable pricing called
10  R.J. Health.  They provide a newsletter, the title of
11  which I'm unaware.
12   Q.    Okay.  What other periodicals?
13   A.    Those are the main periodicals I can
14  think of.
15   Q.    Okay.  What is The Pink Sheet?
16   A.    The Pink Sheet is a -- it's fairly big
17  and I'm not sure who the publisher is -- but it
18  provides updates on issues as they go through the FDA
19  or other issues as it relates to pharmaceuticals.
20   Q.    You also mentioned that you subscribe to
21  First Data Bank and/or Medispan for the pricing.  Are
22  there any other industry pricing compendia?

10 (Pages 34 to 37)

# EXHIBIT 9

1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3

4

5                No. 01CV12257-PBS

6

7

8    ***********************************

9                                    *

     IN RE:   PHARMACEUTICAL INDUSTRY    *

10   AVERAGE WHOLESALE PRICE LITIGATION   *

                                        *

11   ***********************************

12

13   DEPOSITION OF JILL S. HERBOLD, taken pursuant to

14   the Federal Rules of Civil Procedure, at CIGNA

15   Headquarters, 900 Cottage Grove Road, South Building,

16   Bloomfield, CT, before Diana M. Noel, a Registered

17   Professional Reporter, Certified Realtime Reporter,

18   and Licensed Shorthand Reporter No. 199, in and for

19   the State of Connecticut, on Friday, January 14,

20   2005, commencing at 12:48 PM.

21

22

Page 74

1  acquisition costs?
2      A.  Yes.
3      Q.  And what is your understanding of that term?
4      A.  That it is -- it represents a rate amount
5  that is supposed to be the wholesaler's acquisition
6  cost, but exactly how it all gets calculated, I do not
7  know.  What I do know about it is that it -- every
8  situation -- I've never known it to be above AWP, so
9  less than AWP, but exactly what the number is doesn't
10 have a direct relationship with AWP.
11     Q.  Would you say that Cigna has an understanding
12 that providers need to make a profit margin in order to
13 stay in business?
14         MR. ST. PHILLIP:  Objection.
15     A.  Your question was if providers need a profit
16 margin to stay in business?
17     Q.  Is that correct?
18     A.  Yes.
19     Q.  And that as a general matter, Cigna assumes
20 that the reimbursement rates that it provides providers
21 will allow the physicians to make a fair and reasonable
22 margin and stay in business; isn't that correct?

Page 75

1          MR. ST. PHILLIP:  Objection.
2          THE WITNESS:  Could you repeat the
3      question.
4          (The court reporter read back.)
5      A.  The reimbursement to the providers is the
6  result of the negotiations, and while as we cannot
7  determine if that reimbursement will allow us -- will
8  allow the provider to make a profit or not, it is in
9  Cigna's interest that providers do stay in business,
10 because they are the ones that are servicing our
11 members.
12     Q.  Does Cigna have a preference for the site
13 that a physician administered drug is administered?
14         MR. ST. PHILLIP:  I'm sorry, can you
15     read that back.
16         (The court reporter read back.)
17     A.  To my knowledge, no.  The -- we want doctors
18 following standard medical protocols, but I do not know
19 of a specific statement of any sort related to that
20 matter.
21     Q.  For example, if a particular drug could be
22 administered in a physician's office but could also be

Page 76

1  administered in a hospital outpatient department, does
2  Cigna have any preference over the site of care?
3          MR. ST. PHILLIP:  Objection, insofar as
4      it calls for an across the board answer.  Go
5      ahead.
6      A.  The answer to that is that our preference, if
7  it was medically appropriate to do so, for that
8  injectable to be administered in a physician's office
9  because it generally is better for the member as well
10 as the lower medical costs.
11     Q.  And do you know why there are lower medical
12 costs in a physician's office as opposed to a hospital
13 outpatient department?
14     A.  That would be because of the overhead and
15 facility costs that is associated with the outpatient
16 facilities.
17     Q.  So Cigna's reimbursement to the hospital
18 would generally be greater than its reimbursement to a
19 physician's office for administration of the same
20 product?
21         MR. ST. PHILLIP:  I'm going to object.
22     Q.  Is that correct?

Page 77

1          MR. ST. PHILLIP:  The court excluded
2      deposition topic No. 18 which reads, whether
3      and to what extent you provide different
4      reimbursement rates for subject drugs when
5      they are administered in providers' offices
6      rather than in hospitals, including your
7      clients' rationale for doing so or not doing
8      so.  The Magistrate Judge excluded that
9      testimony, so I instruct the witness not to
10     answer.
11         MS. SCHOEN:  Well, clearly we disagree
12     and feel that this deposition topic falls
13     under other areas.
14         For purposes of moving forward today, we
15     will move forward.
16     Q.  Do you have any knowledge that doctors have
17 conspired with drug manufacturers to inflate drugs'
18 average wholesale price?
19         MR. ST. PHILLIP:  Object insofar as it
20     calls for a legal conclusion, but you can
21     answer.
22     A.  I have no knowledge.

Page 82

1  have knowledge of that period, is it your testimony
2  that Cigna reimburses the physician at a rate, a
3  negotiated rate, but a rate that was a percentage off
4  of -- expressed as a percentage off of average
5  wholesale price or AWP, is that correct?
6      MS. SCHOEN:  Objection to form.
7      MR. ST. PHILLIP:  If you could do that
8      one more time, we just increased in volume so
9      we'll be able to do it.
10     Q.  Sticking with the period from 2002 earlier,
11  I'm basing your conversations with people at Cigna, was
12  it your testimony today that Cigna reimburses
13  physicians or reimbursed physicians at a price that was
14  a discount off of average wholesale price?
15     MS. SCHOEN:  Objection to form.
16     Q.  Is that correct?
17     A.  Prior to 2002, Cigna reimbursed physicians at
18  the negotiated rates.  Those negotiated rates were
19  commonly expressed as percent of AWP.  They may have
20  also been expressed as a percent of billed charges, but
21  those are the only two approaches that I'm aware of.
22     Q.  And then for the period from 2002 on, you

Page 83

1  said that approximately 50 percent of reimbursement is
2  done at or under that same methodology as a negotiated
3  price off of the average wholesale price or as a
4  percentage of bill charged; is that correct?
5      A.  That is correct.
6      Q.  And the other 50 percent is based on Cigna's
7  national standard pricing list, is that correct?
8      A.  Yes, that is correct.
9      Q.  And even the prices on Cigna's national
10  standard pricing list are expressed as a percentage off
11  of average wholesale price, is that correct?
12     A.  Yes, some of them are.  Not all of them are.
13     Q.  Some of them are.
14         The ones that aren't, are you referring
15  specifically to the 13 -- the drugs that fall under the
16  13 codes that are based --
17     A.  Yes.
18     Q.  -- on something different?
19     A.  Yes.
20     Q.  And those exceptions, those 13 codes, the
21  reimbursement methodology for those drugs is based on
22  acquisition costs, but isn't it true that it also has a

Page 84

1  part of the formula that is also based on average
2  wholesale price, is that correct?
3      A.  That is correct.
4      Q.  Would you agree with me that Cigna's goal is
5  to get the best -- when negotiating with physicians
6  about the reimbursement for physician administered
7  drugs, would you agree that Cigna's goal is to get the
8  best deal it can for itself while providing adequate
9  reimbursement to physicians for the drugs it
10  administers to its members?
11     A.  Yes.
12     Q.  And is it fair to say that Cigna expects that
13  the doctors in its network to make a living primarily
14  providing treatment to patients and not from large
15  markups on those physician administered drugs?
16     MS. SCHOEN:  Objection to form.
17     A.  Could you please repeat the question.
18     Q.  Sure.
19         Is it fair to say that Cigna expects
20  that doctors in its networks are -- make their living
21  primarily providing treatment to patients and the
22  payment from providing treatment to patients and not

Page 85

1  from large markups on prescription drugs that it
2  administers?
3      MS. SCHOEN:  Objection to form.
4      A.  With respect to the reimbursement of
5  practitioners for their services, we expect that the
6  physician is negotiating with us and another carrier so
7  that they can maintain sufficient profit margin to
8  operate their business and stay in business.  We don't
9  have a specific expectation about exactly what their
10  billed charges might be for a particular service
11  because it's a difference between that billed charge
12  and the reimbursement amount that I would call and
13  refer to as a markup.
14     Q.  When you use the term billed charge, what are
15  you referring to?
16     A.  What I'm referring to there is the fee amount
17  that the physician would submit on the claim in order
18  for the claim to get paid.  It's -- another way to say
19  it is it is the amount that the physician would charge
20  for an indemnity member.
21     Q.  Let's turn back to the 13 codes that we
22  talked about a few minutes ago.

Page 86

1        I believe you testified that one -- and
2    correct me if I'm wrong -- that the reason that Cigna
3    singled out these 13 codes for different treatment was
4    the fact that there became available on the market
5    generic forms of those drugs that were available at a
6    cheaper price, is that accurate?
7        A.   Yes, and let me clarify.  Our change that we
8    made was in reaction to the result of competitive
9    market forces.  Generic drugs were introduced that
10   drove down the acquisition cost, the cost of the
11   product in the marketplace.
12       Q.   And the change -- were you finished?
13       A.   Yes -- I'm finished, yes.
14       Q.   And the change in the reimbursement for those
15   codes that Cigna instituted, was that an attempt to
16   bring physician reimbursements for those codes in line
17   with the lower price available in the marketplace for
18   those drugs?
19       A.   Yes.
20       Q.   So if Cigna had information that other drugs
21   other than that 13 were available for a price that was
22   significantly less than the reimbursement that Cigna

Page 87

1    currently provides in its national standard price list,
2    would Cigna take steps to try to bring the
3    reimbursement rate that it provides down to the level
4    that's available -- the level of reimbursement that's
5    available to doctors who purchase in the marketplace?
6        MS. SCHOEN:  Objection to form.
7        A.   Cigna is trying to make sure that we maintain
8    -- well, that we have competitive medical costs that we
9    are able to sell our products and have members, and
10   Cigna is -- also has an interest, as I've stated, in
11   making sure that the providers can stay in business.
12       And in terms of applying that to the
13   reimbursement for specific drugs, we made those changes
14   reflecting the changes that were going on in the
15   marketplace, and also what physicians were willing to
16   accept for reimbursement.
17       I mean, another way of thinking about
18   that is that we ranked the changes that we're aware of
19   in terms of market price changes, but it also -- we
20   have to factor in what is the reimbursement amount that
21   physicians are willing to accept.
22       Q.   You testified that -- when you were asked

Page 88

1    whether Cigna understands what physicians paid for
2    physician administered drugs, you just testified that
3    Cigna didn't have an understanding of that.
4        Is that generally your testimony?
5        A.   We don't have specific knowledge about it.
6    The knowledge that we have is just based on what --
7    it's really based on we set a fee amount, and the
8    providers come back and complain about it or they
9    don't.  So it's not that we understand their specific
10   acquisition costs, but if our reimbursement is too low,
11   we hear about it.
12       Q.   I think you testified that one of the
13   exceptions is some -- with respect to some
14   manufacturers of immunization products.
15       Do you remember testifying about that?
16       A.   I'm sorry, can you please repeat that
17   question?
18       Q.   Sure.
19       I think that you testified with respect
20   to having had some contact with some manufacturers of
21   immunization products?
22       A.   Yes.

Page 89

1        Q.   And in that way learning what the physician
2    acquisition price for immunization products -- at least
3    some products are; is that accurate?
4        A.   That is accurate.  My prior comment was
5    related to injectables.  I'm sorry, I didn't clarify
6    that.
7        Q.   That's okay.
8        As with respect to the immunization
9    products and the information that Cigna obtained with
10   respect to those conversations, did that information
11   then -- was that used by Cigna in determining what
12   reimbursement it would provide to physicians for those
13   immunization products?
14       A.   That's a very interesting question.  As I
15   mentioned, it is in the recent past, and to be more
16   specific, the last month and a half, that we have
17   gotten that information, and we have yet to make a
18   determination about exactly how we're going to set our
19   reimbursement on immunizations going forward.
20       MR. NOTARGIACOMO:  I have no other
21   questions.
22       MR. ST. PHILLIP:  I have none.

# EXHIBIT 10

James T. Kenney                                           September 20, 2004
Wellesley, MA

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3                  NO. 01CV12257-PBS

 4       _____

 5    In re:  PHARMACEUTICAL          )

 6    INDUSTRY AVERAGE WHOLESALE      )

 7    PRICE LITIGATION                )

 8       _____)

 9    THIS DOCUMENT RELATES TO:       )

10    ALL ACTIONS                     )

11       _____)

12                     DEPOSITION of HARVARD PILGRIM HEALTH

13    CARE BY JAMES T. KENNEY, called as a witness by and

14    on behalf of the Defendants, pursuant to the

15    applicable provisions of the Federal Rules of Civil

      Procedure, Rule 30 (b)(6), before P. Jodi Ohnemus,

16    Notary Public, Certified Shorthand Reporter,

17    Certified Realtime Reporter, and Registered Merit

18    Reporter, within and for the Commonwealth of

19    Massachusetts, at the offices of Harvard Pilgrim

20    Health Care, 93 Worcester Road, Wellesley,

21    Massachusetts, on Monday, 20 September, 2004,

22    commencing at 10:50 a.m.
```

James T. Kenney                                                      September 20, 2004
Wellesley, MA

1    physician clinics that provide services to the
2    Harvard Pilgrim members, is that correct?
3        A.   Yes.
4        Q.   How did Harvard acquire the drugs that
5    were dispensed in its pharmacies through the staff
6    model HMO?
7            MR. HORGAN:  Objection.
8        A.   It purchased them either direct from a
9    manufacturer or through a wholesaler.
10       Q.   Similarly, with respect to the drugs
11   dispensed -- withdraw that question.  With respect
12   to the drugs administered in physicians' offices,
13   how did Harvard acquire those drugs --
14           MR. HORGAN:  Objection.
15       Q.   -- through the staff model HMO?
16       A.   Same, either direct or through the
17   wholesaler.
18       Q.   Were you involved at all in the
19   contracting or negotiation for the purchase of
20   drugs from either manufacturers or wholesalers for
21   the staff model HMO?
22       A.   Yes.

1        Q.   And what was your involvement?
2        A.   My role was to negotiate contracts with
3    those manufacturers that -- how do I phrase it?  We
4    didn't really have a central function.  So, each
5    pharmacy negotiated a few contracts.
6        Q.   Uh-huh.
7        A.   That's kind of how it worked.
8        Q.   How many pharmacies were -- made up the
9    network of the staff model HMO?
10       A.   At that time, I believe it was nine.
11       Q.   So, is it correct that in your role over
12   the years as -- in the various pharmacy roles for
13   your staff model HMO, you negotiated purchase
14   contracts with manufacturers for the drugs
15   dispensed through the pharmacy?
16       A.   In my role at the staff model, yes.
17       Q.   To your recollection, were the prices for
18   the drugs that Harvard purchased from manufacturers
19   set based upon any particular benchmark?
20           MR. HORGAN:  During the staff model HMO?
21           MR. HAAS:  Yes.
22       A.   I would say the benchmark was WAC.

1        Q.   Uh-huh.  And to your recollection, what
2    was the range of percentages markup or discount off
3    of WAC at which Harvard acquired drugs from
4    manufacturers for dispensing through its staff
5    model HMO pharmacists?
6            MR. HORGAN:  Objection.  You can answer.
7        A.   2 percent, to maybe 50, 60 percent.
8        Q.   Above or below WAC?
9            MR. HORGAN:  Objection.
10       A.   Below WAC.
11       Q.   With respect to brand name drugs -- let's
12   stick with brand name drugs for a moment.  What was
13   the percentage markup or discount off of WAC that
14   Harvard Pilgrim acquired drugs from manufacturers
15   for its staff model HMO?
16           MR. HORGAN:  Objection.  Can you -- all
17   these are just if you know, all these questions.
18       A.   The branded discount was 2 to 50 percent.
19       Q.   2 percent to 50 percent.
20       A.   2 to 50 percent off.
21       Q.   Did the discounts off of WAC differ with
22   respect to generic drugs that Harvard purchased on

1    behalf of its staff model HMO?
2        A.   Yes.
3        Q.   What were the discounts off of WAC that
4    Harvard Pilgrim received with respect to the
5    general risk purchased from manufacturers for its
6    staff model HMO?
7        A.   50 percent to 80 percent.
8        Q.   At that time did Harvard negotiate
9    separate manufacturer rebate agreements with
10   manufacturers for the drugs that were dispensed or
11   administered by the staff model HMO?
12       A.   No.
13       Q.   Were the rebate -- withdraw that question.
14   Were the discounts off of WAC at which Harvard
15   acquired drugs from manufacturers inclusive of a
16   rebate that pertained to the drugs that were
17   dispensed or administered by the pharmacies --
18           MR. HORGAN:  Objection.
19       Q.   -- or the clinics?
20           MR. HORGAN:  Objection.
21       A.   No.
22       Q.   Was it your understanding that at the time

Henderson Legal / Spherion
(202) 220-4158

James T. Kenney                                                                    September 20, 2004
Wellesley, MA

Page 14

1    that you were negotiating these prices with
2    manufacturers for drugs for the staff model HMO
3    that Harvard Pilgrim was getting a particularly
4    good price from the manufacturers that wasn't
5    otherwise available in the marketplace?
6         MR. HORGAN:  Objection.
7    A.   No.
8    Q.   So, to your understanding at the time, any
9    pharmacy could obtain drugs at between 2 percent to
10   50 percent or 60 percent off for brand name drugs
11   from manufacturers, is that correct?
12        MR. HORGAN:  Objection.
13   A.   I don't know.
14   Q.   Was that your understanding at the time?
15   A.   I don't know.
16        MR. NALVEN:  Objection.
17   A.   I don't know what any other pharmacies
18   were paying.
19   Q.   With respect to the drugs acquired from
20   wholesalers, was the price for the drugs that
21   Harvard Pilgrim purchased from wholesalers for the
22   staff model HMO based on any particular benchmark?

Page 15

1    A.   WAC.
2    Q.   Uh-huh.  What was the range of discounts
3    off of WAC or above WAC at which Harvard acquired
4    brand name drugs from wholesalers?
5    A.   WAC plus 2 percent.
6    Q.   What was the discount above or below WAC
7    at which Harvard acquired generic drugs from
8    wholesalers for its staff model HMO?
9    A.   50 to 80 percent.
10   Q.   Off WAC?
11   A.   Uh-huh.
12   Q.   And again, was it your understanding at
13   the time that those were market prices that
14   otherwise would be available in the industry?
15        MR. NALVEN:  Objection.
16        MR. HORGAN:  Objection.
17   A.   Yes.
18   Q.   When you were negotiating with
19   manufacturers and wholesalers for the purchase of
20   drugs on behalf of staff model HMO, what was your
21   understanding of the term "WAC" or wholesale
22   acquisition cost?

Page 16

1    A.   The price that the manufacturer charged
2    the wholesaler.
3    Q.   Did you have an understanding at the time
4    whether or not that price was published in any
5    industry compendia?
6    A.   No.
7         MR. NALVEN:  Object to the form on that
8    last question, please.
9    Q.   With respect to tracking drug costs or
10   reimbursement internally at the staff model HMO,
11   did Harvard Pilgrim track the drugs that were
12   dispensed to its members based upon a benchmark or
13   at a cost amount, to your knowledge?
14        MR. HORGAN:  Objection.
15   A.   Cost.
16   Q.   Did there come a point in time that you
17   became involved in the negotiation of rebates for
18   manufacturers?
19   A.   Yes.
20   Q.   When was that?
21   A.   1988.
22   Q.   What was your involvement at that time?

Page 17

1    A.   My role was to establish a rebate program
2    -- or rebate contracts for Harvard Community Health
3    Plan.
4    Q.   Prior to 1988, did Harvard Community
5    Health Plan have any rebate program with
6    manufacturers?
7         MR. HORGAN:  Objection.
8    A.   No.
9    Q.   To your knowledge, prior to 1998, did
10   Harvard Community Health Plan receive any rebates
11   through its contract with any pharmacy benefit
12   manager?
13   A.   I don't know.
14   Q.   Uh-huh.
15   A.   I'm sorry.  PBM, no.
16   Q.   At any point in time while you were at
17   Harvard Community Health Plan, did Harvard
18   Community contract with a PBM for the
19   administration of its pharmacy benefit?
20   A.   Could you repeat that question, please.
21   Q.   Yeah.  At any time that you worked for
22   Harvard Pilgrim, has Harvard Pilgrim contracted

5 (Pages 14 to 17)