# EXHIBIT 11

Steven J. Fox                                                                                                    March 8, 2006
Boston, MA

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3                 NO. 01CV12257-PBS

 4     _____

 5     In re:  PHARMACEUTICAL          )

 6     INDUSTRY AVERAGE WHOLESALE      )

 7     PRICE LITIGATION                )

 8     _____)

 9     THIS DOCUMENT RELATES TO:       )

10     ALL ACTIONS                     )

11     _____)

12                    DEPOSITION of STEVEN J. FOX,

13     called as a witness by and on behalf of the Johnson

14     & Johnson, pursuant to the applicable provisions of

15     the Federal Rules of Civil Procedure, before P.

16     Jodi Ohnemus, Notary Public, Certified Shorthand

17     Reporter, Certified Realtime Reporter, and

18     Registered Merit Reporter, within and for the

19     Commonwealth of Massachusetts, at the offices of

20     Robins, Kaplan, Miller & Ciresi, L.L.P., 800

21     Huntington Avenue, Boston, Massachusetts, on

22     Wednesday, 8 March, 2006, commencing at 9:35 a.m.
```

Steven J. Fox                                                                     March 8, 2006
Boston, MA

Page 50

1     Q.   Okay.  How long did you remain in the
2  claims processing role?
3     A.   Six months.
4     Q.   Okay.  What was the next position that
5  you moved to?
6     A.   I would have brought a copy of my
7  resume.  I think the next position I had, I then
8  left to go into what was then called "professional
9  relations" as a coordinator.  So, essentially,
10  that was where I began my career working with
11  physicians.
12     Q.   And that was in the fall of '91?
13     A.   Well, six months after that.  So,
14  probably -- I think I actually landed in that role
15  -- it was probably by then 1992.  So, whatever
16  that -- not exactly sure of the time frames, but -
17  -
18     Q.   Okay.  Somewhere in the '91, '92 period?
19     A.   Yeah.  Yeah.
20     Q.   Now, how long did you remain in the
21  professional relations coordinator role?
22     A.   I was probably a coordinator for a

Page 51

1  couple of years, just responsible for taking phone
2  calls and assisting what we called provider
3  representatives.  So, individuals from our company
4  that would go out and meet with physicians.
5  Again, I was kind of an internally-based person.
6  And then I stayed in that role for probably a
7  couple of years, and then I later took a job as
8  the external provider relations representative.
9     Q.   Now, when you were in the coordinator
10  role, were you taking calls only from the field
11  reps or also from physicians directly?
12     A.   No, I took calls from physicians
13  directly.  I was the person they called if they had
14  an issue or things like that.
15     Q.   Now, while you were in that role, BCBS
16  of Massachusetts acquired Bay State Health Care,
17  is that correct?
18     A.   That's correct.
19     Q.   When was that acquisition?
20     A.   I think it was October of 1992.
21     Q.   Now, Bay State Health Care also had a
22  staff model HMO in the early '90s, is that

Page 52

1  correct?
2        MR. COCO:  Objection.
3     A.   No, I don't think -- I don't think we
4  did.
5     Q.   Do you understand what I mean when I use
6  the term "staff model HMO"?
7     A.   I do.
8     Q.   What is your understanding of that term?
9     A.   A group of employed physicians that were
10  owned and operated by the health plan, but I don't
11  -- our Bay State did not -- to my knowledge --
12  didn't own or employ physicians and did not have a
13  clinic-based practice.
14     Q.   Are you aware that other witnesses have
15  testified that Bay State did, indeed, have a staff
16  model HMO in the early '90s?
17        MR. COCO:  Objection.
18     A.   I'm not aware that they have.
19     Q.   Well --
20     A.   In my role, again, if there was, I had
21  no involvement with it.  So, my understanding is
22  that there wasn't.

Page 53

1     Q.   Is it possible that there was a staff
2  model HMO and you weren't aware of it?
3        MR. COCO:  Objection.
4     A.   No.
5     Q.   So, you're absolutely certain that there
6  was no staff model HMO, and anyone who testified
7  to the contrary is wrong?
8        MR. COCO:  Objection.
9     A.   They have reason to obviously give you
10  testimony based on what they know.  If you're
11  asking me if Bay State had a staff model HMO, to
12  the best of my knowledge, the answer is no.
13     Q.   Now, did BCBS of Massachusetts acquire
14  Bay State Health Care -- well, withdraw that.  Are
15  you familiar with an entity called "Bay State
16  Health System"?
17     A.   Yes.
18     Q.   Okay.
19     A.   No relation.
20     Q.   What is Bay State Health System?
21     A.   Bay State Health System is a health
22  system in western Massachusetts -- Springfield --

14 (Pages 50 to 53)

Steven J. Fox                                                                        March 8, 2006

Boston, MA

Page 126

1      A.   Well, AWP is the price determined -- set
2  by the manufacturer.  So, if that's -- if that's
3  the rate -- I don't know if that's the rate
4  Medicare uses or not, but that's the rate that we
5  used as the industry reimbursement.
6      Q.   No, I understand that.  My question is
7  why?
8      A.   Why?
9      Q.   Why was it a hundred percent of AWP and
10 then 95 percent --
11     A.   Oh.  Okay.
12     Q.   -- of AWP versus something else?
13     A.   Oh, I understand.  Well, I think, again,
14 AWP being a -- for lack of a better word -- set by
15 the manufacturer, so, let's call that 100 percent
16 of charge, if you will.  And so, again, I think,
17 as I've been involved in physician reimbursement,
18 I think we had a general understanding that that
19 number was largely inflated.  And so, we could
20 take a percentage off and negotiate it like we
21 negotiate other numbers.
22     Q.   Now, for as long as you've been involved

Page 127

1  in reimbursement, you understood that number was
2  largely inflated.  What did you -- what do you
3  mean when you say, "largely inflated"?
4      A.   I think it was known in the -- again, in
5  my dealings with physicians and my understanding
6  of physician reimbursement -- that the average
7  wholesale price is much like a sticker price of a
8  car, much like the charges in a hospital.  It's a
9  price with which you start.  And again, it's an
10 industry benchmark, and we go from there.
11     Q.   And that's been known in the industry
12 for a long time, right?
13         MR. COCO:  Objection.
14     A.   Well, I would say it's been -- AWP, as
15 the reference point, has been known.  I don't
16 think the health plan -- I can't speak for
17 everybody else.  Blue Cross, I think, understood
18 that AWP was -- it was a pricing model set by the
19 manufacturer.  I don't -- and, again, how we then
20 reimburse physicians off of that, again, there
21 were some -- there was some level of discounting
22 that could be attained.  At what level and how and

Page 128

1  -- I think as we started to hear from physicians,
2  I think we then understood what that meant.
3      Q.   Okay.  I think my question was a little
4  unclear.  Let me try and rephrase it.  We talked
5  about the fact that, you know, it's well known
6  that AWP is a sticker price and that it's an
7  inflated number.  The question is, how long has
8  that been well known?
9          MR. COCO:  Objection.
10     A.   Well, again, I don't know what you mean
11 by "well known."  When I say it's a sticker price,
12 what I'm saying is that AWP is a number that is
13 pegged to the price of a drug; that AWP pricing is
14 not -- again, that's not what we're reimbursing.
15 We then -- again, my involvement in the fee
16 schedule, my assumption would be that there is
17 some -- there is some relation between the average
18 wholesale price and the cost that we would then
19 end up paying.  There has to be a relation,
20 similar to what we talked about earlier when we
21 discount fee schedules.  It's based on something,
22 whether it's Medicare -- in this instance, it's

Page 129

1  AWP.
2      Q.   Okay.
3      A.   So, did we know -- did I know that AWP
4  was a standard -- a basis of comparison?  Yes.  I
5  don't know for how long.
6      Q.   Okay.
7      A.   You know.
8      Q.   Well, you said that since you started in
9  the provider reimbursement area it's been known
10 that AWP is an inflated number, right?
11         MR. COCO:  Objection.
12     A.   AWP -- that's my term, yeah.  AWP
13 essentially is set by the manufacturer, and that
14 number, again, when I'm saying, "inflated," I'm
15 saying, "inflated" in relation to how that price
16 then gets passed to a physician and how the
17 physician then bills.
18         We talked earlier, I think, today about
19 conversation of margin.  And so, typically, my
20 conversations with physicians on margin have been
21 exactly on that point.
22     Q.   Okay.  So, to use your sticker price

33 (Pages 126 to 129)

Steven J. Fox                                                    March 8, 2006
Boston, MA

Page 146

1    cost and the AWP or anything else?
2          MR. COCO:  Objection.
3       A.   No.  What I'm saying is that --
4       Q.   I'm sorry.  Let me just focus my
5    question.
6       A.   Yeah.
7       Q.   My question is, do you have a specific
8    understanding as to a specific number that is the
9    relationship between physicians' acquisition cost
10   for drugs and the rate at which Blue Cross Blue
11   Shield of Massachusetts reimburses?  Do you have a
12   specific understanding as to that point?
13         MR. COCO:  Objection.
14      A.   Specific, no.  Reasonable, yes.
15      Q.   Okay.  And what --
16      A.   Reasonable is not a, number but I would
17   assume it to be reasonable.
18      Q.   What's reasonable?
19         MR. COCO:  Objection.
20      A.   I couldn't give you a number.  I don't
21   know a -- reasonable number?
22      Q.   Okay.  Well, what do you mean when you

Page 147

1    use the term "reasonable"?
2          MR. COCO:  Objection.
3       A.   Reasonable.
4       Q.   Well, what would be reasonable and what
5    would be unreasonable?
6          MR. COCO:  Objection.
7       A.   I'm not -- I don't have a particular
8    number in my mind.  I'm not going to give you a
9    number, because I would not know what a reasonable
10   specific number would be.  I would know something
11   that was unreasonable.  I can't tell you
12   reasonable.  Are double digits unreasonable or
13   reasonable?  I don't know.
14      Q.   And if I were to identify a specific
15   number, would you -- would you say that well,
16   there's no way you can peg it to a specific
17   number, that's just unreasonable?
18         MR. COCO:  Objection.
19      A.   Yes.
20      Q.   So, if I were to say, well, would you
21   expect it to be 20 percent, 30 percent, 40
22   percent, 50 percent, you would say that's

Page 148

1    unreasonable, and there's no way you can put a
2    specific number on what I expect it to be?
3          MR. COCO:  Objection.
4       A.   Again, I'd just go back to that I would
5    expect it to be reasonable.  I'm not going to put
6    any number parameters around it.
7          MR. NOTARGIACOMO:  Take a break.
8       Q.   Well, my question was, would you say
9    that I'm being unreasonable if I say the number
10   should be 20, 30, 40, or 50 percent relationship
11   between acquisition and AWP?  Would you say that
12   that's unreasonable, and there's no way to peg a
13   specific number to that?  Would you say that?
14         MR. COCO:  Objection.
15      A.   Well, I'm not going to -- I'm not going
16   to get into what your -- I'm not going to agree or
17   disagree with that again.
18      Q.   Well, I'm asking you, do you agree with
19   it or do you disagree with it?
20         MR. COCO:  Objection.
21      A.   I have no opinion on it.
22      Q.   My question is, if I were to say that

Page 149

1    you expect there to be a relationship between
2    acquisition and AWP -- that's 20 percent, 30
3    percent, 40 percent, 50 percent, a specific number
4    -- would that be true or would that be untrue?
5          MR. COCO:  Objection.
6       A.   I would expect there to be a reasonable
7    --
8       Q.   No.  My question is, would it be true or
9    would it be untrue?
10         MR. COCO:  Objection.  It's not a true-
11   or-false question.
12         MR. MANGI:  It is.
13      Q.   I understand you expect it to be a
14   reasonable number.  My question is, if I were to
15   try and say, Well, by "reasonable" you mean this
16   specific number, would you agree with that or
17   disagree with that?
18      A.   I wouldn't --
19         MR. COCO:  Objection.
20      A.   I would neither agree nor disagree,
21   because what I'm trying to tell you is that it
22   would be reasonable.  I have no preconceived

38 (Pages 146 to 149)

Steven J. Fox                                                                                    March 8, 2006
Boston, MA

Page 150

1   notion of what reasonable is.  I am not going to
2   give you a number, because I don't have one in my
3   mind.
4           MR. MANGI:  We can take a break now.
5           (Recess was taken.)
6       Q.   Now, Mr. Fox, during the break I had an
7   opportunity to review the section of the
8   transcript, and I'd like to ask you about an
9   answer you gave previously.
10      A.   Sure.
11      Q.   I asked you what you mean when you say
12  AWP is inflated.  And your answer was, "But that
13  potentially is not -- is not accurate in relation
14  to the price they pay and the price we pay them."
15  And you said that you've had really specific
16  instances where you've talked to physicians about
17  that.
18          What are the specific instances you were
19  referring to there?
20          MR. COCO:  Objection.
21      A.   I'm talking about -- again, not related
22  specifically to AWP, okay.  So, I mean, I've

Page 151

1   talked to physicians about the -- yeah, we went
2   back -- you talked earlier about, you know,
3   reimbursement rates and charge-based -- physicians
4   have charges and we reimburse.  And so, I think in
5   general, it's just trying to understand the
6   relationship between what is charged and what is
7   reimbursed.  And again, so, then I think we're
8   having the conversation about AWP.
9       Q.   Well, again, let's go back to your
10  previous answer.  When you said that, "AWP
11  potentially is not accurate in relation to the
12  price they pay," physicians pay --
13      A.   Physicians.
14      Q.   -- how do you know that?
15          MR. COCO:  Objection.
16      A.   How do I know that?  Physicians -- just
17  conversations I've had with physicians.  Again, we
18  reimburse, and we expect a fair and reasonable
19  reimbursement, so --
20      Q.   How long -- when's the first -- well,
21  withdraw that.  When's the first of these
22  conversations with physicians you recall that led

Page 152

1   you to understand AWP is not accurate in relation
2   to the price physicians pay?
3       A.   There's no specific instance that I --
4           MR. COCO:  I'm sorry.  Objection.
5           THE WITNESS:  Sure.
6       A.   There's no specific instance.  Again, I
7   -- you know, we go back in time, and you know, I
8   recall having conversations.  I can't tell you
9   with who or when.  But, again, just try to under -
10  - as I -- just wanting to understand more about
11  the reimbursement side.  Again, the pharmacy
12  reimbursement or the medical drug in this instance
13  that we're talking about is a real small piece of
14  the overall reimbursement pie that I deal with.
15      Q.   How long have you known that AWP is not
16  accurate in relation to the price physicians pay
17  to acquire drugs?
18          MR. COCO:  Objection.  Misstates
19  previous testimony.
20          MR. MANGI:  I'm actually reading from
21  his testimony.
22          MR. COCO:  When you had read it before,

Page 153

1   you had read that "AWP potentially is not
2   accurate," and now you're taking out the word
3   "potentially."
4           MR. MANGI:  "But that potentially is not
5   -- is not accurate in relation to the price they
6   pay."  That's the sentence I'm reading from.  My
7   question is a simple one.  When you say it's not
8   accurate in relation to the price they pay, how
9   long have you known that?
10          MR. COCO:  Objection.
11      A.   Well, rather than me -- I guess then
12  what I'll say is that obviously the word that I'm
13  using is not -- I'm not using it in that context.
14  And so, as you're playing back what I'm saying,
15  maybe I was going too fast --
16          THE WITNESS:  As you suggested --
17      A.    -- but my point that I was trying to
18  make, and if I change the word, since there's so
19  much focus on it, AWP is a point of reference, and
20  I guess what I'm trying to say is that I
21  understand that to be a point of reference.  I'm
22  understanding that there is a difference between

39 (Pages 150 to 153)

Steven J. Fox                                                                                          March 8, 2006
Boston, MA

Page 218

1    broker, customer.
2         Q.   Okay.  Who do you understand to be Blue
3    Cross Blue Shield of Massachusetts' customers?
4         A.   Accounts --
5              MR. COCO:  Objection.
6         A.   -- brokers.
7         Q.   Okay.  What sort of entities are you
8    thinking of when you say, "accounts"?
9         A.   I'm not thinking of any particular
10   account.
11        Q.   Okay.
12        A.   I'm just thinking of accounts in
13   general.
14        Q.   Let me rephrase the question.  Are
15   employers -- companies that employ individuals --
16   clients of Blue Cross Blue Shield of
17   Massachusetts?
18        A.   I would agree with that definition.
19        Q.   Similarly, then do the clients of Blue
20   Cross Blue Shield of Massachusetts include health
21   and welfare funds?
22        A.   They should.

Page 219

1         Q.   Unions?
2         A.   Anyone who's contracted with us for
3    services could include any of those.
4         Q.   Now, when -- let's take -- let's take a
5    specific example.  Are you familiar with the Pipe
6    Fitters Local 537 Trust Fund?
7         A.   Not specifically.
8         Q.   Okay.  But you're aware that that's one
9    of the trust funds -- one of the types of entities
10   we're talking about?  Are you familiar with the
11   entity?
12        A.   (Witness nods.)
13             MR. COCO:  Objection.
14        Q.   Never heard of it?
15        A.   No.
16        Q.   Okay.  Well, let's talk about any
17   generic health and welfare fund then.  Let's call
18   it Customer X.  When Customer X, a health and
19   welfare fund, comes to Blue Cross Blue Shield of
20   Massachusetts seeking to obtain coverage for its
21   members, does it enter into a contract with Blue
22   Cross Blue Shield of Massachusetts?

Page 220

1         A.   I'm not -- I'm not on the sales side of
2    the house, but that's -- my understanding is that
3    they do.
4         Q.   Do the clients of Blue Cross Blue Shield
5    of Massachusetts, by contracting with Blue Cross
6    Blue Shield of Massachusetts, then get access to
7    Blue Cross Blue Shield of Massachusetts' provider
8    networks?
9         A.   Yes.
10        Q.   Do any of Blue Cross Blue Shield of
11   Massachusetts' clients have their own networks?
12        A.   I'm not aware that this exists.
13        Q.   So, as far as you know, all of them use
14   networks provided by Blue Cross Blue Shield of
15   Massachusetts?
16        A.   As far as I'm aware, yes.
17        Q.   The terms -- because they're using Blue
18   Cross Blue Shield of Massachusetts' network, the
19   terms of reimbursement are then determined by
20   what's been agreed between Blue Cross Blue Shield
21   of Massachusetts and the provider, right?
22             MR. COCO:  Objection.

Page 221

1         A.   Repeat this -- just repeat the question.
2         Q.   Sure.  Well, when a client comes to Blue
3    Cross Blue Shield of Massachusetts -- a health and
4    welfare fund, for example -- they enter into a
5    contract with Blue Cross Blue Shield of
6    Massachusetts that gets them access to Blue Cross
7    Blue Shield of Massachusetts' provider network,
8    right?
9         A.   That's correct.
10        Q.   Now, Blue Cross Blue Shield's contract
11   with the providers, the contract that sets out the
12   network, that provides for what the payment terms
13   to the provider will be, right?
14             MR. COCO:  Objection.
15        A.   Our contract with our provider sets the
16   payment terms.
17        Q.   So, Blue Cross Blue Shield of
18   Massachusetts' clients are not directly involved
19   in negotiating the amount that will be paid to the
20   provider in reimbursement, is that correct?
21             MR. COCO:  Objection.
22        A.   They -- they may not be directly, but

56 (Pages 218 to 221)

Steven J. Fox                                                                    March 8, 2006
Boston, MA

Page 222

1    they -- we are -- in our role, we are actually --
2    the whole point of entering into those
3    negotiations and the whole point of those
4    reimbursements is essentially to pass on any of
5    those savings to our accounts.
6        Q.   You're acting on behalf of your clients
7    in contracting with the providers.
8            MR. COCO:  Objection.
9        A.   That's correct.
10       Q.   Are you familiar with the Teamsters?
11       A.   I know who they are.
12       Q.   All right.
13       A.   I know they're an account.
14       Q.   Are you aware that Teamsters Local
15   Health and Welfare Fund are clients of Blue Cross
16   Blue Shield of Massachusetts?
17       A.   Yes, I am.
18       Q.   The facts that we just discussed in
19   terms of the networks of relationships, those
20   apply, I believe, to the Teamsters, that's one
21   example of the type of customer that would have
22   these relationships?

Page 223

1            MR. COCO:  Objection.
2        A.   I can't speak to the Teamsters' contract
3    with us, I -- again, at a high level, our networks
4    are available to our accounts.
5        Q.   I use Teamsters as an example of one of
6    the types of funds we've been talking about.
7            MR. COCO:  Objection.
8        Q.   Now, other than Blue Cross Blue Shield
9    of Massachusetts, are there any other entities
10   that have their own provider networks in
11   Massachusetts?
12       A.   Are there other entities?  Other health
13   plans?
14       Q.   More broadly, any other entities you're
15   aware of that have their own networks of
16   providers.
17       A.   Well, I mean, "network" is a pretty
18   broad term.  Pharmacies have a network of
19   pharmacies, chains --
20       Q.   I'm talking about networks of providers,
21   of physicians.
22       A.   I don't -- I mean, I just don't think I

Page 224

1    understand what your question is.
2        Q.   Blue Cross Blue Shield of Massachusetts
3    has contracts with providers -- has set up a
4    provider network, right?
5        A.   That's correct.
6        Q.   Okay.  Other health plans, the CIGNAs,
7    the Fallons, the Neighborhoods, they similarly
8    have their own networks of physicians, right?
9        A.   They have -- they have their own
10   networks.  They're largely the same.
11       Q.   Now, other than these entities, the
12   health plans that we've talked about, do you know
13   of any other entities in the marketplace that have
14   networks of contracted physicians in
15   Massachusetts?
16       A.   There may be disease management vendors,
17   but I'm not -- I mean, I'm not aware specifically.
18   I'm not sure what you're thinking of, but I can't
19   think of anything.
20       Q.   Are you aware of any employer plans in
21   Massachusetts, including unions' health and
22   welfare funds, that maintain their own provider

Page 225

1    networks?
2        A.   I'm not aware of any that maintain their
3    own.
4        Q.   Are you aware of any employer plans --
5    including health and welfare funds -- that
6    negotiate reimbursement rates with physicians
7    directly?
8        A.   I'm not aware of that.
9        Q.   Now, earlier in the day we were running
10   through your employment history at the company,
11   and we got up to the period '95/'96 when you were
12   a network manager.  Do you recall the --
13       A.   Yeah.
14       Q.   -- we were talking about that?
15       A.   Yes.
16       Q.   What was your next position after
17   network manager?
18       A.   Would be regional director.
19       Q.   When did you move into that position?
20       A.   It was probably -- probably right after
21   that, '97.
22       Q.   How long did you stay in that position?

57 (Pages 222 to 225)

Steven J. Fox                                                                                                   March 8, 2006
Boston, MA

Page 226

1      A.   I would say '97 to 2000.
2      Q.   What were your responsibilities as a
3  regional director?
4      A.   Just -- I mean --
5      Q.   I'm sorry.  Withdraw that for a second.
6  Was that a regional director in a particular
7  department?
8      A.   Regional director of provider relations.
9      Q.   Okay.  Now, what were your
10 responsibilities in that position?
11     A.   The responsibilities were to coordinate
12 the activities of staff and essentially -- it
13 becomes largely an internally-based role, versus
14 in the previous roles, which are more externally-
15 based.  You get more involved in management and
16 administration and representing kind of a
17 particular region, and just -- instead of having a
18 knowledge or relationship of a particular group of
19 providers, you become knowledgeable around a
20 larger group, more at a regional level.
21     Q.   Were you still dealing directly with
22 provider groups?

Page 227

1      A.   Sure.  I maintained some relations out
2  there, but -- yeah.
3      Q.   Was that a smaller proportion of your
4  time than it had been previously?
5      A.   Yes.  Yes.  Definitely.
6      Q.   What proportion of your time was spent
7  in direct contact?
8      A.   Probably less than 25 percent.
9      Q.   Now, after the regional director stint
10 from '97 through 2000, what was your next
11 position?
12     A.   Director.
13     Q.   Director of provider relations?
14     A.   Director of provider relations, and then
15 I took on communications as well.
16     Q.   How long was your title just director of
17 provider relations?
18     A.   It wasn't.  It was when I took on the
19 director of provider relations, with that came the
20 other department, which was a separate department.
21     Q.   And remind me, what was the full title?
22     A.   At that time it was provider relations

Page 228

1  and communications.
2      Q.   Okay.  So, how long was your title,
3  director of provider relations and communications?
4      A.   Till a year ago, February of 2005.
5      Q.   And what did it change to in February of
6  '05?
7      A.   Senior director of provider relations,
8  communications, and eHealth.
9      Q.   Now, is provider relations and
10 communications the same thing, or is it two
11 separate tasks in that title?
12     A.   It's two different departments.
13     Q.   Okay.  What's the function of provider
14 relations, and what's the function of provider
15 communications?
16     A.   Provider relations is responsible for
17 the external administrative relationships.  I
18 think I may have mentioned -- I mentioned in my
19 other -- earlier we talked about the role.  It's
20 working with physicians, doing a lot of education,
21 training, you know, helping them to understand how
22 to work with the plan.  It also is involved in

Page 229

1  implementing contracts that were executed under --
2  you know, so physicians knew what the terms were,
3  etcetera.
4          The communications side of -- is
5  communications strategy.  All of the external
6  provider communications that the Plan produces
7  come out of this shop, all the newsletters,
8  organization of meetings, things like that.
9      Q.   In the communications role, does that
10 focus on communications from BCBS to physicians,
11 as opposed to the communications?
12     A.   Correct.
13     Q.   Okay.  So, the focus is on mailings and
14 things like that which are being sent out to
15 physicians?
16     A.   That's correct.
17     Q.   Insofar as this communication going the
18 other way from the physician to BCBS of
19 Massachusetts, that would be part of the provider
20 relations department rather than provider
21 communications department?
22     A.   That's accurate.

58 (Pages 226 to 229)

Steven J. Fox                                                                    March 8, 2006
Boston, MA

Page 298

1      A.   Our -- again, my knowledge would be the
2    AWP price, and in a -- and can go on from there.
3    You're introducing a term that I'm not familiar
4    with around this WAC.
5      Q.   Let me ask you --
6      A.   So --
7      Q.   -- to then simply understand that the
8    actual acquisition costs are 30 percent below the
9    AWP --
10     A.   Uh-huh.
11     Q.   -- for Remicade, and that that number,
12    the acquisition price, is actually publicly
13    available. It's published.
14     A.   Uh-huh.
15     Q.   In that situation, is Centocor
16    committing fraud, in your opinion?
17         MR. COCO:  Objection.
18     A.   I'm not a lawyer. I can just tell you
19    that we expect fair and reasonable reimbursement.
20     Q.   Okay. Expecting --
21         MR. COCO:  Again --
22     Q.   I'm sorry. I thought you were done.

Page 299

1    Are you not?
2         MR. COCO:  Adeel, let me complete my
3    sentence as well. The record doesn't reflect it,
4    but there are times when you start getting on a
5    roll with your questions, and you are cutting off
6    the witness before he has completed a sentence --
7         MR. MANGI:  I strongly disagree with
8    that, but I'm happy to wait for the witness to
9    complete his answer.
10        MR. COCO:  And you just did it now.
11        MR. MANGI:  I did it to you, but I
12    haven't done it to the witness.
13        MR. COCO:  For the record, I would just
14    ask that you pause to make sure that the witness
15    is done completing his answer before you proceed
16    to the next question.
17        MR. MANGI:  That's fine. I interpreted
18    from the witness's pause that he was done. If he
19    wasn't done, I apologize.
20     Q.   Were you done?
21     A.   The point I was going to finish with is,
22    separate and apart from numbers which are, you

Page 300

1    know, is this reasonable, is this not reasonable,
2    this is a business that we're in where 1 percent
3    margin, 2 percent margin that people are making is
4    make or break between staying in business and
5    going out of business. So, in that context,
6    again, what's reasonable? Reasonable is in the
7    eyes of beholder. And in the context of drug or
8    drug prices, I don't know if that's reasonable or
9    not. I'm not qualified to make a determination in
10    my role as director on the reasonableness of that
11    question.
12     Q.   Do you personally, as the director of
13    provider relations, feel misled about anything
14    Centocor did around the pricing of Remicade?
15         MR. COCO:  Objection.
16     A.   If you're asking me personally, a 30
17    percent differential would not seem to be
18    reasonable. Again, 1 to 2 percent, 3 percent
19    margins that we're talking about in the business
20    that we're in is different than a double-digit.
21     Q.   Now, so -- and a double-digit margin
22    you're saying would be unreasonable whereas 1, 2,

Page 301

1    3, 4 percent would be reasonable?
2         MR. COCO:  Objection.
3      A.   I'm not going to qualify it. I'm just -
4    - in the example that you're using, given the
5    difference in the pricing that you're talking
6    about, that, again, I don't have direct knowledge
7    of, just answering your assumptions.
8      Q.   Are you aware that the position you just
9    stated is flatly inconsistent with the position
10    that the Plaintiffs', Blue Cross Blue Shield of
11    Massachusetts, and others have taken in this
12    litigation? Are you aware of that fact.
13         MR. COCO:  Objection.
14     A.   I would have no knowledge of what's in
15    the --
16     Q.   Are you aware that the Plaintiffs in the
17    litigation --
18         MR. COCO:  Again, he did not finish.
19         MR. MANGI:  He was clearly done with
20    that answer.
21     Q.   Were you -- did you have something more
22    to say?

Henderson Legal Services
(202) 220-4158

Steven J. Fox                                                    March 8, 2006
Boston, MA

Page 306

1     A.   What year are you referring to?
2     Q.   Well, for what period of time was it the
3   carrier, as far as you know?
4     A.   1967? I mean, Medicare was formed in
5   1967. We've been working with Medicare -- I mean,
6   that's what I'm saying is we were a carrier in the
7   '80s, you know, early '90s. But I don't know who
8   was responsible for it. It was not my area. It
9   was a different division.
10     Q.   Do you know when BCBS of Massachusetts
11   ceased to be a Medicare carrier for Massachusetts?
12     A.   Sometime in the '90s. I don't remember
13   exactly when it was.
14     Q.   Do you know of any current employees at
15   BCBS of Massachusetts who did have responsibility
16   for work on the carrier side of the business?
17     A.   No.
18     Q.   Do you know of any former employees who
19   had responsibility for that side of the business?
20     A.   No.
21     Q.   Are you aware that Blue Cross Blue
22   Shield of Massachusetts had a staff model HMO at a

Page 307

1   point in time?
2     A.   Yes.
3     Q.   That was called Medical East Medical
4   West, right?
5     A.   Yes.
6     Q.   For what period of time did BCBS of
7   Massachusetts have that staff model HMO?
8     A.   I don't know how long. Again, I came on
9   board when the staff models were in existence.
10   They were in existence from the '80s.
11     Q.   When?
12     A.   I don't know specific years and dates.
13     Q.   When did BCBS of Massachusetts cease to
14   have a staff model HMO?
15     A.   That was -- we spun off the health
16   centers as a separate corporation probably around
17   19 -- well, it's ten years. So, it's 1996,
18   probably 1997.
19     Q.   Do you know who at BCBS of
20   Massachusetts, be it current or former employee,
21   would be knowledgeable as to how and/or what
22   prices staff model HMO acquired drugs?

Page 308

1     A.   I would have no idea.
2     Q.   Do you know whether or not Blue Cross
3   Blue Shield of Massachusetts contracts with drug
4   manufacturers for rebates pertaining to formulary
5   replacement?
6     A.   Manufacturers?
7     Q.   Yeah.
8     A.   We have a pharmacy benefit manager that
9   does our contracting, but --
10     Q.   Okay. Is that Express Script?
11     A.   That's correct.
12     Q.   Does ESI contract on BCBS of
13   Massachusetts' behalf with manufacturers for
14   rebates?
15          MR. COCO:  Objection.
16     A.   I have no idea what their relationship
17   is or what they do.
18     Q.   Okay. Do you know whether or not,
19   directly or indirectly, BCBS does contract with
20   manufacturers for formulary rebates?
21          MR. COCO:  Objection.
22     A.   Again, we don't contract with

Page 309

1   manufacturers, so I wouldn't have any of that
2   knowledge. We contract with Express Scripts. I
3   don't know what Express Scripts does.
4     Q.   Okay. How many employees does BCBS of
5   Massachusetts currently have?
6     A.   Employees?
7     Q.   Uh-huh. Do you know how many people
8   make up the organization?
9     A.   Over 3,000.
10     Q.   Do you know how many employees worked on
11   the carrier business before it was spun off?
12     A.   No idea.
13     Q.   Do you know whether it was a handful of
14   people or dozens of people?
15     A.   I have no frame of reference. Again,
16   had little to no involvement with that side of our
17   business.
18          MR. MANGI:  Let's mark the next
19   document.
20          (Group Primary Care Physician
21   Agreement marked Exhibit Fox 012.)
22     Q.   Now, Exhibit Fox 012 is a boilerplate

78 (Pages 306 to 309)

Steven J. Fox                                                                                    March 8, 2006
Boston, MA

Page 310

1   contract template, right?
2       A.   Yes.
3       Q.   Now, this particular template says,
4   "Entered into between BCBS --" then there are some
5   more words there "-- on behalf of the Plan's HMO
6   Blue products." Do you see that?
7       A.   Yeah.
8       Q.   Now, were there different templates for
9   different products?
10      A.   Yes.
11      Q.   And how many products does BCBS have in
12  total?
13      A.   I don't know how many products. There
14  are 16 different templates.
15      Q.   There are 16 different templates in
16  existence at the present time?
17      A.   There's probably more than that, but the
18  boilerplate -- 16 boilerplates. Again, largely
19  the same, just different between primary care
20  physicians and specialists, group versus
21  individual, PPO, HMO, indemnity products.
22      Q.   How often do those boilerplates change?

Page 311

1       A.   Not frequent.
2       Q.   When you say 16 templates, are you
3   including within that hospital templates?
4       A.   No, just physician.
5       Q.   Just physicians?
6            MR. MANGI:   For the record, we called
7   for the production of 16 templates. We've only
8   received about five.
9       Q.   I'd like you to -- by the way, I asked
10  you earlier -- perhaps you can remind me --
11  there's which network correct BCBS only has one
12  physician network?
13      A.   I would classify, again, one network.
14      Q.   Turn to clause -- the Section 2.3 of
15  that contract, please. It's on Pages 5 and 6.
16      A.   Uh-huh.
17      Q.   Now, I'd like you to turn over to Page
18  6, and I'm looking at the last ten sentences of
19  that clause, "Moreover, the group understands and
20  accepts that some or all of the new offerings may
21  involve limited networks."
22      A.   Right.

Page 312

1       Q.   What are limited networks?
2       A.   It means in the future we could decide
3   to offer -- a product could be developed that did
4   not require all physicians participating in a
5   given network. So, this boilerplate contemplates
6   the future product offerings.
7       Q.   And has a limited network ever been
8   developed, to your knowledge?
9       A.   No, it has not.
10      Q.   Turn to Section 1.9, please. Page 2.
11      A.   And just for the last point, since you
12  made the reference about the number of
13  boilerplates, the reason that you don't is because
14  the recent changes in Medicare Advantage laws
15  required us to create separate boilerplates for
16  our Medicare business. So, several templates are
17  Medicare Advantage, so, just --
18      Q.   Are those included within the 16?
19      A.   Yes.
20      Q.   How long have there been 16 standard
21  templates?
22      A.   Probably just fairly recently. Fairly

Page 313

1   recently.
2       Q.   Last three years?
3       A.   Last two years, yeah.
4       Q.   How many templates were there in
5   existence before that time?
6       A.   There should just be -- boilerplates?
7   It's largely -- it's this same language, just with
8   different headers. It should be one, two, three -
9   - there should really be four. Again, if you want
10  to say that HMO Blue products, PPO products, and
11  indemnity products are different then, again, four
12  contracts, but there could just be different words
13  at the top. But true boilerplates, there's really
14  only four. The additional ones are really recent.
15  So, I'm sorry. You were asking me to look at what
16  section now?
17      Q.   Actually, I may be able to short-circuit
18  that. I'm asking you to turn to 4.15.
19      A.   4. what?
20      Q.   4.15 on Page 6.
21      A.   Okay. Yeah.
22      Q.   Now, this clause describes two types of

79 (Pages 310 to 313)

Page 314

1  compensation available to physicians.
2      A.   Uh-huh.
3      Q.   There is the Fee For Service, and then
4  the Member Management Fee program, right?
5      A.   Uh-huh, yes.
6      Q.   Now, the Fee For Service compensation is
7  based on the lesser of the physician's charges or
8  the amount listed in the fee schedule, minus any
9  applicable copayment, right?
10     A.   Yes.
11     Q.   Okay.  Now, in what percentage of cases
12 are the physicians' bill charges lower than the
13 amount on the fee schedule?
14     A.   Physicians' billed charges lower than
15 the fee schedule?  I'm not aware of specific
16 examples.  We have 26,000 physicians in our
17 network.
18     Q.   Okay.  Well, let me ask you to take a
19 look at Clause 1.19, which is on Page 4 in
20 connection with what we were talking about.
21     A.   Uh-huh.
22     Q.   It says -- it defines physician payment

Page 315

1  benefit as, "The lesser of the charge for the
2  covered service or the amount listed on the fee
3  schedule," right?
4      A.   Uh-huh.
5      Q.   Now, how long has that lesser-of
6  methodology been used in BCBS of Massachusetts
7  contracts?
8      A.   I don't know how long.  I mean, it's --
9  I don't know specifically.
10     Q.   If I wanted to look at claims data, for
11 example, and figure out which claims were paid at
12 the fee schedule rate, which ones were paid at the
13 bill charge, how would I know which is which?
14     A.   You wouldn't.  You -- I mean, you
15 wouldn't.
16     Q.   So, there would be no way for me to
17 figure that out?
18     A.   No way that I --
19         MR. COCO:  Objection.
20     A.   No.
21     Q.   Now, if you turn to Clause 4.15.4,
22 please, which is on Page 17.

Page 316

1      A.   Uh-huh.
2      Q.   This clause provides for 90 days written
3  notice, right?
4      A.   Yes.
5      Q.   Okay.  Now, other than the annual
6  updates that we spoke about earlier, how often are
7  fee schedules revised, in part or in total?
8      A.   Once a year.
9      Q.   So, the annual update is the only
10 revision.
11     A.   Yes.
12     Q.   Now, and that update incorporates any
13 negotiated variations, as well as any overall
14 increases in reimbursement, right?
15         MR. COCO:  Objection.
16     A.   I mean, this is standard language in all
17 of our agreements.  So, there, again, this is an
18 evergreen contract.  There is no start and stop
19 date to this.  So, if we enter into a negotiation,
20 they may have different dates and terms, but the
21 language would be the same.
22     Q.   What happens if a provider disagrees

Page 317

1  with a change made by BCBS of Massachusetts to the
2  fee schedule?
3      A.   What happens if they disagree?  I
4  suppose they could let us know.  If they don't,
5  they could terminate their contract if they were
6  that aggrieved by our rates.
7      Q.   Now, sticking with this Section 4.15, we
8  looked earlier at the Member Management Fee
9  program, right?
10     A.   Uh-huh.
11     Q.   And that's described further at Appendix
12 B to the contract --
13     A.   Uh-huh.
14     Q.   -- which is at Page 34 of the document.
15 Do you see that?
16     A.   Yeah.
17     Q.   Now, are you generally familiar with the
18 Member Management Fee program?
19     A.   Yes.
20     Q.   Okay.  Describe it for me.  What is that
21 program?
22     A.   It is an incentive program that is in

80 (Pages 314 to 317)

# EXHIBIT 12

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3                      MDL No. 1456

 4               C.A. No. 01-CV-12257-PBS

 5      *   *   *   *   *   *   *   *   *   *   *   *   *

 6   IN RE:  PHARMACEUTICAL INDUSTRY            *

 7   AVERAGE WHOLESALE PRICE LITIGATION         *

 8   _____      *

 9   THIS DOCUMENT RELATES TO ALL ACTIONS       *

10      *   *   *   *   *   *   *   *   *   *   *   *   *

11                      VOLUME I

12

13   DEPOSITION OF JAN L. COOK, M.D., a witness called on

14   behalf of Johnson & Johnson, pursuant to the Federal

15   Rules of  Civil Procedure, before Jessica L.

16   Williamson, Registered Merit Reporter, Certified

17   Realtime Reporter and Notary  Public in and for the

18   Commonwealth of  Massachusetts, at the Offices of

19   Robins,  Kaplan, Miller & Ciresi L.L.P., 800 Boylston

20   Street, Boston, Massachusetts, on Wednesday, March 6,

21   2006, commencing at 9:37 a.m.

22
```

Jan L. Cook, M.D.                              CONFIDENTIAL                                March 6, 2006
                                                Boston, MA

Page 34

1   Q.   Now, in 2000 what positions did you move
2   to?
3   A.   Quality medical director, Blue
4   Cross/Blue Shield of Massachusetts.
5   Q.   Was that a part-time position also?
6   A.   Correct.
7   Q.   Were you working anywhere else at that
8   time?
9   A.   No.
10   Q.   And how long did you remain the quality
11   medical director?
12   A.   For a year.
13   Q.   And how about in that position, what
14   responsibilities did you have?
15   A.   Responsible for the clinical quality
16   department, Blue Cross/Blue Shield of
17   Massachusetts.
18   Q.   What does the clinical quality
19   department do?
20   A.   Design programs to help the company
21   become in compliance with NCQA accreditation, the
22   URAC accreditation.

Page 35

1   Q.   What is NCQA?
2   A.   National Committee for Quality
3   Assurance.
4   Q.   Is this a position related to
5   credentialing?
6   A.   No.  Credentialing is one of the
7   standard -- but this was more managed care
8   organizations.  It's sort of like the good seal
9   of, you know, housekeeping -- showing my age -- of
10   approval but it's like our J codes for hospitals,
11   joint commission for hospitals.  It's essentially
12   our accreditation by that says that the managed
13   care company was doing everything they should, and
14   I was responsible for the elements related to
15   clinical quality.
16   Q.   So that brings us up to about 2001;
17   correct?
18   A.   Correct.
19   Q.   What position did you move to at that
20   time?
21   A.   Regional medical director.
22   Q.   Now, what were your responsibilities in

Page 36

1   that position?
2   A.   To support provider contracting,
3   provider services at Blue Cross/Blue Shield of
4   Massachusetts, and initially in the northern part
5   of the state.
6   Q.   How long did you hold that position?
7   A.   I'm still in that position.
8   Q.   Your title has not changed?
9   A.   Not really, no.  Regional medical
10   director.
11   Q.   Have the areas of the country for which
12   you have responsibility changed?
13   A.   Correct.  So I'm now responsible for the
14   central and western part of the state.
15   Q.   When did that change occur?
16   A.   I think 2002, 2003.  I'm not quite -- I
17   don't quite remember when exactly.
18   Q.   And you've been employed in that
19   position continuously from 2001 till the present
20   time?
21   A.   Correct.
22   Q.   Are you still a part-time employee?

Page 37

1   A.   Correct.
2   Q.   And you've been part time throughout
3   that period of time?
4   A.   Correct.
5   Q.   But throughout that period of time this
6   is the only position you've been working in, you
7   haven't also had another job; is that correct?
8   A.   Correct.
9   Q.   Let me show you a document, and we'll
10   mark this as Exhibit Cook 001?
11        (Exhibit Cook 001, Document Bates-
12   numbered BCBSMA-AWP-12120 - 12146, marked for
13   identification.)
14   Q.   Now, if you could turn to the second
15   page of that document, which is the BC/BS
16   organization page?
17   A.   Okay.
18   Q.   Is this the current -- does this reflect
19   the current structure of the organization?
20   A.   No.
21   Q.   Okay.  How has the organization changed?
22   A.   Well, the chairman and chief executive

10 (Pages 34 to 37)

Jan L. Cook, M.D.                    CONFIDENTIAL                    March 6, 2006
                                     Boston, MA

Page 202

1  relationship between the price at which they
2  acquire drugs and the amounts they reimburse, if
3  any?
4          MR. COCO:  Objection.
5      A.  I'm only aware of what our payment
6  policy is. I'm not aware of what people in
7  general are paying for their drugs.
8      Q.  So is the answer to my question that you
9  have no understanding or expectation as to the
10 relationship between the price that they pay to
11 acquire drugs and the amount that they're
12 reimbursed for drugs?
13         MR. COCO:  Objection.
14     A.  Yeah.
15     Q.  Now, let me mark a document. This will
16 be Exhibit Cook 002.
17         (Exhibit Cook 002, Document Bates-
18 numbered BCBSMA-AWP-12489 - 12492, marked for
19 identification.)
20         (Discussion off the record.)
21     Q.  Now, there are a number of e-mails on
22 this chain. I'll draw your attention to specific

Page 203

1  parts of them, but please take your time to
2  familiarize yourself and let me know when you're
3  ready.
4          (Witness reviews document.)
5          MR. MANGI:  Off the record.
6          (Discussion off the record.)
7          MR. MANGI:  Okay. Back on the record.
8      Q.  I would like to draw your attention
9  first to the last e-mail in the chain which starts
10 on Page 12493. Do you have that?
11     A.  Yes.
12     Q.  Now, this e-mail that is sent to you
13 from vdulong@mms.org?
14     A.  Uh-huh.
15     Q.  Who is that?
16     A.  That's Virginia or Ginny Dulong at the
17 Mass. Medical Society.
18     Q.  What is your relationship between the
19 Mass. Medical Society and MASCO, if any?
20     A.  I don't know what the, like, official --
21 I mean, if they're part of the organization or the
22 Massachusetts Medical Society offers them support.

Page 204

1  Ginny at the time in 2002 was sort of like the
2  administration liaison for MASCO. And I am not
3  really sure who employed her, was it the Mass.
4  Medical Society or the group employed her, but...
5      Q.  Now I would like you to turn to -- well,
6  first of all, her e-mail is listing a number of
7  specific issues and seeking an update from you as
8  to where things stand as to those issues, right?
9      A.  Yes.
10     Q.  I would like you the turn to No. 6,
11 please. And the topic is "Inadequate chemo
12 reimbursement:" And the question is, has anyone
13 at BC/BS had a chance to review the articles that
14 Dr. Goldstein provided about inadequate
15 chemotherapy reimbursement? Now, who is Dr.
16 Goldstein?
17         MR. COCO:  I'm sorry, new question? You
18 said my question is this, and then you asked who's
19 Dr. Goldstein?  So you just want an answer to
20 who's Dr. Goldstein?
21         MR. MANGI:  I thought that was the only
22 question that I posed.

Page 205

1      Q.  But you can answer that. Go ahead.
2      A.  You know, I don't know -- I don't
3  remember this e-mail, so I don't know if that --
4  offhand I'm thinking is that one of the
5  oncologists?  It could have been one of the
6  oncologists -- is there a Michael Goldstein? I
7  can't remember if that's who that is.
8      Q.  Do you know what articles are being
9  referred to?
10     A.  I don't offhand. I don't remember.
11     Q.  Do you recall the Mass. Medical Society
12 or MASCO forwarding you articles from time to time
13 dealing with reimbursement issues generally?
14     A.  No. They generally didn't send
15 articles, and I don't think if -- in this case I
16 look at this and it looks like this was the action
17 items off of a meeting. I wonder if he gave us
18 articles at that meeting. I don't think -- they
19 don't generally send articles to us.
20     Q.  Do you have any recollection as to what
21 these articles were addressing?
22     A.  No, I don't, not offhand, I don't. It's

52 (Pages 202 to 205)

Page 206

1   been a long time ago.
2       Q.   Let me ask you to turn to the previous
3   page on the next e-mail up, which is your response
4   to Ms. Dulong.  And if you have a look at No. 6
5   there, "Inadequate chemo reimbursement:", your
6   response is "We reimburse as Medicare does AWP
7   minus 5 percent.  We understand that in some
8   situations this is very favorable to practitioners
9   and in others it may be less advantageous.  In
10  general we feel that this process evens itself
11  out.  If this isn't the case, we would be glad to
12  continue to discuss this with you."
13      Do you recall sending that e-mail?
14      A.   No.
15      Q.   Okay.
16      A.   But it says it was from me, so yes.
17      Q.   Okay.  Now, what did you mean when you
18  said you understand that in some situations it's
19  favorable and in others it's less advantageous?
20      MR. COCO:  Objection.
21          (Witness reviews document.)
22      A.   Well, I'm assuming -- I mean, I don't

Page 207

1   remember writing this e-mail, but if I read it
2   now, I assume what I'm saying is what I said that
3   sometimes it's more favorable to others, then
4   sometimes it's not.
5       Q.   Well, my question is:  In what respect
6   is it favorable or not favorable?
7       MR. COCO:  Objection.
8       A.   I think that, you know, not everybody --
9   and I'm trying to remember that time, and I don't
10  remember clearly, but not everybody gives
11  chemotherapy in their office and that I think that
12  people who -- there's a lot of reasons why people
13  would choose to do that and not choose that.  I
14  think that I think at times that if you were
15  giving a lot of medications in your office, that
16  you might be getting some sort of volume discount.
17  Sometimes it was more favorable to you than not
18  because not everybody would do this practice.
19      Q.   Okay.  So you were -- withdraw that.
20      So your understanding was that
21  oncologists who did administer chemo in their
22  offices may be able to get volume discounts that

Page 208

1   would lower their acquisition costs for the drugs;
2   is that correct?
3       MR. COCO:  Objection.
4       A.   I wouldn't tell you that was my
5   understanding, because nobody ever exactly said
6   that to me, but my assumption was that might have
7   been the -- that somehow that why doesn't
8   everybody do this, okay?  So my assumption was
9   that somehow somebody was -- something was
10  happening to that effect maybe.
11      Q.   And your assumption was also that the
12  amount of the discount would vary from provider to
13  provider depending in part on their volume of use?
14      MR. COCO:  Objection.
15      A.   Well, I don't think I thought about it
16  that much, but I think what I thought was that you
17  might if you -- I really didn't think about it
18  that much in terms of I think I thought that if
19  you might get something on volume if you did a lot
20  of volume.  But I didn't really think, well, you
21  only did -- I mean, nobody ever said to me, Jan,
22  you get X amount when you do X, Y and Z.  So I

Page 209

1   have no idea, but I assume that somehow, because
2   some people did it and some people didn't, that
3   they might get something like that.
4       Q.   Well, I'm trying to understand
5   specifically what you mean when you refer to the
6   fact that they may be different situations, you
7   know, less favorable in some, more favorable in
8   others.  Were you assuming there that the
9   acquisition cost for drugs would vary from
10  provider to provider, meaning the rates would be
11  more favorable for some providers and less
12  favorable for other providers?
13      MR. COCO:  Objection.
14      A.   I think I was assuming pretty much what
15  I've told you, I mean, that, you know, I think
16  that -- I think that -- you know, pretty much what
17  I told you, that maybe somebody -- some things if
18  you prescribed a lot of medications, that you got
19  a better deal.  But I mean, I didn't think a whole
20  lot more about that than that.
21      Q.   Now, could I ask you to turn to the very
22  first page of the exhibit, and turning now to the

53 (Pages 206 to 209)

# EXHIBIT 13

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3                  MDL No. 1456

 4             C.A. No. 01-CV-12257-PBS

 5     *   *   *   *   *   *   *   *   *   *   *   *   *   *

 6   IN RE:  PHARMACEUTICAL INDUSTRY              *

 7   AVERAGE WHOLESALE PRICE LITIGATION           *

 8   _____      *

 9   THIS DOCUMENT RELATES TO ALL ACTIONS         *

10     *   *   *   *   *   *   *   *   *   *   *   *   *   *

11

12                   VOLUME I

13

14   DEPOSITION OF LISA M. GORMAN, a witness called on

15   behalf of Johnson & Johnson, pursuant to the Federal

16   Rules of Civil Procedure, before Jessica L.

17   Williamson, Registered Merit Reporter, Certified

18   Realtime Reporter and Notary Public in and for the

19   Commonwealth of Massachusetts, at the Offices of

20   Robins, Kaplan, Miller & Ciresi L.L.P., 800 Boylston

21   Street, Boston, Massachusetts, on Tuesday, March 7,

22   2006, commencing at 9:00 a.m.
```

Lisa M. Gorman                    HIGHLY CONFIDENTIAL                    March 7, 2006
                                      Boston, MA

Page 6

1           E X H I B I T S  (CONTINUED)
2    NUMBER            DESCRIPTION           PAGE
3    Exhibit Gorman 008, Document Bates-numbered
4              12942 - 12945................ 124
5    Exhibit Gorman 009, Document Bates-numbered
6              BCBSMA-AWP-00057 - 00058..... 156
7
8
9         Note: Original Gorman Exhibits 1 - 9 were
10        retained by the court reporter and forwarded
11        to Henderson Legal Services, Inc. for
12        distribution.
13
14
15
16
17
18
19
20
21
22

Page 7

1           P R O C E E D I N G S
2
3              LISA M.GORMAN a witness called by
4    counsel for the Johnson & Johnson, being first
5    duly sworn, was examined and testified as follows:
6
7              DIRECT EXAMINATION
8    BY MR. MANGI:
9         Q.   Good morning, Ms. Gorman.
10        A.   Good morning.
11        Q.   As I mentioned when we met, my name's
12   Adeel Mangi. I represent Johnson & Johnson in
13   this litigation. Have you ever been deposed
14   before?
15        A.   No.
16        Q.   Okay. I'll just run through some of the
17   basics of the deposition.
18        A.   Okay.
19        Q.   If I ask you any questions that are
20   unclear, please just tell me that, and I'll do my
21   best to rephrase them, okay?
22        A.   (No verbal response.)

Page 8

1         Q.   You also need to answer all questions
2    verbally, because the reporter can't take down a
3    nod of the head or a shrug of the shoulders, okay?
4         A.   Okay.
5         Q.   And if at any point you would like to
6    take a break, just let me know. I'll finish the
7    line of questioning and we'll do that, okay?
8         A.   Okay.
9         Q.   Now, are you currently employed?
10        A.   Yes.
11        Q.   Where are you employed?
12        A.   At Blue Cross/Blue Shield of
13   Massachusetts.
14        Q.   What is your current title?
15        A.   My current title is regional director of
16   the metro north provider relations team.
17        Q.   What regions does metro north cover?
18        A.   Metro north covers half of Boston, all
19   physicians and hospitals north of Boston all the
20   way over to the center of the state.
21        Q.   Does it include any parts of Boston
22   itself?

Page 9

1         A.   South of Boston?
2         Q.   No, does it include Boston itself?
3         A.   Yes.
4         Q.   Okay. So it's the north part of Boston
5    --
6         A.   Yes.
7         Q.   -- as well as everything to the center
8    of the state?
9         A.   Yes.
10        Q.   Is that a -- forgive my lack of
11   geography, but is that a mix of rural and urban
12   areas?
13        A.   Yes.
14             MR. COCO:  I'm sorry. Is there truly
15   anything rural in the northeast?
16             MR. MANGI:  Massachusetts.
17             MR. COCO:  Just Massachusetts.
18             MR. MANGI:  I'm from Jersey. You should
19   try that.
20        Q.   Now, can you please describe for me your
21   educational background after high school.
22        A.   After high school, I graduated from

                                                3 (Pages 6 to 9)

Page 106

1    Q.   Okay.  Now, earlier in the day you also
2  testified that you don't know as a general matter
3  what exactly physicians paid to acquire drugs,
4  right?
5    A.   Yes.  It's not part of my job
6  responsibility.
7    Q.   Okay.  So you do have an understanding
8  here that different doctors may have paid
9  different rates, but your testimony is that you
10 don't know what the rates are that any doctors pay
11 to acquire drugs?
12   A.   That's true, yeah.
13   Q.   So you have no understanding or
14 expectation, then, as to what the relationship is
15 between doctors' acquisition prices for drugs and
16 the amounts that they are reimbursed for drugs?
17       MR. COCO:  Objection.
18   A.   I don't know, no.
19   Q.   So your answer is that you have no such
20 understanding or expectation?
21   A.   I don't, yeah.
22       MR. MANGI:  Let's mark the next

Page 107

1  document.  It's going to be Exhibit Gorman 005.
2        (Exhibit Gorman 005, Document
3  Bates- numbered BCBSMA-AWP-00078 - 00079, marked
4  for identification.)
5        MR. COCO:  It's been about 50 minutes.
6  Does it make sense to break now?
7        MR. MANGI:  Sure, any time you want.
8        (Recess taken.)
9    Q.   Now, Ms. Gorman during the break, did
10 you have a discussion with counsel?
11   A.   Yes.
12   Q.   Did you have a -- or did you discuss
13 during the break the testimony that you were
14 giving before the break?
15   A.   We -- yes.
16   Q.   Okay.  What did you discuss?
17   A.   We just talked about some of the
18 questions that you were asking and some of my
19 responses.
20   Q.   Okay.  What did counsel ask about, and
21 what did you respond in relation to the answers
22 you were giving earlier?

Page 108

1        MR. COCO:  Objection.  And I'll instruct
2  you not to answer.
3        MR. MANGI:  You'll instruct her not to
4  answer that question?
5        MR. COCO:  Yes.
6        MR. MANGI:  On what basis?
7        MR. COCO:  It's attorney/client
8  privilege.
9        MR. MANGI:  No, it's not.  It's well
10 established in federal courts around the country
11 and in this district that questions about the
12 substance of examination are not privileged and
13 are the proper scope for examination.  Moreover,
14 your firm has a precedent where you have
15 previously recognized that and allowed questioning
16 of that type through your colleague, Mr. Sullivan,
17 at the deposition of Mr. Killion.
18       MR. COCO:  Can we take a break?
19       MR. MANGI:  Sure.
20       (Recess taken.)
21   Q.   Okay.  On the record.  May we have the
22 last question read back, please.

Page 109

1        (Record read.)
2        MR. COCO:  Objection.  Instruct the
3  witness not to answer.
4        MR. MANGI:  Okay.  We'll have to call
5  the magistrate judge.  We'll do that at the end of
6  this session when we take a lunch break.
7        MR. COCO:  And for the record, the
8  witness is not changing testimony.  The witness is
9  not giving any indication that there was any
10 discussion about changes to the testimony.  And if
11 you were simply inquiring as to, you know,
12 generally what attorneys discuss with a witness
13 about the deposition and what's been happening and
14 does not reflect any changes or any alteration of
15 previous testimony, then it is our position that
16 you are not entitled to --
17       MR. MANGI:  I understand your position.
18       MR. COCO:  -- go into those.
19 BY MR. MANGI:
20   Q.   Now, Ms. Gorman, can you turn to -- oh,
21 you don't have it anymore -- the exhibit that
22 we've marked as Exhibit Gorman 005.

28 (Pages 106 to 109)

# EXHIBIT 14

Vincent D. Plourde                    HIGHLY CONFIDENTIAL                    April 13, 2006
                                           Boston, MA

1                UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3                      MDL No. 1456

4                C.A. No. 01-CV-12257-PBS

5     *   *   *   *   *   *   *   *   *   *   *   *   *   *

6    IN RE:  PHARMACEUTICAL INDUSTRY              *

7    AVERAGE WHOLESALE PRICE LITIGATION           *

8    _____     *

9    THIS DOCUMENT RELATES TO ALL ACTIONS         *

10    *   *   *   *   *   *   *   *   *   *   *   *   *   *

11

12                        VOLUME I

13

14          VIDEOTAPED DEPOSITION OF VINCENT D. PLOURDE, a

15    witness called on behalf of Johnson & Johnson,

16    pursuant to the Federal Rules of Civil Procedure,

17    before Jessica L. Williamson, Registered Merit

18    Reporter, Certified Realtime Reporter and Notary

19    Public in and for the Commonwealth of Massachusetts,

20    at the Offices of Robins, Kaplan, Miller & Ciresi

21    L.L.P., 800 Boylston Street, Boston, Massachusetts,

22    on Thursday, April 13, 2006, commencing at 9:35 a.m.

Vincent D. Plourde                    HIGHLY CONFIDENTIAL                    April 13, 2006
                                           Boston, MA

Page 6

1        MR. SKWARA:  Steve Skwara, Blue Cross/Blue
2   Shield of Massachusetts.
3        MR. COCO:  Stephen Coco, Robins, Kaplan,
4   Miller & Ciresi, representing Blue Cross/Blue Shield
5   of Massachusetts.
6
7            VINCENT D. PLOURDE,
8   a witness called on behalf of Johnson & Johnson,
9   having first been duly sworn, was deposed and
10  testifies as follows:
11
12           DIRECT EXAMINATION
13  BY MR. MANGI:
14       Q.  Morning, Mr. Plourde.
15       A.  Good morning.
16       Q.  Have you ever been deposed before?
17       A.  I have.
18       Q.  How many times have you been deposed?
19       A.  Once that I can recall.
20       Q.  When was that deposition?
21       A.  I believe it was September of 2004.
22       Q.  What kind of case was that?

Page 7

1        A.  I believe it was the Thomas/Solomon case.
2        Q.  You are currently employed by Blue
3   Cross/Blue Shield of Massachusetts, correct?
4        A.  Correct.
5        Q.  What is your title?
6        A.  Vice president of the provider services
7   division.
8        Q.  How long have you held that position?
9        A.  Since 2002.
10       Q.  Your deposition in the Thomas litigation,
11  was that a one-day deposition?
12       A.  It was.
13       Q.  What's your understanding as to what that
14  litigation was about?
15       A.  It was about some alleged improprieties
16  that were believed to have taken place between Blue
17  plans and limiting information that was accessible
18  to providers.
19       Q.  What sort of improprieties and limiting
20  information are you aware of?
21           MR. COCO:  Objection.
22       A.  I'm sorry, what type of --

Page 8

1        Q.  Let me rephrase the question.  In terms of
2   the allegations that you've just mentioned --
3        A.  Yeah.
4        Q.  -- what specifically was being alleged in
5   terms of improprieties or ways of limiting
6   information?
7        A.  What was -- what was asked of me?
8        Q.  Or your general understanding of what the
9   case was about.
10       A.  I think it was generally around physicians
11  not knowing how exactly specific edits are applied
12  to claims processing.  I think that was the general
13  gist, that there was -- they were unaware of
14  information that was being used to make claim
15  payment decisions.
16       Q.  Anything else that you're aware of that
17  was at issue in that case?
18       A.  There was concern about the kinds of
19  disclosures of information to physicians around
20  those claim edits, and I think there were -- I'm
21  trying to think -- again, just general disclosures
22  of information, were providers aware that there were

Page 9

1   edits applied to claims processing?
2        Q.  Was one of the issues in that case
3   disclosure of the actual rates at which
4   reimbursement is made, fee schedules and such, as
5   opposed to edits that are made to the designated
6   rates?
7        A.  I'm not sure I understand your question.
8        Q.  You're aware that there are fee schedules
9   and base payment for providers that are in fee-for-
10  service --
11       A.  Correct.
12       Q.  -- contracts, right?
13       A.  (No verbal response.)
14       Q.  Was one of the issues in the Thomas
15  litigation whether or not those fee schedules were
16  given to providers?
17       A.  I believe that may have been part of the
18  issue, yes.
19       Q.  Was that an issue that you were questioned
20  on at your deposition?
21       A.  No.
22       Q.  Do you have an understanding as to whether

3 (Pages 6 to 9)

Vincent D. Plourde                    HIGHLY CONFIDENTIAL                    April 13, 2006
                                           Boston, MA

Page 58

1  When we brought pricing files over, it's not like we
2  took the Blue Shield pricing files and necessarily
3  melded them with the Blue Cross pricing files.  It's
4  simply a separate table.  So whatever Blue Shield
5  provider rates that were in effect before were
6  housed in one part of the system and whatever Blue
7  Cross rates that were in effect were housed in a
8  different part of the system, but it didn't -- there
9  wasn't an activity to take a professional rate and
10  meld it with the Blue Cross system to come up with a
11  new melded rate.
12     Q.  At some point thereafter, after that
13  initial process of bringing all the rates into one
14  system had been complete, did such a process take
15  place of combining them to arrive at one set of
16  payment rates?
17     A.  I would have to say no.  I mean, we today
18  still -- it's a -- we paid based on a number of
19  different arrangements.  We pay fee-for- service, we
20  pay I'm sure in some select arrangements charges, we
21  pay payment on account factor.  So we use all of
22  those different variables.  We pay DRG, we pay per

Page 59

1  diem.
2     Q.  There's no -- there's no distinction today
3  between Blue Cross rates and Blue Shield rates in
4  the system, right?
5     A.  There are -- there are -- no, there are
6  inpatient and outpatient payment on account factors
7  --
8     Q.  Right.
9     A.  -- that are employed.  And to answer your
10  question, I honestly can't tell you whether or not -
11  - whether or not I would presume that if the same
12  service were rendered in a hospital versus in an
13  outpatient clinic, that those in fact -- I mean, in
14  a physician's office, that those services in fact
15  wouldn't be paid the same rates because they're two
16  different settings.
17     Q.  I didn't quite follow your last -- your
18  last statement.
19     A.  I guess I'm trying to clarify the
20  statement that you made or the question that you
21  asked around, you know, these rates somehow being
22  the same.  And what I'm saying is I'm not sure that

Page 60

1  if a particular procedure is performed, if that
2  procedure is performed in a hospital versus that
3  same procedure being performed in a physician's
4  office.  What I'm saying is my sense is those rates
5  of reimbursement are not the same.  There's
6  different overhead in a hospital setting to render
7  care than there is in a physician's office.
8     Q.  I didn't intend to raise that issue, but
9  it's an interesting issue, so let's talk about it a
10  bit.  Do I understand correctly the point you are
11  making is that there are different payment rates for
12  hospitals versus physicians' offices in part due to
13  the fact that they have different overheads?
14     A.  Correct.  Correct.
15     Q.  Do you have an understanding as to which
16  setting is more expensive to Blue Cross/Blue Shield
17  of Massachusetts?
18     A.  My --
19        MR. COCO:  Objection.
20     A.  My sense, and it would just be to my
21  sense, that intuitively I would think that the
22  services rendered in a hospital setting would be

Page 61

1  more expensive.
2     Q.  And that would include a hospital
3  outpatient department as opposed to a physician
4  clinic?
5     A.  Correct.
6     Q.  Okay.  Now, what is the basis for the
7  intuitive understanding?  In other words, what makes
8  you think that?
9     A.  The fact that the hospital has much more
10  overhead.  They have a staff of nurses, they have
11  hospital beds, they have all kinds of other fixed
12  costs that a physician practicing in an office does
13  not have.  Now, whether that's reflected in a
14  payment rate or it's differentiated through some
15  type of, you know, multiplier, I have no idea.
16     Q.  Now, let's turn back to the issue I was
17  trying to address earlier which pertains to the
18  coming together of Blue Cross and Blue Shield
19  systems.  I understand that when the merger first
20  took place there were just the different components
21  housed in the same system.  Today, however, as we
22  discussed, they're not separate Blue Cross rates

16 (Pages 58 to 61)

Vincent D. Plourde                    HIGHLY CONFIDENTIAL                    April 13, 2006
                                           Boston, MA

Page 114

1  they would apply these discounts.  So if a provider
2  wanted to be part of this net -- of the PCS network,
3  which was the vendor at the time, then they had to
4  accept the terms of that contract.
5      Q.  Now, your Medex time was -- could you
6  remind me what the time period was when you were in
7  charge of Medex?
8      A.  1991 through 1995.
9      Q.  And when did you outsource some of this
10 work to a PBM?
11     A.  I'm not sure.
12     Q.  Okay.
13     A.  I would -- I would guess 1994.
14     Q.  Do you know which PBM that was?
15     A.  PCS.
16     Q.  Okay.  So in the early '90s you understood
17 that PCS could get discounts and rebates on the
18 rates it reimbursed for drugs?
19         MR. COCO:  Objection.
20     A.  Correct.
21     Q.  Did you also understand that PCS could get
22 rebates and discounts on drugs that it purchased,

Page 115

1  say, for its mail order division?
2          MR. COCO:  Objection.
3      A.  I don't have any specific knowledge about
4  their mail order.
5      Q.  Okay.  But based on the fact that PCS as a
6  PBM could get discounts and rebates, you also
7  understood that other entities in the market like
8  physicians and hospitals would be able to get
9  discounts and rebates on drugs that they purchased?
10         MR. COCO:  Objection.
11     A.  I don't have any specific knowledge to
12 that.
13     Q.  Okay.  Well, earlier you mentioned that
14 when -- that you understand that providers can get
15 discounts and rebates on drugs.  I'm trying to
16 understand your basis for that knowledge.
17     A.  The statement I made that PCS, the PBM
18 vendor that we worked with, was able to deliver to
19 us a price less than AWP.
20     Q.  Okay.  Do I understand correctly that in
21 that '91 to '95 time period you understood that
22 providers can also get discounts and rebates on

Page 116

1  their drug acquisitions?
2          MR. COCO:  Objection.
3      A.  I do not know.  I did not know that they
4  could get, no.  I know we got a discount.
5      Q.  Okay.  Well, here's what I'm trying to
6  understand.  Did I understand correctly your earlier
7  testimony that today, as you sit here now, you do
8  understand that providers can get rebates and
9  discounts on drug purchases?
10     A.  I do.
11         MR. COCO:  Objection.
12     Q.  Okay.  How long have you been aware of
13 that fact?
14     A.  Maybe a year.
15     Q.  Okay.  How did you come by that knowledge?
16     A.  Just reading information in journals, Web
17 stories, you know.
18     Q.  Okay.  What sort of stories or journals
19 are you thinking of?
20     A.  Just the fact that there are these, you
21 know, discounts available.
22     Q.  Now, is it your understanding that the

Page 117

1  discounts and rebates that are available to
2  hospitals and physicians are all -- are uniform,
3  there's a particular discount or a particular rebate
4  available across the board, or do you understand
5  there to be variable rates of discounts and rebates?
6      A.  My understanding would be that there are
7  variable discounts.
8      Q.  Okay.  Is it your understanding that those
9  rebates and discounts fall within a particular range
10 or a particular band or that they vary widely?
11         MR. COCO:  Objection.
12     A.  I do not have a particular percentage in
13 mind.
14     Q.  Okay.  So you have no particular
15 expectation as to what the range of discounts and
16 rebates would be, although you know that rebates and
17 discounts exist?
18     A.  Correct.  Correct.
19     Q.  Are there any particular journals or
20 stories that you've read that you are thinking of?
21     A.  No, just different Web services that I
22 subscribe to, i-Health Beat, different trade

30 (Pages 114 to 117)

Vincent D. Plourde                    HIGHLY CONFIDENTIAL                    April 13, 2006
                                          Boston, MA

Page 126

1    A.  There are some, yes.
2    Q.  Another issue that was discussed in the
3  provider financial strategies work group was
4  transitioning hospital outpatient departments from a
5  percentage of bill charge methodology, and I'm
6  talking now about drugs administered to patients in
7  hospital outpatient departments.  My sentence has
8  become long, so let me start the question again.
9       Another issue that's been discussed in the
10  provider financial strategies work group is
11  transitioning hospital outpatient departments from a
12  reimbursement methodology that uses percentage of
13  bill charge in relation to drugs administered to
14  members to a methodology that uses 95 percent of
15  AWP.  Are you familiar with that transition?
16    A.  I have heard that term discussed.  I'm not
17  familiar with the outcome.
18    Q.  Okay.  When you say, "I've heard that term
19  discussed," what term are you referring to?
20    A.  What you just said, that we -- you know,
21  taking a look at outpatient charges as today being
22  adjudicated at a percent of charges and considering

Page 127

1  whether or not they should be instead reimbursed at
2  some percentage of AWP.
3    Q.  So you were saying that you're familiar
4  with the issue, you weren't referring to any
5  particular phrase that I used?
6    A.  I'm familiar with the issue --
7    Q.  Okay.
8    A.  -- right.
9    Q.  Okay.  Did you participate in provider
10  financial strategy work group meetings where that
11  issue was discussed?
12    A.  I may have been in attendance at meetings
13  where that was discussed.
14    Q.  Did you participate in any of the
15  discussions regarding that transition?
16    A.  I did not.
17    Q.  Did you consider it at all relevant to
18  those discussions that you are aware of the
19  existence of rebates and discounts on drug
20  acquisitions for providers?
21       MR. COCO:  Objection.
22    A.  I did not.

Page 128

1    Q.  Okay.  Why not?
2    A.  I didn't see the connection.
3    Q.  Well, if what was being contemplated was
4  moving from a percentage of bill charges to an AWP-
5  based methodology and you're aware of the fact that
6  providers purchased drugs at a discount and get
7  rebates off them, wouldn't you consider that
8  relevant to a determination of whether or not an AWP
9  methodology should be adopted?
10       MR. COCO:  Objection.
11    A.  I'm not following the question.
12    Q.  Okay.  In moving from a percentage of bill
13  charges to an AWP-based methodology for hospital
14  outpatient departments, did you consider it relevant
15  to the issue what those hospital outpatient
16  departments were actually paying to buy the drugs?
17    A.  I did not.
18    Q.  Now, another area that you mentioned
19  responsibility for is e-Health initiatives?
20    A.  Correct.
21    Q.  Can you describe for me what that is
22  about?

Page 129

1    A.  It's essentially supporting a number of
2  pilot programs to put new technologies out in the
3  physician offices to help them improve the quality
4  of care delivered to patients.
5    Q.  And what sort of initiatives or
6  technologies?
7    A.  E-Prescribing -- we launched an e-
8  Prescribing pilot.  We launched a couple of EMR and
9  Medical Decision Support pilots, those kinds of
10  activities.
11    Q.  And the seventh area you mentioned was
12  working with provider support teams?
13    A.  Correct.
14    Q.  What are the provider support teams?
15    A.  They're the folks that are responsible for
16  making sure that providers are able to pass us
17  HIPAA-compliant claims and make sure that as we
18  begin the migration to this national provider
19  identifier system, that we're able to process the
20  claims and that the providers are able to get them
21  to us.
22    Q.  Is the focus of those teams primarily on

33 (Pages 126 to 129)