# EXHIBIT 24

Page 1

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3               NO. 01CV12257-PBS

4

5      _____

6    In re:  PHARMACEUTICAL            )

7    INDUSTRY AVERAGE WHOLESALE        )

8    PRICE LITIGATION                  )

9    _____)

10   THIS DOCUMENT RELATES TO:         )

11   ALL ACTIONS                       )

12   _____)

13

14

15               HIGHLY CONFIDENTIAL

16

17

18   VIDEOTAPED DEPOSITION OF SHEILA R. CIZAUSKAS

19              800 BOYLSTON STREET

20            BOSTON, MASSACHUSETTS

21            FRIDAY, 10 MARCH, 2006

22                  9:38 AM

Sheila R. Cizauskas                    HIGHLY CONFIDENTIAL                    March 10, 2006
                                          Boston, MA

Page 122

1    Q.   Do you have any understanding as to what
2    the relationship is, if any, between ASP and AWP?
3       A.   No.
4       Q.   Do you understand those to be different
5    numbers?
6       A.   Yes.
7       Q.   So, you understand that if we're talking
8    about any given drug, the ASP will be an entirely
9    different number from the AWP for that drug.
10           MR. COCO:  Objection.
11      A.   I don't know that to be true in every case
12   or any case.
13      Q.   Well, when you said earlier that you
14   understood the ASP to be different from AWP, what
15   did you mean?
16      A.   I mean that it's a different frame of
17   reference, but I don't know that the actual price
18   is different in every case or any case or all
19   cases.
20      Q.   But you understand it's a different
21   benchmark?
22      A.   Yes.

Page 123

1    Q.   Do you know whether BCBS of Massachusetts
2    ever considered shifting to an ASP-based
3    methodology with regards to drugs administered in
4    physicians' offices?
5       A.   I don't have any knowledge of decisions
6    for physicians' offices.
7       Q.   Are you aware of contemplation of shifting
8    to an ASP-based methodology in any other
9    circumstances?
10      A.   It was offered as a potential methodology
11   in the development of a hospital outpatient fee
12   schedule.
13      Q.   When you say it was offered, what do you
14   mean by that?
15      A.   When we decided to establish a fee
16   schedule for drugs at the -- in the hospital
17   outpatient setting, it was one methodology that was
18   offered late in the -- in the process.  We had
19   already done a lot of work and came to a different
20   methodology, but that had been offered as a
21   suggestion late in the process.
22      Q.   Now, when did BCBS of Massachusetts first

Page 124

1    set up a fee schedule for hospital outpatient
2    department drugs?
3       A.   It was effective October 1st, 2005 for a
4    small subset of hospitals.
5       Q.   Prior to October 1st, 2005, how had BCBS
6    of Massachusetts reimbursed hospital outpatient
7    departments in relation to drugs administered to
8    members?
9       A.   As a percent of charges.  It was paid on a
10   percent-of-charges basis.
11      Q.   Was the percent of charges static, or did
12   it vary from contract to contract?
13      A.   It was a negotiated percent by contract.
14      Q.   So, prior to October 1st, 2005, all
15   hospital outpatient departments were reimbursed in
16   relation to drugs administered to members at a
17   percentage of bill charge, but the percentage
18   varied from contract to contract.
19      A.   Correct.
20      Q.   After October 1st, 2005, did some
21   hospitals transition to the new fee schedule or all
22   hospitals?

Page 125

1    A.   Only the hospitals that were up for
2    renewal at that point.
3       Q.   Now, how many hospitals were up for
4    renewal at that point?
5       A.   I don't know exactly.  Each year,
6    generally, a third of our network is up for
7    renewal.
8       Q.   Is it contemplated that as more hospital
9    outpatient department-related contracts come up for
10   renewal BCBS will seek to transition them also from
11   a percentage of charge-based methodology to the new
12   fee schedule?
13      A.   Yes.
14      Q.   What is the methodology utilized in the
15   new fee schedule in relation to reimbursing
16   hospital outpatient departments for drugs
17   administered to members?
18      A.   It's a percent of AWP.
19      Q.   What is the percent of AWP in question?
20      A.   95 percent.
21      Q.   So, BCBS of Massachusetts has made a
22   purposeful decision that it wants to transition

Page 126

1  hospital outpatient departments from a
2  percent-of-charge basis -- in relation to drugs
3  administered to members -- to an AWP-based
4  methodology --
5       MR. COCO:  Objection.
6    Q.  -- is that correct?
7    A.  It's a conscious decision to transition
8  from percent of charge -- which is unpredictable
9  and dependent upon the hospital's setting of their
10 charges -- to a more predictable methodology that
11 has -- that has an industry understanding or an
12 industry standard.
13   Q.  And that's AWP.
14      MR. COCO:  Objection.
15   A.  And that is -- that was the AWP fee
16 schedule.
17   Q.  When was the question of setting up a fee
18 schedule for hospital outpatient departments first
19 raised?
20   A.  It was raised in maybe the winter of 2003.
21   Q.  And who raised that topic for the first
22 time?

Page 127

1    A.  I don't know for the first time, but I
2  raised the question of how much was -- how much of
3  our hospital reimbursement was being paid at a
4  percent of charges and asked to commission a group
5  to look at how to update that to a -- to fee
6  schedules where appropriate.
7    Q.  Who did you raise this issue with?
8    A.  My boss.
9    Q.  And who was your boss at that time?
10   A.  Deb Devaux and a group of leaders that --
11 well, she brought that to a group of other leaders
12 in the organization, and a group was commissioned
13 to study it.
14   Q.  Now, the group of leaders that she took
15 the proposal to -- took your proposal to -- does
16 that group go by any particular name?
17   A.  PFSW.
18   Q.  That's the Provider Financial Strategy?
19   A.  Provider Financial Strategy -- yeah.
20 Yeah.
21   Q.  So, you took the proposal to Deb Devaux;
22 she took it to the Provider Financial Strategies

Page 128

1  Work Group, and what did they then do?
2    A.  They agreed that it was something to
3  study, and a -- and a team was commissioned, and
4  through that team, a phased-in approach to a new
5  outpatient fee schedule methodology was developed.
6    Q.  Now, who was on the team that was
7  commissioned to study this issue by the Provider
8  Financial Strategy Work Group?
9    A.  I don't remember the people's names, but
10 they represented cross-functional areas of the
11 organization that included claims IT, finance,
12 contracting -- the first phase of the team included
13 someone from our pharmacy area and payment
14 policies.
15   Q.  Do you recall the names of any of the
16 individuals who were on that committee?
17   A.  Myself, Terrence Driscoll, who worked in
18 finance at the time -- he has since transitioned to
19 my team -- Tom Kowalski, Mark Pruesar, Carlene
20 Fournier.
21   Q.  I'm sorry.  As you list these people --
22   A.  Yeah.

Page 129

1    Q.  -- could you also describe what of the --
2  which of the cross-functional areas you described
3  earlier they came from?
4    A.  Mark Pruesar came from actuarial.  Tom
5  Kowalski came from pharmacy.  John Killion came
6  from ancillary contracting.  Some of these people
7  came in and out of the team as necessary.
8    Q.  Was Mr. Killion a consistent member of the
9  team?
10   A.  No, he was -- came to a few meetings.
11   Q.  Anyone else that you recall?
12   A.  Some of the people were on the phone, so I
13 can't even picture their faces, but they were from
14 the operational areas -- claims IT and payment
15 policies.
16   Q.  When was this -- well, withdraw that.  You
17 first raised the issue with Ms. Devaux in winter of
18 2003, right?
19   A.  Yes.
20   Q.  Okay.  When did the provider -- and she
21 then took it to the Provider Financial Strategies
22 Work Group?

Page 134

1    A.   It was different for each hospital.
2    Q.   Were there circumstances in which payment
3  on an AWP-based methodology would be more cost
4  effective for Blue Cross Blue Shield of
5  Massachusetts?
6    A.   There were cases where the AWP methodology
7  would pay less than the percent-of-charge
8  methodology in isolation.  So -- and then there
9  were also cases where the AWP methodology would pay
10 more than the percent-of-charges methodology.
11   Q.   Would you have an understanding as to in
12 what proportion of cases AWP would result in lower
13 payment versus higher payment?
14        MR. COCO:  Objection.
15   A.   What percentage of cases?  You mean
16 hospitals?
17   Q.   Uh-huh.
18        MR. COCO:  Objection.
19   A.   How many hospitals -- you're asking me how
20 many hospitals resulted in --
21   Q.   Well, let me -- let me rephrase the
22 question.  Was the analysis in relation to drugs

Page 135

1  specifically carried out on a hospital-by-hospital
2  level or a drug-by-drug level?
3    A.   Hospital-by-hospital level.
4    Q.   Okay.  So, for any given hospital, the
5  analysis that was performed was to look at what
6  drugs were being billed for, how much was being
7  paid for them on a percent-of-charge basis, and how
8  much would be paid on an AWP basis?
9        MR. COCO:  Objection.
10   Q.   Is that correct?
11   A.   I'm not sure.  If you could just say that
12 again.
13   Q.   Sure.
14        MR. MANGI:  Would you mind rereading the
15 question.
16        (Question read back.)
17   A.   So, we looked at a hospital and all of the
18 codes that would fall into an identifiable bucket
19 of codes, how much was paid historically for that
20 group of codes, and then we looked at how much
21 would be paid if we paid 95 percent of AWP for that
22 group of codes.  And that number was provided to

Page 136

1  the contracting department and was part of the
2  negotiation in the renewal.
3    Q.   Did you find that for -- since the
4  analysis was on a hospital-by-hospital basis, at
5  specific hospitals, was there variation as to
6  whether AWP-based billing for drugs, you know,
7  would be higher than bill charges for some drugs
8  and lower than bill charges for other drugs?
9        MR. COCO:  Objection.
10   A.   We didn't look at a drug-by-drug analysis.
11 It was overall.
12   Q.   Okay.  So, on the basis of that overall
13 analysis, was there any consistency as to whether
14 AWP was higher or lower than bill charges for
15 drugs?
16   A.   Some hospitals --
17        MR. COCO:  Objection.
18   A.   -- the AWP methodology paid more, and
19 some hospitals the AWP methodology paid less.
20   Q.   Do you know what the relative proportion
21 was of hospitals for which AWP resulted in higher
22 payment versus lower payment?

Page 137

1    A.   Fewer hospitals resulted in higher
2  payment.
3    Q.   So, for the majority of hospitals, based
4  on the analysis that BCBS of Massachusetts carried
5  out in late '04 and '05, moving to an AWP-based
6  methodology to reimburse for drugs administered in
7  office --
8    A.   In hospital.
9    Q.   -- in hospitals, would result in a net
10 saving.
11        MR. COCO:  Objection.
12   A.   Not necessarily, and if I could just
13 expand a little bit, the -- it was a component of
14 the negotiation of the renewal.  And so,
15 ultimately, the renewals ended up with higher rates
16 overall for the hospital than prior to the renewal.
17   Q.   Well, I'd like to get to the negotiation a
18 little later.  For now I'm --
19   A.   Uh-huh.
20   Q.   -- focusing just on the analysis that was
21 performed prior --
22   A.   Uh-huh.

35 (Pages 134 to 137)

Page 138

1    Q.   -- to the negotiation.  I understood from
2  your testimony earlier that the analysis only
3  showed that -- and for the majority of hospitals
4  studied --
5    A.   Uh-huh.
6    Q.   -- reimbursing at a percentage of AWP --
7  95 percent of AWP -- would result in BCBS paying
8  less than it had been paying under the
9  percentage-of-bill-charge methodology.
10       MR. COCO:  Objection.
11   Q.   Is that correct?
12   A.   The part that I'm struggling with is that
13 it would have generated a payment of less to Blue
14 Cross.  What it generated was an analysis that
15 showed one methodology having higher level of cost
16 or payment -- if that were implemented -- than
17 another methodology.  But then, we need to go to
18 the implementation, which --
19   Q.   I understand that.  I'm talking only about
20 the analysis for the moment.
21   A.   Uh-huh.  Right.
22   Q.   Not about what actually happened.

Page 139

1    A.   So, it isn't -- I guess I'm struggling
2  with the word "savings," because that suggests that
3  there ended up being a savings.
4    Q.   Let me try and rephrase it then without
5  using that word.
6    A.   Okay.
7    Q.   All right.  In late 2004 and early 2005, I
8  understand from your testimony that BCBS of
9  Massachusetts analyzed the amounts it was paying to
10 -- it had paid historically to certain hospitals
11 for drugs that they administered in their hospital
12 outpatient departments, right?
13   A.   (Nods.)  Right.
14   Q.   And those payment -- historic payments
15 that were being studied were a percentage of the
16 hospital's bill charges.
17   A.   Correct.
18   Q.   Okay.  BCBS also then calculated what it
19 would have paid if those payments had, instead,
20 been paid on the basis of 95 percent of AWP.
21   A.   Correct.
22   Q.   And BCBS then compared those two numbers.

Page 140

1    A.   Yes.
2    Q.   Compared them to see whether -- if the
3  payment had been at 95 percent of AWP, would it
4  have permitted more or less than it actually did
5  using a percentage of bill charge?
6    A.   Correct.
7    Q.   And as a result of that analysis, BCBS
8  concluded that if it had made those payments based
9  on 95 percent of AWP, for the majority of
10 hospitals, it would have paid less in reimbursement
11 than it actually did using the
12 percentage-of-bill-charge methodology.
13       MR. COCO:  Objection.
14   A.   For the hospitals that were up for
15 renewal, which was a subset of all of the
16 hospitals, most of the hospitals, the AWP number
17 was lower than the percent-of-charge numbers.  But
18 some hospitals, the AWP was higher than
19 percent-of-charge number.
20   Q.   But based on that analysis, BCBS then
21 decided that it would seek to transition all
22 hospitals to an AWP-based methodology.

Page 141

1    A.   No.
2        MR. COCO:  Objection.
3    Q.   Okay.  Was a decision made to only seek to
4  transition those hospitals for which AWP resulted
5  in a savings -- would result in a savings compared
6  to bill charge?
7        MR. COCO:  Objection.
8    A.   No.  You said that, based on the analysis,
9  Blue Cross made the decision to transition to AWP,
10 and that's not the case.  The decision to
11 transition to AWP was based on having a standard
12 fee schedule.  The analysis was intended to call to
13 our attention what that impact would be on the
14 hospital.
15   Q.   I see.  So, the analysis was one of the
16 factors that BCBS looked at in considering whether
17 or not to move all hospitals to an AWP-based
18 methodology.
19   A.   No.
20       MR. COCO:  Objection.
21   Q.   It wasn't one factor that was looked at.
22   A.   No.

36 (Pages 138 to 141)

Sheila R. Cizauskas                   HIGHLY CONFIDENTIAL                   March 10, 2006
                                         Boston, MA

Page 146

1    A.   That's a standard fee schedule.  That is
2  -- has been implemented consistently with the
3  renewal hospitals.
4    Q.   Am I correct in my understanding that BCBS
5  is now seeking to transition all hospital
6  outpatient departments to the new fee schedule?
7    A.   As hospitals come up for renewal, it will
8  be one of the components of the negotiation, and
9  it's intended that they will be implemented on the
10  new fee schedule.
11    Q.   When was the -- I understand that the
12  implementation of these -- of this change started
13  in October of '05, but when was the final decision
14  made by the Hospital Outpatient Department Fee
15  Schedule Group to proceed with the transition?
16        MR. COCO:  Objection.
17    A.   Probably the spring of '05.
18    Q.   So, between spring and October, the
19  company was working on logistical issues associated
20  with making the transition?
21    A.   Negotiations generally start with
22  hospitals in the spring and summer of the preceding

Page 147

1  -- of the year that the new rates go in place.
2    Q.   What proportion of hospital outpatient
3  departments have now been transitioned to the new
4  AWP-based fee schedule?
5    A.   I don't know exactly, but I -- it's
6  between 25 and 30 percent of the hospitals.
7    Q.   Have any hospitals thus far refused to
8  make the transition?
9    A.   No.
10    Q.   How long is it anticipated that it'll take
11  before all hospital outpatient departments have
12  been successfully transitioned to the new AWP-based
13  fee schedule?
14    A.   Five years.
15    Q.   So, BCBS of Massachusetts plans to
16  continue working to transition all hospitals to an
17  AWP-based fee schedule until that process is
18  completed in approximately 2011?
19    A.   The decision has been made for the
20  renewals that are coming up for October of '06 to
21  include the AWP fee schedule in those renewals.
22    Q.   And it's anticipated that by 2011, the

Page 148

1  process will be complete and all hospital
2  outpatient departments will have been transitioned
3  to AWP-based fee schedules.
4        MR. COCO:  Objection.
5    A.   If we continue in this manner, yes.  But
6  there's been no decision that we wouldn't change to
7  another methodology.  It's been decided for the
8  renewals in 10/1/06 to continue.
9    Q.   Well, is there a -- when you said it's
10  anticipated it'll will take five years to do that,
11  is that a -- is that number -- how did you come up
12  with that number?
13    A.   I'm just thinking about how long -- how
14  long we have with each contract.  So, I'd say,
15  actually, it was probably five years at the time we
16  started this.  Now it's probably four years.  Our
17  longest contract out there is a five-year contract,
18  so that's what I'm thinking.
19    Q.   So, the decision has been made on an
20  ongoing basis to continue to transition hospitals
21  to an AWP-based fee schedule for drugs administered
22  in outpatient departments as the contracts come up

Page 149

1  for renewal, and based on the current rate of
2  progress, if there's no change in approach, you
3  anticipate that will take up until around 2011.
4        MR. COCO:  Objection.
5    A.   The decision has been made for the
6  renewals that are coming due this year to include
7  AWP fee schedule in those renewals.  Each year the
8  -- all of the components to the hospital contract
9  are reviewed and decisions are made annually.
10    Q.   Am I correct in understanding, though,
11  that in -- when a decision was made to proceed with
12  the transition, the decision was to try and proceed
13  with the transition for all hospitals, but to
14  stagger implementation as contracts came up for
15  renewal?
16        MR. COCO:  Objection.
17    A.   The decision is made on an annual basis of
18  how to handle the group of hospitals that are up
19  for renewal.  And that's -- so, at this point, we
20  have the renewals that took place for 10/1/05, and
21  now the renewals that are coming due for 10/1/06
22  that we include AWP.

38 (Pages 146 to 149)

Sheila R. Cizauskas                    HIGHLY CONFIDENTIAL                    March 10, 2006
                                         Boston, MA

Page 150

1    Q.   So, in the spring of '05 -- withdraw that.
2  Do I understand correctly that these contracts come
3  up for renewal once a year?
4    A.   There are multi -- they're multi-year
5  contracts, so there are some contracts that come up
6  for renewal each year.  It's not the same contract
7  each year.
8    Q.   So, in the spring of 2005, a decision was
9  made to implement the transition for all the
10  contracts that were coming up for renewal later in
11  '05.
12    A.   Correct.
13    Q.   And this year, in '06, a decision's been
14  made to implement the transition to an AWP-based
15  fee schedule for all contracts that are coming up
16  for renewal in '06?
17    A.   Correct.
18       MR. COCO:  Objection.
19    Q.   And similarly, the decision for '07 will
20  be made in early '07.
21    A.   Yes.
22    Q.   Okay.  When --

Page 151

1       MR. COCO:  When you get to a good breaking
2  point.
3    Q.   When was the decision made regarding
4  transitioning hospitals that are coming up for
5  renewal in '06 to an AWP-based methodology?
6       MR. COCO:  Objection.
7    A.   When was the decision made for the '06
8  hospitals?
9    Q.   Yeah.
10    A.   It was made in conjunction with the
11  overall hospital contracting plan, and I would say
12  that that was made early in '06.
13    Q.   In January or February of '06?
14    A.   I can't put a particular date.  There was
15  -- there was no decision made to deviate from the
16  prior years' implementation.
17    Q.   Who made the decision regarding
18  implementation of the transition to an AWP-based
19  methodology for hospital outpatient departments in
20  2006?
21       MR. COCO:  Objection.
22    A.   There is no single person.  It's sort of a

Page 152

1  consensus decision.
2    Q.   Is the Hospital Outpatient Department Fee
3  Schedule Group still in existence?
4    A.   Yes.
5    Q.   Is that the group which makes the
6  decisions regarding transitioning hospitals to the
7  new methodology?
8    A.   No.
9    Q.   Okay.  Is that group tasked merely with
10  the analytical and logistical work associated with
11  making those changes?
12    A.   Yes.
13    Q.   So, who or which group is responsible for
14  making the actual decision about transitions?
15    A.   PFSW.
16    Q.   So, in the spring of '05, when a decision
17  was made to transition the contracts coming up for
18  renewal in '05, that was a decision from the
19  Provider Financial Strategies Group.
20    A.   The Provider Financial Strategy Group
21  would be made aware of the overall contracting
22  strategy each year, and unless there's an

Page 153

1  objection, that's the way contract strategy will be
2  rolled out.
3    Q.   That's the body that provides the final
4  approval?
5       MR. COCO:  Objection.
6    A.   It's not -- I -- I don't know of a stamp
7  of approval, but that they are made aware of the
8  strategy.  And if there were an objection, they
9  would make the objection.
10    Q.   And similarly, in the spring -- in --
11  earlier in '06, the decision for the --
12  transitioning the hospital outpatient department
13  contracts coming up for renewal in '06 was
14  presented to the Provider Financial Strategies Work
15  Group?
16       MR. COCO:  Objection.
17    A.   I don't remember a formal presentation,
18  but the group was made aware of the strategy
19  overall, and there was no objection to it.
20       MR. MANGI:  This is a good time for lunch.
21       VIDEO OPERATOR:  The time is 1:04.  We're
22  off the record.

39 (Pages 150 to 153)

Page 170

1    the conclusion that a similar system could not be
2    implemented at BCBS in relation to services
3    provided in treating patients in hospital
4    outpatient departments?
5        A.   I didn't come to the conclusion, but it
6    was communicated to me that our system -- our
7    computer systems could not handle that type of a
8    methodology.
9        Q.   Who communicated that to you?
10       A.   I don't remember.
11       Q.   Now, you testified earlier today that you
12   raised this issue for the first time with Deb
13   Devaux in late 2003, right?
14       A.   (Witness nods.)
15           MR. COCO:  Objection.
16       Q.   Is that correct?
17       A.   I raised the -- the issue of the hospital
18   outpatient fee schedule having a lot of services
19   falling into percent-of-charges bucket.
20       Q.   Right.
21       A.   And that was the -- that was my concern,
22   that there was -- that there was a lot of payment

Page 171

1    going through this methodology, percent of charges.
2        Q.   Do I understand correctly that this whole
3    process started with you?
4        A.   I don't know what happened before I
5    arrived, and I don't know if it started with me.  I
6    know that when I came in to Blue Cross and saw the
7    payment methodology for hospital outpatient, I
8    believed that there was an awful lot falling in the
9    percent-of-charges category.
10       Q.   When you raised the issue with Ms. Devaux,
11   did she tell you that someone was already working
12   on this or had already looked at this?
13       A.   No.
14       Q.   Okay.  Did Ms. Devaux treat it as a new
15   suggestion or a new idea?
16       A.   I don't know if she saw it as a new
17   suggestion, but she -- she considered it to be a
18   valid suggestion.
19       Q.   And did she tell you that she would then
20   raise it with others at the company?
21       A.   It -- it sort of didn't go anywhere for a
22   little while because of other competing priorities,

Page 172

1    and then, eventually, she felt that the time was
2    right for me to pull together some people to look
3    into it.
4        Q.   Now, you said she felt the time was right
5    for you to pull together people to look at it.
6    Were you in charge of the Hospital Outpatient
7    Department Fee Schedule Group?
8        A.   It was a collaborative group, and I was
9    partnering with my counterpart -- one of my
10   counterparts in the actuarial department.
11       Q.   Well, who was your -- who were you
12   partnering with from the actuarial department?
13       A.   Mike Marrone.
14       Q.   Did the group have a structure?  Was there
15   -- were there people or a person who was in charge
16   of and ultimately responsible for the group's work?
17       A.   There was a person that was project
18   managing the group, setting out an agenda, and
19   pulling the people together, scheduling the
20   meetings.
21       Q.   Who was the project manager?
22       A.   Terrance Driscoll.

Page 173

1        Q.   Forgive me, but I forget, what was his
2    title?
3        A.   At the time he was an analyst in the
4    finance department.
5        Q.   Was Mr. Driscoll's work -- when you
6    described him as a project manager, was his
7    management role administrative, or was he
8    substantively in charge of the work with the group?
9        A.   It was administrative.
10       Q.   Who was substantively in charge of the
11   group's work?
12       A.   Myself and Mike Marrone.
13       Q.   What is Mr. Marrone's title?
14       A.   I'm not sure if this is correct, but
15   director of something in the actuarial department
16   -- provider pricing and -- I don't know the -- he's
17   a director of something in actuarial.
18       Q.   At the time that you were considering
19   these issues and the Hospital Outpatient Fee
20   Schedule Group was doing its analysis, did you
21   consider that Medicare was also moving to an
22   ASP-based methodology for reimbursing drugs

Sheila R. Cizauskas

March 10, 2006

Page 174

1  administered to patients in hospital outpatient
2  departments?
3      A.  We became aware of that at the end of our
4  work and after the decision had been made to use
5  the AWP methodology.
6      Q.  What -- when did you become aware of that?
7      A.  I don't know exactly.  It was -- it was
8  somewhere before the implementation in October, but
9  after much of the work had been done to move to
10  AWP.
11     Q.  Sometime in the summer or fall --
12     A.  I don't know.
13     Q.  -- of 2003?
14     A.  I can't -- I wouldn't want to say.  I
15  don't know.  It's somewhere in -- before we
16  actually implemented.
17     Q.  Can you estimate how -- was this a matter
18  of days before October, weeks, or months?
19     A.  I would say it was several weeks.
20     Q.  How did you become aware of CMS's plans to
21  move to ASP for reimbursement in outpatient
22  departments?

Page 175

1      A.  I don't remember specifically.  It could
2  have been something I read or something someone
3  mentioned.  I don't remember specifically.
4      Q.  Was anyone on the hospital outpatient
5  department financial -- Hospital Outpatient
6  Department Fee Schedule Group tasked with analyzing
7  what Medicare was doing in relation to reimbursing
8  for drugs administered to patients in outpatient
9  departments?
10     A.  No.
11     Q.  Now, do I recall correctly you said that
12  you may have read about it?
13     A.  I may have seen something in a -- in a
14  journal or heard about it from someone internally
15  that may have -- I know I became aware of it and
16  don't remember exactly how.
17     Q.  What did you do after you first became
18  aware of the fact that CMS intended to move to
19  ASP-based reimbursement in hospital outpatient
20  departments?
21         MR. COCO:  Objection.
22     A.  I didn't really do anything.

Page 176

1      Q.  Was that issue discussed in the Hospital
2  Outpatient Department Fee Schedule Group?
3      A.  It was not formally discussed, because we
4  were so far down the road of implementing the AWP
5  and --
6      Q.  Was there -- were there informal
7  communications about the issue?
8      A.  I recall someone, and I don't know who,
9  mentioning that Medicare was changing to the ASP,
10  and -- and I remember thinking that we were so far
11  down the road with our analysis and our
12  implementation, that -- that we wouldn't be
13  considering that.
14     Q.  Were there any reasons why BCBS of
15  Massachusetts did not consider following suit with
16  Medicare, other than the stage of the process?
17         MR. COCO:  Objection.
18     A.  I don't know.  When you say, "Blue Cross,"
19  that's kind of a big --
20     Q.  Well, I'm happy -- I'm happy to rephrase
21  the question.  Are there any reasons why you, as
22  one of the two people in charge of the Hospital

Page 177

1  Outpatient Department Fee Schedule Group, did not
2  consider further whether or not to move to ASP,
3  other than the fact that the work of the committee
4  was substantially along?
5      A.  My rationale was that -- first, what you
6  said, that we were far along in our process.  And
7  secondly, that Blue Cross -- that this was -- this
8  was an incremental move to a new methodology and
9  wasn't intended to cause a lot of alarm in the --
10  with anyone, and it was simply to move to a
11  standard methodology.  This would be the first --
12  this would be our first, you know, attempt to move
13  to a standard methodology.
14     Q.  And if you had followed Medicare in moving
15  to an ASP-based methodology, rather than an
16  AWP-based methodology, would that have caused
17  alarm, to use your phrase?
18     A.  I don't know.
19         MR. COCO:  Objection.
20     Q.  Well, was that a concern?
21         MR. COCO:  Objection.
22     A.  It was a concern that -- it wasn't a

45 (Pages 174 to 177)

Page 178

1    concern about one versus the other, but using the
2    AWP was something that was familiar with everyone,
3    myself included, and there didn't seem to be any
4    reason to change our direction at that point.
5        Q.   Well, when you said earlier that -- when I
6    had asked what were the rationales for not
7    following Medicare, you said one of the reasons was
8    not wanting to cause alarm.  I'm trying to
9    understand what you meant by that.
10       A.   In my mind, AWP was -- had been around a
11   long time and seemed to be accepted, and I didn't
12   know what the reaction or what the -- what people
13   thought about ASP, because it was so new.
14       Q.   We've spoken a bit about the Provider
15   Financial Strategy Work Group.  Have you ever been
16   a member of that group?
17       A.   Yes.
18       Q.   How long have you been a member of that
19   group?
20       A.   Since I've been an employee of Blue Cross.
21       Q.   That's since --
22       A.   2003.

Page 179

1        Q.   -- 2003?
2        A.   Yes.
3        Q.   Has -- how many people are part of the
4    Provider Financial Strategies Work Group?
5        A.   Oh, I don't know for sure, but in any
6    given meeting, there's eight to ten people.
7        Q.   Since you've been at the company, has the
8    membership of the Provider Financial Strategies
9    Work Group been relatively stable?
10       A.   There are certain core people that have
11   been stable, and then others have joined or -- or
12   stopped coming.
13       Q.   Who are the core people that have been
14   part of the Provider Financial Strategies Work
15   Group since you joined the company in 2003?
16       A.   Uh-huh.  It's led by Deb Devaux and Rena
17   Vertes.
18       Q.   What is Ms. Vertes' title?
19       A.   She's the senior vice president of the --
20   or she's the chief actuary, senior vice president.
21   And so, they lead the group, and then there are
22   representatives from finance and actuary, sales,

Page 180

1    contracting, provider relations.
2        Q.   Other than Ms. Devaux, Ms. Vertes, and
3    yourself, is there anyone else who has been a
4    member of the Provider Financial Strategies Work
5    Group since 2003?
6        A.   Tony Centrella, who is a vice president in
7    the finance area, and then as people come into
8    their roles in the organization that serve a
9    certain function, they join the group, or when they
10   leave the organization, they leave the group.
11       Q.   Yeah, I understand that.  I'm just trying
12   to understand -- get a list of the people who have
13   been there steadily since 2003.  Is there anyone
14   else you can think of who fits that description?
15       A.   Steve Fox, I think, has been a -- he's the
16   director of provider relations.  I think he's been
17   a consistent member of the group.  There are others
18   who are consistent members but not -- that don't
19   attend consistently, like the sales
20   representatives.
21       Q.   So, you said the total membership's eight
22   to ten people, and at least five people have been

Page 181

1    members of that group consistently since 2003 when
2    you first joined the company?
3        A.   Yes.
4        Q.   Now, I asked you earlier whether you were
5    familiar with Blue Cross Blue Shield of
6    Massachusetts' consideration of whether or not to
7    move to an ASP-based methodology in the physician
8    office setting.
9        A.   (Witness nods.)
10       Q.   And I believe your testimony is that
11   you're not familiar with that.
12       A.   Correct.
13       Q.   Are you aware that that issue was
14   discussed -- a subject of consideration -- at
15   meeting or meetings of the Provider Financial
16   Strategies Work Group?
17       A.   I was not in attendance at that meeting,
18   so I may have missed it.
19       Q.   Okay.  Let me show you a document.
20           MR. MANGI:  We'll mark this as Exhibit
21   Cizauskas 002.
22           ("Analysis of CMS Average Wholesale Price

HIGHLY CONFIDENTIAL
Boston, MA

Page 182

1   Reform, 2/7/04 marked Exhibit Cizauskas 002.)
2      Q.   Have you ever seen that document before?
3      A.   No, not that I recall.
4      Q.   Take your time --
5      A.   Yeah.
6      Q.   -- and familiarize yourself with it.
7      A.   (Witness reviews document.) No.
8      Q.   Do you have any recollection -- does that
9   -- does reviewing that document refresh your
10  recollection as to having participated in any
11  discussions with the Provider Financial Strategies
12  Work Group assessing whether or not to move to an
13  ASP-based methodology?
14     A.   No, and it talks about the provider --
15  "Product and Provider Financial Management." I
16  don't know if that's PFSW or not.
17     Q.   I'll represent to you that there has been
18  previous testimony that the PFSW was the group
19  analyzing this.
20     A.   Okay. Uh-huh.
21     Q.   So, you have no recollection of --
22     A.   I don't.

Page 183

1      Q.   -- having discussed that issue. Now, in
2   all of the analysis that the Hospital Outpatient
3   Fee Schedule Group performed, did it carry out any
4   study of what hospitals and hospital outpatient
5   departments are paying to acquire drugs?
6      A.   I'm sorry. Say that again.
7      Q.   Sure.
8           MR. MANGI:  Would you mind reading that
9   back.
10          (Question read back.)
11     A.   No.
12     Q.   Was information as to what hospitals are
13  paying to acquire drugs at all relevant to the
14  analysis you were involved with regarding whether
15  or not to move to an AWP-based methodology for
16  reimbursement?
17          MR. COCO:  Objection.
18     A.   No.
19     Q.   Is the Hospital Outpatient Department Fee
20  Schedule Group still in existence?
21     A.   Yes.
22     Q.   What does that group do now?

Page 184

1      A.   We are analyzing and preparing to update
2   the outpatient fee schedule for all of the other
3   services that fall into the percent-of-charges
4   category and move those, as much as possible, to a
5   standard fee schedule.
6      Q.   What other aspects of the fee schedule are
7   you referring to when you say aspects that are
8   still on a percent of charge?
9      A.   Surgeries that had not been slotted into
10  fee schedules, some lab codes, other anesthesia,
11  recovery room codes, and then there's new codes
12  that hadn't been updated. It's been -- it's been a
13  long time between updates on the fee schedule, so
14  there's a lot of housekeeping cleanup work.
15     Q.   Now, are you familiar with a product
16  called BC 65?
17     A.   Yes.
18     Q.   And BC 65 is a managed care Medicare
19  product, is that correct?
20     A.   Correct.
21     Q.   It's a product wherein Medicare pays BCBS
22  of Massachusetts a capitated rate, and then BCBS of

Page 185

1   Massachusetts assumes the risk in relation to
2   members of that plan, is that a -- is that a fair
3   statement?
4      A.   It would be better if you asked the
5   finance people exactly how that works, but to the
6   best of my knowledge, that's correct.
7      Q.   In your present position, are you involved
8   with contracting related to the BC 65 product?
9      A.   For the most part, it's the hospitals and
10  negotiating the rate for the hospitals. There
11  might be a couple of physician groups that -- most
12  of the physician side is through a fee-for-service
13  arrangement, and I don't deal with that.
14     Q.   Do you know whether or not reimbursement
15  to physicians under the BC 65 program for drugs
16  administered to members in office is currently 95
17  percent of AWP?
18     A.   I don't know.
19     Q.   Who would know the answer to that
20  question?
21     A.   The finance department, I would imagine --
22     Q.   Is there a specific individual in the

47 (Pages 182 to 185)

HIGHLY CONFIDENTIAL
Boston, MA

Page 186

1  finance department who would know the answer to
2  that question?
3      A.  Andreana Shanley.
4      Q.  What is Ms. Shanley's position?
5      A.  She's the director of actuary.
6      Q.  Anyone else?
7      A.  Maybe Steve Fox, director of provider
8  relations.
9      Q.  Anyone else?
10     A.  I can't think of anyone else.
11         MR. MANGI:  Let me take a quick break.
12         VIDEO OPERATOR:  The time is 2:42.  We're
13  off the record.
14         (Recess was taken.)
15         VIDEO OPERATOR:  The time is 2:53 p.m.
16  This is Cassette 3 in the deposition of Sheila
17  Cizauskas.  We're on the record.
18     Q.  Are there any members of the Hospital
19  Outpatient Department Fee Schedule Group who are
20  also members of the Provider Financial Strategies
21  Work Group other than yourself?
22     A.  Mike Marrone, John Killion was in and out

Page 187

1  of the Hospital Outpatient Fee Schedule Group, and
2  he's also a member of Provider Financial Strategy.
3      Q.  When the Provider Financial Strategy Work
4  Group discussed this issue, who was tasked with
5  presenting the findings and analysis of the
6  provider -- of the Hospital Outpatient Department
7  Fee Schedule Group?
8      A.  I don't remember specifically, but I know
9  that, as part of my presentation of the overall
10  hospital contracting strategy, I presented that
11  component as a bullet point in there.
12     Q.  Let me show you another document.
13         (BCBSMA-AWP 12501 marked Exhibit
14  Cizauskas 003.)
15     Q.  Would you please review that document,
16  Exhibit Cizauskas 003, and let me know when you're
17  ready to proceed.
18     A.  (Witness reviews document.)  Okay.
19     Q.  These are the minutes of a July 11, 2005
20  meeting of the PFSW, right?
21     A.  Yes.
22     Q.  And you're listed there as one of the

Page 188

1  attendees?
2      A.  Yes.
3      Q.  I'd like to draw your attention to the
4  last bullet point under "Hospital Multi-Year
5  Strategy."
6      A.  Uh-huh.
7      Q.  Does that bullet point pertain to the work
8  of the outpatient department fee schedule group?
9      A.  Yes.
10     Q.  Do you see under "Action Items:  Next
11  Steps," it says, "Sheila to continue her
12  presentation at the next meeting"?
13     A.  Correct.
14     Q.  Does this refresh your recollection as to
15  how many meetings the work of the Hospital
16  Outpatient Department Fee Schedule Group was
17  discussed at?
18     A.  According to my recollection, I presented
19  the overall hospital contracting plan at this
20  meeting, which that last bullet point was part of
21  that, and didn't get to two pieces of the plan that
22  I was supposed to present at a subsequent meeting,

Page 189

1  but I don't believe I ever did, and it -- the two
2  pieces were unrelated to the AWP.
3      Q.  The AWP-related components we've been
4  talking about were all discussed and analyzed at
5  the meeting of July 11, 2005.
6      A.  I believe so.
7      Q.  The third bullet point from the top --
8      A.  Uh-huh.
9      Q.  -- this refers to "Key changes in approach
10  to hospital contracting."  Do you see that?
11     A.  Yes.
12     Q.  Okay.  The first one is, "We will provide
13  the potential for the hospitals to earn reasonable
14  cost, plus a margin with the percentage of payment
15  that is linked to performance increasing as a
16  portion of the total increase over the three- to
17  four-year contract cycle."
18     A.  Uh-huh.
19     Q.  Now, did this pertain to inpatient --
20  inpatient reimbursement to hospitals?
21     A.  This referred to the total reimbursement
22  to the hospital.

48 (Pages 186 to 189)

Page 202

1   I'm sorry. I didn't follow your last --
2       A. At the hospital system, Caritas, there was
3   an analysis done on the impact of moving to the AWP
4   fee schedule, and it included all the products,
5   including Medicare product.
6       Q. Including BC 65, for example?
7       A. Correct.
8       Q. So, the first sentence indicates that in
9   relation to this one specific hospital system,
10  which is Caritas Hospital system --
11      A. Yes.
12      Q. -- moving to the AWP-based methodology
13  from the previous charge-based methodology would
14  result in a savings of $3.9 million?
15      A. The difference between their
16  percent-of-charge methodology and an AWP
17  methodology -- Mike is saying -- was this number.
18      Q. Okay. And was the AWP methodology, did
19  that come to 3.9 million less than the
20  percent-of-charge methodology?
21      A. Yes, that's what it looks like he's
22  saying.

Page 203

1       Q. And he says, "If we adjust for that, the
2   commercial estimate is 3.5 million. However, this
3   needs to be trended for one year, which would bring
4   the commercial number back up close to 3.9." And
5   there he's referring to how the number would change
6   if you excluded the managed Medicare products from
7   the analysis, is that correct?
8           MR. COCO: Objection.
9       A. I'm not sure what -- I'm not sure exactly
10  what he's -- how he's itemizing each piece.
11      Q. Okay. Do you recall reviewing this e-mail
12  when you received it in November of '05?
13      A. Yes.
14      Q. Okay. When he says, "If we adjust for
15  that, the commercial estimate is 3.5 million,"
16  what did you understand him to be referring to?
17      A. I understood that the -- of the 3.9
18  million, 3.5 was for commercial.
19      Q. He then says in parentheses, "John is
20  running some numbers this morning." Who is the
21  "John" referred to there?
22      A. I'm not sure.

Page 204

1       Q. Would that be John Killion?
2       A. I doubt it. It would not have been John
3   Killion.
4       Q. He then says, "This analysis, as is all of
5   our AWP analysis, values the savings associated
6   with the first-year implementation of the AWP
7   reimbursement methodology." When he says, "As is
8   all of our AWP analysis," is he referring to the
9   other analysis performed in conjunction with the
10  work of the Hospital Outpatient Department Fee
11  Schedule Group?
12          MR. COCO: Objection.
13      A. I believe that's what he would have been
14  referencing, though this is his e-mail, not mine.
15      Q. And then he says that they are still
16  trying to find a solid way to estimate future
17  savings -- or savings for future years.
18      A. Correct.
19      Q. You'll be happy to know we're not going to
20  go through all of these. Do you know who Mary
21  Powers is?
22      A. Powers? It sounds like a name I should

Page 205

1   know. I think she's someone that left the company,
2   so I didn't really know her very well.
3           MR. MANGI: Exhbiit Cizauskas 006.
4           THE WITNESS: Exhibit Cizauskas 007.
5           (BCBSMA-AWP 000173-000175 marked Exhibit
6   Cizauskas 007.)
7       Q. Now, I understand this is a document
8   generated prior to your arrival at BCBS -- you'll
9   see on the top left the date is 10/1/99 -- however,
10  based on your experience at the company working on
11  hospital contracting, do you have an understanding
12  as to the analysis that's being performed in this
13  document?
14          MR. COCO: Objection.
15      A. I've never seen this type of analysis.
16      Q. Could you take a look at the second page
17  of the document. Have you ever seen analysis of
18  this type?
19          MR. COCO: Objection.
20      A. I've never seen this.
21      Q. You'll see that under "Milton Hospital" or
22  "South Shore Hospital" there's a column for "99

# EXHIBIT 25

Robert C. Farias                                                    October 20, 2004
Wellesley, MA

Page 1

```
 1                  UNITED STATES DISTRICT COURT
 2                  DISTRICT OF MASSACHUSETTS
 3                     NO. 01CV12257-PBS
 4
 5       _____
 6       In re:   PHARMACEUTICAL          )
 7       INDUSTRY AVERAGE WHOLESALE       )
 8       PRICE LITIGATION                 )
         _____ )
 9       THIS DOCUMENT RELATES TO:        )
         ALL ACTIONS                      )
10       _____ )
11
12                     DEPOSITION OF ROBERT C. FARIAS,
13       called as a witness by and on behalf of the
14       Defendants, pursuant to the applicable provisions
15       of the Federal Rules of Civil Procedure, before P.
16       Jodi Ohnemus, Notary Public, Certified Shorthand
17       Reporter, Certified Realtime Reporter, and
18       Registered Merit Reporter, within and for the
19       Commonwealth of Massachusetts, at the offices of
20       Harvard Pilgrim Health Care, 93 Worcester Road,
21       Wellesley, Massachusetts, on Wednesday, 20 October,
22       2004, commencing at 10:05 a.m.
```

Robert C. Farias                                                                                              October 20, 2004
Wellesley, MA

Page 18

1  to?
2      A.  Next title was senior project manager; and
3  I did that for about two years.  That function was
4  in the network management area -- a variety of
5  projects related to network management that could
6  be related to medical management, could be related
7  to referral authorization type things; could be
8  related to managing recontracting efforts.  Just a
9  wide variety of projects.
10     Q.  When you say, "network," you're referring
11 to networks of providers?
12     A.  That's right.  It was an
13 internally-focused position.
14     Q.  What do you mean by that?
15     A.  Meaning that I didn't have contact with
16 providers.  I worked on projects that supported the
17 work of network management.
18     Q.  Okay.  You held that position for about
19 two years you said?
20     A.  That's right.
21     Q.  Okay.  What was the next area that you
22 moved into?

Page 19

1      A.  Next area was specifically to the
2  contracting department in a project management
3  role.  That title was manager of planning and
4  administration.
5      Q.  Okay.  And you moved into that position
6  sometime around 2000, is that correct?
7      A.  Probably about 2000, yeah.
8      Q.  What were your responsibilities in that
9  position?
10     A.  In that position I was responsible for
11 both the administrative side of managing the
12 contracting department and the administrative side
13 -- I mean the departmental administrative budget,
14 the infrastructure of the department -- project
15 management specific to the contracting department.
16 For example, you know, when recontracting was, you
17 know, kicking off, I would be responsible for
18 drafting, you know, notification letters that would
19 go out to the -- to the providers, responsible for
20 working with legal on updating the contract
21 templates, and also, managing the work flows
22 related to recontracting.  And again, a wide

Page 20

1  variety of projects.  You know, liaisons with other
2  departments and so forth.
3      Q.  The focus you said was entirely on the
4  administrative side of managing the department?
5      A.  Administration and planning.  The planning
6  -- it was really a split function, and it continues
7  to be.  But the planning side was related to, you
8  know, the significant, you know, project business
9  unit initiatives, contracting being primarily --
10     Q.  How long did you remain in that position?
11     A.  Actually, it was a little bit of an
12 evolution.  Probably about a year.  That position
13 evolved into my current role, director of planning
14 and administration.  When there was a
15 reorganization, contracting became more of a broad
16 business unit again.  Network service and
17 operations is the name of the business unit.  So,
18 my title now and following being manager of
19 planning and administration for contracting was
20 director of planning administration for network
21 service and operations.
22          MR. MANGI:  I'm sorry.  Could you read

Page 21

1  back that last answer, please.
2          (Answer read back.)
3      Q.  So, your current position is director of
4  planning and administration, right?
5      A.  Right.
6      Q.  And you've held that since 2001.
7      A.  Yeah.
8      Q.  Okay.  Have your responsibilities changed
9  from your manager of planning and administration
10 position?
11     A.  Yes.  In addition to those
12 responsibilities, I have reporting -- folks
13 reporting to me, including the provider
14 communications and training area.  There's a small
15 group of project managers and a budget coordinator
16 which, again, they focus primarily on the
17 infrastructure and administration side of things.
18 In addition to that, the provider reimbursement
19 area reports to me.
20     Q.  What are your responsibilities in relation
21 to that provider reimbursement area?
22     A.  The manager of provider reimbursement

6 (Pages 18 to 21)

Robert C. Farias                                                                    October 20, 2004
Wellesley, MA

Page 42

1    reimburse them for?
2            MR. NALVEN:  Objection.
3        A.  I don't know.
4        Q.  Would others at Harvard Pilgrim be more
5    familiar with that issue?
6            MR. NALVEN:  Objection.
7        A.  I couldn't answer for others.
8        Q.  Okay.  Is it fair to say that Harvard
9    Pilgrim does not require providers to disclose
10   their acquisition costs as part of their contracts
11   with Harvard Pilgrim?
12           MR. NALVEN:  Objection.
13       A.  Within my area, we do not.
14       Q.  Uh-huh.  And indeed, Harvard Pilgrim
15   doesn't require them to disclose their acquisition
16   costs for drugs in any other way that you're aware
17   of, is that correct?
18       A.  Not that I'm aware of, no.
19           MR. NALVEN:  Objection.
20       Q.  Indeed, the providers' acquisition costs
21   are not relevant to Harvard Pilgrim's calculation
22   of the amount that it's going to reimburse them for

Page 43

1    drugs.  Is that a fair statement?
2            MR. NALVEN:  Objection.
3        A.  Yes.
4        Q.  So, indeed, if providers' acquisition
5    costs for drugs were to change, that would not
6    alter the amount that Harvard Pilgrim is
7    reimbursing them for drugs, is that correct?
8            MR. NALVEN:  Objection.
9        A.  That's correct.
10       Q.  And indeed, if Harvard Pilgrim were to
11   learn more information about what providers paid to
12   acquire drugs, that would not change the amount
13   that Harvard Pilgrim is reimbursing for drugs.  Is
14   that a fair statement?
15           MR. NALVEN:  Objection.
16       A.  That's a fair statement.
17       Q.  Now, what is your involvement at present
18   in relation to Harvard Pilgrim's contracts with
19   physicians?
20           MR. NALVEN:  I'm sorry.  May I hear the
21   question again, please.
22           (Question read back.)

Page 44

1            MR. NALVEN:  Objection.
2        A.  I don't have direct involvement with
3    physician contracting, other than providing the
4    tools that the contracting consultants need as far
5    -- you know, like the contract templates, the
6    reimbursement strategy.  That is what my --
7        Q.  When you say, "contract consultants," what
8    are you referring to there?
9        A.  The staff that is responsible for directly
10   working with the providers --
11       Q.  And those are?
12       A.  -- in negotiating and administering the
13   contracts.
14       Q.  Those are Harvard Pilgrim's employees,
15   right?
16       A.  That's correct.
17       Q.  And when you refer to "reimbursement
18   strategy," what are you talking about there?
19       A.  The reimbursement staff reporting to me,
20   you know, what -- how are we going to -- the
21   physician fee schedule generally is a good example.
22   The physician fee schedule is an RBRVS fee

Page 45

1    schedule -- how are we going to update the fee
2    schedule in the coming year?  That's what I'm
3    talking about.
4        Q.  Do you have an understanding as to the
5    criteria Harvard Pilgrim uses when deciding whether
6    or not to contract with a provider?
7        A.  Yes.
8        Q.  Okay.  What are those criteria?
9        A.  Well, generally, it's -- I mean, they have
10   to be credentialed, and they have to meet all of
11   the credentialing standards.  There has to be a
12   need.  The fact of the matter is, in our service
13   area, our network is robust.  You know what I mean?
14   So, we're not -- it's not like a network
15   development situation where we're going out and
16   seeking providers.
17       Q.  Anything else?
18       A.  No.
19       Q.  Okay.  Since Harvard Pilgrim has one fee
20   schedule that it applies to all providers, is it
21   fair to say that there is no negotiation between
22   Harvard Pilgrim and providers over the amount that

12 (Pages 42 to 45)

# EXHIBIT 26

1

IN THE UNITED STATES DISTRICT COURT

2         FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.   01CV12257-PBS

3

4    IN RE:  PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

5    PRICE LITIGATION

6    THIS DOCUMENT RELATES TO:

ALL ACTIONS

7

8                    * * * * * * * * * *

9            CONFIDENTIAL DEPOSITION OF

10                   EDWARD LEMKE

11                  JANUARY 11, 2005

12                   * * * * * * * * * *

13              TAKEN BY DEFENDANTS

14              AT 500 WEST MAIN STREET

15               LOUISVILLE, KENTUCKY

16                   * * * * * * * * * *

17

18        THE DEPOSITION OF EDWARD LEMKE, TAKEN AT

19   500 WEST MAIN STREET, LOUISVILLE, KENTUCKY ON

20   JANUARY 11, 2005; SAID DEPOSITION TAKEN PURSUANT TO

21   NOTICE AND IN ACCORDANCE WITH THE RULES OF CIVIL

22   PROCEDURE.

Page 18

1    Q.  So your involvement through your
2  involvement with AWP, you understood it to be a
3  benchmark utilized in setting reimbursement for
4  drugs; is that correct?
5          MR. ST. PHILLIP:  Objection to form.
6          THE WITNESS:  It was -- the majority of
7  the time it was used as a benchmark for measure and
8  comparison of costs.
9  BY MR. MANGI:
10    Q.  At any time prior to arrival at Humana,
11  are you aware of any instances where any entity was
12  acquiring drugs at a price at or even close to
13  average wholesale price, or AWP?
14    A.  I have no knowledge of that.
15    Q.  Now, you arrived at Humana in 2000; is
16  that correct?
17    A.  Yes.
18    Q.  What was your title at the time that you
19  joined Humana?
20    A.  Director of fee schedule management.
21    Q.  What is your title today?
22    A.  Same title.

Page 19

1    Q.  Have you held that title continuously
2  since 2000?
3    A.  Yes.
4    Q.  Do you have the same responsibilities
5  today as you did in 2000, or have they changed over
6  time?
7    A.  They have changed over time.
8    Q.  What were your responsibilities when you
9  first joined Humana?
10    A.  Major responsibility was building a
11  database that would be used for contract
12  negotiation, primarily built off of comparison to
13  Medicare fee levels.
14    Q.  Anything else?
15    A.  And support of contractors for Humana's
16  Choice Care Network, which is a national PPO
17  network.
18    Q.  Anything else?
19    A.  Those are the two major responsibilities.
20    Q.  Now, how did those responsibilities
21  changed over time?
22    A.  The focus has changed away from the --

Page 20

1  strictly the PPO Choice Care Network to the entire
2  Humana national contracting.
3    Q.  So your responsibilities have expanded,
4  yes?
5    A.  Yes.
6    Q.  Do you have an understanding as to what
7  Humana was reimbursing physicians in relation to
8  drugs administered in the office prior to 2000?
9          MR. ST. PHILLIP:  Objection to the form.
10          THE WITNESS:  Only to the extent that I
11  have access to historical information on how a fee
12  schedule was developed or built.
13  BY MR. MANGI:
14    Q.  To what extent do you have access to such
15  historical information?
16    A.  I have access to all of it that currently
17  exists.
18    Q.  How much of it currently exists?
19    A.  If I had to make an educated guess, I
20  would say we probably have history on 35 percent of
21  our fee schedules prior to year 2000.
22    Q.  If I asked you what methodology or

Page 21

1  methodologies Humana was using to reimburse
2  physicians for drugs administered in office back to
3  1991, would you know the answer to that?
4          MR. ST. PHILLIP:  Objection to form.
5          THE WITNESS:  Intimately, only since 2000.
6  BY MR. MANGI:
7    Q.  Okay.  Would you know in broad terms what
8  methodologies were used prior to 2000?
9    A.  Only based on that history that's
10  available to me, yes.
11    Q.  Can you describe for me to the best of
12  your knowledge the reimbursement methodologies that
13  were used by Humana to reimburse physicians for
14  drugs administered in office for the period from
15  1991 to 2000.
16          MR. ST. PHILLIP:  Objection.
17          THE WITNESS:  Of what I'm aware of, the
18  great majority was based off of Medicare, current
19  Medicare fees for that particular year.  And for
20  those not based on Medicare would be based on
21  physician charges known as the HIAA fee schedules.
22          THE REPORTER:  HIAA?

1  Lemke to provide an answer.
2       MR. MANGI: I obviously disagree with that
3  interpretation, and the question is encompassed by
4  other subject matters.  You can answer.
5       THE WITNESS: I know of no analysis that
6  exists that would indicate that being the case.
7  BY MR. MANGI:
8       Q.  Now, you testified earlier that you don't
9  know what exactly providers are paying to acquire
10 drugs, correct?
11      A.  Correct.
12      Q.  All right.  So it's fair to say that you
13 have no particular expectation that there is a given
14 relationship between the amount they paid to acquire
15 drugs and the amount that Humana reimburses for
16 those drugs; is that correct?
17      MR. ST. PHILLIP: Objection, calls for
18 speculation.
19      THE WITNESS: I have no personal knowledge
20 that -- of that.
21 BY MR. MANGI:
22      Q.  And certainly, Humana has no expectation

1  that the amount that physicians pay to acquire drugs
2  are 10 percent, 20 percent, 50 percent, 60 percent
3  less than the amounts that Humana reimburses in
4  relation to those drugs; would you agree with that
5  statement?
6       MR. ST. PHILLIP: Objection, objection to
7  form.
8       THE WITNESS: I have no knowledge of that.
9  BY MR. MANGI:
10      Q.  And you have no expectation to that effect
11 either; is that correct?
12      MR. ST. PHILLIP: Objection.  Same
13 objection.
14      THE WITNESS: I'm not quite sure what you
15 mean, whether I have an expectation of that.
16 BY MR. MANGI:
17      Q.  Is it Humana's expectation that the
18 amounts that providers pay to acquire drugs are a
19 fixed percentage less than the amount Humana
20 reimburses in relation to those drugs?
21      A.  The expectation that -- first of all, that
22 it's fixed, no.  The expectation that good business

1  practice and assuming providers that we do business
2  with practice good business practices, is that they
3  would only accept payment that is at or above their
4  costs.  That's my only expectation.
5       Q.  And certainly, you have no fixed
6  expectation as to how much higher it would be than
7  their acquisition costs, correct?
8       A.  Correct.
9       Q.  And indeed, that would vary from provider
10 to provider, depending on what they paid to acquire
11 drugs and what Humana reimburses them for drugs?
12      A.  Correct.
13      Q.  The percentage could be 10 percent in one
14 case, 50 in another, 100 in another, correct?
15      MR. ST. PHILLIP: Objection.
16      THE WITNESS: Could be.
17      MR. MANGI: Let's take a look at a few
18 documents.  Before that, does anyone need a break?
19      MR. ST. PHILLIP: It's 12:35, let's take
20 one.
21      (A LUNCH BREAK WAS TAKEN.)
22 BY MR. MANGI:

1       Q.  Now, Mister Lemke, when we started this
2  morning, I had asked you about your responsibilities
3  as director of fee schedule management, and at
4  first, you had identified was building a database
5  for use in contract negotiations.  What's that
6  database you were referring to there?
7       A.  It's an extract of physician claims,
8  provider claims from two of our major claims
9  processing platforms that we enhance the data from
10 the claim to include a Medicare equivalent based on
11 geographic area and CPT or HCPCS code so that we
12 have that data all together in one place to better
13 analyze an individual fee schedule or an individual
14 procedure or market all the way up.
15      Q.  Okay.  So it's a database that enables you
16 to compare what you're paying a particular provider
17 as opposed to what he would be getting from
18 Medicare?
19      A.  Correct.
20      Q.  Is that database still in existence?
21      A.  Yes.
22      Q.  What does that database generate by way of

# EXHIBIT 27

Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE DISTRICT OF MASSACHUSETTS

2

3

      IN RE:                        )

4                                   )

      PHARMACEUTICAL INDUSTRY       ) Civil Action No.

5     AVERAGE WHOLESALE PRICE       )   01CV12257-PBS

      LITIGATION                    )

6

7

8              HIGHLY CONFIDENTIAL

9                 DEPOSITION

10               of JOE SPAHN

11

12             Taken at Anthem

13           4361 Irwin Simpson Road

14             Mason, Ohio   45040

15        on November 30, 2004, at 9:12 a.m.

16        Reported by: Rhonda Lawrence, RPR/CRR

17

18

19                  -=0=-

20

21

22

Joe Spahn

Highly Confidential
Mason, OH

November 30, 2004

Page 6
```
1          JOE SPAHN
2  being first duly sworn, as hereinafter certified,
3  deposes and says as follows:
4          EXAMINATION
5  BY MR. MANGI:
6     Q. Good morning, Mr. Spahn.
7     A. Good morning.
8     Q. As I said, my name is Adeel Mangi.
9  I'm from the law firm of Patterson, Belknap,
10 Webb & Tyler.  We represent the defendant
11 drug manufacturers in this case.
12        MR. MANGI:  Before we begin,
13 pursuant to a conversation I just had with
14 counsel for Anthem, we're going to designate
15 this deposition transcript and the
16 transcripts for all Anthem witnesses we'll
17 be taking over the next couple of days as
18 highly confidential pursuant to the
19 protective order.  And we can revisit that
20 as to sections as necessary in the future.
21        MR. THOMAS:  Great.
22     Q. Mr. Spahn, thank you for taking the
```

Page 7
```
1  time to speak with us today.  Have you ever
2  been deposed before?
3     A. I don't believe so.  I don't ever
4  recall having, like, a court reporter.  So I
5  think the answer's no.
6     Q. Okay.  Let me just run through some
7  of the standard ground rules for a
8  deposition, then.
9        The first is, it's important that
10 you answer all questions verbally so that
11 the court reporter can take down your
12 answers.  She can't take down a nod of the
13 head or shrug of the shoulders.  Okay?
14    A. (Indicates affirmatively.)
15    Q. And you'll have to answer that
16 verbally.
17        MR. THOMAS:  Say okay.
18    A. Oh.  Okay.
19    Q. Just so she can write it down.
20        If at any point a question that I
21 ask you is unclear, please stop me and tell
22 me that, and I'll do my best to rephrase it.
```

Page 8
```
1     A. All right.
2     Q. If at any point during the
3  deposition you'd like to take a break,
4  please let me know, and as soon as possible,
5  we'll take a break.
6     A. All right.
7     Q. What is your current job title,
8  Mr. Spahn?
9     A. My current job title is senior
10 health care consultant.
11    Q. And who's your employer?
12    A. Anthem Blue Cross/Blue Shield.
13    Q. Is your work focused on a particular
14 region?
15    A. Anthem Midwest.
16    Q. What states fall within that area of
17 responsibility?
18    A. Ohio, Kentucky and Indiana.
19    Q. How long have you been in this
20 position?
21    A. Since 1992.
22    Q. And you've held the same title,
```

Page 9
```
1  senior health care consultant, since 1992?
2     A. Yes.
3     Q. Is that when you joined Anthem?
4     A. No.
5     Q. When did you join Anthem?
6     A. I joined Anthem in April of '87.
7     Q. We'll go through your employment
8  history from '87 to the present in the
9  moment.
10        But first, perhaps you could
11 describe for me your educational background
12 after high school.
13    A. I have a bachelor's in accounting
14 and an MBA in finance.
15    Q. When did you get your bachelor's in
16 accounting?
17    A. I got my bachelor's in 1972.
18    Q. Where did you get that
19 qualification?
20    A. University of Cincinnati.
21    Q. And the MBA?
22    A. From Xavier University, in 1982.
```

3 (Pages 6 to 9)

Page 94

1   Q.  The reimbursement is driven entirely
2  by the fee schedule?
3      A.  Correct.
4      Q.  Regardless of what the specific
5  provider's acquisition costs for those drugs
6  may be?
7      A.  Correct.
8      Q.  So if, for example, Anthem were to
9  learn that a particular provider were
10 getting a discount or a rebate on a
11 particular drug that lowered his acquisition
12 costs for that drug, that wouldn't change
13 the amount that Anthem is reimbursing that
14 practice in relation to that drug, right?
15     A.  No.
16     Q.  Because the reimbursement amount is
17 tied to the fee schedule?
18     A.  Right.
19     Q.  And if Anthem were to learn that
20 providers in a region were getting a
21 discount or rebate from a drug manufacturer
22 in relation to a particular drug, again,

Page 95

1  that wouldn't change the amount Anthem
2  reimburses because that's tied to the fee
3  schedule?
4      MR. THOMAS:  Asked and answered.
5      A.  Yes.  That's correct.
6      Q.  Do you know whether Anthem's
7  contracts with providers contain
8  confidentiality clauses?
9      A.  I don't know.
10     Q.  Do you know whether or not -- are
11 you aware of any free sample programs
12 whereby providers can get free samples of
13 drugs from manufacturers?
14     A.  No, I'm not aware.
15     Q.  That's not an area that you deal
16 with?
17     A.  No.
18     Q.  Are you familiar with the major drug
19 wholesalers operating the market today?
20     A.  No.
21     Q.  Do you have an understanding of what
22 wholesalers pay to acquire drugs?

Page 96

1      A.  No, I don't.
2      Q.  Are you familiar with prompt pay
3  discounts?
4      A.  No, I'm not.
5      Q.  You've never heard that term?
6      A.  No, I haven't.
7      Q.  To the best of your knowledge, do
8  you know of any instances where providers
9  have conspired with drug manufacturers to
10 inflate the average wholesale prices for
11 drugs?
12     A.  No.
13     Q.  Are you aware of any instances where
14 pharmacies or pharmacy benefits managers
15 have conspired with any drug manufacturers
16 to inflate any drug's average wholesale
17 prices?
18     A.  No.
19     MR. MATT:  Objection.  No
20 foundation.
21     MR. THOMAS:  I was just going to let
22 it go.

Page 97

1      Q.  Do you know whether Anthem has been
2  involved in any litigations pertaining to
3  average wholesale prices for drugs other
4  than this one here today?
5      A.  No.
6      MR. THOMAS:  Objection.  Foundation.
7      Q.  Do you know of any other litigations
8  that Anthem has been involved in relating to
9  reimbursements to providers for drugs
10 administered in office?
11     A.  No.
12     MR. THOMAS:  Same objection.
13     MR. MANGI:  Let's take another quick
14 break and then we'll look at some documents.
15     (Recess taken.)
16 BY MR. MANGI:
17     Q.  Prior to the break, we were talking
18 about providers' acquisition costs and the
19 fact they're not relevant to Anthem's
20 reimbursement amounts.  Do you recall that
21 testimony?
22     A.  Yes.

25 (Pages 94 to 97)

Page 98

1    Q. Okay. And part of that was that
2 Anthem has no information about what the
3 providers' acquisition costs are, right?
4    A. Correct.
5    Q. So it's fair to say that Anthem has
6 no particular expectation that providers'
7 costs would be, you know, 10 percent, 30
8 percent, 50 percent, something more,
9 something less than the amount they're
10 reimbursed in relation to those drugs,
11 right?
12       MR. THOMAS: Object to form.
13    A. Yes.
14    Q. I'd like to just plug a couple of
15 gaps here.
16       Do you know how many states Anthem
17 operates in nationwide?
18    A. Gosh. I think it's nine.
19    Q. Do you know how many regions that's
20 divided into? One is the Midwest that we've
21 been discussing.
22    A. You have Mideast, you have Midwest,

Page 99

1 you have West, and you have South,
2 Southeast. I think Virginia's called the
3 Southeastern region.
4       MR. THOMAS: It's just East. It's
5 not Mideast.
6    A. Did I say Mideast? Sorry. East,
7 West, Midwest and Southeast.
8    Q. So a total of four regions?
9    A. Four regions.
10    Q. Do you have an understanding as to
11 whether or not Anthem reimburses providers
12 that are not part of its network if an
13 individual insured is treated by that
14 physician?
15    A. I'm sorry. Could you repeat that?
16    Q. Sure. You understand that Anthem
17 has contracts with providers, correct?
18    A. Correct.
19    Q. And you understand that Anthem's
20 insureds primarily are treated by those
21 providers?
22    A. Correct.

Page 100

1    Q. Now, if an Anthem insured visits a
2 doctor that is not part of Anthem's network
3 and is administered a drug by that doctor,
4 do you have an understanding as to whether
5 or not Anthem will reimburse that doctor in
6 relation to that drug?
7    A. Do I have an understanding?
8    Q. Right.
9    A. Yes.
10    Q. What are the terms of that
11 reimbursement?
12    A. Well, we wouldn't. If they're
13 non-par, we wouldn't reimburse.
14    Q. I'm sorry?
15    A. If they're not par,
16 non-participating, if they're noncontracted,
17 then we don't -- we wouldn't reimburse them.
18 We'd reimburse the member.
19    Q. So in that instance, the individual
20 member would pay the physician's full bill
21 and then seek reimbursement from Anthem?
22       MR. THOMAS: I'm going to object on

Page 101

1 foundation. We're not talking about any
2 specific product here. It may vary
3 depending upon product.
4    Q. Sure. Let's clarify that.
5       Do you have an understanding as to
6 whether reimbursement for
7 out-of-network-provider visits varies from
8 plan to plan or product to product?
9    A. No. It's the same.
10    Q. Okay. Now, in those instances, will
11 Anthem reimburse anyone in relation to that
12 office visit?
13    A. We would repay our fee schedule
14 amount to the member.
15    Q. So the responsibility for making
16 payments to the physician would rest
17 entirely on the member; is that correct?
18    A. Correct.
19    Q. And the member would then seek
20 reimbursement from Anthem?
21    A. Correct.
22    Q. And in that instance, when we're

26 (Pages 98 to 101)

# EXHIBIT 28

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - - x

4    In re:  PHARMACEUTICAL          :MDL DOCKET NO.

5    INDUSTRY AVERAGE WHOLESALE       :CIVIL ACTION

6    PRICE LITIGATION                :01CV12257-PBS

7    - - - - - - - - - - - - - - - x,

8                          Tuesday, November 23, 2004

9                          Washington, D.C.

10

11             HIGHLY CONFIDENTIAL

12

13        Deposition of KELLY ELLSTON, commencing at

14   9:59 a.m., held at the offices of Morgan, Lewis &

15   Bockius, 1111 Pennsylvania Avenue, N.W., Washington,

16   D.C., before Keith Wilkerson, a notary public in and

17   for the District of Columbia.

18

19

20

21

22

Page 22

1    A.   That's correct.
2    Q.   In 2001 did you move to a different job?
3    A.   Yes.  I moved to Union Labor Life.
4         MR. KLEIN:  Can you repeat that?
5         THE WITNESS:  I moved to Union Labor Life
6    Insurance Company.
7         MR. KLEIN:  Thank you.
8         BY MR. MANGI:
9    Q.   And that's where you're still employed.
10   Correct?
11   A.   That's correct.
12   Q.   Have you been continuously employed by
13   Union Labor Life since 2001?
14   A.   That's correct.
15   Q.   What position did you come to at Union
16   Labor Life?
17   A.   The assistant vice president for claims
18   and care management.
19   Q.   How long did you remain in that position?
20   A.   I'm still in that position.
21   Q.   So your title is currently assistant VP
22   for claims and care management?

Page 23

1    A.   That's right.
2    Q.   Who do you report to?
3    A.   The VP of insurance operations.
4    Q.   And who is that?
5    A.   Jim Tillotson.
6    Q.   Now, are you familiar with ULLICO?
7    A.   Yes.
8    Q.   Is ULLICO the same thing as Union Labor
9    Life Insurance Company or is it a subsidiary?
10   A.   Union Labor Life Insurance Company is a
11   subsidiary of ULLICO, I believe, Inc.
12   Q.   And you work for the subsidiary, Union
13   Labor Life Insurance Company?
14   A.   I believe so.  I'm not trying to hedge
15   that one.  It's just our family of companies is a
16   little bit complicated.  I believe my employer is
17   Union Labor Life.
18   Q.   Now, just to get our terminology
19   straight, does ULLICO stand for Union Labor Life
20   Insurance Company also?
21   A.   Union Labor Life Insurance Company is an
22   entity.  ULLICO is an overarching entity that

Page 24

1    includes other product lines and other divisions, so
2    it may somewhat stand for it, but they're two
3    different things.
4    Q.   For purposes of today's deposition, when
5    I'm referring to the parent company, I'll call it
6    ULLICO, and when I'm referring to the subsidiary I'll
7    refer to Union Labor Life.
8    A.   That's how we do it generally.
9    Q.   Now, are you familiar with Zenith
10   Administrators?
11   A.   Yes, I am.
12   Q.   What is Zenith Administrators?
13   A.   Zenith Administrators is a third party
14   administrator that is owned by ULLICO, Inc.  It
15   provides administrative services to Taft-Hartley
16   trust funds and health and welfare funds.
17   Q.   Other than both being subsidiaries of
18   ULLICO, is there a relationship between Zenith
19   Administrators and Union Labor Life?
20   A.   To the extent that Zenith Administrators
21   actually provides claims payment services for some of
22   our insured business.

Page 25

1    Q.   Does Zenith function purely as a claims
2    processing entity?
3    A.   Not that I understand.  They also provide
4    eligibility administration and pension
5    administration, I believe.  I'm not fully familiar
6    with all the product lines they deliver.
7    Q.   Now, are you familiar with USA Health
8    Services?
9    A.   I believe that was a company that was
10   around a long time ago, but not really.
11   Q.   Do you know what if any the relationship
12   is between Union Labor Life and USA Health Services?
13   A.   No.
14   Q.   How about between USA Life and Zenith
15   Administrators?
16   A.   No.
17   Q.   At the position you've held at Union
18   Labor Life since 2001, what were your
19   responsibilities as assistant VP of claims and care
20   management?
21   A.   I was initially responsible for running a
22   service center and multiple claim offices for Union

Page 86

1  $5,000 for an immunization which is beyond anything
2  that would be expected, say 10 percent you'd be
3  paying, that would be something we would investigate
4  to say what would be reasonable and acceptable.
5       So in those instances, if there is an
6  outlier that doesn't make sense, we would research
7  it, and it's possible. We probably would not
8  understand what they paid for it, but we would
9  definitely benchmark it against what should be
10 acceptable.
11      BY MR. MANGI:
12      Q.  So if a particular physician were to bill
13 an extraordinary sum in relation to an immunization,
14 then that may form the basis for an investigation.
15 Correct?
16      A.  It would be a flag, just like we have
17 flags for fraud and abuse and we have reviews for
18 different dollar amounts. There are many steps in
19 the claims process that look to making sure that
20 things make sense.
21      Q.  It would be a flag of some sort of
22 overbilling.

Page 87

1       A.  Yes.
2       Q.  And the basis for that flag would be a
3  comparison to the amount that Union Labor Life would
4  ordinarily pay in relation to a similar immunization.
5  Is that correct?
6       A.  Or what would be, again possibly using
7  our pharmacy team, what would be the expected amount
8  that should be reimbursed.
9       Q.  Does Union Labor Life have a particular
10 benchmark of what are common reimbursement amounts
11 for all drugs?
12      A.  I don't know. That would be in the
13 pharmacy area, whatever tools or methods they use to
14 get information.
15      Q.  Well, in relation to paying claims to
16 physicians in relation to drugs that are not
17 immunizations, other injectable and infusible drugs,
18 how will Union Labor Life determine whether or not
19 the amount that it's paying is subject to a flag or
20 not subject to a flag?
21      A.  For the most part it is by the amount.
22 We have thresholds of review, and it's not just

Page 88

1  specific to a drug. We have thresholds of review for
2  a provider claim over a thousand dollars for office
3  visits, hospital claims over 5,000, 10,000, 25,000.
4  So we have different points at which there's a review
5  just to make sure that things are adding up.
6       Q.  Now, leaving aside those specific
7  instances where there's a suspicion that a physician,
8  a particular physician is overbilling or there's some
9  other concern about fraud or something like that,
10 leaving those instances aside, if Union Labor Life
11 were to gain more information generally about what
12 physicians in the market are paying to acquire drugs,
13 that wouldn't change the amount they would pay as
14 reimbursement. Correct?
15      MR. MCGLONE:  Same objection.
16      THE WITNESS:  In our current structure,
17 because we are guided and utilizing the PPO
18 contracts, it would not, because that's part of the
19 negotiation that the PPO and the provider have.
20      BY MR. MANGI:
21      Q.  And indeed, Union Labor Life is not
22 involved in that negotiation process.

Page 89

1       A.  That's correct, between the PPO and the
2  provider.
3       Q.  Now, based on the fact that Union Labor
4  Life does not know what physicians' acquisition costs
5  are, is it fair to say that Union Labor Life does not
6  know how much money physicians are or are not making
7  in relation to drugs they administer in office?
8       A.  That's correct.
9       Q.  Union Labor Life does not know how much
10 of a loss they're taking or how much of a profit
11 they're making?
12      A.  That's correct.
13      Q.  And it would be fair to say that Union
14 Labor Life certainly does not have a particular
15 percentage expectation of the amount of profit that a
16 physician may be making. Correct?
17      A.  No.
18      Q.  It would be impossible to say that Union
19 Labor Life expects that they'll make a percentage
20 profit of 5 percent, 10 percent, 20 percent, 30
21 percent, 40 percent?
22      A.  That's not in our calculations.

1    Q.   That's something that is entirely
2  irrelevant to Union Labor Life's calculations of the
3  amounts that it's going to reimburse. Is that
4  correct?
5    A.   Correct.
6    Q.   Now, we spoke about instances where
7  billing is a percentage of charges.
8    A.   Yes.
9    Q.   I just want to be clear here. Do
10  physicians bill based on a fee schedule or on a
11  percentage of bill charges or either?
12    A.   It could be either.
13    Q.   Do you have any knowledge as to how
14  physicians would arrive at the amounts billed when
15  they're not using a fee schedule?
16    A.   Well, generally the physician doesn't
17  derive what they bill based on percentage of savings
18  or fee schedules. To my knowledge, the physician's
19  billing is completely up to how they decide to set
20  their prices. It's how they're reimbursed is the
21  percentage of savings or the fee schedule. Billing,
22  they can charge what they charge.

1        MR. MANGI: Nothing further. Do you have
2  any questions, Alan?
3        MR. KLEIN: I do have a couple of
4  questions.
5        EXAMINATION BY COUNSEL FOR PLAINTIFFS
6        BY MR. KLEIN:
7    Q.   My first question is: To what degree
8  were you involved in the negotiation between Union
9  Labor Life and the PPOs?
10    A.   I was not.
11    Q.   And to what degree do you know what
12  factors those that did negotiate on behalf of Union
13  Labor Life, what factors they considered in
14  negotiating with the PPOs?
15    A.   My understanding is when we have
16  proposals or we are looking at new PPOs we have a
17  team of -- a multi-disciplinary team, that goes over
18  the process. And in that team, discussions of the
19  codes for amount, CPT codes that are looked at,
20  access fees that are derived, and scope and
21  responsibility of the contracts are discussed.
22    Q.   And have you ever taken part in these

1  discussions?
2    A.   Yes.
3    Q.   And do you normally take part in these
4  discussions?
5    A.   Yes.
6        MR. KLEIN: I have no further questions.
7        MR. MCGLONE: I have a request to make
8  that we record on the record what I think is an
9  understanding, and if not, I hope it will be one,
10  that the deposition transcript will be designated
11  highly confidential pursuant to the protective order
12  in place in this case.
13        MR. MANGI: We have no objection to that.
14  Alan, I trust you have no objection to that.
15        MR. KLEIN: I have no objection.
16        EXAMINATION BY COUNSEL FOR JOHNSON & JOHNSON
17        BY MR. MANGI:
18    Q.   Just a quick bit of follow-up. In
19  relation to the factors that are considered in
20  deciding whether or not to enter into a contract with
21  a PPO which you were just questioned about, is it
22  fair to say that the amount of profit or loss that

1  physicians in a particular network will make when
2  reimbursed for drugs in office is not one of the
3  factors that's considered by Union Labor Life?
4    A.   I would say that's correct. Our factor
5  is what will it cost us to provide health care
6  services to our membership or our clients at a more
7  macro level.
8    Q.   And in that regard, Union Labor Life is
9  always looking, based on a competitive dynamic, to
10  get the best and most price efficient deal that it
11  can. Correct?
12    A.   That's correct.
13    Q.   And as we discussed before, Union Labor
14  Life has no expectation of what sort of profit
15  physicians may be making in relation to drugs
16  administered in office, be it 20 percent, 30 percent,
17  40 percent, or something more than that.
18    A.   We don't get to that level of
19  granularity, and we're looking at the overall cost of
20  health care.
21    Q.   That's something that's irrelevant to
22  Union Labor Life's determination of the amounts that

# EXHIBIT 29

Page 1

1             IN THE UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3                          --oOo--

4    In re: PHARMACEUTICAL          )

5    INDUSTRY AVERAGE WHOLESALE     )    No. 01-2257-PBS

6    PRICE LITIGATION,              )

7                                   )

8    THIS DOCUMENT RELATES TO ALL   )

9    ACTIONS,                       )

10   _____    )

11

12                 HIGHLY CONFIDENTIAL

13            PURSUANT TO PROTECTIVE ORDER

14        TELEPHONIC DEPOSITION OF SCOTT WERT

15              WEDNESDAY, FEBRUARY 1, 2006

16

17        Telephonic deposition of SCOTT WERT, taken

18   on behalf of Johnson & Johnson, 10834 International

19   Drive, Suite 200, Rancho Cordova, California, at

20   10:00 a.m., on Wednesday, February 1, 2006, before

21   RICHARD M. RAKER, CSR No. 3445, Certified Shorthand

22   Reporter.

Page 6

1  name is Adeel Mangi, as you've just heard.  I
2  represent Johnson & Johnson in this litigation.  We
3  are doing this deposition by phone today, so I'd ask
4  that any questions I ask that are unclear because of
5  problems with the transmission, please let me know
6  and I'll repeat them.  Okay?
7      A.  Okay.
8      Q.  Similarly, if any questions I ask are
9  unclear to you substantively, please let me know,
10  and I'll do my best to rephrase it.
11      A.  Okay.
12      Q.  I didn't get your answer to the last
13  question, Mr. Wert.
14      A.  "Okay."
15      Q.  And now's a good time to mention, since
16  we're on a phone deposition, it's especially
17  important to answer questions verbally, both so I
18  hear it and the reporter can take it down.
19      A.  Sure.
20      Q.  Are you currently employed, Mr. Wert?
21      A.  Yes.
22      Q.  Who is your employer?

Page 7

1      A.  Health Net Pharmaceutical Services.
2      Q.  What is your title at present?
3      A.  Vice president trade relations.
4      Q.  How long have you held that position?
5      A.  Since November of 2001.  So that would be
6  a little more than four years.
7      Q.  How long have you been employed at Health
8  Net Pharmaceutical Services?
9      A.  I'm just trying to think.  It's a little
10  bit difficult to answer because I started working
11  for a company that ended up merging with Health Net
12  and Health Net Pharmaceutical Services.
13      Q.  Let's come to it another way.
14      A.  Okay.
15      Q.  Can you describe to me your education
16  after high school, please.
17      A.  I have a degree -- a BA degree in
18  psychology from Franklin & Marshall College in 1982.
19  I have a Pharm.D from the University of Arizona in
20  1993.  I have a pharmacy practice residency
21  completed at the VA Hospital in Tucson, Arizona, in
22  1994.

Page 8

1      Q.  Between -- in what -- did you complete the
2  bachelor's degree in 1982?
3      A.  Yes.
4      Q.  Were you employed between 1982 and '93?
5      A.  I was a military officer from December of
6  1982 through August of 1987.
7      Q.  Did your role in the military involve
8  health insurance or the provision of healthcare
9  services of drugs in any way?
10      A.  No.
11      Q.  What did you do after you left the
12  military in 1987?
13      A.  I enrolled at the University of Arizona.
14      Q.  That was in your Pharm.D program, correct?
15      A.  Correct.
16      Q.  You were a full-time student until you
17  completed that degree in '93?
18      A.  That's correct.
19      Q.  Did you then immediately start the
20  residency at the VA Hospital that you completed in
21  '94?
22      A.  Correct.

Page 9

1      Q.  In the course of that residency, did you
2  have any role in relation to the acquisition or
3  purchase of drugs?
4      A.  No.
5      Q.  What did you do after completing that
6  residency?
7      A.  I joined -- I was hired by Intergroup
8  Healthcare Corporation, a managed care organization
9  located at the time in Tucson, Arizona.  I was hired
10  as a clinical pharmacist.
11      Q.  How long were you with Intergroup?
12      A.  It was six months, and then the company
13  merged with Foundation Health and subsequently
14  Foundation Health became Health Net.  So I
15  essentially spent my entire career within Health
16  Net.
17      Q.  As a clinical pharmacist starting with
18  Intergroup -- how long did you hold that position,
19  by the way, clinical pharmacist?
20      A.  Six months.
21      Q.  What were your responsibilities in that
22  position?

3 (Pages 6 to 9)

Page 34

BY MR. MANGI:
1
2    Q.  Well, let me ask it another way.  You're
3  aware that wholesalers will purchase drugs at WAC or
4  an amount below WAC depending on the rebates and
5  discounts that they get, correct?
6    A.  Yes.
7    Q.  You're also aware that WAC is a different
8  number from AWP, correct?
9    A.  Correct.
10   Q.  Indeed, the AWP will generally be either
11 20, 25 or 30 percent over the WAC for a drug, right?
12   A.  Right.
13   Q.  It's certainly fair to say that
14 wholesalers and other entities in the market are not
15 actually purchasing drugs at AWP; they're purchasing
16 at WAC or something below WAC, right?
17       MR. WILLIAMS:  Calls for speculation.
18       MR. SELFRIDGE:  Also lack of foundation.
19 BY MR. MANGI:
20   Q.  You can answer.
21   A.  Generally, yes.
22   Q.  Indeed, you're not personally aware of any

Page 35

1  single entity that purchases at AWP, correct?
2        MR. WILLIAMS:  Lack of foundation.
3        THE WITNESS:  Am I aware?  I'm not aware.
4  BY MR. MANGI:
5    Q.  Okay.  Now, we've discussed a couple of
6  different things.  We've discussed WAC, and we've
7  discussed the fact that the price at which entities
8  in the market acquire drugs will be a percentage
9  below WAC that varies depending on the amount of the
10 rebate or discount that entity gets on that drug,
11 right?
12   A.  Right.
13   Q.  We've discussed AWP, which is a benchmark
14 that is either 20 or 25, sometimes 30 percent above
15 the WAC for given drugs, right?
16   A.  Right.
17   Q.  So it's fair to say, isn't it, that the
18 relationship between any individual entity's
19 acquisition cost for drugs and the AWP for that drug
20 will vary depending on the amount of rebates or
21 discounts that that entity is getting, right?
22   A.  Right.

Page 36

1    Q.  Indeed, there will be no settled
2  percentage differential between the two of those
3  numbers, the actual acquisition costs on the one
4  hand and the AWP for that drug on the other, right?
5    A.  Right.
6    Q.  Will vary from entity to entity, drug to
7  drug depending on the leverage that those entities
8  have and their ability to exact differential rebate
9  and discounts from drug manufacturers, right?
10   A.  Yes.
11   Q.  And certainly Health Net has no fixed
12 expectation or has no expectation that there is, in
13 fact, a fixed relationship between actual
14 acquisition and AWP, correct?
15       MR. WILLIAMS:  Objection; lack of
16 foundation.
17       THE WITNESS:  Correct.
18 BY MR. MANGI:
19   Q.  In other words, Health Net recognizes that
20 the relationship between the actual acquisition cost
21 for a drug and the AWP for a drug will vary widely
22 depending on the amounts of rebates or discounts

Page 37

1  that the purchasing entity can get from the
2  manufacturer.
3    A.  Right.
4    Q.  So certainly, if one were to say that,
5  well, you know Health Net expects that there will be
6  a fixed relationship of, say, 20 percent or 30
7  percent or 40 percent, there would be absolutely no
8  foundation for that, correct?
9    A.  Correct.
10   Q.  That would be simply an inaccurate
11 assumption that lacks any foundation whatsoever,
12 right?
13       MR. WILLIAMS:  I'll object as ambiguous.
14 Also calls for speculation.
15       MR. SELFRIDGE:  It's an argumentative
16 question, but you can answer.
17       THE WITNESS:  Yes.
18 BY MR. MANGI:
19   Q.  Now, let's talk for a moment about generic
20 drugs.  Actually, withdraw that.
21       Do you know at what rate Health Net can't
22 reimburse doctors for drugs that they administer to

10 (Pages 34 to 37)

# EXHIBIT 30

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4    IN RE PHARMACEUTICAL          )

5    INDUSTRY AVERAGE WHOLESALE )   MDL No. 1456

6    PRICE LITIGATION             )   Civil Action: 01-CV-12257-PBS

7    THIS DOCUMENT RELATES TO      )

8    ALL CLASS ACTIONS            )

9

10

11        Deposition of MIKE BEADERSTADT, taken before

12   GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

13   pursuant to the Federal Rules of Civil Procedure for

14   the United States District Court pertaining to the

15   taking of depositions, at Suite 300, 1630 Fifth

16   Avenue, in the City of Moline, Illinois, commencing

17   at 9:07 o'clock a.m., on the 17th day of September,

18   2004.

19

20

21

22

Mike Beaderstadt                                                                 September 17, 2004

Moline, IL

Page 70

1  that process.
2     Q.  Okay.  I want to shift over now to talk
3  about the pharmacy side.  Should we switch over to
4  Carol?  Is that the best thing to do?
5     A.  Probably.  She will have all the
6  information I have and more.
7        MR. HAAS:  Okay.
8        MS. MacMENAMIN:  Will Mr. Beaderstadt be
9  available for questioning later on, or is he
10 leaving?
11       MR. HAAS:  No, he's sitting here.  We will
12 come back to him with some top-level questions.
13       MS. MacMENAMIN:  Sounds good.
14           (Whereupon, an off-the-record
15            discussion was held.)
16 BY MR. HAAS:
17    Q.  Okay.  One follow-up question for Mike.
18        With respect to the transition from AWP to
19 AWP -- 87 percent of AWP that we discussed earlier,
20 without going back to the documents, is it correct
21 that that project first began in the fall of 2001?
22    A.  Yes.

Page 71

1     Q.  Aside from the contracts with Caremark and
2  McKesson that we have discussed, did John Deere have
3  any other contracts with specialty pharmacies or
4  specialty supply houses or PBMs for the supply of
5  drugs?
6     A.  For me?  Yes.  We had several different
7  home health agencies, others who would be dispensing
8  those types of drugs, some of them national.  Not
9  all of the names will come to me.
10    Q.  Was the relationship with those specialty
11 providers similar to that of McKesson in that
12 John Deere would reimburse the specialty provider
13 for drugs provided on an as-needed basis to the
14 physician?
15    A.  Yes.
16    Q.  Do you have an idea of when the particular
17 time frame that those specialty pharmacies and
18 specialty providers entered into these relationships
19 with John Deere?
20    A.  My recollection is that they may have been
21 entered into for some time.  It was though probably
22 late in '99 or somewhere in '99 when we first

Page 72

1  started insisting that they be sourced from that
2  supplier.
3     Q.  So prior to 1999, doctors had the option
4  of utilizing that alternative to the buy-and-bill
5  methodology, and it was starting in 1999 that
6  John Deere required that?
7     A.  Yes, approximately '99.
8        MR. HAAS:  Okay.  I have no further
9  questions.
10       MS. MacMENAMIN:  I actually have some
11 follow-up questions for Mr. Beaderstadt.  I didn't
12 know you were going to go straight there.  And one
13 follow-up question for Carol, for Ms. Sidwell.
14           (Whereupon, an off-the-record
15            discussion was held.)
16           EXAMINATION
17 BY MS. MacMENAMIN:
18    Q.  All right.  Mr. Beaderstadt, can I ask you
19 generally, what is your understanding of the term
20 average wholesale price?
21    A.  Generally my understanding is that it's a
22 benchmark that we use to price specific drugs in the

Page 73

1  physician's office and the pharmacies.
2     Q.  Do you understand it to have a
3  relationship to any actual acquisition cost?
4     A.  I don't believe it has any relationship
5  that is a consistent relationship.
6     Q.  Are you aware of who establishes or sets
7  AWP?
8     A.  I don't know exactly how it's established.
9  I know that we get different numbers from a variety
10 of sources.
11    Q.  In your time at John Deere, was it ever
12 your responsibility or your role to negotiate
13 pharmacy reimbursement contracts?
14    A.  Indirectly in my oversight of Carol's
15 role.
16    Q.  Was it ever your role to negotiate rebates
17 or discounts with drug manufacturers?
18    A.  Once again, indirectly.
19    Q.  Was it ever your role or responsibility to
20 negotiate contracts with PBMs?
21    A.  No.
22    Q.  In your oversight of the pharmacy and

19 (Pages 70 to 73)