# EXHIBIT 31

1                    UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
2

      IN RE:  PHARMACEUTICAL INDUSTRY
3     AVERAGE WHOLESALE PRICE
      LITIGATION                    MDL NO. 1456
4

      THIS DOCUMENT RELATES TO:
5     ALL CLASS ACTIONS  MASTER FILE NO. 01-CV-12257-PBS
6     _____
7     IN THE SUPERIOR COURT OF THE STATE OF ARIZONA IN AND
      FOR THE COUNTY OF MARICOPA
8

      ROBERT J. SWANSTON, INDIVIDUALLY AND
9     ON BEHALF OF HIMSELF AND ALL
      OTHERS SIMILARLY SITUATED                 PLAINTIFF
10

      VERSUS                         NO. CV2002-004988
11

      TAP PHARMACEUTICAL PRODUCTS,
12    INC.; ET AL.                         DEFENDANTS
13    ****************************************************
14

                  DEPOSITION OF MICKEY BROWN
15

16    ****************************************************
17                APPEARANCES NOTED HEREIN
18             TAKEN AT INSTANCE OF: DEFENDANTS
                    DATE: MARCH 9th, 2005
19        PLACE: BRUNINI, GRANTHAM, GROWER & HEWES
                    POST OFFICE DRAWER 119
20           JACKSON, MISSISSIPPI 39205-0119
                      TIME: 10:00 a.m.
21
22

1  answer that because I'm not faced with that
2  decision.
3       I don't know how -- I don't know that the
4  practice happens or is prevalent or how that affects
5  what is fair and reasonable.  All of those questions
6  would have to be answered before I think I could
7  answer the question that you've asked.
8  MR. MANGI: (Continuing.)
9       Q   Do you know whether or not physicians
10  contract in any cases with manufacturers to get
11  rebates and discounts on drugs?
12       A   I don't have any idea.
13       Q   Now, I believe you agreed earlier that
14  acquisition costs for drugs could vary from
15  physician to physician, correct?
16       A   I think what I said is that I didn't
17  know whether it did or didn't.  My assumption would
18  be that it does.  But I don't know whether it does
19  or doesn't.
20       Q   Well, certainly, we can agree that the
21  AWP for any given drug bears no fixed relationship
22  to acquisition costs for that drug, correct?

1       A   As I've said before, I don't know where
2  average wholesale price comes from.  So the relation
3  of average wholesale price to acquisition cost is
4  not something that I'm familiar with.  So I don't
5  know that I can agree or disagree with your
6  statement.
7       Q   Then it's certainly fair to say you have
8  no particular expectation that there will be a fixed
9  relationship between AWP and acquisition cost?
10       MS. FEGAN:  Objection to form.
11       A   Average wholesale price is a point of
12  reference that we use.  It's relation to acquisition
13  cost, I'm not familiar with.  So, I mean, I don't
14  have an expectation one way or the other on that.
15  MR. MANGI: (Continuing.)
16       Q   Certainly, you don't have an expectation
17  that acquisition costs will be 20 percent less than
18  AWP, 40 percent, 80 percent.  You just have no
19  expectation at all about that; is that a fair
20  statement?
21       MS. FEGAN:  Objection to form.
22       A   I mean, I -- all I can -- all I can

1  answer to answer honestly is I have no understanding
2  of the relation between the two.  And to speculate
3  on, you know, what is and what isn't the
4  relationship, I'm not comfortable doing.
5  MR. MANGI: (Continuing.)
6       Q   So it's fair to say, then, certainly you
7  have no expectation of what the relationship is
8  either, correct?
9       A   I think it's fair to say I don't know
10  what the relationship between the two is.  And we
11  strictly use AWP as a point of reference, and that's
12  really all I feel comfortable responding to.
13       Q   On a separate note, you mentioned that
14  CMS fee schedules are used as a point of reference
15  in generating your fee schedules, correct?
16       A   I said it is another source that we look
17  at just so that we have an understanding of what's
18  going on in the marketplace.  It's not a point of
19  reference in the same sense that average wholesale
20  price is.  Our -- our reimbursement is not based on
21  what Medicare's reimbursement is.
22       Q   Do you -- does Blue Cross/Blue Shield of

1  Mississippi act as a Medicare carrier?
2       A   Blue Cross/Blue Shield of Mississippi
3  has a subsidiary company called Tri-span that is a
4  part A intermediary.
5       Q   Are you involved at all with the
6  activities of Tri-span?
7       A   I am not.
8       Q   Does Blue Cross/Blue Shield of
9  Mississippi offer any Medicap or Medigap or other
10  supplement insurance?
11       A   We offer Medicare supplement policies.
12       Q   And is that -- are those policies
13  intended to cover the copayment due from Medicare
14  beneficiaries?
15       A   I think I mentioned before that I'm not
16  an expert on benefit plans, and I -- I'm even less
17  an expert on Medicare supplements.  It's my
18  understanding that those are standardized plans,
19  that the government standardized those plans, and we
20  apply whatever those standard benefits are.  But
21  what those are, I have no idea.
22       Q   So you don't know what percentage of the

# EXHIBIT 32

Page 1

1              THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3                       ---oOo---

4

5   In re:  PHARMACEUTICAL              MDL DOCKET NO.

6   INDUSTRY AVERAGE WHOLESALE          CIVIL ACTION

7   PRICE LITIGATION                    01CV12257-PBS

8   _____/

9   THIS DOCUMENT RELATES TO:

10  ALL ACTIONS

11  _____/

12

13                  D E P O S I T I O N

14

15  DEPONENT: Bruce M. Niebylski, M.D.

16  DATE:     Friday, June 30, 2006

17  TIME:     9:49 a.m.

18  LOCATION: Feikens, Stevens, Kennedy & Galbraith, P.C.

19            First National Building

20            660 Woodward Avenue, Suite 700

21            Detroit, Michigan  48226

22  REPORTER: Michele E. French, CSR-3091, RMR, RPR, CRR

Page 70

1    Q.   Was it your understanding that physicians'
2  acquisition prices for drugs that generated these
3  potential margins were the same for all drugs or
4  varied from drug to drug?
5    A.   I knew it was different than what AWP was
6  and I really didn't care how much different because
7  for the most part we were reimbursing for IVs and
8  things like that where we would pay, say, a hundred
9  dollars, and if they were making an extra 10 or $20
10 per IV bag, and I thought that's fine.  I'm all for
11 physicians trying to make a living.
12      When the cost of a drug in some cases is
13 $10,000, making a thousand dollars for a half hour
14 of work didn't seem fair.
15   Q.   Well, was it your impression that the
16 percentage of margin was the same in every case or
17 that the percentage was different?
18   A.   I just figured it depended on where the
19 physician was buying the drug from.
20   Q.   In other words, in some instances
21 physicians could get a different discount or rebates
22 versus other --

Page 71

1    A.   I had no idea what they were able to buy
2  for.  I just assumed that -- I had no idea what kind
3  of margin they were making, only I heard that they
4  were making a margin.
5    Q.   Did you have and have you at any time at
6  HAP had any particular expectation as to what
7  physicians' acquisition cost for drugs are in
8  relation to reimbursement?
9    A.   I don't know.  That's -- that hasn't been
10 a concern of mine.
11   Q.   Okay.  So if one were to say that, well,
12 your expectation is that acquisition costs will be
13 20 percent, 30 percent, 50 percent, something more,
14 something less, a specific number in relation to
15 reimbursement amounts, would that be inaccurate?
16      MR. WILLIAMS:  Objection to form.
17      THE WITNESS:  I haven't had any
18 expectations what their margin would be.
19 BY MR. MANGI:
20   Q.   When you considered the use of specialty
21 pharmacies in this 2003 time period, were you
22 looking at only Bioscript or did you consider

Page 72

1  different vendors?
2    A.   I had asked our PBM, physician benefit
3  manager, is MedImpact in San Diego, and I had asked
4  them if they could do some utilization controls for
5  us.  They said no, but they got me in touch with
6  Bioscripts as a vendor that they had heard good
7  things about.
8    Q.   Does MedImpact contract with retail
9  pharmacies on HAP's behalf in relation to self-
10 administered drugs?
11   A.   No.  All MedImpact does is pay our claims
12 to the pharmacies.  They don't negotiate or anything
13 else.
14   Q.   Now, they put you in touch with Bioscript.
15 Did you talk to any other specialty pharmacy vendors
16 or just Bioscripts?
17   A.   No, just Bioscripts.
18   Q.   Were you the person in charge of those
19 initial discussions with Bioscript?
20   A.   Yes.
21   Q.   And what was Bioscript offering?
22   A.   They were offering delivery of the

Page 73

1  medication within one business day to either the
2  physician office or to the patient home, and in
3  return they were asking for reimbursement of 15
4  percent below AWP.
5    Q.   Was -- was the arrangement that HAP would
6  pay Bioscript 15 percent below AWP?
7    A.   Yes.
8    Q.   And did HAP have an understanding as to
9  what Bioscript was paying to acquire those drugs?
10   A.   No.
11   Q.   So, in other words, it would be safe to
12 say you assumed they were getting the drugs for less
13 than you were paying them?
14   A.   They were probably making some money in
15 this whole thing.
16      MR. STEVENS:  Bruce, would you do this.
17 While it is normally in conversation that you
18 respond, because you know what he's asking midway
19 through, her fingers are going to fall off if we do
20 this all day and we're both talking at the same
21 time, so if you would just give a beat once he
22 finishes.

# EXHIBIT 33

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3      *******************************

 4   IN RE PHARMACEUTICAL INDUSTRY   ) MDL NO. 1456

 5   AVERAGE WHOLESALE PRICE         ) CIVIL ACTION:

 6   LITIGATION                      ) 01-CV-12257-PBS

 7   -------------------------------) JUDGE PATTI B. SARIS

 8   THIS DOCUMENT RELATES TO ALL    )

 9   CLASS ACTIONS                   )

10      *******************************

11

12        30(b)(6) DEPOSITION OF PIPEFITTERS

13   LOCAL UNION 537 through CHARLES HANNAFORD, a

14   witness called on behalf of Bristol-Myers

15   Squibb, pursuant to the Federal Rules of

16   Civil Procedure, before Kristin Kelley, a

17   Registered Professional Reporter and Notary

18   Public in and for the Commonwealth of

19   Massachusetts, at the offices of Hagens

20   Berman Sobol Shapiro, LLP, One Main Street,

21   Cambridge, Massachusetts, on Thursday,

22   December 29, 2005, commencing at 9:56 a.m.
```

Charles Hannaford                                                December 29, 2005
Cambridge, MA

Page 10

1  aerospace to pipefitters?
2      A.  I was a teacher in pipefitting in math.
3      Q.  What I'm trying --
4      A.  I did have formal education.  I did a
5  five year apprenticeship program with the
6  pipefitters.
7      Q.  When was that?
8      A.  1974.  It was four years.  Sorry.  They
9  changed it to four.  1974 to 1979.
10     Q.  What were you doing between 1970 and
11  1974 after you got your master's from USC and
12  before the program at Purdue?
13     A.  I had several different jobs.  I worked
14  for an air freight company.  I worked for a small
15  airline in Hawaii until I joined the pipefitters.
16     Q.  When you say join the pipefitters, was
17  that became a union member?
18     A.  Became an apprentice.
19     Q.  That year was what?
20     A.  '74.
21     Q.  Where were you apprenticing?
22     A.  In Boston.

Page 11

1      Q.  For whom?
2      A.  The pipefitters local union 537.
3      Q.  The present entity with which you're
4  affiliated?
5      A.  Correct.
6      Q.  At that time you were apprenticing as a
7  pipefitter.  What does a pipefitter do?  What does
8  an apprentice pipefitter do?
9      A.  I would work on building systems, HVAC,
10  heating ventilation air conditioning.  Apprentice
11  means that you're entry level.  You would learn the
12  systems and go to school.  You work during the day
13  and go to school at night.
14     Q.  The school you took was at Purdue?
15     A.  No.
16     Q.  Where was it?
17     A.  It was in Dorchester.
18     Q.  Maybe I was confused.
19     A.  After I became an instructor when I
20  graduated apprenticeship school I became an
21  instructor at the school and then I started
22  attending Purdue and Ann Arbor.

Page 12

1      Q.  Let's concentrate on your
2  apprenticeship.  How long did that last, 1974 to
3  when?
4      A.  '79.
5      Q.  All that time you were working during
6  the day and you were going to school at night?
7      A.  Correct.
8      Q.  And the school was Dorchester?
9      A.  Correct.
10     Q.  What kind of jobs did you work on during
11  that time period?
12     A.  I worked for mainly a control company,
13  such as Johnson Controls and Honeywell.  I would
14  work in a particular building putting in
15  temperature controls, such as the thermostat that
16  you would see on a building.
17     Q.  At a certain point during your
18  apprenticeship did you become entitled to health
19  benefits?
20     A.  Correct.
21     Q.  When was that?
22     A.  600 hours after I started.

Page 13

1      Q.  How does that translate into time?
2      A.  About six months into the apprenticeship
3  period.
4      Q.  This was some time in 1974, 1975?
5      A.  Right.  I started in -- actually, I
6  started early.  Probably around July.  I would
7  have become eligible for benefits in the union
8  approximately six months later, somewhere around
9  the first of the year.
10     Q.  What kind of benefits did your union
11  offer at that time?
12     A.  Health and welfare, pension.  There
13  wasn't any annuity.
14     Q.  Under the health and welfare was there a
15  major medical program?
16     A.  Yes.
17     Q.  Who was that offered through?
18     A.  At that time it was Aetna, Aetna
19  Insurance.
20     Q.  Did it at some point switch to Blue
21  Cross Blue Shield of Massachusetts?
22     A.  That is correct.

Henderson Legal Services
(202) 220-4158

Charles Hannaford                                                    December 29, 2005
Cambridge, MA

Page 14

1    Q.   When?
2    A.   Approximately a couple of years later.
3    Q.   Sometime before 1979?
4    A.   Yes.
5    Q.   From that point forward has the union
6    continuously offered major medical benefits?
7    A.   Yes.
8    Q.   Has it always been through Blue Cross
9    Blue Shield of Massachusetts?
10   A.   Yes.
11   Q.   Going back to your employment history.
12   We went through your apprenticeship.  In 1979
13   where did you go at that time?
14   A.   I worked for Honeywell Controls.
15   Q.   On a full-time basis?
16   A.   Correct.
17   Q.   Where was that located?
18   A.   The home office was in Newton.
19   Q.   How long were you with Honeywell?
20   A.   Approximately five years.
21   Q.   Until approximately 1984?
22   A.   Approximately.

Page 15

1    Q.   What type of work were you doing for
2    Honeywell?
3    A.   Temperature controls.
4    Q.   What was your next position?
5    A.   I went to Carrier Air Conditioning.
6    Q.   Still in the Boston area?
7    A.   Yes.
8    Q.   What did you do for Carrier?
9    A.   Temperature controls and refrigeration.
10   Q.   For how long was that?
11   A.   It spanned 18 years but I left them
12   twice.
13   Q.   Roughly from 1984 to 1992, right?  I'm
14   sorry.  To 2002?
15   A.   Yes.  No.  It was probably '83 or '84 to
16   about 2001.
17   Q.   You say there was some gaps.  Where did
18   you go during those gaps?
19   A.   To war.  I got activated for Desert
20   Storm.
21   Q.   You're a member of the National Guard?
22   A.   No.

Page 16

1    Q.   Or Reserve?
2    A.   Air Force Reserve.
3    Q.   Was that both times that you were absent
4    with the Air Force Reserve?
5    A.   No.
6    Q.   One time was for Desert Storm?
7    A.   Yes.
8    Q.   The other time was?
9    A.   I went to work at a pharmaceutical
10   company, constructing a pharmaceutical, Genzyme.
11   Q.   You were building their building?
12   A.   The building.
13   Q.   Which was located where?
14   A.   Right on the Charles River.
15   Q.   For a brief period of time you left the
16   employ of Carrier and were employed by Genzyme?
17   A.   No.  Employed by the union working at
18   the Genzyme site.  Actually, I worked for Hart
19   Engineering.
20   Q.   For how long were you on that project?
21   A.   About six months.  I left one other
22   time.  I worked for J. Mont Management Company. I

Page 17

1    was the chief engineer for downtown office
2    buildings, but I was still in the union.
3    Q.   I'm going to assume that for all this
4    time you were a union member.
5    A.   Absolutely.
6    Q.   What you had was different employers
7    over time?
8    A.   We're called the multiemployer trust so
9    that we're a Taft-Hartley multiemployer trust.
10   Q.   But now we're edging over into the
11   benefits area.  I'm just talking now about your
12   employment, who you received your paycheck from. I
13   assume that first you were receiving it from
14   Carrier?
15   A.   Correct.
16   Q.   At some point it now sounds like at one
17   point you were receiving a check from probably the
18   U.S. government as an Air Force Reserve?
19   A.   Correct.
20   Q.   You were also receiving a check from
21   Hart Engineering at a different time?
22   A.   Correct.

Henderson Legal Services
(202) 220-4158

Charles Hannaford                                                                December 29, 2005
Cambridge, MA

Page 22

1    Q.   That would be roughly from 1979 to 1984
2    that you were doing that?
3    A.   Approximately.
4    Q.   Then you continued on through 2001 by
5    virtue of your right as --
6    A.   I didn't go every year but I did most
7    years.
8    Q.   Most years it was a one week period?
9    A.   Right.  40 hours of instruction.
10   Q.   Have we cleaned you out on your
11   postgraduate school educational experience?
12   A.   Yes.
13   Q.   Did any of this postgraduate education
14   experience involve the issue of health benefits?
15   A.   I guess you haven't cleared me out of
16   all my postgraduate because I attend conferences
17   in my present position and the International
18   Foundation.
19   Q.   Of Employee Benefit Plans?
20   A.   Yes.
21   Q.   Are you a member of that association?
22   A.   Yes.

Page 23

1    Q.   Since when?
2    A.   2002.
3    Q.   Let's break it up then.
4    A.   I attended a school for them.
5    Q.   Between 1979 and 2001, let's focus on
6    that time period, did we get all of your
7    postgraduate educational experience?
8    A.   Yes.  I think.
9    Q.   Now, if we go past that you say you got
10   some educational experience in other areas?
11   A.   Do you consider Air Force schools?
12   Q.   Are they mostly in flight training?
13   A.   I did all sorts of things.
14   Q.   Anything relating to health benefits?
15   A.   No.
16   Q.   I think we can do without the Air Force
17   schools.  Let me ask you this question.  Right now
18   you're an administrator for the union trust fund.
19   Correct?
20   A.   That is correct.
21   Q.   Did you do some training before you took
22   that position?

Page 24

1    A.   I did not, no.
2    Q.   Did you do some training once you got
3    that position?
4    A.   Correct.
5    Q.   When was that?
6    A.   I attended conferences each year at the
7    International Foundation.
8    Q.   Starting in 2000 and what?
9    A.   Two, 2002.
10   Q.   What type of conferences?
11   A.   They were for administrator of trust
12   funds.
13   Q.   Did you have to travel some place to go
14   to those?
15   A.   Yes.
16   Q.   Where is that?
17   A.   One was Toronto.  One was San Diego.  One
18   was New Orleans.  One was Hawaii.
19   Q.   Why don't you take us through the
20   transition then.  It sounds like you ended with
21   Carrier in 2001.
22   A.   I worked for another shop, Intel.  I

Page 25

1    worked for a company called KSI at the Intel job
2    site.  I took that just prior to taking this
3    present job.
4    Q.   The present job is the administrator of
5    the trust fund, correct?
6    A.   Correct.
7    Q.   How did you learn of that job?
8    A.   The prior administrator had the job for
9    an excess of 12 to 14 years.  He was going to
10   retire.  He was 72.  The job got published and I
11   interviewed for it.
12   Q.   When you say the job got published?
13   A.   A letter was sent to every individual in
14   the union.
15   Q.   What time period are we talking about
16   now?
17   A.   2002.
18   Q.   This person who had the job, that's
19   William Keogh?
20   A.   Correct.
21   Q.   Do you know where Mr. Keogh is now?
22   A.   Retiring and enjoying life.

7 (Pages 22 to 25)

Page 130

1 of the person I was thinking of. Elaine Mackay
2 and Patty Keogh.
3     Q.  Is there some sort of circulation of the
4 paper within the office?
5     A.  When I first came in I wanted everybody
6 to get familiar with certain issues.  If I see a
7 particular thing I started sending it around. When
8 I first saw that article in the Wall Street
9 Journal about the New York attorney suing Express
10 Scripts I did not send that around, but it gave me
11 pause for thought.  Then after that we saw this
12 and so I just sent it around for FYI, for your
13 information.
14    Q.  The article about the New York Attorney
15 General would have been prior to this time?
16    A.  Yes.
17    Q.  Do you recall how long?
18    A.  I think it was very shortly before this.
19    Q.  Do you still have a copy of that
20 article?
21    A.  No.
22    Q.  Is there some reason you saved this

Page 131

1 particular article in your file?
2     A.  No particular reason.  I just put it in
3 the file.
4     Q.  You say you circulated it to other
5 members of your office?
6     A.  Yes.
7     Q.  Did you give it to the trustees?
8     A.  No.
9     Q.  Did you provide it to anybody else?
10    A.  No.
11    Q.  If you turn to the third page of the
12 document it's a continuation of the article on
13 page A6 of the edition that day.  There's a bolded
14 section in the middle "ain't what's paid".  You see
15 that?
16    A.  Yes.
17    Q.  It says "but it's an open secret in the
18 industry that AWP's are often severely inflated,
19 says Robert Garis, a pharmacy professor at
20 Creighton University in Omaha, Nebraska who is
21 studying pricing by PBM's. Some industry veterans
22 joke that AWP ought to stand for quote ain't

Page 132

1 what's paid".
2         Had you ever heard AWP referred to as ain't
3 what's paid prior to this time?
4     A.  No.
5     Q.  At or around the time of this article or
6 the time that you saw the New York State Attorney
7 General article did you have any discussions with
8 anybody about AWP and whether it represented
9 actual transaction prices or not?
10    A.  Amongst our staff we talked about it.
11    Q.  When you're saying your staff is it the
12 same people that you just mentioned?
13    A.  Correct.
14    Q.  Did you ever bring it to the attention
15 of the trustees?
16    A.  Yes.
17    Q.  What did you say to them?
18    A.  Basically, that in a discussion you talk
19 about I just quoted a couple of things from this.
20 They didn't see the whole article.  I said, you
21 know, I hope Blue Cross Blue Shield is getting a
22 better deal than we are.

Page 133

1     Q.  You mean when you say than we are you
2 mean on the mail order aspect of things?
3     A.  Yes.
4     Q.  Did you ever ask Blue Cross Blue Shield
5 what kind of deal they were getting on the
6 prescription drug benefit?
7     A.  Yes.  They had a very -- they didn't
8 have a set fee.  I guess it was a sliding fee.  I
9 didn't understand all of it.  I respected them
10 because they were a large firm that they should be
11 able to exact a better discount for us.
12    Q.  Who was the person at Blue Cross Blue
13 Shield of Massachusetts that you had this
14 conversation with?
15        MR. NOTARGIACOMO: Objection. I don't
16 think he ever said he had a conversation.
17    Q.  Did you have a conversation with
18 somebody at Blue Cross Blue Shield about this?
19    A.  It was Chris May at the beginning, yes.
20    Q.  Did you talk to others within Blue Cross
21 Blue Shield of Massachusetts about the meaning of
22 AWP and what kind of --

34 (Pages 130 to 133)

Charles Hannaford                                                         December 29, 2005

Cambridge, MA

Page 154

1     A.   That's correct.
2     Q.   You have that document?
3     A.   Yes.
4          MR. TRETTER:  We'll ask for that.
5     Q.   Going back to your declaration, which is
6   Exhibit Hannaford 012.  We'll concentrate on the
7   written portion of the exhibit.  Paragraph four
8   says "Blue Cross Blue Shield of Massachusetts
9   compiled claims data for the fund for the period
10  1995 through 2003".  You see that?
11    A.   Yes.
12    Q.   Do you know why that date range was
13  picked?
14    A.   The lawyers probably asked for it.
15    Q.   You were just reiterating what the
16  lawyers asked for?
17    A.   Yes.
18    Q.   There's a reference also in paragraph
19  four to something called the "tract 1 defendants".
20  Do you know what that means?
21    A.   Where's the reference?
22    Q.   In paragraph four.

Page 155

1     A.   Yes.
2     Q.   What does that mean?
3     A.   Tract 1 defendants would be those that
4   supply the physician administered drugs.
5     Q.   Have you heard that there are certain
6   manufacturers that are on a more accelerated
7   schedule than others?
8     A.   No.
9     Q.   If you would go now to the Exhibit
10  Hannaford 013 there are all these headings.  The
11  first one is "serv-prov", probably service
12  provider, then "service provider tax i.d.", "bill
13  provider".  Do you know what any of these refer or
14  relate to?
15    A.   Well, service provider I know Blue Cross
16  Blue Shield has a number for a particular entity
17  that provides a service.
18    Q.   You think it might be the actual doctor?
19    A.   Right.
20         MR. NOTARGIACOMO:  As I'm sure you're
21  aware, next week there's going to be a deposition
22  of the data individual who produced this material

Page 156

1   from Blue Cross Blue Shield.  The best person to
2   ask those specific questions about headings and
3   what is in one column and another is that person.
4          MR. TRETTER:  Okay.
5     Q.   The patient identifier, do you know what
6   that relates to?
7     A.   No.
8     Q.   On this printout, as I read it, there
9   are 12 discrete patients' numbers.  Is it your
10  understanding that between 1995 and 2003 the fund
11  had only 12 people that were administered these
12  tract 1 defendants' drugs?
13    A.   I don't know.
14    Q.   How would you know that they even were
15  administered these tract 1 drugs?
16    A.   Blue Cross Blue Shield would have
17  supplied this.  I would guess this is what it is.
18    Q.   You're entirely dependent on them?
19    A.   Absolutely.
20    Q.   You have no independent knowledge?
21    A.   No.
22    Q.   In the column marked "proc-code" there

Page 157

1   are these J's and Q's and then a number.  Do you
2   see that?
3     A.   I see that, yes.
4     Q.   Do you know what any of that means?
5     A.   No, I do not.
6     Q.   Further over to the right there's
7   something "charge-ANT allowed-ANT".  Do you
8   understand what those are?
9     A.   Yes.
10    Q.   Let's start with "charge-ANT".  What is
11  that?
12    A.   It's what the service provider charged
13  for a particular service.
14    Q.   Or in this case a drug?
15    A.   Yes.
16    Q.   What is the allowed amount?
17    A.   The amount that's allowed under Blue
18  Cross Blue Shield.
19    Q.   Please go back to your declaration,
20  Exhibit Hannaford 012, and paragraph three.  "My
21  understand is that, based on arrangements between
22  Blue Cross Blue Shield of Massachusetts and

40 (Pages 154 to 157)

Page 158

1 participating physicians payments made by the
2 following four physician administered drugs,
3 including those at issues in this lawsuit, are
4 based on average wholesale price ("AWP")".  What
5 is your understanding based on?
6     A.  My understanding is that Blue Cross Blue
7 Shield in their plans do an average wholesale
8 price less a discount.
9     Q.  With the doctor?
10    A.  With the doctor.
11    Q.  Where did you get that understanding
12 from?
13    A.  In earlier conversations when they
14 talked about price scheduling, as I told you
15 earlier, that they have different various
16 discounts for different things, but I don't have a
17 copy of it and I don't know the specifics.
18    Q.  As I understand that former testimony,
19 we talked about after you read those articles in
20 the Wall Street Journal about what AWP meant and
21 what it didn't mean?
22    A.  Right.

Page 159

1     Q.  You had conversation with Chris May
2 about the subject?
3     A.  Right.
4     Q.  And the net of it was you were satisfied
5 that they were sophisticated enough that they knew
6 what they were doing, that the fund wasn't paying
7 for drugs through Blue Cross Blue Shield.  Is that
8 accurate?
9     A.  Yes.
10    Q.  You, however, have never seen an actual
11 fee agreement between either Blue Cross Blue
12 Shield and a doctor or Blue Cross Blue Shield and
13 a pharmacy?
14    A.  No.
15    Q.  So you have no independent basis to
16 verify whether or not they're using AWP and how
17 much of a discount off of AWP they're using?
18    A.  Correct.
19    Q.  Do you have any reason to believe that
20 in its contracting with doctors in its network
21 Blue Cross Blue Shield is not getting the best
22 discount off of AWP that it can get?

Page 160

1     A.  I have no reason to believe that.
2        MR. NOTARGIACOMO:  For the record, Blue
3 Cross Blue Shield is now a party -- well, it's not
4 yet entered.  The plaintiffs and defendants have
5 agreed that Blue Cross Blue Shield will be a party
6 to this litigation and their depositions are going
7 forward next week to explain exactly how both for
8 Blue Cross Blue Shield itself and for pipefitters
9 the payments made for the drugs at issue were
10 based on average wholesale price.
11    Q.  Did you know that Blue Cross Blue Shield
12 of Massachusetts was going to join this lawsuit?
13    A.  I just found out.
14    Q.  Today or yesterday?
15    A.  Today.
16    Q.  Let me show you, I'm not going to mark
17 it, it's the Third Amended Master Consolidated
18 Class Action Complaint.  This is a mini version of
19 it.  Why don't you flip through it.  My only
20 question to you is whether you've ever seen it.
21    A.  No.
22        MR. NOTARGIACOMO:  Let me show you my

Page 161

1 version.  You're probably more familiar with it.  I
2 don't want to violate any protective order.
3     Q.  Why don't you just look at the first
4 page?
5     A.  Yes.  I've seen this.
6        MR. TRETTER:  Let the record reflect the
7 witness' attorney showed him a large binder that
8 have the same documents just in full copy form as
9 opposed to minuscript.
10       THE WITNESS:  At my age you can't read
11 this.
12       MR. TRETTER:  Referring to the
13 minuscript.
14    Q.  When did you see that document?
15    A.  Saw it a couple of weeks ago.
16    Q.  Was that the first time?
17    A.  Yes.
18    Q.  Was it in connection with preparing for
19 today's deposition?
20    A.  Yes.
21    Q.  Did you see it before the trustees
22 approved back in October?

41 (Pages 158 to 161)

# EXHIBIT 34



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
| --- | --- | --- |
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
|  | ) | CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) ) | Judge Patti B. Saris |

### NOTICE OF ERRATA TO THE FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT TO COMPLY WITH COURT'S CLASS CERTIFICATION ORDER

TO ALL PARTIES AND THEIR COUNSEL

PLEASE TAKE NOTICE THAT Health Care For All was inadvertently omitted from the Fourth Amended Consolidated Class Action Complaint (Dkt. Nos. 2171-76 [redacted version] and #2227 [filed under seal - unredacted version]) as a Class 3 representative pursuant to Fed. R. Civ. P. 23(b)(2). Plaintiffs have now included Health Care For All in the Amended Complaint and attach Paragraph 39a to this Notice and revise paragraphs 38 and 39 to add "Appendix A" in place of the blanks erroneously left in the Complaint. Plaintiffs also attach to this Notice an Appendix A (revised) and Appendix B, which were also omitted from the Fourth Amended Consolidated Complaint as filed.

DATED:  March 10, 2006

By___ /s/ Steve W. Berman_____
Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003
**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000
**CO-LEAD COUNSEL FOR
PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **NOTICE OF ERRATA TO THE FOURTH AMENDED CONSOLIDATED CLASS ACTION COMPLAINT TO COMPLY WITH COURT'S CLASS CERTIFICATION ORDER** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on December 9, 2005, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By_____ **/s/ Steve W. Berman**_____
    Steve W. Berman
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292

001534-16 98839 V1

Medicare Part B context based on published AWPs from Track 1 Defendants. All of BCBSMA drugs that are at issue in the Complaint are identified in Appendix A. BCBSMA contracts to reimburse providers based on fee schedules generated by BCBSMA which fee schedules relating to physician administered drugs are based on the AWP for those drugs.

39. Pipefitter's Local Union 357 ("Pipefitters") is an employee welfare benefit plan and employee benefit plan maintained pursuant to Section 302(c)(5) of the LMRA and is an employee welfare benefit plan established and maintained pursuant to ERISA, for the purpose of providing health benefits to eligible participants and beneficiaries. Pipefitters maintains its principal place of business in Allston, Massachusetts. During the Class Period, Pipefitters has been billed for and paid charges for AWPIDs outside of the Medicare Part B context based on published AWPs. All of Pipefitters drugs that are at issue in the Complaint are identified in Appendix A. During the Class Period Pipefitters contracted with a third-party administrator, BCBSMA, to administer its prescription drug benefit for its beneficiaries. Pipefitter's Reimbursement for AWPIDs is based on fee schedules generated by BCBSMA which fee schedules relating to physician administered drugs are based on the AWP for those drugs.

39a. Plaintiff Health Care For All ("HCFA") is a consumer health advocacy organization that has led the fight in Massachusetts to expand access to affordable, quality health care since 1985. HCFA maintains its principal place of business in Boston, Massachusetts. During the Class Period, HCFA's members have been billed for and paid charges for AWPIDs outside of the Medicare Part B context based on published AWPs.

40. In addition, from 2002 through 2003, plaintiff William Barnewolt paid out-of-pocket amounts for Procrit (J&J), Arenesp (Amgen), Furosemide (Abbott), and Infed (Watson). Plaintiff William Barnewolt is represented in this action by plaintiff Bonnie Barnewolt, as a successor in interest to William Barnewolt. The amounts Mr. Barnewolt paid were based on AWP. Mr. Barnewolt was a beneficiary of the UFCW Fund. The UFCW Fund is administered

- 18 -

# EXHIBIT 35

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3                  MDL No. 1456

 4            C.A. No. 01-CV-12257-PBS

 5    *   *   *   *   *   *   *   *   *   *   *   *   *   *

 6    IN RE:  PHARMACEUTICAL INDUSTRY          *

 7    AVERAGE WHOLESALE PRICE LITIGATION       *

 8    _____      *

 9    THIS DOCUMENT RELATES TO ALL ACTIONS     *

10    *   *   *   *   *   *   *   *   *   *   *   *   *   *

11

12              DEPOSITION OF MELISSA D. SHANNON, a witness

13    called on behalf of Baxter International Inc. and

14    Baxter Healthcare Corporation, pursuant to the

15    Federal Rules of Civil Procedure, before Jessica L.

16    Williamson, Registered Merit Reporter, Certified

17    Realtime Reporter and Notary Public in and for the

18    Commonwealth of Massachusetts, at the Offices of

19    Hagens Berman Sobol Shapiro LLP, One Main Street,

20    Cambridge, Massachusetts, on Tuesday, May 23, 2006,

21    commencing at 9:35 a.m.

22
```

Shannon, Melissa D.                                                                                    May 23, 2006
Cambridge, MA

Page 50

1   pages of documents were produced in response to
2   this subpoena.
3         Is that your memory that after looking
4   at the subpoena and reviewing the company's -- or
5   Health Care For All's documents, about 100
6   documents were determined to be responsive, 100
7   pages?
8      A.   100 pages sounds about right. I did not
9   count them.
10     Q.   Do you know whether you produced to us
11  all documents you determined to be responsive to
12  this subpoena?
13     A.   We did.
14     Q.   Did you research any documents or not
15  produce any documents on the basis of any
16  privilege?
17     A.   No.
18     Q.   If you look at Mr. Notargiacomo's
19  letter, he basically says, "enclosed please find
20  all non-objectionable documents."
21        Were there any documents that you
22  determined were responsive to the subpoena, but

Page 51

1   you did not produce them because they were somehow
2   objectionable?
3         MR. NOTARGIACOMO: I'm going to object
4   to the question. It's a question better directed
5   at counsel than at the witness, I believe. And I
6   would be happy to talk to you about it off-line.
7      Q.   Well, let me have your answer first.
8      A.   I agree with that.
9      Q.   Meaning?
10     A.   Meaning that not that I'm aware of. I
11  would have to discuss with my counsel if he made a
12  determination legally of some documents were
13  privileged or otherwise objectionable to produce.
14        (Exhibit Shannon 003, Letter dated
15  May 16, 2006, marked for identification.)
16     Q.   And I'll show you what's been marked as
17  Deposition Exhibit Shannon 003. Deposition
18  Exhibit Shannon 003 is simply a letter from me to
19  your counsel requesting that kind of information.
20        MR. JACKSON: So, Ed, did you keep any
21  documents that you determined were objectionable?
22        MR. NOTARGIACOMO: There were no

Page 52

1   documents that were produced by the -- by Health
2   Care For All that would have been withheld as a
3   result of any privilege or that were withheld by
4   we thought they were objectionable. I think there
5   are some categories of documents like membership
6   law, you know, information on particular members
7   that arguably could have been covered by the
8   subpoena that we did not produce because we did
9   not feel they were relevant. And that's something
10  I probably should have outlined in response to
11  this letter, but hadn't had a chance to do yet.
12        MR. JACKSON: Okay. Let's do this
13  way: And obviously I may not agree with you, but
14  if you'll do that and we'll -- at the end of this
15  deposition we might have to preserve the ability
16  to come back and talk to the witness regarding
17  those issues.
18  BY MR. JACKSON:
19     Q.   Let's go to Deposition Exhibit Shannon
20  004.
21        (Exhibit Shannon 004, Notice of
22  Errata to the Fourth Amended Consolidated Class

Page 53

1   Action Complaint to Comply With Court's Class
2   Certification Order, marked for identification.)
3      Q.   Deposition Exhibit Shannon 004 is a
4   document entitled "Notice of Errata to the Fourth
5   Amended Consolidated Class Action Complaint to
6   Comply With Court's Class Certification Order."
7   Do you see that document?
8      A.   I do.
9      Q.   Ms. Shannon, have you ever seen this
10  document before?
11     A.   Yes.
12     Q.   When did you first see this document?
13     A.   Yesterday.
14     Q.   Can I have you look at the last page of
15  the document, referring particularly to Health
16  Care For All, Paragraph 39a. Do you see that?
17     A.   Uh-huh. Yes.
18     Q.   The last sentence says, "During the
19  Class Period, HCFA's members have been billed for
20  and paid charges for AWPIDs outside of the
21  Medicare Part B context based on published AWPs."
22        Do you see that?

Henderson Legal Services
(202) 220-4158

Shannon, Melissa D.                                                    May 23, 2006
Cambridge, MA

Page 54

1    A.   I do.
2    Q.   What's your factual basis for making
3  that assertion?
4    A.   I first noticed this sentence yesterday
5  afternoon, and I'm not sure how it got in there.
6  I don't think it accurately describes our
7  relationship with our members in this case.
8    Q.   Do you have any data regarding whether
9  your members have purchased any drugs that are at
10 issue in the AWP complaint?
11   A.   No.
12   Q.   Do you have any information regarding
13 whether any of your members paid any charges for
14 the drugs identified in the AWP complaint?
15   A.   No.  We are a plaintiff for injunctive
16 relief only.
17   Q.   Did you undertake any effort, that is,
18 Health Care For All, to contact any members, any
19 of your members to ask about their drug purchases
20 or drug payments?
21   A.   No.  The only outreach we did to members
22 on this question was last August/September in

Page 55

1  trying to ascertain whether any of our members
2  wanted to be named plaintiffs in the lawsuit.
3    Q.   What kind of outreach did you do?
4    A.   We sent e-mails out to our member -- to
5  our membership and to the database I mentioned
6  earlier.  We posted something on our website
7  asking people if they wanted to participate.
8    Q.   Anything else?
9    A.   We did some outreach with other
10 organizations to see if they would spread the word
11 as well, and we reviewed our help line database to
12 see whether there were some seniors who might have
13 potentially been interested in the lawsuit.
14   Q.   Did anyone express interest in response
15 to that, quote-unquote, outreach?
16   A.   Some people expressed interest, but no
17 one turned out to be a plaintiff in the lawsuit.
18   Q.   Let me refer you back now to Paragraph
19 39a of Deposition Exhibit Shannon 004.  The first
20 sentence states, "Plaintiff Health Care For All
21 ('HCFA') is a consumer health advocacy
22 organization that has led the fight in

Page 56

1  Massachusetts to expand access to affordable,
2  quality health care since 1985."
3         Do you see that sentence?
4    A.   Yes.
5    Q.   Do you agree with the facts outlined in
6  that sense?
7    A.   That sentence is accurate.
8    Q.   Second sentence says, "HCFA maintains
9  its principal place of business in Boston,
10 Massachusetts."
11        Do you see that sentence?
12   A.   Yes.
13   Q.   And is that sentence accurate?
14   A.   Yes.
15   Q.   You previously testified that you
16 thought the third sentence of Paragraph 39a of
17 Deposition Exhibit Shannon 004 was not accurate,
18 correct?
19   A.   Only in that we don't know whether our
20 members have been billed for and paid charges for
21 AWPIDs.
22   Q.   And, to your knowledge, Health Care For

Page 57

1  All did nothing to attempt to confirm that,
2  correct?
3    A.   That's correct.
4    Q.   Why is that?
5    A.   I just became aware of this sentence
6  yesterday and because we're plaintiffs for
7  purposes of injunctive relief only, so we weren't
8  concerned with the drug use or payment history of
9  our members, and we don't ever ask those questions
10 in the routine course of advocacy with our
11 members.
12   Q.   And you say your -- Health Care For All
13 is only interested in injunctive relief only; is
14 that correct?
15   A.   In this case, we're a plaintiff in this
16 track of this lawsuit for injunctive purposes
17 only.
18   Q.   So Health Care For All is not seeking
19 any damages in this case?
20   A.   That's correct.
21   Q.   Since coming to Health Care For All,
22 have you had an occasion to do any research

15 (Pages 54 to 57)

Shannon, Melissa D.                                                    May 23, 2006
Cambridge, MA

Page 58

1 regarding the federal government's knowledge
2 regarding drug pricing, particularly as it relates
3 to AWP?
4     A.  Somewhere along the way I learned in a
5 very cursory way that Medicare was no longer using
6 AWP, but I don't recall where I learned that, and
7 I don't recall any real details associated with
8 that piece of information.
9     Q.  Have you ever looked at the Medicare
10 Modernization Act?
11    A.  I have.
12    Q.  Does that help you refresh your memory
13 about how Medicare is no longer reimbursing based
14 upon AWP?
15    A.  No.
16    Q.  I presume therefore you haven't
17 researched or read all of the federal government's
18 information that's publicly available regarding
19 AWP or the definition of AWP or the use of AWP in
20 the Medicare system since the '60s?
21    A.  That's correct.  If I have, I don't
22 recall reading anything about that.

Page 59

1          MR. NOTARGIACOMO:  When you get a
2 chance, can we take a very quick break?
3          MR. JACKSON:  Sure.  We can go off the
4 record.
5          (Recess taken.)
6          MR. JACKSON:  Let's go back on the
7 record.
8 BY MR. JACKSON:
9     Q.  Ms. Shannon, is it okay if I refer to
10 you by Ms. Shannon?
11    A.  Yes.  You can call me by my first name,
12 if you prefer.
13    Q.  You used the word in an answer or two
14 ago, "track."  When you used the word "track,"
15 what were you referring to?
16    A.  Can you remind me of the context I used
17 it in?
18    Q.  Well, let me ask it a different way.
19 Were you aware that the Court in the AWP
20 litigation has broken this case into a Track 1 and
21 Track 2?
22    A.  Yes.

Page 60

1     Q.  Were you aware of that?
2          And when you used the word "track," were
3 you referring to Track 1 or Track 2 or --
4     A.  Track 1, yes.
5     Q.  You were referring to Track 1.
6          So by that --
7     A.  Only because I wasn't making any
8 assumptions about our involvement in future
9 tracks.
10    Q.  Okay.  Let me go back and ask a few
11 questions just to make this a little cleaner.
12         I asked you earlier about the
13 allegations contained in Paragraph 39a of
14 Deposition Exhibit Shannon 004?
15    A.  Yes.
16    Q.  And the last sentence of which you said
17 was inaccurate?
18    A.  Yes --
19    Q.  Now --
20    A.  -- to my knowledge.  We don't have
21 knowledge about that.  That may be an accurate
22 sentence, but we don't have knowledge enough to

Page 61

1 say whether that was true or not.
2     Q.  And you, to your knowledge, Health Care
3 For All has spoken to none of its members about
4 drug purchases or drug sales or drug
5 reimbursement?
6     A.  That's correct, although we have -- some
7 of our members have agreed to be plaintiffs in
8 other lawsuits, and therefore I have talked to
9 some members about their use of prescription drugs
10 related to those other lawsuits.
11    Q.  But none relating to the AWP litigation?
12    A.  That's correct.
13    Q.  Now, does your answer to this question
14 supply whether we're talking about Track 1
15 defendants and Track 1 drugs or Track 2 defendants
16 and Track 2 drugs?
17    A.  I assume that it does, but I know -- you
18 know, I'm not a lawyer in a litigation context,
19 and there may be -- the situation may be very
20 different by the time we get to Track 2.  I don't
21 know whether -- what's going to happen in Track 2
22 is all I meant to say.  I wasn't meaning to say

16 (Pages 58 to 61)

Shannon, Melissa D.                                                                                    May 23, 2006
Cambridge, MA

Page 94

1   additional consumer groups.
2       Q.   Okay.  If you look, attached to the
3   letter then are several pages, fact sheets,
4   several fact sheets.  Were all of these provided
5   to you by PAL?
6       A.   Yes.
7           (Exhibit Shannon 009, E-mail dated
8   August 30, 2005, marked for identification.)
9       Q.   I show you what's been marked as
10  Deposition Exhibit Shannon 009.  Deposition
11  Exhibit Shannon 009 appears to be an August 30,
12  2005 e-mail from Renee Markus Hodin to you.  Have
13  you ever seen this document before?
14      A.   Yes.
15      Q.   When did you first see it?
16      A.   August 30th, 2005.
17      Q.   Who provided this document to you?
18      A.   Renee Markus Hodin e-mailed it to me.
19      Q.   Did you and Renee then discuss the
20  document?
21      A.   We did.
22      Q.   What was your conversation?

Page 95

1       A.   I called her and asked her for more
2   information.  I honestly can't remember whether we
3   discussed it shortly prior to my receiving this e-
4   mail or shortly afterwards.
5       Q.   If you look at the second paragraph, it
6   says, "Recently, the Judge in this case ruled that
7   the case can go forward, but only if certain types
8   of individuals step forward to be added as
9   plaintiffs in the case."
10          Did you and Renee discuss that list?
11      A.   We discussed that issue.  I don't know
12  if we did it -- I don't know if I highlighted this
13  sentence and asked her about it, but we discussed
14  what types of plaintiffs were needed for the
15  lawsuit.
16      Q.   And what types of plaintiffs were needed
17  for the lawsuit?
18      A.   Two types of plaintiffs, primarily
19  nationwide.  It was a little bit of a tricky
20  situation because they were communicating with
21  groups nationwide about identifying Medicare Part
22  B recipients who may have taken the subject drugs,

Page 96

1   but in Massachusetts they were also interested in
2   non-Medicare recipients.
3       Q.   You know, you must have been kind of in
4   receive mode, and Renee was telling you about
5   what's going on?
6           MR. NOTARGIACOMO:  Objection.  You can
7   answer the question.
8       Q.   Is that accurate?
9       A.   Yes.
10      Q.   The next paragraph then says, "PAL needs
11  your help to identify individuals on Medicare who
12  have paid for certain drugs that are administered
13  in a doctor's office or in a hospital."
14          Do you see that?
15      A.   Yes.
16      Q.   Did you and Renee discuss that?
17      A.   Yes.
18      Q.   Okay.  Did you then attempt to identify
19  individuals on Medicare, that is, Health Care For
20  All?
21      A.   Yes, we attempted to identify people on
22  Medicare and people not on Medicare.

Page 97

1       Q.   And how did you do that?
2       A.   By -- as I mentioned earlier, we sent an
3   e-mail out to our members and other people in our
4   database.  We posted it on our website, and we
5   reached out to groups like AARP, Mass. Senior
6   Action Coalition and other senior advocacy
7   organizations that we work with.
8       Q.   But none of your individual members,
9   none of the Health Care For All members?
10      A.   We did send an e-mail to them.  I didn't
11  discuss drug use with any members in particular.
12      Q.   The next paragraph says, "Because the
13  AWP case is one of the most important challenges
14  to drug company greed going on in this country
15  today, PAL attorneys are making grants available
16  to certain groups that can help identify people
17  who might be eligible to join the case.  Health
18  Care For All has been selected as a possible grant
19  recipient because of its past involvement in PAL
20  and its ability to mobilize potential plaintiffs."
21          Do you see that?
22      A.   Yes.

25 (Pages 94 to 97)

Shannon, Melissa D.                                                                May 23, 2006
Cambridge, MA

Page 98

1    Q.   Did you have a conversation with Renee
2    about what he meant by "grants"?
3    A.   Yes.
4    Q.   What did he say?
5    A.   What -- she.
6    Q.   What she meant, I'm sorry.
7    A.   She told me that there would be money
8    available to help us cover the costs of these
9    types of outreach efforts which can be pretty
10   labor-intensive.
11   Q.   How much money was available?
12   A.   We ended up receiving $10,000.
13   Q.   Who did you receive $10,000 from?
14   A.   The money came through PAL from Hagens
15   Berman.
16   Q.   When did that occur?
17   A.   I don't know exactly when the money was
18   received.  I assume it would be within a month or
19   two of this e-mail.
20   Q.   Did Hagens Berman write a check to PAL
21   and PAL write a check to you?
22   A.   You would have to ask our CFO that

Page 99

1    question.
2    Q.   Did you --
3    A.   I didn't see any checks or -- you know,
4    I wasn't party to any money being changed hands
5    (sic) except to write a proposal and to lead the
6    outreach effort.
7    Q.   But you believe that $10,000 was paid to
8    Health Care For All?
9    A.   I do.
10   Q.   The next sentence says, "I will be
11   calling you later today to discuss this proposal
12   in further detail and to talk about your ideas for
13   reaching out to your constituents over the coming
14   month."
15       Did you and Renee have this
16   conversation?
17   A.   We did.
18   Q.   Was it that day?
19   A.   Probably, yes.  Things were moving very
20   quickly at that point in time.
21       (Exhibit Shannon 010, Handwritten
22   document, Bates No. AWP-HCFA-000056, marked for

Page 100

1    identification.)
2    Q.   Let me show you what's been marked as
3    Deposition Exhibit Shannon 010.
4        MR. JACKSON:  I only have one copy of
5    that, Ed.
6    Q.   Deposition Exhibit Shannon 010 has a
7    Bates number of 000056, bottom right-hand corner.
8    Do you see that?
9    A.   I do.
10   Q.   Was this produced from Health Care For
11   All's records?
12   A.   Yes.
13   Q.   Is this your handwriting?
14   A.   It is.
15   Q.   At the top it says "AHP Report"?
16   A.   Yeah, totally unrelated.
17   Q.   Okay.  How about the next -- underneath
18   the line it says "Renee" and "AWP"?
19   A.   Yeah.  Just to be clear, this was
20   probably from a note pad I kept at my desk.  The
21   AHP information wasn't very important, so when I,
22   you know, ripped off this page of the note pad and

Page 101

1    put it into my AWP file, AHP refers to associated
2    health plans which is a totally unrelated subject
3    I work on.
4    Q.   Is that your practice when you take
5    notes regarding a matter, that you'll rip it off
6    your pad and put it in a file?
7    A.   Yes, if I think it's something important
8    that I wouldn't naturally remember.
9    Q.   I'm going to try to read some of your
10   handwriting, and let me know if I'm wrong.  And
11   there will be times when I ask you to read it.
12   It's much better than mine, I might say.
13   A.   It's pretty bad.
14   Q.   It says, "AWP - HCFA was a plaintiff in
15   2001.  Medicare switched to ASP."
16       What's that mean?
17   A.   I don't know.  I don't remember.  That
18   Medicare moved away from AWP to another mechanism
19   to determine price, I assume, but I don't recall
20   what ASP stands for.
21   Q.   Is this the information that you had
22   prior to your call with Renee, or is this

26 (Pages 98 to 101)

Page 102

1  information that Renee provided to you during your
2  call?
3      A.  A combination of both.  I don't think
4  that was the first time I had been told that
5  Medicare switched away from AWP, but, you know,
6  she may have been reminding me of some things and
7  that's why I was writing them down.
8      Q.  Okay.  The next says, "AWP" -- can you
9  read the next line for me?
10     A.  I think that that says, "AWP is a faulty
11  price system, causing people to overpay."
12     Q.  Okay.  And is that --
13     A.  And just for the record, this is me
14  probably paraphrasing what I'm hearing from Renee.
15     Q.  Understand.  That was going to be my
16  question.
17     A.  Okay.  I don't know that she used those
18  words.  You know, she probably used many more
19  words, and I was taking short notes.
20     Q.  Okay.  The next line says, "Judge
21  changed the class."  What's the word after that?
22     A.  "Particularly," and then I didn't finish

Page 103

1  that thought.
2      Q.  Okay.  What's the next line say?
3      A.  "Hagens Berman made money available."
4      Q.  Okay.  Can you continue to read that
5  paragraph for me just to make sure, and then I'll
6  come back and ask you about it.
7      A.  "Hagens Berman made money available.
8  $10,000 45 to 60 days of work - supervision."
9          I assume that implies that I'll be
10  supervising the -- that I would be responsible for
11  supervising the outreach team.
12     Q.  You, Melissa?
13     A.  Me, Melissa.
14     Q.  Okay.
15     A.  "What could groups do outside the norm
16  to reach out to plaintiffs as possible."
17         I think that means possible plaintiffs.
18     Q.  Okay.  Keep reading, if you would.
19     A.  Some ideas at -- it doesn't say "some
20  ideas" there --
21     Q.  But --
22     A.  -- but just what it says here, "Ads in

Page 104

1  newspaper, newsletter, special meetings, phone
2  banking.  Looking for extraordinary effort."
3      Q.  Keep reading, and then we'll come back
4  and ask you about that.
5      A.  "As many plaintiffs as possible.
6  Medicare Part B drugs, cancer drugs mostly.  All
7  or part of 20 percent co-pay, could be in doctor's
8  office or hospital."  The word "Taxol" is written
9  there, T-A-X-O-L.  I'm not sure why.  And "Seniors
10  or disabled."
11     Q.  Now, going back up to where it says
12  "Hagens Berman made dollars available.  10,000 45
13  to 60 days of work," was there some specific task
14  that Hagens Berman asked Health Care For All to
15  perform for the $10,000?
16     A.  No.  I was encouraged by Renee to write
17  an application to receive the monies outlining
18  what we thought we could do to reach out to find
19  potential plaintiffs in a lawsuit.
20     Q.  Did you do that?
21     A.  Yes.
22     Q.  Did you send that document to Renee or

Page 105

1  to Hagens Berman?
2      A.  I sent it to Renee.  I believe she sent
3  it on to Hagens Berman, and we did produce it.
4      Q.  For the record, I don't think I've seen
5  any proposal, but we'll go through the documents,
6  and if you see it, what you think is the proposal,
7  that would be great.
8          You think you collected it during your
9  collection process?
10     A.  Yes.
11     Q.  Can you tell me about the document?  Is
12  it two pages?  Is it 22 pages?  What can you
13  remember?
14     A.  It's two pages, or three, something in
15  that neighborhood.
16     Q.  And in that document did you outline
17  what it is Health Care For All proposed to do?
18     A.  Yes.
19     Q.  And can you describe basically what it
20  is Health Care For All proposed to do?
21     A.  Sure.  We proposed to reach out to our
22  members, to reach out to advocacy groups that we

27 (Pages 102 to 105)

Page 178

1    Q.   Pearson?
2    A.   Uh-huh.
3    Q.   Do you know what that person was asking
4    about?
5    A.   He had taken albuterol and had paid for
6    some of it out of pocket.  I thought he might
7    qualify as a plaintiff.
8    Q.   Did he?
9    A.   No.
10   Q.   Why; do you know?
11   A.   Because it wasn't physician-
12   administered.
13           (Exhibit Shannon 029, E-mail dated
14   April 26, 2006, Bates Nos. AWP-HCFA-000059 - 82,
15   marked for identification.)
16   Q.   Let me show you what's been marked as
17   Deposition Exhibit Shannon 029.  Deposition
18   Exhibit Shannon 029 was produced to us by Health
19   Care For All in response to the subpoena.  This is
20   Bates pages 000059 through 82.  Have you seen this
21   document before?
22   A.   Yes.

Page 179

1    Q.   What is this document?
2    A.   There's an organization called a
3    National Legislative Association on Prescription
4    Drug Pricing run out of Vermont, and the woman who
5    runs it, Sharon Treat, sends out a weekly e-mail
6    of news in the field of prescription drug pricing,
7    development in state legislation and some
8    information about lawsuits, mostly state
9    legislation, or developments in the different
10   states.
11   Q.   And by this was she just forwarding
12   information, kind of random related information
13   that they would track routinely?
14   A.   Yes.
15   Q.   Did you and she have any conversation
16   about the AWP litigation in response to this?
17   A.   None at all.
18   Q.   Have you ever?
19   A.   I've never spoken with her about the AWP
20   litigation.
21   Q.   All right.  Let me return your attention
22   to Exhibit Shannon 001, the subpoena, Attachment

Page 180

1    A, which is the third page of the document, "Areas
2    of Inquiry."  We discussed Health Care For All's
3    structure, history, membership and funding, but
4    you produced no documents relating to that; is
5    that correct?
6    A.   That's correct.
7    Q.   And if you turn the page, we asked for
8    information relating to prices paid by Health Care
9    For All, its members --
10   A.   Sorry, what number?
11   Q.   13, I'm sorry.
12   A.   You might have said that.  Okay.
13   Q.   Prices paid by Health Care For All, its
14   members or anyone else for prescription drugs, and
15   you produced none of that information, correct?
16   A.   That's correct.  We don't collect that
17   information.
18   Q.   And you haven't collected that
19   information for purposes of this litigation as
20   well?
21   A.   That's correct.
22   Q.   And just to make sure, you didn't

Page 181

1    contact and ask for your members' information
2    regarding drugs used or how they were -- whether -
3    - how any paid for their drugs or whether there
4    was any reimbursement, correct?
5    A.   Unless they were a plaintiff in a
6    different lawsuit, no.
7    Q.   But as to the AWP litigation, the
8    answer's no?
9    A.   That's correct.
10   Q.   No. 21 -- I'm sorry, No. 18, as to
11   information regarding the injury suffered by
12   Health Care For All, you've produced no documents
13   relating to that.  How has Health Care For All
14   been injured as a result of the complaints in the
15   AWP litigation?
16   A.   Health Care For All itself doesn't --
17   isn't claiming any damages and doesn't have any.
18   We are concerned --
19   Q.   Doesn't have any injury?
20   A.   Any injury.
21   Q.   Okay.
22   A.   As an organization we're concerned, as I

46 (Pages 178 to 181)

# EXHIBIT 36



E-SERVED
09/03/04
07:56 PM ET
MDL No. 1456

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

IN RE PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE LITIGATION )
                               )
——————————————————— )

THIS DOCUMENT RELATES TO ALL )
CLASS ACTIONS )
01-CV-12257-PBS AND 01-CV-339 )
——————————————————— )

MDL No. 1456

CIVIL ACTION:  01-CV-12257-PBS

Judge Patti B. Saris

Chief Magistrate Judge Marianne B. Bowler

**[PROPOSED] ORDER GRANTING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

       Plaintiffs have moved, pursuant to Fed. R. Civ. P. 23, for an order certifying a class in

this action.  Having considered the submissions of the parties and the record in this case, IT IS

HEREBY ORDERED as follows:

       1.     Plaintiffs' motion for class certification is GRANTED as to all claims asserted in

the Amended Master Consolidated Complaint ("AMCC").

       2.     The Court certifies the following Classes:

       **Medicare Part B Co-Pay Class.**

       All persons or entities who made a co-payment for a Medicare
       Part B covered AWPID manufactured by AstraZeneca, the BMS
       Group, the GSK Group, the Johnson & Johnson Group, and the
       Schering Plough Group.[1]  Excluded from the Class are those who
       make flat co-pays and those whose co-pay was reimbursed by an
       insurer or other third party.

---

[1]  These "groups" are defined in the AMCC.

- 1 -



**Third-Party and Co-Payor Class.**

Third Party Payors who make reimbursements for any AWPID manufactured by AstraZeneca, the BMS Group, the GSK Group, the Johnson & Johnson Group, and the Schering Plough Group under contracts with persons or entities that provide pharmaceutical benefits, based on contracts that expressly use AWP as a pricing standard. Included within the Class are individual payors who paid coinsurance (*i.e.,* co-pays proportional to the reimbursed amount) for an AWPID that was based upon use of AWP as a pricing standard.

**RICO Subclass.**

Third-Party Payors who made reimbursements for any AWPID manufactured by AstraZeneca, the BMS Group, the Johnson & Johnson Group, the GSK Group, or the Schering Plough Group under contracts with any of the following PBMs, Caremark, AdvancePCS, Express Scripts and Medco (or their predecessors), where the contracts with the PBMs expressly use AWP as a pricing standard.

3.    The Court certifies a RICO Subclass under Count II of the AMCC (violation of

the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ["RICO"], Count

IV of the AMCC (violation of State Consumer Protection Laws) and under Count IX (The Law

of Civil Conspiracy).

4.    The Court also certifies a Medicare Part B Co-Pay Class and Third-Party and Co-

Payor Class under Count IV (State Consumer Protection Laws). The Court will apply the state

law of each Defendant's home state. The parties will report to the Court as to what states are

home states and such states will be identified in the notice sent to the Class.

5.    Excluded from these classes are the defendants herein; any subsidiaries or

affiliates of defendants; the officers and directors of defendants during the Class Period;

members of the Individual Defendants' immediate families; any person, firm, trust, corporation,

officer, director or any individual or entity in which any defendant has a controlling interest or

- 2 -



which is related to, or affiliated with, any of the defendants; and the legal representatives, agents,

affiliates, heirs, successors-in-interest or assigns of any such excluded party and governmental

entities.

6.      The Class Period is 1991 to the present.

7.      The Court also certifies the Plaintiffs as Class Representatives.  Pursuant to Fed.

R. Civ. P. 23(g), the Court appoints the following firms as co-lead counsel:  Hagens Berman

LLP, Spector Roseman & Kodroff P.C., Hoffman & Edelson, The Wexler Firm, Hein Mills &

Olson.

8.      Co-lead counsel for Plaintiffs shall prepare and submit within 30 days from the

date of this Order a proposed form of notice to be sent to members of the Class.  Defendants may

file any comments to the notice within 15 days and Plaintiffs may reply 15 days after.

9.      The Court approves the notice program prepared by Kinsella/Novak.  Defendants

shall prepare and submit to the Court and to counsel for the Plaintiffs within 30 days from the

date of this Order a list of names and addresses of all Class members who can be identified with

diligent effort.

DONE IN COURT this _____ day of _____, 2004.

_____
HON. PATTI B. SARIS
United States District Court



## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on September 3, 2004, a copy to Verilaw Technologies for Posting and notification to all parties

By

Steve W. Berman
**HAGENS BERMAN LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292

- 4 -

# EXHIBIT 37



**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

IN RE PHARMACEUTICAL INDUSTRY )
AVERAGE WHOLESALE PRICE LITIGATION )
                            )
_____ )
                            )
THIS DOCUMENT RELATES TO )
ALL CLASS ACTIONS )
                            )
_____ )

MDL No. 1456

CIVIL ACTION:  01-CV-12257-PBS

Judge Patti B. Saris

Chief Magistrate Judge Marianne B. Bowler

**[PROPOSED] ORDER GRANTING PLAINTIFFS'
AMENDED MOTION FOR CLASS CERTIFICATION**

Plaintiffs have moved, pursuant to Fed. R. Civ. P. 23, for an order certifying a class in this action.  Having considered the submissions of the parties and the record in this case, IT IS HEREBY ORDERED as follows:

1.     Plaintiffs' amended motion for class certification is GRANTED as to all claims asserted in the Amended Master Consolidated Complaint ("AMCC").

2.     The Court certifies the following Classes with respect to AWPIDs manufactured by AstraZeneca, the BMS Group, the GSK Group, the Johnson & Johnson Group, and the Schering-Plough Group:

> **Physician-Administered Drugs Class (Medicare Part B Co-Pay
> and Private System Physician-Administered Drugs)**
>
> All persons or entities in the United States and its territories who
> (i) paid all or a portion of the co-insurance under Medicare Part B
> for an AWPID during the Class Period, and/or (ii) reimbursed
> another for a physician-administered AWPID under a contract that
> expressly uses AWP as a pricing standard, along with all

- 1 -



individual persons who paid coinsurance (*i.e.*, co-pays proportional
to the reimbursed amount) under such contracts for such AWPIDs,
during the Class Period. Excluded from the Class are those who
make flat co-pays and those whose co-pay was reimbursed by an
insurer or other third party.

### Self-Administered and Specialty Pharmacy Drugs Class (Third-Party and Co-Payor Class for Self-Administered Drugs)

All persons or entities in the United States and its territories who
reimbursed another for any self-administered AWPID, or for any
AWPID which was distributed through a specialty pharmacy,
under a contract that expressly uses AWP as a pricing standard,
along with all individual persons who paid coinsurance (*i.e.*,
co-pays proportional to the reimbursed amount) under such
contracts for such AWPIDs. Excluded from the Class are those
who make flat co-pays and those whose co-pay was reimbursed by
an insurer or other third party.

The foregoing class is further subdivided into the following
subclasses:

(a)     brand name sub-class; and

(b)     generic drug sub-class

### RICO Class for Self-Administered and Specialty Drugs

All persons or entities in the United States and its territories who
reimbursed another for any self-administered AWPID, or for any
AWPID which was distributed through a specialty pharmacy,
under a contract with Caremark, AdvancePCS, Express Scripts
and/or Medco (or their predecessors), which contract expressly
uses AWP as pricing standard, along with all individual persons
who paid coinsurance (*i.e.*, co-pays proportional to the reimbursed
amount) under such contracts for such AWPIDs. Excluded from
the Class are those who make flat co-pays and those whose co-pay
was reimbursed by an insurer or other third party.

The foregoing class is further subdivided into the following
subclasses:

(a)     brand name sub-class; and

(b)     generic the sub-class

- 2 -



3.      The Class Period is January 1991 to the present.

4.      Excluded from these classes are the defendants herein; any subsidiaries or affiliates of defendants; the officers and directors of defendants during the Class Period; members of the Individual Defendants' immediate families; any person, firm, trust, corporation, officer, director or any individual or entity in which any defendant has a controlling interest or which is related to, or affiliated with, any of the defendants; and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party and governmental entities with respect to claims asserted for governmental damages.

5.      Plaintiffs seek certification of the RICO Class for Self-Administered and Specialty Drugs under Count II of the AMCC (Violation of the Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ["RICO"], and under Count IX (The Law of Civil Conspiracy).

6.      Plaintiffs seek certification of the Physician-Administered Drugs Class, and Self-Administered and Specialty Pharmacy Drugs Class under Count IV of the AMCC (Violation of Sate Consumer Protection Laws).  The Court will apply the state law of each Defendants' home state.  The parties will report to the Court as to what states are home states and such states will be identified in the notice sent to the Class.

7.      The Court also certifies the Plaintiffs as Class Representatives.  Pursuant to Fed. R. Civ. P. 23(g), the Court appoints the following firms as co-lead counsel:  Hagens Berman LLP, Spector Roseman & Kodroff P.C., Hoffman & Edelson, The Wexler Firm, and Hein Mills & Olson.

- 3 -



8.      Co-lead counsel for Plaintiffs shall prepare and submit within 30 days from the date of this Order a proposed form of notice to be sent to members of the Class.  Defendants may file any comments to the notice within 15 days and Plaintiffs may reply 15 days after.

9.      The Court approves the notice program prepared by Kinsella/Novak.  Defendants shall prepare and submit to the Court and to counsel for the Plaintiffs within 30 days from the date of this Order a list of names and addresses of all Class members who can be identified with diligent effort.

DONE IN COURT this _____ day of _____, 2004.


_____
HON. PATTI B. SARIS
United States District Court

- 4 -



## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **[PROPOSED] ORDER GRANTING PLAINTIFFS' AMENDED MOTION FOR CLASS CERTIFICATION** to be electronically filed with the Court pursuant to the December 16, 2004 Order and to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on December 17, 2004 a copy to Verilaw Technologies for posting and notification to all parties.

By_____ **/s/ Steve W. Berman**_____
Steve W. Berman
**HAGENS BERMAN LLP**
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594

- 5 -