# Exhibit 42



**Blue Cross and Blue Shield of Massachusetts, Inc.**
**HMO Blue Products**
**Group Primary Care Physician Agreement**

This Agreement is entered into between Blue Cross and Blue Shield of Massachusetts, Inc. ("the Plan"), an independent licensee of the Blue Cross and Blue Shield Association, on behalf of the Plan's HMO Blue Products as described below, and _____ Group"), a corporation organized and operated for the purpose of providing health services to its patients.

Whereas, the Plan and the Group mutually desire to enter into an agreement in which the Plan will provide certain administrative services, and the Group will provide primary health care services and arrange to have specialty health care services provided to Members;

Now therefore, in consideration of the mutual promises contained in this Agreement, the parties agree to the following:

## 1.    Definitions

1.1.    **Account** means an entity that has entered into a contract with the Plan pursuant to which the Plan provides or administers benefits for that entity's current or former employees and their dependents.

1.2.    **Agreement** means this Agreement and any subsequent amendments and revisions made to this Agreement by mutual consent of the Plan and the Group or by the Plan as provided for in this Agreement.

1.3.    **Allowable Fee** means, for any Covered Service provided by a Group Primary Care Physician, the amount of the Physician Payment Benefit for the Covered Service, reduced by the amount of any Member Copayment.

1.4.    **Copayment** means a payment that a Member is responsible for making directly to a provider pursuant to the terms of his/her Member Contract. Copayments may include any applicable coinsurance or deductibles.

1.5.    **Covered Services** means the health care services which a Member is entitled to receive through the Plan if such services are: (1) included in the applicable Member Contract; (2) determined by the Plan or the Plan's designee to be Medically Necessary, covered by the Plan's medical policy, and not experimental in nature; (3) initiated pursuant to a referral from a Plan Primary Care Physician if such referral is required by the Plan's policies or

procedures; (4) properly authorized for payment by the Plan in accordance with the applicable Member Contract, this Agreement, and other Plan policies and procedures; and (5) provided by a credentialed or privileged provider if such credentialing or privileging is required by the Plan.

1.6.   **Effective Date** means the date the Agreement goes into effect.  The Effective Date is set forth by the Plan on the signature page of this Agreement.

1.7.   **Emergency Services** means those Covered Services, inpatient and outpatient, that are furnished by a provider qualified to furnish emergency services and needed to evaluate or stabilize an emergency medical condition.

1.8.   **Emergency Medical Condition** means a medical condition that manifests itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson who possesses an average knowledge of health and medicine could reasonably expect the absence of immediate medical attention to result in placing the health of the individual or an unborn child in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.

1.9.   **Fee Schedule** means the list of fees corresponding to Covered Services rendered to Members paid by the Plan to the Group, as applicable to a particular HMO Blue Product. The list of fees included on the Fee Schedule may differ for different HMO Blue Products.  The Fee Schedule is established from time to time by the Plan.

1.10.  **Group Primary Care Physician** means a Plan Primary Care Physician who is a member in good standing of the Group and has been accepted by the Plan to participate under this Agreement.

1.11.  **Late Claims** mean claims submitted more than ninety (90) days after the date of service.

1.12.  **Medically Necessary** care means health care that is required to diagnose or treat a Member's illness, injury, symptom, or complaint and:

- is consistent with the diagnosis and treatment of the Member's condition and is provided in accordance with generally accepted medical practice and the Plan's medical policy and medical technology assessment guidelines;

- is essential to improve the Member's net health outcome and is as beneficial as any established alternatives covered under this Agreement;

- is as cost-effective as any established alternatives and requires the level of skilled services that are furnished; and

- is furnished in the least intensive type of medical care setting required by the Member's medical condition.

The Plan determines if a treatment, service, supply, or drug is Medically Necessary for the Member. When required by HCFA, the Plan will use Medicare guidelines to determine whether a treatment, service, supply, or drug is Medically Necessary. Inclusion of a procedure on the Fee Schedule shall not be considered a determination that the procedure is Medically Necessary in all circumstances.

1.13.   **Medical Management Program** means the utilization management policies and procedures described in the Member's Contract, this Agreement, the Physician Administrative Manual, or as otherwise instituted by the Plan.

1.14.   **Medicare Related Products** means products such as, but not limited to, Managed Blue for Seniors but does not include any Medicare Risk Products .

1.15.   **Member** means any individual who is eligible to receive Covered Services from the Plan including, but not limited to:  (1) individuals and their dependents enrolled through an Account or on an individual basis, or through the Plan's agreements with government agencies, or (2) any member of a plan or program with which the Plan has entered into a reciprocity or similar arrangement.

1.16.   **Member Contract** means the description of Covered Services a Member is entitled to, including the application, the subscriber certificate, any amendments to the subscriber certificate, and any special agreement required by Accounts or government agencies, in force at any time during the term of this Agreement that the Member will be furnished any Covered Service by the Group or Group Primary Care Physician. A copy of the Member Contract is available upon request.

1.17.   **Physician Administrative Manual** means the Plan's *blue book for physicians' offices*, as amended by the Plan from time to time, that sets forth many of the Plan's policies, procedures, rules, and guidelines for Plan Primary Care Physicians and Specialty Care Physicians. The Physician Administrative Manual is incorporated herein by reference.

1.18.   **Physician Incentive Plan** shall mean any compensation arrangement that may directly or indirectly have the effect of reducing or limiting services furnished to Members as set forth in 42 CFR 417.479 or any successor provisions, as amended from time to time, or in

any other federal or state law or regulation that may include in its scope physician incentive plans that cover Members.

1.19.   **Physician Payment Benefit** means, for any Covered Service provided by a Group Primary Care Physician, the lesser of the Group Primary Care Physician's charge for the Covered Service or the amount of the fee for the Covered Service listed on the Fee Schedule as in effect at the time the service was rendered. The Physician Payment Benefit for a Covered Service is equal to the sum of the Plan's Allowable Fee for the Covered Service plus the amount of the Member's Copayment.

1.20.   **Plan Panel** means those Members who are registered with a particular Group Primary Care Physician and for whose care that Group Primary Care Physician is responsible, pursuant to this Agreement.

1.21.   **Plan Primary Care Physician** means a physician practicing in the specialty of internal medicine, family practice, or pediatrics who has been accepted by the Plan to participate in HMO Blue products and who has entered into an Agreement with the Plan, such that he/she is responsible for supervising, coordinating, and rendering initial and all primary physician Covered Services to Members of his/her Plan Panel, initiating referrals to other Plan Providers, and coordinating all medical care for those Members.

1.22.   **Plan Provider** means a professional, institutional, or ancillary health care provider who/that has a written payment agreement with the Plan to provide Covered Services to Members.

1.23.   **Product** means a health benefit plan offered by the Plan to Members either directly, through an Account, or through a governmental sponsor.

1.24.   **Service Area** means the geographic area within which the Member shall receive Covered Services other than Urgently Needed Services or Emergency Services that are required when a Member is located outside of the Service Area, or certain specialty services recommended by the Member's Group Primary Care Physician and authorized in advance by the Plan.

1.25.   **Specialty Care Physician** means a physician who specializes in a medical practice or subspecialty other than, or in addition to, those listed in the definition of Plan Primary Care Physician and who has entered into an Agreement with the Plan such that he/she, pursuant to a referral by a Group Primary Care Physician or the Plan as set forth in the Physician Administrative Manual or other Plan policy, is responsible for rendering specialty physician Covered Services to a Member.

1.26.   **Urgently Needed Services** means those Covered Services that are Medically Necessary and immediately required in order to prevent serious deterioration of a Member's health that results from an unforeseen illness, condition or injury when the Member is temporarily absent from the Service Area (or, under unusual and extraordinary circumstances, provided when the Member is in the Service Area but the Plan's provider network is temporarily unavailable or inaccessible) and that cannot be delayed until the Member returns to the Service Area, as determined by the Plan.

## 2.   Scope of Participation

2.1.   **Covered Products.** This Agreement applies to HMO Blue Products currently offered by the Plan and all HMO Blue Products offered by the Plan at any time during the term of this Agreement, subject to the limitations set forth in this section. Current HMO Blue Products include, but are not limited to: HMO Blue, Network Blue, and HMO Blue New England; HMO Blue associated Point of Service (POS) Products (Blue Choice and Blue Choice New England); and HMO Blue associated Medicare Related Products. This Agreement does not apply to HMO Blue Medicare Risk Products or Medicare+Choice Products.

The Group understands and accepts that some or all of the programs associated with these Products may involve limited networks. Because of this, the Group's consent to participate in these Products does not guarantee inclusion in all networks.

2.2.   **Product Participation.** The Group acknowledges that: (1) participation in any POS or preferred provider arrangement (PPA) Products licensed under G.L. c.176I is not conditioned on participation in any other Product, (2) the Group and each Group Primary Care Physician has freely chosen to participate in these G.L. c.176I Products, and (3) all Group Primary Care Physicians have agreed to participate in all HMO Blue Products covered by this Agreement.

2.3.   **New Offerings.** The Plan reserves the right to offer other Products and programs licensed or administered under G.L. c.176G or G.L. c.176I during the term(s) of this Agreement ("New Offering(s)"). The Plan will give the Group ninety (90) days prior written notice of such New Offerings, and the Group will have ninety (90) days to opt out of participation in such New Offerings licensed or administered under G.L. c.176I, upon written notice to the Plan. Such notice not to participate in any New Offering licensed or administered under G.L. c.176I will have no effect on the Group's participation in this Agreement. The parties further agree that each New Offering licensed or administered under G.L. c.176I will constitute a separate contractual agreement with the Plan, and that

the terms and conditions of this Agreement will apply to any New Offering, unless and until the Plan notifies the Group otherwise in writing. The Plan reserves the right to create or revise policies and procedures in order to accommodate any New Offering upon ninety (90) days prior written notice to the Group. Moreover, the Group understands and accepts that some or all of the New Offerings may involve limited networks. Because of this, the Group's consent to participate in these New Offerings does not guarantee inclusion in all New Offerings networks.

2.4.   **Independent Contracting.** The Group hereby expressly acknowledges its understanding that this Agreement constitutes a contract between the Group and the Plan and that the Plan is an independent corporation operating under a license from the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans ("Association"), permitting the Plan to use the Blue Cross and Blue Shield service marks in the Plan's Service Area, and that the Plan is not contracting as the agent of the Association. The Group further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than the Plan and that no other person, entity, or organization other than the Plan shall be held accountable or liable to the Group for any of the Plan's obligations to the Group created under this Agreement. This paragraph shall not create any obligations whatsoever on the part of the Plan other than those obligations created under other provisions of this Agreement.

## 3.   Physician Participation

3.1.   **Binding Authority.** The Group represents and warrants to the Plan that the Group has full and complete authority to bind its Group Primary Care Physicians to the terms and conditions of this Agreement for Covered Services provided under this Agreement. Unless the Group provides the signature of each Group Primary Care Physician on the "Group Primary Care Physician Attachment" (Appendix A), the Group shall provide evidence of the legal relationship between the Group and each Group Primary Care Physician and the binding authority over each Group Primary Care Physician prior to inclusion of such Group Primary Care Physician in this Agreement. If requested, the Group shall provide to the Plan sample copies of any agreements executed between the Group and Group Primary Care Physicians. All evidence provided by the Group must be acceptable to the Plan as sufficient to meet the requirements of the Plan, including any requirements imposed by governmental agencies.

In each case where authority to bind the Group Primary Care Physicians to this Agreement is granted through the signature of each Group Primary Care Physician, each Group Primary Care Physician shall complete and sign Appendix A ("Group Primary Care Physician Attachment"). Furthermore, in each case where such authority is granted

through the signature of each Group Primary Care Physician, the Group shall cause each new Group Primary Care Physician to sign the "Group Primary Care Physician Attachment" prior to the date that such new Group Primary Care Physician is included in this Agreement.

The Plan may, at its discretion, allow the Group to submit other documentation, approved in advance by the Plan, to identify and bind its Group Primary Care Physicians to be covered under this Agreement. Such other documentation must clearly demonstrate the relationship between the Group and the Group Primary Care Physicians to the satisfaction of the Plan and must be submitted with all necessary supporting information as required by the Plan to implement this Agreement.

No physician will be covered by this Agreement until he/she has been fully credentialed by the Plan, approved by the Plan for participation in HMO Blue, and approved by the Plan for participation under this Agreement.

3.2.   **Notice of Change in Group or Group Primary Care Physician Status.**  The Group shall send written notice to the Plan of any change in legal or beneficial ownership ninety (90) days before such change will occur. Furthermore, the Group shall send written notice to the Plan of any change in either the Group's or a Group Primary Care Physician's name, location address or mailing address ninety (90) days before such change will occur. The Group will provide ninety (90) days prior written notice to the Plan of the intention of any Group Primary Care Physician to terminate or otherwise alter his/her participation in the Group and thus in this Agreement. In every case where the Group Primary Care Physician's contract with the Group allows for an opt out or immediate termination, the Group shall provide immediate written notification to the Plan of any Group Primary Care Physician who has exercised the opt out or immediate termination option in his/her agreement with the Group.

3.3.   **Removal of Group Primary Care Physicians.**  In the event the Group wishes to terminate a Group Primary Care Physician from participation in this Agreement, the Group must inform the Plan of such decision and obtain the approval of the Plan prior to effectuating such termination. The Plan shall not withhold or delay approval unreasonably, provided that nothing in this Agreement shall preclude the Group generally from terminating the employment or engagement of Group Primary Care Physicians. The Group shall provide the Plan with thirty (30) days prior written notice of the termination of employment or engagement of any Group Primary Care Physician.

3.4.   **Physician Participation Outside of the Group.**  In the event a Group Primary Care Physician elects to disassociate from the Group, the Group agrees that the Plan shall have

the right, but not the obligation, to contract with that physician outside of the auspices of this Agreement.

3.5.   **Compensation to the Group on Behalf of Group Primary Care Physicians.** The Group shall be solely financially responsible for compensation to Group Primary Care Physicians. The Group agrees that all compensation by the Plan to the Group on behalf of Group Primary Care Physicians shall be paid by the Group to each Group Primary Care Physician in accordance with the terms of the applicable agreement between the Group and the Group Primary Care Physician. The Group shall, jointly and severally, hold the Plan harmless and indemnify the Plan against any claim by a Group Primary Care Physician for compensation for services rendered pursuant to this Agreement.

## 4.   Obligations of the Group

4.1.   **Contractual Status of the Group.** The Group agrees and shall cause each Group Primary Care Physician to agree to perform all of the obligations set out in this Agreement. The parties agree that the term "Group" as used in this Agreement means the Group and each individual Group Primary Care Physician, each of whom expressly shall be bound by the terms of this Agreement.

4.2.   **Legal Status of the Group.** The Group shall perform its obligations under this Agreement through duly adopted articles of organization, bylaws, rules, legal requirements imposed by federal, state, or local statute or regulation, and other written corporate standards or policies applicable to the Group or the individual corporate entities making up the Group. The Group shall make written materials demonstrating the Group's legal status available to the Plan at the Plan's request.

4.3.   **Physician Services.** The Group agrees that the Group Primary Care Physicians are bound by all the terms and conditions of this Agreement and shall ensure that its Group Primary Care Physicians provide Covered Services to Members included under this Agreement in accordance with this Agreement. The Group shall provide the Plan with all information required to allow the Plan to effectively administer those aspects of the Agreement which call for monitoring of Group Primary Care Physicians on an individualized basis.

4.4.   **Credentialing of Physicians.** This Agreement shall not take effect with respect to any particular physician unless and until that physician has been credentialed and accepted by the Plan for participation in HMO Blue Products. Further, the Plan reserves the right to terminate any Group Primary Care Physicians from participation under this Agreement

for failure to meet the Plan's recredentialing criteria. The Plan will credential and recredential physicians according to the Plan's credentialing and recredentialing criteria.

4.4.1. **Credentialing Information.** The Group shall assist the Plan in obtaining all necessary application, credentialing, and recredentialing materials requested by the Plan of Group Primary Care Physicians and physicians not yet accepted under this Agreement. The Group shall obtain any authorizations for release of information for such credentialing purposes and submit information required for recredentialing within time frames established by the Plan.

4.4.2. **Review of Information.** A Group Primary Care Physician may review information used by the Plan to evaluate credentialing applications of Group Primary Care Physicians, provided that information has not been designated by law, regulation, or the Plan as protected under the peer review process.

4.5. **Provision of Covered Services to Members.** The Group Primary Care Physician shall provide or manage the health care services and benefits program for Members who are in his/her Plan Panel. Covered Services shall be provided in accordance with generally accepted standards of sound patient care, the terms and conditions of this Agreement, and in accordance with applicable state and federal laws and regulations. To the extent permitted under his/her license, the Group Primary Care Physician shall be responsible for providing proper care and treatment for all of his/her patients. The Group Primary Care Physician shall use his/her own independent judgment as to the proper course of care or treatment of his/her patients without regard to any agreement, provision, or understanding with the Plan, whether expressed or by implication, contained herein or elsewhere. The Group and Group Primary Care Physicians shall communicate freely with patients regarding all available treatment options, without regard to any benefit coverage issues imposed by the Plan. The Group further acknowledges and agrees that no Plan agreement, provision, understanding, rule, or policy, whether expressed or by implication, contained herein or elsewhere shall be construed in a manner so as to conflict with any applicable standard of proper medical care, treatment, or course of conduct by the Group or by any member of its staff. The Group and Group Primary Care Physicians shall provide the same quality of care to Members as is provided to their other patients. The Group acknowledges that the Plan makes no representations as to the health status of its Members.

4.6. **Group Participation.** The Group shall arrange for a sufficient number of Group Primary Care Physicians to serve the needs of Members who want to choose a Group Primary Care Physician. At least seventy-five percent (75%) of Group primary care

physicians shall participate in HMO Blue Products not licensed or administered under G.L. 176I.

4.7.   **Plan Panel Size.** Each Group Primary Care Physician shall accommodate a Plan Panel of at least one hundred and fifty (150) Members unless his/her practice is closed to all patients covered by all payers. The Group will notify the Plan at least ninety (90) days prior to closing the Plan Panel of any Group Primary Care Physician to new Members.

4.8.   **Obligation to Treat.** Each Group Primary Care Physician agrees to accept any Member assigned by the Plan to his/her Plan Panel within the parameters set forth above in Section 4.7. The Group Primary Care Physician's obligation to provide care to a Member for a particular condition or related conditions may cease if the Member refuses to follow the course of treatment prescribed by the Group Primary Care Physician. Prior to taking any action, the Group Primary Care Physician will refer the matter to the Plan for review and resolution. The Plan will notify the Group Primary Care Physician of the outcome of the review and will inform him/her of required action.

4.9.   **Maintenance of Physician Relationships.** Neither the Group nor any Group Primary Care Physician shall seek, either through the Plan or through communication to the Member, to have a Member transferred to a physician, including a Plan Primary Care Physician, who is not included in the Group for reasons in any way related to that Member's (or a member of that Member's family) medical condition, health status, or the amount, variety, type, or cost of Covered Services.

4.10.   **Coverage.** The Group Primary Care Physician shall maintain appointment hours that are sufficient and convenient to serve Members and, at all times and at his/her own expense, provide or arrange for twenty-four (24) hour per day, seven (7) day per week emergency and on-call services by a Plan Primary Care Physician in accordance with the provisions of Plan policy.

4.11.   **Referrals for Other HMO Patients.** As its practice permits, the Group agrees to accept referrals from the Plan to provide or arrange for the provision of Urgently Needed Services to designated individuals who are temporarily within the Service Area and who are members of certain health maintenance organizations (HMOs) that participate in referral agreements with the Plan and to accept payment according to the compensation provisions of this Agreement that are applicable to reciprocity Members. In all instances, the Group agrees to bill the Plan and not the referred patient. Patients who receive services on this basis will not be included in the Member Management Fee Program described in Appendix B.

4.12. **Compliance with Medical Management and Quality Programs.** The Group shall participate in and comply with the Plan's medical management and quality management programs and standards, as set forth in the Physician Administrative Manual and/or medical and quality management plans, as amended from time to time. In connection with these programs, the Group shall permit the Plan, or its designee, to inspect the Group's facilities and to conduct on-site reviews of the facilities and medical records for Members who are or were provided services by the Group. The Group shall allow the Plan to inspect and copy Member records and shall comply with Plan requests to provide copies of records. All information, records and documents required shall be provided within a reasonable period of time and without cost to the Plan.

4.12.1. **Medical Management.** Except to the extent prohibited by applicable law, the Group Primary Care Physicians will only make referrals to Plan Providers in accordance with policies and procedures set forth in the Physician Administrative Manual, or as otherwise instituted by the Plan. If Plan authorization for a referral is required, the Group will use best efforts to contact the Plan to request authorization at least five (5) days prior to the scheduled date of each referral service. Where the Group has referred a Member to any provider, the Group will evaluate the outcome of the referred services and coordinate the Member's further medical needs in a timely manner.

In the event a Member is admitted to any hospital, the Group will cooperate with the Plan to evaluate and coordinate the Member's care. If the Member notifies the Group or a Group Primary Care Physician directly of such an admission, the Group or the Group Primary Care Physician will so inform the Plan on the first business day following such notification.

Services provided by the Group Primary Care Physician without prior authorization when required pursuant to this Agreement and Plan policy will be considered non-Covered Services and will be the liability of the Group. The Group will not bill either the Plan or the Member for such services. The Group may request review of Plan decisions pursuant to the Plan Provider appeal procedure outlined in the Physician Administrative Manual. Any disallowance of a claim made in good faith by the Plan after an appeal is considered shall be conclusive and binding upon the Group.

If, through the Plan's medical management activity, the Plan determines that any portion of service provided by the Group to a Member is not Medically Necessary, the Plan may, at its discretion, deny payment for these services. Prior approval of a service does not preclude subsequent retrospective review to confirm that

documentation supports the information on which the approval of Medical Necessity was based. The Group may appeal this decision through the Plan Provider appeal procedure outlined in the Physician Administrative Manual. Any disallowance of a claim made in good faith by the Plan after an appeal is considered shall be conclusive and binding upon the Group.

The Plan shall provide the Primary Care Physician with timely notification of its decisions regarding authorization of services or referrals.

4.12.2. **Quality Improvement Activities.** The Group and each Group Primary Care Physician shall actively participate in all of the Plan's quality improvement activities required of other Plan Primary Care Physicians. The Group shall identify the lead physician accountable for quality improvement programs and for coordinating with the Plan on data collection and improvement efforts related to quality improvement programs designed and implemented by the Plan, Massachusetts Health Purchasers Group goals, Healthplan Employer Data & Information Set (HEDIS) measures, the National Committee on Quality Assurance (NCQA), and other quality initiatives.

4.12.3. **Performance Standards.** The Group and the Group Primary Care Physicians shall make best efforts to be in compliance with the Plan's targeted performance goals, including, but not limited to, access standards and clinical quality measures in effect at any time during this Agreement when the Group and the Group Primary Care Physicians are in a position to influence such measures.

4.12.4. **Primary Care Physician Utilization Levels.** The Plan shall monitor, on a regular basis, utilization levels of Members. The Group agrees that if the Plan finds that any Group Primary Care Physician appears to be underutilizing or overutilizing services, the Plan and the Group Primary Care Physician will meet promptly with a Medical Director of the Plan to review the situation and establish improvement goals if necessary. The Plan will share with the Group and the Group Primary Care Physician the methodologies used to measure outlier levels of utilization prior to such meeting. The Plan may terminate the Group Primary Care Physician's participation in accordance with this Agreement if such utilization levels are deemed by the Plan to be outside of acceptable levels.

4.13. **Member Records.** The Group shall maintain medical records for each Member in an accurate and timely manner; in accordance with all applicable state and federal laws and regulations; and with the standards of the profession and licensure, certification, and accreditation requirements of the Plan, and shall provide copies of all such records to the Plan on request. The Group shall cooperate with the Plan in its efforts to comply with

obligations imposed by accrediting bodies and by state and federal agencies with which the Plan may contract to provide services. Such cooperation may include, for example, providing access to records and facilities as may be required by such agreements. The Group shall work with the Plan to provide data as necessary for the Plan to comply with HEDIS measures, as well as other quality of care measures.

4.13.1. **Copies of Records.** If the Plan requires copies of or information from medical records and reports, or patient account information maintained by the Group for purposes of assessing quality of care, Medical Necessity, appropriateness of care, medical management, quality management, claims payments, patient treatment, authorized research, or regulatory compliance, these shall be provided by the Group promptly and without cost. The Group also shall make such records available to applicable state and federal authorities and their agents involved in assessing quality of care or investigating Member grievances, appeals, or complaints.

4.13.2. **Compliance with Law.** The Group shall comply with all applicable state and federal laws related to privacy and confidentiality of Member medical records. The Group agrees that all such records and reports, together with any other confidential information concerning Members (such as, but not limited to, Member-specific utilization data provided by the Plan), shall not be otherwise disclosed or published in any manner without the Member's prior written consent, except as provided for in this Agreement. The Group shall provide Members with access to their medical records in a timely manner upon a Member's request.

4.13.3. **Release of Records.** In the event a release, including a specific written release, is required by law or regulation, the Group shall obtain a written release prior to releasing information, records, or reports. In the event the Member refuses to provide such a release, the Group shall be under no obligation to provide the medical records or reports to the Plan. If the Plan is unable to make a benefit determination because the Member refuses to provide the release, the Group may bill the Member directly.

4.13.4. **Transfer of Records.** The Group agrees to transfer Member records promptly upon written request from any Member who transfers to another physician's care.

4.13.5. **Information Provided by Plan to the Group.** In order to enable the Group to perform its professional business functions required under this Agreement, the Plan shall provide the Group with data agreed to between the Plan and the Group, provided such release is allowed by law. The Group shall treat this data as

confidential and agrees not to release it to any third party except as permitted by this section.

The Group shall maintain in accordance with all applicable law, the confidentiality of any Member data or information, including, but not limited to, demographic, claims, eligibility, and medical information provided to the Group by the Plan or any other third party. The Group recognizes the confidential and proprietary nature of such information, and agrees that failure to comply with this provision will be grounds for immediate termination of this Agreement. Furthermore, the Group shall use this information only for medical management and quality management. The Group will not use this information to the detriment of the Plan, or to withhold Medically Necessary care from a Member. The Group will not release this information to any third party without the prior written consent of the Member and the Plan. The Group shall indemnify and hold the Plan harmless for any improper and unauthorized use of this information, including, but not limited to, any claims of breach of Member confidentiality or withholding of care.

4.13.6. **Access Upon Termination.** Upon termination of this Agreement, the Group shall permit access by the Plan to medical and office records for Members for a period of seven (7) years.

4.13.7. **Government Access to Records.** Without limiting the obligations of the Group, to the extent required by Section 1861(v)(1)(I) of the Social Security Act, 42 U.S.C. § 1395x(v)(1)(I) ("Section 1861") or any successor regulations, until the expiration of six (6) years after the furnishing of any services provided under this Agreement and upon written request by the Secretary of the U.S. Department of Health and Human Services (the "Secretary") or by the U.S. Comptroller General (the "Comptroller General") or by their respective duly authorized representatives, the Group shall make available, and shall cause the Group Primary Care Physicians to make available, this Agreement and all books, documents and records of the Group or the Group Primary Care Physicians that are necessary to certify the nature and extent of the costs of such services. If the Group carries out the duties of this Agreement through a permitted subcontract worth $10,000 or more over a twelve (12) month period with a related organization, to the extent required by Section 1861, such subcontract also shall contain an access clause to permit access by the Secretary, the Comptroller General, and their respective duly authorized representatives to the related organization's books, documents and records.

4.14. **Member Relations.** The Group shall cooperate with the Plan as required by the Plan to administer its Member relations programs.

4.14.1. **Marketing.** The Group and Group Primary Care Physicians shall permit the Plan to use their names in promotional materials, directories, and other communications to the public or others regarding the services provided through this Agreement. No use or reference to the registered service marks of the Plan is permitted without the Plan's prior written express permission.

Each Group Primary Care Physician shall permit the Plan the use of his/her name, address, specialty, educational and professional training, affiliation, office telephone number, office hours, and services that address the unique needs of the population (such as foreign languages, including American Sign Language) in the Plan's promotional materials, directories, and other communications to the public or others regarding services provided through this Agreement. The Group shall notify the Plan ninety (90) days in advance of any change in such information. Each Group Primary Care Physician shall display evidence of participation in the Plan in a manner that is at least as prominent as that for other health care plans in which he/she participates.

4.14.2. **Member Advice.** Neither the Group nor any Group Primary Care Physician shall exert influence on Members to switch their enrollment to another form of health care coverage or to involve Members unnecessarily in Plan administrative or procedural issues, but instead shall seek problem resolution through the Plan's provider grievance procedures.

4.14.3. **Member Communications.** Neither the Group nor any Group Primary Care Physician shall send any written correspondence to Members regarding any aspect of this Agreement, including any process related to any aspect of this Agreement, without the prior written approval of the Plan.

4.14.4. **Communication of Treatment Options.** Nothing in this section regarding communications with Members, nor any other provision of this Agreement, shall be construed to impede any discussion between Members and their physicians regarding clinical information or treatment options.

4.14.5. **Communication of Compensation Arrangements.** Neither the Group nor any Group Primary Care Physician shall withhold information regarding the nature of their compensation arrangements with the Plan when such information has been requested by a Member. The Group and Group Primary Care Physicians are not obligated to discuss with patients specific amounts of compensation that are considered to be confidential according to this Agreement.

4.14.6. **Complaints.** The Group shall, to the extent permitted by law, fully advise the Plan of any complaint, grievance, claim or appeal it receives relating to services provided to Members by Group Primary Care Physicians. The Group shall cooperate with the Plan in its resolution of Member and provider complaints and grievances. The Group shall comply with complaint reporting requirements imposed by any professional licensure board or association as they may apply to the Group, its employees, agents, or affiliates. The Group accepts that HCFA classifies all complaints as either a grievance or an appeal.

4.14.7. **Member Grievance and Appeals Policy.** The Group shall comply with and participate in the Plan's Member grievance and appeals procedures as outlined in the Physician Administrative Manual and as otherwise set forth by HCFA or other governmental agency with associated authority. The Plan's and HCFA's grievance policy applies when a Member has complaints that do not involve a denial of a claim and/or service or item, including denial of a request for a referral. The Plan's and HCFA's appeals policy applies when a Member has complaints that involve a denial, in whole or part, of a claim and/or service or item.

4.14.8. **Expedited Appeals.** HCFA requires that Members enrolled in some Medicare Related Products have the right to request that the Plan conduct an expedited appeals process for reviewing and issuing certain Plan determinations and reconsiderations. Because the Plan must complete the expedited appeals process within seventy-two (72) hours, the Group agrees to use best efforts to provide, within twenty-four (24) hours, records or information requested by the Plan regarding a Member enrolled in a Medicare Related Product who has initiated the expedited appeals process.

4.15. **Compensation.** The Group agrees that payment pursuant to this section, plus applicable Copayment, represents payment in full for Covered Services provided to Members.

4.15.1. **Fee-for-Service Payments.** The Group shall accept payment from the Plan for each Covered Service rendered to a Member pursuant to this Agreement in an amount equal to the Allowable Fee for such Covered Service. For reciprocity Members, the Group shall accept the Allowable Fee for Covered Services and any other compensation provided by the reciprocity plan or program, as specified in the Member's Contract, as payment in full.

4.15.2. **Member Management Fee Program.** The Group agrees to participate in the Member Management Fee (MMF) program as described in Appendix B. The Plan

reserves the right to determine, at its discretion, whether this program will apply to any existing or new Products or Accounts covered under this Agreement with thirty (30) days written notice.

4.15.3. **Proprietary Information.** The Group agrees that the Fee Schedule is proprietary to the Plan and will be held strictly confidential and not revealed to any third party, and further agrees that the MMF program and any associated materials, such as network price and utilization information, are proprietary to the Plan and will be held strictly confidential and not be revealed to any third party. In addition, the Group agrees that these compensation provisions and any associated utilization information, whether reported by the Plan in aggregate or on a Member-specific basis, are proprietary to the Plan and will be held strictly confidential and not be revealed to any third party.

4.15.4. **Changes to the Fee Schedule.** The Fee Schedule may be amended by the Plan by providing ninety (90) days prior written notice to the Group. At the Plan's discretion, the Fee Schedule and these compensation provisions shall be applicable to any HMO Blue Product developed by the Plan in the future and covered by this Agreement.

4.16. **Compliance with Legal and Industry Standards.** The Group shall be in compliance with the following standards throughout the term of this Agreement.

4.16.1. **Licensure/Hospital Privileges.** Throughout the term of this Agreement, each Group Primary Care Physician shall maintain a valid and unrestricted medical license, state and federal dispensing license, and active and full unrestricted hospital privileges at an HMO Blue contracted hospital, and will provide the Plan with evidence of same upon request. The Group will give the Plan immediate written notice in the event that a Group Primary Care Physician's medical license, dispensing license, or hospital privileges (whether at a Plan or non-Plan hospital) are revoked, limited, or suspended. The Group will also give immediate written notice to the Plan if a Group Primary Care Physician relinquishes his/her hospital privileges at a Plan contracted hospital on a voluntary basis.

4.16.2. **Continuing Education.** Each Group Primary Care Physician shall complete one hundred (100) hours of continuing medical education every two (2) years as required for the physician license renewal or such other continuing medical education requirement as may be imposed from time to time by the Commonwealth of Massachusetts.

4.16.3. **Board of Registration in Medicine.** The Group shall comply with the regulations of the Board of Registration in Medicine and the Plan's Patient Care Assessment Program, as required by the Board of Registration in Medicine and established by the Plan. The Group shall notify the Plan of any incidents involving Members that it is required to report to the Board of Registration in Medicine.

4.17. **Patient Self-Determination Act.** The Group shall comply with the requirements of the Patient Self-Determination Act, including making Members aware of their rights to an advance directive or health care proxy, and documenting any such advance directive or health care proxy in the Member's medical record.

4.17.1. **Group Insurance.** The Group shall maintain comprehensive general and professional liability insurance in amounts not less than one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate per year, or such other forms of self-insurance as are acceptable to the Plan.

The Group shall provide evidence of its insurance to the Plan upon request and will promptly notify the Plan in writing within five (5) business days of learning of any material adverse change in its insurance coverage. If any of the Group's insurance coverages are provided upon a "claims-made" rather than "occurrence" basis, the Group shall maintain tail coverage in the same amounts for a period of not less than seven (7) years after termination of this Agreement.

4.17.2. **Group Primary Care Physician Insurance.** Each Group Primary Care Physician shall carry throughout the term of this Agreement, on behalf of him/herself and individually on behalf of each of his/her provider employees, malpractice insurance with limits not less than one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) in the aggregate, and in addition, comprehensive general liability insurance in amounts appropriate for the area. The Group will ensure that and hereby warrants to the Plan that any physician employed by, subcontracted to, or affiliated with the Group who is involved in the rendering of services under this Agreement has obtained and maintains individual malpractice insurance with limits of not less than one million dollars ($1,000,000) per occurrence and three million dollars ($3,000,000) annual aggregate, and that any other health care provider employed by, subcontracted to, or affiliated with the Group who is involved in the rendering of services under this Agreement has obtained and maintains individual malpractice insurance in amounts customarily appropriate in their profession. Where malpractice coverage is maintained on a claims-made basis, appropriate tail coverage shall be secured for seven (7) years after termination of the policy in effect when this Agreement is terminated.

The Group shall provide evidence of such coverage as requested by the Plan. The Group shall notify the Plan in writing within ten (10) days of any cancellation, non-renewal, or reduction in any such policies. The Group further shall notify the Plan immediately of any claims or lawsuits filed against it or any Group Primary Care Physician arising out of services performed under this Agreement.

4.17.3. **Compliance with HCFA Mandates.** The Group acknowledges and agrees to comply with all applicable laws, regulations, or rules pertaining to all Products, including Medicare Related Products, and agrees that in the event of conflict with this Agreement, such laws, regulations, or rules shall control. Notwithstanding any language in this Agreement to the contrary, any changes to this Agreement or any Plan policy made by the Plan, when necessary to comply with any changes required by HCFA, will not be deemed to be amendments and may be made unilaterally by the Plan without the consent of the Group. The Plan will make best efforts to provide the Group with thirty (30) days written notice of such changes.

4.17.4. **Compliance with Other External Requirements.** The Group shall cooperate with the Plan in complying with obligations imposed by state or federal agencies with which the Plan may contract to provide services. As necessary, the Group agrees to work with the Plan to provide data or to cause Group Primary Care Physicians to provide data and/or medical records as appropriate for the Plan to conduct medical record reviews and compile information for purposes of participating fully in initiatives related to HEDIS measures, as well as other quality of care initiatives promoted by purchasers, purchasing coalitions, accrediting bodies, or other organizations with which the Plan conducts business.

4.17.5. **Provider Financial Relationships.** The Group shall comply with all relevant federal and state laws and regulations regarding provider compensation including, but not limited to, fraud and abuse, false health care claims, Physician Incentive Plan, and physician self-referral laws and regulations throughout the term(s) of this Agreement, as if they applied fully to this Agreement. The Group shall notify the Plan of any investigation or adverse action taken by any regulatory agency, including, but not limited to, the Office of Inspector General (OIG), HCFA, and the Internal Revenue Service (IRS), for violations of any law, rule, or regulation applicable to this Agreement.

4.17.6. **Regulatory Requirement for Participation.** As one condition of participation in this Agreement, the Group acknowledges that it has not been excluded from participation in Medicare or Medicaid, and that no Group Primary Care Physician

has been charged with or convicted of a criminal offense related to his/her participation in Medicare or Medicaid or other federal health or social service programs. Furthermore, the Plan will not continue to contract, through any vehicle, with Group Primary Care Physicians included on either the General Services Administration's *List of Parties Excluded from Federal Procurement Programs* or the *OIG Sanction Report*. In the event a Group Primary Care Physician is excluded from participation in the Medicare or Medicaid program, charged with or convicted of a criminal offense related to his/her participation in Medicare or Medicaid or other federal health or social service programs, or included on either report referenced herein, the Plan may immediately terminate this Agreement in its entirety or may terminate from this Agreement the Group Primary Care Physician so excluded, such termination to be effective only for the excluded physician.

4.18.  **Physician Incentive Plans.**  The Group shall not, at any time during the term of this Agreement, establish a Physician Incentive Plan that is prohibited by or inconsistent with federal or state law, for any Member population that is the subject of any state or federal regulation addressing Physician Incentive Plans, including without limitation, 42 CFR 417.479.

The Group agrees that throughout the term of this Agreement, the Group shall not place any Group Primary Care Physicians at risk in excess of risk thresholds established by 42 CFR 417.479 or any other state or federal regulation addressing Physician Incentive Plans, unless the Group furnishes stop-loss meeting the requirements of the applicable law or regulation, and meets any other requirement of such law or regulation imposed when physicians are placed at risk in excess of applicable risk thresholds.

If required by law or regulation, and upon request by the Plan, the Group shall provide to the Plan copies or descriptions of any Physician Incentive Plan affecting its Group Primary Care Physicians at a level of detail sufficient to ensure that the Plan and the Physician Incentive Plan are in compliance with any applicable federal or state law. The Group consents to the Plan's disclosure, if required by federal or state law, of information relating to any such Physician Incentive Plan, including information regarding withhold levels, stop-loss provisions, capitation payments to the Group or to Group Primary Care Physicians for primary care services, referral services to specialists, hospital services, and other types of provider services, and results of Member surveys regarding services provided by the Group and Group Primary Care Physicians, and other financial details relating to such incentive arrangements. The Group shall cooperate with the Plan in the provision of any information relating to a Physician Incentive Plan that is requested by a government agency. The Group shall provide the Plan with descriptions of any changes to any Physician Incentive Plan in place affecting Group Primary Care Physicians. All

information and data generated by the Group and used by the Plan to develop any disclosure reports must be retained by the Group for at least three (3) years and promptly provided upon request of the Plan, government agency, or either party's designee.

To the extent required by law, the Plan may provide Members with information regarding the Group's Physician Incentive Plans when such information is requested by a Member. Such information may describe the type of incentive arrangement, how the incentive plan affects the use of referral services, whether the arrangement provides for stop-loss protection, or the results of any beneficiary surveys conducted by the Plan. If Member surveys are required under any applicable state or federal law relating to Physician Incentive Plans, the Plan will conduct such beneficiary surveys of Members.

If, in accordance with 42 CFR 417.479 as it may be amended from time to time, the Plan is required to verify that the Group's Primary Care Physicians have stop-loss protection meeting the standards set forth in the regulations, the Group shall fund the cost of any such stop-loss that exceeds the level covered by the Plan as set forth in this Agreement.

4.19.    **Non-Discrimination Provisions.**  The Group shall comply with the requirements set forth in Section 202 of Executive Order 11246 of September 24, 1965 as amended, and any applicable state and federal law, rule, or regulation concerning non-discrimination in employment and provision of services to patients. The Group agrees not to discriminate against any Member on the basis of membership in a managed care plan, source of payment, sex, age, race, color, religion, origin, health status, or handicap in providing health care services under this Agreement.

## 5.    Obligations of the Plan

5.1.    **Licensure.**  The Plan shall maintain all regulatory approvals necessary to operate as a health maintenance organization under Massachusetts law and a license to insure or administer indemnity products under Massachusetts law, and shall remain in compliance with the provisions of G.L. c.176I governing PPAs (or successor provisions). The Plan will notify the Group immediately if any such licenses or approvals are suspended or revoked. The Group acknowledges that any licenses, certificates, or permits obtained in the context of any corporate restructuring shall be sufficient to meet the Plan's obligations under this section and that any general or Product-specific change in licensure status resulting from any restructuring processes will not affect any terms of the Agreement unless a change is required by any governmental body with authority to mandate such change.

5.2. **Regulatory Compliance.** The Plan is committed to fair and proper contracting procedures and compliance with all federal and state laws.

5.3. **Administration and Oversight.** Unless expressly delegated to the Group by contract, the Plan shall retain responsibility for all administrative services customarily performed by a health maintenance organization or a licensed insurer, including, but not limited to: underwriting and rating; marketing and sales; eligibility and enrollment; Account management; Account and individual billing; Member services; appeals and grievances; credentialing; claims adjudication, processing, and payment; management information support and reporting; regulatory compliance; quality assurance; and medical management. In those cases where functions have been delegated, the Plan will conduct oversight in accordance with Plan policy.

5.4. **Provision of Member Contract and Directory.** Copies of the Member Contract and the directory of professional Plan Providers available to Members and potential Members will be made available to the Group upon the Group's request. The Plan will provide the Group with timely notification of any changes in Covered Services included in the Member Contract.

5.5. **Member Eligibility.** The Plan will maintain a current Member eligibility data system, including provisions for access by the Group. The Plan will provide monthly lists of Members enrolled in the Group Primary Care Physician's Plan Panel, quarterly utilization reports associated with those Members, and a reconciliation of errors for those utilization reports.

5.6. **Payment for Covered Services.** The Plan shall pay for Covered Services the Group renders to Members pursuant to the Fee Schedule and the terms of this Agreement.

5.7. **Member Management Fee Program.** The Plan agrees to administer the Member Management Fee program in accordance with the provisions of Appendix B.

5.8. **Medical Management and Quality Management.** The Plan may develop and administer programs for medical management, quality management, risk management, and Member and provider education. The Plan shall make efforts to conduct activities related to these programs in a manner that does not interfere unreasonably with the Group's operations. The Plan shall ensure that utilization management decisions are based only on appropriateness of care and service. In addition, the Plan acknowledges that it does not compensate individuals conducting utilization review for denial of coverage or service, and does not provide any finical incentives to individuals making utilization management decisions that encourage denial of coverage or service.

5.9.    **Marketing.**  The Plan shall use its best efforts to contract with a sufficient number of Plan Providers to allow Group Primary Care Physicians and Members reasonable access to cost-effective care and treatment.

5.10.   **Member Satisfaction Data.**  The Plan shall administer one or more Member satisfaction survey(s).  If requested by the Plan, the Group shall assist the Plan in surveying Members by requiring that Group Primary Care Physicians distribute survey materials, as made available by the Plan, to Members at the time of each appointment, or as otherwise agreed to by the parties.

5.11.   **Provider Satisfaction Data.**  The Plan may administer a provider satisfaction survey of physicians participating in HMO Blue Products.  This survey may include Group Primary Care Physicians.  If requested by the Plan, the Group shall assist the Plan in surveying Group Primary Care Physicians by working with the Plan to distribute and collect survey materials.

5.12.   **Member Grievance and Appeal Procedure.**  The Plan will maintain a grievance and appeal procedure for Members in accordance with the requirements of applicable law.

5.13.   **Physician Grievance and Appeal Procedure.**  The Plan will maintain a grievance and appeal procedure by which the Group or a Group Primary Care Physician may request review of Plan decisions.  Such procedure shall be set forth in the Physician Administrative Manual.

5.14.   **Administrative Notification.**  The Plan maintains and provides the Group with a Physician Administrative Manual.  From time to time, the Physician Administrative Manual may be revised by the Plan.  The Plan will provide the Group thirty (30) days prior written notice of such changes, except for changes related to claims submission or medical management policies, in which case the Plan will provide ninety (90) days written notice, or changes required to ensure the Plan is in compliance with federal or state law or regulation, in which case the Plan will make best efforts to provide thirty (30) days prior written notice.

The Plan shall develop and distribute such other policies, procedures, and rules as may be necessary for the efficient administration of its Products.

6.    **Billing and Payment**

6.1.   **Member Hold Harmless Provisions.** In no event, including, but not limited to, non-payment by the Plan or the Plan's insolvency or breach of this Agreement, shall the Group or any Group Primary Care Physician bill, charge, collect a deposit from, seek compensation, remuneration or reimbursement from, or have any recourse against a Member or person (other than the Plan) acting on the Member's behalf for services provided under this Agreement. This provision does not prohibit the Group or any Group Primary Care Physician from collecting Copayments as specifically provided in the Member Contracts, or fees for non-Covered Services delivered on a fee-for-service basis to a Member when the Member was notified in advance in writing that such services are not covered, and the Group or the Group Primary Care Physician obtained the Member's written assent to be billed.

In the event of the Plan's insolvency or other cessation of operations, the Group and each Group Primary Care Physician shall continue to make Covered Services available to Members through the period for which premiums have been paid by the Account or, in the case of a Member confined in an inpatient facility on the date of insolvency or other cessation of operations, until his/her discharge, whichever is later.

These provisions shall survive the termination of this Agreement regardless of the reason for termination, including the Plan's insolvency, and shall be construed to be for the benefit of Members.

These provisions supersede any oral or written contract or agreement now existing or hereafter entered into between the Group or any Group Primary Care Physician and a Member or persons acting on behalf of a Member, insofar as such contract or agreement relates to liability for, payment for, or continuation of Covered Services provided under the terms and conditions of these clauses.

Further, neither the Group nor the Plan may make any change to the provisions of this section without the prior written approval of the Commonwealth of Massachusetts Division of Insurance.

6.2.   **Billing.** The Group's charges for Covered Services shall be uniformly applied to all Members under the Member's Contract. For Members whose Member Contract includes a Copayment, the Group shall be responsible for collecting such Copayments directly from the Member. Prior to billing Members for non-Covered Services, the Group shall verify with the Plan that the claim is the Member's responsibility.

If any services are not Covered Services, the Group may bill Members at a rate not in excess of the rate that it bills the general public, after first notifying the Member in writing

in advance of rendering the service that the service is not covered and obtaining the Member's written assent to be billed. The Group shall provide the Plan with such documentation upon request. The Group shall, in no event, charge the Plan or the Member for any services which are not Medically Necessary, as determined by the Plan.

If a Member has been retroactively or otherwise disenrolled from the Plan and the Group Primary Care Physician provided services to the former Member with or without Plan authorization after enrollment was terminated, the Group shall bill the former Member or his/her insurance carrier directly for such services.

If any claims paid by the Plan are subsequently disallowed by the Plan, the Group shall be liable to the Plan for the amount of such payment. The Plan may, at its election, enforce such liability by offset against any amount then or thereafter owed by the Plan to the Group or by other collection procedures. Under no circumstances will the Group charge the Member or hold the Member liable for services which are disallowed.

The Group agrees that in the event the Plan determines services provided are not covered by the Plan's medical policy, or are experimental in nature, it will not bill the Plan or the Member for such services. The Group also agrees that in the event the Plan has denied a referral, or determines there is no referral on file with the Plan, it will not bill the Plan or the Member for such services, unless the Group has obtained the Member's written assent to be billed prior to rendering the services.

The Group agrees that it shall not contact any Member with respect to the failure of the Plan to pay pursuant to this Agreement.

6.3.   **Claim Submission.** The Group shall submit accurate and complete claims to the Plan for all Covered Services rendered to Members within ninety (90) days of the date of service, in accordance with procedures set out in the Physician Administrative Manual and other Plan policies. Late Claims shall be rejected by the Plan. In the event the Group resubmits Late Claims after they have been rejected, adequate documentation regarding the reason for delay must be submitted for the Plan to consider paying such Late Claims. The Plan reserves the right not to honor Late Claims, and the Member shall not be billed for Late Claims.

6.4.   **Claim Payment.** For claims submitted in accordance with the Physician Administrative Manual, other Plan policies, and this Agreement, the Plan shall pay the Group for Covered Services provided to Members in accordance with the applicable Fee Schedule. Claims not submitted in accordance with the Physician Administrative Manual, other Plan policies, and this Agreement may be denied by the Plan, and the Member shall have no

liability with regard to such claims. The Plan will make claims payments on average within forty-five (45) days after receipt of an accurate and complete claim form. If payments have not been made on average within forty-five (45) days after receipt of an accurate and complete claim form, the Plan will pay interest on such payments unless the delay relates to: (1) the Group's failure to obtain required authorizations, (2) coordination of benefits or other liability recovery, or (3) investigation under medical management programs. No interest shall be paid on adjustments made for retroactive enrollments and disenrollments. Any applicable interest payments will accrue beginning on the sixty-first (61st) day after receipt of an accurate and complete claim and will be calculated based on the prime rate in effect on such first day of accrual.

6.5.    **Coordination of Benefits.**  The Group shall comply with generally accepted practices and procedures for coordination of benefits and other third party liability recovery, including, without limitation, workers' compensation and subrogation. The Group will collect information from all Members concerning other party liability, such as duplicate coverage, workers' compensation, and personal injury liability at the time of service and provide such information to the Plan in a timely manner. All claims submitted by the Group to the Plan should be appropriately coded to indicate any of the above situations. The Group shall cooperate with the Plan to identify and recoup any moneys due the Plan for the provision of services that are determined to be the primary fiscal responsibility of another party.

In the event the Member's condition is work-related, the Group will bill the workers' compensation carrier directly and will so inform the Plan in writing. Similarly, if the Group determines or is notified by the Plan that another carrier is primary for the Member's coverage, it will bill that carrier directly.

The Plan shall administer coordination of benefits as described in the Member's Contract. If the Plan is the secondary payer, it will make no payment on a claim unless and until it receives notification of action taken by the primary payer and a determination is made that the Plan has liability for the claim. In such cases, the Plan will pay only the excess, if any, of the amount which it would have paid as the primary carrier over the actual payment made by the primary carrier. If the Plan makes payments for Covered Services under this Agreement as if it were the primary plan and later determines it is the secondary plan, it will offset or recoup the original payment and issue a new payment in the amount of its secondary plan liability. The Plan may withhold payments under this Agreement until coordination of benefits liability is determined. It will then make payments in accordance with its primary or secondary liability.

The Group shall comply with Plan procedures regarding authorization and referral for all such services, including services rendered for the diagnosis and treatment of work-related medical conditions, in order to provide coordination of the Member's care in the event that any costs for such services shall become a liability of the Plan.  In no event will the Group bill the Member for Covered Services.

6.6. **Incorrect Payments.**  If at any time during the term of this Agreement the Plan determines that it has made an incorrect payment to the Group, the Plan shall have the right to recover from the Group the full amount incorrectly overpaid.  Such recovery may be in the form of a set off, withhold of future payments, or demand for repayment, but the Plan's right of resort to those remedies shall not act as a limitation on any other right of the Plan to recover overpayments from the Group by any other means.  The Group may dispute the Plan's determination.

6.7. **Right to Offset.**  The Plan shall have the right to offset any payments due the Group under this Agreement for any particular Product against any payments due the Group for any other Product administered by the Plan.

7.    **General Provisions**

7.1.    **Term.** This Agreement will be effective on the date set forth as the Effective Date by the Plan on the signature page of this Agreement. This Agreement shall continue in effect until terminated in accordance with Section 7.2 of this Agreement.

7.2.    **Termination.** This Agreement may be terminated as follows, or as may otherwise be provided in this Agreement.

7.2.1.    **Termination Without Cause.** This Agreement may be terminated without cause at any time by the Group or, with respect to any individual Group Primary Care Physician by that Group Primary Care Physician, upon ninety (90) days prior written notice to the Plan, or by the Plan with respect to the Group as a whole or any individual Group Primary Care Physician upon ninety (90) days prior written notice to the Group or the Group Primary Care Physician.

7.2.2.    **Termination for Cause.** The Plan may terminate this Agreement immediately upon notice with respect to the Group or a Group Primary Care Physician in the event either fails to meet the provisions of this Agreement (if such failure is not cured or commenced to be cured within ten [10] business days of receipt of notice of the alleged failure and such cure is not thereafter diligently pursued to completion); fraud; misrepresentation; exclusion from federal procurement programs by the General Services Administration; loss of Medicare or Medicaid qualification; following the imposition of sanctions by the OIG or any state or federal agency; loss, limitation or suspension of the Group Primary Care Physician's license, hospital privileges or medical staff membership; serious disciplinary action by the Board of Registration in Medicine; adverse report by the National Practitioner Data Bank; failure to meet the Plan's credentialing or recredentialing requirements; or in the event the Plan reasonably determines that continuation of the Agreement may negatively affect patient care.

7.2.3.    **Immediate Termination.** This Agreement may be terminated immediately, at the Plan's discretion, where the Group: (1) makes a general assignment for the benefit of creditors, (2) suffers or permits the appointment of a receiver for its business or assets, or (3) avails itself of or becomes subject to any proceeding under the Federal Bankruptcy Act or any statute of any state relating to insolvency or the protection of rights of creditors.

7.2.4.    **Notification Upon Termination.** Upon issuance or receipt of a termination notice, the Group Primary Care Physician's Plan Panel will be closed to new

Members. The Plan will expedite the reassignment of Plan Panel Members to other Plan Primary Care Physicians.

7.2.5. **Continued Provision of Care.** For any termination other than one based on failure to provide proper care and treatment as determined by the Plan, this Agreement shall continue to be in effect with respect to any Member undergoing a continuous course of treatment when the ninety (90) day notice period has terminated, and the Group shall continue to provide care pursuant to the terms of this Agreement until alternative arrangements for the Member's care have been made by the Plan. For any services provided pursuant to this Agreement during the notice period, and for any continuation of care provided after termination, the Group shall accept the Plan payment for Covered Services under this Agreement. The Group shall bill the Member no more than the applicable Copayments for services rendered during the continuation of care period referenced in the preceding sentence.

7.3.  **Notification.** Notifications required or permitted under this Agreement shall be effective if delivered by hand or sent by first-class mail, postage prepaid, by the Group or Group Primary Care Physician to the Plan to:

> Vice President, Provider Contracting
> Blue Cross and Blue Shield of Massachusetts, Inc.
> 100 Summer Street 01/04
> Boston, MA  02110-2190

and by the Plan to the Group or any Group Primary Care Physician at the address listed on the signature page, or by either party to such other address as either party may subsequently designate.

7.4.  **Assignment and Transfer of Ownership.** This Agreement shall not be assigned or transferred in whole or in part without the prior written consent of the non-assigning party. A change in control or ownership of a party shall constitute an assignment of the Agreement. Notwithstanding the above provision, this Agreement may be assigned or transferred in whole or in part by the Plan without the consent of the Group.

7.5.  **Waiver.** A waiver of any breach of this Agreement shall not be construed to be a continuing waiver for a similar breach.

7.6.  **Contract Integration.** This Agreement, including the Appendices, constitutes the entire understanding of the parties with regard to these services and supersedes all prior and/or

contemporaneous representations, agreements, and understandings, whether oral or
written.

7.7.   **Jurisdiction.** This Agreement shall be governed by and construed according to the laws
of the Commonwealth of Massachusetts and any applicable federal law.

7.8.   **Primacy of Member Contract.** This Agreement incorporates by reference and is subject
to all provisions of the Member's Contract. In the case of conflict between the provisions
of the Member's Contract and this Agreement, the provisions of the Member's Contract
shall take precedence.

7.9.   **Survival of Terms.** The provisions of this Agreement concerning Member and office
records, insurance, Member hold harmless, and confidential and proprietary information
shall survive the termination of this Agreement by either party for any reason.

7.10.  **Severability.** The invalidity, illegality or unenforceability of any provisions of this
Agreement, by statute, court order or otherwise, shall not affect the validity, legality, or
enforceability of any other provision of this Agreement, which shall remain in full force
and effect.

7.11.  **Headings.** The headings contained in this Agreement are for convenience of reference
only and are not intended to have any substantive significance in interpreting this
Agreement.

7.12.  **Regulatory Compliance.** The Plan may modify the terms of this Agreement as may be
required by statute or regulation. The Plan agrees to provide the Group with as much
advance notice as is practicable concerning any such modification.

7.13.  **Notice of Changes/Amendments.** This Agreement may be amended at any time by
written agreement of authorized representatives of both parties. Plan changes to the
Physician Administrative Manual, administrative policies, procedures, rules, and Fee
Schedule, or changes required to ensure the Plan is in compliance with federal or state
law or regulation, are not deemed to be amendments.

7.14.  **Independent Contractor Status.** The parties agree that this Agreement is not intended
to create any legal relationship between the parties other than that of independent parties
contracting with each other solely for the purpose of effecting this Agreement. No party
shall be liable for the acts or omissions of another party.

Signature page to follow.

This Agreement has been executed by the parties in duplicate by their duly authorized representatives whose signatures appear below.

**The Group**

_____
*Name of Group*

_____
*Executed by - Signature*

_____
*Print Name of Executor*

_____
*Title of Executor*

*Date of Group Signature:* _____

*Address of Group :*

_____

_____

_____

**Blue Cross and Blue Shield of Massachusetts, Inc.**

_____
*Signature*

William Winkenwerder, Jr., MD
Executive Vice President

*Date of Signature:* _____

*Effective Date of Agreement:* _____

## Appendix A

## Group Primary Care Physician Attachment

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the undersigned physician ("you") shall participate in the Plan as outlined in the Agreement between Blue Cross and Blue Shield of Massachusetts, Inc. ("the Plan"), and _____ ("Group"), (the "Agreement").  You agree to act as a Group Primary Care Physician for purposes of the Agreement, and to fully cooperate with the Plan and the Group to implement the terms of the Agreement.  You agree to be bound by all of the terms of the Agreement.  You agree to arrange to have the Plan notified in writing ninety (90) days in advance of your departure from the Group, your retirement from practice, or your intent to close your Plan Panel to new Members.  You also represent you have read and understand the Agreement. You understand and agree that the Plan shall be a third party beneficiary of any agreement between the Group and you.

Without limiting the generality of the foregoing, you agree to look solely to the Group for payment for any services you render pursuant to the Agreement and agree to hold the Plan and Members harmless for any loss, cost or expense you suffer as a consequence of the Group's failure to distribute to you payments by the Plan for services you render.

ACCEPTED AND AGREED TO:

_____, M.D.
Signature

| For Blue Cross and Blue Shield of Massachusetts, Inc. Use Only |
| --- |
| Reviewed by: _____ |
| Effective Date of Agreement: _____ |

_____
Name (print)

_____
Date of Group Primary Care Physician Signature

_____
Massachusetts License Number

Other State License Number: _____

Number/State

**Appendix B**

**HMO Blue Primary Care Physician Agreement
Member Management Fee Program**

This Appendix describes the Member Management Fee (MMF) Program, which consists of the Base Member Management Fee and its adjustments based on financial and non-financial performance evaluations. The MMF program applies to the following products: HMO Blue, HMO Blue New England, Blue Choice Plan 1, Blue Choice Plan 2, Blue Choice New England, Network Blue, and any other products licensed through 176G or 176I that may be developed in the future. The Member Management Fee Program does not apply to Medicare Related Products. The Plan reserves the right to exclude or include at its discretion a Product or an Account from the Member Management Fee program with thirty (30) days written notice.

1. **Definitions**

   1.1. **Accounting Period.** The period January 1, 1995 through December 31, 1995 and each twelve month period thereafter ending on June 30 or December 31 (three months before the date of the Member Management Fee adjustment).

   1.2. **Applicable Payments.** Payments made by the Plan, or by Members through Copayment obligations, regardless of the identity or type of provider receiving the payment, for any Covered Services, exclusive of:

   • Mental health and substance abuse services
   • Emergency care provided outside the Plan Service Area

   1.3. **Chargeable PCP Account Payments.** Applicable Payments, including, but not limited to, payments for Primary Care Physician and Specialty Care Physician services, inpatient and outpatient hospital care, laboratory, radiology, medical supplies and other services, exclusive of:

   • Institutional Inpatient Payments in excess of $1500 related to any particular Inpatient Stay
   • Payments above the PCP Individual Stop Loss Limit

   The computation of Chargeable PCP Account Payments is set forth in Part II of Schedule 4, which is appended to and incorporated into this Appendix.

1.4.   **Chargeable Primary Care Team Account Payments.**  Applicable Payments, exclusive of:

- Chargeable PCP Account Payments
- Payments above the Primary Care Team Individual Stop Loss Limit

The computation of Chargeable Primary Care Team Account Payments is set forth in Part III of Schedule 4, which is appended to and incorporated into this Appendix.

1.5.   **Inpatient Stay.**  A particular inpatient admission of a Member and any subsequent inpatient admissions of the Member not separated from it or from each other by intervals of more than twenty-four (24) hours.

1.6.   **Institutional Inpatient Payments.**  All payments made by or on behalf of Members for inpatient services (exclusive of inpatient physician services billed and paid for separately from institutional services) provided by acute care hospitals, rehabilitation hospitals, chronic care hospitals, sub-acute care facilities, skilled nursing facilities, and other inpatient institutions.

1.7.   **Member Allowances.**  A monthly dollar amount for each Member periodically established by the Plan according to the age and sex of the Member, the presence or absence of a drug benefit in the Member's benefit program, regional price levels and other factors, such as health status, that the Plan determines to be predictive of the Member's level of Chargeable PCP and Primary Care Team Account Payments.  Each Member Allowance shall be the sum of two components:  the PCP Allowance and the Primary Care Team Allowance.  The amount of the Member Allowance for each Member Class shall be prospectively determined.  A Member will be assigned to a Member Class after the close of an Accounting Period.

1.8.   **Member Class.**  An aggregation of Members exhibiting the same or similar characteristics, such as, but not limited to, age, sex, and health status.

1.9.   **Primary Care Team.**  A self-selected group of no fewer than five (5) and no more than fifteen (15) Primary Care Physicians whose Plan Panels collectively include at least five hundred (500) Members and who voluntarily join together to:  (a) assure their Members of twenty-four (24) hour per day, seven (7) day per week coverage; and (b) afford themselves the opportunity to participate in the Member Management Fee program as it relates to such Primary Care Teams.  Primary Care Physicians who do not join a Primary Care Team will be assigned to one created by the Plan from the pool of other such Primary Care Physicians who practice at the Site Hospital or in the same geographic area.  Primary

Care Physicians will have the right to change from one Primary Care Team to another once per Accounting Period, with the change to be effective at the beginning of the next Accounting Period. The Plan will have the right to review and approve or disapprove the initial composition and any subsequent changes to the composition of Primary Care Teams, and at its own discretion, to allow Primary Care Teams not meeting each of the requirements stated above to participate in the Member Management Fee Program. The Plan also reserves the right to assign a Primary Care Physician to a Primary Care Team.

1.10.   **Primary Care Team Account.** For each Accounting Period, the Plan will maintain a Primary Care Team Account on behalf of each Primary Care Team. Credits to the Primary Care Team Account shall consist of the total of the Primary Care Team Allowances attributable during the Accounting Period to those Members who have chosen a Primary Care Physician in the Primary Care Team as their Primary Care Physician. As medical care is provided to these Members, it will be paid for by the Plan (and by the Members through their Copayment obligations) and associated Chargeable Primary Care Team Account Payments will be deducted from the Primary Care Team Account. Chargeable Primary Care Team Account Payments for services provided to newborns during their initial Inpatient Stay shall be charged to the Primary Care Team Account of the mother's Primary Care Physician.

1.11.   **Primary Care Team Allowance.** A monthly dollar amount derived from the Member Allowance that will be calculated prospectively as the average expected Chargeable Primary Care Team Account Payments of a Member.

1.12.   **Primary Care Team Individual Stop Loss Limit.** The Plan will establish and periodically update a Primary Care Team Individual Stop Loss Limit that will constrain the total amount of Applicable Payments that will be fully charged to the Primary Care Team Account and any associated PCP Account during any Accounting Period for any particular Member. The Primary Care Team Individual Stop Loss Limit applicable to the period covered by this Agreement, until such time as it is revised by the Plan at its discretion, shall be $50,000, plus ten percent (10%) of any Applicable Payments made on behalf of a particular Member in any Accounting Period in excess of this limit, plus any payments above $50,000 that are chargeable to the PCP Account. Schedule 4 of this Appendix illustrates the application of the Primary Care Team Individual Stop Loss Limit.

1.13.   **PCP Account.** For each Accounting Period, the Plan will maintain a PCP Account on behalf of each Primary Care Physician. The PCP Account shall consist of the total of the PCP Allowances attributable to the Members in the Primary Care Physician's Plan Panel during the Accounting Period. As medical care is provided to the Primary Care Physician's Plan Panel, it will be paid for by the Plan (and by the Members through their

Copayment obligations) and associated Chargeable PCP Account Payments will be deducted from the PCP Account. Chargeable PCP Account Payments for services provided to newborns during their initial Inpatient Stay shall be charged to the PCP Account of the mother's Primary Care Physician.

1.14.   **PCP Allowance.** A monthly dollar amount derived from the Member Allowance that will be calculated prospectively as the average expected Chargeable PCP Account Payments of a Member.

1.15.   **PCP Individual Stop Loss Limit.** The Plan will establish and periodically update a PCP Individual Stop Loss Limit that will constrain the total amount of Applicable Payments that will be charged to any PCP Account during any Accounting Period for any particular Member. The PCP Individual Stop Loss Limit applicable to the period covered by this Agreement, until such time as it is revised by the Plan at its discretion, shall be $5,000 plus ten percent (10%) of Applicable Payments over $5,000 (excluding any Institutional Inpatient Payments above $1,500 for any particular Inpatient Stay) generated during the Accounting Period. Schedule 3 of this Appendix illustrates the application of the PCP Individual Stop Loss Limit.

## 2.   Base Member Management Fee

The Base Member Management Fee (MMF) will be $1.50 per Member per month. The Plan reserves the right to change the Base Member Management Fee with ninety (90) days prior written notice to the Primary Care Physician.

## 3.   Financial Performance Evaluations/Related Member Management Fee Adjustments

The Plan will, within ninety (90) days after the close of each Accounting Period, determine for each Primary Care Physician the balance in the PCP Account and the balance in the associated Primary Care Team Account. These balances will be calculated on a per Member per month (PMPM) basis and will result in adjustments to the PCP's Member Management Fee in accordance with this Appendix B. The Plan will provide the Primary Care Teams with reports supporting the MMF adjustments on a timely basis.

3.1.   **The PCP Account Adjustment.** The balance in the PCP Account, calculated on a PMPM basis, shall determine the PCP Account Adjustment in accordance with Schedule 1(A), which is appended to and incorporated into this Appendix B. The PCP Account Adjustment shall be calculated on an individual, PCP-specific basis for each Primary Care Physician whose Plan Panel has an average of one hundred (100) or more Members

during the Accounting Period. For those Primary Care Physicians who do not meet this Member threshold, the PCP Account Adjustment shall be calculated as a uniform adjustment based on combined PCP Account balances; accordingly, for this purpose, the Plan will aggregate such Primary Care Physicians in the following preferred order: (1) they will be aggregated with other such Primary Care Physicians in their Primary Care Team provided the combined Plan Panels of these Primary Care Physicians meet the one hundred (100) Member threshold; or (2) they will be aggregated with other Primary Care Physicians at their Site Hospital, provided the combined Plan Panels of these Primary Care Physicians meet the one hundred (100) Member threshold; or (3) they will be aggregated with other Primary Care Physicians in the same geographic area if neither condition (1) nor condition (2) is met.

3.2.    **The Primary Care Team Account Adjustment.** The balance in the Primary Care Team Account, calculated on a PMPM basis, shall determine the Primary Care Team Account Adjustment in accordance with Schedule 1(B). The Primary Care Team Account Adjustment to the Member Management Fee shall be the same for all Primary Care Physicians in the particular Primary Care Team.

## 4.    Timing of Member Management Fee Adjustments and Limitations

For each Accounting Period, the Plan will calculate a prospective adjustment to the Base Member Management Fee of each Primary Care Physician to reflect the PCP Account Adjustment and the Primary Care Team Account Adjustment. These MMF adjustments will remain in effect for six (6) months, whereupon they will be replaced by the next MMF adjustment. The related calculations are described in Section 6 of this Appendix B.

The first Member Management Fee adjustment will go into effect on April 1, 1996 and will be based on the January 1, 1995 through December 31, 1995 Accounting Period. Thereafter, starting on October 1, 1996, the Member Management Fee adjustments will go into effect every six (6) months and will be based on the twelve (12) month Accounting Periods ending three (3) months before the date of the Member Management Fee adjustment. The PCP's first Member Management Fee adjustment will go into effect subsequent to the effective date of the Agreement.

The timing requirements of Member Management Fee adjustments will routinely prevent some Chargeable PCP Account Payments and some Chargeable Primary Care Team Account Payments associated with services provided during an Accounting Period from being charged to those accounts for that Accounting Period. Such payments will be charged to the appropriate accounts in a subsequent Accounting Period.

A Primary Care Physician whose performance under this program produces the maximum downward PCP Account Adjustment of $1.50 for two (2) or more consecutive Accounting Periods may be subject to administrative review.

The Plan reserves the right to continue to assign to the PCP Account of a Primary Care Physician both the PCP Allowances and the Chargeable PCP Account Payments associated with Members who leave the Plan Panel of the Primary Care Physician if the Plan finds that the Primary Care Physician encouraged such Members to transfer for inappropriate reasons. Similarly, the Plan reserves the right to continue to assign to the Primary Care Team Account both the Primary Care Team Allowances and the Chargeable Primary Care Team Payments associated with Members who leave the Plan Panel of the Primary Care Physician if the Plan finds that the Primary Care Physician encouraged such Members to transfer for inappropriate reasons. The Plan will give the Primary Care Physician and/or the Primary Care Team, as appropriate, ninety (90) days notice before implementing this provision, but any related adjustments that are made by the Plan will be computed from the date of the transfer.

5.    **Non-Financial Performance Evaluations and Related Incentive Payments**

The Plan wishes to provide financial incentives to Primary Care Physicians to encourage the delivery of high quality services, the achievement of high levels of Member satisfaction, and the attainment of other related Plan objectives. Therefore, the Plan reserves the right to make adjustments to the Member Management Fee of the Primary Care Physician based on the Plan's evaluation of the performance of the Primary Care Physician or the Primary Care Team in these non-financial performance areas. The adjustment for the non-financial performance evaluation will be added to the Combined MMF (see Schedule 2).

6.    **Combined Member Management Fee**

During the period January 1, 1995 through March 30, 1996, the Plan will pay the Primary Care Physician the Base Member Management Fee of $1.50 per Member per month. Effective April 1, 1996, the Plan will pay the Primary Care Physician a Combined Member Management Fee consisting of: the Base Member Management Fee, the PCP Account Adjustment, and the Primary Care Team Account Adjustment. However, the Combined Member Management Fee will be no less than $0.00 for any Primary Care Physician; will be no more than $5.00 for Primary Care Physicians who had an average of fewer than one hundred (100) Members during the Accounting Period from which the MMF adjustments derive; and will be no more than $8.00 for Primary Care Physicians who had an average of one hundred (100) Members or more during the Accounting Period from which the MMF adjustments derive.

A Primary Care Physician whose Combined Member Management Fee would have exceeded $8.00 except for the limitation specified above will have the first $1.50 of the differential amount in excess of $8.00 carried over and added to his/her Combined Member Management Fee in the next period, and thereby into future periods if necessary, provided that the result does not exceed the $8.00 Combined Member Management Fee limit in any period.

7. **Adjustments to PCP and Primary Care Team Accounts:  Effective Dates and Termination of Member Coverage**

If a Member leaves a Plan Panel effective on the fifteenth day of a month or later, or joins effective before the fifteenth day of a month, the Plan will add all of the applicable PCP Allowance for that month to the appropriate PCP Account and will add all of the applicable Primary Care Team Allowance to the appropriate Primary Care Team Account for that month.  Otherwise, no PCP Allowance or Primary Care Team Allowance will be added to the PCP Account or to the Primary Care Team Account in the month in which a Member leaves or joins a Plan Panel.

8. **Exclusion of Medicaid Members from MMF Program**

Members enrolled in HMO Blue through the Medicaid account shall be excluded from the MMF program effective July 1, 1996.  For Medicaid members, the Plan shall pay the Group the base Member Management Fee of $1.50 per Member per month for Accounting Periods beginning on or after July 1, 1996.  The Plan shall begin to pay this base Member Management Fee at the time the MMF adjustment applicable to the fourth Accounting Period is paid out. All MMF adjustments reflecting Group and Primary Care Team performance for Accounting Periods beginning prior to July 1, 1996 will continue to include the experience of Medicaid members.

**Schedule 1(A)**

**Schedule of Primary Care Physician Account Adjustments
to the Member Management Fee (MMF)**

| Per Member Per Month Balance in the PCP Account at the End of the Accounting Period | | | PCP Account Adjustment to the MMF |
|---|---|---|---|
| Greater than: | but | not more than: | |
| | | -$13.75 | -$1.50 |
| -$13.75 | | -$11.25 | -$1.25 |
| -$11.25 | | -$8.75 | -$1.00 |
| -$8.75 | | -$6.25 | -$0.75 |
| -$6.25 | | -$3.75 | -$0.50 |
| -$3.75 | | -$0.50 | -$0.25 |
| -$0.50 | | $0.35 | $0.00 |
| $0.35 | | $1.05 | $0.25 |
| $1.05 | | $1.80 | $0.50 |
| $1.80 | | $2.50 | $0.75 |
| $2.50 | | $3.20 | $1.00 |
| $3.20 | | $3.90 | $1.25 |
| $3.90 | | $4.65 | $1.50 |
| $4.65 | | $5.35 | $1.75 |
| $5.35 | | $6.05 | $2.00 |
| $6.05 | | $6.80 | $2.25 |
| $6.80 | | $7.50 | $2.50 |
| $7.50 | | $8.20 | $2.75 |
| $8.20 | | $8.90 | $3.00 |
| $8.90 | | $9.65 | $3.25 |
| $9.65 | | $10.35 | $3.50 |
| $10.35 | | $11.05 | $3.75 |
| $11.05 | | $11.80 | $4.00 |
| $11.80 | | $12.50 | $4.25 |
| $12.50 | or more | | $4.50 |

## Schedule 1(B)

## Schedule of Primary Care Team Account Adjustments
## to the Member Management Fee (MMF)

| Per Member Per Month Balance in the Primary Care Team Account at the End of the Accounting Period | | | Primary Care Team Account Adjustment to the MMF |
|---|---|---|---|
| Greater than: | but | not more than: | |
| | | -$13.75 | -$1.50 |
| -$13.75 | | -$11.25 | -$1.25 |
| -$11.25 | | -$8.75 | -$1.00 |
| -$8.75 | | -$6.25 | -$0.75 |
| -$6.25 | | -$3.75 | -$0.50 |
| -$3.75 | | -$0.50 | -$0.25 |
| -$0.50 | | $0.35 | $0.00 |
| $0.35 | | $1.05 | $0.25 |
| $1.05 | | $1.80 | $0.50 |
| $1.80 | | $2.50 | $0.75 |
| $2.50 | | $3.20 | $1.00 |
| $3.20 | | $3.90 | $1.25 |
| $3.90 | | $4.65 | $1.50 |
| $4.65 | | $5.35 | $1.75 |
| $5.35 | | $6.05 | $2.00 |
| $6.05 | | $6.80 | $2.25 |
| $6.80 | | $7.50 | $2.50 |
| $7.50 | | $8.20 | $2.75 |
| $8.20 | | $8.90 | $3.00 |
| $8.90 | | $9.65 | $3.25 |
| $9.65 | | $10.35 | $3.50 |
| $10.35 | | $11.05 | $3.75 |
| $11.05 | | $11.80 | $4.00 |
| $11.80 | | $12.50 | $4.25 |
| $12.50 | or more | | $4.50 |

**Schedule 2**

**Combined Member Management Fee (MMF) Calculations
(all figures per Member per month)**

|  | PCP averaging fewer than 100 Members | PCP averaging 100 or more Members |
|---|---|---|
| *Best Case:* | | |
| Base MMF | $1.50 | $1.50 |
| Maximum Effective Financial Adjustment (i.e., sum of PCP & PCT Adjustments and carryover) | 3.50 | 6.50 |
| Maximum Non-Financial Adjustment | 0.50 | 0.50 |
| **Maximum Combined MMF** | **$5.50** | **$8.50** |
| *Worst Case:* | | |
| Base MMF | 1.50 | 1.50 |
| Lowest Effective Financial Adjustment (i.e., sum of PCP & PCT Adjustments) | (1.50) | (1.50) |
| Lowest Non-Financial Adjustment | 0.00 | 0.00 |
| **Lowest Combined MMF** | **$0.00** | **$0.00** |

**Schedule 3**

**Illustration of**
**Combined Member Management Fee (MMF) Adjustments**

For illustrative purposes, assume that Dr. Smith is a Primary Care Physician with more than 100 Members in his Plan Panel for the particular Accounting Period. He is a member of Primary Care Team XYZ. His base MMF is $1.50.

At the end of the relevant Accounting Period, Dr. Smith's PCP Account shows a per Member per month balance of $5.75. At the same time, Primary Care Team XYZ's Primary Care Team Account shows a per Member per month balance of $3.55.

The computation of Dr. Smith's new MMF would be performed as follows by referring to the ranges and associated MMF adjustments shown in Schedules 1(A), 1(B), 1(C) and 1(D):

| | |
|---|---|
| Base MMF | $1.50 |
| PCP Account Adjustment | $2.00 |
| Primary Care Team Account Adjustment | $1.25 |
| | |
| New MMF | $4.75 |

## Schedule 4

### Accounting for an Individual Member's Medical Expenses

| Part I. **Summary of payments made by the Plan** for the individual patient during the prior twelve months (i.e., payments made for services in the MMF program, excluding MHSA and OOA) |  |
|---|---|
| A. For each distinct inpatient admission, enter the total Institutional Inpatient Payments made by the Plan: | |
| • Admission 1 | _____ |
| • Admission 2 | _____ |
| • Admission 3 | _____ |
| • Admission 4 | _____ |
| B. Total Institutional Inpatient Payments (sum of all entries in item A) | _____ |
| C. Enter total of other payments made by the Plan | _____ |
| D. Total Applicable Payments (B + C) | _____ |

| Part II.  **The Chargeable PCP Account Payments** |  |
|---|---|
| A. For each inpatient admission in Part I, item A, enter $1,500 or the actual payment, whichever is less: | |
| • Admission 1 | _____ |
| • Admission 2 | _____ |
| • Admission 3 | _____ |
| • Admission 4 | _____ |
| B. Calculate the sum of all entries in item A | _____ |
| C. Enter total other payments (from Part I, line C) | _____ |
| D. Add lines B and C (these are the payments to be applied against the PCP Individual Stop Loss Limit) | _____ |
| E. If line D > $5,000, then subtract $5,000 from line D; otherwise, enter $0 | _____ |
| F. Enter 10% of line E (these are the payments above $5,000 chargeable to the PCP Account) | _____ |
| G. If line F > 0, then enter $5,000; otherwise, enter total from line D (these are the total payments up to $5,000 chargeable to the Primary Care Team Account) | _____ |
| H. Add lines F and G:  these are the Total *"Chargeable PCP Account Payments"* | _____ |

**Schedule 4**

**Accounting for an Individual Member's Medical Expenses**

| Part III.  The Chargeable Primary Care Team Account Payments | |
|---|---|
| A.  Enter total Applicable Payments (from Part I, line D) | _____ |
| B.  Enter total from Part II, line G | _____ |
| C.  Enter total from Part II, line F | _____ |
| D.  If line A □ $50,000, then enter (A - B - C) and skip to line F; otherwise, skip to line E | _____ |
| E.  If line C □ $4,500, then enter $50,000 - B - C); otherwise, enter $40,500 | _____ |
| F.  Add lines D and E (these are the total payments under $50,000 chargeable to the Primary Care Team Account) | _____ |
| G.  If line A > $50,000, then enter (A - $50,000) x 10%; otherwise, enter $0 (these are the payments above $50,000 chargeable to the Primary Care Team Account) | _____ |
| H.  Add lines F and G:  these are the total *"Chargeable Primary Care Team Account Payments"* | _____ |

| Part IV.  Summary of medical costs charged against Accounts or covered by the Plan | |
|---|---|
| A.  Total Chargeable PCP Account Payments          (enter total from Part II, line H) | _____ |
| B.  Total Chargeable Primary Care Team Account Payments (enter total from Part III, line H) | _____ |
| C.  Total Charges Covered by the Plan          (Part I, line D) - A - B | _____ |
| D.  Total Applicable Payments (A + B + C) | _____ |