# Exhibit 43

Injectable Drug Codes
1997-2003

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | IMMUNE GLOBULIN HUMAN FOR INTRAMUSCULAR USE | $38.00 | 5/1/2000 | $38.00 | 5/1/2000 | $38.00 | 5/1/2000 | $38.00 | 5/1/2000 | | |
| | IMMUNE GLOBULIN HUMAN FOR INTRAVENOUS USE | $90.25 | 5/1/2000 | $90.25 | 5/1/2000 | $90.25 | 5/1/2000 | $90.25 | 5/1/2000 | | |
| | BOTULINUM ANTITOXIN EQUINE ANY ROUTE | $3.98 | 5/1/2000 | $3.98 | 5/1/2000 | $3.98 | 5/1/2000 | $3.98 | 5/1/2000 | | |
| | BOTULISM IMMUNE GLOBULIN HUMAN INTRAVENOUS USE | $3.98 | 5/1/2000 | $3.98 | 5/1/2000 | $3.98 | 5/1/2000 | $3.98 | 5/1/2000 | | |
| | CYTOMEGALOVIRUS IMMUNE GLOB HUMAN IV USE | $590.90 | 3/1/2002 | $590.90 | 3/1/2002 | $655.98 | 1/1/2001 | $611.80 | 5/1/2000 | | |
| | DIPHTHERIA ANTITOXIN EQUINE ANY ROUTE | $16.21 | 5/1/2000 | $16.21 | 5/1/2000 | $16.21 | 5/1/2000 | $16.21 | 5/1/2000 | | |
| | HEPATITIS B IMMUNE GLOB HUMAN INTRAMUSCULAR USE | $649.80 | 4/1/2003 | $135.43 | 1/1/2002 | $159.13 | 5/1/2000 | $159.13 | 5/1/2000 | | |
| | RABIES IMMUNE GLOB HUMAN IM &/ SUBQ USE | $72.85 | 10/1/2002 | $71.25 | 1/1/2002 | $106.32 | 5/1/2000 | $106.32 | 5/1/2000 | | |
| | RABIES IMMUE GLOB HEAT-TREAT'D HUMN IM &/ SUBQ | $78.11 | 7/1/2003 | $73.63 | 1/1/2002 | $147.25 | 5/1/2000 | $147.25 | 5/1/2000 | | |
| | RSV IMMUNE GLOBULIN INTRAMUSCULAR USE 50 MG EACH | $637.55 | 3/1/2002 | $637.55 | 3/1/2002 | $664.49 | 1/1/2001 | $1,217.00 | 1/1/2000 | | |
| | RSV IMMUNE GLOBULIN HUMAN FOR INTRAVENOUS USE | $16.55 | 4/1/2003 | $21.39 | 5/1/2000 | $21.39 | 5/1/2000 | $21.39 | 5/1/2000 | | |
| | RHOGAM HUMAN FULL-DOSE FOR INTRAMUSCULAR USE | $119.83 | 3/1/2002 | $119.83 | 3/1/2002 | $113.05 | 5/1/2000 | $113.05 | 5/1/2000 | | |
| | RHOGAM HUMAN MINI-DOSE FOR INTRAMUSCULAR USE | $35.91 | 7/1/2003 | $41.33 | 3/1/2002 | $41.33 | 5/1/2000 | $41.33 | 5/1/2000 | | |
| | RHO IMMUNE GLOBULIN HUMAN FOR INTRAVENOUS USE | $134.90 | 3/1/2002 | $134.90 | 3/1/2002 | $134.90 | 5/1/2000 | $134.90 | 5/1/2000 | | |
| | TETANUS IMMUNE GLOBULIN HUMAN INTRAMUSCULAR USE | $114.00 | 4/1/2003 | $102.60 | 1/1/2002 | $95.00 | 5/1/2000 | $95.00 | 5/1/2000 | | |
| | VACCINIA IMMUNE GLOBULIN HUMAN INTRAMUSCULAR USE | $9.33 | 5/1/2000 | $9.33 | 5/1/2000 | $9.33 | 5/1/2000 | $9.33 | 5/1/2000 | | |

Injectable Drug Codes
1997-2003

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | VARICELLA-ZOSTER IMMUNE GLOBULIN HUMAN IM USE | $118.75 | 3/1/2002 | $118.75 | 3/1/2002 | $118.75 | 5/1/2000 | $118.75 | 5/1/2000 | | |
| | ADENOVIRUS VACCINE TYPE 4 LIVE FOR ORAL USE | $38.00 | 1/1/1999 | $38.00 | 1/1/1999 | $38.00 | 1/1/1999 | $38.00 | 1/1/1999 | | |
| | ADENOVIRUS VACCINE TYPE 7 LIVE FOR ORAL USE | $38.00 | 1/1/1999 | $38.00 | 1/1/1999 | $38.00 | 1/1/1999 | $38.00 | 1/1/1999 | | |
| | ANTHRAX VACCINE FOR SUBCUTANEOUS USE | $133.12 | 7/1/2002 | $133.12 | 7/1/2002 | $104.16 | 1/1/1999 | $104.16 | 1/1/1999 | | |
| | BACILLUS CALMETTE-GUERIN VACC TB LIVE PERQ USE | $168.56 | 7/1/2003 | $183.82 | 4/1/2002 | $168.33 | 4/1/2000 | $168.33 | 4/1/2000 | | |
| | BCG VACCINE FOR BLADDER CA LIVE-INTRAVESICAL USE | $185.93 | 7/1/2003 | $183.82 | 4/1/2002 | $168.33 | 4/1/2000 | $168.33 | 4/1/2000 | | |
| | CHOLERA VACCINE, ORAL | $0.00 | 4/1/2000 | $0.00 | 4/1/2000 | $0.00 | 4/1/2000 | $0.00 | 4/1/2000 | | |
| | HEPATITIS A VACCINE ADULT DOS INTRAMUSCULAR USE | $64.26 | 4/1/2003 | $66.93 | 4/1/2002 | $59.45 | 4/1/1999 | $59.45 | 4/1/1999 | | |
| | HEPATITIS A VACC PED/ADOLES DOS 2 DOSE SCHED IM | $31.37 | 4/1/2003 | $66.93 | 4/1/2002 | $59.45 | 4/1/1999 | $59.45 | 4/1/1999 | | |
| | HEP A VACC PED/ADOLES DOSAGE 3 DOSE SCHEDULE IM | $31.37 | 4/1/2003 | $66.93 | 4/1/2002 | $59.45 | 4/1/1999 | $59.45 | 4/1/1999 | | |
| | HEP&HEP B VACCINE ADULT DOSE INTRAMUSCULAR USE | $98.15 | 7/1/2002 | $98.15 | 7/1/2002 | $54.70 | 1/1/1999 | $54.70 | 1/1/1999 | | |
| | HEMOPHILUS FLU B VACCINE HBOC CONJUGATE IM USE | $25.60 | 4/1/2003 | $26.75 | 7/1/2002 | $24.05 | 1/1/2000 | $24.05 | 1/1/2000 | | |
| | HEMOPHILUS INFLUENZA B VACC PRP-D CONJ-BOOSER-IM | $23.50 | 7/1/2002 | $23.50 | 7/1/2002 | $23.45 | 7/1/1999 | $23.45 | 7/1/1999 | | |
| | HEMOPHILUS FLU B VACC PRP-OMP CONJUGATE IM USE | $23.50 | 7/1/2002 | $23.50 | 7/1/2002 | $23.45 | 7/1/1999 | $23.45 | 7/1/1999 | | |
| | HEMOPHILUS FLU B VACCINE PRP-T CONJUGATE IM USE | $23.50 | 7/1/2002 | $23.50 | 7/1/2002 | $23.45 | 7/1/1999 | $23.45 | 7/1/1999 | | |
| | FLU VIRUS VAC SPLIT PRES FREE 6-35 MO AGE IM | | | | | | | | | | |

Injectable Drug Codes
1997-2003

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | FLU VIRUS VAC SPLIT PRES FREE IND 3 YR AGE&> IM | | | | | | | | | | |
| | INFLUENZA VIRUS VACC-SPLIT VIRUS 6-35 MO IM USE | $8.44 | 4/1/2003 | $7.50 | 7/1/2002 | $2.14 | 7/13/2001 | $4.99 | 4/1/1999 | | |
| | INFLUENZA VIRUS VACC-SPLIT VIRUS 3 YR AGE & > IM | $8.44 | 4/1/2003 | $7.50 | 7/1/2002 | $4.27 | 7/13/2001 | $4.99 | 4/1/2000 | | |
| | Influenza virus vaccine, whole virus, for intramuscular or jet injection use (Code Price is per 0.5 mL dose)(Code deleted effective 1/1/04 - product no longer available) | $8.44 | 4/1/2003 | $7.50 | 7/1/2002 | $4.27 | 7/13/2001 | $4.99 | 4/1/2000 | | |
| | INFLUENZA VIRUS VACCINE LIVE FOR INTRANASAL USE | $4.99 | 4/1/1999 | $4.99 | 4/1/1999 | $4.99 | 4/1/1999 | $4.99 | 4/1/1999 | | |
| | LYM DZ VACCINE ADULT DOSAGE INTRAMUSCULAR USE | $64.31 | 4/1/2002 | $64.31 | 4/1/2002 | $61.25 | 1/1/1999 | $61.25 | 1/1/1999 | | |
| | PNEUMOCOCCAL CONJUGATE VAC POLYVALENT < 5 YRS-IM | $72.50 | 1/1/2000 | $72.50 | 1/1/2000 | $72.50 | 1/1/2000 | $72.50 | 1/1/2000 | | |
| | RABIES VACCINE FOR INTRAMUSCULAR USE | $143.33 | 7/1/2003 | $151.38 | 4/1/2000 | $151.38 | 4/1/2000 | $151.38 | 4/1/2000 | | |
| | RABIES VACCINE FOR INTRADERMAL USE | $143.23 | 7/1/2003 | $90.63 | 4/1/2000 | $90.63 | 4/1/2000 | $90.63 | 4/1/2000 | | |
| | ROTAVIRUS VACCINE TETRAVALENT LIVE FOR ORAL USE | $48.25 | 7/1/1999 | $48.25 | 7/1/1999 | $48.25 | 7/1/1999 | $48.25 | 7/1/1999 | | |
| | TYPHOID VACCINE LIVE ORAL | $9.62 | 4/1/2002 | $9.62 | 4/1/2002 | $9.13 | 1/1/2000 | $9.13 | 1/1/2000 | | |
| | TYPHOID VACC VI CAPSULAR POLYSACCHARIDE IM USE | $44.21 | 7/1/2003 | $47.68 | 4/1/2002 | $44.95 | 7/1/1999 | $44.95 | 7/1/1999 | | |
| | TYPHOID VACC-HEAT & PHENOL INACTIVATED SUBQ/DERM | $1.93 | 10/1/2001 | $1.93 | 10/1/2001 | $1.16 | 4/1/2000 | $1.16 | 4/1/2000 | | |
| | TYPHOID VACCINE ACETONE-KILLED DRIED SUBQ USE | $1.93 | 10/1/2001 | $1.93 | 10/1/2001 | $1.16 | 4/1/2000 | $1.16 | 4/1/2000 | | |

**Injectable Drug Codes**
**1997-2003**

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DTAP-HIB-IPV FOR INTRAMUSCULAR USE | | | | | | | | | | |
| | DTAP INDIVIDUAL YOUNGER THAN 7 YRS IM USE | $23.59 | 4/1/2003 | $22.27 | 4/1/2002 | $20.38 | 10/1/2000 | $19.51 | 1/1/2000 | | |
| | DIPHTH TETANUS TOX&WHOLE CELL PERTUSS VAC IM USE | $22.27 | 4/1/2002 | $22.27 | 4/1/2002 | $20.38 | 10/1/2000 | $19.51 | 1/1/2000 | | |
| | DT ADSORBED INDIVIDUAL YOUNGER THAN 7 YRS IM USE | $3.21 | 1/1/2000 | $3.21 | 1/1/2000 | $3.21 | 1/1/2000 | $3.21 | 1/1/2000 | | |
| | TETANUS TOXOID ADSORBED FOR INTRAMUSCULAR USE | $15.13 | 7/1/2003 | $2.54 | 4/1/2000 | $2.54 | 4/1/2000 | $2.54 | 4/1/2000 | | |
| | MUMPS VIRUS VACCINE LIVE FOR SUBCUTANEOUS USE | $18.79 | 4/1/2003 | $20.88 | 7/1/2002 | $19.96 | 4/1/2001 | $18.36 | 4/1/1999 | | |
| | MEASLES VIRUS VACCINE LIVE SUBCUTANEOUS USE | $15.17 | 7/1/2003 | $18.11 | 4/1/2002 | $17.31 | 4/1/2001 | $15.93 | 4/1/1999 | | |
| | RUBELLA VIRUS VACCINE LIVE SUBCUTANEOUS USE | $17.62 | 7/1/2003 | $18.98 | 4/1/2002 | $18.12 | 4/1/2001 | $16.88 | 7/1/1999 | | |
| | MEASLES MUMPS & RUBELLA VIRUS VACC LIVE-SUBQ USE | $42.85 | 7/1/2003 | $43.76 | 4/1/2002 | $40.01 | 10/1/2000 | $38.28 | 1/1/2000 | | |
| | MEASLES & RUBELLA VIRUS VACCINE LIVE SUBQ USE | $25.36 | 4/1/2000 | $25.36 | 4/1/2000 | $25.36 | 4/1/2000 | $25.36 | 4/1/2000 | | |
| | Rubella and mumps virus vaccine, live, for subcutaneous use.  (Further Documentation Requested)(Code deleted effective 01/01/2003) | $0.00 | 4/1/2003 | $27.44 | 4/1/1999 | $27.44 | 4/1/1999 | $27.44 | 4/1/1999 | | |
| | MEASLES MUMPS RUBELLA&VARICELLA VACC LIVE SUBQ | $45.70 | 1/1/2003 | $38.48 | 10/1/2000 | $38.48 | 10/1/2000 | $37.23 | 4/1/2000 | | |
| | POLIOVIRUS VACCINE LIVE FOR ORAL USE | $24.59 | 4/1/2002 | $24.59 | 4/1/2002 | $20.45 | 7/1/1999 | $20.45 | 7/1/1999 | | |
| | POLIOVIRUS VACCINE INACTIVATED SUBCUTANEOUS USE | $27.06 | 7/1/2003 | $30.93 | 10/1/2001 | $28.95 | 4/1/2001 | $26.05 | 4/1/2000 | | |

Injectable Drug Codes
1997-2003

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Tetanus and diphtheria toxoids (Td) adsorbed, preservative free, for use in individuals seven years or older, for intramuscular use (Code Price is per 0.5 mL)(Note: Code is not effective for billing Medicare until 7/1/05) | | | | | | | | | | |
| | TDAP VACCINE INDIVIDUAL 7 YEARS/OLDER IM USE | | | | | | | | | | |
| | VARICELLA VIRUS VACCINE LIVE SUBCUTANEOUS USE | $72.45 | 7/1/2003 | $65.22 | 7/1/2001 | $65.22 | 7/1/2001 | $59.56 | 1/1/2000 | | |
| | YELLOW FEVER VACCINE LIVE FOR SUBCUTANEOUS USE | $62.28 | 7/1/2003 | $73.38 | 4/1/2001 | $73.38 | 4/1/2001 | $71.24 | 4/1/2000 | | |
| | TD ADSORBED INDIVIDUAL 7 YEARS OR OLDER IM USE | $12.13 | 7/1/2003 | $3.21 | 4/1/2000 | $3.21 | 4/1/2000 | $3.21 | 4/1/2000 | | |
| | DIPHTHERIA TOXOID FOR INTRAMUSCULAR USE | $3.94 | 1/1/1999 | $3.94 | 1/1/1999 | $3.94 | 1/1/1999 | $3.94 | 1/1/1999 | | |
| | DIPTH TET&WHOLE CELL PERTUSS&INFLU B VAC-IM | $39.57 | 4/1/2003 | $36.85 | 1/1/2000 | $36.85 | 1/1/2000 | $36.85 | 1/1/2000 | | |
| | DIPTH TET&ACELL PERTUSSIS&INFLU B VAC-IM USE | $51.41 | 7/1/2003 | $36.85 | 1/1/2000 | $36.85 | 1/1/2000 | $36.85 | 1/1/2000 | | |
| | DTAP-HEP B-IPV INACTIVATED-IM USE | $24.56 | 7/1/2002 | $24.56 | 7/1/2002 | | | | | | |
| | CHOLERA VACCINE FOR INJECTABLE USE | $3.85 | 10/1/2001 | $3.85 | 10/1/2001 | $1.73 | 4/1/2000 | $1.73 | 4/1/2000 | | |
| | PLAGUE VACCINE INTRAMUSCULAR USE | $7.50 | 4/1/1999 | $7.50 | 4/1/1999 | $7.50 | 4/1/1999 | $7.50 | 4/1/1999 | | |
| | PPV 23-VALENT ADLT/IMMUOSUP-2 YR/OLDER SUBQ/IM | $13.79 | 4/1/2003 | $16.06 | 4/1/2002 | $13.33 | 12/15/2000 | $14.04 | 4/1/2000 | | |
| | MENINGOCOCCAL POLYSACCHARIDE VACC SUBQ USE | $105.00 | 7/1/2003 | $105.00 | 11/1/2001 | $77.25 | 4/1/2001 | $75.00 | 7/1/1999 | | |
| | MNINGOCOCCL CONJUGATE VAC SEROGRP A C Y&W-135 IM | | | | | | | | | | |

**Injectable Drug Codes**
**1997-2003**

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Injection, secobarbital sodium, up to 250mg. (Code deleted as of January 1, 2002) | $0.00 | 4/1/2002 | $0.00 | 4/1/2002 | $5.84 | 1/1/1999 | $5.84 | 1/1/1999 | $5.84 | 1/1/1998 |
| | INJECTION AUROTHIOGLUCOSE UP TO 50 MG | $15.93 | 4/1/2003 | $14.57 | 1/1/2002 | $9.07 | 1/1/1999 | $9.07 | 1/1/1999 | $9.07 | 1/1/1998 |
| J2912 | INJECTION SODIUM CHLORIDE 0.9% PER 2 ML | $0.49 | 4/1/2003 | $0.79 | 1/1/2002 | $0.44 | 5/1/2000 | $0.44 | 5/1/2000 | | |
| | Injection, sodium ferric gluconate complex in sucrose injection, 62.5mg (Code deleted effective 01/01/2003 refer to J2916) | $0.00 | 4/1/2003 | $40.85 | 1/1/2002 | $79.80 | 1/1/2001 | | | | |
| J2916 | INJ SODIM FERRIC GLUCONATE CMPLX SUCROSE 12.5 MG | $8.17 | 1/1/2003 | | | | | | | | |
| J2920 | INJ METHYLPRDNISOLONE SODIUM SUCCNAT TO 40 MG | $1.58 | 10/1/2002 | $1.92 | 1/1/2002 | $1.09 | 1/1/1999 | $1.09 | 1/1/1999 | $1.09 | 1/1/1998 |
| J2930 | INJ METHYLPRDNISOLONE SODIUM SUCCNAT TO 125 MG | $1.92 | 10/1/2002 | $3.10 | 1/1/2002 | $2.51 | 1/1/1999 | $2.51 | 1/1/1999 | $2.51 | 1/1/1998 |
| | INJECTION SOMATREM 1 MG | $45.56 | 10/1/2002 | $41.90 | 1/1/2002 | | | | | | |
| | INJECTION SOMATROPIN 1 MG | $43.74 | 7/1/2002 | $45.56 | 7/1/2002 | | | | | | |
| | INJECTION PROMAZINE HCL UP TO 25 MG | $0.46 | 1/1/2002 | $0.46 | 1/1/2002 | $0.95 | 1/1/1999 | $0.95 | 1/1/1999 | $0.95 | 1/1/1998 |
| | Injection, methicillin sodium, up to 1g. (Code deleted as of January 1, 2002) | $0.00 | 4/1/2002 | $0.00 | 4/1/2002 | $6.08 | 1/1/1999 | $6.08 | 1/1/1999 | $6.08 | 1/1/1998 |
| | INJECTION RETEPLASE 18.1 MG | $1,306.25 | 1/1/2002 | $1,306.25 | 1/1/2002 | $1,306.25 | 1/1/2001 | | | | |
| | Injection, reteplase, 37.6mg (two single vials). (Code deleted as of January 1, 2001) | $0.00 | 4/1/2001 | $0.00 | 4/1/2001 | $0.00 | 4/1/2001 | $2,612.50 | 5/1/2000 | | |
| | INJECTION STREPTOKINASE PER 250000 IU | $89.06 | 7/1/2003 | $120.95 | 1/1/2002 | $115.64 | 9/1/2000 | $71.25 | 1/1/1999 | $71.25 | 1/1/1998 |

**Injectable Drug Codes**
**1997-2003**

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/96 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Injection, alteplase recombinant, per 10mg.(Code deleted as of January 1, 2001) | $0.00 | 4/1/2001 | $0.00 | 4/1/2001 | $0.00 | 4/1/2001 | $261.25 | 1/1/1999 | $261.25 | 1/1/1998 |
| | INJECTION ALTEPLASE RECOMBINANT 1 MG | $35.63 | 4/1/2002 | $35.63 | 4/1/2002 | $26.13 | 1/1/2001 | | | | |
| | INJECTION STREPTOMYCIN UP TO 1 G | $6.35 | 4/1/2003 | $6.34 | 1/1/2002 | $5.65 | 5/1/2000 | $5.65 | 5/1/2000 | $0.00 | 1/1/1994 |
| | Injection, Strontium-89 Chloride, per 10mL (discontinued 12/31/1997) | $0.00 | 1/1/1999 | $0.00 | 1/1/1999 | $0.00 | 1/1/1999 | $0.00 | 1/1/1999 | $2,458.60 | 1/1/1998 |
| J3010 | INJECTION FENTANYL CITRATE 0.1 MG | $0.93 | 7/1/2003 | $1.34 | 1/1/2002 | $1.96 | 1/1/1999 | $1.96 | 1/1/1999 | $1.96 | 1/1/1998 |
| J3030 | INJECTION SUMATRIPTAN SUCCINATE 6 MG | $26.56 | 10/1/2002 | $25.94 | 1/1/2002 | $48.49 | 5/1/2001 | $46.18 | 1/1/2000 | $38.30 | 1/1/1998 |
| | INJECTION PENTAZOCINE 30 MG | $5.23 | 4/1/2003 | $2.89 | 1/1/1999 | $2.89 | 1/1/1999 | $2.89 | 1/1/1999 | $2.89 | 1/1/1998 |
| | Injection, chlorprothixene, up to 50mg. (Code deleted as of January 1, 2002) | $0.00 | 4/1/2002 | $0.00 | 4/1/2002 | $4.59 | 1/1/1999 | $4.59 | 1/1/1999 | $4.59 | 1/1/1998 |
| | INJECTION TENECTEPLASE 50MG | $2,612.50 | 1/1/2002 | $2,612.50 | 1/1/2002 | | | | | | |
| | INJECTION TERBUTALINE SULFATE UP TO 1 MG | $29.39 | 4/1/2003 | $2.13 | 1/1/2002 | $2.68 | 5/1/2001 | $2.34 | 1/1/2000 | $1.91 | 1/1/1998 |
| | INJECTION TERIPARATIDE 10 MCG | | | | | | | | | | |
| | INJECTION TESTOSTERONE ENANTHATE UP TO 100 MG | $8.12 | 7/1/2003 | $11.32 | 1/1/2002 | $0.95 | 1/1/1999 | $0.95 | 1/1/1999 | $0.95 | 1/1/1998 |
| | INJECTION TESTOSTERONE ENANTHATE UP TO 200 MG | $16.25 | 4/1/2003 | $22.65 | 1/1/2002 | $4.00 | 1/1/1999 | $4.00 | 1/1/1999 | $0.95 | 1/1/1998 |
| | INJECTION TESTOSTERONE SUSPENSION UP TO 50 MG | $0.40 | 4/1/2003 | $0.97 | 1/1/2002 | $0.95 | 1/1/1999 | $0.95 | 1/1/1999 | $0.95 | 1/1/1998 |
| | INJECTION TESTOSTERONE PROPIONATE UP TO 100 MG | $1.71 | 7/1/2003 | $0.87 | 1/1/2002 | $1.71 | 1/1/1999 | $1.71 | 1/1/1999 | $0.95 | 1/1/1998 |

**Injectable Drug Codes**
**1997-2003**

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | INJECTION CHLORPROMAZINE HCL UP TO 50 MG | $4.40 | 7/1/2003 | $3.47 | 1/1/2002 | $1.01 | 1/1/1999 | $1.01 | 1/1/1999 | $1.01 | 1/1/1998 |
| | INJ THYROTROPIN ALPHA 0.9 MG PROV 1.1 MG VIAL | $617.50 | 7/1/2003 | $566.68 | 4/1/2002 | $531.05 | 5/1/2001 | $150.46 | 1/1/1999 | $150.46 | 1/1/1998 |
| J3245 | Injection, tirofiban hydrochloride, 12.5mg (Code deleted effective 1/1/05 refer to J3246) | $471.39 | 7/1/2003 | $462.16 | 4/1/2002 | $415.62 | 12/15/2000 | $399.00 | 1/1/2000 | | |
| | INJECTION TIROFIBAN HCL 0.25MG | | | | | | | | | | |
| | INJECTION TRIMETHOBENZAMIDE HCL UP TO 200 MG | $1.55 | 10/1/2002 | $1.24 | 1/1/2002 | $4.59 | 9/1/2000 | $1.23 | 4/1/2000 | $3.21 | 1/1/1998 |
| J3260 | INJECTION TOBRAMYCIN SULFATE UP TO 80 MG | $4.46 | 7/1/2003 | $11.35 | 1/1/2002 | $3.47 | 1/1/1999 | $3.47 | 1/1/1999 | $3.47 | 1/1/1998 |
| | INJECTION TORSEMIDE 10 MG/ML | $1.42 | 4/1/2003 | $2.53 | 7/1/2002 | $2.21 | 7/13/2001 | $1.04 | 1/1/2000 | $1.83 | 1/1/1998 |
| | Injection, imipramine HCl, up to 25mg. (Code deleted as of January 1, 2002) | $0.00 | 4/1/2002 | $0.00 | 4/1/2002 | $0.98 | 1/1/1999 | $0.98 | 1/1/1999 | $0.98 | 1/1/1998 |
| | INJECTION THIETHYLPERAZINE MALEATE UP TO 10 MG | $5.65 | 7/1/2003 | $4.60 | 1/1/2002 | $4.43 | 1/1/1999 | $4.43 | 1/1/1999 | $4.43 | 1/1/1998 |
| | INJECTION TRIAMCINOLONE ACETONIDE PER 10 MG | $1.52 | 1/1/2002 | $1.52 | 1/1/2002 | $1.32 | 1/1/1999 | $1.32 | 1/1/1999 | $1.32 | 1/1/1998 |
| J3302 | INJECTION TRIAMCINOLONE DIACETATE PER 5 MG | $0.34 | 7/1/2003 | $0.86 | 1/1/2002 | $3.86 | 1/1/1999 | $3.86 | 1/1/1999 | $3.86 | 1/1/1998 |
| J3303 | INJECTION TRIAMCINOLONE HEXACETONIDE PER 5 MG | $1.01 | 4/1/2003 | $2.60 | 1/1/2002 | $1.95 | 1/1/1999 | $1.95 | 1/1/1999 | $1.95 | 1/1/1998 |
| J3305 | INJECTION TRIMETREXATE GLUCORONATE PER 25 MG | $142.50 | 10/1/2002 | $118.75 | 1/1/2002 | $118.75 | 7/13/2001 | $69.83 | 1/1/2000 | $53.47 | 1/1/1998 |
| | INJECTION PERPHENAZINE UP TO 5 MG | $7.14 | 10/1/2002 | $6.79 | 1/1/2002 | $4.07 | 1/1/1999 | $4.07 | 1/1/1999 | $4.07 | 1/1/1998 |
| | INJECTION TRIPTORELIN PAMOATE 3.75 MG | $415.24 | 1/1/2003 | | | | | | | | |

**Injectable Drug Codes**
**1997-2003**

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | INJ SPECTINOMYCIN DIHYDROCHLORIDE UP TO 2 GM | $26.80 | 1/1/2002 | $26.80 | 1/1/2002 | $14.10 | 1/1/1999 | $14.10 | 1/1/1999 | $14.10 | 1/1/1998 |
| | INJECTION UREA UP TO 40 GM | $84.23 | 1/1/2002 | $84.23 | 1/1/2002 | $84.23 | 5/1/2000 | $84.23 | 5/1/2000 | | |
| J3360 | INJECTION DIAZEPAM UP TO 5 MG | $0.97 | 7/1/2003 | $2.32 | 1/1/2002 | $1.50 | 7/13/2001 | $1.71 | 4/1/2000 | $3.42 | 1/1/1998 |
| | INJECTION UROKINASE 5000 IU VIAL | $10.23 | 7/1/2003 | $56.61 | 1/1/2002 | $50.96 | 1/1/1999 | $50.96 | 1/1/1999 | $50.96 | 1/1/1998 |
| | INJECTION IV UROKINASE 250000 IU VIAL | $511.50 | 4/1/2003 | $466.17 | 1/1/2002 | $411.64 | 1/1/1998 | $411.64 | 1/1/1998 | $397.16 | 1/1/1998 |
| J3370 | INJECTION VANCOMYCIN HCL 500 MG | $7.03 | 7/1/2003 | $5.20 | 1/1/2002 | $5.19 | 6/1/2000 | $8.13 | 5/1/2000 | $0.00 | 1/1/1998 |
| | Injection, methoxamine, up to 20mg (Code deleted as of January 1, 2002) | $0.00 | 4/1/2002 | $0.00 | 4/1/2002 | $18.29 | 1/1/1999 | $18.29 | 1/1/1999 | $18.29 | 1/1/1998 |
| | Injection, verteporfin, 15 mg (Code deleted effective 1/1/05 refer to J3396) | $1,458.25 | 1/1/2002 | $1,458.25 | 1/1/2002 | | | | | | |
| | INJECTION VERTEPORFIN 0.1 MG | | | | | | | | | | |
| | INJECTION TRIFLUPROMAZINE HCL UP TO 20 MG | $11.86 | 1/1/2002 | $11.86 | 1/1/2002 | $12.35 | 1/1/1999 | $12.35 | 1/1/1999 | $12.35 | 1/1/1998 |
| | INJECTION HYDROXYZINE HCL UP TO 25 MG | $1.21 | 7/1/2003 | $0.70 | 1/1/2002 | $0.95 | 1/1/1999 | $0.95 | 1/1/1999 | $0.95 | 1/1/1998 |
| | INJECTION THIAMINE HCL 100 MG | | | | | | | | | | |
| | INJECTION PYRIDOXINE HCL 100 MG | | | | | | | | | | |
| | INJECTION VIT B-12 CYANOCOBALAMIN TO 1000 MCG | $0.13 | 7/1/2003 | $0.98 | 1/1/2002 | $0.95 | 1/1/1999 | $0.95 | 1/1/1999 | $0.95 | 1/1/1998 |
| | INJECTION PHYTONADIONE PER 1 MG | $2.42 | 7/1/2003 | $2.33 | 1/1/2002 | $3.97 | 1/1/1999 | $3.97 | 1/1/1999 | $3.97 | 1/1/1998 |
| | Injection, methoxamine, up to 20mg (Code deleted as of January 1, 2002) | $0.00 | 4/1/2002 | $0.00 | 4/1/2002 | $2.38 | 1/1/1999 | $2.38 | 1/1/1999 | $2.38 | 1/1/1998 |
| | INJECTION VORICONAZOLE 10 MG | | | | | | | | | | |
| | INJECTION HYALURONIDASE UP TO 150 UNITS | $20.58 | 1/1/2002 | $20.58 | 1/1/2002 | $5.18 | 1/1/1999 | $5.18 | 1/1/1999 | $5.18 | 1/1/1998 |

Injectable Drug Codes
1997-2003

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | INJECTION MAGNESIUM SULPHATE PER 500 MG | $0.29 | 7/1/2003 | $0.39 | 1/1/2002 | $0.34 | 5/1/2000 | $0.34 | 5/1/2000 | | |
| | INJECTION POTASSIUM CHLORIDE PER 2 MEQ | $0.08 | 4/1/2003 | $0.70 | 1/1/2002 | $0.16 | 4/1/2000 | $0.16 | 4/1/2000 | | |
| J3485 | INJECTION ZIDOVUDINE 10 MG | $1.02 | 4/1/2003 | $0.95 | 1/1/2002 | $0.91 | 1/1/2001 | | | | |
| | INJECTION ZIPRASIDONE MESYLATE 10 MG | | | | | | | | | | |
| | INJECTION ZOLEDRONIC ACID 1 MG | $217.43 | 4/1/2003 | | | | | | | | |
| | EDETATE DISODIUM PER 150 MG | $0.13 | 5/1/2000 | $0.13 | 5/1/2000 | $0.13 | 5/1/2000 | $0.13 | 5/1/2000 | $0.00 | 1/1/1995 |
| J7030 | INFUSION NORMAL SALINE SOLUTION 1000 CC | $10.77 | 4/1/2003 | $10.07 | 1/1/2002 | $9.27 | 1/1/1999 | $9.27 | 1/1/1999 | $9.27 | 1/1/1998 |
| J7040 | INFUSION NORMAL SALINE SOLUTION STERILE | $5.39 | 4/1/2003 | $11.03 | 1/1/2002 | $8.56 | 1/1/1999 | $8.56 | 1/1/1999 | $8.56 | 1/1/1998 |
| J7042 | 5% DEXTROSE/NORMAL SALINE | $9.44 | 10/1/2002 | $11.56 | 1/1/2002 | $9.34 | 1/1/1999 | $9.34 | 1/1/1999 | $9.34 | 1/1/1998 |
| J7050 | INFUSION NORMAL SALINE SOLUTION 250 CC | $2.70 | 4/1/2003 | $11.03 | 1/1/2002 | $9.09 | 1/1/1999 | $9.09 | 1/1/1999 | $9.09 | 1/1/1998 |
| J7051 | STERILE SALINE OR WATER UP TO 5 CC | $1.33 | 7/1/2003 | $0.86 | 1/1/2002 | $0.40 | 5/1/2000 | $0.40 | 5/1/2000 | | |
| J7060 | 5% DEXTROSE/WATER | $9.04 | 7/1/2003 | $10.49 | 1/1/2002 | $10.69 | 5/1/2000 | $10.69 | 5/1/2000 | | |
| J7070 | INFUSION D-5-W 1000 CC | $10.97 | 7/1/2003 | $13.19 | 1/1/2002 | $9.75 | 5/1/2000 | $9.75 | 5/1/2000 | $0.00 | 1/1/1998 |
| J7100 | INFUSION DEXTRAN 40 500 ML | $25.11 | 4/1/2003 | $94.46 | 1/1/2002 | $39.76 | 5/1/2000 | $39.76 | 5/1/2000 | | |
| J7110 | INFUSION DEXTRAN 75 500 ML | $14.21 | 10/1/2002 | $103.12 | 1/1/2002 | $23.70 | 5/1/2000 | $23.70 | 5/1/2000 | | |
| | RINGERS LACTATE INFUSION UP TO 1000 CC | $12.45 | 4/1/2003 | $14.29 | 1/1/2002 | $5.36 | 5/1/2000 | $5.36 | 5/1/2000 | | |
| J7130 | HYPERTONIC SALINE SOLUTION 50/100 MEQ 20 CC VIAL | $0.52 | 4/1/2003 | $2.81 | 1/1/2002 | | | | | | |
| J7190 | FACTOR VIII PER IU | $0.87 | 4/1/2003 | $0.86 | 1/1/2002 | $0.90 | 5/1/2000 | $0.90 | 5/1/2000 | $0.00 | 1/1/1998 |
| | FACTOR VIII PER IU | $2.04 | 4/1/2003 | $2.09 | 1/1/2002 | $2.09 | 5/1/2000 | $2.09 | 5/1/2000 | | |
| J7192 | FACTOR VIII PER IU | $1.26 | 4/1/2003 | $1.12 | 1/1/2002 | $1.22 | 5/1/2000 | $1.22 | 5/1/2000 | $0.00 | 1/1/1998 |
| | FCT IX ANTIHEMOPHIL FCT PURIFIED NON-RECOMB-IU | $1.12 | 4/1/2003 | $1.05 | 1/1/2002 | | | | | | |
| J7194 | FACTOR IX COMPLEX PER IU | $0.37 | 4/1/2003 | $0.31 | 1/1/2002 | $0.48 | 5/1/2000 | $0.48 | 5/1/2000 | | |
| | FACTOR IX PER IU | $1.12 | 1/1/2002 | $1.12 | 1/1/2002 | | | | | | |

Injectable Drug Codes
1997-2003

| Code | Description | Fee Prior to 9/1/03 | Eff Date Prior to 9/1/03 | Fee Prior to 9/1/02 | Eff Date Prior to 9/1/02 | Fee Prior to 9/1/01 | Eff Date Prior to 9/1/01 | Fee Prior to 9/1/00 | Eff Date Prior to 9/1/00 | Fee Prior to 9/1/98 | Eff Date Prior to 9/1/98 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | ANTITHROMBIN III PER IU | $1.25 | 7/1/2003 | $1.05 | 1/1/2002 | $1.05 | 5/1/2000 | $1.05 | 5/1/2000 | | |
| | ANTI-INHIBITOR PER IU | $1.43 | 1/1/2000 | $1.43 | 1/1/2000 | $1.43 | 1/1/2000 | $1.43 | 1/1/2000 | | |
| | INTRAUTERINE COPPER CONTRACEPTIVE | $284.05 | 3/1/2002 | $284.05 | 3/1/2002 | $273.13 | 5/1/2000 | $273.13 | 5/1/2000 | $274.00 | 4/15/1998 |
| | LEVONORGESTREL-RLSE INTRAUTERN CNTRACPT 52 MG | $375.25 | 1/1/2002 | $375.25 | 1/1/2002 | | | | | | |
| | CONTRACEPT SUPPLY HORMONE CONTAINING VAG RING EA | | | | | | | | | | |
| | CONTRACEPTIVE SUPPLY HORMONE CONTAINING PATCH EA | | | | | | | | | | |
| | AMINOLEVULINIC ACID HCL TOP ADMN 20% 1 U DOSE | $100.94 | 1/1/2002 | $100.94 | 1/1/2002 | | | | | | |
| | GANCICLOVIR 45 MG LONG-ACTING IMPLANT | $4,750.00 | 1/1/2002 | $4,750.00 | 1/1/2002 | $4,750.00 | 5/1/2000 | $4,750.00 | 5/1/2000 | | |
| | Sodium hyaluronate, 20mg, for intra-articular injection (Code deleted as of January 1, 2002, refer to J7316) | $0.00 | 4/1/2002 | $0.00 | 4/1/2002 | $136.80 | 1/1/2001 | $125.59 | 5/1/2000 | | |
| | Sodium hyaluronate, 5 mg for intra-articular injection (Code discontinued effective 7/1/02 - refer to code Q3030)(Code Q3030 deleted effective 01/01/2003 refer to J7317) | $0.00 | 10/1/2002 | $27.88 | 4/1/2002 | | | | | | |
| | SODIM HYALURONATE 20-25 MG INTRA-ARTICLR INJ | $142.27 | 4/1/2003 | | | | | | | | |
| | HYLAN G-F 20 16 MG FOR INTRA-ARTICULAR INJECTION | $233.14 | 7/1/2003 | $223.25 | 1/1/2002 | $213.86 | 1/1/2001 | $204.86 | 5/1/2000 | | |
| | Autologous cultured chondrocytes, implant | $0.00 | 10/1/2002 | $14,250.00 | 1/1/2002 | | | | | | |

# Exhibit 44

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

Stephen L. Coco
(617) 859-2731

May 25, 2006

**<u>Via Overnight Mail</u>**

Adeel A. Mangi, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:     *In Re Pharmaceutical Industry Average Wholesale Price Litigation*,
        MDL No. 1456, Civil Action No. 01-12257-PBS
        Our File No.:  072188-0000

Dear Adeel:

I have enclosed with this letter the documents referred to in the letter that I sent you earlier today. Some identifying information is provided below:

| Bates Range | Source or Subject Matter | Protective Order Designation |
|---|---|---|
| BCBSMA-AWP-17052-17054 | RJ Health information | None |
| BCBSMA-AWP-17055-17335 | NM3 Committee | Highly Confidential |
| BCBSMA-AWP-17336-17344 | Federal Employees Program | Highly Confidential |
| BCBSMA-AWP-17345 | Sharon Smith Presentations | Highly Confidential |
| BCBSMA-AWP-17346-17443 | Gary Shramek, (former director of pharmacy) | Highly Confidential |

BCBSMA will continue to supplement its production when additional documents are available. Please contact me if you have any additional questions.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI, LLP

Stephen L. Coco

SLC
Enclosures
cc:     Edward. Notargiacomo, Esq.
BN1 35031684.1

# Unreported Cases

Westlaw.

Slip Copy                                                                        Page 1
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)
**(Cite as: Slip Copy)**

C

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Tennessee,
Southern Division.
SWIFT FREEDOM AVIATION, LLC, Gregory A.
Swift and Robert K. Anderson Plaintiffs,
v.
R.H. AERO, Robert H. Fiske, Executive Aviation,
Inc., Defendants.
**No. 1:04-CV-90.**

Sept. 13, 2005.

Charles P. Dupree, Chattanooga, TN, for Plaintiffs.
Bruce C. Bailey, Chambliss, Bahner & Stophel, PC,
Phillip E. Fleenor, Valerie H. Richardson,
Shumacker, Witt, Gaither & Whitaker, PC,
Chattanooga, TN, Carl S. Wosmek, Donald C. Mark,
Peter A. Antonenko, Fafinski, Mark & Johnson, PA,
Eden Prairie, MN, for Defendants.

*MEMORANDUM*

COLLIER, J.
*1 Before the Court are motions for summary
judgment filed by Defendants Executive Aviation,
Inc. ("Defendant Executive Aviation"), Robert H.
Fiske ("Defendant Fiske"), and R.H. Aero
("Defendant R.H. Aero") (collectively referred to as
"Defendants") (Court File Nos. 73, 77). In deciding
these motions, the Court has considered Defendants'
briefs and supporting documentation (Court File Nos.
74, 75, 76, 78, 82, 108, 115) and Plaintiffs Swift
Freedom Aviation, LLC ("Plaintiff Swift Freedom"),
Gregory A. Swift ("Plaintiff Swift"), and Robert K.
Anderson's ("Plaintiff Anderson") (collectively
referred to as "Plaintiffs") responses and supporting
documentation (Court File Nos. 102, 107, 117, 123).
The Court need not conduct an evidentiary hearing to
decide these motions, and, for the following reasons,
the Court will GRANT IN PART and DENY IN
PART Defendants' motions for summary judgment as
follows:

The Court will DENY Defendants' motions for
summary judgment on all claims brought by
Plaintiffs Swift and Anderson individually. The Court
also will DENY Defendant Fiske's motion for
summary judgment as to all claims against him
individually.

The Court will GRANT Defendant Executive
Aviation's motion for summary judgment as to (1) the
fraud claims based on the advertisement on
www.controller.com and statements by Kirk Otteson
and (2) the claims of breach of implied warranties of
merchantability and fitness for a particular purpose,
and the Court further will DISMISS those claims.

However, the Court will DENY Defendant Executive
Aviation's motion for summary judgment (1) based
on the Court's lack of personal jurisdiction over it; (2)
as to the fraud claims based on alleged
misrepresentations it made in a prebuy inspection
report; (3) as to the breach of contract claim based on
the contract to perform a prebuy inspection; (4) as to
the breach of an express warranty of airworthiness
claim; and (5) as to the claims under the Tennessee
Consumer Protection Act, and the parties WILL BE
ORDERED TO PROCEED TO TRIAL on each of
those claims.

The Court will GRANT Defendants R.H. Aero and
Fiske's motion for summary judgment as to (1) the
fraud claims based on the advertisement on
www.controller.com and statements by Kirk Otteson;
(2) the claim of breach of implied warranty of fitness
for a particular purpose; and (3) the claims under the
Tennessee Consumer Protection Act, and the Court
further will DISMISS those claims.

The Court will DENY Defendants R.H. Aero and
Fiske's motion for summary judgment on (1) the
breach of contract claim and (2) the claim of breach
of implied warranty of merchantability, and the
parties WILL BE ORDERED TO PROCEED TO
TRIAL on those claims.

I. *STANDARD OF REVIEW*

Summary judgment is proper where "the pleadings,
depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if
any, show that there is no genuine issue as to any
material fact and the moving party is entitled to a
judgment as a matter of law." Fed.R.Civ.P. 56(c).
Initially, the burden is on the moving party to
conclusively show no genuine issue of material fact
exists, *Leary v. Daeschner*, 349 F.3d 888, 897 (6th
Cir.2003), and the Court must view the evidence and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, the nonmoving party is not entitled to a trial merely on the basis of allegations, but must come forward with some significant probative evidence to support its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Id.* at 323, 106 S.Ct. at 2552.

**\*2** The Court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Weaver v. Shadoan,* 340 F.3d 398, 405 (6th Cir.2003). The standard for summary judgment mirrors the standard for directed verdict. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52, 106 S.Ct. at 2512. There must be some probative evidence from which the jury could reasonably find for the nonmoving party. If the Court concludes a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Id.; Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir.1994).

## II. *RELEVANT FACTS*

The facts in this case revolve around the sale of an airplane. Plaintiff Swift Freedom is an LLC organized under the laws of North Carolina with its principal office in Cleveland, Tennessee (Court File No. 82, Exh. F, Draft Copy of Deposition of Gregory Swift ("Swift Draft Depo.") p. 10). The company was formed to buy an airplane (*Id.* at 16). Plaintiffs Swift and Anderson are its members (*Id.* at 9). Both Swift and Anderson are licensed pilots (*Id.* at 20; Exhibit to Court File No. 117, Deposition of Robert Anderson ("Anderson Depo.") p. 83). Plaintiff Swift characterizes himself as an "entrepreneur," and owns and manages several companies in a variety of industries, including transportation, forestry equipment, wound care, and real estate investment

(Swift Draft Depo. at 3-9). Defendant Executive Aviation is a Minnesota corporation with its sole location in Eden Prairie, Minnesota (Court File No. 75, Affidavit of Kirk Otteson ("Otteson Aff.") ¶¶ 4-6). Defendant R.H. Aero is either a Delaware corporation or LLC, and was the seller of the airplane at issue (*see* Court File No. 2, ¶ 4; Court File No. 105, p. 2). Defendant Fiske states he is the "sole member" of this company (Court File No. 105 p. 2), and is a pilot who is a citizen of Minnesota (Court File No. 2, ¶¶ 3, 14). The parties did not submit any affidavit or deposition testimony by Defendant Fiske, but Defendant Executive Aviation's employee Kirk Otteson stated in an affidavit Fiske flies charter flights for Aviation Charter, Inc., presumably in Minnesota (*see* Otteson Aff. ¶ 13).

In March 2003, Plaintiff Swift found a listing for a 1972 Beech Baron airplane on the website www.controller.com, listed for sale by Defendant Executive Aviation (Anderson Depo. at 76, Exhibit to Court File No. 117, Final Draft of Deposition of Gregory Swift ("Swift Depo.") at 40). Defendant Executive Aviation pays a fee to list airplanes for sale on this website, and it permitted Defendant Fiske to list his airplane on it (Otteson Aff. ¶¶ 13-16). Defendant Aviation did not charge Fiske a fee for this privilege (*Id.* ¶ 17).

**\*3** Plaintiff Swift had purchased an airplane once before, although it was a single-engine airplane, smaller than the twin-engine airplane at issue in this case (Swift Draft Depo. at 24-26). Plaintiff Swift contacted Defendant Executive Aviation about the plane via telephone and spoke to one of Executive Aviation's employees, Kirk Otteson, about purchasing it on approximately ten occasions (Swift Depo. at 34, 42, 61). Plaintiff Swift states Otteson told him the plane "had been on the field for several years and hangered there and that [Defendant Executive Aviation] had worked on the airplane and knew the airplane very well and had a lot of confidence in it, and expressed to me that it was a very nice, pretty airplane and very well maintained and taken care of" (Swift Depo. at 48). While Plaintiff Swift understood through the course of his dealings with Otteson that Defendant Executive Aviation was "brokering the airplane for an employee and it was their listing" (Swift Depo. at 49-55), Defendant Executive Aviation asserts it did not receive any proceeds from this sale (Otteson Aff. ¶ 26).

During Plaintiff Swift and Defendant Fiske's negotiations for the purchase of the airplane, Swift

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

contacted Defendant Executive Aviation to perform what Swift characterizes as "a pre-buy inspection and review of the airplane" (Swift Depo. at 148). In an e-mail with the subject line "Baron inspection request," dated March 19, 2003, Plaintiff Swift wrote to Otteson, "Kirk: I would like to get a price for your shop to perform the attached work on Mr. Fiske's B55 Baron. Please call me when you get a price" (Exhibit to Court File No. 73, Exh. 16 to Swift Depo.). Plaintiff Swift then sent a follow-up e-mail listing the ten specific tasks he would like to have performed:

1. Review logs for AD compliance on the airplane including the following: Airframe, engines, props, heater

2. Perform compression check on both engines and document, preferably a hot check

3. Inspect landing gear and perform gear retraction to ensure proper operation and ensure gear box is not leaking

4. Check for corrosion in airframe

5. Ensure spar crack inspection is current

6. Confirm from logs that all fuel cells have been replaced, write date of each replacement

7. Inspect exterior for damage, patches, and cracks, especially on flight controls

8. Inspect boots for overall condition and confirm whether boot pressure is from engine

9. Check electric cowl flap motors for proper operation

10. Check date of following: induction air filters, elt battery, IFR cart

(*Id.*).

Plaintiff Swift testified after he sent this e-mail, Defendant Executive Aviation's employee Bruce Johnson, an airframe and powerplant mechanic, called to tell Swift he could check the ten items on the list, "but by the time I've done all of that, I can just do a full-blown prepurchase inspection on the airplane and it will cost about $1,200. And I got the impression that he's doing that because Mr. Fiske is an employee and they're going to cut me a little break on the price of this thing" (Swift Depo. at 162, *see also* 224-26). Plaintiff Swift states he negotiated the price for this inspection with Johnson but did not discuss specifically what this inspection would include (Swift Depo. at 157, 163). Plaintiff Swift states he "assumed that when an airplane gets a prepurchase inspection, it's been my understanding that they essentially go through and do an annual inspection on the airplane, minus the lubrication" (Swift Depo. at 152). Plaintiff Anderson also assumed a prebuy inspection would include a

thorough check of the logbooks, exterior, interior, airframe, engines, and safety elements of the airplane (Anderson Depo. at 190-200).

*4 Johnson testified in an affidavit, "[n]either Gregory Swift nor anyone acting on behalf of Swift requested that I perform any repairs or inspections other than those set forth [in the e-mail]" (Court File No. 74, Affidavit of Bruce Johnson ("Johnson Aff") ¶ 9). Johnson also states he performed only the inspections and repairs specifically requested by Plaintiff Swift in the e-mail (*Id.* ¶¶ 3, 5, 7; *see also* Otteson Aff. ¶ 21-22). Johnson avers during the requested inspection and repairs, he "did not notice any of the alleged defects in the airplane set forth in the Plaintiffs' Complaint for Damages" (Johnson Aff. ¶ 10). Johnson also states he did not provide any warranties to anyone regarding the condition of the airplane (*Id.* ¶ 14).

The invoice Defendant Executive Aviation prepared for Plaintiff Swift describing the actions taken and billing for the work contains the phrase "PRE BUY INSPECTION" in the "General Comments" section (Exhibit to Court File No. 73, Exh. 7 to Swift Depo.). Defendant Executive Aviation charged $1,283.14 for the inspection, which was paid by a credit card number given to Executive Aviation and authorized by Plaintiff Swift (Otteson Aff. ¶ 24). Johnson made an entry in the airplane logbook showing the work he had performed and Defendant Executive Aviation provided a report of the inspection on an invoice to Plaintiff Swift (Johnson Aff. ¶ 11). This invoice noted the inspection included the items listed in the e-mail as well as a list of 16 "Squawk items," some listed with repairs made to remedy them. Plaintiff Swift testified "squawk" is an airplane or military term used to denote a problem with an airplane (Swift Depo. at 194). Plaintiff Swift states upon receiving this invoice, he assumed Defendant Executive Aviation went through the Federal Aviation Administration ("FAA") annual inspection checklist in performing this inspection, but sent him only the invoice, with his requested items and "squawk" items listed that needed to be fixed, rather than the entire completed FAA checklist (*Id.* at 152). Swift also assumed the invoice disclosed all problems the inspection discovered with the airplane (*Id.*).

On April 10, 2003, Defendant Fiske flew the plane to Cleveland, Tennessee for Plaintiff Swift to inspect it (Swift Depo. at 66). Plaintiff Swift was not certified to fly the plane himself at that time, but Defendant Fiske flew him from Cleveland, Tennessee to Chattanooga, Tennessee and back (*Id.* at 68, 79). The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

weather on this date was inclement, with periods of heavy rain (*Id.* at 69). Plaintiff Swift during this flight saw Defendant Fiske unscrew a red alternator warning light on the pilot's panel, and upon Swift's asking Fiske what the alternator status on one of the engines was, Fiske replied the bulb was bad (*Id.* at 69). Plaintiff Swift also noticed problems with the autopilot and other instruments during this flight (*Id.* at 72). After the plane landed, Plaintiff Swift and a mechanic at Hardwick Field in Cleveland, Tennessee inspected the airplane and found the right engine alternator belt had slipped off its pulley (*Id.* at 73-74). Plaintiff Swift asked Defendant Fiske about this problem, and Fiske stated it was a new engine and had just slipped off (*Id.* at 74). The mechanic replied, "these belts don't just fly off, but I'll take a look at it," which he then proceeded to do (*Id.*)

**\*5** Plaintiff Swift examined the plane's logbooks and discussed its condition with Defendant Fiske, particularly the alternator belt problem (*Id.* at 178-79). Plaintiff Swift asserts Defendant Fiske told him he would pay what it took to fix that alternator belt problem (*Id.* at 74). After examining the airplane and its logbooks and reviewing the prebuy inspection report, Plaintiff Swift eventually decided the airplane's condition appeared to be in accordance with the representations by Defendant Fiske and Otteson (Court File No. 103, p. 3).

Plaintiff Swift and Defendant Fiske agreed Plaintiff Swift Freedom would purchase the airplane, and the sale took place at Swift's bank in Cleveland, Tennessee (Swift Depo. at 63). Plaintiff Swift asserts the first time he heard Defendant R.H. Aero owned the plane was during the consummation of the sale, when Defendant Fiske told him to make the cashier's check out to R.H. Aero (Court File No. 107 at 2). Plaintiff Anderson first saw the plane after Plaintiff Swift took delivery of it (Anderson Depo. at 56-57, 76). The plane now is owned by and titled to Plaintiff Swift Freedom (Swift Draft Depo. at 15).

After Plaintiff Swift Freedom purchased the plane, Plaintiffs discovered numerous problems with it, which they allege made it unairworthy (Swift Depo. at 81-85, Anderson Depo. at 53-59, 87-148). Defendant Fiske paid for certain repairs to the plane and arranged for the plane to have warranty work done to the right engine by Leaders Flying Service in Minnesota (Anderson Depo. at 88, 93-95, 97, 99-102). Approximately nine months after the purchase, Plaintiffs received the plane again, but assert it still is not "correct or as represented" because it cannot be flown on autopilot or in any instrument or weather

conditions.

Plaintiffs now assert the plane was not in the condition in which it was represented to be and was not airworthy at the time of purchase (Court File No. 1, p. 3), and on March 25, 2004 filed this lawsuit alleging fraud, breach of contract, breach of the implied warranties of merchantability and fitness for a particular purpose and express warranties, and violation of the Tennessee Consumer Protection Act ("TCPA").

### III. *DISCUSSION*

Many of the claims asserted against Defendant Executive Aviation are intertwined with those asserted against Defendants R.H. Aero and Fiske, so the Court will evaluate their motions for summary judgment jointly.

### A. Personal Jurisdiction Over Defendant Executive Aviation

The Court first will address Defendant Executive Aviation's argument the Court does not have personal jurisdiction over it, since all its other arguments would be mooted upon a finding in its favor on this point. The Court previously addressed the issue of personal jurisdiction in its ruling on Defendant Executive Aviation's motion to dismiss (Court File Nos. 28, 29). While the Court is aware the standard of review on a motion for summary judgment is different from that on a motion to dismiss, Defendant Executive Aviation has not pointed to any error in the Court's prior understanding of the facts or law relevant to this point. Instead, Defendant Executive Aviation has cited a case involving the prebuy inspection of an airplane in the Northern District of Ohio, in which the court decided it did not have personal jurisdiction, *Douglas v. Modern Aero, Inc.,* 954 F.Supp. 1206 (N.D.Ohio 1997) (Court File No. 76, pp. 13-16). This precedent is, of course, not binding on the Court, but even if it were, the Court finds the facts in that case are distinguishable from those here involving Defendant Executive Aviation, which, as noted in the Court's previous extensive memorandum opinion on this point, had more substantial contacts with the state of Tennessee than any one defendant in *Douglas* did with the forum state there. *See Douglas,* 954 F.Supp. at 1212-14. Therefore, the Court's prior decision regarding its personal jurisdiction over Defendant Executive Aviation will stand, and its motion for summary

Slip Copy                                                                                    Page 5
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)
**(Cite as: Slip Copy)**

judgment will be DENIED on that ground.

### B. Plaintiffs' Swift and Anderson's Standing

**\*6** Defendants next argue Plaintiffs Swift and
Anderson do not have standing to pursue their claims,
because they do not hold any individual ownership
interest in the airplane at the center of the claims,
which is owned by Plaintiff Swift Freedom. Standing
is a doctrine courts use to analyze whether
individuals possess a sufficient, personal stake in a
controversy to warrant the exercise of judicial power
on their behalf. *Metropolitan Air Research Testing
Auth. v. Metropolitan Gov't of Nashville and
Davidson County,* 842 S.W.2d 611, 615
(Tenn.Ct.App.1992); *Browning-Ferris Indus. v. City
of Oak Ridge,* 644 S.W.2d 400, 402
(Tenn.Ct.App.1982). When a party asserting a claim
lacks a legally protectable and tangible interest in the
dispute, the court must dismiss the case, regardless of
its merits. *Knierim v. Leatherwood,* 542 S.W.2d 806,
808 (Tenn.1976).

Plaintiff Swift Freedom is a limited liability company
organized under the laws of North Carolina (Draft
Swift Depo. at 10). Plaintiffs Swift and Anderson are
its members (*Id.* at 20). Under North Carolina law,
membership in an LLC is personal property. *See* N.C.
Gen.Stat. § 57C-5-01. However, "[a] member has no
interest in specific limited liability company
property." *Id.* Therefore, Plaintiffs Swift and
Anderson have no personal interest in the property
owned by Plaintiff Swift Freedom. There is no
dispute Plaintiff Swift Freedom, not Swift or
Anderson in their individual capacities, purchased the
airplane at issue here and owned it at all times
relevant to this action (*see* Swift Depo. at 194-95).
The cashier's check for the purchase price of the
airplane is further evidence of this, as it was made out
from Swift Freedom Aviation LLC to R.H. Aero (*see*
Court File No. 82, Exh. D).

Were this the only ground on which Plaintiffs Swift
and Anderson asserted standing, dismissal of their
claims might be appropriate. However, Plaintiffs
Swift and Anderson assert they "are liable on the
financing that was obtained to purchase the airplane
and are liable for the cost of repairs. In addition, they
have both suffered damages separate from those of
the LLC because of the deprivation of use and
mechanical problems that have left them stranded"
(Court File No. 107, p. 1). As to their second point,
Plaintiffs Swift and Anderson essentially argue they
purchased this airplane for business travel for the

companies they manage, and they personally were
injured in their inability to use the airplane for this
business travel, in "wastes of time" driving to
locations to which they should have been able to fly
in the plane (*see* Swift Depo. at 195-202). Plaintiffs
Swift and Anderson's personal liability on the
financing and repairs for the plane, combined with
their asserted injuries from being unable to use it for
business travel, constitute a sufficient, personal stake
in a controversy to warrant the exercise of judicial
power on their behalf. *See Metropolitan Air Research
Testing Auth.,* 842 S.W.2d at 615. Therefore, the
Court will DENY Defendants' motions for summary
judgment on this ground.

### C. Claims Against Defendant Fiske Individually

**\*7** Defendant Fiske similarly argues Plaintiffs may
not assert any claims against him individually
because Defendant R.H. Aero owned the plane and
was the party to any contract for its sale to Plaintiff
Swift Freedom. The Court is unclear whether
Defendant R.H. Aero is a Delaware corporation, as it
stated in its answer (*see* Court File No. 2), or a
limited liability company, as it stated in its reply brief
on the instant motions (*see* Court File No. 105). In
either event, Defendant Fiske argues he had no
personal interest in the airplane at issue, thus Plaintiff
Swift Freedom's claims against him cannot stand.

If Defendant R.H. Aero is an LLC, "... the debts,
obligations and liabilities of a limited liability
company, whether arising in contract, tort or
otherwise, shall be solely the debts, obligations and
liabilities of the limited liability company, and no
member or manager of a limited liability company
shall be obligated personally for any such debt,
obligation or liability of the limited liability company
solely by reason of being a member or acting as a
manager of the limited liability company." 6 Del. C.
§ 18-303.

If Defendant R.H. Aero is a corporation, it "is
presumptively treated as a distinct entity, separate
from its shareholders, officers, and directors."
*Oceanics Schs., Inc. v. Operation Sea Cruise, Inc.,*
112 S.W.3d 135, 140 (Tenn.Ct.App.1999). However,
a corporation's separate identity may be disregarded
or pierced "upon a showing that it is a sham or a
dummy or where necessary to accomplish justice."
*Id.* A corporation's separate identity should be
disregarded "with great caution and not
precipitately." *Schlater v. Haynie,* 833 S.W.2d 919,
925 (Tenn.Ct.App.1991).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                Page 6
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)
**(Cite as: Slip Copy)**

Plaintiffs in their complaint allege Defendant R.H. Aero is actually the "alter ego" of Defendant Fiske (see Court File No. 1, p. 1). In their response on the issue of Defendant Fiske's potential liability in this case, Plaintiffs reiterated this, stating Defendant Fiske "of course, acts as the alter ego of R.H. Aero, his holding company that actually owned the airplane" (Court File No. 103 at 7). The Court presumes by using this language, Plaintiffs are implicitly arguing the Court should "pierce the corporate veil" of Defendant R.H. Aero to hold Defendant Fiske personally liable for their claims against R.H. Aero.

The Tennessee Court of Appeals recently cited with approval the following statement of law regarding piercing the corporate veil:
Some factors the court considers in determining whether to pierce the corporate veil are whether the corporation was grossly undercapitalized, the nonissuance of stock certificates, the sole ownership of stock by one individual, the use of the corporation as an instrumentality or business conduit for an individual or another corporation, the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, the use of the corporation as a subterfuge in illegal transactions, the formation and use of the corporation to transfer to it the existing liability of another person or entity, and the failure to maintain arms length relationships among entities.

**\*8** *See Boles v. Nat'l Dev. Co.,* 2005 Tenn.App. LEXIS 247, \*38-42 (Tenn.Ct.App.2005) (*quoting VP Buildings, Inc. v. Polygon Group,* 2002 Tenn.App. LEXIS 11, 2002 WL 15634, \*4-5 (Tenn.Ct.App.2002)) (internal citations and quotation marks omitted).

The veil piercing inquiry is particularly fact-specific. *See id.* The only facts Plaintiffs put forth to combat Defendant Fiske's assertions the corporate veil should not be pierced are that Plaintiff Swift dealt with Fiske in negotiating the purchase of the airplane and first learned the plane belonged to Defendant R.H. Aero when he was making out the check for the purchase of the plane (Court File No. 107 at 2). These allegations, together with assertions Defendant Fiske is the "alter ego" of Defendant R.H. Aero, are not nearly sufficient for the Court to pierce the corporate veil in this case. *See Boles,* 2005 Tenn.App. LEXIS 247 at \*38-42.

However, under agency principles, Defendant Fiske may be personally liable for his conduct in the sale of the plane even though he did not have an individual ownership interest in it. Defendant Fiske appears to have been acting as an agent on behalf of Defendant R.H. Aero, since a company can only act through its agents, and Fiske is the person who negotiated and consummated the sale of the airplane with Plaintiff Swift. *See Security Federal Sav. and Loan Ass'n. v. Riviera, Ltd.,* 856 S.W.2d 709, 715 (Tenn.Ct.App.1992). As to Plaintiffs' misrepresentation claims, Tennessee has held "an agent cannot escape liability for tortious acts, including fraud or misrepresentation, against third persons simply because the agent was acting within the scope of the agency or at the direction of the employer." *Brungard v. Caprice Records, Inc.,* 608 S.W.2d 585, 590 (Tenn.Ct.App.1980). Further, on the breach of contract claims, in Tennessee, an agent acting on behalf of an undisclosed principal may be personally liable on a contract he enters on behalf of the principal. *See Anderson v. Durbin,* 740 S.W.2d 417, 418 (Tenn.Ct.App.1987); Restatement (Second) of Agency, § 322. Here, Plaintiff Swift has stated Defendant Fiske did not reveal Defendant R.H. Aero's interest in the airplane until the very end of the sale, therefore, it is unclear whether Plaintiff Swift Freedom knew it was dealing with a corporate entity rather than an individual at the time the agreement was made, a relevant fact in the undisclosed agent liability inquiry. *See Jurgensmeyer v. Prater,* 2003 Tenn.App. LEXIS 304, \*20-22 (Tenn.Ct.App.2003). Several grounds for individual liability exist for Defendant Fiske in this case.

Therefore, because Defendant Fiske has not shown he cannot, as a matter of law, be held individually liable on any of Plaintiffs' claims, *see* Fed.R.Civ.P. 56, the Court will DENY his motion for summary judgment on this ground.

D. Fraud and Intentional Misrepresentation

Plaintiffs in their complaint assert, after an enumerated list of defects in the airplane, "[e]ach and every one of these defects and misrepresentations would or could have been identified by all the Defendants, and are contrary to the representations made regarding the airplane ..." (Court File No. 1, Complaint, ¶ IV). In order to prevail on their claim of fraudulent or intentional misrepresentation, Plaintiffs must prove: (1) the defendant made an intentional misrepresentation relating to an existing or past fact; (2) the representation related to a material fact; (3) the representation was made either

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

with knowledge of its falsity, without belief in its truth, or with reckless disregard for its truth; (4) they reasonably relied on the misrepresented material facts; and (5) they suffered a detriment from this reliance. _Allied Sound, Inc. v. Neely,_ 58 S.W.3d 119, 122 (Tenn.Ct.App.2001); _see also First Nat'l Bank v. Brooks Farms,_ 821 S.W.2d 925, 927 (Tenn.1991).

**\*9** Defendant Executive Aviation argues it did not make any false statements regarding a past or existing fact to Plaintiffs. Plaintiffs' first theory of misrepresentation is based on alleged misstatements regarding various conditions of the airplane in the advertisement on www.controller.com and by Otteson, which they attribute to all Defendants. Plaintiffs also seem to assert a second theory of misrepresentation against Defendant Executive Aviation only, that by agreeing to perform the prebuy inspection, Executive Aviation agreed to evaluate and disclose any problems with the airplane, and by not disclosing several major problems, Executive Aviation implicitly misrepresented the airplane was free of major problems.

### 1. Misrepresentations in Advertisement on www.controller.com and by Otteson

As to the first theory, the Court, after comparing Plaintiffs' list of alleged defects in the airplane with the advertisement from www.controller.com, has found the following discrepancies between the advertisement and Plaintiffs' statements of actual condition of the airplane: (1) at least some of the fuel cells, advertised as "New" and dated February 2002, actually were dated 1991 and therefore were not "new;" (2) the alternators, also advertised as "new," had not been replaced; (3) the paint, advertised variously as "1998," "Late style paint design.1995 or newer," and "Excellent White with Blue and Silver accents Rated 8" is not as represented or properly logged as to when and where it was done; (4) the interior, advertised as "Excellent Original Interior with new carpet Rated 8," actually is rough and heavily worn, with old, stained carpet; (5) the total hours on both the airframe and one engine actually were greater than represented in the advertisement; (6) the plane was advertised as having a KLN89B glidescope when actually the unit was delivered, uninstalled, in a box and it is unclear whether it is operational; (7) the avionics and radios listed in the advertisement are all inoperable or operate improperly, making the plane not "IFR" (or "instrument flight rated"), as it was advertised; (8) the door seal, advertised as an "electric inflateable

door seal," actually had to be inflated by a hand pump and therefore was not "electric;" and (9) the general condition of the plane was advertised as "Excellent" while in fact the body had missing screws and bolts and there were many mechanical problems with the plane (_see_ Exh. to Court File No. 73, Exh. 4 to Anderson Depo., _see also_ Swift Depo. at 154-71, 258-263). Further, Plaintiff Swift asserts Otteson told him the airplane was a "beautiful airplane" and was in excellent condition, both of which he asserts were untrue (Swift Depo. p. 217).

Even assuming, _arguendo,_ Plaintiffs can meet the first three elements of their misrepresentation claim because these statements were intentional misrepresentations relating to existing or past material facts, made either with knowledge of their falsity, without belief in their truth, or with reckless disregard for their truth, Plaintiffs have not shown they can meet the fourth element, reasonable reliance on those statements.

**\*10** Whether a party's reliance on a misrepresentation was reasonable is a question of fact. _J.C. Bradford & Co. v. Southern Realty Partners,_ 2000 WL 34411153, \*10 (Tenn.Ct.App.2000). In order to determine the reasonableness of a plaintiff's reliance on a misrepresentation, a Court should consider: (1) the plaintiff's business expertise and sophistication; (2) the existence of a longstanding business or personal relationship between the parties; (3) the availability of the relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of the fraud; (6) the opportunity to discover the fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation. _Id._ After reviewing these considerations, the Court finds no dispute of fact on this issue.

This is not the first airplane purchase in which Plaintiff Swift had been involved, therefore Swift had some expertise in this area (Swift Draft Depo. at 24-26). Before Plaintiffs made the final decision to purchase the airplane, Plaintiffs had the opportunity to obtain, and believed they had obtained, a thorough inspection of the airplane (Swift Depo. at 148). Further, Plaintiff Swift had the opportunity to perform his own inspection of the plane in person when Defendant Fiske flew the plane to Tennessee, and did so (_Id._ at 66).[FN1] Plaintiff Swift was alerted to at least one significant problem with the right engine alternator and problems with the autopilot and other instruments during a test flight he took with Defendant Fiske in Tennessee, and in fact took the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 8
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)
**(Cite as: Slip Copy)**

airplane to his local mechanic where the alternator problem was identified (*Id.* at 69-74).

> FN1. Plaintiff Swift stated he did not point out some of the discrepancies between the condition of the plane as advertised and the condition in which it was delivered to Defendant Fiske at delivery because "I didn't see all of that until probably the next day when the rain had cleared and we had a chance to really take a look at the airplane ... Conditions didn't warrant a real good walk-around at that time" (Swift Depo. at 187).

In light of all of these circumstances, it is questionable whether Plaintiffs were still relying on the statements in the advertisement or Otteson's statements regarding the condition of the airplane at the time of the sale, but if they were, it certainly was not reasonable for them to do so. *See Capital Mgmt. Partners v. Eggleston,* 2005 Tenn.App. LEXIS 390, *39-40 (Tenn.Ct.App.2005) (plaintiff's reliance on borrower's financial representations not reasonable where plaintiff's agent, sophisticated businessperson, admitted he relied upon "a panoply of information *in addition to* the financial statements" supplied by defendant and his actions belied extent of reliance he claimed) (emphasis in original); *Pitz v. Woodruff,* 2004 Tenn.App. LEXIS 851, *31-34 (Tenn.Ct.App.2004) (plaintiffs' reliance on home seller's representations not reasonable where one plaintiff had expertise as a building expert and both had free rein and possession of the property and an ample opportunity to inspect the property prior to closing); *Asbury v. Lagonia-Sherman,* 2002 Tenn.App. LEXIS 731, *17-21 (Tenn.Ct.App.2002) (plaintiffs did not reasonably rely on seller's representations about property line where plaintiffs admitted seller's agent was uncertain about property line in question but plaintiffs elected not to look at publicly recorded plat book or survey the property prior to closing). Therefore, because Plaintiffs have not shown they can prove an essential element of this claim, *see Celotex,* 477 U.S. at 323, the Court will GRANT Defendants' motions for summary judgment as to Plaintiffs' claim of misrepresentation based on statements in the advertisement on www.controller.com and by Otteson.

2. Misrepresentations in Prebuy Inspection Report

**\*11** As to Plaintiffs' second theory, general misrepresentation of the airworthiness of the plane in the prebuy inspection report, Defendant Executive Aviation argues it made no general representation about the airworthiness of the plane. Defendant Executive Aviation contends, although Plaintiffs Swift and Anderson may have assumed the inspection Defendant Executive Aviation performed would be broader than the items included in his e-mail requesting the inspection, Swift and Anderson never conveyed that assumption to it, therefore it made representations only as to the items Swift listed in his e-mail to Otteson (Court File No. 76 at 8). A genuine dispute of material fact exists on this point. During his deposition, Plaintiff Swift more than once detailed a conversation he had with Defendant Executive Aviation's employee Johnson, during which the ten-item list was discussed but Johnson offered to perform a more thorough prebuy inspection, rather than just check the items on the list (*see* Swift Depo. at 162-63, 224-26). Plaintiff Swift further testified Johnson told him if he found "any additional problems with the airplane, [he would] contact [Swift] and [he would] contact Fiske to see who's-we'll make a determination of who is going to pay for that additional work" (Swift Depo. at 224-25). Johnson in his affidavit denies Plaintiff Swift requested any inspection outside the ten-item e-mail list, and states he performed only the inspections and repairs specifically requested by Swift in the e-mail (Johnson Aff. ¶ ¶  3, 5, 7, 9). The Court cannot resolve this dispute of fact about the breadth of the inspection to which Johnson agreed, which goes to the heart of what Defendant Executive Aviation represented regarding the plane's condition in its prebuy inspection report and therefore Plaintiffs' misrepresentation claim against it. For this reason, the Court will DENY Defendant Executive Aviation's motion for summary judgment on this claim of intentional misrepresentation only. *See* Fed.R.Civ.P. 56.

E. Breach of Contract

1. Claim Against Defendant Executive Aviation

Defendant Executive Aviation states Plaintiffs cannot prevail on their breach of contract claim for sale and delivery of an airplane in a different condition than was represented, because Executive Aviation had no contract for the sale or delivery of an airplane with Plaintiffs. It is undisputed the contract for the sale of the airplane was between Defendant R.H. Aero and Plaintiff Swift Freedom. However, Defendant Executive Aviation and Plaintiffs did have a contract

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                Page 9
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)
**(Cite as: Slip Copy)**

for certain repairs and inspection of the airplane, and Plaintiffs allege Defendant Executive Aviation breached that contract by failing to deliver the thorough pre-buy inspection it promised. Under Tennessee law, the elements of a breach of contract include (1) the existence of a contract, (2) breach of the contract, and (3) damages which resulted from the breach. _Life Care Centers of America, Inc. v. Charles Town Associates Ltd. Partnership,_ 79 F.3d 496, 514 (6th Cir.1996).

**\*12** The parties have not presented any express, written contract for the performance of repairs and inspection of the airplane, and it is unclear from the parties' statements and various writings what the terms of this contract were. Oral contracts are enforceable, but those seeking to enforce them must demonstrate that the parties mutually assented to the terms of the contract and that the terms are sufficiently definite to be enforceable. _Burton v. Warren Farmers Coop.,_ 129 S.W.3d 513, 521 (Tenn.Ct.App.2002) (citing _Davidson v. Holtzman,_ 47 S.W.3d 445, 453 (Tenn.Ct.App.2000); _Castelli v. Lien,_ 910 S.W.2d 420, 426-27 (Tenn.Ct.App.1995)). Whether Defendant Executive Aviation agreed to perform a prebuy inspection that was broader than the list Plaintiff Swift e-mailed is an issue purely of fact, which is material to the determination of this contract dispute. _See Byrd v. Hall,_ 847 S.W.2d 208, 211 (Tenn.1993) (citing _Evco Corp. v. Ross,_ 528 S.W.2d 20, 24-25 (Tenn.1975)); _see also_ Fed.R.Civ.P. 56. Since a genuine dispute of material fact exists as to the terms of the contract, this is a proper matter for the jury to determine, therefore Defendant Executive Aviation's motion for summary judgment as to the breach of the contract claim based on the prebuy inspection will be DENIED.

### 2. Claim Against Defendants R.H. Aero and Fiske

Plaintiffs allege Defendant R.H. Aero and Fiske breached their contract by delivering the airplane in a damaged and unairworthy condition, "rather than in the condition as represented" (Court File No. 1, Complaint ¶ V). Defendants R.H. Aero and Fiske argue they did not breach its contract for the sale of the airplane because they fulfilled their half of the bargain: they delivered the airplane to Plaintiffs after allowing them to inspect the airplane and log books and take a test flight.

The elements of a breach of contract in Tennessee were articulated _supra._ The parties have not attached as an exhibit to any filings any written contract for

the sale of this airplane, thus the Court will presume it was an oral agreement. However, neither party has so much as alleged what the terms of this agreement were relating to the condition of the plane. This is, unlike the situation above, not a situation of a disputed material fact, but a complete lack of material fact in the record as to what the parties agreed the condition of the plane would be upon delivery. The Court cannot begin to evaluate whether Plaintiffs can prevail on their claim Defendants R.H. Aero and Fiske breached the contract without this essential fact. Because Defendants R.H. Aero and Fiske have not addressed this fact in their arguments on this claim, they have not met the initial burden on summary judgment of showing they are entitled to prevail as a matter of law. _See_ Fed.R.Civ.P. 56. Therefore, the Court will DENY summary judgment to Defendants R.H. Aero and Fiske as to this breach of contract claim.

### F. Breach of Warranties

**\*13** Tennessee's adoption of the Uniform Commercial Code ("UCC") governs this contract for the sale of an airplane, which is a "sale of goods." _See Haverlah v. Memphis Aviation, Inc.,_ 674 S.W.2d 297, 302 (Tenn.Ct.App.1984); Tenn.Code Ann. § 47-2-101 et seq. In every sale of goods, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Tenn.Code Ann. § 47-2-314. Additionally, an implied warranty of fitness for a particular purpose arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods ..." Tenn.Code Ann. § 47-2-315.

Further, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise, [and a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Tenn.Code Ann. § 47-2-313. Under this statute, "[i]t is not necessary ... that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." _Id._

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)
(Cite as: Slip Copy)

Page 10

1. Warranties by Defendant Executive Aviation

a. Implied Warranties of Merchantability and Fitness
for a Particular Purpose

Plaintiffs argue Defendant Executive Aviation
"breached the warranties and implied representations
that the airplane was in airworthy condition" (Court
File No. 1, Complaint ¶ VII). Defendant Executive
Aviation argues because it never entered into a
contract for the sale of the airplane at issue as a
*seller,* as specified by both implied warranty statutes,
it made no implied warranties under that contract,
and thus these claims against it must fail. Under the
UCC sections quoted above, only a seller of a good
makes implied warranties to the buyer; third parties
do not fall under these provisions. See Tenn.Code
Ann. § § 47-2-314, 315. Plaintiffs give no basis in
law for holding Defendant Executive Aviation, a
third party to the contract, liable under these implied
warranty provisions. Therefore, because Plaintiffs
have not made a showing on this essential element of
these claims, *see Celotex,* 477 U.S. at 323, Defendant
Executive Aviation is entitled to summary judgment
as a matter of law, and the Court will GRANT its
motion on Plaintiffs' claims of breach of implied
warranties of merchantability and fitness for a
particular purpose.

b. Express Warranty of Airworthiness of Airplane

Plaintiffs also claim Defendant Executive Aviation
"warranted the airworthiness and the fitness for flight
of the airplane" by performing and signing off on
annual and prebuy inspections of the airplane (Court
File No. 1, Complaint ¶ VII). Defendant Executive
Aviation notes it did not complete the annual
inspection of the airplane required by federal
regulations, which took place in November 2002,
which included a certificate of airworthiness. There
seems to be no dispute on this argument, as Plaintiffs
have provided no evidence Defendant Executive
Aviation performed this inspection. Defendant also
argues it made no warranties by performing the
limited prebuy inspection as requested, which did not
include a check for "airworthiness." Because of the
factual dispute as to the representations made by
Johnson with regards to the breadth of the prebuy
inspection Defendant Executive Aviation agreed to
perform, the Court cannot make a determination as to
any warranties it may have made and possibly

breached pursuant to such inspection.[FN2] Therefore,
the Court will DENY Defendant Executive Aviation's
motion for summary judgment as to Plaintiffs' claim
regarding express warranties of airworthiness they
allege Defendant Executive Aviation made.

> FN2. The Court would note this claim may
> be more properly asserted against
> Defendants R.H. Aero and Fiske, for
> representations Defendant Executive
> Aviation made on their behalf as an agent in
> the sale of the airplane, rather than directly
> against Defendant Executive Aviation, since
> the statute refers to express warranties by a
> "seller." See Tenn.Code Ann. § 47-2-313.
> However, since Defendant Executive
> Aviation did not move to dismiss this claim
> on this ground, the Court will not do so *sua
> sponte.*

2. Warranties by Defendants R.H. Aero and Fiske

a. Implied Warranty of Merchantability

*14 Defendants R.H. Aero and Fiske argue because
they are not "merchants," the implied warranty of
merchantability did not arise in this contract,
therefore they could not have breached it. In a sale of
goods, "a warranty that the goods shall be
merchantable is implied in a contract for their sale if
the seller is a merchant with respect to goods of that
kind." Tenn.Code Ann. § 47-2-314 (emphasis
added). Defendants R.H. Aero and Fiske argue they
are not "merchant[s] with respect to goods of that
kind," *i.e.,* they are not aircraft dealers. A "merchant"
is defined under the UCC as
a person who deals in goods of the kind or otherwise
by his occupation holds himself out as having
knowledge or skill peculiar to the practices or goods
involved in the transaction or to whom such
knowledge or skill may be attributed by his
employment of an agent or broker or other
intermediary who by his occupation holds himself out
as having such knowledge or skill.

Tenn Code Ann. § 47-2-104(1). Plaintiffs present no
evidence Defendants R.H. Aero or Fiske were aircraft
dealers, or evidence they held themselves out "as
having knowledge or skill peculiar to the practices or
goods involved in the transaction." However,
Plaintiffs do argue Defendants R.H. Aero and Fiske
employed "an agent or broker or other intermediary
who by his occupation holds himself out as having

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such knowledge or skill" since they used Defendant Executive Aviation to list and broker the sale of the airplane (*see* Court File No. 107 at 2). Plaintiffs state Defendant Executive Aviation is in the business of "renting, buying and selling airplanes," therefore it held itself out as having knowledge or skill peculiar to the good involved in this transaction (*Id.*).

Defendant Executive Aviation itself states only that it is "a fixed based operator, providing services to aircraft operators at the Flying Cloud Airport in Eden Prairie, Minnesota" (Otteson Aff. ¶ 5). However, other evidence in the record, particularly the facts it "pays a flat fee in order to be able to list an unlimited number of aircraft for sale on www.controller.com," listed the plane at issue for sale on that website with its contact information for interested buyers, and told Plaintiff Swift it was brokering the sale of the airplane all indicate Defendant Executive Aviation holds itself out as an airplane dealer (Otteson Aff. ¶ 16; Swift Depo. at 49-55). Defendants R.H. Aero and Fiske did not address this argument in their briefs.

Based on the facts as evidenced in the testimony of Plaintiff Swift, Defendants R.H. Aero and Fiske did employ Defendant Executive Aviation in some manner to assist it in selling the airplane. Defendant Executive Aviation listed the airplane on the www.controller.com website, a service for which it pays a fee, on behalf of Defendants R.H. Aero and Fiske, but listed its contact information, not that of Defendants R.H. Aero or Fiske, for interested buyers (Otteson Aff. ¶ 13). Plaintiff Swift stated he spoke with Defendant Executive Aviation's employee Otteson approximately ten times, Otteson told Swift "they were brokering the airplane for an employee and it was their listing," and Otteson was his link to Defendant Fiske, whose identity was not immediately disclosed by Otteson, and with whom he spoke on far fewer occasions than with Otteson (Swift Depo. at 34, 42, 48-55, 61). Taking these facts in the light most favorable to Plaintiffs, the nonmoving parties, Defendants R.H. Aero and Fiske have not met their burden on summary judgment of proving they are entitled to prevail as a matter of law on its argument the implied warranty of merchantability does not apply to this transaction because they are not merchants. This warranty applies here by virtue of Defendants R.H. Aero and Fiske's employment of Defendant Executive Aviation, a "merchant" in airplanes, in this sale.

**\*15** The implied warranty of merchantability includes the goods "pass[ing] without objection in the trade under the contract description" and "fit[ness]

for the ordinary purposes for which such goods are used." Tenn.Code Ann. § 47-2-314. Under this statute, "there can be no recovery by the purchaser from the immediate seller unless it has shown that the goods purchased do not measure up to the requirements of the implied warranty at the time the goods passed from the seller to the purchaser." Leach v. Wiles, 58 Tenn.App. 286, 429 S.W.2d 823, 832 (Tenn.Ct.App.1968). Defendants R.H. Aero and Fiske did not present any arguments on the issue of whether, finding itself bound by the implied warranty of merchantability, it breached that warranty because the airplane did not "pass without objection in the trade under the contract description" or was not "fit for the ordinary purposes for which such goods are used." Thus, Defendants R.H. Aero and Fiske have not shown they are entitled to prevail as a matter of law on Plaintiffs' claim they breached this warranty, and the Court cannot grant Defendants R.H. Aero and Fiske summary judgment on that claim. *See* Fed.R.Civ.P. 56. For this reason, the Court will DENY Defendants R.H. Aero and Fiske's motion for summary judgment as to Plaintiffs' breach of the implied warranty of merchantability claim.

### b. Implied Warranty of Fitness for a Particular Purpose

An implied warranty of fitness for a particular purpose arises "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods ..." Tenn.Code Ann. § 47-2-315 (emphasis added). "[T]o establish an implied warranty of fitness for a particular purpose, the buyer must prove that: (1) the seller knew that the buyer had a particular purpose for which the goods were required; (2) the seller knew that the buyer was relying on the seller's skill or judgment to provide the buyer with goods fit for that particular purpose; and (3) the buyer must have actually relied on the seller's skill or judgment." *Jet Printing v. Deep S. Wholesale Paper Co.,* 2003 Tenn.App. LEXIS 46, \*12 (Tenn.Ct.App.2003) (*citing Kopper Glo Fuel, Inc. v. Island Lake Coal Co.,* 436 F.Supp. 91, 95 (E.D.Tenn.1977)). After the buyer establishes an implied warranty of fitness for a particular purpose, the buyer must then show the goods were not fit for the purpose for which they were intended. *Id.* (citing Masters v. Rishton, 863 S.W.2d 702, 706 (Tenn.Ct.App.1992)).

Defendants R.H. Aero and Fiske argue Plaintiffs did

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not discuss with Fiske any particular purpose they might have had for the airplane, they merely discussed the specifications of the aircraft itself and the contents of the www.controller.com advertisement. Therefore, Defendants R.H. Aero and Fiske state, Plaintiffs must not have relied on R.H. Aero's or Fiske's "skill or judgment to select or furnish suitable goods" for any purpose they might have had. Plaintiffs have not stated what their "particular purpose" was for the airplane, although it appears from Plaintiff Swift's deposition it was intended for business travel for himself and Plaintiff Anderson (*see* Swift Depo. at 195-202). Plaintiffs further have not even alleged they shared that particular purpose with Defendant Fiske, or Fiske knew they would be relying on his skill or judgment to provide them with an airplane fit for that particular purpose. Plaintiffs have not put on any evidence to overcome Defendants R.H. Aero and Fiske's arguments on this point, therefore they have not met their burden of showing they can prove the essential elements of this claim. *See Jet Printing,* 2003 Tenn.App. LEXIS 46 at *12. Because Plaintiffs have not come forward with the required, minimal showing on these elements to defeat Defendants R.H. Aero and Fiske's arguments showing they should prevail as a matter of law on this claim, *see Celotex,* 477 U.S. at 323, the Court will GRANT R.H. Aero and Fiske's motion for summary judgment on the claim of breach of the implied warranty of fitness for a particular purpose.

### G. Tennessee Consumer Protection Act

*16 Finally, Defendants argue Plaintiffs cannot prove their claim under the TCPA, Tenn.Code Ann. § § 47-18-101 *et seq.* Plaintiffs do not elaborate as to what portion of the TCPA Defendants violated, but since most of the facts they present relate to alleged misrepresentations, the Court will presume they are alleging claims under Tenn.Code Ann. § 47-18-104, which prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce." Included as "unfair or deceptive acts or practices" are "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have;" "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;" "[a]dvertising goods or services with intent not to sell them as advertised;" and "[e]ngaging in any other act

or practice which is deceptive to the consumer or to any other person." Tenn.Code Ann. § § 47-18-104(b)(5), (7), (9), (27).

The TCPA provides, "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages." Tenn.Code Ann. § 47-18-109(a)(1) (emphasis added). Thus, every claim under the TCPA must include a showing of a causal link between the unfair or deceptive act or practice and the injury. *See Land v. Dixon,* 2005 Tenn.App. LEXIS 401, *12 (Tenn.Ct.App.2005).

Plaintiffs do not particularly allege what conduct by Defendants violated the provisions of the TCPA, they state merely the actions alleged in their complaint "are in further violation of" the TCPA (*see* Court File No. 1, ¶ VIII) and the testimony of Plaintiffs Swift and Anderson "is sufficient for the question[ ] of violation of the Tennessee Consumer protection Act ... with its allocable treble damages and attorney fees" (Court File No. 103 at 7). As outlined *supra,* Plaintiffs Swift and Anderson testified in their depositions to numerous alleged misrepresentations by Defendants Executive Aviation, R.H. Aero, and Fiske with regards to the condition of the airplane.

### 1. Defendant Executive Aviation

Defendant Executive Aviation argues because summary judgment was appropriate on Plaintiffs' misrepresentation claim, and the same conduct (*i.e.,* statements in the advertisement on www.controller.com, by Otteson, and in the prebuy inspection report) is alleged to have violated the TCPA, Plaintiffs also cannot prevail under the TCPA. *See Land,* 2005 Tenn.App. LEXIS 401 at *12. In *Land,* upon which Defendant Executive Aviation relies entirely in making this argument, the Tennessee Court of Appeals found the plaintiffs knew the truth regarding every alleged misrepresentation before they closed on a real property sale, therefore their claims of misrepresentation failed. *Id.* at *11-12. Although the *Land* court did not specify, the Court, after reviewing its analysis, understands this holding was based on plaintiffs' inability to meet the fifth element of misrepresentation, a showing the plaintiff suffered a detriment *because of* its reliance on the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

misrepresentation.

\*17 The *Land* court then found that same rationale precluded the plaintiffs' claims based on the same misrepresentations under the TCPA, since the section of the TCPA creating a private right of action "requires a showing by a plaintiff that the alleged violations *caused* his or her injury." *Id.* at 12 (emphasis added); *see also* Tenn.Code Ann. § 47-18-109(a)(1) ("Any person who suffers an ascertainable loss ... *as a result of* the use or employment by another person of an unfair or deceptive act or practice declared to be unlawful by this part, may bring an action individually to recover actual damages") (emphasis added). The *Land* court reasoned, since the plaintiffs "voluntarily elected to close on the contract for sale of the property with full knowledge of the alleged misrepresentations and of the truth regarding the property, Plaintiffs cannot show the required causative link between the misrepresentations and their alleged injury" necessary to prevail under the TCPA.2005 Tenn.App. LEXIS 401 at \*12. Since the Plaintiffs in *Land* failed to meet the causation element on both the misrepresentation claim and the TCPA claim, the court found summary judgment was appropriate on both claims. *Id.*

The Court would note *Land* does not stand for the proposition, as Defendant Executive Aviation seems to imply in its briefs, a claim under the TCPA can never go forward where summary judgment has been granted on a claim of misrepresentation based on the same misconduct as that upon which the TCPA claim is based. While the facts in *Land* supported a grant of summary judgment on both claims, such will not always be the case. These claims have separate elements, and facts that might not support one could support the other. For example, the TCPA does not require reasonable reliance as an element of any claim thereunder. *See* Tenn.Code Ann. § § 47-18-104, 109(a)(1). The requisite mental state showing also differs between misrepresentation and the TCPA, particularly since the mental state required in a TCPA claim depends on which of the many types of unfair or deceptive conduct enumerated in the statute a plaintiff alleges the defendant committed. *See Ganzevoort v. Russell,* 1997 Tenn. LEXIS 406, \*2 (Tenn.1997) ("though in most situations [under the TCPA] actionable fault is not a prerequisite to liability, in others, knowledge is a prerequisite, and in still others, intent to deceive is the standard)." *Id.*

Further, the Court based its decision to grant summary judgment on Plaintiffs' misrepresentation

claims related to the www.controller.com advertisement and Otteson's statements, *supra,* not on the causation element, as the Court in *Land* seems to have done, but on the lack of reasonable reliance element. Therefore, *Land* is of only limited relevance here in its analysis of parallel holdings on misrepresentation and TCPA claims based on the same conduct. Further, the Court did not grant summary judgment on all misrepresentation claims brought against Defendant Executive Aviation, specifically, the Court denied summary judgment on those claims related to the prebuy inspection. Therefore, Defendant Executive Aviation's argument a grant of summary judgment on the misrepresentation claim alone necessitates a grant of summary judgment on a TCPA claim based on the same conduct is not sufficient to dispose of Plaintiffs' TCPA claims here.

\*18 As Defendant Executive Aviation's entire argument on this point is that summarized above, and it has not addressed whether Plaintiffs can prove the required elements of their TCPA claims, it has not met its burden of showing it must prevail on Plaintiffs' claims under the TCPA as a matter of law, *see* Fed.R.Civ.P. 56, and the Court will therefore DENY its motion for summary judgment on this claim.

### 2. Defendants R.H. Aero and Fiske

Defendants R.H. Aero and Fiske argue Plaintiffs had full access to the aircraft and its logs as well as Defendant Executive Aviation's prebuy inspection report, Plaintiff Swift's own in-person inspection, and their own airfield mechanic's inspection of the plane before deciding to purchase the airplane, thus it cannot be liable under the TCPA for *causing* their damages by any unfair or deceptive trade practices. This argument is analogous to the one the Court found persuasive in *Land,* where a buyer was "in possession of all material facts, either actually or constructively," relevant to the condition of the item for sale, yet proceeded with the purchase, and could not succeed on its TCPA claim because any unfair or deceptive trade practices were not the *cause of* its injury. *See Land,* 2005 Tenn.App. LEXIS 401 at \*12-13. Here, Plaintiffs had at least constructive possession of material facts relating to the poor mechanical condition of the airplane since before agreeing to purchase it they had the opportunity to obtain as thorough an inspection as they wished, and in fact believed they had obtained a thorough prebuy inspection (Swift Depo. at 152, 162; Anderson Depo.

Slip Copy                                                    Page 14
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)
**(Cite as: Slip Copy)**

at 190-200). Further, Plaintiff Swift had actual knowledge the right engine alternator, auto pilot, and other instruments had mechanical problems, as these arose during the test flight he took with Defendant Fiske (Swift Depo. at 69, 72), so he had actual knowledge of the truth behind at least the alleged misrepresentations relating to those parts of the plane. Therefore, even taking the facts in the light most favorable to Plaintiffs and assuming Defendants R.H. Aero and Fiske engaged in unfair or deceptive trade practices in violation of the TCPA, Plaintiffs have not shown those practices *caused* their injuries, an essential element of these claims. *See id.; Celotex,* 477 U.S. at 323. For this reason, the Court will GRANT Defendants R.H. Aero and Fiske's motion for summary judgment on Plaintiffs' claims under the TCPA.

## IV. CONCLUSION

For all of the foregoing reasons, Defendants' motions for summary judgment will be GRANTED IN PART and DENIED IN PART. The parties WILL BE ORDERED TO PROCEED TO TRIAL as to the following claims by Plaintiffs against Defendant Executive Aviation: (1) fraud claims based on alleged misrepresentations it made in the prebuy inspection report; (2) breach of contract claim based on the contract to perform a prebuy inspection; (3) breach of an express warranty of airworthiness claim; and (4) claims under the Tennessee Consumer Protection Act. The parties further WILL BE ORDERED TO PROCEED TO TRIAL as to the following claims by Plaintiffs against Defendants R.H. Aero and Fiske: (1) the breach of contract claim and (2) the claim of breach of implied warranty of merchantability. The Court WILL DISMISS all other claims.

**\*19** An Order shall enter.

E.D.Tenn.,2005.
Swift Freedom Aviation, LLC v. Aero
Slip Copy, 2005 WL 2246256 (E.D.Tenn.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2890746 (Trial Motion, Memorandum and Affidavit) Memorandum In Support of Motion In Limine and Rule 26(A)(3) Objections of Defendant Executive Aviation, Inc. (Sep. 30, 2005)
• 2005 WL 2657739 (Trial Motion, Memorandum and Affidavit) Defendant Executive Aviation, Inc.'s Reply to Plaintiffs' Response to Executive Aviation, Inc.'s Motion for Summary Judgment (Aug. 15, 2005)

• 2005 WL 2657737 (Trial Motion, Memorandum and Affidavit) R.H. Aero and Robert H. Fiske's Memorandum of Law in Support of Motion for Summary Judgment (with Updated Deposition Citations) (Aug. 11, 2005)
• 2005 WL 2296797 (Trial Motion, Memorandum and Affidavit) Brief in Support of Objection to Motions for Summary Judgment (Aug. 8, 2005)
• 2005 WL 2296796 (Trial Motion, Memorandum and Affidavit) Motion to Compel Production and Answer to Request for Production (Jul. 27, 2005)
• 2005 WL 2296792 (Trial Motion, Memorandum and Affidavit) Defendant Executive Aviation, Inc.'s Motion for Summary Judgment - Fed. R. Civ. P. 56 (Jul. 19, 2005)
• 2005 WL 2296793 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Defendant Executive Aviation, Inc.'s Memorandum for Summary Judgment (Jul. 19, 2005)
• 2005 WL 2296795 (Trial Motion, Memorandum and Affidavit) R.H. Aero and Robert H. Fiske'S Memorandum of Law in Support of Motion for Summary Judgment (Jul. 19, 2005)
• 2005 WL 1363687 (Trial Motion, Memorandum and Affidavit) Memorandum (Mar. 28, 2005)
• 2005 WL 1363686 (Trial Pleading) Answer of Executive Aviation, Inc. (Feb. 11, 2005)
• 2005 WL 2890745 (Trial Motion, Memorandum and Affidavit) Memorandum (2005)
• 2004 WL 3374715 (Trial Motion, Memorandum and Affidavit) Memorandum (Dec. 13, 2004)
• 2004 WL 3367602 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Special Appearance and Motion to Dismiss of Executive Aviation, Inc., Shirley Wikner, And Kirk Otteson -- Fed. R. Civ. P. 12(b)(2), (3), and (6) (May 10, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.