Westlaw.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1992 WL 93221 (D.Mass.), RICO Bus.Disp.Guide 8005  
(Cite as: Not Reported in F.Supp.)

Page 1

Briefs and Other Related Documents

United States District Court, D. Massachusetts.  
READING CYCLES, Plaintiff,  
v.  
George BRADLEY and Robert C. Maurer, Jr., Defendant.  
Civ. A. No. 89-2490-WF.

April 13, 1992.

MEMORANDUM AND ORDER

WOLF, District Judge.

*1 In June, 1985, the plaintiff in the instant case brought an action against Cycom Corporation ("Cycom") pursuant to M.G.L. c. 93A, alleging unfair and deceptive trade practices in the sale of a computer system. See Reading Cycles, Inc. v. Cycom Corporation, C.A. No. 85-2601-W-A. In June, 1989, plaintiff prevailed in a non-jury trial in that case and was awarded $34,000 trebled, plus attorneys fees and costs by the presiding judge, Bailey Aldrich. See slip op. at 17 (D.Mass. June 14, 1989).

Apparently plaintiff was unable to collect on its judgment. On November 2, 1989, plaintiff brought this action against George Bradley of Cycom, whose conduct was in the original action found to be false and deceptive by Judge Aldrich, and his superior Robert Maurer. Id. at 2. The instant complaint charges Bradley and Maurer with violating M.G.L. c. 93A and the federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 et seq. These claims are based upon the conduct of Bradley which was addressed in the initial suit. Complaint, ¶ 7. The defendants have moved for summary judgment on the ground that plaintiff's claims are barred by the applicable statutes of limitations. Despite plaintiff's opposition, defendants' contention is correct. Thus, summary judgment must be granted.

The limitations period for claims under M.G.L. c. 93A is four years. M.G.L. c. 260, § 5A. Baldassari v. Public Finance Trust, 369 Mass. 33, 43 (1975). Under Massachusetts law:

In all cases the statute of limitations begins to run when the injured person has notice of the claim. The "notice" required is not notice of every fact which must eventually be proved in support of the claim. These details are properly the subject of requests for discovery once an action is filed. See Mass.R.Civ.P. 26-37. Rather, "notice" is simply knowledge that an injury has occurred.

White v. Peabody Construction Co., 386 Mass. 121, 130 (1982) (emphasis added).

Generally, the plaintiff has the ultimate burden of proving facts that show its claim is not barred by the statute of limitations. Franklin v. Albert, 381 Mass. 611, 619 (1980). Thus, to defeat a motion for summary judgment based on the statute of limitations on a M.G.L. c. 93A claim, the plaintiff must offer admissible evidence sufficient for a reasonable fact finder to decide that it did not know of the injury for which it seeks to recover within four years of the filing of the action at issue. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

There is also a four year statute of limitations for federal RICO claims. Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 156 (1987). The Court of Appeals for the First Circuit has held that the statute of limitations on a RICO claim starts running "when a plaintiff knew of should have known of his injury ..." Rodriquez v. Banco Central, 917 F.2d 664, 666 (1st Cir.1990) (emphasis added). Thus, to survive a motion for summary judgment on a RICO claim, plaintiff must once again offer evidence placing in dispute whether it first knew or should have known of the injury at issue less than four years before filing suit.

*2 Even looking at the record in the light most favorable to the plaintiff, it is evident that Reading Cycles knew of the injury it sustained as a result of Bradley's conduct on behalf of Cycom before filing its M.G.L. c. 93A action against Cycom in June, 1985. Thus, the present action, filed more than four years later, is barred by the applicable statutes of limitations.

More specifically, in his affidavit opposing the motions for summary judgment of Bradley and Maurer, Ken Pratt, plaintiff's President, asserts that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 2915-12   Filed 07/24/06   Page 3 of 20

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1992 WL 93221 (D.Mass.), RICO Bus.Disp.Guide 8005
**(Cite as: Not Reported in F.Supp.)**

when the initial suit charging Cycom with violating M.G.L. c. 93A was filed, he did not know that Bradley's misconduct was "perpetrated ... with malice." Affidavit of Ken Pratt dated April 8, 1990 at 5-6.[FN1] Nor, Pratt asserts, did he then know of Maurer's role in that misconduct. *Id.* Pratt contends that the November 6, 1985 deposition of Bradley was "an eye-opener" with regard to Bradley and also suggested Maurer's role in the misrepresentations made to Cycom. *Id.* at 2-3. Maurer was deposed in July 1986. *Id.* at 3. Pratt also claims that information indicating that Maurer and Bradley had caused Cycom to defraud other customers was obtained shortly before trial in 1989. *Id.* at 3.

The foregoing demonstrates that plaintiff has not placed genuinely in dispute the fact that it knew of the injury at issue in the instant case before June, 1985. Details concerning Bradley's motivation and Maurer's role may have been developed in discovery in that case, but such details are not decisive for statute of limitations purposes. *White,* 386 Mass. at 130. Plaintiff could have properly moved to amend its original complaint to add Bradley as a defendant no later than November, 1985, and to add Maurer as a defendant no later than July, 1986. In retrospect, plaintiff's failure to add these individuals as defendants in the original action may seem to have been a tactical error, but any such error may not serve to extend the otherwise applicable four year statutes of limitations.

The court recognizes that this ruling may have the practical effect of keeping a proven victim of deceptive conduct from recovering for the harm done to it. However, the court is also obligated to recognize the legislative judgment, implicit in all statutes of limitations, that it is in the public interest to run the risk of extinguishing possibly meritorious claims if defendants, who might otherwise be liable, have not been given timely notice of their alleged liability. See *Kay v. Johnson & Johnson,* 722 F.Supp. 874, 879 (D.Mass.1989), *aff'd.,* 902 F.2d 1 (1st Cir.1990).

Accordingly, defendants' motions for summary judgment are hereby ALLOWED.

FN1. Pratt states in his affidavit, at pages 4 and 5:
In sum, at the time I authorized suit to be filed against Cycom Corporation, I knew the system did not work as represented and I believed that Cycom had committed an unfair and deceptive trade practice upon Reading Cycles. What neither I nor anyone at Reading Cycles knew then, however, was that these unfair acts of Cycom Corporation were perpetrated by Mr. Bradley with malice.

D.Mass.,1992.
Reading Cycles v. Bradley
Not Reported in F.Supp., 1992 WL 93221 (D.Mass.), RICO Bus.Disp.Guide 8005

Briefs and Other Related Documents (Back to top)

• 1:89cv02490 (Docket) (Nov. 02, 1989)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.
Robert SALOIS and Dianne E. Salois, Ninon R.L. Freeman, and David M. Leary and Linda Scurini-Leary, Individually and on Behalf of Others Similarly Situated, Plaintiffs,
v.
THE DIME SAVINGS BANK OF NEW YORK, FSB, Harry W. Albright, Jr., John B. Pettit, Jr., William J. Mellin, William J. Candee III, William A. Volckhausen, James E. Kelly, Ralph Spitzer, Robert G. Turner, Brian Geraghty, Lawrence W. Peters, E. Judd Staley III, and John Doe Companies, Defendants.
No. Civ.A. 95-11967-PBS.

Nov. 13, 1996.

MEMORANDUM AND ORDER
SARIS, J.

I. *INTRODUCTION*

*1 Plaintiffs filed this proposed class action on September 1, 1995, alleging that the Dime Savings Bank ("Dime") and its employees violated federal and state law with respect to the advertisement, sale, and servicing of the negative-amortization mortgages that it issued in Massachusetts from 1986 to 1989.[FN1] The graduated payment, variable rate mortgages were designed so that the monthly payments would not cover the monthly interest, causing the principal balance to increase over the repayment period. Plaintiffs complain that Dime, on its own and through its subsidiary Dime Real Estate Services of Massachusetts, misrepresented the nature of the mortgages, failed to make the required statutory disclosures, and made the loan documents sufficiently complicated that the ordinary consumer would be unable to understand the terms of the loan. They also allege that the servicing of the loans was contrary to the loan documents and Massachusetts law.

> FN1. The thirteen count, 277 paragraph, second amended complaint dated February 15, 1996 added new named plaintiffs, Ms. Ninon Freeman and the Leary's. The statute of limitations analysis does not hinge on when the parties were named as plaintiffs. The second amended complaint alleges violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO) (Count II), the Truth-In-Lending Act, 15 U.S.C. § 1601 et seq. (Count III), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 (RESPA) (Count IV), the Parity Act, 12 U.S.C. §§ 3801-3806 (Count V), the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. L. ch. 140D (Count VI), the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A (Count VII), breach of contract (Count VIII-Recission), breach of the covenant of good faith & fair dealing (Count IX), breach of fiduciary duty (Count X), fraud, deceit, and misrepresentation (Count XI), civil conspiracy (Count XII), and negligent misrepresentation, negligent hiring and supervision, and vicarious liability (Count XIII). Plaintiffs make a jury demand, and seek declaratory judgment (Count I), certification of a class, damages, rescission, injunction against foreclosure, and attorney's fees.

Defendants move to dismiss, arguing that all claims are barred by the statutes of limitations because they were filed over seven years after the execution of the plaintiffs' loan agreements. Plaintiffs respond that the inadequate and misleading disclosures prevented them from discovering their claims despite the exercise of reasonable diligence, and that defendants fraudulently concealed their claims. Defendants also argue that the complaint fails to state a claim on the merits, and that they are not properly subject to the personal jurisdiction of this court.

The Court concludes that all claims arising out of the representations, disclosures, and fees at the time the loans were issued are time-barred. The breach of contract claims that the loans continued to be serviced improperly throughout the repayment period are also time-barred with respect to the specific allegations and attachments to the Second Amended Complaint. Accordingly, defendants' motion for summary judgment is *ALLOWED* without prejudice to the Salois' claim of breach of the settlement

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 2915-12   Filed 07/24/06   Page 6 of 20

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
(Cite as: Not Reported in F.Supp.)

agreement.

## II. FACTUAL BACKGROUND

Accepting all facts pled in the complaint as true for the purposes of this motion, the Court treats the following facts as undisputed.

The Dime Savings Bank of New York, FSB ("Dime"), a federally chartered savings bank, set up and controlled subsidiaries in states throughout the eastern United States, including Massachusetts. Operating as The Dime Real Estate Services-Massachusetts ("DRES-MA"), defendants conducted loan transactions out of a number of offices in Massachusetts, between July 1, 1986 and December 31, 1989. The bank made more than four thousand mortgage loans in Massachusetts during that time period, totalling in excess of six hundred million dollars. (Compl.¶ 4.) By 1990 DRES-MA was dissolved and/or merged into Dime. (Compl.¶ 12.) Dime continued to service at least some of the loans. (Compl.Ex. F.) The current holders of the outstanding mortgage loans which Dime originated have been designated the "John Doe Companies."

### A. *The Alleged Product and Sales Scheme*

*2 In Massachusetts, Dime marketed primarily the "Impact Loan", instructing loan production representatives ("LPRs") who marketed the loans to the public to push the sale of that type of loan to the exclusion of other options. (Compl.¶ 79.) Dime's "Impact Loan" featured both graduated monthly payments and a variable interest rate. It had two additional distinctive features. First, it was designed to negatively amortize. Second, it required very little verification of employment, income, or assets. (Compl.¶¶ 36-37.)

#### 1. *Negative amortization*

Monthly loan payments are fully "amortizing" when they cover the monthly interest on the loan and pay down the principal. "Negative amortization" occurs when the monthly payment is insufficient to cover the monthly interest. The unpaid interest is added to the principal, and begins to accrue interest itself. Thus, despite the borrower's regular payments, the principal owed on the loan increases over time. Under the Dime agreements, no payments were applied to the principal until all deferred interest had been paid. (Compl.¶ 53.)

Dime made its loans more attractive to plaintiffs and others by offering a discounted interest rate of 7.5% for the first six months, and a cap of 9.5% for the second six months. (Compl.¶ 57.) Only after that time would the rate charged conform to the Cost of Funds index plus three per cent, as described in the loan agreement, with a cap of 13.875%. (Compl.Ex. C.) Once the interest rate rose, the principal would begin to negatively amortize, unless and until falling interest rates and/or increased monthly payments resulted in a payment which covered the monthly interest. (Compl.¶ 40.)

After the first six months, the monthly statements showed increases in the principal balance "like clockwork." (¶ 40, 62). "Deferred interest" began to appear on the statements in the second year of the loan. (Compl.¶ 62.) Once the principal balance reached 110% of the original principal, the borrower would be required to make fully amortizing payments. (Compl.¶ 42.)

#### 2. *Loan verification*

Dime instructed its managers and LPRs to ensure that the loan verification supported the application. As a matter of policy, loan approvals were granted on the basis of the value of the real estate being sold, rather than on the basis of the borrowers' down payment or financial credentials. (Compl.Ex. X.) In addition, LPRs and attorneys were instructed not to investigate the existence or source of down payment funds and closing costs. (Compl.¶ 86.) In some cases, the down payment would come from a second mortgage on the property being purchased. (Compl.¶ 161.)

#### 3. *Marketing*

The complaint alleges that defendants engaged in a calculated scheme to market their loans which included: (1) fraudulent mortgage advertisements, disclosures, and loan documents; (2) federal Truth-in-Lending Disclosure Statements, Loan Commitments, and mortgage loan documents which omitted important information and were sufficiently complicated that the actual material terms would be concealed from all but a few well-trained mortgage analysts; and (3) unfair and/or deceptive marketing tactics such as product tampering and equity skimming. (Compl.¶ 43.) At no time in the "typical" transaction would the LPR tell the borrower the loan

Case 1:01-cv-12257-PBS    Document 2915-12    Filed 07/24/06    Page 7 of 20

Not Reported in F.Supp.    Page 3
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

was a negative amortization loan. (Compl.¶ 165.)

*3 As part of the general scheme of loan sales, Dime told potential borrowers "We always do it this way," and "You don't need an attorney. Dime's attorney will handle things." The Salois' were instructed that they would not need their own attorney, so they did not hire one. (Compl.¶ 162.)

### 4. *Foreclosure*

In the event of foreclosure on a property, Dime would typically debit the entire amount of the mortgage loan as a "tax loss carry forward," and expend a lesser amount to purchase the property. This allowed the bank to avoid the paper loss through a tax savings. (Compl.¶ 103.) From 1990 to 1993, Dime had a foreclosure rate of sixty per cent, the highest rate in the country. (Compl.¶ 104.) In 1993, Dime was able to shield approximately forty-four million dollars of income from any federal corporate income taxes and still had approximately two-hundred thirty-nine million dollars worth of "tax loss carry forward." (Compl.¶ 105.)

### B. *The Plaintiffs' Loans*

There are three loans specifically at issue in this complaint. Ninon R.L. Freeman, who was added as a plaintiff in the amended complaint, obtained a loan from Dime with her then-husband for $150,000 to refinance their Newton, Massachusetts home on November 18, 1986. This loan was paid off in full in December 1993 and Ms. Freeman still resides at that residence.

The Learys put down $70,000 on their first home in Tewksbury and executed a $100,000 loan from Dime on April 15, 1987. This property was foreclosed upon in May 1991. (Compl.¶ 182.)

Robert and Dianne Salois entered a loan agreement with Dime for $145,600 on or about June 16, 1987, when they signed the Adjustable Rate Note and executed a mortgage security interest in the home they were purchasing. They had made a $36,400 down payment, and at the time the initial complaint was filed, still resided in that home. (Compl.¶ 174.)

### 1. *The Loan Documents*

The plaintiffs signed Adjustable Rate Notes as part of their loan application processes. (Compl.Ex. C.) They understood the Adjustable Rate Note to be a final contract between Dime and themselves. They took the Note to be a complete and integrated document. (Compl.¶¶ 174-175.)

The Salois' loan documents are attached to the complaint as a representative example. Under the title "ADJUSTABLE RATE MORTGAGE," appears the following: THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT, WITH LIMITATIONS, AND ALLOWS FOR INCREASES IN THE PRINCIPAL AMOUNT TO BE REPAID (Negative Amortization). The document describes how the interest rate on the mortgage will be calculated throughout the course of the loan. On the second page of the three-page document, under the heading "Additions to My Unpaid Principal (Negative Amortization)", is a section which reads in full,
The amount of my monthly payment could be less than the amount of the interest portion of the Full Payment Amount after each Interest Change Date. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest added to the principal will be the rate required by Section 4(A) above.

*4 Additionally, the Federal Truth in Lending Disclosure Statement, a one-page document signed by both Salois' on May 7, 1987, explained negative amortization under a bold-faced heading directly above their signatures. This section indicates the amount by which the loan principal would increase if monthly payments were insufficient to cover the interest rate differential. (Compl.Ex. L.)

The Adjustable Rate Note provided that in the event of changes in the amount of monthly payments a telephone number of a person who would answer questions would be provided. (Compl.¶ 65, Ex. C.) However, when borrowers, including plaintiffs, called Dime to find out what "deferred interest" was, customer service representatives did not accurately answer their questions. (Compl.¶ 65.)

### 2. *The Correction of the Salois' Note*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 2915-12   Filed 07/24/06   Page 8 of 20

Not Reported in F.Supp.                                                                                       Page 4
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

On February 29, 1988 and June 1, 1988, Dime sent the Salois' new Adjustable Rate Notes to execute. The new notes were to change what Dime first said was "procedural only", and then said was only a typewriting error. (Compl.¶ ¶ 184-85.) The original note (Compl.Ex. C.) states the loan was capped at two-per-cent change in interest rate per "Interest Rate Change Date", i.e. per month, as defined by the preceding paragraph of that document. The corrected documents, which plaintiffs allege were not signed until "at least 1988," would have removed the cap on monthly interest adjustments, leaving only the overall 13.875% rate cap. (Compl.Exs.D, E.). The cover letter signed by Dana S. Cohen, Esq. explains that the initial note "incorrectly reflects the limits on your interest rate, by stating that the cap is two (2%) percent per change date." (Ex. D). The changes were made by crossing out the 2 percent cap and writing in "N/A".

3. *The Salois' back charges*

In February 1995, the Salois' were notified that they owed Dime $12,575.95 in back charges, and that if they would make such a payment their account would be fully up-to-date and their loan would be reinstated. (Compl.¶ 191.) The Salois' paid the full amount but on or about March 10, 1995 were notified that $1,115.50 was still outstanding ($15 in returned check fees. $496.95 in unpaid late charges, and $604.05 for a short-fall in the escrow balance). (Compl.¶ 192.)

D. *The Instant Action*

This action was commenced on September 1, 1995. The Salois' state they were not aware of their claims until advised by their attorney in the last week of September, 1994. (Compl.¶ 153.) Ms. Freeman and the Learys were advised by the same attorney in the summer of 1995. The plaintiffs do not allege facts to explain what prompted them to consult legal counsel.

III. DISCUSSION

A. *Motion to Dismiss for Failure to State a Claim*

In ruling on a motion to dismiss for failure to state a claim, the Court may look only to the complaint itself, <u>Harper v. Cserr, 544 F.2d 1121, 1122 (1st Cir.1976)</u>, even if the defendant raises affirmative defenses, <u>DiMella v. Gray Lines of Boston, Inc., 836 F.2d 718, 719-20 (1st Cir.1988)</u>. The motion shall be allowed if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir.1987)</u> (quoting <u>Conley v. Gibson, 355 U.S. 41, 45-46 (1957)</u>).

*5 The Court must accept all factual allegations in the complaint as true, <u>United States v. Mississippi, 380 U.S. 128, 143 (1965)</u>, and draw all reasonable inferences in favor of the plaintiff, <u>Coyne v. City of Somerville, 972 F.2d 440, 442-42 (1st Cir.1992)</u>. Although fraud must be pled with particularity, <u>Fed.R.Civ.P. 9(b)</u>, other claims require only "a short and plain statement of the claim showing that the pleader is entitled to relief," <u>Fed.R.Civ.P. 8(a)</u>. However, the court need not accept "legal conclusions or ... bald assertions" made without factual support. <u>Resolution Trust Corp. v. Driscoll, 985 F.2d 44, 48 (1st Cir.1993)</u>; see generally <u>Boston & Maine Corp. v. Town of Hampton, 987 F.2d 855, 863 (1st Cir.1992)</u> (discussing the tension among First Circuit cases with respect to the particularity required in pleadings).

Defendants move for dismissal of this case on the basis of the affirmative defense of limitation of the action, as well as on the merits. The statute of limitations defense may be addressed in a Rule 12(b)(6) motion when the defense is obvious on the face of the pleadings. See <u>Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 592 (1st Cir.1989)</u>; see also <u>5 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1277</u> n.13 (1990).

B. *Federal claims*

The plaintiffs' mortgages were issued November 18, 1986, April 15, 1987, and June 16, 1987, and corrected mortgage documents were presented to the Salois' in February and June, 1988. This action was not filed until September 1, 1995, over seven years after the last corrective document was sent. The statutes of limitations on the federal claims range from one year to four years. Therefore, unless the actions accrued at a later date, or were tolled by fraudulent concealment, all federal claims are time-barred. Federal common law determines when the statute begins to run on the federal claims. See <u>Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127 (1st Cir.1987)</u>.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 2915-12   Filed 07/24/06   Page 9 of 20

Not Reported in F.Supp. Page 5
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
(Cite as: Not Reported in F.Supp.)

### 1. *RICO (Count II)*

RICO imposes civil liability for injury to business or property "by reason of a violation of section 1962," which in turn makes it a crime "for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § § 1962(c), 1964(c). An act of "racketeering activity" is the commission of one of the crimes enumerated in the statute. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity. § 1961(5).

Because RICO does not include a limitations period, the Clayton Act's four-year period, 18 U.S.C. § 15b, has been held to apply to civil RICO claims. *See Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 156, 107 S.Ct. 2759, 2767 (1987).* The four-year period begins to run "when a plaintiff knew or should have known of his injury." *Rodriguez v. Banco Central, 917 F.2d 664, 666 (1st Cir.1990).* Once each element of RICO has been satisfied, and the plaintiff has cause to know of the injury, the statute will run. *See id.* at 667. Even an additional predicate act within the limitations period will not save the action. *See id.* at 666-67. As the complaint was filed September 1, 1995, any claims which accrued prior to September 1, 1991, are time-barred.

*6 Plaintiffs allege that the defendants, through DRES-MA, engaged in a pattern of racketeering activities between July 1, 1986, and December 31, 1989, while "developing, marketing, providing, and servicing 'Impact Loans' in Massachusetts." They allege that defendants committed mail and wire fraud by defrauding the plaintiffs and others "into taking mortgage loan(s) with Dime and making down payments and monthly payments that they otherwise would not have entered into or have been obligated to make, in order to benefit the defendants." Under the plaintiffs' theory, then, they sustained injuries when they were defrauded into taking out the mortgages and continuing to make payments under the mortgages.

These RICO injuries were sustained, if at all, when the mortgages were issued, and when payments were made under the mortgages. At least two predicate acts had been committed by the second mortgage payment, and the statute of limitations began to run.[FN2] Plaintiffs argue, however, that the statute of limitations ought to be tolled because they could not have known of the injuries. They argue that their loan documents omitted important information, and were sufficiently complicated that the actual material terms were concealed from all but a few well-trained mortgage analysts.

> FN2. Even if the two predicate acts were the two corrective loan documents mailed in 1988, the claim is still time-barred.

However, all information necessary to ascertain the cause of action was in the plaintiffs' possession from the time they entered the loan agreements. *See Maggio,* 824 F.2d at 129 (tolling unavailable where plaintiff had ample information at his disposal to suggest cause of action). Any failure to provide a required disclosure would have been discoverable as soon as the loan transaction was completed. *Cf. Lynch v. Signal Finance Co.,* 367 Mass. 503, 507-08, 327 N.E.2d 732, 734 (1975) (rejecting tolling where "plaintiffs knew the terms of the loan and knew what had been disclosed to them and what had not"). The loan documents notified plaintiffs of the possibility of negative amortization, when it would apply, and how it would work. If the LPR's had misrepresented the nature of the loans, the loan documents plaintiffs signed would have put them on notice of the fraud.

Plaintiffs acknowledge that the loan documents revealed the possibility of negative amortization (Compl.¶ 55), but complain that the documents failed to disclose the *certainty* of negative amortization. In the seventh month of the loan, however, the increasing principal began to appear on the bills. In the second year, the deferred interest began to appear. Reasonable diligence would have led the plaintiffs to discover by 1988 that the negative amortization described in the loan documents had begun. *See Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 594 (1st Cir.1989)* ("[T]he limitations period will be suspended only upon a clear showing of diligent efforts to discover the cause of the injury ...."); *see also Maggio,* 824 F.2d at 128 ("[W]hether a plaintiff should have discovered the fraud is an objective question requiring the court to determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud.") (internal quotations omitted).

*7 Plaintiffs have failed to allege facts to show reasonably diligent efforts to understand their loans or to make them understandable. *Cf. Lynch,* 367 Mass. at 508, 327 N.E.2d at 735 (rejecting tolling where "discovery of the nondisclosure may have

required merely the making of mathematical computations from known data or the receipt of information as to the governing legal requirements"). Plaintiffs signed their loan documents when the loans were issued, and received statements every month thereafter. No facts are alleged as to what prompted plaintiffs to consult an attorney, if not their loan documents and monthly statements. As in *Aldahonda-Rivera,* here "the only logical conclusion that can be drawn is that [the plaintiffs] filed [their] complaint [several] years too late because it took [them] that long to consult an attorney." FN3 882 F.2d at 593. If the plaintiffs' loan documents and statements prompted them to consult an attorney in 1994 and 1995, unprompted by any new disclosure, there is no reason they could not have consulted an attorney several years earlier.

> FN3. The briefs suggest that the Salois' were prompted to seek legal advice because financial circumstances led to their inability to meet their monthly payments.

Plaintiffs further allege that defendants fraudulently concealed the cause of action, such that the statute of limitations should be tolled in their favor. In federal question cases, the fraudulent concealment doctrine "operates to toll the statute of limitations where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part ... until the fraud is discovered." *Maggio,* 824 F.2d at 127 (quoting *Cook v. Avien,* 573 F.2d 685, 694-95 (1st Cir.1978)). Plaintiffs "must demonstrate that (1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) [the plaintiffs] were not on actual or constructive notice of the evidence, despite (3) their exercise of reasonable diligence." *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1255 (1st Cir.1996), *cert. denied,* 117 S.Ct. 81 (1996). "Furthermore, it is [plaintiffs'] burden under Federal Rule of Civil Procedure 9(b) to plead with particularity the facts giving rise to the fraudulent concealment claim." *Id.*

As discussed above, the explanations of negative amortization in the loan documents, combined with the appearance of increased principal and deferred interest on the monthly statements by the second year, constituted notice of any misrepresentations with respect to whether or not the loans would negatively amortize. There is no indication that plaintiffs, if they did not understand their loans, exercised reasonable diligence in seeking an explanation. Therefore they cannot take advantage of the federal fraudulent concealment doctrine.

The motion to dismiss is *ALLOWED* with respect to Count II, because it is barred by the four-year statute of limitations and no viable theory for tolling has been advanced.

### 2. *TILA, Parity Act and RESPA Claims (Counts III, IV, IV)*

*8 Claims for rescission under the federal Truth-in-Lending Act (TILA), 15 U.S.C. § 1601 *et seq.,* must be brought within three years of the "consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the disclosures required under this section or any other material disclosures required under this chapter have not been delivered to the obligor." 15 U.S.C. § 1635(f). As this language elucidates, nondisclosure is not a continuing violation for purposes of the statute of limitations. *See Moor v. Travelers Ins. Co.,* 784 F.2d 632, 633 (5th Cir.1986) (citing *In re Smith,* 737 F.2d 1549, 1552 (11th Cir.1984)). The last contract was consummated in June 1987 and "corrected" in 1988, and the complaint was not filed until September 1995. To the extent the plaintiffs seek rescission under TILA, the claim is time-barred.

Failure to make the disclosures required by the TILA also creates liability for damages. An action for damages must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). Although the one-year period typically runs from the consummation of the transaction, *King v. California,* 784 F.2d 910, 915 (9th Cir.1986), *cert. denied,* 484 U.S. 802 (1987); *Moor,* 784 F.2d at 633, "the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action," *King,* 784 F.2d at 915; *see also Jones v. TransOhio Sav. Ass'n,* 747 F.2d 1037, 1041 (6th Cir.1984). "To clothe himself in the protective garb of the tolling doctrine, a plaintiff must show that the defendant concealed the reprobated conduct and despite the exercise of due diligence, he was unable to discover that conduct." *Moor,* 784 F.2d at 634 (refusing to toll statute because, by the consummation of the loan, plaintiff knew or should have known that the required information had not been disclosed). As discussed above, plaintiffs have failed to plead facts constituting reasonable diligence sufficient to toll the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS    Document 2915-12    Filed 07/24/06    Page 11 of 20

Not Reported in F.Supp.                                                                  Page 7
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

statute of limitations.

Acts in violation of the Alternative Mortgage Transactions Parity Act (Parity Act), 12 U.S.C. § 3801 et seq., are to be treated as violations of TILA. See 12 U.S.C. § 3806. The Parity Act claim is therefore time-barred for the reasons stated.

Finally, plaintiffs allege in their Real Estate Settlement Practices (RESPA) claim, 12 U.S.C. § 2601 et seq., that defendants failed to make required disclosures, overcharged for certain services, and took kickbacks at the time the loans were issued. RESPA provides a one-year statute of limitations "from the date of the occurrence of the violation." 12 U.S.C. § 2614. As discussed above, with the notable exception of the alleged kickbacks, most of the missing disclosures or overcharges would have been apparent at the issuance of the loans. In the second-amended complaint, plaintiffs allege for the first time that defendants charged more for the title insurance premium than was paid to the title insurance company and obtained discounts and/or kickbacks from title insurance companies. ¶ 126(c)(vi). Although, to be sure, kickbacks are by their nature fraudulent and secret, the doctrine of equitable tolling does not apply. Hardin v. City Title & Escrow Co., 797 F.2d 1037, 1039 (D.C.Cir.1986). This claim is therefore also time-barred.

*9 Accordingly, the motion to dismiss is ALLOWED with respect to Counts III, IV, and V.

C. *State claims*

Plaintiffs' state claims accrue according to Massachusetts' "discovery rule" and may be tolled under the Massachusetts doctrine of fraudulent concealment.

1. *Discovery rule*

Under the Massachusetts "discovery rule," an action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known, the factual basis for the cause of action. See Tagliente v. Himmer, 949 F.2d 1, 4 (1st Cir.1991) (citing Maggio, 824 F.2d at 130); Puritan Medical Center, Inc. v. Cashman, 413 Mass. 167, 175, 596 N.E.2d 1004, 1010 (1992). "The standard set forth by the discovery rule is an objective one.... In order for the statute of limitations to be tolled pursuant to the discovery rule, the factual basis for the cause of action must have been 'inherently unknowable' at the time of injury." Tagliente, 949 F.2d at 4. The burden is on the plaintiff to prove that in the exercise of reasonable diligence he could not have known of the misrepresentation within the statute of limitations. Id. at 5 (citing Friedman v. Jablonski, 371 Mass. 482, 485-87, 358 N.E.2d 994, 998 (1976)).

2. *Fraudulent Concealment*

Massachusetts law also provides for the tolling of statutes of limitations by fraudulent concealment. Under Mass. Gen. L. ch. 260 § 12 (1990):
If a person liable to a personal action fraudulently conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

In Massachusetts, fraudulent concealment requires either (1) an affirmative act of concealment done with intent to deceive, or (2) breach of a fiduciary duty of full disclosure. Puritan Medical Center v. Cashman, 413 Mass. 167, 176, 596 N.E.2d 1004, 1010 (1992) (where "a fiduciary relationship exists between plaintiff and defendant ... mere failure to reveal information may be sufficient to constitute fraudulent concealment for the purposes of § 12") (internal quotations and citations omitted). Plaintiffs have not alleged any affirmative acts of concealment.

Instead, plaintiffs argue that Dime owed them fiduciary duties. A fiduciary relationship exists when a party places special trust and confidence in another who knowingly accepts the responsibility. In re Fordham, 130 B.R. 632, 648-49 (Bankr.D.Mass.1991). "[P]laintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature." Broomfield v. Kosow, 349 Mass. 749, 755, 212 N.E.2d 556, 560 (Mass.1965); see also In re Fordham, 130 B.R. at 649 ("[A]lthough [plaintiffs] avow that they placed trust and confidence in [defendants] they may not abandon all caution and responsibility for their own protection and unilaterally impose a fiduciary relationship."). "Traditionally, Massachusetts courts have viewed a bank's relationship to its customers as one of creditor and debtor, a relationship which imposes no duty to counsel or make disclosures to the customer." Flaherty v. Baybank Merrimack Valley, N.A., 808 F.Supp. 55, 64 (D.Mass.1992).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

*10 It is true that Dime had a statutory duty, under Mass. Gen. L. ch. 184 § 17B, to inform plaintiffs of their right to obtain separate counsel and to explain that Dime's attorneys represented Dime's interests. Plaintiffs allege these disclosures were never made. However, there is no authority for the proposition that failure to comply with this statutory requirement is sufficient to impose a fiduciary duty upon a bank for the purposes of fraudulent concealment. *Cf. Lynch,* 367 Mass. at 507-08, 327 N.E.2d at 735 (rejecting contention that "breach of the statutory duty imposed by the TILA should be given the same effect as breach of a fiduciary duty" in tolling statute of limitations).

In support of their argument that there was a fiduciary relationship, plaintiffs allege having been told that they did not need their own attorney and that Dime's attorney would "handle things." Significantly, there is no allegation that anyone told plaintiffs that Dime's attorney would represent their interests. Rather, the allegation is that plaintiffs were told an attorney was not necessary for the completion of the transaction. *Cf. Flaherty,* 808 F.Supp. at 61 (holding reliance on attorneys "patently unreasonable" as a matter of law, where the "attorneys clearly represented the banks" and the "plaintiffs failed to communicate, either by words or actions, that they were relying on these attorneys to serve their interests"). The discouragement of the retainer of separate counsel that is alleged here is, without more, an insufficient basis for the formation of a fiduciary relationship between parties to a one-time business transaction.

The cases relied upon by plaintiffs are distinguishable. Both concerned long-time friends and advisors of plaintiffs, who clearly knew they were being relied upon and accepted that trust. In *Broomfield v. Kosow,* 349 Mass. at 757, 212 N.E.2d at 561, for two years there had been "a close business relationship and business friendship between the two men." In *Reed v. A.E. Little Co.,* 256 Mass. 442, 446, 152 N.E. 918, 919 (Mass.1926), plaintiff called upon defendant and asked him to "advise him as a friend in the interest of the plaintiff, in respect to the matters therein contained, and whether it was for the plaintiff's best interest to sign such an agreement." That court found the crucial determinant of a fiduciary relationship to be whether the defendant could exert influence over the person trusting him. Given that there is no such long-standing friendship, or ability to exert influence in the case at bar, the plaintiffs have not alleged sufficient facts to establish a fiduciary relationship between the parties.

Therefore, the Massachusetts statutes of limitations cannot be tolled on the basis of breach of fiduciary duty.

### 3. *Massachusetts Consumer Credit Cost Disclosure Act (Count VI)*

The requirements of the Massachusetts Consumer Credit Cost Disclosure Act ("MCCCDA"), Mass. Gen. L. ch. 140D, are substantially the same as the requirements of the federal TILA. Plaintiffs allege that Dime violated MCCCDA by failing to give complete and accurate disclosures with respect to the loan. This claim is governed by a four-year statute of limitations. Mass. Gen. L. ch. 140D § 10(f). It is time-barred for the same reasons discussed in the context of the TILA claim. Moreover, "[i]n Massachusetts, one who signs an agreement is presumed to have read and understood its contents." *Lerra v. Monsanto Co.,* 521 F.Supp. 1257, 1262 (D.Mass.1981). Thus plaintiffs cannot rely on the argument that they were unable to understand their loan documents. The motion to dismiss is *ALLOWED* with respect to Count VI.

### 4. *Chapter 93A (Count VII)*

*11 Chapter 93A makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. L. ch. 93A § 2, and authorizes any person injured by such acts to bring an action for damages and/or injunctive relief, ch. 93A § 9(1). Under the Attorney General's regulations enacted under Chapter 93A, an act or practice violates section two if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection," 940 Code Mass. Regs. § 3.16(3), or if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes," § 3.16(4). Chapter 93A claims are subject to a four-year statute of limitations. Mass. Gen. L. ch. 260 § 5A.

Plaintiffs allege first that Dime violated the requirements for "graduate payment mortgages" in Mass. Gen. L. ch. 167E by failing to provide the option to change to a more conventional mortgage,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS    Document 2915-12    Filed 07/24/06    Page 13 of 20

Not Reported in F.Supp.                                                                                                Page 9
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

failing to offer a conventional mortgage, and failing sufficiently to explain the terms of the mortgage. These claims, however, accrued and should have been discovered at the time the loan was issued and are therefore time-barred.

Plaintiffs also allege that Dime violated Chapter 93A by "bait and switch" advertising, product tampering, and equity skimming in the development and marketing of its loans. Compl. ¶ ¶ 200-207. These claims are also barred by the four-year statute of limitations. All the information necessary to discover these claims was in the plaintiffs' possession from the time they entered into the loans. The alleged violation of Mass. Gen. L. ch. 183 § 63, which regulates the fees charged at the time the loan is issued, is also time-barred, as are the alleged violations of Mass. Gen. L. ch. 184 § § 17B & 17D, which mandate that certain disclosures be made at the time of the loan. FN4 As the complaint does not allege that Dime's duty to pay real estate taxes in accordance with Mass. Gen. L. ch. 183 § 62 continued beyond the first year of the loan (Compl.¶ 137), this claim is also time-barred.

> FN4. Defendants correctly point out that Chapter 184, § 17D, did not go into effect until 1988, which was after the issuance of the plaintiffs' loans.

On the other hand, several of plaintiffs' claims are continuing violations that are not barred by the statute of limitations. Plaintiffs allege that Dime violated Mass. Gen. L. ch. 167E § 2(B)(9) by changing the payment amount more than once a year. If the evidence shows that the monthly payment has changed more than once a year within the past four years, this claim is not time-barred. The complaint does not foreclose this possibility. Additionally, plaintiffs allege that Dime violated the requirements for variable rate mortgages in Mass. Gen. L. ch. 167E § 2(B)(10), by changing the rate of interest more than once every six months. As the interest changed five times in 1995, this claim is not time-barred.

*12 However, defendants argue that Chapter 167E doesn't apply to Dime because a federal bank is not subject to regulation by the Massachusetts commissioner of banks.FN5 Mass. Gen. L. ch. 167E, § 1 (defining bank as a savings bank, co-operative bank, or trust company subject to the supervision of the Commissioner of banks). The second amended complaint does not allege defendants fall within this definition of bank.

> FN5. Dime does not argue that this statute is in applicable due to pre-emption. *See generally* Grunbeck v. Dime Sav. Bank of New York, FSB, 74 F.3d 331 (1st Cir.1996) (state statute requiring computation of interest on a simple interest basis not pre-empted).

Finally, plaintiffs allege that Dime violated federal fair debt collection protections when, on February 24, 1994, it sent a collection letter on another's letterhead to create the false belief that an entity other than Dime was participating in the collection process. Compl. ¶ 208; *see* 15 U.S.C. § 1692j ("It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating."). However, this claim arose on February 24, 1994 and the complaint was filed on September 1, 1995. Therefore, this Court lacks jurisdiction pursuant to 15 U.S.C. § 1692j(b) and § 1692K(d) (permitting federal jurisdiction over claims brought within one year from the date on which the violation occurs). *Cf. Mattson v. U.S. West Communications, Inc.,* 967 F.2d 259, 261 (8th Cir.1992) (holding that the statute of limitations was jurisdictional).

The motion to dismiss Count VII is therefore *ALLOWED.*

*5. Breach of contract and the covenant of good faith and fair dealing (Counts VIII & IX)*

The plaintiffs also allege that Dime has breached its contract on several occasions. "Actions of contract ... shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2.

First, plaintiffs argue that Dime breached its contractual promise to provide "the name and telephone number of a person who will answer any question [they] may have regarding the notice" (Compl.Ex. C, ¶ 4(E)), when its customer service representatives would not accurately answer questions about deferred interest. (Compl.¶ 65.) The complaint states that the plaintiffs called Dime to inquire about the deferred interest "[w]hen 'deferred

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 10
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)
**(Cite as: Not Reported in F.Supp.)**

interest' started appearing on the plaintiffs' monthly payment statements." (Compl.¶ 194.) As the deferred interest appeared on the statements at the latest in mid-1988, seven years before the complaint was filed, this claim is time-barred. If the failure to answer questions over the phone was a breach of contract, plaintiffs had all information necessary to discover their cause of action as soon as the phone conversations took place.

Next, the Salois' argue that Dime breached its contract in 1988 when it sent them letters requesting that they sign the 'corrective' documents, because the letters materially altered the terms of the loan. (Compl.¶ 253.) However, this claim is barred by the six-year statute of limitations because the Salois were on notice of the precise change in the proposed modified contract by June, 1988.

*13 The Salois' also argue that "Dime breached the Adjustable Rate Note by servicing it as if the purported 'corrective' documents had been signed, even before they had been signed." (Compl.¶ 253.) Specifically, they allege that Dime did not comply with the cap on variation in the interest rate that appeared in the original loan documents and instead applied a rate permitted only by the corrective documents. Whether or not this claim would be time-barred, it must be dismissed based on the documents attached to the complaint. Although the complaint alleges that the original note capped the interest rate variation at 2% per year, the attached note makes clear that the interest cap was per "Interest Rate Change Date," or per *month*. (Compl.Ex. C.) Plaintiffs own charts reveal that the interest rate never changed more than 2% per month. (Compl.Ex. Y.)

Plaintiffs' memorandum of law specifies the basis for Ms. Freeman's breach of contract claim. Ms. Freeman alleges that defendants breached the loan which called for a 7.5% rate cap for twelve months. (Exh. A, ¶ 2(D)). However, plaintiff was aware of this no later than 1987. Therefore, her contract claim is time-barred.

Finally, the Salois' allege that in February 1995, Dime agreed with the Salois' that their account would be fully up to date if they paid $12,575.95 by the end of the month. Compl. ¶ 191. After paying the required amount on time, however, the Salois' were informed that additional funds were due. The plaintiffs do not assert this alleged breach of a settlement agreement as a basis for its breach of contract claim. (See ¶¶ 252-259). Even if it had been adequately alleged, it does not involve enough money to support this Court's diversity jurisdiction.

The motion to dismiss Counts VIII and IX is therefore *ALLOWED* without prejudice to filing an action for breach of the settlement agreement in state court.[FN6]

> FN6. There are also conclusory allegations that Dime failed to service the contract properly within the six years prior to the commencement of the suit. This dismissal is without prejudice to any claims of breach of contract based on inadequate servicing not addressed in this opinion.

6. *Remaining tort claims (Counts X, XI, XII, & XIII)*

Finally, plaintiffs bring several tort claims. In Massachusetts, "actions of tort ... shall be commenced only within three years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2A.

Plaintiffs allege in Count X that Dime breached a fiduciary duty by (1) telling the plaintiffs they could afford the monthly payments when they couldn't; and (2) failing to give proper disclosures. However, as discussed above, the plaintiffs have failed to plead facts sufficient to establish a fiduciary relationship between the parties.

Plaintiffs claim in Count XI that Dime acted fraudulently by misrepresenting (1) whether the loan would be certain to enter negative amortization, (2) whether the plaintiffs could afford the monthly payments on their loan, and (3) whether the corrective notes materially altered the terms of the loan. Next, plaintiffs allege (Count XII) that defendants conspired to wrongfully procure their mortgage notes. Compl. ¶ 268. In their final claim (Count XIII), plaintiffs allege that the defendants' employees negligently induced them to enter into the loan agreements. Compl. ¶ 274. Because the latest of the alleged misrepresentations, conspiracies, and negligent acts occurred in 1988, when the corrective notes were sent, all are barred by the three-year statute of limitations for Massachusetts torts. *See* Mass. Gen. L. ch. 260 § 2A.

*14 The motion to dismiss is therefore *ALLOWED* with respect to Counts X, XI, XII, and XIII.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)  
**(Cite as: Not Reported in F.Supp.)**

Page 11

### IV. ORDER

Defendants' motion to dismiss (Docket No. 51) is therefore *ALLOWED* without prejudice to filing a breach of settlement agreement claim in state court.

D.Mass.,1996.  
Salois v. Dime Sav. Bank of New York, FSB  
Not Reported in F.Supp., 1996 WL 33370626 (D.Mass.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 1
Not Reported in F.Supp.2d, 2002 WL 1969661 (D.Mass.), Fed. Sec. L. Rep. P 92,260
**(Cite as: Not Reported in F.Supp.2d)**

▷

Briefs and Other Related Documents

United States District Court, D. Massachusetts.
In re XCHANGE INC. SECURITIES LITIGATION
No. CIV.A.00-10322-RWZ.

Aug. 26, 2002.

MEMORANDUM OF DECISION
ZOBEL, D.J.

*1 Plaintiffs are investors who purchased stock in Xchange, Inc. ("Xchange"), a publicly traded software company, between December 9, 1998, and September 29, 2000. They allege that the company, its officers, and its auditors knowingly used an inappropriate revenue recognition model in order to manipulate and artificially inflate the company's reported earnings. Specifically, they claim that Xchange was required to use "contract accounting," which measures incremental revenue over time, because the company's software products often require substantial modification and installation over the course of many months; instead, they say Xchange fraudulently recorded revenue using "out-of-the-box accounting," which recognizes all revenue from one contract on the date of that contract.

Plaintiffs filed a class action complaint on February 21, 2001, against Xchange and four of its officers, Andrew J. Frawley, F. Daniel Haley, David F. McFarlane and Robin Green asserting two counts of securities fraud: (1) violation of 15 U.S.C.S. § 78j(b) ("Exchange Act § 10(b)"), and 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and (2) violation of 15 U.S.C.S. § 78t(a) ( "Exchange Act § 20(a)"). The complaint described numerous misstatements by Xchange officers between July 24, 2000, and September 29, 2000, when an Xchange press release revealed that the company was switching to "contract accounting" for certain transactions. Six months later, on August 3, 2000, plaintiffs filed an amended complaint adding two new defendants (Xchange's auditors, Arthur Anderson ("AA"), and Xchange's Chief Financial Officer, John G. O'Brien) and three new claims. The amended complaint alleges: violation of Exchange Act § 10(b) and related Rule 10b-5 by Xchange and its five officers (Count I); violation of Exchange Act § 20(a) by the five individual officers (Count II); violation of Exchange Act § 10(b) and related Rule 10b-5 by Arthur Anderson (Count III); violation of 15 U.S.C.S. § 77k(a) ("1933 Act § 11") by Xchange, its five officers and Arthur Anderson (Count IV); and violation of 15 U.S.C.S. § 77o ("1933 Act § 15") by the five individual officers (Count V). The first two claims are identical to those in the original complaint, except that they add defendant O'Brien; the last three claims are newly raised in the amended complaint.

Defendants Xchange and AA have moved for dismissal on numerous grounds.

They argue initially that the statute of limitations bars all claims first raised in the amended complaint either against AA or under § 11 and § 15 of the 1933 Act. The parties agree that the applicable statute of limitations for actions under the Exchange Act and the 1933 Act is one year from the date when the plaintiffs knew or should have known of their injury. They disagree about the date the cause of action accrued: plaintiffs insist that the statute began to run on September 29, 2000 [FN1], when they received actual notice of the alleged fraud in the form of Xchange's announcement that it was switching to "contract accounting" for certain transactions, whereas defendants argue that the limitations period started to run by March or April of 2000, when plaintiffs had ample information to discover their claims.

> FN1. At various points in their briefs, plaintiffs refer to the date of actual notice as both September 29, 2000 (when Xchange announced that it *expected* low third quarter results, in part because it would be using the contract accounting method for some transactions) and October 2, 2000 (when Xchange announced its *actual* third quarter results, elaborating on its shift to contract accounting). I will continue to use the September 29, 2000, date for the sake of consistency, particularly as there is no difference between the dates for purposes of a statute of limitations analysis.

*2 The relevant question in determining the statute of limitations for a securities fraud action is not when plaintiffs actually learned of the fraud, but rather when they should have discovered it through reasonable diligence. " 'Storm warnings' of the

Case 1:01-cv-12257-PBS   Document 2915-12   Filed 07/24/06   Page 18 of 20

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2002 WL 1969661 (D.Mass.), Fed. Sec. L. Rep. P 92,260
**(Cite as: Not Reported in F.Supp.2d)**

possibility of fraud trigger a plaintiff's duty to investigate in a reasonably diligent manner... and his cause of action is deemed to accrue on the date when he should have discovered the alleged fraud." *Cooperative de Ahorro Y Dredito Aguada v. Kidder, Peabody & Co.,* 129 F.3d 222, 224 (1st Cir.1997) (citing *Maggio v. Gerard Freezer & Ice Co.,* 824 F.2d 123, 128 (1st Cir.1987)).

The complaint describes a number of "storm warnings" which put the plaintiffs on inquiry notice of their claims long before September 29, 2000. Most notable is the widely-publicized accounting controversy that took place in early 2000 regarding the accounting for a contract between Xchange and its competitor, MicroStrategy. The contract, dated December 28, 1999, was recorded by both companies in the fourth quarter of 1999 and made up a large percentage of both companies' revenue for that quarter. In early 2000, MicroStrategy announced that the contract had been improperly reported and should have been recorded in the first quarter of 2000; it restated its fourth quarter 1999 results, and announced that it would restate its revenue for the prior three years using "contract accounting" in order to properly recognize incremental revenue over time. MicroStrategy's stock subsequently plummeted from $226 per share to $74 per share in two days. Investors sued both MicroStrategy and its auditors, PricewaterhouseCoopers, based on the improper revenue recognition.

MicroStrategy's announcements prompted considerable press coverage regarding the contract between Xchange and MicroStrategy. Analysts publicly questioned whether Xchange, too, had misreported the contract revenue in order to manipulate quarterly earnings. Xchange stood by its revenue statements and did not restate its earnings for the MicroStrategy contract, emphasizing that its auditors had approved the accounting. Nevertheless, Xchange's stock also experienced a dramatic (albeit more gradual) drop in value from a high of $67.44 per share on March 28, 2000, to only $12.19 per share on April 28, 2000.

Each of these "storm warnings"-a public controversy over the accounting for one of Xchange's biggest contracts, Xchange's failure to restate revenue from the contract after MicroStrategy did so, and the subsequent sharp drop in Xchange's stock price-occurred by late April of 2000 and triggered the plaintiffs's duty to investigate the possibility of fraud. Since the facts underlying plaintiffs' fraud claims-that Xchange used "out-of-the-box accounting," that its software products were frequently modified and installed over long periods of time, and that accounting guidelines require such contracts to be recognized under the "contract accounting" method- were matters of public record, plaintiffs are charged with such knowledge. They thus should have known of their claims against Xchange and its auditors by April 2000 at the latest.

*3 Plaintiffs argue that, even if this is so, the statute of limitations was tolled until September 29, 2000, when they had actual notice of their claims, because Xchange fraudulently concealed its fraud by "fail[ing] to disclose that out-of-the-box accounting was an inappropriate method for recognizing Xchange's revenue." However, this Circuit has held that, "[i]rrespective of the extent of the effort to conceal, the fraudulent concealment doctrine will not save a charging party who fails to exercise due diligence, and is thus charged with notice of a potential claim." *Truck Drivers & Helpers Union v. National Labor Relations Board,* 993 F.2d 990, 998 (1st Cir.1993). Since Xchange's accounting method, the nature of its software products and contracts, and the relevant accounting guidelines were matters of public knowledge, plaintiffs did not exercise due diligence in investigating their claims. Accordingly, they may not claim fraudulent concealment, and the statute of limitations began to run in April 2000 when plaintiffs had sufficient knowledge to trigger a duty to investigate.

Plaintiffs filed their first complaint on February 21, 2001, well within the statute of limitations. The amended complaint, which added new claims and new defendants, was filed on August 3, 2001, after the one-year statute of limitations had run. Thus, the new claims are time-barred unless they relate back to the original complaint.

Under Federal Rule of Civil Procedure 15(c)(3), an amendment adding a new party relates back to the filing of the original complaint only if three requirements are met: (1) "the claim or defense asserted in the amended pleading arose out of the conduct, occurrence or transaction set forth or attempted to be set forth in the original pleading;" (2) the new party "has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits;" and (3) the new party 'knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against [him]." ' Rule 15(c)(3).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:01-cv-12257-PBS   Document 2915-12   Filed 07/24/06   Page 19 of 20

Not Reported in F.Supp.2d                                                                                                     Page 3
Not Reported in F.Supp.2d, 2002 WL 1969661 (D.Mass.), Fed. Sec. L. Rep. P 92,260
**(Cite as: Not Reported in F.Supp.2d)**

With respect to AA, the first element is easily satisfied because the claims raised against AA in the amended complaint involve the same allegedly fraudulent revenue statements and earnings reports that served as the basis for the claims against Xchange and its officers in the original complaint. Plaintiffs maintain that the second element is also satisfied because, as Xchange's auditors, AA would necessarily have been informed of this class action as a contingency to be accounted for in the company's financial statements. Whether or not this is the case, it is clear that the third element of Rule 15(c)(3) is not satisfied-the plaintiffs' failure to name AA in the original complaint was not the result of a mistake in the identity of the proper party.

Rule 15(c)(3) enables plaintiffs to correct their pleadings and add defendants whom they would have named in the original complaint, if not for a mistake regarding identity or proper name. It does not protect plaintiffs who *knew* of the late-named party at all times but failed to include that party in the original filing. "What the plaintiff knew (or thought he knew) at the time of the original pleading generally is the relevant inquiry in respect to the question of whether a mistake concerning identity actually took place." Leonard v. Parry, 219 F.3d 25, 29 (1st Cir.2000).

*4 The amended complaint states that, before September 29, 2000, Xchange and its officers "repeatedly assured investors that [it had] appropriately accounted for the [MicroStrategy] transaction and Defendant AA had confirmed this." Thus, according to their own allegations, plaintiffs knew at the time they filed the original complaint, from statements by defendants, that AA had reviewed and approved Xchange's allegedly fraudulent revenue reports. Nothing prevented plaintiffs from naming AA in the original complaint; they simply overlooked a rather obvious defendant. Under these circumstances, AA had insufficient notice of the claims against it because it might have reasonably concluded that plaintiffs deliberately chose to omit Xchange's auditors from the action for tactical reasons. Accordingly, the claims against AA do not relate back and are time-barred.

The other new defendant, Mr. O'Brien, is in a different position. The claims against him satisfy all three requirements of Rule 15(c)(3): first, they involve the same conduct and transactions as those claims raised in the original complaint; second, as chief financial officer, O'Brien has an identity of interest with the company and is presumed to have received notice of this action as soon as it was brought, Serrano v. Gonzalez, 909 F.2d 8, 12 (1st Cir.1990) (citing Hernandez Jiminez v. Astol Calero Toledo, 604 F.2d 99, 102-03 (1st Cir.1979)); finally, given that the original complaint named Xchange's chief executive officer, chief strategy officer, chief operating officer and senior vice president, Mr. O'Brien should have known, as the only corporate officer not named in the original complaint, that he was omitted by mistake. Therefore, the claims against him do relate back.

Defendants also challenge for lateness the new claims under the 1933 Act. Counts IV and V allege that defendants filed false or misleading registration statements in connection with Xchange's IPO on December 9, 1998, and Second Offering on June 4, 1999. Since these claims were added after the one-year statute of limitations had passed, they, too, are time-barred unless they relate back to the original complaint.

A new claim relates back to the date of the original pleading if the claim "arose out of the conduct, transaction or occurrence set forth... in the original pleading." Rule 15(c)(2). By definition, plaintiffs' new claims under § 11 and § 15 the 1933 Act involve misstatements made in Xchange's registration statements. Yet, the original complaint made no reference to Xchange's December 1998 IPO or June 1999 Second Offering, nor did any allegations concern the registration statements for those offerings. Indeed, that complaint did not assert any fraud prior to July 24, 2000, but limited its allegations to various financial reports and public announcements made by defendants between July 24, 2000, and September 29, 2000. Based on these narrowly-drawn allegations, defendants could not have anticipated that this action would reach as far back in time as the IPO and Second Offering. Because the new claims are not supported by any conduct, transaction or occurrence alleged in the original complaint, they do not relate back and are dismissed as time-barred.

*5 Defendants have urged several other grounds for dismissal. They argue (1) that plaintiffs failed to satisfy the strict pleading requirements; (2) that they failed to identify any misstatement by defendants; (3) that the allegedly false and misleading statements were not material; (4) that the complaint is written in a "disjointed style" that violates pleading requirements; and (5) that plaintiffs lack standing to bring 1933 Act claims because they have not established that their stock can be traced back to the IPO or Second Offering. The amended complaint,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                Page 4
Not Reported in F.Supp.2d, 2002 WL 1969661 (D.Mass.), Fed. Sec. L. Rep. P 92,260
**(Cite as: Not Reported in F.Supp.2d)**

read in the light most favorable to the plaintiffs, sufficiently alleges material misstatements on the part of the defendants and meets the relevant pleading requirements. Defendants' first four arguments are thus unavailing. I need not consider whether defendants' fifth argument (that plaintiff lack standing to bring claims under the 1933 Act) has merit, because Claims IV and V are dismissed as time-barred.

For the reasons stated above, defendants' motion to dismiss is ALLOWED as to Counts III, IV and V, and DENIED as to Counts I and II.

D.Mass.,2002.
In re Xchange Inc. Securities Litigation
Not Reported in F.Supp.2d, 2002 WL 1969661 (D.Mass.), Fed. Sec. L. Rep. P 92,260

Briefs and Other Related Documents (Back to top)

• 2002 WL 32151516 (Trial Motion, Memorandum and Affidavit) Xchange Defendants' Motion for Clarification (Sep. 04, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.