**EXHIBIT F**



ROPES & GRAY LLP

ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951 7050

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

June 7, 2006

Christopher Dillon
cdillon@ropesgray.com
(617) 951-7827

**BY ELECTRONIC DELIVERY AND U.S. MAIL**

Jeniphr A. Breckenridge
Hagens Berman Sobol Shapiro
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101

Re: *Nevada AWP Actions*

Dear Jeniphr:

I write in response to your June 1, 2006, letter.

*Document Requests*

As requested in our May 16 letter, please confirm whether we now have all documents responsive to Category Nos. 1, 2, 10, 13, Duraiswamy March 31, 2005 email (Wherry and Duarte notes), and the written discovery of the non-Medicaid entities. In addition, the following issues remain unresolved.

**Category 3:** (Open) This request seeks Mr. Willden's legislative files. Your April 25 letter states that the State's search is ongoing. Please provide an update on the status of your search and production.

**Category 4:** (Open) This request seeks correspondence from the legislative branch regarding drug reimbursement. Your April 25 letter states that the State's search is ongoing. Please provide an update on the status of your search and production.

**Category 5:** (Open) This request seeks white papers prepared for legislative sessions. Your April 25 letter states that documents will be produced. Please provide an update on the status of your search and production.

Jeniphr A. Breckenridge        - 2 -        June 7, 2006

**Categories 6 & 9:** (Open) Your June 1 letter says that that State will produce MAC reports it has been able to obtain from First Health. We have recently received two boxes of MAC reports. Please confirm that all responsive materials have now been produced.

**Category 11:** (Open) This request seeks claims data for physician-administered drugs. Your April 25 letter says that the State is working to locate this information. Please provide an update on the status of your search and production.

**Rebate Data:** (Open): My clients expect to produce rebate data, and a stipulation regarding the data will be forthcoming.

*30(b)(6) Notice*

In reliance on your June 1 letter representing that the State is open to adopting prior testimony in lieu of a further deposition, the defendants will undertake to identify the portions of existing testimony that they would like the State to adopt. Our preliminary review indicates that the State has not offered testimony on a number of categories and, thus, for these we will still be seeking a deponent. We will get back to you regarding a list of proposed testimony and topics for which we still seek a live witness.

*Parens Patriae Claims*

Your June 1 letter says that "the State relies on sales data provided by defendants to support its *parens patriae* claims. The State is not relying on its own data." Your letter further states "As for the identity of the *parens patriae* claimants, the State expects these to be revealed at the time the claims are made as part of the claims process." We are unaware of any "claims process." This case is not a class action. As discovery closes, you have not identified the claimants for whom you purport to bring the *parens patriae* claims, you have not produced any documents from them, you have not produced any claims data regarding these claims, and you have not produced any witnesses. Please let me know if the State intends to produce any additional information regarding its *parens patriae* claims.

*Claims Data*

As requested, attached as Exhibit A is the list of questions regarding the claims data. Please let us know when you have identified the person who can answer these questions and when we may speak with this person. As you will appreciate, we will need to preserve this information in an admissible form, and are open to discussing the form this would take.

10051725_1

Jeniphr A. Breckenridge                    - 3 -                         June 7, 2006

With respect to the First Health claims data, the defendants do not intend to pay First Health for data that the State is required to produce. Your letter was unclear as to whether the State has obtained claims data from First Health, albeit in a format different from what the defendants originally sought. If so, we request that the State provide the data in the format it has received it. Otherwise, our respective positions are clear: we think that you have failed to produce information within your control that is essential to proving a *prima facie* element of your claim and will seek to dismiss such claims; whereas, you do not think the First Health claims data is necessary to prove the State's claims.

*Non-Medicaid Entity Discovery*

I am attaching as Exhibit B, a list of documents that were identified by Mr. Hillerby, Ms. Lopez, and Ms. Olson, which we believe are responsive to outstanding discovery requests. We are mindful of the limitations that Judge Bowler has placed and request that you produce them or confirm that such documents do not exist in the files of these individuals, their assistants, or in the general program files.

In addition, as we discussed on Friday, we are interested in obtaining complete copies of the contracts for Senior Rx and the PEB program. For the PEB program, we do not have the RFP or the proposal for the winning bidder for the 1996 PEB contract (PEBP/Merck-Medco Contract, Effective 01/1996, NV019544 - 019547, RFP mentioned but no number present). With respect to the Senior Rx program, defendants have been provided with the following: RFP #1377 with its corresponding contract (dated 9/14/04), RFP # 1289 with its corresponding contract (effective 4/14/03), and RFP #1173 with its corresponding contract (dated 10/20/00). We do not have the winning bid proposals (which are part of the contracts) for any of the RFPs listed above and request that you provide them. In addition, if there are any other contracts (or amendments thereto) that existed between the Senior Rx program and any provider of health insurance and/or pharmacy services, please produce them along with the corresponding RFP and winning bid proposal.

In anticipation of Dr. Ebo's deposition, we would like to have complete copies of all contracts between the State and MMCAP. If there is a separate contract between the State and a wholesaler (which is responsible for the physical delivery of the drugs) we would like that as well.

Finally, your May 17 letter says that Mr. Abba has withheld certain documents from production pursuant to Nev. Rev. Stat. 218.625, and that the Legislative Counsel Bureau would be preparing a privilege log reflecting all documents that have been withheld from production pursuant to section 218.625. We have not yet received such a log and request that the State produce this in advance of Mr. Abba's deposition, as Defendants will need time to review the log and to formulate a course of action regarding potential objections. We also note that pursuant to

10051725_1

Jeniphr A. Breckenridge        - 4 -        June 7, 2006

Nev. Rev. Stat. 218.625 individuals at the Legislative Counsel Bureau may disclose and discuss otherwise confidential information if "the person entrusting the matter to the legislative counsel bureau" gives consent. Nev. Rev. Stat. 218.625(b). To the extent such confidential information originated from the Department of Health and Human Services or the PEB program and is relevant to the claims at issue in this lawsuit, we would request that the State consent to such disclosure, of course the defendants would be open to treating such information as confidential pursuant to the protective order. Please advise us as to whether the State is agreeable to this arrangement.

*Electronic Discovery*

We have still not received any electronic discovery. We understood that it was going to be produced on a rolling basis. We again reiterate our commitment to working with you to address any search terms that are producing a high number of false positives. Given that discovery is drawing to a close and we do not have these documents, we reserve our rights to take or retake the depositions of any witness for whom the State later produces documents.

In our May 16 letter, we asked that you explain when the State e-mail system change occurred and whether that was when Janice Wright's, Chris Thompson's, and Laura Squartsoff's e-mail accounts were no longer retained. We are still awaiting an answer to this request.

*Interrogatories*

To date, your letters have not addressed the Interrogatory Response issues identified in my April 28 letter. We look forward to your response regarding these issues.

Please call me if you have any questions.

                                                              Very truly yours,

                                                              Christopher Dillon

cc:    L. Timothy Terry
         Defense counsel

10051725_1

Exhibit A: Questions for Plaintiffs Regarding the Nevada Claims Data

1. Mr. Swenson did not know whether physician-administered drug reimbursements were included in the data provided and did not know how the State would store this information. Please confirm that drugs administered in an office-based setting were not included in the data produced and explain how and where that information would have been stored.
2. Mr. Swenson did not know whether the data contain only Medicaid fee-for-service claims. Please confirm that other types of claims (e.g., Medicaid managed care, SCHIP, Workers' Compensation) are included and how they are identified.
3. Mr. Swenson testified that the field **"IC-DRUG-MAC-EXCL"** identifies State Upper Limit ("SUL")-based reimbursements. In particular, Mr. Swenson testified that this field would contain an "X" if a transaction were priced based on AWP and would be blank if a transaction were based on SUL. *See* Swenson's 1/5/06 Deposition at 75-77. Please confirm that this testimony accurately reflects the Nevada claims data and that there is no additional field in the claims data to capture the basis of the amount Nevada Medicaid paid.
4. Mr. Swenson was unable to testify regarding whether the data contain specialty pharmacy transactions. Does it, and if so, is there a field that differentiates them from retail transactions?
5. Please confirm whether mail-order pharmacy transactions are found in the data. If so, is there a field that differentiates them from retail transactions?
6. Please confirm that the data identifying Medicaid's reimbursements (**"IC-SAMI-AMT"**) do not separate dispensing fees and ingredient costs (i.e., **"IC-SAMI-AMT"** appears inclusive of both).
7. What dispensing fee is used for retail drugs and home infusion drugs throughout the relevant time period?
8. Is there a field that denotes when Medicaid is paying a portion of a claim left over after another payor (e.g., Medicare) has already paid? Is there a field identifying the other payor that paid on the claim?
9. Mr. Swenson testified there is a file containing the prices used by Medicaid to adjudicate claims, although he testified that it is limited to relatively recent price updates.
    a. Is this file available electronically?
    b. What pricing bases does this file contain (e.g., AWP, WAC, FUL, SUL, Baseline Price)?
    c. Does this file contain effective dates for these prices?
10. Mr. Swenson testified that the **IC-VEN-CD** field contains three provider types: 28 (Pharmacy Claims), 33 (Durable Medical Supplies), and 37 (IV Therapy). See Swenson's 1/5/06 Deposition at 7-8. Does the State treat Provider types 33 and 37 as non-Pharmacy? Please specify the types of drug administration included in code 37.

11. According to Mr. Swenson specialty pharmacy transactions (e.g. long term care or nursing facilities) are included in the **IC-RESIDENCE** field. He testified that an "N" indicates a nursing facility; however, he was uncertain of the "O" designation. Swenson's 1/6/05 Deposition at 11. Please explain what the "O" designation indicates?
12. If the **IC-RESIDENCE** field contains an "O" designation and the **IC-DRUG-NURES-FACILITY** field is also populated, is the claim a nursing facility claim or a residence claim?
13. Mr. Swenson testified that physician administered claims may be indicated in field **IC-PROV-NAME**. Is there a way to determine if a claim relates to an outpatient or inpatient pharmacy?
14. What field contains the date the claim was paid? Mr. Swenson testified that the Julian date may be stored in the field **IC-CLAIM-NUMBER-R**. Is **IC-CLAIM-NUMBER-R** the correct field, and, if so, how is the date extracted from this field?
15. What does the field **IC-SER-UNITS** indicate? According to Mr. Swenson, **IC-SER-UNITS** always defaults to 1, meaning one service unit. We have identified instances where the **IC-SER-UNITS** equals 0, what does this mean?
16. Mr. Swenson testified that Medicaid used the **IC-DRUG-BENEFIT CODE** "...to determine whether they're going to pay a drug or not. They would have to tell you the value...when we received a new drug from First Data Bank it would go on our drug file. Medicaid would have to go and assign a drug benefit code." Please explain what the following values mean: blank, 0, 1, 2, 3.
17. Mr. Swenson was unable to clarify the field names that were coded into letters, numbers and symbols. Please provide a complete list of decodes for each field that is coded into letters, numbers and symbols. Also, if the coded values have changed over time, please provide the decodes for the entire relevant time period. Below are examples of some of the coded field names with references to the location of the field in the COBOL file layout ("file layout") that was provided with the data.
    a. **IC-APPROVAL-CD** (p. 3 of file layout, middle)
        i. What data does this field contain?
        ii. The most common value present is "A". What does this letter represent?
    b. **IC-SPEC-HLDG** (p. 3 of file layout, middle)
        i. What data does this field contain?
        ii. The values are "H", "P", and "B". What do these letters represent?
    c. **IC-SPEC-ACCT** (p. 3 of file layout, middle)
        i. What data does this field contain?
        ii. The values are "F", "E", and "I". What do these letters represent?
    d. **IC-AID-1** (p. 1 of file layout, top)
        i. What data does this field contain?

        ii. The most common values are "9", "1", and "4". What do these numbers represent?
- e. **IC-AID-2** (p. 1 of file layout, top)
    i. What data does this field contain?
    ii. How does this field differ from ic-aid-1?
    iii. The most common values are "0", "7", "9", and "1". What do these numbers represent?

18. Please provide field descriptions defining each field in the data (i.e., a "data dictionary").

Exhibit B:  Documents Identified in Recent Depositions

Mike Hillerby:

(1) Spreadsheets given to the Governor's Office from evaluators during the RFP process for Medicaid Managed Care and/or PBM contracts, outlining the different bids received.

(2) Documents associated with presentations made to the Governor's Office by HHS as part of the budget approval process, including copies of the budget reports that were given to the legislature, to the extent these related to the acquisition or purchase of drugs, drug pricing, or reimbursement for drugs;

(3) National Association of Chain Drug Stores / Retail Association of Nevada handout (Mr. Hillerby recalled that these organizations may given him a handout when they presented their opposition to the reimbursement change on June 4, 2002);

(4) Advocacy presentations made by different groups on pharmacy issues during the budget process, to the extent these presentations related to the acquisition or purchase or drugs, drug reimbursement, or drug pricing;

(5) Any National Governors' Association white papers or other papers sent by policy groups concerning pharmacy issues, including any agenda set in advance of NGA conferences, to the extent these papers relate the acquisition or purchase or drugs, drug reimbursements, or drug pricing;

(6) Reports from private health care consultants offering services to the Governor's Office, to the extent these reports relate to drug acquisition or purchase, drug reimbursement, or drug pricing;

(7) The following Senior RX materials: "several folders, presentations given to the legislature, budget information, monthly budget updates that we would get from the program, enrollment data, enrollment forms, presentations I made to the legislature, actuarial reports from Milliman and Robertson . . . various kinds of correspondence, information on the formulary" to the extent they related to drug acquisition or purchase, drug reimbursement, or drug pricing.

Donna Lopez:

(1) Minutes of Public Employees' Benefit Program (PEBP) board meetings, including any available video tapes or CDs (kept with Capitol Reporters), to the extent these relate to the acquisition or purchase of drugs, drug reimbursement, or drug pricing;

(2) Advance packets provided to board members before scheduled board meetings, to the extent these relate to the acquisition or purchase of drugs, drug reimbursement, or drug pricing;

(3) Reports generated by Pharmacy Benefit Managers (PBMs) in accordance with the PBM contract;

(4) Presentations made to the PEBP board by finalists in the PBM request for proposal (RFP) processes from 1995, 1998 and 2001;

(5) Reports generated by consultants to PEBP (including but not limited to Aon Consulting or Segal Consulting) during any RFP process involving contracts for pharmacy benefit services;

(6) Lists of evaluators for the last three PEBP RFP sessions involving contracts for pharmacy benefit services;

(7) Other documents from the last three RFP processes for pharmacy benefit services: evaluator score sheets, proposals of the losing bidders, questions posed by bidders with corresponding answers by PEBP, evaluator recommendations to the PEBP board; score sheet used by the PEBP board; correspondence between evaluators and consultant, documents provided to PEBP or to the evaluators from a consultant (i.e., "financial analysis" completed by consultant); correspondence between PEBP staff and vendor during the contract negotiation period for any of the three RFP processes at issue (1995, 1998 and 2001);

(8) Documents or correspondence related to pharmacy issues received by PEBP due to involvement with SALGBA;

(9) Documents showing comparisons of the PEBP program with those of other state and local governmental entities to the extent these documents relate to the acquisition or purchase of drugs, drug reimbursement, or drug pricing;

(10)    Audit reports from the last three or four times the PEBP has been independently audited (Lopez testified that these audit reports are included in a board packet), to the extent these relate to the acquisition or purchase of drugs, drug reimbursement, or drug pricing.

<u>Laurie Olson:</u>

(1) Notes of meetings that she attended regarding implementation of the Medicaid Modernization Act, to the extent that they relate to pharmacy reimbursement;

(2) Documents associated with the RFP process by which Catalyst RX was awarded the Senior RX PBM contract. Ms. Olson testified that these documents would be at Purchasing or in the files at Senior RX;

(3) Reports from Catalyst RX related to the operation of the PBM for Senior RX;

(4) Reports compiled by Senior RX personnel from the Catalyst reports and distributed to other government agencies.

# EXHIBIT G



**HAGENS BERMAN
SOBOL SHAPIRO LLP**

JENIPHR A.E. BRECKENRIDGE
DIRECT • (206) 224-9325
JENIPHR@HBSSLAW.COM

June 19, 2006

*Via E-Mail*

Mr. Christopher R. Dillon
Ropes & Gray
One International Place
Boston, MA 02110-2624

    Re:    AWP Nevada Litigation

Dear Mr. Dillon:

    We write to disagree with your June 6, 2006 letter regarding Medicaid's production in connection with the managed care program.

    Your letter refers to testimony by Ms. Lopez regarding "highly relevant documents," yet the letter identifies none of the testimony. Thus, it is not clear to what testimony your letter refers. As you know, Ms. Lopez has never been employed by Nevada Medicaid. Therefore, she would not seem to be a good source to identify "highly relevant" documents.

    We do not believe that the documents you list are relevant to the case. Discovery of the Medicaid managed care program took place earlier in the case and none of the issues were raised. Defendants deposed Phillip Nowak who has had responsibility for the managed care activities of Medicaid for more than five years on December 22, 2005. The deposition lasted less than 2 hours and included no examination of the topics on which defendants now seek discovery. After the deposition, defendants requested the managed care contracts. These contracts were one subject of the Defendants' Motion to Compel. They were provided prior to the hearing and defendants withdrew the issue from the Court's consideration.

                        Sincerely yours,

                        HAGENS BERMAN SOBOL SHAPIRO LLP

                        *[sent via electronic delivery]*

                        Jeniphr A.E. Breckenridge

ATTORNEYS AT LAW      SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO
T 206.623.7292   F 206.623.0594
1301 FIFTH AVENUE   SUITE 2900   SEATTLE, WASHINGTON 98101
www.hagens-berman.com

001534-13 113879 V1

# EXHIBIT H



ROPES & GRAY LLP
ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951 7050
BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

June 6, 2006

Christopher Dillon
cdillon@ropesgray.com
(617) 951-7827

**BY ELECTRONIC DELIVERY AND U.S. MAIL**

Jeniphr A. Breckenridge
Hagens Berman Sobol Shapiro
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101

Re: *Nevada AWP Actions*

Dear Jeniphr:

      In reviewing Plaintiff's production, it appears to be deficient with respect to documents relating to the Medicaid managed care program. In her recent deposition, Donna Lopez explained the request for production (RFP) process. Ms. Lopez's testimony indicates that certain highly relevant documents may exist within the Medicaid program office regarding the Medicaid managed care program. These include, without limitation:

(1) Managed care contracts (and any amendments thereto);
(2) Requests for proposal (RFPs) regarding these contracts;
(3) Responses to RFPs (including but not limited to bids)
(4) Evaluations, reports, and other analysis and/or correspondence regarding the RFP process;
(5) Presentations (by top three bidders);
(6) Audit reports of or by the entities providing managed care services; and
(7) Monthly and quarterly reports to the Medicaid program from the managed care entity.

We do not believe that we have received any of these documents, which are called for by the following Document Requests: Request Nos. 13, 14, 26, 32 and 38. For each of the categories of documents listed above, please identify (1) whether the documents exist, and (2) if so, when you expect them to be produced.

Jeniphr A. Breckenridge - 2 - June 6, 2006

Please call me if you have any questions. I will respond to you separately regarding your June 1 letter.

> Very truly yours,
>
> Christopher Dillon

cc: L. Timothy Terry
    Defense counsel