## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION, | MDL No. 1456 |
| | CIVIL ACTION:  01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO | Judge Patti B. Saris |
| *State of Nevada v. Abbott Labs., Inc. et al.*, Case No. CV-02-00260 (Nevada I), | |
| *State of Nevada v. American Home Products, et al.*, CA NO. 02-CV-12086-PBS (Nevada II) | |

## STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT
## MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE

# TABLE OF CONTENTS

**PAGE**

I.    INTRODUCTION ....................................................................................................1

II.   FACTUAL BACKGROUND ...................................................................................2

    A.    Procedural History ........................................................................................2

III.  LEGAL ARGUMENT ..............................................................................................5

    A.    The State's Obligation to Preserve Documents in this Case Was Triggered No Earlier Than the Filing of the Complaint ................................................6

    B.    Where, As Here, There is No Bad Faith, Willful or Intentional Destruction of Evidence; the Burden Shifts to Defendants ............................................7

    C.    Defendants Cannot Meet Their Burden to Demonstrate a Nexus Between the Negative Inferences Sought and the Lost Evidence ...............................9

    D.    There Is No Evidence of the Link Required Between the Contents of the Lost Documents and the Sanctions Sought ....................................................9

        1.    The OIG ("Office of the Inspector General") reports and other federal government reports ..............................................................10

        2.    Documents relating to Nevada's reimbursement formula ........................11

            a.    The Keith MacDonald study ...........................................................11

            b.    Myers & Stauffer survey .................................................................12

        3.    Communications between Nevada and others related to AWP ................13

            a.    Communications with other State Medicaid programs .................13

            b.    Communications between Medicaid and non-Medicaid agencies regarding pharmacy ......................................................14

        4.    Communications with defendants ...........................................................16

    E.    Defendants Have Suffered No Prejudice ...................................................17

IV.   CONCLUSION ......................................................................................................17

i

# TABLE OF AUTHORITIES

## CASES

*Bass-Davies v. Davis*,
    134 P.3d 103 (Nev. 2006) ..................................................................................................17

*Computer Assocs. Int'l, Inc. v. American Fundware, Inc.*,
    133 F.R.D. 166 (D. Colo. 1990) ....................................................................................6, 8

*McGuire v. Acufex Microsurgical, Inc.*,
    175 F.R.D. 149 (D. Mass. 1997) ....................................................................................5, 6

*Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*,
    692 F.2d 214 (1st Cir. 1982) ..............................................................................................9

*Sacramona v Bridgestone/Firestone, Inc.*,
    106 F.3d 444 (1st Cir. 1997) ...........................................................................................5, 7

*Turner v. Hudson Transit Lines, Inc.*,
    142 F.R.D. 68 (S.D.N.Y. 1991) ...................................................................................7, 8, 9

*Vasquez Corales v. Sea-Land Serv.*,
    172 F.R.D. 10 (D.P.R. 1997) ...........................................................................................5, 6

*Wm. T. Thompson Co. v. GNC*,
    593 F. Supp. 1443 (C.D. Cal. 1984) ...............................................................................6, 8

*Zubulake v UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ....................................................................................6, 7

*Zubulake v UBS Warburg LLC*,
    229 F.R.D. 422 (S.D.N.Y. 2004) ....................................................................................6, 7

# I.       INTRODUCTION

Defendants accuse the State of destroying documents and seek severe sanctions that, if imposed, could alter the outcome of the case.  The motion should be denied because it is unsupported by (i) any confirmation that the State destroyed even one document; (ii) evidence that many of the documents *ever* existed in the State's files or elsewhere; (iii) any extrinsic evidence of the contents of the documents defendants contend have been destroyed; and (iv) a demonstrated nexus between the documents allegedly destroyed and the negative inferences defendants seek.  The motion is also untimely as it was brought before defendants reviewed the tens of thousands of electronic witness files the State has or will produce.

This is the second time that the State has been forced to respond to defendants' *unsupported* document destruction claims.  Defendants began their campaign to establish spoliation in November 2005, before full discovery had taken place and without presenting any evidence beyond their own speculation.  *See* Defendants' Motion for an Order Holding Plaintiffs in Contempt, for Preservation of Potentially Relevant Documents, and For An Accounting of Spoliated Documents (Dkt. No. 1941).[1]  Eight months, more than one dozen state witnesses and tens of thousands of documents later, defendants' claims that the State destroyed important, relevant evidence remain unsupported.  The reason for the void is simple and dispositive of the motion before the Court:  *no documents have been destroyed*.

The true purpose of the motion lays within the negative inferences defendants seek as sanctions.  Defendants seek factual admissions they need to defend the case but have been unable to obtain from witness testimony and the thousands of documents the State has produced.

For all of these reasons and the reasons stated more fully below, the motion should be denied in its entirety.

---

[1] The original motion is pending.

## II.     FACTUAL BACKGROUND

### A.     Procedural History

The State takes defendants' accusations very seriously.  Nearly all of the documents defendants accuse the State of destroying relate to Department of Health Care Finance and Policy ("DHCFP") (also known as "Nevada Medicaid") business.  DHCFP is comprised of professionals and staff dedicated to public service.  Because Medicaid is a public entity, much of the information the Medicaid staff handles is publicly available.  Thus Nevada Medicaid personnel have no incentive to hide or destroy documents.  To the knowledge of key individuals in the organization, many of whom have been deposed, there has been no destruction of documents since the lawsuit was filed.[2]

In January, 2002, the State filed this lawsuit against the drug manufacturers alleging that the defendant drug manufacturers defrauded, deceived, and misled the State by manipulating the published AWP ("Average Wholesale Price").  DHCFP lawyers notified the department of the filing of the lawsuit on January 17, 2002, by circulating the Attorney General press release regarding the suit.  Breckenridge Decl., Ex. 2.  This was the first notice of the lawsuit most DHCFP employees received.

The State had not been involved in any litigation related to AWP prior to filing the complaint.  Drug manufacturer use of AWP had, however, been in the public eye as a target of media reports and Congressional attention.  In May, 2000, the State's Medicaid Fraud Control Unit ("MFCU") through Tim Terry, its senior attorney, had contacted certain drug manufacturers to request information regarding their AWP practices.  *See*, *e.g.*, Defs. Ex. B.  MFCU was and is independent of the Nevada DHCFP.  MFCU does not represent DHCFP or Nevada Medicaid.

---

[2] *See*, *e.g.*, Declaration of Jeniphr Breckenridge in Support of State of Nevada's Opposition to Defendants' Joint Motion for Redress for Spoliation of Evidence ("Breckenridge Decl."), Ex. 1 (Chuck Duarte Dep., Vol. 1 at 117-23) (Mr. Duarte has been the Medicaid Administrator in Nevada since 2001); Breckenridge Decl., Ex. 12 (Coleen Lawrence Dep., Vol. 3 at 596-97).

DHCFP has its own counsel.  Neither DHCFP nor its counsel were copied on the letters to the drug manufacturers.

The sole purpose of the letters was to gather information.  Breckenridge Decl. at ¶ 2.  The letters did not threaten litigation.  At the time, no litigation was contemplated.  The drug manufacturers responded to the letters by denying any fraudulent practices that could lead to legal charges or litigation.  *See*, *e.g.*, Defs. Ex. C.  In both of the examples cited by defendants, the drug companies responded through their presidents and CEOs, not lawyers.  *Id*.  The president and CEO of Dey acknowledged the generic interest in the topic.  *Id*.  There was no litigation pending or planned and thus no obligation to preserve documents on the part of the State had been triggered.

Between May, 2000 and the lawsuit filing, additional information regarding drug manufacturer misconduct and AWP was developed from a variety of sources.  Authorized Records Retention and Disposition Schedules were in place throughout this time and continue today.  *See*, *e.g.*, Defs. Ex. D.  In addition, individual Medicaid employees had their own document retention practices that included retaining copies of material that was important or useful to them in their work.  Often this meant that documents were retained longer than the formal retention policy.[3]  Medicaid Administrator Chuck Duarte testified that he was not aware of any instances where the document retention policy was violated and that his department had acted to identify and protect documents relevant to the litigation.[4]  Nevada Medicaid witness

---

[3] *See*, *e.g.*, Vicki Langdon Dep. at 51-52 (Breckenridge Decl., Ex. 3); Carol Tilstra Dep. at 41-44 (Breckenridge Decl., Ex. 4).

[4] *See* Breckenridge Decl., Ex. 1 (Chuck Duarte Dep., Vol. 1 at 117-23).  *See also* Breckenridge Decl., Ex. 12 (Coleen Lawrence Dep., Vol. 3 at 596-97).

testimony **not cited by defendants** has been consistent that no witness is aware of any instance where employees destroyed documents.[5]

Defendants waited until three years after the lawsuit was filed to serve their first discovery requests.  The discovery requests were overbroad and burdensome and requested virtually every piece of paper that had passed through Nevada Medicaid during the relevant time period (1991 to the present).  The State worked to produce the requested information.

Almost as soon as the State began its document production, defendants accused the State of destroying documents.  In November 2002, defendants filed their original spoliation motion. Defendants could not articulate specific examples of documents that were supposedly destroyed, when they were destroyed or who destroyed them.  The State nonetheless took the allegations very seriously.  In response to the motion, Mr. Duarte, with counsel, circulated a memorandum reminding Medicaid employees of their obligations to preserve documents for the litigation. Breckenridge Decl., Ex. 6.  The memorandum also asked employees who had questions about the document preservation order or had knowledge that documents had been destroyed to contact counsel.  *Id*.  None came forward.  Breckenridge Decl. at ¶ 3.  In addition, the State's outside counsel conducted extensive interviews of key Medicaid fileholders regarding the department's document handling and destruction practices.  Breckenridge Decl. at ¶ 4.  No evidence of document destruction was uncovered.

Defendants immediately went on the offensive, determined to develop support for their spoliation accusations *ex post facto*.  Defendants examined every State deposition witness exhaustively on document destruction.  In many instances the depositions became a spoliation witch hunt, with defendants' document destruction accusations dominating the record to the

---

[5] *See*, *e.g.*, Chuck Duarte Dep., Vol. 3 at 70-75 (Breckenridge Decl., Ex. 5).

exclusion of inquiries relevant to case issues.  Despite the zeal of the hunt, defendants were not able to confirm their spoliation accusations.  Presumably defendants have presented their best evidence of spoliation to the Court.  The record defendants submit confirm that no employee testified to knowledge that any document was destroyed.  Similarly, with few examples, defendants could not elicit regarding any specific documents that were destroyed or even lost or the contents of such documents.  The motion is baseless; there is no evidence of spoliation.

Defendants' demand for sanctions is also untimely.  In March 2006, Magistrate Judge Bowler ordered the State to provide extensive electronic discovery to the defendants.  The process has been laborious and time consuming, involving the review of hundreds of thousands of electronic files by the State to identify information to be produced.[6]  The State has just begun to produce the bulk of the files.  Defendants renewed their motion without reviewing electronic files produced or without waiting to see what will be produced.  Certain of the categories of information defendants claim were destroyed will be located within the electronic files.

## III.    LEGAL ARGUMENT

Courts have the authority to consider allegations of spoliation and, if appropriate, sanction a party's misconduct.  *McGuire v. Acufex Microsurgical, Inc.*, 175 F.R.D. 149, 153 (D. Mass. 1997).  The principal purpose of the sanction is remedial.  *Sacramona v Bridgestone/Firestone, Inc.*, 106 F.3d 444, 446 (1st Cir. 1997); *Vasquez Corales v. Sea-Land Serv.*, 172 F.R.D. 10, 11 (D.P.R. 1997).  Courts assess whether to impose sanctions by considering three elements:  (1) whether the party having control over the evidence had an obligation to preserve the evidence; (2) whether the records were destroyed with a "culpable state of mind"; and (3) whether the destroyed evidence was "relevant" to the party's claim or

---

[6] In just one production earlier this week, the State produced approximately 85,000 electronic files for just four witnesses.  Breckenridge Decl., Ex. 13

defense such that a reasonable trier of act could find that it would support that claim or defense. *Zubulake v UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("*Zubulake IV*").[7] Relevance in this context is also known  as "corroboration."  The process is left to the court's discretion and the elements are not a rigid test.  *Vasquez Corales*, 172 F.R.D. at 11.  Although courts may express the elements slightly differently,[8] the elements are essentially the same. Before sanctions are actually imposed, an additional element "is in a sense always required, namely prejudice to the opposing party."  *McGuire*, 175 F.R.D. at 154.

When these elements are applied to the facts defendants bring before the Court here, two conclusions emerge:  the State has not engaged in any actionable misconduct and there has been no prejudice to the drug manufacturers.

## A.    The State's Obligation to Preserve Documents in this Case Was Triggered No Earlier Than the Filing of the Complaint

The obligation to preserve documents attaches when the lawsuit is filed or when the filing of the suit is imminent.[9]  *McGuire*, 175 F.R.D. at 153.  Anything short of this has been called "pre-litigation limbo" and too indefinite to trigger any legal obligations.  *Id.*  In this case, the obligation arose when the State filed the lawsuit in January, 2002.  There is no evidence of litigation or legal claims supporting the earlier date cited by the defendants.  Defs. Mem. at 7

---

[7] Defendants' motion refers to *Zubulake v UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003) ("*Zubulake IV*") and *Zubulake v UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) ("*Zubulake V*") interchangeably.  To avoid confusion here, the State refers to the cases as *Zubulake IV* and *Zubulake V*.

[8] *Compare McGuire v. Acufex*, 175 F.R.D. at 154 (citing Jamie S. Gorelick, *et al.*, DESTRUCTION OF EVIDENCE, §§ 3.8-3.12).

[9] As a practical matter, there is no evidence that any relevant documents were destroyed between the time MFCU sent the letters and the filing of the lawsuit, before or after.  In fact, the State has produced volumes of information pre-dating May 2000 - all the way back to 1991, the dates the States' claims begin.  For this reason, the discussion of the State's "obligation" to preserve documents is largely moot.  The State preserved documents regardless of when its legal obligation attached.

Analyzing spoliation in the absence of proof that document destruction has taken place is awkward.  In each of the cases cited by defendants, the party advocating a spoliation sanction had adduced clear evidence that documents had been destroyed.  *See*, *e.g.*, *McGuire*, 175 F.R.D. 149; *Wm. T. Thompson Co. v. GNC*, 593 F. Supp. 1443 (C.D. Cal. 1984); *Computer Assocs. Int'l, Inc. v. American Fundware, Inc.*, 133 F.R.D. 166 (D. Colo. 1990).  For purposes of discussing the relevant legal authority, then, the State will ignore the requirement that documents actually have been lost or destroyed before the analysis takes place.

("[t]his litigation was reasonably foreseeable to Nevada in May 2000 *at the latest.*").  The communications between MFCU and the drug manufacturers do not mention legal claims.  In fact, the drug manufacters deny any conduct that might subject them to legal action.  Defs. Ex. C. Thus, at the earliest, the State was under an obligation to preserve documents when Attorney General del Papa filed the suit in January 2002.  The State met this obligation.

**B.      Where, As Here, There is No Bad Faith, Willful or Intentional Destruction of Evidence; the Burden Shifts to Defendants**

Once an obligation to preserve evidence is established, courts must assess whether the party's conduct warrants an adverse inference or other sanction.  *Zubulake IV*, 220 F.R.D. at 221. Courts usually consider the second  (the "culpable mind") and third (relevance or corroboration) elements together.

The "culpable mind" refers to the purported spoliator's intention in destroying evidence. When evidence is destroyed in bad faith, either willfully or intentionally, that factor alone may be sufficient to demonstrate relevance.  *Zubulake V*, 229 F.R.D. at 431.  At the court's discretion, a finding of "bad faith" or intention to avoid evidence by destroying it can alone lead to harsh penalties such as an adverse inference or other sanction.  *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 74-75 (S.D.N.Y. 1991) (discussing First Circuit law).

A "culpable state of mind" for purposes of a spoliation inference may also include carelessness or ordinary negligence.  *Sacramona*, 106 F.3d at 448.  Where the destruction results from ordinary negligence, the party seeking the sanction has a higher burden to meet; relevance must be proved by the party seeking the sanction.  *Zubulake V*, 229 F.R.D. at 431.  In such cases, the contents of the evidence destroyed becomes the paramount concern.  *Turner*, 142 F.R.D. at 74-75.  An adverse inference will not be drawn absent a demonstrated link between the proposed inference and the lost evidence.  *Id*.  The heightened burden on the accuser is required because

7

"it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." *Id.* at 77.

Importantly, in this case neither witness testimony nor defendants suggest that the State took any particular action to destroy evidence or that the State destroyed documents to avoid their use in this lawsuit. At the most, defendants allege, the State's "disregard of its obvious preservation obligations" constitutes willfulness – without any discussion of the State's actions Defs. Mem. at 9.

When examined, it is clear that the destruction allegations here fall short of "bad faith" or willfulness found by the Courts in cases relied on by defendants. The two principal cases defendants rely on are dissimilar to the facts before the Court. In both of the cited cases, *Wm. T. Thompson Co . v. GNC*, 593 F. Supp. 1443 (C.D. Cal. 1984) and *Computer Assocs. Int'l, Inc.* v. *American Fundware, Inc.*, 133 F.R.D. 166 (D. Colo. 1990), the destruction of evidence and the party's bad faith with respect to the destruction were unquestioned and resulted in the ultimate sanctions: default judgment against the spoliating party. In *Wm. T. Thompson*, for example, the court recited a long list of the evidence that defendant destroyed in defiance of a court order, suggesting that it was not only the "best objective evidence on many central issues," but the only evidence. *Wm. T. Thompson*, 594 F. Supp. at 1451. In *Computer Assocs.,* defendants intentionally destroyed irreplaceable computer code, without which the case could not be fairly tried. *Computer Assocs.*, 133 F.R.D. at 169.

Although the State denies that ***any*** evidence was lost or destroyed, it is evident based on defendants' submission that any loss after the filing of this lawsuit was the result of State "carelessness or negligence." The "carelessness or negligence" shifts to defendants the burden to demonstrate that the inferences sought bear a relationship to the lost evidence.

8

**C.    Defendants Cannot Meet Their Burden to Demonstrate a Nexus Between the Negative Inferences Sought and the Lost Evidence**

By contrast to the cases defendants cite, the court's analysis in *Turner v. Hudson Transit Lines*, 142 F.R.D. 68 apply here.  The *Turner* court concluded that the destruction of the documents was not intentional, but rather was negligent.  The court next considered whether an adverse inference was warranted.  The court considered whether there was any corroboration between the missing evidence and the negative inference sought.  Absent intentional conduct, the Court admonished, "[b]efore an adverse inference may be drawn, there must be some showing that there is in fact a nexus between the proposed inference and the information contained in the lost evidence."  *Id*. at 76 (citing 2 Wigmore on Evidence § 291 at 228 (Chadbourn rev. 1979)). The court concluded that ***no adverse inference*** was appropriate because there was "no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator."  *Id*. at 77.  *Compare Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.,* 692 F.2d 214, 218 (1st Cir. 1982) (approving how much detail party had shown regarding contents of missing documents via direct and circumstantial evidence).

This is a case like *Turner.*  The lack of extrinsic evidence of the contents of documents defendants claim are missing renders the adverse inferences sought inappropriate.  In fact, here, the sanctions sought are even more egregious because through them defendants seek to go far beyond what any document could possibly show and to establish proof required for their defense.

**D.    There Is No Evidence of the Link Required Between the Contents of the Lost Documents and the Sanctions Sought**

Defendants have identified several categories of documents they claim have been destroyed without making any attempt to link the contents of the allegedly lost documents with the negative inferences they seek, as the case law requires.

9

1.     The OIG ("Office of the Inspector General") reports and other federal
       government reports

Defendants accuse the State of destroying OIG and other federal government reports and

ask for the negative inference found in Defs. Ex. A.1 and A.2 as sanctions.[10]  *See generally* Defs.

Mem. at 11-15.  Defendants ask the Court to resolve issues that could more simply be resolved

by the parties conferring.  Defendants have presented absolutely no evidence that this category of

documents was destroyed.  And, if they had asked, defendants would have learned that the State

does not argue that federal reports were not received by the State and circulated among State

Medicaid employees.  This was established via Medicaid employee testimony,[11] and common

sense.  Medicaid Director Chuck Duarte and Pharmacy Program Services director Coleen

Lawrence both also testified that they did not maintain hard copies of the OIG reports because

they were perpetually available on line.[12]  In addition, many of the OIG reports defendants have

asked about are found in the electronic files produced to defendants, particularly the files of

witnesses Duarte and Lawrence.  Breckenridge Decl. at ¶ 5.

Even if the reports had been lost, the sanction sought by defendants would be

inappropriate.  Adverse inferences imposed as a sanction must be commensurate with the lost

missing evidence, relating to the information that would likely have been proved ***through the***

***document*** if that document were available.  To the contrary here, defendants asked the Court to

enter "fact admissions" that Nevada had knowledge of the contents of the OIG Reports dated

April 1996, through the present and relating to AWP and pharmacy reimbursement and CCH and

other unspecified "federal government publications, such as GAO Reports," and considered

---

[10] The State will refer to the sanctions defendants call "Factual Admissions Requested by Defendants" in Exhibit A to their motion (usually referred to  as "negative inferences" in spoliation case law) by the exhibit number ("A") with the specific negative inference's number.

[11] *See generally* Defs. Mem. at 12-13 (describing state witness testimony regarding federal reports).

[12] *See, e.g.*, Breckenridge Decl., Ex. 12 (Coleen Lawrence Dep., Vol. 1 at 26-27, 94-97 and Vol. 3 at 549-50); Breckenridge Decl., Ex. 7 (Chuck Duarte Dep., Vol. 2 at 46-49).

these documents in setting and/or assessing its Medicaid pharmacy reimbursement." Defs. Ex. A.1 and A.2. This is overreaching. Knowledge or affirmative action such as "considering these document in setting and/or assessing its Medicaid pharmacy reimbursement" is not something that could be proved through documents issued by the federal government even if they were available. Defendants would have had to establish the State's knowledge of or use of the documents through testimony or internal analyses, which they have not been able to do.

>           2.      **Documents relating to Nevada's reimbursement formula**

Defendants accuse the State of destroying one specific document related to Nevada's Reimbursement formula and a broader destruction of a category of documents defendants believe must exist. Defs. Mem. at 15-17.

>           a.      **The Keith MacDonald study**

Defendants accuse the State of destroying a study Medicaid Director Keith Macdonald created at least fourteen years before this case was ever filed and ask for a negative inference that would confirm both the specific data in the study ***and*** the use of that information by Nevada Medicaid during as part of the rate setting process for the past 20 years even though most Medicaid employees have never seen the document. Defs. Mem. at 15-17; Defs. Ex. A.3.

As an initial matter, the study predates the State's claims. The study and other pre-1991 documents were one subject of the defendants' motion to compel. In March 2006, Magistrate Judge Bowler ruled that the State did not have to produce documents from this time period. Breckenridge Decl. at ¶ 6. On that basis alone, defendants' requested relief as to the study should be denied.

Further, defendants again seek too much in the way of sanction – even if the State had been required to produce the document and was unable to do so. Defendants have not offered any evidence as to the contents of the document nor could there have been any basis to conclude

from the document itself that it had been used "as part of all changes and/or assessments of its

Medicaid pharmacy reimbursement rate from 1988 through the present."  Defs. Ex. A.3.  At the

March 24, 2006 deposition of Mr. MacDonald, defendants did not even ask him about the survey

or its contents.  Breckenridge Decl. at ¶ 7.  The purpose of negative inferences when imposed as

a sanction is to allow the party sponsoring the negative inference to restore the benefit of any

negative information that would likely have been in the document if the document had been

produced.  The purpose is **not** to improve the sponsoring party's position in the litigation beyond

what the document could have proved if available.  A document created in the 1980's could

never be used to prove what future use was made of it.

> **b.**      **Myers & Stauffer survey**

Defendants accuse the State of destroying unspecified documents related to a margin

analysis study outside consultant Myers & Stauffer completed.  Defendants complain that the

State has "only produced two versions of this margin analysis, a memorandum from Myers &

Stauffer discussing it, and a few other related documents."  *Id*. at 16.  Defendants cannot identify

any one document that the State did not produce or evidence that related documents were

destroyed – despite having deposed the State Medicaid Administrator,[13] State pharmacy director

Coleen Lawrence (the employee responsible for the survey)[14], two times and deposing a Myers

& Stauffer witness exclusively on the topic of the survey.  There is no definitive evidence that

the documents defendants want to see ever existed.

The sanction defendants seek is unwarranted even if the documents had existed and were

lost.  Defendants ask the Court to impose the inference that the State had knowledge of the

---

[13] *See* Chuck Duarte Dep. Vol. 2 at 37-38 (Breckenridge Decl., Ex. 7 (Mr. Duarte testifying that he knew of no other documents related to the survey)).

[14] Ms. Lawrence testified that defendants had all of the information related to the Myers & Stauffer survey. Coleen Lawrence Dep., Vol. 3 at 549-50 (Breckenridge Decl., Ex. 12).

information set forth in the Myers & Stauffer margin analysis, including one very specific example extracted from seven pages of examples,[15] *and* used that knowledge to set its reimbursement rate in 2002.  Defs. Ex. A.4.  Again, defendants are asking the Court to go beyond what any document could show into what Medicaid personnel ***did*** with the information.  Even if available, the documents described by defendants could not demonstrate what "knowledge" Medicaid had or whether "considered this information in setting its reimbursement rate in 2002."  Defs. Ex. A.5.  At most, they would show what information the State was provided.

### 3. Communications between Nevada and others related to AWP

Defendants accuse the State of destroying communications between State Medicaid employees and other state Medicaid program staff and between State Medicaid employees and others.  Defs. Mem. at 17-20.  Defendants offer limited evidence of their accusations despite the fact that they have had adequate opportunity to examine State Medicaid witnesses on the topic.

### a. Communications with other State Medicaid programs

The State does deny that Medicaid personnel subscribe to list servs and communicate with their counterparts in other states.  And defendants admit that the State has produced some of these interstate communications, but they want more.  The evidence submitted by defendants, however, does not support the negative inference sought.  Defendants have recently received voluminous electronic communications among various state Medicaid programs.  Even if some communications had been destroyed, an allegation contradicted by the contents of Coleen Lawrence's electronic files alone,[16] this would be inadequate to support the sanction sought.

---

[15] *See* Defs. Ex. J.

[16] Ms. Lawrence produced over 160,000 electronic files for attorney review after Magistrate Bowler's March 30, 2006 Order.  Among these files were dozens, if not hundreds, of list-serv emails among Medicaid staff people in various states.  Breckenridge Decl. at ¶ 5.  It is expected that other employees, including Medicaid Director Chuck Duarte, have a similar volume of interstate Medicaid communications.

13

Even if State Medicaid employees received interstate communications, there is no

evidence that they read them, let alone considered them in setting Nevada Medicaid

reimbursement rates.  Yet, defendants seek the following inference:  "Nevada had knowledge of,

and considered in setting its Medicaid pharmacy reimbursement rate, ***all of the reimbursement***

***rates*** used from January 1999, to the present, by the Medicaid programs for the states and

jurisdictions that participated in the e-mail list identified in documents produced by the State of

Montana in related litigation against the Defendants."  Defs. Ex. A.5 (emphasis added).  Further,

there is nothing in the Montana documents or any other evidence that suggests the sweeping

inference here:  knowledge of all reimbursement rates, let alone the consideration of the same.

### b.    Communications between Medicaid and non-Medicaid agencies regarding pharmacy

Defendants accuse the State of destroying communications between Medicaid and non-

Medicaid agencies or about non-Medicaid entities pharmacy practices without ever establishing

that the documents existed, let alone that they were destroyed.

Defendants' allegations that documents existed and were destroyed is based on

speculation.  For example, defendants allege communications witness Squartsoff "***may have***

***had***" with individuals at the Nevada Department of Corrections, the Nevada state hospital, and

the Southern Nevada Adult Mental Health Department about prescription drug acquisition or

reimbursement issues," Defs. Mem. at 19 (emphasis added), and then complain because the State

has not produced "any studies or internal communications" relating to discussions that only ***may***

***have happened***.

Defendants want the Court to impose the inference that Nevada Medicaid had knowledge

as to how ***all*** other Nevada pharmacy programs, including SIIS, the Department of Corrections,

14

the State Hospital, the Department of Mental Health ("MMCAP")[17], Public Employee Benefits,

and Senior Rx, acquired and/or reimbursed drugs from April 1996 through the present, and

considered this information in setting and/or assessing its Medicaid pharmacy reimbursement

formula during this time period."  Defs. Mem. at 19; Defs. Ex. A.6.  The sanction to which

defendants claim that they are entitled based on this flimsy evidence is vastly broader than the

discussions that one or two witnesses recall Medicaid *may have had*.  It is also contradicted by

the testimony of numerous Medicaid and non-Medicaid witnesses that Medicaid does not

communicate with non-Medicaid entities regarding pharmacy issues[18] and certainly does not

consider those agencies' rates when setting their own reimbursement policies and rates.  Further,

This inference is not linked to any document defendants claim has been destroyed.  Many of

these entities were not even founded at the time Laurie Squartsoff was employed by the State.

       Finally, it is no coincidence that defendants seek this sweeping inference in connection

with evidence related to entities from which Magistrate Judge Bowler denied them discovery.  It

is a blatant effort to obtain through inference discovery that they were denied (and does not exist

anyway).  Defendants attempted to obtain unrestricted discovery from Nevada non-Medicaid

agencies via a motion to compel.  The State objected to the production of the evidence as

irrelevant to the case because the State does not seek damages on behalf of the non-Medicaid

entities and documents from those witnesses files only.  Magistrate Bowler limited the

---

[17] The reference to "the Department of Mental Health (MMCAP)" is confusing.  The Department of Mental Health and Developmental Services ("DMHDS") is a non-Medicaid Nevada entity which provides certain pharmacy services to its clients.  MMCAP is the Minnesota Multistate Contracting Alliance for Pharmacy.  It is a Minnesota state entity which puts together purchasing consortiums for prescription drugs.  Nevada Medicaid has had no known contractual relationship with MMCAP.  As defendants are aware, no Nevada state entity has access to MMCAP documents.  MMCAP documents must be obtained from MMCAP directly.

[18] *See* Emmanuel Ebo Dep. at 95-97 (Dr. Ebo is a pharmacist with DMHDS and testified that he does not communicate with Medicaid regarding drug pricing and reimbursement.) (Breckenridge Decl., Ex. 8); Donna Lopez Dep. at 42-43, 159-63) (Ms. Lopez is with the Public Employees Benefit Program and testified that she does not work with Medicaid on drug pricing and reimbursement.) (Breckenridge Decl., Ex. 9).

15

defendants to three depositions of non-Medicaid entities in Nevada of their choosing.  They

selected PEBP, Senior Rx and the Mental Health and Developmental Services.

### 4.        Communications with defendants

Defendants accuse the State of destroying communications between unidentified "many

defendants" reporting sales prices.[19]  Defendants cite no evidence that any of these documents

were destroyed because they cannot.  State witnesses have testified that some of the information

was received.[20]  The State has produced many documents from this category.  Breckenridge

Decl., Ex. 10.  Moreover, this is not an instance where the evidence defendants contend is

missing is unique and cannot be recovered via other methods.  Presumably the defendants have

copies of the information they complain is missing from States.  As just one example, the State

requested copies of the Bayer communications it could not find and Bayer provided the State

with a complete set.  Breckenridge Decl., Ex. 11.

The sanction sought is extreme given the circumstances:  an inference that the State

"received, reviewed, and considered" the actual sales price information from ***all drug***

***manufacturers*** from 2001 to the present.  There is no evidence that most drug manufacturers

sent average sales price information to the State.  And the suggestion that the State "received,

reviewed, and considered" the actual sales price information is not supported by evidence of

documents supplied from those that did is not supported by the testimony defendants elicited

from state witnesses.

---

[19] Defendants identify only Warrick, Schering-Plough, AstraZeneca and Bayer as having reported their sales prices to the State before and during this litigation.  The sanction they seek extends widely to the "manufacturers."

[20] *See* Coleen Lawrence Dep., Vol. 3 at 536-37, 608-10 (discussing Bayer sales data) (Breckenridge Decl., Ex. 12).

16

**E.      Defendants Have Suffered No Prejudice**

The final consideration is whether defendants have been prejudiced by the loss of any evidence.  There has been no prejudice to defendants here.  No unique or even critical evidence has been lost.  The OIG and other federal reports, if not produced in electronic witness files, may be recreated from various websites or libraries.  The drug manufacturers' own information may be recreated from their files and, in the case of Bayer, has been.  Nothing has precluded the defendants from questioning state witnesses about the information defendants claim has been lost – and they have.  Most importantly, the sanctions defendants seek go far beyond the objective information that might have been contained in any of the documents and thus they are inappropriate.  It has been incumbent upon defendants to develop this information themselves; it simply would not have been found in the documents.

Finally, denying defendants' motion does not leave them without recourse.  If in the unlikely even that down the road defendants can establish that there were specific responsive documents in existence and in the State's hands that are no longer available and have not been produced, defendants can introduce the facts at trial.  In many cases, such issues are dealt with via jury instructions.  *Bass-Davies v. Davis*, 134 P.3d 103 (Nev. 2006).

## IV.      CONCLUSION

An adverse inference is an extreme sanction that should not be given lightly.  The circumstances before the Court do not justify the imposition of sanctions, let alone the negative inferences sought.  There is no evidence that the State destroyed documents – knowingly or at all, that many of the document ever existed or that the documents if they had existed would have contained the evidence defendants insist they claim.  Most importantly, there is absolutely no nexus between the inferences defendants seek and the contents of documents defendants claim were destroyed.  Defendants' motion is an opportunistic stretch designed to achieve proof that

they have been unable to secure via witness testimony and documentary evidence.  Granting the

motion would irreparably prejudice the State.

By_____/s/ Steve W. Berman_____          DATED:  August 4, 2006.

   Steve W. Berman
   Sean R. Matt
   Jeniphr A.E. Breckenridge
   HAGENS BERMAN SOBOL SHAPIRO LLP
   1301 Fifth Avenue, Suite 2900
   Seattle, WA  98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594

   Thomas M. Sobol
   Edward Notargiacomo
   HAGENS BERMAN SOBOL SHAPIRO LLP
   225 Franklin Street, 26th Floor
   Boston, MA  02110
   Telephone: (617) 482-3700
   Facsimile: (617) 482-3003


   George J. Chanos
   Attorney General of the State of Nevada
   L. Timothy Terry
   Deputy Attorney General Attorney General
   100 N. Carson Street
   Carson City, Nevada 89701-4714

   COUNSEL FOR PLAINTIFF
   STATE OF NEVADA

18

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **STATE OF NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on August 4, 2006, a copy to LexisNexis File & Serve for Posting and notification to all parties.

By          **/s/ Steve W. Berman**
          Steve W. Berman
          **HAGENS BERMAN SOBOL SHAPIRO LLP**
          1301 Fifth Avenue, Suite 2900
          Seattle, WA  98101
          (206) 623-7292

001534-13  122197 V1