# Exhibit 1

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

**ORIGINAL**

_____          MDL DOCKET NO.

CIVIL ACTION

01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/


VOLUME I

DEPOSITION OF CHARLES DUARTE

NOVEMBER 15, 2005

CARSON CITY, NEVADA


REPORTED BY:   STEPHANIE ZOLKOWSKI CCR 283

COMPUTER-ASSISTED TRANSCRIPTION BY:   caseCATalyst

Duarte, Charles - Vol. I                    November 15, 2005
Carson City, NV

117

1    Q    Do you know who the Chief of Nevada Medicaid

2    was in 1986?

3    A    I do not.

4    Q    Do you know who the pharmaceutical consultant

5    was in 1986 for Nevada Medicaid?

6    A    I do not.

7    MR. TERRY:  Laurie Squartsoff.

8    THE WITNESS:  Was it Laurie Squartsoff?

9    MR. TERRY:  I'm pretty sure it is.

10    THE WITNESS:  Could we take a break?

11    MR. DOVE:  Sure.

12    (Recess.)

13    MR. DOVE:  I would like to mark as Exhibit

14    Duarte 003 a document bates labeled NV 03760 entitled

15    State of Nevada Department of Human Resources Division

16    of Health Care Financing Policy Authorized Records

17    Retention and Disposition Schedules June 9, 2004.

18    (Exhibit Duarte 003 marked for identification.)

19    BY MR. DOVE:

20    Q    I ask the witness if you could please

21    identify that document.

22    A    I have seen it before.

Duarte, Charles - Vol. I                    November 15, 2005
                    Carson City, NV

                                                                118

1       Q    Is this the document retention policy that is

2    currently in effect?

3       A    I believe so.  Yes.

4       Q    Is this the same policy that was in effect

5    when Nevada filed its lawsuit in this case?

6       A    I'm not sure when the lawsuit was filed.

7       Q    Filed in 2002.

8       A    Some aspects of it were revised after that

9    time frame.  But for the most part policies remained

10   the same.

11      Q    Do you know in particular certain changes

12   that have been made since that time?

13      A    I don't know the specific changes that were

14   made.

15      Q    Does the State keep copies of its prior

16   document retention policies?

17      A    Not to my knowledge.

18      Q    I know in discussion with counsel earlier

19   today Plaintiff's will be producing either a draft or

20   an earlier version of this policy to Defendants.

21           We would certainly ask if there are other

2    policies that were in effect during any time from 1991

Duarte, Charles - Vol. I                        November 15, 2005
                    Carson City, NV

119

1    to the present we ask those be produced.

2           MS. BRECKENRIDGE:  For the record, we have

3    produced what we were able to find this morning.  We

4    were not going to produce it.  We did produce it.

5    I'll produce a bates stamped copy next week.  But we

6    provided your colleague with what I believe is a draft

7    of this policy.

8           You're welcome to ask the witnesses questions

9    about our efforts to find these policies.  But we have

10   searched for them more than once and this is what we

11   could find.

12   BY MR. DOVE:

13      Q    Who is primarily responsible for

14   administering the document retention policy?

15      A    Primarily it falls to our administrative

16   assistants, our secretarial staff, to make sure

17   records are retained in the appropriate manner

18   consistent with policy.  Each individual also has

19   responsibility to make sure records are retained

20   according to schedule.

21      Q    Are you aware of any instance in your

22   Division where an individual has been found to have

Duarte, Charles - Vol. I                             November 15, 2005
Carson City, NV

120

1    violated the document retention policy?

2         A    Not to my knowledge.

3         Q    Does this document retention policy cover

4    electronic documents including email?

5         A    I do not believe it does.

6         Q    Is there a policy in place that does cover

7    electronic documents such as email?

8         A    Not to my knowledge.

9              MR. DOVE:  Whoever is typing if they could

10   please put that on mute.

11             Thanks.

12   //

13   BY MR. DOVE:

14        Q    Turn to page NV 03761 under the section

15   labeled Disposition Holds Include Litigation.

16             Do you see that?

17        A    Yes, I do.

18             MS. BRECKENRIDGE:  What was the page number?

19             THE WITNESS:  Here.

20   BY MR. DOVE:

21        Q    This section on Disposition Holds requires an

22   agency to take certain steps to preserve documents

Duarte, Charles - Vol. I                    November 15, 2005
Carson City, NV

121

when it learns of litigation.

Is such a hold in effect as a result of this case?

A    I don't believe that we have specifically put a hold on that.  We have not issued a specific order to put a hold on that.

Q    So specifically the first sentence under the section entitled Litigation states "When an agency received notification that a lawsuit has been filed against or in behalf of them they should immediately consult their legal counsel and/or the Attorney General's office."

A    We have done so.

Q    Second section states that "All records pertaining to the litigation should be identified, separated from other files and protected."

A    We have done that.

Q    Third sentence says "All destruction of records pertaining to the lawsuit must be stopped until the legal action has been resolved."

A    We have done that.

Q    Has the Division issued any sort of notice to

1   the Personnel Division regarding this litigation and

2   the responsibility of each person regarding retaining

3   documents while the litigation is pending?

4       A    Not specifically on retention of documents

5   other than what we have here.

6           But with respect to the two prior sentences

7   where we're asked to provide, and I have assigned

8   specific staff to document all the requested

9   information and provide it through counsel to you, we

10  have done so.  And I believe we retained records.  I

11  mean, copies of those as well.

12      Q    What assurances would Defendants have that

13  documents that relate to the subject matter of the

14  litigation but yet fall outside the time periods in

15  this document retention policy are nevertheless being

16  maintained?

17      A    Let me make sure I understand the question.

18  Are you asking me whether I can provide assurance that

19  all documentation associated with the lawsuit going

20  back to the period in question 1985 were complied

21  with?

22      Q    Yes.

Duarte, Charles - Vol. I                          November 15, 2005
                    Carson City, NV

123

1        A    I don't know.

2        Q    Do you know who would know that answer?

3        A    No.  I do not.

4             MS. BRECKENRIDGE:  Other than counsel?

5             MR. DOVE:  Other than counsel.  Yes.

6    BY MR. DOVE:

7        Q    Turn to page NV 03762, the section entitled

8    Hearings Files:  Provider Complaints.

9             What specific types of documents would fall

10   into this category?

11       A    Besides specific hearings files?  I'm sorry.

12   This would involve providers who are filing a

13   complaint related to a policy or a reimbursement.

14       Q    So if a pharmacy complained about

15   reimbursement rates, for example, that letter would be

16   retained for at least six years; is that right?

17       A    If they requested it -- if they indicate it

18   as an appeal, then yes.

19       Q    They indicate it's a formal appeal then yes

20   but if it were an informal letter complaining about a

21   particular reimbursement rate?

22       A    We may or may not have treated it as an

# Exhibit 2

                              Re  Drug Company Lawsuit to be Filed(1).txt
From: Chuck Duarte <cduarte@govmail.state.nv.us>
Date: 1/22/2002 5:16:28 PM
To: Mary Wherry
CC: Deb King
Subject: Re: Drug Company Lawsuit to be Filed

Don't worry.  Just continue with the improvements we have planned for drug
rebate including the retro review of disputes.  It's very difficult and time
consuming to anticipate what may be asked of us and to prepare for it.  I'd
say, hold tight until we hear.
-----Original Message-----
From: Mary Wherry <mwherry@govmail.state.nv.us>
To: Coleen Lawrence <coleenl@govmail.state.nv.us>
Cc: Charles Duarte <cduarte@govmail.state.nv.us>; Deb King
<dking@govmail.state.nv.us>
Date: Sunday, January 20, 2002 3:32 PM
Subject: FW: Drug Company Lawsuit to be Filed


>Holy S---.  What's your reaction to this?  What would we have to do in
order
>to be prepared to participate in this?  Have you discussed this with
Dionne?
>We need to start to get our ducks in a row in case they start asking for
>detail.  It concerns me that we are so far off in our drug rebate program
>understanding in coincidence with this.
>-----Original Message-----
>From: Chuck Duarte <cduarte@govmail.state.nv.us>
>To: Coleen Lawrence <coleenl@govmail.state.nv.us>; Mary Wherry
><mwherry@govmail.state.nv.us>
>Date: Thursday, January 17, 2002 11:33 AM
>Subject: FW: Drug Company Lawsuit to be Filed
>
>
>>FYI
>>-----Original Message-----
>>From: CINDY PYZEL <CAPYZEL@ag.state.nv.us>
>>To: jandrews@dhrmail.state.nv.us <jandrews@dhrmail.state.nv.us>;
>>mwillden@dhrmail.state.nv.us <mwillden@dhrmail.state.nv.us>;
>>cduarte@govmail.state.nv.us <cduarte@govmail.state.nv.us>;
>>ysylva@govmail.state.nv.us <ysylva@govmail.state.nv.us>
>>Date: Thursday, January 17, 2002 11:12 AM
>>Subject: Drug Company Lawsuit to be Filed
>>
>>
>>Attached is the press release from Frankie Sue concerning the lawsuit this
>>office is filing.  Thanks for your assistance in obtaining information
>>concerning this.  I am also sending a copy to Mary Liveratti.
>>
>>
>>
>

# Exhibit 3

Vickie Langdon                                December 21, 2005
Carson City, NV

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

**ORIGINAL**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE PHARMACEUTICAL INDUSTRY AVERAGE) MDL NO. 1456

WHOLESALE PRICE LITIGATION            ) CIVIL ACTION:

-----------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO STATE OF     )

NEVADA V. ABBOTT LABORATORIES, Et al,)

Case No. CV02-00260 (Nevada I) and    )

STATE OF NEVADA V. AMERICAN HOME      )

PRODUCTS, et al., Case No.            )

02-CV-12086-PBS (Nevada II)           )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF VICKIE LANGDON

Carson City, Nevada

BE IT REMEMBERED that on WEDNESDAY, the 21st day of

December, 2005, at the hour of 9:00 A.M. of said day,

at the offices of THE ATTORNEY GENERAL'S OFFICE, 100

N. Carson Street, Carson City, Nevada, before me,

GAIL R. WILLSEY, a notary public, personally appeared

VICKIE LANGDON, who was by me first duly sworn and

was examined as a witness in said cause.

Vickie Langdon                                December 21, 2005

Carson City, NV

51

1    **file cabinets were already in that office and already**

2    **set up with one of them being product literature and**

3    **the other for policy minutes.**

4         Q.   Do other people within your department or

5    division have access to your files?

6         **A.   My chief and the administrative assistant.**

7         Q.   And your chief is Miss Lawrence?

8         **A.   Yes.**

9         Q.   And who is the administrative assistant?

10        **A.   Her name is Katinka Roush.  She makes up**

11   **the file tabs for me prints them out.**

12        Q.   Is it possible then that Miss Lawrence or

13   Katinka could have searched your files for responsive

14   documents without your knowledge?

15        **A.   It is possible.**

16        Q.   And you would not have necessarily known if

17   they conducted that search, would you?

18        **A.   No, not necessarily.**

19        Q.   And have you destroyed any documents since

20   you began in your position about a year ago?

21        **A.   No, I haven't.**

22        Q.   To your knowledge, has anyone else gone

Vickie Langdon                                December 21, 2005

Carson City, NV

52

1    through your files and purged or destroyed any

2    documents?

3         **A.    I'm not aware of that, no.**

4         Q.    I don't have any further questions.

5              MR. LITOW:  Okay.  Thank you.

6              MS. BRECKENRIDGE:   I should have asked my

7    could-counsel here.

8              MR. TERRY:  No, thank you.

9              (Proceedings adjourned at 10:45 A.M.)

10

11

12

13                    _____

14                    VICKIE LANGDON

15

16

17

18

19

20

21

22

# Exhibit 4

Carol Tilstra                                    December 21, 2005
                    Carson City, NV

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS    **CERTIFIED COPY**

**************************************

IN RE PHARMACEUTICAL INDUSTRY AVERAGE) MDL NO. 1456

WHOLESALE PRICE LITIGATION         ) CIVIL ACTION:

-------------------------------------) 01-CV-12257-PBS

THIS DOCUMENT RELATES TO STATE OF    )

NEVADA v. ABBOTT LABORATORIES, Et al,)

Case No. CV02-00260 (Nevada I) and   )

STATE OF NEVADA v. AMERICAN HOME     )

PRODUCTS, et al., Case No.           )

02-CV-12086-PBS (Nevada II)          )

**************************************

DEPOSITION OF CAROL TILSTRA

Carson City, Nevada

BE IT REMEMBERED that on Wednesday, December

21, 2005, at the hour of 1:00 p.m. of said day, at the

offices of THE NEVADA ATTORNEY GENERAL, 100 North

Carson Street, Carson City, Nevada, before me, DEBORAH

MIDDLETON GRECO, a notary public, personally appeared

CAROL TILSTRA, who was by me first duly sworn and was

examined as a witness in said cause.

Carol Tilstra                                    December 21, 2005

Carson City, NV

41

1        A.    I do recall.

2        Q.    Do you know who would have been involved

3    in making the determination of the particular

4    discount off AWP that would be appropriate to use as

5    a reimbursement rate?

6        A.    I would --

7        Q.    I understand it would not be you.

8        A.    Yeah.  And I was not working in the unit

9    at the time that that occurred.

10            MR. LITOW:  I have no further questions.

11            MS. BRECKENRIDGE:  Okay.  We're just going

12    to confer for a few minutes.

13                (A recess was taken)

14                EXAMINATION

15    BY MS. BRECKENRIDGE:

16        Q.    Okay.  We just have a few questions.

17            Okay, ready?

18            Miss Tilstra, I just have a few questions

19    for you on behalf of the state.

20            I'd like to refer you to Exhibit Tilstra

21    001 which is Mr. Duarte's November 30th, 2005,

22    memorandum to, as counsel described it, everyone.

Carol Tilstra

December 21, 2005

Carson City, NV

42

1    The exhibit refers to document destruction
2  and document handling.  I'd like to ask you a few
3  questions about your document-handling practices
4  throughout your tenure for the state.
5       Can you describe for the record generally
6  how you've handled your documents, your professional
7  documents?
8     A.   My professional documents, I make up a
9  file with a heading and try as best I can to keep
10  filing everything into that file so that I can go
11  back and refer to it.
12       I --
13    Q.   I'm sorry.  Go ahead.
14    A.   I'm a pack rat.
15    Q.   Okay.  And what does that mean in the
16  context of your files, then?
17    A.   I don't think I've thrown anything out.
18    Q.   Okay.  And you're aware, aren't you, that
19  the defendants in this case, including Mr. Litgow's
20  clients, have accused the state of destroying
21  documents, aren't you?
22    A.   Yes.

Carol Tilstra                                    December 21, 2005
Carson City, NV

43

1       Q.    In your experience, have you destroyed any

2   documents?

3       A.    I have not.

4       Q.    And you've seen the list in Exhibit

5   Tilstra 001?

6       A.    I have.

7       Q.    And you have discussed that list with

8   counsel, correct --

9       A.    Yes.

10      Q.    -- which would be me.

11            And have you destroyed any of the

12   documents in the categories identified in Mr.

13   Duarte's November 30th memorandum?

14      A.    No, I haven't.

15            MS. BRECKENRIDGE:   I don't have any

16   further questions.

17            MR. LITOW:   Just have a couple, couple

18   questions.

19                 FURTHER EXAMINATION

20   BY MR. LITOW:

21      Q.    Do you ever delete email?

22            MS. BRECKENRIDGE:   Any email, ever?

Carol Tilstra                                    December 21, 2005

Carson City, NV

44

1    BY MR. LITOW:

2        Q.    When you get emails, do you delete them

3    sometimes?

4        A.    I delete some.

5        Q.    And when you go to meetings, do you take

6    notes at those meetings sometimes?

7        A.    Yes.

8        Q.    Handwritten notes?

9        A.    Just handwritten.

10       Q.    Do you save those notes?

11       A.    Sometimes.

12       Q.    And sometimes you discard them?

13       A.    Correct.

14             MR. LITOW:   I have no further questions.

15             MS. BRECKENRIDGE:   I have no further

16   questions.

17             MR. LITOW:   Thanks.   Thank you so much.

18                (Proceedings concluded at 2:14 p.m.)

19

20

21                              _____

22                              CAROL TILSTRA

# Exhibit 5

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____          MDL DOCKET NO.

                                           CIVIL ACTION

                                           01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS


_____/


VOLUME III

DEPOSITION OF

CHARLES DUARTE

MARCH 22, 2006

CARSON CITY, NEVADA


REPORTED BY:  STEPHANIE ZOLKOWSKI CCR 283

COMPUTER-ASSISTED TRANSCRIPTION BY: caseCATalyst

Charles Duarte, Vol. III

Carson City, NV

March 22, 2006

---

70

1    A.  About this case?
2    Q.  Right.
3    A.  No.
4        Again, I will say that besides our already
5    standing records retention policy, we have that
6    already in place, and so people know that any
7    documents related to public decisions and policy
8    decisions that we make need to be preserved.
9        And we do a good job of doing that.
10   Q.  Prior to issuance of this email do you
11   have any reason to believe that documents relevant
12   to this case were not disposed of in accordance with
13   the retention policy you just described?
14       MS. BRECKENRIDGE: Objection.
15       THE WITNESS: I have no reason to believe
16   they were destroyed.
17   BY MR. LITOW:
18   Q.  There were instructions to individuals not
19   to destroy them in accordance with the policy, the
20   retention policy; is that correct?
21       MS. BRECKENRIDGE: Objection. Form.
22       THE WITNESS: I don't understand the

---

71

1    question.
2    BY MR. LITOW:
3    Q.  There's a retention policy in place,
4    correct? General retention policy for documents?
5    A.  Yes.
6    Q.  That policy stated that documents needed
7    to be retained for a certain amount of time; is that
8    correct?
9    A.  Yes.
10   Q.  After that time those documents could be
11   disposed of; is that correct?
12   A.  Yes.
13   Q.  My question is: Do you have any reason to
14   believe documents were not disposed of in accordance
15   with that policy related to this litigation?
16       MS. BRECKENRIDGE: Objection. It's the
17   same question.
18       THE WITNESS: I think I understand the
19   question better now.
20       I don't believe there was — I have no
21   reason to believe documents were destroyed in
22   violation of the standing records retention policy.

---

72

1    BY MR. LITOW:
2    Q.  I understand that.
3        But in compliance with the policy those
4    documents would be disposed of when they're -- after
5    the 3 years or whatever time period for preservation
6    was up; is that right?
7        MS. BRECKENRIDGE: Objection.
8        THE WITNESS: Yes.
9    BY MR. LITOW:
10   Q.  It's possible that documents pertaining to
11   this litigation were disposed of when the 3-year
12   period or whatever period there was for those
13   documents had expired; is that correct?
14       MS. BRECKENRIDGE: Objection. Foundation.
15       THE WITNESS: It's possible, yes.
16       That assumes a great deal of efficiency in
17   our records retention area but...
18   BY MR. LITOW:
19   Q.  Is there a retention records division or
20   someone responsible for the records retention or
21   just each individual is responsible for their own
22   retention of their own documents?

---

73

1    A.  Documents pertaining to public policy
2    change, whether they're related to State Plan
3    changes or Medicaid Services Manual which is our
4    State regulations, documents related to other types
5    of policy are all retained in accordance with the
6    records retention policy.
7        They're retained in our library and then
8    moved to State Archives. And in some cases if
9    they're not specifically related to public policy
10   change, for example, claims documents and reports,
11   those are retained in a — with a vendor. I believe
12   the name is Iron Mountain which is a record storage
13   area or storage facility.
14   Q.  You mentioned State Archives.
15       Is that located here in Carson City?
16   A.  Yes, it is.
17   Q.  Who at State Archives is responsible for
18   the maintenance of that?
19   A.  I don't know.
20   Q.  Do you know whether these individuals at
21   State Archives were informed of the need to preserve
22   documents relating to this case?

---

Charles Duarte, Vol. III                                    March 22, 2006
Carson City, NV

20 (Pages 74 to 77)

---

**74**

1  A.  I don't know.

2  Q.  Did you ever issue that instruction to

3  them?

4  A.  No, I did not.

5  Q.  Did you ever issue such instruction to

6  anyone at Iron Mountain?

7  MS. BRECKENRIDGE:  Objection.

8  THE WITNESS:  No, I did not.

9  BY MR. LITOW:

10  Q.  I would like to direct your attention to

11  the last paragraph.  The paragraph states, "If you

12  have any questions about his request" -- I suppose

13  it means this request -- "or believe that you are

14  aware of circumstances under which these steps have

15  not been followed with this litigation, please

16  contact Deputy Attorney General L. Timothy Terry at

17  775.684.1185." And then there's Mr. Terry's email

18  address.  "Or the State's outside counsel, Jeniphr

19  Breckenridge of Hagens Berman Sobol Shapiro at

20  206.224.9325." And then it provides her email

21  address.

22  Are you aware of any circumstances under

---

**75**

1  which the steps outlined in this email were not

2  followed?

3  A.  I'm not aware of any.

4  MR. LITOW:  I would like to take a short

5  break.

6  (Recess.)

7  MR. LITOW:  At this time I would like to

8  ask the reporter to mark as Exhibit Duarte V3 005 a

9  document entitled Supplemental Responses of the

10  State of Nevada to Defendants' First Set of

11  Interrogatories.

12  (Exhibit Duarte V3 005 marked for

13  identification.)

14  BY MR. LITOW:

15  Q.  Mr. Duarte, have you ever seen this

16  document before?

17  A.  Yes.

18  Q.  Were you involved at all in drafting the

19  responses to the interrogatories?

20  A.  Yes.

21  Q.  What was your involvement?

22  A.  I asked specific staff to answer specific

---

**76**

1  questions as well as answer a few myself.

2  Q.  Which staff did you ask to answer

3  questions?

4  A.  Primarily Coleen Lawrence and John

5  Liveratti.

6  Q.  Did you review the answers that they gave

7  in response to your request?

8  A.  Yes.

9  Q.  I would like to direct your attention to

10  interrogatory 3 and the answer which is on page 6.

11  You see that?

12  A.  Yes.

13  Q.  That interrogatory reads, "Identify the

14  time period and State program in which You have used

15  AWP's recommended by the United States Department of

16  Justice or National Association of Medicaid Fraud

17  Control Units, as noted in the September 2001 HHS-

18  OIG report, entitled 'Medicaid's Use of Revised

19  Average Wholesale Prices' and Identify why you have

20  not used such AWP's during any other time period."

21  Do you see that?

22  A.  Yes.

---

**77**

1  Q.  The answer is "Nevada has investigated

2  this interrogatory and has been unable to determine

3  the answer.  Nevada will continue to investigate

4  this interrogatory and will provide an answer if

5  possible."

6  Do you see that?

7  A.  Yes.

8  Q.  Since these interrogatories were, these

9  answers were, served on November 22, 2005, has the

10  State since been able to determine whether it's used

11  AWP's recommended by either the Department of

12  Justice or the National Association of Medicaid

13  Fraud Control Units?

14  A.  There is a State —

15  I'm sorry.  Can you repeat it?

16  Q.  It says here you continue to investigate

17  and provide an answer if possible.

18  Have you been able to determine an answer

19  to this interrogatory?

20  A.  Not to my knowledge.

21  Q.  Could you please describe the

22  investigation you undertook to determine an answer

---

# Exhibit 6

## Jeniphr Breckenridge

| | |
|---|---|
| **From:** | Chuck Duarte [cduarte@dhcfp.state.nv.us] |
| **Sent:** | Wednesday, November 30, 2005 8:59 AM |
| **To:** | Everyone (DHCFP) |
| **Cc:** | TIM TERRY; Jeniphr Breckenridge; CINDY PYZEL; Darrell Faircloth ; Mike Willden; Mary Liveratti |

**Importance:** High

To:     Division of Health Care Financing and Policy staff

From:   Charles Duarte, Administrator

Re:     In re: Average Wholesale Price Litigation
        Ongoing Litigation / Document Request


As many, of you are aware, the State of Nevada is involved in litigation entitled *State of Nevada v. American Home Products Corp., et al.;* this lawsuit is also known as the Average Wholesale Price Litigation or "AWP" Litigation.  This lawsuit was brought by the State of Nevada in 2002 through its Attorney General on behalf of the State of Nevada and persons residing in Nevada who have paid inflated charges for medications based in whole or in part on the defendant pharmaceutical companies use of the Average Wholesale Price for pricing of drugs for which the State reimburses.

The purpose of this e-mail is to confirm the proper handling and preservation of documents which might be relevant to the lawsuit.  In this instance, the term "documents" is interpreted broadly to encompass paper, electronic and any other recorded forms of information that might be related to the lawsuit.  **It is extremely important that any documents pertaining to the litigation are identified,  separated from other files and protected.  All destruction of records pertaining to the lawsuit must be stopped until the legal action has been resolved.  Although the relevant time period for the lawsuit extends back to 1991, it is important that all documents which might be relevant are preserved and maintained regardless of their date.  A description of documents that might be relevant is included below.**

This handling is consistent with the State's Authorized Records Retention and Disposition Schedules section relating to "Disposition Holds - Litigation."

In most cases, these steps have already been taken.  We are issuing this e.mail as a reminder.

This request relates to your files, both electronic and paper, as well as division files and the files for any other individuals for whom you have responsibility.

To help you determine whether information might be covered by this communication, we have attached a copy of the questions and requests for documents that defendants have served upon the State.  The title of this list of questions and requests is Defendants' First Set of Interrogatories and Requests for Production to the State of Nevada.  Again, most of you have seen this document before as you have been involved in searching for and producing documents responsive to the questions and requests from your department's files, your files or the files of others.

A summary of the types of information - in both electronic and paper form -  which would be covered follows.  This is a summary only and is no substitute for the description in the attached document.

Generally all documents related to the division's prescription drug program should be separated from other files and preserved.  More specifically, these documents might included documents containing information on the following list as well as others like them.

12/19/2005

- The State's reimbursement of or expenditures for pharmaceutical products or dispensing fees;
- Pricing for the reimbursements or expenditures: AWP, MAP, MAC, WAC, EAC, Best Price, or other prices - from any source
- The methodologies for pricing and/or setting of reimbursement rates
- The cost of drugs
- Legislative testimony and preparation for legislative testimony involving any topic related to pharmaceutical products
- Public hearings, preparation for public hearings and any public comment involving any topic related to pharmaceutical products
- Communications with the federal government (including, but not limited to, HHS Offices of the Inspector General, HCFA, General Accounting Office) , state governments or pharmaceutical manufacturers and/or their employees related to pharmaceutical products, including - but not limited to -  studies and reports
- Pharmaceutical company information regarding drug pricing
- NDC Codes
- J-Codes
- The Federal Supply Schedule
- Rebate and Supplemental Rebate programs related to pharmaceutical drugs, including the programs themselves and any hearing mechanism for rebate disputes
- Provider comments regarding the State's reimbursement or expenditures for drugs and dispensing fees
- Documents related to Third Party Administrators, Benefits Consultants, or PBMs working for the State - whether or not actually retained
- Reviews or evaluations or studies of the State Medicaid program
- Dual eligible
- Provider payments
- cost containment efforts related to State expenditure for drugs
- Communications with National Association of Medicaid Fraud Control Units, the National Association of Attorneys General, PAL
- Responses to federal or state assessment, study , analysis , review or audit concerning reimbursement of pharmaceutical products, definitions or methods of determining EAC, use of AWP or dispensing fees.
- Ven-A-Care of the Florida Keys

If you have any questions about his request or believe that you are aware of circumstances under which these steps have not been followed for this litigation, please contact Deputy Attorney General L. Timothy Terry at 775.684.1185 **LTTERRY@ag.state.nv.us**  or the State's outside counsel, Jeniphr Breckenridge of Hagens Berman Sobol Shapiro at 206.224.9325 or jeniphr@hbsslaw.com .

**Charles Duarte**
Administrator
Division of Health Care Financing & Policy
1100 E. Williams St. Suite 101
Carson City, Nevada 89701
PH:  (775) 684-3677
Fax: (775) 687-3893

# Exhibit 7

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

**ORIGINAL**

_____          MDL DOCKET NO.

                                 CIVIL ACTION

                                 01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/

VOLUME II

DEPOSITION OF CHARLES DUARTE

NOVEMBER 16, 2005

CARSON CITY, NEVADA

REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

Duarte, Charles - Vol. II                    November 16, 2005
                          Carson City, NV

37

1      Q      What is this exhibit?  I understand there may

2    be two documents, and you can describe what this

3    exhibit is.

4      A      Okay, the cover is an e-mail that I sent to

5    counsel in response to a request for contact

6    information, and it provides the name of the author of

7    a document that's attached.

8            The author is Allen Hansen, the document is

9    margins on pharmacy reimbursement model dated January

10   sixteenth, 2002.

11     Q      I'd like to direct your attention to the

12   cover e-mail.  It states that attached is the Myers

13   and Stauffer AWP analysis summary memo.  Sorry I

14   couldn't find the full report.  Do you see that?

15     A      Yes.

16     Q      I believe we touched on this a little bit

17   yesterday, but just so the record is clear, do you

18   recall ever seeing the, quote, full report?

19     A      Yes, that's the document that we provided you

20   there (indicating).

21     Q      So the document that we discussed yesterday

22   which is part of Exhibit Duarte 016?

Duarte, Charles - Vol. II                    November 16, 2005
                      Carson City, NV

                                                            38

 1       A      Yes.

 2       Q      That is what you understand the full report

 3   to be?

 4       A      Yes.

 5       Q      So other than that -- the document we

 6   discussed yesterday that was part of Exhibit Duarte

 7   016 and the Myers and Stauffer AWP analysis summary

 8   memo which is attached to this exhibit, are you aware

 9   of any other documents from Myers and Stauffer

10   relating to this analysis of pharmacy reimbursement

11   margins?

12       A      No.

13       Q      Turning now to the attached memorandum in

14   Exhibit Duarte 020, this is from Allen Hansen.   I

15   believe it was your testimony yesterday that Allen

16   Hansen would be the person at Myers and Stauffer most

17   knowledgeable regarding this project; is that right?

18       A      Yes.

19       Q      So if I wanted to learn the details of the

20   margin analysis tool that we discussed yesterday in

21   Exhibit Duarte 016, Allen Hansen would be the one to

22   talk to?

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

**ORIGINAL**

_____          MDL DOCKET NO.

                                 CIVIL ACTION

                                 01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/


                    VOLUME II

        DEPOSITION OF CHARLES DUARTE

            NOVEMBER 16, 2005

            CARSON CITY, NEVADA




REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

Duarte, Charles - Vol. II

November 16, 2005

Carson City, NV

46

1    other federal publications that were -- that were

2    published during the time period preceding 1991 and

3    between 1991 and 2000.

4         I believe the substance of much of your

5    testimony with regard to those documents was that

6    you -- you didn't know whether the State, you know,

7    was essentially aware of the contents of those

8    documents during that time period; is that correct?

9    A    That is correct.  As a part of my efforts, I

10   also went to the OIG web site and the CMS web site for

11   state Medicaid directors, and the internet -- their

12   internet libraries did not go back very far.  I think

13   the CMS web site only went back as far as 2002.

14   Q    I believe you did testify yesterday that the

15   State does receive a variety of reports from the

16   federal government, from CMS, from OIG?

17   A    Yes.

18   Q    Is that correct?

19   A    That's correct.

20   Q    Just to be clear, copies of these reports

21   kept by the State?

22   A    I believe so, yes.

Duarte, Charles - Vol. II                November 16, 2005

Carson City, NV

47

1      Q      And do you know who is -- or where -- strike

2   that.  Do you know where these federal government

3   documents are kept by the State?

4      A      Either they're kept in our administrative

5   office files or in archive, or they're destroyed after

6   the holding period.

7      Q      Do you know who is responsible for

8   maintaining copies of these federal government

9   reports?

10     A      The administrative staff is responsible, but

11  I am the custodian of records.

12     Q      Who is -- other than yourself, who is the

13  next person down the line with regard to being

14  responsible for the maintenance of records?

15     A      Our administrative staff, secretaries,

16  et cetera.

17          MR. DOVE:  We would ask that the State search

18  for and produce any copies of federal government

19  reports that have been kept by the State either in the

20  files the witness mentioned or in the State archives.

21  BY MR. DOVE:

22     Q      Do you know of anyone at the Nevada Medicaid

Duarte, Charles - Vol. II                    November 16, 2005
                        Carson City, NV

48

1    agency who would be able to testify as to whether the

2    State received the federal government documents

3    between 1991 and 2000 that we discussed yesterday, and

4    whether the State was aware of the contents of those

5    documents?

6         A    I think besides the -- I can't any think of

7    anybody else besides individuals that we've listed.

8         Q    When you say individuals that we've listed,

9    I'm not sure I understand what you mean.  I mean, I

10   guess we went through yesterday a number of

11   organizational flow charts from the time period of

12   your tenure, and then we went to -- we saw some

13   organizational flow charts from the 1980s, but we did

14   not see any organizational flow charts from the 1990s.

15        So I'm wondering, you know, who in particular

16   do you think might be able to testify as to the

17   State's knowledge of the contents of the documents in

18   the OIG and other reports during the 1990s that I

19   showed to you yesterday?

20        A    With respect to whether or not they may have

21   seen it, there's a possibility that the individuals

22   we've discussed, Lori Squartshoff, Colleen Lawrence, I

Duarte, Charles - Vol. II

November 16, 2005

Carson City, NV

49

1  believe you'll be speaking with John Liveratti; my

2  deputy, Mary Wherry would be the individuals who may

3  have seen these.

4      I don't know as to what -- I don't know

5  whether or not they actually did see those or what

6  their level of knowledge is related to the issue.

7  Again, it's a possibility that they may have seen

8  those documents.

9      I think we listed yesterday Chris Thompson,

10  Janice Wright, Keith McDonald.  We have listed a

11  number of individuals who were involved with the

12  Medicaid program prior to my tenure, so they may have

13  seen those documents.  I can't say for certain.

14      Q    If you could turn back to Exhibit Duarte 001

15  from yesterday's deposition.  Yesterday, Mr. Duarte,

16  I'm sure you recall we spent a good deal of time going

17  through this 30(B)(6) notice, and I asked you whether

18  you were knowledgeable about each of these particular

19  topics and, you know, the extent of that knowledge.

20  Do you recall that?

21      A    Yes.

22      Q    I'd like to go back through this now, at

# Exhibit 8

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In Re: PHARMACEUTICAL        )

INDUSTRY AVERAGE WHOLESALE   )

PRICE LITIGATION             )

_____      )MDL DOCKET NO.

                             )CIVIL ACTION

                             )01CV12257-PBS

THIS DOCUMENT RELATES TO:    )

ALL ACTIONS                  )

                             )

_____      )

DEPOSITION OF

EMMANUEL EBO, M.D.

BE IT REMEMBERED that on WEDNESDAY, the 28th

day of JUNE, 2006, at the hour of 11:15 AM of said

day, at the offices of THE ATTORNEY GENERAL, 100

North Carson Street, Carson  City, Nevada, before me,

STEPHANIE ZOLKOWSKI, a notary public, personally

appeared EMMANUEL EBO, M.D.  who was by me first duly

sworn and was examined as a witness in said cause.

Ebo, M.D., Emmanuel   HIGHLY CONFIDENTIAL                June 28, 2006
Carson City, NV

25  (Pages 94 to 97)

---

94

1   Leadership as a summary from Jennifer. Part of our
2   monthly report.
3       I was not privy to this part of the email.
4   But we did discuss this topic. It was a concern
5   there was so much potential to lose revenue in this.
6   So it came up in our meetings.
7       Q.  Do you recall -- why would you lose
8   revenue?
9       A.  I don't know if loss of revenue is the
10  right expression.
11      They had some outstanding bill claims they
12  wanted adjudicated. They couldn't adjudicate
13  because they didn't have a way to communicate to the
14  Medicaid computer.
15      Q.  Do you know how that situation was
16  ultimately resolved?
17      A.  No.
18      Maybe we still haven't billed for it. We are
19  out 24 months.
20      Q.  If I could direct your attention to
21  Exhibit Ebo 008. This is also an email chain. I
22  only want to focus, though, on the very first page,

---

95

1   the last email.
2       There's an email there from Mr. Chuck Duarte
3   dated 12-31-2003, and it says, Pat, please set up
4   this meeting some time next week. It is regarding
5   MHDS billing and egibility issues. I need Mel,
6   Colleen someone from FHSC perhaps Mel can recommend
7   someone appropriate to follow up on this.
8       Do you recall whether there was a meeting
9   between the Medicaid Program Office and Mental
10  Health regarding this billing issue?
11      A.  I don't recall.
12      Q.  You weren't involved?
13      A.  I wasn't involved.
14      Q.  I want to go back to the email we first
15  started with here in Exhibit Ebo 008. It was the
16  very first email you sent to Ms. Lawrence.
17      MR. TERRY: Exhibit Ebo 007?
18      MR. DILLON: I'm sorry. Exhibit Ebo 007.
19  BY MR. DILLON:
20      Q.  In the email you sent to --
21      A.  What page?
22      Q.  Page 9.

---

96

1       A.  I got it.
2       Q.  In the last paragraph you say please
3   include any current dispensing fees because of our
4   affiliation with the Minnesota Multi State Buying
5   Group, we have very competitive acquisition costs
6   for medications.
7       I presume that's the MMCAP we have been
8   talking about.
9       A.  That is correct.
10      Q.  Do you remember having discussions with
11  Ms. Lawrence or anyone else at the Medicaid Program
12  Office regarding your affiliation with MMCAP?
13      A.  No. I don't recall.
14      Colleen is Medicaid if I recall. Colleen is
15  Medicaid?
16      Yeah. I did have such conversation with
17  Laurie Squartsoff. At one time the Medicaid Office
18  looked at setting up State pharmacy system.
19      Again, it was a cost type of thing. If they
20  set up a State pharmacy system then they would have
21  various retail pharmacies out there. Retail like
22  pharmacies out there.

---

97

1       The whole point was with the MCAP acquisition
2   cost being as low as it is the Medicaid group will
3   save a lot of money because all that will matter is
4   the acquisition cost which would be less than any
5   discount.
6       So at that time, yes, the office was aware of
7   my MMCAP price discounts.
8       Q.  Do you recall when that conversation with
9   Ms. Squartsoff occurred?
10      A.  Pre 2003, when she was the Medicaid
11  pharmacist.
12      Q.  Did you also have conversations with Ms.
13  Lawrence about the MMCAP?
14      A.  No.
15      Q.  Other than this email?
16      A.  Just email.
17      Again, because the dispensing fee changes
18  periodically. It's something I called the retail
19  pharmacies out there to find out the current
20  dispensing fee.
21      Somebody had that information because it's
22  embedded in the program. They simply change it in

---

# Exhibit 9

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

-----------------------------------X

**ORIGINAL**

IN RE:  PHARMACEUTICAL            )   MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE PRICE  )   CIVIL ACTION

LITIGATION.                       )   01CV12257-PBS

---------------------------------)

THIS DOCUMENT RELATES TO:         )

ALL ACTIONS                       )

-----------------------------------X

DEPOSITION OF DONNA KAY LOPEZ

Thursday, May 25, 2006

Carson City, Nevada

Reported by:           ERIC V. NELSON, CCR #57,

Certified Realtime Reporter

Lopez, Donna Kay     HIGHLY CONFIDENTIAL          May 25, 2006
Carson City, NV

42

1        A.     I'm not supposed to ask you any questions.

2        Q.     No, that is a good one to ask.  I didn't

3   want his life history.

4        A.     He works for the Department of Parole and

5   Probation.  His exact position I don't know off the

6   top of my head.

7        Q.     How about Mr. Duarte?

8        A.     Mr. Duarte is the current administrator of

9   the Medicaid program.

10       Q.     I think if I understand correctly, he

11  works for the Department of Health and Human

12  Services?

13       A.     Yes.

14       Q.     Do you know anyone else within the

15  Department of Health and Human Services?

16            MS. BRECKENRIDGE:   Anyone?

17  BY MR. DILLON:

18       Q.     Professional level.  Do you work with any

19  of the people in the Department of Health and Human

20  Services?

21            MS. BRECKENRIDGE:   That is a different

22  question.

Lopez, Donna Kay    HIGHLY CONFIDENTIAL         May 25, 2006
                    Carson City, NV

43

1              MR. DILLON:  It is.

2              THE WITNESS:  No.

3    BY MR. DILLON:

4        Q.   The rep from the Budget Division, who is

5    that?

6        A.   **Bill Anderson.**

7        Q.   The nonstate and local, is that somebody

8    from one of the counties or towns?

9        A.   **Correct.**

10       Q.   Who currently fills that position?

11       A.   **Angus McHeren.**

12       Q.   Good Scottish name.  Where does Mr.

13   McHeren work?  What entity does he represent?

14       A.   **He works for the Clark County Health**

15   **District.**

16       Q.   How is the PEBS program funded?

17       A.   **It's funded by premiums paid for by the**

18   **participants and by the State of Nevada.**

19       Q.   I presume since it is funded at least in

20   part by the State of Nevada that there is a budget

21   item for PEBS; is that correct?

22       A.   **Yes.**

1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

-----------------------------------X

IN RE:  PHARMACEUTICAL            )   MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE PRICE  )   CIVIL ACTION

LITIGATION.                       )   01CV12257-PBS

----------------------------------)

THIS DOCUMENT RELATES TO:         )

ALL ACTIONS                       )

-----------------------------------X


DEPOSITION OF DONNA KAY LOPEZ


Thursday, May 25, 2006


Carson City, Nevada


Reported by:            ERIC V. NELSON, CCR #57,

                        Certified Realtime Reporter

Lopez, Donna Kay     HIGHLY CONFIDENTIAL          May 25, 2006
                      Carson City, NV

159

1      Q.    Is the program subject to any federal

2  statutes?

3      A.    Yes.

4      Q.    What types of federal statutes are there,

5  is the program subject to?

6      A.    **Some benefit mandates, such as Cobra.**

7      Q.    But the principal operations of the

8  program, are those governed by state statute?

9      A.    Yes.

10          MR. CHABANIS:   Objection.

11  BY MS. BRECKENRIDGE:

12      Q.    Have you ever worked for Medicaid?

13      A.    No.

14      Q.    Do you have a professional familiarity

15  with Medicaid?

16      A.    Yes.

17      Q.    What is the basis of that familiarity?

18      A.    **They are another state agency.**

19      Q.    Do you have, in your role at PEB, do you

20  have a formal relationship with Medicaid?

21      A.    No.

22      Q.    Do you work with Medicaid at all

Lopez, Donna Kay     HIGHLY CONFIDENTIAL     May 25, 2006
Carson City, NV

160

1    professionally?

2        **A.    Sometimes.**

3        Q.    What would be the nature of it?  Could you

4    describe that work for the record?

5        **A.    That would be in some cases participants**

6    **of the PEB program also have coverage under**

7    **Medicaid, and there is a coordination issue**

8    **sometimes that needs to be resolved.**

9        Q.    Are there any other instances or

10   opportunities for you to work with Medicaid?

11       **A.    No.**

12       Q.    Have you ever discussed drug pricing with

13   Medicaid?

14       **A.    No.**

15       Q.    Have you ever discussed drug pricing with

16   Medicaid personnel?

17       **A.    No.**

18       Q.    What about drug reimbursement, the same

19   questions?  Have you ever discussed drug

20   reimbursement with Medicaid either formally or

21   informally or with Medicaid personnel?

22       **A.    I would say yes.**

Lopez, Donna Kay    HIGHLY CONFIDENTIAL         May 25, 2006
                       Carson City, NV

161

1        Q.    In what context would that come up?

2        **A.    If I remember right, it was when they were**

3   **looking at implementing the Senior RX program and**

4   **contacted us in regards to the Catalyst RX contract**

5   **that we had.**

6        Q.    So it was in the context of the Senior RX

7   program?

8        **A.    Yes.**

9        Q.    You as part of your appearance at the

10  deposition today were asked to search for some

11  documents, weren't you?

12       **A.    Yes.**

13       Q.    And do you recall being asked to search

14  for communications you might have had with Medicaid?

15       **A.    Yes.**

16       Q.    Did you find any documents responsive to

17  that?

18       **A.    No.**

19       Q.    I thought I ought to give you a chance to

20  answer that since they didn't even ask you about it

21  here today.

22            MR. DILLON:   Objection.

Lopez, Donna Kay    HIGHLY CONFIDENTIAL        May 25, 2006
Carson City, NV

162

1                MS. BRECKENRIDGE:  Basis?

2                MR. DILLON:  It is argumentative.

3                MS. BRECKENRIDGE:  I just made a comment.

4    I'm not arguing with the State employee.  I just

5    wanted to get it on the record because you did ask

6    for them.  And I do think it goes to what you sought

7    and used and didn't use.

8    BY MS. BRECKENRIDGE:

9        Q.   Mr. Duarte, Chuck Duarte, he is on the PEB

10   Board; correct?

11       **A.   Yes.**

12       Q.   How long has he been on the PEB Board?

13       **A.   I believe for a couple of years, about two**

14   **years.**

15       Q.   And who was his predecessor?

16       **A.   That would have been Myla Florence.**

17       Q.   And how did Mr. Duarte come to take Miss

18   Florence's place?

19       **A.   He was probably nominated for the position**

20   **and then appointed by the Governor.**

21       Q.   Was Miss Florence a Medicaid employee?

22       **A.   No.**

Lopez, Donna Kay   HIGHLY CONFIDENTIAL   May 25, 2006
Carson City, NV

163

1      Q.   Is the spot that Mr. Duarte holds on the

2   PEB Board a Medicaid designated spot?

3      **A.   No.**

4      Q.   How would you describe that spot?

5      **A.   I would describe that spot as one of the**

6   **two management positions.**

7      Q.   Is it fair to say then that it is just a

8   coincidence that Mr. Duarte is the administrator for

9   the Department of Health Care, Finance and Policy,

10   Medicaid, and is also on the PEB Board?

11      **A.   Yes.**

12      Q.   There is nothing about his role at

13   Medicaid that is critical to his spot on the PEB

14   Board, is there?

15      **A.   No.**

16      Q.   I'd like to have you take a look at

17   Exhibit Lopez 001, which is the top exhibit.   My

18   questions are pretty general about this exhibit.

19          Just to clarify, you were not involved in

20   the creation of this document, were you?

21      **A.   No.**

22      Q.   Have you seen this document before today?

# Exhibit 10



CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

**HAGENS BERMAN
SOBOL SHAPIRO LLP**

April 24, 2006

***Via UPS Next Day Air***

Mr. William F. Cavanaugh
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710

  Re: <u>Nevada AWP Litigation</u>

Dear William:

  Attached are documents bates labeled NV 018241-317. These Ortho-McNeil documents were located in Nevada Medicaid files. The State of Nevada produces them to you as counsel for Ortho-McNeil. They have not been produced to other defendants. Please distribute as your client finds necessary.

       Sincerely yours,

       Carrie L. Flexer
       Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc: Jeniphr Breckenridge

ATTORNEYS AT LAW    SEATTLE LOS ANGELES CAMBRIDGE PHOENIX CHICAGO
206.623.7292 F 206.623.0594
1301 FIFTH AVENUE SUITE 2900 SEATTLE WASHINGTON 98101
www.hagens-berman.com

001534-13 105910 V1



**HAGENS BERMAN
SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

April 24, 2006

***Via UPS Next Day Air***

Ms. Toni-Ann Citera
Jones Day
222 East 41st Street
New York, NY 10017-6702

    Re:   <u>Nevada AWP Litigation</u>

Dear Toni-Ann:

    Attached are documents bates labeled NV 018426-580. These TAP documents were located in Nevada Medicaid files. The State of Nevada produces them to you as counsel for TAP. They have not been produced to other defendants. Please distribute as your client finds necessary.

    Sincerely yours,

Carrie L. Flexer
Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:    Jeniphr Breckenridge

ATTORNEYS AT LAW      SEATTLE  LOS ANGELES  CAMBRIDGE  PHOENIX  CHICAGO
206.623.7292    F 206.623.0594
www.hagens-berman.com

001534-13  105917 V1



CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

April 24, 2006

*__Via UPS Next Day Air__*

Mr. Christopher R. Dillon
Ropes & Gray
One International Place
Boston, MA  02110-2624

  Re: <u>Nevada AWP Litigation</u>

Dear Christopher:

  Attached are documents bates labeled NV 018362-383 and NV 018389-425. These Schering documents were located in Nevada Medicaid files.  The State of Nevada produces them to you as counsel for Schering.  They have not been produced to other defendants.  Please distribute as your client finds necessary.

       Sincerely yours,

       Carrie L. Flexer
       Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc: Jeniphr Breckenridge

ATTORNEYS AT LAW    SEATTLE LOS ANGELES CAMBRIDGE PHOENIX CHICAGO
206.623.7292 F 206.623.0594
www.hagens-berman.com

001534-13  103913 V1



**HAGENS BERMAN
SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

April 24, 2006

***Via UPS Next Day Air***

Mr. Christopher R. Dillon
Ropes & Gray
One International Place
Boston, MA  02110-2624

      Re:   <u>Nevada AWP Litigation</u>

Dear Christopher:

      Attached are documents bates labeled NV 018626-697.  These Warrick documents were located in Nevada Medicaid files.  The State of Nevada produces them to you as counsel for Warrick.  They have not been produced to other defendants.  Please distribute as your client finds necessary.

              Sincerely yours,

              Carrie L. Flexer
              Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:    Jeniphr Breckenridge

ATTORNEYS AT LAW        SEATTLE   LOS ANGELES   CAMBRIDGE  PHOENIX  CHICAGO
T 206.623.7292    F 206.623.0594
1301 FIFTH AVENUE SUITE 2900 SEATTLE WASHINGTON 98101
www.hagens-berman.com

001534-13 105919 V1



CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

April 24, 2006

**_Via UPS Next Day Air_**

Mr. Michael P. Doss
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603

Re:   NV AWP

Dear Michael:

Attached are Bayer-related documents located by Coleen Lawrence in Nevada
Medicaid files.  These documents bear the production numbers NV 018727-746.  The
State of Nevada is producing them to Bayer only with the expectation that Bayer will
distribute the documents to other defendants as necessary.

Sincerely yours,

Carrie L. Flexer
Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:   Jeniphr Breckenridge

ATTORNEYS AT LAW                                                SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO
T 206.623.7292      F 206.623.0594
1301 FIFTH AVENUE, SUITE 2900 SEATTLE, WASHINGTON 98101
www.hagens-berman.com

001534-13  105905 V1



**HAGENS BERMAN
SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

May 17, 2006

*Via U.S. Mail*

Merle M. DeLancey, Jr.
J. Andrew Jackson
Dickstein Shapiro Morin & Oshinsky LLP
2101 L St. NW
Washington, DC  20037

        Re:     Nevada AWP Litigation

Dear Mr. Delancy:

        Attached are documents bates labeled NV 020837-020848.  These Baxter International Inc. and Baxter Healthcare Corporation documents are correspondence between Timothy Terry and drug manufacturers.  The State of Nevada produces them to you as counsel for Baxter.  They have not been produced to other defendants.  Please distribute as your client finds necessary.

                                Sincerely yours,

                                Carrie L. Flexer
                                Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:     Jeniphr Breckenridge



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

May 17, 2006

***Via U.S. Mail***

Howard F. Daniels
O'Melveny & Myers LLP
400 Hope Street
Los Angeles, CA 90071-2899

      Re:   <u>Nevada AWP Litigation</u>

Dear Mr. Daniels:

     Attached are documents bates labeled NV 020866-020880.  These B. Braun Medical documents are correspondence between Timothy Terry and drug manufacturers. The State of Nevada produces them to you as counsel for Braun.  They have not been produced to other defendants.  Please distribute as your client finds necessary.

                    Sincerely yours,

                    Carrie L. Flexer
                    Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:   Jeniphr Breckenridge

ATTORNEYS AT LAW               SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO

T 206.623.7292    F 206.623.0594
www.hagens-berman.com

001534-13 109381 V1



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

May 17, 2006

*__Via U.S. Mail__*

James R. Daly
Toni-Ann Citera
Jones Day
77 West Wacker Drive
Suite 3500
Chicago, IL 60601-1692

      Re:    <u>Nevada AWP Litigation</u>

Dear Mr. Daly:

    Attached are documents bates labeled NV 020849-020864. These Abbott
Laboratories, Inc. documents are correspondence between Timothy Terry and drug
manufacturers. The State of Nevada produces them to you as counsel for Abbott. They
have not been produced to other defendants. Please distribute as your client finds
necessary.

                Sincerely yours,

                Carrie L. Flexer
                Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:    Jeniphr Breckenridge

ATTORNEYS AT LAW               SEATTLE  LOS ANGELES  CAMBRIDGE  PHOENIX  CHICAGO
T 206.623.7292    F 206.623.0594
www.hagens-berman.com

001534-13 109373 V1



**HAGENS BERMAN
SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

May 17, 2006

### *Via U.S. Mail*

Elizabeth I. Hack
Elizabeth S. Finberg
Sonnenschein Nath & Rosenthal, LLP
1301 K Street, NW
Suite 600, East Tower
Washington, DC  20005

     Re:    <u>Nevada AWP Litigation</u>

Dear Ms. Hack:

    Attached are documents bates labeled NV 020910-020921.  These Gensia Sicor Pharmaceuticals, Inc. documents are correspondence between Timothy Terry and drug manufacturers.  The State of Nevada produces them to you as counsel for Sicor.  They have not been produced to other defendants.  Please distribute as your client finds necessary.

                  Sincerely yours,

                  Carrie L. Flexer
                  Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:    Jeniphr Breckenridge



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

May 17, 2006

*Via U.S. Mail*

John C. Dodds
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103

Scott A. Stempel
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, DC  20004

      Re:   Nevada AWP Litigation

Dear Mr. Dodds:

    Attached are documents bates labeled NV 020951-020969. These Pharmacia documents are correspondence between Timothy Terry and drug manufacturers. The State of Nevada produces them to you as counsel for Pharmacia. They have not been produced to other defendants. Please distribute as your client finds necessary.

        Sincerely yours,

        Carrie L. Flexer
        Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:   Jeniphr Breckenridge

· ATTORNEYS AT LAW             SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO
206.623.7292   F 206.623.0594
www.hagens-berman.com

001534-13 109384 V1

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

May 17, 2006

*Via U.S. Mail*

Kathleen M. O'Sullivan
Perkins Coie
1201 Third Avenue, Suite 4800
Seattle, WA 98101

    Re:   Nevada AWP Litigation

Dear Ms. O'Sullivan:

    Attached are documents bates labeled NV 020944-020950. These Immunex documents are correspondence between Timothy Terry and drug manufacturers. The State of Nevada produces them to you as counsel for Immunex. They have not been produced to other defendants. Please distribute as your client finds necessary.

             Sincerely yours,

Carrie L. Flexer
Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:   Jeniphr Breckenridge



**HAGENS BERMAN
SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

May 17, 2006

***Via U.S. Mail***

Douglas B. Farquhar
Hyman Phelps & McNamara PC
700 13th Street, N.W.
Suite 1200
Washington, DC  20005

   Re: <u>Nevada AWP Litigation</u>

Dear Mr. Farquhar:

   Attached are documents bates labeled NV 020970-021001.  These Watson Pharmaceuticals, Inc. documents are correspondence between Timothy Terry and drug manufacturers.  The State of Nevada produces them to you as counsel for Watson.  They have not been produced to other defendants.  Please distribute as your client finds necessary.

       Sincerely yours,

       Carrie L. Flexer
       Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc: Jeniphr Breckenridge

ATTORNEYS AT LAW    SEATTLE LOS ANGELES CAMBRIDGE PHOENIX CHICAGO
T 206.623.7292 F 206.623.0594
www.hagens-berman.com

001534-13 109380 V1



CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

May 17, 2006

*Via U.S. Mail*

Lyndon M. Tretter
Hogan & Hartson LLP
875 Third Avenue
New York, NY 10022

Re:   Nevada AWP Litigation

Dear Mr. Tretter:

Attached are documents bates labeled NV 020898-020909. These Bristol-Myers Squibb Company documents are correspondence between Timothy Terry and drug manufacturers. The State of Nevada produces them to you as counsel for Bristol-Myers. They have not been produced to other defendants. Please distribute as your client finds necessary.

Sincerely yours,

Carrie L. Flexer
Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:   Jeniphr Breckenridge



**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

May 17, 2006

***Via U.S. Mail***

Michael T. Scott
Reed Smith LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA  19103-7301

Andrew L. Hurst
Reed Smith LLP
1301 K Street NW
Suite 1100 – East Tower
Washington, DC  20005-3373

      Re:   <u>Nevada AWP Litigation</u>

Dear Mr. Scott:

     Attached are documents bates labeled NV 020890-020897. These Fujisawa
Healthcare, Inc. documents are correspondence between Timothy Terry and drug
manufacturers. The State of Nevada produces them to you as counsel for Fujisawa.
They have not been produced to other defendants. Please distribute as your client finds
necessary.

                      Sincerely yours,

                      Carrie L. Flexer
                      Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:   Jeniphr Breckenridge

ATTORNEYS AT LAW
T 206.623.7292   F 206.623.0594        SEATTLE   LOS ANGELES   CAMBRIDGE   PHOENIX   CHICAGO
1301 FIFTH AVENUE SUITE 2900 SEATTLE WASHINGTON 98101
www.hagens-berman.com

001534-13 109374 V1



CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

**HAGENS BERMAN**
**SOBOL SHAPIRO LLP**

May 17, 2006

*Via U.S. Mail*

Paul F. Doyle
Christopher C. Palermo
Philip D. Robben
Kelley Drye & Warren LLP
101 Park Avenue
New York, NY 10178

Re:     Nevada AWP Litigation

Dear Mr. Doyle:

Attached are documents bates labeled NV 020823-020836. These Dey documents are correspondence between Timothy Terry and drug manufacturers. The State of Nevada produces them to you as counsel for Dey. They have not been produced to other defendants. Please distribute as your client finds necessary.

Sincerely yours,

Carrie L. Flexer
Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:     Jeniphr Breckenridge



CARRIE L. FLEXER
DIRECT • (206) 268-9334
CARRIE@HBSSLAW.COM

**HAGENS BERMAN
SOBOL SHAPIRO LLP**

May 17, 2006

_**Via U.S. Mail**_

Adam Wright
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

Re:   Nevada AWP Litigation

Dear Mr. Wright:

Attached are documents bates labeled NV 021002-021009. These Warrick Pharmaceutical documents are correspondence between Timothy Terry and drug manufacturers. The State of Nevada produces them to you as counsel for Warrick. They have not been produced to other defendants. Please distribute as your client finds necessary.

Sincerely yours,

Carrie L. Flexer

Paralegal to Jeniphr Breckenridge

CLF:CF
Enclosure
cc:   Jeniphr Breckenridge

# Exhibit 11



| | | |
|---|---|---|
| SIDLEY AUSTIN LLP | BEIJING | GENEVA | SAN FRANCISCO |
| ONE SOUTH DEARBORN | BRUSSELS | HONG KONG | SHANGHAI |
| CHICAGO, IL 60603 | CHICAGO | LONDON | SINGAPORE |
| (312) 853 7000 | DALLAS | LOS ANGELES | TOKYO |
| (312) 853 7036 FAX | FRANKFURT | NEW YORK | WASHINGTON, DC |

bkelth@sidley.com
(312) 853-7814                    FOUNDED 1866

July 10, 2006

**By Federal Express**

Jeniphr A.E. Breckenridge
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Re:    *State of Nevada v. Abbott Laboratories, Inc. (Nevada I)*

Dear Jeniphr:

        I write in response to your June 16, 2006 letter concerning the State of
Nevada's response to Bayer Corporation's ("Bayer") discovery requests in the above-
titled matter.  Your letter responded to my June 8, 2006 letter, which explained that,
despite Bayer's express discovery request, Nevada had failed to produce many of the
quarterly average sale price ("ASP") reports Bayer provided the State, pursuant to the
parties' 2001 Settlement Agreement, for all Bayer products since early 2001.  In
particular, missing from the State's production are reports for the following quarters:  Q2
2001, Q3 2001, Q4 2001, Q1 2002, Q2 2002, Q3 2002, Q4 2002, Q1 2003, Q2 2003,
Q3 2003, Q2 2005, and Q3 2005.  (*See* NV 017838-846 & NV 018727-746.)

        In response to my earlier letter, you wrote that you were not aware of what
happened to the missing reports, but that, if Bayer could demonstrate that Nevada
received them, you would "make further inquiries."  Please find enclosed copies of each
quarterly report from Q2 2001 to Q1 2006, together with certified mail acknowledgments
demonstrating that the State indeed received all of Bayer's ASP reports.  (For the Q3
2002 report, Bayer located proof that it mailed the report to the appropriate Nevada
address, but could not locate Nevada's return receipt.)  These documents are Bates
labeled BAY-NV000001 to BAY-NV000514 and, because they contain Bayer's internal
pricing information, are designated Highly Confidential and should be treated
accordingly under the Court's Protective Order.

        Please make further inquiries concerning the missing Bayer ASP reports,
and any other document, paper or electronic, related to the ASP reports or the State's
2001 Settlement Agreement with Bayer.  If the State cannot locate the Bayer ASP
reports it received, it must supplement its discovery responses to explain what the State
has done to locate the reports and why the State no longer has them.  (*See* Bayer's 1st



Jeniphr A.E. Breckenridge
July 10, 2006
Page 2

Set of Interrogs. & Reqs. for Produc. to Nevada, General Instructions ¶ D; Defs.' 1st Set
of Interrogs. & Reqs. for Produc. to Nevada, Definitions ¶ 17(h).)

I look forward to hearing from you regarding this matter.

Very truly yours,

Ben Keith

Ben Keith

Enclosures

cc:     Richard D. Raskin,
        Michael P. Doss,
        Sidley Austin LLP

# Exhibit 12

Coleen Lawrence                                    August 15, 2005
                        Carson City, NV

1

                  UNITED STATES DISTRICT COURT

                  DISTRICT OF MASSACHUSETTS

                           -oOo-

In Re: Pharmaceutical

Industry Average Wholesale

Price Litigation                    MDL No. 1456

                                    Civil Action No.

                                    01-CV-12257-PBS

This Document Relates to State of   CA No. 02-CV-00260-ECR

Nevada v. Abbott Laboratories, et al.,

 (Nevada I), and

State of Nevada v. American Home

Products, et al.,          CA No.02-CV-12086-PBS (Nevada II)


                  VOLUME 1 OF THE DEPOSITION OF

                       COLEEN LAWRENCE

                      August 15, 2005

                      Carson City, Nevada




  REPORTED BY:  DEBORAH MIDDLETON GRECO, CCR #113, RDR, CRR

26

1    A   Not regarding drug reimbursement itself. I know of
2  the company. If it's the same company. Where is this company
3  from?
4    Q   I forget. I saw it on some of the documents that were
5  produced.
6    A   It was a previous contractor of ours, but not
7  regarding drug reimbursement.
8    Q   Do you review federal government studies and policy
9  statements about prescription drugs?
10   A   Yes.
11   Q   And how do you get those federal government studies?
12      Are they routed to you from Duarte, or do you get some
13  sort of publication that have them in -- the studies in there?
14  How does it work?
15   A   It depends on what the source of the study is. Some
16  do come from our administrator. Some may come from email links.
17  I don't have any specific email links.
18      And if we hear about a study, we can go onto the
19  Center for Medicaid and Medicare Services website to find them.
20   Q   Are you on any email newsletters that relate to, at
21  least in part, drug reimbursement issues?
22   A   No. They're very global to all my areas.

27

1    Q   What email groups are you involved in?
2    A   The only one I could think of, I would have to get the
3  actual name of what it is, it's one from CMS.
4    Q   Is this just an email group that whenever CMS has
5  something to report or something to say, they email everybody on
6  the list?
7    A   Right. We have, like some of their
8  Dear-State-Medicaid letters and those types of issues. Nothing
9  particular just for pharmacy.
10   Q   I'd like to take a few moments just to talk about your
11  status as a Rule 30(b)(6) designee.
12      Do you know why you have been designated to represent
13  the state of Nevada in this deposition?
14   A   My understanding is because of my current employment.
15   Q   Do you know who made the decision for you to represent
16  Nevada in today's deposition?
17   A   No, I do not.
18      MR. DOVE: I'd like to mark as Nevada Exhibit Lawrence 001
19  a document entitled Notice of Rule 30(b)(6) Deposition to State of
20  Nevada, served on June 10th, 2005.
21      (Exhibit Lawrence 001 marked for identification)
22      MR. DOVE: Off the record.

28

1      (Discussion off the record)
2      MS. PYZEL: This might be a good opportunity to take a
3  little bit of a break.
4      MR. DOVE: That would be fine. Sure.
5      (Discussion off the record)
6      MR. DOVE: Let's go back on the record.
7  BY MR. DOVE:
8    Q   Let's go back for a minute to earlier where we were
9  talking about other people in the department who deal with drug
10  reimbursement and rebate issues.
11      And I don't think you mentioned Carol Tilstra. I just
12  wanted -- I know that she was designated by the state of Nevada
13  as an additional 30(b)(6) witness, and I just wanted to ask you
14  what her job responsibility is?
15   A   Okay. Currently she oversees the therapists, which
16  would be the physical therapy, occupational therapy, speech
17  therapy.
18      She also oversees ambulatory surgical centers, and she
19  oversees a staff person who oversees inpatient hospitals, but
20  they do not set any pharmacy reimbursement methodologies. They
21  oversee the medical coverage policies.
22   Q   Does she do any work relating to

29

1  physician-administered drugs?
2    A   As far as the medical coverage policies, if they
3  happen to overlap into the ambulatory surgery centers or the
4  inpatient, but not so much the physician-administered. Our
5  pharmacy program oversees all of the pharmacy.
6    Q   Do you know why she has been designated as an
7  additional 30(b)(6) witness, what area she covers that you do
8  not?
9    A   She does not cover anything currently right now in her
10  history with the state of Nevada. She, again, oversaw some of
11  the medical coverage policies. And again, it was toward --
12  carried them through, such as the physician-administered and --
13   Q   And when did she oversee the medical coverage side and
14  physician-administered side, do you know?
15   A   It was before my time. I do not know.
16   Q   Do you know how long she has worked for the Nevada
17  Medicaid department?
18   A   I honestly do not know. I would have to look at her
19  personnel file.
20   Q   Miss Lawrence, have you had the opportunity to review
21  the Rule 30(b)(6) deposition notice?
22   A   I just briefly saw this right before today.

---

**50**

1   electronic records such as email?

2       A   I do not know. That would not be underneath my scope.

3       Q   Do you know who would know the answer to that

4   question?

5       A   Our administrator, Charles Duarte.

6       Q   In connection with this litigation, has -- have you

7   sent, you or anyone in the agency, sent around an email or some

8   other communication instructing employees to retain all

9   documents that might be relevant to the subject matter of this

10  litigation?

11      MS. BRECKENRIDGE: Objection.

12      THE WITNESS: I am unaware.

13  BY MR. DOVE:

14      Q   But you don't recall seeing any such communication?

15      A   Not a formal communication, no. I was instructed by

16  my counsel in the very beginning not to destroy any type of

17  documents, to retain all documents regarding any of this

18  information.

19      Q   And did you -- have you instructed your staff to

20  comply with that instruction, as well?

21      A   Yes.

22      Q   Does the Division of Healthcare Financing and Policy

---

**51**

1   have a specific policy in place for the retention of claims

2   data?

3       A   Yes, we do.

4       Q   And is that policy written down?

5       A   I do not know. It's not within my scope. I believe

6   it's within the contract of our fiscal agent.

7       Q   When you say your fiscal agent, who is that?

8       A   First Health Services Corporation.

9       Q   I guess we would ask for the contract with First

10  Health in which the claims data retention policy is described,

11  that that be produced.

12      MS. BRECKENRIDGE: I am keeping a list of all the

13  requests that you have made here.

14      And to the extent that they are responsive to

15  outstanding discovery, and not privileged, or otherwise

16  objectionable, the state has absolutely no problem producing

17  them.

18      MR. DOVE: Okay.

19      MS. BRECKENRIDGE: You know, subject to the normal, I

20  just want to know -- and we can compare notes at the end of the

21  deposition to make sure we have the same understanding of what

22  you are requesting.

---

**52**

1       MR. DOVE: That's fine. And we'll go back through the

2   transcript and make sure. I believe most all of my requests are

3   within the scope of the larger.

4       MS. BRECKENRIDGE: I'm just saying I don't want my

5   silence to be misconstrued. But from any of these, we will

6   certainly locate and produce.

7       MR. PALERMO: This is Chris Palermo on the phone.

8       If I can ask the parties to try to keep their voice up

9   so those on the phone can hear? Thank you.

10      MR. DOVE: We'll do the best we can, Chris.

11      MR. PALERMO: Thanks.

12      MR. TERRY: Show up next time.

13      MR. PALERMO: Maybe next time I will, but I'd

14  appreciate it.

15      MR. DOVE: Okay.

16      MR. PALERMO: Thanks a lot.

17  BY MR. DOVE:

18      Q   Miss Lawrence, I'm not sure if you are the person to

19  answer this question, but I'll give it a shot, anyway.

20      The complaint in this case alleges that there are

21  numerous state agencies that overpaid for prescription drugs

22  because of the -- an alleged inflation of AWP.

---

**53**

1       Do you know which agencies or entities other than

2   Medicaid alleged to have overpaid for prescription drugs?

3       A   No.

4       MS. BRECKENRIDGE: Objection.

5       MR. DOVE: Basis?

6       MS. BRECKENRIDGE: Beyond the scope of this

7   deposition. And I'm not sure -- it goes to foundation, of this

8   witness' foundation to testify.

9   BY MR. DOVE:

10      Q   So, for example, if the state Bureau of Prisons was

11  purchasing prescription drugs, you wouldn't have anything to do

12  with that; is that correct?

13      A   Correct.

14      Q   Or if the Nevada Public Employees Union was purchasing

15  prescription drugs, you wouldn't have anything to do with that,

16  correct?

17      A   Correct.

18      Q   Do you ever speak with -- well, strike that.

19      In your capacity as, you know, a person knowledgeable

20  about drug reimbursement for Nevada Medicaid, do you ever speak

21  about drug reimbursement issues with your counterparts at other

22  state agencies that have to deal with drug reimbursement?

---

Coleen Lawrence                                    August 15, 2005

Carson City, NV

---

**94**

1       (A lunch recess was taken)
2       MR. DOVE: All right. Why don't we go back on the
3    record.
4    BY MR. DOVE:
5       Q   Miss Lawrence, does the state receive documents from
6    the federal government regarding its Medicaid program?
7       A   In what nature --
8       Q   In what nature of --
9       A   -- are the documents? Educational, informational?
10      Q   Just any sort of documents. Does the state receive
11   documents from the federal government relating to its Medicaid
12   program?
13      A   Yes.
14      Q   What sorts of documents do you receive from the
15   federal government?
16      A   Well, CMS puts out, like, Dear-State-Medicaid letters,
17   and they are published on their website.
18       Any type of policy updates may be done on the
19   websites.
20      Q   And that would come from CMS?
21      A   It's on the CMS website, yes.
22      Q   So do you have a practice of kind of reviewing the CMS

---

**95**

1    website on a weekly basis or daily basis?
2       A   If the Dear-State-Medicaid letters come in, they are
3    usually filtered down to me from our administrator.
4       Q   How often do the Dear-State-Medicaid letters appear?
5       A   I don't know if there's a frequency. Like, it's not
6    like a quarterly or a monthly. It's whenever they issue one.
7       Q   Okay. Do you get -- does the state receive documents
8    from OIG?
9       A   Yes, we do.
10      Q   And do those documents come directly to you, or do
11   they come -- are they routed to you through someone else?
12      A   They usually come to our administrator, and then he
13   disburses them as he feels appropriate.
14      Q   Does the state receive documents -- you said the state
15   receives documents from CMS.
16       Does the state receive documents separately from HCFA?
17      A   CMS is HCFA. Healthcare Financing --
18      Q   Yeah.
19      A   Yeah.
20      Q   So you're putting CMS and HCFA, for your purposes, are
21   the same?
22      A   Correct.

---

**96**

1       Q   Does the state receive documents from GAO?
2       A   Yes.
3       Q   And how do you receive those documents?
4       A   Again, if I receive them, they are through my
5    administrator.
6       Q   But he's the first one to get those documents?
7       A   I don't know if he's the first one in the state, but
8    he's the first in our agency typically.
9       Q   Where do you keep the documents that you receive from
10   the federal government?
11      A   We don't actually need to keep them because they are
12   resourced on their website. So if we ever need to get back to
13   it, we can just go back to the actual website.
14      Q   And that would apply to all of these --
15      A   Correct.
16      Q   -- agencies that I'm talking about, CMS, OIG, GAO?
17      A   Yes. They all publish them and keep them on for
18   public record.
19      Q   Do you still keep some hard copies of these documents?
20      A   I'm sure there are some hard copies that I have kept.
21      Q   And where would you keep those documents?
22      A   In my filing cabinet.

---

**97**

1       Q   Is there any sort of official hard copy file or hard
2    copy notebook that would contain, for example, you know, OIG
3    reports?
4       A   No.
5       Q   There's no --
6       A   No.
7       Q   -- book or file that would contain official
8    Dear-State-Medicaid letters?
9       A   No. The Dear-State-Medicaid letters are so broad
10   across every program, so, no.
11      Q   Has the state received communications from CMS
12   regarding the state's EAC calculations?
13      A   Not that I'm aware of on the actual EAC calculations.
14       The calculations that are pertinent to our state?
15      Q   Yes.
16      A   Just our state plan amendment.
17      Q   What do you mean by the state plan amendment?
18      A   It's our regulation with the federal government
19   stating what our reimbursement policy is.
20      Q   And what sorts of communications do you receive about
21   your state plan amendment?
22      A   That they either approve or disapprove of the actual

---

391

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-oOo-

In Re: PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE

PRICE LITIGATION

_____     MDL DOCKET NO.

THIS DOCUMENT RELATES TO:     CIVIL ACTION

Abbott Laboratories, et al.,  01CV12257-PBS

CA No. 02-CV-00260-ECR

(Nevada I) and State of

Nevada V American Home

Products, et al., CA No.

02-CV=12086-PBS (Nevada II)

_____/

VOLUME III

DEPOSITION OF

COLEEN LAWRENCE

March 23, 2006

Carson City, Nevada

REPORTED BY: JACKIE ADAMS CA CSR 7455; NV CSR 278; RPR

COMPUTER-ASSISTED TRANSCRIPTION BY: caseCATalyst 4

Coleen Lawrence, Vol. III

March 23, 2006

Carson City, NV

38 (Pages 536 to 539)

---

**536**

1  part of this litigation?
2      A.  I know we did on some of them. I don't
3  know if we had all of them, but if we have a
4  specific request, we can look for specific
5  manufacturers. I know we did for Bayer.
6      Q.  Other than Bayer, do you recall producing
7  any other letters?
8      A.  I don't recall specifically doing it.
9      Q.  Other than filing the letters in the file
10  case, did you do anything else with these letters?
11      A.  No.
12      Q.  Are you aware of the names of any other
13  manufacturers that routinely send pricing
14  information to the Nevada Medicaid program?
15      A.  I believe Bayer does due to litigation,
16  and I believe Tap does, but that's all I know.
17      Q.  Have you ever forwarded the Bayer or Tap
18  documents to anyone, or do those also just go in the
19  filing cabinet?
20      A.  They're not in a format that we utilize.
21  Our pricing methodology is based upon AWP minus
22  fifteen.

---

**537**

1      Q.  I understand that. My specific question -
2  -
3      MS. BRECKENRIDGE:  Let her finish.
4      THE WITNESS:  So we don't forward them
5  because they're not of a useful document to us. So
6  even with these documents that was supplied by
7  Schering and the other one, they give me a range of
8  numbers.
9      And my system can't handle a range of
10  numbers for a price reimbursement. It needs to be
11  specific. And this tells me specifically in this
12  letter that that's not the AWP price, and I need the
13  AWP price to work with for my system.
14  BY MR. DILLON:
15      Q.  I move to strike that answer. Did you
16  forward the Tap or Bayer letters to anyone or were
17  they just put in a file cabinet?
18      A.  I don't recall if I forwarded the Tap
19  ones. I don't believe we did with the Bayer.
20      Q.  To your knowledge, does the Nevada
21  Medicaid program require any manufacturer to submit
22  AWP information to the state of Nevada's Medicaid

---

**538**

1  program?
2      A.  Do we require the manufacturer to?
3      Q.  Yes.
4      A.  No, we rely on First Data Bank.
5      Q.  Are you aware of any requirement for a
6  manufacturer to report any pricing information to
7  the Nevada Medicaid program?
8      A.  They may with a supplemental agreement
9  arrangement.
10      Q.  But other than through their participation
11  in the supplemental rebate program, is there any
12  requirement that a manufacturer transfer pricing
13  information to the Nevada Medicaid program?
14      A.  No.
15      Q.  And in January of 2002, there was no
16  supplemental rebate program; is that correct?
17      A.  Correct.
18      Q.  When did that program begin?
19      A.  When we got federal approval for it to
20  start or when our contract came? The contract was
21  2003, but we had to wait for federal approval.
22      Q.  So when would a manufacturer have had to

---

**539**

1  submit information related to its pricing in order
2  for it to participate in the supplemental Medicaid
3  rebate program?
4      MS. BRECKENRIDGE:  I'm sorry, I didn't
5  hear the years.
6      (Previous answer read back by
7  reporter.)
8  BY MR. LITOW:
9      Q.  When did you obtain federal approval?
10      A.  I don't remember the specific date, but it
11  was 2004.
12      Q.  So is it fair to say that no manufacturer
13  would have submitted pricing information until after
14  the federal approval of the supplemental rebate
15  program?
16      A.  It's not fair to assume that because First
17  Health was working with the drug manufacturers prior
18  to, because we developed the process together, the
19  drug reps did, so I don't know if they communicated
20  the pricing beforehand.
21      Q.  Okay. Do you know how retail pharmacies
22  in Nevada typically acquire drugs?

---

548

1   you have where you can store documents?
2       A.  None.
3       Q.  Do you have a local drive for your own
4   computer?
5       A.  Yes, but we don't encourage keeping State
6   documents on it, just because of a crash of a
7   computer.
8       Q.  Do you ever keep pharmacy documents on
9   your local drive?
10      A.  No, they're on my share drive.
11      Q.  Do you think that pharmacists would
12  continue to participate in the Medicaid program if
13  they didn't earn a profit?
14          MS. BRECKENRIDGE:  Objection.
15          THE WITNESS:  I don't know what they would
16  do.
17  BY MR. DILLON:
18      Q.  Based on your experience in working with
19  pharmacists, if the reimbursement amount dropped to
20  below their cost, would they continue to
21  participate?
22          MS. BRECKENRIDGE:  Objection.

549

1           THE WITNESS:  It would honestly depend on
2   how much of their business is comprised of it,
3   because we do have them that don't make a profit on
4   Medicaid.
5   BY MR. DILLON:
6       Q.  And do you have some that do make a profit
7   on Medicaid?
8       A.  I don't know their financial situation.
9       Q.  Are you aware of any documents prior to
10  your involvement with the Nevada Medicaid program
11  related to the acquisition costs of drugs for the
12  Nevada Medicaid program?
13      A.  From who?
14      Q.  From anyone.  Is there -- I'm just
15  wondering if there are any documents that may have
16  been created by your predecessors or received by
17  your predecessors that were there when you arrived
18  at the program.
19      A.  The only document I know about, and I know
20  it's been presented as an exhibit, is the Keith
21  McDonald letter.  That's the only one I know about.
22      Q.  With respect to the OIG reports, is it

550

1   your practice to keep those reports or just to know
2   where you can access them on the OIG web site?
3       A.  We just access them through the web site.
4   We don't keep them.
5       Q.  Has that been your practice since you
6   arrived?
7       A.  As long as they've been maintained
8   electronically.
9       Q.  And how long has that been?
10      A.  From OIG?
11      Q.  Yes.
12      A.  I don't know.
13      Q.  Has it been throughout the time you've
14  been there?
15      A.  I don't know.
16      Q.  Do you recall a time when you would keep
17  paper copies of the OIG reports?
18      A.  No.
19      Q.  Other than these pricing letters we've
20  looked at from Warrick and Schering, have you had
21  any communications with either Warrick or Schering?
22      A.  I may have possibly met a drug

551

1   manufacturer through one of our public hearing
2   processes, but I could not tell you who specifically
3   is with what manufacturer.
4       Q.  Do you have any knowledge of how Warrick
5   or Schering sets the prices for its drugs?
6       A.  No.
7       Q.  Do you have any knowledge regarding how
8   Warrick or Schering markets their drugs?
9       A.  No.
10      Q.  Do you have any knowledge regarding how
11  Warrick or Schering distributes their drugs within
12  the state of Nevada?
13      A.  No.
14      Q.  Is it fair to say that you have no opinion
15  one way or the other regarding any allegations that
16  are in the Complaint as they respect Warrick or
17  Schering?
18          MS. BRECKENRIDGE:  Objection.
19          THE WITNESS:  I'd have to look at each one
20  of the allegations.  I don't know what all the
21  allegations are.
22  BY MR. DILLON:

596

1  well?
2  A. Yes, they've -- I've never seen anything
3  Nevada specific.
4      MR. PALERMO: Objection to form.
5  BY MS. BRECKENRIDGE:
6  Q. And if you -- well, I'll withdraw that.
7  You're aware that in this case, the defendants at
8  this table and the other defendants have accused the
9  State of destroying documents, aren't you?
10     MR. LITOW: Objection, form.
11     MS. BRECKENRIDGE: I need to know more.
12     MR. LITOW: You're characterizing that
13  we're accusing you of things. We may or may not be
14  doing that.
15     MS. BRECKENRIDGE: We should get that on
16  the record if not --
17     MR. LITOW: Our briefs have spoken for
18  themselves. I'm just going to state my objection.
19     MS. BRECKENRIDGE: I'm going to let the
20  question stand.
21  BY MS. BRECKENRIDGE:
22  Q. Are you aware that the defendants sitting

597

1  at this table and the other defendants in the case
2  have accused the State of destroying documents?
3  A. Yes.
4  Q. Are you aware of any documents that have
5  been destroyed --
6  A. No.
7  Q. -- related to this case?
8  A. No.
9  Q. Have you destroyed any documents yourself?
10  A. No.
11  Q. Have any of your staff come to you in
12  response to any inquiry that you made and said oh,
13  shoot, I destroyed that?
14  A. No.
15  Q. Would you tell us here today if they had?
16  A. Absolutely.
17  Q. I'd like to refer you to Exhibit Lawrence
18  V3 008, which is a -- purportedly a letter from
19  Warrick to you. This is one of the letters you
20  don't recall receiving, correct?
21  A. Correct.
22  Q. There's a question about whether the zip

598

1  code is correct on the letter?
2  A. Correct.
3  Q. Is the address otherwise correct?
4  A. No, that's actually our old address.
5  Q. But you may have received this letter; you
6  don't -- you don't know as you sit here today?
7  A. Correct.
8  Q. Do you know if the information in this
9  letter, including the attachments, was provided to
10  First Data Bank?
11  A. I do not know that.
12  Q. Did you -- have you ever during your
13  tenure -- has Nevada Medicaid ever during your
14  tenure taken in drug manufacturer pricing data
15  directly and used it in connection with
16  reimbursement for the pharmacy program?
17  A. No, because actually, when we would
18  receive AWP, the manufacturers know that we use
19  First Data Bank and they realize that we wouldn't be
20  able to use it until it went to First Data Bank
21  system.
22      So they would always tell us they were

599

1  sending their AWPs to First Data Bank and it was an
2  informational letter to us because we didn't have it
3  in house. Some states do.
4      MR. DILLON: Objection, move to strike.
5      MS. BRECKENRIDGE: I'd like it read back.
6      (Previous answer read back by
7  reporter.)
8  BY MS. BRECKENRIDGE:
9  Q. How do you know that? Tell me what the
10  source of your understanding about the drug
11  manufacturers' understanding is.
12     MR. PALERMO: Objection to the form.
13  BY MS. BRECKENRIDGE:
14  Q. You can answer.
15  A. Per previous discussions I've had with
16  manufacturers, especially when I first started here,
17  they always inquire about what we do and what our
18  process is.
19      So I would always say we get our pricing
20  from First Data Bank. So what they would show us
21  was informational, but then they would forward the
22  information to First Data Bank because they knew we

Coleen Lawrence, Vol. III                                March 23, 2006

Carson City, NV

56 (Pages 608 to 611)

---

**608**

1   start over. Given the dates -- do you know why --
2   do you have any understanding of why Schering and
3   Warrick might have issued letters beginning in 2002
4   regarding the topic of drug pricing?
5           MR. DILLON:  Objection.
6           THE WITNESS:  No.
7   BY MS. BRECKENRIDGE:
8       Q.   You can answer.
9       A.   No.
10      Q.   Do you know if it has any relationship to
11  the fact that Schering and Warrick and other drug
12  industry representatives had been sued by various
13  entities regarding their AWP pricing?
14          MR. DILLON:  Objection.
15          MR. PALERMO:  Objection.
16          THE WITNESS:  No.
17          MS. BRECKENRIDGE:  Basis?
18          MR. DILLON:  She just said she has no
19  foundation for answering that question.
20          MS. BRECKENRIDGE:  I can ask her.
21          MR. DILLON:  And it's a factual matter --
22          MS. BRECKENRIDGE:  We do not need to have

---

**610**

1   usual and customary used as part of the Nevada
2   Medicaid process? And I'm talking about throughout
3   your tenure.
4       A.   For on-line adjudication?
5       Q.   For any purpose.
6       A.   In on-line adjudication, there are several
7   components that go into the pricing algorithm.
8   Usual and customary is one of them, MAC pricing,
9   federal upper limit, average wholesale price minus
10  fifteen percent, and the on-line adjudication -- oh,
11  sorry, Department of Justice pricing.
12          And the on-line adjudication system takes
13  the lesser of any of those calculations, and that's
14  how the claim is priced. So usual and customary is
15  a component of the algorithm for pricing.
16      Q.   And how long has that been the case to
17  your knowledge?
18      A.   For that specific scenario, since the
19  point of sale system implemented in February 2003.
20      Q.   And prior to that, do you have any
21  information as to whether usual and customary was
22  used?

---

**609**

1   you testify on the record. You've had your day.
2           MR. DILLON:  I'm concluding my objection.
3           MS. BRECKENRIDGE:  You can only object,
4   foundation or form, and you said foundation.
5           MR. DILLON:  I believe you've gone on at
6   some length to put your explanations on the record.
7   BY MS. BRECKENRIDGE:
8       Q.   Okay, the next question is, you testified
9   about receiving information regarding Bayer. Was it
10  your testimony that you did not use the Bayer
11  information?
12      A.   Yes.
13      Q.   And could you describe for the record why
14  that is?
15      A.   When the Bayer information came in, it was
16  in a hard copy and a diskette. And again, we need
17  to get all of our information through First Data
18  Bank is the way our system is set up to accept
19  pricing data. There's no manual intervention in
20  there.
21      Q.   Regarding the usual and customary
22  information, can you for the record state, when is

---

**611**

1       A.   My understanding is usual and customary
2   billed charges was utilized in the Legacy system.
3       Q.   Under -- do you know under what
4   circumstances?
5       A.   The same thing with the pharmacy pricing.
6       Q.   Okay. Would whether usual and customary
7   was used as a basis for pricing be indicated on a
8   claims form?
9       A.   The claim form wouldn't say it's usual and
10  customary. The usual and customary price would come
11  in on the claim form, and then how the system paid
12  it, you could backtrack it to see which one of those
13  mechanisms was used to pay the claim.
14          MS. BRECKENRIDGE:  I don't have any
15  further questions. Have you talked to Bayer?
16          MR. LITOW:  No.
17          MS. BRECKENRIDGE:  Because their deal was
18  with you.
19          MR. LITOW:  I didn't make a deal with
20  them. I said if we had time --
21          MS. BRECKENRIDGE:  I told them to -- is
22  the Bayer lawyer on the phone?

---

# Exhibit 13

## Jeniphr Breckenridge

| | |
|---|---|
| **From:** | Jeniphr Breckenridge |
| **Sent:** | Friday, July 28, 2006 10:57 AM |
| **To:** | Jeniphr Breckenridge; 'Dillon, Christopher R.'; 'Sipos, Charles (Perkins Coie)' |
| **Cc:** | Carrie Flexer; Tim Terry; 'Bovingdon, Ali' |

**Subject:** RE: AWP : MT + NV : electronic file production : additional information

We expect the electronic files identified below to be ready to produce on Monday. The Nevada files will be produced on an external hard drive. The Montana files will be produced on a DVD. These files are being produced subject to the qualifications we have discussed with you at length. The States are concerned about inadvertently produced patient health information and privileged information. Defendants have given the States the assurance that any such information uncovered by defendants' review will be handled carefully and brought to the States' attention immediately. We appreciate your cooperation.

Please provide HB case paralegal Carrie Flexer with delivery information. I will be out of the office and largely unreachable on Monday and Tuesday.

| Nevada witnesses | approximate number of files |
|---|---|
| Duarte (complete) | 27,000 |
| King (complete) | 10,000 |
| Lawrence (partial) | 25,000 |
| Liveratti (complete) | 26,000 |

| Montana witnesses | approximate number of files |
|---|---|
| Buska | 17,000 |
| Chappuis | 38,000 |
| Preshinger | 18,000 |

**Jeniphr Breckenridge**
**Hagens Berman Sobol Shapiro LLP**
**206.224.9325**

---

**From:** Jeniphr Breckenridge
**Sent:** Friday, July 28, 2006 10:05 AM
**To:** Dillon, Christopher R.; 'Sipos, Charles (Perkins Coie)'
**Subject:** AWP : MT + NV : electronic file production

Counsel. As of this morning we have the approval of both states to produce the witness files with limited screening. Details to follow. Please advise to whom we should send each state's production.

Jeniphr

**Jeniphr Breckenridge**
**Hagens Berman Sobol Shapiro LLP**
**206.224.9325**

8/4/2006