UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>STATE OF NEVADA V. ABBOTT LABORATORIES, INC., ET AL., CA NO. CV-02-00260-ECR (Nevada I)<br><br>STATE OF NEVADA V. AMERICAN HOME PRODUCTS, ET AL., CA NO. 02-CV-12086-PBS (Nevada II) | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris<br><br>Chief Magistrate Judge Marianne B. Bowler<br><br>**ORAL ARGUMENT REQUESTED** |

## DEFENDANTS' JOINT REPLY TO NEVADA'S OPPOSITION TO DEFENDANTS' JOINT MOTION FOR REDRESS FOR SPOLIATION OF EVIDENCE

Plaintiff State of Nevada's ("Nevada" or "State") opposition is premised on the demonstrably false assertion that "***no documents have been destroyed.***" State of Nevada's Opposition to Defendants' Joint Motion for Redress for Spoliation of Evidence ("Opposition" or "Opp.") at 1 (emphasis in original). Nevada brazenly ignores the record, which is replete with examples of documents that Nevada possessed at the time it first contemplated this litigation in May 2000, but that are no longer in its possession due to its failure to instruct its employees to save them until November 30, 2005. Common sense dictates that in the intervening five-and-a-half years, these employees discarded, deleted, and failed to save relevant documents in their files and on their computers. Nevada's lawyers knew that they were supposed to preserve documents, but the relevant employees did not. As a result, evidence regarding the central issues in this case was *destroyed*, *see Wm. T. Thompson Co. v. Gen. Nutrition Corp.*, 593 F. Supp. 1443, 1446 (C.D. Cal. 1984) ("'[D]estroyed' includes the physical destruction, discarding, failure

to retain in its possession, and - in case of electronically-readable records - the erasure of

records[]."), including:

- The e-mails and electronic documents of Nevada Division of Health Care Financing and Policy's ("DHCFP" or "Nevada Medicaid") staff pharmacist from 1989-2001, Laurie Squartsoff;
- The e-mails and electronic documents of the former Nevada Medicaid Deputy Administrator from 1997-1999 and Administrator from 1999-2000, Janice Wright;
- The e-mails and electronic documents for other Medicaid officials including April Townley and Christopher Thompson. [1]
- Over thirty OIG reports discussing Medicaid reimbursement and showing the vast and unpredictable differences between AWP and acquisition cost;
- At least seven CCH publications and federal government reports, including GAO and CMS publications discussing Medicaid reimbursement;
- The Nevada Medicaid drug rebate binder;
- A 1980s Nevada Medicaid drug cost study;
- Nevada Medicaid's periodic surveys of the reimbursement rates of other State agencies; and
- Defendants' pricing letters, which showed the actual prices at which they sold their drugs.

All of these documents existed in the files of Nevada Medicaid after May 2000 and Nevada has

been unable to locate and produce them.  In its Opposition, Nevada tries to manufacture a Catch-

22:  if Defendants are able to identify the lost document, Nevada asserts no prejudice; if

Defendants are unable to identify with specificity the destroyed document, Nevada asserts that

there is no evidence the document existed.  But the dilemma is false:  first, each and every time a

relevant piece of evidence regarding a material issue is destroyed, Defendants are prejudiced;

second, Defendants have established that relevant evidence was destroyed.

In addition to challenging the irrefutable fact that documents were destroyed, Nevada

challenges the breadth of the proposed fact admissions, asserting that it should not be presumed

to know the contents of documents it received (and its employees testified they read) or use the

knowledge it learned from those documents in setting its reimbursement rates.  Thus, while

---

[1] Despite repeated requests Nevada has not identified when it deleted the e-mails and electronic records of Mr. Thompson and Ms. Townley.

Nevada admits that "federal reports were [] received and circulated among State Medicaid employees," Opp. at 10, it now contends that it should not be presumed to have read or considered the information in those reports.  This is remarkable, considering the reports were directed at State Medicaid agencies, and made specific recommendations to those agencies.  The proposed fact admissions flow naturally and logically from destruction of the specified documents.  Any uncertainty here as to whether a document existed, its precise contents, whether it was read, and whether that knowledge was used by Nevada, should be resolved against the party that created the uncertainty through its destruction of relevant documents and internal correspondence discussing those documents.

Finally, although Nevada has yet to complete its Court-ordered production of electronic documents, such tardiness does not warrant a reprieve from this motion, as Nevada's on-going production pertains to few of the categories of destroyed documents.[2]

## I.   DOCUMENTS RELEVANT TO THIS CASE HAVE BEEN DESTROYED.

### A.   E-mails and Electronic Documents Were Destroyed.

As of the filing date of this reply brief, no e-mails bearing dates prior to May 2001 (a year after its preservation obligation started) have been produced to Defendants.  The destruction of electronic documents is also apparent from the following:

- The State's representation that it has not preserved e-mails or electronic documents from the accounts of key employees such as Ms. Squartsoff and Ms. Wright, both of whom received e-mails from their counterparts in other states regarding pharmacy reimbursement, *see* Joint Memo. at 18, n. 17-18; Exs.[3] L.2-3;
- The Montana e-mails sent to Nevada Medicaid employees but not produced to Defendants by Nevada, *see* Ex. O; and

---

[2] Nevada's late production of electronic documents does not render Defendants' motion premature.  A number of the destroyed documents were paper documents, and the State retains no e-mail prior to 2001 and no OIG reports prior to 2005.

[3] Exhibits A through Q are found in the Appendix to Defendants' Joint Memorandum in Support of Defendants' Joint Motion for Redress for Spoliation of Evidence ("Joint Memo."), and Exhibits R through U are attached to the Declaration of Carisa A. Klemeyer, Esq., submitted in support of the Joint Reply ("Klemeyer Decl.").

- The emails between outside consultant Myers and Stauffer and Nevada Medicaid, which were produced by Myers and Stauffer but not the State, *see* Ex. M.

It is impossible to identify the lost e-mails; however, the magnitude of Nevada's destruction can be seen by the number of e-mails *retained* (even without a litigation hold) by current employees: Nevada's Medicaid director: 2001 (0), 2002 (207), 2003 (835), 2004 (988), and 2005 (1208); Nevada's pharmacy consultant: 2001 (155), 2002 (664), 2003 (961), 2004 (1047), 2005 (772). *See* Klemeyer Decl. ¶ 9. In the face of these documented instances, Nevada's denial "that any evidence was lost or destroyed[,]" Opp. at 8, is absurd.

### B. OIG And Other Government Reports Were Destroyed.

Nevada concedes that it received the government reports Defendants identified regarding AWP, acquisition cost, and reimbursement issues and circulated them among State Medicaid employees. *See* Opp. at 10. Nevada has been unable to produce them to Defendants because they were destroyed. Nevada's claim that "Defendants have presented absolutely no evidence that this category of documents was destroyed[,]" Opp. at 10, ignores the law, *see Wm. T. Thompson*, 593 F. Supp. at 1446 ("destruction" includes failure to retain) and the record evidence:

- Medicaid Director Charles Duarte testified he deleted OIG Reports, *see* Joint Memo. at 13;
- Ms. Squartsoff testified that she kept OIG Reports and other publications relating to drug reimbursement during her tenure at DHCFP from 1989-2001, yet none of these have been produced, *see* Joint Memo. at 12-13;
- The testimony of Coleen Lawrence, Social Services Chief at Nevada Medicaid from 2001 through the present, stating that she maintained hard copies of OIG, CMS, and GAO reports and publications in her file cabinet, which have not been produced to Defendants. *See* Lawrence Dep., Vol. 1 at 94-96 (except where otherwise noted, all deposition testimony cited herein is attached at Ex. Q).

C.   **Nevada Has Destroyed Numerous Documents That Were Maintained By Medicaid Employees.**

Nevada Medicaid employees testified to the existence of numerous documents that they had in their possession since May 2000, which Nevada has not been able to locate and produce.

- Ms. Squartsoff testified that she kept a red or blue binder of documents regarding Nevada Medicaid's drug rebate program; but this binder has been destroyed.  *See* Joint Memo. at 12, n. 8.
- Ms. Lawrence testified that she had a copy of Keith MacDonald's drug cost study; but this study has been destroyed.  *See* Joint Memo. at 15-16.
- Ms. Squartsoff testified that she conducted periodic surveys to compare Nevada's Medicaid reimbursement rates with those of other states, other Nevada agencies, and/or third-party payers to make sure they were similar.  *See* Joint Memo. at 18-19.  While the State has produced two 1995 documents that show the results of two such surveys, *see* Exs. H.2-3, no others have been produced.
- Many Defendants reported sales prices to Nevada before and during this litigation.  *See* Joint Memo. at 19.  The State concededly received at least some of this information.  *See* Opp. at 16.  While some letters were produced, many others were destroyed.  *See* Joint Memo. at 19.

II.   **NEVADA FAILED TO COMPLY WITH ITS PRESERVATION OBLIGATIONS**

A.   **The State Does Not Dispute That Nevada Medicaid Did Not Put A Disposition Hold In Place Until November 30, 2005.**

In its Opposition, Nevada relies heavily on *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68 (S.D.N.Y. 1991); that case teaches that Nevada had an affirmative duty to prevent the destruction of relevant documents:

> This obligation ran first to counsel, who had a duty to advise his client of the type of information potentially relevant to the lawsuit and of the necessity of preventing its destruction.  Similarly, the defendants' corporate managers were responsible for conveying this information to the relevant employees.
>
> It is no defense to suggest, as the defendant attempts, that particular employees were not on notice.  To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant.   The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials.

*Id.* at 73 (internal citations omitted).  Nevada does not dispute that a disposition hold was not put into place at DHCFP until November 30, 2005.[4]

In an attempt to deflect attention from this failing, the State references a press release regarding the fact of filing of the lawsuit, which was apparently circulated by DHCFP lawyers in January 2002.  *See* Opp. at 2.  That press release, however, did not instruct employees to preserve documents, and did not tell employees what types of documents would be relevant for this litigation.  *See* Breckenridge Decl., Ex. 2.  Moreover, no employee recalled receiving that release or testified that it prompted him to retain documents for this litigation.  Every State employee that was deposed, including Mr. Duarte (Duarte Dep., Vol. III at 64-65), Ms. Lawrence (Lawrence Dep., Vol. III at 490), and Director of Nevada's Department of Health and Human Services Michael Willden (Willden Dep. at 77-78, attached at Ex. R), testified that he or she learned of this litigation in 2005.  Along these same lines, the State characterizes Charles Duarte's November 30, 2005, e-mail instituting the disposition hold as a "remind[er]" to preserve documents.  *See* Opp. at 4.  Yet DHCFP's employees testified they were not told to preserve documents prior to November 2005.  *See, e.g.,* Duarte Dep., Vol. I at 121-22, 129-30; Liveratti Dep., at 54.  Only Coleen Lawrence testified that she previously was instructed to preserve documents, and that was shortly before her August 2005 deposition.  *See* Lawrence Dep., Vol. III at 489-91.  And some State employees who had relevant documents were never told to retain documents.  *See* Joint Memo. at 6.

B.   **Nevada's Preservation Obligation Arose In May 2000 At The Latest.**

The State misstates the standard set forth in *McGuire v. Acufex Microsurgical, Inc.,* 175 F.R.D. 149, 152-53 (D. Mass. 1997).  Nevada's preservation obligation arose when litigation was

---

[4] This fact renders incorrect the State's pronouncement that the Retention Policy was followed, *see* Opp. at 3, as the Retention Policy required a disposition hold to be put in place at the outset of the litigation.  *See* Joint Memo. at 5; *see also* Ex. D.

reasonably foreseeable, not "imminent."  *See* Opp. at 6; *McGuire*, 175 F.R.D. at 152-53 (holding that duty to preserve arises when a party is on notice that documents may be relevant to potential litigation); *see also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (defining spoliation of evidence as "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation").  The letters to Defendants sent from L. Timothy Terry, Esq., *see* Ex. B, show that litigation was reasonably foreseeable to Nevada in May 2000.  Mr. Terry's letters essentially track the allegations in the State's Complaint.  They argue that a disparity exists between AWP and market prices for drugs, and state that AWP figures are derived from "*inflated* pricing data" (emphasis added), which Mr. Terry alleged caused Nevada to "overpay for drugs by a considerable amount."  *See* Ex. B.  Regardless of Nevada's current assertion that it did not contemplate litigation back in May 2000, Mr. Terry's letters outlining their claims, and Defendants' responses – some of which came from lawyers, *see* Ex. C[5] – demonstrate that, at the very least, Nevada should have anticipated litigation at that time.

Nevada also tries to avoid its pre-filing obligations began by asserting that Mr. Terry did not represent Nevada Medicaid at the time of the letters.  *See* Opp. at 2-3.  But this is absurd.  Mr. Terry was (and is) the senior attorney in the *Medicaid* Fraud Control Unit of Nevada's Office of Attorney General.  His May 2000 letters are on Nevada Medicaid Fraud Control Unit letterhead and state in the first line that his investigation involves "Nevada State Medicaid reimbursement."  Ex. B.  These cases were brought by the Office of the Attorney General on

---

[5] The State's assertion that only Defendants' CEOs and Presidents responded to Mr. Terry simply is not true.  *See* Opp. at 3.  For example, the letter from Warrick, *see* Ex. C.2, is signed by John F. Hoffman, associate general counsel for Schering-Plough Corporation.

behalf of the State, including Nevada Medicaid.  Mr. Terry is co-counsel in the matter and his

name appears on the complaint filed in January 2002.

## III.   NEVADA'S ACTIONS CONSTITUTE WILLFULNESS FOR THE PURPOSES OF THE REMEDY ANALYSIS.

Although not necessary as Nevada concedes, *see* Opp. at 7, Defendants have established

that Nevada's destruction of documents was willful.  From its first interactions with Defendants,

Nevada was aware of the importance to this litigation of the federal government reports, internal

and external studies regarding drug acquisition costs, and communications with others regarding

the meaning of AWP.  In direct contravention of CMO No. 2, Nevada did not institute a

disposition hold as required by its Retention Policy, *see* Ex. D, NV 03761, until November 30,

2005.  Such actions constitute willfulness.  *See Computer Assocs. Int'l, Inc.*, v. *American

Fundware, Inc.*, 133 F.R.D. 166, 169-70 (D. Colo. 1990) (notice of the importance of computer

source code to the claims as a result of a pre-litigation conference, the filing of the complaint,

discovery requests, and motion practice, and the failure to retain that code constituted willfulness

even though the defendant was acting pursuant to a document retention policy);  *see also Wm T.

Thompson Co.*, 593 F. Supp. at 1445-47 (bad faith found where defendant's employees were not

instructed to preserve relevant records, and documents were therefore destroyed despite pre-

litigation correspondence between counsel, the filing of the complaint, service of discovery

requests by plaintiff, depositions, and the filing of a motion for preliminary injunction).[6]

---

[6] Contrary to the State's suggestion, a finding of willfulness or bad faith does not require that the "only" or "best" evidence for Defendants' case be destroyed.  *See* Opp. at 8.  In *Wm. T. Thompson* and *Computer Assocs.*, the conduct of the spoliators necessitated the finding of willfulness;  the fact that the documents destroyed were the only, irreplaceable evidence on central issues in the cases implicated the severity of sanctions.  As Nevada acknowledges, both of those courts imposed extreme sanctions—default judgment and dismissal.  Here, Defendants have extrinsic evidence regarding the contents of the destroyed documents, and therefore are asking the Court merely to "restor[e] the evidentiary balance," *see Turner*, 142 F.R.D. at 75, by entering narrowly tailored fact admissions regarding the documents.

Moreover, even if the Court were to find that Nevada's actions were merely negligent, the Court should still grant the fact admissions sought in the joint motion. *See Kelley v. United Airlines, Inc.*, 176 F.R.D. 422, 427 (D. Mass. 1997) (finding negligence sufficient for imposition of sanctions). Nevada's reliance on *Turner* is misplaced. In *Turner*, as in *Kelley*, the Court found that negligent destruction is sufficient for imposing sanctions:

> [T]his sanction should be available even for the negligent destruction of documents if that is necessary to further the remedial purpose of the inference. It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently. The adverse inference provides the necessary mechanism for restoring the evidentiary balance.

*Turner,* 142 F.R.D. at 75. In *Turner*, the court denied the requested adverse inference because there was no correlation between the fact inference sought (the brakes failed) and the spoliated documents: there was no evidence that (1) the destroyed records would have shown that there were problems with the brakes; (2) the brakes were in fact faulty; (3) the accident was caused by the bus's inability to stop; or (4) the new owner of the bus had uncovered problems with the brakes. *Id*. at 76-77. In contrast to *Turner*, here there is evidence establishing that the documents are relevant to the issues in the litigation and there is extrinsic evidence establishing the contents of the destroyed documents. *See infra*, Section IV. Defendants are not required to show more. *See Nation-Wide Check Corp.. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 218-19 (1st Cir. 1982) (finding submission of direct and circumstantial evidence sufficient to support sanction).

**IV.    DEFENDANTS' REQUESTED FACT ADMISSIONS ARE NARROWLY TAILORED TO THE DOCUMENTS NO LONGER IN THE STATE'S POSSESSION.**

Nevada incorrectly asserts that the fact admissions[7] requested are broader than the information that would have been contained in the documents.  The fact admissions are closely tied to the information that was likely contained in the documents and the natural and logical consequences of Nevada's possession and review of these documents.  Moreover, any uncertainty regarding the scope of the admissions should be resolved against the party that caused the loss of documents.  *See Turner*, 142 F.R.D. at 75 (sanctions provide "the necessary mechanism for restoring the evidentiary balance.  The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss.")

   A.    **OIG Reports**

Nevada asserts that "[k]nowledge or affirmative action such as 'considering these document in setting and/or assessing its Medicaid pharmacy reimbursement' is . . . something that could be proved through documents issued by the federal government even if they were available."  Opp. at 11.  This is nonsensical and contradicted by the testimony of Nevada Medicaid employees, who admitted that they read the OIG Reports, and, thus, were presumably knowledgeable about their contents:

>    Q.  I take it your answer would be the same if the state received an OIG or GAO report from the federal government that related to prescription drugs.  You would have ultimately seen that report. Correct?
>
>    A.  I would hope so, yes.
>
>    Q.  And if you did receive the report you would have reviewed it.  Correct?

---

[7] Contrary to Nevada's characterization in its Opposition, Defendants do not seek merely an adverse or negative inference; rather, defendants have requested that the Court enter fact admissions in the form of a preclusion order.

A.   Yes.

Squartsoff Dep. at 63-64.  Certain of these reports included specific recommendations to State

Medicaid agencies regarding drug reimbursement rates.  *See* Ex. E.30 at p.2 ("if states continue

to use a reimbursement system based on AWP, we recommend that CMS encourage states to

consider adopting a four-tiered payment in order to bring pharmacy reimbursement more in line

with the actual acquisition cost of drug products").  If State employees knew the information in

the reports regarding the differences between AWP and acquisition cost, and the specific

recommendations regarding reimbursement, then the logical inference is that these employees

considered that information in setting reimbursement rates. [8]

B.   **MacDonald Study**

Nevada does not dispute that Ms. Lawrence had Keith MacDonald's study in her

possession and does not dispute that it has been unable to produce it.  Nevada's argument that

since the document was created before 1991 it is beyond the scope of discovery is without merit.

The study was in Ms. Lawrence's possession in the 2000s, after its obligation to maintain those

documents had begun.  *See* Lawrence Dep., Vol. I at 137.  Had Nevada complied with its

preservation obligations, the study would have been produced from her files along with her other

documents.   As to the scope of the remedy, Nevada conducted a study of pharmacy drug

acquisition costs in the 1980s and then set its reimbursement rate at AWP-10%.  It did not

change that discount until 2002 when it went to AWP-15%.  Presumably, the study was a

relevant factor in Nevada's decision not to change its rate until 2002.

---

[8] The State also likely had internal correspondence and e-mail regarding the OIG Reports, which would further demonstrate Nevada's consideration of those reports, but these documents have not been produced, likely because they have been destroyed.

C.    **Communications with State Medicaid Programs**

Nevada admits that "Medicaid personnel subscribe to list servs and communicate with their counterparts in other states[,]" Opp. at 13, and that it did not retain the e-mail accounts of Ms. Squartsoff and Ms. Wright (*see supra*, at 3).  These concessions by themselves warrant the requested fact admission.  Nevada asserts that it is in the process of producing e-mails that will show Ms. Lawrence and Mr. Duarte also participated in those list-servs, but Nevada has produced no e-mails for the period January 1999 to May 2001, Mr. Duarte retained no e-mail before 2002, and Nevada's e-mail production is likely incomplete since no employee was alerted to save relevant e-mail until November 2005.  Moreover, Nevada's on-going production provides further evidence that the states shared knowledge regarding AWP.  *See* Ex. S (a March 5, 2002, e-mail to Ms. Lawrence stating that Washington State was changing its reimbursement rate to AWP-50% for multi-source drugs as a result of a recent OIG study); Ex. T (an eleven-page spreadsheet titled, "State Pharmacy Program Comparisons," listing Medicaid pharmacy reimbursement rates for other states).

Nevada asserts that "there is no evidence that [State employees] read them, let alone considered them in setting Nevada Medicaid reimbursement rates."  Opp. at 14.  But this is not true.  Nevada Medicaid employees testified that they did survey other states and used that information in evaluating and setting reimbursement rates.  *See* Lawrence Dep., Vol. I at 144 ("Q How does the state determine the appropriate method for determining estimated acquisition costs? . . .  A   We had the comparison of what other states were doing at the time . . .") (attached at Ex. R); Squartsoff Dep. at 90-91.

D.    **Communications between Medicaid and Non-Medicaid Agencies**

In asserting that Defendants cannot show such documents existed or even that such communications took place, Nevada ignores the testimony of Ms. Squartsoff and Dr. Emmanuel

Ebo (Pharmacy Director for the Division of Mental Health and Developmental Services), which definitively establishes that such communications occurred. *See* Squartsoff Dep. at 116-19; Deposition of Emmanuel Ebo, June 28, 2006, ("Ebo Dep.") at 95-97, attached at Ex. R. Moreover, Ms. Squartsoff testified that her supervisor *periodically* requested that she provide information related to the reimbursement rates of other programs. *See* Squartsoff Dep. at 91. Nevada has produced the documents Ms. Squartsoff created in 1995, but has not produced any of the other surveys that Ms. Squartsoff may have created. Since Nevada did not save Ms. Squartsoff's e-mail, electronic documents, or paper files, Defendants cannot specifically identify each of the documents. That is not Defendants' burden, but it is exactly what Nevada is asking Defendants to do. Opp. at 14. Defendants have shown that the communications occurred and that documents were created. The requested factual admission flows logically from this premise. Any uncertainty on this point should be resolved against Nevada for not maintaining the documents.[9]

      E.      **Communications with Defendants**

Nevada objects to the proposed fact admission on the grounds that it did not receive pricing letters from *all* defendants, and that it should not be presumed to have read or considered these letters. But Defendants do not assert that all manufacturers sent Nevada pricing letters. The admission sought is that Nevada received pricing information from drug manufacturers and had that information available for purposes of setting its rates. The fact that Nevada did not

---

[9] As documented in Ex. R, numerous other communications occurred between Medicaid and these other State agencies. Nevada cites the testimony of Dr. Ebo for the proposition that "he does not communicate with Medicaid regarding drug pricing and reimbursement[,]" Opp. at 15, n.18, but ignores his subsequent testimony about his e-mail exchanges with Ms. Lawrence regarding drug pricing and reimbursement and his discussions with Ms. Squartsoff regarding a proposal for his program to purchase drugs and provide them to the Medicaid program for its distribution to beneficiaries. *See* Ebo Dep. at 95-97. Similarly, Nevada cites the testimony of Nevada Public Employees Benefit Program Officer Donna Lopez that she does not work with Medicaid on drug pricing and reimbursement, but ignores the testimony of Laurie Olson, Program Manager for the Senior Rx Program, that Ms. Lopez served on the Medicaid Managed Care RFP evaluation team. *See* Deposition of Laurie Olson, May 26, 2006 ("Olson Dep."), at 39, attached at Ex. R.

change its reimbursement for the drugs for which it received actual sales prices is evidence that it would not have changed its pricing even as to the drugs for which it did not receive such data. The letters, relevant to Nevada's knowledge of how AWP is used in the industry, admittedly were received and therefore made available to the State for consideration in its reimbursement decisions.

F.     **Nevada's August 1, 2006, Production Of Electronic Documents Renders The Requested Fact Admission Regarding The Myers & Stauffer Study Uncesssary.**

At the time Defendants filed this motion, Nevada had produced few documents regarding the Myers & Stauffer study.  Nevada asserted, and in its Opposition continues to assert, that no such documents existed: "[t]here is no definitive evidence that the documents defendants want to seek ever existed."  Opp. at 12.  Nevada then asserts that this motion should be denied because Defendants cannot identify "any one document that the State did not produce."  Opp. at 12.

However, on August 1, 2006, Nevada produced to Defendants electronic documents from the files of Charles Duarte and Coleen Lawrence.[10]  Included in these files were over 1,000 documents (many of them duplicates) regarding the Myers & Stauffer study[11], including a January 11, 2003, e-mail from Charles Duarte to Michael Willden:

> In their letter, the NACDS suggest that this reduction [from AWP-10 to AWP -15] was taken without any evaluation.  For your information, we initiated this with the support of OIG as well as

---

[10] On March 29, 2006, the Court ordered Nevada to produce its electronic documents "ASAP."  Nevada did not produce any electronic documents until June 2006; it initially produced them in paper form, but as of July 31, 2006, had produced only approximately seven boxes of documents.  On August 1, 2006, it produced in electronic form 123,000 electronic files.  Nevada's production came more than a year after Defendants' request, four months after the Court's order, and four months after Defendants had taken their last deposition of a Medicaid employee.  Nevada has engaged in the very conduct it alleges in its Motion for Sanctions against Baxter (Dkt. Entry No. 2786), wherein it seeks a default judgment against Baxter.

[11] This casts doubt on Nevada's original objections to producing any electronic documents in February 2006:  (1) "[t]he information that may be obtained electronically is also likely available from other sources[,]"Opposition of the States of Nevada and Montana to Defendants' Second Motion to Compel Discovery (Dkt. Entry No. 2135) at 18; and (2) "the majority of the *relevant* information available to the States and responsive to defendants' document requests has now been produced."  *Id.* at 2.

14

> Tom Scully, CMS Medicaid Administrator.  Mr. Scully, and the
> OIG, have been urging states to increase the discount up to as high
> as 21%.  Additionally, we had our rates contractor, Myers and
> Stauffer conduct a "margin" analysis to look into the continued
> profitability of pharmacies at the 15% discount level.  I've attached
> that analysis as well.  As you can see, pharmacies remain
> profitable at this discount rate.

*See* Ex. U.

Nevada's electronic documents remove any doubt that Nevada was aware of the study and considered it as part of its 2002 rate change.  Nevada's production of the relevant documents (along with an opportunity to depose the relevant individuals) moots the requested fact admission.  It also proves, however, that Defendants were not overreaching in their requests; and, thus, demonstrates the appropriateness of the Court's entry of the other fact admissions for which Nevada will not be able to belatedly come forward with documents.

## V.   DEFENDANTS ARE PREJUDICED BY NEVADA'S DESTRUCTION OF THOUSANDS OF DOCUMENTS

Nevada's assertion that Defendants have not been prejudiced by the loss of evidence, because "no unique or critical evidence" has been lost, is simply wrong.  The State's failure to preserve documents has led to the destruction of internal communications such as the MacDonald study, the Squartsoff reimbursement assessments, the Squartsoff drug rebate binders, internal electronic communications regarding pharmacy reimbursement, and internal discussions relating to government reports.  These documents were "unique" to Nevada and their destruction deprives Defendants of important evidence supporting the State's knowledge regarding AWP. The loss from the State's files of the OIG Reports, CCH, and other federal reports[12] central to this case and attached to Exhibit E also constitutes the loss of documents that are "unique" in the sense that Nevada's mere possession of them would have further established receipt and

---

[12] Nevada's statement that these documents are available from other sources misses the point; it is the State's possession and consideration of them that is at issue.

consideration of these documents and prevented witnesses from hedging regarding their contents. Despite Nevada's suggestion, these documents are also important to Defendants' case as they provide additional, powerful support to the fact that Nevada knew that AWP was not based on market prices.  Finally, Defendants have been prejudiced by the destruction of countless documents that they are unable to identify due to the lengthy period during which Nevada destroyed relevant documents.

*Respectfully submitted,*

___/s/   Carisa A. Klemeyer_____
John T. Montgomery (BBO# 352220)
Brien T. O'Connor (BBO# 546767)
Christopher R. Dillon (BBO# 640896)
Ryan M. DiSantis (BBO# 654513)
Carisa A. Klemeyer (BBO# 655045)
ROPES & GRAY LLP
One International Place
Boston, MA  02110
(617) 951-7000

*Attorneys for Schering-Plough Corp. &*
*Warrick Pharmaceuticals Corp. on behalf*
*of the Defendants in Nevada II*

Dated:  August 14, 2006

## CERTIFICATE OF SERVICE

I, Carisa A. Klemeyer, hereby certify that a true copy of the foregoing document was served upon all counsel of record in Nevada I and Nevada II electronically pursuant to Fed. R. Civ. P. 5(b)(2)(D) and CMO No. 2 on this 14th day of August, 2006, by causing a copy to be sent to LexisNexis File & Serve for posting and notification to all counsel of record.

                                    /s/   Carisa A. Klemeyer