# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL CLASS ACTIONS | Judge Patti B. Saris |

## PLAINTIFFS' RESPONSE TO THE TRACK TWO DEFENDANTS' SUBMISSION REGARDING THE MEANING OF AWP

# TABLE OF CONTENTS

**PAGE**

I.     INTRODUCTION ........................................................................................................1

II.    FIRST CIRCUIT LAW MANDATES THAT THE COURT
CONTSTRUE THE MEANING OF AWP AS A MATTER OF LAW.............................2

III.   THE COURT SHOULD APPLY THE PLAIN MEANING RULE ...................................3

    A.     Defendants Ignore Plenary First Circuit Law ..........................................................3

    B.     The Track 2 Defendants' Construction Is Illogical And Contrary To Law.............7

          1.     AWP's plain meaning is workable ..............................................................7

          2.     The absence of a statutory definition and detailed implementing
regulations supports application of the plain meaning rule .........................8

          3.     There is simply no evidence that Congress intended AWP to be
anything other than an actual average............................................................9

          4.     Defining AWP within the former Medicare regime will not
adversely impact Medicaid programs ........................................................13

IV.   THE TRACK 2 DEFENDANTS' "KNOWLEDGE" ARGUMENT
IS A RED HERRING ...................................................................................................13

V.    THE TRACK 2 DEFENDANTS' DUE PROCESS ARGUMENT
IS UNSUPPORTED .....................................................................................................17

VI.   CONCLUSION.............................................................................................................19

001534-16  123235 V1

# TABLE OF AUTHORITIES

## CASES

**PAGE**

*In re Aiken*,
    133 B.R. 258 (D. Me. 1991) ...................................................................................2

*Aspinall v. Philip Morris Cos., Inc.*,
    442 Mass. 381, 813 N.E.2d 476 (2004) ........................................................15, 16

*In re Bajgar*,
    104 F.3d 495 (1st Cir. 1997) ...............................................................................4

*Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.*,
    464 U.S. 89 (1983) .............................................................................................2

*Crowe v. J.P. Bolduc*,
    365 F.3d 86 (1st Cir. 2004) ...............................................................................18

*In re Hart*,
    328 F.3d 45 (1st Cir. 2003) ...............................................................................4

*Hershenow v. Enterprise Rent-A-Car Co.*,
    445 Mass. 790, 840 N.E.2d 526 (2006) ............................................................17

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989) .............................................................................18

*Laracuente v. Chase Manhattan Bank*,
    891 F.2d 17 (1st Cir. 1989) ...............................................................................3

*Leardi v. Brown*,
    394 Mass. 151, 474 N.E.2d 1094 (1985) ..........................................................15

*Levings v. Forbes & Wallace, Inc.*,
    8 Mass. App. Ct. 498, 396 N.E.2d 149 (1979) .................................................15

*In re Lupron Mktg. & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) ..............................................................10

*Marbury v. Madison*,
    5 U.S. 137 (1803) ..............................................................................................2

*Massachusetts v. Blackstone Valley Elec. Co.*,
    67 F.3d 981 (1st Cir. 1995) ............................................................................6, 7

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
 366 Mass. 593, 321 N.E.2d 915 (1975) ..........................................................................15

*In re Pharm. Indus. Average Wholesale Price Litig.*,
 263 F. Supp. 2d 172 (D. Mass. 2003) ..............................................................................2

*Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*,
 324 U.S. 806 (1945).........................................................................................................18

*Purity Supreme, Inc. v. Attorney Gen.*,
 380 Mass. 762, 407 N.E.2d 297 (1980) ..........................................................................15

*Rhode Island v. Narragansett Indian Tribe*,
 19 F.3d 685 (1st Cir. 1994)...............................................................................................2

*Sprint Spectrum, L.P. v. Town of Ogunquit*,
 175 F. Supp. 2d 77 (D. Me. 2001) ...................................................................................2

*Tagliente v. Himmer*,
 949 F.2d 1 (1st Cir. 1991)..........................................................................................16, 17

*Textron Inc. v. Comm'r*,
 336 F.3d 26 (1st Cir. 2003).............................................................................................7

*United States v. Lachman*,
 387 F.3d 42 (1st Cir. 2004)............................................................................4, 5, 7, 18

*United States v. Thompson*,
 32 F.3d 1 (1st Cir. 1994)...........................................................................................4, 9

## STATUTES

940 C.M.R. § 3.04....................................................................................................................15

940 C.M.R. § 3.05(1) ..............................................................................................................15

42 C.F.R. § 415.36...................................................................................................................10

## MISCELLANEOUS

*Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value
 Unit Under the Physician Fee Schedule for Calendar Year 1999*,
 63 Fed. Reg. 58814 (Nov. 2, 1998).......................................................................................8

*Medicare Program; Fee Schedule for Physicians' Services*,
    56 Fed. Reg. 25800 (June 5, 1991) ...................................................................11, 12

*Medicare Program; Fee Schedule for Physicians' Services*,
    56 Fed. Reg. 59525 (Nov. 25, 1991)................................................................10, 12, 13

*OIG Compliance Program Guidance for Pharmaceutical Manufacturers*,
    68 Fed. Reg. 23731 (May 5, 2003) ...........................................................................5

H.R. Rep. 108-178(II), 108th Cong. (July 15, 2003).......................................................5

001534-16  123235 V1

# I.     INTRODUCTION

Both Plaintiffs *and* the Track 1 Defendants have agreed that it is the Court's province to define AWP within the context of the Medicare Part B program.  After voluminous briefing on this issue, after the Court held the Track 1 summary-judgment hearing, and after the Court has indicated that it will "statutorily define AWP" for Classes 1 and 2 (as it should),[1] the Track 2 Defendants now claim that the Court should not construe the meaning of AWP.  Indeed, the Track 2 Defendants have submitted perhaps the most preposterous brief yet filed in this case, claiming that First Circuit precedent prohibits the Court from defining AWP within the Medicare Part B program, that doing so now will violate the Track 2 Defendants' unspecified constitutional rights and "throw the nation's healthcare system into turmoil" (even though Medicare no longer uses the AWP benchmark).  In the alternative, the Track 2 Defendants argue that, because Congress chose not to define AWP, "that is the way the statute must remain" – in other words, like the Track 1 Defendants, these Defendants offer no definition of AWP leaving them free to manipulate AWP as they see fit.  The Court should quickly reject the Track 2 Defendants' apocalyptic cries.

Defendants are in desperate straits.  If the Court adopts a definition of AWP that differs in any way from Defendants' "AWP meant whatever we wanted it to mean" non-definition, then a liability finding is ever so close because Defendants will not be able to defend their practice of creating giant spreads on the Subject Drugs.  Consequently, the defense strategy of claiming that Congress intended AWP to have no meaning is understandable, yet does not withstand scrutiny.  Looking past Defendants' desperation and focusing intently on the proper case law demonstrates

---

[1] *See* July 6, 2006, Hearing Transcript at 52.

that not only should the Court define AWP, it should do so by applying the plain meaning of those words as Congress intended the Court to do.

## II.     FIRST CIRCUIT LAW MANDATES THAT THE COURT CONSTRUE THE MEANING OF AWP AS A MATTER OF LAW

The Track 2 Defendants demand that the Court not construe the Medicare statute and regulations, Defs. Br. at 4, yet it is the duty of the Court to do so.  The Plaintiffs and the Track 1 Defendants have urged the Court to construe the meaning of AWP as a matter of law.  This was clear from the Track 1 summary-judgment briefing and affirmed during the Court's Track 1 summary-judgment hearing.[2]  Indeed, early in the litigation the Court recognized that its duty is to interpret the meaning of AWP as that phrase is used in the regulatory scheme.  *See*, *e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F. Supp. 2d 172, 180-81 (D. Mass. 2003) ("*In re AWP*") (observing that it is the Court's duty to engage in the "heartland task of construing statutory language"); *see also Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 98 n.8 (1983) (observing that "deciding what a statute means" is "the quintessential judicial function") (quoted with approval in *In re AWP*); *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  And statutory construction is clearly a matter of law.  *See*, *e.g.*, *Sprint Spectrum, L.P. v. Town of Ogunquit*, 175 F. Supp. 2d 77, 89 (D. Me. 2001) ("statutory construction is a matter of law") (quoting *Home Builders Ass'n of Me., Inc. v. Town of Eliot*, 750 A.2d 566 (Me. 2000)); *In re Aiken*, 133 B.R. 258, 259 (D. Me. 1991) ("Questions of statutory construction are questions of law."); *see also Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 698-99 (1st Cir. 1994) (Court engaged in statutory construction and noted that "[i]n the

---

[2] *See, e.g.,* May 23, 2006, Hearing Transcript at 28 ("All right, I do think it's appropriate for me, and I think both sides are urging me to do that, to define AWP as a matter of law.  And both sides, one wants it as a term of art which reflects just what the report says; one says I should do it sort of based on plain language.  That is for me.  That I will do.").

game of statutory interpretation, statutory language is the ultimate trump card"; only a "'clearly expressed legislative intention' contrary to [the statutory] language . . . would require [the court] to question the strong presumption that Congress expresses its intent through the language it chooses" ) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987)); *Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 23 (1st Cir. 1989) (construing meaning of statute as a matter of law and noting that "in the absence of a clearly expressed legislative intention to the contrary, the plain language of the statute is conclusive").

Moreover, the Court should not defer this task of statutory construction, because deferral will impair the efficient conduct of the upcoming trials. *Cf.* Fed. R. Civ. P. 1 ("[These rules] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."). This is simply an issue that must be decided before trial so that the jury has a proper standard against which to measure Defendants' conduct; it is not for the jury to decide what AWP means within the Medicare regime. It is also an issue that should be decided before the November Class 2 trial. Without the Court's prior ruling on the definition, it will be unclear to the parties what proof will be required at trial, *i.e.*, whether proof will conform to a statutorily defined AWP or a market expectation theory. The difference in proof and witnesses that must be offered under different definitions is significant.

### III.    THE COURT SHOULD APPLY THE PLAIN MEANING RULE

### A.    Defendants Ignore Plenary First Circuit Law

The Track 2 Defendants declare that First Circuit law precludes a definition of AWP based on the plain meaning rule. Defs. Br. at 7-9. Defendants radically misconstrue First Circuit law.

The First Circuit has spoken strongly about the primacy of the plain meaning rule. "Where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it

according to its terms.'"  *In re Bajgar*, 104 F.3d 495, 497 (1st Cir. 1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters.'"  *Id.*; *In re Hart*, 328 F.3d 45, 49 (1st Cir. 2003); *see also United States v. Lachman*, 387 F.3d 42, 50-51 (1st Cir. 2004) ("if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written"); *United States v. Thompson*, 32 F.3d 1, 5 (1st Cir. 1994) ("When interpreting a statute, it is axiomatic that a court must first look to the plain words and structure of the statute" and "accord[] words in common usage their ordinary meaning.").

"Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations."  *Lachman*, 387 F.3d at 51.  As Plaintiffs have explained, dictionaries show that "average" has a definite meaning as a mean proportion, and that "wholesale price" refers to the price that a retailer pays in expectation of reselling to its customers at a higher price in order to make a profit.  *See* BLACK'S LAW DICTIONARY at 135 and 1597 (6th ed. 1990); AMERICAN HERITAGE DICTIONARY at 144 (2d ed. 1991).  Importantly, the absence of legislative history should not be used to interpret a statute or guideline in a manner inconsistent with its plain language.  *Thompson*, 32 F.3d at 5 n.3.  And in evaluating different definitions when applying the plain meaning rule, the Court should adopt the definition most consistent with the statute's purpose.  *Lachman*, 387 F.3d at 51.[3]  Defendants violate these maxims in arguing that Congress intended AWP to have no meaning.  As Plaintiffs have

---

[3] Courts also construe a regulation in light of the congressional objectives of its underlying statute.  *Id.* at 52.  Thus, over defendants' objections that "specially designed" was a technical term of art derived from agency custom and usage, the First Circuit in *Lachman* applied the plain meaning of the terms consistent with the "central purpose" of the statute to protect national security and found that the regulation included controls designed to be used with regulated commodities even though they are also capable of use with non-regulated items.  *Id.* at 52-53.

demonstrated and do so again below, Congress always intended that reimbursement for Part B

drugs be tied to estimated acquisition cost, and Congress certainly did not intend to reimburse

drugs at inflated prices.

In support of the "technical term of art" interpretation of AWP, Defendants decry a plain

meaning definition that "no one has ever acknowledged" and that would be crafted "for the first

time ever," Defs. Br. at 9, yet these assertions are patently untrue in light of the evidence already

presented to the Court.  For example, the House of Representatives has acknowledged that

"AWP is intended to represent the average price used by wholesalers to sell drugs to their

customers;"[4] Thomas A. Scully, former Administrator of CMS, testified to Congress that "AWP

is intended to represent the average price at which wholesalers sell drugs to their customers,

which include physicians and pharmacies;"[5] and OIG Guidelines emphasize the requisite

accuracy of Defendants' price reporting for reimbursement purposes, including the inclusion of

price reductions in those reported prices.[6]  Moreover, plain meaning is eschewed in favor of a

"technical term of art" only when the statute or regulation "adopted a well-accepted and pre-

existing legal understanding of the term . . ."  *Lachman*, 387 F.3d at 53.  In light of the H.R.

Report, the Scully testimony, the OIG Guidelines and other evidence before the Court,

Defendants fall far short of shouldering the burden of demonstrating a well-accepted and pre-

existing legal understanding of AWP that trumps its plain meaning in favor of Defendants'

proffered definition of grossly inflated prices.

---

[4] H.R. Rep. 108-178(II), 108th Cong. (July 15, 2003) at 197.

[5] *See* March 14, 2002, Testimony of Thomas A. Scully on Reimbursement & Access to Prescription Drugs under Medicare Part B, Senate Finance Committee, Subcommittee on Health at 5, attached as Exhibit B to the Declaration of Steve W. Berman in Support of Plaintiffs' Motion for Partial Summary Judgment Against All Track 1 Defendants.  *See also id.* at 2-3 ("Medicare beneficiaries, through their premiums and cost sharing, and U.S. taxpayers, are spending far more ***than the 'average' price that we believe the law intended them to pay***.") (emphasis added).

[6] *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg. 23731, 23733-734 (May 5, 2003).

- 5 -

Defendants have no answer to Plaintiffs' authorities.  Defendants' lone case citation, *Massachusetts v. Blackstone Valley Elec. Co.*, 67 F.3d 981 (1st Cir. 1995), does not support Defendants' position.  In passing CERCLA, Congress directed the Administrator of the Environmental Protection Agency ("EPA") to promulgate and revise regulations designating "hazardous substances" subject to CERCLA.  The EPA subsequently codified a consolidated list of hazardous substances into a list known as "Table 302.4."  Many of the substances found in Table 302.4 resulted from regulations that the EPA implemented, after a public notice and comment period, under the Clean Water Act, including the category "cyanides."  Although "cyanides" was a general category, the substance at issue in the case – ferric ferrocyanide or "FFC" – was not specified.  *Id.* at 984.

In moving for summary judgment, the Commonwealth of Massachusetts claimed that FFC fell within the plain meaning of the term "cyanides" in Table 302.4, and the Court had before it conflicting expert declarations as to whether FFC was in fact a cyanide.  *Id.* at 985.  In light of the clear record of Congressional deference to the EPA to compile Table 302.4, the history of the EPA's formal rulemaking procedures used to determine inclusion in Table 302.4 and its amicus brief arguing that whether FFC should be included is a decision left to the EPA, and considerable doubt about whether FFC should be included as a "cyanide" in Table 302.4 given that it was a non-toxic substance, the First Circuit invoked the doctrine of primary jurisdiction and referred the matter to the EPA for a rulemaking determination of whether FFC was a "cyanide" covered by Table 302.4.  *Id.* at 991-92.

*Blackstone* is obviously a world apart from the instant case.  The subject matter was highly technical and marked by legitimate scientific debate – just the sort of evaluation that an administrative agency with expertise should handle, and not a court.  As the First Circuit

- 6 -

emphasized, "[t]he judicial machinery is ill-suited to fashioning a workable rule for determining whether the substance FFC by virtue of its chemical, structural, functional, or other qualities, falls within the properly conceived definition of 'cyanides.'" *Id*. at 992. *Blackstone* thus falls within that category of cases refusing to apply the plain meaning rule to highly technical areas.

In contrast, determining the meaning of AWP is not a highly complex, technical exercise. It does not involve differentiating between chemical ions, the task confronting the court in *Blackstone*. In sum, as Plaintiffs explained in their Reply Memorandum in Support of Partial Summary Judgment Against All Track 1 Defendants at pages 9-10, if courts can apply the plain meaning rule to specialized areas such as national security[7] and the tax code,[8] it can certainly do so here. The Track 2 Defendants, like the Track 1 Defendants before them, are unwilling and unable to distinguish Plaintiffs' authorities.

The rule that Defendants really seek to create is that, when Congress elects not to define words in a statute, Congress intended them to have no meaning. Defendants' construction is absurd and should be quickly rejected.

**B.      The Track 2 Defendants' Construction Is Illogical and Contrary to Law**

**1.      AWP's plain meaning is workable**

Defendants next argue that it is too difficult to apply the plain meaning rule and that Congress could not have intended to do so. Defs. Br. at 9-12. This is nonsense. Again, there is no evidence that Congress ever intended anything but the plain meaning of the words "average wholesale price" to apply. Defendants claim that it is unworkable, Defs. Br. at 9-10, but

---

[7] *Lachman*, 387 F.3d at 50-51 (employing standard English dictionaries to interpret the plain meaning of "specially designed" as used in regulation enacted under the Export Administration Act to ensure that, among other things, the strategic commodity at issue – which could be suitable for use in rocket components and ballistic missiles – was not sold to Communist Bloc countries).

[8] *Textron Inc. v. Comm'r*, 336 F.3d 26, 31 (1st Cir. 2003) (applying plain meaning rule over IRS's own interpretation of its regulation to define the meaning of "nonmember" in the context of an affiliated group of corporations).

Plaintiffs have already dispensed with such arguments.  There is nothing ambiguous about "wholesale," as Defendants would have us believe.  Neither the House of Representatives nor former CMS Administrator Scully found the word "wholesale" ambiguous when acknowledging that AWP was intended to represent the average price used by wholesalers to sell drugs to their customers, which included physicians and pharmacies.  Nor does Congress's silence as to time frame render the Court powerless to interpret AWP; it is wholly reasonable to take a "prevailing" approach, that is, prices prevailing at any given time or as otherwise defined in later regulations.  The Court is empowered to employ ordinary common sense, as did HCFA when it clarified that AWP meant a national average.  *See Medicare Program; Revisions to Payment Policies and Adjustments to the Value Unit Under the Physician Fee Schedule for Calendar Year 1999*, 63 Fed. Reg. 58814, 58849 (Nov. 2, 1998).[9]

> **2.    The absence of a statutory definition and detailed implementing regulations supports application of the plain meaning rule**

Defendants also attempt to justify abandonment of the plain meaning rule by pointing to precise definitions in the AMP and Best Price Medicaid programs and the new Medicare ASP regime, declaring that "Congress knows how to supply details and specific calculation instructions" and that "[s]ince Congress chose to import into its statute the term 'average wholesale price' without a specific definition or calculation, that is the way the statute must remain."  Defs. Br. at 11.  But Defendants have it backwards:  the plain meaning rule is ***the default***.  When Congress intends something ***other*** than the plain meaning rule to apply, it then provides a different definition.  Thus, the lack of Congressional definition, coupled with HCFA's decision not to specify a definition beyond the plain meaning of the phrase in implementing

---

[9] Plaintiffs also note that the very questions that Defendants invoke as to timing and distribution channels remain unanswered under Defendants' own proffered "non-definition" of AWP.

regulations, demonstrates that Congress intended the plain meaning of AWP to apply.  Indeed,

Defendants' argument proves too much:  the very fact that Congress chose to define AMP, Best

Price and ASP in other regimes demonstrates that, in choosing not to define AWP, Congress

intended the plain meaning of those words to apply.

### 3.   There is simply no evidence that Congress intended AWP to be anything other than an actual average

Defendants next conjure up the fiction that Congress and HCFA fully intended AWP to

be inflated "to accomplish the legislative intent of properly paying providers so they voluntarily

participate in the federal and state programs."  Defs. Br. at 12.  ***Defendants cannot and do not
cite to a single piece of reliable evidence demonstrating any such Congressional intent***.  To the

contrary, the reams of evidence on this issue show quite clearly that Congress intended that

Medicare not overpay for drugs or, for that matter, any other service.

Defendants have argued that, before Congress adopted AWP in the statute in 1997,

HCFA had previously intended AWP to be inflated and that Congress merely adopted that intent.

First, under the proper rules of statutory construction and the plain meaning rule discussed

above, the Court cannot conclude from Congressional silence such intent – one that is utterly at

odds with Congressional intent to control Medicare spending.[10]  Under Defendants'

interpretation, Congress cared not what the government would spend on drugs under Medicare

Part B – which Congress intended to create a system that had no control on expenditures and the

money that providers and drug companies could make at the expense of taxpayers.  As Plaintiffs

pointed out in their post-hearing submission in response to the Track 1 Defendants' post-hearing

brief, other federal drug reimbursement schemes expressly intend the federal government to pay

---

[10] *See Thompson*, 32 F.3d at 5 n.3 (the absence of legislative history should not be used to interpret a statute or guideline in a manner inconsistent with its plain language).

less than the usual cost for the drug sold, including the 340B program, the Veterans'

Administration ("VA") program, and the Medicaid "best price" and rebate regime.  In all of

these contexts, the government intended to pay less than the market rate.  When Congress

adopted the 95% of AWP formula, it was implementing what it intended to be a savings measure

(as HCFA had previously), even if that pricing mechanism would not yield the same magnitude

of savings as, for example, the VA program.  Indeed, various sections of Medicare Part B, as

well as Part A, reveal painstaking efforts by Congress to achieve administratively efficient

methods by which to reimburse, but not overpay, providers and suppliers.  As Judge Stearns

recognized, "by setting the Medicare reimbursement rate below the AWP, Congress took a

tentative step towards using Medicare's purchasing power as a means of driving down the cost of

prescription drugs to the Medicare program."  *In re Lupron Mktg. & Sales Practices Litig*., 295

F. Supp. 2d 148 (D. Mass. 2003).  The Track 2 Defendants have no answer to this cogent

argument.

  Second, Defendants have repeatedly misrepresented HCFA's reliance on AWP prior to

Congress's 1997 adoption of the metric.  As the Court has recognized, AWP appeared in the

regulatory regime for the first time in 1991, when HCFA promulgated the regulation found at 42

C.F.R. § 415.36 (Payment for drugs incident to a physician's service) to base payment for drugs

under Medicare Part B on the lower of the national AWP or the Medicare carrier's estimate of

actual acquisition costs.  *See Medicare Program; Fee Schedule for Physicians' Services*, 56 Fed.

Reg. 59525 (Nov. 25, 1991) (relevant excerpts attached as Ex. A to the Declaration of Steve W.

Berman in Support of Plaintiffs' Response to the Track Two Defendants' Submission Regarding

the Meaning of AWP ("Berman Decl.")).  As HCFA explained in first proposing a variant of

what would eventually become this final rule, in creating the Medicare Program in 1965,

Congress "established the principles of reasonable charge payment for physicians' services and certain other services under part B." *Medicare Program; Fee Schedule for Physicians' Services*, 56 Fed. Reg. 25800 at 12 (June 5, 1991) (relevant excerpts attached as Ex. B to the Berman Decl.).  Furthermore, HCFA recognized that "Medicare policy, since the beginning of the Medicare program, has been to base payment for 'incident to' drugs on the estimated acquisition costs." *Id*. at 25.  The general practice had been for carriers to base payment on the "***physician's estimated cost of the drug using one of the wholesale price guides such as the Red Book***" although "some carriers base[d] payment on actual acquisition costs determined on the basis of carrier surveys."  *Id*. at 24-25 (emphasis added); *see also id*. at 124 ("As explained in section IV.A.5.c., carriers generally base payment for covered drugs on the physician's estimated cost of the drug using one of the wholesale price guides such as the Red Book, which is an annual pharmacists' reference published by the Medical Economics Company, Inc., Oradell, New Jersey").  Thus, from the very beginning HCFA linked the AWPs published in the *Red Book* with the physician's estimated cost of the drug and not some inflated figure divorced from actual costs as Defendants would have the Court believe.

This theme is further evident from subsequent comments that HCFA made in the June 5, 1991 Federal Register.  For instance, HCFA was evaluating several options for paying for drugs in the future and elected to "[m]ake a separate payment for a drug but require a consistent method in pricing to be used by the carriers."  *Id*. at 25.  Concluding that it was impractical to include drugs in a fixed fee schedule given the large number of different drugs and the myriad of dosage levels, and seeking greater consistency in how drugs are paid for under the program, HCFA proposed that payment be based on 85% of AWP as published in the *Red Book* and similar price listings.  *Id*.  HCFA proposed 85% of AWP because two OIG studies cited evidence

- 11 -

that pharmacies were able to purchase drugs at less than the published AWPs and that HCFA

"ha[d] no reason to believe prices paid by physicians [we]re any higher than pharmacies pay."

*Id*.  HCFA further explained that it proposed this limit under statutory authority to establish

limits on charges based on "inherent reasonableness" so that a charge is not "grossly lower than

or in excess of acquisition or production costs for the item or service," *id.*, and expected that the

change would result in a savings well over $100 million in the ensuing five years.  *Id*. at 124.

This again reinforces the view that HCFA expected drug reimbursements to be tied to actual

physician costs.[11]

    The final regulation that HCFA issued in 1991 differed from this proposed regulation.

Instead of basing reimbursements on 85% of AWP, the final regulation based payment on the

lower of the national AWP or the Medicare carrier's estimate of actual acquisition costs.  56 Fed.

Reg. 59525 at 20 (Nov. 25, 1991) (attached as Ex. A to the Berman Decl.).  Estimated

acquisition costs would be determined based on surveys of actual invoice prices paid by the

providers furnishing the drug.  *Id*.  HCFA referenced the many comments that it had received,

primarily from oncologists, stating that the proposed 85% discount from AWP was

"inappropriate" since many drugs were not discounted and that individual physicians could not

receive the discounts that large pharmacies would be eligible to receive.  *Id*. at 56.  It also noted

the "bulk of comments" suggesting that amounts paid should be based on actual or estimated

acquisition costs; HCFA responded to these by calling on the Medicare carriers to conduct

surveys of a sampling of physicians.  *Id*. at 56.  Further debunking the myth advanced by

Defendants' that HCFA was knowingly overpaying for drugs, HCFA estimated that this change

---

[11] And defeating the notion advanced by Defendants that the government knowingly and purposefully overpaid for drugs to make up for costs of administration, HCFA noted that "[p]ayment for both the cost of non-drug supplies and administration of the drug would be included in the payment for the visit or other service."  *Id.* at 26.

- 12 -

would garner $75 million in savings over the following five years.  *Id*. at Part II, p. 98.[12]  In sum,

even before Congress adopted AWP into the statutory scheme in 1997, HCFA had linked AWP

to estimated acquisition costs and not some nebulous and inflated metric crafted by Defendants.

### 4. Defining AWP within the former Medicare regime will not adversely impact Medicaid programs

Defendants also attempt to scare the Court into declining to define AWP because "the

Court would be impermissibly intruding into the decision by all the state legislatures and

interfering with the administration of the state Medicaid programs. . . ."  Defs. Br. at 12.  But

Plaintiffs are not asking the Court to define AWP within the context of any state Medicaid

program, only the Medicare program prior to its change to the ASP system.  Thus, there is no

chance that the Court's decision could "disrupt[] public health programs nationwide" or "inject

chaos into the public health system" including Medicaid as Defendants' claim.  Defs. Br. at 12,

14.

### IV. THE TRACK 2 DEFENDANTS' "KNOWLEDGE" ARGUMENT IS A RED HERRING

Claiming that the government and private payers knew that AWP did not signal actual

acquisition costs, the Track 2 Defendants argue that the Court does not need to discern the

meaning of AWP because Plaintiffs will be unable to establish deception under state consumer

protection acts.  Defs. Br. at 4-7.  In other words, Defendants want summary judgment on

causation grounds before the Court defines AWP.  But Defendants "put the cart before the

horse."  ***The Court needs to define AWP as used in the Medicare program so that a standard is***

***established against which to judge whether Defendants committed unfair or deceptive acts***.

---

[12] And further defeating Defendants' unsupported theory that the government knowingly and purposefully overpaid for drugs to make up for costs of administration, HCFA, in responding to comments that physicians would not be compensated for actually administering the drug injections, explained that "we have decided to pay separately for cancer chemotherapy injections, including intra-muscular, intravenous, intra-arterial, and subcutaneous injections, in addition to the visit furnished on the same day."  *Id*. at 57.

Furthermore, Defendants' challenge based on purported "knowledge" issues is not even relevant to liability.  As the Court properly recognized during the May 23 summary-judgment hearing, varying levels of knowledge amongst the members of Class 1 or Class 2 are not relevant to the liability determination where a statutory mandate exists basing reimbursements on AWP.  *See*, *e.g.*, May 23, 2006 Hearing Trans. at 19-20.  Other courts in AWP litigation agree.  For example, after a lengthy evidentiary hearing and extensive briefing, the Honorable Joseph C. Visalli of the New Jersey Superior Court granted the plaintiff's motions *in limine* to bar evidence of purported insurer and government knowledge from the trial of plaintiff's claims of AWP inflation for Lupron in *Walker v. TAP Pharmaceutical Prods., Inc.*, Case No. CPM L-602-1.  In the State of New York's AWP case on behalf of consumers and the State Medicaid program, the court recently found that purported state agency knowledge that AWPs were not actual prices was irrelevant because reimbursement was "based solely upon statutory formulae over which the agencies have no discretion or control."  *New York v. Pharmacia et al.*, RJI No. 01-03-076343, Decision and Order at 6 (N.Y. Sup. Ct. Albany County July 19, 2006) (attached as Ex. C to the Berman Decl.); *see also id.* at 7 ("[E]vidence that the Legislature and state agencies knew that the reported 'average wholesale prices' were inaccurate and when they knew it is not relevant herein.").  The same conclusion obtains for the Class 1 consumers and Class 2 TPPs who made statutory-based payments.

And these rulings are consistent with the tests for unfairness and deception under consumer laws.  For instance, varying levels of sophistication and knowledge amongst TPPs are not relevant to deciding whether Defendants have committed unfair or deceptive acts or practices in violation of Chapter 93A.  An act or practice is ***unfair*** if it (i) is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (ii) is immoral,

unethical, oppressive or unscrupulous; and (iii) causes substantial injury to consumers, competitors or other business people. *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596, 321 N.E.2d 915 (1975) (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972)). Whether a given practice runs afoul of these touchstones must be determined from the circumstances of each case. *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504, 396 N.E.2d 149 (1979). These inquiries necessarily focus on the defendants' conduct, and not the conduct of the plaintiff.

An act or practice is ***deceptive*** if it possesses a capacity or tendency to deceive the general public. *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381, 396, 394, 813 N.E.2d 476 (2004); *Leardi v. Brown*, 394 Mass. 151, 156, 474 N.E.2d 1094 (1985).[13] This standard includes "'that vast multitude which includes the ignorant, [the] unthinking, and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions.'" *Aspinall*, 442 Mass. at 395 (quoting *Beneficial Corp. v. FTC*, 542 F.2d 611, 618 n.11 (3d Cir. 1976)). Importantly, the standard for deception is an ***objective*** one that does not depend on an inquiry into the individual circumstances of each class member. In *Aspinall*, a false advertising case under Ch. 93A challenging Philip Morris's representations that "light" cigarettes delivered "lowered tar and nicotine," defendants urged causation inquiries into each

---

[13] *See also* 940 C.M.R. § 3.04 ("No claim or representation shall be made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value or the past, present, common or usual price of a product, or as to any reduction in price of a product, or any saving relating to a product."); 940 C.M.R. § 3.05(1) ("No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect."). These Attorney General regulations have the force of law, and violations of them constitute violations of G.L. ch. 93A. *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 775, 407 N.E.2d 297 (1980). "In determining whether an act or practice is deceptive, 'regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have upon the general public.'" *Leardi*, 394 Mass. at 156 (quoting *P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950)). The plaintiff need not prove that the defendant intended to deceive the plaintiff. *Aspinall*, 442 Mass. at 394. Nor is proof of reliance required, or even knowledge on the part of the defendant that the representation was false. *Id.*

- 15 -

smoker's individual smoking habits.  442 Mass. at 393-94.  The court rejected this assertion, explaining that "[w]hether conduct is deceptive is initially a question of fact, *to be answered on an objective basis and not by the subjective measure argued by the defendants*."  *Id*. at 394 (emphasis added).  Thus, the capacity or tendency to deceive test focuses on the effect that the challenged practice may reasonably be expected to have *on the general public*.  *Id*.[14]

The tests for unfairness and deception under consumer laws do not turn on the knowledge inquiry advanced by Defendants.  Whether Defendants committed unfair or deceptive acts or practices in violation of Ch. 93A will turn on evidence that is common to all class members and not on an inquiry into the idiosyncratic and subjective knowledge of class members.  The focus of this inquiry will be on Defendants' reporting of inflated WACs and AWPs, the calculation of Defendants' real ASPs, and Defendants' promotion of the spreads created at the expense of the Classes.  The entire Medicare Part B reimbursement landscape was infected by Defendants' misrepresented AWPs; this is the impact on the general public that Chapter 93A seeks to remedy. Whether a particular consumer or TPP was sufficiently sophisticated to realize the full extent of the secret spreads at issue here is therefore not the proper inquiry in making the unfair or deceptive determination under Ch. 93A, notwithstanding the fact that there is no evidence that consumers or TPPs ever had such a realization.

Defendants' citation to *Tagliente v. Himmer*, 949 F.2d 1 (1st Cir. 1991), does not help them.  It was not a case involving market-wide misrepresentations but, instead, involved a

---

[14] Turning next to the issues of class injury, the Court explained that an appropriate model under Ch. 93A encompasses demonstrating that, as a result of defendants' deception, all consumers paid more than they otherwise would have.  *Id*. at 398-99.  And the Court carefully differentiated between proving actual injury and individual damages, commenting that the two concepts should not be confused.  *Id*. at 402.  Injury can be demonstrated via common impact, even if individual damages are more complex:  "Difficult issues with respect to determining the appropriate amount of actual or statutory damages to be awarded in a class action, or potential difficulties with the distribution of the aggregate damages award, do not preclude class certification when all other requirements are met."  *Id*.

transaction between a landowner and real estate developer for the purchase of land where the court found that opinions and puffery rendered while marketing the land did not rise to the level of misrepresentations or unfair or deceptive actions, especially since it was obvious that wetlands were part of the property.  *Id*. at 7-8.  The court did not establish any standards under Chapter 93A relating to inquiries into the knowledge of consumers in the marketplace.  Likewise, *Hershenow v. Enterprise Rent-A-Car Co.*, 445 Mass. 790, 840 N.E.2d 526 (2006), also cited by Defendants, did not establish any standards for deception but, rather, addressed general causation principles under Chapter 93A.[15]

Lastly, even if government, consumer and TPP knowledge is relevant to the unfair or deceptive inquiry under Chapter 93A, Plaintiffs have demonstrated in previous briefing that the federal government was not aware of, and did not condone, Defendants' actions in creating and marketing spreads.  *See* Plaintiffs' Memorandum in Opposition to Track 1 Defendants' Joint Motion for Summary Judgment at 10-28; Plaintiffs' Reply Memorandum in Support of Motion for Partial Summary Judgment Against All Track 1 Defendants at 18-22; Plaintiffs' Memorandum in Response to Defendants' Unauthorized Post-Hearing Submissions Regarding the Meaning of AWP at 4-8.  Plaintiffs will not repeat those arguments here and instead incorporate that briefing by this reference.

## V.   THE TRACK 2 DEFENDANTS' DUE PROCESS ARGUMENT IS UNSUPPORTED

The Track 2 Defendants close their brief with an ill-defined due process argument that, if the Court adopts the plain meaning of AWP, the Track 2 Defendants will be deprived of their

---

[15] In *Hershenow*, the court sustained summary judgment in favor of defendants on plaintiffs' claims that a technical violation of a statute requiring certain disclosures relating to collision damage waivers in car rental agreements entitled the plaintiffs to receive money.  The court held that plaintiffs had not sustained any legally cognizable loss as a result of the technical violation because defendants never sought to enforce the offending provisions.  *Id*. at 534-45.

"right to fair notice of their obligations under law."  Defs. Br. at 13-14.  Not even the Track 1 Defendants made this argument and for good reason:  it makes no sense.

Due process concerns are invoked usually in the context of criminal proceedings and where (i) an agency issues contradictory or misleading public interpretations of a regulation such that there exists sufficient confusion for a regulated party to justifiably claim a deprivation of fair notice, or (ii) the agency fails to give sufficient fair notice to justify a penalty if the regulation is so ambiguous that a regulated party cannot be expected to arrive at the correct interpretation using standard tools of legal interpretation.  *Lachman*, 387 F.3d at 57.  This is obviously not a criminal proceeding but, in any event, neither of these prongs applies here, where CMS has not issued contradictory or misleading interpretations of AWP or otherwise left AWP so ambiguous that Defendants could not discern its meaning.

In the civil context, the analysis is not one of due process protection but a "***narrow equitable exception***" to the retroactive application of a court decision.  *Crowe v. J.P. Bolduc*, 365 F.3d 86, 93 (1st Cir. 2004) (cited by Defendants) (emphasis added).[16]  But the Track 2 Defendants invoke equitable relief that is not otherwise available to them because they arrive at this request with very unclean hands.  The doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief."  *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814 (1945); *see also K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 912 (1st Cir. 1989) ("he who comes into equity must come with clean hands") (quoting *Codex Corp. v. Milgo Elec. Corp.*, 717 F.2d 622, 633 (1st Cir. 1983)).  Given Defendants' clear record of purposefully creating spreads and then –as the Department of Justice has proclaimed in its suit against

---

[16] In *Crowe*, the First Circuit decided that its holding would operate only prospectively because it was altering clear circuit precedent in regard to filing motions for an award of mandatory prejudgment interest.

Defendant Abbott Labs – using the public fisc as a marketing tool, their hands are very dirty indeed, closing the door to any equitable exception in their favor.

In any event, the equities otherwise do not favor the Track 2 Defendants' invocation of this very narrow exception, for adopting the plain meaning of AWP as Congress intended will hardly result in a "new and unexpected rule of law" as Defendants contend.  Defs. Br. at 13. There is nothing "newly minted" about the plain meaning of AWP; it is not novel as Defendants proclaim.  As shown above, HCFA linked AWP to estimated acquisition costs all the way back in 1991.  The House of Representatives, former CMS Administrator Scully and the OIG never indicated that the plain meaning of AWP was novel.  And it did not stop the United States from criminally prosecuting TAP, AstraZeneca and Bayer, and it did not stop those same companies from paying collectively *over a billion dollars* to settle those cases.

## VI.    CONCLUSION

It is the Court's duty to engage in the "heartland task" of statutory construction and define AWP within Medicare Part B as a matter of law, just as Plaintiffs and the Track 1 Defendants have agreed should be done.  The Court should reject the Track 2 Defendants' argument that AWP cannot be defined and has no meaning.

DATED:  August 21, 2006.                    By___ **/s/ Steve W. Berman**_____
                                                     Thomas M. Sobol (BBO#471770)
                                                     Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

- 19 -

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  123235 V1

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE

Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 21, 2006, I caused copies of **PLAINTIFFS' RESPONSE TO THE TRACK TWO DEFENDANTS' SUBMISSION REGARDING THE MEANING OF AWP** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


 **/s/ Steve W. Berman**
Steve W. Berman

001534-16 123235 V1