## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| IN RE PHARMACEUTICAL INDUSTRY | ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | Civil Action No. |
| | ) | |
| | ) | Judge Patti B. Saris |
| | ) | |
| THIS DOCUMENT RELATES TO: | ) | Chief Magistrate Judge Marianne B. Bowler |
| ALL ACTIONS | ) | |
| | ) | |

## TRACK TWO DEFENDANTS' MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION

### [REDACTED VERSION]

2013352v2

# Table of Contents

|  |  | Page |
|---|---|---|

TRACK TWO DEFENDANTS' MEMORANDUM IN OPPOSITION TO CLASS CERTIFICATION ...................................................................................... 1

ARGUMENT ...................................................................................................... 4

I. Plaintiffs' Burden Of Proof Cannot Be Shifted To Defendants Nor Deferred Until Another Day ................................................................................................ 4

II. Individual Variations Among Class Members, Providers And Drugs Preclude Certification of Proposed Classes 2 And 3 ........................................................ 5

    A.   Plaintiffs' Claims and Defendants' Defenses Depend Upon Inquiries Specific to Each Class Member and Each Transaction ............................................... 5

    B.   Classes 2 and 3 Include Sophisticated Payers Who Purchased PADs and Were Aware of Mega-spreads ........................................................................ 10

    C.   TPPs Aggressively Negotiate for Lower, Across-the-Board, Reimbursement Rates And Cross-Subsidization Is Part of the Negotiating Process ..................... 13

    D.   TPPs Have Purposefully Retained AWP-Based Reimbursement Methodologies 14

    E.   An Individual Inquiry Is Necessary to Determine the Basis of the Reimbursement Payment for Each Transaction ................................................................ 15

        1.   There was substantial variation in the methods by which TPPs and Medicare Part B carriers set maximum allowable reimbursement rates for PADs .............................................................................................. 15

        2.   Determining the reimbursement rates for multi-source drugs is even more complex ....................................................................................... 16

        3.   There was substantial variation in the methods by which providers set their billed charges for PADs ................................................................ 17

    F.   Provider Margin Requires an Individual Determination for Each Transaction .... 18

    G.   Rule 23(c)(4)(A) Does Not Change the Predominance Analysis ........................ 19

III. Predominance Of Common Issues And Superiority Do Not Exist For Proposed Class 1. 20

    A.   The Elements of the Parties' Claims and Defenses Require Individual Adjudication for Each Class Member and Each Transaction ............................... 20

    B.   Variations in State Law Preclude Certification of Class 1 ................................... 21

# Table of Contents
## (continued)

| | | | Page |
|---|---|---|---|
| | 1. | State law variations regarding intent are material | 23 |
| | 2. | State law variations as to reliance and causation are material | 24 |
| | 3. | Other state law variations are material | 25 |
| | 4. | Plaintiffs' novel theory of recovery further complicates the choice-of-law inquiry | 26 |
| IV. | | Plaintiffs' Expert Assumptions And Proposed Methodologies Are Fundamentally Flawed And Do Not Obviate The Need For Individual Inquiries For Each Transaction | 27 |
| | A. | Individual Issues of Liability May Not Be Swept Under the Judicial Rug by Reliance on Averages and Statistical Extrapolations | 27 |
| | B. | Plaintiffs' Presumptions Are Contradicted by the Facts | 28 |
| | C. | Expert Testimony Requires Rigorous Scrutiny | 30 |
| V. | | Plaintiffs Lack Standing, Their Claims Are Atypical, And They Can Not Adequately Represent The Proposed Classes | 32 |
| | A. | Plaintiffs Have Failed to Establish that any Named Plaintiff Has Standing | 32 |
| | B. | Sheet Metal Workers Lacks Standing to Pursue a Chapter 93A Claim | 33 |
| | C. | Pipefitters Cannot Adequately Represent Class 3 Plaintiffs | 34 |
| | | 1. Pipefitters is subject to unique defenses | 34 |
| | | 2. Pipefitters cannot adequately represent consumers | 34 |
| | | 3. Inherent conflicts exist among the putative members of Class 3 | 35 |
| | D. | Plaintiffs' Claims Are Not Typical of other Class Members | 36 |
| VI. | | A Class May Not Be Certified Pursuant To Rule 23(b)(2) | 37 |
| | A. | The Proposed 23(b)(2) Plaintiff Lacks Standing to Pursue Injunctive Relief | 37 |
| | B. | Plaintiffs Have Never Briefed, Much Less Satisfied, The Requirements of Rule 23(b)(2) | 38 |
| VII. | | The Classes Are Not Ascertainable | 39 |
| | | CONCLUSION | 40 |

2013352v1

## Table of Authorities

Page

**Cases**

*Adashunas v. Negley*, 626 F.2d 600 (7th Cir. 1980) ..............................................23

*Ad Hoc Committee to Save Homer G. Phillips Hospital v. City of St. Louis*, 143 F.R.D. 216 (E.D. Mo. 1992) ..............................................39

*Adise v. Mather*, 56 F.R.D. 492 (D. Colo. 1972) ..............................................36

*Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226 (Mo. 2001) ..............................................24

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ..............................................4

*Arch v. America Tobacco Co., Inc.*, 175 F.R.D. 469 (E.D. Pa. 1997) ..............................................9

*Archer v. Warner*, 538 U.S. 314 (2003) ..............................................7

*Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52 (2d Cir. 2000) ..............................................34

*Barnes v. America Tobacco Co.*, 161 F.3d 127 (3rd Cir. 1998) ..............................................38

*Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) ..............................................9

*Bennett v. Visa U.S.A. Inc.*, No. 32005-00659-COA-R9CV, 2006 WL 770467 (Tenn. Ct. App. Mar. 27, 2006) ..............................................34

*Berenda v. Langford*, 914 P.2d 45 (Utah 1996) ..............................................26

*Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331 (4th Cir 1998) ..............................................27

*Carpenter v. BMW of N. America, Inc.*, No. CIV. A. 99-CV-214, 1999 WL 415390 (E.D. Pa. June 21, 1999) ..............................................25

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ..............................................19, 26

*Cement & Concrete Workers District Council Welfare Fund v. Lollo*, 148 F.3d 194 (2d Cir. 1998) ..............................................25

*Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998) ..............................................25

*Cimino v. Raymark Industrial Inc.*, 151 F.3d 297 (5th Cir. 1998) ..............................................27

*City & County of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130 (N.D. Cal. 1997) ..............................................25

i

<u>Table of Authorities</u>
(continued)

<u>Page</u>

*Clay v. America Tobacco Co.*, 188 F.R.D. 483 (S.D. Ill. 1999) ..................................40

*Clean Harbors, Inc. v. John Hancock Life Insurance Co.*, (Mass. 2005) 833 N.E.2d 611 ..........34

*Colindres v. Quitflex Manufacturing*, No. CIV. A. H-01-4319, 2006 WL 846367 (S.D. Tex. Mar. 31, 2006) ..........................36

*Concourse Ticket Agency v. Kraft*, No. CA9500666, 1995 WL 809935 (Mass. Super. Ct. Apr. 3, 1995) ..........................12, 35

*Crosby v. Social Sec. Admin.*, 796 F.2d 576 (1st Cir. 1986)..........................40

*Damon v. Sun Co.*, 87 F.3d 1467 (1st Cir. 1996)..........................12, 35

*Davis v. Kraft Foods N. America*, No. 03-6060, 2006 WL 237512 (E.D. Pa. 2006) ..................36

*DeVaux v. America Home Assurance Co.*, 387 Mass. 814, 444 N.E.2d 355 (1983)..................34

*District Cablevision Ltd. P'Ship v. Bassin*, 828 A.2d 714 (D.C. 2003) ..........................24

*Dumas v. Albers Medical, Inc.*, No. 03-0640-CV-W-GAF, 2005 WL 2172030 (W.D. Mo. Sept. 7, 2005) ..........................39

*Epifano v. Boardroom Business Products, Inc.*, 130 F.R.D. 295 (S.D.N.Y. 1990)..................36

*Field v. Mars*, 516 U.S. 59 (1995) ..........................24

*Finstad v. Washburn University of Topeka*, 845 P.2d 685 (Kan. 1993) ..........................25

*Flanagan v. Altria Group, Inc.*, No. 05-71697, 2005 WL 2769010 (D. Mich. Oct. 25, 2005) ..........................26

*Fletcher v. Cape Cod Gas Co.*, 394 Mass. 595 (1985)..........................12

*Freeman v. Alamo Management Co.*, 607 A.2d 370 (Conn. 1992) ..........................24

*Gariety v. Grant Thornton, LLP*, 368 F.3d 356 (4th Cir. 2004) ..........................4

*General Motors v. Garza*, 179 S.W.3d 76 (Tex. App. 2005) ..........................5

*General Telegraph Co. v. Falcon*, 457 U.S. 147 (1982) ..........................40

2013352v1

Table of Authorities
(continued)

Page

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ...........................................................28

*Guillory v. Am Tobacco Co.*, No 97-C-1864, 2001 WL 290603 (N.D.Ill. Mar. 20, 2001) .............8

*Gunnells v. Healthplan Services Inc.*, 348 F.3d 417 (4th Cir. 2003) ................................8

*Heerwagen v. Clear Channel Communications*, 435 F.3d 219 (2d Cir. 2006) ........................4, 31

*Hershenow v. Enterprise Rent-a-Car Co. of Boston, Inc.*, 840 N.E.2d 526 (Mass. 2006) .............7

*Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613 (S.D. Ohio 1996) ....................................24

*In re: America Medical System*, 75 F.3d 1069 (6th Cir. 1995)....................................22, 26

*In re AWP (First MTD Decision)*, 263 F. Supp. 2d 172 (D. Mass. 2003) .................................1, 37

*In re Baycol Products Litigation*, 218 F.R.D. 197 (D. Minn. 2003)....................................24

*In re Bridgestone*, 288 F.3d 1012 (7th Cir. 2002) ..................................................26

*In re Ford Motor Co. Vehicle Paint Litigation*, 182 F.R.D. 214 (E.D. La. 1998)....................9, 26

*In re HealthSouth Corp. Securities Litigation*, 213 F.R.D. 447 (N.D. Ala. 2003) .............25, 34, 35

*In re MTBE Products Liability Litigation*, 209 F.R.D. 323 (S.D.N.Y. 2002) ............................19

*In re N. District of Cal. "Dalkon Shield" IUD Products Liability Litigation*, 693 F.2d 847
    (9th Cir. 1982)..................................................................................24

*In re Pharm. Industrial Average Wholesale Price Litigation*, 230 F.R.D. 61 (D. Mass.
    2005) ...................................................1, 2, 4, 5, 6, 8, 9, 10, 11, 22, 26, 27, 31, 32, 33, 34

*In re Polymedica Corp. Securities Litigation*, 432 F.3d 1 (1st Cir. 2005)...............................31

*In re Relafen Antitrust Litigation*, 221 F.R.D. 260 (D. Mass. 2004) ..................................22

*In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293 (7th Cir. 1995)...............................19, 20, 26

*In re School Asbestos Litigation*, 977 F.2d 764 (3d Cir. 1992) ......................................23

*In re St. Jude Medical, Inc.*, 425 F.3d 1116 (8th Cir. 2005).........................................22

*In re Stucco Litigation*, 175 F.R.D. 210 (E.D.N.C. 1997) ...........................................24

iii

Table of Authorities
(continued)

Page

*In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001)......................31

*Jim Moore Insurance Agency, Inc. v. State Farm Mutual Automobile Insurance Co.*, No.
 02-80381-Civ., 2003 WL 21146714 (S.D. Fla. May 6, 2003)...............................36

*Jones v. Roy*, 202 F.R.D. 658 (M.D. Ala. 2001).......................................37

*Knapp Shoes, Inc. v. Sylvania Shoe Manufacturing Corp.*, 72 F.3d 190 (1st Cir. 1995) ...........35

*Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149 (Mass. App. 1979) ......................35

*Lifschultz Fast Freight, Inc. v. Consolidated Freightways Corp.*, 805 F. Supp. 1277
 (D.S.C. 1992) ...............................................................7

*Markarian v. Conn. Mutual Life Insurance Co.*, 202 F.R.D. 60 (D. Mass. 2001)..................6, 12

*Mass. Farm Bureau Federation, Inc. v. Blue Cross of Mass., Inc.*, 532 N.E.2d 660 (Mass.
 1989) .......................................................................6

*McFarland v. Brier*, 769 A.2d 605 (R.I. 2001)........................................24

*McMahon v. Digital Equipment Corp.*, 944 F. Supp. 70 (D. Mass. 1996) ......................33

*Monreal v. Potter*, 367 F.3d 1224 (10th Cir. 2004)....................................39

*Moskowitz v. Lopp*, 128 F.R.D. 624 (E.D. Pa. 1989)....................................26

*National Air Traffic Controllers Association v. Dental Plans, Inc.*, No. Civ.A. 1:05-CV-
 882TW, 2006 WL 584760 (N.D. Ga. Mar. 10, 2006) ...................................36

*National Market Share, Inc. v. Sterling National Bank, Inc.*, 392 F.3d 520 (2nd Cir. 2004)..........7

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)................27

*Oshana v. Coco-Cola Bottling Co.*, 225 F.R.D. 575 (N.D. Ill. 2005) .........................9

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) .................................23

*Plating Co. Inc., v. NAPCO, Inc.*, 85 F.3d 752 (1st Cir. 1996) ............................9

*Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ...............................32

iv

Table of Authorities
(continued)

Page

*Rawlings v. Apodaca*, 726 P.2d 565 (Ariz. 1986)................................................................24

*Remco Enterprises, Inc. v. Houston*, 677 P.2d 567 (Kan. App. 1984) ...............................26

*Robinson v. Metropolitan-North Commuter R.R. Co.*, 267 F.3d 147 (2d Cir. 2001) ...................39

*Robinson v. Sheriff of Cook County*, 167 F.3d 1155 (7th Cir. 1999)....................................37

*RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10 (1st Cir. 2001) ...............................7

*Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*, 319 F.3d 205 (5th Cir. 2003)..........................................................................................................9

*Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D. Pa. 2000) ..........................................10

*Schrier v. Banknorth, N.A.*, No. 02105B, 2004 WL 3152399 (Mass. Super. Ct. Dec. 30, 2004) ..........................................................................................................................12

*Sea Shore Corp. v. Sullivan*, 158 F.3d 51 (1st Cir. 1998).....................................................38

*Shook v. El Paso County*, 386 F.3d at 963 (10th Cir. 2004).................................................38

*Stephenson v. Capano Development, Inc.*, 462 A.2d 1069 (Del. 1983) ...............................24

*Tagliente v. Himmer*, 949 F.2d 1 (1st Cir. 1991)..................................................................6

*Thorn v. Jefferson Pilot Life Insurance Co.*, 445 F.3d 311 (4th Cir. 2006)..............4, 5, 9, 28

*Thornton v. Equifax, Inc.*, 619 F.2d 700 (8th Cir. 1980) ......................................................22

*Tucker v. Sierra Builders*, 180 S.W.3d 109 (Tenn. App. 2005) ..........................................34

*Unger v. Amedisys, Inc.*, 401 F.3d 316 (5th Cir. 2005) ........................................................4

*Waste Management Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000) ...............9, 22

*Willard v. Bic Corp.*, 788 F. Supp. 1059 (W.D. Mo 1991)...................................................6

*Williams v. Ford Motor Co.*, 192 F.R.D. 580 (N.D. Ill. 2000) ............................................6

*Windham v. America Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) .........................................28

Table of Authorities
(continued)

Page

**Statutes**

42 U.S.C. §§ 1395u(o)(1) ...................................................................................................39

Mass. Gen. Laws ch. 93A ............................................................................................7, 9, 35

Mass. Gen. Laws ch. 93A § 11 .............................................................................................35

**Rules**

Rule 23 ...................................................................................4, 5, 19, 32, 38, 40

Rule 23(a)...........................................................................................................34, 39

Rule 23(b)(2)..................................................................................................38, 39,

Rule 23(b)(3) ...................................................................................................4, 38

Rule 23(c)(4)(A) ...............................................................................................1, 19

2013352v1

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Track One class certification briefing focused primarily on self-administered drugs ("SADs"), which comprised the vast majority of drugs at issue in Track One.[1] Not surprisingly, Dr. Ernst R. Berndt noted at that time that the record on issues as to physician-administered drugs ("PADs") and their reimbursement was "unclear" and merited "clarification."[2] As the Court recognized in its August 2005 Order,[3] Dr. Berndt also viewed the record as "unsettled" as to whether third party payers' ("TPP") payments to physicians for PADs were even based upon AWP.[4] The Court also noted that it had not been presented with evidence that TPPs purchased PADs or were aware of "mega-spreads."[5]

Since the Court's August 2005 Order, the record has been supplemented with dozens of depositions and hundreds of documents related to both TPP and consumer claims, additional reports from and depositions of Plaintiffs' experts Hartman and Rosenthal, the March 2006 declarations of Bell, Gaier, Haegele, McFadden and Morton, and the Declarations of Dyckman, Young, and Murphy that accompany this memorandum.[6] These materials address the record gaps Dr. Berndt and the Court recognized in the context of Track One. And they are crucial because, unlike Track One, most of the Track Two subject drugs are PADs. Indeed, most are multi-source drugs, which create a host of issues which were not present for the Track One SADs, and which significantly complicate any effort to adjudicate Plaintiffs' claims on a class-wide basis. Specifically:

- For multi-source drugs, a J-code to NDC crosswalk is not possible. Instead, for each drug that each plaintiff received on each separate occasion, a multi-step, document-intensive analysis is necessary to

---

[1] As noted by Dr. Ernst R. Berndt, the potential size of a self-administered drug class was "likely to be much larger" than that of a physician-administered drug class. Feb. 9, 2005 Report of Independent Expert Professor Ernst R. Berndt to Judge Patti Saris (Berndt Report) ¶ 83.

[2] Berndt Report ¶ 197. *See also id.* ¶¶ 98, 228-30, 233.

[3] *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61 (D. Mass. 2005) ("*In re AWP*" or "August 2005 Order").

[4] *Id.* at 75 (citing Berndt Report ¶ 98).

[5] *Id.* at 86.

[6] The appendix filed herewith contains the declarations and other materials cited herein.

determine whether any payments for the drug were based on an AWP – and in the vast majority of cases, such payments are not based on AWP.

- Even if such an AWP-based payment was made for a given drug encounter, it is usually not possible to determine the source of the drug – whether a Track Two defendant named for the drug, some other Track Two defendant, or indeed, one of many other sources not party to this litigation.

- Even if an AWP-based payment was made for a given drug encounter, and even if it can be determined that the named Track Two defendant was the source of the drug, one must still determine whether the AWP used was that associated with the named defendant (which is unlikely), or instead, that of one of many other sources of the drug.

It is therefore not surprising that at least four of the six class representatives proffered by Plaintiffs for Class 1 do not even have standing for the claims they raise against the Track Two defendants – and the process required to ascertain even that basic fact is, because of the drugs involved in Track Two, complex and document-intensive to the point of being infeasible.

Strikingly, Plaintiffs have made no effort to address recent discovery or to respond to the previously "unsettled" questions noted by the Court. Instead, Plaintiffs merely filed a four-page memorandum in support of class certification, trying hard to blur for the Court these important distinctions between Track One and Track Two – apparently in the hopes of shifting the burden of proof to the Track Two Defendants to *disprove* that Plaintiffs are entitled to certification. The Court should not be taken in.

More specifically, with respect to proposed Class 3 (a class of both TPPs and consumers for subject drugs reimbursed outside of Medicare), this Court previously noted that, because individual trials will be needed for each TPP, "plaintiffs have failed to explain why class certification is superior."[7] The following additional issues also preclude certification of proposed Class 3 as to the Track Two defendants:

- Different levels of knowledge exist among the TPP and consumer class members,

---

[7] 230 F.R.D. at 91.

- many TPPs purchased physician-administered drugs themselves and knew their actual acquisition costs,

- even if a TPP contract referenced AWP, the contracts provide different bundles of services, requiring that the Court examine individual contracts,

- TPP knowledge, expectations, market leverage and contracting practices present individual questions of intervening causation for the claims of the consumer plaintiffs, and

- individual jury trials will be needed to resolve issues of causation, actual expectations, statute of limitations, and mitigation of damages.

As to proposed Class 2 (TPP MediGap providers), the record demonstrates an overlapping membership of TPPs in Classes 3 and 2, such that the individual questions of knowledge, expectations, limitations and failure to mitigate identified for Class 3 are likewise at issue. In addition, the following issues preclude certification of proposed Class 2:

- The varying degrees by which TPP MediGap providers were actually or constructively aware of Medicare reimbursement terms and associated provider margins when setting premiums or whether such premiums were simply based on estimated medical care prices and volume,

- the varying coinsurance and fixed co-pay plans offered by TPP MediGap providers that have varied over time,

- the intervening role of CMS and its carriers in setting reimbursement terms that varied across drugs, from place to place and over time, and

- the individual adjudication necessary to determine whether each Part B coinsurance obligation was based on the subject drug's AWP.

Finally, the following issues preclude certification of Plaintiffs' proposed Class 1 (Medicare Part B Co-Payers):

- Plaintiffs' experts wrongly ignore the provider's billed charges as part of the Part B reimbursement equation,

- the intervening role of CMS and its carriers in setting reimbursement terms that varied across drugs, from place to place and over time,

- the individual adjudication necessary to determine whether a consumer made or incurred a Part B coinsurance obligation based on AWP,

- the threshold inquiry of class membership requires individual fact-finding,

- the inclusion of persons with varying knowledge and expectations regarding AWP and provider margins, including physicians, pharmacists, and TPP employees, and

2013352v1

- the need to resolve the viability of Plaintiffs' excess-physician-profit claim, the applicable standards of conduct, available defenses, and Plaintiffs' burdens of proof under varying consumer protection laws around the country.

In sum, Plaintiffs have not carried their burden of proving by a preponderance of the evidence that their novel, excess-physician-profit claims may be certified and *tried* as a class action. Plaintiffs' motion for class certification must be denied.

## ARGUMENT

### I.   Plaintiffs' Burden Of Proof Cannot Be Shifted To Defendants Nor Deferred Until Another Day

Plaintiffs have the strict burden of proving that they have satisfied all of the requirements of Rule 23;[8] that burden cannot be shifted to the Defendants.[9]  "Courts have likened the degree of proof required" by plaintiffs to "the standards used in preliminary injunction hearings" and "jurisdictional contests."[10]  Compliance with Rule 23(b)(3)'s predominance requirement "cannot be shown by less than a preponderance of the evidence."[11]  Otherwise, class certification would be "granted despite the motion judge's belief that it is more likely than not that individual issues would predominate."[12]

Moreover, this Court must address class certification on the record Plaintiffs and Defendants have assembled; certifying a class on the condition that Plaintiffs *subsequently* show compliance with Rule 23 requirements is no longer permitted.[13]  Nor may the Court grant class

---

[8]  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-15 (1997). Pursuant to the Court's directive in CMO 24, the Track Two defendants do not set forth in detail the legal standards for class certification, although we do emphasize points not urged by the Track One defendants and case law post-dating the Track One briefing.

[9]  *Thorn v. Jefferson Pilot Life Ins. Co.*, 445 F.3d 311, 322 (4th Cir. 2006) ("Our cases permit no exception to the rule that the plaintiff bears the burden of showing compliance with Rule 23.")

[10]  *Unger v. Amedisys, Inc.*, 401 F.3d 316, 322-23 (5th Cir. 2005) (collecting cases).

[11]  *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 233 (2d Cir. 2006).

[12]  *Id.*

[13]  *In re AWP*, 230 F.R.D. at 80.

- 4 -

certification with unresolved questions about whether the prerequisites are satisfied or whether elements may be adjudicated on a common basis.[14]

## II.   Individual Variations Among Class Members, Providers And Drugs Preclude Certification of Proposed Classes 2 And 3

To demonstrate that a particular element of a claim or defense presents a common issue, Plaintiffs must establish that the particular element can be proven for all class members without resort to individual proof that is specific to any one of them.[15]   When, on the other hand, a particular fact is only "typically" true among the class members – or is even true for most class members most of the time – the matter is not susceptible to common proof and presents an individual issue.[16]

### A.   Plaintiffs' Claims and Defendants' Defenses Depend Upon Inquiries Specific to Each Class Member and Each Transaction

In its August 2005 Order, the Court found that the state law claims related to TPPs and SADs failed the predominance requirement of Rule 23 because of the following facts:

- Even if a contract referenced AWP as the benchmark, "the contracts provide different bundles of services and rebates."

- "There are also different levels of sophistication and knowledge among the TPPs."

- "Significantly, many putative TPP class members . . . purchased drugs themselves and therefore had first hand knowledge of the acquisition costs for drugs."

- "[I]ndividual issues of each TPP will overwhelm the common questions and render the class action inefficient."

- The argument that this would be a manageable class is too large a pill to swallow."[17]

---

[14]   *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366-67 (4th Cir. 2004).

[15]   *Thorn*, 445 F.3d at 322-23.

[16]   *Id.; General Motors v. Garza*, 179 S.W.3d 76, 81 (Tex. App. 2005) ("Inescapably individual differences cannot be concealed in a throng. The procedural differences of a class action eliminates the necessity of adducing the same evidence over and over again in a multitude of individual actions. It does not lessen the quality of evidence required in an individual action or relax burdens of proof.").

[17]   230 F.R.D. at 95.

- 5 -

The record now demonstrates that each of the above findings as to why the TPPs' SAD claims failed the predominance requirement applies with equal force to their PAD claims.[18]

Individual issues of causation "often plague class actions" brought under consumer protections acts.[19] To satisfy the elements of injury and causation, Plaintiffs will be required to at least prove that (1) the payer made an AWP-based payment, (2) the difference between the AWP-based payment and the provider's acquisition cost was greater than the payer expected, and (3) the transaction was based on an AWP reported by the company that marketed and sold the subject drug.[20] Significantly, Plaintiffs' novel excess-provider-profit theory depends upon inherently subjective elements, such as the class members' knowledge and expectations regarding provider profits and whether, in light of all the circumstances, the provider's margin was excessive and unfair.

For precisely such reasons, Massachusetts and federal courts have repeatedly held that knowledge of an alleged misrepresentation defeats the causation prong.[21] For example, BCBSMA, one of the class members here and the administrator of Plaintiff Pipefitters' health plan, previously avoided liability in another matter by arguing that it had no duty to modify its standard practices because the plaintiff was a business "with a background of knowledge, resources, and experience in the insurance industry."[22] The Supreme Judicial Court of Massachusetts agreed, and held that the plaintiff's prior knowledge barred any recovery from BCBSMA due to a lack of any causal relationship between the allegedly misleading statement

---

[18] As one of plaintiffs' counsel acknowledged in his opposition to the Lupron settlement: "Individual questions as to the . . . different levels of knowledge of the underlying misconduct, . . . different documents available to prove individual claims, [and] different interest in obtaining early payments . . . prevent certification of the amorphous settlement class proposed by the parties." Memorandum of Intervenors Valerie Samsell and Milton Greene at 87.

[19] *Williams v. Ford Motor Co.*, 192 F.R.D. 580, 585 (N.D. Ill. 2000); *see also Willard v. Bic Corp.*, 788 F. Supp. 1059, 1070 (W.D. Mo 1991) (rejecting consumer protection claim because plaintiff could not establish that defendant was the "reasonable proximate cause" of her damage).

[20] *In re AWP*, 230 F. R.D. at 65, 71, 93.

[21] *See, e.g., Tagliente v. Himmer*, 949 F.2d 1, 7-8 (1st Cir. 1991); *Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D. 60, 68-69 (D. Mass. 2001).

[22] *Mass. Farm Bureau Fed'n, Inc. v. Blue Cross of Mass., Inc.*, 532 N.E.2d 660, 664 n.3 (Mass. 1989).

and the claimed loss.[23] Similarly here, when TPPs are aware of the provider margins created by AWP-based payments and nevertheless choose to use AWP over other methodologies as a basis for setting maximum reimbursement rates, and when they choose to offer Medi-Gap policies while having similar knowledge, there can be no causal relationship between allegedly deceptive AWPs and losses claims by the TPPs. That inquiry would have to be undertaken for each TPP class member.

The Supreme Judicial Court of Massachusetts also recently confirmed that, regardless of whether reliance is required under its consumer protection act,[24] "there must be a causal connection between the seller's deception and the buyer's loss."[25] To prove the necessary element of proximate causation, therefore, Plaintiffs must overcome issues of intervening or superseding cause.[26] For example, the record contains significant evidence that

With no statutory definition for AWP,[29] CMS and its carriers set widely varying reimbursement amounts,[30] thereby severing any causal link between the provider margin created by the reimbursement payment and any pricing data reported by the company that priced and marketed

---

[23]   *Id.* at 664.

[24]   Mass. Gen. Laws ch. 93A.

[25]   *See Hershenow v. Enterprise Rent-a-Car Co. of Boston, Inc.*, 840 N.E.2d 526, 532 (Mass. 2006); *see also RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 16 (1st Cir. 2001) ("[C]ausation remains a necessary element of a successful 93A claim.")

[26]   *Archer v . Warner*, 538 U.S. 314, 326 (2003); *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 527 (2d Cir. 2004).

[27]   . Notably, the compendia published AWPs despite their receipt of various disclaimers from manufacturers reporting that list prices did not reflect provider acquisition costs. *See, e.g.,* Aventis Pharmaceuticals Inc.'s Individual Memorandum in Opposition to Plaintiffs' Motion for Track Two Class Certification at 3. (Aventis Memorandum)

[28]   .

[29]   *Berndt* Report ¶¶ 20-23.

[30]   Dyckman Decl. ¶ 38.

the drug.[31]  The role of knowledgeable and sophisticated TPPs in adopting any AWP-based reimbursement rates also presents individual issues of intervening cause as to the Class 3 consumer plaintiffs.[32]  As the Court noted in its August 2005 Order: "Plaintiffs admit that Defendants may be entitled to a jury trial on . . . whether the market power of the doctors with whom a TPP dealt was an intervening cause of damages, breaking the causal chain."[33]

Further, whether expectations as to provider margins were material to the decisions to purchase or provide insurance for PADs will also vary among the consumers and TPPs and change over time and across transactions.[34]  For example, various insurance company executives testified that :

Plaintiff Sheet Metal Workers similarly testified that it made no investigation of how its Medicare Part B co-insurance obligations were calculated by Medicare.[36]  Instead, it simply set its premiums based on its overall anticipated co-insurance obligations and passed all charges on to its members.[37]  Consumer beliefs regarding provider margins also vary from place to place and over time.[38]  To "further complicate matters, the allegations span a decade, requiring individualized inquiries concerning each TPP in different time periods."[39]

---

[31] *Cf. Lifschultz Fast Freight, Inc. v. Consol. Freightways Corp.*, 805 F. Supp. 1277, 1294-97 (D.S.C. 1992) (claims that defendants caused government regulator to set truck freight rates that drove plaintiff out of business deemed too remote to support proximate cause).

[32] *See, e.g., Gunnells v. Healthplan Servs. Inc.*, 348 F.3d 417, 465 (4th Cir. 2003) (commonality outweighed by need to determine individual intervening causes of injury).

[33] 230 F.R.D. at 91.

[34] *See Guillory v. Am. Tobacco Co.*, No 97C1864, 2001 WL 290603, at *8 (N.D.Ill. Mar. 20, 2001) (causation depends not only on the extent to which an individual is exposed to the information at issue, but whether the information is material to the purchasing decision).

[35] *See, e.g., .                          Cf. In re AWP*, 230 F.R.D. at 95 (observing that audit rights "affect the expected spreads").

[36] Nov. 17, 2005 Randle Dep. at 51-52, 61-62, 127.

[37] *Id*. at 138.

[38]

[39] *In re AWP*, 230 F.R.D. at 91.

- 8 -

When alleged misrepresentations "varied from transaction to transaction," numerous courts have denied class certification.[40] Here, Plaintiffs' alleged misrepresentations vary from transaction to transaction because whether an AWP was deceptive because it created a greater-than-expected physician-margin turns on the individual expectations of each purchaser and third-party payer.[41] Varying circumstances such as market pressures, geography, bargaining power ,and cross-subsidization practices will also affect a TPP's expectations about, and acceptance of, varying degrees of provider margins.[42]

Defendants are entitled to cross-examine each class member on defenses that would preclude or limit recovery.[43] For example, a statute of limitations accrual rule or tolling doctrine, which "focuses on the contents of the plaintiff's mind, is not readily susceptible to class-wide determination."[44] "Examination of whether a particular plaintiff possessed sufficient information such that he knew or should have known about his cause of action will generally require individual examination of testimony from each particular plaintiff to determine what he knew and when he knew it."[45] Such knowledge is also relevant to other defenses, such as failure to mitigate.[46] And even if reliance were presumed, Defendants would be entitled to rebut this presumption and challenge each class member as to causation.[47]

Thus, as discussed in greater detail below, deciding injury, causation and deception for each transaction will depend upon individual factual determinations. Plaintiffs, therefore, cannot

---

[40]  *Id.* 230 F.R.D. at 82, 89.

[41]  *See Oshana v. Coco-Cola Bottling Co.*, 225 F.R.D. 575, 586 (N.D. Ill. 2005) ("Without determining what each member heard, saw, or knew, it is impossible to assign liability."); *Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indemnity Ins. Co.*, 319 F.3d 205, 218-19 (5th Cir. 2003) ("Knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the 'but for' cause of the damages.")

[42]  *See In re AWP*, 230 F.R.D. at 91 ("[T]he TPPs' injuries vary based on their individual expectations of the price and their reimbursement rates").

[43]  *Id.* at 91; *see also In Re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221 (E.D. La. 1998); *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 489 n.21 (E.D. Pa. 1997).

[44]  *Thorn*, 445 F.3d at 320.

[45]  *Id. Accord Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 295 (1st Cir. 2000).

[46]  *See, e.g., Plating Co. Inc., v. NAPCO, Inc.*, 85 F.3d 752, 773 (1st Cir. 1996) (applying failure to mitigate to reduce damages for a Massachusetts General Chapter 93A claim).

[47]  *See Basic, Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988).

- 9 -

carry their burden of proving that common issues predominate or that their claims could be manageably tried in a class action.  In fact, Plaintiffs' refusal to offer a proposed trial plan[48] is significant because it reflects the hard reality that there is no manageable method by which to handle the individual issues the Defendants are entitled as a due process matter to raise in this case. Because the Court would have to conduct an enormous number of mini-trials to determine the merit of each putative class member's claims, the class action device would be no less costly than other forms of litigation and it is not, therefore, a superior way of proceeding.[49]   Indeed, the Court previously concluded that "Plaintiffs have failed to explain why class certification is superior if an extensive separate trial will be needed for each TPP. . . .[50]

### B.  Classes 2 and 3 Include Sophisticated Payers Who Purchased PADs and Were Aware of Mega-spreads

Proposed Classes 2 and 3 include large, sophisticated health insurance companies with first-hand knowledge of pharmaceutical pricing practices and provider margins,

and other health and welfare plans with varying degrees of knowledge and experience in the insurance industry.  For example,

---

[48]   *See* Plaintiffs' Objection and Response to Track 2 Defendants' Request for Production of Documents (Plaintiffs' proposed two-phase trial plan submitted during the Track One proceedings was based on their RICO claims and is of no moment here.).

[49]   *See Sanneman v. Chrysler Corp.*, 191 F.R.D. 441, 455 (E.D. Pa. 2000) ("Plaintiff's related efficiency-based arguments become less forceful in light of considerations of the likely ensuing post-certification mess, and the extensive administrative problems that the action would present.").

[50]   230 F.R.D. at 91. In addition, the fact that "[m]any TPPs . . . are well-heeled corporations (Aetna, Cigna, Blue Cross/Blue Shield companies) able to defend their interests if they believe they have been defrauded," 230 F.R.D. at 95, also undermines any finding of superiority.

[51]

[52]

[53]

[54]

2013352v1

TPPs were also aware of "mega-spreads" of more than 1000% between AWPs and acquisition costs for some PADs.[56] Thus,                    TPPs were aware of differences between AWPs and provider acquisition costs and appreciated the magnitude of these differences, especially with respect to multi-source drugs.[57]

Further, some of the TPPs have owned and operated various providers of PADs, including staff-model HMOs,

As a result, they earned provider margins on drugs and thereby acquired personal knowledge regarding provider margins for PADs.  TPPs also hire experienced personnel with awareness of PAD acquisition costs.

---

[55]

[56]  *See, e.g.*, HHC003-0481 ("Based on these results, we found that Medicare's reimbursement was excessive and in many cases provided profit margins of more than 500% and, in some instances, more than 1000%."). *See also* A-02-91-01049 (1992 OIG Report listing spreads exceeding 400% and declaring: "AWP is not a reliable indicator of the cost of a drug to physicians."); Barron's (June 1996) (article depicting spreads in excess of 700%);H.R. Rep. 105-149 (June 24, 1997) (noting OIG had reported Medicare reimbursement spreads of "nearly 1000 percent").

[57]

[58]

[59]

[60]

[61]

- 11 -

As the Court previously acknowledged with respect to the private reimbursement context,[62] prior knowledge of spreads is also relevant to claims by TPPs for Medi-gap payments. First, the decision by any TPP to provide supplemental insurance for Medicare Part B drugs is a voluntary one. Someone who enters into this business with knowledge of spreads cannot claim to have been deceived.

In addition, some Medi-Gap reimbursement payments are not set by statute. While standardized Medi-Gap policies must conform to the statutory scheme, TPPs have issued non-standardized policies. Other TPPs reimburse under employer benefit plans based on a coordination of benefits scheme. These TPPs determine, in the first instance, what reimbursement methodology they will use.

As a result, such TPPs stand in exactly the same position as TPPs who reimburse for non-Medicare PADs.

In addition, sophisticated purchasers, such as physicians, pharmacists, TPP employees, and other informed persons are not excluded from Class 3. Some consumer plaintiffs may have acquired knowledge from the media or other publicly available resources[65] and may have seen or otherwise become aware of various disclaimers that accompanied the manufacturer's price reporting.[66] Significantly, the "relative levels of sophistication may enter into the fact-based analysis the court carries out in weighing whether a party's act was unfair or deceptive."[67] As a result, determining liability under 93A is highly specific to particular parties and transactions.

---

[62] *In re AWP*, 230 F.R.D. at 95.

[63]

[64]

[65]

[66] *See, e.g.* Aventis Memorandum at 3.

[67] *Damon v. Sun Co.*, 87 F.3d 1467, 1484 n.9 (1st Cir. 1996); *Concourse Ticket Agency v. Kraft*, No. CA9500666, 1995 WL 809935, at *3 (Mass. Super. Ct. Apr. 3, 1995) (observing that "the business plaintiff is held to a higher standard of proof than the less sophisticated plaintiff").

- 12 -

Indeed, Massachusetts courts have repeatedly held that the individual question of plaintiff knowledge precludes class certification of chapter 93A claims.[68]

### C.   TPPs Aggressively Negotiate for Lower, Across-the-Board, Reimbursement Rates And Cross-Subsidization Is Part of the Negotiating Process

Extensive knowledge and sophistication, while fatal if it does exist, is not required for a TPP to secure competitive reimbursement.[69]  Rather, the repeated nature of the contracting process and the large number of available providers allow TPPs to make successive reimbursement rate offers and observe the response of providers.[70]

A long and well-known history of cross-subsidizing the providers' storage, handling and dispensing costs through reimbursement payments for PADs also exists among TPPs.[72]  :

Some TPPs,                             include withhold clauses in their contracts with providers, such that if provider billings exceed specified targets, the TPP has recourse as to the provider.[74]  Some TPPs,

---

[68]  *See, e.g., Schrier v. Banknorth, N.A.,* No. 021050B, 2004 WL 3152399, at *5-7 (Mass. Super. Ct. Dec. 30, 2004); *Markarian,* 202 F.R.D. at 68-70; *Fletcher v. Cape Cod Gas Co.,* 394 Mass. 595, 603 (1985).

[69]

[70]

[71]

[72]  Dyckman Decl. ¶ 44-45.

[73]

[74]

[75]

- 13 -

**D.    TPPs Have Purposefully Retained AWP-Based Reimbursement
         Methodologies**

TPPs have continued to use AWP-based maximum allowable
reimbursement rates for various reasons.  For example,

Plaintiffs' causation theory assumes that TPPs would not have used AWP as a
reimbursement benchmark had they known of the difference between AWP and the "but for"
spreads that Dr. Hartman proposes to calculate.

Such evidence can be
developed and presented to a jury only on a TPP-by-TPP basis.

---

76
77
78
79
80
81
82
83

2013352v1

E.   **An Individual Inquiry Is Necessary to Determine the Basis of the Reimbursement Payment for Each Transaction**

In both the Medicare and non-Medicare contexts, the vast majority of reimbursement payments for PADs over the class period were based on the lower of a maximum allowable reimbursement rate or the billed charge from the provider.  Neither the maximum allowable reimbursement rates, nor the billed charges, however, were always based on the AWP of the subject drug.

1.   **There was substantial variation in the methods by which TPPs and Medicare Part B carriers set maximum allowable reimbursement rates for PADs**

In the non-Medicare context, reimbursement rates varied across drugs, among TPPs and over time.  The methods by which TPPs set maximum reimbursement rates included the provider's submitted charge,[84] a percentage of the submitted charge, a proprietary fee-schedule, or some percent below or above a pricing benchmark such as an AWP.[85] Because of this variability, an individual contract-by-contract inquiry is required for each TPP-provider relationship to determine whether a particular drug transaction was reimbursed based on an AWP.[86] Similarly, CMS and its Medicare Part B carriers[87] employed different methods to determine reimbursement amounts resulting in substantial variation with respect to the maximum allowable reimbursement rates for Part B drugs.  Differences existed among the carriers in the method of selecting an AWP when there were multiple NDCs (each with its own AWP) associated with a single J-code.[88]  Differences existed in whether carriers implemented

---

[84]   The submitted charge is sometimes referred to as the billed charge or provider charge and represents the amount billed to the patient and submitted by the provider to the patient's health insurance plan. Providers use a common set of charges and do not modify charges to match any particular payer's maximum allowable payments. Dyckman Decl. ¶¶ 13,   -35.

[85]   Dyckman Decl. ¶¶ 37-43.

[86]   Young Decl. ¶¶ 92-94, 112; Dyckman Decl. ¶43.

[87]   Over the class period, CMS contracted with dozens of insurance companies, including BCBSMA and NHIC, to process reimbursement claims as Part B carriers for particular states or regions.

[88]                  ; *see also* AWP002-1942/1944 (CMS advising carrier that resolving HCPCS to NDC crosswalk was within its discretion); AWP002-1942/1944, AWP002-1959/1960, AWP002-1962/1965 (NHIC debating and reconciling reimbursement rate differences among regions for single HCPCS code with multiple NDCs).

alternative AWPs issued by CMS.[89]  Differences also existed within geographic regions administered by a single carrier based on whether the maximum allowable rates were correctly calculated and whether particular J-codes were considered eligible for reimbursement.[90]

### 2.    Determining the reimbursement rates for multi-source drugs is even more complex

While the Track One subject drugs were primarily branded, single-source drugs, the Track Two subject drugs are primarily multi-source drugs and drugs administered in the hospital setting.  This distinction makes Plaintiffs' Track Two claims much less amenable to class treatment because generally dozens of multi-source NDCs are reimbursed under a single J-code and it simply is not feasible to crosswalk a multi-source J-code to the source company or AWP for the drug administered to the patient.[91]  In fact, even Plaintiffs make no effort to attempt this crosswalk and instead list multiple defendants for a single J-Code transaction  – a tacit admission that the source company for a multi-source drug can be nearly impossible to identify.[92]  Moreover, a multi-source drug is rarely reimbursed based on the reported price of the source company because Medicare and most TPPs base multi-source reimbursement on the lower of the median AWP for all drugs within the J-code or the lowest AWP of several equivalent drugs marketed under anything other than the name of the generic chemical.[93]  As a result, for each multi-source drug transaction, a complex and document-intensive analysis is required to identify the source of the drug and determine whether payments for the drug were based on its AWP.[94]

---

[89]    See, e.g., AWP001-0841/0842; AWP001-0891/0892 (NHIC refusing to implement HCFA's September 2000 alternative AWPs).
[90]    AWP001-0894/0897; AWP001-0964; AWP001-0975; AWP003-0002/0006; AWP003-0014/0039.
[91]    Young Decl. ¶¶ 12, 24, 35.
[92]    See, e.g., May 4, 2006 Randle Aff. Ex. 2;
[93]    Young Decl. ¶¶ 12, 13, 25-43.
[94]    Id. ¶¶ 10, 12-13.

3.   **There was substantial variation in the methods by which providers set their billed charges for PADs**

Over the proposed class period, Medicare Part B reimbursed providers based on the lower of either the provider's submitted charge or a statutory maximum.[95]  Because at times some physicians billed Medicare an amount that fell below the statutory ceiling, throughout the class period, Medicare made payments and calculated co-insurance obligations for subject drugs based on the physicians' billed charges.[96]  Similarly, in their reimbursement contracts with providers, and other TPPs agreed to pay the lower of the provider's submitted charge or some percentage of AWP.[97]  Pursuant to similar "lower of" clauses, TPPs repeatedly made reimbursement payments based on the providers' billed charges.[98]

Provider charges for an NDC vary over time and among different physicians.[99]  Providers use various methods for calculating their submitted charges, including cost, cost plus a fixed amount, cost plus a percentage, last-year's charge plus a percentage, matching what other providers are charging for the particular NDC, or a percentage above or below a pricing benchmark such as an AWP.[100]  Over time, providers may use different charge-calculating methods for the same NDC, and, at any point in time, providers may use different charge-calculating methods for different NDCs.[101]  More often than not, provider charges for PADs are not based on AWP.[102]  For any charges that are based on AWP, the value of the AWP may vary among providers even for the same drug dispensed on the same day based on their use of

---

[95]   Dyckman Decl. ¶ 30; May 5, 2006 Murphy Decl. ¶ 5. From 1995 to 1997, the statutory maximum was 100% of the "national average wholesale price" (an undefined term subject to varying interpretations among the carriers and by other federal agencies). The reimbursement ceiling was reduced to 95% of AWP for 1998 and, for most Part B drugs, was lowered again to 85% in 2004.

[96]   Dyckman Decl. ¶¶ 31-35.

[97]   Id. ¶¶ 31-32.

[98]   Id.

[99]   Notably, from 1998 to 2003, there were from 25,000 to nearly 31,000 Medicare Part B providers in Massachusetts alone. Murphy Decl. ¶ 7.

[100]   Dyckman Decl. ¶¶ 33-36.

[101]   Id. ¶¶ 34-36.

[102]   Dyckman Decl. ¶ 39; ᶜ

- 17 -

different price-reporting services that sometimes publish varying AWPs for the same NDC.[103] Finally, the method by which a provider calculated its charge for a drug is not reflected in the forms used to process reimbursement payments and would require individual provider discovery to determine.[104] Neither Part B carriers nor TPPs can determine from their records whether a provider's charge was based on AWP.[105] "Only the providers can answer that question."[106] In sum, despite the use at times by some TPPs of AWP-based, maximum allowable rates for some subject drugs, a significant portion of TPP payments for PADs over the class period was based on providers' billed charges or other non-AWP methodologies.[107]

F.    **Provider Margin Requires an Individual Determination for Each Transaction**

Although ascertaining the reimbursement and charge methods used is difficult enough, still more is required to determine whether a provider's margin exceeded a payer's expectations. The fact finder will also need evidence regarding the provider's acquisition cost for the drug and associated overhead expenses.

Given the various concessions and incentives in a provider's purchasing contracts, determining the acquisition cost for a drug transaction is not a simple matter. A provider's cost will depend not only on the price paid for the drug, but also on price concessions related to its volume of sales for the NDC, its volume of sales for other drugs by the same manufacturer, the rate at which it dispenses the NDC versus other competing products, prompt payment discounts and other contract terms.[108] Thus, the acquisition cost for a single NDC varies across time and among different physicians and requires individual determination for each transaction.

---

103

104    Young Decl. ¶ 36, 92, 112; '

105    Murphy Decl. ¶ 6; .
106    Murphy Decl. ¶ 6.
107    Dyckman Decl. ¶ 33-43;
108

- 18 -

Further, determining a provider's margin is not simply a matter of comparing its acquisition cost for a PAD against its reimbursement. Unique storage, handling and dispensing costs must be deducted to determine the provider-margin for any PAD transaction. These costs vary over time, among drugs, and among providers. Because the physician's office is a less expensive and otherwise preferred site of care (versus treatment in a hospital setting) for both TPPs and patients, the negotiated rates between providers and TPPs reflect the prices at which the TPP can secure the provider's office as the site of care for its beneficiaries while accounting for these additional provider costs.[109]

G.    **Rule 23(c)(4)(A) Does Not Change the Predominance Analysis**

Rule 23(c)(4)(A) is only a component, and not a trump card, to Rule 23 – as such, the predominance requirement must first be satisfied as to the entire action.[110] Here, paragraph (c)(4) is of no help because, as previously discussed, the individual issues are not limited to the amount of damages. Each of the individual issues discussed above are central to deciding liability in this case and, therefore, may not be reserved until the second phase of a bifurcated trial.

Courts must also "carve at the joint" between liability and damage issues so as to avoid dividing "issues between separate trials in such a way that the same issue is re-examined by different juries."[111] For example, an attempt to adjudicate defendants' conduct in Phase I, and then resolve the individual issues of intervening causation and statutes of limitations in a subsequent proceeding does not "carve at the joint" and would impermissibly allow one jury to re-examine the findings of another in violation of the Seventh Amendment.[112] The Seventh Amendment likewise precludes separate trials for the Class 2 and 3 claims of the TPPs that are

---

[109]   *See generally* 56 Fed. Reg. 59524 (Nov. 25, 1991).

[110]   *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996); *In re MTBE Prods. Liab. Litig.*, 209 F.R.D. 323, 351 (S.D.N.Y. 2002).

[111]   *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1302-03 (7th Cir. 1995).

[112]   *Id.*

members of both classes because one jury would re-examine the knowledge and expectations findings of another.

**III.    Predominance Of Common Issues And Superiority Do Not Exist For Proposed Class 1**

    **A.    The Elements of the Parties' Claims and Defenses Require Individual Adjudication for Each Class Member and Each Transaction**

For the same reasons discussed above, fact of injury for the members of Class 1 likewise turns on individual inquiries into the reimbursement rate, acquisition cost, provider margin and payer expectation for each transaction.  Causation similarly requires an individual inquiry as to whether the company that marketed and sold the subject drug is the source of the AWP upon which the payment was based.  Individual adjudication regarding knowledge and materiality will also be necessary to determine the issues of proximate causation, the statute of limitations and failure to mitigate.

In addition, as the recent record makes clear, to determine whether a Part B enrollee actually made a payment based upon AWP requires a detailed analysis of documents (and sometimes testimony) from both the provider and insurer for each drug transaction. Notably, prior to the implementation of the Medicare Modernization Act in 2005, providers did not collect the Part B beneficiaries' co-insurance payments as much as 50% of the time.[113]

That experienced counsel is unable to determine whether any Medicare Part B enrollee is a member of Plaintiffs' proposed Part B class and whether he or she sustained any alleged

---

[113]  Dyckman Decl. ¶¶ 49-50.

[114]

[115]

injuries proves that the process requires individual adjudication and cannot be reduced to a claims form procedure.

Plaintiffs propose six individuals or their estates to represent the Medicare Part B Beneficiary Class.[116] However, at least four of these representatives did not incur an obligation to make an AWP-based payment for the subject drug for any of the following reasons:

- The patient was not responsible for the 20% co-insurance payment;

- the drug transaction occurred after January 1, 2005, (outside the proposed class period) and was reimbursed under the ASP-based structure as required by the Medicare Modernization Act;

- the drug transaction involved a multi-source drug for which reimbursement is not based on the AWP of the subject drug;

- the drug was reimbursed based on the physician's submitted charge and not on the statutory AWP ceiling;

- the drug was administered during an inpatient hospital stay and reimbursed under Medicare Part A, which does not reimburse providers based on an AWP for the subject drug; or

- the drug was administered during a hospital outpatient visit and reimbursed under the Medicare Hospital Outpatient Prospective Payment System ("OPPS"), which does not require a patient co-payment based on an AWP.

These issues will not be avoided by allowing class counsel to propose alternative class representatives. Whether a class member made a payment based on AWP is a threshold liability issue in this case. The fact that this issue alone depends on a fact-intensive, individualized inquiry demonstrates the lack of predominance and superiority.

**B.    Variations in State Law Preclude Certification of Class 1**

The Track Two Defendants address herein issues regarding state law variations that were not discussed in the prior briefs submitted to this Court.[117] Having rejected Plaintiffs' argument

---

[116] On June 8, 2006, the Court granted Plaintiffs' Motion for Leave to Join Harold Bean as a Plaintiff and Class Representative [2584]. The Track Two Defendants will separately brief class certification issues specific to Mr. Bean following discovery.

[117] The Track 2 Defendants incorporate by reference the prior briefing on choice-of-law and variations in state law provided by the Track 1 Defendants. *See* Track 1 Memorandum in Opposition to Class

*(cont'd)*

- 21 -

that the law of the Defendants' principal places of business should govern Plaintiffs' state-law claims, the Court held that "the laws of the home states of the consumers govern."[118]

Implicit in this Court's choice-of-law holding was the recognition that state consumer protection statutes vary in significant ways.[119] It is axiomatic that, in order for any judgment to be binding on either class members or defendants, the jury must be instructed in accordance with applicable state law.[120] Here, Plaintiffs have not provided any analysis as to how this Court will accomplish what virtually every other court has considered prohibitive: instructing the jury on relevant state laws that vary in numerous and material ways, without hopelessly confusing the jury and rendering their task impossibly complex.[121]

Plaintiffs focused on three elements in their Track One briefing – intent, reliance and causation – and argued that variations in these requirements are not material.[122] On the one hand, Plaintiffs appear to intend to require each class member to satisfy a scienter requirement that may not be applicable in their state. On the other hand, Plaintiffs urge this court to disregard requirements as to reliance and causation. Neither approach results in a correct application of law. Class members must be held to their precise burden under the relevant statutes and the jury

---

(cont'd from previous page)

Certification and Appendices A and B; Defendant GlaxoSmithKline's Individual Memorandum in Opposition to Class Certification GSK Memorandum.

[118] *In re AWP*, 230 F.R.D. at 83.

[119] *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1120 (8th Cir. 2005); *In re AWP*, 230 F.R.D. at 90.

[120] *See Thornton v. Equifax, Inc.*, 619 F.2d 700, 705 (8th Cir. 1980) (broadening the standard otherwise provided in the jury instructions based on the governing state's law held to be sufficient basis for a new trial).

[121] *See In re Am. Med. Sys.*, 75 F.3d 1069, 1085 (6th Cir. 1995) ("If more than a few of the laws of the fifty states differ, the district judge would face an impossible task of instructing a jury on the relevant law, yet another reason why class certification would not be the appropriate course of action.").

[122] Any reliance by Plaintiffs upon *Mowbray* and *Relafen* is misplaced. Neither *Mowbray* nor *Relafen* supports certification of a 42-jurisdiction class. In *Mowbray*, the class, as certified, included less than 100 persons and 35 transactions. 189 F.R.D. at 196, 198-99, 202. The *Mowbray* court did not address the implications of state law variations in a nationwide class involving hundreds of thousands of transactions. Rather, *Mowbray* involved a very small class, with few transactions, and the laws of only a handful of states. Likewise, in *Relafen*, the court limited its initial consideration of state law variations to 12 states. *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 278 (D. Mass. 2004). After its review of variations in state law, the court limited the antitrust and consumer protection claims by the class to only four states. *See id.* at 288.

- 22 -

must be instructed as to each and every element of a class member's claim under the relevant state law, no more and no less.

### 1. State law variations regarding intent are material

Although Plaintiffs argue that they have alleged "intentional" violations of consumer protection acts, such a broad assertion does not overcome variations in state scienter requirements. "[E]ach plaintiff in this case has the right to have its claims judged according to the law of its jurisdiction, not according to that of a putative or imaginary strictest state."[123] Should Defendants prevail on the merits in this action, class members whose claims were governed by a state's law that did not require proof of intent could argue that the verdict is not binding as to them.[124] Instructing the jury as to an element that is not required under applicable law, therefore, exposes a defendant to an impermissible fail safe class.[125]

Moreover, it is not a simple question of whether "intent" is required under a state consumer protection statute, but how the requisite state of mind is defined by statute and/or relevant case law. Significantly, Plaintiffs do not identify what scienter definition will govern their claims. Indeed, it is now apparent that Plaintiffs do not intend to prove the requisite state of mind according to any uniform standard. For example, in opposing AstraZeneca's motion for summary judgment, Plaintiffs argued that, under Oregon law, they are required to prove no more than ordinary negligence.[126] However, that is not the standard for recovery under every state consumer protection statute.[127]

---

[123] *In re School Asbestos Litig.*, 977 F.2d 764, 797 (3d Cir. 1992) (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985)).

[124] *See, e.g.*, Joint Memorandum of the Attorneys General of Illinois, Kentucky, Wisconsin and Idaho Regarding Plaintiffs' Motion for Class Certification at 9 (arguing that claims asserted by the Attorneys General do not require proof of reliance or intent).

[125] *See School Asbestos Litig.*, 977 F.2d at 797. Courts have repeatedly held that courts cannot certify fail safe classes, *i.e.*, classes which would result in a binding judgment only if favorable to plaintiffs. *See, e.g.*, *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980).

[126] Pl. Opp. to AstraZeneca Pharmaceuticals LP's M. for Sum. J. at 6.

[127] *See* Appendix A to Track 1 Defendants' Memorandum in Opposition to Class Certification.

At bottom, Plaintiffs' analysis of the scienter element rests upon a false premise. It is not the Defendants' burden on class certification to show that "intentional, fraudulent" conduct would be permitted under any consumer protection statute. Defendants deny that they engaged in such conduct. The mere fact that Plaintiffs allege "intent," does not mean that the jury will find "intent." For the jury to resolve this issue, it must be correctly instructed as to the controlling legal standards.

Further, it must be remembered that, at issue is not only the requisite level of culpability that must be proven to recover compensatory damages, but also the *mens rea* required for multiple or punitive damages, if available.[128] In addition to diverse standards of wrongdoing necessary to support a claim for punitive damages,[129] the burden of proof varies.[130] As a result, courts have repeatedly refused to certify nationwide class actions where varying state standards governing punitive damages would have to be applied.[131]

2.     State law variations as to reliance and causation are material

As with the scienter requirement, relevant state law regarding reliance and causation varies both in terms of the required elements and how those elements are defined.[132] Omitting or relaxing the elements that Plaintiffs are required to prove would violate due process.[133] Here, Plaintiffs attempt to avoid their burden of proving reliance and/or causation by asserting that the

---

[128]  The availability of multiple or punitive damages also varies by state. *See Id.*

[129]  *See, e.g., Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986) (evil motive); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076-77 (Del. 1983) (gross, oppressive or aggravated conduct); *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 247 (Mo. 2001) ("complete indifference to or conscious disregard for the safety of others"); *McFarland v. Brier*, 769 A.2d 605, 611 (R.I. 2001) (willfulness, recklessness or wickedness as amounts to criminality).

[130]  *See, e.g., Freeman v. Alamo Mgmt. Co.*, 607 A.2d 370, 374 (Conn. 1992) (preponderance of the evidence); *Dist. Cablevision Ltd. P'Ship v. Bassin*, 828 A.2d 714, 726 (D.C. 2003) (clear and convincing).

[131]  *See, e.g., In re N. Dist. of Cal. "Dalkon Shield" IUD Prods. Liab. Litig.*, 693 F.2d 847, 850 (9th Cir. 1982); *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 215 (D. Minn. 2003); *In re Stucco Litig.*, 175 F.R.D. 210, 216 (E.D.N.C. 1997); *Ilhardt v. A.O. Smith Corp.*, 168 F.R.D. 613, 620 (S.D. Ohio 1996).

[132]  *See, e.g., Field v. Mars*, 516 U.S. 59, 73 & nn.10-12 (1995) (noting that states have defined various standards for reliance).

[133]  *See Chin v. Chrysler Corp.*, 182 F.R.D. 448, 457 (D.N.J. 1998).

- 24 -

Court may presume, as a matter of law, that all of the proposed Class 1 class members made AWP-based co-insurance payments and none had any knowledge regarding pharmaceutical pricing or provider margins.[134] Not only is such a presumption unsupported factually, Plaintiffs' analysis fails to demonstrate why reliance and causation are not material elements of a class member's claim. If anything, Plaintiffs' theory concedes their inability to prove transaction causation or direct reliance,[135] which states typically require to sustain a CPA claim.[136] Rather than eliminating the elements of reliance and causation, Plaintiffs' theory forces them to rely upon a theory of third-party reliance or causation.[137] The jury must still receive correct instructions as to applicable law to determine whether these elements have been proven.

### 3. Other state law variations are material

Other variations in state law have simply been ignored by Plaintiffs. For example, Plaintiffs have not even addressed variations in the available remedies and measure of damages.[138] Nor have they discussed variations in the type of conduct actionable[139] or requirements for materiality or privity.[140] Also, in addition to different limitations periods, states have widely varying law governing the accrual and tolling of statute of limitations.[141]

---

[134] *See* nn. 157-58, *infra*.

[135]

                                     *Cf. In re HealthSouth Corp. Secs. Litig.*, 213 F.R.D. 447, 459-60 (N.D. Ala. 2003).

[136] *See, e.g., Finstad v. Washburn Univ. of Topeka*, 845 P.2d 685 (Kan. 1993) (reliance required to establish causation under KCPA); *see also* individual memoranda in opposition to Track Two class certification.

[137] Numerous states would not even recognize a theory of third-party reliance or causation and, in other jurisdictions, the question is undecided. *See, e.g., Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) (plaintiff cannot establish reliance for fraud under New York law by showing that third party relied on allegedly fraudulent statements); *City & County of San Francisco v. Philip Morris, Inc.*, 957 F. Supp. 1130, 1142 (N.D. Cal. 1997) ("[A] fraud action cannot be maintained based on a third party's reliance [under California law].")

[138] *See Carpenter v. BMW of N. Am., Inc.*, No. CIV. A. 99-CV-214, 1999 WL 415390, at *4 (E.D. Pa. June 21, 1999).

[139] *See* GSK Memorandum at 4.

[140] *See* GSK Memorandum at 5 n.18.

[141] *See Berenda v. Langford*, 914 P.2d 45, 52 (Utah 1996).

Correct jury instructions must incorporate not only the broad outlines of applicable state law, but must also account for nuanced variations in state law.[142] Even the detailed charts provided by the Track one Defendants could not capture all relevant variations in state law.[143] Here, Plaintiffs have not even attempted to provide a plan for how such state law differences can be managed.

### 4. Plaintiffs' novel theory of recovery further complicates the choice-of-law inquiry

Standards vary among the states for determining whether an excess profit allegation may state a claim for which relief will be granted and some state courts have squarely rejected "excess profit" theories of liability under their consumer protection acts.[144] Whether Plaintiffs' claims are subject to state law exemptions for acts authorized by law will also vary from state to state.[145] The fact that Plaintiffs assert a novel, excess-provider-profit claim requiring numerous *Erie* predictions counsels strongly against class certification.[146]

---

[142] *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995); *accord In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1085 (6th Cir. 1996); *see also In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 222 (E.D. La. 1998) (observing that the plaintiffs' "proposed jury charges and interrogatories fall far short of addressing the nuances in state law which must be captured in any jury charge that does not invite reversal on appeal").

[143] For example, even as to such a fundamental concept as burden of proof, states have developed varying jury instructions. *Compare*, for example, Ill. PJI 21.00, *with* Fla. Standard Jury Instructions in Civil Cases 3.4, *with* N.Y. PJI-Civil 1.23. Nuanced variations are also reflected in differing instructions on causation. *See* Appendix.

[144] *See, e.g., Remco Enters., Inc. v. Houston* 677 P.2d 567, 572 (Kan. App. 1984) (350% profit margin not actionable under KCPA).

[145] *See, e.g.*, The Johnson & Johnson Defendants' Memorandum in Support of Their Motion for Summary Judgment as to Class 1 and Class 2 at 21-22 (discussing application of Oklahoma exemption); *Flanagan v. Altria Group, Inc.*, No. 05-71697, 2005 WL 2769010, at *7 (E.D. Mich. Oct. 25, 2005) (noting that state court interpretation of exemption differs from its "common-sense reading").

[146] *See In re Bridgestone*, 288 F.3d 1012, 1019 (7th Cir. 2002); *Castano*, 84 F.3d at 749; *Moskowitz v. Lopp*, 128 F.R.D. 624, 632 (E.D. Pa. 1989). This Court has already recognized that the trial of a statewide class will provide important information for an accurate evaluation of claims under other state laws. *In re AWP*, 230 F.R.D. at 86. This test case concept, however, should proceed by way of an individual trial and not class treatment. *In re Rhone-Poulenc*, 51 F.3d at 1301.

- 26 -

**IV.     Plaintiffs' Expert Assumptions And Proposed Methodologies Are Fundamentally Flawed And Do Not Obviate The Need For Individual Inquiries For Each Transaction**

**A.     Individual Issues of Liability May Not Be Swept Under the Judicial Rug by Reliance on Averages and Statistical Extrapolations**

Plaintiffs' expert Dr. Hartman has proposed a method by which he purports to determine aggregate damages.

Significantly, federal courts have made plain that fact of injury (an aspect of causation), as distinguished from the amount of damages, is part of plaintiff's prima facie liability case. "Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)."[149] As a result, "[t]he ability to calculate the aggregate amount of damages does not absolve plaintiffs from the duty to prove each [class member] was harmed by the defendants' practice. . . . [T]he issue is not the calculation of damages but whether or not class members have any claims at all."[150]  As this Court observed, "it is not permissible to use methods such as averaging damages to sweep individual issues under the judicial rug."[151]

Each of the individual issues discussed in this memorandum goes not to the amount of damages, but whether any particular transaction caused injury and whether any such injury was proximately caused by a defendant.  Such individual issues cannot be obscured by reliance on averages or alleged market expectations. "Whether the 'average citizen' (whoever that is) or 'the

---

147

148

149   *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 188 (3d Cir. 2001).

150   *Id. See also Cimino v. Raymark Indus. Inc.,* 151 F.3d 297, 313 (5th Cir. 1998) (causation is a uniquely individual issue that must be determined as to "individuals, not groups").

151   230 F.R.D. at 87. *Accord Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 344-45 (4th Cir. 1998) (certification was improper because it deprived defendant of right to dispute individual issues on an individual basis).

- 27 -

public' (whoever *that* is) was or was not 'generally aware of [the alleged practices by the defendant], is . . . irrelevant to the question that the trier of fact will have to answer . . . ."[152] The relevant question is whether any individual class member was aware of the challenged conduct.[153] Defendants have a due process right to cross examine every class member regarding the transactions at issue and their knowledge and expectations as to AWP.[154] A class action cannot be certified when the only way to render it manageable is "'to deprive each defendant of his undoubted right to have his claimed liability proved, not by presumptions or assumptions, but by facts, with the burden of proof upon the plaintiff or plaintiffs[,] and to offer evidence in his defense.'"[155]

## B.    Plaintiffs' Presumptions Are Contradicted by the Facts

Plaintiffs attempt to sweep aside the need for individual inquiries by asserting that the Court may presume that Medicare reimbursement payments were always based on AWP, that TPP reimbursement payments outside the context of Medicare were always based on AWP, and that physicians always based their charges for subject drugs on AWP.   None of these presumptions is accurate. Indeed, as discovery related to the claims of the proposed class representatives demonstrates, Part B enrollees *did not* typically pay an AWP-based co-insurance amount for the subject drugs.[156]

Drs. Rosenthal and Hartman assume that Medicare reimbursement payments were always based on AWP.   In fact, throughout the class period, Medicare reimbursement for the subject drugs was based on the lower of the physician's actual charge to Medicare or the applicable statutory ceiling.[157]

---

[152]   *Thorn*, 445 F.3d at 323 (emphasis in original).
[153]   *Id.*
[154]   *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses").
[155]   *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 n.34 (4th Cir. 1977) (citation omitted).
[156]   *See* nn.            179, *infra*.
[157]   *See* n.95, *supra*.

- 28 -

But, to the contrary, "the actual charge on the Medicare claim form" refers to the amount billed to the patient and for which the provider seeks reimbursement from Medicare.[159]  The physician's billed charge could be lower or higher than the statutory reimbursement ceiling, but was never required to reflect the physician's acquisition cost.[160]

Likewise, TPP reimbursement payments outside the Medicare context were not always based on AWP.  Hartman's assumption to the contrary is based on his misinterpretation of two MedPac reports from 2003.  As Dr. Dyckman (the author of the reports) explains, neither report provides support for Hartman's assumption and the assumption is contradicted by long-standing practices in the health insurance field and the evidence in this case.[162]

Plaintiffs' experts also wrongly assume that providers *always* billed their patients and sought reimbursement based on the AWP of the subject drug.[163]  In fact, over the proposed class period, providers used various methods across the subject drugs, over time and from place to place.[164]  As a standard practice, providers do not bill patients based on the particular allowances of their health insurance providers.  Rather, regardless of the patient's insurance coverage,

---

[158]

[159]  Dyckman Decl. ¶ 31.
[160]  *Id.*
[161]

[162]  Dyckman Decl. ¶¶ 40-43.
[163]

[164]  *See* nn. 99-103, *supra.*

- 29 -

providers typically charge all patients based on their own charge-master, which contains a list of charges that are commonly based on factors other than AWP.[165]

Plaintiffs' novel and untested, class-wide injury and damages theories[166] are not only based on false assumptions, but also on a fundamental misunderstanding of the Medicare reimbursement regime and further misinterpretations of the 2003 MedPac reports. In particular, Hartman predicates his theory in part on the false belief that Medicare intended or understood its AWP-based reimbursement payments to be equal to the providers' acquisition costs. This belief is at odds with the overwhelming evidence that Congress, federal agencies, insurers and providers all knew and understood that AWP bore no relationship to provider acquisition costs and that Medicare drug reimbursement cross-subsidized other provider expenses and generated provider profits.[167] In the private payor context, Hartman similarly bases his classwide theory on the false belief that TPPs expected AWPs to have a consistent and reasonable relationship to provider acquisition costs. The MedPac reports upon which Hartman relies for this presumption, however, provide no support for his proposition.[168] The evidence also establishes that TPPs had widely varying or no expectations at all about any relationship between AWPs and provider acquisition costs.[169]

### C.    Expert Testimony Requires Rigorous Scrutiny

Such fundamentally flawed opinions cannot serve as the basis for predominance finding and provide no support for Plaintiffs' class certification motion. Moreover, this Court has already expressed significant doubt about the opinions of Plaintiff's experts. For example, this Court noted:

> While Hartman's yardstick methodology may demonstrate average injury to the class and aggregate damages, the TPP's injuries vary based on their individual expectations of the price and their reimbursement rates. While Hartman mentions

---

[165] Dyckman Decl. ¶ 35.
[166]
[167] See Dyckman Decl. ¶¶ 24-43; ]
[168] See Dyckman Decl. ¶ 32;
[169] Dyckman Decl. ¶ 27-28; (

2013352v1

using actual contract reimbursement rates in Phase II, plaintiffs have not adequately explained how each class member will show where its expectation as to the spread between AWP and ASP falls within the 18% to 33% range (and hence damages) absent and individual trial.[170]

The Court further noted:

The present record suggests concerns about the feasibility of using the yardstick methodology in the physician-administered context. How will plaintiffs find reliable comparator drugs to derive the but-for spread? How difficult is it to get reliable survey data on spreads in light of the ambiguities created by J-Codes and the overall lack of pricing transparency?[171]

Declining to follow *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124 (2d Cir. 2001), the First Circuit has rejected the argument that a court may not weigh conflicting expert testimony at the class certification stage and held instead that while class certification cannot be turned into a trial on the merits, a court must still critically evaluate the expert testimony offered by the plaintiffs.[172] Under this standard, the insufficiency of the Plaintiffs' evidence – as noted by the Court – is fatal to class certification.

Indeed, even the Second Circuit has significantly limited its holding in *Visa Check* and explained that a district court should weigh expert testimony where necessary to resolve the "independent question of whether plaintiff had made a proper showing of predominance."[173] Here, weighing the expert testimony does not require an inappropriate merits determination. The court is not being asked to determine whether Plaintiffs will ultimately prevail. Rather, the issue is whether the need for individual evidence on injury and causation would be eliminated by Dr. Hartman's model. Because it goes to the very heart of the predominance inquiry, expert evidence requires the same rigorous analysis as any other class certification evidence – a level of scrutiny that Plaintiffs' "expert evidence" cannot withstand.[174]

---

[170] 230 F.R.D. at 91.
[171] *Id.* at 90.
[172] *In re Polymedica Corp. Secs. Litig.*, 432 F.3d 1, 5, 17 (1st Cir. 2005).
[173] *Heerwagen v. Clear Channel Communications*, 435 F.3d 219, 232-33 (2d Cir. 2006).
[174]

- 31 -

## V.   Plaintiffs Lack Standing, Their Claims Are Atypical, And They Can Not Adequately Represent The Proposed Classes

### A.   Plaintiffs Have Failed to Establish that any Named Plaintiff Has Standing

"[S]tanding . . . frequently appear[s] as [a] threshold requirement[ ] for the maintenance of federal class actions and must be considered in addition to the requirements of Rule 23 when deciding whether a particular action may be certified."[175]  Accordingly, the Court previously held: "Plaintiffs must establish that there is an individual class representative with standing to sue each defendant."[176]  Under Plaintiffs' theory, an AWP is not deceptive and no injury occurs so long as the margin between AWP and provider acquisition cost is within the payer's expectation.  However, Plaintiffs have not come forth with any information regarding their providers' acquisition costs or their then-existing, provider-margin expectations.

Plaintiffs have failed to demonstrate, as required in the Court's August 2005 Order,[178] that the proposed Class 1 representatives made co-insurance payments based on the AWP of the subject drug.[179]  The Court has also observed that fifteen states have "special notice provisions for bringing consumer protection claims" and held that "unless plaintiffs give evidence of compliance with the notice provisions, these states will be excluded."[180]  Plaintiffs have offered

---

[175]  *In re AWP*, 230 F.R.D. at 79 (quoting 7AA Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 1785.1 (3d ed. 2005)). *See also Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("[I]t is well settled that prior to the certification of a class, and technically speaking before undertaking any formal typicality or commonality review, the district court must determine that at least one named class representative has Article III standing to raise each class subclaim.").

[176]  *In re AWP*, 230 F.R.D. at 80.

[177]

[178]  *In re AWP*, 230 F.R.D. at 81.

[179]  Young Decl. ¶¶ 34-36. *See also* Individual Memoranda of Track Two Defendants in Opposition to Class Certification.

[180]  *In re AWP*, 230 F.R.D. at 84-85 (emphasis added).

- 32 -

no such evidence and therefore lack standing to bring or represent Class 1 claims under these states' laws.[181]

Furthermore, neither Sheet Metal Workers' National Health Fund (Sheet Metals) nor Pipefitters Local 537 Trust Funds (Pipefitters) have demonstrated that they paid for a subject drug based on its source company's AWP,[182] in part because the majority of drugs for which Sheet Metals and Pipefitters allegedly made payments are multi-source drugs for which they cannot determine whether payments were based on a source company's AWP.[183]

**B.      Sheet Metal Workers Lacks Standing to Pursue a Chapter 93A Claim**

In its August 2005 Order, this Court held that Massachusetts law required application of the consumer protection statute of the plaintiff's home state.[184] As the Court observed, the most significant contacts for choice of law purposes are the place where the plaintiff acted in reliance on a representation, the place were the representation was received and the plaintiff's residence.[185] As to Sheet Metals, which is located in Tennessee,[186] these factors favor the application of Tennessee law. With respect to Sheet Metals' decisions as to whether an how to offer Medi-Gap insurance, the places in which its beneficiaries obtained subject drugs is not a significant choice-of-law factor. Sheet Metals received the alleged AWP representations and acted upon them by setting reimbursement rates in Tennessee, its home state. Significantly, it is doubtful that Sheet Metals' claim is even viable under Tennessee law. It is far from clear that class actions are permitted under Tennessee's consumer protection act.[187] And, a Tennessee

---

[181]   *See, e.g., McMahon v. Digital Equip. Corp.*, 944 F. Supp. 70, 77 (D. Mass. 1996) (requirement of notice to defendant 30 days before commencement of litigation is a jurisdictional prerequisite for a consumer's chapter 93A claim).

[182]   Young Decl. ¶¶ 84-87, 114-116. *See also* Individual Memoranda of Track Two Defendants in Opposition to Class Certification.

[183]   Randle Aff. Ex. 2; Young Decl. ¶¶ 12-15.

[184]   230 F.R.D. at 83.

[185]   *Id.*

[186]   FAMCC ¶ 30.

[187]   *See Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 n.9 (Tenn. App. 2005) ("The [Tennessee Consumer Protection] Act limits private actions to 'individual' claims. Accordingly, class actions cannot be maintained under the TCPA.")

- 33 -

appellate court recently held that Tennessee's consumer protection act does not apply to alleged anti-competitive conduct, regardless of whether such conduct is actionable under the state's antitrust act.[188]

### C.   Pipefitters Cannot Adequately Represent Class 3 Plaintiffs

#### 1.   Pipefitters is subject to unique defenses

Noting that TPPs may be subject to unique defenses based upon their superior knowledge regarding AWP and that conflicts of interest exist between TPPs and consumers based upon their different economic interests, the Court previously held that TPPs could not adequately represent the interests of consumer plaintiffs.[189]   These same considerations are present here.

Pipefitters uses BCBSMA to administer its plan.[190]

As Pipefitters' agent, BCBSMA's knowledge is imputed to Pipefitters.[192]   Thus, Pipefitters is charged with the same knowledge and sophistication as BCBSMA.   Courts have repeatedly held that, due to their vulnerability to unique defenses, plaintiffs with greater knowledge and sophistication than other members of the class fail to satisfy Rule 23(a)'s requirements for typicality and adequacy.[193]

#### 2.   Pipefitters cannot adequately represent consumers

The claims of proposed Class 3 are limited to claims actionable under chapter 93A of the Massachusetts General Laws.   Significantly, by both statute and case law, actions by commercial

---

[188]   *See Bennett v. Visa U.S.A. Inc.*, No. E2005-00659-COA-R9CV, 2006 WL 770467, at *6 (Tenn. Ct. App. Mar. 27, 2006).

[189]   *See In re AWP*, 230 F.R.D. at 80.

[190]   Mar. 8, 2006 Hannaford Decl. ¶ 5.

[191]

[192]   *See DeVaux v. Am. Home Assurance Co.*, 444 N.E.2d 355, 358 (Mass. 1983); *Clean Harbors, Inc. v. John Hancock Life Ins. Co.*, 833 N.E.2d 611, 623 n.13 (Mass. App. 2005).

[193]   *See, e.g., Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 59-60 (2d Cir. 2000) (proposed class representative, who was more sophisticated and had access to greater information than other class members was not typical); *In re HealthSouth Corp. Secs. Litig.*, 213 F.R.D. 447, 459 (N.D. Ala. 2003) (plaintiffs' superior knowledge subjected them to unique defenses rendering their claims atypical).

- 34 -

entities are governed by different standards than actions by consumers. Actions by persons engaged "in the conduct of any trade or commerce" are governed by Section 11 of Chapter 93A.[194] Actions by all other persons are governed by Section 9.[195] Massachusetts and federal courts have consistently respected the differences between the two sections.[196] Claims brought under Section 11, which is limited to business plaintiffs, are governed by a heightened standard of culpability.[197] Because its claims will be subject to different legal rules and burdens of proof, Pipefitters cannot adequately represent consumer members of Class 3.

### 3. Inherent conflicts exist among the putative members of Class 3

"Due process requires that no potential conflicts exist between class representatives and class members that would interfere with the representation of the class."[198] The relationship between Pipefitters, its plan members and BCBSMA makes plain the interrelationships among Class 3 members that give rise to inherent conflicts of interest. For example, Pipefitters relied upon BCBSMA to obtain the best discount it could for drugs and believed that BCBSMA had a contractual obligation to do so.[199] Presumably, Pipefitters' plan members were relying upon Pipefitters for the same result. Given BCBSMA's knowledge that AWP bore no relationship to actual acquisition costs, and given its knowledge of actual acquisition costs as a purchaser of drugs, Pipefitters and its members have potential claims against fellow Class 3 member BCBSMA.

---

[194]   Mass. Gen. Laws ch. 93A § 11.

[195]   *Id.* § 9.

[196]   *See Damon v. Sun Co.*, 87 F.3d 1467, 1486 (1st Cir. 1996); *see also Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. 1979) ("The remedies and procedures in §§ 9 and 11 are related, but not parallel, and the conditions of one section should not be read by implication into the other.").

[197]   *Damon*, 87 F.3d at 1483; *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 200 (1st Cir. 1995); *Concourse Ticket Agency v. Kraft*, No. CA9500666, 1995 WL 809935, at *3 (Mass. Super. Ct. Apr. 3, 1995).

[198]   *In re HealthSouth Corp.*, 213 F.R.D. at 462.

[199]   Dec. 29, 2005 Hannaford Dep. at 173-74, 237.

2013352v1

Where class members have potential claims against each other, conflicts of interest arise that prevent adequate representation.[200]  For the same reason, a class representative's failure to pursue a claim against a potentially culpable party creates a conflict of interest that defeats adequacy.[201]  Here, an inherent conflict exists between Class 3 members who administered plans and plan participants.  This conflict cannot be cured by allowing plaintiffs' counsel to propose another class representative.  The same conflicts are likely to arise among any other plan provider, plan participants and plan administrator.  Even if a class representative not afflicted by this conflict could be found, the conflict would still extend to class counsel.[202]

Class conflicts cannot be cured by an opt-out right.[203]  Rather, "[p]rospective conflicts between class representatives and class members must be assessed at the outset of the litigation."[204]  Notice and the right to opt-out are not a substitute for the adequate conflict-free representation.[205]  The unavoidable conflicts of interest among putative class members precludes certification of proposed Class 3.

**D.    Plaintiffs' Claims Are Not Typical of other Class Members**

"[I]f [a class representative's] claim is atypical, he is not likely to be an adequate representative; his incentive to press issues important to other members of the class will be impaired."[206]  For the reasons discussed above, each the Plaintiffs' claims is highly dependent

---

[200]  *See Epifano v. Boardroom Business Prods., Inc.*, 130 F.R.D. 295, 300 (S.D.N.Y. 1990).

[201]  *See, e.g., Adise v. Mather*, 56 F.R.D. 492, 496 (D. Colo. 1972) (plaintiff's failure to name as a defendant an entity with whom it had an ongoing business relationship created a conflict of interest with the class).

[202]  *Cf. Nat'l Air Traffic Controllers Ass'n v. Dental Plans, Inc.*, No. Civ.A. 1:05-CV-882TW, 2006 WL 584760, at *4 (N.D. Ga. Mar. 10, 2006) (proposed class counsel had a conflict of interest when they also represented a party potentially liable to the class); *Davis v. Kraft Foods N. Am.*, No. Civ.A. 03-6060, 2006 WL 237512, at *11-12 (E.D. Pa. 2006) (class counsel conflicted by representation of plaintiff's supervisor).

[203]  *See Jim Moore Ins. Agency, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 02-80381-Civ., 2003 WL 21146714, at *7 (S.D. Fla. May 6, 2003), *magistrate opinion adopted*, 2003 WL 22097937 (Sept. 2, 2003).

[204]  *Id.*

[205]  *Colindres v. Quietflex Mfg.*, No. CIV.A. H-01-4319, 2006 WL 846367, at *25 (S.D. Tex. Mar. 31, 2006).

[206]  *Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999).

upon their unique circumstances and, therefore, no Plaintiffs' claim is typical of all class members.

Further, a plaintiff cannot stand in the shoes of everyone that has purchased a subject drug from a particular defendant. The Court has noted that "'a common commercial practice' . . . is not enough to establish juridical linkage" and that "[t]he doctrine of juridical linkage is not indefinitely elastic so as to permit an industry-wide challenge on the basis of the conduct of select companies."[207] In addition, typicality requires that a representative plaintiff have a personal stake in the outcome of a particular claim. Altruism is not enough. A plaintiff who purchased only Drug A has no stake in proving liability as to Drug B.[208] Though many subject drugs may be manufactured by a single defendant, each drug is priced and marketed differently than the other. For example, an injectible drug for prostrate cancer is priced, introduced to the market, and sold in ways that differ in significant respects from a respiratory inhalant. Indeed, Plaintiffs have conceded that liability must be determined on a drug-by-drug basis.[209] The Court must decline to certify any claims related to drugs for which no named plaintiff can demonstrate making a payment based on an AWP from the source company for the drug.

## VI.   A Class May Not Be Certified Pursuant To Rule 23(b)(2)

### A.   The Proposed 23(b)(2) Plaintiff Lacks Standing to Pursue Injunctive Relief

Plaintiffs propose that Health Care For All (HCFA), a membership-based association, serve as the Rule 23(b)(2) representative for Class 3. An association may assert standing on behalf of its members only if at least one of them possesses standing in his or her own right by meeting Article III requirements.[210] HCFA's 30(b)(6) designee testified, however, that the allegations in the FAMCC regarding its members' making payments for subject drugs based

---

[207] *In re AWP* (First MTD Decision), 263 F. Supp. 2d 172, 193-94 (D. Mass. 2003).

[208] *Cf. Jones v. Roy*, 202 F.R.D. 658, 662-63 (M.D. Ala. 2001).

[209] *See* Plaintiffs' Opposition to Amgen's Motion to Dismiss CAMCC at 5 ("Whether or not a given AWP is reliable or inflated by the scheme is discovered on a drug-by-drug basis."); Plaintiffs' Reply to Bristol-Myers Squibb's Individual Memorandum in Opposition to Class Certification at 5 ("liability and damages will be both defendant- and drug-specific").

[210] *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998).

- 37 -

upon AWP are "inaccurate."[211]  HCFA conceded that it has no knowledge whether any of its members have been injured as a result of any alleged AWP scheme.[212]  HCFA also admitted that it – separate from its members – has not been injured by Plaintiffs' alleged AWP scheme.[213] Accordingly, HCFA lacks standing to sue.

### B.   Plaintiffs Have Never Briefed, Much Less Satisfied, The Requirements of Rule 23(b)(2)

Class cohesiveness and manageability are inherent requirements of every class action, regardless of the provision of Rule 23 invoked by plaintiffs.[214]  While Rule 23(b)(2) does not expressly require a finding of predominance, courts have held that this provision of the rule is even less tolerant of individual issues than Rule 23(b)(3).[215]  Given the variability of the proofs necessary to establish recovery for each class member in this case, class certification is just as improper under Rule 23(b)(2) as under 23(b)(3).[216]

Rule 23(b)(2) certification is also not appropriate because Plaintiffs seek predominately monetary damages.[217]  The fact that the proposed representative for the (b)(2) class conceded that it does not know and cannot identify the injunctive remedy it seeks[218] confirms that Plaintiffs assert no more that an "[i]nsignificant or sham request[]" intended to "provide cover for (b)(2) certification of claims that are brought essentially for monetary recovery."[219] Moreover, as a result of the Medicare Modernization Act, Medicare reimbursement is no longer based on AWP and, on a quarterly basis, an average of the prices at which manufacturers sell

---

[211]  May 23, 2006 Shannon Dep. at 53-54, 60.
[212]  *Id.* at 54, 56-57, 61-63.
[213]  *Id.* at 181.
[214]  *Shook v. El Paso County*, 386 F.3d at 963, 972-73 (10th Cir. 2004) .
[215]  *Barnes v. Am. Tobacco Co.* 161 F.3d 127, 143 (3d Cir. 1998)  (stating that "a (b)(2) class may require more cohesiveness than a (b)(3) class . . . because in a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out").
[216]  Given that Plaintiffs have never briefed the requested (b)(2) relief and that Health Care for All – Plaintiffs' proposed (b)(2) representative – had no idea as to the nature of the relief requested, Plaintiffs' requested (b)(2) relief should be summarily rejected.
[217]  Rule 23(b)(2) Advisory Committee Notes (1966); *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004).
[218]  Shannon Dep. at 65, 182.
[219]  *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir. 2001).

- 38 -

drugs to wholesalers or providers is publicly available on the CMS website.[220] Thus, as the Court previously acknowledged, "there's [no apparent] prospective [injunctive] relief that would be appropriate on AWP."[221]

## VII.   The Classes Are Not Ascertainable

For the reasons discussed above, Part B beneficiaries, and most TPPs (and the lawyers representing them) have no idea whether they made an AWP-based co-pay. Determining whether any consumer or TPP made a payment based upon AWP for a subject drug sold by a Track Two Defendant is a difficult, complex and fact-intensive process requiring third-party discovery – and for multi-source drugs at issue here, the answer is almost always "no." Rule 23(a) includes an implicit requirement that there be an ascertainable or identifiable class.[222] Otherwise "problems may arise regarding the provision of notification to class members, the binding effect of any judgment rendered in the case and the general concerns of propriety of an overly large class."[223] As a result, when "class members [are] impossible to identify prior to individualized fact-finding and litigation, the class fails to satisfy one of the basic requirements for a class action under Rule 23."[224] The individual fact-finding required to determine class membership and Plaintiffs' counsel's repeated inability to do so accurately demonstrates that Plaintiffs have failed to define a readily ascertainable class.[225]

---

[220]  *See* 42 U.S.C. §§ 1395u(o)(1), 1395w-3a.

[221]  Jan. 19, 2006 Hr'g Tr. at 33.

[222]  *Dumas v. Albers Med. Inc.*, No. 03-0640-CV-W-GAF, 2005 WL 2172030, at *5 (W.D. Mo. Sept. 7, 2005).

[223]  *Ad Hoc Comm. to Save Homer G. Phillips Hosp. v. City of St. Louis*, 143 F.R.D. 216, 219 (E.D. Mo. 1992).

[224]  *Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986).

[225]  Due process requires that a class be precisely defined. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 160-61 (1982); *Clay v. Am. Tobacco Co.*, 188 F.R.D. 483, 490 (S.D. Ill. 1999). Plaintiffs, however, have failed to fix the composition of the defined classes because, among other things: (1) the absence of a cut-off date for Class 3 allows the class to change in composition throughout the trial; and (2) including those "who incurred an obligation enforceable at the time of judgment" in classes 1 and 3 puts the composition of the class in flux and purchasers of subject drugs will not know whether they are in the class or not until a final judgment is entered. Plaintiffs' proposed class definitions fail to satisfy due process.

## CONCLUSION

For each transaction, Plaintiffs' claims will require individual adjudication of:

- Whether a given drug transaction resulted in a Plaintiff incurring any obligation to pay for a Subject Drug based on the AWP of a named defendant source (probative of injury and causation);

- Provider acquisition costs and cross-subsidies (probative of whether an AWP was a misrepresentation and whether the alleged injury occurred);

- Reimbursement and provider charge methodologies (probative of injury and causation);

- Payer knowledge and expectations (probative of deception, causation, injury, limitations and failure to mitigate); and

- Source company reported pricing and disclaimers, independent determination of AWPs by pricing compendia and Part B carriers, and the market power or providers and TPPs (probative of injury, causation and intervening causation).

The sheer complexity of this analysis itself renders it infeasible to afford class treatment to the claims of the named plaintiffs as they relate to Track 2 Subject Drugs. As a result, individual issues predominate and class action treatment would neither be superior to individual litigation nor manageable. Further, neither commonality nor typicality is satisfied because the class members' claims are subject to varying legal standards and each claim arises from unique circumstances. Finally, the proposed class representatives lack standing to assert claims for damages or injunctive relief and cannot adequately represent the class.

- 40 -

Respectfully submitted,

Michael DeMarco (BBO #119960)
  mdemarco@klng.com
Aimée E. Bierman (BBO #640385)
  abierman@klng.com
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
(617) 261-3100


Michael L. Koon
James P. Muehlberger
Nicholas P. Mizell
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
(816) 474-6550

Attorneys for Aventis Pharmaceuticals Inc.
and on behalf of the following Track Two
Defendants:

Abbott Laboratories, Amgen Inc., Aventis
Pharmaceuticals Inc., Baxter Healthcare
Corp., Baxter International Inc., Bayer
Corporation, Dey, Inc., Fujisawa Healthcare
Incorporation, Fujisawa USA, Inc., Hoechst
Marion Roussel, Inc., Immunex
Corporation, Pfizer, Inc., Pharmacia Corp.,
Pharmacia & Upjohn, Sicor, Inc. f/k/a
Gensia, Inc., Gensia Sicor Pharmaceuticals,
Inc., Sicor Pharmaceuticals, Inc., Watson
Pharmaceuticals, Inc., and ZLB Behring
L.L.C.

Dated: June 15, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2006 I served a true and correct copy of the foregoing on Plaintiffs' liason counsel, Thomas M. Sobol and Edward Notargiacomo, Hagens Berman Sobol Shapiro LLP, One Main Street, 4th Floor, Cambridge, MA 02142, by hand delivery.


Aimée E. Bierman

- 41 -

2013352v1