# EXHIBIT 1
## [REDACTED VERSION]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY | ) | |
| AVERAGE WHOLESALE PRICE | ) | MDL NO. 1456 |
| LITIGATION | ) | |
| | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Judge Patti B. Saris |
| ALL CLASS ACTIONS | ) | |
| | ) | Chief Magistrate Judge Marianne B. Bowler |

[REDACTED VERSION]

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2
DEFENDANTS' OPPOSITION TO CLASS CERTIFICATION

June 14, 2006

**EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION**

## 1.     SUMMARY OF OPINIONS

1)      I am a health economist and the author of two reports that are cited by Plaintiffs' experts in support of their opinions in this case.  These reports were prepared on behalf of the Medicare Payment Advisory Commission (MedPAC), advisor to Congress on Medicare payment, quality of care and access issues.  Dyckman Study 1 describes private health plan payment methodology for physician services and Dyckman Study 2 focuses on payment methodology for physician-administered drugs.

2)      I have been asked by the Track 2 defendants (Defendants) to address the following issues that relate directly to a determination of class-wide causation and injury, and to consideration of class certification:

- Plaintiffs experts' possible misinterpretations and misunderstandings of data and other facts contained in my reports

- Plaintiffs experts' possible misunderstandings and errors regarding Medicare payment for physician services, including physician-administered drugs

- Plaintiffs experts' possible misunderstandings and errors regarding private health plan payment for physician services, including physician-administered drugs

3)      Plaintiffs' expert, Dr. Hartman, develops a class-wide theory of causation, injury and damages related to the Track 1 Defendants that relies, to a significant extent, on findings from my 2003 MedPAC Studies.   I find that the Plaintiffs' experts, Dr. Rosenthal and Dr. Hartman, misinterpret and misunderstand data and other facts included in the two Dyckman reports.   In addition, based on my experience, I conclude that Plaintiffs' experts have an inadequate understanding of other commonly known facts relating to physician charge practices, and Medicare and private health plan physician payment methodology.  These misinterpretations and misunderstandings render Dr. Hartman's class-wide theory of causation and injury fundamentally flawed.  Among the more important misunderstandings and errors are:

1

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

- Dr. Hartman misinterprets data in Dyckman Study 2 regarding health plans' typical average wholesale price (AWP) pricing formula.  He wrongfully claims that

- Dr. Rosenthal and Dr. Hartman assume erroneously, relying in part on Dyckman Study findings, that Medicare and third-party payer (TPP) payments to physicians are consistently based on payer maximum allowances, and not on physician submitted charges.

- Dr. Rosenthal and Dr. Hartman assume erroneously in the few situations when they acknowledge that payment may be based on the physician charge and not the Medicare or TPP fee, that payment is still based on AWP because providers set their charges based on AWP.

- Dr. Rosenthal and Dr. Hartman assume erroneously, disregarding findings from the Dyckman Studies and other sources, that payment rates for drugs are not interrelated with payment rates for drug administration services and they do not consider that many payers understand this interrelationship and incorporate it into their drug pricing decisions.

- Dr. Rosenthal and Dr. Hartman are wrong in their assumption that more than 99 percent of all Medicare beneficiaries pay their co-payment liability for drugs, and variation in payment of co-payment liability need not be a concern in considering who may have suffered damages under Plaintiffs' theory of causation, injury and damages.

4)      It is my conclusion that, as a result of these and other misunderstandings and errors, Dr. Hartman is wrong in his conclusion that causation and injury can be determined on a class-wide basis.  Substantial variability exists among class members regarding spread expectations, whether drug payment amounts were based on AWP, and whether a member actually paid coinsurance.  For each drug transaction, individualized inquiry is required to determine if causation and injury exist under Plaintiffs' theories.  Moreover, because there is no neat and consistent pattern of variability within the proposed classes for the required components of Plaintiffs' theories, it is not possible to create a structure of sub-classes, by drug, by health plan, by time, or by any other classification scheme that I could imagine to determine causation and injury on a sub-class basis.

2

**EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION**

---

Qualifications

5)      I am the author of several of the reports cited by Plaintiffs' experts in support of their
opinions in this case.  My expertise is in health economics and specifically in several of the areas
relevant to this case.

6)      I am a health economist and President of Dyckman & Associates.  Dyckman &
Associates is a health care research and consulting firm that provides services to health care
payers and providers, government agencies with health care responsibilities, and other
participants in the health care industry.  I received my Ph.D. in economics from the University of
Pennsylvania.  My curriculum vita is provided as Attachment A.  A list of trials and depositions
at which I have testified over the past four years is provided as Attachment B.  I am being
compensated for my work on this case at my standard rate of $450 per hour.

7)      I have more than 25 years of research and consulting experience in several areas directly
relevant to this case, including Medicare and private health plan payment practices for physician
services and prescription drugs.  I have authored several widely cited studies on provider
payment issues and have testified before Congressional committees, and state regulatory and
legislative bodies on these and other health care finance issues.  These studies have been done
for the federal Medicare program, the Medicare Payment Advisory Commission (MedPAC), and
other public and private sector organizations.

8)      My experience in working with private health plans on physician and other provider
payment methodologies is extensive.  Since 1990, I have evaluated and helped design physician
payment systems for approximately 40 different health plans.  My private payer experience
includes approximately ten consulting and litigation support projects for health plans in
Massachusetts, all involving provider payment issues.

9)      Two recent studies that I directed on behalf of MedPAC are especially relevant to this
case, and have been cited extensively in Plaintiffs' expert reports and in other case submissions.
These are:

> Dyckman Study 1: Dyckman, Z. and Hess, P.  "Survey of Health Plans Concerning
> Physician Fees and Payment Methodology," Medicare Payment Advisory Commission,
> No. 03-7, August 2003.

3

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

Dyckman Study 2: Dyckman, Z. and Hess, P. "Health Plan Payment for Physician-
Administered Drugs," Medicare Payment Advisory Commission, No. 03-5, August 2003.

10)     In Dyckman Study 1, we surveyed 33 health plans regarding physician fees and

characteristics of physician payment methodology, competitive dynamics in physician service

markets, and factors that influence health plans in making physician fee decisions. Dyckman

Study 2 reports on findings from the same survey and provides more detail regarding health plan

payment for physician-administered drugs. Findings from Dyckman Study 1 were included in

the March 2003 MedPAC Report to the Congress and findings from Dyckman Study 2 were

included in the June 2003 MedPAC Report to the Congress.


## 2.     RELEVANT BACKGROUND INFORMATION

<u>Proposed Class Structure</u>

11)     The Court has been offered a proposed Consolidated Order Re: Motion for Class

Certification Track 2. This proposed Order identifies three proposed classes:

> (1) All natural persons nationwide who made, or who incurred an obligation enforceable
> at the time of judgment to make, a co-payment based on AWP for a Medicare Part B
> covered Subject Drug that was manufactured by Abbot, Amgen, Aventis, Baxter,
> Dey, Fujisawa, Immunex, Pfizer, Pharmacia, The Sicor Group and Watson. Excluded
> from the Class are those who made flat co-payments, or who were reimbursed fully
> for any co-payments, or who have the right to be fully reimbursed; and the residents
> of the states of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi,
> Montana and Virginia (where consumer protection statutes do not permit class
> actions).

> (2) All Third-Party Payors who made reimbursements for drugs purchased in
> Massachusetts, or who made reimbursements for drugs and have their principal place
> of business in Massachusetts, based on AWP for a Medicare Part B covered Subject
> Drug that was manufactured by Abbot, Amgen, Aventis, Baxter, Dey, Fujisawa,
> Immunex, Pfizer, Pharmacia, The Sicor Group and Watson.

> (3) All natural persons who made or who incurred an obligation enforceable at the time
> of judgment to make a payment for purchases in Massachusetts, and all Third-Party
> Payors who made reimbursements based on AWP as a pricing standard and have their
> principal place of business in Massachusetts or who have made reimbursements for
> Medicare Part B consumers in Massachusetts, for a physician-administered Subject
> Drug that was manufactured by Abbot, Amgen, Aventis, Bayer, Baxter, Dey,

4

Fujisawa, Immunex, Pharmacia, The Sicor Group and Watson. Included within this Class are natural persons who paid co-insurance (i.e., co-payments proportional to the reimbursed amount) for a Subject Drug purchased in Massachusetts, where such coinsurance was based upon use of AWP as a pricing standard. Excluded from this Class are any payments or reimbursements for generic drugs that are based on MAC and not AWP.[4]

12)     Sub-classes are proposed for each of the individual defendant groups. The proposed class period for Class 1 and Class 2 is January 1, 1995 to January 1, 2005. For Class 3, it is January 1, 1991 to the "present". In discussing the three proposed classes, I refer to them as:

- Class 1: Medicare Part B Co-Payment Class

- Class 2: TPP MediGap Supplemental Insurance Class

- Class 3: Non-Medicare Consumer and TPP Class


Definition of Common Provider Payment Terms

13)     There are several commonly used provider payment terms that are often confused. It may help to understand the issues in this case if there is greater clarity and consistency regarding these terms.

- The provider's **submitted charge** (or **actual charge** or **billed charge**) for a service is the amount that is on the patient's bill and on the claim form submitted by the provider to a health plan. Based on my experience, providers use a common set of charges for all payers and do not alter the charge to reflect the expected price for a particular payer.

- The **maximum allowance** is the Medicare or health plan's maximum reimbursement for a service. It is inclusive of all patient cost sharing, such as coinsurance, fixed co-payments and deductibles. The word **fee**, as in Medicare or health plan **fee schedule**, is sometimes used in place of the maximum allowance.

- The **allowed charge** (or **allowed amount**) is the price that a health plan pays for a specific service rendered by a specific provider to a specific patient, inclusive of all patient cost sharing such as coinsurance, fixed co-payments and deductibles. The allowed amount for a physician service under Medicare, and based on my experience, for private health plans as well, is the lesser of the submitted charge and the plan's maximum allowance.

- The health plan **payment** or **amount paid** is the amount that is paid by the health plan for the service. The health plan payment for a service is the allowed amount less

---

[4] [Proposed] Consolidated Order Re: Motion for Class Certification Track 2 [Version 2], March 1, 2006.

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

<hr>

any applicable patient cost sharing such as coinsurance, fixed co-payments and
deductibles.

Sources Relied Upon in Developing My Opinions

14)     In preparing this report, I reviewed numerous documents, including government reports,
communications and other documents, health trade industry publications, and professional
literature related to payment of physician services and physician-administered drugs.  I also
reviewed expert reports, deposition transcripts and other case documents.  A listing of the
documents relied upon in developing my opinions is provided in Attachment C.

3.     PLAINTIFFS' EXPERTS MISINTERPRETATIONS OF DYCKMAN STUDY
DATA AND OTHER ERRORS

Relevance of Variation Among Class Members

15)     A distinction needs to be made between the types of variation that can cause complexities
in measuring the amount of individual class member damages and the types of variation that can
cause complexities in determining whether an individual class member was injured.  Dr.
Hartman focuses on variation that results in different amounts of damages to individual class
members and argues that this variation is not a barrier to calculating class-wide damages.  I focus
on the types of variation that are critical to a determination of whether or not potential injury
may exist for members of the proposed three classes, and whether a determination can be made
without individualized inquiry as to whether each member of the proposed class has or has not
experienced injury under Plaintiffs' theories.

16)

Dr. Hartman goes on to note,

<hr>

6

**EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION**

17)    Dr. Hartman acknowledges that there is price and AWP spread variation among class
members.

18)    As I demonstrate below, variation exists among class members regarding multiple
independent factors that result in uncertainty as to which members of the proposed classes
actually experienced any injury at all under Plaintiffs' theory.  Dr. Hartman and Dr. Rosenthal
do not recognize or admit the existence of this variation.  This failure is caused by their
misunderstanding of findings in the two Dyckman studies, their inadequate understanding of
physician charge practices, private health plan and Medicare payment methodologies, and their
refusal to give credence to the deposition testimony of knowledgeable staff from numerous
health plans who are members of the proposed classes in this litigation.

<u>AWP Spread Expectations Based on Dyckman Study Price Data</u>

19)

7

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

Exhibit 2 provides data on the average percentage AWP formula used
by most of the study plans, which varies from 85 to 115 percent of AWP.  In referring to the data
in Exhibit 2, Dr. Hartman states:

20)     I believe this is a serious misinterpretation of my study's findings.  The health plan
survey did not include any questions regarding spread expectations.  It asked about prices that
were being used in the market place, not about expectations.  Findings from the survey cannot be
used to define or confirm expectations about AWP spread.

21)     There is no "revealed preference" based on findings from my study beyond what buyers
and sellers have agreed to pay for drugs at a specific point of time, fall 2002.[11]  Based on the
Dyckman Study, there is no way to tell whether health plans had spread expectations or, if they
did, what they were.  However, other information is available which may shed some light on this
issue.

22)     As part of our provider payment research for MedPAC, reported in Dyckman Study 1, we
asked health plans to identify the factors that were important in their physician fee decisions.
The three factors that were considered as "Very Important" by one or more of the 33 study plans
were:

1.  Impact of fee changes on claims cost and premiums (25 plans)

---

[11] The study did not consider drugs administered at a hospital inpatient or outpatient setting.

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

2. Impact on plan's ability to maintain an adequate provider network that meets customer access requirements (22 plans)

3. Parity/Consistency with competitor fee levels (8 plans)

23)    None of the other factors, including a) Consistency with inflation or medical cost indices or b) Desire to achieve specific proportionate relationship between plan fees & Medicare fees, was perceived as Very Important by any of the study plans.[12]

24)    It is my experience in working with health plans on physician payment over the past two decades, confirmed by the Dyckman Study 1 findings summarized above, that health plans generally do not examine nor are they interested in physician cost data in setting or adjusting their fees.[13] Health plans try to balance the sometimes conflicting objectives of moderating cost growth and maintaining an attractive provider network, at the same time keeping an eye on how their fees compare with competitor health plan fees in their market. In addition, health plans sometimes alter fees or allow add-on payments for specific services to motivate physicians to provide care in a cost-effective manner. Thus, health plans may provide additional reimbursement to physicians to promote delivery of care, where medically appropriate, in an office setting instead of in a more costly hospital setting.

---

[12] Dyckman Study 1, p. 18.
[13] An exception to this statement is that when physicians seek fee increases as a result of their claiming to have experienced large increases in cost for a specific expense category, e.g., malpractice premiums, health plans may seek evidence of the actual cost increase for the expense category.

9

25)     Both Dr. Hartman and Dr. Rosenthal downplay the validity of comments regarding
spread expectations in deposition testimony from health plan staff,

Both Plaintiffs' experts commented
that the opinions offered in deposition testimony may be from those without direct involvement
in drug pricing decisions.  In fact, deposition testimony is available from individuals that clearly
were involved in drug pricing decisions, who indicated they had no expectations regarding a
specific spread.

26)     The AWP pricing data in my report, relied upon by Dr. Hartman in forming his opinion
regarding expectations, provide no insight as to whether or not health plans had expectations
regarding the spread.  Based on my experience in working with public and private sector health
plans on physician payment issues, review of numerous health plan staff depositions in this case,
and Medicare staff communications that are part of the record in this case, I believe that few if
any class members had any expectations at all regarding the spread.

27)     Dr. Berndt found that there was a wide variety in degree of understanding among health
plans regarding what AWP is, and its relationship with wholesale acquisition cost (WAC) and
provider acquisition cost.[18]  Dr. Berndt comments that "it is also quite clear that knowledgeable
observers understood that physicians were able to purchase many of the Medicare Part B
outpatient drugs at acquisition costs considerably less than AWP."[19]  The health plan depositions

---

[18] Dr. Berndt cites deposition testimony from some health plan staff that they understood that providers acquired
drugs at considerably less than AWP and testimony from others that they thought AWP represented actual provider
transaction prices.  Report of Independent Expert Ernst R. Berndt, February 9, 2005, Paragraph 75.
[19] Report of Independent Expert Ernst R. Berndt, February 9, 2005, Paragraph 97.

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

further support the conclusion that opinions about the size of the spread varied among many
health plans.

28)      Based on the review of information contained in Dr. Berndt's report and my own review
of deposition testimony in this case, I conclude that, while there was a wide range of opinions
concerning the existence of a spread and its size and variability, it is uncertain if any of these
opinions rose to the level of expectations.  Spread expectations did not play a role in drug pricing
decisions for most (and possibly all) health plans during the class period.  Expectations regarding
the spread is critical to the Plaintiffs' theory of causation and injury.  Inquiry is required at the
individual health plan level to determine the pricing methodology used, the expectations, if any,
regarding spread, and any role that the expectations may have had in setting pricing strategy for
drugs.

29)      A central component of Plaintiffs' class-wide theory of causation, injury and damages is
that class members consistently paid prices that were based on AWP.  There are several
components to this argument:

   1.  Payment by class members is nearly always based on the Medicare or health plan
       maximum allowance and almost never on the provider charge
   2.  Even if payment is based on the provider charge, the provider charge is based on AWP
   3.  Medicare and health plan maximum allowances are consistently based on AWP

Hartman's Assumption: Payment is Based on Maximum Allowance, Not Provider Charge

30)      Dr. Hartman implicitly assumes in his report that the price paid by class members for
drugs is always the Medicare or health plan maximum allowance and never the provider charge.
This assumption by Dr. Hartman is wrong.  The allowed charge under Medicare is the lower of
the submitted charge or the Medicare maximum allowance.  The Medicare Claims Processing
Manual clearly states, "The Medicare allowed charge for such physicians' services (provided on

11

or after January 1, 1992) is the lower of the actual charge or the fee schedule amount."[21]
Specifically for prescription drugs, Federal regulations specify that Medicare payment "…is
based on the lower of the actual charge on the Medicare claim for benefits or 95 percent of the
national average wholesale price of the drug or biological."[22]

31)    Dr. Hartman has an incorrect and highly unusual understanding of what Medicare
regulations mean by actual charge or billed charge.

The term billed charge or actual charge has a very clear and well-understood meaning
in Medicare (as well as in private health insurance) reimbursement methodology.  It is the
provider's charge that is included in the provider's claim to Medicare for a product or service,
not the amount that the provider may have paid another party for the product or service.  By
denying the possibility that Medicare pays the lower of the maximum allowance and the provider
submitted charge, Dr. Hartman assumes causation and injury, and calculates damages where
none may exist under the alleged AWP scheme.

32)    Similar to Medicare, it long has been standard health insurance industry practice to pay
physicians based on the lower of the submitted charge or the health plan maximum allowance.
This payment rule is often included in health plan-physician contracts.    In working with more
than 40 health plans over the past two decades, I do not recall a single plan that would pay the
physician based on the plan's maximum allowance if it exceeded the physician's billed charge.
The practice of both public and private health plans paying based on the lower of the provider
charge or the maximum allowance is so well established and so well known, I and others who
conduct research on provider payment issues tend not to mention it in reports and articles.  Thus,
it was not noted in the two Dyckman studies.

---

[21] Medicare Claims Processing Manual, Ch. 12 Physicians/Nonphysician Practitioners, Section 20, Medicare
Physician Fee Schedule (MPFS).
[22] Code of Federal Regulations, Title 42, Sec. 405.517 (revised as of October 1, 1999).

**EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'**
**OPPOSITION TO CLASS CERTIFICATION**

33)     Payment below Medicare maximum allowances for physician-administered drugs occurred through much of the proposed class period.  There are a number of reasons for provider charges being below Medicare maximum allowances:

- Based on my experience, some physicians set their charges for drugs, supplies, laboratory tests and other items that they purchase from others at or very close to the price that they pay for the item.  Other physicians set their charges at a percentage above their — acquisition costs.  It is reasonable to believe that many physicians do not use AWP as the basis for their charges to Medicare and private payers.  For physicians that set their charges based on acquisition costs, charges for at least some and perhaps for many drug claims during the class period were likely to be below Medicare and private health plan maximum allowances.

- Until 2003, each Medicare carrier determined its own drug prices using AWP pricing sources of its own choosing.  A November 1993 internal government memo referred to "huge carrier fee discrepancies."[25]  As late as December 2002, a government official referred to the problem of "divergent drug pricing around the country."[26]

The frequency with which provider charges were below plan maximum allowances varied by provider, by drug and by health plan.

Hartman's Assumption: Provider Charge is Based on AWP

34)

. Dr. Rosenthal makes

the following comments:

---

[25] Memorandum from Fred Rosen, Director, Medicare Carrier Operations Branch to Carol Walton, Director, Bureau of Program Operations, Assignment of Lead Contractor to Calculate Average Wholesale Price for Drugs, November 2, 1993. (HHC908-1051)

[26] CMS Memorandum Intermediaries/Carriers, Transmittal AB-02-174, Single Drug Price (SDP), December 3, 2002. (AWP026-0324-0329)

13

35)     Plaintiffs' experts are mistaken regarding their understanding as to how physicians set their charges, for the following reasons. There is no evidence that I am aware of that physicians typically set their charges based on AWP or that they use different charges for different payers. Based on my experience, it is common practice within the health care industry for physicians to use a single set of charges for all public and private third-party payers. This set of charges, sometimes referred to as a charge-master, is not adjusted to reflect anticipated payment rates of different payers.[31] Popular physician billing software allows great flexibility in how and what charges are loaded on the billing system, including manual loading for individual codes. Based on my experience, many physicians tend to establish and update charges for commonly billed items on a manual basis, and review those charges on an annual basis and/or when they experience significant changes in costs.

36)     Dr. Hartman's errors regarding physician charges leads to his overlooking significant variation in charge levels, in whether charges are based on AWP, and ultimately in whether Medicare and private health plan payment rates are based on AWP. He makes no provision in his class-wide damage calculations that Medicare or private health plans ever pay based on the provider charge that is lower than the maximum allowance, which he assumes to be always based on AWP. For those physician-administered drug claims for which the allowed charge is based on the provider charge, Dr. Hartman assumes causation and injury, even when none exists under Plaintiffs' alleged AWP scheme.

---

[31] A rare exception to this practice occurs when a non-participating physician under the Medicare program does not accept Medicare assignment and bills the patient directly for the service. The physician is limited by regulation to charging no more than 9.25 percent above the Medicare maximum allowance for non-assigned claims. Non-assigned claims represent less than 1 percent of Medicare allowed charges. MedPAC, Report to the Congress, March 2006, p. 91.

14

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

Hartman's Assumption: Maximum Allowance Always is Based on AWP

37)    A core assumption in Plaintiffs' theory of class-wide causation and injury and in Dr.
Hartman's methodology for computing class-wide damages is that Medicare and private health
plans' maximum allowances consistently are based on AWPs.  Because practices vary among
health plans regarding the calculation of maximum allowances, use of AWP and the sources of
AWP data, individualized inquiry is required to determine injury under the alleged AWP
scheme.  I discuss the variability in use of AWP and how it is used under Medicare and under
private health insurance.

38)    There are more than 50 different Part B Medicare carriers.[32]  Substantial Medicare price
variation existed among carriers throughout the 1992-2002 period.  Each carrier independently
set payment rates and developed coding rules for physician-administered drugs in one or more
geographic areas, under guidance and direction from the Centers for Medicare and Medicaid
Services (CMS).[33]  Medicare carriers computed payment limits for physician-administered drugs
based on different data sources, based on different NDC/J-code cross-walks, and based on
instructions from HCFA that were vague and subject to multiple interpretations.  A November
1993 internal government memo referred to "huge carrier fee discrepancies."[34]  The Office of the
Inspector General (OIG) of the Department of Health and Human Services (DHHS) reported in
1997 that "There is no consistency among carriers in establishing and updating Medicare drug
reimbursement amounts," both for multiple source and single source drugs.  It cited several
examples of pricing variation, including one carrier paying $20 and another carrier paying
$48.20 for code J9000 during the first quarter of 1995.[35]  A 2000 Transmittal from HCFA (AB-
00-86) offered a national set of drug prices to the carriers.  A number of carriers responded that
their own prices were often substantially different, varying by several hundred percent for some
J-codes.[36]  In December 2002, almost a decade after the comment was made about "huge carrier

---

[32] Federal Register, Vol. 69, No. 219, November 15, 2004, pp. 66689-90.
[33] Prior to 2001, known as the Health Care Financing Administration (HCFA).
[34] Memorandum from Fred Rosen, Director, Medicare Carrier Operations Branch to Carol Walton, Director, Bureau
of Program Operations, Assignment of Lead Contractor to Calculate Average Wholesale Price for Drugs, November
2, 1993 (HHC908-1051)
[35] Department of Health and Human Services, Office of Inspector General, Excessive Medicare Payments for
Prescription Drugs, December 1997, p. 9.
[36] One carrier, Cigna, indicated in an October 13, 2000 memo to HCFA that adoption of the recommended national
prices would result in a reduction of $11 million in Medicare allowances. (AWP039-2776) Another carrier, Palmetto

15

EXPERT REPORT OF ZACHARY DYCKMAN IN SUPPORT OF TRACK 2 DEFENDANTS'
OPPOSITION TO CLASS CERTIFICATION

fee discrepancies," a government official referred to the problem of "divergent drug pricing around the country" in a memo announcing the implementation of a single set of Medicare drug prices nationwide."[37]

39)     The use by 50 Medicare carriers of different pricing methodologies, different NDC/J-code cross-walks and different sources of AWP data during 1992-2002 period resulted in very substantial price differences among Medicare carriers, all of whom supposedly based their drug prices on AWP. Individualized inquiry is required by carrier, by individual drug, by time and possibly by individual claim to determine if injury occurred for members of Classes 1 and 2 under the alleged AWP scheme.

40)     The need for individualized inquiry regarding maximum allowances used by private health plans similarly is required for Class 3 members. Drs. Hartman and Rosenthal misinterpret and mischaracterize facts in my report that they believe indicate that health plans used a reasonably consistent AWP pricing methodology as a basis for determining payment rates for physician-administered drugs over the proposed class period.

41)     The Dyckman Studies collected information for a particular point in time, fall 2002, which cannot be generalized to earlier in the class period. The studies provide no information as to health plan payment methodology and pricing for drugs during earlier years. Medicare changed in 1992 from a reasonable and customary (R&C) charge methodology to a resource-based relative value scale (RBRVS) for physician services, and to an AWP methodology for physician-administered drugs. Many private health plans were relatively slow to adopt the Medicare RBRVS methodology and continued to use an R&C type payment methodology or a fee schedule, with fees based on historical charge patterns, through the mid and even late 1990s.[38] Based on my experience, a sizable proportion of plans continued to use charge-based payment methodologies for physician services and physician-administered drugs through much of the class period.

---

Government Benefits Administrators, responded in a memo on the same date that the recommended new national prices would result in a decline in Medicare allowances of $167 million and indicated areas of confusion and possible errors. (AWP039-2781-2782)
[37] CMS Memorandum Intermediaries/Carriers, Transmittal AB-02-174, Single Drug Pricer, December 3, 2002. (AWP026-0324-0329)
[38] I assisted numerous health plans implement RBRVS physician fee schedules during the mid and late 1990s.