**HIGHLY CONFIDENTIAL**

Moreover, while proposed Classes 1 and 2 both relate to Medicare (in which there is one uniform regulatory framework), the reimbursement structures for the proposed Class 3, which involves reimbursement outside of the Medicare context, are contractual — TPPs typically contract with Providers on behalf of their plan members.[9]

20. As a result, analysis of proposed Class 3 requires a two-pronged approach: (1) analysis of the overall reimbursement approach of the specific TPP; and (2) analysis of the same encounter specific issues involved with an assessment of Classes 1 and 2. There are a number of significant issues for Pipefitters for both levels of the analysis.

21. First, Pipefitters contracts with ▮▮▮▮▮ to manage the care for its members and process medical benefit claims.[10] Through this arrangement, Pipefitters obtains the full benefit of ▮▮▮▮▮ negotiated fee schedules with the plan's provider network and the managed care techniques ▮▮▮▮▮ uses to control medical expenses for its customers. ▮▮▮▮▮ has had direct contracts with Track 2 Defendants for the purchase of Subject Drugs at deeply discounted prices since the mid 1990's. The role that ▮▮▮▮▮ played in the reimbursement paid by Pipefitters raises additional issues that bear on the assessment of Pipefitters as a named plaintiff which I discuss in detail later in this report.

22. Second, the discovery provided by Pipefitters was inadequate to perform the necessary transaction level analysis to determine if the identified transactions were even based on the AWP of the Subject Drug. Because of the lack of documentation provided by Pipefitters, it is not possible to perform the level of analyses I performed for the proposed Classes 1 and 2; however, I can conclude based on the analysis I have been able to complete and my experience that the vast majority of Pipefitters' claims are not within the class definition (e.g., the cited claim had no payment for the drug, the claim was paid at full charges indicating it was not reimbursed based on AWP or the claim related to a multi-source drug).

---

[10] See the March 8, 2006 Declaration of Charles Hannaford that states 

**HIGHLY CONFIDENTIAL**

23. It is my opinion, based on this analysis, the complexity of the analysis, and the over-riding issues associated with reimbursement for multi-source drugs (which impact the majority of these encounters) that it would not be feasible to assess the allegations in the Complaint on a class-wide basis for Track 2 Subject Drugs for the proposed Class 3.

## ANALYSIS

### I. MULTI-SOURCE DRUGS AND THEIR REIMBURSEMENT UNDER MEDICARE PART B

24. There is a critical difference between the Track 2 Subject Drugs and the Track 1 Subject Drugs. Whereas the drugs named for the Track 1 Defendants are primarily branded and oncology drugs, the drugs named for the Track 2 Defendants are predominately multi-source drugs[11] and Hospital Products. Indeed, 17 of the 21 drug J-codes[12] involved with Track 2 Subject Drug encounters identified by the proposed Class 1 plaintiffs are for multi-source drugs. Classes 2 and 3 involve yet additional multi-source drugs.

#### A. Regulatory Background

25. All competing versions of a multi-source drug are billed within the same J-code at a single reimbursement level. As a result of having all competing drugs billed within the same J-code with no ability to differentiate the source, multi-source drugs are treated differently than single-source drugs under Medicare Part B. Medicare has known of large variations in the AWP for the various sources of drugs within a given multi-source J-code.[13] In addition, Medicare has long been aware of the very large

---

[11] For purposes of this report, I consider a multi-source drug to be any drug where there are 2 or more sources (NDCs) associated with one J-Code. I use this definition for two reasons. First, the issues I have identified associated with multi-source drugs apply once there is more than one source for a drug coded under the same J-code (e.g. it is unknown which source was administered to the patient, the government or TPP must select one and only one of the different AWPs to use for the reimbursement of that J-code, and two competing sources of the drug must, by definition, be reimbursed at the same amount under that J-code). Second, Medicare recognized this approach when it implemented the Single Drug Pricer (See note 18) by including J-codes with only 2 sources in the Single Drug Pricer analysis and supporting background file.

[12] Two of the multi-source drugs did not have a J-code provided for the drug encounters put forth in the plaintiffs' discovery.

[13] See "Medicare Reimbursement of Prescription Drugs," Department of Health and Human Services Office of the Inspector General Report, January 2001.

**HIGHLY CONFIDENTIAL**

differences between the acquisition cost of, and the published AWP for, multi-source drugs.[14]

26. In fact, Medicare utilizes a "lower of" methodology for establishing the reimbursement for individual J-codes that include multi-source drugs. The regulation governing multi-source Medicare reimbursement before January 1, 2005 was as follows:[15]

> For a multi-source drug or biological, the AWP is equal to the lesser of the median AWP of all of the generic forms of the drug or biological or the lowest brand name product AWP. A "brand name" product is defined as a product that is marketed under a labeled name that is other than the generic chemical name for the drug or biological.[16]

27. This reimbursement methodology allowed Medicare to select one "lower of" reimbursement level for all sources of a drug within a single J-code and applies equally to the original patented product and all generic versions under the same J-code.

28. Until December 2003, each Medicare Carrier used individual discretion to apply these requirements (e.g. the calculation of the median AWP and the selection of lower of the median or the AWP for the lowest brand name product) and arrive at the amount of reimbursement for multi-source drugs for the jurisdiction (usually by state) for which they were responsible. The Carriers' discretion generated wide variability from one Carrier to the next and over time as to the actual Medicare reimbursement amount used for many drugs.

29. In January of 2001, the DHHS Office of Inspector General issued Report #OEI-03-00-00310 entitled "Medicare Reimbursement of Prescription Drugs," analyzing the variability among Carriers in implementation of the reimbursement regulation. Table 2 of the OIG's report provides examples of the level of variability:

---

[14] See "Physicians' Cost for Chemotherapy Drugs," Department of Health and Human Services Office of Inspector General, November 1992. See also "Excessive Medicare Payments For Prescription Drugs," Department of Health and Human Services Office of the Inspector General, December 1997.

[15] Medicare Part B reimbursement on and after January 1, 2005 does not reference AWP at all, but instead uses ASP as a benchmark. Plaintiffs' proposed Classes 1 and 2 do not include claims after January 1, 2005.

[16] See Section 4556 of The Balanced Budget Act of 1997. This definition applies when two generic sources are competing with the original branded product (i.e., 3 sources). The regulations do not specifically address the method of determining reimbursement when two competing sources are included within the same J-code.

**HIGHLY CONFIDENTIAL**

Table 2: Variation in Medicare Prices for Selected Drugs

| HCPCS Code | Generic Drug Name | Median Medicare Amount | Minimum Medicare Amount | Maximum Medicare Amount | Difference Between Minimum and Maximum Amount |
|---|---|---|---|---|---|
| J0640 | Leucovorin Calcium | $18.02 | $17.51 | $35.47 | 102.6% |
| J1562 | Immune Globulin | $396.63 | $380.00 | $439.38 | 15.6% |
| J2820 | Sargromostim | $27.41 | $23.95 | $27.42 | 14.5% |
| J9000 | Doxorubicin HCl | $42.92 | $38.03 | $52.44 | 37.9% |
| J9217 | Leuprolide Acetate | $592.60 | $564.65 | $623.79 | 10.5% |
| J9350 | Topotecan | $573.75 | $546.44 | $602.44 | 10.2% |

30. In response to this report, in December 2003, CMS implemented a Single Drug Pricer (SDP) to standardize Medicare Part B reimbursement for multi-source drugs.[17] This program provided the Medicare Carriers with quarterly updates of the standardized reimbursement level for all multi-source drugs, and also provided a background file that described the bases of reimbursement for many multi-source drugs.

31. I have analyzed in detail the extensive SDP documentation and background files maintained by CMS. Based on that analysis, I am able to offer the following explanation of how Medicare Part B reimbursed for multi-source drugs after December 2003 and how these same issues affected reimbursement prior to the implementation of this standardized methodology.[18]

B. **Multi-Source Drug Reimbursement Under Medicare Part B**

32. Medicare Part B reimbursement for multi-source drugs and Hospital Products before January 1, 2005 was, of course, based on J-codes. The Medicare Part B reimbursement process was, however, far more complex for multi-source drugs than for the branded single-source drugs in Track 1. Indeed, ████████ raised the

---

[17] See Program Memorandum AB-02-174 dated December 3, 2002 which states, "CMS is establishing the SDP to correct identified discrepancies, further the legislative goal of establishing a uniform payment allowance as a reflection of the AWP, and otherwise apply the existing statute and regulation more accurately and efficiently."

[18] I was unable to analyze in this kind of detail Medicare Part B reimbursement for multi-source drugs prior to the implementation of the SDP, due to the wide variability of the bases for multi-source drugs across Medicare Carriers. Each of the multi-source issues I explain below existed throughout the class period (both before and after the implementation of SDP). The support provided for the SDP allows me to provide specific examples. The same issues would exist prior to the SDP, but there would be further variability by carrier. Plaintiffs have not attempted the required analysis of the SDP or the pre-SDP carrier reimbursements for multi-source drugs; any effort to do so would require a detailed investigation on a Carrier-by-Carrier, year-by-year basis to identify how Medicare applied the provisions of the regulations to determine the reimbursement for multi-source drugs in each year for each Carrier jurisdiction.

**HIGHLY CONFIDENTIAL**

importance of considering the impact of Medicare's use of J-codes for reimbursement in his original report and concluded based upon further review:

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

33.    The crosswalk process ▓▓▓▓▓▓▓▓▓ raises relates to attempting to crosswalk a Medicare J-code for a drug encounter to a specific source's NDC or associated AWP. As I have discussed previously, it is a complex process to cross-walk a branded single source drug between the Medicare J-code and the manufacturer's AWP; in most cases, though difficult, it is possible to do so if the drug's unit of measure is quantity adjusted to Medicare's Fundamental Billing Unit ("FBU").

34.    ▓▓▓▓▓▓▓▓▓ concurred with this point when he stated:



35.    As ▓▓▓▓▓▓▓▓▓ indicates, cross-walking multi-source drugs is much different than single source drugs. An example illustrates this phenomenon: Take J-code J7040, which is established for all reimbursements of Sodium Chloride IV fluids – DSW 500cc. Five different entities identified in the Medicare Crosswalk and SDP Background files (and a total of 7 entities identified from other sources, most of which are not even Track 2 Defendants), sell and market a drug that is reimbursed under that J-code. The NDCs from Redbook[21] range from a low of $5.17 per Medicare Fundamental Billing Unit to a high of $35.15 per Fundamental Billing Unit[22] for that J-code. For each of the quarters of this 10-year class period, it is infeasible to determine

---

[19] See ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[20] See ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[21] Based on the Thomson Micromedix CD dated May 2006 (www.micromedex.com)

[22] These amounts were from 2003 when the SDP was implemented. Based on the information available, similar variability existed throughout the class period.

**HIGHLY CONFIDENTIAL**

which of these AWPs were considered by each Medicare Carrier and which AWP was selected by that Carrier to establish the reimbursement for each multi-source J-code for their jurisdiction. Therefore, it is simply not feasible to crosswalk J-code reimbursements for multi-source drug encounters to the specific source or the associated AWP.[23]

36. Furthermore, for multi-source drugs, it is impossible to determine for any given drug encounter which source's drug was administered to the patient because providers do not submit NDC numbers as part of their Medicare Part B claim and only submit the J-code as the basis of payment for the claim. Because not all sources for a given multi-source drug are parties to this litigation, it is impossible to determine whether any Track 2 Defendant's drug was actually involved. The source of the drug is part of the proposed class definition. Therefore, not knowing the source of the drug related to a specific patient's drug encounter makes it impossible to establish that the encounter falls within the class definition.

37. Even plaintiffs' counsel recognizes the importance of demonstrating that a multi-source drug administered to a named plaintiff was purchased from a Track 2 Defendant. Specifically, ███████████████████████████████████████████

38. Moreover, reimbursement is ultimately effected at one and only one level for all drugs within a J-code, no matter the source. Specifically, the Medicare reimbursement structure used the lower of (1) the median AWP for all generic drugs within the J-code, or (2) the AWP for the lowest "branded" drug.[25]

---

[23] Exhibit 6 summarizes various analyses I have performed to address the request of ███████ related to the ability to cross-walk multi-source J-codes to a specific manufacturer or a specific AWP. That Exhibit combined with the supporting analyses of the drug encounters for the 3 proposed classes supports my conclusion that it is not feasible to cross-walk multi-source J-codes.

[24] See Haviland Declaration, p. 7.

[25] The term "branded," as utilized by Medicare in this context, means something different than the normal use of the term in the pharmaceutical industry. Here, the term "branded" means "a product that is marketed under a labeled name that is other than the generic chemical name for the drug or biological"; the industry, in contrast, normally uses the term branded to refer to the manufacturer with the original patent rights. Because many generic versions of a drug use non-chemical names, and are therefore considered "branded" for purposes of Medicare's reimbursement definition, the lowest AWP of these named generics often establishes reimbursement for all drugs within the J-code which is well below the median of the AWPs for the generic sources.

**HIGHLY CONFIDENTIAL**

39.  The impact of the Medicare Part B reimbursement structure for multi-source drugs is twofold:

- Due to the number of different sources for most multi-source drugs, I would expect that it would be rare that the multi-source Subject Drugs for Track 2 Defendants would actually be reimbursed based on that Track 2 Defendant's AWP for the drug. In fact, the plaintiffs have been unable to demonstrate that the plaintiffs' payments were based on the AWP associated with the Track 2 Defendant. Through extensive analysis of the drug encounters associated with the individual named plaintiffs, I have determined that the Class 1 plaintiffs were not responsible for a co-insurance payment based on any Track 2 Defendant's AWP for multi-source drugs.
- Even if the reimbursement of that drug happened to be based on the AWP of that specific source, a source could not effect higher reimbursement than its competitors for a multi-source drug, nor would they have any incentive to do so, because all drugs within a single J-code from all competing sources are, by definition, reimbursed at the same amount.

40.  To complete the picture, I note that reimbursement for multi-source drugs is often a very low dollar amount per administration. This magnifies the significance of cross-subsidization for the underpayment of other services provided by the doctor which has been discussed extensively in previous reports. Specifically, ▮▮▮▮▮▮▮▮▮▮▮▮, and I have each discussed the impact of the cross-subsidization of services.[26] Cross-subsidization occurs when the parties recognize that under-reimbursement of services is offset by higher reimbursements for drugs. Unlike with more expensive branded single-source drugs, reimbursement amounts for the multi-source and hospital product drugs are much lower and are often far less than the fee increases that occurred when lower drug reimbursements were implemented. For example, the reimbursement level for code 90782 "Intramuscular Injections" was increased from



$4.41 in 2003 to $24.64 in 2004.[27] The amount of this increase is greater that the total reimbursement for many of the multi-source drugs associated with Track 2 Defendants.

41.     Even though my discussion thus far has focused on Medicare Part B reimbursement, these points are equally important in the context of the non-Medicare Part B class (proposed Class 3) discussed later in this report.

42.     Nor can these points be deflected, as plaintiffs have attempted to do in Track 1, by attempting to adjust drug quantity for multi-source drugs to Medicare's Fundamental Billing Unit ("FBU") or by completely ignoring actual reimbursement data and instead relying upon manufacturer sales data with "assumed" reimbursement amounts. A review of the determination of multi-source drug reimbursement by Medicare on the CMS SDP support files based on the then applicable AWPs reveals significant AWP differences between different NDCs from different sources of the drug after adjusting all AWPs to Medicare's FBU. Exhibit 6 summarizes the wide range of quantity normalized AWPs within each multi-source J-code.[28] Furthermore, plaintiff's approach taken in Track 1 of relying solely on manufacturer sales data and not actual reimbursement data and thereby incorrectly "assuming" what the reimbursement level was at the time is clearly inappropriate for multi-source drugs. The proposed class definition requires plaintiffs to demonstrate that the actual reimbursements were based on the AWP associated with the specific Track 2 Defendant's NDCs that is the subject of the claim. The inability to cross-walk the J-code reimbursement to the specific source's NDC and associated AWP makes it impossible for plaintiffs to merely "assume" what they believe the reimbursement was based on Track 2 Defendants' sales data.

43.     The importance of the different issues posed by the multi-source drugs in Track 2 permeates my analysis of the named plaintiffs' drug encounters, and whether each meets a proposed Class definition. I analyze each proposed Class in turn.

---

[27] See GAO report number GAO-05-142R entitled "Medicare Chemotherapy Payments: New Drug and Administration Fees Are Closer to Providers' Costs" which was released on December 01, 2004.

[28] Exhibit 6 responds to ███████ request for additional analyses to determine the feasibility of cross-walking multi-source J-codes to a specific manufacturer's NDC and to a specific AWP. One of the analyses summarized on Exhibit 6 is the wide variability of AWPs for a given multi-source J-code. The AWP for the various sources of a drug within a given J-code, adjusted to the common Fundamental Billing Unit established by Medicare and used by many TPPs, ranged widely with approximately 2/3rds of J-codes having an AWP that was greater than 100% higher than the lowest AWP within that J-code and many having an AWP that was greater than 500% higher than the lowest AWP with the same J-code.

**HIGHLY CONFIDENTIAL**

## II. PROPOSED CLASS 1

44. Plaintiffs have identified 6 proposed class representatives for Class 1, defined to include:

> All natural persons nationwide who made, or who incurred an obligation enforceable at the time of judgment to make, a co-payment based on AWP for a Medicare Part B covered Subject Drug that was manufactured by Abbott, Amgen, The Aventis Group, Baxter, Dey, Fujisawa, Immunex, Pfizer, Pharmacia, The Sicor Group and Watson. Excluded from the class are those who made flat co-payments, who were reimbursed fully for any co-payments, or who have the right to be fully reimbursed; and the residents of the states of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana, and Virginia (where consumer protection statutes do not permit class actions).

### A. The Vast Majority Of The Named Plaintiffs' Drug Encounters Do Not Meet The Proposed Class Definition Because They Were Not Paid Based On The AWP For The Subject Drug Identified For The Track 2 Defendant

45. The 6 proposed class representatives for Class 1 were administered Subject Drugs identified for certain Track 2 Defendants that span 21 different J-codes[29] and include 130 separate drug encounters.

46. I have summarized below my analysis, which demonstrates that the vast majority of the identified drug encounters did not fall within plaintiffs' proposed class definition. This result is due to various reasons, including that:

#### 1. The Encounter Relates To Inpatient Hospital Stay And Is Reimbursed Under Medicare Part A – Any Co-Payment Was Not Based On The AWP Of The Subject Drug

47. The proposed Class 1 definition limits the class to those drug reimbursements "based on AWP for a Medicare Part B covered Subject Drug." Accordingly, drug encounters involving the administration of, and reimbursement for, Track 2 Subject Drugs received in an inpatient hospital setting – which are covered under Medicare Part A (Hospital Insurance), rather than Medicare Part B (Medical Insurance) – do not meet the class definition. ▬▬▬ and I agree that these types

---

[29] J-codes were determined using the April 2005 CMS NDC-HCPCS Crosswalk. See http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/02a_2005aspfiles.asp#TopOfPage

of drug encounters, which take place in a hospital inpatient setting, do not meet the definition of proposed Class 1.[30] Several of the drug encounters provided in discovery supporting claims against cited defendants involved hospital inpatient claims.

48.     The documentary support provided by plaintiffs does not always easily identify those drug encounters involving an inpatient stay. Frequently, the EOMB that would clearly identify Part A reimbursement was not provided by plaintiffs, which required a careful, encounter-by-encounter analysis of the hospital billing statement for each drug encounter to determine whether the encounter occurred in an inpatient setting. (Hospital overnight room charges on such forms, for example, establish that an encounter was during an inpatient stay.)

49.     I have concluded, based on my analysis, that 8%[31] of the drug encounters put forth by plaintiffs in support of their Medicare Part B class were in fact reimbursed under Medicare Part A because they involved a hospital inpatient stay and are therefore outside the proposed class definition.

### 2. The Encounter Was Reimbursed Under Medicare Part B After The Implementation Of ASP In 2005 – Any Co-Payment Was Not Based On The AWP Of The Subject Drug

50.     On January 1, 2005, Medicare implemented a new methodology for calculating its physician reimbursement for prescription drugs under the Medicare Part B physician fee schedule. Medicare reimbursement for such drugs is now based upon a drug's average sales price (ASP), and no longer references AWP.[32] The proposed class definition itself excludes reimbursement after January 1, 2005, yet plaintiffs have

---

[31] To avoid double counting of transactions in my explanation of exclusions, each percentage of drug encounters falling outside the class definition offered in this Section relates to encounters remaining after removing encounters already shown to be outside the class definition. By removing previously explained categories of transactions, each transaction is shown only once in my quantification of the number of occurrences even if multiple issues apply to the transaction.

[32] "Section 303(c) of the Medicare Modernization Act of 2003 (MMA) revised the payment methodology for Part B covered drugs that are not paid on a cost or prospective payment basis. In particular, section 303(c) of the MMA amended Title XVIII of the Act by adding section 1847A, which established a new average sales price (ASP) drug payment system. Beginning January 1, 2005, drugs and biologicals not paid on a cost or prospective payment basis will be paid based on the ASP methodology, and payment to the providers will be 106 percent of the ASP." Source: http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/01_overview.asp

**HIGHLY CONFIDENTIAL**

identified 2005 drug encounters in support of their claims against the Track 2 Defendants.[33]

51.   Accordingly, each drug encounter must be analyzed individually to determine whether it occurred before or after this new ASP-based reimbursement regime was implemented.

52.   I have concluded, based on my analysis, that 27% of the drug encounters put forth by plaintiffs do not fall within the proposed class definition because they were reimbursed based on ASP and not based on AWP.

### 3. The Encounter Was Reimbursed Under The Medicare Hospital Outpatient Prospective Payment System (Hospital OPPS) – Any Co-Payment Was Not Based On The AWP Of The Subject Drug

53.   Effective July 1, 2000[34], the Hospital OPPS reimbursement system was implemented by Medicare for services performed by a hospital in an outpatient setting. Under this methodology, reimbursement is based on predetermined amounts calculated using actual costs for designated services.[35] Drugs reimbursed by Medicare Part B under Hospital OPPS are generally not based on the AWP of the Subject Drug for one of two reasons:

- For the vast majority of Track 2 Subject Drugs, Hospital OPPS uses a bundled reimbursement methodology similar to that used in the Hospital inpatient setting under Medicare Part A (e.g. Diagnosis Related Group or DRG reimbursement).[36] That is, reimbursement for most Track 2 Subject Drugs under Hospital OPPS is accomplished by paying a single fee for a

---

[34] Prior to this date Medicare reimbursed hospital outpatient visits based on hospital charges which are not based on AWP. The patient paid 20% of charges and Medicare paid 80% of charges after reducing these charges to cost by applying that hospital's cost to charge ratio. Neither charges nor the cost based payment structure was based on AWP, so hospital outpatient drug encounters prior to implementation of Hospital OPPS are not within the class definition.

[35] See Federal Register dated April 7, 2000 Part 419.2 which states, "Under the hospital outpatient prospective payment system, predetermined amounts are paid for designated services furnished to Medicare beneficiaries (patients)…The prospective payment system establishes a national payment rate, standardized for geographic wage differences, that includes operating and capital-related costs that are directly related and integral to performing a procedure or furnishing a service on an outpatient basis."

[36] CMS (formerly HCFA) classified all outpatient services and procedures into Ambulatory Payment Classification ("APC") groups to arrive at a uniform reimbursement methodology nationwide.

**HIGHLY CONFIDENTIAL**

- bundled APC group of drugs and services. Such reimbursements are, by definition, not based on the AWP of the Subject Drug.
- Hospital OPPS does reimburse separately for limited drugs, referred to as transitional or "pass-through" drugs. When Hospital OPPS was implemented, however, CMS conducted a survey of hospitals to determine their actual acquisition cost for these drugs. Based on this survey, CMS arrived at average adjustment factors, which lower the reimbursement level to hospital cost. The cost conversion factor varies based on the category of drug administered. Hospital OPPS now determines the patient co-insurance amount based upon that survey, adjusting the patient co-insurance payment to cost.[37] Accordingly, for these drugs patients do not pay based on the AWP of the Subject Drug, but instead, based on its actual cost as determined by the CMS survey.

54. Whether an individual drug encounter was reimbursed under Hospital OPPS depends upon whether the outpatient service was provided in a hospital-owned clinic. It is often difficult to differentiate Hospital owned clinics from clinics owned by physicians or other organizations. Because it is often not possible to determine whether a drug encounter was reimbursed based on OPPS by reviewing the provider bill or statement for the encounter, the individual EOMB for each drug encounter must be analyzed.

55. I have identified all encounters paid through Hospital OPPS reimbursement or co-insurance payments which were not based on the AWP of the Subject Drug. Based on analysis of the EOMBs that were provided for the named plaintiffs' drug encounters (not all were provided), I conclude that an additional 12% of

---

[37] Medicare calculates its portion of reimbursement to the hospital (the amount other than the patient co-insurance portion) through a transitional payment structure. This transitional payment adjusts the drug reimbursement from the cost based amount previously explained up to 95% of AWP. This methodology of reimbursement demonstrates CMS knew AWP needed to be adjusted to equate to costs in order to determine the basis for beneficiary co-payments. CMS then elected to adjust Medicare's portion of the reimbursement back up to 95% of AWP. This approach further establishes Medicare's knowledge regarding the issues raised in this complaint. See Federal Register dated April 7, 2000. "For drugs with one manufacturer (sole-source), the ratio of acquisition cost to AWP equals 0.68. For drugs with more than one manufacturer, but no generic competitors, the ratio of acquisition cost to AWP equals 0.61. For drugs with more than one manufacturer and with generic competitors, the ratio of acquisition cost to AWP equals 0.43." These ratios were modified by CMS occasionally based on more recent information they obtained. In 2004, CMS elected to deviate from the cost based co-insurance process for a limited number of recently introduced sole source pass-through drugs which had no generic competition. See Federal Register Vol. 69, No. 3 January 6, 2004. This one year election by CMS has minimal impact on the analysis of Track 2 Subject Drugs because the majority of those drugs are multi-source drugs.

the drug encounters put forth by plaintiffs are outside the class definition due to the Hospital OPPS reimbursement structure. It is possible that yet additional drug encounters were reimbursed under Hospital OPPS, but plaintiffs have failed to provide EOMBs for all drug encounters, making it impossible to tell.

### 4. The Plaintiff Either Paid Nothing For The Subject Drug, Or Any Payment Made By The Plaintiff Was Not Based On The AWP For The Subject Drug

56. By definition, the only drug encounters that fall within the proposed Class 1 are those that resulted in a person "ma[king]," or "incur[ring] an [enforceable] obligation . . . to make, a co-payment based on AWP." Indeed, for that very reason, drug encounters for which named plaintiffs made "flat co-payments," or for which named plaintiffs "were reimbursed [or had the right to be reimbursed] fully for any co-payments," are explicitly excluded from the proposed Class 1.

57. Yet, my individual analysis of the Complaint, documents provided in discovery, and deposition testimony demonstrates that many of those drug encounters did not result in any named plaintiff making an AWP-based payment or incurring an obligation to do so. Indeed, many fall within the categories of explicitly excluded drug encounters (e.g. flat co-pays). Based on my analysis of these materials, I conclude that an additional 25% of the drug encounters put forth by the plaintiffs are outside the class definition for this reason.

#### a. Supplemental Insurance Covered 100% Of Plaintiff's Payment Responsibility

58. For certain drug encounters, the named plaintiff was covered by supplemental insurance, which fully covered the drug co-insurance payment. For example, ▇▇▇▇▇▇▇ had such supplemental insurance, and therefore had no financial responsibility associated with the drugs covered by her supplemental insurance after her deductible was met.

59. To determine whether a particular drug encounter is outside the class for this reason, I had to examine the EOMB and/or the EOB for the supplemental insurance on an encounter-by-encounter basis. In addition, the supplemental insurance coverage information is also required to determine if the patient had the "right to be fully

**HIGHLY CONFIDENTIAL**

reimbursed for a drug administration," as required by the class definition. As previously discussed, some plaintiffs were unable to provide critical documentation concerning their supplemental insurance.

### b. A Financial Assistance Program Covered The Full Cost Of The Drug

60. For certain drug encounters, the Subject Drugs administered to the named plaintiff were covered by a financial assistance program, which limited the patient payment to a flat co-payment. ████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ put forth by ██████ nvolved those two drugs and the documents ██████ provided confirm that he was definitely covered by this program for some of his drug encounters and likely covered by the this program for all of his drug encounters.[39]

61. To determine whether a particular drug encounter is outside the class for this reason, I had to examine various documents related to the type of supplemental financial assistance, any information that may indicate the date the assistance became effective and any information related to changes to the patient payment structure under this plan as well as payment support for the patient on an encounter-by-encounter basis.

### c. The Drug Was Not "Covered" By Medicare Part B And The Plaintiff Therefore Incurred No Responsibility To Pay

62. For certain drug encounters, Medicare Part B did not provide coverage, and the named plaintiff was not responsible to pay anything for the drug. (Medicare Part B does not cover all drugs or all circumstances in which a physician administers a drug to a Medicare patient.) This information is explained on the EOMB that Medicare provides to the plaintiff when the Medicare Carrier processes the claim for the plaintiff's visit. ████████████████████████████████████████

---

[38] See Bates Number ██████

[39] See Exhibit 7 for a more complete discussion of this coverage and the supporting discovery documentation.

[REDACTED]

63. To determine whether a particular drug encounter is outside the class for this reason, I had to examine EOMBs and the related notes on an encounter-by-encounter basis.

### d. The Drug Encounter Was Not Reimbursed By Medicare Part B Due To A Local Medical Review Policy (LMRP) And The Plaintiff Was Not Liable For Payment For The Drug

64. For certain drug encounters, the Medicare Carrier responsible for handling reimbursement had a specific policy, through an LMRP, which both precluded the reimbursement of a specific drug by Medicare and also established that the patient was not liable for the drug payment. For example, [REDACTED] The EOMB states that this drug is a non-covered service due to a LMRP[41] and the carrier does not reimburse the provider for this drug[42] and the patient has no responsibility[43] to pay the provider. As a result, no payment was required for 9 separate administrations of this drug.

65. To determine whether a particular drug encounter is outside the class for this reason, I had to examine EOMBs on an encounter-by-encounter basis.

### e. The Drug Encounter Was Reimbursed Based On Provider Charges – Not Based On AWP

66. Finally, for certain drug encounters there were no reimbursements based on AWP because the encounter was reimbursed based on a provider's actual charge. As described in previous reports, Medicare reimbursement for drugs under Medicare Part B is based upon the lesser of two amounts: (1) the amount actually charged by the

---



[40] See Bates Range Young[REDACTED] See more specifically, footnotes b, c, and d from the EOMB.

[41] [REDACTED]

[42] See Bates Number[REDACTED] b. "The information provided does not support the need for this service or item."

[43] See Bates Number[REDACTED] d. "It appears that you did not know that we would not pay for this service, so you are not liable."

**HIGHLY CONFIDENTIAL**

provider, or (2) the Medicare Physician Fee Schedule amount.[44] Where reimbursement was made based on the amount actually charged by the provider, it was by definition not based on AWP, but instead based on the provider's charge. Reimbursements that are based on provider charges were likely not reimbursed based on AWP and do not fall within the class definition.

67.   To determine whether a particular drug encounter is outside the class for this reason, I had to examine the EOMB and the provider statement in conjunction with the applicable physician fee schedule[45] on an encounter-by-encounter basis.

### 5.   The Encounter Involved A Multi-Source Drug, And Reimbursement For The Multi-Source Drug Was Not Based On The AWP For The Subject Drug

68.   As previously discussed, the Track 2 Subject Drugs differ from the Track 1 Subject Drugs in that most of the Track 2 Subject Drugs are multi-source drugs. It is rare that Medicare or TPPs reimburses for multi-source drugs based on the AWP of the Subject Drug.

69.   Every drug encounter related to the 17 multi-source drug J-codes at issue fails to meet the proposed class definition, for the reasons discussed in Section I.B. above. Nevertheless, it is informative to consider the issues involved with multi-source reimbursement put forth by plaintiffs and my analysis further highlights why it would be inappropriate to include multi-source drugs in any class certification in this case. Specifically, these multi-source drug encounters illustrate that:

- In all cases, drugs from multiple sources were reimbursed under a single J-code, with one single reimbursement level established by the multi-source "lower-of" process for all sources of the drugs.[46] In fact, 13 of the 17 J-codes had 5 or more sources. Most of these sources are not even Track 2 Defendants.

---

[44] See Federal Register, Vol. 68, No. 161 dated August 20, 2003.

[45] After implementation of the SDP a single reimbursement schedule was used for drugs under the "lower-of" process required by the regulations. Prior to implementation of SDP each Carrier's fee schedule for each year would be required to assess this issue because each Carrier independently performed this "lower-of" determination. Discovery to date have not accumulated these critical fee schedules for the dozens of Carriers that processed claims during the proposed class period.

[46] Prior to the implementation of the SDP, each carrier arrived at the single reimbursement level for each multi-source J-code based on its method of implementing Medicare's "Lower of Median and Lowest Branded" reimbursement structure.

**HIGHLY CONFIDENTIAL**

- Not only is the reimbursement not based on the AWP for the particular multi-source drug (but rather on the lower of either the median AWP or the AWP for the lowest branded drug) but it is not possible to determine the source of a multi-source drug reimbursed under a J-code. All of the 17 multi-source J-codes involved NDCs with sources other than the cited Track 2 Defendant and just a few encounters for 2 of the 17 multi-source J-codes provided by plaintiffs could be identified with a Track 2 Defendant as the source of the product only because the plaintiffs provided additional evidence not normally available to support their claim that that the product was sourced from a Track 2 Defendant (i.e. in one case plaintiffs produced packaging documentation for a self administered drug and in one other case the plaintiffs obtained a letter from the provider indicating that a Track 2 Defendants drug was purchased by the provider).
- 8 of the 17 J-codes were reimbursed based on the lowest brand name source (either the original branded product or a brand name generic product) and not the median of all AWPs for the J-code.
- The multi-source reimbursement levels for many of the J-codes were low dollar amounts. Only 11 of the 17 proposed class 1 drugs had a 20% co-insurance amount shown related to the drug encounter. Of those transactions with co-insurance amounts shown, 6 of the 11 drugs resulted in a 20% co-insurance amount of less than $10. When this analysis is expanded to include the multi-source drugs that had co-insurance information related to proposed classes 2 and 3 drug encounters, 11 of 29 drugs would result in a 20% co-insurance amount of less than $10.

70. As previously discussed, rarely was a plaintiff's drug administration shown to have even involved a Track 2 Defendant. Even so, because reimbursement is based on the "median AWP" or the AWP for the lowest branded, it is not possible for any given source of a multi-source drug to effect a higher reimbursement for its product than a competitor's product or to create a financial incentive, based on reimbursement, for a

customer to select its product over another due to higher AWP based reimbursement for that product.

71.  To illustrate this, I analyzed each of the limited number of Track 2 Subject Drug encounters for multi-source drugs for the proposed Class 1 plaintiffs not eliminated by the reimbursement factors previously discussed (e.g. Hospital Part A, ASP, Hospital OPPS, no patient responsibility). This analysis established that none of the remaining multi-source drug encounters meet the proposed Class 1 definition because they were not reimbursed based on the AWP for the Subject Drug. The Medicare reimbursement for three J-codes (J1580, J7050 and J7030) was based on the median generic AWP, which was the AWP of a source that is not named as a Defendant for these Subject Drugs. The Medicare reimbursement level for the remaining four J-codes (J1720, J9060, J9062 and J1100) was based on the AWP for lowest brand name drug – an AWP that is not associated with the cited Track 2 Defendant. Furthermore, other than 2 drugs, none of the drug encounters for these J-codes were shown to be sourced from a defendant at all.

72.  I have summarized my analysis of the 17 Track 2 multi-source Subject Drugs identified by plaintiffs for Class 1 as well as similar information for the additional 29 multi-source drugs identified by the plaintiffs for Classes 2 and 3 in Exhibit 6.

73.  Based on my analysis of encounters for Proposed Class 1 named plaintiffs shown on Exhibit 3, I conclude that an additional 22% of the drug encounters put forth by plaintiffs are outside the class definition for multi-source issues.

### 6. For The Remaining 6% There Is Conflicting Information Regarding Supplemental Insurance and Medicare Coverage For the Subject Drug

74.  Throughout the previous sections of this report, I have demonstrated that there are a number of individual issues associated with the named plaintiffs and individual drugs based upon the documentation provided during discovery. Inadequate documentation was provided for many drug encounters. As a result, I could not fully assess all issues for each encounter.

75.  Although only 6% of the drug encounters remained after the eliminations previously discussed, the overall issue of the amount of documentation necessary to