**HIGHLY CONFIDENTIAL**

determine whether a payment falls within the class definition is important to understanding the significance of the individual issues involved in this matter as it relates to Track 2 drugs. Only with additional information and an individual review of each patient drug encounter can one determine whether or not the encounter meets the proposed class definition. Examples of such situations include:

- **No EOMB Provided.** Records of an outpatient bill or monthly summary for an outpatient stay were often provided by plaintiffs' counsel to support their claims, but it is not possible to determine whether the drug was billed based upon the Hospital OPPS or Physician Fee schedule based on this information. Such a determination could be made with an EOMB, however, none has been provided in many cases. Similarly, identifying coverage issues and non-payments related to LMRPs requires a review of the EOMB to determine if the administration of the drug falls within the class definition.

- **No EOB Provided.** For many transactions there are no Explanation of Benefits provided for the supplemental insurer even though the plaintiff or the other billing records indicate that a supplemental insurer covered the patients' medical costs. Without this information, it cannot be determined whether the named plaintiff had supplemental insurance for the specific reimbursement, or whether the named plaintiff was reimbursed fully for any co-insurance or had the right to be fully reimbursed by the supplemental insurer.

- **Inadequate Information Regarding Supplemental Insurance And Financial Assistance Programs.** Plaintiffs did not provide the requisite information to determine the start date of supplemental insurance and financial assistance programs. Plaintiffs also failed to provide the requisite description of the supplemental coverage or financial assistance plan coverage as well as any changes to those plans and the related effective date of those changes.

- **Inadequate Evidence To Demonstrate That A Multi-Source Drug Encounter Was Sourced From A Defendant.** The proposed Class

**HIGHLY CONFIDENTIAL**

definition requires that the drug administration for a plaintiff be sourced from a Track 2 Defendant. In almost every case, plaintiffs provided no evidence that a given multi-source drug encounter was, in fact, related to a drug purchased from a Track 2 Defendant.

- **No Remittance Advice, Or Other Evidence That The Plaintiff Paid The Co-Insurance Related To The Drug Encounter, Provided.** Without some form of remittance advice or other confirmation of payment from individual providers, it is not possible to determine who ultimately reimbursed the provider in many cases. For example, one cannot determine whether a supplemental insurer reimbursed the provider fully or based on a co-payment.

**B. A Plaintiff-By-Plaintiff Assessment For Class 1 Confirms That 4 of the 6 Proposed Class Representatives Are Not Members Of The Proposed Class Because They Did Not Pay For A Subject Drug Identified For A Track 2 Defendant Based On AWP**

76. As previously discussed, Exhibit 2 provides a summary pie chart of all 130 Track 2 drug encounters for the named plaintiffs associated with Subject Drugs for the named defendants. I have prepared a similar pie chart for each of the six individual named plaintiffs for Class 1 in Exhibit 2a-f. This section summarizes my analysis of all of these drug encounters on a plaintiff-by-plaintiff basis. The detailed assessment of each individual drug encounter with the related discovery support establishing that the encounter did not fall within the proposed class is shown in Exhibits 2a-f and 3a-f.

77. In addition, plaintiffs' counsel has selected 15 of these drug encounters for analysis in connection with class certification.[47] In Exhibit 7, I provide detailed analysis with supporting discovery related to this subset of Track 2 Subject Drug encounters for the named plaintiffs. That Exhibit demonstrates that at least 11 of the 15 encounters selected do not fall within the proposed Class 1 definition – and the remaining 4 relate to one drug, administered to one plaintiff, for which there is inconsistent discovery related to his supplemental insurance coverage. In addition, encounters related to two

---

[47] See Declaration of Donald E. Haviland, Jr., Esquire in Support of Plaintiffs' Motion to Certify Claims with Respect to Track 2 Defendants, May 8, 2006.

**HIGHLY CONFIDENTIAL**

other drugs cited in support of class certification against the Track 2 Defendants involved products that were not sold by any Track 2 Defendant.[48] My review of the discovery establishes that these encounters do not fall within the proposed Class 1 definition because they involved one or more of the following circumstances:

- No liability for the plaintiff due to full supplemental insurance coverage,
- No liability for the plaintiff due to Medicare's disallowance of the charge with no liability accruing to the plaintiff,
- Incorrect identification of drugs which were not associated with the Track 2 Defendant,
- Reimbursement based on the post-January 1, 2005 ASP-based methodology,
- Multi-source drugs. Reimbursement for these encounters is not based on the AWP for the Track 2 Subject Drug – and indeed, for nearly all multi-source drug encounters, it is not even possible to determine which of the numerous sources of the multi-source drug actually sold the drug at issue.

78.     In this section of my report, after I discuss all drug encounters for each named plaintiff, I briefly summarize the importance of the narrower selections made for that named plaintiff by plaintiffs' counsel. Interestingly, I have determined that the vast majority of the 130 drug encounters for the named plaintiffs do not meet the class definition. I have been informed by counsel that class certification presumes that all encounters can be treated the same, with one named plaintiff representing the class; therefore it is inappropriate to determine whether the proposed classes can be certified by cherry-picking some encounters. Moreover, even if this approach were proper, that plaintiffs' counsel, who has been intimately involved with issues of drug reimbursement for many years, is unable to select drug encounters which all fall within the proposed Class 1 definition is informative regarding the feasibility of administering this class.

- [REDACTED]

---

[48] In one case plaintiffs confused J-code J3302, which is produced by a Track 2 Defendant, with J3301, which is not produced by a Track 2 Defendant. In the other case, the encounter related to a drug for which the only Track 2 Defendant that ever manufactured the drug sold the rights to the drug over 2 years before the transaction.

**HIGHLY CONFIDENTIAL**



Plaintiffs' counsel analyzed these 35 encounters and isolated 1 that he believed qualified ▌▌▌▌▌ as an appropriate class representative.[49]

▌▌▌▌▌

This assertion is incorrect for several reasons. First, this was an outpatient Hospital claim that was not reimbursed based on AWP at all. Second, the Medicare EOMB clearly establishes ▌▌▌▌▌ was not responsible for, and did not pay anything related to, this drug encounter. Plaintiffs' incorrect evaluation of this encounter, while understandable given the complexity of the inquiry required, appears to have resulted from not identifying and assessing the complete reimbursement record for this encounter.

---

[49] See Declaration of Donald E. Haviland, Jr. dated May 8, 2006, p. 13.

**HIGHLY CONFIDENTIAL**



did make payments for the co-insurance portion of these encounters, but he indicated in his deposition he had supplemental insurance until early 2005. It is not possible to determine what ▇▇▇▇ payment obligations were without additional insurance documentation, which has not been provided by plaintiffs. Furthermore, ▇▇▇▇ testified during his deposition that he paid his medical costs based on his ability to pay rather than the full amounts due to the provider based on the allowed Medicare reimbursements.[51]

**HIGHLY CONFIDENTIAL**



Therefore, none of these encounters falls within the proposed Class definition.



HIGHLY CONFIDENTIAL



**HIGHLY CONFIDENTIAL**



**HIGHLY CONFIDENTIAL**



## III. PROPOSED CLASS 2

### A. Class Definition and Overall Class Characteristics

79. Plaintiffs have proposed Sheet Metal Workers as the class representative for the proposed Class 2, which is defined to include:

> All Third-Party Payors who made reimbursements for drugs purchased in Massachusetts, or who made reimbursements for drugs and have their principal place of business in Massachusetts, based on AWP for a Medicare Part B covered Subject Drug that was manufactured by Abbott, Amgen, The Aventis Group, Baxter, Dey, Fujisawa, Immunex, Pfizer, Pharmacia, The Sicor Group and Watson.

80. Mr. Glenn Randle, a member of the Board of Trustees for the Sheet Metal Workers, submitted an Affidavit dated May 4, 2006, identifying 33 drug encounters in support of Sheet Metal Workers' claims against the Track 2 Defendants.

---

[52] This J-code also demonstrates another unique characteristic of multi-source J-codes with very low reimbursement amounts. The allegedly inflated Medicare allowed amount for these two transactions was $1.73 and $1.55 under the AWP based system which is in fact less than the reimbursement established under the new ASP-based reimbursement system for this J-code. The ASP based reimbursement for 2005 for this J-code increased to an amount that ranged from $1.80 to $1.89 per administration.

**HIGHLY CONFIDENTIAL**

81.  I followed the same process to assess whether each of these individual drug encounters for the named plaintiff met the definition of proposed Class 2 as I did for Class 1. As I explain below, however, the process required to analyze each drug encounter to identify Hospital OPPS reimbursements was even more complex for Class 2 than for Class 1. This factor further complicates the analysis of drug encounters to determine whether they fall within the proposed Class 2.

82.  For some reason, for various drug encounters involving multi-source drugs, Sheet Metal Workers provided the same documentation to support its claim against several different Defendants. Because the drug encounter involved one administration of the drug, which would have been sold by one company (and not necessarily a Track 2 Defendant), this approach artificially inflates the actual drug encounters at issue, and is flawed because if adopted, would support double, triple, and even quadruple recovery for the same drug encounter.

83.  The table below summarizes each single claim identified for several different Track 2 Defendants. The table provides the date of service, the drug J-code that was claimed, the drug name, the number of defendants that the same claim was made against for the same encounter, and the number of other non-defendant sources for the specific J-code claimed.

| Date of Service | J Code | Drug Description | Number of Defendant Sources | Number of Other Non-Defendant Sources |
|---|---|---|---|---|
| 1/7/2004 | J1580 | Gentomycin Sulfate | 2 | 6 |
| 9/19/2005 | J3370 | Vancomycin HCL | 3 | 2 |
| 2/2/2004 | J9000 | Doxorubic hcl 10 MG vl chemo | 3 | 2 |
| 10/1/2002 | J0640 | Leucovorin calcium injection | 4 | 8 |

84.  Sheet Metal Workers' multiple-claim approach for each of these transactions only highlights many of the key issues related to the problems in considering multi-source drug claims in the class context:

- It is not possible to identify the source of a multi-source drug based on the information available to the patient and TPP because the source of the product is not needed to reimburse the provider and is therefore not included in the documentation. As a result, it is not possible to establish that the

product was purchased from a Track 2 Defendant as opposed to a non-defendant source.

- All sources, both defendant and non-defendant, are by definition reimbursed at the exact same level making it impossible for any source to effect a higher AWP-based reimbursement for its product than its competitors.
- In most cases it was clear that the AWP for the Track 2 Defendant was not used to arrive at the reimbursement for all competing drugs within a J-code and due to the large number of sources for most of the Track 2 Defendant Subject Drugs, the AWP used for reimbursement for a given J-code will usually not be associated with the specific Track 2 Defendant's drug against which the claim is made.

**B.   The Vast Majority Of The Named Plaintiffs' Drug Encounters Do Not Meet The Proposed Class Definition For Class 2 Because They Were Not Paid Based On the AWP For the Subject Drug Identified For The Track 2 Defendant**

85.   As with the proposed Class 1 drug encounters, over 97% of the drug encounters for Sheet Metal Workers do not meet the Class 2 definition.

86.   I have illustrated results of my encounter-by-encounter analysis of the Class 2 claims in a pie chart attached as Exhibit 4-A. Exhibit 4-B reflects the detail for each encounter, which further supports my conclusions.

87.   The drug encounters do not meet the Class 2 definition because:

- 27% of the drug encounters occurred after January 1, 2005,[53] which is outside of the class period and at which time Medicare converted to an ASP-based reimbursement structure for Track 2 Subject Drugs. I identified these claims based on the date of service associated with the claim.
- 24% of the drug encounters occurred in connection with a hospital outpatient visit reimbursed under the Medicare Hospital Outpatient

---

[53] I have included this category because the named Plaintiff specifically cited 2005 transactions in support of its claims against the Track 2 Defendants. The plaintiffs provided documentation related to ASP based transactions, so I have included all transactions to establish a complete record of transactions for named plaintiffs provided in discovery associated with cited defendants to avoid future confusion regarding these transactions.

**HIGHLY CONFIDENTIAL**

Prospective Payment System (Hospital OPPS) and not under the Medicare physician fee schedule. Hospital OPPS does not require a patient co-payment based on AWP for the Subject Drug. In most cases the EOMB was not provided to allow for the identification of Hospital OPPS claims. As a result, I was required, for each drug encounter, to perform a more complicated analysis, by assessing a combination of various characteristics to isolate potential hospital outpatient claims, including: whether the claim was submitted on a hospital claim form (UB92), whether the name of the provider clearly established that it was a hospital, whether the co-insurance percentage was not 20% (indicative of a Hospital OPPS claim), and whether the Medicare claim was processed by a Fiscal Intermediary that only processes hospital claims versus a Medicare carrier that processes physician claims.

- 43% of the drug encounters involved multi-source drugs where the plaintiffs did not show that the reimbursement was based on the AWP for the Track 2 Subject Drug and it is infeasible to do so given the large number of sources and NDCs for these J-codes. Furthermore, in all cases, it is not possible to determine which of the numerous sources of a multi-source drug, most of them not defendants in this case, actually sold the drug at issue.

- 1 encounter (less than 3% of the total) involved a purchase from a Pennsylvania location that was billed from a Chicago address and paid from a Tennessee address for a patient that lived in Massachusetts. I have been advised that this encounter does not constitute a purchase in the State of Massachusetts as required by the proposed Class definition.

88. As with proposed Class 1, the complex and document-intensive analysis required to permit me to reach these conclusions and the increased effort required due to missing evidence related to this named plaintiff as to the drug encounters put forward by the named plaintiff, combined with the over-riding issues associated with reimbursement for multi-source drugs (which impact the majority of these encounters), establish that it would be infeasible to assess the allegations in the Complaint on a

**HIGHLY CONFIDENTIAL**

class-wide basis for the Subject Drugs identified for Track 2 Defendants in connection with proposed Class 2.

## IV.   PROPOSED CLASS 3

### A.   Class Definition and Overall Class Characteristics

89.   Pipefitters is the sole proposed class representative for Class 3, which is defined to include:

> All natural persons who made or who incurred an obligation enforceable at the time of judgment to make a payment for purchases in Massachusetts, and all Third-Party Payors who made reimbursements based on AWP as a pricing standard and have their principal place of business in Massachusetts or who have made reimbursements for Medicare Part B consumers in Massachusetts, for a physician-administered Subject Drug that was manufactured by Abbott, Amgen, The Aventis Group, Bayer, Baxter, Dey, Fujisawa, Immunex, Pharmacia, The Sicor Group and Watson. Included within this class are natural persons who paid coinsurance (*i.e.*, co-payments proportional to the reimbursed amount) for a Subject Drug purchased in Massachusetts, where such coinsurance was based upon the use of AWP as a pricing standard. Excluded from this Class are any payments or reimbursements for generic drugs that are based on MAC and not AWP.

The proposed Class Period for Class 3 is January 1, 1991 to the present.

90.   Mr. Charles Hannaford, Fund Administrator for Pipefitters, submitted a Declaration dated March 8, 2006. As described in that Declaration, and confirmed in discovery, Pipefitters contracts with TPP Blue Cross Blue Shield of Massachusetts (BCBSMA) to manage the care to its members and process medical benefit claims.[54]

91.   Proposed Class 3 differs from proposed Classes 1 and 2 in that, while the proposed class members for Class 1 are all consumers, and the proposed class members for Class 2 are all TPPs, proposed Class 3 combines the two payor groups. Because most individuals that fall within the Class 3 definition are covered by insurance, and therefore each drug encounter potentially involves both an individual and his TPP, the analysis for Class 3 is significantly further complicated because, since

---

[54] See March 8, 2006 Declaration of Charles Hannaford that states ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**HIGHLY CONFIDENTIAL**

reimbursement for proposed Class 3 drug encounters is ultimately determined by each TPP, the TPP aspects must also be analyzed for each drug encounter.

92. Moreover, while proposed Classes 1 and 2 both relate to Medicare (in which there is one uniform regulatory framework that establishes various methods of reimbursement for provider claims depending on the setting in which a drug is administered, such as Hospital inpatient, Hospital outpatient, skilled nursing facility, physician's office, etc.), the reimbursement structures for the proposed Class 3, in contrast, are not established under one uniform regulatory framework.  Accordingly, in Class 3, reimbursement levels are established by contract. More specifically, each TPP contracts with each hospital, clinic, skilled nursing facility, nursing home, home health agency and physician ("Provider") that it reimburses within its network, setting varying reimbursement rates with each based on the TPP's own policies, processes, knowledge and negotiating objectives.

93. As a result, to determine whether a given drug encounter was reimbursed based on AWP of the Subject Drug as described in the proposed Class 3 definition, one must first analyze the overall reimbursement approach the TPP uses for each category of providers (as well as modifications to the overall approach agreed to as part of the contractual negotiation process between an TPP and each Provider with which it negotiates a contract) and then examine the individual aspects of the encounter discussed in connection with proposed Classes 1 and 2 above.

94. Ultimately, then, for reimbursements in the non-Medicare proposed Class 3 setting, analysis requires a two-pronged approach for each identified drug encounter, including:

- Assessment of the numerous issues generated by the TPP involved in the encounter, including issues unique to that TPP's reimbursement arrangements in general, and also any issues unique to the TPP's specific

**HIGHLY CONFIDENTIAL**

reimbursement arrangement for the Provider involved in the encounter; and

- As with proposed Classes 1 and 2, individual transactional issues such as reimbursement structure difference based on the place of service (i.e. inpatient hospital, outpatient hospital, clinics, physician office, specialized treatment facility, post acute care treatment location such as a skilled nursing facility, nursing home, and home health); coverage issues for each managed care product type (i.e. HMO, PPO and POS); drug specific reimbursement methodology issues such as how the reimbursement level for a multi-source drug J-code is established given the many sources which may exist for the drug; and whether the multi-source transaction in question was actually sourced from a Track 2 Defendant versus a non-defendant or involved reimbursement based on the AWP for the identified Track 2 Defendant's Subject Drug.

I will separately address each of these two categories of issues in turn.

### B. The Variability Between TPPs Requires A TPP-By-TPP Analysis For Each Proposed Class 3 Plaintiff

95. ███████████████████████████████████████████████ identified a number of specific issues breaking causation for potential claims by individual TPPs. Many of the considerations identified in ████████ report vary from one TPP to the next. This variability for each TPP demonstrates why individual analysis on TPP-by-TPP basis is necessary to assess the allegations of the Complaint for the proposed Class 3.[56] In this section, I will recap those issues and provide additional discovery support that has been obtained recently that further supports those conclusions.

---

[56] I will not repeat ████████ extensive analysis in this area, but I will provide additional evidence specific to Track 2 Defendants and certain limited discovery received after ████ report was issued.

**HIGHLY CONFIDENTIAL**

### 1. Massachusetts TPPs Are Typically Large And Sophisticated Organizations With Significant Knowledge Of Drug Acquisition Cost

96.     The discovery in this case shows that TPPs, including ▇▇▇, have varying knowledge of the prices at which physicians and other providers acquire the drugs that the TPP reimburse. As described in ▇▇▇ report, ▇▇▇ insures approximately 46% of the covered lives in the state of Massachusetts.[57] ▇▇▇ like other large TPPs, is aware of differences between AWP and providers' acquisition costs and understands the magnitude of those differences, especially related to multi-source drugs and Hospital Products due to its direct contracts to purchase Track 2 Defendant drugs and the direct knowledge of its personnel.

#### a. Direct Contracts With Track 2 Defendants At Significant Discounts

97.     ▇▇▇ purchased Track 2 drugs at deeply discounted prices which, if compared with AWP, ranged from 33% below AWP to as low as 90% below AWP as shown in Exhibit 5-a and 5-b. Similarly, many of the other TPPs in the State of Massachusetts such as ▇▇▇ and others purchased drugs directly from Track 2 Defendants.[58] Collectively, discovery indicates that TPPs covering more than 65% of the persons in Massachusetts have direct contracts with Track 2 Defendants to purchase drugs at discounted prices. For example, ▇▇▇ graphically show the discounts obtained by Pipefitters' TPA, ▇▇▇ ▇▇▇ A review of these discounts highlights the variability of discounting levels between both individual drugs and between different manufacturers and the extensive level of knowledge regarding the deep discounting of drugs within this TPP. Any analysis of knowledge regarding the acquisition cost of drugs by a TPP would require a TPP-by-TPP analysis.



**HIGHLY CONFIDENTIAL**

### b. TPPs Hire Personnel With Experience And Visibility To Acquisition Costs

98. ▇▇▇▇▇ provides evidence that TPPs ▇▇▇▇▇ hire personnel with significant experience regarding the acquisition cost of drugs. More specifically, the report explains that individuals responsible for managing provider contract and fee schedule negotiations did have previous experience in clinical or hospital administration or were practicing physicians or pharmacists. Beyond ▇▇▇ example of ▇▇▇▇▇▇▇▇ whose responsibilities include being the main liaison with the plan's provider network and managing the regional medical directors, others responsible for the provider contracting process have extensive experience and knowledge of provider acquisition costs.

99. For example, ▇▇▇▇▇▇▇▇▇▇▇ had direct knowledge of acquisition costs and the deep discounts associated with multi-source drugs while working for Tufts from 1992 to 2002.[60] Another individual responsible for physician reimbursement is ▇▇▇▇▇▇▇▇▇▇▇ who has previously worked in contracting for the New England Medical Center (which includes hospitals and physician groups) and also worked as a consultant for Ernst and Young advising both providers and TPPs[61].

### 2. TPPs Possess Competitive Leverage

100. In section IV of his report, ▇▇▇▇ concludes that as a result of the competitive leverage exerted by TPPs, numerous TPPs would not have overpaid for physician-administered drugs as a result of the alleged AWP scheme. ▇▇▇▇ has provided specific examples in his report related to ▇▇▇▇ leverage over providers. The level of competitive leverage a specific TPP has will affect the level of drug reimbursement and that variability must be considered on a TPP-by-TPP basis.



### 3. TPP Drug Reimbursements Cannot Be Considered In Isolation Due To Cross-Subsidization

101. ▬▬▬▬ ecognized the cross-subsidization of drug reimbursements and services under Medicare Part B in his report when he stated:

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

102. The use of cross-subsidization in non-Medicare reimbursements has also been well documented in depositions of commercial TPPs as I summarized in Attachment B to my Sur-reply report dated ▬▬▬▬ Specifically, the Attachment provides extensive deposition testimony and contemporaneous documents ▬▬▬▬▬▬▬▬▬▬ xplaining that cross-subsidization between drugs and services is common and the fee schedule is negotiated at the overall basis and not at the individual line item basis.

103. More specifically, the deposition testimony of ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ explained that physician negotiations are performed at the overall fee schedule level in her ▬▬▬▬ ▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬