# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICALS INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
| | ) ) | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO THE CONSOLIDATION CLASS ACTION | ) ) ) ) | |

## DECLARATION OF DARLENE MURPHY

I, Darlene Murphy, declare and state as follows:

1.     My name is Darlene Murphy. I am over the age of 18, of sound mind, and fully competent to testify to the facts and matters set forth in this Affidavit.

2.     I am an employee of Electronic Data Systems Corporation. One of EDS' subsidiaries is National Heritage Insurance Company ("NHIC"), and I have worked on the Medicare Part B Carrier account for NHIC since 1997. At NHIC, I am a project manager for change management for the Medicare Part B Carrier account. In that capacity my duties include reviewing, coordinating, and implementing directives from the Centers for Medicare and Medicaid Services ("CMS"), and as such I have knowledge of or familiarity with the matters set forth in this Declaration.

3.     I have reviewed the requirements of the proposed Order submitted by NHIC to the Court with respect to Aventis' motion to compel, and have made appropriate inquiries, including conferences with Deborah Johnson, with respect to the matters described in

DECLARATION OF DARLENE MURPHY – Page 1

Paragraph 2 thereof. I am authorized to provide this declaration on behalf of NHIC as to those matters.

4.     Surveys of Physicians.

NHIC conducted no surveys of physicians regarding their Medicare Part B drug acquisition costs during the period January 1, 1998, to date, and hence has no NHIC-conducted surveys or documents relating to any such surveys in its possession, custody, or control.

5.     NHIC Payment Practices.

Other than the submitted charges themselves, the Red Book published by Thomson PDR, CMS pricing directives provided to NHIC (including the CMS Single Drug Pricer or "SDP" implemented in January 2003), and the claims history reflecting the submitted charges, NHIC has no information with respect to why and how submitted charges from physicians deviated from the statutory AWP ceilings for Part B covered drugs from 1998-2003 (I interpret the phrase "statutory AWP ceilings" to refer to the prices in the Red Book and CMS SDP pricing files).

NHIC's standard practice during the period January 1, 1998 to 2003 was to pay such charges based on the prices set forth in the Red Book and, commencing in January 2003, on the CMS SDP pricing files provided to NHIC. The only exceptions to this practice during this period of which I am aware were those instances in which physicians submitted charges that were lower than the Red Book or CMS SDP pricing files, in which case NHIC would pay the lower price submitted. I have not located any instances during the period from January 1998 until January 2003 in which NHIC deviated from the prices set forth in the Red Book in paying claims for Part B covered drugs. Since CMS started issuing SDP pricing files in

DECLARATION OF DARLENE MURPHY – Page 2

January 2003, NHIC has had no discretion to vary from the prices provided, and it has not done so.

### 6. Basis for Submitted Charges.

NHIC is not able to determine definitively from the Massachusetts Medicare Part B records from 1998-2003 maintained by NHIC whether all submitted charges for Part B covered drugs were based upon AWP.

This is so because the providers are the ones who prepared the submitted charges, and NHIC cannot tell from its own records whether all such charges were based on AWP. Only the providers can answer that question. NHIC does have the records of the submitted charges, the amounts paid, the Red Book, the CMS SDP pricing files, and the claims history reflecting the charges and amounts paid, from which comparisons can be made of the submitted charges and the prices reflected in the Red Book and the CMS pricing files, but I am not aware of the existence of any such comparisons.

### 7. Volume of Claims and Number of Providers.

There were 121,011,989 Part B claims processed in the fiscal years covering the period 1998-2003 (specifically, October 1, 1997, to September 30, 2004) for Massachusetts. Each such claim was submitted by a single provider or group of providers, but the converse may not be true; some providers may have submitted multiple claims, and not all providers eligible to submit claims during this period may have done so. The total number of participating and nonparticipating providers (including physicians, limited licensed practitioners, and others) derived from existing internal reports for the time periods in question are set forth in the following chart:

---

**DECLARATION OF DARLENE MURPHY – Page 3**

| Time Period | Number of Providers |
|---|---|
| 1/1/98–12/31/98 | 25,157 |
| 1/1/99–12/31/99 | 27,726 |
| 1/1/00–12/31/00 | 30,613 |
| 1/1/01–12/31/01 | 30,391 |
| 1/1/02–12/31/02 | 29,414 |
| 1/1/03–12/31/03 | 30,868 |

8.    Except as set forth herein, I know of my own personal knowledge that each of the facts and matters set forth in this Declaration is true and correct, and I could and would testify to them if called upon to do so.

_5·31·06_
Date

_Darlene Murphy_
Darlene Murphy

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: LUPRON® MARKETING AND SALES PRACTICES LITIGATION | MDL No: 1430<br>Master File No.: 01-CV-10861 |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | Judge Richard G. Stearns |

**MEMORANDUM OF INTERVENORS, VALERIE SAMSELL AND MILTON GREENE, IN OPPOSITION TO THE JOINT MOTION FOR PRELIMINARY APPROVAL OF PROPOSED NATIONWIDE LUPRON® PURCHASER CLASS SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS AND APPROVAL OF NOTICE PLAN**

## I.   INTRODUCTION

Intervening Plaintiffs, Valerie Samsell and Milton Greene, by their undersigned counsel ("Intervenors"), hereby oppose the Joint Motion for Preliminary Approval of Proposed Nationwide Lupron® Purchaser Class Settlement, Certification of Settlement Class and Approval of Notice Plan ("Joint Motion"). Despite the extremely short notice of the Joint Motion and hearing on the same set by the Court for November 23, the pendency of the Intervenors' Motion for Rule 16 Conference, and the fact that the Joint Motion and hearing have been expedited by this Court without any formal notice or request by any party for requesting the same, Intervenors endeavor herein to respond fully to the Joint Motion.[1]

---

[1] In recognition of the requirement that they respond to the protracted Joint Motion and related papers on less than one week's notice, Intervenors respectfully request that the Court accept this over length brief without a formal motion for leave to exceed the page limit and also respectfully submit that, by attempting to respond and agreeing to appear at the November 23 hearing, they do not waive their substantial objections to the procedural infirmities of these proceedings and expressly reserve

1

Superiority calls for a determination that the proposed class action is the best method of achieving a "fair and efficient adjudication of the controversy." Fed R. Civ. P. 23(b)(3).

Rule 23(b)(3) requires that the proponents of a settlement class show a "predominance of legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist any settlement." *Amchem Prods. v. Windsor*, 521 U.S. at 623. As discussed below, the parties have not met their burden to show that common issues predominate over individual questions. Individual questions as to the value of each class members' claim, different levels of knowledge of the underlying misconduct, different state laws, different documentation available to prove individual claims, different interest in obtaining early payments, and different pending legal proceedings, prevent certification of the amorphous settlement class proposed by the parties.

i.   *Different values for different claims*

A court should exercise particular caution in assessing whether a particular settlement class meets the predominance requirement "when individual stakes are high and disparities among class members great." *Amchem*, 521 U.S. at 624. The fact that some class members have more valuable claims than other class members is a difference than can predominate over common questions and complicate class certification. *See Ortiz v. Fiberboard Corp.*, 527 U.S. 815, 857, (1999), *Relafen*, 2004 WL 2441256 at *4. Depending on the circumstances, an insufficient accommodation of these differences can implicate both predominance and adequacy concerns. *Ortiz*, 527 U.S. at 856; *Relafen*, 2004 WL 2441256 at *4.

Many of the TPP class members who insure hundreds or even thousands of consumers have significant individual interests in the outcome of this case. Many consumers do, too. In fact, one of the Intervening Plaintiffs, Valerie Samsell, who was denied coverage by her insurer paid over

87

# EXHIBIT 5



7352680

Nov 3 2005
4:04PM

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>Case No. 01-cv-12257-PBS<br><br>Judge Patti B. Saris<br><br>Chief Magistrate Judge Marianne Bowler |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | |

<u>**TRACK 2 DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS TO
PLAINTIFFS**</u>

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Rules
26.5 and 34.1 of the Local Rules of the United States District Court for the District of
Massachusetts, the Track 2 Defendants hereby request that plaintiffs produce the following
documents within thirty (30) days of service:

<u>REQUEST NO. 1:</u>   Your Proposed Trial Plan for adjudicating each element of
all causes of action and affirmative defenses as to all Track 2 Defendants and every individual
class member.

<u>REQUEST NO. 2:</u>   A sample or samples of any proof-of-claim form that you
propose to utilize during any stage of these proceedings to prove or refute any element of the
class members' and Track 2 Defendants' causes of action, affirmative defenses and damages.

<u>REQUEST NO. 3:</u>   Your proposed verdict form(s) or jury interrogatories for
adjudicating each element of all causes of action, affirmative defenses and damages as to all
Track 2 Defendants and every individual class member.

1793425v1

REQUEST NO. 4:    All documents concerning the methods by which plaintiffs intend to identify, match or "cross-walk" HCPCS-coded drug transactions with the NDCs of the dispensed drugs at issue in this matter, both generic and branded, when proving each class member's claim at trial.

/s/ Aimée E. Bierman
Michael DeMarco (BBO#119960)
mdemarco@klng.com
Aimee E. Bierman (BBO #640385)
abierman@klng.com
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
75 State Street
Boston, MA 12109-1808
(617) 261-3100

Michael L. Koon
James P. Muehlberger
SHOOK HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
(816) 474-6550

ATTORNEYS FOR DEFENDANT AVENTIS
PHARMACEUTICALS INC.

2

1793425v1

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2005, a true and correct copy of the foregoing document was served by electronic service, pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456, to all counsel of record.

/s/ Aimée E. Bierman
Aimée E. Bierman

3

# EXHIBIT 6



10246340

Jan 12 2006
5:43PM

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL | Chief Magistrate Judge Marianne Bowler |
| CLASS ACTIONS | |

## PLAINTIFFS' OBJECTION AND RESPONSE TO TRACK 2 DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Rules 26.5 and 34.1 of the Local Rules of the United States District Court for the District of Massachusetts, the plaintiffs respond as follows.

REQUEST NO. 1:  Your Proposed Trial Plan for adjudicating each element of all causes of action and affirmative defenses as to all Track 2 Defendants and every individual class member.

RESPONSE:  No such document exists at this time other than the trial plan submitted in the Phase 1 class certification proceeding.

REQUEST NO. 2:  A sample or samples of any proof-of-claim form that you propose to utilize during any stage of these proceedings to prove or refute any element of the class members' and Track 2 Defendants' causes of action, affirmative defenses and damages.

RESPONSE:  No such document exists at this time.

- 1 -

REQUEST NO. 3:  Your proposed verdict form(s) or jury interrogatories for adjudicating

each element of all causes of action, affirmative defenses and damages as to all Track 2

Defendants and every individual class member.

RESPONSE:  No such document exists.

REQUEST NO. 4:  All documents concerning the methods by which plaintiffs intend to

identify, match or "cross-walk" HCPCS-coded drug transactions with the NDCs of the dispensed

drugs at issue in this matter, both generic and branded, when proving each class member's claim

at trial.

RESPONSE:  See Hartman reports.

DATED:  January 12, 2006

By____/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

- 2 -

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**PROPOSED CO-LEAD COUNSEL
FOR PLAINTIFFS**

- 3 -

001534-16 85459 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **PLAINTIFFS' OBJECTION AND RESPONSE TO TRACK 2 DEFENDANTS' REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFFS** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 12, 2006, a copy to Lexis/Nexis File & Serve for posting and notification to all parties.

By_____/s/ Steve W. Berman_____
    Steve W. Berman
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292

- 4 -

# EXHIBIT 7



7352602

Nov 3 2005
4:00PM

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br><br>Case No. 01-cv-12257-PBS<br><br>Judge Patti B. Saris<br><br>Chief Magistrate Judge Marianne Bowler |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | |

### TRACK 2 DEFENDANTS' INTERROGATORIES TO PLAINTIFFS

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Rules 26.5 and 33.1 of the Local Rules of the United States District Court for the District of Massachusetts, the Track 2 Defendants hereby request that plaintiffs answer the following interrogatories within thirty (30) days of service hereof.

### DEFINITIONS

1.     "And" as well as "or" shall be construed either disjunctively or conjunctively.

2.     "HCPCS" means Healthcare Common Procedure Coding System.

3.     "NDC" means National Drug Code product identifier for a particular drug as listed in the National Drug Code Directory.

4.     "TAMCC" means the Third Amended Master Consolidated Class Action Complaint filed in connection with MDL Docket No. 1456, Civil Action No. 01-12257-PBS, in the United States District Court for the District of Massachusetts.

### INSTRUCTIONS

1.     The answers to these interrogatories should include all information as is known or available to you.  Where the facts set forth in your answers or portions thereof are supplied upon

1

information and belief rather than actual knowledge, please so state and specifically describe and identify the source(s) of such information and belief.

2.      Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these interrogatories are deemed to be continuing in nature, and plaintiffs have a duty to supplement their responses if plaintiffs learn that the response is in some material respect incomplete or incorrect.

## INTERROGATORIES

INTERROGATORY NO. 1: Describe with particularity the methods by which the elements of all causes of action, affirmative defenses and damages may be adjudicated as to each Track 2 Defendant and every individual class member.

INTERROGATORY NO. 2: State the class definition(s) of all class(es) and subclasses plaintiffs propose be certified, including any and all Massachusetts state-wide class(es).

INTERROGATORY NO. 3: Describe with particularity the methods by which plaintiffs intend to identify, match or "cross-walk" HCPCS-coded drug transactions with the NDCs of the dispensed drugs at issue in this matter, both generic and branded, when proving each class member's claim at trial.

INTERROGATORY NO. 4: For those instances in which a single HCPCS-code was used for multiple forms, strengths, quantities, labelers or manufacturers of the drugs at issue in the TAMCC, describe with particularity the methods by which plaintiffs intend to establish the NDC codes for the dispensed drugs at issue in this matter, both generic and branded, when proving each class member's claim at trial.

/s/ Aimée E. Bierman
Michael DeMarco (BBO#119960)
mdemarco@klng.com
Aimee E. Bierman (BBO #640385)
abierman@klng.com
KIRKPATRICK & LOCKHART
NICHOLSON GRAHAM LLP
75 State Street
Boston, MA 12109-1808
(617) 261-3100

Michael L. Koon
James P. Muehlberger
SHOOK HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, Missouri 64108-2613
(816) 474-6550

ATTORNEYS FOR DEFENDANT AVENTIS
PHARMACEUTICALS INC.

3

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2005, a true and correct copy of the foregoing document was served by electronic service, pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456, to all counsel of record.

/s/ Aimée E. Bierman
Aimée E. Bierman

1793490v1

# EXHIBIT 8



10246340

Jan 12 2006
5:43PM

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL | Chief Magistrate Judge Marianne Bowler |
| CLASS ACTIONS | |

## PLAINTIFFS' RESPONSE TO THE TRACK 2 DEFENDANTS' INTERROGATORIES TO PLAINTIFFS

### INTERROGATORIES

INTERROGATORY NO. 1: Describe with particularity the methods by which the elements of all causes of action, affirmative defenses and damages may be adjudicated as to each Track 2 Defendant and every individual class member.

ANSWER: Plaintiffs object to this interrogatory as premature and overbroad. But, plaintiffs' trial plan was described in the briefing on class certification; see also Hartman reports and all briefing on class certification.

INTERROGATORY NO. 2: State the class definition(s) of all class(es) and subclasses plaintiffs propose be certified, including any and all Massachusetts state-wide class(es).

ANSWER: See plaintiffs' latest Phase 1 definition submitted in the Amended Proposed Class Certification Order.

- 1 -

INTERROGATORY NO. 3:  Describe with particularity the methods by which plaintiffs intend to identify, match or "cross-walk" HCPCS-coded drug transactions with the NDCs of the dispensed drugs at issue in this matter, both generic and branded, when proving each class member's claim at trial.

ANSWER:  See Hartman reports.

INTERROGATORY NO. 4:  For those instances in which a single HCPCS-code was used for multiple forms, strengths, quantities, labelers or manufacturers of the drugs at issue in the TAMCC, describe with particularity the methods by which plaintiffs intend to establish the NDC codes for the dispensed drugs at issue in this matter, both generic and branded, when proving each class member's claim at trial.

ANSWER:  See Hartman expert report.

DATED: January 12, 2006

By   /s/ Steve W. Berman
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

001534-16 85465 V1

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Facsimile: (215) 772-1359
Telephone: (215) 772-1000

**PROPOSED CO-LEAD COUNSEL
FOR PLAINTIFFS**

- 3 -

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **PLAINTIFFS' RESPONSE TO THE TRACK 2 DEFENDANTS' INTERROGATORIES TO PLAINTIFFS** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on January 12, 2006, a copy to Lexis/Nexis File & Serve for posting and notification to all parties.

By_____**/s/ Steve W. Berman**_____
    Steve W. Berman
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292

- 4 -

# EXHIBIT 9

**[Withdrawn pursuant to June 21, 2006
Letter to Judge Saris]**

# EXHIBIT 10



### VEN-A-CARE
OF THE FLORIDA KEYS, INC.

A Home I.V. and Nutritional Service

933 FLEMING ST.
KEY WEST, FLA 33040
(305) 292-1635
FAX: (305) 292-1739

<u>SENSITIVE- DO NOT DISCLOSE- INFORMATION CONTAINED HEREIN RELATED
TO PENDING FEDERAL CASE UNDER COURT ORDERED SEAL</u>

October 2, 1996

Dr. Bruce Vladeck
Administrator
Health Care Financing Administration
Department of Health and Human Services
200 Independence Blvd. S. W.
Hubert Humphrey Building Room 314G
Washington, D. C. 20201

RE: <u>EXCESSIVE REIMBURSEMENTS FOR CERTAIN PHARMACEUTICALS BY THE
MEDICARE AND MEDICAID PROGRAMS.</u>

Dear Dr. Vladeck,

Ven-A-Care of the Florida Keys, Inc. "VAC" has attempted for more than seven years to
assist the Health Care Financing Administration "HCFA" and the State Medicaid
programs in limiting infusion and inhalation pharmaceutical reimbursements to the
reasonable levels contemplated by the enabling legislation. VAC is particularly
concerned now about the continuing practice of the Medicare and Medicaid programs of
paying exorbitant reimbursement for infusion and inhalation drugs which results in more
than <u>one billion dollars per year</u> of federal funds being wasted. VAC's efforts, to date,
have not resulted in much needed changes. Accordingly, we are appealing to you
directly to insure that the necessary resources are dedicated to terminating this
unnecessary loss of program dollars as soon as possible.

Enclosed with this letter you will find two volumes of exhibits that substantiate and
support the fact that the Medicare and Medicaid programs are continuing to make
excessive reimbursements to providers for infusion and inhalation pharmaceuticals.
These reimbursements are at many multiples over and above the amount that the
programs ever intended to pay.

### BACKGROUND

VAC specializes in the provision of drugs that are administered parenterally as well as
respiratory solutions and their necessary supplies and equipment. VAC is a Florida
Medicaid, Champus, and Medicare Part B "PEN" provider and services patients whose
medical benefits are administered by virtually all of the major health insurance
companies. VAC was formed in 1987 by five physicians, three pharmacists, and two
nurses in Key West, Florida.

HHC003-0479

Dr. Bruce Vladeck
HCFA
October 2, 1996
Page 2

Infusion pharmaceuticals are primarily utilized by patients being treated for various forms of Cancer and HIV diseases. As I am sure you are well aware, both of these diseases are affecting a rapidly expanding population of people in the United States. This fact will only compound the future problem of finding adequate funding sources in order to provide these much needed benefits.

For approximately seven years, we have diligently worked in an attempt to inform responsible government officials, including HCFA and others, of the cause and effect that excessive reimbursements for infusion and inhalation drugs are having on our health care delivery system. As a result of these excessive payments, the Medicare and Medicaid programs are expending more than one billion dollars annually in additional costs. These excessive reimbursements also serve as a vehicle that drives overutilization and fuels illegal kickbacks. Much of the information which we have provided over past several years is now being reported by the media (Exhibit 1) and substantiated by various governmental reports, including but not limited to, the following Office of the Inspector General reports:
  1.) Supplier's acquisition cost for albuterol sulfate
  2.) Medicare payments for nebulizer drugs
  3.) A comparison of albuterol sulfate prices
  4.) Review of pharmacy acquisition cost for drugs reimbursed under the Medicaid prescription drug program of the California Department of Health Services
  5.) OIG physician's cost for chemotherapy drugs
  6.) Inappropriate payments for total parenteral nutrition (TPN)

Over a year ago, we traveled to the HCFA in Baltimore and met with various representatives of your agency and made a detailed presentation regarding these excessive reimbursements and their impact on the health care delivery system. Unfortunately, for the Medicare and Medicaid programs as well as the American public, to date, no meaningful action has been either proposed or implemented by your agency to deal with these issues. We find this fact not only disconcerting but potentially the source of a major embarrassment to both your Agency and to the Administration.

### AWP FRAUD ON THE PROGRAMS

Currently, Medicare and most Medicaid programs' reimbursement methodologies for pharmaceuticals is based on a factor of a drug's Average Wholesale Price, "AWP". For Medicare, this methodology is the average of the generic form of the drugs AWP and for most state Medicaid programs the methodology is at a small percentage reduction, approximately 10% off of a drugs AWP. This methodology determination was intended to make the Medicare and Medicaid programs prudent purchasers of pharmaceuticals.

HHC003-0480

Dr. Bruce Vladeck
HCFA
October 2, 1996
Page 3

AWP has become the benchmark in the industry for establishing pharmaceutical reimbursement. Virtually every federally sponsored program, including Medicare, Medicaid, Champus, Federal Employees, and Railroad Workers as well as most private third-party programs is relying on AWP to base their reimbursement decisions (Exhibit 6,7,8,9, and 10). Unfortunately, the pharmaceutical manufacturers have circumvented the intent of the government's reimbursement methodology by falsely reporting inflated AWP pricing information enabling providers to reap windfall profits from the provision of infusion and respiratory drugs.

In 1995, the Medicare program had allowable charges of more than one billion dollars for approximately 50 infusion and inhalation drugs (Exhibit 2). Using these drugs as a basis for illustration, we compiled VAC's cost from a multitude of wholesale sources and compared them to Medicare's reimbursement (Composite exhibit 3). Based on these results, we found that Medicare's reimbursement was excessive and in many cases provided profit margins of more than 500% and, in some instances, more than 1000%. For some drugs, the 20% Medicare co-insurance payment is equal to or greater than the cost of the drug. Needless to say, the financial impact is being borne not only by the programs but by the beneficiaries and Medicare secondary payers who are responsible for the 20% co-payment.

To illustrate the magnitude of this problem, we recalculated the Medicare program's cost for these drugs using VAC's best price (Exhibit 4) and VAC's worst price (Exhibit 5). The best and worst prices do not represent "weekly specials" (Exhibit 15) which are widely available from wholesalers and can create additional savings on average of approximately 20%. It also does not take into account purchasing in bulk volume or multidose vials which also provide apprpximately 10- 20% savings or profit (Composite exhibit 3).

An example of a provider maximizing profits through purchases of drugs in bulk or multidose vials is the drug Ceftriaxone sodium, HCPCS J0696- 250mg.(Composite exhibit 3-3). VAC's best price for 250mg is $9.37. However, if VAC purchases a 2gm. vial that yields eight 250mg doses, the cost  for each dose is reduced significantly to $6.88 per 250mg.( the cost of the 2gm. vial is $54.98). This represents an additional 14% savings or profit. Based on VAC's cost, the Medicare program alone can achieve annual savings of approximately $350 to $500 million dollars for the drugs listed in our exhibits. Similar savings can be achieved by the State Medicaid programs over and above the cost-containment mechanisms already in place, such as the rebate program.

933 Fleming Street                     VEN-A-CARE  of the Florida Keys, Inc.                     Key West, Florida  33040
                                                    (305) 292-1635

HHC003-0481

Dr. Bruce Vladeck
HCFA
October 2, 1996
Page 4

Third-party payers are unable to accurately estimate costs for infusion and inhalation drugs because drug manufacturers falsely inflate their drugs pricing information, including but not limited to, AWP. The manufacturers are and have been reporting false and fraudulent drug pricing information, including a drug's AWP, direct price, "DP", and wholesaler acquisition cost, "WAC" (Composite exhibit 12). Drug manufacturers are in direct control of all pricing information provided to the marketplace, from the wholesale price to the amount of reimbursement (and thus the desired level of profits for their customers) by the Medicare and Medicaid programs. By falsely inflating drug pricing information, the drug manufacturers increase the profit margins enjoyed by their customers, thereby driving demand upward and increasing utilization. In some instances, the available profit margins arising from the manufacturers' false pricing information creates and incentive for the physician to utilize the manufacturer's drug rather than that of a competitor or prescribe alternative courses of treatment.

A number of years ago, the Florida Medicaid program changed its reimbursement methodology from AWP minus 10% plus a dispensing fee to WAC plus 7% plus a dispensing fee in an effort to further limit Medicaid pharmaceutical expenditures. The pharmaceutical manufacturers have thwarted Florida's attempt to control reimbursement for infusion and respiratory drugs by falsely reporting inflated WAC information. Additionally, Congress, has for a number of years been concerned about the spiraling costs of pharmaceuticals in the Medicare and Medicaid programs as evidenced by its enacting the Medicaid rebate program. For infusion and inhalation drugs, the drug manufacturers have caused this enactment to be a miserable failure in what can only be characterized as a farce. This outrage is easily demonstrated by the drug Leucovorin calcium manufactured by Elkins-Sinn. A  50mg. vial's NDC number is 00641-2369-41, its AWP is $56.25 and its DP is $45.00 as reported by the manufacturer. However, its true cost to providers is approximately $4.00. The Florida Medicaid program's reimbursement for this drug is approximately $46.00 (in addition applicable dispensing fee) which is more than twice Medicare's allowable for HCPCS J0460 (50mg. Leucovorin). Under the intent of the Medicaid rebate program, Florida should be receiving a rebate of approximately $4.60. When it comes to paying rebates to the State Medicaid programs, the drug manufacturers are truthfully reporting their required cost information and Florida receives a rebate of only $0.46!

Seizing the opportunity to exploit their control over drug prices, the drug manufacturers have in some instances, reported higher prices for generic products than the equivalent brand. In truth and in fact, the prices paid by the providers are much less. An example of this deceitful pricing practice is the drug Etoposide, HCPCS codes J9181 and J9182. This drug was a single source innovator drug produced under the brand name Vepesid by Bristol-Myers. Bristol-Myers reported an AWP of $136.49 for 100mg.(which was also false since

HHC003-0482

Dr. Bruce Vladeck
HCFA
October 2, 1996
Page 5

the true AWP was approximately $80.00). When Vepesid came off patent, the first
generic was produced by Gensia. Gensia reported an AWP of $141.97 for their generic
version of 100mg. Etoposide and thus caused the Medicare program to increase the
allowable from $136.49 to $141.97! Simultaneously, the free market was working
because the providers began to enjoy lower prices for purchasing Etoposide due to
competition. These lower prices were dramatic. As of today, there are two additional
manufacturers, Pharmacia and Chiron, who have priced their AWP for Etoposide
100mg. at $136.49 (same as Bristol-Myers) and $140.00 , respectively. The price for
100mg. of Etoposide has plummeted to $18.00. However, the reimbursement from
Medicare, Medicaid and other payers continues to be based on the fraudulent AWP.

The drug manufacturers are further exploiting their ability to falsify pricing information by
using their falsifications of AWP as a marketing tool. This is particularly true in cases
where payers, such as State Medicaid programs calculate separate reimbursements for
each manufacturer's drug based on the drug's NDC numbers. Our company has been
solicited on numerous occasions by drug manufacturers who brag about their use of
falsely inflated pricing information as a reason for purchasing their product over a
competitor's with a lower AWP.

We understand that the HCFA may be examining a plan that would, for Medicare only,
abandon the AWP reimbursement methodology. We perceive three major flaws with
such an approach. First, this approach is based on the erroneous assumption that there
is something wrong with the historical concept of AWP. The damage to the Medicare
and Medicaid programs is being caused by false pricing information being submitted by
the drug manufacturers rather than truthful representations of AWP. In other words, the
problem can't be fixed unless it is accurately defined. Second, any plan must insure that
there is truth and honesty in drug pricing information provided by the manufacturers and
upon which reimbursement decisions are based. Ignoring the drug manufacturers'
propensity to falsify pricing information in order to drive up reimbursement and utilization
will doom any new methodology to failure. Third, the Medicaid programs must not be
ignored. Drug manufacturers must be precluded from continuing to submit false pricing
information to State Medicaid officials which is perpetuating the fleecing of the Medicaid
programs

HHC003-0483

Dr. Bruce Vladeck
HCFA
October 2, 1996
Page 6

We would be happy meet with you and answer any questions or concerns you may have on these very important issues.

Sincerely,

Zachary T. Bentley

T. Mark Jones

cc: Michael Theis, Esq. Trial Attorney
    Department of Justice
    202-307-0497

    Mark A. Lavine, Esq. AUSA
    U.S. Attorney's Office
    Southern District of Florida
    305-536-5472

933 Fleming Street                VEN-A-CARE of the Florida Keys, Inc.        Key West, Florida 33040
                                          (305) 292-1635

HHC003-0484      L