# EXHIBIT 31

## [Filed Under Seal]

# EXHIBIT 32

## [Filed Under Seal]

# EXHIBIT 33

## [Filed Under Seal]

# EXHIBIT 34

## [Filed Under Seal]

# EXHIBIT 35

## [Filed Under Seal]

# EXHIBIT 36

1

1        UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3    ********************************

4    IN RE PHARMACEUTICAL INDUSTRY   ) MDL NO. 1456

5    AVERAGE WHOLESALE PRICE          ) CIVIL ACTION:

6    LITIGATION                       ) 01-CV-12257-PBS

7    ------------------------------) JUDGE PATTI B. SARIS

8    THIS DOCUMENT RELATES TO ALL     )

9    CLASS ACTIONS                    )

10   ********************************

11

12       30(b)(6) DEPOSITION OF PIPEFITTERS

13   LOCAL UNION 537 through CHARLES HANNAFORD, a

14   witness called on behalf of Bristol-Myers

15   Squibb, pursuant to the Federal Rules of

16   Civil Procedure, before Kristin Kelley, a

17   Registered Professional Reporter and Notary

18   Public in and for the Commonwealth of

19   Massachusetts, at the offices of Hagens

20   Berman Sobol Shapiro, LLP, One Main Street,

21   Cambridge, Massachusetts, on Thursday,

22   December 29, 2005, commencing at 9:56 a.m.

1    might have against Blue Cross Blue Shield of

2    Massachusetts?

3        A.    No.

4        Q.    What did you consider Blue Cross Blue

5    Shield's job was to do with regard to fee

6    agreements with providers, like doctors?

7        A.    Say that again.

8        Q.    Let me break it down.

9        A.    I didn't hear part of it.

10       Q.    It is a bad question.   As I understand

11   it, the fund is self-insured.

12       A.    Correct.

13       Q.    So what happens is Blue Cross Blue

14   Shield makes available a network of doctors to the

15   fund but the fund ultimately bares the cost of

16   those doctors.

17       A.    Yes.

18       Q.    What the fund is really buying is the

19   bargaining power of Blue Cross Blue Shield of

20   Massachusetts, correct?

21       A.    Correct.

22       Q.    What is your understanding of what

1  you're paying Blue Cross Blue Shield to do vis-a-

2  vis the providers in the network?

3      A.   To get a discount for us.  We have a

4  specific discount that they tell us that we get

5  from the providers.

6      Q.   Is it theoretically possible because

7  they're able to pass through all their costs to

8  you that they're not fighting as hard for the

9  discount that they could get that they might

10  otherwise get?  Is that theoretically possible?

11     A.   I have no way of knowing that.

12     Q.   Would that be of concern to you if that

13  were in fact happening?

14     A.   Yes.

15     Q.   Are the administrative fees of Blue

16  Cross Blue Shield of Massachusetts figured out

17  based in part on the total dollar amount of claims

18  that are passed through to the fund?

19     A.   It isn't anymore.  It was at one time.

20     Q.   When did that change?

21     A.   In '97.

22     Q.   Why did that change?

1  it's using the network and it's also the usage

2  that you have of the product.  The more claims you

3  have, the more you're using it.

4      Q.   In other words, theoretically, if you

5  spend more on claims than you otherwise would, you

6  have a higher administrative fee?

7      A.   Yes.

8      Q.   So if Blue Cross Blue Shield is not

9  doing as good a job as it could have done you may

10  have paid too much in administrative fees?

11     A.   Yes.

12     Q.   For example, if they could have worked

13  harder and gotten better discounts from doctors

14  you would have paid less in claims presumably?

15     A.   Yes.

16     Q.   And then not only would you have paid

17  less in claims but you would have paid less in

18  administrative fees?

19     A.   Yes, but they may not have been our

20  contractor long if another one is cheaper out

21  there.

22     Q.   You said in your declaration that your

# EXHIBIT 37

## [Filed Under Seal]

# EXHIBIT 38

## [Filed Under Seal]

# EXHIBIT 39

## [Filed Under Seal]

# EXHIBIT 40

**[Filed Under Seal]**

# EXHIBIT 41

Page 1

1                  UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3

4          -

5                  No. 01CV12257-PBS

6

7

8     ************************************

9                                        *

      IN RE:   PHARMACEUTICAL INDUSTRY    *
10    AVERAGE WHOLESALE PRICE LITIGATION  *
                                          *
11    ************************************

12

13    DEPOSITION OF JILL S. HERBOLD, taken pursuant to

14    the Federal Rules of Civil Procedure, at CIGNA

15    Headquarters, 900 Cottage Grove Road, South Building,

16    Bloomfield, CT, before Diana M. Noel, a Registered

17    Professional Reporter, Certified Realtime Reporter,

18    and Licensed Shorthand Reporter No. 199, in and for

19    the State of Connecticut, on Friday, January 14,

20    2005, commencing at 12:48 PM.

21

22

Page 61

1        A.    The reimbursement with our provider groups,

2    when negotiating, is considered in total, so it's the

3    final total contract that may be decided -- that will

4    be decided upon, and there are trade-offs made between

5    the different services as you go through the process of

6    negotiation and compromise to get to a solution that is

7    agreeable to both parties.

8        Q.    And would that statement be true for all of

9    the line items in the rate exhibit?

10            MR. ST. PHILLIP:   Objection.

11       Q.    In other words, you're looking at all the

12   line items in a rate exhibit together and the total

13   package -- not pulling out one line and just looking at

14   that -- pulling out one segment and looking at that?

15            MR. ST. PHILLIP:   Same objection.

16       A.    The negotiations are done looking across the

17   entire range of services that the provider groups

18   provide to the members, and during those negotiations

19   there are trade-offs to get to a final compromise

20   solution between ourselves and the provider group, and

21   during those negotiation discussions, it is -- it very

22   much happens that they talk about an individual line

Jill S. Herbold

Bloomfield, CT

January 14, 2005

1    item.

2              But when the bottom line is set, it's

3    what is the overall level of reimbursement.  That's

4    what both parties have to get comfortable with.

5         Q.    So could there ever be a case where Cigna may

6    agree to a higher reimbursement for the -- for

7    injectable drugs, for example, and -- in exchange for a

8    lower reimbursement for the physician's administrative

9    fee?

10              MR. ST. PHILLIP:  I think actually that

11              question is right at the heart of this, so

12              we'll object based on Magistrate Judge's

13              exclusion in paragraph 15.  But I'll allow

14              the witness to answer the question and

15              preserve our right to move to strike.

16              MS. SCHOEN:  For the record, we clearly

17              disagree on that, but to move things along --

18         A.    That could be a potential trade-off that does

19    happen during the negotiation process.

20         Q.    From 2001 to the present, do any of the

21    reimbursement rates that Cigna uses rely on Medicare's

22    reimbursement rates?

Page 79

```
 1    what we paid to other providers for the same or similar

 2    types of services.

 3         Q.    So on occasion, Cigna uses external sources

 4    to assess its reimbursement levels to providers, is

 5    that correct?

 6                   MR. ST. PHILLIP:  Objection.

 7         A.    Yes.  The assessments that we're able to do

 8    are -- that would really be external are not to

 9    specific provider groups but rather to the competitive

10    position in the overall market.

11         Q.    Does Cigna attempt to lower its negotiated

12    rates with physicians over time?

13         A.    Cigna tries to get competitive rates with

14    physicians because we need to control the medical costs

15    for our members.  Sometimes that means competitive --

16    we give increases.  Other times it means decreases.

17         Q.    And does Cigna have a way of determining

18    whether any increases or decreases of the reimbursement

19    rate in an attempt to be competitive have gone too far

20    or gone not far enough in the case of an increase?

21         A.    We don't have any specific way to assess that

22    beyond a retrospective look at the same type of
```

# EXHIBIT 42

## [Filed Under Seal]

# EXHIBIT 43

## [Filed Under Seal]

# EXHIBIT 44

## [Filed Under Seal]

# EXHIBIT 45

### [Filed Under Seal]

# EXHIBIT 46

## [Filed Under Seal]

# EXHIBIT 47

## [Filed Under Seal]

# EXHIBIT 48

## [Filed Under Seal]

# EXHIBIT 49

1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MASSACHUSETTS

3                   ---oOo---

4

5   In re:  PHARMACEUTICAL          MDL DOCKET NO.

6   INDUSTRY AVERAGE WHOLESALE      CIVIL ACTION

7   PRICE LITIGATION                01CV12257-PBS

8   _____

9   THIS DOCUMENT RELATES TO:

10  ALL ACTIONS

11  _____/

12

13

14          Deposition of GLENN RANDLE, taken before

15  GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

16  pursuant to the Federal Rules of Civil Procedure for

17  the United States District Court pertaining to the

18  taking of depositions, at Suite 2000, One North

19  LaSalle Street, in the City of Chicago, Cook County,

20  Illinois, commencing at 8:11 o'clock a.m., on the

21  17th day of November, 2005.

22

51

1      Q.   If you know, how does Medicare determine

2   the approved amount for physician or medical

3   services?

4           MS. CONNOLLY:   Objection, form.

5           THE WITNESS:   Do you want to restate?

6   BY MR. CHRISTOFFERSON:

7      Q.   You've said earlier that the Fund pays

8   20 percent of what Medicare approves in charges.

9           Do you know how Medicare determines what's

10  approved?

11     A.   I don't personally know how.   They have

12  their formula on that.

13     Q.   And specifically physician-administered

14  drugs, do you know how they determine the amount

15  that's paid?

16          MS. CONNOLLY:   Same objection.

17          THE WITNESS:   Do you want to restate that?

18  BY MR. CHRISTOFFERSON:

19     Q.   Do you know how Medicare determines what's

20  the allowable amount for physician-administered

21  prescription drugs?

22     A.   No, I don't have personal knowledge of

52

1   that.

2       Q.   Are participants required to pay a

3   deductible under this program, this Wraparound Plus

4   Program?

5       A.   Yes, 900 on the Part A, 100 on the Part B

6   as I recall.

7       Q.   And is this deductible, for example, on

8   Part B, this $100 deductible, is that the

9   deductible -- is that a deductible in addition to

10  the deductible that Medicare requires, or is this

11  the Medicare deductible that you're referring to?

12          MS. CONNOLLY:   Objection to form.

13          THE WITNESS:   Restate.

14  BY MR. CHRISTOFFERSON:

15      Q.   What is -- does the Fund in connection

16  with the Medicare Wraparound Plus Program require a

17  deductible over and above the $100 deductible that

18  Medicare requires?

19      A.   To my knowledge, they don't.  I think it's

20  one and the same, both those deductibles, but, you

21  know, that has been in place, and I think it steps

22  up.  Medicare changes that through the years or has

1  understanding that if a physician-administered drug

2  is administered pursuant to the provision or I

3  should say pursuant to the Outpatient Prospective

4  Payment System and that the Fund is reimbursing,

5  providing reimbursement for that drug, that the Fund

6  will do its best -- strike that -- that the Fund

7  will determine the total allowable charge.

8        Do you know if that determination is based

9  upon the average wholesale price of that drug?

10        MS. CONNOLLY:  Same objection.

11        THE WITNESS:  What did you say?

12        MS. CONNOLLY:  Same objection, but you can

13  answer.

14        THE WITNESS:  Our instructions to them,

15  what I understand is done is that they never deviate

16  from the Medicare-approved claim.  So it sounds like

17  some of these are a little bit hard to interpret,

18  but they always base from the Medicare approval.

19  They don't step out and look at any costs separate

20  from that Medicare approval.

21        So they let Medicare be the guide.

22  BY MR. CHRISTOFFERSON:

62

1    Q.   So you don't know if it was based on AWP

2  or not?

3           MS. CONNOLLY:  Objection to form.

4           THE WITNESS:  Restate it.

5  BY MR. CHRISTOFFERSON:

6    Q.   You don't know whether the determination

7  that the Fund makes pursuant to this section with

8  respect to physician-administered drugs is based on

9  average wholesale price of those drugs?

10          MS. CONNOLLY:  Objection to form.

11          You can answer.

12          THE WITNESS:  Again, they're instructed to

13  follow Medicare.  Medicare would be the one doing

14  this average wholesale price situation.  Our people

15  should never step into that arena.  It's always

16  behind the Medicare.

17          Is that -- the answer, to my knowledge,

18  that's the way that they have all been handled.

19  BY MR. CHRISTOFFERSON:

20    Q.   So you do know that it's based on AWP?

21    A.   No, it's based on Medicare, on their

22  approval, their paid claim.

1   BY MR. CHRISTOFFERSON:

2       Q.    Were the amounts that the Fund paid to

3   providers under the Wraparound Plus Program for the

4   drugs that you've identified in Paragraph 4, were

5   those amounts based on average wholesale price of

6   the drugs that are listed in Paragraph 4?

7              MS. CONNOLLY:  Objection to form.

8              You can answer.

9              THE WITNESS:  All payments were made based

10  on the Medicare-approved plan form.  No other

11  criteria was looked at by our third-party

12  administrator to my knowledge other than, you know,

13  you have to go to Medicare to find out that as I

14  would see.

15  BY MR. CHRISTOFFERSON:

16      Q.    Do you know if the average wholesale price

17  of any of the drugs that were reimbursed appears on

18  any of the documents that were produced by the Fund?

19             MS. CONNOLLY:  Objection, form.

20             THE WITNESS:  Only if it's a standard

21  process of Medicare.  I don't know personally.

22  BY MR. CHRISTOFFERSON:

1          How is it that the Fund was harmed by

2    those Defendants such that you're suing for

3    recovery?

4          MS. CONNOLLY:  Objection to form.

5          You can answer.

6          THE WITNESS:  In my viewpoint, the

7    participants were harmed, you know.  These are

8    fixed-income people that their cost to this Fund is

9    dependent upon our expense, which our expense comes

10   from those providers providing the services and

11   drugs and whatever.

12         So they were harmed in the fact of any

13   overpayment for services or drugs going into the

14   formula that we as trustees set as their rate, no

15   different than we looked at the $56 in whatever year

16   that was, now being 112, double.

17   BY MR. CHRISTOFFERSON:

18      Q.   Does the Fund contend that it suffered

19   harm from Defendants who manufactured drugs for

20   which the Fund did not make any reimbursement

21   payment?

22         MS. CONNOLLY:  Objection to form.