# EXHIBIT 50

1

1          UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MASSACHUSETTS

3              MDL No. 1456

4           C.A. No. 01-CV-12257-PBS

5   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

6   IN RE:  PHARMACEUTICAL INDUSTRY           *

7   AVERAGE WHOLESALE PRICE LITIGATION        *

8   _____       *

9   THIS DOCUMENT RELATES TO ALL ACTIONS      *

10  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

11

12          DEPOSITION OF MELISSA D. SHANNON, a witness

13  called on behalf of Baxter International Inc. and

14  Baxter Healthcare Corporation, pursuant to the

15  Federal Rules of Civil Procedure, before Jessica L.

16  Williamson, Registered Merit Reporter, Certified

17  Realtime Reporter and Notary Public in and for the

18  Commonwealth of Massachusetts, at the Offices of

19  Hagens Berman Sobol Shapiro LLP, One Main Street,

20  Cambridge, Massachusetts, on Tuesday, May 23, 2006,

21  commencing at 9:35 a.m.

22

1    Action Complaint to Comply With Court's Class

2    Certification Order, marked for identification.)

3        Q.   Deposition Exhibit Shannon 004 is a

4    document entitled "Notice of Errata to the Fourth

5    Amended Consolidated Class Action Complaint to

6    Comply With Court's Class Certification Order."

7    Do you see that document?

8        A.   I do.

9        Q.   Ms. Shannon, have you ever seen this

10   document before?

11       A.   Yes.

12       Q.   When did you first see this document?

13       A.   Yesterday.

14       Q.   Can I have you look at the last page of

15   the document, referring particularly to Health

16   Care For All, Paragraph 39a.  Do you see that?

17       A.   Uh-huh.  Yes.

18       Q.   The last sentence says, "During the

19   Class Period, HCFA's members have been billed for

20   and paid charges for AWPIDs outside of the

21   Medicare Part B context based on published AWPs."

22            Do you see that?

1     A.    I do.

2     Q.    What's your factual basis for making

3  that assertion?

4     A.    I first noticed this sentence yesterday

5  afternoon, and I'm not sure how it got in there.

6  I don't think it accurately describes our

7  relationship with our members in this case.

8     Q.    Do you have any data regarding whether

9  your members have purchased any drugs that are at

10  issue in the AWP complaint?

11     A.    No.

12     Q.    Do you have any information regarding

13  whether any of your members paid any charges for

14  the drugs identified in the AWP complaint?

15     A.    No.  We are a plaintiff for injunctive

16  relief only.

17     Q.    Did you undertake any effort, that is,

18  Health Care For All, to contact any members, any

19  of your members to ask about their drug purchases

20  or drug payments?

21     A.    No.  The only outreach we did to members

22  on this question was last August/September in

1   Massachusetts to expand access to affordable,

2   quality health care since 1985."

3            Do you see that sentence?

4       A.   Yes.

5       Q.   Do you agree with the facts outlined in

6   that sense?

7       A.   That sentence is accurate.

8       Q.   Second sentence says, "HCFA maintains

9   its principal place of business in Boston,

10  Massachusetts."

11           Do you see that sentence?

12      A.   Yes.

13      Q.   And is that sentence accurate?

14      A.   Yes.

15      Q.   You previously testified that you

16  thought the third sentence of Paragraph 39a of

17  Deposition Exhibit Shannon 004 was not accurate,

18  correct?

19      A.   Only in that we don't know whether our

20  members have been billed for and paid charges for

21  AWPIDs.

22      Q.   And, to your knowledge, Health Care For

1  All did nothing to attempt to confirm that,

2  correct?

3      A.   That's correct.

4      Q.   Why is that?

5      A.   I just became aware of this sentence

6  yesterday and because we're plaintiffs for

7  purposes of injunctive relief only, so we weren't

8  concerned with the drug use or payment history of

9  our members, and we don't ever ask those questions

10 in the routine course of advocacy with our

11 members.

12     Q.   And you say your -- Health Care For All

13 is only interested in injunctive relief only; is

14 that correct?

15     A.   In this case, we're a plaintiff in this

16 track of this lawsuit for injunctive purposes

17 only.

18     Q.   So Health Care For All is not seeking

19 any damages in this case?

20     A.   That's correct.

21     Q.   Since coming to Health Care For All,

22 have you had an occasion to do any research

60

1       Q.    Were you aware of that?

2             And when you used the word "track," were

3   you referring to Track 1 or Track 2 or --

4       A.    Track 1, yes.

5       Q.    You were referring to Track 1.

6             So by that --

7       A.    Only because I wasn't making any

8   assumptions about our involvement in future

9   tracks.

10      Q.    Okay.  Let me go back and ask a few

11  questions just to make this a little cleaner.

12            I asked you earlier about the

13  allegations contained in Paragraph 39a of

14  Deposition Exhibit Shannon 004?

15      A.    Yes.

16      Q.    And the last sentence of which you said

17  was inaccurate?

18      A.    Yes --

19      Q.    Now --

20      A.    -- to my knowledge.  We don't have

21  knowledge about that.  That may be an accurate

22  sentence, but we don't have knowledge enough to

1   say whether that was true or not.

2       Q.   And you, to your knowledge, Health Care

3   For All has spoken to none of its members about

4   drug purchases or drug sales or drug

5   reimbursement?

6       A.   That's correct, although we have -- some

7   of our members have agreed to be plaintiffs in

8   other lawsuits, and therefore I have talked to

9   some members about their use of prescription drugs

10  related to those other lawsuits.

11      Q.   But none relating to the AWP litigation?

12      A.   That's correct.

13      Q.   Now, does your answer to this question

14  supply whether we're talking about Track 1

15  defendants and Track 1 drugs or Track 2 defendants

16  and Track 2 drugs?

17      A.   I assume that it does, but I know -- you

18  know, I'm not a lawyer in a litigation context,

19  and there may be -- the situation may be very

20  different by the time we get to Track 2.  I don't

21  know whether -- what's going to happen in Track 2

22  is all I meant to say.  I wasn't meaning to say

62

1   that anything I've said wouldn't also apply to

2   Track 2, assuming that we're still a plaintiff in

3   the case at that time.

4        Q.   But today your answers apply to both

5   Track 1 and Track 2?

6        A.   Yes.

7        Q.   You previously mentioned that there were

8   four individuals who were working with PAL?

9        A.   Yes.

10       Q.   Do you know who those -- or --

11       A.   Three.

12       Q.   Three individuals.

13            Who were the three individuals who

14   worked with PAL?

15       A.   They have a director of the project,

16   Alex Sugarman-Brozan -- there's a hyphen between

17   Sugarman and Brozan -- and Renee Markus Hodin.

18   I'm not sure her exact job title. She's sort of

19   deputy director of that project. She's sort of

20   the liaison to community groups around the

21   country. And then they have what they call an

22   associate who supports them.

63

1    Q.   And who's that?

2    A.   Julie Bizzotto.

3    Q.   Are those three individuals employed by

4  Health Care For All?

5    A.   No.   They're employed by Community

6  Catalyst.

7    Q.   Do you know whether any of those three

8  individuals worked for any other entity as well as

9  Community Catalyst?

10    A.   Currently?

11    Q.   Yes, ma'am.

12    A.   To my knowledge, they don't.

13    Q.   And just to make sure, you don't know

14  which Track 1 or Track 2 drugs were purchased by

15  any of Health Care For All's members, correct?

16    A.   That's correct.

17    Q.   Nor do you know whether any members,

18  drug purchasers -- whether reimbursement had been

19  based on AWP at all, correct?

20    A.   For our members, not at all.

21    Q.   Nor do you know whether any of your

22  members actually paid for drugs at prices lower

65

1  Track 2?

2      A.   That's correct.

3      Q.   What remedy does Health Care For All

4  seek in this AWP litigation?

5      A.   We're in the lawsuit for injunctive

6  relief only to hope that the practices would be

7  changed so that consumers can have more access to

8  prescription drugs at affordable prices.

9      Q.   What specific injunctive relief do you

10  want?

11     A.   We don't have a specific remedy in mind.

12     Q.   For example, are you suggesting that

13  through your lawsuit, Congress should somehow

14  change Medicare reimbursement?

15     A.   No, we're not suing Congress.  No.  We

16  do -- we don't have a specific remedy in mind.

17              (Exhibit Shannon 005, Document

18  headed "Consumer Groups Charge Industry-Wide Price

19  Manipulation - Over $800 Million in Illegal

20  Profits from Medicare & Medicare Patients," marked

21  for identification.)

22     Q.   Let me show you what's been marked as

1  contact and ask for your members' information

2  regarding drugs used or how they were -- whether -

3  - how any paid for their drugs or whether there

4  was any reimbursement, correct?

5      A.   Unless they were a plaintiff in a

6  different lawsuit, no.

7      Q.   But as to the AWP litigation, the

8  answer's no?

9      A.   That's correct.

10     Q.   No. 21 -- I'm sorry, No. 18, as to

11  information regarding the injury suffered by

12  Health Care For All, you've produced no documents

13  relating to that.  How has Health Care For All

14  been injured as a result of the complaints in the

15  AWP litigation?

16     A.   Health Care For All itself doesn't --

17  isn't claiming any damages and doesn't have any.

18  We are concerned --

19     Q.   Doesn't have any injury?

20     A.   Any injury.

21     Q.   Okay.

22     A.   As an organization we're concerned, as I

1   said initially, about healthcare access, and so we

2   are concerned that the practices alleged in this

3   lawsuit have contributed to making prescription

4   drugs less accessible to people, particularly

5   people of limited means who are our primary

6   constituency.

7       Q.   No. 21 indicated we were going to ask

8   you questions about the decision to seek

9   injunctive relief, and we have asked those

10  questions.  I believe you testified that you don't

11  know what remedy Health Care For All seeks; is

12  that correct?

13      A.   Yeah, what type of injunctive relief?

14      Q.   Yes.

15      A.   That's correct.

16      Q.   Okay.  Why?

17      A.   Because we are not expert in how this

18  issue should be resolved.  We're interested in

19  seeing the practice changed in an equitable way.

20  I think that that could be done in any number of

21  forms.

22      Q.   But you just don't know what they are?

183

1       A.    That's correct.

2             MR. JACKSON:   Subject to recall, based

3    upon additional documents that may be produced, I

4    don't have any further questions of Health Care

5    For All at this time.   I will say -- add that I

6    think that I'll be sending you a letter asking for

7    other documents that were mentioned during our

8    deposition today that have not yet been produced

9    in other similar matters, but subject to that and

10   the ability to recall this witness, I have nothing

11   further today.

12            MR. NOTARGIACOMO:   We'll respond to that

13   letter upon receipt.   I have -- unless people on

14   the phone have questions, I just have a few

15   questions.   Anybody on the phone have any

16   questions?

17            MS. WALKER:   I don't.

18            MS. MACER:   No.

19

20                CROSS EXAMINATION

21   BY MR. NOTARGIACOMO:

22      Q.    And, Ms. Shannon, I have just a few

# EXHIBIT 51

## [Filed Under Seal]

# EXHIBIT 52

## [Filed Under Seal]

# EXHIBIT 53

## [Filed Under Seal]

# EXHIBIT 54

## [Filed Under Seal]

# EXHIBIT 55

| 105TH CONGRESS<br>1st Session | HOUSE OF REPRESENTATIVES | REPORT<br>105–149 |
| --- | --- | --- |

## BALANCED BUDGET ACT OF 1997

R E P O R T

OF THE

## COMMITTEE ON THE BUDGET
## HOUSE OF REPRESENTATIVES

TO ACCOMPANY

H R 2015

A BILL TO PROVIDE FOR RECONCILIATION PURSUANT TO SUB-
SECTIONS (b)(1) AND (c) OF SECTION 105 OF THE CONCURRENT
RESOLUTION ON THE BUDGET FOR FISCAL YEAR 1998

together with

ADDITIONAL AND MINORITY VIEWS



JUNE 24 1997—Committed to the Committee of the Whole House on
the State of the Union and ordered to be printed

U.S GOVERNMENT PRINTING OFFICE
WASHINGTON  1997

1354

provision is intended to promote efficiency, increase uniformity, and reduce administrative burdens in claims administration and billing procedures

*Effective Date* The provision is effective upon enactment

*Section 10615 Updates for ambulatory surgical services*

*Current Law* Medicare pays for ambulatory surgical center (ASC) services on the basis of prospectively determined rates These rates are updated annually by the CPI-U OBRA 93 eliminated updates for ASCs for FY1994 and FY1995

*Explanation of Provision.* The provision would set the updates for FY 1998 through FY2002 at the increase in the CPI-U minus 2 0 percentage points

*Reason for change* This provision would contribute to slowing unsustainable growth in Part B expenditures

*Effective date* This provision is effective for services delivered on or after October 1, 1997

*Section 10616 Reimbursement for drugs and biologicals*

*Current Law* Payment for drugs is based on the lower of the estimated acquisition cost or the national average wholesale price Payment may also be made as part of a reasonable cost or prospective payment.

*Explanation of Provision.* The provision would specify that in any case where payment is not made on a cost or prospective payment basis, the payment shall be equal to 95 percent of the average wholesale price for the drug or biological involved.

*Reason for Change* The Inspector General for the Department of Health and Human Services has found evidence that over the past several years Medicare has paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals For example, the Office of Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs The Committee intends that the Secretary, in determining the average wholesale price, should take into consideration commercially available information including such information as may be published or reported in various commercial reporting services The Committee will monitor AWPs to ensure that this provision does not simply result in a 5% increase in AWPs

*Effective Date* The provision is effective January 1, 1998

*Section 10617 Coverage of oral anti nausea drugs under chemotherapeutic regimen*

*Current Law* Medicare provides coverage for certain oral cancer drugs The Administration has specified that Medicare will pay for anti-emetic drugs when they are needed for the administration and absorption of primary Medicare covered oral anticancer chemotherapeutic agents when a high likelihood of vomiting exists.

*Explanation of Provision.* The provision would provide coverage, under specified conditions, for a self administered oral drug used as an acute anti-emetic used as part of an anticancer chemotherapeutic regimen It would have to be administered by or under the supervision of a physician for use immediately before,