# EXHIBIT 2

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

*****************************

IN RE:  PHARMACEUTICAL                MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE            01CV12257-PBS

PRICE LITIGATION

*****************************         DEPOSITION OF

THIS DOCUMENT RELATES TO:            MICHAEL T. MULREY

ALL ACTIONS                          JANUARY 5, 2006

*****************************

            C O N F I D E N T I A L

DEPOSITION of MICHAEL T. MULREY, a witness called on

behalf of the Defendant Johnson & Johnson pursuant to

the Federal Rules of Civil Procedure, before Judith

McGovern Williams, Certified Shorthand Reporter,

Registered Professional Reporter, Certified Realtime

Reporter, Certified LiveNote Reporter, and Notary

Public in and for the Commonwealth of Massachusetts,

at the offices of Robins, Kaplan, Miller & Ciresi,

L.L.P., 800 Boylston Street, Boston, Massachusetts

02199, on Thursday, January 5, 2006, commencing at

1:38 p.m.

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey        CONFIDENTIAL        January 5, 2006
                          Boston, MA

1    administered to its members in 1991 through today?

2        A.    I would say yes.

3        Q.    Okay.  So the shift from usual and

4    customary to the fee schedule was in part due to

5    the administrative simplicity with using fee

6    schedules?

7        A.    Yes.

8        Q.    Now focusing on these four different

9    schedules that you have identified, how do they

10   differ, if at all, with respect to the amounts

11   that are afforded to physicians for the

12   administration of drugs to Blue Cross/Blue Shield

13   of Massachusetts members?

14       A.    The drug fees on all four schedules

15   right now are all equal, the same.

16       Q.    Okay.  Currently today what is the

17   amount in the fee schedules that is afforded to

18   physicians for the administration of drugs to Blue

19   Cross/Blue Shield of Massachusetts members?

20       A.    You are asking what the AWP was set at?

21       Q.    Is there a constant methodology utilized

22   for all drugs in each of the fee schedules?

Michael T. Mulrey        CONFIDENTIAL        January 5, 2006
Boston, MA

1    A.    Right.

2    Q.    And is that methodology for the fee-for-

3    service reimbursement based upon a percentage of

4    AWP?

5    A.    Yes.

6    Q.    And what is that percentage?

7    A.    95 percent.

8    Q.    How long has Blue Cross/Blue Shield of

9    Massachusetts utilized a reimbursement amount of

10   95 percent of AWP to reimburse all drugs on all

11   its fee schedules?

12   A.    Since '98 when Medicare made their

13   change.

14   Q.    Prior to 1998, what methodology did Blue

15   Cross/Blue Shield of Massachusetts use to

16   reimburse -- to determine the reimbursement

17   amounts for drugs on its fee schedules?

18   A.    I don't -- I'm -- let me back this up.

19   What methodology did we use?

20   Q.    When I say methodology, --

21   A.    Yes.

22   Q.    -- you have referred to 95 percent of

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey      CONFIDENTIAL        January 5, 2006
                       Boston, MA

Page 62

1    AWP --

2          A.    Yes.

3          Q.    -- as the basis for the reimbursement

4    amounts in the fee schedules for drugs, and I'm

5    referring to that as methodology.

6          A.    Okay.

7          Q.    So 95 percent of AWP methodology.

8          A.    Okay.

9          Q.    So let me ask the question.

10               Prior -- from 1995 through 1998, what

11   was the basis by which Blue Cross/Blue Shield of

12   Massachusetts calculated the amounts in its fee

13   schedules for physician-administered drugs?

14         A.    100 percent of AWP.

15         Q.    Starting in 1995, how did Blue

16   Cross/Blue Shield of Massachusetts determine the

17   AWP it used to calculate the amounts in its fee

18   schedules?

19         A.    We basically just used Medicare's AWP.

20         Q.    When you say "Medicare's AWP," what are

21   you referring to?

22         A.    Medicare's AWP fee schedule for their J

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey        CONFIDENTIAL        January 5, 2006
                           Boston, MA

Page 63

1    codes.

2         Q.    Okay.   So is it correct that Blue

3    Cross/Blue Shield of Massachusetts did not

4    calculate its own dollar amounts in the fee

5    schedule but simply adopted the amounts that were

6    specified in the Medicare fee schedules?

7         A.    Yes.

8         Q.    Okay.   There came a point in time when

9    that changed; correct?

10        A.    What changed?

11             MR. HAAS:   Well, let me withdraw that

12   question.

13        Q.    Does Blue Cross/Blue Shield of

14   Massachusetts still use Medicare's amounts, dollar

15   amounts, in its fee schedules?

16        A.    No.

17        Q.    What does Blue Cross/Blue Shield of

18   Massachusetts currently do to determine the 95

19   percent of AWP used to calculate -- to determine

20   the amounts in its fee schedule for the

21   reimbursement of physician-administered drugs?

22        A.    We are using a vendor to provide us

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey        CONFIDENTIAL        January 5, 2006
Boston, MA

Page 64

1    pricing.

2        Q.    Which vendor?

3        A.    R.J. Health.

4        Q.    How to your knowledge does R.J. Health

5    derive its AWPs from?

6        A.    I don't know.

7        Q.    Does R.J. Health calculate a dollar

8    amount which is then provided to Blue Cross/Blue

9    Shield of Massachusetts?

10       A.    Yes.

11       Q.    So Blue Cross/Blue Shield of

12   Massachusetts does not duly calculate 95 percent

13   of AWP --

14       A.    No.

15       Q.    -- for each drug?

16       A.    No.

17       Q.    Is there someone at Blue Cross/Blue

18   Shield of Massachusetts who is familiar with the

19   methodology that R.J. Health actually uses to come

20   up with that number that Blue Cross/Blue Shield of

21   Massachusetts uses in its fee schedule?

22       A.    I'm not sure.

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

Page 65

1        Q.    When did Blue Cross/Blue Shield of

2    Massachusetts first begin to use R.J. Health as a

3    vendor to determine reimbursement amounts for

4    physician- administered drugs?

5        A.    2005.

6        Q.    And Blue Cross/Blue Shield of

7    Massachusetts started using R.J. Health because

8    Medicare no longer reimbursed for physician-

9    administered drugs on an AWP basis; correct?

10       A.    Yes.

11       Q.    In the 2004 time frame before Medicare

12   switched its reimbursement methodology, did Blue

13   Cross/Blue Shield of Massachusetts give any

14   consideration to revising its reimbursement

15   methodology for physician-administered drugs?

16       A.    Yes.

17       Q.    What involvement, if any, did you have

18   in that process?

19       A.    I completed an analysis.

20       Q.    What analysis was that?

21       A.    An analysis of ASP pricing that Medicare

22   was proposing against our utilization.

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                            Boston, MA

1    determined that following Medicare to the ASP

2    methodology, that would result in a decrease in

3    overall reimbursement afforded to physicians; is

4    that correct?

5         A.    Yes.

6         Q.    And as a consequence of your analysis,

7    is it correct that Blue Cross/Blue Shield of

8    Massachusetts elected not to shift to the ASP

9    reimbursement methodology?

10        A.    At this time, yes.

11        Q.    Okay.  And the decision was made not to

12   shift because Blue Cross/Blue Shield of

13   Massachusetts determined that it was not in its

14   best interests to reduce the reimbursement to

15   physicians; correct?

16             MR. HARRINGTON:  Objection.  Go ahead.

17        A.    I mean we normally follow industry

18   standards, and Medicare has moved to ASP. Right

19   now from our perspective, we don't see that as an

20   industry-acceptable standard just yet.

21        Q.    Isn't it correct that you in fact have

22   followed Medicare's standard since 1995 and

d5b2c624-66e9-441f-8a11-51d382d08c9f

Page 79

1        A.    Yes.

2        Q.    In your view, what is this case about?

3        A.    It is about the overinflation of AWP

4    versus real costs.

5        Q.    What do you understand the term

6    "overinflation" to mean?

7        A.    That the -- there is fat, if you will,

8    in the AWP, AWP prices that are set by drug

9    companies.

10       Q.    Do you understand to what extent there

11   is fat based upon plaintiffs' position in this

12   litigation?

13       A.    No.

14       Q.    Based upon your position as a member of

15   the provider reimbursement department, sitting

16   here today, do you have a view as to whether or

17   not you are misled as to the meaning of AWP?

18       A.    I want to say my opinion is the AWP

19   would be the bottom-line wholesale cost that would

20   be -- providers could buy their drugs at.

21       Q.    That is your view as a -- currently that

22   is your understanding of the -- well --

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey         CONFIDENTIAL         January 5, 2006
                           Boston, MA

Page 87

1   term AWP, average wholesale price, meant the

2   average of actual wholesale prices paid?  Was that

3   your understanding in 2000?

4        A.   Yes.  The fees at which we reimbursed

5   our providers.

6        Q.   Okay.  You added something that was

7   inconsistent with my question, so I will ask it

8   again.

9             Was it your understanding in 2000 that

10  the term AWP, average wholesale price, meant the

11  average of actual wholesale prices paid?

12       A.   I guess paid to who?  That is where I am

13  --

14       Q.   I am asking what your understanding was.

15  Okay?  Let's just start with that point.

16            In 2000, what was your understanding of

17  the term AWP, or average wholesale price?

18       A.   It is the price that we would reimburse

19  our providers, and it was the price at which we

20  felt providers purchased their drugs at.

21       Q.   Okay.  So it is your understanding -- it

22  was your understanding in 2000 that it was the

d5b2c624-66e9-441f-8a11-51d382d08c9f

1    price at which providers purchased their drugs; is

2    that correct?

3         A.    Yes.

4         Q.    So, in other words, it is your position

5    that you understood that Blue Cross/Blue Shield of

6    Massachusetts was reimbursing providers at their

7    average cost?

8         A.    Yes.

9         Q.    Okay.  Is it your understanding as a

10   member of Blue Cross/Blue Shield of Massachusetts

11   that the plaintiffs in this litigation have taken

12   the position that you just espoused as to the

13   meaning of AWP throughout the 1990s?

14        MR. HARRINGTON:  Well, I am going to

15   object.  Plaintiffs haven't taken any position as

16   to what his understanding was in 2000.

17        MR. HAAS:  That is not my question.

18   BY MR. HAAS:

19        Q.    I mean you have espoused an

20   understanding that you had in 2000 of the term

21   AWP. My question is whether or not it is your

22   understanding of the allegations in this case that

d5b2c624-66e9-441f-8a11-51d382d08c9f

Michael T. Mulrey          CONFIDENTIAL          January 5, 2006
                              Boston, MA

Page 93

1      Q.    Have you had discussions with anyone at

2   Blue Cross/Blue Shield of Massachusetts concerning

3   the meaning of the term AWP?

4      A.    No.

5      Q.    So in 2003-2004, as a member of the

6   provider reimbursement group, you learned that AWP

7   was no longer, you know, from your perspective an

8   average of actual wholesale costs but indeed was

9   something greater than the costs that doctors paid

10  for drugs; right?

11     A.    Yes.

12     Q.    At that point did you run to anybody and

13  say, "We now have to reduce reimbursement, because

14  we aren't in fact reimbursing at actual cost"?

15          MR. HARRINGTON:   What is the time frame

16  on that question?

17          MR. HAAS:   What he just testified to,

18  2003-2004.

19     A.    Well, we did that analysis, which was

20  part of, you know, looking at how our drug fees

21  were set.

22     Q.    Right.  And in connection with that

d5b2c624-66e9-441f-8a11-51d382d08c9f

# EXHIBIT 3



**From:** Janine Suscewicz
**Sent:** Tuesday, January 30, 2001 11:36 AM
**To:** Steven L Greco; Milton E Goggans; Donald J Sollysiak; Kristine Peterson; Samuel J Moed; Mark J Ahn; Jeffrey Hatfield; Gary Zieziula
**Cc:** Joel M Lasker; Rosemary A Crane; Rick E Winningham; Richard Lane; Thomas P McKenna
**Subject:** Message from Ed Penick

 

PricingPractices.doc janine.suscewicz.vc

 Kindly distribute this memorandum regarding the Company's pricing and promotional practices to all U.S. Medicines Sales and Marketing Personnel.

Please contact me if you have any questions.

Many thanks.

1

HIGHLY CONFIDENTIAL

BMS/AWP/000192875





### Executive Memorandum

Bristol-Myers Squibb Company
U.S. Medicines Group

| | | | |
|---|---|---|---|
| To: | U.S. Sales & Marketing Personnel | Date: | January 26, 2001 |
| From: | E. Penick | cc: | R. Crane, R. Lane, J. Lasker |
| | | | T. McKenna, R. Winningham |
| Subject: | Media Coverage – | | |
| | Pharmaceutical Pricing Practices | | |

As you may be aware, there has been increasing media coverage of pharmaceutical pricing practices. Beyond the usual charges that pharmaceutical companies charge too much for their products, the government has recently focused on the differential between the Average Wholesale Price ("AWP") of products and the products' actual selling price. The government refers to that differential as the "spread."

The government has long been aware of the existence of the spread. For years, a substantial amount of public information has detailed the size of the spread for many drugs. Nevertheless, it is important to recognize that the government's recent focus on the spread is part of the reason it gives when asserting that the government is overpaying for the drugs it reimburses.

In light of the recent attention being paid to the spread, it is appropriate to remind you that Bristol-Myers Squibb Company, in accordance with its Code of Conduct, promotes and sells its products "solely on the basis of price, quality and service." Although it is appropriate to respond to a customer's inquiry about a product's AWP and its cost, the spread should not be used as a promotional or marketing tool.

Please contact the U.S. Medicines Legal Department if you have any questions or concerns about this issue.

HIGHLY CONFIDENTIAL

# EXHIBIT 4

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MASSACHUSETTS

 3                            VOLUME II

 4

 5                            -  -  -

 6      IN RE:  PHARMACEUTICAL        :  MDL NO. 1456

 7      INDUSTRY AVERAGE WHOLESALE    :  MASTER FILE NO.

 8      PRICE LITIGATION              :  01CV12257-PBS

 9                            -  -  -

10

11

12                 Continuation of the videotaped

13      deposition of ERIK SCHULTZ was taken, pursuant to

14      notice, at COURTYARD PHILADELPHIA AIRPORT, 8900

15      Bartram Avenue, Philadelphia, Pennsylvania on

16      Thursday, February 16, 2006, beginning at 9:25

17      a.m., before M. Kathleen Muino, Professional

18      Shorthand Reporter, Notary Public, and Michael

19      Mullin, Videographer, there being present:

20

21

22                            -  -  -
```

HIGHLY CONFIDENTIAL
Philadelphia, PA

1    okay.  I -- I'll -- if you got a -- you know, a

2    dog barking and running around you, you know, the

3    last thing you want to do is try and kick it.

4    It's already excited and angered, so they wanted

5    to lay low like not kicking the dog.

6    Q.        Did -- did the investigation affect what

7    you did in any way?

8    A.        Could you rephrase the question?

9    Q.        Yeah.  It -- did -- did it have any

10   impact on what you did in -- in the course of your

11   work at the company?

12   A.        Not at the time.

13   Q.        Did it at some time?

14   A.        Yes.

15   Q.        At what time?

16   A.        In later years, when they wanted to --

17   they looked at changing the price.  I was not

18   supportive of that.

19   Q.        Could you be more specific?  What -- what

20   do you mean they looked at changing the price?

21   A.        Oh, I believe earlier you asked about the

22   spreads and what type of -- what it would mean if

1   you changed certain price points, and that was a

2   constant request for -- to evaluate those

3   scenarios, and I, frankly, was not very

4   cooperative in those efforts because I didn't

5   think it was a wise choice.

6   Q.      You didn't think it was a wise choice

7   vis-a-vis the OIG investigation?

8   A.      Well, just in -- I didn't agree with the

9   principle in general, and certainly the OIG

10  investigation only inflamed that because it raised

11  the likelihood that unethical actions would be

12  discovered.

13  Q.      When you say you didn't agree with the

14  principle in general, what principle are you

15  talking about?

16  A.      In paying doctors more money -- trying to

17  pay doctors more money to prescribe more product.

18  Competing on finances.  It make no sense from a

19  pricing strategy standpoint or an ethical one.

20  Q.      Did you make your views known?

21  A.      (Indicating.)

22  Q.      Did you make your views known?

1    A.      Yes.

2    Q.      To who?

3    A.      Pretty much everybody who asked me to do

4    that type of work.

5    Q.      Would that have included Mr. Freeberry?

6    A.      He never asked me.  But he knew my views.

7    Q.      Who asked you to do that type of work

8    then?

9    A.      The brand teams, senior leaderships.

10   Q.      Did -- did your view prevail?

11   A.      I don't know that it was because of me,

12   but yes.

13   Q.      And what time frame are we talking about?

14   A.      The entire time I was at AstraZeneca.  I

15   don't believe they ever made a change to list

16   price.  We did increase the terms to physicians at

17   one point, in maybe 2004, if I remember, perhaps

18   2003, and I think they may have changed discount

19   levels towards my departure in 2005, somewhere

20   there.

21   Q.      Was the changing of discount levels and

22   increasing terms something that you objected to

```
 1                    MS. LAWSON:  Object --

 2                    THE WITNESS:  There was --

 3                    MS. LAWSON:  -- to form.

 4                    THE WITNESS:  -- a way.

 5    BY MR. WEXLER:

 6    Q.      Yes.  Okay.  Just to follow up on your

 7    answer, what was that way?

 8    A.      That way was --

 9                    MS. LAWSON:  To form.

10                    THE WITNESS:  -- to calculate what

11    the competitors' acquisition price and -- versus

12    their reimbursement, what that left for profit,

13    versus how it compared to ours, our products.

14    BY MR. WEXLER:

15    Q.      Did you -- did you do those kinds of

16    analyses?

17    A.      I -- as I told you earlier, I resisted

18    and was very uncooperative.  I do know that they

19    were done extensively before my arrival because of

20    spreadsheets Kaylor Kowash turned over to me

21    showing all those calculations.  When I was asked

22    to do them, I refused to use those sheets and did
```

```
 1    it my own way, did the analysis my own way, and

 2    often then would -- would not redo the analysis

 3    because I thought there was a bigger question,

 4    like even if it shows we make more money, I'm not

 5    going to sup -- support or recommend changing the

 6    prices, so --

 7    Q.      When you say you did it your own way,

 8    what do you mean?

 9    A.      I -- you know, you balance your checkbook

10    your way; I balance my checkbook my way --

11    Q.      Well, how did you --

12    A.         -- with my math.

13    Q.      How -- how -- how did you do your -- how

14    did you balance your checkbook --

15    A.      I made a --

16    Q.         -- in this --

17    A.         -- spreadsheet from scratch, I imagine,

18    or hand wrote it on a napkin.  I don't really

19    recall which, but I didn't use their spreadsheets

20    to do the calculations, and this was greatly

21    upsetting to them.

22    Q.      Was --
```

HIGHLY CONFIDENTIAL
Philadelphia, PA

1    A.       But I --

2    Q.       Were the calculations that you performed

3    intended, though, to actually monitor the

4    difference in return to practice that could be

5    realized through the purchase of Lupron as opposed

6    to the purchase of Zoladex and --

7    A.       That's what --

8    Q.       -- the price --

9    A.       -- they had asked me to do, and when I

10   did that calculation, that -- that -- that was the

11   intent of it.

12   Q.       Okay.  When you did the calculation, did

13   you provide it to anybody?

14   A.       I have no idea.  Probably not.

15   Q.       Did you do the calculation on your

16   computer?

17   A.       You're asking me, you know, this is a

18   long time -- this was when we first merged.  I --

19   I did it like one time then.  They were looking

20   for any way to get prof -- more profitability to

21   the doctor.  I identified potential scenarios and

22   stated I was not going to support that type of a

**HIGHLY CONFIDENTIAL**
Philadelphia, PA

1    move and, you know, we -- we -- we never made that

2    move.

3    Q.      Did someone else get that task?

4    A.      No.   They kept asking me to do it over

5    and over and over and -- and -- but I eventually

6    just was uncooperative, say -- saying I'm -- you

7    know, it's not going to make a difference because

8    I'm not -- you know, I can identify ways, but so

9    what.

10   Q.      Did --

11   A.      There were some -- some defining events

12   where it was worth -- I felt it was worth making

13   some type of evaluation of how the pricing would

14   change the reimbursement environment and so forth;

15   Zoladex protected needles, siliconized needle,

16   felt those were worthy of a new price

17   recommendation, being a new product, and so I did

18   some analysis around there, I imagine.  I don't

19   recall it specifically.

20   Q.      So in other words, you felt that it -- it

21   could be justified to make the -- the change with

22   the advent of a -- of an -- either a change to the

1    product or an addition to the product?

2                MS. LAWSON:   Object to form.

3    BY MR. WEXLER:

4    Q.       I'm not trying to put words in your...

5    I'm just trying to understand what you're saying.

6    In other words -- because I -- I -- I -- I've seen

7    some documents to this effect, and I'll show them

8    -- I will show them to you eventually when I --

9    hopefully we'll get to them.

10               But the -- you know, like with a new

11   needle, safety needle, that would have been a -- a

12   -- what you thought was an appropriate time, if

13   there was any, to make a change in price?

14               Am I ahead of myself here?

15   A.       No, you're not ahead of yourself.

16   Frankly, I had an ethical problem with trying to

17   increase profitability to physician, which was the

18   key driver in this marketplace, and as a result of

19   that, I did -- was not cooperative.  However, when

20   you were coming out with a new product, the

21   protected needle, the siliconized version, it

22   seems less sleazy --

 1    Q.        I got you.

 2    A.        -- somehow because it's a new technology,

 3    the cost of goods, however miniscule, was higher,

 4    things of that nature, would evaluate a new

 5    option.   Maybe we deserved more money for that

 6    product, and, therefore, let's do the analysis to

 7    make sure we would not adversely affect, you know,

 8    physician return to practice.

 9    Q.        Okay.  Did you have any discussions with

10    Mr. Freeberry about your reluctance to do these

11    analyses?

12    A.        I'm sure.

13    Q.        Do you recall any in particular?

14    A.        I -- I -- it's where you spent -- spent

15    all, you know, the last thousand dollars.  It's --

16    it certainly happened, but I -- I -- I would talk

17    with John about many things, and he certainly

18    understood my reluctance, and I believe he agreed

19    with that.

20    Q.        Okay.

21    A.        Ethical, he was a very -- I thought he

22    was a very ethical person and -- and wouldn't have

# EXHIBIT 5

Mark Levonyaka          HIGHLY CONFIDENTIAL          July 21, 2005
                        Seattle, Washington

Page 1

THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------------------------

IN RE: PHARMACEUTICAL          )MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE  )CIVIL ACTION

PRICE LITIGATION,              )01CV12257-PBS

_____

THIS DOCUMENT RELATES TO:    )

ALL ACTIONS                    )

------------------------------------------------------------

HIGHLY CONFIDENTIAL DEPOSITION

UPON ORAL EXAMINATION OF

MARK LEVONYAK

------------------------------------------------------------

9:00 a.m

July 21, 2005

HOLLAND & KNIGHT

2600 Pike Tower

520 Pike Street

Seattle, Washington 98101

REPORTED BY:  Judith A. Robinson, CCR #2171

Henderson Legal Services
(202) 220-4158

5ca5ed7a-674f-4611-9700-2c5d7976d731

Mark Levonyaka        HIGHLY CONFIDENTIAL        July 21, 2005
                      Seattle, Washington

Page 80

1    subtle?

2        A.    It really depended.  I mean, I don't have a

3    specific way to tell you that.

4        Q.    Give me some examples as to how they would convey

5    that -- that concern.

6        A.    Without any specifics, at least the way I recall

7    it, you would talk about the efficacy and safety and

8    convenience of the product and they would genuinely feel,

9    yes.  This was a very efficacious drug.  It was very safe.

10   It was the most convenient.  But economically, they didn't

11   feel as though they had the best cost in order to use your

12   product.

13       Q.    Were some of them more direct than just using the

14   term, "cost," where they referred directly to reimbursement

15   or profit?

16       A.    Yeah.  At times they would talk about

17   reimbursement.

18       Q.    How were the sales reps that worked for you told

19   to handle those types of situations?

20                   MR. TORREGROSSA:  Objection.  No time period.

21                   THE WITNESS:  Yeah.  What time period?

22   BY MR. LENETT:

Henderson Legal Services
(202) 220-4158

5ca5ed7a-5741-4611-9700-2c5d7976d731

Mark Levonyaka      HIGHLY CONFIDENTIAL      July 21, 2005
                    Seattle, Washington

Page 81

1      Q.   While you were the oncology sales director.

2      A.   It changed.

3      Q.   Okay.  Tell me -- tell me how it started out and

4  the way in which it changed.

5      A.   Initially, when we first started and were learning

6  this business and trying to understand it, you could address

7  those issues.  You could talk to them about it and talk to

8  them about the different ramifications of the costs and the

9  reimbursement scenario.

10          Then there was a change.  And I can't remember

11  exactly but there was a change in policy that we couldn't

12  have that discussion at all, including not having any, you

13  know, documents about it.  Then that got relaxed where we

14  could understand it very well but we were not allowed to

15  show anything to physicians.

16     Q.   You could discuss it with them but not show it?

17          MR. TORREGROSSA:  Objection to form.

18  Mischaracterizes.

19          THE WITNESS:  You could discuss it if they

20  brought it up.

21  BY MR. LENETT:

22     Q.   I see.  Okay.  Let's see if we can put some time

Mark Levonyaka      HIGHLY CONFIDENTIAL      July 21, 2005
                    Seattle, Washington

Page 91

1    things?

2        A.    I'm sure I did one.

3        Q.    How are you sure about that?

4        A.    Because when a directive like that comes down I

5    want to reinforce it with my sales team.

6        Q.    Do you remember reinforcing it with your sales

7    team?

8        A.    I'm sure I did.

9        Q.    Are you just assuming that you did or do you

10   remember that you did?

11       A.    I'm pretty sure that I reinforced it.

12       Q.    And in what way did you reinforce it, what did you

13   say to your sales team?

14       A.    Exactly what was quoted in the -- the voice mail.

15   Which was, you know, we were to "cease and desist" with any

16   reimbursement discussions, any development of spreadsheets

17   for our own internal information.

18       Q.    Did you refer to spreadsheets that had been used

19   prior to that?

20       A.    I don't know if I referred specifically to that. I

21   just probably used it in general tense.

22       Q.    For example, did you state to the sales team we

Henderson Legal Services
(202) 220-4158

5ca5ed7a-674f-4611-97b0-2c5d7976d731

Mark Levonyaka        HIGHLY CONFIDENTIAL        July 21, 2005
                      Seattle, Washington

1    have to stop using the spreadsheets we have been using?

2                    MR. TORREGROSSA:  Objection to --

3    BY MR. LENETT:

4        Q.   Anything to that effect?

5                    MR. TORREGROSSA:  Objection to form.

6                    THE WITNESS:  I can't remember exactly but

7    that would have been my intent probably.

8    BY MR. LENETT:

9        Q.   Okay.  So there had been some spreadsheets you

10   were using then prior to that time?

11                   MR. TORREGROSSA:  Objection to form.

12                   THE WITNESS:  Yes.

13   BY MR. LENETT:

14       Q.   And there -- there had been discussions with

15   customers on reimbursement issues?

16                   MR. TORREGROSSA:  Same objection.  Go ahead.

17   BY MR. LENETT:

18       Q.   Is that true?

19       A.   Prior to the Email.

20       Q.   Yes.  And these discussions and spreadsheets, my

21   understanding is they would generally show the comparison

22   and spreads between reimbursement of Kytril and its

Henderson Legal Services
(202) 220-4158

5ca5ed7a-674f-4611-9700-2c5d7976d731

Mark Levonyaka        HIGHLY CONFIDENTIAL        July 21, 2005
                      Seattle, Washington

Page 93

1    competitors; is that correct?

2              MR. TORREGROSSA:  Form objection, please.

3              THE WITNESS:  It represented a whole bunch of

4    different things.  You know, some was on the reimbursement

5    side.  Some were on the cost saving side.

6    BY MR. LENETT:

7         Q.   But among the things that they represented --

8    among the things that were represented in the spreadsheets

9    and among the things that were included in the discussions

10   with customers, was comparative information regarding the

11   spreads between Kytril and its competitors?

12             MR. TORREGROSSA:  Objection.  Form.

13   Compound.  Confusing.  Go ahead.

14   BY MR. LENETT:

15        Q.   Is that true?

16        A.   Yeah.  One of the parts of it.  Yes.  I would

17   agree with that.

18        Q.   What did you personally do after Mr. DeVinney's

19   voice mail message?

20             Did you take any specific actions?

21        A.   I did what we just talked about.

22        Q.   Right.  You reinforced it with your sales team?

5ca5ed7a-674f-4611-9700-2c5d7976d731

Mark Levonyaka        HIGHLY CONFIDENTIAL        July 21, 2005
                      Seattle, Washington

Page 214

1                   THE VIDEOGRAPHER:   The time is 3:51 p.m.

2     We're now back on the record.

3     BY MR. LENETT:

4         Q.   Mr. Levonyak, have you had a chance to review

5     Exhibit Number 011?

6         A.   Yes.

7         Q.   Can you please identify this document?

8         A.   These are -- these are paper copies of electronic

9     spreadsheets that are comparing Kytril and Zofran in a

10    reimbursement situation on the first spreadsheet and a cost

11    savings situation on the second.  Cost savings on the third

12    and then again, cost savings on the last.

13                  BY MR. LENETT:   I'm going to make a formal

14    request on the record for production of this document in its

15    original electronic format.

16                  MR. TORREGROSSA:   Put it in an Email then.

17                  THE WITNESS:   Yeah.   I don't know if we have

18    one.

19    BY MR. LENETT:

20        Q.   Mr. Levonyak, did you send this spreadsheet, this

21    electronic spreadsheet, with a cover Email message to

22    certain people?

5ca5ed7a-674f-4611-9700-2c5d7976d731

Page 215

1         A.    Did I send this out?  Yes.  As I look at this

2    document, this is from me to my sales team.

3         Q.    Okay.  Was this circulated before or after

4    Mr. DeVinney's voice mail message?

5         A.    This was circulated and that '97 time period --

6    period is somewhat nebulous.  Once there was clarity around

7    what we could do and couldn't do.

8         Q.    So this was circulated once there was that

9    clarity.  Is that what you're saying?

10        A.    Yes.  Because I say here, it's now okay to use

11   this.  Which means, I got clarity on the fact that no, we

12   can't -- the clarity here was that we could still use these

13   spreadsheets for us to understand this internally.

14        Q.    Okay.  And who did you get that clarity from?

15        A.    That was the clarity that came out of those

16   subsequent meetings during that 3 or 4-month period.

17        Q.    And the clarification would have come from

18   Mr. DeVinney?

19        A.    I believe so.  I can't give you specifics there.

20        Q.    Okay.  This -- your Email message states here:

21              "Hello Everyone.  Attached is the Kytril

22   reimbursement spreadsheet that we have used in the past from

Mark Levonyaka      HIGHLY CONFIDENTIAL       July 21, 2005
                    Seattle, Washington

```
                                                    Page 216
1    David Newman."

2            So you had -- let me just stop right there.  You

3    had used this type of a spreadsheet before in the past,

4    right?

5        A.    For our general understanding and knowledge, yes.

6        Q.    Well, in the past, weren't you able to provide

7    this to customers?

8                MR. TORREGROSSA:  Objection, form.

9    Mischaracterizes.

10               THE WITNESS:  In the past, prior to, you

11   know, any announcement from Bill DeVinney, we used this to

12   understand the business.  Did we use it with customers?  You

13   know, specifically, I can't say exactly.  We certainly knew

14   the information.

15   BY MR. LENETT:

16       Q.    Wasn't it possible that spreadsheet-type

17   information, such as in this exhibit, was provided to

18   customers before Mr. DeVinney's announcement?

19               MR. TORREGROSSA:  Objection, form.

20               THE WITNESS:  Could have been.  I'm not with

21   my sales representatives all the time.

22   BY MR. LENETT:
```

5ca5ed7a-674l-4611-9700-2c5d7976d731

Mark Levonyaka     HIGHLY CONFIDENTIAL     July 21, 2005
                   Seattle, Washington

Page 217

1         Q.   Okay.  But that was one of its purposes, to

2    provide it to customers, at least during the period of time

3    that you felt that you could do that?

4                   MR. TORREGROSSA:  Objection, form.

5    Confusing.

6    BY MR. LENETT:

7         Q.   Isn't that right?

8         A.   I would say, prior to any, you know, directive

9    from Bill DeVinney.  These were primarily used to understand

10   the situation related to reimbursement and cost savings.

11             Using it with -- with customers occurred at times

12   but certainly not all the time.

13        Q.   Okay.  Your next sentence states:

14             "It is now okay to use this again with a new

15   multi-dose vial being approved."

16             And I think you just indicated where you say, it's

17   okay to use it again, that's because you had received

18   clarification that it was okay, right?

19   ·     A.   Yeah.  Okay to use it again internally.  I should

20   have said internally there.  But okay to use it again so

21   that we could still understand the market dynamics.

22        Q.   You could still convey this spreadsheet

Page 218

1    information to customers without showing them it, if you

2    were responding to something they brought up, right?

3                    MR. TORREGROSSA:   Objection, form.

4    Mischaracterizes.

5                    THE WITNESS:   Well, let me -- let me just

6    clarify what we shared.   We could share with them the cost,

7    the AWP.   They would have to do all of the reimbursement

8    calculations on their own which are pretty straightforward.

9    But we could say, this is what he sell for.   Here's the AWP.

10   And you figure out the -- the rest of it.   We knew it, as

11   you would know any product.   The inside and out of your

12   product versus your competition.

13   BY MR. LENETT:

14       Q.    But to the extent they were making any

15   representations about what the relative spreads were between

16   Kytril and one of the competing products, you could set them

17   straight on what the true state of affairs was by referring

18   to that type of information, right?

19                   MR. TORREGROSSA:   Objection.

20   Mischaracterizes.

21                   THE WITNESS:   I don't know if I would state

22   it that way.   What we were able to share with the customer

# EXHIBIT 6

Laura Glassco          HIGHLY CONFIDENTIAL          September 1, 2005
                       New York, New York

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL DOCKET NO. CIVIL ACTION 01CV12257-PBS

-------------------------------------x

In re: PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

-------------------------------------x

THIS DOCUMENT RELATES TO:

ALL ACTIONS

-------------------------------------x

                    September 1, 2005

                    9:00 a.m.


                    HIGHLY CONFIDENTIAL


          Videotaped deposition of LAURA GLASSCO,

pursuant to Notice, held at the offices of Patterson,

Belknap, Webb & Tyler LLP, 1133 Avenue of the

Americas, New York, New York, before Jineen Pavesi, a

Registered Professional Reporter, Registered Merit

Reporter, Certified Realtime Reporter and Notary

Public of the State of New York.

Laura Glassco          HIGHLY CONFIDENTIAL          September 1, 2005
New York, New York

26

1  manager, Bruce Henderson was John Hogan's manager or
2  regional business director, Mike Ziskin was the
3  director of healthcare and reimbursement I think was
4  his title, Brian Fitzpatrick was in marketing, I
5  believe, for Centocor, and Ken Wegner himself.
6      Q.      At the time is this pretty much all the
7  national account managers there were?
8      A.      I believe there were four, yes, plus
9  myself.
10     Q.      Attached to the cover memo or cover
11 e-mails of Exhibit Glassco 001, at the bottom it says
12 a file called California PMP.PPT, and there appears
13 to be some type of PowerPoint behind that.
14             Have you seen that before, the
15 PowerPoint that's attached to Exhibit Glassco 001?
16     A.      Yes.
17     Q.      Did you create it or help create it?
18     A.      Yes.
19     Q.      What is it?
20     A.      It is exactly what I gave you in
21 Exhibit Glassco 002.
22     Q.      The text would be the same?

27

1      A.      Yes, I believe it is.
2              I haven't compared it page-for-page,
3  but it looks very similar.
4      Q.      Would Mr. Wegner also be giving PMP
5  presentations then?
6      A.      Yes.
7      Q.      Let me ask you about the PMPs.
8              You said -- first of all, were any of
9  them ever done in the physician's office to his staff?
10     A.      I don't recall.
11     Q.      That means you don't recall doing any,
12 right?
13             MR. HAAS: Objection to form.
14     Q.      You don't recall doing any in a
15 physician's office?
16             MR. HAAS: Objection to form.
17     A.      I never did one in a physician's
18 office; I don't know if there were others done in a
19 physician's office.
20     Q.      Typically you would do it with a group
21 of physicians that you brought together?
22     A.      Yes.

28

1      Q.      How many in a typical group?
2              MR. HAAS: Objection.
3      A.      I don't know.
4      Q.      More than ten, less than a hundred?
5              MR. HAAS: Objection to form.
6      A.      Probably somewhere between five and
7  ten.
8      Q.      In addition to the -- it would be the
9  physician or it could be people from his office staff,
10 as well, right?
11             MR. HAAS: Objection to form.
12     A.      Correct.
13     Q.      Where specifically would these PMP
14 presentations take place?
15     A.      I recall one that I went to was a
16 restaurant in the Seattle area.
17     Q.      How many PMP presentations did you do?
18     A.      I don't know.
19     Q.      More than a dozen?
20     A.      No.
21     Q.      By the way, you didn't give the entire
22 PMP presentation, right?

29

1      A.      No, I did not.
2      Q.      The whole presentation was a
3  day-and-a-half typically, is that what you said?
4              MR. HAAS: Objection, asked and
5  answered.
6      Q.      I can see you nod your head, the court
7  reporter can't take anything down, you have to say yes
8  or no.
9      A.      Yes.
10     Q.      How would it be decided what doctors
11 were invited to these PMP presentations?
12     A.      It would be decided based on the market
13 and what the field felt was important.
14     Q.      Does that mean that the reps could
15 invite whoever they felt it was important to invite?
16     A.      Yes.
17     Q.      If this was a day-and-a-half, would you
18 provide hotel rooms for the doctors or staff as part
19 of this?
20             MR. HAAS: Objection to form.
21     A.      I don't know, I didn't get involved in
22 logistics.

Henderson Legal Services
(202) 220-4158

Laura Glassco          HIGHLY CONFIDENTIAL          September 1, 2005
New York, New York

30

1  Q.  Did you understand the doctors were
2  paying their own hotel rooms and transportation to get
3  there?
4      MR. HAAS:  Objection to form, asked and
5  answered.
6  A.  Many times they would have a local
7  location so there weren't any overnights required.
8  Q.  Would you provide the meals to the
9  doctors?
10  A.  Yes.
11  Q.  Did you or anyone you know keep track
12  of what doctors went to PMPs or when?
13      MR. HAAS:  Objection to form.
14  Q.  Was there a list of doctors who went to
15  PMPs?
16  A.  I would imagine someone kept track of
17  who attended, but it wasn't me, so I don't have that
18  information.
19  Q.  Do you know where it would be?
20  A.  No.
21      MR. HAAS:  Objection.
22  Q.  Did you have a certain budget for PMPs

31

1  or amount of money you could spend on them?
2  A.  No.
3  Q.  Did you ever invite people to come to
4  PMPs?
5  A.  No.
6  Q.  By the way, the PMPs that we're talking
7  about now are for physicians, right, the physicians
8  and their staffs?
9  A.  Yes.
10  Q.  Was there ever a similar program or any
11  kind of program put together by Centocor for health
12  plans or MCOs?
13  A.  No.
14  Q.  Did you ever have any — strike that.
15  Why were you forwarding Mr. Wegner's
16  e-mail to everybody on your list here?
17  A.  I felt it was important for people to
18  see what the interaction was of corporate accounts
19  with physicians and what the physicians' response was.
20  Q.  And this was a good example of that,
21  right?
22      MR. HAAS:  Objection to form.

32

1  A.  Yes.
2  Q.  Do you know if Dr. Kassan ultimately
3  did start infusing patients in his office?
4  A.  I believe so, I am not sure.
5  Q.  I want to talk to you about the
6  PowerPoint that's attached here.
7  You and Mr. Wegner wrote this together
8  or did you write it or did he write it?
9  A.  We worked on it together, yes.
10  Q.  The one that we got from your computer,
11  Exhibit Glassco 002, that's something you wrote primarily
12  yourself?
13      MR. HAAS:  Objection to form.
14  Q.  Who wrote the PowerPoint that's marked
15  as Exhibit Glassco 002?
16  A.  I worked on it with Ken.
17  Q.  By the way, Mr. Wegner's e-mail is
18  dated November 2000, but if we look at the PowerPoint
19  that's attached to it, it has a date of December 18,
20  2003.
21  Do you see that in the lower left
22  corner?

33

1  A.  I do.
2  Q.  Do you know why that is?
3  A.  No, I don't.
4  Q.  Were you still giving PMP presentations
5  in December of '03?
6  A.  No, I don't believe so.
7  Q.  Is this PowerPoint something you would
8  give the doctors as part of the PMP presentation?
9  A.  Are you asking if I would hand this out
10  and hand it to them?
11  Q.  Yes.
12  A.  No.
13  Q.  For example, I'm looking at what you
14  would call the payer grid, Bates No. 290, California
15  payers, do you see that?
16  A.  Yes, I do.
17  Q.  With provider numbers and reimbursement
18  amounts.
19  You would have some other piece of
20  paper you would give physicians that would have this
21  same information?
22  A.  No.

Laura Glassco          HIGHLY CONFIDENTIAL          September 1, 2005
New York, New York

---

102

1  described.
2         MR. HAAS: Take it under advisement and
3  I ask you to put it in writing.
4         MR. MACORETTA: I will show you what
5  we're going to mark as Exhibit Glassco 007.
6         (Exhibit Glassco 007, Bates Nos.
7  MDL-CEN 88912-32, was marked for identification, as of
8  this date.)
9  Q.    Let me know when you have had a chance
10 to look at that.
11 A.    All right.
12       (Witness perusing document.)
13 Q.    Have you ever seen this before?
14 A.    I don't recall seeing it, no.
15 Q.    The first page sets out the heading
16 "Practice Management Weekends."
17       At least some of these practice
18 management presentations that you went to were weekend
19 presentations?
20 A.    Yes, there were a few.
21 Q.    Was there a distinction between
22 practice management programs and practice management

---

103

1  weekends?
2  A.    Not that I am aware of.
3  Q.    On the first page there is something
4  called strategic imperatives and objectives.
5         Did you ever have any discussions with
6  anybody at Centocor about what the strategic
7  imperatives and objectives were of the practice
8  management program?
9  A.    No.
10 Q.    Did you ever have any understanding
11 about what they were?
12       MR. HAAS: Objection to form.
13 A.    I can only speak to why I was called in
14 to do a presentation.
15 Q.    What was your understanding of why you
16 were called in?
17 A.    As I mentioned earlier, when I went to
18 do a practice management program, it was to discuss
19 what was going on with the payers in their community
20 and what were some of the payer landscape issues that
21 had come up, such as specialty pharmacy providers,
22 et cetera.

---

104

1  Q.    Who would be the person calling you in
2  for that?
3         MR. HAAS: Objection to form, you can
4  answer.
5  A.    As I recall, again, memory has to go
6  back here in time, back to 2001, it might have been
7  somebody from the marketing department.
8         But also, as I mentioned earlier, it
9  might have been area business specialist or regional
10 business manager that felt it was important to have a
11 corporate accounts person attend.
12 Q.    Whoever called you in would say this is
13 what I want you to talk about?
14 A.    Yes, they would have asked me to talk
15 about the payers in the community.
16 Q.    Bates No. 920, "overview of the PMP
17 economic model," do you know what the PMP economic
18 model is?
19       MR. HAAS: Object to the form.
20       (Witness perusing document.)
21       MR. HAAS: Foundation.
22 A.    No.

---

105

1  Q.    Have you ever heard of something called
2  the PMP economic model?
3  A.    No, I have not.
4  Q.    I want to go back to Exhibit Glassco 001
5  and talk about your presentations at PMPs for a second.
6         Typically this PMP would be in some
7  kind of conference room or ballroom type setting?
8  A.    Yes.
9  Q.    You would be up on a stage?
10 A.    Yes.
11 Q.    The PowerPoints similar to what we have
12 in Exhibit Glassco 001 would be projected?
13 A.    Yes.
14 Q.    I am not interested in the discussion
15 of the specific state payers.
16       Starting on page 298, when you talk
17 about average Medicare reimbursements, could you tell
18 me what exactly you would say to the physicians in
19 connection with these slides?
20       MR. HAAS: Objection to form.
21 Q.    You can answer.
22 A.    Basically I would share with the

---

Henderson Legal Services
(202) 220-4158

Laura Glassco          HIGHLY CONFIDENTIAL          September 1, 2005
New York, New York

110

1   is?
2       Q.      Generally, but I am not the only
3   audience for this transcript, so I ask you to explain.
4       A.      A CPT code is a therapy versus a drug,
5   so CPT code stands for something that's being provided
6   by a healthcare professional.
7           In this case these are different codes
8   that a physician might be able to bill, might be able
9   to bill, I should repeat that, for office visits or
10  other types of reasons.
11          So 99211 through 99215 are different
12  what they call E&M codes, evaluation and management
13  services, that could be billed if they were considered
14  separate and identifiable from Remicade.
15      Q.      So if the patient just comes in and
16  gets an infusion and that's it, probably the physician
17  can't bill for any of the CPT codes?
18      A.      That's my understanding.
19      Q.      But if the doctor does something else,
20  some kind of evaluation or management, he may be able
21  to bill using one of these CPT codes?
22      A.      That's my understanding, yes.

111

1       Q.      And the point of that is you can bill,
2   meaning get more money from Medicare for whatever the
3   services are, right?
4       A.      Correct.
5           I wasn't advising him, I was just
6   giving him as much information as possible.
7       Q.      Telling him those codes are out there,
8   right?
9       A.      Yes.
10      Q.      The next slide after your Medicare
11  example is summary and that's what, a summary of
12  everything that went before?
13          (Witness perusing document.)
14      Q.      Is it a summary of just the Medicare
15  example?
16      A.      I think I just am summarizing the whole
17  presentation of the large health plans in their area;
18  if you look through the slide, it is basically
19  summarizing the previous.
20      Q.      Then the slide after that titled
21  "Reimbursement for Remicade," can you tell me how you
22  would talk about that slide?

112

1       A.      Sure.
2           Basically this is a grid that shows if
3   AWP is at that amount shown here and if the
4   reimbursement from any given payer, public or
5   otherwise, private, is a reduction off of AWP, what
6   the physician would be reimbursed per vial and what
7   the difference between AWP and that reimbursement
8   would be based on an assumed purchase of $500.
9           For the next line, it discusses, as we
10  spoke earlier, about the average of three vials per
11  patient, so it basically multiplies what one vial is
12  times three vials.
13          And the last line then takes a patient
14  to a year, first it talks about per vial, then it
15  talks per infusion, and then it talks about per year,
16  based on the different reimbursements that we knew
17  available out there with the public payers and private
18  payers.
19      Q.      Let me ask you a little differently
20  then.
21          Could you give me an example, you just
22  told me what the slides say --

113

1       A.      That's what I would have said.
2       Q.      Just like what you told me?
3
4       A.      Very similar, yes, spelling out for
5   them exactly what I just said.
6           It is what it is.
7       Q.      What you are calling here on the last
8   slide profit per patient or profit on three-vial
9   infusion, is that concept of profit something that you
10  would discuss with the health plans?
11          MR. HAAS:  Objection.
12      A.      I wouldn't think the health plan would
13  be concerned about that, no, I would not.
14      Q.      It is not something?
15      A.      No, it is not something I would discuss
16  with them.
17      Q.      Was there a time at Centocor when
18  instructions were given that you couldn't talk about
19  profit anymore, are you aware of any policy at
20  Centocor that said don't talk about profit anymore?
21          MR. HAAS:  Objection to form.
22      A.      To physicians about profit?

Laura Glassco          HIGHLY CONFIDENTIAL          September 1, 2005
                        New York, New York

114

1    Q.    Yes.
2    A.    I think it was pretty much understood
3    that we shouldn't discuss profits probably a couple of
4    years ago, yes, I think it was a policy, but I don't
5    have it written down.
6    Q.    How would you have learned of that
7    policy, would someone have sent you a writing saying
8    this is the new policy?
9         MR. HAAS: Objection, form.
10   A.    I am not sure if it was in writing or
11   not.
12        I think it was well understood through
13   verbal communication, as well.
14   Q.    At that time somebody said don't talk
15   about profit?
16   A.    Right.
17   Q.    Who would that have been, do you know?
18   A.    I don't recall, I don't specifically
19   recall.
20   Q.    Do you remember when that was?
21   A.    No, I don't.
22   Q.    Do you remember why that policy came

115

1    into being?
2    A.    No, I don't.
3    Q.    If you wanted to review whatever the
4    policy is to figure out exactly what it said, is there
5    a place you could go look for that at Centocor?
6         MR. HAAS: Objection, form.
7    A.    No.
8    Q.    Is there some central library of all
9    the policies out there?
10   A.    No.
11        MR. HAAS: Objection to form.
12   Q.    Were you ever involved in training
13   anybody else regarding the practice management
14   program?
15   A.    I am not sure of the question.
16   Q.    I think I asked you some of this
17   earlier.
18        You were never involved in creating any
19   training materials for anybody?
20   A.    No, I was not.
21   Q.    And you may have occasionally given a
22   talk or a presentation in some training, right?

116

1    A.    And some training?
2    Q.    At some training for representatives or
3    somebody else, is that true?
4    A.    Yes, yes.
5    Q.    And that was the extent of your
6    involvement in training anybody regarding practice
7    management or reimbursement?
8    A.    Correct.
9         MR. MACORETTA: Why don't you give me a
10   minute here.
11        THE VIDEO TECHNICIAN: Time is 11:29
12   a.m., going off the record.
13        (Recess taken.)
14        THE VIDEO TECHNICIAN: Time is 11:34
15   a.m. and we're back on the record.
16   BY MR. MACORETTA:
17   Q.    I wanted to talk to you for a minute
18   about the documents you produced to us today.
19        Let me show you first what we can mark
20   as Exhibit Glassco 008, which is a two-page document
21   that says "Practice Management Worksheet For Assessing
22   New Services," Bates No. CEN 00107382-383.

117

1         (Exhibit Glassco 008, Bates No. CEN
2    00107382-383, was marked for identification, as of
3    this date.)
4    Q.    Do you have a copy of that?
5         (Witness perusing document.)
6    Q.    What is this, Ms. Glassco?
7    A.    When I was asked to appear, I was asked
8    to look at my computer on certain subjects and I found
9    this in my computer.
10        It is not a document that I used per
11   se, but I think it was a document that was used during
12   the practice management programs.
13   Q.    So it is --
14   A.    It is a worksheet.
15   Q.    It is a Centocor-created document?
16   A.    Correct.
17   Q.    Is this a computer worksheet, meaning
18   does it work that when you fill in certain columns,
19   the numbers in other columns change?
20   A.    I don't know.
21        What you see is what I had.
22   Q.    That number at the bottom right of the

Henderson Legal Services
(202) 220-4158

# EXHIBIT 7

Jan L. Cook, M.D.          CONFIDENTIAL          March 6, 2006
                           Boston, MA

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MDL No. 1456

C.A. No. 01-CV-12257-PBS

* * * * * * * * * * * * * *

IN RE:  PHARMACEUTICAL INDUSTRY          *

AVERAGE WHOLESALE PRICE LITIGATION       *

                                         *

THIS DOCUMENT RELATES TO ALL ACTIONS     *

* * * * * * * * * * * * * *

VOLUME I


DEPOSITION OF JAN L. COOK, M.D., a witness called on

behalf of Johnson & Johnson, pursuant to the Federal

Rules of  Civil Procedure, before Jessica L.

Williamson, Registered Merit Reporter, Certified

Realtime Reporter and Notary  Public in and for the

Commonwealth of  Massachusetts, at the Offices of

Robins,  Kaplan, Miller & Ciresi L.L.P., 800 Boylston

Street, Boston, Massachusetts, on Wednesday, March 6,

2006, commencing at 9:37 a.m.

76035d72-18a4-4e31-a0f5-9eddb0e85ae0

Jan L. Cook, M.D.        CONFIDENTIAL            March 6, 2006
                          Boston, MA

Page 133

1    number.

2         Q.    Now, when you say you thought it was an

3    average wholesale price, what do you mean by that?

4         A.    I mean, I thought it was a number --

5    just -- I thought it was a number, a number.

6         Q.    Well, it is a number, isn't it?

7         A.    I think so.

8         Q.    You're aware that the average wholesale

9    price is a number that's publicly published and

10   available in price reporting services?

11        A.    Yes.  It's got to be a number that's

12   available, because people use that for payment.

13        Q.    Okay.

14        A.    So there is a number that is available

15   for a drug.  It's called the AWP, and there's a

16   number.

17        Q.    Right.  That's listed as the AWP?

18        A.    Yes.

19        Q.    So it certainly is a number?

20        A.    Yes.

21        Q.    My question is, what did you think that

22   number was supposed to represent, if anything?

76035d72-18a4-4e31-a0f5-9eddb0e85ae0

Jan L. Cook, M.D.    CONFIDENTIAL    March 6, 2006
Boston, MA

Page 134

1     A.   What it said it was supposed to --

2     MR. COCO:  Objection.

3     Q.   So you thought the AWP is supposed to be

4   an actual average of wholesale prices; is that

5   correct?

6     A.   Well, I actually didn't think about it a

7   whole lot.  I thought it was a number -- yeah, I

8   guess I thought it was the wholesale price, the

9   average wholesale price.

10     Q.   So you understand it to be an actual

11   average of the prices at which entities in the

12   market could purchase drugs from wholesalers?

13     MR. COCO:  Objection.

14     A.   I didn't give it that much thought.  I

15   think I thought it was just -- you know, if you

16   say that, I guess -- well, I just didn't give it

17   that much thought.  I thought it was a number.  In

18   my world it's a number that people pay a

19   percentage of.

20     Q.   Now, when you say it's a number that

21   people pay a percentage of --

22     A.   Yes.

76035d72-18a4-4e31-a0f5-9eddb0e85ae0

# EXHIBIT 8

John J. O'Brien, Jr.    CONFIDENTIAL    April 5, 2006
Boston, MA

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

In re:  PHARMACEUTICAL        )    NO. 01CV12257-PBS

INDUSTRY AVERAGE WHOLESALE    )

PRICE LITIGATION              )

_____)

THIS DOCUMENT RELATES TO:     )

ALL ACTIONS                   )

_____)

C O N F I D E N T I A L

VIDEOTAPED DEPOSITION of JOHN J. O'BRIEN, JR., called

as a witness by and on behalf of the Defendant,

AstraZeneca Pharmaceuticals, pursuant to the

applicable provisions of the Federal Rules of Civil

Procedure, before P. Jodi Ohnemus, Notary Public,

Certified Shorthand Reporter, Certified Realtime

Reporter, and Registered Merit Reporter, within and

for the Commonwealth of Massachusetts, at the offices

of Robins, Kaplan, Miller & Ciresi, L.L.P., 800

Boylston Street, Boston, Massachusetts, on Wednesday,

5 April, 2006, commencing at 10:49 a.m.

John J. O'Brien, Jr.          CONFIDENTIAL          April 5, 2006
                              Boston, MA

11  (Pages 38 to 41)

**38**

1      Q.  Can you recall what was discussed during
2  the last MSCO meeting?
3      A.  (Witness nods.)  No.
4      Q.  What's typically --
5      A.  Excuse me.  Shouldn't be shaking her head.
6  Speak up.
7          MR. COCO:  We warned him.
8      Q.  What is typically discussed during these
9  MSCO meetings?
10     A.  I -- I don't recall.  I -- you know, I'm
11 in attendance, but I'm not the lead on that
12 discussion.
13     Q.  Who would be the lead on that discussion?
14     A.  Normally, Jan Cook, regional medical
15 director.
16     Q.  So, is your role -- what is your role
17 during the meetings?
18     A.  My role is basically to be -- to represent
19 and be in attendance in terms of being --
20 representing Blue Cross -- Provider Relations.
21     Q.  Have members of MSCO or any of the other
22 provider groups whose meetings you've attended, have

**39**

1  they expressed any reimbursement-related concerns to
2  you?
3      A.  No.
4      Q.  Are you aware of any benchmarks for
5  reimbursement that are used by Blue Cross Blue
6  Shield?
7          MR. COCO:  Objection.
8      A.  I don't understand the question.
9      Q.  For instance, for physician-administered
10 drugs, do you know how Blue Cross Blue Shield
11 reimburses providers?
12     A.  Not really, no.
13     Q.  Okay.
14     A.  Oh.  Excuse me.  As I indicated
15 previously, we have a fee schedule.  We reimburse
16 based upon the fee schedule.
17     Q.  Okay.  And have you ever heard the term
18 "AWP" in your role as physician -- in your roles in
19 which you deal with physicians?
20     A.  Yes.
21     Q.  And what's your understanding of that
22 term?

**40**

1      A.  My understanding on that term is that it
2  is the average wholesale price of a drug.
3      Q.  And do you know -- does that have any
4  meaning for you?  Do you --
5      A.  It means the average price of a drug.
6      Q.  And in what context have you heard that
7  term?
8      A.  I -- I can't recall, but I -- you mean
9  what context?
10     Q.  Do you remember when you first heard the
11 term?
12     A.  No, no.  I've been in -- you know, I've
13 been in the field -- I've been in this particular
14 job for over 20 years, so --
15     Q.  Was it when you first started, or was it a
16 little bit later in your inquiry?
17     A.  I can't recall.
18     Q.  Were you involved with the HMO staff model
19 for Blue Cross Blue Shield?
20     A.  Which one?
21     Q.  Well, either/or, any --
22     A.  Yes.

**41**

1      Q.  Could you name them?
2      A.  Yes.  I -- years ago it was known as
3  Medical West, currently known as River Bend Medical
4  Group, and when I was in marketing, we, as part of
5  our portfolio, you know, so, essentially, as part --
6  part of my role in marketing was to -- you know, was
7  to sell Medical West coverage or offer Medical West
8  coverage, as well as offer other lines of -- other
9  plans within our portfolio to employer groups.
10     Q.  Just to clarify, Medical West is now River
11 Bend?
12     A.  Yes.
13     Q.  It's the same organization?
14     A.  Yeah.
15     Q.  Was there anything that changed when the
16 name changed?
17     A.  Ownership.
18     Q.  And how did ownership change?
19     A.  Well, from -- my understanding is it went
20 from a holding company to physician ownership.
21     Q.  And which physicians are part of the
22 physician ownership now?

Henderson Legal Services
(202) 220-4158

# EXHIBIT 9

Deborah Devaux        HIGHLY CONFIDENTIAL        March 9, 2006
                        Boston, MA

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

In re:  PHARMACEUTICAL            )

INDUSTRY AVERAGE WHOLESALE        ) HIGHLY

PRICE LITIGATION                  ) CONFIDENTIAL

                                  )

THIS DOCUMENT RELATES TO:         )

ALL ACTIONS                       )


        DEPOSITION of DEBORAH DEVAUX, called as a

witness by and on behalf of Johnson & Johnson,

pursuant to the applicable provisions of the Federal

Rules of Civil Procedure, before P. Jodi Ohnemus,

Notary Public, Certified Shorthand Reporter,

Certified Realtime Reporter, and Registered Merit

Reporter, within and for the Commonwealth of

Massachusetts, at the offices of Robins, Kaplan,

Miller & Ciresi, L.L.P., 800 Boylston Street,

Boston, Massachusetts, on Thursday, 9 March, 2006,

commencing at 9:35 a.m.

2bdd3069-4247-4a1a-a01f-853ca9963118

Deborah Devaux     HIGHLY CONFIDENTIAL     March 9, 2006
Boston, MA

1   rate which can be applied to the AWP to provide a

2   reasonably-consistent estimate of the physician's

3   acquisition cost, we do not feel that AWP provides

4   a useful measure of the acquisition cost of a drug

5   to physicians."

6        Now, is it your testimony that BCBS of

7   Massachusetts has assumed that there is some

8   relationship between AWP and acquisition costs for

9   drugs?

10        MR. COCO:  Objection.

11     A.   I don't know what Blue Cross Blue Shield

12   Massachusetts assumes.

13     Q.   Okay.

14     A.   I personally would have thought that there

15   would be some relationship between any pricing

16   methodology and the underlying cost, as a -- as Deb

17   Devaux.

18     Q.   Okay.  Now, I believe you mentioned that

19   you're not aware of WAC, is that correct?

20     A.   I am not familiar with WAC.

21     Q.   Okay.  I'll represent to you that in the

22   price reporting services, WAC is another benchmark

2bdd3069-4247-4a1a-a01f-853ca9963118