# EXHIBIT 10

Steven J. Fox                                   March 8, 2006
                      Boston, MA

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

In re:  PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE      )

PRICE LITIGATION                )

                                )

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS                     )

                                )

DEPOSITION of STEVEN J. FOX,

called as a witness by and on behalf of the Johnson

& Johnson, pursuant to the applicable provisions of

the Federal Rules of Civil Procedure, before P.

Jodi Ohnemus, Notary Public, Certified Shorthand

Reporter, Certified Realtime Reporter, and

Registered Merit Reporter, within and for the

Commonwealth of Massachusetts, at the offices of

Robins, Kaplan, Miller & Ciresi, L.L.P., 800

Huntington Avenue, Boston, Massachusetts, on

Wednesday, 8 March, 2006, commencing at 9:35 a.m.

Steven J. Fox

March 8, 2006

Boston, MA

1        A.    When I go to negotiate a car and I look

2     at the sticker price, I know that I'm not going to

3     pay the sticker price, but there is a relationship

4     between the price I pay and that sticker price,

5     otherwise the sticker price has no meaning.

6           I then go to an invoice price.  That

7     invoice price then gives me some basis of

8     comparison.  So, I'm saying AWP is the basis of

9     comparison.  That number is a number that --

10    that's an industry number.  That is a number that

11    -- I would have no reason to argue with that

12    number, because that number is the basis of

13    comparison.

14          Again, if it was -- you earlier asked

15    me, Well, why didn't we discount?  If we -- if we

16    thought that there was an unrealistic set between

17    that and some other price, we would have

18    discounted it by some other number, by 20 percent,

19    by 25 percent, by 30 percent.

20        Q.    Uh-huh.  Well, let me focus my question

21    then.  When you say it has some relationship to

22    the price that you pay, you're saying it has some

bdd57108-7753-44c2-9abc-fb5a39ba25dd

Steven J. Fox                                    March 8, 2006
                        Boston, MA

1    assumption, then what's your basis for thinking

2    the differential would be reasonable?

3              MR. COCO:  Objection.

4         A.   Again, just like -- I mean, for services

5    that a plan reimburses, if we start with a number,

6    and we assume that there's a reasonable margin

7    built into that, again, standard with our

8    methodology, standard with -- with the industry, I

9    would not expect there to be an unrealistic

10   relationship between that number and a number that

11   a physician is paying to get that, implicitly

12   implying that when they bill the payer, that there

13   is lots of money to be paid.

14        Q.   Well, when you said you assumed there's

15   a reasonable margin --

16        A.   Uh-huh.

17        Q.   -- as we discussed earlier, when you

18   used the term "margin," you're referring to the

19   difference between AWP and acquisition, right?

20        A.   Yes.

21             MR. COCO:  Objection.

22        Q.   So, when you say, "reasonable margin,"

bdd57108-7753-44c2-9abc-fb5a39ba25dd

Steven J. Fox                                    March 8, 2006
                        Boston, MA

1    you're saying you expected there to be a

2    reasonable difference between the AWP and the

3    acquisition, right?

4            MR. COCO:  Objection.

5       A.   If any.

6       Q.   Okay.  And so, when you say a reasonable

7    -- and you don't know what the physician is paying

8    to acquire drugs, right?  You don't know what the

9    specific number is?

10      A.   That's right.

11      Q.   Okay.  But you do know what the AWP is,

12   'cause that's published.

13           MR. COCO:  Objection.

14      Q.   Right?

15      A.   I don't particularly -- I don't

16   personally, but yes.

17      Q.   You understand that AWPs are published.

18      A.   Yes.  Correct.

19      Q.   So, when you assume that -- there to be

20   a reasonable margin, and the only information that

21   you have is the AWP, aren't you axiomatically

22   taking the position that AWP provides some

bdd57108-7753-44c2-9abc-fb5a39ba25dd

Case 1:01-cv-12257-PBS  Document 3033-4  Filed 08/30/06  Page 6 of 56

1    indicator of the cost of the drug to physicians?

2              MR. COCO:  Objection.

3        A.    I don't -- I mean, that's a level of

4    detail that I don't get involved in.  If there

5    were no other factors involved, but clearly the

6    physician -- AWP is the -- is a price the

7    physician is paying for a drug.  The drug is

8    supplied.  The drug is billed to the insurer.

9        Q.    You said AWP is a price a physician is

10   paying?

11       A.    AWP is an index.  It's a price.  It's

12   out there.  It -- I don't know if that's the price

13   the physician is paying.  I'm -- I don't know

14   that.  There is a -- there is -- clearly, there is

15   an AWP price that is set by the industry as the

16   wholesale price.  There is then a price that the

17   physician pays to get that drug, and there is then

18   a price that the insurer, some third party, pays

19   the physician for administering that drug.  The

20   numbers can't all be the same.

21       Q.    Let me ask you this:  Here's a report

22   from 1992 which says, "AWP is not a reliable

bdd57108-7753-44c2-9abc-fb5a39ba25dd

# EXHIBIT 11

```
00001
  1    UNITED STATES DISTRICT COURT
  2    FOR THE DISTRICT OF MASSACHUSETTS
  3
  4
  5    ---------------------------------------x
  6    IN RE PHARMACEUTICAL INDUSTRY
  7    AVERAGE WHOLESALE PRICE LITIGATION,
  8    ---------------------------------------x
  9
 10    Civil Action:  01-CV-12257-PBS
 11
 12                         July 28, 2004
 13                         9:40 a.m.
 14
 15      H I G H L Y   C O N F I D E N T I A L
 16
 17         30(b)(6) Deposition of THOMAS HIRIAK,
 18    held at the offices of Patterson Belknap
 19    Webb & Tyler, before David Henry, a
 20    Certified Shorthand Reporter and Notary
 21    Public of the State of New York.
 22
```

00252
```
 1          Q.     But even if all these things were
 2    not captured, are you aware of a report that
 3    captured most of these things?  I
 4    understand -- I'm not saying that this has
 5    to be the only definition that was operating
 6    from 1991 until now as to how net price was
 7    being calculated for Procrit, but were there
 8    reports that attempted to capture this
 9    concept prior to 2001 that were created by
10    the finance department?
11                 MR. SCHAU:     Object to form.
12          A.     Yeah, the concept of ASP, no.
13    But if -- again --
14          Q.     You are getting -- I think you
15    are getting caught up in the ASP.  I'm not
16    talking about the concept of ASP exclusively
17    with regard to average selling price,
18    different companies call it different things
19    prior, or other than average selling price.
20    Is there something that this was called or
21    something similar that was calculated that
22    was called something over than average
```

00253
1   selling price in order to keep track and
2   monitor what the net price of the drug was
3   during the lifespan of the drug?
4        A.   Yes.
5        Q.   And what reports was that
6   information contained in?
7        A.   Again, there are finance reports,
8   looking at gross to net, what our net
9   purchases are.  I don't know if it has a
10  specific name, or I'm not aware of any name
11  for that report.
12       Q.   Was that information subsumed
13  into another type of report, like a P&L?
14       A.   Well, obviously performance is
15  measured at Ortho Biotech.  I mean, we do
16  have a forecast, we are measured on that
17  forecast by J&J.  We measure performance on
18  a quarterly basis, so yeah, I'm sure it all
19  rolls up in into the performance of Ortho
20  Biotech during a calendar year.
21       Q.   And is that broken down by drug
22  within Ortho Biotech?

00254
1      A.    Well, the performance of the
2  company is, the company itself.  But I'm
3  sure that this type of information is
4  available by drug, yes.
5      Q.    Okay, and that information has
6  always been available during the lifespan of
7  this product, correct?
8      A.    As far as I know, yes.
9      Q.    Okay.  Do you know who that data
10  was circulated to, data showing the net
11  price of the drug during the lifespan of the
12  drug?
13          MR. SCHAU:   Object to form.
14      Q.    You've stated that these reports
15  were --
16      A.    I would say finance and senior
17  management.
18      Q.    Okay, do you know what they did
19  with these reports?
20      A.    No.
21      Q.    I thought you just testified they
22  were trying to engage the performance, among

00255
1   other things, they tried to gauge the
2   performance of the drug, is that correct?
3       A.   Yes.
4       Q.   Anything else they would have
5   done with the reports?
6       A.   No.
7       Q.   Is there some other report that
8   regularly reports the ASP?
9       A.   Ken Nelson right now develops a
10  report that calculates ASP.  That's the only
11  report I've seen that actually calculates
12  ASP.
13      Q.   And how often was that
14  calculated?
15      A.   Well again, right now it's on an
16  ad hoc basis based upon internal analysis.
17  If Medicare does adopt ASP, then I know that
18  it will be on a much more regular basis, and
19  I think it's done at that time on a
20  quarterly basis if I'm not mistaken.
21      Q.   Can you tell me what other
22  financial reports OBI regularly creates?

# EXHIBIT 12

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

IN RE:  PHARMACEUTICAL INDUSTRY ) HIGHLY CONFIDENTIAL

AVERAGE WHOLESALE PRICE          ) MDL NO.  1456

LITIGATION                       ) MASTER FILE NO.

                                 ) 01-CV-12257-PBS

VIDEOTAPE DEPOSITION OF DAVID R.  BRENNAN

FEBRUARY 14,  2006

Videotape deposition of DAVID R.  BRENNAN taken

pursuant to notice at the offices of AstraZeneca,

1800 Concord Pike, Wilmington, Delaware, beginning at

10:00 a.m., on Tuesday, February 14, 2006, before

Eleanor J. Schwandt, Registered Merit Reporter and

Notary Public.

Page 30

1  selling Zoladex to doctors for, right?
2      MR. WISE: Object to the form of the
3  question.
4      A. I mean, if there is confidentiality
5  associated with it, then we certainly wouldn't be
6  the ones to do it. But I think everybody was aware
7  that there were discounts from AWP and from WAC.
8      Q. Everyone was aware. The consumer getting
9  a shot of Zoladex was aware of the discount?
10     MR. WISE: Object to the form of the
11 question.
12     Q. Yes or no?
13     A. I don't know the answer to that.
14     Q. Do you think so? Do you think so? Do you
15 think the consumer getting a shot of Zoladex in his
16 abdomen knew that the percentage of the co-pay he
17 had to pay was higher than it would have been had
18 the reimbursement been based on the actual
19 acquisition cost of the drug rather than AWP? Do
20 you think the consumer knew that?
21     A. I don't know. I honestly can't say I
22 know. I mean, I think that there was incentive in

Page 31

1  the system. There was co-pays in the system. It is
2  difficult to say, for me to say that I know exactly
3  what somebody who was getting a shot would know.
4      Q. Was there ever an effort made by
5  Astra/Zeneca to let the consumer know exactly what
6  it was that their doctor purchased the drug for?
7      A. Not that I am aware of.
8      Q. Just out of curiosity, do you think it is
9  fair for somebody to be reimbursing at a level that
10 is much higher than the acquisition cost for the
11 drug?
12     MR. WISE: Object to the form of the
13 question.
14     Q. And not know it?
15     MR. WISE: Object to the form of the
16 question.
17     Q. Is that fair?
18     MR. WISE: To whom? For what purpose?
19     Q. To the reimburser, to the person paying
20 for the drug?
21     A. I think that the system that's in place is
22 very complex, and that it involves a number of

Page 32

1  different, you know, parties that are involved in
2  all of this. It is not a straightforward, one-size-
3  fits-all system that we operate in. So I can't –
4      Q. I grant you --
5      A. So it is difficult for me to say what is
6  fair, what is not fair.
7      I mean, within the context of the system,
8  we operated with the intention to make sure there
9  was access to our products. And with Zoladex in
10 particular, it was to try to have a lower priced
11 product, competitively, to try to make it more
12 attractive to be used, because there were a lot of
13 similarities between our product and the competitive
14 product. So...
15     Q. My question to you is this: You have a
16 consumer getting a shot of Zoladex in the abdomen.
17 And the reimbursement for the drug, for that shot,
18 is being based on AWP, which is significantly higher
19 than the doctor's actual acquisition cost of the
20 drug. And AstraZeneca has in place no mechanism to
21 tell the consumer what that doctor paid for the
22 drug. He just has to pay his portion of the co-pay.

Page 33

1  Is that right?
2      MR. WISE: Object to the form of the
3  speech, and the question.
4      Q. Is that right?
5      A. We don't -- I mean, it is not our practice
6  to inform consumers on prices of our products. The
7  prices that are paid in the market are quite
8  variable depending on the circumstances, the
9  reimbursement systems, etcetera. So there isn't a
10 single price point that one could say, here is what
11 the price should be. Those factors are determined
12 by the market.
13     Q. But given the situation where the AWP is
14 significantly higher, and the reimbursement is based
15 upon AWP, and the consumer's co-payment is based
16 upon AWP, is it fair for that person not to know
17 what the doctor's actual acquisition cost of the
18 drug is?
19     MR. WISE: Same objection to the form.
20     A. I'm not going to comment on it. I mean, I
21 think, as I said, the complexity of the system
22 doesn't expect us to be providing that kind of

# EXHIBIT 13

# Intron A for Supperficial Bladder Carcinoma

**Intron A (IFN a-2b) 100 million IU once weekly for 12 weeks and then 50miu once a month for one year.**

Price advantages in setting up Direct Account through Schering representative.

Net Direct price      (Amount reimbursed) J9214 code
50 miu vial = $471.01     50miu of Intron at 95% AWP = $536.95

$536.95 – $471.01 = $65.94 in profit for every 50miu vial used

**First 12 weeks of therapy is 100miu weekly**

Net Direct price          AWP (reimbursement)
$942.02 x 12wks= $11304.24   $1073.90 x 12wks= $12886.80
Difference of **$1582.56** in profit of drug.

**50miu once a month for 12 mths =**  $471.01 x 12mths  $5652.12
                      $536.95 x 12mths  $6443.40
                    Differnce of     $791.28 (profit)

Total saving(profit) of Intron A when purchasing direct for bladder cancer is **$2373.84**

**Urology Billing Codes**

**J9214**    per one million units(MU) of drug
**51720\*\***  infusion directly to bladder
**99211 - 99215** for the visit, depending on the services rendered

\*\* for intra-bladder infusions. You may not bill for a catheterization or irrigation with this service.

Highly Confidential

SPF0104512

# EXHIBIT 14

## AWP (Ain't What's Paid)

### Origin

Before the 1980's, there were many pharmaceutical companies, who sold to many wholesalers and many retailers. Since the wholesalers were regional in nature, it was difficult to ascertain the "average" price manufacturers sold product for. Most manufacturers sold through wholesalers only, but some did sell direct to retailers. The price manufacturers sold product to wholesalers for was termed Wholesale List Price or "WLP". On average, wholesalers marked WLP up 20% from manufacturers selling product to wholesalers only, when selling product to retail pharmacies. Wholesalers marked-up product 25% from manufacturers who also had direct pharmacy sales. As an example, Bristol-Myers did not deal in direct sales, hence had a 20% markup, while Squibb's direct policy caused a 25% markup, also known as WLP to AWP spread.

A pricing service, FirstDataBank, found a market niche in surveying wholesalers and retailers for the average price wholesalers sold product to pharmacies for, hence "Average Wholesale Price." They published this information in such sources a Redbook and PriceAlert.

Over the past 20 years, much consolidation has occurred within the pharmaceutical wholesale and retail supply chain. Now, major wholesalers and pharmacy chains are able to negotiate much better pricing from each other, as well as from manufacturers. Wholesalers and retailers now work on slim margins and mark-ups from WLP are in the 2% - 4% range. But, FirstDatabank has maintained the 20% - 25% AWP markup legacy and continues to publish this artificially inflated number. This markup is applied to new and old products based on the manufacturer assigned to the product labeller code.

### Current Usage

While pharmacies and payors both know that AWP is artificially inflated, it is the only easily obtained, published price source. Therefore, reimbursement formulas are still based on AWP, with a discount subtracted from it. An example of how a MCO reimburses a pharmacy might be: AWP – 13% + a filling fee of $2 less the co-pay that has already been paid by the customer when picking up the prescription. In simple terms:

AWP – discount +fee – copay

The discount level depends on the payor type and the contract entered into by payor and pharmacy.

In addition, pharmacies often use AWP as a benchmark when determining how much to charge a cash paying customer for a prescription.

Aside from pharmaceutical distribution channels, AWP is used by many when providing analysis on drug pricing. Many newspaper articles and invest bank research notes use AWP as a tracking variable. Since it is a published number, AWP is the logical variable to track when performin price increase analysis, as so many publications and advocacy groups do.

Highly Confidential

# EXHIBIT 15

## PHARMACEUTICAL SALES AGREEMENT

**AGREEMENT** made this _15_ day of _June_ , 19 92 by and between
CareMark, residing at 455 Knightsbridge Parkway, city of
Lincolnshire, State of Illinois, hereinafter called the BUYER;
and ORTHO BIOTECH INC. residing at Route 202, P.O. Box 300,
Raritan, New Jersey 08869-0602, hereinafter called the SELLER.

WITNESSETH that in consideration of the mutual covenants and
agreements herein contained, the parties do hereby agree as
follows:

### GENERAL TERMS AND CONDITIONS

1.  The term of the agreement shall begin on the date set out
    above and shall continue through March 31, 1997.  It covers
    the purchase by BUYER or its members of PROCRIT brand
    Epoetin alfa.

2.  SELLER specific PROCRIT® pricing and conditions are listed
    on an attachment.

3.  Each member of BUYER that wishes to take advantage of the
    PROCRIT product pricing set forth in the attachment
    (a "Participating Member") must purchase all of its
    requirements of recombinant human erythropoietin ("r-HuEPO")
    (or equivalent) as PROCRIT brand Epoetin alfa, and may not
    substitute, dispense or administer equivalents for such
    product except for any such r-HuEPO required for patients on
    dialysis.

4.  BUYER represents that SELLER products are dispensed through
    CareMark ~~wholly~~ owned and operated ~~hospital based~~ pharmacies
    solely ~~as inpatients, to outpatients~~ as an original take-
    home prescription, and to institution staff, employees, and
    students for their own dependents' use and not for resale or
    competition with private sector pharmacies.  If SELLER shall
    reasonably determine that  BUYER is using the products for
    any other purpose, it shall have the right to immediately
    terminate this agreement with respect to such BUYER and to
    refuse to accept any further orders under this agreement
    from or on behalf of such BUYER.

5.  All orders for PROCRIT brand Epoetin alfa by BUYER shall be
    subject to availability of the product from SELLER.  If the
    product is unavailable from SELLER in quantities necessary
    to meet BUYER's  reasonable requirements, BUYER may purchase
    a substitute product from another vendor, but only so long
    as SELLER is able to supply neither the product nor a

**HIGHLY CONFIDENTIAL**

MDL-OBI00054909

substantially equivalent product.

6.  SELLER agrees to indemnify, defend and hold harmless the BUYER from and against any liabilities, cost, expenses or damages for personal injury to third party allegedly caused by use of SELLER's product and not due to the negligence or willful misconduct of BUYER, its members, their agents or employees, or any third party, provided that the SELLER shall control and direct any litigation for which indemnification is sought hereunder including but not limited to the selection of counsel and further provided that BUYER shall cooperate with SELLER in the defense of such litigation and SELLER shall have the exclusive right to compromise or settle any claim arising out of such litigation.

7.  Terms and conditions of this agreement are confidential. BUYER will contact SELLER first before initiating any press releases or other publicity regarding any content of this contract.  Specific information regarding the content of this agreement or its attachments will be held in confidence by the BUYER's employees who have direct responsibility for the decision to implement this contract and those who are responsible for abiding by the terms and conditions.

## TERMINATION

8.  SELLER reserves the unilateral right to cancel this agreement upon 30 days' written notice in the event of a breach by BUYER or any of the terms and conditions hereof, provided that such breach shall not have been remedied within such 30-day period.

**HIGHLY CONFIDENTIAL**                    **MDL-OBI00054910**

## AUDIT

9.   Seller shall have the right upon reasonable notice during
     regular business hours to audit the books and records of
     BUYER and its Participating Members to determine whether
     BUYER is in compliance with BUYER's obligations hereunder.

ORTHO BIOTECH INC.                         CareMark

By _Bradly K. Kazar_                       By _T.W. Joseph_
   Bradley K. Kozar                           Tim Joseph
   Director, Institutional
   and Managed Healthcare

**HIGHLY CONFIDENTIAL**

## SPECIFIC CONDITIONS AND PRICING

1.  All prices in this attachment on products manufactured or
    distributed by SELLER will be protected for the life of the
    contract.

2.  ORTHO BIOTECH INC. provides a Cost Sharing Program (CSP) the
    details of which are outlined in the enclosed brochure.

3.  ORTHO BIOTECH INC. provides a Reimbursement Support Program
    called PROCRITLine*, the details of which are outlined in
    the enclosed brochure.

4.  ORTHO BIOTECH INC., through Roche Biomedical Laboratories,
    will pay for an EPO levels test which is a clinigen EIA
    assay.  This includes all shipping charges, as well as the
    expense of the assay.

5.  Contract Pricing is available through PRIME VENDORS only.

6.  ORTHO BIOTECH INC. agrees to pay CareMark a Performance
    Allowance of 2% of net purchases of products under this
    agreement, paid quarterly, and adjusted annually.

7.  ORTHO BIOTECH INC. will extend to CareMark the Early
    Purchase Program.  Through this program, you will receive a
    **total 10%** discount on all purchases of PROCRIT for a 45 day
    period, commencing with your first order.  Submit your
    invoices to ORTHO BIOTECH INC and you will receive a rebate
    check for the additional 3%, for a **total 10%**.

**HIGHLY CONFIDENTIAL**                    **MDL-OBI00054912**

**CAREMARK**
**455 KNIGHTSBRIDGE PARKWAY**
**LINCOLNSHIRE, ILLINOIS   60069**

### YEAR 1 (7%)

| PRODUCT | NDC # | Price/Pkg | Price/Case |
|---|---|---|---|
| PROCRIT (Epoetin alfa) 2,000 u/ml | 0062-7402-01 | 111.60 | 446.40 |
| PROCRIT (Epoetin alfa) 3,000 u/ml | 0062-7405-01 | 167.40 | 669.60 |
| PROCRIT (Epoetin alfa) 4,000 u/ml | 0062-7400-03 | 223.20 | 892.80 |
| PROCRIT (Epoetin alfa)10,000 u/ml | 0062-7401-03 | 530.10 | 2,120.40 |

### YEAR 2 (7.5%)

| PRODUCT | NDC # | Price/Pkg | Price/Case |
|---|---|---|---|
| PROCRIT (Epoetin alfa) 2,000 u/ml | 0062-7402-01 | 111.00 | 444.00 |
| PROCRIT (Epoetin alfa) 3,000 u/ml | 0062-7405-01 | 166.50 | 666.00 |
| PROCRIT (Epoetin alfa) 4,000 u/ml | 0062-7400-03 | 222.00 | 888.00 |
| PROCRIT (Epoetin alfa)10,000 u/ml | 0062-7401-03 | 527.25 | 2,109.00 |

### YEAR 3 (8%)

| PRODUCT | NDC # | Price/Pkg | Price/Case |
|---|---|---|---|
| PROCRIT (Epoetin alfa) 2,000 u/ml | 0062-7402-01 | 110.40 | 441.60 |
| PROCRIT (Epoetin alfa) 3,000 u/ml | 0062-7405-01 | 165.60 | 662.40 |
| PROCRIT (Epoetin alfa) 4,000 u/ml | 0062-7400-03 | 220.80 | 883.20 |
| PROCRIT (Epoetin alfa)10,000 u/ml | 0062-7401-03 | 524.40 | 2,097.60 |

. Cost Sharing Program (Attached)
. EPO Levels Test through Roche Biomedical Laboratories

**HIGHLY CONFIDENTIAL**

# EXHIBIT 16

## PHARMACEUTICAL SALES AGREEMENT
### January 7, 1993

AGREEMENT made this _12_ day of _APRIL_ , 19_93_ by and between Stadtlanders, residing at 600 Penn Center Boulevard, City of Pittsburgh, State of Pennsylvania, hereinafter called the BUYER; and Ortho Biotech Inc., residing at Route 202, P.O. Box 700, Raritan, New Jersey 08869-0670, hereinafter called the SELLER.

WITNESSETH that in consideration of the mutual covenants and agreements herein contained, the parties do hereby agree as follows:

### GENERAL TERMS AND CONDITIONS

1.  The term of the agreement shall begin on the date set out above and shall continue through January 31, 1998.  It covers the purchase by BUYER or its members of PROCRIT brand Epoetin alfa.

2.  SELLER specific PROCRIT® pricing and conditions are listed on an attachment.    _BKK_

3.  Each member of BUYER ~~that wishes to~~ _MAY_ take advantage of the PROCRIT product pricing set forth in the attachment _by purchasing_ (a "Participating Member") ~~must purchase all of~~ "its _BKK_ requirements of recombinant human erythropoietin ("r-HuEPO") (or equivalent) as PROCRIT brand Epoetin alfa, and may not substitute, dispense or administer equivalents for such product except for any such r-HuEPO required for patients on dialysis.    _BKK_

4.  BUYER represents that SELLER products are dispensed through Stadtlanders ~~closed system~~ mail service operation and not for resale or competition with private sector pharmacies. If SELLER shall reasonably determine that BUYER is using the products for any other purpose, it shall have the right to immediately terminate this agreement with respect to such BUYER and to refuse to pay any further rebates under this agreement from or on behalf of such BUYER.

5.  All orders for PROCRIT brand Epoetin alfa by BUYER shall be subject to availability of the product from SELLER.  If the product is unavailable from SELLER in quantities necessary to meet BUYER's reasonable requirements, BUYER may purchase a substitute product from another vendor, but only so long as SELLER is able to supply neither the product nor a substantially equivalent product.

APR 1 4 1993

**HIGHLY CONFIDENTIAL**                     **MDL-OBI00055078**

Stadtlanders
Pittsburgh, PA
January 7, 1993
Page 2

6.  SELLER agrees to indemnify, defend and hold harmless the
    BUYER from and against any liabilities, cost, expenses or
    damages for personal injury to third party allegedly caused
    by use of SELLER's product and not due to the negligence or
    willful misconduct of BUYER, its members, their agents or
    employees, or any third party, provided that the SELLER
    shall control and direct any litigation for which
    indemnification is sought hereunder including but not
    limited to the selection of counsel and further provided
    that BUYER shall cooperate with SELLER in the defense of
    such litigation and SELLER shall have the exclusive right to
    compromise or settle any claim arising out of such
    litigation.

7.  Terms and conditions of this agreement are confidential.
    BUYER will contact SELLER first before initiating any press
    releases or other publicity regarding any content of this
    contract.  Specific information regarding the content of
    this agreement or its attachments will be held in confidence
    by the BUYER's employees who have direct responsibility for
    the decision to implement this contract and those who are
    responsible for abiding by the terms and conditions.


**TERMINATION**

8.  SELLER reserves the unilateral right to cancel this
    agreement upon 30 days' written notice in the event of a
    breach by BUYER on any of the terms and conditions hereof,
    provided that such breach shall not have been remedied
    within such 30-day period.

**HIGHLY CONFIDENTIAL**

Stadtlanders
Pittsburgh, PA
January 7, 1993
Page 3

**AUDIT**

9.  Seller shall have the right upon reasonable notice during
    regular business hours to audit the books and records of
    BUYER and its Participating Members to determine whether
    BUYER is in compliance with BUYER's obligations hereunder.

Ortho Biotech Inc.                          Stadtlanders

*Bradle F. Kozar*                           *Haver for Stadtlanders*
Bradley K. Kozar                            Joseph Haver, R.Ph., M.S.
Director, Institutional
and Managed Healthcare                      *4-12-93*
                                            Date

**HIGHLY CONFIDENTIAL**                     **MDL-OBI00055080**

### SPECIFIC CONDITIONS AND PRICING

Stadtlanders
Pittsburgh, PA  15238
January 7, 1993

1.  All prices in this attachment on products manufactured or
    distributed by SELLER will be protected for the life of the
    contract.

2.  A Cost Sharing Program (CSP) and Financial Assistance
    Program (FAP) is provided (details attached).

3.  Ortho Biotech Inc. agrees to pay a 2% Performance Allowance
    on all purchases of PROCRIT®, on a quarterly basis.

4.  A 4% rebate will be paid to Stadtlanders by Ortho Biotech
    Inc. annually.

5.  Ortho Biotech Inc. is extending additional annual rebates as
    follows:

    •   On purchases of $500,000 - Total 2% Rebate
    •   On purchases of $1,000,000 - Total 3% Rebate

**HIGHLY CONFIDENTIAL**

**MDL-OBI00055081**

**STADTLANDERS**
**600 PENN CENTER BOULEVARD**
**PITTSBURGH, PA**

### (4%)  REBATE

| PRODUCT | NDC # | Price/Pkg | Price/Case |
|---------|-------|-----------|------------|
| PROCRIT (Epoetin alfa) 2,000 u/ml | 0062-7402-01 | 4.80 | 19.20 |
| PROCRIT (Epoetin alfa) 3,000 u/ml | 0062-7405-01 | 7.20 | 28.80 |
| PROCRIT (Epoetin alfa) 4,000 u/ml | 0062-7400-03 | 9.60 | 38.40 |
| PROCRIT (Epoetin alfa)10,000 u/ml | 0062-7401-03 | 22.80 | 91.20 |

Subject to terms and conditions as stated in Pharmaceutical Sales Agreement
dated January 7, 1993.

**HIGHLY CONFIDENTIAL**                              **MDL-OBI00055082**

# EXHIBIT 17

# AstraZeneca Pharmaceuticals

## AGREEMENT

### UROLOGY PRACTICE

This Agreement is made by and between _____ ("Urology Practice"), a group located in the State of _____, having a place of business at _____ and AstraZeneca Pharmaceuticals LP ("AstraZeneca"), a Delaware corporation, having a place of business at 1800 Concord Pike, Wilmington, Delaware 19850.

**WHEREAS,** Urology Practice is an organized group of physicians ("Participating Physicians"); and

**WHEREAS,** AstraZeneca is a manufacturer and distributor of pharmaceutical products; and

**WHEREAS,** Participating Physicians may lawfully dispense prescription drugs which may include AstraZeneca Products to their patients; and

**WHEREAS,** AstraZeneca desires that certain AstraZeneca Products, as described in Exhibit B ("Products") be designated by Urology Practice as preferred products for use by its Participating Physicians, and Urology Practice desires to contract for the purchase of Products for use by its Participating Physicians.

NOW THEREFORE, Urology Practice and AstraZeneca, in consideration of their respective promises to each other, understand and agree as follows:

1. **Term; Participating Physicians.** This Agreement shall commence on the first day of the month following the date it is accepted by AstraZeneca (the "Commencement Date") and remain in effect for a period of three (3) years ("Initial Term"). The Initial Term shall be divided into three consecutive twelve-month contract years (each a "Contract Year"). Urology Practice's Participating Physicians that are authorized to purchase Products under this Agreement are listed in Exhibit A attached hereto. During the term of this Agreement, Urology Practice may, with AstraZeneca's consent, add or delete Participating Physicians to or from Exhibit A by giving AstraZeneca prior written notice. If AstraZeneca does not consent to the addition or deletion, it shall notify Urology Practice within thirty (30) days after receipt of such notice; if AstraZeneca does not respond within such time period, then the Participating Physicians(s) will be deemed added or deleted. It is understood and agreed that in entering into and carrying out this Agreement, Urology Practice is acting as an agent for and on behalf of the Participating Physicians. Urology Practice shall inform all Participating Physicians of the terms of this Agreement.

2. **Preferred Product.** Products included in this Agreement and their National Drug Code ("NDC") numbers are listed in Exhibit B. During the term of this Agreement AstraZeneca may add pharmaceutical products to this list only with prior written consent of Urology Practice. Products may be deleted from the list upon thirty (30) days written notice to Urology Practice. Urology Practice agrees that all Products listed in Exhibit B shall be designated as "Preferred" within thirty (30) days of the date of this Agreement, and shall remain Preferred products for the term of this Agreement. Furthermore, Products shall be

HIGHLY CONFIDENTIAL

prescribed unless deemed inappropriate by Participating Physicians. Urology Practice certifies that it has, or will implement within sixty (60) days after the date of this Agreement, a program to advise physicians of its preference that Products are to be prescribed to Participating Physician's patients.

3. **Own Use.** Urology Practice represents, to the best of its knowledge, that all purchases of Products requested under this Agreement will be for the use of the patients of Participating Physicians only. It is expressly prohibited to resell, redistribute or group other practices' or physicians' orders hereunder.

4. **Price; Price Protection**

Contract price shall commence no later than forty-eight (48) hours following the date this Agreement is accepted by AstraZeneca. The price per unit of Products hereunder shall be based on the number of units of Products expected to be purchased by Urology Practice on an annual basis ("Annual Purchase Objective"). Initially, the Annual Purchase Objective will be as set forth in Exhibit C. The Annual Purchase Objective may be changed by AstraZeneca as provided in this Section 4. For all purchases of Products, Urology Practice shall be entitled to the percentage discount off the prevailing Average Wholesale Cost ("AWC") of the Product(s) on the first day of each Contract Year as set forth in Exhibit D and corresponding to the applicable Annual Purchase Objective. The formula for converting depots into monthly equivalents is set forth in Exhibit C. AstraZeneca will review the volume of Products purchased by Urology Practice on a quarterly basis to determine whether volume purchased on a pro rata basis is consistent with the Annual Purchase Objective. If AstraZeneca in its sole discretion determines that Urology Practice is unlikely to meet, or is likely to exceed its Annual Purchase Objective, AstraZeneca reserves the right to set a new Annual Purchase Objective for Urology Practice to correspond with Urology Practice's ongoing purchasing pattern. The price for Product(s) shall then be adjusted, if applicable, for the succeeding quarter as set forth in Exhibit D. Urology Practice agrees that it or its Participating Physicians, as appropriate, shall reimburse AstraZeneca for all taxes or other charges, except income and franchise taxes imposed on AstraZeneca's income, which AstraZeneca may be required to pay to any government, whether national, state or local, upon the sale or transportation of Products sold hereunder now in effect or which may be imposed subsequent to the effective date of this Agreement.

For each individual Contract Year during the Initial Term of this Agreement, the price for Products for such Contract Year shall be set on the first day of each such Contract Year. Except as provided in the next sentence, the price for the duration of a Contract Year shall be the AWC in effect on the first day of such Contract Year, less the discount corresponding to the Annual Purchase Objective. The price for Products will not be affected by changes to AWC during that Contract Year, but shall be adjusted to account for any change in discount percentage as a result of a change in the Annual Purchase Objective during such Contract Year as provided in this section.

5. **Purchase/Billing.** All purchases of Products by Urology Practice pursuant to this Agreement shall be made through and directed to AstraZeneca's duly authorized agent, which currently is:

**Specialty Distribution Services ("SDS")**

2

AZ0431263

1-800-400-4140

Orders for Products may be placed either by Urology Practice or by the individual Participating Physicians. If placed by Urology Practice, Urology Practice must designate the number and type of units to be delivered to each Participating Physician.

After credit approval by AstraZeneca, Urology Practice shall have the following options for invoicing, one of which must be elected upon contract execution:

☐ AstraZeneca shall invoice the individual Participating Physicians for the units ordered by or for such Participating Physicians as reported to SDS. Each such Participating Physician will be responsible for payment of the invoice in full pursuant to the provisions set forth on such invoices.

☐ AstraZeneca shall invoice the Urology Practice for the units ordered by, or for Participating Physicians as reported to SDS. Urology Practice will be responsible for payment of the invoice in full pursuant to the provisions set forth on such invoices.

This election may be changed by Urology Practice (to be effective no sooner than sixty (60) days after requesting a change) if requested in writing and approved by AstraZeneca in its sole discretion. Regardless of the billing option selected above, AstraZeneca reserves the right to review the credit standing of both Urology Practice and Participating Physicians and implement credit policies and practices (including designating or changing the party or parties to be invoiced) as deemed appropriate in its sole discretion.

6. **Confidentiality.** Urology Practice and Participating Physicians shall keep confidential all of the terms and conditions of this Agreement, and the existence of this Agreement, throughout the duration hereof and for a period of three (3) years following the effective date of expiration or termination.

7. **Records.** Urology Practice and Participating Physicians shall at all times keep and maintain accurate books, records and files relating to the purchase/dispensing of Products and billing and records relating to Products (collectively, the "Records"). During the term of this Agreement and for a period of two (2) years following expiration or termination of this Agreement, upon receipt of written notice from AstraZeneca, Urology Practice and Participating Physicians shall retain and shall make all such Records available for inspection by AstraZeneca or its designated auditors during regular business hours upon twenty (20) days prior written notice in order to confirm Urology Practice's compliance with this Agreement.

8. **Termination.** In the event that a party materially breaches this Agreement, the other party may terminate this Agreement on thirty (30) days prior written notice. No termination under this Paragraph 8 shall affect the rights and obligations of the parties accruing prior to the effective date of such termination. Either party may terminate this Agreement at any time without cause upon sixty (60) days written notice to the other party. AstraZeneca may terminate this Agreement immediately if any change or law or regulation, or interpretation of existing law or regulation would (i) make this Agreement or Discount or a material portion of a party's performance under this Agreement illegal, (ii) prohibit or eliminate, or require a

3

HIGHLY CONFIDENTIAL

AZ0431264

material change of any Discount offered hereunder, or (iii) require that any material terms of this Agreement be extended to any nonparty.

9. **Notice.** Any notice required or permitted to be given by either party to the other shall be given in writing and shall be delivered either in person or sent by first class mail, postage prepaid, addressed to the other party as follows:

| | |
|---|---|
| If to Urology Practice: | Urology Practice name goes here |
| | Street |
| | City, State, Zip |
| | |
| If to AstraZeneca | AstraZeneca Pharmaceuticals LP |
| | 1800 Concord Pike |
| | PO Box 15437 |
| | Wilmington, DE 19850-5437 |
| | Attention: Contract Operations |

10. **Force Majeure.** Noncompliance with obligations under this Agreement due to force majeure, such as acts of God, acts of governmental authority, war, civil commotion, destruction of production facilities and materials, fire, earthquake or storm, labor disturbances, shortages of materials, failure of public utilities or common carriers, and any other causes, circumstances or contingencies beyond the reasonable control of the parties, shall not constitute a breach of this Agreement.

11. **Assignment.** Urology Practice shall not have the right to assign this Agreement to a third party without the prior written consent of AstraZeneca, which consent shall not be unreasonably withheld. Any permitted assignee shall assume all obligations of its assignor under this Agreement. No assignment shall relieve Urology Practice or Participating Physicians of responsibility for the performance of any obligations, which have already accrued. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assigns.

12. **Compliance with Federal and State Statutes.**

(a) It is the sole responsibility of Urology Practice and/or Participating Physician to accurately report any discounts under this Agreement to federal, state and private reimbursers (including Medicare and Medicaid) if and as required by applicable law.

(b) Urology Practice agrees, warrants and certifies that in performance of this Agreement it will fully comply with the provisions of the Social Security Act, Section 1128(b) (42 U.S.C. §1320a-7b(b)) which, inter alia, prohibit the knowing or willful solicitation or receipt of any remuneration, including rebates, directly or indirectly, in return for purchasing or recommending purchasing any goods, services, or items for which payment may be made in whole or in part under a federal or state public health care program, and which include the full, accurate and timely reporting, where applicable, of any reimbursement made pursuant to a federal or state health care program.

4

HIGHLY CONFIDENTIAL

(c) AstraZeneca hereby represents and warrants that, to the best of its knowledge, the terms of this Agreement do not violate any applicable federal or state anti-kickback laws.

(d) The discount amounts set forth in this Agreement are subject to change by AstraZeneca in the event they would render AstraZeneca liable for rebate payments higher than the then-established floor under the Omnibus Budget Reconciliation Act of 1990, as amended from time to time.

13. Miscellaneous.

(a) This Agreement will be governed in all respects, including validity, interpretation, construction and performance, in accordance with the laws of the State of Delaware without regard to its choice of laws provisions.

(b) This Agreement constitutes the entire contract between Urology Practice and AstraZeneca with respect to the subject matter hereof, and the terms and conditions set forth herein may only be modified or amended in a subsequent writing signed by both parties. In the event AstraZeneca and Urology Group or any of the Participating Physicians shall have in effect on the Commencement Date, an agreement with respect to the purchase of Products, such agreement shall be terminated as of the Commencement Date of this Agreement.

(c) No waiver by either Urology Practice or AstraZeneca with respect to any breach or default or of any right or remedy and no course of dealing shall be deemed to constitute a continuing waiver of any other breach or default or of any other right or remedy, unless such waiver be expressed in writing signed by the party to be bound.

(d) The parties to this Agreement are independent contractors, and nothing herein shall be construed to the contrary. Neither party shall assume or create any obligations or responsibilities express or implied, on behalf of the other party, or bind the other party in any manner or thing whatsoever.

5

HIGHLY CONFIDENTIAL

AZ0431266

(e)   This Agreement may not be amended, altered or modified in any manner except in a writing signed by both parties hereto.

This Agreement is executed in duplicate by the respective parties as of the date first above written.

**AstraZeneca Pharmaceuticals LP**                    **Urology Practice**


By: _____                    By: _____

Print Name:  Michael P. Diggin                    Print Name: _____

Title:  Director, Contract Operations                    Title: _____


Date: _____                    Date: _____



To be completed by AstraZeneca -
Contract Price Effective Date: _____

Zoladex Buy Group Annual Contract

6

HIGHLY CONFIDENTIAL                                        AZ0431267

# EXHIBIT A

## Participating Physicians
(to be completed by Urology Practice)

*Ship to*                                                    *Bill to*

Dr.'s Name:
Practice Name:
Address:
City, State, Zip:
DEA#/Exp. date:
ME#/Exp. date:

Dr.'s Name:
Practice Name:
Address:
City, State, Zip:
DEA#/Exp. date:
ME#/Exp. date:

Dr.'s Name:
Practice Name:
Address:
City, State, Zip:
DEA#/Exp. date:
ME#/Exp. date:

Dr.'s Name:
Practice Name:
Address:
City, Sate, Zip:
DEA#/Exp. date:
ME#/Exp. date:

Dr.'s Name:
Practice Name:
Address:
City, State, Zip:
DEA#/Exp. date:
ME#/Exp. date:

7

HIGHLY CONFIDENTIAL

AZ0431268

# EXHIBIT B

| **PRODUCT** | **DOSAGE STRENGTH** | **NDC#** |
|---|---|---|
| ZOLADEX® (goserelin acetate implant) | 3.6 mg depot | 0310-0960-36 |
| ZOLADEX® (goserelin acetate implant) | 10.8 mg depot | 0310-0961-30 |

8

HIGHLY CONFIDENTIAL

AZ0431269

# EXHIBIT C

The Annual Purchase Objective is: _____ Monthly Equivalents.

Monthly Equivalents:

One 3.6 mg depot equals one monthly equivalent.

One 10.8 mg depot equals three monthly equivalents.

9

HIGHLY CONFIDENTIAL

AZ0431270

# EXHIBIT D

| Annual Purchase Objective In Monthly Equivalents | Discount Off Current AWC | |
|---|---|---|
| | 3 Month Depot | 1 Month Depot |
| 1,200 – 1,999 | 33% | 32% |
| 2,000 – 2,399 | 35% | 34% |
| 2,400 – 3,199 | 38% | 37% |
| 3,200 – 3,599 | 40% | 39% |
| 3,600 – 4,399 | 42% | 41% |
| 4,400 – 4,799 | 45% | 44% |
| 4,800 – 5,999 | 47% | 46% |
| 6,000 + | 50% | 49% |

Monthly Equivalents:

One 3.6 mg depot equals one monthly equivalent.

One 10.8 mg depot equals three monthly equivalents.

10

HIGHLY CONFIDENTIAL

AZ0431271

# EXHIBIT 18



**Warrick**
Pharmaceuticals

7500 North Natchez Avenue, Niles, Illinois 60714-3804 • Telephone 1 800 547-3869

February 2, 1995

Fallon Clinic Pharmacy
630 Plantation Street
Worcester, MA    01605

ATTN:    Burt Orland
         Director of Pharmacy

Per your request, Warrick Pharmaceuticals offers the following
product(s)/price(s) effective March 1, 1995 through December 31, 1995
to:

                    Fallon Clinic Pharmacy
                    630 Plantation Street
                    Worcester, MA    01605

                    (hereafter "customer")

under the terms and conditions herein and in the attachments listed
below as such may be changed from time to time on thirty (30) days
notice:

         RETURNED GOODS POLICY    #21
         PRIME VENDOR PROGRAM     #25
         CONFIDENTIALITY          #35
         AUDIT                    #36
         FORCE MAJEURE            #37

## PRODUCTS

| | | |
|---|---|---|
| ALBUTEROL SULFATE SOL, 25x3ML U/D | 59930-1500-8 | $11.50 |
| ALBUTEROL SULFATE SOL, 20ML | 59930-1515-4 | 6.95 |
| ALBUTEROL SYRUP | 59930-1510-5 | 7.95 |
| CLOTRIMAZOLE CREAM, 15GM | 59930-1570-1 | 4.75 |
| CLOTRIMAZOLE CREAM, 30GM | 59930-1570-2 | 8.50 |
| CLOTRIMAZOLE CREAM, 45GM | 59930-1570-3 | 10.30 |

Warrick reserves the right to increase the contract price of offered
products by no more than five percent (5%) per calendar year.

Payment terms are:  2% 30 days from date of invoice:  net 45 days from
date of invoice.  Min. order $500.00, Federal Employer #22-3220986.

If this offer is acceptable, please indicate your approval by signing
below and returning both originals to this office.  Upon receipt a
signed copy will be returned for your records.  **THIS OFFER WILL REMAIN
IN EFFECT FOR SIXTY (60) DAYS FROM THIS DATE.  WRITTEN ACCEPTANCE MUST
BE RECEIVED BY WARRICK BEFORE EXPIRATION OF THE OFFER.**  This Agreement

SP 0001454
CONFIDENTIAL
ATTORNEYS' EYES ONLY

FALLON CLINIC
7/1/96 THROUGH 6/30/98
WARRICK OFFER
ADDENDUM

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE |
|---|---|---|---|---|
| albuterol sulfate | | | | |
| USP Inhalation Sol 0.083% | 1500-8 | 25 x 3ml | $0.30 | AN |
| USP Solution for Inhalation | 1515-4 | 20ML | 0.30 | AN |
| USP Syrup, 2 MG/5ML | 1510-5 | 16oz | 0.25 | AA |



SP 0001455
CONFIDENTIAL
ATTORNEYS' EYES ONLY



**Warrick**
Pharmaceuticals

7500 North Natchez Avenue, Niles, Illinois 60714-3804 • Telephone 1 800 547-3869

ATTACHMENT #21

RETURN GOODS POLICY

**All wholesaler returns must have the prior approval from Customer Services and be forwarded *prepaid* to 1011 Morris Avenue, Union, New Jersey 07083.**
**All retail account returns for credit over $1,500 must have the prior approval of an authorized representative and be forwarded prepaid to 1011 Morris Avenue, Union, New Jersey 07083.** Returns under $1,500 can be approved by calling Customer Service,
1-800-547-3869 All returns to receive credit must be accompanied with a completed Return Goods Authorization form which will be supplied by Warrick. Warrick reserves the right to return any product that is received without a Return Goods Authorization form completed.

a.      Credit will be allowed on unopened and undamaged packages at current net prices as of date of return (except merchandise sold on a special promotion offer, in which case the invoice price will apply) as follows:

      1)      Prescription product returns made within 3 months after a price increase will be credited at the price prior to the price increase.

      2)      Dated products-full credit up to one year after expiration. No credit for products returned older than one year past expiration.

      3)      Retail accounts can make returns directly to Warrick. The name and address of the Wholesaler that the return is to be credited through must be indicated on the Return Goods Authorization form. All conditions stated above apply to retail accounts.

      4)      **Warrick reserves the right to return or destroy products which are not returned in compliance with this policy without giving credit.**

b.      The above adjustments will appear on Warrick's credit memoranda as follows:

      1)      Items given full credit will show as individual line extensions.

      2)      Items currently in the for which only partial credit has been allowed will be shown as separate line extensions.

      3)      Discontinued items receiving partial credit will be included under "Miscellaneous Product."

c.      Manufacturers are expressly forbidden (under the Federal Food, Drug, and Cosmetic Act) from returning expired dated items to customers. Such items returned to Warrick will be destroyed. Warrick also reserves the right to destroy without credit, packages that are unfit or unsafe for sale or do not comply with applicable law.

SP 0001456
CONFIDENTIAL
ATTORNEYS' EYES ONLY

d.  Consideration will be given to adjustments for losses suffered in a natural disaster (flood, hurricane, tornado, etc.) not covered by insurance.  Your Warrick Representative will be glad to assist you in such emergencies.

e.  Our Representatives are not permitted to modify any of the above policies.

This returned goods policy does not apply to goods returned by persons other than the original retailer, wholesaler or hospital purchaser of the goods, or to goods which have been repacked or are in other than original Warrick containers.



SP 0001457
CONFIDENTIAL
ATTORNEYS' EYES ONLY

WAR0043144
Highly Confidential

ATTACHMENT #25



**Warrick**
Pharmaceuticals

7500 North Natchez Avenue, Niles, Illinois 60714-3804 • Telephone 1 800 547-3869

PRIME VENDOR PROGRAM

Warrick Pharmaceuticals agrees to make bid prices available
through designated wholesaler(s). In designating a wholesaler as
prime vendor, the customer agrees to honor the terms and
conditions herein. These are as follows.

- Warrick requires written notification from the account naming
  the wholesaler(s) designated as prime vendor(s).
- A listing of participating hospitals including complete
  address and DEA number must be provided.
- No institution can be added to a group purchase contract
  without Warrick's approval. Warrick reserves the right to
  reject or accept new group members and remove current members
  at Warrick's sole discretion. Thirty days after notification
  of approval by Warrick, new members are eligible for
  chargeback purchases.
- Any wholesaler "Service Fee" is determined between the
  participating Wholesaler and the Customer and/or Buying
  Group. Any Wholesaler's Service Fee is in addition to the
  contract prices of Warrick Corporation. Warrick
  Pharmaceuticals will not participate in the negotiations of
  any such Service Fee between the wholesaler and the customer.
  Any charges for shipping cost will be the responsibility of
  the Wholesaler and the Customer.
- Return of bid price merchandise from the institution must be
  made directly by the institution to Schering. Credit will be
  issued through the wholesaler via a credit memorandum.
  Wholesaler shall notify Warrick immediately of any bid price
  merchandise that is returned to the wholesaler, for whatever
  reason, by an institution. Wholesalers shall not distribute
  or sell bid price merchandise returned by an institution
  without Warrick's written consent.
- Account understands and agrees that any product purchased,
  either direct from Warrick or through a prime vendor, at
  contract bid prices shall be for the Institution's "own use"
  as defined by the United States Supreme Court in Portland
  Retail Druggists' Association, Inc. v Abbott Laboratories et
  al (425 U.S. 1 (1976)).

'Notification of designated wholesaler(s) should be mailed to:

    Warrick Pharmaceutical
    Attn: Cassandra Bragg, C/B Dept.
    P.O. Box 3193
    Union, NJ  07083-1993

    Phone: 908-820-4806   Fax: 908-820-4848

SP 0001458
CONFIDENTIAL
ATTORNEYS' EYES ONLY

WAR-25



**Warrick**
Pharmaceuticals

7500 North Natchez Avenue, Niles, Illinois 60714-3804 • Telephone 1 800 547-3869

ATTACHMENT #35

CONFIDENTIALITY

Customer shall maintain the confidentiality of all pricing, marketing or other
Warrick product information, including this agreement it's terms and conditions
throughout the duration hereof and for a period of three (3) years following the
effective date of expiration or termination.

WAR-35

6P 0001459
CONFIDENTIAL
ATTORNEYS' EYES ONLY


**Warrick**
Pharmaceuticals

7500 North Natchez Avenue, Niles, Illinois 60714-3804 • Telephone 1 800 547-3869

ATTACHMENT #36

AUDIT

Customer shall, at all times, keep and maintain accurate books, records and
files with respect to any information relative to the dispensing, administration
or sale of Warrick's products. Upon customer's receipt of written request from
Warrick customer shall make such information available, through pharmacies or
otherwise, in a manner mutually satisfactory to Warrick and customer, for
inspection by Warrick's representatives or its designated auditors during
regular business hours.

SP 0001460
CONFIDENTIAL
ATTORNEYS' EYES ONLY

WAR-36



**Warrick**
Pharmaceuticals

7500 North Natchez Avenue, Niles, Illinois 60714-3804 • Telephone 1 800 547-3869

ATTACHMENT #37

FORCE MAJEURE

Noncompliance with the obligations of this Agreement due to <u>force majeure</u>, laws
or regulations of any government, war, civil commotion, destruction of
production facilities and materials, fire, earthquake or storm, labor
disturbances, shortage of materials, failure of public utilities or common
carriers, and any other causes beyond the reasonable control of the parties,
shall not constitute breach of contract.

SP 0001461
CONFIDENTIAL
ATTORNEYS' EYES ONLY

WAR-37

WAR0043148
Highly Confidential

# EXHIBIT 19

 Schering-Plough

*MAY 1 9 1998*

Memo

| | | | |
|---|---|---|---|
| To: | R. Kapur | Date: | May 15, 1998 |
| From: | B. Michael Kennedy | Copies: | J. Bencic |
| Subject: | Rite-Aid Chargeback Program | | H. Weintraub |
| | | | P. Malcolm |
| Reference: | | | |

As we briefly discussed, Warrick has maintained a chargeback program for Rite-Aid since 1995, but for which there is no contract. The program permits Rite-Aid to pay the wholesale price to wholesalers and then submit a chargeback to Warrick for the difference between the price paid to the wholesaler and the contract price for which Rite-Aid is entitled. Ordinarily, it is the wholesaler who submits the chargeback to Warrick, but Rite-Aid does not want the wholesalers to know its prices. Consequently, they submit the chargeback.

Because this is an exception to Warrick's Chargeback Program Terms and Conditions, and because there is no contract, my staff has no authorization to pay the chargebacks to Rite-Aid. Consequently, I must ask that you sign below, indicating your approval of this arrangement and thereby authorizing us to continue processing these chargebacks from Rite-Aid.

Thank you for your support.

Approved _____
R. Kapur

CONFIDENTIAL
WP00007148A

WAR0029661
Highly Confidential

# EXHIBIT 20

# RITE-AID CORPORATION

Note: Rite-Aid wishes to keep its pricing a secret and therefore, buys from the wholesaler at the wholesaler's price and then charges back Warrick for the difference in the Rite-Aid contract for the product.

| Product | Period | Wholesaler | Wholesaler's Price | Rite-Aid's Price | Difference | Units | Credit |
|---|---|---|---|---|---|---|---|
| Albuterol 20 mL | 7/20/97 - 7/26/97 | Amerisource | 7.42 | 4.01 | 3.41 | 153 | 521.73 |
| Albuterol 25 x 3 mL | 7/20/97 - 7/26/97 | Amerisource | 10.00 | 6.00 | 4.00 | 650 | 2,600.00 |
| Albuterol Inhaler 17g | 7/20/97 - 7/26/97 | Amerisource | 5.31 | 3.83 | 1.48 | 476 | 704.48 |
| Albuterol Refill | 7/20/97 - 7/26/97 | Amerisource | 5.00 | 3.50 | 1.50 | 49 | 73.50 |
| Clotrimazole 15gm | 7/20/97 - 7/26/97 | Amerisource | 3.75 | 1.80 | 1.95 | 16 | 31.20 |
| Clotrimazole 30gm | 7/20/97 - 7/26/97 | Amerisource | 6.43 | 3.15 | 3.28 | 29 | 95.12 |
| Clotrimazole 45gm | 7/20/97 - 7/26/97 | Amerisource | 7.00 | 3.75 | 3.25 | 9 | 29.25 |
| Perphenazine 2mg | 7/20/97 - 7/26/97 | Amerisource | 14.10 | 9.20 | 4.90 | 17 | 83.30 |
| Perphenazine 4mg | 7/20/97 - 7/26/97 | Amerisource | 19.75 | 12.62 | 7.13 | 7 | 49.91 |
| Perphenazine 8mg | 7/20/97 - 7/26/97 | Amerisource | 24.26 | 16.46 | 8.80 | 12 | 105.60 |
| Perphenazine 16mg | 7/20/97 - 7/26/97 | Amerisource | 33.25 | 20.75 | 12.50 | 6 | 75.00 |
| Griseofulvin 250mg | 7/20/97 - 7/26/97 | Amerisource | 40.62 | 25.28 | 15.34 | 41 | 628.94 |
| Griseofulvin 330mg | 7/20/97 - 7/26/97 | Amerisource | 37.22 | 33.10 | 4.12 | 19 | 78.28 |
| Glyburide 1.25mg | 7/20/97 - 7/26/97 | Amerisource | 5.68 | 2.35 | 3.33 | 5 | 16.65 |
| Glyburide 2.50mg | 7/20/97 - 7/26/97 | Amerisource | 8.12 | 3.11 | 5.01 | 10 | 50.10 |
| Glyburide 5mg/100 | 7/20/97 - 7/26/97 | Amerisource | 12.34 | 4.50 | 7.84 | 16 | 125.44 |
| Glyburide 5mg/500 | 7/20/97 - 7/26/97 | Amerisource | 55.55 | 22.00 | 33.55 | 9 | 301.95 |
| Glyburide 5mg/1000 | 7/20/97 - 7/26/97 | Amerisource | 96.29 | 30.40 | 65.89 | 4 | 263.56 |
| Theophylline 100mg/100 | 7/20/97 - 7/26/97 | Amerisource | 2.83 | 1.70 | 1.13 | 4 | 4.52 |
| Theophylline 200mg/1000 | 7/20/97 - 7/26/97 | Amerisource | 32.22 | 15.50 | 16.72 | 1 | 16.72 |
| Theophylline 300mg/1000 | 7/20/97 - 7/26/97 | Amerisource | 37.78 | 21.50 | 16.28 | 28 | 455.84 |
| Theophylline 450mg/100 | 7/20/97 - 7/26/97 | Amerisource | 11.80 | 10.62 | 1.18 | 9 | 10.62 |
| | | | | | | 1,570 | 6,321.77 |

CONFIDENTIAL
WPX0015210

WAR0015071
Highly Confidential

# RITE-AID CORPORATION

Note: Rite-Aid wishes to keep its pricing a secret and therefore, buys from the wholesaler at the wholesaler's price and then charges back Warrick for the difference in the Rite-Aid contract for the product.

| Product | Period | Wholesaler | Wholesaler's Price | Rite-Aid's Price | Difference | Units | Credit |
|---|---|---|---|---|---|---|---|
| Albuterol 20 mL | 5/04/97 - 5/10/97 | Amerisource | 7.42 | 4.01 | 3.41 | 299 | 1,019.59 |
| Albuterol 25 x 3 mL | 5/04/97 - 5/10/97 | Amerisource | 10.00 | 6.00 | 4.00 | 414 | 1,856.00 |
| Albuterol Inhaler 17g | 5/04/97 - 5/10/97 | Amerisource | 6.31 | 3.83 | 1.48 | 559 | 827.32 |
| Albuterol Refill | 5/04/97 - 5/10/97 | Amerisource | 5.00 | 3.50 | 1.50 | 56 | 84.00 |
| Clotrimazole 15gm | 5/04/97 - 5/10/97 | Amerisource | 3.75 | 1.80 | 1.95 | 13 | 25.35 |
| Clotrimazole 30gm | 5/04/97 - 5/10/97 | Amerisource | 6.43 | 3.15 | 3.28 | 12 | 39.36 |
| Clotrimazole 45gm | 5/04/97 - 5/10/97 | Amerisource | 7.00 | 3.75 | 3.25 | 9 | 29.25 |
| Perphenazine 2mg | 5/04/97 - 5/10/97 | Harvard | 15.79 | 9.20 | 6.59 | 8 | 52.72 |
| Perphenazine 4mg | 5/04/97 - 5/10/97 | Harvard | 21.89 | 12.62 | 9.27 | 10 | 92.70 |
| Perphenazine 8mg | 5/04/97 - 5/10/97 | Harvard | 25.56 | 15.45 | 10.11 | 4 | 40.44 |
| Perphenazine 16mg | 5/04/97 - 5/10/97 | Harvard | 33.25 | 20.75 | 12.50 | 3 | 37.50 |
| Griseofulvin 250mg | 5/04/97 - 5/10/97 | Amerisource | 40.62 | 20.00 | 20.62 | 37 | 762.94 |
| Griseofulvin 330mg | 5/04/97 - 5/10/97 | Amerisource | 37.22 | 29.48 | 7.74 | 11 | 85.14 |
| Theophylline 100mg/100 | 5/04/97 - 5/10/97 | Amerisource | 2.83 | 1.70 | 1.13 | 17 | 19.21 |
| Theophylline 300mg/*1000 | 5/04/97 - 5/10/97 | Amerisource | 37.78 | 21.50 | 16.28 | 27 | 439.56 |
| Theophylline 450mg/100 | 5/04/97 - 5/10/97 | Amerisource | 11.80 | 10.62 | 1.18 | 16 | 17.70 |
| | | | | | | 1,494 | 5,228.78 |

CONFIDENTIAL
WPX0015252

WAR0015114
Highly Confidential