# EXHIBIT 21

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

NO. 01CV12257-PBS

---

In re: PHARMACEUTICAL          )

INDUSTRY AVERAGE WHOLESALE     )

PRICE LITIGATION               )

_____)

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS                    )

_____)

DEPOSITION of CHRISTOF A. MARRE,

called as a witness by and on behalf of the

Plaintiffs, pursuant to the applicable provisions

of the Federal Rules of Civil Procedure, before P.

Jodi Ohnemus, Notary Public, Certified Shorthand

Reporter, Certified Realtime Reporter, and

Registered Merit Reporter, within and for the

Commonwealth of Massachusetts, at the offices of

Hagens, Berman, Sobol, Shapiro, LLP, One Main

Street, Cambridge, Massachusetts, on Friday, 26

August, 2005, commencing at 8:40 a.m.

Christof A. Marre       HIGHLY CONFIDENTIAL       August 26, 2005
Cambridge, MA

34

1  using contracts an advantage?
2      A.  Typically, hospitals and office-based
3  oncologists don't buy directly from a manufacturer.
4  They buy their products from a wholesaler or
5  distributor.  The fact that we have a sales force
6  that calls on oncologists, however, gives us direct
7  access to these customers.  And we were competing
8  with generic manufacturers who, for the most part,
9  had to rely on distributors and wholesalers,
10  because they didn't have a sales force or didn't
11  have a large sales force with the reach that we
12  did.  So, this was a competitive advantage for
13  Bristol-Myers Squibb that we wanted to leverage.
14      Q.  So, is the advantage then in having a
15  direct relationship through the contract, even
16  though the drugs are still purchased by the
17  customer through a wholesaler?
18      A.  That's correct.
19      Q.  Is that accurate?
20      A.  So, they continue to buy the drug from the
21  wholesaler, but the wholesaler will respect and
22  apply whatever price we've negotiated directly with

35

1  the customer.
2      Q.  Was it your goal to have BMS sign
3  contracts with most of the large hospitals in the
4  country?
5      A.  Yes.
6      Q.  And were you successful in that goal?
7      A.  I believe we were successful.  I can't say
8  exactly how many contracts we signed, but it must
9  have been in the 50s.
10      Q.  Percentile?
11      A.  No, 50 contracts with 50 institutions.
12      Q.  And do you have any sort of an
13  appreciation for what percentage of the market for
14  hospital oncology drugs those 50 or so institutions
15  represented?
16      A.  I don't recall the exact percentage for
17  that segment of the market.  Our overall share of
18  the Paclitaxel business, for example, or for other
19  products that had generic competition must have
20  been around 50 percent.
21      Q.  And are you speaking specifically to the
22  hospital market?

36

1      A.  No, the overall market.
2      Q.  The overall market.  What are some of the
3  largest hospitals that BMS had contracts with?
4      A.  Memorial Sloan Kettering, M.D. Anderson,
5  University of Michigan, Fox Chase Cancer Center.
6      Q.  Those are the big ones that come to mind?
7      A.  Yeah.
8      Q.  Where is Fox Chase located?
9      A.  Philadelphia.
10      Q.  M.D. Anderson's in Houston, right?
11      A.  Right.
12      Q.  Memorial Sloan Kettering is New York?
13      A.  New York City.
14      Q.  And Michigan is in Ann Arbor?
15      A.  Yeah.
16      Q.  Do you know what percentage of the sales
17  of BMSO drugs were done under contract?
18      A.  No.
19      Q.  No?  Do you know the approximate
20  percentage of all oncology customers that purchased
21  BMSO drugs under a contract with BMS?
22      A.  No.

37

1      Q.  No.  So, is it just too general a question
2  for you to be able to answer?
3      A.  Yeah.
4      Q.  How did BMS determine which organizations
5  to sign contracts with?
6      A.  The primary determinant was the sales
7  volume, and I guess the second determinant was
8  their willingness to do contracting.
9      Q.  And when you say, "sales volume," what do
10  you mean?
11      A.  Number of units they buy.
12      Q.  So, that's another way of saying --
13  targeting the larger organizations?
14      A.  Yeah.  Uh-huh.
15      Q.  And the contracts, did they always contain
16  pricing that was lower than the wholesale list
17  price that BMS offered products at, right?
18      A.  Yes, although there were some products
19  that we would not offer contract pricing on.
20      Q.  And what products — and what products
21  were they and at what point in time?
22      A.  Uh-huh.  Well, Paraplatin was the main

Christof A. Marre    HIGHLY CONFIDENTIAL    August 26, 2005
Cambridge, MA

38

1  product that for a long time we didn't offer
2  discounts to most customers. And only when it came
3  closer to losing exclusivity did we start
4  considering offering some small discounts.
5      Q.  So, you didn't offer discounts before the
6  time that you got close to the loss of exclusivity,
7  because it was -- the only product in -- in other
8  words, it didn't have any competition at that point
9  in time, right?
10      A.  That's correct. But we did have some
11  customers who did receive discounts or some other
12  price consideration even before that.
13      Q.  And the contract -- the prices contained
14  in contracts between BMS and customers, those are
15  confidential and not publicly available, correct?
16      A.  Yeah.
17      Q.  I'll just make sure I understand the
18  contracting process with office-based oncologists.
19      A.  Uh-huh.
20      Q.  Those were signed through OTN?
21      A.  Uh-huh.
22      Q.  Okay. But the contracts that OTN would

39

1  offer its customers originated in your department,
2  right?
3      A.  The way I would put it was the contract
4  was written by OTN, because they represented many
5  different manufacturers and had many types of
6  contracts, but whenever the contracts included BMS
7  products, we would get involved in revising the
8  contract language and approving the terms and
9  conditions.
10      Q.  Including price.
11      A.  Right.
12      Q.  And was there a specific person at OTN you
13  would work with on that one issue?
14      A.  I think there were a number of people
15  involved with that. The one person who I
16  interacted with the most until he left OTN was
17  Sandy McMahon.
18      Q.  And do you know when he left OTN?
19      A.  I don't recall the exact date.
20      Q.  Was it before you left BMS?
21      A.  Yes.
22      Q.  Okay. And the POA meetings you talked

40

1  about earlier, were the average wholesale prices of
2  drugs generally discussed?
3      A.  Which meetings?
4      Q.  At the POA meetings.
5      A.  No.
6      Q.  Were there any discussions of the
7  differences between the AWPs and actual -- actual
8  acquisition costs of drugs?
9      A.  Well, when we became more involved with
10  contracting, we would talk about the price erosion
11  of the price for Taxol, for example.
12      Q.  And how would that relate to AWPs?
13      A.  When almost any drug has exclusivity, you
14  sell the drug at list price. But once you face
15  generic competition, the generics try to gain
16  market share by bringing the price down and
17  offering discounts to their customers. So, as the
18  branded company, your choice is either to quickly
19  lose business if you don't bring your contract
20  prices in line with the market, or to offer
21  competitive prices and hope to maintain a
22  significant volume share of the market.

41

1      Q.  Okay. Has that -- I discern from an
2  earlier answer that there was some relation between
3  that and AWP, and that's what I'm trying to follow
4  up. I believe my initial question asked whether
5  there were any discussions between -- about the
6  difference between the average wholesale price for
7  a drug and its actual acquisition cost.
8      A.  I think we were more interested in the
9  difference between the price that we offered to our
10  customers and the price that the generic
11  competitors would offer to the customers.
12      Q.  Does that mean that you've never discussed
13  AWP with anyone at BMS?
14      A.  No. Of course, where relevant, we are
15  going to discuss AWP.
16      Q.  Let me then explore with you the use of
17  AWP --
18      A.  Uh-huh.
19      Q.  -- that you made when you were director of
20  marketing.
21      A.  Uh-huh.
22      Q.  Let me lay some foundations first. What

Christof A. Marre        HIGHLY CONFIDENTIAL        August 26, 2005
Cambridge, MA

---

78

1    A.  Uh-huh.
2    Q.  Do you remember that question?
3    A.  Yes.
4    Q.  And I believe one of your answers was the
5    competitive intelligence, if you were -- that you
6    were receiving on contract prices?
7    A.  Yeah.  Uh-huh.
8    Q.  Did you also look at the competitor's
9    AWPs?
10   A.  No.
11   Q.  Or the competitor's WACs?
12   A.  No.
13   Q.  So, your focus was on contract pricing.
14   A.  Yeah.
15   Q.  For my work in this case, I'm familiar
16   with the different ways in which BMS provided
17   discounts off of wholesale list price.
18   A.  Uh-huh.
19   Q.  And I want to just see if you're familiar
20   with the same contracts.  We have contract prices
21   that we've already discussed today, right?
22   A.  Yeah.

---

79

1    Q.  Are you familiar with rebates --
2    A.  Yes.
3    Q.  -- okay, and administration fees --
4    A.  Yes.
5    Q.  -- and marketing fees?
6    A.  Yes.
7    Q.  And BMS offered all of these to its
8    customers, correct?
9    A.  Yeah.
10   Q.  And rebates, what's your familiarity with
11   rebating?
12   A.  Well, unlike a discount, a rebate is
13   typically not applied at the time of purchase but
14   at some later point in time.  And typically, it's
15   tied to certain criteria, certain performance
16   criteria of the contract.
17   Q.  Usually volume?
18   A.  Volume, growth, market share.
19   Q.  And the contracts with which you had
20   involvement, were rebates sometimes included in the
21   provisions?
22   A.  Yes.

---

80

1    Q.  Administration fees.  What is an
2    administration fee?
3    A.  Well, the way I understand it, it's a
4    percentage of your sales that you pay to a GPO as a
5    consideration for being included on their list.
6    Q.  And are there a typical range of fees that
7    you're familiar with?
8    A.  I think a typical range would be anywhere
9    from .25 to 3 percent.
10   Q.  Have you seen administration fees paid by
11   BMS that exceeded 3 percent?
12   A.  I recall that the way it was explained to
13   me, there was a maximum of 3 percent for
14   administration fees.
15   Q.  Do you know why that was a maximum?
16   A.  I believe there's a legal maximum.
17   Q.  And you're familiar with marketing fees.
18   A.  Uh-huh.
19   Q.  What is a marketing fee?
20   A.  It's a fee for services or value that goes
21   beyond being included on a contract or on a list of
22   contracted products.

---

81

1    Q.  Can you think of an example of a service?
2    A.  Yes.  We discussed with Novation a private
3    label arrangement whereby we would be allowed to
4    manufacture and supply Novation with our drugs
5    under their brand name, under the Nova Plus brand,
6    and we would pay a marketing fee in exchange for
7    the exclusive right to be allowed to use that brand
8    name.
9    Q.  And what drugs did BMS sell under this
10   Nova Plus arrangement?
11   A.  Depends on the period of time that you're
12   looking at.  Before I came on board, there had been
13   a very comprehensive Nova Plus arrangement between
14   BMS and Novation, which covered, I think, almost
15   all of our brands that had generic competition, and
16   then something happened in the relationship between
17   BMS and Novation where that was discontinued, and
18   then we reapproached the opportunity to include our
19   brand on Nova Plus with Novation under my
20   leadership in 2004, maybe 2003, 2004.
21   Q.  Okay.  And do you have any recollection of
22   what a typical marketing fee was?

---

Christof A. Marre        HIGHLY CONFIDENTIAL        August 26, 2005
Cambridge, MA

---

82

1    A.  From some documents that we reviewed
2  yesterday that refreshed my memory. --
3    Q.  Yeah.
4    A.  -- I remember seeing 8 percent.
5    Q.  I may have one in this stack.
6    A.  Yeah.
7    Q.  I've got a bunch of contracts I pulled.
8    A.  Yeah.
9    Q.  And if I see one, I'll ask you about it.
10   A.  Okay.
11   Q.  Okay.  So, contract prices, rebates,
12  administration fees, and marketing fees.  They
13  would be reflected -- and all those would be
14  reflected in a contract, right?
15   A.  Yes.
16   Q.  You wouldn't pay an admin fee without a
17  contract.
18   A.  Correct.
19   Q.  You wouldn't pay a marketing fee without a
20  contract.
21   A.  Right.
22   Q.  You wouldn't pay a rebate without a

---

83

1  contract.
2    A.  Right.
3    Q.  And those types of discounts are not made
4  public by BMS, right?
5    A.  Yeah.  I think it's unusual that they
6  would be made public.
7    Q.  They're not published in any compendia
8  that you're aware of?
9    A.  No.  I think we have an obligation to the
10  government to disclose if any of these prices are
11  below prices that we offer the government for
12  certain types of transactions.
13   Q.  Okay.
14   A.  So, when that's the case, obviously, we
15  have to report that.
16   Q.  But beyond that one example, you're not
17  aware of any effort by BMS to make public these
18  various discounts that we were just discussing?
19   A.  Correct.
20   Q.  And those various discounts are not
21  reflected in the wholesale list price.  That's
22  what --

---

84

1    A.  Yes, correct.
2    Q.  No, they're not?
3    A.  They're not reflective of list price.
4  List price stays the same.
5    Q.  Okay.  I wanted to talk to you about
6  specific products now.
7    A.  Uh-huh.
8    Q.  I'm going to ask you the same series of
9  questions for each specific drug and find out what
10  information you have.  Blenoxane, that is a
11  multisource drug, correct?
12   A.  Correct.
13   Q.  Was it multisource for the entire time you
14  were at BMS?
15   A.  Yes.
16   Q.  And do you know when BMS first sold it?
17      MR. EDWARDS:  Sold it?
18   Q.  First sold it, period.  I mean marketed
19  it.
20      MR. EDWARDS:  You mean as a brand?
21      MR. MATT:  Yes.
22   A.  My understanding, it was in the early

---

85

1  '80s.
2    Q.  Okay.  So, it's certainly before your time
3  at BMS?
4    A.  Yes.
5    Q.  Do you recall any specific marketing
6  programs that BMS had under your tenure for
7  Blenoxane?
8    A.  No, no specific Blenoxane programs other
9  than addressing requests for price matching for
10  Blenoxane.  If you call that a marketing program,
11  then that was the extent of our marketing program.
12   Q.  And do you have -- you said price
13  matching, right?
14   A.  Yes.
15   Q.  And that's what we discussed earlier --
16   A.  Yeah.
17   Q.  -- in terms of someone presenting you with
18  a price from a distributor --
19   A.  Correct.
20   Q.  -- and asking BMS to match it.
21   A.  Correct.
22   Q.  All right.  Do you have any recollections

---

# EXHIBIT 22

JUN 09 '94  WEIDERT MEM NATRE RELIGED

ABBOTT LABORATORY   F.C
                                           JUN 09 '94  09:18AM

**ABBOTT**

FROM: WASHINGTON OFFICE   Dolly A. Hanrahan

INTEROFFICE CORRESPONDENCE

DEPT. NO.:         BLDG.         EXT.

TO:        Alan MacKenzie                    DATE: June 8, 1994

RE: Medicare Proposal

Pursuant to our conversation, I have been in contact with the Washington representatives of Bristol-Myers Squibb, Amgen, Zeneca and the American Society for Clinical Oncology (ASCO) regarding the memorandum from Charles R. Booth, Director, Office of Payment Policy at HCFA, to the Medicare carriers regarding changes in payment for certain drugs.

Everyone shares our concerns over the survey HCFA is conducting on the acquisition price versus the average wholesale price on certain drugs. ASCO issued a memorandum to its members advising them that compliance with the survey is voluntary and that physicians are under no legal obligation to complete the survey issued by the carriers. HCFA is not pleased with ASCO's guidance to its physicians. ASCO is working directly with the Office of Management and Budget (OMB) to essentially kill the survey based on the grounds that HCFA has not followed administrative procedures. OMB may stop the survey but this would only serve to buy more time; HCFA would simply resubmit the survey following appropriate procedures. We can guess this would take two or three months.

The physician who chairs ASCO's Clinical Practice Subcommittee strongly recommends that the drug manufacturers stay out of the negotiations. Legal counsel for Bristol-Myers concurs saying that it would only agitate the situation further, particularly since HCFA is focused on high volume drugs. ASCO has asked us to discuss other ways in which physicians might be helpful and to advise them of our ideas.

The Washington representatives are prepared to meet if we all determine the best course of action is to do so. Please think about what our next steps should be and let me know how to proceed. I agree with ASCO that we need to be careful and maintain a certain distance from the issues.

Thank you and I look forward to talking with you soon.

cc:  G. Coughlan    CFO Abbott
     D. Landsidle

TAP GB 08146

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER



EXHIBIT
Hanrahan - 6

# EXHIBIT 23



JUN 27 1995

June 21, 1995

## CONFIDENTIAL

To:        Don Patton                    From:     Alan MacKenzie

cc:        Yasu Hasegawa
           Doug Durand
           Don Meek
           Karen Howard

Subject:   Meeting with Ann Vickery of Hogan and Harston

### Tuesday June 20th

Don Meek, David Landsidle and myself met with Ann Vickery of Hogan & Harston for nearly 3 hours. I called this meeting to review the following issues with Ann:

1.   <u>Application of Lupron Reimbursement White Paper</u>
     Now that the paper is complete we discussed the use of this argument with payors. Another H & H attorney, Bob Brady (a former FDA enforcement lawyer) gave us his opinion on whether or not we should be concerned for regulatory (labeling) review of this document. The conclusion... the paper is written in fair balance, and risk is low. Next step, put paper in final form, review with Dean Sundberg and have available as a ready document for situations where medical therapy is limited or excluded for advanced prostate cancer due to payor policy.

2.   <u>HCFA initiative to set guidelines for GnRH AGONIST use</u>
     Ann has had very recent discussions with the top HCFA Policy Director who indicated that there is no further effort at this time to set new policy in this area. However, HCFA remains concerned at the "extraordinary costs" of this class of medicine and would like to see AUA active in setting guidelines in PCA treatments. Hogan and Harston will continue to monitor.

DD 0081

O:\ALAN\CORRESP\H&H.DOC



3. <u>Estimated Acquisition Cost Policy</u>
Good news here! Ann just spoke with the Senior Director on payment policy told her the following:
"HCFA does not have the manpower to meet all the requirements of the OMB to statistically validate the drug survey process". Thus Ann call this a "Bureaucratic Mexican Standoff", OMB will not budge on its policy and HCFA can not put the resources toward it. Thus no action is in place to move the survey process ahead. Ann believes we are at least a year away (if ever) from any EAC activity. She.did mention that congress could include EAC into the Medicare Reform Bill as.an add-on. H & H will closely monitor this in bill mark ups.

4. Future of Medicare Program
For certain, the Medicare Budget will be cut from $250-$300 billion over the next five years. Both Republican and Democratic sponsored bills call for incentives to move beneficiaries into managed care programs. Another possibility is a voucher option, where a beneficiary receives a voucher for the cash value of their Medicare benefits and then goes out to the market place to purchase private health insurance. The voucher plan would also push people toward managed care to get the perceived biggest bang for their buck. In all scenarios, TAP can expect continued acceleration of managed care delivery of Medicare.

5. 3 Month Depot
We informed Ann.of our imminent 3 month approval and the absolute need to have a smooth reimbursement process at launch. Ann thought that providing there are no significant changes in the cost for an equivalent month of therapy, we should expect no difficulty. H & H provides expert guidance in the applications for codes/reimbursement from HCFA. Both Don Meek and I agree to retain H& H for this use.

Finally we reviewed the overall relationship between TAP and Hogan and Harston. Practically, it makes sense to set up 2 billing entities at TAP, one in Marketing for retainer and policy monitoring and the other in Operations for day to day support of our reimbursement services

Hogan and Harston continues to provide expert counsel for TAP and as you can tell from the above notes, this was a most productive meeting.

DD 0082

# EXHIBIT 24



**Lopez, Ibis [OBI]**
**From:**     Klein, Maren [OBI]
**Sent:**      Wednesday, January 07, 1998 4:38 PM
**To:**        Keele, Bruce [OBI]; Lopez, Ibis [OBI]
**Subject:**   FW: MEDICARE REIMBURSEMENT

**From: Dooley, Cathleen [OBI]**
**Sent: Wednesday, January 07, 1998 2:33 PM**
**To: Klein, Maren [OBI]; Pearson, Bill [OBI]**
**Subject: FW: MEDICARE REIMBURSEMENT**



EXHIBIT 4A
Dooley
Jan. 13. 2006

FYI- I meant to copy you both on this . .
Cathy

**From:**     Dooley, Cathleen [OBI]
**Sent:**      Wednesday, January 07, 1998 2:31 PM
**To:**        Gatens, Richard [JJCUS]
**Cc:**        Moran, Richard [OBI]
**Subject:**   RE: MEDICARE REIMBURSEMENT

Rich-

They initiated a pricing survey in 1994 that was cancelled mid-way as there was a regulatory glitch that they did not take into effect. This was fortunate for us.

A pricing survey is one of the two ways the Secretary of Health can set a price. If they had done a survey and come up with an average price, this would have changed the reimbursement. This is what is happening with Epogen used in ESRD - they did a survey last year and they are now considering lowering the reimbursement rate to $9.00/1,000 units from the current $10.00/ 1,000 units.

The reason that this is not an easy fix for them is that drugs in the Medicare program are billed based on a HCPCS (HCFA Common Procedure Coding System). Each drug is assigned a code which indicates that dosage amount, not a brand. In the Medicaid system the use of the NDC number makes the information easy to track - in the Medicare system it makes it impossible.

The only way they could correct the current system is to require an invoice be submitted with each Medicare claim that is sent in. This would be very cumbersome and the medical providers and Medicare carriers have rejected this.(With 39 million recipients, the number of claims is significant.) Right now they do not know what the cost is for different providers.

If they were smart, they would expand the current demonstration project they have to expand the depots and only allow drugs to be purchased through identified depots where pricing could be controlled.

Please let me know if you need any additional information.

Regards,
Cathy

**From:**     Gatens, Richard [JJCUS]
**Sent:**      Wednesday, January 07, 1998 11:33 AM
**To:**        Dooley, Cathleen [OBI]

MDL-OBI00058842

**Subject:   FW: MEDICARE REIMBURSEMENT**



Cathleen, I sent this to Dick but probably should have sent my question directly to you. It seems like they can solve their own problem by using this EAC. Why don't they use EAC to calculate their reimbursement? RG

| | |
|---|---|
| **From:** | Gatens, Richard [JJCUS] |
| **Sent:** | Wednesday, January 07, 1998 10:30 AM |
| **To:** | Moran, Richard [OBI] |
| **Subject:** | RE: MEDICARE REIMBURSEMENT |

Dick, as I read the Inspector General report it would seem to me the easy thing for them to do is not use AWP, but use the EAC( which is a survey of ACTUAL prices paid for the drug) to calculate the reimbursement. Do we know why they don't use this EAC approach? RG

| | |
|---|---|
| **From:** | Moran, Richard [OBI] |
| **Sent:** | Wednesday, January 07, 1998 9:48 AM |
| **To:** | Gatens, Richard [JJCUS] |
| **Subject:** | FW: MEDICARE REIMBURSEMENT |

| | |
|---|---|
| **From:** | Dooley, Cathleen [OBI] |
| **Sent:** | Tuesday, January 06, 1998 6:07 PM |
| **To:** | Moran, Richard [OBI] |
| **Cc:** | Klein, Maren [OBI]; Pearson, Bill [OBI] |
| **Subject:** | RE: MEDICARE REIMBURSEMENT |

Dick –

In response to Ed's question, the following information might help clarify this issue:

o   The Office of Investigator General (OIG) report refers to the price the physician pays AAC (Average Acquisition Cost) and what Medicare reimburses off of which is AWP (Average Wholesale Price). AWP, as you know, is defined by the Red Book, the official pricing source for Medicare, as list plus 20%. (Some manufacturers request it be list plus 25%.)

o   Medicare has historically paid 80% of AWP; effective 1/1/98, they will pay off of AWP minus 5%.

▪   By law, the physician must bill the patient the remaining 20% co-pay.

o   The reason there is no reference to the co-pay in the OIG report is that the government knows that by law, the remaining co-pay of 20% must be billed. They know that a certain percentage of the co-pays will be collected and therefore the physician will "make money" on the administration of certain drugs.

o   This will be a sensitive issue because the physician is able to bill Medicare and the patient off of AWP; the patient's 20% co-pay is higher than it would be if it was billed off of acquisition cost (public relations' issue).

As a follow-up to your voice mail, you are correct that this report focuses on the fact that IF the 22 drugs identified in the report had cost under the Medicare program what they cost under Medicaid program, the savings would have been the estimated $447 million plus. As we discussed yesterday, there is no exposure for Medicaid because Medicaid



MDL-OBI00058843



gets the calculated "best price" which involves us paying rebates on the lowest possible unit cost on a quarterly basis.

Please let me know if you have any questions.

Thanks
Cathy

| From: | Moran, Richard [OBI] |
|---|---|
| Sent: | Tuesday, January 06, 1998 8:16 AM |
| To: | Dooley, Cathleen [OBI]; Klein, Maren [OBI] |
| Subject: | FW: MEDICARE REIMBURSEMENT |

How should we respond to ed?

Dick

---

| From: | Strobino, E. D. (Corp.) [JJCUS] |
|---|---|
| Sent: | Monday, January 05, 1998 9:00 PM |
| To: | Gatenc, Richard [JJCUS]; Leahy, Kenneth [PRI]; Nystrom, Thomas [OMP]; Srabo, John A. *; Moran, Richard [OBI] |
| Cc: | Forte, Marilyn [JJCUS] |
| Subject: | MEDICARE REIMBURSEMENT |

BASED ON THE OFFICE OF INSPECTOR GENERAL REPORT I AM CONFUSED ESPECIALLY IF I USE BIOTECH'S NUMBERS. THE REPORT KEEPS REFERRING TO THE DIFFERENCE BETWEEN THE AWP PRICE THAT MEDICARE PAYS AND WHAT THE PHYSICIAN PAYS. THERE IS NO REFERENCE TO ANY CO-PAY AMOUNT RECEIVED BY THE PHYSICIAN. IF THIS IS THE DIFFERENCE IN THE TWO AMOUNTS, THEN WE DO NOT HAVE A PROBLEM AS IT RELATES TO BIOTECH??? HELP. ED

Highly Confidential



# EXHIBIT 25

Cathleen M. Dooley                           January 13, 2006
                    Washington, DC

                                                        Page 391

        IN THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - x

IN RE:  PHARMACEUTICAL          :   MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE      :   CIVIL ACTION

PRICE LITIGATION                :   01CV12257-PBS

- - - - - - - - - - - - - - - x

THIS DOCUMENT RELATES TO        :

ALL ACTIONS                     :

- - - - - - - - - - - - - - - x


            VOLUME II - PAGES 391 to 608


     Deposition of CATHY DOOLEY, held at the offices

of Johnson & Johnson, 1350 I Street, N.W., 12th Floor,

Washington, D.C., commencing at 12:07 p.m., Friday,

January 13, 2006, before Elizabeth Mingione, Notary

Public.

58b89dcb-3b0b-4288-b65a-b2dd7495b86d

Cathleen M. Dooley                                    January 13, 2006
                            Washington, DC

Page 536

1  system is to require an invoice be submitted with
2  each Medicare claim that is sent in.
3      A.  Um-hmm.
4      Q.  And then you go on to say that that would
5  be cumbersome because there's so many claims. Do you
6  see that?
7      A.  Um-hmm.
8      Q.  And then you state, "Right now they do not
9  know what the cost is for different providers." See
10 that?
11     A.  Um-hmm.
12     Q.  And what was true prior to 1998 as well;
13 right?
14     A.  I would assume so.
15     Q.  So up to that point in time they did not
16 know what the cost was for different providers
17 through their surveys or through lack of surveys?
18     A.  Well, unless they asked. I suppose they
19 could have asked and known.
20     Q.  But according to you in this memo they
21 hadn't done so; correct?
22     A.  But I don't know that they didn't ask

Page 537

1  certain docs. You know I wasn't aware of something
2  in the public domain, but.
3      Q.  Your statement in this is right now they do
4  not know what the cost is for different providers;
5  right? I know you are giving me a bunch of
6  qualifications now today, but in this statement in
7  you memo you say they don't know what the cost is for
8  general providers.
9      A.  Are you asking me what my sentence says? It
10 says right now they do not know what the cost is for
11 providers.
12     Q.  Right. So at that time, in January 1998,
13 in your opinion they didn't know what the cost was
14 for different providers; correct? You'll agree to
15 that?
16     A.  Allan, I'll agree to the sentence as it
17 reads here, not when you reparaphrase it.
18     Q.  Then you say something curious here at the
19 end. It says, "If they were smart, they would expand
20 the current demonstration project they have to expand
21 the depots and only allow drugs to be purchased
22 through identified depots where pricing could be

Page 538

1  controlled." Do you see that?
2      A.  Um-hmm.
3      Q.  So that's your idea for how they could
4  figure out a method for determining what actual
5  acquisition costs should be; right? ·
6      A.  No.
7          MR. SCHAU:  Object to form.
8      A.  That's incorrect.
9      Q.  What is it that that's saying?
10     A.  That basically is saying that, well, first
11 off, the statement you made is totally incorrect.
12 That doesn't have anything to do with acquisition
13 costs. All that I was saying there is that you have
14 something called depots where basically depots
15 actually dispense the drug for certain government
16 facilities.
17         If the government really wanted to actually
18 do something about this problem that they perceive
19 that they had, they could have easily said here's the
20 drug, and here's the price, and here's where you get
21 it. So the government, you know, was fully aware
22 this was an issue and could have taken a way to solve

Page 539

1  it if they wanted to.
2      Q.  Did you ever suggest this way to the
3  government as a way of solving the problem of --
4      A.  That was in the public domain all the time
5  there. I am sure there's lots of reasons why they
6  couldn't do it that way, but --
7      Q.  Did you ever suggest that to the
8  government?
9      A.  I wouldn't be in the position of suggesting
10 things. I mean they, you know, they would know that
11 that was a very logical solution.
12     Q.  Would OBI want to be suggesting to the
13 government how they should be conducting a survey?
14         MR. SCHAU:  Object to form.
15     A.  I don't think it would be appropriate for
16 OBI to suggest that.
17     Q.  In addition to it not being appropriate,
18 would it also not be in their business interest to
19 suggest how the government could find a way for
20 creating a survey that would be -- lead to an
21 accurate result?
22         MR. SCHAU:  Object to form.

38  (Pages 536 to 539)

58b89dcb-3b0b-4288-b65a-b2dd7495b86d

# EXHIBIT 26

Memo to:     Jason Rubin
From:        Mike Ziskind
Subject:     New Vial Sizes
Date:        July 6, 1999

CC:          Jon Cabral
             Ron Krawczyk
             Julie McHugh
             Dann Wattier

In response to your recent question, this memo provides general background on AWP and relative spread. In brief, the "spread" on most products typically ranges from 20 to 25 percent. As a matter routine this reflects the databases tendency to assume 25 percent going forward off the price to wholesalers or 20 percent going backward of "AWP" or "recommended AWP". Below, I have offered a few comments on the adequacy of the spread and factors that may influence customers perception of that spread. I also, offer comment on issues to consider when we talk about the "cost of Remicade."

**Standard spreads typically structured to meet the needs of retail pharmacy and office-based markets.**

Spreads of 20 to 25 percent are usually sufficient to meet the needs of retail pharmacies and physician offices. Given those spreads, pharmacies and providers will typically make between 12 and 25 percent margin, plus dispensing and administration fees as appropriate. If providers have a well-insured population and are good at collecting coinsurance, copayments and deductibles, the margin is more likely to be in the 20 to 25 percent range. If providers do a poor job a collecting from patients, they may have margins of about 5 percent, or less, depending upon the payers and payment provisions.

**Infused products often have a higher than average spread.**

Although spreads of 20 to 25 percent are usually sufficient to meet the needs of retail pharmacies and physician offices, infused drugs and especially biologics have often had higher spreads (e.g., IGIV products have had spreads of 40 to 60 percent.). These spreads largely reflect manufacturer sponsored pricing initiatives and payers' inability to understand or control pricing in the early 1990s. In addition, it also reflects "spread creep" as AWP has increased over time as wholesaler prices have remained steady or decreased. It is likely that the pricing activities that led to these spreads will become the subject of closer HHS OIG scrutiny (e.g., TAP Lupron).

**Some home infusion companies demand higher "spreads".**

When it comes to profit margins on drugs, home infusion companies represent a difficult situation. For many years, many home infusion companies had a reputation for enormous mark-ups and high profitability. This reflected their use of labor intensive infused therapies, as well as weaknesses in payers' reimbursement processes. In fact, profit

MDL-CEN000085404

margins in excess of 100 percent for costly drugs were not uncommon into the early 1990s. As a result, payers began to negotiate aggressive discounts because there were a lot of savings to be found. In turn, home infusion companies have responded by pressing manufacturers for steep discounts so that they can maintain the profitability to which they had become accustomed.

Home infusion companies may need a higher spread than other providers because of their overhead cost structures and the time required to send staff and equipment to patients' homes. In my opinion however, home infusion companies should not be cost shifting to drugs. Instead, they should be going back to payers to negotiate appropriate payment for nursing services and equipment.

### Cost varies by audience.

When Centocor discusses the cost of Remicade therapy, it is important to note that the "cost of therapy" varies widely based on the audience. For example, cost to wholesalers is less than the cost to hospitals and doctors' offices, which is usually less than the price payers reimburse. Likewise, the cost to a Kaiser Permanente organization may be less than the cost to Aetna, because Kaiser may purchase directly from wholesalers, whereas insurers may be paying based on AWP or charges.

Therefore, when we discuss the cost of therapy and when the cost of Remicade is compared to other treatment options, it is important to understand the audience's perspective. For example, if we were to routinely use cost to wholesalers we would set payers' expectations too low. If we were to routinely use AWP, we might scare off some providers who are concerned about acquisition cost. My recommendation is to adopt some standard description so that the audience knows what "cost" is being cited. I would not, however, include both cost figures in the same presentation because that may highlight spread more than we would like, even though our spread is well in the range of other infused drugs.

\* \* \* \* \* \*

Jason, I hope this has been helpful. Please call me at extension 6008 if you have any questions.

M:/Zirkind/AWP Rubin Question.doc

HIGHLY CONFIDENTIAL

MDL-CEN000085405

# EXHIBIT 27

◆

**ORTHO BIOTECH**

**Memorandum**



**To:** T. Amick

**From:** C. Dooley

**Date:** August 6, 1996

**cc:** J. Slurzberg

**Subject:** Reimbursement Considerations for Spillover Planning

Jo Ellen and I outlined some relevant reimbursement issues which will serve in providing background for spillover planning.

### REIMBURSEMENT ISSUES FOR EPO - HISTORICAL PERSPECTIVE

- In the fall of 1993, HCFA changed the reimbursement rate for Epoetin alfa from $11.00/1,000u to $10.00/1,000u across all indications . Several things contributed to this change in price including an informal survey and politics around the ESRD program in California. Prior to this time, the reimbursement was set by the government at $11.00/1,000u strictly based on the ESRD. Other than EPO, the government has not historically set any prices for a pharmaceutical or biologic; rather, the reimbursement rate has been based on AWP. However, the government does have the right to change the reimbursement for any product by an arbitrary pricing decision or by a survey ( eg. IQLAB, LifeScan and ESRD). Medicare does not pay for self administered drugs, except by exception (oral chemotherapies) as the initial intent of Medicare was that it would not provide drug coverage, but focus on acute illness. Drugs make up approximately 4% of the Medicare budget with growth factors making up 1% of this segment. NEUPOGEN does not hit the radar screen for pricing impact. EPO on the other hand, hits the radar screen because of high usage in the ESRD program and the fact that it is reimbursed at 100% in this government program .

### REIMBURSEMENT ISSUES FOR NEUPOGEN

- NEUPOGEN is not reimbursed through a government carve out, but rather reimbursed based on standard AWP. There is no mandated program under HCFA for NEUPOGEN. It is reimbursed as a "traditional injectable".

- NEUPOGEN is sold to physicians by supply houses through the same mechanisms that Ortho Biotech provides PROCRIT. Amgen has the flexibility to raise the price of Neupogen as it is not government controlled. A year ago, they raised their price approximately 1.0%. With a price increase, they have the flexibility to change the discounts offered to their physicians. A factor in the significant discount offered with NEUPOGEN may be an element of compensation for the hassle of a 7 day daily administration.

- NEUPOGEN is reimbursed per total vial as opposed to per unit based reimbursement. With the recent price increase from $148.00 to $152.30 for a 300mcg, physicians would be reimbursed at 80% of AWP ($152.30) or approximately $121.84. Therefore, they are making at least $26.30/vial or more if they are at a lower contracted price.





EXHIBIT 1A
Dooley
Jan. 13, 2006

ORTHO 00989132
Confidential - Attorneys Only

- Some oncology products and chemotherapies are reimbursed per vial, others per unit. For example, Zofran is billed on a per unit is basis vs Leustatin which is reimbursed per vial. Determination of whether a drug is billed per unit or per vial is based on what is usual and customary and the indication for the drug.

## REIMBURSEMENT OF EPO
- To a payer, EPO equals EPO. This has significant implications for PROCRIT.
    - The Federal Government mandates the reimbursement rate for EPO under the ESRD Program - CONGRESS MANDATES.EPO PAYMENT RATES
    - The cost per thousand units of EPO was lowered from $11.00 to $10.00 under OBRA '93 for ESRD. This was the result of:
        - A need to cost shift to cover the increased payment of immunosuppressive agents for transplant patients;
        - Survey of dialysis centers which reflected a lower acquisition; and
        - Politics
    - Amgen is essentially handcuffed by the government regarding changing the price of EPOGEN. This has implications for PROCRIT when it comes to raising price.
    - It is important to note that EPO IS CURRENTLY BEING REIMBURSED AT A PREMIUM RATE for non dialysis use at AWP, compared to the average acquisition cost.

## HOW IS EPOGEN REIMBURSED?

- EPOGEN is reimbursed under the ESRD Program:
    - In 1989, Amgen successfully lobbied for EPO to be self-administered and reimbursed at 100% rather than be included in the composite rate for dialysis treatment. It is reimbursed at $10.00 /1,000u by law through the ESRD program . A separate reimbursement carve out program for erythropoietin for patients with a specified level of anemia was created. OBRA'90 extended coverage of self-administered erythropoietin for home dialysis patients. It is estimated that about 90% of Medicare ESRD patients use erythropoietin. As previously noted, THE PAYMENT FOR ERYTHROPOIETIN IS MADE ON A PER UNIT BASIS, SET BY LAW AT $10.00/1,000u. It should be noted that the estimates for expenditures for erythropoietin under Medicare in 1994 were $736 million which is approximately $5600 per patient based on average use.
    - Attempts to bundle erythropoietin into the composite rate have been unsuccessful.

## HOW IS PROCRIT REIMBURSED?

- PROCRIT Reimbursement
    - Once again, from the government perspective, EPO is EPO is EPO. For our purpose, the government sees OBI as responsible for Epoetin alfa indicated for non-ESRD uses.

        To obtain the current reimbursement rate based on AWP of $11.40/10,000u for non-dialysis patients, we lobbied HCFA to differentiate the ESRD patient from the non-dialysis patient.  The majority of pre-dialysis is wrapped into the ESRD (any state that currently uses the Q99 HCPCS are reimbursed at $10.00/1,000u)



ORTHO 00989133
Confidential - Attorneys Only

HLY CONFIDENTIAL                                    MDL-OBI00061804

- Both ESRD and non-dialysis are paid for under Part B funds (treasury vs. Part A which comes out of the CBO)



- If a patient has an insurance plan that allows for supply and outpatient administration, either through home health care agency or a retail plan, the physician office will send the patient through these vehicles to access PROCRIT.

- There is no concern of driving the patient currently in the physician office to the retail setting as these are the Medicare patient or a private patient plan that fashions after Medicare, requiring that the drug be administered incident to a physician's service.

- Since we are not labeled for self administration, some insurers are hesitant to allow for self-administration due to liability. We are seeing this in some of the managed care plans and in Medicare Managed Care.

- Non-ESRD use of Epoetin alfa is reimbursed at 80% of the AWP allowable amount with beneficiaries being responsible for the remaining 20%.
  - A drug survey is imminent and would show that no physicians are paying AWP in the market place. A survey would look at average acquisition price and associated overhead costs. If there was a significant difference between AWP and acquisition price (which there would be), the reimbursement rate would be lowered. Again reimbursement rates can be lowered by survey or an arbitrary pricing decision.

- Elimination of some of our commercial rebates, has resulted in physicians paying more for our drug with an increase in business being driven through contract prices.



- Any change in our current discount rates, resulting in a higher acquisition prices, actually protects OBI in a survey. HOWEVER, IT IS KEY TO NOTE THAT HCFA WOULD NOT RAISE THE REIMBURSEMENT RATE. This would result in our customers paying more for their drug.

## WHAT WOULD HAPPEN IF WE RAISED THE PRICE OF PROCRIT?

- An increase in price of PROCRIT would drive the payer to EPOGEN, who cannot increase their price.

- The increase would be passed onto the payers

- There would be a high probability of triggering a survey because there would then be two prices in the marketplace for the same product. The two products are currently priced the same BUT reimbursed differently BECAUSE a survey was done of dialysis centers which determined they purchased EPOGEN at lower than AWP resulting in a decrease reimbursement rate from $12 to $10/1,000u.

## IMPLICATIONS FOR THE SURGERY INDICATION:

- 70% of the market is Medicare

ORTHO 00989134
Confidential - Attorneys Only

HIGHLY CONFIDENTIAL

MDL-OBI00061805

- We need to ensure appropriate reimbursement for our product if physicians are purchasing at a higher rate



- Orthopedic surgeons may send their patients to the hospital for injections; if we do not take ownership of this market in the hospital setting and grow the non-dialysis market , Amgen wins our indication.

There will need to be assurance that physicians supply and administer PROCRIT and bill out of their office will be reimbursed for the cost of the drug.

## RISK ASSESSMENT
- Based on the fact that physicians are reimbursed at a an average of $11.40/1,000 under Medicare and EPO is likely to be a target in a drug survey which will demonstrate lower AAC, it is unlikely that this reimbursement rate WILL EVER INCREASE.

- Medicare does not pay for drugs; PROCRIT as an injectable is not labeled for self administered.

- Once patients have moved into Medicare managed care, the cost of care is expected to be reduced. Currently, Medicare Managed Care Organizations are reimbursed at 95% of the AAPCC (i.e. the amount the government pays per month). With time, this rate will be decreased; AAPCC rates will be adjusted and therefore there will be no room to increase price as the majority of care will be at a contracted price.

- Amgen hospital customers who offer a 12% discount.
  i.e. 12% of $100.00 AWP= 12.00 OFF A VIAL
  VIAL 88.00
  EQUALS 8.80 PER 1,000/u
  THEY ARE REIMBURSED AT 10.00/1,000u
  EQUALS +$1.20 per 1000/u

BUT, the hospitals are actually receiving 100% payment and there is no bad debt associated with the EPO use in the dialysis indication.

## RECOMMENDATIONS:

- Growth in the non-dialysis market is dependent on increasing the untapped potential in the non-dialysis market. We need to grow our TOTAL PORTION WITHIN THE TOTAL MARKET WHILE SIMULTANEOUSLY GROWING THE MARKET.

- The long term non-dialysis potential for EPO is larger than dialysis portion of the business based on new indications in growing patients population, i.e. the elderly as opposed to dialysis, where the government is looking at ways to better control the patient population as evidenced by the ESRD demonstration project. ESRD is growing in lower socioeconomic areas.

- With the movement of Medicaid patients into managed care, there is a movement to implement preventive medicine which will keep these patients off of dialysis longer . Dialysis is a limited

ORTHO 00989135
Confidential - Attorneys Only

HIGHLY CONFIDENTIAL

MDL-OBI00061806

- market with no room for new indications; therefore, it can only grow proportionate to its existing markets.

- The potential implementation of Medicare rebates may introduce a Medicare best price consideration.

- Eliminating the current discount from our 10,000u and 20,000u vials would obviously increase the cost to our payers and has the potential to trigger a survey for a price comparison between AWP and AAC.

## IMPACT OF REDUCING DISCOUNT

The goal is to keep the physician "whole" i.e. whole on the 80% as there is a fear that they will not be reimbursed on the remaining 20%.

Therefore discount cannot be reduced more than a percentage that would allow the physician to break even with the reimbursement rate of 80% of $11.40/10,000u

For physician's offices:
$95 for 10,000u
% discount = $7.60 or $87.40/10,000u or $8.74/1,000u
reimbursed at 80% of AWP ($114) or $91.20 (or $9.12/1,000u)

If we gave no discount to physician offices, and they purchased at list price of $95/vial , they would still be reimbursed by the government at 80% of AWP which is equal to $91.20. Physicians would be at risk for bad debt for patients without supplemental insurance to cover the remaining 20%. 76% f patients have supplemental coverage; 15% of Medicare recipients have no supplemental insurance, but have a large impact on physician use due to failure to pay and complaints about out-f-pocket expenses. Participating Medicare physicians, cannot bill more than the Medicare allowable narge.

a.
$95.00 for 10,000/u
5% discount = $4.75
AAC $90.25
(reimbursed at 80% of AWP ($114) or $91.20

he nominal for the physicians to capture their full acquisition costs discount to equal $95.00, would eed to be about 5.0% which is $4.75 or $91.20/10,000/u .

ORTHO 00989136
Confidential - Attorneys Only

MDL-OBI00061807

CONFIDENTIAL

# EXHIBIT 28





November 5, 1998

C. Kaye Riley, HCPCS Coordinator
Health Care Financing Administration
C5-08-27
7500 Security Blvd.
Baltimore, Maryland  21233-1850

Dear Ms. Riley:

I am pleased to submit the enclosed application for an alpha-numeric code in the Health Care Financing Administration Common Procedure Coding System (HCPCS) for Remicade™ (infliximab), a breakthrough drug for the treatment of Crohn's disease.

Remicade™ is indicated for the treatment of moderately to severely active Crohn's disease or the reduction of the signs and symptoms, in patients who have an inadequate response to conventional therapy. It is also indicated as a treatment for patients with fistulizing Crohn's disease for reduction in the number of draining enterocutaneous fistula(s).

Following an expedited review, Remicade™ was approved by the FDA on August 24, 1998 and became available for wholesale purchase on October 5. Rapid and widespread adoption is expected of this new drug by gastroenterologists and other physicians who treat patients with Crohn's disease. To date, there have been 85 Medicare orders written for Remicade™. Therefore, I have included in the application a request for the assignment of a temporary code to be used pending approval of a new code for use beginning January 1, 2000.

A temporary code will facilitate claims processing and reduce the administrative burden with J3490 "Unclassified drugs". Specifically, a temporary code will eliminate the unnecessary and costly submission by physicians and review by carriers of written documentation regarding the drug administered, the dosage, the route of administration and the charge.

If you have any questions or require any additional information, please do not hesitate to contact me. In particular, if there is anything missing that would preclude consideration of the application at your next HCPCS meeting I would appreciate hearing from you as soon as possible.

I look forward to working with you on the development of the temporary and permanent codes needed to promptly and accurately report the use of this important advance in the treatment of Crohn's disease.

Sincerely,

Valerie Asbury, Director
Centocor, Inc.

enc- 2

**HIGHLY CONFIDENTIAL**                                    MDL-CEN00108051

Health Care Financing Administration
Common Procedure Coding System (HCPCS)
Alpha-Numeric Coding Recommendation Format

1

Submitted by Centocor, Inc.
November 4, 1998

## INFORMATION SUPPORTING CODING MODIFICATION RECOMMENDATION

| 1. | Item trade/brand name: | **REMICADE™** |
|----|------------------------|---------------|
|    | Generic name: | **Infliximab** |
|    | FDA Classification: | **Chimeric (Human Murine) Monoclonal Antibody to Tumor Necrosis Factor (BB-IND 5389/ODA 95-924)** |

2.    Describe the item in general terminology.

**Description**
Remicade is indicated in the treatment of patients with Crohn's disease, a chronic and debilitating disorder of the gastrointestinal tract that can greatly affect a patient's quality of life. The chronic inflammation of Crohn's disease is attributed to an imbalance between pro- and anti-inflammatory mediators. Pro- and anti-inflammatory mediators called cytokines regulate inflammation in Crohn's disease. Tumor necrosis factor-α and other pro-inflammatory cytokines predominate in Crohn's disease, resulting in chronic mucosal inflammation. Crohn's disease is neither medically or surgically curable. The goal of treatment is to induce and maintain remission, maintain quality of life, and minimize the toxicity of therapy.

**Indication**
REMICADE is indicated for treatment of moderately to severely active Crohn's disease or the reduction of the signs and symptoms, in patients who have an inadequate response to conventional therapy. It is also indicated as a treatment for patients with fistulizing Crohn's disease for reduction in the number of draining enterocutaneous fistula(s).

**Action**
REMICADE is the first of a new class of agents that blocks activity of a key biologic response mediator called tumor necrosis factor alpha (TNF-α). It is believed that REMICADE reduces intestinal inflammation in patients with Crohn's disease by binding to and neutralizing TNF-α on the cell membrane and in the blood and by destroying TNF-α producing cells. This action may explain why REMICADE is a particularly effective inhibitor of TNF-α and why REMICADE has a rapid and substantial clinical benefit.

**Dosage and Route of Administration**
The recommended dose of Infliximab is 5 mg/kg given as a single intravenous infusion for treatment of moderately to severely active Crohn's disease in patients who have had an inadequate response to conventional therapy. In patients with fistulizing disease, an initial 5 mg/kg dose should be followed with additional 5mg/kg doses at 2 and 6 weeks after the first infusion.

**How Supplied**
Remicade (infliximab) lyophilized concentrate for injection is supplied individually-boxed single-use vials in the following strength: NDC 57894-030-01, 100 mg infliximab in a 20-ml vial.

3.    Why are the current code categories inadequate to describe the item?

**There are no current code categories that describe this item. Remicade™ is the first anti-TNF inhibitor to receive FDA approval.**

HIGHLY CONFIDENTIAL

2

Health Care Financing Administration
Common Procedure Coding System (HCPCS)
Alpha-Numeric Coding Recommendation Format

Submitted by Centocor, Inc.
November 4, 1998

4.   List any local codes used by any third party payor to process the item.

We are unaware of any local codes in use by third party payers.

5.   If specific codes are not being used, how are you currently billing for the item.

Code J3490 *Unclassified drugs* is being used.  In addition, documentation of the drug administered, the dosage, route of administration and charge is submitted with the claim.

6.   How long has this item been on the market?

Remicade™ was commercially available October 5, 1998.

The review timetable is listed below:

- December 30, 1997: Infliximab application submitted
- May 28, 1998: FDA voted unanimously to recommend approval of infliximab
- June 30, 1998: FDA issues a Complete Review letter for infliximab
- August 24, 1998: Centocor receives approval for Remicade™ from the FDA
- October 5, 1998: Product available for wholesaler purchase

➢  Although a time span of 6 months has not elapsed since the approval of Remicade™, Centocor is requesting with this application, that Remicade™ be granted a temporary J-code. Clinical data accumulated over the past 5 years was substantial enough for the FDA to grant Remicade™ an expedited review, resulting in product approval. Remicade™ is the first agent in its class (anti-TNF inhibitor) to be approved by the FDA. In addition, Remicade™ is the only FDA approved therapy for the treatment of Crohn's Disease.

7.   How are you currently marketing this product or service?

Centocor sells direct to wholesalers and specialty distributors. Remicade™ is distributed nationally through these vendors.

8.   Are Medicare carriers currently paying for this item?

Initial claims are just beginning to be filed. Discussions with Medicare carriers suggest that this product will be covered since Remicade™ is the only FDA approved therapy for Crohn's disease.

9.   What is the total Medicare, medicaid and private business annual volume in sales and or rental for the six months of marketing experience prior to submitting the request for coding consideration?  (Do not estimate or provide projections – the information provided must represent actual volume of sales for the drug/product for the specific period of time indicated.)

Six months worth of data is not available.  However, between October 5 and November 3, 1998 eighty-five (85) Medicare orders for Remicade™ have been received.

10.   Of the volume identified in #9, what is the percent of use in the following settings?

MDL-CEN00108053

3

Health Care Financing Administration
Common Procedure Coding System (HCPCS)
Alpha-Numeric Coding Recommendation Format

Submitted by Centocor, Inc.
November 4, 1998

- Physician office
- Ambulatory Care Clinic
- Patient Home
- Inpatient Facility
- Other

(Based on discussions with clinicians, Remicade™ will be predominantly delivered as an outpatient infusion, either in the physician office or other ambulatory site: infusion center, endoscopy suite, or hospital outpatient department.)

11.   What is the wholesale cost of the item?

Remicade™ AWP: $585.00 per 100mg vial

12.   What is the retail cost of the item?

Remicade™ List Price:  $450.00 per 100mg vial

13.   List any manufacturers or suppliers of similar items.

None

14.   Identify the difference between this item and that of competitors.

There are no competitors for Remicade™.    Remicade™ is the first agent in its class (anti-TNF inhibitor) to be approved, and the only agent approved by the FDA for use in Crohn's disease.

Recommendation submitted by:

Valerie Asbury, RN, BSN
Director, Corporate Accounts
Centocor, Inc.
200 Great Valley Parkway
Malvern, PA 19355-1307
Phone: (610) 651-6551
Fax: (610) 889-4769
Email: asburyv@centocor.com

_11/4/98_
Date

Valerie Asbury, Director, Corporate Accounts

MDL-CEN00108054