# EXHIBIT 29

**Internal Memorandum**

DATE:  November 20, 1995

FROM:  Keith Patterson

    TO:  Chris Iacono

ZENECA Pharmaceuticals Group
Your Department
Wilmington, DE  19897
Telephone (302) 886->
FAX No. (302) 886->

CC:  Steve Strand
      Steve Buckanavage
      Tom Chen
      Sarah Harrison

## ZOLADEX PRICING STRATEGY

### Current View

Year end 1995 sales of Zoladex are expected to exceed $80 million, and in doing so, will surpass the forecasted budget of $79.1. This sales volume represents an approximate growth rate of 33+% vs. 1994 and continues a trend of consecutive years of 30+% growth for the brand.  Looking forward, the previous 1996 base case scenario forecasted $126.7 million in annual revenues from Zoladex. However, this figure was predicated on the assumption of a 12 month lead time in the launch of Zoladex 10.8mg vs. the competitive Lupron 3 month formulation.  Now, after considerable intelligence gathering, it is apparent that little, if any, lead time will be realized in bringing Zoladex 10.8mg to market.  In recognition of this new intelligence we must now revise our 1996 financials and accept the downside view of $99 million.

In each of the last two fiscal years, Zoladex sales performance has shown signs of reaching a plateau.  On each occasion, the implementation of a quantity based discounting program served to stimulate sales.  Following is a delineation of Zoladex sales over the last 30 months which clearly shows three tiers of performance.  These tiers coincide with the timing and availability of three pricing strategies.

<u>Zoladex Average Daily Volume by Quarter</u>

Tier 1.  No discounts offered.

| Quarter | 3Q93 | 4Q93 | 1Q94 |
|---------|------|------|------|
| Units/Day | 798 | 747 | 752 |



14-01-0216

HIGHLY CONFIDENTIAL

AZ0237164

Tier 2.  15% Maximum discount offered for purchases of 48+ depots. (May 4, 1994)

| Quarter | 2Q94 | 3Q94 | 4Q94 | 1Q95 |
|---|---|---|---|---|
| Units/Day | 925 | 1006 | 1141 | 1074 |

Tier 3.  20% Maximum discount offered for purchases of 72+ depots. (Mar 31, 1995)

| Quarter | 2Q95 | 3Q95 | 4Q95 |
|---|---|---|---|
| Units/Day | 1204 | 1452 | 1500+ |

As can be seen by the above illustration, the implementation of quantity based pricing strategies has resulted in rapid and pronounced increases in Zoladex sales. In fact, without the incorporation of two additional tiers of discounts in March 1995, we would have fallen short of our 1995 budget. The two steeper discounts (15%, 20%) for purchase levels above 48 depots has given Zoladex a more competitive profile within this tier of accounts and has resulted in new business.

It has been widely documented that LHRH-generated profits to the purchasing physician (or more delicately stated, Return to Practice) is one of the two most important factors driving this market- the other being patient preference. Return to Practice is simply the difference between the published price (AWP), against which HCFA reimburses at 80%, and the acquisition price (AWC less any discounts)--the patient pays the 20% of AWP that HCFA does not pay. Our competitors from TAP learned to take advantage of this system early on and, as a result, gained a substantial foothold in the marketplace. We are now beginning to make some inroads by basing our pricing decisions, in part, upon their impact on Return to Practice.

The previous quantity based discounts resulted in a Return to Practice for Zoladex that was similar to, but still less than, that which could be realized by purchasing Lupron. More recently, as of November 1, TAP has implemented a 3.9% price increase which will place Zoladex at a further disadvantage in terms of this significant parameter. In addition, we have learned that TAP is now offering increased discounts for purchase volumes in excess of 200 depots, a strategy that was not previously in evidence. The trend toward consolidation of practices and formation of buying groups with increased purchasing leverage illustrates the need for such a strategy.

It is recommended that we take advantage of the opportunity presented by TAP's action to implement an aggressive pricing response, otherwise another plateau in Zoladex volume performance can be expected. Without an additional stimulus to the

14-01-0217

market, attainment of even the downside Zoladex forecast in 1996 is at risk.

### Recommended Strategy

As discussed, the Return to Practice that can be realized via the purchase of LHRH agonists is the primary driver behind this market. Return to Practice is enhanced by widening the margin between the published price and the acquisition cost. This can be accomplished through several pricing manipulations:

1) Increase the AWP
2) Decrease the acquisition cost relative to the AWP, or
3) Both 1 and 2.

In order to maximize the Return to Practice, and to maximize our competitive position, it is recommended that we exercise option #3 from above by implementing a differential price increase. Accordingly, it is recommended that we **increase AWP by +7%, and increase AWC by 3.5%.** (N.B. We have requested an opinion from our legal department as to the legitimacy of this strategy. As of this writing a definitive position has not been issued.) This action will, in effect, expand the AWP-AWC margin from its current level of 25% to a new margin of 29.2%. Furthermore, in order to allow Zoladex to be competitive with Lupron in the top tier of accounts, it is recommended that a we **create a discounted tier of 24% for purchases in excess of 192 depots (32 cases).** ☞ ~~33 or 198 depots~~ cases

The net result of these two pricing actions is that purchases of Zoladex will result in a **more favorable Return to Practice than Lupron at all purchase volumes above 6** depots. A comparison of Return to Practice for Zoladex and Lupron can be found in Figure 1 in the column entitled RTP vs. Lupron. This comparison is shown both with and without the 2% discount for payment within 30 days. No early payment discounts are routinely available from TAP.

The 7%/3.5% differential was chosen after consideration of several factors. First and foremost was the comparative Return to Practice for the urologist- as stated previously, the differential strategy results in favorable financials for Zoladex at every purchase level above 6 depots. Secondly, more aggressive price increases were considered, but it was felt that increases above the 7% level would jeopardize our position in the benign gynecology market where our lower price is our only marketable advantage. A 7%/3.5% increase leaves us with a $13.23 advantage in list price vs. Lupron 3.75mg and at least a $20.62 advantage in acquisition cost ( to our knowledge, no quantity based pricing is available for Lupron 3.75mg). Third, the proposed pricing tiers are particularly favorable for Zoladex at purchases volumes in the 72-96 depot range where a large volume of Lupron business now exists. Finally, the recommended strategy requires steeper discounts than are now available only for purchases of 192+ depots. To date, no physician account has purchased this volume

- 3 -

HIGHLY CONFIDENTIAL                                    AZ0237166

of Zoladex in a single order.

One final consideration weighed heavily in the identification of the recommended
pricing increases— Zoladex 10.8mg pricing. Until a unique J-code for Zoladex 10.8mg
is issued by HCFA, physicians will be reimbursed at a rate of three times the price of
Zoladex 3.6mg. (It is possible that a J-code will not be issued until 12-18 months post
launch.) Therefore, any acquisition price for the 10.8mg in excess of that for 3X3.6mg
will diminish the Return to Practice that is now realized by the physician. Although
there are several caveats to be considered, in general, an aggressive price increase
on the 3.6mg allows more aggressive pricing on the 10.8mg.

**For a more detailed analysis of the various pricing scenarios that were
considered and the development of the recommended strategy, please refer to
the attached document compiled by Steve Buckanavage and Tom Chen.**

### Strategic Risks

The risks attendant to the implementation of the recommended pricing strategy are
essentially the same as those presented by the rollout of our current pricing schema.
It is possible that some accounts may simply shift their ordering patterns to take
advantage of steeper discounts. In the proposed scenario, the only accounts who will
be able to take advantage of a more lucrative discount than is already available are
those accounts who can purchase in excess of 192 depots. There are currently only
five accounts who order in excess of 1000 depots of Zoladex per year. It is this small
contingent of accounts where a 4% downside risk due to shifting order patterns is
possible. However, accessing just one new account at this level more than outweighs
any realistic risk.

It must also be considered that there is a possible, however likely, risk of a reaction
from Medicare. It is feasible that HCFA may see through this strategy and take
offense. However, even with the aggressive strategy that we have proposed,
reimbursing for Zoladex still represents a much more economical alternative than does
reimbursing for Lupron, from a HCFA perspective.

### Timing

A January price increase is desirable. This timing will allow for the publication of
updated Zoladex pricing in the January 1996 RedBook. This reference is used by
many of the state Medicare carriers in revising their reimbursement levels. There is a
lower level of confidence that these revisions will be proactively implemented in a
timely manner if the Zoladex price increase is published in the February/March
RedBook updates. Additionally, the recent Lupron price increase has left Zoladex at a
competitive disadvantage that we are anxious to remedy.

- 4 -

14-01-0219

HIGHLY CONFIDENTIAL

AZ0237167

Ultimately, the timing of the price increase will be dependent upon product availability. Due to a variety of factors (production equipment problems, three consecutive months of exceeding forecast) our current level of safety stock is perilously low. At present, it is not certain whether adequate supplies can be accumulated to support a price protected buy-in in the January time frame. Although a buy-in was accounted for in current MRP forecasts, the speculative nature of the forecast combined with the higher than anticipated product demand leaves little room for error, especially with an extremely low safety stock.

On the positive side, as of this week the PPP ( the production facility for U.S. Zoladex 3.6mg supplies) will be dedicated to producing product for the U.S. only- previously this facility also manufactured product for specified international markets in addition to supplying the U.S. demand. As a result, we will benefit from an increased production capacity. It is still not known whether this action will result in a restoration of adequate safety stock by the January time frame. Henry Metz has committed that an answer should be forthcoming on November 27. Even if the forecasted capacity will satisfy our needs in January, it should be realized that even a single batch failure, for any reason, could put us in jeopardy of a back order situation.

### Conclusion

A retrospective analysis reveals that our two previous executions of a quantity based pricing strategy have resulted in a rapid increase in Zoladex demand. Market conditions are now favorable for the introduction of a more aggressive strategy- in fact, an aggressive move is requisite in order to maintain our competitive profile and to continue on a 30+% trend in annual revenue growth.

Accordingly, it is the recommendation of Product Management and Marketing Strategy to implement a differential price increase of AWP +7%/AWC +3.5% and to create an additional discount tier of AWC less 24% for purchases of 192 depots or greater.

I would like to thank Steve Buckanavage and Tom Chen for their valuable input toward the derivation of this pricing strategy. Finally, I would appreciate any feedback you have to offer and I await your decision as to our way forward.

- 5 -

14-01-0220

HIGHLY CONFIDENTIAL

AZ0237168

# FIGURE 1. ZOLADEX QUANTITY BASED DISCOUNT PRICING SCHEDULE RETURN TO PRACTICE VS. LUPRON

| QUANTITY PIECE | DISC | AWP | ACQUISITION COST | HCFA REIMB | PATIENT COPAY | RTP W/317.5 | RTP W/248.30 | RTP vs LUPRON W/398.88 | RTP vs LUPRON W/2% |
|---|---|---|---|---|---|---|---|---|---|
| 1-5 | 0% | $383.85 | $ 288.86 | $ 306.92 | $ 76.73 | $ 92.71 | $ 88.77 | $ (12.49) | $ (8.54) |
| 6-11 | 6% | $383.85 | $ 279.07 | $ 306.92 | $ 76.73 | $ 110.16 | $ 104.58 | $ 5.53 | $ 10.91 |
| 12-23 | 9% | $383.85 | $ 270.16 | $ 306.92 | $ 76.73 | $ 118.89 | $ 113.49 | $ 2.33 | $ 7.31 |
| 24-47 | 12% | $383.85 | $ 261.25 | $ 306.92 | $ 76.73 | $ 127.62 | $ 122.39 | $ 0.28 | $ 3.52 |
| 48-59 | 15% | $383.85 | $ 252.35 | $ 306.92 | $ 76.73 | $ 136.35 | $ 131.30 | $ 4.29 | $ 0.31 |
| 60-71 | 16% | $383.85 | $ 243.44 | $ 306.92 | $ 76.73 | $ 145.08 | $ 140.21 | $ 5.23 | $ 0.10 |
| 72-95 | 20% | $383.85 | $ 237.50 | $ 306.92 | $ 76.73 | $ 150.90 | $ 146.14 | $ (19.) | $ 11.95 |
| 96-143 | 20% | $383.85 | $ 237.50 | $ 306.92 | $ 76.73 | $ 150.90 | $ 146.14 | $ 3.22 | $ 7.08 |
| 144-192 | 20% | $383.85 | $ 237.50 | $ 306.92 | $ 76.73 | $ 150.90 | $ 146.14 | $ 3.22 | $ 7.04 |
| 192 | 24% | $383.85 | $ 225.03 | $ 306.92 | $ 76.73 | $ 162.53 | $ 150.02 | $ 0.03 | $ 5.52 |

AWP/AWC 1.99%

Spread 89.2%

Notes:
1) RTP vs Lupron= return to practice Zoladex vs. Lupron
2) Lupron 3.75mg price: AWP= $398.88
AWC= $317.5

ZPRICE2

14-01-0221

HIGHLY CONFIDENTIAL

AZ0237169

# EXHIBIT 30

**Internal Memorandum**

DATE:  January 19, 1996

FROM:  Keith Patterson

    TO:  Chris Iacono

ZENECA Pharmaceuticals Group
Your Department
Wilmington, DE  19897
Telephone (302) 886-8476
FAX No. (302) 886-7896

CC:  Steve Strand
      Sarah Harrison
      Tom Chen
      Paul Feirstein
      Steve Buckanavage

## Zoladex Pricing Strategy-Revised View

### Introduction

The positive impact of quantity based pricing schemas upon the sales performance of Zoladex during 1994 and 1995 has now been widely documented.  In each of the last two years a plateau in product performance was overcome and reversed by the implementation of a discounting strategy. .The basic objective behind the current Zoladex pricing strategy is to provide a economically attractive package to the direct purchasing physician without diminishing our realized revenue per unit.  In 1995, by improving the economic parameters at higher purchase levels, Zoladex unit volume increased by a factor of 38% while our realized revenue per unit remained stable (vs. 1994) at approximately $250.

Prior to November 1995, the RTP realized by the physician for purchases of Zoladex was similar to but still less than that realized for Lupron at most purchase volumes.  In November, TAP increased the price of Lupron by a factor of +3.9%— an action which effectively improves their competitive profile, from the physicians point of view.  As a result, Zoladex is now at an even greater disadvantage in terms of the financial attractiveness of our product profile.  In order to avoid another plateau in sales performance, it is now incumbent upon us to devise a pricing schema which will not only remove this competitive disadvantage, but will position Zoladex favorably vs. Lupron from the physicians perspective.  Following are the recommendations of the Zoladex Marketing Team.

### Recommended Strategy



EXHIBIT
Patterson·017
4/29/05 mkm

01-14-1131



REDACTED
HIGHLY CONFIDENTIAL

AZ0024479

The challenge in this instance is to come up with a scenario which:
1) is more attractive financially than Lupron for the direct purchasing physicians.
2) does not erode our realized revenue per unit, and
3) minimizes any perceived risk from a regulatory/legal/public relations perspective.

These objectives can be met by: 1) enacting a parallel and equal increase in both the AWP and AWC for Zoladex 3.6mg and, 2) in conjunction, increasing the existing discounts for quantity purchases by an amount slightly less than the AWP/AWC increase.

Accordingly, it is recommended that a **7% price increase** be instituted for Zoladex 3.6mg. In parallel, it is recommended that an **additional 2-3% discount** (depending on the tier) be added to existing tiers. Furthermore, it is recommended that **two additional tiers of discounts** (23% and 27%) be added for single purchases of 73-191 and 192+ depots, respectively. This scenario is displayed in a spreadsheet format in Figure 1.

This pricing scenario will achieve the following:
1) A 2-3% improvement in the economic profile for the physician.
2) An increase in average realized revenue per unit for Zeneca.
3) A "responsible" or "patient friendly" pricing position which results in Zoladex 3.6mg being priced at $112.60 per dose less than our competition.
4) A resulting price which allows us to maintain a pricing advantage vs. Lupron 3.75mg in the benign gynecology market.
5) A more attractive financial scenario than Lupron 7.5mg at all purchase levels above 5 depots.
6) A significant improvement in our ability to compete in the top quintile of Lupron business (i.e a contingent of 200+ accounts who purchase an average of 100 depots per month).

When pricing the Zoladex 10.8mg formulation, the lack of a dedicated J-code must be considered. Until such a code is issued (or until a temporary Q-code can be obtained), the physician will be reimbursed at a rate of 3 x Zoladex 3.6mg when a claim is filed electronically. By exception, a miscellaneous claim can be filed manually which will allow reimbursement at a rate of 80% of the published price for Zoladex 10.8mg. In pricing the three month depot the following objectives must be met:

1) Allow for a competitive economic profile vs. Lupron.
2) Insure that the direct purchasing physician is not penalized by filing electronically without the benefit of a dedicated J-code.


HIGHLY CONFIDENTIAL

01-14-1132

AZ0024480

3) Allow for a small pricing premium, justifiable by improved convenience and health care resource conservation..

4) Allow for a negotiating position when seeking a dedicated J-code from HCFA (i.e price of Zoladex 10.8mg is less than 3 x Zoladex 3.6mg plus the cost of office visits, injection fees, extra claim processing, etc.).

5) Allow for greater realized revenue per unit.

In order to meet the above stated objectives it is recommended that the Zoladex 10.8mg depot be priced at a 5% premium to three times the 3.6mg depot. In parallel, an additional 2% will be added to the discounted tiers that are specified above for the 3.6mg pricing schedule. Given this scenario, all of the above stated objectives are met. (This anticipates that Lupron will be priced at a level of 3 times their current price for the 7.5mg formulation.) For greater detail, please see Figure 2.

In conclusion, the above pricing scenarios are designed to counter a complex array of interacting forces that work together to define a key component in the competitive profile of the LHRH agonist, name the economic profile. The recommended strategy attempts to consider the interests of all parties involved— the purchasing physician, the health care system in general including HCFA, and Zeneca itself. While the recommended price increases may appear to be somewhat aggressive, it is believed that we will still be left with a very "responsible" pricing position when it is considered that Zoladex 3.5mg will be $112.60 less expensive per dose than our competition.

Again I would like to acknowledge the valuable input that has been provided by Tom Chen and Steve Buckanavage. I anxiously await your response and approval.

01-14-1133

AZ0024481

HIGHLY CONFIDENTIAL

# EXHIBIT 31



Prepared for Bristol-Myers Squibb

Prepared by Charles River Associates

# Paraplatin Deconversion

## Discussion Outline

### July 21, 1999

nly Confidential

# BMS/BLO Sales Force

■ Provide training and information on:

- Economic issues

- Characteristics of vulnerable physicians

■ Economic issues to be discussed in a low key manner

- No printed materials

- Respond to physician concern

- Maintain the "high road" -- officially promoting Paraplatin based on efficacy, tolerability and quality of life

> Training to be provided via existing sales meeting or a special seminar





Highly Confidential

BMS/AWP/01233134

# EXHIBIT 32

# HEALTHIIQ



750 THE CITY DRIVE, SUITE 210
ORANGE  CA 92668-4940
TELEPHONE 714.750.4474
800.866.4474
FACSIMILE 714.750.8313
INTERNET INFO@HEALTHIQ.COM

March 15, 1996

Bob Boxer
Kytril Special Projects
SmithKline Beecham Pharmaceuticals
One Franklin Plaza
P.O. Box 7929
Philadelphia, PA 19101-7929

Dear Bob:

Thank you for sending the information regarding Glaxo's new pricing strategy. I understand your intent was for HEALTHIQ to follow-up our recent, and highly effective, correspondence to the Medicare Part B Medical Directors with an update regarding Glaxo's latest attempt to "gouge" the Medicare system. However, we believe this would not be in SmithKline Beecham's best interest, for the following reasons:

1  Medicare guidelines under the Part B benefit stipulate that reimbursement for pharmaceuticals will be based on the lower of the actual charge, the average wholesale prices (AWP) for the generic form of the drug, or in the case of multiple source drugs, the median of all the generic AWPs or an estimate of actual acquisition costs. Although HCFA has not implemented a system to monitor actual acquisition costs, and currently "defers" to AWP, there have been, and continue to be, serious discussions regarding this matter.

2.  A recent report released by the Department of Health and Human Services Office of the Inspector General, which focused specifically on Medicare payment methodologies for three prescription drugs used by nebulizer patients, concluded that significant cost savings to the Medicare program would result from implementing new reimbursement methodologies, for example, drug rebate programs, discounts off AWP, or "inherent reasonableness" -- basing payment of drugs on the estimated acquisition cost.

3.  In speaking with Dr. David P. Sheridan, Medical Director for South Carolina, he indicated Medicare had no intention of paying more than cost. As a result, this carrier will require attachment of an invoice with every claim submitted for Zofran pre-filled bag. HEALTHIQ will continue to follow-up with other Medical Directors to determine their policy regarding this issue, and provide SmithKline Beecham with a summary of our findings.

4.  From the communications received to date, the letter submitted by Physician Homecare Associates, Inc., ostensibly written on behalf of physicians and other healthcare providers, appeared to be greatly appreciated by the Medical Directors. A follow-up letter apprising Medicare of an increase in Glaxo's AWP and a proffered discount to purchasers (which would seem to benefit providers), might appear "peculiar" and prompt questions as to the "true" identity of Physician Homecare Associates.

As a result of the issues raised above, HEALTHIQ is concerned that highlighting the difference between the actual acquisition cost and the published AWP may not only increase attention to Glaxo's pricing practices, but may provide the impetus for HCFA to implement a system that could impact not only reimbursement of anti-emetics, but all pharmaceutical and biological products. The ramifications could extend well past Medicare to include Medicaid programs (also administered by HCFA) as well as private payors (who tend to mimic policies and procedures implemented by public payors).

PLAINTIFF'S
EXHIBIT

YOUR
KNOWLEDGE
PARTNER

P 007133

SB01915

FR-15-1996  09:03   FROM  HEALTHIQ CA                     TC              12157917632   P.02

Bob Boss
March 15, 1996
Page 2

Therefore, HEALTHIQ feels it would be best not to pursue this matter with the Medicare Part B Medical
Directors.

Bob, please let me know your thoughts.

Best regards,

Rubén R. Alvarado
Senior Vice President

P 007134

SB01916

# EXHIBIT 33

| To | Kevin Lokay | cc | David Newman |
|---|---|---|---|
| | | | Michele Stafiniak |
| From | Pearl Pugh | Date | 27 January 2000 |

Subject    **Recommendation for Kytril price increase**

### Situation
SB is preparing to increase prices on pharmaceutical products on March 15,2000. Each product team has been asked to decide whether or not to participate in this group price increase exercise for their product.

### Target
To make a recommendation on the following: Should SB increase the price of Kytril? If so, by how much? What would be the timing be?

### Proposal
As the price for Kytril was increased in May 1999 by 4.9%, and previously in October 1998 by 4.9%, **I am recommending that we do NOT take a price increase of any kind in March and hold off until 4Q of this year to re-evaluate a potential price increase.** Reasons are as follows:

1. Contribution to Kytril net sales would be minimal, as RAR rate is projected to increase to 27.3% this year, with gross sales budget of $275 million and net sales budget of $200 million. Last year's analysis was based upon a budgeted RAR rate of 23.1% and showed that a 4.9% increase in July would result in a $1.0 million increase in net sales (based upon budgeted net sales of $206 million), and $6.5 million increase in gross sales (based upon budgeted gross sales of $268 million).  Note that actual price increase took place in May.
2. Due to greater government focus on injectable drug pricing in the oncology clinic setting, it is wise for SB to further space the timing between price increases on Kytril.  If, for example, SB were to raise the price of Kytril in November of this year, a solid 18 months would have passed since the last price increase.
3. We are anticipating a labeling change for Kytril next year to include use in days after chemotherapy (not just on day of chemotherapy) based upon study results due to be completed in 2Q of this year. Furthermore, we are also filing an NDA for Kytril oral solution in 2Q of this year which should result in a new commercially available formulation in 2001. Therefore, there is no good reason based upon product profile enhancements, that SB should take a price increase on Kytril in the near future.



X

Highly Confidential under Protective Order/MDL No. 1456

X

**Estimation - Gross market value**

| | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| vs. prior year | | 7% | 0% | -3% | -3% |
| Total Mkt Value | 537,700 | 575,000 | 575,000 | 558,000 | 541,250 |
| Zofran | 255,096 | 270,250 | 235,750 | 228,780 | 221,917 |
| Kytril | 279,604 | 276,000 | 276,000 | 267,840 | 259,605 |
| Anzemet | 0 | 28,750 | 63,250 | 61,380 | 59,539 |
| | | | | | |
| Total Mkt Share | 100% | 100% | 100% | 100% | 100% |
| Zofran | 48% | 47% | 41% | 41% | 41% |
| Kytril | 52% | 48% | 48% | 48% | 48% |
| Anzemet | 0% | 5% | 11% | 11% | 11% |

**Estimation - Net market value**

| | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| vs. prior year | | 1% | -5% | -3% | -3% |
| Total Mkt Value | 457,045 | 460,007 | 431,372 | 418,618 | 406,059 |
| Zofran | 219,382 | 218,681 | 179,170 | 173,873 | 168,657 |
| Kytril | 237,663 | 220,800 | 207,000 | 200,880 | 194,854 |
| Anzemet | 0 | 20,548 | 45,202 | 43,985 | 42,549 |
| | | | | | |
| Total Mkt Share | 100% | 100% | 100% | 100% | 100% |
| Zofran | 48% | 48% | 42% | 42% | 42% |
| Kytril | 52% | 48% | 48% | 48% | 48% |
| Anzemet | 0% | 4% | 10% | 10% | 10% |

| | WAC | OSH | ave distributor price | ave contract price | net price |
|---|---|---|---|---|---|
| **1999, 2000, & 2001** | | | | | |
| Zofran | 203.69 | 167.09 | 185.39 | 140.90 | 76% Zofran |
| Kytril | 148.88 | 131.01 | 139.95 | 104.95 | 75% Kytril |
| Anzemet | 124.90 | 71.00 | 97.95 | 70.00 | 71% Anzemet |
| **1998** | | | | | |
| Zofran | 203.69 | 167.09 | 185.39 | 150.00 | 81% Zofran |
| Kytril | 148.88 | 131.01 | 139.95 | 111.96 | 80% Kytril |
| Anzemet | 124.90 | 71.00 | 97.95 | 70.00 | 71% Anzemet |
| **1997** | | | | | |
| Zofran | 203.69 | 167.09 | 185.39 | 157.58 | 85% Zofran |
| Kytril | 141.44 | 124.46 | 132.85 | 113.01 | 85% Kytril |
| Anzemet | 124.90 | 71.00 | 97.95 | 70.00 | 71% Anzemet |

**Assumptions:**
1. No further price increases for any product
2. Discounting and market share stabilize for 1999, 2000, and 2001

cc: Rich

Kevin -
Here's a quick look
at rut $ and share.

Michele

Kyrar, Net mkt value

12/22/1998, 11:24 AM

Highly Confidential under Protective Order/MDL No. 1456

# EXHIBIT 34

*Files - newformanel*

**ORTHO BIOTECH**

**Memorandum**

*CONFIDENTIAL*

To:      G. Reedy                                    Date:   December 2, 1997

From:    C. Dooley                                   cc:     B. Pearson

Subject:   Implications and Ramifications of Price Increase over Parity with Amgen's 10s and 20s
           PROCRIT – Attorney Client Privilege

This memo addresses 2 issues:
1. Implications of exceeding 1.8% price increase resulting in OBI not being on parity with Amgen's 10s and 20s and the potential implications this would have for HCFA and other payers
2. Implications of the Congressional mandate in ESRD stipulating payment of $10.00/ 1,000 units for ESRD patients and the ramifications in the oncology arena of a change in AWP

**Issue:**
- High use of EPO in ESRD makes EPO a visible expenditure for HCFA
- EPO is currently reimbursed at different rates by the federal government for different indications – **same drug different reimbursement rate**
- Epoetin alfa EQUAL Epoetin alfa to the government
- Currently OBI is reimbursed at a premium rate – Amgen is essentially "handcuffed" by the government regarding increasing EPO price.
- Non-dialysis is reimbursed at $12.00 / 1,000 units; ESRD is reimbursed at $10.00 / 1,000 units

**Implications for Increase over Parity**
- **The mandated price set by the Congressional mandate for ESRD results in market sensitive to price change. (HCFA is the major payer for ESRD.)**
- **Change in list price could trigger a drug survey by HCFA.**
  [HCFA reserves the right to pay the average acquisition cost established by surveying the market. (Federal government can lower the price by one of two means: 1) Congressional mandate to decrease price; or 2) application of Inherent Reasonable Clause – e.g. LifeScan.]
- **You may have a pricing survey anyway, but raising red flags could trigger it earlier.**
  (There is already sensitivity on Medicare drug pricing based on OIG report in the spring of 1997 which outlined the money the federal government spends on the same drug under the Medicare program vs the Medicaid program and articles that have appeared in Baron's (6/97 and 11/97) and the *Pink Sheets*.
- **Consequence of pricing survey could be acquisition, FSS or ESRD reimbursement rate in non-dialysis.**



EXHIBIT 3A
Dooley
Jan. 13, 2006
PENGAD 800-631-6989

**Private Payers**
- Private fee-for-service and discounted fee-for-service often mimic the Medicare payment strategy. Pharmaceuticals are generally reimbursed based on AWP.
- Some private plans and managed care plans allow or prefer that PROCRIT be accessed through a retail pharmacy channel of distribution. Prescription co-pays may apply.

**Background on ESRD Payment**
- Federal Government mandates the reimbursement rate for EPO under the ESRD program – Congressional mandate sets EPO payment rates in the dialysis market.
- The Congressional mandate is a carve out that stipulates guidelines for coverage, payment, and intervention points for use of EPO in ESRD.
- The reimbursement rate per thousand units of EPO in ESRD was lowered from $11.00 to $10.00 under OBRA '93 for ESRD.
    - This was a cost shift to cover the increased payment of immunosuppressive agents for transplant patients.
    - It was determined that providers could sustain lower reimbursement rate for Epoetin alfa because it more accurately reflected their purchase price.  Survey of dialysis center reflected the lower acquisition cost.

HIGHLY CONFIDENTIAL

MDL-OBI00061053

# EXHIBIT 35

175WEBB.TXT
```
00001
   1                    HIGHLY CONFIDENTIAL
   2              SUBJECT TO PROTECTIVE ORDER
   3                         *  *  *
   4              UNITED STATES DISTRICT COURT
   5            FOR THE DISTRICT OF MASSACHUSETTS
   6    - - - - - - - - - - - - - - - - - x
   7    IN RE PHARMACEUTICAL INDUSTRY     :
   8    AVERAGE WHOLESALE PRICE           : CIVIL ACTION:
   9    LITIGATION                        : 01-CV-12257-PBS
  10    - - - - - - - - - - - - - - - - - x
  11                         Mt. Crested Butte, Colorado
  12                         Friday, August 12, 2005
  13
  14            Videotaped Deposition of CAROL WEBB, a
  15    witness herein, called for examination by counsel
  16    for Plaintiffs in the above-entitled matter, pursuant
  17    to notice and the Federal Rules of Civil Procedure,
  18    the witness being duly sworn by CRAIG KNOWLES,
  19    a Notary Public in and for the State of Colorado,
  20    at 9:30 a.m.,  and the proceedings being taken down
  21    in Stenotype by CRAIG KNOWLES and transcribed under
  22    his direction.
 0
00002
   1    APPEARANCES:
   2
   3            On behalf of the Plaintiffs:
   4                    ALLAN M. HOFFMAN, ESQ.
   5                    Hoffman & Edelson, LLC
   6                    45 West Court Street
   7                    Doylestown, Pennsylvania 18901
   8                    Ph. (215) 230-8043
   9                    Fax (215) 230-8735
  10
  11            On behalf of Johnson & Johnson and its
  12              Operating Companies and Carol Webb:
  13                    ADEEL A. MANGI, ESQ.
  14                    Patterson, Belknap, Webb & Tyler, LLP
  15                    1133 Avenue of the Americas
  16                    New York, New York 10036-6710
  17                    Ph. (212) 336-2563
  18                    Fax (212) 336-7947
  19
  20            ALSO PRESENT:   Kenneth Zoetewey,
  21                            Videographer
  22
 0
00003
   1                        C O N T E N T S
   2    THE WITNESS:
   3    CAROL WEBB
   4            By Mr. Hoffman......................... 8
   5            By Mr. Mangi........................... 397
   6
   7                    E-X-H-I-B-I-T-S
   8
   9    WEBB EXHIBIT NO.                                PAGE NO.
  10    Exhibit Webb 001  Notice of Subpoenaed Deposition    8
  11
  12    Exhibit Webb 002  Savage memo dated 12/7/2000        51
  13
  14    Exhibit Webb 003  OBI Historical List Price Change Procrit  73
```

175WEBB.TXT
```
18          BY MR. HOFFMAN:
19     Q.   In both non-dialysis and dialysis, isn't
20  that correct?
21          MR. MANGI:  Same objection.
22     A.   That's true.
```
0
00101
```
 1          BY MR. HOFFMAN:
 2     Q.   So, and I believe you testified to this
 3  earlier, that that was one reason why you wanted to
 4  maintain your price at parity with Epogen's, so
 5  that --
 6     A.   But I want to say that that's not a
 7  competitive move.  That move would be so that
 8  anyone purchasing the drug wouldn't purchase it
 9  because there was a lower price on one of the two.
10     Q.   Why would OBI have to raise its price to
11  keep that from happening?
12          Let me ask it this way.  Why would OBI have
13  to raise its price to meet Epogen's price to assure
14  that Epogen wasn't lower priced than Procrit?
15          MR. MANGI:  Object to the form.
16     A.   Why would we not want price at parity?  If
17  we were below their price, then our revenue would
18  not -- would be less.  So why wouldn't we take a
19  price increase in order to have the drugs at
20  parity?
21          BY MR. HOFFMAN:
22     Q.   Right.  So you would want the price
```
0
00102
```
 1  increase so that you could increase revenue up
 2  through the level of Epogen's price?
 3     A.   That's correct.
 4     Q.   And that was true in 1997?
 5     A.   I would believe that would be the reason.
 6     Q.   Are you aware at any time between 1991 and
 7  2003 when the list price of Procrit was higher than
 8  that of Epogen's?
 9     A.   No.
10     Q.   And was that done on purpose by OBI?
11          MR. MANGI:  Object to the form.
12     A.   I don't remember.
13          BY MR. HOFFMAN:
14     Q.   Is it possible that was a deliberate
15  strategy of OBI throughout that period?
16          MR. MANGI:  Is it possible that was a
17  deliberate strategy?  Object to the form.
18     A.   It's hard to answer your question.  Could
19  you restate it?
20          BY MR. HOFFMAN:
21     Q.   Sure.  Was it OBI's strategy at any time
22  during 1991 to 2003 that it remain at or near
```
0
00103
```
 1  parity of Epogen pricing?
 2     A.   It was one consideration.
 3     Q.   And that was always a consideration that
 4  was discussed at the time of any price change?
 5     A.   One consideration.
 6     Q.   For every price change that you were aware
 7  of?
 8     A.   That, I couldn't tell you.
```
                                       Page 39

```
 9       Q.   And is it fair to say that another
10   consideration in connection with keeping their
11   price at parity or below that of Epogen was not to
12   trigger a survey or investigation by the government
13   into epoetin alfa pricing for Procrit?
14           MR. MANGI:  Object to the form.
15       A.   A consideration, yes.
16           BY MR. HOFFMAN:
17       Q.   For all price changes?
18       A.   That, I couldn't tell you.
19       Q.   For which price changes was that a
20   consideration?
21       A.   I have no idea.
22       Q.   Okay.  And the same thing with regard to
```
0
00104
```
 1   keeping the price of Epogen at parity, for which
 2   price changes was that a strategy?
 3       A.   I have no idea.
 4       Q.   Let's go back to -- actually, let me just
 5   finish with Exhibit Webb 005.
 6           In the last paragraph it says:  Our
 7   strategy is to create a stable
 8   pricing/reimbursement environment for Procrit and
 9   focus on increasing top line revenues and net
10   profit by accelerating market penetration and
11   continuing to reduce, eliminate our rebate/discount
12   structure.
13           Do you see that?
14       A.   Yes, I do.
15       Q.   By stable -- what is your understanding of
16   what he meant by a stable pricing reimbursement
17   environment for Procrit?
18       A.   What we were trying to do was to ensure
19   that our drug was reimbursed.
20       Q.   By whom?
21       A.   By all parties.
22       Q.   Okay.  And by raising your price at parity
```
0
00105
```
 1   with that of Epogen, how were you going to ensure
 2   that there was going to be a stable pricing
 3   reimbursing environment for Procrit?
 4           MR. MANGI:  Objection.  Mischaracterizes
 5   the document.
 6       A.   I don't believe that they have anything in
 7   common.  I think the last paragraph is just a
 8   recap.
 9       Q.   A recap of strategies?
10       A.   Of strategy.
11       Q.   Strategies that were identified earlier in
12   this document?
13       A.   No, I think just a recap of strategy in
14   general.
15       Q.   Is it your belief that these strategies
16   that are identified in this document are
17   inconsistent with the overall strategies that are
18   being recapped here?
19           MR. MANGI:  Object to the form.
20       A.   I don't quite understand your question.
21           BY MR. HOFFMAN:
22       Q.   You are telling me that the last paragraph
```
0

# EXHIBIT 36

*Lupron Settlement*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

UNITED STATES OF AMERICA          :

         v.          :          CRIMINAL ACTION

               :.          NO. 01-CR-10354-WGY

TAP PHARMACEUTICAL PRODUCTS, INC.:

## SENTENCING MEMORANDUM OF THE UNITED STATES

Comes now the United States of America, by Michael J.
Sullivan, United States Attorney, and Michael K. Loucks, Health
Care Fraud Chief, and Susan G. Winkler, Assistant United States
Attorney for the District of Massachusetts, and files this
Sentencing Memorandum in support of the Rule 11(e)(1)(C) plea
agreement and sentence, and the attendant global settlement
agreement entered into between the United States Attorney in this
District, the United States Department of Justice, prosecutors in
all fifty states and the District of Columbia, and the Office of
General Counsel for the Department of Health and Human Services,
on the one hand, and the defendant TAP Pharmaceutical Products
Inc., on the other hand.

TAP and the Government have reached a global criminal and
civil settlement agreement resolving all of TAP's criminal and
civil liability regarding the marketing and sale of the drugs
Lupron and Prevacid.  The broad terms of that agreement are
described in the first section of this memorandum.  Now before

$160,000,000 total. TAP's management was aware of that prosecution and even circulated among its employees a copy of a legal reporter discussing the prosecution and the punishment. Yet, TAP itself was then actively and aggressively engaged in crimes; the prosecution of its corporate neighbor had no effect whatsoever on TAP's conduct: general deterrence did not work as to TAP.

Second, also in 1995, TAP, in a moment of delicious irony, accused its competitor, the manufacturer of Zoladex, with providing inducements to physicians in violation of the Medicare fraud and abuse laws, to include the fact that employees of the competitor were giving free samples to doctors to encourage them to switch from Lupron to Zoladex. The competitor, in turn, accused TAP of the very same conduct. Top employees from the two companies met in a summit meeting to discuss this exchange of criminal allegations. *Did the serious allegations curb TAP's conduct? Did TAP, aware of allegations that its employees had engaged in criminal conduct, undertake expeditiously to stop the behavior, to train its employees in the rules and to enforce their adherence to the rules? Did either company, in possession of information that a competitor was violating the rules, report the conduct to prosecutive authorities in an effort to clean up the industry?* Unfortunately, the answer to all of these questions is no: TAP, cognizant of the rules and having been

-62-

accused of violations, simply carried on its business as it always had, full criminal speed ahead.

The punishment the Government proposes is harsh and severe and the attendant corporate compliance program will, hopefully, constitute a strong step to curbing future criminal conduct by TAP and others in its industry.

Respectfully submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

MICHAEL K. LOUCKS
HEALTH CARE FRAUD CHIEF
SUSAN G. WINKLER
ASSISTANT U.S. ATTORNEY
United States Courthouse
Suite 9200
1 Courthouse Way
Boston, MA 02210
617/748-3185
Massachusetts Bar No. 305520

# EXHIBIT 37



# COACH'S PLAYBOOK

TAP 5030224



The main point to make to physicians is that confidentially clause is a protection for them. If word is leaked back to HCFA/Medicare that the cost of Lupron is going down, they very well may take steps in reducing allowable. This tactic should help prevent physicians talking amongst themselves.

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

TAP 5030300

FOR REP USE ONLY                                  34

# EXHIBIT 38



# Memorandum

 Bristol-Myers Squibb Company

U.S. Pharmaceuticals

| | | | |
|---|---|---|---|
| To: | Mark Durand | Date: | December 5, 1997 |
| From: | Ron Miller | cc: | |
| Subject: | Oncology Policy Issues - Confidential | | |

Mark:

As we've discussed, I believe that there is a need to add an Oncology/Immunology policy person to our Policy Department, given the number of policy issues that Oncology faces. At the recent strategic planning meeting, the following issues were identified:

♦ **APG's.** These are outpatient DRG's that HCFA is working on that are essentially outpatient DRG's. They will apply to outpatient Oncology clinics. The key issue is: whether or not to include pharmaceuticals inside or outside of the APG. Our understanding is that HCFA is leaning on including them inside the APG, which we would oppose. Significant analysis and lobbying is required to impact this issue.

♦ **Continued Medicare Part B Battle.** This past year, we worked closely with Oncology on the Medicare Part B Reimbursement Issue with a very favorable outcome (instead of Oncology drug reimbursement being based on actual acquisition cost, which was proposed by the Administration, reimbursement will be based on 95% of the AWP. While this was a major success, the 95% number could be easily lowered in subsequent sessions of Congress. At the same time, Oncologists are enjoying larger margins on generic oncolytics, which gives them strong incentives them to use generics instead of branded products. We need to actively manage this issue.

♦ **NTI Legislation.** NTI legislation is popping up in several states and is sure to be a key business issue in several states. The legislation that has been drafted so far is poorly written and does not apply well to Oncology drugs. Dave Bonk would like to explore using NTI as a mechanism to protect our products going off patent from automatic generic substitution.

♦ **Medicare Structural Reform.** While we will continue to work on this issue, we need an Oncology expert to specifically evaluate proposed reforms from the Oncology perspective.

All of these issues have huge financial implications for Bristol-Myers Squibb. Given the large number of issues that we already staff (FDA Reform, Medicare Reform, Integrated Patient Care, PhRMA Staffing, NPC Staffing, all other state and federal issues) we are in need of additional headcount to effective manage these critical issues.

The type of person we would need would have a strong Oncology background and experience and a strong interest in Policy Analysis & Development. I would think that we would need someone at an Associate Director's level, given the background and experience that would be required.

Please let me know if you need any additional information.

ghly Confidential

# EXHIBIT 39



September 10, 1996

**VIA FAX & REGULAR MAIL**
(302) 886-2972

Mr. Mark Reisenauer
Product Promotion Manager
Specialty/Oncology Care
Zeneca Pharmaceuticals
P.O. Box 15438
Wilmington, DE  19850-5438

Dear Mark·

As per my voice mail message to you, the Office of Budget and Management
has tied the hands of Medical Directors, preventing them from surveying for prices or
using invoices on which to base their payments. This circumstance paves the way for
us to accomplish the goals that we originally set with our contract

We are anxiously awaiting the information requested in our June 20th letter -
specifically the O.K. to contact your sales reps and work directly with them in mounting
the offensive on each of the Medicare Directors, as well as obtaining from them the
key users of Zoladex in each state. We do have a significant amount of information on
what carriers are doing, the direction they are going and the amount they are paying.
Please advise as to how would like me to communicate this information to you

Also, Mark, we had talked once before about your sending me the briefs from
the lawyers, updating me on their activities, and also relaying information as to what is
going on at the national level with State and Federal  All of this knowledge could be
beneficial in achieving the final goals at the state level

We have a communication in one of the Medicare Bulletins which I think is
going to be very helpful in turning the other states around  It very succinctly states the
communication from HCFA regarding using surveys and invoices. and I think it will
move others to average wholesale price (AWP). I feel that we do have a window of
opportunity. and that we should move swiftly. I need your help! Talk to you soon.

Sincerely.

M Ray Painter, M.D , F.A C S.
President

MRP/lkm

01-08-2196

HIGHLY CONFIDENTIAL                                          AZ0011640

APR 29 '57 00:48 0                                                    P.2



PHYSICIAN REIMBURSEMENT SYSTEMS

April 28, 1997

Mr. Timothy Arenson
Associate Promotions Manager
Specialty/Oncology Care
ZENECA Pharmaceuticals
1800 Concord Pike
Wilmington, DE  19850

> RE:   **June 12, 1996, Contract Between PRS and ZENECA**

Dear Tim:

The goal of the above referenced contract, negotiated with Tom Chen and signed by Fred Roberts, was to obtain AWP reimbursement for the three month supply of Zoladex ($1,208.49).  After reviewing the contract, my notes made of conversations and communications with ZENECA, and examining the actual work performed, I think I understand the problem as perceived by ZENECA and of concern to PRS.

Since we were able to convert a number of states into paying for the three month Zoladex vial, PRS provided a service that was of value to ZENECA. Even though a method of communication was requested by PRS, it was never properly established, and PRS was never asked for reports of work in progress.

Specifically, there were four parts to the contract.

1.   PRS immediately researched the Medicare carrier payment policies and continued to monitor them on a monthly basis.  (See document being sent by separate cover.)

2.   We worked directly with Medicare Medical Directors, Carrier Advisory Committee urology members, and other practicing urologists and assisted in achieving payment for the three month Zoladex vial in several states.  We did not receive the requested list of key urologists using Zoladex in each state.

*WHICH STATES? WHEN WAS THIS ACHIEVED?*

3.   PRS set up a toll-free hotline for ZENECA representatives and answered all calls. This line remained open until approximately three months after the contract officially ended.  We were somewhat hampered by not receiving the list of sales representatives, including their phone numbers, with whom we had anticipated working directly.

*HOW MANY CALLS PROCESSED?*

1675 Larimer Street, Suite 410, Denver, Colorado 80202
303-534-0571 • Fax 303-534-0572

01-08-2191

—HIGHLY CONFIDENTIAL—                                    AZ0011635

APR 29 '97 00:49 0                                                           P.3

Mr. Timothy Arenson
Page 2

4.   PRS was also to receive a list of the 200 HMOs for which ZENECA
     wanted us to determine payment policies. However, we never received
     the listing. This is the part of the contract we were unable to complete.
                                *HOW MANY? DEDICATED TO 2 HOLINE?*
     In summary, we had full-time employees staffing the hotline and
performing a significant amount of research, including many phone calls to
carriers and urologists, attempting to change the payment status. We assisted
in negotiating the payment in a number of states and also were instrumental in
helping to change Colorado from using surveys/invoices for the payment of
Zoladex. When the Colorado policy was abandoned, we communicated this
change to a number of other states that were attempting to do the same thing.
Further, we were able to assist Mark in some strategies based on some
additionally projected changes.                     *↳ SUCH AS?*

     As mentioned above, we could not complete the database or perform the
research for the 200 HMOs. Although we had the personnel with the capacity to
provide the research and had the database prepared for input, we did not
complete that part of the contract because we did not receive the list.   If
ZENECA feels that it should receive credit for that portion of the contract, we
would be happy to provide additional research. If you would prefer, we could
give you credit on future contracts. I'm not sure how we quantify the actual
value, but when you compare the payment policy of 200 HMOs to the continued
monitored negotiation and databasing of information from Medicare carriers,
the percent of the contract involved would be small.

     In order to expedite a satisfactory closure to this issue, PRS would be
willing to give ZENECA a $20,000 credit on the proposed private payer phone
consultation contract.

                                             Sincerely,

                                             *Ray*

                                             M. Ray Painter, M.D., F.A.C.S.
                                             President

Enclosures

ADDENDUM: As evidence of part of the work we performed, under separate
cover you will be receiving a large notebook of state specific data on Zoladex
coverage by Medicare carriers. If you have any additional questions or would
like further information, please so advise. I look forward to hearing from you
soon.

01-08-2192

HIGHLY CONFIDENTIAL                                          AZ0011636—

# FAX

| | |
|---|---|
| **Date** | '08/06/96 |
| **Number of pages including cover sheet** | _3_ |

| | | | | |
|---|---|---|---|---|
| **TO:** | Keith Patterson | **FROM:** | Carol Ware | |
| | Mark Reisenauer | | S&FA | |
| | | | 1101 King Street | |
| | | | Suite 600 | |
| | | | Alexandria, VA  22314 | |
| **Phone** | | **Phone** | 703-518-4290 | |
| **Fax Phone** | 302-886-7896 | **Fax Phone** | 703-706-5925 | |

**CC:**

**REMARKS:**   ☒ Urgent    ☐ For your review    ☐ Reply ASAP .    ☐ Please Comment

Keith and Mark,

Great news!  Please see the attached from HCFA's Regional Office instructing Dr. Steffen of Colorado to cease payments for ZOLADEX® based on invoice cost and to reinstate AWP reimbursement immediately.

Paula and I recommend that we send a bulletin to reps and providers in the states of ND, SD, WY, and CO informing them of this new development and instructing them to resubmit any underpaid claims for full AWP reimbursement.  We would like to use the Zeneca customer list for providers, but of course, we can use the Hotline database instead.  I'll begin drafting the bulletin right away.

Call me with questions at 703-518-4290.

PXL01258
HIGHLY CONFIDENTIAL



**Medicare**

600 Grant Street, Suite 600
Denver, CO 80203-3527

# MEMORANDUM

**To:**      All the Physicians Who Wrote In About Lupron

**From:**    Grant E. Steffen, MD

**RE:**      Average Wholesale Price (AWP) and Acquisition Cost (AC)

**Date:**    August 6, 1996

The Regional Office of HCFA has instructed me to write this letter retracting my request for invoices made in my memo to you dated July 11, 1996. This letter will also serve to notify you that there will be no, nor was there any reduction in the payment for either Zoladex or Lupron. This carrier will continue to allow payment on the basis of the AWP.

Thank you for your patience.

PXL01259
HIGHLY CONFIDENTIAL