UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) | |
| | ) | MDL No. 1456 |
| | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) | Judge Patti B. Saris |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF RAYMOND S. HARTMAN IN RESPONSE
TO DR. GAIER'S DECLARATION IN SUPPORT OF
THE TRACK 1 DEFENDANTS' JOINT MOTION
FOR SUMMARY JUDGMENT WITH RESPECT TO CLASS 3**

**Executive Summary**

In their Motion for Summary Judgment with Respect to Class 3, Defendants rely upon the July 14, 2006 Declaration of Dr. Gaier, who asserts that private-sector third-party payers with staff-model HMOs that purchased Part B drugs knew of and were not deceived by the alleged AWP spreads. However, Dr. Gaier's analysis is incomplete and his assertions are incorrect. Using data summarizing reimbursements to physician providers within the network of the largest TPP in Class 3, Blue Cross Blue Shield of Massachusetts (BCBS-MA), I demonstrate that knowledge of the ASPs of Part B drugs did not enable BCBS-MA to defeat the alleged AWP Inflation Scheme and negotiate network provider reimbursements reflecting ASPs rather than AWPs. Deposition testimony from BCBS-MA confirms the fact that there was no communication of such knowledge within BCBS-MA and that network provider reimbursements relied upon AWP formulas exactly as did reimbursements by TPPs without staff model HMOs.

The fact that such knowledge did not enable BCBS-MA to defeat the AWP Inflation Scheme is consistent with the theories of institutional behavior and bounded rationality, the theory of status quo bias, Dr. Berndt's observation of the importance of drug costs being unimportant, the costs of information processing and the observation that BCBS-MA's ASPs may provide poor signals for the drug acquisition costs of network providers. In any case, there is no evidentiary value in Dr. Gaier's analysis or assertions. The reasons that members of Class 3 did not and could not make use of such ASP information to defeat the AWP Inflation Scheme also explain public payors' inability to defeat the AWP Inflation Scheme in the face of similarly incomplete and imperfect information.

Furthermore, other assertions put forward by Defendants in their Motion for Summary Judgment are demonstrated to be surprisingly contradictory or uninformed.

## I.    Introduction and Overview of this Declaration

1.    My name is Raymond S. Hartman. I have presented my qualifications to this Court in prior MDL AWP and State AWP testimony.

2.    I have been asked by Counsel to the named Plaintiffs and the Plaintiff Class to review the July 14, 2006 Declaration of Dr. Eric M. Gaier in Support of Summary Judgment with Respect to Class 3[1] and where appropriate Defendants' reliance on Dr. Gaier's analysis in their Motion for Summary Judgment.[2]

Dr. Gaier's declaration introduces *no new arguments* in support of Summary Judgment; it introduces *no new empirical analysis*; it merely repackages the presentation

---

[1] Declaration of Eric M. Gaier, Ph.D., in Support of the Track 1 Defendants' Joint Motion for Summary Judgment with Respect to Class 3, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, C.A. No. 01-12257-PBS, July 14, 2006 (hereafter "*Gaier July 2006 Declaration*").

[2] The Track 1 Defendants' Memorandum of Law in Support of their Motion for Summary Judgment with Respect to Class 3, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, C.A. No. 01-12257-PBS, July 24, 2006, (hereafter "*Track 1 Defendants' Memorandum*").

of his earlier empirical analysis[3] and eliminates data for manufacturers that have settled out of the litigation.[4]  As a result, my conclusions regarding the lack of evidentiary value of his arguments and his data are the same as those put forward in my earlier response to his analysis.[5]

3.      In both declarations, Dr. Gaier focuses upon direct purchases of physician-administered drugs by the major Massachusetts TPPs.  He demonstrates that these TPPs purchased physician-administered drugs at ASPs below, and usually well below, the Medicare AWP reimbursement formulae.  The purchases were always through operating divisions independent from the claims reimbursement operating division.  He concludes that these TPPs therefore had sufficient information to *institutionally* understand that spread inflation was occurring and to *institutionally* defeat the alleged AWP Inflation Scheme.

4.      As in his prior declaration, his assertions and conclusions fail in his current declaration.  I demonstrate this as follows.  In Section II, I reexamine the issues raised and arguments made by Dr. Gaier.  I reiterate the reasons why the issues are irrelevant and why Defendants' arguments for Summary Judgment fail.  In Section III, I extend the discussion to the availability of pricing information more generally and whether that availability would defeat the alleged AWP inflation scheme.  Specifically, I address whether knowledge of spread information was sufficient to defeat the AWP Inflation Scheme for public payors.  I find that it was not.  I discuss the reasons why the knowledge of such information fails for public payors generally and members of Class 3 specifically.  In Section IV, I draw the appropriate conclusions regarding the evidentiary value of the interpretations of Dr. Gaier's analysis made by Defendants in their motion for summary judgment.  In Section V, I summarize this Declaration.  Attachment A identifies additional materials relied upon in this Declaration.


## II.     Dr. Gaier Incorrectly Asserts that Massachusetts Private Sector TPPs with Staff Model HMOs Which Purchased Part B Drugs Were Sufficiently Knowledgeable to Defeat the Alleged AWP Inflation Scheme

5.      If any entities would benefit from and act upon knowledge concerning the "mega-spreads" that existed between the AWPs and acquisition costs of drugs (spreads which are asserted by Defendants to be fully understood by the market), one would assume that it would be profit-maximizing TPPs, particularly those which themselves purchased the

---

[3] His prior argument and analysis were presented in his Declaration In Support of Track 1 Defendants' Joint Motion for Summary Judgment, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, C.A. No. 01-12257-PBS, March 15, 2006 (hereafter "*Gaier March 2006 Declaration*").  In his current declaration, for reasons that are not discussed, Dr. Gaier does add pricing data for several NDCs for several reported drugs.  This extension does not alter his results in any meaningful way.

[4] The data he eliminates is discussed in ¶ 2 of *Gaier July 2006 Declaration*.

[5] Declaration of Raymond S. Hartman in Opposition to Defendants' Motions for Summary Judgment, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, C.A. No. 01-12257-PBS, April 6, 2006 (hereafter "*Hartman April 2006 Declaration*").

same physician-administered drugs. One would expect that such profit-maximizing entities would be well informed and sufficiently economically agile to exploit such information and negotiate reimbursement rates to ASPs.

6.      This expectation is the point of departure of Dr. Gaier's testimony. He claims that "knowledge regarding the differences between AWP and provider acquisition costs, as a matter of economic theory, would prevent payors from overpaying for prescription drugs as a result of the alleged AWP scheme and therefore insulated them from economic harm" (at his ¶ 4).

It must be noted that in this assertion, Dr. Gaier has conflated **a hypothesis** regarding evidence of TPP knowledge with **an unproven conclusion** concerning TPP reimbursement behavior, **a conclusion which is proven incorrect by the available data from these TPPs,** as discussed below.

7.      Specifically, Dr. Gaier has analyzed sales data for "four of the top five Massachusetts TPPs[6] … [that] purchased physician-administered drugs directly through contracts with manufacturers, through group purchasing organizations ('GPOs'), or through drug wholesalers. These purchases were made by organizations that provided medical care, required a supply of drugs for their operation, and were owned by these TPPs" (at ¶ 6 in his *March 2006 Declaration* and his *July 2006 Declaration*). The purchases were made by these TPPs through their operating divisions that provided the medical care.

Hence, the medical reimbursement and insurance activities of these TPPs were a part of the broader overall corporate structure which also included direct provision of healthcare services. Dr. Gaier provides no information about the array of health services provided by each TPP or about the degree to which the operating divisions acted independently or in an integrated fashion.

8.      Dr. Gaier found that "these TPPs purchased significant volumes of physician-administered drugs" (at his ¶ 7 in both declarations) ... "at discounted prices generally at, and in many cases below, the ASPs calculated by plaintiffs' expert Dr. Hartman" (at his ¶ 8 in both declarations).

He concludes (at ¶ 9 of his *March 2006 Declaration* and at ¶ 10 of his *July 2006 Declaration*) that "manufacturer sales data demonstrate that at least four of the largest five TPPs in Massachusetts – including plaintiff BCBS-MA … – had knowledge that the subject physician-administered drugs were available to providers at substantial discounts from AWP and knew the magnitude of those discounts since at least 1991."

9.      But his logic fails. Dr. Gaier simply has not completed the necessary analysis to draw the conclusion that he and Defendants draw. His analysis has merit only if he demonstrates these direct purchases truly did inform the TPPs of the actual acquisition costs paid by the staff model HMOs and that those TPPs made use of that information in

---

[6] He focuses on four TPPs in Massachusetts (BCBS MA, Harvard Pilgrim, Cigna and Fallon) which account for approximately 70% of covered lives in Massachusetts. BCBS MA is the largest, accounting for 46%. See Dr. Gaier's Table 1 in his *March 2006* and *July 2006 Declarations*. "Harvard Pilgrim and Fallon were staff/group model health maintenance organizations ('HMOs')"; see ¶ 6 in both Gaier declarations.

their claims reimbursement practices with their network providers.  Dr. Gaier did not conduct that analysis.

10.     I do conduct that analysis as follows.  In my *April 2006 Declaration* I demonstrated that the reimbursed amounts paid by BCBS-MA (the largest Massachusetts TPP) were not informed by and did not reflect this "knowledge" of ASP.  Instead, these BCBS-MA reimbursement amounts were related to AWP in the same way as found with claims reimbursed by TPPs without staff model HMOs and therefore without ASP information provided by staff model HMOs.  Hence, the only valid conclusion that Dr. Gaier can draw from an appropriately complete analysis of his data (and related deposition testimony[7]) is that BCBS-MA's staff-HMO information was simply not shared with and acted upon in any meaningful way by the claims administration group (the "provider reimbursement group").

11.     In performing my analysis, I had my staff gather and analyze the data summarizing claims administered outside of the staff-model HMO setting for BCBS-MA.[8]  My analysis of the BCBS-MA claims data focuses upon the period 1994-2003 and summarizes the average reimbursement amounts paid for a subset of the drugs and J-Codes that Dr. Gaier introduced.  My analysis is presented in Attachment B.[9]

   If Dr. Gaier's hypothesis is correct, I should find the following:

   a) For those drugs which it purchased directly, BCBS-MA should have been well-informed concerning acquisition costs and should have been able to make use of that information to negotiate reimbursement rates that approximated BCBS-MA's EACs (or ASPs).  Apparently they do not.

   b) Even if BCBS-MA did not purchase certain physician-administered drugs directly, the pricing and market information that it obtained from its purchase of other physician-administered drugs should have enabled BCBS-MA to aggressively negotiate reimbursement rates closer to drug acquisition costs than to

---

[7]  See ¶ 13 and footnotes 44-46 below and Attachment C to this declaration.

[8]  BCBS-MA was the only Massachusetts TPP for which data were available.

[9]  Attachment B (which is a reproduction of Attachment B to the *Hartman April 2006 Declaration*) describes the data and my implementation of the analyses.  The drugs that I analyze that were purchased by BCBS-MA include Vepesid, Zofran, Procrit, Blenoxane and Kytril.  The drugs that I analyze that Dr. Gaier infers BCBS-MA did not purchase directly are Zoladex, Taxol and Remicade (Dr. Gaier does not report direct prices for these three drugs).  If Dr. Gaier's hypothesis is true, then the reimbursement amounts paid by BCBS-MA for the first set of drugs certainly should track the ASPs rather than AWPs.  Likewise, given Dr. Gaier's expansive belief in the power of available information to enable TPPs to negotiate better reimbursement amounts, we should find that BCBS-MA was able to negotiate reimbursement rates that approximate the ASPs rather than the AWPs of those physician-administered drugs that it did not purchase directly.

   The analysis of claims data rejects Dr. Gaier's hypothesized power of the knowledge of ASP information to negotiate better reimbursement rates.  For the drugs Vepesid, Zofran, Procrit, Kytril, Taxol and Remicade, average reimbursement rates are uniformly very close to or greater than AWP or 95% of AWP.  For the drugs Blenoxane and Zoladex, average reimbursement rates are within approximately 15% of AWP, the range found by the *MedPAC Report to the Congress*, June 2003, chapter 9.

traditional reimbursements formulae based off AWP. Apparently they do not do this either.

12.      I conclude the following. The analysis of claims data **rejects Dr. Gaier's hypothesized power of information** to enable TPPs to negotiate better reimbursement rates. Average reimbursement rates are either very close to or greater than AWP or they are within approximately 15% of AWP, the range found by the MedPAC Report. I conclude:

a)  **Dr. Gaier is wrong** when he claims that TPPs with subsidiaries or divisions that purchase physician-administered drugs can make use of that information to better negotiate reimbursement rates for those insured lives that are not served by the staff model HMO.

b)  Nothing in Dr. Gaier's Declaration proffers factual evidence that TPPs with direct purchasing of physician-administered drugs were better able, or at all able, to avoid the economic impact and injury of the AWP inflation scheme.

c)  There is no evidence of **direct learning** by BCBS-MA. Direct learning would occur if a drug purchased by a staff-model HMO informed reimbursement by BCBS-MA to network providers. For those drugs purchased by the BCBS-MA staff-model HMO, the average reimbursement allowed to network providers was based on AWP not ASP. While each drug exhibits some idiosyncratic behavior, the evidence provides a powerful demonstration that the market for pharmaceuticals is characterized by non-transparency **within** sophisticated buyers, such as BCBS-MA.

d)  Likewise, and not surprisingly, there is no evidence of **indirect learning** by BCBS-MA. Indirect learning would occur if a staff-model HMO learned of the AWP-ASP spread for a given set of drugs, conveyed that information within the TPP generally, and the TPP's provider reimbursement group extrapolated that knowledge to gain some inferences about the ASPs related to claims for reimbursement for other drugs. I find that the reimbursement rates for other drugs reimbursed by BCBS-MA track AWP rather than ASP.

e)  To summarize, because some group within an institution has obtained pricing information that could benefit that institution generally does not automatically insure that such information will be transmitted to or shared with the division or group (in this case, the provider reimbursement group) that would make use of and benefit from that information. More specifically, the fact that the healthcare-services group of BCBS-MA obtained information concerning the ASPs of specific physician-administered drugs did not insure that such information was transmitted to or shared with its provider reimbursement group in a way that BCBS-MA minimized claim reimbursements and defeated the AWP Inflation Scheme.

13.      Various reasons explain this lack of communication or learning:

a)  As so aptly paraphrased by Dr. Berndt, "If spending on some good or service is perceived to be only a small portion of total costs, that good or service will not be as likely to be on cost cutters' radar screens; instead, they will tend to focus more

on big-ticket items." As we know by now, Dr. Berndt calls this insight the "Importance of Being Unimportant,"[10] and he infers that over a recent 10 year period[11] managed care organizations and TPPs have focused their cost cutting efforts and analyses on hospital care, physician services and "all other" categories of reimbursement and expenditure, rather than on pharmaceutical reimbursements, which have been relatively less important. This unimportance is even more important for physician-administered drugs, which represent a small portion of an already small component of costs (i.e., the cost of all pharmaceuticals).

b) An extremely large number of drugs (branded, generic and physician-administered) must be reimbursed and tracked by each and every payor. The larger the payor, the larger the number of drugs. It is difficult and expensive for payors, even large payors, to track all pricing information for all drugs. The computerized information management systems used to implement the reimbursement formulae for physician-administered drugs are difficult to alter, despite the discovery of specific cost information related to specific drugs.[12] In

---

[10] See for examples ¶ 60.c) and footnote 31 of my December 15, 2005 Declaration on Liability and Calculation of Damages; and ¶¶ 57.c) & 69 and footnotes 24 & 115 of my December 16, 2004 Rebuttal Declaration.

The "importance of being unimportant" is made clear by deponent testimony. For example, Kelly Ellston, Assistant Vice President for Claims and Care Management at Union Labor Life Insurance, Co., Inc., states

"Q. And as we discussed before, Union Labor Life has no expectation of what sort of profit physicians may be making in relation to drugs administered in office, be it 20 percent, 30 percent, 40 percent, or something more than that.

A. We don't get to that level of granularity, and we're looking at the overall cost of health care.

Q. That's something that's irrelevant to Union Labor Life's determination of the amounts that it will reimburse physicians for drugs administered in their offices?

A. It is not a consideration that we utilize. The relevance would be only as it affects the total cost of health care delivery" (Deposition of Kelly Ellston, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, November 23, 2004, pp. 93-94).

[11] Over the period 1990-1998 (the last year for which Dr. Berndt presents data), prescription drug costs constituted the least important cost borne by managed care, ranging from 5.4% of total health care expenditures in 1990 to 7.9% in 1998.

The concept of the "importance of being unimportance" may also be characterized as "bounded rationality." The notion of bounded rationality is that even sophisticated economic entities are still bounded by the degree to which they can process information in order to implement strategic plans to initiate rational economic behavior. As a result, economic entities will focus their initial efforts on those economic decisions that are most important to them. Dr. Berndt's insight is that, given bounded rationality, competitive forces were focused more intensively on other areas of health-care spending and less focused on understanding and dissipating the impacts of the AWPID fraud. Having addressed those other areas, TPPs have finally turned more aggressively to pharmaceutical spending, perhaps explaining this and related litigation.

[12] As stated in ¶ 2.e of Attachment K to my December 15, 2005 Declaration on Liability and Calculation of Damages (**emphasis added**), "In his ¶ 49, Mr. Young correctly observes 'The use of AWP by commercial Health Plans as a benchmark for expressing reimbursement limitations for prescription drugs dispensed to the plans' members expanded in the 1980's. The expanded use corresponded with (i) the growth of private

---

such situations, business entities typically fall back on simple rules of thumb that have worked in the past, such as "reimburse at AWP – x %." This merely reflects the commonly understood notion of bounded rationality (see my footnote 11) and administrative efficiency.[13]

c) The fact that the BCBS-MA staff HMO knew **its** acquisition costs of physician-administered drugs likely provided **a poor signal** for the acquisition costs of **many small to mid-sized oncology/provider groups**, whose acquisition costs are the basis for the reimbursement amounts paid by BCBS-MA. Hence, BCBS-MA may simply rely upon the AWP formula, since its internal ASP information may have little relevance to its non-staff model provider claims.

d) The study of institutional economics or the economics of institutions and organizations has a long and diverse history and literature. Of the many insights provided by this branch of economics, one modest conclusion is that intra-institution interest groups making decisions in response to new and uncertain information respond slowly.

- Addressing organizational economics generally under the rubric, "transaction cost economics," Oliver Williamson notes that "the core problem of the economic organization of society [is] that of facing and dealing with uncertainty." One uncertainty that he identifies is "uncertainty [which] arises 'from lack of communication, that is from one decision maker having no way of finding out the concurrent decisions and plans made by others.'"[14]

---

insurance coverage for prescription drugs, (ii) the increased implementation of computer programs to manage the large volume of claims relating to drugs dispensed from retail pharmacies, and (iii) the shift from indemnity type coverage (based on pharmacy or physician 'charges') to coverage based on negotiated reimbursement rates (discussed in detail below). **The published benchmark provided a standardized and programmable means of implementing claims processing systems that could handle the wide-ranging discounts negotiated with individual pharmacies for millions of retail pharmacy claims.**'"

As shown in the Deposition of Michael T. Mulrey, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, January 5, 2006, the several reimbursement schedules used by BCBS-MA for physician-administered drugs did not differentiate among physicians, but rather relied on Medicare as the common basis for reimbursement (pp. 50-64). Specifically, see Attachment C, Mulrey Quote 1. Mickey Brown, Director of Provider Networks at BCBS of Mississippi, discussed the costs and effort involved in undertaking a departure from the current reimbursement system. See his March 9, 2005 deposition (*In re: Pharmaceutical Industry Average Wholesale Price Litigation*, pp. 67-69) stating that converting to a reimbursement system based on provider acquisition costs would be "a much bigger effort than we're willing to undertake."

See also, Declaration of Robert P. Navarro in Opposition to the Plaintiffs' Motion for Class Certification, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, October 25, 2004, ¶ 46.

[13] Dr. Anderson, Professor of Medicine, and Health Policy at Johns Hopkins, testified in *Lupron* that with 65,000 drugs, "negotiation of a specific price for each ... would be administratively impossible," thus fostering the pricing standard – AWP. Declaration of Gerrard F. Andersen in Support of Plaintiffs' Motion for Class Certification in *In re Lupron Marketing and Sales Practice Litigation*, MEL No. 1430.

[14] Oliver Williamson, "Transaction Cost Economics," chapter 3, p. 143, quoting T. Koopmans, in R. Schmalensee and R. Willig, *Handbook of Industrial Organization*, North Holland Press, 1989.

---

- Applying that notion, Bengt Holmstrom and Jean Tirole[15] observe that "The nature of decision-making within firms is of a different kind than individual choice in markets. …In the aggregate, firm behavior is the result of a complex joint decision process."

- Summarizing these notions, Wendell Gordon[16] notes, "The institutions into which society is organized adjust slowly and reluctantly to assimilate and use new technical knowledge and to accommodate and adjust their own behavior norms the better to utilize this new knowledge."

e) Even economic entities not characterized by institutional complexities and impediments to decision making have been documented to be characterized by "Status Quo Bias."[17]   According to the notion of status quo bias, economic entities become accustomed to the status quo and are reluctant to move in the face of uncertainty, even if such a move is economically rational.

14.     I confirm this analysis and these conclusions through deposition testimony.

a) The deposition testimony of Michael T. Mulrey, Manager of Provider Reimbursement at BCBS-MA, provides clear indication that his understanding (prior to 2004) of AWP differed from what AWP actually was.

> "Q.  I am asking what your understanding was. Okay?  Let's just start with that point. In 2000, what was your understanding of the term AWP, or average wholesale price?
> A.  It is the price that we would reimburse our providers, and it was the price at which we felt providers purchased their drugs at.
> Q.  Okay.  So it is your understanding -- it was your understanding in 2000 that it was the price at which providers purchased their drugs; is that correct?
> A.  Yes.
> Q.  So, in other words, it is your position that you understood that Blue Cross/Blue Shield of Massachusetts was reimbursing providers at their average cost?
> A.  Yes" (pp. 87-88).
> …
> "Q.  So in 2003-2004, as a member of the provider reimbursement group, you learned that AWP was no longer, you know, from your perspective an average of actual wholesale costs but indeed was something greater than the costs that doctors paid for drugs; right?
> A.  Yes" (p. 93).[18]

b) Mr. Mulrey's testimony clearly demonstrates BCBS-MA came to realize it had been deceived by its understanding of AWP as a measure of provider acquisition costs in 2003-2004.  Following the deposition testimony cited above (at p. 112 of his deposition transcript), he states

---

[15]  Bengt R. Holmstrom and Jean Tirole, "The Theory of the Firm," chapter 2, p. 63, *ibid.*

[16]  Wendell Gordon, *Institutional Economics: The Changing System,* University of Texas Press, 1990, p. 9.

[17]  For example, see R.S. Hartman, M. J. Doane, and C.K. Woo, "Consumer Rationality and the Status Quo," *The Quarterly Journal of Economics*, February, 1991.

[18]  Mulrey Deposition, January 5, 2006.  A portion of this quote appears in Attachment C, Mulrey Quote 2.

> "Q. Is it your position in this litigation that Blue Cross/Blue Shield of Massachusetts was misled by doctors and manufacturers through the publication of AWPs that bore little or no resemblance to actual acquisition costs at which doctors purchased drugs?
> A. I mean –
> Q. I am asking your position.
> A. My position? It is not –
> …
> A. -- the company's or anything?  Yes."

It is interesting to note that Dr. Gaier cites in his Appendix D, Mr. Mulrey's deposition transcript (pp. 11-17, thereof, where he purports to establish that BCBS-MA had a staff HMO unit) to support the assertion that the staff-HMO unit sent their P & L's to the parent BCBS organization.  However, Dr. Gaier fails to cite the next few pages of Mr. Mulrey's testimony which indicate that despite this institutional connection, Mr. Mulrey did not gain an understanding of the costs at which physician-administered drugs could be obtained,[19] despite the fact that Mr. Mulrey began his career with BCBS-MA in 1987 as a senior financial analyst for BCBS-MA's staff model HMO (see footnote 38 below).

c) Mr. Mulrey's testimony demonstrates that price and cost information did not readily flow within this organization, and as a result, the provider reimbursement group of BCBS-MA was unaware of specific information regarding rebate policies and discounts that manufacturers offered to physician providers.

d) Finally, Mr. Mulrey's testimony indicates that when BCBS-MA actually became aware of the divergence of reimbursement rates from ASP **through outside information**, it remained hesitant to use that information to alter its drug reimbursement procedures from an AWP-based system until "an industry-acceptable standard" became apparent.  Specifically,

> "Q. When did Blue Cross/Blue Shield of Massachusetts first begin to use R.J. Health as a vendor to determine reimbursement amounts for physician-administered drugs?
> A. 2005.
> Q. And Blue Cross/Blue Shield of Massachusetts started using R.J. Health because Medicare no longer reimbursed for physician-administered drugs on an AWP basis; correct?
> A. Yes.
> Q. In the 2004 time frame before Medicare switched its reimbursement methodology, did Blue Cross/Blue Shield of Massachusetts give any consideration to revising its reimbursement methodology for physician-administered drugs?
> A. Yes.
> Q. What involvement, if any, did you have in that process?
> A. I completed an analysis.
> Q. What analysis was that?
> A. An analysis of ASP pricing that Medicare was proposing against our utilization" (p. 65).

---

[19] See Attachment C, Mulrey Quote 3.

"Q. Your analysis basically involved a change in the status quo analysis? You were contemplating what would happen if Blue Cross/Blue Shield of Massachusetts switched to an ASP environment; correct?

A. Yes" (pp. 66-67).

"Q. And as a consequence of your analysis, is it correct that Blue Cross/Blue Shield of Massachusetts elected not to shift to the ASP reimbursement methodology?

A. At this time, yes.

….

A. I mean we normally follow industry standards, and Medicare has moved to ASP. Right now from our perspective, we don't see that as an industry-acceptable standard just yet" (p. 72).[20]

e) For another example, Robert C. Farias, the director of planning administration for network services and operations at Harvard Pilgrim, in his October 20, 2004 deposition states that Harvard Pilgrim was unaware of physician acquisition costs. The Farias deposition states that Harvard Pilgrim did not investigate physician acquisition cost. Furthermore, given the contract that Harvard Pilgrim enters into with any given physician or physician group, they would be unable to do anything other than reimburse according to the terms of the contract, in this case at 95% of AWP.[21]

15. Mr. Mulrey's and Mr. Farias' testimony demonstrate the following:

a) Corroborating my data analysis, knowledge gained from purchases by the BCBS-MA staff-model HMO health-care-services provider group was not communicated to the provider reimbursement group and did not inform the reimbursement practices of BCBS-MA as a whole.

b) The provider reimbursement group became aware of provider acquisition costs through **outside information sources** in 2004. However, status quo bias and inertia characterized BCBS-MA's provider reimbursement group's response to the information. As within any large institution, before a major shift occurs in operational practices, the institution wants to observe whether the newly acquired-information is indicative of a real change in the economic terrain in which that institution competes.

c) Defendants could take advantage of the reimbursement practices of TPPs in general and TPPs in Massachusetts in particular.

- Knowing that there was institutional inertia for the reasons discussed above, Defendants continued to exploit the AWP Inflation Scheme, until it became clear that TPPs and other payors would actually incorporate the new information into their reimbursement practices and procedures. In the cases of

---

[20] See Attachment C, Mulrey Quote 4.

[21] Deposition of Robert C. Farias, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, October 20, 2004. See Attachment C, Farias Quote 1.

the four Massachusetts TPPs analyzed by Dr. Gaier, there is no evidence of which I am aware that they have yet been able to do so.

- Because Massachusetts TPPs, like Harvard Pilgrim, entered into contracts with physicians that specify drug reimbursements according to fee schedules based on AWP or 95% of AWP, Defendants knew that those TPPs (Harvard Pilgrim) felt bound by that contract. As a result, physicians knew that their spreads were guaranteed. Even if and when Harvard Pilgrim had become aware of the fact that physicians were receiving large discounts, Harvard Pilgrim would not alter its contractually-established institutional practice regarding negotiated reimbursement rates.[22]

## III.   The Inability of Class 3 Massachusetts' TPPs to Exploit Knowledge of ASPs to Defeat the AWP Inflation Scheme is Mirrored by the Revealed Behavior of the Major Public Payors, Medicare and Medicaid

16.    As demonstrated in Section II above, **private TPPs** (specifically BCBS-MA) with **within-institution** pricing information did not and apparently could not exploit that information to negotiate better reimbursement rates that more closely reflect acquisition costs (ASPs) rather than AWPs. This inability to defeat the AWP Inflation Scheme through more complete and better information is not limited to private-sector TPPs in Massachusetts or TPPs nationally; it is characteristic of the market for physician-administered drugs as a whole. Examination of the experience of HCFA, CMS, and Medicare reimbursement practices and procedures support this conclusion. Examination of Medicaid reimbursement practices and procedures demonstrates this inability to exploit pricing information to defeat the AWP Inflation Scheme with self-administered drugs. Examination of the experience of both sets of public payors sheds corroborative light on the inability of members of Class 3 to make use of knowledge to defeat the AWP Inflation Scheme.

17.    Let me examine what HCFA/CMS, Medicare and Medicaid knew and whether they could act upon it.[23] Defendants have argued previously[24] that HCFA (CMS) and Medicare knew that AWP exceeded EAC and ASP, and that they were aware of survey evidence that AWP exceeded EAC and ASP, at times "substantially." As a result, Defendants have asserted, incorrectly, that HCFA and Medicare were not deceived by the AWP inflation scheme, and that HCFA and Medicare had the information, ability and duty to mitigate the reimbursement impacts of the alleged AWP inflation scheme.[25] By

---

[22] See Attachment C, Farias Quote 2.

[23] For ease of discussion and without loss of interpretation, I discuss these entities as if they are independent. I note, however, that the Medicare is run by and a part of HCFA/CMS and that Medicaid reimbursement is run primarily by the states with oversight by HCFA/CMS.

[24] Memorandum of Law in Support of Track 1 Defendants' Joint Motion for Summary Judgment, March 15, 2006 (*Joint Motion*). *In re: Pharmaceutical Industry Average Wholesale Price Litigation,* United States District Court, District of Massachusetts, MDL No. 1456, Civil Action No. 01-12257, Section II.

[25] In making these assertions Defendants relied principally upon their expert Dr. Addanki, who revisited facts that were explicitly cited and incorporated into my prior Declarations. Dr. Addanki appealed to

---

inference, I assume that Defendants would make the same argument for Medicaid reimbursement.

18.     In my *April 2006 Declaration* (¶ 11), I discussed the studies to which Defendants' expert appeals.

a) Defendants' expert introduces an array of OIG reports, many of which focus upon self-administered drugs, rather than the drugs subject to this litigation.  These studies found that the spreads on branded self-administered drugs through the end of the 1990s and after 2000 were within my yardstick for a finding of causation and liability. Furthermore, these studies found that until the mid-1990s, the spreads of generic self-administered drugs were within my liability yardstick.

It was only in those surveys between 1996 and 2000 that the increased spreads on *generic self-administered drugs* became evident.  These findings are relevant for reimbursement under Medicaid, which has been an issue in the AWP state litigation.[26]

b) Nearly half of the studies introduced focus upon a cross-section of physician-administered drugs.  I relied upon two of them.  In an attempt to look at trends over the decade, I identified one study implemented early in the Damage Period (the 1992 OIG report on chemotherapy drugs) and one study implemented late in the damage period (the 2001 ASCO survey on chemotherapy drugs).  Both surveys found spreads within my liability yardstick for single-source physician-administered drugs.

c) A variety of survey results focused upon the physician-administered drug albuterol and its spreads, finding them to be quite large beginning in 1996 and growing considerably over time.  While large, these spreads were for a single generic physician-administered drug.  The observation that the spreads for a single drug were large would certainly not provide sufficient evidence to the government, policy makers, and industry participants that all spreads on all physician-administered drugs were large.  Indeed, the survey results of ASCO, which looked at a broader cross section of drugs at a later point in time, found just the opposite.

19.     Defendants take such discovery materials as explicit demonstration that HCFA and Medicare were not deceived by the alleged AWP inflation scheme.  That conclusion fails and, indeed, is less compelling for public payors like Medicare than for private TPPs like BCBS-MA, where, as demonstrated in Section II above, it was not compelling at all.

The fact is that institutional knowledge is slow to be disseminated, assimilated and even slower to be acted upon for many reasons, some clarified in ¶ 13 above.

---

"some 33 publications containing information on spreads." I reiterated and analyzed the 33 studies identified by Dr. Addanki in Attachment C of my *April 2006 Declaration*.  Indeed, I added additional studies.

[26] See my Declarations for Montana and Nevada: "Calculation of Damages and Penalties for the State of Montana" and "Calculation of Damages and Penalties for the State of Nevada," *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, United States District Court for the District of Massachusetts, June 13, 2006.

a) First, the early OIG survey information was indicative but not comprehensive. Medicare would not alter its reimbursement practices based upon a single generic Part B drug or on several multi-source generic drugs beginning to be cited in 1996. Hence, the substantial evidence that the spread on albuterol was large in 1996 and became a mega-spread by 2000 was not sufficient to make it cost effective for public payors to alter their entire claims reimbursement practices for physician-administered drugs generally.[27] Likewise, the sporadic survey information that the spreads on some multi-source drugs were large for some providers over the 1990s was not sufficient to make it cost effective for payors to alter their entire claims reimbursement practices for physician-administered drugs generally.

b) The Importance of Being Unimportant was in effect, as noted by Dr. Berndt, for all three Classes subject to this litigation.

c) The existence of bounded rationality and the administrative efficiency of staying with a simple AWP-based rule of thumb were compelling.

d) When dealing with imperfect information, inertial institutional responsiveness is inevitable.

20.     As a result, Medicare and HCFA were slow to fully understand the existence and the extent of the AWP inflation scheme; they were slow to understand the economic injury induced by the scheme; they were slow to correct the pricing problem. Defendants exploited that slowness through the AWP Inflation Scheme.[28] While information slowly became clearer and slowly was assimilated by Congress over the decade (1992-2003), it took Congress until 2003[29] to more fully understand the extent to which the AWP provided incomplete information for reimbursement and required that Medicare reimbursement be set at 106% of ASP beginning in 2005. At the same time, CMS required that drug manufacturers provide it with sufficient information to understand the ASP by drug and manufacturer, in order to monitor Medicare reimbursement.

Since private TPPs follow the lead of Medicare with respect to reimbursement practices and procedures,[30] I expect that members of Class 3 and TPPs nationally will follow the lead of Medicare, with some lag,[31] despite the fact that as private-sector

---

[27] See p. 6 of Attachment K to my December 15, 2005 Declaration on Liability and the Calculation of Damages for a more detailed discussion of the reasons.

[28] Leading to such extreme consumer exploitation as found in the Lupron and Zoladex matters (See ¶ 53.b) of my December 15, 2005 Declaration on Liability and Calculation of Damages and the *Lupron Sentencing Memorandum*) and in the case of Vincasar (See ¶ 53.a) of my December 15, 2005 Declaration on Liability and Calculation of Damages and Chapter 9, *MedPAC Report to the Congress*, June 2003, pp. 155-158).

[29] The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (DIMA); see footnote 13 of my December 15, 2005 Declaration on Liability and the Calculation of Damages.

[30] See pp. 9-10 of my September 3, 2004 Declaration in Support of Plaintiffs' Motion for Class Certification. See also Chapter 9, *MedPAC Report to the Congress*, June 2003, which notes: "Most private payers are still using AWP-based payment methods similar to the Medicare model" (p. 164).

[31] See ¶ 14.d) and 15.b) above.

economically-rational profit-maximizing entities, one would expect that the private TPPs composing Class 3 would respond more quickly than the government.

21.     Likewise and for the same reasons, despite the growing evidence of spread competition and inflation by the manufacturers of self-administered drugs, it has taken a similar length of time for the federal government to respond to the effects of AWP inflation upon Medicaid reimbursement. Its response has been in the form of OIG *Compliance Program Guidance for Pharmaceutical Manufacturers* published in April, 2003.[32] The *MedPAC Report to the Congress*[33] characterizes this *Compliance Program Guidance* as follows:

> "The Office of Inspector General (2003) issued voluntary compliance guidelines for pharmaceutical manufacturers. If a manufacturer manipulates the AWP to increase federal payments to its customers, the federal antikickback statute is implicated.  In other words, it is illegal for a manufacturer knowingly to establish or maintain an AWP if one purpose is to manipulate the spread to induce customers to purchase its products."[34]

---

[32] Federal Register, Vol. 68, No. 86, Monday, May 5, 2003, *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, pp. 23731-43; cited in *Complaint*, ¶¶ 169-170.

[33] See footnote 28 above.

[34] More specifically, the *OIG Compliance Program Guidance for Pharmaceutical Manufacturers* states:

> "Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers.  The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. …

> Where appropriate, manufacturers' reported prices [therefore] should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers.  Any discount, price concession, or similar benefit offered on purchases of multiple products should be fairly apportioned among the products. … Underlying assumptions used in connection with reported prices should be reasoned, consistent, and appropriately documented, and pharmaceutical manufacturers should retain all relevant records reflecting reported prices and efforts to comply with federal health care program requirements" (pp. 23733-34).

And

> "The 'spread' is the difference between the amount a customer pays for a product and the amount the customer receives upon resale of the product to the patient or other payer.  In many situations under the federal programs, pharmaceutical manufacturers control not only the amount at which they sell a product to their customers, but also the amount those customers who purchase the product for their own accounts and thereafter bill the federal health care programs will be reimbursed.  To the extent that a manufacturer controls the 'spread,' it controls its customer's profit.

> … [M]any state Medicaid programs and other payers base reimbursement for drugs and biologicals on AWP.  Generally, AWP or pricing information used by commercial price reporting services to determine AWP is reported by pharmaceutical manufacturers.

> If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated. Unlike *bona fide* discounts, which transfer remuneration from a seller to a buyer, manipulation of the AWP transfers remuneration to a seller's immediate customer from a subsequent

---

IV.     **Members of Class 3 Were Not Sufficiently Knowledgeable to Defeat the AWP Inflation Scheme**

22.     Whether the institution is a firm (e.g., a TPP or a more broadly-based health-care-services provider with a TPP subsidiary) or a regulatory agency, the evidence in this matter, including discovery materials, deposition testimony and the analysis of data (both for BCBS-MA and for public payors) demonstrate that institutional knowledge is slow to be disseminated, if disseminated at all, and even slower to be acted upon. Thus we find that while some pharmaceutical price information (i.e., spreads) has been put forward by the OIG since the mid-1980s, the CMS and the federal government have only recently affirmatively reacted to the accumulating information by issuing the *2003 OIG Compliance Program Guidance* for self-administered drugs and the *2003 Medicare Prescription Drug Improvement and Modernization Act*. That is a long response time.

23.     It has been this slowness or inertia on the part of public payors that has been exploited by Defendants through the AWP Inflation Scheme with respect to Sub-Classes 1 and 2 in this matter. It has been a concurrent slowness or inertia on the part of private sector TPPs generally and the Massachusetts TPPs that compose Sub-Class 3 that has been exploited by Defendants through the AWP Inflation Scheme. The lessons from the TPPs' own data (Section II above) and from the broader analysis of publicly-available data suggest that the members of Sub-Class 3 all relied upon AWP and that individual issues regarding varying degrees of knowledge were of minimal importance in determining their ability to defeat the AWP Inflation Scheme.

24.     Defendants' assertions to the contrary fail. For example, Defendants appeal to "an overwhelming factual record proving that Class 3's use of AWP was knowing and deliberate."[35] That this appeal is disingenuous and patently self-serving can be demonstrated as follows. Defendants assert that

> "The members of Class 3, which consists mainly of large sophisticated insurance companies, know exactly what AWP is, and they know what it is not. They know that AWP is a reimbursement benchmark, not an average of provider acquisition costs. They know that AWP is higher than the price paid by the provider;"[36]

In further support of these assertions, Defendants state that Dr. Berndt's "unequivocally correct assessment," is that

> "To knowledgeable industry observers, it has long been widely known that in the US pharmaceutical industry the term 'average wholesale price' (hereafter, AWP) is a misnomer: it is not a measure of prices generally paid by wholesalers to

---

purchaser (the federal or state government). Under the anti-kickback statute, offering remuneration to a purchaser or referral source is improper if one purpose is to induce the purchase or referral of program business. In other words, it is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the 'spread' to induce customers to purchase its product" (pp. 23736-37).

[35] *Track 1 Defendants' Memorandum*, p.1.

[36] *Ibid.*

manufacturers, it is not a measure of prices frequently paid by retail or mail order pharmacies or wholesalers, nor is it some average of these;"[37]

**Yet, these assertions are directly contradicted by Mr. Mulrey's deposition testimony.** Mr. Mulrey, the Manager of BCBS-MA's Provider Reimbursement Department since 2000[38] (recalling that BCBS-MA is the largest and one would think most sophisticated TPP within Class 3) has testified (see my ¶ 14.a) above)

- **He did not know what AWP was**.

- **He thought it was the wholesale cost at which providers buy their drugs**.

- **Prior to 2004, he was misled by his understanding of the meaning of AWP**, in precisely the way Plaintiffs have alleged.

Precisely how do Defendants expect such assertions to prevail when Class member testimony so explicitly and directly contradicts those assertions?

25.   In their "Preliminary Statement," Defendants continue to frequently rely on Dr. Gaier and make assertions of "undisputed facts that compel summary judgment for defendants,"[39] assertions which are contradicted by the facts and/or deponent testimony.

   a) First, they assert that BCBS-MA contracts do not "expressly use" AWP as a pricing standard, and that BCBS-MA is therefore not a member of Class 3.  Yet in his January 5, 2006 deposition testimony, Mr. Mulrey responds as follows:[40]

> "Q. Isn't it correct that you in fact have followed Medicare's standard since 1995 and including this shift in reimbursement from 100 percent to 95 percent AWP?
> A.   That's correct."

   More surprisingly, **Defendants explicitly contradict this assertion on page 11 of their Motion**,[41] inexplicably stating

> "BCBS/MA Has Purposefully Chosen To Continue Using AWP … [It] is admittedly satisfied with its use of AWP as a reimbursement benchmark. …  In fact, BCBS/MA is so enamored with AWP that it is currently in the process of extending its use of AWP …"

   Defendants' analysis and conclusions regarding BCBS-MA's "express use" of AWP are inexplicably inconsistent and seem to be driven by the immediate need to make and bolster indefensible assertions.

   b) Second, they assert that "Class 3 payors, including BCBS-MA were not deceived by 'mega spreads' because they knew that spreads on physician-administered

---

[37] *Ibid.*

[38] Indeed, Mr. Mulrey has been with BCBS-MA since 1987 and was a senior financial analyst for one of their staff model HMOs from 1987-1991 (Mulrey Deposition, pp. 12-17).

[39] *Track 1 Defendants' Memorandum*, pp. 1-2.

[40] See also Attachment C, Mulrey Quote 5.

[41] *Track 1 Defendants' Memorandum*, p. 11.

drugs could vastly exceed 30%  … [because] BCBS-MA was a direct purchaser of drugs." This assertion fails for the following reasons.

- The BCBS-MA data demonstrate that the ASPs paid by the health-care-service provider group were not reflected in the reimbursement rates paid by the provider reimbursement group.  Instead, network providers were reimbursed based upon AWP, as reflected in Mr. Mulrey's testimony.  The most likely explanation is the health-care-services provider group of BCBS-MA did not communicate the relevant ASPs in a meaningful way to the provider reimbursement group for the reasons cited in my ¶ 13 above and revealed by deponent testimony cited in my ¶ 14.[42]

- Furthermore, suppose that the health-care-services provider group did communicate the ASPs to the provider reimbursement group. Since BCBS-MA provider reimbursement rates are designed to reflect acquisition costs of **the network providers being reimbursed**, it is most likely that the ASPs of a large buyer such as BCBS-MA did not reflect the acquisition costs of other smaller network providers.  In that case, BCBS-MA's direct purchases would provide an imprecise signal for the acquisition costs of the relevant providers submitting reimbursement claims.  Given the costliness of evaluating this issue, BCBS-MA would rationally use the AWP-based reimbursement formula for the reasons cited in my ¶ 13 above.

- In either case, Defendants could exploit the reliance upon AWP-based reimbursement regardless of what BCBS-MA's health-care-services provider group knew of ASP and regardless of what the OIG was publishing.

- It is my understanding that in certifying Sub-Class 2, the Court has already concluded that the AWP provided insufficient information for commercial payors to accurately ascertain provider acquisition costs.  Judge Saris has stated:[43]

  > "Some TPPs may have greater sophistication with respect to the existence of spreads because they purchase self-administered drugs, but **there is no evidence that TPPs purchase physician-administered drugs or know of the mega-spreads that exist for these drugs**" (Emphasis added).

c) Third, Defendants assert that "despite clear knowledge that AWP could exceed acquisition cost by more than 30%, BCBS-MA continued to reimburse physicians based on AWP."   This assertion fails for the following reasons.

- I have seen no evidence that BCBS-MA had clear *institutional* knowledge that AWP could exceed acquisition cost by more than 30%.  Specifically, it is clear that the ASPs at which BCBS-MA directly purchased many physician-

---

[42]  Additional deponent testimony documenting TPP's lack of knowledge of provider acquisition cost is found in the deposition transcripts cited in footnotes 44-46 below.  This lack of knowledge is found for TPPs with and without direct purchases by staff model HMOs.

[43]  *Memorandum and Order*, pp. 58-60.

administered drugs implied spreads in excess of 30%. However, **that fact does not constitute institutional knowledge**. BCBS-MA's health-care-services provider group must communicate that information to the provider reimbursement group and that group must act upon it, *in order for institutional knowledge to be revealed*. I have found no claims data or deponent testimony demonstrating that BCBS-MA *as an institution* understood, acknowledged, or acted upon such information. Indeed, the first acknowledgement of the existence of spreads in excess of 30% of which I am aware is in 2002-2004, as noted by Mr. Mulrey, as cited in Attachment C to this Declaration.

- Once the understanding was made clear to the provider reimbursement group under Mr. Mulrey that AWP diverged from ASP in 2004, BCBS-MA did not switch to an ASP-based reimbursement formula because "we don't see that as an industry-acceptable standard just yet" (see ¶ 14.d) above). This is precisely the institutional inertia I have analyzed above, the reasons for which are discussed in ¶ 13 above. It is precisely this institutional inertia that Defendants' exploited by the AWP Inflation Scheme.

d) Fourth, Defendants assert that "testimony of Class 3 payors uniformly contradicts plaintiffs' theory that class members expected AWP not to exceed acquisition cost by more than 30%." This assertion fails. The payors to which Defendants' appeal for support of this assertion fall into three main groups:

- TPPs which had no idea of the relationship between AWP and provider acquisition cost;[44]

- TPPs which believed that AWP was approximately equal to provider acquisition costs;[45] and

- TPPs that understood that AWP was not equal to provider acquisition cost but otherwise had no idea about the relationship.[46]

Regardless of whether these TPPs had an expectation about whether AWP exceeded provider acquisition cost by more than 30%, **the truth of that observation is no defense for the fraudulent behavior alleged in this matter.** It is precisely these TPPs that were completely uninformed about the "mega-spreads" being used by Defendants as part of the AWP Inflation Scheme. It is precisely these TPPs that therefore were completely vulnerable to the fraudulent

---

[44] See for examples, the deposition testimony of Jan Cook of BCBS-MA (March 6, 2006, pp. 132-3, 137, 140-1); Mickey Brown of BCBS-Mississippi (March 9, 2005, pp. 66-7, 84-5, 111-2, 125-7); and Kelly Ellston of Union Labor Life Insurance, Co., Inc. (November 23, 2004, pp. 85-6, 89-90); (all *In re: Pharmaceutical Industry Average Wholesale Price Litigation*).

[45] See for example, the deposition testimony of Michael Mulrey of BCBS-MA, *op. cit.* (pp. 79-82, 87, 118).

[46] See for examples, the deposition testimony of Steven Fox (March 8, 2006, pp. 146-9, 169-70) and John Killion (January 6, 2006, pp. 137-9) of BCBS-MA; Mike Beaderstadt of John Deere Health Care (September 17, 2004, pp. 46-7, 73); and Joseph Spahn of Anthem BCBS (November 30, 2004, p. 59); (all *In re: Pharmaceutical Industry Average Wholesale Price Litigation*).

pricing practices.  It is precisely these TPPs that would have benefited from non-fraudulent pricing practices.

e) The fifth assertion calls for a legal opinion which I cannot render.

## V.     Summary and Conclusions

26.      In their Motion for Summary Judgment with Respect to Class 3, Defendants rely upon the July 14, 2006 Declaration of Dr. Gaier, who asserts that private-sector third-party payers with staff-model HMOs that purchased Part B drugs knew of and were not deceived by the alleged AWP spreads.  However, Dr. Gaier's analysis is incomplete and his assertions are incorrect.   Using data summarizing reimbursements to physician providers within the network of the largest TPP in Class 3, Blue Cross Blue Shield of Massachusetts (BCBS-MA), I demonstrate that knowledge of the ASPs of Part B drugs did not enable BCBS-MA to defeat the alleged AWP Inflation Scheme and negotiate network provider reimbursements reflecting ASPs rather than AWPs.   Deposition testimony from BCBS-MA confirms the fact that there was no communication of such knowledge within BCBS-MA and that network provider reimbursements relied upon AWP formulas exactly as did reimbursements by TPPs without staff model HMOs.

The fact that such knowledge did not enable BCBS-MA to defeat the AWP Inflation Scheme is consistent with the theories of institutional behavior and bounded rationality, the theory of status quo bias, Dr. Berndt's observation of the importance of drug costs being unimportant, the costs of information processing and the observation that BCBS-MA's ASPs may provide poor signals for the drug acquisition costs of network providers.  In any case, there is no evidentiary value in Dr. Gaier's analysis or assertions.  The reasons that members of Class 3 did not and could not make use of such ASP information to defeat the AWP Inflation Scheme also explain public payors' inability to defeat the AWP Inflation Scheme in the face of similarly incomplete and imperfect information.

Furthermore, other assertions put forward by Defendants in their Motion for Summary Judgment are demonstrated to be surprisingly contradictory or uninformed.

I declare under penalty of perjury that this Declaration is true and correct.

Executed on August 29, 2006

Raymond S. Hartman

**Attachment A**

**Attachment A:  Additional Materials Relied Upon**


**Legal Documents:**

Beaderstadt, Mike, Deposition, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, September 17, 2004.

Brown, Mickey, Deposition, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, March 9, 2005.

Cook, Jan, Deposition, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, March 6, 2006.

Fox, Steven, Deposition, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, March 8, 2006.

Gaier, Eric M., Declaration of Eric M. Gaier, Ph.D., in Support of the Track 1 Defendants' Joint Motion for Summary Judgment with Respect to Class 3, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, C.A. No. 01-12257-PBS, July 14, 2006.

The Track 1 Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment with Respect to Class 3, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, Civil Action No. 01-12257-PBS, July 14, 2006.

Ellston, Kelly, Deposition, *In re:  Pharmaceutical Industry Average Wholesale Price Litigation,* November 23, 2004.

Hartman, Raymond, Calculation of Damages and Penalties for the State of Montana, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, United States District Court for the District of Massachusetts, June 13, 2006.

Hartman, Raymond, Calculation of Damages and Penalties for the State of Nevada, *In Re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, United States District Court for the District of Massachusetts, June 13, 2006.

Hartman, Raymond, Declaration of Raymond S. Hartman in Opposition to Defendants' Motions for Summary Judgment, *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, C.A. No. 01-12257-PBS, April 6, 2006.

Killion, John, Deposition, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, January 6, 2006.

Spahn, Joseph, Deposition, *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, November 30, 2004.

**Other Materials:**

Federal Register, *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, Vol. 68(86), Monday, May 5, 2003, pp. 23731-23737.

Gordon, Wendell, *Institutional Economics: The Changing System,* University of Texas Press, 1990.

Hartman, R.S., M. J. Doane, and C.K. Woo, "Consumer Rationality and the Status Quo," *The Quarterly Journal of Economics*, Vol. 106(1): 141-162, February 1991.

Holmstrom, Bengt R. and Jean Tirole, "The Theory of the Firm," *Handbook of Industrial Organization*, Edited by R. Schmalensee and R. Willig, North Holland Press, 1989, pp. 61-134.

Williamson, Oliver, "Transaction Cost Economics," *Handbook of Industrial Organization*, Edited by R. Schmalensee and R. Willig, North Holland Press, 1989, pp. 135-182.

**Attachment B**

**Attachment B.1**
**Comparison of BCBS-MA Reimbursement Amounts for Vepesid (J9181) with AWP and ASP**



Note: NDC 00015-3061-20 is used
for the AWP and ASP.

**Attachment B.2**
**Comparison of BCBS-MA Reimbursement Amounts for Zofran (J2405) with AWP and ASP**



Note: NDC 00173-0442-00 is used
for the AWP and ASP.



**Attachment B.3**
**Comparison of BCBS-MA Reimbursement Amounts for Procrit (Q0136) with AWP and ASP**

Note: NDC 59676-0302-01 is used
for the AWP and ASP.

Privileged and Confidential

**Attachment B.4**
**Comparison of BCBS-MA Reimbursement Amounts for Kytril (J1626) with AWP and ASP**



Note: NDC 00029-4149-01 is used
for the AWP and ASP.

**Attachment B.5**
**Comparison of BCBS-MA Reimbursement Amounts for Kytril (Q0166) with AWP and ASP**



Note: NDC 00029-4151-05 is used
for the AWP and ASP.

**Attachment B.6**
**Comparison of BCBS-MA Reimbursement Amounts for Blenoxane (J9040) with AWP and ASP**



Note: NDC 00015-3010-20 is used
for the AWP and ASP.

**Attachment B.7**
**Comparison of BCBS-MA Reimbursement Amounts for Zoladex (J9202) with AWP and ASP**



Note: NDC 00310-0960-36 is used
for the AWP and ASP.

**Attachment B.8**
**Comparison of BCBS-MA Reimbursement Amounts for Taxol (J9265) with AWP and ASP**



Note: NDC 00015-3475-30 is used
for the AWP and ASP.

**Attachment B.9**
**Comparison of BCBS-MA Reimbursement Amounts for Remicade (J1745) with AWP and ASP**



Note: NDC 57894-0030-01 is used
for the AWP and ASP.

**Notes to Attachment B**
**Blue Cross Blue Shield of Massachusetts Electronic Data Calculation Notes**


**File List:**
(AWP Track 1 data with Mem ID's.mdb: BCBS Track 1 claims data[1])

**Sources:**
Deposition of Denise M. DeMaina (Blue Cross Blue Shield of Massachusetts), January 5, 2006.

**Data Processing:**

- The data were exported to a tab delimited format ("BCBS data.txt"), and then imported into SAS.
- Records where the claim number begins with '25' or '30' were flagged as Medigap. According to the DeMaina deposition (pp. 119-121), these represent some, but not all, Medigap payments.
- Records where ALLOWED_AMT or PAID_AMOUNT equal zero were excluded from this analysis.
- Records where SERV_PROV begins with '0000' followed by a letter, followed by five numbers were identified as physician providers (pp. 88-89 of DeMaina deposition). All other records (non-physician providers) were excluded from this analysis.
- For non-Medigap payments, average reimbursement was calculated as ALLOWED_AMT/NUMBER_SERVICES where NUMBER_SERVICES does not equal zero.  It is assumed that NUMBER_SERVICES is in terms of number of J-code billing units.
- For Medigap payments, average reimbursement was calculated as 5*(PAID_AMOUNT/NUMBER_SERVICES) where NUMBER_SERVICES does not equal zero.  It is assumed that NUMBER_SERVICES is in terms of number of J-code billing units.
- Annual AWP data were merged from Hartman's December 15, 2005 Declaration, using the NDCs indicated in each figure. Average reimbursement was adjusted from the fundamental billing unit for each J Code to the appropriate units for each NDC.
- For 1998 – 2003, adjusted AWP is calculated as 0.95*AWP. Before 1998, adjusted AWP is equal to AWP.
- Records not flagged as Medigap, where the average reimbursement (based on PAID_AMOUNT) is between 17 and 23 percent of adjusted AWP (inclusive), are assumed to represent Medigap payments not identifiable using the claim number

---

[1] Note that these data do not include the Pipefitters Union (group number 002225284) or the Sheet Metal Workers Union (group number 002229789), which were provided separately.  These two groups account for fewer than 200 records and therefore would not change the results of this analysis in any substantial way.

(see DeMaina Deposition, pp. 119-121). For these records, the average reimbursement is calculated as 5*(PAID_AMOUNT/NUMBER_SERVICES).

- Records where the average reimbursement is less than 10% of adjusted AWP or greater than 200% of adjusted AWP (exclusive) are excluded from this analysis.
- A total dollar amount is calculated for each record as the product of NUMBER_SERVICES and the average reimbursed amount. Dollars are tabulated by J code by year.
- Units are calculated by tabulating NUMBER_SERVICES by J code by year.
- Average reimbursement by J code by year is calculated as Dollars/Units.
- Average reimbursement is graphed, with AWP, adjusted AWP and ASPs from selected NDCs in Hartman's December 15, 2005 Declaration.

**Attachment C**

# Attachment C: Deposition Quotes[1]

## *Mulrey: Quote 1*

> Q. What is your basis for understanding that there was a change in practice or policy as of 1995?
>
> MR. HARRINGTON:  Well, objection.  Go ahead.
>
> A.  Prior to that, the fee schedules were usual and customary, and it was felt, you know, to administer those was a burden, so they moved to a more standardized nationally-recognized payment methodology. (p. 57).
>
> …
>
> Q.  Okay.  So the shift from usual and customary to the fee schedule was in part due to the administrative simplicity with using fee schedules?
>
> A.  Yes. (p 60).

## *Mulrey Quote 2*

> Q.  Based upon your position as a member of the provider reimbursement department, sitting here today, do you have a view as to whether or not you are mislead as to the meaning of AWP?
>
> A.  I want to say my opinion is the AWP would be the bottom-line wholesale cost that would be – providers could buy their drugs at. (p. 79.)
>
> …
>
> Q.  So in 2004, you obtained an understanding of the term AWP that differed from your earlier understanding?
>
> A.  Yes. (p. 80).
>
> …
>
> Q.  So in 2003-2004, as a member of the provider reimbursement group, you learned that AWP was no longer, you know, from your perspective an average of actual wholesale costs but indeed was something greater than the costs that doctors paid for drugs; right?
>
> A.  Yes. (p. 93).

---

[1]   Mulrey Quotes 1-3 and Farias Quotes 1-2 appear in Attachment F to the *Hartman April 2006 Declaration*.

*Mulrey Quote 3*

Q. As part of your financial analysis that you were doing at Braintree health center [i.e., the staff HMO unit], did you incorporate their drug costs into their expenses for the P & L that was consolidated with the Blue Cross/Blue Shield of Massachusetts P & L"

A. I can't recall exactly. (p. 18).

…

Q. Okay.   As part of your work at Braintree, did you gain an understanding as to the costs at which physician-administered drugs could be acquired?

A. No.

Q. Did you get an understanding of whether or not manufacturers, pharmaceutical manufacturers, gave discounts or rebates to physicians or pharmacies depending upon the volume of drug purchased or the particular leverage of the account?

A. No.

Q. Did there ever come a point in time when you learned – that you obtained that understanding?

A. Yes.

Q. When was that?

A. It was pretty much at the time when Medicare was reviewing their AWP logic and payment methodology.

Q. And when was that?

A. The 2002-2003 time frame. (pp. 19-20).


*Mulrey Quote 4*

Q. When did Blue Cross/Blue Shield of Massachusetts first begin to use R.J. Health as a vendor to determine reimbursement amounts for physician- administered drugs?

A. 2005.

Q. And Blue Cross/Blue Shield of Massachusetts started using R.J. Health because Medicare no longer reimbursed for physician-administered drugs on an AWP basis; correct?

A.  Yes.

Q. In the 2004 time frame before Medicare its reimbursement methodology, did Blue Cross/Blue Shield of Massachusetts give any consideration to revising its reimbursement methodology for physician-administered drugs?

A. Yes.

Q. What involvement, if any, did you have in that process?

A.  I completed an analysis.

Q. What analysis was that?

A. An analysis of ASP pricing that Medicare was proposing against our utilization. (p. 65).

…
- A. Could you ask that again? I am sorry.
- Q. Sure. Your analysis basically involved a change in the status quo analysis? You were contemplating what would happen if Blue Cross/Blue Shield of Massachusetts switched to an ASP environment; correct?
- A. Yes. (pp. 66-67).

…
- Q. And as a consequence of your analysis, is it correct that Blue Cross/Blue Shield of Massachusetts elected not to shift to the ASP reimbursement methodology?
- A. At this time, yes.

…
- A. I mean we normally follow industry standards, and Medicare has moved to ASP. Right now from our perspective, we don't see that as an industry-acceptable standard just yet. (p. 72).

### *Mulrey Quote 5*

- Q. Okay. Currently today what is the amount in the fee schedules that is afforded to physicians for the administration of drugs to Blue Cross/Blue Shield of Massachusetts members?
- A. You are asking what the AWP was set at?
- Q. Is there a constant methodology utilized for all drugs in each of the fee schedules?
- A. Right.
- Q. And is that methodology for the fee-for-service reimbursement based upon a percentage of AWP?
- A. Yes.
- Q. And what is that percentage?
- A. 95 percent.
- Q. How long has Blue Cross/Blue Shield of Massachusetts utilized a reimbursement amount of 95 percent of AWP to reimburse all drugs on all its fee schedules?
- A. Since '98 when Medicare made their change.
- Q. Prior to 1998, what methodology did Blue Cross/Blue Shield of Massachusetts use to reimburse -- to determine the reimbursement amounts for drugs on its fee schedules?
- A. I don't -- I'm -- let me back this up. What methodology did we use?
- Q. When I say methodology, --
- A. Yes.
- Q. -- you have referred to 95 percent of AWP --
- A. Yes.
- Q. -- as the basis for the reimbursement amounts in the fee schedules for drugs, and I'm referring to that as methodology.
- A. Okay.

Q.  So 95 percent of AWP methodology.

A.  Okay.

Q.  So let me ask the question. Prior -- from 1995 through 1998, what was the basis by which Blue Cross/Blue Shield of Massachusetts calculated the amounts in its fee schedules for physician-administered drugs?

A.  100 percent of AWP.

Q.  Starting in 1995, how did Blue Cross/Blue Shield of Massachusetts determine the AWP it used to calculate the amounts in its fee schedules?

A.  We basically just used Medicare's AWP.

Q.  When you say "Medicare's AWP," what are you referring to?

A.  Medicare's AWP fee schedule for their J codes.

Q.  Okay.  So is it correct that Blue Cross/Blue Shield of Massachusetts did not calculate its own dollar amounts in the fee schedule but simply adopted the amounts that were specified in the Medicare fee schedules?

A.  Yes. (pp. 60-63).

*Farias Quote 1*

Q.  Let's suppose that a physician receives a free sample, administers it to a patient who's a Harvard Pilgrim member … and then charges Harvard Pilgrim for that drug that the doctor received for free and administered to the patient … would Harvard Pilgrim think it relevant in determining whether to reimburse the doctor for that drug that the doctor got it for free?

…

Q.  Would Harvard Pilgrim consider that relevant in determining whether to pay the doctor for the drug cost or not?

…

A.  No, we wouldn't -- we wouldn't factor that in.  We wouldn't do that level of exploration.

Q.  Again, though, Mr. Farias, I understand that you wouldn't do that level of exploration, but I'm asking you to assume that the doctor got the drug for free.  Would you reimburse the doctor, based on AWP minus 5 percent, even though the doctor got it for free?  Would that be relevant to you that the doctor got it for free?

…

A.  If the provider submitted a claim in conformance with his contract, provider submitted a claim for a covered service, Harvard Pilgrim would reimburse for that service under the terms of the contract.

Q.  For the service.  And when you say, "the service," you mean, as well, the drug?

A.  Right.

Q.  And is that because you assume that the doctor, in submitting that bill, paid for the drug?

…
A.  Not -- again, not at that level of detail.  We would be assuming that the provider is performing under the terms of his contract or her contract with Harvard Pilgrim.

Q.  Okay.  So, when you give me that answer, you really think about it in terms of at the level of the claims submission?

A.  That's correct (pp. 135-137).

**Farias Quote 2**

Q.   You're coming to the end of a contract period --

A.  Yes.

Q.   -- you learn that the physician pays only 10 percent of the cost that you, Harvard Pilgrim, have been reimbursing them all along for a drug --

A.  Uh-huh, right.

Q.   -- and that they're getting a 90 percent profit on the drug --

A.  Uh-huh.

Q.   -- when you turn to renegotiate that contract, would the fact that the doctor pays only 10 percent of what you are reimbursing --

A.  We don't but --

Q.   -- influence your judgment?

A.   We talked about before, we don't negotiate our physician -- our drug fee schedule.

Q. And that's because you rely on the Medicare AWP.

…

A.   Well, no, that's not because.  We do use AWP as a basis, yes.  But that's not the reason why we don't negotiate it.  We, as I said before, we don't negotiate it because we want standardization across the network. (pp. 140-141).

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing, **DECLARATION OF RAYMOND S. HARTMAN IN RESPONSE TO DR. GAIER'S DECLARATION IN SUPPORT OF THE TRACK 1 DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO CLASS 3**, to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on August 30, 2006, a copy to LexisNexis File & Serve for posting and notification to all parties.


By_____/s/ Steve W. Berman_____
    Steve W. Berman
    **HAGENS BERMAN SOBOL SHAPIRO LLP**
    1301 Fifth Avenue, Suite 2900
    Seattle, WA  98101
    (206) 623-7292