UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | CIVIL ACTION: 01-CV-12257-PBS  Judge Patti B. Saris |

**DECLARATION OF DEBORAH DEVAUX IN SUPPORT OF PLAINTIFFS' OPPOSITION TO TRACK 1 DEFENDANTS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO CLASS 3**

I, Deborah Devaux, under the penalty of perjury, hereby declare as follows:

1.  I submit this Declaration in support Plaintiffs' Opposition to Track 1 Defendants' Motion for Summary Judgment with Respect to Class 3.

2.  I have personal knowledge of the facts stated below, would so testify in court if called upon to do so, and am competent to provide testimony.

3.  I am currently employed at Blue Cross Blue Shield of Massachusetts ("BCBSMA") as Senior Vice President for Health Care Contract Management. I have been employed at BCBSMA for approximately six years. Previous to my current title I held the positions of Senior Director for Provider Contracting and Vice President for Health Care Contract Management at BCBSMA.

4.  My job duties include setting the overall direction of contracting for all providers (except dentists) and leading or supporting major corporate initiatives in areas such as incentive payment, product development, and policy development.

5.      While employed at BCBSMA, I have had responsibility for establishing contracts between BCBSMA and, among other entities, physicians and physician organizations.

6.      I have personally been involved in negotiating such contracts have also supervised a staff of BCBSMA employees that negotiates such contracts. Reimbursement for physician administered drugs is typically not a point of negotiation between BCBSMA and physicians. BCBSMA establishes, and periodically updates, fee schedules that govern the amount that any physician or physician organization in the BCBSMA network will be reimbursed both for the physician administered drugs and for the administration fee associated with administration of those drugs to BCBSMA members.

7.      The fee schedules maintained by BCBSMA are referenced in the contracts with physicians or physician groups. If a contract with a physician covers multiple years or has an "evergreen" clause – meaning it continues from year to year unless amended or cancelled by one of the parties – the physician or physician group will be notified of fee schedule changes or updates during the contract term.

8.      Although I am not responsible for establishing the fee schedules for physician administered drugs, I understand that they are developed by BCBSMA's Actuarial Services area using AWP as the basis for reimbursement. Currently BCBSMA's reimbursement for physician administered drugs is set at 95% of AWP.

9.      In addition to my duties as described above, I am also Chair of the Provider Financial Strategy Work Group ("PFSWG"). This is a working group within BCBSMA that, among other responsibilities, makes policy decisions at BCBSMA that relate to reimbursement to physicians and physician groups for services and for physician administered drugs.

10.     In early 2005, the PFSWG considered the fact that the CMS had decided, as of January 2006, to change from using AWP as a basis for reimbursement for physician administered drugs and instead to use a calculation of the average sale price ("ASP") for the Medicare program. The PFSWG considered an analysis of the impact on BCBSMA of Medicare's new ASP fee schedules using historic utilization data from BCBSMA that was prepared by Michael Mulrey, Manager in BCBSMA's Professional Provider Reimbursement Area.

11.     Although the analysis that was presented to the PFSWG indicated that if BCBSMA moved to Medicare's ASP methodology, BCBSMA would save a modest amount of money, the PFSWG decided not to move to the use of ASP.

12.     Generally, BCBSMA does not make policy decisions or adopt new benchmarks unless they are well-established and accepted as industry standards. Members of the PFSWG felt that the savings associated with moving to the ASP methodology were uncertain. PFSWG members agreed to monitor the use of ASP to determine whether it became an accepted industry standard.

13.     Members of the PFSWG were also concerned with changing to the ASP methodology because it was not clear at the time that Medicare would continue to use that methodology on a long-term basis. Members of the PFSWG felt that BCBSMA should not spend time and money in moving to an ASP-based methodology if there was a possibility that that methodology would be discontinued or that Medicare would adopt a different standard.

14.     Until the PFSWG considered the move to ASP, I was unaware of large spreads between the published AWP and the actual sales prices at which physicians can apparently purchase some of these drugs. I was aware that some physicians, physicians or physician groups with large practices who could buy in greater quantities for instance, may have paid less and other doctors

3

may have paid more for the drugs. However, I was not aware that certain drug manufacturers may have been publishing or causing to be published AWPs that exceeded some of their drugs' actual average sale prices by more than 30% and that they may have done so in order to increase their market share for these drugs at the expense of payors like BCBSMA. Even when PFSWG was considering whether to follow Medicare and begin using ASP, I did not know, and the PFSWG members did not otherwise discuss, which drug manufacturers may have been engaged in the inflation of AWP in this way or which drugs were involved.

15. Other than through this litigation, I have not received information about which physician-administered drugs may have had unduly inflated AWPs.

I make the foregoing statements under penalty of perjury on the date written next to my name below.

Date: August 30, 2006

_____
Deborah Devaux