# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
| | ) | CIVIL ACTION: 01-CV-12257-PBS |
| | ) | |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) ) | Judge Patti B. Saris |
| | ) | Chief Magistrate Judge Marianne B. Bowler |
| | ) ) | **[FILED UNDER SEAL PURSUANT TO COURT ORDER]** |
| | ) ) | |

## DECLARATION OF RAYMOND S. HARTMAN
## IN SUPPORT OF PLAINTIFFS' CLAIMS OF LIABILITY
## AND CALCUATION OF DAMAGES

Since it is necessary for a manufacturer to increase the spread of the relevant physician-administered drug above what would have been the case absent the fraud in order to implement and benefit from the AWP scheme, I find causation and liability for any NDC of any of these drugs if Equation (1a) of my September 3, 2004 Declaration is found to hold. Specifically the alleged AWP scheme excessively raised reimbursement rates for drug j of Defendant k if

(1a)    $\text{Spread}_{jk} > \text{Spread}_{jk}^{\text{but-for}}$.

### C. Yardsticks for a Finding of Causation and Liability

57.    Equation (1a) explicitly relies upon the notion of the yardsticks that I discussed in my earlier Declarations and that the Court has recognized at p. 63 of the *Memorandum and Order*.

58.    As noted above, the alleged AWP scheme was effectuated when a manufacturer increased the AWP of the drug and/or decreased its ASP in order to offer financial incentives to providers to move market share. Reliance upon increased, non-transparent and unmonitored spreads became strategically useful to drug manufacturers when they faced increased therapeutic competition. In the absence of therapeutic competition, a given manufacturer would find it unnecessary **and unprofitable (if ASP were reduced)** to increase spreads to move market share. Hence, as noted with my discussion of Table 3 above, successful "break-through" innovator drugs serve as reasonable yardsticks for "but-for" spreads, specifically, for spreads that would be anticipated in the market when spread manipulation was unnecessary to move market share and was therefore not undertaken.

59.    While I have requested of Defendants data for as many drugs in Tables 3.A and 3.B as possible, I have received limited usable data. I have, however, been able to make use of some Defendant data, data and analyses of Defendants' experts, and other data. I will continue to examine data I have requested of Counsel and will refine my yardsticks as such data are made available.

    a) Specific physician-administered drugs

---

- In Attachment H.1, I present AWP and ASP information for Zofran (see Table 3.B). The data for Zofran NDC 00173044200 are compelling. Zofran launched as the first Serotonin 5-HT3 Blocker (antiemetic), a unique market niche. It did not face therapeutic competition until Kytril launched in 1994. Once Kytril did launch, the manufacturers of each drug clearly used spread (see Attachment F of this Declaration) to compete for market share, as alleged and as described in Attachment E of my September 3, 2004 Declaration. Prior to the time that GSK felt compelled to increase spread to move market share in 1994, its spread was 18.6%-20% for the three years, 1991-1993. Once therapeutic competition arose, the spreads were increased to compete for market share, as described in Attachment F to this Declaration.[59]

- In Attachment H.2, I present the AWPs and ASPs for Taxol from its launch in 1993. At that time, it was the only therapeutic competitor offering Paclitaxel. When it launched, using RedBook AWPs, its spread was 25% and remained at 25-27% from 1994 until 2000, when generic launch introduced price competition to move market share. When it launched, using First DataBank AWPs, its spread was 20% and remained at 21-22% from 1994 until 2000, when generic launch introduced price competition to move market share.

- In Attachment H.3, I present the AWPs and ASPs of Blenoxane, which was not included in Table 3.B. Using Red Book AWPs, it launched in 1993 with a spread of about 27% and remained at that level until it faced competition motivating it to increase its spread. Using First DataBank AWPs, it launched in 1993 with a spread of about 22% and remained at that level until it faced competition motivating it to increase its spread.

- I conclude that the relevant yardsticks provided by innovator single-source physician-administered drugs untainted by the AWP inflation scheme and based upon Red Book AWPs (in this case, Class drugs prior to the time they began to effectuate the AWP scheme) range from 18-27%. If I based my yardsticks upon First DataBank AWPs, the range would be 18%-22%

b) As cited in ¶ 22. b) above, in the course of my analysis for this matter I have reviewed a variety of publicly-available survey research summarizing the "market" expectations of spreads for single-source physician-administered drugs. For this group, the range of reasonably anticipated spreads found in the survey research is 11%-25%, which corroborates the comparator drugs introduced in ¶ 59.a) above.

c) Dr. Gaier admits to a yardstick of 20-25% in his Rebuttal Declaration for all single-source innovator drugs.[60]

---

[59] Note that Zofran's AWPs are equivalent in the RedBook and First DataBank. This is not the case for Taxol and Blenoxane.

[60] In the process **Dr. Gaier reveals confusion** regarding the coincidence of the proffered opinions of Dr. Schondelmeyer and me. Specifically, at his ¶ 58 Dr. Gaier states, "Notwithstanding the record evidence that many payors did not expect AWP was a signal for manufacturer's selling price, Dr. Hartman's assertion that payors were harmed because they incorrectly 'expected that AWP is larger than ASP by a

d) Reimbursement patterns for most physician-administered drugs, whether administered under Medicare coverage or under private commercial payor coverage, are driven primarily by Medicare reimbursement practices.[61]  As a result, contracts negotiated by commercial payors with provider groups offer less information about "revealed preferences" or "revealed expectations" about spreads than do TPP contracts with PBMs for single-source self-administered orals.[62]

e) Given the information available, I weight most heavily the evidence from the physician-administered comparator drugs and the publicly available survey research for physician-administered drugs.  I conclude that a reasonable range of yardsticks for spreads untainted by the AWP scheme is 11%-25%, using First DataBank.  However, using RedBook AWPs, I conclude that a reasonable range of yardsticks for spreads untainted by the AWP scheme is 11%-27%.  To be conservative, I choose 30% as my yardstick for a finding of liability.  Specifically, if a manufacturer either raises its AWP and/or lowers its ASP such that the realized spread exceeds 30% for a given NDC for a given period of time (I choose a year), I conclude that the manufacturer has fraudulently increased the spread on that NDC in that period to move market share.

f) It is appropriate to proceed by NDC and its related AWP.  It is clear from discovery materials, fact evidence and my analysis in the Lupron matter that manufacturers decide to artificially increase the spread for a given NDC relative to other NDCs for strategic reasons.  Indeed, I understand that there has been documentation of the temptation to shop NDCs for the highest AWP.

The fact evidence certainly indicates that manufacturers strategically increase and decrease the spreads of certain NDCs over time relative to other NDCs, as their marketing strategies and product life cycles evolve.  Likewise, providers can reasonably be assumed to be profit-maximizing actors who bill the most they can

---

*reasonably predictable amount'* is contradicted by plaintiffs' expert, Dr. Schondelmeyer (Schondelmeyer Declaration, p. 37; *Emphasis added*), who writes:

'For most brand name products that are still covered by patent or exclusivity terms, the price relationship between list prices (AWP and WAC) and actual transaction prices (actual acquisition cost or average selling price) for a given class of trade is *reasonably predictable.* That is, the WAC is equal to, or close to (+ or - *5%*) the actual acquisition cost for the community pharmacy class of trade and the AWP, at present, is typically 20 to 25 percent above the WAC, or alternatively, WAC is 16.67 or 20 percent below AWP. *In such cases, a payment policy using AWP as a benchmark (e.g., usually AWP minus a certain percent) may be relatively accurate.*'

**Despite Dr. Gaier's confused assertion to the contrary, there is no contradiction between Dr. Schondelmeyer and me.** We are in complete agreement. We both agree that for single-source self-administered innovator drugs, the market **reasonably predicted** that AWP was approximately 20-25% above drug acquisition costs, or the ASP.

[61]  Again, See MedPAC Report, chapter 9.

[62]  Both Mr. Young and I agree that negotiated reimbursement rates are AWP minus 13%-18% for these drugs (*Memorandum and Order*, p. 64), which allows for the pharmacy margins discussed in Attachment K to this Declaration.  For physician-administered drugs, contracted reimbursement rates are AWP ± 15%.

---

I declare under penalty and perjury that this Declaration is true and correct.

Executed on December 15, 2005

Raymond S. Hartman

# Attachment J.4.j: Johnson & Johnson Non-Medicare Damages: Massachusetts (Sub-Class 3) Aggregated by Drug

## Nominal Damages

| Drug | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Total |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|-------|
| Procrit | 0 | 0 | 1,548 | 0 | 1,493 | 183,009 | 42,461 | 248,144 | 56,525 | 0 | 0 | 72 | 509,026 | 509,026 | 1,551,302 |
| Remicade | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2,877 | 36,179 | 71,044 | 550,966 | 622,078 | 852,014 | 675,019 | 2,810,177 |
| Total | 0 | 0 | 1,548 | 0 | 1,493 | 183,009 | 42,461 | 251,020 | 92,704 | 71,044 | 550,966 | 622,150 | 1,361,040 | 1,184,045 | 4,361,479 |

## Damages Including Pre-Judgment Interest (2005$)

| Drug | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | Total |
|------|------|------|------|------|------|------|------|------|------|------|------|------|------|------|-------|
| Procrit | 0 | 0 | 2,570 | 0 | 2,278 | 267,731 | 59,547 | 333,590 | 72,843 | 0 | 0 | 82 | 553,933 | 531,005 | 1,823,580 |
| Remicade | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,867 | 46,624 | 87,765 | 652,468 | 706,188 | 927,180 | 704,166 | 3,128,259 |
| Total | 0 | 0 | 2,570 | 0 | 2,278 | 267,731 | 59,547 | 337,458 | 119,467 | 87,765 | 652,468 | 706,270 | 1,481,113 | 1,235,171 | 4,951,838 |

Contains Confidential Information Subject to Protective Order

# Attachment G.4.c: Johnson & Johnson Annual Spreads

| NDC | Drug | Description | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00062740003 | Procrit | PROCRIT 4000U/ML AMG | 22.5% | 22.7% | 20.9% | | | | | | | | | | |
| 00062740103 | Procrit | PROCRIT 10000U/ML AMG | 22.8% | 23.2% | 23.3% | | | | | | | | | | |
| 00062740201 | Procrit | PROCRIT 2000U/ML AMG | 24.4% | 25.0% | 23.6% | | | | | | | | | | |
| 00062740501 | Procrit | PROCRIT 3000U/ML AMG | 21.2% | 25.4% | 22.4% | | | | | | | | | | |
| 59676030201 | Procrit | PROCRIT 2000 U/ML 6'S | | | 21.3% | 24.4% | 24.7% | 24.2% | 23.9% | 24.0% | 24.0% | 20.8% | 21.4% | 20.5% | 18.0% |
| 59676030202 | Procrit | PROCRIT 2000 U/ML, INSTITUTIO | | | 20.9% | 25.3% | 29.6% | 30.8% | | 30.0% | 26.3% | 20.7% | 27.4% | 33.6% | 66.5% |
| 59676030301 | Procrit | PROCRIT 3000 U/ML 6'S | | | 23.3% | 24.2% | 25.4% | 24.2% | 23.7% | 23.1% | 23.3% | 21.2% | 21.6% | 20.9% | 18.5% |
| 59676030302 | Procrit | PROCRIT 3000 U/ML 25'S | | | 51.1% | 27.0% | 28.5% | 31.0% | | 28.4% | 25.7% | 21.9% | 25.2% | 30.4% | 24.6% |
| 59676030401 | Procrit | PROCRIT 4000 U/ML 6'S | | | 26.0% | 24.0% | 26.0% | 24.6% | 23.6% | 22.7% | 22.9% | 21.5% | 22.3% | 22.0% | 20.6% |
| 59676030402 | Procrit | PROCRIT 4000 U/ML 25'S | | | 23.5% | 26.3% | 28.4% | 30.0% | | 27.3% | 25.9% | 19.9% | 23.6% | 22.7% | 20.6% |
| 59676031001 | Procrit | PROCRIT 10000 U/ML 6'S | | | 24.9% | 23.6% | 30.3% | 27.3% | 27.2% | 24.4% | 24.8% | 22.1% | 22.4% | 22.0% | 22.5% |
| 59676031002 | Procrit | PROCRIT 10000 U/ML 25'S | | | | 23.7% | 26.1% | 27.2% | | 30.5% | 31.1% | 27.0% | 29.1% | 27.4% | 22.0% |
| 59676031201 | Procrit | PROCRIT 10,000 U/ML, MULTIDOS | | | | | 26.0% | 47.0% | 33.1% | 28.2% | 27.3% | 22.8% | 25.1% | 24.4% | 26.9% |
| 59676032001 | Procrit | PROCRIT 20,000 U/ML - 1ML | | | | | | | 30.8% | 37.7% | 31.6% | 28.6% | 29.9% | 28.5% | 25.7% |
| 59676034001 | Procrit | PROCRIT 40000 U/ML 4'S | | | | | | | | | 25.2% | 26.7% | 29.1% | 27.7% | 30.0% |
| 57894003001 | Remicade | C168J, REMICADE 1PCK US PD | | | | | | | | 30.8% | 33.4% | 31.9% | 36.1% | 33.9% | 34.3% |

Contains Confidential Information Subject to Protective Order

# EXHIBIT 2

Jayson S. Dukes                                          May 5, 2006

New York, NY

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------x

In re:  PHARMACEUTICAL

INDUSTRY AVERAGE WHOLESALE          MDL DOCKET NO.

PRICE LITIGATION                    CIVIL ACTION

---------------------------------x  01CV12257-PBS

THIS DOCUMENT RELATES TO:

ALL ACTIONS                         CERTIFIED COPY

---------------------------------x

                    May 5, 2006

                    9:36 a.m.


          Deposition of JAYSON S. DUKES  taken

      by the Plaintiffs, at the offices of

      Patterson, Belknap, Webb & Tyler, LLP, 1133

      Avenue of the Americas, New York, New York,

      before David Levy, CSR, a Notary Public of

      the State of New York.

Jayson S. Dukes                                    May 5, 2006
                        New York, NY

                                                          22

1          **A.    CPE.**

2          Q.    CPE.   CLE for lawyers.  And you don't

3     have a background in economics, right?

4          **A.    No.**

5          Q.    Now, so I understand, are you giving

6     an opinion on whether or not Dr. Hartman's

7     methodology is right or wrong?

8          **A.    No.**

9          Q.    You tell me.   What is your opinion on?

10         **A.    My opinion is on taking the**

11    **methodology as laid out by Dr. Hartman and**

12    **calculating ASPs and associated spreads based upon**

13    **that methodology.**

14         Q.    So you're using Dr. Hartman's

15    methodology completely without any changes?

16         **A.    Yes.**

17         Q.    And you're using essentially some

18    other data or some more refined data, at least, to

19    recalculate ASPs, correct?

20              MR. SCHAU:   Object to form.

21         Q.    You can answer that.

22         **A.    I'm using the data that was produced**

                 Henderson Legal Services
                    (202) 220-4158

Jayson S. Dukes                                    May 5, 2006
                  New York, NY

                                                         41

1    Dr. Hartman did, right?  He didn't exclude those

2    discounts.

3            MR. SCHAU:  Object to form.

4        A.    I thought he had.

5        Q.    Okay.  Do you have an understanding as

6    to whether or not prompt pay discounts are

7    included or excluded when calculating ASP for the

8    Medicare Modernization Act?

9        A.    I don't.

10       Q.    Same question -- first of all, service

11   fees, what are service fees, as you use it in

12   paragraph 2?

13       A.    Fees for service.  Fees for services

14   provided by the specialty distributor.

15       Q.    Do you know what services specifically

16   were provided?

17       A.    No.

18       Q.    Do you know if the fee paid was equal

19   to the service that was actually received?

20           MR. SCHAU:  Object to form.

21       A.    I was not asked to look at that.

22       Q.    Why did you decide to exclude service

Jayson S. Dukes                                      May 5, 2006
                         New York, NY

                                                              42

1   fees?

2        **A.     Because it was a fee for service, I**

3   **was told to excluded from the --**

4        Q.     Told by whom?

5        **A.     Told by counsel.**

6        Q.     Did you look at any of the contracts

7   or documents that detail what those services are?

8        **A.     I was not asked to.**

9        Q.     Okay.  So you simply looked for

10  service fees and took them out.

11       **A.     Correct.**

12       Q.     Okay.  And you don't have any

13  rationale for why you did that other than counsel

14  told you to do it.

15            MR. SCHAU:  Object to form.

16       **A.     Yeah.**

17       Q.     Do you understand that Dr. Hartman

18  kept those service fees in?

19       **A.     I don't know that specifically.**

20       Q.     Okay.  Well, wouldn't you have to know

21  whether or not he kept them in to determine

22  whether or not you were following his methodology?

Jayson S. Dukes                                          May 5, 2006
                        New York, NY

                                                              53

1        Q.     And you didn't make any attempt to
2    figure out if the fee paid by Centocor for those
3    services actually equaled the value of the
4    services, right?
5        A.     I was not asked to do that.
6        Q.     And do you know if any of those
7    service fees that the specialty distributors paid
8    were ever passed on to any of their customers?
9        A.     I don't know the answer to that.
10       Q.     Okay.  Do you know what the Medicare
11   regulations for calculating ASP are in connection
12   with service fees?
13       A.     Not specifically.
14       Q.     But you didn't make any effort in your
15   decision here to follow Medicare's rules.
16       A.     No.
17       Q.     Other than management reports you
18   talked about, do you know what other services
19   Centocor may have been buying here?
20       A.     I don't recall.
21       Q.     And you would have learned that only
22   through some conversation with counsel?

                   Henderson Legal Services
                       (202) 220-4158

Jayson S. Dukes                                    May 5, 2006
                        New York, NY

                                                         71

1    include or exclude them?

2         A.    I do not recall him discussing service

3    fees.

4         Q.    So how did you know whether or not he

5    intended to exclude or include them?

6         A.    Can you repeat the question?

7         Q.    If you don't remember Dr. Hartman

8    discussing service fees, how did you know whether

9    or not he intended to include or exclude them?

10        A.    I spoke with counsel.

11        Q.    Okay.  The only reason you took them

12   out is because counsel told you to take them out.

13        A.    Correct.

14        Q.    Okay.  Let me go back to your

15   statement of assumptions.  Number three, "Patient

16   assistance program fees."

17             You took them out for Remicade, too;

18   right?

19        A.    Correct.

20        Q.    And why did you take them out?

21        A.    I was told that they were fees for

22   services and they were to be excluded from the

                    Henderson Legal Services
                       (202) 220-4158

Jayson S. Dukes                                    May 5, 2006
                        New York, NY

                                                          72

1    calculation, and the fees -- the transactions were

2    included but the transactions were grossed up to

3    list.

4         Q.    Okay.  I'm sorry, I didn't mean to cut

5    you off.

6         A.    I'm done.

7         Q.    Okay.  So you took them out because

8    counsel told you to take them out.

9         A.    Correct.

10        Q.    Did you do any investigation at all as

11   to figure out whether or not they were in fact

12   fees for services?

13        A.    I was not asked to look into that.

14        Q.    Do you have any understanding as to

15   whether or not the Medicare ASP calculations

16   require the inclusion or exclusion of these kinds

17   of fees?

18        A.    No.

19        Q.    That would be Exhibit 21.

20             MR. MACORETTA:  That we'll mark as

21        Exhibit Dukes 006.

22             (Deposition Exhibit Dukes 006,

Jayson S. Dukes                                     May 5, 2006
                        New York, NY

75

1    the invoice was issued, and we compared that price

2    to the list price at that point in time, and we

3    found out that these orders had been placed prior

4    to an effective date taking place.

5                The customer was -- received that price

6    but the invoice went out after the effective price

7    date.  And that's how we did our match-up to, the

8    list price was based upon the price at the date of

9    the invoice.

10       Q.    So the invoice would show a sale below

11   the current list price as of the date of the

12   invoice.

13       A.    Correct.

14       Q.    Okay.  Dr. Hartman didn't do this

15   analysis, did he?

16             MR. SCHAU:  Object to form.

17       Foundation.

18       Q.    Do you know if Dr. Hartman performed a

19   similar analysis to identify invoices postdating

20   the order?

21       A.    Not specifically.

22       Q.    By the way, this was only for

Jayson S. Dukes                                          May 5, 2006
                        New York, NY

                                                              80

1          Q.    You can answer.

2          **A.    Can you repeat the question?**

3          Q.    Sure.  If Centocor did have an

4    agreement with certain customers that it would

5    provide price protection, that would be a reason

6    why the invoice would show the lower price, even

7    though it was dated after the price increase,

8    wouldn't it?

9               MR. SCHAU:  Object to form.

10         **A.    That would be a valid assumption.**

11         Q.    Okay.  Did you do anything to figure

12   out whether or not Centocor had such an

13   arrangement?

14         **A.    I was not asked to do so.**

15         Q.    And in fact, was it your understanding

16   that that was a way wholesalers make some money,

17   by profiting from this price protection

18   arrangement, buying low and selling a little bit

19   higher?

20               MR. SCHAU:  Object to form.

21         **A.    Yes.**

22         Q.    Do you know whether or not Dr. Hartman

Henderson Legal Services
(202) 220-4158

Jayson S. Dukes                                    May 5, 2006
                        New York, NY

                                                          82

1          **A.     I don't recall that specific**
2   **conversation.**
3          Q.     Your next assumption, you took out, it
4   says you took out units where the sale price was
5   zero for both Procrit and Remicade.  I'm looking
6   at assumption 5 on your attachment.  That's what
7   you did; right?
8          **A.     Yes.**
9          Q.     Why did you decide to do that?
10         **A.     At the direction of counsel, we were**
11  **told that these were charity-type donations.**
12  **Therefore, they should be removed.**
13         Q.     Did you do anything to confirm that?
14         **A.     No.**
15         Q.     I mean, if this was an audit and
16  somebody told you that, you would go ask for some
17  proof that it really was a charity donation;
18  right?
19         **A.     It would depend.**
20         Q.     Well, you wouldn't just take the
21  company's word that you should take these out,
22  would you?

Jayson S. Dukes                                           May 5, 2006
                          New York, NY

                                                                83

1        A.    It would depend upon the materiality.

2        Q.    Let's say it was material.

3        A.    Yes.

4        Q.    Yes, you would want some prior

5    verification beyond the company's say-so.

6        A.    Correct.

7        Q.    Okay.  Do you know if Dr. Hartman took

8    out the zero price units?

9        A.    He may have.

10       Q.    Well, so you weren't doing this to be

11   consistent with what Dr. Hartman did, then; were

12   you?

13       A.    I was doing this under the direction

14   of counsel.

15             MR. MACORETTA:  Let me hand you what's

16        marked as Exhibit Dukes 008.

17             (Deposition Exhibit Dukes 008,

18        printout of Exhibit 23 to declaration of

19        Jayson Dukes, marked for identification, as

20        of this date.)

21             (Document placed before the witness.)

22             MR. MACORETTA:  And let me show you

                    Henderson Legal Services
                       (202) 220-4158

Jayson S. Dukes

New York, NY

May 5, 2006

87

1    quantify or clarify that.

2         Q.    Okay.  So are you telling me that you

3    interpreted Dr. Hartman's report to be that he

4    took out all the zero unit sales?

5         A.    That's one interpretation.

6         Q.    Is that the interpretation you used?

7    Let me try it this way:

8               You didn't take out the zero unit

9    sales because you were trying to match what

10   Dr. Hartman did, did you?

11        A.    No.

12        Q.    You did it because the lawyers told

13   you to do it.

14        A.    Correct.

15        Q.    Okay.  Your assumption number 7,

16   "Calculating Procrit ASP across all NDCs by year."

17              And what this means, I take it, is

18   that there are about -- there are how many Procrit

19   NDCs, 7 or 8?

20        A.    Fifteen.

21        Q.    Fifteen, I'm sorry.  So you tried to

22   make one ASP for all those NDCs.

Jayson S. Dukes                                    May 5, 2006
                    New York, NY

97

1        Q.     Did you ever talk to anybody at either

2    of the companies about using that approach?

3        A.     No.

4        Q.     If I wanted to see the calculations

5    for how you came up with that weighted average,

6    meaning how many sales you used in one period of

7    time vs. how many sales in another period of time,

8    where would those calculations be?

9        **A.     Those would be in the spreadsheets**

10   **that were produced to you all maybe a couple of**

11   **weeks ago.**

12       Q.     There's something that shows that

13   weighted average calculation?

14       **A.     There is.**

15       Q.     Your assumption number 8, "Remicade

16   managed care analysis."

17              Why did you decide to do this managed

18   care analysis that we're talking about in

19   assumption number 8?

20       **A.     It was within the scope of what I was**

21   **asked to do by the attorneys.**

22       Q.     This isn't something you came up with

Jayson S. Dukes                                      May 5, 2006
                        New York, NY

                                                              98

1    on your own, it's something the attorneys told you

2    to do?

3         A.    Yes.

4         Q.    And this is not something Dr. Hartman

5    did, right?

6         A.    I don't believe he did.

7         Q.    Essentially what you're doing here is,

8    you're taking the managed care rebates and

9    subtracting them from AWP in your spread

10   calculation, right?

11        A.    From the amount reimbursed,

12   theoretically reimbursed based upon AWP.

13        Q.    Well, Dr. Hartman assumes that the

14   amount reimbursed is AWP, right?

15        A.    Yes.

16        Q.    And that's what you do with this

17   exception, right?

18        A.    Correct.

19        Q.    Okay.  And nowhere does Dr. Hartman

20   have any subtractions from AWP, right?

21        A.    I don't believe so.

22        Q.    Other than counsel telling you to do

Jayson S. Dukes                                     May 5, 2006
                      New York, NY

                                                          106

1          Q.    Now, is it possible that any of those

2    sales that you looked at or that you took out and

3    moved up to list could have included some of these

4    managed care rebate dollars?

5                MR. SCHAU:   Object to form.

6          **A.    No, I'd have to think about that.**

7    **Right now I don't think I have an opinion on it.**

8          Q.    Okay.   But as we sit here right now,

9    you're just not sure?

10         **A.    I'm not sure.   I'd have to think about**

11   **it.**

12         Q.    Do you know what the Medicare ASP

13   calculation rules are on rebates?

14         **A.    Not off the top of my head.**

15         Q.    I mean, you don't believe that

16   Medicare makes the same calculation you do where

17   you somehow add back in the rebates; right?

18               MR. SCHAU:   Object to form.

19         **A.    They do make -- actually, I don't**

20   **know.   I'd be guessing.**

21         Q.    Staying on the subject of rebates, if

22   we could go back to paragraph 55, well, let's

Jayson S. Dukes                                        May 5, 2006
                          New York, NY

                                                              115

1    **declaration, no.**

2         Q.    And as part of your work, did you look

3    at all the Procrit customers and decide what class

4    of trade they should be in?

5         A.    **No, we were provided a list from the**

6    **company.**

7         Q.    Okay.  And at some point, did you do

8    any analysis and move customers from one class of

9    trade to another?

10        A.    **No.**

11        Q.    Did you resolve any conflicts with

12   customers appearing in more than one class of

13   trade?

14        A.    **Yes.**

15        Q.    So the classes of trade you used to do

16   your analysis are the same classes of trade that

17   existed at the company previously.

18        A.    **Correct.**

19        Q.    Is there something that gives us a

20   definition or an explanation of who is in what

21   category and why?

22        A.    **Not within the -- actually --**

Jayson S. Dukes

New York, NY

May 5, 2006

125

1    Did you do anything to confirm that in fact, all

2    those chargebacks were to government or managed

3    care?

4         **A.    Relied upon the representation of the**

5    **company.**

6         Q.    And you don't know how the company

7    figured out which customer was which for that,

8    right?  They just gave you the end product for

9    that?

10        **A.    Correct.**

11        Q.    Do you know who at Centocor was

12   involved in that process?

13        **A.    No, because I wasn't involved in that**

14   **process.  One of my staff was.**

15        Q.    So if we wanted to -- I mean, I

16   understand Exhibits 1 or 2 would show us which

17   customers you took out.  But to understand, to

18   recreate the methodology as to how that was done,

19   what could tell us that?  Have to be a person at

20   the company?

21        **A.    To understand their methodology?**

22        Q.    Yes, to recreate.

Jayson S. Dukes                                          May 5, 2006
                       New York, NY

131

1        A.      Yes.

2        Q.      Okay.   Now, who decided that -- I'll

3    take the first one, San Francisco General

4    Hospital, should go from Paraguard Physicians to

5    teaching hospital, was that somebody at FTI or

6    somebody at OBI?

7        A.      Somebody at OBI.

8        Q.      Who created the various new class of

9    trade descriptions?

10       A.      The company.

11       Q.      Was that something you guided them on

12   or --

13       A.      It was not.

14       Q.      Was that something they created for

15   the litigation or was that something they were

16   using on their own?

17       A.      I don't know the answer to that.

18       Q.      Do you know who at OBI was involved in

19   that process?

20       A.      No.   It was one of my staff who worked

21   with one of the attorneys in the company.

22       Q.      Just so I understand this, at some

Jayson S. Dukes                                                    May 5, 2006
                            New York, NY

132

1    point in time if we asked internally at OBI, "What

2    COT is San Francisco General Hospital," the answer

3    would have been Paraguard Physicians, right?

4              MR. SCHAU:   Object to form.

5         A.    I don't know the answer to that.

6         Q.    Was the old COT something they were

7    actually using for some purpose at OBI?

8         A.    I don't know.

9         Q.    Okay.  Now, the new COT description

10   we're looking at here, is that something

11   Dr. Hartman was given in advance of his report?

12        A.    I don't know when it was produced.

13        Q.    And you don't know why the company

14   went and did this new COT description.  Meaning

15   whether or not it was for the litigation or for

16   some other purpose.

17        A.    Correct.

18        Q.    Okay.  But there's no question that

19   this is a more accurate -- I'll concede on some of

20   these that the new COT seems to be more accurate

21   than the old COT.

22        A.    Correct.

Jayson S. Dukes                                          May 5, 2006
                        New York, NY

                                                              166

1    are in, which customers are out.

2              Can you quantify for me what the

3    impact was of that, of just the reclassification

4    of classes of trade?

5              MR. SCHAU:  Object to form.

6         **A.    How do you define reclassification?**

7         Q.    Well, you have a bunch of assumptions

8    here as to which things are in or out and then you

9    also say that, "For Remicade, we excluded certain

10   customers because they weren't in the proper

11   classes, Dr. Hartman shouldn't have included

12   them."

13             Putting aside the assumptions, let's

14   just talk about the customers that you took out

15   that Dr. Hartman included.

16             Can you tell me what the impact of

17   that was?

18        **A.    Not off the top of my head, nor do I**

19   **think we did those -- I don't believe we did those**

20   **calculations.**

21        Q.    Okay.  Same question for Procrit.

22        **A.    Yes, same answer.**

Henderson Legal Services
(202) 220-4158

Jayson S. Dukes                                          May 5, 2006
                         New York, NY

---

167

1          Q.    Okay.  Let's talk about your, I'm

2     going to go down attachment 2, your statement of

3     assumptions.

4                Number 2, your exclusion of service

5     fees and prompt pay discounts, can you tell me

6     what the impact of excluding that was?

7          **A.    We didn't calculate an impact.**

8          Q.    Pardon?

9          **A.    We did not calculate an impact.**

10         Q.    So you don't know what it is.

11         **A.    No.**

12         Q.    But presumably, the effect was to

13    raise the ASP.

14         **A.    Could you repeat the question?**

15         Q.    By excluding service fees and prompt

16    pay discounts, you effectively raised the ASP,

17    isn't that right?

18         **A.    Yes.**

19         Q.    Okay.  Same question for number 3, the

20    patient assistance program fees.  Do you know what

21    the impact of excluding them was?

22         **A.    No, I do not.**

---

Jayson S. Dukes                                    May 5, 2006
                    New York, NY

168

1          Q.    And excluding them also had the effect

2    of raising the ASP, right?

3          A.    Yes.

4          Q.    Okay.  Same question for transactions

5    with invoices postdating the order.  Excluding

6    them had the effect of raising the ASP, right?

7          A.    Correct.

8          Q.    Can you tell me what the impact of

9    that exclusion was?

10         A.    No.

11         Q.    Same questions for units with the

12   sales price of zero.  Can you tell me what the

13   impact of excluding them was?

14         A.    No.

15         Q.    But it would have had the effect of

16   raising the ASP.

17         A.    Yes.

18         Q.    Again, for -- well, number 6, do you

19   know what the impact of your weighted average AWP

20   was?

21         A.    No.

22         Q.    So you don't know what effect that

Jayson S. Dukes

New York, NY

May 5, 2006

169

1    would have had.  Would that have had the effect of

2    raising or lowering the spreads?

3        A.    Would depend.  Could have been in

4    either direction.

5        Q.    And the same for number 8, the managed

6    care analysis, did you ever figure out what the

7    impact of that was?

8        A.    The impact of what?

9        Q.    Of adding in rebates, of using the

10   managed care rebates for Centocor as a reduction

11   of AWP.

12       A.    The impact of what?

13       Q.    The impact to spread calculations.

14       A.    It would decrease the spread.

15       Q.    It would decrease the sped.  But did

16   you ever try to figure out by what percentage

17   or --

18       A.    No.

19       Q.    -- it would?

20       A.    No.

21       Q.    And all the assumptions we're looking

22   at here, assumptions 1 through 8, they were all

Jayson S. Dukes                                    May 5, 2006
                    New York, NY

                                                          170

1    made because counsel told you to make them, right?

2         **A.     Under the direction of counsel, yes.**

3              MR. HOFFMAN:  You want to step out for

4         a second?  Why don't you give us thirty

5         seconds to step out.

6              (Recess taken.)

7              MR. MACORETTA:  All right, Mr. Dukes,

8         let me show you what we're going to mark as

9         Exhibit Dukes 012.

10             (Deposition Exhibit Dukes 012,

11        MDL-OB100015367, marked for identification,

12        as of this date.)

13             (Document placed before the witness.)

14   EXAMINATION (Cont'd.)

15   BY MR. MACORETTA:

16        Q.   Mr. Dukes, have you ever seen this

17   before?

18        **A.     I do not recall ever seeing this**

19   **schedule.**

20        Q.   Do you know what the reference to

21   "gross" and "net" ASP is in this document?

22        **A.     I do not.**

# EXHIBIT 3

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE ) <br> LITIGATION ) | MDL NO. 1456 <br> Civil Action No. 01-12257-PBS |
| ) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ) <br> 01-CV-12257-PBS AND 01-CV-339 ) | **FILED UNDER SEAL** |

## DECLARATION OF JAYSON S. DUKES IN SUPPORT OF THE JOHNSON & JOHNSON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CLASS 1 AND CLASS 2

**CORRECTED**

### QUALIFICATIONS AND COMPENSATION

1. I am a Managing Director in the Forensic and Litigation Consulting Practice of FTI Consulting, and a part of FTI's Life Sciences Regulatory Practice. FTI Consulting is a multi-disciplinary consulting firm with practices in financial restructuring, forensic and litigation consulting, and economic consulting.

2. I am a Certified Public Accountant and I received a Bachelor's Degree in Accounting from the University of Georgia.

3. I have assisted in resolving disputes across a wide variety of industries for nearly 15 years. I have advised healthcare providers, pharmaceutical companies, and other life sciences clients on financial, accounting, and economic matters. My current clients include Bristol-Myers Squibb, Wyeth, Johnson & Johnson, and HCA.

4. I have particular expertise in the analysis of pharmaceutical pricing practices, including rebating, discounting, and other commonly used financial incentives. My curriculum vitae is annexed to this Declaration as Attachment 1.

5. While I have directed all of the work connected with this engagement, I have been assisted by several other FTI employees.

6. FTI Consulting's fees for this engagement are based upon time expended and expenses incurred. My billing rate is $424 per hour. The rates charged by the other FTI Consulting employees who have assisted me in this engagement range from $195 per hour to $495 per hour.

## II.   SCOPE OF ASSIGNMENT

7. FTI Consulting was retained by Patterson, Belknap, Webb & Tyler LLP, attorneys for the Johnson & Johnson Defendants, to perform data analyses and financial calculations relating to Procrit®, a product sold by Ortho Biotech Products, L.P., and Remicade®, a product sold by Centocor, Inc.

8. First, FTI Consulting was asked to calculate the average selling price ("ASP") for Procrit® and Remicade®, by product National Drug Code ("NDC"), by year. We were asked to calculate the ASPs using the same two methodologies purportedly used by plaintiffs' expert, Dr. Raymond S. Hartman, as described in his reports dated December 15, 2005 and February 3, 2006.

9. Second, FTI Consulting was asked to calculate ASPs for Procrit® and Remicade® on a weighted average, per unit basis, by year, across all NDCs. Dr. Hartman's reports did not include such calculations.

10. Third, FTI Consulting was asked to calculate the "spreads" between the above-described ASPs, and the published AWPs for Procrit® and Remicade®. The term "spread" is used in this Declaration in the same manner in which it was used in Dr. Hartman's reports, *i.e.*, it is the difference between AWP and ASP, expressed as a

IV.    CALCULATIONS OF THE PROCRIT® AND REMICADE® ASPS AND ASSOCIATED
       "SPREADS" AS PER THE METHODOLOGY DESCRIBED IN DR. HARTMAN'S
       DECEMBER 15, 2005 REPORT

      A.    Dr. Hartman's Calculations as per the Methodology Described in Dr.
          Hartman's December 15, 2005 Report

25. Dr. Hartman's December 15, 2005 calculations of the Procrit® and Remicade® ASPs
    were attached to his December 15, 2005 Report as Attachment G.4.a. A copy of that
    Attachment is annexed to this Declaration as Exhibit 3.

26. Dr. Hartman's December 15, 2005 calculations of the Procrit® and Remicade®
    "spreads" were attached to his December 15, 2005 Report as Attachment G.4.c. A
    copy of that Attachment is annexed to this Declaration as Exhibit 4.

27. Dr. Hartman's December 15, 2005 calculations of Procrit®'s ASPs, by NDC, and by
    year, yielded 116 separate "spread" calculations. He identifies 97 Procrit "spreads"
    that were less than 30% (84%), three Procrit® "spreads" that were equal to 30% (3%),
    and 16 Procrit® "spreads" that exceeded 30% (14%).[1]

28. Dr. Hartman's December 15, 2005 calculations of Remicade®'s ASPs, by NDC, and
    by year, yield six "spread" calculations, all of which exceed 30%. He finds that
    Remicade®'s "spreads" were 30.8% in 1998, 33.4% in 1999, 31.9% in 2000, 36.1% in
    2001, 33.9% in 2002, and 34.3% in 2003.

      B.    FTI Consulting's Calculations as per the Methodology Described in
          Dr. Hartman's December 15, 2005 Report

29. When my staff and I applied the methodology described in Dr. Hartman's December
    15, 2005 Report, excluding the hospital, managed care, and government transactions
    identified in Exhibit 1, we found that the ASPs for Procrit® are frequently higher than
    those listed in Attachment G.4.a of Dr. Hartman's Report. Our calculations of
    Procrit®'s ASPs, by NDC, and by year, are shown in the table annexed to this
    Declaration as Exhibit 5.

30. When my staff and I applied the methodology described in Dr. Hartman's December
    15, 2005 Report, excluding the hospital, managed care, and government transactions
    identified in Exhibit 1, we found only one Procrit® "spread," for one Procrit® NDC,
    for one year, that exceeded 30%, and I suspect that that one figure may reflect data
    anomalies, which I am continuing to investigate. Our calculations of Procrit®'s

---

[1] In his December 15, 2005 Report, Dr. Hartman's calculated three Procrit® "spreads" that
allegedly exceeded 50%, including one NDC in 1993 that was 221.3%. In my opinion, based
upon my own calculations, these three "spread" calculations (and others) are incorrect. I note that
Dr. Hartman's second set of calculations, discussed below, do not show any NDCs with
"spreads" above 50%, and only one NDC with a "spread" above 40%. (The 221.3% "spread" is
reduced to 35.3%.) I interpret Dr. Hartman's revisions to suggest that he agrees with me that his
initial calculations showing three Procrit® "spreads" in excess of 50% were incorrect.

## Attachment 2
## Statement of Assumptions

**1. Identification of Remicade Direct Sales and Chargeback Data Entry Errors**

I have excluded from my ASPs calculations, certain transactions Centocor represents to be data entry errors. A schedule of these transactions is provided at Exhibit 19.

**2. Identification of Specialty Distributors Service Fees**

We also excluded the effects of service fees and prompt pay discounts earned by specialty distributors and to wholesalers from our Remicade® ASP calculations. A schedule of these transactions is provided at Exhibit 20.

**3. Patient Assistance Program Fees**

Nova Factor and Priority healthcare were paid fees for their role in administering Centocor's Patient Assistance Program. These fees would appear on a Remicade® invoice as a discount, but they are fees for services, rather than a reduction in the list price. Accordingly, the effects of these discounts were excluded from my ASP calculations. A schedule of these transactions is provided at Exhibit 21.

**4. Identification of Transactions with Invoices Postdating the Order**

Certain Remicade® sales orders were placed prior to a price increase going into effect. In these instances the related invoices that were issued on or after the effective date of the price increase, reflected the price in effect at time of order. I therefore adjusted my ASP to AWP comparisons to account for these timing differences. A schedule of these transactions is provided at Exhibit 22.

**5. Units with a sales price of $0.**

Transactions with units where the sales price was $0 were excluded from our ASP calculation for both Procrit® and Remicade®. A listing of excluded transactions is provided at Exhibits 23 and 24.

**6. AWPs Employed in Spread Comparison**

In instances where a price change occurred during a year, I used a weighted average to calculate a single AWP to be used when calculating the spread for a particular NDC for a year. I weighted the average based upon direct sales unit sold less units with a sales price of $0.

**7. Calculating Procrit ASP across all NDCs by Year**

For purposes of calculating an ASP for Procrit across all NDCs for a year as well as for comparing this calculated ASP to an equivalent ASP calculation by Dr. Hartman, I needed to employ several assumptions when performing these calculations. First, for my ASP calculations, I needed to calculate a weighted average AWP across all NDCs for a particular year. I used direct sales unit sold

**Attachment 2**
**Statement of Assumptions**

less units with a sales price of $0 as the basis for weighting the AWP. Second, I needed to calculate a weighted average for Dr. Hartman's ASP calculations. I used direct sales unit sold less units with a sales price of $0 as the basis for weighting the AWP.

**8. Remicade® Managed Care Analysis**
For the purpose of recalculating the "spreads" for Remicade treating managed care rebates as a credit against the "spread", I considered the following information. First, I identified that Centocor paid managed care rebates for Remicade® in the amounts of $411,727, $7,334,593 and $25,367,372 for 2001, 2002, and 2003 respectively. Second, I calculated an average managed care rebate paid per unit per year in the amounts of $.30, $3.04 and $8.50 for 2001, 2002 and 2003 respectively. I then calculated a net price paid per unit per year based upon the following equation: AWP per unit – Average Managed Care Rebate Paid Per Unit. I then compared the net price paid to my previously calculated ASP to determine the recalculated "spread". I employed the same methodology for calculating this "spread" as the methodology employed for the "spread" calculation discussed at ¶ 10 of the Declaration.

# Exhibit 5

# FTI Comparison of ASP Calculations - Dr. Hartman's Declaration Dated December 15, 2005

*Excludes Government, Managed Care, and Hospital Sales*

*Exhibit 5*

| Product | NDC | 1991 | | 1992 | | 1993 | | 1994 | | 1995 | | 1996 | | 1997 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI |
| Procrit | All NDCs | 9.68 | 9.56 | 9.58 | 9.42 | 9.43 | 9.36 | 9.47 | 9.32 | 9.18 | 9.36 | 8.95 | 9.26 | 9.28 | 9.43 |
| Procrit | 00062740003 | 235.17 | 234.83 | 234.43 | 232.31 | 238.18 | 234.76 | | | | | | | | |
| Procrit | 00062740103 | 536.83 | 557.00 | 555.15 | 554.09 | 554.58 | 553.23 | | | | | | | | |
| Procrit | 00062740201 | 115.76 | 115.77 | 115.21 | 115.28 | 116.53 | 117.14 | | | | | | | | |
| Procrit | 00062740501 | 178.21 | 178.46 | 172.27 | 172.36 | 176.50 | 176.94 | | | | | | | | |
| Procrit | 59676030201 | | | | | 44.81 | | 115.74 | 116.45 | 115.49 | 117.21 | 115.93 | 117.22 | 116.21 | 117.75 |
| Procrit | 59676030202 | | | | | 496.36 | 497.71 | 478.79 | 492.02 | 463.65 | 484.50 | 458.72 | 473.71 | | 475.01 |
| Procrit | 59676030301 | | | | | 729.92 | 736.71 | 708.87 | 726.79 | 760.23 | 720.77 | 687.97 | 714.84 | | 719.08 |
| Procrit | 59676030302 | | | | | 190.56 | 192.28 | 173.89 | 174.11 | 172.26 | 175.00 | 231.20 | 175.60 | 174.56 | 176.52 |
| Procrit | 59676030401 | | | | | | | 232.12 | 232.54 | 228.63 | 234.09 | 234.47 | 235.17 | 232.99 | 236.54 |
| Procrit | 59676030402 | | | | | 952.45 | 960.16 | 951.37 | 963.63 | 934.49 | 954.21 | 922.04 | 947.11 | | 952.83 |
| Procrit | 59676031001 | | | | | 553.96 | 552.82 | 553.22 | 552.39 | 525.13 | 556.61 | 537.43 | 556.52 | 556.33 | 574.35 |
| Procrit | 59676031002 | | | | | 2,282.20 | 2,285.15 | 2,304.67 | 2,307.42 | 2,259.60 | 2,296.31 | 2,339.98 | 2,270.73 | | 2,304.56 |
| Procrit | 59676031201 | | | | | | | 2,289.60 | 1,140.00 | 1,085.61 | 1,128.44 | 930.85 | 1,103.09 | 1,063.35 | 1,111.53 |
| Procrit | 59676032001 | | | | | | | | | | | | | 1,082.05 | 1,143.21 |
| Procrit | 59676034001 | | | | | | | | | | | | | | |
| Remicade | 57894003001 | | | | | | | | | | | | | | |

| Product | NDC | 1998 | | 1999 | | 2000 | | 2001 | | 2002 | | 2003 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI | Plaintiff | FTI |
| Procrit | All NDCs | 9.37 | 9.64 | 9.42 | 9.63 | 9.93 | 10.01 | 10.12 | 10.29 | 10.54 | 10.62 | 10.35 | 10.60 |
| Procrit | 00062740003 | | | | | | | | | | | | |
| Procrit | 00062740103 | | | | | | | | | | | | |
| Procrit | 00062740201 | | | | | | | | | | | | |
| Procrit | 00062740501 | | | | | | | | | | | | |
| Procrit | 59676030201 | 116.16 | 118.09 | 116.08 | 118.22 | 123.88 | 123.27 | 127.82 | 127.10 | 133.62 | 131.19 | 135.83 | 132.14 |
| Procrit | 59676030202 | 461.66 | 480.81 | 474.87 | 482.56 | 516.66 | 507.97 | 506.57 | 515.81 | 494.83 | 523.60 | 491.04 | 531.80 |
| Procrit | 59676030301 | 175.42 | 177.20 | 175.23 | 177.14 | 185.22 | 184.06 | 189.96 | 190.57 | 195.91 | 196.05 | 202.95 | 197.05 |
| Procrit | 59676030302 | 701.15 | 725.03 | 716.18 | 727.50 | 767.26 | 753.43 | 773.21 | 776.77 | 768.76 | 792.24 | 804.01 | 803.57 |
| Procrit | 59676030401 | 334.71 | 237.38 | 234.53 | 237.50 | 246.32 | 247.22 | 253.34 | 256.01 | 262.55 | 263.25 | 265.76 | 264.32 |
| Procrit | 59676030402 | 942.69 | 970.84 | 955.73 | 969.04 | 1,040.01 | 1,006.98 | 1,004.36 | 1,036.01 | 1,086.63 | 1,072.42 | 1,090.41 | 1,078.62 |
| Procrit | 59676031001 | 578.48 | 590.43 | 578.90 | 590.19 | 612.72 | 614.50 | 632.47 | 637.30 | 656.85 | 656.33 | 657.09 | 655.43 |
| Procrit | 59676031002 | 2,200.54 | 2,382.24 | 2,260.15 | 2,387.21 | 2,454.11 | 2,499.88 | 2,598.72 | 2,570.54 | 2,621.19 | 2,664.12 | 2,620.80 | 2,665.61 |
| Procrit | 59676031201 | 1,123.14 | 1,150.17 | 1,131.46 | 1,159.73 | 1,218.73 | 1,217.94 | 1,237.79 | 1,248.11 | 1,282.71 | 1,289.55 | 1,275.43 | 1,284.75 |
| Procrit | 59676032001 | 1,049.06 | 1,150.28 | 1,094.11 | 1,149.04 | 1,163.87 | 1,194.86 | 1,191.80 | 1,230.43 | 1,247.37 | 1,270.94 | 1,332.54 | 1,271.71 |
| Procrit | 59676034001 | | | 1,533.40 | 1,541.36 | 1,575.92 | 1,598.04 | 1,589.67 | 1,642.73 | 1,673.13 | 1,696.74 | 1,588.99 | 1,691.61 |
| Remicade | 57894003001 | 447.26 | 450.00 | 458.23 | 463.98 | 485.17 | 495.17 | 508.25 | 524.19 | 516.65 | 532.01 | 514.98 | 532.01 |

Contains Confidential Information
Subject to Protective Order

# EXHIBIT 4

Raymond S. Hartman, Ph.D. CONFIDENTIAL          March 1, 2006
                Boston, MA

Page 1169

          THE UNITED STATES DISTRICT COURT

          FOR THE DISTRICT OF MASSACHUSETTS

     *****************************

IN RE:  PHARMACEUTICAL              MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE          01CV12257-PBS

PRICE LITIGATION

     *****************************    MARCH 1, 2006

THIS DOCUMENT RELATES TO:           VOLUME: V

ALL ACTIONS                         PAGES: 1169-1469

     *****************************

               C O N F I D E N T I A L

CONTINUED VIDEOTAPED DEPOSITION OF RAYMOND S.

HARTMAN, PH.D., called as a witness by and on behalf

of the Defendants, pursuant to the applicable

provisions of the Federal Rules of Civil Procedure,

before P. Jodi Ohnemus, Notary Public, Certified

Shorthand Reporter, Certified Realtime Reporter, and

Registered Merit Reporter, within and for the

Commonwealth of Massachusetts, at the offices of Dwyer

& Collora, LLP, 600 Atlantic Avenue, Boston,

Massachusetts, on Wednesday, 1 March, 2006,

commencing at 9:46 a.m.

cab18838-43d4-45a1-8a93-ca0deca5338e

Raymond S. Hartman, Ph.D. CONFIDENTIAL                March 1, 2006
                          Boston, MA

Page 1234

1  drugs. And so, the speed limit was an implicit
2  understanding built into the reimbursement formula
3  -- formulae -- of payers and -- of payers.
4      Q. Are you saying that manufacturers
5  understood that there was a speed limit of 30?
6      A. I'm saying that manufacturers understood
7  that payers had certain expectations, and the
8  upper bounds -- I'm using an upper bound of what
9  those expectations were. I'm saying that the
10 expectations ranged anywhere from 18 to 26
11 percent, 27 percent. I'm being conservative to
12 say, okay, let's take 30 percent. But that they
13 understood that and that that was -- that knowing
14 that, and knowing that the -- that the payers were
15 not going to know that they were speeding or that
16 they were -- they were exceeding that, that was
17 the reason that the -- the alleged fraud allowed
18 them to -- use that inflation to move market
19 share.
20     Q. If -- if we use your -- stick with your
21 speeding analogy for a moment, would it be fair to
22 characterize it as there was a -- sign -- this

Page 1235

1  implicit sign posted that said 30 miles an hour
2  for private payers, and for government, the speed
3  limit was zero? Is that a fair characterization
4  of your -- of your analysis here in -- in your
5  speeding context?
6          MR. NALVEN: Objection.
7      A. A fair -- a fair analysis of my speeding
8  context -- of my speeding context was that there
9  was a relationship between AWP and ASP, the
10 maximum of which I've taken as 30 percent, a
11 conservative upper bound. That was -- that was
12 for all units sold. So that's for government and
13 for nongovernment. That's what the understanding
14 was in the market.
15     Q. Well, I thought your -- your opinion is
16 that with respect to government it was zero.
17     A. No, my understanding with respect to
18 government is that if -- in my declaration of
19 December 15th, that if a drug exceeds the speed
20 limit, then there is -- there are statutory -- if
21 they don't exceed the speed limit, then it's not
22 zero. The speed limit is what it is. And it only

Page 1236

1  becomes subject to liability if it exceeds the
2  speed limit.
3          Under the Medicare regulations, as
4  reiterated in my Footnote 13, that indicates the
5  extent to which damages would occur if the speed
6  limit is exceeded. And that's -- that is a --
7  that's a -- those damages are not the threshold of
8  behavior or liability. That's just a damage
9  calculation, which is a different calculation,
10 which has that zero in it based on my reading of
11 the -- of the CFR.
12     Q. But in order to be -- in order to be
13 subject to damages for Medicare Part B sales, you
14 have to violate your speed limit of 30, right?
15     A. In my December 15th declaration, that
16 was the approach, yes.
17     Q. Okay. And have you altered that view?
18     A. I have no view of what -- that is a
19 legal view. In my supplemental declaration I was
20 asked to assess what the implication would be for
21 damages and liability if -- if the zero threshold
22 applied for Medicare, but that's not -- that was

Page 1237

1  something I was asked to do by counsel, and I have
2  --
3      Q. So --
4      A. I have a view as what market
5  expectations were and what everyone in the market
6  understood transactions costs were relative to
7  posted AWPs.
8      Q. So, if we have your zero -- based on
9  your supplemental report, if you have a zero
10 liability threshold and a 30-percent threshold
11 liability, again, using your speeding analogy,
12 there are two different speed limits posted on the
13 road, right?
14     A. The -- the speed limit that's posted on
15 the road is the understanding of the relationship
16 of a list price and transactions price. And
17 that's what's posted.
18         Now, the -- how policemen have enforced
19 that speed limit, what that's -- there's -- it's a
20 different -- the analogy would be in the
21 supplemental I've been asked to assume that even
22 though the -- the speed limit is 30 percent, we

                          18 (Pages 1234 to 1237)

Henderson Legal Services
(202) 220-4158

cab18838-43d4-45a1-8a93-ca0deca5338e