**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL CLASS ACTIONS | Judge Patti B. Saris |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO BMS DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT AS TO CLASS 3**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................1

II. ARGUMENT....................................................................................................2

   A.  BMS Caused Fictitious AWPs For All Of Its Drugs To Be Published .......................2

       1.  BMS controlled the AWPs for its Subject Drugs by reporting
           WLPs with full knowledge of the mark-up factors that the
           Publishers would use to create the AWPs......................................................2

       2.  BMS knew that payors would base reimbursement for BMS
           oncology drugs on the BMS AWPs.............................................................3

       3.  BMS "owned" the AWPs for its drugs and published AWPs ....................4

       4.  BMS knew that AWPs did not reflect the prices at which BMS
           oncology drugs were sold ...........................................................................5

   B.  BMS's WLP Defense Fails................................................................................6

       1.  WLPs and AWPs are formulaic equivalents; by reporting one,
           BMS effectively reports the other................................................................6

       2.  BMS's reporting of WLPs, knowing full well how they would
           translate into AWPs published by BMS and others, legally
           obligated BMS to take steps to ensure that the AWPs for its drugs
           were not unfair or deceptive ......................................................................8

       3.  BMS's cases are inapposite ...................................................................13

       4.  BMS's remaining WLP arguments only serve to highlight its
           patent manipulation of AWPs .................................................................15

   C.  BMS Marketed The Spread ...........................................................................19

       1.  BMS emphasized to marketing and sales representatives the
           importance of reimbursement .................................................................19

       2.  BMS did not merely respond to questions that medical providers
           had about AWPs and spreads but systematically marketed spreads
           to its customers ......................................................................................20

   D.  Spread Manipulation And Marketing Constitutes Unfair And Deceptive Acts
       And Practices In Violation Of Consumer Protection Acts .........................................22

   E.  Causation Is Established ................................................................................23

     F.    Massachusetts' TPPs Were Unaware Of BMS's Fraud ..............................................25

III.  CONCLUSION...........................................................................................................................25

001534-16  125258 V1

# TABLE OF AUTHORITIES

## CASES

Page

*Aspinall v. Philip Morris Cos., Inc.*,
442 Mass. 381, 813 N.E.2d 476 (2004) ........................................................................24

*Augat, Inc. v. Collier*,
1996 U.S. Dist. Lexis 2702 (D. Mass. Jan. 22, 1996).....................................................11

*Bonilla v. Volvo Car Corp.*,
150 F.3d 62 (1st Cir. 1998)............................................................................................14

*Cashman v. Allied Prods. Corp.*,
761 F.2d 1250 (8th Cir. 1985) .......................................................................................11

*Helbros Watch Co. v. FTC*,
310 F.2d 868 (D.C. Cir. 1962) .......................................................................................10

*Hershenow v. Enterprise Rent-A-Car Co. of Boston*,
445 Mass. 790, 840 N.E.2d 526 (2006) ...................................................................23, 24

*Homsi v. C.H. Babb Co.*,
10 Mass. App. Ct. 474, 409 N.E.2d 219 (1980) ..............................................................8

*Katzman v. Victoria's Secret Catalogue*,
167 F.R.D. 649 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) ...........................13

*L.B. Corp. v. Schweitzer-Manduit Int'l, Inc.*,
121 F. Supp. 2d 147 (D. Mass. 2000) ............................................................................13

*Langford v. Rite Aid of Ala., Inc.*,
231 F.3d 1308 (11th Cir. 2000) .....................................................................................14

*In re Lupron Mktg. & Sales Practices Litig.*,
295 F. Supp. 2d 148 (D. Mass 2003) .......................................................................14, 25

*Niresk Indus., Inc. v. FTC*,
278 F.2d 337 (7th Cir. 1960) ...........................................................................................9

*PMP Assoc., Inc. v. Globe Newspaper Co.*,
366 Mass. 593, 321 N.E.2d 915 (1975) ...........................................................................8

*In re Pharm. Indus. Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass 2005).........................................................................................7

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    307 F. Supp. 2d 196 (D. Mass. 2004) ............................................................................24

*Ragsdale v. Kennedy*,
    286 N.C. 130, 209 S.E.2d 494 (1974) ...........................................................................11

*Matter of Regina Corp.*,
    61 F.T.C. 983, 1962 F.T.C. Lexis 92 (Oct. 11, 1962) ..................................................8, 9

*Regina Corp. v. FTC*,
    322 F.2d 765 (3d Cir. 1963) .............................................................................................9

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987) .............................................................................................10

*St.-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.*,
    246 F.3d 64 (1st Cir 2001) .......................................................................................11, 18

*Turner v. Johnson & Johnson*,
    809 F.2d 90 (1st Cir. 1986) .............................................................................................11

*Underwood v. Risman*,
    414 Mass. 96, 605 N.E.2d 832 (1993) ...........................................................................11

*Union Pac. Resources Group, Inc. v. Rhone-Poulenc, Inc.*,
    247 F.3d 574 (5th Cir. 2001) ..........................................................................................11

*V.H.S. Realty, Inc. v. Texaco, Inc.*,
    757 F.2d 411 (1st Cir. 1985) ...........................................................................................10

*Whitehall Co. v. Barletta*,
    404 Mass. 497, 536 N.E.2d 333 (1989) .........................................................................13

*Zwiercan v. GMC*,
    58 Pa. D. & C. 4th 251, 2002 Pa. D. & C. Lexis 74 (2002)............................................11

## STATUTES

940 Ma. Admin. § 3.16 ............................................................................................................8

Massachusetts Gen. Laws Ch. 93A............................................................................... *passim*

**MISCELLANEOUS**

*OIG Compliance Program Guidance for Pharmaceutical Manufacturers*,
68 Fed. Reg. 23731 (May 5, 2003) ...................................................................................23

# I.      INTRODUCTION

As it did in seeking summary judgment against Classes 1 and 2, BMS asks the Court to ignore the totality of its unfair and deceptive acts or practices and grant summary judgment in its favor and against Class 3.  For many of the same reasons that preclude summary judgment in BMS's favor on the Class 1 and 2 claims, the same result obtains on behalf of Class 3.[1]

BMS's entire motion is predicated on the fiction that BMS merely submits "truthful" list prices to industry publications and has no control over AWPs.  In addition, BMS argues that case law permits it to report list prices without disclosing discounts, but such a narrow focus ignores the pervasive fraud challenged in this case.  Plaintiffs do not simply allege that BMS publicized list prices yet in some instances charged less.  Rather, Plaintiffs challenge a pervasive scheme whereby BMS reported list prices that most buyers did not pay, knowing full well that the list prices would be used to create AWPs that BMS and others published for use by reimbursers, and that providers would be purchasing the drugs at prices not just significantly lower than AWPs, but oftentimes nowhere near the list prices that formed the basis of the AWPs.

Although BMS would like the Court to focus on the narrow issue of whether list prices are merely sticker prices, the law commands an examination into the full scope of BMS's activities, which reveal a clear pattern of unfair and deceptive conduct.  The Court should deny BMS's motion.

---

[1] Plaintiffs incorporate herein by this reference:  (i) Plaintiffs' Memorandum in Opposition to the BMS Defendants' Motion for Summary Judgment (regarding Class 1 and 2) and all exhibits and declarations filed therewith; (ii) Plaintiffs' Memorandum in Support of Motion for Partial Summary Judgment Against All Track 1 Defendants and all exhibits filed therewith relating to BMS; and (iii) Plaintiffs' Reply Memorandum in Support of Partial Summary Judgment against Defendant BMS and all exhibits filed therewith.

## II.     ARGUMENT

**A.     BMS Caused Fictitious AWPs For All Of Its Drugs To Be Published**

BMS argues that the mere fact that it developed and used list prices and reported them to the Publishers is not deceptive or unfair; that it had no control over AWPs; and that "BMS had no reason to believe that anyone was deceived . . . ." BMS Br. at 2-7. The evidence clearly demonstrates otherwise.

### 1.     BMS controlled the AWPs for its Subject Drugs by reporting WLPs with full knowledge of the mark-up factors that the Publishers would use to create the AWPs

As BMS describes, it sent to the Publishers a wholesale list price ("WLP") or direct price, from which the Publishers predictably calculated the AWPs. *See, e.g.,* Ex. 1 (Response to Interrog. No. 11).[2] At times, BMS specifically instructed the Publishers to "[p]lease supply AWP's for these products once they have been processed through your database." *See, e.g.,* Ex. 2.[3] Denise Kaszuba, BMS's Associate Manager of Pricing Support and the person responsible for reporting WLPs to the Publishers and reviewing the AWPs established therefrom, readily admitted that the Publishers reported an AWP using BMS WLPs as the base. Ex. 10 at 44.

On at least one occasion, BMS instructed the publishers to use a 25% mark-up factor for BMS oncology products: "Effective immediately, Bristol-Myers Oncology Division products factor used in determining the AWP should be changed from 20.5% to 25%." *See, e.g.,* Ex. 11. The *Red Book* made this change as BMS directed. Kaszuba Aff., ¶ 2.

The publishers sent a report back to BMS showing the AWPs that were to be printed from the WLPs (Ex. 1), and BMS Pricing Support reviewed the AWPs for reasonableness and to

---

[2] All exhibits cited herein are attached to the Declaration of Steve W. Berman in Opposition to BMS's Motion for Summary Judgment as to Class 3 submitted herewith.

[3] *See also* Exs. 3-9.

audit the markup factor applied.  Ex. 10 at 105-06.[4]  In sum, BMS well understood the markup

factors applied by the publishers to the BMS WLPs, especially those used by the *Red Book*,

which printed AWPs based on the mark-up factor directed by BMS.

### 2. BMS knew that payors would base reimbursement for BMS oncology drugs on the BMS AWPs

BMS admits that "AWP (often less a negotiated percentage discount) is sometimes used

as a basis for reimbursement in transactions outside of the Medicare Part B context."  Answer,

¶ 5 (Dkt. No. 800); *see also* Ex. 1 (Response to Interrog. No. 11) (acknowledging that "both

private and public payors have adopted an industry practice of using AWP as a benchmark for

determining reimbursement rates . . . .").  Many senior BMS managers testified that they

understood that Medicare, as well as private reimbursement schemes, were based on AWP,

including Dianne Ihling, BMS's former Director of Pricing and Institutional Operations (Ex. 15

at 90-93); Christof Marre, BMS's former Director of Marketing, Oncology (Ex. 16 at 49);

Denise Kaszuba (Ex. 10 at 44-45); John Akscin, OTN's Vice President of Government Relations

and Managed Care Services (Ex. 17 at 26-27); and Marsha Peterson, OTN's Western Sales

Manager (Ex. 18 at 10).[5]

Moreover, BMS knew early in the class period how to effect changes to AWP and how

this would directly affect reimbursement regimes based on AWP.  For example, an internal

Apothecon memo from 1993 discussing pricing strategy for two different lines of antibiotics

explained how to set a new AWP "that maximizes its Marketing efforts":

> Mechanically the way to accomplish this is to raise the list price
> (list price + 25% = AWP) of Trimox, Veetids and Betapen.  This is
> a list price change only.  The average selling price of the products

---

[4] *See also* Ex. 12 at 000186649 ("Review AWP's for reasonability, ie 20%-25% higher than new wholesale price…."); Ex. 13 and Ex. 10 at 149-50; Ex. 14 and Ex. 10 at 151-52.

[5] Until 2005, OTN was a wholly-owned subsidiary of BMS and sales agent for BMS oncology products.

- 3 -

> will not change.  However, the data services will report this as a
> Bristol-Myers Squibb list price increase.

Ex. 19 at 0041865.  Other documents clearly demonstrate that BMS knew that it could effect

precise changes in AWP through changes in its reported WLPs.[6]

### 3.    BMS "owned" the AWPs for its drugs and published AWPs

In addition to controlling the AWPs reported by the Publishers for BMS oncology drugs,

BMS itself was a ***direct*** publisher of AWPs.  From 1995 through 2004, BMS produced an

Internal Price List that contained various prices including AWPs (Ex. 10 at 46-47), which were

included at the request of marketing personnel, who were interested in AWPs because customers

reimbursed based on AWP (*id.* at 50-51).  Pricing Support would occasionally field calls from

marketing personnel with requests for AWP information on both BMS drugs and the drugs of

competitors.  *Id.* at 50-55.  Furthermore, throughout the 1990s, Pricing Support provided the

BMS oncology sales force with a Pocket Reference Guide that contained AWPs from all three

data services.  *Id.* at 110-12.

OTN continually republished the AWPs for BMS Subject Drugs.  For example, the OTN

periodic publication *The Network News* reported the AWPs taken from the *Red Book*.[7]  As

explained in the back of *The Network News* under the caption "Reimbursement":

> The Average Wholesale Prices (AWPs) and HCPCS codes for
> drugs commonly used in cancer treatment are provided for your
> use as a reimbursement resource. . . .  The AWPs are obtained
> from the *1998 Red Book* and the *November 1998 Red Book
> Update*.  For drugs that have multiple manufacturers, the AWP for

---

[6] *See, e.g.,* Ex. 20 (the proposed price increase would result in a 111% increase in reimbursement amount based on AWP-15%); Ex. 21 (recognizing that a 25% markup to WLP is applied and that, consequently, a 7% price increase on Plavix translates into an 11% AWP increase and a 13% MCO increase based on a typical reimbursement formula of AWP – 13%); Ex. 22 and Ex. 10 at 117-20 ("If we never sell these multi source products at the High Billing Category 51 price, why not reduce the bc 51, 56, 57, 58, 59 price?  Since the AWP (Average Wholesale Price) is calculated based on the wholesale list – retailers benefit from a High AWP price under the reimbursement policies of Insurers."); Ex. 23 (further confirming that BMS well knows how AWPs are set based on BMS WLPs).

[7] *See* Ex. 24 (May/June 1994; November/December 1994; date unclear but Spring 1994); Ex. 25; Ex. 26 (various issues from 1997-2000).

- 4 -

the product most commonly stocked by OTN is listed.  For ease of use, we list the AWP information in the first three columns.

OTN also published numerous online reports to which customers subscribed, including: the "AWP Report," which contained a list of current AWPs for drugs that the client has previously purchased; the "AWP/Price Report," which contained the AWP for drugs that the client purchases and the billing unit for each particular drug (Ex. 27; Ex. 18); and the Purchase History Report, which also showed AWP and OTN prices in side-by-side columns (Ex. 48).

### 4.     BMS knew that AWPs did not reflect the prices at which BMS oncology drugs were sold

Notwithstanding BMS's control and publication of AWPs, and its knowledge that reimbursements were based on AWP, BMS knew that its AWPs were fictitious.  BMS never conducted a study of wholesalers to determine what they charged for BMS drugs prior to directing the publications to use a 25% mark-up factor.  *See, e.g.,* Ex. 10 at 101; Ex. 15 at 93. But BMS probably thought that this was unnecessary, ***because it knew that wholesalers did not charge anything near AWP for BMS drugs***.  For instance, Oncology Marketing Director Christof Marre admitted that purchasers in the marketplace would not actually buy BMS drugs at the AWP because wholesalers would buy at list price less a 1 or 2 percent prompt payment discount and would not be able to command a 25 or 30% margin.  Ex. 16 at 42-44.  Marre also recognized that customers buying under contracts purchased well below WLP.  *Id.* at 48.[8]

Documents, such as the "Executive Summary," also recognized that no one pays AWP: "As previously discussed, by convention all manufacturers sell to wholesalers at prices 2% below the list price.  Wholesalers then sell medicines to retail pharmacies at prices significantly

---

[8] For her part, Pricing Support Manager Kaszuba was aware that wholesalers typically purchase at WLP less 1-2% for a prompt payment discount, Ex. 10 at 58, and that end-purchasers of BMS drugs can purchase at contract pricing less than WLP and also receive rebates from BMS.  *Id.* at 58-60.  Nonetheless, Kaszuba attempted to feign ignorance as to whether anyone ever pays AWP for BMS drugs, *id.* at 60-61, but later admitted in response to at least one document that no one paid AWP for that particular drug.  *Id.* at 65.

- 5 -

below the published AWP." Ex. 28 at 00469291. A document titled "AWP (Ain't What's Paid)" declares that the *First DataBank* 20-25% AWP markup is an "artificially inflated number" but that reimbursement formulas were still based on AWP because "it is the only easily obtained published price source." Ex. 29.[9]

So, did BMS take any action to publicize that the AWPs for its drugs were artificially inflated? ***It is an undisputed fact that BMS took no such action***. For example, at no time did Marre take any action to try and correct the AWPs that were being published, Ex. 16 at 45-46, notwithstanding his knowledge that AWP was used as a reimbursement term by Medicare Part B and private insurers. *Id*. at 49. This undisputed fact is even more remarkable given the undisputed fact that BMS recognized that "***AWPs can confuse the understanding of pricing within the US pharmaceutical system***" and that it consequently "need[s]to be wary of using AWPs ***because the name is misleading***." Ex. 30 at 00442097 (emphasis added).[10] Nonetheless, BMS continued to report WLPs to be marked-up to AWP, published AWPs, and used AWPs in its marketing efforts (*see infra*). Moreover, BMS never went back to the *Red Book* to retract BMS's command that the *Red Book* use the 25% mark-up factor.

**B.    BMS's WLP Defense Fails**

**1.    WLPs and AWPs are formulaic equivalents; by reporting one, BMS effectively reports the other**

Even putting aside the substantial body of record evidence demonstrating that BMS controlled and published the AWPs for its oncology drugs, market behavior demonstrates that WLP and AWP are "formulaic equivalents" such that reporting a WLP is the same as reporting

---

[9] This constitutes yet another admission by BMS that, when it was directing the Publishers to use a 25% mark-up factor for BMS oncology drugs, that BMS was directing the Publishers to propagate artificially inflated prices for BMS Subject Drugs.

[10] This document alone destroys BMS's claim that it "had no reason to believe that anyone was deceived by a mark-up factor of 20%-25%." BMS Br. at 5.

- 6 -

an AWP.  The Court has already agreed, finding that "[t]he AWP, or its formulaic equivalent the WAC (Wholesale Acquisition Cost), is interpreted by industry as the signal for the underlying structure of list and transaction prices for almost all drugs."  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 68 (D. Mass 2005) ("*In re AWP*") (quoting Hartman at 3).[11]  And as Dr. Hartman has described:

> [A]s a matter of economics, list prices are some of the most important signals that all drug manufacturers, particularly innovator drug manufacturers, use to strategically place drug products in the market.  The two most important list prices are the AWP and the WAC (or WLP). . . .  Since there is a well understood formulaic relationship between AWP and WAC, . . . reporting ***either*** to the price reporting services implies that ***the other list price is set automatically***.

April 6, 2006 Declaration of Raymond S. Hartman in Opposition to Defendants' Motion for Summary Judgment ("April 6, 2006 Hartman Decl."), ¶ 27 (footnotes omitted; emphasis added); *see also* Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification ("Hartman Class Cert. Decl."), Attachment D, ¶ 1 (explaining that AWP and WAC are "interchangeable" since "the two list prices are usually related by a constant ratio [and] convey the same information to purchasers and other entities that rely on published price data.").

As the evidence highlighted above reveals, BMS well understood the interchangeability between WLP and AWP.  Although try as it may to be the veritable ostrich with its head in the sand, BMS's act of reporting WLPs resulted directly and predictably in the creation of AWPs. As Dr. Hartman amplifies, "[t]he argument that BMS would report only its WAC (WLP) and pay no attention to the resulting AWP set by the pricing services is implausible and disingenuous, as a matter of economics and the business practices in this industry and market."  April 6, 2006 Hartman Decl., ¶ 27 (footnote omitted).

_____

[11] So, too, does Dr. Berndt (Berndt Report at 6) and even Mr. Young (Oct. 25, 2004 Young Rebuttal Report at ¶ 134).

- 7 -

**2.** **BMS's reporting of WLPs, knowing full well how they would translate into AWPs published by BMS and others, legally obligated BMS to take steps to ensure that the AWPs for its drugs were not unfair or deceptive**

BMS was not required to volunteer its WLPs to pricing compendia.  Nor was it required to direct those compendia to apply a 25% mark-up factor to WLP to get the AWP.  But once BMS chose to do so – knowing fully that those AWPs were "artificially inflated," that payors would be reimbursing at those inflated prices and that AWP can confuse the understanding of pricing within the US pharmaceutical system – BMS became obligated to ensure that its representations were accurate.

Disseminating list prices when fully aware that list prices are not the usual and customary prices at which the products are sold constitute unfair and deceptive practices under the Federal Trade Commission Act.  *See Matter of Regina Corp.*, 61 F.T.C. 983, 1962 F.T.C. Lexis 92, at *34-36 (Oct. 11, 1962) (citing cases).[12]  Indeed, the Commission has explained that, while establishment of list prices is not necessarily unlawful, "a legal practice may not be used to accomplish an illegal objective."  *Id.*, at *8.  The Massachusetts Attorney General's regulations are in accord.  They provide that "[n]o claim or representation shall be made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value of the past, present, common or usual price of a product, or as to any reduction in price of a product . . . ."  940 Ma. Admin. § 3.16.[13]  And *Regina* eviscerates BMS's attempt to leave the Publishers "holding the bag" of liability instead of BMS:  "[I]t is settled that '[o]ne who places in the hands of another a means of consummating a fraud or competing unfairly in violation of the

---

[12] Chapter 93A directs courts "to consider the interpretations of unfair acts and practices under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (1970), as construed by the Federal Trade Commission and the Federal courts."  *PMP Assoc., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 321 N.E.2d 915, 917 (1975); *accord*, 940 Ma. Admin. § 3.16.

[13] AG rules and regulations, including those relating to Chapter 93A, "unless invalid, have the force of law."  *Homsi v. C.H. Babb Co.,* 10 Mass. App. Ct. 474, 479, 409 N.E.2d 219, 224 (1980) (citation omitted).

- 8 -

[FTC] Act is himself guilty of a violation of the Act.  Proof of petitioner's intention to deceive is not a prerequisite to a finding of a violation . . .; it is sufficient that deception is possible."
*Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir. 1963) (citations omitted).

BMS tries to distinguish *Regina* on the basis that, unlike the manufacturer in *Regina*, BMS does not suggest retail prices to consumers.  BMS Br. at 4.  BMS misreads the decision:  at issue were fictitious list prices supplied by a manufacturer to "distributors and retailers, thereby representing, directly or indirectly or by implication, that such 'list' prices are the usual and customary retail prices for such merchandise," 1962 F.T.C. Lexis 92, at *2, very similar to what BMS did with its own list prices.  This violated the FTC Act:

> Misrepresentations of the usual and customary value of a product and of savings afforded by an offered sale price of such product are unfair and deceptive practices under the Federal Trade Commission Act. . . .  In this case, Regina disseminated its suggested list prices to resellers rather than directly to the purchasing public.  Regina was fully aware that these suggested list prices were not the usual and customary retail prices at which Regina products were sold in the trading areas involved.  In so furnishing fictitious retail prices to resellers, Regina placed in the hands of retailers and others the means and instrumentalities by which they could mislead and deceive the purchasing public.  Such practice is a violation of the Federal Trade Commission Act.

*Id.*, at *34-36 (citations omitted).[14]  *See also Niresk Indus., Inc. v. FTC*, 278 F.2d 337, 340 (7th Cir. 1960) ("Misrepresentations of the regular and customary value of a product offered for sale and of savings afforded by an offered sale price of such product are unfair and deceptive practices as defined by the Act.").  And BMS underestimates the importance that courts accord accurate price signals in the marketplace.  As one court has explained:

> Fictitious prices are illegal even though it is obvious to the sophisticated that the price tag is only a come-on.  "The law is not

---

[14] The defense argued that benefits flow from its list prices, including providing guidance to financing institutions and to retailers determining product value.  But the Commission found that any such benefits cannot justify the dissemination of the fictitious prices.  *Id.*, at *36.

> made for the protection of experts, but for the public – that vast
> multitude which includes the ignorant, the unthinking and the
> credulous, who, in making purchases, do not stop to analyze, but
> are governed by appearances and general impressions."

*Helbros Watch Co. v. FTC*, 310 F.2d 868, 870 n.4 (D.C. Cir. 1962) (citations omitted).

BMS also claims that *Regina* is inapposite because the FTC later adopted regulations providing that a list price is not deemed fictitious if substantial sales are made at that list price. BMS Br. at 4 (citing 16 C.F.R. § 233.3).  But this regulation does not overturn *Regina*. Moreover, it only serves to highlight the unlawfulness of BMS's conduct because, as demonstrated below in Part II.B.3, ***most of BMS's offending sales were made at prices nowhere near WLP***.  In other words, substantial sales were not made at list.  *See Helbros Watch*, 310 F.2d at 870 (finding that unlawful fictitious pricing occurred when 40 percent of sales were made at prices substantially less than the "preticketed" price).

*Regina* is not the only authority prohibiting BMS's conduct.  It is axiomatic under statutes prohibiting misrepresentations that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party."  *V.H.S. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (RICO and securities claims).  Indeed, the First Circuit has specifically held that "[w]hen a corporation does make a disclosure – ***whether it be voluntary or required*** – there is a duty to make it complete and accurate."  *Roeder*, 814 F.2d at 26 (emphasis added).  "'Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . . .'"  *V.H.S. Realty*, 757 F.2d at 414-15 (quoting *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708 (1969)).  Thus, if a drug manufacturer "chooses to reveal relevant, material information even though it had no duty to do so, it must disclose the whole truth."  *Roeder*, 814 F.2d at 26 (quoting *Grossman v.*

- 10 -

*Waste Mgmt., Inc.*, 589 F. Supp. 395, 409 (N.D. Ill. 1984)); *see also, e.g., Ragsdale v. Kennedy*,
286 N.C. 130, 139-40, 209 S.E.2d 494, 501 (1974) ("The rule is that even though a vendor may
have no duty to speak under the circumstances, nevertheless if he does assume to speak he must
make a full and fair disclosure as to the matters he discusses."); *Underwood v. Risman*, 414
Mass. 96, 99, 605 N.E.2d 832 (1993) ("A duty exists under c. 93A to disclose material facts
known to a party at the time of a transaction.") (citations omitted).[15]  Furthermore, as the First
Circuit explained in *St.-Gobain Indus. Ceramics, Inc. v. Wellons, Inc.*, 246 F.3d 64, 73 (1st Cir
2001), the methods, acts, and practices deployed by a defendant must be assessed "'in their
factual setting,'" *id.* (citations omitted), not in terms of some cynical parsing of the overall
scheme.  *See also id.* (in interpreting ch. 93A "'[w]e focus on the nature of the challenged
conduct and on the purpose and effect of that conduct as the crucial factors in making a G.L. 93A
fairness determination'") (citations omitted).

In light of these authorities, BMS's claims that it had nothing to do with AWPs and
should therefore not be liable for them are unavailing.  BMS Br. at 5-7.  BMS did not need to
control the operations of the Publishers in a corporate or legal sense in order to benefit from
using the AWPs that the Publishers disseminated, because it knew as surely as night follows day
that the Publishers voluntarily would and did publish whatever AWPs that BMS wanted for their

---

[15] *See also Zwiercan v. GMC*, 58 Pa. D. & C. 4th 251, 2002 Pa. D. & C. Lexis 74, at *9-10 (2002) (discussing
contexts in which there may be a duty to disclose under consumer protection acts and noting Illinois CFA decisions
holding "that omissions or concealment of a material fact in the conduct of trade or commerce constitutes fraud.")
(citing *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 504, 675 N.E.2d 584, 595 (1997)); *Cashman v. Allied Prods.
Corp.*, 761 F.2d 1250, 1255 (8th Cir. 1985) (approving jury instruction under state consumer protection act
providing in pertinent part that "[s]ilence . . . may be a misrepresentation if it relates to a material fact and there is a
duty to disclose the matter.  This duty may arise out of a relationship of trust or confidence, an inequality of
bargaining position, an awareness that the undisclosed fact would prevent a previous representation from being
misleading or an unequal access to information."); *Turner v. Johnson & Johnson*, 809 F.2d 90, 100 (1st Cir. 1986)
(finding that "an incomplete or partial statement may be the basis for fraud when only full disclosure would avoid
deception"); *Augat, Inc. v. Collier*, 1996 U.S. Dist. Lexis 2702, at *47 (D. Mass. Jan. 22, 1996) (noting that
disclosure of partial information may be fraudulent); *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d
574, 586 (5th Cir. 2001) (finding disclosure of "some but less than all material facts" may be actionable where
"partial disclosure convey[s] a false impression").

products.  Moreover, BMS *itself* published AWPs, thereby making affirmative

misrepresentations itself.

And BMS knew the impact that creating spreads would have:  a growing disparity

between WLP and AWP creates an incentive for physicians to select the brand.  For example,

BMS once explained with respect to its VePesid drug:

> The Etopophos product file is significantly superior to that of
> etoposide injection . . . . Currently, physician practices can take
> advantage of the growing disparity between VePesid's list price
> (and, subsequently, the Average Wholesale Price [AWP]) and the
> actual acquisition cost when obtaining reimbursement for
> etoposide purchases.  If the acquisition price of Etopophos is close
> to the list price, the physicians' financial incentive for selecting the
> brand is largely diminished.

Ex. 38 at 0011221.  In order to promote Etopophos, a new BMS drug that was expected to

cannabilize BMS's VePesid sales, the document suggested lowering VePesid's AWP in order to

create sales for Etopophos:  the "AWP for Vepesid would be reduced from its current level to the

highest bid price currently in the marketplace."  *Id.*  Furthermore, "[s]ince the AWP . . . is

calculated based on the wholesale list – retailers benefit from a High AWP Price under the

reimbursement policies of Insurers."  Ex. 22; Ex. 10 at 117-20; *see also* Ex. 34 (acknowledging

that the list price is set to establish an AWP that is competitive with other offerings and will not

reflect actual selling price since atenolol is sold primarily at contract pricing); Ex. 39 at 0000583

("To accomplish a rapid market introduction of albuterol, wholesale list prices must be

established.  These wholesale prices do not reflect actual selling prices, as albuterol will be sold

primarily at contract or special offer pricing….").

In the face of these authorities, there is no way that summary judgment can be granted in

BMS's favor.

### 3.     BMS's cases are inapposite

BMS's authorities do not help it.  *L.B. Corp. v. Schweitzer-Manduit Int'l, Inc.*, 121 F. Supp. 2d 147 (D. Mass. 2000), actually supports Plaintiffs, because the court plainly held that "[u]nlike common law fraud and misrepresentation, Chapter 93A imposes liability for material non-disclosure in transactions."  121 F. Supp. 2d at 154 (citation omitted).  *Whitehall Co. v. Barletta*, 404 Mass. 497, 536 N.E.2d 333 (1989), does not support BMS, where the court merely commented on the evidence adduced below, which was equivocal enough as to contractual requirements bearing on the duty to disclose the discount at issue that the appellate court would not second-guess the trial judge.  536 N.E. 2d at 337.  Moreover, the fact that list prices here admittedly did not reflect the reality of discounts is only a part of BMS's scheme.  And *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 656 (S.D.N.Y. 1996), *aff'd*, 113 F.3d 1229 (2d Cir. 1997), has no bearing here, because the court merely held that Plaintiffs failed to identify any duty requiring defendants to sell their goods to all buyers at the same prices.  And given BMS's control over AWPs, and its status as a direct publisher of AWPs, the so-called "no control" cases cited by BMS at page seven of its brief do not apply.

The *Lupron* court has rejected BMS's remaining authorities.  While applying the higher standard imposed under RICO, Judge Stearns recognized that the court must take a broad look at the totality of defendants' conduct.  In rejecting a defense strategy nearly identical to that pressed by BMS here, Judge Stearns distinguished several of the cases BMS relies on and explained:

> A good argument can go wrong when its fundamental premise is flawed.  It is true, as defendants contend, that no federal case or statute imposes a duty on a manufacturer to disclose to retail consumers the prices that it charges intermediate suppliers for its products, nor with a possible antitrust exception, is a seller required to charge the same price for a product to every consumer in every market.  This is true even where the seller derives a presumed benefit from the consumer's ignorance of what it actually paid for the products it sells.  *See Alves v. Harvard*

> *Pilgrim Health Care, Inc.*, 204 F. Supp. 2d. 198, 212-14 (D. Mass. 2002) (Saris, J.), *aff'd*, 316 F.3d 290 (1st Cir. 2003) . . . . But this is not a case of nondisclosure. Defendants did not stand mute. [D]efendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud. Whether one views the defendants' actions as involving the dissemination of information that was wholly false, or false because of an incomplete depiction of the truth, they are actionable under the mail and wire fraud statutes. . . . This is not a case of a retailer failing to disclose the discounted prices that it offered to favored customers (*Langford*),[16] or a manufacturer the price differentials on its sales of the same product in different markets (*Bonilla*),[17] or a health plan the discounts it received on prescription drugs (*Alves*).[18] Rather, this is a case of affirmative misrepresentation. And because the alleged misrepresentations were knowing, deliberate, and made in furtherance of a scheme to defraud, they are sufficient to support the predicate acts of mail and wire fraud.

*In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 167-68 (D. Mass. 2003)

(footnote omitted)).[19]

In sum, BMS's deliberate decision to report pricing information to publications and itself

become a publisher of AWPs, coupled with its thorough awareness of how AWPs were derived

---

[16] *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308 (11th Cir. 2000). BMS also invokes *Langford*, but its reliance thereon is risky given that the court in that decision went out of its way to limit its holding to the specific circumstances before it, finding that the uninsured consumer plaintiffs were perfectly able to shop for lower prices and that, had those consumers been "somehow less able to shop around and identify attractive drug prices than were other consumers, the situation may have demanded that Rite Aid make certain disclosures to them." 231 F.3d at 1314. That very concern operates in the instant case where the plaintiff consumers had *no* shopping choices whatsoever because (i) their physicians chose the medication to be administered in the provider's office, and (ii) the consumers' insurers required them to make a 20% co-payment. There simply was no opportunity to "shop around," even if an elderly chemotherapy patient had wanted to.

[17] *Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1st Cir. 1998). Like the *Lupron* defendants, BMS also errantly relies on *Bonilla*.

[18] Judge Stearns could have also distinguished *Alves* on the basis that this Court in *Alves* was balancing the policy factors employed to determine whether a plan sponsor breached its fiduciary duty under ERISA. Such an inquiry under ERISA is not relevant here.

[19] In briefing submitted in support of its summary judgment motion against Classes 1 and 2, BMS argued that *Lupron* is inapposite because Judge Stearns had found that TAP reported the AWP as it appeared in the *Red Book*, whereas BMS made no affirmative misrepresentation. BMS may make the same argument here on reply. BMS's position is impossible to reconcile with the evidence detailed above demonstrating that BMS controlled its AWPs and republished them. This *is* indeed a case of affirmative misrepresentation, and Judge Stearns' statement that the TAP "defendants trumpeted a lie by publishing the inflated AWPs, knowing (and intending) them to be used as instruments of fraud" rings just as true here. 295 F. Supp. 2d at 167.

- 14 -

from its prices and that published AWPs would form the basis of an industry-wide reimbursement system, obligated BMS by law to ensure that these pricing benchmarks were not misleading. Whether reported by the Publishers or BMS itself, AWP was a BMS-controlled fiction used to artificially inflate and maintain drug prices as part of a scheme to induce physicians to prescribe BMS drugs and increase BMS's profits. BMS co-opted the relationship between physicians and their patients and conscripted physicians into assisting the scheme by setting actual costs to medical providers well below the inflated AWP and marketing this spread to the providers as a means to induce providers to prescribe Defendants' drugs over alternative drugs or treatments. As Plaintiffs explained in their own motion for partial summary judgment, this course of conduct was unfair and deceptive as a matter of law. In the alternative, there is, at a minimum, at least a material issue of fact on these issues such that the Court cannot conclude as a matter of law that summary judgment is due BMS.

### 4. BMS's remaining WLP arguments only serve to highlight its patent manipulation of AWPs

BMS exaggerates the "truthfulness" of its list prices (BMS Br. at 2-3) and, in the process, underscores its pricing manipulation. Reporting of list prices cannot be assessed in isolation. Whether they were "truthful" or not does not account for a pricing scheme whereby BMS could and did cause insurers and patients to pay deceptively inflated prices. The deception occurred in the larger scheme, of which list prices were only one part. BMS used list prices to set up AWPs, but it did not use list prices to cause the reporting of lower AWPs when it offered mega price cuts on its products, which widened the spreads well beyond what the market had come to expect.[20]

---

[20] *See, e.g.*, Szabo Decl., ¶ 3 (stating that BMS generally keeps WLPs constant once competition is introduced); Kaszuba Decl. ¶¶ 3-4 (same).

BMS's admissions on pricing are remarkably consistent with Dr. Hartman's expert testimony. According to BMS, AWPs were generally 20-25% higher than list prices, and that *the vast majority* of its revenues were generated at prices within 5% of WLP. BMS Br. at 2. *This, of course, reinforces that indeed, as Dr. Hartman has testified, where there was a marketplace expectation, that expectation was of a 30%-or-less spread between AWP and actual price*.

But BMS also admits that, when it faced competition, it lowered prices, BMS Br. at 2-3,[21] and did so well below the marketplace expectation in order to incentivize providers. Data and documents indeed confirm that BMS created and manipulated spreads in order to influence provider prescribing behavior. Confidential discounts, which were purposely not reflected in BMS's WLPs or AWPs, were frequently huge, ranging up to 80% or more. *See, e.g.,* Exs. 32-37.[22]

Analysis of the spread histories of BMS drugs highlights the time periods for which BMS actually manipulated spreads, as BMS's witness Greg Bell largely confirms:[23]

> Blenoxane: The WLP for Blenoxane remained constant over time while contract pricing dropped, Ex. 16 at 86,[24] while weighted average discounts off of WLP ranged from 62 to 66% at the end of 2002, Ex. 31 with some discounts as high as 80%. *See* Exs. 40-42; Ex. 16 at 145-46. Dr. Hartman echoes this data, demonstrating that Blenoxane spreads largely increased over time, with spreads on NDC 00015-3063-01 increasing from 23.6% in 1996 to 187.1% in 2002. Ex. 43. Bell exhibits D and E confirm that, by 2002, very few sales were made at WLP.

---

[21] BMS asserts that, for drugs facing generic competition, 29% of net revenues were generated from transactions within 5% of list price. *Id.*

[22] BMS created spreads through special pricing and other discounting methods reflected in confidential contracts that were *not* made public by BMS or any publication. Contract pricing is *always* less than WLP. Ex. 16 at 78-84.

[23] BMS has incorporated by reference the Declaration of Gregory K. Bell. BMS Br. at 1 n.2.

In addition to the brief summary that follows, Plaintiffs refer the Court to pages 61-65 of Plaintiffs' Memorandum in Support of Partial Summary Judgment for a more complete discussion.

[24] Marre testified that WLP for generics generally remain constant over time even if actual contract prices fall: "it's an industry standard that once a drug was generic, the list price stays wherever it was when it went generic and is not updated." Ex. 16 at 86.

- 16 -

<u>Cytoxan</u>:  For most NDCs, Cytoxan's WLPs remained constant over time, while spreads for most NDCs increased and then decreased in 2001 as the drug was poised to become single source.  Ex. 43.  Indeed, after Marre recognized that Cytoxan was once again a sole source drug, he tried to raise contract prices.  Ex. 16 at 90.  Bell exhibits D and E confirm that, by 2002, very few sales were made at WLP.

<u>VePesid</u>:  For most versions of VePesid, WLPs and therefore AWPs remained constant over time, Ex. 44, while spreads ballooned in the late 1990s to over 1,000% for several NDCs.  Ex. 43.  In 2002 Duke received contract prices for VePesid that were 94-95% off WLP.  Ex. 40 at 000217851; *see also* Ex. 16 at 144.  Marre testified that most of BMS's sales of injectible VePesid in 2002 were made under contracts (*see* Ex. 45 at 01123963; Ex. 16 at 130-31), which, of course, means that no one paid WLP, let alone AWP, for the drug.  Bell exhibit D confirms that, by 2002, virtually no VePesid sales were made at WLP.

<u>Rubex</u>:  WLPs and AWPs remained constant over time, Ex. 44, while spreads blossomed in the mid-to-late 1990s and then decreased, Ex. 43, as BMS phased out the drug.  Ex. 16 at 97-98.  Bell exhibit D confirms that, by 2002, very few sales of Rubex were made at WLP.

<u>Taxol</u>:  The WLP for Taxol remained constant over time, and then, after loss of exclusivity in 2000, contract prices rapidly decreased.  Ex. 16 at 100-01; Ex. 43; and Ex. 46.  Spreads on some NDCs of Taxol exploded from about 25% to over 500% in 2002, Ex. 43, and the Taxol unit-weighted average spread percentage across all NDCs jumped nearly 100% between 2001 and 2002.  Ex. 47.  In 2002 Duke received contract prices for Taxol that were 75% off WLP.  Ex. 40 at 000217851; *see also* Ex. 16 at 144.  Bell exhibit D confirms that, by 2002, the vast majority of Taxol sales were made at prices substantially below WLP.

<u>Paraplatin</u>.  Paraplatin lost exclusivity in November of 2004.  Ex. 16 at 126.  WLPs increased over time, Ex. 43, while spreads remained relatively constant until increasing modestly beginning in 2002 as loss of exclusivity neared.  Ex. 43.  Bell exhibit D reflects increasing Paraplatin spreads beginning in 2002.

It is these gross deviations from the marketplace expectation of prices within 20-25% of AWP (or within 5% of list price as BMS states) that are actionable.  It is one thing to say that AWP does not really mean "average wholesale price" and that AWP may deviate from actual sales prices by up to 30%.  BMS admits to creating that "marketplace expectation" by way of what it says are its usual pricing practices, as illustrated by the pricing and sales data it sets forth in its briefing.  It is another thing entirely for BMS to deviate grossly from the established course of dealing by unilaterally effecting spreads for some products at certain times that are many

- 17 -

multiples of what had come to be expected, all without any sort of disclosure to payors, and patients.  Accordingly, the deception occurred in the maintenance of AWP within certain relatively narrow bands even while BMS decreased actual prices, thus increasing the amount that its customers would be reimbursed or otherwise paid for the products they dispensed to patients, all to the detriment of Plaintiffs and the Classes.  All that mattered was BMS's bottom line.  Surely the propriety of BMS's market-share scheme, which resulted in Plaintiffs and Class members overpaying tens of millions of dollars for BMS drugs so desperately needed by the sickest of the sick, ought at the least to face the scrutiny of a jury.  *St.-Gobain*, 246 F.3d at 73.

BMS excitedly proclaims that it has "compelling proof" that it did not control AWPs because in 1999 it "began to include language in its communications with  the  publications an explicit statement that its list prices did not include discounts."  BMS Br. at 6.  According to BMS, it was the Publishers who declined, even after receiving these vague notifications, to change the way by which they calculated AWPs (the Publishers stuck reliably to the usual factoring method based on the list prices that BMS reported, to BMS's benefit).  That BMS began including the referenced language in its communications with publications is an admission that notice to the marketplace of its pricing practices, given the use of the AWP-based reimbursement system for its products, was appropriate and necessary.  But even the notice it did give was inadequate.  To say simply that "[c]ertain multisource products are always sold at lower special offer prices," BMS Br. at 6, is a gross understatement when BMS often caused spreads to zoom from below 30% to hundreds of percent in the face of competition.  More importantly, BMS did nothing more when, as it might have expected, the Publishers did not change the way in which they were arriving at AWPs based on BMS-supplied numbers.  BMS failed to notify payors who, if they could expect any sort of spread, would have expected spreads of 30% and

below.  And BMS took no action to correct AWPs when it recognized internally that they were "artificially inflated" and "can confuse the understanding of pricing."

## C.    BMS Marketed The Spread

BMS coyly asserts that its salesmen "from time to time answered questions that medical providers had about AWPs on BMS drugs and/or the spread between the AWPs and the prevailing market price for the drugs."  BMS Br. at 7-8 (selectively citing the depositions of three oncology sales representatives in an attempt to portray, inaccurately, that all BMS representatives did was innocently respond to questions from clients).  BMS ignores the reams of evidence revealing that its sales force was prepared, armed and indeed encouraged to (and did) actively discuss spreads with customers.

### 1.    BMS emphasized to marketing and sales representatives the importance of reimbursement

The BMS spread-marketing "story" starts with the ubiquitous recognition of the importance of reimbursement and margins to office-based oncology providers ("OBOs").  For instance, OTN Vice President John Akscin emphasized in presentations to OTN and BMS sales representatives that the "Top Three OBO Concerns" were "***Reimbursement, Today***," "***Reimbursement, Tomorrow***," and "***Reimbursement!***"  Ex. 17 at 89; Ex. 49 at 000096636. Indeed, Akscin acknowledged that OBO revenue is "Highly Medicare Driven" because 50-55% of OBO patients are Medicare recipients, and that 64 percent of OBO revenues came from drug reimbursements.  *Id.* at 000096634; Ex. 17 at 91-93.

Other BMS documents recognized that "65% of a medical oncologist's revenue is derived from administering chemotherapy," that drug reimbursements are based on AWP, and that "drug reimbursement has been a significant source of revenue and profit."  Indeed, "[f]or covered products, Medicare reimbursement is much higher than the actual acquisition cost to

providers.  Some manufacturers have exploited the situation by increasing the 'spread' between

the acquisition cost and the AWP, in order to provide a monetary incentive for physicians to use

their product."  In addition, "[s]ince insurance companies do not reimburse providers for the cost

of administering chemotherapy, the profit made on drug mark-ups is a mainstay of most private

practices."  Ex. 50 at 00393437, 440, 462.  Not surprisingly, then, another Akscin presentation to

the sales force stated "Little Wonder… **Why the Focus on Price**?"  Ex. 51 at 000083798

(emphasis added).[25]

### 2.  BMS did not merely respond to questions that medical providers had about AWPs and spreads but systematically marketed spreads to its customers

Having created and manipulated spreads, BMS then marketed spreads to customers.

"Exhibit A" in this regard is provided by the OTN on-line reports discussed earlier.  To reiterate,

OTN published the "AWP Report," which contained a list of current AWPs for drugs that the

client has previously purchased; and (ii) the "AWP/Price Report," which contained the AWP for

drugs that the client purchases, and the billing unit for each particular drug.  Ex. 27.  *The latter*

*report listed OTN's dispensing unit price in one column and AWP less _% in the next,*

*permitting customers to manually input the discount from AWP in a setup screen*.[26]  OTN also

offered customers a "Cost Differential" report that displayed, by regimen, the AWP, acquisition

cost and "AWP Cost Differential" or spread.  Ex. 52.  These OTN reports represent not only

instances in which OTN is republishing AWPs, they also serve as blatant examples of systematic

spread marketing to all customers.  Indeed, OTN touted access to AWP information:  "Practices

---

[25] OBO reimbursement concerns were so important that BMS and OTN offered various reimbursement consulting services to their clients, which included assistance with setting up billing and reimbursement systems (Ex. 17 at 18-20, 22-24, 26, 43-44), a reimbursement hotline that conveyed information regarding billing and AWPs (*id.* at 37-38, 42-43; Ex. 54 at pages 904 and 909), and a program called ProCert that assists customers who have had reimbursement claims denied (Ex. 17 at 331; *see also* Ex. 53 at 132-35).

[26] Marsha Peterson testified that customers found the price and AWP information displayed on a single screen "useful," and acknowledged that spreads are relevant to the customers.  Ex. 18; *see also* Ex. 27.  Mr. Akscin also testified that practices found the presentation of the information in the AWP Price Report to be "very valuable."  Ex. 17 at 112.

can access current AWP and J code information through the web site.  Starting April 3, 2000, a new display of AWP information will be available.  This information will be updated on a monthly basis."  Ex. 55 at 000096974.

BMS also provided its sales representatives with spread-marketing materials, or they created their own.  For instance, many of the Akscin presentations included information on the difference between the acquisition cost and Medicare reimbursement amounts for oncology drugs.  *See, e.g.,* Ex. 49 at 000096639; Ex. 17 at 94-95).  Another document compares spreads on Taxol with spreads on Taxotere, highlighting Taxol's 35.5% "margin" between Medicare reimbursement and OTN cost as compared to Taxotere's smaller margin of 12.7%.  Ex. 56 at 000157426.  A similar analysis for weekly administration generated a 52% margin for Taxol compared to a 23% margin for Taxotere.  *Id.* at 000157428-29.  Taxol also won out on a three-week administration period, with a 39% margin versus 23% for Taxotere.  *Id.* at 000157430-31.  BMS also distributed to the sales force a Powerpoint comparing costs and reimbursement amounts for Taxol and Paraplatin purchased from OTN.  Ex. 41 at 001502281-82, 00150297-98); *see also id.* at 001502285 (stating that "[c]linical benefit & reimbursement drive utilization").

The BMS sales force translated these spread marketing signals from management into action and marketed the spread.  For example, BMS "Grand Master" Sales Representative Doug Soule admitted to having discussions with clients about "margin," the term that he uses for spread, Ex. 53 at 55, as well as BMS margins compared to a competitor's drug.  *Id.* at 57.  Soule also testified to having discussions with other BMS sales representatives about margins.  *Id.* at 167-68.  Soule also created a number of documents reflecting spread marketing or other

discussions with clients about reimbursement issues.  One includes a "Decision Analysis Worksheet," where Soule compared spreads between Taxol and Paraplatin.  *See* Ex. 57.

Documents produced by sales representative Barbara Davidson, another "Grand Master," also reveal spread-marketing.  *See* Ex. 58 (various documents comparing profits on Taxol and Docetaxel using cost and reimbursement rates; presenting various profit scenarios between Taxol and generic paclitaxel, factoring in Paraplatin savings tied to Taxol sales; and comparing profits on Taxol and Taxotere).[27]

These are just a few of many examples.  They, along with Mr. Akscin's "Focus on Price" admonitions and other material focusing on reimbursement and AWPs that was distributed to BMS sales representatives, destroy any notion that BMS sales and marketing personnel merely responded innocently and in passing to rare questions about "margins."  Rather, BMS pushed the spread.

**D.      Spread Manipulation And Marketing Constitutes Unfair And Deceptive Acts And Practices In Violation Of Consumer Protection Acts**

Without any explanation, BMS asserts that its conduct was entirely in accord with the OIG Guidelines, not unfair or deceptive and that, in any event, there was no causal connection between its conduct and Class 3 overpayments for BMS drugs.  BMS Br. at 8.  BMS is wrong on each score.

The expectations established by the OIG Guidelines are clear:

- Pharmaceutical manufacturers are under a ***legal duty*** not to submit "false, fraudulent, or misleading information" where "reimbursement by Medicare and Medicaid … for the

---

[27] *See also id.* at 001508114-17 (email documenting conversations between Davidson and an OBO employee: Based on cost numbers provided by Documedics, "Cindy recommended to the doctors that they consider using more cisplatin [and not BMS's Paraplatin].  She doesn't want to do this and knows it's not as good for patients."  Steven Pond, at BMS, replied in part:  "Given the current environment I find it hard to believe that a decision on what drug to give is based on a small margin and not what is best for the patient.  Congress and others would not be happy if they found out that Documedics and pharmacy directors are telling Doctors to use Cisplatin over Paraplatin based on just the drug prices and not the total APC.").

- 22 -

manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, ***directly or indirectly***, and the manufacturer has knowingly … failed to generate or report such information completely and accurately." *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg. 23731, at 23733 (May 5, 2003) (emphasis added).

- "Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers." *Id*.

- "If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated." *Id*. at 23737.

- "[I]t is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the 'spread' to induce customers to purchase its product." *Id*.

- "The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute.  Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product." *Id*.

The acts and practices outlined above plainly violate these guidelines, notwithstanding BMS's unsupported conclusion that they do not.

Furthermore, BMS's acts and practices are unfair and deceptive under Massachusetts Gen. Laws Ch. 93A even without reference to the OIG Guidelines.  For a thorough discussion of why, Plaintiffs respectfully refer the Court to the Argument section of their Memorandum in Opposition to the Track 1 Defendants' Motion for Summary Judgment with Respect to Class 3, Parts III.A.2.a and b, which are incorporated herein by this reference.

**E.     Causation Is Established**

Citing *Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 445 Mass. 790, 840 N.E.2d 526 (2006), BMS claims – again without any supporting explanation – that Plaintiffs cannot establish causation.  BMS. Br. at 8.  BMS is again wrong.  The consumer need only prove a

causal connection between a deceptive act and a loss.  840 N.E.2d at 528.  Causation under Ch.

93A encompasses demonstrating that, as a result of defendants' deception, class members paid

more than they otherwise would have.  *Aspinall*, 442 Mass. at 398-99.  Courts should carefully

differentiate between proving actual injury and individual damages:  Injury can be demonstrated

via common impact, even if individual damages are more complex.  *Id.* at 402.

Had BMS reported accurate pricing information, the prices reported would have been

lower.  Had BMS not engaged in manipulation of spreads, Medicare reimbursement and co-pays

based thereon would have been lower.  Class members would have paid less because, in the

absence of concealment of the actual prices and BMS's gaming, inflated billings could not have

been sustained.  Dr. Hartman explains this at great length in his December 15, 2005, Declaration

in Support of Plaintiffs' Claims of Liability and Calculation of Damages.  Furthermore, in

deciding Defendants' motions to dismiss, the Court already considered and rejected Defendants'

lack of causation arguments, finding that they were "not persuasive" and that the harm incurred

was direct:

> In the private, end-payor context, ***the harm alleged by
> Defendants' alleged actions is visited directly upon the end-payor
> Plaintiffs, as they have paid directly for the named drugs based
> on the AWP's***.  Similar arguments about intervening causes
> between the setting of an AWP by a defendant and injuries to plans
> and individual co-payors were recently rejected [by Judge Stearns]
> as "bordering on the frivolous."

*In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 207 (D. Mass. 2004)

(quoting *Lupron*, 295 F. Supp. 2d at 175) (emphasis added).  And as Judge Stearns amplified in

discussing the direct injury requirement under RICO:

> RICO requires "some direct relation between the injury
> asserted and the injurious conduct alleged."  *Holmes*, 503 U.S. at
> 268.  Defendants' challenge to this element of plaintiffs' RICO
> claims borders on the frivolous.  The argument begins with a
> settled principle of law, that the intervening act of a third party can

- 24 -

> break the chain of proximate causation thereby relieving the
> original actor of liability. *Griffiths v. Campbell*, 425 Mass. 31, 34-
> 36, 679 N.E.2d 536 (1997). The intervening third party actors to
> whom defendants refer are the physicians who purchased and
> prescribed Lupron(R), the publishers of the *Red Book* and other
> industry journals who listed the AWP, and the government itself,
> which through Medicare, set the reimbursement rate for
> Lupron(R). ***What the argument ignores is the corollary***
> ***requirement that the intervening act be unforeseeable and***
> ***completely independent of any act undertaken by the original***
> ***actor***. (An arsonist, for example, is not relieved of liability by a
> fireman's intervening efforts to suppress the fire). *See*
> Massachusetts Superior Court Civil Jury Instructions § 2.1.9
> (1998). A proximate cause need not be a precipitating or "but for"
> cause, in the sense of being the last cause in a chain of events
> leading to the harm, but need only be a substantial cause of a
> succession of events that in a logical sequence ultimately causes a
> plaintiff injury. *Id*. § 2.1.8. Here it was defendants who instigated
> both the culpable and the innocent intermediaries to commit acts
> that were not only foreseeable but intended. By way of analogy, a
> company that issues its stock at a fraudulently inflated price is not
> insul[a]ted from liability by the intervening acts of the brokers,
> transfer agents, and financial analysts who promote the sales of its
> stock, execute trades on behalf of injured investors, and report the
> company's falsified financial statements.

*Lupron*, 295 F. Supp. 2d at 174-75 (emphasis added).

### F.     Massachusetts' TPPs Were Unaware Of BMS's Fraud

Repeating the same argument advanced in Defendants' joint motion, BMS closes its brief

with the argument that Massachusetts TPPs could not have been fooled because they purportedly

purchased three BMS drugs at "mega spreads." BMS Br. at 8-9. BMS is wrong. For a full

response to this argument, Plaintiffs refer the Court to Memorandum in Opposition to the Track

1 Defendants' Motion for Summary Judgment with Respect to Class 3 *passim*.

## III.     CONCLUSION

For the foregoing reasons, summary judgment in favor of the Track 1 Defendants on

these Class 3 issues should be denied.

- 25 -

DATED:  August 30, 2006.

By_____/s/ Steve W. Berman_____
    Thomas M. Sobol (BBO#471770)
    Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

001534-16  125258 V1

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  125258 V1

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 30, 2006, I caused copies of **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO BMS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO CLASS 3** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


 **/s/ Steve W. Berman**
Steve W. Berman

001534-16  125258 V1