**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

**PLAINTIFFS' RESPONSE TO SCHERING-PLOUGH'S INDIVIDUAL
MOTION FOR SUMMARY JUDGMENT AS TO CLASS 3**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...........................................................................................1

II.    STATEMENT OF FACTS / ARGUMENT ..................................................1

      A.     SPW Perpetrated the Fraudulent AWP Scheme for All of the Class 2 Drugs.........1

           1.     SPW set and published AWPs .....................................................1

           2.     AWP was the reimbursement mechanism for SPW drugs..........................2

           3.     SPW's AWPs violate OIG guidelines..........................................5

           4.     Specific examples of SPW's manipulation....................................6

                  a.     Integrilin®..............................................................7

                  b.     Temodar ................................................................8

                  c.     Intron-A................................................................9

                  d.     Proventil®.............................................................10

                  e.     Warrick Albuterol Sulfate .........................................10

                  f.     Perphenazine .........................................................11

III.    CONCLUSION..........................................................................................12

## I.      INTRODUCTION

There is only one SPW[1] drug at issue on Class 3, Intron-A.  Summary Judgment as to that drug is inappropriate.

As evidenced by Schering's own documents and actions, Schering was a company committed to engaging in illegal marketing practices, including using the spread between AWP and ASP to maintain or increase market share.[2,3]  In a now infamous strategy memo, a top Schering executive laid out in detail Schering's strategy to sell the spread and its motivation for doing so.

SPW, on August 29, 2006, agreed to plead guilty to charges of filing false claims relating to Intron-A and Temodar, and paid $435 million in total to resolve claims of illegal conduct. This is a company that had a corporate culture that freely chose to exploit the AWP system. Summary judgment on Intron-A is not appropriate.

## II.      STATEMENT OF FACTS / ARGUMENT

**A.      SPW Perpetrated the Fraudulent AWP Scheme for All of the Class 2 Drugs**

**1.      SPW set and published AWPs**

In their answers, both SP and Warrick admitted to reporting pricing information for their medicines to pharmaceutical industry pricing publications.[4]

---

[1] For the reasons stated in the Declaration of Steve W. Berman Pursuant to Rule 56(f), Temodar might come back into Class 3 after discovery of the material relating to SPW's guilty plea.

[2] Hartman S.J. Opp. at ¶ 30(d), p. 33.

[3] *See, e.g.*, Exhibit 1, Hartman Liability Report, Attachment G.5.c., finding Schering spreads of 107.4% in 1993 (NDC 151504) growing to 627.9% in 2002, 142% in 1993 on NDC 150006 growing to 1535.4% in 2002.  All references to "Exhibit __" are to exhibits attached to the Declaration of Steve W. Berman in Support of Plaintiffs' Memorandum in Opposition to Schering-Plough Corporation's and Warrick Pharmaceuticals Corporation's Motion for Summary Judgment as to Class 2 Claims, filed April 7, 2006.

[4] These admissions are contained in ¶¶ 3 and 481 of Warrick's and SP's Answers to Intervenor's Amended Master Consolidated Class Action Complaint filed April 9, 2004.

- 1 -

However, SPW did not merely report "pricing information"; SPW reported AWPs that it had sole responsibility for creating.  Discovery has confirmed conclusively that SPW controlled and set the AWPs for its products.[5]  After setting the AWPs, SPW caused the AWPs to be published in pharmaceutical pricing compendia[6] and, thereafter, advertised the AWPs directly to customers.[7]

### 2.      AWP was the reimbursement mechanism for SPW drugs

SPW established inflated AWPs with full knowledge that AWP was the benchmark for third-party payors' reimbursements to providers.[8]  The creation and maintenance of favorable

---

[5] With regard to Warrick generics, in a June 21, 2000 letter from SPW attorney, John Hoffman, to L. Timothy Terry, OAG – Nevada, WAR0006155-56, Hoffman admits on behalf of Warrick: "…Warrick does report AWP to First DataBank for all its products … in writing … generally sets AWP at 10-15% below the brand.  Generally Mr. Harvey Weintraub determines AWPs, sometime in consultation with Mr. Raman Kapur…."  Attached as Exhibit 4.  For Schering brands, in a May 5, 2000 email from Debbie Kane, SPW Contract Manager, to Contract and Pricing Staff, SPF0241686, Kane stated:  "As you know, Pharmaceutical Manufacturers publish AWPs (Average Wholesale Prices) for reimbursement purposes.  Most manufacturers (including Schering) report AWPs at NDP plus 20%."  Attached as Exhibit 13.  *See also* Jan, 15, 2003 Dep. of Richard Zahn, Pres. of Schering Laboratories, at 176-177 (SPW0039627-28):  "... there was a 20% margin or difference between an AWP and a standard, you know, shipment cost … your price plus 20 percent essentially was AWP."  Exhibit 14.

[6] There are many examples of Western Union Mailgrams (*see* Exhibit 15 (FDB-AWP 03929)) and faxes (*see* Exhibit 16 (FDB-AWP 03988); Exhibit 17 ( WAR0007634); and Exhibit 18 (WAR0024086) from Schering and Warrick to First Data Bank and Redbook.

[7] *See* Exhibit 30 – Jan. 15, 2003 Dep. of Richard Zahn, Pres. of Schering Laboratories, at 95-96 (SPW0039607): "…[h]ave we published AWPs for our products?  Yes we have … we have had a price list that was distributed to wholesalers and direct-buying customers in the past that would list AWP, you know, as well as a net direct."  Also, a standard SPW marketing practice for Warrick generics was to advertise the spread by sending notices to customers of price changes showing the static AWP juxtaposed next to the new, lower net direct price.  For example, *see* Exhibits 15 and 19.  Certain offers for generics would also show the AWP, cost and " %AWP Spread" – *see* SPW0042091-093, Exhibit 20.  SP also sent similar notices for branded drugs advertising AWPs juxtaposed to net direct pricing.  For example, *see* Exhibit 15, Integrilin pricing notice SPF0057742.

[8] Executives of SPW acknowledged AWP was for reimbursement purposes:  "AWP is used as the benchmark from which the – for reimbursement."  Jerome Sherman, Schering Plough employee and National Sales Director for Warrick, Dep. Mar. 6, 2002, at 46:3-4, Exhibit 21; "I think we were always aware that some third party payors used AWP" (in determining the amount of reimbursement), H. Weintraub, Dep. Oct. 26, 2004, at 332:6-7, Exhibit 22; and "As you know, Pharmaceutical Manufacturers publish AWPs (Average Wholesale Prices) for reimbursement purposes.  Most manufacturers (including Schering) report AWPs at NDP plus 20%."  Debbie Kane May 5, 2000 email to Contract and Pricing Staff, SPF0241686, Exhibit 13.  Also, Exhibit 23, the responses of Louis Manfredi, Warrick Manager of Business Development, March 1996 – February 1999, deposed Jul. 11, 2005 in W.Va. case. (at 58:9-59:12) clearly reflect SPW's position on AWP, to-wit:

Q.   What was your understanding of the term AWP when you were at Warrick?

A.   In general, my understanding of AWP is a price that is available if someone were to look and see what a price of any particular Rx item is, they would go to a pricing service, such as Red Book, or First Data

spreads for reimbursement to pharmacies and providers were no accident; such spreads were express marketing objectives of SPW.  SPW intentionally "gamed the system" by creating favorable reimbursement spreads for both the branded and generic products.  This latter proposition is confirmed by a memo dated 12/10/2002 from Brian Longstreet to the General Manager of SP's Oncology and Biotech Business Unit (OBBU), Olav Hellebo, and Longstreet's direct supervisor within OBBU, James Robinson.

The memo, hereinafter referred to as the "Longstreet Confession," addressed pricing strategies against competitive brands and proposed rebates for retail pharmacies.  Longstreet, at the time of the memo, was the Director of Managed Care Marketing for the OBBU and was working with the Trade Team on devising market share rebate offers to pharmacies.[9]  With his considerable experience within SPW formulating and implementing pricing strategies, Longstreet made the following comments on AWP pricing regarding both branded and generic SPW products:

> As previously discussed there are a few stakeholders in the process
> of drug distribution (wholesalers-pharmacies-doctors-patients-
> managed care/insurance companies).  When it comes to

---

Bank, their Price Alert tool, and be able to look up this AWP for just about every prescription SKU you could imagine.

Q.  What would that number tell them?

A.  It's my opinion, absolutely nothing.

Q.  So why would someone need to look at that number?

A.  Again, my understanding of how AWP is used is not so much on acquisition by a customer, but on the back end regarding reimbursement for the drug.

Q.  So it's your understanding that AWP was a number used for reimbursement purposes?

A.  Every drug has an AWP. The utility of AWP comes from reimbursement, not on acquisition, knowledge about reimbursement, not on acquisition.

Q.  Reimbursement by whom?

A.  Third party payors, insurance companies.

[9] The Trade Team consisted of Frank Dilascia, SP-VP Trade Sales and Pharmacy Development; Mike Walsh, SP-Trade Sales Director NE; Peter Kamins, SP-Trade Sales Director SE; Joe Caso, VP Key Pharmaceuticals Marketing and Sales; and Bob Bucko, SP-VP Finance.  *See* Exhibit 24.

pharmacies, they are driven by Managed Care or insurance reimbursement, profit motive, and state law. A Managed Care organization (MCO) can mandate reimbursement of a product vs. another similar product; if a generic is available, either the MCO or state can mandate generic substitution. In addition, Pharmacies are paid a dispensing fee, plus the margin of whatever they purchase the product minus the reimbursement rate (usually AWP minus a %). **With generics the acquisition cost is usually much lower than the published AWP and creates a very favorable "spread" particularly when multiple generics exist and the acquisition price drops dramatically (and the published AWP does not).**

Having a higher AWP and having reimbursement being paid on a % of AWP can be favorable to the Pharmacies. **For example, our recommended strategy of keeping the AWP (and the NDP) higher if Roche comes in with a lower Net Direct Price (NDP) … actually could create a favorable situation because the reimbursement rate will be higher for our product.** Simple example, if the reimbursement rate is AWP-15%, for a $100 AWP product the reimbursement is $85 compared to a $70 AWP product where the reimbursement is $59.50.[10] (Emphasis added.)

The "Longstreet Confession" is a clear admission by a knowledgeable SPW executive of

the phony AWP schemes employed by SPW to move the markets for SPW products at inflated

---

[10] Attached as Exhibit 24 (SPF00017394-395). Longstreet's description of the use of "spread" in gaming the system is a reflection of the general knowledge of and acceptance by SPW executives and sales managers of those tactics. Hellebo's reply to Longstreet's Confession was "Sounds good." Exhibit 24 (SPF00017394). Another example of the understanding by SPW employees that SPW was involved in a "spread game" is the deposition testimony of Louis Manfredi, a business development manager for SPW, July 11, 2005 Dep. W. Va. Case (at 89:13-90:14):

> A. My understanding of the term marketing the spread is the spread is the difference between AWP and what the acquisition cost is for that product. So that difference between AWP and acquisition cost is very commonly called the spread.
>
> Q. Whose acquisition cost are you referring to?
>
> Mr. McDonald: I object to the form.
>
> A. I believe the term would go back to the retail pharmacy, who is seeking reimbursement.
>
> Q. Do you know how that spread would be used?
>
> Mr. McDonald: I object to the form.
>
> A. Well, there again – my basic knowledge is that there are formulas for reimbursement. AWP less a certain percentage. So if AWP less 30 percent is what an item gets reimbursed at, theoretically, and that is $10, and an AWP for the product is set at $50, and the acquisition cost is $20, and the difference there is $30. The difference between the $10 and that $30 is **the retailer comes out ahead of the game**, if you will. (Emphasis added.) Transcript attached as Exhibit 23.

- 4 -

prices to the damage of Medicaid, Medicare, state programs, TTPs and consumers, namely: (1) for generics, create favorable spreads by setting and keeping a high AWP while dropping actual acquisition cost; and (2) for brands, manipulate AWP and actual acquisition costs to create favorable reimbursement spreads for pharmacies or providers.

### 3.    SPW's AWPs violate OIG guidelines

Contrary to SPW's assertion in their brief that Plaintiffs were seeking to impose an arbitrary standard for reimbursement, the importance of an accurate AWP was reconfirmed in the OIG April 2003 report.[11]  The government sets reimbursement with the expectation that the data provided on AWP is a meaningful and accurate figure.  In spite of the government's expectation of accuracy, SPW's use of AWPs has never been linked to accuracy, and has been meaningful only with regard to marketing the spread for provider reimbursements.[12] SPW admitted in their answers that the reported AWPs are typically higher than the prices ultimately paid for by providers purchasing such medicines from wholesalers and distributors.[13]

More significantly, SPW manipulated AWP pricing by maintaining spreads that benefited providers and retailers at the expense of the Class.[14]  The favorable spreads for the providers were created by AWP-acquisition price differentials[15] and off-invoice inducements such as

---

[11] Plaintiffs' Summ. J. Mem. at 44.

[12] *See* Exhibit 13, Kane Mem.

[13] These admissions are contained in ¶¶ 3 and 485 of Warrick's and SP's Answers to Intervenor's Amended Master Consolidated Class Action Complaint filed April 9, 2004.

[14] *See* "Longstreet Confession," Exhibit 24.  *See also* Nov. 18, 1997 letter from H. Weintraub to J. Blatt, VP, Generic Sales, Merck-Medco Managed Care, proposal to sell albuterol solution 20ml for $3.95 with an AWP of $14.99 (Spread of 279.5%) –Exhibit 25 (SW0173547).

[15] *See* Exhibit 26, SPW013821, Sept. 21, 1995 Warrick price change notice/advertisement to Walgreen Co. for Albuterol sulfate solution, 0.5%, 20ml with AWP of $14.99, Direct price of $9.00, less off-invoice **instant rebate** of 23%, leaving net invoice price of $6.93 (a spread of 116%) less current rebate plus a price protected order to purchase at old price.  *See also* Exhibit 27 (WAR0020649), Warrick Oct. 9, 1998 price change notice/advertisement offering to sell to Walgreen Co. same albuterol product at same AWP of $14.99 but at direct price of $4.00 (a spread of 275%) plus an offer of off-invoice 10% product rebate on future purchases, to be issued quarterly, plus an offer of off-invoice rebates for combined markets share, Proventil Brand/Warrick Generick, for albuterol products.  Added

- 5 -

discounts,[16] rebates,[17] price-protected orders,[18] free goods,[19] grants,[20] stock/inventory

adjustment,[21] and bundling of products with steeply discounted drugs.[22]

## 4.  Specific examples of SPW's manipulation

The transactional data that reflects the implementation and amounts involved in the

inflated pricing of products and the various discounting schemes was produced to Plaintiffs in

SPW's databases designated Direct Sales, Chargebacks and Rebates.  From this data, the

"spreads" (percentage difference between the AWP and the acquisition price after factoring

rebates and discounts) for each NDC of the subject drugs can be calculated.  Hartman Liab.

Report Attachment G.5.; also attached to Berman Schering Decl. as Ex. 1.

Schering-Plough Group drugs examined in this litigation are as follows:

- Temodar (temozolomide).  Used to treat certain cancerous brain tumors.

- Intron-A.  An interferon alfa-2b recombinant for injection for cancer treatment.

- Proventil®.  Schering-Plough brand of albuterol sulfate for DME nebulizers.

---

to all of the offered rebates is an Inventory Adjustment incentive whereby Warrick adjusts on-hand inventory in the event of market price decrease.

[16] *Id.*

[17] *Id.*  Warrick rebates are described in detail in Exhibits 28 (WCT0001285-1296) and 29 (WCT0001300-1301).

[18] *Id.*

[19] While Schering provided off-invoice discounts and free goods to doctors, for a "distinct competitor advantage" with dispensing doctors, Schering "went with free goods whenever possible."  Email exchanges between Olav Hellebo and Peter Maguire, March 2001.  Exhibit 30 (SPF00013330-SPF00013331).  The "free goods" scheme was the basis for AstraZeneca's guilty plea.

[20] A blatant example of misuse of offering grants for illegal incentives to obtain market share for integrilin is an email/inter-office memo dated Sept. 29, 2000 reporting on meetings with Catholic Healthcare West wherein the object was to increase utilization of integrilin, SP was willing to negotiate "a commitment of $ for unrestricted educational grants-which we plan to discuss on our next visit per them making INTEGRILIN the preferred agent system wide."  Exhibit 31.

[21] Stock/Inventory adjustments is a retroactive payment/credit to certain classes of trades that result when the price of product occurs within a certain time period after initial purchase.  On one occasion, such a rebated netted CVS a $504,097 credit.  *See* Raman Kapur, Dep. Mar. 7, 2002, at 227 and attached Dep. Ex. 151, attached as Exhibit 32.

[22]SP records for the year 2002 show bundle Warrick albuterol products with Schering branded products at steeply discounted prices.  *See* Exhibit 33.

- Warrick Albuterol Sulfate.  Schering-Plough's generic label for DME nebulizers.

- Perphenazine.  Schering-Plough's generic antipsychotic.

Each of these drugs will be taken in turn to discuss specific evidence that reflects (1) setting and manipulating AWPs so as to create spread and an inflated price, and (2) the marketing of that spread.  Although in Class 3 only Intron-A is at issue, practices as to other drugs are relevant to its conduct and motivation as to Intron-A.

### a.    Integrilin®

Integrilin is prescribed for acute coronary syndrome and utilized during heart catheterization procedures.  As with all their drugs, Schering set and published phony AWPs that were intended to be used in reimbursement scenarios by Medicare, TTPs and consumers.  While generally administered in the hospital setting, on August 1, 2000, HCFA implemented the Medicare Hospital Outpatient Prospective Payment System (OPPS) under the Balanced Budget Refinement Act (BBRA).  The BBRA mandated payment for drugs approved for pass-through payment at 95% of AWP.  This reimbursement status and how to ensure that protocols and billing would take advantage of Medicare reimbursement was advertised by Schering to all its customers.[23]

The protocol that allowed pass-through payment was referred to by the Schering sales force as "drip-n-ship."  In 2000, for the 2mg, 100ml vial of Integrilin, the Schering AWP and discounting had a marketing advantage over competitors by creating a spread that allowed customers to obtain reimbursement ***at $200 above acquisition cost for each 2mg, 100ml vial.***

---

[23] *See* Email dated Aug. 16, 2000 from Kathleen Taylor to Sales Force with Customer letter and Commonly Asked Questions Sheet.  Exhibit 34 (SPF0115322-SPF0115327).  Schering also provided sales force with "reimbursement toolkits" for customer marketing that included form letters explaining Integrilin reimbursement, powerpoint slides and schedules of reimbursement teleconferences to help sell Integrilin on the basis of the reimbursement set at 95% of AWP.  Exhibit 35 (SPF0114601-60).

***SPW drug sales representatives were provided promotional outlines on the Integrilin reimbursement spread advantage so that they could use the information in their sales pitch to customers***.[24] In connection with their joint motion for summary judgment, as well as in this motion, SPW offers no evidence that Congress was aware the SPW representatives were out promoting to doctors a ***$200 profit for each vial of Integrilin***.

Schering marketed Integrilin using off-invoice discounts[25] and price protection orders[26] that resulted in inflating the already phony AWP. To increase market share, Schering marketed Integrilin by showing to customers the profitability of Integrilin in presentations that would show "$ Profit for Hospital" when using "Actual Price" and 95% of phony "AWP Price."[27]

The transactional databases capture the reported discounts and rebates for the Class Period for Integrilin. Actual spreads for Integrilin calculated from the transactional data that captured reported discounts and rebates range between 18.6% and 70.4%.[28]

### b.   Temodar

All oncology drugs sales representatives were trained to provide reimbursement information to the physicians and pharmacies that they called on. Depositions of SPW sales representatives confirmed that it was their standard practice to make reimbursement information a part of their sales pitch to their customers.[29]

---

[24] *See* Exhibit 36 (SPF0117637).

[25] In a 2001 Q&A for a multi-company collaboration, Schering noted in an "INTERNAL USE" comment that net price increases were dependant on contracted discounting. Exhibit 37 (SPF0118422). For specific rebates of 7% and 4.5% for Integrilin, *see* Exhibit 38 (SPF0105089-SPF0105092). Also see Schering Integrilin Committed Member Program form (SPW0042546) utilized for promoting off-invoice discounts for market share performance, Exhibit 39.

[26] PPOs were extensively used to create spread and move the market. *See* Exhibit 40 (SPF0119115).

[27] *See* Exhibit 41 (SPF0113276-300).

[28] *See* Exhibit 42.

[29] Excerpts from SPW drug representatives' depositions demonstrating their training in AWP and reimbursement issues for marketing purposes are attached as Exhibit 44.

Temodar rebates, actual and estimated/planned, for the years 1998 through 2003 are set forth in SPF0053736-SPF0053790 (rebates between 3-5.7%).  Actual spreads from the transactional databases show Temodar spreads for the Temodar products to range from 19.8% to 55.1% for the Class Period.[30]

### c.      Intron-A

Marketing of profitability to physicians of Intron-A treating bladder cancer based on the difference of AWP/NDP is demonstrated by a 1998 Memo to Oncology sales representatives with a profit message for urologists and oncologists for a new 95% of AWP reimbursement for using Intron-A for bladder Cancer.  The message was:  "***Treating bladder patients with Intron is still very profitable!!***"  ***One patient on Intron can represent $16,956.36 of incremental sales and $2,373.84 of profit for our physicians just on the drug alone.***  These figures are based on having your physicians buy Intron-At Net Direct pricing and treating on high dose of Intron…." (SPF0104510-SPF0104512.)[31]

The reported off-invoice discounts[32] and rebates are captured within the transactional databases produced to plaintiffs. Calculations based on the SPW databases show spreads for Intron-A between 16% and 132% for the Class Period.  And Dr. Hartman has found damages on just this drug of $30,847,772 on a national basis for Class 3[33] and damages of $250,000 for the Massachusetts Class 3 payors.[34]

---

[30] *See* Exhibit 42.

[31] Exhibit 45 (SPF0104512).

[32] Schering had a standard form marketing Intron-A only by offering an off-invoice discount of 14% off NDP (~30% off AWP) if quarterly utilization rate met or exceeded quarterly national market share benchmark reported by NDC.  *See* Exhibit 46 (SPW0042545).

[33] Hartman Liability Report at J.5.h.

[34] *Id.* at J.5.i.

Schering's suggestion that because in some years its spreads did not exceed Hartman's threshold it is entitled to summary judgment is belied by the damages to the Class. It is further belied by yesterday's plea agreement. It wants the Court to deem its conduct innocent; all the while it has pled guilty to paying substantial kickbacks to doctors on this very drug. These kickbacks would have inflated the reported AWP. *See* Exhibit A attached hereto.

### d.     Proventil®

The SPW albuterol sulfate line of products carries two separate labels, Schering Proventil® and Warrick Albuterol. The products are identical, manufactured under the same NDA, but with different NDCs.[35]

At the outset of the Class Period in 1991, Proventil still enjoyed the price protection under patent and the AWP/actual sales price spread generally reflected the standard AWP mark-up of 20%. However, in anticipation of generic competition in 1992 and the launch of albuterol generics in 1993, Schering increased the spread in order to compete against other manufacturers. In the years that followed, Proventil spreads increased significantly with the highest spread in 2004Q1 of 1279.6%.[36]

Actual spreads for Proventil were hidden by bundling discounted/nominal priced Warrick solution to make up value differences or by having discounts/rebates on Proventil sales paid by Warrick through the Schering Brand/Warrick Generic Market Share Programs.[37]

### e.     Warrick Albuterol Sulfate

Warrick albuterol inhalation products covered under the Medicare DME provisions represent the most serious example of deceptive marketing practices and gaming the system

---

[35] *See* Exhibit 47 (Weintraub Dep. Aug. 25, 2005, at 63-64).

[36] *See* Exhibit 1, Hartman Liab. Report G.5.

[37] *See* Exhibit 48 (Warrick proposal to CVS (WAR0006979-980).

- 10 -

through AWP fixing and price manipulation to move the market.  The annual spreads of reported/captured discounts and rebates is evidenced by the AWP/pricing spreads reflected in analysis of the transactional data that shows spreads ranging from 107.4% to 1535.4%.[38]

The evidence suggests that the spread percentages are higher than reflected in the transactional data as many rebates, such as administrative fee rebates, new product launch rebates, certain customer chargeback rebates, and certain auto-substitution contract sales rebates were not captured in the databases provided by SPW.[39]

SPW created favorable marketing spreads by maintaining a "fixed" AWP and reducing the acquisition price to move the market.[40]

SPW marketed the spread on generic albuterol by direct advertisement to customers by showing the "fixed" AWP juxtaposed by the acquisition price.

In addition to advertising the AWP-acquisition price, SPW, as a routine marketing practice to increase sales of albuterol as well as the other Class 2 drugs, offered customers off-invoice discounts and price-protected orders to increase the spread.

### f.    Perphenazine

Perphenazine was marketed in the same fashion as albuterol, albeit in significantly reduced volumes.  The spreads for perphenazine had a range of 92.1% to 603%.[41]

---

[38] *See* Exhibit 1, Hartman Liab. Report G.5.

[39] *See* Exhibit 49 (0398802-8805) (Feb. 13, 2002 Report showing Warrick Rebate Programs and whether described rebates were captured/not captured in Tram database, original data source for produced databases).

[40] *See* Longstreet Confession, Exhibit 24.

[41] Exhibit 42.

## III.    CONCLUSION

The foregoing demonstrates that Schering was a company ready, willing and able to play the AWP scheme.  Intron-A was sold at times throughout the Class period based on inflated AWPs and the Class was damaged as a result.  Summary Judgment should be denied.[42]

DATED:  August 30, 2006.

By____/s/ Steve W. Berman_____
   Thomas M. Sobol (BBO#471770)
   Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Robert F. Lopez
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

---

[42] In addition, for the reasons stated in the declaration of Steve W. Berman regarding the Schering plea agreement, and pursuant to Rule 56(f), discovery on the facts regarding Schering's plea should be permitted.

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on August 30, 2006, I caused copies of **PLAINTIFFS' RESPONSE TO SCHERING-PLOUGH'S INDIVIDUAL MOTION FOR SUMMARY JUDGMENT AS TO CLASS 3** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

 **/s/ Steve W. Berman**
Steve W. Berman

- 14 -

001534-16  126550 V1