# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA <u>ex rel.</u><br><br>       VEN-A-CARE OF THE FLORIDA KEYS, INC., a Florida corporation, by and through its principal officers and directors, ZACHARY T. BENTLEY and T. MARK JONES,<br><br>                 Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES, INC. and HOSPIRA, INC.,<br><br>             Defendants. | Case No.: 06-CV-21303-ASG<br><br>Hon. Alan S. Gold |

**ABBOTT LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR**
**ADMISSION TO PLAINTIFF UNITED STATES OF AMERICA**
<u>**AND RELATOR VEN-A-CARE OF THE FLORIDA KEYS, INC.**</u>

Defendant Abbott Laboratories, Inc. ("Abbott"), pursuant to Rule 36 of the Federal Rules of Civil Procedure, submits the following requests for admission to Plaintiff the United States of America and Relator Ven-A-Care of the Florida Keys, Inc. to be answered under oath within 30 days after service.

The Definitions and Instructions contained in Defendant Abbott Laboratories, Inc.'s First Set of Requests for the Production of Documents and Tangible Things to Plaintiff United States of America and Defendant Abbott Laboratories Inc.'s First Set of Requests for the Production of Documents and Tangible Things to Relator Ven-A-Care of the Florida Keys, Inc. are hereby incorporated by reference.

## <u>REQUESTS FOR ADMISSION</u>

1.      The term "Average Wholesale Price" or "AWP" is not defined in any federal statute or regulation.

2.      During the Relevant Claim Period, the term "Average Wholesale Price" or "AWP" was not defined in any state statute or regulation.

3.      During the entire Relevant Claim Period, no federal statute or regulation required Medicare Part B to provide payment to Providers based on or in any way using AWP.

4.      Before the effective date of the Balanced Budget Act of 1997, no federal statute or regulation required Medicare Part B to provide payment to Providers based on or in any way using AWP.

5.      After the effective date of the Balanced Budget Act of 1997, no federal statute or regulation required Medicare Part B to provide payment to Providers based on or in any way using AWP.

6.      After the effective date of the Balanced Budget Act of 1997, one or more federal statutes or regulations did require Medicare Part B to provide payment to Providers based on or using AWP.

7.      During the entire Relevant Claim Period, no federal statute or regulation required Medicaid to provide payment to Providers based on or in any way using AWP.

8.      During the entire Relevant Claim Period, no statute or regulation required Medicaid to provide payment to Providers based on or in any way using AWP.

9.      During the entire Relevant Claim Period, no federal statute or regulation prohibited Medicare Part B from providing payment to Providers at the amount that Providers paid to acquire drugs.

10.      During the entire Relevant Claim Period, the U.S. Government had authority to seek information from Providers about their acquisition costs for the Subject Drugs.

11.      During the entire Relevant Claim Period, Medicare Part B could have required Providers to indicate their actual acquisition cost for drugs on the claim forms submitted for payment.

12.      During the entire Relevant Claim Period, Providers could have provided their actual acquisition cost for drugs on the claim forms submitted for payment under Medicare Part B.

13.     During the entire Relevant Claim Period, Medicaid could have required Providers to indicate their actual acquisition cost for drugs on the claim forms submitted for payment.

14.     During the entire Relevant Claim Period, Providers could have provided their actual acquisition cost for drugs on the claim forms submitted for payment under Medicaid.

15.     During the Relevant Claim Period, Medicare Part B could have paid for drugs at an EAC that was not based upon or in any way related to AWP.

16.     During the Relevant Claim Period, State Medicaid Programs could have paid for drugs at an EAC that was not based upon or in any way related to AWP.

17.     During the Relevant Claim Period, Medicare Part B could have paid for drugs at an EAC determined by surveys or studies of Provider acquisition costs.

18.     During the Relevant Claim Period, State Medicaid Programs could have paid for drugs at an EAC determined by surveys or studies of Provider acquisition costs.

19.     During the Relevant Claim Period, State Medicaid Programs were encouraged by HCFA/CMS to base payment for drugs at an EAC determined by surveys or studies of Provider acquisition costs.

20.     During the entire Relevant Claim Period, no federal statute or regulation prevented Providers from seeking payment from Medicare Part B at the price they paid to acquire drugs.

21.     During the entire Relevant Claim Period, no federal statute or regulation prevented Providers from seeking payment from Medicaid at the price they paid to acquire drugs.

22.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug knowing it would be paid at an amount that exceeded its acquisition cost submitted a false claim under the False Claim Act.

23.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug knowing it would be paid at an amount that exceeded its acquisition cost did not submit a false claim under the False Claim Act.

24.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug when it knew its acquisition cost for the drug was "far lower" (*see* Complaint, ¶ 3) than the AWP then published for the drug submitted a false claim under the False Claim Act.

25.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug when it knew its acquisition cost for the drug was "far lower" (*see* Complaint, ¶ 3) than the AWP then published for the drug did not submit a false claim under the False Claim Act.

26.     It is the Plaintiff's position that a Provider who submitted a claim for payment to Medicare Part B or Medicaid for a drug when it knew its acquisition cost for the drug was "far lower" (*see* Complaint, ¶ 3) than the AWP then published for the drug, and did not return the difference to the Medicare or Medicaid program, submitted a false claim under the False Claim Act.

27.     For at least some of the false claims Plaintiff alleges Abbott caused to be filed, it is Plaintiff's position that the Provider who filed the claim submitted a false claim under the False Claims Act.

28.     For all of the false claims Plaintiff alleges Abbott caused to be filed, it is Plaintiff's position that the Provider who filed the claim submitted a false claim under the False Claims Act.

29.     During the Relevant Claim Period, no federal statute or regulation provided that Abbott or other Manufacturers must report prices for drugs.

30.     During the Relevant Claim Period, no federal statute or regulation defined the prices that Abbott or other Manufacturers must report to Publishers.

31.     During the Relevant Claim Period, no federal statute or regulation defined the prices that Abbott or other Manufacturers reported to Publishers.

32.     During the Relevant Claim Period, no federal statute or regulation regulated the prices that Abbott or other Manufacturers reported to Publishers.

33.     During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to disclose their average sales prices to Publishers.

34.     During the entire Relevant Claim Period, HCFA/CMS was aware that the term "Average Wholesale Price" or "AWP" referred to figures reported by Publishers.

35.     During the entire Relevant Claim Period, Ven-A-Care was aware that the term "Average Wholesale Price" or "AWP" referred to figures reported by Publishers.

36.     During the entire Relevant Claim Period, HCFA/CMS was aware that AWP generally did not reflect discounts, rebates, and chargebacks associated with the sale of drugs by Manufacturers to wholesalers, distributors, and at least some Providers.  (Throughout these

requests, the word "generally" should be construed as it is used in paragraphs 35 and 50 of the Complaint.)

37.    During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all discounts available to certain wholesalers, distributors, or purchasers of drugs.

38.    During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all rebates available to certain wholesalers, distributors, or purchasers of drugs.

39.    During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all chargebacks available to certain wholesalers, distributors, or purchasers of drugs.

40.    During the Relevant Claim Period, no federal statute or regulation required Abbott or other Manufacturers to report prices to Publishers that incorporated all discounts, rebates, and/or chargebacks available to certain wholesalers, distributors, or purchasers of drugs.

41.    During the Relevant Claim Period, no federal statute or regulation prohibited Abbott or other Manufacturers from offering discounts, rebates, and or chargebacks to wholesalers, distributors, or purchases of drugs.

42.    During the Relevant Claim Period, Medicare Part B reimbursed for one or more units of a Subject Drug based on or in reference to the Provider's cost to acquire that drug.

43.    During the Relevant Claim Period, at least one State Medicaid Program reimbursed for one or more units of a Subject Drug based on or in reference to the Provider's cost to acquire that drug.

44.    During the Relevant Claim Period, Medicare Part B reimbursed for one or more units of a Subject Drug based on or in reference to the Provider's Usual and Customary Charges.

45.    During the Relevant Claim Period, Medicaid reimbursed one or more units of a Subject Drug based on or in reference to the Provider's Usual and Customary Charges.

46.    During the Relevant Claim Period, the U.S. Government purchased one or more units of each of the Subject Drugs based on an amount arrived at through negotiations with Abbott.

47.    Throughout the Relevant Claim Period, the U.S. Government purchased Vancomycin from Abbott at a price at least ten times less than the AWP then published by First DataBank.

48.     By at least the end of 1994, the U.S. Government had purchased Vancomycin from Abbott at a price at least ten times less than the AWP then published by First DataBank.

49.     Throughout the Relevant Claim Period, the U.S. Government purchased sodium chloride from Abbott at a price at least ten times less than the AWP then published by First DataBank.

50.     By at least the end of the 1994, the U.S. Government had purchased sodium chloride from Abbott at a price at least ten times less than the AWP then published by First DataBank.

51.     Throughout the Relevant Claim Period, the U.S. Government purchased dextrose in water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

52.     By at least the end of the 1994, the U.S. Government had purchased dextrose in water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

53.     Throughout the Relevant Claim Period, the U.S. Government purchased sterile water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

54.     By at least the end of 1994, the U.S. Government had purchased sterile water from Abbott at a price at least ten times less than the AWP then published by First DataBank.

55.     During the Relevant Claim Period, Plaintiff is unaware of any evidence that Abbott submitted an AWP to any Publisher for any of the Subject Drugs.

56.     During the Relevant Claim Period, Ven-A-Care is unaware of any evidence that Abbott submitted an AWP to any Publisher for any of the Subject Drugs.

57.     During the Relevant Claim Period, neither HCFA nor CMS relied on any statement made directly to it by Abbott in setting payment rates or methodologies under Medicare Part B for any of the Subject Drugs.

58.     During the Relevant Claim Period, no Medicare Carrier relied on any statement made directly to that Medicare Carrier by Abbott in providing payment or setting payment rates or methodologies under Medicare Part B for any of the Subject Drugs.

59.     During the Relevant Claim Period, no Medicaid Intermediary relied on any statement made directly to that Medicaid Intermediary by Abbott in providing payment or setting payment rates or methodologies under Medicaid for any of the Subject Drugs.

60. Before filing the Complaint, Plaintiff did not seek information from wholesalers or distributors about the price(s) that Providers paid for any of the Subject Drugs.

61. During the entire Relevant Claim Period, in connection with the Medicaid Drug Rebate Program, HCFA/CMS received data from Abbott that set forth AMPs for all of the Subject Drugs.

62. During some part of Relevant Claim Period, in connection with the Medicaid Drug Rebate Program, HCFA/CMS received data from Abbott that set forth AMPs for all of the Subject Drugs.

63. The AMP information provided to HCFA/CMS by Abbott for each of the Subject Drugs during the Relevant Claim Period was accurate.

64. The AMP information provided to HCFA/CMS by Abbott for Abbott Vancomycin during the Relevant Claim Period was accurate.

65. The AMP information provided to HCFA/CMS by Abbott for Abbott sodium chloride during the Relevant Claim Period was accurate.

66. The AMP information provided to HCFA/CMS by Abbott for Abbott sterile water during the Relevant Claim Period was accurate.

67. The AMP information provided to HCFA/CMS by Abbott for Abbott dextrose in water during the Relevant Claim Period was accurate.

68. Neither Plaintiff nor the Relator contend that AMP information provided to HCFA/CMS by Abbott for any of the Subject Drugs during the Relevant Claim Period was inaccurate.

69. Plaintiff contends in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid by all wholesalers for that drug.

70. Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid by all wholesalers for that drug.

71. Plaintiff contends in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices charged by all wholesalers for that drug.

72. Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices charged by all wholesalers for that drug.

73.     Plaintiff contends in this litigation that the published AWP for a Subject Drugs should have reflected the average of all prices paid by all Providers for that drug.

74.     Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid by all Providers for that drug.

75.     Plaintiff contends in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid to Abbott for that drug.

76.     Plaintiff does not contend in this litigation that the published AWP for a Subject Drug should have reflected the average of all prices paid to Abbott for that drug.

77.     The Subject Drugs are multiple source drugs.

78.     The HCPCS code for a multiple source drug does not identify the Manufacturer of such drug.

79.     The HCPCS code for Vancomycin did not identify the Manufacturer of the drug.

80.     The HCPCS codes for the sodium chloride solutions at issue in this litigation did not identify the Manufacturer of the solutions.

81.     The HCPCS codes for the sterile water at issue in this litigation did not identify the Manufacturer of the sterile water.

82.     The HCPCS codes for the dextrose in water solutions at issue in this litigation did not identify the Manufacturer of the solutions.

83.     The J Code for a multiple source drug does not identify the Manufacturer of such drug.

84.     The J code for Vancomycin did not identify the Manufacturer of the drug.

85.     The J codes for the sodium chloride solutions at issue in this litigation did not identify the Manufacturer of the solutions.

86.     The J codes for the sterile water at issue in this litigation did not identify the Manufacturer of the sterile water.

87.     The J codes for the dextrose in water solutions at issue in this litigation did not identify the Manufacturer of the solutions.

88.     During the Relevant Claim Period, Medicare Part B generally used the HCPCS to reimburse for drugs.

89.     During the Relevant Claim Period, Medicare Carriers generally reimbursed for drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

90.     During the Relevant Claim Period, Medicare Carriers generally reimbursed for the Subject Drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

91.     During the Relevant Claim Period, Medicaid Intermediaries generally reimbursed for physician-administered drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

92.     During the Relevant Claim Period, Medicaid Intermediaries generally reimbursed for the Subject Drugs using a median AWP calculated by HCPCS or J-Code, but not by NDC.

93.     During the Relevant Claim Period, Medicaid Intermediaries generally did not reimburse for physician-administered drugs by NDC.

94.     During the Relevant Claim Period, Medicaid Intermediaries generally did not reimburse for the Subject Drugs by NDC.

95.     Plaintiff is seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicare by Providers contained a HCPCS Code or J Code but did not contain an NDC.

96.     Plaintiff is not seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicare by Providers contained a HCPCS Code or J Code but did not contain an NDC.

97.     Plaintiff is seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicaid by Providers contained a HCPCS Code or J Code but did not contain an NDC.

98.     Plaintiff is not seeking damages in this litigation for reimbursement of Subject Drugs when the claim form submitted to Medicaid by Providers contained a HCPCS Code or J Code but did not contain an NDC.

99.     During the Relevant Claim Period, for purchases of drugs made pursuant to Section 340 of the federal Public Health Act, 340B Providers were required to submit their actual acquisition cost of a drug to Medicaid when seeking reimbursement of such drug.

100.    During the Relevant Claim Period, for purchases of drugs made pursuant to Section 340 of the federal Public Health Act, 340B Providers submitted their actual acquisition cost of a drug to Medicaid when seeking reimbursement of such drug.

101.    During the Relevant Claim Period, State Medicaid Programs were aware of the actual acquisition cost of drugs to 340B Providers.

102.    During the Relevant Claim Period, State Medicaid Programs were aware of the actual acquisition cost of the Subject Drugs to 340B Providers.

103.    During the Relevant Claim Period, State Medicaid Programs were aware that the actual acquisition cost of drugs to 340B Providers was less than the published AWP for those drugs.

104.    During the Relevant Claim Period, State Medicaid Programs were aware that the actual acquisition cost of the Subject Drugs to 340B Providers was less than the published AWP for those drugs.

105.    During the Relevant Claim Period, HCFA/CMS could have been aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs.

106.    During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs.

107.    During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs.

108.    During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin.

109.    During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin.

110.    During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride.

111.    During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride.

112.    During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water.

113.    During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water.

114.    During the Relevant Claim Period, HCFA/CMS were aware of the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water.

115.    During the Relevant Claim Period, HCFA/CMS had data showing the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water.

116.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs with the amount paid by Medicare Part B.

117.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for each of the Subject Drugs with the amount paid by Medicaid.

118.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin with the amount paid by Medicare Part B.

119.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott Vancomycin with the amount paid by Medicaid.

120.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride with the amount paid by Medicare Part B.

121.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sodium chloride with the amount paid by Medicaid.

122.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water with the amount paid by Medicare Part B.

123.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott sterile water with the amount paid by Medicaid.

124.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water with the amount paid by Medicare Part B.

125.    During the Relevant Claim Period, HCFA/CMS compared the prices paid by the VA, Department of Defense, and/or 340B Providers for Abbott dextrose in water with the amount paid by Medicaid.

126.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for at least some drugs did not represent the average drug acquisition costs paid by Providers.

127.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for at least some drugs exceeded the average drug acquisition costs paid by Providers.

128.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for the Subject Drugs did not represent the average drug acquisition costs paid by the Customers (*see* Complaint, ¶ 3) who submitted the claims Plaintiff alleges were false.

129.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for the Subject Drugs exceeded the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

130.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott Vancomycin did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

131.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott Vancomycin exceeded the average acquisition cost paid by the Customers who submitted the claims Plaintiff alleges were false.

132.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott Vancomycin exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

133.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott sodium chloride did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

134.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sodium chloride exceeded the average acquisition cost paid by the Customers who submitted the claims Plaintiff alleges were false.

135.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sodium chloride exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

136.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott sterile water did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

137.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sterile water exceeded the average acquisition cost paid by the Customers who submitted the claims Plaintiff alleges were false.

138.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott sterile water exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

139.    During the entire Relevant Claim Period, HCFA/CMS was aware that AWPs for Abbott dextrose in water did not represent the average drug acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

140.    During the entire Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott dextrose in water exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

141.    During some part of the Relevant Claim Period, data available to HCFA/CMS indicated that AWPs for Abbott dextrose in water exceeded the average acquisition costs paid by the Customers who submitted the claims Plaintiff alleges were false.

142.    During at least some part of the Relevant Claim Period, HCFA/CMS was aware that a reimbursement methodology based upon AWP could lead Manufacturers to market the "spread" between the acquisition costs paid by Providers and reimbursement under Medicare Part B or Medicaid.

143.    A Medicare Carrier may consult a variety of industry publications and other sources for the AWP for both single and multi-source drugs.

144.    During the Relevant Time Period, different Medicare Carriers calculated different median AWPs for the same drug at the same time.

145.    Abbott did not receive a kickback, as that term is used in 42 U.S.C. s. 1320a-7b(b) and paragraphs 5 and 17 of the Complaint, in connection with the misconduct alleged in the Complaint.

146.     In an August 6, 1968 memorandum authored by Irwin Wolkstein, Assistant
Director, Division of Policy and Standards, United States Department of Health, Education and
Welfare, Mr. Wolkstein stated that the "Red book" is a "listing of prices of manufacturers which
is often violated by volume and other discounts" and "would be subject to abuse by
manufacturers setting prices high to advantage retailers."  Attached at Tab 1 is a true and
accurate copy of that memorandum.  The memorandum was made at or near the time by, or from
information transmitted by, a person with knowledge of the contents of the memorandum, and
was made and kept in the course of regularly conducted business activity.

147.     In December 1968, a Task Force of the United States Department of Health,
Education and Welfare published a background paper on payment for prescription drugs, which
stated, among other things:  "The Red Book and Blue Book do not reflect the actual
manufacturers' prices to wholesalers and retailers, which are determined by the amounts of
various kinds of discounts."

148.     Medicaid is jointly financed by the federal and state governments and is
administered by the states.  While the Medicaid program is voluntary, states which choose to
participate must submit a state plan that fulfills requirements imposed by the Medicaid statute
and other requirements imposed by the Secretary of the United States Department of Health and
Human Services.  State Medicaid plans must be approved by the Secretary of the United States
Department of Health and Human Services.  If approved, the state becomes entitled to
reimbursement by the federal government for a portion of its payments to providers furnishing
services to Medicaid recipients.

149.     In October of 1987, the state of Louisiana proposed an amendment to Louisiana's
state Medicaid plan.  The Louisiana amendment proposed to define the Estimated Acquisition
Cost (EAC) for drugs as "the Average Wholesale Price of the drug dispensed, as reported by the
American Druggist Blue Book or other national compendia of drug prices."

150.     In a letter dated December 11, 1987, the HCFA regional office processing the
Louisiana amendment requested the Louisiana state Medicaid agency to "explain how you
concluded that AWP is your best estimate of the price generally and currently paid by providers
for drug products."

151.     On May 16, 1988, the HCFA Administrator informed the state of Louisiana that
its October 1987 proposed state plan amendment was being disapproved for lack of compliance
with federal regulations.  The Administrator explained the basis for the disapproval as follows:
"We believe there is a preponderance of evidence that demonstrates that AWP significantly
overstates the price that pharmacy providers actually pay for drug products and, thus, is not 'the
price generally and currently paid by providers.'  The continued use of AWP results in
significant potential overpayments to pharmacy providers."

152.     The HCFA Administrator sustained HCFA's May 16, 1998 disapproval of
Louisiana's October 1987 proposed amendment to its state plan after a reconsideration hearing.

The state of Louisiana appealed the decision to the United States Court of Appeals for the Fifth Circuit.

153.    Attached at Tab 2 is a true and correct copy of a brief filed on or about January 12, 1990 by the Department of Health and Human Services in the United States Court of Appeals for the Fifth Circuit in *The State of Louisiana v. The United States Department of Health and Human Services*, Case No. 89-4566 (5th Cir., July 13, 1990).  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the record, and was made and kept in the course of regularly conducted business activity.

154.    The United States Court of Appeals for the Fifth Circuit affirmed the decision of the HCFA Administrator that disapproved Louisiana's October 1987 proposed amendment to its state Medicaid plan.

155.    On August 24, 1990, the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit returned to the General Counsel for HHS the three volume record submitted to the Court in *The State of Louisiana v. The United States Department of Health and Human Services*, No. 89-4566 (5th Cir., July 13, 1990).

156.    In November 1974, HCFA issued a draft regulation calling for states to pay the lesser of a federally-set MAC or EAC plus a dispensing fee to Providers dispensing Medicaid-covered drugs.  39 Fed. Reg. 41,480 (Nov. 27, 1974).  In that draft regulation, HCFA expressly rejected AWP as the benchmark for reimbursement because AWPs "are frequently in excess of actual acquisition cost to the retail pharmacist."

157.    Commenting on the final regulation setting Medicaid reimbursement in July 1975, HCFA stated that "published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers."  40 Fed. Reg. 32,293 (July 31, 1975).

158.    As of August 15, 1975, the Secretary of HHS was aware that AWP data did not represent average acquisition costs of Providers.

159.    From 1975 through 1989, HCFA had a consistent policy to move states away from using published AWP as a basis for reimbursing providers for drugs under the Medicaid.

160.    In December 1977, HCFA issued a memorandum to state Medicaid agencies criticizing states' use of AWP as a reimbursement measure under Medicaid.  The memorandum stated, in part:  "The Department is not convinced that those states which continue to reimburse at [AWP] . . . have made a real effort to approach [actual acquisition cost]."  HCFA Action Transmittal 77-113 (MMB) (Dec. 13, 1977).

161.    As of December 1977, HHS was not convinced that states continuing to reimburse at AWP had made a real effort to approach Provider's actual acquisition costs for drugs reimbursed by Medicaid.

162.    An audit of six states conducted by HHS-OIG in 1983 found that Pharmacists' drug costs were, on average, about 16% below AWP, and that Providers paid AWP or higher in only 14 of 3,469 purchases (and on those occasions only for extenuating reasons).  Department of Health and Human Services, Departmental Appeals Board, Decision No. 1273 (Aug. 22, 1991).

163.    Prior to 1984, the Secretary of HHS lacked cumulative, well-documented evidence affirmatively demonstrating that AWP was in fact not an accurate measure of the prices generally paid by providers.

164.    After 1984, the Secretary of HHS was aware of a widening base of documented evidence demonstrating that AWP significantly overstated the Provider's acquisition costs.

165.    In or about 1984, HHS became convinced as a factual matter that there was a significant discrepancy between AWP and the actual purchase prices for drugs.

166.    In June 1984, HHS-OIG published a lengthy report of an audit of pharmacy drug purchases in six states, titled "Changes to the Medicaid Prescription Program Could Save Millions" (the "June 1984 HHS-OIG Audit Report").

167.    The June 1984 HHS-OIG Audit Report contained carefully documented evidence that average wholesale prices significantly overstated the prices that pharmacies actually paid for drugs.

168.    The June 1984 HHS-OIG Audit Report found that 99.6 percent of the 3,469 pharmacy purchases audited were made at prices averaging about 15.93 percent below AWP, as a result of purchase and trade discounts that were routinely available to purchasing pharmacies.

169.    In its June 1984 Report, the HHS-OIG recommended that HCFA revise the upper limit regulations applicable to Medicaid drug reimbursement to include a specific prohibition on use of AWP in establishing the EAC for those drugs.

170.    The June 1984 HHS-OIG Audit Report stated that "[w]ithin the pharmaceutical industry, AWP means undiscounted list price.  Pharmacies purchase drugs at prices that are discounted significantly below AWP or list price."  HCFA Medicaid Action Transmittal, No. 84-012 (Sept. 1984).

171.    The June 1984 HHS-OIG Report further advised state Medicaid agencies that "AWP cannot be the best—or even an adequate—estimate of the price providers generally pay for drugs.  AWP represents a list price and does not reflect several types of discounts."  HCFA Medicaid Action Transmittal, No. 84-012 (Sept. 1984).

172.    During the Relevant Claim Period, AWP was not an adequate estimate of the acquisition price paid for drugs by the Customers (*see* Complaint, ¶ 3) who submitted the claims Plaintiff alleges were false.

173.    During the Relevant Claim Period, AWP represented a list figure and did not reflect several types of discounts.

174.    In September 1984, HCFA sent the June 1984 HHS-OIG Audit Report to all state Medicaid agencies in order to make them aware of the potential savings that could result if states would make a greater effort to determine more closely the price pharmacists pay for drugs, rather than using AWP.

175.    In its Medicaid Action Transmittal dated September 1984 (No. 84-12), HCFA stated:  "Excessive payments are being made nationwide for the ingredient cost of prescription drugs under the Medicaid program.  The purpose of this report is to alert Department management to the opportunity for significant reductions in program expenditures if actions are taken to stop the present widespread use of [AWP] in determining program reimbursement for prescription drugs."

176.    In or about 1984, staff in HCFA's Region VI Office (comprising Arkansas, Louisiana, New Mexico, Oklahoma, and Texas) conducted reviews of pharmacy purchasing prices in Louisiana, New Mexico, Oklahoma, and Texas that provided further evidence that AWP significantly overstated prices paid by providers.

177.    The HCFA Region VI Office convened a region-level working group, composed of HCFA regional office staff and staff from state Medicaid agencies, which met in November 1984 and January 1985 to examine the use of AWP as the EAC and to develop alternate methods that could be used in arriving at more accurate estimates.

178.    During a September 4, 1985 conference call, senior officials from HCFA's central office reminded the ten HCFA regional office administrators of HCFA's policy that "states were to be free to develop and adopt any method of drug pricing that resulted in a more accurate reflection of providers' costs since no specific methodology developed at the federal level was mandated."

179.    On September 17, 1985, officials from HCFA's central office sent a model letter to regional offices, for transmittal to states, which warned:  "States that rest solely on AWPs can no longer do so and still claim that they are applying their best estimate to determining prescription drug costs as required by [the EAC regulation] unless they can provide other evidence that supports a contrary conclusion."

180.    HCFA Region IX stated in a 1986 survey report on Hawaii's Medicaid Program that HHS (then known as HEW) "believed that published [AWPs], which were being used as a

major pricing reference for reimbursement of prescription drugs in the Medicaid program, were not representative of the prices pharmacists paid for drugs."

181.    In its 1986 survey report on Hawaii's Medicaid program, HCFA stated that the survey demonstrated that "pharmacies generally purchase drugs at prices that are discounted significantly below AWP" and that "AWPs are not determined by surveying market transactions and thus do not accurately reflect prices pharmacists pay for drug products."

182.    In its 1986 survey report on Hawaii's Medicaid program, HCFA also stated that "[i]t is apparent from this review that AWP, which is the basis for the State's EAC, is not a reliable predictor of the prices pharmacists actually pay for drugs."

183.    In 1987, the Under Secretary at HHS explained to an officer of a major pharmaceutical association that AWP seldom represents true costs.

184.    In a speech given on Sept. 28, 1987 at the Symposium on the New Medicaid Regulations on Drug Reimbursement, Robert Helms, Ph.D., Assistant Secretary for Planning and Evaluation at HHS, stated, among other things, that a 1982 Task Force appointed by Secretary Schweiker identified the "clear unworkability of the MAC process," "arbitrary and unfair results," and the "artificiality" of "Red Book prices."  Attached at Tab 3 (HHC902-1078 through HHC902-1089) is a true and accurate copy of Mr. Helms' remarks.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the remarks, and was made and kept in the course of regularly conducted business activity.

185.    On April 6, 1988, HHS' position was that AWP was a figure that did not represent the price generally paid by providers.

186.    On April 26, 1988, HCFA's Region VI chief state operations officer, Don Hearn, in a letter to the Office the Director, Bureau of Eligibility, Reimbursement and Coverage, stated: "It has been repeatedly shown that AWP is an inflated figure and does not comply with [statutory requirements] that Medicaid payments be consistent with efficiency, economy, and quality of care.  We also believe that use of the AWP cannot meet the definition of EAC found at CFR 447.301, i.e. the 'agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size most frequently purchased by providers.'"  Attached at Tab 4 (HHC011-0861 through HHC001-0862) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

187.    On or about May 16, 1988, the HCFA Administrator stated in a letter disapproving Louisiana's State Plan Amendment No. 87-33:  "We believe there is a preponderance of evidence that demonstrates that AWP significantly overstates the price that pharmacy providers actually pay for drug products and, thus, is not 'the price generally and

currently paid by providers.'  The continued use of AWP results in significant potential overpayments to pharmacy providers."

188.    As of May 16, 1988, the HCFA Administrator was aware that AWP significantly overstated the price pharmacy providers actually paid for drug products.

189.    As of May 16, 1988, the continued use of AWP as the basis for reimbursing providers under Medicaid resulted in significant overpayments to pharmacy providers.

190.    On August 12, 1988, HCFA's Regional Administrator, J.D. Sconce, informed U.S. Senator Dale Bumpers in a letter that "[t]here is a preponderance of evidence that demonstrates that the published AWP significantly overstates the price that pharmacy providers actually pay for drug products and, thus, is not 'the price generally and currently paid by providers."  Attached at Tab 5 (HCC011-2189 through HHC001-2190) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

191.    On September 22, 1988, HCFA's Program Analysis Officer, Peter Rodler, testified under oath as follows:  "In early November 1983, the Secretary of [HHS] appointed a, I believe, four member task force to conduct public hearings to obtain comments from concerned individuals as to ways in which the current Medicaid drug regulations could improve.  It was a three day session in which I was present and the executive's secretary of the National Wholesale Druggist Association, which is the professional association of wholesalers that sell drugs nationwide, testified that AWP is like the sticker price on an automobile.  It is the very highest price that anyone would be expected to pay for the drug product.  I remember that statement very clearly.  Obviously I spent twelve years in reimbursement policy for the Medicaid program, and that statement has significant meaning."

192.    Also on September 22, 1988, HCFA's Region VI Medical Policy Specialist, Nancy Saltzman, testified under oath as follows:  "I don't think anyone has ever disputed the fact – or to my knowledge that I've spoken with, has ever disputed the fact that discounts are there.  I think there is –  some people believe that those discounts are not available under certain circumstances, such as you have to buy "X" number of dollars to receive those or you have to pay your bills on time or what have you.  There are various types of discounts, and we found that before and we found that again.  The OIG found the same thing.  But they're always there and I will not say always available, but if a provider meets the criteria – let me put it this way, there are things, discounts that we call routine discounts, and to us, that means those discounts are always available to the pharmacists.  They're trade discounts, as Mr. Rodler testified earlier.  The wholesalers do not consider AWP to be the price that is paid by pharmacists routinely to purchase drug products.  There are instances, we have been told, where a provider may actually pay AWP.  I have had one or two providers tell me they'll pay AWP if they have to go down the street and buy it from another provider, that product from another provider.  If they need it today or overnight and they can't get it from their primary wholesaler or manufacturer, whoever they buy it from, they may get it from a secondary source that they don't do business with all the time

or very much dollar business with, and they may be charged and pay the AWP.  But again, I would say, guessing, probably ninety to ninety-five percent of the purchases are made at prices below the AWP, and that's confirmed by what the wholesalers tell us.  Interviews with wholesalers, interview with pharmacists, in prior years, in current years."

193.    In July 1989, HCFA's Associate Regional Director for Region IX , Lawrence L. McDonough, stated as follows in a letter to the Deputy Director of California's Department of Health Services, John Rodriguez:  "While we can understand that the term 'average wholesale price' connotes what pharmacies pay for drug products, in the pharmaceutical industry it is commonly understood to be higher than actual costs.  There have been a number of studies which indicate that the published AWP overstates actual prices paid by as much as 10-25 percent because of discounts, premiums, special offers or incentives."  Attached at Tab 6 (HHC016-0747 through HHC016-0748) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

194.    HCFA's Acting Administrator, Loius B. Hays, testified before the Senate Special Committee on Aging in 1989 that "[w]hile the term 'average wholesale price' is suggestive of the amount that pharmacies actually pay for the drugs, it is in fact significantly higher than actual costs.  The average wholesale price is somewhat comparable to the manufacturer's sticker price on a new car."  Mr. Hays' prepared written statement adds:  "this is rarely the price actually paid for the car."

195.    In 1989, the Senate Special Committee on Aging issued a report stating that AWP exceeds actual drug prices.  Majority Staff Report, Special Committee of Aging, United States Senate, *"Prescription Drug Prices:  Are We Getting Our Money's Worth?,"* S. Rep. 101-49 at 11 (1989).

196.    In its 1989 Report, the Senate Special Committee on Aging stated that the Department of Veteran's Affairs received an average discount of 41% off of AWP for single source drugs and an average of 67% off of AWP for multiple source sources, and that hospitals, HMOs, and nursing homes that contract with wholesalers achieve discounts up to 99% off AWP.

197.    On or around July 31, 1989, Senator David Pryor (D-Ark) made statements in the U.S. Senate about Medicare reimbursement for drugs.  Among other things, Senator Pryor commented:  "After all the charts and all the graphs and all the words, it comes down to this: for the same bottle of prescription drugs, different buyers pay dramatically different prices.  For example, if we look at the price of the brand-name painkiller 'Motrin,' the published list price is $32.  If the new Medicare prescription drug benefit were currently in place, Medicare would pay $29.  Mr. President, the Veterans' Administration has been smart.  They have gone and dealt with drug manufacturers.  They say, 'We want a better price.'  The bottom line is that the Veterans' Administration pays a price of $5 for a bottle of capsules of Motrin.  Medicare pays $29 for the same bottle."  135 Cong. Rec. 9059 (daily ed.  July 31, 1989) (statement of Sen. Pryor).

198.     In October 1989, the HHS-OIG issued a report on Medicaid reimbursement that stated:  "[W]e continue to believe that AWP is not a reliable price to be used as a basis for making reimbursements for either the Medicaid or Medicare Programs."  *Use of Average Wholesale Price in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program* (A-06-89-00037) (Oct. 1989).

199.     Relying on the October 1989 HHS-OIG Report, HCFA revised its State Medicaid Manual to instruct State Medicaid agencies not to use AWP as a drug's EAC for Medicaid reimbursement purposes "without a significant discount being applied."  HCFA, State Medicaid Manual § 6305.1.

200.     On October 5, 1989, HCFA informed the Arkansas Department of Health Services in a letter:  "The published AWP is not an acceptable measure because it is frequently inflated and does not reflect the various incentives, sales promotions, discounts and allowances (other than discounts for cash or prompt payment) that are routine terms of purchasing in the drug marketplace."  Attached at Tab 7 (HHC010-0969 through HHC010-0970) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

201.     From 1989 to 1991, HCFA invalidated or threatened to invalidate state Medicaid programs in Louisiana, Arkansas, and Oklahoma that used undiscounted AWP as the benchmark for reimbursement and also refused to pay the federal share to such states.  *See Louisiana v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 877 (5th Cir. 1990); *In re Arkansas Dep't of Human Servs.*, 1991 WL 634857 (HHS Dept. App. Bd. Aug. 22, 1991); *In re Oklahoma Dep't of Human Servs.,* 1991 WL 634860 (HHS Dept. App. Bd. Aug. 13, 1991); *Rite Aid of Pa., Inc. v. Houstoun*, 171 F.3d 842, 847 (3d Cir. 1999).

202.     As of January 12, 1990, the position of the Secretary of HHS was that AWP significantly overstated the prices pharmacists were generally paying for prescription drugs.

203.     On May 8, 1990, Senator Pryor made the following statement in the United States Senate:  "There are two domestic markets in the U.S. for most big-selling prescription drugs: a price-competitive market, characterized by deep discounts off the published list price (benefiting the Department of Veterans Affairs, hospitals, and managed care plans, such as HMOs), and a high-priced market where retail customers, Medicare, and Medicaid purchase their prescription drugs ."  He further commented that the Department of Veterans Affairs "achieves an average discount of 41% off the manufacturer's published 'Average Wholesale Price' (AWP) for single source drugs and an average of over 60% off the AWP for multiple source drugs.  In contrast, Medicaid programs, in almost all cases, pay top dollar (or at best, AWP minus 10%) for drug products."  136 Cong. Rec. E5814 (daily ed. May 8, 1990) (statement of Sen. Pryor).

204.     On May 10, 1990, Senator David Pryor (D-Ark) made the following statement in the U.S. Senate:  "I have brought with me today two medicine bottles that illustrate the shameful situation we must correct.  I would ask my colleagues to note that these two bottles are the same.

They're the same because they contain the same quantity of the same drug to treat serious stomach ulcers--a drug called Zantac--and because they were both made by the same brand name manufacturer.  But one of these bottles was purchased by the Veteran's Administration for $34, while the other was purchased by the Medicaid program for $68.  An antiasthma medication made by Schering-Plough that is sold to the Veterans' Administration for $8 while an identical package of the drug commands three times as much--$24--from the fiscally struggling Medicaid Program.  And I could just as easily have brought in bottles of the very popular antihypertensive drug called Dyazide.  For 2 years now, the Veteran's Administration has negotiated a price of $50 for a 1,000 capsules, but Medicaid pays about $280 for the same package from the same company.  Mr. President, as talented as the negotiators at the Veterans' Affairs are, they aren't the only people getting access to good prices for prescription drugs.  Besides the vast majority of hospitals and HMO's in this country, other industrialized nations of the world are getting much better deals as well."  136 Cong. Rec. S5986 (daily ed. May 10, 1990) (statement of Sen. Pryor).

205.    In July 1990, HCFA's M. J. Christenberry, Associate Regional (Region VI) Administrator, Division of Medicare, sent a memo to HCFA's Kathleen Buto, Director, Bureau of Policy Development  that stated:  "We believe it is time to revise Medicare's drug payment policy for several reasons."  One of the reasons cited was that "[p]rices in the Red Book are inflated and do not represent physicians' and suppliers' acquisition costs" and that Red Book prices "are 'well above the prices at which supplier can purchase these factors' and 'substantial discounts are available'."  Attached at Tab 8 (HHC906-0093 through HHC906-0098) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

206.    On or around September 12, 1990, Congressmen Ron Wyden (D-Or.) and Jim Cooper (D-Tenn.) introduced a bill in U.S. House of Representatives titled the "Medicaid Prescription Drug Fair Access and Pricing Act of 1990."  In extension of remarks made in the Congressional Record, Representative Wyden stated:  "Medicaid isn't getting competitive prices because Medicaid has never required competitive prices."  He also stated that the VA paid an average of 41 percent less for drugs than the Medicaid Program, and displayed charts comparing VA prices and Medicaid reimbursement.  For single source drugs, the charts showed an example where Medicaid paid 93% more than the Federal Government.  For multi-source drugs, the chart showed percentage differences of 1130% and 5000%.  136 Cong. Rec. E2813 (daily ed. Sept. 12, 1990) (statement of Rep. Wyden).

207.    HHS' Appeals Board stated as follows in a decision on August 22, 1991:  "In the mid-1970's, HCFA had proposed to limit payment to actual acquisition costs, apparently to counter the practice of using the AWP in national drug pricing publications.  Determining actual costs was burdensome, however, and the agency ultimately decided to specify use of estimate costs in its regulations."  Department of Health and Human Services, Departmental Appeals Board, Decision No. 1273 (Aug. 22, 1991).

208.    On August 12, 1992, HCFA's Associate Regional Administrator for Region X, Albert J. Benz, wrote a memo stating:  "[B]ecause of variations in carrier calculation

methodologies, there is the potential for carriers to derive different AWP amounts from the same data.  The carriers in this region have informed us that these calculations are tremendously time consuming.  One carrier estimated that over a month of staff time was required to perform this task.  The present practice of each carrier calculating the AWP independently is duplicative, prone to errors and variances in payment amounts and <u>extremely expensive</u>.  If the costs to all the carriers are considered, they would run into the tens of thousands of dollars" (emphasis in original).  Attached at Tab 9 (HHC903-0976 through HHC903-0977) is a true and accurate copy of that memorandum.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the memorandum, and was made and kept in the course of regularly conducted business activity.

209.    An HHS-OIG report dated November 6, 1992, titled *Physicians' Costs for Chemotherapy Drugs* (A-01-91-01049), stated that "[H]igh dollar volume chemotherapy drugs are available at a cost below AWP.  For example, one of the five providers submitted a claim for drugs administered on March 7, 1991.  Analysis showed that each drug's cost was below AWP and that the total cost for the drugs claimed was 48% of AWP."

210.    A 1993 GAO report, which studied drug acquisition cost and Medicaid reimbursement in Maryland and Illinois, found that Medicaid reimbursement exceeded drug acquisition cost by 10-23% in Illinois, and by 11-34% in Maryland.  *Medicaid: Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland*, GAO Report (HRD-93-55FS) (Mar. 18, 1993).

211.    According to the GAO's 1993 report, pharmacies paid an average of 26% less than AWP for the drugs reviewed, and "HCFA and state Medicaid officials agreed that pharmacies most often use excess Medicaid reimbursements to cover their dispensing costs."

212.    In a memorandum dated November 2, 1993, the Director of the Medicare Carrier Operations Branch for Region X, Fred Rosen, stated to Carol Walton, Director, Bureau of Program Operations:  "We believe that the area of drug pricing continues to be an area where there are huge carrier fee discrepancies for the same products.  Medicare carriers have great latitude in establishing drug pricing since Medicare regulations are broad and HCPC coding does not fully reflect various drug concentrations, dosages and packages."  He also stated that the "continued use of Drug Topics Redbook or Medispan, as the source for AWP data is still a problem, since AWP data reported in these publications, by all accounts, is greatly inflated."  Attached at Tab 10 (HHC019-0291 through HHC019-0292) is a true and accurate copy of that memorandum.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the memorandum, and was made and kept in the course of regularly conducted business activity.

213.    In March 1994, the Director of HCFA's Office of Pricing Policy, Charles R. Booth, circulated a memorandum to all Medicare Regional Administrators.  Among other things, it stated:  "To help carriers determine acquisition costs for high volume drugs, we suggest that they request copies of the most current invoice from a sample of 5-10 physicians who bill for the drugs in question.  The sample can be for the entire carrier area, i.e., separate samples are not

needed for each locality.  Physicians should be asked whether there are any discounts not reflected on the invoices.  The median price (net of any discounts) paid by the sampled physicians should be considered the estimated acquisition cost."  Attached at Tab 11 (HHC903-0913 through HHC903-0916) is a true and accurate copy of that memorandum.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the memorandum, and was made and kept in the course of regularly conducted business activity.

214.    A letter addressed to all Region IV Medicare Carriers and dated May 25, 1994 states:  "In accordance with 42 CFR 405.517, carriers may, but are not required to, take into account overhead costs such as inventory and spoilage, in determining the EAC.  This could be determined based on actual cost surveys or other means.  For example, a carrier might determine that an overhead allowance of 10 percent above the material costs would be equitable in establishing the EAC."  Attached at Tab 12 (AWP057-0832 through AWP057-0833) is a true and accurate copy of that memorandum.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the memorandum, and was made and kept in the course of regularly conducted business activity.

215.    On October 17, 1994, the Chief of the Medicare Technical Issues Section, Frank J. Camozzi, wrote a letter to Susan Coonfield, Manager of Medicare Claim Administration at Aetna Life Insurance Company, that stated:  "In July [1994], because of a protest under the Reduction of Paperwork Act, the Office of Management and Budget asked that we suspend the surveys being conducted to arrive at an estimated acquisition cost.  Thus, at this time, all carrier drug pricing is based on the AWP."  Attached at Tab 13 (HHC015-1677 through HHC015-1679) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

216.    On February 2, 1995, the Chief of the Medicare Technical Issues Section, Frank J. Camozzi, wrote a letter to Celeste Brose, Supervisor, Focused Medical Review, Blue Shield of California, that stated:  "Drugs are [paid] at the lowest of the national Average Wholesale Price (AWP), Estimated Acquisition Cost (EAC) or actual charge.  As no method for arriving at the EAC has been approved, drugs are priced at AWP."  Attached at Tab 14 (HHC015-1618) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

217.    On June 23, 1995 Ven-A-Care filed a qui tam action under the False Claims Act against a number of pharmaceutical manufacturers, including Abbott, seeking money damages and civil penalties pursuant to 31 U.S.C. §§3729-3732.

218.    When Ven-A-Care filed its qui tam action on June 23, 1995, it served a copy of the Complaint, along with a written disclosure of substantially all material supporting evidence and information in its possession, upon the Attorney General of the United States in Washington, D.C.

219.    When Ven-A-Care filed its qui tam action on June 23, 1995, it served a copy of the Complaint, along with a written disclosure of substantially all material supporting evidence and information in its possession, upon the United States Attorney for the Southern District of Florida.

220.    As of June 23, 1995, the U.S. Government was aware of information that the Medicare and Medicaid programs had paid amounts for certain drugs that exceeded a Provider's acquisition cost by approximately nine hundred percent (900%).

221.    As of June 23, 1995, the U.S. Government was aware of information indicating that AWP for some drugs exceeded a Provider's actual acquisition cost by one thousand percent (1000%).

222.    As of June 23, 1995, the U.S. Government was aware of information suggesting that reimbursement rates paid by Medicare and Medicaid "acted as an inducement" for Providers to purchase drugs from Abbott and other pharmaceutical manufacturers.

223.    As of June 23, 1995, the U.S. Government was aware of allegations that "when it benefited [pharmaceutical manufacturers] to report highest prices to maximize the reimbursement amount for the providers/suppliers from the Medicare and Medicaid programs, they used false and grossly inflated prices."

224.    The June 23, 1995 qui tam action filed by Ven-A-Care contained a number of pages with information relating to drug prices and acquisition costs for drugs manufactured by Abbott.  Those pages consisted of charts, organized by drug according to NDC code, comparing Ven-A-Care's acquisition costs to Abbot's Published Prices and AWP / DP prices for Abbot drugs listed in the Red Book and the Blue Book.  These charts provided information on five of the Subject Drugs at issue in this litigation.

225.    The charts in Ven-A-Care's 1995 Complaint provided information on prices for Sodium Chloride 0.9% (NDC 00074798309), one of the Subject Drugs, indicating that Red Book and Blue Book AWP prices for the drug were between $9.29 and $10.05, while Ven-A-Care's acquisition costs were between $1.01 and $1.03.

226.    The charts in the Original Complaint provided information on prices for Vancomycin HCL (NDC 00074433201), one of the Subject Drugs, indicating that the Red Book and Blue Book AWP prices for the drug were between $27.95 and $30.23, while Ven-A-Care's acquisition costs were between $3.51 and $3.75.  In addition, Red Book and Blue Book AWP prices for Vancomycin HCL (NDC 00074653301), another of the Subject Drugs, were between $55.90 and $60.44, while Ven-A-Care's acquisition costs were between $6.40 and $7.50.

227.    The charts in the Original Complaint provided information on prices for Dextrose 5% in Water (NDC 00074792209), one of the Subject Drugs, indicating that the Red Book and Blue Book AWP prices for the drug were between $10.18 and $11.02, while Ven-A-Care's

acquisition costs were between $1.11 and $1.12. In addition, Red Book and Blue Book AWP prices for Dextrose 5% with Sodium Chloride 0.9% (NDC 00074794109), another Subject Drug, were between $11.12 and $12.04, while Ven-A-Care's acquisition costs were between $1.21 and $1.23.

228.     Starting in or around 1989, Ven-A-Care initiated communications with HCFA and State Medicaid Programs aimed at reducing governmental reimbursement for infusion and inhalation pharmaceuticals to reasonable levels. Throughout this time period, Ven-A-Care was concerned about a continuing practice of the Medicare and Medicaid programs paying exorbitant reimbursement for such drugs. Ven-A-Care believed this resulted in over one billion dollars per year of wasted federal funds.

229.     In mid-1995, representatives from Ven-A-Care traveled to HCFA in Baltimore to make a presentation regarding what they believed to be excessive reimbursements for drugs by the Medicare and Medicaid programs.

230.     Attached at Tab 15 (HHC003-0479 through HHC003-0484) is a true and accurate copy of a letter dated October 2, 1996 from Ven-A-Care to Dr. Bruce Vladeck, Administrator of HCFA. This letter was copied to Michael Theis, Esq., a Trial Attorney with the United States Department of Justice and Mark A. Lavine, Esq., of the Southern District of Florida U.S. Attorney's Office. The letter was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

231.     On or around October 2, 1996, Dr. Bruce Vladeck reviewed the October 2, 1996 letter from Ven-A-Care.

232.     The October 2, 1996 letter from Ven-A-Care contained two volumes of exhibits that Ven-A-Care believed supported its belief that the Medicare and Medicaid programs were making excessive reimbursements for infusion and inhalation drugs. These exhibits contained over 1000 pages of information relating to drug prices and acquisition costs. Included within those pages were charts, organized sequentially by J-Code, that compared Ven-A-Care's cost to acquire certain drugs and the amount allowable under Medicare in the state of Florida ("Florida Medicare Allowable").

233.     The Complaint covers eleven different J-Codes. *See* Complaint, ¶ 35. The charts comparing Ven-A-Care's cost to the Florida Medicare Allowable, sent with Ven-A-Care's October 2, 1996 letter, provided information on all but three of the J-Codes at issue in this litigation.

234.     The charts provided information relating to Vancomycin, J-Code J-3370, including information about the four Vancomycin NDC manufactured by Abbott at issue in this litigation. For NDC 00074650901, one of the Subject Drugs, the charts showed Ven-A-Care's cost at between $29.75 and $44.03 and the Florida Medicare Allowable at $129.10. For NDC

00074653301, another Subject Drug, the charts showed Ven-A-Care's cost at between $6.10 and $9.06 and the Florida Medicare Allowable at $25.82.  For NDC 00074653401, another Subject Drug, the charts showed Ven-A-Care's cost at between $3.00 and $4.84 and the Florida Medicare Allowable at $12.91.  For NDC 00074653501, another Subject Drug, the charts showed Ven-A-Care's cost at between $6.00 and $9.04 and the Florida Medicare Allowable at $25.82.

235.    The charts provided information relating to J-Codes J7030, J7040, and J7050, relating to Sodium Chloride, including drugs manufactured by Abbott.  For NDC 00074798309 (J7030), one of the Subject Drugs, the charts showed Ven-A-Care's cost at $1.03 to $2.95 and the Florida Medicare Allowable at $11.06.  For NDC 00074798303 (J7040), another Subject Drug, the charts showed Ven-A-Care's cost at $.95 to $1.55 and the Florida Medicare Allowable at $10.14.  For NDC 00074798302 (J7050), another Subject Drug, the charts showed Ven-A-Care's cost at $.95 to $1.55 and the Florida Medicare Allowable at $9.43.

236.    The charts provided information relating to J-Code J7042, 5% Dextrose/Normal Saline.  For NDC 00074794109, one of the Subject Drugs, the charts showed Ven-A-Care's cost at $1.23 to $3.05 and the Florida Medicare Allowable at $20.48.

237.    The charts provided information relating to J-Code J7051, Sterile Saline or Water.  For Subject Drugs reimbursed by Abbott, the charts showed the Florida Medicare Allowable in the range of 10 to 30 times larger than Ven-A-Care's cost.

238.    The charts provided information relating to J-Codes J7060 or J7070, 5% Dextrose in Water.  For Subject Drugs reimbursed by Abbott, the charts showed the Florida Medicare Allowable in the range of 5 to 20 times larger than Ven-A-Care's cost.

239.    In the October 2, 1996 letter from Ven-A-Care to Dr. Vladeck, Ven-A-Care noted that the failure to take action to deal with excessive reimbursement of drugs by Medicare and Medicaid would be a major embarrassment to HCFA and the U.S. Government.

240.    In the October 2, 1996 letter, Ven-A-Care contended that pharmaceutical manufacturers were falsely reporting AWP figures that allowed Providers to reap windfall profits on infusion and respiratory drugs.

241.    In the October 2, 1996 letter, Ven-A-Care contended that pharmaceutical manufacturers were falsely reporting WAC figures in order to thwart state attempts to control reimbursement for infusion and respiratory drugs.

242.    In the October 2, 1996 letter, Ven-A-Care contended that pharmaceutical manufacturers were falsely reporting pricing information as a marketing tool, and informed Dr. Vladeck that Ven-A-Care has been solicited on numerous occasions by drug manufacturers who brag about their use of false pricing information as a reason to purchase their product over a competitor's with a lower AWP.

-27-

243.    In the October 2, 1996 letter, Ven-A-Care contended that, "[w]hen in it comes to paying rebates to the State Medicaid Programs, the drug manufacturers are truthfully reporting their required cost information," resulting in lower rebates to states.

244.    In the October 2, 1996 letter, Ven-A-Care contended that, in some instances, the Medicare copayment was equal to or greater than the cost of drugs to Providers.

245.    HHS-OIG conducted audits of 11 different states in 1996 and 1997 and found that generic drugs sold at about 42.5% below AWP, while brand name drugs sold at about 18.3% below AWP.

246.    On February 1, 1996, the U.S. Department of Justice served on Abbott a Civil Investigative Demand (No. 95-125), regarding an investigation into "allegations that the corporation knowingly presented or caused to be presented false and fraudulent pricing information regarding the [AWP] of injectable pharmaceutical drugs to the Medicare and Medicaid programs, and, thus, caused to be submitted false and/or fraudulent claims to the Medicare and Medicaid Programs."

247.    A February 26, 1996 Barron's Magazine article stated:  "Much of the revenues of an oncology practice, and often most of the profits come from hefty markups of the prices of cancer drugs.  These drug mark ups which can be 60% or more, are a ready target for HMOs and the federal government's increasingly strapped Health Care financing agency."  The article also stated:  "The big bills for cancer treatment start with the manufacturers who can set high wholesale prices for chemo drugs because there is little competition," "but oncologists tack on their own profit margin when they bill for drugs.  Anecdotes abound about the size of mark ups and their importance to the profits at oncology practices."  *See "Painful Profits:  Cancer Treatment Firms May Soon See Plump Margins Slashed,"* Barron's Magazine (Feb. 26, 1996).

248.    On August 5, 1996, Dr. Grant E. Steffen of CMS wrote a letter to Jill Merrill, Medicare Program, HCFA (Denver, Colorado), that stated:  "Is it not possible for HCFA and the OMB to collaborate on a set of questions that would constitute a valid survey of acquisition costs?  Today I received Ms. Debus' letter stating that a RIL dated August 12, 1996 [sic] requested that this carrier suspend any effort to survey physicians for AC.  Until today, I was not aware of this RIL.  Two years have passed and there has been no visible attempt at collaborating on a valid survey.  Perhaps such a collaboration is more difficult than I can imagine, or perhaps this is a low-priority issue for HCFA."  Attached at Tab 16 (HHC014-0172 through HHC014-0176) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

249.    Mr. Steffen's letter also stated:  "This letter is my request to the Regional Office to recommend to HCFA that it reopen discussions with the OMB with the objective to develop a valid survey for determining the Estimated Acquisition Cost (EAC)."

250.    Ven-A-Care informed HCFA in a December 3, 1996 letter to Thomas Hoyer, Director, Office of Chronic Care and Infusion Policy, HCFA, that "grossly excessive reimbursement" for pharmaceuticals is costing Medicare a significant amount of money, including a "gross mark-up of 248%" in one instance.  Attached at Tab 17 (HHC003-0471 through HHC003-0473) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

251.    In 1997, HCFA's Grace Witles, Health Insurance Specialist, Bureau of Policy Development, wrote a letter to Senator Joe Lieberman that stated:  "The Office of the Inspector General has issued several reports indicating that, on average, Medicare pays approximately 15 percent above the cost of drugs.  In some individual cases this mark-up is much higher.  We believe that the program is intended to pay physicians for their professional services and expertise, and not to pay a profit on the drugs they furnish.  While in the past the program's payment for drugs may have included the cost of wastage and storage, etc., that will no longer be true."  Attached at Tab 18 (HHC003-0507 through HHC003-0508) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

252.    On Jan. 21, 1997 HHS-OIG issued a report, titled *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Missouri Department of Social Services*, which stated:  "[W]e determined that there is a significant difference between AWP and pharmacy acquisition costs."  Charts in the report indicated that for Missouri, the overall estimate of the extent that AWP exceeded invoice prices was 18.5% percent for brand name drugs and 46.4% for generic drugs.  The national estimates were 18.3 percent and 42.5 percent, respectively.

253.    Referring to a June 10, 1996 Barron's Magazine article entitled *Hooked on Drugs*, HHS-OIG's 1997 report stated:  "Barron's compared about 300 dose forms of the top 20 Medicare drugs and concluded that the true cost was 10 to 20 percent below AWP for brand name drugs and 60 to 85 percent below AWP for generic drugs.  Barron's also reported that industry insiders joke that AWP really means 'Ain't What's Paid.'"

254.    On May 29, 1997, HCFA's Adrienne M. Kaylor, Health Insurance Specialist, Bureau of Policy Development, informed Senator Russell Feingold that a proposal in the 1998 budget bill would require that Medicare "pay for drugs based on the physician's or supplier's acquisition cost for the drug.  In this way, the program would pay the price charged to the physician or supplier and eliminating any markup."  Attached at Tab 19 (HHC003-0498 through HHC003-0502) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

255.    On June 11, 1997 a member of the Virginia Carrier's Advisory Committee wrote a letter to HCFA that stated:  "Instead of being reimbursed by Medicare for the actual cost, the

acquisition price, [physicians] receive a far larger sum based on [AWP]. The difference between the two prices, which can be considerable, is kept by the purchaser." Attached at Tab 20 (HHC003-0514 through HHC003-0515) is a true and accurate copy of that letter. It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

256.    A June 24, 1997 House Committee Report accompanying the Balanced Budget Act of 1997 stated: "The Inspector General for the Department of Health and Human Services has found evidence that over the past several years Medicare has paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals. For example, the Office of the Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs." H.R.Rep. No.105-149, at 1354.

257.    In the Balanced Budget Act of 1997 (the "1997 BBA"), Congress adopted 95% of AWP as the benchmark of Medicare reimbursement. H. Rep. No. 105-149 at 1354 (1997).

258.    In the legislative history to the 1997 BBA, Congress acknowledged that HHS-OIG reports had found that "Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs." H. Rep. No. 105-149 at 1354 (1997).

259.    In a written response to a question posed by Senator Orrin Hatch during deliberations on the 1997 BBA, Secretary Donna Shalala stated: "Medicare pays the [AWP] for covered drugs. However, the AWP is not the average price actually charged by wholesalers to their customers. Rather, it is a 'sticker' price set by drug manufacturers and published in several commercial catalogs." *Hearing on President's Fiscal Year 1998 Budget Proposal for Medicare, Medicaid, and Welfare Before the Senate Committee on Finance*, 105th Cong. 265 (1997) (written response of Secretary Donna Shalala to questions of Senator Hatch).

260.    An October 1, 1997 internal HHS memorandum from Nancy-Ann Min DeParle, HCFA Deputy Administrator, to June Gibbs Brown, Inspector General, stated that an HHS-OIG report concluded: "The published AWPs currently used by Medicare carriers to determine reimbursement do not resemble the actual wholesale prices which are available to the physician and supplier communities that bill for these drugs." Attached at Tab 21 (AWP019-1277 through AWP019-1278) is a true and accurate copy of that memorandum. It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the memorandum, and was made and kept in the course of regularly conducted business activity.

261.    The 1997 BBA was enacted over the objections of Congressman Pete Stark, who wrote HHS on December 8, 1997 and stated: "The Administration should be congratulated for trying to achieve these savings in this year's budget bill. Unfortunately, because of aggressive, shameless lobbying Congress defeated the Administration's actual acquisition cost (AAC) proposal and you were presented with a continuation of the worthless average wholesale price system." Attached at Tab 22 (HHC001-0365 through HCC001-0366) is a true and accurate copy

of Mr. Stark's letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

262.    Following passage of the 1997 BBA, President Clinton criticized the law in a national radio address to the nation, stating:  "Sometimes the waste and abuses aren't even illegal; they're just embedded in the practices of the system.  These overpayments occur because Medicare reimburses doctors according to the published average wholesale price – the so-called *sticker price* – for the drugs.  Few doctors, however, actually pay the full sticker price."  White House Office of Press Secretary, Remarks by the President in Radio Address to the Nation, 1997 WL 767416 (White House Dec. 13, 1997).

263.    A December 1997 HHS-OIG report, titled *Excessive Medicare Payments For Prescription Drugs*, stated:  "Although Medicare's reimbursement methodology for prescription drugs does not provide for different payment rates based on geographical factors, the allowed amounts for individual drug codes varied among the carriers."  It also stated that, "[f]or some drug codes, the differences in allowed amounts were significant" and that "variations would seem to be caused by carriers' decisions regarding when to update reimbursement, what sources to use for documenting AWPs, and in the case of multiple-source drugs, which generic drugs to include in calculating the median statistic."

264.    The December 1997 HHS-OIG report stated:  "The findings of this report provide evidence that Medicare and its beneficiaries are making excessive payments for prescription drugs.  The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physicians and supplier communities that bill for drugs."

265.    On March 3, 1998, in a hearing before the House Subcommittee on Health of the Committee on Ways and Means, Congressman Pete Stark stated:  "[D]octors[] [are] opposing the President's proposal for paying for drugs on the basis of acquisition cost rather than on this so-called average wholesale price which is sort of the equivalent of the sticker price on an automobile.  If you know anybody who paid that for their car, you found somebody to sell a bridge to.  These drugs are reimbursed by Medicare at 10 times the amount the doctor pays for them."  *Reports Regarding Medicare Payment Policies: Hearing Before the Committee on Ways and Means*, 105th Cong. 31 (1998) (statement of Rep. Stark, Member, Subcomm. on Health) at 31.

266.    On October 9, 1998, Rep. Harold Ford, Jr. (D-Tn) inserted into the Congressional Record a report that stated:  "The best publicly available indictor [sic] of the prices companies charge their most favored customers, such as large insurance companies and HMOs, is the Federal Supply Schedule (FSS).  The FSS is a price catalog containing goods available for purchase by federal agencies.  Drug prices on the FSS are negotiated by the [VA].  The prices on the FSS closely approximate the prices that the drug companies charge their most favored nonfederal customers.  According to the [GAO], '[u]nder [General Services Administration] procurement regulations, VA contract officers are required to seek an FSS price that *represents*

*the same discount off a drug's list price that the manufacturer offers its most-favored nonfederal customer under comparable terms and conditions.'"  Prescription Drug Pricing in the 9th Congressional District in Tennessee:  Drug Companies Profit At The Expense of Older* Americans, 144 Cong. Rec. E2063 (October 11, 1998) (report submitted by Rep. Ford) (emphasis in original).

267.    Also, on October 9, 1998, Rep. Ford submitted into the Congressional Record results related to a certain pricing study performed in his district.  The study indicated that differences between retail prices and prices for favored customers for the top 10 drugs for senior citizens ranged from 76% to 258%, with an average differential of 115%.  The study noted that the differential for the drug Synthroid was 1,512%.  Rep. Ford's remarks also that local pharmacies "appear to have relatively small markups between the prices at which they buy prescription drugs and the prices at which they sell them.  The retail prices in Tennessee are 8% above the published national Average Wholesale Price.  The differential between retail prices and a second indicator of pharmacy costs, the prices from one wholesaler, is only 27%."  144 Cong. Rec. E2061, E2062 (daily ed. Oct. 9, 1998) (reported submitted by Rep. Ford).

268.    An HCFA employee named Fay Baier stated in an email in 1998:  "If the situation is anything like the cancer drugs, the urologists will purchase the drug for pennies on the dollar and then bill Medicare the full allowed amount; this can be quite lucrative."  Attached at Tab 23 (HHC908-1266) is a true and accurate copy of that email.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the email, and was made and kept in the course of regularly conducted business activity.

269.    On April 21, 1999, Congressman Pete Stark (D-Cal) wrote a letter to Nancy-Ann Min DePerle, the Administrator of HCFA.  In that letter, Congressman Stark strongly urged HCFA to immediately issue written guidance to State Medicaid Programs and Medicare Carriers to approve the use of new pricing information from First Data Bank relating to certain injection, infusion and inhalation drugs and biologicals.  The new pricing information was developed in connection with DOJ, HHS-OIG, HCFA, and NAMFCU.  Congressman Stark noted that every day HCFA waited to implement the new pricing information, Medicare and Medicaid wasted more money in reimbursing drugs.  Attached at Tab 24 (HHC001-0733 through HHC001-0734) is a true and accurate copy of that letter.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

270.    The Balanced Budget Act of 1997 ("BBA") required the Secretary of HHS to report to the Committees on Ways and Means and Committee of the House of Representatives and the Committee on Finance of the Senate the impact of the BBA provision establishing Medicare reimbursement for certain drugs at 95% of AWP.  On or around July 1, 1999, Donna Shalala, the Secretary of HHS, prepared and sent a "Report to Congress" with that information.  That report indicated that, for the last 13 years, OIG had issued a series of reports that consistently showed that the Medicare program overpays for drugs because the drugs can be obtained at much lower cost than the AWP.  The report also indicated that AWP was not a well-defined concept, was not regulated in any way, and bore no relationship to the prices actually

paid by physicians and suppliers to drug wholesalers in the marketplace.  The report further
noted that very few purchasers actually pay the AWP amount.

271.     Attached at Tab 25 (HHC902-0801 through HHC902-0818) is a true and accurate
copy of a report submitted to Congress by Donna Shalala, the Secretary of HHS on or about July
1, 1999.  It was made at or near the time by, or from information transmitted by, a person with
knowledge of the contents of the report, and was made and kept in the course of regularly
conducted business activity.

272.     On June 15, 1999, in an extension of his remarks regarding the proposed
Medicare Early Access Act, Rep. Pete Stark stated that the act provided for "Medicare payment
for pharmaceuticals, biologicals, or parenteral nutrients on the basis of actual acquisition cost
rather than the average wholesale price which is often far above the price at which the drug can
really be purchased."  145 Cong. Rec. E1251, E1252 (daily ed. June 15, 1999) (statement of Rep.
Stark).

273.     In September 1999, HCFA issued a Program Memorandum to Medicare Carriers
indicating that drugs not reimbursed on a cost or prospective payment basis were to based on the
lower of billed charge or 95% of AWP as published by sources such as Red Book, Blue Book, or
Medi-Span.  *See Implementation of New Payment Limit for Drugs and Biologicals*, HCFA
Transmittal Mem. AB-99-63 (Sept. 1999).

274.     In an email sent on October 5, 1999, CMS Region VI employee Margaret Cano
stated:  "In my conversation with one of the consultants from Myers and Stauffer, (Allen) he told
me that the cost of the drugs given to him did not include the discounts which were received by
the pharmacies.  He also stated that the 17.3% discount shown for the AWP was only an average,
that in reality there were much larger discounts received by some of the pharmacies.  The old
formula used by Arkansas rendered almost 100% profit."  Attached at Tab 26 (HHC010-0834) is
a true and accurate copy of that email.  It was made at or near the time by, or from information
transmitted by, a person with knowledge of the contents of the email, and was made and kept in
the course of regularly conducted business activity.

275.     On April 7, 2000, HCFA issued a Final Rule concerning, among other things,
reimbursement for drugs under the new outpatient prospective payment system ("OPPS").  65
Fed. Reg. 18,434 (April 7, 2000).  In developing the regulation, HCFA used data taken from an
external survey of hospital drug costs to establish the applicable copayment that beneficiaries
would have to pay on certain types of drugs.  65 Fed. Reg. 65 Fed. Reg. 18,481 (April 7, 2000);
66 Fed. Reg. 59,894 (November 30, 2001).

276.     In its April 7, 2000 regulation, HCFA based the copayment amount on an external
survey of hospital drug costs because the data showed, on average, that hospital drug acquisition
costs were lower than AWP.  For multi-source drugs with generic competitors, the external
survey relied upon by HCFA found that hospital drug acquisition costs were only 43% of AWP,
and for multi-source drugs without generic competitors, the survey found that hospital
acquisition costs were only 61% of AWP.  65 Fed. Reg. 65 Fed. Reg. 18,481 (April 7, 2000); 66

Fed. Reg. 59,894 (November 30, 2001).  Although the copayments paid by Medicare beneficiaries were based upon the lower acquisition costs found in the external survey, Medicare's portion of the payment for these drugs continued to be based upon the higher AWP price.  65 Fed. Reg. 65 Fed. Reg. 18,481 (April 7, 2000); 66 Fed. Reg. 59,894 (November 30, 2001).

277.    In its April 7, 2000 regulation, HCFA did not base Medicare's portion of the payment for these drugs upon the lower acquisition costs found in the external survey because it believed that doing so might conflict with statutory requirements.

278.    In its April 7, 2000 regulation, HCFA based the copayment amount on the external survey because HCFA believed the hospital acquisition drug cost figures found in the survey were a better indicator of the true acquisition costs of the drugs than AWP.

279.    In May 2000, HHS Secretary Shalala announced that Medicare would equate AWP with actual sales price, based on actual sales price data collected by the DOJ.  Letter from Donna Shalala, Secretary, HHS, to Hon. Thomas Bliley, Chairman, House Commerce Comm. (May 31, 2000) http://com-notes.house.gov/cchear/hearings106.nsf.

280.    Attached at Tab 27 (AWP010-0029 through AWP010-0032) is a true and accurate copy of a letter sent on or about May 31, 2000 by Donna Shalala, Secretary, HHS, to Hon. Thomas Bliley, Chairman, House Commerce Committee.  It was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

281.    On June 13, 2000, Nancy-Ann Min DeParle, Administrator, U.S. Department of Health and Human Services, made the following comment to the House Committee on Ways and Means:  "[T]he President has for the last four or 5 years now proposed a law to help us to be able to do this better, to make sure that we get the prices that physicians actually are paying."  She was asked by Rep. Lloyd Doggett (D-Tex):  "What you are saying is that there have been I believe four occasions when the administration has come to the Republican Congress and said please give us the tools to ensure that the taxpayer is not being ripped off and that they are paying the actual wholesale price and not some contrived wholesale price."  In response, Ms. Min DeParle stated:  "Unfortunately, yes, that is the case."  *Legislation to Cover Prescription Drugs Under Medicare: Hearing Before the Committee on Ways and Means*, 106th Cong. 103 (2000) (statements of Nancy-Ann Min DeParle, Administrator, U.S. Department of Health and Human Services and Rep. Doggett).

282.    Shortly after the Secretary's May 2000 announcement of a plan to equate AWP with prices actually paid by physicians, 89 Members of Congress wrote her to object, noting that oncologists rely on Medicare paying a markup on drugs to compensate for Medicare's underpayment of them for their professional services.  Letter from 89 Members of Congress to Donna Shalala, Secretary, HHS (July 28, 2000).  Attached at Tab 28 is a true and accurate copy of a that letter.  It was made at or near the time by, or from information transmitted by, a person

with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

283.    The 89 Members included in the July 28, 2000 letter also remarked that Congress has "repeatedly addressed" the reimbursement issue "over the past few years" and that "[i]t is disturbing that [HHS] would now seek to circumvent those congressional actions by redefining AWP."

284.    On September 5, 2000, Senator John Ashcroft stated in the U.S. Senate:  "While there are indications that drug reimbursements have often exceeded doctors' and hospitals' costs, these margins have been used to help cover costs for professional services, which are inadequately reimbursed according to the cancer community, the General Accounting Office, and HCFA itself."  146 Cong. Rec. S8022, S8022 (daily ed. Sept. 5, 2000) (statement of Sen. Ashcroft).

285.    On September 8, 2000, HCFA provided a Program Memorandum to Medicare Carriers and Medicaid Intermediaries titled *An Additional Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program*, HCFA Transmittal Mem. AB-00-86 (Sept. 8, 2000).  HCFA Program Memorandum AB-00-86 advises its Intermediaries and Carriers of "an alternative source of average wholesale price data (attached) for some drugs and biologicals covered by the Medicare program" that could the Carriers and Intermediaries "are to consider in determining the Medicare payment allowances."  The Program Memorandum stated that "[t]hese data are generally consistent with the findings from OIG reports."

286.    On September 25, 2000, Representative McHugh submitted into the Congressional Record a July 2, 2000 article by journalist Alan Emory.  This article stated, in part:  "Letters to Congress have stressed that oncologists deserve an increase above that price, not a reduction, and they point out that many hospitals and doctors cannot obtain the needed drugs at those prices.  This is not the story of greedy drug manufacturers boosting prices to the point where some Americans travel to Canada to obtain medication at reasonable prices.  It is not the story of doctors and hospitals pocketing huge markups.  It is one about a reduction or in compensation for doctors that may be cut even more to a point where the welfare of senior citizen cancer patients is endangered."  146 Cong. Rec. E1587, E1587 (daily ed. Sept. 25, 2000) (*Watertown Daily Times* news article by Rep. McHugh).

287.    On September 25, 2000, Rep. Pete Stark stated in the Congressional Record:  "Medicare has delayed reducing the level of reimbursement for various chemotherapy drugs, because of lobbying by some oncologists and drug companies that the profits are essential to cover the cost of running an oncology medical practice.  Hmmmmmmm."  146 Cong. Rec. E1578, E1578 (daily ed. Sept. 25, 2000) (statement of Rep. Stark).

288.    On November 14, 2000, HCFA issued a Program Memorandum to Medicare Carriers and Medicaid Intermediaries stating that reimbursement should be based on "the lower of the billed charge or 95 percent of the AWP as reflected in sources such as the Red Book, Price

Alert, or Medispan," and explaining that for multi-source drugs, AWP "is equal to the lesser of the median AWP of all the generic forms of the drug or biological or the lowest brand name product AWP." *Implementation of the New Payment Limit for Drugs and Biologicals*, HCFA Transmittal Mem. AB-00-110 (Nov. 14, 2000).

289.   On November 17, 2000 HCFA issued another Program Memorandum to Medicare Carriers and Medicaid suspending "until further notice" the September 8, 2000 Program Memorandum, AB-00-86, that had recommended consideration of the DOJ's alternate source for AWP data. *Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program,* AB-00-115 (Nov. 17, 2000).

290.   HCFA's November 17, 2000 Program Memorandum informed Intermediaries and Carriers that "you should **NOT** use the data attached to PM AB-00-86 in your next update of Medicare payment allowances for drugs and biologicals," but should instead "use the AWP data from your usual source." *Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program,* AB-00-115 (Nov. 17, 2000) (emphasis in original).

291.   The November 17, 2000 Program Memorandum also stated:  "While we continue to believe that the AWPs reported in the usual commercially available sources are inaccurate and inflated above the true wholesale prices charged in the marketplace, congressional action may preclude the use of this alternative source." *Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program,* AB-00-115 (Nov. 17, 2000).

292.   In December 2000, Congress enacted the *Medicare, Medicaid and SCHIP* Benefits Improvement and Protection Act of 2000 ("BIPA"), which barred the Secretary from "directly or indirectly decreas[ing] the rates of reimbursement" for drugs covered by Part B until the Comptroller General had studied the issue of Medicare drug reimbursement.  Pub. L. No. 106-554 § 429, 114 Stat. 2763 (2000).

293.   In order to implement BIPA, in May 2001 HCFA issued a Program Memorandum to Intermediaries and Carriers instructing them to continue using AWPs provided in industry publications, not to use "any alternative sources of data for average wholesale prices," and to disregard the September 2000 instruction to equate AWP with actual prices paid by providers. *See* HCFA Transmittal Mem. AB-01-66, *Implementation of Medicare Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 (BIPA) Requirements for Payment Allowance of Drugs and Biologicals Covered by Medicare* (May 3, 2001).

294.   During Relevant Claim Period, even though HCFA/CMS and HHS were aware of differences of over 100% between AWP and the average acquisition cost of Providers, HCFA/CMS and HHS believed Congressional legislation prohibited the adoption and implementation of regulations that would have caused Medicare and Medicaid to reimburse Providers at amounts that more closely approximated acquisition costs.

295.    During some part of the Relevant Claim Period, even though HCFA and HHS were aware of differences of over 100% between AWP and the average acquisition cost of Providers, HCFA and HHS believed Congressional legislation prohibited the adoption and implementation of regulations that would have caused Medicare and Medicaid to reimburse Providers at amounts that more closely approximated acquisition costs.

296.    After Congress passed BIPA, HCFA Acting Administrator Michael M. Hash wrote a letter dated November 15, 2000 to Representative Tom Bliley of the Commerce Committee of the U.S. House of Representatives.  In that letter, Mr. Hash commented that BIPA's freeze on the use of new AWP information from the United States Department of Justices "is a continuation of continuation of congressional efforts over the past several years to block Administration initiatives to lower drug prices."  Attached at Tab 29 (HHC001-0357 through HHC001-0358) is a true and accurate copy of that letter.  The memorandum was made at or near the time by, or from information transmitted by, a person with knowledge of the contents of the letter, and was made and kept in the course of regularly conducted business activity.

297.    The reports and regulations listed on Schedules A and B of Defendant Abbott Laboratories' First Set of Requests for Production of Documents and Tangible Things to Plaintiff United States of America are public records or reports that set forth activity of various agencies of the U.S. Government.

298.    On or about the time they were prepared, the U.S. Government distributed copies of those final reports listed on Schedule A of Defendant Abbott Laboratories' First Set of Requests for Production of Documents and Tangible Things to Plaintiff United States of America to Stated Medicaid directors.  If the U.S. Government cannot make this admission for all of the listed reports, please list those reports listed on that Schedule A where the U.S. Government can make the admission.

Dated:  July 12, 2006

Respectfully submitted,

_____

Mark P. Schnapp, Esq.
  Florida Bar No. 501689
Sabrina R. Ferris, Esq.
  Florida Bar No. 419273
GREENBERG TRAURIG, P.A.
1221 Brickell Avenue
Miami, Florida 33131
Telephone:  (305) 579-0541
Facsimile:  (305) 579-0717
SchnappM@gtlaw.com
FerrisS@gtlaw.com

James R. Daly, Esq.
  Admitted *pro hac vice*
Daniel E. Reidy, Esq.
  Admitted *pro hac vice*
JONES DAY
77 West Wacker
Chicago, IL  60601-1692
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
jrdaly@jonesday.com
dereidy@jonesday.com

R. Christopher Cook, Esq.
David S. Torborg, Esq.
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001
Telephone:  (202) 879-3939
Facsimile:  (202) 216-4125

*Counsel for Defendant Abbott Laboratories, Inc..*

-38-

## CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2006, a true and correct copy of the foregoing **ABBOTT LABORATORIES, INC.'S FIRST SET OF REQUESTS FOR ADMISSION TO PLAINTIFF UNITED STATES OF AMERICA AND RELATOR VEN-A-CARE OF THE FLORIDA KEYS, INC.** was served upon:

Mark A. Lavine, Esq. **(By Fed Ex)**
United States Attorney's Office
99 N.E. 4 Street
Miami, FL 33132

Renée Brooker (**By Hand**)
Assistant Director
U.S. Department of Justice
Civil Division, Fraud Section
601 D Street NW
Suite 9918
Washington, DC  20004

James J. Breen, Esq. **(By Fed Ex)**
Alison Simon, Esq.
The Breen Law Firm
3350 S. W. 148th Avenue, Suite 110
Miramar, FL 33029

_____
James R. Daly, Esq.