**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL NO. 1456 Civil Action No. 01-12257-PBS |
|  | ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) | |

**THE JOHNSON & JOHNSON DEFENDANTS' REPLY MEMORANDUM**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO CLASS 3**

**PRELIMINARY STATEMENT**

Most of the spreads on Procrit and Remicade were less than 30% and only few were higher.  This is true regardless of whether one accepts the spreads as calculated by Dr. Hartman, which the J&J Defendants dispute and which Dr. Hartman refuses to defend, or whether one accepts the corrected spreads as calculated by the J&J Defendants' expert, Mr. Dukes.

Plaintiffs offer two responses.  First, they contend that it does not matter that the Procrit and Remicade spreads were small, because Dr. Harman's "speed limit" is absolute – any excess over 30%, no matter how trivial, violates Chapter 93A.[1]  Second, they argue that Mr. Dukes' recalculations of the Procrit and Remicade spreads are incompetent and biased.[2]

Neither argument saves plaintiffs from summary judgment.

**ARGUMENT**

**I.   PLAINTIFFS CANNOT PROVE THAT THE MODEST SPREADS ON PROCRIT AND REMICADE WERE THE PROXIMATE CAUSE OF THEIR ALLEGED INJURIES**

Plaintiffs begin their argument by misstating the J&J Defendants' position. According to plaintiffs, "J&J is not claiming that it did not manipulate the spread, or that it did not market the spread for its own purposes, but rather that its manipulation of the spread did not exceed Dr. Hartman's 30% ceiling, or if they did it was not by enough to be deceptive."[3]  That is not J&J's argument, and plaintiffs know it.  The J&J Defendants deny that they "manipulated"

---

[1] *Plaintiffs' Memorandum in Opposition to the Johnson & Johnson Defendants' Motion for Summary Judgment On Class 3* ("Pls.' Mem. Opp.") at 1-2, 5 ("As Dr. Hartman explained during his deposition, the 30% liability threshold is equivalent to a speed limit, and a manufacturer is subject to liability *the moment he exceeds the limit*.") (emphasis added).

[2] *Id.* at 2-5.

[3] *Pls.' Mem. Opp.* at 2.

the spread or that the conduct plaintiffs inaccurately characterize as "marketing the spread" was improper.  In fact, the J&J Defendants have moved for summary judgment on the grounds that the evidence relating to the J&J Defendants' conduct does not come close to demonstrating a violation of Chapter 93A.[4]

For purposes of this summary judgment motion, however, plaintiffs' "manipulation" and "marketing" claims need not be decided.  The J&J Defendants are entitled to summary judgment against Class 3 because, even if Dr. Hartman's spread calculations are correct, plaintiffs have not proved – and cannot prove – that Class 3 payors would have lowered the reimbursement rate on Procrit and Remicade if they had known that a handful of spreads exceeded 30% by a few percentage points.  Without such proof, Class 3's claim under Chapter 93A fails as a matter of law.

To prevail on a claim under Chapter 93A, a plaintiff must prove that its injury was proximately caused by the defendant's alleged deception.  *Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 840 N.E.2d 526, 528 (Mass. 2006) ("proving a causal connection between a deceptive act and a loss … is an essential predicate for recovery" under Chapter 93A).  *See also The Track 1 Defendants' Memorandum In Support Of Their Motion For Summary Judgment With Respect To Class 3* at 30-33.  Here, plaintiffs allege that Class 3 was deceived because the "expected spreads" on Procrit and Remicade were 30%, but the "true spreads," while typically less than 30%, were sometimes a bit higher than 30%.  Class 3's claims thus turn on the incremental difference between the "expected" and "true" spreads.  If knowledge of the "true"

---

[4] *See The Johnson & Johnson Defendants' Memorandum in Support Of Their Motions for Summary Judgment as to Class 1 and Class 2* (Mar. 15, 2006); *Declaration of John Hoffman in Support of the Johnson & Johnson Defendants' Motion for Summary Judgment as to Class 1 and Class 2* (Mar. 14, 2006); and *Declaration of Thomas C. Hiriak in Support of the Johnson & Johnson Defendants' Motion for Summary Judgment as to Class 1 and Class 2* (Mar. 14, 2006).

1309550v1

spreads would not have caused Class 3 to lower the reimbursement rate, then Class 3 cannot

attribute its alleged injury to the alleged deception.

The weighted average spreads for Procrit and Remicade, based on the figures

supplied by Dr. Hartman, are shown below.  Most of the spreads are less than 30%, a few are a

bit higher, and the highest is 36.1%.

| Procrit Spreads Calculated Per Dr. Hartman's Dec. 2005 Report | | | | | | |
|---|---|---|---|---|---|---|
| **1991** | **1992** | **1993** | **1994** | **1995** | **1996** | **1997** |
| 22.7% | 23.6% | 25.1% | 24.1% | 27.3% | 30.1% | 27.8% |
| **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | |
| 29.4% | 27.1% | 25.6% | 27.5% | 26.7% | 30.3% | |

| Remicade Spreads Calculated Per Dr. Hartman's Dec. 2005 Report | | | | | |
|---|---|---|---|---|---|
| **1998** | **1999** | **2000** | **2001** | **2002** | **2003** |
| 30.8% | 33.4% | 31.9% | 36.1% | 33.9% | 34.3% |

Plaintiffs do not point to a shred of evidence that Class 3 payors would have

reduced their reimbursement rates for Procrit and Remicade if they had known what Dr. Hartman

says they did not know, *viz*:  that there were incremental margins of between 0.1% (Procrit,

1996) and 6.1% (Remicade, 2001).  In this context, plaintiffs' talk of "mega-spreads," and of

AWPs that exceeded acquisition cost by hundreds or even a thousand percent, rings hollow.

Whatever one thinks of very large spreads – and the evidence shows that Class 3 payors knew

about them too – plaintiffs' case against the J&J Defendants fails because plaintiffs cannot prove

that Class 3 would have acted differently if told that the "true" margins exceeded the "expected"

margins by 0.1% to 6.1%.

1309550v1

Of course, as set forth in the joint brief submitted by the Track 1 Defendants, Dr. Hartman's 30% figure is arbitrary.[5] Class 3 payors knew about spreads much larger than 30%. BCBS/MA's former Director of Pharmacy testified that he was personally aware of rebates and discounts resulting in acquisition prices up to 90% below WAC (a "spread" of 1100%). He emphasized that "I was certainly aware of these facts when working for BCBS/MA in the late 1980s and early 1990s."[6]

Moreover, BCBS/MA purchased Vepisid for use by the physicians in its staff model HMO at prices reflecting spreads up to 1265%. It purchased Albuterol at prices reflecting spreads as high as 255%. It purchased Blenoxane at a price reflecting a spread of 84%. When BCBS/MA researched proposals to adopt a specialty pharmacy program it identified spreads of 22%-67%, 150%-233%, and 616%.[7] These spreads vastly exceed the spreads on Procrit and Remicade. If knowledge of spreads in excess of 1000% did not prompt BCBS/MA to reduce its reimbursement rate, then knowledge of spreads in the range of 30.1% to 36.1% would not have prompted it to change its reimbursement rate. Plaintiffs submit no evidence to the contrary.

---

[5] It is worth recalling that Dr. Hartman's did not come up with his 30% figure until after he calculated the J&J spreads. Before he knew what the J&J spreads were, he opined that payors expected spreads up to 33%. *Declaration of Raymond S. Hartman In Support Of Plaintiffs' Motion For Class Certification* at ¶ 30.f.

[6] *See* September 21, 2006 Declaration of Edward S. Curran Jr. ¶¶ 1, 5-13, attached as Ex. 48 to the Reply Declaration of Andrew D. Schau dated September 22, 2006 submitted in support of *The Track 1 Defendants Reply Memorandum of Law In Support Of Their Motion for Summary Judgement With Respect to Class 3*.

[7] *The Track 1 Defendants' Memorandum Of Law In Support Of Their Motion For Summary Judgment With Respect To Class 3* at 14-15.

1309550v1

## II.    PLAINTIFFS' ATTACK ON THE WORK PERFORMED BY MR. DUKES IS UNFOUNDED

As noted, the J&J Defendants are entitled to summary judgment even if Dr. Hartman calculated the Procrit and Remicade spreads correctly.  Of course, the fact that Dr. Hartman steadfastly refuses to defend his calculations suggests that he knows they are incorrect.[8]

In any event, the shabby criticisms leveled by plaintiffs' counsel against Mr. Dukes and his work are unfounded and undeserved.  As Mr. Dukes explains in his accompanying declaration, Dr. Hartman has been provided with all the information he needs to replicate Mr. Dukes' calculations and ascertain for himself whether those calculations are correct.[9]  If Dr. Hartman contends that Mr. Dukes' calculations are incorrect, he should say so, and he should explain why he believes the calculations are wrong.  His failure to challenge Mr. Dukes' calculations is far more telling than counsel's recitation of Mr. Dukes' alleged deficiencies as an expert, all of which Mr. Dukes responds to and refutes in his declaration.[10]

### CONCLUSION

There is no evidence that payors in Class 3 would have lowered the reimbursement rate on Procrit and Remicade if they had known that a few spreads were 0.1% to

---

[8] *See Declaration Of Jayson S. Dukes In Support Of The Johnson & Johnson Defendants' Motion For Summary Judgment As To Class 3* at ¶¶ 5-6.

[9] *Id.* at ¶ 4.

[10] Not surprisingly, the cases plaintiffs rely on in suggesting that Mr. Dukes' caculations are unreliable are easily distinguished.  The expert in *DataQuill Ltd. v. Handspring,* 2003 WL 737785 (N.D. Ill. 2003) copied large sections of his report verbatim from plaintiff's interrogatory responses (and then lied about it).  The expert in *Irvine v. Murad Skin Research Laboratories, Inc.*, 194 F.3d 313 (1st Cir. 1999) based his analysis on facts that were demonstrably "erroneous."  Neither of these criticisms apply to the work done by Mr. Dukes.  There are no grounds for believing that Mr. Dukes copied his calculations from counsel or relied on erroneous data.  In fact, his calculations are based on the same business records and data that Dr. Hartman used to make his calculations.  *See International Adhesive Coating Company, Inc. v. Bolton Emerson International, Inc*., 851 F.2d 540 (1st Cir. 1988) (accounting expert may appropriately rely on company's business and financial records and interviews with company personnel, particularly where the adverse party also had access to those records and had ample opportunity to investigate, expose and rebut any of the expert's allegedly insupportable opinions).

6.1% over Dr. Hartman's "speed limit."  Accordingly, plaintiffs' Class 3 claim fails as a matter

of law.  The J&J Defendants' motion for summary judgment as to Class 3 should be

ALLOWED.


Dated:  September 22, 2006          /s/ William F. Cavanaugh, Jr.
                                    William F. Cavanaugh, Jr.
                                    Andrew D. Schau
                                    Erik Haas
                                    Adeel A. Mangi
                                    **PATTERSON BELKNAP WEBB & TYLER** LLP
                                    1133 Avenue of the Americas
                                    New York, New York  10036-6710
                                    (212) 336-2000

                                    *Attorneys for the Johnson & Johnson Defendants*

6

1309550v1

## CERTIFICATE OF SERVICE

I certify that on September 22, 2006 a true and correct copy of the foregoing The Johnson & Johnson Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment as to Class 3 was served on all counsel via LEXIS/NEXIS.


/s/ Andrew D. Schau
Andrew D. Schau