# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ | |
| ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE ) | Civil Action No. 01-12257-PBS |
| LITIGATION ) | |
| _____) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ) | |
| ALL CLASS ACTIONS ) | |
| _____) | |

**THE TRACK 1 DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO CLASS 3**

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT .........................................................................................................................3

I.     PLAINTIFFS CANNOT POINT TO A SINGLE PAYOR
WHO BASED ITS REIMBURSEMENT ALLOWANCE ON DR.
HARTMAN'S POSTULATED "EXPECTATION" THAT AWP
DID NOT  EXCEED ACQUISITION COST BY MORE THAN 30% .............................3

II.    PLAINTIFFS' RESPONSE CONFIRMS THAT SUMMARY
JUDGMENT MUST BE GRANTED AGAINST BCBS/MA ...........................................5

    A.    BCBS/MA Was Aware Of Drug Prices Based On Drug Purchases
Made By Or On Behalf Of Its Staff Model HMO ...................................................5

         1.    BCBS/MA Had Both Direct and Imputed Knowledge Of
The Prices Paid For Drugs Administered At Its Staff Model HMO ...........6

         2.    BCBS/MA's Refusal To Negotiate Lower Reimbursement Rates
Does Not Prove That It Was Unaware That AWP Could Exceed
Acquisition Cost By More Than 30% ......................................................10

    B.    Mr. Mulrey's Personal Understanding of AWP Is Irrelevant Because
The Knowledge Of All BCBS/MA Executives Is Imputed To BCBS/MA...........16

    C.    Plaintiffs Admit That BCBS/MA Chose To Continue To Use AWP
Rather Than Adopt A Specialty Pharmacy Program, And To Extend Its
Use of AWP To Hospitals, Despite Knowledge of Spreads In Excess
of 30% ..................................................................................................................18

         1.    Plaintiffs Admit That BCBS/MA Chose Not To Adopt A
Specialty Pharmacy Program Despite Knowledge of Spreads In
Excess of 30% .........................................................................................18

         2.    Plaintiffs Admit That BCBS/MA Chose Not To Change To
ASP-Based Reimbursement Despite Knowledge of Spreads In
Excess of 30% .........................................................................................19

         3.    Plaintiffs Admit That BCBS/MA Chose to Extend Its Use of
AWP To Hospital Out-Patient Departments Despite Knowledge
of Spreads In Excess of 30% ...................................................................20

III.     PLAINTIFFS' RESPONSE CONFIRMS THAT SUMMARY JUDGMENT
         MUST BE GRANTED AGAINST PIPEFITTERS.............................................................20

IV.      PLAINTIFFS' RESPONSE CONFIRMS THAT SUMMARY JUDGMENT
         MUST BE GRANTED AGAINST HEALTH CARE FOR ALL .....................................22

V.       DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST
         ALL THIRD-PARTY PAYORS IN CLASS 3 BECAUSE PLAINTIFFS CANNOT
         ESTABLISH CAUSATION UNDER CH. 93A AS A MATTER OF LAW ...................23

VI.      PLAINTIFFS' CLAIM FOR TOLLING OF THE STATUTE OF LIMITATIONS IS
         WITHOUT FOUNDATION.............................................................................................25

VII.     PLAINTIFFS' RESPONSE CONFIRMS THEIR FAILURE TO MITIGATE ...............31

CONCLUSION.................................................................................................................34

# TABLE OF AUTHORITIES

*Adams v. Bernard*,
  No. 001248, 2001 WL. 1470380 (Mass. Super. Sept. 6, 2001)
  *aff'd.*, 796 N.E.2d 465 (Mass. App. Ct., Sept. 23, 2003)......................................................21n

*Albrecht v. Clifford*,
  767 N.E.2d 42 (Mass. 2002) ...........................................................................................31

*Aspinall v. Philip Morris Companies, Inc.*,
  813 N.E.2d 476 (Mass.  2004) .........................................................................................23

*Baldassari v. Produce Terminal Realty Corp.*,
  361 Mass. 738, 282 N.E.2d 649 (Mass. 1972)....................................................................8

*Betances v. Sea-Land Service, Inc.*,
  248 F.3d 40 (1st Cir. 2001)..............................................................................................4

*Bockser v. Dorchester Mut. Fire Ins. Co.*,
  327 Mass. 473, 99 N.E.2d 640, 642 (1951)…………………………………………………..9

*Bolduc v. Beal Bank, SSB*,
  994 F. Supp. 82 (D.N.H. 1998)........................................................................................9

*Bowen v. Eli Lilly & Co., Inc.*,
  557 N.E.2d 739 (Mass. 1990) .........................................................................................30

*Cambridge Plating, Co., Inc. v Napco, Inc.*,
  85 F.3d 752 (1st Cir. 1996)............................................................................................31

*Carreiro v. Rhodes Gill & Co.*,
  68 F.3d 1443 (1st Cir. 1995)............................................................................................4

*Catrone v. Thoroughbred Racing Associates of North America, Inc.*,
  929 F.2d 881 (1st Cir. 1991)..........................................................................................26

*Commonwealth v. TLT Constr. Corp.*,
  No. 96-2281 1999 Mass. Super. LEXIS 252 (Mass. Supp. Ct., Jun. 25, 1999) ....................33

*DeVaux v. American Home Assurance Co.*,
  387 Mass. 814, 444 N.E.2d 355 (1983) ...........................................................................18

*DiVenuti v. Reardon*,
  637 N.E.2d 234 (Mass. App. 1994) ...............................................................................31

*Dinjian v. Dinjian*,
495 N.E.2d 882 (Mass. App. Ct. 1986) ...................................................................................24

*Duco Associates, Inc. v. Lipson*,
416 N.E.2d 555 (Mass. App. Ct. 1981) ...................................................................................27

*Frank Cooke, Inc. v. Hurwitz*,
406 N.E.2d 678 (Mass. App. Ct. 1980) ...................................................................................27

*Fraser Engineering Co., Inc. v. Desmond*,
26 Mass. App. Ct. 99, 524 N.E.2d 110 (1988) .......................................................................23

*Friedman v. Jablonski*,
358 N.E.2d 994 (Mass. 1976) ..................................................................................................27

*GrassRoots Recycling Network, Inc. v. U.S. E.P.A.*,
429 F.3d 1109 (D.C. Cir. 1995)...............................................................................................23

*Greenray Indus., Inc. v. Charleswater Products, Inc.*,
No. 88-2566-Z, 1990 U.S. Dist. LEXIS 2568 (D. Mass. 1990) .............................................33

*Gunderson & Son, Inc. v. Cohn*,
596 F. Supp. 379 (D. Mass. 1984) ...........................................................................................32

*Hanson Hous. Auth. v. Dryvit System, Inc.*,
560 N.E.2d 1290 (Mass. App. Ct. 1990) .................................................................................30

*Haufler v. Zotos*,
446 Mass. 489, 845 N.E.2d 322 (Mass. 2006).........................................................................6

*Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*,
840 N.E.2d 526 (Mass. 2006) ..................................................................................................23

*Int'l Totalizing Sys., Inc. v. PepsiCo, Inc.*,
29 Mass. App. Ct. 424, 560 N.E.2d 749 (Mass. App. Ct. 1990) ..............................................9

*Keane, Inc. v. Swenson*,
81 F. Supp. 2d 250 (D. Mass. 2000) ........................................................................................31

iv

*Knapp Shoes, Inc. v. Sylvania Shoe Mfg., Corp.*,
72 F.3d 190 (1st Cir. 1995) ..................................................................29, 31

*Lavely v. Trustees of Boston Uni.*,
1987 U.S. Dist. LEXIS 8582 (D. Mass. 1987) ......................................33

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ..............................................................................22, 23

*In re Lupron Mktg. & Sales Practices Litig.*,
228 F.R.D. 75 (D. Mass. 2005) .............................................................30

*Madan v. Royal Indem., Co.*,
532 N.E.2d 1214 (Mass. App. Ct. 1989) ..............................................24

*Maggio v. Gerard Freezer & Ice Co.*,
824 F.2d 123 (1st Cir. 1987) .................................................................25, 30

*Malapanis v. Shirazi*,
487 N.E.2d 533 (Mass. App. Ct. 1986) ................................................26

*Markarian v. Connecticut Mut. Life Ins., Co.*,
202 F.R.D. 60 (D. Mass. 2001) .............................................................23

*Maryland Highways Contractors Ass'n, Inc. v. State of Md.*,
933 F.2d 1246 (4th Cir. 1991) ..............................................................23

*Mass. Farm Bureau Fed'n v. Blue Cross of Mass.*,
532 N.E.2d 660 (Mass. 1989) ...............................................................23, 24

*Mass. v. Philip Morris, Inc.*,
No. 957378J, 1998 WL. 1181992 (Mass. Super. Ct. 1998) ................8

*New England Trust Co. v. Bright*,
274 Mass. 407, 174 N.E. 469 (1931) ...................................................17

*New England Trust Co. v. Farr*,
57 F.2d 103 (1st Cir. 1932) ...................................................................21

*Paloeian v. Day*,
299 Mass. 586, 13 N.E.2d 398 (1938) .................................................17

*Paul Revere Life Ins., Co. v. Fish,*
   910 F. Supp. 58 (D.R.I. 1996) ................................................................21

*In re Pharm. Indus. Average Wholesale Price Litig.,*
   307 F. Supp. 2d 196 (D. Mass. 2004) ......................................................25

*RSA Media, Inc. v. AK Media Group, Inc.,*
   260 F.3d 10 (1st Cir. 2001) .....................................................................33

*Rafferty v. Mills,*
   No. 93-03831 1995 WL. 809915 (Mass. Super. Ct. 1995) .......................7

*Salois v. Dime Sav. Bank of NY,*
   No. 95-11967-PBS 1996 WL. 33370626 (D. Mass. Nov. 13, 1996) ........30

*Sarna v. American Bosch Magneto Corp.,*
   290 Mass. 340, 195 N.E. 328 (1935) .......................................................17

*Savers Prop. & Cas. Ins., Co. v. Admiral Ins. Agency, Inc.,*
   807 N.E.2d 842 (Mass. App. 2004) ..........................................................31

*Sawyer v. Indevus Pharms., Inc.,*
   No. 03-5028-B, 2004 WL. 1739405 (Mass. Super. Ct. July 26, 2004) .....29

*State Res., Corp. v. Architectural Team, Inc.,*
   433 F.3d 73 (1st Cir. 2005) ......................................................................32

*Sunrise Prop. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.,*
   425 Mass. 63, 679 N.E.2d 540 (Mass. 1997) ...........................................17

*Swanson v. Bankers Life Co.,*
   389 Mass. 345 (1983) ...............................................................................24

*Tagliente v. Himmer,*
   949 F.2d 1 (1st Cir. 1991) .................................................................23, 24, 25

*Thompson v. Metro. Life Ins. Co.,*
   149 F. Supp. 2d 38 (S.D.N.Y. 2001) ........................................................29

*Torres v. Pisano,*
   116 F.3d 625 (2d Cir. 1997) .....................................................................21

*U.S. v. AVX Corp.,*
   962 F.2d 108 (1st. Cir. 1992) ...................................................................23

vi

*U.S. v. Bank of New England*,
    821 F.2d 844 (1st Cir. 1987) ...................................................................17

*U.S. v. President & Fellows of Harvard College*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ....................................................21

*Veranda Beach Club Ltd., P'ship v. West. Sur., Co.*,
    936 F.2d 1364 (1st Cir. 1991) ...............................................................32

*Whitcomb v. Pension Dev. Co., Inc.*,
    808 F.2d 167 (1st Cir. 1986) ..................................................................30

*Winlake II, Inc. v. Mercier*, 21 Mass. L. Rep. 166
    No. MICV2005-00043-C 2006 Mass. Super. LEXIS 225
    (Mass. Super. Ct. May 3, 2006) ............................................................24

*Wise v. Hubbard*,
    769 F.2d 1 (1st Cir. 1985) ...............................................................27, 30

*Wolinetz v. Berkshire Life Ins. Co.*,
    361 F.3d 44 (1st Cir. 2004) ....................................................................29

*Young v. Lepone*,
    305 F.3d 1 (1st Cir. 2002) ......................................................................29

## STATUTES

Mass. Gen. Laws. Ann. ch. 260, § 12 ...........................................................30

## MISCELLANEOUS

6 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations
§2585.10 (2005 rev. ed.) ................................................................................7

1306555v4

## PRELIMINARY STATEMENT

Plaintiffs said their Class 3 case was simple. They said payors uniformly regarded AWP as a signal for provider acquisition cost, and "expected" that it would not exceed acquisition cost by more than 30%. These expectations would be proven by deposition testimony and surveys.

The case is simple, but not in the way plaintiffs envisioned. The discovery record flatly contradicts plaintiffs' liability theory. Not a single payor testified that its reimbursement allowance was based on the expectation that AWP exceeded acquisition cost by no more than 30%. Most large Massachusetts insurers, including BCBS/MA, purchased drugs for their staff model HMOs at discounts yielding spreads larger than 30%. A number of BCBS/MA witnesses said they knew that doctors often received substantial discounts. Other payors also testified that they knew about spreads, or that spreads were irrelevant to their negotiations with doctors. And plaintiffs never did conduct a survey.

In response, plaintiffs submit affidavits from a couple of BCBS/MA executives who say they thought AWP was an actual average of wholesale prices. What these particular employees knew or did not know is irrelevant, because other BCBS/MA executives knew that AWP was not an average of wholesale prices. As a legal matter, BCBS/MA is charged with the knowledge of *all* of its executives, not just those who knew the least about AWP. It is undisputed that a number of high-ranking BCBS/MA executives actually knew about spreads in excess of 30%.

At the very least, sophisticated health insurers like BCBS/MA should have known about spreads in excess of 30%. These payors cannot turn a blind eye to their own HMO purchases, the knowledge of their fellow employees, and the copious public record. These

information sources revealed that many providers received discounts and rebates that lowered their net acquisition cost. The members of Class 3 cannot establish causation under Ch. 93A if they knew or should have known of significant differences between acquisition cost and AWP.

Pipefitters' claim also fails. Pipefitters hired BCBS/MA as its agent for purposes of administering its health plan, because BCBS/MA had knowledge and expertise that Pipefitters lacked. Thus, what Pipefitters itself knew or did not know about AWP is irrelevant. BCBS/MA's knowledge as agent is imputed to Pipefitters as principal. In addition, because BCBS/MA rather than Pipefitters made the decision to use AWP as a reimbursement benchmark, Pipefitters' lack of knowledge concerning AWP was not the proximate cause of its alleged injury.

Finally, the claim by Health Care For All fails because it cannot prove that any of its members suffered "injury-in-fact." Health Care For All admits it has no evidence its members were injured. Rather, it says it "believes" its members were injured because they are interested in health care policy issues. Mere belief in injury is insufficient to confer standing as a matter of law.

## ARGUMENT

I.    **PLAINTIFFS CANNOT POINT TO A SINGLE PAYOR WHO BASED ITS REIMBURSEMENT ALLOWANCE ON DR. HARTMAN'S POSTULATED "EXPECTATION" THAT AWP DID NOT EXCEED ACQUISITION COST BY MORE THAN 30%**

Plaintiffs' Class 3 liability theory rests entirely on Dr. Hartman's opinion that private payors expected AWP to exceed acquisition price by no more than 30%. According to plaintiffs, this so-called "speed limit" provides a "bright line test" for liability under Ch. 93A. Notably, this "speed limit" is not found in the statute. It is not based on a survey.[1] It is not based on scientific literature.[2] It is not supported by deposition testimony[3]; indeed it is not affected by contrary deposition testimony.[4] Rather, the number was simply "determined" by Dr. Hartman:

> The 30% spread threshold determined by Plaintiffs' economics expert, Dr. Raymond Hartman, is a bright line test, equivalent to a speed limit. Dr. Hartman explained that the market understood, and expected, up to a 30% spread between AWP and actual acquisition cost of physician-administered drugs. AWPs that exceed the 30% threshold are considered deceptive.[5]

---

[1] Dr. Hartman originally promised to base his testimony on surveys. *See* Declaration of Raymond S. Hartman In Support of Plaintiffs' Motion for Class Certification dated September 3, 2004 ("Hartman 9/3/04 Report") at ¶¶ 21, 33. *See also* Memorandum and Order Re: Motion for Class Certification dated August 16, 2005 [Docket No. 1648] at 64 (noting that Dr. Hartman originally promised that "as a cross-check, he will compare the calculated "but-for" spread with industry wide surveys.").

[2] *See* Declaration of Daniel L. McFadden dated March 21, 2006 at ¶¶ 42-55. *See also id.* at ¶¶ 56-87.

[3] Dr. Hartman originally promised that he would base his opinion on deposition testimony. *See* Hartman 9/03/04 Report at ¶ 29 ("Of course, final yardstick spreads to be used to determine injury and damages during the Damages Phrase of this Litigation would take these yardstick estimates as points of departure and refine them further though …depositions of appropriate personnel in TPPs and managed care organizations. Such further refinement will more precisely determine expectations concerning a non-fraudulent relationship between AWP and ASP.")

[4] *See* Reply Declaration of Andrew D. Schau dated September 22, 2006 ("Schau Reply Decl.") Ex. 45 (February 27, 2006 deposition of Raymond Hartman) at 781:15-:782:3 (stating that payor deposition testimony doesn't "provide sufficiently scientific evidence to be incorporated into what I have done here."). *See also id.* at 739:1-781:14 (discussing specific payor testimony refuting expectations).

[5] Plaintiffs' Memorandum in Opposition to the Johnson & Johnson Defendants' Motion for Summary Judgment On Class 3 at 1-2 (citation omitted).

3

Plaintiffs had no shortage of opportunities to develop a record in support of Dr. Hartman's theory. Dozens of payors were subpoenaed for documents and deposition testimony. Indeed, plaintiffs argued that defendants subpoenaed so many payors that it looked like defendants were taking a complete "census," not merely a "representative sample."[6]

With all this discovery in hand, one would expect that plaintiffs could provide at least some deposition testimony from payors affirming that they based their reimbursement allowance on the expectation that AWP did not exceed the physicians' acquisition costs by more than 30%. Plaintiffs did not submit such testimony because there is none. To the contrary, payor after payor denied believing that AWP bore a predictable relationship to acquisition cost.[7] For example, a Health Net corporate representative agreed that Dr. Hartman's theory was "an inaccurate assumption that lacks any foundation whatsoever."[8]

Moreover, four of the five major Massachusetts health insurers – BCBS/MA, Harvard Pilgrim Health Care ("Harvard Pilgrim"), Cigna Healthcare of Massachusetts ("Cigna") and Fallon Community Health Plan ("Fallon") – purchased Track 1 drugs for their staff model

---

[6] *See* Schau Reply Decl. Ex. 46 (Transcript of February 2, 2006 Hearing Before Magistrate Judge Bowler) at 24-25 ("Defendants have already taken over 40 health plans covering over 50% of the covered lives in the United States. It really begs the question at this point now that they have obtained all of the health plans discovery that constituted their representative sample why are they back here now seeking further discovery of four Massachusetts health plans.… This isn't a representative sample, Your Honor. This is a census that they are seeking.")

[7] *See* The Track 1 Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment With Respect to Class 3 ("Defs.' Mem.") at 17-23.

[8] *See* Declaration of Andrew D. Schau dated July 14, 2006 filed in support of The Track 1 Defendants' Motion for Summary Judgment With Respect to Class 3 ("Schau Decl.") Ex. 29 (February 1, 2006 deposition of Scott Wert) at 35:17-37:17. Plaintiffs ignore this and all other similar testimony from health insurers in their brief. In their Rule 56.1 statement, they make grudging admissions such as "this is the testimony" but "counter state that Humana [sic] expected AWP to be accurate." *See* Responses to Statements 66, 69-73. These "counter statements" – which have no basis and run directly contrary to the record evidence – should be disregarded because they not supported by "page references to affidavits, depositions and other documentation" as required by Local Rule 56.1. *See also Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1446 (1st Cir. 1995) ("Properly supported facts set forth by the moving party are deemed admitted unless controverted by the factual statement of the opposing party."); *Betances v. Sea-Land Service, Inc.*, 248 F.3d 40, 44 (1st Cir. 2001) ("Bombast and bluster, wholly detached from verified facts of record, cannot serve to blunt the force of a movant's statement of undisputed facts.").

HMOs at prices at or close to their ASPs.[9]  Plaintiffs respond that, in the case of BCBS/MA, these purchases were made by the HMO subsidiary, not by BCBS/MA.  In fact, at least some of the drug purchases were made by BCBS/MA directly.  *See* pp. 5-9, *infra*.  But even assuming *arguendo* that BCBS/MA was in the dark about the prices paid for drugs administered by its own HMO clinics, there is no record that Harvard Pilgrim, Cigna and Fallon were unaware of the prices paid for the drugs administered in their staff model HMO clinics.[10]

In sum, the discovery record uniformly contradicts plaintiffs' assertion that payors expected that AWP exceeded acquisition cost by no more than 30%.

## II. PLAINTIFFS' RESPONSE CONFIRMS THAT SUMMARY JUDGMENT MUST BE GRANTED AGAINST BCBS/MA

### A. BCBS/MA Was Aware Of Drug Prices Based On Drug Purchases Made By Or On Behalf Of Its Staff Model HMO

BCBS/MA knew about spreads because it purchased Track 1 physician-administered drugs throughout the 1990s at discounts as high as 92.7% below AWP [a "spread" of 1,265%].[11]  Plaintiffs do not deny that purchases were made at steeply discounted prices.  Rather, they claim that these purchases were made by individuals employed by the staff model HMO subsidiary, not by BCBS/MA, and hence BCBS/MA did not know about them.[12]  Plaintiffs also contend that the mere fact that BCBS/MA reimbursed at rates higher than ASP proves that

---

[9] *See* Defs.' Mem. at 3-6, 17-20.

[10] In their responsive Rule 56.1 statement, plaintiffs either deny the relevance of statements of undisputed facts relevant to these other health insurers' drugs purchases (Response to Statement 63), deny them without citing any contrary record evidence (Responses to Statements 64 and 65), or admit them by failing to respond to them (Statement 94).  These responses are all deemed admissions as a matter of law. *See* fn 8 above.

[11] *See* Defs.' Mem. at 3-6.  BCBS/MA also purchased Track 2 physician-administered drugs at prices ranging from 32% to 90% below AWP [resulting in "spreads" of 47% to 900%].  *See* Track 2 Defendants Memorandum in Opposition to Class Certification at 10, fn 54 (citing Young Decl. ¶ 97 and Exhibits 5a and 5b.)

[12] Plaintiffs' Memorandum in Opposition to the Track 1 Defendants' Motion for Summary Judgment With Respect to Class 3 ("Pls.' Mem. Opp.") at 5.

BCBS/MA could not have known how much its staff model HMO was paying for drugs.[13]  Both arguments fail.

> ### 1.    BCBS/MA Had Both Direct and Imputed Knowledge Of The Prices Paid For Drugs Administered At Its Staff Model HMO

Plaintiffs are mistaken when they say that only the staff model HMO, and not BCBS/MA, purchased physician-administered drugs.  At least during the period 1990-1993, the purchase contracts for drugs administered at the staff model HMO were signed by Sharon Smith.  Ms. Smith was employed *by BCBS/MA* as BCBS/MA's Vice President for Network Delivery Management.[14]  Ms. Smith was "the person in the company with overall responsibility for the operation of the staff model HMO."[15]  Ms. Smith says she personally "signed all the contracts that had to do with Medical East and Medical West," including drug purchase contracts, above a dollar threshold.[16]  Indeed, a sample purchase contract bearing her signature was marked as an exhibit at her deposition.[17]

To be sure, Ms. Smith testified that she did not read the drug purchase contracts she signed, because she assumed that someone else in her department read them.[18]  But whether she or someone else read the contracts is irrelevant.  Ms. Smith and BCBS/MA are charged with knowledge of the contracts' terms as a matter of law.  *See Haufler v. Zotos*, 446 Mass. 489, 501, 845 N.E.2d 322, 333 (Mass. 2006) (quoting *Wilkisius v. Sheehan*, 258 Mass. 240, 243, 155 N.E.

---

[13] Pls.' Mem. Opp. at 6, 25-32, citing Declaration of Raymond S. Hartman in Response to Dr. Gaier's Declaration in Support of the Track 1 Defendants' Joint Motion for Summary Judgment with Respect to Class 3 ("Hartman 8/29/06 Report").

[14] *See* Schau Reply Decl. Ex. 47 (additional excerpts from April 14, 2006 deposition of Sharon Smith) at 10:7-10.  *See also* Schau Decl. Ex. 1 (originally submitted excerpts from Smith Tr.) at 20:9-21:6.

[15] *See* Schau Decl. Ex. 1 (Smith Tr.) at 20:9-21:6, 22:13-17.

[16] *See* Schau Reply Decl. Ex. 47 (Smith Tr.) at 31:4-32:6, 33:3-7.

[17] Schau Decl. Ex. 3.

[18] *See* Schau Reply Decl. Ex. 47 (Smith Tr.) at 31:4-32:6, 35:20-36:9.

6

5 (1927)) ("The general rule is, that, in the absence of fraud, one who signs a written agreement is bound by its terms whether he reads and understands it or not."); *Rafferty v. Mills*, No. 93-03831, 1995 WL 809915, at *2 (Mass. Super. Ct. 1995) (citing *Cormier v. Central Massachusetts Chapter of National Safety Council*, 416 Mass. 286, 289 (1993)) ("Under Massachusetts law, a person signing what is obviously a legal document is presumed to know and understand its contents."). *See also* 6 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 2585.10 (2005 rev. ed.) ("A party may not sign a contract and thereafter assert ignorance or failure to read the contract as a defense.").

Ms. Smith was not the only BCBS/MA employee who signed contracts to purchase drugs for use at BCBS/MA's staff model HMO. Mr. Edward S. Curran, Jr., BCBS/MA's former Director of Pharmacy, has submitted a declaration stating that, between 1988 and 1992, while employed by BCBS/MA, he personally negotiated and co-signed contracts with drug manufacturers to purchase drugs at steep discounts for use at BCBS/MA's staff model HMO.[19] Mr. Curran's testimony flatly refutes plaintiffs' contention that BCBS/MA and its staff model HMO were so separate that BCBS/MA was unaware of the prices it was paying for drugs administered at its staff model HMO:

> "Throughout the time period I worked at BCBS/MA, my responsibilities included negotiating with drug manufacturers for rebates and discounts on the drugs BCBS/MA purchased for use at its staff model HMO sites. I was also one of the signatories on those contracts once they were finalized. I do not now recall the range of rebates and discounts we achieved on our drug purchases, but they varied widely from drug to drug. I was also responsible for managing the staff model HMO pharmacy sites.
>
> As discussed above, I worked as the Director of Pharmacy for BCBS/MA. Put another way, I was employed by BCBS/MA, not

---

[19] *See* Schau Reply Decl. Ex. 48 (Declaration of Edward S. Curran, Jr. dated September 21, 2006 (hereafter "Curran Decl.")) ¶¶ 1, 15-16.

by the staff model HMO, Medical East/Medical West.  However,
people at the staff model HMO and BCBS/MA worked closely
together.  Indeed, I was never quite sure whether there was a
distinction between the two.  I spoke to and worked with people at
the staff model sites all the time, there was free sharing of
information, and employees moved back and forth between the
organizations.  We worked together under one big umbrella."[20]

This unequivocal testimony proves that BCBS/MA itself negotiated and signed at
least some purchase contracts for drugs used at its staff model HMO.  BCBS/MA's sole basis for
claiming that the HMO contracts were not signed by BCBS/MA is the declaration of Maureen
Coneys, who says the contracting "would have been done" by "Medical West employees."[21]
This testimony is clearly speculative.  At her deposition, Ms. Coneys admitted that she had no
memory as to what department, division, individuals or part of the organization made these
purchases.[22]

But even assuming *arguendo* that BCBS/MA was ignorant of the discounted
prices paid for drugs administered at its subsidiary HMO, that fact would not save BCBS/MA
from summary judgment.  In these circumstances, Massachusetts law imputes the subsidiary's
knowledge to the parent.  *See Massachusetts v. Philip Morris, Inc.*, No. 957378J, 1998 WL
1181992, at *2 n.2 (Mass. Super. Ct. 1998) ("While, absent an agency relationship or piercing
the corporate veil, the court may not attribute to B.A.T. Industries p.l.c. what its subsidiaries *did*,
it may impute to B.A.T. Industries p.l.c. the knowledge that its subsidiaries had on these
matters." (emphasis in original)); *Baldassari v. Produce Terminal Realty Corp.*, 361 Mass. 738,
743, 282 N.E.2d 649, 652 (Mass. 1972) ("[W]e are of opinion that there was a sufficient nexus
between [parent] and [subsidiary] so that, within G.L. c. 84, s 21, notice to [parent] constituted

---

[20] *Id*. at ¶¶ 15-16.

[21] Declaration of Maureen Coneys in Support of Plaintiffs' Opposition to Track 1 Defendants' Motion for
Summary Judgment With Respect To Class 3 (hereafter "Coneys Decl.") at ¶ 11.

[22] *See* Schau Decl. Ex. 2 (April 12, 2006 deposition of Maureen Coneys) at 50:14-51:13.

1306555v4

notice to [subsidiary] as a matter of law."); *Bolduc v. Beal Bank, SSB*, 994 F.Supp. 82, 93 (D.N.H. 1998) ("LAC is a wholly owned subsidiary of Beal Bank, and LAC's knowledge may be imputed to Beal Bank."). *See also International Totalizing Systems, Inc. v. PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 433-34, 560 N.E.2d 749, 755 (Mass. App. Ct. 1990) ("It is well settled that, '[w]hen an agent acquires knowledge in the scope of her [or his] employment, the principal ... is held to have constructive knowledge of that information.'"); *Bockser v. Dorchester Mut. Fire Ins. Co.*, 327 Mass. 473, 477-478, 99 N.E.2d 640, 642 (1951) ("notice to, or knowledge of, an agent, in the course of the transaction in which he is acting for his principal, is constructive notice to, or knowledge of, the principal.") (Citations omitted).

In any event, there is no doubt that BCBS/MA had ready access to drug pricing information.  If, as BCBS/MA now says, purchase price information was "not the type of information that would have *typically* been made available to BCBSMA employees,"[23] that would only be because BCBS/MA's employees did not ask for it.  According to Mr. Curran, the parent and its subsidiary HMO worked together closely.[24]  Employees freely moved from one entity to the other.[25]  Certainly there was nothing to stop BCBS/MA from asking its HMO employees what the purchase prices were.  If BCBS/MA was indifferent to the prices physicians

---

[23] Coneys Decl. at ¶ 12 (emphasis added).

[24] Curran Decl. at ¶¶ 15-16.

[25] Ms. Coneys herself is a good example.  She first worked as Executive Director for the Medical East Community Health Center Site in Braintree from 1987 to 1991.  *See* Schau Reply Decl. Ex. 49 (additional excerpts from April 12, 2006 deposition of Maureen Coneys ("Coneys Tr.")) at 36:5-10, 40:17-19.  She then moved into the parent organization and has worked in various positions including Regional Executive Director for HMO Blue, Deputy Director of Blue Cross Blue Shield of Massachusetts and New Hampshire LLC, VP for Government Programs, and Senior Vice President for Health Care Quality and Cost.  *Id.* at 8:11-21, 44:13-19, 94:14-19, 98:5-11.  Ms. Coneys testified she continued to work with the staff model HMO while at the parent organization.  *Id.* at 44:13-45:5.  Indeed, she worked on HMO Blue, a product that epitomized the seamless interface in that patients could seek treatment at either the staff model sites or other sites with which BCBS/MA contracted.  (*Id.* at 44:13-45:5, 73:21-75:19; Schau Reply Decl. Ex. 47 (Smith Tr.) at 47:3-22).  *See also* Curran Decl. ¶¶ 15-16.

paid to acquire drugs it likely was because BCBS/MA knew its reimbursement allowance was
competitive in view of what physicians were willing to accept.[26]

### 2.   BCBS/MA's Refusal To Negotiate Lower Reimbursement Rates Does Not Prove That It Was Unaware That AWP Could Exceed Acquisition Cost By More Than 30%

In his rebuttal report, Dr. Hartman opines that BCBS/MA *must not* have known
about drug prices because it *did not* reduce its reimbursement rate to ASP, which he contends it
*would have* done if aware of staff model HMO drug purchase prices.[27]  This conclusion turns on
Dr. Hartman's assumption that "BCBSMA provider [drug] reimbursement rates are designed to
reflect acquisition cost of the network providers being reimbursed."[28]

Dr. Hartman's assumption is wrong.  If BCBS/MA intended to reimburse
physicians at acquisition cost, it certainly would have shifted to ASP-based reimbursement
without changing administration fees in 2004, when it considered implementing ASP and was
admittedly aware of "large spreads." [29]  But BCBS/MA expressly rejected a move to

---

[26] For example, Dr. James Fanale – who worked at BCBS/MA from 1999 to 2004 as Senior Vice
President for Provider Partnerships and then Chief Medical Officer – testified that BCBS/MA raised its
reimbursement rates to physicians around 1999 because BCBS/MA's competitors were paying doctors
more than BCBS/MA and he felt an increase was needed to maintain a competitive edge.  *See* Schau
Reply Decl. Ex. 50 (June 9, 2006 deposition of James Fanale ("Fanale Tr.")) at 19:3-21:16 (reflecting his
titles) and 135:13-136:2 ("I thought that we needed to have a strategy to increase the rates to demonstrate
that we listened and valued what our physicians were saying. I thought that our rates needed to be
competitive with our marketplace, Medicare being one of the players, but I wanted to make sure that we
were at least at or a bit above our two principal competitors at that time being Tufts and Harvard.").
Another BCBS/MA executive, Deborah Devaux, provided similar testimony regarding her time at
Harvard Pilgrim:  "I don't remember reasonable costs and margin being a specific topic of discussion.  I
think that the often, not always, the focus was around not being disadvantaged in the marketplace.  So,
Harvard Pilgrim not paying rates that were significantly higher than other plans."  *See* Schau Decl. Ex. 51
(additional relevant excerpts from March 6, 2006 deposition of Deborah Devaux) at 98:9-20.

[27] *See* Hartman 8/29/06 Report at ¶ 10.

[28] *See id.* at ¶ 25, p. 18.

[29] *See* Declaration of Deborah Devaux in Support of Plaintiffs' Opposition to Track 1 Defendants' Motion
for Summary Judgment with Respect to Class 3 (hereafter, "Devaux Decl.") at ¶ 14.

10

reimbursement based on ASP.[30]  BCBS/MA chose not to adopt ASP because it was concerned

that, even with an increase in administration fees, doctors would react to the loss of drug revenue

by sending their patients to hospital out-patient departments, where BCBS/MA's reimbursement

costs would be higher.[31]  In other words, BCBS/MA did *not* want to reimburse its physicians at

acquisition cost because BCBS/MA recognized that physicians needed a margin and would not

participate in BCBS/MA's network if reimbursed at acquisition cost.

　　　　　BCBS/MA's witnesses confirmed that BCBS/MA knew about and intended to

provide a margin to its physicians.  Dr. James Fanale testified that "they can't continue to run

their practices without that profit center" and that "it's pretty understood, there must be some

financial benefit, the extent of which I can't say, to administering drugs in the office."[32]

Deborah Devaux, who before coming to BCBS/MA negotiated contracts with health insurers on

behalf of providers, testified that her goal in those negotiations was to make sure the providers

were able to cover their costs plus a margin.[33]  Indeed, she noted that even a not-for-profit

provider group would need margin "to continue to remain a viable entity."[34]  She was also aware

that the margins physicians made on drugs could vary from one geographic region to another:

"in some markets, the margins that are achieved by providers are, in general, lower than others.

… in general, the providers are first trying to meet the goal of covering costs, and then, you

---

[30] *See* Defs.' Mem. at 11-14 citing Schau Decl. Ex. 16 ("Analysis of CMA Average Wholesale Price Reform – Reimbursement for Part B Drugs" dated February 7, 2004 produced electronically on CD bearing Bates number BCBS/MA-AWP 11598A (hereafter "BCBS/MA Shift to ASP Analysis")).

[31] *See* Defs.' Mem. at 13-14.

[32] Fanale Tr. 84:13-86:13.

[33] Schau Decl. Ex. 15 (Devaux Tr.) at 164:6-12.

[34] Schau Decl. Ex. 51 (Devaux Tr.) at 50:4-15.

11

know, some – some margin above that."[35]  BCBS/MA's intent to provide a margin was

consistent across markets – in hospitals its goal was to cover the hospitals' costs plus a margin.[36]

BCBS/MA's former Director of Pharmacy, Edward Curran, agrees that

BCBS/MA knew that physicians earned a margin when it reimbursed based on AWP.  Mr.

Curran states that it was known "since at least the 1960s" that AWP was not an average of

wholesale prices.[37]  He says health insurers such as BCBS/MA knew since at least the mid-1980s

that physicians and other purchasers received discounts and rebates from manufacturers.[38]  He

says health insurers understood the economic forces that drive discounts and rebates.[39]  They

also knew that rebates and discounts varied dramatically depending on the drug's competitive

position in the market:

> "The range of rebates and discounts that can be achieved varies
> widely based on these factors.  In my own experience, I have seen
> rebates and discounts resulting in acquisition costs for drugs up to
> 90% below WAC [a spread of 1100%].  I have the impression that
> some rebates and discounts that have been available in the market
> are even higher, i.e., that they lowered acquisition costs even
> beyond that level.  The fact that rebates and discounts vary widely
> for these reasons and can be at or possibly beyond these levels has
> been common knowledge in the health insurance industry since at
> least the mid-1980s.  I was certainly aware of these facts when
> working for BCBS/MA in the late 1980s and early 1990s.
>
> It follows that it has been commonly known in the health insurance
> industry since at least the mid 1980s that AWP – because it does
> not reflect rebates and discounts – bears no predictable relationship
> to drug acquisition costs.  And one cannot claim that rebates and
> discounts fall within any particular percentage band or levels or
> that the health insurance industry expected that to be the case.

---

[35] *Id.* at 73:22-74:19.

[36] *See* Schau Reply Decl. Ex 52 (additional excerpts from March 10, 2006 deposition of Sheila Cizauskas ("Cizauskas Tr.")) at 187:15-190:12.

[37] Curran Decl. at ¶ 5.

[38] *Id.* at ¶¶ 7-8.

[39] Id. at  ¶ 12.  *See also* id. at ¶¶ 7-11.

Rather, it has been well understood throughout this period that the
relationship between AWP and acquisition costs for drugs will
vary widely and across a very broad range depending on the levels
of rebates and discounts available."[40]

Similar knowledge is reflected in BCBS/MA documents.  On September 20, 2006

(*i.e.*, earlier this week) counsel for BCBS/MA produced for the first time a document from its

files that previously had been withheld.[41]  It is a report of a study by the Lewin Group dated

September 8, 2000, entitled "Impact of Proposed AWP Reductions on the Provision of Home

Drug Therapies to Medicare and Medicaid Patients."[42]  The authors of the study concluded that

the reductions in AWP-based reimbursement then being contemplated under Medicare and

Medicaid would have devastated home health providers, resulting in "severe losses" to providers

and "reduced access" to care for program beneficiaries:

> "[L]arge purchasers of pharmaceuticals often receive substantial
> discounts from manufacturer's list prices. …  The difference
> between what companies are paid by Medicare and Medicaid (a
> percentage of AWP) and their 'true' drug acquisition costs is the
> only way providers of home health therapies are able to provide
> ongoing professional services integral to quality patient care under
> the current payment arrangements.
>
> *            *            *
>
> High initial profit margins are no inoculation against the threat of
> proposed AWP reductions.  If proposed AWP reductions for
> respiratory and infusion therapies are enacted for the Medicare and
> Medicaid programs, the financial health of all companies surveyed
> will be placed in jeopardy.  Potential revenue reductions are so
> significant that all companies surveyed expect to experience
> operating losses as a result (for their respiratory and infusion home
> services to Medicare and Medicaid patients).  For companies that
> serve a high proportion of Medicare and Medicaid patients,
> operating losses will be particularly severe.

---

[40] *Id.* at ¶¶ 12-13.

[41] *See* Schau Reply Decl. Ex 53 (letter from Stephen L. Coco to Andrew D. Schau dated September 20, 2006).

[42] Schau Reply Decl. Ex. 54 (documents Bates Numbered BCBSMA-AWP 42822-42831).

Given these financial realities, companies affected by proposed AWP reductions intend to exit the Medicare market.  Medicare beneficiaries will be negatively affected because they will experience reduced access to medically prescribed in-home services, potentially diminished quality of services and, in all likelihood, increased costs."[43]

The Lewin Report provides additional confirmation that BCBS/MA knew there was a difference between AWP and "'true' drug acquisition costs," and understood that reductions in AWP-based reimbursement rates could have negative consequences for providers and patients.  In fact, the margin between AWP and acquisition cost is described as "integral to quality patient care."

Other health plans besides BCBS/MA also knew that reimbursement at AWP gave physicians a margin over their acquisition price.  Trigon Services, Inc. explained its understanding of AWP – and its intention to use AWP to provide physicians with a margin – in a letter it wrote to a physician group known as US Oncology:

"Trigon recognizes that your acquisition cost for drugs is highly variable when expressed as a percentage of the AWP.  Ninety percent of AWP should provide you with substantial margins for some drugs and nearly zero margins for others.  As you know, acquisition cost as a percent of AWP is much lower for the older and more established generics and multi-source brands.  These relatively low cost drugs provide substantial margins and are prominent in the established combination regimens for common malignancies.  Therefore, on balance, providing drugs to Trigon insureds at ninety percent of AWP provides you with a positive margin, even when inventory costs are considered."[44]

Margaret M. Johnson, Executive Director of Pharmacy for Horizon Blue Cross Blue Shield, testified as follows:

Q.   … were you aware of the fact that providers were making a margin?

---

[43] *Id.* at BCBSMA-AWP 42824, 42828.

[44] Schau Reply Decl. Ex. 55 (Trigon document bearing Bates numbers A-VA 03010065-68 at 03010066).

A.   Yes.

Q.   Would it be fair to say that the existence of that margin for providers is something that is well known in the industry?

A.   Yes.

Q.   It was certainly well known by 1993 and '94, correct?

A.   I believe it was known in '93 and '94.

Q.   It is certainly well known today, correct?

A.   Yes.[45]

Ms. Johnson's testimony is consistent with the testimony of numerous other health plans.[46]

In short, Dr. Hartman's assumption that health insurers intended to reimburse physicians at acquisition cost is contradicted by the record. So too is his conclusion that the failure to reimburse at acquisition cost proves that Class 3 payors must have been unaware of spreads in excess of 30%.

---

[45] Schau Reply Decl. Ex. 56 (September 22, 2004 deposition of Margaret Johnson) at 46:5-7 (reflecting her title) and 30:22-31:19.

[46] *See, e.g.*, Schau Reply Decl. **Ex. 57** (September 17, 2004 deposition of Carole Sidwell, Manager of Provider Relations for John Deere Health Care) at 6:12-13 (reflecting her title), 40:2-8 (John Deere understood it was providing margin to providers); Schau Reply Decl. **Ex. 58** (September 13, 2004 deposition of Eric Cannon, Director of Pharmacy for Intermountain Health Care) at 7:11-14 (reflecting his title), 147:4-7 (IHC understood that providers were earning margin on their sales of physician administered drugs); Schau Reply Decl. **Ex. 59** (September 14, 2004 deposition of Paula Pfankuch, Senior Manager, Professional Reimbursement Programs for Blue Cross Blue Shield of Illinois) at 8:7-10 (reflecting her title), 50:3-14 (BCBS of IL understood providers were making margin on drugs and that margin varied from physician to physician depending on their purchases prices); Schau Reply Decl. **Ex. 60** (September 17, 2004 deposition of Dan Dragalin, VP in Charge of Network for Multiplan) at 9:8-11 (reflecting his title), 60:7-18 (payors understood margin acted as a cross-subsidy and had different expectations as to what that margin should be); Schau Reply Decl. **Ex. 61** (November 30, 2004 deposition of Joe Spahn, Senior Health Care Consultant for Anthem) at 8:7-12 (reflecting his title), 93:6-95:5 (Anthem does not require physicians to disclose acquisition cost because it does not factor into the reimbursement amount); Schau Reply Decl. **Ex. 62** (October 20, 2004 deposition of Robert C. Farias, Director of Planning and Administration for Harvard Pilgrim) at 21:3-5 (reflecting his title), 151:19-153:3 (Harvard Pilgrim does not require physicians to disclose acquisition cost because it does not factor into the reimbursement amount); Schau Reply Decl. **Ex. 63** (September 9 and 10, 2004 depositions of Reann Maxwell, Director of Pharmacy Services for UMPC) at 4:10-15 (reflecting her title), 154:2-157:1 (negotiated reimbursement amount would be the same whether it was based on a "true average" ASP plus a percentage or a "grossly inflated" AWP minus a percentage).

15

**B.      Mr. Mulrey's Personal Understanding of AWP Is Irrelevant Because
         The Knowledge Of All BCBS/MA Executives Is Imputed To
         BCBS/MA**

The centerpiece of plaintiffs' opposition is the testimony of one BCBS/MA

employee, Michael Mulrey, who says that until 2004 he thought AWP was an actual average of

wholesale prices.[47]  This testimony is meaningless.  Plaintiffs cannot base their liability case on

the ignorance of selected employees.

To begin, even Dr. Hartman admits that Class 3 payors "expected" spreads

between ASP and AWP of 30%.  Mr. Mulrey thus appears to be something of a special case, in

that his knowledge of AWP fell short of what Dr. Hartman says was common.

Mr. Mulrey aside, it is undisputed that other BCBS/MA executives knew that

AWP was not an actual average of wholesale prices.  As detailed above, *see* pp. 12-13 *supra*,

BCBS/MA's former Pharmacy Director, Edward Curran, knew throughout his tenure at

BCBS/MA in the late 1980s and early 1990s that AWP bore no predictable relationship to drug

acquisition costs and that rebates and discounts resulted in net prices that were up to 90% below

WAC (a spread of 1100%).  Mr. Curran understood in detail the economic factors that motivated

manufacturers to provide rebates and discounts to select purchasers, including physicians.[48]

Similarly, John Killion testified that it was common knowledge by 1994 that AWP was an

"artificial price" that "bore no predictable relationship to the actual cost as paid."[49]  Dr. Fanale

testified that it was "commonly understood that some of the – some drugs in physician's offices

could be paid at X percent below AWP, maybe 40 or 50 percent [a "spread" of 67% to

---

[47] *See*, *e.g.*, Pls.' Mem. Opp. at 8-9.

[48] *See* Curran Decl. ¶¶ 5-13.

[49] *See* Defs.' Mem. at 6-7.

83%]…."[50] Dr. Fanale also testified that "this was not just for Blue Cross, but if you got into some of the medical literature and the AMA News and that stuff, you could hear about the range of costs of drugs in offices."[51]

The knowledge of these BCBS/MA employees cannot be swept under the rug. The entirety of what BCBS/MA's executives knew is attributed to BCBS/MA as a matter of law. As the First Circuit has emphasized, corporations typically have more than one component part, so corporate knowledge is measured by the "aggregate" knowledge of its employees:

> "[T]he knowledge obtained by corporate employees acting within the scope of their employment is imputed to the corporation. Corporations compartmentalize knowledge, subdividing the elements of specific duties and operations into smaller components. The aggregate of those components constitutes the corporation's knowledge of a particular operation. It is irrelevant whether employees administering one component of an operation know the specific activities of employees administering another aspect of the operation."

*United States v. Bank of New England*, 821 F.2d 844, 856 (1st Cir. 1987) (citation omitted).

*Accord*, *Sarna v. American Bosch Magneto Corp.*, 290 Mass. 340, 343, 195 N.E. 328, 330 (1935) ("The defendant is chargeable with the combined knowledge which all its agents acquired within the scope of their authority together with legitimate inferences from all the evidence"); *Paloeian v. Day*, 299 Mass. 586, 591, 13 N.E.2d 398, 401 (1938) (same); *Sunrise Properties v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky & Fitzgerald, P.C.*, 425 Mass. 63, 68, 679 N.E.2d 540, 543-44 (Mass. 1997) (law firm president's knowledge of insurance claim was imputed to firm even though he did not inform other members of firm); *New England Trust Co. v. Bright*, 274 Mass. 407, 411-15, 174 N.E. 469, 470-71 (1931) (employee's knowledge of improper conduct was imputed to defendant employer and barred recovery from plaintiff);

---

[50] Fanale Tr. 185:13-186:9.

[51] *Id.* at 186:17-21.

*DeVaux v. American Home Assurance Co.*, 387 Mass. 814, 818, 444 N.E.2d 355, 358 (1983)

("When an agent acquires knowledge in the scope of her employment, the principal, here the

attorney, is held to have constructive knowledge of that information").

    **C.**    **Plaintiffs Admit That BCBS/MA Chose To Continue To Use AWP Rather Than Adopt A Specialty Pharmacy Program, And To Extend Its Use of AWP To Hospitals, Despite Knowledge of Spreads In Excess of 30%**

        **1.**    **Plaintiffs Admit That BCBS/MA Chose Not To Adopt A Specialty Pharmacy Program Despite Knowledge of Spreads In Excess of 30%**

Starting in 2001, BCBS/MA considered implementing a specialty pharmacy

program for physician-administered drugs. The program would have bypassed AWP-based

reimbursement altogether. The team assigned to consider this change identified physician

spreads as high as 616%. BCBS/MA decided not to implement a specialty pharmacy program

for physician-administered drugs, because it was concerned that physicians would react

negatively to the loss of revenue and send patients for treatment in the hospital, which would be

more expensive for BCBS/MA.[52]

BCBS/MA's decision to continue reimbursing physicians based on AWP rather

than adopt a specialty pharmacy program for physician-administered drugs, despite knowledge

of spreads as high as 616%, confirms that BCBS/MA's use of AWP was not based on the belief

that spreads did not exceed 30%.

---

[52] *See* Defs.' Mem. at 14-16. Plaintiffs do not mention these facts in their opposition brief. In their Rule 56.1 responsive statement they generally either admit these facts (Responses to Statements 43, 48, 49, 52), deny that they are "relevant" (Responses to Statements 41-42, 44-46, 50-51), or deny them without citing any contrary record support (Response to Statement 40). Thus, pursuant to Local Rule 56.1, the facts relating to BCBS/MA's specialty pharmacy program are admitted or deemed admitted. *See* fn 8, *supra*.

2.    **Plaintiffs Admit That BCBS/MA Chose Not To Change To ASP-Based Reimbursement Despite Knowledge of Spreads In Excess of 30%**

Plaintiffs admit that BCBS/MA considered moving to ASP in 2004.[53]  They admit that BCBS/MA carefully considered all allegations regarding AWP's lack of predictable relationship to drug acquisition costs.[54]  They admit that BCBS/MA calculated that it could save over $6 million a year if it adopted ASP.[55]  They admit that BCBS/MA did not adopt ASP, in part because it was concerned that doctors would send their patients to hospital out-patient departments where reimbursement costs were higher.[56]  They admit that, after weighing and evaluating these factors, BCBS/MA decided to continue using AWP.[57]

Plaintiffs' only response is to claim that changing reimbursement methodologies would have been difficult because actual acquisition cost is difficult to obtain, and use of a standardized benchmark like AWP is easier.[58]  This is a red herring.  An ASP-based system would not be difficult to administer.  ASPs are published quarterly by CMS.[59]  The work required to calculate ASPs is done by the manufacturers.  ASP has none of the logistical impediments associated with gathering actual acquisition cost data.  The move to ASP would have been administratively simple.

---

[53] *See* Pls.' Mem. Opp. at 10; Mulrey Decl. ¶ 12.

[54] *See* Plaintiffs' Response to 56.1 Statement ¶¶ 29-30, 34.  *See also id.* at ¶ 39 (only disputing relevance and therefore admitting statement of fact as a matter of law).

[55] *See* BCBS/MA Shift to ASP Analysis at 7.  *See also* Plaintiffs' Response to 56.1 Statement ¶ 35 (only disputing relevance and therefore admitting statement of fact as a matter of law).

[56] *See* BCBS/MA Shift to ASP Analysis at 12.  *See also* Plaintiffs Response to 56.1 Statement ¶¶ 36-38 (only disputing relevance and therefore admitting statement of fact as a matter of law).

[57] *See* Plaintiffs Response to 56.1 Statement ¶¶ 36-38 (only disputing relevance and therefore admitting statement of fact as a matter of law).

[58] *See e.g.*, Pls.' Mem. Opp. at 11; Hartman 8/29/06 declaration at ¶ 13(b).

[59] *See* http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice

19

3.      **Plaintiffs Admit That BCBS/MA Chose to Extend Its Use of
AWP To Hospital Out-Patient Departments Despite
Knowledge of Spreads In Excess of 30%**

Starting in 2005, BCBS/MA has been changing the way it reimburses hospital

out-patient departments from "billed charges" to AWP.  This process will continue for five years,

at which time all of BCBS/MA's hospital out-patient contracts will be based on AWP.  In other

words, BCBS/MA is embracing and extending AWP as a reimbursement benchmark, despite its

litigation claim that AWP is a fraud.[60]

BCBS/MA's actions speak louder than its words.  BCBS/MA does not even

attempt to explain why its business professionals are extending the company's use of a

reimbursement benchmark that its attorneys say is artificially inflated.[61]  As noted above,

BCBS/MA uses AWP because it is convenient, administratively simple, and results in a level of

reimbursement that providers are willing to accept.[62]

## III.   PLAINTIFFS' RESPONSE CONFIRMS THAT SUMMARY JUDGMENT MUST BE GRANTED AGAINST PIPEFITTERS

Despite the fact that Pipefitters contracted with a PBM to provide prescription

drug coverage to retirees at "AWP less 18%," it says it did not know that AWP was not an actual

average of wholesale prices.[63]  It admits that no pharmaceutical company ever told it that AWP

---

[60] *See* Defs.' Mem. at 16-17.

[61] In their response to defendants Rule 56.1 statement, plaintiffs either admit relevant facts (Response to Statement 54) or deny their relevance without contrary record citation (Responses to Statements 53, 55-62).  These responses are all deemed admissions as a matter of law.  *See* fn 8.

[62] On a final and separate note as to BCBS/MA, it should also be noted that Plaintiffs confirm that BCBS/MA's contracts do not expressly reference AWP.  Pls' Memo. Opp. at 14.  Plaintiffs also confirm that BCBS/MA did not reimburse based on AWP until 1995.  *Id.* at 6.  Consequently, BCBS/MA is not a member of any certified class.  *See* Defs.' Mem. at 26-28.

[63] *See* Declaration of Charles Hannaford in Support of Plaintiffs' Opposition to Track 1 Defendants' Motion for Summary Judgment With Respect to Class 3 ("Hannaford Decl.") at ¶¶ 12-13.

was a real average.[64]  It says it hired BCBS/MA because it is "too small and has too few

resources" to separately negotiate the prices paid for medical services and pharmaceuticals.[65]

BCBS/MA was Pipefitters' designated agent for purposes of administering its

health plan.  As a matter of law, an agent's knowledge is imputed to a principal.  Contrary to

plaintiffs' claim, this is true even if the agent's knowledge was constructive, although, as noted

above, BCBS/MA's knowledge was direct.  *See Torres v. Pisano*, 116 F.3d 625, 634 (2d Cir.

1997) (knowledge that a manager reasonably should have known is imputed to the employer);

*Paul Revere Life Ins. Co. v. Fish*, 910 F. Supp 58, 63 (D.R.I. 1996) (actual or constructive

knowledge of an insurer's agent is imputed to the insurer).  BCBS/MA's knowledge is thus

imputed to Pipefitters as a matter of law.[66]

Moreover, the fact that Pipefitters entrusted BCBS/MA with entire responsibility

for administering its health plan means that Pipefitters' lack of knowledge concerning AWP

could not have been the proximate cause of its alleged injury.  BCBS/MA, not Pipefitters, made

the decision to reimburse based on AWP.  Pipefitters knew nothing about BCBS/MA's

---

[64] *Id.* at ¶ 14.

[65] *Id.* at ¶ 15.  *See also* plaintiffs' responsive rule 56.1 statement, admitting statements 74-79.

[66] The cases cited by plaintiff are not to the contrary.  *New England Trust Co. v. Farr*, 57 F.2d 103 (1st Cir. 1932) relates to an agent's knowledge of matters unrelated to its agency relationship with the principal.  In that circumstance, the agent's knowledge is not imputed.  Here, BCBS/MA's knowledge of AWP relates directly to its service as Pipefitters' agent in the management of Pipefitters' health plan. *United States v. President & Fellow of Harvard College*, 323 F. Supp. 2d 151 (D. Mass. 2004) holds that an agent's knowledge is not imputed to the principal if the agent is acting outside the scope of its authority.  Here there is no question that BCBS/MA knowledge of AWP related to the reimbursement component of the health plan it was authorized to administer.  Finally, in *Adams v. Bernard*, No. 001248, 2001 WL 1470380 (Mass. Super. Sept. 6, 2001), the buyer of a house with an undisclosed defect in the basement argued that his broker had constructive knowledge of the defect, and should have told him of its existence, because the broker knew that some houses were defective.  The Court declined find that the broker had constructive knowledge of the particular defect at issue.  The case has nothing to do with whether an agent's constructive knowledge may be imputed to a principal.

reimbursement practices.[67]   There is no reason to believe that Pipefitters would have done

anything differently had it known that AWP was not an actual average of wholesale prices.  To

the contrary, Pipefitters is still using BCBS/MA, and BCBS/MA is still using AWP.[68]

## IV.   PLAINTIFFS' RESPONSE CONFIRMS THAT SUMMARY JUDGMENT MUST BE GRANTED AGAINST HEALTH CARE FOR ALL

Health Care For All admits that it cannot prove injury-in-fact.  Melissa Shannon,

its Director of Government Affairs, admits that the organization does not "maintain records of

the prescriptions administered to its members."[69]  She testified previously that she has no

knowledge that any of its members were injured.[70]  After receiving $10,000 from plaintiffs'

counsel, Health Care For All conducted "an extensive outreach program to try to identify

individuals who would qualify and might be interested in participating in this litigation as a

named representative of Class 1."[71]  Despite this effort, none of its members stepped forward as a

suitable class representative.  Nevertheless, because Ms. Shannon suspects that a majority of the

group's members "have experienced significant health care needs," she "believes" that the

organization's members are "*affected by* the AWP scheme set forth in the complaint in this

case."[72]

Ms Shannon's belief that Health Care For All's members are "affected by" the

alleged scheme does not confer standing.  The requisite injury-in-fact must be "(a) concrete and

particularized, and (b) actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders*

---

[67] *See* Schau Decl. Ex. 33 (December 29, 2005 deposition of Pipefitters' Fund Administrator Charles Hannaford ("Hannaford Tr.") at 25:4-6 (reflecting his title), 156:8-21, 159:15-18.

[68] *See* Hannaford Decl. ¶¶ 11, 15.

[69] *See* Declaration of Melissa D. Shannon In Support of Plaintiffs' Opposition to Track 1 Defendants' Motion for Summary Judgment With Respect to Class 3 ("Shannon Decl.") at ¶¶ 3, 11.

[70] *See* Schau Ex. 35 (May 23, 2006 deposition of Melissa Shannon) at 53:14-57:3.

[71] Shannon Decl. at ¶ 9.

[72] Shannon Decl. at ¶¶ 11-12 (emphasis added).

*of Wildlife*, 504 U.S. 555, 560 (1992).  *Accord:  U.S. v. AVX Corp.*, 962 F.2d 108, 117 (1st. Cir.

1992) ("A barebones allegation, bereft of any vestige of a factual fleshing-out, is precisely the

sort of speculative argumentation that cannot pass muster where standing is contested.");

*GrassRoots Recycling Network, Inc. v. U.S. E.P.A.*, 429 F.3d 1109, 1113 (D.C. Cir. 2005)

("[B]ecause nothing in the record shows the [defendant's] Rule has caused … any member an

injury in fact, [Plaintiff] does not meet the minimum constitutional requirements for

associational standing]; *Maryland Highways Contractors Ass'n, Inc. v. State of Md.*, 933 F.2d

1246, 1251 (4th Cir. 1991) (holding that association lacked standing to sue for failing to provide

evidence of injury-in-fact to any of its members).

## V.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT AGAINST ALL THIRD-PARTY PAYORS IN CLASS 3 BECAUSE PLAINTIFFS CANNOT ESTABLISH CAUSATION UNDER CH. 93A AS A MATTER OF LAW

Plaintiffs do not dispute that causation is a legal requirement of a 93A claim.

Pls.' Mem. Opp. at 24 ("[A] causal relationship between the [act or practice] and the injury to the

plaintiff.") (citing *Fraser Eng'g Co., Inc. v. Desmond*, 26 Mass. App. Ct. 99, 104, 524 N.E.2d

110 (1988)); *see also Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 840 N.E.2d 526, 528

(Mass. 2006); *Aspinall v. Philip Morris Companies, Inc.*, 813 N.E.2d 476, 491 n.19 (Mass.

2004).  Nor do plaintiffs deny that they bear the burden of proving that the allegedly deceptive

conduct was both a "but for" and proximate cause of plaintiffs' loss.  *See Markarian v.

Connecticut Mut. Life Ins. Co*., 202 F.R.D. 60, 68-69 (D. Mass. 2001).  Most importantly,

plaintiffs do not dispute that they cannot establish causation under Ch. 93A if they knew or

should have known about the defendants' allegedly "deceptive" conduct.  *See Mass. Farm

Bureau Fed'n v. Blue Cross of Mass.*,  532 N.E.2d 660, 665 (Mass. 1989); *Tagliente v. Himmer*,

23

1306555v4

949 F.2d 1, 3, 8 (1st Cir. 1991).[73]  Indeed, plaintiffs do not even attempt to distinguish any of the on-point case law cited by defendants in support of summary judgment.

    Instead, plaintiffs rely on case law describing the types of acts and practices that may violate Ch. 93A because they have a capacity or tendency to deceive.[74]  These cases are entirely beside the point.[75]  Regardless of whether the Track 1 defendants' alleged conduct had the capacity or tendency to deceive (which it did not), if BCBS/MA and other Class 3 payors were not, in fact, deceived or should not have been deceived, then plaintiffs cannot establish causation.  *See Mass Farm Bureau Fed'n*, 532 N.E.2d at 665.  In other words, if Class 3 payors did not base their reimbursement practices on the erroneous belief that spreads never exceeded 30%, then plaintiffs cannot establish that defendants' alleged deceptive conduct was a "but for" or "proximate" cause of Class 3's alleged injuries.  Plaintiffs' reliance on this Court's prior opinion dealing with causation under the RICO statute is misplaced.  Contrary to plaintiffs' suggestion, this Court has not yet addressed defendants' argument that plaintiffs cannot prove causation under 93A because they knew about and embraced AWP despite knowledge of spreads

---

[73] *See also Swanson v. Bankers Life Co.*, 389 Mass 345, 349 (1983) ("a plaintiff's conduct, his knowledge, and what he reasonably *should have known* may be factors in determining whether an act or practice is unfair.") (emphasis added); *see also Winlake II, Inc. v. Mercier*, No. MICV 2005-00043-C, 2006 Mass. Super. LEXIS 225 at *29 (Mass. Super. Ct. 2006) (holding that defendant was entitled to summary judgment on claim regarding leased premises where lessee should have been aware of the property's condition because he "had plenty of opportunity to inspect the Premises and consult with contractors"); *Madan v. Royal Indemnity Co.*, 532 N.E.2d 1214, 1218 (Mass. App. Ct. 1989) (finding that plaintiff could not sustain a 93A claim where the plaintiff suing for breach of lease and unfair and deceptive practices was an attorney and should have known that an oral agreement for a lease was unenforceable.); *Dinjian v. Dinjian*, 495 N.E.2d 882,888 (Mass. App. Ct. 1986) (rejecting 93A claim because the fact that "[defendants] did not explain to their co-lenders that they would receive a loan origination fee is of dubious weight where the lenders already understood that [defendants] had a financial interest in the loan, both as principals and as loan managers for a commission.").

[74] Pls.' Mem. Opp. at 18-25.  Notably, many of the allegedly deceptive acts and practices are attributed to companies that are not Track 1 defendants, such as Abbott, TAP, and GSK.  *See* Pls.' Mem. Opp. at 49-54.

[75] So too is "Plaintiffs' L.R. 56.1 Counterstatement of Undisputed Material Facts in Support of Their Opposition to the Track 1 Defendants' Motion for Summary Judgment as to Class 3."  This statement, which is not contemplated by L.R. 56.1 because plaintiffs have not filed a cross-motion, is deficient because it is not supported by citations to record evidence.

in excess of 30%.[76] *C.f. In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 207 (D. Mass. 2004) (holding that intervening acts of third parties did not negate causation under RICO).

## VI.   PLAINTIFFS' CLAIM FOR TOLLING OF THE STATUTE OF LIMITATIONS IS WITHOUT FOUNDATION

Plaintiffs ignore the requirement of Massachusetts law that a plaintiff with knowledge of facts suggesting injury must demonstrate reasonable diligence in the pursuit of its claims. *Tagliente v. Himmer*, 949 F.2d 1, 5 (1st Cir. 1991). Plaintiffs have made no such showing of diligence; their claims, therefore, are barred.

Plaintiffs admit that they have the burden of demonstrating that their claims are timely.[77] They purport to invoke the Massachusetts "discovery rule," but acknowledge that under the rule "a cause of action [accrues when] . . . the plaintiff knew, or in the exercise of reasonable diligence should have known of the factual basis for a cause of action."[78] Massachusetts law is clear that plaintiffs with knowledge of facts or who could have discovered facts suggesting they have been injured have an affirmative duty of due diligence to investigate and discover their claims, and the burden is on plaintiffs to establish they could not have discovered their claims within the period provided by the applicable statute of limitations. *Tagliente*, 949 F.2d at 5 ("The burden is on the plaintiff to prove that in the exercise of reasonable diligence she could not have known of the misrepresentation within the statute of limitations."); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 130 (1st Cir. 1987) (if

---

[76] In fact, Defendants' causation argument is only appropriately addressed at summary judgment because it concerns application of the undisputed facts to the legal requirements of 93A.

[77] Pls.' Mem. Opp. at 39.

[78] *Id.*, (quoting *Patsos v. First Albany Corp.*, 741 N.E.2d 841, 846-47 (Mass. 2001).

plaintiff had "exercised a reasonable degree of diligence" he would have discovered his claim prior to the statute running).

       As set forth in detail above, the record firmly contradicts plaintiffs' claim that Class 3 members were unaware of spreads in excess of 30%. Four of the five largest Massachusetts insurers brought substantial quantities of physician-administered drugs from 1991-1997 at prices generally at and often below the ASPs calculated by Dr. Hartman.[79]  Mr. Curran, who worked at BCBS/MA from 1988 to 1992, confirmed that BCBS/MA purchased drugs for its staff model HMO at substantial discounts, that he was aware of rebate and discounts lowering acquisition costs up to 90% below WAC [a spread of 1100%] and beyond, and that health insurers have known since the mid-1980s that, because of discounts and rebates, AWP bears no predictable relationship to drug acquisition costs.[80]  Mr. Killion, who worked at Tufts and BCBS/MA, testified that he understood as of 1994 that AWP was an artificial price that did not bear a predictable relationship to acquisition cost.[81]

       A plaintiff's actual knowledge of its claim precludes any application of the discovery rule. *Catrone v. Thoroughbred Racing Assocs. of North America, Inc.*, 929 F.2d 881, 886 (1st Cir. 1991) (granting summary judgment for plaintiff and holding that discovery rule did not apply where plaintiff "had actual knowledge" of the injury); *Malapanis v. Shirazi*, 487 N.E.2d 533, 538 n.8 (Mass. App. Ct. 1986) (if plaintiff is "deemed to know the facts upon which

---

[79] *See* Declaration of Eric. M. Gaier in Support of the Track 1 Defendants' Joint Motion for Summary Judgment With Respect to Class 3 dated July 14, 2006 ("Gaier 7/14/06 Decl.") at 8-9.  Documents produced from BCBS/MA since Dr. Gaier's analysis have further confirmed that BCBS/MA was purchasing drugs at prices that were at or close to their ASPs.  These documents reflect pricing information for subject drugs and for time periods that go beyond those identified in the pricing data located and studied by Dr. Gaier.  *See e.g.*, Schau Reply Decl. Ex. 64 (BCBSMA-AWP-33415 and BCBSMA-AWP-40618) (listing Zoladex prices for Medical East and Medical West); Schau Reply Decl. Ex. 65 (BCBSMA-AWP-41630) (listing an Albuterol price to Medical West).

[80] Curran Decl. ¶¶ 5-13.

[81] *See* Defs.' Mem. at 6-7.

his claim rests, there can be no fraudulent concealment."). Thus, as to the five largest Class 3

payors in Massachusetts (BCBS/MA, Tufts, Fallon, Cigna, and Harvard Pilgrim), the statute

began to run prior to 1997.

As to the remaining members of the Class, they are charged at a minimum with

the information contained in publicly-available government reports and news articles, such as the

*Barron's* article.  *Wise v. Hubbard*, 769 F.2d 1, 2-3 (1st Cir. 1985) ("Under Massachusetts law, a

fact is  not inherently unknowable when it is a matter discoverable by examination of public

records."); *Friedman v. Jablonski,* 358 N.E.2d 994, 997 (Mass. 1976) (finding claim was barred

by availability of public records from which plaintiff could have discovered the fraud); *Duco*

*Assocs., Inc. v. Lipson*, 416 N.E.2d 555, 556 (Mass. App. Ct. 1981) (following *Friedman* and

holding claim was barred where information regarding plaintiff's claim was available for public

inspection); *Frank Cooke, Inc. v. Hurwitz*, 406 N.E.2d 678, 684 (Mass. App. Ct. 1980).

The *Barron's* article, published in a national business periodical in June 1996

(and cited in the Complaint at ¶ 152), stated that "drug providers actually pay wholesale prices

that are 60%-90% below the so-called average wholesale price, or AWP."  These prices are

equivalent to the spreads calculated by Dr. Hartman of 150% to 900%.  The article gave

examples of spreads for specific drugs (including drugs at issue here, e.g., doxorubicin HCL and

etoposide) with spreads of 250 to 500% or more.  Defendants also cite numerous government

reports disclosing large spreads on Medicare and Medicaid drugs.[82]

---

[82] To give just one example, a 1992 OIG report discussed spreads for thirteen high dollar volume
chemotherapy drugs reimbursed by Medicare.  The report disclosed that some of these drugs were
available to physicians at prices below AWP of up to 80%.  1992 OIG Report A-02-91-01049, Appendix
III.  As a result, the report concluded that "AWP is not a reliable indicator of the cost of a drug to
physicians."  *Id.* at 2.  The report disclosed that cyclophosamide (the generic name for BMS' Cytoxan)
was available at 20-59% below AWP (resulting in "spreads" of 25% to 144%), doxorubincin (generic
name for Rubex) was available at 56%-60% below AWP (resulting in "spreads" of 126% to 150%), and
other chemotherapy drugs were available at up to 83% off AWP (resulting in a "spread" of 500%).  *Id.* at
Appendix III.

27

Plaintiffs' claim that they could not have discovered defendants' alleged fraud is not persuasive.

First, while admitting knowledge that "AWP did not directly mirror actual transaction pricing" they deny knowledge of "large" spreads.[83]  That is simply wrong.  The purchases of physician-administered drugs by BCBS/MA, Cigna, Harvard Pilgrim and Fallon were at very substantial spreads similar to those plaintiffs cite at page 45 of their opposition.[84]  Similarly, the *Barron's* article, disclosed spreads on specific generic drugs of between 250% and 800%.  The 1992 OIG report disclosed spreads on Medicare Part B drugs of from 143% to over 480%.[85]

Plaintiffs also claim that defendants' concealment prevented them from discovering the fraud.  Again, that is simply not true.  They could have performed the same analysis that the author of the *Barron's* article did:  comparing the publicly-available AWPs to the price lists available from various wholesalers.  Moreover, plaintiffs, who were sophisticated private payors, had other means at their disposal to uncover the alleged fraud.  Plaintiffs could have asked the physicians in their extensive networks the prices at which they could acquire physician-administered drugs.

---

[83] Plaintiffs' submissions are vague about how large BCBS/MA thought spreads were.  Ms. Devaux is the only witness who puts a number on it.  She says in her declaration that *she* didn't know about "large spreads." Devaux Decl. at ¶ 14.  She also says she didn't know that manufacturers may have published AWPs that exceeded average selling price by "more than 30% *and* that they may have done so in order increase their market share for these drugs at the expense of payors like BCBSMA."  *Id.* (emphasis added).

[84] To give just a few examples, BCBS/MA purchased Vepesid at spreads up to 1,200%, Albuterol at spreads up to 255%, Proventil at spreads up to 220%, and Procrit at spreads up to 34%.  Cigna purchased Vepesid at spreads ups to 2,200%, Albuterol at spreads of 520-640%; Fallon purchased at spreads of 500% (Cytoxan) and 1,300-2,200% (Vepesid); and Harvard Pilgrim purchased at spreads of 540%-1,275% (Cytoxan and Vepesid).  *See* Gaier 7/14/06 Decl., Tables 4-18.

[85] 1992 OIG Report at Appendix III.

Plaintiffs' cases are easily distinguished.  In *Sawyer v. Indevus Pharms., Inc.*, No. 03-5028-B, 2004 WL 1739405 (Mass. Super. Ct. July 26, 2004), a personal injury case, the Court found that plaintiffs had raised a jury question as to whether they were diligent in discovering their injury, because they had consulted their doctors after reading media accounts of the dangers of prescription diet drugs.  2004 WL 1739405 at *15.  In contrast, plaintiffs here make no showing that any Class representative or Class member exercised due diligence.  In *Wolinetz v. Berkshire Life Ins. Co.*, 361 F.3d 44 (1st Cir. 2004), an insurance policy fraud case, the Court found that the plaintiff had received "plausible explanations" from the defendant which "may have reasonably dissuaded [plaintiff] from investigating" the fraud.  361 F.3d at 50. Similarly, the Court in *Young v. Lepone*, 305 F.3d 1 (1st Cir. 2002), an accounting fraud case, held that the defendant accounting firm's management letters containing discussions of weaknesses in the company's reporting systems did not put plaintiff on notice of the fraud because the defendant certified the company's financial statements and gave assurances to the company's Board and the plaintiff that they need not be concerned.  The Court held that "this steady stream of comforting words" rebutted any claim of notice.  305 F.3d at 11.  Plaintiffs point to no such conduct by defendants here.  In *Thompson v. Metro. Life Ins. Co.*, 149 F. Supp. 2d 38 (S.D.N.Y. 2001), the Court found an issue of fact as to whether the "relatively unsophisticated and economically disadvantaged" plaintiffs should have been able to discover their claims.  149 F. Supp. 2d at 49, 53.  Plaintiff third-party payors are sophisticated and have substantial financial means they could have used to discover the purported fraud.

Plaintiffs' reliance on the Judge Stearn's opinion denying TAP's motion to dismiss in the *Lupron* case is curious to say the least.  In *Lupron*, Judge Stearns found, after full discovery, that "defendants have a powerful argument that the AWP was known to Congress and

large insurers to be an artificial benchmark with no real market significance" and third-party payors "were the most likely to have been aware of the manipulation of AWP by TAP and therefore the most vulnerable to TAP's knowledge defense." *In re Lupron Marketing & Sales Practices Litig.*, 228 F.R.D. 75, 97 (D. Mass. 2005). Plaintiffs ignore these findings.

Plaintiffs also claim that the statute has been tolled by defendants' alleged fraudulent concealment. Even if the court were to assume – contrary to fact – that defendants had committed acts of concealment that were fraudulent, for the statute to be tolled under Mass. Gen. Laws. Ann. ch. 260, § 12, defendants' conduct must have prevented plaintiff from discovering the cause of action. *Wise v. Hubbard*, 769 F.2d 1, 3-4 (1st Cir. 1985); *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d at 130-31. The estoppel provision of ch. 260 § 12 "is generally not available where the plaintiff is capable of discovering the facts allegedly concealed." *Wise*, 769 F.2d at 4 (quoting *Burbridge v. Board of Assessment of Lexington*, 417 N.E.2d 477, 480 (Mass. App. Ct. 1981)). Here, plaintiffs clearly were capable of discovering the facts, in fact, they had done so, and therefore their claims are barred prior to October 1997.

Finally, plaintiffs argue that "issues concerning a plaintiff's knowledge of the injury, fraudulent concealment, and triggering of the statute of limitations are almost always questions of fact for the jury."[86] That is simply not so: there are numerous cases in this Court, the First Circuit and the Massachusetts courts where summary judgment on the statute of limitations has been granted in 93A cases. *E.g.*, *Maggio*, 824 F.2d at 131; *Salois*, No. 95-11967-PBS, 1996 WL 33370626 at *11 (1st Cir. 1987); *Hanson Hous. Auth. v. Dryvit Sys., Inc.*, 560 N.E.2d 1290, 1295 (Mass. App. Ct. 1990); *Bowen v. Eli Lilly & Co., Inc.*, 557 N.E.2d 739, 743 (Mass. 1990); *Whitcomb v. Pension Dev. Co., Inc.*, 808 F.2d 167, 172-73 (1st Cir. 1986);

---

[86] Pls.' Mem. Opp. at 38.

*Albrecht v. Clifford*, 767 N.E.2d 42, 49- 50 (Mass. 2002); *Keane, Inc. v. Swenson*, 81 F. Supp. 2d 250, 255-56 (D. Mass. 2000).

## VII.   PLAINTIFFS' RESPONSE CONFIRMS THEIR FAILURE TO MITIGATE

Plaintiffs do not contest that, under 93A, "a party cannot recover for harms that its own reasonable precautions would have avoided." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 204-205 (1st Cir. 1995).  Plaintiffs do not contest that 93A plaintiffs cannot "turn their backs on reasonable, probable, and practical dispute resolution so they can conduct a prolonged quest for the mother lode." *DiVenuti v. Reardon*, 637 N.E.2d 234, 236 (Mass. App. 1994) (quoting trial judge).  Plaintiffs do not even contest that a duty to mitigate exists under 93A.  They do contest, though, that such a duty to mitigate applies to *them*.  They assert that Class 3 payors lacked "extensive knowledge" of defendant's conduct and, even if they had such knowledge, "critical market structural impediments" rooted in "the very nature of the AWP system would [have] prevent[ed] them from taking dramatic action to quickly change business practices."[87]  This argument fails for several reasons.

First, Class 3 payors knew that AWP was not an actual average of wholesale prices and were themselves able to purchase drugs at substantial discounts.  They had more than enough information to impose "a duty to investigate the matter further" and "plan a course of action." *Savers Prop. & Cas. Ins. Co. v. Admiral Ins. Agency, Inc.*, 807 N.E.2d 842, 849-850 (Mass. App. 2004) (holding that insurer had duty to mitigate once it was informed it might have to provide coverage for snow removal); *see also Cambridge Plating*, *Inc. v NAPCO, Inc.*, 85 F.3d 752, 772 (1st Cir. 1996) (holding that plaintiff had duty to mitigate after expert informed it of missing component).

---

[87] Pls.' Mem. Opp. at 55-56.

In addition, Class 3 payors fail to show that they took *any* action – much less *reasonable* action – in response to the wealth of information about acquisition costs and AWP. Plaintiffs spend considerable time – both in their brief and in a declaration from Dr. Hartman – explaining why they did nothing.  Plaintiffs' complaint that the duty to mitigate cannot require them "to play the seer, choosing the course of action that would, in hindsight have turned out best."  Pls.' Mem. Opp. at 55 (citing *Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1386 (1st Cir. 1991)).  Though mitigation does not require omniscience, it does require action.  Even in *Veranda Beach*, a case cited by plaintiffs, the court found that the plaintiff had fulfilled its duty to mitigate based on proof that the plaintiff had, in fact, "*acted reasonably*" in seeking to mitigate its loss.  936 F.2d at 1386 (emphasis added).  Here, plaintiffs failed to take *any* action based on the information they had.  *See Gunderson & Son, Inc. v. Cohn*, 596 F. Supp. 379, 383-4 (D. Mass. 1984) (affirming special master's rejection of counterclaim when defendant "did not take diligent steps to mitigate the damage," even though they hired two repairmen).

Plaintiffs complain that mitigation would have required them "to take outlandish chances," to do the "impossible," to – as a "single Plaintiff or Class Member" – change "the industry as a whole."[88]  But plaintiffs cannot excuse their own inaction by stating that they were waiting on the industry to change.  Indeed, there is no evidence that Class 3 payors ever *tried* to change or even *wanted* to change their *individual* reimbursement practices, much less the industry-wide change they say was required.[89]  When they did consider making chances, they elected to continue using AWP.

---

[88] Pls.' Mem. Opp. at 55-56.

[89] To the extent plaintiffs suggest that their alleged harm was systemic, their claims fail for lack of causation.  *See State Resources Corp. v. Architectural Team, Inc.*, 433 F.3d 73, 85 (1st Cir. 2005) (affirming denial of motion to amend to add 93A claim when plaintiffs' alleged loss is "not a result of

Finally, plaintiffs argument that summary judgment is not the time to consider a failure to mitigate defense is without merit.  Though mitigation is usually a factual matter for trial, even plaintiffs' new citation, *Commonwealth v. TLT Constr. Corp.*, demonstrates that summary judgment is appropriate when no genuine issues of fact exist left to be tried.  *See Commonwealth*, No. 96-2281, 1999 Mass. Super. Lexis 252, at *6 (Mass. Super. Ct. 1999) (noting that non-movant must respond with record evidence to create issue of fact).  Where no genuine issues of fact are left for trial, summary judgment is warranted, even on a failure to mitigate defense.  *See Lavely v. Trustees of Boston Univ.*, 1987 U.S. Dist. LEXIS 8582, No. 83-955-G, at *8 (D. Mass. 1987) (granting summary judgment on failure to mitigate claim because of lack of genuine issues of fact as to essential elements); *Greenray Indus., Inc. v. Charleswater Products, Inc.,* No. 88-2566-Z, 1990 U.S. Dist. LEXIS 2568, at *10-11 (D. Mass. 1990) (stating that it was possible to decide mitigation defense for plaintiff if "no reasonable fact finder could find [plaintiff's] conduct unreasonable under the agreed facts," but noting neither party submitted record evidence to facilitate such a decision).  Given that Class 3 payors did nothing, despite clear knowledge of the basis for their purported harm, their failure to mitigate bars their claims.

---

[defendant mortgagee's] conduct, but is a consequence of the foreclosure process and its requirements."); *RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 15-16 (1st Cir. 2001) (affirming summary judgment based on finding that defendant's alleged misconduct did not cause harm to defendants, who were harmed not because of defendant's statements, but "because of the Massachusetts regulatory scheme that prevents new billboards from being built.").

## **CONCLUSION**

For the above-stated reasons, the Track 1 defendants respectfully ask that the Court enter an order granting defendants summary judgment with respect to plaintiffs' Class 3 claims.

Dated:  September 22, 2006

/s/ William F. Cavanaugh, Jr.

William F. Cavanaugh, Jr.
Andrew D. Schau
Erik Haas
Adeel A. Mangi
**PATTERSON BELKNAP WEBB & TYLER** LLP
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000

*Attorneys for the Johnson & Johnson defendants on
behalf of all Track 1 defendants*

34

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was delivered on September 22, 2006 via electronic service to counsel for all parties.

/s/ Andrew D. Schau
Andrew D. Schau