## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
|  | MDL NO. 1456 |
|  | Civil Action No. 01-12257-PBS |
|  | ) ) Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | ) ) ) |

## <u>REPLY DECLARATION OF ANDREW D. SCHAU</u>

ANDREW D. SCHAU, declares as follows:

1.     I am a member of the law firm of Patterson Belknap Webb & Tyler LLP, attorneys for Johnson & Johnson, Centocor, Inc. and Ortho Biotech Products, L.P.  I submit this reply declaration in further support of the Track 1 Defendants' Motion for Summary Judgement With Respect to Class 3.

2.     Attached hereto are true and correct copies of the following exhibits, which are numbered sequentially following on from the declaration I submitted in support of defendants' moving papers dated July 14, 2006:

| Designation | Description |
|---|---|
| Exhibit 45 | Relevant excerpts from the February 27, 2006 deposition of Raymond Hartman |
| Exhibit 46 | Relevant excerpts from the transcript of the February 2, 2006 hearing before Chief Magistrate Judge Bowler |
| Exhibit 47 | Additional relevant excerpts from the April 14, 2006 deposition of Sharon Smith |

| Designation | Description |
|---|---|
| Exhibit 48 | Declaration of Edward S. Curran, Jr. dated September 21, 2006 |
| Exhibit 49 | Additional relevant excerpts from the April 12, 2006 deposition of Maureen Coneys |
| Exhibit 50 | Relevant excerpts from the June 9, 2006 deposition of James Fanale |
| Exhibit 51 | Additional relevant excerpts from the March 9, 2006 deposition of Deborah Devaux |
| Exhibit 52 | Additional relevant excerpts from the March 10, 2006 deposition of Sheila Cizauskas |
| Exhibit 53 | Letter from Stephen L. Coco to Andrew D. Schau dated September 20, 2006 |
| Exhibit 54 | Document produced by BCBSMA bearing Bates Nos. BCBSMA-AWP 42822-42831 |
| Exhibit 55 | Documents produced by Trigon bearing Bates Nos. A-VA 03010065-68 |
| Exhibit 56 | Relevant excerpts from the September 22, 2004 deposition of Margaret M. Johnson |
| Exhibit 57 | Relevant excerpts from the September 17, 2004 deposition of Carol Sidwell |
| Exhibit 58 | Additional relevant excerpts from the September 13, 2004 deposition of Eric Cannon |
| Exhibit 59 | Relevant excerpts from the September 14, 2004 deposition of Paula Pfankuch |
| Exhibit 60 | Relevant excerpts from the September 17, 2004 deposition of Dan Dragalin |
| Exhibit 61 | Additional relevant excerpts from the November 30, 2004 deposition of Joe Spahn |
| Exhibit 62 | Additional relevant excerpts from the October 20, 2004 deposition of Robert Farias |
| Exhibit 63 | Relevant excerpts from the September 10, 2004 deposition of Raeann Maxwell |

| Designation | Description |
|---|---|
| Exhibit 64 | Documents produced by BCBSMA bearing Bates Nos. BCBSMA-AWP-33415 and BCBSMA-AWP-40618 |
| Exhibit 65 | Document produced by BCBSMA bearing Bates No. BCBSMA-AWP-41630 |

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  September 22, 2006                      /s/ Andrew D. Schau
                                                Andrew D. Schau

1310576v1

# Exhibit 45

Page 629

1      THE UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF MASSACHUSETTS

3      * * * * * * * * * * * * * * * * * * * * * * * * * * *

4    IN RE:  PHARMACEUTICAL                MDL DOCKET NO.

5    INDUSTRY AVERAGE WHOLESALE            01CV12257-PBS

6    PRICE LITIGATION

7      * * * * * * * * * * * * * * * * * * * * * * * * * * *    FEBRUARY 27, 2006

8    THIS DOCUMENT RELATES TO:             VOLUME: III

9    ALL ACTIONS                           PAGES: 629-904

10     * * * * * * * * * * * * * * * * * * * * * * * * * * *

11              C O N F I D E N T I A L

12          CONTINUED VIDEOTAPED DEPOSITION OF

13            RAYMOND S. HARTMAN, PH.D.

14  CONTINUED DEPOSITION of RAYMOND S. HARTMAN, Ph.D., a

15  witness called on behalf of the Defendants pursuant to

16  the Federal Rules of Civil Procedure, before Judith

17  McGovern Williams, Certified Shorthand Reporter,

18  Registered Professional Reporter, Certified Realtime

19  Reporter, and Notary Public in and for the Commonwealth

20  of Massachusetts, at the offices of Dwyer & Collora,

21  600 Atlantic Avenue, Boston, Massachusetts 02110, on

22  Monday, February 27, 2006, commencing at 9:42 a.m.

Page 738

1  quote, "Considering that we also found that there
2  is no single discount rate which can be applied to
3  the AWP to provide a reasonably consistent
4  estimate of physicians' acquisition cost, we do
5  not feel that AWP provides a useful measure of the
6  acquisition cost for a drug to physicians."
7        Is it your testimony that a payer
8  reading that statement would nevertheless conclude
9  that AWP is larger than ASP by a reasonably
10  predictable amount?
11        A.  It is again the drug you're pointing to
12  is one of the multi-source drugs.  It is
13  methotrexate sodium.  And we find that there is -
14  - there is much greater variation in the multi-
15  source drugs, and -- I've -- I've -- I haven't
16  used those for that purpose.  The data on
17  characterizing a relationship between AWP and ASP
18  for multi-source drugs is -- that kind of survey
19  information is much more spotty, as has been
20  recognized by Dr. Berndt and as I cite in my
21  report, and so, you know, this is just summarizing
22  the same thing.

Page 739

1        Q.  Isn't it a fact, Dr. Hartman, that a
2  number of payers have testified to exactly what is
3  stated in this OIG report, that they understood
4  that there was no reasonably predictable
5  relationship between AWP and ASP?
6        MR. SOBOL:  Objection to the form.
7        A.  Well, I know that --
8        MR. SOBOL:  Objection to the form.
9        THE WITNESS:  That was a double
10  objection.
11        MR. SOBOL:  Sorry.
12        A.  There were a variety of depositions of
13  payers that I reviewed, well, that were put
14  forward by Mr. Young and Dr. Gaier that purported
15  to demonstrate that payers didn't rely on AWP,
16  that they had -- that they didn't give a damn
17  about what the acquisition cost was, and there --
18  and stated a variety of things, and I have -- I
19  have responded to -- to a large group of those in
20  my rebuttal -- two rebuttal reports.  I would have
21  to see whether what you are going to put in front
22  of me is one of those quotes.

Page 740

1        But again, a quote from a deponent, I
2  would have to see what the full context was, what
3  that person knew, whether that person was really
4  the person that was in charge of reviewing data
5  and understanding what acquisition costs were and
6  setting reimbursement rates.  But given those
7  caveats, I would be glad to read any depositions
8  you want to put in front of me.
9        MR. EDWARDS:  Well, let's mark as
10  Exhibit Hartman 028 to this deposition a copy of
11  the transcript of Mickie Brown.
12        THE WITNESS:  Are we done with this one?
13  Can I give this one back to you, the OIG?
14        MR. EDWARDS:  You can put that one down.
15        (Deposition transcript of Mickie
16  Brown taken March 9, 2005 marked Exhibit Hartman
17  028 for identification.)
18  BY MR. EDWARDS:
19        Q.  I want to direct your attention to page
20  126 of the deposition.
21        A.  Could you tell me who Mickie Brown is?
22        Q.  I believe he was with Blue Cross/Blue

Page 741

1  Shield of Mississippi.
2        A.  And could you tell me what his job was
3  there?  Where does it describe what he is doing
4  there?
5        Q.  I don't have that information at my
6  fingertips.  I take it you're not aware of the
7  answer to that either; is that correct?
8        A.  Without -- I mean I may have looked at
9  this in my rebuttal stage, but I don't remember
10  precisely, so I am seeing Blue Cross of
11  Mississippi on page 9, he left in '96.
12        Q.  I take it you have never read this
13  deposition; is that correct?
14        A.  I don't recall whether I have or not.
15        Q.  I believe on page 16 he testifies that
16  he is the director of provider networks, but I
17  want to direct your attention to the testimony
18  that begins at line 20 on page 126.  Do you have
19  that?
20        A.  Let me turn to that.  Line?  I am sorry.
21  What page?  I am sorry.  I didn't hear the page.
22        Q.  Page 126, line 20.

29 (Pages 738 to 741)

Page 742

1    (Witness complying.)
2    A.   Okay.
3    Q.   "Question:  Well, certainly we can agree
4  that the AWP for any given drug bears no fixed
5  relationship to acquisition cost for that drug;
6  correct?
7        "Answer:  As I have said before, I don't
8  know where average wholesale price comes from, so
9  the relationship of average wholesale price to
10  acquisition cost is not something that I'm
11  familiar with, so I don't know how I can agree or
12  disagree with your statement.
13        "Question:  Then it is certainly fair to
14  say that you have no particular expectation that
15  there will be a fixed relationship between AWP and
16  acquisition cost?
17        "Answer:  Average wholesale price is a
18  point of reference that we use. Its relation to
19  acquisition cost, I'm not familiar with, so I mean
20  I don't have an expectation -- I don't have an
21  expectation one way or the other on that."
22        How do you reconcile that testimony with

Page 743

1  your opinion that payers have expected that AWP is
2  larger than ASP by a reasonably predictable
3  amount?
4        MR. SOBOL:  Objection to the form.
5    A.   My conclusion and those of the other
6  persons cited in my report that there is a
7  reasonable expectation characterizes the market as
8  a whole.  You are going to have market entities
9  out there that are -- are unaware of a
10  relationship and essentially are going to follow
11  in terms of negotiating an acquisition cost -- I
12  am sorry -- a reimbursement rate, they're going to
13  follow some rule of thumb, percentage off AWP, and
14  these are precisely -- these -- the -- those
15  payers and those payers designing reimbursement
16  rates for third-party payers that actually have no
17  understanding of this relationship are at the
18  mercy of, one, what the market expectation --
19  well, they are unaware of what the market
20  expectations are, but these are precisely the
21  payers that are most easily gouged by the alleged
22  fraud, because they have no idea.  They are just -

Page 744

1  - they just -- they assume, well, AWP is what
2  Medicare is using.  95 percent of AWP.  I'm --
3  that seems to be what the government is doing.
4  They must know what they are doing.
5        So there is going to be people with no
6  expectations.  It is like someone walking into a
7  car dealer and seeing what the sticker price is
8  and saying, "Well, okay, I will take it at that,
9  I'm not going to negotiate it with you," doesn't
10  look up on Carfacts, doesn't do any research.  I
11  read this as an uninformed payer that -- this
12  doesn't mean that there is not a set of
13  relationships that inform the market.  This just
14  means that there is one person that is not aware
15  of it.
16        MR. EDWARDS:  I will mark as Exhibit
17  Hartman 029 a copy of the deposition transcript of
18  Thomas E. Greenbaum taken on January 14, 2005.
19        (Deposition transcript of Thomas E.
20  Greenbaum taken on January 14, 2005 marked Exhibit
21  Hartman 029 for identification.)
22    A.   You know, I would like to follow up with

Page 745

1  just one further response on this previous
2  exhibit.
3        You know, the -- it says that he is
4  currently director of provider networks, but again
5  we are pulling out -- you are pulling out one page
6  of this fellow's deposition.  I have no idea
7  whether this is the person, you know, someone who
8  is director of provider relationships, or provider
9  networks, whether he is the person doing the
10  negotiations.  This doesn't really tell me what
11  this entity, this payer, you know, unless I know
12  this is the guy that is negotiating, you know,
13  there is many a management person that is sitting
14  there director of something and the details are
15  left to somebody else.
16        So in addition to this person, whether
17  he knew or not and whether he was being gouged or
18  not, he may not be -- they may have a very good
19  idea, this entity, of what the acquisition cost
20  is.  This person doesn't (pointing to Exhibit
21  Hartman 028). He may not be the person who is
22  going to know anything about that.

Case 1:01-cv-12257-PBS    Document 3130    Filed 09/22/06    Page 8 of 33

Page 746

```
 1        Q.  Do you know how Mr. Brown was chosen as
 2   a witness?
 3        A.  My guess would be that he was designated
 4   in response to a 30(b)6 that said, "We would like
 5   to speak to somebody who knows about reimbursement
 6   rates."
 7        Q.  It says, "Please produce the person most
 8   knowledgeable about this subject."
 9        A.  Um-hmm.
10        Q.  Is that consistent with your
11   understanding?
12        A.  I have not --
13        MR. SOBOL:  Objection to the form of the
14   question.
15        THE WITNESS:  Yes.
16        A.  I have not seen -- I have -- I have been
17   on the requesting end of many 30(b)(6)s where I
18   have asked for a person in that context and gotten
19   someone who didn't know what it was, but I -- I
20   would assume you have asked for somebody who did
21   know.
22        I don't know whether this person -- I
```

Page 747

```
 1   don't -- I would have to read this fully to
 2   establish his bona fides to establish whether he
 3   really does know.
 4        Q.  Blue Cross/Blue Shield of Mississippi is
 5   a class member in this case; correct?
 6        A.  I would assume so.
 7        Q.  These are the people that Mr. Sobol
 8   represents; correct?
 9        A.  The -- Mr. Sobol represents the third-
10   party payers and the beneficiaries, the class as
11   it is defined.
12        Q.  They are the people who are alleging
13   that these defendants should be held liable and
14   should be required to pay money; correct?
15        A.  They are -- they are one of the -- one
16   of the subclasses.  They are subclass 2 and part
17   of subclass 3.  They are not in subclass 1.
18        Q.  So it is certainly not in their interest
19   to bend over backwards to help the defendants
20   here; correct?
21        MR. SOBOL:  Objection to the form.
22        A.  I'm -- it is certainly reasonable to
```

Page 748

```
 1   believe that whomever they would produce it would
 2   be somebody who would help in this particular --
 3   help in understanding an area where they are a
 4   stakeholder.  I don't know whether they have or
 5   not.  I -- that --
 6        Q.  I want you to take a look at the
 7   transcript of the deposition of Thomas Greenbaum,
 8   which we have marked as Exhibit Hartman 029.
 9        (Handing Exhibit Hartman 029 to the
10   witness.)
11        Q.  He is from Cigna.  Cigna is a large,
12   sophisticated payer; is that correct?
13        A.  They are a -- they are a large payer.
14   That's true.
15        Q.  I want to direct your attention to the
16   testimony that begins at line 12 on page 75.
17        A.  You know, before I get directed to any
18   testimony, I just want to see who this person is
19   besides his name.
20        (Pause.)
21        (The witness viewing Exhibit
22   Hartman 029.)
```

Page 749

```
 1        Q.  Take a look at page 6, line 9.  "I'm the
 2   chief operating officer of CIGNA pharmacy."
 3        A.  Okay.  I just want to look at kind of
 4   his background a bit here.
 5        (Pause.)
 6        (The witness viewing Exhibit
 7   Hartman 029.)
 8        A.  So this is -- I mean I am looking at a
 9   little bit more of his background, and it -- it
10   sounds like Brownie of FEMA.  I mean I go to the
11   bottom of page 8, and it says -- or I am sorry --
12   of 6 and 7 -- "Can you tell me in broad terms
13   prior to coming to Cigna three years ago about
14   your employment background?"
15        "I worked as a general manager of the
16   Book of the Month Club.  Prior to that I was chief
17   operating officer of Marvel Entertainment and
18   prior to that I worked for an entertainment
19   products company in Wisconsin."
20        So it would be correct to say that prior
21   to coming to Cigna three years ago you had not
22   previously worked in the healthcare insurance
```

31 (Pages 746 to 749)

Page 750

1  industry; is that true?
2       Okay.  So conditioning that on that
3  person's understanding of this industry, what is
4  it that you want me to look at?
5    Q.  Well, when you compare this person to
6  Brownie of FEMA, what did you have in mind?  Are
7  you trying to infer that this person is somehow
8  incompetent?
9    A.  No.  I am saying that as with, I think,
10  Mr. Brown's bona fides were that he had been head
11  of the Arabian Horse Society prior to being placed
12  as head of FEMA, and that that experience did not
13  give him a nuanced deep understanding of what was
14  necessary for the job into which he was placed,
15  and I -- so I look at this, and I see that someone
16  does not have a -- I mean he is the COO of Cigna,
17  but I'm not seeing a long history of understanding
18  the nuances of all that is -- Cigna is a big
19  company, and it is doing -- it is doing
20  reimbursement for physicians and for hospitals, it
21  is doing all kinds of information management, and
22  along with prescription reimbursement and

Page 751

1  reimbursement for physician- administered drugs,
2  and I just wanted to see what -- this is a
3  background that doesn't argue a nuanced deep
4  understanding to me, but, and I just wanted to get
5  that in the record. I just wanted to know what his
6  background was.
7    Q.  Well, is it your testimony that to the
8  extent that any payer claims it was injured here
9  it is because they were not competent, like
10  Brownie here?
11    A.  No.  It is my testimony that there --
12  there were -- there were expectations in the
13  market, and there were -- that -- that essentially
14  those expectations that developed in the late
15  '80s, early '90s, relative to these particular
16  drugs, physician-administered drugs, and the
17  relationship of AWP to acquisition costs of the
18  providers was set in Medicare's mind and in third-
19  party payers' minds in the early '90s, and they
20  changed very slowly, and people weren't aware,
21  weren't aware of all of that.
22       And so the -- it is -- it is very easy

Page 752

1  for even knowledgeable third- party payers that
2  haven't -- are not paying attention to this one
3  particular aspect of things, where this is an area
4  that can be abused easily by manufacturers, as we
5  see in the Vincasar matter that I cited earlier in
6  my report in the paragraph that quotes Medpac or
7  that were exploited in the Lupron matter. These
8  were -- these were drugs and these were
9  reimbursement rates that were low on the radar
10  screen in Professor Berndt's nomenclature, and so
11  someone that is relatively well informed would not
12  notice the abuse of this spread, and certainly
13  someone who has little background in it is easily
14  duped or could be -- the alleged fraud would be
15  particularly easy to impose upon someone -- a
16  payer like this if this is the person negotiating
17  reimbursement rates.
18    Q.  So it is your testimony that Cigna was
19  duped?
20    A.  It is my testimony as I read -- you have
21  put a deposition in front of me.  I am looking at
22  the background of the person, because you are

Page 753

1  asking me a question about what he knew, and I am
2  looking at his background, and I see that his
3  background suggests to me that he hasn't spent a
4  lot of time studying this market to know that
5  much, and that's all I am saying.
6       And so --
7    Q.  Take a look at page 75 beginning at line
8  12.
9       (Witness complying.)
10    Q.  And this is part of a question:
11       "Would the same statement that you just
12  made hold true for the actual acquisition cost,
13  that Cigna does not have an expectation of a
14  relationship between average wholesale price or
15  actual acquisition cost but in fact those are two
16  separate pieces?"
17       And then there are a series of
18  objections.
19       "Answer: Yeah.  I mean I think that our
20  acquisition costs are separate from AWP, and we
21  don't have any expectations of what the
22  relationship is between what we purchase the drug

32 (Pages 750 to 753)

Raymond S. Hartman, Ph.D.                    CONFIDENTIAL                    February 27, 2006
                                              Boston, MA

Page 754

1  for and what AWP is."
2         Now given that testimony, do you think
3  that your opinion that payers have expected that
4  AWP is larger than ASP by a reasonably predictable
5  amount simply doesn't apply to Cigna?
6         MR. SOBOL:  Objection to the form.
7     A.  I'm saying -- I am saying that the
8  expectations that I have framed and analyzed and
9  put forward in my report summarize the market as a
10  whole for those -- for those groups who have been
11  surveyed, for those payers for which contracts
12  have been negotiated, and there are going to be --
13  I would like to see Cigna's contracts with -- with
14  -- with an oncology group to see what was actually
15  negotiated.
16        The -- you know, I am seeing -- I am
17  sorry.  I was trying to see whose all of these
18  names here were.
19        This is a person who I would assume when
20  negotiating contracts -- this is a senior person
21  that is not close to those details given his
22  background and given the response.

Page 755

1         So this -- this is again -- has no
2  evidentiary value that I see really even about
3  what Cigna was doing or what Cigna knew.
4     Q.  So are you saying that when you
5  summarize expectations in the marketplace you
6  ignore all evidence that is contrary to your
7  hypothesis?
8         MR. SOBOL:  Objection to the form.
9     A.  No.  I seek evidence wherever I can get
10  evidence of someone knowledgeable about what it is
11  I'm analyzing, and from what I see here, this
12  deponent has little credibility as to an
13  understanding of what expectations were, relations
14  were, period.
15    Q.  I want to show you the deposition of
16  Jill Herbold taken January 14, 2005, which I will
17  mark as Exhibit Hartman 030.
18        (Deposition transcript of Jill A.
19  Herbold taken on January 14, 2005 marked Exhibit
20  Hartman 030 for identification.)
21        MR. EDWARDS:  And I apologize to anybody
22  who might listen to the audio of this deposition

Page 756

1  for constantly coughing on the record.  I just
2  can't help it.
3         THE WITNESS:  Can I offer you a Halls?
4         MR. EDWARDS:  Maybe at the break.
5  BY MR. EDWARDS:
6     Q.  You said --
7     A.  Could I just take a second, if you would
8  bear with me?
9         (Pause.)
10        (The witness viewing prior
11  exhibit.)
12    A.  I just want to review one of the prior
13  exhibits that you had put before me.
14        (Further pause.)
15        (The witness continues to view
16  prior exhibits.)
17    A.  Okay.  I am sorry.
18    Q.  Now you testified a moment ago when I
19  was asking you questions about Mr. Greenbaum that
20  you would like to see Cigna's contracts in order
21  to evaluate his testimony about the relationship
22  between AWP and ASP; correct?

Page 757

1     A.  And I -- I think you have been very good
2  in finding me a person who might help in that
3  regard.
4         I did say that.  Yes.
5     Q.  I take it you have never asked
6  plaintiffs' counsel to provide you with copies of
7  Cigna's contracts, have you?
8     A.  I have asked for contracts, and I forget
9  what was provided.  It is my recollection that we
10  did not receive -- I did not receive a lot of
11  contracts.  I certainly relied on some contracts
12  that were put forward by Mr. Young, but I did ask
13  for contracts.  I didn't -- I don't think I
14  received any, but I would have to look.  I can't
15  recall.
16    Q.  Well, you identify contracts for
17  physician-administered drugs that you rely on in
18  attachment C --
19    A.  I do, yes.
20    Q.  -- to your declaration; correct?
21    A.  That's correct.
22    Q.  And basically you identified four

33 (Pages 754 to 757)

Raymond S. Hartman, Ph.D.                     CONFIDENTIAL                     February 27, 2006
Boston, MA

Page 758

1 contracts; correct?
2     A.   And I think those four contracts were
3 ones that I was able to get from defendants.
4     Q.   None of those are Cigna contracts;
5 correct?
6     A.   I would assume not, but I -- I am trying
7 to think whether --
8          (Pause.)
9          (The witness viewing Exhibit
10 Hartman 023.)
11     A.   -- in my rebuttal reports I had seen
12 Cigna contracts, but that is something I can
13 check.
14     Q.   Okay.  Let's go back to Ms. Herbold's
15 deposition.  She is also with Cigna; correct?
16     A.   Yes.  It appears that as far as I can
17 tell she is responsible for strategy and policy as
18 well as financial analysis for practitioner
19 reimbursement, and so she is an assistant VP
20 practitioner reimbursements.  She has been that
21 since 2004, so she has been doing that job since
22 fairly recently, and --

Page 759

1     Q.   I want to direct your attention to page
2 21 of this deposition beginning at line 8.
3          (Witness complying.)
4     Q.   "Question:  Can you tell me the range
5 below AWP that these rates and the Cigna national
6 standard injectable reimbursement rate was varied?
7          "Answer:  Typically 15 percent.  We have
8 codes that are up to 45 percent below AWP."
9          Do you see that?
10     A.   I do.
11     Q.   So Cigna's contracts do not fall within
12 the plus or minus 15 percent of AWP range on which
13 you premise your report; correct?
14          MR. SOBOL:  Objection to form.
15     A.   Well, certainly their typical contract
16 does.  Now they claim they have codes up to 45
17 percent below AWP, and I would assume that is for
18 a multi-source, and I would have to -- I would
19 have to -- as to typicality, I see 15 percent.  As
20 to whether -- how much of an exception 45 percent
21 is, and this is again as of 2004, and there
22 certainly have been more multi-source drugs

Page 760

1 recently, in the last five years of the physician
2 administered, so I would assume that that applies
3 to multi-source.
4     Q.   So that would be another example of
5 payer expectation with respect to multi-source
6 differing from the expectation with respect to
7 single source?
8     A.   This is one piece of evidence regarding
9 as of 2004 what a relationship would be for a
10 multi-source product.
11     Q.   Next I want to show you the transcript
12 of the deposition of Joe Spahn taken November 30,
13 2004.
14          MR. EDWARDS:  This will be Exhibit
15 Hartman 031.
16          (Deposition transcript of Joe Spahn
17 taken on November 30, 2004 marked Exhibit Hartman
18 031 for identification.)
19          (Handing Exhibit Hartman 031 to the
20 witness.)
21 BY MR. EDWARDS:
22     Q.   Mr. Spahn is with Anthem.  Do you know

Page 761

1 what Anthem is?
2     A.   It is my recollection that Anthem is a
3 Blue Cross/Blue Shield, but I would have to
4 confirm that.  Oh, yes.  There it is.  Anthem Blue
5 Cross/Blue Shield.
6     Q.   Anthem is an amalgamation of a number of
7 Blue Cross/Blue Shield entities; correct?
8     A.   That -- it's -- I think that's correct.
9 I don't know how many, and I would have to confirm
10 that.
11     Q.   Do you know whether Anthem is at this
12 point the largest payer in the country?
13     A.   As of today, you mean?
14     Q.   Yes.
15     A.   I don't know.
16     Q.   What I want to do is direct your
17 attention to the testimony that begins at page 93,
18 line 6.
19          "Question:  Now you testified earlier
20 that Anthem has -- does not know exactly what
21 providers are paying to acquire drugs; correct?
22          "Answer:  Correct.

34 (Pages 758 to 761)

Raymond S. Hartman, Ph.D.                    CONFIDENTIAL                              February 27, 2006
                                               Boston, MA

Page 762

1    "Question:  That is not something that -
2    - withdraw that.
3       "Anthem does not require providers to
4    disclose their acquisition cost for drugs as part
5    of their contracts with those providers; correct?
6       "Answer:  Correct.
7       "Question:  So providers' acquisition
8    costs for drugs do not form part of Anthem's
9    determination of what it will reimburse them in
10   relation to drugs?
11      "Answer:  Correct.
12      "Question:  The reimbursement is driven
13   entirely by the fee schedule?
14      "Answer:  Correct.
15      "Question:  Regardless of what the
16   specific providers' acquisition cost for those
17   drugs may be?
18      "Answer:  Correct.
19      "So if, for example, Anthem were to
20   learn that a particular provider were getting a
21   discount or a rebate on a particular drug that
22   lowered his acquisition cost for that drug, that

Page 763

1    wouldn't change the amount that Anthem is
2    reimbursing that practice in relation to that
3    drug; right?
4       "Answer:  No.
5       "Because the reimbursement amount is
6    tied to the fee schedule?
7       "Answer:  Right.
8       "Question:  And if Anthem were to learn
9    that providers in a region were getting a discount
10   or rebate from a drug manufacturer in relation to
11   a particular drug, again that wouldn't change the
12   amount that Anthem reimburses because that is tied
13   to the fee schedule?
14      "Answer:  That's correct.
15      And then continuing on page 97,
16   beginning with line 17, "Prior" -- question:
17      "Prior to the break, we were talking
18   about providers' acquisition cost and the fact
19   that they are not relevant to Anthem's
20   reimbursement amounts.  Do you recall that
21   testimony?
22      "Answer:  Yes.

Page 764

1    "Question:  Okay.  And part of that was
2    that Anthem has no information about the
3    providers' acquisition costs?  Right?
4       "Answer:  Correct.
5       "Question:  So it is fair to say that
6    Anthem has no particular expectation that
7    providers' costs would be, you know, 10 percent,
8    30 percent, 50 percent, something more, something
9    less than the amount they're reimbursed in
10   relation to those drugs?  Right?
11      "Answer:  Yes."
12      Now based on that testimony, would it be
13   fair to say that your opinion that payers have
14   expected that AWP is larger than ASP by a
15   reasonably predictable amount would not apply to
16   Anthem?
17      A.   What this says to me is what occurred
18   over the '90s and into the early 2000s, and that
19   is that there were a set of expectations going
20   into that period of time of what the relationship
21   was, and that formed expectations as cited by Mr.
22   Young as laid out in the 1992 OIG report for

Page 765

1    single-source drugs, as reflected in contracts
2    that were negotiated over this entire period of
3    time, and what was also the discussions that were
4    going on Congressionally about Medicare.  That
5    there were expectations in place that governed
6    reimbursement of both Medicare and third-party
7    payers looked to Medicare and discounts off of AWP
8    and how they reimbursed.  There was a growing
9    awareness with both the legal action and once
10   managed healthcare dealt with some of the larger
11   cost issues, like hospitalization and physician
12   costs, they started focusing on issues about
13   prescription drugs and then physician-
14   administered drugs.
15      And this says to me that Anthem, going
16   into this, that they didn't -- they don't have the
17   information they need to know more than relying on
18   the general kinds of rules of thumb that have
19   characterized this market and that has been able
20   to be abused by the manufacturers, and so they
21   have locked into a computer system and a
22   reimbursement system a set of AWPs and

35 (Pages 762 to 765)

Raymond S. Hartman, Ph.D.                    CONFIDENTIAL                    February 27, 2006
                                              Boston, MA

Page 766

1   reimbursements off of AWPs, and I know there are
2   private third-party payers that are starting to
3   evaluate this kind of issue now and starting to
4   learn that there is a bigger gap than they
5   thought, but this is something that is only
6   recent, and it hasn't been -- this is precisely
7   why this has been a lucrative area to exploit by
8   the kind of behavior that is alleged on the part
9   of manufacturers.
10      Q.  If you look at pages 8 and 9 of this
11  deposition, you will see that Mr. Spahn testifies
12  that he has served as senior healthcare consultant
13  to Anthem since 1992.  Do you see that?
14      A.  I do.
15      Q.  And he doesn't say in the testimony that
16  we just read that his views of this matter have
17  changed over the period of time since 1992 to the
18  present, does he?
19      A.  He -- you are asking -- there is --
20  there is -- there is hundreds -- there is 174
21  pages of deposition here, and for -- I'm not going
22  to attempt to characterize that particular set of

Page 767

1   quotes.
2         What page was that again?  Oh, here we
3   go.
4       Q.  The quotes we read were from --
5       A.  No.  I see it.  I have got it.
6       Q.  -- I think 93 to 97.
7       A.  The quotes?
8       Q.  Or 98.  Pages 93 to 98.
9       A.  Okay.  I thought -- yes.  Not years.
10        Yes.  I mean I am -- I am -- I would
11  assume that as of now, 2004-2005- 2006, that these
12  -- that providers are beginning to realize that
13  these expectations, the expectations that they
14  have relied on to write their contracts, that is
15  reflected in all of the testimony that I have
16  cited and the surveys that I have cited and what
17  the Judge has relied on, reflected a period of
18  time where the spreads have obviously been
19  exploited in very dramatic fashion, as recognized
20  by Dr. Berndt, and payers are beginning to say,
21  you know, there is something -- we need to be
22  thinking about acquisition costs.  I don't know

Page 768

1   what it is right now, and because our systems of
2   reimbursement are hard wired to AWP, I don't know
3   what it is.  We can't work with that.  But I know
4   that third-party payers are beginning to try to,
5   precisely because they -- the extent of the
6   problems alleged in this matter are becoming
7   clear.
8       Q.  What is the basis for your testimony
9   that Mr. Spahn's expectations have changed since
10  1992?
11        MR. SOBOL:  Objection to the form.
12      A.  I didn't say Mr. Spahn's.  I am saying
13  that the -- as a -- as a matter of information,
14  that is -- that is compelling, we have talked
15  about this 1992 OIG report that the -- how much
16  that was disseminated as to the multi-source
17  spreads is unclear -- is unclear to me, but what
18  is clear and has become clear, as I have said in
19  paragraph 53A, and these are events where we have
20  had the Lupron behavior becoming known, that was
21  behavior going on in the '90s, and exploiting
22  understandings of reimbursement in the '90s, and

Page 769

1   it became clear in 2000 -- with the litigation,
2   and then with the settlement agreement with 2001,
3   the sentencing memorandum, there were hearings
4   before the House Energy Subcommittee, and if you
5   will give me leeway to find one more.
6         (Pause.)
7         (The witness viewing Exhibit
8   Hartman 023.)
9       Q.  Would you agree with me that --
10      A.  I would like to get just this one last
11  statement in the record, if I could.
12        (Further pause.)
13        (The witness continues to view
14  Exhibit Hartman 023.)
15      A.  And there is probably a time limit at
16  some point.
17        MR. EDWARDS:  While you are looking, why
18  don't I have the reporter mark the next deposition
19  exhibit, which is Exhibit Hartman 032.
20        (Deposition transcript of Edward
21  Lemke taken on January 11, 2005 marked Exhibit
22  Hartman 032 for identification.)

                                        36 (Pages 766 to 769)

CONFIDENTIAL
Boston, MA

February 27, 2006

Page 770

1      THE WITNESS:  Yes.  I can't find it.
2      MR. EDWARDS:  It is the deposition of
3  Edward Lemke, taken on January 11, 2005.
4      THE WITNESS:  Oh, wait.  I found it.  It
5  is also the quote put forward by Dr. Berndt at
6  page 42 of his report where again he is stating
7  fairly recent understandings, and he says, this is
8  in footnote 12, he says, "In a different industry
9  publication, an executive of Advanced PCS reports
10 that in his experience health plans become
11 flabbergasted on what they are paying for years on
12 drugs on the medical side because of dramatic
13 price markups."
14     So this is again another summary of a
15 recent understanding of what has occurred over the
16 period of the '90s.
17     Q.  Take a look at the deposition of Edward
18 Lemke of Humana, which we have marked as Exhibit
19 Hartman 032.
20         (Handing Exhibit Hartman 032 to the
21 witness.)
22     Q.  Have you read this deposition before?

Page 771

1      A.  I think I -- I think I have seen parts
2  of it.  I think in terms of reviewing defendants'
3  experts, I had read part of this, but I can't
4  recall.
5      Q.  I just want to direct your attention --
6      A.  I am sorry.  I just want to find out who
7  this person is before we --
8      Q.  You may want to look at page 18, where
9  Mr. Lemke states that he is director of fee
10 schedule management for Humana.
11         (Witness complying.)
12     A.  Okay.  Humana.  Okay.
13     Q.  Let me ask you to look at page 123,
14 beginning at line 17.
15         (Witness complying.)
16     Q.  "Question:  Is it Humana's expectation
17 that the amounts that providers pay to acquire
18 drugs are a fixed percentage less than the amount
19 Humana reimburses in relation to those drugs?
20     "Answer:  The expectation that first of
21 all that it's fixed, no.  The expectation that
22 good business practice, and assuming providers

Page 772

1  that we do business with practice good business
2  practices, is that they would only accept payment
3  that is at or above their costs."
4      A.  I --
5      Q.  "That is my only expectation --"
6      A.  Counsel, I am sorry.  I missed the -- I
7  thought I had the page, and I have been looking
8  for the words.  Could you tell me?
9      Q.  Sure.
10     A.  Just start me.
11     Q.  It starts at 123.
12     A.  Page 123, okay.
13     Q.  Line 17.
14     A.  Okay.  I am sorry.
15     Q.  And what I just read you is line 17 on
16 page 123 through line 4 on page 124.
17     A.  Okay.
18         (Pause.)
19         (The witness viewing Exhibit
20 Hartman 032.)
21     Q.  Where he says it is his only expectation
22 that they would want payment at or above their

Page 773

1  costs.
2      And then continuing on:
3      "Question:  And certainly you have no
4  fixed expectation as to how much higher it would
5  be than their acquisition cost; correct?
6      "Answer:  Correct.
7      "Question:  And indeed that would vary
8  from provider to provider depending on what they
9  paid to acquire drugs and what Humana reimburses
10 them for drugs?
11     "Answer:  Correct.
12     "Question:  The percentage could be 10
13 percent in one case, 50 in another, 100 in
14 another; correct?
15     "Answer:  Could be."
16     Now, Dr. Hartman, is it fair to say that
17 your conclusion that payers have expected that AWP
18 is larger than ASP by a reasonably predictable
19 amount does not apply to Humana?
20     A.  No.
21     Q.  Well, if the Court or the jury finds
22 that the testimony of Mr. Brown, Mr. Greenbaum,

37 (Pages 770 to 773)

Raymond S. Hartman, Ph.D.

CONFIDENTIAL
Boston, MA

February 27, 2006

Page 774

1  Mr. Spahn, and Mr. Lemke is more representative of
2  market expectations than the sources you have
3  cited for market expectations, what does that do
4  to your report?
5      MR. SOBOL:  Objection to the form.
6      A.  Well, right now there has been quotes
7  from people about -- about very general kinds of
8  statements, you know, that -- that tell me that
9  this person doesn't really know and is relying on
10  the general rules of thumb that have characterized
11  this market for physician- administered drugs.
12  The fact that it is 10 percent, 50 or 100, he
13  said, "Could be," I would want to see the
14  contracts.  I would want to see, before I would
15  introduce this into evidence, here I have got -- I
16  have got contractual information; I have got
17  survey information on what people pay.
18      He is talking about again there, just
19  like what we were saying before, there could be a
20  variety of thoughts about what could be the case
21  of what I'm going to pay.  When you step up to
22  the, belly up to the bar and you sign a contract,

Page 775

1  then you see what it is for the different kinds of
2  drugs.
3      And so I see 10 percent.  I don't know.
4  50 percent, 100 percent.  In a multi-source
5  context?  This is again in 2005 when the
6  information was much different than the
7  preponderance of the class period.  2005 is not
8  even in my damage calculations.
9      Q.  Would you --
10     A.  So -- so I want to see contracts.  I
11  would want to see the contracts of these
12  companies.
13     Q.  Would you agree with me that Mr. Lemke
14  at least did not believe that AWP is larger than
15  ASP by a reasonably predictable amount?
16     MR. SOBOL:  Objection to the form.
17     A.  I don't think the question is -- I -- I
18  can't judge from this, this set of responses and
19  this set of questions.  It is too general and too
20  diffuse.  It is -- it --
21     Q.  Where he agrees that the percentage
22  could be 10 percent in one case, 50 in another,

Page 776

1  100 in another, is it your testimony that that is
2  consistent with your opinion that payers believe
3  that AWP is larger than ASP by a reasonably
4  predictable amount?
5      A.  My opinion goes to single-source
6  physician-administered drugs, as I have said, in
7  basing it on the information that I have looked
8  at, I extended to multi- source later, and discuss
9  how I -- how that -- what my assumptions are
10  therein.
11     But this is so broad and diffuse, this,
12  this doesn't tell me -- I don't know what he is
13  talking about.  I don't know if it is single
14  source.  I don't know if it is multi-source, if it
15  is a particular type of drug.  I don't know if
16  it's -- I don't know what -- it is too -- it is
17  too -- too broad, too general.
18     Q.  Your opinion that payers have expected
19  that AWP is larger than ASP by a reasonably
20  predictable amount is what an economist would call
21  a hypothesis; correct?
22     MR. SOBOL:  Objection.

Page 777

1      A.  It is -- it -- it could be called a
2  hypothesis.  It could also be called a conclusion.
3  And I've -- I approached this with a hypothesis
4  and came to a conclusion that it is the case.
5      Q.  Okay.  And the thing that gets you from
6  a hypothesis to a conclusion is an examination of
7  the evidence; correct?
8      A.  That's right.
9      Q.  And yet you are rejecting the evidence
10  that I have put forward to you from the
11  depositions of Mr. Brown, Mr. Greenbaum, Mr.
12  Lemke, and Mr. Spahn, and you are adhering to your
13  conclusions; correct?
14     A.  No.  I am -- the -- this is not evidence
15  as to what the actual -- what the reimbursement
16  rate, what the -- the contractual discounts off of
17  AWP would reflect whatever this understanding
18  would be, that -- that -- that's -- those are when
19  you survey it and you look at the actual numbers,
20  as I have cited in here, you look at what the
21  contracts say, there is going to be very -- it is
22  like flying, getting on an airline.  There are --

38 (Pages 774 to 777)

Raymond S. Hartman, Ph.D.                CONFIDENTIAL                February 27, 2006
Boston, MA

Page 778

1   there are list prices, and there are lots of
2   different discounts, and you are going to
3   negotiate, and you are going to -- and there is
4   going to be a list price that is going to reflect
5   certain things, and you may -- you may have -- it
6   could be anything.
7           But what is going to finally count is
8   what you pay, what you set that rate at.  And so I
9   don't know what this says about -- I want to see
10  the contracts of this, for this payer, to  know
11  what -- how the very vague understandings that are
12  articulated here are reflected in a real decision
13  that is made contractually or in real data.  I
14  mean this is -- you are -- this is very ill-formed
15  hearsay.
16      Q.   So you are saying that --
17          MR. SOBOL:  Wait, wait, wait.
18      Q.   -- the evidence --
19          MR. SOBOL:  It is one o'clock. Let's
20  take lunch.
21          MR. EDWARDS:  Could I ask just two more
22  questions on this line?

Page 779

1           MR. SOBOL:  Actually, no, because I have
2   a call.
3           MR. EDWARDS:  Please?
4           MR. SOBOL:  No.  Not even if you say
5   "pretty please."
6           THE VIDEOGRAPHER:  The time is 1:02. We
7   are off the record.
8           (Luncheon recess taken at 1:02
9   p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 780

1           AFTERNOON SESSION          1:47 P.M.
2
3           THE VIDEOGRAPHER:  The time is 1:47.
4   We're back on the record.
5
6           CONTINUED DIRECT EXAMINATION OF DR.
7   HARTMAN BY MR. EDWARDS:
8      Q.   Dr. Hartman, a while ago we were talking
9   about the possibility of conducting surveys that
10  you had mentioned in your prior deposition, and I
11  believe you testified that you decided not to
12  conduct those surveys in part because you had
13  deposition evidence available; is that correct?
14      A.   That was one of the reasons, yes.
15      Q.   What were the other reasons?
16      A.   Well, the other reason was really to get
17  at the issues involved would require just
18  implementing and designing an appropriate survey
19  would take time and would be involved to do
20  properly and do scientifically, and also to try
21  and do a survey going back where you are just
22  trying to get at expectations rather than revealed

Page 781

1   behavior, going back that far is very hypothetical
2   and very speculative. So it -- it was more useful
3   to look at the information that I looked at and
4   look at the depositions that I looked at.
5      Q.   Did you discuss the possibility of
6   conducting surveys with counsel for the
7   plaintiffs?
8      A.   You know, I think I raised it as a
9   possibility early on, as I was clear in the
10  declaration.  The decision not to do it came from
11  me, not from them.  So, yes, there was some
12  discussion, but.
13      Q.   What was their position on that?
14      A.   I don't recall.
15      Q.   And just so the record is clear, it is
16  your testimony that the testimony of payers that
17  we have reviewed thus far, the Brown deposition,
18  the Greenbaum deposition, the Lemke deposition,
19  the Spahn deposition, does not have an impact on
20  the conclusions you have expressed in your report?
21      A.   Those -- those opinions as they are
22  expressed and as they are discussed and as they

39 (Pages 778 to 781)

Raymond S. Hartman, Ph.D.

CONFIDENTIAL
Boston, MA

February 27, 2006

Page 782

1  are developed don't provide sufficiently
2  scientific evidence to be incorporated into what I
3  have done here (pointing to Exhibit Hartman 023).
4      Q.  Is there any literature that you can
5  cite to me to support the proposition that in
6  determining market expectations you should
7  disregard the testimony of participants in the
8  market as to what their expectations were?
9      MR. SOBOL:  I object to the form.
10     A.  The -- I think there is a literature
11  that -- certainly there is a whole class of
12  literature that is aimed at what is known as
13  contingent valuation, which is what -- which is a
14  set of surveys and survey designs that attempt to
15  elicit the feelings of market participants about
16  their expectation or their valuation without
17  having to buy that -- actually enter into an
18  economic transaction that would make -- that
19  would reveal what the final result of those
20  expectations were, and it has been demonstrated
21  that those kinds of surveys and that kind of
22  information can be very unreliable, and that's a

Page 783

1  form of expectations or beliefs about what
2  willingness to pay or certain things.
3      So the -- as a general rule, economists
4  will look to revealed preferences and what is
5  revealed in actual transactions, contracts,
6  prices, what is actually paid, what has actually
7  been written into a contract as the summary of
8  expectations.
9      Q.  Well, are there particular economists
10  that you can identify who have expertise in this
11  area of contingent valuation that you just
12  mentioned?
13     A.  There is -- there are economists that
14  have implemented it -- and I can't really remember
15  the names now.  There are economists that have
16  argued against the validity of that kind of work,
17  and there is a -- there is a paper -- there is a
18  monograph out that includes some authors, Jerry
19  Hausman and some other authors.  I forget.  I
20  think it is called -- it is -- I can't remember
21  the press name.
22     Dr. Gaier probably knows the press name.

Page 784

1  Where is he?
2      THE WITNESS:  He doesn't know the press
3  name.
4      A.  North Holland is -- and it is a critique
5  of contingent valuation.
6      Q.  And I take it that this theory of
7  contingent valuation is one of the things that you
8  would rely on in rejecting the deposition
9  testimony of Mr. Brown, Mr. Greenbaum, Mr. Lemke,
10  and Mr. Spahn that we have discussed earlier
11  today?
12     MR. SOBOL:  Objection.
13     A.  What?  I'm not quite sure the -- the --
14  the approach of contingent valuation is to survey
15  persons and say, "Well, what do you think you
16  would do in this situation, what would you pay,
17  what would you be willing to pay."
18     And that has -- that is not unlike, you
19  know, what did you think the costs were?
20     And there has been -- so I am not
21  proposing -- I am saying that that is an approach
22  that would say, "Go after expectations."

Page 785

1      I am saying that a lot of economists
2  have found that that is -- that there are problems
3  with that, and it is not reliable.  Once you allow
4  persons that express expectations or valuations to
5  actually put money on the table and sign a
6  contract or pay a price that it differs quite --
7  quite a bit from what the expectations were.
8  There is expectations that inform a final
9  decision, but what I focused on here was evidence
10  on final decisions, and I was focusing on evidence
11  in the -- in the '90s, not the depositions you are
12  telling -- you are pointing out to me are all, you
13  know, very recent, and expectations have changed
14  over the last 15 years.
15     Q.  Can you identify any payer who has
16  testified that it was his expectation that AWP
17  exceeded ASP by a range that did not exceed 30
18  percent?
19     A.  I just cited to in the -- in attachment
20  K that were -- that were dealing with self-
21  administered drugs.
22     Q.  And that is as good as you can do?

40 (Pages 782 to 785)

# Exhibit 46

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No. 01-12257-PBS

CITIZENS FOR CONSUMER JUSTICE, ET AL.
      Plaintiffs      .

          v.         .

ABBOTT LABORATORIES, et al    .
      Defendants     .

. . . . . . . . . . . . . .



TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE
HELD ON FEBRUARY 2, 2006

APPEARANCES:

For the plaintiffs: David S. Nalven, Esquire, Hagens, Berman, Sobol, Shapiro, LLP, One Main Street, Cambridge, MA  02142.

For Shering-Plough: Eric Christofferson, Esquire, Ropes and Gray, LLP, One International Place, Boston, MA  02110, (617) 951-7751.

For Johnson & Johnson:  Adel Mangi, Esquire, Patterson, Belknap, Webb & Tyler, LLP, 1133 Avenue of the Americas, New York, NY 10036-6710.

For Astrazeneca Pharm.:  Nicholas Theodorou, Esquire, Foley Hoag LLP, 155 Seaport Boulevard, Seaport World Trade Center West, Boston, MA  02210, (617) 832-1163.

For Dey, Inc.:  Chris Palermo, Esquire, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY  10178, (212) 808-7800.

For Abbott Labs:  Carol Geisler, Esquire, Jones Day, 222 East 41st Street, New York, NY  10017-6702.

For Empire Blue Cross Blue Shield:  Theodore Hess-Mahan, Esquire, Shapiro Haber & Urmy, LLP, 53 State Street, Boston, MA 02108, (617) 439-3939.

MARYANN V. YOUNG
Certified Court Transcriber
Wrentham, Massachusetts 02093
(508) 384-2003

24

1  depositions of over 40 third party payers - they're seeking as

2  well - the two that you previously saw on the basis that they

3  had constructed this representative sample.  They argued and

4  we've set forth in our papers on four or five occasions when

5  they represented to Judge Saris and to you that the reason that

6  they needed the specific discovery of an identified health plan

7  provider was because it was a key part of that representative

8  sample.

9        Defendants have already taken over 40 health plans

10 covering over 50% of the covered lives in the United States.

11 It really begs the question at this point now that they have

12 obtained all of the health plans discovery that constituted

13 their representative sample why are they back here now seeking

14 further discovery of four Massachusetts health plans?  Did the

15 defendants have a representative sample in the first place as

16 they have represented to the Court, and if they did, why is it

17 that at this point they require more?  The defendants respond

18 to that argument which is set forth in our papers by saying in

19 essence the world has changed since they constructed their

20 representative sample.  What they say to the Court is Judge

21 Saris has certified two specific Massachusetts only classes and

22 so that as a result now they need to drill down into

23 Massachusetts third party payers.  You did hear from Mr. Mangi

24 just one moment ago that the proof with respect to the

25 Massachusetts class will be demonstrated by the knowledge of

25

1   the industry as a whole which is the reason that they continue

2   to pursue discovery of third party payers nationally.  So that

3   again begs the question why select four more Massachusetts

4   third party payers?  Let me note, Your Honor, that they have

5   already taken two depositions, I'm sorry, three depositions of

6   Blue Cross Blue Shield of Massachusetts which were granted by

7   Your Honor in November.  And they have also already taken

8   discovery and four depositions from Harvard Pilgrim Community

9   Health Plan.  These two Health Plans together compromise more

10  than 50% of the covered lives in Massachusetts.  Your Honor, I

11  work here in Massachusetts, you work here in Massachusetts.

12  They have discovery from Blue Cross Blue Shield of

13  Massachusetts, Harvard Pilgrim.  They are now seeking discovery

14  from Tufts, Fallon, Neighborhood Health and more discovery from

15  Harvard Pilgrim.  Are you aware of any health plan providers

16  other than those five in Massachusetts?  This is not a

17  representative sample even of Massachusetts, even if it were

18  needed, this is every covered life in Massachusetts.  This

19  isn't a representative sample, Your Honor.  This is a census

20  that they are seeking.  You know, the Nielson Company does

21  their sample of all American television watchers with 400

22  families.  It seems to defy credulity that the defendants

23  really need discovery of virtually every covered life in

24  Massachusetts.

25          Three more very brief points, Your Honor.  Number

# Exhibit 47

Page 1

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3      -----------------------------------X

4    IN RE: PHARMACEUTICAL INDUSTRY    ) Civil Action

5    AVERAGE WHOLESALE PRICE LITIGATION ) No. 01-12257-PBS

6      -----------------------------------X

7    THIS DOCUMENTS RELATES TO:        ) MDL NO. 1456

8    THE MASTER CONSOLIDATED            )

9    CLASS ACTION                       )

10     -----------------------------------X

11

12              HIGHLY CONFIDENTIAL

13

14   VIDEOTAPED DEPOSITION OF SHARON L. SMITH, called as a

15   witness on behalf of the Defendants, pursuant to the

16   applicable provisions of the Federal Rules of Civil

17   Procedure, before Jeanette N. Maracas, Registered

18   Professional Reporter and Notary Public in and for

19   the Commonwealth of Massachusetts, at the Offices of

20   Robins, Kaplan, Miller & Ciresi, LLP, 800 Boylston

21   Street, Boston, Massachusetts, on Friday, April 14,

22   2006, commencing at 10:18 a.m.

Sharon L. Smith                          HIGHLY CONFIDENTIAL                          April 14, 2006
                                              Boston, MA

Page 10

1    A.   No.
2    Q.   In 1980, what was the first position you
3  took up in the pharmaceutical industry or health
4  insurance industry?
5    A.   It was senior planning analyst at Blue
6  Cross/Blue Shield.
7    Q.   From 1980 until your retirement in 2005,
8  were you continuously employed at Blue Cross/Blue
9  Shield of Massachusetts?
10   A.   Yes.
11   Q.   Now, in your first position as senior
12 planning analyst, what were your job
13 responsibilities?
14   A.   I've worked on a management by objective
15 program, an annual planning process and consulting
16 projects.
17   Q.   How long did you hold that position?
18   A.   Four months.
19   Q.   What was the management by objective
20 program you were working on?
21   A.   It's a program where areas set annual
22 goals and then are measured on a quarterly basis

Page 11

1  against those goals.
2    Q.   What were some of the goals that you were
3  working around?
4    A.   I don't remember.
5    Q.   Were they goals related to financial
6  objectives or procedural logistical objectives?
7    A.   They were operational.
8    Q.   You held that position for four months?
9    A.   Mm-hmm.
10   Q.   What was your next position after that?
11   A.   Manager of corporate planning.
12   Q.   Now, is corporate planning the same
13 department in which you were a senior planning
14 analyst?
15   A.   Yes.
16   Q.   Did you have the same sorts of
17 responsibilities as a manager in that department?
18   A.   Yes.
19   Q.   Was it the same areas, substantive areas
20 in which you were working but at a higher level?
21   A.   Yes.
22   Q.   How long were you the manager of corporate

Page 12

1  planning?
2    A.   Four years.
3    Q.   Now, what were the departments that you
4  were assisting with setting their annual goals and
5  processes?
6    A.   It was all departments in Blue Cross and
7  in Blue Shield.
8    Q.   Do you recall any examples of the types of
9  goals or processes and projects you worked on during
10 that time?
11   A.   No.
12   Q.   Again, were these primarily operational
13 goals as opposed to financial goals?
14   A.   Yes.
15   Q.   Do you recall any projects relating to
16 drug acquisition or drug purchases?
17   A.   No.
18   Q.   After you completed your tenure as the
19 manager of corporate planning, what was the next
20 role that you moved into?
21   A.   Director of Medicare B.
22   Q.   How long did you hold that position?

Page 13

1    A.   Four years.
2    Q.   Now, was this role in relation to BC/BS of
3  Massachusetts work as a Medicare carrier for the
4  State of Massachusetts?
5    A.   Yes.
6    Q.   What were your responsibilities in that
7  capacity?
8    A.   I was responsible for the operations.
9    Q.   What did operations involve?
10   A.   Claims, customer service and provider
11 relations.
12   Q.   In terms of claims, were you responsible
13 for the actual administration of the claims
14 processing system?
15   A.   I was responsible for processing claims,
16 not the system.
17   Q.   In that time period, were claims processed
18 electronically?
19   A.   No.
20   Q.   It was a manual system?
21   A.   Yes.
22   Q.   Could you describe in the '84 to '88 time

4 (Pages 10 to 13)

Sharon L. Smith                          HIGHLY CONFIDENTIAL                          April 14, 2006
                                             Boston, MA

Page 30

1  to review the document and let me know when you're
2  ready to proceed.  While you do that, I'll note for
3  the record that Exhibit Smith 001 is a non-Bates
4  stamped document which bears the logo of SmithKline
5  Beecham Pharmaceuticals on the cover page, and
6  although it's not stamped, we designate it as highly
7  confidential pursuant to the protective order.
8      A.  Mm-hmm.
9      Q.  Are you ready to proceed?
10     A.  Yes.
11     Q.  Have you ever seen this document before?
12     A.  I must have seen it because my signature
13  is on it, but I do not remember it.
14     Q.  Now, based on your review of this
15  document, do you have an understanding as to what
16  this is?
17     A.  You want me to read it?
18     Q.  Well, yes, I do want you to read it.
19     A.  Looks like it's a pricing contract for the
20  drug Tagamet.
21     Q.  And if you'll have a look at the second
22  page under pricing and Subpoint D, you'll see a

Page 31

1  series of rebate levels dependent on internal market
2  share.  Do you see that?
3      A.  Yes.
4      Q.  Now, does looking at this document refresh
5  your recollection as to any role you may have played
6  in relation to drug purchases for the staff model
7  HMO?
8      A.  I didn't play any role.  I signed all the
9  contracts that had to do with Medical East and
10  Medical West, but I did not review what came in.  I
11  had something that would be on top of this from
12  someone telling me that it was okay to sign, so it
13  is highly unlikely that I even looked at this.  It
14  would have been turned to the page for me to sign.
15  I had a stack of maybe 30, 40 of them on my table
16  every week and I just signed them.
17     Q.  Now, as vice president of delivery network
18  management, do I understand correctly that your
19  responsibilities included signing all contracts that
20  related in any way to the staff model HMO?
21     A.  I signed all the contracts of a certain
22  dollar amount.  I don't remember what that was so

Page 32

1  anything above that dollar amount I signed.  Others
2  were signed.  There were lots of contracts at
3  different levels.  I also signed all physician
4  contracts -- I don't think I signed the physicians.
5  I don't know whether I signed the actual physicians
6  who were employed.  I don't think I did.
7      Q.  What do you mean when you say "I don't
8  know if I signed the actual physicians"?
9      A.  Physician contracts for those who were
10  employed, I don't believe that I did.
11     Q.  Are you referring to their contracts of
12  employment?
13     A.  Yes.
14     Q.  Now, would you have been the person
15  responsible for signing all contracts related to
16  drug purchases including contracts providing for
17  discounts and rebates if they were above the dollar
18  threshold that you mentioned?
19     A.  All I know is I was responsible to sign
20  contracts, and there was a definition of what those
21  contracts were which I don't remember over a certain
22  dollar amount, so it wasn't any contract.  It was

Page 33

1  any contract pertaining to and there was a list of
2  that.  I don't know what it was.
3      Q.  Well, looking at this contract that we've
4  marked as Exhibit Smith 001, it appears you signed
5  at least some contract relating to drug purchases
6  and rebates and discounts?
7      A.  Yes.
8      Q.  Do you know one way or another whether
9  that was an area for which you had responsibility,
10  generally signing contracts related to drug
11  purchases?
12     A.  I don't know whether in general I did.  My
13  memory is more around dollar amount.
14     Q.  I'd like to talk about the process you
15  describe whereby your staff would work on these
16  issues and then bring them to you for signature, and
17  I'd like to focus specifically on drug purchases.
18  What departments or divisions were there in your
19  staff who handled the negotiation of drug purchase
20  contracts?
21     A.  I don't remember.
22     Q.  Do you recall whether there were any

9 (Pages 30 to 33)

Sharon L. Smith

HIGHLY CONFIDENTIAL
Boston, MA

April 14, 2006

Page 34

```
1    individuals who dealt with that for you?
2        A.   Any specific individuals that that was
3    their job?
4        Q.   Well, let's first take it at a broader
5    level. Do you recall whether there were people in
6    the organization who handled the negotiation of drug
7    purchase contracts or drug rebate and incentive
8    terms?
9        A.   I don't know that they were in my
10   organization. They could have been. They could
11   have been in other parts of the company.
12       Q.   What parts of the company could they have
13   been in?
14           MR. COCO: Objection.
15       A.   There were parts of the company that did
16   general contracting for the other products.
17       Q.   Do you know one way or another whether
18   drug, the negotiation of drug purchase contracts or
19   drug purchase rebate and discount terms was done by
20   someone who worked under you or whether it was done
21   through BC/BS of Massachusetts general contracting
22   division unrelated to the staff model HMO?
```

Page 35

```
1           MR. COCO: Objection.
2        A.   I don't know because I can't remember who
3    did it.
4        Q.   Now, as vice president of network delivery
5    management, did your responsibilities include the
6    overall financial operation of the staff model HMO?
7        A.   Yes.
8        Q.   Were you responsible for setting budgets?
9        A.   Yes.
10       Q.   Were you responsible for financial
11   performance over the course of the year?
12       A.   Yes.
13       Q.   Did those budgets include analysis of the
14   costs of drug purchases?
15       A.   Not that I remember seeing.
16       Q.   Did performance targets include spending
17   amounts on drug purchases?
18       A.   Not any that would have been reported
19   directly to me.
20       Q.   Did I understand correctly from your
21   previous answer that although you signed these
22   contracts for drug purchases or rebate and discount
```

Page 36

```
1    terms, you did not actually review them?
2            MR. COCO: Objection.
3        A.   Yes, that's correct.
4        Q.   And did I understand correctly also that
5    although you signed these contracts, you did not
6    know what rebates or discounts had actually been
7    negotiated?
8            MR. COCO: Objection.
9        A.   That's correct.
10       Q.   Did your responsibilities exclude the
11   financial terms that could be attained or negotiated
12   on drug purchases?
13           MR. COCO: Objection.
14       A.   I don't understand the question.
15       Q.   Who at BC/BS of Massachusetts was
16   ultimately responsible for ensuring that you got a
17   good price on drugs that you purchased for the staff
18   model HMO?
19       A.   I don't remember.
20       Q.   Were you responsible for that?
21       A.   Not that I remember.
22       Q.   So do I understand correctly, then, that
```

Page 37

```
1    there was a distinction or a cleavage where you were
2    the person signing these contracts but you were not
3    the person responsible for ensuring that their terms
4    were acceptable?
5            MR. COCO: Objection.
6        A.   That's not what I said. I said I don't
7    remember what my responsibility was.
8        Q.   Well, you do recall that, as a general
9    matter, you did not review the terms of these
10   contracts, correct?
11       A.   Yes.
12       Q.   But you do not recall whether or not your
13   responsibility included review of terms of
14   contracts. Do I understand that correctly?
15           MR. COCO: Objection.
16       A.   I'm not sure I understand what you're
17   saying. I was responsible for signing the contract.
18       Q.   What I'm trying to understand is really
19   quite simple. I understand you were the person who
20   signed these contracts. I'm trying to figure out,
21   No. 1, were you responsible for the terms of the
22   contract in ensuring they were acceptable, and if
```

10 (Pages 34 to 37)

Sharon L. Smith
HIGHLY CONFIDENTIAL
Boston, MA
April 14, 2006

Page 46

1  putting together your own presentation for your own
2  boss, did you do that all yourself?
3      A.  No.  Ron Davie and Ron Himmelgarn would
4  have put that together for me, and I don't know who
5  put it all together for me.
6      Q.  Did Mr. Davie and Mr. Himmelgarn only put
7  together their own pieces for Medical East/Medical
8  West or did they also assist you in preparing the
9  overall --
10     A.  No, they didn't assist me with the rest,
11  and I don't remember how it all came together.
12     Q.  Do you recall whether you had assistance
13  with the rest or whether you did it yourself?
14     A.  I didn't do it myself.  Somebody assisted
15  me, but I don't remember who it was.
16     Q.  Do you know whether you had any staff who
17  worked on areas of financial analysis in the
18  organization that reported to you?
19     A.  I had staff.  I don't remember when they
20  came on board, but I had staff that were doing
21  overall financial analysis.  My memory of it was
22  that it was around building HMO Blue.  It may have

Page 47

1  been other things, but I don't remember.  My main
2  focus during this period was building HMO Blue.
3      Q.  Let's talk, then, about HMO Blue.  Can you
4  describe for me what that product was and what
5  perceived market need or market niche it was
6  directed at filling?
7      A.  It's a mixed model HMO.  It was the first
8  statewide HMO in the state at the time.
9      Q.  What do you mean when you say it was a
10  mixed model HMO?
11     A.  It had both the staff models and the IPAs.
12     Q.  Now, prior to HMO Blue, did members have
13  any products available to them that would enable
14  them to receive treatment at Medical East/Medical
15  West facilities as well as other facilities?
16     A.  Only the medical -- no, the Medical
17  East/Medical West product was only for those
18  facilities.  They couldn't go elsewhere.
19     Q.  What was the Medical East/Medical West
20  product called?
21     A.  Medical East and Medical West Health Plan,
22  I think.

Page 48

1      Q.  Now, were you involved at all in the
2  marketing of that product, the Medical East/Medical
3  West Health Plan?
4      A.  The marketing?
5      Q.  Mm-hmm.
6      A.  No.
7      Q.  Do you know the names of any clients who
8  purchased that product in terms of employment groups
9  and health and welfare funds?
10     A.  No.
11     Q.  Who was responsible for the marketing of
12  that product?
13     A.  It was marketed under Ron Himmelgarn and
14  Ron Davie.
15     Q.  Did Mr. Davie and Mr. Himmelgarn have a
16  dedicated marketing staff?
17     A.  Yes.
18     Q.  Was there any marketing for that product
19  that was done through the BC/BS of Massachusetts
20  organization generally as opposed to directly
21  through Mr. Davie and Mr. Himmelgarn?
22     A.  At some point between 1990 and 1992, I

Page 49

1  don't remember when, we moved marketing from the
2  staff model and it went into the corporate
3  marketing.
4      Q.  Now, what were the tasks that you carried
5  out in building the HMO Blue product?
6      A.  Well, there was over a thousand-page work
7  plan, so there were a lot of tasks.
8      Q.  To your recollection, what were -- can you
9  describe the task of building that product into --
10  can you divide it into some broad categories?
11     A.  It started with as simple as we had to
12  determine a name.  We had to develop a marketing
13  strategy, advertising strategy.  We had to build a
14  network.  We had put in place a system, technology
15  system that would process everything for it.  We had
16  to develop the financial for the product and we had
17  to do the contracts of the expansion beyond what was
18  already in place.
19     Q.  Now, the HMO Blue product consisted of the
20  staff models and the IPAs, correct?
21     A.  Yes, and then others we added.
22     Q.  What other things were added to that

Henderson Legal Services
(202) 220-4158

# Exhibit 48

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) | MDL No. 1456 |
|  | ) | Master File No. 01-CV-12257-PBS |
|  | ) |  |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) | Judge Patti B. Saris |

## DECLARATION OF EDWARD S. CURRAN, JR.

I, Edward S. Curran, Jr. declare as follows:

1.      I worked at Blue Cross Blue Shield of Massachusetts ("BCBS/MA") from about 1988 to 1992. During that time, my title was Director of Pharmacy. I submit this declaration to testify to my knowledge regarding issues that I understand are relevant to this litigation.

### Background

2.      I hold a Bachelors of Science in Pharmacy from the Massachusetts College of Pharmacy. I received that qualification in 1972. From 1972 to 1980, I worked for a retail pharmacy chain called OSCO Drug as a pharmacist and later as a pharmacy manager. I then spent a few months as a consultant. From 1980 to 1988, I worked for Harvard Community Health Plans (now Harvard Pilgrim). My positions there included Assistant Director of Pharmacy at the Kenmore Health Center (a staff model HMO site), Director of Pharmacy at the Boston Health Center (another staff model HMO site) and Director of Pharmacy for Group Health Plans. From 1988 to 1992 I worked at BCBS/MA as discussed above.

3.      After leaving BCBS/MA I went to work for Aetna. I worked there from 1992 to 2000 in a variety of roles including Product Manager, Director of Drug Formulary Management

and then Vice President of Drug Formulary Management. I was based in Connecticut from 1992 to 1996 and then in Waltham, MA from 1996 to 2000.

      4.      Since 2000, I have been working at CVS as a pharmacist.

## AWP Ain't What's Paid

      5.      AWP stands for Average Wholesale Price, but almost no-one actually pays AWP to buy drugs and it is certainly not an average of wholesale prices. The fact that AWP is not an actual average of wholesale prices has been common knowledge since at least the 1960s. I knew that fact when I became a pharmacist in the early 1970s. AWP is often referred to by those in the health insurance business as "Ain't What's Paid." I like to think I was the first person to make that joke in the early 1990s, but perhaps others came up with it before me. The reality it reflects was certainly well known.

      6.      Part of the reason AWP "ain't what's paid" is that there are many rebates and discounts available in the marketplace and those often lower market entities' acquisition prices for drugs. Those rebates and discounts take prices below Wholesale Acquisition Cost or WAC, which is another drug pricing benchmark. AWP is typically 20% to 25% above WAC.

      7.      Drug manufacturers generally pay these rebates and discounts to entities in the market that can move market share in a therapeutic category or drive volume usage of their drugs. Entities purchasing drugs that receive such rebates and discounts include staff model HMOs, hospitals, long term care facilities and physicians in relation to injected or infused drugs that they administer in their offices.

      8.      The availability of such rebates and discounts to entities that can move market share and drive volume has been commonly known in the health insurance industry for many

2

years. I'd say it was commonly known in the staff model HMO environment since at least the early 1980s. The staff model HMOs I worked with were aware of these rebates and discounts early on because they were purchasing drugs for their own facilities. Knowledge of rebates and discounts was common among all health insurance plans, including those without staff model HMOs, by the mid-1980s.

9.      The extent or amount of the rebates and discounts that any entity can achieve in the market will vary widely from drug to drug and entity to entity.

10.     In terms of variation among drugs: The amount of rebates and discounts available on any given drug is a function of whether or not there is competition in its therapeutic category. It is not unusual to see rebates and discounts on branded drugs but, in general, rebates and discounts will increase for those branded drugs when competition enters the market for a particular drug or in its therapeutic category. Later, when generic drugs enter the market, this cycle peaks and at that stage prices often fall like a rock. This is all a result of competition.

11.     In terms of variation by entity: The ability of any given entity (be it a staff model HMO, a hospital, or a physician practice, etc.) to obtain rebates and discounts tends to vary based on their demonstrated ability to move market share and the volume they can move. It may also be influenced by their leverage and negotiating power in the marketplace.

12.     The range of rebates and discounts that can be achieved varies widely based on these factors. In my own experience, I have seen rebates and discounts resulting in acquisition costs for drugs up to 90% below WAC. I have the impression that some rebates and discounts that have been available in the market are even higher, i.e., that they lowered acquisition costs even beyond that level. The fact that rebates and discounts vary widely for these reasons and can

3

be at or possibly beyond these levels has been common knowledge in the health insurance industry since at least the mid-1980s. I was certainly aware of these facts when working for BCBS/MA in the late 1980s and early 1990s.

13.    It follows that it has been commonly known in the health insurance industry since at least the mid 1980s that AWP – because it does not reflect rebates and discounts – bears no predictable relationship to drug acquisition costs. And one cannot claim that rebates and discounts fall within any particular percentage band or levels or that the health insurance industry expected that to be the case. Rather, it has been well understood throughout this period that the relationship between AWP and acquisition costs for drugs will vary widely and across a very broad range depending on the levels of rebates and discounts available.

### Rebates to Health Insurers

14.    My responsibilities as Director of Pharmacy also included negotiating with drug manufacturers for rebates payable to BCBS/MA in consideration for formulary status. This is just another facet of the phenomenon I discussed earlier – manufacturers pay rebates to entities that can move market share. By making decisions on formulary placement, BCBS/MA and other health insurers have a well-known ability to drive usage of particular drugs over their competitors.

### BCBS/MA Staff Model HMO

15.    Throughout the time period I worked at BCBS/MA, my responsibilities included negotiating with drug manufacturers to get rebates and discounts on the drugs BCBS/MA purchased for use at its staff model HMO sites. I was also one of signatories on those contracts once they were finalized. I do not now recall the range of rebates and discounts we achieved on

.4

our drug purchases, but they varied widely from drug to drug.  I was also responsible for managing the staff model HMO pharmacy sites.

16.     As discussed above, I worked as the Director of Pharmacy for BCBS/MA.  Put another way, I was employed by BCBS/MA, not by the staff model HMO Medical East/Medical West.  However, people at the staff model HMO and BCBS/MA worked closely together. Indeed, I was never quite sure whether there was a distinction between the two.  I spoke to and worked with people at the staff model sites all the time, there was free sharing of information, and employees moved back and forth between the organizations.  We worked together under one big umbrella.

I declare under penalty of perjury that the foregoing is true and correct.

Edward S. Curran, Jr.

Executed on this 21st day of September 2006

5