# Exhibit 51

Page 1

1            UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3              NO. 01CV12257-PBS

4    _____

5   In re: PHARMACEUTICAL         )

6   INDUSTRY AVERAGE WHOLESALE     )

7   PRICE LITIGATION            )

8    _____ )

9   THIS DOCUMENT RELATES TO:     )

10   ALL ACTIONS               )

11

12       DEPOSITION of DEBORAH DEVAUX, called as a

13 witness by and on behalf of Johnson & Johnson,

14 pursuant to the applicable provisions of the Federal

15 Rules of Civil Procedure, before P. Jodi Ohnemus,

16 Notary Public, Certified Shorthand Reporter,

17 Certified Realtime Reporter, and Registered Merit

18 Reporter, within and for the Commonwealth of

19 Massachusetts, at the offices of Robins, Kaplan,

20 Miller & Ciresi, L.L.P., 800 Boylston Street,

21 Boston, Massachusetts, on Thursday, 9 March, 2006,

22 commencing at 9:35 a.m.

Deborah Devaux                                                                                      March 9, 2006

Boston, MA

Page 50

1  services were and developed a budget, and then
2  tried to target our negotiations to be able to
3  cover those costs, plus a reasonable margin.
4      Q.   Now, given that the New England Medical
5  Center was a not-for-profit facility, as opposed
6  to, you know, any standard, commercial, say, an
7  oncologist's practice --
8      A.   Yes.
9      Q.   -- why was the New England Medical Center
10  still seeking to get a reasonable margin on top of
11  its costs for --
12      A.   In order to be able to continue to invest
13  in capital and to fund salary increases for
14  employees, primarily.  So, to continue to remain a
15  viable entity.
16      Q.   If the New England Medical Center had not
17  been able to earn a reasonable margin and had only
18  been reimbursed purely at cost, would it have
19  remained a viable entity?
20          MR. COCO:  Objection.
21      A.   I don't know.
22      Q.   What would have been some of the --

Page 51

1  withdraw that.  When you refer to a reasonable
2  margin as the goal in the negotiating process, how
3  did you quantify what would be reasonable as a
4  margin?
5      A.   I don't remember what was considered
6  reasonable at that time.  I don't remember what
7  kind of cost of living raises or capital
8  investments were being made at that time.
9          Today about a third of the hospitals in
10  Massachusetts are not earning a margin; about a
11  third of the hospitals are earning somewhere
12  between a zero and 2 percent margin, and about a
13  third are earning above a 2 percent margin.  It's
14  very, very rare for a hospital to earn more than a
15  4 to 5 percent margin in my market.
16      Q.   And do you attribute that to the use of
17  DRGs in hospital reimbursements?
18      A.   I'm sure there are a lot of factors.  I
19  don't know what the major drivers are.
20      Q.   Now, you remained at the New England
21  Medical Center up until 1995, right?
22      A.   Roughly, yes.

Page 52

1      Q.   Okay.  Where did you move to in 1995?
2      A.   I moved to Ernst & Young's health care
3  consulting practice in Boston.
4      Q.   How long were you employed at Ernst &
5  Young?
6      A.   A little over three years.
7      Q.   Did you hold one title during that time or
8  more than one?
9      A.   Yes, senior manager.
10      Q.   Now, who were the clients for whom you
11  performed work while at Ernst & Young?
12      A.   Primarily providers, meaning hospitals and
13  physicians, but we did have some health plan
14  clients.
15      Q.   All right.  Did you have any drug
16  manufacturers as clients?
17      A.   No.
18      Q.   Any PBMs?
19      A.   No.
20      Q.   Any --
21      A.   Ernst & Young may have.  I did not work on
22  any clients that were pharmacy related.

Page 53

1      Q.   Any drug wholesalers?
2      A.   No.
3      Q.   Now, what sort of projects did you work on
4  during your time at Ernst & Young?
5      A.   We generally worked on projects that
6  helped to structure the relationship either between
7  hospitals and physicians or hospitals, physicians
8  and health plans, usually advising the -- either
9  the provider or the plan on approaches to working
10  productively together.
11      Q.   Anything else?
12      A.   I did -- I did one project building a
13  Medicaid plan for a hospital in Boston -- setting
14  up a Medicaid -- Medicaid contract and plan for
15  them.
16      Q.   Okay.  Anything else?
17      A.   No.
18      Q.   Now, the work that you did on projects
19  helping to structure the relationships between
20  providers and health plans, when you use the term
21  "structuring relationships," are you referring to
22  negotiating contracts?

14 (Pages 50 to 53)

Page 70

1    Q.   Because health plans need to compete with
2  other health plans for the same clients, right?
3    A.   Right.
4    Q.   Now, one of the factors that determines
5  what premiums a plan can offer is the costs it's
6  incurring for reimbursement, right?
7    A.   That is one of the factors.
8    Q.   All right.  So, in other words, if a plan
9  can achieve a -- a low rate of reimbursement while
10  still maintaining an adequate network, that will
11  help it offer more competitive premiums.
12    MR. COCO:  Objection.
13    A.   Not necessarily.  I mean, there are other
14  factors that go into what the premium is, including
15  the volume of services used, the mix of services
16  used --
17    Q.   For --
18    A.   -- etcetera, so, I don't think there's a
19  one-to-one correlation.
20    Q.   Fair enough.  As someone who has studied
21  economics, let's do what economists do and say --
22    A.   Don't give that too much credit.  If you

Page 71

1  studied economics -- I sort of vaguely remember my
2  class in economics, but that's --
3    Q.   Well, let's adopt the economics precept as
4  saying all other things remaining equal.
5    A.   Yeah.
6    Q.   So, all other things remaining equal, if a
7  health plan is able to negotiate a relatively low
8  rate of reimbursement, that will enable them to
9  achieve more competitive premium rates in the
10  market, right?
11    MR. COCO:  Objection.
12    A.   Never been in a situation where all other
13  things remained equal.
14    Q.   I understand that.
15    A.   So, I'd be --
16    Q.   In that --
17    A.   I'd be hypothesizing beyond my experience.
18    Q.   I understand that.  But in that situation,
19  based on your -- the experience that you do have,
20  would you agree with me that, all other things
21  remaining equal, if a health plan is able to
22  achieve lower rates of reimbursement, that will be

Page 72

1  one factor that will assist it in offering more
2  competitive premiums?
3    MR. COCO:  Objection.
4    A.   It is one factor that would go into
5  creating a lower premium.  Whether it would be more
6  competitive or not depends on what the other health
7  plans are doing.  It's never a static situation.
8    Q.   Now, we spent some time talking about the
9  goals of the health plan clients you had at Ernst &
10  Young --
11    A.   Yes.
12    Q.   -- and this negotiating process.  Now,
13  let's talk about the provider side.  What --
14    MR. COCO:  Adeel, if -- we've been going
15  about an hour and a half.  Is this a good break
16  or --
17    MR. MANGI:  Yeah.  Why don't we go up till
18  11, if that's okay with you, then we'll finish off
19  this line, and then move to something else.
20    THE WITNESS:  All right.  Sure.
21    Q.   Now, what about the provider entities that
22  you consulted with, what were their goals as they

Page 73

1  entered into these negotiating --
2    A.   Really some, more on the mirror side of
3  it.  They wanted to understand the -- their revenue
4  stream, the adequacy of it, the predictability of
5  it.  They wanted to understand the nature of the
6  relationship with the plan.  Generally, the
7  providers also wanted to have stable relationships
8  for similar reasons to the health plans.  They
9  didn't want to disrupt the members.
10    I think, you know, different providers are
11  in different circumstances in terms of their
12  current capital needs, which is a greater concern
13  for providers than it is for health plans, because
14  they're having to project what they're going to
15  need to invest in in buildings, I think, in a much
16  more significant way than health plans do.  So,
17  they're generally trying to -- to make sure that
18  they're adequately planning for what they're going
19  to need to invest in capital going forward in a way
20  that's -- puts a little bit different twist on it
21  than it does for the health plans.
22    Q.   How about in terms of the rates of

19 (Pages 70 to 73)

Page 74

1 reimbursement versus costs and margin? What were
2 the goals of the providers in regards of those
3 issues when negotiating with health insurers?
4     A.   Yeah.  Again, I don't exactly remember at
5 that time what the margins were, and this was in
6 different marketplaces around the country, and as
7 I'm sure you know, in some markets, the margins
8 that are achieved by providers are, in general,
9 lower than others.
10     So, in California, I think people were
11 just trying to survive.  In Vermont, probably the
12 margins were above cost.  But as I mentioned, I
13 think in general, the hospital and physician
14 industry has been a very low margin.  Those have
15 been very low-margin industries, as have the health
16 plan industry.
17     In general, the providers are first trying
18 to meet the goal of covering costs, and then, you
19 know, some -- some margin above that.  As I said,
20 probably a third in the 1 to 2 percent range, and
21 then, in any given market it differs, but probably
22 another 20, 30 percent that are above a 2 percent

Page 75

1 range.
2     Q.   Okay.  And these are hospital clients that
3 you're referring to?
4     A.   Hospitals, yeah.  Physicians, I don't know
5 as much about the -- the margins.  I think it's
6 harder to calculate exactly what the physician
7 costs include.
8     Q.   Were the provider entities you were
9 consulting with while at Ernst & Young commercial
10 entities or not-for-profits?
11     A.   I believe they were all not-for-profits.
12 Some of the physician entities within the systems
13 may have been for profit.  The hospitals, I
14 believe, were all not-for-profit.
15     Q.   Okay.  Given the -- the nature of the
16 market as you've described it, would it be fair to
17 say that their goal was to cover all of their
18 reasonable costs and then earn whatever margin they
19 would be able to negotiate with the health insurer?
20     MR. COCO:  Objection.
21     A.   It certainly was to cover their costs.  I
22 don't know exactly what the goals were around

Page 76

1 margin.  There was certainly an implicit
2 understanding that they needed to cover reasonable
3 costs.
4     Q.   Okay.  Well, let me ask the question more
5 broadly.  Was one of their goals in the negotiating
6 process to maximize the amount of reimbursement
7 that they could achieve?
8     A.   You know, we're talking about different
9 clients in different markets with different
10 parameters and boundaries.  I think it's -- if
11 you're -- if you're really asking me to make a
12 global characterization about, in general, how do
13 providers want to come out of a negotiation, they
14 want to be -- they want to feel that they're being
15 paid fairly relative to other providers in that
16 market; that they're not being disadvantaged; and
17 that they can cover their costs, plus some margin.
18 And what the variation is in terms of what
19 different providers think that margin should be,
20 I'm not really -- I'm not an expert on.
21     Q.   Well, that's fair enough, because the --
22 the perceptions of what would be an appropriate

Page 77

1 margin will vary from provider to provider, right?
2     A.   Yeah.  I think, again, going back to what
3 their past history has been around capital,
4 investment, and you know, circumstances that have
5 occurred at the hospital, it might vary, even for
6 any hospital, over a period of time.
7     Q.   Now, we've spoken about the goals of your
8 health plan clients; we've spoken about the goals
9 of your provider clients, I assume you never
10 represented both sides of a negotiation, right --
11 of the same negotiation?
12     A.   That's right.
13     Q.   Okay.  But you've had insight into what
14 some of the considerations are for parties on
15 either side of that divide through your work at New
16 England Medical Center and then at Ernst & Young.
17     A.   Yes.
18     Q.   Okay.  Now, when these two sides come
19 together to negotiate, each with their own set of
20 goals and priorities, as we've discussed, what are
21 the factors that determine what is the eventual
22 deal that results?

20 (Pages 74 to 77)

Page 98

1  So, my question is, was that just a general
2  business need consistent with all situations, or
3  was this something that had a particular relevance
4  because of the receivership?
5      A.   This had particular relevance because of
6  the receivership.  We believed that our rates of
7  payment in some cases were not going to enable us
8  to offer a competitive product.
9      Q.   Did -- and when you refer to the
10 reasonable reimbursement, consistent with what we
11 discussed earlier, was the goal to ensure that
12 reasonable costs were covered and some margin was
13 provided to the providers?
14         MR. COCO:  Objection.
15     A.   I don't remember reasonable costs and
16 margin being a specific topic of discussion.  I
17 think that the, often, not always, the focus was
18 around not being disadvantaged in the marketplace.
19 So, Harvard Pilgrim not paying rates that were
20 significantly higher than other plans.
21     Q.   Well, building on that, how did Harvard
22 Pilgrim go about determining what other plans were

Page 99

1  paying in order to decide what it would pay?
2      A.   We didn't have any way of accessing that
3  data directly, but generally, our statement to the
4  hospitals and physicians or the major focus of the
5  discussions at that time was that we wanted them to
6  help us understand why they would want us to pay
7  them at a higher level than competitors, and,
8  therefore, not be allowed to compete in the
9  marketplace and potentially have to go out of
10 business.
11         And we also looked at publicly-available
12 filings for what percentage of the premium other
13 plans were spending on medical expenses, and we
14 knew that we were spending a greater percentage.
15 So, we generally used that information to say -- we
16 weren't asking the providers to tell us what the
17 other plans paid, but we were saying, Here's our
18 proposal for what we would pay, and if you wouldn't
19 accept that, help us understand why.  Is it because
20 it's less than what the other plans are paying you,
21 or concern -- and it generally gave us some
22 benchmark for what the other plans' total costs

Page 100

1  were.
2      Q.   So, as I understand it, the process that
3  you went through at Harvard Pilgrim when trying to
4  achieve lower reimbursement rates and figure out
5  what would be a viable rate --
6      A.   Right.
7      Q.   -- was not to think about what are the
8  providers' costs and what are their margins --
9      A.   Right.
10     Q.   -- but rather to look at and to try and
11 ascertain information about what other plans are
12 paying in the marketplace, and then to try and
13 arrive at a rate that was similar or lower than
14 what other plans were paying.
15         MR. COCO:  Objection.
16     A.   Not at a unit cost level.  But globally,
17 we knew we were spending a percentage of our
18 premium on medical expenses, and we knew it was
19 higher than the other plans.
20     Q.   At a global level you agree with my
21 statement?
22     A.   At a global level.  So, then what we would

Page 101

1  do is try to break that down and say in every
2  situation that we could, how could we best
3  understand where that higher global cost is coming
4  from?
5      Q.   So, in other words, you weren't looking at
6  this at a line-item level, at particular CPT codes
7  or anything like that.  You were looking at it in
8  terms of overall reimbursement?
9      A.   Yes.
10         MR. COCO:  Objection.
11     Q.   And in that frame of reference, the
12 process was not to look at providers' cost and its
13 margins, but rather, to gather what other
14 information was publicly available and to engage in
15 a conversation with physicians about what they were
16 getting from other plans and to try and arrive at a
17 global reimbursement level that was competitive
18 with or lower than other health plans --
19 competitive health plans -- in the area.
20         MR. COCO:  Objection.
21     A.   We -- we didn't -- I think you made
22 several points there.  We did not engage with

26 (Pages 98 to 101)

Page 150

1 didn't have such a file, but we double-checked it.
2 The only documents I had were on my e-mail.
3     Q.  Did you review the contents of your hard
4 copy files for documents relative to this case?
5     A.  Did I review the -- the hard copy of the
6 e-mails?
7     Q.  No.  Leaving aside your electronic
8 files --
9     A.  Yeah.
10     Q.  -- which were searched by your admin
11 assistant --
12     A.  Yes.
13     Q.  -- did you search files that you had in
14 hard copy for documents responsive to this
15 litigation?
16     A.  The only thing I did was look in our files
17 for a folder labeled "AWP."  I knew I had not
18 created such a folder, but I thought that perhaps a
19 predecessor or someone might have.  So, I did look
20 to see if there was a file that had anything to do
21 with AWP, but I didn't find one.
22     MR. MANGI:  For the record, we ask that

Page 151

1 Ms. Devaux's hard copy files be searched for
2 documents responsive to the subpoena.
3     Q.  Now, was yesterday -- well, withdraw that.
4 When's the first time you became aware of this
5 litigation?
6     A.  I may have become aware sooner, but the
7 first time I really registered was when I got an
8 e-mail from our internal counsel, Steve Skwara, a
9 few weeks ago saying that he wanted me to have
10 certain dates to potentially be deposed with you.
11     Q.  What's your understanding of what this
12 case is about?
13     A.  My understanding is that what this case is
14 about is the process by which the manufacturers
15 established an AWP rate for certain drugs, and then
16 how that rate related to the actual costs of the
17 drugs to physicians.
18     Q.  Do you have an understanding as to how
19 Plaintiffs are alleging that the rate should have
20 related to actual rates?
21     A.  No.
22     Q.  Okay.  Do you have an understanding as to

Page 152

1 whether or not AWP does relate to actual
2 acquisition cost for drugs?
3     A.  I don't have an in-depth knowledge of how
4 it actually does relate.  I have a general
5 impression that AWP is similar to other
6 reimbursement structures in that there's some sort
7 of relative value established between the different
8 services or, in this case, products that are in
9 that construct, but I don't know how it's -- how
10 that process is established.
11     Q.  What do you mean when you say there are
12 some sort of relative values?
13     A.  Well, in other circumstances that I'm more
14 familiar with, like, for example, physician fee
15 schedules, the way that a -- the physician fee
16 schedule that we use, which is the Medicare RBRVS
17 schedule, the way that's established is to
18 determine what the relative value of one service is
19 compared to the other, and that's based on the
20 effort that goes into the service, which is another
21 way of saying the cost that it takes to produce
22 that service, the resource intensity and value of

Page 153

1 that service.
2     And similarly, when we pay for inpatient
3 care, we use a DRG methodology that measures the
4 relative resources that are used for one case
5 relative to the other.  So, the way that the -- the
6 schedule is established is based on relativity to
7 other services on that schedule.
8     Q.  Okay.  What is your understanding as to
9 what Plaintiffs are alleging the Defendant drug
10 manufacturers did wrong?
11     A.  My understanding is the -- the question is
12 about the difference between the AWP and the actual
13 acquisition cost of the drug and whether that
14 difference is a reasonable one.
15     Q.  And when did you gain that understanding?
16     MR. COCO:  Objection.
17     A.  I don't know really when I gained that
18 understanding.
19     Q.  Well, I'm asking, when did you first learn
20 what this case was about?
21     A.  You know, probably, again, specifically,
22 over the last few weeks, once I knew that there was

39 (Pages 150 to 153)

March 9, 2006

Page 178

1  1 was not adopted the reasons that we've just
2  discussed and what's listed in Exhibit Devaux 002
3  under "cons"?
4       MR. COCO:  Objection.
5       A.  I don't know what the thinking was of
6  everyone in the group.  I know that what drove my
7  thinking about not wanting to move in this
8  direction were the two things that I just
9  mentioned, and there may have been different --
10 different opinions by others in the group, and I
11 don't -- I don't recall the discussion about that.
12      Q.  In other words, the -- the reasons that
13 you've just described as significant to you
14 outweighed the benefits of moving to this
15 methodology at this time.
16      MR. COCO:  Objection.
17      A.  At that time.
18      Q.  And the reasons that you've just described
19 outweighed the reason for reform listed in this
20 document as you analyzed it at that time.
21      MR. COCO:  Objection.
22      A.  My view was that we should continue to

Page 179

1  keep an eye on this issue; that there was clearly a
2  concern about the payment for -- the level of
3  payment for the drug.  That there was clearly a
4  reason why CMS was choosing to change their
5  methodology, but that, in the interest of
6  understanding all of the consequences of the
7  change, including some potentially unknown and
8  intensive consequences, that we shouldn't jump.
9       Q.  Now -- I'm sorry.  Were you done with that
10 answer?
11      A.  Yes.
12      Q.  Now, the second option that's discussed
13 here would be to "Move to a budget-neutral CMS ASP
14 methodology without --" and that's underlined there
15 "-- changes in administration fees."  Do you recall
16 discussion of this option at the Provider Financial
17 Strategy Work Group meeting?
18      A.  I don't recall discussion about this.  I'm
19 sure we must have outlined it.  I don't recall
20 significant discussion about this option.
21      Q.  Looking at the subject bullet point, what
22 is being anticipated here was adopting the ASP drug

Page 180

1  fees and then applying a multiplier to the fees.
2       Do you have an understanding as to what a
3  multiplier is?
4       MR. COCO:  Objection.
5       A.  I have an understanding of what a
6  multiplier is.
7       Q.  Okay.  In this context?
8       A.  In this context, I don't remember
9  discussing it.
10      Q.  Okay.  Are you familiar with multipliers,
11 generally, as applied to fee schedules?
12      A.  Yes.
13      Q.  And what is a multiplier, generally, as
14 applied to a payment fee schedule?
15      A.  It's a modifier to the basic fee.  So, it
16 takes the basic fee in a fee schedule and adjusts
17 it up or down through -- you know, through applying
18 a percentage.
19      Q.  Okay.  And what does the term "budget
20 neutral" mean, as used in Page 13?
21      MR. COCO:  Objection.
22      A.  Don't remember discussing it here.

Page 181

1       Q.  Okay.  Well, taking a look at Page 13 of
2  this document as a whole, do I understand correctly
3  that Option 2 involved moving to the CMS ASP
4  methodology, but applying a multiplier such that
5  the total payments in dollar terms to physicians
6  for drugs administered in their offices would
7  remain the same or budget neutral?
8       MR. COCO:  Objection.
9       A.  I don't remember any discussion of this
10 option.  I -- I'm sure it was referenced, but this
11 isn't something that registered in my mind or that
12 I -- that I remember at this point.
13      Q.  Okay.  Well, as you review Page 13 today,
14 is your understanding of what's being contemplated
15 here different from the understanding that I just
16 espoused?
17      MR. COCO:  Objection.
18      Q.  And please, do take your time to answer
19 it.
20      A.  Yeah.  Can you restate your understanding.
21      Q.  Sure.  My understanding reading this is
22 what's being contemplated is that BCBS of

46 (Pages 178 to 181)

Page 182

1   Massachusetts would move to an ASP-based
2   methodology, but rather than reimburse at the same
3   rate as Medicare, would apply a multiplier to the
4   -- the ASP-based fee schedule, such that the dollar
5   number that was being reimbursed to physicians for
6   drugs administered in their office would remain the
7   same.  Or, in other words, they would be -- it
8   would be budget neutral.
9           MR. COCO:  Objection.
10   A.   I just don't know.  I just don't know what
11   was -- what was meant by this.
12   Q.   Okay.
13   A.   I didn't seriously consider this option, I
14   can tell you personally.  And I -- I don't know if
15   others did.
16   Q.   Okay.  So, this option was not adopted,
17   right?
18   A.   It was not adopted.
19   Q.   Okay.  At the bottom of this page there's
20   A "Budget Neutral Drug Code Multiplier, 1.36."  Do
21   you know what that refers to?
22   A.   I don't.

Page 183

1   Q.   Okay.  And further up on Page 3 under the
2   first subbullet point, it says, "This option would
3   allow BCBSMA to adopt the CMS ASP methodology
4   without reducing the total payments for drugs on a
5   networkwide basis."
6           Doesn't that state rather clearly that the
7   goal of Option 2 was to move to an ASP methodology
8   but to keep payments the same?
9           MR. COCO:  Objection.
10   A.   I don't know.  I mean, my impression of
11   this is that because we had always previously used
12   the CMS method -- CMS method -- sorry -- CMS
13   methodology, that the work group looking at this
14   thought that we should evaluate the methodology
15   itself, but that methodology did not get
16   significant discussion.  So, I think -- I think the
17   group felt they had to lay out the full scale of
18   options.  Like, if we felt that we wanted to follow
19   Medicare, but not necessarily with the same fee
20   impact, what would that mean?  I -- that's, to me,
21   the gist of Option 2.  It was never seriously
22   discussed in my mind and didn't really register as

Page 184

1   an option that was --
2   Q.   Okay.
3   A.   -- likely to be seriously considered.
4   Q.   Let's take a look at Option 3, which is on
5   Page 14 of the document.  What was being
6   contemplated with Option 3?
7   A.   This one I actually don't remember
8   significantly either.  I remember -- I remember
9   discussing Option No. 1 and Option No. 4.  This
10   option -- I guess looking at it now, if I had to
11   summarize this option, it would be hold, you know,
12   for Blue Cross.  In other words, just hold at what
13   we were doing at that time -- just don't change
14   anything.
15   Q.   In other words, what was being
16   contemplated was freezing payment terms at the rate
17   they were at that time?
18   A.   I think that's what this option was meant
19   to outline.
20   Q.   Right.
21   A.   Again, as sort of in the -- in the spirit
22   of what are all of the options?

Page 185

1   Q.   Right.
2   A.   This one, again, I can tell you, never
3   seriously registered as a -- an option in my mind.
4   Q.   Okay.  So, let's turn to the option, which
5   was the other one that was seriously discussed,
6   Option 4.  What was contemplated with Option 4?
7   A.   I don't remember the discussion in the
8   room anymore.  This is going back a couple of
9   years, but I remember my own thinking process about
10   it, and I think that what I was contemplating with
11   Option 4 was that I was not prepared to have a
12   reflex reaction to follow Medicare, given the two
13   considerations that we just talked about a little
14   while ago.  So, I did not feel inclined to have a
15   knee-jerk reaction and follow Medicare until we
16   could see what happened with that change in
17   methodology.
18           And it seemed to me that what we should do
19   in the meantime was to continue our existing
20   methodology, find a way of doing that until we
21   could make a rational decision about whether to
22   change it or not.  So, at that point -- and still,

47 (Pages 182 to 185)

# Exhibit 52

Page 1

1             UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3                 NO. 01CV12257-PBS

4

5     _____

6    In re:  PHARMACEUTICAL            )

7    INDUSTRY AVERAGE WHOLESALE        )

8    PRICE LITIGATION                  )

9     _____ )

10   THIS DOCUMENT RELATES TO:         )

11   ALL ACTIONS                       )

12   _____  )

13

14

15             HIGHLY CONFIDENTIAL

16

17

18   VIDEOTAPED DEPOSITION OF SHEILA R. CIZAUSKAS

19              800 BOYLSTON STREET

20            BOSTON, MASSACHUSETTS

21          FRIDAY, 10 MARCH, 2006

22                  9:38 AM

Page 186

1  finance department who would know the answer to
2  that question?
3     A.  Andreana Shanley.
4     Q.  What is Ms. Shanley's position?
5     A.  She's the director of actuary.
6     Q.  Anyone else?
7     A.  Maybe Steve Fox, director of provider
8  relations.
9     Q.  Anyone else?
10    A.  I can't think of anyone else.
11       MR. MANGI:  Let me take a quick break.
12       VIDEO OPERATOR:  The time is 2:42.  We're
13  off the record.
14       (Recess was taken.)
15       VIDEO OPERATOR:  The time is 2:53 p.m.
16  This is Cassette 3 in the deposition of Sheila
17  Cizauskas.  We're on the record.
18    Q.  Are there any members of the Hospital
19  Outpatient Department Fee Schedule Group who are
20  also members of the Provider Financial Strategies
21  Work Group other than yourself?
22    A.  Mike Marrone, John Killion was in and out

Page 187

1  of the Hospital Outpatient Fee Schedule Group, and
2  he's also a member of Provider Financial Strategy.
3     Q.  When the Provider Financial Strategy Work
4  Group discussed this issue, who was tasked with
5  presenting the findings and analysis of the
6  provider -- of the Hospital Outpatient Department
7  Fee Schedule Group?
8     A.  I don't remember specifically, but I know
9  that, as part of my presentation of the overall
10  hospital contracting strategy, I presented that
11  component as a bullet point in there.
12    Q.  Let me show you another document.
13       (BCBSMA-AWP 12501 marked Exhibit
14  Cizauskas 003.)
15    Q.  Would you please review that document,
16  Exhibit Cizauskas 003, and let me know when you're
17  ready to proceed.
18    A.  (Witness reviews document.)  Okay.
19    Q.  These are the minutes of a July 11, 2005
20  meeting of the PFSW, right?
21    A.  Yes.
22    Q.  And you're listed there as one of the

Page 188

1  attendees?
2     A.  Yes.
3     Q.  I'd like to draw your attention to the
4  last bullet point under "Hospital Multi-Year
5  Strategy."
6     A.  Uh-huh.
7     Q.  Does that bullet point pertain to the work
8  of the outpatient department fee schedule group?
9     A.  Yes.
10    Q.  Do you see under "Action Items:  Next
11  Steps," it says, "Sheila to continue her
12  presentation at the next meeting"?
13    A.  Correct.
14    Q.  Does this refresh your recollection as to
15  how many meetings the work of the Hospital
16  Outpatient Department Fee Schedule Group was
17  discussed at?
18    A.  According to my recollection, I presented
19  the overall hospital contracting plan at this
20  meeting, which that last bullet point was part of
21  that, and didn't get to two pieces of the plan that
22  I was supposed to present at a subsequent meeting,

Page 189

1  but I don't believe I ever did, and it -- the two
2  pieces were unrelated to the AWP.
3     Q.  The AWP-related components we've been
4  talking about were all discussed and analyzed at
5  the meeting of July 11, 2005.
6     A.  I believe so.
7     Q.  The third bullet point from the top --
8     A.  Uh-huh.
9     Q.  -- this refers to "Key changes in approach
10  to hospital contracting."  Do you see that?
11    A.  Yes.
12    Q.  Okay.  The first one is, "We will provide
13  the potential for the hospitals to earn reasonable
14  cost, plus a margin with the percentage of payment
15  that is linked to performance increasing as a
16  portion of the total increase over the three- to
17  four-year contract cycle."
18    A.  Uh-huh.
19    Q.  Now, did this pertain to inpatient --
20  inpatient reimbursement to hospitals?
21    A.  This referred to the total reimbursement
22  to the hospital.

48 (Pages 186 to 189)

Sheila R. Cizauskas                    HIGHLY CONFIDENTIAL                    March 10, 2006
                                            Boston, MA

Page 190

1    Q.   Okay.  Now, under the first point which we
2  just looked at, "Providing the potential for
3  hospitals to earn reasonable cost plus a margin --"
4    A.   Uh-huh.
5    Q.   -- that wasn't a change from prior
6  approach, was it?
7    A.   That was not a change.
8    Q.   Okay.  That -- that part of the sentence
9  had been a consistent approach --
10    A.   Correct.
11    Q.   -- at BCBS in the past.
12    A.   Yes.
13        MR. COCO:  Objection.
14    Q.   The second part of that sentence is, "With
15  the percentage of payment that is linked to
16  performance increasing as a proportion of the total
17  increase," is that the change that is being
18  referred to?
19    A.   That is a change in this plan.
20    Q.   And the -- the consistent strategy which
21  we just talked about, which is to provide a
22  reasonable cost plus a margin, that's true of

Page 191

1  physician offices as well as hospitals, correct?
2    A.   No.
3        MR. COCO:  Objection.
4    Q.   That's not true of physician offices?
5    A.   I'm not aware of the strategy on physician
6  offices.  My role is on hospitals.
7    Q.   But you do know that that's always been
8  true in relation to hospitals.
9    A.   I don't know that it's always been true.
10    Q.   It's been true for the period of time
11  you've been at the company?
12    A.   It was true when I arrived at the company,
13  and that's when I became aware of it.
14    Q.   The second bullet point from the top,
15  "Sheila reviewed the elements of commercial
16  hospital contracts for 2005, FY '06 --" is that
17  full year '06?
18    A.   Fiscal year.
19    Q.   "-- fiscal year '06, including core rate
20  increases, performance incentives -- quality and
21  technology, AWP fee schedule," and then it
22  continues.  Is this bullet also referring to the

Page 192

1  work of the Hospital Outpatient Department Fee
2  Schedule Group?
3    A.   Just the AWP fee schedule piece of that
4  bullet.
5    Q.   So, that part of the second bullet and the
6  last bullet would pertain to the work of the
7  Hospital Outpatient Department Fee Schedule Group?
8    A.   Correct.
9    Q.   Do any other bullet points relate to the
10  work of that group?
11    A.   I don't think so.  (Witness reviews
12  document.)  No, I don't think there is anything
13  else.
14    Q.   The bottom of the page says, "Draft agenda
15  for 7/25 meeting."  You'll see there's an entry
16  there with your name by it.
17    A.   Yes.
18    Q.   Are those the sections that you did not
19  get to?
20    A.   Correct.
21    Q.   What does "BH rates" mean?
22    A.   Behavioral health rates.

Page 193

1        (BCBSMA 005188-5239 marked Exhibit Cizauskas
2  004.)
3    Q.   I show you a document which was marked as
4  Exhibit Cizauskas 004.  Can you please take a look at
5  that document, and let me know when you're done.
6    A.   (Witness reviews document.)  Okay.
7    Q.   Now, earlier in the day we discussed
8  HealthONE --
9    A.   Yes.
10    Q.   -- which is one of the entities which has
11  and continues to be reimbursed on a global
12  capitated rate, including drugs.  Do you recall
13  that testimony?
14    A.   Yes.
15    Q.   Are Harvard Vanguard Medical Associates,
16  Dedham Medical Associates, and Southboro Medical
17  Group, Inc. part of HealthONE?
18    A.   Yes.
19    Q.   So, these -- are these -- do these
20  documents together make up the contract whereby
21  HealthONE receives the global capitated rate that
22  we've discussed?

49 (Pages 190 to 193)

# Exhibit 53

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

**Stephen L. Coco**
**(617) 859-2731**

September 20, 2006

**Via Facsimile and Overnight Mail**

Andrew D. Schau, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:     *In Re Pharmaceutical Industry Average Wholesale Price Litigation,*
MDL No. 1456, Civil Action No. 01-12257-PBS
Our File No.:  072188-0000

Dear Andrew:

I am responding to your letter of September 12, 2006.  While BCBSMA does not believe that the two documents referenced in Mr. Skwara's August 1, 2006 letter are necessarily responsive to the defendants' document requests, to avoid any unnecessary dispute, I have enclosed copies of those documents, bates stamped BCBSMA-AWP-42797-831.

I am somewhat surprised at your position that my August 14, 2006 letter is not privileged, given that both Robins, Kaplan, Miller & Ciresi LLP and Hagens Berman Sobol Shapiro, LLP are representing BCBSMA, either individually or as a class member, in this litigation, and I would expect privilege to attach to communications between those firms.  If your position remains that such communications are not privileged, please confirm that you have adopted the same position with respect to similar communications among the various law firms that are representing the defendants in this case and have produced such communications which, I expect, are within the scope of document requests made by the plaintiffs in this action.  Otherwise, I would reiterate my request for the return and/or destruction of my August 14, 2006 letter.

Finally, your speculation about "fee arrangements" is unfounded.  As with most class action litigation, expenses, such as the costs of deposition transcripts, are borne by the law firms representing the named plaintiffs and/or the class.  My August 14, 2006 letter simply relates to whether my firm, as part of its representation of BCBSMA, or Hagens Berman Sobol Shapiro, LLP, as part of its representation of the class as a whole, is to bear that expense.  BCBSMA's previous response that there are no documents concerning any fee arrangement between BCBSMA and the MDL class counsel, because no such fee arrangement exists, was and remains accurate.

BN1 35034148.1

Andrew D. Schau, Esq.
Page 2
September 20, 2006

     Please contact me if you have any additional questions.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI, LLP

Stephen L. Coco

Enclosures
SLC
cc:    Edward Notargiacomo, Esq.

# Exhibit 54

DIVISION HEALTH CARE
FINANCE AND POLICY

01 DEC 14 PM 1:33

#2567



# *The* LEWIN GROUP

# Impact of Proposed AWP Reductions on the Provision of Home Drug Therapies to Medicare and Medicaid Patients

**American Association for Homecare**
*September 8, 2000*

The Lewin Group

Falls Church, Virginia • San Francisco, California • Boston, Massachusetts
Montreal • London • Paris • Amsterdam

BCBSMA-AWP-42822

# Impact of Proposed AWP Reductions on the Provision of Home Drug Therapies to Medicare and Medicaid Patients

Prepared for:

**American Association for Homecare**
*September 8, 2000*

By:

**Allen Dobson, Ph.D.**
**JoAnn Lamphere, Dr.P.H.**
**Lane Koenig, Ph.D.**
**Jennifer Babcock**

**The Lewin Group**

BCBSMA-AWP-42823

## EXECUTIVE SUMMARY

The American Association for Homecare retained The Lewin Group in July 2000 to examine the potential consequences of a change in Medicare drug reimbursement policy for home pharmaceutical providers. The Association's impetus for commissioning the study was a May 31, 2000 announcement from the Department of Health and Human Services (DHHS) that it intended to reduce Medicare Part B payments for specific drug therapies and fundamentally alter the method by which certain drug therapies are reimbursed. Proposed Medicare drug payment changes are scheduled to go into effect on October 1, 2000. The DHHS announcement follows on the heels of a Department of Justice recommendation to state Medicaid programs to adopt new (and reduced) pricing for nearly 400 national drug codes.

In this paper we estimated the cost structure of providing respiratory and infusion drug therapies in the home setting and the impact of adopting proposed reductions in Medicare Part B and Medicaid reimbursement for these drugs. Key findings include:

- The total cost of providing respiratory therapy and infusion drugs in the home to Medicare and Medicaid patients far exceeds the cost of acquiring the actual drug itself.

- All companies surveyed would experience an operating loss for these pharmaceutical services, averaging 93 percent, as a result of proposed AWP reductions.

- The companies projecting the greatest percentage losses are those that are the largest, have operations in many states, and generally serve the highest proportion of Medicare patients.

- Medicare and Medicaid patients'. access to respiratory and infusion drug therapies will diminish, as a result, as firms reduce services in public sector markets.

## BACKGROUND AND SIGNIFICANCE

The issue of drug pricing is receiving considerable and increasing attention among public and private policymakers. Concern is being expressed by members of Congress, the Office of Inspector General at the Department of Health and Human Services, and the Department of Justice about the levels of Medicare and Medicaid reimbursement for certain pharmaceuticals and drug therapies. Many policymakers assert these levels are "excessive" because reimbursement is based on an average wholesale price (AWP). This is because large purchasers of pharmaceuticals often receive substantial discounts from manufacturer's listed prices; if viewed by itself, the payment for certain drug products may appear high. This perspective is arguably narrow, however, given the economics of the home pharmacy industry. The difference between what companies are paid by Medicare and Medicaid (a percentage of AWP) and their "true" drug acquisition costs is the only way providers of home drug therapies are able to provide ongoing professional services integral to quality patient care under current payment arrangements.

The Department of Health and Human Services announced on May 31, 2000 that it is moving administratively to reduce Medicare payments for select drug therapies. For Medicare Part B

BCBSMA-AWP-42824

claims, DHHS intends to pay the "average wholesale catalog price," compiled by the Department of Justice and recommended for state Medicaid programs. Although First Data Bank (FDB) recalculated wholesale drug prices for nearly 400 national drug codes, the method used by FDB has not been made publicly available. Resulting Medicare drug payment changes are scheduled to become effective October 1, 2000.

The Lewin Group has completed its analysis of data collected from mail and telephone surveys of providers. The following is a report of what was learned through this effort.

## ANALYSIS AND APPROACH

### Study Objectives

The Lewin Group conducted a study for the American Association for Homecare during July-August 2000 that estimated the cost structure of providing respiratory and infusion drug therapies in the home setting and the financial impact of adopting proposed reductions in Medicare Part B and Medicaid reimbursement for these drugs. As part of this study, The Lewin Group assessed the potential effect of these reimbursement changes on Medicare and Medicaid patients who receive drug therapies in the home.

### Sample

Data were obtained from 12 providers of home medical equipment and pharmaceutical services, specifically respiratory and infusion therapies, who completed a written survey instrument and a telephone interview.  The sample is believed to be generally representative of home pharmaceutical companies nationally. Sampled companies range in size from less than $1 million to $1 billion annual net revenue and serve Medicare and Medicaid patients in all geographic regions throughout the United States.

The sample was stratified by size of companies' volume of business.  Small firms were defined as those with less than $5 million total annual revenue; large firms were those with $30 million or more in total annual revenue; and mid-sized firms were in-between.

### Survey Design

The cost survey, designed in conjunction with industry financial experts, sought to calibrate the cost structure of the industry as it pertains to the provision of respiratory and infusion drug therapies in the home setting to Medicare and Medicaid patients. A chief financial officer (or designee) from each participating company completed the mail-in cost survey and participated in an extensive follow-up telephone interview.

The Lewin cost survey identified major categories of professional services that accompany the provision of drug therapies in the home (such as pharmacy, patient management, delivery, and others) and other corporate costs.  Revenue and cost data were provided by surveyed companies and then proportionately allocated to the business unit providing respiratory and infusion services to patients whose care is covered by Medicare or Medicaid.  Estimates of AWP

BCBSMA-AWP-42825

reductions were derived for approximately 50 drug categories listed in First Data Bank's compilation of drugs that would be affected by new pricing data (as of June 2, 2000), as communicated in a Department of Justice letter to State Medicaid directors. In addition to financial data, the survey and follow-up telephone interviews posed open-ended questions concerning the provider's assessment of the business impact of proposed AWP reductions in the Medicare and Medicaid sectors for those drug therapies under review. Finally, participants provided their perceptions of the consequences in terms of access, quality, and cost for Medicare and Medicaid patients who receive the drug therapies considered for AWP reductions.

## Analysis

Average company financial losses for Medicare and Medicaid sources and ranges of losses were projected under the new AWPs by determining profit ratios for each company, both before and after AWP reductions. Cost data were analyzed for small, medium and large companies by averaging categories of cost (patient service costs, non-patient related costs, and drug acquisition costs) and calculating ratios of specific cost categories to total cost. Qualitative information was categorized and summarized from the telephone interviews.

## FINDINGS

## Value of Services Provided to Medicare and Medicaid Patients

The cost to a home pharmaceutical company of acquiring respiratory and infusion drugs is small in comparison to the total cost of services included in the provision of these drug therapies to Medicare and Medicaid patients. Surveys revealed that companies provide many essential professional services as part of delivering respiratory and infusion therapies in the home. These services include ongoing patient education, clinical monitoring of patients, nursing care, care coordination and management, emergency response, delivery, and others.

Assuring quality patient care and meeting established patient quality standards (e.g., JCAHO, federal and state licensure and regulatory requirements, customer service, education and training, emergency response, sanitary guidelines, and so forth) is an essential dimension of the service home medical companies offer to *all* patients and is often required for Medicare participation. The cost of assuring quality care is considerably greater than the cost of "a reasonable handling fee" that some policymakers have stated they would consider negotiating with providers.

A key finding of the study is that the total cost of patient management, pharmacy, quality assurance, delivery, medication storage, patient account services, storage, and company overhead is much greater than the acquisition cost of drugs (respiratory and home infusion therapy) for sample companies.

- Depending on company size, between 58 percent and 74 percent of the total costs of providing respiratory therapy and infusion drugs in the home to Medicare and Medicaid patients, on average, are not related to acquiring the pharmacy product (Figure 1). Note: in both Figures 1 and 2, average cost of pharmacy products is the acquisition price for the drugs; average cost of patient services includes the categories of patient management,

BCBSMA-AWP-42826

nursing, pharmacy and customer services; and average non-patient costs includes overhead, billing and collection, and storage and warehouse costs.

- If bad debt costs are excluded from revenue estimates, between 58 percent and 72 percent of the total costs of providing respiratory and infusion drugs in the home to Medicare and Medicaid patients, on average, are not related to acquiring the pharmacy product (Figure 2).

## Financial Impact of Proposed AWP Reductions

- Companies providing respiratory and infusion drug therapies to Medicare and Medicaid patients at home may experience a 93 percent operating loss for these service components, on average, as a result of proposed AWP reductions. Loss was calculated as [net revenue post-AWP reductions minus costs] divided by net revenue post-AWP reductions.

- No company surveyed would remain profitable for the provision of home respiratory and infusion drug therapies to Medicare and Medicaid patients should the proposed AWP reductions be implemented. The estimated initial financial loss to companies as a result of proposed reductions ranges from 2 percent to 214 percent (Figure 3). If bad debt costs are excluded from financial loss estimates, only two companies expect to show any profit from Medicare and Medicaid services after AWP reductions (Figure 4). Note: in both Figures 3 and 4, sampled companies are arrayed in order of expected loss, not by size of company.

- The companies projecting the greatest percentage losses are those that are the largest and which have operations in many states. Two-thirds of the largest companies and three-quarters of mid-sized companies expect to experience a 50+ percent loss on studied services should proposed AWP reductions be adopted for the Medicare and Medicaid programs.

- Most of the companies with the greatest projected negative impact are those which serve a high proportion (>75 percent) of Medicare patients in their respiratory and/or infusion service areas.

## Impact on Medicare and Medicaid Beneficiaries

- Medicare and Medicaid beneficiaries' *access* to respiratory and infusion drug therapies is expected to diminish should AWP reductions be adopted. Firms indicate they will reduce exposure in certain public sector markets. Companies report that they will be forced to curtail accepting new Medicare and Medicaid patients. Several companies assert they will exit the Medicare and Medicaid markets altogether.

- *Quality* may be jeopardized as companies limit ongoing patient monitoring and reduce staff.

- Ironically, Medicare patient *costs* could increase should proposed AWP reductions be adopted. Said one pharmacist, "I could serve patients one whole year for what it will cost Medicare for a day when they end up in the emergency room" [because of reduced access to in-home services]. In addition, some companies report they may stop accepting assignment for Medicare patients, thus increasing costs to the patient.

BCBSMA-AWP-42827

It is important for public policymakers to grasp the financial realities of the health care industry that provides respiratory and infusion services to Medicare and Medicaid patients in the home. Companies in this study's sample serve Medicaid patients in 31 states. Due to revenue losses from Medicaid AWP reductions for respiratory and infusion drug therapies, companies report they have begun curtailing acceptance of new Medicaid referrals, not accepting Medicaid beneficiaries who do not carry additional insurance, and departing from Medicaid markets in certain states. According to the National Home Infusion Association, by August 2000 seventeen states had adopted AWP reductions for the drug therapies under review. At the time the Lewin survey was conducted, companies had already begun curtailing services to new Medicaid patients in 15 of the 17 states that had adopted the Medicaid reductions.

## CONCLUSION

High initial profit margins are no inoculation against the threat of proposed AWP reductions. If proposed AWP reductions for respiratory and infusion drug therapies are enacted for the Medicare and Medicaid programs, the financial health of all companies surveyed will be placed in jeopardy. Potential revenue reductions are so significant that all companies surveyed expect to experience operating losses as a result (for their respiratory and infusion home services to Medicare and Medicaid patients). For companies that serve a high proportion of Medicare and Medicaid patients, operating losses will be particularly severe.

Given these financial realities, companies affected by proposed AWP reductions intend to exit the Medicare market. Medicare beneficiaries will be negatively affected because they will experience reduced access to medically prescribed in-home services, potentially diminished quality of services and, in all likelihood, increased costs.

Lending credence to these conclusions is the real world experience of Medicaid. Sampled companies already have stopped serving new Medicaid patients in fifteen of the seventeen states that adopted reduced AWP pricing.

Federal and state governments' concerns with proper pricing of drug therapies must consider patient access and the unintended consequences of policy choices. The movement by Medicare and Medicaid towards simply paying for the acquisition costs of drug therapies is contrary to the economics of the home pharmacy industry. "Excess" revenue is needed to cover the additional wrap-around services associated with the provision of drug therapies and quality patient care. If AWP reductions are implemented, then it is essential to simultaneously adopt a reimbursement mechanism that recognizes the professional service component of providing these drug therapies, such as the private sector has done.

BCBSMA-AWP-42828

# Figure 1: Estimated Distribution of Average Total Cost of Providing Respiratory Therapy and Infusion Drugs in the Home to Medicare and Medicaid Patients, by Company Size



Between 58% and 74% of costs are not related to the acquisition of the drug product.

Sample Size = 12

BCBSMA-AWP-42829



Figure 2: Estimated Distribution of Average Total Cost of Providing Respiratory Therapy and Infusion Drugs in the Home to Medicare and Medicaid Patients, by Company Size (excluding bad debt)

Sample Size = 12

BCBSMA-AWP-42830

# Figure 3: Estimated Initial Financial Impact of AWP Reductions for Respiratory and Infusion Drug Therapies to Medicare and Medicaid Patients at Home by Individual Company



BCBSMA-AWP-42831