# Exhibit 55

# TRIGON.

January 5, 2000

Ms. Karen Ford Manza
Regional Director, Managed Care
US Oncology
16825 Northchase Drive
Suite 1300
Houston, TX 77060

Dear Ms. Manza:

It was a pleasure speaking with you regarding the new Trigon Services, Inc. Agreements. I also want to thank you for forwarding your suggested changes to the agreement language. As we discussed, the Agreements have undergone significant revisions that are beneficial to your practice. However, you still have a number of concerns regarding the contract language. At this time, I would like to address your concerns in an attempt to further clarify Trigon Services, Inc.'s position on certain issues.

Exhibit H - Bundling

Further clarification necessary.

History Edits - Oncology

Further clarification necessary.

Non-Covered Oncology Services

Further clarification necessary.

Medical Necessity

As defined in the Agreements, Medical Necessity determinations are based upon the following criteria: consistent with the symptom or diagnosis and treatment of the Covered Person's condition; in keeping with standards of generally accepted medical practice; not mainly for the convenience of the patient, the patient's family, or the provider; and the most suitable supply or level of service that can be safely provided. Economic factors are not a component of Medical Necessity determinations. Determination of Medical Necessity is based upon sound clinical evidence and outcomes information. Trigon uses national medical necessity standards for these determinations.

If you disagree with a Medical Necessity determination made by Trigon and feel that it is based purely on economic factors, you should appeal the insurance claims in accordance with Virginia Code Section 32.1-137.7 *et. seq*

Experimental/Investigational

See Medical Necessity section.

A-VA 03010065
Highly Confidential

Trigon Services, Inc., a subsidiary of Trigon Healthcare, Inc.
3800 Concorde Parkway • Suite 2000 • Chantilly, Virginia 20151 • Tel 703-227-5300 • Fax 703-227-5355

111559

PAR/PPO Modifiers

Further clarification necessary.

Drug Pricing According to Exhibit H

Trigon recognizes that your acquisition cost for drugs is highly variable when expressed as a percent of the AWP. Ninety percent of AWP should provide you with substantial margins for some drugs and nearly zero margins for others. As you know, acquisition cost as a percent of AWP is much lower for the older and more established generics and multi-source brands. These relatively low-cost drugs provide substantial margins and are prominent in the established combination regimens for common malignancies. Therefore, on balance, providing drugs to Trigon insureds at ninety percent of AWP provides you with a positive margin, even when inventory costs are considered. At the time of future fee schedule updates, Trigon might introduce new or different allowances for drugs. It is possible that new allowances might not be based upon a constant percent of AWP. However, any fee schedule changes may be many months in the future.

Medical Documentation

Further clarification necessary.

CPT Coding and Medicare Processing Guidelines

Trigon updates its fee schedules yearly, according to Medicare's Relative Value Units, competitor payments and changes in medical technology that affect specific allowances.

General Contractual Issues

1. Although the Fair Business Practices Act only applies to insured business. you will see some changes in processes and procedures across all lines of business as a result of the changes we are making relative to the new law. For example, we will provide voluntary pre-authorization with eligibility determinations across all lines of business, and we will provide information about policies and payments consistently across all lines of business. And we will, of course, continue to strive to pay all claims promptly and accurately. However, we have only changed the procedures for requesting additional information and tracking and paying claims for our insured lines of business, as required by the law. All Covered Services provided to fully insured and self-insured Covered Persons of Affiliates listed in Exhibit A of the Agreement will be reimbursed in accordance with the applicable Schedule of Allowances in Exhibit H. Trigon's adjudication logic is consistent with industry standards and is similar to logic applied by most payors. Often, Trigon's adjudication logic is consistent with Medicare and AMA CPT methodology, but at times Trigon's logic may conflict with these guidelines. Upon request, Trigon will address any specific questions regarding rebundling, downcoding, or reduction of claims containing certain combinations of codes.

2. While the Fair Business Practices Act requires that physicians have fifteen (15) business days from receipt of an amendment to consider and provide written objection to any contract amendment, Trigon provides twenty (20) business days from postmark date to review any amendment and notify us of any objection. Amendments will become effective ninety (90)

A-VA 03010066
Highly Confidential

viewItem [https://www.lextranet.com/lcs/search/prodDocs/viewItem.lcs?docID=2242257eDocID=9tableID=1183]

calendar days after the review period. Likewise, any termination that results from your failure to accept an amendment will not take place until ninety (90) calendar days after the twenty (20) business day period. This timing helps ensure continuity of care and a smooth transition for our members and your patients.

3.  The new Trigon Services, Inc. agreements do not contain the "most favored nations" clause. While we remain committed to ensuring the best reimbursement available for our members, we will achieve this, as we always have, by considering Medicare's Relative Value Units, competitor payments and changes in medical technology that affect specific allowances.

4.  Trigon has always reserved the right to share information with its customers, network providers, and Covered Persons. In fact, some of the language in this section is taken verbatim from the previous agreement. In an improvement from the previous agreement, Trigon has added language to this section to protect physicians. Trigon has committed to including statements that notify recipients of potential data limitation that could affect interpretation of the information and has provided the physician with the opportunity to review economic profiling information 30 days in advance of any external publication. As stated in Section III.K., you may provide comments and questions to us for our consideration by telephoning our Health Economics Unit at 1-800-447-2345.

5.  Trigon's determination that certain health care services are not Medically Necessary represents a denial of payment, not a denial of treatment. Only if Trigon deems the provision of certain health care service to be not Medically Necessary and thus a non-Covered Service, the physician is responsible for making the decision to provide or not to provide treatment based upon his/her professional judgement. If based upon his/her professional judgement, the physician wishes to provide the non-Covered Service to the Covered Person, or if the Covered Person is adamant about receiving such services, the physician can bill the Covered Person directly provided that an appropriate Patient Waiver form has been completed. Trigon does not assume liability for payment of non-Covered Services on behalf of Covered Persons. This practice, along with the definition of Medical Necessity and Covered Services are supported by the Covered Person's Evidence of Coverage.

6.  See number 1.

7.  Further clarification necessary.

8.  Under the Trigon Services, Inc. agreement, all Affiliates are obligated to pay clean claims for Covered Services in accordance with the timeframe imposed by the Fair Business Practices Act.

9.  All Affiliates listed on Exhibit A of the Agreement are, per Section I.A the definition of Affiliate, party to the Agreement and are subject to the terms and conditions expressed in the Agreement. Also, the definition of Plan refers to Blue Cross Blue Shield plans participating in the BlueCard Program. Likewise, these Plans are subject to the terms and conditions expressed in the Agreement including Exhibit H. Section III.P states that the Provider will comply with the utilization review policies of such Plan in lieu of the utilization review policies in Exhibit F. A list of Plans participating in the BlueCard Program will be mailed to you upon request.

10. Further clarification necessary.

11. In this instance, please call your Provider Network Consultant and he/she will serve as the liaison to the Trigon corporate office to resolve the issue.

12. The Trigon Reference Guide will be mailed to providers in late January 2000. This Reference Guide will have updated information and include provisions from the Ethics and Fairness in Carrier Business Practices Act.

13. Trigon does not publish or disseminate distinct medical record consent forms.

14. All self-insured plans administered by Affiliates are required to comply with the obligations in Section II, Trigon Services, Inc. and Affiliate Obligations, which include Ethics and Fairness in

A-VA 03010067
Highly Confidential

Carrier Business Practices Act provisions.  Self-insured plans are also subject to Section III.M and thus, in certain situations, may be liable for payment.

15. If a non-participating provider has provided services to a Covered Person, Trigon will pay the claim directly to the Covered Person.  The reimbursement varies according to the benefit structure of the Covered Person.

I hope that this information addresses some of your concerns regarding contract language. If you require further explanation or wish to discuss these issues in greater depth, please notify me upon review of this letter.  I am also researching your concerns that were not addressed in this letter and will notify you once completed.  If you have any questions, please contact me at 703-227-5316.

Sincerely,

Keane Chan
Provider Network Consultant – Northern Region


cc:    Sara D. Bajkowski, Network Contracting Representative, Fairfax-Prince William Hem/Onc
       Gary Miller, Director, Provider Networks – Northern Region

A-VA 03010068
Highly Confidential

# Exhibit 56

Page 1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3            CIVIL ACTION: 01-CV-12257 PBS

4    -------------------------------------X

5    IN RE: PHARMACEUTICAL INDUSTRY      :

6    AVERAGE WHOLESALE PRICE LITIGATION  :

7    -------------------------------------X

8

9     HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

10              Wednesday, September 22, 2004

11                 10:33 a.m. - 4:43 p.m.

12

13        Deposition of MARGARET M. JOHNSON, R.Ph.,

14   taken by Defendants, pursuant to Subpoena, at the

15   offices of Horizon Blue Cross Blue Shield, Three

16   Penn Plaza - East, Newark, New Jersey, before

17   Ellen Marie Gumpel, a Certified Shorthand

18   Reporter, Registered Professional Reporter and

19   Notary Public within and for the State of New

20   York.

21

22

Page 30

1   become aware of that fact after coming to Univera
2   or did you become aware of it previously?
3        A.    That doctors in general made a
4   margin.  I know that I assumed that physicians
5   were making a margin buying and being reimbursed
6   for drugs, yes.
7        Q.    Can you identify any particular time
8   frame when you first would have become aware of
9   that fact?
10       A.    Probably most associated with my
11  work in the director of pharmacy role for
12  Blue Cross and Blue Shield where I was involved
13  in more work related to physicians than my very
14  specific role under the PBM.
15       Q.    Forgive me for getting confused
16  about dates, but could you remind me of when that
17  was that you were director of pharmacy?
18       A.    1993, '94.
19       Q.    Would it be fair to say that -- I'm
20  sorry.
21       A.    No, it started in '94 through '99.
22       Q.    Would it be fair to say as director

Page 31

1   of pharmacy services your principal sphere of
2   responsible pertained to pharmacies, rather than
3   providers?
4        A.    Absolutely, yes.
5        Q.    Despite that, although you weren't
6   involved with providers, you were aware of the
7   fact that providers were making a margin?
8        A.    Yes.
9        Q.    Would it be fair to say that the
10  existence of that margin for providers is
11  something that is well known in the industry?
12       A.    Yes.
13       Q.    It was certainly well known by 1993
14  and '94, correct?
15       A.    I believe it was known in '93 and
16  '94.
17       Q.    It is certainly well known today,
18  correct?
19       A.    Yes.
20       Q.    At the time that you were working
21  for Univera, did you Univera contract with any
22  PBMs?

Page 32

1        A.    Yes.
2        Q.    Which PBMs did Univera contract
3   with?
4        A.    Centrus.
5        Q.    Would you mind spelling that for the
6   court reporter?
7        A.    C-e-n-t-r-u-s.
8        Q.    What tasks or responsibilities did
9   Univera delegate to Centrus?
10       A.    We delegated claims processing.
11  They provided clinical support for our pharmacy
12  and therapeutics committee.  They did rebate
13  administration for us and I think supported
14  competitive analysis and benefit design analysis
15  and analytics and reporting those types of
16  things.
17       Q.    In terms of rebate administration,
18  you're referring to rebates that were paid to
19  Centrus by drug manufacturers; is that correct?
20       A.    Yes.
21       Q.    Did Centrus pass on all, 100 percent
22  of those rebates to Univera?

Page 33

1        A.    Univera held the contracts and
2   received the rebates sometimes directly,
3   sometimes through Centrus and there was a
4   percentage share of the rebates, I believe at
5   that time was the financial arrangement between
6   Univera.
7        Q.    Do you recall what the percentage
8   share was?
9        A.    I believe I recall.  I am wondering
10  if it's information that is not to be shared.
11       MS. LEONARD:  Beyond the scope of
12  your deposition.
13       THE WITNESS:  I mean, I'm not
14  employed there now and I'm concerned about the
15  proprietary nature of that information.
16       MR. MANGI:  Actually, that reminds
17  me, I should put on the record, since we will be
18  going through some documents from Horizon that
19  have been marked as Highly Confidential Pursuant
20  to Protective Order that has been entered by the
21  judge in this case, I would like to designate
22  this transcript of this deposition as highly

1  appear to be the version of the old chart that
2  was in effect from August of '01 through and
3  until June of '04; would that be correct?
4      A.    I have no idea.
5      Q.    Now, you mentioned that your current
6  title at Horizon is executive pharmacy director.
7      A.    Right.
8      Q.    What are your responsibilities in
9  that position?
10     A.    My responsibilities are management
11 of the pharmacy benefits for Horizon Blue Cross
12 and Blue Shield of New Jersey, as well as Horizon
13 Healthcare New York.  And that includes oversight
14 of our PBM arrangement, clinical management of
15 our P&T and related clinical programs or
16 unrelated clinical programs.  The administration
17 includes benefit design, all of the interfaces
18 with the PBM.  We have a business development
19 area and specialty pharmacy and audit and
20 utilization management.  And then sales support,
21 those things that I think I mentioned previously.
22     Q.    Do you subscribe to any periodicals

1  on prescription drug pricing, on that topic
2  generally?
3      A.    We have many periodicals and I'm
4  sure some of them relate to the prices of
5  prescription drugs.
6      Q.    Do you personally subscribe to any
7  of these periodicals?
8      A.    They may be addressed to me.
9  They're not my personal subscriptions.  They're
10 corporate subscriptions.
11     Q.    Do you know if they include price
12 reporting services?
13     A.    We may receive something from Red
14 Book or First Data Bank.  We don't directly
15 subscribe to that.
16     Q.    You're familiar with those price
17 reporting compendiums, Red Book and First Data
18 Bank; is that right?
19     A.    Yes.
20     Q.    And you're also familiar with
21 Medi-Span?
22     A.    Yes.

1      Q.    What is your understanding of the
2  prices that are listed in those price
3  compendiums?
4            Do you know what is listed in them?
5      A.    Do I know what is listed?
6            Do you mean, how they're referenced?
7      Q.    Right.
8      A.    They're listed generally
9  alphabetically by drug with one or more prices.
10     Q.    Do you know whether or not the
11 prices are referred to by any particular term?
12     A.    I believe that generally there is a
13 published AWP and I think sometimes, not always
14 the wholesale acquisition cost.  I believe that.
15 I'm not absolutely certain.
16     Q.    You're aware that there is a
17 differential between the two?
18     A.    I am aware of that.
19     Q.    What is your understanding of the
20 relationship between the WAC and the AWP?
21     A.    My understanding is that there is a
22 percentage differential.  I don't know if you

1  would call it a markup, but a percentage
2  differential between the wholesale acquisition
3  cost and AWP.
4      Q.    And do you know what that markup is
5  in general for drugs?
6      A.    My understanding is that it varies.
7      Q.    To calculate what the differential
8  is for a particular drug, you could go to the
9  price reporting service and take a calculator and
10 calculate the percentage differential between the
11 two, assuming both were published?
12     A.    Yes.
13     Q.    Are you a member of any industry
14 associations at present?
15     A.    I am.
16     Q.    Which industry associations are
17 those?
18     A.    The Academy of Managed Care
19 Pharmacy, AMCP.
20     Q.    How long have you been a member of
21 AMCP?
22     A.    Let's see.  I've probably been a

# Exhibit 57

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3

 4     IN RE PHARMACEUTICAL           )

 5     INDUSTRY AVERAGE WHOLESALE )   MDL No. 1456

 6     PRICE LITIGATION              )   Civil Action: 01-CV-12257-PBS

 7     THIS DOCUMENT RELATES TO      )

 8     ALL CLASS ACTIONS             )

 9

10          Deposition of CAROL SIDWELL, taken before

11     GREG S. WEILAND, CSR, RMR, CRR, Notary Public,

12     pursuant to the Federal Rules of Civil Procedure for

13     the United States District Court pertaining to the

14     taking of depositions, at Suite 300, 1630 Fifth

15     Avenue, in the City of Moline, Illinois, commencing

16     at 10:38 o'clock a.m., on the 17th day of September,

17     2004.

18

19

20

21

22
```

Page 6

1    MS. KNOLL:  Erik, Carol has not been sworn
2  in.
3        MR. HAAS:  Can you swear in Carol.
4        (Witness sworn.)
5            CAROL SIDWELL
6  after being first duly sworn, testified as follows:
7            EXAMINATION
8  BY MR. HAAS:
9      Q.   Ms. Sidwell, would you please state your
10 full name for the record.
11     A.   Carol Sidwell.
12     Q.   And what is your current position?
13     A.   Manager of provider relations.
14     Q.   And as manager of provider relations, you
15 report to Michael Beaderstadt, correct?
16     A.   Beaderstadt, yes.
17     Q.   Beaderstadt. I'm going to walk through
18 with you the same background that we walked through
19 with Michael, and I apologize for putting you
20 through it.
21        But if you would, could you starting with
22 post high school just quickly describe for me your

Page 7

1  employment and educational experience.
2      A.   Okay.  After graduating from high school,
3  I went to the University of Iowa, graduated from
4  there in 1981 with a degree in pharmacy.  During
5  that time there were miscellaneous jobs including
6  restaurant and lifeguarding and non-drug-related
7  experiences.
8      Q.   Me too, both of those.
9      A.   After graduating in '81, I worked for a
10 retail pharmacy chain for about nine months or so as
11 a staff pharmacist filling prescriptions, billing
12 insurance claims.
13     MS. MacMENAMIN:  I'm sorry, the phone
14 seems to be cutting out a little bit.  I don't know
15 if the speaker is too far away from the witness.
16     MR. HAAS:  I'll turn up the volume too and
17 see if that helps out at all.
18 BY MR. HAAS:
19     Q.   Okay.  The witness testified that she
20 worked for a retail pharmacy chain as a staff
21 pharmacist and filling prescriptions.
22        Is that correct?

Page 8

1      A.   Correct.  From there I started working at
2  a hospital pharmacy reviewing the physician orders,
3  overseeing injections, filling of the medication
4  carts, being a resource to the physician within the
5  hospital pharmacy environment.
6      Q.   What is the time frame that you worked in
7  the hospital?
8      A.   I would have to check for exact dates on
9  that, but I believe I started there in '82 or '83,
10 and I worked there for about a three-year time
11 frame, and I left there to then go back in retail
12 pharmacy working for a different chain as a pharmacy
13 manager in one of their retail locations.  I worked
14 with that organization in various functions managing
15 pharmacies until 1993, when I became to John Deere
16 Health.
17     Q.   And how have your responsibilities and
18 titles changed from 1993 to date while at John Deere
19 Health?
20     A.   When I first came to John Deere Health, I
21 don't remember the exact title.  I believe it was a
22 pharmaceutical care representative where I would go

Page 9

1  out and work with physicians, talk with them about
2  their prescribing habits, their formulary
3  utilization, generic utilization, trying to use
4  first line agents.
5        I was then involved in some special
6  projects putting together a preferred drug list for
7  our TennCare product, the Tennessee Medicaid
8  product, and then went on to other special projects
9  working with what we refer to as the health center
10 or our clinic, our staff model HMOs.  As we were
11 building new facilities, I was responsible for
12 designing the pharmacy, hiring the pharmacy staff,
13 getting the licensure, setting up the purchasing
14 agreements for those clinics.
15        And then I went to the provider
16 contracting area where I became responsible for
17 pharmacy contracting and pharmaceutical manufacturer
18 contracting for rebates, as well as the customer
19 service provider service aspects of pharmacy, the
20 claims processing, authorizations, implementation of
21 the drug benefit, interactions with the claims
22 processor.

Page 38

1  of the items available, all of the drugs available
2  within that given entity and what a -- I'll call it
3  an average or what an average price would be looking
4  at brands and generics available.
5      Q.  Is it your understanding that the MAC
6  price that John Deere develops as a proprietary
7  price will differ from the MAC price that other
8  health plans use?
9      A.  Certainly.
10     Q.  And is it fair to say that AWP is not the
11  basis for the MAC price that John Deere has
12  developed?
13     A.  Absolutely.  It is used as one of our
14  benchmarks in looking at determining a MAC price,
15  where we would like to achieve at least a certain
16  percentage discount, but it certainly is not the
17  biggest factor.
18     Q.  During the course of your tenure at
19  John Deere, has John Deere done any studies or costs
20  of provider or pharmacy costs of acquisition of
21  drugs to your knowledge?
22     A.  I wouldn't say we have done any formal

Page 39

1  studies of that.  Certainly information is available
2  through journals and through other means to allow us
3  to know that our reimbursement for pharmacies and
4  for physicians does include a margin in there.
5          On occasion, if a pharmacist would request
6  that we change a MAC price or change a reimbursement
7  for a drug, they do have the opportunity to submit
8  their acquisition cost in there.
9      Q.  Okay.  When you referred to the sources of
10  information about drug costs, is there anything that
11  particularly comes to mind that you've reviewed over
12  the last decade?
13     A.  Some of it comes from the various
14  manufacturers.  Some of it is a claim review from a
15  pharmacy where they didn't feel that the
16  reimbursement was enough and were willing to provide
17  information.  Some of it is drug topics or some of
18  your journals, conferences such as the Academy of
19  Managed Care Pharmacy, some of the networking
20  opportunities there.
21          On occasion some pharmacies have or
22  physicians have provided a copy of an invoice to us

Page 40

1  to demonstrate what their cost was.
2      Q.  To sort of reiterate the conclusion you
3  just made, it's fair to say that in providing
4  reimbursement to pharmacies and doctors, John Deere
5  understood that it was providing an element of
6  margin to the physicians and the pharmacies; is that
7  correct?
8      A.  That is correct, yes.
9      Q.  Now, you also mentioned that you were
10  involved in the development of John Deere's staff
11  model HMO.
12     A.  Of the pharmacy pieces of that, yes.
13     Q.  Okay.  And did that staff model HMO have a
14  particular name?
15     A.  John Deere Family Health Plan.
16     Q.  Family.  And is it correct that that HMO
17  was in operation from 1993 to 1999, to the best of
18  your recollection?
19     A.  Those dates sound close.  I'm not sure
20  when it actually ceased operation.
21     Q.  Describe for me once again what exactly
22  your involvement was with the HMO.

Page 41

1      A.  I was involved with -- we had one HMO, one
2  staff model that was up and running at that point,
3  another one that was under development, and we were
4  looking at opening some additional sites.
5          So I was responsible for getting the
6  licensure for the facility, working with the
7  architects and other people as far as the layout of
8  the pharmacy, the actual design of the pharmacy,
9  hiring a staff, setting up arrangements with the
10  wholesalers and with the various buying groups, some
11  involvement with the manufacturer contracts for own
12  use purchasing at that point, and pharmacy systems,
13  basically getting the pharmacy up and ready to run.
14     Q.  Were you involved at all in the
15  negotiation or contracting for drugs that were going
16  to be dispensed by the staff model pharmacies or
17  administered by the staff model physicians?
18     A.  Some of the agreements were already in
19  place when I came on board because we had pharmacies
20  in operation, but we did extend those to other
21  facilities.
22     Q.  Were those contracts with wholesalers or

11 (Pages 38 to 41)

Page 66

1  BY MS. MacMENAMIN:
2      Q.  Okay.  You also testified as to your
3  belief that the pharmacies had a reasonable margin
4  built into the reimbursement that they received from
5  you?
6          MR. HAAS:  Objection to form.
7          THE WITNESS:  Yes.
8  BY MS. MacMENAMIN:
9      Q.  Can you give us a ballpark guess as to
10 what that reasonable margin might have been?
11         MR. HAAS:  Objection to form.
12         THE WITNESS:  I don't know that I know
13 their specific margin.  I do know that even at AWP
14 minus 20 that they were still able to cover their
15 operating expenses without losing money, so whatever
16 their operating costs would be, their margin was
17 still there to cover that along with the dispensing
18 fee component that we pay.
19 BY MS. MacMENAMIN:
20     Q.  Okay.
21     A.  If you look at a pharmacy, in the data
22 that I've seen, it looks like the average cost to

Page 67

1  dispense a prescription used to be 6 something.  I
2  think it's 7 or 8 something per prescription now.
3  And if I'm paying them as in some of these contracts
4  $1.75 or $1.49 per prescription, there has to be
5  additional margin in the drug cost for them to be
6  able to continue to be in business.
7      Q.  Okay.  From what you're saying, I
8  understand that you find AWP to be a useful
9  benchmark in place of actual acquisition cost?
10         MR. HAAS:  Objection to form.
11         THE WITNESS:  Yes.  It's an industry
12 standard.
13 BY MS. MacMENAMIN:
14     Q.  And would you say that it's a useful
15 benchmark because it has a relation to some kind of
16 real world price?
17         MR. HAAS:  Objection to form.
18         THE WITNESS:  I would say that it's useful
19 because it is a benchmark, because it is an industry
20 norm that then I can apply discounts to to get
21 consistent adjudication of claims.
22 BY MS. MacMENAMIN:

Page 68

1      Q.  Are you aware of any other benchmarks that
2  are available for use in reimbursing pharmacies?
3      A.  Certainly like the HCFA MAC would be a
4  benchmark price.  That's one that I don't -- we
5  don't use in our business to implement it.  We use
6  it as one of the things in compiling our own MAC
7  pricing.
8      Q.  Is the HCFA MAC exclusive to generic
9  products?
10     A.  I believe so.  It doesn't include all
11 generics.
12     Q.  So just speaking of brand name drugs here
13 exclusively, are you aware of any other benchmarks
14 available for use in reimbursing pharmacies?
15         I'm sorry, I didn't hear your answer if
16 you did answer.
17     A.  I'm still thinking.  I'm not aware of any
18 easily definable other benchmark out there.
19 Certainly there are different sources of AWP than
20 what we use today.
21     Q.  So if you learned that AWP did not have a
22 relation to any sort of real world prices, would

Page 69

1  that affect your negotiations with pharmacies in
2  using AWP as a benchmark?
3          MR. HAAS:  Objection to form.
4          THE WITNESS:  I guess I already understand
5  that AWP is not necessarily a direct linear
6  relationship to the cost or the price that that
7  pharmacy pays for the drug, so since I know that
8  today, I'm not sure that it would change the way I'm
9  doing business or the way I'm contracting with my
10 pharmacies.
11 BY MS. MacMENAMIN:
12     Q.  In your negotiations with manufacturers
13 for rebates and discounts, are those negotiations
14 also based on the benchmarks AWP and WAC?
15     A.  Those are certainly two of the things that
16 are used to calculate the various levels of rebates.
17     Q.  Can you tell me of any other benchmarks
18 that are available?
19     A.  I look at the other costs of drugs in that
20 class based on AWP, based on WAC, and based on the
21 rebate amounts that the other manufacturers are
22 willing to offer to get down to a net price.

18 (Pages 66 to 69)

# Exhibit 58

Eric Cannon
30(b)(6)

Case 1:01-cv-12257-PBS   Document 3130-4   Filed 09/22/06   Page 16 of 44
Highly Confidential
Salt Lake City, UT

September 13, 2004

Page 1

1                    IN THE DISTRICT OF MASSACHUSETTS

2

3                                    -O-

4

5     IN RE:                         :

6     PHARMACEUTICAL INDUSTRY          MDL No. 1456

7     AVERAGE WHOLESALE PRICE        :    01-CV-1225

8     LITIGATION

9

10          30(b)(6) DEPOSITION OF:   IHC HEALTH PLANS

11

12                          ERIC CANNON

13

14                                   -O-

15

16               Place:      IHC Health Plans

17                           4646 West Lake Park Blvd.

18                           Salt Lake City, Utah 84120

19          Date:            September 13, 2004

20                           9:40 a.m.

21          Reporter:        Vickie Larsen, CSR/RPR

22                                   -O-

Eric Cannon
30(b)(6)

Case 1:01-cv-12257-PBS   Document 3130-4   Filed 09/22/06   Page 17 of 44

Highly Confidential
Salt Lake City, UT

September 13, 2004

Page 6

| 1 | -oOo- |
| 2 | |
| 3 | E X H I B I T S |
| 4 | No.          Description          Page |
| 5 | |
| 6 | Exhibit Cannon 012  1999maf          159 |
| 7 | |
| 8 | Exhibit Cannon 013  2001 HPI Physician Fee          164 |
| 9 | Schedules |
| 10 | |
| 11 | -oOo- |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

Page 7

1   September 13, 2004                    9:40 a.m.
2
3              P R O C E E D I N G S
4
5              ERIC CANNON,
6   called as a witness, having been duly sworn,
7        was examined and testified as follows:
8
9              EXAMINATION
10  BY MR. EVERETT:
11       Q.    Would you please state your name and
12  current position for the record.
13       A.    My name is Eric Cannon.  I am Director of
14  Pharmacy Services for IHC Health Plans.
15       Q.    Mr. Cannon, have you been deposed before?
16       A.    No.
17       Q.    Let me just run through some of the
18  basics of the deposition.
19              First of all, as I'm sure you realize
20  now, you are under oath.  So it's just like you're in
21  a courtroom.  Do you understand that?
22       A.    Yes.

Page 8

1        Q.    And because there is a court reporter
2   here who's taking down everything that's said, it's
3   important that you wait until I finish my question
4   before answering.
5        A.    Okay.
6        Q.    Do you understand?
7              And that you speak out loud.  The court
8   reporter can't take down head nods.
9        A.    Yes.
10       Q.    If you don't understand anything in any
11  of my questions, feel free to ask me to clarify.  I'm
12  happy to do that.
13       A.    Okay.
14       Q.    And if you need to take a break, let me
15  know and I'm happy to do that as well, as long as
16  there's not a question that is pending.
17       A.    Okay.
18              MR. LAWLOR:  Clay, then just for purposes
19  of the protective order, we'd like to consider
20  everything that Eric says here highly confidential.
21              MR. EVERETT:  Okay.
22       Q.    Mr. Cannon, you understand that you're

Page 9

1   here today testifying on behalf of IHC Health Plans?
2        A.    Yes.
3        Q.    And that my questions today will go to
4   the knowledge of the company, unless I indicate that
5   I'm asking for your personal knowledge.  Do you
6   understand that?
7        A.    Yes.
8        Q.    Okay.  I'm going to hand you what I'm
9   marking as IHC Deposition Exhibit 1.
10    (Exhibit Cannon 001 was marked for identification.)
11       Q.    BY MR. EVERETT:  Which is the Amended
12  Notice of Deposition of IHC Health Plan that was sent
13  out last week.  Are you familiar with this document?
14       A.    I have seen it before.
15       Q.    On Pages 3 through 6 of the document are
16  a list of deposition subjects.  Have you seen these
17  deposition subjects before?
18       A.    Yes, I have.
19       Q.    Are you prepared today to testify about
20  IHC Health Plans' knowledge with regard to each of
21  these deposition items?
22       A.    Yes, I am.

3 (Pages 6 to 9)

Eric Cannon
30(b)(6)

Case 1:01-cv-12257-PBS   Document 3130-4   Filed 09/22/06   Page 18 of 44

Highly Confidential
Salt Lake City, UT

September 13, 2004

Page 146

1   the other services or procedures provided in a
2   physician's office.
3       Q.      Does IHC Health Plans have any capitation
4   contracts with the providers?
5       A.      Not currently that I am aware of.
6       Q.      Did it have capitation contracts with
7   providers in the past?
8       A.      I'm unaware.
9       Q.      If you will turn, please, to IHC AWP 121.
10  At the bottom of the page and carrying over into
11  Page 122 indicates that:
12              "Provider will be paid [at] the
13              lesser of [the] Provider's current
14              prevailing fee or the amounts on the
15              Health Choice Maximum Allowable Fee
16              Schedule."
17      Do you see that?
18      A.      Uh-huh.
19      Q.      Are prescription drugs included on the
20  maximum allowable fee schedules?
21      A.      Yes, they are.
22      Q.      And are there different maximum allowable

Page 147

1   fee schedules for prescription drugs for different
2   products sold by IHC?
3       A.      Yes, there are.
4       Q.      Did IHC Health Plans understand that
5   providers were earning some margin on their sales of
6   physician administered drugs?
7       A.      Yes.
8       Q.      Are there any particular groups of
9   physicians that are must haves for the IHC Health
10  Plans now?
11      A.      IHC Health Plans must maintain a provider
12  network that meets the medical needs of our patients.
13  So we must have adequate numbers of primary care
14  physicians that would include internal medicine,
15  family practice, pediatricians.  We must have adequate
16  numbers of specialty providers, whether they are
17  orthopedic surgeons, hematologists, oncologists,
18  rheumatologists, neurologists.
19          Is anyone of those providers a must have
20  over the other?  I don't think, although from time to
21  time there may be a specialty with whom we are more
22  challenged to have access than another.

Page 148

1       Q.      Are there separate negotiations with
2   providers about fee schedules?
3       A.      Yes.
4       Q.      Do different providers -- are different
5   providers paid based on different fee schedules by IHC
6   Health funds?
7       A.      For injectable drugs all providers are
8   paid off the same fee schedule -- or physician -- it
9   would be better if I said physician administered drugs
10  as opposed to injectables.
11      Q.      So there's a single fee schedule for all
12  physician administered drugs?
13      A.      Yes.
14      Q.      Have any providers threatened to leave
15  IHC Health Plans network due to the amount that's
16  included on the fee schedule for physician
17  administered drugs?
18      A.      Yes.
19      Q.      And how did IHC Health Plans respond to
20  that threat?
21      A.      The threats that I'm thinking of were in
22  response to our negotiating over lowering the price we

Page 149

1   currently paid or changing the reimbursement
2   methodology for injectable drugs, and it centered
3   around rheumatologists.
4       Q.      And did IHC Health Plans maintain its
5   contractual relationship with those rheumatologists?
6       A.      Yes, we did.
7       Q.      Did IHC Health Plans change its
8   methodology or lower its payment for physician
9   administered drugs to those rheumatologists?
10      A.      No, we did not.
11      Q.      Did IHC Health Plan try to figure out
12  providers cost in determining the amounts that they
13  would agree to reimburse based on a fee schedule for
14  physician administered drugs?
15      A.      Can you repeat that.
16      Q.      Sure.  Did you try to figure out what
17  physicians were paying for drugs that were reimbursed
18  by IHC Health Plans?
19      A.      I don't think we tried to figure out what
20  they were paying.  I think we had a ballpark idea of
21  what they were paying.  Did we do an analysis or go to
22  a lot of work to figure out?  No.

38 (Pages 146 to 149)

# Exhibit 59

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3                        - - -

4    In Re:  PHARMACEUTICAL         : MDL DOCKET NO.

5    INDUSTRY AVERAGE WHOLESALE     : CIVIL ACTION #

6    PRICE LITIGATION               :  01CV12257-PBS

7    ----------------------------------------------

8    THIS DOCUMENT RELATES TO:

9    ALL ACTIONS

10   ----------------------------------------------

11            The deposition of PAULA PFANKUCH,

12   called by the Defendants Pfizer, Pharmacia, and

13   Upjohn for examination, taken pursuant to the

14   Federal Rules of Civil Procedure of the United

15   States District Courts pertaining to the taking

16   of depositions, taken before KIMBERLY WINKLER

17   CHRISTOPHER, a Notary Public within and for the

18   County of Kane, State of Illinois, and a

19   Certified Shorthand Reporter of said State, taken

20   at 300 East Randolph Drive, Suite 2800, Chicago,

21   Illinois, on the 14th day of September, 2004, at

22   the hour of 9:40 o'clock a.m.

Page 6

1    A.   The case involves Evergreen Medical and
2    our ClaimCheck product.
3        Q.   Okay.  So you've been through this
4    before.  You know, I think, the ground rules.
5    I'm going to ask you some questions today, and
6    you're going to answer them.  The court reporter
7    is going to be writing down what we say, so it's
8    important both that we talk out loud as opposed
9    to, you know, in casual conversation you'll nod
10   your head or smile to answer and that sort of
11   thing that she can't really take down.  So it's
12   important, especially with yes-or-no questions,
13   to make sure we get a verbal answer that we can
14   put on the record.
15       It's also important that we take turns.
16   So if, you know, you'll let me finish my
17   questions before you start your answer and I'll
18   do my best to not interrupt you and let your
19   answers finish so that -- she can't really take
20   down if two people are talking over each other,
21   just so that we can be clear, make sure that we
22   understand everything.

Page 7

1        My job today is to ask you clear,
2    precise questions that you can understand and
3    answer.  I guarantee you there will be some point
4    where I will fail in that endeavor and will ask
5    you a question that you will not understand.  And
6    if I do that, just let me know.  Just say, you
7    know, I don't understand that question, can you
8    clarify it or ask it another way.  So just let me
9    know if you have any questions about anything.
10       As I think you understand, you're here
11   testifying today as a representative for Health
12   Care Service Corporation which we all typically
13   call BlueCross BlueShield of Illinois.
14       One of the issues that that will
15   present is as I'm asking my questions, I will
16   probably use the word "you" a lot, such as do you
17   know or did you know X, Y, or Z.  And when I do
18   that, what I'm asking for is any knowledge that
19   you know on behalf of the corporation.  So if a
20   colleague has told you something about how the
21   company does business, if you could provide that
22   sort of information as well in addition to

Page 8

1    anything that you may know personally because
2    what we're trying to get at is everything that
3    your company knows about these topics that we're
4    going to be asking about today.
5        Do you have any questions about that?
6        A.   No, I don't.
7        Q.   What is your official position at
8    BlueCross BlueShield of Illinois?
9        A.   Senior manager, professional
10   reimbursement programs.
11       Q.   And what exactly does that position
12   entail?
13       A.   It's a fairly wide scope.  It involves
14   three slightly different but related areas.
15   Probably the most prominent is the reimbursement
16   to professional providers.  That includes
17   physicians.
18       Additionally, I'm responsible for the
19   ClaimCheck auditing within our adjudication
20   system.  Additionally, we maintain the procedure
21   code master file that allows professional claims
22   to be processed.

Page 9

1        Q.   And when you say the procedure code
2    master file that allows claims to be processed,
3    that's some sort of automated system?
4        A.   It's an automated system.  I'll give
5    you an example to help clarify.
6        If you look at the AMA CPT manual,
7    you'll see approximately 6,000 procedure codes.
8    Those procedure codes, along with their
9    descriptions, have to be placed on the
10   adjudicator to allow claims to come in and be
11   processed through the system.  So we are
12   responsible for getting that procedure code out
13   there and assimilated information.
14       Q.   Okay.  Do those codes include J codes
15   for physician-administered drugs?
16       A.   It includes the CPT codes as well as
17   the HCPCS codes H-C-P-C-S -- I believe.  And
18   that's where the J codes would fall.
19       Q.   We deal so much with drugs sometimes we
20   forget there are other codes out there other than
21   the J codes.
22       How long have you held your position as

3 (Pages 6 to 9)

Page 50

1    Q.   When we left off, we were talking about
2  the use of AWP as a benchmark.
3        Did BlueCross BlueShield of Illinois
4  understand that using a benchmark may result in
5  some providers getting a higher margin on drugs?
6    A.   What BlueCross BlueShield realizes is
7  that certain physician groups may because of
8  their volume be able to purchase things at a
9  lower rate than others.
10   Q.   And if all purchase groups are being
11 reimbursed at the same rate, then they would have
12 different margins for their drugs; is that
13 accurate?
14   A.   That would be accurate.
15   Q.   Did BlueCross BlueShield of Illinois
16 accept those different margins as a cost of being
17 able to use a benchmark?
18   A.   I guess I don't understand what you
19 mean by "cost."
20   Q.   Were you willing to allow different
21 providers to earn different margins so that you
22 could use a benchmark for pricing?

Page 51

1    A.   BlueCross's decision had less to do
2  with that type of thinking than it did with our
3  pricing system.  Accept one price for one
4  procedure code per fee schedule.  So regardless
5  we can set one price for everybody.
6    Q.   So it was in essence a technical
7  decision you had to agree on one price?
8    A.   Yes, that would be correct.
9    Q.   You mentioned for several of the
10 fee-for-service plans such as the PPO that
11 there's a defined physician network.
12       How are those networks created?
13   A.   Those networks are created by provider
14 affairs.  Provider affairs contracts with the
15 various specialty providers.  It extends beyond
16 physicians certainly to other provider types, so
17 I don't want you to think it's strictly
18 physicians.  Some of that is dictated by the
19 direction of the medical marketplace, where
20 things are going.  And some of that is dictated
21 by our large national accounts, but all of the
22 contracting is done by provider affairs.

Page 52

1    Q.   Do you know how that negotiation worked
2  for reimbursement of the providers?
3    A.   The PPO does not have a negotiation
4  process.  The PPO is a set fee schedule, or SMA
5  as we talked about earlier.  And it is a
6  take-it-or-leave-it proposition from a pricing
7  perspective.
8    Q.   So all providers are reimbursed at the
9  same rate?
10   A.   Until the last two to three years, that
11 is correct.
12   Q.   And what happened in the last two or
13 three years to change that?
14   A.   In the last two to three years, we've
15 had a few very large, prominent provider groups
16 pressure us into paying slightly higher rates
17 because they are key to the network.  We had no
18 choice but to develop separate fee schedules for
19 those providers.
20   Q.   So an increase in the amount of
21 reimbursement is one of the tools that you use to
22 keep these large, prominent provider groups in

Page 53

1  your network?
2    A.   In limited circumstances, very limited
3  circumstances.
4    Q.   But that has happened?
5    A.   Yes, it has.
6    Q.   Do providers compete to be in your
7  network?
8    A.   I don't know what you mean by
9  "compete."
10   Q.   Let me put it another way.
11       Does any provider who wants to be in
12 the BlueCross BlueShield network -- are they able
13 to join the network assuming that they're willing
14 to agree to the fee schedule?
15   A.   In terms of the PPO, that is correct,
16 assuming they are what we consider a solicited
17 provider type, meaning physicians are solicited
18 and therefore any physician that's willing to
19 accept our fee schedule and the other terms that
20 you've seen in the contract -- if they elect to
21 agree to that, they can be in the network.  If
22 not, they wouldn't be in the network.

14 (Pages 50 to 53)

# Exhibit 60

Page 1

```
 1          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
 2               IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 3
 4      ---------------------------x
        In Re: PHARMACEUTICAL           )
 5                                       )
        INDUSTRY AVERAGE WHOLESALE      ) MDL No. 1456
 6                                       )
        PRICE LITIGATION                 ) CIVIL ACTION NO.
 7                                       )  01-CV-12257-PBS
                                         )
 8      ---------------------------)
        THIS DOCUMENT RELATES TO        )
 9      ALL ACTIONS                      )
        ---------------------------x
10
11
12
13          30(b)(6) DEPOSITION OF DAN DRAGALIN, M.D.
14                  New York, New York
15               Friday, September 17, 2004
16
17
18
19
20
21
22
```

Dan Dragalin, M.D                    HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                September 17, 2004
                                                  New York, NY

Page 6

1      A.    Generally it occurred when I was the
2  corporate medical director of Prudential in
3  the '80s, and there were a number of insurance
4  issues, suits, et cetera.
5      Q.    Okay.
6          MS. FELLER:  Excuse me.  Who is on
7  the phone?
8          MR. MACORETTA:  I'm sorry, this is
9  John Macoretta from Spector, Roseman & Kodroff
10 for the plaintiffs.  Good morning.
11         MS. FELLER:  Good morning.  This is
12 Marcy Feller.  John, can you spell your last
13 name?
14         MR. MACORETTA:  Sure.  Macoretta.
15 M-a-c-o-r-e-t-t-a.
16         MS. FELLER:  Thank you.
17         Q.   Okay.  Dr. Dragalin, can you
18 just move the phone a little closer or speak up?
19         THE WITNESS:  All right.  There you
20 go.
21         MR. MACORETTA:  That's much better.
22 Thank you.

Page 7

1  MR. WELLS:
2      Q.   Okay, we were talking about your
3  prior depositions.  Obviously I think you know
4  the rules and how this works.  I'm going to ask
5  you questions, you're going to answer them, the
6  reporter is going to write everything down.  For
7  that reason it's really important that we take
8  turns and not talk over each other so that we can
9  get a clear transcript.  It's also important that
10 we give verbal answers as opposed to nodding the
11 head and that sort of thing as you might do in
12 casual conversation so that the reporter can get
13 everything down.
14         My task today is to try to ask you
15 clear questions that you can answer.  I assure
16 you at some point I will not do that, there will
17 be a question that you don't understand.  If and
18 when I do that, just let me know and I'll try to
19 rephrase it or ask it another way.
20         If you need a break for any reason,
21 just let me know.  And I don't think John was on
22 the phone, but I think we're going to take an

Page 8

1  early lunch around 11:30 so that Dr. Dragalin can
2  step out for a quick conference call, and then
3  reconvene somewhere shortly after noon.
4          MR. MACORETTA:  That's fine.
5      Q.   Also you're here testifying, as you
6  know, as a representative of MultiPlan, and
7  throughout the deposition I'll probably use the
8  term "you" in some of my questions, and when I
9  use that I'm going to be referring to MultiPlan
10 as a company, not necessarily you as an
11 individual.  So if there's information that you
12 have that might be from documents or other people
13 in the company, if you could provide that as
14 well, that would be appreciated.
15         Do you understand that?
16     A.   Yes.
17     Q.   Okay.  Dr. Dragalin, what is your
18 educational background?
19     A.   I went to undergraduate school at the
20 Georgia Institute of Technology, got a BS in
21 applied biology.
22         I went to medical school at

Page 9

1  Georgetown University, got an M.D. there.  I did
2  my residency, pediatric internship and residency
3  at Emory University in Atlanta.
4          Board certified in pediatrics.  And
5  then at Emory I received a master's in public
6  health.  And there's a couple of fellowships
7  thrown in there somewhere.
8      Q.   And what is your position at
9  MultiPlan?
10     A.   Executive vice president in charge of
11 the network.
12     Q.   And how long have you held that
13 position?
14     A.   About a year and three months.
15     Q.   And what did you do before that?
16     A.   I was the president of the Northeast
17 region for Great West Life Insurance.
18     Q.   And what generally were your
19 responsibilities at Great Western Life?  Great
20 West Life?
21     A.   I had a 13-state region covering the
22 whole northeast, down through Virginia, and I had

3 (Pages 6 to 9)

Dan Dragalin, M.D                     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                    September 17, 2004
                                                          New York, NY

Page 58

1    would be excessive, and we would use the AWP
2    knowledge to substantiate our claim, our charge.
3        Q.    And what were the providers' typical
4    reactions to that?
5        A.    Too bad for you.
6        Q.    And this e-mail continues later, and
7    I quote: "It is also not difficult to convince
8    providers (principally oncologists, nephrologists
9    and endocrinologists, dialysis centers and home
10   infusion agencies) to accept, as payment in full,
11   some variation of average wholesale price (AWP)
12   (or- 10%) since they know they have been ripping
13   off the payor community for decades."
14           Is that an accurate statement?
15       A.    Yes.
16       Q.    Why do you believe that the doctors
17   knew that they were "ripping off the payor
18   community for decades"?
19       A.    Well, because they know what they get
20   the price for.  I mean they know what they buy
21   the drug for and they know what they're charging
22   the drug out for.  And in general their attitude

Page 59

1    is, especially -- I mean the oncologists are the
2    most egregious -- their attitude is that by
3    substantially overcharging for the drug, they're
4    making up for the underpayment they receive for
5    the rest of their services.  So to them it's a
6    balance that they evoke.
7        Q.    Did you ever have any discussions
8    with your payor clients about that?
9        A.    With selected ones, yes.
10       Q.    Did you ever specifically discuss the
11   idea that some providers felt that the
12   reimbursement levels were appropriate to
13   compensate them for undercompensation for their
14   services?
15       A.    Yes.
16       Q.    And what were the payors' reactions
17   to that?
18       A.    Well, they varied, but there were
19   proposals such as, well, you know, why don't we
20   increase the administrative portion of the bill
21   so that we can, you know, so that a decrease in
22   the AWP -- or a decrease in the reimbursement for

Page 60

1    the actual drug, it would be more palatable.
2        Q.    And did any payors, to your
3    knowledge, actually go in that direction?
4        A.    Not through us.  They might have
5    through their own primary networks, but not
6    through us.
7        Q.    Did any payors say something along
8    the lines of yes, we understand that we're
9    providing a margin on a drug to compensate these
10   providers for their services?
11       A.    Yeah, they all agreed to that.  It's
12   the size of the margin that's the issue here.
13   Well, the size and the variability of the margin,
14   I should say.
15       Q.    Is it fair to say that different
16   payors had different expectations of what those
17   margins should be?
18       A.    Yes.
19       Q.    I would like to move on to a second
20   e-mail here, this one is on page 12, and it's the
21   second e-mail, actually, on the page from you to
22   a group of people beginning with Andrea Rowe, and

Page 61

1    dated June 16 of 2003.  Do you see that?
2        A.    Yes.
3        Q.    And it, No. 2 in this e-mail makes a
4    proposal to, quote, "reprice all J and Q codes at
5    AWP and determine additional potential savings."
6            Why did you recommend to reprice at
7    AWP?
8        A.    Well, the recommendation was not to
9    reprice at AWP, rather, it was to run an analysis
10   repricing at AWP, and by finding out the
11   difference between AWP generically and what we
12   were repricing at, we would then have the margin,
13   if you will, and then we could analyze applying
14   various factors to the margin -- you know, plus
15   10 percent, plus 20 percent, et cetera.  So it
16   was an analytic exercise, not a recommendation
17   that we reprice at AWP.
18       Q.    And if we could look at the third
19   e-mail, which is on page 24 of Exhibit 2.  It's
20   an e-mail to you from Karen M-u-c-c-i-n-o dated
21   June 16 of 2003.
22       A.    Right.

# Exhibit 61

Page 1

1        IN THE UNITED STATES DISTRICT COURT

         FOR THE DISTRICT OF MASSACHUSETTS

2

3

    IN RE:                      )

4                               )

    PHARMACEUTICAL INDUSTRY     ) Civil Action No.

5   AVERAGE WHOLESALE PRICE     )   01CV12257-PBS

    LITIGATION                  )

6

7

8               HIGHLY CONFIDENTIAL

9                   DEPOSITION

10                 of JOE SPAHN

11

12              Taken at Anthem

13           4361 Irwin Simpson Road

14             Mason, Ohio  45040

15      on November 30, 2004, at 9:12 a.m.

16      Reported by: Rhonda Lawrence, RPR/CRR

17

18

19                  -=0=-

20

21

22

Page 6

1          JOE SPAHN
2 being first duly sworn, as hereinafter certified,
3 deposes and says as follows:
4          EXAMINATION
5 BY MR. MANGI:
6    Q. Good morning, Mr. Spahn.
7    A. Good morning.
8    Q. As I said, my name is Adeel Mangi.
9 I'm from the law firm of Patterson, Belknap,
10 Webb & Tyler. We represent the defendant
11 drug manufacturers in this case.
12     MR. MANGI: Before we begin,
13 pursuant to a conversation I just had with
14 counsel for Anthem, we're going to designate
15 this deposition transcript and the
16 transcripts for all Anthem witnesses we'll
17 be taking over the next couple of days as
18 highly confidential pursuant to the
19 protective order. And we can revisit that
20 as to sections as necessary in the future.
21     MR. THOMAS: Great.
22    Q. Mr. Spahn, thank you for taking the

Page 7

1 time to speak with us today. Have you ever
2 been deposed before?
3    A. I don't believe so. I don't ever
4 recall having, like, a court reporter. So I
5 think the answer's no.
6    Q. Okay. Let me just run through some
7 of the standard ground rules for a
8 deposition, then.
9     The first is, it's important that
10 you answer all questions verbally so that
11 the court reporter can take down your
12 answers. She can't take down a nod of the
13 head or shrug of the shoulders. Okay?
14    A. (Indicates affirmatively.)
15    Q. And you'll have to answer that
16 verbally.
17     MR. THOMAS: Say okay.
18    A. Oh. Okay.
19    Q. Just so she can write it down.
20     If at any point a question that I
21 ask you is unclear, please stop me and tell
22 me that, and I'll do my best to rephrase it.

Page 8

1    A. All right.
2    Q. If at any point during the
3 deposition you'd like to take a break,
4 please let me know, and as soon as possible,
5 we'll take a break.
6    A. All right.
7    Q. What is your current job title,
8 Mr. Spahn?
9    A. My current job title is senior
10 health care consultant.
11    Q. And who's your employer?
12    A. Anthem Blue Cross/Blue Shield.
13    Q. Is your work focused on a particular
14 region?
15    A. Anthem Midwest.
16    Q. What states fall within that area of
17 responsibility?
18    A. Ohio, Kentucky and Indiana.
19    Q. How long have you been in this
20 position?
21    A. Since 1992.
22    Q. And you've held the same title,

Page 9

1 senior health care consultant, since 1992?
2    A. Yes.
3    Q. Is that when you joined Anthem?
4    A. No.
5    Q. When did you join Anthem?
6    A. I joined Anthem in April of '87.
7    Q. We'll go through your employment
8 history from '87 to the present in the
9 moment.
10     But first, perhaps you could
11 describe for me your educational background
12 after high school.
13    A. I have a bachelor's in accounting
14 and an MBA in finance.
15    Q. When did you get your bachelor's in
16 accounting?
17    A. I got my bachelor's in 1972.
18    Q. Where did you get that
19 qualification?
20    A. University of Cincinnati.
21    Q. And the MBA?
22    A. From Xavier University, in 1982.

3 (Pages 6 to 9)

Page 90

1  baseline.
2      Q.  Okay.  And since that's the
3  baseline, is it fair to say that, as a
4  general proposition, providers are seeking
5  reimbursement at an amount greater than the
6  Medicare fee schedule?
7      A.  In general, yes.  But there's
8  another component, too, which is volume.
9  You have to -- you know, if Anthem is --
10  drives a lot of volume to that provider, you
11  know, they may be willing to -- because, you
12  know, what they're looking at is their total
13  reimbursement.  You got the -- how much
14  you're paying them for each procedure, but
15  also the number of procedures that they do.
16      So if Anthem has a large membership
17  in an area, they may be willing to take less
18  than the actual fees, but they make more
19  money because of the volume.
20      Q.  So the determination of the
21  reimbursement rate that will be paid to a
22  practice is very much an individualized

Page 91

1  issue focusing on that particular practice,
2  correct?
3      A.  Did you say an individual practice?
4      Q.  Let me clarify the question.
5      We've discussed how there are some
6  competitive factors that give one practice a
7  stronger bargaining practice than another,
8  right?
9      A.  Correct.
10      Q.  And what we just discussed is that
11  volume would also be a factor in determining
12  the reimbursement rates, how much volume
13  Anthem drives towards a particular physician
14  practice?
15      A.  Correct.
16      Q.  So it's fair to say that the
17  determination of the amount that Anthem will
18  reimburse a practice for drugs that are
19  administered in office turns on factors
20  specific to that practice, right?
21      A.  Correct.
22      Q.  Including its competitive bargaining

Page 92

1  power, the amount of volume that's driven to
2  it by Anthem?
3      A.  Correct.
4      Q.  Are there other factors that go into
5  that calculation?
6      A.  I think those are the main ones.
7      Q.  Okay.  Now, do you have an
8  understanding -- well, withdraw that.
9      You know that there are some drugs
10  that can be administered either in a
11  physician's office or in a hospital,
12  correct?
13      A.  I assume there are.  Again, I'm only
14  familiar with the physician side.
15      Q.  Okay.  Do you have an understanding
16  as to whether Anthem regards the
17  administration of drugs in physicians'
18  offices as being more or less cost-effective
19  than the administration of the same drug in
20  a hospital setting?
21      A.  I don't know.  I've never heard
22  anyone talk about that.

Page 93

1      Q.  Okay.  Are you aware of any analysis
2  at Anthem regarding the relative costs of
3  administration of a drug in a physician's
4  office versus a hospital setting?
5      A.  No, I haven't.
6      Q.  Now, you testified earlier that
7  Anthem has -- does not know exactly what
8  providers are paying to acquire drugs,
9  correct?
10      A.  Correct.
11      Q.  That's not something that --
12  withdraw that.
13      Anthem does not require providers to
14  disclose their acquisition costs for drugs
15  as part of their contracts with those
16  providers, correct?
17      A.  Correct.
18      Q.  So providers' acquisition costs for
19  drugs do not form part of Anthem's
20  determination of what it will reimburse them
21  in relation to drugs?
22      A.  Correct.

24 (Pages 90 to 93)

Page 94

1    Q.  The reimbursement is driven entirely
2  by the fee schedule?
3    A.  Correct.
4    Q.  Regardless of what the specific
5  provider's acquisition costs for those drugs
6  may be?
7    A.  Correct.
8    Q.  So if, for example, Anthem were to
9  learn that a particular provider were
10  getting a discount or a rebate on a
11  particular drug that lowered his acquisition
12  costs for that drug, that wouldn't change
13  the amount that Anthem is reimbursing that
14  practice in relation to that drug, right?
15    A.  No.
16    Q.  Because the reimbursement amount is
17  tied to the fee schedule?
18    A.  Right.
19    Q.  And if Anthem were to learn that
20  providers in a region were getting a
21  discount or rebate from a drug manufacturer
22  in relation to a particular drug, again,

Page 95

1  that wouldn't change the amount Anthem
2  reimburses because that's tied to the fee
3  schedule?
4    MR. THOMAS:  Asked and answered.
5    A.  Yes.  That's correct.
6    Q.  Do you know whether Anthem's
7  contracts with providers contain
8  confidentiality clauses?
9    A.  I don't know.
10    Q.  Do you know whether or not -- are
11  you aware of any free sample programs
12  whereby providers can get free samples of
13  drugs from manufacturers?
14    A.  No, I'm not aware.
15    Q.  That's not an area that you deal
16  with?
17    A.  No.
18    Q.  Are you familiar with the major drug
19  wholesalers operating the market today?
20    A.  No.
21    Q.  Do you have an understanding of what
22  wholesalers pay to acquire drugs?

Page 96

1    A.  No, I don't.
2    Q.  Are you familiar with prompt pay
3  discounts?
4    A.  No, I'm not.
5    Q.  You've never heard that term?
6    A.  No, I haven't.
7    Q.  To the best of your knowledge, do
8  you know of any instances where providers
9  have conspired with drug manufacturers to
10  inflate the average wholesale prices for
11  drugs?
12    A.  No.
13    Q.  Are you aware of any instances where
14  pharmacies or pharmacy benefits managers
15  have conspired with any drug manufacturers
16  to inflate any drug's average wholesale
17  prices?
18    A.  No.
19    MR. MATT:  Objection.  No
20  foundation.
21    MR. THOMAS:  I was just going to let
22  it go.

Page 97

1    Q.  Do you know whether Anthem has been
2  involved in any litigations pertaining to
3  average wholesale prices for drugs other
4  than this one here today?
5    A.  No.
6    MR. THOMAS:  Objection.  Foundation.
7    Q.  Do you know of any other litigations
8  that Anthem has been involved in relating to
9  reimbursements to providers for drugs
10  administered in office?
11    A.  No.
12    MR. THOMAS:  Same objection.
13    MR. MANGI:  Let's take another quick
14  break and then we'll look at some documents.
15    (Recess taken.)
16  BY MR. MANGI:
17    Q.  Prior to the break, we were talking
18  about providers' acquisition costs and the
19  fact they're not relevant to Anthem's
20  reimbursement amounts.  Do you recall that
21  testimony?
22    A.  Yes.

25 (Pages 94 to 97)

# Exhibit 62

Robert C. Farias                                                    October 20, 2004
Wellesley, MA

Page 1

1             UNITED STATES DISTRICT COURT

2             DISTRICT OF MASSACHUSETTS

3                NO. 01CV12257-PBS

4

5        _____

6    In re:  PHARMACEUTICAL              )

7    INDUSTRY AVERAGE WHOLESALE          )

8    PRICE LITIGATION                    )

         _____)

9    THIS DOCUMENT RELATES TO:           )

     ALL ACTIONS                         )

10       _____)

11

12             DEPOSITION OF ROBERT C. FARIAS,

13    called as a witness by and on behalf of the

14    Defendants, pursuant to the applicable provisions

15    of the Federal Rules of Civil Procedure, before P.

16    Jodi Ohnemus, Notary Public, Certified Shorthand

17    Reporter, Certified Realtime Reporter, and

18    Registered Merit Reporter, within and for the

19    Commonwealth of Massachusetts, at the offices of

20    Harvard Pilgrim Health Care, 93 Worcester Road,

21    Wellesley, Massachusetts, on Wednesday, 20 October,

22    2004, commencing at 10:05 a.m.

Page 18

1 to?
2     A.   Next title was senior project manager; and
3 I did that for about two years.  That function was
4 in the network management area -- a variety of
5 projects related to network management that could
6 be related to medical management, could be related
7 to referral authorization type things; could be
8 related to managing recontracting efforts.  Just a
9 wide variety of projects.
10     Q.   When you say, "network," you're referring
11 to networks of providers?
12     A.   That's right.  It was an
13 internally-focused position.
14     Q.   What do you mean by that?
15     A.   Meaning that I didn't have contact with
16 providers.  I worked on projects that supported the
17 work of network management.
18     Q.   Okay.  You held that position for about
19 two years you said?
20     A.   That's right.
21     Q.   Okay.  What was the next area that you
22 moved into?

Page 19

1     A.   Next area was specifically to the
2 contracting department in a project management
3 role.  That title was manager of planning and
4 administration.
5     Q.   Okay.  And you moved into that position
6 sometime around 2000, is that correct?
7     A.   Probably about 2000, yeah.
8     Q.   What were your responsibilities in that
9 position?
10     A.   In that position I was responsible for
11 both the administrative side of managing the
12 contracting department and the administrative side
13 -- I mean the departmental administrative budget,
14 the infrastructure of the department -- project
15 management specific to the contracting department.
16 For example, you know, when recontracting was, you
17 know, kicking off, I would be responsible for
18 drafting, you know, notification letters that would
19 go out to the -- to the providers, responsible for
20 working with legal on updating the contract
21 templates, and also, managing the work flows
22 related to recontracting.  And again, a wide

Page 20

1 variety of projects.  You know, liaisons with other
2 departments and so forth.
3     Q.   The focus you said was entirely on the
4 administrative side of managing the department?
5     A.   Administration and planning.  The planning
6 -- it was really a split function, and it continues
7 to be.  But the planning side was related to, you
8 know, the significant, you know, project business
9 unit initiatives, contracting being primarily --
10     Q.   How long did you remain in that position?
11     A.   Actually, it was a little bit of an
12 evolution.  Probably about a year.  That position
13 evolved into my current role, director of planning
14 and administration.  When there was a
15 reorganization, contracting became more of a broad
16 business unit again.  Network service and
17 operations is the name of the business unit.  So,
18 my title now and following being manager of
19 planning and administration for contracting was
20 director of planning administration for network
21 service and operations.
22          MR. MANGI:  I'm sorry.  Could you read

Page 21

1 back that last answer, please.
2          (Answer read back.)
3     Q.   So, your current position is director of
4 planning and administration, right?
5     A.   Right.
6     Q.   And you've held that since 2001.
7     A.   Yeah.
8     Q.   Okay.  Have your responsibilities changed
9 from your manager of planning and administration
10 position?
11     A.   Yes.  In addition to those
12 responsibilities, I have reporting -- folks
13 reporting to me, including the provider
14 communications and training area.  There's a small
15 group of project managers and a budget coordinator
16 which, again, they focus primarily on the
17 infrastructure and administration side of things.
18 In addition to that, the provider reimbursement
19 area reports to me.
20     Q.   What are your responsibilities in relation
21 to that provider reimbursement area?
22     A.   The manager of provider reimbursement

Robert C. Farias

October 20, 2004

Wellesley, MA

Page 150

```
1   who sets AWP?
2      A.  I -- again, I didn't know that it was set.
3   I don't know.
4      Q.  Okay.  So you have no idea who sets AWP.
5      A.  Right.
6      Q.  You referred to AWP as being an industry
7   standard.
8      A.  Yes.
9      Q.  When you say that, do you understand that
10  it's standard of the industry to use AWP as a
11  reimbursement benchmark, correct?
12     A.  Yes.
13         MR. NALVEN:  Objection.
14     Q.  And you understand that it's standard in
15  the industry to reimburse at a discount off AWP,
16  correct?
17     A.  Yes.
18     Q.  Mr. Nalven asked you a bunch of questions
19  about OIG and Medicare.
20     A.  Uh-huh.
21     Q.  You're not an expert in OIG or Medicare,
22  are you?
```

Page 151

```
1      A.  No.
2      Q.  So, you were just testifying about your
3   general impressions, is that right?
4      A.  Based on previous experiences, yes.
5      Q.  Okay.  But you have no precise knowledge
6   about what the role of OIG is in relation to
7   Medicare.
8      A.  No.
9          MR. NALVEN:  Objection.
10     Q.  Now, then there were a whole bunch of
11  questions about whether or not -- well, your
12  knowledge of physicians' acquisition costs and so
13  on.
14     A.  Yes.
15     Q.  Let's see if we can get that straight in
16  my mind, based on your earlier testimony when we
17  were speaking.
18     A.  Uh-huh.
19     Q.  Physicians' acquisition costs form no part
20  of Harvard Pilgrim's reimbursement methodology,
21  right?
22     A.  Correct.
```

Page 152

```
1      Q.  So, if a physician were committing a crime
2   and billing for a drug that he had got as a free
3   sample, Harvard Pilgrim would still reimburse him,
4   but would hope that the authorities would catch up
5   with him, right?
6      A.  I think that's safe to say.
7      Q.  And Harvard Pilgrim doesn't have any
8   knowledge about what providers' acquisition costs
9   are, right?
10     A.  No.
11     Q.  Doesn't require them to disclose those.
12     A.  No.
13     Q.  And if it learned that those were higher
14  or lower than it currently thinks they are, that
15  wouldn't change the fact that it reimburses that
16  methodology, which is 95 percent of AWP?
17     A.  Correct.
18     Q.  Indeed, if it learned that in a particular
19  instance physicians were getting a particular drug
20  at a -- were getting a rebate or a discount from a
21  manufacturer on a particular drug, that wouldn't
22  change the fact that Harvard Pilgrim's standard
```

Page 153

```
1   across the board methodology is 95 percent of AWP?
2      A.  Correct.
3          MR. NALVEN:  Objection.
4          MR. MANGI:  That's it.
5          MR. NALVEN:  I have nothing further.
6          THE WITNESS:  Okay.  Great.
7          (Whereupon the deposition ended at
8          12:52 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

39 (Pages 150 to 153)

# Exhibit 63

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE DISTRICT OF MASSACHUSETTS

2

                    - - - -

3

In Re: PHARMACEUTICAL          ) MDL DOCKET NO.

4  INDUSTRY AVERAGE WHOLESALE     ) Civil Action #

PRICE LITIGATION               ) 01CV12257-PBS

5  _____ )

                                  )

6  THIS DOCUMENT RELATES TO ALL    )

ACTIONS                         )

7  _____ )

8                    - - - -

9          DEPOSITION OF:  RAEANN MAXWELL

10                  VOLUME II

11                  - - - -

12              September 10, 2004

13              Friday, 1:30 p.m.

14

15          DEPOSITION OF RAEANN MAXWELL,

16  a witness, called by the Defendants for examination,

17  in accordance with the Federal Rules of Civil

18  Procedure, taken by and before Claire Gross, CRR,

19  RDR, a Court Reporter and Notary Public in and for

    the Commonwealth of Pennsylvania, at the offices of

20  UPMC, One Chatham Center, 112 Washington Place,

    Pittsburgh, Pennsylvania, on Friday, September 10,

21  2004, commencing at 1:30 p.m.

22

                    - - - -

Page 2

```
 1   APPEARANCES:
 2
 3       FOR THE PLAINTIFFS:
 4   Ed Notargiacomo, Esq.
 5   HAGENS BERMAN, LLP
 6   1 Main Street
 7   Fourth Floor
 8   Cambridge, Massachusetts  02142
 9   617-482-3700
10
11       FOR THE DEFENDANTS:
12   Erik Haas, Esq.
13   Jessica Golden Cortes, Esq.
     PATTERSON BELKNAP WEBB & TYLER, LLP
14   1133 Avenue of the Americas
     New York, New York  10036-6710
15   212-336-2222
16
17       FOR UPMC HEALTH PLAN:
     Daniel Vukmer, Esq.
18   UPMC HEALTH PLAN
     One Chatham Center, Suite 600
19   112 Washington Place
     Pittsburgh, Pa  15219
20   412-454-5618
21
22
```

Page 3

```
 1           * I N D E X *
 2   Examination by Mr. Haas - - - - - - - - - -    4
 3   Certificate of Court Reporter  - - - - - - - -   92
 4
 5
 6
 7       * INDEX OF EXHIBITS *
 8
 9   Exhibit Maxwell 001 - - - - - - - - - - - -   73
10
```

Page 4

```
 1           RAEANN MAXWELL,
 2        having been duly sworn,
 3   was examined and testified as follows:
 4           - - - -
 5           EXAMINATION
 6           - - - -
 7   BY MR. HAAS:
 8   Q.    Please state your full name for the record.
 9   A.    My name is Raeann Maxwell.
10   Q.    Ms. Maxwell, where are you currently
11        employed?
12   A.    University of Pittsburgh Medical Center
13        Health Plan.
14   Q.    What is your current position?
15   A.    Director of pharmacy services.
16   Q.    Are you currently employed anywhere else?
17   A.    No, I am not.
18   Q.    If you would, describe your employment
19        history after high school.
20   A.    I went --
21   Q.    Let me withdraw that question.  First if you
22        could describe for me your educational
```

Page 5

```
 1   history plus high school and describe for me
 2   your professional --
 3   A.    I obtained my bachelor's degree in pharmacy
 4        in 1987, went directly from my bachelor's
 5        degree into a Ph.D. program.  Both of those
 6        degrees were obtained from the University of
 7        Pittsburgh School of Pharmacy.  I obtained my
 8        Ph.D. in 1997 and it was in pharmaceutical
 9        sciences with a specialty in clinical
10        pharmacy.
11   Q.    After you received your doctorate you started
12        as an employee of University of Pittsburgh?
13   A.    Actually, I have been an employee of UPMC
14        since 1988.  I was a part-time pharmacist at
15        Western Pychiatric Institute and Clinic, and
16        that was prior to it becoming part of UPMC.
17        When it did become part of UPMC that
18        is when working with the company began.  I
19        was with Western Pychiatric for sixteen years
20        prior to coming here to the Health Plan.
21        In that time I was a part-time
22        pharmacist up until 1994 in which in November
```

Page 154

1  A.  No.
2  Q.  Earlier in the deposition Mr. Haas asked you
3      about your knowledge concerning controversy
4      in the last decade or so concerning the use
5      of AWP as a reimbursement mechanism, and he
6      asked you about your knowledge concerning
7      more recent legislation to use ASP as opposed
8      to AWP.
9          He asked you whether from UPMC's
10     perspective it mattered whether as a
11     reimbursement basis one used an AWP minus
12     some percentage or ASP above some percentage,
13     and you said not to my knowledge, I believe.
14     Is that accurate?
15 A.  That is correct -- that is accurate.
16 Q.  Would it make a difference to UPMC if UPMC
17     knew that -- in the answer to the question
18     would it make no difference to UPMC if UPMC
19     was aware that AWP, the average wholesale
20     price, for a particular drug was grossly
21     inflated and was not related to the actual
22     sales prices for that drug but it knew that

Page 155

1      the ASP was a true average of the actual
2      sales price?  Given that knowledge would it
3      make a difference to UPMC as to which basis
4      was used for reimbursement or payment?
5          MR. HAAS:  Objection to form,
6      characterization of the benchmarks, but you
7      can answer if you can understand it.
8  Q.  Were you able to follow that question?
9  A.  Basically you're saying that -- let me
10     paraphrase and see if I understand what you
11     were trying to get across, that you're
12     stating AWP is potentially inflated versus
13     ASP which would be a truer benchmark?
14 Q.  Basically yes.
15         MR. HAAS:  I will object on form and
16     foundation and characterization, among other
17     things.
18         MR. VUKMER:  This is Dan Vukmer.  Let
19     me talk to my client for just one second, if
20     you wouldn't mind.
21         - - - -
22     (There was a discussion off the record.)

Page 156

1          - - - -
2  A.  No, it shouldn't matter which that we would
3      potentially use.
4  Q.  Why is that?
5  A.  Because regardless of which number that you
6      utilize and you do whatever percentage minus
7      you should still come up close to a
8      negotiated reimbursement price to your
9      provider which would be a pharmacy or
10     physician.
11 Q.  Well, the instance where -- does that assume
12     that in the negotiation -- I don't know that
13     the negotiation you just posited -- does that
14     assume in that negotiation you understand
15     that AWP is, in fact, an inflated number?
16         MR. HAAS:  Objection, foundation,
17     form, speculative.
18 A.  I don't know how to answer that question.
19 Q.  Your testimony was it didn't matter whether
20     you used an AWP minus or an AWP plus system
21     because you would negotiate to a particular
22     point of reimbursement?

Page 157

1  A.  Potentially, yes.
2  Q.  Would you reach the same point of
3      reimbursement if you did not understand that
4      AWP was an inflated number?
5          MR. HAAS:  Objection, ambiguous.
6      What does that mean?
7  Q.  All right.  That AWP, in fact, did not
8      reflect or, put it this way, grossly
9      misrepresented what the actual sales prices
10     were in the market?
11         MR. HAAS:  Objection.  She testified
12     she didn't believe it did.
13 Q.  You can answer the question if you understand
14     it.
15 A.  I don't understand.
16 Q.  Let me ask you why wouldn't it matter -- let
17     me see if I have time to get back to this.
18     Under the contract with Argus, which I
19     believe was Exhibit 6 to your deposition, at
20     least for those pharmacies that are in the
21     Argus network as opposed to the UPMC network,
22     with their being reimbursed Argus is being

17 (Pages 154 to 157)

# Exhibit 64

DATE: 7/14/92   TIME: 19:27:44

JAMES BRUNWICK CO. INC.
CONTRACT BY CUSTOMER REPORT

PAGE  68
CUTOFF DATE: 7/01/92

PREPARED FOR: C59095 MEDICAL EAST-BRAINTREE (H)

| CONTRACT NUMBER | CONTRACT DESCRIPTION | ITEM NUMBER | ITEM DESCRIPTION | SIZE | U/M | CONTRACT COST | NET COST | START DATE | END DATE |
|---|---|---|---|---|---|---|---|---|---|
| 301901 | GLAXO – MEDICAL EAST/WEST | 9941236 | ZANTAC TAB 150MG U/D | 100 | EA | 103.77 | 104.80 | 7/01/92 | 6/30/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 921242 | ZANTAC TAB 300MG | 30 | EA | 52.83 | 53.35 | 7/01/92 | 6/30/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 9912306 | ZANTAC TAB 300MG U/D | 100 | EA | 177.60 | 179.37 | 7/01/92 | 6/30/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 9912204 | ZANTAC VIAL MULTI DOSE | 10ML | EA | 12.87 | 12.99 | 7/01/92 | 6/30/93 |
| 02996-10 | PARKE-DAVIS – MEDICAL EAST/WEST | 9912191 | ZARONTIN CAP 250MG | 100 | EA | 47.60 | 48.07 | 7/01/92 | 6/30/93 |
| 02996-10 | PARKE-DAVIS – MEDICAL EAST/WEST | 9941782 | ZARONTIN SYRUP | 16OZ | EA | 46.35 | 46.81 | 7/01/92 | 6/30/93 |
| BWGWH00924 | STUART – MEDICAL EAST/WEST | 993006 | ZESTORETIC TAB 20/12.5MG | 100 | EA | 67.23 | 67.90 | 3/01/92 | 2/28/93 |
| BWGWH00924 | STUART – MEDICAL EAST/WEST | 993008 | ZESTORETIC TAB 20/25MG | 100 | EA | 68.06 | 68.74 | 3/01/92 | 2/28/93 |
| BWGWH00924 | STUART – MEDICAL EAST/WEST | 993014 | ZESTRIL TAB 10MG | 100 | EA | 53.75 | 54.28 | 3/01/92 | 2/28/93 |
| BWGWH00924 | STUART – MEDICAL EAST/WEST | 993017 | ZESTRIL TAB 20MG | 100 | EA | 57.53 | 58.10 | 3/01/92 | 2/28/93 |
| BWGWH00924 | STUART – MEDICAL EAST/WEST | 993020 | ZESTRIL TAB 40MG | 100 | EA | 84.03 | 84.87 | 3/01/92 | 2/28/93 |
| 40A529 | DERMIK – MEDICAL EAST/WEST | 993010 | ZETRIL TAB 5MG | 100 | EA | 52.00 | 52.52 | 3/01/92 | 12/31/93 |
| 40A529 | DERMIK – MEDICAL EAST/WEST | 993889 | ZETAR EMULSION | 6OZ | EA | 12.70 | 12.82 | 1/01/92 | 12/31/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 994570 | ZINACEF INFUSION PACK 1.5GM | 10 | EA | 107.50 | 108.57 | 7/01/92 | 6/30/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 994572 | ZINACEF INFUSION PACK 750MG | 10 | EA | 55.36 | 55.91 | 7/01/92 | 6/30/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 994549 | ZINACEF VIAL 1.5GM | 25 | EA | 262.03 | 264.65 | 7/01/92 | 6/30/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 994569 | ZINACEF VIAL 7.5GM/100ML BULK | 6 | EA | 308.15 | 311.23 | 7/01/92 | 6/30/93 |
| 301901 | GLAXO – MEDICAL EAST/WEST | 994552 | ZINACEF VIAL 750MG | 25 | EA | 131.69 | 133.00 | 7/01/92 | 6/30/93 |
| DG 92 | ALCON – MEDICON | 994952 | ZINCFRIN EYE DROPS | 15CC | EA | 4.25 | 4.30 | 4/01/92 | 3/31/93 |
| PWGRMO0924 | ICI PHARMA – MEDICAL EAST/WEST | 995318 | ZOLADEX IMPLANT | 1 | EA | 254.95 | 257.49 | 3/01/92 | 2/28/93 |

BCBSMA-AWP-33415
HIGHLY CONFIDENTIAL

MEDICAL WEST INC - CHICOPEE
INVENTORY COST AND QUANTITY WORKSHEET
SORTED BY LOCATION AND LABEL NAME
LOC:   ON

| NDC# Label name | LOC | Pkg Size | UOM | Current Pkg Cost | Actual Pkg Cost | Onhand Pkg Qty | Phys. Count | Ext. Cost |
|---|---|---|---|---|---|---|---|---|
| 00310096036 | ON | | | | | | | |
| ZOLADEX 3.6MG IMPLANT SYRN | | 1.000 | EA | 257.50 | _____ | .00 | 7 | 1,802. |

BCBSMA-AWP-40618
HIGHLY CONFIDENTIAL

# Exhibit 65

BC SP

```
REPORT ID: IV0010MJ;IV001BZ
Date:    12/07/91                                          PAGE:     14
                        MEDICAL WEST INC - PEABODY
                     INVENTORY COST AND QUANTITY WORKSHEET
                        SORTED BY LOCATION AND GENERIC NAME
                              LOCATION:   F1
```

| Generic Name/strength/form NDC# | MFG | LOC | Pkg Size | Current Pkg Cost | Actual Pkg Cost | Onhand Pkg Qty | Physical Count | Ext Cost |
|---|---|---|---|---|---|---|---|---|
| ALBUTEROL |  |  | 5MG/ML | SOLUTION | 7 |  | 2 |  |
| 00173038558 | GLA | F1 | 20.000ML | 7.15 | _____ | 2.000 |  | 14.30 |
| α ALBUTEROL |  |  | 90MCG | AEROSOL | 7 |  | 42 |  |
| 00173032188 | GLA | F1 | 17.000GM | 5.95 | _____ | 46.000 |  | 249.90 |
| ℒ CROMOLYN SODIUM |  |  | 800MCG | AEROSOL | ✓ |  | 13 |  |
| 00585067502 | FIS | F1 | 9.000GM | 25.23 | _____ | 13.000 |  | 327.99 |
| CROMOLYN SODIUM |  |  | 800MCG | AEROSOL | ✓ |  | 29 |  |
| 00585067501 | FIS | F1 | 15.000GM | 40.14 | _____ | 28.000 |  | 1,164.06 |

1,756.25

BCBSMA-AWP-41630
HIGHLY CONFIDENTIAL