# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action No. 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | Judge Patti B. Saris<br>Chief Magistrate Judge Marianne B. Bowler |

## BMS DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AS TO CLASS 3

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
 Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
 Steven M. Edwards, Esq.
 Lyndon M. Tretter, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.*

Defendants Bristol-Myers Squibb Company ("BMS") and Oncology Therapeutics Network Corporation ("OTN") (together "BMS")[1] respectfully submit this reply to Plaintiffs' Memorandum in Opposition to BMS Defendants' Motion for Summary Judgment as to Class 3 ("Pltfs' Mem.") and in further support of their motion for summary judgment as to Class 3.

## Preliminary Statement

BMS's 9-page memorandum in support of its motion for summary judgment as to Class 3 established three fundamental propositions:

(1) BMS does not report AWPs -- it reports list prices;

(2) For the drugs at issue in this case, a substantial percentage (86%) of BMS's net sales are within 5% of list price; and

(3) BMS does not control the way that the publications report AWPs.

Rather than attempting to raise any genuine issue of material fact with respect these propositions, plaintiffs unleash a 25-page blizzard of assertions that are either irrelevant, misleading or completely devoid of support. Even more telling, plaintiffs are unable to refute the fundamental legal proposition on which the motion is based: There is no obligation to adjust list prices to reflect discounts. We show below that plaintiffs have failed to demonstrate that there is any genuine issue of material fact with respect to BMS's motion for summary judgment as to Class 3 and BMS is entitled to judgment as a matter of law.[2]

---

[1] OTN is a former wholly-owned subsidiary of BMS that distributes oncology products (including but not limited to those manufactured by BMS), primarily to office-based practices. Another former subsidiary of BMS, Apothecon Inc., is also named in the Third Amended Master Consolidated; however, it specialized in generic self-administered drugs that are not among the "Subject Drugs" listed in the Court's January 30, 2006 Class Certification Order.

[2] As in its opening memorandum ("BMS's Mem."), BMS incorporates by reference the materials filed in support of its motion for summary judgment as to Classes 1 and 2, and attaches excerpts from those materials to this memorandum for the convenience of the Court. (See BMS's Mem. at 1 n.2.)

Argument

I.  PLAINTIFFS FAIL TO RAISE ANY GENUINE ISSUE OF MATERIAL FACT.

Plaintiffs' do not contest the first two prongs of BMS's motion -- that BMS does not report AWPs and a substantial percentage of BMS's net sales are within 5% of list price. Rather, plaintiffs focus on the third prong and contend that BMS "caused" fictitious AWPs for its drugs to be published because it allegedly "controlled" the mark-up factors that the publications used to create those AWPs. (Pltfs' Mem. at 2.) In so doing, plaintiffs ignore the overwhelming direct evidence cited in BMS's memorandum demonstrating that BMS does not control the mark-up factors. (BMS's Mem. at 5.)

Unable to respond to the undisputed evidence demonstrating lack of control, plaintiffs focus on three documents which they claim create issues of fact: (1) a document reflecting the publications' practice of supplying AWPs to BMS; (2) a document stating that BMS reviews those AWPs for "reasonability" and (3) a request that BMS made in 1992 to increase the mark-up factor for oncology drugs from 20.5% to 25%. (Pltfs' Mem. at 2-3.) None of those documents demonstrates that BMS controls how the publications calculate AWPs. The first two documents simply reflect BMS's practice of reviewing AWPs -- after the publications independently establish them -- to ensure that the math was done correctly. (Tab 1.) With respect to the third document, as we have pointed out countless times in the past, BMS made the request because the publications were using a mark-up factor of 20.5% for some oncology drugs and 25% for others, and one of the publications agreed to the request but the other two rejected it, thereby demonstrating a lack of control. (Tabs 2 and 3.)

Plaintiffs also try to demonstrate control by claiming that BMS "owned" AWPs. (Pltfs' Mem. at 4.) Their proof of ownership is that BMS made AWP information available to providers such as doctors. (Id. at 4-5.) Making AWP information available to providers,

however, does not demonstrate that BMS controlled the way that publications calculated AWPs.[3] The undisputed fact is that the publications, acting independently of BMS, controlled how they calculated AWPs. Indeed, it was the publications -- not BMS -- who decided to call the prices that they published AWPs.

Plaintiffs nevertheless stress that BMS knew how the publications calculated AWPs and that payors relied on them for reimbursement purposes. (Pltfs' Mem. at 2-3.) While plaintiffs do not explicitly make the argument, presumably their claim is that BMS caused any harm suffered by payors because it was foreseeable. As we have demonstrated elsewhere, however, foreseeability is a necessary condition of causation, but it is not sufficient.[4]

"The defendant is not liable merely because he could foresee the harm; the harm must be the kind that he should have avoided by acting more carefully." D. Dobbs, The Law of Torts at 447 (2001). This issue arises frequently in the context of securities analysts, who may obtain information from an issuer, manipulate it in some way, and then disseminate it to the marketplace. The law is clear that, absent proof that the issuer controlled the analyst or endorsed the analyst's statements as its own, the issuer is not liable. In re Cabletron Sys. Inc., 311 F.3d 11, 38 (lst Cir. 2002).

It should be emphasized that this is not a case in which a party furnished misleading information to a third party who republished it. This is a situation in which a party furnished truthful information -- i.e. BMS's list prices -- to a third party who adopted a mark-up of 20-25% and called it "AWP".[5] If there is liability under these circumstances based on

---

[3] Plaintiffs have never claimed in this case that BMS communicated AWPs to payors, as opposed to providers.
[4] See The BMS Defendants Reply Memorandum of Law In Support of Their Motion for Summary Judgment, dated April 28, 2006, at 9-11.
[5] Plaintiffs rely on an Apothecon document to suggest that BMS raised its list price even though its average selling price did not change. (Pltfs' Mem. at 3-4.) As we have stated in the past, Apothecon was BMS's generic subsidiary, and its business model was different from the business model pursued by BMS's oncology group. None of the

foreseeability alone, then any person who supplies a product or a service to another person could be liable for that other person's acts.

This is also not a situation in which it can be said that BMS provided list prices to industry publications for the purpose of having them converted into AWPs that would mislead payors. As plaintiffs' own expert has conceded, the entire industry -- including third-party payors -- knew that AWPs did not reflect transaction prices. (Tab 6.) Indeed, the very document that plaintiffs misleadingly quote in their memorandum makes this point. Plaintiffs quote from Exhibit 29 of the Declaration of Steve W. Berman, dated August 30, 2006, to make the point that AWP is "artificially inflated" and "is the only easily obtained published price source." (Pltfs' Mem. at 6.) The <u>entire</u> sentence from which plaintiffs quote says: "While pharmacies <u>and</u> <u>payors</u> <u>both</u> <u>know</u> that AWP is artificially inflated, it is the only easily obtained, published price source." (Tab 7) (emphasis added).[6]

Plaintiffs have failed to establish any genuine issue of material fact.

II.    BMS IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.

Even though BMS did not control the actions of the publications, plaintiffs contend that BMS assumed an obligation to control them because "BMS was not required to volunteer its WLPs to pricing compendia." (Pltfs. Mem. at 8.) Plaintiffs do not cite any legal authority for this proposition, and it ignores the fact that no payor will reimburse a provider for a drug unless that drug is listed with a price in one of the publications. (Tab 9.) Payors use the publications to identify the drugs that will be included in their databases. (Tab 10.) In order to sell its products, therefore, BMS <u>must</u> communicate a description and a price to the publications.

---

drugs at issue in this case is an Apothecon drug. (Tab 4.) Plaintiffs also rely on a document relating to Etopophos to suggest that BMS manipulated the spread to influence provider decisions. (Pltfs' Mem. at 12.) Plaintiffs' own expert has admitted that the plan suggested in that document was never implemented. (Tab 5.)

[6] Similarly, plaintiffs' quotation of Exhibit 30 to the Berman Declaration leaves out the sentence: "AWPs are outside of the control of BMS but do effect [sic] the way that customers view the cost of our products." (Tab 8.)

BMS has chosen to communicate its actual list prices to the publications. A fundamental question that plaintiff cannot answer is "what should BMS have done differently?"[7]

As a practical matter, the only thing that BMS could have done differently is to adjust its list prices to reflect discounts. Relying on Matter of Regina Corp., 61 F.T.C. 983, 1962 F.T.C. Lexis 92 (Oct. 11, 1962), plaintiffs suggest precisely that, claiming that a list price must be a "usual and customary price" as a matter of law. (Pltfs' Mem. at 8.) It is shocking that plaintiffs would continue to rely on this decision when BMS has pointed out at least twice in the past[8] that the decision was modified by the FTC after it adopted a regulation providing that a list price is not fictitious if there are "substantial (that is, not isolated or insignificant) sales" at that price. Matter of Regina Corp., 64 F.T.C. 246, 1964 WL 72929 (Apr. 7, 1964); 16 C.F.R. § 233.3. Furthermore, plaintiffs do not explain why Regina, which involved a comparison of list prices and sale prices to "the purchasing public," 1962 F.T.C. Lexis 92, at *34-36, should apply to a corporate payor in Class 3.[9]

Adding insult to injury, plaintiffs contend that "most of BMS's offending sales were made at prices nowhere near WLP." (Pltfs' Mem. at 10.) The key word, of course, is "offending" because plaintiffs do not dispute the findings of BMS's expert, Dr. Bell, that on an overall basis, for the products at issue in this case, more than 86% of BMS's net revenue was

---

[7] As noted in our opening memorandum, beginning in 1999 BMS's communications with publications explicitly stated that BMS's list prices did not include discounts, but that had no impact on the way that publications determined AWPs. ("BMS's Mem. at 6.) Plaintiffs contend that this statement was inadequate and that BMS should have notified payors directly. (Pltfs' Mem. at 18-19.) Plaintiffs do not proffer an alternative statement or provide any legal basis for their position. Nor do plaintiffs suggest that the result would have been any different if BMS had used a different statement or contacted payors directly. Since 2005, average sales prices have been publicly available but that has not affected the way that publications calculate AWPs or payors -- such as Blue Cross/Blue Shield of Massachusetts ("BCBS/MA") use AWPs.

[8] BMS's Mem. at 3-4; The BMS Defendants' Memorandum Concerning Subsequent History of Case Cited by Plaintiffs in Support of Their Motion for Summary Judgment, dated May 26, 2006.

[9] The consumers in Class 3 do not have independent claims because their reimbursement amounts were determined by payors such as BCBS/MA. Similarly, the reimbursement amounts paid by allegedly unsophisticated health and welfare funds and employer plans were determined by sophisticated payors.

generated in transactions within 5% of the list price. (See BMS's Mem. at 2.)[10] It would not make sense for BMS to report a special list price that reflected only the discounted transactions and ignored the substantial number of sales that are at or near the actual list price. BMS's list prices satisfy the Regina test.

Plaintiffs' contention that BMS's disclosure of list prices triggered a duty to disclose transaction prices in order to ensure that no one was misled (Pltfs' Mem. at 10-11) is similarly misplaced. Such a duty only exists where the initial statement is misleading or a "half truth." Nei v. Boston Survey Consultants, Inc., 388 Mass. 320, 322, 446 N.E.2d. 681, 683 (1983). BMS's list prices are not half truths -- they are exactly what they purport to be. As one of the cases cited by plaintiffs states: In the absence of a special duty, or misleading statement or half truth, "[t]he prevailing view . . . is that there is no such affirmative duty of disclosure." Roeder v. Alpha Indust., Inc., 814 F.2d 22, 27 (1st Cir. 1987).

Nor is there an affirmative duty to disclose discounts. Try as they may (Pltfs' Mem. at 13-15), plaintiffs are unable to distinguish the cases cited by BMS that establish this fundamental proposition. (See BMS's Mem. at 3.) Plaintiffs suggest that Judge Stearns' decision in Lupron is to the contrary (id. at 14), but the very language plaintiffs quote makes clear that Judge Stearns viewed Lupron as "a case of affirmative misrepresentation" because the defendants "published inflated AWPs." In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 167-68 (D. Mass. 2003). Judge Stearns recognized that, in the absence of an affirmative misrepresentation, there is no duty to disclose discounts. Id.

This Court recognized the same thing in Alves v. Harvard Pilgrim Health Care, Inc., 204 F. Supp. 2d 198, 212 (D. Mass 2002), aff'd, 316 F.3d 290 (1st Cir. 2003), where the

---

[10] Plaintiffs repeatedly suggest that BMS "manipulated" the spread, but Bell's analysis belies that claim. There are no instances in which BMS increased its list price without obtaining significant sales at the increased price. (Compare Hartman Attach. G.2.B (Tab 11) with Bell Exh. E (Tab 12).)

Court held that an ERISA plan, which gave its beneficiaries receipts that listed the "retail value" of prescription drugs, did not have to disclose that it had actually acquired the drugs at substantial discounts below retail value.  Plaintiffs here attempt to distinguish <u>Alves</u> on the ground that the issue there was "whether a plan sponsor breached its fiduciary duty under ERISA" (Pltfs' Mem. at 14 n.18), but a fiduciary duty is generally deemed to <u>enhance</u>, not <u>reduce</u>, any duty to disclose.  <u>See</u>, <u>e.g.</u>, <u>Chiarella v. United States</u>, 445 U.S. 222, 235 (1980).  If a third-party payor does not have a duty to disclose discounts to its plan beneficiaries, to whom it owes a fiduciary duty, it is difficult to see how a manufacturer could have a duty to disclose discounts to third-party payors with whom it does not even have direct dealings.  <u>See</u> <u>L.B. Corp. v. Schweitzer-Mauduit Int'l Inc.</u>, 121 F. Supp. 2d 147, 152 (D. Mass. 2000) ("[A] plaintiff must allege some sort of transaction between the parties for liability to attach under [Mass. G.L. ch. 93A]."); <u>John Boyd Co. v. Boston Gas Co.</u>, 775 F. Supp. 435, 440 (D. Mass. 1991) ("[T]he Supreme Judicial Court has stressed the existence of some contractual or business relationship between the parties as a precursor to liability under Chapter 93A.")

III.     PLAINTIFFS' REMAINING ARGUMENTS ARE BESIDE THE POINT.

Plaintiffs' contention that communicating AWP information to providers constitutes "marketing the spread" does not add anything to the analysis.  Plaintiffs have not attempted to show that BMS's communications with providers were deceptive or unfair to payors.  Nor have plaintiffs alleged that those communications affected the price they paid for drugs.[11]

---

[11] BMS defers to the Track 1 Defendants' joint reply for the legal implications of discounted purchases of BMS drugs by third-party payors.

Conclusion

For the foregoing reasons, the Court should grant BMS's motion for summary judgment as to Class 3.

Dated:   Boston, Massachusetts
         September 22, 2006

Respectfully Submitted,

By:   /s/ Jacob T. Elberg (BBO No. 657469)
Thomas E. Dwyer (BBO No. 139660)
Jacob T. Elberg (BBO No. 657469)
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
Tel: (617) 371-1000
Fax: (617) 371-1037
tdwyer@dwyercollora.com
jelberg@dwyercollora.com

Steven M. Edwards (SE 2773)
Lyndon M. Tretter ((LT 4031)
Admitted *pro hac vice*
**HOGAN & HARTSON LLP**
875 Third Avenue
New York, NY  10022
Tel: (212) 918- 3000

*Attorneys for Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network, Corp.*

**CERTIFICATE OF SERVICE**

       I, Lyndon Tretter, certify that on September 22, 2006 a true and correct copy of BMS Defendants' Reply Memorandum in Support of Their Motion for Summary Judgment as to Class 3 was served on all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 by sending a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                /s/ Lyndon M. Tretter
                                                    Lyndon Tretter