Tab 6

Raymond S. Hartman, Ph.D. CONFIDENTIAL        February 27, 2006
                     Boston, MA

Page 666

1     A. Being --
2     Q. You are pointing to the original?
3     A. The December, the original December 2005
4  report.
5     Q. Okay.
6     A. Should the Court find differently as to
7  what the reimbursement rate would be under
8  Medicare and whether -- whether under -- under the
9  law there -- there is no -- that the threshold of
10 liability for those reimbursements are zero, that
11 is something that, as I understand it, is a legal
12 issue, and it is not for me as an economist to
13 render an opinion. I can describe what the
14 implications are from either of those.
15    Q. Well, is it fair to say that your
16 December 15 report is more conservative --
17       MR. SOBOL: Objection to form.
18    Q. -- than the supplemental report?
19       MR. SOBOL: Objection to the form.
20    A. It is certainly more conservative in
21 that there are drugs for which damages occur in
22 the supplemental report that do not occur in the

Page 667

1  original December report. So it is conservative
2  in that way.
3        It is conservative also in the
4  calculation of the ASP. It is a higher ASP, and
5  so that filters through the analysis and what
6  leads to lower damages.
7        So certainly the December report is more
8  conservative on a number of fronts in terms of
9  damages and impact and causation.
10    Q. Okay. I want to change the subject a
11 little bit. Just so we're clear on this for the
12 record, would you explain your methodology?
13       MR. SOBOL: In what?
14    Q. Your methodology for determining
15 yardsticks?
16    A. There are a variety of yardsticks
17 included herein for damages and for liability. Can
18 you be more specific or --
19    Q. Well, I meant to encompass both.
20    A. Oh, okay.
21       Well, I think, just to --
22    Q. And I'm not asking for a long answer. I

Page 668

1  am --
2     A. I know.
3     Q. I am just asking for a concise, clear
4  answer.
5        MR. SOBOL: Why ask for any answer? It
6  is right in his report.
7        THE WITNESS: Yes.
8     A. I want to point you to where it is --
9  where you will get the complete, you know --
10 certainly the description of the findings for a
11 liability yardstick are first introduced in
12 paragraph 22, and essentially what I'm talking --
13 what I introduce there is I am going to look for
14 comparator drugs, and I am going to look for a
15 number of pieces of information that will allow me
16 to draw conclusions for the levels of spread that
17 manufacturers would use if they weren't using the
18 spread to move market share in a way that was --
19 that exceeded what the market understood them to
20 be. And so I look at comparator drugs, and I
21 indicate the drugs that I had asked for in table
22 3.

Page 669

1        I have also looked at studies that have
2  been done, survey work that has been done, which I
3  mention in paragraph B of that paragraph, and this
4  is the OIG report and the ASCO report, which
5  indicate those liability thresholds.
6        There are studies that have been done
7  that reveal the preferences of payers and what
8  they have negotiated with physician groups,
9  provider groups that we see summarized in the
10 Medpac report, which summarizes the Dyckman
11 report, and also a report by the University of
12 Chicago and NORC, so I look to those, those, that
13 information to form the basis of what the
14 yardstick for liability is and what the
15 understanding is in the market for spreads for
16 single-source physician- administered drugs and
17 then for multi- source physician-administered
18 drugs.
19       And I expand on that later, which I
20 won't go to the paragraphs. I will let you read
21 those.
22    Q. Well, why didn't you conclude that AWP

11 (Pages 666 to 669)

Henderson Legal Services
(202) 220-4158

c0d7cacf-36eb-4753-bbb5-bff3c69d22d9

Page 670

1  should equal ASP?
2      A.  Because the industry knows that it
3  doesn't.
4      Q.  Okay.  Are you aware of the fact that in
5  certain other cases that have been filed against
6  these defendants, the plaintiffs are alleging that
7  AWP should equal ASP?
8      A.  The -- you know, I don't know -- I would
9  have -- you are asking me about cases that I
10 haven't read the full Complaint.  I don't know
11 what the context is.
12         You are also raising an issue where I'm
13 not sure whether you are talking about a liability
14 issue or you are talking about a damages issue.
15 Certainly under Medicare, the reimbursement rate
16 is to be the lesser of the ASP or some fraction of
17 AWP.
18         Now that doesn't mean that AWP should be
19 equal to ASP, but under Medicare, it means that
20 the reimbursement rate should have been at ASP.
21 Now maybe some people interpret that to mean that
22 the AWP should be at ASP, but that is not what I

Page 671

1  interpret.
2      Q.  Outside of the Medicare context, would
3  you agree with me that to the extent that
4  plaintiffs in other cases are alleging that AWP
5  should equal ASP, that is simply incorrect?
6      A.  I -- I really can't comment on cases
7  that I know nothing about.  I mean --
8      Q.  It is inconsistent with what your
9  understanding of the market expectation is;
10 correct?
11     A.  Certainly for purposes of what I have
12 done here and looking at market expectations,
13 looking at the many deponents that Mr. Young
14 cites, which I have summarized in attachment K
15 here, and I have dealt with in my rebuttal
16 reports, there is an understanding that AWP is a
17 sticker price.  And I mean this is more than just
18 those deponents.  It is anybody that writes about
19 this market.  And that there is an ASP that is
20 below that that allows some margin to be earned by
21 retail pharmacies for self-administered drugs or
22 some retail margin to be earned by physicians, and

Page 672

1  that's quoting Mr. Young, that would imply that
2  AWP is greater than ASP, and greater than WAC, and
3  so I don't know what -- that is what is built into
4  -- into my analysis here.  That is my
5  understanding of this market, and that's what is
6  reflected in my yardsticks.
7      Q.  Well, you keep referring to a market
8  understanding.  Do you have any reason to believe
9  that the government doesn't have the same
10 understanding?
11     A.  The government has -- you need to be
12 more -- well, let me answer this briefly.
13         The government has set reimbursement
14 rates that reflect an understanding that is
15 comparable to what I would say is the -- in my
16 yardsticks.
17     Q.  Well, leaving aside for the moment your
18 yardstick, which I understand is based on your
19 interpretation of a statute which we'll get to in
20 a moment, what I want to focus on is --
21     A.  I am sorry?
22     Q.  -- what the government --

Page 673

1      A.  Which yardstick?  My yardstick is not -
2  - the yardstick for liability --
3         MR. SOBOL:  Let's not have a
4  conversation here.
5         THE WITNESS:  Okay.
6         MR. SOBOL:  Let's have questions and
7  answers.
8         MR. EDWARDS:  Now I have lost my train
9  of thought.
10        THE WITNESS:  I am sorry.  It was very
11 rude of me.
12        MR. SOBOL:  Now there is more
13 conversation.
14 BY MR. EDWARDS:
15     Q.  You are not -- in terms of the market
16 understanding of the difference between AWP and
17 ASP, you are not saying that the government's
18 understanding was any different from the
19 understanding in the private sector, are you?
20     A.  I am saying that if anything with
21 physician-administered drugs the private sector
22 looked to Medicare and Medicare approaches to