**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO COMPEL SCHERING-PLOUGH TO PRODUCE DOCUMENTS AND DATA UNDERLYING CRIMINAL PLEA AND SETTLEMENT AGREEMENT**

I, Steve W. Berman, under oath declares as follows:

1. I am one of the attorneys for Class Plaintiffs in MDL 1456 and have personal knowledge of the facts set forth herein.

2. When the Government announced its Settlement in August we were surprised at the fact Schering was agreeing to both a criminal plea and to pay hundreds of millions in fines arising out of conduct that was directly related to the allegations in the MDL.

3. The Settlement Agreement refers to Schering paying $500.00 per patient to induce doctors to prescribe Peg Intron. Our review of the MDL discovery does not reveal that such payment records were produced.

4. We also cannot find evidence of the inducements paid to doctors to use Temodar or Intron-A, as described in the Settlement Agreement.

5. We immediately wrote to Schering asking for the identification of the Bates numbers where such information had been produced.

6. Schering responded by refusing to identify where such documents had been produced.

7. Class Plaintiffs also issued a 30(B)(6) deposition notice seeking the identity of witnesses who could testify on the facts and documents relating to the plea and physician inducements. Schering failed to show up.

8. Attached hereto are true and correct copies of the following exhibits:

A Settlement Agreement and Release

B. Plaintiffs' Omnibus Requests for Production and Interrogatories to Defendants Abbott, Amgen, Aventis, Baxter, Bayer, Boehringer, Braun, Dey, Fujisawa, Novartis, Pfizer, Pharmacia, Sicor, TAP and Watson And to All Other Defendants With Respect to Drugs That Were Not Previously Subject to Discovery

C Response of Schering-Plough Corporation and Warrick Pharmaceuticals Corporation to Plaintiffs' Omnibus Requests For Production and Interrogatories

D August 30, 2006 Letter to John Montgomery from Steve Berman

E September 8, 2006 Letter to Steve Berman from Adam Wright

F 30(B)(6) Deposition of Schering-Plough and Schering Sales dated September 13, 2006

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of September, 2006.

/s/ Steve W. Berman
STEVE W. BERMAN

**CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE**
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on September 22, 2006, I caused copies of **DECLARATION OF STEVE W. BERMAN IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION TO COMPEL SCHERING-PLOUGH TO PRODUCE DOCUMENTS AND DATA UNDERLYING CRIMINAL PLEA AND SETTLEMENT AGREEMENT** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

**/s/ Steve W. Berman**
Steve W. Berman

# EXHIBIT A

LEXISNEXIS FILE & SERVE 12311735 E-SERVICE Sep 8 2006 4:54PM

# SETTLEMENT AGREEMENT AND RELEASE

## I. PARTIES

This Settlement Agreement ("Agreement") is entered into by the United States of America, acting through the United States Department of Justice and the United States Attorney's Office for the District of Massachusetts, and the Office of Inspector General ("OIG-HHS") of the United States Department of Health and Human Services ("HHS"); TRICARE Management Activity ("TMA")(formerly known as the Office of the Civilian Health and Medical Program of the Uniformed Services), a field activity of the Office of the Secretary of Defense, the United States Department of Defense; the Office of Personnel Management ("OPM"), which administers the Federal Employees Health Benefits Program ("FEHBP"); Schering-Plough Corporation ("Schering"), a New Jersey Corporation with a principal place of business in Kenilworth, New Jersey, and its subsidiaries and divisions, including Schering Sales Corporation, through their authorized representatives. Collectively, all of the above shall be referred to as "the Parties."

## II. PREAMBLE

A WHEREAS, at all relevant times, Schering distributed, marketed and sold pharmaceutical products in the United States, including the following prescription drug products (1) loratadine rapidly dissolving tablets, a non-sedating antihistamine, marketed under the brand name Claritin Redi-Tabs; (2) potassium chloride 20 meq, an electrolytic and water balance agent, marketed under the brand name K-Dur 20; (3) temozolomide, a chemotherapeutic agent, marketed under the brand name Temodar; (4) interferon alfa-2b, a biologic, marketed under the brand name Intron A; (5) pegylated interferon alfa-2b, a biologic, marketed under the brand name PEG-Intron; (6) interferon alfa-2b marketed together with ribavirin, a nucleoside analogue, under the brand name



Schering Exhibit No. 003 LISA A. MOREIRA 9/13/06

Rebetron; and (7) pegylated interferon alfa-2b marketed together with ribavirin as PEG-Intron Combination Therapy (collectively, "the drugs"). Schering sold the drugs to various customers including, among others, health maintenance organizations ("HMOs"), hospitals, long term care providers, chain pharmacies, specialty pharmacies, and physicians. One of the HMOs to which Schering sold drugs was Kaiser Permanente Medical Care Program ("Kaiser").

B. WHEREAS, Schering Sales Corporation, a wholly owned subsidiary of Schering-Plough Corporation, has agreed to enter into a plea agreement with the United States Attorney for the District of Massachusetts (the "Plea Agreement"), under which, if the Plea Agreement is approved by the Court, Schering Sales Corporation will enter a plea of guilty pursuant to Fed. R. Crim. P. 11(c)(1)(C) to an Information to be filed in United States of America v. Schering Sales Corporation (District of Massachusetts)(the "Criminal Action") that will allege that Schering Sales Corporation violated Title 18, United States Code, Section 371, by conspiring to make false statements in violation of Title 18, United States Code, Section 1001, to the Health Care Financing Administration ("HCFA") in connection with Schering's best price for Claritin Redi-Tabs for second quarter 1998 through fourth quarter 1999, and to the United States Food and Drug Administration ("FDA") in response to an inquiry by the FDA in July 2001 regarding Schering's off-label marketing activities.

[Redacted]

/

/

/

/

/

/

/

D. WHEREAS, at all material times, Schering participated in the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, which is part of the federal Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v. As a participant in the Medicaid Rebate Program, Schering entered into a rebate agreement with HCFA, currently known as the Centers for Medicare and Medicaid Services ("CMS"), and Schering's drug products were covered by state Medicaid plans that provided medical assistance for outpatient prescription drugs. 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(12), and 1396r-8(a)(1). Under the Medicaid Rebate Program and rebate agreement with HCFA, Schering generally agreed: (i) to report quarterly to HCFA its average manufacturer price and, for single source and innovator multiple source drugs, best price for its drug products, as defined by 42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C); and (ii) to pay quarterly rebates to the states based on the product of (a) the units of each dosage form and strength paid for under the State Medicaid plan during the rebate period as reported by the state, and (b) the greater of the difference between the average manufacturer price and best price, or a minimum rebate percentage of the average manufacturer price, as further defined in 42 U.S.C. § 1396r-8(c)(1).

E. WHEREAS, at all material times, Schering participated in the Drug Pricing Program, 42 U.S.C. § 256b, which is part of the Public Health Service ("PHS") Act, 42 U.S.C. §§ 201-300gg-92. As a participant in the Drug Pricing Program, Schering entered into an agreement with HHS in connection with the pricing of its drug products sold to entities such as AIDS drug purchasing assistance programs, community health centers, hemophilia treatment centers, and disproportionate

share hospitals, as defined in 42 U.S.C. § 256b(a)(4) (the "PHS entities"). Under the Drug Pricing Program and its agreement with HHS, Schering generally agreed that the amount that Schering required the PHS entities to pay for drug products would not exceed the average manufacturer price, as reported by Schering to HCFA in the previous calendar quarter, minus a specified rebate percentage that was derived in part from the Medicaid rebate paid by Schering in the preceding calendar quarter for each drug, as further described in 42 U.S.C. § 256b(a).

F. WHEREAS, Schering has entered into or will be entering into separate settlement agreements (hereinafter referred to as the "Medicaid State Settlement Agreements") with the states which will be receiving settlement funds from Schering pursuant to Paragraph 1(B) below for the Covered Conduct described in Paragraph H below (hereinafter referred to as the "Medicaid Participating States").

G. WHEREAS, the United States alleges that Schering caused to be submitted claims for payment for the drugs to the Medicaid Programs, established pursuant to or in connection with Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the "Medicaid Program"); and the United States further alleges that Schering caused to be submitted claims for payment for the drugs to the Medicare Program, established pursuant to Title XVIII of the Social Security Act, § 1395-1395ggg, which is administered by HHS; the TRICARE Program (formerly known as the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS")), 10 U.S.C. §§ 1071-1106, which is administered by the Department of Defense through the TMA; the FEHBP, 5 U.S.C. §§ 8901-8914; and that Schering caused purchases of the drugs by the Department of Veterans' Affairs ("DVA").

H. WHEREAS, the United States contends that it has certain civil claims against Schering under the False Claims Act, 31 U.S.C. §§ 3729-33, the Medicaid Rebate Program, 42 U.S.C. § 1396r-8, the Drug Pricing Program, 42 U.S.C. § 256b, other federal statutes, and/or common law doctrines as specified in Paragraph 2 below for engaging in the following conduct:

(i) The United States contends that, from Second Quarter 1998 through Fourth Quarter 1999, Schering knowingly and willfully misreported its best price to HCFA and underpaid its Medicaid rebates for Claritin Redi-Tabs by omitting from its determination of best price the free Claritin Redi-Tabs contingent on future purchases that were provided to Kaiser to effectuate an agreed-upon lower price;

(ii) The United States contends that, from First Quarter 2000 through Fourth Quarter 2001, Schering knowingly misreported its best price to HCFA and underpaid its Medicaid rebates for Claritin Redi-Tabs by omitting from its determination of best price deeply discounted Claritin Redi-Tabs that were provided to Kaiser to effectuate an agreed-upon lower price;

(iii) The United States contends that, from Fourth Quarter 1995 through Fourth Quarter 2000, Schering knowingly misreported its best price to HCFA and underpaid its Medicaid rebates for K-Dur 20 by omitting from its determination of best price the price of K-Dur 20 that was private labeled for Kaiser;

(iv) The United States contends that, from Fourth Quarter 1998 through Second Quarter 2002, Schering overcharged the PHS entities for Claritin Redi-Tabs; and from Second Quarter 1996 through Second Quarter 2001, Schering overcharged the PHS entities for K-Dur, as a result of Schering's misreporting of its best prices as described in Preamble Paragraphs H (i), (ii) and (iii), above;

(v) The United States contends that, as part of Schering's sales and marketing practices for PEG-Intron, Rebetron, and PEG-Intron Combination Therapy for patients with Hepatitis C from January 1999 through December 2002, Schering knowingly and willfully offered and paid illegal remuneration to induce physicians to start patients on drug therapy for Hepatitis C in violation of 42 U.S.C. §1320a-7b(b)(2) through three improper sales and marketing programs: the ReCAP Program, which paid physicians up to $500 for each patient begun on drug therapy for Hepatitis C; the Physician Assistants ("PA") Fellowship Program, which placed Schering-funded physician assistants in busy physician practices; and Low Quintile Advisory Board programs, which paid physicians for attendance at Schering-sponsored events. Furthermore, the Government contends that during this time period, Schering knowingly caused the submission of false or fraudulent claims to the Medicaid and TRICARE Programs for PEG-Intron, Rebetron, and PEG-Intron Combination Therapy, and caused the DVA to purchase PEG-Intron, Rebetron, and PEG-Intron Combination Therapy by providing physicians with illegal remuneration through these three programs to induce them to prescribe these drugs to patients;

(vi) The United States contends that, as part of Schering's sales and marketing practices for Temodar, from September 1999 through December 2003, Schering knowingly and willfully offered and paid various forms of illegal remuneration to physicians and physicians' practices to induce utilization of Temodar for brain tumors and brain metastases, including, for example, improper preceptorships, advisory boards, entertainment, and placement of clinical studies in violation of 42 U.S.C. §1320a-7b(b)(2). Furthermore, the Government contends that, during this time period, Schering knowingly caused the submission of false or fraudulent claims for Temodar to the Medicaid and TRICARE Programs and caused the DVA to purchase Temodar by providing

physicians and physicians' practices with illegal remuneration to induce them to prescribe Temodar for patients;

(vii) The United States contends that, during the period September 1999 through December 2003, Schering knowingly promoted the sale and use of Temodar for brain metastases and certain brain tumors (including, specifically, newly-diagnosed anaplastic astrocytomas and a certain subset of glioblastoma multiformes), uses for which the Food and Drug Administration ("FDA") had not approved Temodar: i.e., Schering promoted Temodar for "unapproved" or "off-label" uses. The Government further contends that such off-label marketing violated the Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. §§ 331 (a) and (d). The United States further contends that the use of Temodar for brain metastases during this time period, and the use of Temodar for certain brain tumors during the portion of this time period prior to 2002, were not medically-accepted indications, as defined in 42 U.S.C. § 1396r-8(k)(6), and that certain State Medicaid Programs could not reimburse these uses. The Government further contends that Schering knowingly caused the submission of false or fraudulent claims for Temodar to the TRICARE, FEHBP, and Medicaid programs for non-reimbursable uses, and caused the DVA to purchase Temodar dispensed to patients for unapproved indications; and

(viii) The United States contends that, as part of Schering's sales and marketing practices for Intron A for superficial bladder cancer from September 1999 through December 2003, Schering knowingly and willfully offered and paid various forms of illegal remuneration to physicians and physicians' practices to induce the utilization of Intron A for superficial bladder cancer including, for example, improper preceptorships, advisory boards, entertainment, and placement of clinical studies in violation of 42 U.S.C. § 1320a-7b(b)(2), and encouragement of

improper billing by physicians of Intron A vial overfill and free drugs. The Government further contends that Schering promoted Intron A for superficial bladder cancer although Schering did not have approval from the FDA for use in that indication. Furthermore, the Government contends that during this time period, Schering knowingly caused the submission of false or fraudulent claims to the Medicaid, Medicare, and TRICARE Programs for Intron A and caused the DVA to purchase Intron A by inducing physicians to prescribe it to patients with superficial bladder cancer by providing them with such illegal remuneration.

Schering's conduct as described in the Information in the Federal Criminal Action and Preamble Paragraph H is hereafter referred to as the "Covered Conduct."

[Redacted]

/

/

I. WHEREAS, HHS-OIG contends that it has certain administrative claims against Schering, as specified in Paragraphs 4 and 5 below, for engaging in the Covered Conduct.

J. WHEREAS, this Agreement is neither an admission of facts or liability by Schering, with the exception of such admissions as Schering Sales Corporation makes in connection with a guilty plea to the Information referenced in Paragraph B above, nor a concession by the Government that its claims are not well founded.

K. WHEREAS, to avoid the delay, expense, inconvenience, and uncertainty of protracted litigation of these claims, the Parties mutually desire to reach a full and final settlement as set forth below.

## III. TERMS AND CONDITIONS

NOW, THEREFORE, in reliance on the representations contained herein and in consideration of the mutual promises, covenants, and obligations set forth below in this Agreement, and for good and valuable consideration as stated herein, the Parties agree as follows:

1. Schering agrees to pay to the United States, the Medicaid Participating States, and the PHS entities, collectively, the sum of two hundred fifty-five million twenty-five thousand, eighty-nine dollars and sixty cents ($255,025,089.60), plus interest in an amount of 4.292% per annum on the Federal Settlement Amount and Medicaid State Settlement Amount as further set forth in subparagraphs A and B below ($29,527 per day) from July 27, 2005 and continuing until and including the day before complete payment is made (the "Settlement Amount"). This sum shall constitute a debt immediately due and owing to the United States and the Participating States on the Effective Date of this Agreement. This debt is to be discharged by payments to the United States and the Medicaid Participating States, under the following conditions:

A. Schering shall pay to the United States the sum of one hundred fifty-nine million five hundred two thousand dollars ($159,502,000), plus interest in an amount of 4.292% per annum ($18,756 per day) from July 27, 2005, and continuing until and including the day before complete payment is made (the "Federal Settlement Amount").

[Redacted]

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

/

B. Schering shall pay to the Medicaid Participating States the sum of ninety-one million, six hundred two thousand dollars ($91,602,000), plus interest in an amount of 4.292% per annum ($10,771 per day) from July 27, 2005, until and including the day before complete payment is paid (the "Medicaid State Settlement Amount") under the terms and conditions of the Medicaid State Settlement Agreements. This Medicaid State Settlement Amount shall be paid into an interest bearing account as set forth in the Medicaid State Settlement Agreements no later than seven

business days after Schering receives written payment instructions from the National Association of Medicaid Fraud Control Units' Settlement Team for the Medicaid Participating States and following the latest of the dates on which the following occurs: (1) this Agreement is fully executed by the Parties and delivered to Schering's attorneys, or (2) the District Court accepts the Fed. R. Crim. P. 11(c)(1)(C) guilty plea in connection with the Criminal Action and imposes the agreed upon sentence. The Medicaid State Settlement Amount shall be paid to the Medicaid Participating States from the account following execution of the Medicaid State Settlement Agreements with all the Medicaid Participating States, or at any earlier date as otherwise agreed in writing between Schering and the National Association of Medicaid Fraud Control Units' Settlement Team.

C. Schering shall pay to the PHS entities the sum of three million nine hundred twenty-one thousand eighty nine dollars and sixty cents ($3,921,089.60) (the "PHS Settlement Amount"). Schering agrees to present for review and audit the underlying calculations used to determine the correct price(s) for the PHS entities during the relevant time periods. Schering agrees that if it is determined that Schering owes any additional amounts to any PHS entity, based upon the allegations in the Covered Conduct, Schering agrees to pay any additional amount required to make that entity whole. The PHS Settlement Amount shall be paid by Schering to each affected PHS entity by check within sixty (60) days following the latest of the dates on which the following occurs: (1) this Agreement is fully executed by the Parties and delivered to Schering's attorneys, or (2) the District Court accepts the Fed. R. Crim. P. 11(c)(1)(C) guilty plea in connection with the Criminal Action and imposes the agreed upon sentence.

D. If Schering Sales Corporation's agreed upon guilty plea pursuant to Fed. R. Crim. P. 11(c)(1)(C) in the Criminal Action described in Preamble Paragraph B is not accepted by

the District Court or that Court does not impose the agreed upon sentence for whatever reason, this Agreement shall be null and void at the option of either the United States or Schering. If either the United States or Schering exercises this option, which option shall be exercised by notifying all Parties, through counsel, in writing within five business days of the District Court's decision, the Parties will not object and this Agreement will be rescinded. If this Agreement is rescinded, Schering will not plead, argue or otherwise raise any defenses under the theories of statute of limitations, laches, estoppel or similar theories to any civil or administrative claims, actions or proceedings which are brought by the United States within 90 calendar days of notification to all other Parties of that rescission, except to the extent such defenses were available before February 5, 2003.

2. Subject to the exceptions in Paragraphs 3, 4, 6 and 7 below, and in consideration of the obligations of Schering set forth in this Agreement, conditioned upon Schering's payment in full of the Settlement Amount, subject to Paragraph 16 below (concerning bankruptcy proceedings commenced within 91 days of the Effective Date of this Agreement or any payment under this Agreement), and subject to the acceptance by the United States District Court for the District of Massachusetts of Schering Sales Corporation's guilty plea described in Preamble Paragraph B, the United States, on behalf of itself, and its officers, agents, agencies, and departments, agrees to release Schering, its predecessors, and its current and former parents, affiliates, divisions, subsidiaries, successors and assigns, and their current and former directors, officers , and employees, from any civil or administrative monetary claim that the United States has or may have under the False Claims Act, 31 U.S.C. §§ 3729-33; the Food Drug and Cosmetic Act, 21 U.S.C. §§ 331(a), 331(d) and 332; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-12; the Medicaid Rebate Statute, 42

U.S.C. § 1396r-8; the Drug Pricing Program, 42 U.S.C. § 256b; the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a; any statutory provision applicable to federally-funded programs in this Agreement for which the Civil Division, Department of Justice has actual and present authority to assert and compromise pursuant to 28 C.F.R. Part O, Subpart I. 0.45(d)(1995); and common law claims for fraud, unjust enrichment, payment by mistake, or disgorgement for the Covered Conduct.

3. Notwithstanding any term of this Agreement, the United States specifically does not release any person or entity from any of the following claims or liabilities: (a) any criminal, civil, or administrative claims arising under Title 26, U.S. Code (Internal Revenue Code); (b) any criminal liability; (c) any liability to the United States (or any agencies thereof) for any conduct other than the Covered Conduct; (d) any claims based upon obligations created by this Agreement; (e) except as explicitly stated in this Agreement, any administrative liability, including mandatory exclusion from Federal health care programs; (f) any express or implied warranty claims or other claims for defective or deficient products and services provided by Schering; (g) any claims for personal injury or property damage or for other consequential damages arising from the Covered Conduct; (h) any claim based on a failure to deliver items or services due; or (i) any civil or administrative claims against individuals, including current and former directors, officers, and employees of Schering, its predecessors, subsidiaries, and affiliates, who receive written notification that they are the target of a criminal investigation, are criminally indicted or charged, or are convicted, or who enter into a criminal plea agreement.

4. In consideration of the obligations of Schering set forth in this Agreement, and the Corporate Integrity Agreement and Addendum thereto (collectively, "CIA"), conditioned on Schering's payment in full of the Settlement Amount, and subject to Paragraph 16 below (concerning

bankruptcy proceedings commenced within 91 days of the effective date of this Agreement or any payment under this Agreement). OIG-HHS agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion from the Medicare, Medicaid, or other Federal health care programs (as defined in 42 U.S.C. § 1320a-7b(f)) against Schering, and except for Schering Sales Corporation, its predecessors, and its current or former parents, affiliates, divisions, subsidiaries, successors, and assigns, under 42 U.S.C. § 1320a-7a (Civil Monetary Penalties Law), or 42 U.S.C. § 1320a-7(b)(7) (permissive exclusion for fraud, kickbacks or other prohibited activities), for the Covered Conduct, except as reserved in Paragraph 3 above, and as reserved in this Paragraph. The OIG-HHS expressly reserves all rights to comply with any statutory obligations to exclude Schering from the Medicare, Medicaid, or other Federal health care program under 42 U.S.C. § 1320a-7(a) (mandatory exclusion) based upon the Covered Conduct. Nothing in this Paragraph precludes the OIG-HHS from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 3 above.

5. In compromise and settlement of the rights of OIG-HHS to exclude Schering Sales Corporation pursuant to 42 U.S.C. § 1320a-7(a)(1)(mandatory exclusion for a criminal offense related to the delivery of an item or service under Medicare or Medicaid) based on the Plea Agreement described in Paragraph II.B. above, and pursuant to 42 U.S.C. § 1320a-7(b)(7) based on the Covered Conduct described in Paragraph II.H above, Schering Sales Corporation agrees to be permanently excluded under these statutory provisions from Medicare, Medicaid, and all other Federal health care programs as defined in 42 U.S.C. § 1320a-7b(f). Such exclusion shall have national effect and shall also apply to all other federal procurement and nonprocurement programs. Federal health care programs shall not pay Schering Sales Corporation or anyone else for items or

services, including administrative and management services, furnished, ordered, or prescribed by Schering Sales Corporation in any capacity while Schering Sales Corporation is excluded. This payment prohibition applies to Schering Sales Corporation and anyone who employs or contracts with Schering Sales Corporation. The exclusion applies regardless of who submits the claims or other request for payment. Schering Sales Corporation shall not submit or cause to be submitted to any Federal health care program any claim or request for payment for items or services, including administrative and management services, furnished, ordered, or prescribed by Schering Sales Corporation during the exclusion. Violation of the conditions of the exclusion may result in criminal prosecution and imposition of civil monetary penalties and assessments. Schering Sales Corporation further agrees to hold the Federal health care programs, and all federal beneficiaries and/or sponsors, harmless from any financial responsibility for goods or services furnished, ordered, or prescribed to such beneficiaries or sponsors during the exclusion. Schering Sales Corporation waives any further notice of the exclusion and agrees not to contest such exclusion either administratively or in any state or federal court. Schering Sales Corporation has been excluded since October 20, 2005, and the exclusion, as set forth in this Paragraph, shall continue permanently hereafter.

6. In consideration of the obligations of Schering set forth in this Agreement, conditioned upon Schering's full payment of the Settlement Amount, and subject to Paragraph 16 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of this Agreement or any payment under this Agreement), TMA agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking exclusion or suspension from the TRICARE Program against Schering, its predecessors, its current or former parents, affiliates, divisions, subsidiaries, successors and assigns, and their current and former directors, officers , and

employees, under 32 C.F.R. § 199.9 for the Covered Conduct, except as reserved in Paragraph 3 above, and as reserved in this Paragraph. TMA expressly reserves its authority under 32 C.F.R. § 199.9(f)(1)(i)(A) and (f)(1)(i)(B) based upon the Covered Conduct, and under 32 C.F.R. § 199.9(f)(1)(iii) if any entity is excluded by OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a). Nothing in this Paragraph precludes TMA or the TRICARE Program from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 3, above.

7. In consideration of the obligations of Schering set forth in this Agreement, conditioned upon Schering's full payment of the Settlement Amount, and subject to Paragraph 16 below (concerning bankruptcy proceedings commenced within 91 days of the effective date of this Agreement or any payment under this Agreement), OPM agrees to release and refrain from instituting, directing, or maintaining any administrative action seeking debarment from FEHBP against Schering, its predecessors, its current or former parents, affiliates, divisions, subsidiaries, successors and assigns, and their current and former directors, officers , and employees, under 5 U.S.C. § 8902a or 5 C.F.R. Part 890 for the Covered Conduct, except as reserved in Paragraph 3 above, and except if excluded by the OIG-HHS pursuant to 42 U.S.C. § 1320a-7(a). Nothing in this Paragraph precludes OPM from taking action against entities or persons, or for conduct and practices, for which claims have been reserved in Paragraph 3, above.

8. The Parties each represent that this Agreement is freely and voluntarily entered into without any degree of duress or compulsion whatsoever.

9. [Redacted]

/

/

/

/

/

/

/

/

/

/

10. Schering waives and shall not assert any defense it may have to criminal prosecution or administrative action relating to the Covered Conduct, which defense may be based in whole or in part on a contention that, under the Double Jeopardy Clause of the Fifth Amendment of the Constitution or the Excessive Fines Clause of the Eighth Amendment of the Constitution, this Agreement bars a remedy sought in such criminal prosecution or administrative action.

11. In consideration of the obligations of the United States set forth in this Agreement, Schering, on behalf of itself and its predecessors, its current and former parents, affiliates, divisions, subsidiaries, successors and assigns fully and finally releases, waives and discharges the United States, its agencies, employees, servants, and agents from any claims (including attorneys' fees, costs, and expenses of every kind and however denominated) which Schering has asserted, could have asserted, or may assert in the future against the United States, its agencies, employees, servants, and agents, related to or arising from the United States' investigation and prosecution of [Redacted], the Federal Criminal Action, and the Covered Conduct.

12. The Settlement Amount that Schering must pay pursuant to Paragraph 1 above will

not be decreased as a result of the denial of claims for payment now being withheld from payment by any State or Federal payer, related to the Covered Conduct; and, if applicable, Schering agrees not to resubmit to any State and Federal payer any previously denied claims, which denials were based on the Covered Conduct, and agrees not to appeal or cause the appeal of any such denials of claims.

13. Schering agrees to the following:

a. Unallowable Costs Defined: that all costs (as defined in the Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 31.205-47 and in Titles XVIII and XIX of the Social Security Act, 42 U.S.C. §§ 1395-1395ggg and 1396-1396v, and the regulations and official program directives promulgated thereunder) incurred by or on behalf of Schering, its predecessors, parents, divisions, subsidiaries, or affiliates, and its present or former officers, directors, employees, and agents in connection with: (1) the matters covered by this Agreement and the related Plea Agreement; (2) the United States' audit and civil and criminal investigation relating to matters covered by this Agreement; (3) Schering's investigation, defense, and any corrective actions undertaken in response to the United States' civil and criminal investigations in connection with the matters covered by this Agreement (including attorneys' fees); (4) the negotiation and performance of this Agreement, the Plea Agreement, and the Medicaid State Settlement Agreement; (5) the payments made to the United States or any State pursuant to this Agreement, the Plea Agreement, or the Medicaid State Settlement Agreement and Release and any payments that Schering may make [Redacted]; and (6) the negotiation of and obligations undertaken pursuant to the CIA to: (a) retain an independent review organization to perform annual reviews as described in Section III of the CIA; and (b) prepare and submit reports to the OIG-HHS, are unallowable costs on Government contracts

with DVA and other agencies and under the Medicare Program, Medicaid Program, TRICARE Program, and FEHBP. However, nothing in this Paragraph affects the status of costs that are not allowable based on any other authority applicable to Schering. (All costs described or set forth in this Paragraph are hereafter, "Unallowable Costs").

b. Future Treatment of Unallowable Costs: If applicable, these Unallowable Costs shall be separately estimated and accounted for by Schering and Schering shall not charge such Unallowable Costs directly or indirectly to any contracts with the United States or any State Medicaid program, or seek payment for such Unallowable Costs through any cost report, cost statement, information statement, or payment request submitted by Schering, its predecessors, divisions, subsidiaries, or affiliates to Medicare, Medicaid, TRICARE, FEHBP or DVA.

c. Treatment of Unallowable Costs Previously Submitted for Payment: If applicable, Schering further agrees that within 60 days of the Effective Date of this Agreement, it shall identify to applicable Medicare and TRICARE fiscal intermediaries, carriers, and/or contractors, and Medicaid, DVA, and FEHBP fiscal agents, any Unallowable Costs (as defined in this Paragraph) included in payments previously sought from the United States, or any State Medicaid Program, including, but not limited to, payments sought in any cost reports, cost statements, information reports, or payment requests already submitted by Schering, its predecessors, parents, divisions, subsidiaries, or affiliates and shall request, and agree, that such cost reports, cost statements, information reports, or payment requests, even if already settled, be adjusted to account for the effect of the inclusion of the Unallowable Costs. Schering agrees that the United States, at a minimum, shall be entitled to recoup from Schering any overpayment, plus applicable interest and penalties, as a result of the inclusion of such Unallowable Costs on previously-submitted cost

reports, information reports, cost statements, or requests for payment. Any payments due after the adjustments have been made shall be paid to the United States pursuant to the direction of the Department of Justice, and/or the affected agencies. The United States reserves its rights to disagree with any calculations submitted by Schering or its parents, divisions, subsidiaries or affiliates on the effect of inclusion of Unallowable Costs on Schering or its divisions, subsidiaries or affiliates' cost reports, cost statements, or information reports. Nothing in this Agreement shall constitute a waiver of the rights of the United States to examine or re-examine the Unallowable Costs described in this Paragraph.

14. Schering agrees that it shall not seek payment for any of the health care billings covered by this Agreement from any health care beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors. Schering waives any causes of action against these beneficiaries or their parents, sponsors, legally responsible individuals, or third party payors based upon the claims for payment covered by this Agreement.

15. Schering expressly warrants that it has reviewed its financial condition and that it is currently solvent within the meaning of 11 U.S.C. §§ 547(b)(3) and 548(a)(B)(ii)(I), and shall remain solvent following payment of the Settlement Amount. Further, the Parties expressly warrant that, in evaluating whether to execute this Agreement, the Parties (a) have intended that the mutual promises, covenants, and obligations set forth herein constitute a contemporaneous exchange for new value given to Schering within the meaning of 11 U.S.C. § 547(c)(1), and (b) have concluded that these mutual promises, covenants and obligations do, in fact, constitute such a contemporaneous exchange.

16. In the event Schering commences, or another party commences, within 91 days of the

Effective Date of this Agreement or any payment made hereunder, any case, proceeding, or other action under any law relating to bankruptcy, insolvency, reorganization, or relief of debtors (a) seeking to have any order for relief of Schering's debts, or seeking to adjudicate Schering as bankrupt or insolvent, or (b) seeking appointment of a receiver, trustee, custodian or other similar official for Schering or for all or any substantial part of Schering's assets, Schering agrees as follows:

a. Schering's obligations under this Agreement may not be avoided pursuant to 11 U.S.C. §§ 547 or 548, and Schering shall not argue or otherwise take the position in any such case, proceeding or action that: (i) Schering's obligations under this Agreement may be avoided under 11 U.S.C. §§ 547 or 548; (ii) Schering was insolvent at the time this Agreement was entered into, or became insolvent as a result of the payment made to the United States hereunder; or (iii) the mutual promises, covenants, and obligations set forth in this Agreement do not constitute a contemporaneous exchange for new value given to Schering.

b. If Schering's obligations under this Agreement are avoided for any reason, including, but not limited to, through the exercise of a trustee's avoidance powers under the Bankruptcy Code, the United States, at its sole option, may rescind the releases provided in this Agreement, and bring any civil and/or administrative claim, action or proceeding against Schering for the claims that would otherwise be covered by the releases provided in this Agreement. If the United States chooses to do so, Schering agrees that for purposes only of any claims, actions or proceeding referenced in this first clause of this Paragraph (i) any such claims, actions, or proceedings brought by the United States (including any proceedings to exclude Schering from participation in Medicare, Medicaid, or other Federal health care programs) are not subject to an "automatic stay" pursuant to 11 U.S.C. § 362(a) as a result of the action, case, or proceeding

described in the first clause of this Paragraph, and that Schering shall not argue or otherwise contend that the United States' claims, actions, or proceedings are subject to an automatic stay; (ii) Schering shall not plead, argue, or otherwise raise any defenses under the theories of statue of limitations, laches, estoppel, or similar theories, to any such civil or administrative claims, actions, or proceedings which are brought by the United States within 90 calendar days of written notification to Schering that the releases herein have been rescinded pursuant to this Paragraph, except to the extent such defenses were available before February 5, 2003; and (iii) the United States and the Participating States have a valid claim against Schering in the amount of two hundred fifty-five million twenty five thousand eighty nine dollars and sixty cents ($255,025,089.60) plus applicable multipliers and penalties and they may pursue their claims, inter alia, in the case, action, or proceeding referenced in the first clause of this Paragraph, as well as in any other case, action or proceeding; and

c. Schering acknowledges that its agreements in this Paragraph are provided in exchange for valuable consideration provided in this Agreement.

17. Except as otherwise stated in this Agreement, this Agreement is intended to be for the benefit of the Parties only, and by this instrument the Parties do not release any claims against any other person or entity.

18. Nothing in this Agreement constitutes an agreement by the United States concerning the characterization of the amounts paid hereunder for purposes of the Internal Revenue laws, Title 26 of the United States Code.

19. Each party to this Agreement shall bear its own legal and other costs incurred in connection with this matter, including the preparation and performance of this Agreement.

20. This Agreement is governed by the laws of the United States. The Parties agree that the exclusive jurisdiction and venue for any dispute arising between and among the Parties under this Agreement shall be the United States District Court for the District of Massachusetts

[Redacted]

except that disputes rising under the CIA shall be resolved exclusively through the dispute resolution provisions set forth in the CIA.

21. [Redacted]

/

/

/

/

/

/

/

/

/

22. The undersigned Schering and Schering Sales Corporation signatories represent and warrant that they are authorized by their respective Board of Directors to execute this Agreement. The undersigned United States signatories represent that they are signing this Agreement in their official capacities and they are authorized to execute this Agreement on behalf of the United States through their respective agencies and departments.

23. The "Effective Date" of this Agreement shall be on the date of signature of the last

signatory to the Agreement. Facsimiles of signatures shall constitute acceptable binding signatures for purposes of this Agreement.

24. This Agreement shall be binding on all successors, transferees, heirs, and assigns of the Parties.

25. This Agreement shall not be amended except by written consent of the Parties, except that only Schering and OIG-HHS must agree in writing to modification of the CIA, without the consent of any other party to this Agreement or the Plea Agreement.

26. Schering hereby consents to the disclosure of this Agreement and information about this Agreement by the United States to the public.

27. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement

UNITED STATES OF AMERICA

By: [redacted] Dated: 8/29/06

SUSAN WINKLER
JENNIFER BOAL
GREGG SHAPIRO
Assistant U.S. Attorneys
United States Attorney's Office
District of Massachusetts

By: [redacted] Dated:

ANDY J. MAO
Trial Attorney, Civil Division
United States Department of Justice

signatory to the Agreement. Facsimiles of signatures shall constitute acceptable binding signatures for purposes of this Agreement.

24. This Agreement shall be binding on all successors, transferees, heirs, and assigns of the Parties.

25. This Agreement shall not be amended except by written consent of the Parties, except that only Schering and OIG-HHS must agree in writing to modification of the CIA, without the consent of any other party to this Agreement or the Plea Agreement.

26. Schering hereby consents to the disclosure of this Agreement and information about this Agreement by the United States to the public.

27. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which shall constitute one and the same Agreement

**UNITED STATES OF AMERICA**

By: [redacted] Dated:

SUSAN WINKLER
JENNIFER BOAL
GREGG SHAPIRO
Assistant U.S. Attorneys
United States Attorney's Office
District of Massachusetts

By: [redacted] Dated: 8/28/06

ANDY J. MAO
Trial Attorney, Civil Division
United States Department of Justice

By: [redacted]
EUGENE THIROLF
Director, Office of Consumer Litigation
United States Department of Justice

Dated: 8/23/2006

By: [redacted]
GREGORY E. DEMSKE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services

Dated:

By: [redacted]
LAUREL C. GILLESPIE
Deputy General Counsel
TRICARE Management Activity
United States Department of Defense

Dated:

By: [redacted]
KATHLEEN McGETTIGAN
Deputy Associate Director
Center for Retirement & Insurance Services
United States Office of Personnel Management

Dated:

By: [redacted]
J. DAVID COPE
Assistant Inspector General for Legal Affairs
United States Office of Personnel Management

Dated:

By: [redacted] Dated:
EUGENE THIROLF
Director, Office of Consumer Litigation
United States Department of Justice

By: [redacted] Dated: 8/25/06
GREGORY E. DEMSKE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services

By: [redacted] Dated:
LAUREL C. GILLESPIE
Deputy General Counsel
TRICARE Management Activity
United States Department of Defense

By: [redacted] Dated:
KATHLEEN McGETTIGAN
Deputy Associate Director
Center for Retirement & Insurance Services
United States Office of Personnel Management

By: [redacted] Dated:
J. DAVID COPE
Assistant Inspector General for Legal Affairs
United States Office of Personnel Management

By: [redacted] Dated:

EUGENE THIROLF
Director, Office of Consumer Litigation
United States Department of Justice

By: [redacted] Dated:

GREGORY E. DEMSKE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services

By: [redacted] Dated: [illegible]

LAUREL C. GILLESPIE
Deputy General Counsel
TRICARE Management Activity
United States Department of Defense

By: [redacted] Dated:

KATHLEEN McGETTIGAN
Deputy Associate Director
Center for Retirement & Insurance Services
United States Office of Personnel Management

By: [redacted] Dated:

J. DAVID COPE
Assistant Inspector General for Legal Affairs
United States Office of Personnel Management

By: [redacted] Dated:

EUGENE THIROLF
Director, Office of Consumer Litigation
United States Department of Justice

By: [redacted] Dated:

GREGORY E. DEMSKE
Assistant Inspector General for Legal Affairs
Office of Counsel to the Inspector General
U.S. Department of Health and Human Services

By: [redacted] Dated:

LAUREL C. GILLESPIE
Deputy General Counsel
TRICARE Management Activity
United States Department of Defense

By: [redacted] Dated: 8/24/06

KATHLEEN McGETTIGAN
Deputy Associate Director
Center for Retirement & Insurance Services
United States Office of Personnel Management

By: [redacted] Dated: 8/24/06

J. DAVID COPE
Assistant Inspector General for Legal Affairs
United States Office of Personnel Management

**SCHERING-PLOUGH CORPORATION**

By: [redacted] Dated: 8/25/06

THOMAS J. SABATINO
Executive Vice President and General Counsel
Schering-Plough Corporation

By: [redacted] Dated: 8/25/06

BRIEN O'CONNOR
JOAN MCPHEE
JOSHUA LEVY
Ropes & Gray
Counsel to Schering-Plough Corporation

**SCHERING SALES CORPORATION**

By: [redacted] Dated: 8/25/06

BRENT SAUNDERS
President
Schering Sales Corporation

By: [redacted] Dated: 8/25/06

BRIEN O'CONNOR
JOAN MCPHEE
JOSHUA LEVY
Ropes & Gray
Counsel to Schering Sales Corporation

# EXHIBIT B

3/37

26

E-SERVED 03/31/04 06:55 PM ET AWP-MDL No. 1456

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | Judge Patti B. Saris |

**PLAINTIFFS' OMNIBUS REQUESTS FOR PRODUCTION AND INTERROGATORIES TO DEFENDANTS ABBOTT, AMGEN, AVENTIS, BAXTER, BAYER, BOEHRINGER, BRAUN, DEY, FUJISAWA, NOVARTIS, PFIZER, PHARMACIA, SICOR, TAP AND WATSON AND TO ALL OTHER DEFENDANTS WITH RESPECT TO DRUGS THAT WERE NOT PREVIOUSLY SUBJECT TO DISCOVERY**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and LR D. Mass. 26.5 and 34.1, and pursuant to case management orders of this Court including the March 25, 2004 Order, the plaintiffs hereby request that each defendant produce the documents requested herein in compliance with the March 25, 2004 Order.

Prior to the Court's March 25, 2004 Order, several defendants commenced production for specific drugs pursuant to prior document requests. This Omnibus Request does not seek production of documents to the extent that such documents were both previously requested and actually produced by a defendant.

## I. DEFINITIONS

1. "Agreement" means a contract, arrangement or understanding, formal or informal, oral or written, between two or more persons.

2. "All documents" means every document and every non-identical copy known to you and every such document or writing which you can locate or discover by reasonably diligent efforts, including, but not limited to, documents now in the possession, custody or control of a defendant, its merged or acquired predecessors, its former and present directors, officers, counsel, agents, employees and/or persons acting on its behalf.

3. "AMCC" means the Amended Master Consolidated Complaint.

4. "AMP" or "Average Manufacturer Price" shall have the meaning set forth in 42 U.S.C. § 1396r-8(k)(1).

5. "Any" means one or more.

6. "ASP" means average sales price.

E-SERVED 03/31/04 06:55 PM ET MDL No. 1456

(g) The full name and address of each entity purchasing the AWPID (and, in addition, the full name and address of the parent company where the database or documents identify a subsidiary, corporate affiliate, division, satellite office, or warehouse).

26. For each of your AWPIDs, all documents that reflect the prices charged to, or terms of conditions of sale for, purchasers of the AWPID including, but not limited, to:

(a) The wholesale acquisition price or other published price of the AWPID or any generic equivalent;

(b) Payment terms;

(c) discounts, rebates, chargebacks or other adjustments offered to any class of purchaser;

(d) Prices and terms of sales for wholesale purchasers;

(e) Prices and/or discounts and/or rebates or other adjustments for chain pharmacy purchasers;

(f) Prices and/or discounts and/or rebates or other adjustments for hospital purchasers;

(g) Prices and/or discounts and/or rebates or other adjustments for managed care purchasers;

(h) Prices and/or discounts and/or rebates or other adjustments for pharmacy benefit managers;

(i) Prices and/or discounts and/or rebates or other adjustments for internet pharmacies;

(j) Prices and/or discounts and/or rebates or other adjustments for mail order purchasers; and

(k) Prices and/or discounts and/or rebates or other adjustments for any other purchaser class or subgroup.

27. For each of your AWPIDs, documents sufficient to show, in digital or computerized form, in chronological order:

(a) The date of each sales transaction;

(b) Every discount, rebate, and/or any other adjustment that any customer of D has received;

E-SERVED 03/31/04 06:55 PM ET AWP-MDL No. 1456

(c) The date each discount, rebate, and/or any other adjustment was given;

(d) The time period covered by each discount, rebate, and/or any other adjustment;

(e) Sales in units by National Drug Code sold, shipped, and/or returned by dosage form, strength, and package size;

(f) Sales in dollars by National Drug Code sold, shipped, and/or returned by dosage form, strength, and package size;

(g) Net sales in dollars for each sale;

(h) The name, address, account number, and all other identifying numbers or codes for the person or entity billed, invoices, and/or credited for the transaction; and

(i) The name, address, account number, and all other identifying numbers or codes for the person or entity to whom the product was shipped or from whom product returns were received.

28. For each of your AWPIDs, documents sufficient to identify:

(a) The published AWP;

(b) AMP;

(c) ASP;

(d) EAC;

(e) WAC;

(f) MAC;

(g) Earned margin (difference between AWP and actual product cost);

(h) Documents that indicate whether the AWP, ASP, AMP and Earned Margin include all rebates, chargebacks, discounts, allowances, credits, administrative fees, price/volume discounts and any other incentives provided to third parties.

(i) Documents summarizing all rebates, chargebacks, discounts, allowances, credits, administrative fees, price volume discounts or other incentives.

29. For each of your AWPIDs, all agreements for sale of the AWPID, whether or not those contracts are with customers who purchased the AWPID directly, including drafts, correspondence, and supporting detail and data (in computerized form where available).

E-SERVED 03/31/04 06:55 PM ET AWP MDL No. 1456

30. All documents concerning communications between you and IMS Health (or any similar entity providing pharmaceutical database information) concerning or relating to any of your AWPIDs.

31. For each of your AWPIDs, documents sufficient to estimate the number of patients taking the AWPID over each one year period.

32. For each of your AWPIDs, all documents concerning your actual, potential, or expected revenues and/or profits from the sale of that AWPID.

33. All documents concerning or relating to the actual or potential impact of the pricing or reimbursement of any drug on the quantity of any of your AWPIDs that have been or might be sold.

34. Documents sufficient to show your per-unit average total cost for each of your AWPIDs, and the components that make up that figure, including but not limited to raw materials, manufacturing, marketing, sales and packaging costs.

35. All documents concerning or relating to the difference between an AWP and any other price for any AWPID.

***Category 6: Inducements***

36. All documents describing any discount programs (including but not limited to volume discounts), rebates, incentives, or penalties for each AWPID.

37. All documents relating to the use or provision of free samples, educational grants, marketing grants, and payments for specific data gathering or other incentives relating to any AWPID.

38. All documents evidencing any "credit memos" or credit extended to hospitals, GPOs or other purchasers of AWPIDs, including but not limited to credit memos or credit issued via a wholesaler to a purchaser, and/or credit for the purpose of "returned goods."

39. All documents setting forth the circumstances in which credit against the purchase of AWPIDs was or could be given to any hospital, GPO, HMO, physician, wholesaler or other purchaser of AWPIDs.

40. All documents setting forth the circumstances in which credit against the purchase of AWPIDs was or could be given to any hospital, GPO, HMO, physician, wholesaler or other purchaser of AWPIDs.

41. All documents relating to or reflecting any payments you gave to providers relating to any AWPID. (Class A Only)

E-SERVED 03/31/04 06:55 PM ET AWP MDL No. 1456

6. Identify the source of each of the documents produced in response to plaintiffs' requests for the production of documents throughout this litigation by identifying the person(s) who possessed those documents, the job position of any such individuals, and the division and department where such documents were located. If you are unable to determine the individual(s) who possessed the documents, identify the department and division where they were/are located when produced.

DATED: March 31, 2004

By_______________________
Thomas M. Sobol (BBO # 471770)
Edward Notargiacomo (BBO #567636)
Hagens Berman LLP
225 Franklin Street, 26th Floor
Boston, MA 02110
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Samuel Heins
Brian Williams
Heins Mills & Olson, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692

Jeff Kodroff
John Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

**CHAIRS OF LEAD COUNSEL COMMITTEE**

# EXHIBIT C

E-SERVED 04/26/04 05:04 PM ET MDL No. 1456

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LIGITATION | MDL No. 1456<br>Civil Action No. 01-12257-PBS<br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | |

**RESPONSE OF SCHERING-PLOUGH CORPORATION AND WARRICK PHARMACEUTICALS CORPORATION TO PLAINTIFFS' OMNIBUS REQUESTS FOR PRODUCTION AND INTERROGATORIES**

Pursuant to Rules 26, 33, and 34 of the Federal Rules of Civil Procedure, and the Local Rules of the United States District Court for the District of Massachusetts, Defendants, Schering-Plough Corporation and Warrick Pharmaceuticals Corporation (collectively "Schering") by their undersigned counsel, hereby respond to Plaintiffs' Omnibus Requests for Production and Interrogatories (the "Omnibus Requests"; the "Requests") as follows:

**PRELIMINARY STATEMENT**

1. By responding to the Requests, Schering does not waive or intend to waive: (a) any objections as to the competency, relevancy, materiality, privilege or admissibility as evidence, for any purpose, of any documents or information produced in response to the Requests; (b) the right to object on any ground to the use of the documents or information produced in response to the Requests at any hearing or trial; (c) the right to object on any ground at any time to a demand for further responses to the Requests; or (d) the right at any time to revise, correct, add to, supplement, or clarify any of the responses contained herein.

E-SERVED 04/26/04 05:04 PM ET AWP-MDL No.1456

Request No. 26. For each of your AWPIDs, all documents that reflect the prices charged to, or terms of conditions of sale for, purchasers of the AWPID including, but not limited, to:

(a) The wholesale acquisition price or other published price of the AWPID or any generic equivalent;

(b) Payment terms;

(c) discounts, rebates, chargebacks or other adjustments offered to any class of purchaser;

(d) Prices and terms of sales for wholesale purchasers;

(e) Prices and/or discounts and/or rebates or other adjustments for chain pharmacy purchasers;

(f) Prices and/or discounts and/or rebates or other adjustments for hospital purchasers;

(g) Prices and/or discounts and/or rebates or other adjustments for managed care purchasers;

(h) Prices and/or discounts and/or rebates or other adjustments for pharmacy benefit managers;

(i) Prices and/or discounts and/or rebates or other adjustments for internet pharmacies;

(j) Prices and/or discounts and/or rebates or other adjustments for mail order purchasers; and

(k) Prices and/or discounts and/or rebates or other adjustments for any other purchaser class or subgroup.

Response to Request No. 26:

In addition to the General Objections set forth above, Schering objects to Request No. 26 on the grounds that it is overly broad and that responding to the Request as stated would be unduly burdensome. Specifically, Schering objects on the ground that the Request seeks documents relating to all pricing and sale conditions that fall within eleven categories for each of the Subject Drugs, and producing the requested data will be unnecessarily costly. Schering further objects to Request No. 26 on the ground that the terms "adjustment" and "discount" are vague and ambiguous. Schering objects to Request No. 26 to the extent it calls for individualized data with respect to every purchase and sale of a drug. Subject to these

E-SERVED 04/26/04 05:04 PM ET AWP-MDL No.1456

objections, Schering will make available for inspection non-privileged electronic data containing the information called for in Request No. 26 for the Subject Drugs, to the extent that such data exist.

Request No. 27. For each of your AWPIDs, documents sufficient to show, in digital or computerized form, in chronological order:

(a) The date of each sales transaction;

(b) Every discount, rebate, and/or any other adjustment that any customer of D has received;

(c) The date each discount, rebate, and/or any other adjustment was given;

(d) The time period covered by each discount, rebate, and/or any other adjustment;

(e) Sales in units by National Drug Code sold, shipped, and/or returned by dosage form, strength, and package size;

(f) Sales in dollars by National Drug Code sold, shipped, and/or returned by dosage form, strength, and package size;

(g) Net sales in dollars for each sale;

(h) The name, address, account number, and all other identifying numbers or codes for the person or entity billed, invoices, and/or credited for the transaction; and

(i) The name, address, account number, and all other identifying numbers or codes for the person or entity to whom the product was shipped or from whom product returns were received.

Response to Request No. 27:

In addition to the General Objections set forth above, Schering objects to Request No. 27 on the grounds that it is overly broad and that responding to the Request as stated would be unduly burdensome. Specifically, Schering objects on the ground that the Request seeks documents relating to all pricing and sale conditions that fall within nine categories for each of the Subject Drugs, and producing the requested data will be unnecessarily costly. Schering further objects to Request No. 27 on the ground that the terms "customer of D," "adjustment," and "discount" are vague and ambiguous. Schering objects to Request No. 27 to the extent it calls for individualized data with respect to every purchase and sale of a drug. Subject to these objections, Schering will make available for inspection non-privileged electronic data containing

E-SERVED 04/26/04 05:04 PM ET AWP-MDL No. 1456

the information called for in Request No. 27 for the Subject Drugs, to the extent that such data exist.

Request No. 28. For each of your AWPIDs, documents sufficient to identify:

(a) The published AWP;

(b) AMP;

(c) ASP;

(d) EAC;

(e) WAC;

(f) MAC;

(g) Earned margin (difference between AWP and actual product cost);

(h) Documents that indicate whether the AWP, ASP, AMP and Earned Margin include all rebates, chargebacks, discounts, allowances, credits, administrative fees, price/volume discounts and any other incentives provided to third parties.

(i) Documents summarizing all rebates, chargebacks, discounts, allowances, credits, administrative fees, price volume discounts or other incentives.

Response to Request No. 28:

In addition to the General Objections set forth above, Schering objects to Request No. 28 on the grounds that it is overly broad and that responding to the Request as stated would be unduly burdensome. Schering further objects to Request No. 28 on the ground that documents concerning AMP are irrelevant and unlikely to lead to the discovery of admissible evidence. Schering further objects to Request No. 28 on the ground that the terms "ASP," "EAC," "MAC," "earned margin," "discount," "incentives," and "allowances" are vague and ambiguous. Subject to these objections, Schering will make available for inspection non-privileged electronic data containing the information called for in Request No. 28 for the Subject Drugs, to the extent that such data exist.

Request No. 29. For each of your AWPIDs, all agreements for sale of the AWPID, whether or not those contracts are with customers who purchased the AWPID directly, including drafts, correspondence, and supporting detail and data (in computerized form where available).

ESERVED
04/26/04
05:04 PM ET
AWP-MDL No.1456

documents concerning" various documents. Schering also objects to Request No. 32 to the extent it calls for documents concerning Schering's revenues and profits on the ground that those documents are not relevant and are not likely to lead to the discovery of admissible evidence.

Request No. 33. All documents concerning or relating to the actual or potential impact of the pricing or reimbursement of any drug on the quantity of any of your AWPIDs that have been or might be sold.

Response to Request No. 33:

In addition to the General Objections set forth above, Schering objects to Request No. 33 on the ground that it is vague and ambiguous. Specifically, Schering objects to Request No. 33 on the ground that the term "actual or potential impact" is vague and ambiguous. Subject to these objections, Schering will make available for inspection non-privileged documents responsive to Request No. 33 for the Subject Drugs, if any such documents exist.

Request No. 34. Documents sufficient to show your per-unit average total cost for each of your AWPIDs, and the components that make up that figure, including but not limited to raw materials, manufacturing, marketing, sales and packaging costs.

Response to Request No. 34:

In addition to the General Objections set forth above, Schering objects to Request No. 34 to the extent it calls for documents concerning Schering's per-unit average total cost and the components that make up that figure on the ground that those documents are not relevant and are not likely to lead to the discovery of admissible evidence.

Request No. 35. All documents concerning or relating to the difference between an AWP and any other price for any AWPID.

Response to Request No. 35:

Subject to the General Objections set forth above, Schering will make available for inspection non-privileged documents responsive to Request No. 35 for the Subject Drugs, if any such documents exist.

Request No. 36. All documents describing any discount programs (including but not limited to volume discounts), rebates, incentives, or penalties for each AWPID.

Response to Request No. 36:

In addition to the General Objections set forth above, Schering objects to Request No. 36 on the grounds that it is overly broad and that responding to the Request as stated would be unduly burdensome. Specifically, Schering objects to Request No. 36 to the extent it seeks "all

E-SERVED 04/26/04 05:04 PM ET AWP-MDL-No.1456

documents describing" various practices. Schering also objects to Request No. 36 on the ground that the terms "discount programs," "incentives" and "penalties" are vague and ambiguous. Subject to these objections, Schering will make available for inspection non-privileged documents sufficient to identify all volume discounts and rebates for the Subject Drugs.

<u>Request No. 37.</u> All documents relating to the use or provision of free samples, educational grants, marketing grants, and payments for specific data gathering or other incentives relating to any AWPID.

<u>Response to Request No. 37</u>:

In addition to the General Objections set forth above, Schering objects to Request No. 37 on the grounds that it is overly broad and that responding to the Request as stated would be unduly burdensome. Specifically, Schering objects to Request No. 37 to the extent it seeks "all documents relating to" various practices. Schering also objects to Request No. 37 to the extent it calls for all documents relating to "free samples," "educational grants," "marketing grants," and "payments for specific data gathering" on the grounds that it would be unduly burdensome to collect those documents and those documents are not relevant and are not likely to lead to the discovery of admissible evidence. Schering further objects to the term "incentives" on the ground that it is vague and ambiguous. Subject to these objections, Schering will make available for inspection non-privileged documents sufficient to identify all educational grants, marketing grants, and payments for data gathering for the Subject Drugs.

<u>Request No. 38.</u> All documents evidencing any "credit memos" or credit extended to hospitals, GPOs or other purchasers of AWPIDs, including but not limited to credit memos or credit issued via a wholesaler to a purchaser, and/or credit for the purpose of "returned goods."

<u>Response to Request No. 38</u>:

In addition to the General Objections set forth above, Schering objects to Request No. 38 on the ground that it calls for the production of documents that are irrelevant and unlikely to lead to the discovery of admissible evidence. Schering further objects to Request No. 38 on the grounds that responding to Request No. 38 as stated would be unduly burdensome.

<u>Request No. 39.</u> All documents setting forth the circumstances in which credit against the purchase of AWPIDs was or could be given to any hospital, GPO, HMO, physician, wholesaler or other purchaser of AWPIDs.

ESERVED 04/26/04 05:04 PM ET AWP-MDL NO.1456

Response to Request No. 39:

In addition to the General Objections set forth above, Schering objects to Request No. 39 on the ground that it calls for the production of documents that are irrelevant and unlikely to lead to the discovery of admissible evidence. Schering further objects to Request No. 39 on the grounds that responding to Request No. 39 as stated would be unduly burdensome.

Request No. 40. All documents setting forth the circumstances in which credit against the purchase of AWPIDs was or could be given to any hospital, GPO, HMO, physician, wholesaler or other purchaser of AWPIDs.

Response to Request No. 40:

In addition to the General Objections set forth above, Schering objects to Request No. 40 on the ground that it calls for the production of documents that are irrelevant and unlikely to lead to the discovery of admissible evidence. Schering further objects to Request No. 40 on the grounds that responding to Request No. 40 would be unduly burdensome.

Request No. 41. All documents relating to or reflecting any payments you gave to providers relating to any AWPID. (Class A Only)

Response to Request No. 41:

In addition to the General Objections set forth above, Schering objects to Request No. 41 on the grounds that it is overly broad and that responding to Request No. 41 as stated would be unduly burdensome. Specifically, Schering objects to Request No. 41 to the extent it seeks "all documents relating to or reflecting any payments [made] to providers . . . ." Subject to these objections, Schering will make available for inspection non-privileged documents responsive to Request No. 41 for the Class A Subject Drugs, if any such documents exist.

Request No. 42. All documents evidencing any chargebacks with respect to the sale of an AWPID.

Response to Request No. 42:

Subject to these objections, Schering will make available for inspection non-privileged electronic data containing the information called for in Request No. 42 for the Subject Drugs, to the extent that such data exist.

E-SERVED
04/26/04
05:04 PM ET
AWP-MDL No.1456

SCHERING-PLOUGH CORP. and
WARRICK PHARMACEUTICALS CORP.
By their attorneys,

John T. Montgomery (BBO#352220)
Brien T. O'Connor (BBO#546767)
Crystal D. Talley (BBO#633759)
John R. Therien (BBO#651185)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated: April 26, 2004

# EXHIBIT D

LexisNexis File & Serve
12235714
E-SERVICE
Aug 30 2006
8:08PM

STEVE W. BERMAN
DIRECT • (206) 224-9320
STEVE@HBSSLAW.COM

HAGENS BERMAN
SOBOL SHAPIRO LLP

August 30, 2006

Mr. John T. Montgomery
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

Re: <u>AWP Pharmaceutical Litigation</u>
MDL 1456

Dear John:

Plaintiffs have served both document requests and discovery on SPW designed to contest the production of information that would reveal discounts, inducement, kickbacks and the like for each of the Subject Drugs. We have searched through our documents, indexes, and your production, and do not see the production of documents bearing on the following:

> (3) **SCHERING** overcharged . . ., (4) **SCHERING** induced physicians to start patients on Intron-A for Hepatitis C by paying them remuneration through three marketing programs (5) **SCHERING** induced physicians to use Temodar for certain patients with brain tumors and brain metastases and to use Intron-A for certain patients with superficial bladder cancer through improper preceptorships, sham advisory boards, lavish entertainment, and improper placement of clinical trials. . .

According to the *Wall Street Journal*, these inducements included paying doctors up to $500 to start patients on Temodar and Intron-A.

Please identify by Bates number where responsive documents on these subjects were produced in the MDL.

Sincerely,

HAGENS BERMAN SOBOL SHAPIRO LLP

**/s/ Steve W. Berman**

Steve W. Berman

SWB:SLA
cc: Via Lexis on all Counsel

# EXHIBIT E

ROPES & GRAY

ROPES & GRAY LLP
ONE INTERNATIONAL PLACE BOSTON, MA 02110-2624 617-951-7000 F 617-951-7050
BOSTON NEW YORK PALO ALTO SAN FRANCISCO WASHINGTON, DC www.ropesgray.com

RECEIVED
SEP 11 2006
HAGENS BERMAN LLP

September 8, 2006

Adam Wright
(617) 951-7956
awright@ropesgray.com

**BY FEDERAL EXPRESS**

Steve W. Berman, Esq.
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Re: *In re Pharmaceutical Industry Average Wholesale Price Litigation,* MDL 1456

Dear Steve:

I write on behalf of Schering-Plough Corporation in response to your letter to John T. Montgomery dated August 30, 2006, your letter to all defense counsel dated August 31, 2006, and Plaintiffs' Notice of Rule 30(b)(6) Deposition to Schering-Plough and to Schering Sales served on August 30, 2006.

These several items address the Settlement Agreement and Release ("Settlement") between Schering and the federal government that was announced on August 29, 2006. The Settlement did not involve AWP issues, but you suggest that the Settlement calls into question whether Schering has produced in this action documents that should have been produced relating to Intron A and Temodar. Please be assured that all documents that should have been produced have been produced.

We are – and always have been – mindful of our obligations under Fed. R. Civ. P. 26(e)(2), as well as our general obligations under the discovery rules and the orders of this Court. In the past, whenever we have had reason to believe that discovery responses should be supplemented, we have supplemented them, and the same would be true if a need for supplementation were to arise in the future. Prior to receiving your correspondence, we did not have reason to believe that a need for supplementation existed in this action, nor had Plaintiffs suggested that one existed. Nevertheless, we have conducted a review of our document production in light of your recently expressed concerns regarding Intron A and Temodar.

Based on this review, we have found no reason to supplement our discovery responses. For example, your expressed concern that Intron A was part of the ReCAP program is misplaced. The ReCAP Program, which is the Rebetron Combination Therapy Compliance Assessment Program, involved Rebetron, which is not – and has never been – a subject drug in this case.

Nowhere in the section describing ReCAP in the Settlement Agreement – page 6, paragraph (v) – is Intron A mentioned. In light of this apparent misunderstanding, we have attached, for your review, the publicly released version of the Settlement Agreement.

As for Plaintiffs' Notice of Rule 30(b)(6) Deposition, we respectfully remind you that discovery has been closed by order of the Court for more than a year. Trial is scheduled to begin in two months. Schering and Warrick, during a discovery period that lasted almost three years, produced numerous deponents, including deponents pursuant to Fed. R. Civ. P. 30(b)(6), in response to numerous requests from Plaintiffs. Under such circumstances, additional discovery is both inappropriate and unnecessary.

Should you wish to conduct such further discovery, we suggest that you file a motion with the Court requesting leave to do so. Should you wish to discuss any of the foregoing, we would be pleased to speak with you at your earliest convenience.

Very truly yours,

Adam Wright

Enclosure

cc: John T. Montgomery, Esq.
All Counsel of Record via Lexis File & Serve

# EXHIBIT F

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MDL Docket No. 01CV12257-PBS

- - - - - - - - - - - - - - - - - - - x

IN RE:

PHARMACEUTICAL INDUSTRY AVERAGE

WHOLESALE PRICE LITIGATION

- - - - - - - - - - - - - - - - - - - x

SCHEDULED DEPOSITION OF

SCHERING-PLOUGH AND SCHERING SALES

Wednesday, September 13, 2006

9:30 a.m.

Hagens Berman Sobol Shapiro LLP

One Main Street

Cambridge, Massachusetts

Reporter: Lisa A. Moreira, RMR/CRR



d65a9c4d-2b34-467e-8f8a-f7c9fad2a079

APPEARANCES

HAGENS BERMAN SOBOL SHAPIRO LLP
(BY: HUGH E. McNEELY, ESQ.)
One Main Street, 4th Floor
Cambridge, MA 02142
(617)475-1961
hugh@hbsslaw.com
Counsel for class plaintiffs

No one appeared on behalf of the Schering entities



INDEX

THE WITNESS:
SCHERING-PLOUGH AND SCHERING SALES PAGE
(By Mr. McNeely)........................... 004

EXHIBITS

NUMBER DESCRIPTION PAGE
Exhibit Schering-Plough 30(b)(6) 001
Notice of deposition.......................... 004
Exhibit Schering-Plough 30(b)(6) 002
Letter from Adam Wright to Steve Berman.........005
Exhibit Schering-Plough 30(b)(6) 003
Settlement agreement and release.............. 005
Exhibit Schering-Plough 30(b)(6) 004
Information.................................. 005
Exhibit Schering-Plough 30(b)(6) 005
Letter to Brien T. O'Connor, 8/24/06.......... 006
Exhibit Schering-Plough 30(b)(6) 006
Letter to Brien T. O'Connor, 8/24/06.......... 006
Exhibit Schering-Plough 30(b)(6) 007
Addendum to corporate integrity agreement..... 007



PROCEEDINGS

(Exhibit Schering-Plough 30(b)(6) 001 marked for identification)

MR. McNEELY: My name is Hugh McNeely, and I'm appearing on behalf of the plaintiffs in this matter. I'm going to introduce the notice of Rule 30(b)(6) deposition to defendants Schering-Plough and Schering Sales, which has been marked as Exhibit Schering-Plough 30(b)(6) 001, calling for a 30(b)(6) deposition for today beginning at 9:30 a.m., and no witness has been produced.

The only correspondence that has been received from counsel for Schering-Plough Corporation is from one Adam Wright with the law firm of Ropes & Gray. Attached to his letter is a copy of the settlement agreement and release between Schering-Plough Corporation and the U.S. Attorneys office here in the District of Massachusetts and the Office of Inspector General of the United States as well as the Department of Health and Human Services. There are other parties to this document, but I am introducing the letter from Mr. Wright as Exhibit



Schering-Plough 30(b)(6) 002 and the settlement agreement and release as Exhibit Schering-Plough 30(b)(6) 003.

(Exhibit Schering-Plough 30(b)(6) 002 and Exhibit Schering-Plough 30(b)(6) 003 marked for identification)

MR. McNEELY: The purpose of this 30(b)(6) deposition was to examine the witness regarding the recent announcement of the settlement by Schering-Plough and also the announced guilty plea or agreement to plea to one count of conspiracy by Schering Sales Corporation to violate 18 USC Section 1001. Exhibit A to the notice requested the existence of any program plan or conduct involving payments to doctors who started patients on Intron-A and/or Temodar. Also, there are five other categories of documents requested, including those documents that were presented to the U.S. Attorney in connection with the announced settlement and guilty plea.

(Exhibit Schering-Plough 30(b)(6) 004 marked for identification)





d65a9c4d-2b34-467e-8f8a-f7c9fad2a079

MR. McNEELY: Also as exhibits to this statement has been marked Exhibit Schering-Plough 30(b)(6) 004, which is the information filed by the U.S. Attorneys office in the United States District Court, District of Massachusetts. It's with a criminal docket number 06 CR 10250 PBS, which is an information, and again it's been marked Exhibit Schering-Plough 30(b)(6) 004.

(Exhibit Schering-Plough 30(b)(6) 005 marked for identification)

MR. McNEELY: Also attached to this statement is a letter from the United States Department of Justice to the attorney for Schering-Plough Corporation with regards to the agreements and the entry of the plea agreement that is scheduled to take place next Wednesday, September the 20th in the afternoon. That letter is marked as Exhibit Schering-Plough 30(b)(6) 005.

(Exhibit Schering-Plough 30(b)(6) 006 marked for identification)

MR. McNEELY: Also what has been marked as Exhibit Schering-Plough 30(b)(6) 006 is a side



letter agreement with Schering-Plough Corporation. It is a four-page -- excuse me, five-page document that has been executed by both the U.S. Department of Justice and acknowledged by Thomas J. Sabatino, executor, vice president and general counsel for the Schering- Plough Corporation.

(Exhibit Schering-Plough 30(b)(6) 007 marked for identification)

MR. McNEELY: And finally, the document that has been marked as Exhibit Schering-Plough 30(b)(6) 007 is an addendum to corporate integrity agreement between the Office of Inspector General of the Department of Health and Human Services and Schering-Plough Corporation.

I will note for the record that Exhibit Schering-Plough 30(b)(6) 004, Exhibit Schering-Plough 30(b)(6) 005, Exhibit Schering-Plough 30(b)(6) 006 and Exhibit Schering-Plough 30(b)(6) 007 are documents that are publicly available from the court filings here in the District of Massachusetts.

At this time, which is 9:47 a.m., no 30(b)(6) witness has been produced by the Schering-



Plough Corporation or Schering Sales and this morning's proceedings are concluded.

(Whereupon the deposition was suspended at 9:47 a.m.)



C E R T I F I C A T E

I, Lisa A. Moreira, Registered Diplomate Reporter, Certified Real-Time Reporter, CSR No. 146299 and Notary Public, do hereby certify that the foregoing transcript, Volume I, is a true and accurate transcription of my stenographic notes taken on September 13, 2006.

____________________________

Lisa A. Moreira
Registered Diplomate Reporter
Certified Real-Time Reporter
CSR No. 146299
Notary Public
My commission expires
December 25, 2009