Exhibit H

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                  )
IN RE PHARMACEUTICAL INDUSTRY     )
AVERAGE WHOLESALE PRICE           )   M.D.L. No. 1456
LITIGATION                        )
_____  )   CIV. ACTION NO. 01-12257-PBS
                                  )
THIS DOCUMENT RELATES TO:         )
ALL ACTIONS                       )
_____  )
```

**CONSOLIDATED ORDER RE: MOTION FOR CLASS CERTIFICATION**

January 30, 2006

Saris, U.S.D.J.

Pursuant to Fed. R. Civ. P. 23, plaintiffs have moved for an
order certifying a class in this action. After considering the
submissions of the parties and the record in this case, and after
hearing on January 19, 2006, I order that plaintiffs' motion for
class certification is **ALLOWED IN PART and DENIED IN PART** as to
the claims asserted in the Third Amended Master Consolidated
Class Action Complaint ("TAMCCAC"). The Court relies on the
reasons stated in court and in In re Pharm. Indus. Average
Wholesale Price Litig., 230 F.R.D. 61 (D. Mass. 2005). The
classes are certified as follows:

**I. CLASSES AND SUBCLASSES CERTIFIED**

**A. Class 1: Medicare Part B Co-Payment Class**

1. Class Definition:

All natural persons nationwide who made, or who

incurred an obligation enforceable at the time of judgment to make, a co-payment based on AWP for a Medicare Part B covered Subject Drug[1] that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.), the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.), SmithKline Beecham Corporation d/b/a GlaxoSmithKline, or the Johnson & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.). Excluded from the Class are those who made flat co-payments, who were reimbursed fully for any co-payments, or who have the right to be fully reimbursed; and the residents of the states of Alabama, Alaska, Georgia, Iowa, Kentucky, Louisiana, Mississippi, Montana, and Virginia (where consumer protection statutes do not permit class actions).

2. The Court certifies four Subclasses corresponding to each of the defendant groups.

3. The Court certifies the following plaintiffs as representatives of these Subclasses pursuant to Fed. R. Civ. P. 23(b)(3). Leroy Townsend (AstraZeneca); David and Susan Ruth Aaronson (GlaxoSmithKline, the BMS Group); Joyce Howe, individually and on behalf of the Estate of Robert Howe (AstraZeneca); James and Teresa Shepley (the Johnson & Johnson Group); Larry Young, individually and on behalf of the Estate of

---

[1] The Subject Drugs are identified in the Table of Subject Drugs found at the end of this Order. Defendants recently raised the issue that some drugs were improperly included. After conferring, the parties may move to strike drugs included in error.

2

Patricia Young (the Johnson & Johnson Group). The representative
of a Subclass need only have paid for one of the Subject Drugs
manufactured or marketed by a defendant group. I decline to
certify a class of persons who made co-payments for drugs
manufactured by the Schering Plough Group (Schering-Plough
Corporation and Warrick Pharmaceuticals Corporation) because
plaintiffs have not proposed any adequate and typical
representatives of that proposed subclass.

4.   The consumer protection act of each state shall apply to
these Subclasses. Specifically, the Medicare Part B Co-payment
Class is certified for claims under the following statutes:
(a) Ariz. Rev. Stat. § 44-1522, et seq.; (b) Ark. Code § 4-88-
101, et seq.; (c) Cal. Bus. & Prof. Code §§ 17200, et seq., 1770;
(d) Colo. Rev. Stat. § 6-1-105, et seq.; (e) Conn. Gen. Stat.
§ 42-110b, et seq.; (f) 6 Del. Code § 2511, et seq.; (g) D.C.
Code § 28-3901, et seq.; (h) Fla. Stat. § 501.201, et seq.;
(i) Haw. Rev. Stat. § 480, et seq.; (j) Idaho Code § 48-601, et
seq.; (k) 815 ILCS § 505/1, et seq.; (l) Ind. Code Ann. § 24-5-
0.5.1, et seq.; (m) Kan. Stat. § 50-623, et seq.; (n) Md. Com.
Law Code § 13-101, et seq.; (o) Mass. Gen. L. Ch. 93A, et seq.;
(p) Mich. Stat. § 445.901, et seq.; (q) Minn. Stat. § 325F.67, et
seq.; (r) Mo. Rev. Stat. § 407.010, et seq.; (s) Neb. Rev. Stat.
§ 59-1601, et seq.; (t) Nev. Rev. Stat. § 598.0903, et seq.;

3

(u) N.H. Rev. Stat. § 358-A:1, *et seq.*; (v) N.J. Stat. Ann. § 56:8-1, *et seq.*; (w) N.M. Stat. Ann. § 57-12-1, *et seq.*; (x) N.Y. Gen. Bus. Law § 349, *et seq.*; (y) N.C. Gen. Stat. § 75-1.1, *et seq.*; (z) N.D. Cent. Code § 51-15-01, *et seq.*; (aa) Ohio Rev. Stat. § 1345.01, *et seq.*; (bb) Okla. Stat. tit. 15 § 751, *et seq.*; (cc) Or. Rev. Stat. § 646.605, *et seq.*; (dd) 73 Pa. Stat. § 201-1, *et seq.*; (ee) R.I. Gen. Laws. § 6-13.1-1, *et seq.*; (ff) S.C. Code Laws § 39-5-10, *et seq.*; (gg) S.D. Code Laws § 37-24-1, *et seq.*; (hh) Tenn. Code § 47-18-101, *et seq.*; (ii) Tex. Bus. & Com. Code § 17.41, *et seq.*; (jj) Utah Code Ann. § 13-1 1-1, *et seq.*; (kk) Vt. Stat. Ann. tit. 9, § 245 1, *et seq.*; (ll) Wash. Rev. Code § 19.86.010, *et seq.*; (mm) W. Va. Code § 46A-6-101, *et seq.*; (nn) Wis. Stat. § 100.18, *et seq.*; and (oo) Wyo. Stat. § 40-12-100, *et seq.* Plaintiffs allege that they have complied with the notice provisions of all consumer protection acts requiring such notice.

5. This Class is certified pursuant to Fed. R. Civ. P. 23(b)(3).

## B. Class 2: Third-Party Payor MediGap Supplemental Insurance Class

1. Class Definition:

All Third-Party Payors who made reimbursements for drugs purchased in Massachusetts, or who made reimbursements for drugs and have their principal place of business in Massachusetts, based on AWP

4

for a Medicare Part B covered Subject Drug that was manufactured by AstraZeneca (AstraZeneca, PLC, Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S.), the BMS Group (Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp., and Apothecon, Inc.), SmithKline Beecham Corporation d/b/a GlaxoSmithKline, the Johnson & Johnson Group (Johnson & Johnson, Centocor, Inc., Ortho Biotech, McNeil-PPC, Inc., and Janssen Pharmaceutica Products, L.P.), or the Schering Plough Group (Schering-Plough Corporation and Warrick Pharmaceuticals Corporation).

2. The Court certifies five Subclasses corresponding to each of the defendant groups.

3. The Court certifies plaintiffs Blue Cross/Blue Shield of Massachusetts and Sheet Metal Workers National Health Fund as the representatives for this Class.

4. The claims for this Class are certified under Mass. Gen. Laws ch. 93A.

5. This Class is certified pursuant to Fed. R. Civ. P. 23(b)(3).

## C. **Class 3: Consumer and Third-Party Payor Class for Medicare Part B Drugs Outside of the Medicare Context.**

1. Class Definition:

All natural persons who made or who incurred an obligation enforceable at the time of judgment to make a payment for purchases in Massachusetts, all Third-Party Payors who made reimbursements based on contracts expressly using AWP as a pricing standard for purchases in Massachusetts, and all Third-Party Payors who made reimbursements based on contracts expressly using AWP as a pricing standard and have their principal place of

5

>           business in Massachusetts, for a
>           physician-administered Subject Drug that was
>           manufactured by AstraZeneca (AstraZeneca, PLC,
>           Zeneca, Inc., AstraZeneca Pharmaceuticals L.P.,
>           and AstraZeneca U.S.), the BMS Group (Bristol-
>           Myers Squibb Co., Oncology Therapeutics Network
>           Corp., and Apothecon, Inc.), SmithKline Beecham
>           Corporation d/b/a GlaxoSmithKline, the Johnson &
>           Johnson Group (Johnson & Johnson, Centocor, Inc.,
>           Ortho Biotech, McNeil-PPC, Inc., and Janssen
>           Pharmaceutica Products, L.P.), or the Schering
>           Plough Group (Schering-Plough Corporation and
>           Warrick Pharmaceuticals Corporation). Included
>           within this Class are natural persons who paid
>           coinsurance (*i.e.*, co-payments proportional to the
>           reimbursed amount) for a Subject Drug purchased in
>           Massachusetts, where such coinsurance was based
>           upon use of AWP as a pricing standard. Excluded
>           from this Class are any payments or reimbursements
>           for generic drugs that are based on MAC and not
>           AWP.

2.    The Court certifies five Subclasses corresponding to
each of the defendant groups.

3.    The Court certifies plaintiff Pipefitters Local 537
Trust Funds and Blue Cross/Blue Shield of Massachusetts as the
representatives for this Class pursuant to Fed. R. Civ. P.
23(b)(2) and 23(b)(3). The Court also certifies Health Care For
All as the representative for this Class pursuant to Fed R. Civ.
P. 23(b)(2).

4.    The claims for this Class are certified under Mass. Gen.
Laws ch. 93A.

## II. CLASSES NOT CERTIFIED

1.    With respect to Class 2, plaintiffs have not submitted

6

an adequate analysis of the feasibility of a nationwide class of Third-Party Payors. Therefore, the Court declines at this time to certify this Class under the consumer protection laws of states other than Massachusetts. However, this denial is without prejudice.

2. With respect to Class 3, the Court declines at this time to certify this Class under the consumer protection laws of states other than Massachusetts. However, this denial is without prejudice.

3. The Court declines to certify a class of persons or Third-Party Payors who made payments or reimbursements for self-administered drugs not appearing in the appended Table of Subject Drugs. This denial is with prejudice.

### III. **MISCELLANEOUS**

1. The Class Period for Class 1 and Class 2 is January 1, 1991 to January 1, 2005. The class period for Class 3 is January 1, 1991 to the present.

2. Excluded from these Classes are: any subsidiaries or affiliates of defendants; the officers and directors of defendants during the Class Period; members of defendants' immediate families; any person, firm, trust, corporation, officer, director, or any individual or entity in which any defendant has a controlling interest or which is related to, or

7

affiliated with, any defendant; the legal representatives,
agents, affiliates, heirs, successors-in-interest, or assigns of
any such excluded parties and governmental entities.

3. Pursuant to Fed. R. Civ. P. 23(g), the Court appoints
the following firms as Co-Lead Counsel: Hagens Berman Sobol
Shapiro LLP; Spector Roseman & Kodroff, P.C.; Hoffman & Edelson;
The Wexler Firm; and Kline & Specter.

4. The "Together Rx" claims are not certified because they
are dismissed without prejudice by the filing of the TAMCCAC.

5. The Court retains the discretion under Rule 23 to modify
this Order. Modifications may include adding new class
representatives, striking existing class representatives, and
striking drugs from the Table of Subject Drugs.

6. The Court declines to certify issues for an
interlocutory appeal pursuant to 28 U.S.C. § 1292(b) or to
recommend appeal pursuant to Fed. R. Civ. P. 23(f).

PATTI B. SARIS
United States District Judge

8

Exhibit I

# THE | WEXLER | FIRM

One North LaSalle Street
Suite 2000
Chicago, Illinois 60602

T: (312) 346-2222   | F: (312) 346-0022 | www.wexlerfirm.com

## Facsimile Cover Sheet

To:     Eric P. Christofferson          Fax No.:     (617) 951-7050

From:  Kenneth A. Wexler

Date:   March 29, 2006

Re:     In re Pharmaceutical Industry Average Wholesale Price Litigation

Total Number of Pages Including Cover Page:     3

Remarks:     Please see attached correspondence

# THE | WEXLER | FIRM LLP

March 29, 2005

*<u>Via Facsimile</u>*

Eric P. Christofferson
Ropes & Gray LLP
One International Place
Boston, MA  02110

      Re:    *In re Pharmaceutical Industry Average Wholesale Price Litigation*
              *MDL No. 1456 (D. Mass.)*

Dear Eric:

I am writing in response to certain questions you raised regarding the SMW+ document production. My understanding is as follows:.

- The redactions made to SMW 56611-56630 do not reflect any reimbursement information.

- The productions from SMW+ in response to your Request Nos. 8 and 10 are complete with respect to pricing and reimbursement information.

- In reference to your Requests Nos. 14 and 16, SMW+ does not have studies of how much it pays for prescription drugs.

Please call with any questions.

Very truly yours,

Kenneth A. Wexler

KAW:dmg

Exhibit J



LEXISNEXIS' FILE & SERVE
12366333
E-SERVICE
Sep 14 2006
2:22PM

ROPES & GRAY LLP

ONE INTERNATIONAL PLACE    BOSTON. MA 02110-2624    617-951-7000    F 617-951-7050

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

September 14 2006

Eric P. Christofferson
617-951-7976
Eric.Christofferson@ropesgray.com

**BY FEDERAL EXPRESS**

Kenneth A. Wexler, Esq.
Wexler Toriseva Wallace LLP
One North LaSalle Street
Suite 2000
Chicago, IL 60602

Re:    *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL 1456

Dear Ken:

In preparation for trial, we have noted that Plaintiffs have not produced documents relating to Sheet Metal Workers' National Health Fund ("SMW") plans covering active workers.  In particular, we have not received documents concerning any coverage of prescription drugs, any contracts with pharmaceutical benefit managers or other entities relating to prescription drug benefits, or any information disclosing the reimbursement rates for pharmaceuticals covered under such plans.  These documents are responsive to the document request served on December 13, 2005.

Although we did not previously focus on these particular documents, their production is necessary to our preparation for trial.  Please produce them promptly.  If you would like to discuss the foregoing, I would be pleased to speak with you at your earliest convenience.

Best regards,

Eric P. Christofferson

EPC:djb

10195854_1

ROPES & GRAY LLP

Kenneth A. Wexler, Esq.                - 2 -                September 14 2006

cc:    Steve W. Berman, Esq.
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue
Suite 2900
Seattle, WA 98101

All Counsel of Record (via Lexis File and Serve)

Exhibit K

# WEXLER | TORISEVA | WALLACE

*A Limited Liability Partnership*

Chicago Office:
One N. LaSalle Street
Suite 2000
Chicago, Illinois 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

## FACSIMILE TRANSMISSION SHEET

| | | | |
|---|---|---|---|
| Date: | September 18, 2006 | From: | Jennifer Fountain Connolly |
| To: | Eric P. Christofferson | Fax No: | (617) 951-7050 |

Number of Pages, Including Cover: 2          Originals to Follow: No

Re:  **In re: Pharmaceutical Industry Average Wholesale Price Litigation
     MDL 1456 (D. Mass)**

COMMENTS:

Please see attached.

# W E X L E R | T O R I S E V A | W A L L A C E

Limited Liability Partnership
Chicago, IL  •  Wheeling, WV  •  Sacramento, CA

September 18, 2006

*__Via Facsimile__*

Eric P. Christofferson
Ropes & Gray
One International Place
Boston, MA 02110-2624

Re:    *In re: Pharmaceutical Industry Average Wholesale Price Litigation*
       MDL 1456 (D. Mass.)

Dear Eric:

I write in response to your September 14 letter to Ken Wexler.

As we discussed on Friday, setting aside the highly attenuated nature of Defendants' Requests, Track 1 discovery ended months ago. Moreover, under CMO No. 19, the deadline for Sheet Metals' document production was March 1, 2006, over six months ago. Defendants specifically agreed to these deadlines.

Therefore, Sheet Metals will not produce any documents in response to your recent request.

Very truly yours,

Jennifer Fountain Connolly

JFC:mls

cc:    All counsel of record (via Lexis-Nexis File & Serve)

Exhibit L

# Sheet Metal Workers' National Health Fund



## Consultant's Annual Experience

## and Statistical Report

## Year Ended December 31, 2004

CONFIDENTIAL
SMW 56631

4

**EXHIBIT 1**
(Continued)

|  |  |
|---|---|
| | The plan was amended to require that a participant be available for work in order to continue coverage under the plan through the use of hour bank hours or the remittance of self-contributions. |
| January 1, 1999 | The trustees voted to terminate the life and AD&D insurance policy and self fund these benefits. |
| | The plan was amended to comply with the Women's Health and Cancer Rights Act of 1998. |
| | Provisions were adopted to allow participation in the plan by owner/operators. |
| | The subsidy agreements with the National Pension Fund and the Local Unions and Councils Pension Fund for those participating in the Supplemental Medicare Wraparound Plus program was changed. Under the agreements, participants were responsible for the cost in excess of the payments from the pension funds. |
| May 21, 1999 | The plan was amended to provide that a participant commencing employment for a non-signatory employer be immediately terminated from coverage. |
| July 1, 1999 | The trustees approved the use of Beech Street PPO for plan participants. The benefit percentage was increased from 80% to 100%, and the calendar year deductible waived for charges from PPO providers. |
| August 8, 1999 | The routine physical examination benefit was expanded to include dependent children, and to include charges for a pediatrician visiting a newborn in a nursery. |
| September 1, 1999 | The trustees approved an additional provision in order to continue coverage as a retiree. The provision required the retiree to have been continuously eligible for benefits under the fund for the 60 consecutive month period ending on the last day of the month preceding the month in which he became retired. |
| December 1, 1999 | The trustees approved special self-contribution rules for surviving spouses of deceased eligible employees. |

**CONFIDENTIAL**
**SMW 56638**

**EXHIBIT 1**
(Continued)

| February 11, 2000 | A prescription drug discount card with National Prescription Administrators was approved. |
| April 1, 2000 | Retiree self-payment categories were restructured and new rates implemented with the rate for those single and retired prior to October 1, 1990 increased from $195 to $205, and those single/couple retired post 10-1-90 increased from $250/$375 to $262/$393, respectively. |
| May 1, 2000 | The merger of Sheet Metal Workers Local Union No. 399, Charleston, South Carolina into the fund was approved.

COBRA rates were approved at $377.06 for months 1-18 (1-36 for dependents) and $565.59 for those disabled and eligible for months 19-29. |
| October 1, 2000 | Coverage for outpatient treatment of Alcohol and Drug Abuse/Addiction payable at 50% up to a lifetime maximum of $2,000 was added to the plan. |
| January 1, 2001 | The continuing eligibility requirement was increased from 100 hours to 125 hours. |
| April 1, 2001 | Changes were made to the schedule of benefits for early retirees, including the elimination of dental and vision benefits and other more nominal changes. |
| May 1, 2001 | COBRA rates were approved at $398.15 for months 1-18 (1-36 for dependents) and at $565.59 for those disabled and eligible for months 19-29. |
| May 22, 2001 | The Workers Assistance Program was approved for extension to all participants covered under the Plan A schedule of benefits.

The non-bargaining employees of YPS, YPS/FS, and YPS Mechanical were approved for participation in the plan.

Coverage was added to the plan when certain parameters were met for reduction mammoplasty and surgical procedures rendered in connection with any overweight condition. |

**CONFIDENTIAL**
**SMW 56639**

**EXHIBIT 1**
(Continued)

| | |
|---|---|
| July 27, 2001 | The non-bargaining employees of Mueller and Wilson, Incorporated were approved for participation in the plan.<br><br>The trustees approved the transfer of certain bank accounts from Firstar Bank to SunTrust Bank. |
| September 1, 2001 | The Plan A and Retiree schedules of benefits were amended as follows:<br><br>♦ The benefit payment percentage for covered PPO charges was reduced from 100% to 90%.<br><br>♦ The special $5,000 hospital expense benefit was eliminated from the plans.<br><br>♦ A maximum out-of-pocket expense of $2,000 per person and $4,000 per family was established for PPO charges.<br><br>♦ The maximum out-of-pocket expense for non-PPO charges was increased from $1,000 to $4,000 per person and from $2,000 to $8,000 per family.<br><br>♦ A calendar year deductible of $200 per person and $400 per family was established for PPO charges.<br><br>♦ The calendar year deductible for non-PPO charges was increased from $200 to $300 per person and from $400 to $600 per family. |
| January 1, 2002 | The plan was amended adding a separate schedule of benefits for optional employees eligible to enroll for Medicare benefits.<br><br>Hour bank provisions of the plan were amended eliminating the 160 hour threshold over which hours were credited. Under the amended provisions, hours worked in excess of 125 would be credited to the hour bank up to the maximum of 600 hours. |
| May 1, 2002 | COBRA rates were approved at $450.86 for months 1-18 (1-36 for dependents) and at $676.29 for those disabled and eligible for months 19-29. |

CONFIDENTIAL
SMW 56640

EXHIBIT 22

# SHEET METAL WORKERS' NATIONAL HEALTH FUND
## SUMMARY OF SCHEDULES OF BENEFITS

---

### SUMMARY OF BENEFIT SCHEDULES

### PLAN A

FOR LOCAL UNIONS NO. 5, NO. 67 AND NO. 399,
LOCAL UNION NO. 71 PRE-APPRENTICES AND COVERED EMPLOYEES OF ST.
LOUIS BLOWPIPE COMPANY

#### FOR ELIGIBLE EMPLOYEES ONLY

DEATH BENEFITS:
Eligible Employees ................................. $   10,000.00
Eligible Dependents ............................... $    2,500.00

ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS:
Eligible Employees - Principal Sum ................ $   10,000.00

WEEKLY ACCIDENT AND SICKNESS BENEFIT:
Weekly Benefit .................................... $      150.00
Maximum Benefit Period ............................         13 Weeks
   Benefits Commence on:
   1st day of Accidental Bodily Injury
   8th day for Illness

#### FOR ELIGIBLE EMPLOYEES AND THEIR ELIGIBLE DEPENDENTS

OUTPATIENT LABORATORY & X-RAY BENEFIT:
Maximum Payment per Covered Person per
   Calendar Year .................................. $      250.00
   (Routine Care Included)

ACCIDENT EXPENSE BENEFIT:
Maximum Payment per Covered Person per Accident ... $      300.00

ROUTINE PHYSICAL EXAMINATION BENEFIT:
Maximum Payment per Covered Person
   Per Calendar Year..............................$       200.00

MAJOR MEDICAL EXPENSE BENEFIT:
Calendar Year Deductible:
   For Charges Incurred with a Participating
      PPO Provider (Including a Participating NPA Pharmacy)

CONFIDENTIAL
SMW 56662

EXHIBIT 22
(Continued)

**FOR ELIGIBLE EMPLOYEES AND THEIR ELIGIBLE DEPENDENTS (Continued)**

|  |  |
|---|---|
| NPA Pharmacy) – | |
| Per Covered Person .......................... | $ 200.00 |
| Per Family of Covered Persons .............. | $ 400.00 |
| | |
| For Charges Incurred with a non-PPO | |
| Provider – | |
| Per Covered Person.......................... | $ 500.00 |
| Per Family of Covered Persons................ | $ 800.00 |

Payment Percentage:
  For Outpatient Treatment of Mental or
    Nervous Disorders ........................... 50%
  For Outpatient Treatment of Alcohol and
    Drug Abuse/Addiction Received from an
    Alcohol Treatment Facility.................... 50%
  For All Other Covered Medical Expenses:
    Charges Incurred with a Participating
      PPO Provider.............................. 90%
    Charges Incurred with a non-PPO
      Provider................................. 70%

Maximum Payment per Calendar Year for
  All Covered Medical Expenses Combined,
  Per Covered Person ........................... $ 200,000.00

Maximum Lifetime Payments:
  For Inpatient Treatment of Alcohol and
    Drug Abuse/Addiction......................... $ 10,000.00
  For Outpatient Treatment of Alcohol
    and Drug Abuse/Addiction Received
    from an Alcohol Treatment Facility............ $ 2,000.00
  For the Diagnosis or Treatment
    of Sleep Apnea and other Sleep Dis-
    Orders, Including Charges for the
    Rental or Purchase of a CPAP Machine.......... $ 2,000.00
  For Audiometry Testing and the
    Purchase and Fitting of Hearing Aids.......... $ 2,000.00
  For All Covered Medical Expenses Combined....... $ 1,000,000.00

Maximum Out-of-Pocket Expense,
  Excluding Calendar Year Deductible,
    Per Calendar Year:
    For Charges Incurred with a Participating
    PPO Provider –
      Per Covered Person.......................... $ 2,000.00
      Per Family of Covered Persons................ $ 4,000.00

CONFIDENTIAL
SMW 56663

EXHIBIT 22
(Continued)

| FOR ELIGIBLE EMPLOYEES AND THEIR ELIGIBLE DEPENDENTS (Continued) |
| --- |

Other Limitations:
  For Treatment Rendered by, or under the
    Supervision of, a Doctor of Chiropractic (D.C.M.) -
    Maximum Visits Per Calendar Year .............     20
    Maximum Payment Per Visit ................... $    25.00
  Daily Hospital Room and Board Limit ............  Semi-Private
                                                     Room Rate

  Intensive Care and Coronary Care
    Accommodations .............................  Actual Charge

DENTAL EXPENSE BENEFIT:
Payment Percentage ............................    80%

Maximum Calendar Year Payment
  Per Covered Person ........................... $   750.00

Maximum Lifetime Payment Per Covered Person
  for Orthodontia .............................. $   750.00

| PLAN B |
| --- |

**FOR SIDING AND DECKING WORKERS IN**
**LOCAL UNIONS NO. 7, 28, 40, 63, 80, 85, 263 AND 265**

| FOR ELIGIBLE EMPLOYEES ONLY |
| --- |

DEATH BENEFITS:
Eligible Employees ............................ $  10,000.00
Eligible Dependents ...........................    None

ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS:
Eligible Employees - Principal Sum .............. $  10,000.00

| FOR ELIGIBLE EMPLOYEES AND THEIR ELIGIBLE DEPENDENTS |
| --- |

OUTPATIENT LABORATORY & X-RAY BENEFIT:
Maximum Payment per Covered Person per
  Calendar Year................................. $   250.00
  (Routine Care Included)

CONFIDENTIAL
SMW 56664

EXHIBIT 22
(Continued)

## FOR ELIGIBLE EMPLOYEES AND THEIR DEPENDENTS (Continued)

ACCIDENT EXPENSE BENEFIT:
Maximum Payment per Covered Person per Accident.... $    300.00

ROUTINE PHYSICAL EXAMINATION BENEFIT:
Maximum Payment per Covered Person
   Per Calendar Year ............................. $    200.00

MAJOR MEDICAL EXPENSE BENEFIT:
Calendar Year Deductible:
   For Charges Incurred with a Participating
     PPO Provider (Including a Participating
      NPA Pharmacy)-
       Per Covered Person ........................ $    200.00
       Per Family of Covered Persons ............. $    400.00
   For Charges Incurred with a non-PPO
     Provider -
       Per Covered Person ........................ $    500.00
       Per Family of Covered Persons ............. $    800.00

Payment Percentage:
   For Outpatient Treatment of Mental or
     Nervous Disorders .......................... 50%
   For Outpatient Treatment of Alcohol and
     Drug Abuse/Addiction Received from an
     Alcohol Treatment Facility.................. 50%
   For All Other Covered Medical Expenses -
     Charges Incurred with a Participating
     PPO Provider ............................... 90%
     Charges Incurred with a non-PPO
     Provider................................... 70%

Maximum Payment per Calendar Year for
   All Covered Medical Expenses Combined,
   Per Covered Person ........................... $ 200,000.00

Maximum Lifetime Payments:
   For Inpatient Treatment of Alcohol and
     Drug Abuse/Addiction........................ $   10,000.00
   For Outpatient Treatment of Alcohol and
     Drug Abuse/Addiction Received from an
     Alcohol Treatment Facility.................. $    2,000.00
   For the Diagnosis or Treatment of Sleep
     Apnea and other Sleep Disorders,
     Including Charges for the Rental or
     Purchase of a CPAP Machine.................. $    2,000.00

CONFIDENTIAL
SMW 56665

EXHIBIT 22
(Continued)

### FOR ELIGIBLE EMPLOYEES AND THEIR DEPENDENTS (Continued)

```
For Audiometry Testing and the
  Purchase and Fitting of Hearing Aids.......... $     2,000.00
For All Covered Medical Expenses Combined....... $ 1,000,000.00

Maximum Out-of-Pocket Expense,
  Excluding Calendar Year Deductible,
      Per Calendar Year:
        For Charges Incurred with a Participating
        PPO Provider -
          Per Covered Person ....................... $     2,000.00
          Per Family of Covered Persons ............ $     4,000.00

Other Limitations:
  For Treatment Rendered by, or under the
    Supervision of, a Doctor of Chiropractic
    (D.C.M.) -
    Maximum Visits Per Calendar Year .............           20
    Maximum Payment Per Visit .................... $        25.00
  Daily Hospital Room and Board Limit ...........   Semi-Private
                                                     Room Rate

  Intensive Care and Coronary Care
    Accommodations ...............................   Actual Charge
```

## PLAN C
### FOR RETIREES

### FOR RETIREES AND THEIR ELIGIBLE DEPENDENTS

ROUTINE PHYSICAL EXAMINATION BENEFIT:
```
Maximum Payment per Covered Person
  Per Calendar Year................................. $      200.00
```

MAJOR MEDICAL EXPENSE BENEFIT:
```
Calendar Year Deductible:
  For Charges Incurred with a Participating
    PPO Provider (Including a Participating
      NPA Provider) -
      Per Covered Person ......................$      200.00
      Per Family of Covered Persons .............$      400.00
```

CONFIDENTIAL
SMW 56666

56

EXHIBIT 22
(Continued)

```
FOR RETIREES AND THEIR ELIGIBLE DEPENDENTS (Continued)

  For Charges Incurred with a non-PPO
    Provider -
       Per Covered Person..........................$        500.00
       Per Family of Covered Persons..............$        800.00

Payment Percentage:
  For Outpatient Treatment of Mental or
    Nervous Disorders............................           50%
  For Outpatient Treatment of Alcohol and
    Drug Abuse/Addiction  Received from an
    Alcohol Treatment Facility...................           50%
  For All Other Covered Medical Expenses:
    Charges Incurred with a Participating
      PPO Provider...............................           90%
    Charges Incurred with a non-PPO
      Provider...................................           70%

Maximum Payment per Calendar Year
  For All Covered Medical Expenses Combined,
  Per Covered Person ...........................$ 200,000.00

Maximum Lifetime Payments:
  For Inpatient Treatment of Alcohol and
    Drug Abuse/Addiction.........................$  10,000.00
  For the Diagnosis or Treatment of Sleep
    Apnea and other Sleep Disorders,
    Including Charges for the Rental or
    Purchase of a CPAP Machine...................$   2,000.00
  For Audiometry Testing and the Purchase
    And Fitting of Hearing Aids..................$   2,000.00
  For All Covered Medical Expenses Combined........$1,000,000.00

Maximum Out-of-Pocket Expense,
  Excluding Calendar Year Deductible,
  Per Calendar Year:
  For Charges Incurred with a Participating
    PPO Provider -
      Per Covered Person .........................$   2,000.00
      Per Family of Covered Persons...............$   4,000.00
```

CONFIDENTIAL
SMW 56667

EXHIBIT 22
(Continued)

### FOR RETIREES AND THEIR ELIGIBLE DEPENDENTS (Continued)

Other Limitations:
  For Treatment Rendered by, or under the
    Supervision of, a Doctor of Chiropractic
    (D.C.M.) –
    Maximum Visits Per Calendar Year............... 20
    Maximum Payment Per Visit..................... $ 25.00
  Daily Hospital Room and Board Limit............. Semi-Private
                                           Room Rate

  Intensive Care and Coronary Care
    Accommodations ............................... Actual Charge
  Daily Home Health Care Expense Limit –
    For Charges Incurred with a
      Participating PPO Provider
      (Deductible is Waived).................... 90%
    For Charges Incurred with a non-
      PPO Provider.............................. 70%

### PLAN D

**FOR NON-BARGAINING EMPLOYEES AND THEIR DEPENDENTS WHO ARE
ELIGIBLE TO ENROLL FOR MEDICARE**

### FOR ELIGIBLE EMPLOYEES ONLY

<u>DEATH BENEFIT</u>:
Eligible Employees ............................. $ 10,000.00
Eligible Dependents ............................ $ 2,500.00

<u>ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS</u>:
Eligible Employees – Principal Sum ............. $ 10,000.00

<u>WEEKLY ACCIDENT AND SICKNESS BENEFIT</u>:
Weekly Benefit.................................. $ 150.00
Maximum Benefit Period......................... 13 Weeks
  Benefits Begin on:
  1st day of Accidental Bodily Injury
  8th day for Illness

CONFIDENTIAL
SMW 56668

EXHIBIT 22
(Continued)

## FOR ELIGIBLE EMPLOYEES AND THEIR DEPENDENTS

MEDICAL BENEFITS:

The Fund will pay Major Medical Expense Benefits for charges approved by Medicare but not paid by Medicare. These will generally include:

- Part A Deductible
- Part A Facility Co-Payments for Hospital and Skilled Nursing Facilities
- Part B Deductible
- Part B Co-Payments
- First 3 Pints of Blood

The Fund also provides for Prescription Drug Coverage under the Major Medical Expense Benefits, subject to the following –

- Outpatient Drugs Only
- Calendar Year Deductible:
    For Charges Incurred with a Participating NPA Pharmacy –
        Per Covered Person...........................$    200.00
        Per Family of Covered Persons...............$    400.00
    For Charges Incurred with a non-NPA Pharmacy –
        Per Covered Person...........................$    500.00
        Per Family of Covered Persons...............$    800.00
- Payment Percentage:
    For Treatment of Mental or Nervous Disorders....          50%
    All Other....................................          70%
- Maximum Out-of-Pocket Expense Per Calendar Year
    (Excluding Deductible):
    Per Covered Person...........................$  4,000.00
    Per Family of Covered Persons................$  8,000.00

Maximum Payment per Calendar Year for
  All Covered Medical Expenses Combined,
  Per Covered Person ............................... $ 200,000.00

Maximum Lifetime Payment for All Medical Benefit
  Payments Combined
     $1,000,000.00

DENTAL EXPENSE BENEFIT:

Calendar Year Deductible Per Covered Person..........$         -0-
Payment Percentage....................................          80%
Maximum Calendar Year Payment per Covered Person......$    750.00
Maximum Lifetime Payment per Covered Person for
  Orthodontia........................................$    750.00

CONFIDENTIAL
SMW 56669

Exhibit M

1                    IN THE UNITED STATES DISTRICT COURT

                    FOR THE DISTRICT OF MASSACHUSETTS

2

3

        In re:                          )

4       PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS

        AVERAGE WHOLESALE PRICE         ) MDL No. 1456

5       LITIGATION                      )

6

7

8                         MOTION HEARING

9             BEFORE THE HONORABLE PATTI B. SARIS

                    UNITED STATES DISTRICT JUDGE

10

11

12

13

                                United States District Court

14                              1 Courthouse Way, Courtroom 19

                                Boston, Massachusetts

15                              May 23, 2006, 3:05 p.m.

16

17

18

19

20

21

22

                            LEE A. MARZILLI

23                    CERTIFIED REALTIME REPORTER

                      United States District Court

24                    1 Courthouse Way, Room 3205

                          Boston, MA  02210

25                          (617)345-6787

1           MR. BERMAN:  Only if there was a settlement.

2           THE COURT:  Right.

3           MR. WISE:  Well, I think that probably is covered

4    in the first notice as well.

5           THE COURT:  Can I see you all at side bar for a

6    minute.

7           (Side-bar conference held.)

8           THE COURT:  Okay, so you, Mr. Berman, were

9    discussing with me --

10          MR. BERMAN:  Yes, your Honor.

11          THE COURT:  -- that there's a trial coming up, and

12   you wanted something.

13          MR. BERMAN:  Well, what we would like is, we're

14   thinking through just a lot of issues.  There's hundreds of

15   exhibits.  There's witness issues.  We think we need -- I

16   know you're very busy, but we need soon -- and I know I'm

17   being presumptuous because there's summary judgment motions

18   pending that haven't been decided -- but we need a trial

19   conference with your Honor, like an hour.

20          THE COURT:  All right, first I'm going to get

21   through summary judgment, and then I'm going to get through

22   the notice, and then you will get a trial conference,

23   probably sometime in July.  That's two months in advance.

24   Most pretrial conferences are a couple weeks in advance.

25          MR. BERMAN:  That's perfect.

1          THE COURT:  But I'm not prepared to do that right

2    now, so --

3          MR. HAVILAND:  Your Honor, on summary judgment, the

4    plaintiffs have two affirmative motions that affect

5    AstraZeneca, so if your Honor would like to hear on those

6    two.  One is the affirmative defenses motion, which is

7    already fully briefed, and I think the papers pretty much

8    speak to the issues of what the Court has to do in terms of

9    the nine remaining defenses.

10          THE COURT:  While you're doing it, it did strike

11    me -- we didn't focus on it because it only knocked out part

12    of the case -- but with respect to the third-party payors,

13    there would be, at the very least, a jury issue on what they

14    knew or should have known with respect to Zolodex.

15          MR. HAVILAND:  And that, your Honor, may be a

16    Class 2 issue, not a Class 1 issue, by the defendants' own

17    admissions.

18          THE COURT:  But aren't I doing both of these?

19          MR. HAVILAND:  Yes, your Honor.

20          THE COURT:  So that's a serious issue.

21          MR. HAVILAND:  It may be.

22          THE COURT:  Do you know whether the third-party

23    payors, like Blue Cross-Blue Shield, were also purchasers of

24    Zolodex?

25          MR. HAVILAND:  Yes, your Honor.

1          MR. BERMAN:  They were, your Honor.

2          THE COURT:  So why wouldn't that --

3          MR. BERMAN:  Because in this class that's going to

4    trial, they had no choice but to pay based off a statutory

5    scheme.  What they knew in Class 1 and 2 is not relevant.

6          THE COURT:  Well, yes, it is as to when they

7    brought the suit.  It wouldn't bar them from recovery, but it

8    would affect how far back they could recover.

9          MR. BERMAN:  Correct.

10          THE COURT:  So, I mean, that seems fair.  That's

11    why I was going to take it drug by drug.  And so with respect

12    to Zoladex, if in fact any company was purchasing, I'm going

13    to have to deal with the effects of that in a class because

14    that would put you on inquiry notice.  If you're paying one

15    price and you see that the statutory AWP price is a different

16    one, that would be inquiry notice.  What's it, the -- you

17    should have engaged in inquiry at that point, right?  So --

18          MR. HAVILAND:  That's the statute of limitations

19    defense, your Honor.

20          THE COURT:  Right.

21          MR. HAVILAND:  And obviously that issue would go to

22    the Class 2 plaintiffs.  There's been no contest, no evidence

23    that the plaintiffs in Class 1 knew or should have known at

24    any point in time.

25          THE COURT:  Right, Class 1 is different.

1          MR. HAVILAND:  And if I may wrap up the argument on

2     the affirmative defenses, we're down to nine, mercifully.

3     We've gone from 58 to nine, so I think the housekeeping has

4     been done.  Five of those nine, though, your Honor, two of

5     which you addressed today, is the political question

6     doctrine.

7          THE COURT:  Right, that's gone.

8          MR. HAVILAND:  The other, the filed rate

9     doctrine --

10         THE COURT:  Gone.

11         MR. HAVILAND:  -- I believe five have been covered

12    by your Honor's ruling, the government action, state action.

13         THE COURT:  What's left?

14         MR. HAVILAND:  Superseding intervening cause, which

15    there's been some discussion of.

16         THE COURT:  Right.

17         MR. HAVILAND:  Preemption, which we believe --

18         THE COURT:  Those are all legal.  I've ruled on all

19    those.

20         MR. HAVILAND:  I believe so too, your Honor, so --

21         THE COURT:  But they need to preserve them for the

22    record for appeal, if they got that far.

23         MR. HAVILAND:  Understood.

24         THE COURT:  They can't drop them.  I'm just not

25    going to rewrite an opinion on them.  So what's left that I

1    haven't ruled on?

2            MR. HAVILAND:  Of those, we have four:  Statute of

3    limitations, your Honor.  The failure to mitigate, again,

4    there's no evidence on the part of Class 1 plaintiffs, or

5    even in the Class 2 plaintiffs, on failure to mitigate.  The

6    issue of statute of limitations overlaps, I suppose, in the

7    sense of when the case should have been brought, but there's

8    been no evidence put in the summary judgment record of a

9    failure to mitigate on anyone's part.  Again, as Mr. Berman

10   points out, in Classes 1 and 2, the statutory regime

11   governs.  It's the 20 percent copay class.  We pay based on

12   AWP.  There's no negotiation.

13           Compliance with regulation I believe is also

14   covered by prior rulings.

15           THE COURT:  And what's the last one?

16           MR. HAVILAND:  Good faith or conformity with

17   standard industry practice, I don't quite know what that one

18   is.

19           THE COURT:  Well, sure, it refutes it, the

20   deception and fairness, which will go to either a jury or me.

21           MR. HAVILAND:  And most of those issues, your

22   Honor, fall in that rubric.  They're really saying there's a

23   lack of proofs on the plaintiffs' part, not really a defense,

24   so --

25           THE COURT:  Were you planning on calling Scully or

1    someone like that, some government witness to trial, either

2    side?

3          MR. HAVILAND:  We were not, your Honor.  We don't

4    believe that the government knowledge defense even comes into

5    the trial of the case.

6          THE COURT:  Well, it may be in terms of -- it may

7    not be a legal bar, but it may be relevant to their state of

8    mind.  I didn't know if either side was planning on calling a

9    government witness currently or a former government witness.

10    But don't forget about the regulations, if the person is

11    currently in the employ of the government, that that will

12    take two or three months to work through.  Do you know what

13    I'm referring to?  All right.

14          MR. HAVILAND:  Lastly, your Honor, the issue of the

15    plaintiffs' motion for partial summary judgment on

16    AstraZeneca's guilty plea.

17          THE COURT:  What do you want me to do with it?

18          MR. HAVILAND:  Well, your Honor, I think the law is

19    very clear that there's an estoppel that's appropriate here.

20    AstraZeneca pled guilty to conspiracy with doctors in three

21    states, three of which are in the class, and interestingly

22    the discussion of Florida law --

23          THE COURT:  But to hand out samples, right?

24          MR. HAVILAND:  Yes, your Honor, but we believe

25    that's the core part of the return-to-practice fraud that was

1      alleged in the complaint.

2              THE COURT:  Well, what would be -- but, you know, I

3      had one of those doctors, actually, in the Lupron case.

4              MR. HAVILAND:  Oh, okay.

5              THE COURT:  So that tended to be handing out

6      samples and saying you can charge for them.  It was a

7      different kind of case than the AWP.  You're saying that

8      there's something that was directly an AWP plea of guilty?

9              MR. HAVILAND:  Well, it was absolutely the same

10     conduct, your Honor.

11             THE COURT:  The same conduct as what, the samples

12     or the AWP?

13             MR. HAVILAND:  Both.  Your Honor, they were

14     providing samples for a hundred percent return to practice.

15     In this case, we focused a lot on the spread.  Here we have a

16     zero acquisition cost, AWP, a hundred percent spread.  It was

17     another way these manufacturers in their marketing and sales

18     fraud got doctors engaged in buying the product.

19             THE COURT:  But what's the summary judgment on?

20     What would I be granting it on?

21             MR. HAVILAND:  We think that the core facts in the

22     information, AstraZeneca's information, should be deemed

23     admitted; and they are that AstraZeneca engaged in a

24     conspiracy with doctors to provide samples, knowing and

25     expecting that they would bill for them, and in fact charged

Exhibit N

1                     IN THE UNITED STATES DISTRICT COURT

                         FOR THE DISTRICT OF MASSACHUSETTS

2

3

        In re:                            )

4       PHARMACEUTICAL INDUSTRY           ) CA No. 01-12257-PBS

        AVERAGE WHOLESALE PRICE           ) MDL No. 1456

5       LITIGATION                        )

6

7

8                            MOTION HEARING

9               BEFORE THE HONORABLE PATTI B. SARIS

                       UNITED STATES DISTRICT JUDGE

10

11

12

13

                                 United States District Court

14                               1 Courthouse Way, Courtroom 19

                                 Boston, Massachusetts

15                               June 26, 2006, 3:10 p.m.

16

17

18

19

20

21

22

                            LEE A. MARZILLI

23                     CERTIFIED REALTIME REPORTER

                       United States District Court

24                     1 Courthouse Way, Room 3205

                            Boston, MA  02210

25                           (617)345-6787

1       relief to very sick and needy people.  This case has been

2       pending for five years.  I understand it's not CMS's fault

3       this came so late.  I fully put that on plaintiffs'

4       shoulders.  But that's where I'm at.  And there's just an

5       enormous amount of court resources that are going into it,

6       and we are about to go public, we're about to go national.

7               MR. HENDERSON:  And I'll forewarn your Honor that

8       the government is going to object to an order that bumps a

9       lot of other --

10              THE COURT:  I'm not.  I'm going with your number.

11              MR. HENDERSON:  -- requests that are in the queue.

12              THE COURT:  I'm going with your number, which is

13      three months.  That's what I'm going to hold you to.  What

14      I'm saying is, I won't now be bumped by someone else.  And

15      they can say, "Come see the Judge."  Okay, I'm going with

16      your figure, three months.  I've already bumped the trial

17      once.  Unless you can -- I can take the heat off of you if

18      you can go more quickly on AstraZenica, and that's the thing

19      that you need to present to them.

20              MR. HENDERSON:  Yes, and I'll just forewarn your

21      Honor that the number of NDCs or J Codes is not particularly

22      important in determining the amount of time that it takes.

23              THE COURT:  You told me that.  Although I don't

24      understand it in my gut, you told me that, so --

25              MR. HENDERSON:  Well, they put in batch requests,

 1    the number of requests into a --

 2             THE COURT:  All right.  Now, let me just understand

 3    this.  As I understand it, even in the best of all worlds,

 4    you can only go back to 1998, or is that three months going

 5    back to 1991?

 6             MR. HENDERSON:  We had originally said three months

 7    going back to 1991.

 8             THE COURT:  Good.

 9             MR. HENDERSON:  And I would anticipate that just

10    going back to 1998 would somewhat reduce the time.

11             THE COURT:  To how far?

12             MR. HENDERSON:  I cannot say, your Honor.

13             THE COURT:  Okay, well, I think at this point I

14    don't really know -- there's a serious issue with respect to

15    the third-party payors as far as whether or not the statute

16    of limitations goes back that far, less serious with the

17    consumers simply because they probably knew nothing.  But do

18    you still want to go back to 1991?

19             MR. SOBOL:  Yes.

20             THE COURT:  So I think that's really where we are

21    at this point.

22             MR. SOBOL:  The hearing on the -- if I may, your

23    Honor?

24             THE COURT:  Yes, so on the 11th we're just going to

25    have an update and a status.  I'm sorry, the 6th.  By the end

1   of this week, I should have final agreed-upon notices, short,

2   long, for both third-party payors and consumers.  I should

3   have a draft of the Web site, a script for the 800 number.

4   And ideally, although less important right away, is a little

5   mini-script for my office about what we say to people.

6   That's lower down on the pecking order.  If you disagree with

7   it, you're going to give me your version, both of it on CDs,

8   and then hopefully I'll just do my own notice.

9        MR. SOBOL:  And then the location and the timing on

10   the weeklies.

11        THE COURT:  Yes.  Let me just -- I'm not a pro, and

12   I understand I read different things than other people read.

13   Intuitively, it's a little hard for me to accept because no

14   one I know reads any of these except possibly National

15   Geographic, it's a little hard for me to understand why

16   newspapers aren't part of this equation.  So at the very

17   least, I'd like a few of the weeklies that I do know people I

18   know read, like People and Time and Sports Illustrated and

19   that sort of thing.

20        Now, she's the expert and I'm not.  It's just, you

21   know, you go based on your everyday experience, and I don't

22   know people who read those, Parade and USA Today.  I assume

23   there's a fair number who do, maybe in the audience we're

24   seeking to hit.  I'll take her word for it, but it's a little

25   hard for me to accept.  Is a newspaper, I mean, so hard?  The