# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | |
| PHARMACEUTICAL INDUSTRY | ) | CA No. 01-12257-PBS |
| AVERAGE WHOLESALE PRICE | ) | MDL No. 1456 |
| LITIGATION | ) | Pages 1 - 119 |

CLASS CERTIFICATION HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
September 12, 2006, 10:25 a.m.

LEE A. MARZILLI
CERTIFIED REALTIME REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA 02210
(617)345-6787

de0c81e3-5126-441b-899c-f9b6feb84c5e

APPEARANCES:
For the Plaintiffs:

THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ., Hagens Berman Sobol Shapiro LLP, One Main Street, Cambridge, Massachusetts, 02142.

DONALD E. HAVILAND, JR., ESQ., The Haviland Law Firm, LLC, 740 S. Third Street, Third Floor, Philadelphia, Pennsylvania, 19147.

JEFFREY L. KODROFF, ESQ., Spector, Roseman & Kodroff, 1818 Market Street, Suite 2500, Philadelphia, Pennsylvania, 19103.

MARC H. EDELSON, ESQ., Hoffman & Edelson, 45 West Court Street, Doylestown, Pennsylvania, 18901.

JENNIFER FOUNTAIN CONNOLLY, ESQ., The Wexler Firm, LLC, One LaSalle Street, Chicago, Illinois, 60602.

For the Defendants:

JOHN C. DODDS, ESQ., Morgan, Lewis & Bockius, LLP, 1701 Market Street, Philadelphia, Pennsylvania, 19103-2921.

JAMES P. MUEHLBERGER, ESQ. and NICHOLAS PATRICK MIZELL, ESQ., Shook, Hardy & Bacon, LLP, 2555 Grand Boulevard, Kansas City, Missouri, 64108.

MICHAEL DeMARCO, ESQ. and AIMEE E. BIERMAN, ESQ., Kirkpatrick & Lockhart Nicholson Graham, LLP, One Lincoln Street, State Financial Center, Boston, Massachusetts, 02111.

STEVEN F. BARLEY, ESQ., Hogan & Hartson, LLP, 111 South Calvert Street, Suite 1600, Baltimore, Maryland, 21202.

RICHARD D. RASKIN, ESQ., Sidley Austin, LLP, One South Dearborn, Chicago, Illinois, 60603.

JONATHAN REES, ESQ., Hogan & Hartson, LLP, 555 13th Street, N.W., Washington, D.C., 20004.

KATHLEEN M. O'SULLIVAN, ESQ., Perkins Coie, LLP, 1201 Third Avenue, 40th Floor, Seattle, Washington, 98101.

APPEARANCES: (Cont'd)

For the Defendants:

ANDREW L. HURST, ESQ., Reed Smith, LLP, 1301 K Street, N.W., Washington, D.C., 20005.

CHRISTOPHER C. PALERMO, ESQ., Kelley Drye & Warren, LLP, 101 Park Avenue, New York, New York, 10178.

ELIZABETH I. HACK, ESQ., Sonnenschein Nath & Rosenthal, LLP, 1301 K Street N.W., Suite 600, East Tower, Washington, D.C., 20005.

DOUGLAS FARQUHAR, ESQ., Hyman, Phelps & McNamara, P.C., 700 13th Street, N.W., Suite 1200, Washington, D.C., 20005.

KIMBERLY D. HARRIS, ESQ., Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York, 10017.

PAMELA A. ZORN, ESQ., Sherin and Lodgen, LLP, 101 Federal Street, Boston, Massachusetts, 02110.

P R O C E E D I N G S

THE CLERK: In re: Pharmaceutical Industry Average Wholesale Price Litigation, Civil Action No. 01-12257, MDL No. 1456, will now be heard before this Court. Will counsel please identify themselves for the record.

MR. SOBOL: Good morning, your Honor. Tom Sobol for the plaintiffs.

MR. HAVILAND: Good morning, your Honor. Don Haviland here for the plaintiffs.

MS. CONNELLY: Good morning, your Honor. Jennifer Connelly for the plaintiffs.

MR. MUEHLBERGER: Good morning, your Honor. Jim Muehlberger on behalf of Aventis Pharmaceuticals.

MR. DeMARCO: Michael DeMarco for Aventis.

MR. DODDS: Your Honor, Jack Dodds for Pfizer and Pharmacia.

MR. BARLEY: Steven Barley for AmGen.

MR. RASKIN: Richard Raskin for Bayer Corp.

MS. BIERMAN: Aimee Bierman for Aventis.

MR. PALERMO: Chris Palermo for Dey, your Honor.

MS. (Inaudible): Good morning, your Honor. (Inaudible) for Abbott Laboratories.

MS. HACK: Elizabeth Hack for Sicor Pharmaceuticals.

THE COURT: What are you doing all the way back

there?

MS. HACK: There were no seats up there.

THE COURT: Does anyone want to be up here? I mean, I'm sure we could adjust the seats. It makes some sense. Mr. Alba, maybe we could move the witness chair down?

THE CLERK: Yes.

MS. HACK: Thank you so much.

THE COURT: All right. Is there anyone else who's way back there who wants to be somewhere else?

MR. FARQUHAR: Doug Farquhar for Watson. Can I just sit in the jury box?

THE COURT: Yes. No vote, but you go.

MR. REES: Good morning. Jonathan Rees for Aventis Behring.

MR. (Inaudible): Good morning, your Honor. (Inaudible) for Baxter, and I'm happy to stay right here.

THE COURT: Okay. If you need to speak, just pop up because I might not notice you.

All right, now, because there are so many attorneys -- and did I miss --

MR. HURST: Andrew Hurst, your Honor, for Fujisawa.

MS. O'SULLIVAN: Katie O'Sullivan for Immunex Corporation and also the defendants' liaison counsel in the states of Montana and Nevada cases, and we have a scheduling issue to bring to your attention at the end of this hearing.

THE COURT: Thank you. Anyone else?

MR. DeMARCO: Your Honor, we missed one person. My colleague, Nick Mizell, in the corner will be operating our little slide presentation.

THE COURT: Thank you. All right, now, because the Court Reporter probably didn't know about all of you, and just to make sure we have the correct people speaking, if you didn't sign a chart, make sure you stand up, and when you speak, identify yourself and the company that you're with.

All right, so at this point we have a motion to certify the Track Two class. One thing is clear, that between Track One and Track Two, you all learned very well how to manipulate font, so that there's a huge amount in both of these briefs.

MR. SOBOL: Less pages.

THE COURT: Almost essentially 40, 50 pages of one-liners, both sides, so it was actually harder to follow than some of the previous briefs because there were so many different issues, and all the citations were put in mini-font in the footnotes, so that it really was chock-full of issues. I would urge you all, because there's no way in writing this I'm going to get through all of this, I'm not going to write and address every single point, so I really need people to focus on the primary issues that they want me to get through on the crosscutting issues as well as any

individual -- for example, individual companies, it's just got to be the high point because I'm just not going to get through it all. All right.

Mr. Sobol, you're the person who's moving. I think you'll be speaking, right?

MR. SOBOL: Yes, your Honor.

THE COURT: And was there a separate handout for you on this?

MR. SOBOL: Yes, I do have a handout, your Honor.

THE COURT: I have defendants' handout. I have two, right, from the defendants?

MR. MUEHLBERGER: That's correct, your Honor. You have a joint submission and an individual defendant-by-defendant submission.

THE COURT: Good, I have that.

MR. SOBOL: There are two-handouts, your Honor. The first handout, your Honor, deals with one of the crosscutting issues, and the second handout is a chart which identifies the manufacturer, the class, and the drug coverage for the class reps. I have two copies of that, Robert.

THE COURT: Thank you.

MR. SOBOL: Your Honor, in my opening remarks, I'm only going to address one issue, and the reason I'm only going to address that one issue is because of the way that procedurally the Track Two issues get teed up, at least from

the plaintiffs' point of view.

From the plaintiffs' point of view, after we went through Track One, the really material issues that needed to be gone through in terms of Track Two is adequacy and typicality of the proposed class representatives for the Track Two defendants, in that there was no need to rehash many of the issues, which, frankly, we believe that the defendants in their submission have sought to rehash from Track One. Those issues they seek to rehash are issues of TPP knowledge, of the extent to which physician-administered drugs are reimbursed on the basis of AWP, on the inability to crosswalk J-Codes --

THE COURT: Can I say, I pretty much agree with you on Class 1 and 2. On Class 3, if I can remember my thought process when I certified it, that was, what was it, like over a year ago now, a year and a half ago?

MR. SOBOL: Yes.

THE COURT: It was a very raw record. Both sides had really focused primarily on the difference between self-administered and physician-administered drugs, with this area of third-party payors in the non-Medicare, physician-administered world being the weakest record. If I remember, in fact, people didn't even start focusing on it until the reply and the surreply. And it was, as far as I was concerned, the area that I understood the least, and I

thought the expert reports reflected the fluidity of the data at that point.

So the question that I raise is, and I start off this way, suppose I certified 1 and 2 and waited to certify 3 until after I had the trial?

MR. SOBOL: Right.

THE COURT: I'm going to learn hugely about that in a way that I wouldn't, and I could make certain judgments based on a fuller understanding of that record.

Now, I understand that may create certain fairness issues for Track Two because you're not part of it, but it would give me a much deeper understanding of the issues.

MR. SOBOL: Right. Nor is there any practical impediment to your doing that either in terms of our rush to get out notice on Track Two. That kind of thing, we just haven't scheduled anything with respect to it. And there's nothing that I can say, frankly, or the defendants can say in this context before you today on those issues that's going to be helpful, since you're going to be having a trial on that. All you will hear today are, you know, different views from an adversarial context in terms of what our positions are on that, when the reality is you're going to get a fulsome record later on on that, later on this fall.

THE COURT: And I'm going to merge the Daubert hearing --

de0c81e3-5126-441b-899c-f9b6feb84c5e

MR. SOBOL: You're going to merge the Daubert hearing. You're going to merge the summary judgment issues. There's going to be a bench trial. You're going to have four defendants litigating the same issues against the plaintiffs. You're going to hear testimony. And, frankly, it's something that's commonly done by judges who are trying to make decisions on class certification. Sometimes they'll have, in the personal injury context, for instance, they'll have sample trials. You know, they'll have exemplar trials.

THE COURT: This is something that struck me as they are all coming to the forefront at about the same time, and I wasn't sure how I would slow down the suit at all by waiting.

MR. SOBOL: I think, as a practical matter, you don't. For the practical issues that are before you, there's no date that you're scheduling that's, you know, critical path to make this decision between now and the end of the year or sometime when you've dealt with the trial.

THE COURT: All right, so I'll let you address all the issues on the merits, but it was certainly the pragmatic solution I was thinking about.

MR. SOBOL: Right.

THE COURT: All right, go ahead.

MR. SOBOL: And that's also one of the reasons why, your Honor, at least in my opening remarks, I'm not going to

get into rebutting the defendants' issues in terms of knowledge, that kind of thing. I'm, frankly, just going to wait to hear what they have to say, figure out if there's anything that's germane to deal with that issue right now.

My cocounsel are going to deal with the specific issues about the coverage of the drugs, the class representatives and the adequacy and typicalities for Class 1 and Class 2. To the extent that it becomes an issue for the Pipefitters Union here in Massachusetts for Class 3, I can deal with a couple of those issues.

It seems to me that there's really only one crosscutting issue that I want to put in its appropriate framework so the Court understands how this becomes relevant in Track Two and where it's not relevant in Track Two. And the buzz word for it, if you will, your Honor, ends up being the J-Code issue. And the issue, of course, vis-a-vis J-Codes is that for physician-administered drugs, it is quite common, as your prior decisions and as Dr. Berndt has pointed out and all the experts have pointed out, that the billing systems, both within Medicare and outside Medicare, use what's called a J-Code, which is a code that encapsulates sometimes, not always, many --

THE COURT: Is that a pun?

MR. SOBOL: Right, I didn't intend it, didn't even pick up on it, your Honor -- which includes numerous NDCs,

sometimes by different manufacturers of different formulations of the same medicinal ingredient. And so the J-Code issue, the first point I want to make clear to you, your Honor, is this: It's important when we're talking about the ability to what people say "crosswalk," meaning either go from J-Codes to NDCs or go from NDCs to J-Codes, to understand the purpose for which one is trying to do the crosswalking. And I submit that there are at least three different ways in which the J-Code issue comes up in this track and in this case.

The three different ways are, first, for class representative purposes. I'll get to that in a minute. Second, for class membership purposes, which I'll get to in a second; and, third, for determining damages, or determining, in other words, the AWP reimbursement.

Now, let me deal with the third of those first. Sometimes the damage estimates that are undertaken in Track Two, and sometimes in Track One, will be for generic drugs. Oh, by the way, of course, the J-Code issue is really only a real issue when we're talking about generic and multi-source drugs. If you're talking about a single-source drug, the J-Code will show, implicitly has the information about the manufacturer because there's only one single source. So really the only time that the J-Code ends up crosswalking is just a matter of figuring out which J-Code

applies to the NDCs for that manufacturer. It's single source for that manufacturer. You know what manufacturer it is. You don't have a J-Code issue for single-source drugs.

THE COURT: Talking basics, how many of these drugs in Track Two are the multi-source?

MR. SOBOL: It's about thirty or so. We'd have to actually go through it, and some of our charts show it. It's in approximately that amount, okay? There are significant number of multi-source drugs.

THE COURT: And how many of the single source?

MR. SOBOL: If you look at the chart that we've handed to you, your Honor, and there's a column called Drug Source, you'll see that, for instance, all the Abbott drugs are going to be multi-source. The AmGen drugs are all single source. The Aventis has some multi, some single. It goes on like that, okay? So rather than me giving you my off-the-cuff estimate, I would rely upon the chart.

THE COURT: So the reason this becomes more significant in this track, at least according to the defendants, is that there's a much larger percentage that are multi-source?

MR. SOBOL: There are more multi-source, which is why the defendants have tried to create more of an issue of the J-Code here than it was in Track One, correct.

THE COURT: Like Dey Labs is all one and --

de0c81e3-5126-441b-899c-f9b6feb84c5e

MR. SOBOL: Yes, and like Abbott is all multi-source, okay?

THE COURT: Okay.

MR. SOBOL: All right, so the J-Code issue is really only relevant, we suggest -- and I don't think the defendants really get into this -- only when we're dealing with the multi-source or the generic, not on the branded side, because walking back and forth is just comparing numbers.

So the three purposes -- we're just talking about the J-Codes now --- I'm going to deal with the last of those purposes, estimating damages. When we go back in time, your Honor, and we seek to estimate what people paid for a drug, the experts start with a J-Code, but they have to look to what the AWPs were associated for that J-Code back in time to be able to look at the, if you will, the scatter shot or the dispersion of the AWPs over time to then be able to determine what the mean was, what the Medicare reimbursement would have been under Medicare at that time.

THE COURT: So Medicare is the mean?

MR. SOBOL: Medicare uses the mean.

THE COURT: The mean.

MR. SOBOL: Okay? As you will see later on, later on it changes it. It says the mean of the AWPs or the branded lower, and I'll explain that a little bit but --



THE COURT: Right, so that's the way the defendants represent it as --

MR. SOBOL: Yes. Yes, there's no dispute here so far, okay? I don't think, okay? And so for damage purposes, you have to go back and you have to look at how the AWP got -- what the reimbursement was, you have to crosswalk back to the AWPs, okay? And then once you get the AWPs, you can figure out what the AWP reimbursement was, we say in the aggregate for all payors, what the total average amount that all payors paid, and that's where the damages come in. That's one purpose for which you have to crosswalk.

Now, we submit that both Dr. Berndt has testified and submitted in his report that for later years, at least, 2000 forward, that's easier to do, more feasible because of the robustness of the data that now exists. We've submitted the affidavit, the declarations of Dr. Hartman repeatedly in this litigation showing, both by way of his testimony and by way of example, that for later years and earlier years, he's been able to crosswalk back from the J-Code to the multiple AWPs, find out what the AWP reimbursement is, and be able to model damages. We have a declaration of Dr. Hartman.

We have examples, even from the defendants, Mr. Young, where he has actually undertaken crosswalking on an episodic basis for particular payors. We have an example that --



THE COURT: I think defendants' point is often not that you can't do it; it's just extremely difficult and time-consuming the farther back you go.

MR. SOBOL: With respect to this purpose, okay, that may or may not be true, but we've demonstrated repeatedly that it can be and we have done it for these purposes, okay? For the purposes of number three that I've just told you about, estimating damages, we've done it. And I'm going to leave it like that. The defendants might have something to say about that. I'm going to leave the chance to rebut it because I've read their expert reports the defendants have recently submitted, and I think it again reinforces the fact that our expert, when estimating AWP reimbursement, historically has been able to do that extraordinarily accurately well. And while it may or may not be time and does, I mean, we have to pay the money, and it takes, you know, it takes effort to be able to do this, that it can be done.

The reason, of course, it has to be done is, there is no published what was the mean at any particular time and what was Medicare reimbursing at any particular time. That does not, as far as we know, exist historically. So this is something we have to go about and estimate rather than pull out as a number.

So if we move from that third purpose for which one



crosswalks --

THE COURT: You've sought a class going back to 1991.

MR. SOBOL: '91.

THE COURT: So is there a point in time at which this is not feasible?

MR. SOBOL: No. We have said that it is feasible for the whole time. Our expert actually focused on trying to do crosswalking for damage estimates pre-2000. He focused on the earlier time because he knew it was easier going forward and has been able to demonstrate that, and we don't think that it's difficult. From our point of view, what we need --

THE COURT: Well, it's difficult, but you say it's doable.

MR. SOBOL: It is doable. It is involved. Frankly, it is just involved. It's really not even all that complex, in the sense that you have to have the time and the patience to, within particular periods of time, isolate the AWPs that were out there for the drugs for that J-Code at that time, and you have to have the patience to be able to do that.

THE COURT: And are you conflating that discussion with figuring out which company was actually the source of the drug?

MR. SOBOL: No, I'm not, because for these



de0c81e3-5126-441b-899c-f9b6feb84c5e

purposes, for the number three purpose -- I haven't dealt with the other two -- for the number three purpose, what we're trying to do is, we're trying to figure out how the generic for multi-source was being reimbursed and in what period of time period of time, okay? And that's going to show how much the increase was for people at that time. So it doesn't matter to us which defendants' drug it was or it wasn't at any particular time. You need to know actually all of the AWPs at that time to be able to figure out what the mean reimbursement was for these purposes.

What we do then on the damages, so you can carry it through and understand, is we look at how much was being paid. That was the analysis we just talked about. And then for each separate manufacturer, we go into that manufacturer's data regarding what their actual average sales price was and how much they sold. And the damages that are applied to any one of the Track Two defendants is based only on the amount of drugs that they sold and the average actual sales price that they sold it at, being the difference between their company ASP and the mean for a generic, what was being reimbursed. Do you follow me?

As a result, no defendant is being charged in this case with having to pay damages for more than the drugs that they've sold and the amount to which their ASPs were below the mean of the AWPs that were out there. It's just their



overcharges that they would be responsible for in terms of the ultimate damage figure.

THE COURT: Would it matter -- suppose they were the low AWP on the mean.

MR. SOBOL: Correct.

THE COURT: So are you overcharging them if you use the mean?

MR. SOBOL: No, because what we will have to do in proving the class trial is prove that, whether they're at the low of the mean or the high of the mean, we're going to have to prove that their contribution, their being close enough to the mean, caused the mean to stay there for reasons I'll get to in a minute. But the theory of liability, whether they're below the mean or above the mean, is that by being near the mean, they maintain that market of being at the mean. So what we're going to do is, we're going to have testimony, for instance, showing --

THE COURT: Why wouldn't you just give everyone the benefit of the doubt; if you can't figure out exactly which drug the guy took, take the low?

MR. SOBOL: Actually our expert does use, from a conservative point of view, he looks at the lowest of the reimbursable amount, so his numbers, his damages actually end up being conservative.

THE COURT: So your expert does take the lowest of



the AWP?

MR. SOBOL: He doesn't take the lowest of all of the published AWPs, but my understanding is that when he is looking at where the mean is, he takes the lowest of the available choices to be able to take to be able to make sure that his number is conservative.

THE COURT: I'm not sure I fully understand it, but go ahead.

MR. SOBOL: Well, okay. So right before I move off this third purpose then, it's just important to, again, I want to emphasize this point: No defendant is being charged with sales beyond the sales that they made, okay.

Now, there are two other ways in which the J-Code issue crops up. It was as a class representative and then as a member of the class. Now, here the question is this: What the plaintiffs have done, with respect to the individual plaintiffs who are put forward as class representatives, is, for multi-source drugs, we have undertaken the efforts that we possibly can to be able to ID the drug that was actually injected into their body with a particular manufacturer.

Now, simply from claims data, with respect to any particular individual, it is very difficult for a multi-source drug to ID a manufacturer. It is in some situations possible, your Honor. How that "some situation" would be possible is if there is a -- well, it gets a little



complicated, but there's a known scatter in terms of what the reimbursement rates are, and there is a particular charge that's put into the billing system. There are rare occasions where the claims data itself might be able to ID a manufacturer. But be that as it may, by and large, simply from claims data is extraordinarily difficult because all you have is the J-Code, and you don't know which of the manufacturers provided that particular product.

So for the class representatives, what we have done is made an effort to try to figure out which manufacturer's drug was injected into the class rep, and my colleagues are going to get into this. That's when you end up having to drill down into, for instance, physicians' records. You try to get records from the defendants who have provided the product to particular places, and if they've provided the product to a place where that class rep came from, then they may be able to ID it that way. We have a situation where somebody actually had a photocopy of the bottle or some kind of copy of the bottle, or that the medical records wrote in the name of the manufacturer or something like that. There are isolated situations like that.

Now, we don't think, however, that for purposes of this case, for a multi-source drug, on the basis of the liability claims that we've had, that we need to ID the injection that went into each person to a particular

Page 22

manufacturer for a multi-source drug in order for that class representative to be an adequate representative for the class or for people to be members of the class. And so I'd like to go to my slides now to be able to explain the reasons why, your Honor. The first slide --

THE COURT: Are there any companies with respect to which you cannot identify any person with certainty that bought a drug from the company?

MR. SOBOL: Yes, there's one company, Pfizer, which when we get into the details of this we can't identify. We haven't found a person who bought that J-Code, okay?

THE COURT: So with respect to all the other ones, you, at least, think that you've got at least one person --

MR. SOBOL: Yes.

THE COURT: -- from each class?

MR. SOBOL: Yes, the answer is "yes." There are a couple of classes where there's a hole here or there, which my cocounsel are going to point out, but the answer is "yes."

And so also, your Honor, if you can listen to the following sentence, and I hope I get this out right, this is our position vis-a-vis class representatives and membership: If a class representative paid a co-pay for a J-Code sold by a defendant, then that plaintiff has purchased a product based upon the defendants' AWP. I'm going to come back to

Page 23

that when I go through this, but that is our position.

THE COURT: And you're saying the only defendant for whom that's absolutely dispositive is Pfizer?

MR. SOBOL: Correct, because we do not have a plaintiff, Pfizer, as opposed to its subsidiary, Pharmacia, so Pfizer standing alone has only one drug in this case, Zythromax.

THE COURT: What is that?

MR. DODDS: It's an in-hospital antibiotic.

MR. SOBOL: There is no class representative for whom we have purchased on the basis of a J-Code, or any basis, Zythromax, so Pfizer would be out.

THE COURT: Well, let me ask you this. Counsel just identified that as an in-hospital antibiotic. Is that the possible explanation -- Mr. Dodds, I'm sorry, is that right?

MR. DODDS: Yes, your Honor, that's correct.

THE COURT: Is that the explanation? Is it only administered inside a hospital?

MR. DODDS: I don't know that it's never administered outside the hospital, but typically it's given to people in-hospital to fight infection.

THE COURT: And so that's a different payment scheme, right?

MR. DODDS: Correct. That's Medicare Part A.

Page 24

THE COURT: Would that be the reason?

MR. SOBOL: It's a large part of the reason, yes, your Honor. I think there's also lots of reasons why it is we've had difficulty finding -- you know, people dying out in this class, you know, for --

THE COURT: People?

MR. SOBOL: People who have been dying out of this class, we've had two or three class representatives who have died, you know, within the past twelve, fourteen months too, so --

THE COURT: Sure. Well, how do you know it's a big issue for you if mostly it's administered in a hospital? In other words --

MR. SOBOL: Well, I think that that can be said, you know, mostly or not. I don't know the breakdown for Zythromax. Even, for instance, Kytril and Zofron, it's provided in hospitals, it's provided in clinical settings, it's provided in other kinds of settings. You know, each of these drugs have different profiles, if you will, of where it is that they tend to be used more than others; but it's not as if, I mean, it's just been acknowledged, you can find no drug that, you know, reimbursed Medicare Part B for Zythromax. But we don't have a class representative who has purchased on the basis of the J-Code for Zythromax, and therefore Pfizer would be out.

Page 25

THE COURT: So I should just dismiss them out right now?

MR. SOBOL: No.

THE COURT: On the consumer class. So do you have third-party payors?

MR. SOBOL: We do not.

THE COURT: You have no one for Pfizer?

MR. SOBOL: Correct. So you would deny the Track Two class certification with respect to it.

THE COURT: So he can go home?

MR. DODDS: I'm doing really well so far, your Honor. I'm happy with how things are going so far.

(Laughter.)

THE COURT: I mean, is that the bottom line?

MR. SOBOL: Well, I think that, you know, if the situation doesn't change, that will end up being the bottom line. I think that the only action you need to take today is, you deny class certification with respect to Track Two as to Pfizer as opposed to Pharmacia, its subsidiary.

THE COURT: Are you representing Pharmacia as well?

MR. DODDS: I am, your Honor, yes.

THE COURT: Okay, so you're not out so fast.

MR. DODDS: Not quite.

THE COURT: Okay, thank you.

de0c81e3-5126-441b-899c-f9b6feb84c5e

MR. SOBOL: So going then to my slides, your Honor, we don't have to focus on the first slide because that's the J-Code issue with respect to single source, which I've already addressed.

Now, with respect to multi-source drug, our position is that the Medicare co-payment for a J-Code will also qualify as class membership, and that crosswalking from J-Codes, this is more feasible for the later time than the earlier time. That's with respect to the ability to do damages.

And on Page 4, your Honor, I have the quote from Dr. Berndt that acknowledged that, and then on Page 5 another quote that acknowledged that. And, of course, also just as a reminder before I go on to this point, your Honor, on Page 6 we've even indicated that this dispute between the experts, between Young on the one hand and Hartman on the other hand as to whether or not J-Code crosswalking for purposes of the damage analysis was possible was the kind of issue that you're going to deal with in the context of a Daubert hearing, not in the context of class certification. So we don't think that J-Code crosswalking vis-a-vis the damages analysis is anything that you have that's relevant for your purposes today.

THE COURT: All right, so let me stop you there. So would it make sense for me to defer class cert on all of

the classes until I did Daubert in the context of the trial in November?

MR. SOBOL: No, I don't think -- again, I don't know -- the practical issue is that I don't know of a critical path issue you have right now vis-a-vis Track Two, getting any of the class issues done. However, I don't think there's much more education that you need in terms of being able to certify Track Two right now, have whatever appellate issues may or may not arise with respect to that, if now is when they want to deal with it, okay, with respect to the other issues for the reasons I'm about to get into, because the only issues we think that are relevant to you today is typicality and adequacy. I'm dealing with the J-Code issue now on my first two points, class membership and class representatives, for the J-Code issue, and now I'm on Page 7, your Honor.

Our position with respect to the defendants' wrongful conduct by the generic companies, when they post high AWPs, is that there is a series of different ways in which their conduct contributes to -- how their AWP manipulation contributes to the median. The first, of course, is the classic one: "Defendants impacting the median through AWP perhaps," meaning if they're actually publishing AWPs, and they frequently do -- in fact half the time they do by definition publish AWPs that are higher than the median --

that ends up being the kind of wrongful conduct that increases the overall --

THE COURT: Well, actually, that's why I asked you that question. So before when you said the mean, it really wasn't the mean? It was the median?

MR. SOBOL: Right, it was the median, correct. Thank you. You got me.

THE COURT: So on the median, don't the outliers get carved off, as I remember?

MR. SOBOL: No. Actually, what the carriers do is, they'll actually pick one particular AWP, which they'll call, although it should be the -- well, in any event, they do pick the one that is in the middle, from what I understand, okay? Here we know that whether it's the median or the mean --

THE COURT: Does the statute say? Isn't there a statute that deals with --

MR. SOBOL: It says the median.

THE COURT: What?

MR. SOBOL: It says the median.

THE COURT: The median.

MR. SOBOL: Yes.

THE COURT: Okay.

MR. SOBOL: Here we know that those defendants that are publishing AWPs that are higher are contributing to a higher median. We also know because we have evidence, and as

you've indicated in your prior decisions, that when generic companies are leapfrogging each other vis-a-vis AWPs, that kind of conduct also, whether they're the one that's being leapt over or they're last or they're the one that leaped over earlier, affect the median.

We also know this, your Honor -- this is in our brief, and it's also in Dr. Hartman's declarations repeatedly -- that the defendants maintain high AWPs. Just by maintaining high AWPs in a buckshot area, if you will, even if you're below the median, even you're below the mean, even if you're below the average, if you are maintaining your AWPs in a high area, what you end up doing is having what our expert calls and what's called usually a Nash equilibrium, meaning that you're keeping all of the same spots up in the same area, and you haven't actually told the truth. If one of them tells the truth and drops way down to where the reality is on the average selling price, that ends up being a huge signal to Medicare, and possibly to private reimbursers, that there must be something wrong with all the other AWPs. And by a company failing to report the truth, it perpetuates the median up where it is, even if that particular defendant's AWP happens to be somewhat less than some of the other defendants.

Now, this we know from the pleadings and from the declarations of Dr. Hartman, and from what has happened

de0c81e3-5126-441b-899c-f9b6feb84c5e

before CMS and Congress, is not just theory but reality. I'm going to skip ahead for a moment, your Honor, to the next page. Your Honor will recall that from '92 to '97, multi-source generics were reimbursed at the lower of EAC, or the MAC, where the MAC is defined as the median of AWP. Then what happened in and around 1996 or 1997, your Honor, is that there was this Nash equilibrium for --

THE COURT: And EAC was AWP or not? What was EAC?

MR. SOBOL: It was the estimated acquisition cost. It didn't happen.

THE COURT: In effect, that's what you've always claimed didn't happen?

MR. SOBOL: Right.

THE COURT: Okay.

MR. SOBOL: Okay? In or around 1996 or 1997, for a particular drug, your Honor -- and I apologize, I don't recall exactly what it is -- there was this Nash equilibrium where there was a branded and a bunch of generics that all had their AWPs up around the same point. What happened is, a branded company chose to tell the truth and dropped its AWP down to where ASP was. And all of a sudden, given this formula, there was this aberration out there in the marketplace because the reimbursement was being forced to be at the median of the AWPs for all generic forms. But the AWP for the branded was much less. By a branded company in this

particular situation having told the truth, the signal came out that the other AWPs must be wildly wrong; why are we paying so much more for generics when you can get the branded for less?

So what happened was -- and we've already skipped to the page -- on Page 9, the whole system had to be changed to deal with that. And what happened was, they said the lesser of, and then you can have the old formula, or the AWP of the least expensive brand name drug. And, again, this is in Dr. Hartman's reports. It's also in, you know, our briefing, that kind of thing.

But, you know, going back to my Page 7, the notion, we think, that when one of these defendants -- and we're going to intend to obviously prove this at the trial that's coming up for their generics and later on -- when one of these defendants are publishing AWPs that are high, sometimes they're going to be higher, sometimes they're going to be lower or whatever, even when they are lower, they impact the ultimate reimbursement level by playing a game along with other people -- it's not a conspiracy -- it was the Nash equilibrium -- that's something different -- but when they play the game of not telling the truth, they're impacting the median reimbursement.

So from our point of view then, anybody who pays on the basis of a J-Code, for instance, for albuterol, if

they've paid for albuterol on the basis of that J-Code, whether it was Schering or Abbott or some other defendant, it's the defendant's drug who they actually got injected into them, that payment was based upon the conduct of the defendant, whether it was Schering or Abbott, because that median was based upon the combined effort of the fact that no one in that Nash equilibrium was telling the truth.

So there are other things, of course, that by the defendants' failing to report true AWPs, that affects the median. It's the point I just made.

Also the point is this, your Honor: There's been a question that's been raised by the defendants about, "Well, if it's the median, we don't have any motive to be having high AWPs. We have no reason to have that motive at all." We've dealt with that extensively in our brief, how it is that that's belied by their own conduct and by their own internal documents.

But it also is the case this, your Honor, and sometimes we lose sight of this: Medicare reimbursement Part B isn't the only place where generic drugs get reimbursed. Generic drugs get reimbursed also by private payors, which are usually but not always MAC'd. Sometimes those private payors may end up in certain circumstances reimbursing on the basis of AWP for some reason. Medicaid sometimes might reimburse on the basis of AWP a

physician-administered drug. There are all sorts of other possible reasons that might creep through so that a defendant might have a motive, not in Medicare Part B but somewhere else, to be having a high AWP. And by posting that high AWP, they can take advantage in that other reimbursement area, but by posting it also, they have affected the Medicare Part B median.

That is the only explanation, by the way, your Honor, if the defendants, even if Medicare Part B religiously, for all multi-source drugs, religiously reimbursed on the basis of the median, that there were no exceptions within that, why it is that there are some very high AWPs that are out there for some generic manufacturers. It can't be just because they willy-nilly do it, that kind of thing. There has to be a reason. The defendants have never come forward with a reason as to why they engage in this or why their documents say that they're doing this.

THE COURT: There's been extensive discovery at this point, so do you have a private payor saying, "We simply accepted the AWP in these multi-source areas"?

MR. SOBOL: I cannot -- I have seen situations, your Honor, although candidly I can't give you the specific examples right now, where I've seen situations where for one reason or another, you have a payor in a particular situation reimbursing a generic on the basis of AWP.

THE COURT: So most of them pick up this median concept, is that right? The third-party payors, how do they reimburse?

MR. SOBOL: For generics, for these drugs, they reimburse also on the basis of a MAC.

THE COURT: Right.

MR. SOBOL: Yes, for the most part, for the most part.

THE COURT: So I'm not understanding your point. Why would it --

MR. SOBOL: Well, because it not always works like that. In other words, there are exceptions to the rule.

THE COURT: And can you think of one right now?

MR. SOBOL: I honestly can't, your Honor.

THE COURT: All right, I understand. All right.

MR. SOBOL: So I want to make sure if I go through a --

THE COURT: You know, we just don't have the rest -- so are you pretty much --

MR. SOBOL: I'm pretty much done. I just want to wrap up this point then, okay? The point that I'm trying to make with respect to this is: If somebody has bought on the basis of a J-Code, they have been impacted by Abbott's wrongful conduct or Schering or whoever else manufactures that J-Code, but that's our position on that.

I also want to point out too, your Honor, that if you go to my Slide 10, "Abuse of AWPs in the multi-source context for Medicare Part B shows that all purchasers of the J-Code multi-sourced drug are impacted similarly by the same median price." In other words, we think the class certification is more amenable here where you have people all being impacted by the median price.

The other thing that's interesting about this, your Honor, is that you remember Dr. Berndt in his report. One of the things that he made clear several times -- I'm not going through the slides, but I have them in here -- is, Dr. Berndt pointed to three or four features of the physician-administered drug area that he thought contributed to why there's all this fraud and abuse capability with respect to physician-administered drugs. He talked about how there was a lack of transparency. There was a couple of other things throughout there. And one of the things he focused on is, he said, you know, the fact that there are J-Codes that are used in this area is something that creates a lack of transparency for manufacturers to be able to engage in fraud and abuse of the reporting, because even the third-party payors, even the sophisticated ones like Aetna and Humana and Cigna and Wellpoint and that kind of thing, because the physician-administered area is happening on the basis of J-Codes, they can't see and they don't know as much

information as they otherwise would. So what Dr. Berndt concluded is that the J-Code issue is a source of the system that enables the defendants to engage in the wrongful conduct that is before you in this case.

It is ironic, therefore, that the defendants try to say, "Because we have some anonymity in the J-Code area, which is a source for our fraud and abuse, you can't certify a class. Because you're never going to be able to find out, you know, which company's albuterol was taken by that elderly cancer patient twelve years ago, don't certify the class." That's what they hinge a very significant part of their case on, the anonymity in the system that they've sought to and have, we allege, abused, and even which Dr. Berndt -- and this is Dr. Berndt's point -- they are trying to use as a basis upon which to have you deny class certification to people who are ripped off for generic pharmaceuticals. We don't think that that's appropriate.

THE COURT: You know, this isn't the first time the courts have struggled with this issue. I'm thinking out loud. I remember in the lead paint industry, there was an issue of who manufactured the paint in an older home. Do you remember where that case law played out?

MR. SOBOL: Yes. In Massachusetts, it's the Payton Labs case which we've cited in our brief. That was a DES case, your Honor, involving a drug that is manufactured

by more than one manufacturer. There, given the kind of theory that the plaintiffs put forward, the SJC said, "Well, we can't go forward with that kind of theory," but at the end of its opinion it gave a road map as to how it is that you would impose essentially market share liability. And one of the critical features they said is, you can't be having one of the defendants pay more than their fair share, more than -- you know, they can't come forward and have to pay a hundred percent of one person's damages if their market share was only 20 percent or something like that.

THE COURT: Is that an appropriate model to think about, even though I know it's not binding on me in a class cert?

MR. SOBOL: It's not binding. It's an appropriate analogy --

THE COURT: Well, actually, going back to Erie V. Tompkins, is this a substance or a procedure issue?

MR. SOBOL: Well, actually, I don't think it -- to me, what it is is this: Our case here is more compelling. There it's a personal injury case, right, where by definition you know that the defendant's product may or may not have caused the harm. That's the issue in Payton Labs. That's the issue in the lead paint case. You don't know if the defendant's wrongful conduct caused the plaintiff harm, but you still might hold them liable. And the courts have said,


"Even in a situation where you know that the defendant's wrongful conduct caused them harm, we might find them harmful for their contribution."

Here we don't have that. Here we know that even if the plaintiff got Schering's albuterol or Warrick's albuterol or Abbott's albuterol, their overpayment was still in part based upon Schering's and Abbott's or Warrick's wrongful conduct.

THE COURT: But what if -- I'm thinking out loud, which is what if one only had 10 percent of the market and he only had 90 percent of the market?

MR. SOBOL: Right. So it would still be based upon their wrongful conduct, but then you go back to my earlier point. Our damage model only seeks to hold them liable to the class as a whole for their sales, so they're never being asked to pay more than their fair share. It would be different -- our damage model could have, your Honor, sought to impose liability upon, for instance, Warrick for all overpayments of generic drugs regardless of their sales because they contributed to a higher median for everybody. That's not our damage model. Instead, we only seek to have the overcharges associated with respect to Warrick's sales, so it never has to pay the class of harmed people more than its fair share.

THE COURT: Thank you. Now, let's --

MR. DeMARCO: Your Honor, just to put some perspective on the arguments today --

THE COURT: Yes, I'd love to hear from you, but let me just ask, does this make sense? I imagine at some point -- well, last time around when I got into the duking it out whether Mr. Bean did or didn't take X, the argument didn't help me very much. I literally needed to roll up my sleeves and actually walk through the documents. So do you all want to have that kind of argument class rep by class rep or rest of your papers?

MR. DeMARCO: Well, this is what we thought might help you out because I know that we're working toward an efficient presentation here. There are two principal speakers today to my right and left, Jack Dodds who you may remember from past times is a RICO man -- today he's a consumer man -- and Jim Muehlberger who's going to argue the TPP issues. Then the reason we submitted two little booklets to you is that one of them is the slides that we expect to use for the joint opposition, which are the so-called crosscutting or the joint issues that my colleagues will argue. Then you have another booklet that addresses every defendant, all thirteen defendant organizations. Each of them, I suspect most of them, are represented by counsel here today. We thought that after you heard the principal speakers and get into whatever you were going to get into, if

you had any questions that were directed specifically to the individuals, their counsel could stand up and give you a couple of minutes.

Failing that or without that, I believe most of the defendants here -- I'm supposed to, I think, speak for most of them at this point -- are willing to rest on their papers and the demonstratives that we've provided to you.

THE COURT: Okay, so let's just deal with the crosscutting issues, and to the extent that I get completely confused once I've resolved the crosscutting ones, I can call in that counsel and plaintiffs' counsel and --

MR. DeMARCO: We'll go from there and figure it out.

THE COURT: That's what took enormous amounts of time last time.

MR. DeMARCO: Yes, trying to keep a little bit of order to the process.

THE COURT: Okay, good.

MR. BARLEY: Your Honor, I'm standing because I represent AmGen, and I would like to address one or two issues that are unique to our company and how we present in the papers. I think I'll be five or ten minutes at the most.

THE COURT: I will try, and if for some reason we don't get there, we could just -- where are you from?

MR. BARLEY: I'm from Baltimore.

THE COURT: So if worse comes to worst, that's only a shoot up the coast, we'll just do another hearing. It's not like someone's coming across country.

MR. HURST: Your Honor, we're found in the same position. I think actually some of our presentation, about 90 seconds, might add a lot of color to the things you're talking about, but we're in the same position as AmGen.

THE COURT: Where are you from?

MR. HURST: We're from south of Washington, D.C.

THE COURT: Not from Japan, right?

MR. HURST: Oh, no, no.

THE COURT: Is there anyone from some incredible location that couldn't come here easily again on an individual issue? All right, fine.

MR. DeMARCO: Okay? So Jack will address the first issue for the defendants.

THE COURT: I'd forgotten that you were a RICO man.

MR. DODDS: Your Honor, I was, and that was a very long time ago, your Honor.

THE COURT: It was.

MR. DODDS: I was RICO man. Now I'm a different person, your Honor. Now I am, simply put, "If you certify these classes, you'll be committing reversible error" man.

THE COURT: All right.

MR. DODDS: And I understand that when your Honor

de0c81e3-5126-441b-899c-f9b6feb84c5e

came out, you said that you pretty much agreed with Mr. Sobol as to Classes 1 and 2, so I'm fighting an uphill battle a little bit here, but I'd like to try to fight it anyway because I think I'm right.

THE COURT: Well, it was with respect to -- not with respect to this last proposition of his.

MR. DODDS: Sure, understood.

THE COURT: It was with respect to commonality, and I'm not going to revisit anything that I did last time unless I have a really good reason for doing so, so -- but this issue is different because he's basically asking me, and that's the new piece here, is to take the standing point, and that's different.

MR. DODDS: Well, your Honor, I want to make one point, and then I'll turn precisely to what Mr. Sobol said. I can understand why, your Honor, with all the work that you've done and with all the work that went into Track One, why you would think you've already addressed commonality, predominance, superiority, ascertainability, as you're required to do. The fact of the matter is, your Honor, with respect to the classes as they're defined here and the class reps as they're set forth here, you actually have not done that because you've never really had an opportunity to do it.

You will recall, your Honor, the procedural posture

in which this thing came to you when the motion for class certification in Track One was presented, and it's especially important with respect to Class 1. You had no individual plaintiffs. You had no individual class reps. Remember when I first stood up here, your Honor, as RICO man, I raised the standing issue for the first time. I raised the issue because in the first complaint there were individual plaintiffs named, people. And I made the point that the plaintiffs had not alleged that any of those people, with one exception, used the drug manufactured by any of the defendants in the case, and that therefore they lacked Article III standing.

Now, plaintiffs' counsel stood up at that time and said -- I think it was Mr. Kodroff stood up and said, "Well, your Honor, it was a drafting error." And that's how I remembered it. I went back and looked at the transcript, and that's what happened. And your Honor gave them leave to amend because they said, if they had leave to amend, they could name individuals with standing. So they amended, and there were no individuals. There were associations and I believe TPPs at that time, or maybe associations and community groups, but there were no individuals. And that's how the case proceeded up until the motion for class certification was presented. The proposed class reps were the associations and the TPPs for Class 1, for the Medicare

Part B class. So there was no discovery of any individual class reps.

THE COURT: Right, and then I agreed with defendants, and I made them come up with individuals and knocked some claims out where there weren't individuals.

MR. DODDS: Correct, and individuals were -- but what your Honor did in the opinion was, your Honor made findings with respect to things like predominance and superiority based on, I submit, your Honor, assumptions because that's all you had at the time. You didn't have a record from which you could make a judgment about whether those things were satisfied as to individual Medicare Part B class representatives.

THE COURT: I remember going through stacks.

MR. DODDS: You had a huge record at the time that related to the class reps that were presented to you, none of whom were individuals at the time that you made those findings, your Honor, none of whom were individuals.

THE COURT: I'm not sure I remember it that way, but go ahead, why don't we go on to this case.

MR. DODDS: Sure, and your Honor can go back and check the record, and you'll see that that is in fact the case. Your Honor said in the opinion that because plaintiffs claimed that they had individuals, their words, and in your Honor's opinion in your words, "waiting in the wings," you

would certify the class subject to them going and finding the individuals.

THE COURT: Right.

MR. DODDS: And you made findings about things like superiority and predominance.

THE COURT: Right, and then they found the individuals, and then I had stats about each individual.

MR. DODDS: Correct, and the only issues that were litigated beyond that point were whether the individuals had standing, whether there was adequacy and typicality. That was all that was litigated after that point. The issues like predominance, superiority, and ascertainability were never litigated, if your Honor goes back and looks at the record, with respect to Class 1.

And here's the reason why it's important, your Honor, and Mr. Sobol actually in one of the statements that he made highlights the problem. Mr. Sobol said -- and this was with respect to the generics issue, but it cuts across the entire, all of these classes, and it exists for generics and for single-source drugs -- Mr. Sobol said that one of the reasons that this crosswalk had to be done was to identify who the class members were, that what he called that detailed and intricate crosswalking would need to be done in each instance for a multi-source drug to identify who the class member was.

Your Honor, our position on this is very, very simple. Under the First Circuit's decision in Crosby and which is cited toward the end of our brief, it would be reversible error for your Honor to certify a class when the class members can only be identified through individual fact-finding and individual litigation, and the record your Honor has before you now shows that that is precisely what has to happen here.

With respect to the --

THE COURT: Because of the J-Code problem?

MR. DODDS: Not just because of the J-Code problem, your Honor, not just because of the J-Code problem; because of the fact that, I think as Mr. Sobol said during the class notice hearing, more than four out of five Medicare Part B beneficiaries don't make any co-pay out of their pocket at all. The vast majority of Medicare Part B beneficiaries make no co-pay out of their own pocket.

THE COURT: Right.

MR. DODDS: Okay. Then you have those who do make some payment out of their pocket.

THE COURT: Right.

MR. DODDS: The record that your Honor has before you now, and as you go through the individual defendant's submissions, as you roll up your sleeves and go through this defendant by defendant, you will see that identifying the

people who paid out of their own pocket, where that payment was based on AWP, which is what has to happen to meet the class definition here, is an intensely -- is a very --

THE COURT: You know, the defendants put together this fabulous tutorial for me, as did the plaintiffs, really early on in the case. I remember sitting at home and just watching the video.

MR. DODDS: Yes, your Honor.

THE COURT: And basically everyone conceded that AWP was the benchmark in the industry. Now, it may be that the theory of the case is shifting, and there may be some instances where it isn't, and that might be a fact issue, but it is a sea change shift as to how the defendants have been characterizing the role of AWP.

MR. DODDS: Your Honor, I don't necessarily agree that that's the case, and I don't remember --

THE COURT: Did you see that? Who was the guy? He gave me -- he was standing there and there was the -- it was a great video.

MR. DODDS: Right. Your Honor, as I recall the tutorial, it dealt mainly with and most of the case up to that point in time dealt mainly with whether self-administered drugs were properly part of the case. That's really what your Honor labored with the most with respect to Track One.

THE COURT: AWP is the sticker price, everybody knew that that was the industry benchmark. I mean, at this point I'm not changing that. Now, there may be another basis, there may be at some later point in time, but I certainly have plenty in the record, overwhelming evidence from both sides in the record that AWP is the typical way in which drugs were charged.

MR. DODDS: Your Honor, what I'm saying now, now we have a record of these individual Part B proffered class representatives, the individuals that have been proffered.

THE COURT: Right, and so with respect to the non-multi-source, as I understand it -- the Center for Medicare and Medicaid Services was here, the guy, the IT guy, who basically said, "I just have to throw in the name and I can tell you who the person is."

MR. DODDS: Can tell who the Medicare Part B beneficiaries are, yes.

THE COURT: Right. So I send out a notice to them, and if they paid out of their pocket, that's a damage issue.

MR. DODDS: Well, actually I take that back, your Honor. You can tell who the Medicare beneficiaries are who received a prescription drug under Medicare.

THE COURT: Sure, of that kind of whatever the brand name is.

MR. DODDS: Right, of a brand name. But, your

Honor, as the evidentiary record that we have now shows, many of those people, and as Mr. Sobol acknowledged during that same hearing, a good four out of five of those people aren't going to have paid based on AWP at all.

THE COURT: Sure, and so they won't be able to claim.

MR. DODDS: And to find who the people are who can claim, you have to do a person-by-person analysis of their claims information, of what they received, of who they received it from, and of what they paid.

THE COURT: That's damages. Why isn't that damages?

MR. DODDS: Because, your Honor, unless they paid based on AWP, they're not within the class definition.

THE COURT: By definition, they do pay based on AWP because that's what the statute says, and that's why you have all conceded over time.

MR. DODDS: Your Honor, we've conceded that AWP, I will confess, is a prominent feature of the reimbursement market. It is, there's no question about that. But under Medicare, it is not the case that every single individual who gets a drug under the Medicare benefit pays based on AWP. In fact --

THE COURT: I'm sure that's right, but that's atypical, and so -- or at least I haven't been persuaded that

it's not typical. Let's just jump to the J-Code thing because that's confusing to me. So they've got a novel theory of standing which I haven't thought about before on the multi-source.

MR. DODDS: Before I do that, your Honor, and I will do that, but your Honor has asked us to sort of cut through the dense briefing, and just to make sure that you have a fair opportunity to think about the point that I've just made, which I understand is not a point that's pleasing to the Court at this point --

THE COURT: It's not that. It's a sea change.

MR. DODDS: It certainly is a point that hasn't been made up to this point, I understand that. I'm going to ask your Honor to go back and look at, as you look at the individual defendant's submissions, look at three cases that are cited in our brief.

THE COURT: Crosby?

MR. DODDS: One is the Crosby case, which says that you simply can't certify a class if to figure out who's in it you have to have individual fact-finding and litigation, and the record as to each of these defendants shows that's exactly what you have to do just to figure out who's in it.

The second case is the Sanneman case, which is an Eastern District of Pennsylvania case which deals with the same issue.

THE COURT: It's for drugs?

MR. DODDS: No. None of these, your Honor, are cases that involve pharmaceutical products. The third case, your Honor, is a case called Dumas. I think these are all cited toward the end of our brief, which is an Eastern District --

THE COURT: Which footnote?

MR. DODDS: It's on Page 39. I don't remember which footnote, your Honor. And even with the glasses I've gotten since I was RICO man, I have trouble reading it too, but it's on Page 39, I believe.

Now, that was a case in which Mr. Sobol's firm represented the class, and I believe Mr. Sobol was involved in it. It didn't involve pharmaceutical products, but that was a case in which the court said, even if membership in the class as an objectively defined term -- in that case it was people who received counterfeit Lipitor -- in this case it's people who paid based on AWP -- the Court said that you cannot certify a class if to figure out who received counterfeit Lipitor you need to do a class-member-by-class-member analysis. And that's what you need to do here, as the record that you now have, that you didn't have before, shows.

THE COURT: Well, your expert is who, Young?

MR. DODDS: Young.

THE COURT: What percentage of people does he say

don't get billed based on AWP?

MR. DODDS: I believe, your Honor, he breaks it down to there are only 9 percent make a co-pay out of pocket.

THE COURT: But that's a different question from what I just said. Yes, that's probably correct. That's consistent with what I've heard over time.

MR. DODDS: Correct.

THE COURT: Because for a variety of reasons. Many of them have supplemental insurance, which is Class 2. That's a primary reason. And the other is that sometimes the doctors don't charge people.

MR. DODDS: During the class period, that was common. In fact, now --

THE COURT: I understand that, but that's different from saying that AWP wasn't the benchmark used for the reimbursement scheme.

MR. DODDS: And, your Honor, I'm not claiming that there is nobody out there who paid based on AWP. I probably wasn't clear, but that's not what I'm saying. What I'm saying is, in order to find those people, in order to find those people, you need to do a very intensive person-by-person analysis, which the case law, Crosby in particular, says you can't do, you cannot certify a class under those circumstances.

THE COURT: I understand your point, but we have

limited time, and I'm really struck with the new issue, which is for some reason it wasn't -- maybe I forgot about it or didn't focus on it, but it wasn't really vetted, is what to do with the multi-source drugs.

MR. DODDS: Yes, your Honor.

THE COURT: And that's a harder issue for me right now.

MR. DODDS: Right. And, your Honor, let me say that the fact that you have to do this analysis for multi-source drugs fits with the argument that I just made. The mere fact that you have to do it, under Crosby and the other cases I cited, says that you would be committing reversible error on this record to certify these classes.

THE COURT: Well, is it true as Mr. Sobol says that you can always figure out which person paid under a certain J-Code, but you can't then figure out which of the multiple sources the person actually purchased it from?

MR. DODDS: Correct. And in this instance, your Honor, it may be that they used a drug of a pharmaceutical company that's not even a defendant within this case, and there are individual briefs that make that point to you, that there are manufacturers of the drugs that have been placed in issue here that are not before you now. So on this sort of theoretical thing that you just heard about, which I'm not quite sure I follow, you would be creating a situation in

de0c81e3-5126-441b-899c-f9b6feb84c5e

which manufacturers who are before you could be held liable, if your Honor entertains all these notions, based on products that aren't even at issue here because of defendants that aren't even present here. That alone is reason enough to reject it, but that's a problem that's identified and made specific in certain of the specific defendant briefs.

THE COURT: Well, for the point of understanding whether someone is appropriately a class member or not, suppose you had a drug where all the sources were defendants, would that be a different situation where there was a significant number of companies that aren't defendants?

MR. DODDS: You know, your Honor, the answer is "no" because we're right back where we started back when I was RICO man, trying to find ways to avoid Article III standing. I don't know of any case, and defendants haven't cited any, where that requirement, that a defendant who wants to be a class representative here can simply avoid Article III standing based on some notion that sort of everybody contributed to it and everybody did it and they were injured by it. Article III standing is a threshold requirement that's glossed over by all of these theories that you've just heard about, all of which, your Honor, by the way, are after all this time purely theoretical. I mean, your Honor made the point that there's been extensive discovery at this point. There's been extensive discovery at

this point, and think about what's happened up to this --

THE COURT: Is discovery closed for Track Two?

MR. DODDS: Yes, it is, your Honor. The discovery has been done. The work has been done. And think about what's happened up to this point in time. When the case started, your Honor found that the generic drugs, the multi-source drugs, didn't fit the paradigm and dismissed them. So they came back and they alleged that this leapfrogging was going on.

Now, Dr. Hartman talks about how it could happen. I'm not aware of any evidence that shows that it did happen, that there were any frogs or that there was any leaping, because if it did, you should be able to look in the Red Book or the Blue Book and see it. If my client Pharmacia -- all of our drugs are multi-source drugs -- if my client Pharmacia sets an AWP for a multi-source drug it has, and another defendant here decides that it wants to compete with that to raise the median, it should be a simple matter to read the read the Red Book, read book Blue Book, read the pricing publications and see it; but you've never been presented with any evidence that it happened because it simply didn't.

THE COURT: It's not clear to me why it happened, but let me ask you this, because it wouldn't help them competitively among each other. It didn't fit the paradigm as originally given to me, but regardless of why, what motive

people had for putting a really high AWP if it didn't gain the market share, regardless of the motive, doesn't it similarly just hurt the consumer paying for it?

MR. DODDS: Your Honor, I suppose it could theoretically. The problem that you have here is, for purposes of class certification or for any other purpose, for that matter, you have no evidence to support any of the theories that have been presented here; not the leapfrogging, not the Nash equilibrium.

THE COURT: But what about, apart from all that, if under the statute an older person has a right to pay 20 percent of AWP and it's inflated a thousand percent, isn't that person harmed?

MR. DODDS: I'm sorry, ask your question again, your Honor.

THE COURT: A lot of these people are older people, right, and they've got cancer?

MR. DODDS: Yes.

THE COURT: And they purchase a multi-source drug of a sort that they now can't figure out which company it was. Apart from why the AWPs were way up here, they nonetheless are overpaying for their copayment.

MR. DODDS: Your Honor, it depends on what the Medicare allowable is for that particular drug. Let me give you an example. Let me give you the example that has been

given for my client, Pharmacia, okay. One of the class reps that's been presented for Pharmacia is the estate of Mrs. Young, and the drug that she supposedly took, allegedly took, was a drug called SoluCortef, which is a multi-source drug that is manufactured by many defendants, some of whom are here, some of whom are not here.

Now, our papers talk about whether they can identify that as our drug, okay, and so I won't belabor that. But if you look at Mr. Haviland's declaration with respect to Mrs. Young, you see a bunch of claims information that shows, here's how much the doctor billed, here's the Medicare allowable, which was way below what the doctor billed, here's what the insurer paid --

THE COURT: When you say "billed," billed who?

MR. DODDS: What the doctor billed for the services that were provided.

THE COURT: To Medicare?

MR. DODDS: Correct, what the doctor billed to Medicare and what the doctor billed to -- well, in this case, what the doctor billed to the insurers, which were Medicare, and then there's a supplemental insurer.

THE COURT: All right, and Mrs. Young didn't pay anything?

MR. DODDS: Mrs. Young was ultimately billed, I believe, 31 cents for the first administration and, like,