Page 58

32 cents or something for the second.

THE COURT: By the doctor? Who bills the co-pay, the doctor?

MR. DODDS: Well, the doctor is supposed to bill the co-pay. Whether they do it or not is a separate issue.

THE COURT: So you're saying the doctor actually billed her the 31 cents?

MR. DODDS: No. In this instance, the doctor submits a claim to Medicare and then a claim to Mrs. Young's insurer. Mrs. Young's insurer pays some portion that's pursuant to their agreement of what's left, and the amount that was left for Mrs. Young to pay was 31 cents. There's no evidence in the record that I'm aware of of whether the doctor ever actually billed her.

THE COURT: But that's the kind of debate I'll get into. So your point is, that's too de minimis to have a stake in the outcome?

MR. DODDS: Well, your Honor, my point is, first of all, that sort of the ongoing idea here is that there's a mass of elderly sick people who have been injured grievously and they're out of pocket in huge amounts, which understandably seems to drive a good portion of the case, understandably. The record that we have before us on the class reps that have been presented, it's not so. It's not so. If you look at all the class reps that have been

Page 59

presented here, you see --

THE COURT: So she's the only class rep for Pharmacia, is that it?

MR. DODDS: I think that there's a Mr. Bean who was brought in late who wasn't part of the case, who was a class rep for Pharmacia as well.

THE COURT: And what did he pay?

MR. DODDS: Your Honor, let me check real quickly, but you have similar circumstances with Mr. Bean. I believe on one of the drug encounters -- and it's in our papers -- he didn't pay anything at all. He wasn't obligated to pay anything at all.

THE COURT: So with respect to Bean, just to give an example, they can trace it to Pharmacia, right?

MR. DODDS: They claim they can.

THE COURT: Right, they have a prima facie case of tracing it to Pharmacia. And you're saying what with respect to him, that he didn't have to pay anything?

MR. DODDS: Well, I'm responding to your Honor's question about these huge spreads and what the Medicare beneficiaries paid, and weren't they harmed by that?

THE COURT: Well, but that's been part of this case from the beginning. Most people have the insurance. It's only a tiny subset, it's tiny that don't, but still numerous for purposes of class cert; you know, in the millions,

Page 60

right?

MR. DODDS: Even if that's the case, your Honor, I contend you can't certify the class for the other reasons that I said.

THE COURT: Right.

MR. DODDS: But if that's the case, I'll accept that for purposes of this discussion, yes, that there may be a lot of people who ultimately paid based on AWP. The problem is that, your Honor, we cannot find them without individual litigation as to each one of those people, because in each instance you're going to have the kind of thing you see in the massive record that you have before you on the Track One class reps now, a battle over whether that person paid for one of the defendants' drugs, one of the defendants in this case as opposed to some defendant who isn't here; whether they paid anything out of pocket --

THE COURT: Well, why wouldn't a claims administrator, luckily not me, sit and do this, the thing I'm going to be doing for every class rep?

MR. DODDS: Here's what the cases say, your Honor. You could construct a process where this could happen. I don't think you could construct a process where this could happen consistent with due process because the issues that I'm talking about now don't go to damages. They go to liability. They go to whether the person is a class member

Page 61

at all, whether they paid out of pocket based on AWP. And those are issues as to which --

THE COURT: But that's how I would define the class.

MR. DODDS: Correct, that's how your Honor would define the class. Then to go out and find the people that fit within that definition, you would have to have, and the defendants would be entitled to, individual litigation.

THE COURT: All right, I understand your point. Now, legally speaking, the one I'm just grasping with is, if you can't figure out which company it is, unlike the Bean and Young situation, say, you can't figure out which one it is and there are a bunch of companies that aren't defendants, whether or not that would be sufficient to confer Article III standing or whether I just carve off those drugs.

MR. DODDS: I can't see how it would be sufficient to confer Article III standing. That person has to show that they suffered an injury at the hand of a particular defendant. And if they can't show that, they don't have Article III standing, whatever the reason is that they can't show it.

THE COURT: But I do think that's a different thought process than the ones for which all defendants are named here.

MR. DODDS: Your Honor, the hypothetical your Honor



de0c81e3-5126-441b-899c-f9b6feb84c5e

Page 62

is positing is, all of the defendants who supposedly are within that J-Code are here, and the person can't show which of those products they used?

THE COURT: Why wouldn't they be an adequate class rep?

MR. DODDS: Well, first of all, your Honor, they wouldn't have standing. They simply wouldn't have standing under Article III.

THE COURT: They'd have standing against one of the four or whatever.

MR. DODDS: They might have standing against one of them, but you have to be able to identify who they are.

THE COURT: Well, that's a very hard legal issue.

MR. DODDS: Well, I don't know that it is, your Honor, because the argument on this point, as I understand it, is, well, you could use a market share construct.

THE COURT: Well, I have to go back and look at that case law. It is 93A class -- I don't know whether it's substance or procedure, so I have to think about that.

MR. DODDS: Well, your Honor, I think the cases that have been cited -- and this market share theory didn't come up until plaintiffs' reply brief on class certification -- the cases that are cited, I don't believe any of them stand for the proposition that under any or all of the, what is it forty-two state consumer protection

Page 63

statutes that are at issue here with respect to Class 1, because those are where the claims will be brought, that there is any such thing as a market share theory; that you don't have to show individual injury, you don't have to show individual injury with respect to a particular plaintiff. Those cases are all tort cases, negligence cases that involve personal injury. I don't believe there is, Mr. DeMarco tells me, any such thing as a market share and liability theory in the state of Massachusetts under 93A or anything else.

THE COURT: It doesn't exist? I just don't remember. It was evolving and in flux for a while.

MR. DeMARCO: Many years ago as a younger man I was involved in DES litigation, and the Payton V. Abbott Labs case was the SJC case that Mr. Sobol referenced. That struck down the theory of market share in Massachusetts. There's only one case in Massachusetts. I believe the case is a case called Monahan. And I don't want to misstate it, and I apologize in advance, I may have the name wrong. It may be Morrissey, but I think it's Monahan. And it was a case where the SJC found market share under the specific facts of the case that had to do with prescribing a birth control drug in a product liability setting. That's the only one. It's the orphan case that's out there on market share. But in terms of drug manufacturers and in the context of diethylstibestrol, DES, we don't have it in Massachusetts.

Page 64

MR. DODDS: Your Honor, let me make just two additional points and ask you to take a look at two cases that I think go to this point. One case is the Amchem case, the Supreme Court case that's cited in our brief, which says that Rule 23's requirements must be interpreted in keeping with Article III constraints and the rules enabling it. You can't come up with some theory that would overwhelm Article III standing. The plaintiff has to have Article III standing.

THE COURT: Are you aware of analogous situations?

MR. DODDS: I'm not, your Honor, no, I'm not. I'm not. And, I mean, this is a case where it's been a class action in search of a class from the very beginning. It's not -- it is.

THE COURT: No, I wouldn't --

MR. DODDS: When it comes to individuals, your Honor, that's what's happened. That is what's happened. But let me ask you to take a look at one other case, and it's your Honor's own decision on this market share theory. And I don't know if this is cited in our -- in fact, I think it's not cited in our briefs because this wasn't raised --

THE COURT: It wasn't in one of those footnotes, huh?

MR. DODDS: No, it wasn't even in one of those footnotes. It was raised because it's responsive to what was

Page 65

raised in plaintiffs' reply, and this is the Mills case, 178 F. Supp. 2nd 1, which I believe held that Massachusetts had never accepted either a market share theory or sort of the kind of the alternative liability theory that's being presented here.

THE COURT: That was lead paint? What was that?

MR. DODDS: I think that's what it was, your Honor. No, it was latex gloves.

THE COURT: It was latex gloves.

MR. DODDS: Yes, your Honor, it was latex gloves.

THE COURT: When did I last look at that?

MR. DODDS: It was 2001.

MR. MUEHLBERGER: That's correct.

THE COURT: Thank you.

THE COURT: Let him do the other crosscutting, and then I'll get to you. Go ahead.

MR. MUEHLBERGER: Good morning, your Honor. Again, my name is Jim Muehlberger. I will be addressing the Class 3 TPP issue which your Honor has already raised. And we agree --

THE COURT: You're with Aventis?

MR. MUEHLBERGER: Yes, your Honor. Track Two agrees that it would be wise for the Court to defer its decision on certification as to Class 3 until after the November trial, until the Court has some judicial experience



de0c81e3-5126-441b-899c-f9b6feb84c5e

with this class. We fully agree with that concept.

Let me first, though, address the factual record that's been developed in the last year on Class 3 TPPs, because that's what we focused on, and then point out five issues that I think will frame the issues for you as you look at certification of the TPP class.

THE COURT: Can I ask you this. This is the only concern. It's been good news for you that you've gone after Track One in some ways, but I also don't want to prejudice you in other ways. I just recently decided, as I'm sure you're aware, to take both classes just so I can essentially get my arms around all the myriad of issues on the third-party payors, but in a way, you're not part of that. There are going to be four companies involved with that who I think have consistent interests, but I'm not completely sure. Are you comfortable with my using that record to address these third-party payor issues?

MR. MUEHLBERGER: That's a very broad question. Let me try and answer it as best I can.

THE COURT: I know that's unfair because you don't know what the record is, but subject to your being able to amplify or address it.

MR. MUEHLBERGER: Let me say this: Obviously Track Two is not part of the November trial. Let me say, however, that the class reps that have been proposed and the



members for the Track One Class 3 and 2 trials, Pipefitters, Sheet Metals, are class representatives and members of the class that plaintiffs propose as to Track Two. And so it is our belief that when your Honor looks at the record with respect to those class representatives, it will be very instructive to your Honor with respect to Class 3, and perhaps Class 2, TPPs in the Track Two context as well.

Let me first tell you that we spent the last year focusing on the unclear issues that Dr. Berndt noted in his report in 2005, specifically as it related to the third-party payors in Class 3, which, as your Honor noted, was a very raw record at the time, a very undeveloped record at the time. In fact, when your Honor certified the Class 3 against Track One and chose Blue Cross and Blue Shield as the class rep, they'd only been in the case for about 30 days and there had been one or two depositions of them. There's now been over the last year about another thirteen or fourteen depositions of them as well as other third-party payors. So I think that discovery record frames certain legal issues, and I think there are five of them that I want to address as I go through it.

Let me start with what Dr. Berndt did say in his 2005 report.

(Discussion off the record.)

MR. MUEHLBERGER: Your Honor, Dr. Berndt



observed -- as your Honor may recall, if you read Dr. Berndt's Track One report, about 90 percent of it focuses on self-administered drugs, and about 90 percent of the briefing focused on self-administered drugs at that time. Dr. Berndt noted that the record was much less clear on physician-administered drug issues, and that determining whether in fact certain features of physician-administered drug transactions were in fact typical would be a major challenge, and he asked the parties' experts to address certain of those issues, such as the extent to which third-party payor payments for physician-administered drugs were based on AWP.

We've spent the last year focusing on those gaps in the record evidence as to physician-administered drugs, primarily with respect to Class 3 third-party payors and Class 2 to a lesser degree. As your Honor may recall, at the time you certified the Track One case as to Class 2, the third-party Medicare payors, there had been no discovery conducted on any Medicare Part B carriers. We have now conducted that discovery and are in the process of continuing to conduct that discovery as against the Massachusetts Part B carrier, currently NHIC, formerly Blue Cross and Blue Shield of Massachusetts. So that is also new evidence that your Honor has never seen before.

I want to go back to your 2005 order because I



think it also framed for us the issues as we approach certification.

THE COURT: Just to make sure I understand, when you say Medicare Part B carrier, are you referring to the carriers that provided the Medigap insurance?

MR. MUEHLBERGER: I'm referring to the CMS contract carriers across the country who administer the Part B claims, and those carriers make decisions and have discretion as to the reimbursement formulas pursuant to Medicare Part B, and utilize that discretion in some instances to even determine which AWP of which drug to base a reimbursement on; for instance, if there are more than one NDC drug from different sources in the same J-Code.

THE COURT: So you're saying with respect to Blue Cross-Blue Shield -- this is new to me -- that Blue Cross-Blue Shield is both a carrier and the one who determines the reimbursement, as well as somebody who pays various amounts of these moneys as well?

MR. MUEHLBERGER: That's correct. From 1991 through August of 1997, Blue Cross and Blue Shield of Massachusetts was the Medicare Part B carrier for the state of Massachusetts. And then in the end of 1997, NHIC took over, and it remains the current Medicare Part B carrier for Massachusetts today.

THE COURT: And do they also pay Medigap as well as

other kinds of coverage?

MR. MUEHLBERGER: NHIC? I don't believe so. We're in the middle of still getting records from NHIC and haven't conducted a single deposition of them yet, but we'll try and figure that out.

THE COURT: I'm actually less familiar with this. All right.

MR. MUEHLBERGER: So there's a lot of new record evidence that has not been before your court until this proceeding. We've attached many of the documents or some of the documents we've gotten from NHIC and Blue Cross and Blue Shield in our appendix to the opposition of class certification that we filed on June 15.

But let me go back to your order from last year for a minute, too, because it framed for us the issues that we sort of developed on the record. As your Honor said in that order, you noted that some third-party payors may have greater sophistication with respect to the existence of spreads because they purchased self-administered drugs. But there is no evidence, and your Honor was absolutely correct, there was no evidence that TPPs purchased physician-administered drugs or know of the spreads that exist for these drugs when your Honor ruled in August of 2005 as to Track One.

We have since spent the last year focusing on the



discovery record as to third-party payors for physician-administered drugs to try to fill or put some flesh on the bones of that record before your Honor. And the record now demonstrates before your Honor that in fact third-party payors covering approximately two-thirds of the persons in Massachusetts have direct contracts with Track Two defendants to purchase subject drugs at issue here. In fact, four out of the top five largest payors in Massachusetts have such contracts. So the distinguishing --

THE COURT: As of when? When did that evolve?

MR. MUEHLBERGER: For Blue Cross and Blue Shield, it entered into contracts, I know pursuant to its HMO that it had, back in the beginning of the class period, '91, '92, '93. So some of them date back quite a bit in time.

Just using Blue Cross and Blue Shield again as an example, Blue Cross and Blue Shield, for instance, purchased Track Two drugs at discounts of 90 percent off of AWP. So if the AWP was $100, they paid $10 for the drug. So the knowledge that you focused on with respect to self-administered drugs, this record now demonstrates that that same knowledge and sophistication existed with respect to physician-administered drugs as well.

Let me just spend a minute talking about some of the highlights, the 30,000-foot-level view of the physician-administered drug knowledge of Blue Cross and Blue



Shield because that's the payor that we spent the most time conducting discovery on.

As your Honor knows, it's a member of both plaintiffs' proposed Classes 2 and 3 as to Track Two defendants. Its executives have testified that they did not believe AWP was a reliable signal for providers' acquisition costs. Its executive had direct knowledge of acquisition costs and deep discounts associated with physician-administered drugs, both while they were at Blue Cross and Blue Shield and at their prior predecessor occupations.

As your Honor might suspect, a lot of these executives move around in the health insurance field, and John Killian, for instance, who was the director at Blue Cross and Blue Shield, was at Harvard Pilgrim or Tufts prior to that and has extensive knowledge as to what AWP was and wasn't then. In fact he said, "Well, even back at Tufts, we knew AWP meant 'ain't what you pay.'"

THE COURT: The plaintiffs have always conceded that, but they say that the understanding was that it was a 30 percent type spread rather than a 1,000 percent type spread.

MR. MUEHLBERGER: Right, right. As your Honor may recall, their initial theory was that it was a literal term. When Track One developed the record that demonstrated that



was absolutely incorrect, they then came up with their 30 percent solution, what I call their 30 percent solution with Dr. Hartman. And as your Honor may remember, and if you look at the August, 2005 opinion for Track One, you were comforted somewhat, I think, by the fact that Dr. Hartman said he was going to conduct industrywide surveys to see whether in fact the third-party payors did have this expectation, this 30 percent expectation. The record before you today, however, one year later demonstrates that Dr. Hartman never performed those industrywide surveys. Why? Because the record that the Track One and Track Two defendants have now developed with respect to third-party payors demonstrates in fact that no one out there had that expectation. In fact, most of the third-party payors knew only that AWP did not equal acquisition cost. Beyond that, they knew that there were deep discounts associated between AWP and the acquisition cost, but nobody, to my knowledge --

THE COURT: Have you all done that survey?

MR. MUEHLBERGER: Pardon?

THE COURT: Have you all done that survey?

MR. MUEHLBERGER: We don't need to, your Honor. We've got testimony from individual after individual third-party payors who say, "We had no such expectation." There's no need for a survey when all of the real evidence before the Court demonstrates --

THE COURT: Did anyone say they understood it was as high as it is?

MR. MUEHLBERGER: There is evidence that Blue Cross and Blue Shield purchased drugs at spreads of approaching a thousand percent. So when you say that as much as it was, it depends from drug to drug. Some drugs in Track Two had really very little -- had a spread below the 30 percent threshold. There were very few drugs that you see having the large spreads, unless, for instance, they're generic drugs that maybe cost a dollar, and they're administered by an oncologist through an I.V. drip who has to have a nurse there. And you can't reimburse an oncologist one dollar to administer that drug, or, guess what? He'll say, "I'm not going to do it. Go to a hospital and get it done there." And so --

THE COURT: You know, the industry has always raised that argument. I remember it was from the very first day. I don't remember who it was. It was Mr. Montgomery or someone else said: It's a political question. That's a situation Congress decided to address.

Maybe that is the political reality. That having been said, I've got a statute. So, I mean, I'm vested in the statute. And so you may be right that's in fact what the political calculus was, but I don't think that's my job as the judge.



MR. MUEHLBERGER: I understand, Judge. I'm just saying, in the real world, there was a real recognition, by Blue Cross and Blue Shield, for instance, we want our members to be treated in the oncology clinics close to the homes of these sick and elderly people. It's cheaper. They can have their oncology drugs administered in a matter of a couple of hours and they're home, rather than putting them in the hospital where they have to be admitted; and because these chemotherapy drugs create nausea and vomiting, there are severe problems with that.

THE COURT: So you literally have experts or people from these third-party payors who said, "We didn't care what the spread was"?

MR. MUEHLBERGER: In not so many words, that's right, your Honor. They said, "We would rather have the people treated in the clinics because it's cheaper for us, it's cheaper for the system to be treated in the clinics than it would be to move those people into the hospital." So they weren't as concerned with it. Sure they knew that spreads existed, but they also wanted to keep their providers happy. They wanted to keep a network of providers for purposes of competition. And some of these providers have market power, and they would push back. They'd say, "You want to pay us less for our drugs, you pay us more for our services, or we won't be in your network." And that's another issue that



your Honor --

THE COURT: But that came up in the Track One. So you're saying you have more evidence of that dynamic?

MR. MUEHLBERGER: Yes, your Honor, very much so.

THE COURT: And it might vary provider by provider or --

MR. MUEHLBERGER: It does.

THE COURT: -- or health plan by health plan? That's really what you're trying to say.

MR. MUEHLBERGER: It does.

THE COURT: It's not so much whether the cross-subsidization was appropriate in the Medicaid context, as that's part of the dynamic on the Class 3?

MR. MUEHLBERGER: That's correct.

THE COURT: And the mini-fonts in the footnotes, that's going to refer me back to the exact pieces of the appendix that are going to say that?

MR. MUEHLBERGER: I hope so, your Honor.

(Laughter.)

MR. MUEHLBERGER: Your Honor, let me now move from --

THE COURT: I feel like I need to get those programs, you know, like, that magnify the print, but --

MR. MUEHLBERGER: Well, I apologize. I don't know how it turned out so small. It looked bigger when I was



looking at it back at the office, but it somehow got very small when it got printed, so I apologize.

Let me back up from the factual record we've now developed and sort of give you sort of the 30,000-foot-level of, I think, five issues that arise from this record that I think are very --

THE COURT: Sure, I'll be quiet. You'll get me through the five, and I'll give you a chance to respond because we do have to finish it, and I know that people have other scheduling and individual issues, so we want to try and get through that.

MR. MUEHLBERGER: Here's what we now know in two contexts: Plaintiffs now admit that Class 3 third-party payor knowledge and expectations are individual issues. In their brief that they submitted in connection with the November trial for Track One, they've acknowledged that this cannot be decided solely on the testimony of one class member. They said that plaintiffs will call these other class members as to their expectations and knowledge of defendants' actions. And if you look at Page 35 to 36 of plaintiffs' memorandum in opposition to the Track One Class 3 Motion for Summary Judgment, you'll note that they also admit and say that, in that context, Blue Cross and Blue Shield's knowledge, and the fact that that cuts off causation under 93A for Blue Cross and Blue Shield's claim, does not tell you

anything with respect to other class members. Now, that's a significant concession, your Honor, because if the element of a claim -- in this case causation under 93A -- depends upon the sophistication/knowledge of the class member, and it's not -- what the Court finds with respect to one class member is not true for all class members, it's not a common issue, and it doesn't predominate.

Let me go to the second point. There are a couple of very basic --

THE COURT: What page are you on here?

MR. MUEHLBERGER: I'm on Page 9, your Honor.

THE COURT: Of the handout?

MR. MUEHLBERGER: Of the slides, of the joint brief slides.

THE COURT: Good.

MR. MUEHLBERGER: Okay? There are two basic assumptions that underlie plaintiffs' claims in this case, and the facts that we have now developed in the records contradicts those assumptions. The first assumption that plaintiffs had were, the third-party payor reimbursement payments outside Medicare were always based on AWP. In fact, in the last year we've now developed a very extensive evidentiary record that demonstrates that in fact the third-party payor reimbursement was based on the lower of the physician's actual charge or the maximum allowable rate set



by contract, and the latter ceiling price may or may have not been based on AWP.

The second assumption, which the record now refutes, is that physicians always based their charges on AWP. In fact, the record now demonstrates that providers used different methods to calculate charges for physician-administered drugs. Some were based on AWP, no dispute about it. Others, however, were based upon things such as the markup over the acquisition cost of the drugs; and Dr. Dyckman's report, which is attached to the Track Two opposition, addresses those assumptions and the record facts as he understands them.

THE COURT: Now, this is in the Class 3 context?

MR. MUEHLBERGER: In the Class 3 -- well, it cuts across really all classes, but certainly in the Class 3 context.

THE COURT: So Dyckman report is about Class 3?

MR. MUEHLBERGER: Dyckman report addresses these assumptions across all three classes, but you could look at it from --

THE COURT: That's somewhat of a change from the way he originally describes it, with respect to 1 and 2 anyway.

MR. MUEHLBERGER: Well, it's a change in focus. And what Dr. Dyckman says, when he did his report for



Medicare, he was looking at another issue. He obviously wasn't looking at whether third-party payors' payments were always based on AWP. In fact, he will tell you, and he says so in his report, that he didn't even mention in the report the fact that physicians don't always base their charges on AWP. Because it's so well known in the industry, he didn't feel like he needed to even say it.

So I think that if your Honor looks at his report, he basically says, "You can't use my report for what you want to use it for. It doesn't stand for that, and here's the context of what it did do and what it was intended to do and the conclusions you can and can't make from it," okay?

Let me now go back to the Court's reasons for denying the self-administered drug third-party payor claims in your August, 2005 Track One order.

THE COURT: You know, here's my problem: We don't have all day, so we're just going to have --

MR. MUEHLBERGER: Three minutes?

THE COURT: Okay. You have five points, right?

MR. MUEHLBERGER: Right. This is the third one.

THE COURT: Okay.

MR. MUEHLBERGER: Okay. You found that there are different levels of sophistication and knowledge among the TPPs precluding certification of the self-administered drug class. We now have the same record for



physician-administered drugs.

You found that many of the third-party payor class members of the self-administered drug class purchased drugs directly themselves and knew about the spreads. We now have the same facts here.

You noted that many of these third-party payors are well-heeled corporations able to defend their interests in court outside the context of the class action. We have the same issues here.

Okay, one other quick point. Let me just address the 30 percent solution, Dr. Hartman's theory that your Honor has noted. It's basically a fraud-on-the-market theory, okay? Dr. Hartman says, "We can prove that there was fraud on the market because everybody had a 30 percent expectation." Well, as your Honor knows, fraud on the market is only recognized in the securities context and only when you have an efficient market. Even Dr. Hartman admits that this market is not efficient, okay, not efficient for purposes of fraud-on-the-market expectation theory. So that's a question of law for the Court, and under In Re: Polymedica, the Court can and should look at that to determine whether you can operate under a fraud-on-the-market presumption with respect to Dr. Hartman's 30 percent solution, which we believe is no solution at all.

THE COURT: Because you're saying that because of



de0c81e3-5126-441b-899c-f9b6feb84c5e

the lack of transparency in the Class 3, that there is no clear market, efficient market? Is that what you're saying?

MR. MUEHLBERGER: He will say, number one, there's no efficient market. He will say that it doesn't matter to him whether the third-party payors had an expectation or not. He basically assumes facts that are completely contradictory to the efficient market theory for fraud on the market. And if your Honor looks at In Re: Polymedica, the recent decision from the First Circuit, which was a 23(f) appeal, we think your Honor --

THE COURT: Is that, I don't know, a drug case?

MR. MUEHLBERGER: Polymedica was a securities fraud case in which the parties' competing experts rendered an opinion as to whether the market was efficient or not. The First Circuit said, the District Court was absolutely right in looking at the expert reports to determine whether there was an efficient market for purposes of fraud-on-the-market theory. We believe your Honor should do the same here as a matter of law.

Finally, my last point, your Honor, is that there has been a recent decision from the Third Circuit, the Wachtel case. We filed a notice of supplemental authority yesterday.

THE COURT: That's the one that came in yesterday?

MR. MUEHLBERGER: Yes, your Honor. And this



decision, I think, is a very significant decision for class certification law. Rule 23(c)(1)(B) says that the Court shall designate the issues, claims, and defenses to be treated for class treatment in its class certification order. In the Wachtel case, the underlying District Court decision did not do that. Wachtel says, "The plain language of Rule 23 requires it, and we're going to have to reverse the District Court until the District Court gives us an order that does that."

Plaintiffs' proposed order here for you for Track Two does not do that. Nowhere in that order will you find any designation of the common issues, claims, or defenses that the court designates for class treatment.

THE COURT: We had that last time, so you're saying it's just deficient this time? I mean, they gave me a whole little game plan last time.

MR. MUEHLBERGER: Well, the plaintiffs' game plan was a RICO game plan actually, your Honor. It was for the RICO case. And they said that if they prove their RICO claim, they will by circumstance also prove their Consumer Protection Act claims.

THE COURT: So you're saying on Class 3, that we don't have a clear game plan? Is that it?

MR. MUEHLBERGER: Well, two things. I'm saying, first of all, that in any class certification order for



Track One, the Court needs to identify for purposes of the parties and the appellate court the issues, claims, or defenses that are to be treated for common purposes. That's my first point, and the plaintiffs haven't given you that.

My second point is that they have not given you a trial plan now. Obviously, this relates primarily more towards Class 1 where you've got a jury trial and you've got forty-two different jurisdictions of law that you have to deal with than it relates to the bench trial that we have in November.

THE COURT: It's been such a long litigation, I thought I'd seen one at some point, but maybe you're right, it was at an earlier stage. So thank you very much.

MR. MUEHLBERGER: Thank you very much, your Honor.

MR. SOBOL: May I, your Honor, very briefly?

THE COURT: Yes. Well, does this carve out poor Mr. Haviland?

MR. SOBOL: Yes.

(Laughter.)

MR. SOBOL: Tell me when we have about 30 seconds left, and I'll send things over back to Mr. Haviland.

Very briefly, your Honor, on the two main issues. First, because it seems that the plaintiffs and the Track Two defendants agree that it makes administrative sense to wait until the trial undergoes, I take it that really the



presentation you just got was a primer on an opening statement, or whatever, in terms of what the defendants --

THE COURT: Yes. I mean, you've both persuaded me that I probably won't do the third-party payors until after the -- so the early part of the year or whenever we finish.

MR. SOBOL: Right. Just so that I make sure that I put this in the record, most of the issues that have just been raised with respect to Blue Cross-Blue Shield of Massachusetts are already in the summary judgment material that you're going to be deliberating on in trial too. There are rebuttals to the --

THE COURT: I haven't gotten to that yet.

MR. SOBOL: I expect you haven't. I'm just telling you that those points are issues that by definition are going to be dealt with in the trial because they've already been briefed by the parties in the summary judgment context, and you'll get your chance to deal with those things on the merits.

I'll also say, before I get to the real important issue in terms of rebuttal, that the Dyckman report, we submit, is a defendants' report. At the time that Dyckman was actually preparing the report, he was a consultant, I think to Aventis, in this litigation; and that's an embarrassment, frankly, that the defendants ultimately have because at the time that their expert was doing some



de0c81e3-5126-441b-899c-f9b6feb84c5e

consulting for Aventis in this AWP case, he was also hired by MedPAC to do a survey that ended up proving the plaintiffs' point in terms of the ubiquity of the use of AWP. That's an issue that the trier actually --

THE COURT: MedPAC is the Medigap?

MR. SOBOL: Yes. Well, MedPAC is actually an advisory committee, I think, to CMS in the context of reimbursement issues and other issues. So in terms of the absence of a survey, actually this novelty that I think the defendants have been trying to pull themselves away from, this Dyckman report ever since, you know, it was released by MedPAC, it turns out when we finally took Dyckman deposition, that was the first time we found out that in fact Dyckman was a consultant for one of the defendants in this litigation.

But I want to go back to the primary point in terms of the standing issue. Three words: conduct, not product. This case is not a case based upon products. The case isn't brought on the basis that the albuterol didn't work and hurt somebody or that somehow the product was the cause of the injury. This case is based upon the conduct --

THE COURT: And this goes back to the J-Code.

MR. SOBOL: The standing issue, the J-Code issue -- conduct of the defendants and what the foreseeable consequences were of the defendants' conduct. Now --

THE COURT: But what do you do if -- I don't know



enough about this -- if you have a particular J-Code where three of the companies are defendants in this case and another five are not?

MR. SOBOL: Right, okay. Let's --

THE COURT: How do you get them into the class?

MR. SOBOL: Sure, absolutely. Let's look at an even more difficult case. Let's assume that there was a product, the same generic product manufactured by ten defendants, and that nine of the defendants went bankrupt, and there was a class of people that wanted money. We submit that the entire class could still sue that one defendant for the conduct that they engaged in in increasing everybody's AWP.

THE COURT: Even if they only bought from one of the bankruptcy companies?

MR. SOBOL: Because this case is about that defendants' conduct, not about selling their product.

THE COURT: Do you have any case to support that?

MR. SOBOL: Every case where there is joint tort feasor conduct in the history of our jurisprudence under consumer protection law, this is very basic: If you have multiple defendants that engage in wrongful conduct that causes the same harm to somebody, the plaintiff doesn't have to sue all of those defendants, and it's not a defense that you didn't sue all the defendants. All these defendants,



each generic manufacturer, if we prove that they engaged in wrongful and deceptive acts under the 93A, and that their conduct was a proximate cause of the increased median that that person paid, they're responsible. It has nothing whatsoever to do with whether or not their product was injected into somebody's arm.

THE COURT: I understand you're sort of extracting yourself from the lead paint area and moving into joint tort feasor, and I understand that. Do you have any cases that would be helpful? I mean, I understand the theory.

MR. SOBOL: Well, I mean, we'll provide you cases, your Honor.

THE COURT: In a class cert context.

MR. SOBOL: Even in the class cert context, yes, your Honor, of the basic proposition that if the defendants are, you know, jointly responsible, that they can be held responsible to a plaintiff. Here we only have the novelty that in addition to there being conduct that they engaged in, that the plaintiffs actually also got a product in the process from some but not all of the defendants. But that's only a novelty. It has nothing to do with the conduct for which they're responsible for. Again, it's a conduct case, not a product case.

Now, it is the situation even, for instance -- here's an analogy that comes to mind. In the Lupron --



THE COURT: This is quite a different argument than you made the first time around.

MR. SOBOL: Well, no, I don't think so, your Honor, at all. I was trying to make this point, that each of the defendants, regardless of what the product was or who got it, they're responsible for that median.

THE COURT: Well, I agree with that as a possible theory, but that's different from standing. So you're trying to sort of -- "hijack" is the wrong word, but you're trying to import that theory of damages into standing?

MR. SOBOL: Yes, yes. But I think it's pretty basic in terms of the standing proposition, that you don't -- if you have been injured by a defendant's conduct, do you also have to prove that you bought their product? The answer is "no," even if it turns out that some members in the class got their product and some other members didn't.

We pointed to the market share area to point out that even in more drastic situations, more attenuated situations, where even where you have a product case such that some members of the class were in fact only injured by the defendant's product, even there the law figures out a way to have a remedy for people who have been injured. That's where they have market share. And I disagree with defendants' spin, understandable, with all due respect --

THE COURT: It's a big shift from what I've done



de0c81e3-5126-441b-899c-f9b6feb84c5e

before because I've said that there had to at least have been someone who purchased someone's drug.

MR. SOBOL: Right, but in that situation -- and you're asking it right-- in that situation, what we were doing is, we didn't have the problem in front of us. It was easy to be able to do it because it was basically branded drugs.

THE COURT: Well, how many drugs are there where you can't --

MR. SOBOL: There are quite a few, your Honor, in Track Two.

THE COURT: -- where you can't say for sure that purchased one particular defendant's drugs and there are multiple producers that aren't part of this case?

MR. SOBOL: There are -- I can't give you a number. There are many situations in Track Two where we are suing for fraud on the basis of a multi-source drug where to date, for the class representatives, we've only been able to show that they purchased the J-Code. Our brief gets into some of the reasons why. We actually did try for the class representatives to drill down further to be able to show that it was a defendant's product because we had engaged in this fancy in the single-source area, and there are reasons why we haven't been able to do it. One of them is, the defendants refused to provide their records. But be that as it may, if



you look back, your Honor, when we were dealing with Track One, this issue wasn't completely relevant because we were dealing with single-source drugs where none of these -- not only did the --

THE COURT: That's what's very different about this.

MR. SOBOL: But, also, even the theory of joint liability wasn't recognized because you only have one defendant's drug --

THE COURT: Right, and I'm unlikely to revisit that, but it does mean that for a certain category of drugs, I've got a very different issue, and you're asking me essentially to reconsider my prior ruling that you have to prove that someone purchased a drug. Now, that may be easier to do where we know there are only four companies that manufactured X and all four of them are in front of me. That may be enough to give you standing of being a class rep. But what if ten people manufactured a drug and only one of them is in front of me? That's a bigger leap for me.

MR. SOBOL: But hear me out, your Honor, because I've gone back over your prior decisions in preparation for this. You have not ruled that for Article III standing, a plaintiff must establish that they were injected with the defendant's drug. What you have ruled is that each plaintiff has to show that they purchased a drug based upon the



defendant's AWP. If you go back to the sentence that I tried to utter correctly, and I'm not sure if I got it right, very earlier on, your rulings have been appropriate in a conduct-based situation, which is, in order to have Article III standing, a plaintiff has to show that they purchased a drug where the co-payment was based on the defendant's AWP; and in the multi-source area, how that happens is through the mechanisms that I've described earlier.

THE COURT: Well, I just have not ruled on this situation.

MR. SOBOL: Okay, this particular spin on it, but I do want to say, you don't have to take back anything that you've ruled on.

THE COURT: I remembered it a little differently, but you've obviously memorized how I said it. But let me just say this: This is new for me. And let me ask, is there a way in this record of at least redoing that chart to add another column that says how many people who manufacture it, what percent? You know, in other words, is it three out of three that are in that J-Code, or is it three out of ten?

MR. SOBOL: The answer to that, your Honor, is, we can redo the chart, and for a snapshot period, we can identify in a column how many generic manufacturers there were for that J-Code, okay? Now, the reason I put it like



that, to make sure, the reason I put it like so that the nuance of that doesn't get lost, right, over time during our large class period, the number of manufacturers that existed for J-Code is going to change, so we're going to have to pick a time period during our class when that existed.

THE COURT: Is there a way of doing a high-low? I mean, I understand this is -- but, in other words, I'm glad you put that new twist on it because I could imagine in one situation I've got everyone, and in the next situation it's quintupled because --

MR. SOBOL: Right, and the answer to that is, we will go back and we'll try to figure out if there's a way to provide more simple information to be able to deal with that nuance because I didn't want that to get lost. But also, and to go back to this basic point, your Honor, I tried to make before, in terms of defendants' conduct with respect to these J-Codes, is that the reality of those changing things over time, the fact that you might have four generic makers but then three or five or whatever for a particular J-Code and having to deal with that, is precisely a part of the system that we claim that these defendants abused to be able to increase reimbursement rates.

THE COURT: But wasn't J-Code a government construct?

MR. SOBOL: Yes, yes, just like AWP and Medicare



de0c81e3-5126-441b-899c-f9b6feb84c5e

was a government construct. If the question then is, okay, you have these constructs, are they free to be abused if there are things about them that open them up? No.

THE COURT: Well, let's suppose I say it's too big a jump, just the information is too vague. Dr. Berndt had said post-2000 you actually could figure it out with some degree of certainty. So would one possibility be to basically keep the class where the data is better?

MR. SOBOL: No, and the reason for that is this. That's why I set out the purposes for which you're trying to be able to earmark J-Code, okay? If in order to be a class representative, you have to be able to identify the manufacturer, that is humanly possible; and if we had the defendants' cooperation, everybody could figure that out because we'd figure out where the purchases came from and that kind of thing. But to be able to establish for membership in the class, so that when somebody submits their claim that they were injected with Abbott's albuterol rather than Warrick's albuterol, that's not going to be practical.

They can allege, they can say under oath what they spent in terms of money for the product. But if you're going to be requiring elderly citizens in the consumer class to go back to their doctors and then figure out where the doctor purchased the product at any particular period of time, I submit -- and we all haven't conferred about this -- that's



asking them too much. So, to me, to us, what you do then is, you go back and you say, what's appropriate for the kind of claim that we have here? What does the conduct do? The conduct of the defendant is increasing the AWP for every J-Code purchaser, and that should be enough.

THE COURT: Okay, well, thank you. You've teed up the issue very nicely.

MR. HAVILAND: Your Honor, if I may just make a few basic points that hopefully will flush out some of the issues. The product ID issue isn't quite as difficult as defendants make it out to be. In the case of Hunter Walters, he had the actual Dey box, and Dey doesn't refute the product ID issue anymore. He had the box -- he was a pack rat -- from 2003, so we satisfied that.

My counterpart, Mr. Dodds, is the consumer man. I'm the consumer man for the plaintiffs. We have product ID on his client because the records say "Solucortef." The actual drug is hydrocortisone sodium succinate. That is a generic, but the trade name used by his client is Solucortef. The doctor said Solucortef. There's no debate as to both the plaintiffs that he bought --

THE COURT: So for how many defendants do you have no debate?

MR. HAVILAND: We don't have it as to Dey because of the box. We don't have it as to Pharmacia because of the



Solucortef. We certainly don't have it as to any of the brand name manufacturers like AmGen. Mr. Carter clearly took Aranesp, darbepoetin alfa. Only they make it.

There is an issue between AmGen and Johnson & Johnson and a debate about epoetin alpha and whose brand it is, but we have four clients that bought the drug where they say, the doctors say it was Epogen, AmGen's product. Again, they're debating the record that the doctor fifty times said Epogen.

We do have outstanding issues, your Honor, about drilling down the product, and I'd like to give you one example, Mr. Bean, use as an example.

THE COURT: So I've got Dey, AmGen where you would say there's no dispute?

MR. HAVILAND: Right, and as to all the other brands that we've identified, we've demonstrated product ID.

THE COURT: So Pfizer is the only one you have nobody?

MR. HAVILAND: That's correct, yes. And if I may, your Honor, the Bayer point. There is no Class 1 representative for Bayer, that's accurate, today. We do have clients that have been long-standing clients of mine since 2003 since the Lupron case. So the quip about this being a case in search of a plaintiff, they were always in the wings waiting to come forward. We know they took immunosuppressive



drugs of companies like Bayer. We haven't gotten to that point. The example I want to give you --

THE COURT: I'm past that.

MR. HAVILAND: I know. Mr. Bean produced on Thursday of last week, his company Lynncare that provides his albuterol just produced the record that said in 2002, some of the albuterol that he was paying 20 percent of was Schering's Proventil. We just now got product ID on Schering. It can be done. It is a process of going to a lot of third-party sources to demonstrate.

Mr. Sobol's point is well-taken that in the multi-source context, we shouldn't have to go to those levels because the plaintiffs are all Medicare beneficiaries. They're all 20 percent percentage payors, some all, some part. They're all percentage payors. They all paid for some J-Coded drug, and that's a truism. The defendants don't debate that. What we're debating about is chasing defendants. And in the case of Mr. Walters who was a pack rat, he had a box. And when Dey's counsel went to the deposition in South Bend, Indiana, the box was put on the table to show them there was no issue there. But should other plaintiffs, like Mr. Bean's other albuterol manufacturers, should we be put to the test of having to drill down each time for every single drug for every single plaintiff in this context where all these market participants



de0c81e3-5126-441b-899c-f9b6feb84c5e

Page 98

are working together?

So I suggest to your Honor, and I'll sit down, that we've gotten halfway there with some of these folks. We're still working on it. And as for Bayer, they shouldn't be let out of case simply because we haven't gotten there yet, but we can continue to try to do that, but your Honor is going to have to resolve that issue about multi-source.

THE COURT: All right, that I know. That's the new piece here for me, yes. Thank you.

MR. RASKIN: Your Honor, Richard Raskin for Bayer Corp. Our name has come up just of late, and I'd like to say a word about the multi-source issue and about the J-Code issue that has been the subject of much discussion here.

We actually posed precisely the Article III question that your Honor posed from the bench. The only, the only thing that keeps Bayer in this case -- there is concededly by plaintiffs no Class 1 representative. There is no Class 2 representative. That's conceded. The proposed order does not suggest certification of a class as to Bayer for Class 1 and Class 2.

Now, for Class 3, the representative is Pipefitters, and the only drug for which Pipefitters has submitted and countered in is immunoglobulin, which has certain J-Codes which are shared. Now, as plaintiffs have indicated in their filing, apparently they assert that Baxter

Page 99

and ZLB Behring also manufacture this drug. But we have also shown that there are four or five nondefendant manufacturers also within this same J-Code. And so the question before your Honor, and it's a purely legal question, is: Is it sufficient for Article III standing to allege nothing more than a plaintiff might have purchased a Bayer drug, the mere possibility, because they --

THE COURT: What percentage of market share do you need?

MR. RASKIN: For that drug? Your Honor, standing here today, I cannot say. And in fact the drug is no longer owned by Bayer.

THE COURT: Would it matter if it were 95 percent as opposed to 10 percent on a likelihood standing?

MR. RASKIN: Well, I don't think it would, frankly, and I'll tell you why. There is a more fundamental problem with plaintiffs' approach to the multi-source drug issue. And the fundamental problem, and it's really essentially conceded in a lot of what you heard today, is that plaintiffs cannot show injury on a classwide basis on multi-source drugs. Dr. Hartman's theory -- and it is only a theory -- Dr. Hartman's theory goes, if anything, to damages. And Mr. Sobol explained quite eloquently why plaintiffs would be able to construct a model by which they could determine damages for multi-source drugs. But what they cannot do is

Page 100

take the J-Code information that they have in the claims data and identify the specific manufacturer. And for certain manufacturers -- and Bayer is one of them, and there are more here today -- there will remain an open question as to whether there is any named plaintiff who purchased that manufacturer's product. That's the situation we're in. It is a pervasive problem in the multi-source part of this case, and we think --

THE COURT: So Bayer has no brand-name drugs involved in this?

MR. RASKIN: Oh, well, we have brand-name drugs, and we have brand-name drugs that have been listed in the complaint, but plaintiffs have never identified a single purchaser, as your Honor ordered several years ago at the time of the motion to dismiss would be a prerequisite for establishing Article III standing. In fact, if you look back to the complaint which was filed in response to your Honor's ruling and where they listed which plaintiff purchased which drug, for Bayer, the only drug for which they indicated they had a purchaser was Cipro, not even the drug by which they today try to certify a class, and that's this immunoglobulin multi-source product. So it's been a constantly shifting story on the multi-source side. And the fundamental fact, the fundamental fact that remains is, injury cannot be proven on a classwide basis.

Page 101

If I can address just one other thing that I think was a point of confusion earlier for your Honor. We have submitted a study from Mr. Young which deals with the specific drug encounters of these named plaintiffs, and it's very important to take a look at the analysis that was done there because I think your Honor may have the impression that we are arguing that AWP is not a widespread reimbursement methodology. That is not the point. The point that we're making here, in terms of the overall issue of Track Two class certification, is that one must go through an excruciatingly individualized examination to determine who is in this class.

We took the 137 drug encounters for each of the named individual plaintiffs, and we looked at each one of them, and overwhelmingly they were not paid based on AWP. And the reasons were, the patient, the proposed class representative, was in the hospital. The patient was in an ambulance. The encounter occurred after January 1 of 2005, when ASP became the methodology of payment for Medicare. The patient made no co-pay, or there was a flat co-pay which was totally unrelated.

THE COURT: Sure. And all of those, couldn't a claims administrator do that? I agree that all those people would be out.

MR. RASKIN: Well, could a claims administrator do

it?

THE COURT: It's a damage issue. I mean, that happens every day: Did you buy the stock? And you've got to submit the -- was it within the class period?

MR. RASKIN: Well, what is interesting is that we have in fact done that with Mr. Young's analysis for the 137 encounters, and virtually every one of these individuals will be out. So that we stand here today --

THE COURT: So you're saying there's no numerosity?

MR. RASKIN: No. There are no named representatives who in fact purchased based on AWP.

THE COURT: And in fact I've got to look at that. That's totally fair game, as is the fact -- but that's a different issue. Are you saying that so many people are carved out because it was really in the hospital or it was really after the time that we don't have enough people to make up a class?

MR. RASKIN: No, that's not my argument.

THE COURT: So the real issue is the difficulty in figuring out who's a class rep and who was in fact -- for a claims administrator to figure out who actually gets money at the end of the day?

MR. RASKIN: There's two points I'd like to leave you with on that.



THE COURT: Okay.

MR. RASKIN: The first is, the fundamental issue of Article III standing cannot be decided without going through that analysis. And you will find once you do -- and I understand you're reserving on that -- that once you do, that none of the individual plaintiffs have Article III standing because they did not pay an amount based on AWP.

THE COURT: With respect to Bayer?

MR. RASKIN: No.

THE COURT: With respect to anybody?

MR. RASKIN: With respect to the Track Two defendants.

THE COURT: At all, not one person, you're saying, not one person of all the individuals paid anything based on AWP? Is that what you're saying?

MR. RASKIN: I am saying that if there is one, it is one and one alone, okay? If you go through, and you'll read it in Mr. Young's report, he goes through in painstaking detail. And virtually ever -- there's room for debate as to a few, but virtually --

THE COURT: I'm assuming, I heard them, Dey, Pharmacia, and AmGen, right?

MR. RASKIN: Well, we didn't go through the whole list. Mr. Haviland didn't go through the whole list of problematic Track Two defendants.



THE COURT: No, but those were the ones where he said it was crystal clear, and then I guess he's conceding that the others aren't, so --

MR. RASKIN: Correct, correct, there's quite a few that aren't. But the other point, besides Article III standing, is that it is not simply a matter of claims administration. This needs to be done now, this question needs to be addressed now, and the reason for that is, you must find in order to certify a class that these issues can be decided on a common classwide basis without individualized analysis. The fact is -- and the law is very clear on this -- we cannot ascertain whether an individual is a member of this class without going through the claims administration process, without analyzing each individual claim. And when we do it just for this sampling the plaintiffs have brought forward, we find that they themselves are not members of this class. And so this is a Rule 23 question.

THE COURT: I do these truth-in-lending cases and securities cases, and we come up with these issues all the time: Did someone buy a mortgage in this time period, and did it fall into this category that they got this kind of notice? And that's something you usually put at the end. You just define it in a way that there's a common question of fact and law, and then you make someone prove up that they're in it.



MR. RASKIN: Article III standing is a threshold issue.

THE COURT: I don't buy it. Okay, but I do buy that I need to go class rep by class rep. What's the next question?

MR. BARLEY: Your Honor, Steve Barley. I represent AmGen. The three class representatives that have been proffered as to AmGen, none of them satisfy their state consumer protection laws. And as your Honor recognized, I think, when you were addressing the Track One summary judgment motions, this is something that's appropriate to be addressed at this stage of the proceedings.

The three named proffered class representatives are Mr. Carter, Mr. Bean, and Ms. Aronson. Mr. Carter and Mr. Bean are both from Texas. Ms. Aronson is from North Carolina.

There are two sections of the Texas Consumer Protection Act under which the plaintiffs are seeking to recover. One is the so-called "laundry list" section. That is, as you have with many consumer protection acts, it will say, "Conduct that violates these sections is illegal."

THE COURT: Right.

MR. BARLEY: Under the Texas statute, it is explicit in the statute that detrimental reliance is required to satisfy the laundry list provision, and the plaintiffs

cite to a case Weitzel V. Barnes that they claim says that's not true. Weitzel was decided before the statute was amended to include the reliance provision. If you look at the case Henry Schein V. Stromboe, it's very clear that reliance is required for the laundry list section.

So apparently realizing that, they're now claiming that they're seeking to recover on behalf of these Texas representatives under what's called the unconscionability section; but that section requires that the unconscionable action or course of action by a person must be a producing cause of the plaintiffs' damages. There are two cases which we cite in our briefs, the Jones case and the Head case, both of which either state or imply that reliance is required to satisfy the producing cause provision.

THE COURT: Are those appellate cases?

MR. BARLEY: They are, your Honor. In particular, I draw your attention to the Head case, in which the court first analyzes the laundry list provision and says the plaintiffs haven't satisfied reliance there, and then says they're also seeking to recover under the unconscionability provision, and for the same reasons -- that is, the plaintiffs didn't rely -- we find they have not satisfied the requirement that they show that the unconscionable conduct was a "producing cause" of their injury.

But I'll take it a step further. You can even put



that aside. There are two particular issues that are unique to the unconscionability section under the Texas statute where Texas courts have held it's inappropriate to decide them in the class certification context. One is the producing cause requirement. The case Wall V. Parkway Chevrolet explicitly finds that in order to satisfy the producing cause requirement, the plaintiff has to show what the consumer could or would have done had they been informed. Okay? And that can only be decided on an individual-by-individual basis, what they could or would have done. And I would even proffer to your Honor that it's impossible for the plaintiffs to satisfy that in this case because under Class 1 and Class 2, where there's a statute in place, there's nothing they could have done but relied on the AW -- or paid based on the AWP.

THE COURT: You think the Texas courts wouldn't want to give a consumer, who's paying 20 percent of $1,000 instead of 20 percent of $100, relief under the consumer protection law?

MR. BARLEY: That's not the question. The question is whether you can satisfy this particular section of the consumer protection statute.

Now, the second issue is -- remember, it's unconscionability. And we're not dealing with common law here. We're not dealing with common law fraud. We're



dealing with the statute.

THE COURT: So you're saying, even if I said it was unconscionable, it doesn't satisfy the causation issue?

MR. BARLEY: No. What I'm saying is --

THE COURT: The producing cause language?

MR. BARLEY: I'm saying two things: First of all, that producing cause is in essence under Texas law akin to looking at reliance, and the plaintiffs concede there's no reliance here, okay?

THE COURT: Well, I think that's right for most --

MR. BARLEY: That's number one. And, number two, the Texas courts have decided that two questions under the unconscionability provision require individualized analysis that prevents them from being decided in the class certification context: one, whether it was the producing cause for that consumer, and, two, whether the conduct was unconscionable, because you can only decide unconscionability in the context of the transaction.

THE COURT: All right, thank you.

MR. BARLEY: And if I can, your Honor --

THE COURT: You know, I don't have time to do each one individually, and you're now taking up more than -- you've got this all briefed, right?

MR. BARLEY: But we did not get an opportunity to submit a surreply, so I'd just like to address the North



Carolina statute, your Honor.

THE COURT: No. I've got all these people, and it's now quarter of 1:00. I can't do it. I'll read it. Have you briefed it all?

MR. BARLEY: With the exception of one issue I want to raise on North Carolina, and then I'll sit down, if I can, your Honor.

THE COURT: You have 30 seconds because I have to deal with other people.

MR. BARLEY: The North Carolina Supreme Court in a case called Pearce requires detrimental reliance under their consumer protection act. The plaintiffs have cited several cases which are outliers that say that's not the case. They all rely on a case called Johnson, which was decided before the North Carolina Supreme Court case in Pearce, and also, your Honor, is interpreting the federal act and not the state act, which doesn't allow a consumer claim, and therefore wouldn't have a causation or reliance requirement.

THE COURT: Thank you.

MR. PALERMO: Your Honor, Chris Palermo on behalf of Dey. Mr. Haviland mentioned Dey in the context of one of the class representatives. And, your Honor, you had indicated at the outset of this hearing, and we understand if you want to roll up your sleeves and look at those papers rather than hear argument on that today and do the



de0c81e3-5126-441b-899c-f9b6feb84c5e

document-intensive individual analysis with respect to each class representative.

We do believe, as Mr. Dodds said, that Crosby in the First Circuit would indicate that that individualized analysis --

THE COURT: Yes, yes, okay, he's been talking for all of you.

MR. PALERMO: The bottom line is, your Honor, we by no means agree with the positions that they've demonstrated the adequacy with respect to Dey, and our position is, there's no standing with respect to Dey. We refer to our papers.

THE COURT: Thank you.

MR. PALERMO: And if your Honor wishes to hear argument at a later point --

THE COURT: Well, that's what I'm hoping to do. I mean, I'm not prepared, I have to say, on each and every company and each and every rep. I wasn't last time either. I just need to read it myself and the cases from Texas and South Carolina, et cetera. And I may end up calling you back in.

MR. PALERMO: Thank you, your Honor. I'm in New York, so it's very easy for me to come back up here.

THE COURT: Okay, terrific, thank you.

MR. HURST: Your Honor, Andrew Hurst on behalf of



Fujisawa. Thirty seconds. I hope you look at the papers. I'll come back anytime you'd like. I'm right in Washington there, so I can grab a plane and come up.

I wanted to add one more wrinkle to this mystery we're unraveling today. My client Fujisawa doesn't sell any physician-administered drugs. We sold off our entire line of multi-source generic physican-administered drugs in 1998. So we have nothing that would be relevant to class on this case for eight years. And the result of Mr. Sobol's theory would be, if someone purchased a drug in 2002, four years after we sold our line, they're trying to certify a class to get us in it. So you can see the problem here. My client is a little guy in here. I've been sitting in the back right corner for a long time, but we're kind of getting dragged into this through these mass star theories. And I think that that will be a bad idea, and I hope you will look at the papers very carefully. And it's a very moving target. We've seen a different set of drugs and encounters every time we open the mailbox.

THE COURT: Are any of the class representatives named with respect to you someone who purchased that long ago?

MR. HURST: There was one that did in 1998 right before we sold, and that one I think was made by 38 other people. And most of the ones they mention here are 2002,



2005, and I don't see a lick of evidence that we sold any of it.

THE COURT: What is the drug?

MR. HURST: There's a number of them. They're all these multi-source generics. Usually they're antibiotics or the things like that that we sold a long time back. Now we only sell self-administered drugs, Prograf and the like. And they're actually not discounted. We're in a very odd spot as a company here. We're a square peg in a round hole, and every time we get before the court with all our actual facts, you usually throw us out. You dismissed us at the (Inaudible) thirteen plus six. Even the plaintiffs throw us out a lot of times. But we just need our day to enforce the rules and get us out again, so I wanted to make sure you heard from us. So I hope you look at ours very carefully. Thank you, your Honor.

THE COURT: All right, well, that was energizing.

(Laughter.)

THE COURT: Montana, okay, from the great state of Montana.

MS. O'SULLIVAN: Katie O'Sullivan. I've been to Montana many times, but I'm actually from Seattle.

Next week, next Thursday is the current deadline for filing summary judgment motions in the Montana and Nevada cases, and the plaintiffs have filed a motion to change that



deadline, and I just wanted to bring that to your attention. It's fully briefed and pending, Docket 3050.

THE COURT: Do you really care?

MS. O'SULLIVAN: Yes, we do.

THE COURT: Why? Did I rule on this yet? I took a slew of these motions yesterday, and I took some, sent some to the magistrate judge, and I don't remember if I ruled on this particular one. I'm not sure I did.

MS. O'SULLIVAN: I didn't see a ruling from your Honor. It's a scheduling motion that we think you would decide in the first instance, not the magistrate. And the state's main argument they claim is judicial economy, that your Honor is going to decide on the meaning of AWP. But these are Medicaid cases, and as you just decided last week in the Florida remand decision, AWP plays no role in the federal piece of the Medicaid.

THE COURT: Well, in that state.

MS. O'SULLIVAN: In Florida.

THE COURT: In Florida they didn't define it through -- how about Montana, did they define it in a specific way?

MS. O'SULLIVAN: Well, in Montana we have a complete discovery record, and we're ready to present the arguments for you to dismiss that case. And the answer to your question will be in our briefing.

Page 114

THE COURT: What's the context? The Montana case is here, right? Everyone wanted it to be here?

MS. O'SULLIVAN: Yes, it's here. The discovery record in Montana is complete, and we ask that the briefing not be put off until 2007.

THE COURT: Well, how far off -- I just don't remember. Just give me some -- what is the requested change?

MS. O'SULLIVAN: The plaintiffs have asked that you defer the submission of any summary judgment motions until January, 2007. So they would be fully briefed in approximately March, 2007, and you might have a hearing in April. You currently have a hearing set for December 12.

THE COURT: Whom are you representing?

MS. O'SULLIVAN: I represent Immunex Corporation, but I have been the defendants' liaison counsel for these two cases.

THE COURT: I see. Is there any prejudice to you at all from waiting until January?

MS. O'SULLIVAN: Well, we're ready to move.

THE COURT: I know it's a hassle. The truth is that I'm swamped at this point, so the odds of my getting to it is -- so I'm just trying to figure out if there's some compromise dates. Plaintiffs' counsel is about to enter into major-league uptick unless it's all settled, which I'm not

Page 115

hearing, on the Track One case.

MS. O'SULLIVAN: The only compromise that I can think of, your Honor, that we did suggest in the defendants' opposition is that any motions that are filed by the current deadline of next Thursday, that briefing continue on that schedule and that you hold a hearing on that schedule. In other words, the defendants' joint brief could be submitted in Montana. Individual briefs could potentially be reserved or plaintiffs' briefs. It's the only compromise.

THE COURT: Now, you're all representing Montana, right? Isn't that what I heard?

MR. SOBOL: Yes, your Honor. Well, obviously my partner Steve Berman and my other partner Sean Matt are primarily responsible for it.

THE COURT: I just don't remember this. Why can't you brief it in the preordained timetable?

MR. SOBOL: Well, I don't know the specific reasons they've articulated in the motions. I'm not familiar with it. I do know their schedule, and as you can imagine, your Honor, they and many other people are flat out. And Mr. Berman has taken one vacation this year, it's this week, and then he comes back next week. And he's obviously, you know, getting ready for a trial in this matter, which you've now indicated is going to be both Class 2 and Class 3. And the reality is that you're not going to be able to be

Page 116

focusing on that until some other time.

THE COURT: My only concern is a -- I'm likely to give them some time because there is so much going on in the Track One case. That having been said, I did manage to persuade the First Circuit to allocate me a third law clerk, given the giant nature of this case. I have no guarantee for next year, so I need to have this all resolved this year. And my concern is, if we're really spinning out the briefing until March, and then I have a hearing in April, and I have to write the bench trial for Track One, at some point it just overwhelms me to get it done within the resources I have.

So let me try -- with those policy concerns in place, maybe there's some compromise. They're going to be basically flat out in November and December, and I believe counsel will probably be asking for more time than I originally had allocated, given the fact that I added Class 3. So I'm sort of assuming November and December and maybe part of January, am I wrong about this, but not more than that?

MR. SOBOL: Right.

THE COURT: I don't know what you're negotiating and then what I'll permit. But let's assume that we could finish that up and then get into the -- your briefs could be due, and then their brief could be -- in other words, you could file them when you want, and they could file it within

Page 117

30 days after the completion of that trial, and then I could hold a hearing earlier rather than later. Would that satisfy what your concerns are?

MS. O'SULLIVAN: Well, I think what we were hopeful to avoid was filing a brief next week and have the plaintiffs have four months to respond to it.

THE COURT: I can't blame you, but I'm simply saying, I'm trying to adjust for everybody's resource issues, and unless there's something really pressing going on here -- what are the issues with yours? Like, give me a thumbnail sketch. I'm assuming it's not a motion to dismiss, right? It's a motion for summary judgment?

MS. O'SULLIVAN: It's a motion for summary judgment in the Montana case.

THE COURT: What's, like, the predominant issue?

MR. O'SULLIVAN: The predominant issue is essentially that the State of Montana, their Medicaid agency chose, consciously knowing that AWP did not represent actual acquisition costs, they chose to retain that system in order to keep the pharmacists in the network of a rural state --

THE COURT: So like the political question thing that I got originally, which is that Congress just sort of shut its eyes because they didn't want to deal with the political hassle?

MS. O'SULLIVAN: I don't know that I would define

it that way, your Honor.

THE COURT: Well, the argument that was made initially in this case was that Congress knew at some point that AWP was by no means an accurate pricing system, but they basically dodged the issue for a variety of reasons, some being political, some being concern about doctors leaving the system. I mean, I've heard that, and that's a similar kind of argument to what you're going to make in Montana?

MS. O'SULLIVAN: It's a similar argument to what we're going to make in Montana, but it's specific to Montana evidence that we've obtained from the Montana Medicaid officials that they were concerned with maintaining access to care and their obligations under the federal Medicaid statute to provide that access.

THE COURT: Well, let me ask this: Even if I don't throw it out on that grounds, does it sharply curtail the amount of damages? How far back -- in other words, I don't remember what the statute of limitations is, but assume it's a three-year statute of limitations, are they seeking going far back before that?

MS. O'SULLIVAN: Yes, they are. Their claims go back to 1991. They sued in 2002, and Montana has a two-year statute of limitations.

THE COURT: So you would say that even if I didn't buy that statutory construction argument, at least it sharply



cuts your damages?

MS. O'SULLIVAN: That it's entirely gone. And it's not a statutory argument in Montana.

THE COURT: What isn't?

MS. O'SULLIVAN: Well, there were administrative regulations.

THE COURT: Oh, I see. So it wasn't done by the Montana legislature.

MS. SULLIVAN: Correct.

THE COURT: Oh, that's interesting. Well, thank you. I'll try and adjust for people's resource issues, but I'd really suggest you try and negotiate it in a way that we'll do it the early part of year. Maybe you could talk right afterwards or call Berman. Where is he? Someplace good, I hope?

MR. SOBOL: He's someplace terrific.

(Laughter.)

THE COURT: All right. Well, when he gets back, why don't you just try and come up with something that sort of accommodates both side's interests.

MS. O'SULLIVAN: We'll do that.

THE COURT: Okay, thank you.

(Adjourned, 12:55 p.m.)

CERTIFICATE

UNITED STATES DISTRICT COURT )
DISTRICT OF MASSACHUSETTS ) ss.
CITY OF BOSTON )

I, Lee A. Marzilli, Official Federal Court Reporter, do hereby certify that the foregoing transcript, Pages 1 through 118 inclusive, was recorded by me stenographically at the time and place aforesaid in Civil Action No. 01-12257-PBS, MDL No. 1456, In re: Pharmaceutical Industry Average Wholesale Price Litigation, and thereafter by me reduced to typewriting and is a true and accurate record of the proceedings.

In witness whereof I have hereunto set my hand this 19th day of September, 2006.

LEE A. MARZILLI, CRR
OFFICIAL FEDERAL COURT REPORTER



de0c81e3-5126-441b-899c-f9b6feb84c5e