# Exhibit D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

In re: PHARMACEUTICAL              MDL DOCKET NO.

INDUSTRY AVERAGE WHOLESALE         CIVIL ACTION

PRICE LITIGATION                   01CV12257-PBS

_____

THIS DOCUMENT RELATES TO:

ALL ACTIONS

_____/

　　　　　Deposition of GLENN RANDLE, taken before GREG S. WEILAND, CSR, RMR, CRR, Notary Public, pursuant to the Federal Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions, at Suite 2000, One North LaSalle Street, in the City of Chicago, Cook County, Illinois, commencing at 8:11 o'clock a.m., on the 17th day of November, 2005.

Page 2

```
 1  PRESENT:
 2  THE WEXLER FIRM, LLP, by
 3  MS. JENNIFER FOUNTAIN CONNOLLY
 4  One North LaSalle Street
 5  Suite 2000
 6  Chicago, Illinois 60602
 7  (312) 346-2222
 8  E-mail: jfconnolly@wexlerfirm.com
 9
10  ROPES & GRAY LLP, by
11  MR. ERIC P. CHRISTOFFERSON
12  One International Place
13  Boston, Massachusetts 02110-2624
14  (617) 951-7000
15  E-mail: eric.christofferson@ropesgray.com
16         On behalf of Schering-Plough
17         Corporation and Warrick
18         Pharmaceuticals Corporation;
19
20
21
22  (CONTINUED)
```

Page 3

```
 1  PRESENT (CONTINUED):
 2  HOGAN & HARTSON LLP, by
 3  MR. THOMAS J. SWEENEY, III
 4  875 Third Avenue
 5  New York, New York 10022
 6  (212) 918-3523
 7  E-mail: tjsweeney@hhlaw.com
 8         On behalf of Bristol-Myers
 9         Squibb, Apothecon and OTN.
10
11  ALSO PRESENT:
12  MR. JAN JENNINGS.
```

Page 4

```
 1             INDEX
 2  November 17th, 2005
 3  GLENN RANDLE
 4                    PAGE
 5  Examination by Mr. Christofferson ..................7
 6  Examination by Mr. Sweeney .......................142
 7  Examination by Ms. Connolly ......................146
 8
 9
10       DEPOSITION EXHIBITS
11
12  NUMBER      DESCRIPTION            PAGE
13  Exhibit Randle 001   Notice of Rule 30(b)(6)
14         Deposition to Sheet Metal
15         Workers National Health
16         Fund, 5 pages...................9
17  Exhibit Randle 002   Affidavit of Glenn Randle,
18         Bates labeled SMW 0001
19         through 0003..................36
20
21
22  (CONTINUED)
```

Page 5

```
 1    DEPOSITION EXHIBITS (CONTINUED)
 2  NUMBER      DESCRIPTION            PAGE
 3  Exhibit Randle 003   Supplemental Medicare
 4         Wraparound Plus (SMW+)
 5         Program of the Sheet Metal
 6         Workers' National Health
 7         Fund, Summary Plan
 8         Description, Bates labeled
 9         SMW 0004 through 0033.........37
10  Exhibit Randle 004   Sheet Metal Workers'
11         National Health Fund,
12         Amended and Restated
13         Plan Document, Effective
14         January 1, 2002, Bates labeled
15         SMW 0604 through 0738.........39
16  Exhibit Randle 005   Sheet Metal Workers
17         National Pension Fund
18         Supplemental Medicare
19         Wraparound Plus (SMW+),
20         1993, Bates labeled SMW
21         0581 through 0603............43
22  (CONTINUED)
```

2 (Pages 2 to 5)

### Page 6

```
 1        DEPOSITION EXHIBITS (CONTINUED)
 2   NUMBER         DESCRIPTION          PAGE
 3
 4   Exhibit Randle 006   Group exhibit, Bates
 5                        labeled SMW 0034
 6                        through 0084...............65
 7
 8   Exhibit Randle 007   Third Amended Master
 9                        Consolidated Class Action
10                        Complaint Amended to
11                        Comply With Court's Class
12                        Certification Order,
13                        Redacted Version,
14                        313 pages..................115
```

### Page 7

```
 1              (Witness sworn.)
 2        MR. CHRISTOFFERSON:  Before we begin, is
 3   there anyone else on this call?  I didn't hear any
 4   beeps, but I figured I would check.
 5        All right.  We will proceed without them,
 6   whoever they may be.
 7              GLENN RANDLE
 8   after being first duly sworn, testified as follows:
 9              EXAMINATION
10   BY MR. CHRISTOFFERSON:
11        Q.  Could you please state your full name for
12   the record.
13        A.  Glenn Randle.
14        Q.  And what is your current address?
15        A.  8304 Adirondack Trail, Austin, Texas.
16        Q.  Have you ever been deposed before,
17   Mr. Randle?
18        A.  Yes.
19        Q.  And when was that?
20        A.  Probably been ten years or so ago.
21        Q.  What was the case in which you were
22   deposed?
```

### Page 8

```
 1        A.  I was a trustee for a friend of mine, a
 2   trust.
 3        Q.  A personal trust?
 4        A.  Yeah, uh-huh.
 5        Q.  And where was that?
 6        A.  Austin.
 7        Q.  Other than that, have you ever been
 8   deposed before?
 9        A.  No.
10        Q.  Just to take a minute to go over the
11   deposition process since it's ten years ago since
12   the last time you did this, because the reporter
13   here is taking down everything I say and everything
14   that you say, it's important that you give verbal
15   responses as opposed to shaking your head yes or no.
16        A.  Uh-huh.
17        Q.  It's important that we not talk over one
18   another, and so if you could wait until I'm finished
19   asking my question before you begin your answer,
20   that would be great, and I'll also try not to
21   interrupt you when you're giving your answer.
22              If there's a question or I say anything
```

### Page 9

```
 1   that you don't understand, just let me know, and
 2   I'll try to rephrase the question and ask it in a
 3   different way.
 4              And certainly if you need to take a break,
 5   just let me or counsel know, and we certainly can
 6   take a break at any time.  That's not a problem.
 7              Do you understand that you're under a
 8   legal obligation to tell the truth here in your
 9   deposition today?
10        A.  Definitely.
11        MR. SWEENEY:  Has he been sworn?
12        MR. CHRISTOFFERSON:  Yes.
13        Could you please mark this.
14              (Exhibit Randle 001 marked as
15              requested.)
16   BY MR. CHRISTOFFERSON:
17        Q.  Would you just take a moment to look over
18   that.
19        A.  Uh-huh.
20        Q.  Mr. Randle, the court reporter has handed
21   you what's been marked as Exhibit Randle 001.
22              Have you seen this document before?
```

Page 10

1   A. No.
2   Q. You have not. Could you please turn to
3   Page Number 3. It says areas of inquiry.
4   A. Uh-huh.
5   Q. Have you seen these various areas of
6   inquiry numbered 1 through 19 before?
7   A. Yes, uh-huh.
8   Q. You have. Which of these areas of inquiry
9   are you designated to testify to today?
10      MS. CONNOLLY: I think we can do this by
11  stipulation. As you and I have discussed,
12  Mr. Randle is here today to respond to the issue
13  raised in Judge Saris' classification order, which
14  is whether the Fund reimbursed for the drugs at
15  issue in the case and whether those reimbursements
16  are based on AWP. Obviously we will give you some
17  latitude about adequacy questions, but we will not
18  be producing him for all the areas of inquiry. As
19  far as we're concerned, that's the limit of today's
20  deposition.
21      MR. CHRISTOFFERSON: Understood.
22  BY MR. CHRISTOFFERSON:

Page 11

1   Q. Mr. Randle, do you understand that as the
2   designee for the various topics that you are
3   designated to testify to that you're obliged to
4   provide all the information reasonably available to
5   the Sheet Metal Workers National Health Fund and
6   that are related to those areas?
7   A. Yes.
8   Q. What steps did you take to learn all that
9   is reasonably available to the organization on these
10  topics?
11  A. Well, visiting with the third-party
12  administrator and, of course, I've been on this Fund
13  for 20 years, so just a working knowledge through
14  the years of it.
15  Q. You say that you visited with the
16  third-party administrator.
17      Who is the third-party administrator?
18  A. Southern Benefits Administrator.
19  Q. And who at Southern Benefits Administrator
20  did you visit with?
21  A. Lynn Brassel.
22  Q. Would you please spell that?

Page 12

1   A. L-y-n-n, B-r-a-s-s-e-l.
2       MR. CHRISTOFFERSON: Excuse me for a
3   moment.
4       Who just joined? Did anyone just join the
5   call? I thought I heard a beep.
6       MR. SWEENEY: Definitely.
7       MR. CHRISTOFFERSON: If someone just
8   joined the call, if you could please identify
9   yourself.
10      MS. CONNOLLY: That happened to me earlier
11  this week.
12      MR. CHRISTOFFERSON: Okay. We will just
13  keep going.
14  BY MR. CHRISTOFFERSON:
15  Q. I'm sorry to interrupt you. You said that
16  you met with Lynn Brassel at Southern Benefits
17  Administrator?
18  A. I didn't meet with him, just visited with
19  him to verify my remembrance on it.
20  Q. And what did you talk about with Lynn?
21  A. Some of these questions just to again
22  verify my memory of it.

Page 13

1   Q. Did you look at any documents in
2   preparation for the deposition today?
3   A. No, just these questions.
4   Q. And is there anything else that you did in
5   preparation for your deposition here today?
6   A. No.
7   Q. Other than speaking with your lawyer, of
8   course.
9   A. Right, uh-huh.
10  Q. You mentioned earlier that you were
11  deposed in a case where you were a trustee for a
12  personal trust ten years ago.
13      Was that in the -- was that 1995 or was it
14  approximately ten years ago?
15  A. I would say approximately '95 would be
16  correct.
17  Q. Have you ever been involved in a criminal
18  legal proceeding?
19  A. No.
20  Q. Other than this case and the time that you
21  were deposed in that case involving a personal
22  trust, have you been involved in any other civil

Page 14

```
 1  legal proceeding?
 2      A.  My firm has filed suit on other
 3  contractors, you know, for work performed, unpaid,
 4  you know, that type thing, so a few where I won I
 5  guess we would say there.  It never went to trial,
 6  but it went through the process of negotiation,
 7  mediation.
 8      Q.  And it was an employment issue, is that
 9  what you said?
10      A.  No, they were general contractor on the
11  job.  It was for damages, delay damages on a
12  construction job.
13      Q.  And approximately when was that?
14      A.  It would have been in 2004 when the
15  mediation happened.  The job was probably in '95
16  itself.
17      Q.  The mediation was in 2004.  Do you
18  remember approximately when the suit was filed?
19      A.  It would be a guess on my part, you know,
20  but early 2004.  You know, actually the thing was
21  probably before then and kept being deferred, so it
22  might have been 2003 when it was originally.
```

Page 15

```
 1          MR. CHRISTOFFERSON:  Did someone just
 2  join?
 3          THE WITNESS:  Have we got a mute button or
 4  something?
 5          MR. CHRISTOFFERSON:  It may be that
 6  because no one has joined they keep reminding us
 7  that we're by ourselves.  I'm not really sure.
 8          If anyone joined, if you could identify
 9  yourself, that would be great.
10  BY MR. CHRISTOFFERSON:
11      Q.  Excuse me again, Mr. Randle.
12      A.  That's all right.
13      Q.  You were talking about that one case
14  involving a general contractor dispute.
15          Any other lawsuits?
16      A.  None to my remembrance.
17      Q.  Are you on any medication today that would
18  impair or limit your ability to answer truthfully or
19  recollect or otherwise participate in this
20  deposition?
21      A.  No.
22      Q.  What's your Social Security Number,
```

Page 16

```
 1  Mr. Randle?
 2      A.  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.
 3      Q.  And what is your date of birth?
 4      A.  June 27, '43.
 5      Q.  Did you go to high school, Mr. Randle?
 6      A.  Sure did.
 7      Q.  Did you graduate from high school?
 8      A.  Yes.
 9      Q.  When did you graduate?
10      A.  1962.
11      Q.  And did you attend college?
12      A.  Yes.  I went to a business school,
13  Nixon Clay, attended Southwest Texas State
14  San Marcos a few semesters, and the University of
15  Texas a few semesters.
16      Q.  Did you obtain a degree from any of those
17  institutions?
18      A.  The business college I did.
19      Q.  And what was that degree?
20      A.  Accounting.
21      Q.  And at Southwest Texas State did you
22  obtain a degree?
```

Page 17

```
 1      A.  No.
 2      Q.  What did you study there?
 3      A.  It was basic freshman English and just the
 4  basic courses for a freshman.
 5      Q.  And did you also say the University of
 6  Texas?
 7      A.  Yes.
 8      Q.  And did you obtain a degree from the
 9  University of Texas?
10      A.  No.
11      Q.  What did you study at the University of
12  Texas?
13      A.  Accounting courses.
14      Q.  When did you obtain your degree from
15  Nixon Clay Business College?
16      A.  It would have been in January of '64.
17      Q.  Was that a BA?
18      A.  You know, it's just a private business
19  college, you know, so it's just their accounting
20  degree, you know.
21      Q.  Did you attend any graduate school?
22      A.  No.
```

Page 18

1  Q. Did you otherwise receive any additional
2  formal educational training?
3  A. No, just attending seminars and things
4  like that has been the only other thing, nothing
5  accredited or, you know, formal.
6  Q. You testified earlier that your firm had
7  been sued -- excuse me, that your firm was involved
8  in a lawsuit a couple of years ago.
9      Is that the firm that you're currently
10 employed at?
11 A. No. That -- let me think a bit.
12     The firm that I owned, I had five of them.
13 That particular firm is no longer in business. It's
14 a corporate shell at this point.
15 Q. Okay. You own several companies now?
16 A. Yes. I sold two of them in July of '04 to
17 Carrier Corporation, and I have one operating
18 company, a leasing company that leases to that
19 company that are currently operational.
20 Q. Okay. Let's start with the ones that are
21 currently operational.
22     How many are there?

Page 19

1  A. There's two.
2  Q. Two. And what are those?
3  A. YPS Facility Services and Randle Leasing
4  Incorporated.
5  Q. And what do those firms do?
6  A. Randle Leasing just buys assets and rents
7  them to the FS company. It has in the past leased
8  equipment to other companies but currently just the
9  one.
10     And YPS Facility Services is an on-site
11 facility service business that provides mechanical
12 system observation, repairs, maintenance, and also
13 it does piping work, sheet metal fabrication,
14 installation work and test and balancing for
15 mechanical systems.
16 Q. And do you have an official title at
17 either or both of these companies?
18 A. The Facility Service company I'm the
19 general partner, and Randle Leasing I'm the
20 president.
21 Q. And I believe you said that Randle Leasing
22 buys assets and leases them to the FS company.

Page 20

1  Is the FS the YPS Facility Services
2  company?
3  A. Right.
4  Q. Just generally, what are your
5  responsibilities as general partner and then as
6  president at these two companies?
7  A. Well, as general partner, to promote the
8  business, to obtain opportunities to work with new
9  firms and expand the work that we're doing with
10 existing firms, so it's somewhat in the sales and PR
11 areas.
12     And then with Randle Leasing, the
13 purchasing of those assets and setting up leaseback
14 contracts.
15 Q. I'm not going to go into too much detail
16 about these, but just a couple of quick additional
17 questions.
18     How many employees does each company have?
19 Let's start with Randle Leasing.
20 A. Randle Leasing doesn't have any employees.
21 My wife and I are the president and vice president.
22 We're not on a salary for that company.

Page 21

1      Facility Services has approximately
2  75 employees.
3  Q. You said that you have recently, and by
4  recently I mean the last couple years, sold some
5  additional companies that you at one time ran.
6      What were those companies?
7  A. One was Young & Pratt Service
8  Incorporated. The second one was YPS Refrigeration.
9  Q. What, again just generally, what did those
10 companies do?
11 A. They provided what we called demand
12 service on air conditioning and plumbing, heating
13 systems, so repairs and equipment replacement, and,
14 of course, Refrigeration was the same thing in the
15 refrigeration market as opposed to YPS being in the
16 general commercial market.
17 Q. And when did you sell these companies?
18 A. July the 6th, 2004.
19 Q. Generally, how long have you owned
20 companies, these companies?
21 A. I went to --
22     MS. CONNOLLY: I'm sorry, can we move on a

Page 22

1  little bit because he's here in his capacity of the
2  Fund, not his personal capacity, so I don't really
3  see the sense in going on to a lot of detail.
4       MR. CHRISTOFFERSON: Sure. I'll finish up
5  quickly.
6  BY MR. CHRISTOFFERSON:
7       Q. I just wanted to know generally how long
8  you've been running companies such as these.
9       A. I bought into the firm in 1980.
10      Q. And just to clarify, what do you mean by
11 the firm?
12      A. Well, the YPS original company. There was
13 another one that I started off with as Young & Pratt
14 Incorporated.
15      Q. Have you ever worked for the military?
16      A. No. Well, military contracts, government
17 contracts, is that the question?
18      Q. No. Just have you ever actually been
19 employed by the military?
20      A. No.
21      Q. Have you ever been employed by the federal
22 government?

Page 23

1       A. No.
2       Q. Or any state government?
3       A. No.
4       Q. Mr. Randle, you're a trustee of the sheet
5  metal fund; is that correct?
6       A. Sheet Metal Health and Welfare.
7       Q. Just so that the record is clear, what's
8  the official name of this fund?
9       A. Sheet Metal Workers International Health
10 and Welfare Fund.
11      Q. If you don't mind, I'll probably refer to
12 it just for ease of reference as the Fund.
13      A. Sure.
14      Q. But if it's never clear what I'm asking
15 about, let me know.
16      A. Uh-huh.
17      Q. How long have you been a trustee?
18      A. I think it was 1983 plus or minus when I
19 joined the Fund as a trustee.
20      Q. And as a trustee, what are your
21 responsibilities?
22      A. We meet quarterly, review data from that

Page 24

1  past quarter and set any new coverages, eliminate
2  any coverages that we might need to, reset the rate
3  of contribution, and just all the general things of
4  an operation like that, hiring third-party
5  administrators.
6       Q. And are you chairman of the trustees, the
7  board of trustees?
8       A. Yes.
9       Q. And how long have you been chairman of the
10 board of trustees?
11      A. I guess it would have been something like
12 2000 would have been when I came into that
13 chairmanship.
14      Q. And what are your responsibilities as
15 chairman that are in addition to your regular
16 responsibilities as a trustee?
17      A. Well, to run the meetings, so to speak,
18 set the time for meetings, review again in a monthly
19 manner all things pertaining to the Fund, and set
20 any special meetings if needed.
21      Q. I apologize. I realize I hadn't
22 introduced myself formally on the record. I should

Page 25

1  have done that at the outset. I'm
2  Eric Christofferson. I work for Ropes & Gray. I'm
3  an attorney at Ropes & Gray, and I represent
4  Schering-Plough Corporation and
5  Warrick Pharmaceutical Corporation in this action.
6  I apologize for not stating that earlier.
7          I'd just like to talk a little bit about
8  the Fund itself and the organization of the Fund.
9          In general terms, what is the purpose of
10 the Fund?
11      A. It is to provide health and welfare
12 coverage for sheet metal workers throughout the
13 United States in a self-funded plan.
14      Q. So what is the relationship between the
15 Fund and, say, its member unions or employers?
16         MS. CONNOLLY: Objection to form.
17         THE WITNESS: Restate that.
18 BY MR. CHRISTOFFERSON:
19      Q. Is the Fund a multiemployer fund?
20      A. Yes, uh-huh.
21      Q. And how many employers are participants in
22 the Fund?

Page 26

1  A.  You know, I wouldn't know.
2  Q.  Approximately, if you know.
3  A.  I wouldn't know the answer to that.
4  Q.  Do you know approximately how many
5  beneficiaries are participants or members of the
6  Fund?
7  A.  In the SMW Plus portion of this fund, it's
8  approximately 17,000.  In the actives, there's in
9  excess of 3,000 actives.
10  Q.  And when you say actives, what do you mean
11  by actives?
12  A.  Currently working members.
13  Q.  So the 17,000 that you said are currently
14  involved in the SMW Plus --
15  A.  Retirees.
16  Q.  -- are retirees?
17  A.  Uh-huh.
18  Q.  And I understand today that we're
19  principally going to be talking about the SMW Plus
20  fund, but just by way of background, how many
21  different benefit programs does the Fund operate?
22  A.  Well, two as I would term it, you know,

Page 27

1  one for the retirees and one for the actives being
2  unique to those classes.
3  Q.  You said earlier that the fund is
4  administrated by Southern Benefits Administrators;
5  is that correct?
6  A.  That's correct.
7  Q.  And where is Southern Benefits
8  Administrators located?
9  A.  Goodlettsville, Tennessee.
10  Q.  If you could describe generally, please,
11  what's the organizational structure of the Fund
12  itself?
13      MS. CONNOLLY:  Object to form.
14      THE WITNESS:  Restate.
15  BY MR. CHRISTOFFERSON:
16  Q.  You have a board of trustees --
17  A.  Correct.
18  Q.  -- that run the Fund, correct?
19  A.  And labor and management is represented,
20  represented on that fund, even numbers of trustees
21  from labor and management.
22  Q.  And approximately how many trustees are

Page 28

1  there?
2  A.  There are -- currently we have a unique
3  situation in the fact that we have got three
4  management trustees certified and four labor.  We're
5  in the process of certifying a fourth member on the
6  management side, and the labor force one doesn't
7  have a vote until we do that, so it's always an even
8  number vote.
9  Q.  So there are currently six voting members
10  of the trustees, board of trustees?
11  A.  Uh-huh.
12  Q.  Does the Fund itself have any employees
13  that, for example, help with administration of the
14  Fund?
15  A.  Employees, no.
16  Q.  Is there anyone else besides the board of
17  trustees who would be considered working for the
18  Fund?
19  A.  Well, just, you know, Southern Benefits as
20  a third-party administrator; an attorney,
21  Jan Jennings here.
22  Q.  We were talking earlier about how it's a

Page 29

1  multiemployer plan.
2  A.  Uh-huh.
3  Q.  And I believe you said it's a national
4  plan?
5  A.  Yes.  You know, the term is international.
6  Q.  International.
7  A.  With the sheet metal workers, they have
8  employees in Canada, but they're not a part of this
9  fund currently to my knowledge.
10  Q.  Are there member employers located in
11  every state in the United States?
12  A.  Restate that question.
13  Q.  Are any of the member unions that are
14  participants in the Fund -- strike that.
15      Are there any unions that participate in
16  this Fund located in Massachusetts?
17  A.  Yes, you know, the retirees in the
18  SMW Plus are as we stated retirees living there.
19  Now, as far as active participants, I'm not sure
20  what level employer and employee, but SMW Plus
21  definitely.
22  Q.  Do you have documentation, does the Fund

8 (Pages 26 to 29)

Page 30

1  have documentation of where its beneficiaries -- let
2  me just ask, do you call them beneficiaries or
3  participants?
4      A.  Participants.
5      Q.  Participants.  Do you have any
6  documentation about where the participants live?
7      A.  You know, the claims paid in the recent
8  past have been filed by chronological order.  They
9  all, of course, have the addresses on them, so that
10 information is available with a laborious process.
11 Our third-party administrator is installing new
12 software that will instantaneously identify
13 locations of the employees, but to date it's not
14 been kept that way.
15     MR. CHRISTOFFERSON:  Just for the record,
16 Defendants would request that any documentation
17 relating to the residence of any of the participants
18 specifically with respect to the State of
19 Massachusetts be produced.
20     MS. CONNOLLY:  I'll just state for the
21 record that they're in the process of going through
22 some of that, and we will take your request under

Page 31

1  advisement, but obviously producing documents
2  related to the residence of all their participants
3  would require turning over the entire fund to
4  Defendants, so we will have to talk later about what
5  specifically you need.
6      MR. CHRISTOFFERSON:  That's fine.  We can
7  talk at another time.
8      If you'll just excuse me for a second, I'm
9  having a screen saving issue here.  It will take me
10 one minute.
11 BY MR. CHRISTOFFERSON:
12     Q.  Where are the Fund's offices located?
13 Excuse me.
14     Where is the Fund's office located?
15     A.  Well, in my interpretation, it doesn't
16 have an office, the Fund's.  The third-party
17 administrator that takes care of claims and does
18 those issues for us is in Goodlettsville, Tennessee.
19 Sheet metal workers' headquarters is in Washington,
20 D.C.
21     Q.  When the board of trustees meets, where do
22 you meet?

Page 32

1      A.  Various locations throughout the country.
2  Our trustees are scattered throughout the
3  United States.
4      Q.  You testified a minute ago about the
5  records that you had or at least you alluded to the
6  records and that you're working on a new computer
7  system I think you mentioned.
8      If you could just describe in general
9  terms what files the Fund keeps related to those
10 issues.
11     MS. CONNOLLY:  Objection to form.
12     THE WITNESS:  Yeah, restate, if you would.
13 BY MR. CHRISTOFFERSON:
14     Q.  With respect to the benefits that the Fund
15 pays, what files or records or documents does the
16 Fund keep or maintain?
17     A.  To my knowledge, everything pertaining to
18 any action of any participants is kept in
19 Goodlettsville.  They're going to electronic
20 retention on those records.  I think there's a
21 six-year time frame that had hard copies to this
22 point.  They took over the Fund in '96 and have all

Page 33

1  the records of theirs since then, and they pulled
2  some of the other records into Goodlettsville also.
3      Q.  Is the third-party administrator also the
4  entity that maintains plan documents?
5      A.  Yes.
6      Q.  Does the third-party administrator to your
7  knowledge have any offices in Massachusetts?
8      A.  Not to my knowledge.
9      Q.  Or any employees in Massachusetts?
10     A.  Not to my knowledge.
11     Q.  Has the Fund ever held any meetings in
12 Massachusetts?
13     A.  Not since I've been a part of the Fund.  I
14 do not recall meeting in Massachusetts, no.
15     Q.  Does the Fund own any property in
16 Massachusetts?
17     A.  No.
18     Q.  Has the Fund ever filed a tax return in
19 Massachusetts?
20     A.  Now, that I don't know personally, sir.
21     MS. CONNOLLY:  Do you want to go off the
22 record real quick?  I'll have someone call.

9 (Pages 30 to 33)

Page 34

1  MR. SWEENEY: That would be a very good
2  idea.
3      (Whereupon, an off-the-record
4      discussion was held.)
5  BY MR. CHRISTOFFERSON:
6      Q. We were talking about earlier that there
7  are some participants in the retiree benefits
8  program that live in Massachusetts.
9      Have any of those participants or
10 beneficiaries purchased a drug manufactured by
11 Defendants in Massachusetts?
12     A. These people are on Medicare. We have the
13 Medicare supplement for them, and, you know, I think
14 very definitely they have, no different than all of
15 our participants throughout the country buying those
16 drugs, and, of course, the manufacturer of the
17 drugs, we would assume it's a pretty wide breadth
18 across the industry.
19     Personal knowledge, of course, I don't
20 have of that, but I'd feel comfortable that the
21 answer would be yes.
22     Q. And in a similar vein, has the Fund ever

Page 35

1  made a payment to a medical services provider in
2  Massachusetts?
3      A. Yes, again, you know, following behind the
4  Medicare with those people there.
5      Again, personal knowledge, I don't exactly
6  have a day-to-day knowledge, but it would be logical
7  and I'd say yes, that definitely payments have been
8  made.
9      Q. And again, that documentation would reside
10 with the third-party administrator?
11     A. Correct.
12     Q. And just to close the loop, has the Fund
13 ever made a payment to a Massachusetts pharmacy for
14 a drug that was purchased in Massachusetts?
15     A. Pharmacy?
16     Q. Yes.
17     A. Again, this coverage as I understand it is
18 behind the Medicare, so, you know, those payments as
19 they go to a pharmacy or go to a physician, I think
20 most of this medication is physician-administered,
21 so I'm sure the physician is the billing point, and
22 payments are made to him and he's in turn paid the

Page 36

1  pharmacy would be what I would say I think would be
2  happening.
3      MR. CHRISTOFFERSON: Would you please mark
4  this.
5      (Exhibit Randle 002 marked as
6      requested.)
7  BY MR. CHRISTOFFERSON:
8      Q. Mr. Randle, the court reporter has handed
9  you what's been marked Exhibit Randle 002.
10     Could you just take a moment to look over
11 that.
12     A. Uh-huh.
13     All right.
14     Q. Do you recognize this document?
15     A. Sure.
16     Q. What is this document?
17     A. It's an affidavit that I signed December
18 of '04 pertaining to this suit, civil action.
19     Q. Did you yourself prepare this document?
20     A. No.
21     Q. When did you first see this document?
22     A. I would say it would have probably been

Page 37

1  December, you know, 12th, 13th. I signed it on the
2  14th, so a day or so before that.
3      Q. Did you review it for any errors?
4      A. Sure, uh-huh.
5      Q. Did you make any changes or revisions to
6  the exhibit?
7      A. I don't recall any changes being made.
8      Q. And that is your signature that appears on
9  Page 3?
10     A. Yes.
11     Q. And this is a true and correct --
12 everything that's contained in this exhibit is true
13 and correct?
14     A. Yes, to my knowledge.
15     Q. I'll return to that in a few minutes.
16     Would you please mark this document.
17     (Exhibit Randle 003 marked as
18     requested.)
19 BY MR. CHRISTOFFERSON:
20     Q. The court reporter has handed you what's
21 been marked Exhibit Randle 003.
22     Could you just take a minute to look over

Page 38

1  that document.
2       A.  Yes.
3       Q.  Do you recognize this document,
4  Mr. Randle?
5       A.  Yes.
6       Q.  What is this document?
7       A.  It's just the Summary Plan Description of
8  the coverage for our participants.
9       Q.  Could you please turn to the page that's
10 been Bates labeled SMW 0032.
11      A.  All right.
12      Q.  And at the top of the page, it says this
13 booklet is only a summary.
14          Do you see that?
15      A.  Uh-huh, yes.
16      Q.  What is the document that is referred to
17 in the second sentence of the second paragraph of
18 that section?
19      A.  The second sentence of the second
20 paragraph, these rules and regulations are set forth
21 in a legal document referred to as a plan document,
22 that would be the official document in Southern

Page 39

1  Benefit Administrators' headquarters that are kept
2  for the Fund.
3          MR. CHRISTOFFERSON:  Would you please mark
4  this document.
5              (Exhibit Randle 004 marked as
6              requested.)
7  BY MR. CHRISTOFFERSON:
8       Q.  Mr. Randle, the court reporter has handed
9  you what's been marked as Exhibit Randle 004.  If you
10 could just take a moment to look over this document,
11 please.
12      A.  Yes.
13      Q.  Is this the document that is referred to
14 in that paragraph we were just discussing in
15 Exhibit Randle 003?
16      A.  Yes, I would say it is, you know, to the
17 best of my knowledge, you know.  I hadn't sit and
18 reviewed it page by page, but knowing that they
19 prepare this, we have all the amendments of each
20 meeting if we have any to it that are attached that
21 are signed, sort of chronological order that Jan is
22 a part of that process too.  I assume you've seen

Page 40

1  it.
2          MR. JENNINGS:  Yes, sir, that's the one
3  that we provided to your attorney of record and she
4  in turn provided to them.
5          THE WITNESS:  Yes, that's it.
6  BY MR. CHRISTOFFERSON:
7       Q.  And if you would please just turn to the
8  very last page of that document.  It appears to be
9  the last page of an amendment, and it's signed --
10 the date on it is the 10th day of November, 2005.
11      A.  Uh-huh.
12      Q.  Is this to your knowledge the most current
13 and up-to-date version of the plan document?
14      A.  We sign some of these -- each meeting that
15 we have quarterly, we sign these updates from the
16 prior meeting.
17          Now, we would have met in December or so.
18 It could be that there's another one or two
19 amendments to this.  It's constantly evolving.
20          So for me to say that this is the last
21 one, I couldn't state that for sure.  I know at our
22 last meeting two weeks ago as I recall I signed some

Page 41

1  amendments, so --
2       Q.  Just for the record --
3       A.  -- there might be one or two --
4       Q.  Excuse me.
5       A.  -- additionally.
6       Q.  Just for the record, the Defendants would
7  request if there are any additional documents, any
8  additional amendments, that those be produced.
9          MS. CONNOLLY:  That's the most current
10 version, to my knowledge.
11         THE WITNESS:  All right.
12 BY MR. CHRISTOFFERSON:
13      Q.  And if you'd look at the front, the very
14 first page, SMW 0604, it says effective January 1,
15 2002.
16      A.  Uh-huh.
17      Q.  Is that, in fact, the effective date of
18 this plan document?
19      A.  Yes.
20      Q.  Were there any plan documents in effect
21 prior to January 1st, 2002?
22      A.  Yes.

Page 42

1  Q. Do you know where those documents are
2  kept?
3  A. It would be this same document less some
4  of these amendments would be my thought in this
5  process. To my knowledge, like I say, this is a
6  living document that's added to as we proceed with
7  our meetings.
8      Jan, is that ...
9      MS. CONNOLLY: You can just testify to the
10 best of your knowledge.
11     THE WITNESS: To the best of my knowledge,
12 uh-huh.
13 BY MR. CHRISTOFFERSON:
14 Q. Are there any other plan documents --
15 strike that.
16     Starting in 1991, are there any other plan
17 documents that were in effect other than what's been
18 marked as Exhibit Randle 004?
19     MS. CONNOLLY: Objection to form.
20     THE WITNESS: Restate.
21 BY MR. CHRISTOFFERSON:
22 Q. You've testified that the effective date

Page 43

1  of the plan document that is Exhibit Randle 004 was
2  January 1st, 2002.
3      Are there any other plan documents from
4  prior years that the Fund maintained?
5  A. To the best of my knowledge, this, like I
6  said, was a living document. It would have started
7  when the Fund first started and has evolved through
8  that process. I think that there's separate
9  documents, and everything should -- you know, like I
10 say, this is my thought process. It could -- I'd
11 have to talk with Jan and the third-party
12 administrator to see, but my knowledge is that this
13 is, like I say, a living document started from the
14 original. It's just been amended.
15     MR. CHRISTOFFERSON: Would you please mark
16 this document.
17         (Exhibit Randle 005 marked as
18         requested.)
19 BY MR. CHRISTOFFERSON:
20 Q. The court reporter has handed you what's
21 been marked as Exhibit Randle 005. If you could just
22 take a moment, please, to look over that document.

Page 44

1  A. All right.
2  Q. The very first page of this document,
3  which has been Bates labeled SMW 0581, please let me
4  know if I'm reading this correctly, Sheet Metal
5  Workers National Pension Fund Supplemental Medicare
6  Wraparound Plus, parens, SMW+, 1993.
7      Did I read that correctly?
8  A. Yes.
9  Q. Is the effective date of this document
10 1993?
11 A. I would assume that it is. Again, like
12 you stated, this is a pension fund document.
13 Participants in SMW Plus are pensioners through the
14 Sheet Metal Workers Pension Fund, so this would be a
15 document that that separate group produced. I don't
16 recall seeing this document myself before. Since it
17 is part of the pension fund operation, so to speak,
18 I wouldn't necessarily.
19 Q. So just so I understand you correctly, are
20 you saying that this is a different -- this
21 represents a different program than what's
22 represented in Exhibit Randle 003?

Page 45

1  A. That's correct. This is the Sheet Metal
2  Workers Health and Welfare, and this is the Sheet
3  Metal Workers Pension, so it's a description from
4  the pension fund of what coverage for the pensioners
5  in SMW Plus is covered on the health and welfare
6  fund.
7  Q. Is the Supplemental Medicare Wraparound
8  Plus Program that is identified in Exhibit Randle 005,
9  is that the same Supplemental Medicare Wraparound Plus
10 Program that's identified in Exhibit Randle 003?
11 A. Yes, in the fact with the exception that
12 this is in '93 and the one that we're looking at,
13 Exhibit Randle 003, is 2003, so it's the -- this has
14 evolved from that.
15 Q. Understood. And where you were saying
16 that this comes from the pension fund as opposed to
17 the national health fund, this summary booklet comes
18 from a different source, is that what you were
19 saying?
20 A. In '93, the pension fund was a
21 coadministrator of the pension fund and the health
22 fund, so not being a third party but being an

**Page 46**

1  in-house administrator of the health and welfare
2  fund, it was tied to both the pension and the health
3  and welfare at that time, so ...
4      Q.  When did the two separate, the pension
5  fund and the health?
6      A.  1996 to my recollection.  I think it was
7  January 1st of '96 is when we hired Southern Benefit
8  Administrators to be the third-party administrator.
9      Q.  So prior to 1996 was the pension fund also
10 the administrator of the Supplemental Medicare
11 Wraparound Plus Fund?
12     A.  Yes, basically in my understanding that's
13 the way it was.  They had the same employee force,
14 so to speak.  All the employees were pension fund
15 employees.  They took care of the pension fund and
16 the health and welfare, and, you know, they adjusted
17 internally the monies between the two of them.
18     Q.  If you could please turn to Page SMW 0596,
19 and if you see towards the top of the page in bold
20 it says Some Final Facts.
21     A.  Uh-huh.
22     Q.  And then under that, it says, the benefits

**Page 47**

1  information in this booklet contains only a summary
2  of the principal features of your policy and
3  coverage.
4          Did I read that correctly?
5      A.  Uh-huh, yes.
6      Q.  Is Randle Exhibit Randle 004 summarized by
7  Exhibit Randle 005?
8          MS. CONNOLLY:  Objection to form.
9          MR. CHRISTOFFERSON:  Strike that.  Let me
10 ask a better question.
11 BY MR. CHRISTOFFERSON:
12     Q.  Where this Exhibit Randle 005 says that it's
13 only a summary of the principal features of the
14 policies and coverage, is there an actual plan document
15 that this is referring to?
16     A.  There would have been at that time.
17     Q.  Do you know if that plan document is
18 Exhibit Randle 004?
19     A.  No.  4 is dated 2002.  This is 1993.  So
20 as again I said, assuming I'm correct that this was
21 a living document, some portions of this would have
22 been a part of it in '93 but being updated.

**Page 48**

1      Q.  Do you know if the Fund maintains a copy
2  of the version that was in effect in 1993?
3      A.  In 1996 Southern Benefit went and obtained
4  all the records that were able to be found of the
5  health and welfare since its inception, and they
6  would have that, assuming it was there.
7      Q.  Did the Fund look for those documents?
8      A.  The Fund instructed the national pension
9  fund employees to produce all documents pertaining
10 to that fund since its inception.
11         MS. CONNOLLY:  Do you mean instruction in
12 1996, or are you talking about for this litigation?
13 BY MR. CHRISTOFFERSON:
14     Q.  Excuse me.  With respect to your
15 obligations in this litigation, did you instruct
16 anyone to search for documents going back to 1993?
17     A.  Did I personally instruct them?
18     Q.  Did the Fund instruct them?
19     A.  I believe it's '91 is the time frame we're
20 looking back to.
21     Q.  So the Fund --
22     A.  Their instructions were to look back to

**Page 49**

1  1991, all records that pertained to the Fund during
2  that time.
3      Q.  And your instructions would have included
4  prior versions of this plan document?
5      A.  Sure.
6      Q.  When was the Supplemental Medicare
7  Wraparound Plus Program, when did it first begin?
8      A.  Well, like I say, I think it was '83 I
9  believe I stated that I joined the Fund.  It had
10 been operational for a few years before then.  To my
11 knowledge and recollection, it was a part of it in
12 '83, so it very possibly started as the Fund was
13 initially put together would be my guess, and that
14 being I think in the 1980 plus or minus time frame.
15     Q.  Just to close the loop on this, do you
16 know how many different versions of this plan
17 document have been in effect since 1991?
18     A.  Personally I don't.  Again, my thought
19 process is that this is a living document.  It
20 started and grew with amendments, changes, per each
21 meeting possibly.
22         MR. CHRISTOFFERSON:  Just for the record

Page 50

1  the Defendants would just reiterate their request,
2  to the extent there are prior versions of this plan
3  document, that they be produced.
4       THE WITNESS: Uh-huh.
5       MS. CONNOLLY: You've got everything we
6  have been able to find.
7       THE WITNESS: Yeah.
8  BY MR. CHRISTOFFERSON:
9    Q. Turning to the actual Wraparound Plus
10 Program, generally speaking, what does this program
11 offer in terms of benefits to participants?
12   A. It is a supplementary coverage behind
13 Medicare. It has on hospital, as I recall, a $900
14 annual deductible, picking up that remaining
15 20 percent, physician, facility. Part B is $100
16 deductible, and it pays that remaining 20 percent
17 behind there.
18      So it's a supplemental coverage for all
19 retired sheet metal workers.
20   Q. What percentage of Medicare approved
21 charges does the Fund pay?
22   A. 20 percent.

Page 51

1    Q. If you know, how does Medicare determine
2  the approved amount for physician or medical
3  services?
4       MS. CONNOLLY: Objection, form.
5       THE WITNESS: Do you want to restate?
6  BY MR. CHRISTOFFERSON:
7    Q. You've said earlier that the Fund pays
8  20 percent of what Medicare approves in charges.
9       Do you know how Medicare determines what's
10 approved?
11   A. I don't personally know how. They have
12 their formula on that.
13   Q. And specifically physician-administered
14 drugs, do you know how they determine the amount
15 that's paid?
16      MS. CONNOLLY: Same objection.
17      THE WITNESS: Do you want to restate that?
18 BY MR. CHRISTOFFERSON:
19   Q. Do you know how Medicare determines what's
20 the allowable amount for physician-administered
21 prescription drugs?
22   A. No, I don't have personal knowledge of

Page 52

1  that.
2    Q. Are participants required to pay a
3  deductible under this program, this Wraparound Plus
4  Program?
5    A. Yes, 900 on the Part A, 100 on the Part B
6  as I recall.
7    Q. And is this deductible, for example, on
8  Part B, this $100 deductible, is that the
9  deductible -- is that a deductible in addition to
10 the deductible that Medicare requires, or is this
11 the Medicare deductible that you're referring to?
12      MS. CONNOLLY: Objection to form.
13      THE WITNESS: Restate.
14 BY MR. CHRISTOFFERSON:
15   Q. What is -- does the Fund in connection
16 with the Medicare Wraparound Plus Program require a
17 deductible over and above the $100 deductible that
18 Medicare requires?
19   A. To my knowledge, they don't. I think it's
20 one and the same, both those deductibles, but, you
21 know, that has been in place, and I think it steps
22 up. Medicare changes that through the years or has

Page 53

1  changed it, so it coincides with theirs.
2    Q. Is there any out-of-pocket payment cap in
3  this program for participants?
4    A. No. We pay the 20 percent behind any
5  Medicare-approved charge.
6    Q. And any amount that the participant might
7  otherwise be responsible for he or she has to pay
8  regardless of how much he or she has paid in the
9  past, would that be accurate?
10   A. Restate that.
11   Q. Let me see if I can do it by way of
12 hypothetical.
13      For example, if someone has been receiving
14 benefits over the course of a year and is having to
15 pay in addition to the 80 percent that Medicare pays
16 of approved charges and the 20 percent that the Fund
17 pays of approved charges, the provider perhaps is
18 charging them more money and that participant is
19 responsible for additional charges, is there any
20 point at which the Fund will start picking up all of
21 the charges for which that participant is
22 responsible?

Page 54

1  A. To my knowledge, you know, we have stated
2  the deductibles in the two areas, Medicare being 80,
3  we pay 20. There's no other cost there, nothing
4  else charged or reimbursed.
5  Q. What does the participant have to pay to
6  participate in this program?
7  A. We have two different groups of
8  participants in this program. There's subsidized
9  and nonsubsidized. The subsidized pays $112 a
10 month. The nonsubsidized pays $135 a month.
11 Q. How does a participant qualify for one
12 group or the other?
13 A. Subsidized would be your pension
14 participation in some of the funding. There's a $31
15 amount that the pension plan contributes to those
16 subsidized.
17 Q. If you could please turn to Page SMW 0012.
18 Towards the top above the section heading May I
19 Enroll in SMW Plus, that sentence says, of course,
20 in order to become and continue to be eligible for
21 these benefits, you must make the appropriate
22 monthly contributions on a timely basis.

Page 55

1     Are the appropriate monthly contributions
2  the dollar amounts you were just discussing?
3  A. Uh-huh, yes.
4  Q. If you could turn to the previous page,
5  11. In the second paragraph and the second sentence
6  of the second paragraph, it says, SMW Plus does not
7  provide coverage for prescription drug benefits and
8  other services which are excluded by Medicare.
9     Did I read that correctly?
10 A. That's correct.
11 Q. What does that mean?
12 A. It means again that Medicare has to
13 approve any claim for us to pay the 20 percent on
14 that claim behind their 80 percent from Medicare.
15 Q. If you could please turn to Page 18.
16 Under Excluded Charges, Paragraph Number 1, the
17 second sentence reads, this means among other things
18 that no coverage is provided under SMW Plus for
19 take-home prescription drugs or most eyeglasses, and
20 the sentence continues.
21 A. I didn't pick up on that exactly. Under
22 Excluded Charges, we're talking the second sentence?

Page 56

1  Q. Yes.
2  A. Doesn't that start off --
3     MS. CONNOLLY: It's Number 1.
4     THE WITNESS: Under Number 1, okay.
5  BY MR. CHRISTOFFERSON:
6  Q. My apologies.
7  A. Okay. Go ahead.
8  Q. This means among other things that no
9  coverage is provided under SMW Plus for take-home
10 prescription drugs.
11    Do you see that?
12 A. Uh-huh, yes.
13 Q. What's your understanding of what that
14 means?
15 A. That, you know, again it's
16 physician-administered drugs that are covered which
17 Medicare covers is what drugs that are covered here.
18 Take-home, so it would have to be a
19 physician-administered drug in their office.
20 Q. So it would have to be a
21 physician-administered drug and also covered by
22 Medicare?

Page 57

1  A. Yes.
2  Q. So there may be additional drugs that are
3  covered by Medicare that are take-home that the Fund
4  does not reimburse for?
5  A. That's correct.
6  Q. Is there any other definition that you
7  know of -- strike that.
8     Is there any other source either in the
9  plan document itself or this summary that describes
10 which prescription drugs are covered by the Fund and
11 this program and which are not?
12 A. No. It's just purely a simple matter of
13 Medicare's covered pay, you know, that 80 percent,
14 we cover the remaining 20.
15 Q. As long as it's physician-administered?
16 A. That's my understanding.
17 Q. Does the Fund provide reimbursement to
18 participants or beneficiaries for prescription drugs
19 administered pursuant to Medicare's Outpatient
20 Prospective Payment System or OPPS?
21 A. State that again.
22 Q. Sure. Maybe it would be helpful if we

Page 58

1  just turn to a page in this document. If you'd turn
2  to Page 19, there's a section --
3       A.  Okay. Wait a minute. You're talking
4  Exhibit A?
5       Q.  I apologize. It's Exhibit Randle 003, the
6  Summary Plan Description.
7       A.  What page?
8       Q.  Page 19, Page 12 of the original document.
9       A.  Okay.
10      Q.  SMW 0019.
11      A.  Okay. Where are we at?
12      Q.  This is the section that's talking about
13 Medicare's Outpatient Prospective Payment System.
14          Under this particular provision, does the
15 Fund provide reimbursement to participants or
16 beneficiaries for drugs, for prescription drugs?
17      A.  We're talking about the one that's headed
18 up a word about Medicare Outpatient --
19      Q.  Right, right.
20      A.  Okay. Again, your question?
21      Q.  Sure. Does the Fund provide reimbursement
22 for participants for drugs, prescription drugs

Page 59

1  administered pursuant to the Medicare Outpatient
2  Prospective Payment System?
3       A.  Being a part of the Summary Plan
4  Description, you know, I feel this is the exact
5  documents that we're guided by. So again, there is
6  some kind of payment. Sounds like they're speaking
7  to the fact they don't know for sure if it's
8  80 percent that Medicare pays, but there's a payment
9  made, reimburse 20 percent of the amount but only up
10 to the outstanding balance.
11          So state the question again.
12      Q.  Let me ask it a different way maybe to
13 make it a little more precise.
14          In the penultimate sentence there of the
15 last paragraph, it says, however, the Fund office
16 will determine a total allowable charge, and we will
17 reimburse 20 percent of that amount but only up to
18 the actual outstanding balance.
19          Did I read that correctly?
20      A.  Yes.
21      Q.  Do you know how the Fund office determines
22 the total allowable charge that's referenced in this

Page 60

1  sentence?
2       A.  I would say to the best of their ability
3  determining what Medicare has allowed. It speaks of
4  the difficulty in calculating the amount that
5  Medicare has allowed for the services, so I would
6  say their attempt would be again to find out what
7  has Medicare allowed and to pay the 20 percent of
8  that amount but never to exceed between the Medicare
9  payment and our payment 100 percent of the balance.
10      Q.  Do you know if the Fund reimburses under
11 this provision for prescription drugs as part of the
12 services that are reimbursed?
13      A.  I would assume the physician-administered
14 drugs, Medicare approved, would be paid under that.
15      Q.  And again, where it says the Fund will
16 determine the total allowable charge, do you know if
17 that determination is made on the basis of average
18 wholesale price or AWP?
19          MS. CONNOLLY: Objection to form.
20          THE WITNESS: Restate.
21 BY MR. CHRISTOFFERSON:
22      Q.  You've testified that at least it's your

Page 61

1  understanding that if a physician-administered drug
2  is administered pursuant to the provision or I
3  should say pursuant to the Outpatient Prospective
4  Payment System and that the Fund is reimbursing,
5  providing reimbursement for that drug, that the Fund
6  will do its best -- strike that -- that the Fund
7  will determine the total allowable charge.
8          Do you know if that determination is based
9  upon the average wholesale price of that drug?
10         MS. CONNOLLY: Same objection.
11         THE WITNESS: What did you say?
12         MS. CONNOLLY: Same objection, but you can
13 answer.
14         THE WITNESS: Our instructions to them,
15 what I understand is done is that they never deviate
16 from the Medicare-approved claim. So it sounds like
17 some of these are a little bit hard to interpret,
18 but they always base from the Medicare approval.
19 They don't step out and look at any costs separate
20 from that Medicare approval.
21         So they let Medicare be the guide.
22 BY MR. CHRISTOFFERSON:

Page 62

1  Q. So you don't know if it was based on AWP
2  or not?
3      MS. CONNOLLY: Objection to form.
4      THE WITNESS: Restate it.
5  BY MR. CHRISTOFFERSON:
6  Q. You don't know whether the determination
7  that the Fund makes pursuant to this section with
8  respect to physician-administered drugs is based on
9  average wholesale price of those drugs?
10     MS. CONNOLLY: Objection to form.
11     You can answer.
12     THE WITNESS: Again, they're instructed to
13 follow Medicare. Medicare would be the one doing
14 this average wholesale price situation. Our people
15 should never step into that arena. It's always
16 behind the Medicare.
17     Is that -- the answer, to my knowledge,
18 that's the way that they have all been handled.
19 BY MR. CHRISTOFFERSON:
20 Q. So you do know that it's based on AWP?
21 A. No, it's based on Medicare, on their
22 approval, their paid claim.

Page 63

1  Q. Well, you've testified earlier that
2  there's a third-party administrator.
3  A. Uh-huh.
4  Q. How does the Fund generally process claims
5  for participants in this program?
6  A. Mailed in or however, faxed or whatever,
7  the claims come into the office. They have a staff
8  that's assigned to our particular fund with people
9  that are fully knowledgable of these documents and
10 how they should be handled. They go through that
11 claim applying these standards and make payments
12 based off that. And if the claimant should
13 disagree, there's an appeal process to go through.
14 Q. And you mentioned that a document or
15 documents are mailed in.
16     What are those documents that generally
17 trigger the process?
18 A. Well, of course, it would be the Medicare
19 claim. Now, very possibly Medicare sends their
20 claims to them on those particular people. I don't
21 know the inner workings of that process, but I guess
22 if I were to try to set that up, I would let

Page 64

1  Medicare know who my participants are, and when that
2  Social Security Number comes up, it would come to
3  it.
4      But, you know, the actual methodology of
5  that I'm not totally familiar with.
6      MS. CONNOLLY: Eric, before you do that, I
7  need to take the quick break I told you about.
8      MR. CHRISTOFFERSON: Go right ahead.
9          (Whereupon, a short recess was
10         taken.)
11     MR. CHRISTOFFERSON: Let's go back on the
12 record.
13     Just for the record, no one has identified
14 themselves on the conference call that we have set
15 up for this deposition, so we're going to
16 disconnect.
17 BY MR. CHRISTOFFERSON:
18 Q. Mr. Randle, we were just talking about the
19 claims process procedure. That's redundant, isn't
20 it? Sorry, the claims process, and you said that
21 you're not familiar with the actual methodology of
22 the procedure.

Page 65

1      Who would be familiar with that process?
2  A. At Southern Benefit, Teresa Jernigan is a
3  lady that's the supervisor of our particular fund,
4  so day-to-day, she would be the most familiar.
5  Q. Could you please spell that name, please?
6  A. T-e-r-e-s-a I believe is Teresa, and
7  J-e-r-i-g-a-n. I know there's more than one Teresa
8  there, so you have to be sure to use that last name.
9      MR. CHRISTOFFERSON: Would you please mark
10 this.
11         (Exhibit Randle 006 marked as
12         requested.)
13     MR. CHRISTOFFERSON: We can go back on the
14 record whenever you're ready.
15 BY MR. CHRISTOFFERSON:
16 Q. Mr. Randle, the court reporter has handed
17 you what has been marked Exhibit Randle 006; is that
18 correct?
19 A. Correct.
20 Q. If you could just take a moment to flip
21 through these documents. Obviously there's a lot of
22 information on each of these documents. I'm not

Page 66

1  asking you to read it. I just want you to
2  familiarize yourself with it.
3     A. The first one I opened up to is
4  Teresa Jernigan's name on 84, which I believe I
5  misspelled her name. J-e-r-n-i-g-a-n.
6     Q. Well, that's fortuitous.
7        I'm going to go over some of these in a
8  minute, but just so that I'm clear, are these the
9  kinds of documents you were referring to just a
10 moment ago when you were saying that documents would
11 be mailed in to the Fund, and that would be the
12 basis of the claims process getting started?
13    A. To my knowledge, yes.
14    Q. Okay. You can set that aside for a
15 minute.
16       If you would, please, turn to Exhibit
17 Randle 004, which is the plan document, effective date
18 January 1st, 2002, and if you would, please turn to
19 Page SMW 0632. Actually, if you turn to the
20 previous page first, 631.
21       It says Section 3.4, summary of schedule
22 of benefits for optional employees described under

Page 67

1  Section 4.15 who are eligible to enroll for Medicare
2  benefits and any of their eligible dependents who
3  are eligible to enroll for Medicare benefits.
4        Did I read that correctly?
5     A. Yes.
6     Q. And then if you would turn to Page 642.
7  If you could flag that page for yourself, 631, I'll
8  come back to that, but 642 at the top says
9  Section 4.15, Eligibility for Optional Employees.
10    A. Uh-huh.
11    Q. Do you see that?
12    A. Yes.
13    Q. Is that what -- that's the section that
14 Section 3.4 on Page 631 was referring to?
15    A. To my knowledge it would be, both
16 identified as optional.
17    Q. What is optional employees?
18    A. Optional employees are employees of a
19 signatory contractor that work in their office, so
20 the plan offers coverage for all of their staff
21 should they want -- should that employer want to
22 take that coverage.

Page 68

1     Q. So they might not be -- that wouldn't be
2  an employer, so to speak, under the Fund but someone
3  who contracts with an employer?
4     A. Restate that.
5     Q. You said that optional employees are
6  employees of a signatory contractor that work in
7  their office.
8        What's a signatory contractor?
9     A. Someone that is signatory to a sheet metal
10 negotiated contract for labor.
11    Q. And how do those employees differ from the
12 other employees that the or the participants that
13 the Fund provides benefits for?
14    A. They are not true sheet metal workers in
15 most cases. They are the office staff of that
16 contractor. Now, it can be the contractor and the
17 office staff. Our requirement is that everyone, if
18 you bring your optional employees in, you bring
19 everybody in your office in under this coverage.
20 There's no exceptions to that, all or none.
21    Q. Okay. If you would, turn back, and I
22 guess now we will go to 632, which is back under

Page 69

1  Section 3.4, and it says at the top For Eligible
2  Employees and Their Eligible Dependents, then it
3  says Medical Benefits. And then it says, the Fund
4  will pay major medical expense benefits for charges
5  approved by Medicare but not paid by Medicare.
6  These will generally include, and then there's a
7  list of bullets, Part A deductible, Part A facility
8  copayments for hospital and skilled nursing
9  facilities, Part B deductible, Part B copayments and
10 first three pints of blood.
11       Mr. Randle, could you tell me how this --
12 the benefits for optional employees and specifically
13 the Medicare benefits for these optional employees,
14 how is that related to the SMW Plus Wraparound Plus
15 benefits program?
16    A. It's totally separate of SMW Plus. That's
17 a group into itself. These optional people are
18 under the actives, the 3,000 plus people. They're
19 covered under that.
20       And, Jan, to my recollection, we would
21 have an amendment back here pertaining to Medicare
22 coverage on optional employees later on. That rings

Page 70

1  a bell with me because I'm going to be there pretty
2  soon. I'm going to be covered at 65, you know. I
3  don't think that there is a supplemental, shall we
4  say, behind Medicare for optional employees.
5     Q.  But they would receive coverage for Part B
6  deductibles and Part B copayments?
7     A.  Well, if they are not covered at all by an
8  amendment on back here, no, but that is my
9  recollection, that within this last three years or
10 so we eliminated those who retired at age 65
11 basically is what I recall from coverage.
12        So this was at one time in place, again,
13 this living document here was, but I think you'll
14 find a sheet through here that's going to remove
15 those people from the Medicare supplement.
16    Q.  Okay. Just so I'm clear, it's your
17 understanding that perhaps at one time optional
18 employees would be able to receive Medicare benefits
19 from the Fund but no longer?
20    A.  That is my recollection.
21    Q.  Is the Fund making claims for damages with
22 respect to payments it made or may have made,

Page 71

1  Medicare payments it may have made, copayments or
2  deductible payments, with respect to optional
3  employees?
4     MS. CONNOLLY:  Objection to form.
5     THE WITNESS:  Restate that.
6  BY MR. CHRISTOFFERSON:
7     Q.  You testified that it's your understanding
8  that optional employees are no longer eligible for
9  Medicare benefits.
10    A.  Uh-huh.
11    Q.  But at one time they were; is that
12 correct?
13    A.  That's what this appears to say, yes.
14    Q.  In this lawsuit, are you seeking damages
15 with respect to payments the Fund made on behalf of
16 optional employees pursuant to Medicare?
17    MS. CONNOLLY:  Objection to form.
18    You can answer.
19    THE WITNESS:  My interpretation of that
20 would be if they were covered during part of this
21 time and they were paid 80 percent by Medicare on a
22 claim and we paid the 20 percent, that it would be

Page 72

1  in this.
2  BY MR. CHRISTOFFERSON:
3     Q.  And I apologize, this document I received
4  late yesterday afternoon, so I didn't get a chance
5  to review it as thoroughly as I would have liked,
6  and I understand that you're suggesting there's
7  probably an amendment at the back?
8     A.  Yes.
9     Q.  I'm not asking you to look through.
10        Do you have a memory of approximately what
11 point the optional employees were -- the Medicare
12 benefits were eliminated for optional employees?
13    A.  I would say four years ago would be my
14 memory of that. The older I get, the time period
15 varies, not as on target as I once was.
16    Q.  If you could please turn to Page 634 and
17 635. Actually, I'm sorry, can we please turn first
18 to Page 677 -- no, not 677. I will find it.
19        It's Page 77, which is 687. I'm sorry.
20    A.  All right.
21    Q.  And the first paragraph, it says -- well,
22 at the top, it says Section 6.1, Supplemental

Page 73

1  Medicare Wraparound Plus Benefits, and the first
2  paragraph says, the benefits described herein shall
3  be furnished to all retirees described under
4  Section 4.19 of the plan and such of their eligible
5  dependents as shall be covered in accordance with
6  those provisions, and then it goes on to say, the
7  last sentence of the second paragraph, the benefits
8  which shall be paid hereunder are limited to those
9  amounts outlined in Section 3.5 hereof.
10        Did I read that correctly?
11    A.  Yes.
12    Q.  Could you please turn back to Page 634.
13        Is this the section, the relevant section
14 of the plan document that describes the benefits of
15 the Supplemental Medicare Wraparound Plus Program?
16    A.  I believe it is.
17    Q.  And when you earlier testified that the
18 Fund pays 20 percent of the Medicare-approved amount
19 for physician-administered drugs, which section of
20 this benefits schedule indicates that such payments
21 are made?
22    A.  I guess again this being a living document