**Page 74**

1  that might be amended in the back, we speak of other
2  services in several areas here under other hospital
3  services and supplies, other services and supplies
4  and skilled. It seems as -- yeah, home healthcare
5  speaks of it. I would assume that it would fall in
6  under that, again being Medicare-approved.
7      Q. So I'm sorry, just so that I'm clear, you
8  said other hospital services under hospitalization,
9  other services under skilled nursing facility care?
10     A. Uh-huh.
11     Q. And --
12     A. And supplies.
13     Q. And supplies. And then supplies and other
14 services under home healthcare?
15     A. Yes, as long as it's Medicare-approved.
16     Q. Anything else?
17     A. Again, on 635, we speak of medical
18 expenses, services and other -- well, services and
19 other services, in-home healthcare speaks of other
20 services.
21         So I would assume that's what it's
22 covering.

**Page 75**

1      Q. If you would, please turn to Page 651.
2      A. 651?
3      Q. Please.
4      A. I see back on 634 here it's speaking under
5  hospice care of outpatient drugs and inpatient
6  respite care.
7          Okay. 651.
8      Q. Yes, 651. In the middle of the page under
9  Part D where it says Enrollment in the Program, and
10 there's a reference there to monthly contributions
11 in the last sentence.
12     A. Uh-huh.
13     Q. Again, is that the contributions you
14 testified to earlier of the subsidized and
15 nonsubsidized employees?
16     A. The same, yes.
17     Q. Could you just briefly turn back to
18 Page 687.
19     A. All right.
20     Q. And the last sentence of that first
21 paragraph says, these benefits are designed --
22 excuse me, are designated as SMW Plus benefits and

**Page 76**

1  are not subject to any of the provisions outlined in
2  Article 5 hereof.
3          Would that include the order of benefit
4  determination rules that is in Section 5C which
5  begins on Page 678?
6          MS. CONNOLLY: You can unclip it if you
7  want.
8  BY MR. CHRISTOFFERSON:
9      Q. If that helps, that section actually
10 starts on Page 676 titled Section 5.17, Coordination
11 of Benefits.
12     A. All right. They speak of it as Article 5,
13 and they're saying that's the same as Section 5. It
14 would have been better if they would have put a page
15 number on that part.
16         But again, what you're speaking of is
17 benefits are not subject to any of the provisions
18 outlined in Article 5. So Article 5 speaks of major
19 medical expense, so it would be separate of that I
20 would say, again just the Medicare coverage and
21 everything doesn't relate to major medical to my
22 knowledge.

**Page 77**

1      Q. I'm sorry, I didn't mean to make this a
2  confusing question, and probably it was.
3          I just wanted to confirm that the
4  coordination of benefits section, which is
5  Section 5.17, and it might help maybe to look at the
6  table of contents at the beginning where it lists
7  the different articles, and that article -- that
8  section comes under Article 5. I just wanted to
9  confirm that, in fact, that provision does not apply
10 to the Supplemental Medicare Wraparound Plus
11 Program. I believe it's Section 5.7.7.
12     A. Yeah, what I'm seeing there -- yeah,
13 everything in there refers to active in Article 5
14 that I've seen so far.
15         Well, 5.11 talks of physical examination,
16 employees and retirees. It looks like we're
17 starting -- Section 5.11 speaks of retirees.
18 Everything before that refers to actives.
19         So I would assume those sections. Again,
20 major medical is talked about in 5.16 and 5.17,
21 coordination of benefits. In 5.18 under
22 subrogation, I would say those are not under the

### Page 78

1  Medicare retirees would be my interpretation,
2  probably just those ones that says retirees, 5.11,
3  5.12.
4      Does that answer your question?
5  Q. Yes, thank you.
6  A. Okay.
7  Q. You can put that aside now. I'm done with
8  that document for now.
9  A. All right.
10 Q. If you would, please, turn to Exhibit
11 Randle 005, and specifically, if you could turn to
12 Page SMW 0590. And if you could please look again
13 at the second to the last sentence of the second
14 paragraph, it says, SMW Plus will pay the remaining
15 20 percent of reasonable charges in most instances.
16     Do you see that?
17 A. Yes.
18 Q. Did I read that correctly?
19 A. Uh-huh.
20 Q. Again, do you know how Medicare
21 determined, quote, reasonable charges?
22     MS. CONNOLLY: Objection to form.

### Page 79

1      THE WITNESS: Do you want to restate?
2  BY MR. CHRISTOFFERSON:
3  Q. This section says that the Fund as we have
4  discussed will pay 20 percent --
5  A. Uh-huh.
6  Q. -- of what in the later summary Medicare
7  was allowable charges.
8  A. Right.
9  Q. And here it says -- and you testified
10 earlier that you didn't know how Medicare determined
11 what allowable charges were.
12     In this case, do you know how Medicare
13 determined what reasonable charges were?
14     MS. CONNOLLY: Objection to form.
15     THE WITNESS: I do not know. Of course,
16 this being a '93 document, probably reasonable
17 charges was a part of the jargon at that time, and
18 now it's allowable charges would be my thought.
19 BY MR. CHRISTOFFERSON:
20 Q. Do you know what it meant by in that
21 sentence in most instances?
22 A. That to me would tell me that the high

### Page 80

1  percent of those are paid. It gives them a leeway
2  of a review process if they feel, you know,
3  typically cover yourself language as I would look at
4  it, so in most instances.
5      Again, I think this has been updated later
6  than this '93, and again, this is the pension fund
7  document, so I don't know what their intent was.
8  Q. So you wouldn't know specifically when or
9  why the Fund would not pay that 20 percent?
10 A. Again, I think this statement is made by
11 the pension people that didn't do the health and
12 welfare, so they made it broad enough for the health
13 and welfare people to work within. This was just a
14 general description for the people.
15 Q. Just generally speaking, do you know what
16 the differences are between the Wraparound Plus
17 Program as described in this 1993 summary as opposed
18 to what's described in the 2003 summary?
19 A. Not item-by-item differences, no.
20 Q. Was the deductible the same in 1993 as it
21 is currently under the program?
22 A. My recollection would be that it would be

### Page 81

1  different. I think Medicare has changed that
2  through the years, and as we follow that, it's
3  evolved to whatever the Medicare.
4  Q. And the Fund didn't require a deductible
5  over and above the amount that Medicare required?
6  A. To my knowledge, no.
7  Q. If you could please turn to Page 587.
8  There's a section, How Much Will SMW Plus Cost You.
9  A. Uh-huh.
10 Q. And there are some amounts listed and
11 described in subsequent paragraphs.
12     Were these amounts analogous to the
13 amounts we were discussing earlier just for a
14 different time period, or are these amounts
15 referring to some other type of payment?
16     MS. CONNOLLY: Objection to form.
17     THE WITNESS: Do you want to restate?
18 BY MR. CHRISTOFFERSON:
19 Q. Yes. I'm just wondering whether, take,
20 for example, the first sentence, it says the
21 national pension fund or local unions and council's
22 pension fund under an arrangement with the Sheet

Page 82

1  Metal Workers National Health Fund is providing
2  SMW Plus at the low cost of $26 per individual per
3  month, and you testified earlier that I believe
4  subsidized, what you called subsidized employees
5  were paying --
6      A.  112.
7      Q.  -- 112.
8          In 1993, was the payment that is now $112,
9  was that $26?
10     A.  The last one speaks to you and your
11 spouse, and I think the coverage now is spouses
12 included, and it's a set amount whether you have a
13 spouse or not.
14         So I would say that $52 amount is the one
15 that aligns to the 112 moving forward to this time
16 period.  And again, this is something that was laid
17 out by the pension people at that point.  The
18 validity of it being correct, I can't attest to
19 that.
20     Q.  If you could please turn to Page 593.  I
21 guess to see the context, you should flip back to
22 592 where it says what is not covered.

Page 83

1      A.  Uh-huh.
2      Q.  And the last sentence of that first
3  paragraph says, no coverage under SMW Plus is
4  provided for, and then there's a list of items that
5  continue on to the next page.
6      A.  Uh-huh.
7      Q.  And the last item is take-home
8  prescription drugs.
9      A.  Uh-huh.
10     Q.  Is the coverage with respect to take-home
11 prescription drugs the same as it was -- excuse me.
12         In 1993, was it the same that it is
13 currently?
14     A.  To my knowledge, take-home prescription
15 drugs are still not covered, so it would align
16 itself apparently with this same statement.
17     Q.  Are there any other prescription drugs
18 that are excluded from coverage?
19     A.  Again, it just falls back to
20 Medicare-approved.  That's, you know, the starting
21 basis for all of the payments.
22     Q.  If you would, staying on the same page,

Page 84

1  593, under the section How Are Benefits Paid, and
2  specifically the second paragraph, that paragraph
3  says, when you have expenses for which benefits are
4  payable under Medicare, you will receive an
5  explanation of benefits, in parenthesis EOB, showing
6  what Medicare has paid toward those expenses.
7  Simply forward a copy of the EOB form to the
8  national health fund office and keep the original
9  for your records, and you will receive a check for
10 the 20 percent of the Medicare charge not paid by
11 Medicare if such charges are covered by SMW Plus.
12         Did I read that correctly?
13     A.  You did.
14     Q.  To your knowledge, is that the same
15 process that's in effect today?
16     A.  The statement that says you will receive a
17 check, you know, is the only thing that concerns me.
18 I think we're paying directly to whomever,
19 physician, hospital, rather than to the person would
20 be my thought on that.
21         Again, this is the pension fund's
22 document, and probably what they meant is it will be

Page 85

1  paid for.
2      Q.  So currently it's your understanding the
3  participants are not required to front the money to
4  their provider but rather the Fund would pay the
5  provider directly?
6      A.  That's right.
7      Q.  Can a participant participate -- strike
8  that.
9          Can an individual participate in the
10 Supplemental Medicare Wraparound Plus Program if
11 they have any additional insurance beyond Medicare
12 other than the Fund?
13     A.  You know, there's a qualification for
14 individuals to meet to participate.  You know, in
15 most medical coverages to my knowledge, no one will
16 be a part of paying more than 100 percent of
17 charges, and when that provider accepts Medicare, he
18 gets paid 80 percent.  The others, we, pay
19 20 percent.  That's 100 percent paid.
20         So, you know, was your question can he go
21 out and buy and pay for other coverage?
22     Q.  Well, let's say, for example, the provider

Page 86

1  charges an amount and Medicare approves an amount
2  that's lower than what the provider charged because
3  for whatever reason the provider charged too much in
4  Medicare's view.
5      A.  From what I understand, Medicare has the
6  strong arm in that.  They tell those providers what
7  they can charge, you know.
8          I relate this to my parents, you know.  I
9  followed through.  They have supplemental insurance
10 with Bankers Life, you know.  They say how much that
11 provider's original bill is, and then they say how
12 much they are going to cover, and they will pay
13 80 percent of that, and then this supplementary
14 insurance pays that 20 percent.
15         So there's no -- the provider has to say
16 he accepts Medicare before that person gets services
17 from him is my understanding, so there's no --
18     Q.  So it's your understanding that the
19 provider can never receive payment in excess of the
20 total amount that Medicare approves?
21         MS. CONNOLLY:  Objection to form.  Sorry.
22         THE WITNESS:  The 100 percent -- restate

Page 87

1  that.
2  BY MR. CHRISTOFFERSON:
3      Q.  Am I understanding your testimony
4  correctly to be that the provider is only allowed to
5  charge what Medicare says is an allowable charge?
6      A.  That's my understanding.
7          MS. CONNOLLY:  Same objection.
8  BY MR. CHRISTOFFERSON:
9      Q.  Does the Fund keep track of whether any of
10 its participants have other insurance?  And
11 participants in the Medicare wraparound program.
12     A.  I think the Fund monitors in case there
13 is, you know, automobile insurance to subrogate
14 against or, you know, any other insurance.  Say a
15 fellow is at a home of somebody and has an accident.
16 It can be filed against that guy's homeowner policy.
17 They monitor it from that standpoint, you know.
18         I'm sure they ask that question if they
19 have got it.  I think most forms when you fill them
20 out, that question I've seen as a part of it, so
21 from that standpoint, I'm sure their standard form
22 asks that question.  But I don't have personal

Page 88

1  knowledge that they do.
2      Q.  If you would, please, just quickly turn to
3  Exhibit Randle 003, which is the 2003 Summary Plan
4  Description.
5      A.  Uh-huh.
6      Q.  And specifically Page SMW 0012.
7      A.  All right.
8      Q.  And there's a section that says May I
9  Enroll in SMW Plus if I Am Covered Under a
10 Nontraditional Medicare Plan.  It says the first
11 paragraph, the benefits provided under the SMW Plus
12 program are offered as a supplement to standard
13 Medicare Part A and Part B benefits.  If you are
14 enrolled in a Medicare plus choice plan such as a
15 Medicare HMO, or if you change your coverage to such
16 a plan, you are not eligible for SMW Plus benefits.
17         Did I read that correctly?
18     A.  Yeah.
19     Q.  Is it your understanding that this policy
20 is actually currently in place?
21     A.  Yes.
22     Q.  And is it your understanding that that

Page 89

1  policy has been in place since the Wraparound Plus
2  Program has been in existence or going back as far
3  as you can?
4      A.  Yeah.  Now, how long has Medicare plus
5  choice plan and Medicare HMO been out there
6  available, I'm not sure.  Our plan should have
7  adopted that statement at the time they came out
8  because our administrator stays on top of every new
9  federal regulation and every new thing that comes
10 out.
11         So I'm sure that we have been following
12 that since those would have come into existence.
13     Q.  If you would, look at the second
14 paragraph.  The second sentence says, if you should
15 join a Medicare plus choice plan, please contact the
16 Fund office so that your coverage under this program
17 can be terminated.  If you incur claims and are
18 enrolled under a Medicare plus choice plan, those
19 claims will not be covered under SMW Plus.
20         Did I read that correctly?
21     A.  Yes.
22     Q.  Is it your understanding that the Fund

Page 90

1  monitors whether its participants are enrolled in
2  other insurance plans such as Medicare plus choice
3  plans?
4      MS. CONNOLLY: Objection to form.
5      You can answer.
6      MR. CHRISTOFFERSON: Strike that. Let me
7  rephrase it.
8  BY MR. CHRISTOFFERSON:
9      Q. How does the Fund know whether its
10 participant is a member of a Medicare plus choice
11 plan or other insurance plan?
12     A. Again, any insurer that's not -- makes
13 sure that there's nothing in excess of 100 percent
14 paid, so in that, assuming, you know, that the
15 provider would come back if a double payment has
16 been made would be one method of checking that out.
17     Now, whether they go to the trouble of
18 asking before they send a payment, is this money
19 still owed, you know, I'm sure they have some checks
20 and balances for doing exactly that. I don't know
21 what they would be, but as you work in this stuff
22 day in and day out, I'm sure you find all those

Page 91

1  methods of having that coverage or having that
2  information to you.
3      Q. Well, just to be a little bit more
4  specific, where it says that or where it appears to
5  be asking the participant to whom this summary is
6  directed to contact the Fund office in the event
7  that it joins a Medicare plus choice plan, is that
8  the way in which the Fund discovers whether any of
9  its participants are enrolled in Medicare plus
10 choice plan?
11     A. I'd say that would be the initial way,
12 and, of course, there's a monthly correspondence on
13 that. I don't think, of course, logically anybody
14 would be paying for two of them, but I'm sure they
15 have some method of making sure of that.
16     Q. Do you know who would know what these
17 various methods are?
18     A. Teresa Jernigan would be the person.
19     Q. You can set that aside for now.
20     If you would please turn back to your
21 affidavit, which is Exhibit Randle 002, and if you
22 would, please look at Paragraph 4. The second

Page 92

1  sentence says, I have also been advised that some of
2  the Defendants were referred to as Track 1
3  Defendants and include the following manufacturers,
4  Astro-Zeneca, Bristol-Myers Squibb, GlaxoSmithKline
5  and Johnson & Johnson.
6      Did I read that correctly?
7      A. Yes.
8      Q. And then the paragraph goes on to say that
9  portions of pharmaceutical bills were covered in the
10 first instance by the health fund -- excuse me, that
11 the health fund paid for portions of pharmaceutical
12 bills that were covered in the first instance by
13 Medicare Part B, numerous drugs fall into this
14 category. After first learning of the
15 above-referenced action, the board of trustees
16 authorized Fund counsel to survey records of the
17 health fund to determine some of the drugs which
18 have been paid for by the health fund as a portion
19 of pharmaceutical bills that were covered in the
20 first instance by Medicare Part B and had been
21 manufactured by Track 1 Defendants. The following
22 drugs were identified as having been paid in this

Page 93

1  category: Cytoxan, Etopophos, Kytril, Levaquin,
2  Nevelbine, Paraplatin, Procrit, Remicade, Rubex,
3  Taxol, Vepesid and Zoladex.
4      Did I read that correctly?
5      A. To my knowledge, yes.
6      Q. And is everything that I've just read, in
7  fact, true?
8      A. Yes.
9      Q. How do you know that the health fund paid
10 a portion of pharmaceutical bills that were covered
11 in the first instance by Medicare Part B?
12     A. By review of claims paid.
13     Q. And who conducted that review?
14     A. Of course Southern Benefit Administrators
15 is involved in it, as they have the records. I
16 think there was people involved in that process. I
17 don't know the exact details of how that was done as
18 to who did it, but a sampling should have been done
19 by the Southern Benefit Administrators,
20 Teresa Jernigan, her people.
21     Q. And is this the survey that you referred
22 to in that same paragraph?

Henderson Legal Services
(202) 220-4158

a44ebf04-96a4-480e-83f5-ffad53b849c4

Page 94

1   A.  Refresh my memory.
2   Q.  It says, after learning of the
3   above-referenced action, the board of trustees
4   authorized Fund counsel to survey records of the
5   health fund.
6   A.  Uh-huh.
7   Q.  When was that survey commissioned?
8   A.  Basically as I signed this document,
9   December the 14th of '04, would have been the
10  authorization to go forward with that, and Jan --
11  Q.  And what records were searched?
12  A.  Well, the claim file, all people situated
13  in this coverage, and I think at that point in time
14  did we have -- we didn't have a Massachusetts named
15  situation.  It was just all people that had claims
16  for drugs, these drugs.
17  Q.  And what was actually requested to be done
18  in this survey?
19      MS. CONNOLLY:  I'm just going to instruct
20  you not to answer anything that you learned just by
21  virtue of talking to either me or Jan.  But you can
22  answer if you can answer outside of that.

Page 95

1       THE WITNESS:  Uh-huh.  State the question
2   again.
3   BY MR. CHRISTOFFERSON:
4   Q.  What was requested with respect to this
5   survey?  What were the instructions provided to I
6   think you said Teresa Jernigan and the others at the
7   third-party administrator in connection with this
8   survey?
9   A.  The instructions were to have claims
10  available for review.
11  Q.  A review by whom?
12  A.  You know, whomever is chosen to be the
13  people that do that review, you know, that states
14  the drugs that were ones to be looked at.
15      So she was to pull the claim file of
16  anyone that had those drugs involved in their claim.
17  Q.  And when you say those drugs, you mean the
18  drugs that are listed in Paragraph 4?
19  A.  To my recollection, that's what they were
20  looking for.
21  Q.  Were there any other drugs they were
22  looking for?

Page 96

1   A.  I think, you know, in that process you're
2   going to see others.  I'm not aware.
3   Q.  That last sentence in that Paragraph 4
4   says, I am certain other drugs have been paid for in
5   similar fashion, and with more time the health fund
6   can determine the names of those drugs.
7       Did I read that correctly?
8   A.  Yes.
9   Q.  How are you certain that other drugs have
10  been paid for in a similar fashion?
11  A.  Just due to the nature of claims being
12  paid for people throughout the United States with
13  various conditions, you know.  I would say a full
14  scope of all drugs available out there in the
15  marketplace are potentially there, logically there.
16  Q.  Have you determined that other drugs were,
17  in fact, covered in the first instance by Medicare
18  Part B and were paid for by the Fund?
19  A.  I personally have not determined that.
20  Q.  What steps did you take to learn whether,
21  in fact, that happened?
22  A.  The process has been initiated.  I think

Page 97

1   it's still currently going, you know.  I don't -- I
2   assume I'll have a report of that at the time it's
3   concluded.
4   Q.  So you're still conducting this survey?
5   A.  Yes.  Yeah, as we're saying, in the filing
6   that we had to file by date order, we're in the
7   transition of the software, so it's a very laborious
8   process.
9   Q.  And how long do you think your survey is
10  going to take to complete?
11  A.  My guess, since they're simultaneously
12  getting this new software, would be another six,
13  eight months possibly.
14  Q.  If you could also just turn to Exhibit
15  Randle 006, the billing records.
16  A.  Uh-huh.
17  Q.  And I should state for the record so that
18  it's clear that Plaintiffs have produced additional
19  documents other than those documents that are
20  contained in this exhibit, and these are just
21  examples of those billing records, and if I should
22  state a question that requires reference to

Page 98

1  another -- to other records or if it's unclear what
2  I'm asking because these are only examples, please
3  let me know, and I'll try to rephrase the question.
4     A.  All right.
5     Q.  Excuse me.
6     A.  Let me have another break before we get
7  into that.
8        MR. CHRISTOFFERSON:  Absolutely.
9           (Whereupon, a short recess was
10              taken.)
11 BY MR. CHRISTOFFERSON:
12    Q.  Mr. Randle, if you would, just please turn
13 back to Exhibit Randle 004 and Page 701, SMW 701, and
14 this appears to be an amendment, Section 3.4, summary
15 of schedule of benefits for optional employees
16 described under Section 4.15 who are eligible to
17 enroll for Medicare benefits and any of their
18 eligible dependents who are eligible to enroll for
19 Medicare benefits.
20    A.  Uh-huh.
21    Q.  And then on the next page under medical
22 benefits, it says, the Fund will pay major medical

Page 99

1  expense benefits for charges approved by Medicare
2  but not paid by Medicare.  These will generally
3  include, and then it goes on to say among other
4  things Part B deductible and Part B copayments.
5         Did I read that correctly?
6     A.  Yes.
7     Q.  And then the last page of that amendment
8  appears to be the next page, 703, and is that your
9  signature that appears on that page?
10    A.  Yes.
11    Q.  And is the date that I'm reading correctly
12 the 2nd day of October, 2002?
13    A.  Yes.
14    Q.  So as of 2002, was the Fund providing
15 Medicare benefits to optional employees?
16    A.  It appears from this that they were.
17    Q.  Does that refresh your recollection as to
18 whether the Fund is currently providing such
19 benefits?
20    A.  I still maintain that we dropped the
21 optional.  Now, you know, it could be just the
22 contractors ourselves rather than the optional

Page 100

1  people.  There was some exclusion when you reached
2  eligibility for Medicare coverage.  Whether it was
3  truly just the contractor or contractor and optional
4  employees, I just feel that that happened, but here
5  at this time, yes.
6     Q.  So at least as of the 2nd of October,
7  2002, the Fund was providing Medicare benefits --
8     A.  Uh-huh.
9     Q.  -- to optional employees?  Thank you.
10        Just getting back to again your affidavit,
11 you can set that aside, you mentioned that as a
12 result of the survey that is still ongoing of the
13 Fund's records that you hoped to get a report at
14 some point?
15    A.  Well, I'm one of those micromanagers, so I
16 generally like to have an idea of what's going on on
17 anything that I'm involved in, so yeah, I'll be
18 asking for an update.
19    Q.  With respect to the drugs that are
20 identified in Paragraph 4, did you receive a report
21 that indicated that those drugs were among those
22 that the Fund had provided reimbursement for under

Page 101

1  the Wraparound Plus Program?
2     A.  That was the initial question, you know,
3  did we have people with this usage of these drugs,
4  and the report that I verbally got back was that
5  there were people.
6     Q.  And how did you learn that?
7     A.  Through conversation.
8     Q.  With whom?
9     A.  It might have been Jan and I.  It might
10 have been Lynn Brassel.  I don't recall for sure
11 who, but there was a conversation that there was
12 those drugs paid for for the SMW Plus people.
13    Q.  And do you know specifically how those
14 drugs were identified?
15    A.  Through the claim forms review.
16    Q.  Have you determined that as of today that
17 other drugs covered in the first instance by
18 Medicare Part B were paid for by the Fund?
19    A.  I personally have not looked at the
20 records and have that knowledge, but, you know, I
21 guess thinking of the process and the people
22 involved and everything that logically probably

Page 102

1  every drug out there, you know, would have some
2  coverage, use by our participants.
3      Q. What steps did you take to learn the
4  current results of your survey?
5      A. Well, there hasn't been any results other
6  than the fact that, you know, certain drugs have
7  been used by participants.
8      Q. Have you identified any drugs manufactured
9  by Schering-Plough or Warrick Pharmaceuticals?
10     A. I have not gotten into that deep of detail
11 in any report.
12     Q. So the Fund has not identified any
13 Schering-Plough or Warrick drugs?
14     A. Well, it's very possible and likely that
15 they have. The report back to me has not identified
16 particular manufacturers or, you know, just the fact
17 that drugs had been used by the participants fell in
18 the class.
19     Q. In preparation for your deposition today,
20 did you ask anyone what the current status of that
21 survey of these records is?
22     A. Yes, I've visited with Teresa to -- not

Page 103

1  Teresa. Sharon Faulkner is the lady that heads up
2  this software conversion, and she told me that it
3  was ongoing and that this information would be more
4  easily obtained in that conversion that they're
5  doing.
6      Q. And did Ms. Faulkner or anyone else tell
7  you that the Fund has identified any drugs
8  manufactured by Schering-Plough or Warrick
9  Pharmaceuticals?
10     A. No, we didn't have that discussion in that
11 detail.
12     Q. If you could, please turn to Exhibit Randle
13 006.
14         You testified earlier that the Fund
15 through the plan administrator maintains records of
16 the claims that it pays under the Wraparound Plus
17 Program?
18     A. Yes.
19     Q. Are these examples of those records?
20     A. To the best of my knowledge. I see them
21 identified as retired sheet metal workers, so from
22 that standpoint, yes.

Page 104

1      State the question again.
2      Q. Are these examples of the types of records
3  that the Fund and the plan administrator for the
4  Fund maintain with respect to the claims that the
5  Fund has paid?
6      A. Yes, to my knowledge, yes.
7      Q. And again, I would represent that
8  Plaintiffs have produced records comprising the
9  Bates range of SMW 0034 through SMW 580, but all
10 that is marked in this particular exhibit is through
11 SMW 0084.
12     A. Uh-huh, yes.
13     Q. How were these records compiled for
14 production?
15     A. For production?
16     Q. In this litigation.
17     A. Well, they're filed chronologically in
18 their current state, and they will be accumulating
19 them by state. In particular Massachusetts at this
20 point will be their target.
21     Q. Have any records to your knowledge been
22 produced reflecting payment to a provider, medical

Page 105

1  services provider based in Massachusetts?
2      A. My understanding is yes, that they have.
3      Q. And just to clarify, it's your
4  understanding that those have not only been located,
5  they have been produced to the Defendants?
6      A. Located I've been told, you know.
7  Produced, I don't know personally.
8          MR. CHRISTOFFERSON: Just for the record,
9  to the extent that there are records that have been
10 located with respect to providers based in
11 Massachusetts, we would request those to be
12 produced.
13         THE WITNESS: That's the intention.
14         MS. CONNOLLY: You'll get them as we get
15 them.
16         THE WITNESS: Uh-huh.
17 BY MR. CHRISTOFFERSON:
18     Q. And these records are kept with the
19 third-party administrator?
20     A. In Goodlettsville.
21     Q. In Goodlettsville.
22     A. I think they have a professional group

27 (Pages 102 to 105)

Page 106

1  that storage wise takes care of them warehouse wise.
2      Q.  Mr. Randle, I'm not going to go through
3  every one of these records because we would be here
4  for weeks, but if you could please just turn to
5  Page SMW 0040, Page 40.  I see this label is
6  actually up a little bit on the page, so it might be
7  difficult to find.
8      A.  All right, uh-huh.
9      Q.  Do you recognize this document that's on
10 this page?
11     A.  I think this is the same document that
12 I've seen in the past that has the form to be used
13 and the claim form.
14     Q.  So you don't obviously recognize this
15 particular --
16     A.  No.
17     Q.  -- form?
18         But you recognize the general form that
19 this appears on?
20     A.  Uh-huh.
21     Q.  What is this document, the form?
22     A.  Just a health insurance claim form.

Page 107

1      Q.  And who creates this document?
2      A.  I would assume that it's created in
3  Goodlettsville by the claims payor, you know.  There
4  would be an initiation of this form from the
5  participant information wise, and I guess that is
6  what we stated earlier came from Medicare, so it was
7  a matter of those people getting their Medicare
8  statement coupling it with probably this claim form
9  as a cover sheet for that.
10         So, you know, I'm sure the participants
11 are not typing this thing out, so I would assume
12 that that would have been by it appears the same
13 machine produced print wise that put the sheet metal
14 Goodlettsville, Tennessee address at the top, so I
15 would assume that they produced it there from the
16 information sent to them.
17     Q.  Let me just clarify.  Perhaps my question
18 wasn't clear.  I think my question was unclear.
19         On this document, there is a form, and
20 then someone or something typed information into
21 this form.
22     A.  Uh-huh.

Page 108

1      Q.  And so let's just deal with those
2  separately.
3          Do you know who created the form itself?
4      A.  The blank form?
5      Q.  The blank form.
6      A.  That would be our third-party
7  administrator I would say would be -- well, of
8  course, it states down here it's been approved by
9  the AMA Council on Medical Services, so it might be
10 a stock form that they buy.
11     Q.  If you would, just try to perhaps help
12 refresh your recollection, if you look at the bottom
13 of this, the very bottom underneath where actually
14 the form stops and you see some writing on the
15 right-hand lower corner that says Form HCFA-1500.
16     A.  Uh-huh.
17     Q.  And then Form RRB-1500 and then
18 Form OWCP-1500.
19     A.  I see that.
20     Q.  Does that help at all refresh your
21 recollection as to who created this form?
22     A.  HCFA, you know, not knowing what that

Page 109

1  stands for, again, my assumption would be that it's
2  a standard form that's out in the industry, health
3  claim industry.
4      Q.  Would it refresh your recollection if I
5  represented to you that this is a form that's
6  generated by the federal government as opposed to
7  your third-party administrator?
8      A.  Yeah.  Well, that's what would stand to
9  reason as it has the AMA Council approval, and
10 everything that would be done by them would probably
11 be a federal agency.
12     Q.  And turning to the information that has
13 been entered onto this form, who or what is
14 responsible for entering the information onto this
15 form?
16     A.  Well, as I look at it, it's very possible
17 it came from the physician, his office, you know.
18 The original information would obviously had to have
19 come from them and the coding that's done or the
20 procedures that were done, because all of that is
21 reviewed in the process by Medicare, so I would
22 assume the physician, their people in the office did

Page 110

1  it.
2     Q.  And if you would, could you just please
3  look at the column in the bottom section that says
4  procedures, services or supplies.
5     A.  Uh-huh.
6     Q.  And then there's a column that's headed
7  CPT/HCPCS.
8     A.  Uh-huh.
9     Q.  And there are some numbers that appear in
10 that column.
11        Do you see where there's an entry that
12 says J9096?
13    A.  Yes.
14    Q.  Do you know what that refers to?
15    A.  No.
16    Q.  Do you know what any of these codes refer
17 to?
18    A.  Not personally I don't, but it stands to
19 reason again it's a standard coding in the business,
20 so to speak.  I'm sure it's aligned with Medicare
21 coding.
22    Q.  With respect to the codes that began with

Page 111

1  a J -- well, strike that.
2        Is there anything on this form that
3  indicates what prescription drug was administered by
4  the physician?
5        MS. CONNOLLY:  Objection, form.
6        You can answer.
7        THE WITNESS:  In that column D, it states
8  procedures, services, supplies.
9  BY MR. CHRISTOFFERSON:
10    Q.  If you would turn to Page 42, two pages
11 ahead of that.
12        Do you recognize this document or this
13 type of document?
14    A.  No, not personally I don't.
15    Q.  Do you know who creates this document?
16    A.  No, I don't.  Of course, at the top
17 right-hand corner it says Medicare Remittance
18 Notice, so I assume Medicare.
19    Q.  Do you know what this document is used
20 for?
21    A.  Well, you have all the codes, the cost,
22 claim total, you know.  It doesn't give enough

Page 112

1  detail to understand for sure.  There's a net
2  amount, so I assume, you know, it shows the total
3  claim and net amount that's paid.
4        So it would be some kind of summary of the
5  doctor's charges.
6     Q.  Do you see at the top there are some
7  columns listed, and it appears that a section of
8  this was redacted, but it appears that these columns
9  run down through the page, and it says among other
10 things there's a column that says P-R-O-C --
11    A.  Uh-huh.
12    Q.  -- at the top.
13        Do you know what that column means?
14    A.  I don't.
15    Q.  Do you know what the column billed means?
16    A.  It would stand to reason it is the amount
17 the physician has billed for these various codes.
18    Q.  And just as an example, if you follow that
19 column down, the second entry there says 75.
20        Is that $75 under that billed amount?
21    A.  Billed amount, I would assume it is.
22    Q.  And then the next column over says

Page 113

1  allowed.
2     A.  Right.
3     Q.  Do you know what that means?
4     A.  I would say that that's Medicare's allowed
5  amount.
6     Q.  And with respect to that same entry, is
7  that $48.86?
8     A.  Yes.
9     Q.  And then there is a column two over that
10 says C-O-I-N-S.
11        Do you know what that means?
12    A.  Coinsurance, I would assume.
13    Q.  And that value in that same entry is
14 $9.77?
15    A.  Which appears to be about 20 percent of
16 the 48.86.
17    Q.  Is that the amount that the Fund paid
18 through the Wraparound Plus Program for that
19 particular entry?
20        MS. CONNOLLY:  Objection to form.
21        MR. CHRISTOFFERSON:  What's the basis of
22 your objection?

Page 114

1    MS. CONNOLLY: He said he doesn't know
2 anything about this form, so he's interpreting the
3 document as much as you can.
4    THE WITNESS: Again, in common sense from
5 the accounting background, you know, total charges
6 3,000, Medicare paid 2,000, SMW Plus paid 402
7 something.
8 BY MR. CHRISTOFFERSON:
9    Q. But you don't know anything really about
10 this form?
11   A. No. I don't get into those details, no.
12 That's what we hire the third-party people for.
13   Q. How does the Fund know what drug it's
14 reimbursing when it reimburses for a
15 physician-administered drug under this program?
16   MS. CONNOLLY: Objection to form.
17     You can answer.
18   THE WITNESS: A code number would give
19 them that indication I would assume.
20 BY MR. CHRISTOFFERSON:
21   Q. And how does the Fund know who
22 manufactured any of the drugs that are listed on

Page 115

1 these forms?
2    MS. CONNOLLY: Objection to form.
3      You can answer.
4    THE WITNESS: I don't know.
5    MR. CHRISTOFFERSON: Would you please mark
6 this.
7        (Exhibit Randle 007 marked as
8         requested.)
9 BY MR. CHRISTOFFERSON:
10   Q. Mr. Randle, if you would, could you please
11 turn to Page 13 of what the court reporter has
12 marked as Exhibit Randle 007.
13   A. This is the original numbering sequence?
14   Q. Yes.
15   MS. CONNOLLY: Yes, it's not Bates
16 numbered.
17 BY MR. CHRISTOFFERSON:
18   Q. Page 13, and specifically Paragraph 25a.
19   A. Uh-huh, all right.
20   Q. The last sentence says -- well, strike
21 that.
22     The penultimate sentence says, during the

Page 116

1 class period, the SMW health fund had paid for
2 portions of pharmaceutical bills that were covered
3 in the first instance by Medicare Part B.
4     Do you see that?
5   A. Uh-huh.
6   Q. Did I read that correctly?
7   A. I wasn't following it. Start it off.
8   Q. Let me try it again. During the class
9 period, the SMW health fund has paid for portions of
10 pharmaceutical bills that were covered in the first
11 instance by Medicare Part B.
12     Did I read that correctly?
13   A. You read it correctly, but it would seem
14 like it should say SMW Plus to me.
15   Q. Fair enough. And is this paragraph,
16 Paragraph 25a, about the Fund of which you're a
17 trustee, just generally?
18   A. Yes.
19   Q. And then the last sentence says, the drugs
20 for which payments were made include Cytoxan, in
21 parenthesis BMS, Etopophos, parenthesis BMS, Kytril,
22 parenthesis GSK, Levaquin, parenthesis J&J,

Page 117

1 Nevelbine, parenthesis GSK, Paraplatin, parenthesis
2 BMS, Procrit, parenthesis J&J, Remicade, parenthesis
3 J&J, Rubex, parenthesis BMS, Taxol, parenthesis BMS,
4 Vepesid, parenthesis BMS, and Zoladex, parenthesis
5 Astro-Zeneca.
6     Did I read that correctly?
7   A. To the best of my knowledge you did.
8   Q. First, if you would, what is the
9 significance of the information that's included in
10 the parenthesis?
11   MS. CONNOLLY: Objection to form.
12   THE WITNESS: It's a further
13 identification of what they just spoke of would be
14 the logic.
15 BY MR. CHRISTOFFERSON:
16   Q. For example, are you alleging that with
17 respect to the drug Cytoxan that the Fund made
18 payments for Cytoxan and that the payments for which
19 they made were the drug that was manufactured by
20 Bristol-Myers Squibb?
21   MS. CONNOLLY: Objection to form.
22     You can answer.

Page 118

1        THE WITNESS: Logically I guess that's
2   what they're saying.
3   BY MR. CHRISTOFFERSON:
4        Q. What's the basis for the claim that the
5   drugs for which the SMW Plus health -- SMW
6   Wraparound Plus Program made payments for these
7   particular drugs manufactured by these particular
8   defendants?
9        MS. CONNOLLY: Objection to form.
10       THE WITNESS: Restate that.
11  BY MR. CHRISTOFFERSON:
12       Q. How do you know that you made payments for
13  these particular drugs?
14       A. Again, our process is a third-party
15  administrator. This coding that we saw in the other
16  would lead you to know, I think, if it were a drug,
17  and I assume, maybe there's a separate code not only
18  for the type of medication but for the manufacturer,
19  and it could be that there's only one manufacturer
20  of a particular drug being the lead for that.
21       Q. What steps did you take in preparation for
22  your deposition today to learn the basis for the

Page 119

1   claims that are made in this with respect to these
2   particular drugs?
3        MS. CONNOLLY: Don't talk to him about any
4   conversations you had with me or Jan.
5        THE WITNESS: Your question being what
6   preparations did I make to understand particular
7   drugs that were covered?
8   BY MR. CHRISTOFFERSON:
9        Q. Yes, as a 30(b)(6) witness, yes.
10       A. I would say I did not make any preparation
11  to pinpoint a drug, product, company, anything like
12  that, you know. That's not a detail that I would
13  logically deal with. It's just again a
14  Medicare-approved process.
15       Q. And I think you mentioned that you said
16  maybe there's a separate code not only for the type
17  of medication but for the manufacturer, and it could
18  be that there's only one manufacturer of a
19  particular drug being the lead for that.
20       What's the basis for that statement?
21       A. That's one of those swags, I guess. It's
22  just a wild guess from my viewpoint.

Page 120

1        Q. But you don't know?
2        A. No, I don't.
3        Q. With respect to drugs that are
4   manufactured by several different manufacturers, how
5   do you know that one particular version of that drug
6   was used versus another?
7        A. Personally, I don't. I wouldn't know how
8   to gain that information.
9        Q. And does the Fund know?
10       A. Sure, I'm sure they do, you know. They're
11  into this business, and I would expect them to know
12  every minute detail of the process.
13       Q. But you don't know on what basis they
14  know?
15       A. Education would be my comment.
16       Q. If you would, Mr. Randle, could you please
17  turn to Page 82, SMW 0082 of Exhibit Randle 006.
18       A. 86?
19       Q. I'm sorry, 82.
20       A. 82.
21          All right.
22       Q. Just take a minute to look over that.

Page 121

1           Do you recognize this document?
2        A. Well, I'd say it's a check produced by the
3   Goodlettsville third-party administrator Southern
4   Benefits for Sheet Metal Workers National Health
5   Fund to this physician, mailed directly to them for
6   411.57.
7        Q. And so this is, if I understand you
8   correctly, this is a record of payment that the
9   sheet metal workers fund made with respect to a
10  particular claim?
11       A. That would be my understanding.
12       Q. Is this a record that is kept in the usual
13  course of the Fund's business?
14       A. Yes, they keep copies of all checks,
15  disbursement checks.
16       Q. Did you, when you commissioned either
17  counsel or whoever it was that was going to be
18  searching for and producing these documents for you,
19  did you request that these documents, the documents
20  indicating payment such as this document, be
21  produced?
22       A. I didn't get specific on what to produce,

Page 122

1  so no, I didn't tell them to produce the payment.
2     Q. Why is it that there are not records of
3  payment with each claim insurance form and Medicare
4  Remittance Notice that was produced?
5        MS. CONNOLLY: Objection to form.
6        THE WITNESS: Restate.
7  BY MR. CHRISTOFFERSON:
8     Q. Well, I'll represent to you that there are
9  actually very few of the documents indicated or
10 represented by what appears on Page 82, and I'm
11 asking why -- I'm asking whether more of these
12 exist.
13    A. You know, on this Page 81, it refers to a
14 check EFT number, so it could be an electronic funds
15 transfer that was done as opposed to a check in some
16 cases, so it's an either/or would be my guess.
17    Q. I'm sorry to interrupt you. If we could
18 just turn back to Page 40, and I'll represent the
19 way these were originally produced there were blue
20 sheets that separated documents, although I didn't
21 reproduce them here with blue. They're separated
22 with white sheets.

Page 123

1        But Page 40, 41 and 42 appeared I'll
2  represent to you as a unit between two blue sheets.
3     A. All right.
4     Q. And is there a record of payment by the
5  Fund that appears in connection with this particular
6  set of claims?
7     A. Up in the top left-hand corner, it looks
8  like electronic transfer or check number, and that
9  number appears to be somewhat in the sequence of
10 what that other one was as I recall the number, 87
11 something.
12    Q. So is it your testimony that that
13 indicates payment by the Fund where it says
14 check/EFT number?
15    A. Yes, and as opposed to having duplication
16 of copies of checks, I would say all those could be
17 produced from that number. They would be filed in
18 the bank statement.
19    Q. And is it your testimony that the amount
20 in this particular case that was produced -- excuse
21 me, that was made to the provider -- strike that.
22       What was the amount that was paid to the

Page 124

1  provider that's indicated by the check/EFT reference
2  at the top of this page?
3     A. Well, you have the last column says
4  provider paid would be what I assume that
5  abbreviation to be, so dropping down to the last
6  figure, the net, 1624.20 would be my guess.
7     Q. That's the amount that the Fund paid or
8  that Medicare and the Fund paid together?
9        MS. CONNOLLY: Objection to form.
10       THE WITNESS: Restate.
11 BY MR. CHRISTOFFERSON:
12    Q. Is it your testimony that 1624.20 is the
13 amount that the Fund paid to this particular
14 provider for the services that were rendered and
15 indicated on the preceding health insurance claims
16 forms?
17       MS. CONNOLLY: Objection to form.
18       THE WITNESS: You know, I wouldn't have
19 knowledge of that for sure. I couldn't state for
20 sure that that's correct.
21 BY MR. CHRISTOFFERSON:
22    Q. Is it possible that this check/EFT number

Page 125

1  is a reference to the amount that Medicare paid to
2  the provider and not the Fund?
3        MS. CONNOLLY: Objection to form.
4        THE WITNESS: Restate it.
5
6  BY MR. CHRISTOFFERSON:
7     Q. Is it your testimony that you're certain
8  that the amount that this check/EFT reference at the
9  top of this Page 42 is in reference to an amount
10 that the Fund paid to the provider as opposed to
11 what Medicare paid in terms of its 80 percent that
12 it owed to the provider?
13       MS. CONNOLLY: Objection to form.
14       THE WITNESS: Yeah, certainly, you know, I
15 couldn't state anything pertaining to that with
16 certainty, you know. I'm looking at this for the
17 first time. I've never been in this part of the
18 process.
19       So I couldn't tell you for sure. That
20 would be something Teresa Jernigan --
21 BY MR. CHRISTOFFERSON:
22    Q. Just to be clear, you don't know, in fact,

Page 126

1  what this check/EFT is in reference to?
2      A.  Common sense would tell me it is a check
3  number or electronic funds transfer reference
4  number.  That's -- I'm taking a guess at that, but
5  that would be the common sense.
6      MR. CHRISTOFFERSON:  Just for the record,
7  Defendants would request that to the extent
8  documents such as those that appear on SMW 0082,
9  that other documents such as this are in existence,
10 that they be produced to the Defendants to indicate
11 payment by the Fund in connection with these claims.
12     THE WITNESS:  82 or -- okay.
13     MS. CONNOLLY:  I'll consider your request.
14 I think we gave you everything, but we will look
15 into that.
16 BY MR. CHRISTOFFERSON:
17     Q.  With respect to the drugs that are listed
18 in Paragraph 4 of your affidavit that we discussed
19 earlier, were payments made by the Fund for these
20 drugs based on average wholesale price or AWP?
21     MS. CONNOLLY:  Objection, form.
22     THE WITNESS:  Do you want to restate?

Page 127

1  BY MR. CHRISTOFFERSON:
2      Q.  Were the amounts that the Fund paid to
3  providers under the Wraparound Plus Program for the
4  drugs that you've identified in Paragraph 4, were
5  those amounts based on average wholesale price of
6  the drugs that are listed in Paragraph 4?
7      MS. CONNOLLY:  Objection to form.
8      You can answer.
9      THE WITNESS:  All payments were made based
10 on the Medicare-approved plan form.  No other
11 criteria was looked at by our third-party
12 administrator to my knowledge other than, you know,
13 you have to go to Medicare to find out that as I
14 would see.
15 BY MR. CHRISTOFFERSON:
16     Q.  Do you know if the average wholesale price
17 of any of the drugs that were reimbursed appears on
18 any of the documents that were produced by the Fund?
19     MS. CONNOLLY:  Objection, form.
20     THE WITNESS:  Only if it's a standard
21 process of Medicare.  I don't know personally.
22 BY MR. CHRISTOFFERSON:

Page 128

1      Q.  What is your understanding of average
2  wholesale price?
3      A.  You know, it is what its name is as I
4  understand it.  It's some type of a standard that's
5  produced by some group and identified as just that
6  average wholesale price.  Now, how their sampling is
7  done and who is it that does it and whatever I don't
8  have any knowledge of.
9      Q.  Do you know who calculates average
10 wholesale price?
11     A.  No.
12     Q.  Do you know generally how it's used?
13     MS. CONNOLLY:  Objection to form.
14     THE WITNESS:  Do you want to restate?
15 BY MR. CHRISTOFFERSON:
16     Q.  Do you know what the purpose of average
17 wholesale price is?
18     MS. CONNOLLY:  Objection to form.
19     THE WITNESS:  Personally I don't.
20 BY MR. CHRISTOFFERSON:
21     Q.  Does the Fund keep track of the average
22 wholesale prices of the drugs that it reimburses?

Page 129

1      A.  Personally, I don't know if they do.
2      Q.  Are you familiar with the term wholesale
3  acquisition cost or WAC, W-A-C?
4      A.  No.
5      Q.  To your knowledge, does the Fund keep
6  track of wholesale acquisition costs or WACs for the
7  prescription drugs that it reimburses?
8      A.  Not to my knowledge.  I don't know.
9      Q.  When did you first learn of this
10 litigation?
11     A.  In the end of 2004 I think, at one of our
12 trustee meetings, Jan made us aware of it being out
13 there and asked us whether we wanted to --
14     MS. CONNOLLY:  Don't tell him what Jan
15 told you.
16 BY MR. CHRISTOFFERSON:
17     Q.  I believe in your affidavit you said
18 December 9th, 2004.
19         Does that refresh your recollection?
20     A.  It's very possible if that's what I said.
21     Q.  And just to be clear, I think you
22 testified earlier that you're in the process of

33 (Pages 126 to 129)

a44ebf04-96a4-480e-83f5-ffad53b849c4

Page 130

1  identifying healthcare providers based in
2  Massachusetts to whom the Fund made payments under
3  the Medicare Wraparound Plus Program, is that
4  accurate?
5     A.  I don't know that we're looking at
6  providers.  We're looking at claims paid for
7  participants that live in Massachusetts as opposed
8  to looking at providers.
9     Q.  Just quickly, with respect to Exhibit
10 Randle 004, Exhibit Randle 004, the plan document,
11 does this plan document cover all of the benefits that
12 the Fund provides currently including the wraparound
13 Medicare plus program?
14    A.  As I stated earlier, there's possibly some
15 other amendments that are not on here.  I don't know
16 for sure.  That would be my -- it is as far as you
17 have it here effective January the 1st of 2002, so
18 if there were any other amendments, you know, they
19 could be a part of it.
20        Now, this amendment here is dated 2005,
21 November, so it would appear that we're pretty well
22 up to date.

Page 131

1        MR. CHRISTOFFERSON:  Just for the record,
2  because Sheet Metal Workers National Health Fund is
3  only a proposed Class 2 representative and therefore
4  only being proposed with respect to claims
5  copayments, Medicare beneficiary copayments,
6  Defendants will not be asking questions related to
7  the other benefits that the Fund provides pursuant
8  to this plan or other plans, but to the extent that
9  at some point in the future this Fund becomes a
10 proposed representative for another class, we
11 reserve the right to ask those questions about that,
12 about those issues then.
13        MS. CONNOLLY:  Okay.  We will deal with
14 that then.
15 BY MR. CHRISTOFFERSON:
16    Q.  What do you understand the Fund's role to
17 be in this lawsuit?
18        MS. CONNOLLY:  Objection to form.
19        You can answer.
20        THE WITNESS:  Restate.
21 BY MR. CHRISTOFFERSON:
22    Q.  Is the Fund being proposed as a class

Page 132

1  representative for the -- well, strike that.
2        If you would go to Exhibit Randle 007, which
3  is the complaint, and if you'd look at the fourth
4  sentence I guess, it says --
5        MS. CONNOLLY:  I'm sorry, what page?
6  BY MR. CHRISTOFFERSON:
7     Q.  My apologies.  We're back on Page 13,
8  sorry, Paragraph 25a.  My apologies.  It's the
9  fourth sentence of that paragraph.  It says, the SMW
10 Health Fund provides a Supplemental Medicare
11 Wraparound Plus Program that covers the Medicare
12 Part B copayments of its beneficiaries.
13        Did I read that correctly?
14    A.  Yes.
15    Q.  And if you'd turn back to Page 10, do you
16 see that this paragraph comes under a section
17 Number 2, Proposed Class 2 Representative, MediGap
18 Payors?
19    A.  Yes.
20    Q.  Is the health fund a proposed class
21 representative?
22        MS. CONNOLLY:  Objection, form.

Page 133

1        You can answer.
2        THE WITNESS:  To my knowledge, it is a
3  proposed group.
4
5  BY MR. CHRISTOFFERSON:
6     Q.  And as a class representative, what are
7  your responsibilities in a lawsuit of this nature?
8        MS. CONNOLLY:  Objection to form.
9        You can answer.
10       THE WITNESS:  Never being a part of one of
11 these, I guess I would have to be educated on my
12 responsibilities in that role.  I don't know off the
13 top of my head for sure.
14 BY MR. CHRISTOFFERSON:
15    Q.  And do you know what the class is that you
16 represent or you're purported to represent?
17       MS. CONNOLLY:  Objection to form.
18       You can answer.
19       THE WITNESS:  It would be multiemployer,
20 you know, MediGap payor groups I would assume, you
21 know.  I don't know the details.  This is the first
22 time I've seen this document.

Glenn Randle                                                November 17, 2005
Chicago, IL

Page 134

1  BY MR. CHRISTOFFERSON:
2     Q.  Did you have the -- with respect to
3  Paragraph 25a on Page 13, when did you first see
4  this paragraph in this document?
5     A.  Today.
6     Q.  So you never had the opportunity to review
7  this before it was filed?
8     A.  There's a document that I've looked at.
9  It's certainly not this thick, some information that
10 I've looked at.  I don't know if this is a
11 duplication of that myself.  Total recollection of
12 what that document said, I don't think so.  As I
13 said, we had that SMW Plus error there in the mid
14 paragraph.  That doesn't ring a bell with me.
15    Q.  Do you know when you reviewed this other
16 document that you're talking about?
17    A.  In the last two or three weeks.
18    Q.  Do you know if it was after October 17th?
19    A.  That I reviewed it, probably.
20    Q.  Did you make changes, any changes to that
21 document?
22    A.  No.

Page 135

1     Q.  What are the claims that the Fund is
2  asserting against the Defendant drug manufacturers?
3        MS. CONNOLLY:  Objection to form.
4        You can answer.
5        THE WITNESS:  Restate it.
6  BY MR. CHRISTOFFERSON:
7     Q.  What claims are you asserting, and by you
8  I mean the Fund, asserting against the Defendants in
9  this litigation?
10       MS. CONNOLLY:  Objection to form.
11       You can answer.
12       THE WITNESS:  For any overcharge relating
13 to physician-administered drugs for any of our
14 participants.
15 BY MR. CHRISTOFFERSON:
16    Q.  And overcharged by whom?
17    A.  By the provider, whomever it would be.  I
18 understand that some of these drugs are -- well, the
19 physicians for the most part administers, are
20 administering the drugs, so I guess they would be
21 the provider.
22    Q.  What is your understanding of the

Page 136

1  documents that the Fund was supposed to produce to
2  Defendants pursuant to the court's order of
3  August 16th, 2005?
4        MS. CONNOLLY:  Don't tell him anything you
5  learned from Jan or me.
6        THE WITNESS:  Say the question again.
7  BY MR. CHRISTOFFERSON:
8     Q.  What's your understanding of the documents
9  that the Fund was required to produce pursuant to
10 the court's order in August?
11       MS. CONNOLLY:  Same thing.  If you know it
12 independent of talking to me or Jan, you can
13 testify.
14       THE WITNESS:  To my knowledge, just claim
15 forms, paid claims.
16 BY MR. CHRISTOFFERSON:
17    Q.  We have already discussed, or you've
18 already testified I should say, that you requested
19 these documents from the third-party administrator.
20    A.  For them to produce.
21    Q.  For them to produce.
22       Did you request any documents from

Page 137

1  Medicare?
2     A.  No.
3     Q.  Did you request any documents from any of
4  your participants?
5     A.  No.
6     Q.  And I think you testified earlier that
7  you're still looking for documents in conducting
8  your search?
9     A.  Yes.  They're filed chronologically, so
10 we're in this software update and doing that and
11 looking for these at the same time.
12    Q.  Other than our conversations here today,
13 has the Fund ever had any written or oral
14 communications with any of the Defendants or
15 representatives of the Defendants?
16    A.  Not to my knowledge.
17    Q.  How was the Fund harmed by the Defendants?
18       MS. CONNOLLY:  Objection to form.
19       THE WITNESS:  Do you want to restate?
20 BY MR. CHRISTOFFERSON:
21    Q.  In this lawsuit, you're suing the
22 Defendants.

35 (Pages 134 to 137)

Page 138

1    How is it that the Fund was harmed by
2    those Defendants such that you're suing for
3    recovery?
4         MS. CONNOLLY: Objection to form.
5         You can answer.
6         THE WITNESS: In my viewpoint, the
7    participants were harmed, you know. These are
8    fixed-income people that their cost to this Fund is
9    dependent upon our expense, which our expense comes
10   from those providers providing the services and
11   drugs and whatever.
12        So they were harmed in the fact of any
13   overpayment for services or drugs going into the
14   formula that we as trustees set as their rate, no
15   different than we looked at the $56 in whatever year
16   that was, now being 112, double.
17   BY MR. CHRISTOFFERSON:
18     Q.  Does the Fund contend that it suffered
19   harm from Defendants who manufactured drugs for
20   which the Fund did not make any reimbursement
21   payment?
22        MS. CONNOLLY: Objection to form.

Page 139

1         THE WITNESS: Restate that.
2    BY MR. CHRISTOFFERSON:
3      Q.  If there are -- strike that.
4         Is it the Fund's contention that it
5    suffered harm caused by the Defendants including
6    Defendants who manufacture drugs for which the Fund
7    did not actually make any payment to a provider?
8         MS. CONNOLLY: Objection to form.
9         THE WITNESS: To my knowledge, no.
10   BY MR. CHRISTOFFERSON:
11     Q.  And what is the Fund seeking from this
12   lawsuit?
13        MS. CONNOLLY: Objection to form.
14        You can answer.
15        THE WITNESS: Well, a settlement in the
16   overcharge for these drugs that come back and help
17   reduce the cost of the participants' cost of
18   coverage is what we're wanting, and, you know, I
19   qualify this by participants. It's not -- the Fund
20   is that invisible thing. It's the individual
21   participants that were harmed and should receive
22   reduced costs because of any monies received from

Page 140

1    overcharge.
2    BY MR. CHRISTOFFERSON:
3      Q.  Who are the attorneys that represent you
4    in this action?
5      A.  Well, you know, Jan Jennings is involved
6    with this process, Jennifer and their firm here.
7    The names --
8      Q.  Wexler?
9      A.  The Wexler.
10     Q.  The Wexler Firm?
11     A.  The Wexler Firm.
12     Q.  Do you have an engagement letter with The
13   Wexler Firm?
14     A.  No.
15     Q.  Are you paying any amount in connection
16   with this case to your attorneys?
17     A.  No.
18        MR. CHRISTOFFERSON: Could we take a quick
19   break?
20        MS. CONNOLLY: Yes.
21        (Whereupon, a short recess was
22        taken.)

Page 141

1         MR. CHRISTOFFERSON: I'm going to pass the
2    witness in just a moment to Mr. Sweeney, but I just
3    wanted to make a statement for the record.
4         Upon the completion of Mr. Sweeney's
5    questions, the Track 1 Defendants will be adjourning
6    this deposition and bringing to Judge Saris'
7    attention the lack of documentation provided to
8    substantiate the qualifications of Sheet Metal
9    Workers Health and Welfare Fund as an adequate class
10   representative, which was required by the court's
11   August 16th, 2005 order. We will resume the
12   deposition after receiving more documents if
13   Judge Saris permits the Fund to become a class
14   representative.
15        In addition, the Track 1 Defendants also
16   reserve the right to resume this deposition on the
17   topics to which Mr. Randle was not designated to
18   testify if and when the Fund is ruled to be an
19   adequate class representative by the court.
20        MS. CONNOLLY: Just as I'm sure you know,
21   we disagree about your characterization about the
22   document production, and we will also oppose any

Page 142

```
 1  subsequent deposition of the Fund.
 2         But we will deal with that when it comes.
 3                 EXAMINATION
 4  BY MR. SWEENEY:
 5     Q.  Sir, I have a few questions.  We met
 6  before.  My name is Tom Sweeney from the firm of
 7  Hogan & Hartson, and I represent BMS, Apothecon and
 8  OTN.  I will not delay you too long.
 9         I think in your testimony you referred to
10  the Fund as self-funded?
11     A.  Yes.
12     Q.  What does that mean, sir?
13     A.  We accumulate income based on past history
14  of expenses, and we're not a profit-making
15  organization basically.  We're trying to provide
16  healthcare coverage for the participants at a cost.
17     Q.  Do the employers make contributions to the
18  Fund?
19     A.  Yes.  Their union agreement tells them the
20  rate.
21     Q.  Okay.  Does the -- do the union members
22  make contributions to the Fund?
```

Page 143

```
 1     A.  If they're out of work at a particular
 2  time, there is some self-funding that can be done.
 3     Q.  So part of their union dues go to the
 4  Fund?
 5     A.  No, they have to physically pay if -- if
 6  their hour bank runs out, their accumulated hour
 7  bank, if their hour bank runs out, they have to pay
 8  monthly out of their funds.
 9     Q.  What do you mean?  Was it our bank?
10     A.  Hour, h-o-u-r.  They accumulate so many
11  hours.  I forget exactly what level it goes to.
12     Q.  And in addition to that at least for the
13  wraparound fund, there's an additional monthly
14  payment that each of the participants has to make?
15     A.  Yes.  And I was speaking to you on actives
16  there.  On this SMW Plus, it's just that flat fee.
17     Q.  Would you take a look at Exhibit Randle 006,
18  which is the claim forms.
19         Is it fair to say, sir, that you're not
20  the right person to talk to about these forms?
21     A.  Absolutely.
22     Q.  Who is?
```

Page 144

```
 1     A.  Teresa Jernigan.
 2     Q.  Okay.  Anybody else?
 3     A.  Well, you know, anyone at Southern Benefit
 4  Administrator, but she's the head of this Fund.
 5     Q.  If you had a question about these forms,
 6  that's who you would turn to?
 7     A.  Teresa.
 8     Q.  Teresa?
 9     A.  Yes.
10     Q.  Okay.  Take a look at Exhibit Randle 003,
11  which is the 2003 Summary Plan Description.
12     A.  Yes.
13     Q.  I just have one question, which is look at
14  the top of the page in the fax line.
15     A.  Uh-huh.
16     Q.  There's a reference to
17  Branstetter Kilgore.
18     A.  Yes.
19     Q.  Who is Branstetter Kilgore?
20     A.  That's Jan's firm.
21     Q.  Mr. Jennings' firm?
22     A.  Uh-huh.
```

Page 145

```
 1     Q.  That's a law firm?
 2     A.  Yes.
 3     Q.  Now, just to clarify something that you
 4  discussed with Mr. Christofferson earlier, is it
 5  correct that before Southern Benefit was hired as
 6  the TPA for the Fund that the Fund was administered
 7  by the Sheet Metal Workers Pension Fund?
 8     A.  Employees common to the pension fund and
 9  the health and welfare, they shared a group of
10  employees that was the administrator for both.
11     Q.  Okay.  And that goes back to the beginning
12  of the wraparound plan as you understand it?
13     A.  Yes.
14     Q.  Okay.  Now, Mr. Christofferson asked you
15  some questions about the optional employees plan --
16     A.  Yes.
17     Q.  -- and whether you covered Medicare
18  copayments and deductibles, I believe, and it was
19  your testimony as I understood it that at some point
20  that that coverage for optional employees was
21  eliminated; is that correct?
22     A.  As they qualified for Medicare.
```

Page 146

1  Q. Right. Why was that coverage eliminated
2  by the Fund?
3  A. I think the costs.
4  Q. You were involved in that decision?
5  A. Yes, uh-huh.
6      MR. SWEENEY: That's all the questions I
7  have.
8      MS. CONNOLLY: I just have two follow-up
9  questions.
10         EXAMINATION
11 BY MS. CONNOLLY:
12 Q. Mr. Randle, you previously testified in
13 response to Mr. Christofferson's question that the
14 Fund believed that it was suing the providers.
15     What did you mean by that?
16 A. Well, of course, this suit is against the
17 pharmaceutical companies in actual fact. The
18 providers, I guess in my mind, provide that in the
19 chain of their billings and everything.
20     So, you know, the pharmaceutical companies
21 and the overcharge for drugs was who we're the
22 bottom line suing, I'd say.

Page 147

1  Q. You understand that as a class
2  representative that you are required to be here and
3  give your deposition today, right?
4  A. Yes.
5  Q. You also understand that you're required
6  to cooperate with your lawyers in producing
7  documents to the Defendants, right?
8  A. Yes.
9  Q. And you understand that if this case
10 should go to trial that you might be required to
11 testify at trial, correct?
12 A. Yes.
13     MS. CONNOLLY: I have nothing further.
14     MR. CHRISTOFFERSON: I have nothing
15 further.
16     MR. SWEENEY: No further questions.
17     THE WITNESS: Okay.
18     (Whereupon, an off-the-record
19     discussion was held.)
20     MS. CONNOLLY: We reserve signature.
21     (Whereupon, the deposition was
22     concluded.)

Page 148

6  _____
   GLENN RANDLE

8  Subscribed and sworn to and before me
9  this _____ day of _____, 20____.

12 _____
13     Notary Public

Page 149

1  STATE OF ILLINOIS )
2                   ) SS:
3  COUNTY OF C O O K )
4      The within and foregoing deposition of the
5  witness, GLENN RANDLE, was taken before GREG S.
6  WEILAND, CSR, RMR, CRR, Notary Public, at Suite 2000,
7  One North LaSalle Street, in the City of Chicago, Cook
8  County, Illinois, commencing at 8:11 o'clock a.m., on
9  the 17th day of November, 2005.
10     The said witness was first duly sworn and
11 was then examined upon oral interrogatories; the
12 questions and answers were taken down in shorthand
13 by the undersigned, acting as stenographer and Notary
14 Public; and the within and foregoing is a true,
15 accurate and complete record of all the questions
16 asked of and answers made by the aforementioned
17 witness at the time and place hereinabove referred to.
18     The signature of the witness was not waived
19 and the deposition was submitted to the deponent as
20 per copy of the attached letter.
21     The undersigned is not interested in the
22 within case, nor of kin or counsel to any of the

Page 150

1  parties.
2         Witness my official signature and seal as
3  Notary Public in and for Cook County, Illinois, on
4  this 1st day of December, 2005.
5
6  _____
7  GREG S. WEILAND, CSR, RMR, CRR
8  License No. 084-003472
9
10
11
12
13
14
15
16
17
18
19
20
21
22

39 (Page 150)