# Purported government knowledge

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| | CIVIL ACTION: 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS | Judge Patti B. Saris |

## MERITS REPORT AND DECLARATION OF GREGORY K. BELL, Ph.D., ON BEHALF OF TRACK 1 DEFENDANTS

**March 22, 2006**

Contains Highly Confidential Material – Subject to Protective Order

52.4.   One would not necessarily expect payors to benefit from a system in
which there was more transparency regarding acquisition costs.

## IV.   EVOLUTION OF MEDICARE PART B

53.    In calculating damages, Dr. Hartman suggests that the Medicare Part B statutes
intended there to be no difference between acquisition costs and reimbursed
amounts, pointing to the statute that calls for reimbursements to be based on
estimated acquisition cost ("EAC").[108]  However, government officials have
repeatedly acknowledged that the Part B reimbursement methodology produced a
spread on drug purchases, that the spread acted to cross-subsidize inadequately
reimbursed services performed by oncologists and their staffs, and that generic
and therapeutic competition caused spreads for drugs facing such competition to
be larger than those for single-source and first-in-class compounds.

54.    To the extent that Medicare Part B reimburses for pharmaceuticals at rates that
exceed acquisition costs, that is the result of a deliberate policy choice on the part
of the government.  As discussed above, over the past 35 years, the government
has commissioned at least 30 reports concerning the acquisition costs and
reimbursement of prescription pharmaceuticals.  Policy makers have always been
aware of differences, sometimes substantial, between acquisition costs and AWP.
Nonetheless, the government has repeatedly affirmed its reimbursement policies
as it sought to move care for Medicare Part B recipients out of the higher-cost
hospital environment and into physician offices.  The acknowledged profits that
physicians make on dispensing pharmaceuticals help to compensate for other
under- or un-reimbursed services that are provided.

55.    For Medicare Part B, unlike in the private sector, competition cannot effectively
constrain reimbursement rates.  Yet, the Medicare Part B reimbursement rates
tend to be less than the private payor rates, which do benefit from competition
among payors and physician providers.  If private payors had been able to
negotiate lower reimbursement rates, presumably they would have done so.  In

---

[108]    Hartman Class Declaration, 2004, ¶ 33, footnote 52; Hartman Liability Report, ¶ 19.

Contains Highly Confidential Material – Subject to Protective Order

fact, private payors were aware of the generally lower reimbursement rates being paid through Medicare Part B and yet were still only able to negotiate reimbursement schedules that tended to exceed Medicare Part B rates. Accordingly, it cannot be the case, as Plaintiffs claim, that the pharmaceutical manufacturers have perpetrated a fraud on Medicare Part B recipients and their Medigap insurers.

56.   In this section, I first discuss the role that public payors played in the evolution of AWP as a benchmark for pharmaceutical reimbursement. Then, I discuss the evolution of reimbursement rates under Medicare Part B, focusing on the information available and the policy choices made by government regarding reimbursement of PADs.

## A.   Public payors supported AWP as a benchmark for reimbursement[109]

57.   Plaintiffs allege that pharmaceutical manufacturers created an AWP "scheme" "solely to cause Plaintiffs and the Class Members to overpay for Covered Drugs."[110]  In fact, one of the first uses of AWP as a reimbursement benchmark occurred in the public sector more than twenty years before the start of the class period.

57.1.   In 1969, the California Medicaid program ("Medi-Cal") sought to standardize its system for reimbursing pharmacists. Rather than continue to reimburse on the basis of billed charges which could vary by dispensing location, Medi-Cal decided to base reimbursement on a consistent benchmark ingredient price (AWP) plus a dispensing fee, generating immediate administrative efficiencies.[111]

---

[109]  See Appendix A for a more extensive discussion of the information on pharmaceutical pricing that was available from government publications prior to and during the class period.

[110]  Third Amended Complaint, ¶ 177.

[111]  Pennebaker, George, "The Rest of the AWP Story," *Contemporary Pharmacy Management*, January-February 1998 ("Pennebaker 1998"), p. 6; Written Testimony of Edward H. Stratemeier, Esq. (Aventis), Before the Subcommittee on Oversight and Investigation Committee on Energy and Commerce on AWP-Based Reimbursement for Prescription Drugs by Medicaid, December 7, 2004 ("Stratemeier Testimony, 2004").

Contains Highly Confidential Material – Subject to Protective Order

58.   Since that time, other public and private payors have acknowledged the efficiency of using AWP as a reimbursement benchmark. It is administratively easier to calculate reimbursement rates by referencing a benchmark, such as AWP, than to negotiate individual reimbursement rates for a multitude of products. The adoption and continued use of the AWP benchmark in reimbursement methodologies was determined by public and private payors—who are class members—not the Defendant manufacturers.

59.   In 1997, decades after its first use as a reimbursement benchmark, Congress, as part of BBA 1997, specified that published AWPs were to be used as the sole reimbursement benchmark for Medicare Part B.[112] In 2000, Congress decided not to change the Medicare AWP-based reimbursement methodology until cross-subsidization issues were resolved.[113] MedPAC summarized the position of the government:

> "AWP has never been defined in statute or regulation. Individual AWPs are compiled and reported in compendia like the Red Book and First Databank, largely on the basis of information supplied by manufacturers. Because there is no official calculation method, CMS potentially can use alternate sources of information like market surveys to establish new AWPs for setting Medicare payment rates. These rates could be tied to actual transactions prices."[114]

---

[112]   HCFA, "Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1999," 63 FR 58814, November 2, 1998 at 58849.

[113]   In 2000, Congress imposed a moratorium on "... any direct or indirect decrease in reimbursement for drugs under the current payment methodology ...," effective for drugs distributed after January 1, 2001, and directed the GAO to study Medicare reimbursement for drugs and biologicals and also study whether the practice expense component was adequate compensation for administration of these drugs. (Congressional Research Service ("CRS"), Memo from Thomas Nicola to the House Committee on Energy and Commerce regarding Regulatory and Legislative History of Medicare Drug Reimbursement Based on Average Wholesale Price, August 31, 2001 ("CRS August 2001"), p. CRS-7.)

[114]   Statements on Introduced Bills and Joint Resolutions, By Mr. Ashcroft (for himself, Mr. Hagel, and Mr. Abraham), Statement regarding S. 3003, the Cancer Care Preservation Act, Congressional Record -- Senate, September 5, 2000, S8022-8023 ("Ashcroft Statement September 2000"), p. S8022.

Contains Highly Confidential Material – Subject to Protective Order

60.    Furthermore, there is no requirement that AWP reflect prices at which actual sales
       by manufacturers take place.[115] Members of Congress,[116] the President,[117] and
       CMS[118] have acknowledged that AWP differs from physicians' acquisition costs
       and Congress and CMS have acknowledged that these margins help cover the
       costs of inadequately reimbursed professional services.[119] In addition, Congress
       has explicitly rejected reforms proposed by Medicare administrators and the
       President that would make reimbursement rates more reflective of acquisition
       costs.[120]

---

[115]   "The reality is, however, that AWP is neither an average nor a price that wholesalers charge.
        Because the term AWP is not defined in law or regulation, there are no requirements or
        conventions that AWP reflect the price of any actual sale of drugs by a manufacturer." GAO,
        *Medicare: Challenges Remain in Setting Payments for Medical Equipment and Supplies Covered
        Drugs*, Statement of Leslie G. Aronovitz, Testimony Before the Subcommittee on Labor, Health
        and Human Services, Education and Related Agencies, Committee on Appropriations, U.S.
        Senate, GAO-02-833T, June 12, 2002 ("Aronovitz 2002"), p. 7.

[116]   Ashcroft Statement September 2000.

[117]   "Last week, the Department of Health and Human Services confirmed that our Medicare program
        has been systematically overpaying doctors and clinics for prescription drugs. ... Now, these
        overpayments occur because Medicare reimburses doctors according to the published average
        wholesale price—the so-called sticker price—for drugs. Few doctors, however, actually pay the
        full sticker price. In fact, some pay just one tenth of the published price." (The White House
        Office of Communications, *Weekly Radio Address to the Nation 12/13/97*, Remarks by the
        President in Radio Address to the Nation, 1997 WL 767416 ("White House"), p. 2.)

[118]   See, for example, HCFA's notification to Medicare carriers of changes resulting from the
        Balanced Budget Act of 1997. "Effective January 1, 1998, pay for drugs and biologicals not paid
        on a cost or prospective basis at the lower of the billed charge or 95 percent of the AWP. This
        change in payment allowance recognizes the fact that the AWP is not a true discounted price and,
        therefore, does not reflect the cost to the physician or supplier furnishing the drug to the Medicare
        beneficiary." (HCFA Program Memorandum, Intermediaries/Carriers, Transmittal No. AB-97-25,
        *Implementation of the New Payment Limit for Drugs and Biologicals*, January 1998.)

[119]   "As we have gathered information on many of the drugs reviewed by DOJ, we have concluded
        that Medicare payments for services related to the provision of chemotherapy drugs and clotting
        factors used to treat hemophilia and similar disorders are inadequate. Therefore, in addition to
        instructing carriers not to use the DOJ data for the 17 drugs related to chemotherapy and clotting
        factors, we plan to take administrative action on chemotherapy administration payments and work
        with Congress to enact legislation regarding clotting factors." Letter to Members of Congress
        from Nancy-Ann Min DeParle, HCFA Administrator, reproduced in *Medicare Part B Resource:
        Focused Information for Medicare Part B Providers in Maine, Massachusetts, New Hampshire,
        and Vermont*, October/November 2000, published by the National Heritage Insurance Company of
        Hingham, Massachusetts ("DeParle Letter to Congress 2000"), pp. 17-18.

[120]   These proposed reforms have included greater reductions from AWP (85 percent proposed in June
        1991) and reimbursement based on EAC. See Testimony of Thomas A. Scully on Medicare
        Payment for Drugs, Centers for Medicare and Medicaid Services, U.S. Department of Health and
        Human Services Before the House Energy and Commerce Subcommittees on Oversight &
        Investigations and Health, September 21, 2001 ("Scully Testimony 2001"),

Contains Highly Confidential Material -- Subject to Protective Order

61.   Thus, it is apparent that Defendant manufacturers did not hatch AWP as a
      "scheme." The adoption and continued use of the AWP benchmark in
      reimbursement methodologies has been determined by public and private payors,
      not pharmaceutical manufacturers. Indeed, for the duration of the class period,
      AWP has been understood to be a reimbursement benchmark that does not
      include adjustments for discounts, rebates, purchasing allowances, or other forms
      of price concessions and therefore not to be a "reasonably predictable" measure of
      acquisition costs. Further, this understanding has been shared by all significant
      elements involved in the distribution and reimbursement of pharmaceuticals,
      including manufacturers, wholesalers, retailers, hospitals and clinics, PBMs,
      insurers and third-party payors, benefits consultants, and the government.[121]

## B.    Evolution of Medicare Part B reimbursement rates[122]

### I.    Prior to 1992

62.   Reimbursement under standard Medicare Part B is the lower of the charges
      submitted or a statutory maximum. Prior to 1992, the statutory maximum was a
      reasonable and customary charge as determined by the local Medicare carrier.
      The Medicaid program, however, was reimbursing pharmacies using AWP as a
      benchmark, despite numerous studies indicating that AWP was not a measure of a
      pharmacist's acquisition costs.

63.   In May 1967, the Task Force on Prescription Drugs was established to study the
      costs of prescription drugs under Medicare. The Task Force considered
      determining reimbursement rates using actual costs as verified by audit, "usual

---

http://www.cms.hhs.gov/apps/media/press/testimony.asp?Counter=612 (accessed, February 26,
2006).

[121]   According to Professor Berndt: "To knowledgeable industry observers, it has long been widely
understood that in the US pharmaceutical industry the term "average wholesale price" (hereafter,
"AWP") is a misnomer: it is not a measure of prices generally paid by wholesalers to
manufacturers, it is not a measure of prices frequently paid by retail or mail order pharmacies to
wholesalers, nor is it some average of these" and this has been true at least since the Brand Name
Prescription Drug Litigation in 1994. (See Berndt Report, ¶¶ 14-15.) Dr. Hartman concurs:
"Anyone who knows this industry knows that almost no one pays AWP and that AWP diverges
from transaction prices" and "It is true that some Class members (indeed any knowledgeable Class
member) knew that AWP was greater than ASP and/or AAC." See Hartman Class Rebuttal, 2004,
¶¶ 25 (d), 17 (f), respectively.

[122]   See Appendix B for a discussion of the history of the Medicare program.

Contains Highly Confidential Material – Subject to Protective Order

and customary" charges, listed wholesale prices, or a fixed program payment. In findings released in 1969 (nearly 25 years prior to the beginning of the class period), the Task Force concluded that published AWPs "rarely had any realistic relationship with actual acquisition costs" but that these differences would be offset by lower administrative costs in comparison to the alternatives.[123]  In the 1975 final rule on Medicaid reimbursement for prescription drugs, HCFA stated that "...published wholesale prices often are not closely related to the drug prices actually charged to, and paid by, providers,"[124] and required ingredient costs for certain multiple-source drugs to be the lower of the MAC or the acquisition cost of the drug.[125]

64.     Despite earlier efforts to encourage states to calculate Medicaid reimbursements using a discount from AWP, the OIG determined in 1984 that many states continued to reimburse at AWP.  The report reiterated the apprehensions about reimbursing at 100 percent of AWP, stating:

> "...pharmacies do not purchase drugs at the AWP published in the 'Bluebook,' 'Redbook,' or similar publications. Thus, AWP cannot be the best—or even an adequate—estimate of the prices providers generally are paying for drugs.  AWP represents a list price and does not reflect several types of discounts, such as prompt payment discounts, total order discounts, end-of-year discounts and any other trade discounts, rebates, or free goods that do not appear on the pharmacists' invoices."[126]

65.     A 1987 GAO study discussed establishing a Medicare outpatient prescription drug benefit and acknowledged that "AWPs do not reflect many types of discounts and rebates available to pharmacies, and thus, tend to overstate pharmacies' drug costs."[127]  Then, in 1989, the OIG concluded that "AWP is not a reliable price to

---

[123]  U.S. Department of Health, Education, and Welfare, Office of the Secretary, Memorandum from Philip R. Lee, Assistant Secretary for Health and Scientific Affairs, February 7, 1969, in Prescription Drugs Under Medicare, 2001 ("Task Force Report"), pp. 30, 146–148.

[124]  40 FR 32284, July 31, 1975, at 32293.

[125]  40 FR 32284, July 31, 1975, at 32294.

[126]  OIG, *Changes to the Medicaid Prescription Drug Program Could Save Millions*, A-06-40216, 1984 ("OIG 1984"), p. 22.

[127]  GAO, *Issues Related to Possible Coverage of Outpatient Prescription Drugs Under Medicare*, Statement of Michael Zimmerman, GAO/T-HRD-87-15, June 2, 1987, p. 3.

Contains Highly Confidential Material – Subject to Protective Order

be used as a basis for making reimbursements for either the Medicaid or Medicare programs."[128]  In a 1990 report to Congress, the Office of Technology Assessment ("OTA") noted, "Some Medicare carriers may be using the AWP to derive an approved charge for physicians who administer recombinant erythropoietin in their offices" and warned that AWPs are "usually list prices instead of the transaction prices that providers actually pay for pharmaceuticals."[129]

66.   In an attempt to ensure that federal and state governments were not paying more for pharmaceuticals than were other purchasers, Congress created the Medicaid drug rebate program as part of the Omnibus Budget Reconciliation Act of 1990 ("OBRA 90").  Under the Medicaid rebate program, manufacturers of single-source or innovator multi-source[130] drugs agreed to pay as rebates the greater of 15.1 percent of the Average Manufacturer Price ("AMP") or the difference between AMP and the lowest price ("best price") charged to purchasers other than Medicaid.[131]  Generic manufacturers must provide a rebate of 11.0 percent of the AMP per unit.[132]  The passage and implementation of the Medicaid rebate program was a major event in the pharmaceutical industry, generating

---

[128]   Management Advisory Report from Richard Kusserow, Inspector General, OIG, to Louis B. Hays, Acting Administrator, HCFA, October 3, 1989, A-06-40216, p. 7.

[129]   Office of Technology Assessment ("OTA"), *Recombinant Erythropoietin: Payment Options for Medicare*, OTA-H-451, May 1990.  In addition, while reporting the FSS discounts for pharmaceuticals, the report noted that "The AWP is an inappropriate benchmark, however, since it is a list price and is not usually charged to any purchaser." (Footnote 30.)

[130]   "Innovator multi-source" refers to a "drug marketed by a cross-licensed producer or distributor under the approved new drug application." DHHS, Health Resources and Services Administration, "Pharmacy Affairs & 340B Drug Pricing Program:  Glossary of Pharmacy-Related Terms," accessed at http://www.hrsa.gov/opa/glossary.htm, citing to Section 1927(k)(7)(A)(ii) of the Social Security Act.

[131]   For virtually all products, the Medicaid rebate would lead to at least a 41.3 percent spread. (This calculation assumes that AWP is only a 20 percent mark-up over WAC and WAC is equal to AMP.)  The Medicaid rebate percentage could be even higher if the rate of inflation of the drug's price exceeded a predetermined rate.  AMP is defined as the average price paid to a manufacturer of a drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade, net of customary prompt pay discounts. (OIG, *Comparison of Medicaid Federal Upper Limit Amounts to Average Manufacturer Prices*, OEI-03-05-00110, June 2005, p. i.)

[132]   DHHS, CMS, "Medicaid Drug Rebate Program: Overview," http://www.cms.hhs.gov/MedicaidDrugRebateProgram/01_Overview.asp#TopOfPage (accessed March 20, 2006).

Contains Highly Confidential Material – Subject to Protective Order

considerable press review[133] and affecting the negotiations between payors (public and private) and manufacturers.

67.    As a result of these studies, regulators and private payors were aware that manufacturers offered price concessions and that AWP was not a measure of acquisition cost. That public and private payors implemented reimbursement measures in the 1980s based on their knowledge of the differences between acquisition costs and AWP is well documented.[134]

ii.    **1992: Medicare Part B adopts AWP as a reimbursement benchmark**

68.    OBRA 1989 sought to bring major changes to the charge-based system of reimbursing physicians under Medicare Part B. The Act established the Resource-Based Relative Value Scale ("RBRVS") for physicians; the intention was to ensure that payments for physicians' services were appropriately based on the resources used to provide the services.[135] The RBRVS was phased in over five years beginning in 1992. In 2002, Thomas Scully, the CMS Administrator, acknowledged that the "transfer and cross subsidy from AWP for oncologists has resulted in our RVRBS payments being somewhat artificially low for practice expenses."[136]

69.    As part of the new reimbursement system for Medicare Part B, HCFA proposed, in June 1991, that payments for Medicare Part B drugs be the lower of EAC or 85 percent of the AWP, as published in the *Red Book* or similar price listings.[137]

---

[133]    Conlan, Michael F., "Now Come Some Serious Medicaid Cuts," *Drug Topics*, September 17, 1990, p. 45; "Drug Makers' Efforts to Cut Costs Not Enough, Prior Says," *Arkansas Democrat-Gazette*, September 3, 1990; Milt Freudenheim, "Business and Health; Medicaid Fight by Drug Makers," *The New York Times*, July 31, 1990, Section D, p. 2.

[134]    See also David Kreling, "A Comparison of Pharmacists' Acquisition Costs and Potential Medicaid Prescription Ingredient Cost Reimbursement in Wisconsin," *Journal of Research In Pharmaceutical Economics*, 1991, p. 26.

[135]    RBRVS sets forth a uniform national fee schedule based around three components—physician work, practice expenses, and malpractice expenses—that were subject to regional adjustment multipliers. See GAO, *Medicare Physician Payments: Need to Refine Practice Expense Values During Transition and Long Term*, GAO/HEHS-09-30, February 1999, p. 18.

[136]    Scully Senate Testimony 2002, p. 13.

[137]    56 FR 25800, June 5, 1991. HCFA also stated that "the Red Book and other wholesale price guides substantially overstate the true cost of drugs."

Contains Highly Confidential Material ~ Subject to Protective Order

Thomas Scully later acknowledged that he was involved in this attempt to "fix AWP" by setting Part B reimbursement at 85 percent of AWP.[138] However, HCFA noted that it "received a great many comments on this issue, primarily from oncologists indicating that our 85 percent standard was inappropriate."[139] HCFA "decided to modify the proposed policy. Payment for drugs would be based on the lower of the national AWP or the Medicare carrier's estimate of actual acquisition cost."[140]

70. In November 1991, HCFA published its final rule for Medicare Part B drug reimbursement, stating that drug reimbursement was to be based on the lesser of EAC or AWP for single-source drugs and the lesser of EAC or the median of wholesale generic prices for multi-source drugs.[141] HCFA specified that EAC "would be based on individual carrier estimates of the costs that physicians or other providers, as appropriate, actually pay for the drugs."[142]

71. Then, in November 1992, OIG issued a study of 13 high dollar volume Medicare Part B chemotherapy drugs, six of which are at issue in this litigation. This was the study noted above that was cited by Dr. Hartman. The study found that the drugs could be purchased at amounts below AWP and that AWP was "not a reliable indicator" of the cost of a drug to physicians.[143]

---

[138] Scully Senate Testimony 2002, pp. 6–7.

[139] 56 FR 59524, November 25, 1991. The "estimated acquisition costs would be based on individual carrier estimates of the costs that physicians, or other providers as appropriate, actually pay for the drugs. Carriers could survey a sample of the physicians who furnish the drugs to obtain cost information. As an alternative, carriers could request that physicians periodically provide cost information when they submit claims for payment for the drugs. For certain types of drugs, such as chemotherapy drugs, there may be significant indirect costs such as inventory costs, waste, and spoilage. Carriers may consider these costs, if documented, as part of the acquisition cost of a drug."

[140] 56 FR 59524, November 25, 1991. HCFA came to an identical conclusion with respect to ESRD drugs, where proposed reimbursement of 85 percent of AWP was rejected in favor of the lower of estimated acquisition cost or the national AWP. (56 FR 59525, November 25, 1991).

[141] OIG November 1992, p. 4.

[142] CRS August 2001, p. CRS-2, citing 56 FR 59525, June 5, 1991.

[143] OIG November 1992, p. 5. Physicians obtained drugs from manufacturers at 20 to 83 percent below AWP; see pp. 5–6 and Appendix III.

Contains Highly Confidential Material – Subject to Protective Order

72.     The surveys to support EAC were never completed; the project was shelved due
        to a violation of the *Paperwork Reduction Act*.[144] Nonetheless, it would appear
        that the proposed definition of EAC was likely to include costs that were
        incidental to the purchase of the drug, including costs of breakage and storage.
        For example, in April 1993 CIGNA Corporation ("CIGNA"), in its capacity as a
        Medicare carrier, informed all of the payors administering the Medicare program
        that, "Our current reimbursement policy for chemotherapy drugs is to pay the
        average wholesale price taken from the Redbook plus an additional 20%. This
        additional allowance is added to consider spoilage, waste, and other overhead
        expenses."[145] Then, in a June 1994 memorandum to Medicare carriers, HCFA
        wrote:

        "In addition to the EAC, consider allowing an additional fee for the
        overhead of handling or dispensing drugs. For example, you might
        determine that an overhead allowance of 10% above the material costs
        would be equitable in establishing EAC. However, in no case can the cost
        of the drug plus a dispensing fee exceed the AWP for the drug."[146]

III.    **1997: Balanced Budget Act reduces reimbursement to 95 percent of AWP**

73.     According to Nancy Min DeParle, the HCFA Administrator,

        "In 1997, the Administration proposed to pay physicians and suppliers
        their acquisition costs for drugs, but Congress did not adopt the
        Administration's proposal. Instead the Balanced Budget Act ("BBA")
        reduced Medicare payments for covered drugs from 100 percent to 95
        percent of the average wholesale price."[147]

74.     A December 1997 OIG study of 22 high dollar volume Medicare Part B drugs,
        eight cited in this litigation, found that Medicare's reimbursement allowances

---

[144]   HHC015-1693 to 1694 (Hartman Liability Deposition, Exhibit 39); CRS August 2001, p. CRS-1, note 1.
[145]   CIGNA 00013677 (also stamped AWP056-1410).
[146]   HCFA, Regional Carrier Letter No. 94-19, "Determination of Costs of Drugs – Action," June 8, 1994, p. 4.
[147]   DeParle Letter to Congress 2000, pp. 17-18. In actuality, the reimbursement rate changed to "the lower of the actual billed amount or 95 percent of the AWP, effective January 1, 1998." (HCFA, "Medicare Program; Revisions to Payment Policies and Adjustments to the Relative Value Units Under the Physician Fee Schedule for Calendar Year 1999," 63 FR 58814, November 2, 1998.

Contains Highly Confidential Material – Subject to Protective Order

were 2 to 10 times the actual prices from wholesalers and GPOs.[148] After the release of this OIG report, Congress considered proposals to set Medicare Part B drug payment rates at 83 percent of AWP, a compromise between the average discount found by the OIG and 95 percent of AWP.[149] Then, in 1999 and 2000, President Clinton revived the proposal to reduce Medicare Part B drug reimbursement to 83 percent of AWP. Congress rejected these proposals.[150]

75. The BBA of 1997 mandated that CMS develop an Outpatient Prospective Payment System ("OPPS"). To do so, HCFA had to classify hospital outpatient services to be reimbursed under the new system into groups called Ambulatory Payment Classifications ("APCs").[151] The reimbursement rates for APCs were based on outpatient claims cost data for 1996. For some pharmaceuticals, acquisition cost data were available from an external survey,[152] but when acquisition cost data were not available for a particular drug, HCFA assumed the following ratios of acquisition cost to AWP: 68 percent for drugs with one manufacturer (single-source innovator drugs), 61 percent for (innovator multi-source), and 43 percent for multi-source drugs with generic competitors (multiple-source).[153] These assumptions lead to the following "spreads": 47 percent for single-source, 64 percent for innovator multi-source, and 133 percent for multi-

---

[148]   "Total allowed charges for the 22 drugs would have been reduced by 29 percent ($447 million of $1.5 billion) if actual wholesale prices rather than AWP were the basis for Medicare reimbursement." (See OIG, *Excessive Medicare Payments for Prescription Drugs*, OEI-03-97-00290, December 1997 ("OIG December 1997"), p. 7.)

[149]   Scully Senate Testimony 2002, p. 94.

[150]   Pear, Robert, "Administration Plans Cuts in Some Drug Payments," *New York Times*, August 6, 2000, Section 1, p. 12..

[151]   Each APC group consists of a cluster of services provided during a particular outpatient procedure. Services in each APC are "clinically similar and require comparable resources." (See MedPAC, *Report to the Congress: Selected Medicare Issues*, June 2000 ("MedPAC June 2000"), p. 37).

[152]   "Hospitals were found to purchase drugs at significant discounts to the so-called 'average wholesale price' (AWP). ... Average hospital acquisition cost for single-source innovator drugs was found to be 67% of AWP, with a standard deviation of 12%. Multi-source drugs were heavily discounted from AWP, with an average acquisition cost of 42% of AWP, and a standard deviation of 24%." Kathpal Technologies, "High Cost Drugs Under the Outpatient Prospective Payment System," Draft, prepared for the Health Care Financing Administration under contract by Myers and Stauffer LC, October 27, 1999 ("Kathpal Report"), p. 4.

[153]   HCFA, "Office of Inspector General; Medicare Program; Prospective Payment System for Hospital Outpatient Services," 65 FR 18434, April 7, 2000 at 65 FR 18481.

Contains Highly Confidential Material – Subject to Protective Order

source drugs with generic competitors. Thus in its implementation of OPPS, HCFA explicitly recognized that AWP exceeded acquisition cost.

76.    HCFA and Congressional implementation of OPPS identifies three flaws in Dr. Hartman's expectations theory. First, HCFA had access to acquisition cost data. Second, the acquisition cost discounts from AWP used by HCFA exceed Dr. Hartman's 30 percent liability threshold. Third, the acquisition cost discount from AWP used by HCFA was significantly higher for multi-source (57 percent) than for single-source (32 percent) drugs.

77.    In 1998, despite the attention placed upon AWP, the OIG proposed that HCFA expand the use of AWP to the calculation of Medicaid rebates.

> "We recommend that HCFA develop and submit a legislative proposal to the Congress that would require drug manufacturers participating in the Medicaid outpatient prescription drug program to pay Medicaid drug rebates based on AWP. We recognize that the opportunity exists that manufacturers could manipulate such a new system but believe that the normal competitive pressures on drug prices in the marketplace would discourage manufacturers from inordinately raising drug prices. However, we are also recommending that if our recommended change is enacted, HCFA should establish safeguards as part of the new rebate process to discourage manufacturers from inordinately raising drug prices to pay for the cost of the additional rebates and at the same time raising AWP to cover the amount of the increased cost to the pharmacies."[154]

78.    In 2000, there was another attempt to reduce Medicare Part B reimbursement rates using data on actual acquisition costs. As a result of investigations by the DOJ, HCFA was "compiling better information about what prices wholesalers are actually paying, and we intend to get that out to our carriers, the private insurance companies that pay Medicare's bills, so they can start using those prices and reimbursing at that rate."[155]

---

[154] OIG, *Need to Establish Connection Between the Calculation of Medicaid Drug Rebates and Reimbursement for Medicaid Drugs*, A-06-97-00052, May 1998.

[155] Testimony of Nancy-Ann Min DeParle, Hearing Before the Committee on Ways and Means, House of Representatives, 106th Congress, Second Session, re Legislation to Cover Prescription Drugs Under Medicare, June 13, 2000, p. 104.

Contains Highly Confidential Material – Subject to Protective Order

79.   Use of the so-called DOJ AWPs was decried by members of Congress as an
      attempt to circumvent prior congressional actions.[156] Further, Congress noted that
      the DOJ AWPs "do not take into account the fact that oncologists are chronically
      underpaid for their drug administration services in treating cancer patients, a fact
      that is widely recognized" and that "many physicians will be unable to continue
      providing cancer care in their offices, and patients will be deprived of a humane,
      convenient and cost-effective treatment option."[157] Pharmacy, medical, and
      patient groups also protested against the proposed change. For example, the
      National Home Infusion Association claimed that in some cases the proposed
      reimbursement would be below the acquisition cost.[158]

80.   Nonetheless, on September 8, 2000, HCFA issued Transmittal AB-00-86, which
      provided "an alternative source of average wholesale price data for certain drugs,"
      based on wholesale prices of drugs as determined by the DOJ and the National
      Association of Medicaid Fraud Control Units ("NAMFCU").[159] In this
      Transmittal, the carriers were told to take these DOJ AWPs into account when
      updating reimbursements for January 2001 for 32 drugs, but not including 14
      oncology drugs and three clotting factors. With respect to these excluded
      products, HCFA noted that, "we have some concern about access to care related
      to the DOJ's wholesale prices ...."[160] Further with respect to these excluded
      products, the HCFA Administrator noted that the payments for Part B drug
      administration were inadequate and "the right approach to addressing Medicare

[156]   "We see no basis for such action in any of our previous legislation, and certainly the Department's
        unilateral declaration of a new definition of AWP, with no regulatory process, is inappropriate."
        (Letter from Members of U.S. Congress to Donna E. Shalala, Secretary, DHHS, July 28, 2000
        ("Congressional Letter to Shalala 2000"), p. 2.)
[157]   Congressional Letter to Shalala 2000, p. 1.
[158]   "Revamped ASP for Medicare and Medicaid criticized," Drug Topics, June 10, 2000.
[159]   Program Memorandum Intermediaries/Carriers, Transmittal AB-00-86, "An Additional Source of
        Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare
        Program, September 8, 2000 ("Transmittal AB-00-86").
[160]   Transmittal AB-00-86, p. 2.

Contains Highly Confidential Material – Subject to Protective Order

profits on drugs" is to couple reductions in drug markups with increased drug administration fees.[161]

81.   On November 17, 2000, HFCA rescinded Transmittal AB-00-86, saying, "Congressional action may preclude the use of this alternative source [of AWPs]."[162]   According to a CRS Report for Congress, the Benefit Improvement and Protection Act of 2000 ("BIPA"), enacted December 21, 2000, prohibited the Secretary of Health and Human Services from implementing any payment reduction for drugs until GAO prepared, and the Secretary reviewed, a report on revised payment methodologies for drugs.[163]

82.   The results of the GAO study mandated under BIPA were sent to Congress on September 21, 2001.  The GAO had studied the twenty highest dollar volume Medicare Part B drugs, four of which are at issue in this litigation.  The GAO found that:  (1) the average discount from AWP for PADs ranged from 13 to 34 percent, equating to "spreads" of 15 to 52 percent; (2) that two PADs had discounts of 65 and 86 percent, equating to "spreads" of 186 to 614 percent; and (3) that two durable medical equipment ("DME") drugs had discounts of 78 and 85 percent, equating to "spreads" of 355 to 567 percent.[164]

83.   Another OIG study in 2001 found that Medicare carriers used inconsistent methodologies to establish J-code-based reimbursements for the 24 most costly PADs, resulting in differences of 10 percent or more for some drugs and as high as a two-fold difference in rates.[165]  Thus, although Medicare Part B specifies a

---

[161]   "As we suggested in May, the right approach to addressing Medicare profits on drugs identified by DOJ is to pay correctly for the drugs, and at the same time make changes, as necessary, to assure that Medicare adequately pays for services related to the provision of the drugs." DeParle Letter to Congress 2000, pp. 17-18.

[162]   DHHS and CMS, Program Memorandum, Transmittal AB-00-115, November 17, 2000; "HCFA Shelves 'new' Medicare AWPs under pressure from Congress," *Drug Topics*, December 11, 2000.

[163]   O'Sullivan, Jennifer, "Medicare: Payments for Covered Prescription Drugs," Report for Congress, CRS, May 21, 2002 ("CRS 2002"), CRS-7.

[164]   GAO, *Medicare – Payments for Covered Outpatient Drugs Exceed Providers' Cost*, GAO-01-1118, September 2001, p. 4.

[165]   OIG, *Medicare Reimbursement of Prescription Drugs*, OEI-03-00-00310, January 2001 ("OIG January 2001"), p. ii.

Contains Highly Confidential Material – Subject to Protective Order

43

"formula" for calculating the drug payment rates associated with J-codes (as a percentage of the AWP benchmark), carriers implemented the methodology differently, which resulted in "wide variation" in payment rates. Carriers differed in their methods for choosing among AWPs for the multiple NDCs associated with a J-code (i.e., multi-source drugs, or single-source drugs with multiple forms, strengths, or packaging), as well as in the frequency of updating AWPs.[166] Thus, effectively there may have been no explicit, formulaic relationship between AWP and Medicare Part B reimbursement rates in many circumstances as may be required under the class definitions for this litigation.[167] Further, I note that to the extent that private payors have modeled their PAD reimbursement methodologies on the Medicare system, many of those reimbursements may similarly exhibit no explicit, formulaic relationship with AWP.[168]

84.     Regarding cross-subsidization, in 2002, the chairman of MedPAC wrote to the CMS Administrator about the series of GAO and OIG studies that "have provided ample evidence that Medicare pays far more than market price for the outpatient prescription drugs that it covers under Part B," and acknowledged the cross-subsidization of inadequate payments for some services with drug payments.[169] In the same year, the Senate held hearings concerning reimbursement and access to prescription drugs under Medicare Part B. Thomas Scully, the CMS Administrator, discussed administration fees for oncologists, end-stage renal disease ("ESRD") clinics, hemophilia agencies, and DME providers, acknowledging that, "Many of these providers rely on cross subsidies to survive,

---

[166]   MedPAC June 2003, p. 152.

[167]   Class Certification Order, pp. 75-76. Note that CMS established a Single Drug Pricer program, effective January 1, 2003, under which one carrier determines reimbursement rates and these rates are disseminated to the other carriers on a quarterly basis. See DHHS and CMS, Program Memorandum, Transmittal AB-02-174, December 3, 2002 ("Transmittal AB-02-174"), Attachment.

[168]   For instance, I note that CIGNA obtained AWPs for J-Codes from First DataBank and that First DataBank created AWPs for J-Codes by averaging the AWPs for the NDCs that fall under that J-Code. If the J-Code included generic products, First DataBank would report the lower of the average AWP for the generics and the average AWP for the brand-name products. (See Herbold (CIGNA) Deposition, pp. 40–42.)

[169]   Letter from Glenn M. Hackbarth, Chairman of MedPAC, to Thomas Scully, Administrator of CMS, October 4, 2002, p. 5.

Contains Highly Confidential Material – Subject to Protective Order

basically, in the Medicare business."[170]  He also explained that while the
Administration or Congress could reduce payments for Medicare Part B drugs,
only Congress had the means to adjust drug administration fees in a budget
neutral way.[171]  Finally, CMS acknowledged that "numerous studies had
established that Medicare was paying for these drugs under a statutory formula
that resulted in payment far in excess of the physician's acquisition costs" and
proposed rules to reduce Part B cross-subsidization.[172]

iv.    **2003: Medicare Prescription Drug, Improvement, and Modernization Act**

85.    The Medicare Prescription Drug, Improvement, and Modernization Act of 2003
       ("MMA") established a new Medicare outpatient prescription drug benefit,
       effective in 2006; changed the 2004 reimbursement percentages for most drugs
       under Medicare Part B to 85 percent of AWP;[173] and introduced the Average
       Sales Price ("ASP") as a new reimbursement benchmark for these drugs
       beginning in 2005.  For 2004, the MMA also dictated that 20 single-source and 9
       multi-source drugs be reimbursed at the greater of 80 percent of AWP or the
       average discount from AWP as per the most recent GAO and OIG studies.[174]
       Seven of the single-source and one of the multi-source drugs at issue in this case
       fell into this category.

86.    The MMA also authorized CMS to study physician practice expenses and revise
       payments for drug administration.

                "Reimbursement by CMS for injectable drugs involves what has long
                been understood by the CMS, providers, and the drug industry as an
                arbitrary but necessary cross-subsidy: Physicians in certain specialties
                (predominantly oncology, rheumatology, endocrinology, and nephrology)

---

[170]    Scully Senate Testimony 2002, pp. 6–7.

[171]    Scully Senate Testimony 2002, pp. 8–9.

[172]    CMS, Competitive Acquisition Program Interim Final Rule (CMS-1325-IFC), June 27, 2005; See
         also, 70 FR 39022, June 6, 2005.

[173]    Under the MMA for 2004, most Part B drugs were reimbursed at 85 percent of the AWP in effect
         on April 1, 2003.  Blood clotting factors, drugs that were not available for Medicare payment on
         October 1, 2003, vaccines, drugs for ESRD, and infusion drugs used with DMB were reimbursed
         at 95 percent of the AWP in effect on October 1, 2003. (69 FR 1086, January 7, 2004.)

[174]    69 FR 1089-90, January 7, 2004.

Contains Highly Confidential Material – Subject to Protective Order

are reimbursed for their evaluation and management of patients at rates that do not cover their incomes and practice expenses; these shortfalls are recovered by the margin between what these providers are reimbursed for the injectable drugs they administer to patients and what they actually pay to purchase those drugs."[175]

87.    Acknowledging the cross-subsidization, Congress implemented a commensurate increase in drug administration fees to offset the reduction in drug payments under the MMA.[176]  Policymakers were aware of the potential consequences of ignoring this cross-subsidization in reducing Medicare Part B reimbursement rates—physicians might find it financially impractical to provide PADs in their offices, forcing patients to seek treatment in the hospital where the costs of care are higher.  In the late 1980s, reductions in Medicare Part B reimbursement for chemotherapy had precisely this effect.[177]

88.    The provisions of the MMA required drug manufacturers to begin submitting quarterly ASP data to CMS on April 30, 2004.[178]  These data have since been publicly reported and updated on a quarterly basis.  Nonetheless, Dr. Hartman concludes that the Medicare Part B program and private payors were deceived about spreads throughout 2004 and later for private payors.

**C.    Conclusion: No expectation that AWP was equal to acquisition cost**

89.    A fundamental assumption in Dr. Hartman's theory is that prior to 2004 policymakers expected that the Medicare Part B drug reimbursement rates were

---

[175]    Kleinke, J.D., "Re-Naming and Re-Gaming: Medicare's Doomed Attempt to Reform Reimbursement for Injectable Drugs," *Health Affairs*, December 8, 2004, p. W4.

[176]    "[T]he MMA required CMS to decrease the Medicare payment for drugs and increase the payments for administering them, as outlined below.  New payments for drugs and their administration were published in January, and reflect an estimated increase of $510 million for drug administration and a reduction in drug reimbursement of $510 million—an exact offset."  See Johnson, Kjel, "Medicare Reimbursement will Affect Specialty Payouts; MMA Pays Less for Drugs, but More for Administering Them," *Managed Healthcare Executive*, July 1, 2004.  Also see testimony of Michael McMullan, Deputy Director, Center for Beneficiaries Choices, CMS before the Senate Committee on Governmental Affairs, "Does CMS Have the Right Prescription?  Implementing the Medicare Prescription Drug Program," April 8, 2004, accessed at http://www.cms.hhs.gov/apps/media/press/testimony.asp?Counter=1010.

[177]    Dougherty, Elizabeth and Dawn Hagin, "Market Memo: Move Quickly, But Cautiously in Outpatient Cancer Care," *Health Care Strategic Management*, February 1989 ("Dougherty and Hagin 1989"), p. 18.

[178]    69 FR 17935, April 6, 2004.

Contains Highly Confidential Material – Subject to Protective Order

equal to the physician's acquisition costs.  The assumption is demonstrably incorrect.

90.   Through the studies and policy debates noted above, Medicare policymakers gained insight into the pricing practices of the pharmaceutical industry. Government publications from before and during the class period revealed the prevalence of price concessions for both SADs and PADs; these concessions were sometimes substantial in magnitude for particular drugs.  Thus, contrary to Plaintiffs' and Dr. Hartman's assertions, Medicare policymakers had ample evidence of so-called "mega-spreads," which are a natural result of price discounting under competition.

91.   In the period from 1991 to 1998, Medicare Part B drug reimbursement was equal to the lesser of the billed charge and 100 percent of AWP or EAC.  Congress explicitly distinguished between EAC and AWP.  In addition, it would appear that EAC could include costs such as wastage, non-collection of coinsurance amounts, and carrying costs, which would clearly make EAC greater than actual acquisition costs.

92.   In fact, Congress has repeatedly made clear its intent to avoid reducing Medicare Part B drug reimbursement to the level of actual acquisition costs.[179]  In so doing, Congress (as well as HCFA/CMS, DHHS, MedPAC, and others) acknowledged that Medicare Part B drug reimbursement cross-subsidized un- and under-reimbursed drug administration services and other practice expenses.

---

[179]   "Because the estimated acquisition cost approach had proved unworkable, in 1997, the President proposed legislation to pay physicians their actual acquisition costs.  Physicians would tell Medicare what they pay for drugs and be reimbursed that amount, rather than the Administration developing an estimate of acquisition costs and basing payment on the estimate.  Unfortunately, Congress did not adopt the Administration's proposal."  Letter from Nancy Ann Min DeParle, Administrator, HCFA, to June Gibbs Brown, Inspector General, June 13, 2000, produced as Exhibit E to OIG, *Medicare Reimbursement of Albuterol*, OEI-03-00-00311, June 2000.

Contains Highly Confidential Material – Subject to Protective Order

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | Judge Patti B. Saris |

## REPORT OF E.M. (MICK) KOLASSA, PH.D

### March 21, 2006

### Introduction

Dr. Kolassa is the Managing Partner of Medical Marketing Economics, LLC. Dr. Kolassa is also an Adjunct Associate Professor of Pharmacy Administration in the School of Pharmacy at the University of Mississippi. Dr. Kolassa is the author of *The Elements of Pharmaceutical Pricing*. Attached as Exhibit A is a current Resume of Dr. Kolassa which lists his previous positions in the area of pharmaceutical economics, his professional associations, and the numerous publications authored by Dr. Kolassa. Dr. Kolassa has served as an advisor to various governmental departments and agencies concerning drug pricing issues including the United States Department of Health and Human Services, United States HealthCare Finance Administration, CMS, Food and Drug Administration, Federal Bureau of Investigation and Mississippi Medicaid.

### Prior Testimony

My curriculum vita is appended to this report as Exhibit 1. This includes a list of my testimony as an expert witness at trial or by deposition within the last four years.

### Publications

My curriculum vita is appended to this report as Exhibit 1. This includes a list of all publications I have authored within the preceding ten years.

### Assignment

Counsel for Schering-Plough Corporation, Schering Corporation and Warrick Pharmaceuticals Corporation asked me to analyze and explain the economic issues raised by the claims asserted by the plaintiffs. In addition, I have been asked to explain the basic principles of pharmaceutical marketing and economics. Finally, I have been asked to comment upon the expert opinions offered by Drs. Hartman and Rosenthal. Specifically, I have been asked to address how both Drs. Hartman and Rosenthal fail to address and account for the "real world" of pharmaceutical marketing and economics.

### Materials reviewed and relied upon

In preparing this report, I have reviewed and relied upon information from a number of sources. These include documents produced in the litigation, information from publicly available sources, depositions, and discussions with Warrick and Schering personnel. In addition, I have relied upon my extensive study of the pharmaceutical industry and Medicaid reimbursement programs during my career in pharmaceutical marketing and economics spanning more than 25 years.

*Compensation*

For my services in this matter, Schering-Plough and Warrick are compensating me at $750.00 per hour.

*General subject areas of opinions*

In giving my opinions, I expect to testify on the following general subject matters.

a.      Pharmaceutical economics.

b.      The pharmaceutical marketplace.

c.      The importance of innovator generic drugs as a factor in creating and maintaining market share.

d.      Pharmaceutical pricing.

e.      The definitions, understanding and calculation of prices using the various pharmaceutical pricing terms.

f.      The manner in which drug manufacturers determine, report and calculate prices for pharmaceuticals.

g.      Information available to Medicaid and Medicare programs that enables them to estimate the actual acquisition cost of prescription drugs.

h.      The government's knowledge of pharmaceutical prices reported by drug manufacturers and others.

i.      Price and cost reporting mechanisms in the pharmaceutical marketplace.

j.      The use of pricing terminology within the pharmaceutical marketplace.

k.      Price setting, reporting, and publishing by drug manufacturers.

l.      Price reporting and publishing by third-party price publishing services.

m.      The role of price publishing services in the pharmaceutical marketplace and their relationship to Medicaid and Medicare reimbursement.

n.      The environment in which pharmaceutical prices are negotiated, set, calculated and reported.

o.      Pharmaceutical reimbursement

p.      Health care public policy as it relates to pharmaceuticals, pharmaceutical economics, and pharmaceutical reimbursement.

q.    The differences between brand and generic pharmaceutical pricing and reimbursement policy and the manner in which private third party payers use varying formulas for reimbursement of brands and generics.

r.    The factors that drive pharmaceutical buying decisions, including the fact that generic reimbursement spreads do not drive such purchasing decisions nor do they cause or account for the Defendants' market shares in the Relevant Drugs.

s.    The procedures and policies utilized by third party payers to incentivize the use of generic rather than brand drugs and how the utilization of generics reduces the overall cost of drugs.

t.    How MAC's are and should be utilized to control the cost of pharmaceutical reimbursement.

u.    The knowledge of DEMERCs and their ability to suggest or set a MAC.

v.    How participants in the health care system have lobbied for policies fair and equitable to their respective concerns.

w.    Why Medicaid and Medicare have greatly benefited from generic competition and lower generic prices.

x.    The Medicare and Medicaid Programs' policies and procedures for reimbursing for pharmaceuticals, currently and historically.

y.    How various state Medicaid Programs have controlled their reimbursement for pharmaceuticals.

z.    The Medicaid Rebate Program.

aa.   State and federal efforts to estimate drug acquisition cost in making pharmacy reimbursement decisions.

bb.   Policy reasons behind the reimbursement decisions made by Medicare and Medicaid programs.

cc.   The public policies associated with Medicare and Medicaid reimbursement.

dd.   The lack of causation between the alleged acts of the Defendants and the damages claimed by the Plaintiffs.

ee.   An analysis of the alleged damages claimed by the Plaintiffs.

ff.   I will also review and evaluate the analysis in this matter performed by Plaintiffs' experts including any subject matters or topics that are the subject of his opinions.

gg.   I will rebut the opinions of Plaintiffs' experts where appropriate.

*General opinions*

The general substance of my mental impressions and opinions and a brief summary of their bases are:

a.  AWP, as a sticker, reference or benchmark price, does not generally purport to be an actual price to any segment of the pharmaceutical market. It is not and has not been understood to be an actual price. It is not an "average" of actual prices nor is it a price at which pharmacies buy from wholesalers.

b.  AWP for generic products can vary by manufacturer but is typically set at the launch of the product at least 10% below the AWP price of a therapeutically equivalent branded product. Historically, once set, AWP typically is not reduced.

c.  AWP prices are neither "true" nor "false." They are simply a benchmark or reference price from which other reimbursement rates are determined by a third party payor. The third party payor chooses how much and when to discount off of AWP. AWP is not understood to be reflective of actual price transactions.

d.  For decades the pharmaceutical industry and government regulators have known that AWP is generally significantly higher than actual pharmaceutical contract prices in the marketplace.

e.  The federal government has failed to publish any meaningful definition of its pricing terms used for reimbursement during the relevant time period of the claims asserted. There are no state or federal laws or regulations as to when or how an AWP should be published, whether it must be published and/or when it should be adjusted, changed or updated.

f.  Government authorities have had reason to be aware of the fact that discounts off of AWP are available in the marketplace, and in fact have sources of information indicating the existence of discounted pricing available to them.

g.  WAC is a well-understood industry term meaning the manufacturer's invoice price to wholesalers, essentially a list price.

h.  WAC, as a list price, does not purport to reflect special deal terms, discounts, rebates, or chargebacks to wholesalers or other classes of trade in the pharmaceutical industry.

i.  There is no state or federal law or regulation that requires Medicaid programs to actually use AWP as a method to establish reimbursement rates.

j.  To the extent that Medicare used AWP or WAC in their reimbursement formulas, Defendants did not cause the alleged damages asserted by the Plaintiffs and their experts.

k.   So-called "spread" is a factor that contributes to providers' gross margins, a concept essential to profitability in sales industries. . Government regulators generally know there is a "spread" and, in fact, create and allow such spreads to be paid to providers to cover their costs and insure access to the various programs. Spreads vary significantly for generic drugs, and there is no uniform "expectation" in the marketplace as to specific amounts of spread.

l.   Given the nature of Medicaid, Medicare and private payor reimbursement, the existence of an adequate profit margin for providers is essential if generic products are to be introduced or survive against their branded counterparts in a competitive market.   This furthers valid policies by encouraging the dispensation of generic drugs and overall cost savings.

m.   Given that participation in government programs by providers is voluntary and yet essential if the goal of providing necessary medications to patients is to be realized, an adequate profit margin must be part of the reimbursement process and is indispensable to assure access to medications.

n.   The dispensing of generic drugs operates to reduce overall costs of healthcare, over time, because such drugs are less expensive than their branded counterparts and thus drive down overall costs through price competition.

o.   The Medicaid and Medicare reimbursement systems have not purported to capture the variability of drug price discounts negotiated in the marketplace.

p.   The failure of Medicaid and Medicare authorities to adopt a practice of using fully discounted contract prices in their formula reflects their policy to use the product ingredient cost as a compensatory component of the reimbursement to subsidize pharmacies to assure their continued voluntary participation in the Medicaid and Medicare programs.

q.   Medicaid and Medicare authorities have not used actual acquisition costs as a measure of product reimbursement.

r.   As between a manufacturer, a wholesaler and a retail pharmacy, the pharmaceutical manufacturer is least able to estimate the pharmacy's actual acquisition cost.

s.   Contract prices are not standardized in the pharmaceutical industry but are variable depending, among other things, on the leverage of the purchaser or its representative, the buying relationship, the nature of the purchase transaction, and the extent and volume of the products purchased over time.

t.   The manufacturer's contracts with its customers reflect post-market deal terms that are often not known or knowable at the time the product is initially sold.

u.   AMP represents an average manufacturer's price reflecting the effect of certain deal terms negotiated in the marketplace, such as discounts, rebates, and

chargebacks. WAC and AMP are pricing concepts distinct and different from AWP.

v.    Actual contract prices can be so numerous that updating them in reports to Medicaid authorities on each generic product would be a continuous and unrealistically onerous exercise for a manufacturer or regulatory entity.

w.    AMP can easily be approximated from the generic manufacturer's OBRA-mandated rebate or publicly available VA prices.

x.    State and federal regulators control the amount of reimbursements to be paid, not the pharmaceutical companies.

y.    After Medicare began utilizing ASP as the basis of reimbursement, it implemented a substantial dispending fee for albuterol. This increase oftentimes results in cost increases to Medicare (and to the patient).

z.    Medicaid and Medicare programs could have used IMS data rather than AWP data from First Databank. If the programs would have utilized IMS data, they would have been able to better estimate the actual acquisition cost by a retail pharmacy.

aa.    I will also address (i) the dynamics, variability, and conventions of the drug purchasing process, including factors such as generic product differentiation and generic product and pricing competition, (ii) the economics of the pharmaceutical industry, including gross and net margins of pharmacies generally and as they relate to reimbursement issues, and (iii) public and political policies impinging on and constraining Medicaid and Medicare reimbursement practices, including necessary provider participation and patient access.

bb.    I will explain the structure of the pharmaceutical industry including, without limitation, Defendants' sales methods, channels of distribution and structure operation and control of governmental reimbursement systems.

cc.    Wholesaler chargebacks, rebates, allowances, performance incentives and adjustments are different in their natures, purposes, calculations and effects on business. Many of these adjustments and incentives are calculated and awarded long after sales have occurred, making their immediate reporting impossible and their precise effects incalculable.

dd.    Federal and state government programs have long known prices in pharmaceutical publishing services do not reflect actual transaction prices. Nearly all of these programs obtain their pricing information from persons or entities other than the drug manufacturers.

ee.    None of the Defendants gained or maintained market share as a result of fraudulent activities or practices.

ff.  I will also offer opinions rebutting those of the Plaintiffs' expert witnesses where appropriate.

gg.  My opinions are based on my extensive study of the pharmaceutical industry and Medicaid reimbursement programs during my career spanning more than 25 years, my review of depositions, pleadings, data and other evidence furnished in connection with this case, and my review of the opinions presented by the Plaintiffs' experts

hh.  The bases for of my impressions and opinions are the documents reviewed by me in this litigation as well as my years of education and experience in the pharmaceutical industry.


_____
E.M. (Mick) Kolassa

3/21/06
Date