# EXHIBIT 17

DRAFT

THE COMPLICATED HISTORY OF MEDICAID REGULATIONS

ON DRUG REIMBURSEMENT

Robert B. Helms, Ph.D.
Assistant Secretary for Planning and Evaluation

Department of Health and Human Services

Talk delivered at "Symposium on the New Medicaid
Regulations on Drug Reimbursement"

September 28, 1987

HHC902-1078

F

Dealing with the proper policy towards prescription drug reimbursement has been one of the most perplexing and time-consuming regulatory efforts that the Department of Health and Human Services has undertaken in recent years.  Although the major impetus for regulation in this area has been Federal budget savings, the amounts involved are relatively small compared to initiatives in other areas such as hospital reimbursement.  The time and attention we have spent on this issue have been greatly disproportionate to the direct Federal budgetary stake.

I think that this time has been well spent, however, given the complex effects of Federal policy in this area.  Drug reimbursement policy affects the financial health of tens of thousands of small businessmen, intervenes in a highly competitive market (a rarity in the health care industry), intrudes on the physician/pharmacist/patient relationship, affects the economics of pharmaceutical research and manufacturing, and sets the terms for the administration of one-half of all the claims paid under the Medicaid program.  In addition to these direct effects, Federal rules can, and to some extent have, provided a "model" which private insurers follow.

As you know, the first major Federal regulation of drug reimbursement was put in place in 1975:  the "MAC/EAC" program.  This regulation was a high priority of then HEW Secretary "Cap the Knife" Weinberger.  It was issued during a time of ferment over repeal of state anti-substitution laws, and represented a

Page 1

HHC902-1079

major Federal endorsement of the therapeutic value of generic versions of off-patent drugs.  Little attention was paid to several highly unusual features of the regulation:  its highly detailed requirements for state reimbursement (far more prescriptive than in any other regulation regarding Medicaid payment), and its use of an administered price system based on wholesale costs.

High hopes were held for the 1975 regulation.  It was expected to save about $50 million a year (over $100 million in today's dollars) through generic substitution.

The reality was somewhat different.  Several years ago HCFA estimated that total multi-source savings were on the order of $10 million a year, about 10% of the original goal.  At least one study estimated that savings for single-source drugs under the EAC program were so small that they were probably equaled by the administrative costs.

And, many have argued, the MAC/EAC program imposed hidden costs which far outweighed its nominal benefits.  Everyone agrees now that the MAC process itself was all but unworkable.  Those of you who opposed the program may not have viewed this as a bad thing, but the observed result was clear.

In the face of widespread complaints from the pharmacy community, in 1982 former Secretary Schweiker appointed a Task Force to

Page 2

HHC902-1080

review the situation.  I had the dubious honor of chairing that
group.  We held several hearings at which some of you testified,
and found that the only unanimous sentiment was dislike of the
existing regulation.  Some of the problems we identified were:

> o  the clear unworkability of the MAC process;

> o  arbitrary and unfair results, such as the use of very low
> generic prices for products which were not in fact widely
> available at those prices;

> o  disruption of regular purchasing channels; and

> o  artificiality of both Red Book prices for some products
> and dispensing fee surveys.

I have brought with me a "Far Side" cartoon which I think
illustrates both the situation we faced and some of the choices
we subsequently considered in seeking to design reforms.
[copies on the tables, or to pass out]

The Task Force identified and recommended a series of relatively
minor reforms which could be implemented, including abolition of
an internal HHS Pharmaceutical Reimbursement Board and placing
responsibility within the Health Care Financing Administration,
and replacing a cumbersome public hearing process on each drug
with a more streamlined approach.  We did not, however, recommend

Page 3

HHC902-1081



HHC902-1082

tampering with the basic structure of the regulation.  We duly
presented these recommendations to then-Secretary Heckler.

Over the next two years, several things ocurred which had a
significant effect on subsequent events:

> o  many states created or expanded so-called "mini-MAC"
> programs to cover more multi-source drugs (HHS had placed a
> hold on new MAC limits pending implementation of Task Force
> Reforms);

> o  after many years of impasse, the Congress passed the
> "Drug Price Competition and Patent Term Restoration Act"
> which greatly eased the entry of generic competitors to a
> large number of post-1962 drugs coming off patent, including
> such heavyweights as Valium;

> o  the Inspector General of HHS issued a report claiming
> that published wholesale prices were on average about 16%
> higher than prices actually paid, and that upwards of $50
> million a year in single-source savings could be obtained.
> This report was followed by a sporadic effort to encourage
> states to create a new set of surveys covering wholesale
> prices, and a crescendo of complaints over both the validity
> of the IG estimates (the report exaggerated somewhat the
> discrepancies in prices) and its failure to recognize that
> many states had deliberately held down dispensing fees as a

Page 4

HHC902-1083

quid pro quo for known "fat" in published wholesale prices;
and

o   the Congress entered the dispute for the first time,
reflecting concern over a substantial rise in drug prices
after many years of below-inflation increases.  Again, I had
the dubious honor of sitting in a key chair; this time in
front of Chairman Waxman.

These events not only delayed implementation of the Task Force
reforms but led us to consider further whether more fundamental
reforms should be made.  This deliberation was aided by two
internal HHS developments:

o   staff developed the "PhIP" concept, a super-simplified
method of encouraging substitution.  PhIP's "150% of the
lowest priced generic wholesale price, plus dispensing fee"
had two major economic implications--the possibility of
extra profits for pharmacists who sought out the lowest-
priced generic and, as a result, potentially substantial
effects on the pricing and manufacturing of generics
themselves; and,

o   in partial response to the problems and vistas opened up
by the PhIP idea, which circulated informally for months,
discussions with retail pharmacy representatives led staff
to develop another and even more radical "CIP" idea--

HHC902-1084

reimbursement of both single- and multiple-source drugs
based primarily on retail prices, with total elimination of
the EAC system.  The essence of the CIP proposal was to take
advantage of competitive market forces which clearly
dominated the sale of pharmaceutical products.

During this period, and the subsequent rule-making, we were ever
cognizant of other complications:

    o  the Medicaid statute requires that covered services be
readily available to clients.  For drugs, neighborhood
access and hence participation by the majority of pharma-
cists is therefore most important;

    o  Medicaid is a cooperative Federal-State program.  By law
and tradition, states have great flexibility in choosing
what services to cover and how to pay for them.  MAC/EAC is
a "limits" regulation and all other regulations of this type
give states great discretion provided that overall spending
is constrained;

    o  The pharmacy community has many diverse interests, some
similar but some potentially conflicting.  Obviously,
predominantly research-oriented firms do not have the same
perspective on substitution as predominantly generic houses.
Similarly, policies can affect chain and independent
pharmacies quite differently, reflecting the somewhat

Page 6

HHC902-1085

different cost structure and services of different types of
store; and

o  administerability--the states and the pharmacies have a
great deal of time, money, and expertise committed to the
MAC/EAC system.  Major changes could be most disruptive and
require years to implement.

In the event, we promulgated a <u>proposed</u> rule in the summer of
1986.  This rule advanced three major options--MAC reform, PhIP,
and CIP--and under each option our intention to increase state
flexibility.  Before and during the rule-making process we
consulted extensively with all of the major affected interests,
prepared internal analyses and studies, and went through a
thorough process of analyzing options.  We sought and got
Department of Justice (antitrust division) and FTC comments as
well.

While I don't want to get into all the nuances of these comments
and what we learned, it is fair to say that two things were
clear:  no one option commanded the endorsement of all the key
interests, and every option had significant problems.  CIP, for
example, was in one form or another endorsed by everybody but the
states; however, the agreement in principle did not extend to the
actual details of implementation.

One additional complicating factor arose because the Office of

Page 7

HHC902-1086

Management and Budget for the first time evidenced an interest in the subject.  The OMB perspective is first and foremost budgetary, but OMB also has substantial interest in both regulatory reform and federalism.  Regardless, OMB pressed us for an early and budget-saving final rule.

As you know, the _final_ rule we published this summer surprised many.  The basic reform it advanced was in one respect fairly radical:  we chose to abolish all requirements for a particular payment method, leaving this up to the states.  This primarily reflected the inconsistency of the old rule with the state flexibility premise of the Medicaid program, problems we identified in all the options we had advanced, and our growing realization that while we didn't like MAC/EAC, we didn't have a clearly superior alternative.  Actually, this should not have been a surprise because we had originally proposed to give the states much greater flexibility regardless of preferred option.

As a second big reform, we did impose overall aggregate spending limits.  Unlike MAC/EAC these limits were not set drug-by-drug but on an overall basis.  Figuring out how to do this was the hardest part of the decision because we didn't want those limits to dictate a payment method, and did want them to be workable. For multiple-source drugs we finally chose something that vaguely resembles the PhIP proposal, primarily because it was equally or even more simple to measure compliance as an aggregate limit as on a drug-by-drug basis.  However, and I want to emphasize this,

Page 8

HHC902-1087

nothing in the final rule requires or even encourages states to pick the lowest price generic as the basis for reimbursement for particular drugs.  In fact, the limit we adopted provides maneuver room for a great variety of reimbursement approaches. The only thing we insist on is that as prudent purchasers we will not reimburse states the full amount of leading brand prices for drugs with multiple and lower-priced competitors evaluated by FDA as therapeutically eqivalent.  This, of course, was no surprise at all and had been assumed in the original Task Force report and all subsequent proposals.

For single-source drugs the problem of setting an aggregate limit was harder.  The basic problem is that we had no simple metric. Whatever the virtues of competitive market prices, they don't appear neatly printed in a Red Book or Blue Book.  Hence, if we were to use competitive prices as an aggregate limit states might have had to initiate new data collection scarcely different from the steps required to implement the CIP option.  After consider- able back and forth within the Department and with OMB, we finally decided to benchmark the aggregate limit against what the states would spend if they used the EAC approach.  This at least had the virtue of a familiar baseline.

In one respect I am disappointed with the final rule.  I would have liked to see a ringing endorsement of a healthy, competitive market.  One the other hand, we did lift a series of unnecessary impediments to efficient and effective drug reimbursement and

Page 9

HHC902-1088

went farther than would have been deemed likely several years
ago.

There is also an important point about reality.  Regardless of
what we decided--even if we had selected CIP as the preferred
payment method--the great majority of the states would have
continued to administer "mini-MACs" and an EAC-like system.  The
states' preferred practices work, save money, and can be fine-
tuned to reflect local conditions.  Bureaucratic inertia is a
powerful force and we never sought to impose a new system against
the states' desires.  Realistically, much of the debate was over
symbolism, not over what was going to happen in the real world.

Indeed, as several PMA companies argued during the public comment
process, we were going to achieve big savings from generic
substititution even if we had no rule at all, simply because of
the product competition which is occurring right now and
foreseeable over the next few years.  Viewed in this light, our
final rule does not create brand new constraints, but is simply
an outer envelope guaranteeing that the public treasury will
benefit from market forces.

HHC902-1089

L