# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: PHARMACEUTICAL INDUSTRY | ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | CIVIL ACTION:  01-CV-12257-PBS |
| | ) | |
| | ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO | ) | |
| *U.S. ex rel. Ven-A-Care of the Florida Keys,* | ) | Chief Magistrate Judge Marianne B. Bowler |
| *Inc. v. Abbott Laboratories, Inc.*, | ) | |
| No. 06-CV-11337-PBS | ) | |


## ABBOTT LABORATORIES, INC.'S REPLY MEMORANDUM
## IN SUPPORT OF ITS MOTION TO DISMISS

R. Christopher Cook
David S. Torborg
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001-2113
Telephone:  (202) 879-3939
Facsimile:  (202) 626-1700

Daniel E. Reidy
James R. Daly
Tina M. Tabacchi
Brian J. Murray
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois  60601
Telephone:  (312) 782-3939
Facsimile:   (312) 782-8585

*Counsel for Defendant*
*Abbott Laboratories, Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

ARGUMENT ........................................................................................................................ 3

I.   The False Claims Act Counts Are Fatally Deficient And Must Be Dismissed
     Under Rule 12(b)(6).................................................................................................. 4

     A.   Plaintiffs Fail To Allege That Abbott's Prices Reported To The
          Compendia Were "False" (Counts 1 and 2)................................................. 4

          1.   Plaintiffs Have Not Adequately Alleged Falsity. ....................... 4

          2.   Ambiguity In The Meaning Of AWP Precludes Liability Here. ............... 6

     B.   Plaintiffs Do Not Plead A False "Claim" (Counts 1 and 2) Or That Abbott
          "Presented" Or "Caused To Be Presented" Any Such Claim (Count 1). ............. 8

     C.   Government Knowledge Negates Both Falsity And Scienter (Counts 1
          and 2). ......................................................................................................... 10

     D.   Reimbursements Paid By The Government To Healthcare Providers Are
          Not "Kickbacks" And Cannot Support An FCA Claim (Count 1). .................... 12

II.  Plaintiffs' Common Law Counts Also Must Be Dismissed. ........................................... 13

     A.   Plaintiffs' Fraud Claim (Count 4) Fails For Lack Of A False Statement. ........... 13

     B.   Unjust Enrichment Fails Because It Is Premised On Other Wrongs, And
          Because Any Benefit Allegedly Obtained By Abbott Was Far Too
          Remote. ....................................................................................................... 14

III. At A Minimum, Counts 1, 2, And 4 Fail To Satisfy Rule 9(b). ..................................... 15

CONCLUSION.................................................................................................................... 15

## TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*In re Average Wholesale Price Litigation*, 339 F.Supp.2d 165 (D. Mass. 2004) .......................... 14

*Beacom v. EEOC*, 500 F. Supp. 428 (D. Ariz. 1980) ................................................................. 5

*Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101 (7th Cir. 1984) ............................................ 4

*Cook County v. U.S. ex rel. Chandler*, 538 U.S. 119 (2003) ........................................................ 9

*Dahl v. Sec'y of U.S. Navy*, 830 F. Supp. 1319 (E.D. Cal. 1993) ................................................. 4

*Doyle v. Hasbro, Inc.*, 103 F.3d 186 (1st Cir. 1996) .................................................................. 6

*Greci v. Birknes*, 527 F.2d 956 (1st Cir. 1976) ........................................................................ 4

*Guyana Telegraph & Telegraph Co. v. Melbourne International Committees,
Ltd.*, 329 F.3d 1241 (11th Cir. 2003) ............................................................................... 14

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 766 (4th Cir. 1999) ............................. 5

*In re Lupron Marketing and Sales Practices Litigation*,
295 F.Supp.2d 148 (D. Mass. 2003) .......................................................................... 14, 15

*Massachusetts v. Mylan Laboratories*, 357 F.Supp.2d 314 (D. Mass. 2005) .......................... 13, 14

*McGrath v. MacDonald*, 853 F. Supp. 1 (D. Mass. 1994) ......................................................... 4

*Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001) ........................................................................ 12

*N. Heel Corp. v. Compo Industrial, Inc.*, 851 F.2d 456 (1st Cir. 1988) ...................................... 4

*Pence v. U.S.*, 316 U.S. 332 (1942) ..................................................................................... 13

*Stasiukevich v. Nicolls*, 168 F.2d 474 (1st Cir. 1948) ............................................................... 4

*U.S. ex rel. Clausen v. Laboratories Corp. of America, Inc.*,
290 F.3d 1301 (11th Cir. 2002) ..................................................................................... 8

*U.S. ex rel. Drescher v. Highmark, Inc.*, 305 F.Supp.2d 451 (E.D. Pa. 2004) ............................. 10

*U.S. ex rel. Franklin v. Parke-Davis*, 2003 WL 22048255 (D. Mass. Aug. 22, 2003) .......... 5, 9, 10

*U.S. ex rel. Gathings v. Bruno's, Inc.*, 54 F. Supp. 2d 1252
(N.D. Ala. 1999) ....................................................................................................... 7

## TABLE OF AUTHORITIES
### (continued)

Page

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220 (1st Cir. 2004)......................9

*U.S. ex rel. Kinney v. Hennepin County Medical Ctr.*,
    2001 U.S. Dist. LEXIS 25475 (D. Minn. Aug. 22, 2001) .................................10

*U.S. ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148
    (2d Cir. 1993)..........................................................................................................11

*U.S. ex rel. Oliver v. The Parsons Co.*, 195 F.3d 457 (9th Cir. 1999)...........................7

*U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of America, Inc.*,
    238 F.Supp.2d 258 (D.D.C. 2002) .......................................................................13

*U.S. v. Greber*, 760 F.2d 68 (3rd Cir. 1985) ................................................................12

*U.S. v. Island Park*, 888 F. Supp. 419 (E.D.N.Y. 1995)................................................5

*U.S. v. Killough*, 848 F.2d 1523 (11th Cir. 1988)........................................................12

*U.S. v. Martin Marietta Corp.*, 894 F. Supp. 218 (D. Md. 1995)...................................5

*U.S. v. Mittal*, 1999 WL 461293 (S.D.N.Y. July 7, 1999)...........................................12

*U.S. v. Napco, Inc.*, 835 F. Supp. 493 (D. Minn. 1993)..............................................7, 8

*U.S. v. Neifert-White Co.*, 390 U.S. 228 (1968)...........................................................9

*U.S. v. Raymond & Whitcomb*, 53 F.Supp.2d 436 (S.D.N.Y. 1999) ..............................9

*U.S. v. Ruttenberg*, 625 F.2d 173 (7th Cir. 1980) .......................................................12

*U.S. v. Zannino*, 895 F.2d 1 (1st Cir. 1990)..................................................................4

*U.S. ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc.*,
    400 F.3d 428 (6th Cir. 2005) ...............................................................................12

*Varney v. R.J. Reynolds Tobacco Co.*, 118 F.Supp.2d 63 (D. Mass. 2000) .................15

### STATE CASES

*Collins v. Huculak*, 783 N.E.2d 834 (Mass. App. Ct. 2003)........................................11

*Doe v. Dilling*, __ N.E.2d __, 2006 WL 2528439 (Ill. App. Ct. Sept. 1, 2006) ............11

**TABLE OF AUTHORITIES**
(continued)

**Page**

**FEDERAL STATUTES AND RULES**

31 U.S.C. §§ 3729(a) ...................................................................................................9

42 U.S.C. § 1396r-8 .....................................................................................................6

Rule 9(b) ..............................................................................................................3, 6, 15

Rule 12(b)(6)......................................................................................................4, 10

## PRELIMINARY STATEMENT

The U.S. Government has known for over 40 years that AWP, reported by various industry compendia for pharmaceutical drugs, does not represent an actual acquisition cost.  In fact, the Government – *with* that knowledge – is the very architect of the Medicaid and Medicare reimbursement schemes making use of the published AWPs of which Plaintiffs now complain. The Government purposely implemented AWP-based reimbursement for various policy reasons – for administrative convenience, to accomplish cross-subsidization (that is, reimbursement for drugs at more than their cost to offset chronic under-reimbursement to health care providers for services), and to ensure sufficient provider participation in the Medicare and Medicaid programs. Plaintiffs cannot now claim to have been duped by Abbott; any alleged flaws in its chosen system of AWP-based reimbursement are (and were) of the Government's own making.

Yet, in this suit, the Department of Justice ("DOJ") contends that AWP should have been acquisition cost.  Nor is this the first time that the Executive Branch has tried to reinvent the pharmaceutical reimbursement system, against the will of Congress:

- In 1990, in response to Executive Branch discussion of lowering reimbursement for drugs through Medicaid, Congress imposed a 4-year moratorium on any change in reimbursement.  (App. A[1], Tab 12 § 1927(f)(1).)

- In 2000, the Secretary of HHS was considering moving away from reliance on compendia because AWP was not an acquisition cost; in response, 89 members of Congress wrote to the Secretary to express their concerns with her plan to supplant compendia-published AWPs with market-based "catalogs and group purchasing organization price lists," explaining that such a move failed to "take into account the fact that [providers] are chronically underpaid for their drug administration services . . . ."  (App. A, Tab 23.)  They stated that, in making AWP a statutory term in 1997, they meant to "instruct[] [HHS] to base reimbursement for drugs on 95% of AWP, a term widely understood *and indeed defined by [HHS] manuals to reference amounts reflected in specified publications*."  (*Id.* (emphasis added.))  They found it "disturbing that [HHS] would . . . seek to circumvent those congressional actions by

---

[1] Abbott Laboratories, Inc.'s Memorandum Of Law In Support Of Its Motion To Dismiss is cited "Mem."; Appendix A in support of that motion is cited "App. A"; Plaintiffs' Opposition (Dkt. No. 3103) is cited "Opp."; and the Government's amicus brief in MDL 1456 (Dkt. No. 3104) is cited "Amicus".

redefining AWP" – and especially through a "unilateral declaration of a new definition of AWP, with no regulatory process . . . ." (*Id.*)

- Later in 2000, Congress commissioned a report analyzing the difference between AWP and market prices and whether Medicare's payment method should be revised consistent with the need for cross-subsidization and patient access to care. (App. A, Tab 25 App. F § 429(a)(1)(A)(iii); *id.* § 429(a)(3)(B).) Congress barred HHS from changing its reimbursement methodology until the report was done. (*Id.* § 429(c).)

Thus, Congress decided *not* to change its policy of AWP-based reimbursement during the relevant time – or indeed, for ten years after this suit was filed – because, as Plaintiffs admit, doing so without addressing *both* drug *and* services reimbursement would have "risk[ed] disrupting important government programs or objectives." (Opp. at 25[2]; *id.*) That is why, when Congress *did* move to acquisition cost-based reimbursement for pharmaceuticals for Medicare in 2005, it simultaneously *lowered* reimbursement for the drugs themselves and *increased* reimbursement for providers' services.

Undeterred, the DOJ seeks to use its reinvented AWP definition to extract from Abbott (not the providers who received it) money the Government spent pursuing its policy objectives. Specifically, the DOJ contends that because "hindsight may have shown that some of the data in the compendia were not reliable indicia from which to estimate supplier acquisition costs for certain drugs" (Amicus at 2), the Government was "defrauded" by compendia-published AWPs for four families of Abbott multi-source products. At nearly every turn, however, the DOJ must try to stretch existing law – or flat out make up new law – in its quest to show (in "hindsight") that Abbott did something wrong.

Most strikingly, each of the complaint's claims requires the DOJ to plead and prove that Abbott reported false information, and that Abbott knew (and the Government did not) that the

---

[2] (*E.g.*, App. A, Tab 29 at 1108 (Federal Register notes that the change would result in the drug reimbursement for certain drugs to decrease by $510 million in the first year, but reimbursement for services in connection with those drugs would increase by $510 million, resulting in "virtually no net change in total Medicare payments for" providers).)

information was false.  That is just not so.  The complaint itself, and the substantial public record, demonstrate that no one – certainly not the Government – thought AWP was an acquisition cost.  Indeed, Plaintiffs concede that there is no "'one' particular acquisition cost" that AWP was supposed to be (Opp. at 13), and that, since at least 1997, "published AWPs had strayed from being a reliable data source for acquisition costs."  (Amicus at 18.)  How could Abbott have reported "false" prices, when even the Government cannot identify what the "true" prices (let alone AWP) should have been?  Plaintiffs cannot simply assume that problem away and urge that this issue "is really one of damages rather than liability and will be informed by . . . discovery."  (Opp. at 12.)

Nor do Plaintiffs explain how Abbott could have used allegedly "false" AWPs (as reported by the compendia) to harm the Government or gain market share, since the four families of Abbott products at issue here are all multi-source drugs.  *All* multi-source drugs within a J-Code, whether Abbott's or someone else's, were reimbursed at the same level – the provider's charge, or a *median* AWP for *all* sources, or the AWP published for the lowest brand name drug.  Neither the complaint nor Plaintiffs' brief explains how any provider's claim resulted in reimbursement based on an AWP associated with an *Abbott* product.  (Mem. at 3-5.)

Plaintiffs' complaint should be dismissed in its entirety.  At the very least, Plaintiffs should be required to replead Counts 1, 2, and 4 to comply with Rule 9(b).

## **ARGUMENT**

Faced with a deficient complaint, no law on point, and 40 years of public record contrary to their position, eleven of which have passed since this action was filed against Abbott, Plaintiffs take two predictable but erroneous approaches in their Opposition.  *First*, Plaintiffs ask the Court to ignore the history and focus only on their claims of fraud.  The request, however, is

unfounded.[3]  *Second*, Plaintiffs attempt to backfill their complaint with their Opposition.  That,

too, is improper.  *See Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)

("[I]t is axiomatic that a complaint may not be amended by briefs in opposition to a motion to

dismiss."); *see also McGrath v. MacDonald*, 853 F. Supp. 1, 3 (D. Mass. 1994) (citing *Car

Carriers*, 745 F.2d at 1107).  Plaintiffs' complaint should be dismissed.

## I.     THE FALSE CLAIMS ACT COUNTS ARE FATALLY DEFICIENT AND MUST BE DISMISSED UNDER RULE 12(b)(6).

### A.     Plaintiffs Fail To Allege That Abbott's Prices Reported To The Compendia Were "False" (Counts 1 and 2).

#### 1.     Plaintiffs Have Not Adequately Alleged Falsity.

Because falsity is an element of FCA liability, Plaintiffs must plead and prove that the

published AWPs for Abbott's products were "false" – *i.e.*, they deviated from the "true"

measure.  (Mem. at 11).  The complaint, however, fails to do so.  In response, Plaintiffs argue

that because the FCA reaches both "false" and "fraudulent" conduct, they need only show that

the AWPs were fraudulent.  That is a non-starter, however, for falsity is still required for

---

[3] The Court should take judicial notice of the public records attached in Appendix A to the Motion to Dismiss.  Plaintiffs concede that the Court can take judicial notice of certain of the public records, but fail to identify which others it considers objectionable and why.  (*See* Opp. at 3 n.2 ("almost none of the reports . . . should be considered").)  This is not sufficient to present the issue for the Court's consideration.  *U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly.").

In any event, Plaintiffs' contention is meritless.  Each of the public reports in Appendix A is one or more of the following:  (1) legislative history (*e.g.*, Tabs 3-4, 12-13, 16, 21, 25, 29, 31); (2) committee reports (*e.g.*, Tabs 8, 17-18); or (3) agency construction of statutory terms (*e.g.*, Tabs 1-2, 5-7, 9-11, 14-15 19-20, 22-24, 26-28, 30).  Accordingly, they are judicially noticeable.  *See N. Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 468 (1st Cir. 1988) (OSHA regulations were subject to judicial notice); *Greci v. Birknes*, 527 F.2d 956 (1st Cir. 1976) (taking judicial notice of State Department internal memorandum); *Stasiukevich v. Nicolls*, 168 F.2d 474, 479 (1st Cir. 1948) (judicial notice of official report of a legislative or congressional committee is proper); *Dahl v. Sec'y of U.S. Navy*, 830 F. Supp. 1319 (E.D. Cal. 1993) (taking judicial notice of President Clinton speech).  Plaintiffs' reliance on this Court's statements during the hearing on the Motion to Dismiss California's State FCA Case is misplaced, because those actually militate toward judicial notice.  (*See* Hr'g Tr. at 31:12-16) ("And I need the legislative – it's just run-of-the-mill, routine judge kind of stuff:  *You look at legislative history.  You look at committee reports.  You look at what an agency construes the statute to be.*  That doesn't mean transforming it into summary judgment.") (emphasis added).

"fraudulence."[4]  Plaintiffs then revert to the (incorrect) syllogism of their complaint:  (1) AWP is an "actual acquisition cost," (2) Abbott's reported prices did not equal that cost, so (3) Abbott's prices must therefore be "false."  (Opp. at 10-11.)  But that syllogism fails at the first step.  No federal regulation or statute governing the reimbursement of the multi-source drugs at issue requires the AWP reported by the compendia for Abbott's products to be a "market price," nor, indeed, is there even a requirement that Abbott report prices to the Government or anyone else.  *See U.S. v. Martin Marietta Corp*., 894 F. Supp. 218, 225 (D. Md. 1995) ("There is no freestanding duty to provide accurate information to the Government.  To the extent a duty exists in this case, it comes from the federal regulations . . . .").

        Moreover, to believe that the Government really thought that AWP should be the "actual market price[]" of those drugs[5], whatever that means – or at least *a* market price, if not "'one' particular acquisition cost," whatever that means (Opp. at 11, 13) – would require the Court to:

- Ignore four decades of public records making clear that the Government knew that AWP was *not* an acquisition cost (*see* Mem. at 5-9, 11-13);

- Ignore Congress having repeatedly – by enacting legislation – forbidden the Secretary of HHS from implementing changes to Medicare and Medicaid reimbursement that

---

        [4] Plaintiffs' cited authorities are not to the contrary.  In *U.S. ex rel. Franklin v. Parke-Davis*, this Court merely recognized that an allegation of a course of fraudulent conduct causing the submission of ineligible (*false*) claims to Medicaid may give rise to FCA liability.  2003 WL 22048255, *2 (D. Mass. Aug. 22, 2003).  This Court further specified the necessity of showing a "false claim," irrespective of whether the underlying "cause" of the claim is fraudulent.  *Id*. at * 2.  Likewise, in *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 766, 788 (4th Cir. 1999), the court recognized that in the government contract context, FCA liability may attach even if submitted claims were not technically false, because in such cases "[t]he initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal – payment of government money to persons who had caused it to be defrauded."  *Id*. at 787-88.  *Harrison* therefore does not apply here, where there is no allegation that Abbott has violated a contractual relationship with the Government.  *U.S. v. Island Park*, 888 F. Supp. 419 (E.D.N.Y. 1995), and Plaintiffs' other cases involving bid-rigging or price collusion (Opp. at 8-9), are similarly inapposite.

        [5] In fact, Plaintiffs are estopped from ascribing a meaning to AWP flatly at odds with 40 years of judicially-noticeable history.  (Mem. at 11-12.)  Plaintiffs argue there can be no estoppel against the Government absent "affirmative misconduct by government agents that was reasonably relied upon by a party."  (Opp. at 13.)  The Government has known the true nature of AWP for over 40 years (and indeed, has had this case under seal for over a decade), yet is now claiming to have been "defrauded" by AWPs not being actual acquisition cost.  (Mem. at 5-9; *see generally* App. A.)  If this is not "affirmative misconduct" on the part of the Government, what is?  *E.g.*, *Beacom v. EEOC*, 500 F. Supp. 428, 438-40 (D. Ariz. 1980).

would have resulted in reimbursement of pharmaceutical products at acquisition cost (App. A, Tabs 12, 23, 25);

- Ignore years of reports from the HHS-OIG recognizing that pharmaceutical products were being sold for less than the Government was reimbursing (*E.g.*, App. A, Tabs 9, 10 (instructing states in 1989 not to use AWP for Medicaid reimbursement without applying a "significant discount"), 15, 20, 26, & 27);

- Ignore that, because Medicare reimbursement was set at less than AWP after 1997 (AWP minus 5%), and Medicaid reimbursement in various states has long been set at less than AWP with U.S. Government approval, providers would have been reimbursed at less than what they paid – inconsistent with the Government's goal of ensuring sufficient provider participation in these programs (Mem. at 3-4);

- Ignore that the Government has long had, at its fingertips, prices of the products at issue, including the "average manufacturer price," which Abbott reported as part of the Medicaid rebate program, 42 U.S.C. § 1396r-8; (*see* App. A, Tab 12); and

- Ignore that the DOJ even tried publishing its own AWPs for various products in 2000, to drive down pharmaceutical reimbursement – only to have HCFA instruct Medicare carriers not to use them, anticipating Congressional disapproval. (App. A, Tab 24.)

Plaintiffs lack the courage of their convictions, for they ultimately give up trying to define – even in "hindsight" – what the "true" prices or published AWPs should have been. Instead, they proclaim that "the issue of what price Abbott should have reported is really one of damages rather than liability and will be informed by all the pricing and sales information about the drugs at issue that Abbott will have to produce in discovery." (Opp. at 12.) Plaintiffs cite no authority relieving them from alleging falsity to establish FCA liability, and there is none.[6]

### 2.    Ambiguity In The Meaning Of AWP Precludes Liability Here.

At most, Plaintiffs have pleaded that "AWP" was ambiguous, which is fatal to Plaintiffs' FCA counts. (Mem. at 13-15.)[7]  In response, Plaintiffs argue that ambiguity only implicates

---

[6] This also shows why the complaint fails to meet the minimum pleading requirements of Rule 9(b), as discussed *infra*.  *See, e.g.*, *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 194 (1st Cir. 1996) ("Rule 9 imposes a heightened pleading requirement for allegations of fraud . . . [in part] to prevent the filing of suits that simply hope to uncover relevant information during discovery.").

[7] Plaintiffs contend that because, as set forth in their Amicus, "AWP was contemplated and used by both Congress and the Secretary to describe estimates of prices available in the marketplace," and thus a "plain meaning" interpretation of that term is appropriate, the Court "does not have to engage in a complex interpretive exercise with

scienter, and there is no ambiguity because the "inflated" AWPs associated with Abbott drugs are contrary to a "plain meaning" of AWP.  (Opp. at 16.)  Plaintiffs are wrong.  *First*, ambiguity does not go *only* to scienter, and *U.S. ex rel. Oliver v. The Parsons Co.*, 195 F.3d 457 (9th Cir. 1999), does not hold that it does.  In *Oliver*, there was some question whether the defendant reasonably interpreted "unquestionably technical and complex" regulations setting forth non-discretionary accounting standards.  *Id*. at 463.  The Court ruled that even if the Defendant's interpretation was "reasonable" it would not preclude falsity, because the Court in the end had to interpret Federal accounting regulations, and then decide whether the defendant's accounting was done correctly.  *See id.*  Here, though, no regulatory or statutory language defines AWP or requires Abbott to report any particular price to anyone.  *Oliver* does not confine ambiguity to the realm of *scienter* here; it can also go to falsity.[8]

*Second*, Plaintiffs cannot sidestep this ambiguity by "hindsight" interpretations of what AWP should have been.  *See U.S. v. Napco, Inc.*, 835 F. Supp. 493, 498 (D. Minn. 1993) (instructing that the Government may not apply "interpretive afterthought" to disambiguate after the fact).  Plaintiffs' attempt to distinguish *Napco* fails; ambiguity was central to the dispute at issue.  835 F. Supp. at 495 ("At the root of [the] lawsuit" was the parties' "differing interpretations of a relevant statute . . . .").  As in the present case, no statute or regulation

---

respect to the meaning of AWP or any other pricing term."  (Opp. at 16.)  That is not, of course, what Congress intended.  (App. A, Tab 23.)  And, as to the Secretary of HHS, Plaintiffs mischaracterize their own Amicus – which unambiguously states that "nothing in the regulatory history . . . suggest[s] that the Secretary [of HHS] intended to be bound by any particular published [compendia] data."  (Amicus at 13.)

[8] Plaintiffs also fail to distinguish *Cox* and *Gathings*, cases illustrating that ambiguity precludes falsity under the FCA.  Other than a half-hearted swipe at *Gathings* (Opp. at 18 n.8), Plaintiffs do not even try to distinguish the other ambiguity cases Abbott cites.  (Mem. at 15 n.7.)  And even as to *Gathings* Plaintiffs are wrong: while Plaintiffs claim that Abbott quoted *Gathings* "out of context," there, as here, ambiguity required dismissal of an FCA complaint where the defendant's interpretation of an ambiguous term was not foreclosed by federal or state regulation.  *See Gathings*, 54 F.Supp.2d at 1260.  To the extent *Gathings* rested on the court's determination that the ambiguous term was not *inconsistent* with governing regulations, that distinction does not help Plaintiffs here, where there is a complete *absence* of any regulatory definition of AWP.

defined the meaning of the ambiguous term at issue.  *See id.* at 496-97.  And plaintiffs' wide variety of hindsight interpretations only highlight the ambiguity:

- In the complaint, Plaintiffs allege in vague terms that "AWP is used to refer to the price at which a pharmaceutical firm or a wholesaler *sells* a drug to a retail Customer . . . ." (Compl. ¶ 42.)

- In their Opposition, Plaintiffs claim that "AWP was contemplated and used by both Congress and the Secretary to describe *estimates* of prices available in the marketplace." (Opp. at 16 (emphasis added).)

- The Government's Amicus brief states that "the Secretary clearly treated [the compendia's] published prices simply as *a source of* data to be used to set the national AWP for payment purposes"; that HHS-OIG reports demonstrated before 1997 that "the published AWPs had strayed from being a reliable data source for acquisition costs"; and that "there is nothing in the regulatory history to suggest that the Secretary intended to be bound by any particular data." (Amicus at 13, 14, 18.)

Thus, far from offering any clear definition of what AWP was supposed to be, these "interpretive afterthoughts" are squarely inconsistent not only with the four-decades-old public record indicating government awareness of AWP as a sticker price, but also with each other.

> **B.      Plaintiffs Do Not Plead A False "Claim" (Counts 1 and 2) Or That Abbott "Presented" Or "Caused To Be Presented" Any Such Claim (Count 1).**

As the Act's title suggests, a false *claim* is the "*sine qua non* of a False Claims Act violation."  *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002); (Mem. at 15-17.)  Plaintiffs' complaint is devoid of any allegation of a "false claim."  In fact, on its face, Plaintiffs' complaint alleges that health care providers (*not* Abbott) submitted the claims at issue. (Compl. ¶ 33.)  But the providers' claim forms do not contain the published AWPs for Abbott's products, so even if those prices were "false" (and they are not), the providers' claims cannot be false by virtue of those prices.  Plaintiffs admit as much.  (Opp. at 4 (admitting that AWP was merely "a component of the claims process").)  Nor do the Government's actual reimbursement rates reflect the AWPs published for Abbott's products:  the products in this case are all multi-source, and the Government has not alleged (nor could it) that the reimbursement

schemes for multi-source drugs like those at issue here were based on the AWP associated with any *Abbott* drug.  (Mem. at 3-5, 16-17.)[9]

Plaintiffs' contrary arguments cannot withstand scrutiny.  Plaintiffs scrupulously avoid the statutory language underlying their Counts 1 and 2, which covers, in turn, persons who:

- "knowingly present[], or cause[] to be presented, to an officer or employee of the [U.S.] Government . . . a false or fraudulent *claim* for payment or approval"; or

- "knowingly make[], use[], or cause[] to be made or used, a false record or statement to get a false or fraudulent *claim* paid or approved by the Government . . . ."

31 U.S.C. §§ 3729(a)(1) & (2) (emphases added).  Both subsections, of course, require "caus[ation]" of presentation or payment of a "*claim*."  Instead, Plaintiffs declare (with no support) that "the FCA must be read expansively" and that a "fraudulent course of conduct" somehow suffices to establish liability under the FCA in the absence of a "false claim."  (Opp. at 8-10.)  That is wrong, and Plaintiffs' authorities do not say that.[10]

---

[9] Plaintiffs fail to distinguish cases stating in unequivocal terms the requirement that a false *claim* triggers liability under the FCA.  For example, Plaintiffs attempt to distinguish *U.S. ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220 (1st Cir. 2004) on the basis that "the relator in that case did not tie the alleged scheme to the submission of claims."  (Opp. at 6.)  True enough, but that is also true here:  Plaintiffs have not alleged how any supposed scheme of Abbott's was tied to *submission* of provider claims, let alone how any of those claims are *false*. *U.S. v. Raymond & Whitcomb*, 53 F.Supp.2d 436 (S.D.N.Y. 1999), is similarly inapposite; there, the court rejected the defendant's argument that it was not liable under the FCA because a third party mailing agent submitted false statements on its behalf.  *Id.* at 444.  The court recognized, however, the basic requirement that there be a "false claim," and noted that FCA liability extends not only to a party submitting the false claim, but also to a party knowingly assisting in causing the government to pay the false claim."  *Id.* at 444-45 (collecting cases).  Moreover, in that case, it was undisputed that the defendant hired the third party to submit mailing statements on its behalf, and the third party acted on defendant's instructions.  *Id.* at 440.  In this case, Plaintiffs have not alleged such agency.

[10] *U.S. v. Neifert-White Co.* held only that there could be liability under the FCA for fraudulent loan applications, even if loan applications were not technically "claims." 390 U.S. 228, 233 (1968).  *Neifert-White* only addresses what may qualify as a false claim under the FCA; it does mean that a false claim is unnecessary.  Similarly, the holding of *Cook County v. U.S. ex rel. Chandler*, 538 U.S. 119 (2003) is directed not to whether the FCA requires a "false claim," but to whether municipal corporations are "persons" amenable to FCA qui tam actions.  *Id.* at 122.  Citing inapposite dicta does not help Plaintiffs' cause.  *Parke-Davis* is also inapposite.  There, this Court expressly described "the existence of false claims" as the "*sine qua non* of a False Claims Act violation." 2003 WL 22048255, at *2.  This Court denied summary judgment to the defendant because some claims it submitted concededly violated Medicaid regulations restricting off-label use, were ineligible for reimbursement, and, therefore, amounted to FCA "false claims."  *Id.* at *3-4.  This Court did not, as Plaintiffs suggest, broadly state that FCA liability may attach in the absence of "ineligible" claims.  Nor do Plaintiffs even allege (nor can they) that the providers here submitted "ineligible" or false claims.

Finally, even if Plaintiffs had properly alleged "false claims" (they have not), Plaintiffs do not contend that *Abbott* "presented" any such claims.  While Plaintiffs apparently contend that Abbott "caused" false claims to be presented by providers (*id.* at 18), the contention fails because Plaintiffs do not allege that Abbott had any degree of participation in the providers' claims process.  Nor could they.  *See, e.g.*, *U.S. ex rel. Kinney v. Hennepin County Med. Ctr.*, 2001 U.S. Dist. LEXIS 25475 (D. Minn. Aug. 22, 2001).  As Plaintiffs note, this Court has stated that there must be a "a causal connection" between a defendant's actions and the false claims submitted. *Parke-Davis*, 2003 WL 22048255, at *4.  But Plaintiffs have not adequately alleged that Abbott's reported prices were a "substantial factor" in producing any "false claims."  *Id.*; *cf. id.* at *6 (actions that do not "play[] a key role in setting in motion a chain of events that [lead] to false claims" are "irrelevant").[11]  Nor could they because, again, the drugs at issue are multi-source, and Plaintiffs have not pled that any provider was reimbursed based on the AWP published for an Abbott product.  (Mem. at 3-5.)  No case Plaintiffs cite even suggests that the allegations of their pleading are sufficient on this point.

## C.   Government Knowledge Negates Both Falsity And Scienter (Counts 1 and 2).

Even if the providers' claims were "false," and even if Abbott caused their submission (neither is properly alleged), Plaintiffs cannot state a claim because the Government's knowledge of the meaning of AWP, and its intentional adoption of AWP for reimbursement, negate *both* the

---

[11] *Parke-Davis* is not, as Plaintiffs urge, inconsistent with *Kinney*.  Here, as in *Kinney*, the claim forms would be submitted in the same fashion irrespective of any act by Abbott (or, for that matter, any other manufacturer of the multi-source products at issue).  Plaintiffs have not pled otherwise.  (Opp. at 22.)  Moreover, Plaintiffs' reliance on *U.S. ex rel. Drescher v. Highmark, Inc.*, 305 F.Supp.2d 451 (E.D. Pa. 2004), is misplaced; it actually supports dismissal of Count 1.  There, the court cautioned that "the government must not be given *carte blanche* to proceed under the FCA using indirect theories of causation which offer only attenuated links between the parties." *Id.* at 460.  The court found the "tenuous" the Government's theory, which alleged that the defendant insurer improperly denied provider claims, thereby "causing" providers to submit the claims to Medicare for payment.  *Id.* The court only denied defendant's Rule 12(b)(6) motion on the possibility that the government might establish causation through evidence that defendant "*direct[ed]* the provider[s] to submit the claim[s] to Medicare for payment."  *Id.* at 461 (emphasis added).  Plaintiffs have not alleged, much less could they prove, that here.

falsity and *scienter* requirements of the FCA.  (*See* Mem. at 18 (collecting cases).)[12]  Although Plaintiffs concede that Government knowledge is relevant to Abbott's scienter, they erroneously assert that it is not a defense to falsity.  (Opp. at 23.)  Plaintiffs are wrong; it goes to both.

Even as to *scienter*, moreover, Plaintiffs try to craft a new rule that Government knowledge is irrelevant unless Abbott "offer[s] credible evidence of a meeting of the minds" with the Government.  (Opp. at 24.)  To that end, Plaintiffs cite, out of context, cases in which there was evidence that FCA defendants, with direct Government contracts, had shared information negating falsity with the Government.  Nothing in this cases mandates, as Plaintiffs suggest, that an FCA defendant make "full disclosure," have "open dialogue," or "completely cooperate[]" with the government in order to employ government knowledge as a defense.  (*Id.* at 25.)  Because Abbott has no relevant contract with the Government – or duty to report its drug prices to the Government – those cases are inapposite.

Finally, Plaintiffs' suggestion that Government knowledge is irrelevant unless it specifically encompasses Abbott's pricing for the four multi-source drugs at issue is wrong. *E.g.*, *Doe v. Dilling*, __ N.E.2d __, 2006 WL 2528439, *16 (Ill. App. Ct. Sept. 1, 2006) ("[T]he question of the plaintiff's right to rely on the defendant's representations . . . is to be answered while viewing the representation in light of all the facts of which plaintiff had actual knowledge as well as those of which he 'might have availed himself by the exercise of ordinary prudence.'") (internal citations omitted); *Collins v. Huculak*, 783 N.E.2d 834, 839 (Mass. App. Ct. 2003) (A "person claiming justifiable reliance is required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he utilized

---

[12] In fact, the government filed an amicus brief in *U.S. ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148 (2d Cir. 1993), conceding that government knowledge goes to falsity.  *Id.* at 1157  ("As the government concedes in an amicus brief addressed to this issue . . .the fact that government officials knew of the contractor's actions may show that . . . the claim submitted by the contractor was not false.").

his opportunity to make a cursory examination or investigation."). Rather, the Government's purposeful adoption of AWP-based reimbursement for all drugs, with full knowledge, negates any claim with respect to Abbott's reported prices or corresponding published AWPs.[13]

> **D.    Reimbursements Paid By The Government To Healthcare Providers Are Not "Kickbacks" And Cannot Support An FCA Claim (Count 1).**

Although Plaintiffs devoted only one sentence of their complaint to alleging that Abbott violated the Anti-Kickback Statute ("AKS") (Compl. ¶ 103), they now contend that Abbott reads the complaint "too narrowly."  (Opp. at 28.)  Plaintiffs devote over six pages of their opposition to attempting to backfill the complaint's one sentence, which is itself reason to dismiss the contention because, as set out above, Plaintiffs may not amend the complaint via brief.

Even on the merits, however, the contention fails.  There simply was no "kickback" (a transfer back from Abbott to providers) in return for drug purchases.  (Mem. at 22-23); *see U.S. v. Ruttenberg*, 625 F.2d 173, 177 (7th Cir. 1980).  As the complaint concedes, the only "transfers" were the Government's *provider* reimbursements, and there is no proper allegation that those reimbursements were "illegal remuneration" under the AKS.[14]  Moreover, even if the implied certification theory applied here, Plaintiffs have not pleaded that the Government would not have paid reimbursement to providers had it known of Abbott's alleged violation – nor could

---

[13] *See U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005) (if "plaintiff cannot show that the government agency would have acted differently had it known of the omission, 'there is no false claim because [the agency's action] would have occurred regardless of [the defendant's] actions'"); *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001) ("Since the [False Claims] Act is restitutionary and aimed at retrieving ill-begotten funds, it would be anomalous to find liability when the alleged noncompliance would not have influenced the government's decision to pay.").

[14] Plaintiffs try to stretch "illegal remuneration" to cover transfers from any source, but their case law is cannot bear that reading.  In *U.S. v. Greber*, 760 F.2d 68 (3rd Cir. 1985), the defendant was prosecuted under the AKS for paying portions of its Medicare reimbursements as referral fees to physicians.  Thus, the defendant transferred the "remuneration" to providers to induce future referrals.  Likewise, in *U.S. v. Mittal*, 1999 WL 461293 (S.D.N.Y. July 7, 1999), the court explained that a defendant could be convicted of receiving "kickbacks" even if the funds at issue were government "sting" money more accurately described as "remuneration," not kickbacks.  *Id.* at *7-8.  *Mittal* does not stand for Plaintiffs' proposition that "federal funds clearly may serve as illegal remuneration" in a case like this.  Finally, *U.S. v. Killough*, 848 F.2d 1523 (11th Cir. 1988), illustrates the unremarkable point that contractors who inflate federal invoices to generate kickback money violate the FCA.

they, given (1) the substantial public record indicating that the Government undertook its reimbursement scheme knowing that AWP exceeded acquisition cost, and (2) that Plaintiffs alleged violations only with respect to multi-source drugs, and there is no allegation that the Government would have paid a different reimbursement had there been no AWP for Abbott's products.  (Mem. at 3-5.).  Because Plaintiffs have not (and could not) so pled, they fail to establish the necessary predicate for extending the FCA to "implied certification."  Finally, even if all of these defects could be overlooked, the theory of implied certification has not been applied to Medicaid claims, and Plaintiffs (again) have no case that says that it has.  *Cf. U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F.Supp.2d 258, 263-66 (D.D.C. 2002) (discussing case law addressing "implied certification" theory of FCA liability).

## II.   PLAINTIFFS' COMMON LAW COUNTS ALSO MUST BE DISMISSED.

### A.   Plaintiffs' Fraud Claim (Count 4) Fails For Lack Of A False Statement.

To plead common law fraud, Plaintiffs must allege "false misrepresentation of a material fact."  *Massachusetts v. Mylan Labs.*, 357 F.Supp.2d 314, 321 (D. Mass. 2005); *see also Pence v. U.S.*, 316 U.S. 332, 338 (1942) (first two elements of federal common law fraud are "a false representation" "in reference to a material fact").  Plaintiffs must plead, at a minimum, that Abbott made a false statement.  Because they have not done so, Count 4 should be dismissed.

In response, Plaintiffs rehash their flawed FCA arguments, claiming that they "need not plead one particular substitute price that Abbott should have reported" (Opp. at 35), and citing specific instances in the complaint where Abbott's reported prices varied from specific purchase prices offered to particular customers at particular times.  *Id.*  Again, such "hindsight" does not adequately plead falsity.  And, while Plaintiffs cite *Mylan* for the proposition that one who has "disclosed partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party" (Opp. at 34), they omit that this applies only where

one chooses "to speak *for the information of the other*" – and there is no allegation that Abbott reported its prices (let alone AWP) directly to or for the Government.  357 F.Supp.2d at 321.

> **B.      Unjust Enrichment Fails Because It Is Premised On Other Wrongs, And Because Any Benefit Allegedly Obtained By Abbott Was Far Too Remote.**

Plaintiffs' unjust enrichment claim, too, cannot stand, for either of two reasons.  *First*, because it is based on the same underlying "wrong" alleged for Counts 1, 2, and 4, it does not state a claim:  "Liability in unjust enrichment has in principle nothing to do with fault"; accordingly, it has no application where "the right on which [a plaintiff] relies arises from [a separate] wrong, not from unjust enrichment."  *Guyana Tel. & Tel. Co. v. Melbourne Int'l Comms., Ltd.*, 329 F.3d 1241, 1245 n.3 (11th Cir. 2003); (Mem. at 25-26.)  Plaintiffs' response is a combination of mischaracterization and omission.  Plaintiffs mischaracterize this Court's decision in *In re Average Wholesale Price Litig.*, 339 F.Supp.2d 165, 181 (D. Mass. 2004) as "h[o]ld[ing] to the contrary."  (Opp. at 35-36.)  But the quoted portion of that decision is pure dicta, not "holding" – and in any event, it interprets New York law, which no one suggests applies here.  Plaintiffs also contend that Massachusetts law differs from the cases Abbott cited, but that, too, is wrong.  Plaintiffs conveniently omit citing *In re Lupron Marketing and Sales Practices Litig.*, 295 F.Supp.2d 148 (D. Mass. 2003); there, picking up on Massachusetts unjust enrichment law's requirement of the "absence of a remedy by law," Judge Stearns construed it to be in accord with *Guyana*.  *Id.* at 182 & n.38 (quoting *Guyana*, 329 F.3d at 1245 n.3).

*Second*, Plaintiffs' unjust enrichment claim must be dismissed because the benefit Plaintiffs allege (increased market share for Abbott) is far too remote from the detriment they allege (overpayment by the Government).  (*See* Mem. at 26 (collecting cases).)  Again, under Medicare, all the drugs at issue in this case are multi-source drugs, and neither the complaint nor Plaintiffs' brief explains how any resulted in reimbursement based on an AWP associated with

an Abbott product.  (Mem. at 3-5.)  Plaintiffs' feeble rejoinders are non-responsive.  Plaintiffs

assert that "Abbott effectively sought to secure business away from competitors by its fraud"

(Opp. at 37), but that is a non-starter: neither the complaint nor the brief explains how Abbott

could use AWP to promote its drugs over competitors' when *all drugs* in the same J-Code were

reimbursed *at the same level*.  Plaintiffs also assert that this is (1) merely a question of damages,

or (2) a fact question that cannot be disposed of now.  (*Id.* at 36-37.)  Wrong again.  This is a

question of whether the complaint states a claim at all, not an issue of "damages," and how AWP

led to unjust enrichment would first have to be *pled* to create a "question of fact."

## III.    AT A MINIMUM, COUNTS 1, 2, AND 4 FAIL TO SATISFY RULE 9(b).

Finally, at minimum, Counts 1, 2, and 4, each of which sounds in fraud, should be

dismissed for failing Rule 9(b).  (*See* Mem. at 29-30.)  Plaintiffs' response, that they are the

Government and thus are held to a lower standard, is unsupported and illogical:

> The insistence on particularity in claims of fraud is neither technical fussiness nor
> form for form's sake.  Particularity not only gives a defendant sufficient
> information to understand what statement, omission, or conduct is called into
> question and to formulate an answer to the complaint, it also permits a court,
> when called upon to do so, to evaluate the sufficiency of the plaintiff's
> legal theories.  A plaintiff may not take refuge in generality from such an
> evaluation.  It is fair to expect a plaintiff to state the particulars and, if she does
> not, to conclude that sufficient particulars do not exist.

*Varney v. R.J. Reynolds Tobacco Co*., 118 F.Supp.2d 63, 68 (D. Mass. 2000) (citation omitted).

These teachings clearly apply here, where even as to the most basic premise of Plaintiffs' fraud

claims – what AWP should have been – Plaintiffs expressly hope to punt on answering that

question until after taking discovery.  (Opp. at 12.)  That does not remotely satisfy Rule 9(b).

## <u>CONCLUSION</u>

Abbott's motion should be granted, and Counts 1-4 dismissed for failure to state a claim.

At minimum, Counts 1, 2, and 4 should be dismissed for failure to comply with Rule 9(b).

Dated:  October 6, 2006                    Respectfully submitted,

                                           /s/ Brian J. Murray
                                           James R. Daly
                                           Tina M. Tabacchi
                                           Brian J. Murray
                                           JONES DAY
                                           77 West Wacker Drive, Suite 3500
                                           Chicago, Illinois  60601
                                           Telephone:  (312) 782-3939
                                           Facsimile:   (312) 782-8585

                                           R. Christopher Cook
                                           David S. Torborg
                                           JONES DAY
                                           51 Louisiana Avenue, N.W.
                                           Washington, D.C.  20001-2113
                                           Telephone:  (202) 879-3939
                                           Facsimile:  (202) 626-1700

                                           *Counsel for Defendant Abbott Laboratories, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

     I, Brian J. Murray, an attorney, hereby certify that I caused a true and correct copy of the foregoing ABBOTT LABORATORIES, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS to be served on all counsel of record electronically by causing same to be posted via LexisNexis, this 6th day of October, 2006.

                           /s/ Brian J. Murray
                           Brian J. Murray