# EXHIBIT D

**COUDERT BROTHERS LLP**
ROBERT A. CHRISTOPHER (SBN 89035)
ERIK HANSHEW (SBN 214292)
530 Lytton Avenue, Suite 300
Palo Alto, California 94301-1541
Telephone: (650) 470-2900
Telecopier: (650) 470-2901

**DICKENSON PEATMAN & FOGARTY PLC**
PAUL G. CAREY (SBN 105357)
809 Coombs Street
Napa, California 94559-2977
Telephone: (707) 252-7122
Telecopied: (707) 255-6876

Attorneys for Plaintiff
Dey, L.P.

**SUMMONS ISSUED**

**FILED**

APR 1 5 2003

Clerk of the Napa Superior Court

By: _____
            Deputy

**DELAY REDUCTION CASE**

CASE MANAGEMENT CONFERENCE
DATE: 9-22-03
TIME: 8:30 AM
PLACE: Courtroom B, 2nd Floor
825 Brown St., Napa CA 94559

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

### IN AND FOR THE COUNTY OF NAPA

#### (UNLIMITED JURISDICTION)

| | |
|---|---|
| DEY, L.P., a Delaware Limited Partnership, <br><br> Plaintiff, <br><br> vs. <br><br> FIRST DATABANK, INC., a Missouri corporation, d/b/a/ First DataBank and d/b/a PriceAlert; and WOLTERS KLUWER HEALTH, INC., a Delaware corporation, d/b/a Medi-Span and d/b/a Facts and Comparisons, <br><br> Defendants. | Case No. **26-21019** <br><br> **COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF** <br><br> (Tortious Interference with Contract and Prospective Economic Benefit; Breach of Contract; Breach of Covenants of Good Faith and Fair Dealing; Unfair Business Practices under Bus. & Prof. C. § 17200) |

Plaintiff DEY, L.P. ("Dey") alleges against Defendants, FIRST DATABANK, INC. ("First DataBank") and WOLTERS KLUWER HEALTH, INC., doing business as Medi-Span ("Medi-Span"), as follows:

- 1 -

COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF
PALOALTO 4057846v1

**Plaintiffs' Exhibit**
**963**
01-12257-PBS

1.      This is an action pursuant to California Code of Civil Procedure Section 526 for injunctive relief and damages. Through the acts, statements and omissions set forth below, Defendants have (i) tortiously interfered with Dey's existing contracts and contractual relationships with third parties and with Dey's prospective economic advantages; (ii) breached their contracts with Dey; (iii) breached their implied covenants of good faith and fair dealing with Dey; and (iv) committed unfair or fraudulent acts in violation of Business and Professions Code § 17200.

## THE PARTIES

2.      Dey, L.P. is a limited partnership duly organized and existing under the laws of the State of Delaware with its principal place of business located at 2751 Napa Valley Corporate Drive, Napa, California 94558.

3.      First DataBank, Inc. is a corporation organized under the laws of the State of Missouri with its principal place of business located at 1111 Bayhill Drive, San Bruno, California 94066. Upon information and belief, First DataBank Inc. is doing business as First DataBank, Bluebook and PriceAlert.

4.      Wolters Kluwer Health, Inc. is a corporation organized under the laws of Delaware with its principal place of business located at 161 North Clark Street, Chicago, Illinois 60601. Upon information and belief, Wolters Kluwer Health, Inc. is doing business as Medi-Span and Facts and Comparisons.

## JURISDICTION AND VENUE

5.      Jurisdiction is proper in this court because Defendants have had substantial, systematic, and continuous contacts with California, including but not limited to conducting a significant volume of business in the State, being licensed to do business in the State and in the case of First DataBank, maintaining offices and personnel within California.  Moreover, jurisdiction is proper in this court as the contracts at issue in this case were entered into in California and with a resident of California, and over the years have been substantially performed in California.  Further, the tortious and negligent conduct referenced herein has caused Dey injury in the State of California.

-2-

COUDERT BROTHERS LLP
TEL: (650) 470-2000
FAX: (650) 470-2001

6.      Venue, per California Code of Civil Procedure Sections 395(a) and 395.5, is proper in the Superior Court of California, County of Napa, because events giving rise to this complaint, including, for example, Defendants' misconduct and Dey's actual and threatened loss of sales due thereto, have occurred and will occur in Napa County.  Furthermore, pursuant to California Code of Civil Procedure Sections 395(b) and 395.5, venue also properly lies in this county because this is an action regarding contracts entered into in Napa County, and Defendants contracted to perform obligations under a contract in this county, and subsequently breached the subject contracts in Napa County.

## FACTUAL ALLEGATIONS RELATED TO ALL CAUSES OF ACTION

### Dey and the Generic Drug Market

7.      Dey is a major manufacturer of generic pharmaceuticals, largely consisting of inhalation therapies used in the treatment of asthma and other chronic respiratory diseases. These include albuterol, cromolyn sodium and ipratropium bromide.  All of these respiratory drugs, as sold by Dey, are generic drugs and are reimbursed under Medicaid and certain private insurance programs.

8.      A generic drug is bioequivalent to its brand name counterpart and usually becomes available once the brand name drug loses its patent or other statutory exclusivity. Generic drugs provide competition in the marketplace.  They initially cost less than the brand name product and, as multiple generics enter the market, their prices move steadily downward.

9.      Generic manufacturers operate in a highly competitive marketplace comprised of products that contain the same active ingredients and that may be therapeutically interchangeable.  Generic manufacturers therefore largely compete on price.

10.     Dey has innovated in this field even while dispensing products that are therapeutically interchangeable to those of its competitors.  In particular, Dey has developed certain value added features in the preparation and packaging of its products that have enhanced the benefits to both dispensers with the products and patients.

-3-

COUDERT BROTHERS LLP
TEL: (650) 470-2900
FAX: (650) 470-2901

11. For example, Dey has provided a unit dose formulation of certain products so that the medication is pre-measured and can be administered in a single dose. Unit dose products make the actual use of the drug more convenient for the patient, minimize wastage, and permit the products to be sterile when delivered to the patient. Dey's unit dose products and manufacturing processes also eliminate the use of certain preservatives that have been shown to cause adverse reactions in certain patients. Clearer labeling and packaging have also been implemented by Dey to reduce the risk of dispensing errors and tampering, and to make Dey's products easier for the patient to use. These supplemental benefits of Dey products, along with competitive pricing, have helped Dey become a manufacturer of choice for many providers of these respiratory drugs.

12. The greater part of Dey's sales are to wholesalers, chain and independent retail pharmacies, hospitals, long term care facilities and managed care organizations. Distribution for this market is comprised predominately of national full line wholesalers or regional distributors who purchase multiple products or product lines from generic manufacturers. Similarly, many independent pharmacies, hospitals and long term care facilities affiliate with large national buying groups (including group purchasing organizations) in order to obtain pharmaceuticals for the lowest possible price. Thus, a large segment of the generic marketplace for respiratory drugs is comprised of a relatively small number of entities controlling purchase decisions.

13. With the steady growth of managed care plans and Medicaid, the vast majority (approximately 85%) of prescription drug transactions are now covered, in whole or in part, by third party payor reimbursement arrangements.

**The Medicaid Reimbursement System**

14. Medicaid is the national health benefits program for lower income persons that is jointly funded by the States and the Federal government pursuant to 42 U.S.C. § 1396 et seq. Under Medicaid, providers of drugs, largely pharmacies and physicians, are reimbursed by state agencies for dispensing those medicines to eligible patients. Federal regulations give state Medicaid programs broad latitude in determining "estimated acquisition costs" used to determine reimbursement levels. The programs in most states use a benchmark "sticker" price known as

- 4 -

COUDERT BROTHERS LLP
TEL: (650) 470-2900
FAX: (650) 470-2901

average wholesale price or "AWP" reported by First DataBank or Medi-Span as the key element in computing the "estimated acquisition costs" to determine the actual amount to be reimbursed to the provider – the physician or pharmacist. These reimbursements are not made to the drug manufacturer.

### The Private Insurance System

15.    Many individuals who do not participate in the Medicaid program have their drugs paid for through private insurance carriers. The vast majority of these carriers also have formulas for determining the amount of reimbursement that they will pay to providers for generic drugs.

16.    These formulas often utilize the AWP reported by First DataBank and Medi-Span as a benchmark and then calculate a reimbursement rate that is significantly discounted below the reported AWP, often in excess of 50%.

### The Nature of AWP

17.    There is no definition of the term "average wholesale price" (AWP) in the federal Medicaid statute or regulations; nor are there definitions of AWP in the various state statutes and regulations that utilize AWP as an element in the reimbursement formula for Medicaid; nor are there any statutory or regulatory directives to pharmaceutical manufacturers on how AWP should be calculated or reported. There is, however, an extensive regulatory and legislative history, and a generally recognized and followed understanding in the industry that AWP is a "sticker price" – a non-discounted price that, before the launch of a generic, the manufacturer suggests to national price reporting services as the wholesalers' list price to the retail pharmacy.

18.    The U.S. Department of Health and Human Services ("HHS"), Congress and many state legislatures have affirmatively adopted and continue to use AWP as a reimbursement metric with the full knowledge that AWP does not reflect an actual market price at which those drugs are sold in the market, but rather is a reference price or "sticker" price. It is commonly known that the provider seeks to make a profit based on the difference between what it actually pays for the drug and the formulaic payment it receives from the Medicaid reimbursement agency based on AWP.

- 5 -

COUDERT BROTHERS LLP
TEL: (650) 470-2900
FAX: (650) 470-2901

19.    While reimbursement for Medicare drugs is not directly at issue in this case, the use and reporting of AWP is, and the concept of AWP has been extensively dealt with, both in regulation and legislation, in the Medicare context. As such, it is helpful to briefly consider how the Medicare reimbursement program has addressed the definition of AWP.

20.    Since its inception, Medicare reimbursement has relied upon a formula based upon AWP, as do most Medicaid programs. In 1997, HHS revised its regulations to reimburse the lesser of the actual charge submitted or 95% of AWP. In the transmittal letter accompanying its regulations, HHS noted that the payment allowance "recognizes the fact that AWP is not a true discounted price and, therefore, does not reflect the cost to the physician or supplier." HHS specifically instructed its carriers to use the AWPs that are published in pharmaceutical industry publications, such as Red Book, Blue Book, First Data Bank and Medi-Span.

21.    In May 2000, HHS sought to cease using AWPs as reported in industry publications and to commence using lower price data estimated through an alternative government survey for certain drugs.

22.    Congress acted swiftly to stop HHS's effort to unilaterally redefine and change the AWP reimbursement rates for Medicare drugs. Eighty-nine Members of Congress wrote Secretary Shalala objecting to HHS's actions. Senator (now U.S. Attorney General) Ashcroft introduced a bill to bar HHS from drastically reducing "Medicare reimbursement rates for cancer drugs by unilaterally changing the definition of 'average wholesale price,' which is at the heart of the current reimbursement formula."

23.    As a result, in November 2000, HHS abandoned its alternative pricing scheme and instructed its reimbursement agents to return to using "AWP data from your usual source." Several weeks later, Congress enacted the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"). BIPA barred the Secretary of HHS from "directly or indirectly decreas[ing] the rates of reimbursement" for drugs covered by Medicare until the Comptroller General (i.e., General Accounting Office) studied the issue of Medicare drug reimbursement.

-6-

24.     In light of this Congressional action, HHS directed Medicare carriers to continue to use the AWPs provided in industry publications, and to disregard HHS's earlier instructions that they equate AWP with alternative prices provided pursuant to the government survey.

25.     The present action arises because one of these industry publications, published by Defendant First DataBank, has now done, with regard to Medicaid and third party reimbursement payments, what Congress has explicitly forbidden the Executive Branch to do with regard to Medicare payments — it has unilaterally, arbitrarily and capriciously changed the reimbursement formula for one generic competitor, Dey, by changing the definition, nature and application of Dey's AWP. It has done so in a manner that is discriminatory and invidious in that it unjustifiably penalizes at least one manufacturer, Dey, and creates a windfall for all other competitive manufacturers.

## Dey's Relationship with the Reporting Services

26.     To participate in the Medicaid and insurance company reimbursement systems, drug manufacturers must submit certain prices to one or more of the generally recognized and accepted industry publications. Two of the principal publications are First DataBank and Medi-Span. Upon information and belief, First DataBank sells electronic drug pricing information to Medicaid agencies, managed care authorities and other subscribers, and has also sold such information in hard copy form in periodic publications that it calls Blue Book and Price Alert. Upon information and belief, Medi-Span sells electronic drug pricing information to Medicaid agencies, managed care authorities and other subscribers.

27.     Dey has an agreement with First DataBank and Medi-Span to provide these reporting services with certain of Dey's pricing information. The benefit Dey receives from this undertaking to furnish this information is the ability to have those prices reported in the recognized industry compendia, thereby enabling Dey to competitively sell its products and Dey's direct and indirect customers to participate in the reimbursement programs discussed above.

28.     If Dey's prices were not reported by First DataBank or Medi-Span, Dey's drugs would not be eligible for reimbursement in these managed care and Medicaid programs. If

- 7 -

COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF
PALOALTO 4057846v1

1  Dey's customers could not obtain reimbursement for Dey's products through participation in

2  these programs, they would not purchase Dey's drugs, but would, instead, purchase those of

3  other manufacturers whose prices are reported and whose products are eligible for

4  reimbursement. Because these programs account for about 85% of all drug prescription

5  transactions, exclusion from these programs would be ruinous for Dey.

6      29.    The benefit that First DataBank and Medi-Span derive from this relationship is

7  the ability to sell their subscription services incorporating complete drug pricing data (including

8  price information for Dey's products) to various participants in the pharmaceutical industry,

9  including wholesalers, distributors, group purchasing organizations, governmental agencies and

10  insurance companies. Without manufacturer's prices, these reporting services would have no

11  product to sell.

12      30.    Dey entered into these agreements to provide these data services with pricing

13  information based upon a clear understanding that these services would make good faith efforts

14  to report information accurately, consistently and fairly for all manufacturers in the industry.

15      31.    One of the prices commonly suggested to the data services and reported by them

16  is an average wholesale price ("AWP"). Another price communicated by Dey to these services

17  and reported by them is wholesale acquisition cost ("WAC"), a form of list price to the

18  wholesale class of trade that is set by a manufacturer and is used as an alternative in Medicaid

19  reimbursement formulas in certain states.   These two prices are not directly related. The AWP

20  prices as suggested by Dey and other competing manufacturers, for the drugs at issue in this case

21  are, and have historically been, significantly higher than its WAC prices.

22      32.    Since at least as early as 1992, Dey has communicated its WAC and AWP prices

23  to First DataBank. Over the years, Dey has communicated these price reports to First DataBank

24  for one or more of its drug products dozens of times. In each case, until the events that have

25  resulted in the present crisis, First DataBank has (except for some inadvertent errors) selected for

26  listing in its published reports the AWP as suggested by Dey. For over ten years, until April

27  2003, no prices other than those submitted by Dey have been listed by First DataBank as AWP

28  for Dey products in its databases.

- 8 -

COUDERT BROTHERS LLP
TEL: (650) 470-2800
FAX: (650) 470-2901

33.     For as long as Dey has been reporting prices to First DataBank, Dey has typically reduced its WAC prices over time. On numerous occasions before April 2002, Dey has submitted downward revisions of WAC for products listed in First DataBank's database. Until the incident which prompted this action, when Dey has advised First DataBank of a reduction in its WAC prices, First DataBank has (except for inadvertent omissions) revised its database to reflect that downward change in WAC, but has left the AWP in its databases unchanged, and identical to the AWP suggested by Dey.



36.     Since at least as early as 1992, Dey has reported its AWP prices to Medi-Span. Dey has transmitted these price reports to Medi-Span for one or more drug products dozens of times. In each case, Medi-Span has selected the AWP as suggested by Dey as the AWP to be listed in Medi-Span's database. For over ten years, until April 2003, no prices other than those submitted by Dey have been listed as AWP for Dey products in Medi-Span's database.

37.     Virtually every drug manufacturer who participates in these reimbursement programs, and against whom Dey competes also communicates their suggested AWP prices to the reporting services. To the best of Dey's knowledge, with few, if any exceptions, First DataBank and Medi-Span have selected and reported the AWP pricing exactly as suggested by these competing manufacturers.

- 9 -

38.     Many providers who dispense generic drugs are cognizant of, and are highly attentive to, AWPs as reported by the recognized industry compendia published by First DataBank and Medi-Span because of the direct relationship between the level of reimbursement anticipated for the drugs selected and the reported AWPs of those drugs.

39.     Dey has relied upon this pattern of treating all competitive manufacturers in a comparable fashion and continued to provide pricing information to the reporting services in the expectation that the reporting policies would be fairly and evenhandedly applied to all of the manufacturers. That reliance on the understandings, the accepted course of dealing and those reasonable expectations have now been violated by First DataBank and Medi-Span with disastrous consequences to Dey.

### The Reporting Services' Arbitrary Change to the System

40.     On or about April 8, 2003, First DataBank began, for the first time ever, to list AWP prices for certain of Dey's drugs that bear no relationship to Dey's suggested AWPs or any AWPs that First DataBank has previously listed for Dey's products. For example, Dey has listed a suggested AWP for its Ipratropium Bromide Inhalation Solution, in 60 vial cartons (NDC# 49502-0685-60) as being $105.60. Until April 1, 2003, First DataBank had reported that price as the AWP for Dey's products. As of April 1, 2003, First DataBank has now changed that AWP number to $29.25. First DataBank has, by unilaterally implementing this change, effectively converted Dey █████████████████████████████████████████

41.     On or about the same date, Medi-Span also changed the AWP for each of Dey's products to match that reported by First DataBank. Upon information and belief, Medi-Span obtained the AWPs that it reported for Dey from First DataBank.

42.     To the best of Dey's knowledge, the AWP as reported by First DataBank and Medi-Span has not been reduced for any of the competing products distributed by other manufacturers. In effect those companies status ██████████████ has not been changed.

43.     Prior to making this arbitrary change in the way they would report AWP, neither First DataBank nor Medi-Span notified Dey to advise Dey that they were going to be reporting

- 10 -

COUDERT BROTHERS LLP
TEL: (650) 470-2000
FAX: (650) 470-2901

1    Dey's prices in a manner wholly different from the manner in which they had been reported in

2    the past, and in a manner wholly different from that which had been understood when Dey first

3    agreed to provide them with its pricing information for publication.

4        44.    Following their arbitrary change in the reporting system, neither First DataBank

5    nor Medi-Span advised Dey that such a change had been implemented. To date, neither First

6    DataBank nor Medi-Span has provided any rationale or justification for this change from the

7    reporting system that had long been in effect and which had been contemplated when the

8    relationship was established.

9        45.    In response to Plaintiff's recent discovery and inquiries about its changing AWP,

10   First DataBank has now stated, for the first time, that it had decided, as of September or October

11   2002 that it would implement a new system of changing AWP if the WAC changed, even though

12   that had not been its policy when the agreement to participate was first made, or throughout the

13   many years that the agreement was in place, and despite the fact that no notice was ever provided

14   to Dey of this new "policy."

15       46.    The concept of AWP had been consistently recognized by manufacturers,

16   wholesalers, retailers, legislators and regulators as consisting of non-discounted prices reported

17   by the pharmaceutical industry to national price reporting services. The reporting services have

18   consistently reported AWP as that non-discounted price for the vast majority of manufacturers,

19   including Dey and its competitors, since the inception of the reimbursement systems.

20       47.    In November 2002, the person designated by First DataBank as most

21   knowledgeable about drug company reporting practices testified, in another proceeding, that,

22   where AWP has been suggested by manufacturers and reporting services had accepted such

23   suggestions as properly reflecting AWP, in no case had the reporting service then changed the

24   method of determining AWP to some ratio based on WAC. However, during that deposition,

25   First DataBank failed to indicate that it had, purportedly implemented a new "policy" that would

26   drastically alter previously reported AWP prices and replace them with numbers based on the

27   manufacturer's WAC.

28       48.    In April 2003, First DataBank unilaterally changed the historical course of dealing

- 11 -

COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF
PALOALTO 4057846v1

COUDERT BROTHERS LLP
TEL: (650) 470-2000
FAX: (650) 470-2901

and do just that – to stop using the basis that it had always used to determine AWP for Dey and to utilize an arbitrary multiple of WAC instead. Upon information and belief, Medi-Span has adopted First DataBank's new method of computing AWP for Dey and has also changed its method of reporting.

49.     Upon information and belief, based on complaints from customers who have indicated that the Dey reimbursement figures have dramatically decreased, First DataBank and Medi-Span have not implemented comparable changes in the AWP reported for Dey's competitors. As a consequence of the arbitrary, capricious, precipitous and inconsistent changes in the reporting of Dey's AWPs by First DataBank and Medi-Span, purchasers will refrain from purchasing Dey products to avoid being under-reimbursed.

**The Immediate Consequences of the Arbitrary Changes**

50.     Since reimbursement to Dey's customers is, in Medicaid program in many states and in and insurance programs, most frequently based on the AWP as reported by the reporting services, this arbitrary and capricious reduction by First DataBank and Medi-Span in AWP would result in a drastic reduction in the reimbursement to drug providers who choose to dispense Dey's product. Since there has not been a comparable reduction in the AWP for Dey's competitors, there would be no comparable reduction in the reimbursement the purchasers of competitive products receive.

51.     Because reimbursement for Dey products would be significantly reduced, but reimbursement for those competing products would remain as they have been, Dey is prevented, by First DataBank's and Medi-Span's arbitrary and capricious acts, from effectively competing in the marketplace.

52.     In fact, within one day of learning that First DataBank and Medi-Span had arbitrarily changed Dey's AWP, Dey has already been contacted by at least nine of its customers complaining about the drastic changes and indicating that, because of those changes, the customers would not be able to purchase Dey products since they could not earn a reasonable profit from the sale of such products.

53.     Further, at least one customer has already indicated that he had canceled all of his

- 12 -

COUDERT BROTHERS LLP
TEL: (650) 470-2000
FAX: (650) 470-2901

1  purchases presently on order from Dey and was, instead, buying those products from Dey's

2  direct competitors.

3      **The Long Term Consequences**

4      54.      Numerous providers of drugs currently purchase Dey's drug products and

5  dispense those products to patients in the State of California, in general, and in Napa County, in

6  particular. These providers will cease to purchase and dispense Dey's drugs if the

7  reimbursement for those drugs is a fraction of those obtained from competing companies.

8  Because purchasing decisions are highly concentrated in this industry among wholesalers and

9  group purchasing organizations, this scenario is playing out across the country and threatens to

10  eliminate sales of Dey's products that are covered by Medicaid and insurance reimbursement

11  programs.

12      55.      This elimination of Dey products from the marketplace will deprive patients of

13  access to quality products that have distinguished themselves for their value-added features, such

14  as sterility based on unit dose packaging, preservative-free products and other beneficial features

15  which, in many instances, were first introduced to the market in Dey products. It will also

16  reduce competition in the marketplace which will, in turn, reduce price competition and the

17  product improvements that competition fosters.

18      56.      Drug purchasers, especially pharmacies, have had a tendency to seek a broad line

19  of products from a relatively small number of manufacturers to simplify their ordering and

20  stocking process. This tendency to purchase a "product line" means that if a purchaser selects

21  one product from a manufacturer, it is also likely to purchase other drug from the same

22  manufacturer, where available.

23      57.      Consequently, the loss by Dey of substantial sales of drugs covered by the

24  reimbursement programs will also directly result in Dey's loss of sales of other drugs. As Dey

25  customers shift to competitors for their covered drugs because of First DataBank's and Medi-

26  Span's unwarranted reduction in AWP, those customers will also shift their other business to

27  those competitors.

28      58.      These catastrophic losses of market share, first in the third party payor programs,

- 13 -

COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF
PALOALTO 4057846v1

COUDERT BROTHERS LLP
TEL: (650) 470-2000
FAX: (650) 470-2001

1   and then affecting other drug purchases, create a significant likelihood that Dey will be

2   constrained to almost immediately reduce its production of generic drugs. These curtailments

3   will be felt at its plant and headquarters in Napa. There is a concomitant risk that, ultimately,

4   Dey may cease to be a viable company in this market.

5

6   **FIRST CAUSE OF ACTION**
    **(Tortious Interference with Contract and Prospective Economic Benefit)**
    **(Against all Defendants)**

7

8   59.     Dey realleges and incorporates herein by reference all of the allegations

9   contained in paragraphs 1 through 58 and 69 through 85 of this Complaint.

10  60.     Dey is and has been party to existing and valid contracts with numerous third

11  parties, including wholesalers, chain and independent retail pharmacies, hospitals, long-term care

12  facilities and managed care organizations to provide generic drugs.

13  61.     Dey has existing relationships with numerous wholesalers, chain and independent

14  retail pharmacies, hospitals, long-term care facilities and managed care organizations, who

15  regularly purchase Dey's generic drugs, and, prior to the Defendants' acts on or about April 8,

16  2003, Dey reasonably expected these relationships to provide Dey with future economic benefit.

17

18  62.     Those contracts and relationships depend upon the use of Defendants' price

19  reporting services to allow drug purchasers to be reimbursed by governmental programs and

20  insurance carriers.

21  63.     Defendants have knowledge of the role played by their data reports and reporting

22  services, and knowledge of the reliance placed on the data which they publish by those who

23  manufacture, purchase and reimburse for prescription drugs.

24

25  64.     The Defendants know of the existence of Dey's contracts and relationships with

26  purchasers and the reliance of those purchasers on the accurate, consistent and fair reporting of

27  AWP prices on Dey's products in connection with those contracts.

28
                                            - 14 -

65.     The Defendants wrongfully, arbitrarily, capriciously and without notice intentionally or negligently changed the method of reporting Dey's suggested AWP prices, dramatically reducing those reported prices, while leaving unchanged the method of reporting AWP for Dey's competitors. The Defendants knew and intended or reasonably should have known, that their actions would substantially reduce third party reimbursements to the purchasers of Dey's products. The Defendants knew and intended, or reasonably should have known, that providers would likely cease to purchase pharmaceutical products from Dey in favor of competitive generics on which they will receive far greater reimbursement.

66.     A number of Dey's customers and prospective customers have stated that they are canceling orders that had been placed with Dey or will no longer purchase Dey's products due to the abrupt and drastic reduction in AWPs reported for Dey's products.

67.     As a result of Defendants' willful or negligent acts, Dey has suffered and will continue to suffer damages in an amount to be proven at trial. The damages suffered by Dey are in excess of the jurisdictional minimum of this Court.

68.     As a result of Defendants' willful or negligent acts, Dey will lose customers who are not likely to return, and Dey will continue to suffer irreparable harm for which it has no adequate remedy at law.

## SECOND CAUSE OF ACTION
### (Breach of Contract)
### (Against all Defendants)

69.     Dey realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 68 of this Complaint.

70.     Dey and the Defendants entered into oral agreements wherein Dey agreed to provide the Defendants with pricing information on an ongoing basis and, in return, the Defendants agreed to publish the pricing information with regard to Dey in an accurate,

- 15 -

COUDERT BROTHERS LLP
TEL: (650) 470-2000
FAX: (650) 470-2001

consistent and fair manner and to treat Dey in a manner comparable to the manner the

Defendants treat manufacturers of products that compete with Dey products.

71.     Dey has fully performed its obligations under the agreements and has relied upon

Defendants to perform their obligations under the agreements.

72.     The Defendants have breached the agreements by arbitrarily and capriciously

implementing a change in the reporting methodology with regard to AWP prices for Dey

products without providing notice to Dey or obtaining the consent of Dey, while continuing to

report AWP prices of manufacturers of competing products using a different, more favorable

reporting methodology.

73.     As a result of Defendants' breach, Dey has suffered and will continue to suffer

damages in an amount to be proven at trial.

74.     As a result of Defendants' breach, Dey will continue to suffer irreparable harm for

which it has no adequate remedy at law.

### THIRD CAUSE OF ACTION
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**
**(Against all Defendants)**

75.     Dey realleges and incorporates herein by reference all of the allegations contained

in paragraphs 1 through 74 of this Complaint.

76.     There exists in every contract an implied covenant of good faith and fair dealing.

This covenant imposes on each party to a contract a duty to not do anything deliberately to

deprive the other party to the contract the benefits of that agreement.

77.     On or about April 8, 2003, the Defendants breached, and continue to breach, the

implied covenant of good faith and fair dealing. In clear disregard of the longstanding

relationships and agreements between Dey and the Defendants, the Defendants, on or about

April 8, 2003, arbitrarily, capriciously and without notice or Dey's consent, implemented a

- 16 -

COUDERT BROTHERS LLP
TEL: (650) 470-2000
FAX: (650) 470-2901

drastically different system for reporting Dey's AWP prices.

78. The Defendants have unfairly implemented this change only with regard to Dey and not with regard to any of Dey's competitors. Consequently, Defendants have subjected Dey to a grossly unfair competitive disadvantage, effectively preventing Dey from selling its affected products. This unfair change will deprive the Dey of the benefits of its agreements with the Defendants.

79. As a result of Defendants' breach, Dey has suffered and will continue to suffer damages in an amount to be proven at trial.

80. As a result of Defendants' breach, Dey will continue to suffer irreparable harm for which it has no adequate remedy at law.

## FOURTH CAUSE OF ACTION
### (Unfair Business Practices, Bus. & Prof. C. § 17200)
### (Against all Defendants)

81. Dey realleges and incorporates herein by reference all of the allegations contained in paragraphs 1 through 80 of this Complaint.

82. Defendants' conduct in arbitrarily and unilaterally changing the method of reporting AWP for Dey products, while continuing to use a more favorable method of reporting AWP for products sold by Dey's competitors constitutes an unfair business act or practice, placing Dey at competitive disadvantage to such an extent that it may effectively destroy its business.

83. Defendants' conduct in changing the method of reporting AWP for Dey products, without providing Dey or the industry with notice of this impending change, while continuing to use a more favorable method of reporting AWP for products sold by Dey's competitors without disclosing to the industry the disparity in treatment constitutes a fraudulent act or practice, placing Dey at competitive disadvantage to such an extent that it may effective destroy its

- 17 -

business.

84.    As a result of Defendants' actions, Dey has suffered and will continue to suffer damages in an amount to be proven at trial.

85.    As a result of Defendants' actions, Dey will continue to suffer irreparable harm for which it has no adequate remedy at law.

*WHEREFORE, Plaintiff prays for judgment as follows:*

*1.    For a preliminary injunction directing Defendants to: (i) restore the status quo with regard to the reporting of the Average Wholesale Price (AWP) for Dey's products to that which existed as of March 31, 2003, namely treating Plaintiff Dey, L.P. in the same manner as all other manufacturers* ████████████████████████ *in the reporting of AWP; (ii) refrain from further modifying the method used to report any of Dey's prices or the prices of products of other manufacturers whose products are competitive to those sold by Dey until such time as an alternative method is approved by this Court;*

*2.    For a permanent injunction directing Defendants to refrain from implementing any new method used to report any of Dey's pharmaceutical prices until such time as Defendants have demonstrated to this Court that any such proposed method treats Dey in the same manner as manufacturers whose products are competitive with Dey's products, and that such method can and will be implemented so that any changes to reported pricing are applied to all manufacturers at the same time;*

*3.    For damages incurred through Defendants' intentionally tortious conduct and negligent acts;*

*4.    For punitive damages incurred through Defendants' intentionally tortious conduct;*

*5.    For damages incurred through Defendants' breach of their contracts with Plaintiff Dey Inc.;*

*6.    For costs of suit;*

- 18 -

COUDERT BROTHERS LLP
TEL: (650) 470-2900
FAX: (650) 470-2001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUDERT BROTHERS LLP
TEL: (650) 470-2900
FAX: (650) 470-2901

7.    For attorney fees allowed by law, if any; and

8.    For such other relief as the Court deems just.

Dated: April 14, 2003                                    **COUDERT BROTHERS LLP**

By:  _Robert A. Christopher_
ROBERT A. CHRISTOPHER
ERIK A. HANSHEW
Attorneys for Plaintiff
Dey, L.P.

- 19 -

COMPLAINT FOR INJUNCTIVE RELIEF, DAMAGES AND OTHER RELIEF
PALOALTO 4057846v1