# Exhibit 2

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
 3
      In re:                          )
 4    PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
      AVERAGE WHOLESALE PRICE         ) MDL No. 1456
 5    LITIGATION                      ) Pages 1 - 119
 6
 7
 8              CLASS CERTIFICATION HEARING
 9         BEFORE THE HONORABLE PATTI B. SARIS
                UNITED STATES DISTRICT JUDGE
10
11
12
13
                            United States District Court
14                          1 Courthouse Way, Courtroom 19
                            Boston, Massachusetts
15                          September 12, 2006, 10:25 a.m.
16
17
18
19
20
21
22
                      LEE A. MARZILLI
23              CERTIFIED REALTIME REPORTER
                United States District Court
24              1 Courthouse Way, Room 3205
                    Boston, MA   02210
25                    (617)345-6787
```

Page 54

1  which manufacturers who are before you could be held liable,
2  if your Honor entertains all these notions, based on products
3  that aren't even at issue here because of defendants that
4  aren't even present here. That alone is reason enough to
5  reject it, but that's a problem that's identified and made
6  specific in certain of the specific defendant briefs.
7      THE COURT: Well, for the point of understanding
8  whether someone is appropriately a class member or not,
9  suppose you had a drug where all the sources were defendants,
10 would that be a different situation where there was a
11 significant number of companies that aren't defendants?
12     MR. DODDS: You know, your Honor, the answer is
13 "no" because we're right back where we started back when I
14 was RICO man, trying to find ways to avoid Article III
15 standing. I don't know of any case, and defendants haven't
16 cited any, where that requirement, that a defendant who wants
17 to be a class representative here can simply avoid
18 Article III standing based on some notion that sort of
19 everybody contributed to it and everybody did it and they
20 were injured by it. Article III standing is a threshold
21 requirement that's glossed over by all of these theories that
22 you've just heard about, all of which, your Honor, by the
23 way, are after all this time purely theoretical. I mean,
24 your Honor made the point that there's been extensive
25 discovery at this point. There's been extensive discovery at

Page 55

1  this point, and think about what's happened up to this --
2      THE COURT: Is discovery closed for Track Two?
3      MR. DODDS: Yes, it is, your Honor. The discovery
4  has been done. The work has been done. And think about
5  what's happened up to this point in time. When the case
6  started, your Honor found that the generic drugs, the
7  multi-source drugs, didn't fit the paradigm and dismissed
8  them. So they came back and they alleged that this
9  leapfrogging was going on.
10     Now, Dr. Hartman talks about how it could happen.
11 I'm not aware of any evidence that shows that it did happen,
12 that there were any frogs or that there was any leaping,
13 because if it did, you should be able to look in the Red Book
14 or the Blue Book and see it. If my client Pharmacia -- all
15 of our drugs are multi-source drugs -- if my client Pharmacia
16 sets an AWP for a multi-source drug it has, and another
17 defendant here decides that it wants to compete with that to
18 raise the median, it should be a simple matter to read the
19 read the Red Book, read book Blue Book, read the pricing
20 publications and see it; but you've never been presented with
21 any evidence that it happened because it simply didn't.
22     THE COURT: It's not clear to me why it happened,
23 but let me ask you this, because it wouldn't help them
24 competitively among each other. It didn't fit the paradigm
25 as originally given to me, but regardless of why, what motive

Page 56

1  people had for putting a really high AWP if it didn't gain
2  the market share, regardless of the motive, doesn't it
3  similarly just hurt the consumer paying for it?
4      MR. DODDS: Your Honor, I suppose it could
5  theoretically. The problem that you have here is, for
6  purposes of class certification or for any other purpose, for
7  that matter, you have no evidence to support any of the
8  theories that have been presented here; not the leapfrogging,
9  not the Nash equilibrium.
10     THE COURT: But what about, apart from all that, if
11 under the statute an older person has a right to pay
12 20 percent of AWP and it's inflated a thousand percent, isn't
13 that person harmed?
14     MR. DODDS: I'm sorry, ask your question again,
15 your Honor.
16     THE COURT: A lot of these people are older people,
17 right, and they've got cancer?
18     MR. DODDS: Yes.
19     THE COURT: And they purchase a multi-source drug
20 of a sort that they now can't figure out which company it
21 was. Apart from why the AWPs were way up here, they
22 nonetheless are overpaying for their copayment.
23     MR. DODDS: Your Honor, it depends on what the
24 Medicare allowable is for that particular drug. Let me give
25 you an example. Let me give you the example that has been

Page 57

1  given for my client, Pharmacia, okay. One of the class reps
2  that's been presented for Pharmacia is the estate of
3  Mrs. Young, and the drug that she supposedly took, allegedly
4  took, was a drug called SoluCortef, which is a multi-source
5  drug that is manufactured by many defendants, some of whom
6  are here, some of whom are not here.
7      Now, our papers talk about whether they can
8  identify that as our drug, okay, and so I won't belabor
9  that. But if you look at Mr. Haviland's declaration with
10 respect to Mrs. Young, you see a bunch of claims information
11 that shows, here's how much the doctor billed, here's the
12 Medicare allowable, which was way below what the doctor
13 billed, here's what the insurer paid --
14     THE COURT: When you say "billed," billed who?
15     MR. DODDS: What the doctor billed for the services
16 that were provided.
17     THE COURT: To Medicare?
18     MR. DODDS: Correct, what the doctor billed to
19 Medicare and what the doctor billed to -- well, in this case,
20 what the doctor billed to the insurers, which were Medicare,
21 and then there's a supplemental insurer.
22     THE COURT: All right, and Mrs. Young didn't pay
23 anything?
24     MR. DODDS: Mrs. Young was ultimately billed, I
25 believe, 31 cents for the first administration and, like,