UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | Civil Action No. 01-12257-PBS<br><br>Judge Patti B. Saris |

**TRACK 1 DEFENDANTS' MEMORANDUM IN RESPONSE
TO THE BRIEF OF THE UNITED STATES AS AMICUS CURIAE**

The Track 1 Defendants[1] respectfully submit this memorandum in response to the Brief of the United States as Amicus Curiae (the "Government's Brief" or "Gov't Br.") regarding the meaning of "average wholesale price" as used in federal regulations and the 1997 Medicare statute.[2]

**PRELIMINARY STATEMENT**

The brief of the United States Department of Justice makes pivotal concessions that severely undercut the class plaintiffs' basis for this legal action. In responding to this court's invitation to provide its views on the meaning of the words "average wholesale price" as used in the 1997 Medicare statute and federal regulations, the Government concedes that "the *Secretary* [of HHS], not manufacturers or publishers, was charged with 'determining average wholesale

---

[1] BMS does not join in this brief.

[2] The government's submission as an "amicus" inappropriately omits disclosure of the government's interest. Such disclosure is required by custom and usage, and it is necessary to have in the record. *See, e.g.*, *United States v. Alkaabi*, 223 F. Supp. 2d 583, 592 (D.N.J. 2002); *United States v. Gotti*, 755 F. Supp. 1157, 1158 (E.D.N.Y. 1991); *cf.* Fed. R. App. P. 29. The Court is aware of some of the government's commercial interest in the position it advances and should be informed of the full extent.

price.'"  Gov't Br.at 18 (emphasis in original).  The Government further concedes that "in setting the agency's national average wholesale price for payment purposes," (*id.* at 14), the Secretary would look to wholesale price figures published by third party publishers as merely one source of data.

The significance of these concessions for the class plaintiffs' claims cannot be overstated. The class plaintiffs have alleged that the defendants published, or caused to be published, "AWPs" that were fraudulent because they did not comport with the plain meaning of the words "average wholesale price."  Based on the allegations in this state law consumer fraud case, the plaintiffs must prove, as a threshold matter, that defendants knowingly and intentionally communicated false and misleading information to plaintiffs.  To avoid having to surmount the daunting burden of proving that the "AWPs" published for the defendants' drugs were fraudulent despite the longstanding usage of the term "AWP" in the pharmaceutical industry, the class plaintiffs have urged this court to give them a shortcut.  Plaintiffs have asked the court to define the federal statutory term "average wholesale price" based on the "plain meaning" of those words – which is to say, the meaning ascribed to those words by plaintiffs – and then to graft that definition on to the "AWPs" without any notice – by regulation or otherwise – to manufacturers that this was the case.  The unjustified premise of this argument is false, because nothing in the Medicare statute directs any defendant either to calculate any price in any manner or to report any price to any entity in any manner.  Although the Government purports to offer views on the definition of the federal statutory "average wholesale price," its brief actually helps make clear why taking this shortcut would be reversible error.

Whether the AWPs that defendants allegedly communicated (or allegedly caused to be communicated) to the third-party publications are actionable does not turn on construction of the

words "average wholesale price" in the Medicare statute.  The federal statutory "average wholesale price" is a Medicare construct that is determined *solely* by the Secretary of HHS.  Even the Government contends that the statutory "average wholesale price" is not the published "AWP," but instead the published "AWP" is merely one source of data that the Secretary is to consult in establishing the statutory "average wholesale price."  (Gov't Br. at 14 ("The Secretary clearly treated the published prices simply as a source of data to be used to set the national AWP").)

Thus, plaintiffs cannot hide behind the construction of words in a statute that imposes no obligation on any of the defendants.  Rather, they will have to present evidence that each defendant engaged in unfair or deceptive conduct.[3]  For their part, the Track 1 defendants will prove at the upcoming trial, among other things, that the published AWPs of their branded drugs are a function of the wholesale list prices for those branded drugs, and the published AWPs for their generic drugs are set at launch as a function of the published AWPs of the brands with which they compete.  The Track 1 defendants will also prove that the relationship between a drug's published AWP and its actual transaction prices will vary among drugs based on the specific competitive conditions that each drug confronts in the market.  As a result, as the Government concedes – with considerable understatement – even the Secretary of HHS was generally aware that the AWPs as published in the compendia had "strayed from being a reliable data source for acquisition costs."  (*Id.* at 18.)

Notwithstanding the Government's significant concessions, it nonetheless offers the Court its views on the Medicare statute and regulations, their legislative history, and the Government's "plain meaning" construction of the words "average wholesale price" in the

---

[3] Even then, it would be a novel (to say the least) use of state consumer protection law for a court to determine that the amount should have been less because, as the Government recognizes, the amount of reimbursement the Government paid was explicitly governed by federal law.

-3-

statute and regulations.  The Government's arguments here are a *non sequitur* in the context of adjudicating the claims before this Court.  Even were that not the case, they are fatally flawed for several reasons.  First, to the extent that the Government implies that Congress intended simply to incorporate the industry's "AWP" into the Medicare statute as the statutory "average wholesale price," the Government distorts the "plain meaning" rule by ignoring the principle that when a term or phrase is used as a term of art in an industry, it should be interpreted in accordance with its industry usage.  Long before the Health Care Financing Administration ("HCFA") or Congress ever thought about using the term "average wholesale price" in a regulation or statute, "AWP" had a well-established meaning in the healthcare industry and both HCFA and Congress were well aware of that meaning.

Second, the Government argues that Medicare's cost-based structure dictates an interpretation of HCFA/CMS regulations and Congressional statutes using the phrase "average wholesale price" as one in which drugs are to be reimbursed based on actual average costs between wholesalers and providers.  (*See, e.g.*, Gov't Br. at 1.)  The language of the statute makes clear, however, that providers were to be reimbursed for drugs on the basis of "reasonable charges" not "reasonable costs."  (*See id.* at 3 (citing 42 U.S.C. § 13951(a)(2)).)  The Government's efforts to conflate Medicare Part A's reasonable *cost* methodology for hospitals with Medicare Part B's reasonable *charge* methodology for doctors is disingenuous.  The one case it relies upon, *American Medical Ass'n v. Matthews*, 429 F. Supp. 1179 (N.D. Ill. 1977), does not support this regulatory alchemy: costs and charges are separate and distinct concepts under Medicare.  Indeed, in another case in this very Court, the Government has acknowledged that Congress intended to build into reimbursement for Medicare Part B drugs a profit

component over and above doctors' costs. *United States v. MacKenzie*, 01-CR010350-DPW (D. Mass. 2004).

Third, the Government bases its flawed statutory construction analysis on the straw man argument that HHS never would have agreed to allow "average wholesale price" to equal whatever is published in industry publications because that would give manufacturers reporting to the publications the unfettered ability to report fictitious prices and manipulate reimbursement. But defendants do not assert that the Medicare program gave the industry carte blanche to set drug reimbursement rates; indeed, the Government repeatedly concedes elsewhere in its brief that the Secretary, not the industry, was charged with (and dutifully exercised) that obligation. It is thus both utterly fallacious and blatantly contradictory for the Government to suggest that accepting defendants' argument would be tantamount to "turning over the keys" to reimbursement to the defendants. Congress delegated to the Secretary of HHS the authority to determine "average wholesale price" for reimbursement of Part B prescription drugs. When the Secretary chose to base payments to providers on the published AWPs for defendants' physician-administered drugs, the Secretary and was acting within his/her power under the statute under Part B's charge-based methodology. Any other conclusion would effectively require this Court to conclude that the Secretary had for more than a decade exceeded her authority by willfully authorizing Medicare carriers to overpay providers for each and every Part B drug. Nothing in the Government's brief suggests that the Secretary would agree with that proposition.

**ARGUMENT**

**I.    THE GOVERNMENT'S POSITION UNDERMINES THE PLAINTIFFS' CASE BY CONCEDING THAT THE SECRETARY, AND NOT MANUFACTURERS, DETERMINES "AVERAGE WHOLESALE PRICES" FOR MEDICARE PART B REIMBURSEMENT**

Plaintiffs' case is anchored in their argument that manufacturers were responsible for establishing and inflating the "average wholesale prices" used by Medicare. The Government rejects the notion that manufacturers established the "average wholesale prices" used by Medicare; the government's position is that "the *Secretary*, not manufacturers or publishers, was charged with 'determining average wholesale price'" as that term was used in the Medicare statute. (Gov't Br. at 18 (emphasis in original).) The Government also acknowledges that Congress and the Secretary knew when the 1997 Medicare statute was enacted that "HHS-OIG reports had shown that published [manufacturers'] AWPs had strayed from being a reliable data source for acquisition costs" (*id*.); for that reason, the government concludes, the "BBA did not mandate the adoption of published prices by the Secretary." (*Id.*) Instead, in describing the Secretary's responsibility under the 1997 statute, the Government states that the AWPs found in the pricing compendia – *i.e.*, the AWPs that manufacturers are alleged by the plaintiffs to have caused to be inflated – were merely a resource to the Secretary in establishing the "average wholesale price" for Medicare:

> While [Medicare] carriers would, as a practical necessity, refer to Red Book for wholesale pricing data, there is nothing in the regulatory history to suggest that the Secretary intended to be bound by any particular published data. Rather, the published data was a resource to the Secretary in setting the agency's national average wholesale price for payment purposes.

(*Id.* at 13.)

According to the Government, the Secretary and Medicare had other resources at their disposal for determining "average wholesale prices," including, for example, the knowledge and experience of the Medicare carriers who administer Part B: Since 1965, "Medicare carriers have been required to limit [reimbursement] to an amount not in excess of that which the carrier paid its own (non-Medicare) policyholders and subscribers . . . ." (*Id*. at 7.) In other words, the

Government's position is that the carriers' knowledge and experience in the marketplace was or at least should have been taken into account when determining reimbursement rates.

These crucial concessions are not surprising given the purpose of the statute and regulations being construed. The relevant portion of the Medicare Act deals *solely* with the role and authority of the federal agency in computing and paying providers' requests for payment under Medicare Part B. The federal statute does nothing more. In particular, the federal Medicare statute does not require drug manufacturers to calculate, to report, to furnish, or to publish anything. As important, neither the statute nor the federal agency gave any direction, guidance, or instruction to drug manufacturers regarding the "average wholesale price." Nothing in either statute or its legislative history suggest that Congress intended to direct publishers of pricing compendia to change how they have calculated and reported AWPs for years, nor is there any hint of a directive from Congress that those manufacturers that chose to report prices to the publishers – including "AWPs" as they had used that term for decades – needed to change their practices.

It is thus indisputable that (a) the Secretary has known for decades that published AWPs were *not* actual averages of provider costs; (b) the Secretary had available throughout, among many other resources, the knowledge and experience of Medicare carriers in designing and implementing Part B reimbursement regimes; and (c) after enactment of the 1997 statute, the Secretary, through CMS, followed the practice that had been in place since 1991 and directed that Part B reimbursement, and so-called "co-payments" by Medicare Part B recipients, be determined on the basis "of the AWP as reflected in" the pricing compendia.

Given this account of what the government knew and did during the class period, there is no room for state consumer protection laws to alter reimbursement rates from those set by the

Secretary in this regulatory system under federal law.  The amount paid by the plaintiffs for Part B drugs was determined by the Secretary as a matter of federal law, with knowledge – the government concedes in its brief – that the amount was not measured by provider acquisition costs.  State law cannot override the Secretary's informed decisions made under authority of supreme federal law.[4]

## II. THE GOVERNMENT'S STATUTORY CONSTRUCTION METHODOLOGY IS FUNDAMENTALLY FLAWED

### A. The Government and Plaintiffs Impermissibly Ignore Industry Usage

The Government relies on a series of Supreme Court decisions for the proposition that when the words in a statute have a plain meaning, that should be the end of the inquiry.  Even if it were necessary to define "average wholesale price" as it is used in the Medicare Statute, Supreme Court and First Circuit case law are clearly contrary to the Government's position.

Dictionary definitions do not apply when a statute admits to "more than one meaning." *See Arnold v. United Parcel Service, Inc.*, 136 F. 3d 854, 858 (1st Cir. 1998).  Furthermore, the Supreme Court has unequivocally held that where, as here, an administrative agency or Congress uses terms that have a well-established industry meaning, the terms "should be interpreted by reference to the trade or industry to which they apply."  *Louisiana Public Service Comm'n v. FCC*, 476 U.S. 355, 372 (1986); *see also S.D. Warren Co. v. Maine Bd. Of Environmental Protection*, 126 Sup Ct. 1843, 1847 (2006) (holding that, because the statutory term "discharge" "is neither defined in the statute nor a term of art, we are left to construe it 'in accordance with

---

[4] The "plain meaning" construction advanced by Plaintiffs (and arguably by the Government) carries potential implications that the Government fails to address.  If the AWPs reported by the pricing compendia for most drugs failed to conform to some statutory standard, then the Secretary's direction that Medicare Trust Fund payments (and "co-payments") be based on 95% "of the AWP, as reflected in" the compendia, may have been  "unauthorized" or "contrary" to the 1997 statute or somehow "void."   The Government certainly has not expressly taken such a radical stance, but neither has the Government grappled with the potential consequences that may follow from a ruling in Plaintiffs' favor.

its ordinary and natural meaning'") The plain meaning rule "is more 'an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence' in contradiction to supposedly plain meaning if such evidence exists." *Greenwood Trust Co. v. Commonwealth of Mass.*, 971 F.2d 818, 825 (1st Cir. 1992). In addition, contrary to what the Government suggests, this doctrine is not limited to technical terms; it applies to commercial terms and terms of art. *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (terms of art); *United States v. Lachman*, 387 F. 3d 42, 53 (1st Cir. 2004) (commercial terms).

Once it is established that a word or phrase in a statute is a term of art, "[i]n the absence of contrary indication, [the court should] assume that when a statute uses such a term, Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991). That is because people in the industry, upon seeing the term in a regulation or statute, will assume that the industry meaning applies unless they are told otherwise. *Cf. NLRB v. Coco-Cola Bottling Co.*, 350 U.S. 264, 269 (1956). While the Government contends that "AWP" is not a "well-defined" or "well-accepted" term in the industry, (Gov't Br. at 19.), AWPs had been used in the pharmaceutical industry for decades prior to HCFA's use of the term "average wholesale price" in its 1991 regulation, including references in numerous Government reports dating back to the 1970s. These AWPs reflected industry norms and competitive dynamics affecting the industry and each drug included in this case. For example, the Court's independent expert, Professor Berndt, detailed the utility of AWP as an industry pricing metric for technological and other reasons. (Report of Prof. Ernst Berndt ("Berndt Report") ¶¶ 20-73.) Dr. Berndt has already made clear that, for brands, AWP is defined and understood by many in the industry to be a benchmark that the pricing compendia calculate by applying a 20% to 25%

mark-up to wholesale acquisition cost.[5] (Berndt Report ¶ 15.) What nobody has ever understood or accepted – not the industry, HCFA nor Congress – is that published AWP was equal to average acquisition cost.

Moreover, the Government was well aware of the use of published AWPs in the industry, and the Government understood that published AWPs were not representative of actual acquisition costs prior to, and after, 1991. Nothing in the legislative history recited in the Government's brief indicates any instruction to manufacturers or any of the myriad providers and TPPs using published "AWP" to change their understanding of the historic meaning of "AWP" once the words "average wholesale price" were inserted into the Medicare Statute. To the contrary, the record is clear that no such duty was imposed on manufacturers or providers.

The Government refuses to acknowledge, or to explain, that the Secretary asked Congress in 1997 to legislate actual acquisition cost *because* the published AWP did not reflect discounts. Congress elected to use "average wholesale price" (the very term the Secretary had used in the 1991 regulation), and the Congress subsequently precluded CMS in 2000 from administratively reducing the "average wholesale prices" that it determined by looking to published AWPs.

As the Government points out, the Secretary could have determined that "average wholesale price" would be something different from what the industry understood published AWP to mean. But the critical fact that the Government ignores is that the Secretary did not do that. The Secretary decided to equate "average wholesale price" with published "AWP," and those in the industry understood published "AWP" to mean what it had always meant before. It would be extraordinary – if not a constitutional violation – for this Court to impose an obligation on manufacturers *nunc pro tunc* in the absence of a regulation or any notice to the industry in

---

[5] With respect to generics, Dr. Berndt and others have observed that the relationship between AWP and actual acquisition prices for generics "is considerably more complex" than for branded drugs, and this "complexity and variability has been known for quite some time." (Berndt Report ¶ 46).

-10-

1991 to do anything different than they had been doing for decades before. *Cf. United States v. Anzalone*, 766 F. 2d 676, 678 (1st Cir. 1985) (explaining this principle in a criminal case).

The government's selective recitation of the legislative and regulatory history of the term "average wholesale price" ignores critical portions of the full story. It begins in the middle of events, ignores what happened before, and looks narrowly so as to avoid seeing the historical context in which Congress and the Secretary were acting in 1997. Defendants have already provided this Court with the full story in the Track 1 Defendants' submissions and filings related to summary judgment. Defendants direct the Court to those papers for a more complete description of legislative and regulatory history.

### B. The Government and Plaintiffs Present Multiple "Plain Meanings" of "AWP"

In the Government's brief, the "plain meaning" of the term "average wholesale price" is a reasonable range of values, and is not the "plain meaning" advocated by Plaintiffs. The latest position advanced by Plaintiffs is that average wholesale price "cannot be anything other than an actual average" of acquisition costs. (Pls.' Resp. to Track 2 Br. on Meaning of AWP ("Pls.' Resp. to Track 2 Br.") at 9 (emphasis added).) The Government, on the other hand, asserts that "average" could be an arithmetic average, a median, or something more "conceptual," and even "a typical price, not out of the ordinary."[6] (Gov't Br. at 16, 22.) These Government "plain meanings" are inconsistent with Plaintiffs' proposed fiat that the statute requires an arithmetic average. In contrast to the Plaintiffs' position, the Government asserts that "it is not uncommon for Congress or the Secretary to employ broad standards to set Medicare payments," and, the Government says, the fact that "standards may result in a range of costs or charges, as opposed to

---

[6] Of course, with respect to generic drugs, the Secretary expressly adopted MAC pricing, and defined "the national average wholesale price for multiple-source drugs as the *median* price for all generic sources of the drug." (Gov't Br. at 14.)

a mathematically precise value, neither renders those standards meaningless nor undercuts Medicare payment goals and objectives." (*Id*. at 22-23.)

Having given multiple "plain meanings" to the term "average wholesale price", the Government oddly then suggests that when the words in a statute have "a" plain meaning, that should be the end of the inquiry. (*Id.*) But that is not the case here. As noted above, the plain meaning rule does not apply where a statute has "more than one meaning." *See Arnold v. United Parcel Service, Inc.*, 136 F. 3d at 858. A court must look beyond the words of a statute where the statute is ambiguous. *General Motors Corp. v. Darling's*, 444 F.3d 98, 108 (1st Cir. 2006).

### C. The Government Attacks a Position that Defendants Do Not Assert

Contrary to the Government's position, defendants do not maintain that "[they seek to] put into the hands of private entities the unfettered power to set the rates at which government-funded payments are made to those entities customers." (Gov't Br. at 21.) That argument ignores the role of published "AWPs" in the pharmaceutical industry generally, which is a single very large market of which Medicare is only one relatively small part. As Dr. Berndt and other authorities have explained, in many cases the third party publishers calculate an AWP for brands by applying a mark-up factor of 20% to 25% to the manufacturer's list price to the wholesaler. (Berndt Report ¶ 15). This is an artifact stemming from a time in which wholesalers were able to sell their products to retailers at an average margin of 20% to 25%. (*Id.* ¶ 22). Over time, competition among wholesalers caused their margins to diminish significantly, but they continued to maintain a mark-up of 20% to 25% and began to view published AWP as a list price. With respect to generics, Dr. Berndt and others have observed that the relationship between published AWP and actual acquisition prices for generics "is considerably more complex" than for branded drugs, and this "complexity and variability has been known for quite

some time." (Berndt Report ¶ 46). This Court has also recognized this variability. *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 68 (D. Mass. 2005).

Dr. Berndt also explained continued reliance on published AWP as a reimbursement benchmark; he wrote:

> The evolution of the AWP-WAC 'spread' for branded self-administered pharmaceuticals is . . . quite understandable, and apparently not the result of any sinister or nefarious conspiracies. Moreover, since AWP was publicly known, it served as a convenient focal point for . . . reimbursements . . . .
>
> Why this "spread" practice has continued long after its underlying rationale has largely disappeared is a bit puzzling, but is I believe understandable and plausible. Given the AWP-WAC history, retail pharmacies plausibly continued to expect their acquisition costs to be 20-25% below AWP and thus . . . [to build in a profit] in their contracts with third-party payor and PBMs, retailers generally expected to reimbursed at 10-15% below AWP."

(Berndt Report ¶¶ 23-24.) This is the same rationale that HCFA gave in the June 1991 announcement of proposed regulations using 85% of published AWP as the reimbursement rate for *physician-administered* drugs; it wrote: "We have no reason to believe prices paid by physicians are any higher than pharmacies pay." 56 Fed. Reg. 25792 at 29800 (June 5, 1991). Of course, with respect to generic drugs, HCFA recognized all along that AWPs represented something different from branded AWPs and therefore expressly adopted MAC pricing, and defined "the national average wholesale price for multiple-source drugs as the *median* price for all generic sources of the drug." (Gov't Br. at 14.) The Court has already ruled that median-based ("MAC")[7] reimbursement in the private context is not part of the class. 230 F.R.D. at 96.

As the Track 1 defendants will establish at trial, for most brands, the WAC from which the AWP is calculated is the price at which the manufacturer plans to sell the drug, particularly at launch. As competition increases over the life of the product, the WAC

---

[7] As the Court stated, a MAC price "is often based on the median or mean of the AWPs of several different manufacturers' versions of a drug." 230 F.R.D. at 74.

-13-

may not reflect discounts, but Congress has defined WAC as a list price that does not reflect discounts.  *See* 42 U.S.C. § 1395w-3a(c)(6)(B).  The important point is that the WAC for brands is originally established in reference to, and is constrained by, market forces, and the AWP for generics typically is set at launch in relation to the brand AWP.

## III.   THE SECRETARY'S USE OF "AWP" IS CONSISTENT WITH PART B'S RELIANCE ON REASONABLE CHARGES RATHER THAN REASONABLE COSTS

The Government's statutory construction is premised on its demonstrably incorrect assertion that the objective of Medicare Part B was to reimburse physicians for drugs at their reasonable *cost*.  (Gov't Br. at 1.)  This overall objective, says the Government, reinforces its "plain meaning" analysis because its proffered range of "plain meanings" for the term "average wholesale price" is consistent with providers' acquisition costs.  On the contrary, the statute governing reimbursement in doctors' offices under Medicare Part B "calls for reimbursement based on "reasonable *charges*," not reasonable *costs*, as the government itself at one point acknowledges.  (*Id.* at 3-4.).

The Government clearly recognizes that reimbursement under Medicare Part B has been from the start based on reasonable charges, whereas reimbursement under Medicare Part A, for hospitalization, has been based on reasonable costs.  (*Id.*)  "Reasonable charges" in ordinary parlance include a margin over cost, with "reasonable" setting the constraint on how much.  The Senate report accompanying the original Medicare statute noted that Medicare carriers (which are also private insurers, and play an administrative role in Part B only) should take steps to insure that reimbursement "is not higher than the charge used for reimbursement on behalf of the carriers' own policy holders or subscribers for comparable services under comparable circumstances," (S. Rep. No. 404, 89th Cong. 1st Sess. (June 30, 1965) at 3), which private

payments include a margin above costs, as basic economics and evidence in this case confirm. (*See, e.g.*, Berndt Report ¶¶ 24-26, 49-51.)  Thus, it follows that the policy of the 1997 statute called for the Secretary to implement a reimbursement rate for drugs that provided for a reasonable margin over drug acquisition cost, and not to reimburse at cost, as the plaintiffs allege.

The Government contends to the contrary that the "reasonable charge" methodology for Part B drugs should be construed as the "reasonable cost" methodology of Part A.  (Gov't Br. at 6.)  In addition to ignoring the policy difference between Part A and Part B reimbursement, which the Government otherwise acknowledges, the Government's position also rests on an inapplicable statutory provision, 42 U.S.C. § 1395x(v)(1)(A), which applies to services, not to drugs, and carefully distinguishes between the two.  *Compare* 42 U.S.C. § 1395x(s)(1) *with* § 1395x(s)(2) (drugs).  It also rests on a statutory provision that the Government mischaracterizes as relating to costs when by its terms it relates to charges.  42 U.S.C. § 1395u(b)(3).  To the extent that the Government relies on *AMA v. Mathews*, 429 F. Supp. 1179 (N.D. Ill. 1977), that reliance is misplaced.  That case simply upheld the Secretary's authority to establish "maximum allowable costs" for multi-source drugs as a cost saving measure; it did not say that "reasonable charge" should be construed to mean "reasonable cost" for all purposes.[8]

The Government's attempt here to apply Medicare's "reasonable cost" methodology to drug reimbursement under Medicare Part B is flatly inconsistent with its position in another case

---

[8] Furthermore, the court in *Mathews* noted that there is a difference in the payment methodologies between the "great proportion of drugs covered by Medicare [Part A] and Medicaid" and the "narrower category of drugs" covered in Part B:  "Congress has directed that the reasonable cost formula of [42 U.S.C. § 1395(x)(v)(1)(A) be applied concurrently to all payments under basic Medicare [Part A], to payments made to hospitals and extended care facilities under supplemental Medicare [Part B], and by reference in [42 U.S.C.] § 1396a(a)(13)(D) to inpatient costs under Medicaid.  By contrast, the "reasonable charge" limitation sections apply to a narrower category of drugs [administered in physician offices] and [the sections] attack the cost problem indirectly by limiting charges in bills for professional services."  429 F. Supp. at 1196 (emphasis added).

before this court, *United States v. MacKenzie*, 01-CR-10350-DPW (D. Mass. 2004).  In that case, the Government alleged that several officers of TAP had misrepresented AWPs, among other things.  The Government initially took the position that HCFA and Congress intended that AWP should be an average of actual costs, but then backed away from that position after Judge Woodlock expressed skepticism as to its merit.

In a brief explaining its reversal of position, the Government conceded that "the spread between list price and AWP was known to the Government in various ways, and assumed by the Medicare reimbursement system."[9]  If the spread between the manufacturer's list price to the wholesaler and AWP was known to the Government and "assumed" by the reimbursement system, it cannot be the case that Congress intended AWP to reflect "reasonable cost" when it established the reimbursement amounts in the BBA of 1997.

---

[9] Government's Memorandum Regarding RTP as a Kickback Under Paragraph 55(b) of the Conspiracy Charged in Count I at 1.

**CONCLUSION**

The government's position highlights points of importance, including the role of the Secretary in setting Medicare Part B reimbursement rates under the 1997 statute, and her knowledge then from OIG reports and other sources that the rates she established under the statute did not approximate provider acquisition costs.  These are points that undermine the plaintiffs' case and refute their proposed "plain meaning" interpretation of the statute.  They also belie the government's proposed, alternative "plain meaning" interpretation of the statute.  An accurate account of the history of the statutory change in 1997, major portions of which are identified in the addendum to this memorandum, demonstrate that Congress and the Secretary understood the role of AWP in the pharmaceutical industry and adopted the term for use in Medicare Part B knowing what the plaintiffs here contend the defendants fraudulently concealed, *i.e.,* that reimbursement based on AWP would induce providers to participate in the voluntary Medicare Part B system by allowing them to earn a margin on their costs of participation.

Respectfully Submitted,

TRACK 1 DEFENDANTS[10]

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Eric P. Christofferson (BBO#654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation*

Dated: October 11, 2006

---

[10] BMS does not join in this brief.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2006, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

/s/ Eric P. Christofferson
Eric P. Christofferson

10223487_1