# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 |
|  | ) Civil Action No. 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) ) Judge Patti B. Saris ) Chief Magistrate Judge Marianne B. Bowler ) |

## THE BMS DEFENDANTS' RESPONSE TO THE GOVERNMENT'S AMICUS BRIEF

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
  Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
  Steven M. Edwards, Esq.
  Lyndon M. Tretter, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc.*

Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc. (the "BMS Defendants") respectfully submit this response to the Brief of The United States as Amicus Curiae ("Gov't Br."), filed September 15, 2006.

<u>Preliminary Statement</u>

BMS is filing a separate memorandum because its position is somewhat unique. BMS does not report average wholesale prices ("AWPs") to industry publications. BMS reports list prices to the publications, who apply a mark-up factor of 20% to 25% to calculate an AWP for BMS's drugs. Those list prices are the prices that appear on invoices to wholesalers, and for the drugs at issue in the case, 86% of BMS's net sales to were within 5% of list price. Thus, the AWPs calculated by the publications for BMS's drugs are not "completely unmoored from reasonable charges in the marketplace," as the government suggests. (Gov't Br. at 2.) They are constrained by BMS's list prices, which are in turn constrained by prices charged in the marketplace.

BMS has been reporting list prices to industry publications since at least the early 1970s. From the outset, the publications calculated AWPs by applying a mark-up factor of 20% to 25% to BMS's list prices. It is undisputed that the entire industry, as well as the government, understood that the AWPs published by the industry publications did not represent transaction prices. It never occurred to BMS when the Health Care Financing Administration ("HCFA") adopted a regulation using AWP in 1991 and Congress passed a statute using AWP in 1997 that they intended the regulatory or statutory definition AWP to be different from the industry definition.

In its amicus brief, the government contends that the words "average wholesale price" should be interpreted in accordance with their plain meaning. What this entails, in the

government's view, is that AWP should approximate provider acquisition costs.  BMS's position is that the words should be interpreted in accordance with their industry usage, which the Congressional Budget Office ("CBO") has aptly characterized as "a publicly available, suggested list price for the sales of a drug by a wholesaler to a pharmacy or other provider [that] is not the actual price that wholesalers charge . . . ."[1]

We show below that, contrary to the government's position that industry usage should be adopted only in unusual circumstances, a court <u>must</u> adhere to the industry usage when a regulation or statute uses an industry term, unless the regulator or Congress indicate otherwise. We also show that, contrary to the government's position, interpreting AWP in accordance with its industry meaning would not frustrate any regulatory or Congressional purpose.  Finally, we show that defining AWP as the suggested list price for transactions by wholesalers to providers would not give pharmaceutical manufacturers unfettered power to establish reimbursement amounts or result in reimbursement amounts without limits.

<u>Argument</u>

I.

THE TERM "AVERAGE WHOLESALE PRICE" SHOULD BE INTERPRETED IN ACCORDANCE WITH ITS INDUSTRY MEANING

Relying on <u>Estate of Cowart v. Nicklos Drilling Co.</u>, 505 U.S. 469 (1992), the government suggests that when the words in a statute have a plain meaning, that should be the end of the inquiry.  (Gov't Br. at 16.)  The words that the government purports to quote actually state that "<u>the beginning point</u> must be the language of the statute . . . ."  <u>Id</u>. at 475 (emphasis added).  The plain meaning rule does not require this Court to blind itself to the truth.

---

[1] CBO, "Prices For Brand-Name Drugs Under Selected Federal Programs" (June 2005) at 4.

Where, as here, a regulation or statute includes an industry term of art, it must be defined in accordance with its industry meaning.  Corning Glass Works v. Brennan, 417 U.S. 188, 202 (1974) (The definition of "working conditions as encompassing surroundings and hazards is 'well accepted across a wide range of American industry'.").  The Supreme Court has consistently recognized that terms that have a preexisting meaning in a trade or industry "should be interpreted by reference to the trade or industry to which they apply."  Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 372 (1986).  Moreover, this rule is not optional, as the government seems to suggest.  "In the absence of contrary indication, [the court must] assume that when a statute uses [an industry] term, Congress intended it to have its established meaning."  McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342 (1991).  "[C]ommercial terms used in a statute relating to trade or commerce are presumed to have been used in their trade or commercial context."  2A Sutherland, Statutes and Statutory Construction § 47.31 (6th ed. 2000).

The cases relied on by the government actually support this well-established rule. For example, the government cites BedRoc Limited, LLC, v. United States, 541 U.S. 176 (2004), for the proposition that when the language of a statute is clear, resort to legislative history is unwarranted.  (Gov't Br. at 17-18.)  There is nothing in BedRoc, however, which suggests that industry terms should not be interpreted in accordance with their industry meaning.  Indeed, the Court in BedRoc emphasized the need to interpret words in their "popular sense" and held that the term "valuable minerals" should not be interpreted to include sand and gravel because no one in the mining industry at the time the statute in question was passed would have considered sand and gravel to be a valuable mineral.  Id. at 184.

The government's reliance on Commonwealth of Mass. v. Blackstone Valley Elec. Co., 67 F. 3d 981 (1st Cir. 1995) is similarly misplaced.  (Gov't Br. at 19.)  In that case, the court

rejected the plain meaning rule, noting that "a dispute about a statute's or regulation's proper construction cannot be resolved simply by placing the gloss of 'plain meaning' on one competing interpretation." Id. at 986.  The court stressed that the purpose of the industry usage rule was to give citizens "fair notice" of what a statute requires, and it referred the case to the Environmental Protection Agency so that it could promulgate a clear definition of the term "cyanide" so that the industry could comply with it going forward.  Id. at 991-92.

The government also erroneously cites United States v. Lachman, 387 F.3d 42 (1st Cir. 2004) for the proposition that a court should interpret a regulatory or statutory term in accordance with its industry usage "only in rare circumstances."  (Gov't Br. at 19.)  The First Circuit in Lachman actually described the industry usage rule as "well-settled" but found that the language at issue in that case was not a term of art.  Id. at 53.  The court stressed that the definition advanced by the defendants was not "publicly communicated or publicly accessible" and that therefore the defendants could not have relied on it.  Id. at 55, 57.

The government contends that the Court should reject the industry's usage of the term average wholesale price because it is not "well-defined" or "well-accepted."  (Gov't Br. at 19.)  Nothing could be farther from the truth.  The term AWP had a well-established industry meaning long before HCFA decided to use it in a regulation in 1991.

As set forth in the addendum annexed hereto, the industry first began to use AWP in the 1960s.[2]  The industry universally recognized that AWP was a list, not a transaction price.[3]  The government recognized this as well,[4] and in 1984 the Office of Inspector General ("OIG") of

---

[2] Declaration of Gregory K. Bell, dated March 22, 2006, ¶ 57.
[3] IMS, "Pharma Pricing USA (1995) at 103-05; Report of Independent Expert Ernst R. Berndt to Judge Patti Saris dated Feb. 9, 2005 ("Berndt Report") ¶¶ 20-22, 66.
[4] 39 Fed. Reg. 41480 (Nov. 27, 1974).

the Department of Health and Human Services ("HHS") wrote: "Within the pharmaceutical industry, AWP means non-discounted list price."[5]

On June 5, 1991, when HCFA first proposed the regulation at issue in this case, it stated that drug reimbursement should be based on, among other things "85 percent of the national average wholesale price of the drug (as published in the Red Book and similar price listings)."[6]  HCFA also noted that "we believe that the Red Book and other wholesale price guides substantially overstate the true cost of drugs."[7]  The commentary accompanying the final regulation observed that "many [multi-source] drugs could be purchased for considerably less than 85% of AWP,"[8] but HCFA nevertheless directed its carriers to use the AWPs established by the publications.[9]

In 1997, when Congress incorporated AWP into the Balanced Budget Act of 1997 ("BBA"), it explicitly rejected the Administration's proposal to base reimbursement on "actual acquisition cost."[10]  In Senate hearings leading up to the bill, the Secretary described AWP as "a 'sticker' price set by drug manufacturers and published in several commercial catalogs."[11]  The House Budget Committee recognized that the AWPs in the publications "range [ ] from 20 percent to nearly 1000 percent per dosage more than acquisition costs," but expressly directed the Secretary to take into consideration "commercially available information . . . published or reported in various commercial reporting services."[12]

---

[5] OIG, "Changes to the Medicaid Prescription Drug Program Could Save Millions" (1984) at 9.

[6] 56 Fed. Reg. 25792 at 25800 (June 5, 1991).

[7] Id.

[8] 56 Fed. Reg. 59502 at 59624 (Nov. 25, 1991).

[9] Booth to All Associate Regional Administrators for Medicare (March 15, 1994.)

[10] Compare Medicare and Medicaid Beneficiary Protection Act of 1997, H.R. 2632, 105th Cong. § 206 (1997) with Pub. L. 105-33 § 4556(a) (1997), codified in 42 U.S.C. § 1395U(o).

[11] Hearing before Senate Committee on Finance (February 13, 1997) at 265.

[12] Report of the Committee on the Budget House of Representatives, Balanced Budget Act of 1997, at 1354 (June 24, 1997).

The Secretary, evidencing her own understanding of what Congress intended, then directed carriers to base reimbursement on 95% of AWP "as reflected in sources such as the Red Book, Blue Book, or MediSpan," recognizing that "AWP . . . does not reflect the cost to the physician or supplier furnishing the drug to the Medicare beneficiary."[13] She later told Congress that AWP in the statute was "a suggested price," "a standard benchmark," and "not representative of any price that is actually changed by wholesalers to their customer."[14] Then, when she tried to define AWP as something other than a list price reported by industry publications, various members of Congress complained,[15] and Congress passed legislation which effectively barred HCFA from employing a definition of AWP other than that used by the publications.[16]

The use of AWP as a list or benchmark price that does not represent provider acquisition costs and exceeds the list price that manufacturers use in their sales to wholesalers is thus well-established.  The CBO, which is an arm of Congress, has consistently defined AWP to mean a "suggested list price" for sales of a drug by a wholesaler to a pharmacy or other provider.[17]  First DataBank has used a similar definition: "Blue Book AWP . . . as published by FDB represents an average of wholesaler's published catalog or list prices or the sale of a drug product to their customers (i.e., retailers, hospitals, physicians and other buying entities)."[18]  In

---

[13] HCFA, "Implementation of the New Payment Limit for Drugs and Biologicals" Program Memorandum No. AB-97-25 (Jan. 1998) at 1 (HHC021-0032-33).

[14] Donna E. Shalala, Secretary, DHHS, "Report to Congress: The Average Wholesale Price for Drugs Covered Under Medicare" (1999) at 2-3 (HHC902-0801-18).

[15] Christopher S. Bond and John Ashcroft to Donna E. Shalala, Secretary, DHHS (Aug. 3, 2000); Senator Spencer Abraham to Donne E. Shalala, Secretary, DHHS (Sept. 6, 2000);  Senator Saxby Chambliss, et al. to Donna E. Shalala, Secretary, DHHS (July 28, 2000).

[16] Pub. L. 106-555, § 429(c) (Dec. 21, 2000).

[17] CBO, "How the Medicaid Rebate on Prescription Drugs Affects Pricing in the Pharmaceutical Industry" (Jan. 1996) at 19; CBO, "Prices for Brand-Name Drugs Under Selected Federal Programs"(June 2005) at 4.

[18] Draft First DataBank Drugs Price Policy (June 2, 2004) (emphasis in original).

addition, wholesalers have testified that their suggested retail prices reflect a 20% to 25% mark-up over the manufacturer's list price.[19]

BMS has also always understood AWP to be a list price calculated by industry publications, with which it is not affiliated.[20] In one of plaintiffs' favorite documents, a BMS employee describes the evolution of AWP as follows:

> "Before the 1980's, there were many pharmaceutical companies, who sold to many wholesalers and many retailers.  Since the wholesalers were regional in nature, it was difficult to ascertain the 'average' price manufacturers sold product for.  Most manufacturers sold through wholesalers only, but some did sell direct to retailers.  The price manufacturers sold product to wholesalers for was termed Wholesale List Price or 'WLP'.  On average, wholesalers marked WLP up 20% from manufacturers selling product to wholesalers only, when selling product to retail pharmacies.  Wholesalers marked-up product 25% from manufacturers who also had direct pharmacy sales.  As an example, Bristol-Myers did not deal in direct sales, hence had a 20% markup, while Squibb's direct policy caused a 25% markup, also known as 'WLP to AWP spread.'
>
> "A pricing service, First Databank, found a market niche in surveying wholesalers and retailers for the average price wholesalers sold product to pharmacies for, hence 'Average Wholesale Price.'  They published this information in such sources a Redbook and PriceAlert.
>
> "Over the past 20 years, much consolidation has occurred within the pharmaceutical wholesale and retail supply chain.  Now, major wholesalers and pharmacy chains are able to negotiate much better pricing from each other, as well as from manufacturers.  Wholesalers and retailers now work on a slim margins and mark-ups from WLP in the 2% - 4% range.  But, First Databank has maintained the 20% - 25% AWP markup legacy and continues to publish the artificially inflated number.  This markup is applied to new and old products based on the manufacturer assigned to the product labeler code."[21]

---

[19] Yonko Dep. Tr. 23-28; James Dep. Tr. 49-52, 55-56, 80-81.

[20] Declaration of Steve W. Berman dated Aug. 30, 2006 ("Berman Decl."), Exh. 23.

[21] Id. Exh. 29.

It never occurred to BMS, and BMS would have had no way of knowing, that HCFA or Congress intended Medicare AWPs to be something different from the publications' AWPs and, indeed, there is no credible evidence that HCFA or Congress intended anything different.

In Greenwood Trust Co. v. Commonwealth of Mass., the court noted that "the plain-meaning doctrine is not a pedagogical absolute.  This rule of construction is more 'an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence' in contradiction to supposedly plain meaning if such evidence exists."  971 F.2d 818, 825 (1st Cir. 1992) (quoting Boston Sand & Gravel Co. v. United States, 278 U.S. 41, 48 (1928)).  The court added that "borrowed phrases do not shed their skins like so many reinvigorated reptiles.  Rather, 'if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it.'"  Id. at 827, quoting Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L .Rev. 527, 537 (1947).  The government has not demonstrated any basis for the Court to ignore industry usage and adopt a "plain meaning" interpretation of AWP that was different from what the industry understood.

## II.

### THE INDUSTRY USAGE IS CONSISTENT WITH THE LEGISLATIVE PURPOSE.

The government suggests that adopting the industry usage of AWP would be inconsistent with "the Secretary's general policy . . . to base payments on estimated costs consistent with reasonable charge principles."  (Gov't Br. at 1.)  The very statement of that argument demonstrates its flaw.  If payment for drugs under Medicare Part B is to be based on reasonable charges, as the government appears to concede (Gov't Br. at 3), then it cannot be limited to "estimated costs" because the term "reasonable charge" -- by definition -- assumes that the provider will be paid something above its costs.

The government tries to get around this inconsistency by suggesting that Congress adopted several amendments to the Medicare statute which had the effect of equating reasonable charge with reasonable cost.  (Gov't Br. at 6.)  As pointed out in the memorandum filed on behalf of the other defendants, however, the amendments on which the government relies consistently refer to reasonable charges, as opposed to reasonable costs.  See 42 U.S.C. § 1395u(b)(3).  Furthermore, the case on which the government relies, American Med. Ass'n v. Mathews, 429 F. Supp. 1179 (N.D. Ill. 1977), simply stands for the unexceptional proposition that HCFA could use maximum allowable cost as a basis for drug reimbursement if it chose to do so.

There are well-documented reasons why HCFA in 1991 and Congress in 1997 deliberately chose to use a standard that permitted providers to earn a margin on drugs.  The commentary accompanying the 1991 regulation referred to "shortfalls in chemotherapy administration payments" and a desire to encourage providers to administer drugs in clinics as opposed to "hospital outpatient departments at substantially higher costs."[22]  When Congress decided to use "an industry accepted AWP, not one derived by government bureaucrats" in the 1997 BBA, it did so because it wanted to cross-subsidize the underpayment for services.[23]  When HCFA withdrew from an effort to define AWP in terms of acquisition costs, it stated it was doing so because "we have concluded that Medicare payments for services . . . are inadequate."[24]  In 2000, when Congress prohibited HCFA from lowering reimbursement for drugs pending further study by the Comptroller General, it did so because it was concerned that reimbursement

---

[22] 56 Fed. Reg. 59502 at 59621 (Nov. 25, 1991).

[23] Senator Spencer Abraham to Donne E. Shalala, Secretary, DHHS (Sept. 6, 2000); Senator Saxby Chambliss, et al. to Donna E. Shalala, Secretary, DHHS (July 28, 2000).

[24] . Nancy-Ann Min DeParle, Administrator to Members of Congress (Sept. 8, 2000) at 2.

for services was too low.[25]  Finally, when Congress decided to adopt a reimbursement standard based on acquisition costs, it chose a completely new concept -- 106% of average sales price or "ASP" -- which it defined in detail,[26] and it increased reimbursement for services significantly.[27]

The government's effort to ignore these facts and to adopt a "plain meaning" of AWP is perverse.  Not only is the government asking the Court to hold the industry to a standard that it had no way of knowing existed, the government is asking the Court to create a standard that is directly contrary to what HCFA and Congress intended.  Interpreting AWP in accordance with industry usage is consistent with the regulatory and legislative purpose.  It is exactly what HCFA and Congress intended.

The government has conceded as much in another case in this Court.  In United States v. MacKenzie, 01-CR-1350-DPW (D. Mass. 2004), the United States Attorney for the District of Massachusetts, whose name is on the amicus brief, stated that "the spread between list price and AWP was known to the government in various ways, and assumed by the Medicare reimbursement system."[28]  If the Medicare reimbursement system "assumed" that there was a spread between AWP and the manufacturer's list price to the wholesaler, then the words "average wholesale price" must be interpreted in accordance with their industry usage and cannot be given a "plain, ordinary meaning."

---

[25] GAO, "Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost," GAO-01-1118, at 2.
[26] 42 U.S.C. § 1395w-3a(b) and (c).
[27] MedPac, "Effects of Medicare Payment Changes on Oncology Services" vii to ix (Jan. 2006).
[28] Government's Memorandum Regarding RTP as a Kickback Under Paragraph 55(b) of the Conspiracy Charged in Count I at 1.

III.

INTERPRETING AWP IN ACCORDANCE WITH INDUSTRY USAGE DOES NOT GIVE
MANUFACTURERS UNFETTERED POWER OVER REIMBURSEMENT RATES.

According to the government, adopting an industry understanding of AWP would result in a benchmark that exhibits "no rational boundaries [and is] completely unmoored from reasonable charges in the marketplace." (Gov't Br. at 1.)  In the case of BMS, that is simply not true.  The AWPs for BMS's drugs are based on BMS's list prices, which in turn are based on the prices that BMS believes it can obtain for its drugs in the marketplace.

Consistent with its understanding of the industry definition of AWP, BMS -- both before and after HCFA first used AWP in a regulation in 1991 -- submitted list prices to industry publications who applied a mark-up factor of 20% to 25% to calculate AWPs.[29]  Those list prices were the prices that appeared on invoices to wholesalers, and they approximated the prices at which a substantial percentage of BMS's net sales were made.[30]  According to BMS's expert, 86% of BMS's net revenues for the drugs at issue in the case during the period 1993 through 2002 were generated from transactions that were within 5% of list price.[31]

Not only are BMS's list prices subject to market constraints, BMS does not control the mark-up factor that the publications use to establish AWPs.[32]  This is illustrated by an episode that occurred in 1992, when some of BMS's oncology drugs had a mark-up factor of 20% and others had a mark-up factor of 25%.  BMS requested the publications to change the

---

[29] Affidavit of Denise M. Kaszuba, sworn to February 18, 2004, ¶ 2.

[30] Declaration of Zoltan Szabo, dated Oct. 25, 2004, ¶¶ 2, 11.

[31] Declaration of Gregory K. Bell ("Bell BMS Decl."), dated March 15, 2006, ¶ 24 & Exh. E.

[32] BMS Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment as to Class 3, dated July 14, 2006, at 5-6.

11

mark-up factor for all oncology drugs to 25%, and Red Book agreed but First DataBank and

MediSpan did not.[33]   MediSpan explained its decision as follows:

> "After reviewing the results of the wholesaler survey performed on
> Bristol Oncology, and discussing these results with John, we have
> determined that for those items with the labeler 0003, we will use a
> 1.25 mark-up and for those items with the labeler 00015, we use a
> 1.20 mark-up."[34]

Thus, the publications controlled the mark-up factor and the methodology.

The control that the publications have over the mark-up factor and what gets

reported as AWP (and, indeed, the use of the term AWP) is perhaps no better illustrated than by

the recent settlement in New England Carpenters Health Benefits Fund v. First DataBank, Inc.,

Civ. Action No. 1:05-CV-11148-PBS (D. Mass., filed Oct. 4, 2006).  It was the publications that

the plaintiffs went to in order to effectuate a change in the mark-up factor from 1.25 to 1.20.  It

was First DataBank who decided to change AWP to "suggested" AWP.

Plaintiffs have complained that BMS's list prices were not adjusted to reflect

discounts, but a list price -- by definition -- does not reflect discounts.[35]  Plaintiffs have also

complained that BMS's practice of not reducing list prices once a product faces generic

competition has resulted in alleged "mega-spreads," but BMS's expert has demonstrated that

29% of BMS's net sales for the drugs at issue in this case were within 5% of list price after

generic competition.[36]  Furthermore, when HCFA adopted its regulation in 1991, it provided that

---

[33] See E-mail from Denise Kaszuba to Tim Wert and Greg Kegler, dated July 10, 1996, attached as Ex.1 to Declaration of Zoltan Szabo, Oct. 25, 2004.

[34] Memorandum from Wyndy J. to Terri R., dated Sept. 19, 1992 (BMS/AWP0011246).

[35] See, 42 U.S.C. § 1395w-3a(c)(6)(B) (defining wholesale acquisition cost as "the manufacturer's list price . . . not including prompt pay or other discounts, rebates or reductions in price.")

[36] Bell Decl. Exh. E.  As Dr. Bell explains, it would not make sense for a manufacturer to reduce its list price, even if the average sales price were going down, so long as some customers are willing to pay list price.  (Bell Decl. ¶ 25.)

reimbursement for multi-source drugs would be based on "the median price for all sources of the generic form of the drug,"[37] which by definition would not be the AWP for the BMS drug.

In addition, the record in this case is clear that payors, including Medicare, did not base their reimbursement decisions on a drug by drug analysis; rather, they were interested in the total amount they are paying for drugs in the context of achieving other goals such as encouraging providers to participate in their programs; incentivizing providers to make the investment and take the risk of establishing their own clinics so they could administer drugs outside of the hospital setting, which is much more expensive; and using reimbursement for drugs to cross-subsidize underpayment for the service of administering the drug.

The government warns that adopting an industry understanding of AWP would put into the hands of private entities the "unfettered power" to set reimbursement rates, but that would be the case no matter how AWP is defined.  Ultimately, drug manufacturers get to decide the prices at which they will sell their drugs.  Regardless of whether AWP is defined as a transaction price, a mark-up over transaction price or a mark-up over a list price, AWP is still subject to market constraints.  The government's claim that defining AWP in accordance with its industry usage would give the manufacturers the ability to establish arbitrary AWPs is a red herring.

---

[37] 56 Fed. Reg. 59502 at 59621.

<u>Conclusion</u>

For the foregoing reasons, the government's position that AWP should be

construed to mean an average of acquisition costs should be rejected.

Dated:    Boston, Massachusetts
          October 11, 2006

Respectfully submitted,


By:    /s/ Jacob T. Ellberg (BBO No. 657469)
       Thomas E. Dwyer, Jr. (BBO No. 139660)
       Jacob T. Elberg (BBO No. 657469)
       **DWYER & COLLORA**
       600 Atlantic Avenue
       Boston, Massachusetts
       Tel: (617) 371-1000
       Fax: (617) 371-1037
       tdwyer@dwyercollora.com
       jelberg@dwyercollora.com


       Steven M. Edwards
       Lyndon M. Tretter
       *Admitted pro hac vice*
       **HOGAN & HARTSON LLP**
       875 Third Avenue
       New York, New York 10022
       (212) 918-3000


       *Attorneys for Defendants Bristol-Myers Squibb Co.,*
       *Oncology Therapeutic Network Corp. and*
       *Apothecon, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

  I, Lyndon M. Tretter, an attorney for Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc., hereby certify that on October 11, 2006, I caused copies of the foregoing document to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.


       <u> /s/ Lyndon M. Tretter </u>
        Lyndon M. Tretter

**ADDENDUM ON THE LEGISLATIVE AND REGULATORY HISTORY OF AWP IN RESPONSE TO THE GOVERNMENT'S INCOMPLETE AND SELECTIVE DISCUSSION OF THAT HISTORY**

The first known use of AWP as a reimbursement benchmark occurred in the 1960s in the California Medicaid Program.  Instead of reimbursing pharmacists on the basis of billed charges, which varied from pharmacy to pharmacy, the program used AWP to provide a consistent starting point for determining reimbursement amounts.[38]  Sometime after the California Medicaid program started using AWPs, the Publications began to publish them.

In the 1960s, the typical mark-up of the wholesaler to the retailer was 20% to 25%, so the Publications calculated AWP by adding 20% to 25% to the wholesaler acquisition cost, or "WAC".  Because of consolidation and competition, however, wholesalers began to offer significant discounts and transaction prices were often less than AWP.  As a result, AWP became a list price, as opposed to a transaction price, between wholesalers and retailers.[39]

Published AWPs rapidly became a widely used reimbursement benchmark for private payors and state Medicaid programs in the late 1960s and early 1970s.[40]  The possible use of AWPs for drug reimbursement by Medicare was first discussed in a report by the Department of Health Education and Welfare ("HEW") Task Force on Prescription Drugs dated February 7, 1969.  That report noted that, if AWP were used, the Government should recognize that "these listed prices rarely have any realistic relationship with actual acquisition costs . . . ."[41]

Even though it was clearly understood that published AWPs did not represent acquisition costs, both Medicare carriers and state Medicaid agencies frequently used AWPs as a benchmark

---

[38] Merits Report and Declaration of Gregory K. Bell Ph.D., on Behalf of Track 1 Defendants, dated March 22, 2006, ¶ 57.

[39] IMS, "Pharma Pricing USA" (1995) at 103-05; Report of Independent Expert Ernst R. Berndt to Judge Patti B. Saris dated Feb. 9, 2005 ("Berndt Report") ¶¶ 20-22, 66.

[40] Bell, supra n.38, ¶ 57 and Apps. A, B and C; Berndt Report ¶ 23.

[41] "Prescription Drugs Under Medicare: the Legacy of the Task Force on Prescription Drugs," reprinted in 10 Journal of Research in Pharmaceutical Economics, No. 2/3 (2001) at 148.

for determining reimbursement amounts for drugs.  In 1974, HCFA embarked on a program to

reduce the dependence on published AWPs by developing maximum allowable costs ("MAC")

for certain drugs under Medicaid and hospital-based Medicare treatment.[42]  In connection with

the proposed rule for reimbursement of drug cost under the Medicaid program, HCFA noted:

> "Most States use average wholesale price, Red
> Book data, Blue Book data, survey results or similar
> standard costs.  <u>Such standard prices are frequently
> in excess of actual acquisition costs</u> to the retail
> pharmacist."[43]

In the final regulation, HCFA directed the states to base reimbursement on estimated acquisition

cost ("EAC"), recognizing that EAC was significantly lower than AWP.[44]

In 1984, the Office of Inspector General ("OIG") of HHS issued a report for

Medicaid estimating that acquisition costs ranged from 0.23% to 41.78% below AWP.[45]  The

OIG report described the industry's understanding of AWP: "<u>Within the pharmaceutical industry,

AWP means non-discounted list price</u>."[46]  In explaining the reason why HCFA chose EAC as

opposed to AWP as a reimbursement standard, the OIG report stated that "HCFA believed that

published AWP was too high and, therefore, the purpose of the EAC requirement in the

regulations was to move states away from using AWP as the upper limit for reimbursing drug

ingredient cost."[47]

In 1988 Congress passed the Medicare Catastrophic Coverage Act ("MCCA")

which, among other things, directed the Secretary of Health and Human Services ("HHS"), the

successor agency to HEW, to promulgate regulations providing for a new Medicare Part B drug

---

[42] 39 Fed. Reg. 40302 (Nov. 15, 1974).
[43] 39 Fed. Reg. 41480 (Nov. 27, 1974) (emphasis added).
[44] 40 Fed. Reg. 34515 at 34518 (Aug. 15, 1975).
[45] OIG, "Changes to the Medicaid Prescription Drug Program Could Save Millions" (1984) at 9.
[46] <u>Id.</u> at 3 (emphasis added).
[47] <u>Id.</u> at 3.

benefit.[48]  HCFA proposed regulations which provided that drug reimbursement would be based on the lower of actual selling prices determined by bi-annual surveys or the "published average price" reflected in the Red Book, the Blue Book or MediSpan.[49]  The regulation explicitly distinguished between survey prices and AWPs:

> "There is a common billing practice of showing both suggested list price and the wholesaler's or manufacturer's actual selling price on invoices.  For example, an invoice has one column marked 'suggested list price,' 'list AWP,' or a similar phrase.  A second column is marked 'actual cost' or 'price.'  We would use the actual selling prices (before discounts) for purposes of the survey because the suggested list prices (or list AWP) are essentially comparative prices to demonstrate that when the purchaser pays the actual selling price, the purchaser pays less than the suggested list prices."[50]

Thus, again, HCFA adopted the industry usage which recognized that AWPs were not transaction prices.

In October 1989, OIG issued another report on the relationship between published AWPs and transaction prices, concluding that "the preponderance of evidence shows that AWP is heavily discounted."[51]  The OIG report added that "all facets of the industry are willing to admit that the discounts exist," and it quoted a wholesaler's comment that "it is recognized in the industry that there are discounts off AWP . . . selling price is based on AWP less a discount or . . . cost plus a markup."[52]  The report noted that nevertheless "[t]he MCCA legislation calls for the

---

[48] Pub. L. 100-360, 102 Stat. 683 (July 17, 1988).

[49] 54 Fed. Reg. 37208 at 37214 (Sept. 7, 1989).

[50] Id.

[51] OIG, "Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and the Medicare Prescription Drug Program" (Oct. 1989) at 2.

[52] Id. at 4.

use of non-discounted AWP, plus an administrative allowance, as one of the reimbursement limits for prescription drugs."[53]

In December 1989, Congress repealed the MCCA (and HCFA subsequently withdrew the proposed regulations)[54] and passed the Omnibus Budget Reconciliation Act of 1989 which, among other things, directed the Secretary to establish a fee schedule for physician reimbursement under Medicare Part B, to be implemented by January 1, 1992.[55]   Section 1848(j)(3) of that Act gave the Secretary authority to exclude certain items and services from that schedule.   Given the large number of different drugs and myriad of dosage levels, HCFA decided to exclude drugs from the fee schedule, but indicated that it would continue to consider that issue in the future.[56]

On June 5, 1991, HCFA proposed a regulation providing that drugs be reimbursed at "85 percent of the national average wholesale price of the drug (as published in the Red Book and similar price listings)" or estimated acquisition cost for high volume drugs.[57]   Citing the 1984 and 1989 OIG reports, HCFA explained that it was proposing a 15% discount off AWP because "we believe that the Red Book and other wholesale price guides substantially overstate the true cost of drugs."[58]   Even though those reports concerned self-administered drugs dispensed by pharmacies under the Medicaid program, HCFA commented that "[w]e have no reason to believe prices paid by physicians are any higher than pharmacies pay."[59]

---

[53] Id. at 6.
[54] Pub. L. 101-234, 103 Stat. 1979 (Dec. 13, 1989); 55 Fed. Reg. 9470 (March 15, 1990).
[55] Pub. L. 101-239 § 1848.
[56] 56 Fed. Reg. 25792 at 29800 (June 5, 1991).
[57] Id. (emphasis added).
[58] Id.
[59] Id.

After receiving comments, on November 25, 1991, HCFA adopted the final rule providing for payment for drugs at the lower of estimated acquisition cost or AWP.[60]  In the commentary accompanying the rule, HCFA noted that "[t]he thrust of most of the comments was that many drugs could be purchased for considerably less than 85 percent of AWP – particularly multi-source drugs – while others were not discounted."[61]  HCFA added:

> "Also, a number of comments from the oncologists indicated that we should use an add-on to cover the cost of breakage, wastage, shelf-life limitations, and inventory costs associated with chemotherapy agents.  Some commentators also suggested that this add-on payment was needed to account for shortfalls in chemotherapy administration payments.  Without adequate compensation, commenters suggested, many physicians would perform the service in hospital outpatient departments at substantially higher costs."

To account for these factors, HCFA set one alternative reimbursement level at 100% as opposed to 85% of AWP.[62]

The other alternative reimbursement level was estimated acquisition cost, which was to be based on surveys of actual invoice prices.[63]  However, HCFA also encouraged carriers to include in their estimates "indirect costs such as inventory costs, waste, and spoilage," which it noted could be "significant" for certain type of drugs such as chemotherapy drugs.[64]  Under either formula established by HCFA, therefore, reimbursement was not limited to drug transaction prices.

---

[60] 56 Fed. Reg. 59502 at 59621 (Nov. 25, 1991).
[61] Id. at 59524.
[62] Id.
[63] Id. at 59621.
[64] Id. at 59525.

As noted in the Track 1 defendants' motion for summary judgment, HCFA never implemented the estimated acquisition cost approach.[65]  Indeed, when a carrier attempted to base reimbursement on a physician's acquisition cost, HCFA directed it not to.[66]  Furthermore, during the period 1992 to 1997, there were numerous documents and reports demonstrating that HCFA knew that "AWP is not a reliable indicator of the cost of a drug to physicians" and in some cases AWPs exceeded transaction prices by as much as 1000%.[67]

In 1997, the Clinton Administration proposed legislation that would limit reimbursement to "actual acquisition cost," which would reflect all discounts, rebates or other benefits the provider received for the drug.[68]  Congress rejected the Administration's proposal and instead passed the Balanced Budget Act ("BBA") of 1997, which set reimbursement at the lesser of the amount charged by the provider or 95% of "the average wholesale price."[69]  The BBA also directed the Secretary to study the effect of this change on the published average wholesale prices and report back to Congress no later than July 1, 1999.[70]

In discussing the Clinton Administration proposal in hearings before the Senate Finance Committee, the Secretary of HHS testified:

> "Medicare pays the 'average wholesale price' (AWP) for covered drugs.  However, the AWP is not the average price actually charged by wholesalers to their customers.  Rather,

---

[65] Memorandum from Charles R. Booth, Director, Office of Payment Policy, BPD, to All Associate Regional Administrators for Medicare  (Aug. 8, 1994) (HHC902-0173); Memorandum from Jill B. Merrill, Health Insurance Specialist, Medicare Operations Branch, HCFA, to All Part B Carriers, RIL No. 94-435 (Aug. 12, 1994) (AWP032-0035.

[66] Letter from Darlene Debus, Manager, Colorado State Team, HCFA, to Grant Steffen, M.D., Blue Cross/Blue Shield of North Dakota at 1 (July 1996) (HHC908-1217-18).

[67] OIG, Physicians' Costs for Chemotherapy Drugs (Nov. 6, 1992) at 2, 5, 11, app. II and III; Z. Bentley and T. Jones to B. Vladeck, Oct. 2, 1996, at 1, 3 (HHC003-0479-84); OIG, Excessive Medicare Payments for Prescription Drugs (Dec. 1997) at 8.

[68] Medicare and Medicaid Beneficiary Protection Act of 1997, H.R. 2632, 105th Cong. § 206 (1997).

[69] Pub. L. 105-33 § 4556(a) (1997), codified in 42 U.S.C. § 1395u(o).

[70] Id.

> it is a 'sticker' price set by drug manufacturers and
> published in several commercial catalogs."[71]

Furthermore, in a statement omitted by the Government in its amicus brief, the House Budget

Committee report observed that Medicare reimbursements for 10 oncology drugs, which were

based on published AWPs, "ranges from 20 percent to nearly 1000 percent per dosage more than

acquisition costs."[72]  Nevertheless, the report stated: "The Committee intends that the Secretary,

in determining the average wholesale price, should take into consideration commercially

available information including such information as may be published or reported in various

commercial reporting services."[73]  Thus, Congress (1) knew that the published AWPs were often

significantly higher than acquisition costs, (2) directed the Secretary to consider those AWPs and

(3) rejected the Administration's proposal to limit reimbursement to acquisition costs.

      The Secretary thereafter demonstrated her understanding of the legislation by

causing HCFA to direct carriers to base reimbursement on 95% of AWP "as reflected in sources

such as the <u>Red Book</u>, <u>Blue Book</u>, or <u>MediSpan</u>."[74]  In that communication, HCFA noted that

"the AWP is not a true discounted price and, therefore, does not reflect the cost to the physician

or supplier furnishing the drug to the Medicare beneficiary."[75]  In 1999, when the Secretary

submitted a report to Congress on the effect that the legislation had on AWPs, she described

AWP as "a suggested price," "a standard benchmark," and "not representative of any price that is

---

[71] Hearing before Senate Committee on Finance, Senate Hearing 105-85 (February 13, 1997) at 265.

[72] Report of the Committee on the Budget, House of Representatives, Balanced Budget Act of 1997, at 1354 (June 24, 1997).

[73] <u>Id.</u>

[74] HCFA, "Implementation of the New Payment Limit for Drugs and Biologicals" Program Memorandum No. AB-97-25 (Jan. 1998) at 1 (HHC021-0032-33).

[75] <u>Id.</u>

actually charged by wholesalers to their customers," and the data that she used to determine the

impact of the legislation was AWP data published by First DataBank.[76]

        If there was any doubt that Congress intended the words "average wholesale

price" to mean the AWPs published by the Publications and not an actual average of transaction

prices, that was dispelled in 2000 when the Secretary announced that HCFA would base

reimbursement for 400 national drug codes on "alternative" average wholesale price data

compiled by the Department of Justice and the State Medicaid Fraud Control Units which

reflected transaction prices.[77]  This elicited an immediate response from members of Congress.

Senators Bond and Ashcroft told the Secretary:

> "[I]n the Balanced Budget Act of 1997 (BBA), Congress instructed
> HHS to base Medicare reimbursement for cancer drugs on 95
> percent of the 'average wholesale price' or AWP, a term widely
> understood and indeed defined by HHS manuals to reference
> amounts reflected in specified publications.   Later, Congress
> pegged reimbursement to drugs in the outpatient setting to the
> same definition of AWP."[78]

Similarly, Senator Abraham wrote that:

> "Congress laid down very clear legislation regarding these [drug]
> reimbursements in the Balanced Budget Act of 1997, where it
> instructed HCFA to base these reimbursement rates at 95% of the
> average wholesale price (assumed to be an industry-accepted AWP,
> not one derived by government bureaucrats . . . .)  This was
> done . . . to ensure that cancer care providers would receive
> adequate reimbursements for the care they provide."[79]

Eighty-nine other members of Congress wrote letters to the Secretary objecting to the plan,

stating: "If reimbursement for drugs is drastically reduced, many physicians will be unable to

---

[76] Donna E. Shalala, Secretary, DHHS, "Report to Congress: The Average Wholesale Price for Drugs Covered Under Medicare" (1999) at 2-3 (HHC902-0801-18).

[77] Donna E. Shalala, Secretary, DHHS, to Representative Thomas Bliley, Chairman, Commerce Committee, U.S. House of Representatives at 2 (May 31, 2000) (HHC001-359-362).

[78] Christopher S. Bond and John Ashcroft to Donna E. Shalala, Secretary, DHHS (Aug. 3, 2000).

[79] Senator Spencer Abraham to Donne E. Shalala, Secretary, DHHS (Sept. 6, 2000).

continue providing cancer care in their offices, and patients will be deprived of a humane, convenient and cost-effective treatment option."[80]

HCFA responded by exempting oncology products (including BMS drugs in this case) and hemophilia drugs from the new program because "we have concluded that Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate."[81]  HCFA subsequently abandoned the new program altogether.[82]  These developments demonstrate that Congress wanted the Secretary to use published AWPs for drug reimbursement <u>because</u> they exceeded acquisition costs and cross-subsidized under-reimbursement on services.

Congress made this clear in December 2000 when it passed the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act, which barred HCFA from "directly or indirectly decreas[ing] the rates of reimbursement for drugs covered by Part B until the Comptroller General (<u>i.e.</u> GAO) studied the issue of Medicare drug reimbursement."[83]  The GAO looked at the relationship between reimbursement for services and reimbursement for drugs, and it observed that: "Medicare bases its reimbursement to physicians and other providers of drugs on AWP, which is often described as a 'list price,' 'sticker price,' or 'suggested retail price,' reflecting the fact that AWP is not necessarily the price paid by a purchaser or a consistently low or 'wholesale' price."[84]  This reflected the universal understanding of the term AWP.

---

[80] Senator Saxby Chambliss, et al. to Donna E. Shalala, Secretary, DHHS (July 28, 2000).
[81] Nancy-Ann Min DeParle, Administrator to Members of Congress (Sept. 8, 2000) at 2.
[82] HCFA, Source of Average Wholesale Price Data in Pricing Drugs and Biologicals Covered by the Medicare Program Memorandum No. AB-00-115 (Nov. 17, 2000).
[83] Pub. L. 106-555, § 429(c) (Dec. 21, 2000).
[84] GAO, <u>Medicare: Payments for Covered Outpatient Drugs Exceed Providers' Cost</u>, GAO-01-1118, at9 (Sept. 2001).

HCFA (which changed its name to the Center for Medicare and Medicaid Services ("CMS") in 2001) continued to reimburse physicians for drugs under Medicare Part B at 95% of the AWPs published by the Publications until the end of 2003, when the Medicare Modernization Act ("MMA") was signed into law.  The MMA reduced the reimbursement percentage to 85% of the published AWPs in 2004, and then it chose a completely new reimbursement formula -- 106% of "average sales price" ("ASP") -- for 2005.[85]  At the same time, Congress and CMS increased the payments for chemotherapy administration services significantly.[86]  Thus, when Congress wanted to base reimbursement levels on acquisition cost, it rejected AWP and chose an entirely new concept, which it defined in detail.[87]

---

[85] 42 U.S.C. § 1395w-3a(b).
[86] MedPac, Effects of Medicare Payment Changes on Oncology Services vii to ix (Jan. 2006).
[87] 42 U.S.C. § 1395w-3a(c).