# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Docket No.   01-12257-PBS

CITIZENS FOR CONSUME, et al       .
          Plaintiffs              .
                                  .     BOSTON, MASSACHUSETTS
          v.                      .     MAY 9, 2006
                                  .
ABBOTT LABORATORIES, et al        .
          Defendants              .
                                  .
.  .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE MARIANNE B. BOWLER
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Class Plaintiffs:  Edward Notargiacomo, Esquire, Hagens
Berman Sobol Shapiro, LLP, One Main Street, 4th Floor, Cambridge,
MA  02142, (617) 482-3700.

For AmeriSource Bergen Corp.:  Paul Weiner, Esquire, Buchanan,
PC, 1835 Market Street, 14th Floor, Philadelphia, PA  19103.

For Aventis Pharmaceuticals:  Michael DeMarco, Esquire, Foley &
Lardner, LLP, 3000 K Street, N.W., Suite 500, Washington, DC
20007, (617) 951-9111; Attorney Aimee Bierman, Nick Mizell,
Esquire, Shook, Hardy and Bacon (DC), 600 14th Street, NW,
Hamilton Square, Suite 800, Washington, DC  20005-2004.

For NHIC:  Benjamin Wattenmaker, Esquire, Shipman & Goodwin LLP
One Constitution Plaza, Hartford, CT 06103, 860-251-5786.

For J&J:  Adeel Mangi, Esquire, Patterson, Belknap, Webb &
Tyler, 1133 Avenue of the Americas, New York, NY 10036, (212)
336-2546.

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

For Oxford Health:  Larz Schelumneck, Esquire, Groom Law Group, Chartered, 1701 Pennsylvania Avenue, N.W., Washington, DC 20006, US, 202-857-0620.

For Blue Cross Blue Shield:  Stephen Coco, Esquire, Robins, Kaplan, Miller & Ciresi LLP, 800 Boylston Street, Suite 2500, Boston, MA 02199, (617) 859-2767.

For Bristol Myers:  Thomas Dwyer, Esquire, Dwyer & Collora, LLP 600 Atlantic Avenue, Boston, MA 02210, 617-371-1000.

Steven Edwards, Hogan & Hartson, 875 Third Avenue, Suite 2600, New York, NY 10012, 212-918-3000.

For Ven-A-Care:  James Breen, Esquire, The Breen Law Firm, P.A. 3562 Old Milton Parkway, Alpharetta, GA 30005, 770-740-0008.

Court Reporter:

Proceedings recorded by digital sound recording, transcript produced by transcription service.

---

*MARYANN V. YOUNG*
Certified Court Transcriber
240 Chestnut Street
Wrentham, Massachusetts 02093
(508) 384-2003

I-30

1    did have those conversations, but I'm speaking about me.  I

2    did not have those conversations.

3          THE COURT:  Well, when you come here, you're expected

4    to know that.

5          MR. SCHELUMNECK:  Well if, again, if I may, if

6    nothing else for the record state why we can't understand why

7    they need this data.  Oxford is a small regional health

8    insurer.  Its business is concentrated in Connecticut, New York

9    and New Jersey.  It has less than 4,000 members in

10   Massachusetts, less than 4,000.  Mr. Mangi keeps talking about

11   a pending summary judgment motion in July.  My understanding is

12   that is dealing with a class and it's confined to

13   Massachusetts.  Why, why are we in a rush to demand this

14   production from Oxford if we can work out an arrangement?  Also

15   Blue Cross and Blue Shield was, as you know, they were admitted

16   as a class representative in this case.  Your Honor granted

17   protective orders on behalf of Tufts Associated Health Plan,

18   Neighborhood Health Plan and Fallon Community Health Plan and

19   in doing so said that Blue Cross' presence in the case changes

20   things.  And we think it changes things for Oxford too, a

21   company who has less than 4,000 members in Massachusetts.

22         THE COURT:  The motion is allowed.  It's too little,

23   too late.  I'm sorry.  All right.  Moving on the 2331.

24         MR. COCO:  Speaking of Blue Cross Blue Shield, this

25   is Stephen Coco, from Roberts, Kaplan, Miller and Tracy

1   representing Blue Cross Blue Shield of Massachusetts.

2          THE COURT:  Thank you.

3          MR. MANGI:  Your Honor, on this motion, this is not

4   the first time I've been here arguing a Motion to Compel

5   against BCBS of Massachusetts.  In the fall of last year, we

6   had a Motion to Compel against them as a third party.  At that

7   time, BCBS came before Your Honor and said well the defendants

8   should seek the discovery they want from the named plaintiffs,

9   not from us.  Well now BCBS of Massachusetts is a named

10  plaintiff and the discovery we're seeking from them pursuant to

11  this motion are documents falling into five categories.  I'll

12  address them one by one if that would meet with Your Honor's

13  approval.

14         THE COURT:  We'll do them, I'll hear from you on each

15  section and then we'll go back and forth and I'll make the

16  rulings as I go.

17         MR. COCO:  Thank you, Your Honor.

18         THE COURT:  All right.

19         MR. MANGI:  Thank you, Your Honor.  Now the first

20  category of documents are not only the most important category

21  of documents in this motion, but perhaps the most important

22  category of documents sought through discovery from BCBS in

23  this case, these are documents pertaining to Blue Cross Blue

24  Shield of Massachusetts staff model HMO, which we know was in

25  existence from sometime in the 80's through up until about

1   1997.  Now the plaintiffs' entire theory of liability in

2   this case turns on the views advanced by their expert, Dr.

3   Hartman.   Dr. Hartman says that payers such as BCBS expected

4   there to be a relationship between the process at which drugs

5   were available in the market and their AWP's of 30 percent or

6   less.  If the differential was greater, in other words, if

7   prices were lower than he says they expected, Dr. Hartman says

8   there's fraud, and damages should accrue.  Well, the presence

9   of a staff model HMO fundamentally has a potential to undermine

10  that theory.  And the reason is, when a health insurer has a

11  staff model HMO, that means it owns pharmacies, it owns

12  physician clinics, and the health insurer itself is then

13  purchasing drugs.  So it's not just reimbursing as in other

14  situations, it's actually a drug purchaser, which means it has

15  first hand knowledge of the prices at which drugs are available

16  in the market.  If in fact those prices, prices at which it

17  purchased drugs, are below what Dr. Hartman says the market

18  expected, plaintiffs' theory has taken a fundamental, indeed a

19  crippling blow.  Judge Saris recognized this exact point.  A

20  critical part of her ruling denied class certification as to

21  self-administered drugs, was her finding that health plans had

22  purchased those drugs.  She said in her August 16, 2005 order

23  in deciding that she would perceive in certifying a physician-

24  administered class, but there's no evidence that third party

25  pairs purchased physician-administered drugs, or know of the

1  mega spreads that exists for those drugs.  Now we submit

2  that it's precisely this type of evidence, the staff model HMO

3  evidence that will prove that point and establish these issues.

4  Well, that's the relevance in why we need these documents.

5  What's BCBS' response?  Well, BCBS--

6          THE COURT:  Well, let's go right to the categories.

7          MR. MANGI:  Certainly, Your Honor.  This is the fist

8  category--

9          THE COURT:  All right.

10          MR. MANGI:  --of document, which are staff model HMO

11  documents.

12          THE COURT:  Okay.

13          MR. MANGI:  They're requests 9 and 17.  And the only

14  response from BCBS has been that well we have an index, this is

15  the index here, and you should choose what you want and then

16  we'll consider it.  The problem is this index is vague to the

17  point of being useless.  The descriptions we have are things

18  like HMOB microfiche, 18 out of 67 and other meaningless

19  acronyms or numbers.  The only way to know what's responsive,

20  what's in these documents is for BCBS to go through them, or to

21  make them available.  Now the law is crystal clear on what

22  happens on when there is an inadequate index, or inadequate

23  record keeping.  We've cited, reported in our papers, the

24  *Koslowski (ph)* case, and the--

25          THE COURT:  Well, have you--

I-34

1          MR. MANGI:  --and the *Riddell (ph)* case.

2          THE COURT:  --sat down with him and said these are

3    the things that we can't understand?  These are the things that

4    need better definition?

5          MR. MANGI:  Your Honor, we have had a conversation

6    with BCBS about this index, but they've conceded to us, and

7    indeed it's the reason for their posture here today, that they

8    agree from this index, one can't tell what's responsive.

9    Someone would have to go through these boxes to find the

10   relevant and responsive documents.  So we're in a situation

11   where because of their inadequate index, someone does have to

12   go through these documents to find what's responsive.

13         THE COURT:  And what are we talking about in volume?

14         MR. MANGI:  BCBS has represented to us that they're

15   approximately 2,000 boxes of documents.  However, we would

16   submit, Your Honor, that that issue, and the burden that's

17   associated with that review must be considered in the context

18   of this case.  This is perhaps the largest pricing and

19   reimbursement litigation in the country, and defendants when

20   they were asked to produce documents to plaintiffs, had to take

21   account of that fact.  Shering, for example, one of the Track 1

22   defendants, had to bring on an army of 60 lawyers just to

23   review documents.  J&J had to bring in 36 lawyers for a more

24   extended period of time.  DMS spent over five million dollars

25   on that similar process, and we would submit that given the

1  case law on indexing in this Court, BCBS as party that has

2  chosen to come to this litigation as a plaintiff, voluntarily,

3  has an obligation to assume and invest at least the same level

4  of resources as those that plaintiffs demanded of defendants

5  when we were making our productions.  If they invest indeed a

6  fraction of the same resources, these documents can be

7  reviewed.  I'm confident that when these boxes are cracked

8  open, it'll soon become apparent what's relevant and what's

9  not, and the documents can be produced quickly.

10          One final point, Your Honor, on the staff model HMO

11  documents.  We've also asked for deposition testimony to see if

12  there is some way to get around this, to get the testimony we

13  seek.  BCBS has represented to us that though it's been months,

14  they're unable to find anyone who can testify knowledgeably on

15  these topics.  So these documents it appears represent the only

16  way we have of getting to these documents about drug purchases,

17  which are at the core of plaintiffs' case.

18          THE COURT:  Well, Mr. Coco, is there a reasonable

19  approach to this?

20          MR. COCO:  I believe there is, Your Honor.  First,

21  with respect to Mr. Mangi's comments concerning the deposition,

22  it's not been briefed.  There are a number of issues dealing

23  with the outstanding 30(b)(6) topics.  And his representation

24  as to what we have told him about our searches are inaccurate.

25  We continue to look.  We're having difficulty because the

1   people who are involved are former employees.  We have been

2   trying to contact one individual who we think may have the

3   information, for the past two, two and a half weeks.  He has a,

4   a night job, unavailable during the day.  It's difficult to

5   even get him on the phone.  We're looking.  And, but that's a

6   separate issue.  Your Honor, relying on Mr. DeMarco again, they

7   looked through 120 boxes.  It took them three days.  We've got

8   2,000, 15 times the number, would be 45 days.  If you have to

9   go through and search the substance of the documents, there is

10  a practical solution.  I agree with Mr. Mangi, if you just were

11  opening the boxes and are saying okay, does this box contain

12  contracts between the staff model HMO and the defendants

13  related to drugs?  Relatively easy to identify.  Does the box

14  contain data about drug pricing, drug purchasing?  Relatively

15  easy to determine.  Once you decide that a box has that

16  information, then you take the box and you look through it in

17  more detail and make sure that you know there isn't anything

18  else that--

19          THE COURT:  What's wrong--

20          MR. COCO:  --might be responsive.

21          THE COURT:  --with that approach?

22          MR. COCO:  Then the problem, just to finish, the

23  problem that we have had is that, I have to agree with counsel

24  for Oxford, which is every time you make a suggestion or try to

25  make a suggestion, there is no assurance given that okay, once

1   you do that, that's it.  And I understand Mr. Mangi doesn't

2   want to have that position in front of the Court here.  The

3   problem we're having and we'll have this with a number of the

4   topics here is the reason you need to draw a line, the reason

5   we end up coming in front of the Court on a Motion to Compel is

6   because you make a proposal and you're never assured okay, once

7   we do that that's it.  And the example here is we've had 13

8   individual Blue Cross Blue Shield witnesses deposed.  In

9   response to those depositions, I now have 38 individual

10  requests in three separate letters asking for follow up.  And

11  so, you know, I don't want to create the misimpression that

12  we're trying to, you know, be obstructive on discovery here.

13  We're, we're not.  We are trying to help and be cooperative and

14  work out compromises, but at some point you have to draw a

15  line.  You know, in looking at this issue, you know, we're

16  willing to, to--

17          THE COURT:  What do--

18          MR. COCO:  --go to the effort.

19          THE COURT:   --you propose?

20          MR. COCO:  If I can go to the storage site where

21  these 2,000 boxes and look for drug contracts and drug pricing

22  data, that, I think is a doable task.

23          THE COURT:  Why isn't that acceptable?

24          MR. MANGI:  Your Honor, that's close to being

25  acceptable, although we seek a couple of additional categories

1    of documents in our requests.

2          THE COURT:  Okay, Mr. Coco, listen to what else he

3    wants here.

4          MR. MANGI:  Certainly in terms of request number 17,

5    what we're seeking are transaction records for contracts

6    pertaining to drug purchases.  In relation to request number 9,

7    we're also seeking documents that show the organizational

8    structure, organizational charts for example--

9          THE COURT:  Well, that's not tough, Mr. Coco, to--

10         MR. COCO:  That--

11         THE COURT:  --include.

12         MR. COCO:  --that's fine

13         MR. MANGI:  And additionally, Your Honor, there's

14   been testimony from BCBS witnesses that in addition to serving

15   BCBS members, the staff model HMO was also serving cash paying

16   patients and patients from other health plans.  So we seek the

17   fee schedules that those witnesses reference or other documents

18   showing how BCBS, the staff model HMO billed those cash paying

19   patients or those other health plans for physician-administered

20   drugs.  In short, Your Honor, what we're seeking here is--

21         THE COURT:  Is that doable, Mr. Coco?

22         MR. COCO:  I don't, I don't see how it could be, Your

23   Honor.

24         THE COURT:  Okay.

25         MR. COCO:  I--

1          THE COURT:  That's a tougher one.

2          MR. COCO:  --I apologize.  I just, the billing, my

3    understanding is that there would be no way to segregate, that

4    you're going to find just massive, from what I've seen in the

5    boxes, you just have massive tapes--

6          THE COURT:  Okay.  I'm going to allow it as to the

7    categories that Blue Cross Blue Shield has agreed to up to that

8    last one at this time.

9          MR. MANGI:  Thank you, Your Honor.  I'll then move

10   onto the second category of documents, which are final signed

11   contracts.  These are pursuant to request number 2 in the

12   subpoena that's at issue.  Now so far, Your Honor, what we have

13   from BCBS of Massachusetts are templates, boilerplate blank

14   contracts as well as a handful of actual contracts which are

15   either from another litigation file or had been produced ad hoc

16   as they've come up in the course of depositions and have been

17   the subject of testimony.  What we're seeking through this

18   motion is a comprehensive production of their contracts, given

19   that here they're a named plaintiff and not a third party.

20   That comprehensive production is necessary for the following

21   reasons; first, this is a class that BCBS purports to represent

22   that is defined expressly in terms of contracts.  The class

23   definition refers to pairs that made reimbursement based on

24   contracts expressly using AWP as a pricing standard.  Now from

25   BCBS witnesses, we've had testimony about BCBS using a variety

1  of different reimbursement methodologies in their contracts.

2  Not only has there been fee for service based on AWP, there's

3  been fee for service based on usual and customary charges.

4  There's been capitation contracts, risk sharing contracts,

5  withhold arrangements.  Indeed, one BCBS witness testified that

6  prior to 1995, they didn't even use AWP.  Now, how do we get to

7  the bottom of all this conflicting and contrasting testimony to

8  get a clear understanding as to whether or not BCBS can

9  represent the class it purports to represent.  That's only to

10  look at the class definition and then to analyze their actual

11  contracts to see to what extent they've used AWP, when they've

12  used it, and to what extent they satisfied the class

13  definition.  Now, not only are these documents needed for that

14  class purpose, they're also needed on the merits.  A critical

15  issue in this case is to what extent payers such as BCBS have

16  available to them alternatives to AWP, to what extent they've

17  chosen to employee AWP with full knowledge of what it is and it

18  isn't because they derived benefits from doing so.  I mean, the

19  case of BCBS of Massachusetts, this is especially important.

20  We know through discovery that in 2004 after assessing all of

21  the issues drawn in AWP allegations about inflation and

22  overcharges, they chose to continue with it instead of moving

23  to ASB, because they were concerned about providing the

24  actions, of shift in the site of care to hospitals, and other

25  business reasons.  Now these contracts will show us going back

1  in time to what extent they've had different methodologies

2  available to them, to what extent they've employed them, and

3  will enable the type of statistical analysis that could

4  fundamentally undermine their claim as plaintiffs in this case.

5         Now in terms of the burden that they've claimed in

6  their papers, there's no practical alternative here, Your

7  Honor.  We can't get a statistically significant sample, or

8  indeed a sample that shows every type of contract without going

9  through all of them.  And what we're asking BCBS to do here

10  again is no different from what the plaintiffs ask defendants

11  to do.  My own client, Johnson & Johnson, was told by

12  plaintiffs, indeed they insisted on it, that we produce copies

13  of all of our final signed contracts, be they with providers,

14  with PBN's, with managed care, and indeed, I myself had the

15  pleasure of spending days in the contracting room collecting

16  these and producing them.  What we're seeking is no different

17  than from what they sought from us.  It's essential given the

18  cost definition.  There's no burden.  This is not a privilege

19  review; it's a copy job.  And we ask that these documents be

20  produced.

21         THE COURT:  What about contracts, Mr. Coco?

22         MR. COCO:  I, have, have to chuckle when he says it's

23  no burden, it's just a copy job.

24         THE COURT:  Oh, well.

25         MR. COCO:  Your Honor, again, this is one of those

1   categories where you really have to take a look at the

2   balancing of the burden versus what they already have and what

3   they really need to get.  Mr. Mangi makes a number of points

4   about the importance of understanding what methodology the

5   various providers were reimbursed at, and says that--

6         THE COURT:  The contracts are pretty basic to the

7   issues, so--

8         MR. COCO:  Well the, but the thing is, Your Honor,

9   that information is already in the claims statement that's been

10  provided to them.  All you need to do in order determine

11  whether a provider has been reimbursed on a particular

12  methodology is look at the claims data.  It tells you that.

13  And so there's no, there's then no need to go to a contract,

14  80-90% of which are form contracts anyway, to verify that if

15  you have a certain, I mean, let me back up.  We have provided,

16  Blue Cross Blue Shield has provided claims data for all the

17  drugs that were physician-administered drug claims that were

18  submitted.  By looking at that data and looking at what was

19  reimbursed for a particular drug, and it can be sorted by

20  provider so you know how much a particular provided in claims

21  for any given time period that you like, you can determine,

22  okay what was that provider reimbursed for that drug.  And if

23  you know what the AWP is, then your comparison will tell you

24  okay, was this provider being reimbursed based on AWP?  They

25  don't want to do that work.  But they want--

1          THE COURT:  They're entitled to the contracts.

2   Contracts to be produced.  No.

3          MR. COCO:  Then I--

4          THE COURT:  No, I think--

5          MR. COCO:  --then I would request that the cost of

6   doing so be shifted to what we were talking about and, and so

7   we're clear, every contract, or just the ones for drugs in this

8   case?

9          THE COURT:  Well, can you narrow it?

10          MR. COCO:  It's in the claims data by provider

11   number.

12          THE COURT:  Can you narrow--

13          MR. MANGI:  Your Honor.

14          THE COURT:  What you're looking for?

15          MR. MANGI:  Your Honor, it's our understanding that

16   going through millions of individual claims and claims data to

17   parse out individual contracts is not feasible.

18          THE COURT:  Yes, I agree.  I agree.  That's why I've

19   ordered the contracts produced, but I'm asking you if you can

20   narrow it.

21          MR. MANGI:  Your Honor, I'm aware of no way and we've

22   tried this with dozens of individual health plans to come up

23   with some sort of a sampling methodology that would work.

24   We've tried it time and again.  It simply doesn't' work.

25          THE COURT:  All right.  Contracts to be produced.  Do

1    you have an idea, Mr. Coco?

2          MR. COCO:  Other than when you say their, their

3    request is for all provider contracts.  Your Honor, my

4    understanding is you are going to require us to produce

5    provider contracts for providers who actually submitted claims

6    for these drugs?

7          THE COURT:  Well, I'm, that's why I'm asking,

8    Mr. Mangi, if there's a way of narrowing it a little bit.

9          MR. COCO:  Well, that still leaves you--

10          THE COURT:  Yes.

11          MR. COCO:  --close to 2,000 provider contracts.  We

12    provided them with three of them that were two boxes.

13          MR. MANGI:  Your Honor--

14          MR. COCO:  Now if you want, if you want us to require

15    us to give another, you know, 2,000 contracts, yes, some of

16    them, yes, are going to be very, you know, a page.  The other

17    scope of the request is they've said, they've asked for

18    contracts and all attachments.  In order to do that process,

19    this is not a question of okay, you have the, all the contracts

20    are stored some, in some location--

21          THE COURT:  And what are the attachments?  Tell me

22    what sort of things are, would be found in the attachments?

23          MR. COCO:  It could be anything, Your Honor.  It

24    could be, they could have attached a fee schedule.  They

25    could've attached additional addendums that the physicians

1  signed.   They could attach, a lot of these physicians are

2  part of practice groups and their individual contract may be

3  appended to a practice group contract, or the practice group

4  contract may be appended to the physician contract.  That's why

5  we took the position of, you know, we understand that they have

6  had with difficulties with sampling in the past.  We understand

7  that.

8          THE COURT:  Do you need the attachments?

9          MR. MANGI:  Your Honor, absolutely.  The class is

10  defined in terms of contracts that expressly use AWP as a

11  pricing standard.  Whether or not it does so is referenced in

12  the attachment in many cases.

13          THE COURT:  So we're talking about 2,000 or so

14  contracts?

15          MR. MANGI:  Your Honor--

16          MR. COCO:  I'm sorry.

17          THE COURT:  Is that about--

18          MR. COCO:  We, what we did is we sorted the claims

19  data we provided.  I believe the number that we came up with

20  was 1950--

21          THE COURT:  All right.

22          MR. COCO:  --1947.

23          THE COURT:  Contracts to be produced with

24  attachments.

25          MR. COCO:  Your Honor, then I just, when you write

1  your order, I do not know how quickly or expeditiously that

2  can be provided.

3      THE COURT:  Well, I'm not going to, give me a

4  timeframe that's, what you think is--

5      MR. COCO:  I have--

6      THE COURT:  Okay, you'll start--

7      MR. COCO:  --months--

8      THE COURT:  --you'll confer with--

9      MR. COCO:  --months.

10     THE COURT:  You'll confer with your colleagues.  It

11  certainly can be a rolling production.

12     MR. MANGI:  Your Honor, we would ask that the class

13  schedule be considered in terms of summary judgment briefs, and

14  to the extent full production is not feasible, we would ask for

15  a rolling production--

16     THE COURT:  Rolling production.

17     MR. MANGI:  --as much as possible up front.  And

18  additionally, Your Honor, given that Mr. Coco has represented

19  that he seeks to narrow the production to providers that

20  submitted claims for drugs, we would ask that those, the

21  contracts provided also include providers whose contracts

22  included drugs within another framework, such as capitation or

23  risk sharing.  It, in other words, if Mr. Coco--

24     THE COURT:  No, I'm not going to go that far at this

25  time.

1          MR. COCO:  I'm not even sure what he's asking.

2          MR. MANGI:  Well, I'm, I'm happy to clarify it for

3   you.

4          THE COURT:  No, next category.

5          MR. MANGI:  Fair enough.  Your Honor, the third

6   category of documents relate to provider negotiations, in other

7   words, the back and forth between physicians and BCBS of

8   Massachusetts.  The critical issue in this case is knowledge,

9   who knew what about AWP, when did they know it.  When did they

10  know about AWP's relationship to drug acquisition, what they

11  did know about the extent of which servicing fees incident or

12  drug administration covered costs, to what extent is their

13  cross subsidization of drug reimbursement covering inadequate

14  servicing fees, and so on.  Now, the place where we would

15  expect to find all the correspondents and communications about

16  this is in the back and forth between providers and between

17  BCBS.  We've asked for the production of those files, which are

18  provider negotiations and communications and BCBS has said, it

19  will be burdensome to produce them.  But again, those are

20  communications about the issues that go to the hearts of this

21  case.  We asked that they be produced.

22         THE COURT:  Denied.  Too burdensome.  Next category.

23         MR. MANGI:  Well, Your Honor, the fourth category of

24  documents are very discrete in terms of what we're seeking.

25  They're two categories of documents.  The first are the

1   documents relating to BCBS's own financial analysis of the

2   amount it stands on drug reimbursement and, secondly, analysis

3   relating to the manner in which drug reimbursements are

4   factored into the setting of premiums.  And that second

5   category we've said we'll accept in the first instance just the

6   top-level analysis giving a basic understanding of how that's

7   done.  These two categories are important because of the theory

8   plaintiffs' expert has put forward.  Plaintiffs refer to this

9   as the importance of being unimportant.  They represent that

10  health plans such as BCBS don't pay much attention to what they

11  reimburse for physician-administered drugs because it's not

12  important compared to what they spent on other areas.  Well,

13  what we're saying is well, if you're saying it's not important,

14  that it's not a significant amount of money, give us, number

15  one, the financial analysis of how much you do spend on these

16  drugs and number two, give us analysis showing how your drug

17  spend, not just physician-, if you have just physician-

18  administered drugs, that's great.  If you haven't broken it

19  out, your entire drug spend, how do you use that in determining

20  premium setting.  If it's not important, then show us the

21  documents showing it's not important.

22              THE COURT:  Mr. Coco, this sounds like a little

23  vaguer--

24              MR. COCO:  Well here, here's the problem.

25              THE COURT:  --request to me.

1        MR. COCO:  The first problem.  I'll break the

2   categories down.  Here's the request; documents sufficient to

3   show your expenditures on physician-administered drugs on a

4   quarterly basis since 1991.  You take the claims data we've

5   provided, you separate it into quarters and that gives you the

6   expenditures on physician-administered drugs on a quarterly

7   basis.  If they're looking for something more detailed than

8   that, we're not aware of any other documents that we produce

9   about physician-administered drugs and expenditures for them.

10  It's just the reimbursement data, which they already have.  The

11  second request is documents reflecting analysis performed by

12  you in setting premiums.  I'll leave off the last part.

13  Documents reflecting analysis performed by you in setting

14  premiums.  That's everything.  Now, they're coming to us and

15  saying well, we're just talking about the, the drug portion of

16  it.  If the question is what is the relevant, how, is, how

17  important are physician-administered drugs, then what relation

18  does that have to premium setting?  It might have some relation

19  to how big is the drug reimbursement versus your overall

20  reimbursement?  It doesn't have anything necessarily to do with

21  premium setting.  Nevertheless, we were able to locate an

22  analysis of, that was done for some of the, you know,

23  physician-administered drug J-code drugs, we'll turn it over,

24  but we don't, the drug portion of it is simply not factored in

25  the way that they would like it to be in order for us to

1   produce documents.  We don't have that.  I can, yes,

2   personally I'm not aware of specifically what the for example

3   yearly quarterly financial reports are that are prepared for

4   Blue Cross Blue Shield.  If this issue is, what's the drug

5   reimbursement expense versus total reimbursement expenses for

6   the company, that's something I'd be willing to go back and say

7   okay, that's, we'll take a look for that so you can see what

8   percentage you have the physician-administered drugs and

9   services that we, that you've got the claims data for--

10          THE COURT:  All right.  I'll allow it that degree,

11   then if you're not satisfied, you can come back.

12          MR. MANGI:  Your Honor, but I'll seek clarification

13   as to the, there are two separate requests that are at issue

14   here.  The first request sought financial analysis showing how

15   much BCBS spends on reimbursing

16   physician-administered drugs.  On that request, Mr. Coco said

17   we should just look at the claims data.  But of course claims

18   data doesn't show BCBS' own analysis which is how you rebut

19   their claim of the importance of being unimportant.

20          THE COURT:  The first part of the request is denied.

21   I'll allow the second part to the extent that Mr. Coco has

22   indicated he thinks he can produce it.  If when you receive

23   that data you're not satisfied, you can come back in and renew

24   the motion.

25          MR. MANGI: Thank you, Your Honor.  That brings us to

1   the fifth and final category, which are documents around,

2   from the public sources available to us, the Department of

3   Justice website.  We've been able to ascertain that in 1994

4   there was a government investigation and a False Claims Act

5   against BCBS of Massachusetts.  As a result of that, BCBS

6   agreed to pay $2.75 million to the government to settle

7   allegations that they had submitted false Medicare reports in

8   processing Medicare claims.  Now we've tried through discovery,

9   through depositions, to get a better understanding as to what

10  was involved in this case.  Witnesses we've had have not been

11  knowledgeable about the details of this case.  It appears

12  certainly from the public record that this case is likely

13  relevant in a couple of ways.  First of all, this, in this

14  case, plaintiffs' damages claims--

15          THE COURT:  Was an action actually filed, or was

16  there a settlement prior to--

17          MR. MANGI:  Your Honor, it's our understanding that

18  an action was filed.

19          THE COURT:  Well, it's your understanding.  I mean,

20  have you just looked on the docket?

21          MR. MANGI:  Your Honor, from the, well from the

22  Department of Justice's press release, it seems quite clear

23  that there was a case, a False Claims Act, which was then

24  eventually settled.

25          THE COURT:  That assumes you believe everything the

1  Department of Justice says.

2       MR. MANGI:  Well, Your Honor, we've also had

3  communications--

4       MR. COCO:  Of course we do.

5       MR. MANGI:  We've also had conversations with

6  Mr. Coco about this topic, because we're seeking their

7  documents produced in the course of that case's, that

8  investigation.  The reason why we contend that these are

9  relevant or potentially relevant, Your Honor, are for a couple

10  of reasons.  First, plaintiffs' claims hear--

11       THE COURT:  This was a civil matter?

12       MR. MANGI:  Our, my understanding is it was a False

13  Claims Act, Your Honor, is that the claims plaintiffs are

14  making in terms of their damage amounts are based on claims

15  data.  And we would like to probe this case to get an

16  understanding of the extent to which this alleged inflation or

17  misrepresentation of claims in their claims systems infected

18  beyond merely these Medicare claims and was a problem and

19  damage to their claims system as a whole, which could impact

20  this case here.  Additionally, from the same press release, we

21  have an understanding that they implemented in the settlement

22  certain monitoring systems, which again could be relevant here.

23  For example, they're monitoring physicians and physician

24  claims.  To what extent did that monitoring give them knowledge

25  of physicians' acquisition cost for drugs and other matters may

I-53

1   be germane to this litigation.  What we're seeking here

2   consistent with the broad scope of discovery are documents

3   relevant to that case so we can fully assess its relevance, or

4   its potential relevance to this litigation.

5          THE COURT:  Mr. Coco, do you know about this

6   litigation.

7          MR. COCO:  I do, Your Honor, and--

8          THE COURT:  Was it a civil case?

9          MR. COCO:  That's, that's implored.

10         THE COURT:  This was a civil case?

11         MR. COCO:  You know, I'm not sure that a case was

12  filed.  There was an investigation.

13         THE COURT:  Okay, that's, I mean that's significant

14  to me.

15         MR. COCO:  It's, I'm not sure that there was

16  litigation filed.  There was a, the reason I hesitate is a lot

17  of times what will happen I know and for example in the FDC

18  context and the justice context, something will be officially

19  filed at the same time you file a settlement.

20         THE COURT:  Exactly.

21         MR. COCO:  I don't want, I don't want to represent

22  that I know one way or another whether that happened in this

23  case in terms of the settlement.  Your Honor, they deposed an

24  individual, Vincent Ploor, who was involved in the government's

25  inquiry into this.  They had him in the deposition.  They asked

1   him questions.  What was this investigation about?  Blue

2   Cross Blue Shield was the Medicare Part B carrier for

3   Massachusetts in the tri-state area.  In order to obtain

4   reimbursement, they're required to file quarterly and yearly

5   reports disclosing how many claims have you processed?  How

6   many resolutions have you reached?  What's the timeliness of

7   it?  Whether, how much have you followed up on, on recovering

8   overpayments?  It's a reporting process that is then used to

9   determine--

10          THE COURT:  Would--

11          MR. COCO:  --how much money Blue Cross Blue Shield

12   gets back.

13          THE COURT:  I don't mean to interrupt you--

14          MR. COCO:  Sure.

15          THE COURT:  --but they're looking for whatever they

16   think was produced in discovery.  It's not clear to me that you

17   even know whether or not anything was produced in discovery in

18   this case.

19          MR. COCO:  There was.

20          THE COURT:  There was.

21          MR. COCO:  There, be, you're saying discovery.

22   Where, as part of the investigation--

23          THE COURT:  As part--

24          MR. COCO:  --did in fact—

25          THE COURT:  --that that they turned over.

1       MR. COCO:  --that they turned over documentation,

2  yes they did, Your Honor.

3       THE COURT:  And do you know, I mean it, what, what's

4  the volume of what they turned over?

5       MR. COCO:  That I do not know.  But, Your Honor, it

6  has no relevance to this case.  It's about reporting.  Blue

7  Cross Blue Shield was required to submit quarterly reports that

8  say in this time period, we processed this number of claims.

9  It doesn't get into the merits of the claims.  It doesn't get

10  into AWP.  It doesn't get into the amount of reimbursement.

11  It's how many claims did we process.

12       THE COURT:  What's the relevance, Mr. Mangi, to AWP?

13       MR. MANGI:  Your Honor, first of all to answer your

14  question, a lawsuit was filed.  I have here the Department of

15  Justice's press release, which states that the lawsuit was

16  filed and just recorded in Boston in 1993.  The settlement was

17  in 1994.  As to the potential relevance of these documents,

18  well, Your Honor, we're talking here about issues in the claims

19  system.  We can only ascertain in an evidentiary format the

20  manner to which, the extent to which those claims processing

21  problems infected the larger claims processing system if we get

22  an understanding of what the issues were.  Moreover, the

23  settlement of those allegations involved the implementation of

24  monitoring systems.  If we have an opportunity to review both

25  the documents, settlement agreement, we get a sense of what

1  those issues were.

2          THE COURT:  Are you going to provide the settlement

3  agreement?

4          MR. COCO:  Well, we're not willing to produce

5  anything, Your Honor.  This, this is truly, that's, that's--

6          THE COURT:  Was the settlement agreement sealed?

7          MR. COCO:  Um--

8          THE COURT:  You know, the first thing to do,

9  Mr. Mangi, is to go to the docket.  Denied at this time without

10 prejudice to be renewed after further investigation by

11 defendant.

12         MR. MANGI:  Thank you, Your Honor.

13         THE COURT:  All right, so in sum, the motion is

14 allowed in part and denied in part according to the oral

15 rulings made from the bench.

16         All right, moving on to 2374, defendant Bristol

17 Myers.

18         MR. COCO:  Thank you, Your Honor.

19         THE COURT:  You're welcome.  I'll get back to you,

20 Mr. DeMarco.  I don't know, the body language says you are on

21 one side of the courtroom and your opponent is on the other.

22 That's not good.

23         MR. DeMARCO:  It's not a good sign.

24         MR. DWYER:  Thomas Dwyer, one of the two Boston

25 people here this morning, for Bristol Myers.

# Exhibit 4

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

Stephen L. Coco
(617) 859-2731

June 30, 2006

**Via Facsimile and Overnight Mail**

Adeel A. Mangi, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

    Re:     *In Re Pharmaceutical Industry Average Wholesale Price Litigation,*
            MDL No. 1456, Civil Action No. 01-12257-PBS
            Our File No.: 072188-0000

Dear Adeel:

    I am writing to provide you with an update on BCBSMA's discovery efforts.

## I.    Provider Contracts

    As we have previously informed you, attempting to identify, locate and copy provider contracts is a time consuming and burdensome process. BCBSMA hopes to have the next batch of contracts ready to produce next week.

## II.    Staff Model HMO documents

    We had identified roughly 1800 boxes of documents that potentially contained documents related to the staff model HMO. We have done an initial review of all but roughly 120 boxes and are completing our initial review of the remaining boxes today. In our initial review, we have identified only a very small percentage of documents that might even be considered responsive. For example, we have identified a few "organizational" charts and no contracts for physician administered drugs with drug companies. There are some documents that appear to contain some information concerning drug costs. I am sending you the first box by overnight mail (BCBSMA-AWP-29648 – BCBSMA-AWP-33063). We will continue to review the remaining materials to determine whether they contain any additional responsive documents and hope to produce any remaining documents next week or early in the week of July 10th.

    We have also used the documents to attempt to identify individuals who may have information concerning the acquisition of physician administered drugs. For example, we have

BN1 35032371.1

Adeel A. Mangi, Esq.
Page 2
June 30, 2006

spoken with Ed Curran, who is mentioned in some of the documents and whom you had previously identified, but he was involved with retail pharmacy drugs, not physician administered drugs. He did identify a couple of individuals who may possess information concerning physician administered drugs, but we have been unable to locate them to date (although we will continue our efforts).

## III.   Financial Information

There was a miscommunication between me and BCBSMA concerning the type of information we were going to produce, as I believe the Court's ruling limited our obligation to documents that would provide overall claims data, which the defendants could use to assess the amount of claims for physician administered drugs versus total claims. Accordingly, I am sending you by overnight mail a disc that has a number of BCBSMA annual reports which contain this information (BCBSMA-AWP-33064), and expect to supplement that shortly for as many years as BCBSMA has such reports.

## IV.   Claims Data

BCBSMA is close to finishing a response to the questions concerning the claims data, and expects to get the information to you next week.

Please contact me if you have any additional questions.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI, LLP

Stephen L. Coco

SLC
cc:     Edward. Notargiacomo, Esq.

BN1 35032371.1

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199-7610
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

**FROM:**   Stephen L. Coco

The information contained in this facsimile message is privileged and confidential information intended for the use of the addressee listed below and no one else.  If you are not the intended recipient or the employee or agent responsible to deliver this message to the intended recipient, please do not use this transmission in any way, but contact the sender by telephone.

DATE:          August 18, 2006

TO:

               Adeel A. Mangi, Esq.
               Patterson Belknap Webb & Tyler, LLP

FACSIMILE NO.:   (212) 336-7947

TELEPHONE NO.:

FILE NO.: 72188-0000

NUMBER OF PAGES INCLUDING COVER SHEET: 4

**If transmission problems occur, or you are not the intended recipient, please call (617) 267-2300, or contact Kelly Gifford at 617-859-2768.**

MESSAGE:

Original:   <u>X</u>  Mailed          Not Mailed

ATLANTA    BOSTON    LOS ANGELES    MINNEAPOLIS    NAPLES    SAINT PAUL    WASHINGTON, D.C.

ROBINS. KAPLAN. MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300 FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

Stephen L. Coco
(617) 859-2731

August 18, 2006

**Via Facsimile and Overnight Mail**

Adeel A. Mangi, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:     *In Re Pharmaceutical Industry Average Wholesale Price Litigation*,
MDL No. 1456, Civil Action No. 01-12257-PBS
Our File No.: 072188-0000

Dear Adeel:

I am responding to the inquires raised in your July 21, 2006 letter. With respect to the document production issues, BCBSMA had previously inquired of the individuals who would be responsible for maintaining documents such as government reports whether BCBSMA possessed such materials. This included people in the "government affairs" area. We were informed that BCBSMA did not possess such materials. After receiving your letter, we reiterated that request and received the same response. Thus, BCBSMA has not located any government reports dealing with AWP.

BCBSMA has now produced all of the documents that it has been able to locate concerning the staff model HMO that are, arguably, within the categories the Court ordered BCBSMA to produce. No contracts were located.

In response to your inquiry, BCBSMA has once again reviewed its files for documents concerning Pipefitters. BCBSMA will be producing e-mails that Chris May was able to locate (none of which appear to be relevant to this litigation). Mr. King is no longer with the company and BCBSMA is not aware of having retained any of his e-mails. BCBSMA has not located additional documents, including the categories listed in your letter, related to Pipefitters.

I have enclosed BCBSMA's current privilege log. I have also enclosed two CDs and documents, bates numbered BCBSMA-AWP-42705- BCBSMA-AWP-42795, which contain additional provider contract materials. These materials have been designated "Highly Confidential."

BNI 35033418.1

Adeel A. Mangi, Esq.
Page 2
August 18, 2006

With respect to depositions, BCBSMA is prepared to make Mike Mulrey available to testify solely with respect to the BC65 product. In the past, I have requested that you provide a specific description of the types of information you will be seeking. In general, you have responded with either descriptions which, because they are vague or overbroad, do not enable me to ensure that the witness will be prepared to discuss all of the topics which you may raise, or by referring me to the other questions asked of BCBSMA witnesses, which would require me to review dozens of transcripts to identify the questions. I request that you view my inquiries as they are intended – an effort to ensure that BCBSMA presents a witness that is educated to provide you with the information you are seeking. By taking a little bit of time on your end to identify specific, reasonable categories of information about the BC65 product into which you wish to inquire, we can work together to ensure that you are presented with a witness who can answer you questions. If you decline to do so, then we will proffer a witness, but it will be your responsibility if the witness is unable to answer some of your questions, and BCBSMA will not proffer an additional witness on this topic.

It is not clear to me what you mean in requesting that BCBSMA make someone available to testify concerning the recently produced documents. BCBSMA does not believe a keeper of the records type deposition is necessary or warranted. BCBSMA has located no witness who is knowledgeable concerning the contents of the documents. BCBSMA is continuing its efforts to locate witnesses with substantive knowledge of the staff model HMO issues, though it has essentially exhausted the avenues it believes it can pursue. At this point, we are collecting the names identified from the staff model HMO materials that were recently produced to determine if they include any additional individuals who may have knowledge concerning physician administered drug purchases, but we believe that it is unlikely. Once that review is complete, however, we will provide you with a detailed description of the efforts we have made and determine where to proceed from there.

With respect to your request for a corporate representative to discuss BCBSMA's Medigap supplemental insurance programs, we disagree that the topics identified in your letter are within the scope of the deposition topics in the subpoena served on BCBSMA. Furthermore, it is impossible to identify an individual who could respond to the topics identified in your letter, given that they are vague and overbroad. Solely as an effort at compromise, BCBSMA is willing to proffer a witness to discuss the Medigap supplemental insurance programs generally. Again, if there are specific, reasonable areas of inquiry which you would like the witness to be prepared to address, please identify them. Otherwise, if there are areas of inquiry which you could have identified and failed to, and the witness is unable to respond fully to those questions, BCBSMA will have no obligation to proffer an additional witness.

Finally, BCBSMA is still researching the claims data-related questions. I hope to have that information shortly, but did not want to delay providing you with the information in this letter.

BN1 35033418.1

Adeel A. Mangi, Esq.
Page 3
August 18, 2006


BCBSMA has been patient and cooperative with the Defendants' discovery requests, including your seriatim requests for additional information and discovery, many of which are only arguably within the scope of the Defendants' discovery requests or not within those requests at all. We have also produced a significant number of witnesses for deposition and are prepared to proffer at least two (and perhaps three) more. BCBSMA views this as the end of the discovery process and, apart from providing the materials and witnesses discussed in this letter, and providing certain additional provider contracts, BCBSMA believes that its discovery obligations are complete.


                                        Sincerely,

                                        ROBINS, KAPLAN, MILLER & CIRESI, LLP

                                        Stephen L. Coco

Enclosures
SLC
cc:     Edward Notargiacomo, Esq.

BN1 35033418.1

ROBINS, KAPLAN, MILLER & CIRESI L.L.P

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

Stephen L. Coco
(617) 859-2731

October 2, 2006

**Via Facsimile and Overnight Mail**

Adeel A. Mangi, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:     *In Re Pharmaceutical Industry Average Wholesale Price Litigation,*
        MDL No. 1456, Civil Action No. 01-12257-PBS
        Our File No.: 072188-0000

Dear Adeel:

        I have enclosed e-mails which Chris May was able to locate concerning communications with Pipefitters, BCBSMA-AWP-42897 - BCBSMA-AWP-43311

                        Sincerely,

                        ROBINS, KAPLAN, MILLER & CIRESI, LLP

                        Stephen L. Coco

SLC
Enclosures
cc:     Edward Notargiacomo, Esq.

BN1 35034487.1

ATLANTA · BOSTON · LOS ANGELES · MINNEAPOLIS · NAPLES · SAINT PAUL · WASHINGTON, D.C.

# Exhibit 5

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

August 22, 2006

By Email Attachment

Stephen Coco, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
25th Floor
800 Boylston Street
Boston, MA 02199

Adeel A. Mangi
(212) 336-2563
Direct Fax (212) 336-7947
aamangi@pbwt.com

Re:   **In re AWP Litigation**

Dear Steve:

   I am writing in response to your letter dated August 18, 2006 regarding discovery from your client Blue Cross Blue Shield of Massachusetts ("BCBSMA").

   With regard to the Blue Care 65 ("BC65") product, please provide dates when Mr. Mulrey is available to be deposed. We have previously identified the specific issues regarding BC65 as to which we seek testimony, but are happy to do so again. Defendants seek testimony on issues including: the methodologies that have been used to reimburse physicians for drugs administered to patients covered by this product in-office and for services attendant to administration of such drugs; any actual or contemplated changes to those reimbursement methodologies, including all reasons why any such changes were made or why contemplated changes were not made, and any analysis associated with consideration of those issues; and the process whereby BCBSMA determines the appropriate premium to charge in relation to its BC65 product. BCBSMA witnesses have testified that the BC65 product is now known as the Medicare Advantage HMO. *See, e.g.*, O'Brien Tr. 90:10-11; 94:2-11. Thus, we also seek testimony in the areas listed above for the Medicare Advantage HMO product. These areas of testimony are directly relevant to causation and to BCBSMA's claim that that it has been damaged in relation to its BC65 and Medicare Advantage HMO products by defendants' conduct.

   With regard to BCBSMA's Medigap product, please provide dates when the witness you reference will be available to testify. We have previously identified the specific areas as to which we seek testimony, but are happy to do so again. Defendants seek testimony on issues including: the range of Medigap products that BCBSMA offers and has offered over time; the analysis that BCBSMA undertakes and the factors it considers in determining whether or not to offer Medigap products; the analysis BCBSMA undertakes to measure the performance of such Medigap products; and the process whereby BCBSMA determines the appropriate premium to charge in relation to its Medigap products. Again, these areas of testimony are

Stephen Coco
August 22, 2006
Page 2

directly relevant to causation and to BCBSMA's claim that it has been damaged in relation to its Medigap products by defendants' conduct.

  With regard to the recently-produced documents concerning BCBSMA's staff model HMO, defendants are not seeking a custodian of records. Rather, BCBSMA is obliged to produce a 30(b)(6) witness who has been educated regarding those documents. Defendants will wait to proceed with that deposition until your efforts to identify a witness with greater knowledge are complete and a detailed description of those efforts has been provided to us as per your letter.

  As to documents regarding Pipefitters, you state that "Mr. King is no longer with the company and BCBSMA is not aware of having retained any of his emails." This response raises potential spoliation concerns. Please provide a more detailed explanation of when Mr. King left the company and why his emails, many of which are likely relevant to this ongoing litigation, we re not retained.

  Defendants disagree with other positions stated in your letter but will not detail the areas of disagreement here.

  Please call if you have any questions.

Sincerely,

Adeel A. Mangi

cc: Ed Notargiacomo, Esq.
  Counsel of Record

1303355v2

# Exhibit 6

# ROBINS, KAPLAN, MILLER & CIRESI LLP

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

Stephen L. Coco
(617) 859-2731

September 29, 2006

**Via Facsimile and Overnight Mail**

Adeel A. Mangi, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:        *In Re Pharmaceutical Industry Average Wholesale Price Litigation*,
           MDL No. 1456, Civil Action No. 01-12257-PBS
           Our File No.: 072188-0000

Dear Adeel:

I have enclosed documents relating to pricing for Medigap and BC 65 products,
BCBSMA-AWP-42832 - BCBSMA-AWP-42896, which may be relevant to the Rule 30(b)(6)
depositions next week. Ken Arruda's title is Director, Senior and Individual Plans. Mr. Arruda
also has some knowledge with respect to the BC65 product, and BCBSMA will designate him to
respond to questions on that topic as well as the Medigap topic, so that the defendants can have
the benefit of both his and Mr. Mulrey's knowledge with respect to the BC65 product.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI, LLP

Stephen L. Coco

SLC
Enclosures
cc:        Edward Notargiacomo, Esq.

BN1 35034455.1

** TOTAL PAGE.02 **

# Exhibit 7

## Mangi, Adeel A. (x2563)

| | |
|---|---|
| **From:** | Coco, Stephen L. [COCOSL@rkmc.com] |
| **Sent:** | Tuesday, October 03, 2006 9:38 AM |
| **To:** | Mangi, Adeel A. (x2563) |
| **Cc:** | Harrington, James S. |
| **Subject:** | Depositions Wednesday and Thursday |

>>>> Please read the confidentiality statement below <<<<

Adeel,

I have attached three documents that the witnesses will rely on to assist their testimony during the depositions. The first two documents, bates numbered BCBSMA-AWP-43312-43316, were located by Mike Mulrey and are related to BC65. The third document, bates numbered BCBSMA-AWP-43317-43320, was prepared by Ken Arruda for purposes of this deposition. We have not produced any documents from Ken Arruda's personal files, as he is being offered in the capactiy of a corporate designee, not as an individual. That said, Mr. Arruda reviewed the document requests and, apart from possessing copies of benefit plans (which BCBSMA has previously objected to producing), was not aware of any documents in his files that are responsive to the requests.

Ken Arruda's current responsibilities include both the Medigap and Medicare Advantage (BC65) products. Accordingly, in addition to testifying concerning the Medigap products, Mr. Arruda will be able to provide testimony concerning BC65 and its general operation. Mr. Arruda will also be the individual to respond to the questions concerning setting of premiums with respect to both Medigap and BC65. Mr. Mulrey will be able to provide information concerning the reimbursement methodologies for BC65, but will not be prepared to discuss the setting of premiums.

Please let me know who will be attending on behalf of the defendants so that I can put their names in the vistors log. It is our understanding that the depositions will start at 9:30. Let me know if this is incorrect.

Steve

---

Information contained in this e-mail transmission is privileged, confidential and covered by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510-2521.

If you are not the intended recipient, do not read, distribute, or reproduce this transmission.

If you have received this e-mail transmission in error, please notify us immediately of the error by return email and please delete the message from your system.

Pursuant to requirements related to practice before the U. S. Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding

# Exhibit 8

# Patterson Belknap Webb & Tyler LLP

1133 Avenue of the Americas    New York, NY 10036-6710    212.336.2000    fax 212.336.2222    www.pbwt.com

October 7, 2006

By Email Attachment

Adeel A. Mangi
(212) 336-2563
Direct Fax  (212) 336-7947
aamangi@pbwt.com

Stephen Coco, Esq.
Robins, Kaplan, Miller & Ciresi L.L.P.
25th Floor
800 Boylston Street
Boston, MA  02199

        Re:    **In re AWP Litigation**

Dear Steve:

        I am writing to memorialize requests for the production of documents referenced during the October 4, 2006 deposition of Kenneth Arruda and to address the issue of questions Mr. Arruda was unable to answer.

**Outstanding Document Production**

        It was apparent from Mr. Arruda's testimony that BCBSMA made a highly selective and inadequate production of documents readily available from its files. Please produce the following documents referenced during Mr. Arruda's deposition.

- The non-produced Actuarial Memoranda prepared in relation to all MediGap plans, including direct and group plans, and maintained in the files of BCBSMA  (Tr. 129-132, 146).
- All schedules accompanying Actuarial Memoranda, including documents sufficient to determine the actual "gains" or "losses" BCBSMA realized on its MediGap plans. (Arruda Tr. 127-129).
- All OIG reports Mr. Arruda testified he reviewed. (Tr. 105-106).

        Defendants require the immediate production of these documents to respond to BCBSMA allegations, particularly since Mr. Arruda could not respond to inquiries concerning performance of BCBSMA MediGap plans other than the Medex Gold referenced in the memoranda disclosed. Indeed, to comply with the disclosure requirements of the Court's pre-trial order, BCBMA must make the production before the close of business Monday. That should not be problematic because, as Mr. Arruda testified, the documents are readily available from BCBMA files.

Stephen Coco
October 7, 2006
Page 2

**Deposition of Susan Pierce**

      Given that Mr. Arruda was produced as a Rule 30(b)(6) deponent, defendants expected that he would be the most knowledgeable person at BCBSMA on the noticed topics and would have been prepared to answer all responsive questions. In the course of the deposition, it became apparent that Mr. Arruda was unable to answer fundamental questions concerning the design and performance of the BCBMA MediGap plans. Instead, he identified Ms. Susan Pierce as the person most knowledgeable about these topics and as the person who would be able to answer the questions posed.

      In these circumstances, we call for the immediate deposition of Ms. Pierce. For your reference, below are some of the questions Mr. Arruda was unable to answer and which he said Ms. Pierce would be able to answer. Also listed are some of the areas central to the Rule 30(b)(6) deposition as to which Ms. Arruda identified Ms. Pierce as the person with principal responsibility:

- Mr. Arruda did not know whether premiums received for MediGap plans were greater than the costs incurred in relation to those plans, but said Ms. Pierce would know the answer. (Tr. 45-46).
- Mr. Arruda did not know whether BCBSMA does any variance analysis to determine the extent to which its cost estimates used in premium setting were accurate, but said Ms. Pierce would know the answer. (Tr. 123-124)
- Mr. Arruda did not have an understanding as to why specific operating gains and losses in relation to MediGap plans occurred, but said Ms. Pierce would know the answer. (Tr. 149)
- Mr. Arruda did not know whether premiums in relation to BC 65 were designed to cover only the cost of providing enhanced services over those available through traditional Medicare or whether they were designed to generate an amount in addition to cost, but said Ms. Pierce would know the answer. (Tr. 160-161)
- Mr. Arruda said Ms. Pierce was the person with responsibility for determining premiums on MediGap products (Tr. 41)
- Mr. Arruda said Ms. Pierce was the person with responsibility for measuring the performance of MediGap plans (Tr. 42-43).
- Mr. Arruda identified Ms. Pierce as the custodian of key actuarial documents. (Tr. 139).

      Please advise us by Monday morning when BCBMA will make production of the missing documents and when it will offer Ms. Pierce for deposition.

      Separately, as discussed at Mr. Mulrey's deposition yesterday, please provide a legible version of the document marked as Mulrey Exhibit 2 bearing Bates numbers BCBSMA-AWP 12594-12609.

1313957v3

Stephen Coco
October 7, 2006
Page 3

Please call if you have any questions.

Sincerely,

Adeel A. Mangi

cc:    Ed Notargiacomo, Esq.
       Counsel of Record

1313957v3