# Exhibit 9

# ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

800 BOYLSTON STREET
25TH FLOOR
BOSTON, MA 02199
TEL: 617-267-2300  FAX: 617-267-8288
www.rkmc.com

ATTORNEYS AT LAW

Stephen L. Coco
(617) 859-2731

October 12, 2006

**Via Facsimile and Overnight Mail**

Adeel A. Mangi, Esq.
Patterson Belknap Webb & Tyler, LLP
1133 Avenue of the Americas
New York, NY 10036

Re:   *In Re Pharmaceutical Industry Average Wholesale Price Litigation,*
MDL No. 1456, Civil Action No. 01-12257-PBS
Our File No.: 072188-0000

Dear Adeel:

I am responding to your letter October 7, 2006 letter as well as the subsequent e-mails you sent concerning that letter.

BCBSMA disagrees that it has any obligation to produce any of the documents referenced on the first page of your letter, as well as with the premise of your letter that BCBSMA had any obligation to produce the "Actuarial Memoranda," numbered BCBSMA-AWP-42832 - BCBSMA-AWP-42871, that BCBSMA made available before Mr. Arruda's deposition. BCBSMA provided a limited set of actuarial memoranda in order to expedite the questioning at Mr. Arruda's deposition. BCBSMA did not represent that it was making a complete production (or that it was obligated to produce those documents).

Rather, BCBSMA's obligations to produce documents are governed by the document requests which the defendants served on BCBSMA and to which BCBSMA has previously objected or responded. BCBSMA has no obligation to respond to belated requests for documents such as those set forth in your letter, particularly where the deadline for fact discovery has passed. Indeed, reviewing the defendants' December 9, 2005 subpoena, the documents identified in the first two bullets of your letter are, though only arguably, within the scope of request 27. In response to BCBSMA's objection to producing documents responsive to that request, the defendants filed a motion to compel, which the Court denied with respect to detailed documents of the type identified in the first two bullets of your letter. Furthermore, the documents identified in the first two bullets of your letter are documents that are publicly filed with the Massachusetts Department of Insurance, and thus have always been available to the defendants (once they were filed).

BN1 35034751.2

Adeel A. Mangi, Esq.
Page 2
October 12, 2006

That said, BCBSMA is willing to accommodate the defendants' request to the extent that it does not impose an undue expense and burden on BCBSMA. BCBSMA has at its offices the rate filings for 1996 through 2007, which contain the Actuarial Memoranda for the Medigap products and the attendant schedules for those products. BCBSMA is in the process of copying and numbering those documents and should be in a position to send those documents to you early next week. Despite doing so, BCBSMA reiterates that it is under no obligation to produce these documents, and that it does not believe that the documents have any relevance to this case. Accordingly, given that attempting to produce documents from prior to 1996 would be unduly burdensome and expensive and given that, to our knowledge, these documents are publicly available at the Massachusetts Department of Insurance, BCBSMA does not intend to produce documents from any of the earlier filings.

With respect to OIG reports, Mr. Arruda testified that he periodically reviewed OIG reports. He did not identify any specific reports that he reviewed nor did he testify that he retained copies of any such reports. In light of your letter, Mr. Arruda has reviewed his files and confirmed that he did not retain any OIG reports in his files. During the course of discovery, BCBSMA has also asked numerous other employees, including those in its legislative affairs business area, whether they maintain OIG reports, and did not receive any affirmative responses. Indeed, as you learned during the numerous depositions of BCBSMA witnesses in which the defendants spent a significant amount of time questioning the witnesses about OIG reports and other reports that the witnesses had never seen before, OIG reports were not the typical sort of publication maintained by BCBSMA employees in the ordinary course of business.

BCBSMA objects to producing Susan Pierce (or any other BCBSMA witness) to testify concerning the subjects identified on the second page of your October 7, 2006 letter. BCBSMA made Mr. Mulrey and Mr. Arruda available last week, well after the close of fact discovery, as an accommodation to the defendants. BCBSMA did not agree that the subjects about which the defendants sought to inquire were either relevant to this litigation or within the scope of any Rule 30(b)(6) topic previously identified and properly noticed by the defendants. In addition, the Actuarial Memoranda and schedules should provide the defendants with sufficient information such that a deposition is not required.

Furthermore, the subjects identified in your letter are similar to the categories contained in request 27 in the defendants' December 9, 2006 subpoena. Given the Court's previous refusal to compel BCBSMA to produce documents in response to that request, BCBSMA believes it is unlikely that the Court would compel BCBSMA to produce a witness on those subjects (even if the defendants could identify a Rule 30(b)(6) topic that arguably encompassed those subjects), particularly in light of the Court's recent order denying a motion to compel based on the fact that the deadline for fact discovery had passed and trial was imminent.

Finally, in my September 20, 2006 letter, I identified the topics which BCBSMA

BNI 35034751.2

Adeel A. Mangi, Esq.
Page 3
October 12, 2006

understood would be the subject of the depositions of Mr. Mulrey and Mr. Arruda.  I then stated:

> *The witnesses will be prepared to discuss these topics generally.  If there are*
> *more specific or more detailed questions that you intend to pose, please let us*
> *know so that, if it is reasonable to do so, we can prepare the witnesses*
> *appropriately.*

At no point did the defendants identify "more specific or more detailed questions" which they
intended to pose.  Having failed to do so, the defendants' position that BCBSMA is obligated to
present an additional witness because Mr. Arruda could not answer some of the defendants' more
specific and detailed questions has no merit.

Finally, I have enclosed a copy of BCBSMA-AWP-12594, which is the page from the
document marked as Exhibit 2 at Mr. Mulrey's deposition which you had difficulty reading.

Please contact me if you have any additional questions.

Sincerely,

ROBINS, KAPLAN, MILLER & CIRESI, LLP

Stephen L. Coco

SLC
Enclosure
cc:    Edward Notargiacomo, Esq.

# Exhibit 10

# Direct Pay Medex Overview



Prepared by:   Lucinda M. Lewis
               Actuarial Department
               June 25, 2001

# Direct Pay Medex Overview

## Contents

**Page**

Pre-reform Environment                                                    1

Post-reform Environment                                                   2

Key Accomplishments                                                       3

Key Risks                                                                 3

Rate Hearing Process                                                      4

Supplemental Materials                                                    6
    Exhibit 1A          History of Rate Increases (Gold and Bronze)
    Exhibit 1B          History of Filed vs. Approved Rates (Gold)

    Exhibit 2A          History of Financial Results (Chart)
    Exhibit 2B          History of Financial Results (Components)

    Exhibit 3A          History of Membership Levels (All Direct Pay Medex Products)
    Exhibit 3B          History of Membership Levels (Gold)
    Exhibit 3C          History of Membership Levels (Bronze)

# Direct Pay Medex Overview

## Pre-reform Environment

- Massachusetts was a waiver state with six standard plans.  Two of the plans (Core and Bronze) did not include prescription drug coverage and are identical to two of the NAIC standard plans.  The other four plans contained prescription drug benefits (unlimited in three of the plans) and were not comparable to any of the NAIC standard plans in this regard.

- BCBSMA was uniquely regulated compared to other Medicare Supplement carriers.

  - Medex rates were always subject to prior approval through a lengthy and highly adversarial public rate hearing process that typically resulted in inadequate rates being approved.  This, in turn, created increased upward pressure on the rates each year, and substantial financial losses.

    - Rate approvals (and, therefore, rate increase effective dates) were frequently delayed, creating additional financial losses to BCBSMA.

    - In some years, losses also resulted from internal corporate decisions to request less than the full needed rates in order to minimize adverse publicity.

  - Only BCBSMA was required to offer all six standard plans.

  - BCBSMA was "insurer of last resort" and was required to community rate its direct-pay products.  Underwriting, pre-existing condition limits, and age rating were prohibited only for BCBSMA.  The result of this difference in practice was to produce a pool of subscribers who could not purchase coverage elsewhere.

  - A contribution to reserves component was prohibited in the rates and an investment income credit was required based on investment earnings on cash flow and general reserves.

  - BCBSMA was required to demonstrate that it had effective cost containment programs in place.

  - Rate filings were typically 1000 pages long and supported by volumes of supplemental materials provided through information and record requests.

- Medicare HMO's penetrated the market beginning in 1993, creating an additional source of adverse selection in our risk pool.

- Due to its predominant market share, its regulatory status, the political environment, and the magnitude of the rate increases needed, BCBSMA's rate requests attracted intense public scrutiny and reaction by regulators, consumer advocates, and the press.  Rate requests were "front-page news" and tended to be interpreted by the public as indicative of rate increase levels on all of BCBSMA's products.

## Direct Pay Medex Overview

### Post-reform Environment

- Under the 1995 Medigap reform legislation, Massachusetts remains a waiver state but the standard plans were reduced to three – two without prescription drug coverage (Core and Bronze) and one with unlimited prescription drug coverage (Gold).

- The reform legislation leveled the playing field to some extent, but BCBSMA is still treated differently in many respects.

  - Two of the standard plans (Core and Gold) are required to be offered by all Medicare Supplement carriers in the market.  Companies may also offer the third standard plan (Bronze), at their option.  Because the only difference between Gold and Bronze is the prescription drug benefit in Gold, offering these two products leads to adverse selection in Gold, because people can readily compare the price difference to their ongoing out-of-pocket drug costs.

  - All carriers must community rate and all plans must be guaranteed issue (one two-month open enrollment period per year or upon first becoming eligible for Medicare).  All carriers' rates are subject to prior approval.

  - In rating, BCBSMA must meet a 90% minimum loss ratio requirement for each product, while the requirement for commercial plans is only 65%.

  - Hearings are mandated if the rate increase requested is over 10%.  At his/her option, the commissioner may also call a rate hearing if the rate increase requested is under 10%. BCBSMA is still subject to heightened scrutiny compared to competitors. Other carriers have filed for large rate increases and then stipulated for the same rates BCBSMA has in effect.

  - The statutory provision prohibiting a contribution to reserves for BCBSMA was repealed.

    - In 1997, a 5.5% contribution to reserves was requested and approved.

    - In 1998, a 5.6% contribution to reserves was requested, but only 2.5% was approved.

    - Because rate increases filed were under 10% for 1999-2001, the 2.5% level has been maintained in order to avoid the possibility that a change would trigger a rate hearing.

  - In its first rate filing under reform (for rates effective 1/1/95), BCBSMA obtained its full rate increase (and was allowed to implement it retroactively) only as a result of BCBSMA's successful appeal to the state Supreme Judicial Court.

- Medicare HMO's continue to draw members from Medex, resulting in significant decline in membership and a deteriorating risk pool.

- For the past three years, as a result of its ability to keep its rate increase requests under 10%, the intense consumer activism and public scrutiny of BCBSMA's rates has diminished and BCBSMA has not been subjected to a public rate hearing.

# Direct Pay Medex Overview

## Key Accomplishments

- Successfully lobbied for Medigap reform legislation, which became effective on 1/1/95.

- Successfully defended our appeal to the SJC on the 1995 rate decision.  We believe this has helped to mitigate the likelihood of frivolous "political" decisions since that time.

- Improved on historical rate filing methodologies and defensibility of filings to the point that for all of the subsequent rate filings since reform, all actuarial projection components of the rates have been accepted as filed.

- While the rate filing still requires 3-5 months to prepare and 4-5 months to defend in a hearing, the number of staff required has been reduced by the hiring of more highly skilled staff and the automation of many processes.

- Achieved significant improvement in financial results as we have successfully brought our rates to adequacy.

## Key Risks

- If the rate request is over 10%, we will be subject to a rate hearing and the adverse publicity associated with it.  Even if the rate request is under 10%, the Commissioner could still call a hearing, in which case BCBSMA is likely to be "front-page news" for whatever reason the hearing is called.

- The public rate hearing process provides a "window" into the operations of BCBSMA. Information sought is not strictly limited to the regulated rate.  The forum provides an opportunity for AG, DOI, newspapers, etc. to find out anything they ever wanted to know about BCBSMA, e.g., executive salaries, hospital and PBM negotiations, level of charitable contributions, etc.  The problem of having a small portion of the business provide a "superhighway" into everything going on at BCBSMA was and remains a risk.

- The process for handling "confidential" or "proprietary" information within the context of the rate hearing has varied in past hearings and remains unresolved.  BCBSMA's position that information pertaining to its Commercial business is proprietary is particularly difficult to maintain when Medex is the beneficiary of or related to some of those proprietary matters.

# Direct Pay Medex Overview

## Rate Hearing Process

- Rate hearings are conducted by the DOI using the legal adversary proceeding format. Pre-reform hearings were required for every rate filing. Now hearings are only required if the rate increase is more than 10%, however, the DOI may call a hearing on any rate filing.

- A hearing for public comments is called thirty days after the filing. These hearings provide a forum for adversaries, consumer advocates, and members to voice their opinions as to why BCBSMA's rate request should be denied. They also afford BCBSMA an opportunity to make a public statement in defense of its rate need. Usually there is one hearing in Boston. One year, there were several scheduled throughout the state. The evidentiary hearing begins shortly after these hearings conclude.

- BCBSMA presents evidence to justify the rate increase requested. In these proceedings, the "burden of proof" is on us. Jeff Swope, from Palmer & Dodge, has been our counsel for many years. Witnesses from BCBSMA always include the Actuary who signs the rate filing, an individual from the expense allocation area responsible for the expense portion of the filing, and the Medex Product Manager who supports the cost containment portion of the filing. Outside expert witnesses have typically included a statistical consultant and a representative from our PBM.

- Traditionally there are two intervenors, the State Rating Bureau (SRB) within the DOI, and the Attorney General's Office (AG). The SRB has one attorney and one actuary. The AG has one attorney and sometimes hires one or more consultants. The responsibility of the intervenors is to contest the accuracy and reasonableness of the filing.

- Usually after a week or two the intervenors begin to submit "Information Requests" (IR) asking for more information on the filing. Under reform, these must be answered in five business days. Before reform, responses were due in ten days.

- A "Technical Conference" is held in advance of the hearing. This is an opportunity for the intervenors to ask technical questions of our witnesses so that the cross-examination portion of the hearing flows faster. This process takes one or two days.

- The SRB and the AG may continue to submit information requests. Any requests asked at the technical conference or at the hearing are known as "Record Requests" and the same rules for the timing of responses apply as for the Information Requests.

- BCBSMA's rate filing contains prefiled testimony by its expert witnesses. The hearing begins with the cross-examination of the BCBSMA witnesses on that testimony by the intervenors' attorneys. The hearing may stretch over several weeks. Cross-examination is followed by re-direct, as our lawyers question our witnesses to clarify responses made on cross-examination.

- Within 10 days following the cross-examination of the BCBSMA witnesses, the intervenors may submit a responsive filing, presenting their expert witness testimony. This is followed by cross-examination of their witnesses by our attorneys then re-direct by their attorneys.

- We then may file a rebuttal filing with more testimony within three days following the cross-examination of the intervenors' witnesses. This is followed by cross-examination. The intervenors then file a surrebuttal filing followed by more cross-examination.

4

# Direct Pay Medex Overview

**Rate Hearing Process (cont'd)**

- The lawyers on both sides agree on what points of controversy are outstanding.  These remaining issues are subjects of briefs by the attorneys due within 14 days following the end of the hearing.  Reply briefs are due four days after the intervenors' briefs.

- Under the reform regulations, the hearing officer must issue a decision within thirty days after the conclusion of the hearing.  As was the case pre-reform, this decision almost always rejects our rates to some extent.  The rejection states what would be an acceptable rate filing. We submit adjusted rates within two days.

- Rate increases may not be effective any sooner than 30 days after the final approval is received.  Prior to reform, if the Commissioner's decision was delayed, the rates were sometimes effective retroactively to the filed effective date.  This possibility was eliminated after reform.  Therefore, a delay in the Commissioner's decision can delay the effective date of our rate increases, creating revenue losses for us in two ways. First, there is a revenue loss in the initial months of the delay while the old rate must continue in force.  Secondly, since rates must remain in effect for at least 12 months, the inadequate revenue in the last months when the new rate is in effect beyond the end of the originally anticipated 12-month rating period.  To avoid this second impact, we file a rate increase factor to be applied for each month of a delayed effective date in the event it should occur.  However, there is no guarantee that this would be approved.

- The preparation and defense of a filing consumes considerable staff resources for 3-5 months prior to and 4-5 months after the filing date.

# Direct Pay Medex Overview

**Supplemental Materials**

| | |
|---|---|
| Exhibit 1A | History of Rate Increases (Gold and Bronze) |
| Exhibit 1B | History of Filed vs. Approved Rates (Gold) |
| | |
| Exhibit 2A | History of Financial Results (Chart) |
| Exhibit 2B | History of Financial Results (Components) |
| | |
| Exhibit 3A | History of Membership Levels (All Direct Pay Medex Products) |
| Exhibit 3B | History of Membership Levels (Gold) |
| Exhibit 3C | History of Membership Levels (Bronze) |
| | |
| Exhibit 4 | Medicare Supplement Plans Offered in Massachusetts |
| | |
| Exhibit 5 | Medicare Eligible Market 1996 vs. 1999 |

Exhibit 1A

**Direct Pay Medex Gold and Bronze**

**Rate History**

| Effective Date | Medex Gold Quarterly Rates | Medex Gold Monthly Rates | % Change | Medex Bronze Quarterly Rates | Medex Bronze Monthly Rates | % Change |
|---|---|---|---|---|---|---|
| 01/01/77 | $50.88 | $16.96 | | $46.35 | $15.45 | |
| 04/01/78 | $55.89 | $18.63 | 9.8% | $48.93 | $16.31 | 5.6% |
| 04/01/80 | $64.74 | $21.58 | 15.8% | $55.65 | $18.55 | 13.7% |
| 04/01/81 | $69.63 | $23.21 | 7.6% | $59.58 | $19.86 | 7.1% |
| 06/01/82 | $83.97 | $27.99 | 20.6% | $73.77 | $24.59 | 23.8% |
| 07/01/83 | $103.17 | $34.39 | 22.9% | $86.61 | $28.87 | 17.4% |
| 08/01/84 | $120.12 | $40.04 | 16.4% | $96.78 | $32.26 | 11.7% |
| 10/01/85 | $130.02 | $43.34 | 8.2% | $98.19 | $32.73 | 1.5% |
| 10/01/87 | $143.67 | $47.89 | 10.5% | $108.51 | $36.17 | 10.5% |
| 11/01/88 | $156.96 | $52.32 | 9.3% | $95.19 | $31.73 | -12.3% |
| 01/01/90 | $257.61 | $85.87 | 64.1% | $171.36 | $57.12 | 80.0% |
| 01/01/91 | $275.91 | $91.97 | 7.1% | $172.74 | $57.58 | 0.8% |
| 01/01/92 | $330.21 | $110.07 | 19.7% | $196.68 | $65.56 | 13.9% |
| 08/01/92 | $355.83 | $118.61 | 7.8% | $222.30 | $74.10 | 13.0% |
| 01/01/93 | $417.75 | $139.25 | 17.4% | $214.83 | $71.61 | -3.4% |
| 01/01/94 | $431.43 | $143.81 | 3.3% | $219.51 | $73.17 | 2.2% |
| 01/01/95 | $519.12 | $173.04 | 20.3% | $219.51 | $73.17 | 0.0% |
| 01/01/96 | $543.03 | $181.01 | 4.6% | $239.79 | $79.93 | 9.2% |
| 03/15/97 | $684.90 | $228.30 | 26.1% | $287.61 | $95.87 | 19.9% |
| 03/15/98 | $775.17 | $258.39 | 13.2% | $318.06 | $106.02 | 10.6% |
| 03/15/99 | $851.91 | $283.97 | 9.9% | $331.62 | $110.54 | 4.3% |
| 03/15/00 | $936.24 | $312.08 | 9.9% | $334.41 | $111.47 | 0.8% |
| 03/15/01 | $1,028.91 | $342.97 | 9.9% | $363.39 | $121.13 | 8.7% |

X:\exhibits\sratehis.xls

Exhibit 1B

**Direct Pay Medex Gold**
**Quarterly Rate History**
**Filed vs. Approved Rates**

| Filed Rates | | | Approved Rates | | |
|---|---|---|---|---|---|
| Effective Date | Rate | % Increase | Effective Date | Rate | % Increase |
| 10/01/88 | $162.09 | 12.8% | 11/1/88 | $156.96 | 9.3% |
| 01/01/90 | $277.92 | 77.1% | 01/01/90 | $257.61 | 64.1% |
| 01/01/91 | $287.34 | 11.5% | 01/01/91 | $275.91 | 7.1% |
| 01/01/92 | $355.20 | 28.7% | 01/01/92 | $330.21 | 19.7% |
| | | | 08/01/92 | $355.83 | 7.8% |
| 01/01/93 (1) | $440.40 | 23.8% | 01/01/93 | $417.75 | 17.4% |
| 01/01/94 | $462.18 | 10.6% | 01/01/94 | $431.43 | 3.3% |
| 01/01/95 | $519.12 | 20.3% | 01/01/95 (2) | $519.12 | 20.3% |
| 01/01/96 | $543.03 | 4.6% | 01/01/96 | $543.09 | 4.6% |
| 01/01/97 | $705.54 | 29.9% | 03/15/97 | $684.90 | 26.1% |
| 03/15/98 | $834.60 | 21.9% | 3/15/98 | $775.17 | 13.2% |
| 03/15/99 | $851.91 | 9.9% | 03/15/99 | $851.91 | 9.9% |
| 03/15/00 | $936.24 | 9.9% | 03/15/00 | $936.24 | 9.9% |
| 03/15/01 | $1,028.91 | 9.9% | 03/15/01 | $1,028.91 | 9.9% |

*Notes:*

*(1)  1/1/93 filed rates are rates revised at 11/12/92:*

*(2)  1/1/95 filed rates were approved after law suit, effective on different dates*

x:\exhibits\M3rthist.xls



Operating Gain/(loss) for Direct Pay Medex 1991-2000

Exhibit 2B

**Blue Cross and Blue Shield of Massachusetts**
**Operating Results for Direct Pay Medex**
**1991 - 2000**
**($Millions)**

| | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Direct-Pay Medex** | | | | | | | | | | |
| Premium | $265.8 | $302.3 | $339.9 | $340.4 | $347.9 | $310.5 | $297.9 | $278.6 | $270.2 | $275.6 |
| Claims | $264.2 | $292.2 | $329.8 | $348.9 | $338.4 | $334.7 | $300.5 | $261.2 | $248.2 | $252.2 |
| *Loss Ratio* | 99.4% | 96.7% | 97.0% | 102.5% | 97.3% | 107.8% | 100.9% | 93.8% | 91.9% | 91.5% |
| Expenses | $19.9 | $19.8 | $22.7 | $19.9 | $21.0 | $22.0 | $18.5 | $15.3 | $14.5 | $13.7 |
| Gain/(Loss) | ($18.3) | ($9.7) | ($12.6) | ($28.4) | ($11.5) | ($46.2) | ($21.0) | $2.1 | $7.5 | $9.7 |
| | | | | | | | | | | |
| *Gain/(Loss) as %Premium* | -6.9% | -3.2% | -3.7% | -8.3% | -3.3% | -14.9% | -7.0% | 0.8% | 2.8% | 3.5% |
| | | | | | | | | | | |
| **Cumulative results** | | ($28.0) | ($40.6) | ($69.0) | ($80.5) | ($126.7) | ($147.7) | ($145.6) | ($138.1) | ($128.4) |



Direct Pay Medex Total
December 1991-2000 Membership

| Year | Membership |
|------|-----------|
| 1991 | 262,246 |
| 1992 | 252,031 |
| 1993 | 251,142 |
| 1994 | 239,819 |
| 1995 | 213,749 |
| 1996 | 186,199 |
| 1997 | 155,732 |
| 1998 | 135,378 |
| 1999 | 125,963 |
| 2000 | 126,967 |

Exhibit 3A

Exhibit 3B



**Direct Pay Medex Gold**
**December 1991–2000 Membership**

| Year | Membership |
|------|-----------|
| 1991 | 187,516 |
| 1992 | 164,227 |
| 1993 | 152,201 |
| 1994 | 139,070 |
| 1995 | 110,117 |
| 1996 | 88,284 |
| 1997 | 64,281 |
| 1998 | 52,130 |
| 1999 | 45,974 |
| 2000 | 42,082 |

Exhibit 3C



**Direct Pay Medex Bronze**
**December 1991-2000 Membership**

| Year | Membership |
|------|-----------|
| 1991 | 67,407 |
| 1992 | 79,250 |
| 1993 | 88,235 |
| 1994 | 89,375 |
| 1995 | 94,888 |
| 1996 | 91,170 |
| 1997 | 86,317 |
| 1998 | 80,006 |
| 1999 | 76,195 |
| 2000 | 80,888 |

Exhibit 4

Medicare Supplement Plans Offered in Massachusetts

| Medigap Carriers Please note that rates may change in 2001 | Monthly Premiums for Policies | | | Membership on 12/31/00 |
|---|---|---|---|---|
| | Medicare Supplement Core | Medicare Supplement 1 | Medicare Supplement 2 | |
| Alliance Life Insurance Company of N.A. Only for members of Air Force Sergeants Assn 1-800-882-5541 Only for members of Fleet Reserve Assn 1-800-424-1120 Only for members of Marine Corps Assn 1-800-424-5181 Only for members of Nat Assn of Retired Fed Emp 1-800-233-5764 Only for members of National Rifle Assn 1-877-672-3006 Only for members of Reserve Officers Assn of USA 1-800-247-7988 (open enrollment: Feb-Mar; at initial eligibility) | $57.17 (rate filed to be effective 6/01/01 $62.83) | $108.25 (rate filed to be effective 6/01/01 $119.00) | $244.42 (rate filed to be effective 6/01/01 $268.67) | 451 |
| Blue Cross & Blue Shield of MA (Medex) 1-800-258-2226 (open enrollment: Feb-Mar; at initial eligibility[1]) | $65.25 (rate filed to be effective 3/15/01 $65.58) | $112.22 (rate filed to be effective 3/15/01 $121.95) | $314.59 (rate filed to be effective 3/15/01 $345.73) | 141,822 |
| Hartford Life Insurance Company Only for members of The Retired Officers Assn 1-800-247-2192 (open enrollment: continuous) | $44.90 | $102.35 | $286.26 | 3,035 |
| Lincoln National Life Insurance Company Only for members of Military Benefit Assn 1-800-336-0100 (open enrollment: continuous) | $53.09 | $78.19 | $116.30 | 5 |
| Oxford Life Insurance Company 1-877-469-3073 (open enrollment through December 31, 2000 and initial eligibility only through January 31, 2001) | $65.00 | $106.00 | $286.00 | 1,406 |
| United HealthCare Insurance Company Only for American Assn of Retired Persons 1-800-523-5800 (open enrollment: Feb-Mar[2]; at initial eligibility[1]) | $78.50 (rate filed to be effective 6/01/01 $86.25) | $124.75 (rate filed to be effective 6/01/01 $128.75) | $314.25 (rate filed to be effective 6/01/01 $345.50) | 20,650 |

[1] Plan offers discounted rates to certain members joining when initially eligible.
[2] Plan adds surcharge for enrollment after initial eligibility period.

**BlueCross BlueShield
of Massachusetts**

**The Health Services Company**

INTEROFFICE MEMO

To:     Bruce W. Butler                                            **Exhibit 5**
        Senior Vice President and Chief Actuary

From:   Susan E. Pierce
        Actuarial – Individual and Senior Products

Date:   November 7, 2000

Re:     **Medicare Eligible Market 1996 and 1999**

cc:     K. Arruda, J. Baran, L. Lewis

---

The health care market for the Medicare eligible population has changed significantly over time. The attached charts show the composition of the market in 1996 and 1999. The figures were provided by Ken Arruda and are based on membership filings required by the DOI. Below are several observations:

**Overview**

- About 50% of the Medicare eligibles are enrolled in either Medicare Supplement plans or Medicare+Choice plans.

- Others are uninsured, in carve-out plans, or in Medicaid.

- The number of Medicare eligible beneficiaries increased by 5.6%. The total number of members not enrolled in a Medigap plan or a Medicare+Choice plan increased by an even higher percent (7.2%).

**Chart 1:  Medicare Eligible Market**

- There was a significant shift of members from direct pay Medigap coverage to direct pay HMO plans. Market share for Medigap plans decreased from 25.9% in 1996 to 16.6% in 1999. HMO membership increased from 12.8% in 1996 to 21.2% in 1999. The total market share in direct pay plans did not change significantly from 1996 to 1999.

- Enrollment in group plans followed the same market shift pattern described above, however, the total group market declined over the period (from 16.5% to 13.9%). Most of the decline of the group market was in the group Medigap plans.

**Chart 2:  Direct Pay Medigap Plans**

BCBSMA still has the majority of this market, although the number and percentage of Medicare eligibles in direct pay Medicare Supplement plans has decreased dramatically (from 240,000 to 163,000 and 25.9% to 16.6%).

**Chart 3:  Direct Pay Medicare HMO Market**

Blue Care 65 ranked fourth, behind Tufts, HCHP, and Fallon in both years.  In late 1999 and 2000, however, BC65 has had significant growth due to HCHP financial difficulties, Kaiser leaving the state, service area reductions, and withdrawals by competitors in some counties.



Medicare Eligible Market

- Group HMO Plans
  4.5%/4.6%
- Group Medigap Plans
  12.0%/9.4%
- Direct Pay HMO Plan
  12.8%/21.2%
- Direct Pay Medigap
  25.9%/16.6%
- Unenrolled
  56.8%/57.6%

1,200,000
1,000,000
800,000
600,000
400,000
200,000
0

1996          1999



## Direct Pay Medigap Market

☐ Other Commercial Carriers
2.9%/4.6%

☐ Bankers Life
8.9%/8.5%

■ United Health Care - AARP
11.3%/12.4%

■ BCBSMA - Medex
76.9%/74.5%

1996    1999

0
50,000
100,000
150,000
200,000
250,000



# *MEDEX OVERVIEW*

## **Executive Summary**

### *Pre-Reform Environment (prior to 1/1/95)*

- BCBS was uniquely regulated compared with other Medigap carriers.
- Chapter 199 prohibited contribution to reserves by Direct Pay Medex line.
- Beginning in 1993, Risk contracts became important competitors.

### *Post-Reform Environment (post 1/1/95)*

- Competitor Medigap plans are now under the same regulations as BCBS.
- Risk contracts are an even more important segment of market.
- Chapter 199 repealed, no statutory prohibition of contribution to reserves.

### *Outstanding Issues*

- Different loss ratio standards still apply to BCBS than to other Medigap carriers.
- BCBS is subjected to heightened scrutiny compared with its competitors.
- Historical risk pool disadvantages persist.

### *Charts and Graphs*



EXHIBIT 4
Arruda
10-4-06

September 1996

# MEDEX OVERVIEW

## Pre-Reform Environment
## Summary

**BCBS was uniquely regulated compared with other Medigap Plans.**
- Medex rates were subject to hearing process and prior approval.
- BCBS could not underwrite and age rate whereas competitors could.

**Chapter 199 prohibited contribution to reserves by Direct Pay Medex line.**
- BCBS was statutorily prohibited from making a contribution to reserves.
- BCBS was statutorily required to provide an investment income credit on cash flow which the hearing officer extended to provide an investment income credit on general reserves.

**Beginning in 1993, Medicare Risk contracts became important competitors.**
- Medicare risk HMOs began to significantly penetrate market even before reform.

2

# *MEDEX OVERVIEW*

## Pre-Reform Environment
## Unique Regulation

### *Medex rates were subject to hearing process and prior approval.*

Each year BCBS changed rates, we needed to obtain the Commissioner's approval before doing so. This approval was contingent upon a rate hearing being conducted. This process continually resulted in inadequate rates being approved. When inadequate rates were approved for the current year, this only increased upward pressure on the rates in the following year.

The rate hearing process was very adversarial, with both the Attorney General and the State Rating Bureau fighting the rate increase as intervenors in the process. Occasionally, another outside group would also hire an attorney to fight our rate requests and intervene in the rate approval process.

This prior approval process led to substantial financial losses to the company. Losses occurred through formal DOI decisions disapproving our rates and approving instead inadequate rates. Losses also resulted from internal corporate decisions to settle ('stipulate') for some rate increase rather than endure the bad publicity of a rate hearing and/or risk a Division decision which would not even grant the negotiated level of increase or in an effort to facilitate passage of Medigap reform.

### *BCBS could not underwrite and age rate whereas competitors could.*

BCBS was the insurer of last resort in Medigap. There could be no underwriting, no waiting periods, and no pre-existing condition exclusions applied to subscribers. Our competitors could underwrite applicants for their products. In combination with the introduction of risk contracts to the market, the result of this difference in practice was to produce a pool of subscribers in Medex (especially Medex Gold, the country's richest Medigap plan) who could not receive coverage elsewhere. That is *not* to say every subscriber was like this nor that every uninsurable person came into Medex, but proportionally Medex had substantially more of these type of people than any other product or company in the market. It is precisely this legacy of being the "dumping ground" pre-reform that is driving our rate increases post-reform.

September 1996

# MEDEX OVERVIEW

## Pre-Reform Environment
## Chapter 199

*BCBS was statutorily prohibited from making a contribution to reserves.*

Chapter 199 of the Massachusetts General Laws required a number of things from us on our regulated lines. However, of most concern was its prohibition of BCBS's making a contribution to reserves from the Direct Pay Medex line. In essence, we were supposed to propose a "break-even" rate each year. However, because we did not allocate investment income by line of business, as will be seen below, this so called "break-even" rate would end up causing a substantial reported loss each year due to the investment income credit. Thus, the state of affairs before Medigap reform was essentially that we would ask for a "break-even" rate that we knew would produce a reported loss on the line of about $10 million. To the extent that the approved rate was not deficient, we could expect to earn this back as investment income reported below the line. However, over time, due to inadequate rates being approved, we have just barely broken even on a pay-as-you-go basis, and come nowhere near funding the appropriate UCL for Medex even after considering investment income.

*BCBS was statutorily required to provide an investment income credit on cash flow which the hearing officer extended to provide an investment income credit on general reserves.*

It was long settled practice that BCBS must provide an investment income credit on the rate to subscribers for collecting premium in advance of paying claims. This credit amounted to between 90 and 120 days of interest and ran in the two to three percent range (note that because inadequate rates are generally approved while BCBS does *in fact* earn some investment income on Medex, the entire investment income credit is not earned back). BCBS was also required to provide a credit for the interest on the general reserves backing the line which was approximately one half of one percent. We challenged that requirement in a filing at one time, on the rationale that since Medex subscribers were prohibited by Chapter 199 from making a contribution to reserves, they should not enjoy an investment income credit based on the general reserves backing the line. The hearing office disagreed with this logic and when we sued in court, we lost on this issue.

September 1996

## *MEDEX OVERVIEW*

## Pre-Reform Environment
## Risk Contracts

***Medicare risk HMOs began to significantly penetrate market even before reform.***

When Medicare risk HMOs began to come into the market, they affected BCBS by lessening our ability to attract members just turning age 65 and luring away through cheaper costs subscribers without strong attachments to their own physicians who did not mind giving up freedom of choice. Unfortunately, both of these types of subscribers are less costly than the subscribers who have continued to join and remain in Medex (and indeed other Medigap products). This effect has continued post-reform as well.

5                                                    September 1996

# *MEDEX OVERVIEW*

## Post-Reform Environment
## Summary

*Competitor Medigap plans are now under the same regulations as BCBS.*

- Under the new law, standard plans with unlimited drug benefits must be offered.
- All rates are still subject to prior approval.
- Rate hearings are specifically triggered if increases are over 10%.
- Most of our competitors have stipulated to rates prior to a decision.

*Risk contracts are an even more important segment of market.*

- In 1995, disenrollment from Medex to risk contracts has been high.
- Blue Care 65 attracted a number of Medex subscribers in its limited availability.
- Medex has lost significant marketshare and the mix of subscribers has changed.

*Chapter 199 repealed, no statutory prohibition of contribution to reserves.*

- BCBS is testing ability to make contribution to reserves in 1997 rate filing.

# MEDEX OVERVIEW

## Post-Reform Environment
## Similar Regulation

### *Under the new law, standard plans with unlimited drug benefits must be offered.*

By law, all Medigap carriers and risk contracts must offer a product with actuarially equivalent drug benefits. The Division has chosen (under the Governor's direction and despite our arguments for a more limited benefit) to implement this law with regulations requiring that the drug benefit be the unlimited Medex Gold benefit. Companies may offer a plan with the same benefits as their drug product, but without any drug benefit. This leads to adverse selection within the market, as people can readily compare the price difference to their ongoing out-of-pocket drug costs.

### *All rates are still subject to prior approval.*

Under Medigap reform, the Commissioner retains her authority as far as prior approval of *any* rate increase. The legal standard that is used is that the Commissioner is a rate *reviewer* not a rate *setter*. In this role, she must determine that the rate is not inadequate, not excessive, and not unfairly discriminatory. She must also be satisfied that the rates are reasonable in relation to the benefits provided. Rates may be found unreasonable if they differ from a presumed reasonable rate by only a penny. All rates now must be community rates and all companies are required to take anyone who applies for coverage during their open enrollment.

### *Rate hearings are specifically triggered if increases are over 10%.*

While the Commissioner retains her prior approval authority over any proposed rate increase, the rate hearing process does not necessarily apply to all rate increase requests. Chapter 176K, the Medigap reform law, and the regulations issued by the Division to implement the law (211 CMR 71.00) specifically provide that if a rate increase request is in excess of a ten percent increase a hearing on the proposed rates must be held. If the rate increase request is less than ten percent, then a hearing may be called at the Commissioner's discretion. Note that in the limited experience of the Medigap market under reform, there has not been a hearing called when requested rate increases were under ten percent.

### *Most of our competitors have stipulated to rates prior to a decision.*

Other than the decision on BCBS' 1995 proposed Medex rates which was subsequently vacated by the SJC, there has been only one decision rendered in a hearing under Medigap reform. Banker's Life and Casualty requested a thirty percent rate increase for 1996. This decision denied the requested rate increase of thirty percent, allowing only a thirteen percent rate increase, effective at the beginning of August. So far, all of our other competitors have stipulated to rate increases prior to decisions being rendered.

# *MEDEX OVERVIEW*

## Post-Reform Environment
## Market Share

*In 1995, disenrollment from Medex to risk contracts has been high.*

Based on a survey of members who would tell us where they were going when they left us, Tufts' Secure Horizons program drew the largest number of members out of Medex, nearly 3,500 in a survey of disenrollees. Fallon and Harvard/Pilgrim trailed behind. Very few subscribers left Medex for alternative Medigap coverage.

The subscribers who leave for risk contracts generally have lower claims than do those who remain in Medex. This exacerbates the adverse selection problem, and tends to lead to higher rate increase needs.

*Blue Care 65 attracted a number of Medex subscribers in its limited availability.*

We had approximately 1,850 subscribers leave Medex for Blue Care 65 with effective dates of March, April, and May (the bulk obviously in April). It is expected that when Blue Care 65 becomes available again that significant numbers of subscribers will transfer to the product.

There is substantially more choice in the Senior market post-reform as compared to pre-reform, it would thus seem that there is not a need to regulate Medigap rates as heavily as before.

*Medex has lost significant marketshare and the mix of subscribers has changed.*

Note the chart at the end of this package which shows the continued erosion of the Medex subscriber base as rates have increased and additional choices have become available in the market. Further, as the prices of Medex Gold and Bronze have become further apart, there has been a continued shift of subscribers out of Gold into Bronze at a substantial loss of revenue to the company without a correspondingly large drop in claims. This effect is the adverse selection of being able to compare one's prescription drug costs to the difference in cost between the plans. Only those people to whom it is financially advantageous have an incentive to downgrade.

September 1996

# *MEDEX OVERVIEW*

## Post-Reform Environment

## Contribution to Reserves

***BCBS is testing ability to make contribution to reserves in 1997 rate filing.***

The 1997 Medex rate filing is the first to incorporate a contribution to reserves for the company. We need to make this contribution to reserves, because every line of business needs to make its fair contribution to the bottom line in today's current competitive environment. The outcome of the hearing will show whether or not the Division will permit such a contribution after repeal of Chapter 199. Our competitors, we assume, have profit margins built into their rates, and if reform has leveled the playing field, we ought to be able to make such a contribution as well.

# *MEDEX OVERVIEW*

## Outstanding Issues
## Summary

*Different loss ratio standards still apply to BCBS than to other Medigap carriers.*

- Commercial plans must meet a 65% loss ratio standard, BCBS a 90% standard.

*BCBS is subjected to heightened scrutiny compared with its competitors.*

- Competitor Medigap plans have not had multiple public hearings on their rates.

*Historical risk pool disadvantages persist.*

- Because of our history as insurer of last resort, we have a worse risk pool.

10

## *MEDEX OVERVIEW*

## Outstanding Issues

## Loss Ratios

*Commercial plans must meet a 65% loss ratio standard, BCBS a 90% standard.*

By law, BCBS must certify that it expects to meet at least a 90% loss ratio with the rates it files with the state. Our competitors need only meet the NAIC developed 65% loss ratio standard. This standard must be met on a product by product basis; therefore, Gold, Bronze, Core, etc. must independently meet the 90% minimum loss ratio. This stringent requirement offers little room to cross-subsidize (as we had done in the past) among products so as to manage rate increases across the portfolio and maintain rational rate relationships among products. In the absence of this management ability, Bronze and Gold rates continue to drift farther apart which only heightens the adverse selective lapsation from Gold.

# *MEDEX OVERVIEW*

## Outstanding Issues
## Heightened Scrutiny

***Competitor Medigap plans have not had multiple public hearings on their rates.***

Two examples from this year should suffice to demonstrate that BCBS is held to a higher level of scrutiny than our competitors. In the Banker's Life and Casualty rate decision, the hearing officer noted that the cost control programs Banker's had in place were insufficient. By regulation, which states that the Commissioner must find that a company provides adequate cost containment programs, the filing ought to have been disapproved. It was not. Banker's Multiple Line (no relation to the other Banker's) has requested rate increases of over 100% for their currently marketed drug products. While they had one public hearing at the Division, they did not have multiple public hearings scheduled all around the state to hear about their rate increase request.

12

# MEDEX OVERVIEW

## Outstanding Issues
## Risk Pool

*Because of our history as insurer of last resort, we have a worse risk pool.*

BCBS' historical status as insurer of last resort continues to affect the market after Medigap reform. Because we took any applicant for Medigap, we have built up a significantly older and sicker risk pool than any of our competitors (for example Banker's Life's average age in their drug product is 71, compared with our age 78). We must continue to rate the product based on the pool of people we have in the product, and this drives the high rate increases and uncompetitive rates we see.

September 1996

Blue Cross Blue Shield of Massachusetts, Inc.

Direct Pay Medex

Quarterly Rate History

| Effective Date | Medex Gold Rates | % Change | Medex Silver Rates | % Change | Medex Standard Rates | % Change | Medex Basic Rates | % Change | Medex Bronze Rates | % Change | Medex Core Rates | % Change | Composite Rates | % Change |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 01/01/77 | $50.88 | | | | $32.73 | | | | $46.35 | | | | $50.76 | 14.4% |
| 04/01/78 | $55.89 | 9.8% | | | $36.45 | 11.4% | | | $48.93 | 5.6% | | | $54.48 | 8.8% |
| 04/01/80 | $64.74 | 15.8% | | | $42.06 | 15.4% | | | $55.65 | 13.7% | | | $63.03 | 15.7% |
| 04/01/81 | $69.63 | 7.6% | | | $46.08 | 9.6% | | | $59.58 | 7.1% | | | $67.74 | 7.5% |
| 06/01/82 | $83.97 | 20.6% | | | $54.42 | 18.1% | | | $73.77 | 23.8% | | | $81.93 | 21.0% |
| 07/01/83 | $103.17 | 22.9% | | | $68.76 | 26.4% | | | $86.61 | 17.4% | | | $100.47 | 22.3% |
| 08/01/84 | $120.12 | 16.4% | | | $80.67 | 17.3% | | | $96.78 | 11.7% | | | $116.40 | 15.9% |
| 10/01/85 | $130.02 | 8.2% | | | $87.21 | 8.1% | | | $98.19 | 1.5% | | | $125.25 | 7.5% |
| 10/01/87 | $143.67 | 10.5% | | | $96.36 | 10.5% | | | $108.51 | 10.5% | | | $138.81 | 10.5% |
| 11/01/88 | $156.96 | 9.3% | | | $116.49 | 20.9% | | | $95.19 | -12.3% | | | $148.40 | 7.2% |
| 01/01/90 | $257.61 | 64.1% | | | $213.87 | 83.6% | $194.07 | | $171.36 | 80.0% | | | $244.20 | 65.9% |
| 01/01/91 | $275.91 | 7.1% | | | $225.15 | 5.3% | $201.00 | 3.6% | $172.74 | 0.8% | | | $249.48 | 5.9% |
| 01/01/92 | $330.21 | 19.7% | $301.26 | 7.7% | $275.52 | 22.4% | $244.20 | 21.5% | $196.68 | 13.9% | $154.53 | | $291.48 | 17.1% |
| 08/01/92 | $355.83 | 7.8% | $324.39 | 7.8% | $298.65 | 8.4% | $267.33 | 9.5% | $222.30 | 13.0% | $154.53 | 0.0% | $316.77 | 8.7% |
| 01/01/93 | $417.75 | 17.4% | $341.76 | 5.4% | $331.65 | 11.0% | $190.83 | -28.6% | $214.83 | -3.4% | $142.17 | -8.0% | $344.73 | 11.8% |
| 01/01/94 | $431.43 | 3.3% | $356.16 | 4.2% | $332.13 | 0.1% | $232.65 | 21.9% | $219.51 | 2.2% | $144.42 | 1.6% | $346.32 | 3.0% |
| 01/01/95 | $519.12 | 20.3% | $391.32 | 9.9% | $396.00 | 19.2% | $232.65 | 0.0% | $219.51 | 0.0% | $123.87 | -14.2% | $393.92 | 14.9% |
| 01/01/96 | $543.03 | 4.6% | $424.47 | 8.5% | $411.78 | 4.0% | $255.69 | 9.9% | $239.79 | 9.2% | $123.87 | 0.0% | $399.48 | 6.0% |

Note: The composite percent increase cannot be calculated from the rates on this chart because rates and percent increase are based on the distribution known at the time of the decision.

X:\exhibits\medexhis.xls

**Direct Pay Medex**
**Rate History**

| Year | Filed Rates | | | Approved Rates | | |
|------|-------------|---|---|----------------|---|---|
| | Effective Date | Composite Rate | % Increase | Effective Date | Composite Rate | % Increase |
| 1975 | 1/1/75 | $32.90 | 12.9% | 1/1/75 | $32.90 | 12.9% |
| 1976 | 1/1/76 | $43.77 | 33.0% | 1/1/76 | $43.77 | 33.0% |
| 1977 | 1/1/77 | $51.74 | 18.2% | 1/1/77 | $50.77 | 14.4% |
| 1978 | 4/1/78 | $55.85 | 11.5% | 4/1/78 | $54.48 | 8.8% |
| 1979 | | | NO FILING | | | |
| 1980 | 4/1/80 | $63.02 | 15.7% | 4/1/80 | $63.02 | 15.7% |
| 1981 | 4/1/81 | $71.54 | 13.5% | 4/1/81 | $67.73 | 7.5% |
| 1982 | 4/1/82 | $92.71 | 36.9% | 6/1/82 | $81.94 | 21.0% |
| 1983 | 6/1/83 | $100.47 | 22.3% | 7/1/83 | $100.47 | 22.3% |
| 1984 | 7/1/84 | $124.95 | 24.4% | 8/1/84 | $116.40 | 15.9% |
| 1885 | 8/1/85 Revised | $129.48 $128.52 | 11.2% 10.4% | 10/1/85 | $125.25 | 7.5% |
| 1986 | 12/1/86 9/1/87 | $136.35 $147.66 | 8.9% 17.6% | 10/1/87 | $138.81 | 10.5% |
| 1988 | 10/01/88 | $153.18 | 10.7% | 11/1/88 | $148.40 | 7.2% |
| 1989 | 01/01/90 | $261.39 | 77.6% | 01/01/90 | $244.20 | 65.9% |
| 1990 | 01/01/91 | $260.64 | 10.7% | 01/01/91 | $249.48 | 5.9% |
| 1991 | 01/01/92 | $314.13 | 26.2% | 01/01/92 | $291.48 | 17.1% |
| | | | | 08/01/92 | $316.77 | 8.7% |
| 1992 | 01/01/93 (1) | $350.31 | 14.7% | 01/01/93 | $344.73 | 11.8% |
| 1993 | 01/01/94 | $369.66 | 10.0% | 01/01/94 | $346.32 | 3.0% |
| 1994 | 01/01/95 | $393.92 | 14.9% | 01/01/95 (2) | $393.92 | 14.9% |
| 1995 | 01/01/96 | $399.48 | 6.0% | 01/01/96 | $399.48 | 6.0% |
| 1996 | 01/01/97 | $480.83 | 26.8% | | | |

**Notes:**

(1) 1/1/93 filed rates are rates revised at 11/12/92:

(2) 1/1/95 filed rates were approved after law suit, effective on different dates

The percent increases may not be derivable from the rates listed on this chart because the rates and percent increases are based on the contract distribution known at the time of the filing

x:\exhibits\ratehist.xls

# Direct Pay Medex Rate History



Quarterly Rate (per member/month)

| | |
|---|---|
| $500.00 | |
| $450.00 | |
| $400.00 | |
| $350.00 | |
| $300.00 | |
| $250.00 | |
| $200.00 | |
| $150.00 | |
| $100.00 | |
| $50.00 | |
| $0.00 | |

Jul-83
Aug-84
Oct-85
Dec-86
Oct-87
Oct-88
Jan-90
Jan-91
Jan-92
Jan-93
Jan-94
Jan-95
Jan-96
Jan-97

□ Rate Requested   ▨ Rate Approved   ▨ Rate Needed

# BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, INC.

## Analysis of Direct Pay Medex Operating Results
### (in thousands)

| PERIOD | EARNED PREMIUM | CLAIMS | OPERATING EXPENSES | NET OPERATING GAIN/(LOSS) | GAIN/(LOSS) AS A PERCENT OF PREMIUM | CLAIMS/ PREMIUM |
|---|---|---|---|---|---|---|
| 1981 | $82,917 | $85,551 | $8,615 | ($11,249) | -13.6% | 103.2% |
| 1982 | $96,229 | $106,487 | $8,778 | ($19,036) | -19.8% | 110.7% |
| 1983 | $117,380 | $118,358 | $8,564 | ($9,542) | -8.1% | 100.8% |
| 1984 | $138,399 | $122,693 | $10,383 | $5,323 | 3.8% | 88.7% |
| 1985 | $151,214 | $146,212 | $13,893 | ($8,891) | -5.9% | 96.7% |
| 1986 | $152,380 | $132,080 | $15,741 | $4,559 | 3.0% | 86.7% |
| 1987 | $148,934 | $156,780 | $14,564 | ($22,410) | -15.0% | 105.3% |
| 1988 | $161,940 | $184,338 | $16,662 | ($39,060) | -24.1% | 113.8% |
| 1989 | $174,473 | $196,196 | $19,086 | ($40,809) | -23.4% | 112.5% |
| 1990 | $257,817 | $268,494 | $19,353 | ($30,030) | -11.6% | 104.1% |
| 1991 | $265,801 | $264,166 | $19,905 | ($18,270) | -6.9% | 99.4% |
| 1992 | $302,264 | $292,241 | $19,773 | ($9,750) | -3.2% | 96.7% |
| 1993 | $339,901 | $329,812 | $22,713 | ($12,624) | -3.7% | 97.0% |
| 1994 | $340,387 | $348,923 | $19,901 | ($28,437) | -8.4% | 102.5% |
| 1995 | $347,868 | $338,371 | $21,034 | ($11,537) | -3.3% | 97.3% |

Source:   Estimates of Direct Pay results underlying numbers published in Annual Statement

Note:   Statutory Annual Statement shows Group and Direct Pay Medex combined (through 1990).  The results shown above are estimates of Direct Pay Medex only, through 1990; 1991 - 1995 numbers are actual for Direct Pay only.

Investment income not included

X:\exhibits\operares.xls



X:\FILE97\BACK-UP\MX\SUBS.PPT



AVERAGE AGE OF MEDEX SUBSCRIBERS OVER TIME

X:\FILE97\BACK-UP\MXAVGAG2.PPT

# Exhibit 11

**Mangi, Adeel A. (x2563)**

| | |
|---|---|
| **From:** | Mangi, Adeel A. (x2563) |
| **Sent:** | Friday, October 13, 2006 5:04 PM |
| **To:** | Coco, Stephen L. |
| **Cc:** | Ed Notargiacomo (ed@hagens-berman.com) |
| **Subject:** | Your letter |
| | |
| **Importance:** | High |

Steve:  We are in receipt of your letter dated October 12, 2006.  Please be advised that we will be filing a motion shortly to compel the deposition of Ms. Pierce.  We will also deal in that motion with BCBSMA's failure to produce responsive documents and a staff model HMO 30(b)(6) witness.  If we have misunderstood your position and you are willing to produce Ms. Pierce please let us know immediately.

Regards

Adeel Abdullah Mangi
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
Ph: (212) 336 2563
Fax: (212) 336 7947
aamangi@pbwt.com

1