UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

**PLAINTIFFS' OPPOSITION TO THE BMS DEFENDANTS' MOTION IN LIMINE TO EXCLUDE ALL EVIDENCE RELATING TO APOTHECON, INC.**

## I.     INTRODUCTION

BMS seeks to exclude from trial evidence relating to its wholly-owned subsidiary Apothecon, Inc., which marketed some generic drugs that are not targeted in the upcoming trial. More specifically, BMS demands that the following Plaintiffs' trial exhibits be excluded: 185, 188, 209, 210, and 211.[1]  BMS's objections are based on relevancy, prejudice and burden. These objections are meritless.

While it is understandable that BMS wishes to "deep six" hot documents relating to blatant manipulation of AWPs for BMS drugs, BMS's effort must ultimately fail. The exhibits at issue are highly relevant, demonstrating that, early in the Class Period, BMS knew how to (i) effect changes to AWP and how this would directly affect reimbursement regimes based on AWP, and (ii) manipulate spreads. The bright-line distinction that BMS seeks – to exclude evidence relating to pricing manipulations for drugs not directly targeted in the trial – is a false one. Direct evidence of manipulation in one arena (oral generics) can be offered to show motive

---

[1] Each of these Exhibits is attached to the Declaration Of Sean R. Matt In Opposition To The BMS Defendants' Motion In Limine To Exclude All Evidence Relating To Apothecon, Inc. (the "Matt Declaration").

- 1 -

and opportunity to manipulate in another (chemotherapy).  The Court should deny BMS's motion.

## II.     ARGUMENT

### A.     The Evidence At Issue

BMS claims that this evidence is "marginally relevant."  To the contrary, the evidence strikes to the very heart of the allegations against BMS.  The documents plainly demonstrate that BMS well understood the connection between its WLPs and AWPs; that AWPs directly impact reimbursement in the marketplace; that BMS knew how to manipulate spreads; and that it did so when competitive considerations demanded it.

One of the documents that BMS seeks to exclude demonstrates that BMS knew early in the Class Period how to effect changes to AWP and how this would directly affect reimbursement regimes based on AWP.  For example, Plaintiffs' Exhibit 185, Matt Decl. Ex. A (BMS/AWP/0041865-69), is an internal Apothecon memo from 1993 discussing pricing strategy for two different lines of antibiotics. Recognizing that health plan reimbursements were typically based on AWP, and that "AWP management strategies have been key to successfully marketing the Apothecon line of antibiotics," the memo describes how Apothecon maintained two distinct AWPs for two sets of antibiotics:  a high AWP line that "allows for maximum reimbursement," and a lower AWP line to facilitate third party plan use of the products because "many third party plans exclude the products because of high AWP."  *Id.* at 0041865.  With more plans disallowing the high AWP line, and with MACs coming online, the memo advises that Apothecon has deleted the high AWP line and must now "develop a one line . . . AWP strategy that maximizes its Marketing efforts.  To do this, a new AWP for the remaining products must be set in the middle of the two lines."  *Id*.  The memo then described how to accomplish this:

> Mechanically the way to accomplish this is to raise the list price (list price + 25% = AWP) of Trimox, Veetids and Betapen. This is a list price change only. The average selling price of the products will not change. However, the data services will report this as a Bristol-Myers Squibb list price increase.

*Id.*

BMS also seeks to exclude Plaintiffs' Exhibit 209, Matt Decl. Ex. C, a composite of documents revealing how BMS reported a fictitious WLP for a new packaging of the generic drug atenolol. The memo found at BMSAWP/0000612 is a recommendation for establishing a list price for atenolol and was sent to Denise Kaszuba who, at the time, was BMS's Senior Pricing Analyst. The "Wholesale List Price" and "Anticipated AWP" that were approved were $500 and $625, respectively. *Id.* at BMSAWP/0000613. Importantly, BMS recognized that no sales would be made at this WLP but that it was necessary to report a WLP in order to establish an AWP so that atenolol would be eligible for reimbursement:

> In order to accomplish a speedy market introduction of atenolol 50mg 1000's, a wholesale list price needs to be created. The price is set to establish an AWP that is competitive with other generic offerings. ***Please note that this wholesale price will not reflect actual selling price, since Apothecon sells atenolol primarily at contract or special offer pricing***.

*Id.* at 0000612 (emphasis added); *see also* Plfs. Ex. 188, Matt Decl. Ex. B (BMS/AWP/00337637-41, at 00337640) ("Reimbursement of drug cost by insurance companies directly or through 3rd Party Payers is denied without product information and AWP.").

As was her duty at the time (and is still her duty today), Ms. Kaszuba communicated the fictitious $500 WLP for atenolol to various Publishers and PBMs via letters that she prepared. *See* Plfs. Ex. 209, Matt Decl. Ex. C, at BMSAWP/0000597-606; Kaszuba Dep. at 61-64, Matt Decl. Ex. F.[2] And Ms. Kaszuba, who is currently BMS's Associate Manager of Pricing Support,

---

[2] All deposition excerpts cited herein are attached to the Matt Declaration.

reported this WLP even though she knew that no one would be paying it (or the anticipated AWP) for atenolol:

> Q. In this instance, do you recognize that no one would have paid AWP for this particular drug at this particular time because they wouldn't have even paid the list price for this drug, correct?
>
> A. Correct.

*Id.*, Kaszuba Dep. at 65:16-21.

BMS enacted the same strategy with albuterol as revealed by Plaintiffs' Exhibit 210, Matt Decl. Ex. D (BMSAWP/0000574-87), which BMS seeks to have stricken from the record:  "To accomplish a rapid market introduction of albuterol, wholesale list prices must be established. These wholesale prices do not reflect actual selling prices, as albuterol will be sold primarily at contract or special offer pricing…." *Id*. at 0000583.  The next page of the document contains the fictitious WLPs that Ms. Kaszuba testified she would have communicated to publishers, including the *Red Book*, *First DataBank*, and *MediSpan*.  Kaszuba Dep. at 66-68, Matt Decl. Ex. F.

And, as another series of documents that BMS wants excluded reveal, BMS issued a fictitious WLP to launch Trimox capsules as well.  *See* Plfs. Ex. 211, Matt Decl. Ex. E (BMSAWP/0000095-120, at 0000099) ("We were successful in using our Unit of Use packaging to secure the Trimox capsule business at Wal-Mart.  It is necessary to furnish wholesale pricing to the pricing publishers to enable them to establish AWPs for third party reimbursement purposes.  It is prudent to point out at this time that these wholesale prices do not reflect actual selling prices, as Trimox Unit of Use will be sold primarily at contract or special offer pricing."); *id.* at 0000105 ("To accomplish rapid introduction of Trimox capsules 500mg 3,000s into the market, wholesale list prices must be established.  It is prudent to point out at this time that these

wholesale prices do not reflect actual selling prices, as Trimox capsules 500mg 3,000s will be sold primarily at contract or special offer pricing."); *id.* at 0000107-18 (letters from Barbara Goetz, who worked at BMS under Denise Kaszuba's supervision, to various publishers and PBMs communicating the fictitious WLP for Trimox).

Another example of AWP manipulation objected to by BMS is Plaintiffs' Exhibit 188, Matt Decl. Ex. B (BMS/AWP/00337637-41), a "procedure for pricing support" document prepared by Ms. Kaszuba for the BMS pricing support coordinators. Kaszuba Dep. at 116-18, Matt Decl. Ex. F. In the document, Ms. Kaszuba references the pricing manipulation for Apothecon generic drugs. In discussing special pricing, Kaszuba posits:

> If we never sell these multi source products at the High Billing Category 51 price – why not reduce the bc 51, 56, 57, 58, 59 price?
>
> Since the AWP (Average Wholesale Price) is calculated based on the wholesale list – retailers benefit from a High AWP price under the reimbursement policies of Insurers.

Plfs. Ex. 188, at 00337638, Matt Decl. Ex. B. Kaszuba explained that Category 51 referenced wholesaler pricing. Kaszuba Dep. at 118-19, Matt Decl. Ex. F. At the time she prepared this BMS pricing support procedure document, it constituted "a fair, accurate guide" of the pricing procedures employed by BMS pricing support. *Id.*, Kaszuba Dep. at 116-18.

### B. The Proffered Evidence Is Highly Relevant

All relevant evidence is admissible. Fed. R. Evid. 401. The rules broadly define relevance: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 402. "The standard for admissibility under [Rule] 401 is a liberal one." *Ferrara & DiMercurio v. St. Paul Mercury Ins. Co.*, 240 F.3d 1, 6 (1st Cir. 2001).

*Far from being of marginal relevance as BMS asserts, these documents are not only "of consequence to the determination" (Fed. R. Evid. 402), they are highly relevant*.  Even though the documents do not reference the specific BMS oncology drugs at issue in the trial, these documents, the associated testimony of Denise Kaszuba and related evidence reveal a BMS course of conduct – as well as motive and opportunity – relating to the reporting of WLPs generally and general recognition of the role that AWPs play in reimbursement regimes.  As the above evidence demonstrates:

- BMS reported WLPs in order to ensure that AWP-based reimbursement would be available for its drugs.

- BMS knew that health plan reimbursements were typically based on AWP.

- BMS knew exactly how a WLP that it reported would translate into a published AWP.

- BMS knew how to manipulate WLPs in order to predictably create a certain AWP.

- When competitive conditions dictated, BMS was more than willing to knowingly report a false WLP in order to make sales.

BMS wants to erect a "Chinese Wall" between its actions related to oral drugs and those related to physician-administered drugs, but no such wall even remotely exists in practice.  Ms. Kaszuba communicated the false WLPs *in her capacity as a BMS employee* and not an Apothecon employee.  *See, e.g.,* Kaszuba Dep. at 64:15-17, Matt Decl. Ex. F ("Q.  Was this done under your area of responsibility as a senior pricing analyst?  A.  Correct.").  Moreover, Denise Kaszuba and her Pricing Support area reported prices for BMS and Apothecon drugs alike and for oral drugs and oncology drugs alike.  There was not a separate set of price reporting policies and procedures for one category of drug versus another.  Indeed, as Kaszuba testified, Exhibit 188, Matt Decl. Ex. B (BMS/AWP/00337637-41) was created for all BMS pricing support

coordinators. Kaszuba Dep. at 116-18, Matt Decl. Ex. F. Notably, she did not testify to procedures that were different based on the type of drug being priced or whether the drug originated from Apothecon or BMS.

Therefore, the activities described in the above documents and in the associated Kaszuba testimony are not limited merely to Apothecon as BMS would have us believe. ***It was BMS that initiated those pricing actions***.

At a minimum, this evidence will aid the Court in putting into context BMS's manipulation of AWPs for its oncology drugs. *See, e.g.,* Advisory Committee Notes to Fed. R. Evid. 401 ("Evidence which is essentially background in nature can scarcely be said to involve disputed matter, yet it is universally offered and admitted as an aid to understanding."); *McElwain v. Harris*, 2006 U.S. Dist. Lexis 18273, at *6 (D.N.H. Apr. 6, 2006) ("background evidence is generally considered relevant") (citing Advisory Committee's Note). Furthermore, BMS's manipulations in connection with Apothecon's atenolol, albuterol, trimox and other generic drugs is helpful background information showing motive, opportunity, know-how and execution. *See, e.g., Ferrara & DiMercurio*, 240 F.3d at 5-6 (reviewing Fed. R. Evid. 401 and 403 and upholding trial court's admission of motive and opportunity evidence relating to the burning of the insured vessel; the insured company was in dire financial trouble (motive) and multiple keys were available (opportunity or lack thereof)).

Given the liberality of Rule 401, BMS is very hard pressed to demonstrate that the exhibits and related evidence that it seeks to exclude are not "of consequence to the determination of the action." The Court should deny BMS's motion.

**C.   BMS Is Not Unfairly Prejudiced By The Introduction Of Such Evidence**

BMS asserts that consideration of the above evidence will be unduly prejudicial. BMS Br. at 5-6. Fed. R. Evid. 403 provides that relevant evidence may nonetheless be excluded "if its

- 7 -

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." However, "Rule 403 is a liberal rule under which relevant evidence generally is admitted." *Jacques v. Clean-Up Group*, 96 F.3d 506, 516 (1st Cir. 1996) (quoting *United States v. McMahon*, 938 F.2d 1501, 1508 (1st Cir. 1991)). Furthermore, Rule 403 "is concerned not with prejudicial evidence, but with unfairly prejudicial evidence." *United States v. Benedetti*, 433 F.3d 111, 118 (1st Cir. 2005).

Evidence is generally deemed unfairly prejudicial if it has an undue tendency to prompt a decision by the factfinder on an improper basis, *id.*, such as an improper emotional basis. *United States v. Flemmi*, 402 F.3d 79, 86 n.8 (1st Cir. 2005). The Court has wide discretion while engaging in this balancing act. *Id.* at 86 ("only rarely – and in extraordinarily compelling circumstances – will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect") (quoting *United States v. Sabetta*, 373 F.3d 75, 82-83 (1st Cir. 2004)).

BMS's claim of unfair prejudice does not withstand scrutiny. First, it does not explain how the Court, in reviewing the above evidence, will be overcome by emotion and render an improper decision. It is extremely unlikely that this sophisticated Court in this bench trial will render an improper decision unduly swayed by emotion. Indeed, courts recognize that questions regarding admissibility or exclusion of evidence "become relatively unimportant" in bench trials because "the rules of evidence relating to admission and exclusion [are] intended primarily for the purpose of withdrawing from the jury matter which might improperly sway the verdict, and not for the trial judge, who is presumed to act only upon proper evidence." *United States v. Norman T.*, 129 F.3d 1099, 1107 (10th Cir. 1997) (quoting *Stevens v. Vowell*, 343 F.2d 374, 380 (10th Cir. 1965)), *cert. denied*, 523 U.S.1031 (1998).

Second, BMS fails to explain why it will not have an opportunity to attempt to counter the inferences associated with these exhibits by introducing evidence that BMS did not know how changes in WLP would effect changes in AWP, or how changes in WLP and AWP would directly affect reimbursement regimes based on AWP, or how to manipulate spreads. Considering these exhibits will not in any way foreclose BMS from attempting to present a defense against them. BMS will ultimately fail in any attempts to do so given the overwhelming weight of evidence against it on these issues, but that is not the standard against which to weigh potential prejudice. *See, e.g., Veranda Beach Club Ltd. Partnership v. Western Sur. Co.*, 936 F.2d 1364, 1372 (1st Cir. 1991) ("trials were never meant to be antiseptic affairs; it is only unfair prejudice, not prejudice per se, against which Rule 403 guards").

BMS's undue prejudice argument fails.

**D.     The Court's Consideration Of This Evidence Will Not Be Unduly Burdensome**

BMS also invokes Fed. R. Evid. 403's provision that evidence can be excluded if its probative value is substantially outweighed "by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Out of the approximately 70 trial exhibits proffered by Plaintiffs as directly relating to BMS, BMS exclaims that a mere five exhibits must be excluded because "including [them] in an already hefty record will impose significant burdens on the court post-trial and delay the ultimate resolution of this case." BMS Br. at 7. Of course, BMS fails to explain how the consideration of just five documents could possibly impose a significant burden and delay trial and resolution, let alone "substantially outweigh" their probative value. BMS's invocation of undue burden is frivolous and should be quickly rejected.

### III.     CONCLUSION

BMS's motion to exclude this highly probative and compelling evidence is meritless and should be denied.

| | |
|---|---|
| DATED:  October 16, 2006. | By    **/s/ Steve W. Berman**<br>   Thomas M. Sobol (BBO#471770)<br>   Edward Notargiacomo (BBO#567636)<br>Hagens Berman Sobol Shapiro LLP<br>One Main Street, 4th Floor<br>Cambridge, MA  02142<br>Telephone: (617) 482-3700<br>Facsimile: (617) 482-3003 |

**LIAISON COUNSEL**

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL  60601
Telephone: (312) 762-9235
Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Kenneth A. Wexler
Jennifer Fountain Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Marc H. Edelson
Allan Hoffman
Edelson & Associates LLC
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Shanin Specter
Donald E. Haviland, Jr.
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA  19102
Facsimile:  (215) 772-1359
Telephone:  (215) 772-1000

**CO-LEAD COUNSEL FOR PLAINTIFFS**

- 11 -

001534-16 133132 V1

- 12 -

**CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE**
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on October 16, 2006, I caused copies of **PLAINTIFFS' OPPOSITION TO THE BMS DEFENDANTS MOTION IN LIMINE TO EXCLUDE ALL EVIDENCE RELATING TO APOTHECON, INC.** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

  /s/ Steve W. Berman
Steve W. Berman