# Exhibit F

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

---oOo---

| | |
|---|---|
| In re:  PHARMACEUTICAL ) | |
| INDUSTRY AVERAGE WHOLESALE ) | |
| PRICE LITIGATION ) | |
| ) | |
| ) | MDL DOCKET NO. |
| ) | CIVIL ACTION |
| ) | 01CV12257-PBS |
| This Document relates to:  ) | |
| ) | |
| ALL ACTIONS.  ) | |
| ) | |

Videotape Deposition of MATTHEW METCALF,
taken on behalf of Plaintiffs, at 980 Ninth Street,
19th Floor, Sacramento, California, commencing at 9:38
a.m., Wednesday, August 31, 2005, before WENDY E.
ARLEN, CSR License #4355, RMR, CRR.

Matthew Metcalf        HIGHLY CONFIDENTIAL        August 31, 2005
Sacramento, CA

Page 20

1   back to the efficacy and safety of Zoladex and once
2   again remind them of the price of Zoladex and allow
3   them to make their own decision based upon that.
4   Q.        Have you ever discussed the AWP for Lupron
5   with a physician?
6   A.        No.
7   Q.        Has anyone ever raised with you -- has any
8   physician ever raised with you the AWP for Lupron?
9   A.        Yes.
10  Q.        Can you tell me a specific instance?
11  A.        Not specifically off the top of my head, no.
12  Q.        How do you respond to that?
13            MS. LAWSON:  Object to form.
14            THE WITNESS:  How do I object -- how do I
15  respond to a physician raising the issue of Lupron
16  AWP?
17  Q.        MR. WEXLER:  Yes.
18  A.        Typically, once again, I would always take
19  them back to the efficacy and tolerability of Zoladex
20  and remind them of our pricing and explain to them
21  that any price comparison would have to be done on
22  their own and I am only able to provide them with

Page 21

1  Zoladex price and hope that they could choose Zoladex
2  based on the efficacy and tolerability.
3  Q.     All right.  Now, in explaining the process by
4  which return -- let me rephrase that.
5         In the series of questions, let me make sure
6  that I ask you that one.  Have you ever gone through
7  with a physician and explained how to calculate return
8  to practice?
9  A.     No, I have not.
10 Q.     Has anyone ever asked you for that?
11 A.     Yes.
12 Q.     And how have you responded?
13 A.     I have always explained to them that I cannot
14 discuss return to practice with physicians.  That's
15 not something that I'm authorized to discuss, but that
16 I can provide you with pricing information and if you
17 have specific reimbursement questions, you know, I can
18 explain the process to you, but I cannot, you know,
19 discuss return to practice.
20 Q.     Why could you not discuss return to practice?
21 A.     It's my understanding that the reason we
22 could not discuss return to practice was due to the

Page 22

1    OIG investigation.

2    Q.    You understand whether the OIG investigation
3    is over?

4    A.    To my understanding, it is.

5    Q.    What did you understand the OIG investigation
6    to concern?

7    A.    In my understanding, I understood the OIG
8    investigation to be regarding samples and the
9    inappropriate billing by physicians of samples to
10   Medicare.

11   Q.    And what was your understanding of why you
12   could not discuss return to practice because of the
13   OIG investigation?

14         MS. LAWSON:  Object to form.

15         THE WITNESS:  I don't know.

16   Q.    MR. WEXLER:  Who conveyed that to you?

17   A.    I can't recall exactly.

18   Q.    Was it Mr. Armstrong?

19   A.    It may have been, but I don't know for sure.

20   Q.    To your recollection, somewhere along the
21   line someone said -- someone told you that you cannot
22   discuss return to practice with a physician because of

Page 23

1   the OIG investigation.
2   A.         I believe that's correct.
3   Q.         In the absence of your discussing return to
4   practice -- in the absence of discussing return to
5   practice with a physician, was it your understanding
6   that -- or is it your understanding that physicians
7   have the capability of determining that number for
8   themselves?
9              MS. LAWSON:  Object to form.
10             THE WITNESS:  I don't believe I understand
11  the question.
12  Q.         MR. WEXLER:  Does a physician have enough
13  information to determine what their return to practice
14  for the purchase of Zoladex as opposed to Lupron would
15  be?
16             MS. LAWSON:  Objection, he can't answer what
17  a physician would have.
18             THE WITNESS:  I don't know.
19  Q.         MR. WEXLER:  How do physicians find out the
20  AWP for Zoladex?
21  A.         The AWP?
22  Q.         Yes.

1  A.        I don't know exactly.  I'm certain they could
2  get it from Medicare.
3  Q.        And do you tell them process or the formula
4  by which they can be reimbursed by Medicare?
5  A.        Can you explain what you mean by formula?
6  Q.        Well, 80 percent of 95 percent of AWP I think
7  you mentioned.
8  A.        Uh-huh.
9  Q.        That's what you explain to them?
10 A.        Right, and most offices were familiar with
11 that.
12 Q.        Okay.  And then as far as the acquisition
13 cost is concerned, the physician can determine that as
14 well, correct?
15 A.        I provide the acquisition cost information.
16 Q.        Now, you said you discussed return to
17 practice with colleagues in the district.  First of
18 all, what do you mean by the district?
19           MS. LAWSON:  Objection.  I'm not sure that
20 accurately characterizes his testimony.
21 Q.        MR. WEXLER:  If it's a mischaracterization,
22 tell me.  I'm not here to put words in your mouth.  So

1   did I mishear something?
2   A.        People in the district were people such as
3   myself selling Zoladex and Casodex in our district,
4   which consisted of the Southern California area.  And,
5   yes, at times we would discuss what that meant because
6   physicians would bring it up and sometimes people
7   didn't understand what that meant, and it was helpful
8   to understand where the physicians were coming from
9   and understand why they were asking the questions, but
10  then again to also reiterate that we do not engage in
11  those discussions with physicians.
12  Q.        Do you recall any particular conversations
13  with a colleague you had about return to practice?
14  A.        Not specifically, no.
15  Q.        You said you had discussions with your DSM
16  concerning return to practice?
17  A.        I can't recall specific examples, but --
18            MR. WEXLER:  Trisha, what did I miss?
19            MS. LAWSON:  I thought you had asked if he
20  had talked about Lupron's pricing.
21            MR. WEXLER:  You know, you're right.  I'm
22  sorry.