# EXHIBIT A

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 CIVIL ACTION: 01-CV-12257-PBS Judge Patti B. Saris Chief Magistrate Judge Marianne B. Bowler |
| THIS DOCUMENT RELATES TO STATE OF MONTANA V. ABBOTT LABORATORIES, ET. AL. CA NO. 02-12084-PBS | |

## DEFENDANT BAYER CORPORATION'S NOTICE OF RULE 30(B)(6) DEPOSITION TO STATE OF MONTANA

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant Bayer Corporation ("Bayer"), by and through its counsel, will take the deposition upon oral examination of a representative or representatives designated by the State of Montana (hereinafter "Plaintiff") to testify on behalf of Plaintiff concerning all matters described herein, before a Notary Public or other person authorized to administer oaths at the offices of Gough, Shanahan, Johnson & Waterman, 33 S. Last Chance Gulch, P.O. Box 1715, Helena, MT, 59601, on February 23, 2006, at 9:30am. The deposition will be recorded by stenographic and/or sound and visual means and will continue from day to day until completion.

Pursuant to Rule 30(b)(6), Plaintiff shall designate in writing to the undersigned counsel for Bayer one or more officers, officials, employees, or other representative to testify on their behalf who are most knowledgeable about and will testify as to matters known or reasonably

CHI 3435653v.1

available to Plaintiff in regard to the matters set forth below.  Plaintiff is further requested to set forth the matter or matters on which each such designated person will testify.

All terms used in this Notice, whether or not capitalized, shall be defined as stated in Defendant Bayer Corporation's First Set of Interrogatories and Requests for Production to the State of Montana.[1]

Unless otherwise specified, the relevant time period is the period from January 1997 to the present.

## AREAS OF INQUIRY

Plaintiff is requested to designate one or more persons who consent to testify on its behalf concerning the following matters:

1.  Plaintiff's use or consideration of Bayer ASP Information, including how or if such Bayer ASP Information has been used, relied upon, referenced, or considered in evaluating, revising, or setting payments to Providers under Plaintiff's Medicaid Program.

2.  Communications between Plaintiff and the National Association of Medicaid Fraud Control Units ("NAMFCU") concerning the Bayer 2001 Settlement or concerning the Bayer 2003 Settlement (or any investigation or inquiry that preceded those Settlements), including internal analysis, memoranda, reports, and reviews related to communications with NAMFCU.

---

[1] Such defined terms include the Bayer 2001 Settlement, the Bayer 2003 Settlement, and Bayer ASP Information.

CHI 3435653v.1

Dated: January 31, 2006                 By:        /s/ Michael Doss
                                                   Richard D. Raskin
                                                   Michael Doss
                                                   SIDLEY AUSTIN LLP
                                                   One S. Dearborn Street
                                                   Chicago, IL  60603
                                                   Tele: (312) 853-7000
                                                   Fax:  (312) 853-7036
                                                   *Counsel for Defendant Bayer Corporation*

3

## CERTIFICATE OF SERVICE

I, Michael Doss, hereby certify that on January 31, 2006, I have caused a true and accurate copy of the foregoing DEFENDANT BAYER CORPORATION'S NOTICE OF RULE 30(B)(6) DEPOSITION TO STATE OF MONTANA to be served on all counsel of record by electronic service, pursuant to Paragraph 11 of Case Management Order No. 2, by sending a copy to Lexis/Nexis for posting and notification to all parties.

Date:   Chicago, Illinois
        January 31, 2006

                                        /s/ Michael Doss
                                        Michael Doss

4

# EXHIBIT B

NATIONAL ASSOCIATION OF MEDICAID FRAUD CONTROL UNITS
750 FIRST STREET NE  SUITE 1100
WASHINGTON, DC  20002
(202) 326-6020
(202) 326-0664 FAX

BARBARA L. ZELNER
*Counsel*

PRESIDENT
ELLYN STERNFIELD
*Assistant Attorney General*
*Director, MFCU*
*Oregon Attorney General's Office*

VICE PRESIDENT
CHARLES W. GAMBRELL, JR.
*Assistant Deputy Attorney General*
*Director, MFCU*
*South Carolina Attorney General's Office*

IMMEDIATE PAST PRESIDENT
L. TIMOTHY TERRY
*Senior Deputy Attorney General*
*Director, MFCU*
*Nevada Attorney General's Office*

January 29, 2001

Alaska Pharmacy Director
State Medicaid Agency
4501 Business Park Blvd.
Suite 24
Anchorage, Alaska 99503

Dear Medicaid Pharmacy Director:

The joint State and federal investigation of drug price misrepresentation by pharmaceutical manufacturers has resulted in the first concluded settlement with a manufacturer, Bayer, Inc. Under the terms of this settlement, Bayer will repay a total of $14 million to cover excess Medicaid payments made for its products, and will enter into a Corporate Integrity Agreement with the Office of the Inspector General of the U. S. Department of Health and Human Services, to ensure the future accuracy and integrity of drug price communications.

Most importantly, from your perspective, the agreement reached requires Bayer to submit to all Medicaid Pharmacy Directors* whose states have entered into the settlement, along with First DataBank and HCFA OIG, quarterly certified statements identifying the actual average sale prices of its products, weighted to reflect the volume of sales at each price. Indeed, it is our

---

* The average sale price information will be sent to the same address as this letter. If you wish to designate another address, please notify your State MFCU of your desire to do so.

intention to make the communication of certified pricing data a mandatory component of any subsequent resolutions of our drug pricing investigation with pharmaceutical manufacturers. This unprecedented access to true market prices will provide you an extraordinary opportunity to compare providers' real acquisition costs with Medicaid reimbursement prices and, we believe, provide you the basis for determining where and how Medicaid prices should be adjusted.

Obviously, while this data has enormous potential value, its true benefits can only be achieved through the efforts of State pharmacy directors to make use of it. *We emphasize that each State will be obliged to determine how this data can be accommodated into its existing pricing formula. Unless and until states take such efforts, and provide First DataBank with specific instructions as to how the data is to be used, this pricing information will have no effect.* Consequently, we write to inform you at the earliest stage possible of the nature and import of the pricing data you will be receiving soon from Bayer and subsequently from other manufacturers.

## The New Price Information You Will Receive

First, we wish to clearly communicate to you what the numbers you will be receiving represent. As set forth in the settlement, manufacturers will be submitting to each state:

> "...the average of all final sale prices charged by [the manufacturer] for the drug or biological product in the United States to all purchasers, excluding those sales exempt from inclusion in the calculation of "Best Price" for Medicaid Rebate Program purposes, pursuant to 42 USC § 1396r-8, and direct sales to hospitals...net of all the following: volume discounts; prompt pay discounts; cash discounts; chargebacks; short-dated product discounts; free goods; rebates and all other price concessions provided by [the manufacturer]...that result in a reduction of the ultimate cost to the purchaser."

Thus, "average sale price" should be understood to mean exactly what it says; it is neither an Average Wholesale Price, nor a Wholesale Acquisition Cost, but the *average* of all prices charged to the overwhelming majority of customers. This average sale price will, moreover, be weighted to reflect the volume of sales at each price, *i.e.*, ten sales at $1.00 and one sale at $0.50 will produce, not a flat average of $0.75, but a weighted average sales price of $0.95.

Additionally, under the terms of the settlement, Bayer will refrain from submitting AWP information for purposes of setting Medicaid reimbursement for the following drugs:

- Koate-HP Antihemophilic Factor (Human)
- Kogenate Antihemophilic Factor (Recombinant)
- Konyne-80 Factor IX Complex (Human)
- Gamimune N, 5% Immune Globulin Intravenous (Human, 5%),
- Gamimune N, 10% Immune Globulin Intravenous (Human, 10%),
- Thrombate III Antithrombin III (Human).

First DataBank will consequently ascertain and communicate a Medicaid AWP for these products independently of any information from Bayer. Bayer will continue to submit AWPs for other drugs it manufactures, but we reemphasize that the average sale price information Bayer will provide to State Medicaid programs will encompass *all* of its products.

## Use of the Average Sale Price Data

A drug's average sale price will consequently afford you a reliable standard for determining what the true market price of a drug is, at least on an average basis. How this information may ultimately be used and what relationship this market price will or should bear to final reimbursement prices are, of course, questions properly left to you and other Program personnel. The Medicaid Fraud Control Units involved in this investigation have pursued the limited goals of halting the communication of false information, and ensuring that Medicaid Program staff have reliable information on which to make decisions. Once those goals have been achieved, the determination as to what levels of reimbursement ought to be, relative to a drug's average sale price, is appropriately left for consideration by Pharmacy Directors, Medicaid Program Directors and other policy makers. *Again, absent your direction to First DataBank, or any subsequent price reporting agency, as to how your state wishes use average sale price information, this data will have no impact on Medicaid prices and you will continue to be susceptible to any price misrepresentations by manufacturers.*

## The Impact on Bayer

Another matter we wish to address concerns Bayer, the initial manufacturer to reach a resolution of its AWP liability. As such, Bayer will be, at least for a time, the only manufacturer to provide you with certified average sale price information, and how that information is used may have a profound effect on our continuing investigation. Our inquiry has indicated that Medicaid providers who bill for pharmaceuticals maximize their reimbursement by migrating to drugs with a high "spread" between AWP and purchase price, and away from lower spread drugs. Consequently, the existing market exhibits the perverse effect of "punishing" the truthful reporter of price data, whose lower reimbursement cannot compete with the larger spread generated by dishonest competitors. Were the Bayer price data to be used to cause this same result – lowering the market appeal of its products relative to its competitors – the effect would be doubly perverse: truthful price reporting by the first company to reach a settlement with the Medicaid Fraud Control Units would operate only to its economic disadvantage. It could hardly be expected that, if this were the outcome, any other manufacturer would consider either providing accurate price data or entering into a settlement with the government.

Of course, we stress, this is not to suggest that the Bayer information not be used. On the contrary, we would *urge* that it be used, effectively and productively, but in a way that provides no competitive advantage to other manufacturers less cooperative and less truthful than Bayer is. Again, the means by which this might be accomplished, *e.g.*, by using Bayer data as a basis for setting State maximum prices, are subjects better left to your discretion.

As we indicated previously, we expect that our continuing investigation will result in more such negotiated resolutions with other pharmaceutical manufacturers in the future. It is our

intention that the provision of accurate information, enforced by the prospect of severe penalties for false submissions in every state, will enable Program reimbursements to be determined far more fairly and rationally than they are at present. We hope that you perceive the potential of this certified pricing data with an equally positive perspective.

Thank you for your continued cooperation and consideration in this matter.

Very truly yours,

For the NAMFCU Drug Pricing Team:

Patrick E. Lupinetti Special Assistant Attorney
General, New York MFCU
Kerry O'Brien, Director Maine MFCU
Thomas F. Staffa, Assistant Deputy Attorney
General, New York MFCU
L. Timothy Terry, Director Nevada MFCU,
David Waterbury, Director Washington MFCU

cc: State MFCU Directors

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In re: PHARMACEUTICAL INDUSTRY ) 
AVERAGE WHOLESALE PRICE )
LITIGATION )     MDL NO. 1456
                               )     Civil Action No. 01-12257-PBS
                               )     Judge Patti B. Saris
THIS DOCUMENT RELATES TO: )
                               )     Chief Magistrate Judge Marianne B.
                               )     Bowler
*State of Montana v. Abbott Labs., Inc., et al.,* )
    CA No. 02-CV-12084-PBS )

## AFFIDAVIT OF MICHAEL DOSS

MICHAEL DOSS states on oath that:

1.     I am a partner at Sidley Austin LLP and represent Bayer Corporation ("Bayer") in the case of *State of Montana v. Abbott Labs, Inc., et al.*, CA No. 02-CV-12084-PBS, which is part of the multi-district litigation currently pending before the Court captioned *In re: Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, CA No. 01-12257-PBS.

2.     On January 31, 2006, I caused to be served on Plaintiff the State of Montana a Notice of Rule 30(b)(6) Deposition (the "Notice").

3.     On March 18, 2006, I sent an e-mail to Montana counsel Jeniphr Breckenridge asking her "whether any of the deponents for the already-scheduled depositions coming up over the coming weeks might appropriately also be designated a 30(b)(6) witness for the Bayer subjects." (3/18/06 E-mail From M. Doss to J. Breckenridge, attached hereto as Exhibit 1.)  I explained that Bayer "would not object to having [its] 30(b)(6) deposition tag along immediately after the individual deposition" and asked Ms. Breckenridge to please "tell us if this option will

work," and if not, to "please advise us what your plans are . . . regarding our 30(b)(6) notices."
(*Id.*)

       4.      At the time of my e-mail, the depositions of at least six present or former employees of the State were pending.  Nonetheless, the State did not identify any of these already-scheduled deponents as the 30(b)(6) witness for the Notice.

FURTHER AFFIANT SAYETH NOT

 

                                              /s/ Michael Doss
                                                Michael Doss

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois  60603
(312) 853-7000
(312) 853-7036

Dated:  May 5, 2006

 

Subscribed and sworn to before me
this fifth day of May, 2006.

      /s/ Linda M. Vogel
        Notary Public

        Linda M. Vogel
        Notary Public, State of Illinois
        My Commission Expires August 15, 2009

2

# EXHIBIT 1
# (Doss Affidavit)

| | |
|---|---|
| **From:** | Doss, Michael |
| **Sent:** | Saturday, March 18, 2006 9:54 PM |
| **To:** | 'Jeniphr Breckenridge' |
| **Cc:** | Raskin, Richard D. |
| **Subject:** | Bayer Montana and Nevada I Discovery |

Jeniphr,

I am writing to follow up on my voice mail of last week. As you know, Bayer has served notices for 30(b)(6) depositions in the Montana and Nevada I AWP actions (on January 31, 2006) concerning issues specific to Bayer. We continue to seek designations from you for deponents on the identified subjects. One option to consider on this front is whether any of the deponents for the already-scheduled depositions coming up over the coming weeks might appropriately also be designated a 30(b)(6) witness for the Bayer subjects. If so, we would not object to having our 30(b)(6) deposition tag along immediately after the individual deposition.

Please tell us if this option will work; if not, please advise us what your plans are in Nevada I and Montana regarding our 30(b)(6) notices. I will be traveling next week, but should be able to discuss this issue by phone with you at your convenience. Thanks.

-Mike

**Michael Doss**
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
mdoss@sidley.com
312-853-7920 (tel)
312-853-7036 (fax)

# EXHIBIT D

**4/5/2006 Bullock, Margaret**

```
 1              THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF MASSACHUSETTS

 3     -------------------------------x

 4     In re:  PHARMACEUTICAL            )

 5     INDUSTRY AVERAGE WHOLESALE        )

 6     PRICE LITIGATION                  ) MDL DOCKET NO.

 7     _____) CIVIL ACTION

 8     THIS DOCUMENT RELATES TO:        ) 01CV12257-PBS

 9     ALL ACTIONS                       )

10     -------------------------------x

11

12              DEPOSITION OF MARGARET BULLOCK

13                   Phoenix, Arizona

14                    April 5, 2006

15                     9:00 a.m.

16

17     DEPOSITION OF MARGARET BULLOCK, commenced at

18     9:00 a.m. on April 5, 2006, at Phoenix, Arizona,

19     before Robin L. B. Osterode, RPR, CSR, Arizona

20     Certified Reporter No. 50695.

21

22
```

**4/5/2006 Bullock, Margaret**

```
 1          Q.    Let's go back to what I think my notes
 2    indicate your first post-vocational rehabilitation
 3    job with the State of Montana was, the program
 4    director for developmental disabilities; do I have
 5    that right?
 6          A.    Uh-huh.   Yes.
 7          Q.    Was there any involvement in that job with
 8    prescription drugs or pharmaceutical benefits?
 9          A.    The program that I oversaw, the
10    developmental disabilities program, did not directly
11    purchase pharmaceuticals for our clients.   Medicaid
12    was paying for those services, we did not purchase
13    them through our programs.
14          Q.    Okay.   Have you been involved with any
15    programs, any state programs, either in Arizona or
16    Montana, that directly purchased pharmaceuticals?
17          A.    Yes.
18          Q.    And what was that involvement?
19          A.    That involvement was the period of time
20    that I was the Medicaid director in Montana.
21          Q.    And what was the nature of the
22    involvement?
```

```
 1        A.    I was the administrator of the Health

 2    Policy and Services Division, which oversaw primary

 3    and acute care Medicaid and public health, but

 4    public health wasn't involved in this.

 5        Q.    So the position Administrator of Health

 6    Policy and Services Division was basically the

 7    Medicaid administrator?

 8        A.    It was the Medicaid director's position,

 9    right.

10        Q.    And that would have been for the period

11    from March 2001 to July of 2003?

12        A.    Yes.

13        Q.    Now, you said public health wasn't

14    involved; what was the nature of the public health

15    part of your responsibilities?

16        A.    The public health part of my

17    responsibilities involved overseeing a variety of

18    programs, probably 50-plus different kinds of

19    programs, where we received -- the state received

20    federal dollars, and we contracted with local

21    entities like county health departments, to provide

22    things like abstinence education -- well, sex
```

# EXHIBIT E

4/18/2006  Hunter, Charles

```
 1              THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSSETTS

 3                       ---oOo---

 4      ----------------------------X

 5   In Re:  PHARMACEUTICAL         )   MDL DOCKET NO.

 6   INDUSTRY AVERAGE WHOLESALE     )    CIVIL ACTION

 7   PRICE LITIGATION               )    01CV12257-PBS

 8      ----------------------------X

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS                    )

11      ----------------------------X

12                TELEPHONE DEPOSITION

13                       OF

14                CHARLES L. HUNTER

15

16         Taken at 33 South Last Chance Gulch

17                  Helena, Montana

18         Tuesday, April 18, 2006 - 9:50 a.m.

19

20         Reported by Mary R. Sullivan, RPR, RMR, Freeland

21   Court Reporter, Notary Public, residing in Missoula,

22   Montana.
```

1    graduate school. When I came back to Montana, I was

2    employed as a management analyst with the Department

3    of Administration with the State of Montana. I left

4    that job. I worked in a wine distributing business

5    for a period close to a year, returned to employment

6    with the State of Montana as the Chief of the

7    Contributions Bureau of the Unemployment Insurance

8    Division, essentially the tax collection side of

9    unemployment insurance. In 1987 I became the

10   administrator of that division. In 1991 I became

11   the administrator of what was called the Employment

12   Relations Division which had Workers Compensation,

13   wage and hour law, public sector collective

14   bargaining, human rights, public safety law. I

15   worked there until 1997. In 1997 I became the

16   administrator of the Child and Family Services

17   Division, which is the child welfare system in the

18   State of Montana. I stayed there until 2002. In

19   2002 I took a job working on Medicaid financing in

20   the director's office of the Department of Public

21   Health and Human Services, worked there for

22   approximately a year. At the end of that year, I

1    took over the--what was called then the Child and

2    Adult Health Resources Division, which is the

3    Medicaid division that I ran. It's not exclusively--

4    it's not the entire Medicaid program in the state of

5    Montana.  That division has the functions, really,

6    of primary and acute services for Medicaid, so it

7    doesn't have disability services, doesn't have

8    senior and long-term care services, but it had the

9    majority of Medicaid.

10        Q.   Going back to way back when when you

11    worked at the residential treatment center, did that

12    job in any way involve drug pricing or drug

13    reimbursement?

14        A.   No.

15        Q.   So am I correct that the first exposure

16    that you had to Medicaid-related issues was in 2002?

17        A.   Yes.

18        Q.   What was the exact start date?  Do you

19    remember the month?

20        A.   I think it was July.

21        Q.   And prior to that time, you hadn't had any

22    involvement with the State's coverage or payment for

1      filing of the lawsuit?

2           A.   No.

3           Q.   Did you receive any instruction about the

4      need to retain documents because of this lawsuit?

5           A.   No.

6           Q.   When you first became involved in 2002,

7      July of 2002 with the Medicaid program, do you

8      recall inheriting any files from anyone?

9           A.   There were all the files from the former

10     administrator there that related to Medicaid.

11          Q.   And who was the former administrator?

12          A.   Nancy Ellery actually, and Maggie Bullock

13     was my direct predecessor.  There were files from

14     both those people in my office.

15          Q.   Did you ever look through those files in

16     connection with your work responsibilities?

17          A.   Not really.  I did retain those files for

18     a period of time just to see if I would need them.

19     There were files that I kept in the office for about

20     six months, didn't find that I was in those files,

21     so they were moved to storage.

22          Q.   What happened with your files when you

# EXHIBIT F

4/12/2006  Dalton, Mary

```
 1              THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF MASSACHUSETTS

 3                         ---oOo---

 4    ------------------------------X

 5    In Re:  PHARMACEUTICAL        )    MDL DOCKET NO.

 6    INDUSTRY AVERAGE WHOLESALE    )    CIVIL ACTION

 7    PRICE LITIGATION              )    01CV12257-PBS

 8    ------------------------------X

 9    THIS DOCUMENT RELATES TO:     )

10    ALL ACTIONS                   )

11    ------------------------------X

12

13            Taken at 33 South Last Chance Gulch

14                    Helena, Montana

15           Wednesday, April 12, 2006 - 8:43 a.m.

16

17               TELEPHONE DEPOSITION OF

18                     MARY DALTON

19

20    Reported by Mary R. Sullivan, RPR, RMR, Freelance

21    Court Reporter and Notary Public, State of Montana,

22    residing in Missoula, Montana.
```

4/12/2006 Dalton, Mary

1    started. It was originally in the--in the director's
2    office, and it was moved into the quality assurance
3    division right around the time of the January 2003
4    session.  It would have been within a few months
5    either way.  I don't remember whether it was before
6    or after.
7         Q.   When you said originally it was in the
8    director's office, do you mean the director of--
9         A.   Department of Public Health and Human
10   Services.
11        Q.   And I have a few specific documents I may
12   show you later about the audit--
13        A.   Okay.
14        Q.   --issue.  The last box under your title
15   there of quality assurance division was licensure
16   bureau. That involved licensure of whom?
17        A.   Licensure of healthcare facilities, group
18   homes, daycares, both child and adult daycare,
19   personal care facilities.  Would have been facility
20   based providers.
21        Q.   And finally in your current position, that
22   is the health resources division administrator?

4/12/2006 Dalton, Mary

1       A.   Yes.

2       Q.   What are your basic duties in that

3    position?

4       A.   The health resources division has the

5    Medicaid programs for what would be considered to

6    be--actually be easier to say what it excludes.  It

7    contains the Medicaid programs except for the long-

8    term care as in the nursing home, the nursing home

9    waivers and the Home Health program.  DD services is

10   not in that division and mental health services for

11   adults are not in that division.  Other than that,

12   Medicaid services that Montana offers would be

13   located in that division along with the CHIP

14   program, Big Sky Rx program, some grants for

15   children's mental health that are--that are separate

16   from Medicaid.

17      Q.   And, so, in this position, do you still

18   have supervisory responsibility over the pharmacy

19   and physician programs?

20      A.   I do.

21      Q.   But when you were in the quality assurance

22   division, you did not?