# 3

# Trial Affidavit of Kenneth Arruda

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: ALL CLASS ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br>Judge Patti B. Saris |

### TRIAL AFFIDAVIT OF KENNETH J. ARRUDA

I, Kenneth J. Arruda, pursuant to 28 U.S.C. § 1746, on oath, depose and state as follows:

1. I am a resident of the Commonwealth of Massachusetts. I have personal knowledge of the facts stated below, would so testify in court if called upon to do so, and am competent to provide testimony.

2. I received a Bachelors of Arts degree in economics from Assumption College in 1977.

3. I currently hold the position of Director of Senior and Individual Plans within the Marketing Division of BCBSMA. I have been employed by BCBSMA in various capacities since 1980. I started at BCBSMA as a customer care representative in Medicare customer service and in 1981 moved to a position in the actuarial department as a data analyst. I held various management positions in the actuarial department through 1992. In 1992, I took a position as an analyst in what was then known as the Public Policy Department supporting the development of health programs for uninsured children. In 1994, I joined what was then called the Small Business and Consumer Markets Division as a manager supporting the development of health insurance programs for small businesses as well as individuals who do not have access to

employer sponsored health plans. In 1996, my position underwent a reorganization and I was moved into a position managing certain specific products offered by BCBSMA including various major medical commercial insurance products and BCBSMA's HMO Blue Plan. In approximately 1999, I became responsible for the Medicare supplemental plans offered by BCBSMA. These are commonly referred to as "MediGap" plans and are also referred to as BCBSMA's "Medex" plans.

4. In my current position, among other responsibilities, I am responsible for designing the benefits under the various Medex plans offered by BCBSMA pursuant to applicable State and Federal Regulations. I am also somewhat familiar with the history of the MediGap plans offered by BCBSMA from 1991 to the present. At the request of BCBSMA's attorneys, I created a chart summarizing the various Medagap plans offered by BCBSMA, the approximate periods for which they were offered and some of the major benefits available under those plans. That chart is attached hereto as Exhibit A [Trial Exhibit _____]

5. The chart attached as <u>Exhibit A</u>, including the comparison of MediGap plans on page 2 of Exhibit A, depicts the benefits available under the various Medicare supplemental plans offered to individuals who purchase supplemental Medicare coverage directly from BCBSMA. These are often referred to as the "Direct Pay Medex Plans." BCBSMA also provides supplemental Medicare coverage as part of employer sponsored health plans. The benefits available under these "Group Medex Plans" include the same basic coverage as the Direct Pay Medex Plans plus any additional benefits or coverage changes negotiated between the employer with BCBSMA.

6. BCBSMA currently has approximately 160,000 individuals who purchase Medicare supplemental insurance directly. Approximately an additional 85,000 individuals

receive Medicare supplemental insurance through a group plan sponsored by their employers or other group. The agreements between BCBSMA and the employers who sponsor Medicare supplemental coverage include both self-funded arrangements where the employer ultimately pays BCBSMA for all claims made for treatment provided to the member as well as arrangements where BCBSMA is ultimately responsible for paying all claims and the employer pays a premium to BCBSMA for the coverage.

7. All of the Direct Pay Medex Plans identified on Exhibit A, as well as all Group Medex Plans, cover the 20% coinsurance for Medicare Part B covered services, including physician administered drugs. (A limited number of self-funded groups may choose not to cover physician office visits and associated services where the office visit is not linked to a member inpatient hospital service within 100 days due to an old Medicare coverage rule.) That is, the Medex plans provide for payment of the 20% copayment for the reimbursement associated with a Medicare Part B reimbursable physician administered drug that would otherwise be the responsibility of the Medicare recipient absent the Medicare supplemental insurance.

8. The amount BCBSMA reimburses a physician who administers a Medicare Part B reimbursable drug to an individual covered under any of its Medex plans is not determined by BCBSMA. Pursuant to applicable regulations, BCBSMA is required to pay 20% of the allowed amount determined by the Medicare carrier. In general, Medicare pays 80% and BCBSMA pays the remaining 20% of the allowed amount determined by Medicare

9. Until my involvement in this case, while I was aware that Medicare established a fee schedule setting out the allowed amount for reimbursement of physician administered drugs under Medicare Part B, I was not aware of the basis upon which Medicare established that fee

schedule. I have only recently learned through my involvement in this litigation that until January 1, 2005 Medicare used the AWP to set reimbursement levels for Medicare Part B reimbursable drugs.

10. Although I have not had occasion to directly use AWP in any of my responsibilities at BCBSMA, I have been familiar with the term since approximately 1971 when I worked as an assistant to pharmacists in a retail pharmacy in New Bedford, Massachusetts. One of my responsibilities in that position was to mark the retail price of pharmaceuticals sold by the pharmacy. This was accomplished by determining the drug's AWP by reference to the Red Book and marking up the drug an additional 40%. The resulting price was the price the pharmacy charged its retail customers as well as insurers reimbursing the pharmacy for drugs supplied to insured customers.

11. Since that time, especially during the 1990s, I heard the term AWP being used at BCBSMA, most often in relation to the rate at which BCBSMA reimbursed its pharmacy benefit manager for self-administered drugs provided to BCBSMA members. I was not involved in any negotiations of contracts or any policy discussions where the AWP was discussed. Based on my experience, both before and while employed at BCBSMA, it was my understanding that the AWP represented the average of wholesale prices for the particular drug to which the AWP applied. During my entire career at BCBSMA, until my involvement in this litigation, I was never exposed to any information or had any discussions with anyone at BCBSMA that would lead me to believe that AWP was anything but the actual average of wholesale prices.

12. I understand from counsel that Defendants in this case claim that BCBSMA paid for some of the drugs at issue in this case through its staff model HMO known as Medical East

4

and Medical West at prices below the AWP for those drugs. While I was aware of the existence of the staff model HMO in the 1990s, how they paid for physician administered drugs and at what price was never information that was known to me or ever discussed in my presence at BCBSMA. To my knowledge, there was very little interaction between individuals at the staff model HMO and employees at BCBSMA who were responsible for determining the reimbursement rates under BCBSMA's indemnity products, including BCBSMA's Medex products.

13. Until I read the allegations in the complaint in this litigation, I was unaware of the large spreads between the AWP and the actual prices at which physicians purchased the physician administered drugs at issue in this case or that some drug manufactures used those spreads to market their drugs to physicians.

14. It is my understanding that pursuant to Massachusetts law and regulations under which BCBSMA operates, BCBSMA is required to offer Medicare supplemental insurance to residents of the Commonwealth of Massachusetts. This stems from BCBSMA's status as a not-for-profit organization organized under M.G.L. c. 176A and B. In the mid-1990's, as a result of the fact that BCBSMA was losing money on its Medex products, the question of whether BCBSMA could choose not to offer a MediGap plan was raised among business leaders at BCBSMA. It is my understanding that M.G.L.c. 176A and c. 176B as well as certain regulations of the Department of Public Welfare, require BCBSMA to offer MediGap insurance to qualified Massachusetts residents

15. As a result of the interplay between state law which requires BCBSMA to provide MediGap insurance and the federal regulations related to Medicare which require that BCBSMA

5

pay 20% of the allowed amount for a physician administered drug under Medicare Part B, it is my understanding that during the period from 1991 to the present BCBSMA could neither choose to get out of the MediGap business nor alter the amounts it was required to reimburse physicians who administered a Medicare Part B reimbursable drug to a member covered under BCBSMA's Medex policies.

16. In approximately 2003, in addition to the responsibilities set forth in Paragraph 4 above, I also became responsible as the product manager for BCBSMA's managed care Medicare product known until recently as "Blue Care 65." On January 1, 2006 the product's name was changed to "Medicare HMO Blue." Medicare HMO Blue is a Medicare Advantage managed care product offered to Medicare recipients as an alternative to traditional Medicare. BCBSMA, along with other sponsors, contracts with Medicare to provide this coverage to eligible and interested Medicare recipients. Medicare pays BCBSMA a set amount for each Medicare recipient who chooses to enroll in Medicare HMO Blue and BCBSMA is at risk to pay for all covered services and pharmaceuticals.

17. BCBSMA reimburses physicians who provide a physician administered drug to a Medicare HMO Blue enrollee based upon a fee schedule that is set and maintained by BCBSMA. That fee schedule is set and maintained by the Actuarial Services Department at BCBSMA - specifically by Michael Mulrey and employees under his supervision. I understand through recent discussions with Mr. Mulrey that the fee schedules related to physician administered drugs under the Medicare HMO Blue product are based on 95% of the applicable AWP.

I make the foregoing statements under penalty of perjury on the date written next to my name below.

Date: October 27, 2006

Kenneth J. Arruda



# Exhibit A




BCBSMA Medex Products Offered by Year

*1992 - Added Medex Silver and Core.
*1995 - Stopped selling Silver, Standard, and Basic when Massachusetts became a waiver state.
*2004 - Added Medex Core Plus.
*2005 - Due to the Medicare Modernization Act, BCBSMA now sells only Bronze and Core (with no prescription coverage).

BCBSMA-AWP-43317
HIGHLY CONFIDENTIAL

## DIRECT PAY MEDEX COMPARISON OF PLANS

| Medicare Coverage | MEDEX BASIC (closed to new members 1/1/95) | MEDEX SILVER (closed to new members 1/1/95) | MEDEX STANDARD (closed to new members 1/1/95) | MEDEX BRONZE | MEDEX GOLD (closed to new members 12/31/05) | MEDEX CORE | MEDEX CORE Plus (Closed to new members 9/15/05) |
|---|---|---|---|---|---|---|---|
| **Medicare Part A Services** | | | | | | | |
| Medicare Inpatient Deductible | No | Yes | No | Yes | Yes | No | No |
| Medicare daily co-insurance from 61st-90th day | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Medicare lifetime reserve co-insurance for 60 reserve days | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Room and board after Medicare benefits are exhausted | Yes (Limit of 365 days per lifetime) | Yes (Limit of 365 days per lifetime) | Yes (Limit of 365 days per lifetime) | Yes (Limit of 365 days per lifetime) | Yes (Limit of 365 days per lifetime) | Yes (Limit of 365 days per lifetime) | Yes (Limit of 365 days per lifetime) |
| Medicare SNF co-insurance from the 21st-100th day | Yes | Yes | Yes | Yes | Yes | No | No |
| **Medicare Part B Services** | | | | | | | |
| Medicare deductible | No | No | No | Yes | Yes | No | No |
| Medicare 20% co-insurance | Yes | Yes | Yes | Yes | Yes | Yes | Yes |

BCBSMA-AWP-43318
HIGHLY CONFIDENTIAL

| Medicare Coverage | MEDEX BASIC (closed to new members 1/1/95) | MEDEX SILVER (closed to new members 1/1/95) | MEDEX STANDARD (closed to new members 1/1/95) | MEDEX BRONZE | MEDEX GOLD (closed to new members 12/31/05) | MEDEX CORE | MEDEX CORE Plus (Closed to new members 9/15/05) |
|---|---|---|---|---|---|---|---|
| Prescription Drugs (including urine glucose testing materials) Note: Effective 7/1/98, Medicare covers equipment and supplies to test for the presence of blood sugar (e.g., glucometers, testing strips, lancets) as DME for all diabetics, whether insulin dependent or not. This is not a pharmacy benefit, since Medicare is prime. | Yes Retail Pharmacy: A $250 annual deductible; 80% of allowed charges for brand-name drugs; 100% of allowed charges for generic drugs No Mail Service | Yes Retail Pharmacy: A $250 annual deductible; 80% of allowed charges for brand-name drugs; 100% of allowed charges for generic drugs; $3,000 limit (for prescriptions purchased at a retail pharmacy) Mail-service option: $10 co-pay for generic drugs; $15 co-pay for brand-name drugs; up to a 90 day supply | Yes Retail Pharmacy: A $35 calendar quarter deductible; 80% of allowed charges for brand-name drugs; 100% of allowed charges for generic drugs Mail-service option: A $2 co-pay for generic drugs; $15 co-pay for brand-name drugs; up to a 90 day supply | No | Yes Retail Pharmacy: A $35 calendar quarter deductible; 80% of allowed charges for brand-name drugs; 100% of allowed charges for generic drugs Mail-service option: A $2 co-pay for generic drugs; $15 co-pay for brand-name drugs; up to a 90 day supply | No | Yes Retail Pharmacy BCBSMA pays 50% of allowed charges with a $150 limit per calendar-quarter for brand name drugs (combined retail and mail) Mail-service option BCBSMA pays 70% of allowed charges with a $150 limit per calendar-quarter for brand name drugs (combined retail and mail) |
| Foreign Travel | Yes | Yes | Yes | Yes | Yes | No | Yes |

Product designs remain the same for Medex except for the cost share for Medicare deductibles and coinsurances which is indexed each year by the Federal Government and changed each year. Any addition, any Federal or State mandates were included as required. See attached.

BCBSMA-AWP-43319
HIGHLY CONFIDENTIAL

## Federal Mandated Benefits applicable to Medigap plans since 1991

—Women's Health and Cancer Rights Act of 1998 – This law requires health insurance coverage that provides mastectomy benefits to cover reconstruction of breast, prostheses, etc.

—The Mental Health Parity Act of 1996 – This law prohibits health care plan from imposing lifetime or annual dollar max. on mental health services.

## State Mandated Benefits applicable to Medigap plans since 1991

[Order of list is based on effective date chronology, with most recent mandated first]

*Effective 2003*

—Hormone Replacement Therapy and Contraceptive Services – This law requires health plans to provide hormone replacement therapy and contraceptive services as applicable.

*Effective 2001*

—Emergency Medical Conditions - Law requires health plans to provide coverage for emergency medical conditions when the condition is judged as an emergency by a prudent layperson

—Speech, Hearing and Language Disorders - Policies must provide benefits for speech, hearing and language disorders by licensed speech pathologist or audiologists.

—Mental Health Parity – Health plans must pay for mental health benefits for biologically-based and non-biologically based  mental disorders, rape-related disorders for children under age 19 with no annual or lifetime dollar maximum.

*Effective 1996*

—Mental Health Counselors – Health plans must cover psychiatric services furnished by mental health counselors.

*Effective 1995*

—Nurse Practitioner – Health plans must cover applicable services performed by a nurse practitioner.

—Hospice Care – Health plan must cover hospice services for patients with life expectancy of six months or less.

—Blood Glucose Monitoring Strips - Health plan must cover blood glucose strips for home use for insulin dependent diabetes.

*Effective 1994*

—Bone Marrow Transplants for Breast Cancer – Health plans must cover bone marrow transplants for applicable persons diagnosed with breast cancer.

—Certified Registered Nurse Anesthetist – Health plan must cover applicable services by a certified registered nurse anesthetist.

—Off-Label Use of Drugs for the Treatment of Cancer and HIV/AIDS – No policy will exclude coverage of any drug used for the treatment of cancer on the grounds that the off-label drug has not been approved by the Food and Drug Administration.

—Non-Prescription Enteral Formulas for Home Use and Low Protein Foods – Policies must provide coverage for nonprescription Enteral formulas for home use.  Low protein food will be covered but up to a $2,500 annual maximum.

BCBSMA-AWP-43320
HIGHLY CONFIDENTIAL