# 11

# Trial Affidavit of Rebecca Anne Hopkins

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL CLASS ACTIONS | Judge Patti B. Saris |

## DECLARATION OF REBECCA ANNE HOPKINS FOR PURPOSES OF TRIAL

I, Rebecca Anne Hopkins, under oath declare as follows:

1.      I currently reside at 10262 East Lake Road, North East, Pennsylvania, 16428, and have lived there for approximately 12 years. I am 50 years of age, married and have one child. My highest level of education is a graduate degree in public relations from Syracuse University. I am not currently eligible for, and have never received, Medicare Part B benefits.

2.      In June of 1991, I was diagnosed with a type of ovarian cancer known as granulosa cell tumor ("GCT") of the ovary. Since then, my cancer has progressed and metastasized elsewhere in my body. Additionally, my cancer and the many drug therapies and treatments for my cancer have caused me to suffer from numerous serious complications and have resulted in other illnesses and medical conditions, some of which were life-threatening and required emergency life-saving medical treatments and surgeries. All told, my GCT, directly or indirectly, has resulted in my receiving scores of medications.

3.  Treatments, surgeries and other medical procedures relating to or caused by my GCT or otherwise, and some of the medications administered or prescribed to me as a result, include, but are not limited to, the following:

    A.  After diagnosis of GCT in June, 1991, I had surgery to remove my right fallopian tube and right ovary and a sample from my omentum;

    B.  After re-occurrence of my GCT in February, 1995, I had a complete hysterectomy and underwent surgical removal of five small GCT nodules/polyps from my abdominal cavity and bladder area and a six-month regimen of chemotherapy every 28 days. This regimen of chemotherapy included administration of bleomycin, cisplatin and etoposide (VP-16);

    C.  In May, 1997, I had another recurrence of my GCT and underwent an eight-month regimen of chemotherapy every 28 days. The chemotherapy was administered through a Mediport implant and consisted of cisplatin and etoposide (VP-16), but not bleomycin because my lungs were too damaged;

    D.  In October, 1998, I had out-patient surgery to reduce a GCT fluid-filled sack around my bladder;

    E.  In 1999, I received monthly Lupron® injections (over 10 months) in a failed attempt to control GCT activity. The tumor, which had metastasized in my right pleural cavity wall, did not reduce in size, and the right lung became affected;

    F.  In December, 2000, I began thorentisis every 90 days to drain my fluid-filled pleural cavity due to GCT irritation of my pleural cavity wall, which affected my right lung breathing capacity;

001534-16 135712 V1

G.  In April, 2001, I received an injection of doxycycline into my right pleural cavity to coat the GCT;

H.  Beginning in November, 2001 and continuing into at least January of 2002, I received weekly Taxol® intravenous chemotherapy through an Optiport/Mediport to reduce the size of the GCT in my right pleural cavity wall. Taxol® treatment was discontinued due to the onset of sepsis (infection) of the Mediport;

I.  In January, 2002, I spent three weeks in the Intensive Care Unit ("ICU") due to sepsis of the Mediport. I nearly died after my kidneys failed and I went into cardiac arrest. Among other intravenous medications, I received vancomycin, and I also received dialysis and an external pacemaker. My three-week stay in the ICU was followed by intensive physical rehabilitation, including re-learning how to walk;

J.  In March, 2002, I began daily oral doses of tamoxifen and monthly local Lupron® injections to control my various GCTs. At that point, chemotherapy was no longer considered an option;

K.  In April, 2002, I developed a staph bone infection in my left ankle and received a six-month daily regimen of minocycline. By October of 2002, this infection still had not been eliminated. I underwent an operation in the following month to remove dead bone and tissue, and was placed in a cast and received antibiotic medical beads for release into my ankle. Between November, 2002 and March, 2003, I received an eight-week daily infusion of vancomycin for the infections, had a stainless steel pin inserted into my ankle and tibia, and had various ankle casts applied;

L.  In April, 2003, I continued to take oral doses of tamoxifen (with monthly Lupron® injections pending);

- 3 -

M.  In July, 2003, I underwent a week of tests relating to coughing and sputum production. I was released and prescribed Zithromax® (azithromycin) and cefuroxime for any general bacterial infections. However, an ultra-sound revealed a mass in addition to a well defined tumor in my lung. In early August, 2003, I underwent surgery to remove my lower right lung lobe and 80% of my diaphragm. My tumors were confined between my pleural cavity wall and right lung, and were resected;

N.  From August, 2003 to March, 2005, I continued to take oral daily doses of tamoxifen and to receive monthly injections of Lupron®. In March, 2005, I discontinued this treatment because it was no longer considered to be therapeutic for me;

O.  Starting in April, 2005, I received Gleevic® treatment based on treatment of a female patient in Germany. This treatment ended in May, 2005. From May to June, 2005, I received a new chemotherapy combination of gembetacine and carboplatin;

P.  In July, 2005, I underwent radiation treatment for a tumor located beside the vena cava (a primary vein that returns blood to the heart), which presented the danger of pressure on the vein.

I have undergone various other treatments and procedures, and received numerous other medications, which are not detailed above.

4.  Since 1991, there have been times when I have had no health care insurance at all to pay for my medical treatment and medications. Other times, I had health care insurance. In fact, over the years, I have had many different kinds of health care insurance provided by many different health care insurers. Sometimes, my insurance required me to pay a deductible; sometimes, it required that I pay flat co-pays; sometimes, I believe, I had percentage-based co-insurance obligations; and sometimes there may have been a combination of a deductible and

either a flat co-pay or percentage-based co-insurance. I have had so many different types of insurance over the years -- due in part to changes in the status of my husband's employment -- that it is difficult for me to recall all of the specifics of my various insurers and types of insurance. However, I do know that there have been times that I have had to pay for my medications either entirely out of my own pocket (for example, at times when I had no insurance) or partially out of my own pocket (when I did have insurance) in a manner that was not simply a flat co-pay.

5. In more recent years, I have become uninsurable and have received welfare assistance through a Commonwealth of Pennsylvania program (known as Pennsylvania Access), which has helped pay for my medical treatment and medications. Over time, my finances were destroyed by the costly medical treatment and excessively priced medications that have been, and continue to be, necessary to keep me alive, and I have become unable to pay for my treatment and medications without welfare assistance. For years, I had great difficulty paying all of my medical providers' bills. Over the years, my providers have sent various collection agencies after me, and I have on-going obligations to pay my providers for past amounts owed. I have always done my best to pay my medical bills, but the burden simply became too great for me to keep up.

6. At times, I have had to pay out-of-pocket, either entirely or in part, for the medications administered or prescribed to me. These payments, at times, were not flat co-pays. Such payments that I made were for medications manufactured by various pharmaceutical companies, one of which is Defendant Bristol Myers Squibb ("BMS"), which I understand to be the company that manufactured the Taxol® that I received in the 2001 to 2002 time frame and against which I am pursuing a law suit and seeking to be a class representative in this action.

7. One instance in which I paid for certain companies' medications entirely out of my own pocket (without any assistance from any insurance carrier) came in 1995 when I paid over $3,800.00 to Roswell Park Cancer Center for my chemotherapy consisting of bleomycin, cisplatin and etoposide. My attorneys and I have produced in this case my cancelled checks and billing statements from Roswell Park Cancer Center that show my payments for these chemotherapy medications.

8. As for BMS drugs, I received chemotherapy with Taxol® over at least the period from in or about November 2001 until at least January 15, 2002. Treatment records, among other documents, produced in this case verify this treatment.

9. I paid a portion of the charges for this Taxol® treatment out of my own pocket, and my payments were not in the form of a flat co-pay. This came during a time when I was insured by Highmark Blue Cross Blue Shield ("Highmark") and I was responsible for a deductible that was applied to medications provided and billed for by Regional Cancer Center, which included this Taxol® treatment. A three-page Supplemental Bill from Regional Cancer Center, dated 11/6/03, that my attorneys and I produced in this case shows multiple treatments with Taxol® and certain other drugs. (*See* Hopkins 0140-42.) The major charge was for the Taxol® at $1,472.00 for each 30 mg dose that I received. This Supplemental Bill identifies my "Personal Check" payment of $144.00 on 2/19/02 (Hopkins 0141) and my "Personal Check" payment of $26.00 on 5/7/03 (Hopkins 0142), and shows a "Current Balance" of $80.00 remaining (Hopkins 0142).

10. Additional documents demonstrate the payments I made for Taxol®, among other drugs. Several Regional Cancer Center billing statements that my attorneys and I produced in this case show that I was responsible for a "balance forward" of $106.00 for "Dec 2001 6mo

- 6 -

chemo 12/18 - 6/17/02." (*See, e.g.*, Hopkins 0421, dated 1/3/03; identical billing statements were sent to me in the months that followed, and still other billing statements show that my balance had later dropped from $106.00 to $80.00 following the additional payment of $26.00 that I had made.)

11.    The records that my attorneys and I produced in this case also show that these payments were necessary due to my deductible obligation under my insurance with Highmark. For example, in a letter dated 5/5/03, Highmark advised me that "[t]he billing from Regional Cancer Center for chemotherapy from 12/18 – 5/17/02 and dated 12/31/01, is your out of pocket deductible and your responsibility to pay. You owe the Regional Cancer Center $106.00 and this should be paid ASAP." (Hopkins 0424.)

12.    I understand that this case is about the use of "AWP" or Average Wholesale Price. My understanding is that I have paid for my medications based on AWPs, but that AWP is a price largely set by the manufacturer.

13.    At the time I was paying for Taxol, I had no idea that my payments were higher than they would have been if the published AWP for Taxol had been a true average of prices paid by providers. I now understand that it was not such an average and that the average price paid by providers was substantially below what I was charged.

14.    I do not know why BMS or other manufacturers would try to impose higher costs on me, but I think it is very unfair. Average folks like me have to rely on the honesty of those setting prices.

15.    I have brought this case because I believe the defendants have acted illegally in using AWPs to inflate the prices of their medications to consumers and other payers, including medications I have taken and for which I have paid. I believe that I and others like me who pay

for medications have all been overcharged for the medications we have purchased, and that we have been defrauded by the defendants, particularly by their inflating prices to create a spread for medical providers who charge me and other payers for our medications. I and others who pay for medications have been harmed by being made to pay these inflated AWPs.

16. Before this case was initiated, I had not heard of AWP. Of course I knew that my medications were very expensive, but I did not know of AWP or that the defendants were inflating their prices in this manner. I did not know of AWP or of a possible pricing spread on any of my medications until after I learned about this lawsuit some time after it was initiated.

17. I understand that this is a class action, involving many consumers, insurance companies and others that have been paying based on defendants' inflated AWPs. I am serving as a class representative in this case. I understand that this is a way for me to represent the many patients who have paid for these high-priced medications. I want to represent those people who, like me, have had their finances impacted by the inflated prices of medications and anyone else who has had to pay too much for their medications.

18. I understand that people like me, who were not receiving Medicare Part B benefits when they paid for their medications, are not currently included in this class action, because for non-Medicare people the case is limited to people and companies who reside in Massachusetts. I understand that there is class action across the nation for people and companies who paid for medications in the Medicare Part B setting. I hope that by testifying as a witness in this case, I can tell my story and perhaps help expand the case to include people like me.

001534-16 135712 V1

- 9 -

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 25 day of October, 2006.

*Rebecca Anne Hopkins*
REBECCA ANNE HOPKINS

001534-16 135712 V1