# 17

# Trial Affidavit of Dan Ryan

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action: 01-cv-12257-PBS |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | Judge Patti B. Saris |

**TRIAL AFFIDAVIT OF DANIEL W. RYAN**

I, Daniel W. Ryan, pursuant to 28 U.S.C. § 1746, on oath, depose and state as follows:

1.  I am a resident of the State of Illinois. I have personal knowledge of the facts stated below and would testify to them in court if called upon to do so.

2.  I have been the Fund Administrator for the United Food Commercial Workers Unions and Employers Midwest Health Fund ("Health Fund" or "UFCW") since 1993. As Fund Administrator, I am charged with performing administrative duties such as recordkeeping, meeting reporting and disclosure requirements, processing applications for benefits, and related functions. I run the day-to-day aspects of the Health Fund and advise the Board of Trustees regarding policy issues that arise during its administration. I am therefore familiar with the operation of Health Fund and, specifically, with its reimbursement for physician-administered drugs both inside and outside the Medicare Part B context.

3.  Part of the duties of my job are to ensure that our members' participants receive the best health care benefits at the best price. I am therefore responsible for the difficult balance of seeing that Health Fund participants receive excellent benefits, while, at the same time, ensuring the financial solvency of the Health Fund. I report to the Board of Trustees. I have made it part of my job to help them do theirs.

- 1 -

4. Also, particularly because participants in the Health Fund are grocery store employees who often have limited means, it is even more important to me as well as to UFCW to hold down, as much as possible, the costs associated with prescription drugs. Because UFCW is providing health care benefits to its members' *employee* participants, our store members want us to provide excellent benefits so that they can compete with other grocery store employers in the marketplace.

5. After learning about the facts alleged in this case, UFCW was one of the earliest plaintiffs to file a lawsuit and has been a plaintiff during the entire time this case has been consolidated before this Court. UFCW understood when it began this litigation over five years ago that, although UFCW wanted to recover Defendants' overcharges to the Health Fund, it also wanted to get that same relief for other MediGap payors and TPPs who reimburse outside of Medicare Part B who similarly overpaid for Defendants' drugs. For that reason, UFCW has been actively involved in this case since the beginning.

6. Although I understand that this Court ultimately decided not to, for the time being, certify a national Class, in its August 16, 2005 class certification order this Court found that UFCW was a typical and adequate class representative for Class 2. *See In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 86 (D. Mass. 2005). In addition, although the Court did not reach the issue of UFCW's typicality or adequacy as a proposed Class 3 representative, UFCW likewise reimbursed for physician-administered drugs outside of the Medicare Part B context based on AWP and is thus a member of Class 3. I have no reason to believe that our experience is any different from other similarly-situated health and welfare funds, whether they are located in Massachusetts or elsewhere in the United States.

001534-16 136103 V1

7.  A Health Fund participant's twenty percent (20%) co-payment under Medicare Part B is, and has been, an eligible expense under UFCW's plans during the class period. If Medicare pays a portion of a participant's claim under Medicare Part B, the Health Fund reimburses the remainder of the claim. I know based on my experience working at and running the Health Fund that, by statute, Medicare's allowable amount is based on AWP. Because UFCW's payment is based off Medicare's allowable amount, our payment, too, is based on AWP. We thus have no choice but to pay at that rate.

8.  As part of its comprehensive medical expense benefit, UFCW also reimburses for physician-administered drugs outside of Medicare Part B. Since January 1, 1994 Blue Cross Blue Shield of Illinois ("BCBS Illinois") has been the administrator of that plan. I know from speaking with a representative of BCBS Illinois during this litigation that BCBS Illinois' allowances were based on a negotiated allowance which was established considering a percentage above AWP. I also understand from speaking with our attorneys that BCBS Illinois has testified to this under oath in this litigation. Under UFCW's major medical plan, UFCW pays varying percentages (including 100% in some cases) of the BCBS Illinois allowable amount. Because, regardless of which plan is in place, UFCW's payments are percentage based, I know that UFCW's payments are based on AWP. I also know that, based on a review of UFCW's claims data, UFCW reimbursed for Defendants' drugs outside of the Medicare Part B context.

9.  Until learning otherwise because of this case, I did not know that the Defendants had deliberately inflated AWP. Nor did I know that there were often enormous spreads between provider acquisition costs and AWP for Defendants' drugs at issue in this case.

10.     I am aware that the complaint alleges that, in order to help physicians who were in effect their customers, and thus themselves, make greater profits, each of the defendants created a spread between AWP and acquisition cost. I have been informed that the effect of this was to cause AWP, which we use as a reimbursement benchmark, to be inflated. UFCW was not aware of these practices.

11.     Specifically, I had no idea that each defendant provided discounts, rebates, and/or off-invoice adjustments which were not reflected in the amount at which UFCW reimbursed.

12.     I was unaware that AstraZeneca responded to learning that doctors wanted a more expensive product so they could make a bigger spread between AWP and acquisition cost and therefore more profits by implementing a volume discount plan that enabled physicians to buy Zoladex for less while being reimbursed based on the much higher AWP. Chen Dep. at 66:19-70:6; 80:13-16; 83:3-84:7.

13.     I was unaware that, as reflected in its internal marketing documents, AstraZeneca knew that its AWP enabled it to sell Zoladex on the basis of discounts, which created spreads or, as AstraZeneca would term it, "Return To Practice." Brennan Dep. at 65; Berkman Dep. at 30, 65-66; *see also* Brennan Dep. at 20-21 (Return To Practice was of concern to AstraZeneca and one of the bases on which AstraZeneca sold Zoladex to doctors); Patterson Dep. I at 63:13-64:1 (Return To Practice became an "emphasis for the sale of Zoladex," a "primary promotional platform.").

14.     I was also unaware that during this period, AZ's marketing team adopted promotional plans and thus centered its marketing activity on promoting a lower AWP and co-pay for patients as compared to Lupron, along with a competitive spread between AWP and the price paid by physicians. Plfs. Ex. 67 (AZ0031261, where AstraZeneca Zoladex compares

001534-16 136103 V1

the cost to the physician and co-pay of the patient of Zoladex and Lupron); Plfs. Ex. 982D (June 21, 1994 Internal Memorandum from Michael C. Tilton Re: Zoladex, AZ0008783, comparing actual costs to physicians for Zoladex and Lupron); Plfs. Ex. 982E (AZ0037020, A draft advertisement geared toward physicians titled "Everyday savings for patients on ZOLADEX," stating that "[t]he average wholesale price (AWP) is more than 25% less than the AWP of Lupron Depot.").

15. I was unaware of the type of marketing practices of AstraZeneca documented in Plaintiffs' Exhibit 43. In that document urologists are offered secret discounts of 33% to 50%.

16. I have also been provided Plaintiffs' Exhibit 38. I was unaware that AstraZeneca was distributing these types of documents to doctors. I was unaware that AstraZeneca was encouraging doctors to "do the math" and calculate their profits which, according to this exhibit, was $150,794 for 700 depots of Zoladex. I was also unaware that Zoladex sales representatives would review comparative information with urologists to increase sales of Zoladex by showing the doctors "how much money the doctor or the office would save purchasing one drug over the other." Bowman Dep. at 56-58.

17. I was unaware that AstraZeneca's sales representatives also sent letters to potential accounts encouraging them to switch from Lupron to Zoladex based on the current AWPs, cost to physicians and resulting Return To Practice. *See* Plfs. Ex. 38 (Letter from Chris Bowman to the Maricopa Urology Lithotripsy Inc. Group (at AZ0105879-81, at 79) (comparing same and stating "**DO THE MATH!**" (emphasis in original)); Plfs. Ex. 39 (Letter from Chris Bowman (AZ0096359) (comparing same and stating "In fact, you will **earn more NET PROFIT by switching to Zoladex!**" (emphasis in original)).

18.     I have also been supplied a copy of the transcript of Dr. Berkman's sentencing hearing (Plaintiffs' Exhibit 5), where the United States Attorney described AstraZeneca's return to practice strategy and AstraZeneca's scheme to, in order to induce physicians to prescribe Zoladex, provide free samples which would be billed to payors such as UFCW. I was unaware of such practices.

19.     I was likewise unaware that BMS was contracting with oncologists and, pursuant to those contracts, providing them with discounts of 61% off WLP (list price), which was itself 20-25% of the AWP.

20.     I have been provided with Plaintiffs' Exhibit 203 and was unaware that BMS was discounting Taxol 73% off list price.

21.     I was also unaware that, while the WLPs (list prices) and AWPs for most versions of Vepesid remained constant over time, Plfs. Ex. 912 (Hartman Decl. Attach. G.2.b.), BMS significantly decreased contract prices. Marre Dep. at 93-94. I was unaware that this caused spreads to balloon in the late 1990s to over 1,000% for several NDCs. Plfs. Ex. 912 (Hartman Decl. Attach. G.2.c.).

22.     I had no idea that BMS provided its sales representatives with spread marketing materials, or they created their own. In particular, I was unaware that:

   a.     Some BMS PowerPoint presentations included information on the difference between the acquisition cost and Medicare reimbursement amounts for oncology drugs. *See, e.g.*, Plfs. Ex. 197 (BMS/AWP/000096632-43, at 000096639; *see also* Akscin Dep. at 94-95.

-6-

001534-16 136103 V1

b. In a document that appears to have been distributed to the sales force, BMS compared spreads on Taxol (ranging from 35.5% to 52% depending on the frequency of administration) with spreads on Taxotere.

c. BMS distributed to the sales force a PowerPoint presentation comparing costs and reimbursement amounts for Taxol and Paraplatin purchased from OTN. Plfs. Ex. 222 (BMS/AWP/001502304-383, at 001502315-16, 00150330-31); *see also id.* at 001502319 (stating that "[c]linical benefit & reimbursement drive utilization").

23. I understand that in response to an interrogatory served in this case BMS has stated as follows: "The existence of a spread is not misleading to a person with even minimal experience in the sale and distribution of drugs" and does not result in "excessive reimbursement." I certainly believe it was misleading to publish an AWP that did not reflect BMS' discounts and now, having been told of the size discounts (anywhere between 30% to 300% or more), believe they resulted in unfair payment by payors such as UFCW.

24. I also understand that in response to Interrogatory No. 8 BMS has stated that any person making a copayment has "actual or constructive notice" of the difference between AWP and the prices at which BMS sold its drugs to the public. *See* Plaintiffs' Ex. 177. UFCW did not have such knowledge, nor do I believe any UFCW members had such knowledge.

25. I had no idea that Warwick was selling Albuterol at 90% below AWP, and that Warrick's AWP for that drug did not reflect those sales.

26. I had no idea that Schering and Warwick were giving away free goods and that such goods were billed by providers, but not reflected in the published AWPs.

001534-16 136103 V1

27. I was also unaware that Johnson and Johnson employees referred to the spread between AWP reimbursement and acquisition cost as a "windfall" for physicians. Plfs. Ex. 365, MDL-OBI00061785.

28. I understand that there are many more examples of this type of conduct which UFCW was unaware of.

29. Although I thought some doctors or other providers might receive discounts off AWP, I had no idea that AWP was being used as a means to compete based on margin as I have now learned from the above and from UFCW's involvement in this litigation.

30. I did not focus on the precise meaning of AWP. I expected that whatever pricing standard that was used would be fairly set.

31. I was unaware that though defendants such as AstraZeneca knew that AWP was "a fictitious number," Freeberry Dep. I at 168:6-20, they continued to use and manipulate AWP for their benefit. I believe it is unfair to use the Medicare-based reimbursement scheme to take advantage of third party payors ("TPPs") such as UFCW.

32. I understand that in this litigation Defendants have argued that various TPPs acquired knowledge of Defendants' inflated AWPs because they retained consultants to advise them regarding their prescription drug benefits. While The Segal Company ("Segal") has been the Health Fund's actuarial and employee benefit consultant firm since the mid-1990s, Segal never advised us that Defendants had falsely inflated their AWPs. In fact, even if Segal had known and had told UFCW of Defendants' inflated AWPs, because all our reimbursements, inside or outside of the Medicare Part B context, are based on AWP, there is nothing the Health Fund could have done about it other than pursue this litigation.

-9-

I make the foregoing statements under penalty of perjury on the date written next to my name below.

_____         _____Park Ridge, IL_____
Daniel W. Ryan                                              Location