# Exhibit C

STORAGE NAME:   s1000z.hc
DATE:  May 21, 1991

**AS PASSED BY THE LEGISLATURE**
CHAPTER #:  91-282, Laws of Florida

## HOUSE OF REPRESENTATIVES
## COMMITTEE ON
## HEALTH CARE
### FINAL BILL ANALYSIS & ECONOMIC IMPACT STATEMENT

reproduced by
FLORIDA STATE ARCHIVES
DEPARTMENT OF STATE
R. A. GRAY BUILDING
Tallahassee, FL 32399-0250
Series __19__ Carton __2278__

BILL #:       CS/CS/SB 1000

RELATING TO:  Health Care Facilities & Services

SPONSOR(S):   Committees on Finance, Taxation and Claims and Health and
              Rehabilitative Services and Senators Malchon, Kirkpatrick and
              Forman

STATUTE(S) AFFECTED:  ss. 11.45, 20.055, 110.123, 154.01, 154.011, 186.003,
186.022, 186.503, 186.507, 186.508, 186.511, 187.201, 216.176, 216.136,
381.025, 381.701-381.715, 381.703, 381.706, 381.708, 381.713, 383.14,
383.011, 383.013, 383.215, 383.216, 383.2161, 390.014, 394.4787, 395.004,
395.007, 395.01465, 395.0335, 395.034, 395.0345, 400.062, 400.126, 400.18,
400.23, 400.332, 400.407, 400.418, 400.467, 400.605, 401.291, 407.50,
407.51, 409.266, 409.2662, 409.2663, 409.2666, 409.2667, 409.267, 409.2671,
409.2673, 409.268, 409.345, 409.701, 409.901 - 409.920, 409.2665, 410.306,
427.012, 483.172, 383.703, 401.291, 381.025, 624.424, 627.4106, 627.736,
631.813, 641.261, 641.31, 641.311, 641.411, 641.48, 641.495, 641.51,
641.511, 641.512, 641.515, 641.52, 655.50, 768.73, 895.02, 895.02, 896.101,
Florida Statutes

COMPANION BILL(S):  HB 735, CS/CS/HB 1161, CS/CS/HB 1169, CS/HB 1215, CS/HB
                    1529, CS/CS/HB 1771, CS/HB 2445, HB 2559

COMMITTEES OF REFERENCE:
     (1)  HEALTH AND REHABILITATIVE SERVICES
     (2)  FINANCE, TAXATION AND CLAIMS
     (3)  APPROPRIATIONS
     (4)
     (5)

****************************************************************************

I.   SUMMARY:

     This is an omnibus health care bill which includes the following:  an
     increase in health facility fees and certificate of need fees to make
     that regulatory program self funding; revisions to the CON law;
     revisions used by the Auditor General in conducting performance
     audits; a "truth in budgeting" provision to be included in the
     Governor's proposed budget recommendations; an expansion of the
     duties of the Revenue Estimating Conference to include trust funds; a
     "healthy start" program to reduce Florida's infant mortality rate; a
     comprehensive rewrite of the statute which creates the state's
     Medicaid program; revisions to the trauma program; a Sunset Review of
     Part IV of Chapter 641, F.S., which relates to quality of care in
     health maintenance organizations; the creation of a health care
     purchasing cooperative for state and local governments; revisions to
     the health planning statutes to establish a clear relationship
     between health planning and the state comprehensive planning process;
     revisions to a training requirement necessary to use a defibrillator;
     small group health insurance rating reforms; and the creation of a
     health care work group to make recommendations to the Governor and
     the Legislature on health care reforms.  A lengthy fiscal note is
     attached.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 2


II. SUBSTANTIVE ANALYSIS:

   A. PRESENT SITUATION:

      Health Facility Fee Increases and Certificate of Need Revisions

      The HRS Office of Regulation and Health Facilities administers the
state health planning program, the certificate of need program,
and the licensure program for health facilities and certain health
personnel.  Currently, the office is funded by a combination of
general revenue (28 percent), federal funds (33 percent), and user
fees in the form of license and inspection fees (39 percent).
Health facilities are also assessed a health planning fee to cover
the cost of the local and Statewide Health Council.

      The certificate of need law requires that in order to initiate
certain health related projects, such as the construction of a
hospital or nursing home, or offering a new institutional health
service, a CON must be obtained.  However, there are exemptions
contained in the law for certain projects undertaken by an HMO and
for projects funded by the Legislature.

      Auditor General

      Section 11.45, F.S., 1990 Supplement, authorizes the Auditor
General to conduct financial and performance audits of various
state and local agencies.  Section 11.45(7)(e), F.S., 1990
Supplement, requires each agency which has been audited to give
the Legislative Auditing Committee a written explanation of the
status of the Auditor General's recommendations.  This explanation
is to be submitted six months after the published date of an audit
report.

      Section 20.055, F.S., 1990 Supplement, requires the head of each
state agency, including the state courts system, to appoint a
chief internal auditor.  The chief internal auditor is required to
review and evaluate the agency's internal controls necessary to
ensure the fiscal accountability of the state agency, as well as
to conduct financial, compliance, and performance audits.  As
currently written, neither s. 11.45 nor 20.055, F.S., 1990
Supplement, specify the role of the chief internal auditor in
providing a written status report of the agency's response to the
Auditor General's recommendations.

      Performance audits examine the effectiveness of administration and
the efficiency and adequacy of a governmental program.  Section
11.45(3)(a)2., F.S., 1990 Supplement, authorizes the Auditor
General to make performance audits of all governmental entities
created pursuant to law.  Section 11.45(3)(a)3.a., F.S., 1990
Supplement, requires the Auditor General to conduct a performance
audit of certain new major programs or modifications of major
programs.  Although professional standards and the Auditor
General's practice dictate what is to be used as criteria for
agency performance in conducting performance audits, current law

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 3

does not specify which criteria the Auditor General is to use in
measuring agency performance.

## Truth in Budgeting

At least 45 days before the scheduled annual legislative session
in each odd-numbered year, the Governor provides the Legislature
with a copy of his recommended balanced budget for the state,
based on his own conclusions and judgment.  Included in this
document are the details of his recommended balanced budget,
including his recommended appropriations, revenues and a financial
schedule showing that his estimates of state revenues will be
sufficient to fund his recommendations.

## Revenue Estimating Conference

The Revenue Estimating Conference is one of seven official state
conferences.  They are:  the Economic Estimating Conference, the
Demographic Estimating Conference, the Revenue Estimating
Conference, the Education Estimating Conference, the Criminal
Justice Estimating Conference, the Social Services Estimating
Conference, and the Transportation Estimating Conference.  The
Revenue Estimating Conference, along with the other estimating
conferences, develops official information, i.e., data, forecasts,
estimates, analyses, studies, and other information which the
principals of the estimating conference unanimously adopt for
purposes of the state planning and budgeting system.

## Healthy Start

While a number of maternal and infant health care programs exist
in Florida, there is no systematic approach to screening for or
providing accessible and comprehensive services to high-risk
pregnant women and their children.

Section 383.013, F.S., requires the Department of Health and
Rehabilitative Services to provide a statewide prenatal care
program for low-income pregnant women.  This law also requires
that the availability and accessibility of prenatal services be
monitored and special outreach programs be developed for medically
underserved and for rural areas.  The department currently
services approximately one-third or 65,000 women of childbearing
age.  However, the HRS Family Health Services Unit indicates that
enhanced services such as screening and risk assessment, outreach,
case management and home visitation, psycho-social counseling,
transportation, nutritional services or parenting and health
education, are minimal due to a lack of resources.

Currently, pregnant women and families with incomes below 150% of
the federal poverty level qualify for Medicaid services.  The
department estimates that 69,433 women meet this income
eligibility level.  With a participation rate in the Medicaid
program of 79.7%, and an uninsured rate of 51.0%, the department
is serving approximately 28,222 women or nearly one-third of the
childbearing population.  Medicaid reimbursement rates for
pregnant women are currently at 150% of the federal poverty level.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 4

### Medicaid Statute Revision

The Medicaid program was created in 1965 as Title XIX of the Social Security Act.  Its purpose was to help low-income and disabled persons meet the costs of necessary medical care.  The Medicaid program was implemented in Florida on January 1, 1970.

Today, Medicaid is the largest health care insurer in the State of Florida.  With a budget approaching $3.3 billion, Medicaid is expected to serve 882,285 medically indigent persons in 1990-91. Funding for Medicaid is shared between the federal (54.5%) and the state (45.5%) governments.

The authority for state administration of the Medicaid program is found in section 409.266(1), F.S., which designates the Department of Health and Rehabilitative Services as the state agency responsible for the administration of Medicaid funds under Title XIX.  The rest of section 409.266, F.S., is a patchwork of Medicaid provisions that is neither cohesive nor complete.

Regulations regarding program eligibility and services are not found in their entirety in the Florida Statutes, but they are found in the Social Security Act, the Code of Federal Regulations and in the State Plan that is required by the federal government. In recent years, the Florida Medicaid program has spent considerable time and effort in litigation defending its authority to implement policies, procedures, and payment rates without a solid basis in Florida Statutes.

### Trauma

Florida continues to be without an adequate trauma care system for the state.  The number of trauma centers declined from 33 state verified trauma centers in 1986 to 13 in 1990.  Two of the major reasons cited for the decline in trauma centers have been the lack of adequate compensation for trauma care and the rigorous verification standards.

In the 1990 Session, the Legislature established a new process for hospitals to become trauma centers and appropriated $24 million to fund state-sponsored trauma centers and air ambulances in underserved areas.

The department began the process for selecting state-sponsored trauma centers and received from hospitals around the state 51 letters of intent to apply for the state-sponsored trauma center program.

State budget reductions that resulted from shortfalls in general revenue first reduced, then eliminated, the funding of the state sponsored trauma center program for fiscal year 1990-91.  The department reports the number of hospitals that will submit their applications to become state-sponsored trauma centers by the April 1, 1991, deadline has dropped substantially due to the lack of funding.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 5

Additionally, last year's legislation replaced the process for
becoming a verified trauma center with the state sponsorship
process which anticipates funding.  As they appear now, the
statutes do not include provisions for verified trauma centers
that are not state funded.

## Sunset Review of Chapter 641, Part IV, HMOs

Complaints against HMOs in Florida began in the 1980s.  Most were
related to questionable enrollment practices and inadequate
quality of care in those HMOs that held Medicare contracts with
the federal government.

Chapter 641, Part IV, F.S., was added in 1987 to ensure that HMOs
and prepaid health clinics delivered high-quality health care to
their subscribers.  This part requires an HMO to receive from the
Department of Health and Rehabilitative Services a **Health Care
Provider Certificate** which confirms that it is in compliance with
the provisions of Part IV before it obtains from the Department of
Insurance a **Certificate of Authority** to operate as an HMO in the
state.

The Department of Health and Rehabilitative Services reports that,
in general, the quality assurance programs of the HMOs in Florida
have been found to meet the statutory requirements for quality
assurance programs.  However, complaints against HMOs continue.
There is evidence of under-reporting of grievances by certain HMOs
to the Department of Insurance.

The federal government has begun a series of investigations into
the practices of seven HMOs in Florida that serve Medicare
beneficiaries in addition to the general population.

## Health Care Purchasing Cooperative

State government spending for health care services is rapidly
escalating and takes a greater portion of the state budget each
year.  For example, the Medicaid budget alone constitutes over 12
percent of the state budget and Medicaid expenditures have been
doubling every three years.

Spending for state employee health benefits has also been
increasing rapidly, and the trust fund used to pay for employee
health benefits has faced a deficit for each of the past several
years.  Benefits have been reduced and copayments and deductibles
increased, and employee contributions have been increased in order
to keep this fund solvent.

In total, state and local government health care spending
increased from $4.8 billion in fy 1988-89 to $5.8 billion in fy
1989-90, an increase of 20.8 percent.  This type of annual
increase in health care spending is typical and represents a
significant problem for state and local governments in this time
of limited public resources.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 6

The Legislature, in an effort to curb the rapid escalation in
health care spending, directed the Health Care Cost Containment
Board to conduct a study on pooling of state and local government
purchasing of health care (see section 25 of ch. 90-295, Laws of
Florida).  A technical assistance panel was convened by the board
and a study was conducted.  The recommendations of this study are
embodied in SB 1000.

Health Planning

Chapters 186 and 187, F.S., establish the structure and process
comprehensive planning by governmental entities in Florida.
Sections 381.025 and 381.703, F.S., establish a separate structure
and process for comprehensive health planning through the
Department of Health and Rehabilitative Services.

Chapter 186, F.S., establishes a state and regional comprehensive
planning structure and process.  The Executive Office of the
Governor is required to prepare a proposed state comprehensive
plan providing long-range guidance for the orderly social,
economic, and physical growth of the state.  The state
comprehensive plan may include goals and policies relating to
health concerns.  The current State Comprehensive Plan, section
187.201, F.S., 1990 Supplement, was developed in 1984, reviewed by
the Administration Commission in early 1985, and adopted by the
Legislature in 1985.  Subsection (6) of s. 187.201, F.S., 1990
Supplement, contains the health element of the State Comprehensive
Plan, although there are also health policies contained in other
elements of the plan.

Chapter 186, F.S., also provides for the establishment of regional
planning councils and comprehensive regional policy plans.  The
comprehensive regional policy plans must contain regional goals
and policies which are consistent with and further the
implementation of the goals and policies in the State
Comprehensive Plan.  Although there is a health element in the
State Comprehensive Plan and comprehensive regional policy plans
do address health, health planning has been a low priority for
regional planning councils.

Section 381.703, F.S., establishes a system for comprehensive
health planning consisting of eleven local health councils, the
Statewide Health Council and the Department of Health and
Rehabilitative Services.  The local health councils are required
to develop health plans for their districts.  The department is
also required to develop a state health plan, which is not defined
in statute.  There is no direct relationship between these plans
and the health elements of the state, regional, and local
comprehensive plans.  However, the local health councils are
supposed to advise and assist regional planning councils and local
governments in the development of optional plan elements to
address the health goals and policies in the State Comprehensive
Plan.  The Statewide Health Council also assists the Department of
Community Affairs in reviewing local government comprehensive
plans to ensure consistency with policies developed in the local
health council plans.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 7

Section 381.025, F.S., requires the department to conduct long-
range planning to establish a state policy framework for health
care and services.  Much of the specific requirements of this
section relate to the department's public health programs.  The
department has interpreted this section as not requiring another
state health plan separate from the state health plan required in
s. 381.703(4), F.S., but the relationship between these two
sections of statute is not clear.

Defibrillator

Section 401.291, F.S., 1990 Supplement, provides for the use of an
automatic or semiautomatic defibrillator (AED) by individuals who
meet a basic level of training.  The training requirements are set
forth in the bill and consist of certification in cardiopulmonary
resuscitation or an 8 hour basic first aid course which includes
cardiopulmonary resuscitation training, demonstrated proficiency
in the use of an AED, and successful completion of at least 6
hours of training in the use of an AED.  An AED may only be used
by a trained individual if authorized by an emergency medical
services medical director.  In addition, an EMS medical director
may authorize any physician to approve a properly trained
individual to use an AED.

Small Group Health Insurance Rating Reforms

Currently, it is common practice for some insurers to price new
business at very low levels and then to increase renewal rates
dramatically as the impact of the initial underwriting and pre-
existing condition exclusions wear off.  This approach appears to
segment the business into small pools based on the duration of
risk and health status of the participants and does not spread the
risk in the same way as with larger groups.  It is believed by the
department that this practice prevents a number of insurers from
entering the small business marketplace since they cannot compete
with the low initial pricing, yet may be better able to maintain
the business at a reasonable level without extraordinary
increases.

Sections 627.410 and 627.411, F.S., set forth the current rate
filing requirements and procedures for approval.  An insurer is
prohibited from delivering or issuing for delivery or renewal in
Florida any health insurance policy form until it has been filed
with the department with a copy of every applicable rating manual,
rating schedule, change in rating manual, and change in rating
schedule or any applicable premium rate or change in applicable
premium rates.  For approval of rates, the insurer must
demonstrate the reasonableness of benefits in relation to premium
rates.  The department must disapprove a health insurance form:
(1) if the benefits are unreasonable in relation to the premium
charges; (2) if it contains provisions which are unfair or
inequitable or contrary to public policy in Florida; or (3) which
encourage misrepresentation.  In determining whether benefits are
reasonable in relation to premium charges the department must
consider:  (a) past loss experience and prospective loss

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 8

experience within and without the state;  (b) allocation of
expenses;  (c) risk and contingency margins, along with
justification of such margins; and (d) acquisition costs.

Prior to solicitation in Florida, group health insurance policies
issued or delivered outside of Florida (to an employer trust, for
example) under which a resident of Florida (employee) is provided
coverage must be filed for informational purposes with the
department.  Certain requirements apply, but there is no rate
approval process currently required for these policies.

B.  EFFECT OF PROPOSED CHANGES:

Health Facility Fee Increases and Certificate of Need Revisions

This section of the bill repeals exemptions to the CON law for
projects funded and mandated by the Legislature currently
contained in s. 381.706(3)(a), F.S.  In addition, this portion of
the bill repeals the exemption from the CON law relating to an HMO
as specified in s. 381.713(1), F.S.  Also included in this part is
an increase in licensure, inspection, health planning and CON fees
for health facilities.

Auditor General

This section specifies the criteria the Auditor General shall use
in conducting performance audits and the role of agency chief
internal auditors in responding to the Auditor General's audits of
an agency.

A new section 11.45(3)(a)7., F.S., is created to specify that,
while conducting performance audits, the Auditor General shall use
an agency's Agency Functional Plan to measure the agency's
performance.

A new section 20.055(8), F.S., 1990 Supplement, is created to
require an agency's chief internal auditor to monitor the
implementation of the agency's response to an Auditor General's
audit of that agency.  The chief internal auditor also is required
to report to the agency head, no later than six months after the
Auditor General publishes his audit of the agency, the status of
corrective actions taken by the agency to address the Auditor
General's recommendations.

Truth in Budgeting

This section establishes "Truth in Budgeting" and requires that
the Governor's recommended budget must summarize all estimated
fees, taxes, revenues, or other income which need to be raised to
fund the proposed budget and its annualized costs.  A similar
statement must be prepared for the General Appropriations Act no
less than 72 hours before the Governor's veto message is due.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 9

### Revenue Estimating Conference

This section expands the duties of the Revenue Estimating
Conference to include trust fund review and estimating.  In
addition, it provides statutory authority for any principal of the
Revenue Estimating Conference to review and estimate revenues for
any trust fund.

### Healthy Start

The section establishes a Florida "Healthy Start" program which
provides:

-  enhanced prenatal and postpartum care to 20,662 high risk
   pregnant women and 8,611 high risk infants;

-  expanded Medicaid coverage to 22,829 pregnant women and their
   children under age one;

-  four prenatal and infant health care community-based
   coalitions;

-  specialized high risk prenatal and obstetric care in twelve
   Regional Perinatal Intensive Care Center satellite clinics;

-  pediatric primary care services to an additional 6,800 non-
   Medicaid eligible children;

-  evaluation services for 11,000 infants and toddlers,
   intervention services for 4,906 newborns, and post discharge
   intervention services for 6,050 infants

### Medicaid Statute Revision

The bill codifies the Florida Medicaid program in statute.  In
doing so, it provides a comprehensive description of the program
which is expected to improve the general understanding of Medicaid
and its requirements.  The bill confirms the department's
authority to administer the Medicaid program and to develop
policies, procedures and rules accordingly.

### Trauma

The section provides a mechanism for hospitals to become trauma
centers when state funding is not available.  In the event state
funding becomes available, clarifications to claims submission and
processing are provided which should facilitate payment to state-
sponsored trauma centers.

### Sunset Review of Chapter 641, Part IV, HMOs

By requiring all HMOs to become accredited, the bill should
provide greater assurance that all HMOs doing business in Florida
meet nationally recognized standards of care.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 10

In addition, the bill should strengthen the Department of Health
and Rehabilitative Services' ability to ensure the quality of
health services provided by HMOs by giving it:  1) access to
accreditation and external quality assurance review reports, 2)
follow-up responsibilities, 3) access to medical records, and 4)
the ability to sanction HMOs that are not in compliance.

Health Care Purchasing Cooperative

This part will establish the Florida Health Care Purchasing
Cooperative.  The cooperative is a nonprofit, private corporation
organized pursuant to chapter 617, F.S.  It would be created for
the purpose of collecting data on the cost and utilization of
health care services by cooperative members.  This data would be
analyzed by the cooperative in order to identify the most
efficient health care providers and to make this known to the
other members of the cooperative.  All data of a confidential
nature is protected from public disclosure and is exempt from the
provisions of s. 119.07(1), F.S.  This exemption is subject to the
Open Government Sunset Review Act.

In addition to collecting data and identifying efficient
providers, the cooperative is authorized to negotiate and enter
into contract on behalf of cooperative members with health care
providers and health care insurers.  The cooperative may also
contract directly with health care providers for the provision of
health care services.

The section establishes a board of directors for the cooperative
to include:  the director of the Division of the State Employees
Insurance of the Department of Administration; the Assistant
Secretary for Medicaid of the Department of Health and
Rehabilitative Services; the Assistant Secretary for Health of the
Department of Corrections; two persons who are responsible for
purchasing health benefits for municipal employees, appointed by
the League of Cities; a person who purchases health care on behalf
of a county, to be appointed by the Florida Association of
Counties; and a person who purchases health care services for a
school district, to be appointed by the Florida Association of
School Administrators.  All appointments must be made by August 1,
1991 and are for a two year period.  Members may be reappointed.
Board members are required to adopt bylaws for the corporation and
are entitled to reimbursement for actual and necessary expenses
incurred by them as members, according to state travel and per
diem limitations.  An exemption from liability is provided for
board members while exercising their duties and powers under this
act.

The section directs the Health Care Cost Containment Board to
provide staff and administrative support to the cooperative until
such time as the board of directors has organized itself and
appointed an executive director.  A first meeting of the board
must be conducted on or before September 1, 1991.

STORAGE NAME:   s1000z.hc
DATE:  May 21, 1991
PAGE 11

## Health Planning

This section establishes a clear relationship between the state
comprehensive planning process and the comprehensive health
planning process.  Responsibilities of the various planning
entities are defined in order to ensure compatibility among the
health plans developed by various levels of government within the
state.

## Defibrillator

This section repeals the current 8-hour basic first-aid training
requirement and retains all other certification requirements
pertaining to the use of an AED.

## Small Group Health Insurance Rating Reforms

This section limits the amount by which an insurer who provides
coverage to small employers may increase rates for the small
employer groups.  It is intended to promote the availability of
health insurance coverage to small employers by improving the
efficiency and fairness in the small group market which in turn
should entice more insurers into this market.  Regulations are
specified which should help to prevent abusive rating practices
and require disclosure of rating practices to the purchaser of the
insurance product.  By limiting abuses and limiting cancellations,
it is hoped that this section will help to provide continuity of
coverage to small employers purchasing insurance.

This section applies to any health benefit plan provided by a
small employer carrier which provides coverage to one or more
employees of a small employer, except non-group health insurance
policies which are subject to the form and rate review of the
department.

Small employer carriers that issue or deliver policies or
certificates outside of Florida which provide coverage to one or
more employees or their dependents who are residents of Florida
are subject to the requirements of this section.  They would also
be required to file rates and forms, prior to use, with the
department for approval.  Currently, these insurers are only
required to file forms, but not rates, for informational purposes
and some of these insurers are not required to file anything with
the department.

This section limits the amount by which a small business carrier
may increase its premium rates both between classes of business
and within classes of business.  It prohibits a small employer
carrier from involuntarily transferring a small employer into or
out of a class of business.  To transfer a small employer, the
carrier must offer to transfer all small employers in that class
of business without regard to case characteristics, claims
experience, health status or duration since issue.

There is a 20 percent cap on the rate difference between classes.
Specifically, the index rate (for each class of business for small

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 12

employers with similar case characteristics the arithmetic average
of the applicable base premium rate and the corresponding highest
premium rate) for a rating period for any class of business shall
not exceed the index rate for any other class of business by more
than 20 percent.

The 20 percent cap does not apply to a class of business if all of
the following apply:

1. The class of business is one for which the carrier does not
   reject, and never has underwritten small employer groups based
   on claim experience or health status.

2. The carrier does not involuntarily transfer, and has never
   involuntarily transferred, a health benefit plan into or out of
   the class of business.

3. The class is currently available for purchase.

Within a single class of business, the premium rate charged to
small employers with similar case characteristics for the same or
similar coverage may not vary from the index rate (the average
rate in the class) by more than plus or minus 25 percent of the
index rate.  (Note that similar "case characteristics", as defined
does not include health characteristics since issue.)

The percentage increase in the premium rate charged to a small
employer for a new rating period may not exceed the sum of:

1. The percentage change in the new business premium rate from the
   first day of the prior rating period to the first day of the
   new rating period.  If the carrier is not issuing new policies,
   the carrier must use the percentage change in the base premium
   rate.

2. An adjustment, not to exceed 15 percent annually and adjusted
   pro rata for rating periods of less than one year, due to the
   claim experience, health status or duration of coverage of the
   employees or dependents of the small employer.

3. Any adjustment due to change in coverage or change in the case
   characteristics of the small employer.

For health benefit plans issued prior to the effective date of
this act, the premium rate for a rating period may exceed the 20
percent cap between classes and the 25 percent cap within classes,
for a period of five years.  However, the percentage increase in
the premium change in the new business premium rate charged to a
small employer in this class of business for a new rating period
may not exceed the sum of the 1 and 3 directly above.  The
limitation of 15 percent due to claim experience, health status or
duration of coverage does not apply.

A health benefit plan subject to the provisions of this section
may not be cancelled or nonrenewed by the small employer carrier
except for the following reasons:

STANDARD FORM 11/90

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 13

1. Nonpayment of required premiums.

2. Fraud or misrepresentation of the small employer, insured individual or subscriber or any of their representatives.

3. Noncompliance with plan provisions.

4. The number or percentage of covered persons is less than the required number or percentage under the plan.

5. The small employer is no longer engaged in the business that he was in when he signed up for the policy.

If a small employer carrier ceases to renew all plans under a class of business, the carrier is required to provide notice to all affected plans and to the commissioner in each state that has an affected insured, at least 90 days prior to termination of coverage.

A carrier that chooses to cease renewing all plans in a class of business is prohibited from establishing a new class of business for 5 years without prior approval of the department.  The carrier is also prohibited from providing coverage to any of the employers of the nonrenewed class of business unless coverage is provided to all affected employers and eligible employees and dependents without regard to case characteristics, claim experience, health status or duration of coverage.

Each small employer carrier is required to disclose in solicitations and sales materials provided to the small employer the following information:

1. The extent to which premium rates are established or adjusted due to specific underwriting criteria.

2. The provisions relating to the carrier's right to change premium rates.

3. A description of the class of business in which the small employer is or will be included.

4. The provisions relating to renewability of coverage.

The small employer carrier is required to maintain a complete and detailed description of its rating practices and renewal underwriting practices which must be made available to the department upon the department's request.  The information will be considered proprietary and trade secret information and shall not be subject to disclosure by the department to anyone outside the department except as agreed to by the carrier or ordered by the court.  On March 1 of each year the small employer carrier is also required to file an actuarial certification with the department which indicates compliance with the provisions of this act.

STANDARD FORM 11/90

STORAGE NAME: s1000z.hc
DATE: May 21, 1991
PAGE 14

The department may suspend all or any part of this act upon a filing by the small employer carrier and a finding by the department that either the suspension is reasonable in light of the financial condition of the carrier or that the suspension would enhance the fairness of the marketplace for small employer health insurance.

C. SECTION-BY-SECTION ANALYSIS:

Section 1. Amends s. 381.702(1), F.S., to include to replace the term "refinancing costs" with "initial financing costs".

Section 2. Amends s. 381.703(3)(b), (c) and (g), F.S., relating to local and state health planning, to establish an annual fee of $150 for licensed health facilities excluding hospitals, nursing homes and adult congregate living facilities which are assessed based on the number of beds. Also specifies that the fees shall be used to maintain the fiscal year 1990-1991 aggregate funding level for local health councils and the Statewide Health Council plus any increase mandated by the Legislature.

Section 3. Amends s. 381.706(1)(c), F.S., relating to CON review, to exclude refinancing debt from CON review.

Section 4. Amends s. 381.708, F.S., to increase CON filing fees.

Section 5. Amends s. 390.014(3), F.S., to increase licensure fees for abortion clinics.

Section 6. Amends s. 395.004(2), F.S., to increase hospital licensing fees.

Section 7. Amends s. 395.007(2)(a), F.S., to increase fees for the review of hospital plans and construction.

Section 8. Amends s. 400.062(3), F.S., to increase licensure fees for nursing homes.

Section 9. Amends s. 400.23(8), F.S., to increase fees for review of nursing home plans and construction.

Section 10. Amends s. 400.407(4)(a), F.S., to increase licensing fees for an adult congregate living facility.

Section 11. Amends s. 400.418, F.S., to revise or correct a reference.

Section 12. Amends s. 400.467(2), F.S., to increase licensing fees for a home health agency.

Section 13. Amends s. 400.605(2), F.S., to increase licensing fees for a hospice.

Section 14. Amends s. 483.172(5), F.S., to increase licensing fees for a clinical laboratory.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 15

Section 15.  Repeals s. 381.713(1), F.S., which provides an
exemption from CON review for certain projects undertaken by an
HMO.  The repeal is drafted so that it will not affect the outcome
of any exemption under the subsection requested of the department
before April 17, 1991.

Section 16.  Repeals paragraph (a) of subsection (3) of s.
381.706, F.S., which provides an exemption from CON for projects
specifically mandated and funded by the Legislature.

Section 17.  Amends s. 11.45(a)(3), F.S., to require the Office of
the Auditor General, while conducting a performance of any agency,
to use the Agency's Functional Plan in the evaluation.

Section 18.  Amends s. 20.055(8), F.S., to require the chief
internal auditor to monitor the implementation of the agency's
response to any agency audit conducted by the Auditor General.
Further, the chief internal auditor is required to report to the
agency head on the status of corrective action taken, and to file
such a report with the Joint Legislative Auditing Committee.

Section 19.  Creates s. 216.176, F.S., to require that the
Governor's recommended budget contain a "truth in budgeting"
statement which shall display in summary form all currently
estimated fees, taxes, revenues, or other income which need to be
raised to fund the proposed budget and its annualized costs.
Further, the "truth in budgeting" statement for the General
Appropriations Act shall be completed by the Legislature no later
than 72 hours prior to the end of the period authorized by law for
veto consideration by the Governor.

Section 20.  Amends s. 216.136(3), F.S., to provide that any
Revenue Estimating principal, as defined in s. 216.136(3), F.S.,
may request the Revenue Estimating Conference to review and
estimate revenues for any trust fund.

Section 21.  Provides legislative intent.

Section 22.  Amends s. 383.14, F.S., 1990 Supplement, to expand
health screening requirements to include environmental risk
factors to identify high-risk pregnant women and infants for
enhanced health services.  This section requires the Department of
Health and Rehabilitative Services to establish and promote a
program to screen all pregnant women and infants for environmental
risk factors, including income, education, maternal and family
stress, substance abuse and other high risk conditions, using a
birth-scoring system.  The bill requires that screening be
conducted by the primary health care provided in hospitals,
perinatal centers, county public health units, school health
programs that provide prenatal care, and birthing centers.
Information is gathered on a risk assessment instrument, developed
by the department, and submitted to the Office of Vital Statistics
for notification and follow-up enhanced services.  This section
requires integration with existing information registries and
existing programs and services for at-risk families.  The program

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 16

remains optional and confidential under existing statute.  This
section will not go into effect until March 1, 1992.

Section 23.  Amends s. 383.011(3), F.S., to direct the department
to administer enhanced prenatal and infant health care services
through the county public health units or subcontractors for the
provision of enhanced services, including case finding or
outreach, assessment of health, social, environmental and
behavioral risk factors, case management, home visiting and
childbirth and parenting education.  A Healthy Start Care
Coordination Program is created in each county public health unit,
specifying the use of family outreach workers to provide the
enhanced services.  A care coordinator is designated to receive
reports, assist health care coalitions and direct outreach
efforts.  The department is directed to adopt rules to assign
certain outreach workers based on the level of risk and to develop
procedures for subsequent screenings as well as immunizations in
accessible locations.  This section also expands pediatric primary
care services to low income children in private physicians'
offices and physician professional services in hospital settings.

Section 24.  Amends s. 383.013(7), F.S., to direct the department
to provide level III obstetric outpatient care to women diagnosed
as being high risk through regional perinatal intensive care
satellite centers.  This program merges the expertise of faculty
obstetrician consultants, nurses, genetic counselors and
nutritionists with local private sector obstetricians and county
public health units to deliver specialized high risk obstetric
care.

Section 25.  Amends s. 383.215(2) and (4), F.S., to direct the
department to establish Development, Evaluation, and Intervention
programs at stepdown perinatal intensive care centers in addition
to those that exist in the Regional Perinatal Intensive Care
Centers.

Section 26.  Creates s. 383.216, F.S., to direct the department to
assist in the establishment of prenatal and infant health care
coalitions at the county or district level to provide coordinated
community prenatal and infant health care.  This section directs
each coalition, in coordination with the department and the local
health planning councils established under s. 381.703, F.S., to
develop a maternal and child health plan for the community,
including a needs assessment.  It also provides requirements for
the plan and specifies the duties of the department, including
supervising the functions of the coalitions, and directs the
department to retain responsibility for all of the functions
delegated to the coalitions in those communities where coalitions
do not exist.

This section also provides up to $150,000 to each prenatal and
infant health care coalition that petitions for recognition, meets
certain criteria, and provides a local cash or in-kind
contribution match of 25 percent of the costs of the coalitions.
Additionally, this section authorizes staffing the coalitions and
directs the coalitions to incorporate as not-for-profit

organizations.  This section also directs the department to adopt
rules that are necessary to carry out the provisions of this act.

Section 27.  Creates s. 383.2161, F.S., to require the Department
of Health and Rehabilitative Services to compile and analyze risk
information and coalition findings and prepare an annual report to
the Legislature which indicates the number of families served, the
unmet need for services and determines program effectiveness.

Section 28.  Directs the Department of Health and Rehabilitative
Services to develop and submit to the Legislature a plan for
decategorizing the budget resources provided to two districts into
a single child and maternal health budget.  The plan is required
to include an alternative reimbursement methodology that rewards
those providers who develop social services, educational linkages
and support services to enhance maternal and child health care.

Section 29.  Amends s. 427.012(1)(k), F.S., to expand the
membership of the Transportation Disadvantaged Commission to
include one member of the State Coordinating Council for Early
Childhood Services, established under chapter 411, F.S.

Section 30.  Creates s. 409.901, F.S., and provides definitions
for the sections in this bill.

Section 31.  Creates s. 409.902, F.S., and designates the
Department of Health and Rehabilitative Services as the single
state agency authorized to make payments for medical assistance
and related services under Title XIX of the Social Security Act.

Section 32.  Creates s. 409.903, F.S., and authorizes the
department to make payments for medical assistance on behalf of
individuals determined by the department to be eligible for
Medicaid.  This section provides descriptions of the eligibility
categories that are mandated by the federal government according
to Title XIX of the Social Security Act.

Included in this section is a Healthy Start provision which
directs the department to expand Medicaid services to qualified
pregnant women and children under 1 year of age from the current
standard of 150 percent of the federal poverty level to 185
percent, effective January 1, 1992.  In the General Appropriations
Act, $23.1 million was appropriated to fund this expansion for six
months in 1991-92.

Section 33.  Creates s. 409.904, F.S., and authorizes the
department to make payments for medical assistance on behalf of
individuals determined by the department to be eligible for
Medicaid.  This section provides descriptions of the eligibility
categories that are considered to be optional by the federal
government according to Title XIX of the Social Security Act.

Section 34.  Creates s. 409.905, F.S., and authorizes the
department to make payments for specified medical and medically-
related services which are required by Title XIX of the Social
Security Act.  These "mandated" services include:  advanced

STANDARD FORM 11/90

registered nurse practitioner; early periodic screening, diagnosis, and treatment; family planning; home health services; hospital services; laboratory; skilled level nursing homes; physician; portable x-ray; rural health clinic; and transportation.  The section stipulates that payment shall be made for medically necessary services only.

Section 35.  Creates s. 409.906, F.S., and authorizes the department to make payments for specified medical and medically-related services which are not required by Title XIX of the Social Security Act.  These "optional" services include:  adult dentures; adult health screening; ambulatory surgical center services; birth centers; case management; children's dental; chiropractic; community mental health; durable medical equipment; hearing; home and community based services for individuals determined to be in need of nursing home care; hospice; intermediate care facilities for the mentally retarded; intermediate level nursing homes; optometric; podiatric; prescribed drugs; state hospital for psychiatric patients over the age of 65; and visual.

Section 36.  Creates s. 409.907, F.S., and directs the department to make payments for medical assistance rendered to Medicaid recipients only to those individuals and organizations which have currently effective provider agreements.  This section requires the provider to provide to Medicaid recipients services or goods of not less than the same scope and quality that it provides to the general public.  It also provides specific detail about what shall be included in provider agreements.  Finally, providers who have been overpaid and who agree with the department on the amount of overpayment may be terminated for non-repayment or partial repayment.

Section 37.  Creates s. 409.908, F.S., and directs the department to reimburse Medicaid providers for services rendered in accordance with state and federal law and the methodologies set forth by the department.  The reimbursement rates of institutional providers shall be established prospectively based on cost reports, whereas, most non-institutional providers, with the exception of prepaid health plans, shall be reimbursed on a fee-for-service basis.  Prepaid health plans shall be compensated on a negotiated, prepaid basis.  Certain providers are reimbursed on an all-inclusive rate basis.

As part of the Healthy Start initiative, this section increases the physicians' Medicaid reimbursement rate for obstetrical services from the current level of $1000 to $1500 for low risk delivery, and from $1600 to $2000 for high risk delivery, effective April 1, 1992.  There is an appropriation of $7.4 million in the General Appropriations Act to fund this increase for three months in 1991-92.

This section also directs the department to establish and implement a Title XIX Long-Term Care Reimbursement Plan (Medicaid) for nursing homes which insures that reimbursement rates are adequate to cover the costs of an efficiently and economically operated nursing home.

STORAGE NAME: s1000z.hc
DATE:  May 21, 1991
PAGE 19

Section 38.   Transfers s. 409.2665, F.S., 1990 Supplement,
related to Medicaid third party liability to newly created s.
409.910, F.S., makes minor revisions, and repeals subsection (19)
of s. 409.910, F.S   In the 1990 Session, this subsection was
intentionally deleted from CS/CS/CS/HB 1209, but was inadvertently
left in SB 748.

Section 39.   Creates s. 409.911, F.S., and directs the department
to distribute moneys appropriated from the Public Medical
Assistance Trust Fund to hospitals providing a disproportionate
share of hospital services to Medicaid and charity care patients.
In the formula, as a hospital's percentage of charity care and
Medicaid patient days increases, the disproportionate share
payment increases exponentially.  An appropriation of $26.5
million appears in the General Appropriations Act; however,
contributions by local governments may increase this amount to
$168 million in 1991-92.

The section also provides definitions related to the
disproportionate share program and the formula for distributing
the appropriated funds.  Further, it authorizes the department to
receive funds from local governments and other political
subdivisions in order to make payments through the
disproportionate share program.

Section 40.   Creates s. 409.9112, F.S., and incorporates the
disproportionate share program for hospitals participating in the
Regional Perinatal Intensive Care Center (RPICC) program into the
Medicaid section.  In 1991-92, $6.7 million shall be distributed
to the ten RPICC hospitals based on the proportion of Medicaid and
charity care services they provide.

Section 41.   Creates s. 409.9113, F.S., and replaces the funding
of graduate medical education in statutory teaching hospitals from
the Medical Education and Tertiary Care Trust Fund with a Medicaid
based disproportionate share program for teaching hospitals in
order to maximize federal funding.  In 1991-92, $16.6 million
shall be distributed to Florida's six teaching hospitals using the
same formula as was previously used to distribute moneys from the
Medical Education and Tertiary Care Trust Fund.

Section 42.   Creates s. 409.9114, F.S., and establishes an
extraordinary disproportionate share program for hospitals.  In
order to qualify for this program, a hospital must either be a
teaching hospital or be owned by a hospital district authority and
have a ratio of net charity care expenditures to net operating
revenues that exceeds 9 percent.  The amount that is distributed
under this program is dependent upon the amount the qualifying
hospitals contribute to this program.

Section 43.   Creates s. 409.912, F.S., and directs the department
to purchase medical and medically-related goods and services for
Medicaid recipients in the most cost effective manner.  The
section authorizes the department to contract with health
maintenance organizations and other public or private entities for

prepaid health care services.  By January 1, 1992, an entity
contracting with the department for prepaid health services must
maintain an amount equal to its monthly prepaid Medicaid revenues
in the form of liquid assets.  That surplus amount increases to an
amount equal to one and a half times its monthly revenues on
January 1, 1993.

This section also authorizes the department to apply for waivers
of federal laws and regulations to implement more cost effective
health care delivery systems.

Further, the department is directed to establish a post-payment
utilization control program to identify recipients who misuse the
Medicaid services, to establish incentive systems to encourage the
cost effective use of services, and to identify use and price
patterns within Medicaid that are not cost effective.

Section 44.  Creates s. 409.913, F.S., and directs the department
to operate a program that oversees the activities of Medicaid
recipients and providers and to insure that fraudulent and abusive
behavior is minimized.  This section instructs the department to
conduct investigations, audits, and analyses of possible fraud.

The section also specifies requirements that must be followed by
providers when submitting claims for payment by Medicaid.  It
provides the length of time that records must be retained by
providers and the section stipulates the time periods information
obtained during an investigation can be exempt from the public
records law.

Finally, the section provides a listing of the circumstances under
which the department may impose administrative sanctions against
Medicaid providers and a listing of the types of sanctions that
may be imposed.  It authorizes the department to recover up to
$15,000 in expenditures related to investigations when the
department's findings are not contested or when the department
prevails in a hearing.

Section 45.  Creates s. 409.914, F.S., and authorizes the
department to use systems that have been developed for the
Medicaid program to assist other entities in programs which
provide access to health care for the uninsured and the
underinsured.

Section 46.  Creates s. 409.915, F.S., and directs the state to
charge counties a certain percentage of the Medicaid inpatient
hospital and nursing homes costs of Medicaid eligible county
residents.  This section requires counties to set aside sufficient
funds to pay for the costs of care of county residents for whom
county contributions are required.  Exemptions from this
requirement are identified.

Section 47.  Creates s. 409.916, F.S., and directs the department
to deposit any funds received from pharmaceutical manufacturers or
from cost containment strategies into the Grants and Donations
Trust Fund.  Funds received from pharmaceutical manufacturers are

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 21

to be used to fund the state portion of the Medicaid prescribed
drug program; however, at least $75,000 may be appropriated for
Medicaid research and development activities in the General
Appropriations Act.

Section 48.  Renumbers s. 409.2662, F.S., which establishes the
Public Medical Assistance Trust Fund, and creates s. 409.918, F.S.
for the purpose of funding health care services for indigent
persons.  This section appropriates $30 million annually from the
Public Medical Assistance Trust Fund for the establishment and
maintenance of primary care programs in the county public health
units.  It also expands the possible uses of moneys in the Fund to
any uses that are specified by law.

Section 49.  Creates s. 409.919, F.S., and directs the department
to adopt rules that are necessary to carry out the provisions of
the act.

Section 50.  Creates s. 409.920, F.S., and provides definitions
related to Medicaid provider fraud.  The section also puts forth
the penalties for specific types of fraud related to the Medicaid
program and sets a statute of limitations of five years after the
cause of action has occurred.  In addition, the Auditor General is
directed to conduct a statewide program of Medicaid fraud control.

Section 51.  This section transfers language from Chapter 90-232,
Laws of Florida, which created the Task Force on County
Contributions to Medicaid to s. 409.915, F.S., and extends the
date by which the Task Force shall provide a report to the
Governor and Legislature to February 1, 1992.

Section 52.  Directs the department to conduct a study of
Florida's Medicaid reimbursement to pharmacy providers and to
prepare a report on the adequacy of reimbursement for
pharmaceutical ingredients and for the dispensing of
prescriptions.  The report is due to the Governor and the
Legislature by December 15, 1991.

Section 53.  This section corrects a cross reference in s.
110.123(3)(d), F.S., 1990 Supplement, the state group insurance
program.

Section 54.  This section corrects a cross reference in s.
154.011(1), F.S., primary care services.

Section 55.  This section corrects a cross reference in s.
394.4787(7), F.S., mental health services.

Section 56.  This section corrects a cross reference in s.
395.01465(2), F.S., emergency care services.

Section 57.  This section corrects a cross reference in s.
400.126(1)(b), F.S., receivership proceedings.

Section 58.  This section corrects a cross reference in  s.
400.18(1), F.S., nursing facilities.

STANDARD FORM 11/90

Section 59.  This section corrects a cross reference in s. 400.332, F.S., nursing homes.

Section 60.  This section corrects a cross reference in s. 407.51(2), F.S., Health Care Cost Containment Board.

Section 61.  This section corrects a cross reference in s. 409.2673(6)(c), F.S., 1990 Supplement, shared county and state health care program.

Section 62.  This section corrects a cross reference in s. 409.345(10), F.S., public assistance.

Section 63.  This section corrects a cross reference in s. 409.701(5)(d), F.S., 1990 Supplement, Small Business Health Access Corporation Act.

Section 64.  This section corrects a cross reference in s. 410.036, F.S., aging and adult services.

Section 65.  This section corrects a cross reference in s. 624.424(9)(a), F.S., insurance code.

Section 66.  This section corrects a cross reference in s. 627.736(4), F.S., insurance rates and contracts.

Section 67.  This section corrects a cross reference in s. 631.813, F.S., insurer insolvency.

Section 68.  This section corrects a cross reference in s. 641.261(1), F.S., health care service programs (commercial health maintenance organizations).

Section 69.  This section corrects a cross reference in s. 641.31(14), F.S., health maintenance organization contracts.

Section 70.  This section corrects a cross reference in s. 641.411(1), F.S., health maintenance organization reporting requirements.

Section 71.  This section corrects a cross reference in s. 768.73(2)(6), F.S, negligence.

Section 72.  Amends subsection (1) of s. 895.02, F.S., to include all Medicaid fraudulent activities described in s. 409.920, F.S., of this act as "racketeering" activities.

Section 73.  Reenacts paragraph (g) of subsection (3) of s. 655.50, F.S., for the purpose of incorporating an amendment to s. 895.02, F.S., 1990 Supplement.

Section 74.  Reenacts paragraph (g) of subsection (1) of s. 896.101, F.S., for the purpose of incorporating an amendment to s. 895.02, F.S., 1990 Supplement.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 23

**Section 75.**  Prohibits the department from providing to nursing homes any diagnosis-specific reimbursement that creates a disincentive for terminally ill patients from electing Medicare or Medicaid hospice benefits.

**Section 76.**  Provides that rules adopted by the department prior to October 1, 1991, related to Medicaid statutes which are amended or repealed by this bill shall remain in effect until they are superseded by new rules.

**Section 77.**  Repeals existing statutes and laws related to the Florida Medicaid program.

**Section 78.**  Amends s. 395.0335(2), (3), (5), (6), (8), and (13), F.S., 1990 Supplement, to replace the designation of state-sponsored trauma centers with state-approved trauma centers.  This revision clarifies legislative intent that hospitals be state-approved as trauma centers regardless of the availability of state funding.

This section also allows the department, under certain circumstances, to grant additional time for hospital applicants to meet facility, equipment, personnel, and quality assurance requirements if they are not located in an area that has reached its maximum allowable number of state approved trauma centers.

**Section 79.**  Amends s. 395.034, F.S., to provide a definition of a state-approved trauma center and to establish that state-approved trauma centers which receive funding are state-sponsored trauma centers.

The section also requires state-sponsored trauma centers to submit claims electronically using a trauma claims processing system developed by the Medicaid program office.

There is a provision which requires the trauma patient day to be <u>medically necessary</u> in order for the state-sponsored trauma center to be compensated by this program.  This provision is in addition to the requirements that the patient meet the definition of charity care and have an injury severity score of 9 or more.

Also, included in this section is the provision that the department pay trauma claims on a monthly basis.  In a month in which the claims submitted for a particular trauma region would consume all of the unexpended funds for that region, then the payment of those outstanding claims would be pro-rated.

Finally, this section excludes funds received from the state-sponsored trauma center program from being considered as net revenues in determining whether an excess has occurred in a hospital's allowable rate of increase permitted by the Health Care Cost Containment Board.

**Section 80.**  Amends s. 395.0345, F.S., to expand the uses of funds in the Trauma Services Trust Fund to include the development and support of a system of state-sponsored trauma centers.  Previous

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 24

language limited the use of funds to the compensation of trauma
centers and the development of a trauma center payment system.

Section 81.  Repeals section 14 of chapter 90-284, Laws of
Florida, as this provision has been moved to s. 395.034, F.S.

Section 82.  Appropriates $200,000 from the Emergency Medical
Services Trust Fund to fund the review team of out-of-state
experts that evaluates each provisional trauma center prior to its
becoming a state approved trauma center.

Section 83.  Amends s. 641.48(3), F.S., to clarify both the
financial and non-financial requirements that are necessary to
contract with the department for a Medicaid prepaid health plan.
Prepaid health plans that enroll only Medicaid recipients are
exempt from the requirements of chapter 641 with the exception of
s. 641.48, F.S.

Section 84.  Amends s. 641.495(10), F.S., to limit the number of
HMOs that are exempt from the hospital licensure requirements in
part I of chapter 395 to those HMOs that provided 10 or fewer
holding beds prior to January 1, 1991.  To qualify for this
exemption an HMO must also maintain its accreditation.  This
section also updates and expands the list of acceptable
accreditation organizations.

Section 85.  Amends s. 641.51, F.S., to remove the requirement
that an HMO's quality assurance program include a review by an
external review organization once every three years and revises
the circumstances under which an HMO subscriber may seek a second
opinion.  Current law limits second opinions to when the
subscriber:  1) disputes the HMO's opinion of necessity of a
surgical procedure, or 2) is subject to a life-threatening injury
or illness.  The new language permits a second opinion when the
subscriber questions the HMO's or the physician's opinion of the
reasonableness or necessity of a surgical procedure or when the
subscriber is subject to a serious injury or illness.

This section permits the subscriber, when seeking a second
opinion, to choose:  1) a physician from a list of contracted or
employed physicians provided by the HMO, or  2) a non-contract
physician who is located in the same geographic area as the HMO.

Section 86.  Creates s. 641.511, F.S., to require each HMO to
provide the department annually with a report on its grievances
and to require the department to investigate all reports of
unresolved grievances received either from subscribers directly or
from the Department of Insurance.  The section also permits the
department to investigate any complaints about HMOs at any time.
A legitimate grievance related to the quality of health services
that is not resolved may be referred to the Statewide Subscriber
Assistance Panel for resolution.

Section 87.  Creates s. 641.512, F.S., to direct the department to
require each HMO to become accredited within one year of receipt
of a Certificate of Authority and to maintain its accreditation

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 25

status as a condition of doing business in Florida.  Accreditation
shall be performed by an accreditation organization with
recognized experience in HMO accreditation.  The accreditation
organization shall be chosen by the individual HMO from an
approved list provided by the department.  In the event that no
accreditation organization can be approved by the department, the
department shall require each HMO to have an external quality
assurance assessment performed by a review organization approved
by the department within one year of receipt of a **Certificate of
Authority** and every two years thereafter.  All costs for the
review are to be borne by the HMO.

**Section 88.**  Amends s. 641.515, F.S., to require the Department of
Health and Rehabilitative Services to investigate any information
provided in reports from the Statewide Subscriber Assistance
Panel, the accreditation organization, or the review organization,
that indicates the HMO does not meet accreditation standards or
the standards of the review organization performing the external
quality assurance assessment.

The section authorizes the department to have access to
subscribers' medical records held both by employed and contracted
physicians.  It deletes the requirement that the department obtain
a subpoena before obtaining a subscriber's medical records.

The department is also directed to adopt rules that establish
standards of care for physicians and hospitals performing services
for HMOs which are applicable to physicians and hospitals that are
not associated with HMOs.  In section 123 of CS/CS/HB 2309, the
department is authorized to impose administrative fines not to
exceed $2,500 per violation when an HMO fails to comply with the
quality of health standards set forth in these rules.

**Section 89.**  Amends s. 641.52(1)(g), F.S., to permit the
department to suspend the authority of the HMO to enroll new
subscribers or revoke the HMO's **Health Care Provider Certificate**
if the HMO has not maintained its accreditation status or has
failed to meet the standards of the review organization performing
the external quality assurance assessment.

**Section 90.**  Directs the Health Care Cost Containment Board to
conduct a study on competition and provider contracts in health
maintenance organizations.  A technical advisory board shall be
appointed by the board to conduct the study.  The board shall
prepare a report and submit it to the Governor and the Legislature
by December 15, 1991.

**Section 91.**  Re-enacts Chapter 641, Part IV, F.S., as amended by
this act until October 1, 2001.

**Section 92.**  Appropriates $600,000 from the Health Maintenance
Organization Quality Care Trust Fund for nine career service
positions to implement the provisions of this part of the bill.

**Section 93.**  Amends s. 154.01(5), F.S., to allow the Legislature
to authorize funding for construction or expansion projects to

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 26

non-profit primary health care providers who are under contract
with the department.

Section 94.  Establishes the Florida Health Care Purchasing
Cooperative and sets forth its duties and powers.  Creates the
board of directors and specifies the initial seven members.  This
section also directs the Health Care Cost Containment Board to
provide staff and administrative support to the cooperative board
of directors until staff can be hired.  Requires that the first
meeting of the board be held on or before September 1, 1991.

Section 95.  Appropriates $500,000 for fy 1991-92 and $500,000 for
1992-93 from the State Employees Disability Trust Fund to the
Health Care Cost Containment Board Trust Fund to fund the
cooperative.

Section 96.  Amends s. 407.50(11)(a), F.S., to exempt hospitals
which are licensed for 33 or fewer beds and which operate
intensive residential treatment programs for children and
adolescents.  These hospitals cannot be part of a multifacility
organization but they must be part of a community mental health
system.

Section 97.  Amends s. 186.003(9), F.S., to add the definition of
"Statewide Health Council".

Section 98.  Amends s. 186.022(2), F.S., to direct the Governor's
Office to consider the findings of the Statewide Health Council
review of agency functional plans.

Section 99.  Amends s. 186.503(7) and (9), F.S., to add the
definitions of "local health council" and "Statewide Health
Council".

Section 100.  Amends s. 186.507(10), F.S., to direct each regional
planning council to enter into a memorandum of agreement with each
local health council in its comprehensive planning district.

Section 101.  Amends s. 186.508(1), F.S., to direct the Executive
Office of the Governor to consider the Statewide Health Council's
review of comprehensive regional policy plans.

Section 102.  Amends s. 186.511, F.S., to direct each regional
planning council to involve local health councils in its region in
the review of the health element of its plan.

Section 103.  Amends s. 187.201(6), F.S., 1990 Supplement, to
direct the Legislature to include specific health goals and
policies in its State Comprehensive Plan.  This section
substantially rewords subsection (6) of s. 187.201, F.S., which is
the health element of the State Comprehensive Plan.  The single
health goal in subsection (6) is replaced with four new goals, the
number of policies is reduced, and the policies are made more
directive.

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 27

Section 104.  Amends s. 381.703(1), (2), and (4), F.S., to direct
local health councils to develop a schedule for appointing
members, and to revise the functions of the local health councils,
the membership and functions of the Statewide Health Council, and
the duties and responsibilities of the department.  This section
specifies that the state health plan developed by the Statewide
Health Council is to contain sub-goals, quantifiable objectives,
strategies and resource requirements to implement the goals and
policies of the health element of the State Comprehensive Plan.
This section requires district health plans developed by the local
health councils to be consistent with the objectives and
strategies in the state health plan.  This section also requires
the Statewide Health Council to review agency functional plans,
comprehensive regional policy plans, local government plans, and
local health council district health plans for consistency with
the health element of the State Comprehensive Plan.  This section
further requires the Statewide Health Council and local health
councils to conduct public forums to discuss the state's health
care goals and policies and to develop suggested revisions to the
health element of the State Comprehensive Plan.

Section 105.  Amends s. 401.291(2), F.S., 1990 Supplement, to
authorize an emergency medical services medical director to allow
the use of an automatic or semiautomatic defibrillator by an
individual who has met certain requirements and who is a member of
a locally coordinated response team.  These training requirements
include certification in CPR, or successful completion of a basic
first aid course which includes cardiopulmonary resuscitation
training, demonstrated proficiency in the use of an AED, and at
least 6 hours of training in the use of an AED.

Section 106.  Appropriates $70,000 from the Local and State Health
Trust Fund to the Statewide Health Council for reviewing agency
functional plans and other plans.

Section 107.  Repeals s. 381.025, F.S., which relates to
legislative intent for long range health planning.

Section 108.  Creates the Health Care Work Group, a 21 member
group appointed by the Governor to make recommendations to the
Governor and the Legislature on health care reforms by January 1,
1992.  The work group is administratively housed in HRS and
staffing for the group is to be provided by HRS.

Section 109.  Exempts certain foreign trained dentists from taking
a specified training course in order to be licensed as long as
they meet all other requirements for licensure.

Section 110.  Creates s. 627.4106, F.S., relating to small group
health insurance rating reforms (see effects of proposed changes
for details).

Section 111.  Provides an effective date of upon becoming a law
except as otherwise specified in the act.

STORAGE NAME: s1000z.hc
DATE: May 21, 1991
PAGE 28

III. FISCAL ANALYSIS & ECONOMIC IMPACT STATEMENT:

   A. FISCAL IMPACT ON STATE AGENCIES/STATE FUNDS:

      1. Non-recurring Effects:

| | 1991-92 | 1992-93 |
|---|---|---|

Transfers:

Department of Health and Rehabilitative Services

Sunset Review of Chapter 641, Part IV, HMOs
Study of HMO provider contracts

| | 1991-92 | 1992-93 |
|---|---|---|
| Health Maintenance Quality Care TF | ($60,000) | |
| Health Care Cost Containment Trust Fund | $60,000 | |

Department of Administration

Health Care Purchasing Cooperative
Administrative Costs

| | 1991-92 | 1992-93 |
|---|---|---|
| State Employees Disability Trust Fund | ($500,000) | ($500,000) |
| Health Care Cost Containment Trust Fund | $500,000 | $500,000 |

Expenditures:

Department of Health and Rehabilitative Services

Trauma
Out-of-state review team

| | |
|---|---|
| Emergency Medical Services Trust Fund | $200,000 |

Sunset Review of Chapter 641, Part IV, HMOs
Study of HMO provider contracts

| | |
|---|---|
| Health Care Cost Containment Trust Fund | |
| Salaries and benefits | $ 30,000 |
| Other personal services | $ 10,000 |
| Expenses | $ 20,000 |

      2. Recurring Effects:

Revenues:

Department of Health and Rehabilitative Services

| | 1991-92 | 1992-93 |
|---|---|---|
| Fee Increases | | |
| Certificate of Need Fee Increases | $3,100,000 | $3,100,000 |
| Health Facility Assessment Increases | 160,000 | 160,000 |
| Construction & Plan Review Increases | 1,694,691 | 1,694,691 |
| Health Facility Fee Increases | | |
| Abortion Clinics | $ 8,925 | $ 8,295 |
| Hospitals | 474,608 | 474,608 |
| Ambulatory Surgical Centers | 62,012 | 62,012 |

STORAGE NAME: sl000z.nc
DATE:  May 21, 1991
PAGE 29

| | | |
|---|---:|---:|
| Nursing Homes | 1,272,629 | 1,272,629 |
| Home Health Agencies | 438,000 | 438,000 |
| Hospice | 17,000 | 17,000 |
| Clinical Laboratories | 167,000 | 167,000 |
| Adult Congregate Living Facilities | 429,651 | 429,651 |
| | $2,869,825 | $2,869,825 |

Expenditures:

Department of Health and Rehabilitative Services

| | 1991-92 | 1992-93 |
|---|---|---|
| **Healthy Start** | | |
| | | |
| **Medicaid** | | |
| Medicaid eligibility/185% Poverty ($10.5m from PMATF, $12.6m from federal sources) | $ 23.1m | $ 46.1m |
| | | |
| Physician services/OB fee increase ($4.1m from PMATF, $3.4m from federal sources) | $  7.4m | $ 29.8m |
| | | |
| **Health Services** | | |
| Enhanced services for high risk pregnant women and infants ALG-IPO program (G.R.) | $  1.9m | $  9.5m |
| | | |
| **Children Medical Services** | | |
| Satellite obstetrical clinics or high risk pregnant women G/A-RPICC support services (G.R.) | $313,296 | $313,296 |
| | | |
| Pediatric primary care system for infants and children G/A primary care program (G.R.) | $525,000 | $700,000 |
| | | |
| Developmental Evaluation and Intervention G/A-Dev Eval/Intervtn serv (G.R.) | $  1.5m | $  2.0m |
| | | |
| **Medicaid Statute Revision** | | |
| Hospital Inpatient Svcs-Disproportionate Share program ($12m from PMATF, $14.5m from federal sources) | $ 26.5m | |
| | | |
| Graduate Medical Education ($7.6m from G.R., $9.0m from federal sources) | $ 16.6m | |
| | | |
| G/A-Regional Perinatal Intensive Care Center Disproportionate Share ($3.0m from G.R., $3.7m from federal sources) | $  6.7m | |

STORAGE NAME: s1000z.hc
DATE:  May 21, 1991
PAGE 30

Sunset Review of Chapter 641, Part IV, HMOs
Salaries, benefits, expenses for
9 career service positions                          $600,000    $600,000

Health Care Purchasing Cooperative
Administrative costs
    Health Care Cost Containment Trust Fund $500,000    $500,000

                                                   1990-91      1991-92

Statewide Health Council
Administrative costs                               $ 70,000    $ 70,000

3.  Long Run Effects Other Than Normal Growth:

    Health Care Purchasing Cooperative

    A revenue source for the cooperative will need to be
    established, perhaps a fee paid by cooperative members.

4.  Total Revenues and Expenditures:

    Revenues:                                       1991-92       1992-93

    Department of Health and Rehabilitative Services

    Health Care Cost Containment TF          $  560,000 $   560,000

    Fee Increases
    Planning and Evaluation Trust Fund        $6,391,887   6,391,887
    Local and State Health Trust Fund            160,000     160,000
    Nursing Home and Related Facilities TF     1,272,629   1,272,629

    *  The total revenue generated by the bill will be distributed
       to the Department of Health and Rehabilitative Services,
       less a 7 percent service charge assessed, generating
       approximately $547,716 to be deposited in the General
       Revenue Fund.

    Expenditures:

    Department of Health and Rehabilitative Services

    Healthy Start
    General Revenue Fund                          $  4.2m    $  5.5m
    Public Medical Assistance Trust Fund         $ 14.6m    $ 34.6m
    Other Trust Funds                            $ 22.9m    $ 48.3m

    Medicaid Statute Revision
    General Revenue Fund                          $ 10.6m
    Public Medical Assistance Trust Fund         $ 12.0m
    Medical Care Trust Fund                      $ 27.2m

    Trauma
    Emergency Medical Services Trust Fund         $200,000

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 31

**Sunset Review of Chapter 641, Part IV, HMOs**

| | | |
|---|---|---|
| Health Care Cost Containment Trust Fund | $ 60,000 | |
| Health Maintenance Org. Quality TF | $600,000 | $600,000 |

**Health Care Purchasing Cooperative**

| | | |
|---|---|---|
| Health Care Cost Containment Trust Fund | $500,000 | $500,000 |

| | 1990-91 | 1991-92 |
|---|---|---|
| **Statewide Health Council** | | |
| Local and State Health Trust Fund | $ 70,000 | $ 70,000 |

B. FISCAL IMPACT ON LOCAL GOVERNMENTS AS A WHOLE:

1. <u>Non-recurring Effects</u>:

   None.

2. <u>Recurring Effects</u>:

   **Healthy Start**

   Enhanced prenatal and postpartum care which includes case-finding, home visits, and postpartum care should improve pregnancy outcomes, reduce infant mortality, and reduce uncompensated care losses at government-owned and voluntary hospitals.  The exact savings have not been determined.

   As prenatal and infant care coalitions develop in communities, improved prenatal and infant health care services will result in improved pregnancy outcomes which should lower uncompensated care losses in government-owned and voluntary hospitals.  The exact savings have not been determined.

   Merging the expertise of faculty obstetrician consultants with local obstetricians and county public health unit staff in satellite RPICC high risk obstetric clinics to deliver specialized high risk prenatal and obstetric care should reduce the incidence of low birth weight babies and infant mortality in those counties where these services are provided.  This should reduce uncompensated care losses at government-owned and voluntary hospitals.  The exact savings have not been determined.

   Mainstreaming Medicaid eligible and low income children with private sector patients in expanded pediatric primary care programs should provide increased access to private physician services and ease the patient care burden at the county public health units.

   **Health Care Purchasing Cooperative**

   Local governments may participate in the cooperative at their option.

3. <u>Long Run Effects Other Than Normal Growth</u>:

   **Health Care Purchasing Cooperative**

   If a membership fee is established, local governments which choose to participate will be required to pay this fee.

C. DIRECT ECONOMIC IMPACT ON PRIVATE SECTOR:

   1. <u>Direct Private Sector Costs</u>:

      **Health Facility Fee Increases and Certificate of Need Revisions**

      Health care providers who anticipated using the exemptions from the CON program repealed by this bill will be required to go through the CON process.

      **Sunset Review of Chapter 641, Part IV, HMOs**

      HMOs will be required to pay for the accreditation or external quality assurance reviews.  The cost of accreditation or an external quality assurance review varies widely, but some can approach $20,000.  For those HMOs which currently have standards that would not meet those required for accreditation, there may be additional costs incurred to come into compliance.

      The bill permits a subscriber to obtain a second medical opinion when that person is subject to a serious medical injury or illness.  As this is a lower threshold than "life-threatening" which exists in current law, HMOs may experience some increase in costs related to second medical opinions.

      **Health Care Purchasing Cooperative**

      There should be none at first.  If the cooperative meets its objective, payments by public agencies for medical care may be reduced.

   2. <u>Direct Private Sector Benefits</u>:

      **Health Facility Fee Increases and Certificate of Need Revisions**

      All health care providers will be more equitably treated by the CON law.  Providers will be able to avoid the cost of a CON review for the projects which have been exempted from CON review.

      **Healthy Start**

      Expanding Medicaid to 185 percent and obstetric fee increases will bring in an additional $75.9 million into the health care delivery system.  Expanded pediatric primary care services will provide an additional $7.8 million in state dollars to those private physicians who serve low income children.  Increased developmental, evaluation and intervention services will provide an additional $7.8 million in state dollars.

STORAGE NAME: s1000z.hc
DATE: May 21, 1991
PAGE 33

Medicaid Statute Revision

Indeterminate.

Sunset Review of Chapter 641, Part IV, HMOs

The 1.5 million HMO subscribers in the State of Florida should have greater assurance that the quality of health services they are receiving meets that of their community.

Health Care Purchasing Cooperative

Those providers which are identified as efficient providers by the cooperative would receive increased business with governmental entities.

3. Effects on Competition, Private Enterprise and Employment Markets:

Sunset Review of Chapter 641, Part IV, HMOs

The costs of the external quality assurance review by the most expensive accreditation organizations and the costs of additional second medical opinions may be burdensome to the smallest HMOs in the state which will put them at a disadvantage in a market that is already competitive.

D. FISCAL COMMENTS:

Healthy Start

The expenditures proposed in this analysis are based on the costs as calculated in the Governor's recommended budget for the 1991-1992 fiscal year.

Sunset Review of Chapter 641, Part IV, HMOs

The examinations that are to be conducted by the Department of Health and Rehabilitative Services are supported by fees collected from the HMOs for Health Care Provider Certificate renewals and regulatory assessments on gross premiums.

The study on HMO provider contracts is funded from the Health Care Cost Containment Trust Fund.

Health Care Purchasing Cooperative

According to the findings and recommendations listed in the report prepared by the HCCB on Pooling State and Local Government Purchasing of Health Care, January 31, 1991, (page 22), "pooled purchasing efforts by private employers have shown the ability to reduce costs to participating employers. Models developed using Florida data showed savings ranging from 1.95 percent to 39.41 percent. These results yield a potential minimum savings of $30 million in employee benefit costs alone."

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 34


IV.  CONSEQUENCES OF ARTICLE VII, SECTION 18 OF THE FLORIDA CONSTITUTION:

   A. APPLICABILITY OF THE MANDATES PROVISION:

     The provisions in this bill should not require counties and
     municipalities, in the aggregate, to expend funds over the next
     five to ten years.

   B. REDUCTION OF REVENUE RAISING AUTHORITY:

   C. REDUCTION OF STATE TAX SHARED WITH COUNTIES AND MUNICIPALITIES:


V.  COMMENTS:

**Healthy Start**

Unless Florida is successful in finding some fiscal relief, it
appears unlikely the state will meet the nation's Health Objectives
for the Year 2000.  In fact, of the 226 measurable objectives set in
1980, about half have been fully achieved.  Florida lags behind in
the areas of maternal and child health and indigent care--a recent
study estimates that 28% of Florida's infants are at risk to develop
handicaps or learning problems, and about half of those will not get
adequate help.  There is consensus that early maternal, prenatal, and
pediatric care improve health outcome, thereby reducing long term,
more expensive health care.  The expansion in Medicaid coverage and
the new revenue sources included in this bill will enable Florida to
provide health care to its indigent citizens in a way that maximizes
federal financial participation and should provide greater efficiency
in Medicaid reimbursement to hospitals and physicians.

**Medicaid Statute Revision**

The bill contains many, very specific provisions which may require
frequent amendments to comply with constantly evolving federal laws
and regulations.

**Trauma**

This bill clarifies existing statutory language to facilitate the
implementation of the state-sponsored trauma center program in the
event funding becomes available.

**Sunset Review of Chapter 641, Part IV, HMOs**

Since 1988, the Department of Health and Rehabilitative Services has
taken a total of 9 actions against HMOs under the authority granted
to the department in Chapter 641, Part IV.  During the same time
period, a total of 7,068 complaints have been registered with the
Department of Insurance and the federal Health Care Financing
Administration against one Florida HMO alone.  Newspapers
increasingly document complaints that subscribers have against HMOs
concerning poor care or inadequate treatment.  This evidence suggests

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 35

that, at a minimum, there is a need for the Department of Health and
Rehabilitative Services to have access to medical records and for
greater external oversight of HMO operations.

Health Care Purchasing Cooperative

This legislation does offer the potential for state and local
governments to save money on health care expenditures through
participation in the cooperative.  However, any savings would likely
not occur for at least a year until the cooperative has an
opportunity to collect and analyze data.

This legislation may result in increased health care costs to those
who do not participate in the cooperative through forcing private
providers of health care services to shift the discounts given to
cooperative members to nonmembers.

<u>Bill History - CS/CS/SB 1000</u>

3/27/91   Senate Health and Rehabilitative Services Subcommittee on
          Health Care:  Favorable as CS; Senate Health and
          Rehabilitative Services Committee:  Favorable as CS
          (combines this bill and 1234 & 2158)

4/02/91   Withdrawn from Senate Appropriations

4/03/91   Senate Finance, Taxation and Claims:  Favorable as CS/CS

4/04/91   (Senate) Placed on Special Order Calendar; amendments
          adopted; amendments failed; CS passed as amended; Yeas 39
          Nays 0

4/22/91   House Finance & Taxation:  Favorable with 2 amendments

4/25/91   Withdrawn from House Appropriations

5/01/91   (House) Amendments adopted; CS passed as amended; Yeas 65
          Nays 46

5/01/91   (Senate) Amendments to House amendments adopted; concurred
          in House amendments as amended; requested House to concur;
          CS passed as amended; Yeas 39  Nays 0

5/02/91   (House) Concurred; CS passed as amended; Yeas 67  Nays 43

VI.  <u>AMENDMENTS OR COMMITTEE SUBSTITUTE CHANGES</u>:

STORAGE NAME:  s1000z.hc
DATE:  May 21, 1991
PAGE 36

**FINAL ANALYSIS PREPARED BY COMMITTEE ON HEALTH CARE:**
Prepared by:                              Staff Director:

_____              _____
Lucy Bloom                                    Michael P. Hansen

_____
Michael P. Hansen

_____
Kate Morgan