IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEW ENGLAND CARPENTERS HEALTH )
BENEFITS FUND, et al,          )
                               )
          Plaintiffs           )
                               )
     -VS-                      ) CA No. 05-11148-PBS
                               ) Pages 1 - 74
FIRST DATABANK, INC.,          )
a Missouri Corporation;        )
and McKESSON CORPORATION,      )
a Delaware Corporation,        )
                               )
          Defendants           )


SETTLEMENT HEARING

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE


United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
October 24, 2006, 10:20 a.m.


LEE A. MARZILLI
CERTIFIED REALTIME REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

1   A P P E A R A N C E S:

2       THOMAS M. SOBOL, ESQ., Hagens Berman Sobol Shapiro LLP, One Main Street, Fourth Floor, Cambridge, Massachusetts,
3   02142, for the Plaintiffs.

4       JEFFREY L. KODROFF, ESQ., Spector, Roseman & Kodroff, 1818 Market Street, Suite 2500, Philadelphia, Pennsylvania,
5   19103, for the Plaintiffs.

6       JENNIFER FOUNTAIN CONNOLLY, ESQ., Wexler Toriseva Wallace, One North LaSalle Street, Suite 2000, Chicago,
7   Illinois, 60602, for the Plaintiffs.

8       SHEILA L. BIRNBAUM, ESQ. and THOMAS E. FOX, ESQ., Skadden, Arps, Slate, Meagher & Flom, LLP, Four Times Square,
9   New York, New York, 10036-6522, for First Databank, Incorporated.
10

        MATTHEW J. MATULE, ESQ., Skadden, Arps, Slate, Meagher &
11  Flom, LLP, One Beacon Street, Boston, Massachusetts, 02108-3194, for First Databank, Incorporated.
12

        LORI A. SCHECHTER, ESQ. and MELVIN R. GOLDMAN, ESQ.,
13  Morrison & Foerster, LLP, 425 Market Street, San Francisco, California, 94105-2482, for McKesson.
14

        JOHN A. KIERNAN, ESQ., Bonner, Kiernan, Trebach &
15  Crociata, LLP, One Liberty Square, Boston, Massachusetts, 02109
16

        MARK C. REDMAN, ESQ., The Hearst Corporation,
17  1345 Avenue of The Americas, New York, New York, 10105, in-house counsel for The Hearst Corporation.

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE CLERK:  The case of New England Carpenters
 3   Health Benefits Fund, et al V. First Databank, et al,
 4   Civil Action No. 05-11148, will now be heard before this
 5   Court.  Will counsel please identify themselves for the
 6   record.
 7            MR. SOBOL:  Good morning, your Honor.  Thomas M.
 8   Sobol, Hagens Berman Sobol Shapiro, for the class plaintiffs.
 9            MR. KODROFF:  Jeffrey Kodroff, Spector, Roseman &
10   Kodroff, also for the plaintiffs.
11            MS. CONNOLLY:  Jennifer Connolly, Wexler Toriseva
12   Wallace, for the plaintiffs.
13            MR. MATULE:  Good morning, Judge Saris.  Matthew
14   Matule from Skadden Arps on behalf of First Databank,
15   Incorporated.  Last night I filed motions for pro hac vice
16   for my partner Sheila Birnbaum and my colleague Thomas Fox,
17   also sitting with me here at --
18            THE COURT:  From Skadden?
19            MR. MATULE:  Both from Skadden.
20            THE COURT:  Any problem?
21            MR. SOBOL:  No, Judge.
22            THE COURT:  Allowed.  All right.
23            MR. MATULE:  Also sitting at counsel table, your
24   Honor, is Mark Redman, Senior Counsel at The Hearst
25   Corporation, which is the parent of First Databank,
```

1  Incorporated.

2      THE COURT: Okay.

3      MS. SCHECHTER: Good morning, your Honor. Lori
4  Schechter and Mel Goldman from Morrison & Foerster on behalf
5  of McKesson, and with us is John Kiernan.

6      MR. KIERNAN: Good morning, your Honor. John
7  Kiernan from Bonner, Kiernan, Trebach & Crociata, Boston
8  counsel for McKesson as well.

9      THE COURT: For McKesson?

10     MR. KIERNAN: Yes.

11     THE COURT: All right. Anybody else want to be --
12 I did receive a letter from the pharmaceutical -- who did I
13 get it from, the Pharmacies of America?

14     MR. SOBOL: I think it was sent by New York
15 Pharmaceutical Pharmacy Association, yes, your Honor.

16     THE COURT: I take it, does anybody want to be
17 heard from them? No? All right.

18     MR. SOBOL: Your Honor, before you is a motion for
19 preliminary approval of a proposed settlement with one of the
20 two defendants, First Databank. There are procedural issues,
21 a process issue I want to go through with you, then the
22 substance of the settlement, and then why it is that you
23 should grant preliminary approval.

24     The reason I first address the process is that if
25 there are features with respect to the process that led up to

1  the settlement, those features can sometimes warrant the
2  inference that the settlement is fair and warrants
3  preliminary approval; and it's important for you to
4  understand, I think, therefore, the process that led up to
5  the settlement that's before you.
6           The case right now is against two defendants,
7  McKesson Corporation and First Databank.  First Databank is a
8  subsidiary of Hearst Corporation, a comparatively small
9  organization, particularly when compared to a company of the
10 size of McKesson.
11          When the case was filed last year, I think in the
12 second quarter of last year, sometime fairly short after that
13 period of time some settlement discussions began with First
14 Databank.  The existence of those settlement discussions were
15 disclosed to the Court much later in the year after there was
16 a series of extensions and we were dealing with the case
17 management issues, so the existence of the settlement
18 negotiations hasn't been a secret at all for about, I guess,
19 eight or nine months or so, and they've been ongoing for
20 about a year.
21          The negotiations have included, of course, class
22 counsel and our class representatives in terms of informing
23 them on it over time, and counsel for First Databank, both
24 outside counsel and in-house counsel, but there were a
25 variety of other constituencies that we brought into play so

1  that they would be aware of the existence of the settlement
2  discussions and so that they could provide us advice and
3  counsel. I'm going to give you examples of those too.
4       For instance, as you become familiar with some
5  other pharmaceutical litigation, there are two, maybe three,
6  large blocks of third-party payors in the United States. By
7  "blocks," I mean represented by the same counsel in
8  litigation from time to time. A couple of those large groups
9  of third-party payors have been aware of the negotiations
10 through their outset, have been advised about the
11 discussions, and have been aware of what we've been doing.
12      THE COURT: Who?
13      MR. SOBOL: Rawlings & Associates, which is a law
14 firm based in Louisville, Kentucky, is one of the largest
15 subrogation health insurers in the United States, has
16 participated in -- I can think of, you know, eight or more
17 pharmaceutical cases, both in settlements and litigation
18 matters. They have many of the country's largest health
19 insurers as their clients.
20      The other law firm that we've been dealing with is
21 Lowey Dannenberg. Lowey Dannenberg is based in White Plains,
22 New York. Among Lowey Dannenberg's largest clients are, for
23 instance, Aetna. And indeed one of the lawyers who was
24 involved was formerly an in-house affirmative litigation
25 person at that. Those people were not only just consulted

1  but also early in the process sat down and did some of the
2  settlement discussions with us too directly with First
3  Databank.
4        In addition to reaching out to third-party payors,
5  another part of the process was also us consulting on an
6  informal basis, without binding in any way the Attorneys
7  General, a group of lawyers from various Attorney General
8  offices so that they would know the context of our
9  discussions, and when, as, and if we reached a proposed
10 settlement, it wouldn't be a surprise to them.
11        THE COURT:  Which states?
12        MR. SOBOL:  New York, Maryland, Ohio.  At times
13 Texas, at times Pennsylvania.
14        THE COURT:  They've signed off on it?
15        MR. SOBOL:  Excuse me?
16        THE COURT:  I'm sorry, I interrupted you.
17        MR. SOBOL:  Well, and there's a provision I'll get
18 to in the settlement that deals with Attorney General issues
19 with respect to this, and you'll see how it is that they have
20 addressed their position with respect to the settlement.
21 I'll get there when I deal with the substance of the
22 settlement.
23        But they were consulted on an informal basis, and
24 my point in saying this is not to say that we have their
25 approval or disapproval or anything like that, that it's not

1  as if, in other words, these were settlement discussions that
2  we undertook without in any way trying to get the advice and
3  consultation of other people, which included many of the
4  Attorneys General.
5        In addition, we also reached out to consumer groups
6  during the course of the time too, most notably the
7  Prescription Access Litigation Project that's been involved
8  in numerous drug pricing litigations, to get their advice and
9  consultation in terms of what we were doing.
10       We reached a general understanding about what the
11 parameters were going to be of the resolution, and it was
12 only until we reached the substantive terms and the general
13 parameters of what the litigation resolution was going to be
14 did we then move on to the issue of whether, and, if so, what
15 fee would be paid to the lawyers, given the fact that the
16 kind of settlement that we had crafted was not a lump-sum
17 settlement.  The reason that we did that was an intentional
18 decision.  We did not want there ever to be any influence,
19 even thought of there being an influence, of any fees playing
20 a role in terms of the contours of the underlying
21 settlement.
22       The result of that, of course, was that because we
23 had reached the parameters of a settlement in terms of its
24 substantive terms with First Databank, when we addressed the
25 issue of fees, the lawyers had essentially no leverage

1  because no matter what we were going to reach by way of a
2  resolution or not on our fees and expenses, we felt as
3  lawyers we were going to be compelled to bring it before the
4  Court anyway.
5        We reached our resolution and the settlement in
6  August of this year, and we then sat down to deal with the
7  issue of crafting the paperwork.  That paperwork took a lot
8  longer than people had hoped, largely because of the time of
9  the year that it fell into, but when we finished the
10 paperwork, we filed the settlement.
11       There was also, by the way, a period of time --
12 I'll just flag this -- during which things got fairly tense
13 between the plaintiff's counsel and First Databank because I
14 was essentially screaming and yelling to have the thing done,
15 knowing that we needed to move forward, number one, and,
16 number two, that the case vis-a-vis McKesson was moving
17 forward, and it would be, in fairness, just something that
18 would be appropriate for us to get the settlement done early
19 and out of the way.
20       So the process therefore is one where we think it
21 has all the appropriate indicia that it has been reached in
22 an arm's-length way with the defendant that has every reason
23 to, you know, bargain the best it can for itself, and for the
24 class, on behalf of the class, for us to bargain the best
25 that we can.  So in terms of just the process, we think we've

1  undertaken a fair process.

2       Also, of course, and probably most important for
3  you here today, is that this is only the beginning of a
4  process, of course.  This is only a preliminary approval
5  order that we've requested.  After today, if you were to go
6  forward and grant preliminary approval, there will be notice
7  sent out to the class in accordance with your order, both of
8  direct mail to TPPs, publication to consumers, and I'll get
9  into that kind of thing.  There are opportunities for people
10 to object to the settlement, opportunities for people to
11 exclude themselves from the settlement.  If someone objects
12 and they want to be heard, they will have an opportunity to
13 object and be heard in the court.  If there are parties who
14 wish to intervene in these litigation, then they have,
15 obviously, the rules available to themselves to file motions
16 to intervene and participate in the final hearing process.

17      So the issue, before I now move on to substance,
18 that's before you really right now is whether we move forward
19 at all or not, and we suggest that we should be moving
20 forward, knowing that we think that there's a fair settlement
21 that I'll describe, but also that there's a fair process
22 ahead for everyone over a period of months.  And indeed we
23 have proposed our final approval here to be in, I think,
24 early April of next year, so there's plenty of opportunity
25 for people to be heard if they think that they should be

1  heard.  So that's the process.

2          Now moving to the substance of the proposed
3  settlement, this settlement is a bold effort and is unique in
4  terms of creative ways to resolve difficult litigation, to
5  maximize in an extraordinary way directly for all members of
6  the class, and at the same time afford that kind of relief
7  without punishing the defendant to a point where they would
8  have to go into bankruptcy, particularly for a defendant such
9  as First Databank that provides a service that is needed,
10 which is the publication of price information and related
11 information on drugs.

12          THE COURT:  Can I stop you before we get into
13 substance on a procedural point.  I read the sealed
14 documents, and I didn't understand why anything was being
15 sealed.  The one exception possibly was the attachments to
16 your affidavit on financial data, but everything else should
17 be public.

18          MR. SOBOL:  Well, I'll tell you what I did, and
19 then I think McKesson would be able to address one piece of
20 it and First Databank the other; that is, the financial.

21          THE COURT:  Something that's so bold and unique,
22 the public should have a right to scrutinize, including the
23 class members.

24          MR. SOBOL:  I agree, your Honor.  There are two
25 things that are filed under seal.  One is a background

1  statement of facts regarding the underlying litigation where
2  the plaintiffs have relied upon documents that have been
3  produced by McKesson in the litigation and were compelled
4  under a Court order to maintain that because McKesson has
5  labeled those documents "confidential."
6              THE COURT:  So give me maybe -- McKesson is the one
7  who wants access to them, as I understood it.
8              MS. SCHECHTER:  That's right, your Honor.  I have
9  not seen the attachment that Mr. Sobol is referring to.
10             THE COURT:  So I couldn't see a thing in anything
11 that shouldn't be made public, with the possible exception of
12 there were two pieces of paper, maybe three, attached to your
13 affidavit with financial data, but then is First Databank a
14 publicly traded company?
15             MR. SOBOL:  No, your Honor.
16             THE COURT:  So is that part of Hearst's public
17 statements?
18             MR. SOBOL:  No.
19             MR. REDMAN:  Hearst is not a public company either.
20             THE COURT:  Hearst is not either?  So those two
21 pieces of paper, at least potentially, have confidential
22 information, but not the bottom line.  Nobody can evaluate
23 the fairness of this without seeing how much money First
24 Databank claims it has, without maybe all the gory details in
25 the little financial statement, and without understanding

1   this deal. So I am going to unseal it with the exception of
2   those two pieces of paper. Can anyone -- you know, it's a
3   little hard for McKesson, but I don't even know what you're
4   talking about. The Hartman affidavit? That was not under
5   seal?
6          MR. SOBOL: That's not under seal, your Honor.
7          THE COURT: But I don't see how your description of
8   the background --
9          MR. SOBOL: Okay, let me address that, your Honor,
10  because I want to be fair also to my brother and sister who
11  represent McKesson. Just give me a minute because I want to
12  make sure. There's a fact statement regarding the claims in
13  the case that involves both McKesson and First Databank. We
14  rely upon documents that McKesson has to label as
15  "confidential." When I got an emergency motion from
16  McKesson yesterday morning that they had not received that
17  attachment, I gave instructions to my office to send it to
18  McKesson's counsel. If that hasn't happened, I apologize.
19  Before that is unsealed --
20         THE COURT: Have you seen it?
21         MS. SCHECHTER: Your Honor, we have not been served
22  with either Mr. Sobol's declaration or with Attachment B to
23  the brief, which I gather from what Mr. Sobol is saying
24  includes McKesson's documents that were filed under seal.
25  What was sent to my office from First Databank was their

a05963f6-3da7-448b-a931-a254f0c76529

1  spreadsheet of confidential financial information, but we
2  don't know which McKesson documents they're talking about and
3  whether or not there's any pricing information or anything
4  else in there.
5              THE COURT:  Well, can I tell you something?  You
6  know, for better or for worse, I have a long history with
7  pharmaceutical litigation, and I find in general the
8  defendants grossly overstate confidentiality.  They basically
9  print "confidential" on everything.  And every time I
10 challenge it, maybe at the end of the day there are two lines
11 that are excluded.  So I am going to allow McKesson to see
12 everything, and I am going to open it all up to the public
13 record unless there's a good-faith basis for excluding it.
14 And so do you have copies right here with you that they can
15 just take a look at so that we can do this today?
16             MR. SOBOL:  I do, your Honor.  I do.
17             THE COURT:  I don't know why they weren't given
18 this if theoretically this was their information.
19             MR. SOBOL:  That was a mistake by my office, your
20 Honor, which I take responsibility.  When I found out that
21 they didn't have the factual statement, as I indicated, I
22 directed my office to send it to them so that this wouldn't
23 have to be an issue today.  And I was also trying to raise
24 that issue because I didn't want you to simply enter an order
25 now requiring it to be disclosed without McKesson, obviously,

Case 1:01-cv-12257-PBS   Document 3280-2   Filed 10/31/06   Page 15 of 18

Page 15

1  having an opportunity to see it.

2            THE COURT:  That's right, that's how I've always

3  handled it in the AWP.  Let me tell you, I demand good

4  cause.  It can't just be ancient information or just what a

5  spread is.  I'm just not going to -- that's what this case is

6  all about.

7            If there's something like the two pages -- well,

8  let me ask First Databank.  Do you object to having the two

9  pages of your detailed financial information disclosed?

10           MR. REDMAN:  We would.  That is confidential

11 information.

12           THE COURT:  At least for this point, I will not do

13 that, but Sobol's affidavit is going in the public record

14 with the bottom line on how much money they think you have

15 because no one could evaluate fairness.  You couldn't even

16 begin to evaluate fairness until they realize -- what's the

17 figure?  Tell me.  For the record, how much do you think they

18 have?

19           MR. SOBOL:  I think that they net pretax

20 $19 million a year.

21           THE COURT:  All right, that the public needs to

22 know, that's the price of settlement, as to whether or not

23 this is fair because it's a highly -- I will use your

24 word -- bold effort and unique.  It's rare that I see a

25 proposed settlement where not a penny exchanges hands.  So

1   the public needs to be able to see what's being proposed and
2   what the reasons for it are.
3            Similarly, with respect to McKesson --
4            MS. SCHECHTER:  Your Honor, we're happy to review
5   those right away and let the Court know if there's any basis
6   that we would like to object --
7            THE COURT:  The one day is going to be today.  So
8   you all are from out of town?
9            MS. SCHECHTER:  We are.  We did ask for the
10  materials, not just yesterday but two weeks ago, so we just
11  need some time to see it.
12           THE COURT:  Where are you all from?
13           MS. SCHECHTER:  San Francisco.
14           THE COURT:  Okay, I don't want you to get on that
15  plane and come back again, so I'm going to give it to you,
16  and, ideally speaking, maybe this afternoon we'll squeeze you
17  in if there's a problem with confidentiality.  When are your
18  planes home?
19           MS. SCHECHTER:  I have a 2:00 o'clock plane to
20  Chicago, but --
21           THE COURT:  All right, well, it will take a half an
22  hour.  This is not a thick document on the scale of what I
23  see.  So you'll take a look at it, and then we'll come back
24  in here maybe -- dealing with the motion to suppress, and
25  then maybe 12:30, we'll give you an hour in there.

1          Okay, so my presumption is, there's a First
2   Amendment right and there's a presumption of open access to
3   court documents, that unless someone can show me why
4   something is confidential information, and for the moment
5   I'll exclude the two pages, but otherwise the bottom line
6   should be open to the public, I'm going to open it all up.
7          All right, so you should speak as if it's all part
8   of the public record right now, because there are a lot of
9   people sitting back here, to explain why this is a fair
10  resolution.
11         MR. SOBOL:  Okay.  So the settlement, I want to
12  describe what the settlement is, and then I move on to why it
13  is that it's fair.  It's important to understand the terms of
14  the settlement first.
15         There are two primary benefits that First Databank
16  provides to the class under the settlement.  I'll call them
17  the rollback and then the AWP discontinuance provisions.
18  Under the rollback, First Databank agrees that if there is
19  final approval of the settlement and the judgment goes into
20  effect, I think it's 60 days after that period of time or 270
21  days from now, whichever is going to end up being later,
22  First Databank will roll back the AWP-to-WAC ratio that
23  exists in its database, called the NDDF, for approximately
24  8,000 NDCs from 1.25 to 1.20.
25         Now, what does that mean?  What that means is --

a05963f6-3da7-448b-a931-a254f0c76529

1          THE COURT:  What did you call it, the NDBF?

2          MR. SOBOL:  NDDF, the National Drug Data Files.

3    That's the technical name, if you will, of First Databank's

4    mega database from which they cut and paste, or whatever, cut

5    pieces of information off to entities.  Okay?

6          So what that means is this:  The 8,400 some odd

7    NDCs are essentially all of the NDCs, new drug codes, that

8    are in the NDDF -- I apologize for all the letters, all

9    right -- that are on a markup factor basis right now -- and

10   I'll get to that in a minute -- that are active, meaning that

11   people actually use nowadays, rather than the NDDF has lots

12   of historical information of obsolete numbers, that kind of

13   thing, but these are for the active drugs.

14         So on a markup factor basis means that many, though

15   not most, of the drugs that First Databank has information

16   on, the way that they arrive at the AWP is that the data, the

17   piece of information that they have is the WAC, the wholesale

18   acquisition cost.  They apply a numeric markup factor to it

19   in order to populate the information in the database of the

20   AWP, which technically actually in their data bank is called

21   the BBAWP, but that's the field that ends up being used writ

22   large in the United States for reimbursement activities.

23         THE COURT:  You say that's 95 percent of --

24         MR. SOBOL:  Correct.  We have gone through and

25   we've looked at all those NDCs.  We've found out which drugs