# Exhibit A



ROPES
&GRAY

ROPES & GRAY LLP
ONE INTERNATIONAL PLACE    BOSTON, MA 02110 2624    617 951 7000    F 617-951 7050
BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

October 17, 2006

John T. Montgomery
(617) 951-7565
jmontgomery@ropesgray.com

## BY FEDERAL EXPRESS

Sandra K. Evans
Acting Deputy Director
Office of Administration
725 17th Street, NW
Washington, DC 20503

Victor Bernson, Esq.
General Counsel
Office of Administration
725 17th Street, NW
Washington, DC 20503

Re:     *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No. 1456, D.
Mass. Civil Action No. 01-12257-PBS, Judge Patti B. Saris

Dear Ms. Evans and Mr. Bernson:

I write on behalf of Track 1 Defendants ("Defendants") in the above-referenced litigation
regarding our intent to request the testimony of Christopher C. Jennings, former Deputy
Assistant to the President for Health Policy Development, at a trial in the United States District
of Massachusetts beginning on November 6, 2006. The trial concerns the so-called Average
Wholesale Price for drugs reimbursed under Medicare Part B, and will proceed before Judge
Patti B. Saris.

As an initial matter, we believe that the relevant *Touhy* regulation – 5 C.F.R. § 2502.30
*et. seq.* -- is inapplicable because the United States is a party to the above-referenced action.[1]
The Justice Department has informed Defendants that it disagrees with this position.[2]  While we

---

[1] Federal courts are virtually unanimous that "the Supreme Court's holding in *Touhy* is applicable only in cases
where the United States is not a party to the original legal proceeding." *Alexander v. F.B.I.*, 186 F.R.D. 66, 70
(D.D.C. 1998); *see also State of Louisiana v. Sparks*, 978 F.2d 226, 234 (5th Cir.1992); *Boron Oil Co. v. Downie*,
873 F.2d 67, 70 (4th Cir. 1989). That is, "in cases originating in federal court in which the federal government is a
party to the underlying litigation, the *Touhy* problem simply does not arise." *Alexander*, 186 F.R.D. at 70. This is
because "where the United States is a party to litigation, 'judicial control over the evidence in a case cannot be
abdicated to the caprice of executive officers.'" *Id.* (eiting *United States v. Reynolds*, 345 U.S. 1, 9-10 (1953)).

[2] In prior correspondence regarding potential testimony from former employees of the Department of Health and
Human Services, Defendants expressed their position to counsel for the United States in this action. (*See* Ltr. from
John T. Montgomery to Gejaa T. Gobena and George B. Henderson, II (Aug. 31, 2006), attached hereto as Ex. 1.)
The Justice Department insisted that the United States is not a party to the case (*see* Ltr. from George B. Henderson,
II (Sept. 12, 2006), attached hereto as Ex. 2), notwithstanding the fact that the Government appears as a

10228371_3

ROPES & GRAY LLP

Sandra K. Evans and Victor Bernson, Esq.    - 2 -                              October 17, 2006

reserve our right to contest the Government's position, we are notifying you in order to avoid an unnecessary dispute. However, given that the trial is less than a month away, we respectfully ask that you inform us of your decision by October 24, 2006.

5 C.F.R. § 2502.31 provides that "[n]o employee or former employee of the Office of Administration shall, in response to a demand of a court or other authority, produce any material contained in the files of the Office of Administration or *disclose any information* or produce any material *acquired as part of the performance of his official status* without the prior approval of the Deputy Director." (emphasis added). The rule requires that "[i]f possible, the Deputy Director shall be notified before the employee or former employee concerned replies to or appears before the court or other authority." 5 C.F.R. § 2502.32(a). Here, the nature of Mr. Jennings's requested testimony, the unavailability of the sought information from other means, and the testimony's alignment with the government's interests merit your authorization.

## 1.    Nature of the Requested Testimony

Mr. Jennings would testify regarding his knowledge of the Government's use of average wholesale price ("AWP") as a basis for reimbursement for drugs under Medicare Part B. This testimony would be based on Mr. Jennings's tenure as the President's Senior Health Policy Advisor from 1993 to 2001. Mr. Jennings was also a Congressional Health Care Advisor from 1983 to 1993, serving as a committee staff member for three U.S. Senators.

Specifically, Mr. Jennings would testify to his knowledge or understanding of the Government's use of AWP for reimbursement, the relationship between AWP and provider acquisition costs, the extent to which reimbursement for drug ingredients operated as a cross-subsidy for the inadequate reimbursement of the costs of service and administration, the reasons for maintaining AWP as part of Medicare reimbursement, and the general operation of the reimbursement system. These issues are relevant to the AWP litigation.

## 2.    Availability from Other Means

The information that could be gleaned from the testimony of Mr. Jennings is unavailable through other means. Specifically, Mr. Jennings provides a unique perspective as the Clinton Administration's Senior Health Advisor during pivotal years when the Administration attempted to reform the Medicare system for the reimbursement of prescription drugs. After recounting the Administration's proposed changes in 1997 and 2000, the *New York Times* quoted Mr. Jennings as calling the current system "unsustainable." Robert Pear, *Administration Plans Cuts in Some Drug Payments*, N.Y. TIMES, Aug. 6, 2000 at 12, attached hereto as Ex. 3.

---

"consolidated plaintiff" on the docket, it has moved to appear as an "interested party," it has intervened in a matter transferred to the MDL, and it has filed an *amicus* brief in the instant case. The instant letter in no way waives our position, which is equally applicable to potential testimony from Mr. Jennings.

ROPES & GRAY LLP

Sandra K. Evans and Victor Bernson, Esq.     - 3 -                              October 17, 2006

Based on this experience, Mr. Jennings is able to offer a unique perspective on the Government's use of AWP as a basis for reimbursement under Medicare Part B. The *St. Peterburg Times* identified him as the health policy advisor dealing with the issue of AWP during the Clinton Administration. He stated: "Report after report concludes the same thing every time. It says we're way overpaying for these drugs. But members of Congress can't agree among themselves how to fix it, and it doesn't hurt that the oncologists are lobbying everyone." Sara Fritz, *Medicare Markup for Drugs: 10,000%*, ST. PETERSBURG TIMES, July 14, 2002 at 1A, attached hereto as Ex. 4. It is this kind of perspective that Mr. Jennings can offer the Court.

## 3.     Interests of the Office of the Administration

Allowing Mr. Jennings to testify is in the best interest of the Government. In almost five years of litigation, the parties have disputed the Government's understanding of the AWP system used in the industry, as well as the Government's decision to use AWP as a basis for reimbursement under Medicare Part B. The United States has taken an active role in this dispute: appearing as a "consolidated plaintiff" on the docket, moving to become an "interested party" in this litigation, and intervening in a similar AWP matter, *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs., et al.*, now pending before the MDL Court. In this context, Judge Saris, who is presiding over this case, has recognized the potential benefit of a government witness to explain the use of AWP as a basis for reimbursement under Medicare Part B. (Tr. of Aug. 3, 2006 Hr'g at 19-20, attached hereto as Ex. 5.). The testimony of Mr. Jennings, as described *infra*, would be such testimony.

Moreover, the primary justification for denying so-called *Touhy* requests – the conservation of agency resources – is absent in this case. *See, e.g.*, *Moore v. Armour Pharmaceutical Co.*, 927 F.2d 1194, 1197-98 (11th Cir. 1991) (recognizing that requiring *current* DHHS doctors to testify would interfere with the agency's "interest in maximizing the use of its limited resources in dealing with a national health crisis"); *Reynolds Metals Co. v. Crowther*, 572 F. Supp. 288, 290 (D. Mass. 1982) (recognizing that if *current* "OSHA employees were routinely permitted to testify in private civil suits, significant loss of manpower hours would predictably result"). In the instant case, since Mr. Jennings is a *former* employee, the primary reason for denying *Touhy* requests – the conservation of governmental resources – does not exist.[3]

For the foregoing reasons, 5 C.F.R. § 2502.31 warrants your authorization of Mr. Jennings to testify in the above-referenced litigation. As stated, this matter is scheduled for trial

---

[3] In fact, should the agency deny this request, it "may even be more costly to the agency in the long run than allowing the employee to testify when originally requested" due to costs defending the agency decision. Robert R. Kiesel, *Every Man's Evidence and Ivory Tower Agencies: How May a Civil Litigant Obtain Testimony from an Employee of a Nonparty Federal Agency?*, 59 Geo. Wash. L. Rev. 1647, 1670-71 (1991).

ROPES & GRAY LLP

Sandra K. Evans and Victor Bernson, Esq.     - 4 -                          October 17, 2006

beginning on November 6, 2006, and Judge Saris has expressed interest in hearing testimony
from government witnesses. Under the circumstances, we respectfully ask that you notify us as
soon as practicable, and no later than one week from today, October 24, 2006. If you have any
concerns, we would be pleased to speak with you at your earliest convenience.

Very truly yours,

John T. Montgomery

John T. Montgomery

JTM/tw
Enclosures

cc:     Gejaa T. Gobena                    George B. Henderson
        Civil Division                     Assistant U.S. Attorney
        Patrick Henry Building             John J. Moakley U.S. Courthouse
        601 D Street, N.W., Room 9028      1 Courthouse Way, Suite 9200
        Washington, DC  20004              Boston, MA  02110

# EXHIBIT 1



ROPES & GRAY LLP

ONE INTERNATIONAL PLACE    BOSTON, MA 02110-2624    617-951-7000    F 617-951-7050

BOSTON    NEW YORK    PALO ALTO    SAN FRANCISCO    WASHINGTON, DC    www.ropesgray.com

August 31, 2006

John T. Montgomery
(617) 951-7565
jmontgomery@ropesgray.com

**BY FEDERAL EXPRESS**

Gejaa T. Gobena                  George B. Henderson, II
Civil Division                   Assistant U.S. Attorney
Commercial Litigation Branch     John J. Moakley U.S. Courthouse
P.O. Box 261, Franklin Station   1 Courthouse Way, Suite 9200
Washington, DC. 20044            Boston, MA 02110

Re: *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL 1456

Dear Mr. Gobena and Mr. Henderson:

I write on behalf of the Track 1 Defendants in the above-referenced litigation ("Defendants") concerning current or former government employees, particularly of the Center for Medicare and Medicaid Services ("CMS"), who may testify at the upcoming November trial.

You will recall that Judge Saris asked the parties at the hearing on August 3 whether any current or former government employees would be called as witnesses at the trial in November, and if so, she noted that the parties should consider the implications of the so-called *Touhy* regulations. *See* 45 C.F.R. § 2 *et. seq.* These regulations set forth a procedure for notice of the intention to call a former government employee of an agency of the Department of Health and Human Services as a witness and for a response from the head of the relevant agency, in this instance the Administrator of CMS.

We have reviewed the regulations, however, and they are not applicable to this proceeding. The United States appears as a "consolidated plaintiff" on the docket, and it has moved to appear as an "interested party" in MDL No. 1456, a motion which was granted by the Court. Additionally, the United States has intervened in a matter, *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs., et al.*, which was recently transferred to MDL No. 1456 and is now pending before this Court. Accordingly, we do not believe the regulations are applicable. *See id.* at 2.1(d)(1).

The Defendants do intend to present one or more current or former employees of CMS as witnesses at trial. Even if the *Touhy* regulations were applicable here, which they are not, it is clear that any testimony from a current or former CMS employee would merit approval from the CMS Administrator. As you know, Judge Saris has expressed her desire to hear from such

ROPES & GRAY LLP

Gejaa T. Gobena
George B. Henderson, II                    - 2 -                       August 31, 2006

witnesses regarding the use of AWP as a basis for reimbursement of prescription drugs under
Medicare Part B. Certainly, it would "promote the objectives of the Department," as provided in
45 C.F.R. § 2.3, to permit current or former employees of CMS to comply with the Court's
request for testimony concerning these issues. The Defendants also believe that the testimony
would be relevant to the development of a complete and accurate record on the issues presented
for decision

If you would like to discuss the foregoing, we would be please to speak with you at your earliest
convenience.

Very truly yours,

John T. Montgomery

John T. Montgomery

# EXHIBIT 2



**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

*Writer's Direct Dial Number:*
*(617) 748-3272*
*Telecopier: (617) 748-3971*

*John Joseph Moakley U.S. Courthouse, Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

September 12, 2006

John T. Montgomery
Ropes & Gray
One International Place
Boston MA 02110-2624

> Re:   In re Pharmaceutical Industry Average Wholesale Price Litigation,
> MDL No. 1456 (D. Mass.)

Dear Mr. Montgomery:

On behalf of the Department of Health and Human Services (HHS), I am
responding to your letter of August 31, 2006, in which you set forth the Track 1
Defendants' position that the HHS <u>Touhy</u> regulations do not apply to the MDL
proceedings.

Your position is meritless. The fact that the United States is a plaintiff in a case
that has been transferred to MDL No. 1456 does not make the United States a "party" to
any of the class action cases, including the Track 1 case scheduled for trial in November.
The transfer of the government's case to MDL 1456 was for pretrial purposes only. The
United States moved to appear in the MDL as an "interested party" solely to facilitate
electronic filing of documents, as the motion indicates. Judge Saris has already indicated
her view that the United States is not a party to the Track 1 class action cases and that the
Touhy regulations apply. *See* August 3, 2006, Status Conference Hearing Transcript at
18:15 - 20:2.

If the Track 1 Defendants seek the testimony of a present or former government
employee concerning information acquired in the course of performing official duties or
because of the person's official relationship with the Department, then the Defendants
must comply with the Department's regulations at 45 C.F.R. § 2 <u>et seq</u>. Any request for
testimony "must be addressed to the Agency head in writing and must state the nature of the

John T. Montgomery
September 12, 2006
Page 2

requested testimony, why the information sought is unavailable by any other means, and the
reasons why the testimony would be in the interest of [HHS] or the federal government."  45
C.F.R. § 2.4.

Sincerely,

George B. Henderson, II
Assistant U.S. Attorney

cc:     Gejaa T. Gobena
        Carol Bennett

# EXHIBIT 3

Administration Plans Cuts In Some Drug Payments The New York Times Augus

Copyright 2000 The New York Times Company
The New York Times

August 6, 2000, Sunday, Late Edition - Final

**SECTION:** Section 1; Page 12; Column 5; National Desk

**LENGTH:** 1275 words

**HEADLINE:** Administration Plans Cuts In Some Drug Payments

**BYLINE:** By ROBERT PEAR

**DATELINE:** WASHINGTON, Aug. 5

**BODY:**

In an effort to save money for Medicare, the Clinton administration is planning to cut payments for anticancer drugs administered to patients in doctors' offices. This could affect hundreds of thousands of elderly patients.

The move has provoked an outcry from patients, doctors, nurses and members of Congress, who say the cuts will make it financially impossible for many cancer specialists to provide chemotherapy in their offices.

Donna E. Shalala, the secretary of health and human services, says the cuts are justified because Medicare, the federal health insurance program for the elderly and disabled, is paying too much for the drugs -- far more than doctors pay for many of the medicines.

Dr. Shalala said the government would reduce the "excessive Medicare payments" later this year, perhaps as early as Oct. 1, because federal investigators had obtained more accurate data showing what doctors actually paid for the drugs.

Doctors said they would send many of their Medicare patients to hospitals for treatment, causing inconvenience to patients while increasing costs to Medicare.

Representative Nita M. Lowey, Democrat of New York, said: "I am very concerned about the impact of these cuts on cancer patients. Many oncologists will find that it's financially impossible to provide chemotherapy services in their offices."

Doctors confirm that they receive more than they pay for some drugs, but insist that the extra payments are essential to cover chemotherapy costs not reimbursed by Medicare.

The dispute illustrates the passions aroused when the fate of cancer patients gets mixed up in debates over drug prices and doctors' income.

At least 120 members of Congress -- 69 Republicans and 51 Democrats -- have signed letters to Dr. Shalala expressing alarm about the administration's plans. Many complained that the administration appeared to be acting unilaterally, without soliciting public comment, as agencies usually do before making major changes in federal regulations.

Dr. Joseph S. Bailes, former president of the American Society of Clinical Oncology, which represents 15,000 cancer specialists, urged the White House to "reconsider and rescind these cuts." He estimated that 750,000 Medicare beneficiaries received chemotherapy in doctors' offices each year. Most have cancer of the breast, colon or lung.

Chris Jennings, the health policy coordinator at the White House, said he was not surprised at the criticism from cancer specialists because they derived substantial amounts of income from Medicare's payments for drugs. He said the White

House had asked Medicare officials to assess whether the cuts would harm access to care or the quality of care.

"Patients should not be hurt in any way, but taxpayers should get a fair deal," Mr. Jennings said in an interview this week. "The current reimbursement policy is unsustainable. It's appropriate to reimburse doctors for the cost of the drugs they purchase, but they should not be allowed to mark up the price by 20, 70 or 700 percent, as they do now in some cases."

A 1997 study by the Department of Health and Human Services said that Medicare payments for 22 drugs, including many cancer drugs, exceeded the actual wholesale prices by 29 percent, or $447 million, in 1996. For 8 of the 22 drugs, it said, Medicare paid more than twice the actual wholesale price.

In the last decade, most cancer chemotherapy has shifted from hospitals to doctors' offices. Doctors say the cuts in Medicare payments would reverse that trend.

Medicare's policy is important for two reasons. At least half of all patients receiving chemotherapy in this country are on Medicare, cancer experts said. Private insurers, which cover other patients, often follow the government's example and could be expected to lower their reimbursement rates as well.

"This is not just a threat to the Medicare program," Dr. Bailes said. "It's a threat to cancer care in general."

Ellen L. Stovall, executive director of the National Coalition for Cancer Survivorship, a patients' group, said, "I'm not interested in helping the physician make more money, but I am worried that patients may have less access to care as an inevitable and unintended consequence of these cuts."

Dr. Barton C. McCann, who was the chief medical officer of the Medicare program from 1986 to 1998, said the cuts "may have the unintended consequence of making it financially impossible for oncologists to treat patients in their offices." If Medicare beneficiaries cannot receive chemotherapy there, Dr. McCann said, they will seek it at hospitals, where care is more expensive, and "total costs to the Medicare program could rise" as a result.

Medicare generally does not pay for prescription drugs outside a hospital, but there are exceptions. Medicare does, for example, pay for drugs provided "incident to a physician's service," including cancer drugs given to patients by injection or infusion in a doctor's office.

Doctors receive separate payments for the drugs and for the service provided when they or their nurses administer the drugs.

The doctors acknowledge that they can buy some cancer drugs, especially older drugs, at prices lower than what Medicare pays. But, they say, Medicare pays much less than what it costs to administer the drugs. Federal officials agree that the doctors' "practice expenses," including the costs of medical staff, supplies and equipment, far exceed the amounts recognized by Medicare.

For years, doctors say, the markup on cancer drugs has partly offset the inadequacy of the payments for administering chemotherapy.

Before 1998, Medicare paid doctors the average wholesale price of cancer drugs. Payments were reduced by a 1997 law, which said that Medicare would pay "95 percent of the average wholesale price," but the law did not specify how that price should be determined.

In 1999 and again this year, President Clinton proposed a further cut. He wanted to pay 83 percent of the average wholesale price. Mr. Clinton said that would "eliminate the physician markup for outpatient drugs." Dr. Shalala said the cut would save Medicare $2.9 billion over 10 years.

Congress has rejected that approach, but Clinton administration officials said they had found a way to achieve a similar result by different means. They intend to redefine "average wholesale price" to reflect the lower prices that they now believe are available to doctors.

Administration Plans Cuts In Some Drug Payments The New York Times Augus

For years, the government obtained wholesale prices from trade publications like the Red Book, published by Medical Economics, a unit of the Thomson Corporation.

Representatives Saxby Chambliss, Republican of Georgia, and Ken Bentsen, Democrat of Texas, said "wholesale price" was understood by Congress to mean the price listed in such publications.

But now, Dr. Shalala said, the government will use the data it recently obtained from catalogs of certain drug wholesalers. The Justice Department compiled the data in an investigation of drug pricing under Medicaid, a separate program.

By redefining "average wholesale price" in this way, federal officials said, they can reduce payments for drugs without any change in federal law or regulations.

"This is the most immediate action we can take without undergoing the formal rule-making process," Dr. Shalala said.

Mr. Chambliss said the question of how to pay for cancer drugs had been repeatedly addressed by Congress in the last few years. "It is," he said, "disturbing that the Department of Health and Human Services would seek to circumvent those Congressional actions by unilaterally adopting a new definition of average wholesale price."

http://www.nytimes.com

**LOAD-DATE:** August 6, 2000

# EXHIBIT 4

Copyright 2002 Times Publishing Company
St. Petersburg Times (Florida)

July 14, 2002 Sunday 0 South Pinellas Edition

**SECTION:** NATIONAL; Pg. 1A

**LENGTH:** 2154 words

**HEADLINE:** Medicare markup for drugs: 10,000%

**BYLINE:** SARA FRITZ

**DATELINE:** WASHINGTON

**BODY:**

For years, federal investigators have been churning out reports showing that physicians are overcharging Medicare for the chemotherapy drugs used to treat cancer patients.

Doctors who pay only $7.75 for a single dose of Vincasar, for example, are reimbursed at a rate of $700 under Medicare. The government covers $560, and the Medicare patient pays $140.

Both the Clinton and Bush administrations have tried unsuccessfully to trim the Medicare overpayments, which are estimated to cost American taxpayers $2-billion a year.

"There must be no room for waste, fraud and abuse in Medicare," President Clinton declared emphatically in one of his many such appeals to Congress.

Congress, under intense pressure from oncologists and drug manufacturers, usually rejects such entreaties.

In 1997, legislators thumbed their noses at Clinton by formally tying the reimbursements to a controversial drug industry benchmark known as "average wholesale price." Despite its name, AWP is not the average price paid by wholesale purchasers. Instead, it serves as a kind of "sticker price" used by the drug companies to open price negotiations, and it far exceeds what doctors actually pay for the drugs.

Bruce Vladeck, who headed the agency that oversees Medicare under Clinton, says this long history of overpayments points up the biggest unspoken risk involved in Congress' current efforts to create a full prescription drug benefit for seniors under Medicare: As unlikely as it seems, no one in government has been able to determine the actual market price of drugs.

"It's clear that for many drugs, there is no real market price," said Vladeck, now the interim chairman of the geriatrics department at Mount Sinai School of Medicine. "These prices can be manipulated. You have to be careful about the pricing rules, or the government is going to get ripped off."

Almost everyone profits

As cancer survivors will attest, chemotherapy is both unpleasant and expensive.

Toxic drugs are administered to the patient through a syringe for anywhere from 20 minutes to several hours. The procedure is handled by a specially trained nurse, who monitors the patient for side effects such as nausea or vomiting.

According to the American Society of Clinical Oncology, the standard treatment for a Medicare patient with metastatic breast cancer - six courses of a combination therapy of Taxol and Herceptin - can cost about $24,000. Treatment

for a patient with advanced nonsmall cell lung cancer with Gemzar and Platinol
is around $15,000.

Medicare has long had the power to set reimbursement rates for doctors and
hospitals, but the pharmaceutical industry has convinced Congress that price
controls on its products would stifle drug innovation. That is why drugs are
handled in a different way.

When Medicare patients regularly received chemotherapy as hospital inpa-
tients, the reimbursement cost of these drugs was not an issue. Hospitals got a
set reimbursement for inpatient treatments that was meant to cover all costs in-
cluding beds, staff, drugs, food and medical supplies. That eliminated the prob-
lem of having to estimate how much to pay for any single item, such as drugs.

In the 1980s, when patients began receiving chemotherapy as outpatients in-
stead of checking into a hospital for it, Medicare officials faced a dilemma.
The government did not pay for outpatient drug treatments, but chemotherapy was
too expensive for most seniors to finance themselves. Cancer patients succeeded
in persuading the government to foot the bill.

Thus began a continuing political struggle to determine how to reimburse doc-
tors for outpatient drug treatments.

Oncology doctors already were receiving reimbursement for their services, but
it was hard to figure out how much to add for drugs because the pharmaceutical
companies were giving oncologists a wide variety of undisclosed discounts.

Initially, Medicare officials decided that oncologists would be paid accord-
ing to AWP, a price listed in the Red Book, an industry guide published by the
Medical Economics Co. By the time federal authorities realized how drastically
AWP overstated the true wholesale price, it had already become the benchmark for
reimbursement.

The drug manufacturers soon discovered they could sell more of their drugs by
simply inflating the AWP figure. The higher these companies set AWP, the bigger
the profit they could offer to doctors and hospitals who used their products to
treat Medicare patients.

Under Vladeck, government officials began to recognize the problem in the
early 1990s when they saw a dramatic increase in the number of Medicare claims
for Luperon, which is used to treat prostate cancer. They eventually found that
TAP Pharmaceutical Products Inc. was routinely providing free samples to physi-
cians, who then charged Medicare for the drugs using a highly inflated AWP.

The TAP case was uncovered about the same time Bayer Corp. was found guilty
of setting unusually high AWPs for several drugs used to treat hemophilia and
immune deficiency diseases  to defraud Medicaid. TAP wound up paying $875-
million in the largest health care fraud settlement in history; Bayer settled
for $14-million.

The two settlements have spawned a variety of pending legal actions against
drug manufacturers by states, unions and consumer groups.

Embedded in the system

"It is simply unacceptable for Medicare to continue paying for drugs in an
outdated, noncompetitive way that costs beneficiaries and the program far more
than it should," says Tom Scully, current director of the Centers for Medicare
and Medicaid Services.

"Simply unacceptable" is the same phrase Clinton used in a radio address in
December 1997 to describe the problem. "Sometimes the waste and abuses aren't
even illegal," Clinton continued. "They're embedded in the practices of the sys-
tem."

For at least a decade, Americans have heard government officials pledge to
trim Medicare reimbursements for outpatient drugs. Under some of the failed pro-
posals put forth by the Clinton and Bush administrations, doctors would have
been reimbursed at a rate of 85 percent of AWP, at 83 percent of AWP, at the

prices listed in the company sales catalogs, at the actual cost of acquiring the drug and at an estimated wholesale price below AWP.

Congress tried to put an end to the debate in 1997 by setting payments at 95 percent of AWP. While AWP had always been used as a benchmark, this was the first time it was written into law.

Both the General Accounting Office and the Department of Health and Human Services inspector general have since done many studies showing that 95 percent of AWP is too high. But they have never been able to propose an average price that would fairly compensate all oncologists.

The huge markup on Vincasar came to light in June when Minnesota Attorney General Mike Hatch filed suit against Pharmacia, the drug's manufacturer. The suit says that most doctors pay only $7.75 for the drug, even though the published AWP is $742.50.

Even inexpensive drugs cost Medicare more than they should.

Janet Rehnquist, Health and Human Services inspector general, estimates Medicare could have saved more than $178-million in 1999 if physicians had been paid the catalog price of 13 cents per milligram for albuterol sulfate (used to treat lung diseases) instead of 47 cents, which is 95 percent of AWP.

When Rehnquist studied 24 drugs commonly administered to Medicare outpatients, she found the government could have saved a total of $887-million in 2000 simply by reimbursing physicians at the wholesale catalog price instead of AWP. Her study did not include the newest, most expensive drugs such as Vincasar.

"Report after report concludes the same thing every time," noted Chris Jennings, a domestic adviser to Clinton who handled this issue at the White House. "It says we're way overpaying for these drugs. But members of Congress can't agree among themselves how to fix it, and it doesn't hurt that the oncologists are lobbying everyone."

Political pressures

Oncologists have been unusually successful in beating back efforts to revise Medicare's reimbursement formula for outpatient drugs.

The American Society of Clinical Oncology is a fast-growing, 16,600-member organization with influential doctors in every congressional district. It also gets generous funding from the pharmaceutical manufacturers. Its Web site lists 25 drug companies that have contributed at least $20,000 to the group in the form of unrestricted educational grants.

Numerous well-organized cancer survivor groups also assist the group in lobbying Congress.

Among the many members of Congress it counts among its friends is Rep. Nancy Johnson, R-Conn., chairwoman of the House Ways and Means health subcommittee, who has been instrumental in preserving the AWP-based reimbursement.

For her consistent support, Johnson received the National Cancer Medal of Honor in April from U.S. Oncology, a national network of community-based cancer centers. The group said, "Johnson shares a deep commitment to helping cancer patients and their families maintain access to the community-based cancer care they need."

Lobbyists for oncologists and cancer patients argue that any effort to trim the payments will force doctors to check their chemotherapy patients into hospitals, which are not equipped to handle such a load, or establish waiting lists for people seeking cancer treatments.

"It is acknowledged that Medicare overpays for cancer drugs, but also widely recognized that Medicare pays less than actual cost of administering those drugs," the Cancer Leadership Council, which includes the American Society of Clinical Oncology, said in a December letter to members of Congress. "If Con-

gress is to address the problem of drug overpayments, it must simultaneously re-
solve the corresponding underpayment for practice expense."

Philip Johnson, pharmacology director for H. Lee Moffitt Cancer Center & Re-
search Institute in Tampa, says proposals to trim the reimbursements are like
"trying to buy a prime rib for the price of a cheeseburger."

"The government is setting up a scenario where the hospitals are going to
look bad and the people won't get the treatment they need," he said.

Presidential politics has played a big role in preserving the current system.

In 2000, the Clinton administration backed away from a proposal to rein in
the payments. Administration officials decided to retract the proposal after
then-Texas Gov. George Bush, the Republican nominee, suggested the Democratic
initiative would undermine health care for Medicare patients.

"The White House folks didn't want to go up against the oncologists," said
Vladeck.

Using government power

Only recently has the word "competition" entered into the debate over Medi-
care reimbursements for outpatient drugs.

Members of Congress now see competition as a possible way to limit drug
prices without imposing actual price controls. The House-passed bill that would
create a prescription drug benefit for all seniors calls for a mild form of com-
petition between companies chosen to manage the pharmacy benefits.

For outpatient drugs, some members of Congress say Medicare should follow the
example of the Veterans Administration, which awards contracts to the wholesaler
that offers to sell a drug to the VA for the lowest price. Because Medicare cov-
ers more patients, they reason, it should get an even bigger discount than the
VA.

According to Rehnquist's study of 24 drugs given to outpatients under Medi-
care, the government could have saved $1.6-billion in 2000 if it had paid for
them according to the VA's price list. For half of these drugs, she said, Medi-
care pays more than double the VA price.

Medicare pays about $173.49 for 30 milligrams of Taxol, which is used to
treat ovarian and breast cancer, while the VA pays only $107.59 - a savings of
38 percent. Medicare pays 47 cents for a milligram of albuterol, and the VA pays
85 percent less at 7 cents.

But there is not enough support in Congress for this idea to be adopted.

The Ways and Means Committee is considering a compromise plan under which the
government would solicit bids from pharmaceutical suppliers and then offer to
pay the average of those prices. In other words, Medicare, unlike the VA, would
not buy from the lowest bidder. The legislation apparently would offer no incen-
tive to preclude the companies making wildly exaggerated bids to drive up the
average.

Vladeck says the government will never be able to get control of Medicare
costs until Congress gets over the idea that it is wrong to use the government's
buying power to get discounts.

"It's idiotic not to use the market power of the federal government to get
lower prices," he says. "We're just unwilling to admit that we're really con-
trolling drug prices."

**LOAD-DATE:** July 14, 2002

# EXHIBIT 5

1

1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
2

3
        In re:                        )
4       PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS
        AVERAGE WHOLESALE PRICE       ) MDL No. 1456
5       LITIGATION                    )
6

7

8                         STATUS CONFERENCE
9            BEFORE THE HONORABLE PATTI B. SARIS
                    UNITED STATES DISTRICT JUDGE
10

11

12

13
                                United States District Court
14                              1 Courthouse Way, Courtroom 19
                                Boston, Massachusetts
15                              August 3, 2006, 4:25 p.m.
16

17

18

19

20

21

22

                         LEE A. MARZILLI
23                  CERTIFIED REALTIME REPORTER
                    United States District Court
24                  1 Courthouse Way, Room 3205
                         Boston, MA   02210
25                       (617)345-6787

```
 1    A P P E A R A N C E S:
 2
      For the Plaintiffs:
 3
 4        STEVE W. BERMAN, ESQ., Hagens Berman Sobol Shapiro LLP,
      1301 5th Avenue, Suite 2900, Seattle, Washington, 98101-1090.
 5
          THOMAS M. SOBOL, ESQ. and EDWARD NOTARGIACOMO, ESQ.,
 6    Hagens Berman Sobol Shapiro LLP, One Main Street, Cambridge,
      Massachusetts, 02142.
 7
          SHANIN SPECTER, ESQ., and DONALD E. HAVILAND, JR.,
 8    Kline & Specter, P.C., 1525 Locust Street, 19th Floor,
      Philadelphia, Pennsylvania, 19102.
 9
10
      For the Defendants:
11
          STEVEN M. EDWARDS, ESQ., Hogan & Hartson, LLP,
12    875 Third Avenue, Suite 2600, New York, New York, 10012.
13        JOHN T. MONTGOMERY, ESQ., Ropes & Gray, LLP,
      One International Place, Boston, Massachusetts, 02110.
14
          D. SCOTT WISE, ESQ., Davis, Polk & Wardwell,
15    450 Lexington Avenue, New York, New York, 10017.
16        WILLIAM F. CAVANAUGH, JR., ESQ., Patterson, Belknap,
      Webb & Tyler, 1133 Avenue of the Americas, New York, New
17    York, 10036-6710.
18        MICHAEL DeMARCO, ESQ., Kirkpatrick & Lockhart Nicholson
      Graham, LLP, State Street Financial Center, One Lincoln
19    Street, Boston, Massachusetts, 02111-2950.
20        JAMES P. MUEHLBERGER, ESQ., Shook, Hardy & Bacon,
      2555 Grand Boulevard, Kansas City, Missouri, 64108-2613.
21
          SCOTT A. STEMPEL, ESQ., Morgan, Lewis & Buckins, LLP,
22    1111 Pennsylvania Avenue, N.W., Washington, D.C., 20004.
23        JAMES R. DALY, ESQ., Jones Day, 77 West Wacker Drive,
      Chicago, Illinois, 50501-1692.
24
          JAMES J. BREEN, ESQ., The Breen Law Firm, P.A.,
25    3562 Old Milton Parkway, Alpharetta, Georgia, 30005.
```

3

1

For the United States:

2

    GEJAA T GOBENA, ESQ., United States Department of

3   Justice, Civil Division, Commercial Litigation-Fraud Section,

    601 D Street, N.W., P.O. Box 261, Washington, D.C., 20044.

4

    GEORGE B. HENDERSON, ESQ., Assistant United States

5   Attorney, Office of the United States Attorney, 1 Courthouse

    Way, Boston, Massachusetts, 02210.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           P R O C E E D I N G S

2               THE CLERK:  In re:  Pharmaceutical Industry Average

3     Wholesale Price Litigation, Civil Action No. 01-12257,

4     MDL 1456, will now be heard before this Court.  Will counsel

5     please identify themselves for the record August 3, 2006.

6               MR. SOBOL:  Good afternoon, your Honor.  Tom Sobol

7     for the plaintiffs.

8               THE COURT:  Good afternoon.

9               MR. SPECTER:  Good afternoon.  Shanin Specter,

10    plaintiffs.

11              MR. HAVILAND:  Don Haviland, your Honor, for the

12    plaintiffs.

13              MR. BERMAN:  Steve Berman, your Honor.

14              MR. EDWARDS:  Steve Edwards, BMS.

15              MR. MONTGOMERY:  John Montgomery, Schering-Plough

16    and Warrick.

17              MR. WISE:  Scott Wise for AstraZeneca, your Honor.

18              MR. CAVANAUGH:  Bill Cavanaugh, Johnson & Johnson.

19              MR. DeMARCO:  Michael DeMarco, Aventis.

20              MR. MUEHLBERGER:  Jim Muehlberger, Aventis.

21              MR. STEMPEL:  Scott Stempel, Pfizer and Pharmacia.

22              MR. GOBENA:  Your Honor, I would just like to let

23    you know the United States --

24              THE COURT:  Has arrived.  Actually, why don't you

25    come on up here.

```
 1                  MR. GOBENA:  All right.

 2                  THE COURT:  And I'm going to ask the USA something

 3     ex parte for one second because there's something that was

 4     just transferred up here, and I'm not sure --

 5                  MR. GOBENA:  Your Honor, should we identify

 6     ourselves for the record?

 7                  THE COURT:  Yes, do that, because I didn't know

 8     there were so many of you all.

 9                  MR. GOBENA:  My name is Gejaa Govena.  I'm with the

10     Justice Department.

11                  MR. HENDERSON:  George Henderson, Assistant U.S.

12     Attorney.

13                  MR. BREEN:   Jim Breen for the relator Ven-A-Care,

14     the 402s.

15                  THE COURT:  All right, then we know.  All right, I

16     just didn't know if that's public.

17                  MR. HENDERSON:  It is as a matter of the caption of

18     the case.

19                  THE COURT:  All right, so why don't at least one of

20     you sit here.  The case involving -- you've stepped in and

21     decided to intervene, is that it?

22                  MR. GOBENA:  That's correct, your Honor.

23                  THE COURT:  The government has?  Are you all

24     familiar with what I'm talking about?

25                  MR. MONTGOMERY:  Yes, your Honor.
```

```
 1              MR. CAVANAUGH:  Yes.

 2              THE COURT:  All right, so you get a table to

 3    yourself.

 4              MR. DALY:  Your Honor, just for the record, Jim

 5    Daly.  I'm here for Abbott Labs, the company that the

 6    government intervened with respect to.

 7              THE COURT:  Okay, thank you very much.  I wasn't

 8    sure, because I just got notice of it through the MBD docket,

 9    whether it was still sealed or not, and that was why I wanted

10    to make sure that I checked that out before I spilled it out

11    in front of this entire room.  But it's now public.  The

12    Department of Justice is here, right?

13              MR. GOBENA:  That's correct, your Honor.

14              THE COURT:  All right, so what is your position in

15    general in this case?  I haven't had a chance to even go

16    through what the case is about from the Justice Department's

17    point of view.

18              MR. GOBENA:  Sure, your Honor.  As your Honor has

19    noted, we've intervened in a case that originated in the

20    Southern District of Florida against -- the defendants in the

21    case are Abbott Labs and Hospira as well --

22              THE COURT:  And?

23              MR. GOBENA:  Hospira, which was a spin-off of

24    Abbott Labs, and what was spun off was the division that

25    manufactured the drugs that were identified in our complaint.
```

1            THE COURT:  Yes, but what's the case?  Was it an
2     AWP case?

3            MR. GOBENA:  It's a False Claims Act case alleging
4     AWP pricing fraud, so it's the same general subject matter as
5     these cases, but we're bringing it under the False Claims Act
6     as well as we have an unjust enrichment claim and a common
7     law fraud claim as well.

8            THE COURT:  And just so I can get a lay of the
9     land -- you may not be prepared to answer this question -- is
10    this just going to be limited to these drugs involving
11    Abbott, or are you going to have a stake in the rest of this
12    litigation?

13           MR. GOBENA:  We're really not prepared to answer
14    that question at this time, your Honor, but it's fair to say
15    that there may be additional defendants that enter into our
16    case.

17           THE COURT:  All right, thank you.  Right now, I
18    thought it would be worthwhile to ask the plaintiffs how much
19    they've accomplished in their notice, since that essentially
20    is the threshold to doing anything, what's been sent out,
21    what hasn't been -- oh, there you are.

22           MR. NOTARGIACOMO:  Good afternoon, your Honor.  Ed
23    Notargiacomo for the plaintiffs.  We are on track with
24    everything your Honor has ordered us to do.  On Friday
25    , July 28, we mailed all of the TPP notices.

1           THE COURT:  Third-party payor, right.

2           MR. NOTARGIACOMO:  Third-party payor notices.  The

3   Web site for third-party payors, that version of the Web site

4   went live on Monday, so that as those third-party payors

5   receive the notices, additional information is available.

6   The same thing with the phone bank available to answer

7   third-party payor questions about it as they receive the

8   notices.  We are on track with the consumer --

9           THE COURT:  So just remind me.  Is that just

10  Track 1 third-party payors, or is it Track 2 as well?

11          MR. NOTARGIACOMO:  It is just Track 1 third-party

12  payors, your Honor.

13          THE COURT:  And just in Massachusetts?

14          MR. NOTARGIACOMO:  Well, the third-party payors

15  could be anywhere in the United States.

16          THE COURT:  Right, but just with respect to the

17  Massachusetts 93A claim.

18          MR. NOTARGIACOMO:  That's right.

19          THE COURT:  Yes, I misspoke.  All right, so that's

20  going forward just on people who have claims under the

21  Massachusetts statute with respect to third-party payors just

22  for Track 1?

23          MR. NOTARGIACOMO:  Yes, your Honor.  The notice

24  included notice to third-party payors who would be in Class 2

25  as well as Class 3.

1           THE COURT:  All right, so for everyone.  I don't
2      have to worry about them again.

3           MR. NOTARGIACOMO:  That's correct.

4           THE COURT:  What about, when's the opt-out date?
5      What did we end up with?

6           MR. NOTARGIACOMO:  I believe October 1, 2006.

7           THE COURT:  Now, as I understand it, and I don't
8      know if you all saw this, I got a report from the Department
9      of Health and Human Services yesterday through Mr. Henderson
10     which basically said that, much more polite language, but
11     basically no way are they going to let the notice go in the
12     Medicare bulletin, legalese for "over my dead body."  So at
13     this point I think that that is a moot issue.  It's too
14     expensive; they don't want it.  It's not worth the holdup to
15     litigate the thing.  Does anyone feel differently about
16     that?

17          Okay, so we're back with the individualized
18     notice.  And, Mr. Henderson, are we on track for that?  Have
19     you checked?

20          MR. HENDERSON:  I haven't checked recently.  I've
21     certainly let the agency know of your order, and I haven't
22     heard anything, anything suggesting that they can't meet it.
23     I can certainly follow up to make sure.

24          THE COURT:  Okay, so what I want you to do is every
25     month check.

1              MR. HENDERSON:  All right.

2              THE COURT:  Because, as you can tell, I'm really

3    moving this at this point, and I'm counting on a Class 1

4    trial in March.

5              MR. HENDERSON:  All right, I'll put that on my

6    calendar.

7              THE COURT:  You know, just tickler it in every

8    month, write me a little status report just to make sure

9    we're on track because I've got this whole thing triggered to

10   a March date.

11             MR. NOTARGIACOMO:  All right.

12             THE COURT:  All right, that's great, with respect

13   to Class 1.

14             Now we're dealing with September and November, the

15   two time periods.  I've had a chance to briefly read your

16   submissions because I didn't get them till late yesterday,

17   and I was on trial all day today and haven't had a chance to

18   return to them.  So the gist of it is, as I understand it,

19   everyone agrees nothing will happen as far as the trial in

20   September.  There's a disagreement about November, about

21   whether there should be any proceeding and what it should

22   look like.  You want to do Daubert in September.

23             MR. MONTGOMERY:  Correct, correct.

24             THE COURT:  But I'm just talking about the trial, a

25   basic merits proceeding, which we are going to get to.  I'm

1    going to do something in November.  I've locked it up, I have

2    staffed up, and that's what we're going to do.  So I reject

3    plaintiffs' request to move everything into March.  I reject

4    defendants' request to just do knowledge.  Knowledge is a

5    piece of it.  The plaintiffs have ignored the fact that

6    knowledge is relevant because I have a statute of limitations

7    problem.  I've got a discovery rule.  At the very least, we

8    have to find out what they knew and when they knew it for

9    when the discovery rule tolled, although you might be quite

10   right that it isn't dispositive on a 93A claim.

11            In addition, knowledge is quite relevant to

12   reasonable reliance, especially in the world of Class 3.  So

13   I will take whatever I learn in the trial in November, and I

14   will use it in dealing with the Class 3.

15            Class 2 is more of a statutory kind of claim,

16   although I still have the intent to deceive, and that

17   intent-to-deceive knowledge has some relevance as to whether

18   or not there was an intent to deceive.  So knowledge is

19   relevant, but it's not dispositive.

20            MR. MONTGOMERY:  Your Honor, we apologize that your

21   Honor did not receive our paper earlier.  I think our concept

22   about how to proceed in November is to focus, in order to

23   avoid any overlap with Class 1, on the conduct of the TPPs

24   and the context in which they were operating during the class

25   period, for your Honor to take all of the evidence that the

```
 1    parties would present with respect to that scope.  And at
 2    some point, of course, you're going to have to determine the
 3    issues to which that evidence is relevant.  We certainly have
 4    a disagreement about the relevance of this evidence, but
 5    certainly it is relevant to the statute of limitations issue,
 6    and that's why we focused on statute of limitations.
 7              THE COURT:  Right.
 8              MR. MONTGOMERY:  But we think it's broader.
 9              THE COURT:  I think that I want to jump start this
10    for lots of reasons.  One is, this litigation is too slow.
11    I'm starting myself to feel bogged under by it without an end
12    in sight.  I think, to the extent that I hold a trial, I will
13    get a handle on the issues in a way that will make me a
14    better trial judge for the actual jury trial.  Two, I think
15    it will facilitate people taking a good look at whether
16    settlement is in their best interests; and, three, I can sort
17    of figure out as I'm going some of the expert issues without
18    having to have a major new Daubert hearing.  I was thinking
19    of possibly -- are you going to be calling your witness in
20    any event for that --
21              MR. BERMAN:  Our expert witness?
22              THE COURT:  Yes.
23              MR. BERMAN:  Yes, we are, your Honor.
24              THE COURT:  So one thought I have is, since you're
25    paying him by the day anyway, I'm sort of assuming, I would
```

13

1     see him some of the afternoons on the Track 3 expectation

2     kind of theory.

3               MR. BERMAN:  Correct.

4               THE COURT:  Does that make sense?

5               MR. BERMAN:  We were going to suggest that you can

6     do any Daubert-ing while you're listening and they're

7     cross-examining at that hearing.

8               THE COURT:  So I'm going to do Track 1, Class 2, in

9     November.

10              Now, I don't know what plaintiff is thinking about

11    when you're talking about -- what was it, 20 hours a side for

12    a 93A?  That was what you were talking about?

13              MR. BERMAN:  Well, what we think we need to do --

14              THE COURT:  You think you're going to do a

15    two-month trial?

16              MR. BERMAN:  No, we don't.  We think we need

17    roughly five to seven days --

18              THE COURT:  Three and a half hours a day.

19              MR. BERMAN:  -- to get in everything we need to get

20    in on knowledge.

21              THE COURT:  No, no, no, this is the whole -- catch

22    this -- the whole.  It's not just knowledge.  You're going to

23    prove your case, if you can.

24              MR. BERMAN:  Correct.

25              THE COURT:  So I don't know why it's just

```
 1    knowledge.  You think you can do seven trial days to try
 2    your -- so we'll do -- we'll have a three-week trial.
 3              MR. BERMAN:  Correct.  We can get our liability
 4    case out in five to seven trial days.
 5              THE COURT:  But what about damages?
 6              MR. BERMAN:  And damages.
 7              THE COURT:  Okay, so seven trial days.
 8              And what do you think you need?
 9              MR. MONTGOMERY:  Your Honor, if you're talking
10    about trying the entire case on Class 2 and Class 3 --
11              THE COURT:  No, just Class 2.
12              MR. MONTGOMERY:  Just Class 2, and then you're
13    talking about doing Daubert --
14              THE COURT:  And there may be some overlap that I'll
15    just, you know, import into a Class 3.  I'm assuming a fair
16    amount will --
17              MR. MONTGOMERY:  Yes, but to just talk about
18    Class 2 and Class 3 together for a second, and just starting
19    with statute of limitations but extending to other issues,
20    we've got the same class representatives, the same kinds of
21    issues, the same conduct focusing on the TPP part of the
22    story.  So it's the same for Class 2 and Class 3 until you
23    get to the edges.  It's exactly the same.
24              THE COURT:  Well, the edges, though, are the really
25    hard economic issues because one's a statutory claim and
```

```
 1    one's sort of more of a, was there an unfair or deceptive
 2    practice that somehow inflated the price in a way the TPPs
 3    couldn't have known?  So you may think it's identical or not.
 4    I haven't thought it through --
 5              MR. MONTGOMERY:  We do, and I know we need to have
 6    more discussion, and this is not the time to do it.
 7              THE COURT:  You need to have more discussion about
 8    it, but, in any event, damages will vary dramatically.
 9              MR. MONTGOMERY:  Damages will vary.
10              THE COURT:  Okay, so it's possible liability is the
11    same.  I really haven't given it any thought, so. . .  I'd be
12    willing to consider Track 2 and 3, but I want the whole
13    thing.  I want people to really focus on this.  How many
14    defendants are going to be in Track 1, four or five?
15              MR. BERMAN:  Just four, your Honor.
16              MR. MONTGOMERY:  No.  In Track 1 there are three.
17    Oh, excuse me, Class 1 is three.  Track 1 is four.  Excuse
18    me.
19              MR. BERMAN:  Four, and the fifth will -- we're
20    almost there.  Next week.
21              THE COURT:  The check's in the mail?
22              MR. SOBOL:  Yes.
23              MR. BERMAN:  Next week.
24              MR. SOBOL:  The check's in the mail.
25              THE COURT:  So that's where we'll go on it in
```

```
 1    November.  But let's assume for a minute you're right, that

 2    it ends up being both classes and I can maybe do the Daubert

 3    hearing sort of simultaneously with the bench trial so that

 4    we're not wasting additional time, how much time will it

 5    take?

 6              MR. MONTGOMERY:  Yes, I mean, this here is a lot

 7    more complicated, your Honor, because if we're not talking

 8    any longer as we were a month ago about the TPPs' conduct,

 9    that evidence, and we're talking about the individual conduct

10    of each of four companies --

11              THE COURT:  Right.

12              MR. MONTGOMERY:  -- that we haven't thought about.

13    I think we need to confer.  We've got four separate cases.

14              THE COURT:  I do, I agree.  That's why I'm asking

15    this.

16              MR. MONTGOMERY:  And so I think I need to confer

17    and we need to talk about that.  We can do that right now,

18    but that's a --

19              THE COURT:  So you can prove against four separate

20    defendants in seven days?

21              MR. BERMAN:  Yes, your Honor.  We planned it out.

22    We've been anticipating this.

23              THE COURT:  Okay.

24              MR. MONTGOMERY:  May we have a moment?

25              THE COURT:  Yes.  You know, you don't have to do
```

1    this on the fly.  I mean, it's --

2              MR. MONTGOMERY:  We think it's a long time.  I

3    mean --

4              THE COURT:  Well, I'm not going to probably give

5    you everything you want because in a bench trial, I can play

6    with different ideas, like you can submit the direct by

7    affidavit, and then we can do cross, or you can do the direct

8    by affidavit and then do maybe an hour or two just to sort of

9    bring me along, if you will, to highlight your big points and

10   then have cross.  There's so much we can do, and I know this

11   case at this point, so I don't need background on the

12   industry so much.  It's always good to refresh my

13   recollection because there's the WACs and the MACs and, you

14   know, all the different acronyms, but basically I have some

15   sense of how it works, so I think it's not going to be so

16   hard.  But what date did we have it set for?

17             MR. BERMAN:  You just had a month.  You didn't give

18   us a date for the November trial.

19             THE CLERK:  Yes.  It's November 6.

20             MR. EDWARDS:  Originally, your Honor, you had

21   November 8 as a potential trial date for BMS when we were

22   doing Class 1 trials first.

23             MR. MONTGOMERY:  But in your recent order, you

24   simply said "in November."

25             THE COURT:  All right, so fair enough.  Okay, so

```
 1    it's November 6?  Okay.  So I think that's right.  As soon as
 2    I took Mr. Wise out of the hot seat as the only guy up there,
 3    never did I see a happier man as he walked out of the last
 4    hearing.  Hopefully you're going to have to prove against
 5    separate defendants, so it is a bigger case.
 6              MR. MONTGOMERY:  You know, another issue I just
 7    would like to mention, if your Honor is going to do a
 8    proceeding that focuses on the defendants' conduct, it is
 9    important, I think, you understand that that same evidence is
10    then going to be presented in the individual company cases on
11    Class 1 beginning in March.
12              THE COURT:  A lot of it will be.
13              MR. MONTGOMERY:  It will be exactly the same
14    evidence, so there is some inefficiency.
15              THE COURT:  There's overlap, I understand that, but
16    I just can't wait, and then something else will happen, and
17    then something else will happen.  I need some forward
18    momentum on this case.  As far as I was concerned, September
19    was where I had blocked off huge amounts of time and staffed
20    up and was ready to go, and then this issue happened with
21    Medicare and with the plaintiffs assuming I'd go
22    publication.  That could happen again with another issue.
23    What if the Medicare machines break down or there's another
24    hurricane and then we get bumped again?  Things happen that I
25    can't control.  But I can control 93A and my schedule, your
```

19

 1      schedules, short of a national emergency, so I plan on doing

 2      this.

 3              Now, to the extent I do this, does the United

 4      States want to be part of this?

 5              MR. GOBENA:   Your Honor, we've only intervened,

 6      obviously, against Abbott labs and Hospira, so I don't

 7      believe they're one of the defendants in that.

 8              THE COURT:   No, but I sure could use some amicus

 9      help on some of these issues.

10              MR. GOBENA:   If your Honor would like that, we'd be

11      more than happy to provide amicus briefing on any issues that

12      your Honor would like.

13              THE COURT:   So that's a good thought.   On

14      individual -- what's coming up obviously, is, will people

15      from the Center for Medicare and Medicaid Services be

16      subpoenaed as part of the trial?

17              MR. EDWARDS:   No.

18              MR. BERMAN:   Not from us.

19              MR. MONTGOMERY:   We don't know.

20              THE COURT:   Okay.   So one thing, you could work

21      together with them so -- Toohy regulations, is that it?   Is

22      that the name of those regulations that you don't get anyone

23      unless you jump through three hurdles --

24              MR. HENDERSON:   That's the name of it.

25              THE COURT:   -- and do a backward flip, right?   You

```
 1    have to decide sooner rather than later if you want a
 2    government witness.  The issue that might be worthwhile,
 3    which I cannot rule on motions for summary judgment till
 4    class notice goes out, a problem, at least for -- so, as I
 5    understand it, the motions for summary judgment are just
 6    sitting there on what AWP means, if you would like to submit
 7    an amicus as a statutory matter.
 8              MR. GOBENA:  You're asking the United States, your
 9    Honor?
10              THE COURT:  Yes.
11              MR. GOBENA:  Yes, I mean, if your Honor would like
12    that, we can do that.
13              THE COURT:  Thank you.  So do I need my own
14    expert?  You all know this case at this point better than I
15    do.  Is there anything that's going to be so hard -- the one
16    thing I'm worrying about is not the basic case; I think I can
17    understand it as well as the next person.  It's assessing the
18    Daubert challenge.  We've let go our independent expert, and
19    the question is, on the expectation theory, which is a novel
20    one, and I understand it's derived from the antitrust area,
21    should I get somebody?
22              MR. MONTGOMERY:  Your Honor, if you think it would
23    be helpful, we certainly wouldn't disagree that it may.  And
24    while we let Professor Byrne go, I think there's still the
25    reservation that you have to ask him if he's available again.
```

```
1              THE COURT:  I talked with him, and I'm just trying
2    to remember.  I think he had a few offers to do things with
3    the industry, and it was going to conflict him out.
4              MR. CAVANAUGH:  Your Honor, we took an informal
5    poll.  We don't think any of the companies have retained him
6    at this point.
7              THE COURT:  I could give him a call.
8              MR. BERMAN:  We were asked, if you recall, to stop
9    retaining him because he wanted to go work for the industry.
10             THE COURT:  But maybe he never did, but I think he
11   had an -- I can't remember what it was.  I think -- you know,
12   it's funny, you think you remember and you don't -- I think
13   he had an opportunity to go work with somebody in the
14   industry, and he wasn't going to take it if I definitely
15   needed him, and I told him at that stage I wasn't sure.
16             MR. BERMAN:  But our concern is that it may not be
17   these four but it may be three others in the AWP case that --
18             THE COURT:  Well, I'll ask.  I'll ask.  And if not,
19   I'll try and find somebody else.  Do you have somebody else
20   that you all agreed upon?  Was there a runner-up when we put
21   him in the saddle?
22             MR. CAVANAUGH:  No.
23             MR. MONTGOMERY:  No.  They suggested
24   Professor Byrne, and we accepted.
25             MR. SOBOL:  Can we have a moment, your Honor?
```

```
 1                THE COURT:  Yes.

 2                (Discussion off the record amongst plaintiffs'

 3     counsel.)

 4                MR. SOBOL:  The concern, your Honor, that the

 5     plaintiffs would have regarding either Professor Byrne or

 6     some other independent expert before you would be a vehicle

 7     by which any of the parties could at least question the

 8     expert if the expert was going down a trail which they,

 9     frankly, thought was incorrect.

10                THE COURT:  I think that's actually helpful.

11                MR. SOBOL:  And that would be an important

12     procedural safeguard to make sure that --

13                THE COURT:  So we're at the trial stage, not the

14     class cert stage.

15                MR. SOBOL:  Sure.

16                THE COURT:  I think that's totally fair, I agree.

17     Yes, that makes sense because even somebody who's neutral, I

18     mean, it's a difference of expert opinion.  It would

19     highlight, at least, the fair areas of disagreement.  So if

20     he can't do it, I have actually one other person partly in

21     mind, although I haven't asked him so I'm reluctant to

22     float --

23                MR. CAVANAUGH:  Don't tell us.

24                THE COURT:  -- that I might call, and if he's

25     available, then float the name, but I'll start with
```

1    Professor Byrne.

2            Okay, so proposed findings of fact and law, I don't

3    think I need a pretrial memo.  I don't have the room for all

4    the memos that I've received in my office, so I think what

5    we're better off doing is a brief set of proposed findings of

6    fact and law just to give me a heads-up about where you're

7    going, and then it can be supplemented afterwards.  Does that

8    make some sense to all of you?  I'm talking about, you know,

9    20, 25 pages for proposed findings.  We could do it the way,

10   actually, you've done it in the past; maybe 25 pages sort of

11   on any common industrywide issues and maybe -- does it make

12   sense to do 15 for each company?  I'm going to be getting

13   very company-specific.  I mean, at this point, I have to be

14   quite candid, I haven't so much except for maybe a drug here

15   or a drug there, and I'm assuming that it's going to have to

16   be very specific per company.

17            MR. CAVANAUGH:  It will be.

18            MR. MONTGOMERY:  I think that would be easy for all

19   of us to do, your Honor.  I mean, we do have summary judgment

20   papers in front of you.  If it's more efficient for you to

21   see this shorter form --

22            THE COURT:  Would that be -- I mean, my concern is,

23   as soon as I wait until after the trial to get proposed

24   findings of fact, you will all ask for a month.

25            MR. MONTGOMERY:  We're fine --

```
 1              THE COURT:  And then you ask for a continuance.
 2              MR. MONTGOMERY:  We're fine submitting proposed
 3    findings beforehand.  I'm just reminding your Honor that
 4    there are summary judgment papers which --
 5              THE COURT:  Do you all want to rely on that?  That
 6    makes sense.
 7              MR. BERMAN:  No.  We would like to submit proposed
 8    findings.
 9              THE COURT:  Well, here's the issue with doing it
10    afterwards:  I forget, the problem is.  I'm on to seventeen
11    other things.  I've got, believe it or not, two other MDLs.
12    I've got a lot of criminal cases.  So I'll forget.  So when
13    you ask for a month, and then you'll ask for a month
14    continuance, and then you want to reply to one another, and
15    now by the time I get to it, it's four or five months out,
16    and I've forgotten.  So I think we're really much better off
17    with things in advance.  And if you think the summary
18    judgment motions, I can use that, that would be great.
19              MR. BERMAN:  We need to first put in findings that
20    focus more on the 93A issues and all our evidence related to
21    that than we did in the summary judgment.
22              THE COURT:  All right, fair enough.  Really just so
23    you don't all have to coordinate, do you want to each do a
24    20-page memo, that's it?  I'll let you supplement
25    afterwards, 20 pages of proposed findings of fact per
```

25

1    defendant, because it's going to be very defendant-specific,

2    and --

3                MR. MONTGOMERY:  Do you want common?

4                THE COURT:  If you do.  Otherwise I could just rely

5    on the summary judgment.  The common stuff, I think I know

6    what you're going to say.  Whether you prove it up, I don't

7    know, but I think I know the case.

8                MR. MONTGOMERY:  When would you like it?

9                THE COURT:  I don't know.  How about a week

10   beforehand?  Does that seem fair enough?

11               MR. CAVANAUGH:  That's fine.

12               THE COURT:  And you just told me this, but when was

13   the opt-out time for the third-party payors?

14               MR. NOTARGIACOMO:  October 1, your Honor.

15               THE COURT:  So if I were to rule on the motion for

16   summary judgment, it would probably have to be sometime in

17   October, if I did.  I may just move it all into the bench

18   trial, depending on how it goes.

19               Is that all we need to deal with?

20               MR. BERMAN:  Could I just ask -- and maybe everyone

21   in Boston knows this, but I don't -- what days of the week

22   you're going to hold court and the what the times will be?

23               THE COURT:  In general, we go from 9:00 to 1:00

24   with a half an hour break at 11:00.

25               MR. EDWARDS:  Five days?

```
 1                THE COURT:  Five days a week.

 2                MR. EDWARDS:  Your Honor, I assume we're going to

 3     have some exchange of witness lists and exhibits?

 4                THE COURT:  Yes, we'll send out a little pretrial

 5     order in general, yes, and premarked exhibits, and I'll want

 6     a set of exhibits for me and a set of exhibits for my law

 7     clerks.  And I will guarantee you that if you start giving me

 8     18 boxes a side, I won't look at it.  I won't look at

 9     anything that's not flagged for me at the trial so I can put

10     a sticky on it and underline it because I'm just not going to

11     sit and read huge boxes of documents.  So it would be very

12     useful to have them here, and you'll turn me to such and such

13     a page, and I will underline it, asterisk it and put a flag

14     on it.  But I'm not going to just sit and randomly read

15     exhibits.  It's not worth it just for an appellate record.

16                So, you know, we can just do it right now.  A week

17     beforehand you'll get me -- is that acceptable for a witness

18     list, or do you want to know it further in advance than

19     that?  Two weeks in advance?

20                MR. EDWARDS:  Yes, I would think further in

21     advance, your Honor, so we can prepare for cross-examination.

22                THE COURT:  All right, on both sides.  So two weeks

23     in advance, witness lists, premarked exhibits, and share them

24     with one another; any motions in limine, although with a

25     bench trial, I'll tend to just go as we go.  And the key
```

1    unanswered question, absolutely essential, is:  Do you agree

2    that we should do 2 and 3 at the same time?

3              MR. BERMAN:  No.  We think, given the breadth of

4    the evidence that you're going to hear in 2, we have to prove

5    our case against each person, defendant, we should just get

6    one clean shot done; and that by doing 2, we're going to have

7    laid a foundation for 1 and 3 later on.

8              THE COURT:  So what is the increment -- other

9    than -- damages is obviously key, that whole expectation

10   theory, but other than that, what would be different?

11             MR. BERMAN:  Testimony about how people were

12   looking at AWP used in the non-Medicare context.  There's

13   that whole other umbrella of, you know, they're going to say

14   there were negotiations; we're going to say there were no

15   negotiations.  They're going to say physicians had market

16   power to change it; we're going to say that they didn't.

17   None of that is in Class 2 because they had to pay per

18   statute.

19             THE COURT:  Well, what if we were to just make it

20   in a Class 2, but I would take everything from Class 2?  In

21   other words, I wouldn't start again from scratch.

22             MR. BERMAN:  That would be fine with us as well.

23             THE COURT:  And we could set something maybe in

24   January -- well, we may all be dead by then, this is such a

25   huge effort.  And you'll get me if you think I should do it

1    all at once, and then maybe you'd explain why you think it's

2    appropriate within the next week or two?  Does that make

3    sense, a couple of weeks?  And you'll tell me why it isn't,

4    and then we'll have plenty of time to resolve it.

5              MR. MONTGOMERY:  Thank you.

6              THE COURT:  But if we move beyond that, even if I

7    only do 2, I would be planning on doing 3 pretty fast right

8    afterwards.  And also, if you could give me some really fair

9    sense of how long you think it would take and the difference

10   between 2 and 3, would it make a difference, that would be

11   really useful.

12             MR. EDWARDS:  Your Honor, at the risk of belaboring

13   the issue, would it make sense for plaintiffs to provide

14   witness lists and exhibit lists first so that we're not

15   passing like ships in the night if we do it simultaneously?

16             MR. BERMAN:  It should be mutual, your Honor.  We

17   have a lot of work to do, and to make us give it to them

18   earlier is a lot.

19             THE COURT:  But it does make some sense.  So three

20   weeks in advance of the trial you do it.  Two weeks in

21   advance of the trial you do it, and then you can supplement,

22   as long as --

23             MR. BERMAN:  That's fair.

24             THE COURT:  Okay, to meet head on what they're

25   going to do, okay?  And then my --

```
 1            MR. SOBOL:  Witnesses and exhibits, your Honor?
 2            THE COURT:  Yes.  And my sense is, for people out
 3   of town, we're certainly not going to do it the Wednesday
 4   before Thanksgiving so you can get out of here by Tuesday,
 5   and I'll stop the week before Christmas so people can be home
 6   for Christmas parties and the like.  So I've got to assume
 7   we're going to be done before Christmas.  At least I'll be
 8   very reluctant to have a trial go beyond that, let's put it
 9   that way.  So that would leave us what, six weeks?  This is
10   probably only going to be a month anyway.  I doubt I'm going
11   to let it go a full six weeks.  So are we all set?
12            MR. DALY:  Your Honor, I wanted to address the
13   amicus point that your Honor raised, speaking for Abbott and
14   Hospira.  The federal government, the Department of Justice,
15   CMS, they are now in this case.  They are advocates, they are
16   litigants.  And Abbott, for one, would object to an amicus
17   brief being filed by an advocate in a matter that's before
18   your Honor.  For example, we have a motion to dismiss that's
19   pending that your Honor will be looking at in due course, and
20   we would object to the United States being treated as an
21   amicus on issues that will be litigated in this case with
22   them as a party.
23            THE COURT:  I understand, but a lot of the -- and I
24   will take it with that weight that they're now in it.  That
25   having been said, it's a statutory issue and they're the
```

1    agency.   I'm assuming they're going to represent CMS in this,
2    right?
3                MR. GOBENA:   They're our client, your Honor.
4                THE COURT:   They're your client?  So I would like
5    to know what CMS's position is.
6                MR. GOBENA:   Your Honor, a procedural matter
7    related to that.  When would you like any briefing on this
8    issue?  I mean, I understand you have a trial coming up.
9                THE COURT:   I'm not here to destroy your family
10   vacation.  When could you do it?
11               MR. GOBENA:   You know, I think I'd probably need a
12   few weeks.
13               THE COURT:   You're getting a whisper from over
14   here.
15               MR. GOBENA:   Your Honor, if we could have it by
16   September 15, the second week in September, if everything's
17   provided, that would be helpful for us.
18               THE COURT:   September 15.
19               MR. GOBENA:   Is that too late for your Honor?
20               THE COURT:   Okay.  But it can't be an extension
21   because the truth is, if I'm going to rule on it, the motion
22   for summary judgment, I can't rule on it until after the
23   opt-out period, which is only two weeks later.  However, the
24   trial is looming.  I'm not sure I can get out a decision -- I
25   may merge it all into the bench trial, but it can't be any

```
 1    later than that.  So I know you have a thousand hoops to jump
 2    through down there, but I'll need it.
 3              And let me ask you this:  If they need some witness
 4    from the Center for Medi -- either side decides to call
 5    someone, are you the person they should get in touch with to
 6    sort of jump any of those hurdles?
 7              MR. GOBENA:  Either contact myself or
 8    AUSA Henderson.
 9              MR. DeMARCO:  Your Honor, on behalf of the
10    Track 2s --
11              THE COURT:  Yes, I saw you sitting back there
12    silently.
13              MR. DeMARCO:  Thank you.  Good afternoon, your
14    Honor.
15              THE COURT:  Good afternoon.  Welcome back.
16              MR. DeMARCO:  If the Track 1s are finished, we just
17    wanted to have a few minutes to address a couple of lingering
18    Track 2 issues, in light of the upcoming class cert hearing
19    next month.
20              THE COURT:  Okay.  I haven't read it yet.
21              MR. DeMARCO:  That's fine.  We don't want to cut
22    into their time.
23              THE COURT:  No, they're done.
24              MR. DeMARCO:  They're done.  Okay, well, my
25    colleague Scott Stempel would like to raise a couple of
```

1    issues with respect to the class cert hearing and a couple of

2    other housekeeping matters as well.

3              MR. STEMPELL:  Your Honor, just one issue with

4    respect to the class cert hearing that occurs.  As you were

5    discussing the possibility of bringing in an independent

6    expert, we thought it was a terrific area when you did it to

7    consider class certification for Track 1.  We've got the

8    hearing coming up.  Professor Byrne specifically identified

9    some areas that were in need of further development of the

10   record, which is exactly where we focused in discovery when

11   you sent us off to do discovery; specifically, the treatment

12   of multisource drugs and private payor physician-administered

13   drugs.  And we think it would be helpful to have an

14   independent expert, Professor Byrne if he's available,

15   consider the record that we've developed to shed some light

16   on any lingering questions.

17             THE COURT:  On class cert?

18             MR. STEMPELL:  On class cert, in continuation of

19   the role he has played, and in fact --

20             THE COURT:  I'll see.  I released him, so I just

21   would have to find out.

22             MR. STEMPELL:  There's one housekeeping issue that

23   Abbott and Dey have asked me to raise, and that is an open

24   issue on an objection from a ruling from Magistrate Bowler.

25   It's Docket 2140.  It was fully briefed back in March, and it

```
 1    had to do with a --
 2              THE COURT:  The objections were briefed?
 3              MR. STEMPELL:  Yes, the objections were briefed.
 4    Judge Bowler issued an order quashing some third-party
 5    subpoenas and --
 6              THE COURT:  I'm sorry, I missed that, so I'm glad
 7    you brought that up, so we'll get those.
 8              MR. STEMPELL:  And just to alert you, we believe we
 9    have reached an agreement, and we'll be submitting a joint
10    scheduling order relating to Mr. Bean, who is the belatedly
11    added class rep.
12              THE COURT:  Okay, thank you.  And have we
13    subpoenaed CMS yet for the lists with respect to Track 2 so
14    I'm not back where I started?
15              MR. BERMAN:  We're right on the verge.
16              MR. MONTGOMERY:  Your Honor, with respect to the
17    amicus brief, we would like leave to respond, if there's
18    anything we need to respond to it.
19              THE COURT:  Of course.
20              MR. MONTGOMERY:  And in particular, we'd like to
21    address the question, at least these three gentlemen would,
22    whether it's appropriate for your Honor to rule on the
23    statutory issue in light of the pendency of the notice
24    process with respect to Class 1.  I think there's a potential
25    complication there as a Rule 23 matter.
```

```
 1                THE COURT:  Well, I can do it with respect to TPPs,
 2      and then I'm going to have to do it again with respect to
 3      Class 1.  And that's a legal issue, in any event.  What I'm
 4      trying to say is, the odds of my issuing an opinion before
 5      the -- what it might mean I have to do is wait until the
 6      opt-out period for Class 1.
 7                MR. MONTGOMERY:  And that's all I was suggesting.
 8                THE COURT:  But it doesn't mean I have to stop
 9      doing the trial.
10                MR. MONTGOMERY:  I wasn't suggesting that, your
11      Honor.  It was just a matter of when you issue a ruling.
12                THE COURT:  It's a good question because
13      essentially, while not technically binding on the class, as a
14      matter of law of the case -- I wouldn't be violating anything
15      by doing that, but the question is whether it's wise.  Do you
16      follow me, Mr. Sobol and Mr. Berman?
17                MR. BERMAN:  Yes, your Honor.  And our position is
18      that since you're not ruling on a claim but you're only
19      ruling on the legal meaning of the term, that you can do that
20      before the Class 2 trial, and that it's really not --
21                THE COURT:  It may be.  I just haven't thought of
22      it, and it's a great point.  I'll think of it.  If worse
23      comes to worse -- I mean, I'm not going to spit this thing
24      out like a, my expression, an ATM ruling where you stick in
25      the card and out comes the opinion.  The odds of my even
```

```
 1    finishing it before the opt-out period for the Class 1s is

 2    pretty low, I think, so -- okay, great, have a nice summer,

 3    because I don't see you again, do I?

 4              MR. BERMAN:  No, your Honor.

 5              THE CLERK:  Court is in recess.

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                C E R T I F I C A T E

 2

 3

     UNITED STATES DISTRICT COURT )

 4   DISTRICT OF MASSACHUSETTS    ) ss.

     CITY OF BOSTON               )

 5

 6

 7

 8            I, Lee A. Marzilli, Official Federal Court

 9   Reporter, do hereby certify that the foregoing transcript,

10   Pages 1 through 35 inclusive, was recorded by me

11   stenographically at the time and place aforesaid in Civil

12   Action No. 01-12257-PBS, MDL No. 1456, In re:  Pharmaceutical

13   Industry Average Wholesale Price Litigation, and thereafter

14   by me reduced to typewriting and is a true and accurate

15   record of the proceedings.

16            In witness whereof I have hereunto set my hand this

17   8th day of August, 2006.

18

19

20

21

22

23            _____

              LEE A. MARZILLI, CRR

24            OFFICIAL FEDERAL COURT REPORTER

25
```

# Exhibit B



**EXECUTIVE OFFICE OF THE PRESIDENT**
**OFFICE OF ADMINISTRATION**
WASHINGTON, D.C. 20503

October 25, 2006

Mr. John T. Montgomery
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624

      Re: *In re Pharmaceutical Industry Average Wholesale Price Litigation*, MDL No.
            1456, D. Mass. Civil Action No. 01-12257-PBS, Judge Patti B. Saris

Dear Mr. Montgomery:

On October 23, 2006, I received your letter dated October 17, 2006, in which you requested the
Office of Administration, Executive Office of the President, approve the testimony of
Mr. Christopher C. Jennings, former Deputy Assistant to the President for Health Policy
Development, who completed his service in that capacity at the close of the last Presidential
Administration in 2001. You made your request in accordance with 5 C.F.R. § 2502.30, *et seq.*

Please be advised that 5 C.F.R. § 2502.30, *et seq.*, applies only to the Office of Administration.
Specifically, 5 C.F.R. § 2502.31 pertains to an "employee or former employee of the Office of
Administration..." Because Mr. Jennings was not an employee of the Office of Administration,
this office is not in a position to act on your request.

Sincerely,

Victor E. Bernson, Jr.
General Counsel

# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
In re. PHARMACEUTICAL INDUSTRY          )        MDL No. 1456
AVERAGE WHOLESALE PRICE                  )        Civil Action No. 01-12257-PBS
LITIGATION                               )
_____ )        Hon. Patti Saris
THIS DOCUMENT RELATES TO THE             )
AMENDED MASTER CONSOLIDATED              )
CLASS ACTION                             )
_____ )

**MOTION OF UNITED STATES
TO BE ADDED AS AN INTERESTED PARTY**

     The United States of America, through its undersigned counsel, hereby moves this

Court to be added as an "interested party" in the electronic case filing system applicable

to this action.  In support of this motion, the United States states that during the course of

this litigation it has filed an amicus brief and  several papers relating to subpoenas issued

to the Department of Health and Human Services (DHHS) and to a DHHS contractor.

The Court has recently asked the United States, on behalf of the DHHS, to file a

statement regarding the possible use of a mass mailing by the Centers for Medicare &

Medicaid Services to Medicare beneficiaries.  Under the Court's ECF system, any

electronic filing must be made on behalf of an entity identified as a participant in the ECF

case system for the case.  The United States asks that it be added as an "interested party"

so that it can electronically file papers on its own behalf.

Wherefore, in order to facilitate electronic filings, the United States requests that it be added as an "interested party" in the electronic case filing system for this action.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:      /s/ George B. Henderson, II
George B. Henderson, II
Assistant U.S. Attorney
John J. Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA  02110
(617) 748-3272
george.henderson2@usdoj.gov

Dated: July 20, 2006