UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action No. 01-CV-12257 PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | Judge Patti B. Saris<br>Chief Magistrate Judge Marianne B. Bowler |

# THE BMS DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
  Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
  Steven M. Edwards, Esq.
  Lyndon M. Tretter, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.*

---

[1] The BMS Defendants incorporate and adopt the Track 1 Defendants' Common Proposed Findings of Fact And Conclusions of Law. The BMS Defendants also incorporate and adopt their Rule 56.1 statements and memoranda of law in support of their summary judgment motions against Classes 1 & 2 and Class 3. Finally, in this document, italicized names of individuals appearing in brackets (e.g. [*Smith*]) are citations to the expected trial testimony or deposition transcripts of BMS Defendants' or third-party witnesses and references to "*DX*" or "*PX*" with a document number are references to trial exhibits. The BMS Defendants reserve the right to amend these proposed findings and conclusions and the citations therefore based on the actual trial record.

   A.   *Overview of the BMS Defendants*

   1.   Defendant Bristol-Myers Squibb Company ("BMS") was formed in 1989 through the merger of two established pharmaceutical manufacturing companies, Bristol-Myers and Squibb.[2] *[Pasqualone; Bell]*  BMS is a major developer, manufacturer and marketer of "brand-name" prescription drugs, including chemotherapy drugs, which are produced by BMS's Oncology group ("BMSO"). *[Pasqualone; Bell]*  This case involves seven BMSO drugs: Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, Taxol and Vepesid (the "BMS Subject Drugs").

   2.   Defendant Oncology Therapeutics Network Corporation ("OTN") was a BMS subsidiary until May 11, 2005, when it became an independent, privately-held company.[3] *[Akscin]*  OTN is what is known as a "specialty distributor" -- a business that sells and distributes injectable drugs and supplies, including but not limited to cancer drugs, to medical providers who administer them in a hospital or office setting to patients. *[Akscin]*  OTN's primary target customers are oncologists in private practice who administer chemotherapy to patients in their offices (i.e. oncologists not employed by a hospital or hospital out-patient clinic). *[Peterson]*

---

[2] BMS also owned a subsidiary called Apothecon, that manufactured and sold primarily generic drugs. BMS sold Apothecon's assets in 2000. *[Pasqualone]* Since none of the Apothecon drugs are at issue in this proceeding, I do not discuss it further.

[3] In the period it was a BMS subsidiary, defendant OTN was a holding corporation for a South San Francisco-based operating company also known as OTN. Today, defendant is the general partner of the operating entity. All references herein to "OTN" include the operating entity.

B. The BMSO Business Model

3. At all relevant times, BMSO pursued a consistent business model for its drugs. *[Pasqualone; Bell]* At launch, BMS established an initial list price, or wholesale list price ("WLP"), for sales to wholesalers. *[Pasqualone; Szabo; Bell]* The WLP was the price that appeared on invoices for BMSO drugs, and the vast majority of BMS's net revenue for the BMS Subject Drugs during the period 1993-2002 was generated from transactions within 5% of list price. *[Szabo; Bell]* BMS offered wholesalers a 2% "prompt pay" discount off of the WLP if the wholesaler remitted payment for a drug within a set time period, and it sometimes provided wholesalers a stocking allowance of 5%-10% below WLP for the first few weeks of a product's launch to incentivize them to move the new product into the marketplace. *[Pasqualone]* In addition, BMS offered OTN customers a 4% discount below WLP as an incentive to purchase product through OTN, as opposed to other specialty distributors, while charging the other specialty distributors full list price. *[Pasqualone; Akscin]*

4. From time to time, after initial launch, BMS increased the list prices of its drugs while they were protected by patents. BMS only did so, however, when it believed that it would achieve substantial sales at the higher list price without the need for price concessions like discounts and rebates. *[Pasqualone; Szabo]* The data shows that BMS did in fact do so. *[Bell; DX-2523]*

5. When BMS drugs reached the end of their patent life and generic competition appeared, BMS generally did not make any further changes to the list price. *[Pasqualone; Szabo]* Those drugs became part of BMSO's "multi-source portfolio" of drugs and the marketing strategy changed to maximizing profitability for the remainder of the drug's useful life through increased, but selective, discounting and rebating as competitive conditions warranted. *[Marre]* BMS did not decrease the list prices of drugs that become multi-source

because there were "brand loyal" customers who were willing to continue to pay the list price. *[Pasqualone; Marre]* BMS also discounted below list to customers who could produce a *bona fide* offer from a competitor for a generic equivalent of the BMS drug. BMS's goal was to price-match the competition. It did not lead prices down to create spreads. *[Marre]*

6.  With minor exceptions, the facts surrounding the Subject Drugs followed very closely the business model discussed above. *[Szabo]* Over the course of 1993-2002, the period for which BMS data was available and produced, BMS achieved 88.8% of its net revenues on the seven BMS Subject Drugs in sale transactions priced within 5% of prevailing WLPs. As expected, for the periods during which the Subject Drugs were protected by patents, the figure was 96%, and for the periods when they were off-patent, it was 31.5%.[4] *[Bell]*

C.  BMS's Dealings With Industry Compendia

7.  A pharmaceutical manufacturer cannot market a drug unless it is listed in one or more industry compendia, commonly known as RedBook, First DataBank and MediSpan (the "Publications"). *[Kaszuba; Szabo]* That is because the electronic claims processing systems used by government programs like Medicare and Medicaid and private third-party payors use the Publications to identify the drugs for which they will pay. *[Kaszuba; Ihling Dep. Tr. 123:6-125:15]* For this reason, since the early 1970s, BMS has reported list prices and product descriptions to the Publications. *[Rogers; Kaszuba]*

8.  The Publications have historically applied a mark-up factor of 20.5% or 25% to BMS's list prices to calculate average wholesale prices or "AWPs." *[Kaszuba; Szabo]* Once the Publications calculate AWPs, they communicate them back to BMS, which checks them for errors. *[Kaszuba]* BMS then uses those AWPs for a variety of purposes, discussed

---

[4] Each of the above and the following figures exclude sales to federal government buyers such as the VA and Public Health Service, which sales are made at federally-mandated discounted prices.

below.  Payors do not rely on BMS for AWP information; they get their AWP information from the Publications.  *[DX-1076; DX-1091;  TPP testimony]*

        *9.*      While plaintiffs contend that BMS "controls" AWPs, there is substantial evidence that this is not the case.  Throughout the Class Period, there has been one employee at BMS, Denise Kaszuba, who has had primary responsibility for BMS's communications with the Publications.  *[Kaszuba]*  Ms. Kaszuba testified that the Publications determine AWPs, and BMS cannot control that process.  *[Kaszuba]*  A witness from First DataBank made the same point. *[Morgan; DX-1137]* In addition, both BMS and plaintiffs also offered numerous documents, created in the regular course of business, which explicitly stated that BMS did not control AWPs. *[DX-1522; DX-2545/PX-944; DX-2554; DX-2585; DX-2587/PX-196; DX-2589/PX-189; DX-2595; PX-187]*  Furthermore, beginning in 1999, BMS expressly informed the Publications that its list prices did not include discounts, but this had no effect on the way the Publications reported AWPs.  *[Kaszuba; DX-2627]*

        10.      Ms. Kaszuba provided other testimony which demonstrates the independence of the Publications.  After the Bristol-Myers and Squibb merger, the Publications applied different mark-up factors to different BMSO drugs based on whether the drug had been a Bristol-Myers or Squibb drug.  *[Kaszuba; Pasqualone; DX-2545]*  In 1992, BMS requested that all BMSO drugs carry the same mark-up factor of 25%.  *[Kaszuba; DX-2552]*  RedBook agreed; First Data Bank and MediSpan did not.  *[DX-2554]*  MediSpan stated that it surveyed its wholesalers before rejecting BMS's request.  *[DX-2553]*

        11.      BMS's lack of control over AWPs is further demonstrated by several documents in BMS's files from the 2001 time period when First DataBank unilaterally changed its mark-up factor on hundreds of drugs of scores of manufacturers, including but not limited to

the factor it previously applied to certain of the BMS Subject Drugs. *[DX-2586]* It appears that certain BMS employees were tasked with analyzing how and why such a change could be made by First DataBank without notice to BMS. These pre-litigation documents are also consistent with BMS's position that it does not control the Publications' AWPs. *[DX-2588; DX-2589]*

12. The Court also finds that BMS had no reason to believe that either Medicare or TPPs were deceived by AWPs. Numerous OIG reports focused on BMS drugs and found spreads consistent with these found by plaintiffs' expert, Dr. Hartman. *[DX-1053; DX-1075]* Moreover, in October 1996, Ven-A-Care sent HCFA a letter and exhibits which put HCFA on notice of the spreads for most of the BMS drugs at issue in the case. *[DX-1881; DX-2631]* In addition, the TPPs purchased BMS drugs at prices that were at or below Dr. Hartman's ASPs. *[Gaier; DX-1374; DX-1378; DX-1382; DX-1386; DX-1418-19; DX-1428-31; DX-1442-45; DX-1456-60; DX-1472-76]*

13. The Court finds that BMS understood the term "average wholesale price," as it appeared in a HCFA regulation and the Balanced Budget Act of 1997, to mean the AWPs published by the publications. *[Pasqualone; Garafalo]* BMS had no reason to believe that the use of the AWP by HCFA and Congress signaled a need to change the way it had reported prices to the Publications since the early 1970s.

14. BMS does not dispute that there is a foreseeable connection between its list price and AWPs, but it has never increased its list prices to create spreads for the Subject Drugs. *[Pasqualone; Bell]* According to Dr. Hartman's charts *[PX-970, Attachment G.2.b]*, for two of the products at issue in the case -- Taxol and Vepesid injectibles -- there were no price increases at all between 1993 and 2002. For four of the products -- Etopophos, Blenoxane, Cytoxan injectibles and Rubex -- there were no price increases between 1995 or 1996 and 2002,

and there were substantial sales at list price both before and during that period.  For the other products -- Cytoxan tablets, Paraplatin and Vepesid capsules -- there were price increases between 1993 and 2002 and substantial sales at the increased price.  *[DX-2524]*

15.     Plaintiffs rely heavily on a 1995 document relating to the launch of Etopophos, which was a successor product to BMS's injectible Vepesid, chemically known as etoposide *[PX-208]*.  Because injectible Vepesid had become subject to generic competition in 1993, many BMS customers were able to obtain the drug at significant discounts.  BMS was concerned that customers would not migrate to Etopophos because they were being reimbursed based on the large spread between the discounted price of Vepesid and AWP.  *[Pasqualone]*

16.     A BMS employee, Larry Lunak, wrote a memorandum suggesting that BMS could incentivize medical providers to switch from Vepesid to Etopophos by either: (1) lowering the list price on Vepesid so that the differential or "spread" between the WLP (and thus the published AWP) on Vepesid and the discounted price for the drug was reduced or (2) establishing a "premium" list price for Etopophos relative to transaction prices so that providers could enjoy a spread on that drug not usually associated with BMS's on-patent drugs.  The evidence is unequivocal that BMS did not implement either option.  Rather, BMS adhered to its business model even though, as a result, Etopophos was a relatively unsuccessful product. *[Paqualone; Bell]*

D.     *The Marketing of BMSO Drugs*

17.     From time to time, as part of an effort to understand how its drugs compared to the drugs of its competitors, BMS used AWPs internally to determine what the reimbursement would be.  There is also evidence that BMS conveyed AWP information to its customers.  Among other things, BMS had an internal price guide for sales representatives that

included AWPs in case a customer asked. *[DX-2611]*  In addition, OTN made AWP and purchase information available to customers so they could determine reimbursement amounts. *[Akscin; Peterson; Soule]*

18. Even though BMS made AWP information available to its customers (as opposed to payors), there is substantial evidence that it was the company's policy to stress the therapeutic benefits and characteristics in sales presentations. BMS's sales representatives were encouraged to "sell the science" and to address reimbursement questions only if the customer raised the issue. The evidence demonstrates that BMS's sales representatives followed that policy. [*PX-177 at Ex. A*; *Armand Tr.* 42:14-43:12, 91:18-93:17; *Cook Tr.* 98:13-99:17; *Faulkner Tr.* 42:7-19, 67:8-16; *Keighley Tr.* 49:5-50:16, 69:21-70:4, 166:12-167:12; *Liptak Tr.* 55:4-56:19; *Morrison Tr.* 95:2-97:11; *Soule Tr.* 55:20-58:10.]

19. The BMS sales representatives tried to convince customers to buy BMS's products, and the OTN sales representatives then took the order. *[Peterson]* Neither the BMS nor the OTN sales representatives had authority to change prices, so they were not in a position to "manipulate" the spread in order to make a sale. *[Soule; Peterson]* The AWP and spread information made available by the BMS and OTN sales representatives to customers was factual material that the customers could have looked up in a publication or calculated themselves from their own purchase invoices and practice data. *[Soule; Peterson; Akscin]*

II.  PROPOSED CONCLUSIONS OF LAW

   A.  *General Standards*

1. To establish a violation of Mass G. L. ch. 93A, plaintiffs must establish that BMS (1) engaged in deceptive or unfair acts or practices and (2) those acts or practices caused plaintiffs and the class members to suffer loss. <u>Aspinall v. Philip Morris Cos., Inc.</u>, 813

N.E.2d 476, 480 (Mass. 2004). An act or practice is deceptive if it has a capacity or tendency to deceive. Abruzzi Foods, Inc. v. Pasta & Cheese, Inc., 986 F.2d 605, 605 (1st Cir. 1993). An act or practice is unfair if it offends public policy or is immoral, unethical, oppressive or unscrupulous. Saint-Gobain Indus. Ceramic, Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001).

        2.      While a violation of a consumer statute can establish unfairness, plaintiffs do not allege that BMS violated a consumer statute and, in any event, a violation of a statute is not automatically actionable under Mass. G.L. ch. 93A. Brazas Sporting Arms, Inc. v. American Empire Surplus Lines Ins. Co., 220 F.3d 1, 9 (1st Cir. 2000). In determining whether there is a violation of the unfairness prong of the consumer protection law, a court should consider the equities between the parties, including what both parties knew or should have known. Ahern v. Scholz, 85 F.3d 774, 798 (1st Cir. 1996). Furthermore, where, as here, both parties are engaged in commerce, the plaintiff must show that the defendant's conduct is so objectionable that it has "attain[ed] a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Quaker State Oil Refining Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989).

        3.      Plaintiffs contend that BMS engaged in deceptive or unfair acts or practices by causing fraudulent AWPs to be published by the Publications. BMS did not report AWPs to the Publications; it reported list prices. The relevant inquiry here, therefore, is whether (a) BMS's list prices were deceptive or unfair and (b) whether BMS engaged in deceptive or unfair conduct by providing list prices to the Publications. If either of those questions is

answered in the affirmative, then the next question is whether those deceptive or unfair acts or practices caused any loss.[5]

### B. BMS's List Prices Were Not Deceptive or Unfair

4. Plaintiffs contend that BMS's list prices were deceptive or unfair because they did not reflect discounts. A list price, by definition, does not include discounts. Merriam-Webster Collegiate Dictionary 726 (11th ed. 2003). BMS's list prices are similar to what other manufacturers call "wholesale acquisition cost" or "WAC," and the Medicare Modernization Act defines WAC as a "manufacturer's list price . . . not including prompt pay or other discounts, rebates or reductions in price." 42 U.S.C. § 1395w-3a(c)(6)(B).

5. For the Court to hold, as plaintiffs suggest, that BMS's list prices should have been adjusted to reflect discounts, it would have to be the case that a seller has a duty to disclose discounts. There is no such duty in the law. Alves v. Harvard Pilgrim Health Care, Inc., 204 F. Supp. 2d 198, 213-14 (D. Mass. 2002), aff'd, 316 F.2d 290 (2003); Bonilla v. Volvo Car Corp., 150 F.3d 62, 69-70 (1st Cir. 1998); Langford v. Rite Aid of Ala., Inc., 231 F.3d 1308, 1313-14 (11th Cir. 2000); Katzman v. Victoria's Secret Catalogue, 167 F.R.D. 649, 656 (S.D.N.Y. 1996), aff'd, 113 F.3d 1229 (2d Cir. 1997); Whitehall Co., Ltd. v. Barletta, 536 N.E.2d 333, 337 (1989). In fact, there are a number of legal principles that caution against the mandatory disclosure of discounts. Great Atl. & Pac. Tea Co. v. F.T.C., 440 U.S. 69, 80 (1979).

6. Plaintiffs have suggested that the FTC's decision in Regina Corp. v. FTC, 322 F.2d 765, 767 (3d Cir. 1963) requires that list prices be "the usual and customary prices at which products are sold." Regina deals with price comparisons in advertising to consumers and is completely inapplicable here. Id. at 767. Furthermore, the FTC modified Regina in light of a

---

[5] BMS reserves the right to provide proposed findings of fact and conclusions of law for damages at a later time.

subsequently adopted regulation which provided that a list price "will not be deemed fictitious if it is the price at which substantial (that is, not isolated or insignificant) sales are made . . . ." 16 C.F.R. § 233.3.  See also, In re Bulova Watch Co., 64 F.T.C. 1054 (1964) (dismissing complaint alleging deceptive list or "ticketed" prices of watch manufacturer where such list prices were not in "excess of the highest prices at which substantial sales were made in the area in which [the manufacturer] was doing business").

7. As noted above, more than 88% of BMS's net revenue for the Subject Drugs during the period 1993 to 2002 was generated from transactions within 5% of list price -- 96% while those drugs were on patent and 31.5% when they faced multi-source competition. *[Bell; DX-2524]* This more than satisfies the Regina standard.  Under any definition, therefore, BMS's list prices cannot be characterized as deceptive or unfair.

C. *Providing List Prices to Industry Publications is Not Deceptive or Unfair*

8. Providing list prices to industry publications, who use those list prices to calculate AWPs, cannot be deceptive or unfair if the list prices are not deceptive or unfair.  It follows that AWPs derived from list prices are not unfair or deceptive, whether or not they reflect actual sales prices.  A statement cannot be unfair if the recipient of the statement knows the truth.  Dinjian v. Dinjian, 495 N.E.2d 882, 888 (Mass. Middlesex Co. 1986).  Even where a plaintiff claims to have been misled, a 93A claim will not succeed if that plaintiff reasonably should have known the truth.  Madan v. Royal Indem. Co., 532 N.E.2d 1214, 1218 (Mass. App. Ct. 1988).

9. Here, there can be no doubt that it was common knowledge that AWPs did not reflect acquisition costs.  There is also substantial evidence that TPPs either knew, or should have known, the extent of spreads because they purchased drugs from BMS at discounted prices.

Therefore, plaintiffs have failed to demonstrate that BMS's AWPs were deceptive under Mass. G.L. ch. 93A.

10.  Plaintiffs contend that AWPs were unfair because the regulation and statute using the term "average wholesale price" should be interpreted in accordance with its "plain meaning" to mean acquisition cost. I reject that contention because the industry understood AWP to be a benchmark that did not reflect, or bear a predictable relationship to, acquisition cost. (BMS Defs.' Resp. to Gov't. Amicus Br. 8-9 & Addendum). The term "average wholesale price" as used in the regulation and statute must be interpreted to mean the AWPs that appeared in the Publications. Corning Glass Works v. Brennan, 417 U.S. 188, 202 (1974) (The definition of "working conditions as encompassing surroundings and hazards is 'well accepted across a wide range of American industry'"); Louisiana Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 372 (1986) (terms that have a preexisting meaning in a trade or industry "should be interpreted by reference to the trade or industry to which they apply"); McDermott Int'l Inc. v. Wilander, 498 U.S. 337, 342 (1991) ("In the absence of contrary indication, [the court must] assume that when a statute uses [an industry] term, Congress intended it to have its established meaning.").

11.  Even if I were to interpret the regulation and statute to mean acquisition cost, it does not follow that the AWPs for BMS's drugs were unfair. It is clear that BMS did not understand the term "average wholesale price" in the regulation and statute to mean anything other than what it meant in the industry. Where a party acts in good faith, its conduct cannot be deemed unfair. Madan, 532 N.E.2d at 1218.

12.  Furthermore, where the plaintiff fully understands the transactions at issue, the defendant's conduct cannot be deemed unfair. Mass. Farm Bureau Fed. v. Blue Cross of

\\\NY - 058559/000059 - 960053 v1               12

Mass., Inc., 532 N.E.2d 660, 665 (1989). Medicare, which established the reimbursement amounts paid by Class 2, was fully knowledgeable about the spreads on the BMS Subject Drugs. The TPPs in Class 2 and Class 3 knew what they were doing when they decided to reimburse for BMS drugs. For this reason, BMS's conduct cannot be deemed unfair.

13. Even if I were to find that the AWPs for BMS's drugs were unfair, it would not necessarily follow that BMS is responsible for those AWPs. As a general proposition, a person is only responsible for another person's conduct if he can control that conduct. "The commonest test of a relationship to which the law attaches vicarious liability is control or the general right of control." J. Harper et al., The Law of Torts §26.3 (2d ed. 1986). Here, there is no evidence that BMS controlled how the Publications calculated AWPs or their decision to call the prices they reported "AWPs."

14. An exception may be made when one party uses another party as a spokesperson, or one party endorses the statements of another party. In re Cabletron Sys., Inc. 311 F.3d 11, 38 (1st Cir. 2002) (finding that absent proof that the issuer controlled the analyst or endorsed the analyst's statements as its own, the issuer is not liable). However, nothing like that happened here. BMS provided list prices to the Publications who <u>changed</u> them into AWPs pursuant to a process that BMS did not invent and that had existed for years. There is no evidence that BMS was using the Publications as a vehicle to communicate AWPs to payors.

15. That the process by which list prices were converted into AWPs may have been foreseeable does not change the result. "The defendant is not liable merely because he could foresee the harm; the harm must be the kind that he should have avoided by acting more carefully." D. Dobbs, The Law of Torts 447 (2001). The evidence shows that there is nothing BMS could have done to change the way the Publications calculated AWPs.

16. Dr. Berndt noted in his report that no single company in the industry was in a position to change the way AWPs were calculated and disseminated by the Publications. (Report of Independent Expert Ernst R. Berndt to Judge Patti Saris dated Feb. 9, 2005, ¶¶ 24-31.) Refraining from providing pricing information to the Publications was not an option because, if BMS took that approach, providers would not be reimbursed for (and thus BMS could not sell them) its products. *[Ihling Tr.* 123:6-125:15*; Kaszuba]*  Where, as here, a manufacturer simply follows industry practice, that cannot violate Mass G.L. ch. 93A. Comm. Union Ins. Co. v. Seven Provinces Ins. Co., 217 F.3d 33, 43-44 (1st Cir. 2000); James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co., 112 F.3d 1240, 1251 (1st Cir. 1997); Govoni & Sons Constr. Co. v. Mech. Bank, 742 N.E. 2d 1094, 1107 (Mass. Worcester Co. 2001).

17. It is also clear that BMS had no duty to payors that would obligate it to take action with respect to AWPs. Under Mass G.L. ch. 93A, a defendant in a commercial context generally does not have duty to a plaintiff in the absence of a "contractual or business relationship."  Nei v. Boston Survey Consultants, Inc., 446 N.E.2d. 681, 684 (1983); see also Mitzan v. Medview Servs., Inc., 1999 WL 33105613, at *9 (Mass. Super. June 16, 1999) ("the Supreme Judicial Court has stressed the existence of some contractual or business relationship between the parties as a precursor to liability under Chapter 93A."); John Boyd Co. v. Boston Gas Co., 775 F. Supp. 435, 440 (D. Mass. 1991) ("a plaintiff must allege some sort of transaction between the parties for liability to attach under [Mass. G.L. ch. 93A]."); L.B. Corp. v. Schweitzer-Mauduit Int'l Inc., 121 F. Supp. 2d 147, 152 (D. Mass. 2000).  BMS has no contractual or business relationship with plaintiffs or the class insofar as AWPs are concerned -- BMS (1) provides list prices to publications who (2) use them to calculate AWPs, which are (3)

used by payors to determine what they should pay to (4) providers, with whom the payors have a direct business relationship.

### D.   Plaintiffs Have Not Demonstrated Causation

18.   In addition to demonstrating that BMS engaged in deceptive or unfair acts or practices, plaintiffs must demonstrate a "causal connection between the seller's deception [or unfair conduct] and the buyer's loss." Hershenow v. Enter. Rent-A-Car Co. of Boston, 840 N.E.2d 526, 528 (Mass. 2006). Causation is established if BMS's conduct "could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted." Id. at 535 (internal quotations omitted). This requires plaintiffs to prove that in the "but for world" -- a world without allegedly fraudulent AWPs -- plaintiffs and the class members would have paid less for BMS drugs. Aspinall, 813 N.E.2d at 491 (Mass. 2004). Furthermore, knowledge of the truth, i.e., that AWPs were not actual prices, eliminates any possible causal connection between the alleged deception or unfair practice and the alleged injury. Tagliente v. Himmer, 949 F.2d 1,7 (1st Cir. 1991).

19.   With respect to Class 2, there is overwhelming evidence that Medicare knew about the spreads between the AWPs for BMS's drugs and acquisition costs. Nevertheless, Medicare continued to reimburse based on the published AWPs, and Congress explicitly rejected a proposal to base reimbursement on acquisition cost instead of AWPs. In addition, there were policy reasons why Congress insisted on reimbursement based on published AWPs. Under the circumstances, plaintiffs cannot prove that the payments made by Class 2 in the but for world would have been any different than they were in the real world.

20.   With respect to Class 3, class representative Blue Cross/Blue Shield of Massachusetts ("BCBS/MA") considered switching to an ASP-based system when ASPs became

publicly available in 2004.  For a variety of policy reasons, BCBS/MA rejected that option and decided to continue reimbursing providers for drugs at 95% of the published AWP  *[BCBS/MA Testimony]*.  There is no reason to believe that the decision of BCBS/MA or any other TPP would have been different if ASPs had been available prior to 2004.  Indeed, as noted above, BCBS/MA and other TPPs had access to information about spreads as a result of their purchase of BMS drugs at discounted prices.  Under the circumstances, plaintiffs cannot prove that payments made by Class 3 in the but for world would have been any different than they were in the real world.

21. In addition, throughout much of the class period, a number of BMS drugs were multi-source drugs subject to generic competition.  Reimbursement for those drugs under Medicare, and many private programs, was based on the median generic AWP.  56 Fed. Reg. § 59502 at 59627.  Since the AWPs for BMS's multi-source drugs remained at the brand level after the patents expired and BMS faced generic competition, the AWPs for those drugs could not have been the cause in fact of the reimbursement amounts paid by either Class 2 or Class 3.

22. Finally, with respect to plaintiffs' claim that BMS "marketed the spread" by discussing reimbursement issues with providers, plaintiffs have failed to demonstrate any causal connection between such discussions and the <u>amount</u> that plaintiffs or the class members paid for BMS Subject Drugs.  Even assuming such discussions occurred, plaintiffs have not demonstrated that they had any impact on price.  Nor have plaintiffs demonstrated that such discussions are deceptive or unfair because there is no indication that the information provided was inaccurate in any way.  <u>Saint-Gobain Indus.</u>, 246 F.3d at 74-75 (no violation of Mass. G.L. ch 93A where uncertainties were openly discussed before entering into the contract).

23. For the foregoing reasons, I find in favor of BMS on the Class 2 and Class 3 claims.

Dated:   Boston, Massachusetts
         November 1, 2006

                                            Respectfully Submitted,


                                      By:   /s/ Jacob T. Elberg
                                            Thomas E. Dwyer (BBO No. 139660)
                                            Jacob T. Elberg (BBO No. 657469)
                                            **DWYER & COLLORA, LLP**
                                            600 Atlantic Avenue
                                            Boston, MA  02210
                                            Tel: (617) 371-1000
                                            Fax: (617) 371-1037
                                            tdwyer@dwyercollora.com
                                            jelberg@dwyercollora.com

                                            Steven M. Edwards (SE 2773)
                                            Lyndon M. Tretter (LT 4031)
                                            Admitted *pro hac vice*
                                            **HOGAN & HARTSON LLP**
                                            875 Third Avenue
                                            New York, NY  10022
                                            Tel: (212) 918- 3000

                                            *Attorneys for Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation*

**CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE**

      I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on November 1, 2006, I caused a copy of **THE BMS DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

                                                                             /s/ Lyndon M. Tretter
                                                                              Lyndon M. Tretter