**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
|  | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| ALL CLASS ACTIONS |  |

**SCHERING-PLOUGH CORPORATION'S AND WARRICK PHARMACEUTICALS CORPORATION'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW**

Schering-Plough Corporation and Warrick Pharmaceuticals Corporation respectfully submit the following proposed findings of fact and rulings of law[1]:

**REQUESTED FINDINGS OF FACT**

**The Parties**

1.    Schering Corporation ("Schering"), a subsidiary of Schering-Plough Corporation, is a research-based pharmaceutical company that develops, licenses, manufactures, markets, and distributes innovative, branded pharmaceutical products.  Source:[2] Testimony of B. Longstreet

2.    Warrick Pharmaceuticals Corporation ("Warrick"), a subsidiary of Schering-Plough Corporation, was formed in 1993 to manufacture, market, and distribute generic pharmaceutical products.  Source:  Testimony of H. Weintraub

---

[1] Since these proposed findings and conclusions are based on the record assembled before trial, they reflect what Schering and Warrick anticipate as evidence and legal rulings at trial; they will be supplemented after trial.

[2] Sources are the persons and exhibits that are expected to provide evidence in support of the facts requested and authorities that support the legal conclusions requested; they will be supplemented after trial to reflect the evidence and legal rulings that occur during trial.

**Reimbursement and the Use of AWP**

3.      The use of average wholesale price, or "AWP," arose in the context of branded

pharmaceutical products, before generic pharmaceuticals were common.  For branded

products, AWPs typically were set at 20% to 25% above the undiscounted list price at

which manufacturers sold products to wholesalers, intermediaries, and other direct

purchasers, which is known as Wholesale Acquisition Cost ("WAC") or Direct Price.

Source: Testimony of M. Kolassa; 9/3/2004 Hartman Decl. Supporting Track 1 Class

Cert., Attach. D; 4/1/2006 Hartman Decl. in Opp'n to Track 1 Summ. J.

4.      AWP was first developed and used as a benchmark for reimbursement by Medi-Cal in the

1960's.  AWP was then adopted broadly by participants in the pharmaceutical markets as a

reference point for negotiating prices and reimbursement rates.  Source:  Testimony of M.

Kolassa

5.      The AWPs used by participants in the pharmaceutical markets are reported in various

commercial reporting services ("compendia"), including the "Red Book," (published by

Thomson/Micromedex), the "Blue Book," (published by First DataBank), and Medispan.

6.      Throughout the decades that AWP has been reported in the compendia, it has reflected the

standard industry mark-up of 20% - 25% from WAC/Direct Price.  Source: Testimony of

M. Kolassa; 9/3/2004 Hartman Decl. Supporting Track 1 Class Cert. at 7

7.      Those who have used the formulaically related AWP as a negotiation benchmark have

known for decades that it is not the price at which manufacturers sell their products or the

price at which pharmacies, physicians, and other providers acquire them.  Source:

Testimony of M. Kolassa; 12/15/2005 Hartman Decl. in Support of Pls.' Claims of

Liability and Damages at 39

8.      WAC and AWP for brands provide the same information to the market.  Testimony of M.
        Kolassa; 12/16/2004 Hartman Rebuttal Decl. in Support of Class Cert., Attach. C at 3

9.      Generic drugs first became a significant factor in the pharmaceutical market following
        passage of the Hatch-Waxman Act in 1984.   Prices for generics are known to decrease
        rapidly as a result of price competition.  <u>Source</u>: Testimony of S. Addanki; Testimony of
        M. Kolassa; 12/16/2004 Hartman Rebuttal Decl. in Support of Class Cert.  ¶¶ 33(d), 24(b)

10.     Due to rapid changes in prices on an individual customer-by-customer basis, many
        generics do not have list prices.  As a result, such generics do not have a WAC/Direct Price
        to mark-up in order to arrive at an AWP.  For generics without list prices, AWPs are
        typically set at the time the product is introduced as a function of AWPs for branded drugs,
        and they remain stable thereafter.  As a result, price competition produces increasing
        spreads between AWP and price.  <u>Source</u>: Testimony of M. Kolassa; 4/27/2006 Hartman
        Reply Decl. in Opp'n to Summ. J. ¶ 35(b)(iii)

11.     Public and private payors were and are aware of increasing spreads for generics, and they
        have responded by imposing maximum allowable costs or "MACs" that set a uniform
        maximum reimbursement rate for all versions of a generic drug.  <u>Source</u>: Testimony of S.
        Addanki; Testimony of M. Kolassa

12.     PBMs and TPPs have imposed MACs on generic drugs that reflect discounts from AWP of
        60% or more.  <u>Source</u>: Testimony of S. Addanki; Testimony of M. Kolassa

13.     The federal government has imposed MACs on generic drugs that take a number of forms.
        For example, the federal government under Medicaid has instituted Federal Upper Limits
        ("FULs") for generics, and state Medicaid agencies have imposed state-specific MACs for
        generics.  The federal government also purchases drugs directly under the Federal Supply

Schedule contracts and through Veteran's Administration contracts at prices reflecting steep discounts from AWP.  <u>Source</u>: Testimony of M. Kolassa

14.  Medicare first employed AWP in reimbursement rates in a regulation promulgated in 1991 that became effective in 1992.  42 C.F.R. § 405.17 (1992) (now superseded)

15.  Congress first employed the term "average wholesale price" in Medicare reimbursement rates when it enacted the Balanced Budget Act of 1997, which became effective in 1998.  <u>Source</u>: Pub. L. No. 105-33, § 4556(a), 111 Stat. 251 (1997) (amending 42 U.S.C. § 1395u(o)(1) (2000))

16.  At the time Medicare began using AWP in its reimbursement rates, AWP had been used for decades as an industry benchmark for pharmaceutical reimbursement.  <u>Source</u>: Testimony of M. Kolassa

17.  At the time Congress adopted "average wholesale price" in the Medicare statute, the House Committee Report stated that "[t]he Inspector General for the Department of Health and Human Services . . . reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs."  <u>Source</u>: Balanced Budget Act of 1997, Report of the Comm. on the Budget of the House of Representatives, H.R. Rep. No. 105-149, at 1354 (1997) (emphasis added)

18.  When an AWP-based reimbursement system was adopted by Medicare, the Government provided no instruction that the standard relationship between AWP and WAC for branded drugs be changed.  The system continued to reflect long-standing industry practice to base AWP on a markup from WAC.  <u>Source</u>: Testimony of M. Kolassa

19.  Similarly, the Government provided no instruction to change AWPs with respect to generic drugs.  The system continued to reflect the long-standing generic-industry pattern of increasing spreads due to vigorous price competition.  <u>Source</u>: Testimony of M. Kolassa

**Schering's Products are Almost Exclusively Self-Administered and Do Not Fit the Plaintiffs' Liability Paradigm**

*Schering's Drugs are Almost Exclusively Self-Administered*

20.     The competitive dynamics affecting the market for self-administered, pharmacy-dispensed drugs are significantly different from those affecting the markets for physician-administered drugs.  In the self-administered drug market, PBMs are the 800-pound gorillas of pharmaceutical reimbursement.  Ninety-five percent of all patients with drug coverage obtain benefits through a PBM.  Pharmaceutical manufacturers compete for PBM business by offering a variety of price reductions.  PBMs facilitate dissemination of information throughout the market.  They stimulate competition among pharmacies and thereby drive drug prices down. Based on these factors, this Court refused to certify a class of TPPs and consumers paying for self-administered drugs. <u>Source</u>: *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. at 69, 71-74

21.     Schering's products are almost exclusively self-administered and dispensed by pharmacies. <u>Source</u>: Testimony of B. Longstreet; Testimony of M. Kolassa

22.     Schering sells its products to several classes of trade, including chain pharmacies, wholesalers, and other intermediaries.  Schering has no infrastructure to support the sale of products directly to physicians and makes virtually no such sales.  <u>Source</u>: Testimony of B. Longstreet

23.     Physicians have no economic interest in reimbursement of drugs that are dispensed by pharmacies.  <u>Source</u>: Testimony of S. Addanki; Testimony of M. Kolassa

24.     There was no incentive for Schering to manipulate or market spreads of its branded, pharmacy-dispensed drugs because physicians have no economic interest in prescribing

them and pharmacies have no choice but to dispense the branded drug prescribed by a physician.  <u>Source</u>: Testimony of S. Addanki; Testimony of M. Kolassa

***Schering Made Substantial Sales of its Products at or Near List Price***

25. WAC or Direct Price for branded products is the undiscounted list price at which the manufacturer typically sells to a wholesaler, intermediary, or other direct purchaser. <u>Source</u>: Testimony of M. Kolassa; Roy Levy, *The Pharmaceutical Industry: A Discussion of Competitive and Antitrust Issues in an Environment of Change*, Bureau of Economic Analysis, Federal Trade Commission, March 1999, Table III.1, p. 52 (as quoted in Report of Prof. Berndt ¶ 139)

26. The meaning of WAC/Direct Price is and has been widely known throughout the industry for many years and is reflected in the federal statute adopted in 2003.  <u>Source</u>: Testimony of M. Kolassa; 42 U.S.C. § 1395w-3a(c)(6)(B)

27. Consistent with industry practice, Schering reported to the compendia its list price (WAC or Direct Price) for its branded products.  <u>Source</u>: Testimony of Schering Witness

28. When a manufacturer sells a product to a wholesaler or intermediary, standard industry practice is to provide a discount of 2% for prompt payment  <u>Source</u>: Testimony of S. Addanki; Testimony of Schering Witness

29. Due to the prompt-payment discount, sales at net prices within 2% of WAC/Direct Price reflect sales at WAC/Direct Price.  <u>Source</u>: Testimony of S. Addanki

30. Substantial sales of Schering's products were made during the class period within 2% of WAC/Direct Price, and the vast majority of Schering's sales were made within 5% of WAC/Direct Price.  <u>Source</u>: Testimony of S. Addanki

31.   The AWPs for Schering's products reported by the pricing compendia consistently reflected a 20% or 25% markup above WAC/Direct Price, in accordance with industry practice.  <u>Source</u>: Testimony of S. Addanki; Testimony of Schering Witness

32.   Reduction of Schering's WACs/Direct Prices would have been economically unreasonable; it would have reduced revenues for sales at WAC for no reason.  <u>Source</u>:  Testimony of S. Addanki

33.   When Schering sells through a wholesaler, chain pharmacy, or other intermediary, Schering does not normally know the price at which the intermediary resells the product to a pharmacy or other provider.  Sometimes, when Schering has a chargeback arrangement with the ultimate customer, Schering has access to the ingredient price paid by such ultimate customers, but it does not know of any service or handling charges by the intermediary. <u>Source</u>: Testimony of B. Longstreet; Testimony of Schering Witness

34.   On the whole, the price at which the wholesaler or other intermediary resells the product to a  pharmacy or other provider must exceed the price at which Schering sells the product to the wholesaler or intermediary for the wholesaler or other intermediary to stay in business. <u>Source</u>: Testimony of S. Addanki

35.   Plaintiffs allege that Schering competes for market share by boosting AWPs of drugs at issue or offering rebates.  However:

   a.   The AWPs for Schering's drugs show no sign of artificial inflation or manipulation. <u>Source</u>: Testimony of S. Addanki

   b.   Offering rebates to targeted segments of the market is a form of pro-competitive price competition.  <u>Source</u>: Testimony of S. Addanki

   c.   There is no correlation between AWP and market share for any product.  For example, following the introduction of generic versions of albuterol sulfate, Proventil maintained

its relatively high WAC/Direct Price (and companion AWP), but steadily lost market share over time.  <u>Source</u>: Testimony of S. Addanki; Testimony of Schering Witness

***Schering's Products at Issue***

36.    The Schering products at issue include certain forms of Temodar®, Proventil®, and Intron-A®.  <u>Source</u>:  1/30/2006 Consolidated Order re: Motion for Class Certification ("Class Cert Order")

37.    Temodar is an antineoplastic used to treat brain cancer.  It is a pill that is exclusively self-administered and dispensed by pharmacies.  Temodar is one of the few breakthrough cancer drugs that are self-administered and reimbursed by Medicare Part B pursuant to a special provision of the Medicare statute.  <u>Source</u>:  Testimony of B. Longstreet; 42 U.S.C § 1395x(s)(2)(Q)

38.    Recognizing that Temodar is a "self-administered oral tablet," Plaintiffs claim no Class 3 damages for Temodar.  <u>Source</u>: Hartman Decl. "Attachment J", Pls.' Ex. 973

39.    Plaintiffs continue to assert Class 2 damages for Temodar; however, Temodar is a self-administered drug dispensed through the price-competitive pharmacy distribution chain, not a physician-administered drug that falls within the pattern of manipulation alleged by Plaintiffs.  <u>Source</u>: Testimony of M. Kolassa; Testimony of S. Addanki

40.    During the Class 2 period, 77% of Temodar sales were within 2% of WAC/Direct Price.  92% of sales were within 3% of WAC/Direct Price, and 95% of sales were within 5% of WAC/Direct Price.  <u>Source</u> Testimony of S. Addanki

41.    Substantial sales of Temodar took place at WAC/Direct Price and, at all times throughout the class period, the AWPs for Temodar reflected the standard mark-up from WAC/Direct Price used by the pricing compendia.  <u>Source</u>: Testimony of S. Addanki

42.     The Temodar WAC/AWPs in the self-administered pharmacy-dispensed market are the same as the Temodar WAC/AWPs in the Medicare market.  <u>Source</u>: Testimony of S. Addanki

43.     Proventil is a branded form of albuterol sulfate used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases.  In its solution form, which is the only form at issue in this case, Proventil is is almost exclusively self-administered through nebulizers and dispensed by pharmacies. <u>Source</u>: Testimony of B. Longstreet

44.     Proventil was subject to competition from both branded and generic forms of albuterol sulfate for nearly the entire class period.  <u>Source</u>:  Testimony of H. Weintraub; Testimony of S. Addanki

45.     Plaintiffs assert claims relating to Proventil for Classes 2 and 3.

46.     With respect to Class 3, Proventil was subject to generic competition from 1992 forward. Therefore, Plaintiffs assume that reimbursement was subject to a MAC from 1993 forward and claim no damages from that point forward.  <u>Source</u>: Hartman Decl. "Attachment J", Pls.' Ex. 973

47.     Plaintiffs continue to assert damages for Class 3 in 1991 and 1992.   However, Proventil is a self-administered drug and not within the class definition.

48.     With respect to Class 2, the solution form of Proventil may be reimbursed under the "Durable Medical Equipment" ("DME") provision of Medicare Part B.  The DME provision of Medicare Part B provides for reimbursement of drugs used in conjunction with equipment that is also reimbursed for use at home.  <u>Source</u>:  42 U.S.C. § 1395 *et. seq*.

49.     Proventil is a self-administered drug dispensed through the price-competitive pharmacy distribution chain, not a physician-administered drug that falls within the pattern of

manipulation alleged by Plaintiffs.  <u>Source</u>: Testimony of M. Kolassa; Testimony of S. Addanki

50.   During the class period, 48% of Proventil sales were within 2% of WAC/Direct Price.  In addition, 71% of sales were within 3% of WAC/Direct Price, and 83% of sales were within 5% of WAC/Direct Price.  <u>Source</u>: Testimony of S. Addanki

51.   Substantial sales of Proventil took place at WAC/Direct Price and, at all times throughout the class period, the AWPs for Proventil reflected the standard mark-up from WAC/Direct Price used by the pricing compendia.  <u>Source</u>: Testimony of S. Addanki

52.   The WAC/AWPs in the self-administered, pharmacy-dispensed market are the same as the Proventil WAC/AWPs in the Medicare market.  <u>Source</u>: Testimony of S. Addanki

53.   Intron-A is an immunomodulator that is used to treat hepatitis, leukemia, melanoma, follicular lymphoma, condyloma, and AIDS-related Kaposi's Sarcoma.  <u>Source</u>: Testimony of B. Longstreet

54.   Intron-A is primarily a self-administered drug.  The predominant form is a "pen" that is purchased at a pharmacy and used at home for self-injection.  An "induction" dose of Intron-A is sometimes administered by physicians to treat melanoma, condyloma, and Kaposi's Sarcoma, and – when administered by physicians – it is reimbursed under Medicare Part B.  When a physician begins a course of treatment with an induction dose, the remainder of the course of treatment is usually self-administered and, thus, is not reimbursed under Medicare Part B.  <u>Source</u>:  Testimony of B. Longstreet

55.   Intron-A is predominantly a self-administered drug dispensed through the price competitive pharmacy distribution chain, not a physician-administered drug that falls within the pattern of manipulation alleged by Plaintiffs.  <u>Source</u>: Testimony of S. Addanki

56.     During the class period, 65% of Intron-A sales were within 2% of WAC/Direct Price.  74% of sales were within 3% of WAC/Direct Price, and 78% of sales were within 5% of WAC/Direct Price.  Source Testimony of S. Addanki

57.     Substantial sales of Intron-A took place at WAC/Direct Price and, at all times throughout the class period, the AWPs for Intron-A reflected the standard mark-up from WAC/Direct Price used by the pricing compendia.  Source: Testimony of S. Addanki

58.     Throughout the class period, the WACs/Direct Prices and AWPs for the physician-administered forms of Intron-A on a per-unit basis were identical to, and moved together with, those of the self-administered forms dispensed through the price-competitive pharmacy distribution chain.   Source: Testimony of S. Addanki

**Plaintiffs' Theories regarding Warrick Generics Do Not Fit with the Realities of the Generic Marketplace**

**_Warrick and the Generic Marketplace_**

59.     Warrick began selling albuterol sulfate products in 1993 and perphenazine products in 1994.  Source: Testimony of H. Weintraub

60.     Generic manufacturers compete to provide the generic version of a drug used by a particular pharmacy or pharmacy chain.  Source: 230 F.R.D. at 74

61.     As a result of vigorous competition in the generic market, Warrick's prices for albuterol sulfate and perphenazine declined substantially over time. Source: Testimony of H. Weintraub; Hartman Decl. "Attachment G.5.a", Pls.' Ex. 970

62.     Due to the dynamics of price competition in the generic market, Warrick's pricing varies customer-by-customer and can change day-by-day.  Source: Testimony by H. Weintraub

63. Due to the dynamic nature of generic pricing, with only a few exceptions, Warrick did not and does not report WAC/Direct Price (or any list price) for its products to the compendia. <u>Source</u>: Testimony of H. Weintraub

64. When Warrick sells to intermediaries, Warrick does not know the prices at which the intermediaries resell to pharmacies or other providers.  <u>Source</u>: Testimony of H. Weintraub

65. Wholesaler margins vary by product over time.  They can be significant, ranging from 3% - 46% for some products, including albuterol sulfate. <u>Source</u>: HHS-OIG, *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392 June 1996) at 5-6; HHS-OIG, *Are Medicare Allowances for Albuterol Sulfate Reasonable?* (OEI-03-97-00292 Aug. 1998) at 6; HHS-OIG, *Suppliers' Acquisition Costs For Albuterol Sulfate* (OEI-03-94-00393 June 1996) at Appendix B

66. With respect to setting AWPs, Warrick followed industry practice and generally set its AWPs at levels that were 10 - 20% below the branded version of the drug.  <u>Source</u>: Testimony of H. Weintraub

67. It is and has been industry practice generally to allow AWPs for generics to remain steady while prices decline.  <u>Source</u>: Testimony of H. Weintraub; Testimony of M. Kolassa

68. Warrick made very few changes to its AWPs and has not changed the AWP for any drug at issue in this case since 1995.  <u>Source</u>: Testimony of H. Weintraub; Testimony of S. Addanki

69. Due to stable AWPs and rapidly falling prices, spreads between the two on generic drugs can be large percentages.  <u>Source</u>: Testimony of M. Kolassa; Testimony of S. Addanki

70. CMS knew that Medicare reimbursement rates for generics were in excess of acquisition costs.  <u>Source</u>: *See generally* Track 1 Defs.' Common Proposed Findings of Fact and Conclusions of Law

71.     The federal government published during the class period at least 6 reports describing
        spreads between albuterol solution AWPs and provider acquisition costs.  Source:  HHS-
        OIG Reports[3]; Testimony of S. Addanki

72.     The Government purposefully maintained that situation: (1) to encourage the use of lower-
        cost generics; and (2) to subsidize inadequate dispensing fees for pharmacies and
        administration fees for physicians.  Source: 230 F.R.D. 61, 75 (D. Mass. 2005); Testimony
        of G. Bell; Testimony of S. Addanki; Testimony of M. Kolassa

73.     Because generic products such as albuterol are relatively inexpensive, large percentage
        spreads equate with small dollars.  Source: Testimony of S. Addanki

74.     For example, a 2002 OIG report on albuterol shows acquisition costs of $0.05 and a
        Medicare reimbursement of $0.41, resulting in a spread of forty-two cents, which equates
        to 720% of acquisition cost.  Source: HHSOIG, *Excessive Medicare Reimbursement for
        Albuterol* (March 2002) at 17, Defs.' Ex. 1103

### *Warrick's Products at Issue*

75.     The Warrick products at issue are albuterol sulfate and perphenazine, both of which are
        self-administered and dispensed by pharmacies.  Source:  Testimony of H. Weintraub

76.     Like the branded Proventil solution, generic albuterol sulfate solution is used to treat
        asthma, chronic bronchitis, emphysema, and other lung diseases.  It is primarily a self-
        administered drug dispensed by pharmacies for patients to use at home with a nebulizer
        and is reimbursed under the "Durable Medical Equipment" provision of Medicare Part B.
        Source: Tesitmony of H. Weintraub; 42 U.S.C. § 1395 *et seq.*

---

[3] HHS-OIG, *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392 June 1996) at 4-7; HHS-OIG, *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393 June 1996) at 6, 9; HHS-OIG, *Are Medicare Allowances for Albuterol Sulfate Reasonable?* (OEI-03-97-00292 Aug. 1998) at 7-9; HHS-OIG, *Medicare Reimbursement of Albuterol* (OEI-03-00-00311 June 2000) at 1-2, 10-12; HHS-OIG, *Excessive Medicare Reimbursement for Albuterol* (OEI-03-01-00410 Mar. 2002) at 8-12; HHS-OIG, *Update: Excessive Medicare Reimbursement for Albuterol* (OEI-03-03-00510 Jan. 2004) at 7-10.

77.    Both Warrick's 0.5% albuterol solution and the 0.083% albuterol solution were launched in 1993.  At the time, several other branded and generic versions of albuterol sulfate had already been introduced to the market and albuterol sulfate was a multi-source drug for the entire period for which Plaintiffs' have calculated damages.  Source:  Testimony of S. Addanki; Tesitmony of H. Weintraub

78.    Plaintiffs assert claims relating to albuterol sulfate in connection with Classes 2 and 3.

79.    Recognizing that Warrick's albuterol sulfate was subject to generic competition since its introduction, Plaintiffs assume for Class 3 that reimbursement was subject to a MAC throughout the class period and claim no damages for Class 3.  Source: Hartman Decl. "Attachment J", Pls.' Ex. 973

80.    Plaintiffs continue to assert Class 2 damages for albuterol sulfate; however, albuterol sulfate is a self-administered drug dispensed through the price-competitive pharmacy-distribution chain, not a physician-administered drug that falls within the pattern of manipulation alleged by Plaintiffs.  Source: Testimony of S. Addanki

81.    Warrick's AWPs for albuterol sulfate were consistently low in relation to those of its competitors.  Source: Testimony of S. Addanki

82.    There is no correlation between the AWPs for Warrick's albuterol sulfate and its market share.  In fact, Warrick had generally high market share despite relatively low AWPs.  Source:  Testimony of S. Addanki

83.    Warrick did not manipulate AWPs or market spreads to gain market share from competing products.  Source: Testimony of H. Weintraub; Testimony of S. Addanki

84.    In the Medicare program, the government used as its "MAC," or alternative reimbursement rate, the median AWP of all available versions of the generic drug.  Source: 42 U.S.C. §

1395u(o) (amended Dec. 8, 2003); 42 C.F.R § 405.517 (amended Nov. 2, 1998; Jan. 7, 2004; Nov. 15, 2004) (now superseded)

85. Throughout the class period, Medicare reimbursement of the Warrick products at issue was based on median AWPs.  Source:  42 C.F.R. § 405.17; 42 U.S.C. § 1395u(o).

86. The use of median AWPs for reimbursement of generics by Medicare means that reimbursement of a generic drug is not based on that individual drug's AWP.  Source: Testimony of S. Addanki; Testimony of M. Kolassa

87. The median AWP for albuterol was computed at different intervals by different carriers by means of different methods, yielding different median rates at the same time, none of which was published or otherwise disclosed to manufacturers.  Source: HHS-OIG, *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392 June 1996) at 2; Testimony of M. Kolassa

88. It is quite difficult – if not impossible – for any one manufacturer to affect the median. Source: Testimony of S. Addanki

89. Because a change in the median would apply equally to all competing forms of the product and provides no means for one manufacturer to gain market share at the expense of another, Warrick had no incentive to manipulate the median, even if it were possible to do so.  Source: Testimony of S. Addanki

90. With few exceptions, Warrick's AWPs for albuterol sulfate were always at or below the median.  Warrick's AWPs for the 0.083% solution – by far the biggest seller – were always at or below the median.  Source: Testimony of S. Addanki

91. Medicare records of reimbursement of albuterol sulfate solutions do not indicate which version of the drug was reimbursed, Warrick's or another manufacturer's.  Source: Testimony of S. Addanki

92.     When Medicare began utilizing ASP as the basis of reimbursement for ingredient costs, it increased the dispensing fee for certain drugs, including albuterol solutions.  As a result, the total reimbursement for at least certain forms of albuterol solutions has increased in conjunction with the shift from AWP to ASP under the Medicare Modernization Act.
        Source:  Testimony of S. Addanki; Testimony of M. Kolassa

93.     Perphenazine is an anti-psychotic drug that is primarily self-administered and dispensed by pharmacies.  Occasionally, but rarely, it is administered by physicians as an anti-emetic agent, and when so administered, it is reimbursed under Medicare Part B.  Source: Testimony of H. Weintraub; Testimony of M. Kolassa

94.     CMS data shows that Medicare Part B paid approximately $50,000 in reimbursement for all manufacturers' versions of perphenazine during the entire class period.   Source: Testimony of S. Addanki

95.     Warrick's form of perphenazine, which is a pill, is not suitable for use as an anti-emetic and likely never was reimbursed by Medicare Part B.   Source: Testimony of M. Kolassa

96.     Medicare records of reimbursement of perphenazine do not indicate that Warrick's version of the drug was ever reimbursed under Part B. Source:  Testimony of S. Addanki; Testimony of M. Kolassa

97.     As in the case of albuterol, Warrick had no knowledge of the various median AWPs computed simultaneously by Medicare carriers during the class period, it had no incentive to affect the median, it had little if any ability to affect the median, and it did not attempt to affect the median.  Source: Testimony of H. Weintraub; Testimony of S. Addanki

        ***Warrick's Marketing Practices***

98.     Warrick does not market or sell its products to physicians.  Source: Testimony of H. Weintraub

99.     Warrick sells its products almost entirely to wholesalers, chain pharmacies, and generic distributors and in so doing competes based on price, quality, and reliability of supply.

Source: Testimony of H. Weintraub

100.    Warrick has a small sales force (3-4 people) that focuses on sales to large wholesalers and chain pharmacies through corporate headquarters, not individual providers.  Source: Testimony of H. Weintraub

101.    Warrick's sales personnel did not compare Warrick spreads with those of competing products or market on that basis. Source:  Testimony of H. Weintraub; Testimony of A. Graf

102.    Warrick did not know the many reimbursement plans adopted by private insurers to reimburse for use of its products, and Warrick did not monitor public rates within Medicaid and Medicare for reimbursement of its products.  Source:  Testimony of H. Weintraub

### The Plaintiffs' Theory of Tacit Collusion by Generic Manufacturers is Unfounded

103.    At the time the Court certified Classes 2 and 3, Plaintiffs' key allegation was that pharmaceutical companies compete (not conspire) with one another for market share by boosting the AWP of competitive drugs or offering rebates.  Source: 230 F.R.D. at 94

104.    In light of the fact that generic reimbursement is based on a median, Plaintiffs have abandoned their theory that generic competitors compete on AWPs and now assert that generic manufacturers collude to form a "tacit Nash equilibrium" to win market share from non-generic therapeutic alternatives.  Source:  Testimony of S. Addanki

105.    A Nash equilibrium is simply a state of affairs in which no participant has any incentive to modify its behavior given the behavior of every other participant.  Therefore, calling a

given marketplace outcome a Nash equilibrium is merely stating the obvious; any sustainable marketplace outcome is such an equilibrium. <u>Source</u>: Testimony of S. Addanki

106. With respect to generic self-administered products such as albuterol and pill-form perphenazine, which are prescribed by physicians and dispensed by pharmacies, Plaintiffs' theory that manufacturers colluded to increase the median of a drug to compete against "therapeutic alternatives" is factually impossible. The pharmacy must dispense the drug prescribed by the physician; pharmacies are not permitted legally to dispense a "therapeutic alternative" to a prescribed drug. <u>Source</u>: Testimony of S. Addanki

## <u>REQUESTED RULINGS OF LAW</u>[4]

1. Third-party payors would inform itself of the basics of pharmaceutical pricing, including the divergence of AWP from provider acquisition cost, especially for generics.

2. The evidence is insufficient to support a finding that Schering manipulated the AWPs of Intron-A, Proventil, or Temodar.

3. The evidence is insufficient to support a finding that Schering "marketed spreads" relating to Intron-A, Proventil, or Temodar.

4. The evidence is insufficient to support a finding that Warrick manipulated the medians on which Medicare reimbursement of albuterol sulfate or perphenazine is based.

5. The evidence is insufficient to support a finding that Warrick "marketed spreads" relating to albuterol sulfate or perphenazine.

6. There is no evidence that generic manufacturers of albuterol or perphenazine worked together or colluded to inflate Medicare medians to gain market share from so-called "therapeutic alternatives."

---

[4] Schering and Warrick adopt and incorporate herein by reference the Track 1 Defendants' Common Proposed Conclusions of Law.

7.    There is no evidence that total reimbursement for albuterol sulfate – ingredient cost plus dispensing fee – would have been materially different if Warrick's albuterol AWPs had been lower.

8.    Plaintiffs' argument that so-called "market-share liability" should apply to manufacturers of generics, like Warrick, must fail because not all manufacturers of each generic are present in this case and because such a theory of liability is now generally disfavored.

9.    The evidence is insufficient to find that Schering committed an unfair or deceptive act by reporting WAC, as it was a price at which substantial (i.e., not isolated or insignificant) sales in the trading area where made.  *Cf.* 16 C.F.R. § 233.3(d); 940 CMR 3.04.

10.   The evidence is insufficient to support a finding that Schering or Warrick committed a deceptive or unfair act under Chapter 93A by competing based on price in the generic market.

11.   The evidence is insufficient to support a finding that Schering or Warrick breached any duty to the plaintiffs under Chapter 93A.

12.   The evidence is insufficient to support a finding that Schering or Warrick committed an unfair act under Chapter 93A.

13.   The evidence is insufficient to support a finding that Schering or Warrick caused any harm under Chapter 93A.

14.   The conduct of which the plaintiffs complain occurred "primarily and substantially" outside Massachusetts; therefore, Plaintiffs have no claim against Warrick or Schering under c. 93A.  *Sentinel Products Corp. v. Mobile Chemical Co.*, 2001 WL 92272, at *23-24 (D. Mass. Jan. 17, 2001) (Saris, J.)

Respectfully submitted,

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Eric P. Christofferson (BBO#654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Schering-Plough Corporation and
Warrick Pharmaceuticals Corporation*

Dated:  November 1, 2006

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 1, 2006, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.


<u>/s/ Eric P. Christofferson</u>
Eric P. Christofferson