**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 01-12257-PBS<br><br>Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO<br>01-CV-12257-PBS AND 01-CV-339 |  |

# THE J&J DEFENDANTS' TRIAL MEMORANDUM

Johnson & Johnson, Ortho Biotech Products, L.P., and Centocor, Inc. (the "J&J Defendants") respectfully submit this Trial Memorandum in advance of the Class 2 and Class 3 trial.

### A. Plaintiffs' 30% Liability Theory

When plaintiffs brought this case, they claimed it was about a handful of aberrational drugs with "mega-spreads." They freely admitted that AWP-based reimbursement "works" for "99%" of drugs, but argued that a few drugs had "mega-spreads," i.e., their AWPs were so grossly inflated that payors were unwittingly being duped into paying excessive reimbursement.[1] The Complaint cited illustrative spreads ranging between 230% and 20,735%.[2]

That is not the case plaintiffs have today, because the facts did not bear it out. This is nowhere more evident than in the case of the two J&J drugs at issue, Procrit and Remicade. When plaintiffs calculated the prices on these drugs they discovered that the "spreads" bore no relationship to the "mega-spread" theory on which the case was based.

The first sign that plaintiffs' case would not be about "mega-spreads" emerged in the briefing on plaintiffs' motion for class certification. Plaintiffs submitted a declaration from their expert, Dr. Raymond S. Hartman, in which Dr. Hartman opined that payors were aware of spreads between acquisition cost and AWP, but "expected" them not to exceed 33%.[3] Given that the difference between undiscounted wholesale list price and AWP is typically 20% or 25%, even very modest discounts below the list price yielded spreads of 33% or more.[4] Nevertheless,

---

[1] *Written Tutorial of Meredith Rosenthal, Ph.D.* (Dec. 6, 2004) at 2-3 and n.2.

[2] E.g., Fourth Amended Master Consolidated Class Action Complaint, ¶ 200.

[3] See Decl. of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification (Sept. 3, 2004), ¶¶ 30(g) and 33(b).

[4] A 6% discount from a list price of $100 ($94), if the AWP is 25% higher than the list price ($125), yields a "spread" of 33%.

a literal interpretation of Dr. Hartman's 33% theory meant that even modest discounts were illegal. Nevertheless, Dr. Hartman promised he would support his theory with deposition testimony and a survey of payor expectations, both of which he said he would obtain in discovery.

When Dr. Hartman's 33% theory was first articulated, plaintiffs were vague about whether drugs with spreads that were only slightly above 33%, e.g., spreads of 34%-40%, would be subject to liability. The Court, however, appears to have been under the impression that plaintiffs still intended to restrict their case to drugs with net prices that were significantly below Dr. Hartman's threshold, i.e., that the case was still about "mega-spreads":

> Plaintiffs claim that "defendants (or wholesalers) sell a drug to retailers at a net price often significantly below the expected 'AWP minus 16% to 33%' threshold . . . ."[5]

The discovery period came and went, but Dr. Hartman did not conduct a survey. Moreover, as defendants emphasized in their summary judgment papers, payors uniformly testified that their decision to use AWP-based reimbursement was not based on the expectation that AWP bore a fixed relationship to acquisition cost.[6]

Plaintiffs were undaunted by the lack of evidentiary support for Dr. Hartman's 33% theory. To the contrary, on December 15, 2005, plaintiffs filed a new Hartman declaration in which he lowered his liability threshold from 33% to 30%. He did so after he calculated the

---

[5] *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 69 (D. Mass. 2005) (Memorandum and Order Re: Motion for Class Certification) (emphasis in original). The Court's formulation expresses the spread as a discount below AWP. Dr. Hartman expresses the spread as premium over the selling price. For example, if the selling price of a drug is 16% to 33% below its AWP (as in the Court's example), the AWP (as expressed by Dr. Hartman) would be 19% to 49% above the selling price.

[6] See, e.g., Track 1 Defendants' Memorandum of Law in Support of their Motion for Summary Judgement With Respect to Class 3 at 6-10.

spreads on the J&J Defendants' drugs and saw that a 33% liability trigger would largely exempt the J&J drugs from liability, because almost all of the J&J spreads were below 33%.

Plaintiffs should have dismissed their case against the J&J Defendants as soon as they saw that the spreads on J&J's drugs were less than 33%. Instead, they simply changed the liability threshold to 30%. This was easy enough to do, since the original 33% threshold was plucked from thin air.

The 30% liability threshold now forms the centerpiece of plaintiffs' case. They say it is equivalent to a "speed limit" that provides a "bright line test" for liability under Ch. 93A:

> The 30% spread threshold determined by Plaintiffs' economics expert, Dr. Raymond Hartman, is a bright line test, equivalent to a speed limit. Dr. Hartman explained that the market understood, and expected, up to a 30% spread between AWP and actual acquisition cost of physician-administered drugs. AWPs that exceed the 30% threshold are considered deceptive.[7]

Needless to say, plaintiffs' 30% "speed limit" is not posted in the statute. It is not based on a survey.[8] It is not based on scientific literature.[9] It is not supported by deposition testimony[10]; indeed it is not affected by contrary deposition testimony.[11] An unsuspecting drug

---

[7] Plaintiffs' Memorandum in Opposition to the Johnson & Johnson Defendants' Motion for Summary Judgment On Class 3 at 1-2 (citation omitted).

[8] Dr. Hartman originally promised to base his testimony on surveys. See Declaration of Raymond S. Hartman In Support of Plaintiffs' Motion for Class Certification dated September 3, 2004 ("Hartman 9/3/04 Report") at ¶¶ 21, 33. See also Memorandum and Order Re: Motion for Class Certification dated August 16, 2005 [Docket No. 1648] at 64 (noting that Dr. Hartman originally promised that "as a cross-check, he will compare the calculated "but-for" spread with industry wide surveys.").

[9] See Declaration of Daniel L. McFadden dated March 21, 2006 at ¶¶ 42-55. See also id. at ¶¶ 56-87.

[10] Dr. Hartman originally promised that he would base his opinion on deposition testimony. See Hartman 9/03/04 Report at ¶ 29 ("Of course, final yardstick spreads to be used to determine injury and damages during the Damages Phrase of this Litigation would take these yardstick estimates as points of departure and refine them further though …depositions of appropriate personnel in TPPs and managed care organizations. Such further refinement will more precisely determine expectations concerning a non-fraudulent relationship between AWP and ASP.")

manufacturer that wanted to know if a 30% or 33% spread was legal or illegal would need to ask Dr. Hartman, take his word for it, and hope he doesn't change his mind later.

**B.    The J&J "Spreads"**

Plaintiffs had a compelling reason to manipulate their liability theory to keep the J&J Defendants' drugs in the case. The two J&J drugs at issue, Procrit® (sold by Ortho Biotech) and Remicade® (sold by Centocor), are block-buster drugs with sales in the billions of dollars. As a result, these drugs comprise a substantial share of plaintiffs' damages claim. But the damages plaintiffs allege on these drugs are driven by sales volume, not by the size of the alleged spreads. Even Dr. Hartman concedes that most of the J&J Defendants' spreads less than 30%:

| Procrit (Wtd. Ave. of All NDCs) Per Hartman Dec. 2005 Report | | | | | | |
|---|---|---|---|---|---|---|
| **1991** | **1992** | **1993** | **1994** | **1995** | **1996** | **1997** |
| 22.7% | 23.6% | 25.1% | 24.1% | 27.3% | 30.1% | 27.8% |
| **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | |
| 29.4% | 27.1% | 25.6% | 27.5% | 26.7% | 30.3% | |

| Remicade Per Hartman Dec. 2005 Report | | | | | |
|---|---|---|---|---|---|
| **1998** | **1999** | **2000** | **2001** | **2002** | **2003** |
| 30.8% | 33.4% | 31.9% | 36.1% | 33.9% | 34.3% |

These spread figures are not remotely like the "mega-spreads" this case was supposed to be about. In fact, during the class certification hearing, the Court was openly skeptical about whether drugs with these sorts of spreads belong in the case:

> Mr. Cavanaugh:   Here's Remicade, your Honor. It's a 30 percent spread. It actually comes in within . . . Dr. Hartman's supposed expectation, which he says is 17 to 33 percent.
>
> The Court:   Okay, that's good one for you. Are there certain drugs that would be somewhere, I imagine --

---

[11] See February 27, 2006 deposition of Raymond Hartman at 781:15-:782:3 (stating that payor deposition testimony doesn't "provide sufficiently scientific evidence to be incorporated into what I have done here."). See also id. at 739:1-781:14 (discussing specific payor testimony refuting expectations).

4

1318963v1

>   Mr. Cavanaugh:   Absolutely. That goes to my point, your Honor. It's going to require that type of individualized inquiry: What did you expect with respect to [Taxol]? What did you expect with respect to Remicade?
>
>   The Court:   *Why can't I throw out these kind of drugs and try the ones where there's a dramatic spread?*[12]

The Court was right to question whether drugs like Procrit and Remicade belong in the case. They clearly do not. This is true even if Dr. Hartman's spread calculations, referenced above, are correct.

But Dr. Hartman's spread calculations are not correct. He miscalculated the Procrit and Remicade spreads because he did not exclude from his calculations discounts that do not benefit providers, such as prompt pay discounts given to wholesalers, and discounts given to managed care organizations, hospitals, and the government. Dr. Hartman acknowledges that he intended to exclude these discounts from his calculations, but when the J&J Defendants' expert attempted to replicate Dr. Hartman's calculations, he discovered that Dr. Hartman had only removed some of them. When the J&J Defendants' expert corrected for these errors, he found that the spreads on Procrit and Remicade <u>never</u> exceeded 30%:

| Procrit (Wtd. Ave. of All NDCs) (Corrected) | | | | | | |
|---|---|---|---|---|---|---|
| **1991** | **1992** | **1993** | **1994** | **1995** | **1996** | **1997** |
| 23.0% | 24.3% | 24.4% | 24.3% | 23.2% | 24.3% | 25.2% |
| **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | |
| 24.5% | 24.6% | 25.1% | 26.5% | 25.7% | 26.0% | |

| Remicade (Corrected) | | | | | |
|---|---|---|---|---|---|
| **1998** | **1999** | **2000** | **2001** | **2002** | **2003** |
| 30% | 30% | 30% | 30% | 30% | 30% |

---

[12] Transcript, Class Certification Hearing before the Honorable Patti B. Saris, U.S.D.J., at 76:2-76:13 (Feb. 10, 2005).

5

1318963v1

Although the J&J Defendants will prove that Dr. Hartman has miscalculated the spreads on Procrit and Remicade, judgment should be entered in favor of the J&J Defendants even if Dr. Hartman's calculations are correct. Even the largest of Dr. Hartman's spreads exceed 30% by a few percentage points. That is why plaintiffs have been forced to hang their case on the assertion that 30% is a "bright line test." According to this theory, Centocor supposedly defrauded payors in 1998 because Remicade's spread was 30.8%, and Ortho Biotech supposedly defrauded payors in 1996 because Procrit's spread was 30.1%. Of course, if Dr. Hartman had not lowered the "speed limit" from 33% to 30%, neither company would be liable in those years. No Massachusetts court has ever said that Ch. 93A imposes a "bright line" test for liability, and plaintiffs' effort to engraft such a test onto the statute is arbitrary and capricious.

Plaintiffs tried to salvage their case against Ortho Biotech by asking Dr. Hartman to disassemble Procrit's pricing data and calculate a separate "spread" for each of Procrit's individual package sizes (or "NDCs"), for each year in which Procrit was sold. Like many drugs, Procrit is sold in several different package configurations and dosage strengths. By looking at each of Procrit's 15 NDCs in each of the years in which it was sold, Dr. Hartman calculated a total of 116 separate "spreads."

According to Dr. Hartman, 16 out of 116 NDCs had "spreads" greater than 30%. (Eight of the 16 were below 33%.) Dr. Hartman thus finds fraud in 1995, even though 10 out of 11 of Procrit's NDCs that year were below 30%. In another instance he finds fraud on a Procrit NDC (59676030201) whose "spread" exceeded 30% only once in 11 years.[13]

---

[13] Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages (Dec. 15, 2005), Attachment I.4 (hereinafter "Hartman Liability Report")

The following table identifies each NDC that Dr. Hartman says had a spread greater than 30%:

| Procrit NDC | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Procrit Spreads > 30% (Per Hartman)** | | | | | | | | | | | | | |
| 00062740003 | | | | | | | | | | | | | |
| 00062740103 | | | | | | | | | | | | | |
| 00062740201 | | | | | | | | | | | | | |
| 00062740501 | | | | | | | | | | | | | |
| 59676030201 | | | ✓ | | | | | | | | | | |
| 59676030202 | | | | | | | ✓ | | | | | ✓ | ✓ |
| 59676030301 | | | | | | | | | | | | | |
| 59676030302 | | | | | | | ✓ | | | | | ✓ | |
| 59676030401 | | | ✓ | | | | | | | | | | |
| 59676030402 | | | | | | | | | | | | | |
| 59676031001 | | | | | ✓ | | | | | | | | |
| 59676031002 | | | | | | | | | ✓ | ✓ | | | |
| 59676031201 | | | | | | ✓ | ✓ | | | | | | |
| 59676032001 | | | | | | | ✓ | ✓ | ✓ | | | | |
| 59676034001 | | | | | | | | | | | | | ✓ |

These individual spread calculations, however, are tainted by the same calculation errors as Dr. Hartman's other calculations. When the calculation errors are corrected, only one out of 116 Procrit spreads exceeded 30%. A corrected version of the same table follows:

| Procrit NDC | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Procrit Spreads > 30% (Corrected)** | | | | | | | | | | | | | |
| 00062740003 | | | | | | | | | | | | | |
| 00062740103 | | | | | | | | | | | | | |
| 00062740201 | | | | | | | | | | | | | |
| 00062740501 | | | | | | | | | | | | | |
| 59676030201 | | | | | | | | | | | | | |
| 59676030202 | | | | | | | | | | | | | |
| 59676030301 | | | | | | | | | | | | | |
| 59676030302 | | | | | | | | | | | | | |
| 59676030401 | | | ✓ | | | | | | | | | | |
| 59676030402 | | | | | | | | | | | | | |
| 59676031001 | | | | | | | | | | | | | |
| 59676031002 | | | | | | | | | | | | | |
| 59676031201 | | | | | | | | | | | | | |
| 59676032001 | | | | | | | | | | | | | |
| 59676034001 | | | | | | | | | | | | | |

7

### C. The J&J Defendants' Marketing Practices

Because the Procrit and Remicade spreads are so modest, plaintiffs cannot credibly claim that the J&J Defendants' pricing practices were unfair or deceptive. Accordingly, plaintiffs have increasingly focused their attack on the J&J Defendants' so-called "marketing practices," which plaintiffs say are "unfair" under Ch. 93A.

The J&J Defendants' marketing practices are entirely lawful. Our summary judgment papers included declarations from Ortho Biotech and Centocor executives which describe how Procrit and Remicade were marketed, and offer a point-by-point rebuttal to plaintiffs' claim that they were marketed unfairly.

At its core, plaintiffs' criticism of Ortho Biotech and Centocor is that the companies "marketed the spread" by telling physicians (1) how much Procrit and Remicade cost, and (2) how much they could expect to be reimbursed by Medicare and private insurers. Although plaintiffs claim such conversations are illegal, they do not explain how such discussions would have injured Massachusetts insurance companies and consumers.[14]

The J&J Defendants will prove that plaintiffs' characterization of their marketing practices is distorted and untrue. For example, the evidence will show that, between the time of Procrit's launch 1991 and the launch of Procrit's first competitor in 2002, Ortho Biotech had little economic incentive to "market" Procrit's spread. The only therapeutic equivalent to Procrit at the time was Epogen, a drug sold by Amgen, Inc. Procrit and Epogen were the same drug under different brand names. However, because of a license agreement between Ortho Biotech

---

[14] Notably, plaintiffs' own expert, Dr. Meredith Rosenthal, concedes that whether or not a company "markets the spread" is irrelevant. The only thing that matters, in her opinion, is the existence of an actionable spread. As she puts it, "marketing the spread" is just a term "the lawyers" use. Deposition of Meredith Rosenthal, Ph.D. at 486:16-487:4 (Feb. 23, 2006). As noted above, the J&J Defendants' spreads are not actionable.

and Amgen, Procrit and Epogen did not compete in the same markets. The absence of competition meant that their "spreads" were not a competitive factor. This was especially true on the Medicare side since most Medicare Carriers reimbursed Procrit and Epogen on the basis on whichever brand's AWP was the lowest.

Plaintiffs focus their ire on a handful of documents that suggest that some Ortho Biotech field sales representatives discussed Procrit's profit potential with oncologists, notwithstanding the company's policy that sales representatives should talk about the product's clinical merits, and should not talk about economics. Procrit was sold to oncologists, a physician group that relied on drug revenue and therefore paid attention to the financial aspects of administering cancer therapy in their offices. In this environment, conversations about Procrit's cost and reimbursement undoubtedly took place. In fact, plaintiffs unearthed a memo from a District Manager in Minnesota in which he describes the economic benefits of administering Procrit and tells the ten sales representatives in his district that they could discuss profit with physicians if pressed, but that the numbers should written on "scratch paper." (Plaintiffs' Ex. 268.) Plaintiffs also located a home-made flyer in the files of a retired sales representative in Florida which showed that administering Procrit was more profitable than giving the patient a blood transfusion. (Plaintiffs' Ex. 245.)

Physician interest in reimbursement is a fact of life, especially in oncology. Physicians naturally want to know how much drugs costs, and what reimbursement will be. It is unrealistic to expect that sales representatives can avoid these discussions entirely, or that none of them will ever be tempted to tell a physician that she can "make money" administering the drug.

Notably, however, Procrit's spread was so small that physicians expressed disappointment in Procrit's reimbursement, claiming in some cases that they lost money

9

1318963v1

administering Procrit. For example, Ortho Biotech learned in 2000 that a company called U.S. Oncology, which is the nation's leading cancer care physician's network, had classified Procrit as "red light" drug whose usage was disfavored in comparison to more profitable "yellow light" and "green light" drugs.[15] The physicians in U.S. Oncology's network who administered Procrit to their patients ran the risk of forfeiting the opportunity to participate in U.S. Oncology's "reward pool," because there were other oncology products that were more profitable. Indeed, some of U.S. Oncology's physicians complained that "when they use more Procrit, they lose more money."[16]

Centocor faced a different challenge. Remicade was a revolutionary therapy for Crohn's disease and rheumatoid arthritis. Existing treatments for these diseases were toxic and barely effective. Patients suffering with these diseases typically were treated by rheumatologists.

Rheumatologists, unlike oncologists, had little or no experience administering drugs in their offices. If rheumatologists were going to provide Remicade infusions in their offices, they needed to purchase infusion equipment, dedicate office space for infusion chairs, hire and train additional nursing staff, and incur a host of other costs and risks that they had not previously encountered.

Not surprisingly, rheumatologists were very concerned about the possibility that they would lose money by providing in-office infusion services. They needed to be assured that

---

[15] Defendants' Ex. 2761.

[16] Id.; see also *Merits Report of Linda A. Haegele, M.D.* (Mar. 20, 2006) at ¶ 67. Dr. Linda Haegele, a oncologist practicing in Pennsylvania. She switched from Procrit to Aranesp in 2005, after Medicare adopted ASP as a reimbursement benchmark, in part because she lost money administering Procrit: "During 2005, I also made a shift in the erythropoietin that I prescribed for many of my patients from Procrit to Aranesp. In my professional opinion, Aranesp is equally effective as Procrit, but Aranesp saves me and my patients time. Moreover it was not financially feasible for me to provide Procrit to Medicare patients in 2005 because the Medicare reimbursement did not cover my acquisition cost. My practice lost $71.53 per shot of Procrit administered to Medicare patients." *Merits Report of Linda A. Haegele, M.D.* (Mar. 20, 2006) at ¶ 67.

providing Remicade infusions was practical and economically viable. They also needed to know exactly what they needed to do in order to set up and run a successful infusion practice.

To educate these physicians and overcome their natural reluctance to incur the cost of providing infusion services, Centocor developed materials that directly addressed the practical aspects of in-office infusion services. These materials addressed a host of issues, including reimbursement economics. They were designed, in part, to enable physicians to determine whether providing in-office Remicade infusions would be financially viable given the individual characteristics of their practices.

Plaintiffs have highlighted Centocor's "Office-Based Infusion Guide," as an example of "marketing the spread." (Plaintiffs' Ex. 252.) The Guide, which was distributed to physicians and posted on Centocor's web site, discussed the practical aspects of in-office infusion services. It lists five "benefits" of providing in-office infusions, including cost savings for payors, patient convenience, closer medical supervision of the infusion process, increased physician autonomy, and, potentially, "a financial benefit to a physician's practice."

Plaintiffs never explain how providing this information to rheumatologists caused injury to payors in Massachusetts. Ironically, in the case of Remicade, it undoubtedly helped to lower the payors' reimbursement costs. The alternative to in-office infusion is to send the patient to the hospital where the cost of treatment is higher. Centocor estimated that an infusion of Remicade in a physician's office costs payors $1,342, whereas an infusion in a hospital costs payors between $1,522 and $5,588. By encouraging in-office administration, Centocor helped lower reimbursement costs.

Centocor highlighted these cost savings with payors. It made presentations to health plans showing them that Remicade was less expensive when administered in the physician's

11

office instead of in hospitals. Several health plans cooperated with Centocor in its effort to persuade physicians that they should infuse Remicade themselves rather than send their patients to the hospital. Indeed, some health plans reported receiving bills from hospitals that were several thousand dollars above the cost of the drug.

### D. The Payors in Class 2 and Class 3 Knew About the J&J Defendants' "Spreads"

The payors in Class 2 and Class 3 had actual knowledge of the specific prices at which J&J drugs could be purchased. In the case of Remicade, this is true by definition, inasmuch as Centocor did not offer discounts to physicians.[17] Accordingly, Remicade could only be purchased by providers at or about the published list price. Remicade's 30% spread was a matter of public record.

Payors also knew Procrit's acquisition price. The following chart compares the prices paid by BCBS/MA, Fallon Community Health Plans, Harvard Pilgrim Health Care, and CIGNA to the ASP and AWP figures reported by Dr. Hartman. All four companies purchased Procrit at prices that closely tracked Dr. Hartman's ASPs.[18]

---

[17] The Johnson & Johnson Defendants' Local Rule 56.1 Statement in Support of Their Motion for Summary Judgment as to Class 1 and Class 2 (Mar. 15, 2006), ¶ 125.

[18] Declaration of Eric M. Gaier, Ph.D. in Support of the Track 1 Defendants' Joint Motion for Summary Judgment (Mar. 15, 2006) at Fig. 4. *See also id.*, App. A at Figs. 16, 17, and 18; Decl. of Jessica V. Barnett in Support of the Reply Memo. of Law in Further Support of the Track 1 Defendants' Joint Motion for Summary Judgment (Apr. 28, 2006) at Ex. 6 (listing maximum and median spreads on Procrit purchases by Class 3 payors).



**Procrit prices to Massachusetts TPPs**

If nothing else, payors should have known that physicians paid less than AWP. Numerous government reports made it clear that, in the pharmaceutical industry, AWP does not mean acquisition cost.[19]

Procrit pricing is discussed in several such reports, including a Government Accounting Office Report published in 2001.[20]  The GAO did a survey that compared AWP to the discounted prices available to "low volume" purchasing physicians to the prices available from wholesalers (referred to as the "widely available price").  The study examined the pricing on 16 Part B drugs, including Procrit.

The GAO survey revealed that Procrit could be purchased by physicians at an average discounted price of 22.1% below AWP.[21]  This discount is equivalent to a spread of 28.4% above ASP.

---

[19] HHS-OIG, "Changes to the Medicaid Prescription Drug Program Could Save Millions" (1984) at 3 ("Within the pharmaceutical industry, AWP means non-discounted list price.")(emphasis added))

[20] GAO Report to Congress, "Medicare-Payments for Covered Outpatient Drugs Exceed Providers' Cost" (Sept. 2001).

[21] Id. at 14, Table 5.

13

1318963v1

The GAO found that the *average* discount below AWP on all 16 drugs in the survey was 29.6%, which is equivalent to a spread of 42.0% above ASP.[22] Thus, the 28.4% spread on Procrit was below average.

Notably, the GAO figures on Procrit are consistent with Dr. Hartman's ASP calculations. Dr. Hartman claims that the spread on Procrit in 2001 was 26.5%. This is less than the 28.4% Procrit spread published in the GAO survey. Thus, a payor interested in knowing what doctors were paying for Procrit could look it up in the public record. In that event, the payor would also have learned that Procrit's spread, like Remicade's spread, was below average.

Lastly, plaintiffs have focused attention on a series of memos written in the mid to late 1990s by Cathleen Dooley, an employee in Johnson & Johnson's Washington, D.C. office. Ms. Dooley's memos were addressed to executives at Ortho Biotech. She comments that the difference between acquisition cost and AWP gave physicians a "windfall."[23] She also noted that it was "fortunate" that HCFA had not done surveys to determine the estimated acquisition cost or EAC for Part B drugs, including Procrit, because the surveys would have resulted in lower reimbursement than AWP.[24]

Ms. Dooley will testify at trial. She will explain that she was simply attempting to explain what was already obvious to everyone familiar with Part B reimbursement, namely that doctors were earning a margin on drugs administered under the program, including Procrit, and that a survey establishing an EAC on a Part B drug that was otherwise being reimbursed off of

---

[22] Id.

[23] Plaintiffs' Ex. 369A.

[24] Id.

14

1318963v1

AWP would have resulted in lower reimbursement, because HCFA was required by regulation to reimburse at the lower of "estimated acquisition cost or the national average wholesale price."[25]

HCFA, of course, knew that EAC surveys would have resulted in lower reimbursement rates, which is why it proposed to conduct surveys in the first place. HCFA did not necessarily know the specific prices that doctors paid for Part B drugs, which Mr. Dooley also acknowledges, but it knew there was a difference between acquisition price and AWP, as the government's own reports acknowledged. Ms. Dooley will explain that Ortho Biotech did nothing to prevent HCFA from conducting surveys, and that the surveys were cancelled for regulatory reasons.

In sum, Ms. Dooley's memos, while seemingly supportive of plaintiffs' argument that the government was a hapless victim, actually buttress the defense argument that the government knew that AWP exceeded acquisition cost, and failed to make use of the tools available to it, such as surveys, which would allowed HCFA to reduce the Part B reimbursement rate to EAC. Indeed, the spreads on Procrit at the time Ms. Dooley was writing her memos were below Dr. Hartman's 30% speed limit based on his estimate of what payors, including the government, knew and supposedly expected.

---

[25] *Medicare Program Fee Schedule for Physician Services,* 56 Fied. Reg. 59,502, 59,621 (Nov. 25, 1991).

15

Dated:  November 1, 2006         /s/ William F. Cavanaugh, Jr.
William F. Cavanaugh, Jr.
Andrew D. Schau
Erik Haas
Adeel A. Mangi
Mark Young
Niraj Parekh
**PATTERSON BELKNAP WEBB & TYLER LLP**
1133 Avenue of the Americas
New York, New York  10036-6710
(212) 336-2000

1318963v1

**Certificate of Service**

I certify that a true and correct copy of the foregoing was served on all parties on November 1, 2006 via LEXIS/NEXIS.

/s/ Andrew D. Schau
Andrew D. Schau

1318963v1