**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

———————————————————————
                                                        )
IN RE PHARMACEUTICAL INDUSTRY   )
AVERAGE WHOLESALE PRICE              )          MDL NO. 1456
LITIGATION                                             )          Civil Action No. 01-12257-PBS
———————————————————————)
                                                        )          Hon. Patti B. Saris
THIS DOCUMENT RELATES TO          )
01-CV-12257-PBS AND 01-CV-339         )
———————————————————————)

**TRACK 1 DEFENDANTS' COMMON PROPOSED**
**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## PRELIMINARY STATEMENT

As the Court directed, the Track 1 Defendants submit these proposed findings of fact and conclusions of law in advance of trial.  These proposed findings and conclusions are necessarily based on pre-trial discovery and, therefore, reflect only facts that the Track 1 Defendants reasonably anticipate will be proven at trial.  In addition, these proposed findings and conclusions may change based upon this Court's ruling on various legal issues and upon Plaintiffs' proof.  The Track 1 Defendants respectfully request the opportunity to submit additional proposed findings and conclusions following completion of the trial, which proposed findings and conclusions would be based on the trial record.

This submission does not include findings and conclusions pertaining to whether the testimony proffered by plaintiffs' expert, Dr. Raymond S. Hartman, is admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  A motion to strike Dr. Hartman's testimony is pending.  If Dr. Hartman is permitted to testify at trial, the Track 1 Defendants request leave to submit separate findings and conclusions addressing Dr. Hartman's testimony.

# I.     THE TRACK 1 DEFENDANTS' COMMON PROPOSED FINDINGS OF FACT

## A.     AWP's Meaning and Usage Under Medicare

1.     In the pharmaceutical industry, since at least the 1960s, "Average Wholesale Price" or "AWP" for a branded drug has referred to a fixed percentage markup over the list price, direct price, or Wholesale Acquisition Cost ("WAC").[1]

2.     The AWP of a generic drug upon launch of the generic usually was set at a discount from the AWP of the brand.

3.     The possible use of AWP as a reimbursement standard by Medicare was first discussed in 1969 a report by the Department of Health Education and Welfare ("HEW") Task Force on Prescription Drugs.  HEW understood in 1969 that AWP was not reflective of acquisition cost.[2]  This was not the only instance in which the federal government acknowledged that AWP exceeds acquisition costs.  The government has issued numerous reports confirming exactly that.[3]

4.     When the Health Care Financing Administration ("HCFA") used the term "average wholesale price" in a regulation adopted in November 1991, it intended to adopt the industry meaning of AWP.[4]  Thereafter, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") confirmed that AWP bore no predictable relationship to acquisition cost, and in some cases exceeded

---

[1] Testimony of Gregory Bell; *see also* Exhibit 5 to the Declaration of Lucy Fowler in Support of Track 1 Defendants' Motion for Summary Judgment (Mar. 15, 2006) ("Fowler Decl.") (HHS-OIG, "Changes to the Medicaid Prescription Drug Program Could Save Millions" (1984) at 3 ("Within the pharmaceutical industry, AWP means non-discounted list price.")(emphasis added)).

[2] Fowler Decl., Ex. 2 (HEW, Task Force on Prescription Drugs—Final Report at 63 (February 7, 1969)).

[3] Fowler Decl., Exs. 3-85.

[4] *Compare* 56 Fed. Reg. 25792 at 25800 (June 5, 1991) (85% of AWP) *with* 56 Fed. Reg. 59502 (Nov. 15, 1991) (multi-source drugs could be purchased for "considerably less than 85% of AWP")

acquisition cost by more than 400%.[5]  In October 1996, Ven-A-Care sent HCFA a letter suggesting that AWP exceeded acquisition cost by more than 1000% in some cases and enclosing several volumes of exhibits identifying the discounted prices for several drugs at issue in this case.

5.      When Congress used the term "average wholesale price" in a statute in 1997, it intended to adopt the industry meaning, explicitly rejecting the Clinton Administration's proposal that drug reimbursement under Medicare Part B be based on actual acquisition cost.[6]  The House Budget Committee observed that reimbursement based on published AWPs could be more than 1000% more than acquisition cost, but it nevertheless directed the Secretary of HHS take into consideration the information published in commercial reporting services in determining AWPs.[7]

6.      After initially basing reimbursement for drugs under Medicare Part B on 95% of the published AWPs, the Secretary attempted to use AWPs developed by the Department of Justice which were supposedly closer to acquisition costs.[8]  Many members of Congress complained, and HCFA reverted to basing reimbursement on published AWPs, recognizing that the spreads created by published AWPs were necessary to compensate for "inadequate" reimbursement for the service of administering

---

[5] Fowler Decl., Ex. 26 (HHS-OIG Report, *Physician's Costs for Chemotherapy Drugs* (Nov. 1992)).

[6] *Compare* Medicare and Medicaid Beneficiary Protection Act of 1997, H.R. 2632, 105th Cong. § 206 (1997) *with* Pub. L. 105-33 § 4556(A) (1997), codified in 42 U.S.C. § 1395U(o)).

[7] Fowler Decl., Ex. 42 (Report of the Committee on the Budget, House of Representatives, Balanced Budget Act of 1997, at 1354 (June 24, 1997)).

[8] Fowler Ex. 62, (Shalala to Representative Thomas Bliley, Chairman, Commerce Committee, U.S. House of Representatives 2 (May 31, 2000)).

1318212v2

drugs.[9]  Congress then barred the Secretary from lowering reimbursement amounts until

the Comptroller General completed a study recommending appropriate benchmarks for

reimbursing both drugs and services under Medicare Part B.[10]

> 7.     Regulatory and legislative efforts to eliminate AWP as a basis for

Medicare reimbursement of Part B drugs were unsuccessful until passage of the Medicare

Prescription Drug, Improvement, and Modernization Act of 2003, 42 U.S.C. § 1395

(2006) ("MMA"), in part because HCFA's successor, the Center for Medicare and

Medicaid Services ("CMS"), and Congress recognized that AWP-based reimbursement

of drugs was cross-subsidizing Medicare's inadequate reimbursement for drug

administration services.[11]

---

[9] Fowler Ex. 65 (Senators Bond and Ashcroft to Shalala (Aug. 3, 2000)); Senator Abraham to Shalala (Sept. 6, 2000); Fowler Ex. 64 (Senator Chambliss, et al. to Shalala (July 28, 2000)).

[10] Pub. L. 106-555, § 429(c) (Dec. 21, 2000).

[11] *See*, *e.g.*, Fowler Decl., Ex. 22 (*Medicare Program Fee Schedule for Physician Services*, 56 Fed. Reg. 59,502, 59,504 (Nov. 25, 1991) (citing "shortfalls in chemotherapy administration payments), Ex. 32 (*Painful Profits: Cancer treatment Firms May Soon See Their Plump Margins Slashed*, BARRONS (Feb. 26, 1996) ("without large drug markups, the [oncology] practices would have been in the red"), Ex. 64 (Letter from Sen. Saxby Chambliss, et al. various members of Congress, to Donna Shalala, Secretary, U.S. Dept. of Health and Human Services 1 (July 28, 2000) ("oncologists are chronically underpaid for their drug administration services in treating cancer patients"), Ex. 66 (146 CONG. REC. S8022 to 23 (daily ed. Sept. 5, 2000) (Statement of Sen. Ashcroft ) (drug "margins have been used to help cover costs for professional services, which are inadequately reimbursed"), Ex. 68 (Letter to Congress, Nancy-Ann Min DeParle, then-Administrator of HCFA (September 8, 2000) ("Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate."), Ex. 72 (GAO Report, *Medicare:  Payments for Covered Outpatient Drugs Exceed Providers' Cost*, GAO-01-1118 (Sept. 2001) (oncologists contend "they need drug payments in excess of their actual costs to compensate for inadequate or nonexistent Medicare payments for administering drugs"), Ex. 73 (Statement of Thomas Scully, then-administrator, CMS, *Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers*, 107 Cong. 87-89 (2001) (physicians say they need drug profits to cross subsidize inadequate Medicare payments for services relating to drugs), Ex. 75 (Testimony of Thomas Scully, then-Administrator, HCFA before the Finance Committee of the U.S. Senate, at 7, 13 (March 14, 2002) ("Many of these providers rely on cross subsidies to survive basically in the Medicare business."), Ex. 78 (Letter from Glenn M. Hackbarth, Chairman of Medicare Payment Advisory Commission ("MedPac"), to Thomas Scully (Oct. 4, 2002) ("inadequate payments for some services are cross-subsidized by overpayments for drugs"), Ex. 80 (MedPac Report to Sen. Comm. on Finance Staff, *Payment System for Prescription Drugs Covered Under Part B* 2 ("payments for drug administration may be too low"), Ex. 81 (MedPac Report to Congress, *Variation and Innovation in*

8. The MMA sets drug reimbursement at 106% of the lesser of "average sales price" or "wholesale acquisition price" for single source drugs and biologicals and 106% of the average sale price for generics.[12] The MMA substantially increased the amount of reimbursement for drug administration services and dispensing fees and instituted a temporary "demonstration project" to make up for providers' loss of drug revenue.[13]

**B. AWP's Meaning and Usage In the Private Sector**

9. TPPs in Class 3 are not obligated by law, regulation or otherwise to use AWP as a reimbursement benchmark. When they use AWP, they do so by choice.

10. TPPs have long known that AWP does not bear any predicable relationship to acquisition costs for physician-administered drugs. Despite this, payors created and perpetuated the use of AWP as a reimbursement benchmark for physician-administered drugs.[14]

11. Payors intended to provide physicians with a margin over acquisition cost to persuade them to continue to administer drugs in their office. The reimbursement rate reflects the relative competitive leverage between TPPs and physicians.[15]

---

*Medicare*, Chapter 9 ("payments [for drug administration] may be too low. Physicians have argued that they need the high payments for drugs to offset inadequate payments for provision of these services").

[12] Fowler Decl., Ex. 83 (42 U.S.C. § 1395w-3a(b)(4) (2006)).

[13] Fowler Decl., Ex. 85 (MedPac, *Effects of Medicare Payment Changes on Oncology Services*, vii to ix (Jan. 2006)).

[14] Testimony of Gregory Bell.

[15] *Id.*

12.     Founded in 1937, BCBS/MA is currently the state's largest health insurance company with 4,038 employees and a total membership of 2.9 million individuals.  In 2005, BCBS/MA paid $9.4 billion in claims.  BCBS/MA covers approximately 46% of the covered lives in Massachusetts.

13.     BCBS/MA did not reimburse based on AWP until 1995.[16]  Prior to 1995 its reimbursement for physician-administered drugs was based on physicians' billed charges up to a "usual & customary" cap.[17]

14.     After 1995, BCBS/MA began to reimburse physician-administered drugs based on fee schedules that do not, on their face, refer to AWP.  BCBS/MA's witnesses testified that the fee schedules are based on AWP, but that cannot be confirmed without a painstaking analysis of BCBS/MA's claims data.  BCBS/MA's reimbursement contracts do not "expressly us[e] AWP as a pricing standard."

15.     According to plaintiffs' expert, Dr. Raymond S. Hartman, TPPs like BCBS/MA were defrauded because they "expected" AWP would not exceed acquisition cost by more than 30%.  He characterizes 30% as a 'speed limit" that provides a "bright line test" for liability under Ch. 93A.[18]

16.     BCBS/MA has known throughout the class period that AWP bears no predictable relationship to acquisition cost, and that it frequently exceeds acquisition cost by more than 30%.  According to BCBS/MA's former Director of Pharmacy, Edward S. Curran, Jr., BCBS/MA and other TPPs knew that physicians could receive

---

[16] Deposition of Michael Mulrey (Jan. 5, 2006) ("Mulrey Tr.") 57:13-59:6, 62:10-19.

[17] Mulrey Tr. 57:13-59:6.

[18] Plaintiffs' Memorandum in Opposition to the Johnson & Johnson Defendants' Motion for Summary Judgment On Class 3 at 1-2.

discounts and rebates of up to 90%, resulting in a "spread" of 1100%.[19]  Mr. Curran said

"it has been commonly known in the health insurance industry since at least the mid

1980s that AWP -- because it does not reflect rebates and discounts -- bears no

predictable relationship to drug acquisition costs."[20]

   17. Other BCBS/MA witnesses confirmed that BCBS/MA knew that

AWP was higher than acquisition coast, and that it bore no predictable relationship to

acquisition cost.[21]

   18. BCBS/MA knew about, and benefited from, "spreads" in excess of

30% because, from before the start of the class period until sometime in the late 1990s,

BCBS/MA purchased Track 1 physician-administered drugs for its staff model Health

Maintenance Organization at substantial discounts below AWP.[22]  The resulting

"spreads" between the BCBS/MA acquisition prices for Track 1 subject drugs and their

AWPs were frequently much greater than 30%.[23]  For example, in 1996 and 1997,

BCBS/MA purchased Schering's drug, Perphenazine at discounts yielding a spread (as

---

[19] Declaration of Edward S. Curran, Jr. (Sept. 21, 2006), at ¶ 12.

[20] *Id.* at ¶¶ 12-13.

[21] Deposition of John Killion (BCBS/MA's Senior Director for Ancillary Services) ("Killion Tr.") at 6:15-17, 119:4-22, 122:18-22, 136:20-137:5, 138:17-139:5, 119:13-122:22; Deposition of Steven Fox (BCBS/MA's Senior Director of Provider Relations) ("Fox Tr.") at 50:4-19, 126:16-127:10; 151:9-19; Deposition of Jan Cook (Regional Medical Director) at 36:8-10, 207:14-16, 202:8-14, Deposition of Lisa Gorman (Regional Director on the BCBS/MA Provider Relations Team) at 8:15-16, and 106:7-21; Deposition of Vincent Plourde (Vice President of the Provider Services ) ("Plourde Tr.") at 7:5-7, 116:5-10; 116:22-117:7-18.

[21] Plourde Tr. at 116:5-118:1 (objections omitted).

[22] *See* Deposition of Maureen Coneys (BCBS/MA's Senior Vice President, Health and Wellness in Health Care Services) ("Coneys Tr.") at 42:14-43:5; 50:18-21; Gaier 7/14/06 Decl. at 2-3; Declaration of Eric. M. Gaier in Support of Track 1 Defendants' Joint Motion for Summary Judgement dated March 15, 2006 ("Gaier 3/15/06 Decl.") at 2.  *Cf.* Declaration of Andrew D. Schau (July 14, 2006) ("Schau Decl.") at Ex. 3 (non-Bates numbered self administered drug purchase agreement between BCBS/MA and SmithKline Beecham dated June 6, 1992, marked as Exhibit 1 to the deposition of Sharon Smith).

[23] Gaier 7/14/06 Decl., at pp 15, 17.

calculated by Dr. Hartman) of 268%.  It purchased Albuterol in 1997 at a discount yielding a spread of 130.6%.  It purchased Blenoxane from BMS at a discount yielding a spread of 84.6%, and Vepisid from BMS at a discount yielding a spread of 1264.9%.[24]

19. Other Massachusetts TPPs, including Harvard Pilgrim Health Care, Inc., CIGNA Healthcare of Massachusetts, Inc., and Fallon Community Health Plans, also benefited from discounts on drugs purchased directly through staff model HMOs at prices reflecting spreads significantly greater than 30%.[25]  Together with BCBS/MA, these plans cover some 70% of the covered lives in Massachusetts.[26]

20. The discounts available to these payors, like the discounts available to BCBS/MA, were often substantial.  CIGNA's HMO secured discounted prices yielding spreads of up to 2,320%.  Fallon benefited from discounts yielding spreads as high as 2,241%.  Harvard Pilgrim's HMO purchased Track 1 physician-administered drugs at discounted prices yielding spreads as high as 1,275%.[27]  The prices these TPPs paid for subject drugs were generally near -- and in some case below -- the ASPs calculated by Dr. Hartman.[28]

---

[24] *Id.*

[25] Gaier 7/14/06 Decl. at p. 3 *et seq.*

[26] *Id.*

[27] Gaier 7/14/06 Decl. at pp. 18, 21, and 24.

[28] Gaier 7/16/04 Decl., at pp. 7-14.

1318212v2

21.     In 2003 and 2004, in the wake of the changes in physician reimbursement under Medicare Part B, BCBS/MA considered whether to jettison AWP-based reimbursement in favor of ASP-based reimbursement.[29]

22.     BCBS/MA's analysis indicated that a move to ASP-based reimbursement might reduce its overall annual reimbursement costs by more than $6 million, even after accounting for increased administration fees.[30]  Nevertheless, BCBS/MA decided to stick with AWP because it feared that a reduction in reimbursement would cause the physicians in BCBS/MA's network to send their patients for treatment in the higher cost hospital setting.[31]

23.     Other TPPs, including Vista Health Plan, CIGNA and Horizon Health Care, also used AWP-based reimbursement as a means of encouraging physicians to treat patients in their offices instead of sending them to hospitals.[32]

24.     Specialty pharmacies purchase drugs and ship them to doctors at a contracted rate that  is unrelated to AWP or is otherwise less than the rates payors reimburse the doctors themselves for the drugs.  BCBS/MA considered implementing a specialty-pharmacy program for physician-administered drugs[33] but decided to continue

---

[29] *See* Schau Decl. Ex. 16 ("Analysis of CMA Average Wholesale Price Reform – Reimbursement for Part B Drugs" dated February 7, 2004 produced electronically on CD bearing Bates number BCBS/MA-AWP 11598A (hereafter "BCBS/MA Shift to ASP Analysis").

[30] *See* BCBS/MA Shift to ASP Analysis at 7.

[31] Deposition of Deborah Devaux (BCBS/MA's Senior Vice President for Health Care Contract Management) ("Devaux Tr.") at 176:15-177:8.  *See also* Coneys Tr. 17:7-18:7 and 19:4-8 (testifying she has been aware since 1979 that the hospital site of care is more expensive than treatment in physician's offices); Killion Tr. 67:10-22 ("reimbursement in the hospital setting is a more expensive setting than in the physician office" and this is something BCBS/MA has "looked at"); Plourde Tr. 60:10-61:15 (same).

[32] *See e.g.*, Deposition of Hal Goldman (Vista Health Plan) at 58:19-60:4; Deposition of Jill S. Herbold (Cigna) at 75:21-76:16; Deposition of Susan Mengert (Horizon Health Care) at 78:13-81:7.

[33] Coneys Tr. 126:17-128:6.

using AWP because it was concerned that the physicians in its network, unless they received a margin on drugs administered in the office, would refer patients their patients to hospitals where BCBS/MA's reimbursement costs would be higher.[34]

       25.    BCBS/MA has historically reimbursed for drugs administered in hospital out-patient departments based on a percentage of the hospital's "billed charges."[35]  In early 2006 it decided to scrap the "billed charge" methodology in favor of reimbursing hospitals at 95% of AWP.[36]

       26.    BCBS/MA executives testified that in choosing AWP as the basis for reimbursing hospitals they did not consider how much hospitals were paying to acquire drugs, because they did not think hospital acquisition costs were relevant.[37]

       27.    Evidence from other payors similarly demonstrates that acquisition cost was not an important consideration in setting drug reimbursement rates.  BCBS Wyoming has known since the 1960s that AWP was not an actual average of acquisition prices.[38]  Harvard Pilgrim did not consider physician acquisition cost in setting its reimbursement allowance.[39]  Humana did not set its reimbursement allowance based on an expectation that there was a fixed relationship between acquisition cost and AWP.[40] Anthem Blue Cross Blue Shield did not think that AWP exceeded acquisition cost by no

---

[34] Coneys Tr. 138:9-138:18; Killion Tr. 67:10-22.

[35] *See* Schau Decl. Ex. 24 (March 10, 2006 deposition of Sheila Cizauskas ("Cizauskas Tr.")) at 124:5-19).

[36] Cizauskas Tr. 124:20-126:16.

[37] Cizauskas Tr. 183:12-18; Plourde Tr. 127:17-128:2.

[38] Deposition of Bob Schultz (Oct. 6, 2004), at 78-79.

[39] *See* Schau Decl. Ex. 25 (October 20, 2004 deposition of Robert Farias) at 21:3-5 (reflecting his title); 43:4-16 (objections omitted).

[40] *See* Schau Ex. 26 (January 11, 2005 deposition of Edward Lemke) at 18:18-22 (reflecting his title); 123:17-124:16 (objections omitted).

more than 30%.[41]  Union Labor Life Insurance Co., Inc. never intended to base its reimbursement allowance on the amount doctors paid to acquire drugs.[42]  Health Net understood that acquisition cost varied and that there was no settled relationship between acquisition cost and AWP.[43]  Other health plans gave similar testimony.[44]

      28.     Pipefitters Local 537 is a Taft-Hartley multi-employer trust fund that provides health and welfare coverage for the local members of the Pipefitters union. The Fund currently covers approximately 4,600 individuals.  The Board of Trustees administer and maintain the Fund pursuant to the "Trust Agreement," established by the employers and the union, which grants the Board discretion to, among other things, establish the plan of benefits, determine eligibility for benefits, and construe and interpret the terms of the plan.  The Board consists of representatives from both the employers and the union and meets approximately once a month.  Pipefitters Local 537 employs five staff members and has an operational budget of several million dollars.  The Fund also has legal counsel, who attend all Board meetings.  Finally, the Fund utilizes actuaries and auditors as well as consultant for the Pension fund.

---

[41] See Schau Ex. 27 (November 30, 2004 deposition of Joe Spahn) at 8:7-10 (reflecting his title); 97:17-98:13 (objections omitted).

[42] See Schau Ex. 28 (November 23, 2004 deposition of Kelly Ellston) at 22:21-23:1 (reflecting her title); 89:18-90:5.

[43] See Schau Ex. 29 (February 1, 2006 deposition of Scott Wert) at 7:2-3 (reflecting his title); 35:17-37:17 (objections omitted).

[44] See e.g., Schau Ex. 30 (September 17, 2004 deposition of Mike Beaderstadt of John Deere Health Care) at 72:17-73:5 ("I don't believe [AWP] has any relationship [to actual acquisition cost] that is a consistent relationship"); Schau Decl. Ex. 31 (March 9, 2005 deposition of Mickey Brown of Blue Cross/Blue Shield of Mississippi) at 127:7-14 (testifying that he did not "have an expectation one way or the other" as to the relationship between acquisition cost and AWP); Schau Ex. 32 (June 30, 2006 deposition of Bruce Niebylski of Health Alliance Plan of Michigan) at 71:5-18 (denying specific percentage expectations and stating that "I haven't had any expectations what [physicians'] margin would be.")

29.     Throughout the class period, Class 3 representative Pipefitters has used BCBS/MA to provide health insurance to its members.[45]  It is "entirely dependent" on BCBS/MA and has "no independent knowledge" on issues relating to that coverage.[46]

30.     BCBS/MA's Senior Director of Provider Relations similarly testified that BCBS/MA's fund clients, such as Pipefitters, rely on networks provided by BCBS/MA, never negotiate directly with providers, and only use rates determined by the contracts between BCBS/MA and providers.[47]  BCBS/MA rather than Pipefitters made the decision to use AWP as a reimbursement benchmark.

31.     Class 3 representative Health Care For All is a membership-based association that was added to this lawsuit in this Court's Class Certification Order dated January 30, 2006.[48]  The corporate representative produced by Health Care For All said that her organization does not know whether any of its members have been injured as a result of the alleged AWP scheme.[49]

32.     Sheet Metal Workers International Health Fund ("SMW") is a Taft-Hartley multi-employer fund that provides health and welfare coverage for sheetmetal workers throughout the United States.  SMW covers approximately 20,000 participants.  It is managed by a Board of Trustees consisting of representatives from

---

[45] Schau Ex. 33 (December 29, 2005 deposition of Charles Hannaford (hereafter "Hannaford Tr.")) at 13:20-14:10.

[46] Hannaford Tr. at 156:8-21.

[47] Fox Tr. 220:10-222:9, 224:20-225:8

[48] *See* Consolidated Order re: Motion for Class Certification at 6.

[49] Deposition of Melissa D. Shannon at 53:12-54:6.

both management and labor that meets quarterly to, among other things, set contribution rates.  It is represented by legal counsel.

33.    SMW employs a third-party administrator, Southern Benefits Administrators ("SBA"), to handle claims and to act both as a third-party administrator and as a consultant to advise the Fund on issues relating to healthcare.  SMW has employed SBA throughout the class period to negotiate, contract for and administer health benefits for SMW's active and retired workers.

34.    SMW relies on SBA to provide the best benefits to its members (including its retirees), and to provide those benefits at the lowest possible cost.

35.    SBA has a fiduciary relationship with SMW.

36.    SBA knew or should have known from its administration of numerous plans (both Medicare and private) for its numerous clients that AWP did not bear a predictable relationship to provider acquisition costs.

37.    SBA knew or should have known from its administration of numerous plans (both Medicare and private) for its numerous clients that both self-administered and physician-administered drugs were available at discounts -- often significant discounts -- from AWP.

38.    SBA knew or should have known from its administration of numerous plans (both Medicare and private) for its numerous clients that there was a significant discrepancy between the rates at which it reimbursed for pharmaceuticals in the private market versus rates at which it reimbursed for pharmaceuticals under Medicare Part B.

### C.     Medigap Insurers

39.     Whether a Medigap insurer such as BCBS/MA makes a profit or a loss on its Medigap Products -- and the extent of any such profit or loss -- is determined by the premiums that Medigap insurer sets for those products.

40.     BCBS/MA, for example, did not incur any loss in relation to its Medigap products due to drug costs.

41.     BCBS/MA, for example, set its premium rates based projections of future costs and a planned contribution to reserves.

42.     Drug costs did not render BCBS/MA rates inadequate at any time during the class periods.

43.     Any variance on projected drugs costs was due to utilization.

44.     BCBS/MA limited its premium rate increases due to concern about triggering political rate hearings.

45.     BCBS/MA limited its premium rate increases due to concern about providing the Massachusetts Attorney General and the Department of Insurance with access to information about BCBS/MA's internal operations.

46.     BCBS/MA limited its premium rate increases due to concern about public relations.

47.     As a result of the manner in which BCBS/MA calculates premiums, the higher the amount it pays out in benefits, including drug costs, the greater the amount it generates as a contribution to reserves.

1318212v2

## II.   THE TRACK 1 DEFENDANTS' COMMON PROPOSED CONCLUSIONS OF LAW

### A.   The Liability Standard

1.      Claims by businesses under § 11 of Ch. 93A are measured by the

'standard of the commercial marketplace':

> "Chapter 93A proscribes those engaged in trade or commerce from
> employing unfair methods of competition and unfair or deceptive
> acts or practices" in business transactions.  It was designed to
> encourage more equitable behavior in the marketplace.  Even so, it
> does not contemplate an overly precise standard of ethical or moral
> behavior.  It is the standard of the commercial marketplace.  To
> trigger liability under 93A, courts have said that the conduct in
> question "must attain a level of rascality that would raise an
> eyebrow of someone inured to the rough and tumble of the world
> of commerce," have "an extortionate quality that gives it the rancid
> flavor of unfairness";  or fall "'within at least the penumbra of
> some common-law, statutory, or other established concept of
> unfairness' or [be] 'immoral, unethical, oppressive or
> unscrupulous."

*Commercial Union Ins. Co v. Sevens Provinces Ins. Co., Ltd.*, 217 F.3d 33, 40 (1st Cir. 2000)

(internal citations omitted).

2.      In determining whether an act or statement is "unfair," the court

must consider it within its commercial context.  "[A] 93A fairness determination focuses

on the nature, purpose, and effect of the challenged conduct."  *Commercial Union Ins. Co*

*v. Sevens Provinces Ins. Co., Ltd.*, 217 F.3d 33, 43 (1st Cir. 2000).  *See also Kerlinsky v.*

*Fidelity & Deposit Co.*, 690 F.Supp. 1112, 1119 (D. Mass. 1987), aff'd 843 F.2d 1383

(1st Cir. 1988) ("[I]t is not the definition of an unfair act which controls, but the context -

- the circumstances to which that single definition is applied.")

3.      "By their nature, Chapter 93A claims tend to be case-specific.

Their general meter, however, is that the defendant's conduct must be not only wrong,

but also egregiously wrong -- and this standard calls for determinations of egregiousness

16

well beyond what is required for most common law claims." *Mass. School of Law v. Am. Bar Assoc.*, 142 F.3d 26, 41 (1st Cir. 1998) (affirming dismissal of complaint based on claim of defamation).

4.     A plaintiff claiming to have been deceived must have acted reasonably.  Thus, in determining whether a challenged act or statement is "deceptive," the court must consider whether the statement has the capacity to cause plaintiffs, "acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)." *Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 488, 491 (Mass. 2004).  *See also Com. v. AmCan Enterprises, Inc.*, 712 N.E.2d 1205, 1209 (Mass. App. Ct. 1999) ("[T]he "tendency to deceive" standard [is] to be construed in the context of a reasonable consumer . . . That the effect be on "consumers acting reasonably under the circumstances' is likewise not a new requirement; an advertisement would not have been considered deceptive if unreasonably misunderstood by an unrepresentative class of persons.").

5.     A court is obliged to consider the equities between the parties, including what each party knew, or should have known, in determining whether there has been a violation of Ch. 93A.  "In determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties.  What a defendant knew or should have known may be relevant in determining unfairness. Similarly, a plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair." *Swanson v. Bankers Life Co.*, 450 N.E.2d 577, 580 (Mass. 1983) (finding no unfairness when

plaintiffs, represented by counsel, knew condition of policy upon which they later made

93A claim); *see also Davis v. Dawson, Inc*., 15 F. Supp. 2d 64, 146 (D. Mass. 1998)

(Saris, J.) ("In evaluating the unfairness of the objectionable conduct, this court may

"assess "the equities between the parties, including what both parties knew or should

have known.'") (internal citations omitted).[50]

      6.     Similarly, there can be no claim of deceptiveness when the

plaintiff was not, in fact, deceived.  *See, e.g.*, *Sheehy v. Lipton Indus, Inc*., 507 N.E.2d

781 (Mass. App. 1987) (in nondisclosure case, noting that "[t]he defendants may also be

able to avoid liability if it is shown that the plaintiff knew about the contamination. . . .

We think this is a case in which possible c. 93A liability . . . is best judged in light of the

---

[50] *Accord*: *Ahern v. Scholz*, 85 F.3d 774, 798 (1st Cir. 1996) (on summary judgment, reversing finding of 93A violation based on failure to deduct royalties, as defendant's manager did not seek to conceal the nature of the deductions but instead reported them); *Thomas v. Metropolitan Life Ins. Co.*, 40 F.3d 505, 511 (1st Cir. 1994) ("To determine whether an insurer's negligence constitutes 'unfairness' for 93A purposes, a court must look to several factors, including what the insurer 'knew or should have known' about the circumstances of a particular claim."); *RLI Ins. Co. v. Wood Recycling, Inc.*, 2006 WL 839514, at **5-6 (D. Mass. 2006) (finding no liability under 93A § 11 because insurer's interpretation of a policy term, even though it was "absurd" and "unpersuasive," "fell within the realm of the 'plausible', though ultimately incorrect" and because "neither of the parties' positions were 'free from doubt.'"); *Mechanics Nat. Bank of Worcester v. Killeen*, 384 N.E.2d 1231, 1237 (Mass. 1979) ("Balancing the equities in the relationship of the parties, a major factor in determining unfairness under G.L. c. 93A, § 2, we conclude that the bank's conduct was not unfair. We discern neither an over-zealous seller taking economic advantage nor a defenseless consumer."); *Boston Symphony Orchestra, Inc. v. Commercial Union Insurance Co.*, 545 N.E.2d 1156, 1160 (Mass. 1989) ("Liability under G.L. c. 93A is based upon the employment of unfair or deceptive acts or practices.  In good faith, [Defendant] relied upon a plausible, although ultimately incorrect, interpretation of its policy.  There is nothing immoral, unethical, or oppressive in such an action."); *Duclersaint v. Federal Nat'l Mortgage Assoc.*, 696 N.E.2d 536, 540 (Mass. 1998) ("[A] good faith dispute as to whether money is owed, or performance of some kind is due, is not the stuff of which a c. 93A claim is made. . . . [I]t appears that the defendant and the plaintiff had a genuine difference of opinion about whether there was a surplus, making this "an ordinary ... dispute without conduct that was unethical, immoral, oppressive, or unscrupulous."  There is nothing in the record to indicate that the defendant acted unfairly.  Moreover, the defendant did not deceive the plaintiff in any way. It simply held a different opinion as to the applicability of [the foreclosure statute] and to the undisputed facts that necessitated the involvement of the court."); *Madan v. Royal Indemnity Co.*, 532 N.E.2d 1214, 1219 (Mass. App. 1989) ("[A] plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair."); *New England Fin. Resources v. Coulouras*, 566 N.E.2d 1136, 1136-40 (Mass. App. 1991) (affirming rejection of 93A counterclaims based on a finding that "there was no deception – that the defendants, acting under the advice of counsel, knew precisely what they were doing.").

circumstances of the entire transaction including the knowledge and motives of the parties."); *Madan v. Royal Indem. Co.*, 532 N.E.2d 1214, 1218 (Mass. App. Ct. 1989) (holding that defendant's conduct was not unfair or deceptive because plaintiff was "experienced" and had knowledge of defendant's conduct and the transaction); *USM Corp. v. Arthur D. Little Sys., Inc.*, 546 N.E.2d 888, 898 (Mass. App. Ct. 1989) (rejecting 93A claim where plaintiff was aware of purportedly withheld information and "was not misled by any of the [defendant's] financial reports"); *Dinjian v. Dinjian*, 495 N.E.2d 882, 888 (Mass. App. Ct. 1986) (rejecting 93A claim because defendants' failure to disclose their financial interest in a transaction "is of dubious weight where the [plaintiffs] already understood that [the defendants] had a financial interest in the loan").

       7.     In considering whether a defendant's conduct violates Ch. 93A, courts should consider whether the defendant's conduct comports with industry norms and standards. *Commercial Union Ins. Co v. Sevens Provinces Ins. Co., Ltd.*, 217 F.3d 33, 43-44 (1st Cir. 2000) (affirming judgment that reinsurer had engaged in unfair conduct under 93A based on, inter alia, expert testimony regarding "the traditional mores of the industry"); *Salisbury v. Monumental Life Ins. Co.*, 1 F.Supp.2d 97, 103 (D. Mass. 1998) (Saris, J.) (on summary judgment, denying 93A claim for unfair and deceptive settlement practices based, inter alia, on "the general nature of the policy as group life insurance as understood under industry (albeit not statutory) standards.").[51]

---

[51] *Accord  James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co.*, 112 F.3d 1240, 1251 (1st Cir. 1997) (finding no 93A unfairness when insurer "adhered to the industry custom"); *Govoni & Sons Constr. Co., Inc. v. Mechanics Bank*, 742 N.E.2d 1094, 1107 (Mass. App. Ct. 2001) (finding no unfairness when procedures were "widely utilized by similar banks in the area"); *USM Corp. v. Arthur D. Little Sys., Inc.*, 546 N.E.2d 888, 898 (Mass. App. 1990) (affirming judgment that no unfair or deceptive acts occurred when plaintiff, "a sophisticated business entity . . . was not misled," and when the seller's "financial reporting practices were in conformity with accepted methods within the business community").

8.     The Track 1 Defendants' conduct was consistent with industry norms and standards dating back to the 1960s.  The spread between WAC and AWP predates AWP's use as a reimbursement benchmark and is not the result of any sinister or nefarious conspiracies.  Discounts below WAC are driven by competition, and were well-known to BCBS/MA and other Massachusetts TPPs.

9.     In considering whether "the wrath of chapter 93A [should be] unleashed," *Mass Cash Register, Inc. v. Comtrex Systems Corp.*, 901 F. Supp. 404, 425 (D. Mass. 1995) (Saris, J.), courts consider whether the parties are sophisticated business entities.  *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 72 F.3d 190, 200 (1st Cir. 1995) ("[T]he showing [of 'rascality'] is especially difficult when the case involves arm's-length transactions between sophisticated business entities."); *Anthony Pier Four, Inc. v. HBC Assoc.*, 583 N.E.2d 806, 822 (Mass. 1991) ("We recognize that there may be "cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business."  In such circumstances, a claimant would have to show greater "rascality" than would a less sophisticated party."); *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1843, n.9 (1st Cir. 1996) ("Regardless of the parties' sophistication, we apply the well-developed standard for section 11 actions between two persons engaged in business.  Of course, their relative levels of sophistication may enter into the fact-based analysis the court carries out in weighing whether a party's act was unfair or deceptive.").

10.    The TPPs at issue here are sophisticated business entities who knew that AWP exceed the physician's acquisition cost, in many instances by much more

than 30%.  In light of this knowledge, Defendants' conduct was neither deceptive nor

unfair within the meaning of Ch. 93A.

11.     Although some courts have found that Ch. 93A embraces a duty to

disclose in consumer cases, that doctrine is typically limited to situations where the

common law imposes a duty to disclose, such as where the defendant serves as a

fiduciary.  *In re First New England Dental Centers, Inc. v. Acquino*, 291 B.R. 229, 241

(D. Mass. 2003) ("Although Chapter 93A authorizes violation of the Attorney General's

regulations -- as in 940 C.M.R. 3.16 -- liability under the regulation attaches only to

transactions involving private consumers, and not to business to business transactions.

As the Court in *Knapp* suggested, the regulations were not meant to apply to mundane

negotiations between businesses and business people.  Indeed, to so apply them, and

thereby to require complete disclosure from both ends of a business deal, would

eviscerate the very notion of negotiating."); *Indus. Gen. Corp. v. Sequoia Pacific Sys.*

*Corp.*, 44 F.3d 40, 44, 46 (1st Cir. 1995) (finding no duty to disclose precarious financial

condition under 93A absent a fiduciary relationship and observing that "[a] commentator

has noted that section 11 "probably does not contain a general duty of disclosure" and

where the statute does give rise to such a duty, it 'should be limited to situations which

even at common law sometimes required disclosure, including instances where the

defendant is a fiduciary.'") (citing Michael C. Gilleran, THE LAW OF CHAPTER 93A §

4:10 (1989).[52]

---

[52] *Accord*:  *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 421-22 (1st Cir. 1985) (Breyer, J.,
dissenting) (majority held that, on motion to dismiss, it was sufficient to allege failure to disclose
discovered oil leaks to seller) ("The basic object of chapter 93A, insofar as it requires disclosure, is to
allow the consumer to make an informed choice, and thus to protect him from entering into a contract that
he would not "really" want were he more knowledgeable or sophisticated.  That purpose is not directly

1318212v2

12.     Specifically, there is no duty to disclose when the plaintiff knew or should have known about the information which is supposed to have been disclosed.  *See Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc.*, 246 F.3d 64, 74-76 (1st. Cir. 2001) (finding commercial supplier was not liable under Chapter 93A for failure to disclose doubts about product, when potential problems "were openly discussed and were well-known" and that test results "were available to all.").[53]

---

served when the bargaining parties are knowledgeable, sophisticated businessmen. . . . Under such circumstances, to allow an action under chapter 93A not only fails to serve the Act's main purpose but indeed may harm those whom the Act seeks to protect.  To insist that the knowledgeable business seller disclose all material facts that the seller 'should have' known . . . is to prevent the buyer and seller from allocating costs and risks as they choose in both the presumably rare situation involving deceptive conduct by the seller and the more typical nondeceptive situation. And, such a prohibition, as a general matter, may raise the price of the underlying good or service by preventing the allocation of risks (e.g., of hidden defects) to the party willing to bear them most cheaply.  Of course, one may think of this general price-increasing tendency as too theoretical, as ephemeral, or not worth much consideration when consumer protection is on the other side of the balance scale; but it is, at the least, worth consideration when weighed against the need to protect those who typically need no protection (such as knowledgeable business buyers)."; *Lily Transp. Corp. v. Royal Institutional Services, Inc.*, 832 N.E.2d 666, 686 n.14 (Mass. App. 2005) (Lawrence, J., dissenting) ("There is no general duty of disclosure under § 11, and any duty of disclosure under that provision would be limited to instances where the defendant is a fiduciary. . . . Such a restriction on the duty of disclosure in business situations under § 11 also makes perfect sense in our largely free enterprise marketplace, for any general duty to disclose all material information in a business transaction would produce absurd, counterproductive and market-disrupting results, leading to mandatory disclosure of such critical propriety matters as cost and pricing information and depriving a party of any flexibility in negotiations by being compelled to reveal its bottom-line bargaining position."); *L.B. Corp. v. Schweitzer-Mauduit Int'l*, 121 F.Supp.2d 147, 154 (D. Mass. 2000) (granting summary judgment based on finding that corporate seller's failure to disclose potential of chemical contamination was "not sufficiently egregious to justify invocation of Chapter 93A § 11."); *Cash Energy, Inc. v. Weiner*, 768 F. Supp. 892, 893-894 (D. Mass. 1991) (found that abutting property owner had no duty to disclose knowledge of contamination absent a transactional relationship with defendant); *Heller Fin. v. Ins. Co. of North America*, 573 N.E.2d 8, 11, 13 (Mass. 1991) (though remanding on question of fact, finding that failure to inform did not violate § 11 where plaintiff had partial knowledge and could have obtained more complete information from public sources); *Schwanbeck v. Federal-Mogul Corp.*, 578 N.E.2d 789 (Mass. App. 1991) rev'd on other grounds 592 N.E.2d 1289 (Mass. 1992) (finding no 93A liability under §11 when business seller, who was negotiating with different potential buyers, did not disclose discussions with one buyer to another buyer).

[53] *Accord Augat, Inc. v. Collier*, 1996 WL 110076, at *19 (D. Mass. 1996) (Bowler, M.J.) (finding no actionable nondisclosure of excess freight charges under 93A when plaintiff had some knowledge of extent of charges, defendant did not prevent plaintiff from acquiring information, and both parties were sophisticated businesspeople); *New England Fin. Resources v. Coulouras*, 566 N.E.2d 1136, 1136-40 (Mass. App. 1991) (affirming rejection of 93A counterclaims based on a finding that "there was no deception – that the defendants, acting under the advice of counsel, knew precisely what they were

22

13.     The Track 1 Defendants were not fiduciaries and had no duty to disclose their transaction prices to the members of Classes 2 and 3.

14.     The Attorney General regulations promulgated pursuant to Chapter 93A, § 2 do not apply to business-to-business transactions under 93A § 11.  *Knapp Shoes Inc. v. Sylvania Shoe Manufacturing Corp.*, 418 Mass. 737, 745, 640 N.E.2d 1101, 1105 (Mass. 1994).  However, even if they were to apply (which they do not), under Chapter 93A, a "per se" violation occurs only if a statutory duty was imposed on the defendant, and the statute was intended for the production of consumers. *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 840 N.E.2d 526, 794-95 (Mass. 2006); *see also Swenson v. Yellow Trans., Inc.*, 317 F.Supp.2d 51, 57 (D. Mass. 2004) (noting that "the case law is clear that a statutory violation is not a per se violation of Ch. 93A and finding no "per se" violation when federal regulation not "intended for protection of consumers"); *Sweeney v. Resolution Trust Corp.*, 16 F.3d 1, 5 (1st Cir. 1994) (finding violation of federal regulation regarding maximum loan-to-value ratios was not actionable under 940 CMR 3.16(d), since the statute was "not a consumer protection statute but a 'means of protecting insured depositors, the [FDIC] fund, and ultimately federal taxpayers.").

---

doing."); *Alves v. Harvard Pilgrim Health Care, Inc.*, 204 F. Supp. 2d 198 (D. Mass. 2002) (Saris, J.) *aff'd* 316 F. 2d 290 (2003) (outside 93A context, holding that, despite fiduciary duty owed to beneficiaries, ERISA plan was not required to disclose discounts to its beneficiaries and noting that "[i]t is true that beneficiaries might like to know about the existence and magnitude of discounting agreements, so that they could determine whether – and to what degree – a plan directly passes on such discounts to its members.  However, neither Congress nor the Department of Labor has mandated this type of disclosure."); *Winlake II, Inc. v. Mercier*, 2006 WL 1360855, at *8 (Mass. Super. 2006) (in § 11 case brought against lessor under § 11, allowing summary judgment for defendant when plaintiff "had plenty of opportunity to" – and in fact, did – inspect the premises and consult with contractors); *DiNunzio v. Jenkins*, 1999 WL 67431 (Mass. Super. 1999) (denying claim of 93A liability based on seller's nondisclosure of proximity of house to interstate, which "was a readily observable, known physical condition").

15.     There was no "*per se*" violation, as the Medicare statute imposed no statutory duty on the defendant companies to disclose or report any price to any entity in any manner, and it is not a consumer protection statute.

**B.     Plaintiff Is Required to Prove that the Deceptive or Unfair Act Occurred During A Business Transaction With the Defendants**

16.     Under Ch. 93A § 11, Plaintiffs must establish that the deceptive or unfair act or practice occurred during a business transaction with the Defendants. *Szalla v. Locke*, 421 Mass. 448, 452, 657 N.E.2d 1267 (Mass. 1995) ("There has been no commercial transaction on these facts in the sense required by Ch. 93A. . . . There was never an exchange of goods or services between the parties, either actual or contemplated.").[54]

17.     The alleged deceptive or unfair practice did not occur during a transaction between Class 2 or Class 3 Plaintiffs and the Track 1 Defendants.

**C.     Plaintiff Is Required to Prove Causation and Injury**

18.     In order to prevail under Ch. 93A, a plaintiff must prove that its injuries were caused by the alleged violation.  Thus, "[a]ny person who . . . suffers any loss . . . as a result of the use or employment . . . of an unfair or deceptive act or practice . . . may . . . bring an action . . . for damages."  M.G.L.A. Ch. 93A, § 11 (West 2006) (emphasis added).  Moreover, taking these words at face value, the Massachusetts

---

[54] *Park Drive Towning, Inc. v. Revere*, 809 N.E.2d 1045, 1051 (Mass. 2004) (finding that municipality was not engaged in trade or commerce while maintaining a list of towing companies, since the transaction was "merely incidental" to the regulation of illegally parked vehicles); *Shipps v. Compass Group USA, Inc.*, 2004 WL 2359859, at *816 N.E.2d 182 (Table) (Mass. App. 2004) (affirming summary judgment based on finding that private corporation was not engaged in trade or commerce when supplying certain items to inmates pursuant to government contract); *Nei v. Boston Survey Consultants, Inc.*, 446 N.E.2d 681, 684 (Mass. 1983) (while noting lack of privity requirement, "declin[ing] to impose a risk of liability under G.L. c. 93A to some prospective purchaser of land because an accurate statement of soil tests given to the owner of the property did not also contain, and was not followed by, an explanation of the significance of the test results

Supreme Court has recently emphasized that "proving a causal connection between a deceptive act and a loss . . . is an essential predicate for recovery" in a Chapter 93A claim.  *Hershenow v. Enterprise Rent-A-Car Co. of Boston*, 840 N.E.2d 526, 528 (Mass. 2006) (discussing the intent of the Massachusetts Legislature); *see also Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 518 N.E.2d 519, 523-24 (Mass. App. Ct. 1988).  To establish a causal connection, plaintiffs must prove that the allegedly deceptive conduct was both the "but for" and the "proximate caus[e]" of plaintiff's loss.  *See Markarian v. Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60, 68-69 (D. Mass. 2001) (citation omitted). Class 2 and Class 3 members have not proved the type of "loss" recoverable under Ch. 93A, nor proved, as a matter of fact, any "loss."

19.    Knowledge of the truth eliminates any possible causal connection between the alleged deception and the alleged injury under Chapter 93A.  *See Mass. Farm Bureau Fed'n v. Blue Cross of Mass.*, 532 N.E.2d 660, 665 (Mass. 1989) (holding that no "causal relationship" existed between the alleged deception and the alleged loss because plaintiff knew that failure to renew its insurance would result in defendant's transfer of the money at issue).  As a matter of law and logic, when a plaintiff knew or should have known about a defendant's allegedly deceptive conduct and nevertheless elects to enter into a transaction, plaintiff's decision to continue with the transaction, rather than defendant's deceptive conduct, is the cause of the alleged loss.  A plaintiff complaining of conduct alleged to be deceptive cannot prove causation if it was not deceived.  *See, e.g., Tagliente v. Himmer*, 949 F.2d 1, 3, 7-8 (1st Cir. 1991) (holding that there was no causal connection between the alleged deception and the alleged loss

because the buyer "knew" of the defect or should have known of it because it was "an easily attainable fact"). [55]

      20.    The members of Class 2 and 3 were not deceived by the AWPs published by the third-party publishers.  At the very least, these class members should not have been deceived.  Accordingly, the plaintiffs' alleged losses were not caused by the Track 1 Defendants' alleged violations of Ch. 93A.

      21.    Of course, even if the plaintiff proves a violation of Ch. 93A, it must prove that the violation caused a loss "of money or property."  Mass. Gen. Laws Ann. Ch. 93A  § 11.  This in turn requires proof that plaintiff would have acted differently but for the violation.  *Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc.*, 840 N.E.2d 526, 534-35 (Mass. 2006) (affirming summary judgment against plaintiffs whose car rental agreement contained a collision damage waiver provision,

---

[55] *Accord*: *See Brown v. Bank of America, N.A.*, --- F.Supp.2d ----, 2006 WL 2989031, No. 05-10713-PBS., at *6 (D. Mass. Oct. 17, 2006) (Saris, J.) (rejecting 93A claim relating to adequacy of disclosure of ATM fees, based on finding that "every class member knows about the fee before it is assessed" and, as they consented to such a fee, Plaintiffs "cannot establish loss causation because the click-through screen breaks the causal connection between the defective notice and the payment of the fee"); *Palochko v. Reis*, 852 N.E.2d 127, 130 (Mass. App. 2006) (in 93A nondisclosure case involving oil spill, finding "critical break in the chain of causation" existed because plaintiff "knew of the danger of the tank toppling over from the home inspector's report and . . . his failure to act was one of the causes of the oil spill"); *Lord v. Comm Union Ins. Co.*, 801 N.E.2d 303, 323 (Mass. App. 2004) (affirming refusal to reward statutory damages where plaintiff could not prove that defendants' failure to send a timely disclosure notice -- an unfair and deceptive act -- caused his loss, when "the plaintiff already knew of the inspection requirement, acknowledged it in writing, and was found to have been the cause of his own loss.") *disagreed with on other grounds, Aspinall v. Philip Morris Cos., Inc.*, 813 N.E.2d 476, 491-92 (Mass. 2004); *Hartford Cas. Ins. Co. v. New Hampshire Ins. Co.*, 628 N.E.2d 14, 19- 20 (Mass. 1994) (on 93A action between insurers based on a failure to settle, finding that lack of proof of causation was "fatal," as plaintiff "had not been misled or harmed by any acts that [plaintiff] claimed were deceptive); *Mass. Farm Bur. Fed'n, Inc. v. Blue Cross of Mass., Inc.*, 532 N.E.2d 660 (Mass. 1989) (finding no "causal relationship" existed between the alleged deception and alleged loss because plaintiff knew that failure to renew its insurance would result in defendant's transfer of the money at issue); *Cf. South Bay Chevrolet v. GM Acceptance Corp.*, 85 Cal.Rptr.2d 301 (Cal. App. 1999) ("South Bay was not likely to be deceived by GMAC's business practice of using the 365/360 method to calculate interest on wholesale floor plan loans since both parties understood and expected the use of such method;  and South Bay's "knowledge, experience and communications with GMAC" rendered it "inconceivable" that South Bay "would or could have been deceived" by GMAC's business practice of using such method on the disputed loans.").

which violated Massachusetts law, when plaintiffs could not prove the violation caused

them any loss, as they were not in an accident or harmed, influenced, or affected by the

"statutorily noncompliant" provision); *Markarian v. Conn. Mut. Life Ins. Co.*, 202 F.R.D.

60, 68-69 (D. Mass. 2001) ("The question of causation for Chapter 93A purposes must

also be decided in the context of the total mix of information available to the purchaser of

an insurance policy.  In a Chapter 93A case, a plaintiff must prove "but for" causation

and proximate causation. . . "A defendant's breach of a legal duty is a cause in fact of the

plaintiff's harm if that harm would not have occurred "but for" the breach.  The second

aspect of the causation analysis is proximate cause, the touchstone of which is

foreseeability.  The pertinent inquiry in determining the existence of proximate, or

"legal," cause is "whether the conduct has been so significant and important a cause that

the defendant should be held responsible.'")[56]

---

[56] *Accord*:  *Polycarbon Indus., Inc. v. Advantage Eng'g, Inc.*, 260 F.Supp.2d 296, 306 (D. Mass. 2003) (internal citation omitted) ("[T]o prevail on Chapter 93A claim, plaintiff must show causal connection between defendant's unfair and deceptive act and damage suffered and that such damage was reasonably foreseeable.");*United Musical Instruments USA, Inc. v. Gordon Music, Inc.*, 174 Fed. Appx. 582, 2006 WL 924004, at *2 (1st Cir. 2006) (affirming rejection of 93A counterclaim based on seller giving competing dealer a larger discount, when buyer failed to prove that act caused a loss of tangible property or money); *State Resources Corp. v. Architectural Team, Inc.*, 433 F.3d 73, 85 (1st Cir. 2005) (affirming denial of motion to amend to add 93A claim when plaintiffs' alleged loss is "not a result of [defendant mortgagee's] conduct, but is a consequence of the foreclosure process and its requirements."); *RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10, 15-16 (1st Cir. 2001) (affirming summary judgment based on finding that defendant's alleged misconduct did not cause harm to defendants, who were harmed not because of defendant's statements, but "because of the Massachusetts regulatory scheme that prevents new billboards from being built."); *J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care, Inc.*, 365 F.Supp.2d 119, 150 (D. Mass. 2005) (finding that certain individual pharmacies' claim that exclusion from a network caused economic harm was 'simply too evanescent to satisfy the "loss of money or property" requirement of Chapter 93A § 11"); *Ciardi v. F. Hoffman-La Roche, Ltd.*, 762 N.E. 2d 303, 313 (Mass. 2002) (observing that, while purchaser of vitamins could bring 93A claim against manufacturers based on allegations of price-fixing, "[w]hether the plaintiff can prove her claim is another matter entirely," and noting defendant's argument that the structure of the industry made it difficult "to show how a portion of an overcharge was passed on at each stage of the distribution chain and by which defendants."); *McCann v. Davis, Malm & D'Agostine*, 669 N.E.2d 1077, 1079 (Mass. 1996) (affirming finding for defendant on 93A claim when, even assuming defendant's negligence violated 93A, jury found that defendant's negligence "was not the proximate cause of the plaintiff's damage" and defendants' conduct "would have made no difference"); *Richards v. Arteva Specialties S.A.R.L.*, 850

22.     Even if I were to find that Classes 2 and 3 were deceived into thinking that the Track 1 Defendants' AWPs did not exceed physician acquisition cost by more than 30%, I would not find a violation of Ch. 93A because Classes 2 and 3 would not have done anything different if advised that AWP could exceed acquisition prices by more than 30%.  As illustrated by BCBS/MA's choice of AWP-based reimbursement in preference to alternative reimbursement methodologies, including ASP and specialty pharmacies, and its subsequent decision to extend AWP-based reimbursement to hospital out-patient departments, BCBS/MA would not have acted differently had the Track 1 Defendants acted in the manner BCBS/MA claims they should have.

23.     Furthermore, the amount of the co-payment made by the insurers in Class 2 was established by contract and linked to what the federal government did under the Medicare program.  The government was not deceived by published AWPs and knew that they did not reflect acquisition costs.  Under the circumstances, therefore, even if AWPs were deceptive in some sense, they did not cause any loss to Class 2.  *Cf. Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213 (rejecting consumer protection claim by consumers where the there was insufficient proof that third-party intermediaries were deceived); *Valente v. Sofamor, S.N.C.*, 48 F.Supp.2d 862 (E.D. Wis. 1999) (rejecting consumer claim against manufacturer bone screws where there insufficient proof that the third-party doctor/intermediaries used the manufacturer's product because they were deceived by the manufacturer's allegedly deceptive statements).

---

N.E.2d 1069, 1078 n.11 (Mass. App. 2006) (in price-fixing case under 93A alleging overcharges, quoting trial judge's observation that "the nature of the product in question . . . seems to mitigate against finding such a causal connection due to the many junctures in manufacturing and retailing at which a cost increase could have been absorbed through the stream of commerce," though concluding it was improper to consider whether causation could be proven at the motion to dismiss stage).

24.     By the same principle, the insured consumers in Class 3 cannot establish causation under Chapter 93A.  These consumers, in effect, rely on the insurer to negotiate the best terms with the provider, including the reimbursement and co-payment amounts for medicines prescribed to the consumer.  Accordingly, if the insurers were not deceived, the consumers cannot establish causation.  *See Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213; *Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862 (E.D. Wis. 1999); *cf. Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 103 (1st Cir. 2002).

### D.     The Statute of Limitations

25.     A four-year statute of limitations applies to plaintiffs' claims under Chapter 93A.  Mass. Gen. Laws Ch. 260, § 5A.  Thus, unless accrual of the statute is tolled, all claims for acts or practices that arose before October 1997 are barred, which is four years from the filing of the first Complaint in this MDL.

26.     In Massachusetts, a tort action normally accrues at the time of the plaintiffs' injury.  *Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 130 (1st Cir. 1987).  However, if plaintiff can show that his injury was "inherently unknowable," a "discovery rule" type of exception applies under which the action accrues "when the injured party knew or, in the exercise of reasonable diligence, should have known the factual basis for the cause of action."  *Maggio*, 824 F.2d at 130.  The "inherently unknowable" wrong must be incapable of detection by the wronged party through the exercise of reasonable diligence.  *Tagliente*, 949 F.2d at 5; *Keane, Inc. v. Swenson*, 81 F. Supp. 2d 250, 255 (D. Mass. 2000); *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 29 Mass. App. Ct. 215, 221, 560 N.E.2d 122, 126 (Mass. App. Ct. 1990).

27.     The reasonable diligence standard is an objective one and the cause of action accrues "when the injured party reasonably should have known the factual basis

29

for the cause of action." *Tagliente*, 949 F.2d at 4 (internal quotations omitted).  The

burden is on the plaintiff to establish he could not have known in the exercise of due

diligence the facts leading to discovering the claim within the statute.  *Tagliente*, 949

F.2d at 5 ("The burden is on the plaintiff to prove that in the exercise of reasonable

diligence she could not have known of the misrepresentation within the statute of

limitations."); *Maggio*, 824 F.2d at 130 (if plaintiff had "exercised a reasonable degree of

diligence" he would have discovered his claim prior to the statute running); *Albrecht v.*

*Clifford*, 436 Mass. 706, 715, 767 N.E.2d 42, 49-50 (Mass. 2002); *John Beaudette, Inc. v.*

*Sentry Ins. A Mut. Co.*, 94 F. Supp. 2d 77, 111 n. 40 (D. Mass. 1999) (granting summary

judgment against Chapter 93A plaintiff and holding that plaintiff bears the burden of

presenting evidence to withstand a statute of limitations argument); *Salois v. Dime Sav.*

*Bank of New York, FSB*, No. Civ. A 95-11967 (PBS), 1996 WL 33370626, at *8 (D.

Mass. Nov. 13, 1996), *aff'd*, 128 F.3d 20 (1st Cir. 1997); *Friedman v. Jablonski*, 371

Mass. 482, 486-87, 358 N.E.2d 994, 997-98 (Mass. 1976).[57]

       28.    Plaintiffs seeking to avoid application of the statute of limitations

have obligations of reasonable inquiry and the decision whether any misrepresentation

should reasonably have been uncovered has to be made in light of what a reasonable

inquiry would have disclosed.  *Geo. Knight & Co., Inc. v. Watson Wyatt & Co.*, 170 F.3d

210, 213 (1st Cir. 1999) (an action accrues when an injured party "in the exercise of

reasonable diligence, should have known the factual basis of the cause of action"); *Bowen*

---

[57] Of course, actual knowledge of the claim by plaintiff precludes any application of the discovery rule.
*Catrone v. Thoroughbred Racing Assocs. of North America, Inc.*, 929 F.2d 881, 886 (1st Cir. 1991)
(granting summary judgment for plaintiff and holding that discovery rule did not apply where plaintiff
"had actual knowledge" of the injury); *Reading Cycles v. Bradley*, 1992 WL 93221, *2 (D. Mass. April
13, 1992) (granting summary judgment for defendant and finding that plaintiff's 93A claim was barred by
the statute of limitations where it was "evident that [plaintiff] knew of the injury").

*v. Eli Lilly & Co.*, 408 Mass. 204, 206, 557 N.E.2d 739, 741 (Mass. 1990) (discussing *Friedman v. Jablonski*).  Where the plaintiff "had the means at its disposal to learn" of the facts regarding his injury, the claim is not "unknowable."  *Hanson Hous. Auth. v. Dryvit Sys., Inc.*, 29 Mass. App. Ct. 440, 443, 560 N.E.2d 1290, 1292-93 (Mass. App. Ct. 1990), *rev. den.*, 409 Mass. 1101, 565 N.E.2d 792 (1991); *Xchange Inc. Sec. Litig.*, No. CIV.A.00-10322, 2002 WL 1969661, at *2 (D. Mass. Aug. 26, 2002) (widely publicized accounting controversy accrued claim for fraud); *Estate of Sarocco v. Gen. Elec. Co.*, 939 F. Supp. 91, 97 (D. Mass. 1996) (ongoing public debate in community put plaintiff on notice).

29.     Where facts disclosing the alleged fraud are publicly available, a plaintiff without personal knowledge of those facts will be charged with those facts. *Wise v. Hubbard*, 769 F.2d 1, 2-3 (1st Cir. 1985) ("Under Massachusetts law, a fact is not inherently unknowable when it is a matter discoverable by examination of public records."); *Friedman*, 371 Mass. at 486, 358 N.E.2d at 997; *Duco Assocs., Inc. v. Lipson*, 11 Mass. App. Ct. 935, 935, 416 N.E.2d 555, 556 (Mass. App. Ct. 1981) (following *Friedman* and holding claim was barred where information regarding plaintiff's claim was available for public inspection); *Frank Cooke, Inc. v. Hurwitz*, 10 Mass. App. Ct. 99, 107-08, 406 N.E.2d 678, 684 (Mass App. Ct. 1980).

30.     A statute of limitations may be tolled by acts of fraudulent concealment, but a plaintiff claiming fraudulent concealment must prove a "positive act of concealment."  The applicable statute, Mass. Gen. Laws. Ch. 260, § 12, has been interpreted to require that plaintiff show an affirmative act of fraudulent concealment by the defendant.  *Maggio*, 824 F.2d at 130-31; *Wise*, 769 F.2d at 3-4 (holding that in the

absence of a fiduciary duty there must be a "positive act of concealment" to constitute

fraudulent concealment); *Salois*, 1996 WL 33370626, at *9; *Hurwitz*, 10 Mass. App. Ct.

at 109, 406 N.E.2d at 685.  In the absence of a fiduciary relationship, silence cannot

constitute fraudulent concealment.  *Friedman*, 371 Mass. at 486, n.3, 358 N.E.2d at 997,

n.3.

    31. The doctrine of fraudulent concealment also requires proof that the

defrauding party prevented plaintiff from acquiring the means of discovering the facts

giving rise to its claim.  *Maggio*, 824 F.2d at 131 (emphasis in original) (Section 12 tolls

the statute of limitations only if the wrongdoer … keeps from the person injured

knowledge of the facts giving rise to a cause of action *and the means of acquiring*

*knowledge of such facts*.);  *see also Wise*, 769 F.2d at 4 (holding that Section 12 was

inapplicable because plaintiff could have discovered cause of action after "issuance and

recordation of a patent") (quoting *Burbridge v. Bd. of Assessment of Lexington*, 11 Mass.

App. Ct. 546, 549-50, 417 N.E.2d 477, 480 (1981)); *White v. Peabody Constr. Co.,* 386

Mass. 121, 133, 434 N.E.2d 1015, 1022 (Mass. 1982) ("(A) cause of action is not

concealed from one who has knowledge of the facts that create it.") (quoting *Stetson v.*

*French*, 321 Mass. 195, 198, 72 N.E.2d 410, 412 (Mass. 1947)).

    32. Claims arising prior to October 1997 are barred by Mass. Gen.

Laws Ch. 260, § 5A.  The members of Classes 2 and 3 knew all of the facts alleged to

give rise to their claims during the entire class period.  At a minimum, they should have

known that AWP frequently exceeded acquisition prices by more than 30%, inasmuch as

that fact was widely reported during the class period.

E.      **Duty to Mitigate Damages**

33.     In cases brought under Ch. 93A, "[t]he general principle is well

settled that a party cannot recover for harms that its own reasonable precautions would

have avoided." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp*., 72 F.3d 190, 204-05 (1st

Cir. 1995) (imposing duty to mitigate in case with 93A claims); *see also DiVenuti v.

Reardon*, 637 N.E.2d 234, 236 (Mass. App. 1994) ("Chapter 93A of the General Laws 'is

not designed or intended to throw out all concepts of reasonableness and mitigation or to

allow injured parties to turn their backs on reasonable, probable, and practical dispute

resolution so they can conduct a prolonged quest for the mother lode.'") (quoting trial

judge); *Savers Property & Cas. Ins. Co. v. Admiral Ins. Agency, Inc.*, 807 N.E.2d 842,

849-850 (Mass. App. 2004) (affirming imposition of duty to mitigate when plaintiff was

on notice of potential liability and "had a duty to investigate the matter further, plan a

course of action . . . [and] should have spurred [the plaintiff] into immediate action.").

34.     Classes 2 and 3 failed to take reasonable steps to mitigate their

losses.  These plaintiffs knew that AWP exceeded acquisition costs, investigated their

other options, concluded that other options would be less costly, but elected to continue

using AWP because they regarded it as the best alternative.

F.      **Pipefitters**

35.     Pipefitters relied entirely on BCBS/MA as its agent to manage

drug reimbursement for its members and beneficiaries.  It is well-established in

Massachusetts that where a principal-agent relationship exists, such as the one between

Pipefitters and BCBS/MA, knowledge of the agent will be imputed to the principal.  *See

e.g. Sunrise Properties, Inc. v. Bacon, Wilson, Ratner, Cohen, Salvage, Fialky &

Fitzgerald, P.C.*, 679 N.E.2d 540, 543 (Mass., 1997) ("When an agent acquires

knowledge in the scope of [his] employment, the principal . . . is held to have constructive knowledge of that information.") (citing *DeVaux v. American Home Assur. Co.*, 444 N.E.2d 355 (Mass. 1983)); *see also Lawrence Sav. Bank v. Levenson*, 59 Mass. App. Ct. 699, 704-705 (Mass. App. Ct. 2003) (stating the general principal that knowledge of an agent is imputed to the principal); *In re Bloom*, 222 Mass. 434, 436-437 (Mass. 1916) (a "reason for the rule is that it is the duty of the agent to disclose to his principal all material facts so coming to his knowledge, and the presumption is that he has discharged that duty").

36.     Pipefitters, as principal, cannot prevail under Ch. 93A if its agent BCBS/MA was not deceived.  *See Shannon v. Boise Cascade Corp.*, 805 N.E.2d 213 (Ill. 2004) (affirming grant of summary judgment against home buyers who claimed misrepresentation by siding manufacturers because home buyers did not show that they were directly deceived or that the builders, architects and other third party intermediaries upon whom they relied had been deceived); *see also Valente v. Sofamor, S.N.C.*, 48 F. Supp. 2d 862 (E.D. Wis. 1999) (where claimants, users of medical devices, alleged that manufacturer made false representations to third-party doctors, the Court granted summary judgment against claimants because claimants failed to produce evidence that the third-party doctors relied upon representations made by the manufacturers).[58] BCBS/MA was not deceived.

---

[58] By the same principle, the consumers in Class 3 cannot establish causation under Chapter 93A.  These consumers, in effect, rely on the insurer to negotiate the best terms with the provider, including the reimbursement and co-payment amounts for medicines prescribed to the consumer.  Accordingly, if the insurers were not deceived, the consumers cannot establish causation.  *See Shannon*, 805 N.E.2d 213; *Valente*, 48 F. Supp. 2d 862; *cf. Systems Management, Inc. v. Loiselle*, 303 F.3d 100, 103 (1st Cir. 2002) (holding that plaintiff established causation because "but for [the] false representations" another party in the causal chain would have taken action that avoided the harm).

G.      **Health Care For All**

37.     Health Care For All lacks standing to sue because it cannot prove that any of its members has been injured as a result of the alleged AWP scheme.  An association lacks standing unless it can allege and prove "that its members, or any of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  Stated another way, an association may assert standing on behalf of its members only if at least one of its members possesses standing to sue in his or her own right.  *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *Sea Shore Corp. v. Sullivan*, 158 F.3d 51, 55 (1st Cir. 1998).  Thus, for HCFA to have Article III standing, at least one of its members must demonstrate an "injury-in-fact" -- that is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted); *Sea Shore Corp.*, 158 F.3d at 55.  In addition, the member must demonstrate that there is "a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (citations and internal quotation marks and alterations omitted); *Sea Shore Corp.*, 158 F.3d at 55.  Finally, the member must show that it is likely that the injury will

be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560; *Sea Shore Corp.*, 158

F.3d at 55.[59]

### H.   Sheet Metal Workers

38.   SMW is a Taft-Hartley fund located in Tennessee that provides

health benefits to active and retired members of the SMW union.  For retired workers, the

Fund -- through a third-party administrator -- made Medicare Part B co-payments to

medical providers that Fund beneficiaries would otherwise been obligated to pay on their

own.  The Fund has been certified as a representative of Class 2.[60]

39.   Because the Court has found that the AWPs and sales conduct of

the Track 1 Defendants were not deceptive or unfair as to Medicare itself and/or did not

cause Medicare itself to overpay on the bundle of Part B drugs and services that made up

the 80% federal share of a Fund member's Medicare claim, it is clear that the SMW

cannot sustain a cause of action for the 20% Medicare co-payments it made on behalf of

Fund members arising out of the same claims.  *Shannon v. Boise Cascade Corp.*, 805

N.E.2d 213 (Ill. 2004) (home buyers cannot sue home siding manufacturer for consumer

fraud where builders using the manufacturer's product were not deceived); *Valente v.*

*Sofamor, S.N.C.*, 48 F.Supp.2d 862 (E.D. Wis. 1999) (consumer of medical device may

---

[59] Health Care For All's status as a "consumer health advocacy organization" does not create an exception.  A general interest in healthcare policy does not create standing.  "A mere interest in an event – no matter how passionate or sincere the interest and no matter how charged with public import the event – will not substitute for an actual injury."  *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992); *see also Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements.").

[60] The Court has previously ruled that the most significant contacts for choice of law purposes here are the place where the plaintiff acted in reliance on a representation, the place were the representation was received, and the plaintiff's residence. 230 F.R.D. at 83.  SMW is located in Tennessee and the effects, if any, that defendants' allegedly misrepresented AWPs may have had on its decisions to offer, administer and set premiums for Medigap policies would have occurred in Tennessee.  Accordingly, the application of Massachusetts law is not appropriate as to SMW's claims

not sue manufacturer for deception if physician who implanted the device was not

deceived).

### I.   Medigap Insurers

40.   Medigap insurers are under no legal obligation at any time during

the class periods to offer Medigap Insurance Policies.

41.   The actions of defendants did not cause BCBS/MA or other

Medigap to incur a loss in relation to the provision of Medigap products.

Dated:  November 1, 2006                /s/ William F. Cavanaugh, Jr.
                                        _____
                                        William F. Cavanaugh, Jr.
                                        Andrew D. Schau
                                        Erik Haas
                                        Adeel A. Mangi
                                        **PATTERSON BELKNAP WEBB & TYLER** LLP
                                        1133 Avenue of the Americas
                                        New York, New York  10036-6710
                                        (212) 336-2000

                                        *Attorneys for the Johnson & Johnson Defendants on
                                        behalf of all Track 1 Defendants*

## **Certificate of Service**

I certify that a true and correct copy of the foregoing was served on all parties on November 1, 2006 via LEXIS/NEXIS.

/s/ Andrew D. Schau
Andrew D. Schau