# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456 |
| | CIVIL ACTION NO. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL ACTIONS | Hon. Patti B. Saris |

### DEFENDANT ASTRAZENECA PHARMACEUTICALS LP'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

AstraZeneca Pharmaceuticals LP[1] respectfully submits the following proposed findings of fact and conclusions of law.

### PROPOSED FINDINGS OF FACT

1. AstraZeneca incorporates by reference the Proposed Findings of Fact filed Jointly on behalf of all Track 1 Defendants. AstraZeneca's proposed findings of fact are supported by the exhibits listed on AstraZeneca's and the Track 1 Defendants' joint exhibit list, and will also be supported by the anticipated testimony of witnesses listed on AstraZeneca's and the Track 1 Defendants' joint list. At the conclusion of trial, AstraZeneca will supplement these proposed findings with citations to the final trial record.

---

[1] For sake of clarity, except where otherwise indicated, AstraZeneca Pharmaceuticals LP and its predecessor companies are referred to as simply "AstraZeneca" or the "Company."

I. **Defendant AstraZeneca**

2. AstraZeneca Pharmaceuticals LP is the U.S. subsidiary of AstraZeneca PLC, one of the world's leading pharmaceutical companies, engaged in the discovery, development, manufacture and marketing of brand name prescription medications.

3. The Company maintains its headquarters in Wilmington, Delaware.

II. **Zoladex**

4. AstraZeneca manufactures and sells goserelin acetate depot, a leutenizing hormone-releasing hormone agonist ("LhRh-a"), under the brand name Zoladex. Zoladex is primarily used to treat prostate cancer, but also has been shown to be effective in the treatment of breast cancer and endometriosis.

5. Throughout the class period, pricing decisions relating to Zoladex were made at AstraZeneca's headquarters in Wilmington, Delaware.

6. The Zoladex 3.6 mg 1-month formulation was launched in January 1990 at a list price of $255.00 per injection. At launch and throughout the class period, AstraZeneca kept the list price for Zoladex, commonly known in the pharmaceutical industry as the wholesale acquisition cost or the WAC, lower than the list price for the competing product, Lupron (leuprolide).

7. AstraZeneca had a company policy for much of the class period to keep WAC price increases for AstraZeneca products below the rate of inflation. The average WAC price increase for Zoladex over the class period was, in fact, lower than the rate of inflation as measured by the Consumer Price Index.

8. Throughout the class period, it was well known among health care industry participants that the published Average Wholesale Price, or AWP, for brand name

2

pharmaceuticals was derived by adding an industry-standard mark-up of 20% or 25% to the WAC for any particular brand name drug.  It was also well known that the AWP for a product was not derived from actual transaction prices.

9. Consistent with industry custom, the AWP for Zoladex was derived by adding an industry-standard markup of 25% to the Zoladex WAC.  This relationship has remained constant over the relevant period.

10. From its headquarters in Wilmington, AstraZeneca provided Zoladex WAC pricing information (and corresponding suggested AWP prices, which were 25% higher than WAC) to FirstDataBank, Medispan and Redbook, independent publishers of prescription drug pricing compendia located in California, Indiana and New Jersey respectively.

11. The publishers made information on Zoladex prices available for purchase to health care industry participants.  Most industry participants, including manufacturers, pharmacies, insurers and government agencies, purchased the data in either paper or electronic form from FirstDataBank, RedBook and/or Medispan.  Accordingly, information on the WAC and AWP for Zoladex was publicly available throughout the class period.

### III. Zoladex is Launched into the LhRh-a Market

12. Prior to the launch of Zoladex and its primary competitor, Lupron, a common treatment for advanced prostate cancer was surgical castration, known as orchiectomy.

13. Zoladex is an important medical alternative to surgical castration that offers prostate cancer patients a better quality of life.  It is an injectable physician-administered drug, which affects the progression of prostate cancer by suppressing the production of testosterone.  LhRh agonists are now standard therapy for advanced prostate cancer.  Typically, Zoladex is administered by a medical professional in the abdomen once a month, for the one-month depot, or once every three months, for the three-month depot.

14. Lupron, manufactured by TAP Pharmaceuticals, is also an injectable LhRh agonist administered by a physician.  Although the method of injection differs, many physicians view Lupron and Zoladex as therapeutically equivalent.

15. Zoladex is the only LhRh-a clinically proven to provide the same therapeutic effect as surgical castration and is the only LhRh-a shown to have a survival benefit when used in combination with radiation therapy for patients with locally advanced prostate cancer.

16. In light of the strong clinical evidence supporting the efficacy of Zoladex, AstraZeneca's promotional messages for Zoladex have focused on clinical efficacy and lower cost – to the physician, the patient and the health care system.

## IV. Zoladex Pricing

### A. AstraZeneca Offered Discounts to Physicians

17. Of the two products, Lupron was the first to come to market in the U.S. in 1989.  At its launch in 1990, AstraZeneca determined to price Zoladex significantly lower than Lupron.  Zoladex was priced at $255, resulting in a corresponding AWP 25% higher, at $318.75.  This was approximately $75 less per dose than Lupron.  The list price

differential between the two grew over time. By 2004, the AWP for Lupron had increased to $685.21 per injection, and the Zoladex AWP was $469.99 -- more than $200 less per injection. As a result, patients, the Medicare program and private insurers have paid less per unit for LhRh-a therapy when Zoladex was administered instead of Lupron.

18. From 1990 to 1993, AstraZeneca sold Zoladex directly to physicians and other purchasers at WAC. AstraZeneca did not offer any discounts or rebates off of WAC except for an industry standard 2% prompt payment discount for accounts paid in full within 30 days of invoice.

19. Despite its lower cost, Zoladex's market share of the LhRh-a market was small in relation to Lupron's market share throughout the early 1990s.

20. After several years of disappointing sales results for Zoladex, it became apparent to AstraZeneca that, because of the reimbursement system established in 1992 under Medicare Part B, Lupron's high AWP offered doctors a financial incentive to choose Lupron over Zoladex for their Medicare patients. This financial incentive was commonly referred to as "Return to Practice".

21. Thus, AstraZeneca's potential customers were resistant to use Zoladex over its much higher priced alternative.

22. In order to address this competitive disadvantage vis-à-vis TAP, AstraZeneca was required to offer quantity discounts to its customers and potential customers.

23. In adopting a discounting strategy for Zoladex, AstraZeneca was responding to market pressure from its customers created by the competitive dynamics of the marketplace.

24. The strategy embodied in AstraZeneca's discounting decisions with respect to Zoladex was to eliminate the financial incentive for doctors to choose Lupron over Zoladex, so that Zoladex could compete on its clinical merits.

25. AstraZeneca began to offer volume-based discounts to physicians on a limited basis in 1993. From time to time from 1994 to 1997, AstraZeneca increased the discounts available. AstraZeneca has not adjusted its volume discounts since 1997.

26. Discounting is a normal practice in a therapeutic market with significant product competition because purchasers with market power have the ability to affect sales. In the LhRh-a marketplace, physicians have such power because they are both the prescribers of the product and the purchasers.

27. Although varying discounts were made available to different trade classes and for varying volume purchases, AstraZeneca has also continued to make sales at WAC.

28. AstraZeneca's pricing and discounting practices for Zoladex were commercially reasonable given the competitive dynamic in this therapeutic category.

29. AstraZeneca provided written and oral information to physicians on the purchase price and the Medicare reimbursement rate for Zoladex as compared to the purchase price and Medicare reimbursement rate for Lupron. AstraZeneca's provision of this truthful information to its customers was a response to the demands of the marketplace.

30. AstraZeneca's written contracts with physicians included the Zoladex discount schedules and provided that physicians should keep the terms of the contracts confidential, but also provided that physicians were obligated to report any discounts received on the purchase of Zoladex whenever such disclosure was required by law.

31. The same reporting requirement was stamped on the invoices physicians received when they purchased Zoladex, and the invoices properly reflected the discounted transaction prices.

32. By offering a lower priced product and by maintaining its financial competitiveness with Lupron, AstraZeneca's sales of Zoladex for Medicare patients provided cost savings to the patients and the Medicare program relative to Lupron.

33. Both Medicare and Third Party Payers reimburse physicians for Zoladex directly – the reimbursement transaction does not involve AstraZeneca.

### B. AstraZeneca Offered Third Party Payers Substantial Discounts Off of WAC for the Purchase of Zoladex

34. AstraZeneca communicated its Zoladex discounts to Plaintiff Blue Cross Blue Shield of Massachusetts and other third party payers. AstraZeneca also offered third party payers, including members of Classes 2 and 3, similar discounts to those offered to physicians.

35. Third party payers who are members of Classes 2 and 3 were offered and/or purchased Zoladex from AstraZeneca directly at substantial discounts off of WAC. The average price at which major Massachusetts insurers like Harvard Pilgrim and Fallon purchased Zoladex was equal to, and at times lower than, the prices paid by physicians.

36. These discounts often resulted in a greater than 30% difference between acquisition cost and published AWP for Zoladex.

37. As part of its marketing strategy for Zoladex, AstraZeneca designed a program called the Zoladex Managed Acquisition Program ("MAP").

38. The purpose of the MAP program was to leverage Zoladex's lower cost by offering Zoladex to third party payer managed care organizations at the same discounts available to physicians. AstraZeneca believed that Zoladex's lower price would be attractive to managed care organizations.

39. Under the MAP program, physicians would order Zoladex from AstraZeneca. AstraZeneca would ship the drug to the physician and then bill the third party payer directly.

40. A number of the managed care organizations which received offers of substantial discounts on Zoladex in connection with the MAP program are members of Classes 2 and 3.

41. The third party payers in Class 3, by definition, decided to base their reimbursement methodology for physician-administered drugs on AWP. AstraZeneca believed that if the third party payers in Class 3 had based their reimbursement methodologies on physician acquisition costs, such policies would have actually benefited Zoladex by allowing Zoladex to compete with Lupron on the basis of clinical efficacy, safety and much lower cost.

42. The third party payers in Classes 2 and 3 knew or should have known that the AWP of Zoladex was not an actual average of prices at which physicians were purchasing Zoladex nor was the AWP of Zoladex predictably related to actual acquisition costs.

43. AstraZeneca's pricing of Zoladex was not unfair to the third party payers in Classes 2 and 3.

## V. AstraZeneca Did Not Deceive Class 3 Consumers About the Price of Zoladex

44. There is no evidence that AstraZeneca had any contact with any consumer in Class 3 regarding Zoladex.

45. Class 3 consumer co-insurance payments for Zoladex, if any, were made pursuant to independent contractual arrangements with insurance carriers, and not on the basis of any understanding or expectation regarding Zoladex's AWP.

## VI. The Federal Government Was Aware of the Zoladex Volume Discounts

### A. Medicare Carriers Were Aware of Discounts Provided to Physicians on the Purchase of Zoladex

46. During the class period at least several regional Medicare carriers obtained documents that contained the volume discount pricing for Zoladex that was offered to physicians.

47. The price lists were also sent to the Health Care Financing Administration ("HCFA"), the federal agency responsible for the administration of the Medicare program at that time.

48. This price information led one Medicare carrier to seek to change reimbursement for Zoladex to reflect physician acquisition cost. In 1996, HCFA instructed this

Medicare carrier to cease its attempt to reimburse for Zoladex based on actual acquisition costs, and to instead resume reimbursement based on published AWP.

### B. AstraZeneca Reported Average Manufacturer's Price to the Federal Government

49. Throughout the claim period AstraZeneca has been required to report an Average Manufacturer's Price ("AMP") to the federal government on a quarterly basis in connection with all drugs reimbursed by the Medicaid program.

50. The AMPs reported by AstraZeneca reflect all discounts received by customers in the retail distribution chain including, in the case of Zoladex, physician practices.

51. Pursuant to this requirement, AstraZeneca has provided the federal government with information on the prices paid by physicians for Zoladex since 1991.

52. The AMPs for Zoladex that AstraZeneca reported to the federal government reflected the discounts that physicians had achieved in their purchases of Zoladex.

### C. The Federal Government Purchased Zoladex at Discounted Prices

53. The Veterans' Administration purchased Zoladex at similar discounts off of AWP during the class period.

### D. Information on Zoladex Discounts Was Available For Purchase From Third Parties

54. Information on amounts actually paid by physicians for Zoladex was also available through a company called IMS, which publishes national pharmaceutical sales and pricing data for all pharmaceutical trade classes.

55. Manufacturers and other suppliers report to IMS their actual invoice pricing of Zoladex sales to physicians and other customers. These invoice prices include on-invoice discounts. IMS publishes monthly reports detailing the total volume and

dollar amount of sales for each product sold, which permits calculation of an average sales price for each drug.

56. IMS data is publicly available for purchase. Current subscribers include, among other entities, government agencies at both the federal and state level.

57. The average sales prices for Zoladex, reported by IMS, are similar to the average sales prices calculated by Plaintiffs' expert Dr. Hartman.

## VII. AstraZeneca Did Not Seek to Deceive Anyone, Nor Did AstraZeneca Believe that Anyone Was Deceived, Regarding Discounts It Offered on Zoladex,

58. AstraZeneca did not attempt to hide the discounts it offered to physicians from the government. Rather, AstraZeneca disclosed the Zoladex discounts it offered to physicians to the government. The government in fact obtained similar discounts in its own purchases of Zoladex, and at times better discounts, than AstraZeneca offered to physicians.

59. AstraZeneca believed that the government was aware that Zoladex was being sold at prices representing a discount off of its published WAC.

60. AstraZeneca did not attempt to hide the discounts it offered to customers from third party payers. Indeed, it offered third party payers the very same discounts, or better discounts, than it offered to physicians.

61. At no time did AstraZeneca seek to convince any third party payer in Class 3 to base its reimbursement methodology for physician-administered drugs on AWP. Indeed, AstraZeneca believed that if the third party payers in Class 3 had set their reimbursement methodologies to preclude physicians from earning a profit on Zoladex (by, for example, participating in the Zoladex MAP program), such policies

would have actually benefited Zoladex by allowing Zoladex to compete with Lupron on the basis of lower cost.

62. AstraZeneca did not intend to deceive consumers in Class 3 regarding these discounts. Class 3 consumers who paid a co-insurance payment for Zoladex did so pursuant to independent contractual arrangements with their respective insurance carriers, and not because of any understanding or expectation regarding Zoladex's AWP.

63. AstraZeneca did not believe that the government or third party payers made reimbursement decisions for Zoladex based on a belief that the Zoladex AWP represented an average selling price (or a predictable signal for an average selling price) for Zoladex. Similarly, AstraZeneca did not believe that the government or third party payers made reimbursement decisions for Zoladex based on a belief that physicians were unable to acquire Zoladex at discounts off WAC.

## VIII. There is No Evidence Linking the Conduct Described in AstraZeneca's June 20, 2003 Guilty Plea to Massachusetts

64. The Information in United States v. AstraZeneca Pharmaceuticals, L.P., Criminal Action No. 03-55 (D. Del.), only identifies two physicians who improperly billed for samples--Dr. Saad Antoun and Dr. Stanley Hopkins--neither of whom practiced medicine in Massachusetts. Information in United States v. Saad Antoun, M.D., Criminal Action No. 02-13 (D. Del.); Information in United States v. Stanley C. Hopkins, M.D., Criminal Action No. 02-127 (D.Del.)[2]

---

[2] An additional physician, Dr. Robert Berkman, also plead guilty to similar conduct. Transcript of the Plea Hearing in United States v. Robert A. Berkman, M.D., Criminal Action No. 03-45 (D.Del.). Dr. Berkman does not practice in Massachusetts.

65. There is no evidence that any of the TPP members of Class 2 or Class 3 reimbursed for a sample or that any consumer member of Class 3 made a co-payment for a sample.

66. AstraZeneca has never had a Corporate policy to provide samples to physicians so that they could seek reimbursement and increase return to practice. In fact, the undisputed evidence demonstrates that AstraZeneca corporate policy expressly prohibited encouraging or advising physicians to bill for samples.

## PROPOSED CONCLUSIONS OF LAW

67. AstraZeneca incorporates by reference the Proposed Conclusions of Law filed Jointly on behalf of all Track 1 Defendants. Because these Proposed Conclusions of Law are being drafted prior to a variety of legal rulings, and before Plaintiffs have explained any alleged liability on the part of Defendants, AstraZeneca respectfully requests the opportunity to submit additional conclusions of law following the completion of trial, based on the trial record.

**I.      Standard of Liability**

68. Plaintiffs bear the burden of proving all of the essential elements of a Mass. G. L. 93A claim.

69. Plaintiffs have not shown that AstraZeneca engaged in deceptive or unfair acts or practices or that Plaintiffs suffered a loss as a result of AstraZeneca's deceptive or unfair acts or practices.

70. Section 11 requires unfair or deceptive conduct to be measured by the "standard of the commercial marketplace." <u>Commercial Union Ins. Co. v. Sevens Provinces Ins. Co., Ltd.</u>, 217 F.3d 33, 40 (1st Cir. 2000).

71. As the First Circuit has explained, "[t]o trigger liability under 93A, courts have said that the conduct in question 'must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce.'" <u>Id</u>. at 40 (quoting <u>Quaker State Oil Ref. Corp. v. Garrity Oil Co.</u>, 884 F.2d 1510, 1513 (1st Cir. 1989)); <u>see also</u> <u>Palochko v. Reis</u>, 67 Mass. App. Ct. 103, 107, 852 N.E.2d 127, 131 (Mass. App. Ct 2006) ("We think it would defeat commercial expectations and foment litigation to impose c. 93A, §11, liability in the present case because the parties are sophisticated.") (internal citations omitted).

72. Furthermore, "[i]n determining whether an act or practice is unfair, as opposed to deceptive, we must evaluate the equities between the parties. What a defendant knew or should have known may be relevant in determining unfairness. Similarly a plaintiff's conduct, his knowledge, and what he reasonably should have known may be factors in determining whether an act or practice is unfair." <u>Swanson v. Bankers Life Co.</u>, 450 N.E.2d 577, 580 (Mass. 1983).

73. AstraZeneca did not engage in unfair or deceptive conduct as required under Section 11 of Mass. G. L. 93A.

II. **Plaintiffs Have Not Satisfied the Business Transaction Requirement**

74. Section 11 requires that the allegedly deceptive or unfair conduct must have occurred during a business transaction between the parties. <u>Szalla v. Locke</u>, 421 Mass. 448,

452, 657 N.E.2d 1267 (Mass. 1995). Plaintiffs' 93A claim fails because the allegedly deceptive act or practice did not occur during a business transaction between plaintiffs and AstraZeneca.

### III. Plaintiffs Have Not Proved Causation

75. Plaintiffs must show that AstraZeneca's deceptive or unfair conduct was the "but for" and "proximate cause" of Plaintiffs' loss. Markarian v. Connecticut Mut. Life Ins. Co., 202 F.R.D. 60, 68-69 (D. Mass. 2001); Hershenow v. Enterprise Rent-A-Car Co. of Boston, 840 N.E.2d 526, 528 (Mass. 2006)

76. Plaintiffs cannot establish causation under Ch. 93A because they knew or should have known that the pricing information that AstraZeneca provided to medical publishers did not reflect actual transaction prices. Plaintiffs therefore cannot show that, but for the alleged deception, they would have paid less for Zoladex. Mass. Farm Bureau Fed'n v. Blue Cross of Mass., 532 N.E.2d 660, 665 (Mass. 1989); Tagliente v. Himmer, 949 F.2d 1, 3, 7-8 (1st Cir. 1991).

### IV. Plaintiffs Do Not Establish Loss

77. Under Section 11, Plaintiffs must prove that the allegedly deceptive act or practice caused a loss of money or property. Mass. Gen. Laws Ann. Ch. 93A § 11.

78. Plaintiffs' claim fails because AstraZeneca's publication of AWP information to medical publishers did not cause a loss of money or property for Plaintiffs. Mass. Gen. Laws Ann. Ch. 93A § 11.

## V.      Statute of Limitations

79. A four year statute of limitations governs Mass. G. L. 93A. Mass. Gen. Laws Ch. 260, § 5A. Plaintiffs' claims prior to 1997 are time-barred by the statute of limitations.

80. A tort action in Massachusetts normally accrues at the time of injury, but where a plaintiff shows that his injury was "inherently unknowable," the cause of action accrues when, with the exercise of reasonable diligence, a party knew or should have known of the factual basis for the cause of action. Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 130 (1st Cir. 1987).

81. Plaintiffs knew or should have known that AWP was not an actual average of wholesale prices throughout the class-period. Accordingly Plaintiffs' alleged injury was not "inherently unknowable."

82. Plaintiffs bear the burden of proving they could not have discovered the factual basis for their cause of action with the exercise of due diligence. Tagliente v. Himmer, 949 F.2d 5 (1st Cir. 1991).

83. Where facts publicly exist that reveal the fraud or deception, Plaintiffs are charged with knowledge of those facts. Wise v. Hubbard, 769 F.2d 1, 2-3 (1st Cir. 1985). Plaintiffs are charged with the knowledge that AWP was not meant to represent an actual average of wholesale prices.

84. In order to toll the statute of limitations for fraudulent concealment, Plaintiffs bear the burden of showing an affirmative act of concealment on the part of AstraZeneca. Maggio, 824 F.2d at 130-31; Wise, 769 F.2d at 3-4. Plaintiffs have not shown any

affirmative act on the part of AstraZeneca to conceal the meaning of AWP, therefore Plaintiffs cannot toll the statute of limitations.

Dated:  Boston, Massachusetts
        November 1, 2006

Respectfully Submitted,

By:  /s/ Katherine B. Schmeckpeper
     Nicholas C. Theodorou (BBO # 496730)
     Katherine B. Schmeckpeper (BBO #663200)
     FOLEY HOAG LLP
     155 Seaport Blvd.
     Boston, Massachusetts 02210
     Tel: (617) 832-1000

     D. Scott Wise
     Michael S. Flynn
     Kimberley Harris
     DAVIS POLK & WARDWELL
     450 Lexington Avenue
     New York, New York 10017
     Tel: (212) 450-4000

     Attorneys for AstraZeneca Pharmaceuticals LP

17

**CERTIFICATE OF SERVICE**

      I certify that a true and correct copy of the foregoing was delivered on November 1, 2006 to counsel for plaintiffs and to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, via LexisNexis File & Serve.

      By: /s/ Katherine B. Schmeckpeper
           Katherine B. Schmeckpeper (BBO# 663200)