# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION:  01-CV-12257-PBS |
| ALL CLASS ACTIONS | Judge Patti B. Saris |

## PLAINTIFFS' COMBINED PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND TRIAL BRIEF FOR THE PHASE 1 TRIAL AGAINST THE TRACK 1 DEFENDANTS

- i -

# TABLE OF CONTENTS

**PAGE**

I.   FINDINGS OF FACT RELATED TO EACH CLASS PLAINTIFF.................................1

II.  GENERALIZED FINDINGS OF FACT AGAINST DEFENDANTS ............................6

    A.   Each Track 1 Defendant Knew That AWP Was the Reimbursement Benchmark
        Used by Medicare Part B and Many Private Payors.................................................6

    B.   Each Track 1 Defendant Caused AWPs to Be Published for Their
        Subject Drugs.................................................................................................6

    C.   The AWPs for Subject Drugs Did Not Include Relevant Discounts Nor
        Reflect an Average, and Each Track 1 Defendant Manipulated AWPs
        and Spreads ....................................................................................................6

    D.   Each Track 1 Defendant Marketed Spreads.................................................6

III.  PARTICULAR FINDINGS OF FACT AGAINST EACH TRACK 1 DEFENDANT ......7

    A.   AstraZeneca Defendants .................................................................................7

        1.   AstraZeneca knew that AWP was the reimbursement benchmark
            used by Medicare Part B and many private payors.......................................7

        2.   AstraZeneca caused AWPs to be published for its Subject Drugs .............8

            a.   AstraZeneca set the published AWP for Zoladex prior to 2002......8

            b.   AstraZeneca communicated its AWP to the Publishers for
                publication.....................................................................................11

        3.   AstraZeneca's AWPs for its Subject Drugs were false in that they
            did not include relevant discounts nor reflect an average, and
            AstraZeneca manipulated its AWPs and spreads.......................................13

            a.   AstraZeneca knew that its AWP was a fictitious number..............13

            b.   AstraZeneca refrained from making AWP a meaningful
                number ..........................................................................................15

        4.   AstraZeneca actively marketed spreads and "Return to Practice" to
            physicians...................................................................................................16

            a.   AstraZeneca recognized that spread was a driver in the
                oncology market............................................................................16

001534-16  127284 V1

b.     AstraZeneca manipulated its AWPs in order to create spreads .....16

c.     AstraZeneca's strategic, operational, and marketing plans and sales training materials focused on communicating to physicians the Return to Practice on Zoladex ...............................21

d.     AstraZeneca's sales representatives marketed the spread and Return To Practice to physicians ...................................................24

e.     AstraZeneca used physician buy groups – and encouraged physicians to join – in order to increase Return To Practice ........26

f.     AstraZeneca pled guilty to marketing the spread by providing free samples of Zoladex to physicians while encouraging those physicians to bill Medicare for them ...............................................27

g.     AstraZeneca used third parties to maximize reimbursement for Zoladex ....................................................................................32

h.     AstraZeneca concealed its selling based on Return To Practice....34

B.     The BMS Defendants.............................................................................35

1.     BMS knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors ...................................37

2.     BMS caused AWPs to be published for its Subject Drugs ......................38

a.     BMS controlled the AWPs for its Subject Drugs by reporting WLPs with full knowledge of the mark-up factors that the Publishers would use to create the AWPs......................................38

b.     BMS republished the AWPs for its Subject Drugs .......................41

3.     BMS's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average, and BMS manipulated its AWPs and spreads............................................43

a.     BMS knew that its Subject Drugs were sold at prices well below AWP.................................................................................44

b.     Recognizing the importance of spreads, BMS created spreads through confidential contract pricing, rebates and other forms of discounting...............................................................................47

(1)     The importance of reimbursement .....................................47

(2)     Creating spreads................................................................50

001534-16  127284 V1

c.   Individual brand and price histories reveal BMS's
     manipulation of spreads ...................................................................53

     (1)   Blenoxane ...............................................................................53

     (2)   Cytoxan ...................................................................................55

     (3)   VePesid ...................................................................................55

     (4)   Etopophos ...............................................................................56

     (5)   Rubex .......................................................................................56

     (6)   Taxol .........................................................................................57

     (7)   Paraplatin .................................................................................59

4.   BMS marketed spreads .............................................................................59

C.   J&J .............................................................................................................................65

     1.   J&J knew that AWP was the reimbursement benchmark used by
          Medicare Part B and many private payors .................................................67

     2.   J&J caused AWPs to be published for its Subject Drugs ..........................68

     3.   J&J's AWPs for its Subject Drugs were false in that they did not
          include relevant discounts nor reflect an average, and J&J
          manipulated its AWPs and spreads ............................................................74

          a.   J&J did not include discounts in its reported AWP and did not
               report an actual average ....................................................................74

          b.   J&J manipulated its pricing to create spreads ...............................77

          c.   J&J hid the true price of its products .............................................78

     4.   J&J marketed spreads ................................................................................83

          a.   J&J marketed the spread on Remicade ..........................................83

          b.   J&J marketed the spread on Procrit ...............................................86

D.   The Schering-Plough Group ......................................................................................93

     1.   Schering-Plough and Warrick knew that AWP was the reimbursement
          benchmark used by Medicare Part B and many private payors ................95

2.      The Schering-Plough Group caused AWPs to be published for its Subject Drugs ................................................................95

3.      The Schering-Plough Group's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average, and the Schering-Plough Group manipulated its AWPs and spreads...........................................................................................98

        a.      The Schering-Plough Group knew that its Subject Drugs were sold at prices well below AWP ..............................................98

        b.      Recognizing the importance of spreads, the Schering-Plough Group created spreads through confidential contract pricing, rebates, and other forms of discounting .......................................100

                (1)     The importance of reimbursement ...................................100

                (2)     Initial spreads and typical increases to the spreads..........103

                (3)     Other ways in which spreads were increased .................106

                        (a)     Setting AWPs for Warrick generics at levels very close to those for corresponding branded products created large spreads from the outset ....106

                        (b)     Using nominal pricing for Schering-Plough and Warrick drugs as a means of avoiding Medicaid rebates created enormous spreads.......................108

                        (c)     The effects of the Integrated Therapeutics Group ..................................................................112

        c.      Individual Brand and Price Histories Reveal the Schering-Plough Group's Manipulation of Spreads ...................113

                (1)     Albuterol sulfate (generic) ...............................................113

                (2)     Intron-A............................................................................114

                (3)     Proventil (branded albuterol) ..........................................115

4.      The Schering-Plough Group marketed spreads .......................115

IV.    CONCLUSIONS OF LAW ................................................................116

       A.      Jurisdiction And Venue..........................................................116

       B.      The Liability Period ...............................................................117

C.    Legal Standards.................................................................................................117

    1.    The Meaning of AWP in the Medicare Part B Program and the Private Insurance Market ...................................................................................117

        a.    AWP as used in the Medicare Part B program was intended to be an actual average of wholesale prices ...............................117

        b.    In the private insurance market, AWP is supposed to be a reasonably accurate signal of prevailing prices ..........................121

    2.    G.L. Ch. 93A Prohibits Unfair and Deceptive Acts or Practices in the Conduct of Trade or Commerce ............................................................121

        a.    Unfair acts or practices standards .................................................122

        b.    Deceptive acts or practices standards ..........................................123

    3.    Relevancy of the OIG Guidelines ............................................................123

D.    Findings That Defendants Committed Unfair Or Deceptive Acts Or Practices In Trade Or Commerce.......................................................................124

    1.    Each Track 1 Defendant Committed Unfair Acts or Practices...............125

    2.    Each Track 1 Defendant Committed Deceptive Acts or Practices .........127

    3.    Defendants have also Violated Ch. 93A as Result of Violating Federal Trade Commission Law....................................................................129

    4.    Defendants have also Violated Ch. 93A as Result of Violating Mass. Regs. Code tit. 940, §§ 3.04, 3.05(1) and 3.16(1)...................................135

    5.    Statute of Limitations and Fraudulent Concealment Findings and "Knowledge" of Plaintiffs and the Class .................................................136

        a.    The statute of limitations does not bar Plaintiffs' claims ...........136

        b.    Defendants actively engaged in fraudulent concealment.............143

E.    Causation................................................................................................149

    1.    Defendants' Arguments against Causation are Unavailing ....................150

    2.    Causation is Established for Generic Drugs ...........................................153

F.    Injunctive Relief..............................................................................................155

G.    Damages...........................................................................................................156

- vi -

|  |  | 1. | General damages | 156 |
|  |  | 2. | Prejudgment interest | 156 |
|  |  | 3. | Treble damages | 157 |
|  |  | 4. | Joint and several liability for OTN | 157 |
|  |  | 5. | Defendants' failure to mitigate defense | 157 |
| H. | Attorneys' Fees And Costs | | | 160 |
| I. | Conclusion | | | 160 |

001534-16  127284 V1

# TABLE OF AUTHORITIES

## CASES

Page

*In re Aiken,*
   133 B.R. 258 (D. Me. 1991) ........................................................................117

*Alan Steiman's Landscape, Inc. v. Lawrence Sav. Bank,*
   1996 WL. 408942 (Jul. 16, 1996 Mass. App. Ct.)..........................................156

*Amgen, Inc. v. Ortho Pharm. Corp.,*
   708 N.E.2d 385 (Ill. Ct. App. 1999) ...............................................................67

*Aspinall v. Philip Morris Cos.,*
   442 Mass. 381, 813 N.E.2d 476 (2004) .......................................................123

*Augat, Inc. v. Collier,*
   1996 U.S. Dist. Lexis 2702 (D. Mass. Jan. 22, 1996)...................................128

*In re Bajgar,*
   104 F.3d 495 (1st Cir. 1997) ........................................................................118

*Bonilla v. Volvo Car Corp.,*
   150 F.3d 62 (1st Cir. 1998)...........................................................................134

*Bureau of Alcohol, Tobacco & Firearms v. Federal Labor Relations Auth.,*
   464 U.S. 89 (1983)........................................................................................117

*Cambridge Plating Co. v. Napco, Inc.,*
   85 F.3d 752 (1st Cir. 1996)...........................................................................127

*Doty v. Sewall,*
   908 F.2d 1053 (1st Cir. 1990)........................................................................156

*Federated Nationwide Wholesalers Serv. v. FTC,*
   398 F.2d 253 (2d Cir. 1968)..........................................................................131

*Fraser Eng'g Co., Inc. v. Desmond,*
   26 Mass. App. Ct. 99, 524 N.E.2d 110 (1988) .............................................123

*Harper v. Albert,*
   400 F.3d 1052 (7th Cir. 2005) ......................................................................153

*In re Hart,*
   328 F.3d 45 (1st Cir. 2003)............................................................................118

*Heavenly Creations, Inc. v. FTC*,
    339 F.2d 7 (2d Cir. 1964) ........................................................................1323

*Helbros Watch Co. v. FTC*,
    310 F.2d 868 (D.C. Cir. 1962) .................................................130, 131, 133

*Homsi v. C.H. Babb Co.*,
    10 Mass. App. Ct. 474, 409 N.E.2d 219 (1980) ......................................129

*ISI Sys. v. Equifax, Inc.*,
    1996 U.S. Dist. Lexis 882 (D. Mass. Jan. 12, 1996).................................152

*In the Matter of John Surrey, Ltd.*,
    67 F.T.C. 299, 1965 F.T.C. Lexis 42, at 73 (1965) .................................133

*Jensen v. Frank*,
    912 F.2d 517 (1st Cir. 1990).....................................................................143

*Langford v. Rite Aid of Ala., Inc.*,
    231 F.3d 1308 (11th Cir. 2000) ................................................................134

*Laracuente v. Chase Manhattan Bank*,
    891 F.2d 17 (1st Cir. 1989)........................................................................118

*Leardi v. Brown*,
    394 Mass. 151, 474 N.E.2d 1094 (1985) ..........................................121, 123

*Levings v. Forbes & Wallace, Inc.*,
    8 Mass. App. Ct. 498, 396 N.E.2d 149 (1979) ..................................122, 126

*In re Lupron Mktg. & Sales Practices Litig.*,
    245 F. Supp. 2d 280 (D. Mass. 2003) .................................................12, 40

*In re Lupron Mktg. & Sales Practices Litig.*,
    295 F. Supp. 2d 148 (D. Mass. 2003) ................................................. *passim*

*Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc.*,
    420 Mass. 39, 648 N.E.2d 435 (1995) ..............................................123, 126

*McEvoy Travel Bureau, Inc. v. Norton Co.*,
    563 N.E.2d 188 (Mass. 1990) ...................................................................156

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("In re MTBE")*,
    379 F. Supp. 2d 348 (S.D.N.Y. 2005)......................................................154

*New England Trust Co. v. Farr*,
    57 F.2d 103 (1st Cir. 1932)....................................................................................152

*Niresk Indus., Inc. v. FTC*,
    278 F.2d 337 (7th Cir. 1960) ...............................................................................130

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    263 F. Supp. 2d 172 (D. Mass. 2003) ..................................................................117

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    307 F. Supp. 2d 196 (D. Mass. 2004) ..................................................................150

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    230 F.R.D. 61 (D. Mass. 2005)....................................................................121, 134, 149

*Patry v. Liberty Mobilehome Sales, Inc.*,
    394 Mass. 270, 272, 475 N.E.2d 392 (1985) ...................................................156

*PMP Assocs., Inc. v. Globe Newspaper Co.*,
    366 Mass. 593, 595, 321 N.E.2d 915, 917 (1975) .....................................122, 129

*Ravo v. Rogatnick*,
    514 N.E.2d 1104 (N.Y. 1987)..............................................................................154

*Matter of Regina Corp. (Regina I)*,
    61 F.T.C. 983, 1962 F.T.C. Lexis 92 (Oct. 11, 1962)...............................129, 130

*Matter of Regina Corp. (Regina II)*,
    65 F.T.C. 246, 1964 F.T.C. Lexis 30 (Apr. 7, 1964) .......................130, 132, 133

*Regina Corp. v. F.T.C.*,
    322 F.2d 765 (3rd Cir. 1963) ..............................................................................135

*Rhode Island v. Narragansett Indian Tribe*,
    19 F.3d 685 (1st Cir. 1994)..................................................................................117

*Rini v. United Van Line*,
    903 F. Supp. 234 (D. Mass. 1995) .......................................................................156

*Roeder v. Alpha Indus., Inc.*,
    814 F.2d 22 (1st Cir. 1987)..........................................................................127, 128

*Sawyer v. Indevus Pharms., Inc.*,
    2004 Mass. Super. Lexis 274 (Mass. Super. Ct. July 26, 2004) ...............137, 142

- x -

*Service Publications, Inc. v. Goverman*,
    396 Mass. 567, 487 N.E.2d 520 (1986) ...................................................................122

*Shantigar Found. v. Bear Mt. Builders*,
    804 N.E.2d 324 (Mass. 2004) .............................................................................154

*Slaney v. Westwood Auto., Inc.*,
    366 Mass. 688, 322 N.E.2d 768 (1975) ........................................................121, 122, 129

*Sprint Spectrum, L.P. v. Town of Ogunquit*,
    175 F. Supp. 2d 77 (D. Me. 2001) .......................................................................117

*Stryker Corp. v. XL Ins. Am., Inc.*,
    2006 U.S. Dist. Lexis 47899 (W.D. Mich. July 14, 2006) ............................................152

*Swanson v. Bankers Life Co.*,
    389 Mass. 345, 450 N.E.2d 577 (1983) ...................................................................123

*Thompson v. Metropolitan Life Ins. Co.*,
    149 F. Supp. 2d 38 (S.D.N.Y. 2001) .....................................................................142

*Turner v. Johnson & Johnson*,
    809 F.2d 90 (1st Cir. 1986) ..............................................................................128

*Union Pac. Resources Group, Inc. v. Rhone-Poulenc, Inc.*,
    247 F.3d 574 (5th Cir. 2001) ............................................................................128

*United States v. Lachman*,
    387 F.3d 42 (1st Cir. 2004) .............................................................................118

*United States v. President & Fellows of Harvard College*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ...................................................................153

*United States v. Thompson*,
    32 F.3d 1 (1st Cir. 1994) ...............................................................................118

*V.S.H. Realty, Inc. v. Texaco, Inc.*,
    757 F.2d 411 (1st Cir. 1985) ............................................................................127

*Veranda Beach Club Ltd. P'ship v. Western Surety Co.*,
    936 F.2d 1364 (1st Cir. 1991) ........................................................................1597

*Weiss v. Augat, Inc.*,
    2000 WL. 1765434 (Mass. 2000) .........................................................................156

*Wolinetz v. Berkshire Life Ins. Co.*,
   361 F.3d 44 (1st Cir. 2004) ................................................................136

## STATUTES/CODES

16 C.F.R. § 233.3(a) ................................................................131

16 C.F.R. § 233.3(d) ................................................................131, 132, 133

42 C.F.R. § 405.517 ................................................................121

15 U.S.C. § 45(a)(1) ................................................................122, 129

18 U.S.C. § 371 ................................................................27

21 U.S.C. § 353(c) ................................................................27

21 U.S.C. § 331(t) ................................................................27

42 U.S.C. § 1395l(a)(1) ................................................................119

42 U.S.C. § 1395u ................................................................118

42 U.S.C. § 1395u(o)(1) ................................................................119

42 U.S.C. § 1395w-3 ................................................................120

42 U.S.C. § 1396a(a)(1)(A) ................................................................108

42 U.S.C.. § 1396d(a)(12) ................................................................108

42 U.S.C. § 1396r-8(a)(1) ................................................................108

42 U.S.C. §1396r-8(c) ................................................................110

42 U.S.C. § 1396r-8(c)(1) ................................................................108

42 U.S.C. § 1396r-8(k)(1) ................................................................109

Mass. Gen. Laws Ann. ch. 231 § 6B ................................................................156, 157

Mass. Gen. Laws Ch. 93A, *et seq* ................................................................ *passim*

Mass. Gen. Laws Ch. 260, § 5A ................................................................137

Mass. Regs. Code tit. 940, § 3.04 ................................................................135

Mass. Regs. Code tit. 940, § 3.05(1) ................................................................135

Mass. Regs. Code tit. 940, § 3.16(3) ................................................................136

Mass. Regs. Code tit. 940, § 3.16(4) ..........................................................129, 135

940 Ma. Admin. § 3.16(4) ...............................................................................122

56 Fed. Reg. 25800 .........................................................................................120

56 Fed. Reg. 59502 ...................................................................................120, 121

56 Fed. Reg. 59621 (Nov. 25, 1991) ...........................................................120, 121

68 Fed. Reg. 23731 (May 5, 2003) ...............................................................120, 124

## SECONDARY AUTHORITY

RESTATEMENT (SECOND) OF AGENCY § 272 ......................................................153

RESTATEMENT (SECOND) OF TORTS, § 433B(2) .................................................155

RESTATEMENT (SECOND) OF TORTS, § 882 .......................................................154

RESTATEMENT (THIRD) OF TORTS, § A18 ........................................................153

## OTHER

H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. (1914) ......................................123

Pub. L. 108-173, 117 Stat. 2066 (2003) ...........................................................120

S. Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.A.A.N. at 1985.
    *See also Lachman*, 387 F.3d at 51 ...........................................................119

Pursuant to the Court's August 21, 2006 Amended Pretrial Order, Plaintiffs submit their Proposed Findings of Fact and Conclusions of Law against Defendants AstraZeneca, BMS, J&J, and Schering-Plough (collectively, the "Track 1 Defendants").[1] This also represents Plaintiffs' Trial Brief.  Plaintiffs first present findings of fact related to each Class Plaintiff.  Plaintiffs next present generalized findings of fact that apply to all Track 1 Defendants.  More particularized findings of fact by each Track 1 Defendants follow.  The proposed Conclusions of Law apply to all Track 1 Defendants.  Plaintiffs reserve the right to submit revised findings at the close of trial.

_____

Upon a complete review of the evidence admitted at trial, the Court finds the following facts:

## I.    FINDINGS OF FACT RELATED TO EACH CLASS PLAINTIFF

1.    Plaintiff Sheet Metal Workers National Health Fund ("Sheet Metal") provides health and welfare coverage for sheet metal workers throughout the United States.  Sheet Metal offers a Supplemental Medicare Wraparound Plus ("SMW+") program for retirees.  In this program, its payments are directly tied to what Medicare pays, and it therefore has no control over the cost of benefits.  Therefore, though the retirees enrolled in the SMW+ Plan are usually on fixed incomes, in reality they have no power over the cost of benefits.  For example, if drug costs increase and are paid by Medicare, Sheet Metal pays its portion.  This means the increased cost may be passed on to the retiree who will be required to pay a higher amount to maintain SMW+ coverage.

---

[1] AstraZeneca" is used to refer to AstraZeneca PLC; Zeneca, Inc.; AstraZeneca Pharmaceuticals L.P. and AstraZeneca U.S.  "BMS" or the "BMS Group" is used to refer to Bristol-Myers Squibb Co.; Oncology Therapeutics Network Corp. ("OTN"); and Apothecon, Inc.  "J&J" refers to Johnson & Johnson; Centocor, Inc.; Ortho Biotech, Inc. ("OBI"); McNeil-PPC, Inc.; and Janssen Pharmaceutical Products, L.P.  The Schering-Plough Group consists of the parent-corporation, Schering-Plough Corporation ("SP"), and its wholly-owned subsidiary, Warrick Pharmaceuticals Corporation ("Warrick").  The term "SPW" is generally used where the evidence applies against both parent and subsidiary.

- 1 -

2.     Sheet Metal reimbursed for Defendants' drugs at issue in this case, and reimbursed Massachusetts residents for Defendants' drugs.  Sheet Metal has submitted payment records for Paraplatin, Plfs. Ex. 953, SMWMASS 001240-47; for Cytoxan and Rubex, Plfs. Ex. 954, SMWMASS 000605; for Procrit, Plfs. Ex. 955, SMWMASS 000092-96; for Zoladex, Plfs. Ex. 956, SMWMASS 001174-76; and for Albuterol, Plfs. Ex. 957, SMWMASS 000576-80.

3.     The Fund was found to be an adequate class representative for Class 2 in this Court's January 30, 2006 Consolidated Order Re: Motion for Class Certification relating to Track I Defendants.

4.     Plaintiff Blue Cross/Blue Shield of Massachusetts ("BCBSMA") provides health coverage for tens of thousands of lives in the State of Massachusetts.

5.     During the Class Period, BCBSMA paid for many of the drugs at issue in this phase of the case both in the Medicare Part B context and the non-Medicare context.

6.     BCBSMA reimburses physicians as follows.  BCBSMA has historically had several types of contractual arrangements with physicians and physician groups, including fee-for-service arrangements, capitated arrangements and risk sharing arrangements.  Fee-for-service arrangements have always been the most prominent contractual arrangement between physicians and physician groups and BCBSMA.  This is especially true from the late 1990's to today, as BCBSMA entered into fewer and fewer risk-sharing arrangements such as capitated contracts with physicians and physician groups.

7.     In 1995, BCBSMA began using AWP as a basis for reimbursement to physicians for physician-administered drugs.  From 1995 to 1998, BCBSMA used 100% of AWP as the basis for establishing the reimbursement amounts in its fee schedules related to physician

reimbursement for physician-administered drugs.  In 1998, BCBSMA moved to using 95% of AWP as the basis for the reimbursement amounts set forth in these fee schedules.

8.      Until 2005, BCBSMA obtained the AWP it used for these fee schedules from Medicare.  Fee updates would be retrieved from Medicare/NHIC websites or the Medicare B Resource guide.

9.      The fee schedules maintained by BCBSMA, including the four fee schedules related to reimbursement for physician-administered drugs, are referenced in contracts with physicians or physician groups.

10.     BCBSMA maintains electronic claims data in its TPS claim system.  This system records a multitude of variables related to each claim paid by BCBSMA, including claims for payment for physician-administered drugs administered to BCBSMA members and participants in plans for which BCBSMA is the fund administrator.  It is possible, using the information recorded in the claims data, to determine which claims were paid based upon the fee schedules referenced above and which may have been paid under a different arrangement, such as a capitated arrangement, with the physician or physician group.  On the TPS claim segment HM screen, the Claim Payment element would show a value of "05", which indicates the claim was a capitated claim.

11.     BCBSMA has made payments for drugs manufactured by each Defendant in both Class 2 and 3.

12.     Pipefitters Local 537 Trust Fund ("Pipefitters") is also a Plaintiff and class representative.

13.     All of the Pipefitter's operations are conducted from its location at 35 Travis Street, Unit One, Allston, Massachusetts.  Pipefitters operates out of a small space of

approximately 1,300 square feet.  The staff of Pipefitters is likewise very small, consisting of five employees in total.  The other employees consist of an office manager, one employee who deals primarily with qualified domestic relations orders, and three other employees who each only have individual responsibility for issues related either to pension benefits, annuity benefits, or the health and welfare benefits provided to union members.

14.     The Pipefitters Fund is a Taft-Hartley Fund, governed by a Board of Trustees consisting of three trustees appointed by management and three labor trustees.  In addition to providing a number of other benefits, the Pipefitters Fund provides major medical benefits, including prescription drug benefits, to all union members and their eligible dependants.

15.     Currently there are approximately 4,600 individuals, both union members and their dependents, who receive major medical benefits, including prescription drug benefits, through the Pipefitters Fund.

16.     Members of the Pipefitters Fund are tradesmen and tradeswomen who work on buildings systems, including but not limited to, heating ventilation and air conditioning (HVAC) systems.  Members of the union and of the Pipefitters Fund generally work and live in Eastern Massachusetts in an area bounded north by Salem, Massachusetts, West by Interstate 495 and South by Route 128 in Massachusetts.

17.     The Pipefitters Fund finances medical and other benefits for its members through employer contributions negotiated by the Union via the collective bargaining process.  The Pipefitters Fund is self insured.  It is fully responsible and at-risk for all payments made for medical benefits, including pharmaceutical products, administered to its eligible members, within the parameters of the coverage provided by the Pipefitters Fund and outlined for its

members in the summary of benefits.  In general, the Pipefitters Fund covers 90% of all costs associated with treatment of its members, including the cost of pharmaceuticals.

18.     Since approximately 1979, the Pipefitters Fund has contracted with BCBSMA to administer the major medical benefit, including coverage for all prescription benefits, provided to members.  The financial arrangement between the Pipefitters Fund and BCBSMA is "cost plus" meaning that BCBSMA charges the Pipefitters Fund whatever it pays for the particular service or pharmaceutical plus an administrative fee.  In this way, the Pipefitters Fund is fully responsible for all costs associated with benefits provided to its members.

19.     Pipefitters has paid for the following drugs made by the following defendants: AstraZeneca, BMS and J&J.

20.     Tracy Garcia is a consumer representative of Class 3.

21.     Ms. Garcia was administered and paid for the following drugs:  Rubex, Cytoxan, Albuterol, Neulasta, Heparin Sod, Sodium Chloride, Anzemet and Dexamethasone Sodium. These drugs were used to treat her breast cancer, except for the Albuterol, which was used to treat a bronchial infection.

22.     Rebecca Anne Hopkins is a consumer who received and paid a co-payment for numerous drugs, including Taxol, bleomycin, cisplatin and etoposide, while being treated for her cancer.

23.     Cheryl Barreca is a consumer who is a member of plaintiff UFCW.  She paid for Procrit, Rubex, Cytoxan and Kytril, while receiving treatment for her cancer.

24.     Anna Choice is a consumer and member of UFCW.  She made a co-payment for Rubex, Zofran and Cytoxan, while being treated for her cancer.

## II.  GENERALIZED FINDINGS OF FACT AGAINST DEFENDANTS

**A.  Each Track 1 Defendant Knew That AWP Was the Reimbursement Benchmark Used by Medicare Part B and Many Private Payors**

25.   AWP was the reimbursement benchmark for physician-administered drugs under Medicare Part B and the reimbursement formulae of most private payors during the Class Periods, and each Track 1 Defendant knew this.

**B.  Each Track 1 Defendant Caused AWPs to Be Published for Their Subject Drugs**

26.   Each Track 1 Defendant caused AWPs for its Subject Drugs to be published in various industry publications.

**C.  The AWPs for Subject Drugs Did Not Include Relevant Discounts Nor Reflect an Average, and Each Track 1 Defendant Manipulated AWPs and Spreads**

27.   The AWPs that each Track 1 Defendant caused to be published neither reflected an average nor included relevant discounts such as contract pricing, rebates, administrative fees and free goods.

28.   Each Track 1 Defendant manipulated the "spreads" between the AWPs that they caused to be published and the prices at which their Subject Drugs were available in the marketplace by a variety of techniques, including selling their drugs to providers based on the profit to be made due to the spread between reimbursement of AWP and cost; secretly offering discounts, rebates or drugs at nominal prices; and maintaining their AWPs while lowering the ASP (cost) and/or providing free goods.

29.   The spreads between AWP and the average sales price for each Subject Drug are set forth in the testimony of Dr. Hartman at Attachment G.

**D.  Each Track 1 Defendant Marketed Spreads**

30.   Each Track 1 Defendant marketed spreads to providers.

### III.   PARTICULAR FINDINGS OF FACT AGAINST EACH TRACK 1 DEFENDANT

**A.   AstraZeneca Defendants**

31.   Defendant Zeneca, Inc. ("Zeneca") is a Delaware corporation with its principal place of business at Malvern, Pennsylvania.  Zeneca is a wholly owned subsidiary of AstraZeneca, PLC, a limited liability company domiciled in the United Kingdom.

32.   Defendant AstraZeneca U.S. is a Delaware corporation with its principal place of business at 1800 Concord Pike, Wilmington, Delaware.

33.   Defendant AstraZeneca Pharmaceuticals L.P. is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware.  AstraZeneca Pharmaceuticals L.P. is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

34.   Zeneca, Inc., AstraZeneca Pharmaceuticals L.P., and AstraZeneca U.S. are collectively referred to as "AstraZeneca" or "AZ".

**1.   AstraZeneca knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors**

35.   AstraZeneca's management and employees have acknowledged that AWP was the reimbursement mechanism for Part B Drugs.  Iacono Dep. I at 125:21-126:8 (AstraZeneca's former Vice President of Marketing testified as follows:  "Q. Now, isn't it true that reimbursement to urologists under Medicare Part B during the time that you were responsible for Zoladex was based upon AWP, a formula based upon AWP?  A. Yes, it's my understanding that AWP was a, a benchmark in that calculation."); Buckanavage Dep. at 59-60 (Former Group Manager of Marketing Development:  "Q. And what is the relevance of AWP to Medicare Part B?  A. My understanding is the relevance is AWP is a reference price used in calculation by the government for reimbursement."), and at 112:13-20 ("A. Well, it – a key factor for the

physicians was their, was that overall reimbursement and the return that they made, yeah.

Q. Which in the Medicare market was driven by, the reimbursement was driven by AWP,

correct? . . .  A. That's how Medicare determined their reimbursement.").

36.     Even at the highest levels of the Company, AstraZeneca's executives knew and

expected that Part B drugs, including Zoladex, would be billed to and paid for by the

government, insurers and individual patients based on AWP.  Black Dep. at 25:17-26:1 (Former

President of Zeneca:  "Q. Let's talk about AWP in the Medicare reimbursement context,

Medicare Part B for Zoladex….  During the time that you were President of Zeneca, AWP was a

benchmark for reimbursement for Medicare Part B drugs, correct?  A. That's my understanding,

yes."); Brennan Dep. at 15:10-14 (Current CEO of AZ former President of AstraZeneca L.P. and

now CEO of AstraZeneca PLC:  "Q. All right.  So now it is your understanding, right, that AWP

was the benchmark for reimbursement under Medicare Part B for Zoladex, correct?  A. That's

right, yes.").

37.     AstraZeneca also knew that AWP was the benchmark for reimbursement in the

private-payor context.  Iacono Dep. I at 126:21-127:16 (testifying that it is his "general

understanding" that AWP was the benchmark for reimbursement from third-party payors);

Schultz Dep. III at 57-58 (testifying that AWP was "usually" the benchmark for reimbursement

for an injection of Zoladex in the non-Medicare setting); Henkel Dep. at 16-17 (AstraZeneca

Sales Representative testified:  "Q. So during your training, were you told that private payers

generally reimbursed at AWP?  A. Right, yes.").

**2.     AstraZeneca caused AWPs to be published for its Subject Drugs**

**a.     AstraZeneca set the published AWP for Zoladex prior to 2002**

38.     AstraZeneca acknowledges that, before 2002, and even later, pharmaceutical

manufacturers set the AWPs for their respective drugs.  *See*, *e.g.*, Schultz Dep. at 102:19-20 ("In

- 8 -

those days, CMS and Redbook were not setting the AWP.  Manufacturers and so forth were

setting AWP."); Plfs. Ex. 15 (Oct. 19, 2000 e-mail and memorandum titled "Medicare Review,"

AZ0431807-11, at 08 ("To date [post 1/1/98], Medicare has not influenced the AWP of any

medication that qualifies for reimbursement.  Companies have the latitude to set AWP as they

wish.")); Plfs. Ex. 16 (Coverage & Reimbursement Guide for Zoladex and Casodex,

AZ0427821-858, at 855 (stating that the AWP is "[t]he composite wholesale price[] charged on a

specific commodity that is assigned by the drug manufacturer and is listed in either the Red Book

or Blue Book and used by third-party payers as a basis for reimbursement.")).  As AstraZeneca's

Director of Pricing Strategy explained:

> Redbook and FirstDataBAnk[sic] are the two primary pricing
> services in the US.  Both of these companies obtain price data from
> pharma companies, compile and sell/publish to various customers
> (eg PBM's, HMO's, state Medicaid, Chains etc etc). Up until the
> last year or so manufacturers basically decided what the AWP
> should be- in other words they recommended a spread over the
> WAC (catalog) price which results in the Average Wholesale price
> (AWP).

Plfs. Ex. 17 (Nov. 30, 2001 John Freeberry email, AZ0465663-65); Plfs. Ex. 983 (March 26,

2003 Power Point presentation entitled "AstraZeneca Contracting," authored by Steve Pitts, an

AZ Contracting Director, AZ0554945-60 (stating at AZ0554954 that AWP is "[a] manufacturer

set premium over WAC.")).

     39.    AstraZeneca set the published AWP for Zoladex prior to 2002.  Plfs. Ex. 19

(Jan. 23, 1996 memorandum from Keith Patterson to Chris Iacono Re: Zoladex Pricing Strategy,

AZ0021762-65 (stating at AZ0021763:  "[t]he Zoladex marketing team sought to derive a

pricing strategy which would allow for: 1) an improved competitive position relative to Return

To Practice, and 2) realization of a 4% increase in net revenue.  In order to achieve both of the

above stated objectives it is recommended that a 7% price increase be instituted, raising both the

AWP and AWC in parallel."")); Plfs. Ex. 984 (April 9, 1999 e-mail from John Freeberry to David

Brennan, CEO of AstraZeneca, AZ0463307 (stating: "Dave, I just want to give you a quick

sense of the current Pricing issues as you begin the AZ integration … AWP Mark-Up Policy: the

vast majority of AstraZeneca products have a 20% markup.  Exceptions include former Astra

USA hospital products as well as Zomig.  Need to decide if consistency is desirable."));

Freeberry Dep. I at 109:2-11 (testifying that, prior to the time that WAC became the only price

term reflected on the pricing spreadsheets sent to pricing services, AZ also included a "suggested

AWP price.").

40.      AstraZeneca's marketing teams, product managers, and pricing strategy managers

made recommendations to management regarding whether, when, and how much the AWP for

its drugs, including Zoladex, should be raised.  *See*, *e.g.*, Buckanavage Dep. at 150:2-12 (Market

Development Manager believed his recommendations for setting AWP, if approved, would be

passed along to publishers); Plfs. Ex. 20 (Nov. 3, 1995 memorandum from Market Strategy &

Contract Operations and the Zoladex Marketing Team, AZ0237142-163 (recommending

increases to the published AWP for Zoladex)).

41.      Approvals of new or revised AWPs came from top AstraZeneca employees.  *See*,

*e.g.*, Black Dep. at 42:7-16 (Former President of Zeneca testified that price changes had to be

approved by him); Buckanavage Dep. at 141:8-142:1 (approval was needed from senior

management); Plfs. Ex. 21 (Jan. 1, 1998 Implementation of Catalog Price Changes, AZ0435309-

316 (setting out approval process and requiring that revised prices be approved by Finance,

David Brennan (current CEO) and Legal Counsel)); Freeberry Dep. I at 29:8-13 ("The brand

teams would receive it [price increase suggestion] first.  This pricing team I mentioned would

recommend to the brand leadership, and they would take it – there's a couple of other levels that it has to go up to up to the corporate until it gets to David Brennan, our CEO.").

        **b.**        **AstraZeneca communicated its AWP to the Publishers for publication**

42.       Once a new or revised AWP was approved, AstraZeneca would inform the Publishers.  *See*, *e.g.*, Freeberry Dep. I at 100:3-102:17, 109:2-110:9 (AZ would send periodic spreadsheets to *First DataBank* ("FDB") and the other Publishers with AZ's AWPs.); Schultz Dep. III at 302:12-303:14 (same); Iacono Dep. I at 125:9-20 (same); Black Dep. at 50:12-51:2 (Zeneca informed the Publishers whenever there was a price change); Plfs. Ex. 22 (July 2, 2001 fax to *First DataBank* with attached price list, FDB-AWP-16989-16996); Plfs. Ex. 23 (May 9, 2000 Freeberry e-mail, AZ0449541-45 (noting that Freeberry will notify pricing services of Casodex and Nolvadex price increases, at AZ0449541)).

43.       AstraZeneca's communications to the Publishers were, as a general practice, made in written form.  *See*, *e.g.*, Freeberry Dep. II at 16:8-10 ("Janet Rosenberg [Freeberry's administrative coordinator], she would send price changes to, by way of fax and e-mails to First DataBank and Redbook and a few other organizations."); Freeberry Dep. I at 110:1-6 (Pricing Strategy Director stating that spreadsheets containing AWP were sent to Publishers with cover memos); Plfs. Ex. 24 (May 15, 2001 fax to *Red Book* with attached price list, AZ0435202-212 ("Attached is the fax you sent to AstraZeneca for validation of prices…Most of the changes involve the AWP price and they are written on your document…")); Plfs. Ex. 25 (May 18, 2001 fax to *First DataBank* attaching AstraZeneca Revised Price List, AZ0435213-214 (Revised Price List includes AZ's AWPs)); Plfs. Ex. 26 (Aug. 22, 2000 e-mail from Barnabas Desta, AZ0445417-24 (final pricing for Pulmicort Respules for publication)).

44.       After 2001, AstraZeneca used the AWPs from *First DataBank* and communicated those AWPs as their own to *Red Book*.  *See*, *e.g.*, Plfs. Ex. 30 (Nov. 30, 2001 e-mail from John

Freeberry (AZ's Pricing Strategy Manager), AZ0465663-65 ("Up until the last year or so manufacturers basically decided what the AWP should be…. However, First DataBank now determines the spread and thus the AWP for all products…. Redbook still does not force a spread but accepts what the manufacturer reports. So while we are not technically developing the spread, I feel comfortable with reporting the spread determined by [FDB] to RedBook.")); Plfs. Ex. 31 (Nov. 26, 2002 e-mail from Janet Rosenberg to *Red Book*, AZ0473119 ("Just want to verify that you have the correct AWP price for Prilosec 20 mg, 30 count bottle, for your December 2002 update: $138.44. We forwarded this information to Redbook's attention around October 7 in the Product Listing Verification. Apparently your November 2002 update was in the process of being printed or was already published.")). The AWPs reported by the *Red Book* are the AWPs that Medicare Part B carriers used. *See, e.g.*, *In re Lupron*® *Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 159 (D. Mass. 2003). The *Red Book* never undertook an independent verification of the actual AWP. *In re Lupron*® *Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d 280, 285 n.7 (D. Mass. 2003); *In re Lupron*® *Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 159.

45.    After 2001, AstraZeneca set the WAC with knowledge that *First DataBank* would publish AstraZeneca's AWP at 125% of WAC. Schultz Dep. III at 59:15-60:2 and 104:7-105:16 (testifying that AZ knew what the AWP would be when it submitted the WAC to FDB).

46.    When AZ raised the WAC prices, AZ directed the Publishers to raise the AWP prices as well:

> We raise WAC prices, for – you know, as inflation is up, we raise
> our prices occasionally, as most companies do. And up until a
> couple of years ago, we would send communications out to First
> DataBank, we see our WAC price went from a $1 to 1.05, we
> would use their AWP price and say that that also went up to a
> dollar. So we would provide the new AWP price for them. We

> calculate it for them, essentially, based on whatever markup they
> were applying for us.

Freeberry Dep. I at 25:5-17.

47.     AstraZeneca also utilized the services of third-party consultants to communicate AWPs on its behalf.  *See* Plfs. Ex. 28 (Apr. 22, 1996 memorandum from Paula E. Jordan to Fred Roberts, AZ 0036643 (As of April 1996, AZ had authorized State and Federal Associates, Inc. ("S&FA"), a lobbying firm that focused on reimbursement issues, "to proceed on the following … projects:  pricing service notification of Zoladex 3.6 mg price increase; Medicare Part B notification of ZOLADEX 3.6 mg price increase…")); Plfs. Ex. 29 (Jan. 29, 1996 Sample Letter from Paula Jordan, AZ0036585 (model letter to be used to notify industry compendia of AZ price increases)); Ware Dep. at 84:17-85:16 (S&FA employee stating she regularly sent letters communicating the AWP for Zoladex to publishers).

**3.      AstraZeneca's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average, and AstraZeneca manipulated its AWPs and spreads**

**a.      AstraZeneca knew that its AWP was a fictitious number**

48.     AstraZeneca's AWPs did not reflect an average wholesale price.  AstraZeneca's Vice President of Marketing testified that AWP is "really [] nothing more than sort of a derived figure…."  Iacono Dep. I at 125:10-11.

49.     AstraZeneca's AWP has not reflected a true average wholesale price since at least 1994, when AstraZeneca's current Director of Pricing Strategy, John Freeberry, was asked by the Company to research whether to change the spread on Company drugs from 25 to 20 percent. Freeberry Dep. I at 167-76.  During the course of that research, Freeberry realized that AWP was "fictitious:"

> We found that [AWP] was the – a kind of a fictitious number; that
> it used to be – we discovered in our research that AWP used to be

- 13 -

a price that wholesalers charged pharmacies way back when they
marked up 20 or 25 percent.  And then business became much
more efficient, much more competitive, and those markup rates
came down to a couple of percent over the years.  By the time I
looked at this in the late '90s, there were a couple percent markup,
2 or 3 percent.  So the AWP no longer represented the average
wholesaler price at retailers representing some fictitious number
that was used as a reference point for reimbursement.  That's what
I learned.

Freeberry Dep. I at 168:6-20.  He reported this up the chain of command.  *Id*. at 172:11-173:3.

But despite his discovery, neither he nor AstraZeneca did anything about it.  *Id*. at 173:9-176:6.

50.     AZ has acknowledged that AWP is not tied to what wholesalers actually pay.  *See*

Plfs. Ex. 40 (E-mail from John Freeberry dated September 13, 2000, AZ0464087 ("The Average

Wholesale Price (AWP) is the [sic] primarily used as a reference price by retailers to price cash

prescriptions and by payers to reimburse retail pharmacist for dispensing prescriptions to patients

with drug coverage.  The AWP dose [sic] not represent the selling price from wholesalers to

retailers.")).

51.     Throughout the Relevant Period, AZ knew that AWP was an "artificial number."

*See* Plfs. Ex. 41 (E-mail from Barnabas Desta, AZ Pricing Strategist, dated June 29, 2001

(AZ0445640-41)).

52.     A former Pricing Strategy Manager for AstraZeneca testified that AZ's AWPs is:

"arbitrary points set by someone at some point in time.  And you could set it at 20, 25, 30, 10.  It

– average wholesale price is neither average – the average wholesale price, it's not an average,

it's not the wholesale price.  It's a complete misnomer."  Schultz Dep. III at 107:2-9; *see also id.*

at 311 (…"the AWP is just a fictitious price…."); Plfs. Ex. 135 (Jan. 30, 2002 e-mail to CEO

David Brennan, attaching AWP Spread White Paper, AZ0565611-14 (describing AWP as "a

misnomer that dates back 20-30 years when it actually represented the price wholesalers charged

- 14 -

to retail pharmacy, hospitals etc.  In that era, the wholesalers' mark-up to retailers and hospitals

was in the 20-25% range – while today it averages about 2-3%." at AZ0565612)).

       **b.**      **AstraZeneca refrained from making AWP a meaningful number**

    53.    AstraZeneca did not take any steps to make AWP a meaningful number.  This

was to preserve and expand its product market.  Mr. Freeberry testified that:

> [P]harmacists are reimbursed on a set contract for all of their
> brands.  That's our understanding of it.  So they're reimbursed an
> AWP minus 10 percent, minus 15 percent.  So if we set our AWP
> at 2 percent, obviously they would lose money, and they wouldn't
> use our products.  So we have to be consistent within the industry
> standard in order for the – to be – to be competitively fair.
>
>           \*   \*   \*
>
> I'm referring to the whole reimbursement process used by the
> payers for the pharmacists.  All those contracts are based on AWP
> price to the retailers.

Freeberry Dep. I at 175:11-20 and 176:3-6.

    54.    Mr. Freeberry, who subsequently became the head of the department charged with

setting prices for AstraZeneca's pharmaceuticals, was responsible for analyzing whether to

increase prices from time-to-time on the Company's existing brands.  In undertaking this

process, AstraZeneca generally hired an outside consultant to send out questionnaires to various

customers, including physicians, retailers, PBMs, hospitals, and long-term care facilities.  *Id.* at

27:17-33:6.  However, even though Freeberry had done the research on AWP, he never sent the

questionnaires to wholesalers.  He and AstraZeneca chose not to do so because, as Freeberry

testified, what wholesalers paid did not impact AstraZeneca's business.  *Id.* at 32:17-18.  The

AWP did.  Freeberry Dep. I at 175:11-20 and 176:3-6.

    55.    AstraZeneca took affirmative steps to prevent Medicare from making

reimbursements based on actual net sales prices and was pleased when they succeeded in

maintaining the AWP system for doctors to realize a greater Return To Practice.  Ware Dep. at

119-121, 123-124, 130 (testifying that it was "great news" that doctors would continue to be paid

based on AWP as opposed to invoice, or acquisition, cost.); Painter Dep. at 82:15-84:5, 87:15-

88:21.

### 4. AstraZeneca actively marketed spreads and "Return to Practice" to physicians

#### a. AstraZeneca recognized that spread was a driver in the oncology market

56.     AstraZeneca knew that reimbursement would be key to the Zoladex marketing

strategy.  Chen Dep. at 63:12-65:1.

57.     Moreover, AstraZeneca knew that "[p]rofit back to the physician" was a driver (a

"factor that impact[s], influence[s] the development and dynamics") of the Zoladex market.

Brennan Dep. at 50:15-51:17, 55:6-8; Plfs. Ex. 68 (AZ0461415-465 (a Urology Portfolio

Strategic Plan dated June 2, 2002, listing "[p]rofit back to the physician" as a "driver" of the

prostate cancer market at AZ0461424)).

58.     AstraZeneca recognized that its AWP enabled AstraZeneca to sell Zoladex on the

basis of discounts, which created spreads or, as AstraZeneca would term it, "Return To Practice."

Brennan Dep. at 65; Berkman Dep. at 30, 65-66; *see also* Brennan Dep. at 20-21 (Return To

Practice was of concern to AstraZeneca and one of the bases on which AstraZeneca sold Zoladex

to doctors); Patterson Dep. I at 63:13-64:1 (Return To Practice became an "emphasis for the sale

of Zoladex," a "primary promotional platform.").

#### b. AstraZeneca manipulated its AWPs in order to create spreads

59.     During the period spanning approximately from 1991 to 1993, the Promotions

Department for Zoladex was governed by a series of one-year promotional and pricing plans

focused on creating and maintaining a low direct-to-physician price along with a competitive

spread between AWP and the price paid by physicians.  Iacono Dep. at 174:6-20 (testifying that:

"The hard reality of, of the situation was that when we introduced Zoladex, when we launched

Zoladex, and, and it was based on a, I guess a promotional message that said we have a lower

cost, overall lower cost alternative, clinically equivalent alternative to Lupron, and we thought

we had some, some convenience messages as well in the fact that it was an injection into the

abdomen as opposed to into the buttocks, which tends to be a bit more painful…"); *see also* Plfs.

Ex. 985 (1991 Zoladex Promotional Plan, AZ0048992-9023 (stating at AZ0048999:  "Currently

Zoladex direct-to-physician price is $255.00 ($318.75 AWP).  Our current $60.00 cost advantage

over Lupron Depot has been very effective with target audience physicians.  The ZOLADEX

pricing plan includes a 10% increase in January 1991 and 5% annual price increases in 1992

through 1995.  This strategy, however, is contingent upon a continued price advantage for

ZOLADEX vs. Lupron Depot.  To maintain this competitive price advantage, a 20% case

quantity discount price may be initiated in early 1991.")).

      60.     During this period, AZ's marketing team adopted the promotional plans and thus

centered its marketing activity on promoting a lower AWP and co-pay for patients as compared

to Lupron, along with a competitive spread between AWP and the price paid by physicians.  Plfs.

Ex. 67 (AZ0031261, AstraZeneca Zoladex comparing the cost to the physician and co-pay of the

patient of Zoladex and Lupron); Plfs. Ex. 986 (June 21, 1994 Internal Memorandum from

Michael C. Tilton Re:  Zoladex, AZ0008783, comparing actual costs to physicians for Zoladex

and Lupron); Plfs. Ex. 987 (AZ0037020, A draft advertisement geared toward physicians titled

"Everyday savings for patients on ZOLADEX," stating that "[t]he average wholesale price

(AWP) is more than 25% less than the AWP of Lupron Depot.").

61.    AstraZeneca learned that doctors wanted a more expensive product so they could make a bigger spread between AWP and acquisition costs, and therefore, more profits.  Chen Dep. at 66:19-70:6, 80:13-16, 83:3-84:7.  AZ responded with a volume discount plan that enabled physicians to buy Zoladex for less while being reimbursed for the full AWP-based rate of reimbursement.  *Id*.

62.    Although AstraZeneca complained internally of TAP's sales practices, it did not report TAP to the authorities.  Instead, AstraZeneca decided to try to beat them by joining them, selling Zoladex based on a higher Return to Practice for doctors.  Chen Dep. at 141:1-144:1 (generally testifying to TAP's sales practices and the possibility that "formal action should be taken against TAP").

63.    AstraZeneca realized that Zoladex would acquire more market share and be more profitable if AZ began manipulating spreads to a greater degree than it had been.  Plfs. Ex. 132 (Oct. 12, 1995 Memorandum from Thomas Chen to Keith Patterson re:  Price Increase for Zoladex, AZ0021838 ("[T]he market we are in wants a more expensive Zoladex, because the doctor can make more money.")).  As one memorandum explained, "Return to Practice" – an expression that AstraZeneca used to refer to spread – was essential in order to compete:

> ZENECA has learned that in order to compete in [the] market dominated by Medicare, there needs to be a compelling argument based on "total Return To Practice."  It is on this basis that many Urologists decide which LhRh agonist to use.***Return To Practice is derived by adding the difference between Medicare reimbursement [based on AWP] and acquisition price, … patient co-pay which equals the 20% deductible that Medicare does not pay, and the benefit of [certain volume discounts].

Plfs. Ex. 14 (Nov. 3, 1995 memorandum from Market Strategy and Contract Operations and the Zoladex Marketing Team, AZ0237142-163, at AZ0237143); *see also* Bowman Dep. at 37-38

- 18 -

(Return To Practice is the spread between AWP and the actual acquisition cost to physicians);
Strand Dep. at 66:11-16 (same).

64.     Return To Practice was specifically considered by AstraZeneca when
contemplating future price increases for Zoladex.  *See* Plfs. Ex. 69 (1998-2002 Zoladex Strategic
Summary, prepared by Keith Patterson, AZ0004616-38, at AZ0004631 ("The single most
important force behind the popularity of the LHRH agonists is their profitability, which is a
direct result of Medicare reimbursement policy.  If LHRH derived profits are diminished or
disappear, then surgical castration or DES may resurface as the treatment of choice for advanced
prostate cancer.")); Plfs. Ex. 133 (Nov. 20, 1995 Memorandum from Keith Patterson to Chris
Iacono Re: Zoladex Pricing Strategy, AZ0080407-411, at AZ0080408 ("It has been widely
documented that LHRH-generated profits to the purchasing physician (or more delicately stated,
Return To Practice) is one of the two most important factors driving this market – the other being
patient preference.  Return To Practice is simply the difference between the published price
(AWP), against which HCFA reimburses at 80%, and the acquisition price (AWC less any
discounts) – the patient pays the 20% of AWP that HCFA does not pay.")).

65.     On November 3, 1995, AZ's Market Strategy & Contract Operations and the
Zoladex Marketing Team recommended an 8.25% increase in AWP (and 4.2% increase in
AWC) to create a 30% spread, "which leverages reimbursement" and "deliver[s] a per-unit
Return To Practice in excess of what Lupron's current scheme can deliver."  Plfs. Ex. 14
(Nov. 3, 1995 memorandum from Market Strategy & Contract Operations and the Zoladex
Marketing Team, AZ0237142-163); *see also* Chen Dep. at 102-05 (explaining this approach to
increasing the Return To Practice for physicians).  The memorandum further recognized that
AstraZeneca needed a compelling spread:

- 19 -

> Our campaigns to grow ZOLADEX sales based on product
> attributes and somewhat straightforward pricing strategies have
> continually been thwarted by TAP responses as well as the method
> used by Medicare to reimburse for LHRH agonists.  Without
> rehashing the entire economic scenario, ZENECA has learned that
> in order to compete in market dominated by Medicare, there needs
> to be a compelling argument based on "total Return To Practice."

Plfs. Ex. 14 (AZ0237142-163, at AZ0237143).

66.     AstraZeneca revised this November 1996 strategy in order to increase net revenue

by increasing Return To Practice.  *See* Plfs. Ex. 19 (Jan. 23, 1996 memorandum from Keith

Patterson to Chris Iacono Re:  Zoladex Pricing Strategy, AZ0021762-65 ("[T]he Zoladex

marketing team sought to derive a pricing strategy which would allow for:  1) an improved

competitive position relative to Return To Practice, and 2) realization of a 4% increase in net

revenue.  In order to achieve both of the above stated objectives it is recommended that a 7%

price increase be instituted, raising both the AWP and AWC in parallel.")); Buckanavage Dep. at

181:15-17 (the physician "wouldn't feel, they wouldn't feel the full impact of the price increase.

They'd be making [a] bigger discount, yeah."); Iacono Dep. I at 168:1-5 (agreeing that

"discounting effectively increase[s] the spread between acquisition cost and AWP").

67.     In 1996, AstraZeneca raised the AWP and also increased the discounts available

to purchasers of Zoladex, thereby increasing the spread:

> In each of the last two years a plateau in product performance was
> overcome and sales were stimulated by the implementation of a
> discounting strategy.  The basic objective behind these pricing
> scenarios is to provide an economically attractive package to the
> direct purchasing physician without eroding our realized revenues.

Plfs. Ex. 19 (Jan. 23, 1996, Memorandum from Keith Patterson to Chris Iacono Re:  Zoladex

Pricing Strategy, AZ0021762-65, at AZ0021762).

68.     The team also discussed a ready-made alibi to "justify" this change by stating

"[i]n the event that our increase is called to task, the move is easily justified on the basis of:

- 20 -

1) increased manufacturing costs, 2) no increase in realized revenue per unit over the last two

years…." *Id*. The Group Manager for Market Strategy and Contract Operations (who was

copied on that memo) testified that AstraZeneca never conducted (or considered conducting) an

analysis of increased manufacturing costs, and that no consideration was given to historical

realized revenue per unit in setting AWP. Buckanavage Dep. at 195:3-17.

69.     AstraZeneca used off-invoice discounting to increase Return To Practice. Plfs.

Ex. 35 (Handwritten note to "Bob," AZ0037022, stating that an invoice "still reflects the case

quantity unit discount price," which "prevents offices from making a profit!" (emphasis in

original)); Plfs. Ex. 36 (July 26, 1996 Memorandum from "MRP" to the Zeneca File Re:

Conversation with Mark Reisenauer, AZ0017129 (stating, "I emphasized the importance of

obtaining an invoice for full-price in order to get the payment cranked up on a state basis.")); 

Plfs. Ex. 37 (June 1-June 30, 1995 Zoladex Reimbursement Hotline Activity Report prepared by

S&FA, at AZ0036510-33, at AZ0036513 (stating:  "The disclaimer on invoices causes confusion

as to whether or not discounts are to be reported when billing ZOLADEX … to Medicare and

Medicaid.  Providers are concerned that they are required to list discounts and therefore,

government payers will not make reimbursement based on AWP…[but] [f]ew require drug

invoices, therefore providers are not required to lower their submitted charges to reflect purchase

discounts.")); Patterson Dep. II at 333:18-334:3; Berkman Dep. at 185:21-186:6 (AZ Associate

Director of Marketing for Oncology and a urologist confirm that volume discounts were not

reflected on Zoladex invoices).

> **c.**     **AstraZeneca's strategic, operational, and marketing plans and sales training materials focused on communicating to physicians the Return to Practice on Zoladex**

70.     AstraZeneca's Strategic, Operational, and Marketing Plans discussed the various

aspects of promoting Zoladex in the marketplace and contained those messages that were to be

conveyed during sales calls to physicians.  Strand Dep. at 36-39 (describing AstraZeneca's

Strategic, Operational, and Marketing Plans); Patterson Dep. I at 121:20-122:21 (describing the

purpose and components of Strategic Plans); Brennan Dep. at 10:1-12:17 (same).

71.    By 1993, each Zoladex 1-Year Tactical Plan and 3-5 Year Strategic Plan

expressly incorporated Return To Practice as a marketing tool and a way to compete against

TAP.  *See* Plfs. Exs. 988-1001 (1992 Zoladex Medical/Marketing Operating Plan, at

AZ0008092-119; 1992-94 Zoladex Medical/Marketing Operational Plan, at AZ0008130-50;

Zoladex Prostate Cancer 1994 Operational Plan, at AZ0048961-91; 1994 Zoladex

Medical/Marketing Operational Plan, at AZ0008087-91; Zoladex Prostate Cancer 1995

Operational Plan, at AZ0009978-91 ("The only customer need that Lupron has a major

advantage satisfying over ZOLADEX is in Reimbursement/ Profitability.  Due to the higher cost

of Lupron vs. ZOLADEX and the way Medicare reimburses, Lupron is considerably more

profitable than ZOLADEX."  AZ0009983); 1995 Zoladex Medical/Marketing Operational Plan,

at AZ0008069-86; Zoladex 3.6mg and 10.8mg Prostate Cancer 1996 Operational Plan, at

AZ0024003-10; Advanced Prostate Cancer 1997 Operational Plan for Zoladex and Casodex at

AZ0004273-84 (suggesting that AZ should continue to "present[]… an improved economic

profile to the direct purchasing Urologist …" at AZ0004275); Zoladex Gyn/Breast Cancer 1997

Operation Plan at AZ0043795-806; Advanced Prostate Cancer 1997 Operational Plan for

Zoladex and Casodex at AZ0004273-84; 1998 Operational Plan for Casodex and Zoladex, at

AZ0033814-40 (promotional strategy includes "aggressive contracting and pricing strategy" for

Zoladex, at AZ0033819); Prostate Cancer 1998 Operational Plan for Casodex and Zoladex (with

handwritten notes), at AZ0001598-603 (including "good economic Return To Practice" as a

1998 product mission for Zoladex, at AZ0001601); 1999 Operation Plan for The Prostate Cancer

Portfolio at AZ0427138-183 (noting that "Return To Practice is key driver for physicians," at AZ0427153); 2003 Draft Product Strategic Plan for Zoladex, at AZ0432467-80 (TAP has "a significant presence and reach in the Urology community, particularly because of their contracting strategy, which is based on maximizing Return To Practice" and "Monitor the reimbursement situation and develop options for different scenarios which would maximize Return To Practice.").

72.     These Strategic and Tactical Plans were reviewed and approved by the highest level of management, including the President of AstraZeneca.  *See* Black Dep. at 13:5-14; Brennan Dep. at 8:13-12:17, 63:2-4; Iacono Dep. at 77-91 (discussing chain of command and review of such Plans).

73.     AstraZeneca's Urology Sales Training for its sales representatives included discussions and definitions of AWP, Discounts, Reimbursement, and "Return To Practice."  *See* Plfs. Ex. 134 (AZ0376204-17, AstraZeneca Urology Representative Training materials).  The Urology Sales Training also included and explained the private payer "reimbursement changes" for Zoladex made from 1995-1999.  *Id*. at AZ0376210.

74.     Sales management and marketing managers communicated to the sales force the current AWPs for Zoladex with intent that the sales representatives would pass this information on to physician customers who bought Zoladex because the AWPs affected the physicians' Return To Practice.  *See*, *e.g.*, Patterson Dep. II at 267:1-268:16 (stating that sales reps were given materials delineating Return To Practice scenarios, prices and discounts); Simpson Dep. at 76-77.  Christopher Bowman, Oncology Sales Representative for AstraZeneca, testified that:

> Q.  During that time period, did you ever receive any instruction from Wilmington regarding how you should communicate with doctors about the pricing of Zoladex?
>
> *   *   *

- 23 -

THE WITNESS:  Only that we needed to know what the average wholesale price was versus the average acquisition cost.  We needed to know the differences between that.

Bowman Dep. at 37:14-22; *see also* Plfs. Ex. 32 (E-mail from a District Sales Manager to Urology sales team members dated June 30, 2001 and attached PowerPoint Presentation on Zoladex Prices and Contract Terms (AZ0433750-56) encouraging sales force to communicate orally with physicians regarding, *inter alia*, guaranteed current Zoladex pricing (AWP and AWC)); Plfs. Ex. 21 (Implementation of Catalog Price Changes dated January 1, 1998, AZ0435309-316 (setting out approval and communication process for price changes)).

> **d.   AstraZeneca's sales representatives marketed the spread and Return To Practice to physicians**

75.    AstraZeneca had its sales force promote and market Zoladex based on its higher Return To Practice than the Zoladex competitor, Lupron, making marketing the AWP Spread and Return To Practice a promotional emphasis.  Patterson Dep. I at 63:14-17; Strand Dep. at 66:11-67:5 (testifying that:  "Q. It [Return To Practice] was an issue, wasn't it, with respect to Zoladex competing with Lupron?  A. To the best of my recollection, if your question is was the issue of price and the amount physicians received in Return To Practice for reimbursement on one product versus another, to the best of my recollection, yes, that was one factor in the selection of products.").

76.    On sales calls, AstraZeneca's sales representatives made presentations to physicians using spreadsheets that compared the Return To Practice of Zoladex to the Return To Practice of Lupron.  *See*, *e.g.*, Plfs. Ex. 33 (Email dated January 3, 1999 with attached spreadsheet entitled "LHRH Reimbursement Analysis" (AZ0437459-60)); Bowman Dep. at 76:9-78:14 (describing a chart showing that, as "a physician purchased a greater volume of Zoladex, the Return To Practice would increase.")); Bowman Dep. at 52:1-53:18 (discussing

- 24 -

charts he created comparing the Return To Practice for Zoladex and Lupron); Henkel Dep. at 90:13-92:22; Patterson Dep. I at 65:5-67:9; Wawrzonek, Regional Oncology Account Manager, Dep. at 58:3-59:4 (stating that he knew sales reps prepared such visual aids to present to doctors and did not object to them being used); Berkman Dep. at 94:9-12; Black Dep. at 43:13-20 ("Q: Now, the internal analyses of Return To Practice for Lupron versus Return To Practice for Zoladex were communicated to the sales force, correct?  A: As far as I know, that was, yes.  Q: I mean because this was something that they had to go out and explain to – A: Well, they had to explain it to the physician, yes."); Plfs. Ex. 83 (LHRH Cost Comparison charts showing relative Return To Practice for Zoladex and Lupron, AZ0422508-13); Plfs. Ex. 1002 (Call notes from AZ sales representative Charles Dadonna, AZ0389025 (stating "Review lhrh cost comparison….").

77.     Zoladex sales representatives would review comparative information with urologists to increase sales of Zoladex by showing the doctors "how much money the doctor or the office would save purchasing one drug over the other."  Bowman Dep. at 56-58.

78.     AstraZeneca's Sales Representatives also marketed Return To Practice by answering physician's questions regarding reimbursement for Zoladex, comparisons to Lupron, and Return To Practice.  *See*, *e.g.*, Bowman Dep. at 37:14-40:15, 64:4-14); Plfs. Ex. 34 (Notes from Regional Consultancy Meeting in July 1997, AZ0426708-13 ("To no big surprise outlay & return are key and with the info that I shared [with the doctors], both appeared ready to take action….Again return in addition to service are the keys here….") and ("On Friday morning, I [J. Mollison] discussed … the profit potential with a contract with the Super Group that he [Dr. Lamb] also liked.  In fact, by Friday evening, he had already discussed this with [Dr.] Basa and told him they will need to take action…" (AZ0426711)) and ("Covered drinks and food poolside for him [Dr. Byard] and discussed our new initiatives with outlay and return (at his

- 25 -

insistence))" (AZ0426712); Plfs. Ex. 1003 (Sept. 25, 2000 call notes from Dana Nevil, AZ Sales

Representative, AZ0385646, states, "cost is an issue for these guys as Return To Practice is

priority.").

79.     AstraZeneca's sales representatives also sent letters to potential accounts

encouraging them to switch to Zoladex based on the current AWPs, cost to physicians and

resulting Return To Practice versus Lupron.  *See* Plfs. Ex. 38 (Letter from Chris Bowman to the

Maricopa Urology Lithotripsy Inc. Group (AZ0105879-81, at 79) (comparing same and stating

"**DO THE MATH!**"  (emphasis in original)); Plfs. Ex. 39 (Letter from Chris Bowman

(AZ0096359) (comparing same and stating "In fact, you will **earn more NET PROFIT by**

**switching to Zoladex!**" (emphasis in original)).

> **e.     AstraZeneca used physician buy groups – and encouraged physicians to join – in order to increase Return To Practice**

80.     AstraZeneca also created Physician Buy Groups that could take advantage of

higher volume discounts to create higher spreads and profits for Zoladex purchasers.  Bowman

Dep. at 45-46, 70-71.  Initially, purchase groups were informal associations of urologists.

Bowman Dep. at 70:15-22.  As time went by, Buy Groups became part of AstraZeneca's contract

strategy, and members formally contracted with AstraZeneca.  Bowman Dep. at 73-74, 83-84.

81.     AstraZeneca promoted the formation of Physician Buy Groups to doctors because

the increased discounts to doctors enabled its members to realize a higher Return To Practice.

Bowman Dep. at 64-64, 77; Plfs. Ex. 1004 (1996 executed Zeneca Pharmaceuticals Agreement

for Urology Groups, AZ0069688-701); Plfs. Ex. 113 (September 26, 1995 Memorandum from

Chris Bowman to Gary Hansen Re:  NSS "Purchase Groups," AZ0096386-88, explaining the

profitability of Purchase Groups, and stating "PURCHASE GROUPS ALLOW US TO SET UP

SMALL ACCOUNTS OF 5-6 DEPOTS PER MONTH, TO PURCHASE ZOLADEX AT

DISCOUNTS AS THOUGH THEY WERE PURCHASING 72+ DEPOTS!"… "OTHER

WORDS, IF A LUPRON ACCOUNT IS PAYING $382.00 PER DEPOT, THEY CAN NOW

SAVE $95.16 (WITHOUT ZOLADEX DISCOUNTING).  THIS TRANSLATES TO A NET

PROFIT ADVANTAGE … (NET PROFIT EQUALS MEDICARE ALLOWABLE MINUS

THE COST OF THE DRUG)," and "THIS ABILITY TO SET UP A PURCHASE GROUP IS A

VALUABLE TOOL FOR US TO COMPETE WITH TAP.  TELL YOUR PURCHASE GROUP

MEMBERS NOT TO JEOPARDIZE THIS GREAT DEAL, BY DISCUSSING IT WITH

THEIR TAP REPS.  IT CAN ONLY CAUSE THE ACCOUNTS HARM IF THEY DID, SO

MAKE SURE THE ACCOUNTS ARE AWARE OF THIS." (all caps in original)).

82.      AstraZeneca specifically encouraged physicians to join, and even led them to join,

Buy Groups.  Hopkins Dep. at 44, 46:7-47:9, 52:19-53:12, 56:13-21; Berkman Dep. at 89-94

(testifying at 90:4-15 that:  "I was advised one day by an AstraZeneca sales representative that

there was a change in how they were going to sell Zoladex, and that if I joined a group of

urologists that was in existence and if they let me join, then I would receive a better pricing

structure as part of a volume purchasing.  I guess – what's the word, consortium or group – than

I would as a single practitioner, which I was.  Q. So whose idea was it that you join a network?

A. It was Astra Zeneca's suggestion.").

> **f.      AstraZeneca pled guilty to marketing the spread by providing free
> samples of Zoladex to physicians while encouraging those physicians
> to bill Medicare for them**

83.      On June 20, 2003, AstraZeneca agreed to waive indictment and plead guilty to a

one-count Information charging it with conspiring (in violation of 18 U.S.C. § 371, the federal

conspiracy statute) to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 353(c), 331(t)

and 333(b)(c)(B) ("PDMA").  *See* Plfs. Ex. 1 (Memorandum of Plea Agreement (June 20, 2003),

- 27 -

*USA v. AstraZeneca Pharmaceuticals LP*, Criminal Action No. 03-55 (D. Del.).  Specifically, the

Information to which AstraZeneca pled guilty states, *inter alia*, as follows:

> 6.    Beginning in or about 1993 and continuing to at least July,
> 1996, the defendant, Zeneca, through its employees, provided a
> total of thousands of free samples of Zoladex to physicians
> knowing and expecting that certain of those physicians would
> prescribe and administer drug samples to their patients and
> thereafter seek and receive reimbursement for those free samples.

*See* Information ¶¶ 5-6 and 8, Plfs. Ex. 2.

> 84.    During the plea and sentencing hearing before the Honorable Judge Joseph J.

Farnan, Jr. in the District of Delaware, AstraZeneca, through Glenn Engelmann, AstraZeneca's

Vice President, General Counsel and Compliance Officer, agreed to plead guilty based on,

among other things, the following proffer of conduct:

> PROSECUTOR:  …"Beginning in or about 1993 and continuing to
> at least July 1996, …Zeneca here, through its employees, provided
> thousands of free samples of Zoladex to physicians knowing and
> expecting that certain of those physicians would prescribe and
> administer those drug samples to their patients and thereafter seek
> and receive reimbursement for the free samples.
>
> The objective for Zeneca was to obtain money from the
> increased sales of Zoladex, while the objective for the physicians
> was to obtain money for reimbursement for the samples of
> Zoladex.  Therefore, it was an objective of Zeneca in this
> conspiracy to provide free samples of Zoladex to induce the
> urologists to order Zoladex."
>
> THE COURT:  "… Do you agree with the government's proffer?"
>
> MR. ENGELMANN: "Yes."
>
> THE COURT:  "And that was the conduct of AstraZeneca, or the
> defendant?"
>
> MR. ENGELMANN:  "Yes, it was, Your Honor."

Transcript of Hearing (June 20, 2003), at 9-10, Plfs. Ex. 3.

- 28 -

85.    For AstraZeneca's conduct and plea of guilty to the one-count Information, the Court sentenced AstraZeneca to one year of probation, a "special condition" of which required AstraZeneca to comply with the terms of the civil settlement agreement and pay $291,027,844 to the federal government and participating state Medicaid programs, as well as a criminal fine of $63,872,156.  *Id.* at 17, 19.

86.    AstraZeneca's admission that it caused doctors to bill for free samples of Zoladex, and knew doctors were in fact billing patients and their insurance companies, is supported by the admissions of several doctors that they billed for free samples and that AstraZeneca knew about it and promoted it.  Three doctors (Saad Antoun, M.D., who practiced in Holmdel, New Jersey; Robert A. Berkman, M.D., who practiced in Columbus, Ohio; and Stanley C. Hopkins, M.D., who practiced in Boynton Beach, Florida) waived indictment and entered guilty pleas as co-conspirators, along with AstraZeneca.

87.    Dr. Saad Antoun waived indictment for and pled guilty to a one-count Information charging him with conspiring with AstraZeneca to violate the PDMA "by submitting, and by causing to be submitted, claims for payment to patients and to those patients' insurance companies for the prescription of Zoladex which had been provided free of charge to the defendant."  Information ¶ 9 (Sept. 18, 2002), *USA v. Saad Antoun, M.D.*, Criminal Action No. 02-13-JJF (D. Del.), Plfs. Ex. 7.

88.    At the sentencing hearing for Dr. Antoun the Court found that:

> Everything that I have been able to find out about you pretty much tells me that you are the kind of doctor everybody wants to go to and that this was a mistake of bad judgment, fostered upon you by the drug company.  If I was in the business today of assessing blame, I would probably, in my judgment, absolve you and do what . . . the government did, bang the heck out of AstraZeneca, because I think that's where the blame lies here.

Transcript of Sentencing Hearing (Sept. 11, 2003), at 15, Plfs. Ex. 369L.

- 29 -

89.     Dr. Robert A. Berkman waived indictment for and pled guilty to a one-count Information charging him with conspiring with AstraZeneca to violate the PDMA "by submitting, and by causing to be submitted, claims for payment to patients and to those patients' insurance companies for the prescription of Zoladex which had been provided free of charge to [him]."  Information ¶ 9, *USA v. Robert A. Berkman, M.D.*, Plfs. Ex. 4.

90.     The government stated at the plea hearing for Dr. Berkman that:

> "…beginning in or around February 1994 and continuing at least until July 1996, Astra-Zeneca sales representatives provided to Dr. Berkman approximately 223 free one-month sample doses of Zoladex. Each sample was labeled not for retail sale and Dr. Berkman signed a sample receipt card for each sample dose he received. At least one Astra-Zeneca sales representative additionally provided Dr. Berkman's office with labels that Dr. Berkman's staff used to cover up the not-for-resale statement on the packaging.
>
> Dr. Berkman administered the free samples and received approximately $84,448 in billing for free samples."

*See* Transcript of Hearing (July 17, 2003), at 10, Plfs. Ex. 5.  *See also* Examples of the labels used to effectuate the fraud and presented as exhibits at the Ohio State Licensing Board Hearing for Dr. Berkman, Plfs. Ex. 6.

91.     Dr. Stanley C. Hopkins also waived indictment for and pled guilty to a one-count Information charging him with conspiring with AstraZeneca to violate the PDMA by "submitt[ing] bills to patients and to their insurance companies for doses of Zoladex which he had received free from [AstraZeneca]."  Superseding Information ¶ 12b, *USA v. Stanley C. Hopkins, M.D.*, No 02-127-JJF (D. Del.), Plfs. Ex. 10.

92.     The government stated at the plea hearing for Dr. Hopkins that:

> From in and around January 1995 through at least July of 1996, Dr. Hopkins conspired with AstraZeneca . . . and employees of that company to receive free doses of Zoladex from Zeneca and to bill patients and patients' insurers for those free doses. . . . Dr. Hopkins

- 30 -

> . . . was paid approximately $69,900 for the prescription of at least
> 167 one-month doses of free drugs.

Transcript of Change of Plea Hearing (Dec. 17, 2002), at 10, Plfs. Ex. 369M.

93.     Doctors Antoun, Berkman and Hopkins alone billed more than $200,000 for

Zoladex free samples. *See* Antoun Information ¶¶ 7, 11 (stating that Dr. Antoun received

approximately 195 free one-month Zoladex doses), Plfs Ex. 7; Antoun Plea Agreement ¶ 5

(stipulating that he received between $30,000 and $70,000 from billing free Zoladex doses), Plfs.

Ex. 8; Berkman Information ¶¶ 7, 11 (stating that Dr. Berkman received approximately 223 free

one-month Zoladex doses), Plfs. Ex. 4; Berkman Plea Agreement ¶ 4 (stipulating that he

received more than $84,448.06), Plfs. Ex. 9; Hopkins Superseding Information ¶ 7, Plfs. Ex. 10 ;

Hopkins Plea Agreement ¶ 4 (stating/stipulating that Dr. Hopkins received approximately

$69,900 from billing for the free Zoladex samples that he received), Plfs. Ex. 11.

94.     Judge Farnan, who presided over both the AstraZeneca and the defendant doctor

proceedings in the District of Delaware, noted at Dr. Berkman's sentencing hearing:

> I've told the other doctors [who appeared before this court
> in connection with similar offenses] that in my view, the
> perpetrator here was the drug company and the sales
> representatives.  I told the last doctor who was here if he felt he
> was being treat [sic] unjustly, his feeling is correct he was being
> treated unjustly.

*See* Transcript of Sentencing Hearing of Dr. Berkman (Nov. 6, 2003), at 7, Plfs. Ex. 12; Feb. 5,

2004 letter from Judge Farnan, Jr., to State Medical Board of Ohio on behalf of Dr. Berkman,

Plfs. Ex. 13.

95.     Indeed, as AstraZeneca knew AWP was the benchmark for government

reimbursement, AstraZeneca likewise knew that the doctors would bill the government at AWP

(and hence Class 1 and 2 Plaintiffs) for the free Zoladex samples it distributed.  *See* Section

III(A)(1), *supra*.

- 31 -

96.     AstraZeneca's sampling conduct was part of its policy to market Zoladex based on Return to Practice.  Rather than providing substantial discounts to urologists on Zoladex, AstraZeneca "sold" samples to them for $0, knowing that those doctors would seek reimbursement for them based on AWP.

97.     AstraZeneca's sale and distribution of free samples of Zoladex were not reflected in AstraZeneca's AWPs for Zoladex.

> **g.     AstraZeneca used third parties to maximize reimbursement for Zoladex**

98.     AstraZeneca helped physicians recover full AWP reimbursement from Third-Party Payors, including Medicare.  Bowman Dep. at 47-48.

99.     AstraZeneca contracted with third parties, including S&FA (also known as Parexel) and Physician Reimbursement Systems to assist physicians in getting paid the maximum reimbursement amount.  Plfs. Ex. 1005 (PXL00955-967, 1998-1999 executed contract between Parexel and AstraZeneca); Plfs. Ex. 1006 (PXL00036-49, 1994 partially executed contract between Parexel and AstraZeneca); Plfs. Ex. 47 (Apr. 28, 1997 letter from Ray Painter (PRS President) to Tim Arenson, AZ's Associate Promotions Manager, AZ0011635-36, discussing PRS contract).

100.     Reimbursement assistance to physicians came out of AstraZeneca's marketing budget.  Strand Dep. at 79 (testifying that there was a budget for "reimbursement support"); *see also* Chen Dep. at 83-84.  Reimbursement assistance was a value-added service in that AstraZeneca "provide[d] a service to physicians that is of value to the physician."  Painter Dep. at 60.

101.     AstraZeneca's purpose in creating reimbursement assistance programs was for AZ to sell more drugs by providing physicians with more profit.  Painter Dep. at 65-66, 71-72.

- 32 -

102.    Some of the assistance provided by S&FA was through an 800-number called the Zoladex Reimbursement Hotline.  Bowman Dep. at 48 (explaining how the Zoladex Reimbursement Hotline worked).

103.    S&FA also provided monthly reports to AstraZeneca that described incoming calls to the Zoladex Reimbursement Hotline, as well as advice that was given to AZ sales representatives and purchasing physicians to help them gain the maximum reimbursement, and therefore, profit.  *See*, *e.g.*, Plfs. Ex. 1007 (March 28, 1997 letter from Stephanie Wagoner of SF&A to Keith Patterson, AZ0036327 attaching the February 1997 activity report for the Zoladex Reimbursement Hotline); Plfs. Ex. 37 (June 1-June 30, 1995 Zoladex Reimbursement Hotline Activity Report prepared by S&FA, at AZ0036510-33); *see also* AZ0036680-686; AZ0036475-497; AZ0036790-800; AZ0036548-574 (Zoladex Reimbursement Hotline Reports prepared by S&FA for AstraZeneca).

104.    AstraZeneca also hosted events with PRS President Ray Painter concerning Zoladex sales and "Reimbursement and Coding to Optimize Revenues in Your Urology Practice."  Plfs. Ex. 1008 (Undated Invitation entitled "An Evening With Ray Painter," AZ0096323).

105.    S&FA played an active role in ensuring that physicians would recover the highest Return To Practice possible.  Ware Dep. at 119-121 ("As I remember the specific issue now with Doctor Steffan (a Medicare reimbursement officer) wanting to – or changing the basis of reimbursement from AWP to invoice costs, based on some information he had obtained.  Q. And what was S&FA – or – sorry – well,  Parexel's response to that?  A. We wanted to correct that situation.  Q. Why?  A. It could result in incorrect payment of claims across – across the state.  Q. And what do you mean by "incorrect payment of claims"?  People – doctors would be paid

- 33 -

too much money?  A. Doctors would not be paid according to average whole price, which was the basis of reimbursement.  Q. All right.  So – okay.  And why was it important that doctors be paid on the basis of average wholesale price?  What was your understanding of why that was important?  A. Mine was just in keeping with accepted practice, as much as I understood.  Q. Did you understand that doctors would make more money if they were reimbursed based on average wholesale price, as opposed to estimated acquisition costs?  A. Yes, I understood that.").

### h.   AstraZeneca concealed its selling based on Return To Practice

106.    By employing contracts with confidentiality clauses preventing the disclosure of pricing terms and discounts, AstraZeneca concealed its practice of selling Zoladex on the basis of Return To Practice.  Brennan Dep. at 29:15-30:7, 39:12-40:4; Plfs. Ex. 67 (AZ0431261-71, a sample Zoladex Buy Group contract containing a confidentiality clause).

107.    AstraZeneca made no effort to tell consumers what their doctors paid for Zoladex. Brennan Dep. at 29:15-30:7.

108.    AstraZeneca did not have a mechanism in place to inform the government or Third-Party Payors what physicians actually paid for Zoladex.  Brennan Dep. at 34-37.

109.    AstraZeneca had no procedure in place to insure that doctors were reporting discounts they received on Zoladex to the government.  Brennan Dep. at 44-46.

110.    AstraZeneca told physicians that they did not need to report discounts they received when they submitted invoices for reimbursement.  Ware Dep. at 31:1-31:20 (testifying that the Zoladex Reimbursement Hotline did not "advise [physicians] on what to bill.  We can provide [physicians] with information on the basis of reimbursement.").

111.    Because of any investigation run by the Office of Inspector General, AstraZeneca made the decision to "lay low" regarding Return To Practice.  Schultz Dep. III at 92:1-93:5.  Part of this strategy was to not increase the price – or AWP – of Zoladex.  Strand Dep. at 118-119.

Instead, AstraZeneca increased discounts to physicians, because lowering the acquisition cost through discounting of Zoladex was a way to increase Return To Practice.  Brennan Dep. at 61:9-15; Iacono Dep. I at 177:20-22 ("Every time an additional [discounting] tier was introduced, it had the effect of leveling that playing field and in fact giving a boost to Zoladex sales, yes.").

112.     Nonetheless, and even in the face of government scrutiny from the OIG, sales representatives continued to discuss Return To Practice with physicians and continued to sell Zoladex based on its higher Return To Practice than Lupron.  Bowman Dep. at 102:21-103:04.

113.     Certain AstraZeneca employees disagreed with the practice of selling Zoladex on the basis of maximizing physician profit.  Pricing Strategy Manager, Erik Schultz, testified that he thought it was "sleazy" for AstraZeneca to manipulate the AWPs for Zoladex based on whether physicians were making enough profit.  Despite Mr. Schultz's resistance, AstraZeneca did it anyway.  Schultz Dep. III at 93:21-95:4 and 124:10-129:8 ("Frankly, I had an ethical problem with trying to increase profitability to physician, which was the key driver in this marketplace, and as a result of that, I did – was not cooperative.").

## B.     The BMS Defendants

114.     BMS or the "BMS Group" was comprised of three entities:  Bristol-Myers Squibb Company, Apothecon, Inc. and Oncology Therapeutics Network Corporation.

115.     Defendant Bristol-Myers Squibb Company is a Delaware corporation with its principal place of business located at 345 Park Avenue, New York, New York.  Plfs. Ex. 176 (Answer of Bristol-Myers Squibb Company, Oncology Therapeutics Network Corporation and Apothecon, Inc. to Plaintiffs' Amended Master Consolidated Class Action Complaint ("BMS Answer"), ¶ 71).  It is involved in the manufacturing, marketing and sale of pharmaceuticals and health care products.  *Id.*

- 35 -

116.    Defendant Apothecon, Inc. is a Delaware corporation and was a subsidiary of Bristol-Myers Squibb Company.  *Id*. at ¶ 74.  Apothecon was sold to Novartis in 2001.  Szabo Dep. at 85, 98.

117.    Defendant Oncology Therapeutics Network Corporation ("OTN") is a Delaware corporation with its principal place of business located at 395 Oyster Point Boulevard, Suite 405, South San Francisco, California.  Plfs. Ex. 176 at ¶ 72.  OTN became a wholly-owned subsidiary of Bristol-Myers Squibb Company in 1996, *id.*, although it became an independent company in 2005.  OTN is a health care services and distribution firm that sells, among other things, Bristol-Myers' infusion oncology drugs and related products to office-based oncology practices in the United States.  *Id*. at ¶ 73.  In 2002, OTN held 44% of the office-based oncology market.  Plfs. Ex. 234 (BMS/AWP/000217958-90, at 000217979).

118.    OTN had a close relationship with BMS.  OTN was the sales agent for BMS oncology products, Szabo Dep. at 101-04, and was so even before it became a BMS subsidiary.  *See* Plfs. Ex. 227 (BMSAWP/0028479-86).  OTN's customers are office-based oncology practices and rheumatology/urology clinics.  Peterson Dep. at 97-99.  BMS established the prices for the BMS drugs sold by OTN.  Szabo Dep. at 102-04; *see also* Peterson Dep. at 120-23 (BMS set floor prices for the BMS drugs sold by OTN.  OTN could charge below the floor price, but needed BMS approval to do so.).  OTN customers were able to obtain a four percent discount on BMS oncology products.  Szabo Dep. at 176-77; Peterson Dep. at 124-25.

119.    OTN and BMS sales representatives communicated regularly, and OTN Territory Business Development Managers ("TBDMs") occasionally went on sales calls with their BMS counterparts in a strategy commonly referred to within the company as "BMS/OTN Synergy."  Peterson Dep. at 104-06; *see also* Plfs. Ex. 843 (BMS/AWP/001483100-21) (reviewing

- 36 -

"BMSO/OTN Synergy in 2003"); Marré Dep. at 26 (referring to close cooperation as "One BMS"); Plfs. Ex. 228 (BMS/AWP/001483218-27, at 001483222 ("The combined efforts of BMS and OTN in driving sales with the OBO practices is a very strong part of our overall success. Every [OTN] TBDM is required to work with the appropriate [BMS] DBM and their teams on a regular basis.  In addition I have started to work with the Directors and continue to work with each of the DBM's in aligning our reps with common goals."); Plfs. Ex. 234 (BMS/AWP/000217958-90, at 000217988) ("BMS/OTN Partnership is Key. Close collaboration between the BMS and OTN sales teams is critical to winning back the branded business").  In other manifestations of close cooperation between parent and subsidiary, OTN employees had BMS voice mail boxes.  Peterson Dep. at 235.

120.    BMS's Director of Marketing for Oncology discussed joint marketing programs with OTN personnel once or twice per week.  Marré Dep. at 25-26.  BMS approved the terms and conditions relating to the sale of BMS products in contracts that OTN had with OTN customers.  Marré Dep. at 33, 38-39.

**1.    BMS knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors**

121.    BMS "admits that Congress has mandated that Medicare Part B reimbursement be based, in part, upon AWP."  Plfs. Ex. 176 (Answer, ¶ 3 (Dkt. No. 800)); *see also* Plfs. Ex. 177 (Plaintiffs' Interrogatories to the Fast Track Defendants, Response to Interrog. No. 11 ("both private and public payors have adopted an industry practice of using AWP as a benchmark for determining reimbursement rates . . . ." )); Plfs. Ex. 196 (BMS/AWP/01088191-202) (recognizing that Managed Health Care companies and Medicare reimbursed based on AWP).

122.    Many senior BMS managers testified that they understood that Medicare, as well as private reimbursement schemes, were based on AWP.  These managers include Dianne Ihling,

BMS's former Director of Pricing and Institutional Operations (Ihling Dep. at 90-93, 117-18);

Christof Marré, BMS's former Director of Marketing, Oncology (Marré Dep. at 49); Denise

Kaszuba, BMS's Associate Manager of Pricing Support (Kaszuba Dep. at 44-45); John Akscin,

OTN's Vice President of Government Relations and Managed Care Services (Akscin Dep. at 26-

27); and Marsha Peterson, OTN's Western Sales Manager (Peterson Dep. at 114-15).

### 2. BMS caused AWPs to be published for its Subject Drugs

123.    BMS controls the AWPs published for its drugs by reporting "list" prices that are

marked up 20 to 25 percent by various Publishers including *Red Book* and *First DataBank*.

After receiving the list prices from BMS, these Publishers provide the AWPs to BMS.  BMS

implicitly approves these AWPs by using them in various ways, including:  (i) distributing

AWPs to a variety of BMS employees, including sales representatives; (ii) including AWPs on

internal price lists; and (iii) publishing AWPs on the OTN website utilized by customers.

### a. BMS controlled the AWPs for its Subject Drugs by reporting WLPs with full knowledge of the mark-up factors that the Publishers would use to create the AWPs

124.    BMS controlled the AWPs for its Subject Drugs by sending prices to the

Publishers with knowledge of their markup factor.

125.    BMS did not send AWPs directly to the Publishers.  Instead, BMS sent to the

Publishers a wholesale list price ("WLP") or direct price, from which the Publishers predictably

calculated the AWPs.  *See*, *e.g.*, Plfs. Ex. 178 (Jan. 19, 2004 BMS Response to Interrog. No. 5).

126.    In some instances, employees in BMS's Pricing Support department would

specifically instruct the Publishers to "[p]lease supply AWP's for these products once they have

been processed through your database" or otherwise provide list the list prices "necessary to

established the AVERAGE WHOLESALE PRICE (AWP)."  *See*, *e.g.*, Plfs. Ex. 179 (composite

exhibit of letters bearing bates numbers BMS/AWP/000092170-86, BMS/AWP/0000468-77,

BMS/AWP/0005335-51, BMS/AWP/0030828-42, BMSAWP/0017275-78,

BMS/AWP/000092406, BMS/AWP/01071969-70, and BMSAWP/0030824-25) (all caps in

original).

127.    Denise Kaszuba, BMS's Associate Manager of Pricing Support was the person

responsible for reporting WLPs to the Publishers and reviewing the AWPs established therefrom.

Ms. Kaszuba has admitted that the Publishers reported an AWP using BMS's WLPs as the base.

Kaszuba Dep. at 44.

128.    The Publishers would then send a report back to BMS showing the AWPs.  Plfs.

Ex. 178 (Jan. 19, 2004 BMS Response to Interrog. No. 5).  Pricing Support then reviewed the

AWPs for reasonability and to determine the markup factor applied.  Kaszuba Dep. at 105-06;

*see also* Plfs. Ex. 180 (BMS/AWP/000186646-49, at 649 ("Obtain AWP's from the Data

Services (First DataBank and Red Book)  Approximate turn around time is 2-3 days.  Review

AWP's for reasonability, ie 20%-25% higher than new wholesale price…."));  Plfs. Ex. 181

(BMSAWP/0005609-22) and Kaszuba Dep. at 149-52 (example of a *Red Book* product listing

verification of BMS prices with BMS's approval indicated by Barbara Goetz's signature); Plfs.

Ex. 182 (BMSAWP0005571-608) (same));  Plfs. Ex. 849 (RB 03291-304) (same); Plfs. Ex. 850

(RB 03228-42) (same); Plfs. Ex. 233 (BMSAWP/0005551-70) (Medi-Span providing list prices

and AWPs back to BMS).

129.    On at least one occasion, BMS instructed the Publishers to use a 25% mark-up

factor for BMS oncology products:  "Effective immediately, Bristol-Myers Oncology Division

products factor used in determining the AWP should be changed from 20.5% to 25%."  *See* Plfs.

Ex. 183 (BMSAWP0011245-48).  The *Red Book* made this change as BMS directed.  Plfs.

Ex. 184 (Affidavit of Denise M. Kaszuba, ¶ 2).  Notably, the AWPs reported by the *Red Book*

are the AWPs that Medicare Part B carriers used.  *See*, *e.g.*, *In re Lupron*® *Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 159.  The *Red Book* never undertook an independent verification of the actual AWP.  *In re Lupron*® *Mktg. & Sales Practices Litig.*, 245 F. Supp. 2d at 285 n.7; *In re Lupron*® *Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 159.

130.    BMS understood the markup factors applied by the Publishers to the BMS WLPs.  The markup factor was 20% for most BMS drugs until 2000, when *First DataBank* changed it to 25%, Kaszuba Dep. at 98-99, and BMS was always aware of the markups being used by all three Publishers.  *Id*. at 100-01.

131.    BMS also knew early in the Class Period how to effect changes to AWP and how this would directly affect reimbursement regimes based on AWP.  For example, an internal Apothecon memo from 1993 discusses pricing strategy for two different lines of antibiotics.  Recognizing that health plan reimbursements were typically based on AWP, and that "AWP management strategies have been key to successfully marketing the Apothecon line of antibiotics," the memo describes how Apothecon maintained two distinct AWPs for two sets of antibiotics:  a high AWP line that "allows for maximum reimbursement," and a lower AWP line to facilitate third party plan use of the products because "many third party plans exclude the products because of a high AWP."  Plfs. Ex. 185 (BMS/AWP/0041865-69, at 0041865).  With more plans disallowing the high AWP line, and with MACs coming online, the memo advises that Apothecon has deleted the high AWP line and must now "develop a one line . . . AWP strategy that maximizes its Marketing efforts.  To do this, a new AWP for the remaining products must be set in the middle of the two lines."  *Id*.  The memo then described how to accomplish this:

> Mechanically the way to accomplish this is to raise the list price
> (list price + 25% = AWP) of Trimox, Veetids and Betapen.  This is

> a list price change only.  The average selling price of the products
> will not change.  However, the data services will report this as a
> Bristol-Myers Squibb list price increase.

*Id*.

132.    Other documents demonstrate that BMS knew that it could effect precise changes in AWP through changes in its reported WLPs.  *See*, *e.g.*, Plfs. Ex. 186 (BMS/AWP/000275052-59 (a document reviewing an August 2002 price increase for Glucophage XR determined that the price increase would result in a 111% increase in reimbursement amount based on AWP-15%)); Plfs. Ex. 187 (BMS/AWP/01109780-84 (PowerPoint recognizing that a 25% markup to WLP is applied and that, consequently, a 7% price increase on Plavix translates into an 11% AWP increase and a 13% MCO increase based on a typical reimbursement formula of AWP – 13%)); Plfs. Ex. 188 (BMS/AWP/00337637-41) ("If we never sell these multi source products at the High Billing Category 51 price, why not reduce the bc 51, 56, 57, 58, 59 price?  Since the AWP (Average Wholesale Price) is calculated based on the wholesale list – retailers benefit from a High AWP price under the reimbursement policies of Insurers."); Plfs. Ex. 189 (BMS/AWP/01088203-11 (PowerPoint titled "Sources of Price Data and their relationship to BMS pricing activities" (April 2002) further confirms that BMS well knows how AWPs are set based on BMS's WLPs).

### b.    BMS republished the AWPs for its Subject Drugs

133.    BMS used AWPs internally and also published AWPs for its Subject Drugs.

134.    From 1995 through 2004, BMS produced an Internal Price List, which contained various prices including wholesale direct hospital pricing, federal supply schedule pricing, Public Health Service pricing, and AWP pricing from all three services.  *See*, *e.g.*, Plfs. Ex. 190 (BMS/AWP/01112957-82; BMS/AWP/01190197-222; BMS/AWP/01071974-2011).  AWPs

were included on the Internal Price List at the request of marketing personnel, who were

interested in AWPs because customers reimbursed based on AWP.  Kaszuba Dep. at 45-51.

135.    BMS's Pricing Support Department licensed software from the publishers that

displayed AWPs and would occasionally field calls from marketing personnel with requests for

AWP information on both BMS drugs and the drugs of competitors.  *Id.* at 50-55.  In setting

BMS prices, BMS would consider the AWPs of competitive drugs.  *See*, *e.g.*, Szabo Dep. at 171.

136.    Throughout the 1990s, Pricing Support provided the BMS oncology sales force

with a Pocket Reference Price List that contained AWPs from all three data services.  *See* Plfs.

Ex. 191 (BMSAWP/0011361-67); Kaszuba Dep. at 109-11.  BMS typically updated and

disseminated the Pocket Reference Price List when list prices changed.  Kaszuba Dep. at 112.

137.    BMS's wholly-owned specialty distributor, OTN, continually republished the

AWPs for BMS Subject Drugs.  For example, periodic issues of the OTN publication, *The*

*Network News*, which was distributed to OTN customers, reported AWPs taken from the *Red*

*Book*.  *See* Plfs. Ex. 192 (various issues from 1994-2000); *see also* Akscin Dep. at 124-26; Cook

Dep. at 182-83.  As *The Network News* explained in the back of the bulletin under the caption

"Reimbursement":

> The Average Wholesale Prices (AWPs) and HCPCS codes for
> drugs commonly used in cancer treatment are provided for your
> use as a reimbursement resource.  Products are listed alphabetically
> by their generic name.  The AWPs are obtained from the *1998 Red*
> *Book* and the *November 1998 Red Book Update*.  For drugs that
> have multiple manufacturers, the AWP for the product most
> commonly stocked by OTN is listed.  For ease of use, we list the
> AWP information in the first three columns.  Please refer to the
> *Sourcebook* for a complete listing of HCPCS codes.

138.    OTN also published numerous online reports to which customers subscribed,

including the "AWP Report,"` which contained a list of current AWPs for drugs that the client

has previously purchased; and (ii) the "AWP/Price Report," which contained the AWP for drugs

- 42 -

that the client purchases, and the billing unit for each particular drug. OTN obtained the AWPs

for both reports from the *Red Book*. Peterson Dep. at 148-50; Plfs. Ex. 193

(BMS/AWP/001486072-73, 001486090).

139. OTN touted access to AWP information: "Practices can access current AWP and

J code information through the web site. Starting April 3, 2000, a new display of AWP

information will be available. This information will be updated on a monthly basis." Plfs.

Ex. 220 (BMS/AWP/000096965-85, at 000096974).

**3.** **BMS's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average, and BMS manipulated its AWPs and spreads**

140. In addition to republishing its own AWPs, BMS manipulated the real prices at

which BMS Subject Drugs were sold in order to take advantage of disparities between the AWPs

and actual acquisition prices or "spreads."

141. BMS distributes all of its drugs to wholesalers, which pay list price or "WLP" for

the drugs. *See, e.g.*, Plfs. Ex. 196 (BMS/AWP/01088191-202, at 01088200 ("BMS has only one

price which it charges to wholesalers . . . Wholesale List Price (WLP")).

142. Most purchasers of BMS drugs bought those drugs from wholesalers. Szabo Dep.

at 111-12. Prices for those drugs were frequently established via contract with BMS. The

wholesaler would provide the product at the contract price and then request payment of a

"chargeback" from BMS for the difference between the WLP and the contract price that the

wholesaler collected form the purchaser. Ihling Dep. at 104-05; Szabo Dep. at 54-56; Kaszuba

Dep. at 58-59; *see also* Plfs. Ex. 230 (BMS/AWP/000056952-69, at 000056967) (graphic

illustration of the chargeback process).

a.     **BMS knew that its Subject Drugs were sold at prices well below AWP**

143.   Senior BMS managers testified that (i) they never conducted surveys of wholesale prices to determine whether the AWPs being reported for BMS drugs were accurate (and never did so prior to directing the publications to use a 25% mark-up factor), or (ii) were not concerned that false AWPs were being published for BMS products.  Examples include:

a.     Zoltan Szabo, Director of Pricing & Reimbursement, from time-to-time reviewed weighted average sale prices by segment for BMS drug, Szabo Dep. at 199-204, and had available to him reports showing the net sales price by drug after all discounts.  Szabo Dep. at 231-35.  He acknowledged that wholesaler margins were small – typically equal to the "couple percent" prompt pay discount that manufacturers provide the wholesaler – yet Mr. Szabo has never communicated to a publisher at any point in time the AWP they were reporting was incorrect.  Szabo Dep. at 139-40, 222-23.

b.     Christof Marré, former Director of Marketing, Oncology:  Marré understood that AWP was a price published in *Red Book* and FDB based on a markup factor applied to the BMS list price.  He admitted that purchasers in the marketplace would not actually buy BMS drugs at the AWP because wholesalers would buy at list price less a 1 or 2 percent prompt payment discount and would not be able to command a 25 or 30% margin due to competition between wholesalers and distributors.  Marré Dep. at 43-44.  Marré also recognized that customers buying under contracts purchased well below WLP.  *Id*. at 48-49.  When pressed about whether it ever concerned Marré, as BMS Director of Marketing, that the AWPs being reported for BMS oncology drugs did not reflect the margins actually realized by wholesalers, he said no.  And at no time did Marré take any action to try and correct the AWPs that were being published, *id*. at 45-

- 44 -

47, notwithstanding his knowledge that AWP was used as a reimbursement term by Medicare Part B and private insurers. *Id*. at 49.

       c.     Denise Kaszuba, Associate Manager of Pricing Support:  Responsible for reporting WLPs to the publishers, Kaszuba is intimately familiar with the mark-up factors applied by the publishers, sporadically examines the AWPs for BMS drugs to ensure that mark-up factors are being accurately applied to the WLPs, and takes the AWPs from FDB and includes them in internal price lists used at BMS.  Kaszuba Dep. at 100-06.  She is aware that wholesalers typically purchase at WLP less 1-2% for a prompt payment discount, and that end-purchasers of BMS drugs can purchase at contract pricing less than WLP and also receive rebates from BMS.  *Id*. at 57-60.  Kaszuba pled ignorance as to whether anyone ever pays AWP for BMS drugs, *id*. at 60-61, but later admitted in response to at least one document that no one paid AWP for that particular drug.  *Id*. at 65.  At no time did Kaszuba or anyone under her supervision conduct any sort of a study into what the wholesalers were charging for BMS drugs, and it never occurred to her that BMS should do such a study, *id*. at 101, even though Ms. Kaszuba herself once directed the publications to use a 25% markup factor for BMS oncology drugs.

       d.     Dianne Ihling, former Director of Pricing and Institutional Operations:  Neither she nor anyone under her supervision ever conducted a survey of wholesalers in order to determine whether the markup factors applied by the publishers to BMS list prices were accurate in that they reflected real prices in the marketplace.  Ihling Dep. at 93.

144.    Several BMS documents demonstrate that BMS AWP as a fictitious number even though BMS knew that Medicare Part B reimbursements were based on AWP.  For instance, an

"Executive Summary" regarding a proposed plan by New England legislators to form a six-state

purchasing group reviewed pricing in the distribution channel and recognized that no one pays

AWP.  "As previously discussed, by convention all manufacturers sell to wholesalers at prices

2% below the list price.  Wholesalers then sell medicines to retail pharmacies at prices

significantly below the published AWP."  The document also recognized that AWP was a

"joke:"

> Retail pharmacies have used the AWP as the basis for setting their
> prices for many years.  As retail acquisition prices fell relative to
> AWP, retailers called the difference an "earned margin," because it
> was first based on purchase size.  Because the discount was earned,
> pharmacies saw no need to pass along the savings, choosing to
> continue to base their prices on the published AWP.  The joke in
> retail pharmacy circles is that AWP stands for "Ain't What's
> Paid."

Plfs. Ex. 194 (BMS/AWP/000469286-99, at 00469291).

145.    Another document titled "AWP (Ain't What's Paid)" declares that the *First

Databank* 20-25% AWP markup is an "artificially inflated number;" and that "[w]hile

pharmacies and payors both know that AWP is artificially inflated, it is the only easily obtained

published price source.  Therefore, reimbursement formulas are still based on AWP, with a

discount subtracted from it."  Plfs. Ex. 195 (BMS/AWP/01327211).

146.    Importantly, BMS recognized that "***AWPs can confuse the understanding of

pricing within the US pharmaceutical system***" and that it consequently "need[s]to be wary of

using AWPs ***because the name is misleading***."  Plfs. Ex. 196 (BMS/AWP/01088191-202

(emphasis added)).

147.    Despite recognizing that AWP is fictitious, misleading and confusing, and that,

nonetheless, public and private payers rely upon it as a reimbursement benchmark, BMS never

- 46 -

took any actions to either persuade Publishers to report accurate AWPs or to publicize the inflated nature of the AWPs for BMS or other drugs.

### b. Recognizing the importance of spreads, BMS created spreads through confidential contract pricing, rebates and other forms of discounting

#### (1) The importance of reimbursement

148.    BMS recognizes that reimbursement issues are very important to physicians working in office-based oncology practices ("OBOs").  This is emphasized in many documents and was acknowledged by numerous witnesses.

149.    John Akscin is OTN's current Vice President of Government Relations and Managed Care Services, whose former title was Director of Business Development for Office Based Oncology, Plfs. Ex. 179; *see also* Akscin Dep. at 14, 16.  Part of Akscin's responsibilities also included daily discussions with OTN clients that were referred to him by sales reps.  Topics discussed included drug reimbursement issues and AWPs.  Akscin Dep. at 56-59.  Akscin sometimes provided specific AWPs to the clients, which he obtained from the *Red Book* or FDB.  *Id*. at 58.

150.    Akscin also gave many presentations to BMS sales representatives using PowerPoints.  Akscin Dep. at 82-84.  In one, Akscin emphasized to OTN and BMS sales representatives that the "Top Three OBO Concerns" were "***Reimbursement, Today***", "***Reimbursement, Tomorrow***," and "***Reimbursement!***"  Plfs. Ex. 197 (BMS/AWP/000096632-43, at 000096636).  This information reflected what OTN customers were telling OTN at the time, and this presentation was provided to OTN in-house and outside sales representatives, as well as to BMS sale reps.  Akscin Dep. at 88-90.  *See also* Plfs. Ex. 232 (BMS/AWP/000956887, 000083788-839, at 000083798 ("Little Wonder… Why the Focus on Price?")).

151.    Akscin acknowledged that OBO revenue is "Highly Medicare Driven" because 50-55% of OBO patients are Medicare recipients, Akscin Dep. at 91-92, and that 64 percent of OBO revenues came from drug reimbursements.  Akscin Dep. at 93.  *See also* Plfs. Ex. 197 (BMS/AWP/000096632-43, at 000096634).

152.    An undated document regarding "Reimbursement" echoed this conclusion, estimating that "65% of a medical oncologist's revenue is derived from administering chemotherapy," that drug reimbursements are based on AWP, and that "drug reimbursement has been a significant source of revenue and profit."  Plfs. Ex. 198 (BMS/AWP/000393437-464, at 000393437).  Indeed, "[f]or covered products, Medicare reimbursement is much higher than the actual acquisition cost to providers.  Some manufacturers have exploited the situation by increasing the 'spread' between the acquisition cost and the AWP, in order to provide a monetary incentive for physicians to use their product."  *Id*. at 000393440.

153.    OBO reimbursement concerns were so important that BMS and OTN offered various reimbursement consulting services to their clients.  OTN hired KR Johnson & Associates ("KRJ," now called Practice Expert) to train OTN employees on how OBOs operate, including billing and reimbursement methods.  Akscin Dep. at 18-20.  The billing and reimbursement part of the training included discussions of AWP "in the context of very high level of how office based oncology practices are reimbursed in their environment."  *Id*. at 26.  Akscin also referred OBOs to KRJ from time-to-time.  The services that KRJ would provide to OTN customers included setting up billing and reimbursement systems.  *Id*. at 23-24.  Customers reported that they valued the services that KRJ provided.  *Id*. at 43-44.

154.    From before 1999 until sometime in 2003, OTN also offered a reimbursement assistance program in the form of a reimbursement hotline provided by a company called

DocuMedix (subsequently purchased by the Lash Group). *Id*. at 35-36. The assistance that DocuMedix provided to OTN customers included conveying information regarding billing codes, disease classification codes, billing units and AWPs. *Id*. at 37-38. Akscin confirmed that OTN customers valued the DocuMedix service that was offered, and OTN actually marketed the service. *Id.* at 42-43. Examples of "mass produced, commonly used marketing materials" that refer to reimbursement assistance support, *id*. at 120-23, include Plfs. Ex. 199 (BMS/AWP/000096900-12, at 000096904 and 909).

155. BMS also offered its clients the ProCert service through ProStat. Akscin Dep. at 31. ProCert "was a program in which, when office based oncology practices received a denial from an insurer for the services and drugs provided to treat that patient, they would contact ProCert for assistance in managing that claim denial." *Id*. at 33. ProCert takes over the claim after initial denial of reimbursement and serves as the client's advocate. Historically, if the claim was ultimately paid, then BMS billed for the drug. If not, OTN would credit the account with free drugs. The program later changed such that the customer paid for the drug up front and then received a credit if ProCert was successful in getting the claim paid. Soule Dep. at 132-35. BMS sales representative Doug Soule confirmed that ProCert is another sales incentive that is marketed to customers as part of the total package that BMS brings to the client. *Id*. at 132. *See also* Plfs. Ex. 231 (BMS/AWP/001502339) (memo to BMS sales rep Greg Keighley encouraging him to use ProCert and noting that "[s]ome accounts are very sensitive to reimbursement issues").

156. Reimbursement was so important to BMS's business that BMS identified "[r]eimbursement changes" as a threat to its business. Plfs. Ex. 200 (BMS/AWP/000094558-603, at 000094565; *see also id.* at 000094573, discussing need to "[c]ontinue to support branded

generics to actively compete in our designated market place by, and make adjustments to allow

for changes in reimbursement (both AWP and Medicare Drug Benefit.")).

157.    And BMS lobbied the federal government to maintain AWP-based reimbursement

for Part B drugs:

> Continued Medicare Part B Battle.  This past year, we worked
> closely with Oncology on the Medicare Part B Reimbursement
> Issue with a very favorable outcome (instead of Oncology drug
> reimbursement being based on actual acquisition cost, which was
> proposed by the Administration, reimbursement will be based on
> 95% of the AWP.  While this was a major success, the 95%
> number could be easily lowered in subsequent sessions of
> Congress.  At the same time, Oncologists are enjoying larger
> margins on generic oncolytics, which gives them strong incentives
> to use generics instead of branded products.  We need to actively
> manage this issue.

Plfs. Ex. 201 (BMS/AWP/000153461).  The memo closes with a request to add personnel to the

Policy Department given that "[a]ll of these issues have huge financial implications for Bristol-

Myers Squibb."  *Id*.

### (2)    Creating spreads

158.    In order to play to OBO concerns about reimbursement, BMS created spreads

through special contract pricing and other discounting methods.

159.    The former Director of Marketing for Oncology, Christof Marré, testified to the

various ways in which BMS provided discounts off of WLP:  contract pricing; rebates; admin.

fees; and marketing fees.  Marré Dep. at 78-82.  If provided, all forms of discounts would always

appear in a contract, were ***not*** made public by BMS or any publication, and would ***not*** be

reflected in the WLP.  *Id*. at 82-84.

160.    BMS was successful in signing contracts with most of the large hospitals in the

country.  *Id*. at 35-36.  BMS targeted the larger organizations, with sales volume being the

primary determinant.  *Id*. at 37.  Marré confirmed that contract pricing is ***always*** less than WLP,

- 50 -

and that contract prices are confidential and not publicly available.  *Id*. at 37-38, 82-84; *see also* Plfs. Ex. 176 (Answer ¶ 192 (BMS admits "that certain price discounts it gives to customers are confidential competitive information . . . .") (Dkt. No. 800)).

161.     Confidential discounts, which were purposely not reflected in BMS's WLPs or AWPs, were frequently huge.  For example, in an email dated January 10, 2003, Michelle Barnard reported "the WLP sales vs. the contract sales as well as the discount off WLP for Blenoxane 15mg/30mg" for the third and fourth quarters of 2002.  The weighted average discount off WLP ranged from 61% to 66%.  Plfs. Ex. 202 (BMS/AWP/000071159-62).  *See also* Plfs. Ex. 203 (BMS/AWP/000056970-7015 (lists contract sales prices for Taxol for each quarter of 2002 and chargebacks for Vepesid injection for the same time period.  The discounts off of WLP for Taxol are huge – as high as 80% for one customer in the fourth quarter of 2002. *Id*. at 000045878.)); Plfs. Ex. 204 (BMS/AWP/000096291-300 at 000096293 (Consorta proposal showing huge discounts off of WLP for Blenoxane, Cytoxan, Taxol and Vepesid)); Plfs. Ex. 205 (BMS/AWP/000096333-45 (Owen Healthcare bid showing huge discounts off of WLP for Blenoxane, Cytoxan, Taxol and Vepesid)); Plfs. Ex. 206 (BMS/AWP/00979750-803 (Premier Current Contracts summary showing huge discounts off of WLP for Blenoxane, Rubex, Taxol and Vepesid)); Plfs. Ex. 207 (BMS/AWP/01124131-56 (MHA Bid spreadsheet showing huge discounts off of WLP for similar drugs)).

162.     BMS knew the impact that creating spreads would have:  a growing disparity between WLP and AWP creates an incentive for physicians to select the brand.  For example, BMS once explained with respect to its VePesid drug:

> The Etopophos product file is significantly superior to that of etoposide injection . . . . Currently, physician practices can take advantage of the growing disparity between VePesid's list price (and, subsequently, the Average Wholesale Price [AWP]) and the

- 51 -

> actual acquisition cost when obtaining reimbursement for
> etoposide purchases.  If the acquisition price of Etopophos is close
> to the list price, the physicians' financial incentive for selecting the
> brand is largely diminished.

Plfs. Ex. 208 (BMSAWP/0011214-35, at 0011221).  In order to promote Etopophos, a new BMS

drug that was expected to cannibalize BMS's VePesid sales, the document suggested lowering

VePesid's AWP in order to create sales for Etopophos:  the "AWP for Vepesid would be reduced

from its current level to the highest bid price currently in the marketplace."  *Id.*

163.    BMS also recognized that "[s]ince the AWP . . . is calculated based on the

wholesale list – retailers benefit from a High AWP Price under the reimbursement policies of

Insurers."  Plfs. Ex. 188 (BMS/AWP/00337637-41, at 00337638).

164.    Other documents reinforce BMS's recognition that it could manipulate spreads:

a.    "In order to accomplish a speedy market introduction of atenolol 50 mg

1000's, a wholesale list price needs to be created.  The price is set to establish an AWP

that is competitive with other generic offerings.  Please note that this wholesale price will

not reflect actual selling price, since Apothecon sells atenolol primarily at contract or

special offer pricing."  Plfs. Ex. 209 (BMSAWP/0000597-617, at 0000612;

BMSAWP/0000647-51).  In the preceding pages of this exhibit, Kaszuba communicates

the new WLP to publishers and PBMs (*see* 597-606).  Kaszuba testified that no one

would have paid AWP for this particular drug at this particular time because they would

not have even paid the list price for the drug.  Kaszuba Dep. at 65.

b.    "To accomplish a rapid market introduction of albuterol, wholesale list

prices must be established.  These wholesale prices do not reflect actual selling prices, as

albuterol will be sold primarily at contract or special offer pricing…."  Plfs. Ex. 210

(BMSAWP/0000574-87, at 0000583); *see also* Plfs. Ex. 211 (BMSAWP/0000095-120, at

- 52 -

0000099) ("We were successful in using our Unit of Use packaging to secure the Trimox

capsule business at Wal-Mart.  It is necessary to furnish wholesale pricing to the pricing

publishers to enable them to establish AWPs for third party reimbursement purposes.  It

is prudent to point out at this time that these wholesale prices do not reflect actual selling

prices, as Trimox Unit of Use will be sold primarily at contract or special offer pricing.");

*id*. at 0000102 ("SMZ/TMP oral suspension is currently manufactured by ALPharma and

Teva.  Both suppliers are implementing price increases in the range of 67-83% for this

product.  Commodity pricing is increasing proportionately.  While these wholesale list

prices do not reflect actual selling prices, we need to increase our ASP pricing across all

areas (wholesale list, direct list, wholesale special offer, and bid pricing) to maintain

profit parity.").

> **c.** **Individual brand and price histories reveal BMS's manipulation of spreads**

165.    Christof Marré, BMS's former Director of Marketing for Oncology, testified to

the sales histories of the BMS oncology drugs at issue in the case, providing information about

when each drug was first marketed, if and when it lost exclusivity, and his recollections of price

trends over time.  This testimony, coupled with Dr. Hartman's calculation of BMS spreads,

demonstrates that BMS manipulated the spreads on its Subject Drugs.

> **(1)** **Blenoxane**

166.    Blenoxane is an antineoplastic used in the treatment of various forms of cancer

and has several competitors.  Marré Dep. at 88.  Blenoxane was a multisource drug the entire

time that Marré was at BMS, and BMS had no specific marketing programs for it.  *Id.* at 84-85.

167.    The WLP for Blenoxane remained constant over time while contract pricing dropped.  *Id.* at 86.[2]

168.    Weighted average discounts off of WLP for 15 and 30 mg formulations of Blenoxane ranged from 62 to 66% at the end of 2002.  Plfs. Ex. 202 (BMS/AWP/000071159-62).  In 2002 Duke received contract prices for Blenoxane that were 71% off WLP.  Marré Dep. at 144; Plfs. Ex. 212 (BMS/AWP/000217841-51, at 000217851).  Some discounts to hospitals were as high as 80%.  *See* Plfs. Ex. 213 (BMS/AWP/000212669-74).

169.    Hartman's calculations echo this data, demonstrating that Blenoxane spreads largely increased over time:



Direct Testimony of Raymond S. Hartman ("Hartman Testimony"), ¶ 47.

---

[2] Marré testified that WLP for generics generally remain constant over time even if actual contract prices fall: "it's an industry standard that once a drug was generic, the list price stays wherever it was when it went generic and is not updated."  Marré Dep. at 86.

**(2)     Cytoxan**

170.     Cytoxan is the BMS brand name for cyclophosphamide, Marré Dep. at 88, and it is an antineoplastic used to treat various forms of cancer.  Cytoxan was multisource for much of the class period but became single source towards the end of 2002 or beginning of 2003 when both competitors exited the market.  *Id*. at 88-89.

171.     For most NDCs, Cytoxan's WLPs remained constant over time, while spreads for most NDCs increased and then decreased in 2001 as the drug was poised to become single source.  Hartman Testimony Attach. G.2.b and G.2.c.  Nonetheless, Duke received 62% of list price in 2002.  Plfs. Ex. 212 (BMS/AWP/000217841-51, at 000217851).  Consorta, Owen and MHA received contract discounts from 65-75% off of WLP.  *See* Plfs. Ex. 204 (BMS/AWP/000096291-300 at 000096293); Plfs. Ex. 205 (BMS/AWP/000096333-45); Plfs. Ex. 207 (BMS/AWP/01124131-56).  After Marré recognized that Cytoxan was once again a sole source drug, he tried to raise contract prices.  Marré Dep. at 90.

**(3)     VePesid**

172.     VePesid is the BMS brand name for etoposide, Marré Dep. at 91, which is an antineoplastic used to treat cancer of the testicles and certain types of lung cancer.  The injectible version was already a multisource drug when Marré started at BMS, *id*., and had numerous competitors.  *Id*. at 97.

173.     For most versions of VePesid, WLPs and therefore AWPs remained constant over time, Hartman Testimony Attach. G.2.b, while contract prices decreased, Marré Dep. at 93-94, and spreads ballooned in the late 1990s to over 1,000% for some NDCs.  Hartman Testimony Attach. G.2.c.

174.     In 2002 Duke received contract prices for VePesid that were 94-95% off WLP.  Plfs. Ex. 212 (BMS/AWP/000217841-51, at 000217851); *see also* Plfs. Ex. 204

- 55 -

(BMS/AWP/000096291-300 at 000096293) (Consorta pricing at 94% off of WLP); Plfs. Ex. 205

(BMS/AWP/000096333-45) (Owen pricing at 94% off of WLP); Plfs. Ex. 206

(BMS/AWP/00979750-803, at 00979756 (Premier pricing at 94% off of WLP); Plfs. Ex. 207

(BMS/AWP/01124131-56, at 01124141) (MHA pricing at 95% off of WLP)).  Indeed, pricing

"had deteriorated very massively compared to other generic drugs" such that BMS was not

always willing to continue matching lower pricing requests from customers.  Marré Dep. at 93-

94.

176.     Marré also testified that most of BMS's sales of injectible VePesid in 2002 were

made under contracts, Marré Dep. at 130-31 (*see also* Plfs. Ex. 214 (BMS/AWP/01123962-74, at

01123963), showing that almost all sales resulted in prime vendor accruals and chargebacks),

which, of course, means that no one paid WLP let alone AWP for the drug.

### (4)     Etopophos

177.     Etopophos is an antineoplastic used to treat cancer of the testicles and certain

types of lung cancer, is considered an exclusive drug without generic competition.  Marré Dep. at

96.

178.     BMS had no specific marketing programs for Etopophos.  BMS may have

considered contracting for some accounts, but discounting was unlikely since it had no

competition and was not a large brand.  *Id*. at 96-97.  WLP remained constant over time,

Hartman Testimony Attach. G.2.b, as did spreads (for the most part).  Hartman Testimony

Attach. G.2.c.

### (5)     Rubex

179.     Rubex was a multisource antineoplastic used to treat various forms of cancer.

- 56 -

180.    After 1994, WLPs and AWPs remained constant over time, Hartman Testimony Attach. G.2.b, while spreads blossomed in the mid-to-late 1990s and then decreased, Hartman Testimony Attach. G.2.c, as BMS phased out the drug.  Marré Dep. at 97-98.

181.    Discounts off of list price were very large.  *See* Plfs. Ex. 206 (BMS/AWP/00979750-803, at 00979756 (Premier at 84% off of WLP).

### (6)    Taxol

182.    Taxol is the BMS brand name for paclitaxel, Marré Dep. at 100, and it was the first of a class of agents called taxanes that interrupt the cell cycle of a cancer cell growth stage and make the tumor more susceptible to the effects of radiation.  It is used to treat ovarian, breast and lung tumors.  Soule Dep. at 34.

183.    In 2000, BMS dominated the U.S. oncology drug market, accounting for over $1.2 billion of the market's $4 billion in sales.  Taxol was the oncology drug leader, with $805 million in sales, with BMS's Paraplatin second at $418 million.  Plfs. Ex. 215 (BMS/AWP/000071256-72, at 000071259-60).  Sixty percent of Paraplatin usage was in combination with Taxol.  *Id.* at 000071267.  At this time, 69% of the market was represented by office-based oncologists ("OBO"), with hospitals comprising the other 31% of the market.  *Id.* at 000071259.  OTN had 60% of the OBO market.  *Id.*

184.    Taxol lost exclusivity in 2000.  Ivax's generic product, Onxol, entered the market in October 2000.  Mylan began producing generic paclitaxel in July 2001, and Bedford entered the market shortly thereafter.  *See* Plfs. Ex. 216 (BMS/AWP/01190031-55, at 01190036-37); *see also* Marré Dep. at 100 (discussing entrance of Ivax, Bedford, Mylan and also Abbott).  Taxotere could be seen as a therapeutic substitution for paclitaxel, but it was a different chemical formulation called docetaxel.  *Id.* at 100.

185.    As a result, during this period of generic introduction, Taxol sales through OTN declined significantly from about $23,000,000 per month in January 2001 to $15,000,000 per month by November 2001.  Plfs. Ex. 216 (BMS/AWP/01190031-55, at 01190039).  By August 2001, OTN lost 50% of its volume of Taxol sales since generic introduction.  Plfs. Ex. 217 (BMS/AWP/001501681).  Plfs. Ex. 215 at page 000071270 graphs the loss in market share that Taxol experienced as of January 2003.

186.    The WLP for Taxol remained constant over time, and then, after loss of exclusivity, contract prices rapidly decreased.  Marré Dep. at 100-01.  Spreads on some NDCs of Taxol exploded from about 25% to over 500% in 2002, Hartman Testimony Attach. G.2.c, and the Taxol unit-weighted average spread percentage across all NDCs jumped nearly 100% between 2001 and 2002:



Hartman Testimony Attach. H.2.

187.    In 2002, Duke received contract prices for Taxol that were 75% off WLP.  Plfs.

Ex. 212 (BMS/AWP/000217841-51, at 000217851).  By the fourth quarter of 2002, BMS was

routinely providing huge discounts on Taxol to large customers, some as high as 80% off of

WLP.  Plfs. Ex. 203 (BMS/AWP/000056970-7015, at 000056988); *see also* Plfs. Ex. 204

(BMS/AWP/000096291-300 at 000096293) (Consorta pricing at 82% off of WLP); Plfs. Ex. 205

(BMS/AWP/000096333-45) (Owen pricing at 75% off of WLP); Plfs. Ex. 206

(BMS/AWP/00979750-803, at 00979756 (Premier pricing at 75% off of WLP).

188.    The rapid provision of substantial discounts off of WLP for Taxol eventually

succeeded in stemming BMS's erosion of market share.  Marré Dep. at 107; *see also* Plfs.

Ex. 218 (BMS/AWP/00478735-74, at 00478749 (depicting sales trend before and after Taxol

Opportunity Program)).

(7)    <b>Paraplatin</b>

189.    Paraplatin treats a wide variety of cancers and is frequently used in conjunction

with Taxol.  Soule Dep at 35.

190.    Paraplatin lost exclusivity in November 2004.  Marré Dep. at 126.  Before then,

Paraplatin list prices increased over time, while spreads remained relatively constant until

increasing modestly beginning in 2002.  Hartman Testimony Attach. G.2.c.  To address the loss

of exclusivity, BMS charted a new course and created a "private label" generic for Paraplatin

called "OTN Paraplatin" so that BMS could sell a generic version of drug in addition to a brand.

Pricing of the generic would follow the pricing of other generic manufacturers, and pricing of the

brand would be at a premium over all generics.  Marré Dep. at 125-29.

### 4.    BMS marketed spreads

191.    BMS officially recognized that marketing the spread was wrong when in January

2001 BMS sent a memo to all U.S. Sales & Marketing Personnel advising that, "in accordance

- 59 -

with its Code of Conduct, . . . the spread should not be used as a promotional or marketing tool. Plfs. Ex. 223 (BMS/AWP/000192875-76).  Nonetheless, BMS marketed the spread.

192.    As noted, as part of OTN's "Lynx2OTN web service (formerly called "OTN-Online" and launched in 1998 – *see* Plfs. Ex. 846 (BMS/AWP/001484077-101, at 001484079), OTN published the "AWP Report," which contained a list of current AWPs for drugs that the client has previously purchased, and the "AWP/Price Report," which contained the AWP for drugs that the client purchases, and the billing unit for each particular drug.  Peterson Dep. at 148-50; Plfs. Ex. 193 (BMS/AWP/001486072-73, 001486090).  ***The report also shows OTN's dispensing unit price in one column and AWP less _% in the next column; customers can input the discount from AWP manually in a setup screen.***  *See also* Peterson Dep. at 166-73, 177-78 (discussing how the report works and how clients were trained on it).  Customers also had access to a Purchase History Report, which showed AWPs and OTN pricing.  *See*, *e.g.*, Plfs. Ex. 848 (BMS/AWP/001484591-613); Peterson Dep. at 217-19.

193.    Marsha Peterson, OTN's Western Sales Manager, testified that customers found the price and AWP info displayed on a single screen "useful," and acknowledged that "margins" or "spreads" are relevant to the customers.  Peterson Dep. at 173-74; *see also* Plfs. Ex. 845 (BMS/AWP/001487883-91, at 001487883 ("Vivian Finch said she had been wanting to set up a data base to track pricing but had been hesitant because she wasn't sure what all she wanted to include.  After she saw our AWP report on lynx2otn she knew exactly how to set up her database and basically copied our report.  She loves lynx2otn."); Plfs. Ex. 847 (BMS/AWP/011103383-85, at 011103385 ("Lynx2OTN:  Mary Jo and Dr. Kovacs love our website and Mary Jo orders everything online now.  I printed off an AWP/Pricing Report and showed it to Meg who does their billing and she can't wait to use it.").  Indeed, OTN marketed the report.  *See*, *e.g.*, Plfs.

- 60 -

Ex. 844 (BMS/AWP/001487357-62, at 001487358); Plfs. Ex. 846 (BMS/AWP/001484077-101,

at 001484100).

196. OTN Vice President of Government Relations and Managed Care Services John

Akscin also testified that practices found the presentation of the information in the AWP Price

Report to be "very valuable."  Akscin Dep. at 111-12.

195. OTN also offered customers a "Cost Differential" report that displayed, by

regimen, the AWP, acquisition cost and "AWP Cost Differential" or spread.  Plfs. Ex. 219

(BMS/AWP/000097131-37, at 000097134-36).

196. Turning to the sales force, in 1999 Greg Bell at Charles River Associates advised

executives at BMS to discuss "[e]conomic issues" in a low key manner" with customers and use

"[n]o printed materials."  Plfs. Ex. 226 (BMS/AWP/01233083-184, at 01233134).  Nonetheless,

he suggested as a tactic "Performance-based Contracting/Pricing," "Acquisition cost and AWP,"

*id.* at 01233118, which later slides make clear is a reference to "AWP and spread opportunities."

*Id.* at 01233120.  "Broader use of contracts [which are confidential] creates a competitive

advantage that is difficult to replicate quickly."  *Id.*  Slides also emphasized that

"Taxol/Paraplatin has higher drug margin per patient treated than current competing regimens."

*Id.* at 01233131.

197. BMS provided its employees with information on spreads, and sales

representatives actively marketed the spread between actual acquisition cost and AWP for drugs

coming off-patent, in order to take advantage of the importance that prescribers place on drug

reimbursements.

198. BMS also provided its sales representatives with spread marketing materials, or

they created their own.

a.      For instance, some of John Akscin's PowerPoint presentations included information on the difference between the acquisition cost and Medicare reimbursement amounts for oncology drugs.  *See*, *e.g.*, Plfs. Ex. 197 (BMS/AWP/000096632-43, at 000096639; *see also* Akscin Dep. at 94-95.

b.      In a document that appears to have been distributed to the sales force, BMS compared spreads on Taxol with spreads on Taxotere.  Taxol generated a 35.5% "margin" between Medicare reimbursement and OTN cost, while the same metrics for Taxotere produced a smaller margin of 12.7%.  Plfs. Ex. 221 (BMS/AWP/000157423-35, at 000157426).  A similar analysis for weekly administration generated a 52% margin for Taxol compared to a 23% margin for Taxotere.  *Id.* at 000157428-29.  Taxol also won out on a three-week administration period, with a 39% margin versus 23% for Taxotere.  *Id.* at 000157430-31.

c.      BMS distributed to the sales force a PowerPoint comparing costs and reimbursement amounts for Taxol and Paraplatin purchased from OTN.  Plfs. Ex. 222 (BMS/AWP/001502304-383, at 001502315-16, 00150330-31); *see also id.* at 001502319 (stating that "[c]linical benefit & reimbursement drive utilization").  Three slides discuss "How Drugs Are Reimbursed," stating that "[m]ost payers use AWP as a basis for calculating allowables"; "payers reference one AWP pricing source" for single source products and "use this value as basis for reimbursement"; and "private payers can vary calculation methodology" for multi-source drugs but "generally reference AWP."  *Id.* at 001502312-14.

199.    The BMS sales force translated these spread marketing signals from management into action and marketed the spread.

200.    For example, BMS "Grand Master" Sales Representative Doug Soule admitted to having discussions with clients about "margin," the term that he uses to refer to the difference between what a customer pays and is reimbursed for a BMS drug.  Soule Dep. at 55.  As Soule testified, "[i]n the process of me fully disclosing everything on my product, oftentimes I would be asked, 'What is your cost and what is the AWP compared to X?'"  "X" was a reference to a competitor's drug.  *Id*. at 57.  Although he tries to focus on the clinical aspects of the drugs, some clients focus more on reimbursement issues and financial aspects, *id*. at 58, and Soule acknowledged that clinics derive much of their revenue from drugs and are therefore interested in the financial aspects of drug reimbursement.  *Id.* at 176.  Soule testified that there is "a margin on every drug used in oncology," including Taxol, *id*. at 109, and the company has over time provided Doug Soule with cost and AWP information.  *Id*. at 160-62.  He also assumes that competitors discuss margins with their clients for the drugs that they sell.  *Id*. at 162.

201.    Furthermore, Soule had discussions with other BMS sales reps about margins.  *Id*. at 167-68:

> Q.  Have you ever had any conversations with other BMS sales representatives about the difference between AWP and actual cost of BMS oncology drugs?
>
> A.  I'm sure.  I could not tell you a specific one, but I'm sure.  It was something that we had to deal with in our business, and often times because of my seniority people would come to me and ask me questions to explain certain things to them.  Sometimes it was just within our own district maybe we would have conversations about what's happening in our workplace.  I'm sure.

202.    Soule also created a number of documents reflecting spread marketing or other discussions with clients about reimbursement issues.  One includes a "Decision Analysis Worksheet," where Soule compared spreads between Taxol and Paraplatin.  *See* Plfs. Ex. 224.

- 63 -

203.    Documents produced by sales representative Barbara Davidson, another "Grand Master," also reveal spread marketing.  *See* Plfs. Ex. 225.

      a.    BMS/AWP/001508052-53 compare profits on Taxol and Docetaxel ($209 per week for Taxol vs. $57.60 per week for Docetaxel) using cost and reimbursement rates;

      b.    BMS/AWP/001508047-61 present various profit scenarios between Taxol and generic paclitaxel, factoring in Paraplatin savings tied to Taxol sales;

      c.    BMS/AWP/001508114-15 compares profits on Taxol and Taxotere, with Taxol coming out on top; and

      d.    BMS/AWP/001508116-17 is an email that documents conversations between Davidson and Cindy, a representative of North Idaho Cancer Center, and shows how spreads adversely affect prescribing decisions.  Based on cost numbers provided by Documedics, "Cindy recommended to the doctors that they consider using more cisplatin [and not BMS's Paraplatin].  She doesn't want to do this and knows it's not as good for patients."  Steven Pond, at BMS, replied in part:  "Given the current environment I find it hard to believe that a decision on what drug to give is based on a small margin and not what is best for the patient.  Congress and others would not be happy if they found out that Documedics and pharmacy directors are telling Doctors to use Cisplatin over Paraplatin based on just the drug prices and not the total APC."

204.    Greg Keighley, BMS's Senior Territory Business Manager for Northern California, admitted that it was important for BMS sales representatives to understand the financial aspects of the drugs that they are promoting (Keighley Dep. at 107), that BMS trained its representatives in reimbursement concepts and drug margins (*id.* at 98-100) and provided

- 64 -

them with reimbursement assistance binders to give customers. *Id.* at 136-40. And although Mr. Keighley gave carefully prepared testimony that financial issues were not frequently discussed with clients, he agreed that some accounts were very sensitive to reimbursement issues (*id.* at 258-89) and that he has had some discussions with customers regarding margins (*id.* at 91-94), including in the context of an official "Practice Efficiencies" program that BMS created for purposes of discussing reimbursement issues with customers. *Id.* at 155-65, 176-84, 267-80.

205.     Call Notes and other memos produced by BMS also highlight discussions between sales representatives and OBOs regarding reimbursement issues. BMS sales representatives are required to make a detailed summary record of all conversations with physicians, which is done by entering information into a computer program called "Call Max," which has been utilized for several years. Soule Dep. 62-63, 71-76. Plfs. Ex. 229 contains examples of Call Notes and memos highlighting discussions relating to reimbursement and/or profitability comparisons between Taxol and Paraplatin and competing regimens.

**C.     J&J**

206.     Centocor, which manufactures, markets and sells Remicade, and Ortho Biotech Products, L.P. ("OBI"), which markets and sells Procrit, are both corporations that are wholly owned by the parent company Johnson & Johnson ("J&J"). J&J Answer, ¶¶ 100, 101,104 (Dkt. No. 789); J&J Rule 56.1 Statement of Facts, ¶15.

207.     In 1990, OBI became an operating company/subsidiary of J&J. Hiriak Dep. at 14:1-6, 14:17-22, 15:1-5; OBI Website (http://www.orthobiotech.com/history.html). Until 1999, Centocor was an independent entity. It was acquired by J&J in 1999. Holveck Dep. at 7:11-16, J&J Answer, ¶ 101 (Dkt. No. 789).

208.     The facts detailed below indicate that J&J exerted general control over Centocor and OBI's operations and specifically set prices for Remicade and Procrit – the drugs at issue

herein.

209.    J&J controls all of Centocor and OBI's pricing, marketing and sales activities. John Hoffman, Centocor's Executive Director of Strategic Customer Relations, testified as a corporate designee under Rule 30(b)(6) that J&J monitors Centocor's marketing activities, strategic plans, annual business plans and monthly sales reports.  Hoffman (Centocor) Dep. at 17:7-10, 58:22, 59:1-17, 60:6-10, 63:7-13, 79:18-22; *see also* David Holveck (former Chairman of Centocor and current J&J executive) Dep. at 16:18-19:19.

210.    J&J chooses the Presidents of both Centocor and OBI.  Holveck Dep. at 23:2-7. The Presidents of the J&J operating companies, including Centocor and OBI, report to a Company Group Chairman from J&J.  Holveck Dep. at 11:7-19, 12:15-13:4 and 13:17-14:21.

211.    There were multiple occasions when J&J initiated discussions as to whether Centocor should increase the WAC price of Remicade.  J. Hoffman Dep. at 80:17-82:4; Holveck Dep. at 65:12-66:14; Plfs. Ex. 842, MDL-CEN0067957-58 (memo to J&J Chairman Robert Savage, responding to J&J "recommendation" to increase price of Remicade).  Each time the price of Remicade was raised, J&J's approval was sought and received before such price increase became final.  Plfs. Ex. 329, MDL-CEN00044499-504 and Plfs. Ex. 372, MDL-CEN00064885-95; Hoffman Dep. 424:21-425:20 and 435:12-17.  J&J's senior management is involved in and approves pricing decisions and proposals by OBI's senior management.  Hiriak Dep. at 201:18-202:3, 231:2-9; Webb Dep. at 54:14-17, 54:22-55:7, 55:15-18, 57:16-21.

212.    J&J regularly reviews and monitors the AWP spreads of Remicade and Procrit. Plfs. Ex. 235, MDL-OBI00007628 (also Defs. Ex. 2780) (letter from J&J Chairman Robert Savage seeking info on all operating company spreads and spread policies); Plfs. Ex. 251, MDL-CEN00021066 (memo from Centocor President J. Scodari discussing Remicade's 30% spread

and noting "[t]his issue got close scrutiny within the J&J pharm group last year…").

      **1.**      **J&J knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors**

213.      Outside of the ESRD program, Medicare carriers reimburse Procrit based on its AWP or the lower AWP of Procrit and Epogen.  J&J Rule 56.1 Statement, ¶ 88.[3]

214.      Centocor knew that Medicare would be a major source of reimbursement for Remicade, and Centocor also knew that Medicare Part B payments were based on AWP.  Plfs. Ex. 249, MDL-CEN00002717-878 (Remicade marketing plan, p. 51 Medicare "covered amount will be 95% of AWP"); Laura Glassco Dep. 49:11-50:1; Julie McHugh Dep. 172:3-16.

215.      As J&J executive Diane Ortiz recognized, "inflated AWPs will increase the cost of prescription drugs to the commercial and public payers," including Medicare.  Plfs. Ex. 327, MDL-CEN00103686-87.

216.      Centocor executive Cheryl Cohen stated even more bluntly that two of Remicade's strengths were its business model of in-office infusion and the fact that it was reimbursed by Medicare.  She noted that AWP reform was a threat to that business model.  Plfs. Ex. 303, MDL-CEN00035294-310, 2002 Corporate Accounts Business Plan at 4, 6-7.

---

[3] Procrit® is OBI's brand of epoetin alfa, which competes with Amgen's epoetin alfa offering called Epogen®. J&J Rule 56.1 Statement, ¶¶ 21-22.  Notwithstanding the different brand names, Procrit and Epogen are identical substances and both are approved for the same indications.  J&J Rule 56.1 Statement, ¶ 24.  In 1985, Amgen and OBI entered into a Product License Agreement ("PLA") governing U.S. sales of epoetin alfa.  J&J Rule 56.1 Statement, ¶ 26.  Pursuant to this PLA, OBI has the exclusive license to market and sell epoetin alfa in the United States for all approved indications except anemia in patients undergoing dialysis for end stage renal disease (ESRD). Amgen retained the exclusive right to market epoetin alfa for treating ESRD patients.  J&J Rule 56.1 Statement, ¶ 26; Hiriak Dep. at 83:3-11, 83:15-17; OBI Website (http://www.orthobiotech.com/history.html).

Physicians are **not** bound by the PLA, and may stock and administer either drug to treat their dialysis and non-dialysis patients.  J&J Rule 56.1 Statement, ¶ 27.  Medicare reimburses Procrit and Epogen at a non-AWP based statutory rate when used to treat ESRD patients.  Medicare reimburses approximately 95 percent of ESRD use.  Plfs. Ex. 263, MDL-OMP009638-39.  Private payers, the majority of which reimburse based on AWP, reimburse the remaining 5 percent.  Kling Dep. at 105:2-6; Webb Dep. at 67:9-22, 68:1-9.

In August 1995, Amgen sued OBI for breaching the PLA by "intentionally promoting and selling Procrit into the dialysis market" and filed a demand in the arbitration proceedings seeking damages and determination of Amgen's right to terminate the PLA (the "termination case").  *See generally Amgen, Inc. v. Ortho Pharm. Corp.*, 708 N.E.2d 385, 387-88 (Ill. Ct. App. 1999).

217.     Many senior OBI managers have testified that they understood that AWP was used as a benchmark for public and private reimbursement of Procrit for non-ESRD treatment. Webb Dep. at 45:2-6, 46:15-22, 50:4-22, 51:5-6, 51:9-10; Kling Dep. at 105:7-12; Dooley Dep. at 110:4-113:1; Hiriak Dep. at 202:17-203:1.

218.     Even before it launched Remicade, Centocor was well aware of how important it was to make sure all major payors were reimbursed for Remicade at a high price level.  The initial Remicade Marketing Plan identified the need to "ensure payer formulary acceptance" as a "Key Strategic Imperative."  Plfs. Ex. 249, MDL-CEN00002717-878 at 2813; *see also id*. at 2758.

219.     A major focus of Centocor's marketing efforts for Remicade was on providing physicians an enormous amount of help in obtaining reimbursement for Remicade.  Centocor's efforts included the creation of a "reimbursement hotline to assist physician offices, a patient assistance program, detailed materials for the sales force to use to provide guidance to physicians and even partnering with a company that would accept assignment of benefits from physicians for their Remicade claims.  Plfs. Ex. 249, MDL-CEN00002717-878 at 2825; Plfs. Ex. 253, MDL-CEN00003607-73 at 3631 (listing various PMP materials available); Plfs. Ex. 290, MDL-CEN00014840-63 (Managed Care Billing Guide for physicians).

220.     Similarly, a major focus of OBI's marketing efforts for Procrit was on providing physicians an enormous amount of help in obtaining reimbursement for Procrit.  OBI's efforts included the creation of PROCRITline, a reimbursement hotline to assist physician offices, and a reimbursement assurance program that guaranteed reimbursement for physicians.  Plfs. Ex. 246, MDL-OBI00012153-99 at 12186; Plfs. Ex. 270, MDL-OBI00062507-661 at 62532-42.

**2.      J&J caused AWPs to be published for its Subject Drugs**

221.     J&J controlled the published AWP for Remicade and Procrit.

222.    In the initial marketing plan for Remicade, Centocor discussed "setting" the AWP, not recommending or suggesting an AWP.  Plfs. Ex. 249, MDL-CEN00002717-78 at 2813.  Centocor decided to create a 30% spread for Remicade by setting the AWP at 30% above WAC.  McHugh Dep. 134:11-135:10.

223.    In the Initial price announcement Centocor provided only an AWP price to Publishers.  There was no WAC for Publishers to calculate a different AWP.  Plfs. Ex. 250, WKH01029.

224.    And Centocor knew that the Publishers would simply republish what Centocor provided them.  For instance, John Hoffman and President Julie McHugh both admitted that Centocor never had any thoughts or concerns that the AWPs Centocor announced would not be accepted and published by the Publishers.  Hoffman Dep. 134:2-137:2; McHugh Dep.183:22-184:12 and 229:5-10.

225.    For each of the four price increases for Remicade, Centocor announced the new "suggested" AWP at the same time it announced a new list price.

a.    On June 18, 1999, Centocor increased the WAC price of Remicade by 4.5% and simultaneously announced an increased AWP price of $611.33, equal to a 4.5% increase.  Plfs. Ex. 822, MDL-CEN00000005, 7, 13, 13718.

b.    On March 30, 2000, Centocor increased the WAC price of Remicade by 4.9% and simultaneously announced an increased AWP price of $641.28, equal to a 4.9% increase.  Plfs. Ex. 821 (composite exhibits) and 824, MDL-CEN00082702-03 (instructing the sales force to immediately advise doctors of price increase and have the doctors tell payors to update their records).

c.    On November 3, 2000, Centocor increased the WAC price of Remicade

by 3.8% and simultaneously announced an increased AWP price of $665.65, equal to a

3.8% increase.  Plfs. Ex. 820 (composite exhibits).

       d.     On June 13, 2001, Centocor increased the WAC price of Remicade by

3.9% and simultaneously announced an increased AWP price of $691.61, equal to a 3.9%

increase.  Plfs. Ex. 821 (composite exhibits) and Plfs. Ex. 295, MDL-CEN00070430-31

(instructing the sales force to immediately advise doctors of price increase and have the

doctors tell payors to update their records).

226.    Within the J&J companies, most AWP to WAC spreads were 20%.  No spreads

were higher than Remicade's 30%.  Plfs. Ex. 251, MDL-CEN00021066.  On several occasions,

Centocor contemplated changing the WAC to AWP spread on Remicade from the original 30%.

Plfs. Ex. 282, MDL-CEN00054641-43 (memo analyzing different options to raise WAC or

lower AWP to create a 25% spread).  This analysis shows that Centocor knew it alone could

control the spread for Remicade, and that lowering the spread would cost Centocor's doctor

customers money.

227.    When OBI launched Procrit in 1991, OBI, with the approval and involvement of

its parent company, set the list price for all Procrit dosages.  Pearson Dep. at 180:6-8; Webb Dep.

at 57:16-21.  At OBI, "list price" means the "wholesale acquisition price" ("WAC") of the drug.

Pearson Dep. at 177:7-13.

228.    Throughout the Class Period, OBI computed and set the AWPs for Procrit by

mechanically adding a 20% markup to the list price.  Dempsey Dep. at 72:3-5; Hiriak Dep. at

202:8-16, 205:14-16; Webb Dep. at 64:3-5, 64:10-14-65; Kling Dep. at 109:17-110:17.  OBI

witnesses explained that OBI added 20% to list because J&J was traditionally a "20 percent

house." Hiriak Dep. at 205:8-206:9; Webb Dep. at 58:8-17, 58:20-22; Kling Dep. at 109:17-110:17.

229.   The 20% markup was applied uniformly at the time of launch and at every price change thereafter, irrespective of the actual costs of manufacturing Procrit, the actual costs connected with administering Procrit, or any discounts, rebates or chargebacks provided to Procrit customers. *See, e.g.,* Kling Dep. at 109:17-110:17; Hiriak Dep. at 205:8-206:9; Webb Dep. at 64:3-15, 64:10-14, 64:18-65:9.

230.   Senior J&J management understood that the pharmaceutical divisions set the WACs and AWPs of their respective drugs. On December 7, 2000, Robert G. Savage, the J&J Company Group Chairman for the J&J pharmaceutical group, sent an internal letter to several J&J pharmaceutical division Presidents (including Gary Reedy of OBI and David Holveck of Centocor), seeking information regarding the manner by which the divisions "set" those AWPs:

> Please find attached correspondence from Pete Stark to Ralph Larsen providing specific information on the practice of a number of US Pharmaceutical companies who have been accused of knowingly and deliberately falsely inflating their representations of AWP and direct prices. Although Johnson & Johnson is not being accused of these practices, ***we would like to be aware of your current policy in setting AWP*** and whether there are variations to this policy across the brands, strengths and packings you market.

Plfs. Ex. 235, MDL-OBI00007628 (emphasis added).

231.   Catherine Piech, a pricing expert for J&J's Pharmaceutical Group Strategic Marketing (PGSM) (Pearson Dep. at 312:8-313:8), a J&J subsidiary responsible for approving strategic price actions of all J&J pharmaceutical divisions, sent a memo to OBI senior management expressing her surprise that any entity other than J&J could control the WACs and AWPs that were published for J&J drugs, stating: ("I'm not sure how a survey of wholesalers

could produce a higher spread since *branded companies typically set and publish/provide their WACs and AWPs*.")  Plfs. Ex. 236, MDL-OBI00040389-90 (emphasis added).

232.    OBI's management, upon realizing that Aranesp, a competing drug from Amgen, had a spread advantage, considered increasing Procrit's AWP from a 20 to a 25% markup over list price, but in the end chose not to do so.  Hiriak Dep. at 283:6-22, 284:1-6; J&J Rule 56.1 Statement of Facts, ¶ 93.  This analysis shows that OBI knew it alone controlled the spread for Procrit.

233.    OBI increased the price of Procrit eight times between 1997 and 2005.  OBI first raised its list price for certain NDCs of Procrit in February 1997 and then again shortly thereafter in January 1998.  In anticipation of Amgen's introduction of Aranesp, OBI aggressively raised the price of Procrit twice in 2000 (in January 2000 and again in November 2000) and once again in September 2001.  To further compete with Aranesp, OBI raised Procrit's list price in June 2004, December 2004 and April 2005.  J&J Rule 56.1 Statement of Facts, ¶ 77.  An August 10, 2000 document titled "Ortho Biotech Inc. Historical List Price Change Procrit," and a document titled "Ortho Biotech Products, L.P.  Historical Pricing Actions," together reflect Procrit list price changes from 1996 through early 2002.  Plfs. Ex.  348, MDL-OBI00055929; Plfs. Ex. 349, MDL-OBI00038306.

234.    At the time of launch, and every Procrit price change prior to June 8, 2004, OBI sent a communication to all of the independent price Publishers (*e.g.*, *Red Book*, *Blue Book*, *Medispan* and *First DataBank*), its wholesalers and distributors announcing its new Procrit list prices *and* corresponding AWPs that OBI had calculated internally.  *See* Plfs. Ex. 237, WKH 77797-801 (referred to by OBI in 1997 as "New AWP"); Plfs. Ex. 369J (MDL-OBI00008666-67); Plfs. Ex. 238, WKH 02434-38 (referred to by OBI in 1998 as "New AWP"); Plfs. Ex. 359,

MDL-OBI0004515-17; Plfs. Ex. 978 (MDL-OBI00002837); Plfs. Ex. 239 (WKH 02446-47

(referred to by OBI in 2000 as "AWP")); Plfs. Ex. 369F (MDL-OBI00056538); Plfs. Ex. 360,

MDL-OBI00056534-35; Plfs. Ex. 369G (FDB-AWP035797-79); Plfs. Ex. 361, MDL-

OBI00002835; Plfs. Ex. 358, MDL-OBI00002833; Dempsey Dep. at 92:10-18; Hiriak Dep. at

203:12-204:1; J&J Rule 56.1 Statement of Facts, ¶¶ 73, 77.

235.    The AWPs that OBI sent to Publishers were not characterized by OBI as mere

"recommendations" or "suggestions."  *See, e.g.,* Plfs. Ex. 237, WKH 77797-801 (referred to by

OBI in 1997 as "New AWP"); Plfs. Ex. 238, WKH 02434-38 (referred to by OBI in 1998 as

"New AWP"); Plfs. Ex. 369J, MDL-OBI00008666-67 (referred to by OBI in 1998 as "New

AWP"); Plfs. Ex. 239, WKH 02446-47 (referred to by OBI in 2000 as "AWP"); Plfs. Ex. 369F,

MDL-OBI00056538 (referred to by OBI in 2001 as "AWP"); Plfs. Ex. 369G, FDB-

AWP035797-79 (referred to by OBI in 2001 as "AWP").

236.    OBI management intended and expected that the actual AWPs that it

communicated to the compendia would be published without question, and OBI witnesses

testified that they could not recall a single instance when the actual AWP prices provided by OBI

were not published.  *See, e.g.,* Webb Dep. at 66:16-21, 67:1-8; Hiriak Dep. at 214:18-215:1;

Kling Dep. at 103:2-5, 115:21-22, 116:1-22.

237.    OBI management knew that clinics, physicians, hospital outpatient clinics and

retailers billed private insurers, patients and Medicare based on a percentage of AWP within or

outside of Medicare.  Webb Dep. at 70:2-12; Dooley Dep. at 110:4-111:14, 164:1-165:22),

166:1-4; Dempsey Dep. at 70:5-12; Kling Dep. at 105:7-12.  OBI management also was aware

that public and private insurers used the compendia to determine the AWPs of drugs for

reimbursement purposes.  Kling Dep. at 105:2-6; Webb Dep. at 67:9-22, 68:1-9.

238.    Beginning June 8, 2004, OBI continued to report Procrit list prices to Publishers, but no longer reported Procrit AWPs.  Hiriak Dep. at 205:1-7.  J&J Rule 56.1 Statement of Facts, ¶ 77.  However, this change in practice did not affect OBI's control over the Procrit AWPs, because OBI knew that major Publishers such as *Red Book*, that did not receive AWPs from OBI, would compute Procrit AWPs based on OBI's historical 20% markup over list price. Pearson Dep. at 179:3-12.

**3.    J&J's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average, and J&J manipulated its AWPs and spreads**

**a.    J&J did not include discounts in its reported AWP and did not report an actual average**

239.    Both Centocor and OBI adopted high AWPs and offered discounts to physicians that were not publicly disclosed.

240.    Centocor acknowledges that its AWP for Remicade was simply the WAC price plus 30%.  The AWP did not represent any price reductions of any kind, and Cenotocor admits that it never sold any Remicade to anyone at AWP.  The highest price Centocor ever charged for Remicade was WAC.  Glassco Dep. at 53:11-20; McHugh Dep. at 129:3-12.

241.    Centocor did provide its customers with several types of price reductions, including prompt payment discounts and service fees.  The prompt pay discounts, up to 2%, were given to customers who paid their bill within a certain timeframe.  McHugh Dep. at 315:12-16.

242.    Centocor also paid "service fees" to specialty distributors who handled Remicade and delivered it to physicians.  Hoffman Dep. at 394:9-395:18.  However, Centocor never calculated those fees to compensate those distributors for services provided, nor did Centocor make any reasonable estimation of the value of the "services" received from the distributors. McHugh Dep. at 313:15-316:13.

243.    Rather than adjusting Procrit's AWP to reflect a reasonable benchmark number, OBI's management continued to set Procrit AWPs at 20% above list price.  Kling Dep. at 110:14-17.

244.    Throughout the Class Period, OBI offered a variety of discounts and rebates to numerous customer types, including physicians, retail pharmacies, hospitals, PBMs, GPOs; wholesalers, physician suppliers and long-term care providers to stimulate Procrit sales.  *See, e.g.*, Kling Dep. at 16:12-17:21, 34:2-13, 34:14-20, 165:10-21, 166:12-168:14, 168:15-169:21, 189:15-190:6, 193:1-21; Dempsey Dep. at 28:16-29:1, 109:3-110:12, 121:7-122:18, 126:11-17, 132:3-133:19, 143:2-6; Plfs. Ex. 240, MDL-OMP00049798; Robbins Dep. at 126:13-18, 138:3-140:6, 231:7-17, 232:11-233:3, 235:13-236:14, 237:1-5; J&J Rule 56.1 Statement, ¶¶ 45-51 (pharmacies), ¶¶ 55-62 (physicians), ¶¶ 64-65 (hospitals, group purchasing organizations ("GPOs"), health plans).

245.    For example, beginning in the early 1990s, OBI offered a 5% off-invoice discount to non-dialysis customers (Kling Dep. at 16:12-17:21, 168:5-169:21; Robbins Dep. at 231:7-17; Dempsey Dep. at 121:7-22) and a 1-2% rebate to PBMs.  Dempsey Dep. at 28:16-29:1.  Physician distributors received a 2% administration fee from OBI.  Dempsey Dep. at 126:11-17, 132:3-133:19.  Hospitals and acute-care facilities were eligible for up-front discounts ranging from 5 to 7%.  Kling Dep. at 193:1-21.

246.    Throughout the 1990's, OBI field sales representatives periodically circulated promotional flyers to physicians and hospitals offering enhanced discounts to purchasers of an additional 3%.  Robbins Dep. at 232:11-233:3, 235:13-236:14.

247.    In March 1997, defendant OBI created an "Express Gram" advertisement to be sent to physicians promoting a new discount program for physicians purchasing Procrit.  *See*

Plfs. Ex. 340, MDL-OBI00037345.  This limited time promotion offered a five percent off invoice discount for purchases of 10,000 and 20,000 *u*/ml put-ups.  *Id.*

248.     OBI offered one to two percent rebates and discounts to Managed care companies and PBMs.  Dempsey Dep. at 28:16-29:1.

249.     In response to Amgen's introduction of a competing drug Aranesp in 2001, OBI sought to increase the level of rebates and discounts that it offered to its customers.  Robbins Dep. at 138.

250.     During 2002, OBI offered the Preferred Purchasing Program to physicians, which included a 5% off-invoice discount, 1% dating, 1% administrative fee to GPO, 2% administrative fee to distributors and offered additional rebates in 2002 of 1%-5.25% and in 2003 of 1%-7%.  In the hospital market, OBI offered a 7% off-invoice discount as well as a National Cancer Institute 5% discount, 6% bundle rebate and a 2% administrative fee to GPOs.  Plfs. Ex. 341, MDL-OMP0049464.

251.     In 2003-2004, to help offset the decreasing market share, OBI created a new contract for physicians offering even greater discounts and rebates, including an up-front discount of 22 percent for Procrit purchases and an additional 2% rebate if market-share or volume-incentive levels were achieved.  *See* Dempsey Dep. at 121:7-122:18, 124:22-125:15.

252.     In an e-mail dated December 5, 2001 from Ken Nelson to Shannon Salmon and Bill Pearson, OBI's internal calculation of Procrit ASP determine that it was equal to 92% percent of its WAC.  Plfs. Ex. 319, MDL-OBI00026235-26236.

253.     Even though OBI offered these significant and varying rebates and steep off-invoice discounts throughout the Class Period, OBI never adjusted its method for setting its AWP at 20% above list price.

b.     **J&J manipulated its pricing to create spreads**

254.     Because Procrit and Epogen are identical substances, and physicians can substitute and administer either drug for the other, OBI's management considered Epogen a competitor throughout the Class Period (Pearson Dep. at 401:15-22, 402:1-5; Dempsey Dep. at 110:13-112:1) and competed against Epogen by keeping list price and AWP at parity with that of Epogen (Plfs. Ex. 263, MDL-OMP0049638-39), while seeking to offer customers greater rebates and discounts than Amgen.  Plfs. Ex. 270, MDL-OBI00062507-661 at 544.

255.     In a memorandum to senior management, OBI's Director of Reimbursement, Cathy Dooley, emphasized that the company's pricing strategy must enable physicians to receive an amount of reimbursement from Medicare that made them "whole" prior to collecting any co-payment revenue from the patient.  See Ex. 339, MDL-OBI00061803-07, at 807.

256.     In a transparent attempt to offset the government's decision to lower the reimbursement rate by 5%, from AWP to AWP-5%, which went into effect on January 1, 1998, OBI, after having never raised its price in the six years since launching Procrit, twice raised its list price, first on its most popular 10,000 unit vial in February 1997 by 3.5%, and then once again merely ten months later in January 1998, by an additional 1.8% to ensure that the ***amount*** of reimbursement received by physicians from the government (due to the reduction to AWP-5%) remained essentially unchanged.  Plfs. Ex. 263, MDL-OMP009638-39; Plfs Ex. 348, MDL-OBI00055929; Plfs Ex. 349, MDL-OBI00038306.

257.     When asked what factors were weighed when OBI considered taking Procrit price increases, Thomas Hiriak, OBI's Executive Director of Strategic Accounts and 30(b)(6) witness testified:

> I think competitive environment, what's going on with the competition, their price, the reimbursement environment, what's

going on in the reimbursement environment.  ***Obviously margins and what could potentially happen to physicians' margins***.  Timing since the last price increase, future marketplace changes, what potential reaction would be of our competitors or scenarios based on that, if there is anything in our potential contract that could mitigate the price increase.  Those are the things that come to mind.

Hiriak Dep. at 228:21-22, 229:1-13 (emphasis added).

258.    One OBI manager, noted in a memorandum regarding the advantages and disadvantages of taking a Price Increase, that the "Pro's" for taking a price increase include "Greater Discounting flexibility" and "Higher reimbursement from private payors – Possible positive perception from Physicians."  *See* Plfs. Ex. 244, MDL-OBI00008374-75; Plfs. Ex. 355, MDL-OBI00015311-12 (duplicate).

259.    Cathleen Dooley referred to the spread between AWP reimbursement and acquisition cost as a "windfall" for physicians.  Plfs. Ex. 365, MDL-OBI00061785.

### c.    J&J hid the true price of its products

260.    When discussing Remicade costs with health plans, Centocor was careful not to reveal the physicians' acquisition cost, but only to reference the AWP price.  For instance, Centocor's Cost Minimization Model or Cost Comparison Model software was used with health plans to encourage them to provide reimbursement for Remicade.  Glassco Dep. at 39:21-40:14 and 56:4-57:6.  That software only references AWP, not WAC or acquisition cost.  Plfs. Ex. 274, MDL-CEN00090081-84 and Plfs. Ex. 285, MDL-CEN00024708-09.  This is the opposite of the Centocor software used with physicians, which specifically calculated physician profit based on the AWP spread.

261.    Centocor's Laura Glassco, who talked to physicians at PMP seminars about profiting from the AWP spread, testified that she would never talk to health plans about physician profit.  Glassco Dep. at 113:7-13, 137:19-22.

262.   Centocor's Senior Director for Reimbursement Services, Michael Ziskind, detailed Centocor's policy of hiding acquisition price from third-party payors and class-members.  In a July 6, 1999 memo on the background of AWP and spread, Ziskind explained that the "'cost of therapy' varies widely based on the audience."  Ziskind then explained Centocor's strategy of hiding the true price of Remicade:

> Therefore, when we discuss the cost of therapy and when the cost of Remicade is compared to other treatment options, it is important to understand the audience's perspective.  For example, if we were to routinely use cost to wholesalers we would set payers' expectations too low.  If we were to routinely use AWP, we might scare off some providers who are concerned about acquisition cost.  My recommendation is to adopt some standard description so that the audience knows what "cost" is being cited.  I would not, however, include both cost figures in the same presentation because that may highlight spread more than we would like, even though our spread is well in the range of other infused drugs.

Plfs. Ex. 260, MDL-CEN000085404-05.

263.   On the one occasion where Centocor discussed with the Federal government the price of Remicade, it hid the truth.  When Centocor applied for a specific J-Code for Remicade, the application asked for Remicade's wholesale price.  Centocor responded by saying that the wholesale price was AWP, which Centocor well knew was higher than the price it, or wholesalers, ever sold Remicade for.  Plfs. Ex. 261, MDL-CEN00108051-54.

264.   On August 6, 1996, Cathleen Dooley, OBI's Director of Reimbursement (Dooley Dep. at 23), sent a memorandum to W. Thomas Amick, OBI's Executive Director of Sales, warning that if the government conducted a survey and, in fact, learned of the "significant" discrepancy between AWP and actual acquisition cost for non-End Stage Renal Disease treatment, the likely consequence would be that the government would take action to lower the reimbursement rate for Procrit providers in non-dialysis:

- Non-ESRD use of Epoetin alfa is reimbursed at 80% of the AWP allowable amount with beneficiaries being responsible for the remaining 20%.

- A drug survey is imminent and would show that no physicians are paying AWP in the market place. A survey would look at average acquisition price and associated overhead costs. If there were a significant difference between AWP and acquisition price (which there would be), the reimbursement rate would be lowered. Again reimbursement rates can be lowered by survey or an arbitrary pricing decision.

Plfs. Ex. 339, MDL-OBI00061803-07 at 05 (emphasis added).

265. When OBI considered taking a price change, it was careful not to raise its list price above that of Epogen because OBI did not want to raise the undue attention of HCFA, which could trigger a pricing survey or investigation by the government. Webb Dep. at 103:9-15.

266. In a memo dated December 2, 1997 to Gary Reedy, OBI's Vice President of Sales and Marketing, Ms. Dooley highlighted several key "Implications for Increase over Parity" including: (1) "Change in list price could trigger a drug pricing survey by HCFA," (2) "You may have a pricing survey anyway, but raising red flags could trigger it earlier," and (3) "Consequence of pricing survey could be acquisition, FSS or ESRD reimbursement rate in non-dialysis." Plfs. Ex. 262, MDL-OBI00061052-53 at 52.

267. Ms. Dooley has admitted that each of the alternative reimbursement rates – namely, acquisition, FSS or ESRD – were below the AWP reimbursement rate. Dooley Dep. at 519.

268. A day later, Gary Reedy sent a memo dated December 3, 1997 to OBI's President, Carol Webb, recommending against OBI taking a price increase above parity for similar reasons:

We have discussed the possibility of pushing PROCRIT pricing above the current established list price and recommend we <u>do not</u> take this action for the following reasons.

\* \* \*

Legislation was passed this year, which effective 1/1/98 will lower the reimbursement rate to AWP less five percent.  ***The government is very aware of the AWP pricing on epoetin alfa and there is great sensitivity around this issue (i.e., companies elevating AWP prices to incent physicians to use more product due to greater reimbursement potential).***

***By implementing our recommended 1.7% price increase on PROCRIT's 10's and 20's, we will reach parity with the established list price of Epogen but not create a higher one.  We feel creating a higher list price could raise undue attention and possibly trigger a drug survey by HCFA because of the difference in list price for the two identical drugs, PROCRIT and Epogen.***

Plfs. Ex. 263, MDL-OMP0049638-39 (emphasis added; underline in original).

269.    Ms. Webb agreed that the risk of triggering a government price survey was a sound basis for advising against OBI taking a greater price increase at that time.  Plfs. Ex. 263, MDL-OMP0049638-39; Webb Dep. at 103:9-15.

270.    A month later, Ms. Dooley, in an e-mail dated January 7, 1998, explained to Richard Gatens, OBI's recent Chief Financial Officer, that it was ***fortunate for OBI*** that Medicare was in the dark as to the actual average acquisition price of Procrit, because if the government actually knew, it would lower reimbursement to providers:

> ***They initiated a pricing survey in 1994 that was cancelled mid-way*** as there was a regulatory glitch that they did not take into effect.  ***This was fortunate for us.***
>
> A pricing survey is one of the two ways the Secretary of Health can set a price.  ***If they had done a survey and come up with an average price, this would have changed the reimbursement.***  This is what is happening with Epogen used in ESRD – they did a survey last year and they are now considering lowering the reimbursement rate to $9.00/1,000 units from the current $10.00/1,000 units.

\* \* \*

> **The only way they could correct the current system is to require an invoice be submitted with each Medicare claim that is sent in.** This would be very cumbersome and the medical providers and Medicare carriers have rejected this...***Right now they do not know what the cost is for different providers.***

Plfs. Ex. 259, MDL-OBI0058842-44 at 58842 (emphasis added); *see also* Dooley Dep. at 536.

271.    In the same e-mail, Ms. Dooley also noted that the government had not yet figured out an obvious method for determining the price at which Procrit was sold to providers, stating:

> If they were smart, they would expand the current demonstration project they have to expand the depots and only allow drugs to be purchased through identified depots where pricing could be controlled.

Plfs. Ex. 259, MDL-OBI0058842-44 at 58842.

272.    OBI knew that consumers were unaware of the discrepancy between AWP and average acquisition cost, and indeed would have been unhappy to learn of it.  In an e-mail from Cathleen Dooley to Richard Moran dated January 6, 1998, Ms. Dooley highlighted that patients would be surprised to learn that physicians bill patients 20% off AWP, rather than off of the lower acquisition cost:  "***This will be a sensitive issue because the physician is able to bill Medicare and the patient off of AWP; the patient's 20% co-pay is higher than it would be if it was billed off of acquisition cost (public relations' issue).***"  Plfs. Ex. 259, MDL-OBI0058842-44 at 58843 (emphasis added).

273.    Both Centocor and OBI's rebate contracts contained confidentiality clauses, which prevented the parties receiving rebates from revealing the amount, or even the existence of rebates on Remicade or Procrit.  Plfs. Ex. 297, MDL-CEN00055412-22 (sec. 1.5 and 3.1); Plfs. Ex. 322, MDL-OBI00029484-91 (¶ 8); Plfs. Ex. 325, MDL-OBI-00030677-84 (¶ 8); Plfs. Ex.

255, MDL-OBI00054909-13 (¶ 7); Plfs. Ex. 320, MDL-OBI00054848-51 (¶ 7); Plfs. Ex. 321,

MDL-OBI00055218-20) (¶ 7); Defs. Ex. 2805 (sec. 1.5 and 3.1).

274.    In 1993, OBI entered into contractual arrangements with some pharmacy

customers requiring that the terms of the contract be kept confidential.  *See* Plfs. Ex. 256, MDL-

OBI00055078-82, at ¶ 7.  These contracts offered rebates but included no requirement that the

various rebate payments be reported and/or passed through to Medicare, Medicaid or any other

third-party payors.  Rather, the contract required that the rebate payments be kept confidential.

275.    OBI's first physician contract program commenced in January 2001.  An example

of the contract, Plfs. Ex. 322, MDL-OBI00029484-91, contains no requirement that rebates be

reported and/or passed through to Medicare, Medicaid, and other third party payors, and there is

a confidentiality clause appearing at paragraph 8.

**4.      J&J marketed spreads**

**a.      J&J marketed the spread on Remicade**

276.    Centocor created the AWP spread and AWP and WAC prices with the intention

of ensuring that doctors buying Remicade could make a profit.  Centocor recognized that it was a

"Key Strategic Imperative" to "set AWP at a level that preserves a modest margin for providers,

ensures break-even potential for Medical providers, and is consistent with payer price

elasticities."  Plfs. Ex. 249, p. 97 (Centocor Initial Marketing Plan) (MDL-CEN00002717-878).

277.    Centocor developed and implemented a multi-faceted Practice Management

Program ("PMP") to show physicians how to make money by buying, infusing and billing for

Remicade.  The PMP began with the launch of Remicade in 1998 and continued for several

years.  Defs. Ex. 2831 and PMP training materials dated 2000, Plfs. Ex. 253, MDL-

CEN00003607-73, p.65; Glassco Dep. at 20:14-21:22; McHugh Dep. at 252:15-253:14 and

355:10-356:13.

278.    Among the PMP materials Centocor developed was a Financial Impact
Worksheet, which a physician could use by filling in:  his acquisition cost for Remicade; the
percent discount off AWP he would get in reimbursement (the AWP was pre-printed on the
form); and his patient case load and the number of vials per patient.  From this a physician could
calculate his estimated "margin per vial" "revenue per patient" and "monthly revenue from
Remicade".  Plfs. Ex. 252, MDL-CEN00003478-500 (Office Based Infusion Guide, with
"Financial Impact Worksheet on p. 8 and stating that one of the benefits of infusing Remicade is
a "financial benefit to the physician's practice", p. 4); McHugh Dep. at 395:19-396:15
("intention was that the physician would fill out the score sheet"); and 479:6-480:7.

279.    The Financial Impact Worksheet was also available on Centocor's website.
Ziskind Dep. at 222:21-223:4.

280.    Centocor also developed a more detailed, more sophisticated PMP software
program that allowed physicians, with the assistance of a Centocor representative, to input
detailed information about their various health plan payors and their patient mix, to reach a more
detailed calculation about the amount of profit that could be obtained from infusing Remicade.
Plfs. Ex. 289 (software model and hardcopy print-out); Ziskind Dep. at 361:7-373:6; McHugh
Dep. at 384:6-385:5.

281.    Centocor's PMP training materials recognized the importance of selling a
physician on the profitability of performing Remicade infusions in his office, stating that the
benefits of in-office infusion include "potential financial benefits for the physician's practice;"
that "reimbursement issues are the focal point of the economic presentation;" and that one of the
sales representatives' overall goals is to help the practice realize "economic benefits (*e.g.*,
increased revenue).  Plfs. Ex. 253, MDL-CEN00003607-73, pp. 7, 32 and 44.  The training

manual also confirms that a benefit of the PMP for Centocor is "Increased demand for Remicade." Plfs. Ex. 253, MDL-CEN00003607-73, p.10.

282.    Keith Patterson, a former Centocor Marketing Director, admitted that Remicade was marketed on a physician's "Return To Practice" or profit, similar to AZ's Zolodex. Patterson Dep. at 311:21-313:17. Patterson also confirms the Centocor touted a physician's profit or "financial incentives" as a reason to conduct in-office infusions. Patterson Dep. at 316:17-317:15.

283.    Centocor had sales representatives, called reimbursement specialists, whose sole job was to talk to prescribing doctors about reimbursement and profitability of Remicade. McHugh Dep. 122:11-123:6 and 124:12-15.

284.    Centocor also brought scores of doctors to PMP seminars, where the economics and profit potential of the AWP spread on Remicade was explained directly. These seminars were at hotels and restaurants and were often multi-day events. Glassco Dep. at 27:7-29:11.

285.    At these PMP seminars, physicians were given a detailed presentation about how they could profit from Remicade. Centocor senior sales executive Laura Glassco provided the PowerPoint presentations she used for such seminars and walked through her presentation on how doctors can profit from both Medicare and private insurers by using the AWP spread on Remicade. Glassco Dep. at 105:4-108:12, 109:15-19, 111:10-112:18; and Plfs. Ex. 254, MDL-CEN00090285-302. Glassco expressly used the term "profit" to highlight the AWP spread on Remicade. Plfs. Ex. 254, MDL-CEN00090285-302, at MDL-CEN00090300 and 90302; Glassco Dep. at 14:16-47:8.

286.    Centocor knew that doctors were motivated, in part, by profit and instructed its sales representatives to talk to doctors about patient costs and then to "go for the greed by

showing how much money they can make."  Plfs. Ex. 981.  Indeed, Centocor executives held up as examples of good salesmanship reports of how sales reps sold physicians on using Remicade based on the AWP spread.  Plfs. Ex. 272, MDL-CEN00090283-84.

287.    At the same time Centocor was operating its wide-scale PMP campaign, its sister J&J Company, OBI, was telling its employees that it "is absolutely inappropriate to sell product based upon the difference between AWP and acquisition price"  Defs. Ex. 2767.

288.    Over a year after this case was filed, in June 2002, Centocor reversed its prior position and told its employees not to answer physician questions about Return To Practice or revenues from Remicade billing, saying that such answers would violate Centocor's policies. Defs. Ex. 2835, questions 3, 4, 12, 14c and 15; Glassco Dep. at 113:17-114:5.

### b.    J&J marketed the spread on Procrit

289.    Prior to bringing Procrit to market, OBI was aware that the amount of reimbursement that physicians, hospitals and retail pharmacists received was a primary driver in those markets.  Hiriak Dep. at 92:1-93:16, 94:1-95:12.  By 1993, OBI knew that oncologists made a "significant" portion of their revenue from the drugs they prescribed.  Hiriak Dep. at 96:13-15, 96:18-97:14, 156:21-157:10, 157:12-15, 159:18-19, 160:3-18.

290.    In an internal document titled "1998 Reimbursement Update and Challenges", Cathleen Dooley, OBI's former Director of Reimbursement, admitted that from at least the early 1990s through late 1997, the Procrit "[m]arket [was] driven by MD profit incentives."  Plfs. Ex. 242, MDL-OBI00058888-923 at 58922.

291.    In 1999, a McKinsey and Company report for OBI concluded that as of that date, Procrit had primarily been "[u]sed by physicians because it is economically attractive."  Plfs. Ex. 243, MDL-OBI00006641-698 at 6659.  McKinsey and Company also found that "physicians have significant economic incentives to prescribe supportive care drugs such as Procrit, due to

- 86 -

revenue and profits from stocking and administering."  Ex. 243, MDL-OBI00006641-698 at 651.

292.     In a follow-up report prepared by McKinsey & Company for OBI dated December 1999, and titled "Strategies for Shaping the Reimbursement Environment: Highlights of Phase 1 findings," McKinsey found that "[f]or private physicians, stocking and administering Procrit yield significant profit opportunities."  The report also highlighted physician statements that "'My practice makes $6-8,000 per month on Procrit.'" (MDL-OBI00006790).  The report also provides a graph of "physician economics" demonstrating the amount of profit physicians receive from prescribing Procrit (MDL-OBI00006792).  Further emphasizing the need for providing economic incentives to physicians, under the heading "Influencing Physician Usage" McKinsey notes that the "Implied Strategy" is that "OBI must preserve positive economics for physicians" and "if economics deteriorate" then "[s]tandard of care and 'habitual' prescribing increases in importance." (MDL-OBI00006810), Plfs. Ex. 334, MDL-OBI00006777-6817.

293.     In the 1990s, OBI internally calculated the amount of physician profit from Procrit.  A memorandum from M. Reese to B. Pearson, dated June 19, 1998, regarding Proposed Rebates, calculates physician profit from Procrit under various reimbursement scenarios.  Plfs. Ex. 356, MDL-OBI00060818-22.

294.     OBI also hired third parties to conduct similar computations on behalf of OBI showing the amount of physician profit from prescribing Procrit.  Trinity Partners, Inc.:  Plfs. Ex. 345, MDL-OBI00059688-89; Plfs. Ex. 347, MDL-OBI00059329-41; Plfs. Ex. 346, MDL-OBI00060859-64; Plfs. Ex. 315, MDL-OBI00059302-05; (McKinsey & Company); Plfs. Ex. 334, MDL-OBI00006777-6817 at 6792 (provides a graph of "physician economics" profit to physicians); (PriceWaterhouseCoopers) Plfs. Ex. 357, MDL-OBI0003671-824 at 3708-09.

295.     In anticipation of Amgen's Aranesp coming to market, and subsequent thereto,

- 87 -

OBI routinely performed internal calculations, and had third parties calculate physician profit from Procrit, with even more frequency, in order to compare the amount of profit available to physicians from Procrit with the amount of profit available from Aranesp.  Plfs. Ex. 351, MDL-OBI00038425-26; Plfs. Ex. 353, MDL-OBI00055915-16; Plfs. Ex. 354, MDL-OBI00054076-81.

296.    Sales materials used by OBI field sales managers and representatives highlighted the financial benefit of the spread to customers.  Sales training materials presented at a three-day 1992 Regional Training Workshop held in Houston, Texas, Plfs. Ex. 270, MDL-OBI00062507-661, were distributed to attendees, including, among others, OBI sales representatives from the Houston, Dallas, Atlanta, Florida, Carolina and Philadelphia Divisions.  *See* Plfs. Ex. 270, MDL-OBI00062508.

297.    Among these materials were included:  (i) A document reflecting the amount of profit a physician will "clear" under Medicare based on the difference between acquisition cost (including rebates) and Medicare reimbursement for the various Procrit dosages (Plfs. Ex. 270, MDL-OBI00062507-661 at 62543); (ii) a document showing that the overall cost of Procrit, after 11% rebates, is far below that of its competitor Epogen (and therefore has a greater spread since it is reimbursed at the identical amount) (Plfs. Ex. 270, MDL-OBI00062507-661 at 544); (iii) a document advising the sales force to highlight the "profitability of 8% retail rebate" (Plfs. Ex. 270, MDL-OBI00062507-661 at 563) and to "[k]now how to explain PROCRIT Profit to the Pharmacist" (Plfs. Ex. 270, MDL-OBI00062507-661 at 599.)).  Nowhere in the material is there a warning not to discuss profit with Procrit customers.

298.    In a document with the heading "Red Alert" and entitled "Physician Economic Impact:  Procrit vs. Transfusions," OBI outlines the amount of reimbursement and "profits" available to physicians who prescribe Procrit rather than transfuse patients.  Plfs. Ex. 245; Plfs.

- 88 -

Ex. 362, MDL-OBI00063642-43.

299.     A former OBI Divisional Sales Manager, John Hess drafted a memorandum to his

sales team (responsible for Minnesota, Wisconsin, Iowa, Nebraska, the Dakotas, Missouri and

Kansas) summarizing an OBI Western Region Marketing Strategy meeting by recapping the

main strategies recommended by an OBI sales and marketing manager to increase sales to high

user oncology clinics, including:

> Business issues – ***The ability to tactfully discuss how an office
> can profit from providing Procrit in the office.***  This discussion
> can be brought up whenever an office raises the objection about
> the expense of Procrit therapy and how they are at risk of losing
> money when they purchase expensive medications such as Procrit.
> ***The office needs to understand that there is profit associated with
> Procrit and that they are also protected from loss under our
> reimbursement Assurance Program.***  This information is most
> beneficial to the Office Manager or Cancer Center Administrator.

Plfs. Ex. 268, MDL-OBI0063656-57 at 56 (emphasis added).

300.     In the very same document, Mr. Hess provided a "return on equity for Procrit"

explanation that sales representatives were to use on visits to oncology practices and advised that

"[w]hen reviewing with a physician or office manager you should ask for their ***real numbers.***"

*Id*. (emphasis added); Plfs. Ex. 268, MDL-OBI0063656-57 at 56 (emphasis added).

301.     The document also specifically quantifies for sales representatives the:  (i) Non-

Medicare per patient profit, and (ii) Medicare per patient profit, for physicians prescribing

Procrit over a week, month, 6 months and year.  *Id*.  In connection with these examples, Mr.

Hess instructs:

> When reviewing this information ***simply draw out the scenario on
> a piece of scratch paper asking for the office billing fee, injection
> fee, and acquisition fee based on medicare or non-medicare.
> Give this a try in those offices raising the objection of cost and
> risk to the office***.  [Plfs. Ex. 268, MDL-OBI0063656-57 at 57
> (emphasis added).]

Hess stated that he did not believe that the content of his memorandum violated any written or unwritten policy at OBI at that time.  Hess Dep. at 96:18-97:1.

302.    When confronted with the Hess Memorandum, James Robbins, OBI National Field Sales Director, conceded that it encouraged spread marketing:

> Q:  And isn't that an incentive –we're referring again to the Exhibit Robbins 021.  Isn't that an incentive for the doctor to put as many patients as he can on Procrit and to keep them on it for as long as possible?
>
> Mr. Schau:  Object to form.
>
> Mr. Robbins:  There's two parts to your question, and the answer's not the same for both.  On the first part, assuming that John's [Hess] numbers are correct there, the first part would be yes."

Robbins Dep. at 466:5-15.

303.    Another OBI internal memorandum shows that sales representatives successfully promoted margin to convert physician practices to purchase Procrit 20,000 multidose units instead of Procrit 10,000 units/vial.  An internal memorandum dated March 22, 1995, highlighted factors that Patricia Hawley, an OBI sales representative in its Orlando District, noted were successful in persuading physician practices to convert to the higher dosages, including:

> Good profit margin between the $96.00 Medicare payment and the $80.75 promotion price for administering 10,000 units of the multidose vial.

Plfs. Ex. 269, MDL-OBI0063644-55 at 48.

304.    A letter dated September 28, 1998, from Brock Weathers to Michael Kalson, M.D. at Academy Orthopaedics [sic], follows up a visit by explicitly laying out the costs and reimbursement of Procrit.  Plfs. Ex. 364, MDL-OBI00059164.

305.    A document entitled "Objection Workshop" for OBI sales representatives who

- 90 -

sell to retail customers advises overcoming customer objections by promoting the profitability of Procrit to the pharmacies, advising "Turn scripts into dollars" (MDL-OBI00058979); "Pharmacist – what is in it for me? a) Profitability of the chain. b) $ savings for independents and profits increase." (MDL-OBI00058982).  The document also highlights that "[d]iscounts mean nothing to the pharmacist.  a) Do business analysis and show benefits of rebates."  Plfs. Ex. 363, MDL-OBI00058979-82.

306.    The OBI business plans that OBI produced during discovery universally identify that a key priority for OBI is to "optimize" and "maximize" reimbursement for Procrit across all franchises and to "establish positive coverage" and "maximize coverage for PROCRIT."  Plfs. Ex. 312, MDL-OBI00011641-58 at 11645 (1998); Plfs Ex. 313, MDL-OBI00007971-84 (1999); Plfs. Ex. 314, MDL-OBI00043203-314 (2000); Plfs. Ex. 316, MDL-OBI00003061-81 (2001).

307.    A presentation titled "Procrit Reimbursement Alternatives," developed and presented by Documedics' Bobbi Buell, with the input and approval of OBI's Cathleen Dooley, on behalf of OBI, asks, "Can you make money????" (MDL-OBI00061833) and states "[d]rugs have paid well under part B." (MDL-OBI00061838).  Ms. Buell concludes her presentation with the question "Should you give PROCRIT?" and her first reason in support thereof is that it provides "Additional revenue." (MDL-OBI00061841).  Plfs. Ex. 331, MDL-OBI00061831-41.

308.    A document entitled "Strategic Plan Worksheet" and created for the OBI oncology sales force (D6 is oncology clinics), asks, "Have you showed this account how to maximize their value impact by using both contracts?  Have you helped them forecast to maximize on our contracts?"  Plfs. Ex. 337, MDL-OBI00063552-556.

309.    Prior to at least November 2001, there was no writing or written policy at J&J or OBI that advised any segment of OBI's sales force against marketing Procrit's spread to

customers.  Plfs. Ex. 330.

310.    A report prepared by McKinsey & Company at the request of OBI management, entitled "Current Strategies," and dated November 2002, outlines the OBI strategies currently in place for competing with Amgen's Aranesp, including offering "additional rebates  and discounts for physicians and hospitals," "a list price increase" to bring Procrit's price and reimbursement  more in line with that of Aranesp, and lobbying for AWP reform.  Plfs. Ex. 338, MDL-OBI00052883-52931 at 52886-87, 52901.

311.    OBI's internal calculations demonstrated that, even considering Aranesp's margin advantage, Procrit could still be more profitable to dispense.  *See* Plfs. Ex. 352, MDL-OBI00041480-82 at 80.[4]

312.    OBI delivered an economic message that in light of the comparatively higher cost of Aranesp to physicians and patients at higher doses, and in light of the costs of switching from Procrit to Aranesp in terms of a loss of rebates, discounts and other administrative costs, a physician would be better off economically by staying with Procrit.  Plfs. Ex. 342, MDL-OBI00053911-75 at 917, 941; Plfs. Ex. 343, MDL-OBI00041457-79 at 466, 469-71, 478; Plfs. Ex. 344.

313.    In August 2002, OBI's consultant, Charles River Associates, advised the Procrit sales force to deliver a message to physicians that would "provide economic incentives to maintain and grow Procrit," "communicate economic benefits of using Procrit," and that the "Procrit sales force must provide compelling evidence that continuing with Procrit provides economic benefits" and must "educate physicians regarding the costs of switching to Aranesp"

---

[4] Amgen received regulatory approval to sell Aranesp for treatment of chronic kidney disease, and introduced it in September 2001.  Pearson Dep. at 216:21-217:3.  In 2002, Amgen received approval to sell Aranesp to treat anemia in oncology.  J&J Rule 56.1 Statement of Facts, ¶¶ 89-90.  While Procrit's spread between AWP based reimbursement and actual acquisition cost was 20%, Amgen offered a spread of 25%.  J&J Rule 56.1 Statement of Facts, ¶ 91.

and "demonstrate the economic consequences of failing to meet Procrit market share requirements."  Plfs. Ex. 344.

314.    OBI even developed computer CD-Rom materials that were designed to show a physician that he would be better off staying with Procrit than switching to Aranesp due to the comparative value of the discounts and rebates offered by OBI.  Plfs. Ex. 367, MDL-OBI00054647; Plfs. Ex. 368, MDL-OBI00054650; Plfs. Ex. 369; Plfs. Ex. 370, MDL-OBI00054659. Testimony indicates that some of the CDs shown to physicians contained references to AWP.  Robbins Dep. at 295:4-19.

## D.    The Schering-Plough Group

315.    Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey.  Schering-Plough Corporation's Answer to Intervenors' Amended Master Consolidated Class Action Complaint ("S-P Answer"), ¶ 116.  Schering-Plough's primary business involves the manufacture and sales of drugs used to treat allergy and respiratory ailments, infections, cancers, cardiovascular illnesses, dermatological issues, and disorders of the central nervous system, among other conditions.  *Id.*, ¶ 117.  Schering-Plough conducts its business via various units and wholly owned subsidiaries, including Schering Corporation, a wholly owned subsidiary, and Schering Laboratories, a company unit.  *See id.* ("Schering-Plough is a holding company . . . .").

316.    Defendant Warrick Pharmaceuticals Corporation ("Warrick") is a Delaware corporation with its current principal place of business purportedly at 12125 Moya Boulevard, Reno, Nevada.  Warrick Pharmaceutical Corporation's Answer to Intervenors' Amended Master Consolidated Class Action Complaint ("Warrick Answer"), ¶ 118.  In reality, the Reno, Nevada address corresponds to a warehouse.  Deposition of Harvey J. Weintraub, September 18-22, 2006

- 93 -

("Sept. 2006 Weintraub Dep.") at 576:1-10, 883:19-884:25; Deposition of Harvey J. Weintraub, November 7-8, 2001 ("Nov. 2001 Weintraub Dep.") at 76:1-24.  Warrick, a wholly owned subsidiary of Schering Corporation, is one of the subsidiaries by and through which Schering-Plough conducts its business.  Warrick Answer, ¶ 118; Plfs. Ex. 429 (WCT0011816) ("Please be informed that Warrick Pharmaceuticals, *a unit of Schering-Plough Corporation*, is pleased to announce the availability of Albuterol, USP Inhalation Aerosol . . . .") (emphasis added).  Schering-Plough formed Warrick in 1993.  Warrick Answer, ¶ 118.  Warrick markets generic pharmaceutical products manufactured by Schering-Plough or entities controlled by Schering-Plough.  Sept. 2006 Weintraub Dep. at 104:13-22.

317.    Drugs manufactured and sold by Schering-Plough, via one or more of its subsidiaries or units, and covered by Medicare Part B during the Class Period, include albuterol solution as a branded product (Proventil), Integrelin (eptifibatide), Intron-A (interferon alfa-2b recombinant), and Temodar (temozolomide) (collectively referenced as "Schering-Plough drugs").  S-P Answer, ¶ 119.  Schering-Plough, via one or more of its subsidiaries or units, sold all of the Schering-Plough drugs during the Class Period under the Schering-Plough name (or under the name of one of its marketing arms or subsidiaries, including Schering Laboratories or Schering Corporation).  *Id.*, ¶¶ 117, 119.

318.    During the Class Period, Warrick sold generic albuterol and albuterol sulfate solutions, as well as generic perphenazine, under the Warrick name.  Sept. 2006 Weintraub Dep. at 99:14-101:1, 106:19-23, 390:20-391:21.

319.    Plaintiffs claim damages in the Class 2 trial as to Proventil (branded albuterol) solution, generic albuterol solution, and Intron-A.  Plaintiffs claim damages in the Class 3 trial as to Intron-A.

- 94 -

1.      **Schering-Plough and Warrick knew that AWP was the reimbursement benchmark used by Medicare Part B and many private payors**

320.    Schering-Plough reported AWPs for its branded drugs with the full expectation that they would be published and later relied upon by third-party payors for reimbursement purposes.  Zahn Dep. at 173:1-23; Deposition of Debra Kane, June 15, 2004 ("Kane Dep.") at 34:7-11 ("[AWP] is a price that is used for reimbursement purposes . . . ."; Plfs. Ex. 809 (RGX0315084-141, at 0315084).

321.    Warrick reported AWPs for its generic drugs with the full expectation that they would be published, *e.g.*, Deposition of Harvey J. Weintraub, February 12, 2003 (" Feb. 2003 Weintraub Dep.") at 655:10-13, and later relied upon by third-party payors for reimbursement purposes.  Sept. 2006 Weintraub Dep. at 370:24-372:8, 741:8-743:11; Feb. 2003 Weintraub Dep. at 427:16-428:18, 429:23-430:23, 488:5-489:14, 528:21-529:13, 548:2-12; Deposition of Louis E. Manfredi, March 31, 2003 ("Manfredi Dep.") at 128:10-129:1; Deposition of Jerome A. Sherman, July 7, 2005 ("July 2005 Sherman Dep.") at 21:5-21.

2.      **The Schering-Plough Group caused AWPs to be published for its Subject Drugs**

322.    Schering-Plough reported the AWPs for its branded drugs to the Publishers of pharmaceutical industry pricing guides such as *Red Book* and *Price Alert*, for publication in those guides.  Deposition of Harvey J. Weintraub, August 25, 2005 ("Aug. 2005 Weintraub Dep.") at 429:24-431:1; Plfs. Ex. 492 (SPF0241686) ("As you know, Pharmaceutical Manufacturers publish AWPs (Average Wholesale Prices) for reimbursement purposes.  Most manufacturers (including Schering) report AWPs at NDP [net direct price] plus 20%.").  Specifically, Schering-Plough reported AWPs for the subject branded drugs at 20% above the so-called direct price (sometimes referenced as "net direct price"), which was Schering-Plough's analogue for wholesale acquisition cost ("WAC") or list price.  *Id.*; Deposition of Richard W.

Zahn, January 15, 2003 ("Zahn Dep.") at 176:4-24; Kane Dep. at 34:7-35:21 ("The company published AWP prices at 120 percent of the net direct price or list price. . . .  Q. So net direct price is the same as list? A. Yes.  Yes. . . ."), 36:5-8; *see also* Plfs. Ex. 809 (RGX0315084-141, at 0315085) ("As a matter of general practice, Schering-Plough sets AWP at 20% over the published Net Direct Price for the drug [referring to albuterol .083%].").

323.    Warrick also reported the AWPs for its generic drugs to the Publishers of pharmaceutical industry pricing guides for publication in those guides.  Specifically, Warrick caused to be published AWPs for the subject generic drugs marketed under the Warrick name (albuterol sulfate and perphenazine) at values slightly below the AWPs for the branded counterparts to those generic drugs.  Aug. 2005 Weintraub Dep. at 30:2-17; Feb. 2003 Weintraub Dep. at 485:1-6, 494:17-495:9.  According to Harvey J. Weintraub, a Schering-Plough vice-president, and later, a Schering-Plough consultant, who was assigned to Warrick by Schering-Plough, his duties included the reporting of AWPs for Warrick-labeled drugs to the Publishers. Feb. 2003 Weintraub Dep. at 472:10-16.  Before reporting AWPs to the Publishers, however, Mr. Weintraub first recommended proposed AWPs to Raman Kapur, Warrick's president, for Mr. Kapur's approval, and then Mr. Weintraub had them approved by "the law department of Schering."  Feb. 2003 Weintraub Dep. at 494:17-25, 495:1-9.

324.    In general, the specific AWPs that Warrick reported for its generic drugs were pegged at 10-15% off the corresponding brand drugs' AWPs, Plfs. Ex. 425 (WAR0006155-156, at 0006155), supposedly "[b]ecause a product is not considered to be a generic unless it is 10 to 15% away [meaning lower in terms of AWP] from the brand."  Feb. 2003 Weintraub Dep. at 472:10-16, 493:16-23, 495:4-6.  Notwithstanding this testimony suggesting that there was some requirement that a generic drug have an AWP within 10-15% of its branded counterpart, Mr.

Weintraub also admitted that if the AWP for a given generic drug were set, for example, at 50%

off of the corresponding brand drug's AWP, the drug indeed would be considered a generic.  *Id.*,

495:7-9.  In other words, there was no impediment to setting much lower AWPs for Warrick

generic drugs; Warrick simply chose to set AWPs for its generic drugs at levels very close to

those for its corporate parent's branded drugs.

325.    In other instances, where one or more competitor generic products were already

on the market, Warrick simply would look to see where the competitor or competitors had set the

AWP(s) for the competitor product or products and "slot" the AWP for its own product

"somewhere in the pack."  Sept. 2003 Weintraub Dep. at 527:6-528:8.  That was a choice, too,

made "to save . . . a lot of time and trouble."  *Id.* at 526:22-528:8.

326.    In addition to causing specific AWPs for its branded drugs to be reported in

widely circulated industry pricing guides, Schering-Plough also republished its AWPs via its

sales force.  Deposition of Gary Bishop, July 27, 2005 ("July 2005 Bishop Dep.") at 30:1, 31:1-

12, 33:5-12, 54:11-56:1-4, 56:13-57:7; Deposition of Gary Bishop, August 11, 2005 ("Aug. 2005

Bishop Dep.") at 61:5-12; Deposition of Portia Edens, August 9, 2005 ("Edens Dep.") at 35:5-

37:3.  In addition, Schering-Plough "issued a price list to its accounts" that included AWPs for

its branded drugs.  Feb. 2003 Weintraub Dep. at 429:23-431:1.

327.    Likewise, Warrick not only caused specific AWPs for its generic drugs to be

reported in industry pricing guides, but it also republished those AWPs.  Deposition of Jerome A.

Sherman, March 6, 2002 ("Mar. 2002 Sherman Dep.") at 45:12-14; Manfredi Dep. at 116:2-13,

117:17-119:8 ("It would not be uncommon for AWP listed on an ad [directed to retail

pharmacies, managed care, buyers at chains, and wholesalers . . . .].");  Sept. 2006 Weintraub

- 97 -

Dep. at 408:21-409:22, 512:12-513:15, 516:19-519:17; Plfs. Ex. 719 (various price notices,

including AWPs, direct prices, and references to actual price diminishments of many sorts).

> **3.    The Schering-Plough Group's AWPs for its Subject Drugs were false in that they did not include relevant discounts nor reflect an average, and the Schering-Plough Group manipulated its AWPs and spreads**
>
> > **a.    The Schering-Plough Group knew that its Subject Drugs were sold at prices well below AWP**

328.    Schering-Plough knew that providers or their agents purchased Schering-Plough

subject drugs at prices well below the AWPs that Schering-Plough caused to be published for

those drugs.  S-P Answer, ¶ 3 ("Schering-Plough further admits that AWPs for its medicines

published in trade publications are typically higher than the prices ultimately piad by providers

purchasing such medicines from wholesalers and distributors.").  For example, Schering-Plough

entered into contracts with certain providers or provider-agents below the wholesale level, so it

knew the prices those entities would pay for Schering-Plough drugs.  Deposition of Thomas

Kelly ("Kelly Dep."), July 15, 2004 at 27:5-28:8, 28:12-22, 29:22-30:5, 31:20-32:1, 72:11-22;

Kane Dep. at 56:4-64:10 (staff model HMOs, group purchasing organizations, and specialty

pharmacies receive contract pricing); *see also* Plfs. Ex. 718 (WCT0133861-867, at 0133861-863

(showing knowledge of "dead net" prices for "superchains'" following price change, and after

rebates); Plfs. Ex. 420 (SW0647978-8033, at 0648000) ("General Contracting Guidelines")

(calculating pharmacy margins with known after-discount acquisition costs).  This knowledge

was underscored when Schering-Plough would make chargeback payments to wholesalers who

would distribute the products to the contract buyer at the contract price, only to expect via

arrangements with Schering-Plough that Schering-Plough pay them (the wholesalers) the

difference between the price that the wholesaler had paid Schering-Plough for the drug and the

lower price that the contract buyer had negotiated with Schering-Plough.  Kelly Dep. at 27:5-

28:8, 28:12-22, 29:22-30:5, 31:20-32:1, 72:11-22.  Furthermore, in some cases Schering-Plough bypassed the wholesaler in its contract sales and sold its drugs directly to customers below the wholesale level.  Kane Dep. at 58:10-13.  In that instance, too, Schering-Plough would know the prices paid for its drugs at entities below the wholesaler level.  More importantly, Schering-Plough can point to no sales of its branded drugs that occurred at AWP.  Indeed, as a 40-year employee and Schering-Plough former vice-president testified, "I wouldn't expect anybody . . . knowledgeable about pricing to pay [AWP]. . . ."  Deposition of Harvey J. Weintraub, October 26, 2004 ("Oct. 2004 Weintraub Dep.") at 130:24-131:9; *see also* Sept. 2006 Weintraub Dep. at 49:18-19, 74:14-76:22 (describing witness's tenure and broad executive experience within the Schering-Plough organization).

329.    Likewise, Warrick knew that providers and retailers, including chain pharmacies that sold Warrick subject drugs reimbursable under Medicare Part B, purchased Warrick subject drugs at prices well below the AWPs that Warrick caused to be published for those drugs.  Warrick Answer, ¶ 3 ("Warrick further admits that AWPs for its medicines published in trade publications are typically higher than the prices ultimately paid by providers purchasing such medicines from wholesalers and distributors."); *see also, e.g.*, Plfs. Ex. 421 (WCT0031786-790, at 0031786-788) (showing intention to sell directly to chains at prices well below AWP); Sept. 2006 Weintraub Dep. at 526:2-21, 761:23-766:10; Plfs. Ex. 709 (WCT0133861-67); *see also* Oct. 2004 Weintraub Dep. at 130:24-131:9 ("Q. So you wouldn't expect anybody to actually be paying the average wholesale price? A. I wouldn't expect anybody who [] knowledgeable about pricing to pay that. . . .") (objections omitted).  What is more, Warrick can point to no actual sales of its products that occurred at AWP.

### b.   Recognizing the importance of spreads, the Schering-Plough Group created spreads through confidential contract pricing, rebates, and other forms of discounting

#### (1)   The importance of reimbursement

330.   Schering-Plough was well aware that purchasers of its products were interested not only in whether they would be reimbursed for its branded products, July 2005 Bishop Dep. at 85:11-86:8, 98:17-99:17; Deposition of Mark Flynn, July 29, 2005 ("Flynn Dep.") at 15:14-18:9, but also in the level at which they would be reimbursed.  Not surprisingly, purchasers were keenly interested in how much profit they could make on Schering-Plough branded drugs, and, not surprisingly, Schering-Plough knew that.  July 2005 Bishop Dep. at 89:9-90-4, 113:1-114:15; Deposition of James Butler, August 11, 2005 ("Butler Dep.") at 7:2-9, 26-21, 33:2-20, 42:4-43:6, 60:5-12, 61:5-12; Plfs. Ex. 783 (RGX 0179000) ("Program Features for Branded Pharmaceutical Suppliers," published by wholesaler AmeriSource, for inclusion of drug(s) as "Preferred Rx Option" formulary of pharmacists across the United States"); indicates that "products considered for inclusion in [formulary] must meet one of the following program elements: . . . Increased spread between AWP and Acquisition Cost."); *see also* Plfs. Ex. 420 (SW0647978-8033, at 0648000) ("General Contracting Guidelines": analyzing profitability from "pharmacy perspective" of "Proventil/Albuterol," and calculating margins for both brands and generics after discounts); Plfs. Ex. 713 (RGX 0255855-876, at 0255875) (discussing potential changes to Medicaid and Medicare Part B payments and opining that "[t]he reduction or elimination of the 'spread' is likely to have a significant effect on choices of Medicare Part B drugs and on utilization in areas of treatment where generic and brand drugs are available. . . ."); Plfs. Ex. 721 (SPF0011695-696, at 0011695) (expressing concern at "negative impact on physician reimbursement" because Caremark had received their own NDC numbers for repackaging and distributing Intron and had published AWPs that were lower than Schering's AWP for Intron).

331.    A compelling example of Schering-Plough's obvious knowledge of, and

participation in, the reimbursement-profit game is found in a message between Schering-Plough

executives regarding the "Retail Pharmacy Trade."  Plfs. Ex. 497 (SPF00017394-395).  This

communication, dated December 10, 2002, was sent by Brian Longstreet, then-Director of

Managed Care Marketing for Schering-Plough's Oncology and Biotech Business Unit

("OBBU"), to the General Manager of the OBBU, Olav Hellebo, and to Mr. Longstreet's direct

supervisor within OBBU, James Robinson.  *Id.*  At the time he sent the communication, Mr.

Longstreet was was working with Schering-Plough's Trade Team, devising market-share rebate

offers to pharmacies.  *Id.*  The communication reads in pertinent part:

> []  As previously discussed there are a few stakeholders in the process of drug
> distribution (wholesalers-pharmacies-doctors-patients-managed care/insurance
> companies).  When it comes to pharmacies, they are driven by Managed Care or
> insurance reimbursement, profit motive, and state law.  A Managed Care
> organization (MCO) can mandate reimbursement of a product vs. another similar
> product; if a generic is available, either the MCO or state can mandate generic
> substitution.  In addition, Pharmacies are paid a dispensing fee, plus the margin of
> whatever they purchase the product minus the reimbursement rate (usually AWP
> minus a %).  ***With generics the acquisition cost is usually much lower than the
> published AWP and creates a very favorable "spread" particularly when
> multiple generics exist and the acquisition price drops dramatically (and the
> published AWP does not).***
>
> Having a higher AWP and having reimbursement being paid on a % of AWP can
> be favorable to the Pharmacies.  For example, our recommended strategy of
> keeping the AWP (and the NDP) higher if Roche comes in with a lower Net
> Direct Price (NDP) for [a competitor drug] actually could create a favorable
> situation because the reimbursement rate will be higher for our product.  Simple
> example, if the reimbursement rate is AWP-15%, for a $100 AWP product the
> reimbursement is $85 compared to a $70 AWP product where the reimbursement
> is $59.50. . . .

*Id.* at SPF00017395 (emphasis added); Longstreet Dep. at 85:1-88:18.  Mr. Hellebro's response

to Mr. Longstreet was telling: "[S]ounds good . . . ."  *Id.* at SPF00017394; *see also* Declaration

of G. Raymond Pironti, Jr. ("Pironti Decl.") (trial declaration of Schering-Plough whistleblower),

¶ 14 ("The comments in [Plfs. Ex. 497] regarding creating favorable reimbursement spreads

- 101 -

through manipulations of AWP and sales pricing for both branded and generic products reflect a well-known strategy by SP senior management in the marketing of SP products."); Plfs. Ex. 713 at RGX 0255855 (discussing government's concerns with AWP and indicating that "AWP is not a market price derived from actual transactions *and is, therefore, subject to manipulation by those reporting the price*") (emphasis added).

332.    Likewise, Warrick was well aware that purchasers of its products were interested not only in whether they would be reimbursed for its generic products, Feb. 2003 Weintraub Dep. at 515:20-516:18, 578:4-10, but also in the level at which they would be reimbursed.  Not surprisingly, purchasers were keenly interested in how much profit they could make on Warrick generic drugs, and, not surprisingly, Warrick knew that.  Plfs. Ex. 772 (RGXA0098615-623, at 00986620 and 00986620) (showing Warrick's interest in, and knowledge of, various effects on retailer/provider profit depending on Warrick increase in AWP for albuterol solution versus post-rebate prices for product, after reimbursement based on AWP) and Sept. 2006 Weintraub Dep. at 460:2-464:10; Plfs. Ex. 779 (SP 0000749-753) (letter to Warrick from retail pharmacy buying group, indicating that Warrick has been chosen to be an "endorsed generic contract vendor" and indicating further that the group looks forward to developing a long-term working relationship with Warrick based upon the attached "Generic Vendor and Product Selection Criteria"; attached document includes the criterion "AWP Spread; MAC" under the heading "Generic Product Selection Criteria"); Plfs. Ex. 775 (WP 0024238A) (setting forth "Action Steps" for Warrick, including need to acquire "retailer computer in house for pricing," with Bergen AccuSource software, which apparently would allow Warrick to ascertain prices at which retailers acquired drugs) and Sept. 2006 Weintraub Dep. at 483:21-485:3 (indicating that Warrick in fact acquired the AccuSource pricing software); Plfs. Ex. 778 (WP 0023700A) (memorandum to

"distribution," including Warrick sales personnel, indicating that albuterol syrup and solution would not be on new HCFA MAC list, meaning that reimbursement for generic albuterol could still be based on AWP and attendant spreads); Plfs. Ex. 780 (RGX 0178842) ("Potention [sic] Discussion Points of Interest to Eckerds," a retail pharmacy chain, and listing at number 1 of 8: "AWP differential"); Plfs. Ex. 781 (SP 0002800) (bid request from mail order pharmacy, asking for "AWP," "Proposed Cost," and "Spread" for Warrick products; Warrick has calculated spreads as part of the bid) and Sept. 2006 Weintraub Dep. at 511:9-513:15).

333.    In short, Warrick understood that the spread could be used for profit-making purposes.  *See* Manfredi Dep. at 210:6-14 ("Q. In what context have you heard of marketing the spread?  A. In what context. . . .  I think it's just a known—I think it's very well-known for—by pharmacists that the name of the game is to acquire the drug at the lowest acquisition cost possible because the reimbursement I think is pretty much fixed.").

## (2)    Initial spreads and typical increases to the spreads

334.    Schering-Plough representatives admit that they set and caused to be published AWPs for Schering-Plough branded subject drugs that did not reflect actual average wholesale prices, *i.e.*, an average of prices charged by wholesalers to retailers or providers for those drugs. Sept. 2005 Weintraub Dep. at 134:19-135:1.  Rather, Schering-Plough simply set its AWPs at 20% above Schering-Plough's direct prices—prices analogous to undiscounted wholesale acquisition costs, or WACs.  Feb. 2003 Weintraub Dep. at 35:1-23; Zahn Dep. at 176:4-24; *see also* Plfs. Ex. 809 (RGX0315084-141, at 0315085).

335.    Schering-Plough's direct prices for its branded drugs were subject to substantial discounts, *e.g.*, Plfs. Ex. 453 (SW0736212-217, at 0736213) (offering 25% market-share discount on Proventil solution if Proventil/generic albuterol market share target is met), Plfs. Ex. 455 (WPX0011864); rebates, Deposition of Peter Kamins, July 19, 2005 ("Kamins Dep.") at

44:6-16; Kelly Dep. at 45:18-46:2, 46:18-47:8, 72:9-12; and chargebacks, Kelly Dep. at 27:5-28:22, 72:9-12.  In addition, customers enjoyed free goods,[5] grants,[6] and bundling with steeply discounted generic goods, which bundling had the effect of lowering the actual acquisition cost of the Schering-Plough drugs.[7]  All of these had the effect of amplifying the spread between net acquisition costs and AWPs for Schering-Plough's branded products.

336.    Like their Schering-Plough branded-drug counterparts, Warrick representatives admit that they set and caused to be published AWPs for Warrick generic subject drugs that did not reflect actual average wholesale prices, *i.e.*, an average of prices charged by wholesalers to retailers or providers for those drugs. Sept. 2005 Weintraub Dep. at 134:19-135:1, 760:16-761:15; Deposition of Harvey J. Weintraub, October 26, 2004 ("Oct. 2004 Weintraub Dep.") at 130:10-18, 24-25-131:9.  Rather, Warrick simply set its AWPs for its subject generic drugs at 10-15% below the AWPs that Schering-Plough had set for its corresponding branded drugs.  Feb. 2003 Weintraub Dep., 494:17- 495:9.

---

[5] Plfs. Ex. 381 (SPF00013329-331) (regarding deals to dispensing doctors: "[i]n the US we always went with free goods whenever possible. . . ."); Plfs. Ex. 505 (WAR0072317-WAR0072336) ("Free Goods Summary" for Schering-Plough branded and Warrick generic products); Edens Dep. at 64:15-19 (acknowledging sampling program); Flynn Dep. at 69:2-70:3 (acknowledging the provision of samples, including Intron-A).  Schering-Plough also provided doctors with tickets to professional football games.  Butler Dep. at 68:1-9.

[6] Plfs. Ex. 572 (SPF00017238-SPF00017279) ("[A]ll grants over 5000 given by OBBU last two years."); July 2005 Bishop Dep. at 43:15-44:1, 44:7-12.

Recently, Schering-Plough agreed to pay hundreds of million of dollars to settle claims by the United States and certain of its agencies that it improperly marketed Temodar by offering and paying "various forms of illegal remuneration to physicians and physicans' practices to induce utilization of Temodar . . . , including, for example, improper preceptorships, advisory boards, entertainment, and placement of clinical studies . . . ."  Plfs. Ex. 559 at 6-7.  Schering-Plough's provision of these inducements had the effect of amplifying Temodar spreads by reducing the actual cost of the drug, to the detriment of the plaintiffs in this case.  Schering-Plough settled similar allegations with regard to marketing of Intron-A for superficial bladder cancer, *id.* at 7-8, together with allegations pertaining to free goods and "vial overfill," and insofar as Schering-Plough's marketing practices resulted in increased spreads for Intron-A, they had a detrimental effect on the plaintiffs in this case.

[7] Pironti Decl., ¶ 12 (explaining bundling and referring to Plfs. Exs. 418 and 470) and Plfs. Exs. 418 (WCT0144924-WCT0144928) and 470 (WAR0036807-WAR0036809); *see also* Plfs. Ex. 772 (WP0004815A-WP00048178A, at 0004817A) (showing effect of bundling of cheaper Warrick generic product with Proventil in lowering Proventil's "effective list price" to chain).

337.    Moreover, Warrick knew exactly what true average wholesale prices were to chain retailer pharmacies such as Walgreens, CVS, or Long's, *e.g.,* Sept. 2006 Weintraub Dep. at 526:2-21 and Plfs. Ex. 432 (WAR0029661), Plfs. Ex. 433 (WAR0015167-0015010) (discussing and illustrating chargeback arrangement with Rite-Aid, and illustrating that Warrick knew the prices at which Rite-Aid pharmacies were buying its products, given that Rite-Aid was buying Warrick drugs on the basis of a contract price that Warrick knew), and Plfs. Ex. 461 (WAR0002533); it knew that these prices were nowhere near its published AWPs, and it also knew that as net acquisition costs inevitably decreased over time, given the trend of ever-lowering prices in the generic market, reimbursement to the pharmacies would grow in situations where AWP was the basis for reimbursement and where, as was Warrick's practice, it did not lower AWPs to reflect lower net acquisition costs.[8] Sept. 2006 Weintraub Dep. at 761:23-766:10; *see also id.*, 866:23-867:4 ("Q. And when Warrick's prices fell, Warrick chose not to proportionally lower the AWPs; isn't that right? A. That is correct.") (objections omitted), 868:11-869:1; Feb. 2003 Weintraub Dep., 548:15-18 (in witness's experience, AWP on generic drugs does not tend to erode with the erosion of market prices); July 2005 Sherman Dep. at 42:9-43:4 (Warrick did not lower AWPs on generic drugs once established); Manfredi Dep., 132:16-22; Mar. 2002 Sherman Dep. at 132:13-18 ("Q. Is it the policy of Warrick to keep AWP and direct prices the same?  A. We keep the AWP the same and we lower the contract prices to meet competition whenever necessary.").

---

[8] Warrick did, however, ***raise*** the AWP for its 20 ml albuterol solution product in 1995, supposedly to track higher net direct prices.  Sept. 2006 Weintraub Dep. at 462:17-463:4.  But as copious numbers of records show, the increase in AWP certainly did not track actual acquisition costs, which remained subject to various diminishments, including discounts, rebates, price protection, and on-hand inventory adjustments.  *E.g.*, Plfs. Ex. 719 (various Bates numbers) (showing AWP for 20 ml solution at $12.50 (*e.g.*, WCT0020159), then at $13.95 (*e.g.*, WCT0012419A), then at $14.99 (*e.g.*, WCT0033782) and showing various adjusments to actual acquisition costs (*e.g.*, WCT0033782, WCT0012073, WCT0134418)).  Thus, in practice, the increase in AWP only served to amplify already large spreads.

338.     Warrick's direct prices for its generic drugs were subject to substantial discounts, *e.g.*, Plfs. Ex. 612 (RGX 0001225-RGX 0001231) (showing discounts to match competitor's prices), Plfs. Ex. 618 (WP00012330A) (showing planned 20% discount to chains), Plfs. Ex. 619 (WP00012629A-WP00012633A) (showing discounted direct prices to chains, among other classes of trade), and Plfs. Ex. 638 (SPW013819) (showing provision of "instant rebate," *i.e.*, discount, in addition to regular rebate, to chain); rebates, *e.g.*, Plfs. Exs. 434, 438, 499 (cataloguing types of available rebates), 501, 502, 503, 504, and 718; Manfredi Dep., 153:21-23, 155:13-21; and chargebacks, *e.g.*, Plfs. Exs. 432 and 433.  In addition, customers enjoyed free goods, *e.g.*, Plfs. Ex. 441 (noting re: free goods: "This is a standard practice . . . ."); Plfs. Ex. 505 (WAR0072317-WAR0072336) ("Free Goods Summary" for Schering-Plough branded and Warrick generic products); grants, and stock/inventory adjustments, Plfs. Ex. 443 (WAR0025195) ("Warrick will adjust on-hand inventory in the event of a market price decrease . . . ."); Plfs. Ex. 469 (WAR0027852).  All of these had the effect of amplifying the spread between net acquisition cost and AWP for Warrick-labeled generic products.

339.     The Schering-Plough Group used other methods to amplify the spreads for its generic and branded products, as discussed below.

### (3)     Other ways in which spreads were increased

#### (a)     Setting AWPs for Warrick generics at levels very close to those for corresponding branded products created large spreads from the outset

340.     Schering-Plough viewed its generics subsidiary Warrick not as an independent entity but rather, as a cog in the wheel of Schering-Plough's overall business strategies for its existing drugs.  Plfs. Exs. 408 (WAR0005993-WAR0006097, at 0005995) ("Action Plan[:] Expand Warrick Pharmaceuticals as a separate entity to function as the vehicle to market 'generic' versions of our current off-patent, non-promoted products.").  Though Warrick was

already in existence, *see* Plfs. Ex. 609 (RGX0001208-RGX0001217) (early strategy

memorandum leading to creation of Warrick),[9] when Schering-Plough d/b/a Schering

Laboratories wrote its "Generic Strategy" plan, Plfs. Ex. 408 (WAR0005993-WAR0006097, at

0005995-5996), the "Generic Strategy" memorandum explains how Schering-Plough planned to

exploit the Warrick entity to the fullest.  *See generally* Plfs. Ex. 408; Plfs. Ex. 408 at

WAR0005996; *see generally* Plfs. Ex. 409 (WAR0005957-WAR0005977).  For example, to

compete in the generic marketplace, Schering-Plough had in Warrick a vehicle by which it could

simply affix Warrick labels onto the self-same products, including albuterol solution, it had been

manufacturing as branded Proventil.  Plfs. Ex. 408 at WAR0005996; Plfs. Ex. 609 at

RGX0001213; Deposition of Raul Cesan, August 31, 2005, 75:11-16; Mar. 2002 Sherman Dep.,

34:25-35:4.  Schering-Plough also saw Warrick as a vehicle by which it could avoid paying

Medicaid rebates.  As explained below, this strategy directly impacted plaintiffs in this matter.

341.   Because generic product prices are already lower than branded product prices to a

considerable degree, Sept. 2006 Weintraub Dep., 185:14-186:3, and because, as Warrick has

admitted, the expectation is always that generic prices will fall, *id.*, 162:12-20, 753:21-754:4,

756:20-24, 757:1-14, 863:1-14; Feb. 2003 Weintraub Dep., 633:11-13, 701:3-16, Warrick built-

in large spreads that would quickly get larger as time passed.  Sept. 2006 Weintraub Dep,

765:11-766:10.  The size of these spreads was only amplified due to the fact that, as stated

above, Warrick set the AWPs for its generic products based on the AWPs for branded

counterpart drugs (for example, generic albuterol AWPs were set on the basis of branded

---

[9] Pironti Decl., ¶ 11 ("[Plaintiffs'] Exhibit 609 is an early strategy paper on developing a generic arm of SP by Jim Audibert. . . .  From [this strategy paper and another], Warrick was created.  Warrick, like ITG [discussed below] and the other SP subsidiaries are 'shared source entities,' *i.e.*, they share SP's assets, recources, and management in their operations.  This latter concept of Warrick using SP resources in reflected in [plaintiffs'] Exhibit 408 at WAR0006053 by the phrase 'backroom' services.").

- 107 -

Proventil AWPs), rather than on the basis of some percentage over the generics' direct, *i.e.*, list, prices.

> **(b)  Using nominal pricing for Schering-Plough and Warrick drugs as a means of avoiding Medicaid rebates created enormous spreads**

342.    Schering-Plough and Warrick both employed so-called "nominal pricing" to avoid paying best-price rebates under the Medicaid program.  Selling their products at nominal prices created enormous spreads vis-à-vis the products' static AWPs.  *E.g.*, Plfs. Ex. 422 (showing contract price of $6.95 in February 2002 for albuterol solution, 20 ml., NDC 1515-4, discounted to $.30 and later discounted to $.08), Plfs. Ex. 431 (WAR0022429) (showing AWP for albuterol solution 20ml., NDC 1515-4, at $13.95 in February 2002), and Plfs. Ex. 434 (showing AWP for albuterol solution, 20 ml., NDC 1515-4, at $14.99, after 1995 increase to AWP); *see also* Sept. 2006 Weintraub Dep., 462:23-463:4 (affirming that Warrick raised AWP for 20 ml. albuterol solution to $14.99 in 1995).

343.    Medicaid provides health care coverage primarily to low-income families with dependent children and low-income aged or disabled individuals.  Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v.  The federal government and the states share funding for the program.  Each state has established outpatient Medicaid prescription drug coverage.  Accordingly, Medicaid drives high volumes of prescription drug sales.

344.    If a drug manufacturer wants its products to be covered by Medicaid, the federal government requires that manufacturer to sign a rebate agreement.  42 U.S.C. §§ 1396a(a)(1)(A), 1396d(a)(12), and 1396r-8(a)(1).  The basic rebate contemplated by the agreement ensures that Medicaid pays manufacturers no more—and sometimes less—than any private purchaser in the United States for outpatient prescription drugs.  42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C).  The manufacturer directly pays the Medicaid rebate on outpatient prescription drugs

to each state Medicaid agency.  42 U.S.C. §§ 1396r-8(k)(1) and 1396r-8(c)(1)(C).  All forms of the Medicaid rebate are based on the average manufacturer price ("AMP") paid by wholesalers, inclusive of all discounts and price reductions for drugs distributed to the retail pharmacy class of trade.  42 U.S.C. § 1396r-8(c)(1).

345.    The rebate for products marketed under a New Drug Application, or NDA, *i.e.*, branded drugs or non-branded versions of an NDA product, Plfs. Ex. 408 at WAR0006070, is equal to (1) the greater of 15.7% of AMP for the product or (2) the difference between AMP for the product and the lowest price at which the product is sold (the so-called "best price"), times the number of Medicaid units dispensed.  *See generally* Plfs. Ex. 523 (WTC0001679-87) (explaining how best-price rebates are calculated).  To minimize rebates, then, a manufacturer wants a spread that is as small as possible between the AMP and the best price for the drug.  Plfs. Ex. 408 at WAR0006070-6073.  This means that the manufacturer has to discount carefully, lest the profit that would come from increased sales at the lower price be offset or exceeded by liability for Medicaid rebates.  *Id.* at WAR0006071.

346.    But there was a loophole that Schering-Plough sought to exploit.  Drugs sold at "nominal prices" (*i.e.*, at a discount of 90% or more) under certain circumstances need not be considered in determining the best price for a given drug.  42 U.S.C. §1396r-8(c)(l)(C).  So as Schering-Plough admits, it undertook to sell Proventil inhalers at nominal prices to certain segments of the marketplace as to which it wanted to give discounts.  Plfs. Ex. 714 (SP 000939-SP 000949) (discussing implementation of nominal pricing strategy); Plfs. Ex. 408 (WAR0005993-6097, at 0006072) (discussion of sale of Proventil inhalers at nominal prices); *see also* Deposition of Brian Longstreet ("Longstreet Depo."), 38:12-39:3 ("When I was in the contracts and information group we did institute nominal pricing for [] Proventil inhaler.").  In

other words, instead of giving moderate-size discounts, or even large discounts, to those customers, Schering-Plough opted to sell its branded inhalers to them at next-to-nothing prices. Plfs. Ex. 408 at WAR0006072; Plfs. Ex. 714 at SP 000942 ("Nominal pricing is in some cases less than our standard cost and may be below the standard cost of a generic manufacturer.  Are we in danger of predatory pricing?").  Whatever money Schering-Plough lost in the process of discounting to such an extraordinarily high degree was made up for in terms of savings as to the best-price rebates that it would have to pay if it had sold the products at more moderate discounts.  *Id.*

347.    A side-effect of this strategy was harm to the Plaintiffs in this case.  Given that it was Schering-Plough's practice not to lower AWPs in tandem with price cuts, enormous spreads developed whenever Schering-Plough employed nominal pricing.  *E.g.*, Plfs. Ex. 408 at WAR0006072.  Accordingly, Plaintiffs paid much more in reimbursement for the nominally priced products than they should have paid.

348.    What is more, the spread was also increased when Schering-Plough would bundle nominally priced products from its subsidiary, Warrick, with its own products.  *See* n.7, *supra*. The actual price the customers would pay for Schering-Plough drugs would be reduced by the value of the extraordinary discounts they were receiving on Warrick drugs.

349.    Furthermore, Warrick sold nominally priced drugs, too.  *E.g.*, Plfs. Ex. 422 (WAR0043141-WAR0043148, at 0043124 and 00043124) (contract with pharmacy, listing contract price for albuterol sulfate solution at $11.50, and later reducing prices to $.30 and then $.08 for the same product); Sept. 2006 Weintraub Dep., 914:5-915:14. The additional profits that Schering-Plough gained by employing the nominal pricing strategy for its branded products were not enough.  Even in the face of generic competition, Schering-Plough knew that it could

continue to, and wished to, sell quantities of its branded products at prices that were a good deal higher than the products' generic counterparts.  Plfs. Ex. 409; Plfs. Ex. 418 (WCT0144924-928) ("Rather than lowering our Proventil prices, I recommend we offer a 2-year Warrick Solution and Syrup market share driven contract addendum to their exisiting GeriMed contract . . . .").  Accordingly, it sought out a way by which it could sell its branded product with relatively moderate discounts while serving customers who would buy product only if it were more heavily discounted.

350.    Enter Warrick.  Schering-Plough recognized that it could use Warrick to sell generic versions of its drugs to buyers demanding heavy discounts.  Plfs. Ex. 409 (WAR0005957-77).  By employing this strategy, Schering-Plough could then figure best-price rebates for Schering-Plough branded and Warrick generic product separately, even though the products would be identical, Plfs. Ex. 408 (WPX0005993-6097, at 0006116), even though both would be manufactured by Schering-Plough or one of its wholly owned subsidiaries, and even though both sellers would be Schering-Plough entities.  Plfs. Ex. 408 (WAR0005993-6097, at 0006061 ("Specifically, under current Medicaid legislation, by establishing separate NDC codes for the same product, i.e., one for Schering and one for Warrick, we believe they would be treated as distinct products for filing purposes.  Thus, we could move deep discounted business for products with minimal full price spillover into Warrick and not be forced to provide large 'best price' rebates in the retail Medicaid market.[10]"), WAR0006070 ("A nonbranded product

---

[10] Schering-Plough was, however, worried that the government would see through the ruse.  Plfs. Ex. 409 (WAR0005957-77, at 0005957) ("If the Government 'pierces the corporate veil' and views Proventil Inhaler and the Private Label [generic] product as identical, incremental medicaid [sic] rebate exposure is as follows: [predicting $18 million and $19.2 in exposure in alternative scenarios for the year 1994].")).

And recently, Schering-Plough agreed to a settlement with the United States and certain of its agencies for hundreds of millions of dollars, in part to address claims that Schering-Plough had "knowingly misreported its best price to HCFA and underpaid its Medicaid rebates for Clariting Redi-Tabs by omitting from its determination of best price deeply discounted Claritin Redi-Tabs that were provided to [HMO] Kaiser [Permanente Medical Care

- 111 -

marketed under a separate NDC remains subject to the best price formula; however, this nonbrand will establish a separate AMP and best price relative to the brand.").

351.    Like Schering-Plough itself, Warrick could also minimize Medicaid rebates by pushing certain sales into the nominal-price category, so as not to set a best price that would be significantly less than the AMP for its drugs.  So everyone would win—or at least, Schering-Plough, Warrick, and the purchasing entities that would seek AWP-based reimbursement on the basis of inflated spreads would win.  But the states that were denied the best-price rebates they should have received, and the Plaintiffs here, definitely lost.  As for the Plaintiffs, they paid for Warrick nominally priced drugs at a much higher rate than they should have had to pay.

### (c)    The effects of the Integrated Therapeutics Group

352.    Yet another Schering-Plough subsidiary, Integrated Therapeutics Group ("ITG"), would also prove helpful to Schering-Plough in amplifying the spreads of its branded and generic drugs.  *See generally* Declaration of Beatrice E. Manning, Ph.D ("Manning Decl.") (trial declaration of Schering-Plough whistleblower); Pironti Decl.  Schering-Plough's scheming via ITG, which centered on the Schering-Plough drug Claritin, led to a whistleblower suit and nearly $350 million in criminal fines and civil settlements.  Manning Decl., ¶ 7; Pironti Decl., ¶ 5; Declaration of Charles M. Alcorn ("Alcorn Decl.") (trial declaration of Schering-Plough whistleblower), ¶ 8.  In brief, among its many off-book inducements to purchase Schering-Plough drugs, ITG would give Schering-Plough customers unreported free or nominally priced drugs, including Proventil and Warrick-branded inhalers, as well as payments in the form of "administrative fees," "partnership fees," and "data fees."  Manning Decl., ¶¶ 9-11; Pironti Decl., ¶¶ 7-9, 12-13; Alcorn Decl., ¶¶ 13-14.

---

Program] to effectuate an agreed-upon lower price. . . ,"  among other claims regarding best-price determinations.  Plfs. Ex. 559.

353.    Where Schering-Plough/Warrick, via ITG, gave customers free or nominally priced subject branded and generic drugs, those free or nearly free products had the effect of decreasing actual acquisition prices for those drugs.  Manning Decl., ¶¶ 12-13; Pironti Decl., ¶¶ 8-9, 13.  This, in turn, increased the spread in light of Schering-Plough's and Warrick's policies not to lower AWPs even in the face of declining actual acquisitions prices, and Schering-Plough and Warrick exploited those increased spreads in their marketing.  Manning Decl., ¶ 13; Pironti Decl., ¶¶ 12, 14; Alcorn Decl., ¶¶ 13-17.

### c.    Individual Brand and Price Histories Reveal the Schering-Plough Group's Manipulation of Spreads

### (1)    Albuterol sulfate (generic)

354.    Warrick's marketing of albuterol inhalation products covered under the Medicare Part B DME provisions was done in the light of enormous spreads that its pricing practices created.  The annual spreads of reported/captured discounts and rebates is evidenced by the AWP/pricing spreads reflected in analysis of the transactional data that shows spreads ranging from 103.3% to 1052.8%.  Hartman Testimony Attach. G.4.c.

355.    The evidence suggests that the spread percentages are higher than reflected in the transactional data because many rebates, such as administrative fee rebates, new product launch rebates, certain customer chargeback rebates, and certain auto-substitution contract sales rebates were not captured in the databases provided by the Schering-Plough Group.  Plfs. Ex. 501 (SW 0398802-05) (Feb. 13, 2002 Report showing Warrick Rebate Programs and whether described rebates were captured or not captured in the Tram database, which was the original data source for produced databases); Plfs. Ex. 674 (SPW0040831) (discussing auto-sub chargebacks).

356.    Warrick created favorable marketing spreads by maintaining a fixed AWP and reducing the acquisition price to move the market.  *E.g.*, Plfs. Ex. 497.

357.    Warrick marketed the spread on generic albuterol by direct advertisement to customers by showing the fixed AWP juxtaposed with the acquisition price.  *E.g.*, Plfs. Exs. 436, 437, 443, 445, 450, 455; *see also* Manfredi Dep., 237:5-15 ("Q. How would a pharmacy benefit from receiving information from a telemarketer regarding Warrick's drugs that is comparing the cost on that product to the AWP on that same product?  A. Yeah.  I think a pharmacy would benefit from knowing on any product what the cost and AWP are.  Q. And that's what's known in the industry as the spread, right?  A. Yes.") (objection omitted).

358.    In addition to advertising the AWP-acquisition price, Warrick, as a routine marketing practice to increase sales of albuterol, offered customers off-invoice discounts and price-protected orders to increase the spread.  *E.g.*, Plfs. Ex. 431 (WAR0022429) (referencing "30 day price protected order" on albuterol solution, following price increase); Plfs. Ex. 638 (SPW013818-SPW013822) (indicating that "price-protected order form for up to your average monthly purchase of Albuterol Solution 20 mL, will be sent to [the customer] shortly," with attached memorandum from the customer, describing the effect of same).

### (2)    Intron-A

359.    Marketing the profitability to physicians of Intron-A treatment for bladder cancer is demonstrated by a 1998 memorandum to oncology sales representatives.  The message was: "***Treating bladder patients with Intron is still very profitable!!***"  **One patient on Intron can represent $16,956.36 of incremental sales and $2,373.84 of profit for our physicians just on the drug alone.**  These figures are based on having your physicians buy Intron-A at Net Direct pricing and treating on high dose of Intron. . . ."  Plfs. Ex. 394 (SPF0104510-512) (emphasis added); *see also* Plfs. Ex. 397 (SW0027026) ("Cost Analysis for Superficial Bladder Cancer," showing profitability of treatment using Intron-A); Plfs. Ex. 723 (SW00719241).

360.     Reported off-invoice discounts[11] and rebates are captured within the transactional databases produced to plaintiffs.  Calculations based on the Schering-Plough databases show spreads for Intron-A up to 132%.  Hartman Testimony Attach. G.4.c.

### (3)     Proventil (branded albuterol)

361.     The Schering-Plough albuterol line of products was marketed under the Schering Proventil and Warrick generic labels.  The products were identical and manufactured under the same NDA, but with different NDCs.  Aug. 2005 Weintraub Dep., 63:9-64:16.

362.     At the outset of the Class Period in 1991, Proventil still enjoyed the price protection inherent to on-patent status, and the AWP/actual sales price spread generally reflected the standard AWP mark-up of 20%.  However, in anticipation of generic competition in 1992 and the launch of albuterol generics in 1993, Schering increased the spread in order to compete against other manufacturers.  The highest spread for Proventil is documented in 2004Q1 and was 1169.7%.  Hartman Testimony Attach. G.4.c.

363.     Actual spreads for Proventil were hidden by bundling discounted or nominally priced Warrick solution to make up value differences or by having discounts or rebates on Proventil sales paid by Warrick through the Schering Brand/Warrick Generic Market Share Programs.  *E.g.* Plfs. Ex. 396 (Warrick proposal to CVS retail pharmacies).

### 4.     The Schering-Plough Group marketed spreads

364.     Schering-Plough marketed the spread for its branded products.  Alcorn Decl., ¶¶ 15-17.

365.     Schering-Plough regularly disseminated price lists showing direct, or net direct prices, often before additional rebates or discounts that were available to the customers,

---

[11] Schering had a standard form marketing Intron-A only by offering an off-invoice discount of 14% off NDP (~30% off AWP) if the quarterly utilization rate met or exceeded the quarterly national-market-share benchmark reported by NDC.  *See* Plfs. Ex. 395 (SPW0042545).

juxtaposed with the AWPs for those products.  Feb. 2003 Weintraub Dep. at 429:23-25, 430:1-25, 431:1; Kamins Dep. at 39:22-41:19, 74:18-76:5.  These price sheets, which displayed AWPs, allowed customers to calculate spreads—and profits—instantly.  And because these price sheets often reminded customers that they were eligible for further discounts off of the quoted direct prices, they served as powerful marketing aids.

366.     In addition, Schering-Plough sales representatives employed other marketing aids that displayed spreads and touted profitability even more explicitly.  Butler Dep. at 31:9-32:15, 42:4-9; Alcorn Decl., ¶¶ 15-17.

367.     Warrick marketed the spread for its generic products.

368.     Warrick regularly disseminated materials showing direct, or net direct prices, often before additional rebates or discounts that were available to the customers, juxtaposed with the AWPs for those products.  Mar. 2002 Sherman Dep., 45:12-14; Manfredi Dep., 116:2-13, 117:17-119:8 ("It would not be uncommon for AWP listed on an ad [directed to retail pharmacies, managed care, buyers at chains, and wholesalers . . . .].");  Sept. 2006 Weintraub Dep., 408:21-409:22, 512:12-513:15, 516:19-519:17; Plfs. Ex. 719 (various price notices, including AWPs, direct prices, and references to actual price diminishments of many sorts).  These materials allowed customers to calculate spreads—and profits—instantly.  And because these materials often reminded customers that they were eligible for further discounts off of the quoted direct prices, they served as powerful marketing aids.

## IV.     CONCLUSIONS OF LAW

### A.     Jurisdiction And Venue

369.     This Court has proper subject matter jurisdiction over this diversity action.

370.     Venue properly lies in the District of Massachusetts.

B.      **The Liability Period**

The liability period parallels the Class Periods for Classes 2 and 3, which the Court has

defined as January 1, 1991 to January 1, 2005, and January 1, 1991 to the present, respectively.

*See* Jan. 30, 2006, Consolidated Order Re: Motion for Class Certification, at 7 (Dkt. No. 2097-1).

C.      **Legal Standards**

1.      **The Meaning of AWP in the Medicare Part B Program and the Private Insurance Market**

a.      **AWP as used in the Medicare Part B program was intended to be an actual average of wholesale prices**

371.    It is the Court's duty is to interpret the meaning of AWP as that phrase is used in

the regulatory scheme.  *See*, *e.g.*, *In re Pharm. Indus. Average Wholesale Price Litig.*, 263 F.

Supp. 2d 172, 181 (D. Mass. 2003) ("*In re AWP*") (observing that it is the Court's duty to engage

in the "heartland task of construing statutory language"); *see also Bureau of Alcohol, Tobacco &*

*Firearms v. Federal Labor Relations Auth.*, 464 U.S. 89, 98 n.8 (1983) (observing that "deciding

what a statute means" is "the quintessential judicial function") (quoted with approval in *In re*

*AWP*); Statutory construction is clearly a matter of law.  *See*, *e.g.*, *Sprint Spectrum, L.P. v. Town*

*of Ogunquit*, 175 F. Supp. 2d 77, 89 (D. Me. 2001) ("statutory construction is a matter of law")

(quoting *Home Builders Ass'n of Me., Inc. v. Town of Eliot*, 750 A.2d 566 (Me. 2000)); *In re*

*Aiken*, 133 B.R. 258, 259 (D. Me. 1991) ("Questions of statutory construction are questions of

law."); *see also Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 698-99 (1st Cir. 1994)

(Court engaged in statutory construction and noted that "[i]n the game of statutory interpretation,

statutory language is the ultimate trump card'; only a "'clearly expressed legislative intention'

contrary to [the statutory] language . . . would require [the court] to question the strong

presumption that Congress expresses its intent through the language it chooses" ) (quoting *INS v.*

*Cardoza-Fonseca*, 480 U.S. 421, 432 n.12 (1987)).

372.    In 1997, Congress enacted the Balanced Budget Act of 1997 (the "BBA"), which, among other things, amended 42 U.S.C. § 1395u to add the following subsection, effective January 1, 1998:

> (o)(1)  If a physician's, supplier's or any other person's bill or request for payment for service includes a charge for a drug or biological for which payment may be made under [Part B] and the drug or biological is not paid on a cost or prospective payment basis as otherwise provided in this part . . ., the amount payable for the drug or biological is equal to . . . 95 percent of the average wholesale price.

373.    Congress did not define the words "average wholesale price."

374.    "Where, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"  *In re Bajgar*, 104 F.3d 495, 497 (1st Cir. 1997) (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of the drafters.'"  *Id.*; *In re Hart*, 328 F.3d 45, 49 (1st Cir. 2003); *see also United States v. Lachman*, 387 F.3d 42, 50 (1st Cir. 2004) ("if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written"); *United States v. Thompson*, 32 F.3d 1, 5 (1st Cir. 1994) ("When interpreting a statute, it is axiomatic that a court must first look to the plain words and structure of the statute" and "accord[] words in common usage their ordinary meaning."); *Laracuente v. Chase Manhattan Bank*, 891 F.2d 17, 23 (1st Cir. 1989) (construing meaning of statute as a matter of law and noting that "in the absence of a clearly expressed legislative intention to the contrary, the plain language of the statute is conclusive") (citation omitted).

375.    "Dictionaries of the English language are a fundamental tool in ascertaining the plain meaning of terms used in statutes and regulations."  *Lachman*, 387 F.3d at 51.  Dictionaries

show that "average" has a definite meaning as a mean proportion, and that "wholesale price" refers to the price that a retailer pays in expectation of reselling to its customers at a higher price in order to make a profit.  *See* BLACK'S LAW DICTIONARY at 135 and 1597 (6th ed. 1990); AMERICAN HERITAGE DICTIONARY at 144 (2d ed. 1991).

376.    Accordingly, the Court defines "average wholesale price," as used in 42 U.S.C. 1395u(o)(1) as the mean price that a retailer pays in expectation of reselling the drug.

377.    This plain interpretation of "average wholesale price" comports with the Medicare statute and its general payment objectives to reimburse for drugs and biologicals based upon standards of "reasonable charges" and "reasonable cost."  42 U.S.C. §§ 1395l(a)(1), 1395x(v); *see* S. Rep. No. 404, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.A.A.N. at 1985.  *See also Lachman*, 387 F.3d at 51 (in evaluating different definitions when applying the plain meaning rule, the Court should adopt the definition most consistent with the statute's purpose).

378.    Furthermore, this plain interpretation is consistent with regulations previously issued by the Secretary of Health and Human Services ("Secretary") anchoring Medicare Part B drug reimbursement to estimated costs.  In 1991, the Secretary limited Medicare Part B payments for covered drugs to the lower of the estimated acquisition cost or the national average wholesale price of a drug.  This regulation, set forth below, governed Part B drug payments until 1997, when Congress passed the BBA:

> (b)  Methodology.  Payment for a drug [not paid on a cost or prospective basis] is based on the lower of the estimated acquisition cost or the national average wholesale price of the drug.  The estimated acquisition cost is determined based on surveys of the actual invoice prices paid for the drug.  In calculating the estimated acquisition cost of a drug, the carrier may consider factors such as inventory, waste and spoilage.
>
> (c)  Multiple-Source drugs.  For multiple-source drugs, payment is based on the lower of the estimated acquisition cost described in paragraph (b) of this section or the wholesale price that, for this

- 119 -

> purpose, is defined as the median price for all sources of the
> generic form of the drug.

56 Fed. Reg. 59502, 59621 (Nov. 25, 1991) (promulgating 42 C.F.R. § 405.517).  It is clear that

"national average wholesale price" as used in the regulation referred to a national average of

actual prices.  First, this regulation reflected the Secretary's recognition in proposing the rule that

"Medicare policy, since the beginning of the Medicare program, has been to base payments for

'incident to' drugs on the estimated acquisition costs."  56 Fed. Reg. 25800 at 25.  Second, the

Secretary recognized that the general practice had been for carriers to base payment on the

"physician's estimated cost of the drug using one of the wholesale price guides such as the Red

Book" although "some carriers base[d] payment on actual acquisition costs determined on the

basis of carrier surveys."  *Id.* at 22; *see also id.* at 124 ("As explained in section IV.A.5.c,

carriers generally base payment for covered drugs on the physician's estimated cost of the drug

using one of the wholesale price guides such as the Red Book, which is an annual pharmacists'

reference published by the Medical Economics Company, Inc., Oradell, New Jersey").  Thus, the

Secretary had originally linked the AWPs published in the *Red Book* with the physician's

estimated cost of the drug.

379.    This payment system remained in place until 2003, when Congress passed the

Medicare Prescription Drug, Improvement and Modernization Act (the "MMA") (*see* Pub. L.

108-173, 117 Stat. 2066 (2003)), under which Congress limited Medicare drug payments for

most Part B drugs to 85 percent of the average wholesale price beginning April 1, 2004, and to

106 percent of the "average sales price" starting January 1, 2005.  *Id.* at § 2238 (amending 42

U.S.C. § 1395w-3).

**b.  In the private insurance market, AWP is supposed to be a reasonably accurate signal of prevailing prices**

380.  The evidence demonstrates that, outside of the Medicare Part B context, AWP is the most widely used benchmark used by third-party payers to reimburse physicians administering drugs to insured patients.

381.  As the Court has previously found, "[t]he AWP, or its formulaic equivalent the WAC (Wholesale Acquisition Cost), is interpreted by [the] industry as the signal for the underlying structure of list and transaction prices for almost all drugs."  *In re AWP*, 230 F.R.D. 61, 68 (D. Mass. 2005) (quoting Hartman).

382.  Furthermore, the evidence reveals that TPPs view AWP as a ***reasonably accurate*** signal of actual wholesale prices, and this is why industry participants have used AWP as a benchmark for reimbursement.

**2.  G.L. Ch. 93A Prohibits Unfair and Deceptive Acts or Practices in the Conduct of Trade or Commerce**

383.  Massachusetts Gen. Laws Ch. 93A, § 2 prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Chapter 93A "is a statute of broad impact" passed "to aid consumers and others . . . by making conduct unlawful which was not unlawful under the common law or any prior statute."  *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 693, 322 N.E.2d 768, 772 (1975) (quoting *Commonwealth v. De Cotis*, 366 Mass. 234, 244 n.8 (1974)).  In particular, the definition of an actionable unfair or deceptive act or practice "goes far beyond the scope of the common law action for fraud and deceit."  *Id.* at 703.  "[T]echnicalities are not to be read into the statute in such a way as to impede the accomplishment of substantial justice."  *Leardi v. Brown*, 394 Mass. 151, 159, 474 N.E.2d 1094, 1101 (1985) (quoting *Baldassari v. Public Fin. Trust*, 369 Mass. 33, 41 (1975)).

384.     The Court need not find the presence of both unfair and deceptive conduct in order to find that Defendants violated G.L. Ch. 93A.  A practice can be unfair without being deceptive.  *See*, *e.g.*, *Service Publications, Inc. v. Goverman*, 396 Mass. 567, 578, 487 N.E.2d 520, 527 (1986).

385.     In construing G.L. Ch. 93A, courts are to be guided by interpretations given by the Federal Trade Commission and federal courts to section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1).  Mass. Gen. Laws Ch. 93A, § 2(b); *Slaney*, 366 Mass. at 694; *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 595, 321 N.E.2d 915, 917 (1975); *accord*, 940 Ma. Admin. § 3.16(4) (act or practice is a violation of Ch. 93A if it violates the FTC Act).

### a.     Unfair acts or practices standards

386.     An unfair act or practice is not amenable to a bounded definition because, as courts have recognized, "[i]t is impossible to frame definitions which embrace all unfair practices.  There is no limit to human inventiveness in this field."  *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 503, 396 N.E.2d 149, 153 (1979) (quoting H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess. (1914)).  Nonetheless, Massachusetts courts, following federal jurisprudence under the Federal Trade Commission Act, have employed the following factors in evaluating whether conduct is unfair:  (i) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (ii) whether it is immoral, unethical, oppressive or unscrupulous; and (iii) whether it causes substantial injury to consumers, competitors or other business people.  *PMP Assocs., Inc.*, 366 Mass. at 596 (citing *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972)).

387.     "Whether a given practice runs afoul of these touchstones must be determined from the circumstances of each case."  *Levings*, 8 Mass. App. Ct. at 504.  In doing so, courts

evaluate the "equities between the parties," and "[w]hat a defendant knew or should have known may be relevant" in making that determination. *Swanson v. Bankers Life Co.*, 389 Mass. 345, 349, 450 N.E.2d 577, 580 (1983). The Court is to "focus on the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors in making a G. L. c. 93A fairness determination." *Massachusetts Employers Ins. Exch. v. Propac-Mass, Inc*., 420 Mass. 39, 43, 648 N.E.2d 435, 438 (1995).

### b.    Deceptive acts or practices standards

388.    An act or practice is deceptive if it possesses a tendency to deceive. *Leardi*, 394 Mass. at 156.

389.    "In determining whether an act or practice is deceptive, 'regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have upon the general public.'" *Leardi*, 394 Mass. at 156 (quoting *P. Lorillard Co. v. FTC*, 186 F.2d 52, 58 (4th Cir. 1950)). The plaintiff need not prove that the defendant intended to deceive the plaintiff. *Aspinall v. Philip Morris Cos.*, 442 Mass. 381, 394, 813 N.E.2d 476, 486 (2004). Nor is proof of reliance required as long as there is a causal relationship between the act or practice and injury to the plaintiff. *Fraser Eng'g Co., Inc. v. Desmond*, 26 Mass. App. Ct. 99, 104, 524 N.E. 2d 110, 113 (1988).

### 3.    Relevancy of the OIG Guidelines

390.    The OIG has issued Guidelines that also inform the Court's analysis of whether the Track 1 Defendants have committed unfair or deceptive acts or practices in violation of G.L. Ch. 93A.

391.    Pharmaceutical manufacturers are under a ***legal duty*** not to submit "false, fraudulent, or misleading information" where "reimbursement by Medicare and Medicaid[]… for the manufacturer's product depends, in whole or in part, on information generated or reported by

- 123 -

the manufacturer, ***directly or indirectly***, and the manufacturer has knowingly … failed to generate or report such information completely and accurately." *OIG Compliance Program Guidance for Pharmaceutical Manufacturers*, 68 Fed. Reg. 23731, at 23733 (May 5, 2003) (emphasis added).

392.   "Where appropriate, manufacturers' reported prices should accurately take into account price reductions, cash discounts, free goods contingent on a purchase agreement, rebates, up-front payments, coupons, goods in kind, free or reduced-price services, grants, or other price concessions or similar benefits offered to some or all purchasers." *Id.*

393.   "If a pharmaceutical manufacturer purposefully manipulates the AWP to increase its customers' profits by increasing the amount the federal health care programs reimburse its customers, the anti-kickback statute is implicated." *Id*. at 23737.

394.   "[I]t is illegal for a manufacturer knowingly to establish or inappropriately maintain a particular AWP if one purpose is to manipulate the 'spread' to induce customers to purchase its product." *Id.*

395.   "The conjunction of manipulation of the AWP to induce customers to purchase a product with active marketing of the spread is strong evidence of the unlawful intent necessary to trigger the anti-kickback statute.  Active marketing of the spread includes, for example, sales representatives promoting the spread as a reason to purchase the product or guaranteeing a certain profit or spread in exchange for the purchase of a product." *Id.*

**D.    Findings That Defendants Committed Unfair Or Deceptive Acts Or Practices In Trade Or Commerce**

396.   Plaintiffs have proved by a preponderance of the evidence that they mailed or delivered an adequate demand letter to each Track 1 Defendant.

397.     Plaintiffs have proved by a preponderance of evidence that each Track 1 Defendant was engaged in trade or commerce.

398.     As discussed further below, Plaintiffs have proved by a preponderance of evidence that each Track 1 Defendant committed unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ch. 93A, §§ 2, 9 and 11.

### 1.     Each Track 1 Defendant Committed Unfair Acts or Practices

399.     Plaintiffs have proved by a preponderance of the evidence that each Track 1 Defendant committed unfair acts or practices.

400.     Defendants perpetuated the publication of the inflated AWPs set forth in Attachment G to the Hartman testimony while knowing full well that those same AWPs constitute the Medicare Part B reimbursement benchmark for Class 2 and the private insurance reimbursement benchmark for Class 3.  In the case of Class 2, those AWPs did not reflect an actual average of prices in the marketplace, as Congress intended them to be.  Consequently, for Class 2 the Court finds as unfair AWPs exceeding an actual average of actual costs to physicians. Nor did those AWPs constitute reasonable pricing signals as the members of Class 3 reasonably expected them to be.  For purposes of Class 3, the Court finds as unfair AWPs that exceed by 30% an actual average of costs to physicians.

401.     Defendants also manipulated spreads between AWPs and actual costs, as the spreads in Hartman Testimony Attachment G reflect.

402.     To varying degrees, each Defendant also took concrete steps to market those spreads to providers.

403.     Each of the foregoing actions constitutes unfair acts or practices.  First, they fall within the penumbra of common-law, statutory, or other established concept of unfairness, particularly given the OIG's admonitions that:  (i) AWP must be a meaningful figure that is not

artificially inflated; (ii) the "government sets reimbursement with the expectation that the data provided are complete and accurate" and include various price reductions; and (iii) it is illegal for a manufacturer to knowingly establish or inappropriately maintain a particular AWP if one purpose is to manipulate the "spread" to induce customers to purchase its product.

404.     Second, that same conduct is immoral, unethical, oppressive or unscrupulous.  It rises to a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings*, 8 Mass. App. Ct. at 504.  Or, as another court has waxed, it leaves a "rancid flavor of unfairness." *Propac-Mass, Inc*., 420 Mass. at 43 (quoting *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226, 598 N.E.2d 666 (1992)).  And although they perpetrated such conduct, even the Track 1 Defendants recognized that manipulating and marketing spreads was unethical or wrong.  *See, e.g.,* Schultz Dep. II at 93-95, 124-29 (AstraZeneca Pricing Strategy Manager, Erik Schultz, explained that he thought it was "sleazy" and "an ethical problem" for AstraZeneca to evaluate and increase the AWPs for Zoladex based on whether physicians were making enough profit); Levonyak Dep. at 80-81, 91-93, 214-18 (Kytril Sales Director explaining how SKB sales force discussed spread issues with customers, then were prohibited from doing so, and then were authorized to discuss in a nuanced manner); Plfs. Ex. 223 (BMS/AWP/000192875-76, acknowledging that "the spread should not be used as a promotional or marketing tool"); Glassco Dep. at 113-14 (Centocor's National Accounts Manager and Regional Business Director instructing employees to stop talking to physicians about profit); Plfs. Exs. 905-908 (letters between Glaxo and SmithKlineBeecham accusing each other of unethical marketing of the spread).  Gouging elderly Medicare Part B beneficiaries is immoral, unethical, oppressive and unscrupulous, especially when the most vulnerable among them – seniors going through traumatic cancer treatments – are adversely affected.

- 126 -

405.   Third, Defendants' conduct is also unfair because it has caused substantial injury to consumers, competitors or other business people, as detailed further below.

### 2.   Each Track 1 Defendant Committed Deceptive Acts or Practices

406.   Plaintiffs have proved by a preponderance of the evidence that each Track 1 Defendant's course of conduct was deceptive because it had the tendency or capacity to deceive.

407.   Defendants' deliberate decision to report AWPs to national pharmaceutical industry publications or list prices with knowledge of how they would be marked up to result in AWPs – knowing that these published AWPs would form the basis of an industry-wide reimbursement system – obligated Defendants by law to ensure that these pricing benchmarks were *not* misleading.  But the AWPs for the Subject Drugs were misleading.

408.   For example, it is axiomatic under statutes prohibiting misrepresentations that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party." *V.S.H. Realty, Inc. v. Texaco, Inc.*, 757 F.2d 411, 414 (1st Cir. 1985); *see also Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987) (RICO and securities claims).  Indeed, the First Circuit has specifically held that "[w]hen a corporation does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate." *Roeder*, 814 F.2d at 26; *Cambridge Plating Co. v. Napco, Inc.*, 85 F.3d 752, 769-70 (1st Cir. 1996) (seller's failure to disclose that a critical component was missing from system it sold to buyer and its misdirection of the buyer's attention to operator error as the source of the system's problems supported the District Court's conclusion that the seller behaved both unfairly and deceptively under Chapter 93A).  "'Fragmentary information may be as misleading . . . as active misrepresentation, and half-truths may be as actionable as whole lies . . . .'" *V.S.H. Realty*, 757 F.2d at 414-15 (quoting *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708 (1969)).  Thus, if a drug manufacturer "chooses to reveal relevant, material

information even though it had no duty to do so, it must disclose the whole truth." *Roeder*, 814

F.2d at 26 (quoting *Grossman v. Waste Mgmt., Inc*., 589 F. Supp. 395, 409 (N.D. Ill. 1984)); *see*

*also Turner v. Johnson & Johnson*, 809 F.2d 90, 100 (1st Cir. 1986) (finding that "an incomplete

or partial statement may be the basis for fraud when only full disclosure would avoid

deception"); *Augat, Inc. v. Collier*, 1996 U.S. Dist. Lexis 2702, at *47 (D. Mass. Jan. 22, 1996)

(noting that disclosure of partial information may be fraudulent); *Union Pac. Res. Group, Inc. v.*

*Rhone-Poulenc, Inc*., 247 F.3d 574, 586 (5th Cir. 2001) (finding disclosure of "some but less

than all material facts" may be actionable where "partial disclosure convey[s] a false

impression.").

409.    Moreover, the Court finds relevant to the deception determination the OIG's

admonitions that:  (i) AWP must be a meaningful figure that is not artificially inflated; (ii) the

"government sets reimbursement with the expectation that the data provided are complete and

accurate" and include various price reductions; and (iii) it is illegal for a manufacturer to

knowingly establish or inappropriately maintain a particular AWP if one purpose is to

manipulate the "spread" to induce customers to purchase its product.

410.    Defendants were not required to volunteer their WLPs, WACs or AWPs to

pricing compendia, like the *Red Book*, which supplied AWPs to Medicare.  And for those

Defendants who provided mark-up factors, they were not required to direct the *Red Book* to use

specified mark-up factors to derive the AWP.  But once Defendants chose to do so – knowing

fully that Medicare and other payors would be reimbursing at those inflated prices – Defendants

became obligated to ensure that their representations were accurate.  They were not.  In the case

of Class 2, those AWPs did not reflect an actual average of prices in the marketplace, as

Congress intended them to be.  Consequently, for Class 2 the Court finds as deceptive AWPs

exceeding an actual average of actual costs to physicians.  Nor did those AWPs constitute

reasonable pricing signals as the members of Class 3 reasonably expected them to be.  For

purposes of Class 3, the Court finds as deceptive AWPs that exceed by 30% an actual average of

costs to physicians.

411.    Moreover, as the evidence demonstrates, each Track 1 Defendant enacted a

concerted scheme to manipulate spreads on their Subject Drugs and then market those spreads.

"[T]he effect [that this] might reasonably be expected to have upon the general public," *Leardi*,

394 Mass. at 156, is obvious:  millions of Medicare Part B beneficiaries have become obligated

to make inflated co-payments for Subject Drugs as a direct and proximate result of the Track 1

Defendants' AWP manipulation, and at no fault of their own.

### 3.    Defendants have also Violated Ch. 93A as Result of Violating Federal Trade Commission Law

412.    As noted, in construing G.L. Ch. 93A, courts are to be guided by interpretations

given by the Federal Trade Commission and federal courts to section 5(a) of the Federal Trade

Commission Act, 15 U.S.C. § 45(a)(1).  Mass. Gen. Laws Ch. 93A, § 2(b); *Slaney*, 366 Mass. at

694; *PMP Assoc., Inc.*, 366 Mass. at 595.

413.    By rule, an act or practice is a violation of Ch. 93A if it violates the FTC Act.

Mass. Regs. Code tit. 940, § 3.16(4).  Attorney General rules and regulations, including those

relating to Chapter 93A, "unless invalid, have the force of law."  *Homsi v. C.H. Babb Co.*, 10

Mass. App. Ct. 474, 479, 409 N.E.2d 219, 224 (1980) (citation omitted).

414.    Disseminating pricing information when fully aware that such prices are not the

usual and customary prices at which the products are sold – as Defendants have done –

constitutes unfair and deceptive practices under the Federal Trade Commission Act.  *See Matter*

*of Regina Corp.*, 61 F.T.C. 983, 1962 F.T.C. Lexis 92, at *34-36 (Oct. 11, 1962) (citing cases)

("*Regina I*"), *aff'd*, *Regina Corp. v. F.T.C.*, 322 F.2d 765 (3rd Cir. 1963), *and modified by Matter of Regina Corp.*, 65 F.T.C. 246, 1964 F.T.C. Lexis 30 (Apr. 7, 1964) ("*Regina II*").

415.    At issue in *Regina* were fictitious list prices supplied by a manufacturer to "distributors and retailers . . . thereby representing, directly or indirectly or by implication, that such 'list' prices are the usual and customary retail prices for such merchandise," 1962 F.T.C. Lexis 92, at *2-3.  Initially, the FTC found that this violated the FTC Act and issued a cease and desist order against Regina on the basis that

> [m]isrepresentations of the usual and customary value of a product
> and of savings afforded by an offered sale price of such product are
> unfair and deceptive practices under the Federal Trade
> Commission Act. . . .  In this case, Regina disseminated its
> suggested list prices to resellers rather than directly to the
> purchasing public.  Regina was fully aware that these suggested
> list prices were not the usual and customary retail prices at which
> Regina products were sold in the trading areas involved.  In so
> furnishing fictitious retail prices to resellers, Regina placed in the
> hands of retailers and others the means and instrumentalities by
> which they could mislead and deceive the purchasing public.  Such
> practice is a violation of the Federal Trade Commission Act.

*Regina I*, 1962 F.T.C. Lexis 92, at *34-35 (citations omitted).  *See also Niresk Indus., Inc. v. FTC*, 278 F.2d 337, 340 (7th Cir. 1960) ("Misrepresentations of the regular and customary value of a product offered for sale and of savings afforded by an offered sale price of such product are unfair and deceptive practices as defined by the Act.").

416.    As another court has explained in another FTC action from the same time period:

> Fictitious prices are illegal even though it is obvious to the
> sophisticated that the price tag is only a come-on.  "The law is not
> made for the protection of experts, but for the public – that vast
> multitude which includes the ignorant, the unthinking and the
> credulous, who, in making purchases, do not stop to analyze, but
> are governed by appearances and general impressions."

*Helbros Watch Co. v. FTC*, 310 F.2d 868, 870 n.4 (D.C. Cir. 1962) (citations omitted).

417. After the Court of Appeals for the Third Circuit affirmed *Regina I*, the FTC

updated its pricing guidelines to provide that list prices cannot be used unless "substantial (that

is, not isolated or insignificant) sales are made in the advertiser's trade area (the area in which he

does business)." 16 C.F.R. § 233.3(d). The rationale underpinning the rule:

> Many members of the purchasing public believe that a
> manufacturer's list price, or suggested retail price, is the price at
> which an article is generally sold. Therefore, if a reduction from
> this price is advertised, many people will believe that they are
> being offered a genuine bargain. To the extent that list or
> suggested retail prices do not in fact correspond to prices at which
> a substantial number of sales of the article in question are made,
> the advertisement of a reduction may mislead the consumer.

16 C.F.R. § 233.3(a).

418. The FTC then modified the terms of the cease and desist order issued in *Regina I*

in light of the new guidelines. *Regina II*, 1964 F.T.C. Lexis 30, at *8-10. Under the modified

order, the FTC ordered the manufacturer to cease and desist from "[a]dvertising or disseminating

any list or preticketed price unless such price is a good faith estimate of the actual retail price and

does not appreciably exceed the highest price at which substantial sales are made in respondent's

trade area." *Id.*, at *10.

419. The FTC did not define "substantial." However, the D.C. Circuit in *Helbros*

*Watch* had previously upheld the FTC's ruling that "preticketing" constituted unlawful "fictitious

pricing" where 40% of all sales were made at prices substantially less than the preticketed price.

310 F.2d at 870.

420. The FTC has also made clear that phony wholesale prices are forbidden.

*Federated Nationwide Wholesalers Serv. v. FTC*, 398 F.2d 253, 257 (2d Cir. 1968) (upholding

FTC finding that calling prices "wholesale" was deceptive when prices charged are uniformly

higher than actual prices paid by retailers).

421.     Furthermore, industry custom of fictitious pricing is not a defense:  "A practice does not 'cease to be . . . (unfair) because the falsity of the . . . representation has become so well known to the trade that dealers, as distinguished from consumers, are no longer deceived.'" *Heavenly Creations, Inc. v. FTC*, 339 F.2d 7, 8 (2d Cir. 1964) (quoting *FTC v. Winsted Hosiery Co.*, 258 U.S. 483, 494 (1922)).

422.     Pursuant to this FTC Act jurisprudence, Defendants' pricing practices here violate the FTC Act as applied in *Regina II* and 16 C.F.R. § 233.3(d).  Defendants' AWPs for the Subject Drugs, which Defendants themselves have deemed "list prices" and which the Court finds are formulaic equivalents to wholesale list prices (and vice versa), violate these well established principles because the record evidence plainly demonstrates that ***no*** sales, let alone "substantial sales," were ever made at those AWPs.

423.     Furthermore, Defendants' wholesale list prices – whether denominated wholesale list prices, wholesale acquisition costs, or some other term (collectively "list prices") – violated the FTC Act, even though Defendants claim that, for some drugs, substantial sales were made at, close to, or very close to, these list prices.  BMS's Taxol and Blenoxane provide two examples. As to the Subject Drugs here at issue, the evidence reveals that at a certain point – sometimes in response to the entry to the market of a generic competitor and sometimes in response to already existing competition – actual sale prices decreased, often dramatically, while Defendants made it their practice ***not*** to submit revised, that is, lower, list prices, to the Publishers, even though Defendants knew that the Publishers would continue regular, periodic re-publications of the list prices that Defendants themselves had previously provided to the Publishers.  After actual prices began tumbling, Defendants could no longer claim that ***substantial*** sales were being made at, close to, or very close to, the list prices that they caused to be published and re-published.

*Regina II*, 1964 F.T.C. Lexis 30, at *10; *Helbros Watch*, 310 F.2d at 870; 16 C.F.R. § 233.3(d);

*see also In the Matter of John Surrey, Ltd., et al.*, 67 F.T.C. 299, 1965 F.T.C. Lexis 42, at *73

(1965) (respondent ordered to cease and desist from "[u]sing the words "manufacturer's list

price," "suggested list price," . . . or words of similar import, to refer to the price at which any

product is generally sold by others, when such amount appreciably exceeds the highest price at

which substantial sales of the product are being made by principal retail outlets in representative

communities throughout respondents' trade area at the time such representation is made").

424. Defendants like BMS contend that they cannot be held liable for simply reporting

list prices at which some sales were made, but this frames the issue too narrowly and at the

expense of the larger picture. The Court must evaluate the totality of Defendants' conduct.

While applying the higher standard imposed under RICO, Judge Stearns in *Lupron* rejected a

defense strategy nearly identical to that pressed by Defendants like BMS here and distinguished

several of the cases that BMS has cited to this Court:

> A good argument can go wrong when its fundamental premise is
> flawed. It is true, as defendants contend, that no federal case or
> statute imposes a duty on a manufacturer to disclose to retail
> consumers the prices that it charges intermediate suppliers for its
> products, nor with a possible antitrust exception, is a seller
> required to charge the same price for a product to every consumer
> in every market. This is true even where the seller derives a
> presumed benefit from the consumer's ignorance of what it
> actually paid for the products it sells. *See Alves v. Harvard
> Pilgrim Health Care, Inc.*, 204 F. Supp. 2d. 198, 212-214 (D.
> Mass. 2002) (Saris, J.), *aff'd*, 316 F.3d 290 (1st Cir. 2003) . . . .
> But this is not a case of nondisclosure. Defendants did not stand
> mute. [D]efendants trumpeted a lie by publishing the inflated
> AWPs, knowing (and intending) them to be used as instruments of
> fraud. Whether one views the defendants' actions as involving the
> dissemination of information that was wholly false, or false
> because of an incomplete depiction of the truth, they are actionable
> under the mail and wire fraud statutes. . . . This is not a case of a
> retailer failing to disclose the discounted prices that it offered to

- 133 -

favored customers (*Langford*),[12] or a manufacturer the price
differentials on its sales of the same product in different markets
(*Bonilla*),[13] or a health plan the discounts it received on
prescription drugs (*Alves*).[14]  Rather, this is a case of affirmative
misrepresentation.  And because the alleged misrepresentations
were knowing, deliberate, and made in furtherance of a scheme to
defraud, they are sufficient to support the predicate acts of mail
and wire fraud.

295 F. Supp. 2d at 167-68 (footnote omitted).

425.    The Court also rejects the defense that Defendants did not report or control

AWPs.  Each Defendant either reported an AWP directly to a publisher, or reported a wholesale

acquisition price, wholesale list price, or the like from which the Publishers would predictably

mark-up the list price to report AWP.  Sometimes, a Defendant actually reported a mark-up

factor that was accepted by a publisher, as BMS once did.  Furthermore, as the Court has

previously found, "[t]he AWP, or its formulaic equivalent the WAC (Wholesale Acquisition

Cost), is interpreted by the industry as the signal for the underlying structure of list and

transaction prices for almost all drugs."  *In re AWP*, 230 F.R.D. at 68 (quoting Hartman).  As Dr.

Hartman has described:

[A]s a matter of economics, list prices are some of the most
important signals that all drug manufacturers, particularly
innovator drug manufacturers, use to strategically place drug
products in the market.  The two most important list prices are the

---

[12] *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308 (11th Cir. 2000).  BMS has invoked *Langford*, but its
reliance thereon is risky given that the court in that decision went out of its way to limit its holding to the specific
circumstances before it, finding that the uninsured consumer plaintiffs were perfectly able to shop for lower prices
and that, had those consumers been "somehow less able to shop around and identify attractive drug prices than were
other consumers, the situation may have demanded that Rite Aid make certain disclosures to them."  231 F.3d at
1314.  That very concern operates in the instant case where the plaintiff consumers had **no** shopping choices
whatsoever because their physicians chose the medication to be administered in the provider's office, and either
Medicare Part B or the consumer's insurance plan required the consumer to make a 20% co-payment.  There simply
was no opportunity to "shop around," even if an elderly chemotherapy patient had wanted to.

[13] *Bonilla v. Volvo Car Corp.*, 150 F.3d 62 (1st Cir. 1998).  Like the *Lupron* defendants, BMS also errantly
relies on *Bonilla*.

[14] Judge Stearns could have also distinguished *Alves* on the basis that this Court in *Alves* was balancing the
policy factors employed to determine whether a plan sponsor breached its fiduciary duty under ERISA.  Such an
inquiry under ERISA is not relevant here.

- 134 -

AWP and the WAC (or WLP). Since there is a well understood
formulaic relationship between AWP and WAC, reporting *either*
to the price reporting services implies that *the other list price is set
automatically*. AWP and WAC are "interchangeable" since the
two list prices are usually related by a constant ratio and convey
the same information to purchasers and other entities that rely on
published price data.

Hartman Testimony, ¶ 44. Moreover, the Court also notes that Defendants themselves often

republished AWPs and cites the BMS Group as an example. In any event, "it is settled that

'[o]ne who places in the hands of another a means of consummating a fraud or competing

unfairly in violation of the [FTC] Act is himself guilty of a violation of the Act. . . . Proof of

petitioner's intention to deceive is not a prerequisite to a finding of a violation . . .; it is sufficient

that deception is possible." *Regina*, 322 F.2d at 768 (citations omitted).

426. Accordingly, because Defendants have violated Section 5 of the FTC Act (15

U.S.C. § 45(a)(1)), the Court finds that they have committed unfair and deceptive acts or

practices in violation of Mass. Gen. Laws Ch. 93A. *See* Mass. Regs. Code tit. 940, § 3.16(4).

**4.    Defendants have also Violated Ch. 93A as Result of Violating Mass. Regs.
Code tit. 940, §§ 3.04, 3.05(1) and 3.16(1)**

427. Mass. Regs. Code tit. 940, § 3.04 provides that

No claim or representation shall be made by any means which has
the capacity or tendency or effect of deceiving buyers or
prospective buyers as to the value of the past, present, common or
usual price of a product, or as to any reduction in price of a product
. . . . [V]alue claims utilized in connection with terms such as . .
'list price' or other like terms, expressions or representations must
be based on facts provable by the claimant . . . [b]y his own
records; or [b]y reasonably substantial competitive sales in the
trading area where such claims or representations are made, under
circumstances and conditions as represented or implied by the
claims or representations.

428. Mass. Regs. Code tit. 940, § 3.05(1) provides in part: "No claim or representation

shall be made by any means concerning a product which directly, or by implication, or by failure

to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect."

429.    The conduct detailed in the section immediately above also violates these regulations, which, in turn, constitutes a violation of Mass. Gen. Laws Ch. 93A, § 2.  *See* Mass. Regs. Code tit. 940, § 3.16(3) ("an act or practice is a violation of M.G.L. c.93A, § 2 if . . . it fails to comply with existing statutes rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection").

### 5.    Statute of Limitations and Fraudulent Concealment Findings and "Knowledge" of Plaintiffs and the Class

430.    The applicable statute of limitations is four years after the cause of action accrues. Mass. Gen. Laws Ch. 260, § 5A.  The Court finds that Plaintiffs' claims were timely filed.

431.    The original Complaint was filed in October 2001, and claims involving damages incurred prior to October 1997 are timely by virtue of both the discovery rule and the doctrine of fraudulent concealment.

### a.    The statute of limitations does not bar Plaintiffs' claims

432.    Massachusetts recognizes a "discovery rule" that tolls the running of the limitations period for claims under Mass. Gen. L. ch. 93A.  *Wolinetz v. Berkshire Life Ins. Co.*, 361 F.3d 44, 47 (1st Cir. 2004) (citing *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d 122, 125-26 (1990)).  Under the discovery rule, "a cause of action … does not accrue until the plaintiff knew, or in the exercise of reasonable diligence should have known of the factual basis for his cause of action."  *Id*. at 47-48 (citing *Patsos v. First Albany Corp.*, 741 N.E.2d 841, 846 (2001)).  This test is an objective one:  "Only if a reasonable person in the plaintiff's position would have been able to discern the harm or the cause of the harm will the

cause of action accrue and the limitations period begin to run." *Sawyer v. Indevus Pharms., Inc.*, 2004 Mass. Super. Lexis 274, at *33 (Mass. Super. Ct. July 26, 2004) (quoting *Riley v. Presnell*, 409 Mass. 239, 245, 565 N.E.2d 780 (1991)).

433.     The Court finds that Plaintiffs did not know and, in the exercise of reasonable diligence, could not have known about Defendants' scheme.

434.     Citing a parade of publicly available reports, Defendants proclaim that the record shows that Massachusetts payors knew or should have known in the exercise of reasonable diligence that AWPs bore no predictable relationship to acquisition costs.  But the record evidence actually demonstrates the opposite.  Although Plaintiffs do not generally dispute that the AWP did not directly mirror actual transaction pricing (and, indeed, Dr. Hartman's market expectation theory is based on the premise that the private market understood that AWP prices would be within a certain range above actual transaction prices), the reports cited by Defendants do not reveal specific acquisition prices or Average Sale Prices ("ASPs") for the Subject Drugs but, rather, merely indicate that acquisition prices are below AWP for some drugs that constitute but a small handful of prescription drugs available in the market.

435.     Furthermore, Plaintiffs did not know, and could not have learned, the actual ASPs paid for the Subject Drugs, or of the specific marketing practices designed to sell the spread at the expense of Class members.  Defendants have testified that their ASP calculations were internal and were never released to the public.  *See*, *e.g.*, Hiriak Dep. at 252:14-254:17 (only senior management got ASP info); Brennan Dep. at 31:4-7, 33:5-6 (AZ didn't give actual prices to consumers); Marré Dep. at 82-84 (BMS contract prices were confidential).  Moreover, there is no suggestion that ASPs, as opposed to a few individual specific sale prices, were generally available to the public or the members of Classes 2 or 3.  Even in the few instances in which

Defendants cite a class member's purchase of a Subject Drug at a price below AWP, such an individual purchase does not reveal the overall market of actual transaction prices or the ASP for that drug, nor did it disclose the underlying creation, manipulation and marketing of the spread. And, since the market in general, and Class 3 members specifically, had an understanding that AWP was closely related to, but did not exactly equal actual transition prices, there was no reason for a Class 3 member to become suspicious when it saw an acquisition price below AWP.

436.   Indeed, BCBSMA and Pipefitters believed that published AWPs were accurate pricing signals.  As Mr. Mulrey explains:

> Until I began looking at materials published by Medicare in preparation for the analysis my staff and I conducted in early 2004 concerning the impact of a move from the use of AWP to ASP, I believed that the AWPs that BCBSMA had been using as a basis for reimbursement was the price at which, on average, physicians were paying to purchase physician administered drugs. . . .  I was not aware that the AWPs which BCBSMA used to establish its fee schedules for physician administered drugs may have been inflated and may not have borne a reasonable or predictable relationship to the actual prices being paid by physicians for these drugs.  [Trial Affidavit of Michael T. Mulrey, ¶¶ 18-19.]

437.   Similarly, BCBSMA representative DeVaux testified that:

> Until the PFSWG considered the move to ASP, I was unaware of the full magnitude of spreads between the published AWP and the actual sales prices at which physicians can apparently purchase some of these drugs.  In my years of experience negotiating contracts between insurers and physician groups, the basis of reimbursement for physician administered drugs was never raised as a point of negotiation.  As far as I know it was also not a subject that was often discussed or widely-known at BCBSMA. . . .  I was aware that some physicians or physician groups with large practices who could buy in greater quantities for instance, may have paid less and other doctors may have paid more to acquire these drugs.  However, I was not aware that certain drug manufacturers were publishing or causing to be published AWPs that exceeded some of their drugs' actual average sales prices by more than 30% and that they were doing so in order to increase their market share for these drugs at the expense of payors such as BCBSMA.  Even when PFSWG was considering whether to

- 138 -

> follow Medicare and begin using ASP, it was not clear to me
> which manufacturers were engaged in the inflation of AWP in this
> way or which drugs were involved. . . .  Other than through this
> litigation, I have not received information about which physician-
> administered drugs may have had unduly inflated AWPs.  [Trial
> Affidavit of Deborah DeVaux, ¶¶ 15-17.]

438.    Charles Hannaford, the Pipefitters' Administrator, was also not aware of
Defendants' scheme and was under the impression, as were Pipefitters staff members, that AWP
was in fact the average wholesale cost of a particular drug.  The prospect of AWP inflation did
not hit Mr. Hannaford's "radar screen" until he read a newspaper article in 2003, and even then
still had insufficient information to determine whether the AWPs were inflated and to what
extent.  Trial Affidavit of Charles Hannaford, ¶¶ 13-17, 20.

439.    Certainly, the consumer members of Class 3 were not familiar with the actual
ASPs paid for the Subject Drugs, or Defendants' specific marketing practices designed to sell the
spread.

440.    Thus, the purportedly publicly available reports cited by Defendants were not
seen by Plaintiffs.  But even had Plaintiffs reviewed them, those reports would have meant little
to them.  As Dr. Hartman notes, Defendants' parade of public studies, and particularly the OIG
studies, focus on self-administered drugs and not physician-administered drugs.  Hartman
Testimony, ¶ 77(a).  Moreover, the studies indicate that, for the limited sampling of brand name
drugs studied, discounts below AWP were well within Dr. Hartman's 30% "yardstick."  In
particular, one of the few studies that focus on physician-administered drugs – the 1992 OIG
report and the 2001 ASCO survey on chemotherapy drugs – found spreads within Dr. Hartman's
liability yardstick.  Hartman Testimony, ¶ 77(b).  Indeed, after reviewing tens of studies, Dr.
Hartman concluded that the publicly available survey evidence about spreads on physician-
administered drugs suggested that those spreads were not excessive.  .  Hartman Testimony, ¶ 77.

- 139 -

441.    Defendants also cite the *Barron's* article from 1996, but no Plaintiff saw it, and, in any event, that article merely identified the fact that transaction prices for certain drugs were below AWP; it did not reveal ASP prices.  Further, as detailed above, BCBSMA was not aware of the actual ASPs on any of the Subject Drugs.  Therefore, its knowledge could not have triggered any applicable statue of limitations for itself or any class members.

442.    Further belying Defendants' assertions that market players should have known in the exercise of reasonable diligence that AWPs bore no predictable relationship to acquisition costs is Dr. Berndt's observation of the "importance of being unimportant," as summarized by Dr. Hartman:

> As introduced and developed by Dr. Berndt in his Independent Report to this Court, the "Importance of Being Unimportant" helps describe the limited response by managed care organizations to the increase in the costs of all pharmaceuticals, self-administered and physician-administered.  Specifically, Dr. Berndt measures and discusses the extent to which pharmaceutical reimbursements have increased substantially since 1994.  The first factor he identifies as a reason is "the importance of being unimportant," meaning that despite their significance on an absolute dollar basis, drug reimbursements still accounted for only 5-8% of all health care expenditures.  According to Dr. Berndt (p. 102),[15] citing Alfred Marshall, "if spending on some good or service is perceived to be only a small portion of total costs, that good or service will not be as likely to be on cost cutters' radar screens; instead, they will tend to focus more on big-ticket items." As a result, he infers that managed care organizations and payors likely focused their cost cutting efforts and analyses on hospital care, physician services and "all other" categories of reimbursement and expenditure.  The lack of focus upon pharmaceutical reimbursement made the increased spreads induced by the fraud alleged in this matter easier to conceal and to be overlooked by all payors.

---

[15]  See Ernst R. Berndt, "The U.S. Pharmaceutical Industry:  Why Major Growth in Times of Cost Containment?" *Health Affairs*, 20(2), 2001.

Hartman Testimony, ¶ 107; *see also* Direct Testimony of Dr. Meredith Rosenthal ("Rosenthal Testimony"), ¶ 65.

443.    The foregoing demonstrates that, for most of the Class Periods, there was no systematic evidence demonstrating that AWPs were not reliable signals for the prices of physician-administered drugs.  As Dr. Hartman has best summarized:

> While hindsight, illuminated through discovery in this litigation and other related litigation, demonstrates that the substantial spreads found with generic self-administered drugs and selected generic physician-administered drugs in the latter half of the 1990s were indeed reflected in spreads for physician-administered drugs generally, ***such a general understanding simply did not exist at that time***.  No consistent body of survey information supported such a *systematic* understanding, let alone such an understanding with respect to each of Defendants' suspect drugs and the scheme's associated with them.  Anecdotal information for some individual Part B drugs was not sufficient to change the overall expectation throughout the 1990s that the AWP provided *a reasonable expectation* for the EAC of Part B drugs.

Hartman Testimony, ¶ 77(g) (emphasis added in bold).

444.    The evidence reveals that reliable information about true margins was simply not available or understood, and, until very recently, no one knew about Defendants' concealed efforts to manipulate and market spreads.[16]  Importantly, Defendants were unable to cite to any reports that gave an approximation of the true spreads or of the unlawful marketing practice that created these spreads.  Examples from the Hartman Testimony Attach. G:  AstraZeneca's spread on Zoladex, a cancer drug, exceeded 100% from 1998 forward.  BMS had spreads on VePesid 1GM/50ML that started at 41.7% in 1993 and grew to over 600% by 1997.  BMS's spread on Cytoxan 200mg grew from 54.9% in 1994 to 285.3% by 1999.  J&J's spread on Remicade, which had a published AWP of over $600 per pack, was consistently around 30%.  And Schering

---

[16] *See* Trial Affidavit of Michael T. Mulrey, ¶ 20 (not aware of potential issues until 2004); Trial Affidavit of Charles Hannaford, ¶¶ 14-15 (not aware of potential issues until 2003).

spreads on Albuterol went from 142% in 1993 to over 600% in 2002.  And, there is nothing in

the so-called publicly available reports that evidence for example, that Schering was telling

doctors that as a result of its spreads "one patient on Intron can represent $16,956.36 of

incremental sales and $2,373.84 of profit for our physicians just on the drug alone."[17]  And there

is nothing in the public documents indicating that Schering was secretly paying doctors $500 per

patient for getting them started on Intron-A or Temodar.

445.    Plaintiffs have cited discovery rule jurisprudence that the Court finds persuasive,

even if they were decisions on motions for summary judgment.  For example, the court in

*Sawyer,* in denying the defendants' motion for summary judgment on the basis of statute of

limitations, found that the wide-spread public information available to plaintiffs about the

withdrawal of diet drugs from the market failed to alert them specifically to the steps necessary

to uncover their harm, and therefore, was not sufficient to determine, as a matter of law, that

plaintiffs should have known of their injuries.  *Sawyer*, 2004 Mass. Super. Lexis 274, at *49.

Publicity of the diet drug epidemic ranged from the major news outlets, including *The New York

Times, USA Today, The Boston Herald, The Boston Globe,* "NBC Nightly News" and the "CBS

Evening News," to 18,000 lawsuits and 100 putative class actions filed across the country.  The

*Sawyer* Court, however, could not find a "single public report that would have put [d]iet [d]rug

users on notice that an echocardiogram was necessary to diagnose [d]iet [d]rug induced heart

disease."  *Id.,* at *13.

446.    *Thompson v. Metropolitan Life Ins. Co.*, 149 F. Supp. 2d 38, 50-53 (S.D.N.Y.

2001), provides another persuasive example.  There, the court reviewed evidence alleged to show

the class's knowledge of the overpriced life insurance at issue:  24 news articles over 60 years

---

[17] Plfs. Ex. 394.

(including stories in *Time* magazine and *The Wall Street Journal*); an FTC Study; two prior individual lawsuits based on the same claims; and a segment on *60 Minutes*. The court concluded that this publicity was insufficient to find on summary judgment that the plaintiffs should have discovered their claims earlier. *Id.* at 50-53.

447.    Similar to the facts at issue in the *Sawyer* and *Thompson* cases, there is no report, investigation, or study that would have indicated or revealed to Plaintiffs here that Defendants were fraudulently reporting an inflated AWP, and in turn, marketing the resulting spread to physicians and pharmacists.

### b.    Defendants actively engaged in fraudulent concealment

448.    The federal doctrine of fraudulent concealment operates to toll the statute of limitations "where a plaintiff has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part.'"  *In re Lupron*, 295 F. Supp. 2d at 183 (citations omitted).  To invoke the doctrine of fraudulent concealment, a plaintiff must plead and prove three elements:  "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts."  *Id.* (citing *Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir. 1984)).[2]  Plaintiffs have proved each element.

449.    There is substantial if not compelling evidence that Defendants concealed the true prices of the Subject Drugs.  First, Defendants' contracts contained confidentiality clauses, which prohibited the buyers (including doctors and PBMs) from revealing the prices they were paying to anyone, including payors.  *See* Plfs. Ex. 255 (1992 OBI contract with Caremark, ¶ 7);

---

[2] The doctrine of equitable tolling is also available to Plaintiffs to toll the statute of limitations because, for the same reasons, Plaintiffs satisfy the elements for fraudulent concealment, and the evidence supports finding that Plaintiffs were actively misled by Defendants.  *See Jensen v. Frank*, 912 F.2d 517, 521 (1st Cir. 1990).

Plfs. Ex. 256 (1993 OBI contract with Stadtlanders); Plfs. Ex. 43 (AZ form Urology contract, ¶ 6

(requiring terms and existence of contract remain confidential); Plfs. Ex. 422 (1995 SPW

contract with Massachusetts physician group requiring confidentiality of all pricing during term

of contract and three years afterward).

450.    Second, Defendants routinely provided discounts to providers below WAC, which

is the lowest publicly available pricing benchmark.  These price reductions were in the form of

"off invoice discounts," rebates or administrative fees.  *See*, *e.g*., Plfs. Exs. 255 and 256 (OBI

1992 and 1993 contracts providing performance allowances, discounts and rebates); Plfs. Ex. 43

(AZ urology contract offering discount of 32-50% off WAC); Plfs. Ex. 422 (1995 SPW contract

with Massachusetts physician group providing confidential pricing terms of greater than 95% off

of AWP for albuterol products); and Plfs. Exs. 432 and 433 ( SPW internal corporate documents

revealing SPW's participation in a special, verbal arrangement with Rite-Aid that began in 1995

offering prices for Warrick labeled drugs that represented discounts between 70-80% off AWP).

Indeed, BMS managers testified that the discounts that BMS offered its customers were

confidential.  BMS's former Director of Marketing for Oncology, Christof Marré, testified to the

various ways in which BMS provided discounts off of WLP:  contract pricing; rebates; admin.

fees; and marketing fees.  Marré Dep. at 78-79.  If provided, all forms of discounts would always

appear in a contract, were not made public by BMS or any publication, and would not be

reflected in the WLP.  *Id.* (Marré Dep. at 82-84).  Marré confirmed that contract pricing is

always less than WLP, and that contract prices are confidential and not publicly available.  *Id.*

(Marré Dep. 37-38); *see also* Answer ¶ 192 (BMS admits "that certain price discounts it gives to

customers are confidential competitive information . . . .") (Dkt. No. 800).

451.     Third, Defendants' own secretive behavior reveals the active concealment of their schemes and their recognition that such schemes were wrong.  Examples abound.  In the mid-1990s, the manufacturers – allied with ASCO – actively discouraged governmental surveys of actual prices in the marketplace.  For instance, Dolly Hanrahan, Defendant Abbott's Washington lobbyist, in discussing HCFA's efforts to conduct EAC surveys reported that "ASCO is working directly with [OMB] to essentially kill the survey based on grounds that HCFA has not followed administrative procedures."  Plfs. Ex. 257 (TAPGB08146).  Acknowledging HCFA's lack of "manpower to meet all the requirements of the OMB to statistically validate the drug survey process," a TAP lobbyist approvingly referred to the state of affairs as "a 'Bureaucratic Mexican Standoff.'"  Plfs. Ex. 258 (DD0082).  Manufacturers could have stepped up and assisted the market by disclosing true prices, but Ms. Hanrahan reported that ASCO preferred that the drug manufacturers not address the survey issue, and that "[l]egal counsel for Bristol-Myers concurs saying that it would only agitate the situation further, particularly since HCFA is focused on high volume drugs."  *Id.*; Plfs. Ex. 257 (TAPGB08146).  In referring to the cancellation of the HCFA survey as "fortunate for us," J&J acknowledged that "[i]f [HCFA] had done a survey and come up with an average price, this would have changed reimbursement [for Procrit]. . . . ***Right now they do not know what the cost is for different providers***."  Plfs. Ex. 259 at 58842 (emphasis added); *see also* Dooley Dep. at 536.

452.     Defendants regularly cautioned physicians and their own sales representatives not to reveal actual transaction prices to insurers:  "if we were to routinely use cost to wholesalers we would set payers' expectations too low."  Plfs. Ex. 260 (memo from Centocor's Michael Ziskind, cautioning sales representatives to use different "costs" for different audiences).  As late

- 145 -

as 1999, Centocor believed that payers did not comprehend the spread between real prices and AWP, and did not want such payers to learn the truth.

453.    When Defendants did communicate with the federal government, they went out of their way to avoid revealing the true prices they were charging.  One example is Defendant J&J's Procrit, where "the Dooley emails" evidence the fact that in August 1996 and January 1998, J&J certainly did not think the government and private payors were aware of the actual spreads on Procrit.  *See* Plfs. Exs. 339 and 259.  Similarly, when asked by the federal government what the wholesale price of Remicade was, Defendant J&J's Centocor did not reveal its true price to wholesalers, but instead reported the AWP as the wholesale price.  *See* Plfs. Ex. 261 (Remicade J-Code Application).

454.    As early as 1995, AZ was concerned that "HCFA may see through" AZ's discounting and spread marketing strategy and "take offense."  *See* Plfs. Ex. 44 (Patterson Pricing Memorandum, AZ0237164-169, at 167).  In one instance in 1996, AstraZeneca developed a complicated way to increase the spread on Zolodex but to avoid any "regulatory/legal/public relations risk" and make AZ appear to be "responsible" or "patient friendly" by setting the AWP just below the competing drug while still offering bigger discounts on the actual purchase price.  *See* Plfs. Ex. 45 (AZ0024479-81).  This is direct evidence of AZ's intent to fraudulently conceal the true pricing of Zolodex.

455.    Similarly, as reviewed in the findings of fact *supra*, the main reason Schering created Warrick was to use that company as a shell corporation to hide the true prices being charged for Schering-Plough products.

456.    As noted by the federal government in its Sentencing Memorandum filed in the

case *United States v. TAP Pharm. Prods., Inc.*, No. 01-CR-10354-WGY (D. Mass.), AstraZeneca

concealed both its fraudulent marketing and that of its competitor, TAP:

> [I]n 1995, TAP, in a moment of delicious irony, accused its
> competitor, [AstraZeneca], the manufacturer of Zoladex, with
> providing inducements to physicians in violation of the Medicare
> fraud and abuse laws, to include the fact that employees of the
> competitor were giving free samples to doctors to encourage them
> to switch from Lupron to Zoladex.  [AstraZeneca], in turn, accused
> TAP of the very same conduct.  Top employees from the two
> companies met in a summit meeting to discuss this exchange of
> criminal allegations.  Did the serious allegations curb TAP's
> conduct?  Did TAP, aware of allegations that its employees had
> engaged in criminal conduct, undertake expeditiously to stop the
> behavior, to train its employees in the rules and to enforce their
> adherence to the rules?  Did either company, in possession of
> information that a competitor was violating the rules, report the
> conduct to prosecutive authorities in an effort to clean up the
> industry?  Unfortunately, the answer to all of these questions is no:
> TAP, cognizant of the rules and having been accused of violations,
> simply carried on its business as it always had, full criminal speed
> ahead.

*See* Plfs. Ex. 913 (Sentencing Memorandum of the United States, at 62-63).  As TAP advised

doctors:

> Doctor, by discussing your costs of Lupron with other physicians,
> you run the risk of that information getting back to HCFA.  *If*
> *HCFA then realizes that AWP is not a true reflection of the*
> *price, the AWP could be affected, thus lowering the amount you*
> *may charge.*

Plfs. Ex. 915 (at TAP 5030300) (emphasis added).

457.    Not only did Defendants conceal the true nature of their wrongdoing from

outsiders, they also actively lobbied to preserve the very system that they were exploiting.  For

instance, BMS lobbied the federal government to maintain AWP-based reimbursement for Part B

drugs:

- 147 -

Continued Medicare Part B Battle. This past year, we worked closely with Oncology on the Medicare Part B Reimbursement Issue with a very favorable outcome (instead of Oncology drug reimbursement being based on actual acquisition cost, which was proposed by the Administration, reimbursement will be based on 95% of the AWP. While this was a major success, the 95% number could be easily lowered in subsequent sessions of Congress. . . . We need to actively manage this issue.

Plfs. Ex. 201 (Dec. 5, 1997 Memorandum from Ron Miller to Mark Durand re: Oncology Policy Issues, BMS/AWP/000153461); *see also* Plfs. Exs. 46, 47, 48 (evidencing Zeneca's lobbying of Medical Directors to maintain Zoladex reimbursement at AWP and to not survey for actual prices).

458.    If there was widespread knowledge about Defendants' practices, Defendants would not have taken affirmative steps to conceal their control and inflation of AWP and their promotion of spreads. As Judge Stearns' observed about the AWP inflation in the *Lupron* case, "[i]f everything [about Lupron®] was known to everybody, why did [d]efendants emphasize secrecy?" *In re Lupron*, 295 F. Supp. 2d at 168 n.19.[18]    The answer is manifest: Defendants took

---

[18] Judge Stearns more fully observed:

Defendants repeatedly assert that they had no duty to disclose what was publicly known to everyone, that is, that the Lupron(R) AWP was a "sticker price" and never intended to reflect the drug's true average wholesale price. In support of this argument, defendants cite a number of government reports acknowledging that the published AWPs for prescription drugs often exceed their acquisition cost. The argument is ultimately unpersuasive. There is a difference between a sticker price and a sucker price. If one were confronting a modest markup of the actual AWP for Lupron(R) (which 300% is not), intended to make sales of the drug for the treatment of Medicare patients commercially viable (given the 95% of AWP reimbursement rate), it is unlikely that there would have been a government investigation of TAP's marketing practices. Similarly, if the same inflated AWP had not been used to set reimbursement rates for private purchasers and insurers, the Amended Complaint would not have been filed. The Blues, in their response to defendants' argument, have it exactly right: "If everything [about Lupron(R)] was known to everybody, why did defendants emphasize secrecy?" Blues Memorandum, at 7. Finally, the recognition on the part of government regulators of inefficiencies in the administration of Medicare does not, as defendants contend, amount to condonation of fraudulent conduct.

*Id.*

these actions because they knew that payors were not aware of Defendants' fraud.  There is
ample evidence that Defendants worked to affirmatively conceal their true prices from the
government, insurers and the Classes.

## E.   Causation

459.   Plaintiffs have proved by a preponderance of the evidence that each Track 1
Defendant's unfair or deceptive acts or practices have caused an injury to Plaintiffs and the
members of Classes 2 and 3.  That is, it is more likely than not that Defendants' unfair or
deceptive acts or practices were a substantial factor in bringing about the injuries to Plaintiffs
and the members of these Classes.

460.   Medi-Gap insurers pay 20 percent of the allowed amount for covered drugs.  *In re
AWP*, 230 F.R.D. at 71. Thus, it is axiomatic that Defendants have caused substantial injury to
the insurer members of Class 2.

461.   The same conclusion obtains for consumer and insurer members of Class 3.  Had
Defendants reported accurate pricing information, the prices reported would have been lower, as
would AWP-based payments.  Had Defendants not engaged in manipulation of spreads, private
reimbursement and co-pays based thereon would have been lower.  Class members would have
paid less because, in the absence of concealment of the actual prices and Defendants' gaming,
inflated billings could not have been sustained.

462.   Thus, the harm incurred was direct.  The harm was visited directly upon the end-
payor Plaintiffs and class members, as they have paid directly for the named drugs based on the
fictitious AWPs.  As the Court has previously observed:

> In the private, end-payor context, ***the harm alleged by
> Defendants' alleged actions is visited directly upon the end-payor
> Plaintiffs, as they have paid directly for the named drugs based
> on the AWP's***.  Similar arguments about intervening causes
> between the setting of an AWP by a defendant and injuries to plans

> and individual co-payors were recently rejected [by Judge Stearns] as "bordering on the frivolous."

*In re Pharm. Indus. Average Wholesale Price Litig.*, 307 F. Supp. 2d 196, 207 (D. Mass. 2004) (quoting *Lupron*, 295 F. Supp. 2d at 175) (emphasis added).

463.     The Court finds that no intervening causes upset the chain of causation between the setting of an AWP by a Defendant and injuries to Plaintiffs and members of the class.  *See also Lupron*, 295 F. Supp. 2d at 175.

## 1.     Defendants' Arguments against Causation are Unavailing

464.     Defendants have argued that Plaintiffs and Class members were aware that drugs were available in the marketplace at prices significantly below AWP and that, consequently, the causal chain is broken.  However, and as just discussed above, the evidence demonstrates that Plaintiffs and the members of Classes 2 and 3, including BCBSMA, did not know:  (i) the true extent of spreads on the Subject Drugs; (ii) that most of the Subject Drugs had a spread exceeding a reasonable relationship to acquisition costs; (iii) of Defendants' secret tactics to market the spread to doctors; and (iv) of the efforts by Defendants' own employees to keep these spread marketing efforts secret.

465.     Defendants claim that BCBSMA and other insurers in Classes 2 and 3 knew that AWP did not bear any relationship to an average and therefore could not have been deceived and/or were not subjected to unfair practices.  The evidence introduced at trial shows otherwise, and as the Court has found, *supra*, TPPs view AWP as a reasonably accurate signal of actual wholesale prices.

466.     Review of Plaintiff testimony provides supporting examples.  BCBSMA witnesses have testified that they believed AWP was an average (Cook Dep. at 133:21-134:19; Trial Affidavit of Michael T. Mulrey, ¶ 18; Trial Affidavit of Kenneth Arruda, ¶ 11; O'Brien

Dep. at 16:10-17:10), and that AWP bore a predictable relationship to actual prices. DeVaux

Dep. at 224:6-17; Fox Dep. at 131, 175-76. Indeed, Mr. Fox testified precisely to the causative

effect of Defendants' practices. Mr. Fox invoked the example of the difference between a sticker

price and the invoice price on a car, explaining his belief that AWP was related to invoices and

that if "we thought there was an unrealistic set between that and some other price, we would

have discounted by some other number. . . ." Fox Dep. at 131.

467.    Similarly, Mr. Hannaford, the Administrator for Plaintiff Pipefitters' Fund,

testified that he believed AWP to be an actual average and did not understand that AWPs on

some drugs were artificially inflated until March 2003 when he reviewed a *Wall Street Journal*

article. Trial Affidavit of Charles Hannaford, ¶ 14.

468.    And, of course, the consumer members of Class 3 would not know that drugs

were available in the marketplace at prices significantly below AWP.

469.    As support for their arguments against causation, Defendants rely heavily on

evidence that a staff-model HMO subsidiary of BCBSMA, Medical West, purchased drugs at

close to ASP. Defendants argue that Medical West's knowledge of ASPs for the drugs it

purchased should be imputed to its parent, BCBSMA. But the factual evidence demonstrates

that Medical West's knowledge was not transferred to BCBSMA. Medical West did its own

contracting and there was little contact between its employees and the divisions of BCBSMA

who administered other health products. Trial Affidavit of Maureen Coneys, ¶¶ 10-11. Not only

was there little contact, Medical West was a separate subsidiary that operated in a location

different from all other BCBSMA personnel. *Id.*, ¶ 12. Information as to Medical West's drug

reimbursement policy or acquisition costs was not shared with divisions of BCBSMA. *Id.*, ¶ 11;

*see also* Trial Affidavit of Kenneth Arruda, ¶ 12. Dr. Hartman's analysis of the transaction data

from drug purchases made by Medical West with the reimbursement price paid by BCBSMA

confirms the lack of shared information.  *See* Hartman Testimony, ¶¶ 117-18 & Attach. E, which

tracks for certain drugs the close relationship between AWP and BCBSMA's actual cost.

470.    Unless the evidence shows otherwise, the general rule is to treat parents and

subsidiary corporations as separate and distinct entities absent some abuse of the corporate form,

*see, e.g., Stryker Corp. v. XL Ins. Am., Inc.*, 2006 U.S. Dist. Lexis 47899, at *29 (W.D. Mich.

July 14, 2006), or that the parent controlled the subsidiary's operations such that knowledge is

imputed to the parent.  *See, e.g., ISI Sys. v. Equifax, Inc.*, 1996 U.S. Dist. Lexis 882, at *11 (D.

Mass. Jan. 12, 1996).  Here, there was no evidence introduced that BCBSMA abused the

corporate form, and no proof that BCBSMA so controlled Medical West that knowledge of ASPs

on the part of Medical West should be imputed to BCBSMA.  For example, there is no evidence

that Medical West was in any way responsible for BCBSMA's traditional indemnity operations,

and no evidence that BCBSMA was responsible for Medical West's staff-model HMO functions.

*See id.* (describing one factor to be considered in corporate-domination analysis the court

employed as "the parent's and subsidiary's relative responsibility for day-to-day operations").

471.    And even if the evidence demonstrated that insurers like BCBSMA had

constructive knowledge of Defendants' schemes by virtue of their staff model HMOs (and the

evidence does not so demonstrate), that knowledge cannot be attributed to Plaintiffs like the

Pipefitters' Fund and the members of Class 3 who were insurers' customers.  Constructive

knowledge imputed from one corporation to another, related corporation cannot then be imputed

to a principal, because it is well understood that only actual knowledge can be imputed from

agent to principal.  *See, e.g., New England Trust Co. v. Farr*, 57 F.2d 103, 110 (1st Cir. 1932)

("This [imputation] rule can apply only to actual knowledge of an agent as distinguished from

constructive knowledge.  Prior constructive knowledge could not be present in the mind of an

agent when acting for another principal, and hence could not be imputed to such principal.").

This conclusion is an extension of the rule that a principal is liable only for acts committed by his

agent acting within the scope of its employment.  *United States v. President & Fellows of*

*Harvard College*, 323 F. Supp. 2d 151, 192 n.33 (D. Mass. 2004); *see also* RESTATEMENT

(SECOND) OF AGENCY § 272 ("[T]he liability of a principal is affected by the knowledge of an

agent concerning a matter as to which he acted within his power to bind the principal . . .").

Therefore, even assuming that BCBSMA had the knowledge Defendants claim, that knowledge

cannot be imputed to Pipefitters as a matter of law.

### 2.      Causation is Established for Generic Drugs

472.    With respect to generic manufacturer SPW, the Court finds that its conduct

created an inflated median AWP for albuterol, making all payments during the Class Period for

J-Codes J7611, J7613, J7618, J7619 and J7620 higher than they would have been absent SPW's

conduct.

473.    Under Massachusetts and every other state law there is the basic principle that

when two or more tortfeasors each cause an indivisible harm, they are each jointly and severally

liable for the whole of the harm suffered.  The RESTATEMENT (THIRD) OF TORTS echoes this

conception of joint and several liability, focusing on the conduct of the tortfeasors rather than on

harm caused by a product:  "If the independent tortious conduct of two or more persons is a legal

cause of an indivisible injury, each person is jointly and severally liable for the recoverable

damages caused by the tortious conduct."  RESTATEMENT (THIRD) OF TORTS, § A18.  *See also*,

*e.g.*, *Harper v. Albert*, 400 F.3d 1052, 1061-62 (7th Cir. 2005) (quoting *Watts v. Laurent*, 774

F.2d 168, 179 (7th Cir. 1985) and noting "[j]oint and several liability is a theory of recovery

which requires that the plaintiffs, in an action alleging tortious or constitutionally repugnant

conduct by multiple actors, establish that each defendant acted in concert to 'produce a single, indivisible injury.'"); *Ravo v. Rogatnick*, 514 N.E.2d 1104, 1108 (N.Y. 1987) (finding joint and several liability appropriate where the plaintiff suffered brain damage and the defendants, an obstetrician and a pediatrician, failed to submit any evidence upon which apportionment of damages could be based).

474.    Successful application of joint and several liability does not require that all tortfeasors be joined to the action.  *See*, *e.g.*, *Shantigar Found. v. Bear Mt. Builders*, 804 N.E.2d 324, 332 (Mass. 2004) ("Under our current system of joint and several liability, a plaintiff injured by more than one tortfeasor may sue any or all of them for her full damages."); RESTATEMENT (SECOND) OF TORTS, § 882 ("If each of two or more persons is subject to liability for the full amount of damages allowed for a single harm resulting from their tortious conduct, the injured person can properly maintain a single action against one, some or all of them.").

475.    For example, Judge Shira Scheindlin reviewed the law in this area in *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig. ("In re MTBE")*, 379 F. Supp. 2d 348, 364-67 (S.D.N.Y. 2005), where cities, municipal corporations, and public and private water providers sued multiple designers, manufacturers, and distributors of gasoline containing the additive methyl tertiary butyl ether ("MTBE") for alleged groundwater contamination.  Defendants sought the dismissal of complaints filed in fifteen states, in part based on questions of whether the plaintiffs could proceed with their claims based on collective theories of liability.  *Id*. at 361-62.  The court carefully examined six forms of collective liability, including concurrent wrongdoing (or joint and several liability), concert of action liability, alternative liability, enterprise liability, market share liability, and "'commingled product' market share liability."  *Id*. at 370-79.  In doing so, the court noted, as Defendants have here, that those states that utilize market share liability

reserve it for use in cases involving fungible goods, *e.g.*, where a ***product*** caused harm to the plaintiffs.  *Id*. at 375-76.  Concurrent wrongdoing, concert of action liability, and alternative liability, however, all focus on the tortious ***conduct*** of the defendants.  *Id*. at 371-72 (noting, in discussing joint and several liability, that "[f]or liability to attach, defendants' tortious ***conduct*** need not be simultaneous in time, but must combine to produce plaintiff's indivisible injury.  This concept of concurrent wrongdoing evolved to relieve plaintiffs of the burden of establishing several liability in cases where more than one defendant proximately caused the harm.") (emphasis added); *see also id*. at 372 (regarding the theory of concert of action:  "One party is responsible for the acts of another if it (a) ***does a tortious act*** in concert…, or (b) knows that the other's ***conduct*** constitutes a breach of a duty and gives substantial assistance… , or (c) …[its] own ***conduct***, separately considered, constitutes a breach of duty to the third person.") (emphasis added); *Restatement (Second) of Torts*, § 433B(2) (defining alternative liability:  "Where the tortious ***conduct*** of two or more actors has combined to bring about harm to the plaintiff … the burden of proof as to the apportionment is upon each such actor.") (emphasis added).

476.    Under this approach, SPW would be liable for the whole of the harm suffered by Plaintiffs and the Classes reimbursing for drugs with J-Codes J7611, J7613, J7618, J7619 and J7620, without regard to which companies' products that were actually purchased.  However, Plaintiffs have not pursued this larger measure of damages and, consequently, the Court will not award this broader measure of damages.

## F.    Injunctive Relief

477.    Defendants are enjoined from reporting to the publishers prices that are not good faith and reasonable estimates of the prices at which Defendants' Subject Drugs are sold to physicians in the marketplace and must include in such prices all relevant discounts.

- 155 -

### G.    Damages

#### 1.    General damages

478.    Plaintiffs have proved by a preponderance of the evidence that, in the aggregate, Class 2 has suffered monetary damages in the amount of $_____.

479.    Plaintiffs have proved by a preponderance of the evidence that, in the aggregate, Class 3 has suffered monetary damages in the amount of $_____.

#### 2.    Prejudgment interest

Federal courts recognize that Massachusetts law governs an award of prejudgment interest when plaintiffs recover under a Massachusetts state law cause of action. *Doty v. Sewall*, 908 F.2d 1053, 1063 (1st Cir. 1990).  The purpose of prejudgment interest is to compensate the prevailing party for loss of the use of money that party should have had in the first place but for the other party's wrongdoing. *McEvoy Travel Bureau, Inc. v. Norton Co.*, 563 N.E. 2d 188, 196 (Mass. 1990) (*citing Conway v. Electro Switch Corp.,* 402 Mass. 385, 390, 523 N.E. 2d 255 (1988)); *see also, Weiss v. Augat, Inc.,* 2000 WL 1765434, at *4 (Mass. 2000) (holding that prejudgment interest given as of right where necessary to compensate a party for the loss of the use of his money and in order to make the party whole).

Under Massachusetts law, plaintiffs are entitled to prejudgment interest on the compensatory portion of a Chapter 93 claim, running from the date of the filing of the lawsuit until the date of entry of judgment. *Rini v. United Van Line*, 903 F. Supp. 234, 239 (D. Mass. 1995); *Patry v. Liberty Mobilehome Sales, Inc*., 394 Mass. 270, 272, 475 N.E.2d 392 (1985). Prejudgment interest under Chapter 93A is controlled by Mass. Gen. Laws Ann. ch. 231, § 6B, *Alan Steiman's Landscape, Inc. v. Lawrence Sav. Bank*, 1996 WL 408942 at *2 (Jul. 16, 1996 Mass. App. Ct.), which provides that prejudgment interest shall be added to the amount of

damages "at the rate of twelve per cent per annum from the date of commencement of the action." Mass. Gen. Laws Ann. ch. 231 § 6B.

The Court has found that the calculation of compensatory damages, to which prejudgment interest will apply, was sufficiently based on admissible and probative evidence. The Court concludes as a matter of law that prejudgment interest on the Chapter 93A claim shall be calculated at the rate of twelve percent (12%) per annum upon the compensatory portion of the damage award.  Therefore, the Court awards pre-judgment interest in the amount of $_____.

### 3.    Treble damages

480.    Defendants' violations of Ch. 93A were willful or knowing.

481.    Plaintiffs are entitled to treble damages due to the willfulness of Defendants' conduct.  Mass. Gen. Laws Ch. 93A, §§ 9(3A), 11.  The Court awards treble damages in the amount of $_____ for Class 2 and $_____ for Class 3.

### 4.    Joint and several liability for OTN

482.    Defendant OTN, part of the BMS Group, is jointly and severally liable for the above damages given that it marketed spreads on all of the Subject Drugs.  It's conduct was not limited to the BMS Subject Drugs alone.

### 5.    Defendants' failure to mitigate defense

483.    As an affirmative defense, Defendants have asserted that Plaintiffs and class members failed to mitigate their damages.  Defendants bear the burden of proving by fair preponderance that the injured party failed to take *reasonable* steps to hold down its losses. *Veranda Beach Club Ltd. P'ship. v. Western Sur. Co.,* 936 F.2d 1364, 1386 (1st Cir. 1991).  As the First Circuit has noted, a plaintiff is not under any duty to take outlandish chances in order to

- 157 -

mitigate its damages; nor is the plaintiff "obliged to play the seer, choosing the course of action that would, in hindsight, have turned out best." *Id.*

484.     Defendants have asserted that, in the wake of these lawsuits, Plaintiffs should have implemented an immediate change to their reimbursement systems.  The Court rejects this defense and finds that the very nature of the reimbursement systems at issue and the insidiousness of Defendants' conduct foreclosed Plaintiffs' ability to mitigate.

485.     First, and with respect to Class 2 Medi-Gap insurers, Massachusetts law requires non-profits like BCBSMA to offer Medicare supplemental insurance to residents of the Commonwealth.  Trial Affidavit of Kenneth Arruda, ¶ 14.  In other words, BCBSMA did not have the option of not providing Medi-Gap insurance under which AWP was the reimbursement benchmark.

486.     Second, without a critical mass of participants, and huge capital expenditures, it would be impossible for any single Plaintiff or Class member to effect any changes on the industry as a whole in order to counteract the AWP scheme.  *See, e.g.,* Trial Affidavit of Deborah DeVaux Decl., ¶¶ 11-14; Hartman Testimony, ¶¶ 116-23 & n.134.  Defendants thus overlook critical structural impediments to reforming the system ***even if Plaintiffs and the members of Classes 2 and 3 had learned the full extent of Defendants' fraud***.

487.     It is difficult and expensive for payors, even large payors, to track all pricing information for all drugs.[19]  Consequently, commonly understood notions of bounded rationality and administrative efficiency command that payors utilize common "rules of thumb" such as the AWP metric in order to adjudicate claims.  Hartman Testimony, ¶ 91.  As Dr. Anderson,

---

[19] "Even when payors attempt to track information on drugs and the acquisition costs of drugs; even when the right to audit a PBM exists; and even when prescription drug benefit consultants are retained, there remains considerable non-transparency in the contracts, billing information and accounting information.  This fact is made vivid by the continued and recent attempts by payors to obtain greater pricing transparency from middlepersons and providers."  Hartman Testimony, n.155.

Professor of Medicine and Health Policy at Johns Hopkins, testified in *Lupron*, with 65,000

drugs "negotiation of a specific price for each . . . would be administratively impossible," thus

fostering the AWP pricing standard.  Hartman Testimony, ¶ 96.  And as Dr. Rosenthal explained:

> Given the large number of drugs and services that third-
> party payers reimburse, there is also a need to rely on a common
> standard to process literally millions of transactions.  Ascertaining
> the acquisition cost for each and every drug would simply not be
> feasible for payers. . . .  In this context, the published AWPs,
> which are readily available to payers from sources such as the Red
> Book, MediSpan, and First DataBank, provide what Berndt calls a
> 'focal point' for reimbursement.

Rosenthal Testimony, ¶ 66 (citing Berndt).  Even BMS recognized that AWP was "the only

easily obtained published price source."  Plfs. Ex. 195.

488.   An industry cannot just simply abandon a market-wide pricing metric "at the drop

of a hat," even if individual participants wanted to.  Its participants need time to absorb learning,

rewrite systems, and get extensive provider networks on board.  Moreover, "before a major shift

occurs in operational practices, the institution wants to observe whether the newly acquired

information is indicative of a real change in the economic terrain in which that institution

competes."  Hartman Testimony, ¶ 118(e).  Thus, even if market participants had extensive

knowledge of Defendants' schemes – and the Court has found that they did not – the very nature

of the AWP system would prevent them from taking dramatic action to quickly change business

practices.

489.   Defendants knew that any payor who attempted a variation risked both confusion

and backlash from the providers who utilized the standardized system.  Of course, the obvious

resolution was for Defendants to simply stop their unlawful inflation of what should have been

the "average wholesale price" for each product.  Defendants chose not to and are estopped from

complaining that Plaintiffs failed to mitigate.

**H.     Attorneys' Fees And Costs**

490.    An award of attorneys' fees and costs is authorized pursuant to Mass. Gen. Laws Ch. 93A, §§ 9(4), 11.

491.    The Court awards reasonable attorneys' fees and costs in favor of Plaintiffs and Classes 2 and 3 in the amount of $_____.

**I.     Conclusion**

492.    Plaintiffs have met their burden of proof on behalf of themselves and the certified Classes 2 and 3.

DATED:  November 1, 2006            By____/s/ Steve W. Berman_____
                                       Thomas M. Sobol (BBO#471770)
                                       Edward Notargiacomo (BBO#567636)
                                    Hagens Berman Sobol Shapiro LLP
                                    One Main Street, 4th Floor
                                    Cambridge, MA  02142
                                    Telephone: (617) 482-3700
                                    Facsimile: (617) 482-3003
                                    **LIAISON COUNSEL**

                                    Steve W. Berman
                                    Sean R. Matt
                                    Robert F. Lopez
                                    Hagens Berman Sobol Shapiro LLP
                                    1301 Fifth Avenue, Suite 2900
                                    Seattle, WA  98101
                                    Telephone: (206) 623-7292
                                    Facsimile: (206) 623-0594

                                    Elizabeth Fegan
                                    Hagens Berman Sobol Shapiro LLP
                                    60 W. Randolph Street, Suite 200
                                    Chicago, IL  60601
                                    Telephone: (312) 762-9235
                                    Facsimile: (312) 762-9286

Eugene A. Spector
Jeffrey Kodroff
Spector, Roseman & Kodroff, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA  18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, IL  60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Donald E. Haviland, Jr.
The Haviland Law Firm
740 S. Third Street, Third Floor
Philadelphia, PA  19147
Facsimile:  (215) 609-4661
Telephone:  (215) 392-4400

**CO-LEAD COUNSEL FOR
PLAINTIFFS**

001534-16  127284 V1

## CERTIFICATE OF SERVICE

I hereby certify that I, Steve W. Berman, an attorney, caused a true and correct copy of the foregoing **PLAINTIFFS' COMBINED PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW AND TRIAL BRIEF FOR THE PHASE 1 TRIAL AGAINST THE TRACK 1 DEFENDANTS** to be delivered to all counsel of record by electronic service pursuant to Paragraph 11 of the Case Management Order No. 2, by sending on November 1, 2006, a copy to LexisNexis File & Serve for posting and notification to all parties.


By **/s/ Steve W. Berman**  
    Steve W. Berman  
    **HAGENS BERMAN SOBOL SHAPIRO LLP**  
    1301 Fifth Avenue, Suite 2900  
    Seattle, WA  98101  
    (206) 623-7292

001534-16  127284 V1