UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) |
| | M.D.L. No. 1456 |
| THIS DOCUMENT RELATES TO: | ) CIVIL ACTION NO. 01-12257-PBS ) ) |
| ALL ACTIONS REGARDING CLASS ONE AND TWO OF TRACK ONE | ) ) ) ) |

**MEMORANDUM AND ORDER**

November 2, 2006

Saris, U.S.D.J.

**I. INTRODUCTION**

Plaintiffs bring this consumer and third-party payor class action against forty-two pharmaceutical defendants, alleging that they fraudulently inflate the average wholesale price ("AWP") of drugs paid by Medicare beneficiaries and third-party payors in violation of state consumer protection statutes. In the first phase of this litigation involving four defendants, the parties have filed cross-motions for summary judgment on the meaning of the term AWP in the Medicare statute, 42 U.S.C. § 1395u(o) (West 1998). The United States Department of Justice, on behalf of the Secretary of Health and Human Services, has filed an amicus brief. Trial is scheduled to begin on November 6, 2006. After hearing, the Court construes the statutory term according to its plain meaning and holds that AWP means the average price at which wholesalers sell drugs to their customers, including physicians

and pharmacies.

## II.  PROCEDURAL BACKGROUND

Pursuant to 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation has transferred ninety-eight cases to this Court involving AWP.

On May 13, 2003, the Court allowed in part the defendants' motions to dismiss the original master consolidated complaint. In re Pharm. Indus. Average Wholesale Price Litig. (Pharm. I), 263 F. Supp. 2d 172 (D. Mass. 2003).[1] After the plaintiffs filed an amended master consolidated complaint and the defendants again moved to dismiss, the Court allowed in part the motions to dismiss on February 24, 2004.  In re Pharm. Indus. Average Wholesale Price Litig. (Pharm. II), 307 F. Supp. 2d 196 (D. Mass. 2004).  On March 25, 2004, the Court structured the master consolidated class action into two separate tracks of defendants for purposes class certification, summary judgment, and trial. (Docket No. 756.)[2]   On January 30, 2006, the Court certified

---

[1] In addition to the private class action, several states, counties, and cities have also brought actions against the pharmaceutical manufacturers for fraudulent inflation of AWP. The multidistrict litigation before this Court currently includes such actions from Arizona, California, Nevada, and New York.  On July 27, 2006, the Judicial Panel on Multidistrict Litigation transferred a qui tam action, in which the United States government has intervened, brought against pharmaceutical manufacturers under the False Claims Act.  The Court does not address these actions here.

[2] The Track Two defendants submitted briefs regarding the construction of the term "average wholesale price."  (Docket Nos. 2676, 2814.)

three classes: (1) a nationwide class of Medicare beneficiaries who made co-payments for Medicare Part B drugs, (2) a Massachusetts class of third-party payors that provide Medigap insurance which reimbursed Medicare beneficiaries for their co-payments for Medicare Part B drugs, and (3) a Massachusetts class of customers and third-party payors that made payments based on AWP for (non-Medicare Part B) physician-administered drugs.  In re Pharm. Indus. Average Wholesale Price Litig. (Pharm. III), 230 F.R.D. 61 (D. Mass. 2005); In re Pharm. Indus. Average Wholesale Price Litig. (Pharm. IV), 233 F.R.D. 229 (D. Mass. 2006) (class certification order).  The Court assumes close familiarity with these opinions, which set forth the factual background of the allegations as well as the appropriate legal standards.

### III. REGULATORY AND STATUTORY BACKGROUND[3]

#### A.   Medicare Part B

Congress created Medicare Part B in 1965 to establish a supplemental medical insurance program for senior citizens.  See 42 U.S.C. §§ 1395j-1395w-4.  The Secretary of the Department of Health and Human Services ("DHHS") oversees and the Centers for Medicare and Medicaid Services ("CMMS"), formerly the Health Care Financing Administration ("HCFA"), administers the program. Medicare Part B provides insurance for physician services,

---

[3] In relating the statutory and regulatory background, I draw heavily from the Brief of the United States as Amicus Curiae (Docket No. 3104).

outpatient hospital services, and other health services.  See id.
§§ 1395j-1395w-4.  Medicare has historically paid the "reasonable
charge" for physicians' services by limiting Part B payments to
the lowest of: (1) the physician's actual charge, (2) the
physician's customary charge,[4] or (3) the prevailing charge[5] in
the physician's locality for similar services.  See 42 U.S.C. §§
1395l(a), 1395u(b); 42 C.F.R. §§ 405.500 et seq.

Medicare Part B covers a limited number of prescription
drugs, including intravenous cancer treatment drugs, drugs that
are administered through a covered item of durable medical
equipment, immunosuppressive drugs, certain oral anti-cancer
drugs, and influenza and hepatitis vaccines.  See 68 Fed. Reg.
50,428, 50,429 (Aug. 20, 2003).  Through Medicare Part B, the
federal government reimburses health-care providers for up to 80
percent of the allowable cost of covered prescription drugs.  The
remaining 20 percent is paid by the Medicare Part B beneficiary,
as a co-payment.  See Montana v. Abbott Labs., 266 F. Supp. 2d
250, 252 (D. Mass. 2003).

**B.**   **Drug Reimbursement**

Prior to 1991, Medicare did not expressly use AWP as a basis

---

[4] The customary charge was limited to the median amount that
the physician charged for a given service during an annual
collection period.  See 42 C.F.R. § 405.503.

[5] The prevailing charge was limited to an amount high enough
to cover 75 percent of the customary charges made for similar
services in a locality.  See 42 C.F.R. 405.504(a).

for payment of Part B drugs.  Like the other items and services
under Part B, Medicare generally paid a "reasonable charge" for
covered drugs.  See 42 U.S.C. §§ 1395l, 1395u(o).

In 1991, the term "average wholesale price" first appeared
in the Medicare Part B drug payment regulations.  After
considering several options for drug payments, the Secretary
concluded:

> We believe that ultimately there should be a national fee
> schedule allowance for all 'incident to' drugs. However,
> given the large number of different drugs and the myriad
> of dosage levels, we have decided that it is not
> practical for us to consider establishing a national drug
> fee schedule at this time.

56 Fed. Reg. 25,792, 25,800 (June 5, 1991) (proposed rule).
Instead, the Secretary elected "to continue to pay for ['incident
to' drugs] under the current 'reasonable charge' system."  Id.

The Secretary initially proposed that drug payments be based
on "85 percent of the national wholesale price" because it

> believe[d] that the Red Book and other wholesale price
> guides substantially overstate the true cost of drugs.
> The OIG reports indicate that pharmacies are getting an
> average discount of 15.9 percent off the published
> wholesale price.  We have no reason to believe prices
> paid by physicians are any higher than pharmacies pay.

Id.  DHHS, however, "received a great many comments on this
issue, primarily from oncologists indicating that our 85 percent
standard was inappropriate" because "many drugs could be
purchased for considerably less than 85 percent of AWP . . .
while others were not discounted" and individual physicians were
unable to get the same discounts as pharmacies and large

practices.  56 Fed. Reg. at 59,524.  Thus, the Secretary,

"[a]fter considering all of the comments on this issue, . . .

decided to modify the proposed policy" in the final rule.  Id. at

59,525.

On November 25, 1991, DHHS promulgated the final rule, which

"set[] forth a fee schedule for payment for physicians' services

beginning January 1, 1992."  56 Fed. Reg. at 59,502.  In

specifying the services to be included in the fee schedule, the

regulation included drugs furnished incident to a physician's

service.  The final rule provided as follows:

> (b)  Methodology.  Payment for a drug described in
> paragraph (a) of this section is based on the lower of
> the estimated acquisition cost or the national **average
> wholesale price** of the drug. The estimated acquisition
> cost is determined based on surveys of the actual invoice
> prices paid for the drug. In calculating the estimated
> acquisition cost of a drug, the carrier may consider
> factors such as inventory, waste, and spoilage.
>
> (c)  Multiple-Source drugs.  For multiple-source drugs,
> payment is based on the lower of the estimated
> acquisition cost described in paragraph (b) of this
> section or the wholesale price that, for this purpose, is
> defined as the median price for all sources of the
> generic form of the drug.

56 Fed. Reg. at 59,621 (promulgating 42 C.F.R. § 405.517 (1992))

(emphasis added).  To determine a drug's estimated acquisition

cost, the Secretary recommended that "[c]arriers could survey a

sample of the physicians who furnish the drugs to obtain cost

information" or "could request that physicians periodically

provide cost information when they submit claims for payment for

the drugs." Id. at 59,525.

C.   **Balanced Budget Act of 1997**

The 1991 regulatory language dictated how Medicare reimbursed for drugs until the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 ("1997 Act").  In February and March of 1997, the Senate Committee on Finance heard testimony that "the AWP is not the average price actually charged by wholesalers to their customers . . . [r]ather, it is a 'sticker' price set by drug manufacturers and published in several commercial catalogs." President's Fiscal Year 1998 Budget Proposal for Medicare, Medicaid, and Welfare: Hearing Before the S. Comm. on Finance, 105th Cong. 265 (1997) (statement of Donna E. Shalala, Secretary of Health and Human Services).

On June 24, 1997, in introducing the bill that became the 1997 Act, the House of Representatives Committee on the Budget issued a report explaining why drug payments should be changed from "national average wholesale price" to "95 percent of the average wholesale price."  The report stated:

> The Inspector General for the Department of Health and Human Services has found evidence that over the past several years Medicare has paid significantly more for drugs and biologicals than physicians and pharmacists pay to acquire such pharmaceuticals.  For example, the Office of Inspector General reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs.  The Committee intends that the Secretary, in determining the average wholesale price, should take into consideration commercially available information including such information as may be published or

7

> reported in various commercial reporting services.  The
> Committee will monitor AWPs to ensure that this provision
> does not simply result in a 5% increase in AWPs.

H.R. Rep. No. 105-149, at § 10616 (1997).

On August 5, 1997, Section 4556 of the 1997 Act placed the term "average wholesale price" in the Medicare statute for the first time by adding that "the amount payable for the drug or biological is equal to 95 percent of the **average wholesale price**."  42 U.S.C. § 1395u(o) (West 1998) (emphasis added).

On November 2, 1998, DHHS changed its regulations accordingly.  <u>See</u> 63 Fed. Reg. 58,814, 58,905 (Nov. 2, 1998) (codified as 42 C.F.R. § 405.517 (1999)).  The HCFA, in response to a comment on the revised rule regarding payments for multiple-source drugs, stated:

> We agree that the law does not define the term "average
> wholesale price," and, therefore, does not distinguish
> brand AWP from generic AWP or average versus median
> price.  However, we believe it is within our general
> authority in implementing the statute to define terms
> that do not have explicit statutory definitions.  We
> believe that when there is an array of charges, the
> median is an appropriate measure of central tendency.

<u>Id.</u> at 58,849.

In addition, § 4556(c) of the 1997 Act required the Secretary of DHHS to "study the effect on the average wholesale price of drugs and biologicals" of decreasing drug payments from national average wholesale price to 95 percent of the average wholesale price and to "report to the Committees on Ways and Means and Commerce of the House of Representatives and the

8

Committee on Finance of the Senate."

The Secretary of DHHS submitted the report to Congress in 1999.  In providing a history of drug Medicare payments, the report stated:

> For the past 13 years, the Office of Inspector General (OIG) has issued a series of reports that consistently show a finding that the Medicare program overpays for the drugs and biologicals it covers.  To address this problem, the President's 1997 budget contained a legislative proposal that would have based payment on the lower of the billed charge or the actual acquisition cost (AAC) for the drug of the physician or supplier billing Medicare.  However, as discussed above, . . . Congress rejected this proposal in favor of the current rule, which is to pay based on the lower of the billed charge, or 95 percent of AWP.

Rep. to Cong., The Average Wholesale Price for Drugs Covered Under Medicare, DHHS 1-2 (1999).  (Fowler Ex. 58.)

The 1997 Act governed Medicare reimbursements for drugs until the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 ("2003 Act").  But neither Congress nor DHHS was dormant or silent in the interim.

On August 3, 2000, in response to DHHS "announc[ing] a plan to furnish Medicare carriers with drug prices from catalogues and group purchasing organization price lists to use instead of AWP," two Senators sent a letter to the Secretary of DHHS.  See Letter from Sen. Christopher Bond and Sen. John Ashcroft to Donna E. Shalala, Secretary of Health and Human Services (Aug. 3, 2000). (Fowler Ex. 65.)  The letter stated that "Congress instructed HHS

to base Medicare reimbursement for cancer drugs on 95 percent of the 'average wholesale price,' or AWP, a term widely understood and indeed defined by HHS manuals to reference amounts reflected in specified publications." <u>Id.</u>

On December 21, 2000, Congress enacted the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000 ("2000 Act") which required that the Secretary study and "quantify the difference between" the "average prices at which such drugs and biologicals are acquired by physicians and other suppliers" and the reimbursement amounts under Medicare.  Pub. L. No. 106-554, § 429(a), 114 Stat. 2763.  Section 429(c) of the 2000 Act also prohibited DHHS from "directly or indirectly decreas[ing] the rates of reimbursement . . . under the current medicare payment methodology . . . until such time as the Secretary has reviewed the report." <u>Id.</u> at § 429(c).

On September 21, 2001, Thomas A. Scully, then Administrator for the CMMS, testified before the House Committee on Energy and Commerce.  In his prepared statement Mr. Scully declared:

> Medicare beneficiaries, through their premiums and cost sharing, and U.S. taxpayers are spending far more than the "average" price that we believe the law intended them to pay. . . .  The AWP is intended to represent the average price at which wholesalers sell drugs to their customers, which include physicians and pharmacies. . . .  This Committee, CMS, the Department's Office of the Inspector General (IG), and others have long recognized the shortcomings of AWP as a way for Medicare to reimburse for drugs.

<u>Medicare Drug Reimbursements: A Broken System for Patients and</u>

<u>Taxpayers: Joint Hearing Before the Subcomm. on Health and the</u>
<u>Subcomm. on Oversight and Investigations of the H. Comm. on</u>
<u>Energy and Commerce</u>, 107th Cong. 87-88 (2001) (prepared statement
of Thomas Scully, Administrator, CMMS).  Following the testimony,
Chairman Tauzin questioned, "Why on earth do we have a system
that requires a Medicare beneficiary to pay 20 percent as a copay
of an artificial price?"  <u>Id.</u> at 95.

On May 5, 2003, the Office of Inspector General of DHHS
issued compliance guidance in the Federal Register "to promote
voluntary compliance programs for the health care industry."  68
Fed. Reg. 23,731 (May 5, 2003).  Under the heading "Integrity of
Data Used To Establish or Determine Government Reimbursement,"
the notice stated:

> Where appropriate, manufacturers' reported prices should
> accurately take into account price reductions, cash
> discounts, free goods contingent on a purchase agreement,
> rebates, up-front payments, coupons, goods in kind, free
> or reduced-price services, grants, or other price
> concessions or similar benefits offered to some or all
> purchasers.

<u>Id.</u> at 23,733-34.

## D.    <u>2003 Medicare Prescription Drug, Improvement and Modernization Act</u>

In passing the 2003 Act, Congress decided to phase out the
use of AWP in Medicare reimbursement.  On July 15, 2003, the
House Committee on Ways and Means issued a report stating that

"[t]he term "AWP" is not defined in statute or regulation, but

generally, AWP is intended to represent the average price used by

wholesalers to sell drugs to their customers."  H.R. Rep. No.

108-178, pt. 2, at 194 (2003).  However:

> AWPs are not grounded in any real market transaction, and
> do not reflect the actual price paid by purchasers.
> Congress has long recognized AWP is a list price and not
> a measure of actual prices.  Congress is now able to
> adopt an alternative basis for payment that will more
> accurately reflect actual acquisition costs for
> physicians.  This will ensure that Medicare no longer
> bases its payments on prices that do not reflect prices
> otherwise available through market incentives and
> transactions.

Id. at 197-98.

On December 8, 2003, the 2003 Act was enacted.  Section 303

of the 2003 Act required that reimbursements for drugs and

biologicals furnished on or after January 1, 2005 be based on

either a competitive acquisition program or an average sales

price.  See 42 U.S.C. § 1395u(o) (2006) (outlining reimbursements

for drugs or biologicals under Medicare B); id. §§ 1395w-3,

1395w-3b (establishing and defining requirements of competitive

acquisition programs); id. § 1395w-3a (defining average sales

price payment methodology).[6]  In addition, the 2003 Act provided

_____

[6] For a single source drug or biological, the payment amount
is "106 percent" of the lesser of the "average sales price" and
"wholesale acquisition cost."  42 U.S.C. § 1395w-3a(b) (2006).
Section 1395w-3a(c)(1) defines "average sales price" as:

> (A) the manufacturer's sales to all purchasers
> (excluding sales exempted in paragraph (2)) in the
> United States for such drug or biological in the
> calendar quarter; divided by

a transition between the old and new payment systems.
Specifically, for most drugs and biologicals furnished before
January 1, 2004, payments are based on "95 percent of the average
wholesale price." Id. § 1395u(o)(1)(A). For those drugs and
biologicals furnished during 2004, subject to certain
limitations, payments are based on "85 percent of the average

---

    (B) the total number of such units of such drug or
biological sold by the manufacturer in such quarter.

The average sales price "shall include volume discounts, prompt
pay discounts, cash discounts, free goods that are contingent on
any purchase requirement, chargebacks, and rebates." Id.
§ 1395w-3a(c)(3). Section 1395w-3a(c)(6)(B) defines "wholesale
acquisition cost" as:

    [T]he manufacturer's list price for the drug or
biological to wholesalers or direct purchasers in the
United States, not including prompt pay or other
discounts, rebates or reductions in price, for the most
recent month for which the information is available, as
reported in wholesale price guides or other
publications of drug or biological pricing data.

    For multiple source drugs, the payment amount is "106
percent" of the amount specified by:

    (A) computing the sum of the products (for each
National Drug Code assigned to such drug products) of—

        (i) the manufacturer's average sales price (as
defined in subsection (c) of this section); and

        (ii) the total number of units specified under
paragraph (2) sold; and

    (B) dividing the sum determined under subparagraph (A)
by the sum of the total number of units under
subparagraph (A)(ii) for all National Drug Codes
assigned to such drug products.

Id. § 1395w-3a(b).

wholesale price (determined as of April 1, 2003)."  <u>Id.</u>
§ 1395u(o)(4)(A).

## IV.  <u>LEGAL DISCUSSION</u>

**A.**    **<u>Summary Judgment Standard</u>**

"Summary judgment is appropriate when 'the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law.'"  <u>Barbour v.
Dynamics Research Corp.</u>, 63 F.3d 32, 36 (1st Cir. 1995) (quoting
Fed. R. Civ. P. 56(c)).  "To succeed [in a motion for summary
judgment], the moving party must show that there is an absence of
evidence to support the nonmoving party's position."  <u>Rogers v.
Fair</u>, 902 F.2d 140, 143 (1st Cir. 1990); <u>see also</u> <u>Celotex Corp.
v. Catrett</u>, 477 U.S. 317, 325 (1986).

"Once the moving party has properly supported its motion for
summary judgment, the burden shifts to the non-moving party, who
'may not rest on mere allegations or denials of his pleading, but
must set forth specific facts showing there is a genuine issue
for trial.'"  <u>Barbour</u>, 63 F.3d at 37 (quoting <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)).  "There must be
'sufficient evidence favoring the nonmoving party for a jury to
return a verdict for that party.  If the evidence is merely
colorable or is not significantly probative, summary judgment may

14

be granted.'"  <u>Rogers</u>, 902 F.2d at 143 (quoting <u>Anderson</u>, 477

U.S. at 249-50) (citations and footnote in <u>Anderson</u> omitted).

The Court must "view the facts in the light most favorable to the

non-moving party, drawing all reasonable inferences in that

party's favor."  <u>Barbour</u>, 63 F.3d at 36.

**B.**   **<u>Statutory Construction</u>**

The parties ask the Court to construe the term "average

wholesale price" in the Medicare statute as a matter of law.

Plaintiffs assert that Congress intended AWP to mean some actual

average of wholesale prices to customers.  Defendants assert that

AWP is a term of art and means a reference price or benchmark

used for price negotiations, rather than an average of actual

prices.

Statutory construction ordinarily begins with the plain

language of the statute.  <u>See</u> <u>United States v. Lachman</u>, 387 F.3d

42, 50 (1st Cir. 2004).  "The Supreme Court has repeatedly

emphasized the importance of the plain meaning rule, stating that

if the language of a statute or regulation has a plain and

ordinary meaning, courts need look no further and should apply

the regulation as it is written."  <u>Id.</u> at 50-51 (citations and

quotations omitted).  "Dictionaries of the English language are a

fundamental tool in ascertaining the plain meaning of terms used

in statutes and regulations."  <u>Id.</u> at 51.  Courts "will only look

behind the plain language to the legislative history, if we find

the statute ambiguous." <u>Gen. Motors Corp. v. Darling's</u>, 444 F.3d 98, 108 (1st Cir. 2006) (quotation omitted).

Seeking to elude the plain language canon of statutory construction, defendants assert that Congress used the term "average wholesale price" as a term of art.  Specifically, the defendants assert that knowledgeable participants in the health care industry had known for years before 1991 that AWP did not signal acquisition costs and that AWP is a reference price or benchmark used for price negotiations, which is not an average of actual prices.  "To be sure, there are instances where a statutory or regulatory term is a technical term of art, defined more appropriately by reference to a particular industry usage than by the usual tools of statutory construction." <u>Lacham</u>, 387 F.3d at 53.  "However, this canon of construction requires the disputed term to actually be a technical term of art." <u>Id.</u> Therefore, the Court must determine whether "average wholesale price" constitutes a technical term of art.

By definition, a term must have an established and settled meaning to constitute a term of art.  <u>See, e.g.</u>, <u>Stewart v. Dutra Constr. Co.</u>, 543 U.S. 481, 487 (2005) ("'[S]eaman' is a term of art that had an established meaning under general maritime law."); <u>Pfizer, Inc. v. Gov't of India</u>, 434 U.S. 308, 315 (1978) ("The word 'person,' however, is not a term of art with a fixed meaning wherever it is used, nor was it in 1890 when the Sherman Act was passed.").  <u>See generally</u>, 2A Norman J. Singer,

16

Sutherland Statutes and Statutory Construction § 47:27 (6th ed. 2005).

As defendants contend, the legislative and regulatory history does show that at some point, knowledgeable persons in the industry and government came to understand that the "average wholesale price" as published in industry compendia overstated the average acquisition cost paid by a provider.  Nonetheless this history provides little support for the argument that in 1997 when Congress passed the Balanced Budget Act, Congress intended AWP to be a term of art for whatever price the industry chose to put in the industry publications.  To the contrary, awareness by the Congress that the pharmaceutical industry was overstating AWPs for some drugs in the industry publications was a source of consternation that the AWP, as reported, was not a reasonable charge for the drugs.  As such, in its report, the House of Representatives Committee on the Budget recommended that Congress limit payment to 95 percent of AWP and order the Secretary to take into consideration "commercially available information including such information as may be published or reported in various commercial reporting services," and promised it would monitor AWPs to ensure the 95 percent provision did "not simply result in a 5 [percent] increase in AWPs."  H.R. Rep. No. 105-149, at § 10616 (1997).  In the statute, Congress not only adopted this cap on reimbursement, but also instructed the Secretary to monitor its effects.  The weight of the legislative

17

history reflects congressional intent to have the AWP moored to actual wholesale pricing, and a nagging concern that AWP was no longer a reasonable price.

Moreover, a term of art must have an established and settled meaning in the industry. While there is some evidence to that effect, there is also evidence to the contrary. The Court's independent expert pointed out that "inconsistent and ambiguous information exists even currently concerning what type of price AWP measures. The continuing confusion is real and understandable." (Berndt Report ¶ 81). For example, representatives from Empire Blue Cross Blue Shield of New York, Three Rivers Health, Multiplan, Inc., Harvard Pilgrim Health Care, and United Food and Commercial Workers "interpreted AWP more literally, as some average of wholesale prices charged by wholesalers and/or paid for by pharmacies to wholesalers." (Id. ¶ 75.) The "glossary of the 1999 textbook authored by Defendants' Expert Robert P. Navarro" defines "average wholesale price" as "derived by taking the average cost of the item to a pharmacy as charged by a large representation of pharmacy wholesale suppliers (for items not otherwise being sold at a discount)." (Id. ¶ 76.) First DataBank, a publisher of AWP prices, stated in 1991 that "AWP represents an average price which a wholesaler would charge a pharmacy for a particular product" and flip-flopped in 2005, stating that "AWP is not intended to represent the wholesale price suggested by the

18

manufacturer."   (<u>Id.</u> ¶¶ 77, 79.)   Therefore, the defendants have
not shown that the term "average wholesale price" had an
established and settled meaning in the industry as a term of art.
<u>Stewart</u>, 543 U.S. at 487.

Pressing its argument that AWP is a term of art for whatever
benchmark was placed in industry publications, Defendants argue
that the statute must be so construed to avoid absurd results.
"It is trite, but true, that courts are bound to interpret
statutes whenever possible in ways that avoid absurd results."
<u>Arevalo v. Ashcroft</u>, 344 F.3d 1, 8 (1st Cir. 2003); <u>see also</u>
<u>Darling's</u>, 444 F.3d at 108 ("[W]e 'avoid statutory constructions
that create absurd, illogical or inconsistent results.'")
(citation omitted).   Defendants argue that "if Congress intended
AWP to refer to an actual average of prices charged by
wholesalers to physicians, it necessarily follows that Congress
intended physicians would be reimbursed . . . less than their
average actual acquisition costs" when enacting the statute in
1997 specifying payments at 95 percent of "average wholesale
price."   However, providing reimbursement at 95 percent of AWP is
consistent with the Congressional intent to provide reasonable
reimbursement for drugs.   As the Secretary explained in the
amicus brief:

> While the Secretary obviously has an interest in ensuring
> that Part B beneficiaries have access to needed
> medication, he has an equally compelling interest in
> protecting the financial integrity of the program and
> ensuring that Medicare dollars are spent prudently.   To

> that effect, Congress and the Secretary have always set
> limits to what would be considered 'reasonable' for part
> B payment purposes.   Such limits, while creating
> incentives for suppliers to act cost-consciously, also
> necessarily create the possibility that some physicians
> will charge Medicare more than it is willing to pay.

(Br. of the United States as Amicus Curiae at 22.)   Judge Stearns

discussed this cost-consciousness when he held:

> It is far more likely that by setting the Medicare
> reimbursement rate below the AWP, Congress took a
> tentative step towards using Medicare's purchasing power
> as a means of driving down the cost of prescription drugs
> to the Medicare program.   "Average," after all, means
> that in a competitive market, some prices will be higher
> and some lower than the median.   Congress might
> reasonably have wished to put Medicare on the lower rung
> of the equation.

In re Lupron Mktg. & Sales Practice Litig., 295 F. Supp. 2d 148,

163 (D. Mass. 2003) (footnote omitted).

Defendants argue that "average wholesale price" should be

construed to mean a retail sticker price without any connection

to prices in the market price because knowledgeable observers

realized that it was not an actual average of prices.   Under this

approach, DHHS and Congress would be surrendering all control

over Medicare fiscal responsibility by anchoring Medicare

reimbursement to a metric that is wholly dictated by the

pharmaceutical industry.   Plaintiffs contend that such an

interpretation would permit pharmaceutical manufacturers to

funnel federal funds to physicians by inflating "average

wholesale prices" when the actual out-of-pocket costs of drugs

were much lower due to discounts and rebates.   As Judge Stearns

stated in rejecting a similar argument, "The suggestion that
Congress would deliberately condone a bribery scheme using public
funds to enrich drug manufacturers and physicians is, to say the
least, unusual." Lupron, 295 F. Supp. 2d at 163 (footnote
omitted).  Defendants respond by suggesting that the Secretary
and the Congress permitted the inflated drug payments to cross-
subsidize physician services which were otherwise
undercompensated by Medicare.  While this problem of ensuring
that doctors were properly compensated may be one reason that
reform of such a flawed pricing system took until 2003, it does
not prove that Congress intended to give the pharmaceutical
industry free reign over drug pricing.

　　　Moreover, because the government shoulders only 80 percent
of drug costs under Medicare under the industry's interpretation,
Congress would be intentionally subjecting Medicare
beneficiaries, who are often old, poor, and sick, to exorbitant
drug co-payments based on artificially high prices.  The
interpretation that Congress intended to permit fictitious
pricing produces the absurd result of penalizing the very
beneficiaries the statute was designed to help.  As Chairman
Tauzin of the House Committee on Energy and Commerce asked
rhetorically in 2001, "Why on earth do we have a system that
requires a Medicare beneficiary to pay 20 percent as a copay of
an artificial price?" Medicare Drug Reimbursements: A Broken
System for Patients and Taxpayers: Joint Hearing Before the

Subcomm. on Health and the Subcomm. on Oversight and
Investigations of the H. Comm. on Energy and Commerce, 107th
Cong. 87-88 (2001).  During the same hearing, Mr. Scully, then
Administrator for the Centers for Medicare & Medicaid Services in
DHHS, observed, "The fact that the beneficiaries pay the 20
percent copayments is a gigantic problem."  Id. at 84.

Accordingly, the Court finds that the term "average
wholesale price" in the Medicare statute is not a term of art for
any price the pharmaceutical industry places in the industry
publication and will be construed under the plain language
doctrine of statutory construction.

C.    **Plain Meaning Definition of Average Wholesale Price**

Determining the plain language meaning of the regulatory and
statutory term "average wholesale price" is a straightforward
exercise that begins with the dictionary.

"Average" is defined in Webster's Third New International
Dictionary of the English Language (3d ed. 1961) (1993 prtg.) as
"1: equaling an arithmetic mean; 2: approximating or resembling
an arithmetic mean specif. in being about midway between
extremes: not out of the ordinary for members of the group under
consideration."[7]  Id. at 150.  "Wholesale" is defined as "of,

---

[7] It is true that several other ambiguities remain.  Is
"average" to be computed geographically (e.g., nationally, by
state, or otherwise) or temporally (e.g., annually or otherwise)?
Does "average" stand for "median" or "mean"?  The parties should
address these issues at trial.

relating to, or engaged in the sale of goods or commodities in
quantity for resale." Id. at 2611.  "Price" is the "amount of
money given or set as the amount to be given as a consideration
for the sale of a specified thing." Id. at 1798.  In the context
of this case, these definitions are reasonably clear.  One
problem is the meaning of price: does "average wholesale price"
account for discounts and rebates?  In this case, in its 1991
regulations, DHS based payment for a branded drug on the lower of
"estimated acquisition cost" or the "national average wholesale
price" of the drug; "estimated acquisition costs" were
"determined based on surveys of actual invoice prices paid by the
providers furnishing the drug."  56 Fed. Reg. at 59,507.
Presumably, the policy here is to ensure that the government gets
the benefit of rebates and discounts, by getting lower prices.
Interpreting "average wholesale price" as a retail sticker price
that does not account for rebates and discounts would be
inconsistent with the policy of having the government pay the
lower of these two rates.  Therefore, the Court construes
"average wholesale price" in the 1998 Medicare statute to include
discounts and rebates.

     The parties have not addressed whether the term AWP in the
2003 statute should be construed differently.  The statute and
the legislative history indicate that by 2003, it had become a
term of art.  At that point, Congress clearly did understand AWP
was different than average sales price and was not reflective of

actual prices in the marketplace.  Therefore, it reduced reimbursement to 85 percent of AWP to account for the overstatement while the new pricing system was being phased in.

The Court will address the remaining issues raised by the summary judgment papers at trial.

### ORDER

The plaintiffs' motion for partial summary judgment (Docket No. 2278) is **DENIED**.  The Track One defendants motion for summary judgment is **DENIED**, except with respect to Medicare Part B drugs furnished in 2004.

**S/PATTI B. SARIS**
United States District Judge