# EXHIBIT F

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br>ALL CLASS ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br>Judge Patti B. Saris |

### DECLARATION OF BEATRICE E. MANNING, PH.D.

1.  My name is Beatrice Manning and I reside at 114 Packard Road, Stow, Massachusetts 01775.

2.  I am currently working on a Master of Arts – Research – Specialty in Ethics (expected 2007) at Andover Newton Theological School. Additionally, I have attached to this affidavit my resume setting forth the details of my education, work experience and publications.

3.  I was an employee of the Schering-Plough Corporation (SP) for slightly over five years (Spring 1997- Spring 2002).

4.  While employed by SP, I and many other SP employees were assigned to work for the disease management unit of SP, a wholly-owned subsidiary named Integrated Therapeutics Group (ITG).

5.  My position at ITG was the manager of clinical opportunities as shown by chart number 06.00 at SW0638453 of Exhibit 407. As manager of clinical opportunities I participated in meetings and discussions with SP officers and employees regarding SP's managed care business operations, marketing and contracting. Also, as manager of clinical opportunities I had access to and reviewed SP memoranda and documents regarding the operations, marketing and

1

contracting for SP drugs, including SP's line of albuterol inhalants, with managed care customers such as IPAs, HMOs and PBMs. The facts testified to in this affidavit are based upon my personal knowledge acquired in the regular course of business in my employment with SP and in my position as manager of clinical opportunities of ITG.

6.  ITG's offices were located in SP's headquarters in Kenilworth, New Jersey. ITG operations were totally financed by SP. ITG was totally operated and controlled by SP officers and employees. The SP officers who directed and controlled ITG were Raul Cesan, Richard Zahn, Len Camarda, and Roch Doliveux.

> **OBJECTION**
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II

7.  During the final four years of my employment with SP, I was a whistleblower against SP for illegal marketing practices that resulted in a global resolution during the summer of 2004 with the United States Attorney for the Eastern District of Pennsylvania that included the following components: (1) SP's wholly-owned subsidiary, Schering Sales Corp., pled guilty to a violation of the Anti-Kickback Statute for paying a kickback to a customer in exchange for preferred formulary treatment of Claritin and SP paid the fine of $52.5 million assessed for the violation; (2) SP agreed to settle its False Claims Act liability and to pay to the United States, 50 Medicaid programs, and certain Public Health Service entities $292,969,482 for Schering's failure to report its true best price for Claritin; and (3) SP entered into a Corporate Integrity Agreement with DHHS to correct its government pricing reporting failures.

> **OBJECTION**
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II

8.  SP used an intricate scheme to cheat Medicaid out of hundreds of millions, if not billions, of dollars. SP evaded its responsibility to charge the U.S. government and its beneficiaries the lowest price it charged to the private sector, i.e., the best price required by federal law. Most of the scheme was carried out using ITG. The scheme, which centered on SP's

> **OBJECTION**
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II

blockbuster drug Claritin, had three major prongs that served as "kick-backs" and hidden rebates and/or discounts.

9. The first prong: ITG provided free or well-below-cost health management services to HMOs that put Claritin on formulary. These services were not provided to Medicaid clients, including Medicaid clients enrolled in those same HMOs. The value of these services was not included in the best-price calculation SP used to establish Medicaid pricing. ITG would sign a contract with the HMOs and this contract would be ostensibly totally separate from the rebate contracts that SP would sign with the managed care organizations. Medicaid auditors would review the rebate contracts with SP (not ITG) and thus would never see the additional "kick-backs" or hidden rebates/discounts SP gave through ITG. The role of ITG services are reflected in Exhibit 565, a draft memo from Linda Zhou, who was then the head of SP's Contracts and Pricing division. In this memo, Zhou is making the "business case" for further investment into ITG's computer capacity. On page 2, under Roman numeral I, Zhou states, "ITG's services complement and enhance Schering's pharmaceutical products and meaningfully differentiate them from the competition. Thus, they provide our primary means of implementing the strategy to *compete on a basis other than price*." On the next page under the section of "Increased Profitability" Zhou stated, "By allowing us to compete on a basis other than price, ITG has increased Schering Lab's profitability. Total discounts as a % of contracted gross sales has declined in 1996 from 23% in 1996 to 17% currently. At 1998 LE sales levels, this equates to annual savings of $222 million."

> **OBJECTION**
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II

10. The second prong: ITG also used "partnership fees" in its relationship with PBMs. ITG would pay the PBMs for studies or analyses of their data sets of patients in amounts of "partnership fees" that were well above their actual cost.

> **OBJECTION**
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II

11.  The third prong: SP, through ITG, "gave" the managed care organizations nominally priced drugs, including Warrick albuterol inhalants, to equalize the difference between the "price" of Claritin and the "price" of Allegra or to create value to induce the MCO to enter into a contract.

> **OBJECTION**
>
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II

12.  As part of the strategy to *compete on a basis other than price*, SP relied on the value of spreads created by high AWPs and reimbursement by Medicaid, Medicare and third party payors on those drugs. Managed care organizations and could further enhance their "discounts" by reselling drugs, including albuterol, which they had been "given" as nominally priced drugs in connection with the scheme to avoid Medicaid rebates and equalize pricing of Claritin in managed care contracts. SP did not account for the value of the hidden rebates/discount given from the nominal priced albuterol in SP sales or rebate/discount records. Essentially, SP was keeping two sets of accounting books, one for SP, one for ITG. SP hid the value of the ITG services, "partnership fees" and nominal pricing rebates/discounts in ITG's books.

> **OBJECTION**
>
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II
>
> Fed. R. Evid. 602
> *See* Memorandum, Part III

13.  As manager of clinical opportunities, I witnessed marketing preparations and presentations to managed care organizations. During the time I worked at SP, I observed preparations of presentations for field forces to market the reimbursement spreads created by false AWPs, to show the value of the nominally priced drugs being "given" as part of a managed care contract. In the presentations I observed the sales forces making such presentations were careful not to leave any presentation material behind after making such marketing presentations and in office preparation of the presentations did not include distribution of these materials to staff other than those who would make the presentations.

> **OBJECTION**
>
> Fed. R. Evid. 402, 403
> *See* Memorandum, Part I
>
> Fed. R. Evid. 404(b)
> *See* Memorandum, Part II
>
> Fed. R. Evid. 602
> *See* Memorandum, Part III

I declare under penalty of perjury that the foregoing is true and correct.

Beatrice E. Manning

Dated: 10/22/2006

5