

12756577

Oct 27 2006
9:20PM

# 2

# Trial Affidavit of Gina M. Alongi

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

## Direct Testimony Affidavit of Gina M. Alongi

**Background of Gina M. Alongi**

1.       My name is Gina M. Alongi.  I am the Administrator of the International Union of Operating Engineers Local 4 Fringe Benefit Funds ("The Funds").  In my role as Administrator, I am responsible for managing a Health & Welfare Plan ("Local 4 H&W"), a Defined Benefit Pension Plan and an Annuity and 401(k) Plan.  These Plans are governed by the Employee Retirement Income Security Act ("ERISA").  These Plans combined have assets close to one billion dollars.  I have been the Administrator of these Plans since 1996 and have been employed by The Funds since 1979.

2.       In my role as Administrator of Local 4 H&W, I manage all of Local 4 H&W's health expenditures, including expenditures for pharmacy benefits.  I also review and negotiate with the assistance of Fund Counsel many of Local 4 H&W's contracts with various providers, including its Prescription Benefits Manager, Caremark, and its medical preferred provider

organization, Blue Cross Blue Shield of MA ("BCBSMA"). The Local 4 H&W Plan is self-insured and self-administered. The entire cost of the Plan is paid for by contributing employers in accordance with various collective bargaining agreements with the Union.

3.     As Administrator, I work directly with the Board of Trustees of the Plan to control costs in order to provide a slate of benefits that will ensure the stability of the Plan despite the high cost of health care.

4.     As part of my job I regularly review publications about health care, including Employee Benefit News and articles from IFEB (International Foundation of Employee Benefits), and I occasionally attend conferences on health care issues.

**Background of Local 4 H&W Fund**

5.     IUOE Local 4's members are operating engineers. These people operate and maintain heavy construction equipment, such as cranes, excavators, and forklifts. Many Local 4 members operated the cranes and other heavy equipment used to construct Boston's Big Dig, the largest public works construction project in United States history. Local 4 H&W's members work for approximately 500 separate employers across Massachusetts, New Hampshire and Maine.

6.     Local 4 H&W currently provides health coverage for approximately 10,000 people (covered lives). In 2005, Local 4 H&W spent approximately $35 million for all its health benefits, with approximately $5 million going to pharmaceutical benefits. Local 4 H&W does not provide Medigap coverage. Among the benefits we provide is a pharmacy benefit, which

2

covers a substantial portion of the cost of prescription drugs, including many of the 15 Subject

Drugs at issue in this litigation.

7.    Local 4 H&W also provides a medical benefit, which provides coverage for drugs

administered through a physician's office and billed through our medical benefits plan, including

the Subject Drugs.

8.    Local 4 H&W's principal office is located in Medway, MA.

**Local 4H&W pays for Subject Drugs at prices based on AWP**

**Payments Under Our Pharmacy Benefit**

9.    Since September 2003 our PBM has been Caremark. Under our contract with

Caremark we pay for retail brand name drugs at AWP minus 16%. A review of Caremark claims

data indicates that Local 4H&W has paid for approximately $32,000.00 worth of the Subject

Drugs through the retail and specialty pharmacy channel, with reimbursements to Caremark at

AWP minus 16%. We have made payments for both Albuterol and Procrit.

Hearsay; Best Evidence Rule

10.    Our contract with Caremark also states that we will receive rebates of $1.77 per

prescription filled. These rebates do not appear to be based on AWP.

Hearsay; Best Evidence Rule

11.    Prior to 2003, Local 4H&W's PBM was Express Scripts ("ESI"). I have reviewed

the ESI contract, which reveals that we paid for brand name prescription drugs generally at AWP

minus 13%. Some of the Subject Drugs are specifically listed in the ESI contract under the

"Specialty Injectables, Biotech and Compounded Drugs" category. We would have paid for

those drugs at AWP minus 13%.

Hearsay; Best Evidence Rule

12. We are still reviewing data from ESI to determine Local 4 H&W's payments for the Subject Drugs.

**Payments Under Our Medical Benefit**

13. Local 4 H&W also pays for Subject Drugs provided in physicians offices and billed through our medical coverage. Prior to August 1, 2005, our payments for Subject Drugs under our medical plan were not based on AWP.

Lack of foundation

14. Starting on August 1, 2005, we entered into a PPO agreement with BCBSMA. Under that agreement Subject Drugs billed in the physicians' office through our medical plan are paid based on an individual provider's discounts. I understand from Plaintiffs' counsel that BCBSMA has testified that its agreements with providers were always based on AWP for the Subject Drugs.

Hearsay; vague/ambiguous; Best Evidence Rule

15. I am awaiting claims data from BCBSMA concerning the amounts which Local 4 H&W paid for the Subject Drugs.

**My Understanding of What AWP Means**

16. I understand that this litigation concerns the Average Wholesale Price ("AWP") of various drugs.

17. I have never had a clear understanding of the meaning of the term AWP. Although I have dealt with the term for many years its exact meaning has always been a source of

4

confusion for me.  Up until I learned about this case, I always believed that AWP represented some kind of actual average of prices being charged.

18.    I understand that the Complaint alleges that each of the defendants used AWP and the reimbursement payment process to create spreads which benefited physicians and the drug companies.  I am aware that the effect of this was to cause the AWP we use as a reimbursement benchmark to be inflated, *i.e.*, it was not a real number or a real average.  Local 4H&W was not aware of these practices and I do not think it is fair to take advantage of us in this fashion.

> Lack of personal knowledge; legal conclusion; no foundation

19.    Thus I was unaware that the marketing practices of AstraZeneca included offering urologists discounts of 33% to 50% on Zolodex in contracts which requires that these terms be kept confidential.  (Plfs. Ex. 43).

> Lack of personal knowledge

20.    I understand that in response to an Interrogatory BMS has stated as follows:  "The existence of a spread is not misleading to a person with even minimal experience in the sale and distribution of drugs" and does not result in "excessive reimbursement."  I certainly believe it was misleading to publish an AWP that did not reflect BMS's discounts and now, having been told of the discounts, believe they resulted in unfair payments by payors.

> Legal Conclusion

21.    I also understand that in response to another  Interrogatory BMS has stated (Plfs Ex. 177) that any person making a copayment has "actual or constructive notice" of the difference between AWP and the prices at which BMS sold its drugs to the public.  Local 4 H&W had no such knowledge.

> Has not established authority to speak for Fund

22.    I was unaware that BMS, for example, was contracting with oncologists to such an extent that Blenoxane had an overage discount of 61% below its list price.

> Lack of personal knowledge; Lacks foundation; relevance

5

23.     I was unaware that discounts for BMS's Taxol were 73% off list prices, as

reported in Plfs Ex. 203.

Relevance;Lack of foundation

24.     I was unaware of the type of activity evidenced in Plfs Ex. 38.  In that exhibit,

AstraZeneca is marketing Zoladex, using doctors to "do the math," which results in a profit for

700 Depots of $150,794, with discounts of up to 41%.

Lacks personal knowledge

25.     I was also unaware that, for example, JJ was marketing drugs to physicians by

telling showing them information such as this (Plfs. Ex. 254 at 90300):

Lack of personal knowledge; Lack of foundation

### Average Medicare Reimbursement for Remicade™ (infliximab)

### When Billed by a Physician's Practice

| | |
|---|---|
| Profit to MD on drug alone: | $327.63 |
| Annual profit for drug alone per patient:<br>    ($327.63 x 7 infusions per year) | $2,293.41 |

**Local 4H&W has never purchased drugs directly**

26.     Local 4H&W has never purchased any prescription drugs directly.  We have never

seen the actual transaction prices, or the actual purchase prices of physician or retail pharmacy

claims for any pharmaceuticals, including the Subject Drugs.

Has not established authority to speak for Fund

27.     Local 4H&W has never owned or operated a staff model HMO or pharmacy.

6

28.     The only time Local 4H&W has paid for any of the Subject Drugs is through

reimbursements to pharmacies or providers who had purchased the drugs.

| Lack of foundation; Best evidence Rule; Vague and ambiguous |
| --- |

## Local 4H&W Does Not Know Actual Transaction Prices

29.     I vaguely remember reading several newspaper articles about AWP, however

those articles added to my confusion over what AWP actually means.  I have never seen any OIG

reports, or other government reports which reveal that AWP is a false number, or reveal the

actual transaction prices for any of the Subject Drugs.

30.     As Local 4H&W has never purchased any drugs itself, it does not have actual

knowledge of the transaction prices paid for any of the Subject Drugs.

| Legal Conclusion |
| --- |

I declare under penalty of perjury that the foregoing is true and correct.

October 26, 2006

_____
Gina Alongi