# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS <br><br> Judge Patti B. Saris |

# TRIAL DECLARATION OF EDWARD S. CURRAN, JR.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In Re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Master File No. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL ACTIONS | Judge Patti B. Saris |

## DECLARATION OF EDWARD S. CURRAN, JR.

I, Edward S. Curran, Jr. declare as follows:

1. I worked at Blue Cross Blue Shield of Massachusetts ("BCBS/MA") from about 1988 to 1992. During that time, my title was Director of Pharmacy. I submit this declaration to testify to my knowledge regarding issues that I understand are relevant to this litigation.

### Background

2. I hold a Bachelors of Science in Pharmacy from the Massachusetts College of Pharmacy. I received that qualification in 1972. From 1972 to 1980, I worked for a retail pharmacy chain called OSCO Drug as a pharmacist and later as a pharmacy manager. I then spent a few months as a consultant. From 1980 to 1988, I worked for Harvard Community Health Plans (now Harvard Pilgrim). My positions there included Assistant Director of Pharmacy at the Kenmore Health Center (a staff model HMO site), Director of Pharmacy at the Boston Health Center (another staff model HMO site) and Director of Pharmacy for Group Health Plans. From 1988 to 1992 I worked at BCBS/MA as discussed above.

3. After leaving BCBS/MA I went to work for Aetna. I worked there from 1992 to 2000 in a variety of roles including Product Manager, Director of Drug Formulary Management

and then Vice President of Drug Formulary Management. I was based in Connecticut from 1992 to 1996 and then in Waltham, MA from 1996 to 2000.

4.  Since 2000, I have been working at CVS as a pharmacist.

### AWP Ain't What's Paid

5.  AWP stands for Average Wholesale Price, but almost no-one actually pays AWP to buy drugs and it is certainly not an average of wholesale prices. The fact that AWP is not an actual average of wholesale prices has been common knowledge since at least the 1960s. I knew that fact when I became a pharmacist in the early 1970s. AWP is often referred to by those in the health insurance business as "Ain't What's Paid." I like to think I was the first person to make that joke in the early 1990s, but perhaps others came up with it before me. The reality it reflects was certainly well known.

6.  Part of the reason AWP "ain't what's paid" is that there are many rebates and discounts available in the marketplace and those often lower market entities' acquisition prices for drugs. Those rebates and discounts take prices below Wholesale Acquisition Cost or WAC, which is another drug pricing benchmark. AWP is typically 20% to 25% above WAC.

7.  Drug manufacturers generally pay these rebates and discounts to entities in the market that can move market share in a therapeutic category or drive volume usage of their drugs. Entities purchasing drugs that receive such rebates and discounts include staff model HMOs, hospitals, long term care facilities and physicians in relation to injected or infused drugs that they administer in their offices.

8.  The availability of such rebates and discounts to entities that can move market share and drive volume has been commonly known in the health insurance industry for many

2

years. I'd say it was commonly known in the staff model HMO environment since at least the early 1980s. The staff model HMOs I worked with were aware of these rebates and discounts early on because they were purchasing drugs for their own facilities. Knowledge of rebates and discounts was common among all health insurance plans, including those without staff model HMOs, by the mid-1980s.

9. The extent or amount of the rebates and discounts that any entity can achieve in the market will vary widely from drug to drug and entity to entity.

10. In terms of variation among drugs: The amount of rebates and discounts available on any given drug is a function of whether or not there is competition in its therapeutic category. It is not unusual to see rebates and discounts on branded drugs but, in general, rebates and discounts will increase for those branded drugs when competition enters the market for a particular drug or in its therapeutic category. Later, when generic drugs enter the market, this cycle peaks and at that stage prices often fall like a rock. This is all a result of competition.

11. In terms of variation by entity: The ability of any given entity (be it a staff model HMO, a hospital, or a physician practice, etc.) to obtain rebates and discounts tends to vary based on their demonstrated ability to move market share and the volume they can move. It may also be influenced by their leverage and negotiating power in the marketplace.

12. The range of rebates and discounts that can be achieved varies widely based on these factors. In my own experience, I have seen rebates and discounts resulting in acquisition costs for drugs up to 90% below WAC. I have the impression that some rebates and discounts that have been available in the market are even higher, i.e., that they lowered acquisition costs even beyond that level. The fact that rebates and discounts vary widely for these reasons and can

3

be at or possibly beyond these levels has been common knowledge in the health insurance industry since at least the mid-1980s. I was certainly aware of these facts when working for BCBS/MA in the late 1980s and early 1990s.

13. It follows that it has been commonly known in the health insurance industry since at least the mid 1980s that AWP – because it does not reflect rebates and discounts – bears no predictable relationship to drug acquisition costs. And one cannot claim that rebates and discounts fall within any particular percentage band or levels or that the health insurance industry expected that to be the case. Rather, it has been well understood throughout this period that the relationship between AWP and acquisition costs for drugs will vary widely and across a very broad range depending on the levels of rebates and discounts available.

### Rebates to Health Insurers

14. My responsibilities as Director of Pharmacy also included negotiating with drug manufacturers for rebates payable to BCBS/MA in consideration for formulary status. This is just another facet of the phenomenon I discussed earlier – manufacturers pay rebates to entities that can move market share. By making decisions on formulary placement, BCBS/MA and other health insurers have a well-known ability to drive usage of particular drugs over their competitors.

### BCBS/MA Staff Model HMO

15. Throughout the time period I worked at BCBS/MA, my responsibilities included negotiating with drug manufacturers to get rebates and discounts on the drugs BCBS/MA purchased for use at its staff model HMO sites. I was also one of signatories on those contracts once they were finalized. I do not now recall the range of rebates and discounts we achieved on

4

our drug purchases, but they varied widely from drug to drug. I was also responsible for managing the staff model HMO pharmacy sites.

16.    As discussed above, I worked as the Director of Pharmacy for BCBS/MA. Put another way, I was employed by BCBS/MA, not by the staff model HMO Medical East/Medical West. However, people at the staff model HMO and BCBS/MA worked closely together. Indeed, I was never quite sure whether there was a distinction between the two. I spoke to and worked with people at the staff model sites all the time, there was free sharing of information, and employees moved back and forth between the organizations. We worked together under one big umbrella.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Edward S. Curran, Jr.

Executed on this 21st day of September 2006

5

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Mark G. Young, hereby certify that I am one of the J&J Defendants' attorneys and that, on November 9, 2006, I caused copies of **TRIAL DECLARATION OF EDWARD S. CURRAN, JR.** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.

/s/ Mark G. Young