UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) MDL No. 1456 ) ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | ) ) ) ) ) |

## TRIAL OF CLASS 2 AND CLASS 3 CLAIMS

### AFFIDAVIT OF DENISE M. KASZUBA SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF OF DEFENDANTS BMS AND OTN IN THE BENCH TRIAL OF CLASS 2 AND CLASS 3 CLAIMS

STATE OF NEW JERSEY    )
                                           ) ss:
COUNTY OF MIDDLESEX )

Denise M. Kaszuba, being duly sworn, deposes and says:

      1.    I am Associate Manager of Pricing Support in the department of Pricing Institutional Operations of Bristol-Myers Squibb Company ("BMS") in Plainsboro, New Jersey. I submit this affidavit based on my personal knowledge and the files in possession of BMS.

*My Background and Corporate Responsibilities*

      2.    I was hired by Bristol-Myers in 1979, before the merger of Bristol-Myers and E.R. Squibb. My first position at Bristol-Myers was a clerk in the drug metabolism and pharmacokinetics division. After that, I worked in various positions at Bristol-Myers until approximately 1987 when I became a pricing analyst. As pricing analyst,

my responsibilities included managing the price master file, implementing price increase actions and disseminating the price lists to our customers.

3.  In 1989, Bristol-Myers merged with E.R. Squibb. Shortly thereafter, I became a senior pricing analyst; I was promoted to associate manager of pricing support in 1995. As senior pricing analyst, I processed price increases and communicated BMS's wholesale list price ("WLP") and direct list prices to customers and others, including third party industry publications such as the Redbook, Medispan and First Databank (these three entities are hereinafter collectively referred to as the "Publications"). I have similar responsibilities as the associate manager of pricing support. I have been the person in charge of communicating with the Publications from 1991 to the present. No prices would have been communicated by BMS to the Publications during this time period without my knowledge.

*BMS's Communications with Publications*

4.  When BMS launches a new product or implements a price increase on an existing product, the finance department sends pricing information to my department. We input the prices into an internal BMS price master file and notify our internal sales force, customers and the Publications of the new prices. Attached hereto at Tab A (Defs' Ex. 2611)[1] is a memorandum entitled "Pricing Increase/Decrease Notification Process." This document outlines the steps that BMS takes to notify our internal sales forces, customers and Publications of new prices. (See also Tab B (Defs' Ex. 2601), outlining the steps my department takes to report price adjustments to BMS employees, customers and the Publications.)

---

[1] Each document attached hereto has been cross-referenced to its corresponding exhibit number on the joint-defendants' exhibit list as "Defs' Ex. ___."

2

5. BMS only communicates information to the Publications when one of four events occurs: (1) BMS introduces a new product; (2) BMS implements a pricing adjustment on one of its current products; (3) BMS discontinues a product; or (4) when a Publication calls up with a question. Attached hereto at Tabs C and D are examples of communications that my department sent to the Publications. (Attached at Tab C (Defs' Ex. 2630) is a notification for a product introduction, which includes product and pricing information; attached at Tab D (Defs' Ex. 2627) is a notification of a price adjustment for Paraplatin, which includes product and pricing information). These notifications include the NDC number, the product description and the wholesale list price and direct price for the products.[2] BMS submits this information to the Publications because, without it, payors will not list the product in their computer systems and they will not reimburse providers for it.

6. To the best of my knowledge, BMS has never communicated average wholesale prices ("AWPs") to the Publications. Moreover, BMS does not determine AWPs. AWPs are established by the Publications by applying a mark-up factor to BMS's direct or list prices. Attached hereto at Tab F (Defs' Ex. 2554) is an e-mail from me to Timothy Wert and George Kegler that explains how the Publications establish AWPs for BMS's products. Attached hereto at Tab G (Defs' Ex. 2595) is an internal memorandum from me to Irene Paulin, a regional manager in the oncology division, outlining the responsibilities of my department and stating that pricing operations is not responsible for establishing AWPs.

---

[2] The wholesale list price is the price that appears on invoices to wholesalers. The direct price is the price to providers who purchase directly from BMS. The list price and direct price for oncology products has always been the same. (See, e.g., Tab C.) Beginning in August 2001, BMS eliminated direct price and began to send a single list price to the Publications. Attached hereto at Tab E (Defs' Ex. 2584) is the "Standby Statement" issued by BMS stating that as of August 15, 2001, BMS will offer its primary care pharmaceuticals to all trade customers at one price.

3

7. Beginning in 1999, BMS's communications with the Publications contained the following statement, which is included at Tab D:

> "Wholesale and direct list prices, including those for the products listed herein, may not reflect BMS sale prices. Certain multisource products are always sold at lower special offer prices. All products may be subject to negotiated discounts, rebates and chargebacks."

This did not have any impact on the way the Publications determine AWP.

8. I understand that there are seven BMS oncology drugs at issue in this case. BMS never changed the list price on any of the NDCs of one of those drugs, Taxol, after the initial launch of each NDC; accordingly, BMS did not send price notifications to the Publications regarding Taxol NDCs other than the initial notification of product introduction. Also, despite the fact that another drug, Etopophos, is a patent-protected drug, BMS did not change the list price on any Etopophos NDC between the product's launch in 1996 and 2003. Therefore, we did not send any pricing notifications to the Publications on the Etopophos NDCs during that period other than the initial launch prices. For the five others drugs at issue (Blenoxane, Cytoxan, Paraplatin, Rubex and Vepesid), BMS generally sent list price changes to the Publications only for the NDCs that remained on patent. Once the NDC was subject to generic competition, we generally did not send any further prices to the Publications unless there was a change in the NDC number or a new NDC was launched for the drug.

9. From time to time, the Publications provide us with data after they have calculated the AWP information. In these circumstances, my department reviews this information merely to verify BMS product and pricing information. We do not approve or reject the AWPs calculated by the Publications.

4

10. I have never sent any AWP information to Medicare or a third-party payor. On occasion, I have received requests from people outside of BMS for AWP information. My standard response has been that they need to contact the data services directly. This data is owned and established by the Publications, and it is their copyrighted information.

11. I also have access to Medispan's and First Databank's pricing information on Price-Chek and Price-Probe. These are software programs, which BMS licenses from Medispan and First Databank. I sometimes review the information on these databases to verify that BMS product information and list prices are accurate. Again, I do not approve the AWP information listed on these databases. In some instances, however, I will inform the Publications when it is clear the AWP information has been erroneously calculated. For example, on one occasion, I noticed that one of the Publications had applied a mark-up factor of 29% or higher for the drug, Cephelaxin. I asked someone on my staff to call the Publication and ask whether that was correct. I do not recall the resolution.

*Communication Regarding Change Markup Factor*

12. In 1992, Dennis Buckley, who was the Director of Sales Operations at that time, asked me to request the Publications to increase the mark up factor for determining AWP on BMS oncology drugs from 20.5% to 25%. At the time, the mark-up factor for the Bristol-Myers drugs was 20.5% and the mark-up factor for the Squibb drugs was 25%. Attached hereto at Tab H (Defs' Ex. 2552) are two letters sent from me to First Databank and Medipan regarding this request.

13. Though this request was made to all the Publications, only Redbook made the change. First Databank and Medispan did not make the change. Attached hereto at

5

Tab I (Defs' Ex. 2553) is an internal Medispan memorandum produced from BMS's files indicating that "after reviewing the results of the wholesaler survey" Medispan determined that they would not make the change.[3] Medispan transmitted this memorandum to me in or around August 1992.

14.     This was the only time that I ever communicated any information regarding AWPs or the mark-up factor to the Publications. To the best of my knowledge, this is the only time that BMS has made such a request, and given my position in the company, I would have known about any such request.

15.     In 2002, First Databank changed the mark-up factor that it used to calculate the AWP for certain drugs to 25%. BMS did not request that this change be made and we did not receive advance notice of the change to the mark-up factor. BMS first learned of the change when a customer notified Wayne Roberts, a trade operations manager at BMS. I then contacted Ms. Morgan at first Databank who informed me that First Databank had changed the mark-up factor to 25% on its own.

---

[3] The document states that Medispan will "use" a markup of 1.25 for items with the "labeler 003." "Labeler 003" refers to products that were formerly E.R. Squibb products, which always had a mark-up factor of 1.25. "Labeler 003" does not include any of the drugs at issue in this case.

6

16. Prior to 2001, BMS had a subsidiary called Apothecon that manufactured and marketed generic and mature branded products. From time to time, some of the Apothecon oral drugs were subject to something called "special offer pricing." None of the drugs at issue in this case (Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, Taxol and Vepesid) were Apothecon drugs.

_____
Denise M. Kaszuba

Sworn to before me this
9th day of November 2006

_____
Notary Public

MELISSA T. McCLOSKEY, Notary Public
My Commission Expires January 17, 2008

7