UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) ) ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | ) ) ) ) |

**TRIAL OF CLASSES 2 & 3 CLAIMS**

AFFIDAVIT OF CHRISTOF MARRE
SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF
OF DEFENDANTS BMS AND OTN IN TRIAL OF CLASSES 2 & 3 CLAIMS

STATE OF MASSACHUSETTS   )
                         ) ss:
COUNTY OF MIDDLESEX      )

CHRISTOF MARRE, being duly sworn, deposes and says:

1. I am a former marketing director for the oncology division of Bristol-Myers Squibb Company ("BMS"). I submit this affidavit based on personal knowledge and files in the possession of Bristol-Myers Squibb as direct testimony in the case-in-chief of BMS and its former subsidiary, Oncology Therapeutics Network Corporation ("OTN").

2. I graduated from the London School of Economics in 1993 with a Masters of Science in Economics. After school, I joined Monitor Company, a management consulting firm in London. In 1995, I began working for the Boston Consulting Group, another such consulting firm in Germany.

3.  I joined BMS in 1998 as a director of strategic planning for BMS Mexico in Mexico City. In 2001, I moved to the United States to take the position of Senior Marketing Manager in BMS Oncology ("BMSO"). In 2002, I became the Director of Customer Marketing for BMSO, later renamed to Portfolio Marketing.

4.  I left BMS in April 2004. I was offered a promotion to become Vice President of Marketing for a company called Corixa, another drug company. In May 2005, I moved to Boston to become the Vice President for Neurology marketing for Biogen IDEC. Right now, I am between jobs.

5.  During the 2001-2004 period, while I had marketing responsibility for BMSO, I concentrated on what was called the "multi-source portfolio" of drugs.[1] These were drugs that had once been under patent, but were at that time subject to generic competition. I understand that several of the multi-source drugs for which I had responsibility are involved in this case, including Blenoxane, Cytoxan and Vepesid. I also was involved in aspects of the marketing of Taxol, which became subject to generic competition at the end of 2000.

6.  My responsibility was to maximize the dollar value of sales of our multi-source portfolio in the face of the generic competition. We had different strategies for different classes of customers. For larger customers, such as hospitals (e.g., Memorial Sloan Kettering, M.D. Anderson, Fox Chase Cancer Center) and group purchasing organizations (e.g., Novation, Premier), we tried to enter into contracts to become the exclusive supplier of the drug for a period of time. For smaller customers, such as individual office-based oncology practices, we

---

[1] Early in this period, however, I also had responsibility for one aspect of the marketing of an on-patent drug, Paraplatin, for indications such as prostate, bladder and head and neck cancer. Later, as Paraplatin approached the end of its patent, I was also involved in the planning for how best to position Paraplatin for generic competition.

gave our distributor subsidiary OTN "floor prices" above which it was instructed to sell our drugs.

7. In both the "contract" and "floor price" scenarios, my primary concern was understanding the price at which the competition was offering the generic equivalent of the BMS drug. In the case of large buyers with whom we contracted, the buyer itself would usually present BMS with a bid that it had received from a generic supplier and would ask whether we could meet or beat it. In the case of setting the floor for smaller buyers, we monitored the "flyers" and other advertising sent out by other specialty distributors besides OTN (e.g. Florida Infusion and Oncology Supply) for prices on the generics. I was required, as part of a BMS "Pricing Committee," to decide whether or not it was in BMS's interest to "price match" the generic competition in order to win the contract from the large buyers. I was also in weekly contact with OTN about the proper "floor" price for the BMS multi-source drugs in light of market conditions.

8. Frequently we matched the competition; however, there were times when it was not profitable for BMS to do so. In several cases we refused to match prices for Vepesid because it was not economic. On rare occasion, we were able to raise our prices. I recall that in late 2002 or early 2003, some of our competitors had difficulty manufacturing the lyophilized version of Cytoxan (cyclophosphamide) and exited the market. This allowed us to raise the contract prices for the product.

9. Rare situations like Cytoxan aside, the average contract prices and floor prices for BMS drugs in the multi-source portfolio tended to trend down over the long term. However, BMS was almost always able to achieve significant revenue through sales of the drugs at or around the list price to those customers that had no contract price. Accordingly, BMS had

no reason to depart from what I understood to be the industry practice of keeping its list price in place after a drug went generic.

10. I am familiar with the term Average Wholesale Price or "AWP" as a published price that is sometimes used by Medicare and other drug reimbursers. My understanding is that the published AWP has historically reflected a mark-up of 20%-25% over the list price at which BMS or a competitor sells to a wholesaler. I believe that competition in the United States at the wholesale level is such that the wholesale-to-retail margin is in fact more like 1% to 3%. Nevertheless, industry publications have kept the historic mark-up factor. I do not know the reasons why the publications have done this, but I believe that this is very well known to anyone who follows the pharmaceutical industry.

11. I can tell the Court that neither I nor the customers with whom I contracted were interested in the published AWP (or, for that matter, the WLP/WAC) of the BMS products compared to those of our generic competitors when we engaged in negotiations. The relevant concerns to me and my customers were the bid price at which the competitor was willing to sell to the generic and whether or not BMS was interested in meeting or beating that price.

12. AWP and WLP/WAC were also irrelevant to my considerations of "floor prices" to OTN. Again, the issue was competition: at what price were other specialty distributors offering the generic equivalent of the BMS drug to the target market, the office-based oncologists. BMS did not "drive" the market price down to gain market share compared to competitors; rather, BMS preferred to lower its floor only if necessary to match the competition. Where possible, we instructed OTN to sell above the floor and as close to list as negotiations with a customer would allow.

13. A good example of my marketing plans for OTN involves Taxol, which as I noted above became subject to generic competition in 2000. I was part of a team of BMS and OTN employees that developed special marketing programs for Taxol to meet this competition. Attached hereto at Tab A (PX-234) is a PowerPoint presentation titled "OBO Opportunities" that includes a description of an early Taxol program called the "Taxol Opportunity Program."

14. As part of the Program, OTN segmented the office-based oncology customers in different "buckets" based on its estimation of how brand-loyal they were likely to be versus how likely they were to switch to a lower-priced generic. OTN decided to charge the first group $1185, the bottom of the range of prices at which OTN's most brand-loyal Taxol customers had been paying. OTN segmented the other group into other "buckets" depending on whether the customers were still buying Taxol or had already switched to the generic and further on whether OTN believed that a price-matching strategy would or would not get them to stay with or return to our branded Taxol.

15. As usual, BMS's plan entailed a "Responsive price match NOT proactive price offer" (capital letters in original) and only if the customer could show us a "bona fide offer" from a generic competitor (not a verbal offer, a one-time sale or a sale of product about to expire). See Tab A at BMS/AWP/000217964. We advised the OTN sales team to "Walk Away from business that was too costly," that is business that could be had only at "rock bottom pricing." Id. at BMS/AWP/000217966

16. I believe the Taxol Opportunity Program was successful in maintaining significant revenue for BMS on Taxol through price differentiation of OTN's customer base and, where necessary, by using price matching of generic competition in order to maintain our market share.

17. During my time at BMS, I created several marketing programs and plans relating to multi-source oncology products, including but not limited to Taxol. None of those plans included any effort to market the difference or "spread" between the published AWPs and the prices at which we were willing to sell those drugs to our customers. That is because in the multi-source area we competed on price, service and reputation, not on AWPs or spreads.

_____
CHRISTO[P] MARRE

Sworn to before me this
9th day of November 2006

_____
Notary Public

MELISSA T. McCLOSKEY, Notary Public
My Commission Expires January 17, 2008