UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456 |
| ) | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 ) ) ) ) | |

**TRIAL OF CLASS 2 AND 3 CLAIMS**

**AFFIDAVIT OF FRANK C. PASQUALONE
SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF
OF DEFENDANTS BMS AND OTN IN TRIAL OF CLASS 2 & 3 CLAIMS**

STATE OF NEW JERSEY   )
                      ) ss:
COUNTY OF MERCER      )

FRANK PASQUALONE, being duly sworn, deposes and says:

1.  I am the Senior Vice President of the Oncology Division of Bristol Myers Squibb Company ("BMS" or "the Company"). I have been with the Company for over twenty years. I submit this affidavit based on personal knowledge and files in the possession of BMS.

*Corporate and Personal Background*

2.  BMS is a Delaware corporation with its headquarters in New York, but with operations world-wide. It is a major developer, manufacturer and marketer of "brand-name" prescription drugs, consumer nutritional products and other health care devices and products. It currently has about 44,000 employees.

3. During the period at issue in this case, 1991 to 2005, the Company's prescription drug operations focused on three functional areas: (1) Oncology, (2) Virology and (3) Primary Care.[1] BMS's Oncology group focuses on chemotherapy agents and includes some of the oldest and newest cancer-fighting drugs, from Cytoxan (for breast cancer) to Erbitux (for colo-rectal cancer). Virology focuses on HIV/AIDS-fighting drugs, such as Videx and Sustiva. Primary Care focuses on drugs used in a variety of fields of internal medicine and includes such well-known products as Pravachol (for high cholesterol), Glucophage (for diabetes) and Plavix (for cardiac patients).

4. I, personally, have spent most of my working life at BMS in the Oncology group, which I will refer to as "BMSO," with a three-year stint in Primary Care. Briefly, my educational and employment history is as follows. I graduated from Bowling Green State University in 1978 with a degree in Business Administration and received an MBA from University of Dayton in 1984. I held two sales-related jobs prior to joining BMS, the first of which was for Motorola and the second was for Cutter Laboratories.

5. I started with BMS in 1986 as a Market Research Analyst for injectible antibiotics. In 1988, I became the Manager of Operations for Corporate Marketing, which marketed all of the Company's product lines to hospital group purchasing organizations, like Premier and Novation. From 1989 to 1993, I was a Product Manager and then Senior Product Manager for BMSO. I had responsibility for marketing in the United States several existing and new oncology products, including Ifex, Platinol, Paraplatin and TAXOL. In 1993, I moved to the Company's "Global Marketing" Department where I became the Director of Marketing for

---

[1] The Company also owned a subsidiary, called Apothecon, that manufactured and sold primarily generic drugs. BMS sold Apothecon's assets in 2000. The business model for Apothecon's generics business was very different from that of BMS's brand-name business, which was, in part, the reason for the sale. I am informed that none of the drugs at issue in this case are Apothecon products and, accordingly, I do not address Apothecon further in this affidavit.

all BMSO products outside the U.S. Marketing at BMS entails educating providers and patients on various aspects of our products, including the results of registrational trial and field studies, side-effect profiles and toxicity management – just to name a few issues.

6. In 1995, I became the Director (and later Senior Director) of Franchise Planning and Development, a job that entailed business and strategic planning and forecasting for all BMS products in the Oncology and Virology "franchise" or portfolio. In 1997, I was named Vice President, Marketing, Oncology & Virology. All product managers for all products in these areas reported to me. Then, from 1999-2002, I left the Oncology & Virology area to gain experience in the Primary Care area as the Vice President, Marketing for the Company's diabetes franchise. Later in 2002, I rejoined the Oncology group as the Senior Vice President, Oncology, with "P&L responsibility" (i.e. profit and loss) for the entire Oncology business.

7. Because of my long history with the BMSO franchise, I believe that I am in a good position to inform the Court how BMSO operated generally and specifically with respect to the products at issue in this case during the period under inquiry.

*The BMSO Business Model Generally*

8. For as long as I have been with the Company, its general approach to oncology has been to develop and sell one or more products within the various major "classes" of chemotherapy agents (platinums, taxanes, etc.) and in areas of major medical need (ovarian, blood, small-cell lung, breast, testicular) so as to be a "one-stop shop" for oncologists. I think that most would say that during the period 1990-2000, BMSO was viewed as the premier cancer drug manufacturer because of the efficacy and innovativeness of its drugs, the breadth of its product lines, and the knowledge and experience of its salespeople.

9. The development of Oncology products, like that of other prescription drugs, is very risky and costly. As an industry rule-of-thumb, only one in 5000 compounds tested becomes an approved new medicine. On average, it takes more than 10 years and $1 billion to bring such a product to market. The benefits are also dramatic. Since the 1970s, the number of cancer survivors has tripled. The overall life expectancy of a person born today has increased 10.7%.

10. BMS recovers its costs by selling its products for a profit. I am involved in developing the marketing strategy and pricing for BMS's products. My recommendations go to a Global Pricing Committee that finally decides on the prices. This requires (i) setting an initial or "launch" price for a drug when it first is approved for commercial use; (ii) reevaluating that price over the life of the drug; and (iii) determining what level of discounts, rebates and price concessions, if any, should be given to which classes of trade and when.

"Launch" Pricing: How BMSO Determines the Initial List Price

11. In determining the launch price, we look at several things. We look at development, manufacturing and marketing costs and attempt to recover them through the pricing of our products. We attempt to value the benefit that the drug provides to the cancer community in terms of unmet medical needs versus the availability of competing therapies. We perform market research to assess customer demand for our product and to make sure we understand the needs of our customer base. Often we perform sensitivity analyses to determine the demand for our product at various price points so we do not price ourselves out of the market. The length of the period of exclusivity BMS is likely to enjoy before the advent of generic competition is also a factor in the revenue that the product may generate. At the end of the day

we try to arrive at a price that will enable us to earn a reasonable return on investment and yet be low enough so that customers find the product attractive.

12. The differences between launch price and reimbursement amounts do not enter into the calculus. Nor do we use spread in developing marketing strategies. To the best of my knowledge and belief, BMS has never established a particular launch price for an Oncology product in order to create spread.

13. Once BMS determines the launch price for a BMSO product, it becomes what is called the wholesale list price or "WLP". This is price at which BMS sells products to wholesalers. The overwhelming proportion of BMSO products are sold through wholesalers and the price at which we sell to them is the WLP. We offer wholesalers a 2% discount, if they pay within a set time period (e.g. 30 days). Also, in the first few weeks of a product's launch, we may provide wholesalers with a stocking allowance of 5-10% below WLP, to incentivize them to move the new product into the marketplace. It is the decision of the wholesaler what to charge its customers unless that customer has a contract for a special below-WLP price with BMS (i.e., a manufacturer discount). In that case, the wholesaler must fill the order of that customer at the contract price and "chargeback" to BMS the difference between that contract price and the WLP. The wholesaler keeps to itself the 2% prompt-pay discount.

Exclusivity Period Adjustments:  Why BMS Increases The WLP

14. After the initial launch, BMSO may decide to raise the list price. This generally happens when a product has achieved a level of acceptance in the marketplace among medical providers. The number and level of increases depend on such factors as consumer inflation, cost of goods, cost of manufacturing, changes in therapeutic competition and continued product research and development. The important point I wish to stress is that BMSO does not

increase a drug's list price unless there is a market demand at that price. We do not increase list price to create "spread." For the products at issue in this case, we have always been able to make sales at the increased price. Furthermore, it would be rare to find a situation where our list prices were trending up and our unit net revenues (gross sales minus price concessions divided by units) were trending down. Instead, they tend to both rise.

### After Exclusivity: Discounting And Rebating

15.  "Discounting" is a form of price concession at the time of sale. "Rebating" is a form of price concession given after sales have been made, usually based on the customer having accepted a pre-determined amount of product. BMSO does not provide free samples on its injectable products.

16.  When a BMSO product has exclusivity, BMS generally does not grant many discounts, rebates or other prices concessions to anyone other than to wholesalers (who receive the 2% prompt-pay discount). Also, we traditionally allowed our former subsidiary, specialty distributor Oncology Therapeutics Network Corporation, to offer its clientele of office-based oncologists a discount of 4% below WLP on BMS products as an inducement for them to prefer dealing with OTN over other specialty distributors (whom we charged full WLP minus only the 2% prompt pay discount). Otherwise, our price concessions during this period were pretty much limited to government buyers (e.g. VA, PHS).

17.  When a BMSO product faces therapeutic or, more seriously, generic competition, BMS must offer a greater amount and range of discounts and rebates if it wishes the retain sales among price-sensitive customer segments like hospitals, HMO's and physician group purchasing organizations. Our strategy is to price match the competition if the customer has proof of a <u>bona fide</u> bid from a competitor; we do not lead the market down in an attempt to gain

market share.  We devote the resources of our sales representatives to our other products that retain their exclusivity, although the representatives are instructed to continue "supporting" our multi-source drugs if a customer needs literature about the drug.  In a word, once a BMSO drug "goes multisource," we try to keep price as high as the market will allow and conserve our costs in order to maximize the period in which the drug remains profitable.  The strategy of writing off the brand in the face of generic competition does not make economic sense.

<u>Why List Price Remains The Same After Patent Expiration</u>

18. Once a BMSO drug faces generic competition, we generally do not change the list price.  In fact, we really do not think of the list price in terms of anything other than an established price in the marketplace that we try to obtain from as many customers as we can and for as long as we can despite the presence of a generic alternative.

19. We have found that there are some customers who remain brand-loyal; they tend to continue buying at list even through generics are available.  The data show that about 30% of our net revenue on post-generic entry commercial sales of the BMSO drugs in this case was achieved in sales within 5% of the list price.  If we were to lower the list, we would lose that revenue and that would defeat the goal of maximizing the period during which our drugs remain profitable.

20. It would be administratively complex to adjust the list prices in response to generic competition.  When a product loses exclusivity and faces generic competition, the market for the drug can be volatile.  Tracking that volatility by changing list prices, and modifying our chargeback system accordingly, would be very difficult and could lead to tremendous confusion in the marketplace.

21. Finally, BMS did not have any reason to believe that anyone was being disadvantaged by our list prices. Generally, the list prices for the generic competitors' drugs are below those of BMS. Private payors and the government generally use a median of the generic prices or federal upper limit or "FUL", which is 150% of the lowest published price, to determine reimbursement amounts once generics are available. Since BMS's list price remains at the brand level, it will never be the median or FUL.

Reimbursement Issues

22. The reimbursement that our customers receive from Medicare and private payors does not enter into BMS's marketing decision-making except in very limited respects. First, we need to make sure that our products are eligible for reimbursement. If medical providers are not reimbursed at all for our drugs, they are unlikely to buy them. That is why we offered a program to doctors called "ProCert." The program was designed to provide reimbursement assistance to a health care provider if he or she administered a BMSO product. At first, we guaranteed the doctor payment even if the payor denied the claim by giving the doctor a replacement drug free. Later, the program was changed so that the risk of denial remained with the doctor, but BMS paid for the costs of the administrative process.

23. Second, BMS has historically followed legislative and regulatory changes to Medicare reimbursement. Since Medicare is one of the largest payors for cancer drugs, its policies influence patient access to care generally and, particularly, where that care will be given: i.e. in a hospital or a physician office. Many of our customers are office-based oncologists and we were informed by those customers that Medicare reimbursement for the drugs they prescribe was important to the viability of their practices.

24. In 1997, I received reports from BMS governmental affairs employees about alternative proposals by the President and HCFA (which favored an acquisition cost model) and Congress (which favored an AWP model) for Medicare drug reimbursement in the office setting. The national oncologist society, ASCO, argued for the AWP model, which allowed doctors to make profits on the drugs, because they felt that oncologists were undercompensated by Medicare for their medical services. I believe that Congress took note. My understanding is that the legislation that finally passed based Medicare Part B drug reimbursement on AWPs in industry publications (the "Publications") and not some average of actual acquisition prices.

25. Although BMS was clearly aware of this debate, BMSO did not set the prices of its drugs with reference to the AWPs in the Publications. We set our prices based on the factors I have discussed above.

26. I am aware that several years earlier, in 1992, BMS asked the Publications to apply a "mark up" factor of 25% uniformly to the WLPs of all BMSO drugs. My understanding of why this request was made was to correct the anomaly that different Publications applied different factors to BMS drugs depending on whether the drug had originally been manufactured by Bristol Myers or Squibb prior to the two companies' merger into BMS. I am informed that one publication agreed to the change but two declined. This confirms my impression that the Publications, not BMS, controls the AWPs.

*Specific BMSO Drugs At Issue In This Case*

27. I understand that seven BMSO drugs are at issue in this case: Blenoxane, Cytoxan, Etopophos, Paraplatin, Rubex, TAXOL and Vepesid. The list and transaction prices of these drugs very much follow the general BMSO business model that I outlined above, with a few exceptions that I discuss below.

Blenoxane

28. Blenoxane is used primarily to treat testicular cancer. BMS licensed Blenoxane from a Japanese company called Nippon Kayaku. Blenoxane lost patent exclusivity in the U.S. in 1996. Because Blenoxane was difficult to manufacture, it received little generic competition at first even after the patent expired; however, it was overcome by generic competition by the late 1990s.

Cytoxan

29. Cytoxan was one of BMS's first oncology products. It is used primarily in the treatment of breast cancer. Originally, it was available only in a powdered form that was to be mixed with a solution and injected into the patient. Later, we developed a lyophilized injectable and a tablet form of the drug. Interestingly, we found that physicians preferred the injectible form for two primary reasons relating to patient monitoring. First, since tablets could be taken (or not) by the patient outside the doctor's office, it was impossible for the doctor to make sure that the patient was taking his or her medication properly. Second, injectable drugs have a much more predictable side-effect profile than do oral drugs and different patients can have very different reactions to the drug. It was much easier for a doctor to modify the dosage of the intravenous formulation than it was to do so for the tablet. Thus, market acceptance of the injectable form was much higher.

### Etopophos

30.  Etopophos is the brand name for the chemical compound etoposide phosphate. Once infused into the patient's bloodstream, it becomes identical to another BMS product called Vepesid (etoposide). Both are used to treat Small Cell Lung cancer and testicular cancer. The primary advantage of Etopophos over Vepesid is that Etopophos can be administered to the patient much more quickly.

31.  Vepesid (in its injectable form) lost patent protection in 1993. BMS had hoped to switch customers to Etopophos, which was newly patented and could command a higher price in the marketplace. Larry Lunak, a member of the marketing team, developed a "launch" plan for Etopophos. His memo is annexed hereto at Tab A (PX 208). At page six of the memo, Larry hypothesizes that one way to switch customers would be to adjust our prices of the drugs relative to reimbursement rates so as to make Etopophos more attractive from a financial point of view. Specifically, Larry suggested that we could either lower our WLP for Vepesid to then highest bid price in the marketplace, or we could try to establish a premium list price for Etopophos.

32.  As the data record will show, BMS did neither. In fact, we ultimately decided not to promote Etopophos because without other clinical advantages, the shorter infusion time was, in our view, insufficient to justify efforts to convert doctors to a higher costing drug. We never increased the list price of Etopophos over the patent life of the drug. Also, other than an initial stocking allowance at the time of launch, we did not offer discounts, rebates or other price concessions on Etopophos.

### Paraplatin

33. Paraplatin (carboplatin) was launched in 1989, approximately six months before I joined BMSO. It is in the class of "platinums" and is indicated for ovarian cancer, although it is also prescribed for other tumor types.

34. Paraplatin is the successor to another BMS product called "Platinol" (cisplatin). In some sense, Paraplatin was the "opposite" of Etopophos, in that the product had such a favorable side-effect profile compared to its respective predecessor that BMS felt very strongly about promoting Paraplatin over Platinol even when Platinol became generic and could be purchased relatively inexpensively. It was Paraplatin's superior therapeutic index -- i.e. equal efficacy but more favorable side-effect profile -- that allowed BMS to raise the WLP regularly and achieve sales at those higher WLPs.

35. I believe that 2002 is the only year in the period for which data was produced where there was any discounting on Paraplatin. Our rationale was to preempt customers' potential switch to the generic by negotiating with them supply contracts that would carry over even after the patent expired. To induce our customers to enter into these contracts we offered them discounts below WLP in the portion of the contract period during which Paraplatin was still protected by patent.

36. Paraplatin lost exclusivity in November 2004. We thought it would take approximately 12 months before generic competition entered the market and drove the prices down. It in fact happened in about two weeks, demonstrating the increasing competitive impact that generic competition is having on our products. In hindsight, therefore, our 2002 contracting strategy for Paraplatin (discussed in the paragraph above) in which we locked in the right to supply our customers at relatively small discounts to WLP, proved very successful for BMS.

Rubex

37.     Rubex is somewhat of "deviation" from the general business model described above among the drugs involved in this case. Rubex is the BMS brand name for a drug, doxorubicin, that had originally been patented by another company, Pharmacia, but had lost patent exclusivity. For a period, we licensed Rubex to a company called Immunex. We took the product back in 1993. The reason BMSO decided to have its own brand of what had become a generic is that doxorubicin is a very heavily prescribed product for several cancers and therefore it was a good drug for us to have in our portfolio under our "one-stop-shop" philosophy as a cancer drug manufacturer. Customers would often order Rubex with other products they were buying from us already.

38.     Rubex is also a good example of the volatility of market prices for multi-source drugs and why it does not make sense for BMS to change its list price in response to market prices. Some customers choose not to enter into contracts with us for a steady supply of drug at discounted prices. Those customers buy at "spot" prices, often at or near WLP. That is probably why the data shows that during the period 1998-2002, the percentage of our net revenues on Rubex that was achieved in sales transactions at or near WLP moved up and down dramatically. Of course, one does not know until the year is over whether the percentage will be high or not. I believe that we took the correct approach in leaving the WLP static.

TAXOL

39.     The cancer fighting properties of what became TAXOL (paclitaxel) were first discovered by the National Cancer Institute; however, it was BMS that underwrote the much greater cost of developing the manufacturing process, conducting an exhaustive research and development program and bringing the drug to market. BMS launched TAXOL in 1992. It was

first indicated for ovarian cancer patients who had failed to respond to other established chemotherapy agents, but it soon proved to be so superior that it became indicated for "front-line" treatment. TAXOL followed the BMSO business model with one important exception: we never increased the list price even while the drug enjoyed patent protection.

40. TAXOL lost its patent exclusivity in 2000. Again, it is difficult to predict how fast and to what extent generic competition will affect our contracting and spot pricing strategies. In the case of TAXOL, we were very successful in segmenting the marketplace and in realizing sales from some classes of customers at or around WLP into 2002.

Vepesid

41. BMS manufacturers Vepesid (etoposide) in both injectible and capsule form. Although the latter lost patent protection in 1993, as late as 2000, we continued to receive significant net revenue for it and realized substantial portions of that net revenue in sale transactions at or around WLP. I do not recall specifically why that happened; however, in my experience there are times when generic supply becomes constrained and we are, therefore, able to make non-contract (spot) sales at higher transaction prices.

*BMSO Sales And Marketing*

42. I understand that the plaintiffs challenge not only BMSO's pricing practices, but also its sales and marketing practices. I do not believe that such a challenge has any merit. Our sales and marketing practices are summarized in a January 26, 2001 memo from Edward Penick, an attorney in corporate counsel's office, to all U.S. Sales & Marketing Personnel. (A copy is annexed hereto at Tab B (PX 223)). He quotes the Company's Code of Conduct that BMS "promotes and sells its products 'solely on the basis of price, quality of service." Mr. Penick adds that "[a]lthough it is appropriate to respond to a customer's inquiry

about a product's AWP and its cost, the spread should not be used as a promotional or marketing tool."

43. In words and substance, this is the same instruction I provided to the people in the BMSO organization and I never provided any other. I believe that, by and large, BMSO salespeople followed these principles.

_____
Frank C. Pasqualone

Sworn to before me this
09 day of November 2006

_____
Notary Public

NADINE A. SPIRITO
Notary Public of New Jersey
My Commission Expires Mar. 21, 2010