# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) ) |

MDL No. 1456

Judge Patti B. Saris

THIS DOCUMENT RELATES TO
01-CV-12257-PBS and 01-CV-339

**TRIAL OF CLASSES 2 & 3 CLAIMS**

## AFFIDAVIT OF DOUGLAS SOULE
### SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF
### OF DEFENDANTS BMS AND OTN IN TRIAL OF CLASSES 2 & 3 CLAIMS

STATE OF WASHINGTON    )
                           )ss:

COUNTY OF PIERCE         )

DOUGLAS SOULE, being duly sworn, deposes and says:

1.     I am an Executive Territory Representative for Bristol-Myers Squibb Company ("BMS"). As such, I am a sales representative for BMS oncology products in parts of the State of Washington. I submit this affidavit based on personal knowledge and files in the possession of BMS as direct testimony in the case-in-chief of defendants BMS and Oncology Therapeutics Network Corporation ("OTN").

2.     I graduated from the University of New Hampshire in 1972 with a B.A. in physical sciences. I served in the active and reserve U.S. Navy and retired in 1994 at the grade

of Captain. I received an M.B.A. with an emphasis in Economics from the Florida Institute of
Technology in 1981.

        3.      I joined Squibb Pharmaceuticals in 1985. Squibb merged with Bristol-
Myers in 1989 and since then I have held several positions in various BMS divisions. Most of
my sales experience from 1985 to 1997 involved "Primary Care" products, self-administered
drugs used for diseases like hypertension and high cholesterol.

        4.      In 1997, I joined Squibb Oncology. My first job was to interface with
medical oncologists and physicians in other related disciplines such as thorasic surgeons,
pulmonologists and radiation oncologists, to help develop better education, awareness, and team
approaches for lung cancer. In 1999, the focus of my job shifted to the more traditional sales
role of promoting BMS oncology products to medical oncology practitioners. The main products
that I promoted initially were Taxol and Paraplatin, both of which were on patent at that time.
However, BMS has a history of being the foremost leader in the oncology field, so I was often
asked questions about older, non-exclusive products, like Blenoxane, Platinol[1] and Vepesid.

        5.      I wanted to join the Oncology group because it was intellectually
challenging. BMS Oncology gave me the opportunity to improve clinical care by providing
doctors and nurses with data and studies and have real discussions with them about why BMS's
products, properly used, could help their patients. In fact, the vast majority of my time as a
BMS Oncology representative has been spent on clinical education relating to our products.
More specifically, I talk with doctors and nurses about the use of my medicines:  the
circumstances under which to use them and not to use them, how to use them (i.e., the
sequencing of delivering one in relation to others) and how to avoid potential risks of

---

[1] The generic version of Platinol is "cisplatin". In the pharmaceutical business, the names of generic drugs are
written in lower case.

hypersensitivity and other side-effects. I prepare for these discussions at home by doing a lot of reading on fairly technical topics.

6.     In switching from Primary Care to Oncology, I also learned that the financial implications of the drugs I sold were much more complex from the doctor's perspective. Because many of the oncology drugs are injectible and are administered in a doctor's office, the doctors actually purchase the products, deliver the products to the patients and put in claims for reimbursement.

7.     My understanding from my oncology customers and company training was that the federal government had set up a system in which financial viability of their practices depended in large part on the money they could make from reimbursement on drugs as opposed to their medical services. Specifically, the customers purchased the product at the best price they could find from a variety of vendors like OTN or other distributors and were reimbursed by Medicare based on a published AWP which was always higher than the price at which the customer could acquire the drug. This difference between AWP and acquisition cost was called "margin."

8.     I was informed that this drug margin was necessary because the doctors and nurses did not receive adequate or any compensation for some of their medical services and there had to be some way to make up for this lack of reimbursement. Ironically, however, issues surrounding the cost of our drugs was very infrequently a topic of my discussions with most of my oncology customers. I believe that this is because most of my customers are more concerned with the immediate needs of their patients than in the long-term viability of their practices. However, many of my hospital-based customers that were considering opening a private practice had questions about whether the drug reimbursement business environment

allowed them to set up their own business entity and financially survive. And, among the customers who were already in private practice, I had a few clients that who were noticeably more "reimbursement oriented" than others.

9.      In the cases of such customers, I tried to refocus our conversations on clinical differences between BMS drugs and those of our competitors. This was harder to do (but not impossible, given BMS' superior manufacturing processes) when the BMS drug became subject to generic competition, but even then, I tried to direct the customer to other areas where BMS provided value that the generic manufacturers did not provide, such as our ProCert program[2] and our medical education programs. However, I did not avoid discussions of AWPs, costs or margins if that was what the customer wanted to discuss or I was otherwise going to lose the customer's business. Instead, I put my MBA and Economics background to good use to correct any misconceptions the customer had about the financial implications of buying the BMS products.

10.      This last situation arose a few times during the 2000-2001 period after Taxol became subject to generic paclitaxel competition and a competing product in the class of taxanes called Taxotere (manufactured by Aventis), was gaining acceptance among oncologists. One customer, Dr. Senecal, was particularly price-focused. Dr. Senecal also had an MBA and thought of himself as a good businessman. His pharmacist, Tom Schleiss, informed me that Dr. Senecal intended to switch to Onxol (a generic form of Taxol) through a distributor called Oncology Supply. I asked Tom to give BMS and OTN a chance to compete for the practice's

---

[2] ProCert was a program designed to help a physician if his or her claim for reimbursement of a BMS drug was denied by Medicare or a private payer. BMS, through an independent contractor, assisted the doctor in the appeals process with the payor at no cost to the doctor. Initially, if the claim were still denied after the appeals were exhausted, BMS would replace the drug that the doctor had given to the patient at no cost. Later, we dropped the replacement element of the program, but we continued to underwrite the payor appeal process.

taxanes business.  Tom spoke with Dr. Senecal, who directed Tom to inform me to put together

"the numbers" and a convincing argument and to leave it with him to read.

11.     I obtained some practice data on taxanes from Tom and some price data

from OTN and in response to his request created what I called a "Decision Analysis Worksheet."

(See Plaintiffs' Exhibit 224, attached hereto at Tab A).  I tried to highlight that the price

differential between Taxol, generic paclitaxel and Taxotere was not that great when one

considered also the big picture of benefits of working with BMS and OTN.  Dr. Senecal agreed.

He recognized that the total package of value brought by BMS outweighed the cost-savings

potential from using generic paclitaxel.  I believe that I gave some version of this Worksheet to

only two other customers out of the 120 medical oncologists that I regularly called upon.

12.     Other customers were making decisions on my products based on

economic factors that were just plain wrong.  Some of my customers thought that once the

generic came out, they could no longer afford the brand and would actually lose money on Taxol

because the reimbursement had decreased.  I tried to show them that OTN's price for Taxol had

fallen or that there were special offers available through advertised BMS programs and that they

could not lose money on Taxol even at the generic paclitaxel reimbursement rates.  (See

Plaintiffs' Exhibit 229, attached hereto at Tab B)

13.     I also discussed with a few customers the economics relating to our

platinum products, Paraplatin and cisplatin.  One of my customers, Dr. Bagley, began to question

whether he should prescribe our on-patent drug Paraplatin[1] when the predecessor product,

Platinol (cisplatin), had become generic and could be purchased from competitors at a much

greater percentage discount to its published AWP than could Paraplatin relative to its published

AWP.  This was particularly troubling to me because Paraplatin has such a superior side-effect

---

[1] The generic version of Paraplatin is "carboplatin".

profile to cisplatin that I thought he could be doing his patients a disservice by switching. I also pointed out an error in his financial argument: focusing strictly on percentage margin made no economic sense because, for example, a 100% margin on a $10.00 drug generates the same revenue as a 10% margin on $100.00 drug. I also informed Dr. Bagley and other customers who brought up the possibility of switching from Paraplatin to generic cisplatin for economic reasons that, in the end, they were unlikely to save money because the greater patient complications (like nausea and renal failure) that attended the latter required more of the practice's time and attention compared to Paraplatin.

14.     I want to stress that not only were these types of communications -- focusing on dollars and cents -- extremely rare, they were purely educational and academic exercises. I had no ability to control or negotiate the price at which one of my customers could acquire a BMS drug. I did not even know the prices available on those drugs unless I inquired of the customer or a distributor, like OTN. I was simply doing what any good salesperson would do, which is point out the incorrectness of a customers' pre-conceived notions that my products were not financially competitive and to emphasize what other benefits -- besides price -- my products, my Company and I brought to their practices.

15.     Finally, even these few communications about dollars and cents tended to dissipate after a few months of a BMS product's losing patent exclusivity. Generally, the customers would make up their minds about whether or not to switch to the generic or to stay brand-loyal and I was no longer called upon by BMS to actively promote products after the generic had become entrenched.

16.     Today, the issue of margin on drugs is even less relevant because of the passage of the Medicare Modernization Act, which compensates for drugs based on Average

Selling Price instead of published AWP. Some of my customers who previously focused on the issue, such as ones in Yakima, have given up their private practice and have returned to the hospitals because they believe that private practice is no longer sufficiently profitable for them. Others have made the adjustment to making less on the drugs and more on their medical services, as the new Act allows.

_____
Douglas Soule

Sworn to before me this
2d day of October 2006

_____
Notary Public