# EXHIBIT B

**Direct Testimony Declaration of Stephen R. Buckanavage**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 |
| | ) |
| | ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | ) ) ) |

**TRIAL OF CLASSES 2 AND 3 CLAIMS**

### DECLARATION OF STEPHEN R. BUCKANAVAGE SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF OF ASTRAZENECA PHARMACEUTICALS LP IN THE TRIAL OF CLASS 2 AND 3 CLAIMS

I, STEPHEN R. BUCKANAVAGE, hereby declare:

1. I have been employed with AstraZeneca Pharmaceuticals LP ("AstraZeneca" or the "Company") for the past 21 years, and have served in a variety of positions.[1] I joined the Company in 1985 as a sales representative for what was then Stuart Pharmaceuticals. I served in a variety of sales positions until 1993, when I joined the Marketing department as a Market Development manager. I subsequently became Group Manager for Market Development.

2. As a Market Development manager, I was responsible for developing recommendations for contracting with organized customers such as Staff Model Health Maintenance Organizations ("HMOs"), Independent Practice Associations ("IPAs"), Preferred Provider Organizations ("PPOs"), hospital group purchasing organizations ("GPOs"),

---

[1] For the sake of clarity, except where otherwise indicated, I refer to AstraZeneca Pharmaceuticals LP and all predecessor companies as simply "AstraZeneca" or the "Company."

governmental entities and physician groups. I served in this position until 1996. I then served in a variety of marketing positions until the merger of Astra and Zeneca in 1999, at which point I was promoted to Global Brand Director for a drug called Zomig. In early 2001 I moved to the position of Global Product Director, where I oversaw worldwide clinical development programs.

3.      In January 2002 I returned to the U.S. domestic business, where I became Group Product Director for Oncology. In March of 2003 the name of my position changed to Commercial Brand Leader, but my responsibilities have remained the same. In this position I have primarily had responsibility for the drugs Arimidex, Faslodex and Nolvadex. However, for a few months in 2003, I also had responsibility for AstraZeneca's prostate cancer portfolio, which consisted of Zoladex and Casodex.

**Pharmaceutical Pricing**

4.      Through my various positions with AstraZeneca I have developed an understanding of how pharmaceuticals are priced. Upon the launch of a new drug, pharmaceutical companies typically establish the drug's Wholesale Acquisition Cost, or WAC, which is the undiscounted list price for that particular product. Discounts off WAC might be offered on a particular product to certain customers if the competitive circumstances in the therapeutic market require such discounting.

5.      When I became a Market Development manager, I learned that Average Wholesale Price, or AWP, was a reference price. Shortly thereafter, I learned that AWP is derived by adding an industry-standard markup of 20% or 25% to a drug's WAC.

6.      I do not believe and have never believed that AWP was an actual average of wholesalers' prices to their customers. Moreover, I believe that it has long been common

knowledge among industry participants that AWP is simply a reference price, and not an actual average of wholesale prices.

**Contracting Strategy for Zoladex**

7.  During the time I was a Market Development manager, one of my responsibilities was to recommend contracting strategies for Zoladex.

8.  In order to recommend a contract strategy, I had to learn the competitive dynamics in the therapeutic category. Zoladex is in a therapeutic class known as leutenizing hormone-releasing hormone agonists ("LhRh-a"), which affect the progression of prostate cancer by suppressing the production of testosterone. I learned that Zoladex's only competitor at that time, in 1995, was Lupron, which had a much higher WAC and AWP than Zoladex. I learned that in this therapeutic category, where physicians viewed the two products as therapeutically equivalent, physicians had an economic incentive to choose Lupron over Zoladex because reimbursement for Lupron was higher under Medicare Part B. I came to understand that this financial incentive was commonly referred to as "Return to Practice."

9.  I understood that in order to level the economic playing field, AstraZeneca had been offering volume discounts to physicians. Although I was generally aware of the volume discounts being offered on Zoladex, I did not personally work on Zoladex discounting strategy until 1995. At that time I was asked by the Zoladex marketing team to help develop a contracting strategy that would address the economic differential between Zoladex and Lupron. At the time, it was my understanding that the Company's intention was for Zoladex to remain the lower cost product as compared to Lupron.

10. Thomas Chen, who was a member of the Zoladex marketing team, and I presented our recommendations in a memorandum dated November 3, 1995, which is labeled as

AZ Defendant's Exhibit 2128. We began the memorandum by noting that AstraZeneca's "campaigns to grow Zoladex sales based on product attributes and somewhat straightforward pricing strategies have continually been thwarted by TAP responses as well as the method used by Medicare to reimburse for LhRh agonists." We also noted that urologists were then in the process of forming buying groups for a number of purposes, including contracting with third party payers. Because these buying groups could purchase products in large volumes, and TAP provided bigger discounts for higher volume purchases, TAP offered a higher Return to Practice for these groups than AstraZeneca. We further noted the economic reality that in order to compete in the prostate cancer market, which was dominated by Medicare, AstraZeneca would have to take into account Return to Practice.

11. In our memorandum, Mr. Chen and I set out several scenarios describing possible contracting strategies that AstraZeneca could adopt in response to TAP's pricing changes. The first scenario was to maintain the status quo. Under the then-current discount schedules, Zoladex delivered less Return to Practice at each volume discount level, from $4.94 per unit less to $23.54 per unit less, depending on the volume level. We concluded that Zoladex could not compete with Lupron under this scenario.

12. The second scenario we outlined involved raising Zoladex's AWP by 8.2%, and WAC (sometimes called AWC) by 4.2%. We also suggested increasing the volume discount for purchases of 200 or more Zoladex depots from 20% to 22%. We pointed out that although these changes would slightly raise both Medicare reimbursement and the patient co-pay for Zoladex, both would remain significantly below the corresponding payment for Lupron. This was the scenario we recommended AstraZeneca follow, as we felt it would "bring[] back into balance the economic factors between Zoladex and Lupron."

4

13. The third scenario we outlined involved increasing both the AWP and WAC by 4.2%. We also suggested increasing the volume discount for purchases of 200 or more Zoladex depots from 20% to 22%. Because the Return to Practice for Zoladex would have remained below that of Lupron for all but one discount tier, we concluded that Zoladex could not effectively compete with Lupron under this scenario. Therefore, we did not recommend the third scenario.

14. The fourth scenario involved increasing both the AWP and WAC for Zoladex by 4.2%. In addition, we suggested increasing the volume discount for purchases of 200 or more Zoladex depots from 20% to 26%. While this route would have reduced Lupron's competitive advantage at the 200+ volume discount tier, it would not have completely eliminated it. Zoladex would still have provided a slightly lower Return to Practice than Lupron, and would have remained uncompetitive at the lower discount tiers. Therefore, we concluded that Zoladex could not compete with Lupron under this scenario either.

15. After making these recommendations, I moved on to other projects relating to contract strategy for other products. As a result, I do not know whether any of these scenarios were implemented. I do recall that Zoladex always remained less expensive than Lupron for patients and the healthcare system.

16. We also included in our memorandum a highlighted note regarding the Zoladex Managed Acquisition Program ("MAP"). We developed this program in order to leverage Zoladex's lower cost by marketing Zoladex directly to managed care organizations at the same or similar discounts offered to physicians in a manner that would remove the need for managed care organizations to reimburse physicians for Zoladex. We felt that Zoladex's lower price would be seen as a benefit by managed care, in a way that it had not been by physicians. With

5

the growing role of managed care in the U.S. healthcare system, we also expected many Medicare-eligible subscribers to enroll in HMO's. For this reason, we saw the MAP program as an innovative way to grow our market share while saving both patients and the health care system money. We viewed this as an important parallel thrust to the Zoladex contracting strategy with physicians. I was not involved in the implementation of the MAP program, but I understand that it was eventually carried forward and offered to MCOs.

17.  Each time we considered and implemented a new volume discount strategy, we were acting in direct response to a move by our competitor, TAP. Each proposed pricing strategy was aimed at leveling the economic playing field between Zoladex and Lupron, and allowing us to compete on the basis of clinical efficacy, safety, and service. At no time did we view our volume discounting pricing strategy as unethical or unfair in any way – it was simply the economic reality of competition in a market dominated by Medicare. Indeed, it is my understanding that volume discounts are not only typical, but standard practice in competitive therapeutic categories where multiple drugs are available with roughly equivalent clinical benefits. In addition, we created a specific program to deliver the same cost savings to managed care entities. At all times, Zoladex remained the lower-cost product for both patients and the health care system.

18.  Nor did we consider these discounts to be secret in any way. I have always understood it to be common knowledge among industry participants that volume discounts are offered to buyers in competitive therapeutic categories. It was also my understanding that Medicare knew that physicians could buy Zoladex at discounts off WAC. I am not aware of any secret discounts offered to doctors for purchasing Zoladex; based on my experience, all discounts to doctors were reflected on the invoices.

19.     At no time during our development of the Zoladex volume discounting strategy did we consider using samples to increase the Return to Practice. Such action would have clearly violated Company policy.

20.     I co-authored the document AZ Defendant's Exhibit 2128 in the ordinary course of business at AstraZeneca.

21.     I declare under penalty of perjury that the foregoing is true and correct.

_____
Stephen R. Buckanavage

Executed on this 10th day of November, 2006.

7