# EXHIBIT C

**Direct Testimony Declaration of Dean McAlister**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) | MDL NO. 1456<br><br>CIVIL ACTION NO. 01-CV-12257-PBS<br><br>Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ALL ACTIONS | | |

**TRIAL OF CLASS 2 AND 3 CLAIMS**

## DECLARATION OF DEAN MCALISTER SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF OF ASTRAZENECA PHARMACEUTICALS LP IN THE TRIAL OF CLASS 2 AND 3 CLAIMS

I, DEAN MCALISTER, hereby declare:

1.      I am a current employee of AstraZeneca Pharmaceuticals LP, ("AstraZeneca" or "the Company")[1] a Delaware corporation with its principal place of business located at 1800 Concord Pike, Wilmington, DE 19850.

2.      I started at AstraZeneca in 1988 as a sales representative, and I have worked at the Company in a variety of sales and marketing related functions for the past 18 years.  A number of my positions involved responsibility for Zoladex in either a sales or marketing capacity.

3.      My first significant exposure to Zoladex was in 1995, when I was promoted to District Sales Manager ("DSM") for Nolvadex, an oral breast cancer medication, and Zoladex.  I supervised 8-10 sales representatives covering the region from the Gulf Coast of Texas to New Orleans, and had overall responsibility for selling Zoladex to physician practices in the region.

---

[1] For sake of clarity, except where otherwise indicated, I refer to AstraZeneca Pharmaceuticals LP and all predecessor companies as simply "AstraZeneca" or the "Company."

4.      In 1997, I became a Regional Oncology Account Manager ("ROAM") for AstraZeneca. Although I no longer acted as supervisor for any sales representatives, I was responsible for contract negotiations with urology buying groups interested in purchasing Zoladex.

5.      In 1998, my focus shifted to the managed care market segment.  From 1998 to 1999, I was an Account Director responsible for marketing AstraZeneca's products, including Zoladex, to managed care customers, including health plans, PBMs, retailers/wholesalers, group purchasing organizations and practice management companies.  From 1999 to 2000, I performed the same function for the emerging markets segment, which included employers, employee benefit practice management companies and oncology practice management companies.

6.      From 2000 to 2001, I became the Contracting Director for Oncology.  In that role I was responsible for contract negotiations with managed care entities interested in purchasing AstraZeneca's oncology products, including Zoladex.  I moved back to managed market sales in 2001, as Regional Sales Director for managed markets.  I subsequently became Senior Segment Sales Director for Government Markets in January 2005, and I am currently Area Sales Director for cardiovascular drugs for the western half of the United States.

7.      Through these positions, I have gained substantial knowledge of and experience in the Company's approach to selling and marketing Zoladex to both the physician and managed care market segments during this time period.  My testimony in this declaration is based on this knowledge and experience.

2

**The Physician Market for Zoladex**

### a.   Marketing to Physicians

8.   In addition to selling Zoladex directly to Staff Model Health Maintenance Organizations ("HMOs"), AstraZeneca also sells Zoladex directly to physicians.  From 1995, when I became a DSM, until today, clinical efficacy has been an important promotional message for Zoladex in communications with physicians.

9.   All sales representatives selling Zoladex were required to be well-versed in Zoladex's clinical profile.  This included being familiar with the clinical studies that showed that Zoladex had the same therapeutic effect as surgical castration for patients with advanced prostate cancer and that it had a survival benefit when used in combination with radiation therapy for patients with locally advanced prostate cancer.

10.   Another promotional message for Zoladex focused on its lower price compared to its competitor, Lupron.  We wanted to emphasize to physicians that Zoladex was more cost-effective for: 1) their practice, since it would require a smaller cash outlay for them to purchase Zoladex; 2) their patients, who would be required to make lower co-insurance payments depending on their insurance coverage; and 3) the health care system, since both Medicare and private insurers would be reimbursing on the basis of a lower AWP than Lupron.

11.   I quickly learned, however, that Zoladex faced two challenges in the physician marketplace: the larger needle size compared to Lupron, and the larger "spread" or "Return to Practice" that physicians could earn if they used Lupron as a result of Medicare's reimbursement policy.

12.   First, let me describe the needle issue.  Zoladex uses a unique delivery system

3

that requires a larger needle than Lupron.  Although AstraZeneca had clinical data showing that the Zoladex subcutaneous injection was actually less painful than Lupron's intramuscular injection, physicians and nurses were apprehensive about the Zoladex needle because it required a new and different technique to administer.  We addressed this concern by providing in-office training to nursing staff on the proper administration technique, and we generally found that once the nursing staff learned the technique, apprehension over the needle size disappeared.

13.    The economic incentive to purchase Lupron over Zoladex presented a bigger problem in our efforts to compete with Lupron.

14.    In the pharmaceutical industry, a brand name manufacturer sells its products to customers at Wholesale Acquisition Cost ("WAC") or, if necessary because of competitive conditions, at discounts off WAC.  In the case of Lupron and Zoladex, that means that physicians, who are buying directly from TAP and AstraZeneca respectively, purchase the products at WAC or at discounts off of WAC.  Medicare, however, decided to reimburse for Lupron and Zoladex at AWP, which, in the case of both Zoladex and Lupron, is a standard industry mark-up of 25% over WAC.  As a result, in my experience, Lupron's higher AWP created a financial incentive for physicians to choose Lupron over Zoladex.

15.    Despite our effort to promote what we viewed as Zoladex's clinical benefits, many urologists generally considered Zoladex and Lupron to be therapeutically interchangeable.  As a result, many urologists were very interested in the economic impact on their practice of purchasing Lupron or Zoladex.  In addition to being medical professionals, these urologists were running a business.  If the patient was going to receive the same basic therapeutic benefit from either drug, they naturally preferred to purchase the drug that would improve their

bottom line.  Since Lupron provided more income to the physician practice than Zoladex, even without any discounts on the purchase price, Lupron was able to gain and maintain significant market share.

16.     As a result, Zoladex was at a competitive disadvantage.  Urologists, who had significant market power since they were both the prescriber and the purchaser of the product, demanded discounts before they would consider buying Zoladex.  In order to compete, AstraZeneca began offering physicians varying discounts off WAC for corresponding volume purchases of Zoladex. Based on my experience with managed care customers, this dynamic is typical in competitive therapeutic categories; purchasers with market power are able to demand discounts.

17.     Although pricing decisions were made at headquarters in Wilmington, Delaware, it was part of our job as the sales force to communicate new prices, including new discount schedules, to the customers.  Since physicians frequently wanted to know the economic impact on their practice of purchasing Zoladex vs. Lupron, the sales force also discussed with customers the expected Medicare reimbursement for Zoladex as compared to the costs and expected reimbursement for Lupron.  As part of this effort, it was not uncommon for sales representatives to provide physicians with spreadsheets or other printed material that reviewed this financial information.

18.     To my knowledge, the discounts we offered to physicians for Zoladex were always in writing (as schedules to contracts). I am not aware of any discounts being offered that were not reflected on the invoice.

19.     Throughout my time at AstraZeneca, it has been against company policy for sales representatives to encourage physicians to bill for samples.  The sales force received strict instructions on the proper use of samples, and I know of no instance where any sales

5

representatives under my supervision violated that policy.  To the best of my knowledge, all samples received by doctors were marked "not for retail sale."

### b.  Physician Buy Groups

20.    As mentioned above, in 1997, I became a Regional Oncology Account Manager, also known as a "ROAM", responsible for negotiating Zoladex contracts with urology buying groups.

21.    Urology buying groups are organized groups of physicians or physician practices who purchase drugs as a group in order to leverage their collective bargaining power to achieve greater volume discounts from drug manufacturers.

22.    In the mid-1990s, urology buying groups began to form as a reaction to the rising influence of managed care entities.  Physicians wanted to lower their costs by purchasing collectively, since many managed care entities were reducing physician reimbursements.

23.    My job as a ROAM was to increase Zoladex's penetration in the urology market by contracting with these large buying groups to purchase Zoladex at large volumes in exchange for discounted prices.  We also provided information to individual physician practices on how to join or form a buying group.  We did so because buying groups would bring in business from physicians who did not currently use Zoladex.  In addition, physicians' peers would lobby for them to join the group in order to increase their buying power, thereby indirectly marketing Zoladex for AstraZeneca.  As a result, the lower revenue earned per unit at the highest discount tiers was effectively recovered through the additional volume purchased.

24.    AstraZeneca entered into standard contracts with these urology buying groups, which included a written discount schedule.  AZ Defendant's Exhibit 2068 and AZ Defendant's Exhibit 2069 are representative of the standard contracts I negotiated with buying groups as a ROAM.

6

25.     AstraZeneca's contracts with physician buying groups, as well as individual physician purchasers, also included standard confidentiality language.  This is a typical term in commercial contracts and was not a mechanism for keeping discounts secret from the government or insurers.

26.     It was my understanding that Medicare did not require discounts to be reported because reimbursement was based on AWP, not acquisition cost.  Nonetheless, these contracts included a standard provision requiring physicians to report all discounts to federal or state agencies if they ever became required to do so.  (AZ Defendant's Exhibit 2068 at AZ0068913; AZ Defendant's Exhibit 2069 at AZ0410150-5; AZ Defendant's Exhibit 2088 at AZ069805; AZ Defendant's Exhibit 2089 at AZ0069843; AZ Defendant's Exhibit 2100 at AZ0068159; AZ Defendant's Exhibit 2198 at AZ0098878; AZ Defendant's Exhibit 2203 at AZ0068892, AZ Defendant's Exhibit 2205 at AZ0072647.)

27.     One of the physician buying groups in my region that entered into a contract with the Company was Urology San Antonio.  That contract, illustrative of the standard urology buying group contract, includes the above-mentioned provision relating to disclosure of discounts.  (AZ Defendant's Exhibit 2088; AZ Defendant's Exhibit 2089).

28.     AZ Defendant's Exhibit 2085 is an exemplary invoice mailed to Dr. Reyna, a physician member of the Urology San Antonio buying group.  This invoice is similar to other invoices mailed to physicians receiving discounts from AstraZeneca pursuant to a contract.

29.     As demonstrated by AZ Defendant's Exhibit 2085, it is my understanding that invoices mailed to physicians reflected the prices at which physicians purchased Zoladex, including discounts.

7

30.     AZ Defendant's Exhibit 2085 also includes a statement that the purchaser agrees to properly report all discounts described in that invoice if required by law.  Such statements were standard and, in my experience, were included on all invoices accompanying shipments of Zoladex being purchased pursuant to contract.

31.     It is my understanding that similar invoices with statements requiring reporting of discounts pursuant to the law were mailed to physicians across the country, including in Massachusetts.

**The Third Party Payor Market for Zoladex**

32.     In 1998 I became an Account Director for Managed Markets.  In this position I learned about AstraZeneca's marketing strategy for Zoladex with respect to managed care customers, including private insurers.

33.     Unlike the physician market segment, where Zoladex's lower cost was a competitive disadvantage, with managed care customers, Zoladex's lower cost was a competitive advantage.  Accordingly, part of our marketing strategy for Zoladex in the managed care segment was to discuss the economics of the luteinizing hormone-releasing hormone ("LHRH") marketplace with third party payors, and convince them that promoting Zoladex within their networks would result in overall savings to the health care plans.

34.     One way AstraZeneca sought to attain a competitive advantage over Lupron in the managed care segment was through the Managed Acquisition Program ("MAP").  The purpose of the MAP program, which was first developed around 1995, was to leverage Zoladex's lower price with managed care customers and increase that advantage by offering discounts to third party payors that were similar to the discounts offered to physicians.

8

35.     Third party payors who signed MAP contracts with AstraZeneca could effectively eliminate the economic incentive for physicians in their network to purchase the higher priced product, Lupron, by eliminating the need for physicians to buy the product directly.  Instead, Zoladex would be shipped to the physician, but the invoice at a volume discount off WAC would go directly to the third party payor – eliminating the need to reimburse the physician at the typical contracted rate based on AWP.  The thrust of the MAP program was to save insurers money by encouraging the use of Zoladex within their physician networks.

36.     As part of this marketing effort, we discussed with the insurers the discounts being offered to physicians and offered them the same opportunities.

37.     AZ Defendant's Exhibit 2195 is an example of a standard MAP contract, this one with QualMed, a health plan in Philadelphia.  As you can see from the discount schedule attached to the contract, health plans were offered discounts on Zoladex of up to 41% off WAC.

38.     Although we tried to sell the MAP program to health plans during my tenure in the Managed Markets group, the effort was ultimately not successful for a variety of reasons.

39.     In particular, several insurers told us that they were concerned that physicians in their network would react negatively to the program because it would effectively reduce their compensation by eliminating the spread.

40.     Thus, many third party payors were given the opportunity to save money spent on reimbursements for Zoladex, but opted not to adopt the program for strategic reasons.

41.     I also specifically remember discussing the economics of the LHRH market, including the Return to Practice dynamic, with United Healthcare in 1999 as part of a similar attempt to convince United Healthcare that it would save money by promoting Zoladex.

42.     I had a similar discussion with Cindy Pigg, Assistant Vice President of Pharmaceutical

Contracting at Cigna.  I tried to convince Ms. Pigg to set limits on reimbursements for LHRH

agonists.  We believed such a policy would benefit AstraZeneca because Zoladex was the less

expensive product.  Ms. Pigg told me that Cigna could not effectively implement such a cost

saving measure because Cigna's computer systems were not equipped to handle it.

43.     Another context in which I discussed the economics of the LHRH marketplace with

managed care organizations ("MCOs") involved the unique challenge AstraZeneca faced when

state Medicare carriers adopted a Least Costly Alternative ("LCA") policy.  In those states,

Medicare carriers reimbursed Zoladex and Lupron at the Zoladex AWP, since they considered

the two products to be therapeutic equivalents and the AWP for Zoladex was lower.  In those

states,  Takeda Abbott Pharmaceuticals ("TAP") discounted the price of Lupron to match

Zoladex.

44.     However, private reimbursement for Lupron in LCA states remained at the AWP of

Lupron.  Accordingly, in LCA states, physicians were purchasing Lupron at the lower Zoladex

price, but being reimbursed by private third party payors at the high Lupron AWP.  This situation

gave physicians a tremendous financial incentive to purchase Lupron, and put Zoladex at a great

competitive disadvantage in LCA states.  Accordingly, as part of our marketing strategy for

Zoladex in those states, we met with third party payors, discussed the "return to practice"

dynamic, and tried to convince them that they should require their physician networks to use

Zoladex in order to save money.

45.     I specifically recall informing a representative from Aetna of the way this practice was

affecting Aetna's costs.

46.     AZ Defendant's Exhibit 2117 is the call-note written shortly after a meeting between

myself, my colleague, Folger F. Tuggle, and Rob O'Brien of Aetna, to document that meeting. As reflected in the call-note, we informed Mr. O'Brien of the nature of the LHRH reimbursement landscape. Our meeting included a discussion of the prices at which physicians were purchasing drugs in comparison to the reimbursements made by Aetna based on AWP.

47.     As reflected in the call-note in AZ Defendant's Exhibit 2117, Mr. O'Brien "clearly underst[ood] where Aetna has been financially overexposed due to inadvertent policy."

48.     It was clear to me during our meeting that Aetna understood that AWP was not the price at which physicians were purchasing Zoladex or Lupron, but was "substantially higher." (AZ Defendant's Exhibit 2117). In my experience, Mr. O'Brien's understanding of the difference between acquisition costs for Zoladex and AWP-based reimbursement rates was typical of most third party payors that I dealt with during my tenure in the Managed Markets group.

49.     In May 2001, I recall an internal meeting held to discuss the potential for establishing a new Zoladex agreement for MCOs. While the program was distinct from MAP, it was similarly premised on offering MCOs the same discounts that physicians received on Zoladex. I specifically remember a meeting in August 2001, with Aetna, where we discussed their interest in this type of contract. However, managed care organizations were largely uninterested in adopting such contracts, and indicated to me that they had concern that physicians in their network would react negatively to the program because it would effectively reduce their compensation by eliminating the spread.

50.    Based on my personal knowledge of certain documents and understanding of the types of documents prepared and maintained by AstraZeneca, all of the documents referenced above[2] were, to the best of my knowledge, prepared in the ordinary course of AstraZeneca's business and were maintained by AstraZeneca in the ordinary course of business.  With respect to the following documents, I personally recall receiving or reviewing the documents:  AZ Defendant's Exhibit 2088, AZ Defendant's Exhibit 2089, and AZ Defendant's Exhibit 2085.

51.    I declare under penalty of perjury that the foregoing is true and correct.

Dean McAlister

Executed on this 10th day of November, 2006.

---

[2] AZ Defendant's Exhibit 2068, AZ Defendant's Exhibit 2069, AZ Defendant's Exhibit 2088, AZ Defendant's Exhibit 2089, AZ Defendant's Exhibit 2100, AZ Defendant's Exhibit 2198,  AZ Defendant's Exhibit 2203, AZ Defendant's Exhibit 2205, AZ Defendant's Exhibit 2085, AZ Defendant's Exhibit 2195, AZ Defendant's Exhibit 2117.