# EXHIBIT D

**Direct Testimony Declaration of Julie-Ann G. Tracy**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) | MDL No. 1456 |
|  | ) ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | ) ) ) ) |  |

**TRIAL OF CLASS 2 AND 3 CLAIMS**

### DECLARATION OF JULIE-ANN G. TRACY SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF OF ASTRAZENECA PHARMACEUTICALS LP IN THE TRIAL OF CLASS 2 AND 3 CLAIMS

I, JULIE-ANN G. TRACY hereby declare:

1.  I am a current employee of AstraZeneca Pharmaceuticals LP ("AstraZeneca" or "the Company"), [1] a Delaware corporation with its principal place of business located at 1800 Concord Pike, Wilmington, DE 19850.

2.  After working as a Registered Nurse in the Burn Unit of Westchester County Medical Center for five years, I accepted a position as a sales representative at the Company in 1983. I was a sales representative for 18 months and then briefly served as a Regional Operations Supervisor before becoming a District Sales Manager in 1985.

3.  In 1993, I became a National Account Manager in the Managed Care Group. During that time, my customers were Managed Care Organizations ("MCOs") including Blue Cross Blue Shield of Massachusetts ("BCBS MA"), Harvard Pilgrim Health Care and its predecessor

---

[1] For the sake of clarity, except where otherwise indicated, I refer to AstraZeneca Pharmaceuticals LP and all predecessor companies as simply "AstraZeneca" or the "Company."

entities, Tufts Associated Health Plan, Fallon, CIGNA, Blue Cross Blue Shield of New Hampshire, Blue Cross Blue Shield of Maine, Connecticare, and Medco.  My position changed from National Account Manager to Corporate Account Director in 1997.  Although some of my customers changed, I continued to serve MCO customers.

4.  In 1999, I moved to my current position as a National Account Director with responsibility for selling AstraZeneca products to trade customers such as wholesalers and retailers in the Northeast.

5.  My testimony in this declaration is based on my personal knowledge and my experiences with MCOs in Massachusetts during the period from 1993 to 1999.

**Average Wholesale Price**

6.  I believe that I first heard the term Average Wholesale Price or "AWP" in 1983 when I was a sales representative.  I have always understood the term Average Wholesale Price or "AWP" to be a reference price that is used by the government and private insurers to calculate reimbursement for pharmaceuticals.  I never believed that AWP represented an actual average of wholesale prices of any drug.  In fact, I do not recall any person with whom I have worked at AstraZeneca indicating that they believed AWP represented or should represent an actual average of wholesale prices.

7.  I have always understood that AWP bears a mathematical relationship to the wholesale list price or Wholesale Acquisition Cost (WAC") of a drug.[2]  It has always been my understanding that the WAC of a drug was either 16 2/3% or 20% lower than its AWP, which translates to a 20 or 25% markup from WAC to get AWP.

---

[2] Our company sometimes used the term Average Wholesale Cost ("AWC") instead of WAC, but for the sake of simplicity, I will use the term WAC.

**Selling Zoladex to Managed Care Organizations**

      8.  I spent the majority of my time during the years from 1993 to 1999 selling AstraZeneca products to MCOs in Massachusetts.

      9.  Most of my MCO customers offered several different types of health plans to their members including: 1) Staff Model HMOs, also known as closed-network HMOs, where the HMO employs physicians to treat members in the HMO's facilities; 2) IPA ("Independent Practice Association") Model HMOs, where members are required to seek services from a network of independent physicians who have contracted with the health plan to provide services at discounted rates; and 3) traditional indemnity health plans.  Blue Cross Blue Shield of Massachusetts ("BCBS MA"), for example, had a Staff Model HMO called Medical West Community Health Plan, Inc., and also offered other types of managed care plans, including an IPA Model HMO, and indemnity plans.

      10. Staff Model HMOs typically have pharmacies that purchase pharmaceutical products directly from manufacturers for use in their facilities.  As described more fully below,  Staff Model HMOs are often able to obtain these products at significant discounts off WAC. Although other types of managed care plans do not buy pharmaceutical products directly, in my experience, they often try to manage their pharmaceutical reimbursement expenditures in a variety of ways, including the use of formularies and contracts with manufacturers or PBMs for utilization-based rebates.

      11. Beginning at least in 1993, AstraZeneca made substantial efforts to sell Zoladex to MCOs, because we believed that the lower cost of Zoladex would make the product particularly attractive to managed care health plans.  In large part, our efforts consisted of offering our MCO customers two different types of contracts that provided the opportunity for them to achieve

3

substantial savings on Zoladex.  Both of these types of contracts, described below, involved offering to MCOs, including MCOs in Massachusetts, the same discounts being offered to physicians.

12. First, for MCO customers that had Staff Model HMO divisions, we offered contracts that included volume discounts on Zoladex similar to the discounts being offered to physicians. In Massachusetts, I discussed and executed these contracts with BCBS MA and Harvard Pilgrim.

13. Second, for MCO customers that had IPA Model HMOs, where their members received services from a network of physicians, we designed and offered a new contract program that would eliminate the need for MCOs to reimburse the physicians in their networks for Zoladex.  Instead, AstraZeneca would ship Zoladex to the network physicians, but bill the MCO directly at discounted prices similar to the prices available to physicians.  This second type of contract was originally referred to at AstraZeneca as "Bill to/Ship to", but later became known as Managed Acquisition Program or "MAP" contracts.

14. The mechanics of the MAP program were simple: (1) The Company would contract with an MCO that had an IPA Model HMO; (2) The contract would offer discounts off the Zoladex WAC based on the volume of purchases; (3) The physician would order Zoladex from AstraZeneca's distributor; and (4) AstraZeneca would bill the MCO directly at the discounted price.  AstraZeneca's Exhibit 2108 is the text of an explanatory hand-out that National Account Managers like me received to explain the MAP program.  The handout describes in more detail the mechanics of the MAP program.  As described in Exhibit 2108, with this program, MCOs would save money by using Zoladex instead of Lupron, because instead of reimbursing physicians based on Lupron's high AWP, MCOs could pay discounted prices for Zoladex to AstraZeneca directly.

15. AstraZeneca's Exhibit 2107 includes a discount schedule that was created in 1995 to use with MCOs when discussing the MAP program. As reflected in the covering email, I received this discount schedule on or around October 10, 1995, for use with my MCO customers that had IPA Model HMO plans in the New England area, including Massachusetts.

16. A few months later, on February 6, 1996, the Corporate Account Directors and the National Account Managers covering managed care customers received another spreadsheet for use in discussing MAP with customers called a "Plan Cost Comparison." This spreadsheet and the covering email, labeled as AstraZeneca's Exhibit 2115, illustrate how much a plan could save if its physician network used Zoladex instead of Lupron. Although the example here was based on Blue Cross Blue Shield of Maryland, I adapted and used spreadsheets like this one during my discussions with MCOs in Massachusetts.

17. The spreadsheet, labeled as AstraZeneca's Exhibit 2115, illustrates another aspect of the program that we tried to promote. As reflected in the spreadsheet, it was our understanding, based on our experiences with MCO customers, that MCOs knew that physicians were deriving income from Lupron and Zoladex. We also understood, based on our experiences with MCO customers, that MCOs were concerned that they would alienate their physicians if they interfered with that income potential by enrolling in the Zoladex MAP. As a result, AstraZeneca offered a solution to that concern by suggesting to MCOs that as part of the MAP program they could actually offer the physicians an incentive payment to replace the lost income and still save money for their plan by signing a MAP contract.

18. Thus, the "Plan Cost Comparison" spreadsheet included as part of AstraZeneca's Exhibit 2115 includes, under the "Lupron" column, a calculation of the income earned by a physician using Lupron and a corresponding line item under the "Zoladex" column for an

5

optional "Physician Incentive Paid to Physician by Plan" that the MCO could choose under the MAP program. The spreadsheet then calculates the savings to the MCO under the Zoladex MAP program with and without this physician incentive option.

19. Although we started to market the Bill to/Ship to program to our customers as early as 1994, AstraZeneca officially changed the name of the program and rolled it out as the Zoladex MAP in 1996. AstraZeneca's Exhibit 2110 is a covering email and all of the background materials that I received, along with the other National Account Managers, to understand and be able to explain the MAP program to our MCO customers. By 1997, AstraZeneca had a number of MAP contracts in place. AstraZeneca's Exhibit 2111 is the standard form MAP contract, this one signed by QualMed Plans for Health.

20. In Massachusetts, I offered MAP contracts to BCBS MA, Harvard Pilgrim and Tufts. My experiences in discussing MAP contracts with these customers, as well as the Staff Model HMO volume discount contracts I discussed above, are described in more detail below.

**Blue Cross Blue Shield of Massachusetts**

21. During the time period from 1993 until January 1997, I had responsibility for selling Zoladex and other AstraZeneca products to BCBS MA. There were Zoladex contracts in place with the BCBS MA Staff Model HMO, Medical West Community Health Plan, when I became the National Account Manager responsible for BCBS MA. Over time, we continued to offer BCBS MA deeper discounts on Zoladex in an effort to stimulate use in their Staff Model HMO.

22. While I was the National Account Manager for BCBS MA, I had meetings with Edward Curran, Director of Pharmacy for BCBS MA, and also with Gary Kerr, the Pharmacy Director for the Staff Model HMO. I had discussions with Mr. Curran, who I believe had overall responsibility for pharmaceuticals for all of the various BCBS MA insurance programs, about the

6

offers of substantial discounts off WAC for Zoladex that I was presenting to BCBS MA's Staff

Model HMO.  In fact, I believe that Mr. Kerr reported to Mr. Curran at the time.

23. AstraZeneca's Exhibit 2091 is an executed amendment to the contract we had with

the BCBS MA Staff Model HMO in 1995.  My signature and Mr. Kerr's signature are on the

document.  This contract provided a volume discount for every unit purchased, reflecting a

discount of 12% off WAC.

24.  In 1996, I tried another contracting strategy to sell Zoladex to BCBS MA.  We

offered an initial discount of 11% off WAC plus a quarterly rebate based on the number of units

of Zoladex purchased.  AstraZeneca's Exhibit 2092 is the contract with BCBS MA's Staff Model

HMO that I signed along with Mr. Kerr that reflects this discount structure.  The base unit price

for each depot was communicated to BCBS MA as a List of Products and Prices, AstraZeneca's

Exhibit 2064, signed by Gary Kerr.  I also signed the document.  This discounted price plus the

rebate schedule means that  BCBS MA could achieve a price per unit of Zoladex as low as 27%

off WAC.

25. When my position changed from National Account Manager to Corporate Account

Director in 1997, Maureen Gillick assumed responsibility for BCBS MA.  It is my understanding

that in September 1997, we entered into a contract with BCBS MA that offered a maximum

discount of 41% off WAC for Zoladex.  AstraZeneca's Exhibit 2094 is a copy of that contract.  I

have been informed by counsel for AstraZeneca that Plaintiffs calculate "spread" as the

difference between the acquisition price and the AWP as a percentage of the discounted price.

Using this method, this 41% discount off WAC translates to a 112% "spread" between the best

price offered to BCBS MA for Zoladex and the published AWP at the time.

26. Once contracts were signed with BCBS MA, AstraZeneca sent a Prime Vendor Price Quotation to notify BCBS MA and wholesalers of the discounted price that BCBS MA should be charged.  AstraZeneca's Exhibits 2193, 2097, and 2098 are examples of these price notifications.

27. I also offered a MAP contract to BCBS MA, but they did not participate in the program.

**Harvard Pilgrim Community Health Care**

28. I also had responsibility for selling Zoladex to Harvard Pilgrim Health Care ("Harvard Pilgrim") and its predecessor entities from 1993 through 1999.  During that time period, I had meetings to discuss the sale of Zoladex and other AstraZeneca products with James Kenney, the Pharmacy Director for the Health Plan, and Kenneth Kazarosian, the Pharmacy Contracts Manager.  Ken Kazarosian signed the contracts for the Staff Model HMO, but he reported to James Kenney.  Both Mr. Kenney and Mr. Kazarosian attended meetings with me to discuss contract offers for the Harvard Pilgrim Staff Model HMO.  Mr. Kenney, who I believed had overall responsibility for pharmaceuticals for all of the insurance plans offered by Harvard Pilgrim, was present when I discussed the substantial discounts being offered to Harvard Pilgrim's Staff Model HMO division.

29. Harvard Pilgrim's Staff Model HMO division bought Zoladex at substantial discounts off WAC during the entire time period that I was the National Account Manager for Harvard Pilgrim from 1993 to 1999.

30. In December 1997, Harvard Pilgrim informed me that the Staff Model HMO had been approached by a physician buy group called LHRH, Inc. with a price that was lower than the existing contract price for the Harvard Pilgrim Staff Model HMO.  AstraZeneca's Exhibit 2054 is the email that I sent describing my conversation with Harvard Pilgrim on this issue.

Harvard Pilgrim told me that it could buy Zoladex for approximately $186 per depot through the LHRH, Inc. buy group contract. The existing Harvard Pilgrim contract offered an 11% discount off of WAC plus a 16% rebate based on market share, resulting in a price of $224 per depot. It was my opinion that we needed to offer Harvard Pilgrim the same price that the LHRH, Inc. physician buy group was offered.

31. Six months later, I signed an amendment to the Harvard Pilgrim Health Plan contract that provided for a 50% discount off the Zoladex WAC. This resulted in a price of $175.70 per depot which was lower than the LHRH, Inc. price. AstraZeneca's Exhibit 2056 is a copy of the contract amendment, which is signed by me and Mr. Kazarosian.

32. In February 1999, I signed another Amendment to the Harvard Pilgrim Zoladex contract which provided for the purchase of Zoladex at substantial discounts off of WAC. AstraZeneca's Exhibit 2057 is a copy of this contract. The maximum discount on this contract translates to a "spread", using the methodology described above, of approximately 150%. It is my understanding that AstraZeneca continued to offer to sell Zoladex to Harvard Pilgrim at the same discounts that the physician buy groups were receiving.

33. In March 1996, I also offered Harvard Pilgrim Health Care a Bill to/Ship to contract for its IPA Model HMO. AstraZeneca's Exhibit 2055 is a copy of this contract offer. The proposed contract provided for volume discounts up to 27% off of the Zoladex WAC. I believe Harvard Pilgrim decided not to sign the contract because they did not want to be perceived as interfering with the medication choices of the physicians in their network.

**Tufts Associated Health Plan**

34. I had responsibility for selling Zoladex and other AstraZeneca products to Tufts Associated Health Plan ("Tufts") from 1993 until January 1997. I had frequent meetings with

Georgiann Koutrouba, the Clinical Pharmacy Program Manager at Tufts.  Through repeated conversations about the clinical benefits and lower cost of Zoladex, I believe that Ms. Koutrouba began to see the potential value of a Bill to/Ship to contract with AstraZeneca.  Ms. Koutrouba worked closely with the Medical Director at Tufts Health Plan, Dr. Joseph Gerstein.  I began to communicate with both of them about potential Zoladex contracting opportunities that could result in substantial savings for their health plan.

35. In May 1995, I had a meeting with Georgiann Koutrouba to discuss the status of Zoladex at Tufts.  On May 8, 1995, I sent her a letter detailing our conversation and repeating some of the information that I had shared with her.  AstraZeneca's Exhibit 2058 is a copy of that letter.  I explained that the LhRh market allowed the physician to realize income from the difference between the actual cost and the reimbursement rate of the drugs.  I included some charts that explained the existing market and highlighted the potential savings versus Lupron that a Zoladex contract could deliver.  I also included a quantity discount schedule.

36. In July 1995, I met with Dr. Gerstein to explain the Bill to/Ship to program. AstraZeneca's  Exhibit 2059 is a copy of a letter I sent to Dr. Gerstein after our meeting.  Dr. Gerstein raised some concerns about the convenience of ordering Zoladex through the program and also the ability to verify patient data and cross check it with actual administration to Tufts patients.  I could not address the verification issues at the time, but the issues were addressed by the time the MAP program was officially launched the following year.

37. In May 1996, I continued my efforts to sign a Zoladex contract with Tufts.  I sent Georgiann Koutrouba a letter with our best pricing for Zoladex. AstraZeneca's Exhibit 2060 is a copy of that letter.  To highlight the savings that Tufts could achieve, I enclosed the existing physician office volume discounts as well as the Bill to/Ship to volume discount schedule that

10

would be applicable to Tufts.  The Bill to/Ship to option included an additional discount tier of 27% off the Zoladex WAC.

38. By January 1997, I no longer had responsibility for Tufts, but I believe that Tufts signed a MAP contract in 1997.  (AZ Defendant's Exhibit 2061, AZ Defendant's Exhibit 2062.) It is my understanding that, like the QualMed Contract referred to above, the contract offer provided for discounts up to 41% off WAC.  Using the methodology described above, this maximum discount corresponds to a "spread" between the lowest price offered to Tufts and the published AWP of approximately 112%.  At that point in time, AstraZeneca began to offer the same discount schedules to the Staff Model HMOs because we were offering those discounts to the IPA Model HMOs.  (AZ Defendant's Exhibit 2094.)

39. In sum, my job as a National Account Manager and later a Corporate Account Director for the Massachusetts market was to increase Zoladex's market share among managed care organizations in Massachusetts by leveraging Zoladex's lower cost.  Since Staff Model HMOs purchased the product directly, they were able to take advantage of the lower cost directly.  Over time, we offered increasing discounts to Staff Models HMOs just like we offered to physicians, because the LhRh category was very competitive and MCOs had the market power to demand greater discounts.   I believed that the individuals at my MCO customers responsible for pharmaceutical reimbursement under the other insurance plans they offered knew that their Staff Model divisions were receiving significant discounts on direct purchases of Zoladex.

40. For non-Staff Model plans, like IPA Model HMOs, we tried to convince MCOs to save costs through the MAP program by requiring their network physicians to use Zoladex that the MCO could pay for directly at the discounted prices that the physicians were offered. Because the key feature of this contract program was reducing costs by removing the physician

11

from the reimbursement equation, I believed that all of my MCO customers in Massachusetts understood that physicians were able to buy Zoladex and Lupron at discounted prices, knew the extent of those discounts, and understood that physicians could realize income from reimbursement at AWP. In fact, as described above, I personally described this dynamic to several of my MCO customers more than ten years ago and showed them the physician discount schedules.

41. Unfortunately, the MAP program was not very successful. We were unable to generate significant interest among our MCO customers. I believe that the Medical Directors were hesitant to contract for oncology products because they were afraid to be perceived as interfering with treatment decisions. I also believed that MCOs did not want to risk their relationships with physicians by reducing reimbursement for Zoladex. It simply did not matter how many times we increased their discounts or explained how much the plan could save by entering into Zoladex contracts. I believe that most MCOs made a business decision to decline the opportunities offered by AstraZeneca.

42. Based on my personal knowledge of certain documents and understanding of the types of documents prepared and maintained by AstraZeneca, all of the documents referenced above[3] were, to the best of my knowledge, prepared in the ordinary course of AstraZeneca's business and were maintained by AstraZeneca in the ordinary course of business. With respect to the following documents, I recall personally receiving or reviewing the documents: AZ

---

[3] AZ Defendant's Exhibit 2108, AZ Defendant's Exhibit 2107, AZ Defendant's Exhibit 2115, AZ Defendant's Exhibit 2110, AZ Defendant's Exhibit 2111, AZ Defendant's Exhibit 2091, AZ Defendant's Exhibit 2092, AZ Defendant's Exhibit 2064, AZ Defendant's Exhibit 2094, AZ Defendant's Exhibit 2193, AZ Defendant's Exhibit 2097, AZ Defendant's Exhibit 2098, AZ Defendant's Exhibit 2054, AZ Defendant's Exhibit 2056, AZ Defendant's Exhibit 2057, AZ Defendant's Exhibit 2055, AZ Defendant's Exhibit 2058, AZ Defendant's Exhibit 2059, AZ Defendant's Exhibit 2060, AZ Defendant's Exhibit 2061, and AZ Defendant's Exhibit 2062.

Defendant's Exhibit 2107, AZ Defendant's Exhibit 2115, AZ Defendant's Exhibit 2110, and AZ

Defendant's Exhibit 2055.  In addition, I wrote and/or signed the following documents in the

ordinary course of business at AstraZeneca: AZ Defendant's Exhibit 2091, AZ Defendant's

Exhibit 2092, AZ Defendant's Exhibit 2064, AZ Defendant's Exhibit 2054, AZ Defendant's

Exhibit 2056, AZ Defendant's Exhibit 2057, AZ Defendant's Exhibit 2058, AZ Defendant's

Exhibit 2059, AZ Defendant's Exhibit 2060.[4]

     43. I declare under penalty of perjury that the foregoing is true and correct.

Julie-Ann G. Tracy

Executed on this 7th day of November  2006.

---

[4] I recognize AZ Defendant's Exhibit 2111 as a MAP contract; I recognize AZ Defendant's Exhibit 2094 as an AstraZeneca contract signed by Maureen Gillick; I recognize AZ Defendant's Exhibits 2193, 2097, and 2098 as AstraZeneca communications to wholesalers; I recognize AZ Defendant's Exhibit 2062 as a draft MAP contract.