# **EXHIBIT E**

**Direct Testimony Declaration of Alan Milbauer**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) ) MDL No. 1456<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | |

**TRIAL OF CLASS 2 AND 3 CLAIMS**

**DECLARATION OF ALAN MILBAUER SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF OF ASTRAZENECA PHARMACEUTICALS LP IN THE TRIAL OF CLASS 2 AND 3 CLAIMS**

I, ALAN MILBAUER hereby declare:

1. In 1965, I graduated from the University of Connecticut, School of Pharmacy with a Bachelor of Science in Pharmacy. I then enrolled in law school at the University of Connecticut and obtained my law degree in 1968.

2. I worked for AstraZeneca Pharmaceuticals LP ("AstraZeneca" or the "Company") and its predecessor companies—Atlas Chemical Industries, Stuart Pharmaceuticals/ICI Pharma and Zeneca Pharmaceuticals ("Zeneca")—for approximately 32 years before my retirement on July 1, 2004.[1]

3. Throughout this time period, I have held various positions. In 1969, I joined Atlas Chemical Industries, a small chemical company, as a food and drug attorney. I was primarily

---

[1] For ease of reference, except where otherwise indicated, I refer to AstraZeneca and its predecessor companies as "AstraZeneca" or the "Company."

responsible for ensuring that marketing practices conformed with applicable statutes and regulations. In 1971, Atlas Chemical Industries was purchased by Imperial Chemical Industries ("ICI"). I retained my position as a food and drug attorney until 1976, when I was appointed director of the newly-formed Regulatory Law Department at ICI. As the Director of the Regulatory Law Department, I supervised a staff of approximately six to ten individuals who interfaced with various government agencies, including the Food and Drug Administration, the Department of Agriculture, and the Environmental Protection Agency.

4. In 1980, I left ICI and joined Leferman Associates, a consumer market research business in Stamford, Connecticut. Three years later, in 1983, I left Leferman Associates and returned to ICI as the Director of the Drug Regulatory Affairs Department. My responsibilities were similar to those in my prior position at ICI, except that I now focused solely on the pharmaceutical business as opposed to the overall chemical business.

5. In 1985, I became Vice President of Planning. My primary responsibility was to assess the potential market for new products emerging from the Research and Development pipeline and to position those products for market entry. I was also involved in long-range strategic planning and forecasting. In this role, I worked closely with the Research & Development Group and the Marketing Group.

6. In August 1991, I was appointed Vice President of Marketing. I held that position until mid-1993, when ICI split into two companies—an industrial chemicals business that retained the name ICI and a pharmaceuticals/agricultural and specialty chemicals business called Zeneca. At that time, I was appointed Vice President of External Affairs for the Zeneca pharmaceuticals business. As Vice President of External Affairs, I was responsible for state

government relations, pharmacy relations and public relations. At some point in 1993 or 1994, federal government relations was added to my responsibilities.

7.      Finally, in 1999, following the merger of Astra and Zeneca, I was appointed Vice President of Public Affairs and I retained that position until my retirement on July 1, 2004. Although my title changed, my duties remained largely the same.

8.      My testimony in this declaration is based on my personal knowledge and my experiences working at AstraZeneca.

**Drug Pricing Generally**

9.      The unique characteristics of the pharmaceutical industry impact how drug pricing decisions are made. In order to further scientific advancements in the treatment of diseases, AstraZeneca and other pharmaceutical companies fund expensive and time-consuming research and development projects. Although only a very small subset of these experimental drugs successfully emerge from the research and development pipeline, the impact of new drugs on the treatment of individuals suffering from particular disease states is often immeasurable.

10.     Sometimes the pharmaceutical industry is criticized by individuals who would prefer that healthcare not be associated with the for-profit business sector. The reality is, however, that market competition and for-profit enterprise is one of the major driving forces behind advancements and innovation in healthcare.

11.     Throughout my career at AstraZeneca, the Company was committed to responsible pricing of pharmaceuticals. To me, responsible pricing balances patient access with the need to

3

fund research and innovation. In my view, innovation is important both to improve upon current treatments and to create new medicines for previously untreatable disease states.

12.   In my experience, AstraZeneca always considered price increases cautiously and with due consideration for both the impact on the payor and the overall political sensitivities surrounding the cost of healthcare in general and pharmaceuticals in particular. For instance, for several years during the mid-1990s, Company policy limited U.S. price increases (as a total product portfolio) to no greater than the general rate of inflation in the U.S. economy, i.e., the Consumer Price Index ("CPI"). Even in the years when AstraZeneca did not have the aforementioned policy, we nonetheless strived to institute responsible pricing.

13.   Pricing decisions for AstraZeneca's products occur at AstraZeneca's headquarters in Wilmington, Delaware. Prior to the merger, the Product Manager would typically generate an initial pricing recommendation, which would then be elevated through the Marketing Team. In my position as Vice President of Marketing, I was involved in approving price increases.

14.   At the launch of a product, AstraZeneca sets the price for the product, called the wholesale acquisition cost or WAC, based on a variety of factors, including the competitive dynamic in the therapeutic category. The AWP, or average wholesale price, of a product is derived simply by adding a 20% or 25% industry standard mark-up to the WAC.

15.   Although the Company provided a suggested AWP to publishers FirstDataBank, RedBook and Medispan (usually by fax or email), that suggested AWP was merely a mathematical calculation from the WAC. The publishers ultimately determined whether to publish the AWP suggested by the Company. It is my understanding that the publishers sold

pricing data—both WAC and AWP—to pharmacies, manufacturers, insurers, the government, and other health care industry participants in either hardcopy or electronic format.

16.     In my experience, AWP is widely understood to be a reimbursement benchmark in the pharmaceutical and insurance industries.  It is not understood to be an average of actual transaction prices.  Moreover, because discounting off WAC is typical in any competitive therapeutic category, in my experience, healthcare industry participants do not expect AWP to bear a predictable relationship to acquisition costs.

17.     As far as I'm aware, there is no and never has been any legal or regulatory requirement for AstraZeneca to report WAC or a suggested AWP.  AstraZeneca reports WAC to the publishing services so that potential customers and insurers have information on the list price for AstraZeneca's products and corresponding reimbursement benchmarks.  Price reporting is a simple commercial reality for any manufacturer selling a product.

**Launch of Zoladex**

18.     Zoladex is an injectable, physician-administered drug used primarily for the treatment of advanced prostate cancer.  Zoladex is a luteinizing hormone-releasing hormone ("LHRH") agonist which slows or stops the progress of prostate cancer by suppressing the production of testosterone.  It is administered once a month or once every three months by injection into the abdomen.  I recall that Zoladex was a very difficult product to make and that the manufacturing process necessitated a significant capital investment.

19.     I first learned about Zoladex during my tenure as Vice President of Planning.  My responsibilities as V.P. of Planning included preparing for the launch of Zoladex.

20. The role of the Planning Department was to understand the prostate cancer marketplace and the opportunity for the product. This included, among other things, research concerning the competitive environment, who would be prescribing the product, how the product would be packaged and priced, and what promotional activities should be implemented.

21. As noted in the 1991 Promotional Plan, AZ Def.'s Ex. 2138 at AZ0048994, we learned that the preferred treatment for advanced prostate cancer was orchiectomy, or surgical castration. LHRH agonists like Zoladex presented a completely new mode of treatment—a chemical in an injectable form—that eliminated the need for surgical castration and, accordingly, was much more palatable to the prostate cancer patient. We also learned that prostate cancer is primarily treated by urologists, not oncologists. This new chemical treatment form, however, had only recently been introduced to urologists, who had relied for some time on surgery as the only treatment option.

22. Accordingly, when planning the marketing strategy for Zoladex, our goal was twofold. First, we wanted to expand the LHRH market by educating urologists on the clinical and psychosocial benefits of treating advanced prostate cancer patients with a LHRH agonist rather than surgery. We also wanted to make sure that this message reached patients, who we felt needed to be informed of this alternative to surgery and its attendant quality-of-life benefits. The key message on this point was the quality of life benefit to patients from reversible hormone therapy as compared to irreversible surgery with potentially devastating psychological effects. Second, we knew we had to demonstrate the advantages of Zoladex over Lupron, the competitor product in the LHRH category. Namely, in contrast to Lupron, Zoladex was the only LHRH agonist clinically proven to have the same therapeutic effect as the then-standard treatment,

6

orchiectomy. We also believed that Zoladex's unique delivery system and less painful injection site were positive distinguishing features.

23.  AstraZeneca also needed to determine the appropriate distribution channel for Zoladex. Because Zoladex must be injected in a physician's office, pharmacies were not a convenient distribution channel. In addition, Zoladex had special handling and storage requirements, including the need for temperature controls. We ultimately determined that it would be best to distribute Zoladex through direct sales to urologists. This was the first time AstraZeneca had ever sold a product directly to physicians.

24.  Finally, in order to develop a recommended launch price for Zoladex, AstraZeneca considered numerous factors, including the value the product would bring to patients and the cost of alternative therapies. We decided to launch Zoladex at a substantial discount to Lupron because Lupron was the first LHRH to market and had already captured significant market share. We believed that we could compete effectively on both clinical attributes and price because Zoladex was a lower cost alternative to Lupron and the only LHRH agonist clinically proven to be as effective as orchiectomy.

**Post-Launch Strategy**

25.  Shortly after Zoladex was launched, I left the Planning Department and became Vice President of Marketing. As a result, from 1991 through mid-1993, I was involved in the development and approval of the Zoladex marketing strategy. As anticipated during the planning phase, AstraZeneca's core promotional message for Zoladex emphasized the quality-of-life benefits and lower cost of the drug. The 1991 Promotional Plan, AZ Def.'s Ex. 2138 at

7

AZ0048999, describes the core promotional message as follows: "As primary therapy for advanced prostate cancer, Zoladex is an innovative LHRH analogue system which offers important quality-of-life advantages versus orchiectomy; plus, it is more convenient and more cost-effective than Lupron Depot."

26. As demonstrated in subsequent strategic plans for Zoladex, this continued to be the core promotional message for Zoladex post-launch:

    a. In the 1992 Promotional Plan, AZ Def.'s Ex. 2122 at AZ0049489, the Zoladex positioning statement read: "Zoladex is as effective as orchiectomy but offers important quality-of-life benefits. Zoladex is more convenient and more cost-effective than Lupron Depot."

    b. In the 1993 Promotional Plan, AZ Def.'s Ex. 2120 at AZ0045873 and AZ Def.'s Ex. 2140 at AZ0049448, the Zoladex core promotional message was defined as follows: "Zoladex is the logical first-choice for truly successful therapy in advanced prostate cancer because of its unsurpassed efficacy, superior Quality-of-Life advantages (vs. orchiectomy) and superior drug delivery and cost advantages (vs. Lupron Depot)."

    c. The Zoladex 1991-1995 Strategic Plan, AZ Def.'s Ex. 2152, continued to advocate promotion of Zoladex on clinical efficacy and cost-effectiveness. The core promotional message, AZ Def.'s Ex. 2152 at AZ0000205, stated: "Zoladex is an innovative monthly subcutaneous implant of LHRH analogue for treatment of advanced prostate cancer. Zoladex is as effective as orchiectomy, more acceptable to many patients, and offers important quality of life advantages. The Zoladex innovative implant system offers convenient, well-tolerated administration, proven

28-day serum levels, and greater cost-effectiveness than the Lupron Depot. Zoladex can be safely used in combination with flutamide."

  d. The 1994-1997 Zoladex Strategic Plan, AZ Def.'s Ex. 2154 at AZ0000105, defined the core promotional message in similar terms: "Zoladex is the preferred LHRH agonist therapy for the treatment of prostate cancer because of its efficacy, either as monotherapy or in combination with an anti-androgen, cost-effectiveness, convenience, and delivery."

27. In keeping with the low-cost strategy, there were no cost increases on Zoladex between launch and 1993. During this time period, AstraZeneca sold Zoladex to physicans at WAC and did not offer any discounts or rebates except for the industry-standard prompt payment discount of 2% for accounts paid in full within 30 days of invoice.

28. After considerable thought, AstraZeneca instituted the first ever price increase for Zoladex on January 15, 1993, as reflected in the memorandum I received, AZ Def.'s Ex. 2104 at AZ0027953. At that time, the price of Zoladex was increased by 4%—an increase typical for the Company portfolio at that time.

29. In the first few years following the launch of Zoladex, even though our product was the lower cost drug, Lupron dominated the LHRH market. For instance, as indicated in the 1993 Promotional Plan, AZ Def.'s Ex. 2140 at AZ0049420, Lupron held 80% of the total prostate cancer market in November of 1992.

30. We were surprised by these results in light of our lower cost to physician and patient. However, based on feedback from the sales force, we learned that these surprising results were driven by Medicare's reimbursement policy for physician administered drugs. In short,

9

Medicare's decision to reimburse based on AWP created an economic incentive for physicians to choose between therapeutically equivalent products based on which product delivered a greater differential or "spread" between AWP and acquisition cost. This was particularly true in the LHRH market because, as we learned, doctors viewed Lupron and Zoladex as therapeutically interchangeable.

31. Even in the absence of discounting, Lupron delivered a higher spread than Zoladex because it had a higher AWP and physicians, like most market purchasers, bought Lupron at WAC. Accordingly, during my tenure as Vice President of Marketing, that is until mid-1993, Zoladex was not able to gain market share from Lupron <u>because</u> of its lower WAC, and therefore lower AWP.

32. In short, the reimbursement system established by Medicare put Zoladex—the lower cost product—at a competitive disadvantage. This economic disadvantage was noted in the Zoladex strategic plans from this period. (1993-1997 Zoladex Strategic Plan, AZ Def.'s Ex. 2153 at AZ0492063; 1994-1997 Zoladex Strategic Plan, AZ Def.'s Ex. 2154 at AZ0000106).

33. I recall a great deal of frustration among the Zoladex marketing team over the fact that the Medicare reimbursement system was constraining our ability to compete against Lupron purely on the basis of cost and clinical attributes. We were also keenly aware that, in the absence of this external constraint, the choice of Zoladex over Lupron would result in considerable savings for both Medicare and patients.

**Responsibilities in External Affairs**

34.     In 1993, I left the Marketing Department and became the Vice President of External Affairs. In this new position, one of my responsibilities was to oversee the activities of the federal government affairs group. However, as an executive at AstraZeneca on the leadership team, I continued to be aware of the marketing and promotional strategy for Zoladex.

35.     Our federal government affairs group is responsible for evaluating federal legislative and executive activity as it relates to the pharmaceutical business. As part of that objective, the federal government affairs group monitors legislation and legislative proposals, congressional hearings, and federal agency reports relevant to the pharmaceuticals industry.

36.     Members of the federal government affairs staff also frequently attend industry and government conferences and monitor news and industry publications related to the pharmaceutical business.

37.     Because of Zoladex, one of the legislative initiatives that the federal government relations group closely monitored from its inception in 1991 through the present was Medicare Part B reimbursement policy, including the various legislative reforms, both successful and unsuccessful. In fact, in early 1998, I sponsored a cross-functional team, chaired by Steve McMillan, the then-Senior Manager of Federal Government Affairs. The team included representatives from the External Relations group as well as Legal, Finance, Business Development, Oncology-Communications, Oncology Marketing, and Oncology Sales. This team was tasked to monitor and analyze legislative activity related to Medicare and report to Senior Management.

38.  The federal government affairs group communicated their work to senior management, through verbal communications, presentations, internal memoranda and reports. These communications often summarized federal legislative or executive activities and sometimes attached relevant agency reports.

39.  Through these communications, I understood, and my staff and I communicated to management, that Congress, members of the Administration, and various federal agencies understood that AWP was not an actual average of wholesale prices and knew that there was a significant difference between AWP and acquisition price for many drugs covered by Medicare Part B. Some examples of the specific information that was communicated to management include the following:

   a. Two reports were issued by the Office of Inspector General for the U.S. Department of Health and Human Services in February and May of 1996, in which the OIG described the "spreads" between AWP and acquisition cost for various Part B drugs and calculated the potential savings that would result from reform of the Medicare Part B reimbursement system.

   b. In March 1997, the Clinton Administration expressed concern that Medicare reimbursement for drugs under Part B exceeded physician's acquisition cost.

   c. In 2001, the Health and Oversights and Investigations Subcommittees of the House Energy and Commerce Committee held a joint hearing in which committee members voiced concerns about the extent of the "spread" between acquisition cost and AWP and frustration that Congress had actually prevented legislative action in the 1997, 1998 and 1999 budget acts.

  d. In November 2001, members of the Health and Oversights and Investigations Subcommittees of the House Energy and Commerce Committee wrote a letter to Thomas Scully, then-Administrator of the Centers for Medicare and Medicaid Services, relaying information about the difference between acquisition price and AWP for drugs covered under Medicare Part B.

  e. Members of the federal government affairs group provided senior management with copies and/or summaries of various additional reports from the Office of Inspector General for the U.S. Department of Health and Human Services and the GAO documenting the "spread" between AWP and actual acquisition cost for drugs covered under Medicare Part B.

40. This information demonstrated to me that, despite the federal government's knowledge that reimbursement based on AWP exceeded physician acquisition cost, the government maintained that system for various reasons, including the fact that some in government believed that physicians were not being adequately compensated for the ancillary expenses associated with physician-administered drugs.

41. In addition, I was aware that AstraZeneca reported Average Manufacturer's Price ("AMP") to the federal government in connection with the Medicaid program and that AstraZeneca offered substantial discounts to the Veteran's Administration, so I believed that the government was aware that Zoladex was available in the marketplace at discounted prices.

42. Furthermore, the legality of discounting itself was clearly established in the industry and a reality of market competition. For instance, I and other senior executives at AstraZeneca were aware that the Federal Anti-Kickback statute provided a safe harbor for discounts on the

price of pharmaceuticals in order to protect the benefits of competition that are conferred on purchasers in a market economy.

43. Plaintiffs believe that AstraZeneca tried to hide discounts from payors by including a confidentiality clause in its contracts with physicians. That is not the case. As a preliminary matter, the fact that purchasers with market power could obtain discounts on pharmaceutical products was common knowledge. Confidentiality clauses are simply standard commercial practice designed to protect proprietary pricing information. Further, it is my understanding that AstraZeneca's invoices to physicians reflected any discounts and directed physicians to comply with any reporting obligations as required by law.

44. At no time did I or, to my knowledge, anyone else at AstraZeneca believe that our pricing policies or the reporting of AWP information to medical publishing companies was wrongful. In fact, we believed that by maintaining the competitiveness of our lower-priced product, we were providing patients and the healthcare system the benefit of a viable alternative LHRH therapy.

**Later Developments**

45. I understand that the Plaintiffs in this case assert that AstraZeneca stopped price increases for Zoladex because of the introduction of Lower Cost Alternative reimbursement in the late 1990's. Plaintiffs are incorrect.

46. The fact is that by 1999, we had a growing awareness of government concerns about the LHRH market. In late 1997, we received a subpoena from the government seeking information relating to how Zoladex was priced and sold, as well as our sampling practices. Over the following years, Government investigators expressed to us concerns about sampling improprieties and the income generated by urologists under the Part B program.

47. All of this activity understandably raised great uncertainty at the Company about what the government's concerns were or would be, and how they might be resolved (if it were necessary to do so). Although we strongly believed at the time, and continue to believe to this day, that our pricing and promotional practices were entirely lawful and appropriate, we decided to freeze prices and discounting while the investigation was ongoing. We also took steps to reconfirm to our sales force the principal marketing message for Zoladex, and to issue additional direction to the field relating to discussions of return to practice with physicians. Again, these steps were taken not because we believed our pricing and sales policies had been wrong or inappropriate in any way. We did not and do not believe that to this day. Rather, they were taken in an effort to avoid any prejudice to our dialogue with the government about how Zoladex was priced and sold, and in an effort to demonstrate our good faith to the government. Indeed, it is my understanding that AstraZeneca's ultimate settlement with the government did not prohibit the continued reporting of AWPs or require a change in AstraZeneca's discounting or pricing policies in any way.

48. In my experience, AstraZeneca has always strived to comply with all legal and regulatory requirements applicable to the pharmaceutical industry. With respect to sampling, AstraZeneca conducts training of all salespersons to ensure that samples are distributed only for

lawful purposes in compliance with applicable legal requirements. AstraZeneca policy has always prohibited the provision of samples as a financial inducement to purchase our products.

49.     Based on my personal knowledge of certain documents and understanding of the types of documents prepared and maintained by AstraZeneca, all of the documents referenced above[2] were, to the best of my knowledge, prepared in the ordinary course of AstraZeneca's business and were maintained by AstraZeneca in the ordinary course of business. In addition, I received the following document in the ordinary course of business at AstraZeneca: AZ Defendant's Exhibit 2104.

50.     I declare under penalty of perjury that the foregoing is true and correct.

_____
Alan Milbauer

Executed this 9th day of November, 2006.

---

[2] AZ Defendant's Exhibit 2104; AZ Defendant's Exhibit 2120; AZ Defendant's Exhibit 2122; AZ Defendant's Exhibit 2138; AZ Defendant's Exhibit 2140; AZ Defendant's Exhibit 2152; AZ Defendant's Exhibit; AZ Defendant's Exhibit 2153; and AZ Defendant's Exhibit 2154.

16