# EXHIBIT F

**Direct Testimony Declaration of Professor John P. Gould**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____

| | | |
|---|---|---|
| | ) | |
| IN RE PHARMACEUTICAL INDUSTRY | ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | |
| | ) | |
| _____ | ) | Judge Patti B. Saris |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | |
| 01-CV-12257-PBS and 01-CV-339 | ) | |
| _____ | ) | |

**TRIAL OF CLASS 2 AND 3 CLAIMS**

**DECLARATION OF PROFESSOR JOHN P. GOULD SUBMITTED AS DIRECT
TESTIMONY IN CASE-IN-CHIEF OF ASTRAZENECA PHARMACEUTICALS LP
IN THE TRIAL OF CLASS 2 AND 3 CLAIMS**

I, JOHN P. GOULD, declare as follows:

1.      I am a member of the faculty at the University of Chicago Graduate School of

Business, where I hold the position of Steven G. Rothmeier Professor and Distinguished Service

Professor of Economics.  I have been on the faculty of the University of Chicago since 1965 in

various capacities, including serving as Dean of the Graduate School of Business (1983 – 1993)

and Vice President for Planning for the University of Chicago (1988 – 1991).  I submit this

declaration as direct testimony in the above-referenced action on behalf of AstraZeneca

Pharmaceuticals LP ("AstraZeneca" or the "Company").  A copy of my curriculum vitae is

annexed to the declaration that I submitted in this litigation on March 22, 2006.  (See AZ

Defendant's Exhibit 2065.)

2.      I have been retained by AstraZeneca and its counsel in this case to:

a.      Evaluate the claims asserted by Plaintiffs in their Amended Master

Consolidated Class Action Complaint as it relates to Zoladex, a physician-administered drug

("PAD") manufactured by AstraZeneca.[1]  Zoladex is reimbursable under Medicare Part B and is used in the treatment of advanced prostate cancer.

      b.    Assess, from an economic perspective, AstraZeneca's pricing and selling activity regarding Zoladex and evaluate the market conditions relating to Zoladex during the relevant time period.

      c.    Evaluate the reports and testimony relating to Zoladex and AstraZeneca by Raymond S. Hartman and Meredith Rosenthal.[2]

## SUMMARY OF OPINIONS AND CONCLUSIONS

3.    As I discussed in my declaration of March 22, 2006, Plaintiffs' theories of deception and fraud concerning AstraZeneca's pricing of Zoladex are not supported by any viable economic analysis or theory.  Plaintiffs' theories also are inconsistent with economic principles, given how much information was available about actual Zoladex prices to payers and the economic incentives that payers had to seek out information on transaction prices.

4.    Documents and data that I reviewed show that AstraZeneca provided volume discounts to physicians who purchased Zoladex directly from the Company, and to certain third-party payers ("TPPs") who purchased Zoladex through wholesalers under contract terms (including quantity discounts) established by agreement with the Company.  The offer of

---

[1] Plaintiffs claim that published Zoladex prices deceived payers.  Although Plaintiffs complain about AWP, they effectively claim that the wholesale acquisition cost ("WAC") of Zoladex—a list price set and made public by manufacturers (and that formulaically determines AWP)—deceived payers into believing that prices paid by doctors and other providers to purchase Zoladex directly from AstraZeneca were higher than they actually were.  Plaintiffs further claim that, if TPPs had known of the volume discounts available to certain providers, TPPs would have paid less than they did to reimburse providers.  Put differently, Plaintiffs allege that TPPs were deceived and injured because they did not understand that WAC was not the actual acquisition cost paid by providers and others.

    Plaintiffs' experts further claim that, absent the alleged fraud, AWP would have been much closer to the transaction prices paid by providers, although there could still be some margin or spread that would accrue to the providers even in this "but-for" scenario.  Moreover, Plaintiffs' experts claim that the alleged fraud did not affect transaction prices, but only affected WAC and AWP.

[2] Dr. Hartman and Dr. Rosenthal have submitted various declarations and have been deposed in connection with this matter.

2

discounts based on the quantity purchased of a product is a widespread competitive practice in many industries.  Evidence shows that such price discounting not only was well known to those entities that purchased PADs generally and Zoladex in particular, but was also well known to private and governmental payers that reimbursed providers for PADs and Zoladex. (See ¶¶ 11-27, below.)

5.      The following points further undermine Plaintiffs' experts' analyses of AstraZeneca's conduct and characterization of the economic forces shaping its actions:

a.      Contrary to claims of Plaintiffs' economists that the potential savings did not warrant attention by TPPs to prices actually paid by providers for PADs, TPPs have significant economic incentives to seek information about PAD acquisition prices in designing their reimbursement structure. (See ¶¶ 28-30.)

b.      Dr. Hartman's claim that there is some "limit" on the amount by which AstraZeneca and others should discount prices to providers and thus on the size of the appropriate "spread" is inconsistent with economic theory and with empirical evidence.  Indeed, any such arbitrarily imposed restriction likely would have adverse consequences and harm the interests of the very Plaintiffs this litigation ostensibly seeks to serve. (See ¶¶ 34-45.)

c.      Dr. Hartman overlooks the fact that TPPs and patients who used Zoladex rather than Lupron, the primary competitive therapy, saved money.  For instance, in 2003, the Medicare reimbursement amount for Zoladex was 27 percent less than the reimbursement amount for Lupron.[3]  Thus, Zoladex's lower price, as compared with Lupron, resulted in cost savings. (See ¶¶ 42-44.)

---

[3] In 2003, Zoladex's AWP was $469.99 (NDC 310096036) while Lupron's AWP (NDC 300364201) was $643.75.  Medicare reimbursed at 95 percent of AWP, so it paid $165 less for each Zoladex unit than it would have if it had reimbursed at 95 percent of Lupron AWP.

      d.     Dr. Hartman's damage calculations are based on the unfounded assumption that selling price in the "but-for" world would be the same as in the actual world. Dr. Rosenthal makes the same incorrect assumption. (See ¶ 45.)

6.     The rest of my declaration is organized as follows. First, I discuss briefly the history of Zoladex pricing and competition it faced from the drug Lupron. Throughout the relevant period, Lupron had a higher WAC and AWP than did Zoladex, and Lupron's prices increased at a higher average rate than did Zoladex prices.  Second, I present evidence of the widespread information available to market participants on the volume discounts available to some purchasers of Zoladex and the effect of those discounts on average selling price.  I explain that TPPs had economic incentives to obtain the available information on selling prices if it were in their interest to do so. Third, I explain the economic role of WAC in AstraZeneca's pricing of Zoladex.  Fourth, I show that Plaintiffs' theory amounts to an attack on competitive discounting. Finally, I explain several fundamental flaws in Dr. Hartman's hypothesized but-for world, the result of which is that his estimates of damages are meaningless.

## ZOLADEX PRICING AND COMPETITION

7.     Zoladex was launched in the United States in 1990.  At that time, there was only one other luteinizing hormone-releasing hormone ("LHRH") agonist—Lupron, a drug sold by Takeda Abbott Pharmaceuticals ("TAP")—available for the treatment of prostate cancer.  The primary alternative to these two drug treatments was orchiectomy, or surgical castration.  Prior to the introduction of LHRH agonists, surgery was the primary option for the treatment of advanced prostate cancer.

8.     Figure 1 illustrates the relationship between the Zoladex AWP and WAC. Although Plaintiffs assert that AWP has been "inflated," Dr. Hartman himself acknowledges that

AWP (which is published in third-party compendia) and WAC (which is a "list" price used by manufacturers and included in price compendia) typically are related by a simple, well known formula.[4]  Accordingly, as WAC has changed, so too has AWP.  The figure shows that Zoladex's WAC increased several times between 1993 and the end of 1998 and has not changed since that time.



**Figure 1**
History of Zoladex WAC and AWP

Note: Zoladex NDC 310096036. Zoladex WAC is calculated from published AWPs.
Source: Annual RedBook, 1991 Zoladex Promotional Plan (DX 2138) for launch price.

9.      Figure 2 compares the Zoladex WAC with that of Lupron.  Since 1990**,** Lupron's WAC has been higher than that of Zoladex.  Moreover, because the Zoladex WAC has not

---

[4] For instance, in his deposition, Dr. Hartman acknowledges that "the WAC is a—is a—is another list price or sticker price that is formulaically related to the AWP by manufacturer."  Hartman Deposition at 677.

changed since December 1998, while WAC for Lupron continued to increase,[5] the WAC and

AWP for Zoladex have been lower than that of Lupron by an increasing amount since 1998.



**Figure 2**

10.     Figure 3 shows that, over the past 15 years, the WAC (and, in turn, the AWP) of

Zoladex has increased by 47.4 percent overall.[6]  This amounts to an average annual rate of

---

[5] Dr. Rosenthal suggests that this resulted from implementation of the Least Costly Alternative ("LCA") policy for Medicare reimbursement.  See Average Wholesale Price Litigation Liability Report of Dr. Meredith Rosenthal (Dec. 15, 2005), at 17.  Dr. Rosenthal's theory is incorrect as a matter of economic theory and is inconsistent with how the industry works.  First, Dr. Rosenthal's theory should apply equally to TAP, which could not, under the LCA policy, increase its AWP to impact the spread.  However, TAP continued to raise WAC (and in turn AWP) of Lupron after 1998 at the same rate it had been increasing in the earlier years.  Second, Dr. Rosenthal does not explain or present data illustrating how rapidly LCA policy was adopted by the states, and how much of Zoladex's sales were covered in 1999 and subsequent years.  She does not even acknowledge that carriers did not apply LCA consistently and that not all carriers had adopted LCA by 2004 (see, OIG, "Medicare Reimbursement for Lupron," (OEI-03-03-00250 (January 2004), p. i.)).  Finally, Dr. Rosenthal does not consider any alternative explanations for why AstraZeneca has not changed the Zoladex WAC.

increase of approximately 2.6 percent. This rate of increase is much lower than that for Lupron price, which increased a total of 81.3 percent (70 percent more than the increase in Zoladex price over the period), or at an average annual rate of increase 4.1 percent. The increase in the Zoladex WAC over this period is lower than that for the consumer price index ("CPI") as a whole (approximately 2.7 percent per year) and lower by a greater amount than the average annual rate of increase in the producer price index for drugs and pharmaceuticals (approximately 3.8 percent per year) and the CPI for medical care (approximately 4.7 percent per year).

**Figure 3**

Increase in Zoladex and Lupron WAC Compared with Increase in Overall Consumer Price Index (CPI), CPI for Medical Care and the Producer Price Index (PPI) for Drugs and Pharmaceuticals



Note: Zoladex NDC 310096036. Lupron NDC 300362901 (1990-99) and 300364201 (2000-05).
Zoladex and Lupron WAC are calculated from published AWPs.

Source: Annual RedBook, 1991 Zoladex Promotional Plan (DX 2138) for Zoladex launch price, and Bureau of Labor Statistics.

---

[6] I have only incomplete information on Lupron WAC, so for 1990-2002, I derive WAC from published AWP information assuming that AWP was 25 percent above WAC. In 2003, published Annual Redbook data show a 4 percent decline in Lupron AWP from the previous year. From First DataBank information on both WAC and AWP for Lupron for 1999 through 2005 (the only years for which I have both prices), I understand that the decline in Redbook's Lupron AWP occurred because of a decline (from 25 to 20 percent) in the markup over WAC, and not because Lupron WAC declined.

## KNOWLEDGE OF THE "SPREAD"

11.     According to Drs. Hartman and Rosenthal, TPPs were deceived about the spread between the Zoladex ASP (as calculated by Dr. Hartman) and AWP because either they lacked access to information concerning the difference between these price points, or they had little or no incentive to obtain this information.  Neither of these assertions (or assumptions) is consistent with economic theory or supported by economic evidence.

*Evidence Concerning the Difference Between AWP and Actual Acquisition Cost Was Available to Government and Private Payers*

12.     Economic logic shows that the analysis and conclusions of Drs. Hartman and Rosenthal are inconsistent with the amount of information on Zoladex transaction prices available in the marketplace. It was well known that the Zoladex AWP did not represent an average of prices at which providers purchased Zoladex.  Information about how AWP differed from actual acquisition cost was publicly available from several sources.

### Government Studies and Discussion

13.     From at least as early as 1992, Congress and other government agencies evaluated and discussed publicly whether to change the reimbursement benchmark under Medicare Part B from AWP to another price point because AWP, which was the basis for reimbursement, differed from actual acquisition prices.  Despite the Health Care Financing Administration's ("HCFA's") understanding of how AWP could and did differ from actual acquisition prices by varying amounts for different Part B drugs and over time for the same drug, proposals to base reimbursement on measures of actual acquisition prices were rejected repeatedly.  (HCFA, now renamed the Centers for Medicare and Medicaid ("CMS"), is the federal agency responsible for administering the Medicare and Medicaid programs.)

14.     For instance, a report from the Office of Inspector General ("OIG") dated November 1998 discussed the price at which the Veterans Administration ("VA") purchased Zoladex, and noted how much Medicare could save if it paid the same price ($206.90) rather than $389.98, which was at the time the median HCFA (Medicare) price.  The OIG report made it clear that HCFA's reimbursement rate provided, in Plaintiffs' terminology, a spread of 88 percent over the VA price, well above the 30 percent that Plaintiffs' claim was the maximum that payers expected. In this same report, the OIG also found "**additional** evidence that published AWPs used in determining Medicare allowed amounts for certain prescription drugs can be many times greater than actual acquisition costs available in the marketplace."[7]

15.     Appendix C to this OIG report is a letter from the Administrator of HCFA, Nancy-Ann Min DeParle, in which she discussed the report's recommendation and summarized past and current proposals of the President to change how Medicare reimbursed for drugs.  She noted that:

> In the President's FY 1998 budget, the Administration proposed a change in the law to reduce Medicare's high payments for certain drugs.  Under this proposal, physicians and suppliers who bill Medicare for outpatient drugs . . . would be paid their acquisition cost.  This would have removed the mark-up currently being paid above the true market price.  While Congress did not enact our recommendation, the Balanced Budget Act of 1997 provided for program payment at the lower of the submitted charge or 95 percent of the average wholesale price.  The President indicated in his radio message of December 13, 1997, that the Congress did not go far enough in the BBA, so we again submitted this proposal in the President's FY 1999 budget.[8]

16.     In 1996, HCFA made it clear in a letter to a regional office that it knew that physicians were purchasing Zoladex at prices well below AWP, but that despite this awareness

---

[7] (See OIG, Comparing Drug Reimbursement:  Medicare and Department of Veterans Affairs (OEI-03-97-00293) (Nov. 1998) (emphasis added), AZ Defendant's Exhibit 2074.)

[8] (Id. app. C.)

the regional offices were explicitly forbidden from reimbursing physicians at Estimated Acquisition Cost (or physician acquisition costs). Rather, as the letter states, "at this time, there should be no drugs paid based on EAC. Effective immediately, you should revise your pricing for Zoladex to allow the AWP."[9]  The Colorado Medicare carrier had reported in August 1996 that it had documents showing AstraZeneca's volume discount on large volume (96 depots or more) sales was a 22 percent discount from WAC, equivalent (in Dr. Hartman's terminology) to a 60 percent spread which exceeds the 43.8 percent spread on ASP calculated by Dr. Hartman (and that he claims was secret and fraudulent).  Thus, as early as 1996 HCFA explicitly rejected evidence of physician acquisition cost for Zoladex and instead insisted on reimbursement based on AWP.

17.     In 2001, Congress again considered changing how Medicare reimbursed providers for Part B drugs, based partly on a study it had commissioned from the Government Accountability Office ("GAO") in 2000 and on other publicly available studies of drug pricing from the OIG and GAO.  In 2003, the Medicare Prescription Drug, Improvement, and Modernization Act ("Medicare Modernization Act") was enacted, which changed the reimbursement method.  Thus, since 1992, public discussion reflected in government studies, Congressional debate and Administration proposals concerning Medicare reimbursement reflected knowledge that AWP was not an average transaction price.[10]

18.     Finally, the U.S. Department of Veteran Affairs negotiates prices with drug manufacturers for inclusion on the Federal Supply Schedule ("FSS").  Direct federal purchasers can purchase at FSS prices (they also can negotiate lower prices directly).  FSS price lists are

---

[9] AZ Defendants Exhibit 2158.

[10] Declaration of Eric M. Gaier, Ph.D., March 21, 2006.

publicly available.[11]  As shown in Figure 4, from 1993 the FSS price has been below or similar

to Dr. Hartman's ASP for Zoladex.

**Figure 4**



19.     Moreover, as shown in Figure 5, AstraZeneca sold Zoladex to the VA at prices

lower than the FSS price.  Thus, the Federal Government, through the VA, purchased Zoladex

for less than the FSS price and even less relative to Dr. Hartman's ASP.

---

[11] Congressional Budget Office, "Prices for Brand-Name Drugs under Selected Federal Programs," June 2005, p. 6.

**Figure 5**



Zoladex Pricing Comparisons:
AWP, WAC, Dr. Hartman's ASP and Federal Government Purchases Through VA

Note: Zoladex ndc=310096036.
Source: Zoladex direct and indirect sales data; First DataBank, 1991 Zoladex Promotional Plan (DX 2138) for launch price, and Dr. Hartman's 2/23/06 Addendum.

**IMS**

20.      IMS Health ("IMS") reported data on transaction prices for various trade classes. These data were, and still are, publicly available for purchase.  I understand that IMS tracks purchases by doctors, which are classified in the "Clinic" trade class.  As depicted in Figure 6, IMS data reflect AstraZeneca's volume discounting of Zoladex to physicians.  Further, the average Zoladex prices reported by IMS clearly show the trends in the ASP that Dr. Hartman calculated, increasing slightly between 1990 and 1997 and then falling substantially by 1998 before leveling out.  For instance, IMS reported an average price for the clinic trade class of less than $220 from 1999 to 2005, a period during which the AWP for Zoladex was approximately $470.[12]  Thus, it was clear from these publicly available data that, using Plaintiffs

---

[12] See AZ Defendant's Exhibit 2066; see also IMS Health, Facts at a Glance, AZ Defendant's Exhibit 2072; IMS Health, Commonly Requested Therapeutic Class and Product Information (update Feb. 2006), AZ Defendant's Exhibit 2073.

characterization, spreads more than 100 percent were typical for sales to urologists from 1998 on.

**Figure 6**



Zoladex Pricing Comparisons:
AWP, WAC, Dr. Hartman's ASP and IMS Price

Note:  Zoladex ndc=310096036.
Source: First DataBank, 1991 Zoladex Promotional Plan (DX 2138) for launch price, IMS NSP, and Dr. Hartman's 2/23/06 Addendum.

**Average Manufacturer Price**

21.     HCFA (and then CMS) has obtained from AstraZeneca its Average Manufacturer Price ("AMP") data for Zoladex since the first quarter of 1991, in accordance with AstraZeneca's obligations under the Medicaid drug rebate program.[13]  I understand that, for drugs generally, AMP is calculated from actual sales transactions, and typically is the average unit price paid to manufacturers by wholesalers for drugs distributed to the retail class of trade (excluding direct sales to hospitals, health maintenance organizations and to wholesalers where the drug is relabeled under that distributors national drug code number), after deducting prompt

---

[13] The AMP data for Zoladex for 1991 through 2003 are contained on a CD-ROM bearing production number AZ0716211, and marked as AZ Defendant's Exhibit 2079.

pay discounts.  In the case of Zoladex, however, I understand that AMP is calculated from virtually all sales, excluding only hospital, government and HMO trade classes.  Therefore, AMP includes direct sales to urologists as well as sales through wholesalers, and it reflects volume discounts and all other price reductions that lower the actual price paid.

22.     As reflected in Figure 7, the AMP data clearly show the effect of volume discounting to providers, and follow the trends in Dr. Hartman's ASP for Zoladex. Thus, along with the periodic studies I discussed above, HCFA/CMS obtained quarterly data directly from AstraZeneca that showed the differences between AWP (on which Medicare based reimbursement for PADs) and prices paid by providers to purchase Zoladex.

**Figure 7**



Zoladex Pricing Comparisons:
AWP, WAC, Dr. Hartman's ASP and AMP

Note:  Zoladex ndc=310096036.
Source: First DataBank, 1991 Zoladex Promotional Plan (DX 2138) for launch price, Dr. Hartman's 2/23/06 Addendum,
        and CMS (AZ0716211).

**TPP Contracts**

23.     Some Massachusetts TPPs had direct knowledge of discounts on Zoladex, because they obtained price reductions directly from AstraZeneca.  Two of the largest

Massachusetts TPPs — Harvard Pilgrim and Fallon's staff-model Health Maintenance
Organizations ("HMOs") — purchased Zoladex through wholesalers pursuant to contractual
arrangements with AstraZeneca during the relevant time period.  Fallon purchased Zoladex from
1999 to 2002 at prices slightly below Dr. Hartman's ASP and thus well below WAC (e.g.,
Fallon's price was about $189, while Dr. Hartman's ASP was about $201 during these years).
As shown in Figure 8, Harvard Pilgrim acquired Zoladex throughout the period for substantially
less than WAC, and at prices close to the level of Dr. Hartman's ASP.  By the late 1990s,
Harvard Pilgrim obtained discounts of 50 percent off WAC (or spreads (as calculated by Dr.
Hartman) of 150 percent).

**Figure 8**



Note: Zoladex ndc=310096036. Trade classes 3, 5 and 6 represent Government and Hospitals, and are excluded.
Source: Zoladex indirect data, First DataBank, 1991 Zoladex Promotional Plan (DX 2138) for launch price,
        and Dr. Hartman's 2/23/06 Addendum.

24.     Thus, these TPPs knew that AWP was not a transaction price and that volume
discounts on Zoladex were available to certain purchasers.  These two TPPs, which represent the

very payers that Plaintiffs claim have been injured by AstraZeneca's alleged deceit, instead benefited from the discounts that AstraZeneca made available to certain customers.

**Large Number of Customers**

25.     So many customers purchased Zoladex at spreads (as calculated by Dr. Hartman) greater than 30 percent that knowledge of actual transaction prices was too widespread for secrecy.  Thousands of physicians purchased Zoladex each year, and a large fraction of them purchased Zoladex at spreads greater than 30 percent during the years in which Dr. Hartman claims that the average spread reflected AstraZeneca's fraud.  The schedule of volume discounts that physicians and other customers earned were described in a standard contract widely available to urologists and urology groups.[14]  These quantity-based discounts were not secretly or individually negotiated with providers, as Plaintiffs appear to suggest, but were explicitly set forth in a standard contract form shared with thousands of entities.

**This Lawsuit**

26.     Finally, the first Class Action Complaint in this action was filed in 2001 and the first Master Consolidated Class Action Complaint was filed in 2002, further adding to public knowledge about AWP and transaction prices.

**Summary**

27.     As shown in Figure 9, several different sources of data were available to the public and to TPPs in particular that showed that, throughout the class period, providers and TPPs obtained Zoladex at prices similar to the ASP price that Dr. Hartman and Dr. Rosenthal claim was hidden through fraud.  Documents also show that HCFA possessed knowledge of how its reimbursement rates differed from transaction prices, and that it and others made this

---

[14] See Agreement between Zeneca Pharmaceuticals and R/D Urology Association, AZ Defendant's Exhibit 2068; Agreement between AstraZeneca and Urology Purchasing Group of Nebraska, AZ Defendant's Exhibit 2069.

information available to the public.   Finally, this evidence shows that TPPs that are members of the class actually obtained Zoladex from AstraZeneca at prices that were similar to Dr. Hartman's ASP, and were not paying AWP.

**Figure 9**
Summary of Zoladex Pricing Comparisons



Note: Zoladex ndc=310096036. Trade classes 3, 5 and 6 represent Government and Hospitals, and are excluded from Harvard Pilgrim.
Source: Zoladex direct and indirect sales data, First DataBank, 1991 Zoladex Promotional Plan (DX 2138) for launch price,
CMS (AZ0716211), Dr. Hartman's 2/23/06 Addendum, IMS NSP, and US Department of Veterans Affairs (www.med.va.gov).

***TPPs Had Economic Incentives to Obtain Information Concerning Actual Acquisition Prices***

28.      According to Dr. Hartman, TPPs had no incentive to seek information about the actual transaction prices for Zoladex, because their potential savings constituted a small fraction of their total spending on health care.  Dr. Hartman states that the "**unimportance [of pharmaceutical expenditures to payers] is even more important for physician-administered drugs**, which represents a small portion of an already small component of costs (i.e., the cost of

17

all pharmaceuticals),"[15] and he concludes that TPPs therefore ignored the potential savings.  For support, Dr. Hartman cites Alfred Marshall (Principles of Economics (1890)). Marshall noted that the demand for a good may be less price elastic (i.e., less responsive to changes in price) when expenditure on the good accounts for only a small part of the total budget of the consumer. However, Dr. Hartman misapplies Marshall's observation, because a payer's absolute gain from obtaining information that could result in lower reimbursement rates may be large compared with the cost of acquiring the information when the total volume of purchases affected by the resulting price reduction is substantial.

29.     Nobel Laureate Professor George Stigler explained the insight that the rational decision whether to expend resources to acquire information about transaction prices is based on the expected benefit of having that information.  For a market participant, "information is gathered until the expected utility of further search no longer outweighs additional search costs. The information a subject acquires is consciously chosen.  Conversely—and perhaps more provocatively—even a lack of market information is rationally and deliberately chosen."[16]

30.     Dr. Hartman claims that the potential gain to TPPs from having information about actual transaction prices for a widely prescribed drug like Zoladex is very large.  If this were true, then his claim that they did not seek such information because of fraud is unpersuasive. Information regarding the difference between the Zoladex AWP and transaction prices was easily accessible from public sources and from the large number of AstraZeneca customers with that knowledge, as described in paragraphs 10-26, above. Because it was not very costly to

---

[15] Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages (Dec. 15, 2005) ¶ 60(b).

[16] See generally AZ Defendant's Exhibit 2077.

obtain this information, economic theory shows that, contrary to Dr. Hartman's claims, either TPPs possessed the information or they had little economic incentive to seek it.

**PLAINTIFFS MISCHARACTERIZE THE PURPOSE OF WAC**

31.     Plaintiffs claim that AWP should reflect formulaically the average price at which actual transactions occur.  They further claim that AWP was not properly related to transaction prices and that the two diverged in a way that was fraudulent and injured payers. Plaintiffs' characterization of AWP is wrong.  Plaintiffs acknowledge that AWP is formulaically related to WAC, so that  AstraZeneca determines AWP by setting WAC, yet they ignore the role of WAC (and thus AWP) in determining the structure of AstraZeneca's prices for Zoladex. WAC is a list price that, like any list price, caps the distribution of prices charged to different buyers.  It reflects the base price from which AstraZeneca discounts to some customers to increase its sales and profits and to meet competition.

32.     Throughout the relevant time period, AstraZeneca's transactional data show that AstraZeneca made sales at WAC to some customers (both physicians and TPPs), while other customers obtained various levels of discounts.  Figure 10 shows that increases in WAC were not offset by additional discounting for certain volumes of purchases.  After it introduced its volume discount program in mid-1993, customers that purchased 25 units of Zoladex or less paid a higher price almost every time AstraZeneca increased WAC.  Thus, increases in WAC almost always caused small volume purchasers to pay higher prices.



**Figure 10**
Unit Price with Quantity and Prompt Payment Discounts
for Purchasing 1, 5, 10 or 25 Units of Zoladex

Note: Zoladex ndc=310096036. Prompt Payment Discounts of 2%.
Source: First DataBank, AZ0048182-3, AZ0097542, AZ0037018-9, AZ0109425-9, AZ0109433-5, AZ0108933-6, and AZ0100627-9.

33.    Contrary to Dr. Hartman's and Dr. Rosenthal's characterization, the published "list" price in this industry, like other industries, does not represent an average transactions price. Instead, it represents the price charged to those customers unable to obtain discounts because they do not meet the manufacturer's requirements (such as buying in sufficient quantity to obtain a volume discount) or because they fail to bargain, or they bargain ineffectively, to obtain price concessions from the supplier.

## PLAINTIFFS ARE COMPLAINING ABOUT PRICE DISCOUNTING AND THE EFFECTS OF COMPETITION

34.    Plaintiffs' Complaint alleges that the Zoladex AWP was inflated. According to Dr. Hartman, "the alleged AWP scheme was effectuated when a manufacturer increased the

AWP of the drug and/or decreased its ASP in order to offer financial incentives to providers to move market share."[17]

35.     Dr. Hartman's statement makes it clear that Plaintiffs are actually complaining about how the parties that control usage of a manufacturer's product use competition to obtain price concessions from manufacturers. Even if (as has been true since 1998) the Zoladex WAC was unchanged, Dr. Hartman finds fraud and damages if AstraZeneca increases discounts offered to certain customers.  In other words, Dr. Hartman finds fraud when competition forces manufacturers to lower transaction prices, even if there is no increase in list price.  Further, Dr. Hartman would find fraud whenever a greater number of providers or TPPs chose to take advantage of existing volume discounts offered by AstraZeneca.

36.     Plaintiffs essentially claim that AstraZeneca's competitive price responses concerning Zoladex were illegal.  The anticompetitive implications and the resulting illogic in their damages theory are clear, as illustrated by the Zoladex experience between 2000 and 2001. During those years, WAC (and AWP) were constant (as they have been since 1998).  However, between 2000 and 2001, ASP (as calculated by Dr. Hartman) declined slightly, increasing the spread.  According to Plaintiffs, this decline in ASP increased damages per unit of Zoladex sold, even though AWP was unchanged.

37.     Even if AWP had remained unchanged between 1991 and 1998 at $331.50, the Plaintiffs and their experts still would find that AstraZeneca had caused injury and owes damages.  Without any change in AWP between 1991 and 1998, the decline in ASP from $255 in 1991 to $188 in 1998, or by 26 percent, would have increased the spread from 30 percent in 1991 to 76 percent in 1998 solely because of increased discounting by AstraZeneca to its

---

[17] Hartman Decl. ¶ 58.

customers.  Thus, even with no "inflation" or change in AWP, competitive pressures that resulted in an increase in "spread" would, according to Plaintiffs, be fraud. Any attempt to prevent such price discounting to maintain a low spread would inhibit competition.

38.     Plaintiffs may claim that AstraZeneca should have lowered WAC (and thus AWP) whenever it decided to increase discounts to its customers.  However, there is no historical evidence in the pharmaceutical industry that firms reduce published prices, even as competition increases.[18]  Moreover, a rule that list price of pharmaceuticals had to decline whenever discounting increased would have a deleterious on competition for several reasons. First, it could deter sellers from offering selective discounts, because any discount offered to one customer could then "spill over" to other customer groups, where the seller could lose more revenue than it gained in the market where it wanted to discount.  Second, it could limit a seller's scope for negotiations with different customer groups.  Third, it could make it more difficult or costly to raise prices at a later time, when costs or competitive conditions have changed.

39.     I therefore conclude that there are valid strategic and business reasons, unrelated to Plaintiffs' claims of fraud, why firms do not reduce WAC for existing products.  These reasons benefit consumers because they stimulate competition, even as they offer discounts to some customers.

## PLAINTIFFS FAIL TO CONSIDER CHANGES IN THE BUT-FOR WORLD IF SPREADS HAD BEEN CONSTRAINED

40.     Plaintiffs' experts describe a "but-for" world in which the spread between the ASP they calculate and AWP does not exceed 30 percent of ASP.  In this but-for world,

---

[18] See, for example, U.S. Congressional Budget Office, "How Increased Competition from Generic Drugs has Affected Prices and Returns in the Pharmaceutical Industry," July 1998 (www.cbo.gov/showdoc.cfm?index=655&sequence=1 (downloaded 2/28/06)), which says that "[v]arious studies have found that generic entry has little effect on the prices of brand-name drugs, which continue to increase faster than inflation."

AstraZeneca would be liable for damages if it offered customers discounts from WAC that exceeded approximately 3.84 percent.

41.     In analyzing the impact of the alleged fraud and the magnitude of claimed damages, Plaintiffs focus only on the spread between AWP and ASP, holding all other factors constant.  For instance, Dr. Hartman's damages calculation assumes that (1) total sales of each drug would be the same in the but-for world; (2) ASP (and, presumably, the price at which each individual customer purchased) would be the same in the but-for world and (3) reimbursement arrangements of Medicare, TPPs, and patients would be the same in the but-for world. According to Dr. Hartman, the *only* difference between the actual and but-for worlds is that AWP would be lower by an amount required to make the but-for spread equal to the percentage that Dr. Hartman claims is appropriate.  The assumption that all else remains constant in the but-for world is inconsistent with economic theory and empirical evidence regarding the market for Zoladex.

42.     **First**, in the but-for world, there would have been more sales of Lupron, a higher-priced product.  Throughout the relevant time period, Zoladex had a lower WAC and AWP than Lupron, and as a result both patients (who paid the full co-payment) and Medicare saved money when Zoladex, rather than Lupron, was prescribed for a patient (see Figure 11).



**Figure 11**

**Co-payments and Medicare Reimbursement were Lower for Zoladex than for Lupron**

Note: Zoladex and Lupron WAC are calculated from published AWPs.
Source: Annual RedBook.

43.     If Zoladex sales were lower in the but-for world than in the actual world, more sales would have occurred at higher prices to the extent that providers administered Lupron rather than Zoladex.[19]  Assume, for example, that Zoladex did not respond competitively to the financial incentives that Lupron offered to physicians, and so Zoladex's share of combined LhRh sales remained at the 10 percent share it had in 1991, rather than increasing to the 30 percent range that it had from 1997 through 2002.  I have calculated the additional co-payment costs and costs to Medicare from the (approximately) 20 percent of sales that Lupron would have gained at its higher WAC and AWP (assuming that all else in the market remains unchanged).

44.     As shown in Figure 12, total co-payments and total Medicare costs for LHRH agonist therapy would have been tens of millions of dollars higher if Zoladex's market share had been limited to 10 percent.  In 2002, for example, aggregate co-payments for LHRH agonist

---

[19] This assumes that Lupron's pricing and other marketing conduct remains unchanged from the historical experience.

24

therapy would have been $30 million more if Zoladex's market share had been 10 percent instead of its actual share of 32.6 percent. This reflects the fact that the co-payment for each depot of Lupron was $33 (37 percent) more than for Lupron.  Figure 12 also shows that in 2002 total Medicare payments for LHRH agonist therapy would have been $118 million greater, because Medicare's payment for each depot of Lupron was $132 more than for Lupron.  Thus, savings to the health care system from Zoladex's growth in share after 1991 were substantial. These savings resulted from Zoladex's competitive response to the incentives that TAP offered providers to use Lupron.

**Figure 12**
**Savings Because Zoladex Market Share Grew Beyond 10%**



Note:  Figure shows the savings from using Zoladex treatment rather than Lupron when Zoladex's actual share exceeded 10 percent.
  Zoladex and Lupron WAC are calculated from published AWPs.
Source:  IMS Health, Annual RedBook, 1991 Zoladex Promotional Plan (DX 2138) for Zoladex launch prices.

45.    **Second**, in the but-for world, AstraZeneca and other pharmaceutical manufacturers would have an incentive to reduce discounts and raise acquisition prices to achieve a given percentage spread.

a.    Dr. Hartman contends that any spread greater than 30 percent is fraudulent, because TPPs expected that (and therefore bargained as if) the actual provider spread were no more than 30 percent.  Plaintiffs and Dr. Hartman have no claims concerning the **level**

25

of AWP – only that, in the but-for world, it cannot be more than 30 percent above the ASP. Contrary to Dr. Hartman's unsupported claim, in the but-for world with a statutory limitation on the **percentage** spread, manufacturers would choose a level of AWP, and thus an average dollar spread, to optimize their profitability, and would not be compelled to keep transaction prices as they have been historically.[20]  This means that they could, by adjusting AWP, give providers the same dollar spread as they did historically, even while limiting the percentage spread to 30 percent.

        b.     AstraZeneca could limit the Zoladex spread to 30 percent by lowering discounts and increasing acquisition prices and WAC.  For example, in 1998, the average dollar spread (based on Dr. Hartman's Zoladex ASP calculation) was $245.25, while the percentage spread was 126 percent (given an AWP of $439.24).  If, instead, AstraZeneca's ASP for Zoladex had been $817.51 and it had set a WAC of $850 (resulting in AWP of $1,063), then the percentage spread would not have exceeded Dr. Hartman's claimed maximum of 30 percent and Dr. Hartman would not find fraud.  Under this pricing, AstraZeneca would still give providers the same dollar incentive ($224.25) to prescribe Zoladex as they have today, but prices would be higher.

        c.     This alternative but-for world, in which Plaintiffs' theory implies no damages, is compared in Figure 13 with Dr. Hartman's but-for world.  In 1998, the dollar spread in the actual and but-for worlds is $224.25.  In the actual world, the spread was 126 percent (as

---

[20] It is well recognized that firms will reduce their discounting if they are forced to offer their lowest prices to customers to whom it is in their interest to charge higher prices.  This concern was expressed by the GAO when it studied the possibility of opening the Federal Supply Schedule for pharmaceuticals to non-federal government buyers.  The GAO noted that "the larger the market [of customers able to purchase at FSS prices], the greater the economic incentive would be for a manufacturer to raise schedule prices to limit the impact of giving low prices to more purchasers."  The same principal applies here – the greater the share of payers reimbursing at a 30 percent spread above ASP, the greater the incentive for AstraZeneca to raise the ASP.

calculated by Dr. Hartman); in the but-for world, the spread was 30 percent and, according to

Plaintiffs and Dr. Hartman's fraud and damages theory, there is neither fraud nor damages.

**Figure 13**

**Comparison of Hartman But-For World and Alternative But-For World for Zoladex**
(NDC 310096036, 3.6 mg)



Source: Hartman's 2/3/2006 Addendum.

  d.  In this "non-fraudulent" world, payers (Medigap and private payers)—the

parties that Dr. Hartman purports to be attempting to protect from fraud  -- would be worse off,

even though there would be no damages under Dr. Hartman's damages theory.  If the spread

were limited by fiat, economic theory suggests that the result would be higher AWPs, less

discounting, and higher acquisition prices, so that manufacturers could continue to give providers

competitive incentives to prescribe their drugs.

  e.  Dr. Hartman fails to consider or address other complexities of the but-for

world, such as increases in nonprice (or "nonfinancial") competition, that arise because of

providers' market power and role in selecting a patient's therapy. Dr. Hartman concedes that

urologists have "market power" to determine the choice of therapy and the power to "shift

patients" between therapies, yet he also acknowledges in his deposition testimony that he had not

considered the implications of providers' market power.[21]  If Zoladex WAC (and thus AWP) cannot increase, and the spread cannot exceed 30 percent, additional non-price competition might take the form of increased advertising, support from detail personnel, and other activities aimed at urologists and others about which treatment to use, and it could result in higher prices as less efficient forms of promotion replace the preferred way in which manufacturers compete today.[22]  Constraints on prices and spread would not alter competitive conditions in the market and the significant role that urologists play in the choices of therapeutic procedure.  In this circumstance, competition between Lupron and Zoladex would rely even more heavily on nonprice forms, because AstraZeneca and TAP would have higher revenues at the current prices and thus still would want doctors to select their product over that of the competition.

    f. The foregoing analysis of the but-for world is based on the known economic structure of the market and the empirical realities that have been observed for more than 15 years.  It shows that the assumptions upon which Dr. Hartman bases his damages calculations are implausible.  WAC (and AWP) would not decline to the level of current ASP if the spread were restricted, as Dr. Hartman hypothesizes. Instead, ASP would increase until it was within the "acceptable" (below the 30 percent spread restriction) range of AWP, and there would be greater non-price competition.

   46. **Third**, other payments to providers would increase if drug reimbursement was constrained.  This is demonstrated by the effect of changes in Medicare reimbursement on provider payments.

---

[21] See Hartman Deposition (2/27/06) at 861-864.

[22] Note that at a 30 percent spread, there would be incentives to keep AWP high.

a.      Dr. Hartman assumes that drug prices and reimbursement provisions are independent of other financial compensation that payers give providers for the package of services associated with administration of a PAD like Zoladex.  For this reason, he asserts that in the but-for world all other components of the financial arrangement between payers, patients, providers, and drug manufacturers would be unchanged except that AWP (and the spread) would decline.  In particular, he assumes that the historical arrangements between providers and payers for reimbursement of physician services associated with Zoladex administration would be the same if the spread for reimbursement of Zoladex were lower.

b.      To the contrary, there long has been widespread recognition that Medicare and other payers viewed the "spread" as an essential part of physician compensation.  It has been widely accepted that the decision to reimburse doctors based on AWP compensated (in part) for inadequate reimbursement rates for physician services and helped assure that physicians earned a sufficient return from dispensing products like Zoladex to ensure that they would continue to serve Medicare patients.  Throughout the 1990s, discussion in Congress and elsewhere about changing the reimbursement formula for PADs typically acknowledged that, by itself, Medicare reimbursement for physician services associated with the administration of PADs did not provide sufficient incentive for providers to serve patients appropriately.

c.      Recent evidence shows that reimbursement rates for PADs can affect reimbursement rates for physician services.  Beginning in 2001, Congress began considering changes in the allowed charges for Medicare Part B drugs, which, in 2002, were $441 for Zoladex and $627 for Lupron.[23]  The 2003 Medicare Modernization Act reduced payment for Part B drugs, including Zoladex. Because PAD reimbursement rates for certain drugs were

---

[23] Federal Register, Vol. 69, No. 4, 1/7/04, 1084.

lower, the Act required the Secretary of Health and Human Services to revise (and increase) physician fees for administration of drugs.  The result of this review was to increase substantially the fee paid by Medicare for administration of Zoladex, from $5.07 in 2002 for the associated CPT code to $37.52 in 2003 and $48.54 in 2004.[24]  This adjustment occurred at least in part due to the recognition that, for certain specialties, the reduction in provider revenue from lower drug reimbursement could have an adverse effect on provider income and thus on medical care received by Medicare beneficiaries[25].

        d.     The same principle applies to reimbursement arrangements between providers and TPPs.  In Dr. Hartman's but-for world, in which the spread on Zoladex is reduced to 30 percent or less and ASP is unchanged, TPPs would have to increase other payments to providers to maintain the same quality of care for their clients (where quality is measured, among other things, by the size and scope of the provider network, the location in which care is provided, and the type of care provided).  A proper damages analysis would take these adjustments into account, and would offset against any claimed reduction in payments for drugs in the but-for world the increase in other costs that would occur.  Dr. Hartman failed to take these adjustments into account either qualitatively or in quantifying his estimate of damages from AstraZeneca's alleged fraud.

---

[24] Id. at 66406.

[25] Contrary to Dr. Hartman's claim that the theory of revealed preference shows that TPPs failed to bargain for lower reimbursement rates because they were deceived, this shows that payers (Medicare) can willingly and with full knowledge, find it in their interest to accept a spread greater than 30 percent.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_John P. Gould_

John P. Gould

_November 10, 2006_

Date

31