# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE ) | |
| LITIGATION ) | |
| ) | |
| _____ ) | Judge Patti B. Saris |
| ) | |
| THIS DOCUMENT RELATES TO ) | |
| 01-CV-12257-PBS and 01-CV-339 ) | |
| _____ ) | |

**TRIAL OF CLASS 2 AND CLASS 3 CLAIMS**

## AFFIDAVIT OF ERIC M. GAIER, PH.D.
## SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF
## OF TRACK 1 DEFENDANTS IN THE TRIAL OF CLASS 2 AND CLASS 3 CLAIMS

DISTRICT OF COLUMBIA )
                )     ss:

ERIC M. GAIER being duly sworn, deposes and says:

1.      I am a Partner and founding member of Bates White, LLC, a professional services firm that performs economic and statistical analysis in a variety of industries and forums. I submit this affidavit as direct testimony in the case-in-chief of the Track 1 defendants.[1] Since I have previously described my qualifications to this Court, I will not repeat them here. A copy of my *curriculum vitae* is annexed hereto at Attachment 1.

2.      I have been asked to perform an analysis of whether the alleged "AWP scheme" caused economic harm to the members of Class 2 and Class 3 by causing them to overpay for subject

---

[1]    The Track 1 defendants are AstraZeneca Pharmaceuticals L.P. ("AstraZeneca"); Bristol-Myers Squibb Co., Oncology Therapeutic Network Corp. ("BMS"); Johnson & Johnson, Centor, Inc., Ortho Biotech, McNeil-PPC, Inc., Janssen Pharmaceutical Products, L.P. ("J&J"); and Schering-Plough Corporation and Warrick Pharmaceuticals Corporation ("Schering-Plough").

physician-administered drugs. I have also been asked to consider the opinions offered by plaintiffs' experts, Dr. Raymond S. Hartman and Dr. Meredith Rosenthal, in my analysis.

3.       As a matter of economic theory, knowledge regarding the differences between Average Wholesale Price ("AWP") and acquisition costs would prevent payors from overpaying for prescription drugs as a result of the alleged "AWP scheme."[2] Furthermore, where a payor has competitive leverage—either because of the payor's size and ability to channel beneficiaries or the extent of competition among providers or both—economic theory predicts that the payor should achieve competitive outcomes, regardless of any alleged "AWP scheme."[3] What this means in the context of this case is: if a payor has knowledge or competitive leverage or both, reimbursements would not be different in the "but-for world" (i.e., a world in which the alleged fraud does not exist) than they were in the actual world.

4.       Because Medicare and third-party payors ("TPPs") in Massachusetts are both knowledgeable and have competitive leverage, I have concluded that the members of Class 2 and Class 3 did not overpay for prescription drugs. Dr. Hartman disagrees with this conclusion because payors reimburse amounts that exceed providers' acquisition costs. He concludes that payors have been deceived and have overpaid because payors have not managed to lower reimbursement rates to approximate estimated acquisition cost ("EAC"), which Dr. Hartman equates with average sales price ("ASP").[4]

---

[2]      I note that Dr. Hartman states, "Had the existence of the 'mega-spreads' been perceived and understood by TPPs, those payors would have negotiated more aggressively than they did, leading to lower reimbursement rates." *Declaration of Raymond S. Hartman in Support of Plaintiffs' Claims of Liability and Calculation of Damages*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, December 15, 2005 ("Hartman Liability and Damages Declaration"), p. 10. Dr. Hartman also states, "The spread must be increased secretly, because if such spreads were understood to exist, competitors would behave to eliminate them." *Declaration of Raymond S. Hartman in Support of Plaintiffs' Motion for Class Certification*, U.S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, September 3, 2004 ("Hartman Declaration"), Attachment C, p. C-15.

[3]      In the context of self-administered drugs, Dr. Berndt states, "If competition among PBMs is vigorous, even if the self-administered AWPIDs were artificially inflated, injury and damages to third party payors do not follow, particularly on a class-wide basis. Since lack of competition among PBMs is crucial to Plaintiff's theory, this would appear to undermine their allegations, and certainly their assumption of class-wide injury and damages." See *Report of Independent Expert Professor Ernst R. Berndt to Judge Patti B. Saris*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, February 9, 2005, ("Berndt Report"), p. 111 (DX 1275). See also, Sorensen, Alan T., "Insurer-Hospital Bargaining: Negotiated Discounts in Post-deregulated Connecticut," *Journal of Industrial Economics*, Vol. 51, No. 4, December 2003, p. 488 (DX 1246).

[4]      Deposition of Raymond S. Hartman ("Hartman deposition"), Volume III, p. 788, Volume IV, pp. 985-986. Dr. Hartman's reasoning, which is not addressed here, is somewhat convoluted. He states that payors had an "expectation" that AWP would not exceed EAC by more than 30 percent. He then posits that by choosing a reimbursement formula of AWP- 15 percent, TPPs are attempting to approximate acquisition costs. He concedes that Medicare's expectations were similar to those of TPPs, but he claims that the statutory scheme provided that reimbursement would approximate EAC.

5. The fundamental flaw in Dr. Hartman's analysis is that he fails to consider whether there are other economic factors, unrelated to the alleged "AWP scheme," which would cause payors to set reimbursement rates above providers' acquisition costs. I have considered those factors and concluded that there are at least three such economic considerations: (1) payors want to motivate providers to join their networks; (2) payors want to incentivize providers to administer drugs outside of the hospital, because reimbursement for the administration of drugs in a hospital setting is more expensive for payors; and (3) payors use provider profits on drug reimbursement to cross-subsidize underpayment on the service of administering the drug.

6. I discuss each of these issues below in both the Medicare Part B context and the private payor context.

## A. Drug reimbursement under Medicare Part-B

7. Class 2 comprises Massachusetts TPPs who make reimbursements based on AWP for a Medicare Part B-covered Track 1 subject drug. The Class 2 members pay the drug co-pays on behalf of Medicare Part B beneficiaries who have Medigap insurance. Because Class 2 pays 20 percent of the amount Medicare reimburses for drugs and physician services, it is necessary to assess the economic harm to Medicare caused by the alleged "AWP scheme" to determine whether Class 2 was harmed.[5]

### 1. Medicare is a knowledgeable and sophisticated payor

8. Throughout the relevant class period, Medicare was a large and sophisticated payor. Medicare knew about the differences between AWP and providers' acquisition costs, the magnitude of these differences, and that these differences varied substantially from drug to drug. Therefore, since the government chose to base Medicare reimbursements on AWP with extensive knowledge, there is no reason to believe that Medicare reimbursements would have been any different in the but-for world. As a result, I conclude that Medicare—and by extension, Class 2—did not suffer economic harm.

9. As early as 1969, the agency responsible for Medicare was aware that AWP was not an appropriate proxy for drug acquisition costs. A report from the Task Force on Prescription Drugs

---

[5] Even if Medicare were harmed, however, it does not necessarily follow that Class 2 TPPs were harmed. For example, if Class 2 TPPs offered Medigap plans on a cost-plus basis, they would actually benefit from the alleged scheme because they would earn a fixed margin on a higher reimbursement base. Consistent with this theory, plaintiff BCBS-MA admits that higher costs lead to higher returns for its Medigap plans, which it characterizes as cost plus. See November 8 Trial Transcript at 138:12-139:12 (Arruda Cross Examination).

of the Department of Health Education and Welfare ("HEW"), the predecessor to the Department of Health and Human Services ("HHS") notes that:

> Ostensibly, wholesale prices are listed in company catalogs and price lists, but these generally represent maximum prices. They serve merely as an umbrella beneath which actual prices are set by quantity discounts, hospital discounts, government discounts, two-for-the-price-of-one deals, rebates and other special arrangements.[6]

In 1974, HEW notes that "Red Book data, Blue Book data … such standard prices … are frequently in excess of actual acquisition costs."[7]

10.     The evidence also demonstrates that Health Care Financing Administration ("HCFA")—the federal agency responsible for overseeing Medicare—understood AWP was not a reliable signal for EAC. As early as 1984, the Office of Inspector General of the Department of Health and Human Services ("OIG") determines that the relationship between AWP and acquisition costs varied widely across drugs:

> Our examination of 1,127 direct purchase invoices showed that prices to pharmacies averaged 21.2 percent below AWP [a markup of 26.9 percent]; ranging from as little as 6.3 percent below AWP [a markup of 6.7 percent] to as much as 41.8 percent below AWP [a markup of 71.8 percent]… Thus, AWP cannot be the best—or even an adequate—estimate of the prices providers generally are paying for drugs.[8]

A 1989 OIG report addressed to HCFA states: "We continue to believe that AWP is not a meaningful payment level and that it should not be used for making reimbursements in either the Medicaid or the new Medicare drug program."[9] In 1992, OIG reports to HCFA that its review of invoices "indicated that AWP is not a reliable indicator of physician cost; indeed, Red Book officials confirmed that the AWP is not designed to reflect physicians' costs."[10] The 1992 OIG report finds that physician-administered

---

[6]   Task Force on Prescription Drugs of HEW, "Prescription Drugs Under Medicare," February 1969, p. 48 (DX 1653).

[7]   39 Fed. Reg. p. 41179, at p. 41180 (November 27, 1974) (DX 1035). Also see 40 Fed. Reg. p. 34515, at p. 34518 (August 15, 1975) (DX 1280).

[8]   Department of Health and Human Services, Office of Inspector General, "Changes to the Medicaid Prescription Drug Program Could Save Millions," 1984, pp. 10, 22 (DX 1039).

[9]   Department of Health and Human Services, Office of Inspector General, "Use of Average Wholesale Prices in Reimbursing Pharmacies Participating in Medicaid and Medicare Prescription Drug Program," October 1989 (DX 1044).

[10]   Department of Health and Human Services, Office of Inspector General, "Physicians' Cost for Chemotherapy Drugs," November 1992, p. 5 (DX 1282).

chemotherapy drugs can be purchased by providers at discounts from AWP ranging from 9 to 83 percent, which corresponded to markups over acquisition cost of 10 to 488 percent.[11]

11.    In a 1996 letter, HCFA is informed by Ven-A-Care of the Florida Keys ("Ven-A-Care"), a specialty pharmacy, that "Medicare's reimbursement was excessive and in many cases provided profit margins of more than 500% and, in some instances, more than 1000%."[12] Ven-A-Care encloses with the letter "two volumes of exhibits that substantiate and support the fact that Medicare and Medicaid programs are continuing to make excessive reimbursements to providers."[13] Information about the magnitude of the differences between AWP and acquisition costs for physician-administered drugs also appeared in the press. For example, a June 1996 *Barron's* article concludes: "For many drugs, especially the growing number coming off patent and going generic, the drug providers actually pay wholesale prices that are 60%-90% below the so-called average wholesale price, or AWP, used in reimbursement claims [equivalent to a 150 to 900 percent markup]."[14] I note that *Barron's* collected price quotes from several leading wholesalers, an option presumably available to Medicare and TPPs.

12.    In 1997, OIG again compared the Medicare allowances for prescription drugs with drug acquisition prices available to physician and supplier communities.[15] The 1997 OIG report described substantial and widely varying differences between AWP and provider acquisition costs for physician-administered drugs expressed as a markup over provider acquisition costs. The overall reported markups ranged from 16 to 899 percent for 1995 and from 15 to 672 percent for 1996. For single-source drugs, the reported markups range from 16 to 162 percent for 1995 and from 15 to 154 percent for 1996. For multi-source drugs, the reported markups range from 71 to 899 percent for 1995 and from 76 to 672 percent for 1996.[16] OIG concludes, "Medicare allowed between 2 and 10 times the actual average wholesale prices offered by drug wholesalers and group purchasing organizations for 8 of the 22 drugs reviewed."[17] In its response to the 1997 OIG report, HCFA agrees with OIG's findings and

---

[11]   Department of Health and Human Services, Office of Inspector General, "Physicians' Cost for Chemotherapy Drugs," November 1992, Appendix III (DX 1282).

[12]   Ven-A-Care letter to Bruce Vladeck, Administrator of HCFA, October 2, 1996, p. 3. See HHC003-481 (DX 1881).

[13]   Ven-A-Care letter to Bruce Vladeck, Administrator of HCFA, October 2, 1996, p. 1. See HHC003-479 (DX 1881).

[14]   Alpert, Bill, "Hooked on Drugs," *Barron's*, June 1996, p. 1 (DX 995).

[15]   Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Payments for Prescription Drugs," December 1997, p. 1 (DX 1075). Also see Department of Health and Human Services, Office of Inspector General, "Suppliers' Acquisition Costs for Albuterol Sulfate," June 1996, p. I (DX 1065).

[16]   Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Payments for Prescription Drugs," December 1997, Appendix B (DX 1075).

[17]   Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Payments for Prescription

recommendations including the finding that "the published AWPs currently used by Medicare Carriers to determine reimbursement do not resemble the actual wholesale prices which are available to the physician and supplier communities that bill for these drugs."[18]

13.     I illustrate the extent of the government's knowledge about differences between AWP and acquisition costs in Attachment 2 annexed hereto. Specifically, for each study referenced above, I plot the markups that the government was able to observe.

14.     In addition, Medicare could have gained knowledge about the magnitude of the differences between AWPs and acquisition costs for numerous drugs because it had access to publicly-available Federal Supply Schedule ("FSS") pricing available to direct government purchasers of drugs such as the Department of Veterans Affairs ("VA") since at least 1966.[19] OIG reports in 1998 and 1999 that compared Medicare's reimbursements to FSS acquisition costs demonstrated that Medicare paid more for drugs than the VA. In 1998, "Medicare allowed between 15 and 1600 percent more than the Department of Veterans Affairs paid for the 34 drugs reviewed."[20] In 1999, "Medicare paid more than double the VA price for 12 of the [24] reviewed drugs."[21] This evidence demonstrates that Medicare knew of the substantial and widely varying differences between AWP and acquisition costs and that AWP was not a reliable signal for the acquisition costs of physician-administered drugs.

15.     At various times during the class period, HCFA and the federal government have implemented changes to Medicare reimbursement policies that demonstrate their ability to reduce costs when they find it appropriate to do so. In June 1997, the House of Representatives Committee on the Budget offers legislation to reduce reimbursements from 100 percent of AWP to 95 percent of AWP because:

> The Inspector General for the Department of Health and Human Services
> has found evidence that over the past several years Medicare has paid

---

Drugs," December 1997, p. II (DX 1075).

[18]   Department of Health and Human Services, Office of Inspector General, "Excessive Medicare Payments for Prescription Drugs," December 1997, Appendix D (DX 1075).

[19]   Medicare Payment Advisory Commission ("MedPAC") reports that the FSS prices are publicly available. See MedPAC, "Report to the Congress: Variation and Innovation in Medicare," June 2003, p. 163 (DX 1110). FSS drug price information has been available through the Freedom of Information Act ("FOIA") request since July 4, 1966. Phone discussion with Donna Nash, FSS FOIA officer, on October 19, 2005. According to Ms. Nash the FSS drug information has existed more or less in its current form since the 1950s and this data has been available via FOIA request since the enactment of FOIA on July 4, 1966.

[20]   Department of Health and Human Services, Office of Inspector General, "Comparing Drug Reimbursement: Medicare and Department of Veterans Affairs," November 1998, p. 7 (DX 1079).

[21]   Department of Health and Human Services, Office of Inspector General, "Medicare Reimbursement of Prescription Drugs," January 2001, p. ii (DX 1094).

> significantly more for drugs and biologicals than physicians and
> pharmacists pay to acquire such pharmaceuticals. For example, the Office
> of Inspector General reports that Medicare reimbursement for the top 10
> oncology drugs range from 20 percent to nearly 1000 percent per dosage
> more than acquisition costs.[22]

Similarly, a 1998 letter from HCFA to Congressman Stark states:

> We have been aware of this problem and, as a result, included a legislative
> proposal in the President's fiscal year 1998 budget to require providers
> and suppliers who bill Medicare for drugs not paid on a cost or
> prospective payment basis to bill the program at their cost for the drug.
> This would remove the markup currently being paid above true
> marketplace wholesale price.
>
> The proposal, which OIG supported, did not survive the legislative process.
> Instead, Congress provided, in section 4556 of the Balanced Budget Act of
> 1997, that program payment be made at 95 percent of the AWP.
> Furthermore, no provision was made for controlling any rise in the AWP.
> The President acknowledged in his radio message of December 13, 1997,
> that Congress addressed this issue, but that it did not go far enough.[23]

A letter in 2000 from Donna Shalala, Secretary of Health and Human Services, to the House of

Representatives Commerce Committee states:

> Indeed, the HHS Inspector General found payments based on average
> wholesale price data to be 11 to 900 percent greater than the prices
> available to the physician community. Therefore, in 1998, the President
> again proposed paying physicians their actual cost to 'ensure that doctors
> are reimbursed no more, and no less, than the price they themselves pay
> for the medicines they give Medicare patients.' However, no
> Congressional action was taken.[24]

Following HCFA's announcement that it planned to reduce Medicare reimbursements for

certain drugs by implementing revised AWPs identified by the Department of Justice ("DOJ

AWPs"), members of Congress expressed concern:

> This source of funding has been a crucial safeguard enabling providers to
> serve patients despite the Medicare program's underpayment of drug
> administration and other essential services…the reduction in

---

[22]   House of Representatives, "Report of the Committee on the Budget: Balanced Budget Act of 1997," June 24, 1997, p. 1354 (DX 1202).

[23]   Letter from Nancy-Ann Min DeParle, Administrator, Health Care Financing Administration, to Rep. Fortney Pete Stark, concerning the payment allowances for drugs covered under the Medicare program, dated January 26, 1998. See HHC 001-0363 (DX 1077).

[24]   Donna Shalala (HHS) Letter to Tim Bliley (Commerce Committee), May 2000, pp. 1-2 (DX 1083).

> reimbursement for drugs would result in a devastating loss to providers
> and pose an unprecedented risk to patients.[25]

HCFA later communicated that, despite the availability of the lower DOJ AWPs, Medicare carriers were not to implement these prices for certain drugs:

> We have some concern about access to care related to the DOJ's
> wholesale prices for 14 chemotherapy drugs and 3 clotting
> factors…Therefore, you are not to consider at this time using the DOJ data
> for these drugs.[26]

These examples demonstrate that HCFA and the government can reduce costs when they find it appropriate to do so.

    16.    In summary, the evidence shows that the federal government chose to base Medicare reimbursement on AWP with extensive knowledge of the widely varying differences between AWP and provider acquisition costs. To use Dr. Hartman's terminology, this was the government's "revealed preference."

### 2. Medicare possesses competitive leverage

    17.    Where a payor has competitive leverage—either because of the payor's size and ability to channel beneficiaries or the extent of competition among providers or both—economic theory predicts that the payor would achieve competitive outcomes, even in the face of the alleged "AWP scheme."[27] One effective way that large payors exercise their competitive leverage is to implement take-it-or-leave-it offers to providers.[28] Bargaining theory predicts that a knowledgeable buyer, such as Medicare, will achieve competitive outcomes by implementing a take-it-or-leave-it offer.[29] According to economist Paul Feldstein, author of a widely used textbook on health care economics:

> Medicare is such a large purchaser of physician services (accounting for about
> 20 percent of total physician expenditures), that it is a monopsonist, that is,
> Medicare is a price setter because it can set the price it pays for physician

---

[25]    Members' of Congress Letter to Donna Shalala (HHS), July 14, 2000 (DX 1085).

[26]    HCFA Program Memorandum to Intermediaries/Carriers, September 8, 2000 (DX 1091).

[27]    Berndt Report, p. 111 (DX 1275). See also Sorensen, Alan T., "Insurer-Hospital Bargaining: Negotiated Discounts in Post deregulated Connecticut," *Journal of Industrial Economics*, Vol. 51, No. 4, December 2003, p. 488 (DX 1246).

[28]    For a discussion of buyer market power and take-it-or-leave it offers in the healthcare industry, see Roger D. Blair and Jeffrey L. Harrison, *Monopsony: Antitrust Law and Economics*, Princeton U. Press 1993, pp. 23, 73-75 (DX 1241).

[29]    Tirole, Jean, *The Theory of Industrial Organization*, MIT Press 1994, p. 23 (DX 1234). I note that obtaining competitive outcomes through take-it-or-leave-it offers does not require payors to be knowledgeable. See *Merits Report and Declaration of Eric M. Gaier, Ph.D.*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, March 21, 2006 ("Gaier Merits Report and Declaration"), Section IV.2 (DX 1277).

services … the physician is thus a 'price taker' in the Medicare (and Medicaid) markets…[30]

18.     Medicare is able to implement take-it-or-leave-it contracting because of its competitive leverage relative to providers. Providers merely can elect to participate or not to participate in the Medicare program.[31] Those that agree to participate accept Medicare's allowed amounts as payment in full as there is no provision for further negotiation between providers and Medicare. Non-participating providers receive lower reimbursements from Medicare than participating providers and face increased collection risk for the balance, which they must recover directly from the beneficiaries.[32] Because beneficiaries pay more to non-participating providers than participating providers, they have strong incentives to patronize participating providers. As a result, physicians have strong incentives to participate with Medicare in order to attract Medicare beneficiaries. Indeed, during 2005, 90 percent of physicians and other practitioners administering services to Medicare beneficiaries were billing under a participation agreement.[33]

19.     Medicare also has competitive leverage relative to providers because of its size and ability to channel a large number of beneficiaries to participating providers. Medicare is the largest payor of physician-administered drugs and services. Throughout the relevant time period, Medicare Part B covered more than 15 percent of the U.S. population covered by insurance.[34] By comparison, WellPoint, Inc.—the nation's largest private managed-care organization—insured 26 million beneficiaries, representing 11 percent of the U.S. population covered by insurance in 2004.[35] In Massachusetts, Medicare covered between 15 and 18 percent of the insured population.[36] Throughout

---

[30]   Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, p. 233 (DX 1237).

[31]   http://www.cms.hhs.gov/cmsforms/downloads/cms460.pdf (DX 1309).

[32]   Providers contracting with Medicare may be participating, and accept Medicare's allowed charge as payment in full for all of their Medicare patients, or may elect to be non-participating, which permits providers to make assignment decisions on a case-by-case basis. Under a non-participating arrangement, Medicare approves only 95 percent of its Part B payment ("approved amount"), but the provider may bill patients for up to 115 percent of the approved amount (in effect, the allowed charge is 115 percent of 95 percent, or 109.25 percent, of the normal fee). The patient is responsible for paying the difference between the provider charge and the Medicare approved amount.

[33]   http://www.cms.hhs.gov/cmsforms/downloads/cms460.pdf, p. 1 (DX 1309).

[34]   Data for total population insured from http://www.census.gov/hhes/www/hlthins/historic/hihist4.html (DX 1338). Data for Medicare Part B enrollment from Centers for Medicare and Medicaid Services, "Medicare Enrollment: National Trends 1966–2003, Supplementary Medical Insurance." See http://new.cms.hhs.gov/MedicareEnRpts/Downloads/SMI.pdf (DX 1294).

[35]   http://www.aishealth.com/Market Data/MCEnrollment/MCEnrol_mc01.html (DX 1332).

[36]   State population data from http://www.census.gov/hhes/www/hlthins/historic/hihist4.html (DX 1338). State Medicare enrollment data from http://www.cms.hhs.gov/MedicareEnRpts/Downloads/Trends99-03.pdf (DX 1298), http://www.cms.hhs.gov/MedicareEnRpts/Downloads/Trends96-99.pdf (DX 1283),

the class period, Part B expenditures constituted approximately six to seven percent of national healthcare expenditures.[37] For instance, in 2002, Medicare spent $8.5 billion on Part B prescription drugs, nearly five percent of national prescription drug spending for that year.[38]

20.     Moreover, many physicians derive a large portion of their revenues from Medicare payments. More than half of oncologists responding to a survey report Medicare beneficiaries represented 40 percent or more of their patients.[39] Similarly, Dr. Ernst Berndt, citing to a 2001 American Society of Clinical Oncology ("ASCO") article, states, "notably, about half of all cancer patients are covered by Medicare."[40] This gives Medicare competitive leverage.

21.     Medicare has greater competitive leverage than TPPs because Medicare does not risk losing beneficiaries to other health plans. Medicare, which provides health care coverage primarily to the elderly and disabled, covers a demographic group very different from groups covered by private TPPs. Medicare's beneficiaries represent 98 percent of the population over 65 years of age. These beneficiaries have lower average incomes than beneficiaries covered by private TPPs.[41] Most Medicare beneficiaries do not have an alternative to Medicare insurance and are thus captive to Medicare policies.[42] This gives Medicare a strong ability to channel its captive beneficiaries, allowing Medicare to have significant competitive leverage over providers.

### 3.     There are economic reasons unrelated to the alleged "AWP scheme" for Medicare to establish reimbursement rates that exceed EAC

22.     Medicare sets Part B reimbursement by balancing its interest in reducing expenditures with two objectives: (1) providing its beneficiaries broad access to providers by ensuring that the total amount paid for drugs and services is adequate and (2) ensuring that office-based treatment

---

http://www.cms.hhs.gov/MedicareEnRpts/Downloads/Trends85-95.pdf,
http://www.cms.hhs.gov/MedicareEnRpts/Downloads/01All.pdf (DX 1287),
http://cms.hhs.gov/MedicareEnRpts/Downloads/02All.pdf (DX 1291), and
http://www.cms.hhs.gov/MedicareEnRpts/Downloads/03All.pdf (DX 1299).

[37]     The national health expenditures data come from
http://www.cms.hhs.gov/NationalHealthExpendData/downloads/nhe2004.zip (DX 1279). Medicare Part B expenditures data come from http://www.cms.hhs.gov/ReportsTrustFunds/downloads/tr2005.pdf, p. 81 (DX 1304).

[38]     http://www.medpac.gov/publications/congressional_reports/June05DataBookSec11.pdf, p. 173 (DX 1307). Also see http://www.uspharmacist.com/index.asp?show+article&page=8_1148.htm (DX 1356).

[39]     http://www.asco.org/portal/site/ASCO.menuitem.v543a013502b2a89se912310320041a0/
?vgnextoid_dad28c393c458010VgnVCM100000ed730a1RCRD (DX 1355).

[40]     Berndt Report, p. 49 (DX 1275).

[41]     Centers for Medicare and Medicaid Services, "Medicare Enrollment: National Trends 1966-2003, Hospital and/or Supplementary Medical Insurance" and U.S. Census Data, 2000 (DX 1294).

[42]     http://thomas.loc.gov/medicare/rogerstest.html, p.3 (DX 1342).

is not shifted to the more expensive hospital setting.[43] The evidence shows that Medicare was aware of the implications of insufficient reimbursements. A 1992 U.S. General Accounting Office ("GAO") report states:

> [O]ncologists we interviewed consistently stated that their choice of treatment setting (once patient welfare is taken into account) often hinges on whether they expect reimbursement to be adequate if treatment is provided in the office setting… HCFA's reimbursement policies for chemotherapy have unintended consequences that extend beyond whether and how much oncologists are reimbursed by Medicare. Specifically, the policies may affect where a cancer patient gets treated and, as a result, Medicare costs for the patient's care.[44]

In 2004, Leslie Norwalk, acting deputy administrator of the Centers for Medicare and Medicaid Services ("CMS"),[45] addresses the issue of adequate reimbursements: "I want to pay the physician the right amount to keep the patient in the physician's office."[46]

       23.    Medicare's proposed decreases in reimbursements have met with significant resistance from providers and Congress. For instance, a 2003 ASCO survey shows that, in response to a bill passed in that year by the Senate to lower reimbursements, 73 percent of oncologists would send patients to hospitals, 53 percent would reduce patient intake, 44 percent would retire early, and 19 percent would stop seeing patients altogether.[47] In another example, decreases in physician service fees have been planned each year since 2002 as a result of the sustainable growth rate ("SGR") mechanism, which is designed to restrain physician service fees in order to keep the overall Medicare budget within targets.[48] MedPAC reports, "For 2003, payments should remain adequate as long as the Congress changes current law to prevent the 4.4 percent payment reduction from taking effect."[49] Since 2003,

---

[43]   Feldstein states, "The impetus of changes in [Medicare's] physician reimbursement came from two sources. The first, and most important, was the federal government, whose interest was (and still is) in reducing Medicare Part B expenditures… The government, however, was constrained in achieving this objective by not having a large number of physicians drop their Medicare participation." See Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, p. 249 (DX 1237).

[44]   General Accounting Office Report to the Chairman, Committee on Finance, U.S. Senate, "Medicare: Reimbursement Policies Can Influence the Setting and Cost of Chemotherapy," GAO/PEMD-92-28, July 1992, pp. 3, 5 (DX 1905).

[45]   In 2001, HCFA changed its name to CMS. See http://www.amda.com/federalaffairs/newsletters/august 2001/hcfa_cms.htm (DX 1349).

[46]   Gardiner, Harris, "Among Cancer Doctors, a Medicare Revolt," *nytimes.com*, March 11, 2004, p. 3 (DX 1930).

[47]   http://www.asco.org/portal/site/ASCO.menuitem.v543a013502b2a89se912310320041a0/ ?vgnextoid_dad28c393c458010VgnVCM100000ed730a1RCRD (DX 1355).

[48]   Congressional Budget Office, "Medicare's Physician Payment Rates and the Sustainable Growth Rate," July 25, 2006, pp. 8-9.

[49]   MedPAC, "Report to Congress: Medicare Payment Policy," March 2003, p. 72 (DX 1954). See

however, the annual decreases in physician fees calculated by the SGR mechanism have been averted by Congress, resulting in either no change or small increases in physician service reimbursements.[50]

24.     Moreover, throughout the class period, Medicare's drug reimbursements have subsidized underpayment for services. This cross-subsidization was recognized by both Medicare and other government agencies. As Dr. Berndt highlights in his report, in response to the June 1991 HCFA proposal to reimburse drugs at 85 percent of AWP:

> [O]ncologists argued that reimbursing them at less than AWP would not cover chemotherapy administration costs, such as mixing powdered toxic chemotherapies in an appropriate solution, "pushing" or infusing the drugs into the patient, consulting with the patient, providing family and grief counseling, managing patient side effects, and maintaining proper inventories.[51]

A letter from Nancy-Ann Min DeParle, HCFA Administrator, to Congress in 2000, states:

> [W]e have concluded that Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate.
>
> [W]e intend to propose modifications … that would increase payments for cancer chemotherapy administration. Our goal would be to have more accurate pricing for both chemotherapy drugs and chemotherapy administration in place at the same time.[52]

A letter from Senators Christopher Bond and John Ashcroft to Donna Shalala, Secretary of HHS, in 2000 states:

> According to our oncologists … this margin pays for wastage, spillage, and administrative costs … for which they say they are inadequately reimbursed. They tell us that, although Medicare makes a payment for chemotherapy administration services, the payment is only a fraction of what is necessary to cover their expenses and they use payment amounts for drugs to help cover these expenses.[53]

---

http://www.medpac.gov/publications/congressional_reports/Mar03_Ch2B.pdf (DX 1297).

[50]  Congressional Budget Office, "Medicare's Physician Payment Rates and the Sustainable Growth Rate," July 25, 2006, pp. 9-10.

[51]  Berndt Report, pp. 50-51 (DX 1275). Internal citations omitted.

[52]  Letter from Marjorie Kanof, Deputy Director of Medicare Contractor Management Center for Beneficiary Services to Regional Administrators attaching Nancy-Ann Min DeParle's letter to Congress. See AWP041-0943-46 (DX 1880).

[53]  Letter from Senators Christopher S. Bond and John Ashcroft to Secretary of HHS, Donna E. Shalala, August 3, 2000 (DX 1087).

In 2001, HCFA acknowledges that reimbursements for drugs "subsidize associated, non-reimbursed costs, such as storage and administration" and "provide other important services that are not adequately compensated."[54] In 2002, Tom Scully, former CMS administrator, acknowledges: "Providers rely on cross-subsidies to survive in the Medicare business. The basis for service payments does not fully … consider all the practice expenses for oncologists because of the acknowledged cross subsidy from AWP overpricing."[55] A GAO report in 2002 states: "If drug payments are tied closer to providers' likely acquisition costs, Medicare would need to ensure that separate and appropriate payments are made to pay for the administration and delivery of covered drugs."[56]

  25. In 2003, Congress passed the Medicare Prescription Drug Improvement and Modernization Act of 2003 ("MMA"), which decreased drug reimbursements (as a result of the switch from an AWP-based methodology to an ASP-based methodology) and at the same time increased service payments. The MMA underscores Medicare's historical cross-subsidization of drugs and services and demonstrates that drug reimbursements cannot be considered in isolation from service payments when determining whether Medicare overpaid for prescription drugs as a result of the alleged "AWP scheme." As Dr. Berndt notes:

> What is apparently clear is that in recognition of the AWP-related cross-subsidy provided to physicians administering Medicare Part B drugs, Medicare is also increasing physician service fees; in the case of inhalation drugs delivered by nebulizers, for example, the dispensing fee has increased from $5 to $57.[57]

  26. For 2004, drug reimbursements generally decreased from 95 to 85 percent of the AWP (determined as of April 1, 2003).[58] Simultaneously, payments for services increased through changes to components of the Physician Fee Schedule ("PFS"), such as increased relative value units ("RVUs") for certain drug administration services and a 32 percent "transitional adjustment" for some drug administration services.[59] For 2005, drug reimbursements were changed to 106 percent of the

---

[54] Department of Health and Human Services, Office of Inspector General, "Medicare Reimbursement of Prescription Drugs," January 2001, Appendix F (DX 1094).

[55] See citation of Tom Scully's testimony before the Senate, "Medicare drug pricing fix could threaten physician pay" (DX 1102). Also see http://www.ama-assn.org/amednews/2002/04/01/gvse0401.htm (DX 1260).

[56] Dummit, Laura A., "Medicare Outpatient Drugs: Program Payments Should Better Reflect Market Prices," GAO-02-531T, March 2002, p. 13.

[57] Berndt Report, p. 52 (DX 1275). Internal citations omitted.

[58] The AWP used for 2004 reimbursements was fixed to the April 1, 2003 AWP. See 69 Fed. Reg. p. 1083, at p. 1086 (January 7, 2004) (DX 1859).

[59] 69 Fed. Reg. p. 1083, at p. 1099 (January 7, 2004).

ASP.[60] Simultaneously, service payments increased through changes to the PFS, such as coding revisions for certain drug administration services.[61] From 2004 to 2006, certain budget neutrality requirements were waived under the MMA, permitting larger increases in service payments than in previous years.[62] In addition to the implementation of the MMA, CMS established a $300 million demonstration program for oncologists for 2005 and a $150 million demonstration program for oncologists and hematologists for 2006.[63]

27.     While drug reimbursement has declined and service reimbursement has increased under the MMA, physicians have also increased the volume and intensity of services. For example, Mark Miller, the Executive Director of MedPAC, testifies before Congress:

> We estimate that physicians provided 13 percent more chemotherapy sessions in 2005 than in 2004. CMS changed its rules to allow physicians to bill more codes for each chemotherapy session, so the number of services has increased faster than the number of sessions, by 33 percent from 2003 to 2005.
>
> We estimate that the number of beneficiaries receiving chemotherapy in physician offices increased 7.5 percent in 2005, based on the most conservative assumption. No matter what set of assumptions we used, Medicare beneficiaries received an increasing number of chemotherapy sessions in physician offices from 2003 to 2005.[64]

28.     Moreover, when the MMA was passed, some experts predicted that the decision to base reimbursement on 106 percent of ASP would cause drug prices to rise. For example, Danzon et al. predicted that drug prices would rise because manufacturers will reduce discounts and because

---

[60]   As stipulated by Medicare, ASPs are based on data reported from two quarters prior and are calculated as sales to all purchasers (exempting sales related to Medicaid Best Price and rebate) less discounts and rebates, divided by total units. For single-source drugs, the applicable ASP is the lesser of the ASP and WAC. See 70 Fed. Reg. p. 10745, at p. 10748 (March 4, 2005). See http://www.communityoncology.org/Portals/coa/Documents/HR4098_Section_Analysis.doc (DX 1305).

[61]   69 Fed. Reg. p. 66235, at. p. 66406-66407 (November 15, 2004) (DX 1303).

[62]   MMA Sec 303. Also see http://www.cms.hhs.gov/media/press/release.asp?Counter=712 (DX 1353).

[63]   In 2005, oncologists received $130 per patient per day for asking four questions regarding patient comfort. See http://www.cms.hhs.gov/media/press/release.asp?Counter=1244 (DX 1360). In 2006, oncologists and hematologists received $23 per patient per day to report the purpose of the visit, the state of the disease, and adherence to clinical guidelines. Also see Testimony of Mark McClellan, Administrator, Centers for Medicare and Medicaid Services, Testimony before the Subcommittee on Health of the House Committee on Energy and Commerce, July 27, 2006, pp. 15-16. Also see ASCO, "Future of the Oncology Demonstration Project and Payment for Quality," September 15, 2006, pp. 6-10.

[64]   Statement of Mark Miller, Ph.D., Executive Director, Medicare Payment Advisory Commission Testimony Before the Subcommittee on Health of the House Committee on Ways and Means, July 13, 2006, pp. 6-7 (DX 1370).

physicians will no longer have an incentive to use the lowest priced drug among therapeutic substitutes.[65] Dr. Berndt makes a similar point:

> If manufacturers have reason to believe *ex ante*, however, that a potential purchaser is likely to report publicly and truthfully the 'secret' prices tendered to it, the manufacturers are less likely to offer 'secret' discounts in the first place.[66]

Consistent with these predictions, Mark Miller testifies before Congress:

> Our analysis of prices paid by physicians showed that price variation for our basket of drugs declined between the first and third quarters of 2005.
>
> The range for single source chemotherapy drugs—small to begin with— narrowed least, falling from 6.9 percent to 5.2 percent. The biggest change was in the range for drugs used to treat the side effects of chemotherapy. That range declined 25.3 percent in the first quarter to 10.3 percent third quarter...[67]

Similarly, the FTC also advises the California Assembly that a proposed law requiring greater transparency in Pharmacy Benefit Manager ("PBM") pricing was "more likely to undermine competition than promote it."[68] In addition, the Federal Trade Commission ("FTC") states that a regulation requiring transparency in wholesale pricing of alcoholic beverages in Massachusetts actually decreased the level of competition.[69]

29.     As shown in DX 1496, annexed hereto at Attachment 3, despite a shift from AWP-based reimbursements to ASP-based reimbursements, CMS estimates that Part B expenditures per beneficiary have increased since 2004 at among the highest rates during the last decade.[70] Thus, based upon the MMA experience, it cannot be concluded that Medicare's reimbursements for drugs and services under Part B would have been any lower during the class period if AWPs had more closely approximated acquisition costs.

---

[65]   Danzon, Wilensky, and Means, "Alternative Strategies for Medicare Payment of Outpatient Prescription Drugs -- Part B and Beyond," pp. 20-21 (DX 1923).

[66]   Berndt Report, p. 78 (DX 1275).

[67]   Statement of Mark Miller, Ph.D., Executive Director, Medicare Payment Advisory Commission Testimony Before the Subcommittee on Health of the House Committee on Ways and Means, July 13, 2006 (DX 1370).

[68]   Letter from FTC Bureau of Competition to Assembly Member Greg Aghazarian, September 7, 2004, p. 12 (DX 1952).

[69]   Statement of Phoebe Morse, Direct of Boston Regional Office FTC of the Commonwealth of Massachusetts Alcoholic Beverages Control Commission, June 26, 1996 (DX 1365). See http://www.ftc.gov/os/1996/06/morese_st.pdf (DX 1365).

[70]   2006 Annual Report of the Boards of Trustees of the Federal Hospital Insurance and Federal Supplementary Medical Insurance Trust Funds, p. 160 (DX 1367).

### 4.      Conclusion

30.      On the basis of Medicare's knowledge, competitive leverage, desire to maintain access to Medicare-participating providers for its beneficiaries, desire to reduce utilization of higher cost alternatives such as hospitalization, and historical reliance on drug payments to subsidize underpayment of physician services, I conclude that Medicare did not overpay for drugs as a result of the alleged "AWP scheme" and suffered no economic harm. It therefore follows that TPPs that make coinsurance payments under Medicare Part B also suffered no economic harm as a result of the alleged "AWP scheme."

### B.      Drug reimbursement by TPPs outside the Medicare context

31.      Class 3 consists of Massachusetts TPPs that reimburse for physician-administered Track 1 subject drugs based on AWP and Massachusetts individuals who pay coinsurance on these drugs based on AWP. Individuals who pay coinsurance pay a percentage of the amount that their respective health plans (i.e., the TPPs) pay for physician-administered drugs. Therefore, by assessing whether TPPs were economically harmed by the alleged "AWP scheme," one can also determine whether these individuals were harmed.

### 1.      TPPs are typically knowledgeable and sophisticated

32.      One way to determine whether the TPPs knew about the difference between AWP and provider acquisition cost is to consider whether payors purchased subject drugs and, if so, whether they paid discounted prices for such drugs. In fact, the evidence demonstrates that Massachusetts TPPs—who collectively cover 70 percent of insured individuals in Massachusetts—bought physician-administered drugs throughout the class period and paid prices that generally approximated ASP. For example, plaintiff Blue Cross Blue Shield of Massachusetts ("BCBS-MA") purchased physician-administered drugs to supply its staff/group-model Health Maintenance Organizations ("HMOs"), Medical East/Medical West.[71] Sales data from the Track 1 defendants show that four of the top five Massachusetts TPPs—plaintiff BCBS-MA (46 percent of covered lives in Massachusetts), Harvard Pilgrim Health Care, Inc. ("Harvard Pilgrim") (15 percent of covered lives), CIGNA Health Care of Massachusetts, Inc. ("CIGNA") (5 percent of covered lives) and Fallon Community Heath Plan ("Fallon") (4 percent of covered lives)—purchased physician-administered drugs directly through contracts with manufacturers, Group Purchasing Organizations ("GPOs"), or drug wholesalers.[72] DX

---

[71]   Deposition of Maureen Coneys of BCBS-MA ("Coneys deposition"), pp. 42-51.

[72]   Information about Massachusetts TPP covered lives from Atlantic Information Services ("AIS") Directory of Health

1373, annexed hereto at Attachment 4, shows the volume of Track 1 subject drugs purchased by Massachusetts TPPs from each manufacturer.

33.     These Massachusetts TPPs purchased the subject drugs at discounted prices that are generally at—and in some case below—the ASPs calculated by Dr. Hartman. DX 1374-DX 1376 and DX 1378-DX 1388, annexed hereto at Attachments 5 to 18, depict AWP and ASP from Dr. Hartman's December 15, 2005 Declaration along with average discounted prices paid by the Massachusetts TPPs for some of the subject drugs. These exhibits show that at least four of the five largest TPPs, including plaintiff BCBS-MA, knew that the subject drugs were available to providers at substantial discounts off AWP since at least 1991 because they purchased these drugs directly from manufacturers and wholesalers at discounted prices.[73]

34.     DX 1389-DX 1403, annexed hereto at Attachments 19 to 33, depict the markups of AWP over the acquisition prices obtained by Massachusetts TPPs for Track 1 drug purchases.[74] The exhibits demonstrate that these TPPs were aware of the widely varying differences between AWP and provider acquisition costs and had knowledge of "spreads" in excess of the 30 percent yardstick employed by Dr. Hartman. For example, plaintiff BCBS-MA observed "spreads" on Proventil in 1991 of 57 percent, on Albuterol in 1994 of 163 percent, on Perphenazine in 1996 of 271 percent, and Vepesid in 1997 of 1,265 percent.

35.     These Massachusetts TPPs also would have known about the relationship between AWP and provider acquisition costs because many hired personnel who were clinical administrators or practicing physicians to manage their provider networks. For example, John Fallon, M.D., Chief Physician Executive at plaintiff BCBS-MA, oversees the company's medical policies, acts as the main liaison with the plan's provider network, and manages the regional medical directors. Prior to joining plaintiff BCBS-MA, Dr. Fallon was the chairman of Partners Community HealthCare, Inc.—a physician network—where he interacted with community physicians and academic medical centers to integrate them into risk and non-risk contracts, oversaw payor negotiations, and developed programs to address escalating pharmacy costs.[75] Similarly, Lee Newcomer, M.D., Business Leader of Oncology Services at United HealthCare, has been associated with United HealthCare since 1991. Dr. Newcomer is also a

---

Plans, MCO State Enrollment table, 2004.

[73]   This knowledge is further reflected in contracts between plaintiff BCBS-MA and AstraZeneca for purchase of Zoladex at discounts off WAC as high as 41 percent (see AZ Defendant's Exhibit 2094).

[74]   Markups are the differences between Dr. Hartman's AWPs and the Massachusetts TPP acquisition prices, expressed as a percentage of the acquisition prices.

[75]   http://mahp.com/news/fallonbio/html (DX 1329).

board-certified medical oncologist with nine years of practical experience.[76] Dr. Newcomer testified as follows regarding the margins that oncologists earn from drug reimbursements:

> Q.    Okay. Do you have a broad sense as to what proportion of the revenue to the practice was based on that differential between drug purchase price and reimbursements?
>
> A.    I—I would put the range between 25 and 50 percent.[77]

36.    Plaintiffs have suggested that there is no proof that information about discounted drug prices was communicated to persons responsible for establishing reimbursement rates. However, testimony from at least one TPP contradicts plaintiffs' claim directly. Specifically, Eric Cannon, Director of Pharmacy Services for Intermountain Health Care Health Plans ("IHC") states, "If you wanted to find out the pricing of products purchased by IHC Health Services, you'd just pick up the phone or walk across the hall."[78] Mr. Cannon testifies that there were communications between the provider relations department and the pharmacy services department concerning physician-administered drug prices and that such communications led to changes in some reimbursements.[79] Similarly, Edward Curran, the former Director of Pharmacy for plaintiff BCBS-MA, states:

> Throughout the time period I worked at BCBS/MA, my responsibilities included negotiating with drug manufacturers to get rebates and discounts on the drugs BCBS/MA purchased for use at its staff model HMO sites. I was also a signatory on those contracts once they were finalized.
>
> As discussed above, I worked as the Director of Pharmacy for BCBS/MA. Put another way, I was employed by BCBS/MA, not by the staff model HMO Medical East/Medical West. However, people at the staff model HMO and BCBS/MA worked closely together. Indeed, I was never quite sure whether there was a distinction between the two. I spoke to and worked with people at the staff model sites all the time, there was free sharing of information, and employees moved back and forth between the organizations. We worked together under one big umbrella.[80]

---

[76]    http://www.communityonc.com/app/homepage.cfm?appname=100474&moduleID=2994&LinkID=20724 (DX 1364).

[77]    Deposition of Lee N. Newcomer, M.D. of United Healthcare, p. 39.

[78]    Deposition of Eric Cannon of Intermountain Health Care Health Plans ("Cannon deposition"), pp. 29-30.

[79]    Cannon deposition, pp. 32-34.

[80]    *Declaration of Edward Curran, Jr.*, U. S. District Court for the District of Massachusetts, MDL No. 1456, Civil Action: 01-CV-12257-PBS, September 21, 2006, pp. 4-5.

Such evidence suggests that if TPPs had intended reimbursements to approximate acquisition costs, they had the information available to do so. Thus, there is no reason to believe that their reimbursements would have been any different if AWPs more closely approximated acquisition costs.

37.     Direct evidence from TPPs further demonstrates that they knew that the difference between AWP and provider acquisition costs varied significantly across drugs. In a letter to US Oncology, Trigon Healthcare states:

> Trigon recognizes that your acquisition cost for drugs is highly variable when expressed as a percent of the AWP. Ninety percent of AWP should provide you with substantial margins for some drugs and nearly zero margins for others. As you know, acquisition cost as a percent of AWP is much lower for the older and more established generics and multi-source brands. These relatively low-cost drugs provide substantial margins and are prominent in the established combination regimens for common malignancies…[81]

Likewise, John Killion, Senior Director of Ancillary Services at plaintiff BCBS-MA—based on his experiences at Tufts Health Plan pharmacy—states that he understood that as a result of multi-source and generic competition, manufacturers offered discounts and rebates on brand name drugs; thus, AWP did not bear a relationship to acquisition cost.[82] Jill Herbold, Assistant Vice President of Practitioner Reimbursement at CIGNA, also testifies that while drugs were typically reimbursed at 15 percent below AWP, some drugs were reimbursed at 45 percent below AWP.[83]

38.     Many TPPs also did not believe that AWP was a reliable signal for acquisition cost. For example, Edward Lemke, Director of Fee Schedule Management for Humana, testifies that he had no expectation that Humana's reimbursement was a fixed percentage above provider acquisition cost, and he knew that acquisitions costs could vary from provider to provider.[84] Michael Beaderstadt, Director of Provider Relations at John Deere Health ("John Deere"), also states that there was no consistent relationship between AWP and acquisition cost.[85] Similarly, Mickey Brown, Director of Provider Networks at Blue Cross Blue Shield of Mississippi testifies, "Average wholesale price is a

---

[81]   Letter from Keane Chan, Provider Network Consultant at Trigon Healthcare to Karen Ford Manza, Regional Director, Managed Care, at US Oncology, dated January 5, 2000 (DX 1268). See A-VA 03010065-A-VA 03010068 (DX 1127). Prior to its 2002 acquisition by Anthem Healthcare, Trigon Healthcare administered Blue Cross health plans in Virginia and held a 35 percent share of the covered lives in that state. Also see http://www.forbes.com/2002/04/29/0429anthem.html (DX 1350).

[82]   Deposition of John Killion of BCBS-MA ("Killion deposition"), p. 122.

[83]   Deposition of Jill Herbold of CIGNA ("Herbold deposition"), p. 21.

[84]   Deposition of Edward Lemke of Humana ("Lemke Deposition"), pp. 123–124.

[85]   Deposition of Mike Beaderstadt of John Deere ("Beaderstadt deposition"), pp. 72–73.

point of reference that we use. It's [*sic*] relation to acquisition cost, I'm not familiar with. So, I mean, I don't have an expectation one way or the other on that."[86] Likewise, Joseph Spahn, Senior Health Care Consultant for Anthem Midwest, states that Anthem had no expectation that providers' acquisition costs would be a fixed percentage—i.e., 10 percent, 30 percent, 50 percent—above the Anthem reimbursement amount.[87] Anthem would not change its drug reimbursement to a particular provider even if it learned that the provider got a discount or rebate that lowered the drug acquisition costs.[88]

39.     TPPs also had access to publicly available information that revealed the differences between AWP and provider acquisition costs including the OIG reports, the *Barron's* article, FSS pricing, and the HCFA and Congressional statements that I discussed earlier.

40.     In 2004, plaintiff BCBS-MA undertook a detailed analysis of Medicare's transition to an ASP-based methodology and considered four options for its own contracting—one of which was to adopt ASP-based contracts like Medicare. Based on its analysis, plaintiff BCBS-MA found that a transition to ASP-based reimbursements would be "administratively easy to maintain" and would save over $6 million per year.[89] Although plaintiff BCBS-MA knew the differences between AWP and ASP, plaintiff BCBS-MA chose to continue reimbursing drugs based on AWP and, in fact, extended its use of AWP-based reimbursements to the hospital outpatient setting in October 2005.[90] This evidence demonstrates that it was plaintiff BCBS-MA's "revealed preference" to continue to use AWPs even though ASP information was readily available. Thus, there is no reason to believe that plaintiff BCBS-MA's reimbursements would have been any lower if AWPs more closely approximated ASPs.

41.     Dr. Hartman has suggested that TPPs did not change their reimbursement systems because their reimbursement systems were "hard-wired" to AWP.[91] There is no evidence of that. Many payors updated their reimbursement systems on a regular basis or possessed the capability to do so.[92] For example, plaintiff BCBS-MA's pricing unit can generally make fee schedule changes within 30

---

[86]   Deposition of Mickey Brown of BCBS Mississippi ("Brown deposition"), pp. 126–127.

[87]   Deposition of Joseph Spahn of Anthem Midwest ("Spahn deposition"), pp. 93–98.

[88]   Spahn deposition, p. 98.

[89]   Blue Cross Blue Shield of Massachusetts, "Analysis of CMS Average Wholesale Price Reform, Reimbursement for Part B Drugs," December 15, 2004. See BCBSMA-AWP-11606 (DX 994).

[90]   Mulrey deposition, p. 139. Also see Deposition of Sheila R. Cizauskas of BCBS-MA, p. 125.

[91]   Hartman deposition, Vol. III, p. 762-768, 792, 806, 844-845.

[92]   Even if those systems are "hard-wired" to AWP, reimbursements can be raised or lowered easily by adjusting the discount from AWP.

days.[93] In some instances, fee schedule changes requiring updates to "thousands of codes" could take up to six months. Such updates to the fee schedule have occurred on an annual basis since plaintiff BCBS-MA began following the Medicare RBRVS methodology in 1995.[94] Similarly, John Deere sends new fee schedules, including fees for injectable drugs, to its participating physicians every year and made several significant changes to its reimbursement methodology during the class period.[95] BCBS Mississippi also updated its professional reimbursement schedule annually, adjusting "individual codes based on market concerns."[96] CIGNA adjusts its overall reimbursement level up or down to remain competitive based on an external review of its competitive position.[97]

42.     Both Drs. Hartman and Rosenthal assert that TPPs were unaware of the considerable information about physician-administered drugs because of what they call "the importance of being unimportant."[98] However, I find that spending on physician-administered drugs is neither small nor unimportant. For example, between 1998 and 2003, Oxford Health Plans ("Oxford") processed an annual average of approximately 214,000 physician-administered drug claims worth about $70 million annually.[99] During that time, its spending on those drugs rose at a rate of 12 percent per year. Plaintiff BCBS-MA, which has nearly 50 percent more beneficiaries than Oxford, likely spent considerably more on physician-administered drugs.[100] Therefore, even a fraction of a percent savings on physician-administered drugs would have justified the salary of staff members to research acquisition costs. Moreover, spending on physician administered drugs has risen rapidly during the class period, which, according to Dr. Berndt, would attract "considerable attention."[101]

2.     **Massachusetts TPPs possess competitive leverage**

43.     As shown in DX 1415, annexed hereto at Attachment 34, the provision of health insurance in Massachusetts is relatively concentrated, with approximately 86 percent of the covered

---

[93]   Deposition of Lisa Gorman of BCBS-MA, p. 143.

[94]   Deposition of Steven Fox of BCBS-MA ("Fox deposition"), pp. 259, 261.

[95]   Beaderstadt deposition, pp. 45-51, 57-60, 65-67.

[96]   Brown deposition, p. 43.

[97]   Herbold deposition, p. 79.

[98]   Hartman deposition, Vol. III, p. 675.

[99]   Oxford operates in New York, New Jersey, and Connecticut and represented 1.51 million covered lives in 2001. See Oxford 2001 SEC 10K filing and medical reimbursement information (DX 1254).

[100]  AIS, Directory of Health Plans, 2004, MCOs table. Because plaintiff BCBS-MA provided data for only 34 selected J-Codes, it is not possible to do an analysis of its overall physician-administered drug spending. It nevertheless spent up to $14.7 million per year on those 34 J-codes, and realized more than a ten-fold increase in spending on them over the eight years from 1995 to 2003.

[101]  Berndt Report, p. 47 (DX 1275).

lives insured by five TPPs. Indeed, plaintiff BCBS-MA is the largest TPP in Massachusetts, insuring approximately 46 percent of the covered lives in 2004. As in the case of Medicare, economic theory predicts that large and sophisticated TPPs implementing take-it-or-leave-it offers would achieve competitive outcomes regardless of any alleged "AWP scheme." Dr. Hartman asserts that the alleged "AWP scheme" would have affected reimbursements because of what he characterizes as bilateral bargaining between TPPs and providers. However, Dr. Hartman's characterization of the competitive dynamic is incorrect. For example, Michael Mulrey of plaintiff BCBS-MA testifies:

> A.    [W]e provide our providers with a contract and fee schedules, and it is their decision whether or not they choose to sign it.
>
> Q.    What negotiation of the fee schedule amounts does Blue Cross/Blue Shield of Massachusetts engage in with physicians, if any?
>
> A.    None.[102]

The American Medical Association ("AMA") also notes the relatively weak position of physicians: "As we have testified previously, the reality is that physician reimbursement rates are often contractually imposed by powerful health plans in a take-it-or-leave it manner."[103] Payors also acknowledge these practices: "Among the plethora of complaints BCBS [of Texas] faced in 2001 were that it refused to negotiate contract terms with medical practices and instead proposed take-it-or-leave-it contracts…"[104] Indeed, plaintiff BCBS-MA has been characterized as a monopsonist in provider markets and faced legal challenges based on its take-it-or-leave-it pricing practices.[105]

44.    In addition, many contracts give TPPs the ability to "deselect" high-cost providers from their network. An Aetna contract states: "This Agreement may be terminated without cause by Company upon at least 90 days prior written notice to the Provider."[106] Such agreements are enforced by

---

[102]   Mulrey deposition, pp. 54-55.

[103]   AMA, Statement to the FTC and DOJ- Hearings on Health Care Competition Law and Policy, Washington D.C., September 24, 2003, available at http://www.ftc.gov/os/comments/healthcarecomments2/030924ama.pdf, p. 1 (DX 1300).

[104]   Blue Cross Blue Shield of Texas reproduced Walt Borges, "Mo' Better Blues: Critics Say Blue Cross Blue Shield Has Improved," *Texas Medicine* on its website at http://www.bcbstx.com/about/pdf/MoBetterBluesarticle.pdf, p. 1 (DX 1248).

[105]   Blair, Roger D. and Jeffrey L. Harrison, *Monopsony: Antitrust Law and Economics,* Princeton Univ. Press, Princeton 1993, p. 75 (DX 1241).

[106]   Aetna Physician Group Agreement, 3/1/2004. See AET 004446 (DX 1271).

payors. For example, the *New York Times* reports that "[m]any doctors say they cannot reject contract terms for fear of being dropped by plans that control hundreds of their patients."[107]

45.     The TPPs' competitive leverage over providers also is reflected in the decreasing reimbursement trend observed in Massachusetts in the face of rising costs for physicians. According to the Massachusetts Medical Society:

> Physician practices have suffered 10 [1990 to 1999] years of flat or declining reimbursements from managed care companies, Medicaid, and Medicare … Unless this trend is reversed, many practices are on a collision course with financial disaster.
>
> …
>
> Professional practice expenses have been rising very rapidly. In 1998 alone, the average physician practice in Massachusetts saw its expenses rise 29%, compared to a national average of 15%.[108]

Decreasing reimbursements coupled with rising costs have led to lower operating margins for office-based providers.

46.     Dr. Rosenthal asserts that competition among providers is constrained by barriers to entry imposed by the AMA through limits on medical school capacity and other aspects of medical education and licensing.[109] However, she fails to acknowledge that since 1980, the per-capita number of physicians in the United States has grown by 40 percent while the per-capita number of specialists like radiation oncologists has grown by almost 100 percent.[110] In Massachusetts, the number of physicians per capita has increased by 54 percent while the aggregate number of physicians has grown by almost 70 percent over the same period.[111] As Paul Feldstein points out, "their excess capacity made physicians more willing to discount their fees for an increase in patients."[112] As a result, "the decline in physician

---

[107]   Freudenheim, Milt, "Insurers Tighten Rules and Reduce Fees for Doctors," New York Times, June 28, 1998, p. 2 (DX 1250).

[108]   Massachusetts Medical Society, "Critical Condition: Physician Practices and the Future of Massachusetts Health Care," 2001, pp. 3, 10 (DX 1255).

[109]   Rosenthal Liability Report, p. 13.

[110]   U.S. Department of Health and Human Services, Health Resources & Services Administration, *United States Health Workforce Personnel Factbook*, Table 202, based on AMA Physicians' Professional Data. Available at http://bhpr.hrsa.gov/healthworkforce/reports/factbook02/FB102.htm (DX 1251).

[111]   Area Resource File 2004 and U.S. Census. Only non-federal physicians are included. Medical specialists are calculated as total physicians minus general practice physicians that are office-based.

[112]   Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, p. 243 (DX 1237).

fees during the 1990s was likely the result of increasing competitive pressures occurring among physicians."[113]

47.      Dr. Rosenthal further contends that competition between providers has not been effective in defeating the purported effects of the alleged "AWP scheme." She cites two statistics to support that conclusion.[114] First, Dr. Rosenthal reports that medical oncologists made upwards of $479,000 in 2001. However, Dr. Rosenthal fails to acknowledge that oncologists often earn less than other specialty physicians in which large investments in education and training are required (see DX 1404, annexed hereto as Attachment 35). Second, she asserts that one study concluded that two thirds of the income of practice-based medical oncologists came from reimbursements for injectable drugs. However, Dr. Rosenthal's assertion is not factually correct. The study actually concluded that two thirds of an oncologist's income stems from both drug reimbursements and associated drug administration fees.[115] Since drug administration fees are not based on AWP, the evidence does not support Dr. Rosenthal's assertion that oncologists' income is consistent with plaintiffs' allegation.

48.      It is my understanding that plaintiffs contend that, even if larger TPPs have knowledge and competitive leverage, smaller payors do not. However, smaller payors also would not have overpaid for physician-administered drugs as a result of the alleged "AWP scheme" because they contract with large and sophisticated TPPs. For example, plaintiff BCBS-MA and other large Massachusetts TPPs administer the health benefit for numerous union trust funds and other smaller payors:

1.  Plaintiff Pipefitters Local # 537 uses plaintiff BCBS-MA's provider network and pays the allowed charges agreed to between plaintiff BCBS-MA and the network providers.[116]

2.  Teamsters Local 170 Health & Welfare Fund contracts with plaintiff BCBS-MA. Beneficiaries can choose between Network Blue New England and Fallon Community Health Plan.[117]

3.  Teamsters Local 25 Health & Welfare Fund contracts with plaintiff BCBS-MA and Tufts.[118] Beneficiaries can choose either the Network Blue New England or the Tufts EPO, both of which are HMOs formed by the TPP and not the union.[119]

---

[113]  Feldstein, Paul J., *Health Care Economics, 6th Edition*, Thomson, New York, 2005, p. 243 (DX 1237).

[114]  Rosenthal Liability Report, p. 14.

[115]  Smith et al., "Why Academic Divisions of Hematology/Oncology Are in Trouble and Some Suggestions for Resolution," *Journal of Clinical Oncology*, Vol. 19, No. 1 (2001), pp. 260-61 (DX 1245).

[116]  Deposition of Denise DeMaina of BCBS-MA, p. 83. Also see Pipefitter Union Local 537, "Health and Welfare Plan," December 2000. See BCBSMA-AWP 11996.

[117]  http://www.teamsters170hwf.com/hp_index.asp (DX 1333).

4.  Plumbers and Pipefitters' Union Local 4 contracts with the following large TPPs (plans noted in parentheses): plaintiff BCBS-MA (Managed Blue and Medex 3), Fallon (Senior, Direct, and Select), and Harvard Pilgrim (PPO).[120]

49.     Under these arrangements, smaller payors generally utilize the provider networks and reimbursement rates of the larger, more sophisticated TPPs. Steve Fox, Senior Director of Provider Relations, Communications, and eHealth at plaintiff BCBS-MA states:

Q.    Are you aware of any employer plans in Massachusetts including unions' health and welfare funds that maintain their own provider networks?

A.    I'm not aware of any that maintain their own.

Q.    Are you aware of any employer plans—including health and welfare funds—that negotiate reimbursement rates with physicians directly?

A.    I'm not aware of that.[121]

Because small payors employ the reimbursement rates of the larger TPPs, I conclude that smaller payors also would not have suffered economic harm from the alleged "AWP scheme."

**3.    There are economic reasons unrelated to the alleged "AWP scheme" for TPPs to establish reimbursement rates that exceed acquisition costs**

50.     Contracts between providers and TPPs are typically set on a bottom-line basis that includes payments for drugs, services, and other contract terms. Elements of the fee schedule, such as individual drugs, are generally considered irrelevant as long as the total reimbursement is acceptable to both parties.[122] Rather, TPPs, like Medicare, are interested in attracting providers to their networks by achieving an appropriate level of overall reimbursement for both administration services and drugs and encouraging providers to treat patients outside of the hospital. For example, Oxford states, "The Company believes that the network of providers under contract with Oxford is an important competitive factor."[123]

---

[118]   http://www.teamsterscare.com/benefits.html (DX 1335).

[119]   http://www.teamsterscare.com/providers.html (DX 1336).

[120]   http://www.ualocal4.org/Health%20&%20Welfare.htm (DX 1327).

[121]   Fox deposition, pp. 224-225.

[122]   See, for example, Herbold deposition, pp. 61-62, Lemke deposition, pp. 83-84, and Deposition of David Thomas of Three Rivers, p. 145.

[123]   See Oxford 2001 SEC 10K filing (DX 1254).

51.     TPPs also try to encourage providers to establish clinics to treat patients outside of a hospital setting.[124] The cost of treating a patient in an outpatient clinic is significantly less than treating a patient in a hospital.[125] John Killion testifies that "reimbursement in the hospital setting is a more expensive setting than in the physician office."[126] Jill Herbold of CIGNA testifies that CIGNA preferred that drug administration take place in the physician's office because generally it was better for the patients and the medical costs were lower.[127] Hal Goldman, Vice President of Pharmacy Operations at Vista Healthplan, identifies three reasons why Vista and it beneficiaries prefer the physician office to a hospital:

> Number one, of course, there is a higher cost of doing an infusion in an outpatient or hospital setting. There's also a time for a member. Traditionally, with infusions in a physician's office you don't have the long waiting period; so less time lost from work, less time lost from family time. The third thing is, putting somebody into an infusion center or a hospital to get an infusion exposes them to a lot more germs than you do in a doctor's office.[128]

52.     Moreover, since many TPPs emulate Medicare's RBRVS reimbursement methodology, cross subsidies between drug reimbursements and administrative service fees are common.[129] In this contracting environment, many TPPs explicitly acknowledge that reimbursements for drugs and administration service fees are interdependent. For example, Jill Herbold, Assistant Vice President Practitioner Reimbursement at CIGNA, states:

> A. …The reimbursement with our provider groups, when negotiating, is considered in total, so it's the final total contract that may be decided – that will be decided upon, and there are trade-offs made between the different services as you go through the process of negotiation and compromise to get to a solution that is agreeable to both parties…[130]

Michael Beaderstadt of John Deere also states: "What we attempted to do, in most cases we're successful, is when the oncologist complained about the reimbursement, rather than changing the reimbursement for the drug itself, we changed the reimbursement for the administration of the drug,

---

[124]   Coneys deposition, pp. 138-139.
[125]   Devaux deposition, pp. 176-177.
[126]   Killion deposition, p. 67.
[127]   Herbold deposition, pp. 75-76.
[128]   Deposition of Hal Goldman of Vista Healthplan, p. 59.
[129]   Dyckman & Associates, "Survey of Health Plans Concerning Physician Fees and Payment Methodology," August 2003, pp. 12, 17 (DX 1140).
[130]   Herbold deposition, pp. 61-62.

which is a separate CPT code."[131] An internal John Deere document shows that it considered increasing service payments when it transitioned drug reimbursement from 110 percent of AWP to 87 percent of AWP: "The Midwest is considering increasing fees to oncologists for chemotherapy admin codes to partially offset the lost revenue from the J-codes. The Southeast has no specific plans for offsetting the J-code revenue loss for physicians, but will develop strategies to retain providers as circumstances dictate."[132] Joseph Spahn of Anthem Midwest testifies that he recommended that if drug reimbursements were lowered, Anthem Midwest needed to correspondingly increase the administration fees.[133]

53.     Some TPPs have raised their physician services payments to offset reductions in drug reimbursements. For example, claim data from Health Net California ("Health Net") show that physician service fees increased as Health Net transitioned to an ASP-based methodology for drug reimbursement in January 2004.[134] Health Net's reimbursement for doxorubicin (J9000) decreased from $42.50 in fourth quarter 2003 to $8.97 in second quarter 2004.[135] Over the same period, Health Net's reimbursements for service CPT 90780, commonly associated with doxorubicin administration, increased from $53.76 to over $86.77. Health Net's changes in reimbursements for doxorubicin and its administration are shown in DX 1405, annexed here as Attachment 36.

54.     Reimbursement on some drugs also cross-subsidize reimbursement on other drugs. The Trigon letter I previously discussed states: "Trigon recognizes that your acquisition cost for drugs is highly variable when expressed as a percent of the AWP. Ninety percent of AWP should provide you with substantial margins for some drugs and nearly zero margins for others."[136]

### 4.     Conclusion

55.     On the basis of TPP knowledge and sophistication, competitive leverage, and use of drug reimbursements to subsidize underpayment for physician services, I conclude that numerous TPPs would not have overpaid for physician-administered drugs as a result of the alleged "AWP scheme" and would not have suffered economic harm. It therefore follows that those beneficiaries that

---

[131]  Beaderstadt deposition, p. 60. CPT stands for Current Procedural Terminology.

[132]  Responses to Specialty Pharmacy Provider Questions from the PRC Monthly Conference Call. See JDH 000287 (DX 1266).

[133]  Spahn deposition, p. 115.

[134]  Deposition of Karla Austen of Health Net, p. 57.

[135]  Bristol-Myers Squibbs' Rubex is the brand-name version of doxorubicin.

[136]  Excerpt of letter from Keane Chan, Provider Network Consultant at Trigon, to Karen Ford Manza, Regional Director, Managed Care, at US Oncology regarding a contractual agreement, dated January 5, 2000. See A-VA 03010065-A-VA 03010068 (DX 1127).

make coinsurance payments under coverage from these TPPs also would not have suffered economic harm as a result of the alleged "AWP scheme."

      **C.**      **TPP reimbursements are often not based upon AWP**

      56.      In calculating purported damages to Massachusetts TPPs under Class 3, Dr. Hartman assumes that non-hospital drug reimbursements are based universally on AWP. This is the principle assumption that Dr. Hartman asserts to calculate purported damages on a class-wide basis simply by analyzing the volume of defendants' sales to physicians. In addition, the assumption is an important element in Dr. Hartman's assertion that the published AWPs caused the plaintiffs' economic harm. The evidence in this case, however, demonstrates that Dr. Hartman's fundamental assumption is incorrect with respect to Massachusetts payors.

      57.      The evidence demonstrates that a range of different reimbursement methodologies have been employed in Massachusetts. For example, Harvard Pilgrim through much of the late 1990s and early 2000s used capitated risk arrangements rather than fee-schedule based arrangements with the majority of its contracted physicians.[137]

      58.      A capitated arrangement is one where the health insurer pays the physician a fixed amount per member per month to provide services to its members. Under such an arrangement, reimbursement is not made for specific drugs or services and AWP generally plays no role. When capitated arrangements are employed, AWP also generally has no bearing on the patients' co-pay or co-insurance obligations.

      59.      Analysis of reimbursements by plaintiff BCBS-MA reflects a similar usage of alternative reimbursement methodologies, including capitation. Plaintiff BCBS-MA witnesses have testified that plaintiff BCBS-MA did not use AWP at all prior to 1995 and instead reimbursed the physicians' usual and customary billed charges.[138] Accordingly, I have focused my analysis of plaintiff BCBS-MA claims data on the period after 1995. For that period, the plaintiff BCBS-MA claims data demonstrates that a substantial proportion of its reimbursements to physicians for drugs administered in their offices remained unrelated to AWP. Specifically, as shown in DX 3006, attached hereto at Attachment 37, only 44 percent of drug reimbursements explicitly reference a fee schedule. Of the remaining 56 percent of drug reimbursements with non-fee schedule payment basis, approximately one-quarter (or 13 percent of the total reimbursements) are at rates that also equal fee schedule pricing.

---

[137]   November 8 Trial Transcript at 33:11-14, 34:3-9 (Mulrey Cross Examination). Also see Deposition of Sheila Cizauskas of BCBS-MA, pp. 44-63.

[138]   Trial Declaration of Michael Mulrey, p. 3.

Taking a conservative approach, even if I assume that these reimbursements are linked to AWP, 43 percent of plaintiff BCBS-MA drug reimbursements would still not be based on AWP and appear to result from the use of alternative reimbursement methodologies.[139]

60.     Thus, I conclude that Dr. Hartman's fundamental assumption that non-hospital reimbursements are made universally on the basis of AWP is incorrect. This flawed assumption causes Dr. Hartman's calculation of purported Class 3 damages to be unreliable. Moreover, the prevalence of non-AWP based reimbursements highlights the fact that contracts between providers and TPPs are set on a bottom-line basis that includes payments for drugs, services, and other contract terms. The focus of the TPPs in setting the overall reimbursement is to ensure that provider payments are sufficient to maintain network participation and encourage non-hospital encounters. In this context, the reimbursement benchmark chosen is irrelevant. If other benchmarks are chosen, such as ASP, there is no reason to believe that total reimbursements will be any different. This is exactly what has occurred with the MMA and for those TPPs who have also chosen to adopt ASP-based reimbursements. Furthermore, this observation also explains why it is rational for plaintiff BCBS-MA to continue making reimbursements based upon AWP even as they are aware of the allegations in this case. Thus, I conclude that the alleged "AWP scheme" did not cause economic harm to Class 3.

### D.    Overall conclusion

61.     In his report, Dr. Berndt highlighted various economic factors, unrelated to the alleged "AWP scheme," that affect manufacturers' pricing incentives.[140] These factors include: (1) "therapeutic class;" (2) "side effect, efficacy and convenience profiles relative to competitors in the class;" (3) "number of single-source brand name competitors in the same therapeutic class;" (4) "class of trade purchaser;" (5) "whether any brands in the same therapeutic class are multi-source, i.e. have generic competitors;" and (6) "time before expected patent expiration and initial generic entry."[141] Dr. Berndt then notes the challenge facing plaintiffs:

> How can it be determined that at any given point in time, it is one or more
> of the above factors that affected and were largely responsible for the price
> decisions made by defendant manufacturers during the product's life cycle,
> rather than the Defendants' alleged AWP scheme to collect inflated

---

[139]   48,556 of the 62,766 reimbursements (77.36 percent) with a non-fee schedule payment basis are not equal to the fee schedule price. These 48,556 reimbursements account for 43.43 percent of the total number of reimbursements (111,806).

[140]   Although Dr. Berndt mentioned these factors in the context of self-administered drugs, they also are relevant for physician-administered drugs.

[141]   Berndt Report, p. 115 (DX 1275).

prescription drug payments? Simply examining and recording larger differences in percent 'spreads' between each AWPID drug and 'drugs not subject to this Litigation' will not be sufficient to establish reliably that any differential 'spread' is attributable solely, partly, or not at all to the alleged AWP scheme to collect inflated prescription drug payments.[142]

62.     Yet, simply examining and recording larger differences in percent spreads is all that Dr. Hartman has done. In particular, Dr. Hartman concludes that Class 2 and Class 3 overpaid because reimbursement for prescription drugs did not approximate acquisition costs. I have demonstrated that both Medicare and TPPs knew that reimbursement rates did not approximate acquisition costs, and they generally knew the extent to which reimbursement rates exceeded acquisition costs. I have also demonstrated that both Medicare and TPPs had sufficient leverage to enable them to achieve competitive reimbursement rates that would not be any different if a different reimbursement benchmark were used. I have also demonstrated that there were economic reasons, unrelated to the alleged "AWP scheme," why both Medicare and TPPs established reimbursement rates that exceeded EACs.

_____
                Eric M. Gaier, Ph.D.

Sworn to before me this
10  day of November 2006

_____
                Notary Public

**Carilyn Torres**
**Notary Public, District of Columbia**
**My Commission Expires 10-31-09**

_____
[142]    Berndt Report, p. 116 (DX 1275).