# TAB
# D

SPECIALTY WHOLESALER MARKETING SERVICES AGREEMENT

Specialty Wholesaler Marketing Services Agreement (this "Agreement"), effective September 1, 1998 ("Effective Date"), is made between Amgen Inc., One Amgen Center Drive, Thousand Oaks, California 91320-1789 ("Amgen"), and Oncology Therapeutics Network, 395 Oyster Point Boulevard, Suite 405, South San Francisco, California 94080 ("Consultant").

WHEREAS, Amgen is engaged in research, development, manufacture, marketing and sale of biotechnology products, including Neupogen® (the "Field");

WHEREAS, Amgen has petitioned the United States Food and Drug Administration ("FDA") for approval and authorization to market, a pre-filled syringe for Neupogen®, to be known as Singleject®.

WHEREAS, Consultant is an oncology drug specialty wholesaler and has experience and expertise in the area of launching new drug products in the oncology marketplace; and

WHEREAS, Amgen desires to retain Consultant to assist in the launch and marketing of Amgen's Neupogen Singleject® product to the office-based oncology market, and Consultant accepts such retainer.

NOW, THEREFORE, in consideration of the premises and the mutual promises and undertakings herein contained, the parties hereto agree as follows:

## ARTICLE ONE
## CONSULTING SERVICES

1.1 Services to be Performed by Consultant. Consultant will work with Ken Keller, Amgen's Neupogen Marketing Manager, to develop and implement detailed marketing plans to promote the use of Neupogen Singleject® in the oncology office setting. No marketing or promotional plans will be implemented unless and until the FDA has approved Singleject® and cleared it for marketing. Specific marketing plans shall include, but not be limited to the following:

A. Neupogen Singleject® Datasheet Via Fax. Consultant will fax a Neupogen Singleject® datasheet (to be developed by Amgen) to all 2,000 accounts in Consultant's database. The timing and content of the fax shall be mutually determined by Consultant and Amgen. The datasheet shall also be used as a

Defendants' Exhibit
2557
01-12257-PBS

follow-up piece when inquiries about Neupogen Singleject® are fielded by Consultant.

B. Newsletter and Sourcebook Advertisements. During the term of this Agreement (and after FDA approval of Singleject®), a one-half page Neupogen Singleject® advertisement will appear in three (3) editions of the *Network News*, Consultant's bi-monthly newsletter sent to over 6,000 oncology professionals nationwide. A one-half page advertisement will be placed in the two (2) issues immediately following FDA approval of Singleject®, of the *Sourcebook*, Consultant's catalog of available products published every three (3) to four (4) months. Amgen shall provide "camera-ready" copies of each advertisement.

C. In-bound Call Message. Following FDA approval of Singleject® and throughout the term of this Agreement, a message regarding Neupogen Singleject® will be programmed on Consultant's in-bound call delay announcer for four (4) one-week periods. While the timing of the placement of such message shall be mutually agreed upon by both parties, it is anticipated that approximately 2,000 messages per week will be heard.

D. Shipment Stuffer. An advertisement for Neupogen Singleject® will be inserted into all shipments from Consultant to its customers for a one-week time period on at least three (3) separate occasions. A minimum of 3,000 packages shipped from Consultant to its customers shall include a Neupogen Singleject® advertisement. Such advertisements shall be developed by Amgen. The timing of the shipment stuffer mailings shall be mutually agreed upon by both parties.

E. Targeted Selling Efforts. For a ninety (90) day period during the term, Consultant shall direct telesales activities of its account representatives to contact the top three hundred (300) purchasers of Neupogen® from Consultant to promote Neupogen Singleject®. Amgen will develop a script, "talking points" and supporting materials to be used to promote Neupogen Singleject®. The timing of all telesales activities shall be mutually agreed upon by both parties, however, shall not commence until such time as FDA has approved the Neupogen Singleject® product.

F. Customer Service Representative Up-Selling. For two (2) two-week periods, Consultant's customer service representatives will prompt all customers ordering Neupogen® vials that the Singleject® product is available, and recommend the purchase of Neupogen Singleject® rather than the vials. The timing of this up-selling shall be mutually agreed upon by both parties, however, shall not occur until FDA approval of the Singleject Product®.

G. Sales Data Purchase. During the term of this Agreement, Consultant shall provide Amgen with account specific monthly sales information on Neupogen® and select cancer chemotherapeutic agents. Consultant shall provide

actual sales information for Neupogen®, however, sales of the select chemotherapeutic agents will be aggregated by therapeutic class and categorized into one of four zone levels. The therapeutic classification system and zone label classification shall be mutually determined and agreed upon by Consultant and Amgen. Consultant shall provide this sales information to Amgen within fifteen (15) days after the end of each preceding month.

ARTICLE TWO
COVENANTS AND WARRANTIES

2.1 Covenants of Consultant. Consultant:

(a) shall act as an independent contractor with no authority to obligate Amgen by contract or otherwise and not as an employee or officer of Amgen;

(b) notwithstanding anything contained in this Agreement to the contrary, shall not initiate or participate in any communications with the United States Food & Drug Administration or any other governmental agency concerning the subject matter hereof unless required by law or requested to do so by Amgen and, then, only upon prior consultation with Amgen;

(c) shall not recruit, solicit or induce any Amgen employee, client, customer or account to terminate their employment or relationship with Amgen;

(d) shall not use Amgen's name or the existence of this Agreement in connection with any press release, publicity, advertising or other disclosure without Amgen's prior written consent;

(e) shall not, in connection with the services to be performed under this Agreement, disclose to Amgen any information which is confidential or proprietary to Consultant or any third party;

(f) shall not, during the term of this Agreement, enter into any other agreement, whether written or oral, which would conflict with Consultant's obligations hereunder;

(g) agrees that (subject to Section 2870 of the California Labor Code which excludes any invention developed entirely on Consultant's own time and without the use of Amgen's supplies, equipment, personnel, facilities or information) any information, including but not limited to discoveries, inventions, innovations, suggestions, know-how, ideas and reports made by Consultant to Amgen which result from, or are related to, information disclosed by Amgen to

Consultant or which are developed as a result of, or in connection with, Consultant's services under this Agreement shall be promptly disclosed to Amgen and treated by Consultant as the sole property of Amgen subject to the confidentiality provisions set forth in paragraph (i) below;

(h) agrees to assign to Amgen any rights that Consultant may acquire in the proprietary information described in paragraph (g) above, and further agrees to assist Amgen (at Amgen's expense) in obtaining, enforcing and maintaining Amgen's rights in and to such information and irrevocably appoints Amgen and its duly authorized officers and agents as Consultant's agents and attorneys for such purpose;

(i) shall, during the term of this Agreement and for a period of five (5) years thereafter, keep confidential any information concerning Amgen or the Field which is disclosed to Consultant by Amgen or which results from, or in connection with, any services performed pursuant to this Agreement ("Information"). Such Information includes, but is not limited to, confidential or proprietary information, materials, know-how and other data, both technical and nontechnical; provided, however, that Consultant shall have no obligation of confidentiality with respect to any portion of such Information which (i) is or later becomes generally available to the public by use, publication or the like, through no act or omission of Consultant, (ii) is obtained from a third party who had the legal right to disclose the information to Consultant, (iii) Consultant already possesses as evidenced by Consultant's written records predating receipt thereof from Amgen, or (iv) is independently developed by Consultant without the use of confidential information belonging to Amgen as evidenced by Consultant's written records; and

(j) agrees that at no time will it purchase or sell Amgen securities based on Information or information not known to the general public.

2.2 Warranties of Consultant. Consultant represents and warrants:

(a) that compensation for the Services to be rendered under the terms of this Agreement shall be consistent with fair market value in arm's length transactions for the services provided and have not been determined in a manner which takes into account the volume or value of any referrals or other business otherwise generated between the parties for which payment may be made in whole or in part under Medicare or a State health care program, and that the services to be performed under the Agreement do not and will not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law;

(b) that Consultant's performance of the services set forth in this Agreement in accordance with the terms and provisions set forth herein do not, and will not, breach any agreement to keep in confidence any proprietary information of

another entity acquired by the Consultant in trust or confidence prior to the date of this Agreement;

(c) that the Consultant has not entered into any agreement, whether written or oral, in conflict of this Agreement; and

(d) that the Consultant has the full power and authority to enter into this Agreement.

ARTICLE THREE
COMPENSATION

3.1 Compensation. As full and complete compensation for Consultant's services hereunder, Amgen shall pay Consultant an amount not to exceed two hundred eighty-five thousand dollars ($285,000), as follows:

(a) seventy-five thousand dollars ($75,000) within thirty (30) days of executing this Agreement;

(b) one hundred five thousand dollars ($105,000) three (3) months following FDA approval of the Neupogen Singleject® product; and

(c) one hundred five thousand dollars ($105,000) six (6) months following FDA approval of the Neupogen Singleject® product.

3.2 Payments. All payments hereunder shall be payable to Oncology Therapeutics Network.

ARTICLE FOUR
TERM AND TERMINATION

4.1 Term. The term of this Agreement shall commence on the Effective Date and shall run for a period of one (1) year. The parties agree that approximately six (6) months following the FDA approval of the Neupogen Singleject® product, they will discuss the possible continuation of this Agreement through additional programs and services.

4.2 Termination, Postponement or Delay by Amgen. This Agreement may be terminated, postponed or delayed upon fifteen (15) days written notice by Amgen. In the event of such termination, postponement or delay per this Section 4.2, Amgen shall pay Consultant for all services satisfactorily rendered through the date of such termination, postponement or delay, including payment for time expended and out-of-pocket expenses incurred or committed to by Consultant. Upon

receipt of written notice of termination, postponement or delay, Consultant agrees to use its best efforts to immediately curtail its efforts in performing the services described herein and make no subsequent commitments for expenditures under this Agreement.

4.3 Effect of Termination. Upon the termination of this Agreement, each party shall be released from all obligations and liabilities hereunder except those arising under sections 2.1 (a), (b), (c), (d), (g) (h), (i), and (j). Upon the termination of this Agreement, Consultant shall promptly surrender and deliver to Amgen all documents and materials of any nature provided to Consultant by Amgen and any other documents or materials of any nature from any source pertaining to Consultant's performance of services hereunder. Consultant shall have no claim against Amgen for lost profits or any other damages which may arise as a result of termination.

ARTICLE FIVE
MISCELLANEOUS

5.1 Waiver. None of the terms of this Agreement may be waived except by an express agreement in writing signed by the party against whom enforcement of such waiver is sought. The failure or delay of either party in enforcing any of its rights under this Agreement shall not be deemed a continuing waiver of such right.

5.2 Entire Agreement. This Agreement constitutes the entire agreement among the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the parties (whether written or oral) relating to said subject matter.

5.3 Amendments. This Agreement may not be released, discharged, amended or modified in any manner except by an instrument in writing signed by Consultant and a duly authorized officer of Amgen.

5.4 Assignment. Amgen has specifically contracted for the services of Consultant and, therefore, Consultant may not assign or delegate Consultant's obligations under this Agreement, either in whole or in part, without the prior written consent of Amgen. Amgen may assign this Agreement at any time without the prior consent of Consultant.

5.5 Severability. If any provision of this Agreement is, becomes, or is deemed invalid, illegal or unenforceable in any jurisdiction, such provision shall be deemed amended to conform to the applicable laws so as to be valid and enforceable, or, if it can not be so amended without materially altering the intention of the parties hereto, it shall be stricken and the remainder of this Agreement shall remain in full force and effect.

5.6 Headings. Article and Section headings contained in the Agreement are included for convenience only and are not to be used in construing or interpreting this Agreement.

5.7 Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be an original and all of which together shall constitute one and the same document, binding on all parties notwithstanding that each of the parties may have signed different counterparts.

5.8 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California, and the parties hereby submit to the jurisdiction of the California courts, both state and federal.

5.9 Notices. Any notices required or permitted hereunder shall be sent by registered or certified mail to the address of each party set forth in this Agreement or any other address as any party shall specify in writing and shall be deemed received three (3) days after the date of mailing.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the Effective Date.

AMGEN INC.

By: Craig L. Brooks
Vice President
Product Marketing

ONCOLOGY THERAPEUTICS NETWORK

(signature)

By: Warren Dodge
(print or type name)

Title: Senior Vice President & GM

AMGEN

Amgen Inc.
One Amgen Center Drive
Thousand Oaks, CA 91320-1799
805.447.1000
www.Amgen.com

December 8, 2000

Oncology Therapeutics Network Corporation
395 Oyster Point Blvd. 405
South San Francisco, CA 94080

Dear Mike Cunningham,

Enclosed please find two original copies Data Collections Agreement # 20007909. Please obtain the appropriate signatures on both copies, and return them to me. We will send you your original when the contract is fully executed. Should you have any questions, do not hesitate to contact me at (805)-447-8120. You may return both originals of the Agreement to:

Lu Ann Clarke
AMGEN
One Amgen Center Drive
MS-37-1-A
Thousand Oaks, CA 91320

Sincerely,

Lu Ann Clarke

Lu Ann Clarke
Project Tracking Analyst

Fran,
Please Fed Ex both original copies to this individual.
Make one copy each for:
(1) Me
(2) Liz Mc.
(3) Jeanette M.
(4) Kathy Mac
Thanks,
Curt



# ONCOLOGY DISTRIBUTOR AGREEMENT

This sets forth the Agreement made this 13th day of June, 2001 by and between Oncology Therapeutic Network (OTN), a Delaware corporation with its principal office and place of business at 395 Oyster Point Blvd., Suite 405, S. San Francisco, CA 94080 (Distributor) and American Pharmaceutical Partners, Inc. a California corporation, with its principal office and place of business at 1101 Perimeter Drive, Suite 300, Schaumburg, IL 60173-5837 (Company).

Company and Distributor agree as follows:

1. **Authorized Distributor.** Company agrees to accept Distributor as an authorized oncology distributor of those healthcare products manufactured and/or marketed by Company set forth in the attached Exhibit A, all of which are hereinafter referred to as Product(s).

Distributor shall be prohibited from selling any Product(s) to hospitals, other distributors, wholesalers, retail pharmacies, other resellers or any other class of trade or customer that has been identified by Company as excludable from Distributor's customer list. Any decision regarding a prohibited customer or customer class shall be based solely on Company's internally designated criteria.

2. **Appointment of Distributor.** Company agrees to accept Distributor as an authorized oncology distributor appointed by group purchasing organization(s) of those healthcare products manufactured and/or marketed by Company based on the terms and subject to the conditions described in this Agreement.

3. **Terms of Sale.** Distributor shall be prohibited from selling any Product(s) to anyone Distributor believes or knows will sell the Product(s) outside of the United States.

4. **Payment Terms.** Reference attached Exhibit B.

5. **Marketing & Administrative Fee.** Reference attached Exhibit B.

6. **Returned Goods.** Company will accept returned goods in accordance with the current Standard Distributor Returned Goods Policy (for end-users) in effect. See attached.

7. **Confidentiality.** Distributor shall keep the terms and conditions of this Agreement, including pricing, in strictest confidence and shall not otherwise disclose, divulge or release such information, except as required by law, without the prior written consent of Company. Failure to comply with this confidentiality requirement shall be grounds for immediate termination of this Agreement as provided in Section 10 below.

8. **Contract Administration and Chargeback Procedures.** Distributor will recognize and administer contracts between Company and/or its customers pursuant to which the customer may purchase certain products have been established, subject to the continued validity of such contracts in accordance with applicable law and this policy. Amounts owed by Company to Distributor relating to chargebacks shall be paid to Distributor within seven (7) days following Distributor's submissions of a request for those amounts. Legitimate chargeback reconciliation issues should be resolved as soon as

practicable with each party responding [illegible]he other within 60 days following receipt o[illegible]cumentation supporting those issues.

8. **Contract Administration and Chargeback Procedures. – Continued**

a. **Chargebacks.** Distributor will submit electronically to Company a monthly or more frequent report of all contract sales to approved Company and Distributor customers. The report shall include at least the following information as to each sale made to a Company customer or a Distributor customer during the month:

(1) Distributor's debit memo number
(2) Distributor's name and DEA number
(3) Company or Distributor customer's name, address and DEA/HIN number
(4) Company or Distributor customer's purchase order number
(5)Company's contract number
(6) Distributor's invoice number
(7) Distributor's invoice date
(8) Product(s)' NDC number
(9) Product(s)' Lot number
(10) Units shipped
(11) Distributor's unit cost
(12) Company's contract unit cost
(13) Extended chargeback amount
(14) Total chargeback amount
(15) HIN (Hospital Identification Number)

Distributor's chargeback sales reports must be received by Company within ninety (90) days of the sales transaction dates in order to be eligible for issuance of a chargeback payment.

b. **Issuance of Credit.** Upon its receipt and approval of Distributor's reports submitted pursuant to Section 8.a. above, Company shall issue a payment to Distributor equal to the difference between the distributor acquisition cost on the date invoiced and the price agreed upon between Company and Distributor or Company and Company's customer (group purchasing organizations), or in such other amount as Company finds is properly due.

c. **Time Limitation.** Chargebacks submitted shall be valid for sales to Distributor's or Company's customers for a period not to exceed ninety (90) days following the date of sale to the Distributor's or Company's customer. Company reserves the right to deny any chargebacks submitted later than ninety (90) days following the date of sale. Corrections and adjustments to chargebacks submitted will be reconsidered provided they are submitted within ninety (90) days of Company's denial date. Any chargeback re-submissions that are provided more than twelve (12) months following the date of the original chargeback submission.

9. **Warranty and Indemnification.** Company hereby warrants that the Products are and shall be manufactured and delivered to Distributor in conformity with the Federal Food, Drug and cosmetic Act, as amended, and all other applicable laws, rules and regulations.

Company shall defend, indemnify, and hold harmless Distributor and its affiliates, directors, officers, employees and representatives from and against any and all claims, liabilities, losses, damages, costs and expenses (including without limitation reasonable attorney's fees) arising directly or indirectly out of: (a) injury or death to person or property alleged to have been caused by any defect in the Products (exclusive defects shown to be attributable to Distributor's negligence and/or misconduct in handling such Products); and (b) "class of trade" pricing, if any, maintained by Company from and after the effective date of this Agreement, including without limitation those arising out of Distributor's administration of Company contracts. Distributor shall notify Company of any such indemnifiable claim promptly following Distributor's receipt of written notice of such claim. The warranty and indemnification provisions of this section shall survive termination of this Agreement for a period of five (5) years.

10. **Term and Termination.** The initial term of this Agreement shall be for two (2) year, beginning on the date set forth on this Oncology Distributor Agreement and ending twelve months thereafter. Company shall have the right at its sole and exclusive discretion to exercise options to renew this Agreement for successive two (2) year terms.

Notwithstanding the foregoing, either party may terminate this Agreement for any reason or without reason at any time by

giving the other party not less than 60 d[illegible] written notice prior to the specified termin[illegible]n date.

11. **Audit and Inspection.** During the terms of this Agreement, upon ten (10) business days notice and during normal business hours, either party shall be entitled to audit and inspect those relevant records which are maintained by the other party in direct connection with its performance under this Agreement; provided, however, the audit or inspection shall be performed by bona fide, permanent employees of the party conducting such audit or inspection and in no event shall any such audit or inspection relate to any transaction or event which occurred more than twenty four months prior to the date of such audit or inspection.

12. **Force Majeure.** If the performance of any part of this Agreement by any party shall be affected for any length of time by fire or other casualty, government restrictions, war, riots, strikes or labor disputes, lock out, acts of God, raw material shortages, or any other causes which are beyond its control, such party shall not be responsible for delay or failure of performance of this Agreement for such length of time, provided, however, that the obligation of either party to pay amounts due to the other party shall not be subject to the provisions of this Section.

13. **Entire Agreement.** This Agreement is the entire agreement between the parties hereto, there being no prior written or oral promises or representations not incorporated herein.

14. **Applicable Law.** This Agreement shall be governed by the laws of the State of Illinois, applicable to contracts made and to be performed in that state.

15. **Amendments.** No amendment or modification of the terms of this Agreement shall be binding on either party unless reduced to writing and signed by an authorized officer of the party to be bound.

16. **Existing Obligations.** Company represents and warrants that the terms of this Agreement do not violate any existing obligations or contracts of Company. Company shall defend, indemnify and hold harmless Distributor from and against any and all claims, demands, actions or causes of action which are hereafter made or brought against Distributor and which allege any such violation.

17. **Remedies.** Waiver by Company of any breach by Distributor shall not operate as a waiver of any future breach nor as a continuing waiver. All of Company's remedies, whether provided by law, contract or contained elsewhere, shall be deemed to be cumulative. Distributor shall bear all costs and expenses, including reasonable attorney's fees, incurred by Company in enforcing the terms and conditions set forth herein.

18. **Assignment.** Company shall have the right to assign any agreement covered by this Oncology Distributor Agreement to any affiliate or successor organization without the prior written consent of Distributor.

ACCEPTED BY:

**Oncology Therapeutic Network**

[signature]
Authorized Signature

Michael G. Cunningham
Print Name

6/13/01
Date

**American Pharmaceutical Partners, Inc.**

[signature]
Authorized Signature

Thomas E. Shea
Print Name

6/13/01
Date

dlr: 5/10/01

# Exhibit A

## Oncology Distributor Agreement

| PRODUCT CODE | NDC NUMBER | PKG SIZE | PRODUCT DESCRIPTION | PRICE/EA | PRICE/PKG | |
|---|---|---|---|---|---|---|
| 23401 | 6332323401 | 25 | ATROPINE SULF .4MG/ML,1ML SDV | 0.30 | 7.50 | |
| **23420 | 6332323420 | 25 | ATROPINE SULF .4MG/ML,20ML MDV | 0.48 | 12.00 | |
| 24601 | 6332324601 | 25 | ATROPINE SULF 1MG/ML,1ML SDV | 0.30 | 7.50 | |
| **31110 | 6332331110 | 25 | CALCIUM GLUCONATE 10%,10ML SDV | 0.46 | 11.50 | |
| 100351 | 6332310351 | 1 | CISPLATIN 50MG, 50ML | 41.00 | 41.00 | |
| 100365 | 6332310365 | 1 | CISPLATIN 100MG, 100ML | 82.00 | 82.00 | |
| 100364 | 6332310364 | 1 | CISPLATIN 200MG, 200ML | 160.00 | 160.00 | |
| 4401 | 6332304401 | 25 | CYANOCOBALAMIN 1,000MCG/ML,1ML | 0.50 | 12.50 | |
| 102710 | 6332312710 | 10 | DACARBAZINE 100MG, 10ML | 6.95 | 69.50 | |
| 102820 | 6332312820 | 10 | DACARBAZINE 200MG, 20ML | 13.50 | 135.00 | |
| 101908 | 6332311908 | 10 | DAUNORUBICIN HCL 20MG, 8ML | 75.00 | 750.00 | |
| 88305 | 6332313010 | 1 | DOXORUBICIN 2MG/ML 5ML LIQUID | 3.00 | 3.00 | + |
| 88310 | 6332388310 | 1 | DOXORUBICIN 2MG/ML 10ML LIQUID | 6.00 | 6.00 | + |
| 88330 | 6332388330 | 1 | DOXORUBICIN 2MG/ML 25ML LIQUID 30ML VIAL | 27.00 | 27.00 | + |
| 100161 | 6332310161 | 1 | DOXORUBICIN 2MG/ML 100MLLIQUID VIAL | 100.00 | 100.00 | + |
| 100405 | 6332310405 | 10 | ETOPOSIDE 100MG 5ML MDV | 5.80 | 58.00 | |
| 100425 | 6332310425 | 1 | ETOPOSIDE 500MG 25ML MDV | 29.00 | 29.00 | |
| 100450 | 6332310450 | 1 | ETOPOSIDE 1GM 50ML MDV | 58.00 | 58.00 | |
| 730902 | 6332373902 | 10 | FAMOTIDINE 20MG, 2ML SDV | 0.68 | 6.80 | |
| 730804 | 6332373804 | 1 | FAMOTIDINE 40MG, 4ML MDV | 1.36 | 1.36 | ++ |
| 730820 | 6332373820 | 10 | FAMOTIDINE 200MG, 20ML MDV | 6.80 | 68.00 | ++ |
| 104507 | 6332314507 | 1 | FLOXURIDINE 500MG 5ML (POWDER) | 106.00 | 106.00 | ++ |
| 101710 | 6332311710 | 10 | FLUOROURACIL FOR INJECTION 50MG/ML, 10ML SDV | 1.01 | 10.10 | |
| 101720 | 6332311720 | 10 | FLUOROURACIL FOR INJECTION 50MG/ML, 20ML SDV | 2.00 | 20.00 | |
| 101751 | 6332311751 | 1 | FLUOROURACIL FOR INJECTION 50MG/ML, 50ML PBP | 4.70 | 4.70 | |
| 101761 | 6332311761 | 1 | FLUOROURACIL FOR INJECTION 50MG/ML, 100ML PBP | 9.40 | 9.40 | |
| 504501 | 6332354501 | 25 | HEPARIN LOCK FL 100U/ML,1ML MDV | 0.30 | 7.50 | |
| **4710 | 6332304710 | 25 | HEPARIN SOD 5MU/ML 10ML MDV | 2.10 | 52.50 | |
| 915501 | 6332391501 | 25 | HEPARIN SOD 20MU/ML 1ML MDV | 1.40 | 35.00 | |
| 701100 | 6332371100 | 1 | LEUCOVORIN CALCIUM 500MG 100ML | 11.80 | 11.80 | |
| 20110 | 6332320110 | 25 | LIDOCAINE HCL 1% 10ML MDV | 0.56 | 14.00 | |
| 96402 | 6332306402 | 25 | MAGNESIUM SULF 50%,1GM,2ML SDV | 0.24 | 6.00 | |

# Exhibit A

## Oncology Distributor Agreement

| PRODUCT CODE | NDC NUMBER | PKG SIZE | PRODUCT DESCRIPTION | PRICE/EA | PRICE/PKG |
|---|---|---|---|---|---|
| **96410P | 6332306410 | 25 | MAGNESIUM SULF 50%,5GM/10ML SDV | 0.42 | 10.50 |
| 1550 | 0469002425 | 25 | MANNITOL 25%,50ML SDV | 0.82 | 20.50 |
| 730310 | 6332373310 | 10 | MESNA 1GM 10ML MDV | 137.50 | 1375.00 |
| 102302 | 6332312302 | 1 | METHOTREXATE 50MG 2ML SDV | 2.10 | 2.10 |
| 102310 | 6332312310 | 1 | METHOTREXATE 250MG 10ML SDV | 4.80 | 4.80 |
| 102102 | 6332312102 | 1 | METHOTREXATE 50MG 2ML SDV PF | 2.10 | 2.10 |
| 102104 | 6332312104 | 1 | METHOTREXATE 100MG 4ML SDV PF | 3.50 | 3.50 |
| 102108 | 6332312108 | 1 | METHOTREXATE 200MG 8ML SDV PF | 3.65 | 3.65 |
| 102110 | 6332312110 | 1 | METHOTREXATE 250MG 10ML SDV PF | 4.80 | 4.80 |
| 102250 | 6332312250 | 1 | METHOTREXATE 1GM 50ML SDV PF | 21.00 | 21.00 |
| **96510 | 6332396510 | 25 | POTASSIUM CHLOR 2MEQ/ML 10ML SDV | 0.30 | 7.50 |
| **96520 | 6332396520 | 25 | POTASSIUM CHLOR 2MEQ/ML 20ML SDV | 0.36 | 9.00 |
| *918610 | 6332318610 | 25 | SODIUM CHLOR 0.9% 10ML SDV | 0.24 | 6.00 |
| **918620 | 6332318620 | 25 | SODIUM CHLOR 0.9% 20ML SDV | 0.34 | 8.50 |
| **205930 | 6332325930 | 25 | SODIUM CHLOR 0.9% BACT MDV,30ML PB | 0.52 | 13.00 |
| 27810 | 6332327810 | 1 | VINBLASTINE SULFATE 10ML | 8.10 | 8.10 |
| **918510 | 6332318510 | 25 | WATER FOR INJ 10ML SDV STERILE | 0.24 | 6.00 |
| **24910 | 6332324910 | 25 | WATER FOR INJ, BACT MDV 10ML PB | 0.45 | 11.25 |
| **24930 | 6332324930 | 25 | WATER FOR INJ, BACT MDV 30ML PB | 0.55 | 13.75 |

dlr: 5/15/01

+ PRODUCT WILL NOT BE AVAILABLE AFTER 6/30/01; HOWEVER, CHARGEBACKS WILL BE HONORED THROUGH 7/31/01

++ NEW PRODUCT.

*AVAILABLE FOR DIRECT PURCHASE IN "SHIPPER" MULTIPLES OF 16X25.

**AVAILABLE FOR DIRECT PURCHASE IN "SHIPPER" MULTIPLES OF 4X25.

# Exhibit B
## Oncology Distributor Agreement

American Pharmaceutical Partners, Inc. (APP) is offering Oncology Therapeutic Network (OTN) the following programs under this Oncology Distributor Agreement:

6/13/01 MGC KR

1. **Marketing Fee.** APP agrees to pay OTN a Marketing Fee for all sales of APP oncology products based on the following:

   6% Fee for maintaining 70% Market Share — 5% fee for maintaining 60% share
   3% Fee for maintaining 40% Market Share — 4% fee for maintaining 50% share

   Market Share is defined as the percentage of all APP sales by product divided by the total sales of the like or same product during a specified time period. Product sales will be measured in total milligrams. OTN will submit to APP a list of market share reports (including sales to group purchasing organizations serviced by OTN) by product including sales of APP products on a weekly basis.

   The Marketing Fee will be paid on total net sales (using APP chargeback reports) submitted under this Agreement and other GPO Agreements serviced by OTN. APP will provide appropriate contract numbers for all Agreements that will be utilized when calculating this fee. Fee will be paid on a quarterly basis.

2. **Famotidine Performance Rebate.** APP agrees to pay OTN a 5% Performance Rebate based on net sales for all Famotidine products. This rebate will be paid based on net sales (using APP chargeback reports) submitted under this Agreement. Rebate will be paid on a quarterly basis and must be greater than $100 to be paid.

3. **Administrative Fee.** In recognition of the administrative efforts assumed in relation to this Agreement as well as other GPO Agreements, APP will pay OTN a 3% Administrative Fee each calendar quarter. This fee will be paid based on net sales (using APP chargeback reports) for all products submitted under this Agreement and other GPO Agreements serviced by OTN. APP will provide appropriate contract numbers for all Agreements that will be utilized when calculating this fee. Fee will be paid on a quarterly basis.

4. **Payment Terms.** OTN shall pay for all products ordered directly from APP according to the payment terms of 2% 30; Net 31 days from date of invoice.

5. **Margin Protection.** APP will guarantee a 15% margin on the OTN selling price, providing OTN's Cisplatin price is not lower than 5% of the APP contract price and the minimal performance compliance conditions continue to be met. If lower prices are required, prior approval from APP is necessary to guarantee the 15% margin. APP may choose to add other key oncology products to the list of margin protected products at a later date.

3. **New Products.** APP will have the option to include other new products (i.e. FUDR, Paclitaxel) to this Agreement, as they become available.

4. **Pricing Review.** APP will review competitive oncology market price information and will maintain a competitive price level for OTN under this Agreement.

Authorized Signature: [signature] Michael G. Cunningham 6/13/01 — OTN [signature] — APP Date 6/13/01