**TAB
E**

# SALES AGENCY AND CONSIGNMENT AGREEMENT

Defendants' Exhibit

**2558**

01-12257-PBS

This Sales Agency and Consignment Agreement dated as of January 24, 1999 between Novartis Pharmaceuticals Corporation, a Delaware Corporation with offices at 59 Route 10, East Hanover, New Jersey ("Novartis"), and Oncology Therapeutics Network Joint Venture, L.P., a Delaware limited partnership with offices at 395 Oyster Point Boulevard, Suite 405, South San Francisco 94080 ("OTN").

WHEREAS, Novartis has determined that, in order to implement its anticipated Aredia® (pamidronate disodium) contracting program for OTN's traditional customer base, which is defined herein as "Participants", as well as (subject to further written agreement by the parties), programs in connection with other Product (as defined herein), it will be effective and efficient to retain a single agent with responsibility for the sale, distribution, contract administration and customer communications required for the program;

WHEREAS, Novartis desires to obtain Aredia, and potentially other Product (as defined herein) sales and marketing data available from OTN,

WHEREAS, OTN is a specialty distributor which possesses expertise in connection with such responsibilities as applied to Participants (as defined herein) and desires to perform them on behalf of Novartis;

NOW THEREFORE, the parties hereby agree as follows:

1. <u>Definitions</u>

    (a) "Participants" shall mean (1) office-based oncologists and oncology medical practices whether organized as corporations, partnerships or associations; (2) office-based urologists, whether organized as corporations, partnerships or associations; (3) chemotherapy and other infusion centers serving cancer patients, so long as Novartis retains the right to delete such centers from eligibility for Price List Sales (as defined herein) for any reason and, 4) other similar entities or representatives of same as agreed to by Novartis in writing, who purchase the Product (as defined herein) pursuant to a Price List (as defined herein). Participants shall only include oncologists or urologists (or their representatives) purchasing (or negotiating for the purchase of) Product (as defined herein) for patient administration in an independent office setting. Without limiting the foregoing, neither physicians nor infusion centers are Participants to the extent that their purchase or use of Product is through any of the following: (a) hospitals, (b) staff or independent practice association model health maintenance organizations, (c) skilled nursing, assisted living or other long-term care facilities, (d) home health care providers, (e) government facilities, including government funded clinics. In the event that it is unclear

1

whether or not any person or entity meets this definition, or whether or not any person or entity should otherwise be excluded as a Participant due to conflicting contractual obligations of Novartis, the parties shall work together in good faith to resolve such issues.

(b) "Product" shall mean any Novartis product listed in Exhibit A.

(c) "Price List Sales" shall mean, except as otherwise expressly provided herein, any sales of the Product (as defined herein) to the Participants (as defined herein) at prices lower than the prevailing wholesale acquisition cost for such Product, through discounts and/or retrospective performance rebates, set forth in a Price List (as defined herein).

(d) "Price List(s)" shall mean a list or lists of prices offered by Novartis to some or all Participants, along with the associated terms and conditions applicable to such offer(s).

(e) "Territory" shall mean the fifty states of the United States of America.

(f) "Unrelated Products" shall mean any Novartis or any other company's product (pharmaceutical or otherwise) other than the Product.

(g) "Warehousing Agent" shall mean OTN's contracted warehousing agent that shall provide storage, order processing and related services for purposes of this Agreement. Pursuant to notice and otherwise as provided in Section 3.2.2, OTN may function as the Warehousing Agent.

2. <u>Term</u>. The term of this agreement shall commence on January 24, 2000 (the "Effective Date") and terminate on December 31, 2001 unless earlier terminated pursuant to the terms of Section 5 herein (the "Term").

3. <u>Appointment and Obligations of OTN</u>

3.1 <u>Appointment of Agent; General Scope of Agency</u>.

3.1.1 OTN is hereby authorized, and, except as limited by three existing Novartis agreements (and any extensions thereof) with other entities (the general existence of which OTN is aware from sources other than Novartis), shall have the exclusive right, on behalf of Novartis, to take and fill orders and distribute (as further set forth in this agreement) Product in connection with Price List Sales in the Territory. OTN shall seek to create, preserve and enhance the goodwill and reputation of Novartis in the Territory. Except as expressly provided herein, OTN is not authorized to assume or create any obligation, express or implied, on behalf or in the name of Novartis, or to bind Novartis in any manner or thing whatsoever. During the Term, OTN may not purchase, sell or distribute the Product except in connection with Price List Sales pursuant to this Agreement.

3.1.2. Except as set forth herein, Novartis shall not solicit, take or fill orders for, or appoint any other sales agent or representative with respect to soliciting, taking or filling orders for, Price List Sales, except as agreed in writing with OTN (by way of example, in connection with customer

2

communications pursuant to Section 3.5 below). Notwithstanding the foregoing, OTN acknowledges and agrees that Novartis will communicate with Participants about the pricing opportunities available through OTN. Such communications shall include, but not be limited to, Novartis negotiations with physician practice management organizations that include Participants. Novartis may sell the Product, at any price and without involving OTN, directly or indirectly, to any customer other than Participants. Novartis shall, except as otherwise provided in Section 3.1.1 above and 3.1.3 below, make Price List Sales available only through OTN.

3.1.3.   In the exceptional circumstance that any Participant, or its representative, finally refuses, after good faith negotiation by Novartis, to use OTN in connection with Price List Sales, such that adherence to the terms of Section 3.1.1 above would mean that neither OTN nor Novartis will be able to make Price List Sales to such Participants, then senior management of Novartis shall have the right to make Price List Sales to such Participants without using OTN as a selling agent. OTN shall be notified in writing within one week of such decision. The granting of an exception shall be maintained in confidence by Novartis and shall not be disclosed to other Participants. The parties anticipate that such situations will be extremely unusual, and a Participant's refusal to use OTN solely because it believes that another Participant is receiving Price List Sales through a distributor other than OTN shall not constitute such a situation and shall not be grounds for making an exception pursuant to this Section 3.1.3. No Participant permitted to purchase Product pursuant to a Price List through an entity other than OTN pursuant to either this Section 3.1.3 or Section 3.1.1 above (with the exception of physician practice management organizations in connection with Section 3.1.1) may receive discounts and rebates for Products which are higher in aggregate than the highest aggregate discount and rebate made available through OTN pursuant to this Agreement.

3.2. Order and Inventory Management; Title and Risk of Loss.

The following provisions shall apply to Price List Sales during the Term:

3.2.1. Order and Inventory Management. OTN will be responsible, on behalf of Novartis, for timely and effective order and inventory management in connection with Price List Sales. In particular, OTN shall: (a) take orders for the Product from Participants and process them on a timely basis; (b) request in writing, through the Novartis Distribution Department, sufficient amounts of such Product to fill such orders. OTN shall make reasonable efforts to request product from Novartis only once per month and to maintain no more than forty-five (45) days' of inventory (based upon OTN's sales forecasts during the first six months of the Term and actual figures for the prior quarter thereafter) at any particular time; (c) within one business day of receipt of product by Warehousing Agent, confirm receipt in writing

3

(including NDC, units and lot number) to the Novartis Distribution Department; (d) be responsible for noting any Novartis shipping discrepancies or Product damage and contacting Novartis to resolve any such issues. Novartis shall promptly ship replacement Product, freight prepaid, in the event of documented short or damaged Product; (e) by the third business day of each month during the Term, provide Novartis with a written inventory report, current as of the last day sales were reported to Novartis pursuant to Section 3.3.1(f), in a form substantially similar to that set forth in Exhibit B; (f) perform a physical inventory, to be witnessed by Novartis representatives, on or about every six months during the Term at a time mutually convenient to the parties and that provides an adequate transaction cut-off to facilitate the reconciliation to Novartis' records.

3.2.2. <u>Warehousing Agent</u>. Novartis acknowledges that OTN presently intends to use a third party in connection with the actual storage and shipment of product to Participants, provided, however, that Novartis shall be entitled to rely solely on OTN for the performance of the activities required of OTN or Warehousing Agent pursuant to this Agreement and Warehousing Agent executes the amendments to its agreement with OTN set forth below. The initial Warehousing Agent shall be Livingston Healthcare Services, with corporate offices at 220 Lake Drive, Newark, Delaware 19702, and warehousing facilities where Product will initially stored at 1910 Danielson Place, Memphis, Tennessee 38114. OTN represents and warrants that such corporate name and location have not changed within four months prior to the Effective Date. OTN may not replace Warehousing Agent without Novartis' written consent (which shall not be unreasonably withheld), unless: (a) OTN gives Novartis sixty (60) days' advance written notice of the change (including a change to OTN), setting forth the information regarding the new Warehousing Agent described above in connection with the current agent, and (b) OTN is moving a substantial majority (by annual sales dollar volume) of the rest of the OTN product line to the same new Warehousing Agent. OTN shall be fully responsible for and liable with respect to Warehousing Agent's performance pursuant to this Agreement. In advance of the Effective Date, or as soon thereafter as is reasonably possible, OTN must secure any modifications or additions to its contractual arrangement with Warehousing Agent reasonably necessary in connection with the provisions of this Agreement including but not limited to waivers and/or subordinations of any statutory liens in favor of the Warehousing Agent. In addition, in advance of the Effective Date, or as soon thereafter as reasonably possible, OTN must include the following provisions in such amendments, which must be in effect during the Term of this Agreement unless otherwise agreed in writing by Novartis. A breach by Warehousing Agent of any of the terms below shall be deemed to be a material breach of this Agreement. In addition, with the exception of the insurance provisions in (f) below, OTN hereby agrees to such provisions on its own behalf in favor of Novartis as though separately set forth in this Agreement in OTN's own name, including without limitation the indemnity of Novartis set forth below:

(a) <u>Segregation</u>: Except for Product in the active pick areas of Warehousing Agent's facilities, Warehousing Agent must keep

4

the Product segregated from other inventory and clearly indicate Novartis ownership by designating such Product as Novartis consigned inventory. Warehousing Agent may not sell, pledge, hypothecate or otherwise transfer to any third party any interest in the Product except as consistent with the terms of the Sales Agency and Consignment Agreement between OTN and Novartis. Warehousing Agent will cooperate with Novartis in filing documentation sufficient to evidence to third parties Novartis's ownership of the Product, including but not limited to filings pursuant to Article 9 of the Uniform Commercial Code.

(b) <u>Storage; Compliance with Law</u>: Warehousing Agent shall store the Product in a safe and secure storage facility providing protection from adverse conditions, including, but not limited to, conditions that could shorten the effective shelf life provided that Warehousing Agent receives in advance written specifications from Novartis regarding product handling, which may be satisfied by providing the prescribing information for the Product. Warehousing Agent agrees to use due care and diligence in the storage, handling and disposal of the Product and to comply with all applicable laws, orders, rules, regulations or ordinances of any federal, state or local governmental or regulatory authorities, boards of fire underwriters, and similar bodies in connection with the storage and handling of the Product. Warehousing Agent will indemnify, defend and hold harmless Novartis for breach of the obligations set forth in this paragraph.

(c) <u>Inspection Rights</u>: Novartis retains the right, upon reasonable written notice, to inspect, or have its designated representative inspect, the facilities where Product is stored, on a monthly basis, or as often as Novartis deems reasonably necessary, for the purposes of inspecting the general condition of the Product stored and verifying the physical inventory.

(d) <u>Indemnity</u>: Novartis shall have no liability for, and Warehousing Agent shall protect, defend, indemnify and hold harmless Novartis from and against, any and all loss, damages, claims, demands, actions, penalties, suits, liability and expense, including but not limited to, costs and reasonable attorney's fees ("Warehousing Agent Claim"), on account of (i) any injury or death of persons or damage to property caused by or arising out of Warehousing Agent's improper storage, use, handling, disposal or possession of the Product, (ii) noncompliance with applicable laws in connection with the storage and handling of Product, (iii) the condition of Warehousing Agent's facilities, (iv) the negligent conduct of Warehousing Agent's business; provided, however,

5

Warehousing Agent shall not be obligated to indemnify Novartis to the extent that any Warehousing Agent Claim results from the negligence of Novartis and Warehousing Agent shall not be obligated to indemnify OTN to the extent that any Warehousing Agent Claim results from the negligence of OTN.  Such duty to indemnify shall include, but not be limited to, any claim pursuant to any laws or regulations now or hereinafter in effect relating to the regulation and protection of human health, safety, welfare, the environment or natural resources.

(e) Compliance with Laws, Regulations and Permits. Warehousing Agent represents and warrants that it has and will maintain during the Term all necessary permits or other authorizations or licenses required in connection with the storage and delivery of the Product, and shall also comply with any applicable laws.

(f) Insurance: During the Term of this Agreement and for two years thereafter, Warehousing Agent shall maintain occurrence-based insurance of the following kinds:

Workers' compensation and employee liability insurance in an amount sufficient to comply with the statutory requirements of the state in which the premises are located, and in any event no less than $1,000,000.

Warehouseman's legal liability insurance sufficient to cover at least $12,000,000 worth of Novartis Product at Warehousing Agent's premises.

Comprehensive general liability with combined limits of not less than $1,000,000 per occurrence for bodily injury, including death and property damage.

Warehousing Agent will be bonded in amounts sufficient to cover the value of the product warehoused at their premises.

Certificates of insurance for the forms of insurance listed above shall be submitted to Novartis.  The policies represented by the certificate will not be cancelled or changed without 30 day's prior notice to Novartis Insurance Department.

3.2.3. Title and Risk of Loss: Title and risk of loss to the Product shall remain with Novartis until Product is delivered to the purchasing Participant (or doctor in a Participant network) and shall never vest in OTN.

3.2.4. Participant Returns. On behalf of Novartis, OTN shall implement the returned goods policy reflected in the Price List and provide refunds, pay shipping costs of defective or nonconforming Products and otherwise treat returns consistent with the business policies of Novartis, except that all such returns shall be destroyed

6

by OTN except as otherwise provided in 3.2.7 below. Reimbursements for returns shall be included in the OTN service fee as set forth in Section 4.4 below, except that Novartis will reimburse OTN for returned Product from Participants the value of which exceeds 0.3% of OTN's annual Product sales valued at the actual Price List sales price to Participants (excluding rebates). OTN shall perform such calculation within fifteen (15) days of the end of the calendar year and provide documentation of the Participant credits for returns. Novartis shall reimburse OTN in connection with such returns upon verification of such information and within thirty (30) days of receipt of an invoice and documentation from OTN. Notwithstanding the foregoing, returns due solely to shipment of product by Warehousing Agent in excess of that ordered by a Participant shall be handled in accordance with Section 3.2.7 below and shall not be included in the calculation of the 0.3% return figure set forth above.

3.2.5. <u>Recalls</u>. Recalls shall be handled in accordance with the standard Novartis business policies for direct accounts and in accordance with applicable law. Reimbursement of OTN for the costs of recalls will be handled in accordance with the National Wholesale Druggists Association standards generally applied by Novartis for wholesalers.

3.2.6. <u>Inventory Discrepancies and Losses</u>. Notwithstanding the provisions of Section 9 below, inventory discrepancies and loss of inventory due to, for example, shrinkage or warehouse damage, shall be presumed to be due to the negligence of OTN or Warehousing Agent unless OTN or Warehousing Agent can prove to the satisfaction of Novartis that neither of them were at fault or as otherwise mutually agreed; and OTN shall reimburse Novartis for such losses to the extent that such discrepancies or losses are not covered by insurance pursuant to Section 3.2.2(f) above. Such reimbursement will be at the wholesale acquisition cost prevailing at the time during the calendar quarter in which such loss occurred. Portions of the service fee set forth in Section 4.4 below are designed to cover insurance and other costs associated with such inventory losses.

3.2.7 <u>Shipment Errors to Participants</u>. If OTN or Warehousing Agent issue credits or debits to Participants for shipment errors, such credits or debits may be deducted or added, as applicable, from or to the sales reported to Novartis as set forth in Section 3.3.1. A corresponding unit addition or subtraction should be made in connection with the inventory held by Warehousing Agent and reflected in the physical inventory set forth in Section 3.2.1 above. Product returned to Warehousing Agent due to shipment error may be put back into active inventory to the extent permitted by applicable law or other Novartis policies, which Novartis shall provide in advance to OTN.

3.3. <u>Contract Administration; Sales and Customer Reports; Participant Payment.</u>

OTN will provide all necessary contract administration services in connection with the Price List Sales, as further set forth below.

3.3.1. <u>Administration of Pricing Terms for Price List Sales</u>. OTN shall (a) load the appropriate pricing terms for each Participant in accordance with its general business practices and invoice Participants on behalf of Novartis, (b) calculate Participant entitlement to such pricing terms pursuant to the terms of each Participant's contractual agreement with Novartis via the Price List, (c) distribute any rebates due to each Participant in accordance with the terms of such agreement, (d) advise Participants by way of a mutually agreed statement in the Participant invoice and upon rebate payments that they may have the obligation to report any discounts and rebates in connection with federal health care program reimbursement, and (e) work to resolve Participant issues in connection with Price List Sales, while promptly advising Novartis of material Participant issues in connection with same; and, (f) within one business day of the fifteenth and second to last business day of each month during the Term, provide to Novartis sales and customer reports in forms substantially similar to that set forth in the attached Exhibits C and D ("Sales Reports" and "Customer Reports"), as well as any other data which Novartis may reasonably request in connection with any reporting requirements, including but not limited to information necessary in connection with the calculation and reporting of Novartis rebates to the Medicaid program. Except as approved in writing by Novartis, OTN may not alter the terms of any Price List Sale except as otherwise agreed in writing by Novartis and accepted by the Participant. By way of example, OTN may not condition Price List Sales on a Participant's purchase of Unrelated Products sold by OTN, and OTN may not in any manner condition sales of Unrelated Products to any Participant on such Participant's purchase of the Products.

3.3.2. <u>Implementation of Price Changes; Novartis Approval of Discounts and Rebates</u>. OTN shall make any new prices available to the affected Participants, either as a result of an increase in a Product wholesale acquisition cost, a change in a Price List discount or rebate or otherwise, within no less than three (3) business days of receipt of written notice of such change. Except as otherwise provided herein, each party must give the other party five (5) days' advance written notice of any changes to OTN's sections of the Price List terms and conditions. OTN shall not communicate price changes to Participants in advance of their effective date to Participants unless otherwise agreed by Novartis. OTN may only offer Price List discounts to Participants approved by Novartis in writing. In addition, thirty (30) days prior to the payment of any rebates to OTN on behalf of a Participant, and, in any event, no later than January 31, 2001, OTN must provide Novartis with a notice setting forth its calculation of such Participant's entitlement to such rebate ("Performance Report"), and no such rebate shall be paid until Novartis has given its written approval of same. The parties shall work collaboratively to create a mutually acceptable such report. OTN will provide Novartis with any information reasonably necessary to permit Novartis to verify the accuracy of such calculations. Unless Novartis, in its sole discretion, advises OTN to the contrary, Novartis will pay rebates to OTN in a lump sum, which OTN then will be responsible for dividing and distributing to each Participant. OTN shall have no claim to such rebates for its own account but instead shall hold such rebates on behalf of Novartis in trust for the Participants entitled to such rebates.

8

3.3.3. <u>Participant Payment to OTN; Credit Issues</u>. Participants shall pay OTN in accordance with such payment and credit terms as OTN independently shall negotiate with such Participant, and such payment terms will be at OTN's expense. Upon OTN's submission to Novartis of the Sales Reports set forth in Section 3.3.1 (f) above, OTN shall be deemed to have purchased the receivables associated with such sales, payment for which shall be due at the time specified in Section 3.4 below. Novartis will provide limited reimbursement to OTN for uncollectable accounts as set forth in Section 4.4 below.

3.3.4. <u>Sales, Use and Excise Taxes</u>. OTN shall comply with the following provisions in connection with any applicable Sales, Use and Excise Taxes that arise, in connection with the sale by Novartis of Product to the Participants pursuant to this Agreement, in accordance with all state and local jurisdiction laws.  On behalf of Novartis, OTN shall:  (1) collect applicable such taxes from Participants;  (2) separately state any applicable such tax on invoices issued to Participants; (3) separately account for and designate as "sales, use and excise tax" any applicable such amounts remitted;  (4) collect and maintain applicable exemption certificates and/or sale for resale certificates on a timely and accurate basis, and in accordance with all state and local laws, (5) provide, by the second business day of each month, a monthly sales report specifically detailing: sales by state, showing state, county and city, sales use and excise taxes invoiced to Participants both for the month and year-to-date, and (6) remit to Novartis sales tax monies collected from Participants at the same time that the sales reports set forth in Section 3.4 below is due for the sales set forth in such report. OTN shall indemnify, hold harmless, and defend Novartis from any and all liability, interest, penalty and fees, loss, claims, lawsuits, damages, injury, settlements, reasonable costs and expenses whatsoever (collectively "Liabilities") with respect to non-compliance with state and local jurisdiction sales, use and excise tax laws that arise in connection with Price List Sales, except to the extent that such Liabilities result from the negligence of Novartis or the failure of Novartis to remit the monies and information pursuant to the information provided by OTN.

3.4 <u>Payments to Novartis</u>.  Novartis must receive payment from OTN for Product sales receivables in accordance with the schedule of due dates set forth in the attached Exhibit E. Such payments will be calculated using the Novartis discounted price (without any amount reflecting actual or anticipated rebates, or any OTN cash or prompt payment discounts). OTN shall not be entitled to any prompt payment discount from Novartis in connection with Price List Sales.

3.5. <u>Customer Communications</u>. OTN will use its best efforts to increase the awareness of the Product contractual opportunities available to Participants through faxes, newsletter articles, advertisements in OTN publications, telesales and similar methods designed to reach Participants. Novartis will be given the opportunity to review promptly and approve any documents that might need to be filed by Novartis in connection with the regulatory requirements of the Food, Drug and Cosmetic Act (at the next available Novartis "core team" meeting for the Product if possible), and

OTN will work closely with Novartis to assess such needs on a case-by-case basis. The parties shall work cooperatively to develop methods by which OTN will give active notification of Price List changes to Participants, so long as the number of different Price Lists to be administered remains commercially reasonable in the view of OTN. OTN may, in a commercially reasonable manner, allocate its communication efforts between the Product and Unrelated Products. The parties shall agree, orally or in writing, upon appropriate methods for OTN to update Novartis on the level of effort devoted to Product communications during each calendar quarter during the Term.

3.6 <u>Additional Data</u>. OTN will, consistent with any obligations of confidentiality and all applicable laws, keep Novartis informed of pertinent marketplace developments, such as promotions offered to Participants by Product competitors where such promotions are provided to OTN by Participants on a non-confidential basis. In addition, OTN will, on a monthly basis, provide Novartis with computer files identifying all Participants with notations identifying each Participant's start date if such Participant began Price List purchases after the Effective Date. OTN will make reasonable efforts to comply with Novartis requests for additional data relating to this Agreement.

3.7. <u>Product Sales Data to Third Parties</u>. Upon written notice by Novartis to OTN, OTN promptly shall stop providing any Product sales data of any kind (including but not limited to dollar amounts and Participants) to third parties, including but not limited to reporting services such as IMS.

3.8. <u>Quarterly Implementation Meetings</u>. The OTN business development team will meet with designated Novartis personnel on a quarterly basis to review implementation issues.

4. <u>Obligations of Novartis</u>

4.1. <u>Price List Sales Agreements</u>. Subject to the additional provisions of this section, Novartis shall provide Price Lists that OTN may offer to designated Participants. The general terms of the first Price List to be made available to OTN for Price List Sales are set forth in Exhibit F. OTN and Novartis will cooperate in the creation of procedures and documentation that will efficiently result in binding agreements with Participants. All prices are within the sole discretion of Novartis, and, with the exception of credit and payment terms, which shall be negotiated separately between OTN and Participants, Novartis retains all rights to control the price and all other terms and conditions with respect to sales to Participants of the Product, and will establish and maintain such prices, terms and conditions in its sole discretion. Without limiting the foregoing, Novartis may elect, in its sole discretion, to implement Price List Sales through individual, bilateral contracts with certain Participants which differ from the terms and conditions of Exhibit F. Novartis may discontinue any and all Price List Sales through OTN by way of, or change any of the terms of any Price List for any Participant, as it sees fit, so long as it complies with

the terms of existing Participant Agreements. Prices shall be subject to change without notice (unless otherwise agreed by Novartis), and will float based upon the prevailing Novartis wholesale acquisition cost. Novartis will give OTN prompt notice of any Participant termination.

4.2 <u>Discontinuation of Price List Sales</u>. In the unlikely event that Novartis discontinues all Price List Sales, or discontinues Price List Sales which, in aggregate, accounted for twenty-five percent (25%) or more of Price List Sales during the prior calendar quarter, then either party, by written notice, may request that the terms of this Agreement be renegotiated. If the parties cannot reach a mutually acceptable agreement in principle within thirty (30) days of such notice, then OTN may terminate this Agreement immediately by giving an additional thirty (30) days' written notice of same to Novartis.

4.3 <u>Product Supply, Delivery and Manufacture</u>. Subject to availability, Novartis shall, consistent with its normal business practices, make commercially reasonable efforts to supply products in sufficient quantity to fill Price List Sales orders. Novartis shall supply inventory sufficient to meet the amounts set forth in Section 3.2.1(b) above, although Novartis shall not unreasonably refuse to agree to supply additional amounts as required by Participant demand. Novartis shall maintain control over product allocation decisions, and nothing herein shall require Novartis to prioritize supplies of available product in favor of OTN relative to any other Novartis purchaser. Notwithstanding the foregoing, Novartis will not materially disadvantage OTN relative to any other distributor to Participants in supply allocation decisions. Without limiting the foregoing, in the event of a shortage of Products, Novartis reserves the right to allocate its inventory of Products in such manner as it may, in its sole and absolute discretion, from time to time, determine, and to direct OTN to allocate certain amounts to particular Participants. Novartis shall ship Product to Warehousing Agent within five (5) days of receiving a request from OTN by a common carrier selected by Novartis, and shall prepay freight and insurance. Novartis retains the right to control every aspect of Product manufacture and formulation and nothing in this Agreement shall be deemed to limit the right of Novartis to (a) discontinue production of the Product, (b) introduce any new Product or Unrelated Product, (c) reformulate the Product or (d) change or alter the formulation, design, packaging or labeling of any Product. Novartis in its sole discretion, may, but shall not be required to, recall any Product in the inventory maintained by OTN in order to perform the reformulation, change or alteration described above. Novartis shall give reasonable notice to OTN of any of the events set forth in (a) through (d) immediately above.

4.4. <u>OTN Service Fee.</u> In consideration of OTN's services and data provided pursuant to this Agreement, and as sole compensation for costs associated with anticipated inventory losses (including any insurance coverage), Product returns from Participants or bad debt, OTN shall be entitled to a fee of four percent (4.0%) of Price List Sales as reflected in the Sales Reports, valued at the Novartis invoiced discounted price or prices prevailing at the time of sale, but not including any rebates

11

subsequently owed to a Participant. OTN shall invoice Novartis for service fees at the same time that it submits the applicable Sales Reports to Novartis, and Novartis shall pay such fee in accordance with the same payment schedule set forth in Section 3.3.1 and the exhibit referenced therein, so long as Novartis has received timely payment from OTN in connection with the purchase of sales receivables. Except as provided in Section 3.2.4 above in connection with returns, the parties intend that such amounts will provide OTN with its sole compensation from Novartis in connection with bad debt, returns and losses.

4.5. <u>Timing of Rebate Payments</u>. Novartis will pay undisputed rebate amounts within thirty (30) days of receipt of the performance reports specified in Section 3.3.2 above.

5. <u>Termination</u>. In addition to the termination rights set forth in Section 4.2 above and Section 9 below:

5.1. Either party may terminate this Agreement with immediate effect upon written notice in the event (a) the other party's insolvency, assignment for the benefit of creditors or any granting of relief from creditors; or (b) that any process is issued against a substantial part of the other party's property; or (c) the institution of dissolution, liquidation or bankruptcy proceedings by or against the other party.

5.2. Either party may terminate this Agreement in the event of any material breach of this Agreement by the other party, which remains uncured after thirty days' written notice.

5.3. Upon termination or expiration of this Agreement, Novartis shall no longer be obligated to ship Products requested by OTN or Warehousing Agent. OTN shall promptly submit to Novartis a written final inventory of Product and a list of any orders outstanding prior to the date of termination. OTN shall promptly cause the delivery of any such inventory to a carrier designated by Novartis, and such inventory shall be returned to Novartis at the expense of Novartis. The parties shall make all payments to each other due and owing as of the date of the termination or expiration of the Agreement and shall otherwise cooperate in a commercially reasonable fashion to unwind their relationship. In the event of Agreement termination before the expiration of the Term, OTN payments for sales receivables shall be due in accordance with Section 3.4 above. Upon expiration of the Term, such payments shall be made at times consistent with the due dates set forth in Section 3.4 above.

6. <u>Indemnification</u>.

6.1. <u>Indemnification by OTN</u>. In addition to the indemnification obligations set forth in Section 3.2.2 above, and without limiting the scope of such indemnification, OTN shall also indemnify, hold harmless and defend Novartis from any and all liability, loss, claims, lawsuits, damages, injury, settlements, costs and expenses whatsoever

(as incurred), including but not limited to reasonable attorneys' fees and court costs (provided; however, that such attorneys' fees and costs shall be indemnified by OTN only if OTN wrongfully refuses a tender of defense from Novartis) ("Claims"), arising out of (a) OTN's negligent storage, use, handling, disposal or possession of Product, (b) noncompliance with applicable laws in connection with the storage and handling of Product, and (c) OTN's gross negligence or willful misconduct in connection with OTN's performance of its contract and pricing administration obligations pursuant to this Agreement. OTN shall not be obligated to indemnify Novartis to the extent that any Claim results from the negligence of Novartis.

6.2. <u>Indemnification by Novartis</u>. Novartis shall indemnify, hold harmless and defend OTN and Warehousing Agent from any and all liability, loss, claims, lawsuits, damages, injury, settlements, costs, and expenses whatsoever (as incurred), including but not limited to reasonable attorneys' fees and court costs (provided, however, that such attorneys' fees and court costs shall be indemnified by Novartis only if Novartis wrongfully refuses a tender of defense by OTN or Warehousing Agent) ("Claims") arising out (a) injury or death to persons or property arising out of the shipment or delivery to OTN or Warehousing Agent of Product that: (1) is the subject of a product liability claim due to a manufacturing defect, design defect, failure to warn or breach of warranty, (2) is adulterated or misbranded within the meaning of the federal Food, Drug and Cosmetic Act, as amended, or (3) may not, under the provisions of Section 505 of said Act, be introduced into interstate commerce, or (b) a claim that the Product or the manufacture or sale of the Product infringes upon any patent, trade secret or other proprietary rights of a third party. Novartis shall not be obligated to indemnify OTN to the extent that any Claim results from the negligence of OTN. Novartis shall not be obligated to indemnify Warehousing Agent to the extent that any Claim results from the negligence of Warehousing Agent.

6.3 <u>Procedural Conditions to Indemnification.</u> Neither party shall be obligated to indemnify the other (or, in the case of Novartis, Warehousing Agent) unless the entity claiming a right to indemnification complies with the following procedural requirements:

6.3.1 promptly providing written notification to the indemnifying party of the Claim;

6.3.2. reasonably cooperating with the indemnifying party in defending against the Claim;

6.3.3. permitting the indemnifying party to defend, control, conduct and prosecute, with counsel of such party's choosing, the defense of Claim;

6.3.4. granting the indemnifying party the right, in its sole discretion to settle, compromise or otherwise terminate the Claim and expressly agreeing that the indemnifying party may do so in the indemnified party's name (so long as the indemnified party is not required to pay any money or take any material adverse

action in connection with such settlement, in which case the indemnified party must consent to the settlement); and

6.3.5. refraining from settling any such Claim, or otherwise consenting to an adverse judgment with respect thereto that diminishes the rights or interests of the indemnified party, without the indemnifying party's prior written consent, which shall not be unreasonably withheld.

## 7. Audit; Records

During the Term and for two (2) years thereafter or longer if required by law (by way of example, seven (7) years for tax purposes), OTN and Novartis shall each maintain records necessary to verify their respective performance and compliance with this Agreement. Independent designated agents for either party (who shall sign a confidentiality agreement containing terms substantially similar to those contained in Section 8 below) shall have the right once in each year during the Term, at the auditing party's expense and upon five (5) work days' advance written notice, to inspect and copy such records during normal business hours at the other party's principal office or the place where such records are kept. The audited party must consent to the identity of the auditing designated agent, although approval of any such agent shall not be unreasonably withheld, and reasons for the objection must be provided to the auditing party.

## 8. Confidentiality

Except as otherwise required by law, the parties shall each maintain the confidentiality of any proprietary or confidential information of the other party ("Information"), including any Information on pricing and the terms and conditions of this Agreement. The Information shall not be disclosed to any third party (including any entity which may acquire a party to this Agreement or which may be acquired by a party to this Agreement subsequent to the Effective Date of this Agreement) except with the prior written consent of the disclosing party. Notwithstanding the foregoing, to the extent that Novartis or OTN must, as a matter of reasonable business practice, disclose some of the Information to one or more Participants in connection with the implementation of this Agreement, it may do so pursuant to the terms of the terms and conditions on the Price List (which shall include a confidentiality provision). Information shall not be deemed confidential if it is or becomes public knowledge through no fault of the recipient or is known to the party from a source with a right to disclose such Information. If a party believes that it is required by law to disclose information, it must, prior to disclosure, give reasonable notice to the disclosing party of the circumstances of such disclosure sufficient in any event to permit the disclosing party to seek the benefit of an appropriate protective order or other similar mechanism designed to protect the confidentiality of such Information, and the receiving party shall reasonably cooperate with the disclosing party in connection with such efforts.

14

## 9. Force Majeure

Neither party shall be responsible for any failure to comply with the terms of this Agreement due to: fire; flood; explosions; acts of God; labor strikes; failure of supplies; acts of a government or agency thereof; judicial action; or any health reform legislation which materially alters the commercial benefit of this Agreement. If such failure continues for a period of greater than thirty (30) days, either party shall have the right to terminate this Agreement immediately by giving written notice to the other party to that effect.

## 10. Insurance.

OTN represents and warrants that through its parent company, Bristol-Myers Squibb, it will maintain during the Term of this Agreement and for as long thereafter as necessary to cover claims resulting from this Agreement, the following insurance programs in amounts no less than that specified for each type:

(a) General liability insurance with combined limits of not less than $1,000,000 per occurrence and $1,000,000 per accident for bodily injury, including death, and property damage;

(b) workers' compensation insurance in the amount required by the law of the State(s) in which OTN workers are located and employer's liability insurance with limits of not less than $1,000,000 per occurrence;

(c) in the event that the use of an automobile is required in the performance of this Agreement, automobile liability insurance with combined limits of not less than $1,000,000 per occurrence and $1,000,000 per accident for bodily injury, including death, and property is required;

(d) third party fidelity insurance with combined limits of $10,000,000 per occurrence, $10,000,000 aggregate;

(e) pollution liability insurance coverage with limits of $3,000,000 per occurrence and $6,000,000 aggregate;

(f) all risk property insurance in the amount of $12,000,000 to cover Product at Warehousing Agent's premises at prevailing wholesale acquisition cost; and

15

OTN will provide evidence of its insurance and will name Novartis as an additional insured party under OTN's insurance policy, and provide to Novartis thirty- (30) day's prior, written notice of any cancellation or change in its coverage.

Novartis represents and warrants that it maintains and will continue insurance or self-insurance sufficient to cover the above amounts and the above coverages.

11. Notices

Any notice required to be given hereunder shall be in writing and shall be deemed given when sent by certified mail, return receipt requested, or overnight mail service, to the following persons:

To Novartis: two notices:

Bill Spelta                    and      General Counsel

Both located at:

Novartis Pharmaceuticals Corporation
59 Route 10
East Hanover, New Jersey 07936-1080

To OTN: two notices:

Michael G. Cunningham, Pharm. D.        and      President,
Vice President, Business                         Oncology Therapeutics Network
Development

Both located at:

Oncology Therapeutics Network
395 Oyster Point Boulevard, Suite 405
South San Francisco, CA 94080

12. Miscellaneous.

(a) No Partnership Relationship. The parties hereto intend that no partnership, joint venture or similar relationship be created pursuant to this Agreement.

16

(b) <u>Authorization</u>. The parties hereto each represent that they are duly authorized to enter into this Agreement and to perform their respective obligations contained herein.

(c) <u>Compliance With Law</u>. Each party shall comply with all applicable laws in connection with this Agreement.

(d) <u>Assignment</u>. This Agreement may not be assigned or otherwise transferred to a third Party or affiliate without the prior written consent of the other party. Any such attempted assignment or transfer shall be null and void. Without limiting the foregoing, this prohibition shall prevent either party from assigning or otherwise transferring its rights or delegating its duties under this Agreement to an affiliate or in connection with the sale or transfer of a controlling interest of the party (by sale or transfer of stock, assets, or otherwise) without the prior written consent of the other party. Notwithstanding anything in this section to the contrary, Novartis may assign this Agreement to Novartis affiliates and subsidiaries, or in connection with the sale or transfer of the business to which this Agreement relates, without the prior written consent of OTN, unless such affiliate or subsidiary is a distributor of third party products to Participants or a group purchasing organization for Participants, in which case OTN shall not unreasonably withhold its consent.

(e) <u>No Affiliation; Independent Contractor</u>. The parties hereto are independent of each other and engaged in the operation of their own businesses. Nothing contained herein shall be deemed or construed to create any other relationship between the parties except as expressly provided herein. OTN's status and relationship with Novartis shall be that of an independent contractor. OTN acknowledges and agrees that it is solely responsible for the compensation of its personnel, and that OTN will be responsible for withholding all federal, state, local or other applicable taxes and similar items. OTN also will be responsible for all other employer-related obligations, including providing appropriate insurance coverage and employee benefits, and making all other deductions required by law affecting the gross wages of each employee.

(f) <u>Entire Agreement; Modifications</u>. This Agreement, including any attached Exhibits, which are incorporated herein by reference, constitutes the entire agreement between the parties concerning the subject matter herein, and supersedes all prior or contemporaneous agreements and communications concerning the subject matter hereof. This Agreement may be modified or amended only in writings specified to be amendments or modifications signed by a duly authorized representative of each party. This Agreement, attached Exhibits and written amendments or modifications shall prevail over any inconsistent statements or documents.

17

(g) <u>Survival of Certain Obligations</u>. The provisions of Section 3.3.4, Section 3.2.5, Section 5.3, Section 6, Section 7 and Section 8 shall survive the Term and termination of this Agreement.

NOVARTIS PHARMACEUTICALS CORPORATION:

By: _____

Title: _____

Date: _____

ONCOLOGY THERAPEUTICS NETWORK JOINT VENTURE, L.P.:

By: _____

Title: _Vice President, Business Development_

Date: _January 21, 2000_

18

**Exhibit A**
## Product List

The following Novartis Product(s) are covered by this Agreement and the prices set forth in the table below will be used by OTN to calculate Price List prices and rebates for Participants.

Novartis may change its price to wholesalers and thereby also Price List prices at any time without notice. Pursuant to Section 4.3 of the Agreement, Novartis reserves the right to change or discontinue the manufacture of Product at any time.

| Aredia® (pamidronate disodium) | | | |
|---|---|---|---|
| Strength | NDC Code# | Pkg Size | Current Novartis Price to Wholesalers |
| 30/470mg | 0083-2601-04 | 4 vials | $888.45 |
| 90/375mg | 0083-2609-01 | 1 vial | $615.56 |

Exhibit B

INVENTORY STATUS REPORT ENDING - (MONTH)

| NDC NUMBER | PRODUCT DESCRIPTION | LOT # | BEGINNING ON-HAND | RECEIPTS | UNITS DAMAGED UPON RECEIPT | UNITS SHIPPED | SHIPMENT ERRORS | ENDING ON-HAND |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| **TOTAL** | | | | | | | | |

InventoryReport.xls

Exhibit C

## SALES REPORT ENDING - (MONTH)

| NDC NUMBER | PRODUCT DESCRIPTION | LOT # | UNITS SOLD | AVG.SELLING PRICE | TOTAL SALE PER LOT # | SHIPMENT ERRORS | NET SALE PER LOT # |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

TOTAL

SalesReport.xls

EXHIBIT D

# Management Reports

Purchasing information is updated every business day.
Now displaying results for the following search parameters:

○ Group By: SHIP ETN

○ Selected Site(s): 001891, 002163, 002295, 004005, 004D07, 102514, 102665, 102502, 102884, 103154, 103235

Displaying Records: 1 - 11 (out of 11)

| CAT NO | PRODUCTS | | JUN 99 | JUL 99 | AUG 99 | SEP 99 1 - 20 | YTAR TO DATE |
|---|---|---|---|---|---|---|---|
| 940-200 | DEFEROXAMINE MESYLATE 500MG/VIAL | Qty $Amt | - - | - - | - - | - - | - - |
| | | Qty $Amt | | | | | |
| 224-200 | OCTREOTIDE ACETATE 100MCG 1ML | Qty $Amt | - - | - - | - - | - - | - - |
| | | Qty $Amt | | | | | |
| 224-300 | OCTREOTIDE ACETATE 500MCG 1ML | Qty $Amt | - - | - - | - - | 20 965.00 | 20 965.00 |
| 224-010 | OCTREOTIDE ACETATE DEPOT SUSP. 10MG | Qty $Amt | - - | 1,146.95 | 4,576.20 | - - | 5,723.05 |
| | | Qty $Amt | | | | | |
| 224-030 | OCTREOTIDE ACETATE DEPOT SUSP. 30MG | Qty $Amt | 1 1,745.70 | - - | - - | - - | 1 1,745.70 |
| | | Qty $Amt | | | | | |
| 940-290 | PAMIDRONATE 90MG | Qty $Amt | 300 165,697.25 | 302 175,005.40 | 348 201,117.66 | 215 124,386.030 | 2205 1,240,981.21 |
| Product Totals | | | 193,661.57 195,780.99 | 229,254.46 | 134,999.73 | | 1,498,986.02 |

OTHER TRANSACTIONS
Other Transactions Totals   0.00   0.00   0.00   0.00   0.00

Total OTN Purchases   193,661.57 195,780.99 229,254.46 134,999.73   1,498,986.02

Feb  8        Jul  11
Mar  10       Aug  18
Apr  12       Sep  19
May  14       Oct  20
June 16       Nov  21
              Dec  22
                   177    | 1852 = 170 |

# OTN Payment Schedule to Novartis EXHIBIT E

| Period Covered | | Sales Report Due Date (as set forth in section 3.3.1(f)) | Payment Date | # of Days |
|---|---|---|---|---|
| 01/24/00 - | 01/28/00 | 01/31/00 | 03/1/00 | 32 |
| 01/29/00 - | 02/15/00 ²² | 02/16/00 } 8 × 3 | 05/1/00. | 75 |
| 02/16/00 - | 02/25/00 ⁷ | 02/29/00 } 240 | 05/1/00 | 61 |
| 02/26/00 - | 03/15/00 | 03/16/00  6×2  100 | 05/1/00 | 46 |
| 03/16/00 - | 03/29/00 | 03/31/00 } 5×3  150 | 06/1/00 | 61 |
| 03/30/00 - | 04/14/00 | 04/17/00 } 12×2  240 | 06/1/00 | 45 |
| 04/15/00 - | 04/26/00 | 04/28/00 | 06/1/00 | 33 |
| 04/27/00 - | 05/15/00 | 05/16/00 } 14×3 | 08/1/00 | 77 |
| 05/16/00 - | 05/29/00 | 05/31/00 } 420 | 08/1/00 | 62 |
| 05/30/00 - | 06/15/00 | 06/16/00 } 8×2  1:0 | 08/1/00 | 46 |
| 06/16/00 - | 06/28/00 | 06/30/00 } 8×3  240 | 09/1/00 | 63 |
| 06/29/00 - | 07/14/00 | 07/17/00 } 17×2  340 | 09/1/00 | 46 |
| 07/15/00 - | 07/27/00 | 07/31/00 | 09/1/00 | 32 |
| 07/28/00 - | 08/15/00 | 08/16/00 } 19×3  540 | 11/1/00 | 77 |
| 08/16/00 - | 08/29/00 | 08/31/00 | 11/1/00 | 62 |
| 08/30/00 - | 09/15/00 | 09/18/00 } 95×2  190 | 11/1/00 | 44 |
| 09/16/00 - | 09/27/00 | 09/29/00 } 95×3  285 | 12/1/00 | 63 |
| 09/28/00 - | 10/13/00 | 10/16/00 } 20×2  400 | 12/1/00 | 46 |
| 10/14/00 - | 10/27/00 | 10/31/00 } | 12/1/00 | 31 |
| 10/28/00 - | 11/15/00 | 11/16/00 | 02/1/01 | 76 |
| 11/16/00 - | 11/28/00 | 11/30/00 } 21×2  210 | 02/1/01 | 63 |
| 11/29/00 - | 12/15/00 | 12/18/00 } | 02/1/01 | 45 |
| 12/16/00 - | 12/27/00 | 12/29/00 } 22 | 03/1/01 | 62 |
| 12/28/00 - | 01/15/01 | 01/16/01 } 3535 | 03/1/01 | 44 |
| 01/16/01 - | 01/29/01 | 01/31/01 | 03/1/01 | 29 |
| 01/30/01 - | 02/15/01 | 02/16/01 | 05/1/01 | 73 |
| 02/16/01 - | 02/26/01 | 02/28/01 | 05/1/01 | 62 |
| 02/27/01 - | 03/15/01 | 03/16/01 | 05/1/01 | 46 |
| 03/16/01 - | 03/28/01 | 03/30/01 | 06/1/01 | 62 |
| 03/29/01 - | 04/13/01 | 04/16/01 | 06/1/01 | 46 |
| 04/14/01 - | 04/26/01 | 04/30/01 | 06/1/01 | 32 |
| 04/27/01 - | 05/15/01 | 05/16/01 | 08/1/01 | 76 |
| 05/16/01 - | 05/29/01 | 05/31/01 | 08/1/01 | 62 |
| 05/30/01 - | 06/15/01 | 06/18/01 | 08/1/01 | 44 |
| 06/16/01 - | 06/27/01 | 06/29/01 | 09/4/01 | 67 |
| 06/28/01 - | 07/13/01 | 07/16/01 | 09/4/01 | 50 |
| 07/14/01 - | 07/27/01 | 07/31/01 | 09/4/01 | 34 |
| 07/28/01 - | 08/15/01 | 08/16/01 | 11/1/01 | 77 |
| 08/16/01 - | 08/29/01 | 08/31/01 | 11/1/01 | 62 |
| 08/30/01 - | 09/14/01 | 09/17/01 | 11/1/01 | 45 |
| 09/15/01 - | 09/26/01 | 09/28/01 | 12/3/01 | 66 |
| 09/27/01 - | 10/15/01 | 10/16/01 | 12/3/01 | 48 |
| 10/16/01 - | 10/29/01 | 10/31/01 | 12/3/01 | 33 |
| 10/30/01 - | 11/15/01 | 11/16/01 | 02/1/02 | 77 |
| 11/16/01 - | 11/28/01 | 11/30/01 | 02/1/02 | 63 |
| 11/29/01 - | 12/14/01 | 12/17/01 | 02/1/02 | 46 |
| 12/15/01 - | 12/27/01 | 12/28/01 | 03/1/02 | 63 |

Normal  71 ril. = 781

D.f   2734

| Average # of Days Outstanding | 54.4 |
|---|---|

# Exhibit F

# Price List Terms and Conditions

## Code No. 1

Product and Pricing available only through Oncology Therapeutics Network Joint
Venture, L.P. ("OTN"), as agent for Novartis Pharmaceuticals Corporation
("Novartis"). These terms and conditions apply to all purchases of the Novartis
Products listed in Attachment A at the prices set forth therein and any revised
pricing made available by Novartis through OTN unless otherwise specified.

> **Buyer's placement of an order for the supply of Novartis Product
> through OTN shall be an acceptance of the terms and conditions of this
> document or the terms and conditions in effect at the time of the order.**

## GENERAL CONDITIONS OF SALE

The following terms and conditions apply to the purchase of the Novartis brand-name drug products listed in Attachment A ("Novartis Products" or "Products") through OTN, the direct-selling agent for Novartis in connection with the Novartis Products listed herein, and are subject to change without notice. All orders are based on the terms and conditions in effect at the time of the order. Current terms and conditions are available by contacting OTN.

1.  **Orders:** All orders are subject to acceptance by Novartis' agent, OTN. Novartis, through OTN, reserves the right to limit the quantities of products to be shipped pursuant to any order or to refuse any order prior to shipment.

    a)  **Minimum Quantities:** Most Novartis Pharmaceuticals Corporation products are packaged as shelf cartons. Specific items which can be ordered only in shelf carton multiples are so designated in this Price List. To speed the processing of orders, Novartis and/or OTN reserve the right to edit orders accordingly.

    b)  **Delivery Terms and Conditions:** Novartis makes no representations, warranties, or agreements with Buyer with respect to any aspect of delivery or billing. OTN will ship Products prepaid. Orders for $100.00 or more are shipped free of charge. Orders for less than $100.00 are subject to a $15.00 service charge. (This charge does not apply to back-ordered items). Product is shipped via overnight delivery to arrive no later than 3:30 p.m. the next business day. Expedited delivery is available upon request for $25.00 as follows: Product orders are shipped to arrive by 10:30 a.m. the next business day. OTN's only obligation pursuant to this paragraph is to make reasonable commercial efforts to make deliveries, and the delivery schedule set forth above is subject to availability in Buyer's location.

    Title and risk of loss to Product pass to the Buyer upon delivery to Buyer by the common carrier.

2.  **Pricing**

    a)  All prices under this price list are available only if Buyer specifically references this price list by Product name. Prices and delivery terms are subject to change without notice. Prices in effect at the time orders are accepted will apply in all instances.

    b)  Buyer must verify current pricing through Novartis' agent, OTN. This pricing is available only pursuant to these terms and conditions, and OTN, on behalf of Novartis, agrees to supply available Novartis Products listed herein and make such pricing available to Buyer.

    c)  Buyer may only purchase through Novartis' agent, OTN, in order to obtain price list pricing for the Novartis Products listed herein.

    d)  Further, Novartis shall extend the pricing hereunder **only** to Buyers who meet the following conditions:

        i)  All Novartis Products purchased pursuant to this Agreement shall be for its "own use," as that phrase is defined in *Abbott Laboratories v. Portland Retail Druggists,*

2

425 U.S. 1 (1976), in supplying the pharmaceutical needs of patients at Buyer's facilit(y)(ies) in combination with other health care services; and

ii) Such patients are unable in practice to purchase drugs from retail drugstores because of (by way of example) the necessity of doctor supervision in administering the Novartis Product, incarceration, physical incapacity, or because they lack an economic incentive to do so by reason of the terms of their agreements with their health care provider such as a prepaid capitated drug benefit; and

iii) Novartis Products purchased pursuant to this price list will not be resold, except as provided above, including without limitation as part of any other wholesale or retail pharmaceutical business in which Buyer may be engaged or to walk-in customers not under the care of Buyer for healthcare.

3. **Taxes:** Any tax, excise or other charge imposed or levied by any governmental or taxing authority (other than on income) in respect of the Products covered hereby or in respect of the manufacture, transportation or sale thereof, shall be added to the purchase price hereunder and be borne by Buyer.

4. **Payment and Credit Terms:** All payment or credit terms are determined independently by Buyer and OTN. All payments for goods purchased hereunder shall be payable to OTN in accordance with its instructions. OTN's current such terms include:

Purchases that remain unpaid past their invoice due date incur finance charges based on the outstanding balance calculated from the due date until paid at an annual percentage rate of 12% (8.5% in Alaska and Arkansas and 8% in Minnesota), or if lower, the maximum rate permitted under applicable law. In the event of any overpayment of finance charges, such overpayment shall be applied to the remaining portion of Buyer's balance or returned to Buyer. If back payments are due, current orders will not be shipped until payments are received. OTN reserves the right to maintain a credit limit on all accounts.

5. **Representations and Warranties:**

a) **Novartis:**

Novartis warrants that, at the time of shipment by Novartis, Novartis Products purchased pursuant to this Agreement will not be misbranded or adulterated under the terms of the Federal Food, Drug and Cosmetic Act and all applicable regulations thereunder. Any damages that are awarded against Novartis as a result of a breach of this limited warranty will be limited to the value of the goods at issue.

EXCEPT FOR THE ABOVE, NOVARTIS DISCLAIMS ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, WITH REGARD TO THE NOVARTIS PRODUCTS PURCHASED BY BUYER PURSUANT TO THE AGREEMENT, INCLUDING THE WARRANTY OF MERCHANTABILITY AND THE WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. UNDER NO CIRCUMSTANCES SHALL NOVARTIS BE LIABLE TO BUYER FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR INDIRECT DAMAGES.

b) **OTN:**

3

**Liability:** OTN shall not be liable under any contract, negligence, strict liability or other theory for any special, indirect, incidental or consequential damages or costs of procurement of substitute goods or services in connection with the subject matter of these terms and conditions or any products or the use, delivery or failure or delay of delivery thereof. OTN shall not be liable to any Buyer for any loss, claim or damage resulting from products or the use, delivery, or failure of delivery thereof, and the Buyer shall hold OTN harmless for any such loss, claim or damage.

**Warranty Disclaimer:** OTN does not manufacture or test the products it distributes. **OTN GRANTS NO WARRANTIES, EXPRESS OR IMPLIED, AND OTN DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT WITH RESPECT TO THE PRODUCTS DELIVERED HEREUNDER. UNDER NO CIRCUMSTANCES SHALL OTN BE LIABLE TO BUYER FOR CONSEQUENTIAL, INCIDENTAL, SPECIAL, OR INDIRECT DAMAGES.**

c) **Buyer:**

Buyer, in requesting supply of Novartis Product pursuant to this price list, represents and warrants that it or the users it represents meet the conditions in section 2d)(i) - (iii) and are office-based physicians licensed to practice medicine who administer Novartis Products to patients in an office setting. Buyer further represents that Product purchased pursuant to this Agreement will not be used in the following settings: (a) hospitals, (b) staff or independent practice association health maintenance organizations, (c) home health care, (d) skilled nursing or assisted living facilities, (e) government facilities.

6. **Shipment Shortage and/or Damage**

a) **Incomplete Delivery**

i) Buyer must note on the delivery slip any shortage in cartons delivered. Such notation on the consignee copy is not acceptable for claims processing.

ii) In the event of an incomplete delivery, the customer must notify OTN by calling OTN's Customer Service Department at 1-800-482-6700 if the delivery is not completed within five (5) business days after the original portion was delivered.

b) **Shipment Shortage:** In the event that the stated number of cartons is delivered but the merchandise received does not match up to the packing slip:

i) If the carrier has misdirected any cartons, the customer must notify the carrier and OTN immediately. (See the address label or stencil on each carton.)

ii) If the discrepancy appears to be a packing error, which originated at the warehouse, the customer must notify OTN by calling its Customer Service Department at the 1-800-482-6700 and giving the specifics of the error. OTN shall not be responsible for any packing errors unless it is so notified within five (5) business days after delivery of the shipment.

c) **Damaged Shipments**

4

i) **Common Carrier:** It is the responsibility of the carrier to deliver shipments in perfect condition. In the event of damage: Customer must note on the delivery slip any apparent damage in the shipping cartons delivered. If any merchandise is found to be damaged, the customer must request the carrier to inspect the damaged merchandise, including the shipping carton. Such inspection must be requested immediately upon unpacking the order. All damaged merchandise must be returned to OTN.

ii) **Parcel Post:** Any shortage or damage experienced in parcels shipped through the US Postal Service must be reported immediately to OTN.

iii) **Buyer Order Errors:** Buyer shall notify OTN within five (5) business days of any errors made by Buyer regarding an order, especially if such error might involve returning a portion or all of an order.

7. **Returns:** In order to return merchandise, Buyer must obtain prior authorization from from OTN, and state approximate quantities to be returned and reason for return. Basis of credit for returned merchandise will be at the Buyer's acquisition cost.

   a) **Authorization**

NEITHER NOVARTIS NOR OTN SALES REPRESENTATIVES ARE AUTHORIZED TO ACCEPT RETURN MERCHANDISE. OTN representatives will supply Buyer with Return Goods Authorization Forms.

Written requests for authorization to return prescription merchandise shall directed to OTN by telephone at 1-800-482-6700 or be addressed to:

> Oncology Therapeutics Network
>
> 395 Oyster Point Blvd., Suite 405
>
> South San Francisco, CA  94080
>
> Attn: Customer Service Department

   b) **Items Not Returnable:** Novartis Products are not returnable:

   i) If purchased on a nonreturnable basis (i.e., free goods).

   ii) If returned in other than original retail trade package.

   iii) If short-dated product was purchased at special price.

   iv) If involved in a fire sale or bankruptcy sale.

   v) If deteriorated because of characteristics beyond control of manufacturer; i.e., due to improper storage, heat, cold, water, smoke, fire, etc.

vi) **Returning the Merchandise:** The shipment shall include an itemized packing list of the items returned.  The Return Goods Authorization Form, including the label, shall be used for this purpose.

vii) **Payment of Transportation Charges:** Returns shall be shipped prepaid by Buyer.

viii)    **Credit:** A credit memo will be issued at acquisition cost.

ix) **Special Instructions or Conditions:** Each shipment of return merchandise must be accompanied by a Return Goods Authorization Form supplied by OTN. Buyer must return outdated merchandise no later than one (1) year after expiration date.

x) **Risk of Loss:** Buyer may want to insure all return goods shipments.  Neither Novartis nor OTN is responsible for shipments lost in transit or received in damaged condition. NOVARTIS AND OTN EACH RESERVE THE RIGHT TO DESTROY, WITHOUT RECOURSE, ALL RETURNED PACKAGES.

xi) **Replacement:** Novartis will furnish reasonable replacement merchandise, determined on the basis of facts at hand.

8.  **Product Recall:** OTN will issue a credit to Buyer at Buyer's current net cost.

9.  **Product Availability:** Neither Novartis nor OTN guarantee to supply any Novartis Products. Product in stock is available for immediate shipment. In the event of excess demand, or short supply, OTN may allocate its inventory among its members as it deems appropriate. Novartis reserves the right to discontinue and withdraw any Product, product size or packaging at any time without notice or further obligation on the part of OTN or Novartis.

10. **Force Majeure:** Neither Novartis nor OTN shall be responsible for any failure to supply or otherwise meet the terms hereof due to fire; flood; explosions; acts of God; labor strikes; inability to supply; acts of a government or agency thereof; judicial action; any health reform legislation which materially alters the commercial benefit of this Agreement; or any other cause beyond the control of either Novartis or OTN. If such failure continues for a period of greater than thirty (30) days, either Novartis, OTN or Buyer shall have the right to terminate any outstanding order for product. The allocations made by Novartis and/or OTN shall be conclusive and binding upon Buyer.  Neither Novartis nor OTN shall be obliged to make-up any deficiencies hereunder due to any such cause.

11. **Compliance with Anti-Kickback Statutes:** Buyer will comply with all applicable provisions of the federal anti-kickback statute, 42 U.S.C. §1320a-7b and all applicable related regulations and similar state laws. Without limiting the foregoing, Buyer warrants that it will comply with all applicable disclosure requirements in connection with pricing and any fees, including but not limited to rebates, made available pursuant to this price list.

12. **Confidentiality:** Except as otherwise required by law, the parties shall each maintain the confidentiality of any proprietary or confidential information ("Confidential Information") of the other party, including any Confidential Information on pricing and the terms and conditions herein (including but not limited to Attachment A) for a period of five (5) years from the submission of this response or termination as applicable of any resulting Agreement. It shall not be considered a breach of this Paragraph 12 to make the disclosures

pursuant to Paragraph 11. Any Novartis Confidential Information furnished by Novartis or OTN for use by Buyer in connection with this Agreement shall remain the sole property of Novartis. The Confidential Information shall not be disclosed to any third party (including any entity which may acquire a party to the Agreement or which may be acquired by a party to the Agreement subsequent to the Commencement Date of the Agreement) except with the prior written consent of the disclosing party. Information shall not be deemed confidential if it is or becomes public knowledge through no fault of the recipient. Novartis may promptly obtain the return of Novartis Confidential Information furnished to Buyer upon written notice to Buyer requesting such return.

13. **Records:** During the term of the Agreement and for two (2) years thereafter or longer if required by law, Buyer shall maintain records necessary to verify its performance and compliance with the terms hereof. Novartis or its designated agent shall have the right, at Novartis' expense and upon five (5) business days advance written notice, to inspect and copy such records during normal business hours at Buyer's principal office or where such records are kept. If an audit reveals that any data submitted by Buyer was incorrect resulting in an overpayment by Buyer to Novartis or OTN, then Buyer shall refund the overpayment to Novartis or OTN within thirty (30) days after notice of the finding. Novartis or OTN may withhold any unpaid monies earned by Buyer until the overpayment has been settled.

14. **Choice of Laws:** This contract shall in all respects be construed and enforced in accordance with, and governed by, the laws of the State of New Jersey, which would be applicable to contracts made and performed in New Jersey.

15. **Entire Agreement:** These General Conditions of Sale comprise the entire agreement among the Buyer, Novartis and OTN and merge and supersede all prior understandings and representations (oral or written) among the Buyer, Novartis and OTN as to the subject matter herein, and supersede any provisions in Buyer's forms, letters, documents or papers. No subsequent agreement amending, supplementing or terminating the General Conditions of Sale, if any, including, but not limited to changes, alterations or erasure, or additions to, deletions from, the printed or typewritten portions of the General Conditions of Sale shall be binding upon Novartis or OTN unless and until it has been signed by a duly authorized representative of Novartis or OTN. Commencement of performance hereunder or under any such amended or subject agreement shall not be a waiver of the requirements of this paragraph. Acceptance of this Contract is expressly limited to these General Conditions of Sale.

**Attachment A to Exhibit F**
# Product Prices and Performance Rebates

Provided that Buyer complies with the applicable Price List terms and conditions for this offer, Novartis, through OTN, will make available to Buyer, a Product discount, and, subject to purchase performance, a rebate as set forth in the table below. By making purchases under this offer, Buyer acknowledges its understanding and agreement to comply with all requirements to disclose and report such discounts and rebates.

| Aredia® (pamidronate disodium) discounts and rebates | | | |
|---|---|---|---|
| **Purchase Discounts** | Effective no later than three (3) business days from OTN's receipt of Buyer's request to be covered by this offer, a 2% discount off Novartis price to wholesalers will apply to Buyer purchases of Aredia through OTN. | | |
| **Performance Rebate** | By purchasing the required Aredia® milligrams from OTN during year 2000, Participant will earn a rebate on such purchases, payable by Novartis through OTN, by March 31, 2001. | | |
| **Rebate % are not additive** | 3% | 4% | 5% |
| Aredia® milligrams purchased in year 2000 must equal or exceed those in 1999 by | 0% up to 10.0% | Greater than 10.0% up to 20% | Greater than 20.0% |

**Aredia® Rebate Calculations.**

1. Year 1999 milligrams purchased by Buyer will be determined by Novartis based on third party data such as IMS America.
2. Year 2000 milligrams purchased will be determined by Novartis based on Participant purchases from OTN. Solely, however, for purposes of Buyer qualification for a specific rebate percentage, Novartis will give Buyer credit for Year 2000 purchases made through an entity other than OTN. Such purchases shall be finally determined by Novartis based upon third party data, such as that available from IMS America. To determine the rebate amount owed, the rebate percentage achieved will be applied only against Buyer's purchases through OTN, as set forth in (4) below.
3. Year 2000 purchases from OTN will be adjusted to be net of returns.
4. Buyer's actual rebate will be calculated as the % achieved multiplied by year 2000 purchases from OTN valued at the Novartis wholesale acquisition cost at the time of purchase.