**TAB I**



**Oncology Care Center**

John F. Akscin
Administrator
4000 NORTH ILLINOIS
BELLEVILLE, ILLINOIS 62221
PHONE: (618) 236-1000

Defendants' Exhibit
**2555**
01-12257-PBS

July 26, 1996

Dr. Gail Wilensky, Administrator
Health Care Financing Administration
Department of Health and Human Services
Attention: BPD-712-P
P.O. Box 26686
Baltimore, Maryland  21207

Dear Dr. Wilensky:

I am writing to comment on the proposed rule "Medicare Programs; Fee Schedule for Physicians' Services" as published in the June 5, 1991, Federal Register.

As Administrator of a freestanding cancer treatment center providing both chemotherapy and radiation therapy services to Medicare beneficiaries, I object to many of the components of the fee schedule.

The transition offset, behavioral offset, and methods used to integrate the existing radiology fee schedule into the new Medicare fee schedule, make certain assumptions which are not well established or confirmed.

In integrating the existing radiology relative value system to the new Medicare fee schedule, previous significant reductions in payment for radiology services are not taken into account. In addition, while a resource based approached to physician component services, rendered in the radiology area has been established, this has not been done to the technical component for such services. Many radiation therapy services are highly technically weighted, and continued reductions in the technical component is inappropriate until a resource based study looking at the actual costs providing these technical services can be completed.

You have assumed in the proposed role that the physicians whose payments are reduced will increase their volumes of services to make up the difference. As a referral program, freestanding cancer treatment centers will not react this way, and therefore the behavioral offset should not apply to specialties and procedures which are referral based.

My final comment refers to proposed reductions to providers of chemotherapy services. The elimination of reimbursement for certain chemotherapy procedures provided incident to a physician's management of the patient would adversely affect the

Dr. Gail Wilensky
July 26, 1991
Page 2

viability of freestanding cancer treatment centers. In addition, while I recognize that AWP pricing of drugs as a method of reimbursement has its shortcomings, reducing reimbursement for chemotherapy drugs to 85% of AWP is considered too severe.

In summary, many freestanding cancer treatment centers provide services to Medicare beneficiaries. In addition, many of these beneficiaries come from the rural health care arena. Reductions as proposed in the "Medicare Programs; Fee Schedule for Physicians' Services" will adversely affect the ability for freestanding cancer centers to provide these services, thus affecting access to this care.

Thank you for your attention to this issue.

Sincerely yours,

John Akscin
Administrator

JA:ew



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                    Health Care Financing Administration

The Administrator
Washington, D.C. 20201

SEP - 8 2000

Dear Member of Congress:

I am writing to update you on the actions that the Health Care Financing Administration (HCFA) is taking to make sure that Medicare pays appropriately for the limited number of drugs that it covers. We share the concerns that have been raised by Members of Congress, the Department of Justice and the HHS Inspector General, on this issue. Medicare beneficiaries and taxpayers should not be forced to pay excessive prices for drugs. Our actions are intended to ensure that Medicare pays a fair price for covered drugs while at the same time ensuring that beneficiaries have access to needed care.

Today, we are sending to all HCFA contractors (carriers) that pay Medicare claims another source of price data for 49 Medicare-covered drugs. These data were compiled by the United States Department of Justice (DOJ) working with the National Association of Medicaid-Fraud Control Units. We are instructing carriers to consider the DOJ data as an additional data source for 32 drugs when they determine the average wholesale prices upon which Medicare drug payments are based for the quarterly update beginning January 1, 2001. Although we are sending the complete set of the DOJ data to each of the carriers, we are instructing them not to use the new price data for 17 of these 49 drugs, primarily those used to treat cancer and hemophilia, until we have the opportunity to gather more information about appropriate pricing for these drugs. While we are analyzing this information over the next few months, we hope Congress will enact a new Administration legislative proposal on hemophilia drugs (described below) and HCFA intends to propose modifications in the physician fee schedule practice expense formula or legislation that would increase payments for chemotherapy administration.

We are instructing carriers to report to us by October 15, 2000 the prices they intend to use for the drugs on the DOJ list. Any changes in payment rates based on the DOJ data would be effective January 1, 2001 for the 32 drugs noted above. The period between October 15, 2000 and January 1, 2001 will provide an opportunity to further assess availability of the drugs at the DOJ prices. We believe that this approach will allow more time for carriers, physicians and suppliers to adjust and assure that beneficiaries have access to covered drugs and the services related to their provision.

AS00058

Defendants' Exhibit
**1090**
01-12257 - PBS

Page 2:

*Drug Payment Policy*

As you know, we have been actively working to address drug payment issues, both legislatively and through administrative actions, for many years. We tried several approaches in the early 1990s, but they were not ultimately adopted. In 1997, the Administration proposed to pay physicians and suppliers their acquisition costs for drugs, but Congress did not adopt the Administration's proposal. Instead, the Balanced Budget Act reduced Medicare payments for covered drugs from 100 percent to 95 percent of the average wholesale price. This policy captures only a small fraction of the excessive Medicare payment amounts, as average wholesale price data do not reflect actual costs for many Medicare-covered drugs. Therefore, the Administration has proposed to pay 83 percent of the average wholesale price. This is an important step towards making Medicare a prudent purchaser of services. Achieving reductions in inflated drug prices is a priority; we stand ready to work with Congress to achieve this important goal.

We have followed closely the investigations of drug pricing conducted by the DOJ and the Department of Health and Human Services' Inspector General. The DOJ has indicated that the data they have compiled, for about 400 national drug codes representing about 50 different chemical compounds, are more accurate wholesale prices for those drugs. Furthermore, the DOJ has indicated that, because purchasers often receive further discounts below the advertised wholesale catalog price, either from a wholesaler or from the drug manufacturer directly, actual acquisition costs may be even lower. The DOJ also indicates that some physicians and suppliers obtain drugs at prices lower than the wholesale catalog prices through Group Purchasing Organizations (GPOs). For example, the DOJ data from wholesale catalogs indicate an average wholesale price of $22 for one albuterol sulfate National Drug Code (NDC) which is substantially less than the $73 average wholesale price in the Redbook (one source of average wholesale price data for that NDC) and compares to $15 from a GPO.

At the same time that we are committed to assuring accurate prices for drugs, HCFA is also committed to ensuring that Medicare beneficiaries have access to covered drugs and services related to furnishing those drugs. We indicated in our letter to you in May that we would make available to our carriers the drug price data compiled by DOJ to consider as an alternative source of average wholesale price data for payment of Medicare drugs. We have now met with physician and other groups covering all the major drugs on the DOJ list to discuss availability of drugs at the DOJ prices and services related to the provision of the drugs.

As we suggested in May, the right approach to addressing Medicare profits on drugs identified by DOJ is to pay correctly for the drugs, and at the same time make changes, as necessary, to assure that Medicare adequately pays for services related to the provision of the drugs. As we have gathered information on many of the drugs reviewed by DOJ, we have concluded that Medicare payments for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders are inadequate. Therefore, in addition to instructing carriers not to use the DOJ data for the 17 drugs related to chemotherapy and clotting factors, we plan to take administrative action on chemotherapy administration payments and work with Congress to enact legislation regarding clotting factors. We have continued to conduct our own analyses on this issue.

AS00059

2

Page 3:

To summarize the direction we are giving to carriers, we are instructing them to consider these alternative wholesale prices as another source in determining their January, 2001 quarterly update for 32 drugs that are not chemotherapy and clotting factors. These drugs account for 75 percent of Medicare spending and 70 percent of savings (based on DOJ data) for the drugs on the complete DOJ list. However, we are instructing carriers not to consider, at this time, using the DOJ data for 14 oncology drugs and 3 clotting factors while we gather more information, seek legislation for clotting factors and propose administrative changes for chemotherapy drug administration. Therefore, carriers would use their usual source of average wholesale prices for oncology drugs and clotting factors until they are instructed otherwise. Two drugs on the DOJ list are covered by Medicare but are not paid on the basis of average wholesale prices.

*Legislative Proposal and Regulatory Action*

In next year's physician fee schedule regulations, we intend to propose modifications to the practice expense formula or legislation that would increase payments for cancer chemotherapy administration. Our goal would be to have more accurate pricing for both chemotherapy drugs and chemotherapy administration in place at the same time. During this time, we will continue to conduct our analysis regarding the administration of chemotherapy drugs.

We are proposing legislation to pay suppliers of hemophilia drugs an administrative fee to cover certain costs they incur such as for shipping, storage and inventory control. We believe that establishing a direct payment for these costs would eliminate any need for suppliers to use Medicare drug profits to cross subsidize inadequate Medicare payments. We hope that Congress would provide for such an amendment in Medicare legislation this Fall.

We look forward to continuing our work with you and other members of Congress to meet the needs of Medicare beneficiaries and the taxpayers.

Sincerely,

Nancy-Ann Min DeParle
Administrator

AS00060