sufficiently high to satisfy industry sales requirements. On the other hand, the relatively weak constraints on use inherent in this payment method could result in overuse of recombinant erythropoietin. This could give the industry an excessive stimulus for investment.

This option would be less burdensome to Medicare carriers and fiscal intermediaries than option 5, because determination of the appropriate payment for each provider would be considerably easier. Like options 3 and 4, however, this option requires the calculation of prospective rates and their periodic updating in response to dynamic changes in the market for recombinant erythropoietin. Also, like options 3 and 4, there is a potential need to differentiate these rates, which further adds to the administrative burden. Lastly, because of the potential for both overprovision and underprovision and the resulting diminutions in the quality of care relating to each, peer review is no less necessary under this option than under the other provider payment options.

### Payment for the Product

This section reviews three methods that Congress could require Medicare to use to determine the rate that it will pay for the product recombinant erythropoietin. Setting a payment rate for the product, in addition to setting rates for providers, may enhance Medicare's overall ability to control the costs of this therapy. Better control of costs implies more effective use of limited Medicare resources and, therefore, more potential benefits to patients.

An important consideration in implementing payment for the product component of recombinant erythropoietin therapy is the mechanism through which a payment rate for the product would be realized by Medicare. The product flows from the manufacturer through one or more wholesalers or other intermediate suppliers before it reaches the ultimate providers. A rate agreement between Medicare and manufacturers and the consequent financial flows may or may not involve intermediate suppliers.

One possibility for handling the financial flow is that the manufacturer or manufacturers of recombinant erythropoietin pay rebates directly to Medicare. Rebates could be based on a specific amount per unit sold to Medicare providers. Volume information could be obtained from copies of claims submitted to Medicare carriers and fiscal intermediaries. If there is more than one manufacturer, specific volumes would have to be verified for each. This should not pose a problem, since each manufacturer's brand of recombinant erythropoietin could be identified from a code appearing on each claim.

A more important difficulty with this approach would arise if some manufacturers of recombinant erythropoietin did not have a rate agreement with Medicare. Since the providers of recombinant erythropoietin would not benefit from the rebates, they would have no incentive to purchase recombinant erythropoietin from Medicare-designated manufacturers. This follows from the fact that rebates paid by manufacturers to Medicare need have no direct bearing on the prices that manufacturers would charge to providers. The total cost savings to Medicare would, therefore, be more limited and would depend on the portion of Medicare providers who chose, for whatever reason, to purchase from

Medicare-designated manufacturers. As a remedy, Medicare could lower payments to providers who failed to purchase from Medicare-designated manufacturers or deny them payment altogether.

Another possibility to address this problem would be for the manufacturer to provide rebates to Medicare providers of recombinant erythropoietin rather than to the Medicare program. Providers would also be identifiable from claims. Under this alternative, providers would have a financial incentive to purchase recombinant erythropoietin produced by Medicare-designated manufacturers, because Medicare's payments to all providers would be based on the low prices negotiated with manufacturers. A major difficulty, however, is that manufacturers would be burdened with the task and cost of periodically providing rebates to thousands of dialysis facilities, physicians, dialysis distributors, and perhaps pharmacies. Alternatively, rebates could flow from the manufacturer to Medicare carriers and fiscal intermediaries which, in turn, could transfer them to providers. Medicare carriers and fiscal intermediaries already directly deal with providers on a regular basis. Since this new responsibility would raise the costs of carriers and intermediaries, it might be necessary for Medicare to raise payments to these contractors.

**Option 7: Mandate the Medicare program to base payment rates for recombinant erythropoietin on manufacturer costs.**

Under this approach Medicare would determine a price for recombinant erythropoietin based on a thorough review of manufacturer costs. This alternative is most applicable to a market with a single manufacturer. Although it could also be used for multiple manufacturers, the complexities involved in determining an appropriate payment rate would make it impractical relative to other alternatives.

If it wished to obtain an explicit rate agreement from the manufacturer, Medicare could use its calculated rate as a target toward which to negotiate. What actual rate emerged from negotiation, and how closely it approached the target rate, would depend on the strength of Medicare's market position relative to that of the manufacturer. Alternatively, Medicare could simply use the target rate as an input in calculating payments to providers of recombinant erythropoietin. Medicare employed a variant of this method to set the current payment rate to dialysis facilities. This latter alternative, however, would be less effective in controlling product costs, since Medicare would have no direct influence over the rates charged by manufacturers.

Calculation of a payment rate for recombinant erythropoietin on the basis of manufacturer costs poses certain difficulties. First, since manufacturers are usually developing and producing many products, it is quite difficult to allot common costs, such as basic research and development and overhead expenses, to the product in question. Common costs are costs that cannot be traced to specific products. It is typical in the pharmaceutical industry that multiple discoveries emerge from the same basic research (70). Although measurement of common costs is difficult, their allocation to specific products is more so.

Accounting methods, such as the allocation of common costs according to the projected sales volumes of the related products, are unlikely to result in appropriate payment rates (1976). In the pharmaceutical industry, the related products sold by a firm usually differ in therapeutic significance. Products emerging from the same basic research and development process are further developed and marketed, if sufficient revenues to cover incremental costs are expected. This often yields a hierarchy of related products in terms of therapeutic significance and strength of market demand (31). Larger shares of common cost are efficiently allocated to products with stronger market demands (128).[26] A product has a strong market demand if it can command a high price and if the quantity purchased is largely insensitive to price. Therefore, to allocate efficiently common costs to recombinant erythropoietin, it is necessary to estimate the strength of its market demand relative to that of related products produced by the firm or firms in question. This determination is further complicated by the fact that demand is measured over time and common costs must also be apportioned according to the expected market life of each product.

A second issue complicating this payment option concerns the determination of an appropriate profit rate for the manufacturers of recombinant erythropoietin. The average profit rate for the pharmaceutical industry may be inappropriate if common costs are allocated using accounting methods.[27] Accounting methods would allocate too small a portion of common research and development and other expenses to products with stronger market demands. Consequently, the application of the average industry profit rate to the investment base for these products would yield profits that were too low. Profit rates for individual pharmaceutical products, when calculated using an accounting allocation of common costs, have been shown to vary widely, with many being very low or negative (78). Therapeutic breakthroughs, such as recombinant erythropoietin, generally have high accounting profits. If common costs were appropriately allocated among related products, profit rates would be more uniform.

It has been argued that large accounting profits on successful products are necessary to offset accounting losses on unsuccessful ones, and that only through these can firms earn an adequate overall rate of return (169). Therefore, if accounting methods are used to allocate common costs, and they may be the only practical methods to use, it may be more appropriate to apply to recombinant erythropoietin the average profit rate for significant therapeutic breakthroughs rather than the average rate for the industry. Actual profit rates, whether for specific classes of products or for the pharmaceutical industry as a whole, are appropriate for the rate calculation in this option only if competition in the industry is sufficient to keep overall profits at reasonable levels.

---

26 The efficient allocation of common costs is essentially equivalent to pricing according to what the market will bear. Therefore, pharmaceutical firms automatically achieve this objective in their pursuit of profits. Although this may lead to product prices that are efficient relative to one another, absolute prices may still result in excessive profits if firms possess considerable market power overall.

27 Accounting methods would tend to allocate common costs on the basis of the projected volumes for each product and would not take into account the product's value to consumers and their sensitivity to price.

Despite considerable research (3,32,36, 39,115,169), the degree of competition in the pharmaceutical industry is still unclear. Consequently, it is difficult to know whether industry profit rates are acceptable for calculating a product rate under this option. An analysis of the average profit rate for the industry might reveal something about the degree of competition. Interindustry comparisons of profit rates are often used in such evaluations. Extreme caution, however, should be applied in making comparisons. Differences could be justified by differences in risk and the timing of returns. Also, profit rates in the pharmaceutical industry should be carefully interpreted and compared with those in other industries, because they are very sensitive to accounting practices and other assumptions made in their calculation (9,22,30,135).

A third complication affecting this payment option concerns inefficient uses of resources. In addition to price competition, some pharmaceutical firms may compete in other ways that are wasteful. Such behavior is possible in an industry that is not purely competitive but is characterized by the imperfect competition associated with brand names and product differentiation. Inefficiency arises if products are marketable at prices that cover incremental costs, only because of "persuasive" promotion. Persuasive promotion is distinct from "informative" promotion, which serves the important function of educating potential users regarding the merits and possible side effects of a product. Persuasive promotion goes beyond conveying to potential buyers the information necessary for making rational purchasing decisions (88) and attempts to encourage

purchase by distorting information or by offering benefits unrelated to the product's price. In addition to encouraging imprudent purchases, expenditures on persuasive promotion are in themselves wasteful of resources. Studies have shown persuasive promotion to be a significant factor in the pharmaceutical industry (73,74). To the extent that this behavior applies to the manufacturers of recombinant erythropoietin, price determinations under this option might limit allowance for promotion and other expenditures relating to products marketed in this manner.

The implications of this option depend on whether Medicare succeeded in calculating a payment rate that reflected the costs of efficient production, including a normal profit. Whether this result would occur, however, is not predictable. If the calculated rate was substantially higher or lower than the rate that reflected efficient production, a number of problems could arise. A high rate would mean fewer benefits per dollar allocated to recombinant erythropoietin and higher costs to the Medicare program. Depending on how Medicare set payment rates for providers, it might also result in 1) the substitution of less effective therapies, such as blood transfusions, with perhaps deleterious effects on patients' health, 2) higher out-of-pocket costs for beneficiaries and consequently, less financial access and lower quality of care, and 3) an excessive stimulus to the pharmaceutical industry for technological innovation. A low rate might be harmful, because it could also distort the selection of therapies and provide an inadequate stimulus for technological innovation. In addition, a low rate could cause the manufacturer of recombinant erythro-

poietin to shift costs to other markets or products, depending on how these prices were determined.

A principal drawback of this option is the difficulty of calculating a payment rate that compensates fairly and encourages the efficient use of resources. Although this consideration is crucial, it also adds significantly to administrative difficulty. Other factors contributing to the administrative costs of this option include the staff resources needed to obtain and update information for periodically recalculating the payment rate for the product. Recalculations would be needed to reflect changes in product volumes, input costs, and other factors that in turn affect the costs of producing and distributing the biologic.

**Option 8: Mandate the Medicare program to set the payment rate at the lowest price for recombinant erythropoietin listed in the Federal Supply Schedule.**

The Federal Supply Schedule (FSS) is a catalog of single- and multiple-source products that are available from various manufacturers to the health care facilities of certain agencies of the Federal Government, such as the Department of Veterans Affairs (VA), the Department of Defense, the Public Health Service, and the Centers for Disease Control. The FSS is distinct from products directly purchased by the VA and distributed to facilities through its depot system. Administrative responsibility for the FSS has been delegated by the General Services Administration to the Department of Veterans Affairs Marketing Center (107,120).

The FSS represents prices negotiated with manufacturers.[28] Federal Government medical centers may buy products at FSS prices directly from these manufacturers. The prices listed on the supply schedule are less than or equal to the lowest prices charged to the same class of trade in non-government transactions. Each manufacturer wishing to list on the FSS must provide the VA Marketing Center with complete and confidential information on the prices charged to other customers. The final price is arrived at after negotiation between the VA Marketing Center and the manufacturer (107,120).

Federal Government medical centers are ordinarily required to purchase the lowest priced item on the FSS that meets their needs. Product orders are placed directly with and are shipped from the manufacturer. The Federal Government does not ordinarily guarantee that any specific volume of the product will be purchased by Government medical centers from the manufacturers listing in the FSS. In addition, facilities may purchase from suppliers not on the FSS if the prices charged by these are lower than the lowest priced products on the FSS (107,120).

As a payment option, Medicare dialysis facilities and perhaps other providers of recombinant erythropoietin could be allowed to purchase this product at the price listed in the FSS. This approach, of course, assumes that at least one recom-

---

28 FSS prices now include delivery to Government medical centers. A different arrangement could be negotiated for recombinant erythropoietin and Medicare dialysis facilities.

binant erythropoietin product is listed.[29] The FSS approach has the advantage of applying the weight of the Federal Government's purchasing power. In this respect it is superior to option 7, in which Medicare would negotiate independently with the manufacturer or manufacturers of recombinant erythropoietin. Nevertheless, the FSS approach may still be a weak method for obtaining the best possible prices from manufacturers.

There seems to be no strong incentive for manufacturers of recombinant erythropoietin either to participate in the FSS or to offer the lowest prices that they will accept, if they do choose to participate. Since manufacturers can later reduce prices and since the Government ordinarily makes no sales commitments to low bidders, the best strategy for a manufacturer may be to offer an FSS price that is considerably higher than the lowest price that the company would accept. High FSS prices give manufacturers the option of either sticking to those prices or selectively offering prices lower than the FSS ones, if competitive pressures warrant. At present, the Government, chiefly through Medicare beneficiaries, accounts for most of the U.S. market for recombinant erythropoietin (see ch. 3). It does not seem that, under such circumstances, a manufacturer would list in the FSS at a significantly discounted price, unless compelled to do so by the threat of lost sales. This situation may change if the non-Medicare market expands.

In any case, there may be some advantages to manufacturers of recombinant erythropoietin from appearing on the FSS as relatively low-priced sellers. Because of wide exposure, it could significantly reduce the need for direct marketing. It could also build good will with both the Government and providers.

Another difficulty that applies specifically to recombinant erythropoietin is the limited information on prices paid by comparable non-government purchasers. For the only indication that the FDA has approved to date, chronic renal failure, the Federal Government is by far the dominant domestic payer. Also, because of difficulties relating to the translation of foreign currencies into U.S. dollars and because of foreign government regulation of prices for recombinant erythropoietin, foreign prices may not be appropriate for comparison (see ch. 4 for foreign prices of recombinant erythropoietin adjusted for purchasing power parities among foreign currencies). Therefore, adequate reference prices from which to negotiate Government price concessions may not be available. This limitation, however, should be eased as more indications for recombinant erythropoietin receive FDA approval.

There appears to be little or no possibility under this option for FSS prices for recombinant erythropoietin to be too low. As argued, however, incentives are such that they could be well above the lowest prices that manufacturers would accept.[30]

---

29 Effective Jan. 1, 1990, Amgen listed recombinant erythropoietin on the FSS. The Federal Government was given a 2-percent discount off Amgen's list price of $20 per 2,000-unit vial, $40 per 4,000-unit vial, and $100 per 10,000-unit vial (117,139).

30 Pharmaceuticals listed in the FSS average 41 percent below the average wholesale price (AWP) for single-source products and 67 percent for multiple source ones (138). The AWP is an inappropriate benchmark, however, since it is a list price and is not usually charged to any purchaser. Moreover, recombinant erythropoietin is a recent therapeutic breakthrough, and the above discounts may not apply to such products.

As discussed in option 7, higher prices mean fewer benefits per dollar allocated to recombinant erythropoietin and higher costs to the Medicare program and beneficiaries. Higher beneficiary costs may reduce access to this product and result in lower quality care. High prices may also provide a socially inappropriate stimulus to technological change.

Although this option has the advantage of the FSS' already being in place, it may still pose some administrative difficulties. These difficulties apply less to dialysis facilities and distributors than to other providers of recombinant erythropoietin. The Government facilities currently purchasing from the FSS are relatively large and few in number. Therefore, the logistics of distributing products to these facilities at FSS prices are manageable. Also, because these facilities serve government-related personnel only, there is little risk to manufacturers that products purchased at FSS prices will be used for non-government purposes. If additional indications for recombinant erythropoietin are approved and Medicare coverage is broadened, very large numbers of physicians and retail pharmacies could be involved. The distribution logistics implied may be far more complicated than those for existing FSS purchases. In addition, the above providers of recombinant erythropoietin serve other than government-related beneficiaries. This could significantly increase the risk to manufacturers that recombinant erythropoietin purchased at FSS prices would be used for unintended purposes.

Both of the above problems, however, would be considerably reduced if the FSS approach were applied only to dialysis facilities and distributors. In 1989, there were about 1,800 dialysis facilities that served primarily beneficiaries of government programs (see ch. 4) (156).

## Option 9: Mandate the Medicare Program to set payment rates for recombinant erythropoietin through competitive bidding.

Under this option prices for recombinant erythropoietin would be obtained through a bidding process established by Medicare. Although competitive bidding could take place with as few as two suppliers, its effectiveness generally increases with the number of bidders. Medicare could set the rules and payoffs of the bidding process, and these would influence how closely price offerings approach the lowest price that each manufacturer would accept. A crucial requirement of the competitive bidding approach is that awards be clear and irrevocable. This means that Medicare must guarantee, through contract, recombinant erythropoietin volumes to the winning bidder or bidders. Otherwise, as with the FSS, suppliers would have little incentive to offer their lowest acceptable prices.

Two basic bidding approaches have been identified and evaluated (95). Under one approach, manufacturers of recombinant erythropoietin would openly quote prices to Medicare with the freedom of making reductions in response to each other's bids. Since bidders are unlikely initially to know the lowest acceptable prices of their rivals, prices would be lowered through successive rounds of bidding. Each bidder, for fear of losing, would have an incentive to gravitate toward its lowest acceptable price, and each bidder, except the winner, would eventually be compelled

to reveal this price. The winner would have to bid only slightly below the previous bid in order to win. Therefore, the winning bid could exceed the lowest price that the winner was willing to accept by some unknown amount.

Under a second approach, manufacturers of recombinant erythropoietin would offer sealed bids to Medicare. The principal difference here is that manufacturers would not be able to adjust offers in response to the observed bids of rivals. If bidders have little or no information regarding each other's lowest acceptable prices, bids would reflect each manufacturer's tradeoff between the probability of winning and winning with a price that, in retrospect, is unnecessarily low. The more severe the consequences of losing Medicare sales, the closer will bids be to each manufacturer's lowest acceptable price.

Without additional information, it is unclear which bidding approach would be more advantageous to Medicare. Open bidding would yield a price slightly below the lowest acceptable price of the second-lowest bidder. Depending on the financial consequences faced by manufacturers, sealed bidding would yield a price that is either higher or lower than the above price. Sealed bidding would be more advantageous to Medicare if the manufacturers of recombinant erythropoietin would incur major financial losses from not winning a contract. Manufacturers would probably be very averse to losing Medicare sales if Medicare accounted for the dominant share of the market for recombinant erythropoietin and if this biologic accounted for a large portion of each firm's total sales. Alternatively, if the Medicare

market was of considerably less importance, manufacturers' aversion to losing Medicare sales might also be less. Under these circumstances, open bidding might be superior. Under either approach, a larger number of bidders (manufacturers of recombinant erythropoietin) would be advantageous to Medicare, because it is more likely to result in the winning bid's being closer to the winner's lowest acceptable price.[31]

The issue of single or multiple winners should also be considered. Multiple winners are possible even if there are only two manufacturers of recombinant erythropoietin. Although the price would be set at the lowest bid, guaranteed sales to the lowest bidder should be significantly greater. This approach is necessary to maintain manufacturers' incentives to reveal their lowest acceptable prices and to discourage collusive behavior. Although a single winner may provide maximum incentives, this approach could be very harmful to losers, the market for recombinant erythropoietin, and the industry. If Medicare accounts for all or nearly all of the market, exclusion of losers might result in their permanent elimination. This would make the market less competitive and could result in higher prices for recombinant erythropoietin in the long run.

A possible disadvantage of multiple winners pertains to the logistics of dividing the Medicare market among manufac-

---

31 For open bidding, the difference between the winner's lowest acceptable price and that of the preceding bidder would most likely diminish as the number of bidders increased. For sealed bidding, a larger number of bidders would reduce the probability that each would win with any given bid. This should induce manufacturers to lower their bids, putting them closer to their lowest acceptable prices.

turers. A relatively simple approach would be geographically to divide the Medicare market for recombinant erythropoietin. The lowest bidder, for example, could be guaranteed the largest portion (percentage of sales) of the Medicare market and the freedom to choose which geographic areas would be included in this share. The remainder of the Medicare market could be divided in a similar manner, with the second-lowest bidder getting the next largest share, and so forth. Medicare would require all participating manufacturers to sell the biologic at the winning price bid. To receive payment, Medicare could require providers in each geographic area to purchase the brand of recombinant erythropoietin that Medicare designated for that area.

Difficulties might arise, however, if one organization had dialysis facilities in areas designated for different areas. Such an organization might be faced with obtaining recombinant erythropoietin from more than one source, a situation that could reduce the organization's ability to negotiate a lower price from suppliers. Another complication would arise if the brands of recombinant erythropoietin are not therapeutically equivalent and if these differences are protected by patent. This implies that for some patients, the different brands would not be interchangeable. In that case, totally excluding a brand from a geographic area would not be feasible. As a solution, physicians could be required to justify a specific brand for those patients for whom substitution would be clinically inappropriate. Manufacturers being awarded geographic contracts should be allowed to produce and distribute all versions of the product within legal limits.

As long as manufacturers of recombinant erythropoietin do not refuse to participate in a Medicare bidding process, this option would appear to be an effective method for obtaining competitive prices. There is little reason to believe that resulting prices would be too high. It is possible, however, that prices could be too low. For example, if Medicare's market position was very strong and a single winner was specified, manufacturers might make bids that were below the costs of efficient resource use.

Any price that would at least cover the incremental costs of producing and distributing recombinant erythropoietin could emerge under this option. Such a price, however, might contribute little or nothing to common costs, that is, the costs of resources that are used by more than one product. As argued, this is inefficient for a product, such as recombinant erythropoietin, that would face a strong demand under normal market circumstances. Medicare can prevent manufacturers from bidding prices that are too low by reducing the risks from not doing so. Risks to manufacturers would be reduced if multiple awards were made and if the differences among awards were smaller.

Prices that are too low can provide inadequate incentives for technological innovation, both for the class of products in which recombinant erythropoietin is included and for all pharmaceuticals for which Medicare is a dominant payer. Low prices may also cause manufacturers of recombinant erythropoietin to shift costs to other markets and products.

Competitive bidding has been used by State and local governments to set payment

rates for health care services, but the results have been mixed (96). Although public and private organizations that deliver health care have obtained certain services or products through competitive bidding, the results of similar attempts by governments acting as third-party payers have been disappointing. Despite the potential, it is not clear that these arrangements have resulted in lower prices or lower expenditures for the programs.

In some cases, manufacturers or suppliers have refused to participate. For example, brand-name manufacturers did not offer bids in response to a solicitation from the Kansas Medicaid program regarding pharmaceutical products (9a). Compared with this situation, however, the Medicare program represents a different market with different incentives for manufacturers. With the Kansas Medicaid program, manufacturers had to weigh the possibility of lost sales to that program against the possibility of much larger revenue losses if price concessions had to be shared with other State Medicaid programs. Given Medicare's current predominance as a payer of recombinant erythropoietin therapy, the possibility of lost payments from Medicare would most likely outweigh negative effects on other markets.

Quality problems that have plagued some other competitive bidding programs would be less likely to apply to recombinant erythropoietin under Medicare. Past difficulties seemed to have stemmed in large part from an inability to define precisely the service. Recombinant erythropoietin, however, is a more specific product whose quality is already controlled by FDA requirements.

The administrative responsibilities of conducting a competitive bidding process,

monitoring the contracts, and distributing rebates from manufacturers would entail additional costs for HCFA. Also unique to this option are administrative difficulties regarding the division of the Medicare market, if multiple winners are specified. Medicare has not previously negotiated a price for an intermediate product that is used by medical providers rendering services to beneficiaries. In many cases, a demonstration project within a limited geographical area enables HCFA to evaluate the feasibility of an innovation, but such a demonstration project would not provide a fair test of this option. If the option applied only to a given region, manufacturers would have less incentive to participate and to tender low bids. It would be more reasonable initially to implement the option for dialysis facilities, which currently treat most of the beneficiaries receiving recombinant erythropoietin. Administrative procedures regarding rebates, for example, would be more manageable for the smaller number of dialysis facilities than if physicians' offices were also included. If successful, the option could subsequently be expanded to physicians.

## CONCLUSION

Selecting payment options for Medicare payment of recombinant erythropoietin requires balancing desirable and undesirable implications. The most important tradeoffs relate to improving access to and quality of care for beneficiaries vs. constraining costs to Medicare and its beneficiaries.

Of all the options analyzed, option 1 (extending Medicare coverage to self-administration of the biologic) would most improve access to care, especially for home

dialysis patients. Such an extension of coverage would reduce beneficiaries' expenses, but raise those of the Medicare program. Option 2 (setting payment rates to encourage providers to engage in further research) has the potential to improve substantially the quality of care that beneficiaries receive over time. However, this option might merely transfer costs from manufacturers to the Medicare program.

Among options for paying providers of the biologic, option 4 (including payment for recombinant erythropoietin in the composite rate paid to dialysis facilities and in the capitation rate paid physicians for dialysis patients) has the greatest potential to constrain Medicare expenditures and beneficiaries' out-of-pocket expenses. This option, however, also contains the strongest incentive for providers to skimp on use, which could damage the quality of care that beneficiaries receive. Along with option 4, option 5 (basing Medicare payment on customary, prevailing, and reasonable charges (CPR)) has the worst implications for the quality of care, but from a different direction. The CPR method threatens the quality of care by rewarding overuse of the biologic and at the same time has the greatest potential to fuel inflation in Medicare expenditures and beneficiaries' cost-sharing. Option 3 (paying a fixed rate per recombinant erythropoietin treatment), the present method, is likely to produce moderate expenditures for Medicare and its beneficiaries. This option moderately rewards providers who skimp on dosage, a practice that is subject to quality review. Option 6 (paying according to a fee schedule) may contain moderate incentives encouraging use, with implications for expenditures and the quality of care. These drawbacks can be addressed, how-

ever, by judiciously setting payment levels and by monitoring use. Adoption of this option would apply to recombinant erythropoietin the same payment method that the Omnibus Budget Reconciliation Act of 1989 recently mandated for Medicare payment of physician services generally.

Under present policy, Medicare varies the level and method of payment for recombinant erythropoietin therapy according to the setting in which it is provided. Equity among beneficiaries and providers and incentives for efficient use of medical services would argue for paying the same amount for the same service, regardless of where it was provided.

If Congress adopted an option for paying for the product itself, the resulting payment rate for the product could be incorporated into the level of payment for providers. Of the product payment options, option 9 (setting payment for the product through competitive bidding) has the potential in the short term to result in the lowest price for Medicare and the lowest expenditures for the program and its beneficiaries. Less clear, however, are its feasibility and the likely effects over time on the viability of companies heavily dependent on Medicare revenue and hence on the competitiveness of the industry.

The viability and advisability of the particular options for product payment must be considered within the dynamic context of the market for recombinant erythropoietin. With only one manufacturer about to enter the market, HCFA used option 7 (basing product payment on manufacturer costs) to set current payment rates for providers, but the impracticality of this option

increases with the number of manufacturers. Given Medicare's predominant position as a payer of recombinant erythropoietin therapy, it is unlikely that, under option 8 (using the Federal Supply Schedule), manufacturers would give substantial price concessions. To be viable, option 9, which calls for competitive bidding, requires at least two manufacturers. Indeed, any contractual agreement between Medicare and a manufacturer would have to take into account the stability of market conditions and the effect on the long-term competitiveness of the industry. If additional manufacturers were poised to enter the market, for example, Medicare would probably benefit from delaying its contracts or limiting them to a short period.

Whatever payment options are adopted, HCFA will have to be able to exercise flexibility in monitoring and responding to changing market conditions. In this dynamic market, the number of manufacturers, FDA-approved medical indications for use, and, eventually, Medicare's predominance are likely to evolve over time. The appropriate level and perhaps even the method of payment may well change with market conditions. HCFA's responsiveness to continuing changes promises to influence the quality of care, Medicare and beneficiary expenditures, and the positions of manufacturers and providers.

# Clinical Significance of Recombinant Erythropoietin

## INTRODUCTION

The purpose of this chapter is to summarize and analyze the clinical literature on the safety and efficacy of recombinant erythropoietin. First, the etiology of and treatment method for anemia associated with chronic renal failure are discussed. Next, the efficacy of recombinant erythropoietin is analyzed with information from clinical trials in chronic renal failure patients. Issues discussed include the effect of recombinant erythropoietin on physiologic parameters, such as hematocrit level, and on the quality of life. This section also examines the efficacy of various doses and routes of administration of the product, including intravenous and subcutaneous routes. Other anemic conditions in which recombinant erythropoietin may be clinically useful are reviewed. The final section considers safety issues related to the use of recombinant erythropoietin, including adverse reactions.

## TREATMENT FOR ANEMIA ASSOCIATED WITH CHRONIC RENAL FAILURE

Anemia is characterized by a significant reduction in red blood cell mass and a corresponding decrease in the oxygen-carrying capacity of the blood (23). Red blood cells are the cellular components of blood responsible for the transport of oxygen to body organs and tissues. Sustained lack of tissue oxygenation results in hypoxia, which is characterized by fatigue, weakness, lethargy, decreased ability to exercise, difficulty breathing, loss of appetite, and a overall decreased sense of well-being. Severely anemic patients may have these symptoms at rest and be unable to tolerate any level of exercise. Some may develop heart failure or transient loss of consciousness, while individuals with mild cases of anemia may or may not exhibit these symptoms.

In addition, due to decreased blood flow to the skin, anemic patients are often sensitive to cold and have pale skin color. Anemic males may complain of impotence, while anemic females may have irregular menstrual cycles. Other signs of anemia are dizziness due to lack of oxygen to the brain, irritability, and difficulty in sleep and concentration (23).

One criterion for the diagnosis of anemia is the hematocrit level, which is the volume of red blood cells expressed as a percentage of total blood volume. The average hematocrit level in men is 42-53 percent, and in women 37-47 percent (12).

There are many causes of anemia: loss of red blood cells, decreased production of red blood cells, and increased destruction of red blood cells (hemolytic anemias). Bleeding from surgery or trauma are examples of anemia associated with red blood cell loss. In hemolytic anemias, red blood cells are rapidly destroyed by the body and have a short survival time. Decreased production of red blood cells may occur through lack of iron, vitamins, or naturally occurring hormones, such as erythropoietin.

When the body detects hypoxia, erythropoietin, a hormone produced primarily by the kidneys, is released into the blood stream.[1] This hormone stimulates the release of red blood cell precursor cells from the bone marrow into the blood stream. These precursor cells work with iron stores in the body, assuming these are sufficient, to develop into mature red blood cells, and the hypoxia is corrected (23).

Successful treatment for anemia depends on the underlying causes of the condition in the patient. One method for treating anemia caused by iron deficiency is through the administration of supplemental iron. Other anemias, such as those due to insufficient bone marrow stores of precursor cells, or insufficient endogenous erythropoietin, are usually irreversible and have been historically treated with other measures, primarily periodic blood transfusions.

---

[1]About 90 percent of endogenous erythropoietin is produced by the kidneys, and 10 percent is produced by the liver (63).

### Box 2-A--Dialysis Treatment Methods

The two major forms of treatment for individuals with chronic renal failure are kidney transplantation and some form of dialysis. The term dialysis refers to any process in which the components of a liquid or solution are separated on the basis of the selective movement of different kinds of molecules through a semipermeable membrane. The movement of the molecules through the membrane is caused by the differences in concentrations of salts and toxins in the blood and in the dialysate that is used to cleanse the blood (27).

The different methods of dialysis and the frequency of their use in the U.S. dialysis population are listed in table 2-1. The most commonly used form of dialysis is hemodialysis, in which a machine pumps blood from the patient's body and returns it through an external blood loop. Waste products and other molecules are passed through a semi-permeable membrane, so that blood can be filtered and cleaned. Hemodialysis patients usually require a total of 13 to 15 hours of dialysis weekly, for sessions of about 3.5-4 hours each (27). In 1988, approximately 85 percent of all dialysis patients, both Medicare and non-Medicare, used this method of dialysis (156).

#### Table 2-1--Dialysis Treatment Methods Used in the United States by Medicare[a] and Non-Medicare[b] Patients, December 31, 1988

| | | |
|---|---|---|
| *Hemodialysis* | | |
| In-unit | 86,250 | (81.7%) |
| Home | 3,197 | (3.0%) |
| Subtotal | 89,447 | (84.7%) |
| *Peritoneal* | | |
| In-unit intermittent | 365 | (0.4%) |
| Home intermittent | 326 | (0.3%) |
| Home CAPD | 13,318 | (13.0%) |
| Home CCPD | 1,922 | (2.0%) |
| Subtotal | 15,931 | (15.0%) |
| *Self-Training* | | |
| Subtotal | 580 | (0.3%) |
| *Total U.S.* | | |
| dialysis population | 105,958 | (100%) |

[a]As of Dec. 31, 1988, 91,820 dialysis patients were covered by Medicare and 6,371 had Medicare coverage pending. The percentage distribution of dialysis patients by dialysis method is for the total U.S. dialysis population.
[b]Patients in the non-Medicare category may include those who are covered by the Veterans Administration, private insurance (including those who have employer group health insurance coverage for the first year of ESRD, with Medicare's becoming the primary insurer thereafter), and Medicaid; foreign nationals; and individuals with no coverage.

KEY: CAPD = continuous ambulatory peritoneal dialysis; CCPD = continuous cycling peritoneal dialysis.

SOURCES: Sagel, 1990 (124); US DHHS, HCFA, 1989 (156).

Although most patients receive hemodialysis treatments in dialysis facilities, some have been trained to perform hemodialysis at home. Home dialysis requires self-reliance, but permits freedom from a facility's dialysis schedules. Because of the possibility of medical complications resulting from hemodialysis, patients with severe medical problems are usually not considered candidates for home hemodialysis (27). Only 4 percent of all dialysis patients are on home hemodialysis (157).

## Box 2-A--Dialysis Treatment Methods--Continued

In the other major dialysis method, peritoneal dialysis, a dialysate or cleansing fluid is introduced into a permanent catheter that has been inserted into the abdomen or peritoneal cavity (146). After remaining in the cavity for a period of time, the dialysate is drained out and discarded. Approximately 15 percent of patients utilize some form of peritoneal dialysis (157).

There are three commonly used forms of peritoneal dialysis. Intermittent peritoneal dialysis involves the use of a machine to deliver sterile dialysate to the patient's peritoneal cavity and, after the prescribed time, to remove the dialysate. This technique, which can be performed both in the facility and at home, is usually carried out for 10 to 12 hours 3 times weekly (146). As the patient's renal function declines, longer treatments are needed with this method.

Continuous ambulatory peritoneal dialysis (CAPD) involves continuous, manual exchange of dialysate, roughly every 4 to 6 hours. CAPD requires no machine, and the patient can usually perform the task without additional assistance. In CAPD, the patient empties a 2-liter bag of dialysate fluid into the peritoneal cavity and then proceeds with usual activities for the next 4 to 8 hours or overnight (146). At the end of the cleansing time, the dialysate is drained. The process is repeated 3 to 5 times daily, 7 days a week. The patient must be cautious to use sterile technique at all times. Due to the number of bag changes, the major risk to the patient with this form of dialysis is peritonitis, an infection of the lining surrounding the abdomen.

Continuous cycling peritoneal dialysis (CCPD) is a combination of the intermittent and CAPD methods. CCPD uses a machine to warm and cycle the dialysate in and out of the peritoneal cavity automatically about every 4 hours as the patient sleeps. The dialysate is instilled in the cavity in the morning and remains there until connection to the machine in the evening. Although still small in total number of patients, CCPD is the fastest growing method of dialysis, increasing 26 percent in use during the period 1982-1987. This method does not predispose the patient to peritonitis as much as CAPD, due to the fewer number of connection changes to the dialysis machine (146). Both CAPD and CCPD are home methods of peritoneal dialysis.

The choice of patient dialysis treatment and setting depends on the patient's medical condition, ability to participate in self-care, the level of support from friends and family at home, and treatment preferences (16). Home dialysis can give those patients needing dialysis a certain measure of independence and may reduce the cost of in-unit personnel needed for dialysis. Approximately 18 percent of all dialysis patients utilize some form of home dialysis (157). Home hemodialysis training takes from 3 weeks to 3 months, and home peritoneal dialysis training takes from 1 to 2 weeks. A profile of home dialysis patients is provided in table 2-2.

### Table 2-2--Home Dialysis Treatment Methods Used in the United States by Medicare and Non-Medicare Patients, December 31, 1988

| Dialysis method | Number of patients | Percent of home dialysis patients |
|---|---|---|
| Hemodialysis | 3,197 | 17 |
| Peritoneal | 15,566 | 83 |
| Intermittent | 326 | 2 |
| CAPD | 13,318 | 71 |
| CCPD | 1,922 | 10 |
| Total | 18,763 | 100 |

KEY: CAPD = continuous ambulatory peritoneal dialysis; CCPD = continuous cycling peritoneal dialysis.
SOURCE: US DHHS, HCFA, 1989 (156).

Anemia is frequently associated with chronic renal failure, a progressive condition that results in permanent and irreversible destruction of the kidneys. Chronic renal failure progresses from a predialysis phase, where the kidneys continue to function but at a reduced rate, to a later phase, where there is little or no kidney function and continuous dialysis is needed to remove waste products from the blood stream (21) (see box 2-A and tables 2-1 and 2-2).

In most chronic renal failure patients, the survival time of red blood cells is only slightly decreased, and anemia results primarily from underproduction of red blood cells. This is due to insufficient production of endogenous erythropoietin by failing kidneys (21). The anemic condition worsens as kidney function declines.[2]

The prevalence of anemia in dialysis patients is substantial. Among approximately 13,000 dialysis patients tested by National Medical Care (NMC)[3] in 1989, for example, approximately 93 percent had a hematocrit level less than 35 percent, 74 percent had a hematocrit less than 30 percent, and 70 percent had a hematocrit between 20-29 percent (see table 2-3). For predialysis patients, estimates of the prevalence of anemia vary widely, from 10-44 percent (see ch 3. and table 3-5). The symptoms of anemia associated with predialysis are, in general, not as debilitating as the symptoms of anemia associated with later-stage chronic renal failure (123).

Until recently, the treatment of anemia associated with chronic renal failure had been limited to the use of blood transfusions, androgen therapy, and administration of supplemental iron (57).

---

[2] Other factors associated with the anemia of chronic renal failure include unavoidable blood loss during the dialysis procedure, decreased red blood cell survival time, and iron deficiency (80).

[3] NMC is the nation's largest chain of dialysis centers (11).

**Table 2-3--Distribution of Hematocrit Levels of Dialysis Patients, by Age, January 1988[a]**

| Age | ≤14 | 15-19 | 20-24 | 25-29 | 30-34 | ≥35 | Cumulative percent by age[b] |
|---|---|---|---|---|---|---|---|
| | | | Percentage of patients with specified hematocrit level | | | | |
| 0-14 | 0.00 | 0.02 | 0.07 | 0.11 | 0.02 | 0.02 | 0.23 |
| 15-24 | 0.00 | 0.32 | 1.00 | 0.57 | 0.14 | 0.05 | 2.30 |
| 25-34 | 0.05 | 0.63 | 2.92 | 2.73 | 0.99 | 0.43 | 10.05 |
| 35-44 | 0.02 | 0.48 | 4.06 | 4.68 | 2.07 | 0.96 | 22.38 |
| 45-54 | 0.02 | 0.50 | 4.60 | 6.06 | 3.06 | 1.36 | 37.97 |
| 55-64 | 0.02 | 0.75 | 6.97 | 10.01 | 4.94 | 2.03 | 62.69 |
| 65-74 | 0.00 | 0.41 | 6.51 | 11.26 | 5.11 | 1.75 | 87.73 |
| ≥75 | 0.00 | 0.25 | 3.66 | 5.68 | 2.20 | 0.54 | 100.06 |
| Cumulative percent by hematocrit level | 0.10 | 3.46 | 33.25 | 74.34 | 92.87 | 100.00 | |

[a] Based on data from approximately 13,200 patients tested by National Medical Care. Data do not distinguish among patients' method of dialysis.
[b] Total does not sum to 100 because of rounding.
SOURCE: Berger, 1989 (11).

It is estimated that one-fourth of dialysis patients undergoing hemodialysis require regular or intermittent blood transfusions to maintain acceptable hematocrit levels (57). At initial administration, blood transfusions produce a quick increase in hematocrit, but as the red blood cells die, the hematocrit level drops and another transfusion is required. Thus, it is difficult to stabilize a patient's hematocrit level with blood transfusions. In addition, many risks are associated with repeated blood transfusions, such as iron overload and the potential for transmission of various types of hepatitis virus or the human immunodeficiency virus (HIV) (65). A more detailed discussion of the risks associated with blood transfusions is found later in this chapter. Whether a patient receives a blood transfusion depends on several factors, such as the patient's hematocrit level, signs and symptoms of anemia, and the clinician's judgment. Androgens are male hormones capable of stimulating erythropoiesis, but are associated with side effects, such as liver toxicity and masculinization, and are used infrequently (104).

## EVALUATION OF THE EFFICACY OF RECOMBINANT ERYTHROPOIETIN

A safe and efficacious treatment for anemia associated with chronic renal failure has been unavailable. Efficacy refers to the probability of benefit to individuals in a defined population from a medical technology applied for a given medical problem under ideal conditions of use (143).

The efficacy of recombinant erythropoietin has been assessed primarily by physiologic factors, including changes in hematocrit level and reduction in the need for blood transfusions, an indication that anemia has been alleviated. Although information from studies does not indicate that use of recombinant erythropoietin increases length of life, evidence suggests that the biologic increases the hematocrit level, reduces the need for blood transfusions, and improves aspects of the quality of life of dialysis patients, such as well-being and activity level. The efficacy of recombinant erythropoietin for conditions besides chronic renal failure is being explored.

## Physiologic Effects of Recombinant Erythropoietin in Chronic Renal Failure Patients

Studies in the United States to determine the efficacy of recombinant erythropoietin were first performed in chronic renal failure patients, including dialysis and predialysis patients. Three different classes of studies were done: randomized studies in which there was an untreated or placebo-treated control group; randomized studies in which there was no untreated control group and a before and after effect was examined; and studies in which there was no randomization, and a before and after effect was examined.[4] Important characteristics of some of these studies are listed in table 2-4.

The studies indicate that recombinant erythropoietin produces a dose-dependent increase in hematocrit levels and can reduce or eliminate the need for blood transfusions in most patients.[5] The time required to increase the hematocrit level (rate of increase) and the amount of increase depend on the dose.

In June 1989, the Food and Drug Administration (FDA) approved recombinant erythropoietin for administration by the intravenous route in dialysis patients[6] and by both the intravenous and subcutaneous routes in predialysis patients (160).

---

[4] In a randomized trial, patients are randomly assigned to a control group, which receives standard or no therapy, or to an experimental group, which receives the intervention being assessed. In a before and after trial, the patients' physiological parameters serve as the baseline to assess the impact of the intervention.

[5] According to the Food and Drug Administration (FDA), transfusion-dependency was defined as requiring at least six transfusions per year (159).

[6] The intravenous route of administration of recombinant erythropoietin was used in hemodialysis patients because of the availability of an access site to the blood stream to which the dialysis machine is connected. The subcutaneous route of administration of recombinant erythropoietin, which is used for both predialysis patients and peritoneal dialysis patients, is more practical for these patients because of the unavailability of an intravenous access site.

## Table 2-4--Efficacy and Safety Studies in Chronic Renal Failure Patients

| Study design | Number of patients | Target hematocrit | Doses used and results | Significance level (p value) | Source[a] |
|---|---|---|---|---|---|
| A | 89 HD | see results | IV dose of 100 units/kg produced increase in hematocrit from 22 to 34 vs. placebo (22 to 23). | | Sobota, 1989 (131). |
| A | 101 HD | 32-38 | IV dose of 150 units/kg or placebo TIW for 12 weeks. 97 percent reached target hematocrit. | 0.0005 | U.S. DHHS FDA, 1989 (160). |
| B | 131 HD | see results | IV doses of 25 units/kg, 100 units/kg, and 200 units/kg increased the hematocrit from 22 to 28, 21 to 32, and 21 to 32 respectively over 138 days. | NA | Sobota, 1989 (131). |
| C | 333 HD | 32-38 | IV dose of 300 units/kg or 300 units/kg reduced to 150 units/kg; or 150 units/kg for 12 weeks. Mean maintenance dose was 108 units/kg. 97 percent reached target hematocrit. | 0.0005[b] | Eschbach, et al., 1989 (56). |
| A | 14 PD | 35-41 | IV doses of 50, 100, and 150 units/kg compared with placebo in 14 patients. Over 8 weeks, increases in hematocrit were 27 to 35, 27 to 36, 28 to 41, and 24 to 28, respectively. | 0.0001 | Lim, et al., 1989 (92). |
| A | 12 PD | 36 | SC dose of 100 units/kg or placebo. Hematocrit increased in 11 patients from 25 to 36 after 3 months. 92 percent reached target hematocrit. | 0.001 | Teehan, et al., 1989 (140). |
| A | 93 PD | 38-40 | SC dose of 100 units/kg (45) or placebo (48). 58 percent reached target hematocrit. | NA | U.S. DHHS FDA, 1989 (160). |
| A | 117 PD | 35-40 | IV doses of 50, 100, and 150 units/kg were compared with placebo in initial phase. Hematocrit increased 0.13, 0.20, 0.26, and -0.01 points/day respectively. Patients then treated SC or IV (75-150 units/kg) in maintenance phase. 94 percent reached target hematocrit. | NA | U.S. DHHS FDA, 1989 (160). |
| B | 17 PD | 37-40 | SC doses of 50-100 units/kg and IV dose of 150 units/kg in initial phase; SC maintenance doses at levels to sustain hematocrit. | 0.0001 | Eschbach, et al.,1989 (58). |
| C | 5 CAPD (Pediatric) | 32-38 | SC dose of 150 units/kg TIW increased hematocrit from 22 to 33. | 0.001 | Sinai-Trieman, et al., 1989 (130). |

[a]Numbers in parentheses refer to list of references.
[b]Compared to patients' initial hematocrit levels.

KEY:   A = randomized clinical trial that employed placebo or untreated control; B = randomized clinical trial that did not employ placebo or untreated control and a before and after effect was examined; C = nonrandomized trial in which a before and after effect were composed; CAPD = continuous ambulatory peritoneal dialysis; HD = hemodialysis; IV = intravenous; kg = kilogram; NA = not available; PD = predialysis; SC = subcutaneous; TIW = 3 times weekly.

FDA's approved labeling for recombinant erythropoietin recommends that there be initial dosing and maintenance dosing phases. According to the labeling, therapy should start with 50-100 units/kg of recombinant erythropoietin 3 times a week by intravenous administration for 6 to 12 weeks. When the hematocrit reaches the target range of 30-33 percent, or rises by more than 4 points in any 2-week period, the labeling recommends that the dose be reduced by 25 units/kg. An individual should be maintained in the target range by adjusting the dosage by 25 units/kg of body weight at 2-6 week intervals (160).[7] The maintenance dose is usually lower than the induction dose once the target hematocrit is attained.

At doses of 50 units/kg, the hematocrit increased 0.11 points/day, and at 100 units/kg, it increased 0.18 points/day, clearly establishing a dose-response relationship (160). To maintain patients in the 34-36 percent hematocrit level, 65 percent of patients required fewer than 100 units/kg 3 times weekly; 10 percent each required either fewer than 50 units/kg or more than 200 units/kg 3 times weekly (160).

FDA reviewed data to show the comparability of intravenous and subcutaneous administration for chronic renal failure (62). However, neither the FDA Summary Basis of Approval nor the FDA-approved labeling addresses the relative efficacy of the intravenous route vs. the subcutaneous route of administration, or the relationship between efficacy and dose by these respective routes.

Studies clearly indicate that intravenous recombinant erythropoietin produces a significant rise in hematocrit level in those patients who are treated as compared with those not treated. Although the populations used in the studies may be representative of the age distribution of the dialysis population as a whole, little differentiation was made in the interpretation of the results of the studies, however, of the effect by age group. Evaluating this dimension becomes particularly important as the number of elderly dialysis patients increases (46).[8]

In a large clinical study, 101 anemic hemodialysis patients were randomized to receive either placebo or intravenous recombinant erythropoietin, 150 units/kg of body weight 3 times weekly for 12 weeks (160). In the second 12-week phase, the control group was given the same dose of recombinant erythropoietin as the experimental group. The target hematocrit of 35 percent was attained by a cumulative 95 percent of the patients, with the target hematocrit's being achieved by 97 percent of patients in the original treatment group and 93 percent of patients in the control group after crossover to experimental treatment. Information on statistical significance levels was not presented.

In another study without an untreated or placebo-treated control group, 333 patients (ages 18-81) were randomized to receive doses of either 300 or 150 units/kg, which was then reduced to 75 units/kg when the target hematocrit of 32-38 percent was reached (56). In 97.4 percent of patients, hematocrit increased from 22.5 percent to 35 percent (p<0.0005) within the first 12 weeks. The average hematocrit level was maintained at 33.8 percent after 6 months of treatment (p<0.0005) and 35.5 percent after 10 months of treatment (p<0.0005). The group receiving the higher dose reached the target hematocrit more quickly than did the group receiving the lower dose (6-8 weeks for the higher dose group vs. 10 weeks for the lower-dose group).

---

[7] As an alternative to using a higher dose during the initial phase and a lower dose in the maintenance phase, a model was recently developed that may allow clinicians to determine an optimal dose from the initiation of therapy. The model is based on survival time of red blood cells in the body and dose-response curves that were developed in earlier studies (67).

[8] Elderly patients are more susceptible to the adverse and toxic effects of most drugs. Changes with aging in body composition and in drug distribution, metabolism, excretion, and response make elderly people more vulnerable to adverse reactions. Since most clinical trials and pharmacological studies are performed in younger people, it is often hazardous to apply drug treatment standards developed for these populations to the elderly (12).

*50 – Recombinant Erythropoietin: Payment Options for Medicare*

In the same study, after 8 weeks of therapy, none of the treated patients was dependent on blood transfusions, including 116 previously transfusion-dependent patients. An average 0.52 units of blood per patient per month had been required before initiation of recombinant erythropoietin therapy. These requirements were reduced to 0.1 units per patient per month after the first 4 weeks of therapy, and 0.04 units or fewer per patient per month during the study.[9] (The impact of recombinant erythropoietin on reducing blood transfusion requirements in chronic renal failure patients is described in table 2-5).

In a before and after study, recombinant erythropoietin was intravenously administered over a range of doses between 15 and 500 units/kg to 25 anemic hemodialysis patients (ages 21-69; hematocrits 15 percent to 24.5 percent) (57). Dose-dependent increases in erythropoiesis were noted over 3 to 7 months. Blood transfusions were no longer needed by 12 patients, the only patients that received them before recombinant erythropoietin was used.

A before and after study of 5 transfusion-dependent pediatric dialysis patients ages 12-18 was undertaken. In the 6 months preceding recombinant erythropoietin therapy, each patient had received between 5 and 18 blood transfusions to

---

[9] This study did not specify the volume in a unit of blood. For dialysis patients, a transfusion usually consists of 250 ml. of packed red blood cells (77).

---

**Table 2-5—Reduction in Blood Transfusions with Recombinant Erythropoietin Therapy**

| Study design | Number of patients | Results | Source[a] |
|---|---|---|---|
| A | 244 HD[b] | In first randomized arm, the transfusion requirements of 113 treated patients receiving 100 units/kg of recombinant erythropoietin were reduced from 0.17 units per patient per week to 0.09 per week over 6 weeks versus the placebo group, which remained at 0.19 units, per patient per week. In the second randomized arm, transfusion requirements of 131 patients were reduced from 0.09 units per patient per week to 0.04 units per patient per week over 6 weeks vs. the placebo group, which increased from 0.18 units per patient per week to 0.22 units per patient per week after 6 weeks. | Sobota, 1990 (132a). |
| B | 131 HD | After 4 weeks, 44 patients treated with 25 units/kg had a reduction in total transfusions from 69 to 25; 44 patients treated with 100 units/kg had a reduction in total transfusions from 70 to 22; 43 patients treated with 200 units/kg had a reduction in total transfusions from 93 to 18. | Sobota, 1990 (132a). |
| C | 333 HD | Patients needed an average 0.52 units of blood per month prior to therapy; this decreased to 0.1 units per patient per month after 4 weeks; and virtually all patients were transfusion-independent after 12 weeks. | Eschbach, et al., 1989 (58). |
| C | 25 HD | 18 patients required transfusions in the 6 months prior to therapy, and 12 were transfusion-dependent, requiring transfusions at least twice a month. These requirements were eliminated in all patients after therapy. | Eschbach, et al., 1987 (57). |
| C | 5 CAPD | In the 6 months before therapy, patients needed 5 to 18 blood (Pediatric) transfusions each; these requirements were eliminated after 12 weeks. | Sinai-Trieman et al., 1989 (130). |

[a] Numbers in parentheses refer to list of references. Another report estimated that transfusion-dependent patients required 7.1 units per year and that these could be eliminated with recombinant erythropoietin therapy (117).

[b] Study consisted of two separate randomized arms.

KEY: A = randomized clinical trial that employed placebo or untreated control; B = randomized clinical trial that did not employ placebo or untreated control and a before and after effect was examined; C = nonrandomized trial in which a before and after effect was examined; CAPD = continuous ambulatory peritoneal dialysis; HD = hemodialysis; kg = kilogram.

maintain a hematocrit of 20 percent and treat symptoms of anemia. The children were treated at home with 150 units/kg recombinant erythropoietin subcutaneously 3 times weekly for 5 to 8 months. The hematocrit level increased from an average of 22 percent to an average of 33 percent (p<0.001), and was maintained in the 32-38 percent range for 5 to 8 months. When the patients reached the target of 35 percent, the dose was decreased in increments of 25 units; when the level reached 40 percent, treatment was discontinued until the hematocrit dropped below 40 percent. The patients were then reinstated on a dose of 150 units/kg once or twice weekly subcutaneously to maintain their hematocrit levels. Further blood transfusions were not required when the target hematocrit was reached (130).

Reflecting the dose-response relationship to recombinant erythropoietin, the time to reach a target hematocrit level and the number of patients reaching any specified target depend on the dose used (see table 2-6). Although the study designs are not presented, it appears from the data that doses of 100 units/kg are needed for 90 percent or more of patients to respond. The data also suggest that with doses of 44 units/kg, slightly more than 50 percent of patients respond. Lower doses seem to produce a lower response rate in a smaller number of patients. In one case, approximately 70 percent of patients (n=116) in a before and after study without randomization increased their hematocrits to 30 percent over 12 weeks with only 50 units/kg 3 times weekly (18).

Studies to date, as indicated in table 2-7, suggest that subcutaneously administered recombinant erythropoietin is also efficacious at both increasing and maintaining the hematocrit level of most patients to whom it is administered. The current evidence is more voluminous for the efficacy of the subcutaneous route of administration in predialysis patients than in dialysis patients. One report does indicates efficacy in dialysis patients (17).

The evidence is clearly convincing that both the subcutaneous and intravenous routes are efficacious in increasing hematocrit levels. Although some have suggested that target hematocrit levels can be attained with lower doses by the subcutaneous route, there are not enough data to fully support this conclusion. No study compared the same doses by different routes of administration. In most of the studies, both the routes of administration and the doses were varied, making comparison difficult.

In some cases, lower doses of subcutaneously-administered doses of recombinant erythropoietin were able to achieve a similar therapeutic response as higher doses of the intravenously-administered product. This usually occurred, however, over a longer period of time. For example, in one study, the target hematocrit was reached in 8 weeks with 150 units/kg intravenous recombinant erythropoietin as compared with 12 weeks with 100 units/kg of subcutaneous recombinant erythropoietin (58). One possible explanation is that subcutaneously admin-

**Table 2-6—Dose Response to Intravenous Recombinant Erythropoietin**

| Dose used (units/kg) | Number of patients | Percent responding[a] | Source |
|---|---|---|---|
| 300/150 | 309 | 97 | Eschbach, et al., 1989 (58). |
| 200 | 43 | >90 | Sobota, 1989 (131). |
| 120 | 28 | 93 | Kuhn, et al., 1988 (186). |
| 100 | 44 | >90 | Sobota, 1989 (131). |
| 80 | 28 | 82 | Kuhn, et al., 1988 (186). |
| 50 | 116 | 71 | Biagg, 1989 (17). |
| 44 | 236 | 55 | Roxas, 1989 (122). |
| 40 | 29 | 28 | Kuhn, et al., 1988 (186). |
| 25 | 44 | <25 | Sobota, 1989 (131). |

[a]Response was considered an increase in hematocrit to over 30 percent in 3 months.
[b]Numbers in parentheses refer to list of references.
KEY: kg = kilogram.
SOURCE: Eschbach, and Adamson, forthcoming. 1990 (55).

## Table 2-7—Studies of Subcutaneous Administration of Recombinant Erythropoietin

| Study design | Number of patients | Dose[a] | Results | Significance level (p value) | Source[b] |
|---|---|---|---|---|---|
| A | 14 PD | SC doses of 100 units/kg or placebo | Average hematocrit increased for treated group from 2 35.8 percent over 12 weeks. Average hematocrit remained at 28 percent for placebo group. | 0.004 | Kleinman, et al., 1990 (83). |
| A | 12 PD | SC doses of 100 units/kg or placebo | Hematocrit increased in 11 patients from 25 percent to 36 percent after 3 months. | 0.001 | Teehan, et al., 1989 (140). |
| A | 93 PD | SC doses of 100 units/kg (45) or placebo (48) | Hematocrit of 38-40 percent attained by 58 percent of treated vs. 4 percent placebo in 12 weeks. | NA | US DHHS, FDA, 1989 (160). |
| A | 117 PD | SC or IV doses of 75-150 units/kg in maintenance phase after target hematocrit of 35-40 percent reached. | Hematocrit maintained in 35-38 percent range for 6 months in 94 percent of patients. | NA | US DHHS, FDA, 1989 (160). |
| B | 17 PD | IV doses of 50-100 units/kg and SC doses of 150 units/kg in initial phase. Maintenance dose given SC at levels to sustain increase in hematocrit. | Hematocrit increased from 28 percent to 37 percent in 12 weeks by SC and 8 weeks by IV. | 0.0001 | Eschbach, et al., 1989 (58). |
| C | 5 CAPD (Pediatric) | SC doses of 150 units/kg | Hematocrit increased from 22 percent to 33 percent. | 0.001 | Sinai-Trieman, et al. 1989 (130). |
| C | 12 CAPD | Initial SC doses of 100 and 150 units/kg; reduced to 50 units/kg. | Hemoglobin increased 2 g/dl over 26+ weeks, reaching 11 to 11 1/2 g/dl in 11 patients. | NA | Stevens, et al, 1989 (134). |
| C | 86 HD[d] | IV doses averaged 101 units/kg in 55 patients and SC doses averaged 108 units/kg in 31 patients. | Patients treated IV maintained target HCT for 23 months; patients treated SC maintained HCT for 21 months. | | Blagg, 1990 (17). |
| C | 29[e] | Doses, routes, and frequency of administration were varied. | Hemoglobin was maintained in target (10.5 < Hb < 13) at doses of 80 units/kg SC weekly in 13 patients and 164 units/kg SC twice weekly in 16 patients. | NA | Besarab, et al., 1990 (13). |

[a] Administered three times weekly, unless otherwise noted.
[b] Numbers in parentheses refer to list of references.
[c] Hemoglobin is the oxygen-carrying protein of red blood cells. Normal average hemoglobin levels in men are 14-18 g/dl (grams/deciliter) and 12-16 g/dl for women (12).
[d] Study compared administration in home dialysis with in-center dialysis patients.
[e] Abstract did not report the patients' methods of dialysis.
KEY: A = randomized clinical trial that employed placebo or untreated control; C = nonrandomized trial in which a before and after effect was examined; CAPD = continuous ambulatory peritoneal dialysis; HCT = hematocrit; HD = hemodialysis; IV = intravenous; kg = kilogram; NA = not available; PD = predialysis; SC = subcutaneous; TIW = three times weekly.

istered product is stored in the muscle tissues and released into the blood stream over a period of time, in contrast to intravenous product, which is released into the blood stream immediately upon injection. The benefit of very high peak serum levels after an intravenous injection seems to be questionable (105). The differences in the doses used may be the primary reason for this phenomenon, however. In the final analysis, additional randomized trials with control groups in larger patient groups are needed to compare the relative efficacy of these two routes.

Patients that perform dialysis at home are most likely to self-administer recombinant erythropoietin by the subcutaneous route. If the patient self-administers the product correctly, there is every reason to believe that the product will be efficacious. Training to perform self-administration will most likely come from the patient's physician and will include instructions on how to store the product (e.g., refrigeration), how to draw up the product from the vial using sterile technique, and how to inject the needle. In addition, it will be important for patients that self-administer the product to have their hematocrit and iron stores checked regularly (17).

Evidence of the efficacy of self-administration of recombinant erythropoietin by patients is limited to a few reports. In one before and after report, 5 hemodialysis patients (ages 18-55) who self-administered recombinant erythropoietin intravenously through the arteriovenous graft over a 3-month period had a mean rise in hematocrit from 18.4 percent to 32.6 percent (110). None of the patients required further blood transfusions. In another before and after report, 17 patients maintained their target hematocrit by administering recombinant erythropoietin subcutaneously at home (82). The dose used to maintain the target hematocrit was tailored to the individual patient's needs. Finally, in a study comparing 55 in-unit dialysis patients treated intravenously with an average of 101 units/kg with 31 home dialysis patients, the home patients were able to maintain for 21 months the hematocrit level attained in the dialysis center in a self-administration program with intravenous doses of 108 units/kg of recombinant erythropoietin (18).

## Effect of Recombinant Erythropoietin on Quality-of-Life in Chronic Renal Failure Patients

The efficacy of recombinant erythropoietin therapy may be measured by its impact on an individual's quality of life, a multifaceted, multidimensional concept. The quality of life may be assessed by measures that relate to such aspects as ability to work, level of functional impairment, well-being, psychological attitude, and life satisfaction (59).

The quality of life of chronic renal failure patients may be affected by several factors, such as the severity and number of the patient's underlying illness or illnesses, the treatment approach (dialysis vs. transplantation), the symptoms associated with anemia of chronic renal failure, and the characteristics of the dialysis and transplant centers, since patients at certain centers seem to be better rehabilitated than those at other centers (59).

The symptoms of anemia may impair the well-being and functioning of dialysis patients. Hypoxia due to anemia associated with chronic renal failure often leads to persistent lethargy, decreased exercise tolerance, poor appetite, and decreased sexual performance. From a theoretical point of view, any increase in the hematocrit should result in increased central and peripheral oxygen availability and enhance exercise capabilities and the quality of life. Because of the many medical and social problems confronting dialysis patients, however, alleviating the symptoms of anemia may only partially contribute to an improved quality of life. Treatment for this anemia, generally consisting of blood transfusions, can produce adverse reactions that effect patients' quality of life. In addition, therapies used to treat other underlying medical conditions, such as drugs, may have debilitating side effects. For example, drug therapy for treating diabetes and hypertension may produce side effects such as lethargy or sexual impotence, which are also common symptoms of anemia.

The time involved in undergoing regular dialysis treatments at home or traveling to a center to receive such treatments may prevent dialysis patients from

developing and maintaining a regular work schedule. This can affect a patient's perception of self-worth and result in financial hardships that affect lifestyle. Thus, when the efficacy of recombinant erythropoietin is considered, it is important to recognize that multiple factors contribute to the quality of life of dialysis patients.

With one exception, the information on recombinant erythropoietin's impact on quality of life comes primarily from randomized or before and after studies of hemodialysis patients in which there was no control group. These quality-of-life studies suggest that correction of anemia associated with chronic renal failure with recombinant erythropoietin can improve the functional abilities of chronic renal failure patients (see table 2-8).

One randomized study examining the quality-of-life involved 118 hemodialysis patients. After 6 months of treatment with recombinant erythropoietin, clinically and statistically significant improvements in the sickness impact profile (p< 0.02), stress test (p<0.0018), and other quality-of-life indicators were noted (physical symptoms, fatigue, relationship with others) as compared with the control group (26).

A randomized study evaluated quality-of-life changes in 17 predialysis patients (58). Investigators described subjective improvement in well-being and appetite in the patients. Predialysis patients continued to work and be active, even though their renal functions continued to deteriorate. The quality of life of patients who were not on therapy was not reported, however, making comparison to the treated group impossible.

A recent before and after study examining the relationship between recombinant erythropoietin therapy and quality of life in 333 hemodialysis patients supports earlier findings. Statistically significant increases in hematocrit were noted in patients treated with recombinant erythropoietin over a 4.4 month period and sustained over an average of 10.3 months (p < 0.001). Improvements in the quality of life were measured by the Karnofsky index (p < 0.01) and subjective quality-of-life indicators, such as well-being (p < 0.004), psycho-

logical affect (p < 0.03), and life satisfaction (p < 0.017). The use of the Nottingham Health Profile produced mixed results, with statistically significant improvements in some measures (energy, emotional reaction) and not in others (pain, sleep, mobility). The number of patients who returned to work after the 10.3 months of treatment was not significantly different from those working at baseline (61).

After the first period, patients reported statistically significant improvements in activity and energy levels (p<0.01), which were correlated with statistically significant increases in hematocrit over baseline (p<0.01). Patients reporting low energy levels at the beginning of the study dropped by half after the first period of the study. Improvements reported after the first period of the study were maintained through the entire study period of about 10 months.

A Nottingham profile index was used to measure patient energy levels. A measure of 0 indicated "no limits" on energy levels, while a measure of 100 indicated complete limits. The patients' average energy level limitation score at the beginning of the study was 47, fell to 31.5 after the first phase of the study, and measured 17.7 at the end of the study (p<0.01). Information on the mean age and other underlying disease states in the patients was not reported. The increase in energy levels was not reported by age group.

A Karnofsky score index was used in another before and after to measure the rehabilitation of 29 dialysis patients (64). (A score of 91-100 indicates ability to engage in full activities without significant effort, while 81-90 indicates ability to engage in usual activities with some effort.) The mean score for the patients increased from 76 to 86.6. Although the significance level was not included, a statistically significant increase in the score was reported for all patients in age groups 20 to 69, but not for those patients aged 70 or over.

In summary, reports to date suggest that recombinant erythropoietin has the potential to improve dialysis patients' quality of life. Long-term studies in the chronic renal failure population are needed, and the relationship between recombinant erythropoietin

*Chapter 2–Clinical Significance of Recombinant Erythropoietin~ 55*

## Table 2-9–Quality-of-Life Studies

| Study design | Number of patients | Physiologic results | Quality-of-Life results | Significance level (p value) | Source[a] |
|---|---|---|---|---|---|
| A | 118 HD | After 5 months hemoglobin averaged 7.4 g/dl for the placebo group, 10.2 g/dl for one treatment group (target 9.5–10.0 g/dl), and 11.7 g/dl for the other treatment group (target 11.5–13.0 g/dl). | Sickness Impact Profile improved, stress test improved | 0.02 0.018 | Canadian EPO Study Group, 1989 (26). |
| C | 333 HD | Hematocrit rose from less than 30 to 35 after 4.4 months and stayed at 34 after 10.3 months. | Karnofsky score increased from 27 percent to 48 percent. Ability to work: -patient reported -staff reported Subjective quality of life -well-being -psychological affect -life satisfaction | 0.01[b]  0.69 0.93  0.004 0.03 0.017 | Evans, et al., 1990 (61). |
| C | 68 HD | Hematocrit rose from 22.9 to 33.5. | Increase in energy, body temperature, appetite sleep, hair growth, sexual interest. | NA | Eschbach and Adamson, 1989 (54)[c]. |
| C | 130 HD | Hematocrit rose from 23.7 to 34.2 (after 5.6 months) to 33.9 (after 9.7 months) | Increase in categories of no complaints, activity energy, and energy limit, as measured by Nottingham profile. | 0.01 | Evans, et al., 1989 (60)[c]. |
| C | 45 HD | Hematocrit rose from 19.3 to 39.8 | Appetite, cold tolerance, sleep, sex function, skin color, hair growth increased. | NA | Delano, et al., 1989 (42)[c]. |
| C | 37 HD | Hematocrit rose from 19.3 to 31.5. 32 patients remained in study for 2 years. | Well-being, appetite, sexual function increased. Karnofsky score used to measure increased range of activities. | NA | Gibilaro, et al., 1989 (64)[c]. |
| C | 8 HD | Hematocrit rose from 17.3 to 33.3. | Improvement in exercise capacity | 0.002 | Mayer, et al., 1988 (100). |
| C | 17 HD | Hematocrit rose from 22.7 to 36.6. | Central nervous system functional status increased. | NA | Nissenson, et al., 1989 (106)[d]. |
| C | 17 HD | Statistically significant increase in hematocrit noted. | Conceptual and visual motor skills increased. | NA | Wolcott, et al., 1989 (173)[d]. |
| C | 17 PD | Statistically significant increase in hematocrit. | Well-being and appetite increased. | NA | Eschbach, et al., 1989 (38). |

[a]Numbers in parentheses refer to list of references.
[b]P values from baseline to 10.3 months.
[c]This study reported on a subset of the 333 patients in Evans, et al., 1990 (61).
[d]Nissenson, et al., 1989 (106) and Wolcott, et al., 1989 (173) report on the same 17 patients.

KEY: A = randomized clinical trial that employed placebo or untreated control; B = randomized clinical trial that did not employ placebo or untreated control, but a before and after effect was examined; C = nonrandomized trial in which a before and after effect was examined; HD = hemodialysis; NA = not available; PD = predialysis.

*56 ~ Recombinant Erythropoietin: Payment Options for Medicare*

therapy and the ability to work in the case of predialysis patients or ability to return to work in the case of dialysis patients needs to be explored. Determining the long-term effect of recombinant erythropoietin on the quality of life is important because a number of factors contribute to this dimension. Recombinant erythropoietin may produce initial short-term improvements in patients that may or may not persist in the long-term. Finally, future studies should report impact on quality of life by age group, particularly the elderly, since they will constitute a larger percentage of the dialysis population in the near future, and previous studies have presented little information on this age group.

The potential to undertake quality-of-life studies increases as the number of patients on long-term recombinant erythropoietin therapy increases. The ability to find patients that are not being treated with recombinant erythropoietin for the purpose of serving as a control group for such studies, however, may become difficult or impossible. Patients may have to serve as their own control group, or the results from past quality-of-life studies of dialysis patients may serve as potential controls.

## Other Potential Uses of Recombinant Erythropoietin

The literature suggests that recombinant erythropoietin may be effective in correcting anemias associated with other medical conditions. Because insufficient endogenous erythropoietin production may only partially contribute to these anemias, careful evaluation of the efficacy of recombinant erythropoietin must be made for each condition.

Studies of the safety and efficacy of recombinant erythropoietin in other medical conditions are in various stages. Furthest along in the process are studies in anemias associated with HIV, which is responsible for acquired immunodeficiency syndrome (AIDS). Ortho Pharmaceutical Corporation submitted a Product Licensing Application (PLA) to FDA for this indication in February 1989 (1).

### Anemias Associated With the Human Immunodeficiency Virus (HIV)

Anemia associated with HIV appears to be prevalent among infected people. Recent data indicate that up to 71 percent of patients with AIDS are anemic (hemoglobin value of less than 14 g/dl).[10] In addition, patients with other HIV-related symptoms also have some level of anemia. For example, about 63 percent of AIDS patients with Kaposi's sarcoma,[11] 20 percent of patients with AIDS-related complex (ARC),[12] and 8 percent of patients who are infected with the HIV virus and asymptomatic, are also anemic (175).

In contrast to anemia associated with chronic renal failure, multiple factors are responsible for anemia in people infected with HIV. These include insufficient bone marrow stores as an adverse effects of drug treatment. For example, anemia is a common complication of therapy with zidovudine (37), the only drug currently approved as effective against HIV.[13] FDA has approved zidovudine for treating AIDS and ARC and, more recently for retarding progression of the disease in certain infected people who have not yet developed symptoms (163).

---

10 Hemoglobin is the oxygen-carrying protein of red blood cells and can also be used as a measure of anemia. Normal hemoglobin values in men are 14-18 g/dl (grams/deciliter) and 12-16 g/dl for women (12).

11 Kaposi's sarcoma is a multifocal, spreading cancer of connective tissue, principally involving the skin; it usually begins on the toes or the feet as reddish blue or brownish soft nodules and tumors. Previously seen in older men of Jewish or Mediterranean descent, Kaposi's sarcoma is now one of the opportunistic diseases occurring in AIDS patients.

12 AIDS-related complex is a variety of chronic but nonspecific symptoms and physical findings that appear related to AIDS and that may consist of chronic generalized lymphadenopathy, recurrent fevers, weight loss, minor alterations in the immune system, and minor infections.

13 Zidovudine is the generic name for Retrovir, also known as AZT.

A randomized study of AIDS patients treated with AZT (1,500 mg/day) or placebo for up to 24 weeks indicates the extent to which AZT can cause anemia. More than half of the 83 AZT-treated patients (46) required transfusions during the treatment period vs. only 15 of the 74 placebo-treated patients (119).

One randomized study with a control group has evaluated the efficacy of subcutaneously administered recombinant erythropoietin in 63 AIDS patients taking zidovudine. The trial produced mixed results; as one would expect, those patients with low levels of endogenous erythropoietin responded better than those patients with high levels. At the beginning of the study, 23 of 29 patients receiving recombinant erythropoietin required blood transfusions. At the end of the study, 11 of these patients still needed transfusions. In the control group of 34 patients, 27 required transfusions before the study and 21 still required them after the study. Some patients in the treated group reported improvement in energy level, work capacity, and quality of life (108).

The results of another randomized trial support the notion that recombinant erythropoietin corrects anemia associated with zidovudine treatment in only a subset of the population, primarily those individuals with low endogenous stores of erythropoietin. There were statistically significant changes in the hematocrit level (p=0.0002) from baseline for patients with low circulating erythropoietin levels (less than 500 milliunits/milliliter) vs. placebo-treated patients. Alternatively, patients with high levels (greater than 500 milliunits/milliliter) did not have a statistically significant increase in hematocrit, nor was the increase in hematocrit statistically different from the placebo-treated patients in the same group (174).

In contrast to chronic renal failure patients treated with recombinant erythropoietin, there was little relationship between hypertension, seizures, and the use of recombinant erythropoietin in HIV-infected patients (174).

## Anemia Associated With Rheumatoid Arthritis

Another potential use of recombinant erythropoietin is to treat anemia associated with rheumatoid arthritis, a progressive, chronic, inflammatory disease that can lead to irreversible joint damage. Anemia associated with arthritis usually results from the bone marrow's inability to respond to endogenous erythropoietin (23). Therefore, exogenous erythropoietin may have limited therapeutic use in this condition. In one observational study, 2 patients with rheumatoid arthritis treated over a 5-month period (with 100-200 units/kg intravenously three times a week) experienced an increase in hematocrit level from 32 and 30 percent to 43 and 39 percent, respectively, during the treatment period (98).

## Autologous Blood Transfusions

Recombinant erythropoietin may be used for patients who want to donate their own blood for potential transfusions during elective surgery, commonly referred to as autologous blood transfusion. The transfusion of homologous blood, or blood from another person, may be associated with various adverse effects, including rejection of the blood if improperly matched and risk of transmission of certain viral infections. The use of autologous blood also reduces the demand on the nation's blood supply.

Current autologous blood donation averages only 2.2 units of blood over a 2-to 5-week period (141). In addition, there is usually a significant time lag between donations, which could delay surgical procedures. The American Association of Blood Banks recommends a minimum hematocrit value of 34 percent and a 7-day period between donations of blood from autologous donors (72). In a randomized controlled study of 47 adults scheduled for elective orthopedic surgery, either recombinant erythropoietin (600 units/kg 2 times a week intravenously) or placebo was administered for 21 days. The mean number of units of blood collected was 5.4 for the group treated with erythropoietin and 4.1 for the placebo group (p<0.05) (66).

*58 – Recombinant Erythropoietin: Payment Options for Medicare*

## Other Anemias

The use of recombinant erythropoietin in correcting cancer-related anemias is currently under investigation. Cancer-related anemia usually results from increased destruction of red blood cells and decreased erythropoiesis due to kidney damage from cancer treatments, such as radiation and chemotherapy. A recent abstract suggested that anemia of cancer may be due to the malignancy itself or may be caused by antineoplastic agents (101). The data suggested that both treated and untreated cancer patients may have low levels of endogenous erythropoietin.

Recombinant erythropoietin has also been used in treating anemia of Gaucher's Disease, an inherited disorder of lipid metabolism (121), and in treating anemia of preterm infancy (87). No studies on efficacy have been done in these conditions to date.

## EVALUATION OF THE SAFETY OF RECOMBINANT ERYTHROPOIETIN

### Adverse Effects of Recombinant Erythropoietin

In evaluating the safety of recombinant erythropoietin, it is important to distinguish among those adverse effects that are attributable to the product itself versus those that result from the natural progression of chronic renal failure. For example, both hypertension and seizures, adverse effects attributable to recombinant erythropoietin,

### Table 2-9—Adverse Reactions to Recombinant Erythropoietin

| Study design | Number of patients | Adverse reactions reported | Source[a] |
|---|---|---|---|
| A | 375 HD[b] | The most frequently reported adverse reactions for all patients were nausea, fever, chest pain, fatigue, pain, dizziness, dyspnea, vomiting, upper respiratory infection. 92 percent of treated patients in randomized phases had one or more adverse reactions vs. 83 percent untreated patients.[c] The incidence of headache and clotting of placebo of the access site appeared to be related to treatment. | Sobota, 1989 (131). |
| A | 14 PD | An increase in antihypertensive medication was needed in 3 treated patients. | Lim, et al., 1989 (92). |
| B | 17 PD | 14 of 17 patients were taking antihypertensives; 9 had an increase in blood pressure with additional antihypertensives needed. 2 originally normotensive patients needed antihypertensives. | Eschbach, et al., 1989 (58). |
| C | 333 HD[d] | 44 percent of normotensive patients (n=71) developed hypertension and 32 percent of the 71 patients needed antihypertensives. 72 percent of hypertensive patients (n=180) had an increase in blood pressure, and 32 percent of the 180 patients needed additional antihypertensives. 43 percent developed iron deficiency (would have been 20 percent greater if some patients were not iron overloaded from blood transfusions). 5.4 percent had seizures (in 18 of 333 patients; 10 of 18 occurred in first 3 months of therapy). | Eschbach, et al., 1989 (56). |

[a]Numbers in parentheses refer to list of references.
[b]The trial consisted of an initial randomized dose-response phase (n=131) without placebo control. Two later phases were randomized, placebo-controlled (n=244). The total number of patients in study was 375.
[c]An adverse reaction was defined as any event that occurred to patients, whether related or unrelated to the intervention.
[d]Of 333 patients in the study, data for 251 patients were sufficient to evaluate changes in blood pressure.

KEY: A = randomized clinical trial that employed placebo or untreated control; B = randomized clinical trial that did not employ placebo or untreated control and a before and after effect were examined; C = nonrandomized trial in which a before and after effect were examined; HD = hemodialysis; PD = predialysis.

**Table 2-10—Percent of Patients Reporting Adverse Reactions from Recombinant Erythropoietin[a]**

| Adverse reaction | Treated patients (n=200) | Placebo patients (n=135) |
|---|---|---|
| Hypertension | 24.0 | 18.5 |
| Headache | 16.0 | 11.9 |
| Muscle aches | 11.0 | 5.9 |
| Nausea | 10.5 | 8.9 |
| Swelling | 9.0 | 10.4 |
| Access to graft clotted | 6.8 | 2.3 |
| Seizure | 1.1 | 1.1 |
| Cerebrovascular accident | 0.4 | 0.6 |

[a]Based on events reported in placebo-controlled studies in patients with chronic renal failure.  Levels of statistical significance are unavailable.

SOURCE: Amgen, Inc., 1989 (5); US DHHS, FDA, 1989 (160).

**Table 2-11—Adverse Reactions to Recombinant Erythropoietin Per Patient Year[a]**

| Reaction | Total treated[b] | Placebo |
|---|---|---|
| Hypertension | | |
| Dialysis patients | 0.69 | 0.33 |
| Predialysis patients | 1.70 | 3.28 |
| Seizure | 0.0473 | 0.037 |
| Clotting of arteriovenous graft | 0.249-0.273 | 0.59 |

[a]In U.S. and non-U.S. trials.
[b]Levels of statistical significance are unavailable.

SOURCE: US DHHS, FDA, 1989 (160).

are common complications of chronic renal failure.[14] In addition, it is important to detect any differences in adverse reactions between predialysis patients and dialysis patients, and differences in adverse reaction between patients receiving recombinant erythropoietin by the intravenous route as compared with the subcutaneous route.

Adverse reactions from recombinant erythropoietin therapy are reported in table 2-9. In chronic renal failure patients using recombinant erythropoietin, hypertension is the most prevalent adverse effect and seizures are the most serious adverse effect. Iron deficiency also occurs frequently.[15] Other side effects that have been reported include headache, muscular pain, nausea, hyperkalemia,[16] and clotted access to the arteriovenous graft (160).

The potential for the development of hypertension with recombinant erythropoietin is important because of the high rate of cardiovascular morbidity

and mortality in chronic renal failure patients. Although data in FDA's Summary Basis of Approval seem to indicate that there is a higher absolute incidence of hypertension in treated than untreated patients, it did not specify whether the difference is statistically significant (see table 2-10).  In addition, table 2-11 indicates the incidence of adverse reactions per patient year among total U.S. and non-U.S. treated patients vs. placebo.  The incidence of hypertension per patient year was twice the rate in dialysis patients as compared to placebo, but only half the rate in predialysis patients.

The literature suggests that an increase in hypertension is most likely to occur in those patients who are already hypertensive (28). Whether the development of hypertension is also related to the rate of increase in hematocrit is inconclusive (40).[17,18]  Since

---

[14]Up to 90 percent of patients in renal failure are hypertensive (38). Overall, deaths from cardiovascular disease account for more than half of all mortality in renal failure patients, whether treated by dialysis or transplantation (113). Seizures occur in approximately 5-10 percent of chronic renal failure patients (160).

[15]Chronic renal failure patients become iron deficient because effective erythropoiesis with recombinant erythropoietin requires iron.

[16]Patients on recombinant erythropoietin generally experience an increase in appetite. Hyperkalemia, an increase in serum potassium, results primarily from an increase in foods that are potassium-rich. The condition, left untreated may cause cardiac problems and muscular problems (91).

[17]Issues of dosing of recombinant erythropoietin are important because the adverse reactions may be dose-related and the product is expensive. The target hematocrit in the FDA-approved labeling is 30-33 percent, which is lower than the hematocrit targets of most of the clinical studies. The FDA Blood Products Advisory Committee decided that the 30-33 percent range was a more appropriate hematocrit range for chronic renal failure patients because of potential side effects (62). Based on clinical studies, Amgen, Inc. initially proposed a dose of 150 units/kg 3 times weekly intravenously. FDA proposed a 50 units/kg starting dose. The committee thought the FDA-proposed initial dose was too conservative, but thought Amgen's recommended dose was too high. The committee decided on a dose of 50-100 units/kg (62).

[18]The increase in hypertension with recombinant erythropoietin may be attributable to two factors: the increase in blood viscosity resulting from an increase in red blood cells and an increase in peripheral vascular resistance (52).

most patients in the trials had their hypertension controlled by drugs, there is little clinical information to indicate the effect of recombinant erythropoietin on patients with uncontrolled hypertension. Nor have the studies reported the incidence of this side effect by racial or age groups.

A major unresolved issue in predialysis patients is whether exacerbation of hypertension from recombinant erythropoietin accelerates renal disease. The correction of the anemic condition in predialysis patients might result in better oxygen perfusion of organs, such as the kidney; alleviate symptoms of anemia; and increase the length of time the kidneys are able to function. Some investigators have observed that a further increase in blood pressure in hypertensive patients does not necessarily accelerate the progression of renal disease (58).

Although seizures clearly represent a significant adverse reaction to recombinant erythropoietin, it is not clear if the overall seizure rate in patients treated with recombinant erythropoietin is different from those treated with placebo or not treated at all. The rate of seizures in treated patients appears to be slightly higher in treated patients, as indicated in table 2-10; however, statistical significance data are unavailable. According to the FDA's Summary Basis of Approval, the seizure rate in treated vs. untreated or placebo-treated patients is the same; the rate is higher in the first 90 days of therapy compared with untreated or placebo-treated patients (160). There was no apparent relationship found, however, between the rate of rise of hematocrit and seizures for chronic renal failure patients experiencing a seizure during the first 90 days of treatment.

Finally, the rate of artervenous graft clotting was almost twice the rate in the placebo group as compared to the rate range in the treated group. According to the FDA's Summary Basis of Approval, the rate of graft clotting in patients treated with recombinant erythropoietin was no greater than that reported in two large independent surveys of untreated dialysis patients (160).

It is unlikely that different types of adverse reactions would occur based on the route of administration of recombinant erythropoietin. There may be some minor administration-related effects, such as pain and swelling at the site of injection after a dose of subcutaneous recombinant erythropoietin. There is some evidence to suggest that, if adverse reactions to recombinant erythropoietin are dose-related, then incidence of adverse reactions can be minimized if lower doses of recombinant erythropoietin can be given by the subcutaneous route. A slower, steadier increase in hematocrit by using low doses of the intravenous route or by using the subcutaneous route can allow clinicians to monitor response, adjust dose, and avert any cardiovascular crisis, such as seizures, if needed.

Based on clinical data available, and discussions with clinicians, it appears that self-administration of recombinant erythropoietin is relatively safe for home dialysis patients. A small number of patients successfully self-administered recombinant erythropoietin at home after only a brief explanatory session by their physician (110).

In another study of home patients whose target hematocrit level was attained and stabilized in the dialysis facility, a dose of 50 units/kg was used to maintain the hematocrit. Researchers in the study cautioned that blood pressure should be well-controlled and measured 3 times daily in patients that self-administer recombinant erythropoietin (171). The nature and extent of any adverse reactions were not reported, however. Another study compared the incidence of adverse reactions in 55 home hemodialysis patients who self-administered recombinant erythropoietin with 31 patients who received recombinant erythropoietin in a dialysis facility. At an average dose of 101 units/kg, 9 of the facility patients experienced seizures over 23 months, and at an average dose of 108 units/kg, 1 self-administration patient experienced a seizure. Data on differences among the patient groups, which may have accounted for different rates of adverse effects, were not given. In another study, 2 patients that self-administered recombinant erythropoietin subcutaneously had pain at the injection site (82). It thus appears that home use of recombinant erythropoietin is relatively safe, if a patient's hematocrit has been stabilized, and if patients are provided instructions on how to properly administer the product and monitor response.

### *Recombinant Erythropoietin and Blood Transfusions*

The use of recombinant erythropoietin to treat anemia associated with chronic renal failure may substantially reduce or obviate the need for periodic blood transfusions. One nephrologist has estimated that 25 percent of dialysis patients require periodic or intermittent blood transfusions to maintain an acceptable hematocrit level (57). Use of recombinant erythropoietin instead of blood transfusions has multiple benefits. Although now relatively low, the risk of contracting blood-borne infections, such as HIV and various types of hepatitis, can be further minimized. Measures adopted in recent years to limit the spread of HIV through the nation's blood supply have minimized the risk of contracting these viruses. In 1989, screening procedures for HIV antibodies have lowered the risk of post-transfusion HIV infection to between 1 in 40,000 and 1 in 250,000 per transfusion. Post-transfusion hepatitis B infection occurs at the rate of 1 per 2,000 transfusions, and the risk associated with non-A, non-B hepatitis (NANBH, some of which is hepatitis C) is approximately 1 in 125 transfusions. The incidence of NANBH should further decrease in the near future with the development of a NANBH assay (4).

Eliminating or reducing blood transfusions may also increase the number of dialysis patients who can become candidates for successful renal transplantation. The development of transfusion-induced antibodies is a major factor limiting dialysis patients from receiving kidney transplants (27). Eliminating or reducing the need for blood transfusions could eliminate the development of these antibodies. In the long term, given a sufficient supply of transplantable organs and patient preference for this treatment, Medicare ESRD expenditures could decrease since expenditures for dialysis patients are about three times as much as transplantation (45). Despite the high initial costs of transplantation, lower costs of maintaining patients with functioning transplants implies that Medicare recovers the costs of transplantation in about 3 years. In addition, transplant patients tend to have a better quality of life than do dialysis patients.

Finally, the use of recombinant erythropoietin could decrease Medicare's expenditures for blood and blood products. It is not evident, however, if the use of recombinant erythropoietin as a substitute for blood will ultimately reduce expenditures for the Medicare program. Recombinant erythropoietin may actually cost Medicare more than blood transfusions. Medicare covers 80 percent of the cost of blood transfusions after a beneficiary has met a 3-pint deductible under Part B of the program. That is, the patient has to replace or pay for 3 pints of blood before the program covers the cost of blood. The cost of blood does not count toward the annual Part B deductible, currently $75. In addition, blood provided under Part B does not meet the 3-pint Part A deductible (42 CFR 410.161).

## SUMMARY OF SAFETY AND EFFICACY OF RECOMBINANT ERYTHROPOIETIN

Recombinant erythropoietin administered intravenously produces a dose-dependent rise in hematocrit level and can reduce or eliminate the need for blood transfusions in patients with anemia associated with chronic renal failure. The number of patient reaching a target hematocrit also depends upon the dose. Current information suggests that greater than 90 percent of patients will reach a target hematocrit of 30 percent with a dose of 100 units/kg. Some patients will reach the target with lower doses.

Further studies need to be done to evaluate long-term side effects and outcomes of therapy based on age (e.g., the pediatric and elderly population), race (outcomes among the various racial groups), and other underlying disease states in chronic renal failure patients. The effect of recombinant erythropoietin on predialysis patients also needs to be explored, that is, does the use of the product in this group of patients have the potential to delay the need for dialysis or does it accelerate the rate of renal injury?

Although evidence suggests that subcutaneously administered recombinant erythropoietin is efficacious, additional studies are needed to determine whether lower doses may be used in lieu of currently recommended doses, and whether lower doses can minimize the incidence of adverse reactions.

Initial studies seem to indicate that the quality of life of dialysis patients may be improved with recom-

*62 – Recombinant Erythropoietin: Payment Options for Medicare*

binant erythropoietin; however, additional studies are being conducted to evaluate the long-term impact of recombinant erythropoietin on the quality of life. Many factors contribute to the quality of life of dialysis patients, including the symptoms of anemia and treatment for underlying disease states. In addition, dialysis patients are generally taking drugs for many of these underlying disease states, which may have side effects that negate any positive impact that can be attributable to recombinant erythropoietin. For example, lethargy and impotence are common adverse reactions to antihypertensive medications. Studies also need to be done on recombinant erythropoietin's ability to allow dialysis patients to return to work. This factor may depend more on current financial incentives for the patients not to return to work than on their ability to work.

A notable number of patients developed hypertension during the course of clinical trials, a relatively manageable adverse reaction to recombinant eryth-

ropoietin. Seizures appear to be the most serious side effect, but the relative risk appears to be no higher in treated patients than untreated patients. This event may be related to the hypertensive state of the patient and the rate of increase in hematocrit. Available information does not indicate whether the occurrence of adverse reactions in treated vs. non-treated patients, including hypertension and seizures, is statistically significant. Hypertension and seizures may also be associated with chronic renal failure.

Although recombinant erythropoietin has been studied in patients since 1986, there are still a number of outstanding issues that need to be addressed related to dosing, side effects, and long-term effect on the quality of life. As additional patients receive the product over a longer period of time, and additional information is collected, clinicians will be better able to address these and other identifiable issues that relate to patient care.

## INTRODUCTION

A therapeutic product, such as a biologic, comes available in the health care marketplace ..er many years of developing and researching the ..oduct, testing it for safety and efficacy in humans ..d animals, gaining marketing approval from the ..od and Drug Administration (FDA), and finally ..veloping a process for distributing and marketing it .. health care professionals and facilities.

This chapter describes the history of the devel- ..ment, production, and marketing of recombinant ..ythropoietin in the United States. A complex set ..legal and regulatory forces are shaping the recom- ..ant erythropoietin marketplace, including biotech- ..logy patent issues, orphan product designations, ..d licensing agreements among the various ..anufacturers. Based on this information, this ..apter discusses the supply side of the market for ..combinant erythropoietin. The final sections of the ..apter outline arrangements for distributing the ..ologic and discuss sources of demand for dialysis ..tients and others.

## HISTORY OF DISCOVERY AND PRODUCTION

Erythropoietin is an amino acid glycoprotein ..rmone that is produced by the kidneys and liver in ..mans and animals[1] (102). Although the medical ..nificance of erythropoietin has long been recog- ..zed, a process to produce sufficient quantities of ..re erythropoietin for therapeutic purposes had ..ded scientists for almost 80 years.

It was first postulated in 1906 that erythropoietin ..s the natural molecule responsible for the ..gulation and control of red blood cell production in ..e body (116,137). In 1957, it was discovered that ..ythropoietin was produced by the kidneys and that ..e anemia of chronic renal disease was caused, at ..ast in part, by deficiency of this renal hormone ..5).

Extended medical research on erythropoietin was minimal, however, because of its scarce availability from natural sources and the lack of a technique that could sufficiently purify the compound for human administration. Attempts to isolate and purify erythropoietin from various sources yielded unstable, biologically inactive preparations of the hormone.

Milestones in the development of recombinant erythropoietin are listed in table 3-1. A major break- through for the potential production of erythro- poietin for therapeutic use occurred in 1977, when scientists developed a technique that isolated and highly purified erythropoietin from the urine of severely anemic patients (102). Although the purification technique itself did not provide sufficient material for therapeutic use, it lead to subsequent work using genetic engineering.

In the 1980s, several biotechnology manufacturers simultaneously pursued strategies to develop pro- cesses to produce recombinant erythropoietin for therapeutic use. These included Amgen Inc. of Thousand Oaks, California and Genetics Institute of Cambridge, Massachusetts.

Amgen and Genetics Institute utilized biotech- nology to develop a process to produce recombinant erythropoietin for therapeutic use. Biotechnology is the application of biological systems to technical and industrial processes. It has been defined as any tech- nique that uses living organisms or parts of living organisms to make or modify products, to improve plants or animals, or to develop microorganisms for specific use (148). Biotechnology is now commonly used by many industrial sectors, including plant agri- culture, hazardous waste management, and human therapeutics. In the pharmaceutical field it can be substituted for conventional methods of making new therapeutic entities by cloning cells that produce human compounds and by producing large quantities of scarce compounds. Pharmaceuticals made through biotechnology are usually classified into one of three categories: those that affect the immune system, those that mediate human tissue repair, and those that correct metabolic defects or alter metab-

---

..lthough the kidney is the major producer of erythropoietin, ..ut 10-15 percent is produced by the liver (63).

## Table 3-1–Milestones in the Development of Recombinant Erythropoietin

| Date | Milestone |
|---|---|
| 1977 | Scientists discover a process that produce highly spurified erythropoietin, but a process for producing significant quantities of the compound is still unavailable. |
| 1983 | Amgen clones the gene for human erythropoietin. |
| 1984 | Amgen and Kirin Brewery of Japan enter into a licensing agreement for recombinant erythropoietin. |
| 1984 | Genetics Institute and Chugai Pharmaceuticals of Japan enter into a licensing agreement for erythropoietin. |
| Nov. 30, 1984 | Amgen applies for patent covering its cell line that produces recombinant erythropoietin in Chinese hamster ovary (CHO) cells. |
| January 1985 | Genetics Institute applies for patents covering erythropoietin and recombinant erythropoietin. |
| Sept. 30, 1985 | Amgen and Ortho enter into licensing agreement for recombinant erythropoietin. |
| Oct. 8, 1985 | Genetics Institute and Boehringer-Mannheim enter into a licensing agreement for recombinant erythropoietin in European markets. |
| April 1986 | Amgen receives orphan drug designation for use of recombinant erythropoietin for anemia associated with ESRD. |
| June 30, 1987 | Genetics Institute patent granted. |
| August 1987 | Ortho receives orphan drug designation for use of recombinant erythropoietin for anemia associated with ESRD. |
| October 1987 | Chugai Pharmaceuticals of Japan receives orphan drug designation for use of recombinant erythropoietin for anemia associated with ESRD. |
| Oct. 27, 1987 | Amgen's patent granted. |
| November 1987 | Amgen files a PLA and ELA with the FDA for use of recombinant erythropoietin for anemia associated with ESRD. |
| May 17, 1988 | Chugai Pharmaceuticals of Japan and Upjohn Company of Kalamazoo, Michigan form Chugai-Upjohn of Rosemont, Illinois. |
| July 1988 | Ortho receives orphan drug designation for use of recombinant erythropoietin for anemia of preterm infancy. |
| September 1988 | Chugai-Upjohn files a PLA and ELA with FDA for use of erythropoietin for anemia associated with chronic renal failure. |
| February 1989 | Ortho files a PLA and ELA for use of recombinant erythropoietin for anemia associated with chronic renal failure and for infection or treatment of human immonodeficiency virus (HIV). |
| March 1989 | Ortho receives orphan drug designation for use of recombinant erythropoietin for anemia associated with HIV infection or treatment. |
| June 1, 1989 | FDA approves Amgen's PLA and ELA for use of recombinant erythropoietin (Epoetin alfa) for anemia associated with chronic renal failure. |
| October 1989 | FDA informs Amgen that it has 7 years of market exclusivity for use of Epoetin alfa in anemia of chronic renal failure (retroactive to June 1, 1989).[a] |
| December 1989 | Boston court rules that central claims of Amgen's and Genetics Institute's recombinant erythropoietin patents are invalid, and certain other parts are valid. |
| March 15, 1990 | Boston court orders Genetics Institute and Amgen to submit royalty-free cross-licensing agreement to court within 60 days and resolve dispute over orphan product designations. |

[a] Amgen originally filed a PLA for the use of recombinant erythropoietin in the anemia of End Stage Renal Disease (ESRD). At the request of the FDA, and prior to approval, this indication was expanded to chronic renal failure. The Office of Orphan Products Development then awarded orphan drug status to Amgen's Epoetin alfa for the broader indication of chronic renal failure (142).

KEY: ELA = establishment licensing application; PLA = product licensing application; ESRD = end stage renal disease.

SOURCE: Office of Technology Assessment, 1990.

olism unrelated to the immune system. Recombinant erythropoietin is classified as a recombinant product for tissue repair, since replacement of red blood cells is considered tissue regeneration (15).

The aspect of pharmaceutical biotechnology that Amgen used to make recombinant erythropoietin is genetic engineering, which is defined as the purposeful manipulation of an organism's deoxyribonucleic acid (DNA) or hereditary material.[2] Genetic engineering of recombinant erythropoietin is a multistage operation requiring identification of the gene that produces erythropoietin, isolation of the gene, replication of the gene in an easily manipulated microorganism, production of recombinant erythropoietin, and purification of recombinant erythropoietin in a stable, biologically active form (15). Large-scale production of recombinant erythropoietin was accomplished through insertion of the human erythropoietin gene into Chinese hamster ovary (CHO) cells, which were then able to produce recombinant erythropoietin (160).

Amgen entered into several licensing agreements with other pharmaceutical manufacturers for recombinant erythropoietin, as indicated in table 3-2.[3] For example, it licensed its recombinant erythropoietin rights in Japan to the Kirin Brewery in 1984. It also entered into a licensing agreement in 1985 with the Ortho Pharmaceutical Corporation, in Raritan, New Jersey, a subsidiary of Johnson and Johnson (166). Under the provisions of this agreement with Ortho, Amgen retained the U.S. marketing rights to recombinant erythropoietin for anemia associated with chronic renal failure in individuals requiring

**Table 3-2—Recombinant Erythropoietin Marketing Rights**

| Company holding patent | Region | Company holding distribution/marketing rights |
|---|---|---|
| Amgen Inc. | USA (dialysis) | Amgen Inc. |
| | USA (non-dialysis) | Ortho Pharmaceutical |
| | Japan | Kirin Brewery |
| | Europe | Ortho Pharmaceutical |
| Genetics Institute | USA | Chugai-Upjohn |
| | Japan | Chugai Pharmaceuticals |
| | Europe | Boehringer-Manheim |

SOURCE: Retterson, 1989 (117); Sobota, 1990 (132).

dialysis, and Ortho obtained recombinant erythropoietin marketing rights for all other indications in the United States, including anemia associated with chronic renal failure for individuals who do not yet require dialysis (predialysis). Ortho also gained the rights to all uses of recombinant erythropoietin in foreign markets other than Japan and China.[4]

Building on the 1977 purification technique breakthrough, Genetics Institute developed a method for producing erythropoietin in 1984. Genetics Institute licensed its erythropoietin product rights to the Chugai Pharmaceutical Company in Japan and to the Boehringer-Mannheim Company in Europe (127). In order to sell recombinant erythropoietin in the United States, Chugai Pharmaceuticals of Japan entered into a cooperative marketing agreement in May 1988 with a major pharmaceutical manufacturer, the Upjohn Company of Kalamazoo, Michigan, to form the Chugai-Upjohn Company, based in Rosemont, Illinois (see table 3-2).

The next steps in bringing recombinant erythropoietin to market were for the manufacturers to test the safety and efficacy of the product in animals and humans and to submit the required data to FDA for approval to market the product.

---

2 DNA is the molecule in chromosomes that is the repository of genetic information in all organisms (with the exception of a small number of viruses in which the hereditary material is ribonucleic acid, known as RNA). The information coded by DNA determines the structure and function of an organism.

3 In the legal context, a license is written authority granted by the owner of a patent to another party empowering the latter to make or use the patented article for a limited period of time or in a limited territory (14). In a licensing agreement, a pharmaceutical manufacturer usually sells its rights to produce and market a product or specific uses of a product to another manufacturer in return for a fee and a royalty arrangement based on sales of the product.

4 In March 1990, Amgen and Ortho were involved in binding arbitration to settle disputes related to their 1985 licensing agreement.

## FDA APPROVAL OF RECOMBINANT ERYTHROPOIETIN

In order for a prescription drug or biologic to be marketed in interstate commerce in the United States, it must have FDA approval. A biologic is defined as any virus, therapeutic serum, toxin, antitoxin, or analogous product applicable to the prevention, treatment, or cure of diseases or injuries of humans (21 CFR 600.3h).

The FDA approval process for new therapeutic products, including biologics, involves a lengthy, complex, and rigorous series of tests for safety and efficacy (21 CFR 601.25d1). After tests in laboratory animals indicate that a compound may have therapeutic value in humans, three phases of clinical trials are required prior to FDA approval (21 CFR 312.21).

Phase I trials involve the participation of a small number of healthy volunteers or patients to determine the safety of the product and appropriate dosing ranges and intervals.[5] The data obtained in this phase should be used to design well-controlled, scientifically valid studies in later phases. Phase II trials include controlled clinical studies that involve the participation of patients who have the disease the product is supposed to treat. The purpose of these studies is to determine the initial efficacy of the product, dosing parameters in diseased patients, and how the agent is metabolized and excreted by the human body. Phase III trials include a series of controlled and uncontrolled studies in which a total of several hundred to several thousand patients are administered the product to gather additional information about efficacy and safety. Phase III studies also determine whether the product produces a broader range of adverse effects than those detected in the smaller Phase I and II studies. An additional series of studies, known as Phase IV studies, may be undertaken after the product is marketed to determine long-term adverse effects that may not have been detected during the first three phases.

After the first three phases of clinical studies for a biologic are completed, the manufacturer submits a Product Licensing Application (PLA) and Establishment Licensing Application (ELA) to the FDA. A biologic cannot be marketed unless a PLA and ELA are both approved by FDA. PLA approval is based on safety and efficacy data generated from the clinical trials; ELA approval is based on inspection and certification by FDA personnel that the facilities in which the biologic is to be produced are in compliance with FDA's definition of good manufacturing practices (21 CFR 601.10b).[6]

Amgen's PLA and ELA for the use of recombinant erythropoietin for anemia associated with end-stage renal disease (ESRD) were submitted to FDA in October 1987 and approved June 1, 1989.[7] FDA, however, approved the product for use in the broader population of chronic renal failure, of which ESRD is a subset.[8] The brand name for Amgen's product is Epogen.

Ortho submitted a PLA and ELA to FDA in February 1989 for recombinant erythropoietin for anemia associated with chronic renal failure and for the anemia associated with human immunodeficiency virus (HIV) infection and treatment (1). FDA has not yet approved either application. The brand name for Ortho's product is Eprex (174).

Chugai-Upjohn submitted a PLA and ELA for its recombinant erythropoietin in September 1988, and neither has yet been approved (1). Chugai-Upjohn is

---

5 The number of participants required for each phase of clinical trials depends on the numbers necessary to achieve sufficient statistical power.

6 According to regulations, licenses for the maintenance of establishments for the manufacture and preparation of biologics may be issued only upon showing that the establishment and the products meet standards designed to ensure the continued safety, purity, and potency of the products (42 USC 201).

7 An inspection of the Amgen production facility was conducted by the Center for Biologics Evaluation and Research on January 9-11, 1989 (160).

8 FDA reasoned that ESRD is one phase along the continuum known as chronic renal failure, and that chronic renal failure is the more global term which adequately describes the spectrum of renal insufficiency. Patients who are being dialyzed and patients who are not being dialyzed may both be anemic and may require transfusions, and with the development of recombinant erythropoietin, may be candidates for treatment with the product (159).

seeking FDA-approval for the use of recombinant erythropoietin for anemia associated with chronic renal failure (1), and will use Marogen as the trade name for its product (132).

FDA developed a nomenclature to distinguish among the potential recombinant erythropoietin products of the various manufacturers. The term epoetin is to be used for recombinant erythropoietin, and a modifier, such as alfa, beta, gamma, etc., will be added to identify the products of the various manufacturers approved by the FDA (160). Therefore, since Amgen's recombinant erythropoietin was the first to be FDA approved, it is known as Epoetin alfa. The next manufacturer's product to be approved by the FDA, if any, would be known as Epoetin beta.[9]

## RECOMBINANT ERYTHROPOIETIN AND PATENT DISPUTES

Under the applicable U.S. laws, a patent may be issued to cover "any new useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." (35 USC 101). The patentability of new synthetic pharmaceutical entities is well established in the U.S. legal system. The patent is a major mechanism by which pharmaceutical manufacturers protect their investment in research and development. Prior to

1980, the U.S. patent office held that living organisms were products of nature and outside the scope of the office's statutory subject matter. Based on this reasoning, the office did not grant patents on such products (148). This situation changed with a 1980 landmark Supreme Court decision, Diamond vs. Charkabarty, in which the Court ruled that live, microorganisms made by humans were patentable (477 USC 303, 1980).

Uncertainty surrounding the actual protection that a patent gives to biotechnology products continues to present potential barriers to further innovation and commercialization in this industry (148). The patent disputes that have developed among Amgen, Chugai, and Genetics Institute are an indication of the complexity and uncertainty of the biotechnology patent law field.

On October 27, 1987, Amgen received a patent on the intermediate product that is used to make recombinant erythropoietin in CHO cells. It applied for the patent on November 30, 1984.[10] Genetics Institute received a patent on homogeneous erythropoietin on June 30, 1987. It applied for the patent on January 11, 1985.[11] Also in January 1985, Genetics Institute filed for a patent on recombinant erythropoietin analogous to Amgen's. Amgen, Chugai, and Genetics Institute are all using recombinant technology to produce recombinant erythropoietin in Chinese hamster ovary cells (48).

In October 1987, in a suit filed against both Genetics Institute and Chugai Pharmaceutical, Amgen claimed that the companies were infringing on its recombinant erythropoietin patent. Genetics Institute and Chugai Pharmaceutical counter sued Amgen on the same grounds. In a complex decision, a Boston court ruled in December 1989 that certain claims of each patent were valid, but that other parts of each patent were invalid (6). The court concluded that each manufacturer was infringing on parts of the

---

[9] According to the upcoming edition of the *United States Adopted Names and the United States Pharmacopeia Dictionary of Drug Names*, Amgen's product has been designated Epoetin alfa and Chugai-Upjohn's product Epoetin beta, notwithstanding the fact that, by April 1990, FDA had not officially given the designation of Epoetin beta to a specific manufacturer's product.

The FDA generally relies on USAN to adopt names for new chemical entities and biological products. USAN is a private organization sponsored by the USP, American Medical Association, and American Pharmaceutical Association and has been engaged in the assignment of names to drugs since January 1964. According to regulations, however, FDA retains the right to publish official names of drugs in situations in which the USAN or other official common name is unduly complex or is not useful for another reason, or two or more official names have been applied to a single drug, or to two or more drugs that are identical in chemical structure or pharmacological action and that are substantially identical in strength, quality, or purity (21 CFR 299c). It appears, therefore, that FDA will make the final determinations of names for recombinant erythropoietin products.

[10] Amgen's patent is No. 4,703,008, "DNA Sequencing Encoding Erythropoietin." U.S. Patent Office Application No. 675,298.

[11] Genetics Institute's Patent is No. 4,677,195, "Homogeneous Erythropoietin." U.S. Patent Office Application No. 690,853.

other manufacturer's patent. Genetics Institute, which was producing recombinant erythropoietin in the United States for sale in Europe, was infringing on Amgen's patent, and Amgen, which was producing recombinant erythropoietin for sale in the United States, was infringing on Genetics Institute's patent. Because Chugai was producing recombinant erythropoietin in Japan, however, it was not infringing on Amgen's recombinant erythropoietin patent. According to the court, U.S. patent protection for Amgen's intermediate product does not extend to production of recombinant erythropoietin by another manufacturer in a foreign country. If Amgen had a patent on the process by which it produced recombinant erythropoietin, or a patent on recombinant erythropoietin itself, then the court might have ruled differently.

The issue of whether U.S. patent protection on intermediate products extends to production outside the United States had been raised in another dispute between Amgen and Chugai. In January 1988, Amgen asked the U.S. International Trade Commission (ITC) to block Chugai Pharmaceutical from importing recombinant erythropoietin from Japan on the grounds that Chugai Pharmaceutical was infringing Amgen's U.S. patent. Chugai Pharmaceutical was making recombinant erythropoietin by a process similar to Amgen's and importing it from its Japanese production facilities for use in U.S. clinical trials (165).

In January 1989, the ITC held that its jurisdiction did not cover the use of a patented product abroad (165). Although Chugai Pharmaceuticals indeed utilized a process similar to Amgen's in the production of Chugai's product, Amgen had a patent on one ingredient that was essential to making recombinant erythropoietin, not on the process by which it was produced. Therefore, Chugai Pharmaceutical could sell recombinant erythropoietin in the United States once it had an approved PLA and ELA for its facility in Japan from FDA, even if Chugai Pharmaceutical was making the product by a process that used Amgen's patented host cells. If Chugai produced recombinant erythropoietin in Japan by a process that Amgen patented in the United States and attempted to market it here, however, it would indeed constitute patent infringement.

Some analysts have speculated that a cross-licensing agreement between the two manufacturers will result from this decision (136). Cross-licensing is the exchange of licenses by two or more patent holders in order that each may use or benefit from the patents of the other (14). Cross-licensing could enable both Amgen to remain on the market and Chugai-Upjohn to enter and remain on the market.

On March 14, 1990, a Federal court judge in Boston ordered Amgen and Genetics Institute to submit to the court a royalty-free cross-licensing agreement with 60 days. The judge indicated that he would issue an injunction to prevent the manufacturer who was noncompliant with his order from making and selling recombinant erythropoietin in the United States (168). The judge indicated that the orphan product status of the manufacturers' products should also be resolved in the agreement (7).

These circumstances surrounding the issuance of two patents on recombinant erythropoietin products are examples of the evolving nature of this body of law. It appears, however, that the granting of two patents will result in multiple sources of recombinant erythropoietin.

## RECOMBINANT ERYTHROPOIETIN AND THE ORPHAN DRUG ACT

The Orphan Drug Act of 1983 (Public Law 97-414) provides economic incentives for pharmaceutical manufacturers (sponsors) to research, develop, and market products for rare conditions. The term rare disease or condition was defined in a 1984 amendment to the Act (Public Law 98-551) as any disease or condition that 1) affects fewer than 200,000 persons in the United States or 2) affects more than 200,000 persons in the United States and for which no reasonable expectation exists that the cost of developing and making available in the United States a drug for such a disease or condition will be recovered from sales.

FDA's awarding of orphan status to a particular sponsor's product is made independently of FDA's approving the product. Before it submits a PLA to the FDA, a sponsor must apply for orphan product status to the Office of Orphan Products Development (69). Several sponsors may obtain orphan

product status for the use of a particular product for a particular condition; however, only that sponsor that receives FDA approval first receives 7 years of marketing exclusivity for that product for that condition. Although regulations to implement the Orphan Drug Act have yet to be put in final form, the Office of Orphan Products Development has been operating within the following guidelines in granting orphan product designations.

Several pharmaceutical manufacturers may obtain orphan product designations for a product's use for a particular condition. Only the sponsor whose product FDA approves for marketing first, however, is awarded the 7-year market exclusivity for that product for the approved use. FDA may grant market exclusivity to two versions of the same product if each applies for a different rare condition. In addition, FDA may grant market exclusivity to two products for the same condition, if FDA considers them different products (69).

For the purpose of orphan product designation, a sponsor makes the estimate of the patient population at the time of submission of the application, and the Office of Orphan Products Development reviews the sponsor's estimate. The Act does not currently permit FDA to remove an orphan product designation if the patient population subsequently exceeds

200,000. Marketing exclusivity may be removed, however, if the manufacturer falsified claims in making application for the designation or is unable to produce sufficient quantities of the product for the patient population.

Amgen, Ortho, and Chugai all have orphan drug designations for the use of recombinant erythropoietin in various medical conditions (see table 3-3). Since Amgen's recombinant erythropoietin was the first to be approved by FDA, it was designated Epoetin alfa and has market exclusivity for chronic renal failure.[12]

Ortho's product has received orphan designation for anemia associated with ESRD, HIV, and infant prematurity, and Chugai's has received orphan designation for anemia associated with ESRD. Regardless of FDA's decision about whether other companies' products are different from Amgen's, if Ortho's Eprex obtains FDA approval for anemia associated with HIV or infant prematurity, Ortho could receive 7 years of marketing exclusivity for the

12 Amgen's original orphan product designation was for anemia associated with ESRD. After FDA approved Epoetin alfa for the broader indication of chronic renal failure, the orphan product designation and market exclusivity were expanded to reflect this broadened indication (142).

### Table 3-3—Recombinant Erythropoietin Products with Orphan Drug Designations, March 1990

| Orphan condition | Sponsor holding designation | PLA and ELA filed | Status |
|---|---|---|---|
| Anemia of ESRD | Amgen (Epogen, Epoetin alfa)[a]<br>Ortho (Eprex)<br>Chugai Pharmceutical (Marogen)<br>McDonnell-Douglas<br>Organon-Teknika | 11/87<br>2/89<br>9/88 | approved, 6/89<br>pending<br>pending<br>suspended<br>suspended |
| Anemia of HIV | Ortho (Eprex) | 2/89 | pending |
| Anemia of infant prematurity | Ortho (Eprex) | | clinical trials |

[a]Amgen's orphan product designation is for use of recombinant erythropoietin for anemia associated with chronic renal failure (142).

KEY: ELA = establishment licensing application; ESRD = end-stage renal disease; HIV = human immunodeficiency virus; PLA = product licensing application.

SOURCES: Turner, 1990 (142); US DHHS, FDA, 1989 (161); 54 CFR 16295, April 21, 1989.

approved indication, because the same product may have orphan status for different rare conditions. By April 1990, FDA had not determined whether Chugai's or Ortho's product is different from Amgen's. If FDA finds either product structurally different from Amgen's, that company's product could theoretically be granted 7 years' exclusivity for anemia associated with ESRD or chronic renal failure. FDA had not decided by April 1990 whether the broader indication of chronic renal failure rather than ESRD would be granted to Ortho's or Chugai's product, if either was deemed different from Amgen's, was given FDA approval for the same indication, and was granted market exclusivity (142). Thus, independently of the resolution of legal disputes among the companies, FDA's decisions regarding product differentiation and market exclusivity have the potential to affect the number of companies in the U.S. market and the indications for which they may market recombinant erythropoietin.

## THE SUPPLY SIDE OF THE MARKET FOR RECOMBINANT ERYTHROPOIETIN

Since the FDA approved Epogen in June 1989, Amgen has been the sole supplier of recombinant erythropoietin for the U.S. market. Although Amgen has held a monopoly on the U.S. sale of this biologic, certain factors have limited its market power. In the short term, Amgen has faced the Medicare program as the dominant payer of recombinant erythropoietin. Not only does Medicare command substantial leverage because of its coverage of dialysis patients, but also Amgen has been particularly dependent on Medicare revenue because Epogen is the company's first and so far its only product on the market.

The dynamics of this market also promise to limit Amgen's influence. Given developments in the legal and regulatory arenas, it is possible that in the near future, the United States will have two additional sources of recombinant erythropoietin: Ortho's Eprex and Chugai-Upjohn's Marogen. This situation illustrates several possible sources besides clinical significance from which products may draw market power: patents, exclusivity as an orphan product,

agreements to divide the market among competitors, FDA approval for certain medical indications, and other differentiation from competing products.

The very purpose of a patent is to encourage innovation by granting new products a period free from competition. For products developed through biotechnology, this period of patent-protected monopoly power appears to be shorter than for other products. In the case of recombinant erythropoietin, Amgen and Genetics Institute have been challenging each other's patents. Unable to resolve the dispute through negotiation, the parties face a court order to reach an agreement to cross-license their rights without payment of royalties. Although attention has focussed on U.S. patents, the scope is properly international, with patents in Japan and Europe relevant to the overall package.

The court order also charges the companies to address another source of market power, FDA's grant of 7 years' exclusivity to an orphan product. Similar to patents, this period of market exclusivity was intended to protect orphan products from competitors and thereby to stimulate the development and testing of products for rare medical conditions. Controversy surrounds the appropriate scope of the condition considered rare and the estimate of the population afflicted. Thus, Chugai disputes the validity of the exclusivity granted to Amgen's Epogen, and Amgen opposes FDA's granting Chugai's Marogen exclusivity. Even more basic is the advisability of granting exclusivity to a product that two or more companies are developing for the same condition. In the case of human growth hormone, FDA's grant of exclusivity to more than one company, on the grounds that different structures rendered the products different entities, has allowed competitors to enter the market (10).

Both Amgen and Genetics Institute have used licensing agreements with other firms to segment the market, both domestic and international. These agreements may divide the market by medical indication, such as Amgen's retaining rights to the U.S. dialysis market and licensing rights to the predialysis population to Ortho. Or companies may