Case 1:01-cv-12257-PBS   Document 3352-4   Filed 11/11/06   Page 1 of 34

divide the market geographically, such as Genetics Institute's licensing of Boehringer-Mannheim for the European market. Especially agreements pertaining to different medical indications may prove difficult to enforce. As described below, physicians may prescribe different brands interchangeably.

FDA approval of a product for certain conditions offers another related route to gain market power. FDA approval allows a manufacturer to segment the market, since a company may promote its product only for approved indications. Ortho's Eprex has applied for approval for anemia associated with HIV and with chronic renal failure.

Like the other bases of market power, this one is also subject to encroachment. Chugai, for example, has applied for approval for anemia associated with end-stage renal disease, a medical condition that is a subset of Amgen's approved indication, anemia of chronic renal failure. Perhaps even more telling, the indications for which FDA approves different brands of recombinant erythropoietin are unlikely to restrict their clinical uses. Although FDA approves a product only for a specific indication, physicians and other providers may use it for a different indication, especially if there are economic incentives and it is clinically efficacious to do so. For example, even if Eprex becomes the only brand approved for anemia associated with HIV, physicians may prescribe Epogen or Marogen for the condition. Similarly, it may become common practice for physicians to use recombinant erythropoietin to increase autologous blood donations or to treat anemia associated with cancer therapy even before FDA approves these indications. To the extent that physicians do not restrict their use of a particular brand of recombinant erythropoietin to the indication for which it was approved, any market power that brand may have derived from FDA approval for a specific indication will be eroded.

A product may also gain market power through other methods of differentiating itself from competitors, such as by physical characteristics or through brand loyalty. By catering to the needs of different users, manufacturers attempt to segment the market and thus support higher prices and gain greater revenue. This is an effective strategy for increasing profits only to the extent that it outweighs the advantages of serving a larger share of the market. Manufacturers of recombinant erythropoietin are already adding features to differentiate their products, such as Marogen's use of a powder in contrast to the liquid form of Epogen and Eprex. Manufacturers may vary the volumes of the product's containers; some buyers may prefer large containers and others small.

Promotional activities may seek to gain a larger market share and users' commitment to a certain brand. As the first brand on the market, Epogen may acquire brand loyalty independent of Amgen's promotional activities. Brand loyalty, however, can be eroded with price concessions and other benefits offered by competing brands.

## DISTRIBUTION OF RECOMBINANT ERYTHROPOIETIN

Recombinant erythropoietin is currently provided to patients in dialysis facilities (hospital-based or free-standing) and physicians' offices. If FDA-approved indications increase beyond chronic renal disease and if legislation is enacted to allow Medicare coverage for self-administration of this biologic, then pharmacies and dialysis distributors (when serving home dialysis patients) may also become providers. Providers share the common functions of administering or dispensing recombinant erythropoietin to patients and submitting claims to Medicare carriers or fiscal intermediaries, but only physicians and dialysis facilities make decisions about use.

Although manufacturers, wholesalers, and other intermediate suppliers may distribute recombinant erythropoietin to providers, Amgen has been selling only to wholesalers, not directly to providers. Intermediate suppliers include wholesalers, dialysis distributors (when serving dialysis facilities), pharmacies (when serving physicians), and other suppliers to physicians. Dialysis distributors specialize in equipment and other supplies relating to dialysis. Physician suppliers also deal in a wide range of products. Unlike providers, manufacturers and intermediate suppliers do not deal directly with patients and are not responsible for billing Medicare. Although

the unit cost of recombinant erythropoietin to each provider is equal to the sum of the manufacturer's price and the intermediate supplier's markup, the manufacturer's price is by far the larger component.

Chains of dialysis facilities may be large enough purchasers to bypass intermediate suppliers and obtain a product such as recombinant erythropoietin directly from the manufacturer. Smaller organizations are by far more likely to purchase products through wholesalers or dialysis distributors. Hospital pharmacies, which often jointly purchase through a buying group that deals with pharmaceutical wholesalers or directly with manufacturers, usually supply hospital-based dialysis facilities. Physician providers often obtain products from physician suppliers or pharmacies. Independent pharmacies would be likely to obtain a product such as recombinant erythropoietin from wholesalers, whereas large chains might purchase it directly from the manufacturer. Dialysis distributors would obtain the product either from manufacturers or pharmaceutical wholesalers.

Medicare beneficiaries now receive recombinant erythropoietin primarily from dialysis facilities and also from physicians' offices. If legislation is enacted enabling Medicare to cover the self-administration of recombinant erythropoietin, many home dialysis patients may choose that alternative. Home dialysis patients could obtain recombinant erythropoietin from dialysis facilities, dialysis distributors, or, if new arrangements were made, from physicians' offices or pharmacies (see ch. 4 for current policies). If self-administration was covered, Medicare beneficiaries in the predialysis phase of chronic renal failure or with future medical conditions that might be approved could also obtain recombinant erythropoietin from physicians' offices or from pharmacies.

## THE DEMAND SIDE OF THE MARKET FOR RECOMBINANT ERYTHROPOIETIN

At present, Medicare is by far the dominant payer for recombinant erythropoietin therapy. If FDA grants approval for indications besides anemia associated with chronic renal failure, Medicare's leverage in the market will probably diminish, as other payers become more prominent. In addition to Medicare,

other Federal Government programs or agencies, such as Medicaid and the Departments of Veterans Affairs and Defense, also purchase or pay for recombinant erythropoietin. If Medicare acted in concert with these other Federal programs or agencies, its market leverage would be reinforced.

Estimates of the patient populations that might use recombinant erythropoietin range widely. According to most estimates of current patients, dialysis patients who are anemic comprise the largest group, with estimates from about 59,000 in 1984 to about 92,000 in 1990 (see table 3-4) (69,103,156).

The great variation in estimates of anemic patients in the predialysis phase of chronic renal failure reflects uncertainty about the number in the predialysis phase and about the proportion who are anemic.[13] Estimates of people in the predialysis phase range from 71,000-110,000 (174) to 93,000 (164), to somewhat over 230,000 (68), to over 2 million (41). Applying estimates of the percentage of people who are anemic to these figures yields, respectively, 9,000-18,600 (10-20 percent anemic) (51,164), 23,400 (10 percent) (68), 31,200-48,400 (44 percent) (174), and 740,000 (35 percent) (29) (see table 3-4).

Although information is not available to assess fully these estimates, it is likely that the estimate of the predialysis population, made by the Degge Group, Ltd., for Chugai-Upjohn, is too high. For example, the numbers of individuals with different comorbidities were summed to derive an estimate of the total symptomatic predialysis population. Since individuals are likely to have more than one of these comorbidities, summing numbers for each comorbidity will overstate the total. This factor, however, does not fully explain the large difference between the Degge Group's estimate and the other estimates. For example, according to the Degge Group's study, the largest comorbidity, diabetic nephropathy, comprised an estimated 1.4 million people. If only these people are considered and if a more conservative 20 percent rather than 35 percent are assumed to be

---

13 As for dialysis patients, not all predialysis patients who are anemic may be candidates for recombinant erythropoietin therapy (see ch. 2).

### Table 3-4–Estimates of Individuals With Selected Conditions Who Are Anemic

| Condition | Range of Estimates | | |
|---|---|---|---|
| | Low | Medium | High |
| Dialysis Patients | 58,900[a] | | 92,000[b] |
| Predialysis Chronic Renal Failure | 9,000-18,600[c] | 23,400[d] 31,200-48,400[e] | 740,000[f] |
| AIDS | 17,000[g] | | |

[a] Based on a 1984 estimate of dialysis patients submitted by Amgen to FDA (69) and an estimate that 75 percent of them are anemic, which was calculated from 1989 hematocrit level distributions obtained from National Medical Care, Inc. (103).

[b] An estimate of the total dialysis population was derived by projecting Medicare dialysis patients, who constitute about 93 percent of the total, to 1990 (46) and adding the remaining 7 percent, who are non-Medicare patients (156). The estimate othat 75 percent of the total are anemic was based on 1989 hematocrit distributions from National Medical Care, Inc. (103).

[c] Estimate of predialysis population from the National Center for Health Statistics (NCHS) (164) and estimate of 10-20 percent of predialysis population as anemic by Eschbach (51). The NCHS figure, 93,000, was based on 1983 discharges from short-stay nonfederal hospitals for whom chronic renal failure, ICD-9-CM Code 585, was listed as a diagnosis. It should be noted that an individual with chronic renal failure may have multiple hospitalizations in a given year, and individuals with this condition who were not hospitalized were excluded.

[d] Estimate of about 230,000 predialysis patients of whom 10 percent were estimated to be anemic (68).

[e] Based on estimates from a survey of randomly selected nephrologists before recombinant erythropoietin was approved: 71,000-110,000 predialysis patients of whom 44 percent had symptomatic anemia. Of these 44 percent, respondents thought 40 percent would be candidates for the biologic (174).

[f] Based on an estimate of over 2 million individuals with symptomatic chronic renal failure who are anemic (41) and an estimate that 35 percent are anemic (132). The number of individuals with symptomatic chronic renal failure was based on prevalence estimates for this condition among the several comorbidities with which it is commonly associated. The percent anemic was based on an estimate of those with the condition who have a blood hemoglobin less than 10 g/dl or hematocrit less than 30.

[g] Calculated from an estimate of people living with AIDS in January 1990 (158) and the percent of these likely to become anemic subsequent to zidovudine use (119).

SOURCE: Office of Technology Assessment, 1990.

### Table 3-5–Projections of Medicare-Eligible Dialysis Patients Who Are Candidates for Treatment With Recombinant Erythropoietin by Age Group, 1990-1995[a]

| Age group | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 |
|---|---|---|---|---|---|---|
| 0-14 | 607 | 605 | 600 | 593 | 583 | 572 |
| 15-24 | 3,021 | 3,135 | 3,224 | 3,291 | 3,335 | 3,337 |
| 25-34 | 7,385 | 7,401 | 7,347 | 7,230 | 7,059 | 6,837 |
| 35-44 | 11,126 | 11,786 | 12,434 | 13,059 | 13,652 | 14,203 |
| 45-54 | 13,470 | 14,624 | 15,867 | 17,180 | 18,541 | 19,932 |
| 55-64 | 19,421 | 20,715 | 22,100 | 23,543 | 25,011 | 26,476 |
| 65-74 | 19,717 | 20,927 | 22,232 | 23,588 | 24,957 | 26,303 |
| > 75 | 10,789 | 11,860 | 13,052 | 14,333 | 15,673 | 17,042 |
| TOTAL | 85,536 | 91,053 | 96,856 | 102,817 | 108,811 | 114,722 |

[a] Based on current treatment guidelines to use recombinant erythropoietin for a hematocrit of less than 30 percent.

SOURCE: Office of Technology Assessment, 1990. Based on data obtained from Eggers, 1989 (46) and National Medical Care, 1989 (103).

anemic, the estimate would still be relatively high, 280,000. There is some question, however, about the number of people with diabetic nephropathy who have symptomatic chronic renal failure. Although the Degge Group assumed that, overall, 22 percent of those with diabetic nephropathy have chronic renal failure, estimates cited in the literature start at 10 percent (41).

FDA is reviewing Ortho's PLA for anemia associated with HIV and, specifically for anemia associated with treatment with zidovudine. In January 1990, people living with acquired immunodeficiency syndrome (AIDS) numbered about 50,000 (158). Compared with untreated AIDS patients, about 34 percent more AIDS patients treated with zidovudine at 1,500 mg daily experienced a 25-percent or greater decline in hemoglobin levels from an initial level of 9.5 g/dl or higher (119). About 17,000 people with AIDS could thus be candidates for recombinant erythropoietin. Although this figure is probably an underestimate of people infected with HIV who would be candidates for recombinant erythropoietin, it is difficult to estimate this population as well. About 12 percent of people with AIDS-related complex had similar declines in hemoglobin levels from zidovudine treatment. FDA has recently approved zidovudine for infected people with CD4-cell counts below 500, even if they are asymptomatic (163). But people earlier in the progression of disease have been less likely to develop anemia from treatment. Moreover, the recommended dose of zidovudine has been greatly reduced, from 1,200 mg to 500-600 mg daily (24, 162). Over time, as the HIV epidemic progresses, the population infected with HIV and those who develop AIDS will increase, but lower doses of zidovudine may reduce the likelihood that treated patients will develop anemia and use recombinant erythropoietin. Development of an effective and safe therapy for HIV infection that does not induce anemia would also lower the potential use of recombinant erythropoietin among this population.

Although Medicare expenditures for recombinant erythropoietin will most likely continue to increase, over time Medicare's share of the U.S. market will undoubtedly decline. Besides growth in Medicare's ESRD population, Medicare's share of the market in future years depends on FDA approval of additional indications, the sizes of the additional populations, the proportions of these populations that are Medicare beneficiaries, and the extent to which other third-party payers cover recombinant erythropoietin.

Only for Medicare's dialysis population were data sufficient to make projections for future years. Future estimates of Medicare dialysis patients depend on several factors: the number of patients who initiate treatment in any one year; the number of patients who have a successful kidney transplant in each year and no longer need dialysis; the number in each year who have a failed transplant and must return to dialysis; and the numbers of patients on dialysis who die. Using these factors, Eggers developed a model that projects the number of total ESRD, dialysis, and transplant patients to the year 2000 (46). For each projection year, a low, midline, and high estimate of each population component was provided. OTA used Eggers' midline projections of the dialysis component, to the year 1995, to estimate the number of beneficiaries on dialysis who will be candidates for treatment with recombinant erythropoietin (see table 3-5).

The calculations in table 3-5 assume that all dialysis patients with a hematocrit level of less than 30 will be eligible for treatment. The proportions, by age group, of dialysis patients with hematocrits below 30 were obtained from National Medical Care (NMC), the largest chain of U.S. dialysis facilities (11). These proportions were applied to generate the estimates in table 3-5. The information from NMC pertained to the largest Medicare beneficiary and patient group for which data were available; NMC treats about 20 percent of Medicare dialysis patients and operates in over 30 States (11). There is no reason to expect that the prevalence of anemia in dialysis patients will change, although use of recombinant erythropoietin during the predialysis phase may increase the average hematocrit level of patients starting dialysis.

The estimates in table 3-5 understate total Medicare beneficiaries who may be candidates for recombinant erythropoietin through 1995. These estimates include neither beneficiaries in the predialysis phase nor those with other indications that might be approved by FDA.

## INTRODUCTION

Since 1973, Medicare has paid for the medical and related services for over 90 percent of the U.S. population with End Stage Renal Disease (ESRD) (147). The ESRD program has become costly for Medicare. Expenditures have increased from $228 million in 1974 to an estimated $2.7 billion in 1989 (156). After a dialysis patient has met the annual Medicare Part B deductible, either through payment for dialysis or other covered medical services, Medicare pays 80 percent of the cost of medical services, and the patient pays 20 percent. This chapter describes Medicare's payment policies for various products and services provided to ESRD patients, pharmaceuticals provided in different settings, and recombinant erythropoietin itself. This background information provides the basis for the analysis in chapter 1 of payment options for recombinant erythropoietin.

## MEDICARE PAYMENT POLICIES FOR ESRD SERVICES

Provisions for Medicare coverage and payment for ESRD services were enacted in the Social Security Amendments of 1972 (Public Law 92-603, Sec. 2991). Congress provided that individuals with ESRD, that is, permanent chronic kidney disease requiring continuous dialysis or a kidney transplant to maintain life, were deemed to be disabled and entitled to Medicare coverage regardless of their age, social status, or ability to pay (42 USC 246(1)(a)).

In 1988, 93 percent of the approximately 105,958 U.S. dialysis patients were approved for Medicare coverage or had Medicare coverage pending (156) (see table 4-1). Medicare coverage for dialysis patients generally begins in the third month after the month in which a regular course of dialysis is initiated (42 CFR 426(1)(a).

ESRD patients are served by 1,915 kidney transplant and dialysis centers, as listed in table 4-2. The majority of these providers are dialysis facilities, of which 63 percent are independent facilities and 37 percent are hospital based (156). The other 214 providers are kidney transplant facilities.

### Table 4-1—Coverage for Dialysis-Related Medical Services in the United States, December 31, 1988

| Coverage | Number of patients covered | Percent of patients covered |
|---|---|---|
| Total Medicare | 98,191 | 92.6 |
| (Medicare approved | 91,820 | 86.6) |
| (Medicare pending | 6,371 | 6.0) |
| Department of Veterans Affairs .. | 3,722[b] | 3.5 |
| Other[c] | 4,045 | 3.9 |
| Total U.S. dialysis population | 105,958 | 100.0 |

[a] Medicare coverage begins the third month after the month in which the course of maintenance dialysis treatments begin. Medicare coverage may begin in the first month of dialysis if the patient participates in a self-dialysis training program in a Medicare-approved training facility. The Medicare-pending category includes those patients that have applied for and are satisfying the three-month waiting period before dialysis benefits begin (42 CFR 426-1b).

[b] Department of Veterans Affairs (VA) dialysis patients include 3,132 in-unit or home dialysis patients who are affiliated with VA facilities and 590 patients who receive dialysis in Medicare-approved dialysis facilities for which VA makes payment to HCFA (109).

[c] Includes patients covered by Medicaid, private insurance (including those who have employer group health insurance coverage for the first year of ESRD, with Medicare's becoming the primary insurer after the first year), foreign nationals, and individuals who do not have coverage for services. HCFA does not collect separate data on Medicaid coverage of ESRD (123).

SOURCES: Otchin, 1990 (109); US DHHS, HCFA, 1989 (156).

### Table 4-2--Dialysis and Kidney Transplant Service Providers in the United States, November 1989[a]

| Type of provider | Number of providers |
|---|---|
| Total providers | 1,915 |
| Total kidney transplant providers | 214 |
| Total dialysis providers | 1,807 |
| Hospital-based dialysis | 661 |
| Independent dialysis | 1,146 |
| Inpatient dialysis | 58 |

[a] Because some facilities fall into more than one classification, the sum of the individual classifications may exceed the total approved facilities.

SOURCE: US DHHS, HCFA, 1989 (156).

In general, a patient's dialysis facility furnishes a package of services, equipment, and supplies, including laboratory tests and certain drugs, for each dialysis treatment. Items and services in the package include bicarbonate dialysate, catheter changes, shunt declotting, cardiac monitoring, suture removal, surgical dressing changes, oxygen and its administration, and staff time involved in the administration of blood and certain parenteral[1] items (151).

Medicare pays for this package of dialysis services by a composite rate. The composite rate per dialysis treatment, which currently averages $129 for the hospital-based facilities and $125 for independent dialysis facilities, (151) must be accepted as payment in full by the facilities for all covered items and services.[2] The rate is based on a formula that takes into account the mix of patients that receive dialysis at a facility or at home and the relative cost of providing such services in these settings (Public Law 101-239).

Patients that receive dialysis at home may choose one of two payment methods. Under Method I, the dialysis facility is paid and must accept the composite rate as payment in full for providing all services, equipment, and supplies needed for home dialysis. Approximately 64 percent of all home dialysis patients chose Method I in 1988 (124). Under Method II, the patient may deal directly with a supplier to obtain home dialysis equipment and supplies. In 1988, 36 percent of all home dialysis patients chose Method II (124). Under a provision of the Omnibus Budget Reconciliation Act of 1989 (Public Law 101-239) that took effect Feb. 1, 1990, providers of supplies and equipment to home dialysis patients must also accept the composite rate as payment in full. Previously, reimbursement to suppliers under Method II was calculated on a reasonable charge basis, and suppliers could charge home dialysis

patients more than the composite rate. This situation could result in higher cost-sharing for those home dialysis patients who chose Method II.[3] In addition, all home dialysis patients must now be affiliated with a dialysis facility, whether they receive their home dialysis equipment and supplies from a facility or a supplier (Public Law 101-239). Medicare pays dialysis facilities and suppliers for services not covered under the composite rate according to a fee schedule (126).

Medicare pays for all dialysis-related physician services through a monthly per-patient payment, currently an average $173 (126). The physician, known as the patient's capitated physician, receives the same amount whether the patient the physician supervises receives dialysis in a facility or at home.

ESRD patients cannot become members of health maintenance organizations (HMOs) or other competitive medical plans (CMPs) that have a risk-sharing contract to serve Medicare beneficiaries.[4] Beneficiaries may retain CMP membership if they develop ESRD subsequent to enrollment. For ESRD patients who are CMP members, Medicare pays a monthly prospective per-capita amount that covers both ESRD and non-ESRD services. Payment is based on the estimated amount (the average adjusted per capita cost)[5] that would be paid for Medicare-covered services if beneficiaries were not enrolled in HMOs and received care from local fee-for-service providers. The rates are adjusted for factors such as age, sex, disability, and, if available and appropriate, welfare and institutional factors (145).

ESRD networks, which function like peer review organizations (PROs) review the quality of care provided to dialysis patients. Under contract to the

---

1 Parenteral refers to some means, other than through the alimentary canal, to introduce a substance into the body. In this case, it refers to intravenous administration of certain drugs.

2 Each facility has its own composite rate, composed of a labor and non-labor portion. To determine a facility's actual payment rate, the labor portion of the appropriate base rate is first adjusted by an area wage index and then added to a nonlabor portion (154).

3 An exception is that for home patients on Continuous Cycling Peritoneal Dialysis (CCPD), Medicare may pay up to 130 percent of the median composite rate for hospital-based facilities (Public Law 101-239).

4 In a risk-sharing arrangement, a fiscal intermediary, such as an HMO or other CMP, assumes the financial risk of arranging for or providing care to Medicare enrollees (145).

5 See app. D for a definition of average adjusted per capita cost.

Health Care Financing Administration (HCFA), these 17 networks are generally organizations of nephrologists. During each year, the networks select approximately 12 percent of all dialysis patients to review quality-of-care problems. Each network develops its own criteria to assess the quality of care. The networks, which have some limited ability to impose sanctions on providers if problems are detected, do not have the ability to deny payment for claims. In March 1990, some of the networks initiated their own review of various aspects of recombinant erythropoietin use. HCFA has no immediate future plans to require the networks to review whether recombinant erythropoietin is being used appropriately in dialysis patients (99).

Payment for dialysis service claims is made by Medicare contractors. These contractors include intermediaries, which usually process claims for Part A providers, such as hospitals and dialysis facilities; and carriers, which process claims for Part B providers, such as physicians (20). These contractors, typically Blue Cross plans or commercial insurance firms, determine reasonable costs or charges for covered services, make payments, and guard against unnecessary use of Medicare-covered services.

## MEDICARE'S PAYMENT POLICIES FOR PHARMACEUTICALS

### General Payment Policies

HCFA first decides if a pharmaceutical (a drug or biological) should be covered by the Medicare program and then determines how payment should be made. Coverage and payment rules differ for each Medicare program, depending on whether the pharmaceutical is provided to an inpatient or outpatient.

HCFA's policy is that a pharmaceutical is covered for FDA-approved indications, unless HCFA determines that it is not safe and effective for a particular use or unless it is subject to a specific exclusion, such as self-administered pharmaceuticals, as discussed below. A HCFA contractor may cover and pay for an FDA-approved pharmaceutical for an indication for which there is no FDA approval, if it is

documented in the medical literature that the pharmaceutical is commonly used in medical practice to treat that particular condition. These are commonly referred to as off-label uses. HCFA does not pay for the use of investigational pharmaceuticals, except in the case of some cancer agents. When HCFA views a coverage or payment issue to be significant, or contractors' interpretations of FDA actions differ, HCFA may issue specific national guidelines on the coverage status of a particular pharmaceutical (35).

In conjunction with its decision about coverage, HCFA also determines the amount that the program will pay for a particular pharmaceutical. The payment method is based on the setting in which the product is administered.

Under Part A, Medicare pays for the operating expenses associated with inpatient care for a particular diagnosis for the entire length of stay through fixed rates set in advance, known as diagnosis-related groups (DRGs). DRGs classify patients according to primary diagnosis, the principal surgical procedure, and the type of discharge. Variations in the DRG rates paid to hospitals are a function of location (urban versus rural), area wage rates, a hospital's teaching affiliation, and the proportion of low-income patients served. Hospitals are paid these rates regardless of the costs that they actually incur (35). The facilities earn a profit when their costs fall below the payment and absorb the loss when the costs are higher than the payment. Payment for pharmaceuticals used during an inpatient stay are included in the predetermined DRG rate.

In accordance with the Social Security Act, Medicare Part B covers pharmaceuticals, if they cannot be self-administered by the patient, such as injectables; are reasonable and necessary for the diagnosis or treatment of an illness by a physician; or are provided incidental to a physician's service (Social Security Act 1861 (s)(2)(A)), or administered to outpatients (even if they are self-administered) for diagnostic purposes (42 CFR 410.28). Therapeutic injectables that are routinely self-administered, such as insulin, are therefore excluded from Medicare

coverage. Whether a drug is self-administrable depends on the usual method of administration of the drug or biologic furnished by the physician. For example, oral dosage forms administered by a physician are not covered (35).

In addition, through legislation, Congress has covered specific pharmaceuticals under Part B, including certain prescription drugs provided incidental to a dialysis treatment, certain immunosuppressive drugs used in transplant therapy for one year following a Medicare-covered organ transplant, pneumococcal vaccine, and hepatitis B vaccine for certain high-risk groups.

Under Part B, pharmaceuticals furnished by physicians, community pharmacies, and independent dialysis facilities are paid on a reasonable charge basis, while those furnished by outpatient hospital facilities are paid on a reasonable cost basis. Medicare pays 80 percent of the reasonable cost of pharmaceuticals provided to patients of an outpatient hospital facility. The reasonable cost of any service is the cost actually incurred by the facility to acquire the product or provide the service, excluding any costs unnecessary for the efficient delivery of needed health services (42 USC 1395v).

Medicare pays 80 percent of the reasonable or approved charge for pharmaceuticals, after a patient has met an annual deductible, currently $75. The patient pays the remaining 20 percent, plus any difference between the actual charge and Medicare's approved charge. HCFA regulations define the reasonable or approved charge as the portion of the charge that is approved for payment by Medicare. The amount is determined by the Medicare contractor according to guidelines developed by HCFA. The approved charge is defined as the lowest of 1) the physician's or supplier's customary charge for that service, 2) the prevailing charge for similar services in that locality, 3) the actual charge made by the physician or the supplier, or 4) the contractor's private business charge for comparable service (35). The method of deriving payment rates for the approved charge is termed the customary, prevailing, and reasonable (CPR) method. For injections, determination of the approved charge is often based on prices in the *Redbook*, *Bluebook*, or *Medispan*,

which are compendia of pharmaceutical price information (155). The approved charge for injectables, such as recombinant erythropoietin, is based on the cost of the injectable and any supplies used to administer it plus a maximum of $2 for the accompanying staff time (155).

Patients who purchase covered Part B pharmaceuticals from non-Medicare providers, such as community pharmacies, must submit a Medicare claim to the Medicare carrier. Patients are reimbursed at 80 percent of the approved charge for the product (126).

## Prescription Drug Coverage Under the ESRD Program

Through the composite rate, Medicare pays for certain routine prescription drugs commonly provided as part of a dialysis treatment. Examples of these drugs include insulin, heparin, protamine, mannitol, saline, xylocaine, antiarrythmic drugs, and antihypertensive medications (151).

Dialysis facilities may bill Medicare separately for other non-routine drugs that may be needed during a dialysis treatment, but are not included in the composite rate. Examples of these drugs include compazine, gentamycin, demerol, morphine, vancomycin, and deferoxamine. Payment is made for the pharmaceutical and any supplies used for its administration; no additional payment is made for staff time used to administer a pharmaceutical (151).

## Hepatitis B Vaccine

The enactment of the Deficit Reduction Act of 1984 (Public Law 98-369) established Medicare coverage for hepatitis B vaccine furnished to a Medicare beneficiary at high or intermediate risk of contracting hepatitis B (150). Hepatitis B is a blood-borne infection that can result in severe morbidity and even death (27). Dialysis patients were included in the high-risk group because they frequently receive blood transfusions. Medicare also pays the facilities for staff time, supplies, and syringes involved in administration of the vaccine (150).

At the time of Medicare coverage of the vaccine, there was only one supplier in the market. In its reimbursement guidelines, HCFA cautioned its con-

tractors that, when they determined the approved charge, lack of competition in the marketplace should not result in overpayments to facilities. The contractor was to consider trade or quantity discounts on purchases of the vaccine that were available to medical providers. In addition, Medicare pays only for the quantity of vaccine that is actually administered to the patient (150). For example, if a facility purchased a vial of hepatitis vaccine for $100 and administered two-thirds of the vial, the reimbursement based on the approved charge method would be approximately $67.

### Immunosuppressive Drugs

The enactment of the Omnibus Budget Reconciliation Act of 1986 (Public Law 99-509) established Medicare coverage for certain immunosuppressive drugs for one year after a Medicare beneficiary's discharge from an inpatient hospital stay during which a Medicare-covered organ transplant was performed. The change in the law was precipitated by FDA-approval in 1983 of the immunosuppressive drug cyclosporine, whose annual treatment costs were estimated to be about $5,000 per patient (126). In addition to cyclosporine, the act extended coverage to azathioprine, antithymocyte/globulin, and muromonab-CD3 (153). In December 1987, Medicare coverage was expanded to those drugs that are not used exclusively as immunosuppressive drugs, but that are commonly used as part of immunosuppressive therapy, such as the steroid prednisone.

## MEDICARE'S CURRENT COVERAGE AND PAYMENT POLICIES FOR RECOMBINANT ERYTHROPOIETIN

In developing payment rates for recombinant erythropoietin, HCFA had to consider the various facilities in which it would be used, including hospitals, dialysis facilities, physicians' offices, HMOs, and other CMPs.

Payment rates for recombinant erythropoietin were not established for inpatient facilities or CMPs. Medicare pays for recombinant erythropoietin administered to inpatients through the DRG rate. Any additional cost to the facility of using recombinant erythropoietin, however, will not be reflected

in a DRG until the rates are recalculated in the future. Similarly, Medicare pays CMPs for use of recombinant erythropoietin through the monthly capitation payment (126).

### Dialysis Facilities

### Initial Payment Policy

In July 1989, HCFA issued special coverage and payment instructions to its intermediaries for administration of recombinant erythropoietin to patients in hospital-based and independent dialysis facilities. Coverage was retroactive to June 1, 1989, the day FDA approved recombinant erythropoietin for anemia associated with chronic renal failure. (154).

HCFA determined that it would pay both hospital-based and independent dialysis facilities $40 for any recombinant erythropoietin dose of 10,000 units or fewer, and an additional $30 for any dose over that amount,[6] (154). Payment was to be made in addition to the composite rate and restricted to administration in a dialysis facility. No additional payment would be made for the staff time or supplies involved in administering recombinant erythropoietin. HCFA assumed that the composite rate adequately covered these expenses, and no increase was made in the composite rate. A review of HCFA payment policy for recombinant erythropoietin administered in dialysis facilities commenced in December 1989 (126).

If a dialysis patient received 10,000 units of recombinant erythropoietin or fewer at each of 3 weekly dialysis sessions, for a total of 156 sessions per year, the annual per patient cost would total approximately $6,240. Medicare would pay 80 percent of the costs ($32 per administration), or $4,992, and the patient would pay the remaining 20 percent ($8 per administration), or $1,248 per year in cost-sharing, if one assumes that the patient had previously met the $75 annual Part B deductible.

---

6 For doses over 10,000 units, HCFA requires that additional information be reported to the intermediary or carrier, including incidences of iron deficiency, Vitamin B12 or folic acid deficiency, hemolysis, or unrecognized blood loss (154).

## Self-Administration of Recombinant Erythropoietin

Since the Social Security Act prohibits Medicare from paying for self-administration of pharmaceuticals (42 CFR 410.29a), Medicare may not pay for dialysis or other patients to self-administer recombinant erythropoietin. This prohibition affects the approximately 18,000 patients that perform dialysis at home (156). Under current regulations, dialysis patients may self-administer certain drugs in the home setting that are considered dialysis supplies, such as heparin; local anesthetics, such as xylocaine; and antibiotics for peritoneal dialysis patients, when used to treat infections of the catheter site (151).

## Method Used To Establish Initial Payment Rates

HCFA established an initial recombinant erythropoietin outpatient payment rate shortly after the agent was approved (see app. E). Approximately 1 year prior to the anticipated approval of recombinant erythropoietin, Amgen and HCFA entered into discussions about payment rates (25). HCFA recognized that recombinant erythropoietin would represent a significant expense for the Medicare ESRD program and for dialysis patients and that HCFA should have an appropriate payment policy ready for its intermediaries. Amgen recognized that the Federal Government, through the Medicare ESRD program, would be the primary payer for recombinant erythropoietin for the foreseeable future and that the payment rate set by HCFA would have a significant impact on the revenues of the company, at least for the near term.

HCFA's initial payment rate of $40 for a dose of recombinant erythropoietin at or under 10,000 units was based, in part, on an analysis of Amgen's cost of producing the amount of recombinant erythropoietin projected to be used by the dialysis population in the first year after FDA approval. HCFA was assisted in analyzing these costs by the Department of Health and Human (DHHS) Services' Office of the Inspector General (OIG) (see app. E). HCFA used this cost analysis along with other factors in setting Medicare's initial payment rate for dialysis facilities.

Several critical decisions had to be made by HCFA and the OIG in analyzing Epogen's costs of production, including estimating the market penetration of Epogen, selecting an appropriate rate of return on Amgen's investment, and identifying the percent of costs from each category that would be allocated to Epogen vs. Amgen's other products.

Based on data supplied by Amgen, HCFA estimated that 20,000-25,000 patients, or about one-fourth of the U.S. dialysis population, would receive recombinant erythropoietin in the first year after FDA approval. After estimating the total costs of production for Epogen, the OIG used this level of initial market penetration to estimate an annual per patient cost of treatment. It then divided this by the number of annual dialysis sessions to estimate a per-administration cost for Epogen.

The OIG used 20 percent as an appropriate return on investment on the grounds that the pharmaceutical industry averaged this profit rate before taxes. In addition, for each cost category, the OIG included only the portion that pertained to Epogen, not to Amgen's other products. For example, in the current research and development and the sales, general, and administrative categories, only that part of costs that the OIG estimated pertained to Epogen was included in the estimate (129).

According to a November 1989 March 1990 survey of dialysis facilities by the OIG, the selling price from wholesalers averaged $41 for the 4,000 unit vial (85). In March 1990, Amgen reported that its list price to wholesalers was $10 for 1,000 units (117). Prices of recombinant erythropoietin in the United States as of December 1989 are compared with prices in other European countries in table 4-3. As the table indicates, the prices of the product are higher in some countries and lower in others compared with the United States.

### Physicians' Offices

In November 1989, HCFA extended coverage to and issued reimbursement instructions for recombinant erythropoietin administration for dialysis patients in physicians' offices. The instructions also

**Table 4-3–Prices of a 4,000-Unit Vial to Providers of Recombinant Erythropoietin, by Country, December 1989**

| Country | Price in country's currency | Purchasing power parities[a] | Price in U.S. dollars |
|---|---|---|---|
| Austria | 694.45 | 16.80 | 41.34 |
| Belgium | 2,022.83 | 44.50 | 38.82 |
| Denmark | 396.00 | 10.20 | 36.13 |
| Finland | 224.39 | 6.21 | 44.41 |
| France | 330.00 | 7.43 | 39.67 |
| Germany | 98.00 | 2.47 | 130.00 |
| Greece | 13,000.00 | 100.00 | 52.75 |
| Italy | 73,777.00 | 1,399.00 | 49.34 |
| Luxembourg | 2,023.00 | 41.00 | 47.50 |
| Netherlands | 114.00 | 2.40 | 44.33 |
| Norway | 383.00 | 8.64 | 113.06 |
| Portugal | 9,508.00 | 84.10 | 67.92 |
| Spain | 7,200.00 | 106.00 | 41.43 |
| Sweden | 360.00 | 8.69 | 36.21 |
| Switzerland | 88.00 | 2.43 | 41.00 |
| United States | 41.00[b] | — | 41.00 |
| United Kingdom | 36.00 | .0.58 | 62.00 |

[a]Represents the purchasing power parities (PPP) for the individual countries, a conversion factor that is based on the purchasing power of foreign currencies relative to U.S. dollars as measured for a given market basket of goods. The measures are 1987 estimates based on extrapolations from 1985 data. The source of the data is the Organization for Economic Cooperation and Development: Health Data File, 1989. Since the purchasing power of U.S. dollars relative to other currencies may have changed over the past 5 years, these measures are subject to some inaccuracy. Purchasing power parities, however, even if dated, are superior to current exchange rates, because the latter are more reflective of the relative demands for the limited goods traded among countries rather than the relative purchasing powers of the respective currencies.
[b]Based on a November 1989-March 1990 survey by the HHS Office of the Inspector General, $41 is the average price of the product to dialysis facility providers, including any markup added by the wholesaler (185).

SOURCES: Schieber and Poullier, 1989 (125); Zahn, 1989 (174).

extended coverage of and payment for recombinant erythropoietin to patients with chronic renal failure who do not yet require dialysis (predialysis patients) (155). Coverage in physicians' offices is possible because Medicare covers pharmaceuticals that are furnished incidental to a physician's professional service (Social Security Act 1861(s)(2)(A)). With the implementation of this coverage, home dialysis patients could receive recombinant erythropoietin from a local physician.

Unlike the case for dialysis facilities, for which the payment rate is $40 for up to 10,000 units of recombinant erythropoietin, Medicare pays the physician an approved charge on a fee-for-service basis; Medicare payment increases with the number of units administered to the patient and the physician's billed charge.

Medicare makes no additional payment for physician's staff time involved in administering injectables to dialysis patients. HCFA assumes that the monthly capitation rate for physician services adequately covers this time (42 CFR 405.542). Therefore, physicians may not bill Medicare separately for time involved in administering recombinant erythropoietin to dialysis patients in their offices. The capitated physician may bill Medicare for any additional supplies, such as needles and syringes, used to administer the product (155). If a physician other than the capitated one administers recombinant erythropoietin, the administering physician may bill the capitated one for staff time. Medicare pays the administering physician only for the amount of product used and any supplies used for administration. For recombinant erythropoietin administered to non-dialysis patients, physicians may make

an additional charge for staff time and supplies used in administering recombinant erythropoietin.

## MEDICAID COVERAGE OF RECOMBINANT ERYTHROPOIETIN

Besides Medicare, other sources of dialysis-related medical service payments are private insurance, Medicaid, and other State programs. Little information is available on the extent to which these sources cover the costs of these services, including recombinant erythropoietin and its administration.

Some information is available, however, on Medicaid coverage. Medicaid is a federally-aided, state-administered program that provides medical assistance to certain low-income people (147). Although over 90 percent of all ESRD patients' medical services is paid for by Medicare, Medicaid covers ESRD services for some individuals ineligible for Medicare, those services not covered by Medicare that a State may choose to provide under Medicaid, and cost-sharing incurred by ESRD patients who are dually eligible for both Medicare and Medicaid. Dually eligible people consist of aged, blind, or disabled Medicare beneficiaries whose income and assets are low enough to meet either Federal or State criteria for Medicaid. Approximately 3.5 million or 12 percent of the aged population fit into this category. Total State Medicaid ESRD expenditures in 1988 were estimated to be $68 million dollars, approximately half of which were paid by the Federal Government. The services

covered for ESRD patients vary by State. A recent survey of Medicaid programs indicated that only 6 of 48 States cover prescription drugs as part of ESRD services (75).

As of March 1990, however, 43 State Medicaid programs paid the $8 per dose recombinant erythropoietin Medicare patient cost-sharing for eligible individuals (117). A decision had been made by five States not to pay this cost-sharing, and four States and the District of Columbia had not made a decision. Many of the States had adopted the HCFA payment policy of $40 for any recombinant erythropoietin dose under 10,000 units with an additional $30 add-on for doses over that quantity. That so many of the Medicaid programs adopted HCFA's payment rate for recombinant erythropoietin underscores the importance of HCFA's payment rates.

ESRD patients may also be able to seek financial relief for medical care costs from individual State kidney programs, some of which were operating before Medicare assumed most of the costs of ESRD treatment in 1973. These programs are generally the payer of the last resort, after all forms of public and private insurance have been exhausted. A total of 19 States operate a kidney program to provide financial assistance for ESRD patients who are not eligible for Medicaid (75). As is the case with the State Medicaid programs, the services covered by the kidney programs differ by State. Sixteen of these programs cover prescription drugs, but the extent to which these programs help defray the cost of recombinant erythropoietin is currently unknown.

The Office of Technology Assessment (OTA) originally undertook this study of Medicare payment for recombinant erythropoietin as part of a larger assessment of Medicare payment for prescription drugs. In connection with the Medicare Catastrophic Coverage Act of 1988 (Public Law 100-360), the House Committees on Energy and Commerce and on Ways and Means and the Senate Committee on Finance jointly requested OTA to examine alternative payment policies for the prescription drug benefit added by the Act. The Senate Special Committee on Aging also requested the study. In April 1989, OTA's Technology Assessment Board (TAB) approved an OTA study on prescription drug payment to start in July 1989. In the context of the larger study, in May 1989 the House Committee on Ways and Means, Subcommittee on Health also asked OTA to study payment strategies that Medicare might apply to recombinant erythropoietin, which was about to be approved by the Food and Drug Administration.

The advisory panel for the parent assessment, "Medicare's Prescription Drug Benefit: Alternative Payment Policies," which consisted of 22 people from pharmaceutical manufacture, distribution, and dispensing; medicine; consumer advocacy; economics; law; and insurance, initially provided guidance for the study on recombinant erythropoietin (see app. C). At its meeting in September 1989, the advisory panel reviewed background material prepared by OTA staff on policy issues related to Medicare payment of recombinant erythropoietin and suggested additional sources of information and payment policies to consider.

During the fall and winter of 1989, OTA staff met with representatives of companies manufacturing recombinant erythropoietin; staff of Federal agencies responsible for policies related to recombinant erythropoietin, chiefly the Food and Drug Adminis-

tration and the Health Care Financing Administration; and health services researchers with expertise on Medicare's End-Stage Renal Disease Program. OTA staff also visited two dialysis centers, one hospital-based and one free-standing, and discussed issues of recombinant erythropoietin with their nephrologists. In addition, OTA staff reviewed the published and unpublished literature on the efficacy and safety of recombinant erythropoietin and on economic topics pertaining to payment options. The Food and Drug Administration (FDA), the Health Care Financing Administration, and the Department of Veterans Affairs provided information on their relevant regulations and guidelines.

In February 1990, OTA convened a workshop to discuss the draft report. Workshop participants included people from the following fields: manufacture of recombinant erythropoietin, wholesale distribution of pharmaceuticals, provision of dialysis services, nephrology, consumer advocacy, economics, Medicare policy, FDA policy, consumer advocacy, pharmacy administration, and law (See app. B). In addition to the workshop participants, the draft report was sent for review to members of the advisory panel for the broader study of Medicare's prescription drug benefit[1] and to others from a range of disciplines and interests. During February and March 1990, OTA staff revised the report on the basis of the discussion at the workshop and on comments and additional material from reviewers. The staff prepared a final draft, which was submitted in late March 1990 to the Technology Assessment Board for its approval.

---

[1]In March 1990, in light of Congress' previous repeal of the Medicare Catastrophic Coverage Act of 1988, OTA's Technology Assessment Board rescinded approval for the study "Medicare's Prescription Drug Benefit: Alternative Payment Policies."

# Appendix B
# Workshop Participants—
# Recombinant Erythropoietin:  Payment Options for Medicare

On February 20, 1990, a workshop was held to discuss the draft report.  OTA staff wish to thank the participants for their review and advice.

Harold Cohen, *Chair*
Harold Cohen, Inc.
Baltimore, MD

Edward Berger
National Medical Care
Waltham, MA

Christopher Blagg
Northwest Kidney Center
Seattle, WA

Charles Booth
Health Care Financing Administration
Baltimore, MD

Paul Dawson
Amgen, Inc.
Thousand Oaks, CA

Louis Diamond
Georgetown University School
of Medicine
Washington, DC

Joseph Fratantoni
Food and Drug Administration
Center for Biologics Evaluation
and Research
Bethesda, MD

Dennis Longstreet
Ortho Pharmaceutical Corporation
Raritan, NJ

Patrick McKercher
The Upjohn Company
Kalamazoo, MI

Carlo Micheletti
California Department
of Health Services
Sacramento, CA

Michael Pollard
Michaels & Wishner
Washington, D.C.

Mark A. Pulido
Redline Medical Supply
Minneapolis, MN

Richard Rettig
Institute of Medicine
Washington, DC

Joseph Sobota
Chugai-Upjohn, Inc.
Rosemont, IL

Joseph Thomas
Purdue University
School of Pharmacy
West Lafayette, IN

Sidney Wolfe
Public Citizen Health
Research Group
Washington, DC

Appendix C
# Acknowledgements

In addition to the workshop participants listed in appendix B, the following people provided valuable guidance to the OTA staff.

Kathleen Buto
Health Care Financing
 Administration
Bureau of Policy Development
Baltimore, MD

Regis A. de Silva
Harvard Medical School
Boston, MA

Paul Eggers
Health Care Financing
 Administration
Office of Research and
 Demonstrations
Baltimore, MD

Bruce Eisen
Genetics Institute, Inc.
Cambridge, MA

Joseph Eschbach
University of Washington
School of Medicine
Seattle, WA

Roger Evans
Batelle Research Center
Seattle, WA

Frank Gotch
Davies Medical Center
San Francisco, CA

Marlene Haffner
Food and Drug Administration
Office of Orphan
 Products Development
Rockville, MD

Richard Husk
Health Care Financing
 Administration
Office of Peer Review
Baltimore, MD

Paul Jeffrey
University of Maryland Hospital
Department of Pharmacy
Baltimore, MD

David Knapp
University of Maryland
School of Pharmacy
Baltimore, MD

Gary Kramer
Department of Health and
 Human Services
Office of the Inspector General
Baltimore, MD

Steven Lawton
Reed, Smith, Shaw, and McClay
Washington, DC

Andreas Leupacis
University Hospital
Department of General Internal
 Medicine
London, Ontario, Canada

Nathan Levin
Beth Israel Medical Center
New York, NY

Jeffrey McCombs
University of Southern California
School of Pharmacy
Los Angeles, CA

Paul Mendelson
Health Care Financing
 Administration
ESRD Network Administration
 Branch
Baltimore, MD

Alan Nissenson
University of California
 at Los Angeles Medical Center
Los Angeles, CA

John Ogden
U.S. Department of Veterans
 Affairs
Department of Pharmacy Services
Washington, DC

Emil Paganini
Cleveland Clinic Foundation
Cleveland, OH

Joseph Polastri
McKesson Drug Company
San Francisco, CA

Neil Powe
The Johns Hopkins University
School of Medicine
Baltimore, MD

Lisa Raines
Industrial Biotechnology
 Association
Washington, DC

Kathleen Retterson
Amgen, Inc.
Thousand Oaks, CA

Dennis Revicki
Batelle Research Center
Washington, DC

Elizabeth Rothberg
Health Insurance Association
of America
Washington, DC

John Sadler
Independent Dialysis Foundation
Baltimore, MD

Bernadette Schumaker
Health Care Financing
Administration
Office of ESRD Payment Policy
Baltimore, MD

Larry Simmons
Department of Health and
Human Services
Office of the Inspector General
Baltimore, MD

Dennis Styrsky
U.S. Department of Veterans
Affairs
Marketing Center
Hines, IL

Thomas Taylor
The Upjohn Company
Kalamazoo, MI

Wayne M. Turner
Food and Drug Administration
Office of Orphan Products
Development
Rockville, MD

Anne Vickery
Hogan and Hartson
Washington, DC

## ADVISORY PANEL ON MEDICARE'S PRESCRIPTION DRUG BENEFIT: ALTERNATIVE PAYMENT POLICIES

Harold Cohen, *Panel Chair*
Harold Cohen, Inc.
Baltimore, MD

Lowell Anderson
Watauga Corporation
St. Paul, MN

Patricia A. Bell
Marriott Corporation
Washington, DC

Orson Berry
Arkansas Health
Services Agency
Little Rock, AR

Leonard J. DeMino
National Association
of Chain Drug Stores
Alexandria, VA

Arnold M. Epstein
Harvard Medical School
and School of Public Health
Boston, MA

Mark C. Hornbrook
Kaiser Permanente
Portland, OR

Ronald Jordan
Blue Cross/Blue Shield
of Rhode Island
Providence, RI

Thomas Kellenberger
PCS, Inc.
Scottsdale, AZ

Kenneth Larsen
Zetachron, Inc.
St. College, PA

Sidney S. Lee
Harvard Medical School
Department of Social Medicine
Boston, MA

Helene Lipton
University of California
Schools of Medicine and Pharmacy
San Francisco, CA

Patrick McKercher
The Upjohn Company
Kalamazoo, MI

Carlo Michelotti
California Department
of Health Services
Sacramento, CA

Marilyn Moon
The Urban Institute
Washington, DC

Michael Pollard
Michaels & Wishner
Washington, DC

Mark A. Pulido
Redline Medical Supply
Minneapolis, MN

Alice Rivlin
The Brookings Institution
Washington, DC

Gary J. Sekulski
Medco Containment
Services, Inc.
Fairlawn, NJ

Joseph Thomas
Purdue University
School of Pharmacy
West Lafayette, IN

Sidney Wolfe
Public Citizen Health
Research Group
Washington, DC

Advisory Panel members provide valuable guidance during the preparation of OTA reports. The presence of an individual on the Advisory Panel, however, does not mean that the individual agrees with or endorses the conclusions of this particular Report.

Appendix D
# Glossary of Terms and Acronyms

## List of ACRONYMS

| | |
|---|---|
| AAPCC | --average adjusted per capita cost |
| AIDS | --acquired immunodeficiency syndrome |
| ARC | --AIDS-related complex |
| AWP | --average wholesale price |
| AZT | --zidovudine |
| CAPD | --continuous ambulatory peritoneal dialysis |
| CBO | --Congressional Budget Office, U.S. Congress |
| CCPD | --continuous cycling peritoneal dialysis |
| CFR | --code of federal regulations |
| CHO | --Chinese hamster ovary |
| CMP | --competetive medical plan |
| CPR | --customary, prevailing, and reasonable |
| DHHS | --Department of Health and Human Services |
| DNA | --deoxyribonucleic acid |
| DRG | --diagnosis-related group |
| ELA | --establishment licensing application |
| ESRD | --end-stage renal disease |
| FDA | --Food and Drug Administration, U.S. Department of Health and Human Services |
| FSS | --Federal Supply Schedule |
| GMP | --good manufacturing practices |
| HCFA | --Health Care Financing Administration, U.S. Department of Health and Human Services |
| HIV | --human immunodeficiency virus |
| HMO | --health maintenance organization |
| ITC | --U.S. International Trade Commission |
| IV | --intravenous |
| kg | --kilogram |
| NANBH | --non-A non-B hepatitis |
| NDA | --new drug application |
| NMC | --National Medical Care, Inc. |
| OIG | --Office of the Inspector General, U.S. Department of Health and Human Services |
| OTA | --Office of Technology Assessment, U.S. Congress |
| PLA | --product licensing application |
| PRO | --peer review organization |
| RCT | --randomized clinical trial |
| rHuEPO | --recombinant (human) erythropoietin |
| RNA | --ribonucleic acid |
| SC | --subcutaneous |
| VA | --Department of Veterans Affairs |

## Glossary of Terms

**Access:** Potential and actual entry of a population into the health care delivery system.

**AIDS (acquired immunodeficiency syndrome):** A disease caused by the retrovirus human immunodeficiency virus (HIV) and characterized by a deficiency of the immune system. The primary defect in AIDS is an acquired, persistent, quantitative functional depression within the T4 subset of lymphocytes. This depression often leads to infections caused by micro-organisms that usually do not produce infections in individuals with normal immunity or to the development of a rare type of cancer (Kaposi's sarcoma) usually seen in elderly persons or in individuals who are severely immunocompro-mised from other causes.

**Amino acid:** A group of 20 molecules that bind together to form proteins. Each type of protein is made up of a specific sequence of amino acids coded for in the DNA.

**Autologous donation:** A blood donation that is stored and reserved for return to the donor as needed, usually in elective surgery.

**Autologous transfusion:** Transfusion of blood or blood components drawn from a donor and maintained for subsequent transfusion to that same donor.

**Average adjusted per capita cost (AAPCC):** The AAPCC is the estimated average per capita amount that would be payable if covered services for Medicare Competetive Medical Plan (CMP) members were furnished in local fee-for-service practices. The AAPCC formula consists of the product of three major components: (1) the U.S. per capita Medicare cost as projected to the current year, (2) an adjustment based on the historical relationship between national Medicare costs and Medicare per capita reimbursements in the local area that a CMP serves, and (3) an adjustment for the differences between persons who choose to enroll in a CMP and the Medicare population at large from which CMP enrollees are drawn.

**Biologics:** Medicinal preparations made from living organisms and their products, including serums, vaccines, antigens, antitoxins, etc.

**Biotechnology:** Techniques that use living organisms or substances from organisms to make or modify a product. "New" biotechnology refers to recombinant DNA techniques and other sophisticated tools relying on the ability to harness and manipulate genetic material.

**Bone marrow:** A highly vascular, modified connective tissue found in the long bones and certain flat bones of vertebrates that is the origin of blood cells.

**Clinical trial:** A scientific research activity undertaken to define prospectively the effect and value of prophylactic, diagnostic, or therapeutic agents, devices, regimens, procedures, etc., applied to human subjects.

**Coinsurance:** That percentage of covered medical expenses, after subtraction of any deductible, for which an insured person is responsible. Under Medicare Part B, after the annual deductible has been met, Medicare will generally pay 80 percent of approved charges for covered services and supplies; the remaining 20 percent is the coinsurance, for which the beneficiary is liable.

**Common Costs:** Costs that are not traceable to any one specific product.

**Continuous ambulatory peritoneal dialysis (CAPD):** Peritoneal dialysis is a form of dialysis in which sterile fluid is introduced into the abdominal cavity and the peritoneum acts as the semipermeable membrane that allows the molecular exchange. In CAPD, the peritoneal dialysis is performed nearly constantly in ambulatory patients who exchange the fluid every 4 to 8 hours.

**Continuous cycling peritoneal dialysis (CCPD):** A form of peritoneal dialysis in which a machine cycles the dialysate in and out of the peritoneal cavity automatically about every 4 hours overnight as the patient sleeps.

**Cost-sharing:** That portion of the payment to a provider of health care services that is the initial liability of the patient and that may include deductibles, copayments, coinsurance, and, under Medicare Part B, unassigned liability. Also, the general set of financial arrangements under which health care insurance is contingent on a purchaser's acceptance of the obligation to pay some

portion of the reimbursements for those services.

**Coverage (Medicare):** In the Medicare program, coverage refers to the benefits available to eligible beneficiaries and can be distinguished from payment, which refers to the amount and methods of payment for covered services.

**Customary, prevailing, and reasonable (CPR) method (Medicare):** The method used by carriers to determine the approved charge for a particular Part B service from a particular physician or supplier based on the actual charge for the service, previous charges for the service by the physician or supplier in question, and previous charges by peer physicians or suppliers in the same locality. Customary charge: In the absence of unusual medical circumstances, the maximum amount that a Medicare carrier will approve for payment for a particular service provided by a particular physician practice. The carrier computes the customary charge on the basis of the actual amount that a physician practice or supplier generally charges for a specific service. Prevailing charge: In the absence of unusual medical circumstances, the maximum amount a Medicare carrier will approve for payment for a particular service provided by any physician practice within a particular peer group and locality. Generally, this amount is equal to the lowest charge in an array of customary charges that is high enough to include 75 percent of all the relevant customary charges. Approved or reasonable charge: An individual charge determination made by a Medicare carrier on a covered Part B medical service or supply. In the absence of unusual medical circumstances, it is the lowest of: (1) the physician's or supplier's customary charge for that service; (2) the prevailing charge for similar services in the locality; (3) the actual charge made by the physician or supplier; and (4) the carrier's private business charge for a comparable service. Also called allowed charge or reasonable charge.

**Dialysate:** The sterile fluid used in dialysis to remove toxic substances from the blood. The chemical composition of the dialysate varies according to the types of substances being removed. According to the basic principle of osmosis, the dialysate generally contains low concentrations of the waste substances.

**Dialysis:** The process of separating crystalloids and colloids in solution by the differences in their rates of diffusion through a semipermeable membrane.

**Efficacy:** The probability of benefit to individuals in a defined population from a medical technology applied for a given medical problem under ideal conditions of use.

**Efficient resource allocation:** The allocation of resources among alternative uses so that maximum social benefits are derived from the resources.

**End-stage renal disease (ESRD):** Chronic renal failure that occurs when an individual irreversibly loses a sufficient amount of kidney function so that life cannot be sustained without treatment. Hemodialysis, kidney transplant surgery, and continuous ambulatory peritoneal dialysis are forms of therapy.

**Fee-for-service payment:** A method of paying for medical services in which each service performed by an individual provider bears a related charge. This charge is paid by the individual patient receiving the service or by an insurer on behalf of the patient.

**Fee schedule:** An exhaustive list of provider services in which each entry is associated with a specific monetary amount that represents the approved payment level for a given insurance plan.

**Glycoprotein:** A protein with attached sugar groups.

**Good manufacturing practices:** Requirements regarding the manufacturing, processing, packing, storage, and other practices involving products under the jurisdiction of the Food and Drug Administration (foods and food additives, cosmetics, drugs, biologics, and medical devices).

**Health maintenance organization (HMO):** A health care organization that, in return for prospective per capita (capitation) payments, acts as both insurer and provider of comprehensive but specified medical services. A defined set of physicians provide services to a voluntarily enrolled population. Prepaid group practices and individual practice associations are types of HMOs.

**Hematocrit:** The volume occupied by the cellular elements of blood in relation to the total volume.

**Hemodialysis:** A process by which blood is pumped from the patient's body into a dialyzer and then returned to the body in a continuous extra-corporeal blood loop. While in the dialyzer the blood flows next to but separate from another fluid, a dialysate. The blood and the dialysate are separated from each other by a semipermeable membrane. By diffusion and osmosis, waste products and other molecules pass through the semipermeable membrane and the blood can again take on its appropriate properties.

**Hepatitis:** Inflammation of the liver which may be due any of several causes, including viruses.

**Hormone:** A chemical substance that is released into the circulatory system by a gland that has a specific regulatory effect on another organ; functions regulated include metabolism, growth, and the development of secondary sex characteristics (such as breasts, facial hair).

**Medicare carriers:** Fiscal agents (typically Blue Shield plans or commercial insurance firms) under contract to the Health Care Financing Administration for administration of specific Medicare tasks. These tasks include computing reasonable charges under Medicare Part B, making actual payments, determining whether claims are for covered services, denying claims for noncovered services, and denying claims for unnecessary use of services.

**Medicare intermediaries:** Fiscal agents (typically Blue Cross plans or commercial insurance firms) under contract to the Health Care Financing Administration for administration of specific Medicare tasks. These tasks include determining reasonable costs for covered items and services, making payments, and guarding against unnecessary use of covered services for Medicare Part A payments. Intermediaries also make payments for home health and outpatient hospital services covered under Part B.

**Non-A, non-B hepatitis (NANBH):** A term used to describe hepatitis (inflammation of the liver) in which both hepatitis A and hepatitis B have been excluded. Hepatitis C has been identified as the cause of a substantial portion of NANBH.

**Orphan Drug Act:** Public Law 97-414, which charges the U.S. Government with identifying and promoting orphan products, defined as drugs and devices for rare diseases.

**Out-of-pocket costs:** Deductibles and copayments incurred by beneficiaries when services are rendered.

**Peritoneal dialysis:** A form of dialysis that occurs

within the patient's body, rather than via an extracorporeal blood loop as in hemodialysis. A catheter is inserted into the abdomen and then dialysate is entered through the catheter into the peritoneal cavity. The fluid is allowed to remain for varying periods of time, during which dialysis occurs across the semi-permeable peritoneal membrane. Later, the dialysate is drained out through the catheter and discarded.

**Phase I, II, and III drug trials:** The sequence of studies in human beings required for new pharmaceutical approval by the Food and Drug Administration. Phase I includes studies in a small number of relatively healthy patients or normal volunteers to determine safety and pharmacologic effects. Phase II includes controlled clinical trials to determine appropriate doses, safety, and effectiveness in a total of about 200 patients. Phase III trials are usually randomized clinical trials.

**Protein:** A molecule composed of hundreds of linked amino acids in a specific sequence, which is, in turn, determined by the sequence of nucleo-tides in DNA in the gene coding for the particular protein. Proteins are required for the structure, function, and regulation of the various cells, tissues, and organs in the body.

**Quality of care:** The degree to which actions taken or not taken increase the probability of beneficial health outcomes and decrease risk and other untoward outcomes, given the existing state of medical science and art.

**Randomized clinical trial (RCT):** An experiment designed to test the safety and efficacy of a medical technology in which people are randomly allocated to experimental or control groups, and outcomes are compared.

**Recombinant DNA (rDNA) technology:** Techniques involving the incorporation of DNA fragments, generated with the use of restriction enzymes, into a suitable host organism's DNA (a vector). The host is then grown in culture to produce clones with multiple copies of the incorporated DNA fragment. The clones containing this particular DNA fragment can then be selected and harvested.

# Method Used by the Office of the Inspector General to Estimate the Manufacturer's Costs of Recombinant Erythropoietin

The Health Care Financing Administration (HCFA) was assisted in setting the initial rate that Medicare paid for recombinant erythropoietin by the Department of Health and Human Services' (HHS) Office of the Inspector General (OIG).[1] Based on data supplied by Amgen and other sources of information, OIG staff estimated Amgen's costs of developing and producing the amount of recombinant erythropoietin expected to be used for the dialysis population in the first year after approval by the Food and Drug Administration (FDA). HCFA used this cost estimate as one of the considerations in setting the initial payment rate for recombinant erythropoietin administered in a dialysis facility. The OIG accepted some of the cost data supplied by Amgen and modified other data.

The OIG's initial cost estimates were predicated on certain assumptions concerning use of recombinant erythropoietin in the first year after FDA approval. These estimates assumed that an average dose of 5,000 units of recombinant erythropoietin would be administered to each dialysis patient 3 times a week, for a total of approximately 156 administrations per year, and that recombinant erythropoietin would be used in 20,000-25,000 dialysis patients in the first year.[2]

The categories that the OIG used to estimate Amgen's costs were current operating expenses; research and development costs; selling, general, and administrative costs; income taxes; and payment of an appropriate rate of return to investors.

Amgen's current-year operating expenses included cost of goods sold; current research and development costs; sales, general and administrative costs; and income taxes. The cost of goods sold included the cost to produce the product, such as labor and materials; royalty payments; and product liability payments. Amgen provided the per-unit budgeted cost of goods sold for recombinant erythropoietin for the first year. Since the OIG had no historical data with which to compare these estimates, the OIG accepted Amgen's figures on cost of goods sold. The ratio of the costs of goods sold to total projected revenue for Amgen was compared with that of 19 other pharmaceutical companies and was found to be lower.

The ratio from other pharmaceutical manufacturers, however, would consist of cost of goods sold for all products made by that manufacturer including, in some cases, non-pharmaceutical products. These ratios might be equal to or lower than Amgen's if the costs of goods sold and revenues from the sales of non-pharmaceutical products were removed from the ratio calculations. For the purpose of comparing the Amgen ratio with that of other pharmaceutical manufacturers, the OIG used both the Business and Investment Almanac of 1988 and Moody's Industrial Index.

Also included in cost of goods sold category was a royalty payment of a certain percent of sales that Amgen has to make to Stanford University for its development of the recombinant gene-splicing technique used to produce erythropoietin. The estimated cost of product liability insurance, based on a certain percent of recombinant erythropoietin sales, was also calculated.

Current research and development costs were defined as the costs that would be incurred by the manufacturer in 1989 to further research and develop products under development, including recombinant erythropoietin. Past research and development

---

1Information in this appendix was based on personal communications with staff members from the HHS Office of the Inspector General (129).

2In December 1988, there were approximately 106,000 dialysis patients in the U.S. (155), and some researchers have estimated that approximately 75-80 percent are anemic (52). The OIG estimated full market penetration would take some time (129).

(R&D) costs were not included in this category. To determine the portion of total R&D on all Amgen's products to include in a cost estimate, the OIG first estimated the portion of the manufacturer's projected 1989 research and development costs that would be allocated to recombinant erythropoietin, and then estimated the portion of these expenditures that would be used for further research and refinement of recombinant erythropoietin in dialysis patients.

For sales, general and administrative costs, Amgen estimated its costs of establishing a marketing and distribution process for recombinant erythropoietin. These estimates were accepted by the OIG because there were no historical data with which the OIG could make comparisons. As was the case with current research and development costs, however, the OIG estimated the percentage of these costs that would be used for recombinant erythropoietin in dialysis patients.

Approximately 20 percent was added to the total of the above cost categories for current profit and return on historical investment. Amgen's income tax payments for the period were also estimated and included.

The OIG estimated the amount of funds invested in Amgen over the past 8 years (1981-1988), an appropriate profit or rate of return on these funds for individuals who had invested, and a period of time over which the investment would be recovered. Past incurred research and development expenses were to be included in this category.

To determine the total amount of funds that had been invested in the company prior to 1989, the OIG used, as a proxy, the value of stockholders' equity. The value of stockholders' equity was derived from analysis of the Amgen's Annual Reports and 10K reports filed with the U.S. Securities and Exchange Commission. Amgen received initial start-up funding from venture capitalists and joint ventures with other pharmaceutical manufacturers, but later obtained funds from three public stock offerings. Investments made in Amgen by other manufacturers

for the purpose of licensing Amgen products or securing the rights for certain recombinant erythropoietin treatment indications were not included in the estimate of stockholders' equity.

The OIG then compounded a 20-percent rate of return on the value of the stockholder's equity for the 8-year period (1981-1988) over which these funds were invested. To determine the percentage of this amount that should be included in the cost calculations for recombinant erythropoietin, the OIG estimated the percent of company revenue over the period 1992-1995 that would be attributable to recombinant erythropoietin sales in the dialysis market. The OIG staff believed that products from Amgen's current research activities would reach maximum sales penetration in the marketplace during this period.[3] This compounded amount was then divided by 8 to determine the amount that would be included in the annual cost calculations.

After totaling the costs in all the designated categories, the OIG then calculated the annual cost per patient by dividing this total amount by the estimate of patients (20,000-25,000) expected to use recombinant erythropoietin during the first year after FDA approval. This resulted in the annual per-patient cost. This amount was then divided by the estimated number of patient dialysis sessions per year (approximately 156) to arrive at a per-treatment payment rate. HCFA used this calculated amount as only one of the considerations in setting its payment rate of $40 for any dose under 10,000 units.

In the final analysis, the OIG's estimate of the per-unit cost of Amgen's recombinant erythropoietin consisted of approximately 27 percent for cost of goods sold; 16 percent for current research and development costs; 24 percent for sales, general and administrative costs; 11 percent for income taxes; and 22 percent for return on initial investment and profit.

---

3 The OIG thought that Amgen would have two mature products in the market in that period of time, recombinant erythropoietin and granulocyte colony stimulating factor.

# References

1. Adams. L., Chief of Special Projects Staff, Office of Legislative Affairs, Food and Drug Administration, Public Health Service, U.S. Department of Health and Human Services, Rockville, MD, letter to the Office of Technology Assessment, U.S. Congress, Washington, DC, Jan. 3, 1990.
2. Adamson, J., "The Promise of Recombinant Human Erythropoietin," *Seminars in Hematology* 26(2) Supp. 2, 1989.
3. Albach, H., "Market Organization and Pricing Behavior of Oligopolistic Firms in the Ethical Drug Industry: An Essay in the Measurement of Effective Competition," *Kyklos* 32(3):523-40, 1979.
4. Alter, H., "The Nation's Blood Supply: Is Absolute Safety Achievable?," abstract from a paper presented at a conference sponsored by the Department of Transfusion Medicine, National Institutes of Health, U.S Department of Health and Human Services, Washington, DC, Nov. 1, 1989.
5. Amgen, Inc., "Prescribing Information for Epogen", Thousand Oaks, CA, June 1989.
6. *Amgen Inc. vs. Chugai Pharmaceuticals Co. Ltd., and Genetics Institute, Inc.*, Civil Action 87-2617-Y, December 11, 1989.
7. Andrews, E.A., "Drug Ruling Is a Setback For Amgen," *New York Times*, pp. D1, D8, Mar. 15, 1990.
8. Arrow, K., "Uncertainty and the Welfare Economics of Medical Care," *American Economic Review*: 941-73, December 1963.
9. Ayanian, R., "The Profit Rates and Economic Performance of Drug Rates," *Drug Development and Marketing*, R.B. Helms (ed.) (Washington, D.C.: American Enterprise Institute, 1975).
9a. Barton, W., Secretary, Department of Social and Rehabilitation Services, State of Kansas, "Statement," *Kansas Medicaid Prescription Drug Cost Reduction Program*, hearing before the Special Committee on Aging, Senate, U.S. Congress, Washington, DC, July 18, 1989.
10. Benson, J., Acting Commissioner Food and Drug Administration, Public Health Service, U.S. Department of Health and Human Services, "Statement," *The Orphan Drug Act, Drug Pricing, Competition and Reauthorization*, hearing before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, U.S. Congress, Washington, DC, Feb. 7, 1990.
11. Berger, E., Director of Government Relations and Regulatory Affairs, National Medical Care, Waltham, MA, personal communication, Nov. 13, 1989 and Dec. 15, 1989.
12. Berkow, P., (ed.), *The Merck Manual*, 15th Edition (Rahway, NJ: Merck and Company, 1987).
13. Besarab, A., Vlasses, P., Caro, J., et al., "Subcutaneous (SC) Administration of Recombinant Human Erythropoietin (H-rEPO) For Treatment of ESRD Anemia," *Kidney International*: Abstracts 37(1):236, January 1990.
14. Black, H. (ed.), *Black's Law Dictionary*, 5th Edition (St. Paul, MN: West Publishing Co, 1979).
15. Black, W., "Drug Products of Recombinant DNA Technology," *American Journal of Hospital Pharmacy* 46:1834-1844, September 1989.
16. Blagg, C.R., "Hemodialysis, Peritoneal Dialysis, and Related Therapies for Renal Dialysis and the Elderly/Technology," prepared for the U.S. Congress Office of Technology Assessment, 1986.
17. Blagg, C.R., Director, Northwest Kidney Center, Seattle, WA, letter to the Office of Technology Assessment, U.S. Congress, Feb. 23, 1990.
18. Blagg, C.R. and Eschbach, J., Northwest Kidney Center, Seattle WA, letters to the Office of Technology Assessment, U.S. Congress, September 29, 1989 and February 9, 1990.
19. Bommer, J., Ritz, E., Weinreich, T., et al. "Subcutaneous Erythropoietin," *Lancet*, 2(8607):406, 1988.
20. Booth, C., Director, Payment Policy, Health Care Financing Administration, U.S. Department of Health and Human Services, Baltimore, MD, personal communication, Feb. 23, 1990.

21. Brenner, B. and Lazarus, M., "Chronic Renal Failure: Pathophysiology and Clinical Considerations," *Harrison's Principles of Internal Medicine*, 11th Edition, R. Petersdorf, et al., (eds) (New York: McGraw Hill Book Co., 1987).

22. Brownlee, O.H., "Rates of Return to Investment in the Pharmaceutical Industry: A Survey and Critical Appraisal," *Issues in Pharmaceutical Economics*, R.A. Chien (ed.) (Lexington, MA: D.C. Heath and Company, 1979).

23. Bunn, H., "Hematologic Alterations: Anemia," *Harrison's Principles of Internal Medicine*, 11th Edition, R. Petersdorf, et al. (eds.) (New York: McGraw-Hill, 1987).

24. Burroughs Wellcome Co., "Retrovir Capsules, Retrovir Syrup," Patient Package Insert, Research Triangle Park, NC, March 1990.

25. Buto, K., Director, Bureau of Payment Policy, Health Care Financing Administration, U.S. Department of Health and Human Services, Baltimore, MD; personal communication, July 18, 1989.

26. Canadian Erythropoietin Study Group, "The Effect of Recombinant EPO upon Quality of Life and Functional Capacity of Anemic Patients on Chronic Hemodialysis," *Kidney International Abstracts*, 1989.

27. Carpenter, C., and Lazarus, M., "Dialysis and Transplantation in the Treatment of Renal Failure," *Harrison's Principles of Internal Medicine*, 11th Edition, Petersdorf, R., et al. (eds.) (New York: McGraw Hill Book Co., 1987).

28. Casati, S., Passerini, P., Campise, M., "Benefits and Risks of Protracted Treatment With Human Recombinant Erythropoietin in Patients Having Hemodialysis," *British Medical Journal* 295:1017-20, 1987.

29. Chugai-Upjohn, materials submitted to the Orphan Drug Products Group, Food and Drug Administration, U.S. Department of Health and Human Services, Rockville, MD, Nov. 14, 1989.

30. Clarkson, K.W., "The Use of Pharmaceutical Profitability Measures For Public Policy Actions," *Issues in Pharmaceutical Economics*, R.A. Chien (ed.) (Lexington, MA: D.C. Heath and Company, 1979).

31. Cocks, D.L., "Product Innovation and the Dynamic Elements of Competition in the Ethical Pharmaceutical Industry," *Drug Development and Marketing*, R.B. Helms (ed.) (Washington, DC: American Enterprise Institute, 1975).

32. Cocks, D.L., and Virts, J.R., "Pricing Behavior of the Ethical Pharmaceutical Industry," *The Journal of Business* 47(3):349-362, 1974.

33. Comanor, W.S., "The Political Economy of the Pharmaceutical Industry," *Journal of Economic Literature* 24:1178-1217, 1986.

34. Commerce Clearing House, Inc., "Physician Reimbursement, Entitlement to Part A Benefits," *Medicare and Medicaid Guide* 1:745 (Chicago, IL: Commerce Clearing House, 1987).

35. Commerce Clearing House, Inc., *Medicare and Medicaid Guide* (Chicago, IL: Commerce Clearing House, Inc., 1989).

36. Costello, P., "The Tetracycline Conspiracy: Structure, Conduct, and Performance in the Drug Industry," *Antitrust Law and Economics*, Summer pp. 13-44, 1968.

37. Creagh-Kirk, T., Doi, P., Andrews, E., et al., "Survival Experience Among Patients With AIDS Receiving Zidovudine," *Journal of the American Medical Association* 260(20):3009-3015, 1988.

38. Curtis, J., Eastwood, J., Smith, E., et al., "Maintenance Hemodialysis," *Quarterly Medical Journal* 38:49-89, 1988.

39. Dao, T.D., "Drug Innovation and Price Competition," *Managerial and Decision Economics* 5(2):80-84, 1984.

40. Davidson, R., Haley, N., Easterling, J., et al., "Serial Hemodynamic Changes Following Recombinant Human Erythropoietin Therapy," *Kidney International* 37:1, 1990.

41. Degge Group, LTD, *Estimating the Prevalence of Renal Failure in the U.S.*, report prepared for Chugai-Upjohn, Arlington, VA, December 1989.

42. Delano, B., Lundin, A., Quinn, R., et al., "Improvements in Quality of Life Following Treatment With Recombinant Human Erythropoietin In Anemia Hemodialysis Patients," *American Journal of Kidney Disease Abstracts* 14(2) Supplement 1:14-18, 1989.

43. Donald, L.L., Director of Operations, Greenfield Health Services Corporation, Birmingham, MI, personal communication, March 19, 1990.

44. Driscoll, D., Analyst, Office of Payment Policy, Health Care Financing Administration, Department of Health and Human Services, Baltimore, MD, personal communication, March 21, 1990.

45. Eggers, P., "Effect of Transplantation on the Medicare End-Stage Renal Disease Program," *New England Journal of Medicine* 318(4):223-229, 1988.

46. Eggers, P., "Projections of the End Stage Renal Disease Population to the Year 2000," *Proceedings of the Annual Public Health Conference on Records and Statistics*, National Ceater for Health Statistics, Public Health Service, U.S. Department of Health and Human Services, DHHS (PHS) 90-1214, pp. 121-126, (Baltimore, MD: November 1989).

47. Eggers, P., Branch Chief, Office of Research and Demonstrations, Health Care Financing Administration, U.S. Department of Health and Human Services, Baltimore, MD, personal communication, Jan. 19, 1990 and April 9, 1990.

48. Eisen, B., Chief Patent Counsel, Genetics Institute, Cambridge, MA, personal communication, March 28, 1990.

49. Eschbach, J., "The Anemia of Chronic Renal Failure—Pathophysiology and Effects of Recombinant Erythropoietin," *Kidney International* 35:134-48, 1989.

50. Eschbach, J., Clinical Professor of Medicine, Division of Hematology, University of Washington Medical School, Seattle, WA, personal communication, Nov. 15, 1989; March 1990; April 4, 1990.

51. Eschbach, J., as cited in M. Haffner, letter to the Office of Technology Assessment, U.S. Congress, Washington, DC, Jan. 9, 1990.

52. Eschbach, J., and Adamson, J., "Correction of the Anemia of Hemodialysis Patients of Recombinant Human Erythropoietin: Results of a Multicenter Study," *Kidney International Abstract* 33:189, 1988.

53. Eschbach, J., and Adamson, J., "Recombinant Erythropoietin: Implications for Nephrology," *American Journal of Kidney Disease* 11:203-209, 1988.

54. Eschbach, J., and Adamson, J., "Guidelines for Recombinant Erythropoietin Therapy," *American Journal of Kidney Disease* 15:2, Supplement 1, 1989.

55. Eschbach, J., and Adamson, J., "The Pathophysiology and Treatment of the Anemia of Chronic Renal Failure," *Current Nephrology*, vol. 14, H.C. Gonick (ed.) (Chicago: Mosby-Yearbook Medical Publishing, forthcoming, 1990).

56. Eschbach, J., Abdulhadi, M., Browne, J., et al., "Recombinant Human Erythropoietin in Anemic Patients with End Stage Renal Disease: Results of a Phase III Multicenter Clinical Trial," *Annals of Internal Medicine* 111(12):992-1000, Dec. 15, 1989.

57. Eschbach, J., Egrie, J., Dowaing, M., et al., "Correction of the Anemia of ESRD with Recombinant Erythropoietin: Results of the Combined Phase I and II Clinical Trials," *New England Journal of Medicine* 316(2):73-78, 1987.

58. Eschbach, J., Kelly, M., Haley, R., et al., "Treatment of the Anemia of Progressive Renal Failure with Recombinant Erythropoietin," *New England Journal of Medicine* 321(3):158-163, July 20, 1989.

59. Evans, R., Manninen, D., and Garrison, L., "The Quality of Life of Patients with End Stage Renal Disease," *New England Journal of Medicine* 312(9): 553-559, 1985.

60. Evans R., Rader, B., Egrie, J., et al., "Correction of Anemia with Recombinant Human Erythropoietin Enhances the Quality of Life of Hemodialysis Patients: Multicenter Erythropoietin Clinical Trial Study conducted at the University of Washington in Seattle," *American Society of Nephrology Abstract*, December 1989.

61. Evans, R., Rader, B., Mannien, D., et al., "The Quality of Life of Hemodialysis Recipients Treated with Recombinant Human Erythropoietin," *Annals of Internal Medicine* 263(6):825-830, 1990.

62. Fratantoni, J., Director, Chief, Cellular Components Laboratory, Blood and Blood Products Division, Center on Drugs and Biologics, Food and Drug Administration, U.S. Department of Health and Human Services, Bethesda, MD, personal communication, July 21, 1989 and Apr. 2, 1990.

63. Fried, W., "The Liver as a Source of Extrarenal Erythropoietin," *Blood* 40:671-677, 1973.

64. Gibilaro, S., Delano, S., Quinn, R., et al., "Improved Quality of Life When Receiving Recombinant Erythropoetin," *American Society of Nephrology Abstracts*, December 1989.

65. Giblett, E., "Other Hematologic Disorders: Blood Groups and Blood Transfusions," *Harrison's Principles of Internal Medicine*, 11th Edition, R. Petersdorf, et al. (eds.) (New York: McGraw Hill Book Co, 1987).

66. Goodnough, L., Rudnick, S., Price, T., et al., "Increased Preoperative Collection of Autologous Blood with Recombinant Human Erythropoietin," *New England Journal of Medicine* 321(17):1163-1168, 1989.

67. Gotch, F., and Uehlinger, D., "Kinetic Modeling of the Individualized Epogen Prescription," unpublished paper submitted to *Kidney International*, 1990.

68. Grimm, A., Flaharty, K., Hapkins, L., et al., "Economics of Epoietin Therapy," *Clinical Therapy* 8:807-11, 1989.

69. Haffner, M., Director, Office of Orphan Products Development, Food and Drug Administration, U.S. Department of Health and Human Services, Rockville, MD, personal communication, Oct. 3, 1989 and Jan. 9, 1990.

70. Hansen, R., "The Pharmaceutical Development Process: Estimates of Development Costs and Times and the Effect of Proposed Regulatory Changes," *Issues in Pharmaceutical Economics*, R.A. Chien (ed.) (Lexington, MA: D.C. Heath and Company, 1979).

71. Hausman, L., Analyst, Congressional Budget Office, U.S. Congress, Washington, DC, personal communication, Jan. 18, 1990.

72. Holland, P., and Schmidt, P., *Standards for Blood Banks and Transfusion Services*, 12th edition (Arlington, VA: American Association of Blood Banks, 1987).

73. Hornbrook, M., "Market Structure and Advertising in the U.S. Pharmaceutical Industry," *Medical Care* 16:90-109, February 1978.

74. Hurwitz, M.A., and Caves, R.E., "Persuasion or Information? Promotion and the Shares of Brand Name and Generic Pharmaceuticals," *Journal of Law and Economics* 31(2):299-320, October 1988.

75. Intergovernmental Health Policy Project, "Medicaid's Experience With End-Stage Renal Disease: Findings of a National Survey," *Focus On...* 28, November 1989.

76. Jacobsen, L., Goldwasser, E., Fried, W., et al., "The Role of the Kidney in Erythropoiesis," *Nature* 179:633, 1957.

77. Jeffrey, P., Director of Pharmacy, University of Maryland Hospitals and Clinics, Baltimore, MD, personal communication, March 20, 1990.

78. Joglekar, P., and Patterson, M.L., "A Closer Look at the Returns and Risks of Pharmaceutical R&D," *Journal of Health Economics* 5(2):153-77, 1986.

79. Johnson, C.A., "Acute and Chronic Renal Failure," *Applied Therapeutics: the Clinical Use of Drugs*, L.Y. Young and M.A. Koda-Kimble (eds.) (Vancouver, WA: Applied Therapeutics, Inc., 1988).

80. Johnson, C., and Chester, M., "Pathophysiology and Treatment of the Anemia of Renal Failure," *Clinical Pharmacy* 7:117-122, 1988.

81. *Journal of the American Medical Association*, "From the Health Care Financing Administration," *Journal of the American Medical Association* 262(3):328, 1989.

82. Kelly, M., Haley, N., Adamson, J., et al., "How Subcutaneous Recombinant Human Erythropoietin Is as Effective and Safe as Given Intravenously," *American Society of Nephrology Abstracts*, December 1989.

83. Kleinman, K., Schweitzer, S., Perdue, C., et al., "The Use of Recombinant Human Erythropoietin in the Correction of Anemia in Predialysis Patients and Its Effects on Renal Function: A Double Blind Placebo Controlled Trial," *American Society of Nephrology Abstracts*, 1988.

84. Knapp, D., "Paying for Outpatient Prescription Drugs and Related Services in Third-Party Programs," *Medical Care Review* 28:826-59, 1971.

85. Kramer, G., Audit Manager, Office of the Inspector General, U.S. Department of Health and Human Services, Baltimore, MD, personal communication, March 1990.

86. Kuhn, K., Nonnast-Daniel, B., Grutzmacher, P., et al., "Analysis of Initial Resistance to Erythropoiesis to Treatment With Recombinant Human

Erythropoietin," *Contributions to Nephrology* 66:94-103, 1988.

87. Lancet, "Anemia in Premature Infants," *Lancet* 2(8572):1371, 1987.

88. Leffler, K.B., "Persuasion or Information? Economics of Prescription Drug Advertising," *Journal of Law and Economics*: 45-74, April 1981.

89. Leibowitz, A., Manning, W., and Newhouse, J., "The Demand for Prescription Drugs as a Function of Cost-Sharing," *Social Science and Medicine* 21(10):1063-69, 1985.

90. Levin, N.W., President, Renal Physicians Association, Washington, DC, personal communication, March 19, 1990.

91. Levinsky, N., "Fluids and Electrolytes," *Harrison's Principles of Internal Medicine*, 11th Edition, R. Petersdorf, et al. (eds.) (New York: McGraw Hill Book Co., 1987).

92. Lim, V., DeGowin, R., Zavala, D., et al., "Recombinant Human Erythropoietin Treatment in Predialysis Patients," *Annals of Internal Medicine* 110(2):108-114, 1989.

93. Longstreet, D., President, Biotechnology Division, Ortho Pharmaceutical Co., Raritan, NJ, personal communication, October 13, 1989.

94. Manninen, D., Research Scientist, Battelle Memorial Institute, Seattle, WA, personal communication, March 15, 1990 and March 19, 1990.

95. McAfee, R.P., and McMillan, J., "Auctions and Bidding," *Journal of Economic Literature* 25:699-738, June 1987.

96. McCoombs, J. and Christianson, J., "Applying Competitive Bidding to Health Care," *Journal of Health Politics, Policy and Law* 12:703-22, Winter 1987.

97. McEvoy, G., (ed.), *American Hospital Formulary Service-Drug Information 1989* (Bethesda, MD: American Society of Hospital Pharmacists, 1989).

98. Means, R., Olsen, N., Krantz, S., et al., "Treatment of the Anemia of Rheumatoid Arthritis With Recombinant Erythropoietin: Clinical and In Vitro Studies," *Arthritis and Rheumatism* 32(5):638-642, 1989.

99. Mendelson, P., Chief, End Stage Renal Disease Administrative Branch, Health Standards and Quality Bureau, Health Care Financing Administration, U.S. Department of Health and Human Services, Baltimore, MD, personal communication, Jan. 5, 1990.

100. Meyer, G., Thum, J., and Cada, E., et al., "Working Capacity is Increased Following Recombinant Human Erythropoietin Treatment," *Kidney International* 34:S25-S28, 1988.

100a. Meyers, A.S., Executive Director, National Organization of Rare Disorders, Inc., New Fairfield, CT, "Statement," *The Orphan Drug Act, Drug Pricing, Competition and Reauthorization*, hearing before the Subcommittee on Health and the Environment, Committee on Energy and Commerce, House of Representatives, U.S. Congress, Washington, DC, Feb. 7, 1990.

101. Miller, C.B., Jones, R.J., Piantodosi, S., et al., "Decreased Erythropoietin (EPO) Response Associated With the Anemia of Malignancy," Paper presented at American Society of Clinical Oncology Annual Meeting, San Francisco, CA, May 23, 1989.

102. Miyake, T., Kung C., and Goldwasser, E., "Purification of Human Erythropoietin," *Journal of Biology and Chemistry* 252(15):5558-5563, August 1977.

103. National Medical Care, Inc., unpublished data, Waltham, MA, December 1989.

104. Neff, M., Goldberg, J., Slifkein, R., et al., "A Comparison of Androgens for Anemia in Patients on Hemodialysis," *New England Journal of Medicine* 304(15):871-875, 1981.

105. Neumayer, H., Brockmöller, J., Fritschka, E., et al., "Pharmacokinetics of Recombinant Human Erythropoietin After Subcutaneous Administration and Long-Term Intravenous Treatment in Patients on Maintenance Hemodialysis," *Erythropoietin: From Molecular Structure to Clinical Application*, C.A. Baldamus, et al. (eds.) (Switzerland: Karger, Inc., 1989).

105a. Nissenson, A.R., "Recombinant Human Erythropoietin: Impact on Brain and Cognitive Function, Exercise Tolerance, Sexual Potency, and Quality of Life," *Seminars in Nephrology* 9(1), Supp 2:25-31, March 1989.

106. Nissenson, A., Marsh, J., Brown, W., et al., "Brain Function Improves in Chronic Hemodialysis Patients After Recombinant Erythro-

poietin," *Kidney International*, Abstracts 35:257, 1989, as cited in A.R. Nissenson (105a).

107. Ogden, J., Director of Pharmacy Services, Marketing Center, U.S. Department of Veterans Affairs, Washington, DC, personal communication, October 1989.

108. Ortho Pharmaceutical Corporation, Biotechnology Division. "Eprex Treatment Program for Anemia in AIDS Patients," Raritan, NJ, May 1989.

109. Otchin, N., Program Chief, Renal Diseases, Department of Veterans Affairs, Washington, DC, personal communication, March 1990.

110. Pascual, J., Liano, F., Matesanz, P., "Recombinant Human Erythropoietin Treatment in Patients on Maintenance Home Hemodialysis," *Lancet* 2(8655): 160, 1989.

111. Pauly, M., "The Economics of Moral Hazard: Comment," *American Economic Review*: 531-37, June 1968.

112. Pine, P., Statistician, Office of Research and Demonstrations, Program Studies Branch, Health Care Financing Administration, U.S. Department of Health and Human Services, Baltimore, MD, personal communication, January 1990.

113. Raine, A. "Hypertension, Blood Viscosity, and Cardiovascular Morbidity in Renal Failure: Implications of Erythropoietin Therapy," *Lancet* 1(8577):97-99, 1988.

114. Raine, A., and Ledingham, J., "Cardiovascular Complications after Renal Transplantation," *Kidney Transplantation: Principles and Practice*, P. Morris (ed.) (London: Grunne and Stratton, 1984).

115. Reekie, W.D., "Price and Quality Competition in the United States Drug Industry," *Journal of Industrial Economics* 26(3):223-37, 1978.

116. Reissman, K. "Studies on the Mechanism of Erythropoetic Stimulation in Parabiotic Rats During Hypoxia," *Blood* 5:372-380, 1950.

117. Retterson, K., Product Manager, Amgen Company, Thousand Oaks, CA, personal communication, Sept. 4, 1989, October 1989, November 1989, December 1989, and March 20, 1990.

118. Rettig, R., Study Director, Study of Medicare End Stage Renal Disease Program, Institute of Medicine, memorandum [on ESRD Dialysis Reimbursement Rate Setting Process], Washington, DC, Dec. 27, 1989.

119. Richman, D.D., Fischl, M.A., Grieco, M.H., et al., "The Toxicity of Azidothymidine (AZT) in the Treatment of Patients with AIDS and AIDS-Related Complex: A Double-Blind, Placebo-Controlled Trial," *New England Journal of Medicine* 317(4):192-197, 1987.

120. Roberson, C., Associate Deputy Assistant Secretary for Depots, Marketing Center, U.S. Department of Veterans Affairs, Washington, DC, personal communication, October 1989.

121. Rodgers, G., and Lessin, L., "Recombinant Erythropoietin Improves the Anemia Associated with Gauchers Disease," *Blood* 73:8, 1989.

122. Roxa, G., presentation to American Society of Nephrology meeting, Dallas, TX, Dec. 3, 1989.

123. Sadler, J., President, Independent Dialysis Foundation, Inc., Baltimore, MD, personal communication, October 1989.

124. Sagel, K., Program Analyst, End-Stage Renal Disease Program, Bureau of Data Management and Strategy, Health Care Financing Administration, U.S. Department of Health and Human Services, Baltimore, MD, letter to U.S. Congress, Office of Technology Assessment, Mar. 9, 1990.

125. Schieber, G.S., and Poullier, J., "Overview of International Comparisons of Health Care Expenditures," *Health Care Financing Review*, 1989 Annual Supplement:1-7, 1989.

126. Schumaker, B., Director, Division of Dialysis and Transplant Payment Policy, Bureau of Policy Development, Health Care Financing Administration, U.S. Department of Health and Human Services, Baltimore, MD, personal communication, Sept. 1, 1989 and Feb. 4, 1990.

127. Scrip World Pharmaceutical News, "Erythropoietin in West Germany," *Scrip World Pharmaceutical News* 1381:1, Jan. 27, 1989.

128. Shankerman, M.A., "Common Costs in Pharmaceutical Research and Development: Implications for Direct Price Regulations," *Impact of Public Policy on Drug Innovation and Pricing*, S.A. Mitchell (ed.), Proceedings of the Third Seminar on Pharmaceutical Public Policy Issues, 1976.

129. Simmons, L., Assistant Inspector General for Health Care Financing Audits, Office of the Inspector General, U.S. Department of Health and Human Services, Baltimore, MD, personal communication, Aug. 27, 1989.

130. Sinai-Trieman, L., Salusky, I., and Fine, R., "Use of Subcutaneous Recombinant Human Erythropoietin in Children Undergoing Continuous Cycling Peritoneal Dialysis," *Journal of Pediatrics* 114(4):530-534, 1989.

131. Sobota, J., "Recombinant Human Erythropoietin in Patients With Anemia due to End-Stage Renal Disease," *Contributions in Nephrology* 76:166-178, 1989.

132. Sobota, J., Executive Vice President, Chugai-Upjohn, Rosemont, IL, personal communication, Feb. 8, 1990.

132a. Sobota, J.T., "Erythropoietin Treatment of End-Stage Renal Disease: North American and Japanese Experience," *Eyrthropoietin in Clinical Practice: An International Perspective*, M. Garnick, (ed.) (New York: Marcel Dekker, in press, 1990).

133. Spivak, J., Bender B., Quinn, T., "Hematologic Abnormalities in the Acquired Immunodeficiency Syndrome," *American Journal of Medicine* 77: 224-8, 1984.

134. Steven, J.M., Hughs, R.T., Oliver, D.D., et al, "Subcutaneous Recombinant Human Erythropoietin in Patients on Continuous Ambulatory Peritoneal Dialysis," *Dialysis and Transplantation* 3:33(A), 1988.

135. Stauffer, T.R., "Profitability Measures in the Pharmaceutical Industry," *Drug Development and Marketing*, R.B. Helms (ed.) (Washington, DC: American Enterprise Institute, 1975).

136. Stipp, D., "Genetics Institute, Japanese Firm Seek Injunction Against Amgen in Patent Case," *Wall Street Journal*, February 1990.

137. Stohlman, F., Rath, C., Rose, J., "Evidence for Humoral Regulation of Erythropoesis: Studies on a Patient with Polycythemia Secondary to Regional Hypoxia," *Blood* 9:721-33, 1954.

138. Styrsky, D., Chief, Pharmaceutical Products Division, Marketing Center, Department of Veterans Affairs, "Statement," hearing before the Special Committee on Aging, Senate, U.S. Congress, Washington, DC, July 13, 1989.

139. Styrski, D., Chief, Pharmaceutical Division, Marketing Center, U.S. Department of Veterans Affairs, Hines, IL, personal communication, January 1990.

140. Teehan, B., Sigler, M., Brown, J., et al., "Hematologic and Physiologic Studies During Correction of Anemia with Recombinant Human Erythropoietin in Predialysis Patients," *Transplantation Proceedings*, 21(6):63-66, 1989.

141. Toy, P., Strauss, R., Stehling, C., et al., "Predeposited Autologous Blood for Elective Surgery: A National Multicenter Study," *New England Journal of Medicine* 316(9):517-520, 1987.

142. Turner, W., Pharmacist Reviewer, Office of Orphan Products Development, Food and Drug Administration, U.S. Department of Health and Human Services, Rockville, MD, personal communication, March 1990 and April 9, 1990.

143. U.S. Congress, Office of Technology Assessment, *Assessing the Efficacy and Safety of Medical Technologies*, OTA-H-75 (Washington DC: U.S. Government Printing Office, September 1978).

144. U.S. Congress, Office of Technology Assessment, *Medical Technology Under Proposals To Increase Competition in Health Care*, OTA-H-190 (Washington, DC: U.S. Government Printing Office, October 1982).

145. U.S. Congress, Office of Technology Assessment, *Payment for Physician Services: Strategies for Medicare*, OTA-H-294 (Washington, DC: U.S. Government Printing Office, February 1986).

146. U.S. Congress, Office of Technology Assessment, *Life Sustaining Technologies and the Elderly*, OTA-BA-306 (Washington, DC: U.S. Government Printing Office, July 1987).

147. U.S. Congress, Office of Technology Assessment, *The Quality of Medical Care: Information for Consumers*, OTA-H-386 (Washington, DC: U.S. Government Printing Office, June 1988).

148. U.S. Congress, Office of Technology Assessment, *New Developments in Biotechnology: U.S. Investment in Biotechnology*, OTA-BA-360 (Washington, DC: U.S. Government Printing Office, July 1988).

149. U.S. Congress, Office of Technology Assessment, *New Developments in Biotechnology: Patenting Life - Special Report*, OTA-BA-370 (Washington, DC: U.S. Government Printing Office, April 1989).

150. U.S. Department of Health and Human Services, Health Care Financing Administration," Payment for Immunosuppressive Drugs Furnished to Transplant Patients," Section 5249, *Medicare Contractors Manual* (Baltimore, MD: February 1985).

151. U.S. Department of Health and Human Services, Health Care Financing Administration, "Reimbursement for ESRD Services and Supplies", *Medicare Provider Reimbursement Manual*, Transmittal No. 6 (Baltimore, MD: July 1986).

152. U.S. Department of Health and Human Services, Health Care Financing Administration, *National Kidney Dialysis and Kidney Transplantation Study* (Baltimore, MD, October 1986).

153. U.S. Department of Health and Human Services, Health Care Financing Administration, "Part 3-Claims Process," *Medicare Carriers Manual*, Transmittal 1177 (Baltimore, MD: February 1987).

154. U.S. Department of Health and Human Services, Health Care Finance Administration, "Part 1-Chapter 27: Reimbursement for ESRD Services and Transplant Services," *Medicare Provider Reimbursement Manual*, HCFA Pub. 15-1-27 (Baltimore, MD: July, 1989).

155. U.S. Department of Health and Human Services, Health Care Financing Administration, "Part 3- Claims Process," *Medicare Carriers Manual*, HCFA Pub. 14-3 (Baltimore, MD: November 1989).

156. U.S. Department of Health and Human Services, Health Care Financing Administration, *End Stage Renal Disease Program Quarterly Statistical Summary* (Baltimore, MD: Nov. 9, 1989).

157. U.S. Department of Health and Human Services, Health Care Financing Administration, *End Stage Renal Disease, 1987*, (Baltimore, MD: December 1989).

158. U.S. Department of Health and Human Services, Public Health Service, Centers for Disease Control, Center for Infectious Diseases, Division of HIV/AIDS, *HIV/AIDS Surveillance Report* (Atlanta, GA: February 1990).

159. U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration Blood Products Advisory Committee, Rockville, MD, May 11, 1989.

160. U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration. "Summary Basis of Approval for Epoetin Alfa," ELA #87-0535, PLA #87-0536, Washington, DC, June 1989.

161. U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration, Office of Orphan Products Development, "Supplement to List of Orphan Drug Designations: Jan. 1, 1989-Aug. 1, 1989," Rockville, MD, September 1989.

162. U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration, "HHS News," P90-5, Jan. 16, 1990.

163. U.S. Department of Health and Human Services, Public Health Service, Food and Drug Administration, "HHS News," March 2, 1990.

164. U.S. Department of Health and Human Services, Public Health Service, National Center for Health Statistics, "Detailed Diagnoses and Surgical Procedures for Patients Discharged From Short-Stay Hospitals," 13(82) DHHS Pub. No. (PHS) 85-1743, 1985.

165. U.S. International Trade Commission, *In the Matter of Recombinant Erythropoietin*, Investigation 337-TA-281, January 1989.

166. U.S. Securities and Exchange Commission, 10K Report for Amgen, Inc. for the fiscal year ending March 1988, Washington, DC, #88157399, June 29, 1988.

167. U.S. Senate Special Committee on Aging. "Prescription Drug Prices: Are We Getting our Money's Worth?" Serial No. 101-D, (Senate Print 101-49) Washington, DC, August 1989.

168. Wall Street Journal, "Makers of EPO Drug Ordered to Submit Cross-Licensing Pacts," *Wall Street Journal*, p. B2, March 15, 1990.

169. Watson, A., "Adverse Effects of Therapy for the Correction of Anemia in Hemodialysis Patients," *Seminars in Nephrology* 9(1):30-33, 1989.

170. Weston, J.F., "Pricing in the Pharmaceutical Industry," *Issues in Pharmaceutical Economics*, R.A. Chien (ed.) (Lexington, MA: D.C. Heath and Company, 1979).

171. Winearls, C., Forman, E., Woffen, P., "Recombinant Human Erythropoietin Treatment in Patients on Maintenance Home Hemodialysis," *Lancet* 2(8662): 569, 1989.

172. Winearls, C., Oliver, D., Pippard, M., et al., "Effect of Human Erythropoietin Derived from Recombinant DNA on the Anemia of Patients Maintained on Chronic Hemodialysis," *Lancet* 2(8517):1175-1178, 1986.

173. Wolcott, D.L., Schweitzer, S., and Nissenson, A.R., "Recombinant Erythropoietin Improves Cognitive Function and Quality of Life of Chronic Hemodialysis Patients," *Kidney International*, Abstracts 35:266, 1989 as cited in A.R. Nissenson (105a).

174. Zahn, R., Director of Marketing, Biotechnology Division, Ortho Pharmaceutical Company, Raritan, NJ, personal communication, December 1989, Jan. 10, 1990 and March 20, 1990.

175. Zon, L.I., and Groopman, J.E., "Hematological Manifestations of the Human Immune Deficiency Virus (HIV)," *Seminars in Hematology* 25(3):208-218, 1988.

# Superintendent of Documents Publications Order Form

Charge your order.
*It's easy!*

To fax your orders and inquiries—(202) 275-0019

Order Processing Code:
**6829**

☐ **YES**, please send me the following indicated publications:

_____ *Recombinant Erythropoietin: Payment Options for Medicare (112 pages)*
GPO stock number 052-003-01188-3; price $5.00.

☐ Please send me your Free Catalog of hundreds of bestselling Government books.

The total cost of my order is $_____ (International customers please add 25%.) Prices include regular domestic postage and handling and are good through 11/90. After this date, please call Order and Information Desk at 202-783-3238 to verify prices.

_____
(Company or personal name)          (Please type or print)

_____
(Additional address/attention line)

_____
(Street address)

_____
(City, State, ZIP Code)

(_____)_____
(Daytime phone including area code)

**Please Choose Method of Payment:**

☐ Check payable to the Superintendent of Documents

☐ GPO Deposit Account ☐☐☐☐☐☐☐–☐

☐ VISA or MasterCard Account

☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐☐

☐☐☐☐ _____
(Credit card expiration date)          *Thank you for your order!*

_____
(Signature)                                            5/90

Mail To: Superintendent of Documents, Government Printing Office, Washington, DC 20402-9325



# Office of Technology Assessment

The Office of Technology Assessment (OTA) was created in 1972 as an analytical arm of Congress. OTA's basic function is to help legislative policy-makers anticipate and plan for the consequences of technological changes and to examine the many ways, expected and unexpected, in which technology affects people's lives. The assessment of technology calls for exploration of the physical, biological, economic, social, and political impacts that can result from applications of scientific knowledge. OTA provides Congress with independent and timely information about the potential effects—both beneficial and harmful—of technological applications.

Requests for studies are made by chairmen of standing committees of the House of Representatives or Senate; by the Technology Assessment Board, the governing body of OTA; or by the Director of OTA in consultation with the Board.

The Technology Assessment Board is composed of six members of the House, six members of the Senate, and the OTA Director, who is a non-voting member.

OTA has studies under way in nine program areas: energy and materials; industry, technology, and employment; international security and commerce; biological applications; food and renewable resources; health; communication and information technologies; oceans and environment; and science, education, and transportation.



# Office of Technology Assessment

The Office of Technology Assessment (OTA) was created in 1972 as an analytical arm of Congress. OTA's basic function is to help legislative policy-makers anticipate and plan for the consequences of technological changes and to examine the many ways, expected and unexpected, in which technology affects people's lives. The assessment of technology calls for exploration of the physical, biological, economic, social, and political impacts that can result from applications of scientific knowledge. OTA provides Congress with in-dependent and timely information about the potential effects—both benefi-cial and harmful—of technological applications.

Requests for studies are made by chairmen of standing committees of the House of Representatives or Senate; by the Technology Assessment Board, the governing body of OTA; or by the Director of OTA in consultation with the Board.

The Technology Assessment Board is composed of six members of the House, six members of the Senate, and the OTA Director, who is a non-voting member.

OTA has studies under way in nine program areas: energy and materi-als; industry, technology, and employment; international security and com-merce; biological applications; food and renewable resources; health; communication and information technologies; oceans and environment; and science, education, and transportation.