# EXHIBIT C

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2
      * * * * * * * * * * * * * *
 3    CITIZENS FOR CONSUMER            *
      JUSTICE, et al                   *
 4              Plaintiffs,            *
                                       *
 5              vs.                    *      CIVIL ACTION
                                       *      No. 01-12257-PBS
 6    ABBOTT LABORATORIES,             *
      et al                            *
 7              Defendants.            *
      * * * * * * * * * * * * * *
 8
                BEFORE THE HONORABLE MARIANNE B. BOWLER
 9                 UNITED STATES MAGISTRATE JUDGE
                            MOTION HEARING
10
      A P P E A R A N C E S
11
                HAGENS BERMAN LLP
12              One Main Street, 4th Floor
                Cambridge, Massachusetts 02142
13              for the plaintiffs
                By:  Thomas M. Sobol, Esq.
14

15              SPECTOR, ROSEMAN & KODROFF, P.C.
                1818 Market Street, Suite 2500
16              Philadelphia, Pennsylvania 19103
                for the plaintiffs
17              By:  Jeffrey L. Kodroff, Esq.

18

19

20

21                                  Courtroom No. 17
                                    John J. Moakley Courthouse
22                                  1 Courthouse Way
                                    Boston, Massachusetts 02210
23                                  September 27, 2004
                                    10:30 a.m.
24

25
```

APPEARANCES, CONTINUED


        THE WEXLER FIRM LLP
        One North LaSalle Street, Suite 2000
        Chicago, Illinois 60602
        for the plaintiffs
        By: Kenneth A. Wexler, Esq.


        LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.
        230 Park Avenue, Suite 1160
        New York, New York 10169
        for the defendants
        By:  David A. Schulz, Esq.

        MURPHY & RILEY, P.C.
        141 Tremont Street
        Boston, Massachusetts 02111
        for the defendants
        By: Richard J. Riley, Esq.

        KELLEY DRYE & WARREN LLP
        101 Park Avenue
        New York, New York 10178
        for the defendants
        By: Christopher C. Palermo, Esq.


        THE HEARST CORPORATION
        959 Eighth Avenue
        New York, New York 10019
        for the defendants
        By: Eve Burton, Esq.

```
 1    APPEARANCES, CONTINUED

 2              KAYE SCHOLER LLP
                425 Park Avenue
 3              New York, New York 100022-3598
                for the defendants
 4              By: Saul P. Morgenstern, Esq.

 5

                WILMER CUTLER PICKERING HALE and DORR LLP
 6              60 State Street
                Boston, Massachusetts 02109
 7              for the defendants
                By: Karen F. Green, Esq.
 8

 9              HOGAN & HARTSON LLP
                875 Third Avenue
10              New York, New York 10022
                for the defendants
11              By: Lyndon M. Tretter, Esq.
                    Steven M. Edwards, Esq.
12

13              DAVIS POLK & WARDWELL
                450 Lexington Avenue
14              New York, New York 10017
                for the defendants
15              By: Kimberly D. Harris, Esq.

16

                HOLLAND & KNIGHT, LLP
17              10 St. James Avenue
                Boston, Massachusetts 02116
18              for the defendants
                By: Geoffrey E. Hobart, Esq.
19
                FOLEY HOAG LLP
20              155 Seaport Boulevard
                Boston, Massachusetts 02210
21              for the defendants
                By: Nicholas C. Theodorou, Esq.
22

23

24

25
```

1    **APPEARANCES, CONTINUED**

2              SHOOK, HARDY & BACON LLP
              2555 Grand Boulevard
3              Kansas City, Missouri 64108-2613
              for the defendants
4              By: James P. Muehlberger, Esq.

5

6              NIXON PEABODY LLP
              101 Federal Street
7              Boston, Massachusetts 02110
              for the defendants
8              By: Robert P. Sherman, Esq.

9

              SHERIN AND LODGEN LLP
10             101 Federal Street
              Boston, Massachusetts 02110
11             for the defendants
              By: James W. Matthews, Esq.
12

13             BINGHAM McCUTCHEN
              150 Federal Street
14             Boston, Massachusetts 02110-1726
              for the defendants
15             By: Joseph L. Kociubes, Esq.

16

              LAREDO & SMITH, LLP
17             15 Broad Street, Suite 600
              Boston, Massachusetts 02109
18             for the defendants
              By: Mark D. Smith, Esq.
19

20             ROPES & GRAY
              One International Place
21             Boston, Massachusetts 02110
              for the defendants
22             By: Eric P. Christofferson, Esq.
                  John T. Montgomery, Esq.
23

24

25

APPEARANCES, CONTINUED


BONNER KIERNAN TREBACH & CROCIATA
One Liberty Square
Boston, Massachusetts 02109
for the defendants
By: John A. Kiernan, Esq.


COVINGTON & BURLING
1201 Pennsylvania Avenue NW
Washington, D.C. 20004-2401
for the defendants
By: Mark H. Lynch, Esq.


SONNENSCHEIN NATH & ROSENTHAL LLP
1301 K Street N.W., Suite 600
East Tower
Washington, D.C. 20005
for the defendants
By: Elizabeth I. Hack, Esq.


DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, Massachusetts 02210-2211
for the defendants
By: Joseph E. Haviland, Esq.


PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
for the defendants
By: Andrew D. Schau, Esq.

1    **APPEARANCES, CONTINUED**

2

3            KIRKPATRICK & LOCKHART LLP
            75 State Street
            Boston, Massachusetts 02109
4            for the defendants
            By: Michael DeMarco, Esq.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21            CAROL LYNN SCOTT, CSR, RMR
            Official Court Reporter
22            One Courthouse Way, Suite 7204
            Boston, Massachusetts 02210
23                (617) 330-1377

24

25

1            P R O C E E D I N G S

2                THE COURT:  Please be seated.

3                THE CLERK:  Today is Monday, September 27,

4    2004.  The case of Citizens for Consumer Justice, et al

5    versus AbbotT Laboratories, et al.  Civil action No.

6    01-12257 will now be heard before this Court.

7            Would counsel please identify themselves for the

8    record.

9                MR. SOBOL:  Good morning, Your Honor.  Tom

10   Sobol, Hagens Berman, for the plaintiffs.

11               THE COURT:  Thank you.

12               MR. KODROFF:  Jeffrey Kodroff, Spector,

13   Roseman & Kodroff, also for the plaintiffs.

14               MR. WEXLER:  Ken Wexler, Your Honor, the

15   Wexler Firm, for the plaintiffs.

16               MR. THEODOROU:  Nicholas Theodorou, Your

17   Honor, for the defendants.

18               MR. HOBART:  Geoffrey Hobart, Your Honor,

19   Holland & Knight, for the defendants.

20               MS. HARRIS:  Kim Harris, Your Honor, from

21   Davis Polk & Wardwell, representing AstraZeneca

22   Pharmaceuticals.

23               MR. EDWARDS:  Steven Edwards, Hogan & Hartson,

24   Bristol-Myers Squibb.

25               MR. MORGENSTERN:  Saul Morgenstern, Kaye

1    Scholer in New York, for Novartis Pharmaceuticals.

2              MS. GREEN:  Karen Green, Wilmer Cutler

3    Pickering Hale and Dorr for Novartis Pharmaceuticals.

4              MR. RILEY:  Your Honor, my name is Richard

5    Riley.  I represent First DataBank, Incorporated and Kay

6    Morgan who are non-parties and have a motion to be heard

7    before you, Your Honor, this morning.

8              This (indicating) is David Schulz who is going to

9    argue pro hac vice for First DataBank.

10             THE COURT:  All right.  You may want to sit at

11   that table then.

12             MR. TRETTER:  And last but not least, Your

13   Honor, Lyndon Tretter from Hogan & Hartson, for

14   Bristol-Myers Squibb.

15             THE COURT:  Thank you very much.

16             MR. SOBOL:  If I may, Your Honor, I have

17   conferred with counsel and we have a schedule of the motions

18   to go through.  I'd like to provide a road map of the, at

19   least the order of the motions that relate to us, unless the

20   Court has --

21             THE COURT:  I have my own road map.

22             MR. SOBOL:  That's why I am asking first.

23             THE COURT:  Well, let me just tell you a few

24   things at the outset.

25             It is my practice in handling discovery matters to

1   make as many decisions as possible from the bench.  If I

2   take things under advisement, they take their place in the

3   order of other matters that I have and then you will have to

4   wait for a ruling.  So it would be my determination here

5   today to make all the rulings from the bench.

6          There may be certain times that I deem it

7·  appropriate to take a recess, go off, look at something and

8   come back.

9          The whole day is available to you.  We will go

10  until one o'clock and then break from one to two and if need

11  be come back.  And I will take a brief recess mid morning.

12         But I have gone through all the motions and

13  fashioned them out in a manner that I think makes sense.

14  There were a few things that were not noticed in the notice

15  that was sent out by the clerk and there also have been some

16  motions that have come in since then that it might be

17  appropriate to deal with at this time.

18         So it would be my fashion to take them in the order

19  in which they were filed.  So I would start with docket

20  entry No. 884, which is plaintiffs' motion to compel.

21         Do you have dockets in front of you, printed

22  dockets?

23               MR. SOBOL:  I don't, Your Honor.

24               THE COURT:  Well, it is really helpful to do

25  that before you come here.  The night before the morning of

1    court to print the final docket, the last, in this case

2    probably one hundred or so docket entries so that you can

3    see everything and see exactly what it is we are dealing

4    with.

5          All right.  That's 884, which is plaintiffs' motion

6    to compel the production of HHA ASP documents relating to

7    all defendants.  All right.

8                MR. SOBOL:  That actually was first on our

9    list.

10               THE COURT:  Of course, Mr. Theodorou.

11               MR. SOBOL:  Before I address the motion, Your

12   Honor, I'd like to report that I think that there is -- the

13   parties agreed to an agreement with respect to the McKesson

14   motion.  And I believe that there is counsel from McKesson

15   who might be here in the courtroom so rather than having him

16   or her sit around, I just wanted to report that.

17         And unless the Court had any questions about it, I

18   think that the matter was going to be taken care of --

19               THE COURT:  He is well known, Counsel.

20               MR. KIERNAN:  Good morning, Your Honor.  John

21   Kiernan on behalf of McKesson Corporation.  And it's my

22   understanding as well that that's been withdrawn.

23               THE COURT:  And, of course, you can't tell me

24   the docket number; can you?

25               MR. SOBOL:  I will momentarily, Your Honor.

```
1                    THE COURT:  Does anyone have a docket?
2           Amazing.
3                    MR. KIERNAN:  Thank you, Your Honor.
4                    THE COURT:  You are excused, Mr. Kiernan.
5                    MR. KIERNAN:  Thank you.
6                    MR. SOBOL:  Your Honor, the briefing on the
7      plaintiffs' motion to compel the HHA ASP documents is
8      briefed in this modern day --
9                    THE COURT:  Just one moment.  If I can see the
10     law clerk for a second.
11              (Whereupon, the Court and the Clerk conferred.)
12                   THE COURT:  As to the McKesson motion, if you
13     can file a letter with the Court indicating what docket
14     entry that was and that it was withdrawn in open court.
15                   MR. KIERNAN:  I will do so immediately, Your
16     Honor.
17                   THE COURT:  All right.  Thank you,
18     Mr. Kiernan.  And you are excused if you don't want to stay.
19                   MR. KIERNAN:  Thank you, Your Honor.
20                   THE COURT:  All right.
21                   MR. SOBOL:  Thank you, Your Honor.
22              I'd like to address the plaintiffs' motion to
23     compel the HHA ASP documents.  The briefs are relatively
24     short and so my argument is also going to be intended to be
25     relatively short.
```

1     It's important to place the motion in the context

2  of the case of course as a whole.  The case ultimately

3  involves a question as to the extent to which the

4  reimbursement rates posted by the defendants in the context

5  of AWP are an abuse of a variety different systems.  Whether

6  they're an abuse of Medicare Part B or whether they're an

7  abuse of reliance of the private reimbursement system for

8  oral pharmaceuticals or for the injectables.

9     Now, there are disputed issues of fact that the

10  parties heatedly have on those matters.  One of them is, for

11  instance, has there been a difference between the actual

12  selling prices in the variety of publicly published pricing

13  points, whether it's AWP or the wholesale acquisition cost,

14  the WAC.

15     It's also a question about whether or not the

16  actual selling prices have been different than other price

17  points that aren't publicly available.  For instance, the

18  average manufacturer price or the AMP.

19     So the extent to which there is a difference

20  between the actual selling price and the posted price is

21  critical to the case.  But the motion seeks to have the

22  defendants compel what they are currently reporting for

23  average selling prices for what the, what we call AWPID, or

24  average wholesale price inflated drugs.  Those are the drugs

25  that are the core obviously of the case itself.

1          Now, if I understand the defendants' argument, it

2     is essentially that, well, what we are doing now is either

3     too complex or, you know, not really refined right now and

4     it's not going to be relevant. And we say that that's not

5     true for the following reasons.

6          First, whether it is practical or not to publish

7     ASPs or to more closely publish reporting prices that more

8     closely reflect the actual transaction cost, whether that's

9     a practical possibility or not is a dispute. And so if we

10    can show what they do right now is something that they can

11    practically do, then that is relevant for us to get the

12    ASPs.

13          Second, the complaint seeks injunctive relief in

14    addition to monetary relief for current wrongdoing. So to

15    the extent to which they are now reporting certain things

16    may be used by the defendant, likely will be used by the

17    defendant as a defense, that it is not necessary to order

18    injunctive relief. But obviously we would need to know the

19    kinds of things that they are actually reporting in order to

20    find out whether it's necessary or not.

21          Third, there is a big issue that the defendants

22    make -- and I think you will see this in a variety of other

23    motions we have here -- as to what exactly should the AWP

24    have been or what is it that an ASP really is. And I think

25    there are many complicated subsidiary issues in that

1   question that they are currently right now trying to iron
2   out with HHS and with CMS.

3        Well, obviously their position that they're taking
4   with respect to those miscellaneous issues, what's inside or
5   outside the calculation of ASP, goes directly to their
6   questions about what we should be doing and what kind of
7   arguments we should be making.  So it's relevant again for
8   us to get that kind of information.

9        Also the argument really is simply a relevancy
10  question.  It's not a question of burden because obviously
11  the information is information that they have readily
12  available so it is current so it's nothing that they have to
13  go back into the archives to be able to retrieve that kind
14  of thing.

15       To the extent that it's confidential -- and it may
16  be confidential to some extent -- this Court already has
17  pending orders that protect the confidentiality of the
18  material also.

19       And ultimately, this really is the bottom point, to
20  the extent that they think it's not a final number but it's
21  something that needs to be discussed and refined more and
22  more, and they have a dialogue with CMS on that, that's
23  precisely all the more reason why this is exactly the kind
24  of information that would be helpful to have for this case.
25  To know what they claim the nuances are to these, what the

1   impracticalities are from their point of view that they're

2   representing to the federal government are helpful.

3           So it goes not only to monetary relief but also to

4   injunctive relief when we get to the core about the

5   practicality and the content of reporting actual prices,

6   Your Honor.

7                   THE COURT:  Mr. Hobart.

8                   MR. HOBART:  Thank you. Your Honor.

9           Mr. Sobol's two central points as to relevance,

10  Your Honor, I'd like to rebut very directly.

11          One, with respect to the average selling price,

12  interim and proposed final regulations that came out in

13  September, the defendants' position has been and is that

14  that guidance is a moving target.  That's point No. one.

15  And I'll explain that in a little bit more detail in a

16  minute.

17          Point No. two, Your Honor, is that the average

18  selling price requirement deals with quarters that are not

19  at issue in the plaintiffs' amendment consolidated complaint

20  at all.

21                  THE COURT:  What is your response to that?

22                  MR. SOBOL:  Twofold, Your Honor.

23          First, what they're doing today goes directly to

24  the question of injunctive relief today.  So regardless of

25  whether or not -- we can't have an injunction for past

```
 1    conduct.  Obviously an injunction seeks to protect current
 2    and future conduct, No. one.
 3         No. two, what someone is doing today can create an
 4    inference about what occurred previously.  So what the
 5    average selling price differences are today against posted
 6    prices might create an inference regarding what those prices
 7    had been in the past.
 8              THE COURT:  Might.
 9              MR. SOBOL:  Might.  I'm not saying that they
10    will.  But, again, it's discoverable information we suggest.
11              MR. HOBART:  And again, Your Honor, the
12    defendants are well aware of the liberal discovery standard.
13    But we are here today to demonstrate to the Court that even
14    under that liberal standard there is no possibility that
15    this information is relevant to injunctive relief or any
16    other issues in this case.
17         This is not a situation, Your Honor, where the
18    companies have not provided the plaintiffs with the data,
19    the transaction level data that they need to perform
20    historical average selling price model if they choose to do
21    that as part of their case.
22         This is, I think, you know, I'm well aware that the
23    Court has extensive background with hospitals and medical
24    issues so I won't -- I'll assume you have knowledge about
25    that.
```

1          But the Medicare reimbursement system has evolved

2   over time to -- since 1991 as reflected in the papers.

3          The average wholesale price is the concept.  It's

4   not defined anywhere.  No pharmaceutical company has ever

5   been required to report an average wholesale price to any

6   government entity or third party acting on behalf of it or

7   contracted by the government.

8          The history itself as this has evolved needs to be

9   compared and contrasted to some other reimbursement systems

10  that were in place.  For example, for Medicare when Congress

11  initially extended coverage to certain drugs in an

12  outpatient setting, the so-called Medicare Part B, the

13  legislation suggested or directed HCFA to reimburse at the

14  doctor's actual charge or pursuant to a fee schedule to be

15  resolved by HCFA.

16         HCFA then proposed a rule that the payment for the

17  drugs should be at 85 percent of the national AWP.

18         The oncologists and the lobbyists, you know, went

19  to work and demonstrated to Congress and to HCFA that that

20  was an inadequate level of reimbursement for the oncologists

21  and other doctors.

22         And that final regulation that came out in 1991

23  provided for reimbursement to be the lesser of one hundred

24  percent of AWP, or estimated acquisition cost as determined

25  by surveys conducted by the Medicare carriers.

1           Those surveys, Your Honor, were never feasible or

2   completed and the reimbursement rate 1991 to 1997 was one

3   hundred percent of AWP.

4           Now, the irony and the reality here is that was the

5   reimbursement rate.  But the companies were never required

6   to report to the government or anybody else --

7           (Whereupon, the Court and the Clerk conferred.)

8           MR. HOBART:  -- about an AWP for a product.

9   And this practice the way the AWPs were derived and used by

10  the Medicare carriers for reimbursement, as a general

11  proposition, companies would report a wholesale price,

12  either wholesale acquisition cost or net wholesale price to

13  three price reporting services:  Red Bank -- Red Book, First

14  DataBank and Medi-Span.

15          Those price reporting services would apply a

16  multiplier, either at 1.2 or 1.25, to derive AWP which they

17  publish in their catalogs for use by the Medicare carriers

18  in establishing reimbursement rates.

19          So in terms of what the companies were reporting or

20  required to report, there was no requirement.  And as a

21  matter of practice, it was the wholesale price that was

22  reported to these price reporting services.

23          Now, different from the AWP, Medicare AWP

24  reimbursement system, in 1991 the Congress also enacted the

25  Medicaid Rebate Statute which did have very clear reporting

```
 1    requirements for the companies.  They defined a number of

 2    the terms, "average manufacturer's price" or AMP, A-M-P as

 3    Mr. Sobol just referred to was one benchmark which is

 4    essentially the price charged to wholesalers for sale to the

 5    retail pharmacy class trade less the prompt paid discount.

 6            A "best price," which is the lowest price charged

 7    by a company to certain purchasers.

 8            And then the state would be entitled to rebates

 9    based on the difference between AMP and best price or the

10    lower or that was -- or the greater of the 15.1 percent.  So

11    it's either 15.1 percent of AMP or the delta between AMP and

12    best price with adjustments for a cost of CPI penalty if

13    applicable.

14            So you have two situations, two different programs

15    with two entirely different sets of rules of the road.

16            In this case the plaintiffs have asked for the

17    production of AMP data.  And the defendants have not

18    objected to that.  And I believe every defendant who has

19    received such a request has complied with that.

20            And the reason we complied with that is, one, the

21    AMPs are calculated for the relevant time periods that are

22    at issue in this case.  And it's pursuant to established

23    regulations and definitions that have become established

24    over time.

25            Different from the average selling price, you know,
```

1   the model that just recently was enacted and is still under

2   evolution.

3          Now, the AWP reimbursement system stayed at one

4   hundred percent AWP from '91 to '97.  There was a fair

5   amount of legislative attention to the high cost of Medicare

6   drugs during that time period.  And I won't go into all the

7   details, but the Clinton Administration made a number of

8   proposals to change the reimbursement benchmark from

9   Medicare, the actual acquisition cost or some percentage off

10  of AWP.

11         And in 1997 on the Balanced Budget Act of 1997 a

12  change was implemented to 95 percent of AWP.  And from 1997

13  to literally 2003 there has been an enormous amount of

14  legislative attention, lobbying efforts by oncologists and

15  others in this political process about what the appropriate

16  reimbursement rate has been.

17         And there has been a number of proposals, '98, '99,

18  2000 including in the year 2000 now Attorney General

19  Ashcroft introduced a bill to freeze any changes in the

20  Medicare reimbursement rate by HCFA until a study can be

21  completed.

22         And in a speech from the Senate floor he

23  acknowledged that the reason for the potential for

24  oncologists to make a profit off of drugs and the difference

25  between their acquisition cost and the AWP was in order to

1    adequately compensate oncologists for other services that
2    are rendered in outpatient cancer clinics that are
3    inadequately compensated under the various fee schedules by
4    HCFA, now CMS.

5         So I understand the plaintiffs' theory, Your
6    Honor -- but it's a lot more complicated than that -- there
7    is the political process at work here.  It's been at work
8    for over twelve years.  And that process finally in the year
9    2000 produced a change in the reimbursement structure for
10   Medicare.

11        In December of 2003 the Medicare Modernization Act
12   was passed.  That act changed the benchmark from the AWP
13   model, the Medicare reimbursement benchmark to an average
14   selling price.

15        What they didn't -- Congress did not flesh out that
16   definition in any, you know, meaningful way that can be
17   applied in practice.  It's an average selling price of
18   purchases or sales to U.S. based purchasers net of what had
19   come to be known as price concessions, discounts, rebates or
20   other items of value, and excluding purchases to otherwise
21   exempt purchasers of the federal supply schedule and folks
22   like that.

23        Under the Medicare Modernization Act the companies
24   are required to begin reporting ASP to -- the ASP numbers by
25   NEC number to CMS beginning the first quarter of 2004.  So

1    the first submission was 30 days after the close of the

2    quarter on April 30th.

3           There has been another submission for the second

4    quarter in July.  The CMS issued proposed interim

5    regulations on April 6.  One of the points the defendants

6    make in their papers is that these proposed regulations in a

7    question/answer form that was conducted made it very clear

8    that there are a number of moving parties to this regulation

9    in terms of trying to implement how an average selling price

10   would actually be calculated or reported to the federal

11   government.

12          One of the key issues that drew a lot of attention

13   from people in the industry was the issue of the lag in

14   reporting time.  Just in two minutes on pharmaceutical drug

15   pricing, Your Honor, I think it would be useful to put this

16   into context.

17          Most pharmaceutical companies have very few direct

18   sales to their end customers.  In terms of distribution the

19   company sells their products to wholesalers.  Wholesalers in

20   turn sell the products to the end users, in this case in

21   particular oncologists.

22          And then the companies also have contracts,

23   typically have contracts with a number of their end user

24   customers.  But because they're not delivering the product

25   to the customers, there is a mechanism in place to make sure

1    that the end customer gets the price they contracted for,

2    that that system is administered by the wholesalers.

3            So, for example, if the contract price is for one

4    hundred dollars to an end user, and the price to the

5    wholesaler is $120, the wholesaler would have the contract

6    information loaded into its computer system and would give

7    the benefit of the bargain to the oncologist.

8            But the wholesaler who bought that drug for $120

9    and is selling it to the oncologist for $100, to make that

10   wholesaler whole they charge the company back the

11   difference, the $20.  That's a charge back.

12           A "charge back" is a term of art really.  It's

13   describing the way in which discounts to end users are

14   administered through the wholesale distribution process.

15           So in terms of calculating an average selling

16   price, it's important to take into account charge backs and

17   discounts.  A lot of contractual relationships involve

18   what's known as rebates or market share performance rebates.

19           So if a contract is for a year and you need to

20   sell, purchase so much of a drug to get like a rebate at the

21   end of the year, you won't know what that rebate is until

22   the contract is completed and the final tally can be done of

23   what was actually purchased.

24           So to deal with this lag issue initially CMS

25   proposed that the company take a twelve month look back.

1   They aggregate by NDC the total amount of price concessions

2   for that twelve months and then divided that number by four

3   to get you an absolute number for that quarter.  And then to

4   back out that number from the gross sales price to get an

5   approximation of the net gross sales for that quarter for

6   that NDC to divide the units into that numerator.

7           As the period went forward, one of the things that

8   a number of the commentators and industry groups noted that

9   that created the possibility for negative ASP numbers.  By

10  using an absolute number instead of a fraction, a rolling

11  average, that created the possibility that if there were a

12  lot of rebates in a particular quarter and not as many sales

13  to match those up against, the numerator could actually be a

14  negative number producing a negative ASP.

15          Very recently, and I have a copy of the Federal

16  Register, Your Honor, it came out September 16th, if the

17  Court would take it?

18              THE COURT:  Do you have a copy for your

19  brother?

20              MR. HOBART:  I do.

21          CMS noticed -- this is the proposed -- the final

22  rule that come out on September 16, 2004, just a couple of

23  weeks ago.

24          And as the defendants predicted in their original

25  paperwork, Your Honor, that this whole process is a moving

```
 1    target.  CMS changed the way in which the lag should be
 2    accounted for.  So rather than doing the math the way they
 3    proposed in the interim regulations, now a fraction is going
 4    to be computed based upon the total price concessions versus
 5    the total sales for a 12 month period.  For example, it
 6    gives an example on the second page.
 7              THE COURT:  I see.
 8              MR. HOBART:  That percentage will be applied
 9    to the sales for a quarter for a product deriving a net
10    sales figure in order to provide a more even way of
11    accounting for the discounts that exist in the field.
12         The net effect of that, Your Honor, however, is
13    that the submissions that the company made to CMS in April
14    and July are now totally meaningless because the methodology
15    has completely changed with respect to this all important
16    issue.
17         The other point, in addition to the moving target
18    piece, Your Honor, we are only talking about the quarters
19    that are currently at issue.  All the companies are provided
20    to the plaintiffs.  All the transaction level data that they
21    need for the time period covered by the amended master
22    consolidated complaint, the charge back data, rebate data,
23    sales level data, it's now -- the challenge for the
24    plaintiffs is how do you aggregate or match up the discount
25    rebates in order to come up with a net price per unit to do
```

1    their own average selling price model.

2         The guise that's in their proposed regulations and

3    what the companies are doing now is not going to be helpful

4    to the plaintiffs at all in terms of performing those types

5    of calculations.

6         If I could give the Court just one real world

7    example of why that would not be helpful to the plaintiff,

8    and taking the company that I represent Glaxosmithkline as

9    the example.

10        One of the drugs at issue for Glaxosmithkline is an

11   antiemetic drug called Zofran.  It was developed in 1991 by

12   Glaxo Inc.  Glaxo, Inc. merged with Barlows Wellcome in 1995

13   to create Glaxo Wellcome, Inc.  And the end of 2000 Glaxo

14   Wellcome, Inc. merged with SmithKline Beecham Corporation to

15   form GlaxoSmithKline.

16        Each one of those mergers involved the aggregation

17   of Legacy Computer Systems in assembling and merging

18   different assumptions and reporting to the point where after

19   the merger in 2000 GlaxoSmithKline was not able to make one

20   integrated report under the Medicaid Rebate Statute until

21   the first quarter of 2003.

22        So now that there is an integrated computer system

23   for GlaxoSmithKline for which these average selling price

24   calculations are being currently performed is not going to

25   be any help at all to Mr. Sobol and the rest of the

1    plaintiffs' lawyers in trying to figure out what the Legacy

2    system for Glaxo Wellcome looked like in 1997 or what the

3    Legacy computer system handling discounts, rebates and

4    charge backs, et cetera, for SmithKline Beecham Corporation

5    during the same time period.

6        Now, the plaintiffs have recently noticed 30(b)(6)

7    depositions of GlaxoSmithKline and other companies to help

8    them understand the data that the companies have provided to

9    them over the course of the summer.  And I suggest to the

10   Court that that's exactly what the plaintiffs should be

11   doing if they want to understand the transactional level

12   data that's already been provided to them or for the

13   relevant time periods.

14       With respect to the current time periods that are

15   after the filing of the amended consolidated complaint, when

16   you're talking about regulations that are sure to be changed

17   again -- and I call the Court's attention to the first page

18   of the proposed regulations that came out on September 16th,

19   the top right-hand corner -- I'm sorry -- it's the middle

20   column, very top.  It's, "Other issues and comments relating

21   to interim final rules will be addressed in the future

22   time."

23       So at the very real world, Your Honor, these

24   regulations are going to change again and again and again.

25   There are a number of ambiguities, inconsistencies that need

1       to be resolved.

2               The agency received 79 sets of comments.  They're

3       under the gun.  They're dealing with this, you know, one

4       quarter at a time for the beginning of ASP reimbursement

5       which starts in the year 2005.

6               For all these reasons, Your Honor, there just isn't

7       any possibility that what the companies are doing struggling

8       with today to comply with the moving target is going to be

9       of any help at all to Mr. Sobol.  They have the tools to

10      deal with the data that's already been provided to them.

11      They have indicated they are prepared to attempt to

12      understand that in deposition and that is sufficient.

13              THE COURT:  A brief reply.

14              MR. SOBOL:  Yes, Your Honor.

15              I think that I have heard the following points:

16              The first, a recantation of the pharmaceutical

17      industry's view of history regarding reimbursements and how

18      that's essentially a defense to the case as a whole.

19              That has been rejected twice already by Judge

20      Saris.  She has sustained allegations that there has been an

21      abuse of Medicare Part B systems, that there has been an

22      abuse of the private reimbursement system and that,

23      therefore, getting to the core of what the actual prices

24      have been in order to demonstrate the extent of the abuse is

25      something that is completely within the target of discovery

1    in this case.

2           Second, in terms of there being a time lag or not,

3    that's precisely why it is we need the information.  All the

4    representations that have just been made to you are not

5    grounded in any kind of record.

6           So what do I mean by that?  Well, the

7    representation that ASP as promulgated by the Modernization

8    Act doesn't, quote, in any meaningful way, end quote, define

9    ASP.

10          We disagree.  We think it does define in a

11   meaningful way.  The fact that there was a HCFA regarding

12   how it is that you roll back over time the charge backs and

13   the rebates and how that was able to be ironed out within a

14   short period of time demonstrates to us quite frankly that

15   we think that the information we will get, that we get this

16   information provided to us, is that the industry actually

17   thinks that this is something that is doable.  It's

18   completely doable.

19          There are going to be some issues regarding how it

20   is you might time wise roll things up or whether or not

21   certain kinds of payments to PBMs would or wouldn't be a

22   part of the thing.

23          But all of that goes to show I think really that if

24   the information is provided, we'll be able to get some

25   sunshine as to what the actual reaction has been to the

1    industry of having to do something which we have said has

2    been practical all along, which the industry said was

3    completely impractical, not realistic until Congress came

4    along last year and said you must do this.  And all of a

5    sudden we think that, you know, the information will be able

6    to demonstrate that.

7         I think at bottom really what the defendants'

8    argument boils -- oh, and then whether or not the

9    information is a moving target or not, whether it's totally

10   meaningless or not.  We will only know if we receive the

11   information.  Otherwise we will have to be told it's totally

12   meaningless, trust us.

13        And at bottom really I think the defendants'

14   argument is, plaintiffs, you will be wasting your time if we

15   give you this information.

16        I really think it's our obligation to make a

17   judgment based upon the information that it's going to be a

18   waste of our time, not to have the defendants make that

19   judgment for us.

20            THE COURT:  Well, at this time I find the

21   request is really too attenuated so the motion is denied.

22        Now, in light of that motion, there was another

23   related motion which is docket number 868 which was not

24   noticed.  And that is Track One Defendants' motion for

25   protective order.  So in light of the denial that should be

1    allowed.  All right.

2            The next matter is docket entry number 888 which is

3    the defendant Bristol-Myers' motion to compel.

4            MR. EDWARDS:  Your Honor, once again, Steve

5    Edwards, Hogan & Hartson, on behalf of Bristol-Myers Squibb.

6            This is a classic situation in which the defendants

7    are trying to pin down the plaintiffs as to their theory of

8    the case.  And the plaintiffs don't want to be pinned down.

9            The plaintiffs allege that the defendants report

10   AWPs to the publications such as First DataBank, Medi-Span

11   and Red Book.  They allege that these AWPs are used by

12   payers to determine reimbursement.

13           They allege that the defendants sell drugs at

14   prices below the reported AWPs.  And as a result there is a

15   spread between the reported AWPs and average sales prices or

16   what the plaintiffs refer to as ASPs.

17           And they allege further that the spread is marketed

18   and manipulated by the defendants in some way.

19           So we posed a series of very simple interrogatories

20   to the plaintiffs.  We asked them, first of all, what do you

21   contend the proper definition of "AWP" should be.

22           Secondly, do you contend that the existence of a

23   spread in and of itself violates the law or is there some

24   other act or conduct required in addition to the spread to

25   give rise to a violation.