**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE ) | |
| LITIGATION ) | Civil Action No. 01-12257-PBS |
| ) | |
| ) | |
| THIS DOCUMENT RELATES TO: ) | Judge Patti B. Saris |
| ALL ACTIONS ) | |
| ) | |
| ) | |

**DECLARATION OF DIRECT TESTIMONY BY EUGENE M. ("MICK") KOLASSA**

I, EUGENE M. KOLASSA, hereby declare:

1.      My name is Eugene M. ("Mick") Kolassa, Ph.D.  I am over the age of twenty-one (21) years, of sound mind, capable of making this affidavit, and have never been convicted of a crime.

2.      Counsel for Defendants, Schering-Plough Corporation, Schering Corporation and Warrick Pharmaceuticals Corporation asked me to analyze certain issues raised by the claims asserted by the plaintiffs.  In addition, I have been asked to discuss the basic principles of pharmaceutical marketing, economics and industry practice and structure.  Finally, I have been asked to comment upon certain aspects of the expert opinions offered by plaintiffs' experts.

3.      My opinions are based on my extensive study of the pharmaceutical industry and reimbursement programs during my career spanning more than 25 years, my review of depositions, pleadings, data and other evidence furnished in connection with this case, and my review of the opinions presented by the plaintiffs' experts.  I have reviewed and relied upon information from a number of sources.  These include documents produced in the litigation,

information from publicly available sources, depositions, and discussions with Warrick and

Schering personnel.

     4.      I am being reimbursed for my services at the rate of $750.00 per hour.

## I.     BACKGROUND AND QUALIFICATIONS

     5.      I am the Managing Partner of Medical Marketing Economics, LLC ("MME").

MME provides consulting services in a number of areas including, among other things,

marketing and pricing of health care goods and services.  I have consulted extensively with

pharmaceutical companies, payors (public and private) and other healthcare organizations.  As a

result of this experience and my background in the pharmaceutical industry, I am personally

familiar with the drugs at issue in this case including their use and distribution in various

channels of commerce in the healthcare industry.  I am personally familiar with the policies,

goals and operations of Medicare and Medicaid as well as private third-party payors.

     6.      I am an adjunct Professor of Pharmacy Administration in the School of Pharmacy

at the University of Mississippi.  I am also an adjunct Professor of Pharmaceutical Business at

the University of the Sciences in Philadelphia, Pennsylvania.  I am a retired Associate Professor

of Pharmacy Administration in the School of Pharmacy at the University of Mississippi.  I am

also a regular lecturer in such areas as pharmaceutical pricing, pharmaceutical and public policy,

and general issues surrounding pharmaceutical markets.

     7.      I previously have been employed by the Upjohn Company, and the Sandoz

Pharmaceutical Company (now called Novartis), both large pharmaceutical companies selling

branded and generic pharmaceuticals, working in the area of pricing of pharmaceutical products.

     8.      A copy of my curriculum vitae is attached hereto as Exhibit "A."

9.      I am the author of The Elements of Pharmaceutical Pricing, a pharmaceuticals pricing reference.  I have also co-authored a book called Pharmaceutical Marketing Principals, Environment and Practice.

10.     I am currently the editor of the Journal of Pharmaceutical Marketing and Management, a peer-reviewed academic journal that focuses on pharmaceutical marketing issues.  I have a regular column in a pharmaceutical journal called The Marketing Edge that deals with pharmaceutical marketing.  In the past, I was the associate editor of the Journal of Research in Pharmaceutical Economics, and the co-editor of the Journal of Pharmacoepidemiology.  I have published the results of several studies in the areas of pharmaceutical pricing and marketing.

11.     A complete list of all relevant publications I have authored in the last ten years is included in my curriculum vitae, attached hereto as Exhibit "A."

12.     I have been asked by Centers for Medicare and Medicaid Studies for guidance and advice on understanding the flow of money and pharmaceutical products in the healthcare system.  I have also been called upon by both the FDA and the FBI as an expert  in connection with criminal prosecutions in the area of pharmaceutical market and drug diversion, as well as pharmaceutical marketing and distribution.  I also have served on a technical advisory group to Mississippi's Medicaid Program to help establish and evaluate Medicaid reimbursement and payment systems.

13.     My work has been quoted and relied upon by Dr. Ernst R. Berndt in his Independent Expert Report in this case.

14.     I also testified as an expert witness for Warrick in the AWP case tried before a jury in West Virginia last year styled *The State of West Virginia ex rel Darrell V. McGraw, Jr.,*

*Attorney General v. Warrick-Pharmaceuticals Corporation, Schering-Plough Corporation, Dey, Inc., Abbott Laboratories and Abbott Laboratories, Inc.*; Civil Action No. 01-C-3011 in the Circuit Court of Kanawha County, West Virginia.

## II.   THE SCHERING AND WARRICK DRUGS AT ISSUE ARE PRIMARILY SELF-ADMINISTERED DRUGS.

15.     The Schering and Warrick drugs that are at issue in this case are primarily self-administered.  As recognized by the Court in the Memorandum and Order Re: Motion for Class Certification dated August 16, 2005 (the "Order"), in a self-administered drug transaction, a retailer, usually a pharmacy, purchases a drug from a wholesaler or manufacturer.  (p. 18)  The retailer then sells the drug to the consumer-patient who has a prescription from the doctor.

16.     Self-administered drug transactions differ significantly from physician-administered drug transactions.  Again, as noted by the Court in the Order, a typical physician-administered transaction involves a patient with a serious disease arriving at the doctor's office to receive an injection.  (p. 27)  The drug is administered at the physician's office and the drug has usually been purchased by the doctor either directly from the manufacturer or through an intermediary physician group purchasing organization.  (p. 27-28)

### A.     <u>Warrick Drugs</u>

17.     In the course of my professional work, I routinely deal with issues that require dealing with drugs at the NDC (National Drug Code) level and the manner in which they are used in the real world.

18.     All Warrick drugs are multi-source generics.  Because physicians do not specify or have control over the selection of the generic manufacturer of the drug that is dispensed by the pharmacy, physicians do not control the dispensing of Warrick drugs by a pharmacy.

19.    Albuterol sulfate, the only Warrick drug remaining in the case, is a multi-source generic drug used to treat asthma, chronic bronchitis, emphysema, and other lung diseases. Albuterol sulfate solution is primarily a self-administered drug dispensed by pharmacies to patients in the form of inhalers, tablets, syrup and nebulizing solution.

**B.    Schering Drugs**

20.    In contrast to Warrick drugs, Schering drugs are single-source branded drugs that are specified by the physician. However, these drugs are principally self-administered drugs. As a result, these drugs must be dispensed by the pharmacist as specified by the physician.

21.    Intron-A, a single-source Schering branded drug, is an immunomodulator. It is principally a self-administered drug used to treat hepatitis, leukemia, melanoma and follicular lymphoma. It is sometimes administered by a physician to treat melanoma, condyloma and AIDS-related Kaposi's Sarcoma. Even when administered by a physician, Intron-A is often purchased by the patient at the pharmacy and brought to the physician for administration. This practice is called "brown-bagging." Intron-A is covered by Medicare Part B only when it is administered in the physician's office and the physician submits a claim for reimbursement.

22.    Temodar is a single-source branded cancer drug sold by Schering. It is a pill that is a self-administered drug. Temodar represents a breakthrough in cancer therapy in that it allows the treatment of brain cancer with minimal side effects.

23.    Proventil is a multiple-source branded Schering product used to treat asthma, chronic bronchitis, emphysema, and other lung diseases. Like its generic counterpart albuterol sulfate, Proventil is primarily a self-administered drug dispensed by pharmacies to patients in the form of inhalers, tablets, syrup and nebulizing solution.

**III.    THE REALITIES OF PHARMACEUTICAL PRICING AND REIMBURSEMENT**

24.     Pharmaceutical pricing is a complex endeavor and is affected by many uncertainties.  Prices are established in a dynamic environment, with changes coming from all sides.  To understand pharmaceutical pricing, one must understand and take into account the dynamics of the industry and the environment in which it operates.  Six key groups shape this environment:  policy makers, competitors, prescribers, pharmacists, payors and patients.  These groups have concerns and goals that are often at odds but must be acknowledged and understood.

25.     There are various governmental health care programs, including Medicare and Medicaid, that reimburse for public health care, including prescription drugs.  The patient enrolled in these programs receives a defined set of benefits which would not be otherwise available without the government programs.  To achieve their objectives, these governmental programs require the voluntary participation of a variety of providers.  For example, the retail pharmacist who chooses to dispense drugs to those eligible to receive state Medicaid or federal Medicare Part B is a voluntary participant in these programs.

26.     This voluntary system has been and is based on economic incentives to the participants.  The government is benefited to the extent a "safety net" is provided to elderly, disabled, indigent and needy members of society.  The provider is incentivized to participate by receiving a fair and reasonable return on its for-profit business activities.  This private-public cooperation is beneficial to the government because it allows the distribution of health services and products through normal channels of distribution without the capital investment that would be required by the government to otherwise provide such benefits directly to the public.

27.     However, in order to have adequate participation by providers, and adequate access to the programs, the providers must be reimbursed their cost and a fair and adequate profit.  Providers must receive adequate and reasonable compensation to maintain and sustain

their business activities.  When it comes to the government program providers such as pharmacies and physicians, the government has long viewed profit incentive as the critical factor in ensuring access to and continuity of these social programs.  Simply put, providers will not voluntarily participate in any system that requires them to operate at a loss.

## IV.     EVOLUTION AND USE OF AWP

28.     Each prescription drug presentation (NDC number) has one AWP ("Average Wholesale Price") that is used throughout the healthcare system for reimbursement purposes. AWP has developed over decades of use and industry practice as a benchmark used by third-party payors (public and private) as a beginning point to determine different and varying reimbursement amounts consistent with their individual policy and business objectives.  Thus, while AWP is a "starting point" or "benchmark" price that is utilized as a fairly constant reference point for all public and private reimbursement systems that choose to use it at any given moment in time, AWP is used in very different ways by third-party payors to achieve different objectives.  For example, in the West Virginia AWP case in which I testified last year, the three plaintiff state entities, Medicaid, Public Employees Insurance and Workers Comp., were reimbursing at three different levels at the same time (Medicaid, AWP-0% to AWP–12%; PEIA, AWP-5% to AWP-65% and Workers Comp., AWP–12%).

29.     The history of AWP pricing is instructive.  AWP was first developed and introduced by California Medicaid ("MediCal") in 1969 at a time when most drugs were branded.  At its inception, almost 40 years ago, AWP was not created to be a calculation of an average of actual wholesale prices.  Instead, MediCal sought to avoid such a complex and burdensome calculation and achieve uniformity and simplicity through the use of an AWP "benchmark" price reflecting typical (but not actual) wholesale prices.  At that point in time,

MediCal was determining AWP and did not create a system that required <u>anyone</u>, much less drug manufacturers, to gather, calculate and report complex pricing data involving millions of separate transactions occurring daily on a national basis.  This historical background is set forth in an article written by George Pennebaker in 1998 called "The Rest of the AWP Story."

30.     From its beginnings in the MediCal program, the AWP system was adopted by private and government payors as an administratively simple and efficient way to implement varying amounts of reimbursement for all providers and all payors.  The utility of this system was that it provided a basis for reimbursement in all distribution channels, subject to ready adjustment by payors and providers, based upon changing market conditions.  The system avoided the need to work with detailed transactional data that would vary constantly for thousands of drugs and millions of transactions across the United States.

31.     As AWP was published in various pricing compendia, standard industry practices developed over time.  The most widely used pricing service has been First DataBank, a unit of publisher Hearst Corp.  For much of the class period, the AWP for brand drugs was determined by First DataBank to be approximately 20% to 25% (depending on the company) above the Wholesale Acquisition Cost ("WAC").  WAC is generally defined within the industry as the undiscounted invoice price from the manufacturer to a wholesaler.  As of 2004, a similar definition of WAC was adopted by the federal government as part of the Medicare Modernization Act.  The term "wholesale acquisition cost" means, with respect to a drug or biological, the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data.  This new

federal definition of WAC is consistent with nearly all prior industry definitions that I am familiar with.  As the list price of brand drugs went up, the AWP was usually increased in the same proportional amount.

32.     In my twenty-five (25) years of experience in the area of pharmaceutical pricing, I have not been made aware of the users of AWP being provided with any guidance or direction from any governmental body as to how an AWP should be calculated, who, if anyone, has to publish an AWP, when it must be published or whether it has to be published at all.  In other words, based upon my years of industry, consulting and academic experience, I am not aware of any governmental body providing guidance, directions or instructions that would change my understanding of the industry practice and meaning of AWP as set forth above.  I am also unaware of any such guidance, directions or instructions from any third-party payors in this regard.

33.     In any event, it is well known and generally understood in the industry that the method for setting AWP for generic drugs is quite different from the way AWP is set for brands.  For the first generics to enter the market, AWP has generally been set upon launch at least 10% below the brand AWP.  As the prices for generic drugs fell over time, the AWP for multi-source generics was usually not lowered.  Therefore, the predominant industry method for setting AWP for multi-source generic drugs has been to set it at least 10% below the brand and then not to change it as the market prices fall.  I will discuss below some of the circumstances surrounding this industry practice and the tools that were quickly and widely adopted by third-party payors to take this into account.

34.     AWP is not understood in the industry (including government third-party payors) to be reflective of actual price transactions.  It is understood in the industry that AWP does not

represent the price that wholesalers or retailers actually charge.  Indeed, because the standard convention for determining a brand AWP is to mark-up the undiscounted list price by a factor of 1.2 –1.25, AWP could never have been understood to reflect discounted prices.

35.     AWPs are neither "true" nor "false."  They are simply a benchmark or reference price from which other reimbursement amounts are determined by a third-party payor.  The third-party payors are free to choose whether to use AWP and, if so, how much and when to discount off of AWP.

## V.   OVERVIEW OF THE DIFFERENCES BETWEEN THE BRAND AND GENERICS MARKETS

36.     The market for generic drugs operates differently than the market for branded drugs in many ways.  First, generic drugs have perfectly substitutable competitors; competing products are equivalent.  Prescriptions for generic drugs may be filled with any version of the drug, which gives pharmacies pricing power over manufacturers because the pharmacies determine which manufacturer's drug they stock.  In contrast, physicians prescribing branded drugs determine which brand is prescribed, and pharmacies must supply the prescribed brand.

37.     Second, generic manufacturers primarily compete for a pharmacy's business by offering discounts and rebates to the pharmacy, either directly, or through a wholesaler.  In contrast, manufacturers of branded products compete for physicians' prescriptions typically by educating physicians about the positive qualities of their products over therapeutic alternatives.

38.     Third, generic drugs are rarely sold directly to individual pharmacies or physicians; instead, they are sold directly to large pharmacy chains and intermediaries such as wholesalers and generic distributors, who then resell the drugs.  Wholesalers typically carry everything sold by the retail pharmacy: all branded drugs, all generics, health and beauty aids,

etc.  The pharmacy can get essentially everything they sell from the wholesaler.  Cardinal, AmerisourceBergen and McKesson are the three major wholesalers in the United States today.

39.     Fourth, prices of generic products vary frequently and substantially, often reflecting individual circumstances such as the size of the individual order, the volume of the buyer's purchases over time, the strategic importance of the buyer to the manufacturer in a particular geographical area or specialty field, and many others.  Prices and price mark-ups vary considerably through the chain of distribution depending upon these diverse and varying commercial factors.  The wholesale mark-up to a large customer may be small but the wholesale mark-up to the smaller, low volume customer may be significantly higher.

40.     OIG reports addressing albuterol drugs used in nebulizers have indicated that wholesaler margins may vary from 3% to 43% depending upon the nature of the transaction.  A 1996 OIG report addressing acquisition costs of albuterol sulfate found that the *average* wholesale markup on the product was 46%.

41.     Finally, and most importantly, generic drugs compete fiercely on price, which often rapidly drives down prices in the generic market.  Because of this price competition, pharmacies, physicians, patients and insurers, including public third-party payors, benefit from the use of generics.  Acquisition costs are lower for providers; reimbursement payments are lower for private and public payors, and co-payments are lowers for patients.  The appropriate dispensing of generic drugs operates to reduce the overall cost of healthcare over time, because such drugs are less expensive than their branded counterparts and thus drive down overall costs through price competition.

42.     The transactions involved in getting a generic pharmaceutical product to the patient generally work as follows:  The manufacturer produces the product and sells it to an

intermediate wholesaler or retail chain. The wholesaler or chain retailer pays the generic manufacturer for the product. Upon conclusion of this transaction, the wholesaler or chain retailer takes possession of the product, and the manufacturer no longer has any control over it. This is the only transaction that the generic manufacturer is involved in, and the only time the manufacturer is paid any money for the sale of its product.

43.     Next, what generally happens is that a retail pharmacy will call the wholesaler or generic distributor and place an order. "I need 'X' number of packages of Albuterol," or whatever the product may be. The wholesaler then delivers the product to the retail pharmacy. The retail pharmacy then pays the wholesaler for it. At that point, the wholesaler is out of the system. The manufacturer does not make money or obtain any benefit from the transaction between the wholesaler and the retail pharmacy. In the case of a retail chain, the product is distributed to individual chain pharmacies from the central chain warehouse. Using a large chain pharmacy like CVS as an example, the CVS chain buys generic drugs in large quantity from generic manufacturers like Warrick. Then the chain warehouse transfers the drugs to individual CVS chain pharmacy stores. CVS, like other large chains, utilizes "transfer pricing" from the warehouse to the store in order to establish a cost basis for the drug product in the inventory of the pharmacy. The individual pharmacy then applies for and receives reimbursement from third-party payors. The manufacturer is not involved in nor does it have knowledge of the chain's transfer pricing.

44.     Next is the transaction between the retail pharmacy and the patient, where the product is dispensed to the patient. The manufacturer does not receive any money from the transaction between the retail pharmacy and the patient. When the manufacturer sells the product, it does not know where or how the ultimate user will obtain the product. The

manufacturer also does not know how the drug will be paid for or which, if any, third-party payor will reimburse for the product or how much reimbursement will be paid.  If a third party payor, whether private insurance, Medicare, Medicaid, etc. is involved, then the pharmacy will dispense the product (and may or may not collect a co-pay from the patient depending on the specific plan) and then submit a claim to the relevant third party payor.  The third party payors have negotiated contracts with the pharmacy in terms of how much they will pay based on whatever formula that they utilize.  The manufacturer has nothing to do with such contracts, or payments made pursuant to them.

45.     It is important to point out that the expansion of the generic market as I have described it above has constituted a "win" for the entire system.  The appropriate dispensing of generic drugs operates to reduce overall costs of health care over time because generic drugs are much less expensive than their branded counterparts.  This drives down the overall cost of health care through price competition.  Recognizing the economic advantage of generic drugs, third-party payors, both public and private, have created economic incentives to encourage the use of generic rather than brand drugs.  For example, many public payors have used an AWP benchmark for generic drugs that they know is certainly higher than actual wholesale prices.  This is not merely a matter of mistake or oversight.  The provider will often make more money on a generic rather than a brand transaction and, therefore, has an economic incentive to substitute generic drugs whenever possible.  This allows the provider to cover costs and encourages substitution of generics.  The savings to the payors is substantial.

46.     No single manufacturer could presume to make the various adjustments to AWP as asserted by the plaintiffs.  For example, at page 20 of his report, Dr. Berndt states it would be

"unprofitable and therefore unsustainable" for any one manufacturer to attempt to change the system pricing structure.

## VI.    GENERICS AND THE AWP SYSTEM

47.    Prior to 1984, generic drugs played a very small part in the pharmaceutical market.  However, the generic pharmaceutical industry was invigorated in 1984 with the passage of the Hatch-Waxman Act.  The purpose of the Hatch-Waxman Act was to facilitate the introduction of generic drugs by speeding up the drug approval process.  Under the statute, a manufacturer may satisfy FDA requirements by proving that its generic counterpart to a branded drug is bioequivalent to the branded drug; it need not incur the time and cost of independently proving the safety and efficacy of the generic version of the approved drug.  In this way, the Hatch-Waxman Act dramatically increased the availability of lower-priced generic pharmaceuticals.

48.    In contrast to the branded world in which AWP generally bears some relationship to WAC (20% to 25%), the AWP system works very differently for generic drugs.  As indicated previously, AWP for generic products is typically set at the launch of product at least 10% below the AWP of the equivalent branded product.  Generic AWPs are set in that manner in order to insure they are listed as generic drugs and are eligible for generic substitution.  Historically and based upon industry practice, once an AWP is set for a generic drug, it is typically not reduced.

49.    Following introduction of generic drugs, pricing behaves very differently from branded drugs.  In contrast to brands, generic drug prices typically decline rapidly as more competitors enter the market.  Price competition is the principal driver of market share in the generic market in large part due to the prevalence of auto-substitution programs and central

- 14 -

buying arrangements.  There is great advantage to being the first generic on the shelf.  The pharmacy would prefer not to change products due to administrative burden and patient disruption.  Price competition is used both to achieve shelf position initially and to maintain it over time.

50.     Moreover, contract prices for generic drugs are not standardized in the pharmaceutical industry but are variable depending, upon among other things, on the leverage of the purchaser, its representative and the buying relationship.  Unlike brands, the wholesalers and retailers have market power as to which generics will be purchased and for how much.  The physicians and manufacturers do not have market leverage in generic sales.

51.     The manufacturer's contracts for generics reflect post-market deal terms that are often not known or knowable at the time the product is initially sold.

52.     Actual contract prices for generics can be so numerous that updating them on each generic product would be a continuous and unrealistically onerous exercise.

53.     Wholesaler margins vary considerably in the various distribution channels for generic drugs, and there is no mechanism to determine the actual range or the average margins.

54.     One of the plaintiffs' false hypotheses which underlie the claims in this case is that the defendants have an incentive to participate in the purported "AWP scheme" in order to gain market share.  In my opinion, reimbursement spreads do not drive market share.  Plaintiffs' theories that pharmacy providers are driven to purchase by reimbursement spreads on particular NDC's make little economic or common sense and do not reflect real world practices.  As to self-administered generic drugs, there has usually been a Maximum Allowable Cost (MAC) in place.  This means that the pharmacy receives the same reimbursement amount regardless of the generic competitors' drug selected.  The pharmacy/retail purchasers will nearly always choose

the product that combines the lowest acquisition price with reliability of supply.  Thus, in my opinion, the primary factors that drive generic market share are acquisition price and reliability of supply.  Generic reimbursement spreads do not drive generic purchasing decisions and do not account for market share.  To a large degree, this explains why manufacturers do not have any incentive to invest in monitoring the AWP system and generally do not do so.

55.     As the use of generic drugs expanded and were reimbursed based on the AWP system, it was quickly apparent that there were limitations on the use of AWP as a benchmark for reimbursement of multi-source generics.  In response, third-party payors (public and private) quickly developed tools which took into account these limitations.  For example, in the Medicare system, the median AWP was adopted in an attempt to control costs.  In the Medicaid system, the Federal Upper Limit (FUL) system was adopted.  Also, various state Medicaid programs used larger discounts off of AWP and caps on reimbursement called Maximum Allowable Cost (MAC).  MACs are set at flat amounts for reimbursement of all generic equivalents.  In the private arena, the third-party payors have developed low flat rates or, in some cases, very steep discounts off of AWP for reimbursement of generic drugs.  For example I have reviewed the Express Script's 2000 contract which defines the maximum price for generics as "equivalent to an average range of 35% to 65% discount off of AWP."  I am also aware of public payors that have established reimbursement rates for generic drugs at levels exceeding AWP–60%.  It has been reported that some payors reimburse for certain generics at AWP-90%.  In fact, the plaintiffs' expert, Dr. Hartman has made the assumption that MACs will be put in place after only six (6) months of generic competition.  (Hartman MDL Liability Report, p. 45; Direct Testimony of Raymond S. Hartman, ¶155).  He then states that once a MAC is in place for a

generic drug, then the AWP does not matter. *Id.* In this respect, Dr. Hartman recognizes the utility and goals of these types of cost savings mechanisms.

56.     It has been suggested that manufacturers could have addressed shortcomings in the generic AWP system by lowering AWPs unilaterally to reflect the falling acquisition cost of multi-source generics. This would not have worked. As Dr. Berndt observed at page 20 of his report, no single manufacturer could have changed the system pricing structure. Second, because the system incorporated such a wide variety of approaches to discounting AWP for generic drugs, any unilateral reductions in AWP for generics could lead its product to being reimbursed substantially below cost and, to a large degree, would lead to industry and commercial chaos. Let me provide some examples. In paragraph 31 above, I pointed out the differences in reimbursement methodology and AWP discounts used in one state – West Virginia. If AWP was unilaterally lowered in West Virginia in the manner suggested by the plaintiffs, then those pharmacies which provide drugs to a PEIA insured (AWP-65%) would certainly be driven from the state system. If AWP were unilaterally lowered as suggested by the plaintiffs', then inadequate reimbursement would cause providers to incur losses and, in all likelihood, leave the system.

57.     In fact, had it been important to them, third-party payors, both private and public, were and continue to be best situated to obtain actual wholesale cost data. Manufacturers do not generally have access to wholesale transaction prices and even attempting to determine such information would raise antitrust concerns. In contrast, it is the third-party payors who have the leverage to obtain access to provider acquisition cost because they can condition payment on receipt of such information.

58.     The competitive dynamics affecting the market for self-administered, pharmacy-dispensed drugs are significantly different from those affecting the markets for physician-administered drugs.  In the self-administered drug market, PBMs are the 800-pound gorillas of pharmaceutical reimbursement.  Ninety-five percent of all patients with drug coverage obtain benefits through a PBM.  Pharmaceutical manufacturers compete for PBM business by offering a variety of price reductions.  PBMs facilitate dissemination of information throughout the market.  They stimulate competition among pharmacies and thereby drive drug prices down.  *In re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. at 69, 71-74

59.     Also, the plaintiffs assert that somehow the use and setting of AWPs for generic drugs leads to "mega-spreads" and the unconstrained inflation of reimbursement amounts.  In light of the above discussions of third-party payors' methods to control costs, this view of the industry is simply incorrect, overly simple and unrealistic.  Reimbursements by all third-party payors for generic drugs are constrained by market forces, including MACs, FULs, median AWP and significant percentage reductions off of AWP as I have discussed above.

## VII.    GOVERNMENT AND TPP KNOWLEDGE ABOUT THE RELATIONSHIP BETWEEN AWP AND ACTUAL ACQUISITION COST

60.     As stated above, for decades the pharmaceutical industry, government regulators and third-party payors have known that AWP is generally significantly higher than actual pharmaceutical contract prices in the marketplace.

61.      In the case of Medicare, HCFA first introduced an undiscounted AWP as the reimbursement mechanism in 1992.  At that time, HCFA was also in litigation with states to preclude the use of undiscounted AWP as the reimbursement standard for Medicaid.

62.     This seemingly contradictory stance taken by the Medicare program is indicative of a longstanding federal policy objective to move the site of care for many serious treatments,

particularly for cancer, to the physician's office where treatment could be provided more cost effectively than in the hospital setting.  See Medicare Program Fee Schedule for Physicians' Services, 56 Fed. Reg. 59,502, 59,524-26 (Nov. 25, 1991); GAO Report to the Chairman, Committee on Finance, U.S. Senate, Medicare: Reimbursement Policies Can Influence the Setting and Cost of Chemotherapy, GAO/PEMD-92-28 (July 1992).  In other words, the AWP system was adopted and modified over time by Medicare and other third-party payors as a tool to incentivize other conduct in the system that would result in overall cost savings to the program. This "real world" understanding and use of AWP is just the opposite of what the plaintiffs contend in this case.  AWP has been knowingly and intentionally used by the government and is not some hidden "scheme" created by the defendants.

63.    So-called "spread" on the ingredient portion of the drug reimbursement is simply a factor that contributes to providers' gross margins, a concept essential to profitability in sales industries. Spreads vary significantly for generic drugs, and there is no uniform "expectation" in the marketplace as to specific amounts of spread.  This is clearly demonstrated by the wide variety of percentage discounts off of AWP and other cost reduction tools used by the thousands of payors in the industry.

64.    Given the nature of Medicaid, Medicare and private payor reimbursement, the existence of an adequate profit margin for providers is absolutely essential if generic products are to be introduced, substituted or survive against their branded counterparts in a competitive market. This furthers valid policies by encouraging the dispensing of generic drugs and overall cost savings for prescription drugs.

65.    Government regulators generally know there is an ingredient cost "spread" and, in fact, allow such spreads to be paid to providers to cover their costs and insure access to the

various programs.  None of these government payors, including Medicare, have ever defined an

"excessive" spread, provided specific guidance on how spreads become "excessive," told anyone

how to calculate an AWP, or when to publish or amend AWP.  This is not merely oversight.  It is

a real-world recognition of the need to provide adequate incentives to providers in order to

ensure access and voluntary provider participation in the program.  Simply put, it is a political

and fiscal "balancing act."

66.    The Medicare program has repeatedly confirmed its understanding that

reimbursement for branded and generic drugs under the AWP system provided a cross-subsidy

for inadequate payments to providers for the cost of service and administration of many drugs.

67.    This understanding of the AWP system and the industry's understanding of the

government's use of AWP did not change in 1997 with the passage of the BBA.

68.    Consistent with this understanding of the cross-subsidy, after ASP was introduced

as the basis of reimbursement for Part B drugs, CMS implemented a substantial dispensing fee

for albuterol. This increase oftentimes results in cost increases to Medicare (and to the patient).

## VIII.  SCHERING AND WARRICK ACTED FAIRLY AND REASONABLY IN A SYSTEM THEY DID NOT CREATE

69.    Schering and Warrick acted fairly and reasonably in a system that neither created.

They did not manipulate or market the spread, nor did they otherwise seek or obtain any

advantage from the AWP system.

### A.    WARRICK

70.    I have reviewed the documents and testimony relating to Warrick's marketing of

generic drugs, including albuterol.  As set forth in the testimony of Harvey J. Weintraub, there is

no indication that Warrick either "manipulated" AWPs to gain a competitive advantage or that it

marketed AWP "spreads" to its generic customers.

71.     In fact, Warrick had some of the lowest AWPs and would have achieved nothing by marketing AWP spread.  Warrick's market share was achieved and maintained by other factors which are clearly set forth in Mr. Weintraub's testimony and depositions.

72.     Therefore, in my opinion, Warrick did not create, participate in or benefit from an alleged "AWP scheme."  Warrick received no money from Medicare or any other third-party payor.  Warrick's market share was the result of other factors.  Finally, neither the plaintiffs nor any of their experts have done any economic studies to correlate Warrick's market share with AWP spread.  I am aware of economic studies that failed to find any relationship between market share and AWP spread.  These analyses revealed that the preferences for generic drugs were driven by non-spread factors.  Based upon my experience, the principal non-spread factors are low price and consistent availability from a trusted source.

## B.     SCHERING

73.     I have reviewed the documents and testimony concerning Schering's marketing of the drugs Temodar, Intron A and Proventil.   In my opinion there is no indication whatsoever that Schering either manipulated AWPs to gain competitive advantage or that it marketed AWP spreads to its customers.

74.     Based upon my industry experience, knowledge and review of this case, the Schering AWPs for these branded, primarily self-administered drugs are in line with the standard industry mark-ups from WAC for branded drugs.  Further, the evidence shows that Schering had substantial sales of these branded drugs at WAC prices.  Thus, there was no spread "manipulation" and it was not the practice of Schering to "market spread" on these drugs.

## IX.   ERRORS IN DR. HARTMAN'S ANALYSIS

75.     In my opinion, a large number of errors flow from the improper methodology and lack of reliable data utilized by Dr. Hartman.  These errors are addressed in the reports of

defense experts, Dr. McFadden and Dr. Addanki.  I agree with those opinions but will not repeat them here.  However, I may refer to some of these opinions in my comments below.

### A.      ERRORS IN ALLOCATION

76.     The health care expenses of a given individual, as a patient in the US, may be insured in a variety ways.  A patient over the age of 65 is eligible for Medicare, but additional insurance, in the form of "MediGap" coverage, employer-paid insurance, self-financed insurance, or Medicaid, is often relied on to pay all or some of the costs not covered by Medicare.  In the late 1990s, approximately half of seniors had prescription drug coverage in addition to their Medicare benefit, with an additional 10% receiving Medicaid assistance for their prescriptions.[1]  Thus only about 40% of seniors, at that time, paid for their outpatient prescription drugs out of pocket, and a smaller percentage paid their co-pay for Medicare Part B drugs out of pocket.

77.     Following the health care dollar for a patient of Medicare age is difficult, because of the many different types of coverage and reimbursement systems within this population. Medicare patients may have a standard "MediGap" plan that covers the 20% co-pay and deductibles that are not covered by Medicare.  Prior to the availability of Medicare Part D, many patients also had prescription drug plans that were provided either by an employer or through some other system, including State governments.  New York's PACE and Massachusetts' Prescription Advantage programs are examples of these.  Such programs often are used to pay

---

[1] Insurance Coverage for Prescription Drugs: Effects on Use and Expenditures in the Medicare Population, Lee A. Lillard, Jeannette Rogowski, Raynard Kington DRU-2073-NIA September 1999 Prepared for the  National Institute on Aging Labor and Population Program Working Paper Series 99-09

for drugs that could be reimbursed through Medicare Part B, but patients and providers often find it easier to use these plans instead.

78.     The majority of the prescription drug plans offered to seniors are administered by private third parties, often PBMs.  For example, the Prescription Advantage program available to low income seniors (and others) in Massachusetts is administered by Caremark, the largest PBM in the country.  The current Medicare Part D plans are administered by these private entities. These PBMs and other plans contract with manufacturers and receive rebates and other payments in exchange for favorable formulary positions.  These payments made to the PBMs help to reduce the operating costs of the insurers, allowing them to pass the savings on to plan sponsors or patients.  Dr. Hartman has completely overlooked this aspect of the Medicare system.

79.     In attempting to calculate damages in this case, Dr. Hartman makes several critical, unfounded assumptions as to the extent of Medicare patient use, and payments for, Schering and Warrick drugs.   With respect to albuterol, Dr. Hartman baldly asserts – without explanation – that almost 60% of Warrick's albuterol sales are attributable to reimbursement by Medicare.

80.     For most of his allocations, Dr. Hartman relies on data from the National Ambulatory Medical Care Survey ("NAMCS") and the National Disease and Therapeutic Index ("NDTI") as a basis for his conclusion.  NAMCS is a national probability sample survey of visits to office-based physicians (3,000 physicians participate for one week each year) in the U.S.  It is conducted and managed by the Centers for Disease Control ("CDC").  The NAMCS data collection instrument, in field (h), asks for the "Primary expected source of payment for this visit."  NDTI is a broader audit, consisting of the records of over 12,000 physicians and providing much more information.

81.     Although – for reasons I explain below – neither of these data sources can be used definitively to determine the extent of Medicare patient use, and payments for, Schering and Warrick drugs, they can be used as a rough guide to the way medical care is provided, and they are certainly more reliable than Dr. Hartman's mere assertions.

82.     In deciding – only with respect to albuterol – not to use NAMCS or NDTI, Dr. Hartman wrongly assumes several things before rejecting the data.  First, Hartman states that "it is known that nebulizers are more common for Medicare beneficiaries," although he provides no evidence of this.  While it is true that nebulizers and the drugs that are delivered through them are reimbursed by Medicare, nebulizers are also the most common method of administering albuterol to infants and small children.  Moreover, albuterol administered via an inhaler is used much more frequently than the nebulized solution, even among patients over the age of 65.  Dr. Hartman's assumption has absolutely no basis in clinical reality.  For that portion of the solution (far less than half, in my estimation) that is prescribed to patients who are Medicare eligible, this eligibility does not guarantee Medicare will be the payer.  When a patient with prescription coverage presents a prescription for the nebulized solution to a pharmacist, it is quite likely that the claim will be processed through, and paid by, the prescription plan and not by Medicare. This is because it is easier and more straightforward for the pharmacy to be reimbursed through this method – even though the amount reimbursed may be less.

83.     To the extent that Dr. Hartman does use the NAMCS and NDTI data to draw conclusions about Schering's and Warrick's other drugs, it is important to note the limitations of the data.  NAMCS is conducted and managed by the CDC, who explicitly state that this database cannot be used to determine incidence or prevalence information.  The survey does not collect information on drug reimbursement, only on the expected reimbursement for the visit.  A patient

over 65 would have Medicare as the expected source of reimbursement for the visit, but the reimbursement for the drug could take many forms. The survey does not ask if the drugs were reimbursed under Medicare Part B or some other plan. It is not possible to determine from the NAMCS whether Medicare actually reimbursed for a particular drug or whether it was reimbursed under a different plan or source. Thus, NAMCS data serve to provide a maximum estimate of the percentage of potential Medicare patients but not the manner in which the drugs were reimbursed.

84.    NDTI is better suited to projections to national levels as the researcher is provided with the appropriate error terms for such projections. Even the NDTI, however, does not track the specific insurance information Dr. Hartman seems to believe he will acquire through these audits. The NDTI does provide patient age, but not specifics about insurance payments for prescribed or complimentary drugs. Again, NDTI provides the maximum potential Medicare patients not the actual Part B drug reimbursement percentage.

85.    Thus, finding that 20% (or any proportion) of patients prescribed or supplied a specific drug were over 65 years old, or that Medicare was the expected source of payment for the office visit, does not identify the source of reimbursement for the drugs – neither survey was meant to do this. To compute these numbers one would need to know, for each patient or office visit, whether the drug was administered in the office, provided as a free sample, or prescribed as an outpatient prescription. Even if Medicare was a source of payment, the co-payment responsibility of the patient could be covered through a MediGap plan or the co-pay may never have been collected, which occurred in up to 50% of office visits for Medicare patients. For those drugs that were offered as outpatient prescriptions one would need to know if the patients were covered by Medicaid or a private prescription drug plan or secured the drug through some

other means.  Without this information the estimations made by Dr. Hartman from NAMCS and NDTI likely overstate the "Medicare" use of a product.

86.     One other important point on the NDTI is that the firm that provides this information, IMS, also provides what they call "precision tables" for researchers using their data. These tables provide error estimates based on the number of times a drug is mentioned within their audit in a given year.  For a drug such as Intron A, which received approximately 44,000 "mentions" in NDTI between July of 1999 and June of 2000, IMS  offers an error rate of +/- 8%, meaning that precise estimates based on these data, even overlooking the aforementioned flaws, cannot be made with certainty.

87.     Dr. Hartman uses NDTI data to calculate that 21.6% of Intron A was paid for by Medicare and 62.3% by Private Payors.  Although it may be true that roughly 20% of Intron A patients were of Medicare age, as I explained above this does not automatically lead to a conclusion that Medicare was the primary payor.  As a self administered drug, the patient's prescription insurance coverage would pay the cost of the drug (minus any co-pay).  For those patients without such coverage, Schering was among the first companies to establish a patient assistance program offering help in securing reimbursement or, when none can be secured, providing the drugs free to patients who cannot afford them.  Thus, of the 21% of Intron-A patients who also were Medicate eligible, it is impossible to tell how many paid how much, but it is likely that many of those prescriptions were paid for by the patient's drug benefit insurance or provided free by Schering.

88.     Temodar is a self-administered, pharmacy dispensed oral anti-cancer agent that may be paid for through Medicare.  That some proportion of Temodar patients were of Medicare

age is undeniable, but what percent of Temodar use was reimbursed by Medicare is indeterminable through the means suggested by Dr. Hartman.

**B.    FAILURE TO GATHER AND CONSIDER PRICES FROM WHOLESALERS TO RETAILERS**

89.    Notwithstanding the fact that the plaintiffs argue that AWP should be defined out of context by a plain dictionary meaning (which is entirely inconsistent with industry and governmental history and understanding as I have outlined above), they have not gathered or analyzed prices from wholesalers to retailers.  Dr. Hartman does not compute or present an average of prices from wholesalers to retailers.  Instead he calculates an ASP or purported manufacturers sales price at an entirely different level of the supply chain.

90.    Dr. Hartman's ASP assumptions are flawed in that he fails to account for wholesaler markups.  Any argument that the government believed AWP = ASP is contrary to the economic realities that (1) Warrick/Schering often sold their products through wholesalers and (2) wholesalers must make a profit to stay in business. They are also contrary to the findings of the Office of Inspector General (OIG) of HCFA  (now CMS). Dr. Hartman admits that he does not have data concerning prices charged by wholesalers or paid by providers to wholesalers, but not because such data does not exist.  As set forth above and as indicated in several OIG reports, data on wholesaler margins for albuterol is available and indicates that margins are not "paper thin" as he portrays, but quite variable.  Dr. Hartman appears to have intentionally avoided seeking this and other similar data because it is contrary to his bald assertions that wholesaler margins are uniformly "thin."  Thus, his ASP calculations are simply unrelated to any plain meaning definition of AWP.

**C.    FLAWED "MARKET EXPECTATION" ASSUMPTIONS**

91.     Dr. Hartman's "market expectation" theories are also unproven assumptions. Spreads vary significantly for generic drugs, and there is no uniform expectation in the marketplace as to specific amounts of spread.  In my opinion, and contrary to the hypotheses of Dr. Hartman, the marketplace has never had any "expectation" that spreads were "zero" for Medicare reimbursement.  If you think about it logically, this would make little sense in the real world.  In the real world, where it is imperative that pharmacists make a profit to ensure access, if AWP = AAC, then Medicare providers are, depending on the time frame involved, "expected" to either take a loss or make no money at all on the ingredient portion of drugs dispersed to Medicare patients.  Dr. Hartman's theoretical, "but for" world is completely inconsistent with the purposes, aims and policies of government drug reimbursement systems.

92.     Moreover, Dr. Hartman's claims concerning "market expectations" do not square with the practice, function and reality of the marketplace.  Market participants, particularly third party payors, not only know but they expect that generic drug prices will drop dramatically due to healthy price competition.  As previously indicated, they actually encourage use of generics, formally and informally, by paying larger reimbursements to providers to dispense generics.

### D.     NO CORRELATION BETWEEN SPREAD AND MARKET SHARE

93.     Dr. Hartman assumes that higher spreads correlate to higher market share.  In fact, he claims that this is the benefit or incentive that causes the defendants to participate in an alleged AWP "scheme."  However, in my experience, a higher AWP or a higher spread, does not correlate or translate into having a larger market share.  I have seen many examples where manufacturers with higher spreads have lower market shares.  Rather, product quality and ability to provide a consistent supply are much more important to a manufacturer's customers.  Also, most pharmacists do not want to change suppliers frequently, because it is disruptive to the

patients.  As long as the acquisition price is competitive and there is a reliable source of supply, these factors, rather than spread, will tend to maintain or increase market share.  Dr. Hartman assumes a correlation between spread and market share without any support.  He has done no correlation studies between alleged spreads and market share.  He has not even gathered the data to do such studies.

### E.  CLAIMS DATA

94.     It is important to understand that the statutory provision that provides Medicare Part B reimbursement of generic drugs is based upon the lesser of billed charge or 95% of the median AWP is intended to act as cap on reimbursement, but is not necessarily, or for some drugs, even ordinarily, the payment methodology that is actually used.  Indeed, the intermediaries who administer Medicare Part B reimbursement have many options that provide for generic reimbursement at a rate much lower than the statutory scheme.

95.     I have reviewed the claims and claims data for the unit dose albuterol provided by Sheet Metal Workers and Blue Cross Blue Shield of Massachusetts.  My review of the unit dose albuterol claims data from Sheet Metal Workers and Blue Cross Blue Shield of Massachusetts allows me to come to two overall conclusions.  First, it is impossible to identify the manufacturer of the albuterol dispensed by the provider.  During the time period 1993 to 2004, there were over 20 different manufacturers and labelers of unit dose albuterol.  Because the claims and claims data merely provide J-Code information, it is impossible to identify which of the many manufacturers albuterol is associated with any particular claim.  Second, the reimbursement paid to the providers is widespread, varying, and often not based upon AWP.   In the case of Sheet Metal Workers, all reimbursement amounts paid to providers were substantially below a

reimbursement base of either billed charge or 95% of the median AWP.   Most of the Sheet Metal claims had billed amounts below AWP and, under the statutory rule, would never have been paid based on AWP.   More important, **none** of the Sheet Metal claims were paid under the statutory rule.   Instead, reimbursement was always for an amount resembling a MAC unrelated to AWP.   This is because the reimbursement for albuterol, as well as other nebulized agents, varies based on the number of drugs that are administered – the Medicare reimbursement level for the second and subsequent drugs is substantially lower than the AWP minus allowed for the first.   Thus the reimbursement rate for nebulized products is often not AWP based at all.

96.     In the case of Blue Cross and Blue Shield of Massachusetts, the reimbursement was wholly unpredictable.   There were many instances where multiple different amounts were paid on the same day.   Generally, the amounts paid were well below 95% of the median AWP. However, there were amounts paid that were multiples above the median AWP.

I declare under penalty of perjury that the foregoing is true.

_____
Eugene M. Kolassa, Ph.D.


EXECUTED this   16   day of  November  , 2006.

# EXHIBIT A

**Resume of:**
**E. M. (Mick) Kolassa, Ph.D.**

## CURRENT POSITIONS

Managing Partner
*Medical Marketing Economics, LLC*
400 South Lamar Blvd, Suite A
Oxford, MS 38655
(662) 281-0502 fax (662) 281-0340
mick@m2econ.com

Adjunct Associate Professor of Pharmacy Administration
*The University of Mississippi*

Adjunct Professor of Pharmaceutical Business
*University of the Sciences in Philadelphia*

## EDUCATION:

Ph.D. The University of Mississippi, 1995
　　　　Pharmaceutical Marketing and Economics
MBA, Eastern Washington University, 1980
　　　　Major Emphasis in Marketing and Decision Science
BA, Eastern Washington University, 1979
　　　　Major: Marketing
　　　　Minor: Economics

## PREVIOUS POSITIONS:

Associate Professor of Pharmacy Administration, and Associate Professor of Marketing, Associate Director, Center for Pharmaceutical Marketing and Management, Coordinator, Pharmaceutical marketing and Management Research Program, The University of Mississippi, 1999-2003

Independent Consultant in Pharmaceutical Economics, Milford, MA, 1998-1999

Vice President and Senior Pricer, Strategic Pricing Group, Marlborough, MA , 1996-1998

Research Scientist , Research Institute of Pharmaceutical Sciences, The University of Mississippi, 1992-1996

Senior Vice President, Hastings Healthcare, Inc., Flemington, New Jersey, 1991-1992

Director, Pricing and Economic Policy, Sandoz Pharmaceuticals,  East Hanover, NJ, 1988-1991

Assistant Professor, Nazareth College, Kalamazoo, Michigan, 1985-1988

Pricing Research Specialist, The Upjohn Company, Kalamazoo, Michigan, 1980-1985

Associate Director, Bureau of Business Research, Eastern Washington University, Cheney, Washington**,** 1979-1980

Marketing Research Analyst, Old National Bank, Spokane, WA, 1978-1979

Marketing Research Intern, Fidelity Mutual Savings Bank, Spokane, WA, 1978

Finance Specialist and Drug and Alcohol Education Specialist, US Army, 14th Finance Section, Furth, West Germany, 1972-1974

**PROFESSIONAL ASSOCIATIONS:**
American Pharmaceutical Association
The Pricing Institute
       Member, Board of Advisors
       Chairman, U.S. Annual Meetings, 1991, 1992, and 1998
Pharmaceutical Marketing Research Group
Pharmaceutical Management Science Association
Hematology/Oncology Pharmacy Association
Beta Gamma Sigma, National Business Honors Fraternity
Rho Chi, National Pharmacy Honors Fraternity

**ACADEMIC COURSE TAUGHT**
UNDERGRADUATE

| | |
|---|---|
| Principles of Marketing | Principles of Management |
| Marketing Research | Organizational Behavior |
| Contemporary Marketing Thought | Administrative Theory |
| Macroeconomics | Microeconomics |
| Money, Banking and Credit | Business Statistics |
| Personal Selling Techniques | Pharmacoeconomics |

GRADUATE

| | |
|---|---|
| Drug Development and Marketing | Primary Research Techniques |
| Secondary Research Techniques | Health Economics |
| Pharmaceutical Economics | Non-parametric Statistics |
| Advanced Statistical Analysis | |

**EDITORIAL:**
Journal of Pharmaceutical Marketing and Management – Editor 2001-Present
Journal of Pharmacoepidemiology – Co-Editor, 1999-2001
Journal of Research in Pharmaceutical Economics – Associate Editor, 1999-2002
Journal of Product & Brand Management - Editorial Advisory Board, 1995-Present
Research in Social and Administrative Pharmacy – Editorial Advisory Board, 2004

**PUBLICATIONS:**
BOOKS

Smith MC, Kolassa EM, Perkins G, Siecker B, Pharmaceutical Marketing: Principles,
      Environment, and Practice, (New York, Haworth Press, 2002)

Kolassa EM, Elements of Pharmaceutical Pricing, (New York, Hayworth Press, 1997).
      Japanese Translation February 2001

BOOK CHAPTERS

Kolassa EM, Lobb W, Reisetter B, Patterson K, Paul DR, Pricing Issues for Biopharmaceutical Products, in <u>Advances in Large-Scale Biopharmaceutical Manufacturing and Scale-Up Production</u>, ASM Press, Rockville, MD, 2004

Kolassa EM, Economic Considerations in Biotechnology, in <u>Pharmaceutical Biotechnology</u>, 2nd edition, Taylor & Francis, London, 2002

Kolassa EM, Evaluating Pricing Strategies, in <u>The Medical Marketing Manual</u>, Euromed Communications, Ltd, London, 2001, 17.1-17.13

Ouriel K, Kolassa EM, Cost-Effectiveness of Thrombolytic Agents in Peripheral Arterial Occlusion, in Ouriel, <u>Lower Extremity Vascular Disease</u>, W.B. Saunders Company, Philadelphia, 1995, 367-71

REFEREED JOURNALS

Lobb, WB, Kolassa, EM., Can Physicians Keep Up? A Quantification of New Information on the Top 25 Drugs from 2000 to 2003. Journal of Pharmaceutical Marketing and Management. Accepted in press

Shah, M.B.; Bentley, J.P.; McCaffrey, D.J.; Kolassa, E.M., Direct-to-Consumer Advertising and the Patient-Physician Relationship, Research in Social and Administrative Pharmacy ,Volume 1, Issue 2 , June 2005, pp 211-230

Lobb WB, Shah M, Kolassa EM, Factors Influencing the Selection of a Major: A Comparison of Pharmacy and Nonpharmacy Undergraduate Students, <u>Journal of Pharmacy Teaching</u>, Vol 11(2) 2004, 45-55

Kolassa EM, The Economic Contribution of Pharmaceutical Marketing, <u>Journal of Pharmaceutical Marketing and Management</u>, Vol. 14,(3/4), 2002, 101-08

Kolassa EM, Smith MC, Banahan BF, Garner DD, Shughart WF, The Effects of Acquisition Cost and Budget-Based Compensation on the Attitudes of Pharmacy Directors Toward the Adoption of a Cost-Effective New Drug, <u>PharmacoEconomics</u>, February 1998, 13(2) 223-230

Banahan BF, Kolassa EM, A Physicians Survey on Generic Drugs and Substitution of Critical Dose Medications, <u>Archives of Internal Medicine</u>, October 13 1997, vol 157, 2080-2088

Kolassa EM, Pharmaceutical Pricing at the Change of Millennia, <u>Journal of Pharmaceutical Marketing and Management</u>, Vol. 10,(2/3/4), 1996

Ouriel K, Kolassa EM, Economic Implication of Thrombolysis or Operation as the Initial Treatment Modality in Acute Peripheral Arterial Occlusion, <u>Surgery</u>, Nov 1995

Kolassa EM, Physicians' Perceptions of Pharmaceutical Prices: Their Accuracy and Effect on the Prescribing Decision, <u>Journal of Research in Pharmaceutical Economics</u>, 6(1), 1995, 23-37

Kolassa EM, Syllabus for a Proposed Course in Pharmaceutical Economics, <u>Journal of Pharmacy Teaching</u>, vol. 4(3), 1994, 15-27

Kolassa EM, Health Care Reform and Its Implications for the Administrative Sciences, American Journal of Pharmaceutical Education, vol. 58, Winter 1994,414-6.

Kolassa EM, Guidance for Clinicians in Discerning the Prices of Pharmaceutical Agents Journal of Pain and Symptom Management, 1994, 9/04, 235-243.

Jacox Ada, Kolassa EM, Cost and Regulation of Drugs, Nursing Economics, 1992, January-February 10/1, 66-69.

NON-REFEREED PUBLICATIONS

Kolassa EM, When Two Heads Are Not Better., Product Management Today, 2006 17 num 6(Jun)

Kolassa EM, Who is the Competition?, Product Management Today, 2006 17 num 5(May)48-50

Kolassa EM, Recommended Reading, Product Management Today, 2006 17 num 3(Mar)57-58

Kolassa EM, The Difference Between a Price and a Pricing Strategy , Product Management Today, 2006 17 num 2(Feb)48-50

Kolassa EM, Grubert N, Key Factors in U.S. Pharmaceutical Pricing, Spectrum (Decision Resources), December 29, 2005

Kolassa EM, Evidence-Based Marketing, Product Management Today, 2005 16 num 10(Oct)48-50

Kolassa EM, Who Owns the Problem?, Product Management Today, 2005 16 num 6(Jun)40-42

Kolassa EM, The Other "P," Product Management Today, 2005 16 num 5(May)16-17

Kolassa EM, Lobb W, Managed Care in the US – Caring More, Managing Less, PHARMA Pricing and Reimbursement Review, vol. 10 num 3, March, 2005, 64-67

Kolassa EM, What We Don't Know About the Medicare Modernization Act , Product Management Today, 2005 16 num 3(Mar) 50-51

Kolassa EM, What We Don't Know, Product Management Today, 2005 16 num 2 (Feb) 18-19

Kolassa EM, International Price Differences. Product Management Today 2004: 15(Dec) 9-10

Kolassa EM, The Generic Effect, Or Lack Thereof. Product Management Today 2004;15(Sep):16, 24

Kolassa EM. Boss, You've Got an Ugly Baby. Product Management Today 2004;15(Jul):16-18

Kolassa EM. What Is a Strategy?. Product Man-agement Today 2004;15(May):32-33.

Daly R, Kolassa M. Start Earlier, Sell More, Sell Longer. In: Anon., eds. The Successful Product Manager's Handbook. Volume 1. New York: Advanstar; 2004:8-20 (a separate supplement to the March 2004 issue of Pharmaceutical Executive).

Kolassa, EM.  Pricing and the Marketing Mix:  Part I.  Product Management Today.  2004; 15(Jan):14-16.

Kolassa, EM.  Pricing and the Marketing Mix:  Part II.  Product Management Today. 2004; 15(Feb):10-12.

Kolassa EM, Unlearning Myths. Product Management Today, October 2003; 16:19

Kolassa EM. Does Marketing Matter?. Product Management Today July/August 2003;14:17-18.

Kolassa EM. The Problem of (and With) Compliance. Product Management Today June 2003;14:14-16.

Kolassa EM. Marketing Odds and Ends. Product Management Today May 2003;14:15-16.

Kolassa EM. Dabbling in Pharmaceutical Marketing. Product Management Today April 2003;14:

Kolassa EM. Who Are Your Customers?. Product Management Today March 2003;14:12-14.

Kolassa EM. Stealth Marketers:  The Wheel of Rx. Product Management Today February 2003;14:16-18

Kolassa EM. Understanding the Value of a New Drug. Product Management Today November 2002;13:14-20.

Kolassa EM. Selecting and Supporting the Appropriate Price. Product Management Today September 2002;13:20-24.

Kolassa EM. Niches, Segments, Pads, and Ignoring the Lessons of Marketing Experience. Product Management Today May 2002;13:22-27.

Kolassa EM. Understanding and Managing the Tri-Cycle. Product Management Today April 2002;13:18-22

Kolassa EM. The Pricing of Product Line Extensions. Product Management Today January 2002;13:14-17.

Smith MC, Kolassa EM. Nobody Wants Your Products. They Are Negative Goods.. Product Management Today December 2001;12:22-28.

Kolassa EM. The Impossibility of Price Optimization. Product Management Today November 2001;12:15-21.

Kolassa EM. Price Sensitivity: A New Way to Think About It. Product Management Today October 2001;12:16-20.

Kolassa EM. Measuring the Right Stuff. Product Management Today September 2001;12:18-20.

Kolassa EM, Maximising Patient Choice, The Economist, Pfizer Forum, September 8, 2001,

Kolassa EM. Differentiating Competition. Product Management Today July 2001;12:16-21.

Kolassa EM. Lifecycles and Lifespans. Product Management Today June 2001;12:26-28.

Kolassa EM. "Strategery". Product Management Today May 2001;12:23-26.

Kolassa EM. The Use and Misuse of Pharmacoeconomics. Product Management Today April 2001;12:32-35.

Kolassa EM. Market Models. Product Management Today March 2001;12:24-26.

Kolassa EM. The Value of Features and Benefits. Product Management Today February 2001;12:24-25.

Kolassa EM. Pharmaceutical Macromarketing. Product Management Today January 2001;12:18-19.

Kolassa EM. The Marketshare Trap. Product Management Today Dec. 2000;11:22-25.

Kolassa EM. Garbage out, Garbage in: Commoditizing Marketing Research. Product Management Today November 2000;11:24-27.

Kolassa EM. Behavioral and Role Segmentation: Part II. Product Management Today October 2000;11:24-49.

Kolassa EM, The Value of Pharmaceuticals and the Role of Pharmacoeconomics, Pharma Pricing and Reimbursement Review, October, 2000; pp. 304-6

Kolassa EM. Behavioral and Role Segmentation: Part I. Product Management Today September 2000;11:24-27.

Kolassa EM. The Cost of Pricing Decisions. Product Management Today August 2000;11:24-26

Kolassa EM. The Role of Price. Product Management Today July 2000;11:22-25.

Kolassa EM. War Games, Football Games, and Other Dysfunctional Market Metaphors. Product Management Today June 2000;11:21-22.

Kolassa EM, Two Dimensions of the Same Pricing Problem, <u>Pharma Pricing and Reimbursement</u>, August 2000,  pp. 232-233

Kolassa EM, Patent Extension of Pipeline Drugs: The Actual Impact of HR 1598 and S 1172, monograph published by The University of Mississippi, October 1999.

Kolassa EM, Pharmaceutical Pricing: Taking the Easy Way Out, <u>Pharma Pricing Review</u>, August 1998, Vol 3, No. 8, pp. 146-147.


Kolassa EM, Pricing: How to Boost Profits in these Tricky Times, <u>Bottom Line Business</u>, July 1998, pp. 1-2

Kolassa EM , The Product Versus the Company – The Affiliate Versus the Industry, <u>Pharma Pricing Review</u>, November 1997, 205-206

Kolassa EM, The High Cost of Pricing Low, <u>Pharma Pricing Review</u>, April 1997, pp. 66-67.

Poovala S, Banahan BF, Kolassa EM, Marketing Smart: What Makes Your MCO Tick? <u>Pharmaceutical Executive</u>, March 1997, pp. 5462

Kolassa EM, Managed Care in the US: The Monster with no Teeth?  <u>Pharma Pricing Review</u>, August 1996, pp. 148-149.

Kolassa EM, Pharmaceutical Pricing Research: A Quest for False Precision, <u>Pharma Pricing Review</u>, January 1996, pp. 10-12.

Kolassa EM, Creating a Pricing Department, <u>The Journal of Professional Pricing</u> 1995, Fall, 2/5, 25-27.

Kolassa EM, Pricing Under Pressure, <u>Medical Marketing and Media</u>, October 1994, 62-67.

Kolassa EM, The Marketing of Pharmacoeconomic Research, <u>Product Management Today</u> 1994, April 4/8, 16-18, 34.

Kolassa EM, Pharmaceutical Pricing Research: Are we asking the wrong people the wrong questions in the wrong way? <u>The Journal of Professional Pricing</u>, 1993, Fall, 2/3, 11-18.

Kolassa EM, The New Reality of Pharmaceutical Pricing, <u>Product Management Today</u>, 1993, January 3/5, 21-22.

Kolassa EM, The How and Why of Rational Pricing, <u>Medical Marketing and Media</u>, 1991, November, 26/12, 82-90.

**PRESENTATIONS:**

Kolassa EM, Do Your Customers Know the Value of Your Product, Do You?, The Pricing Institute PRICEX 05, Chicago, IL, June 2005

Kolassa EM, The State of the Industry: A Hard Look at the Pharmaceutical Pricing Controversy and Forward Looking Strategies, The Pricing Institute PRICEX 05, Chicago, IL, June 2005

Kolassa EM, Understanding Pharmaceutical Pricing, The CFA Institute Annual Meeting, Washington, DC, June 2005

Kolassa EM, Managing Pricing and Reimbursement Issues in the Pharmaceutical Marketplace: What Are the Trends and What Should You Do?, Conference on Drug Delivery Partnerships, Los Angeles, CA, January 2004

Kolassa EM, Pharmaceutical Life Cycle Management, IIR Conference on Life Cycle Management in Pharmaceutical Markets, Philadelphia, PA, December, 2003

Kolassa EM, Formulary Pricing Strategies, Barnett International Conference on Formulary Management, Philadelphia, PA November 2003

Kolassa EM, Paul DR, Managing Pharmaceutical Life Cycles With Line Extensions, CBI Pharmaceutical Branding Summit, Princeton, NJ, July 31, 2003

Kolassa EM, Value Based Pricing of Health Care Goods and Services: Connecting Theory to Practice, The Pricing Institute, Chicago, IL, June 10, 2003

Kolassa EM, Strategies for Using Pharmacoeconomics and Health Outcomes for Pricing Strategies, Presented at the CBI Conference on Strategic Use of Outcomes Studies, Philadelphia, PA, March 17, 2003

Kolassa EM, Formulary Pricing Strategies, Barnett International Conference on Formulary Management, Philadelphia, PA November 2002

Kolassa EM, A Realistic Approach to Value Based Pricing of Pharmaceuticals, CBI Conference on Pharmaceutical Pricing, Washington, DC, October 2002

Kolassa EM, If We Want Things to Stay the Same, Everything Must Change, Presented at the Pharmaceutical Marketing Congress, Philadelphia, PA, September, 2002

Kolassa EM, Competing with Blockbuster Brands, IIR Conference on Pharmaceutical Brand Strategies, Philadelphia, PA, June, 2002

Kolassa EM, The Hard Work of Pricing Right. Pricing Institute 2002, Chicago, IL, April, 2002

Kolassa EM, Marketing Research Across the Product Life Cycle, Presented at the Pharmaceutical Marketing Research Roundtable, Princeton, NJ, October, 2001

Kolassa EM, Pharmaceutical Costs: Is it Pricing or Access?, Women in Government Western Conference, Seattle Washington, July 2001

Kolassa EM, Pharmaceutical Reimportation: A Bad Solution to the Wrong Problem, Presented at the Drug Information Association Annual Meeting, Denver, CO, July, 2001

Kolassa EM, Starting, Developing, and Managing a Pricing Department, Pricing Institute 2001, Chicago, IL, April 2001

Kolassa EM, Pharmaceutical Pricing and Public Policy Issues, South Carolina Association of Family Practitioners, Hilton Head SC, August 2000

Kolassa EM, Pharmaceuticals and the New Health Care Paradigm, American Medical Association State Policy Meeting, Gleneden Beach, OR, August 2000

Kolassa EM, Do Your Customers Know the Value of Your Product? Do You? Pricing Institute 2000, Chicago IL, April 2000

Kolassa EM, Harmer RA, How and When to Conduct Pricing Research, Pricing Institute 2000, Chicago IL, April 2000

Kolassa EM, Formularies: Historical and Conceptual Perspectives, Barrett International Conference on Formularies, Philadelphia PA, February 2000

Kolassa EM, The Valuation of Pharmaceuticals, Presented at the Drug Information Association Conference on Pharmaceutical Pricing and Reimbursement, Washington, DC, April 1999

Kolassa EM, Life Cycle Pricing, Dispelling the Myths, Presented at the 12th Annual US Pricing Conferences, Chicago, IL, April 1999

Kolassa EM, Creating and Managing a Pricing Department, Presented at the 11th Annual US Pricing Conference, Atlanta, GA, April 1998

Kolassa EM, Price Takers, Price Makers, and Price Breakers or "A Funny Thing Happened on the Way to the Strategy," Presented at the 10th Annual US Pricing Conference, Chicago, IL, April 1997.

Kolassa EM, Choice-Based Tradeoff Models: Too Often the Wrong Choice, Presented at the 2nd Annual Pharmaceutical Marketing Research Roundtable, Philadelphia, PA, November 1996.

Kolassa EM, Pharma Pricing in the USA: Making Sense of the Turmoil, presented at 5th International Conference on Pricing and Reimbursement of Pharmaceuticals, Brussels, Belgium, June 1996.

Kolassa EM, Pricing Product Line Extensions, Presented at the 9th Annual US Pricing Conference, Chicago, IL, April 1996.

Kolassa EM, Organizing for Pricing, Presented at the 9th Annual US Pricing Conference, Chicago, IL, April 1996.

Kolassa EM, The Risks of Believing Survey Research Responses, presented at the Pharmaceutical Marketing Research Roundtable, Nashville, TN, November 1995.

Kolassa EM, US Health Care Reform: Moving From Federal Ideas to State and Private Actions, presented at the 4th International Conference on Pricing and Reimbursement of Pharmaceuticals, Brussels, Belgium, October 1995

Kolassa EM, Examining Trends in Pharmaceutical Pricing in the US, presented at PHARMA PRICING '95, Institute for International Research European Conference on Pharmaceutical Pricing and Reimbursement, London, United Kingdom, September 1995.

Kolassa EM, Creating a Pricing Department: The Art of Stepping on Toes Gracefully, presented at the 8th Annual US Pricing Conference, Chicago IL, April 1995.

Kolassa EM, The Appropriate Function of the Pricing Function, American Marketing Association Educator's Conference, Hilton Head, SC, February, 1995

Kolassa EM, Ouriel K, The Economic and Clinical Implications of the use of Urokinase Versus Surgery in Acute Peripheral Arterial Occlusive Disease, Poster presentation at the American Association of Pharmaceutical Scientists, Annual Meeting, San Diego, CA, November 1994.

Kolassa EM, Hospital Pharmacy Directors' Assessment of Their Own Administrative Skills, Poster presentation at the American Association of Pharmaceutical Scientists, Annual Meeting, San Diego, CA, November 1994.

McCaffrey III DJ, Kolassa EM, Profiling Market Position as a Function of Direct Promotion Efforts, Poster presentation at the American Association of  Pharmaceutical Scientists, Annual Meeting, San Diego, CA, November 1994.

Banahan III BF, Kolassa EM, McCaffrey III DJ, Generic Substitution and Narrow Therapeutic Index Drugs, Poster presentation at the American Association of Pharmaceutical Scientists, Annual Meeting, San Diego CA, November 1994.

Kolassa EM, The Effect of Health Care Reforms on the US Pharmaceutical Industry: 1994 Update, presented at PHARMA PRICING-94, Institute for International Research European Conference on Pharmaceutical Pricing and Reimbursement, London, UK, September 1994.

Kolassa EM, The Effect of Health Care Reform on The Administrative Sciences, Invited paper presented at the American Association of Colleges of Pharmacy Annual Meeting, Albuquerque, NM, July 1994.

Frate DA, Allgood J, Benson W, Frate J, Ittenbach R, Juergens J, Kolassa EM, Subsistence Fishing and Agricultural Pesticide Exposure in the Mississippi-Yazoo Rivers Alluvial Plan: An Ecological Model, Poster presentation at the 1st International Symposium on Ecosystem Health and Medicine,, International Society for Ecosystem Health and Medicine, Ottawa, Ontario, Canada, June 1994.

Kolassa EM, Pricing Health Care Goods and Services in the Age of Health Care Reform, presented at the 7th Annual U.S. Pricing Conference, Chicago, IL, April 1994

Kolassa EM, Basara LA, Price Comparison of an International Marketbasket of Pharmaceuticals, Poster presentation at the American Pharmaceutical Association Annual Meeting, Seattle WA, April 1994.  Earned APPM Presentation Merit Award

Kolassa EM, Economic Issues in Thrombolytic Intervention, presented at the conference: Advances in the Treatment of Lower Extremity Occlusive Disease, sponsored by the University of Rochester School of Medicine and Dentistry, New York, NY, April 1994

Kolassa EM, Smith MC, Hospital Pharmacy Director's Use and Understanding of Pharmaceutical Economic Outcomes Studies, Poster presentation at the American Association of Pharmaceutical Scientists Annual Meeting, Orlando FL, November 1993

McCaffrey III DJ, Banahan III BF, Kolassa EM, The Effect of Questionnaire Color on Response Rate to a Mail Survey Instrument, presented at the American Association of Pharmaceutical Scientists, Annual Meeting, Orlando FL, November 1993.

Kolassa EM, The Role of Price in Prescription Product Decision Making, Institute for International Research Conference on Pricing Needs, Washington, DC, November 1993

Kolassa EM, The Effect of Health Care Reforms on the US Pharmaceutical Industry, presented at PHARMA PRICING-93, Institute for International Research European Conference on Pharmaceutical Pricing and Reimbursement, London, United Kingdom, September 1993.

Kolassa EM, Banahan BF and McCaffrey D, The New Economic Environment for Retail Pharmacy, presented at the APhA Annual Meeting, Dallas, TX, March 1993

Kolassa EM, Value-Based Pricing for Health Care Goods and Services, presented at the 6th Annual U.S. Pricing Conference, Chicago, IL, March 1993

Kolassa EM and Schondelmeyer, SW, The Future of Pharmaceutical Pricing, presented at the Foresight Seminar, Russell Senate Office Building, Washington, DC, September 1992

Kolassa EM, The Generic Effect: What Goes on After Patent Loss, presented at The Marketing Institute Conference on Pharmaceutical Sales and Distribution, New York, February 1992.

Kolassa EM, The Pharmaceutical Pricing Decision: What to Consider, What to Ignore, and When, presented at the Institute for International Research conference on Pharmaceutical Pricing, Washington, DC, June 1992.

Kolassa EM, Pharmaceutical Pricing: Lessons From the Past, Guidance for the Future, presented at the Institute for International Research Conference on Generic Drugs, Chicago, July 1992.

Kolassa EM, Future Issues in Pharmaceutical Pricing, presented at the International Business Conferences symposium on Pharmaceutical Price Controls, Washington, DC, September 1991.

Kolassa EM, Creating a Pricing Department, presented at the Third Annual Conference of The Pricing Institute, Atlanta, GA, March 1990.

Kolassa EM, Use and Misuse of the Demand Curve: Dispelling the Myth, presented at The Pricing Institute Canadian Conference, Toronto, Ontario, Canada, August 1989.

Kolassa EM, Precision is the Answer: Now, What was the Question?  A Discussion on Pricing Research Methodologies, presented at The Pricing Institute Conference on Pricing Tools and Strategies, Chicago, IL, July 1991.

Kolassa EM, Pricing Product Line Extensions, presented at The Pricing Institute West Coast Conference, San Francisco, CA, August 1990.

**INVITED GUEST LECTURES**

Boston University, March 1998.  Presented to the graduate School of Business Pricing course of Professor Leslie Simmel.  Topic: Development of Pricing Strategies.

University of Illinois at Champaign-Urbana, April 1994.  Presented to the graduate School of Business, Pricing course of Kent Monroe, Ph.D. Topic: Pharmaceutical Pricing - The Case of A.Z.T.

University of Wisconsin, October 1994.  Presented to graduate students in pharmaceutical marketing of Joseph Wiederholt, Ph.D.  Topic: Pharmaceutical Pricing and Public Policy

**MULTI-CLIENT SYNDICATE STUDIES**

Banahan BF, Principal Investigator, Kolassa EM, McCaffrey DJ, Investigators, 1995, Community Pharmacists' Attitude Toward and Involvement in Therapeutic Recommendations and Cognitive Services Reimbursement Programs

Poovala SP, Principal Investigator, Kolassa EM, Banahan BF, Basara LR, Investigators, The Value of New Pharmaceuticals in a Managed Care Environment

Basara LR, Principal Investigator, Kolassa EM, Banahan BF, McCaffrey DJ, Poovala P, 1994, Pharmaceutical Purchasing and Contracting Arrangements, 1994 Hospital Trends Study

McCaffrey DJ, Principal Investigator, Kolassa EM, Banahan BF, Basara LA, Investigators, 1993 Hospital Trends Study: VA Pharmacy Operations and the Pharmaceutical Industry,"

## MEDIA INTERVIEWS

| | | |
|---|---|---|
| DebatesDebates, PBS | The Associated Press | Bio World |
| US News and World Report | The Boston Globe | Newark Star Ledger |
| The Philadelphia Inquirer | Medical Advertising News | The Wall Street Journal |
| Business Week Magazine | Fortune Magazine | National Public Radio |
| Consumer Reports Magazine | McNeil/Lehrer News Hour | Drug Topics Magazine |

## CONSULTING AND ADVISEMENT:

### ADVISEMENT

Office of the Assistant Secretary, Department of Health and Human Services
Health Care Finance Administration, Department of Health and Human Services
Centers for Medicare and Medicaid Services
Mississippi Division of Medicaid
Agency for Health Care Policy and Research, Cancer Pain Management Guideline Committee
U.S. Food and Drug Administration, Department of Health and Human Services
Generic Products Industry Association

### CONSULTING

A list of clients with whom I have consulted is available on request and subject to client requests for confidentiality.

**LITIGATION SUPPORT/EXPERT WITNESS**

<u>Amgen V. Ortho Biotech</u>, Arbitration 2001-2001, Chicago, IL. Expert witness report, deposition and testimony on competition and that factors that affect pricing in the pharmaceutical industry.

<u>In re: Hayes V. Courtney</u>, 2002, in the Circuit Court of Jackson County, Missouri, at Kansas City.  Expert witness report, deposition and testimony on the use of IMS data by pharmaceutical companies and the presence or absence of standards for their use.

<u>Duramed V. Wyeth</u>, 2001-2002, United States District Court, Southern District of Ohio, Western Division.  Expert witness reports and deposition on pharmaceutical marketing and the determinants of pharmaceutical product success.

<u>Poston V Purdue Pharma, LP, et.al.</u>, 2003, United States District Court, Northern District of Mississippi, Greenville Division, Expert witness reports and deposition on pharmaceutical marketing issues.

<u>United States of America vs. Donald H. Asay, Terri J. Samowitz, Gregory W. Enger and Donald A. Heiden</u>, US District Court, Nebraska, 2003, Expert witness report, prepared for Federal Prosecutors, on the issues of pharmaceutical marketing, distribution, and the diversion of medicines from the distribution system.

<u>Healthpoint, DPT Laboratories, and DFB Pharmaceuticals V Ethex Corporation and KV Pharmaceuticals,</u> US District Court for the Western District of Texas, San Antonio Division, 2003-2004.  Expert witness report and deposition on product selection by pharmacists and interpretation of pharmaceutical advertising.

<u>State of Texas, *ex rel* Venacare of the Florida Keys, Inc. V Warrick Pharmaceutical Corporation, et al</u>. District Court, Travis County, Tx, 53rd Judicial District, 2003, 2004. Expert witness reports and deposition on pharmaceutical marketing issues.

<u>Pfizer, Inc. V Ranbaxy</u>, United States District Court, District of Delaware, 2004, Expert witness report, deposition, and trial testimony on pharmaceutical marketing and the determinants of pharmaceutical product success

<u>J.B.D.L. et al V Wyeth Laboratories, Inc</u>., United States District Court, Southern District of Ohio, Western Division at Cincinnati, 2004, Expert witness report and deposition on pharmaceutical marketing, the determinants of pharmaceutical product success, and pharmaceutical pricing

<u>Bodie V Purdue Pharma, LP, et.al.</u>, 2004-2005, United States District Court, Northern District of Alabama, Western Division, Expert witness reports and deposition on pharmaceutical marketing issues.

<u>International Union of Operating Engineers Local Welfare Fund # 68  V Merck & Co</u>. 2004-2005, Superior Court of New Jersey, Law Division, Atlantic County, Expert report and deposition testimony on the structure of pharmaceutical markets, managed care organizations and formulary management.

<u>Taylor V Purdue Pharma, LP, et. al.</u>, 2005, Middle District Georgia, Macon Division, Expert witness reports and deposition on pharmaceutical marketing issues

<u>Timmons v. Purdue Pharma, L.P., et al</u>, 2005, Middle District Florida, Tampa Division, Expert witness reports and deposition on pharmaceutical marketing issues

<u>State of West Virginia v. Warrick, et. al</u>, 2005, Circuit Court of Kanawha County, WV, Deposition and trial testimony on pharmaceutical marketing issues.

McKnight v<u>. Purdue Pharma, L.P., et al</u>, 2006, US District Court, Easter District of Texas, Lufkin Division, Expert witness reports and deposition on pharmaceutical marketing issues

Freund v<u>. Purdue Pharma, L.P., et al</u>, 2006, US District Court, Eastern District of Wisconsin, Expert witness reports and deposition on pharmaceutical marketing issues

<u>Koenig v. Purdue Pharma, L.P., et al</u>, 2006, US District Court, Northern District of Texas, Dallas Division, Expert witness reports and deposition on pharmaceutical marketing issues

<u>Kleinman v. Merck & Company, Inc</u>, <u>Martin v. Merck and Company, Inc.</u> 2006, Superior Court of New Jersey, Law Division: Atlantic City, Expert report and deposition on pharmaceutical pricing, marketing, and reimbursement.