# TAB C

S. Hrg. 105-85

# PRESIDENT'S FISCAL YEAR 1998 BUDGET PROPOSAL FOR MEDICARE, MEDICAID, AND WELFARE

## HEARINGS

BEFORE THE

## COMMITTEE ON FINANCE
## UNITED STATES SENATE

ONE HUNDRED FIFTH CONGRESS

FIRST SESSION

WITH VIEWS FROM

CONGRESSIONAL ADVISORY COMMISSIONS;
CONGRESSIONAL BUDGET OFFICE; AND THE
GENERAL ACCOUNTING OFFICE

FEBRUARY 13 AND 27; MARCH 4 AND 5, 1997



Printed for the use of the Committee on Finance

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1997

40-162—CC

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-055948-0

MARCH 5, 1997

OPENING STATEMENTS

| | Page |
|---|---|
| Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance | 87 |
| Moynihan, Hon. Daniel Patrick, a U.S. Senator from New York | 88 |

PUBLIC WITNESSES

| | |
|---|---|
| Baumgarten, Jane, member of the board of directors, American Association of Retired Persons, North Bend, OR | 88 |
| Linden, Todd C., president and chief executive officer, Grinnell Regional Medical Center, Grinnell, IA, on behalf of the American Hospital Association | 90 |
| Nelson, Alan R., M.D., executive vice president, American Society of Internal Medicine, Washington, DC | 92 |
| Schwartz, Seymour I., M.D., chairman of the board of regents, American College of Surgeons, Washington, DC | 94 |
| Size, Tim, executive director, Rural Wisconsin Health Cooperative, Sauk City, WI, on behalf of the National Rural Health Association | 96 |

ALPHABETICAL LISTING AND APPENDIX MATERIAL SUBMITTED

| | |
|---|---|
| Baucus, Hon. Max: Letter from GAO, dated October 2, 1995 | 354 |
| Baumgarten, Jane: Testimony | 88 |
| Prepared statement | 367 |
| Chafee, Hon. John H.: Prepared statement | 121 |
| D'Amato, Hon. Alfonse: Prepared statement | 122 |
| Jeffords, Hon. James M.: Prepared statement | 122 |
| Linden, Todd C.: Testimony | 90 |
| Prepared statement | 123 |
| Responses to questions from Senator Hatch | 128 |
| Mack, Hon. Connie: Prepared statement | 123 |
| Moynihan, Hon. Daniel Patrick: Opening statements | 2, 88 |
| Nelson, Alan R., M.D.: Testimony | 92 |
| Prepared statement | 130 |
| Responses to questions from Senator Hatch | 140 |
| Newhouse, Joseph P., Ph.D.: Prepared statement | 40 |
| Ratner, Jonathan, Ph.D.: Prepared statement | 143 |
| Responses to questions from Senators Jeffords, Mack, and Moynihan | 165 |
| Roth, Hon. William V., Jr.: Testimony | 77 |
| Prepared statement | 170 |
| Responses to questions from Senator Murkowski | 181 |
| Schwartz, Seymour I, M.D.: Opening statements | 1, 39, 61, 87 |
| Testimony | 94 |
| Prepared statement | 183 |
| Shalala, Hon. Donna E., Ph.D.: Testimony | 3 |
| Prepared statement | 203 |
| Responses to questions from committee members | 222 |
| Size, Tim: Testimony | 96 |
| Prepared statement | 284 |
| Responses to questions from Senator Kerrey | 310 |

| | Page |
|---|---|
| Van de Water, Paul N., Ph.D.: Testimony | 62 |
| Prepared statement | 313 |
| Responses to questions from Senators Kerrey, Baucus, and Murkowski | 322 |
| Wilensky, Hon. Gail R., Ph.D.: Testimony | 44 |
| Prepared statement | 323 |

COMMUNICATIONS

| | |
|---|---|
| American Association of Eye and Ear Hospitals, et al. | 379 |
| Health Industry Distributors Association (HIDA) | 381 |

## COMMITTEE ON FINANCE

WILLIAM V. ROTH, JR., Delaware, *Chairman*

DANIEL PATRICK MOYNIHAN, New York
JOHN H. CHAFEE, Rhode Island
MAX BAUCUS, Montana
CHARLES E. GRASSLEY, Iowa
JOHN D. ROCKEFELLER IV, West Virginia
ORRIN G. HATCH, Utah
JOHN BREAUX, Louisiana
ALFONSE M. D'AMATO, New York
KENT CONRAD, North Dakota
FRANK H. MURKOWSKI, Alaska
BOB GRAHAM, Florida
DON NICKLES, Oklahoma
CAROL MOSELEY-BRAUN, Illinois
PHIL GRAMM, Texas
RICHARD H. BRYAN, Nevada
TRENT LOTT, Mississippi
J. ROBERT KERREY, Nebraska
JAMES M. JEFFORDS, Vermont
CONNIE MACK, Florida

LINDY L. PAULL, *Staff Director and Chief Counsel*
MARK A. PATTERSON, *Minority Staff Director and Chief Counsel*

(II)

---

# CONTENTS

## FEBRUARY 13, 1997

### OPENING STATEMENTS

Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance ................................................................. 1
Moynihan, Hon. Daniel Patrick, a U.S. Senator from New York ............ 2

### ADMINISTRATION WITNESSES

Shalala, Hon. Donna E., Ph.D., Secretary of Health and Human Services, Washington, DC ......................................................... 3

## FEBRUARY 27, 1997

### OPENING STATEMENTS

Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance ................................................................. 39

### CONGRESSIONAL WITNESSES

Newhouse, Joseph P., Ph.D., Chairman, Prospective Payment Assessment Commission, Cambridge, MA, accompanied by Donald Young, M.D., Executive Director, Prospective Payment Assessment Commission ............ 40
Wilensky, Hon. Gail R., Ph.D., chairman, Physician Payment Review Commission, Washington, DC, accompanied by Lauren Leroy, Executive Director, Physician Payment Review Commission ................................. 44

## MARCH 4, 1997

### OPENING STATEMENTS

Roth, Hon. William V., Jr., a U.S. Senator from Delaware, chairman, Committee on Finance ................................................................. 61

### CONGRESSIONAL WITNESSES

Van de Water, Paul N., Ph.D., Assistant Director for Budget Analysis, Congressional Budget Office, Washington, DC, accompanied by Paul Cullinan, Ph.D., Unit Chief, Human Resources Cost Estimates, and Murray Ross, Ph.D., Chief, Health Cost Estimates Unit ................................. 62
Ratner, Jonathan, Ph.D., Associate Director, Health Financing and Systems Issues, General Accounting Office, Washington, DC, accompanied by Kathryn Allen, Assistant Director and Richard Jensen, Senior Evaluator ... 77

(III)

202

### 1995 NCH Type of Service: Assistant at Surgery

| CPT | DESCRIPTOR | 1995 Alwd Chrg | % of Total | Cum % | 1995 Alwd Freq | % of Total | Cum % |
|---|---|---|---|---|---|---|---|
| TOTAL | | $265,887,725 | 100% | | 1,368,191 | 100% | |
| 57260 | Repair of vagina | $773,085 | 0% | 70% | 9,548 | 1% | 59% |
| 66170 | Glaucoma surgery | $749,778 | 0% | 70% | 4,161 | 0% | 60% |
| 36830 | Artery-vein graft | $740,882 | 0% | 70% | 5,242 | 0% | 60% |
| 47610 | Removal of gallbladder | $731,989 | 0% | 71% | 4,665 | 0% | 60% |
| 45110 | Removal of rectum | $719,945 | 0% | 71% | 2,761 | 0% | 61% |
| 49560 | Repair abdominal hernia | $712,945 | 0% | 71% | 8,549 | 1% | 61% |
| 27132 | Total hip replacement | $674,107 | 0% | 71% | 2,036 | 0% | 61% |
| 67108 | Repair detached retina | $670,306 | 0% | 72% | 2,054 | 0% | 61% |
| 22625 | | $666,968 | 0% | 72% | 2,793 | 0% | 62% |
| 22554 | Neck spine fusion | $662,144 | 0% | 72% | 3,094 | 0% | 62% |
| 22612 | Lumbar spine fusion | $661,718 | 0% | 72% | 2,822 | 0% | 63% |
| 49000 | Exploration of abdomen | $648,814 | 0% | 73% | 6,524 | 0% | 63% |
| 27137 | Revise hip joint replacement | $647,761 | 0% | 73% | 2,147 | 0% | 63% |
| 33516 | CABG, vein, six+ | $638,015 | 0% | 73% | 1,286 | 0% | 63% |
| 51595 | Remove bladder, revise tract | $623,698 | 0% | 73% | 1,379 | 0% | 63% |
| 63042 | Low back disk surgery | $598,747 | 0% | 74% | 2,459 | 0% | 63% |
| 67040 | Laser treatment of retina | $593,067 | 0% | 74% | 1,957 | 0% | 63% |
| 61510 | Removal of brain lesion | $541,062 | 0% | 74% | 1,562 | 0% | 64% |
| 51845 | Repair bladder neck | $537,255 | 0% | 74% | 3,977 | 0% | 64% |
| 27486 | Revise knee joint replace | $535,061 | 0% | 74% | 1,973 | 0% | 64% |
| 35583 | Vein bypass graft | $531,527 | 0% | 75% | 2,035 | 0% | 64% |
| 65755 | Corneal transplant | $525,968 | 0% | 75% | 1,958 | 0% | 64% |
| 61700 | Inner skull vessel surgery | $505,676 | 0% | 75% | 1,149 | 0% | 64% |
| 63075 | Neck spine disk surgery | $493,028 | 0% | 75% | 2,814 | 0% | 65% |
| 67107 | Repair detached retina | $480,147 | 0% | 76% | 2,268 | 0% | 65% |
| 54405 | Insert multi-comp prosthesis | $475,804 | 0% | 76% | 2,073 | 0% | 65% |
| 27590 | Amputate leg at thigh | $463,299 | 0% | 76% | 3,580 | 0% | 65% |
| 23472 | Reconstruct shoulder joint | $460,770 | 0% | 76% | 1,556 | 0% | 65% |
| 32500 | Partial removal of lung | $460,664 | 0% | 76% | 2,951 | 0% | 65% |
| 23470 | Reconstruct shoulder joint | $458,950 | 0% | 76% | 2,177 | 0% | 66% |
| 35661 | Artery bypass graft | $454,160 | 0% | 77% | 2,530 | 0% | 66% |
| 19162 | Remove breast tissue, nodes | $453,524 | 0% | 77% | 2,935 | 0% | 66% |
| 43324 | Revise esophagus & stomach | $445,388 | 0% | 77% | 2,538 | 0% | 66% |
| 33860 | Ascending aorta graft | $444,664 | 0% | 77% | 1,068 | 0% | 66% |
| 44150 | Removal of colon | $442,815 | 0% | 77% | 1,887 | 0% | 66% |
| 51840 | Attach bladder/urethra | $438,326 | 0% | 77% | 3,692 | 0% | 66% |
| 33535 | CABG, arterial, three | $438,027 | 0% | 78% | 981 | 0% | 67% |
| 60500 | Explore parathyroid glands | $426,413 | 0% | 78% | 2,337 | 0% | 67% |
| 35571 | Artery bypass graft | $424,759 | 0% | 78% | 1,591 | 0% | 67% |
| 22650 | | $415,530 | 0% | 78% | 5,481 | 0% | 67% |
| 43632 | Removal stomach, partial | $413,585 | 0% | 78% | 2,010 | 0% | 67% |
| 33522 | CABG, artery-vein, five | $402,499 | 0% | 78% | 2,794 | 0% | 68% |
| 27138 | Revise hip joint replacement | $397,195 | 0% | 79% | 1,328 | 0% | 68% |
| 50360 | Transplantation of kidney | $383,791 | 0% | 79% | 1,075 | 0% | 68% |
| 33426 | Repair of mitral valve | $383,090 | 0% | 79% | 1,375 | 0% | 69% |
| 33517 | CABG, artery-vein, single | $379,924 | 0% | 79% | 11,034 | 1% | 69% |
| 44625 | Repair bowel opening | $377,915 | 0% | 79% | 2,555 | 0% | 69% |
| 35141 | Repair defect of artery | $373,033 | 0% | 79% | 2,250 | 0% | 69% |
| 61312 | Open skull for drainage | $372,030 | 0% | 79% | 1,231 | 0% | 69% |
| 38770 | Remove pelvis lymph nodes | $363,721 | 0% | 79% | 1,828 | 0% | 69% |
| 44320 | Colostomy | $350,211 | 0% | 79% | 2,958 | 0% | 69% |
| 22845 | Insert spine fixation device | $341,678 | 0% | 80% | 1,682 | 0% | 70% |
| 36832 | Revise artery-vein fistula | $340,264 | 0% | 80% | 3,280 | 0% | 70% |

CPT codes and descriptions are copyright American Medical Association

02/27/97

---

203

THE SECRETARY OF HEALTH AND HUMAN SERVICES
WASHINGTON, D.C. 20201

# TESTIMONY
## OF
## DONNA E. SHALALA
## SECRETARY
## U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES

Senate Finance Committee
Thursday, February 13, 1997

204

Mr. Chairman and members of the committee: Thank you for giving me the opportunity to testify today about the President's Fiscal Year 1998 Budget proposal. We in the Administration look forward to working closely with you as we move toward our shared goals of strengthening the Medicare trust fund and balancing the budget.

Someone once described America as "the only country deliberately founded on a good idea."

That good idea is "We the people," and it has emboldened our nation to face -- and overcome -- great challenges with courage and unity.

In the 1940s, we faced a broken Europe, but we summoned the will to fight and win -- and saved the world from tyranny.

In the 50s, we faced the terrible scourge of polio. But children contributed their dimes, and America's best scientists dedicated their lives to finding a vaccine. And we found one.

And, in the 1960s, we faced a Soviet Union that had taken the lead in the race for space. But, President Kennedy issued a challenge to land an American on the moon by the end of the decade. We did, and no country has done it since.

What do all of these triumphs have in common? They came during times of great social and political change. But with a deep sense of urgency, Americans put aside partisan differences, answered the call to unity, and achieved a critical national goal. Today, we must do the same.

Because today, we face another great challenge: At a time when we have fewer resources, a population that is rapidly aging, and a deficit that while much improved, still plagues us, we must come together again: This time to balance the budget and truly reform Medicare, Medicaid, and welfare, while still keeping our promises to the citizens we serve.

## MEDICARE

For more than thirty years, Medicare has provided a blanket of health security for older Americans and people with disabilities. It has helped lift a generation of senior citizens out of poverty and into the middle class. It has helped change what it means to be old in America; what it means to be sick in America; what it means to be disabled in America. And it has often served as a fault line between a life of comfort and good health and a life of struggle and illness.

1

205

The gift that Medicare has given to those who came before us must be preserved for those who come after us -- for our children and our grandchildren, for every generation. That is our moral responsibility.

But you and I know that Medicare now faces several short-term and a long-term financing challenges that demand action. For nearly four years, we have been unable to come to a consensus on the best way to preserve Medicare and improve it for the future. The President has made it clear that he wants to work with the Congress to make this the year of bipartisan agreement on this vital program.

In this budget, the President has reached out to the congressional majority by offering a plan to meet them halfway. His Medicare proposals will extend the life of the Hospital Insurance Trust Fund into 2007, ten years from today. I have with me today a letter from the independent chief actuary of the Medicare program that verifies that fact. I will be happy to submit it for the record.

The President's plan contributes $100 billion to the five-year balanced budget, which corresponds to $138 billion over six years.

And we do that by maintaining a system that guarantees access to a defined set of services rather than creating a defined contribution per beneficiary.

These proposals are made in good faith and are based on sound policy. They make sense for both the Medicare program and its beneficiaries. Our savings are scoreable. I ask for your careful consideration of our proposals, and for your partnership in enacting them.

But Medicare reform is not and cannot be simply an exercise in number crunching. The actions we take this year to preserve the Medicare trust fund also must prepare Medicare for the future. Not many of us would drive cross country in a car that's more than 30 years old. Likewise, we can't move into the next century with a health insurance program built in 1965. That's why to preserve Medicare, we must modernize it. This modernization requires us to do six things:

First, we must make Medicare a more prudent purchaser of health care services.

Second, we must add new choices to compete with today's private market.

Third, we must strengthen our rural health care system.

Fourth, we must protect beneficiaries, by ensuring that beneficiaries receive higher quality health care.

2

264

## Senator Murkowski's Question:

Q1: What assurances can I get from HCFA that the President recognizes this program as a vital and efficient program for Alaskans?

A1: The President's budget proposal to cap the number of residents on a hospital-specific basis is intended to stop the growth in the number of residents nationwide. However, we realize that because of the geographic maldistribution of physicians, particularly in rural areas, certain exceptions to this cap would be appropriate. We would not want this cap to inhibit creative solutions to recruiting physicians to underserved areas, which is why the Administration is currently working on a limited exceptions policy for the resident cap. We would be happy to work with your staff to ensure that this policy meets the needs of the Alaska residency program.

265

## Senator Hatch's Questions:

Q1. The President's FY 1998 Budget proposes to reduce reimbursement for prescription drugs prescribed in a physician's office and reimbursed by Medicare. What is your rationale for this new policy?

A1. While Medicare does not have an expansive outpatient drug benefit, it does cover outpatient injectable drugs that are furnished by a physician and certain drugs that are administered with durable medical equipment. In 1992, the Medicare-allowed charges for these drugs were $680 million. In 1995, allowed charges were $1.8 billion, an increase of over 250 percent in only three years.

Medicare pays the "average wholesale price" (AWP) for covered drugs. However, the AWP is not the average price actually charged by wholesalers to their customers. Rather, it is a "sticker" price set by drug manufacturers and published in several commercial catalogs. As a result, the HHS Inspector General estimates that Medicare currently pays 15 to 30 percent more because the physician is marking up the drug when the manufacturer charges the patient less than the average wholesale price. We believe that physicians should be paid for their professional services and not derive a profit from drugs furnished incident to their professional services. Also, the current payment rules for drugs allow an increase in the AWP even if the cost to the physician remains constant. This creates an incentive for physicians to furnish the most profitable drugs. Our proposal would remove this incentive so that the decision to furnish a particular drug is more directly based on medical considerations.

Q2. How would this new policy work? How would HCFA determine acquisition costs? How would HCFA determine the median national cost that is to be the cap for payment on each drug? How will this program be administered and what will be the costs in dollars and FTEs?

A2. Effective January 1, 1998, the Administration's proposal would eliminate the mark-up for drugs by basing Medicare's payment on the provider's acquisition cost of the drug. Effective January 1, 2000, payments for a particular drug would not be allowed to exceed the national median cost of that drug.

Under the proposed policy, physicians would report their acquisition cost for each drug on the claim submitted for reimbursement. Physicians, rather than HCFA, would determine their acquisition cost. The median limit would be implemented based on actual costs reported for each drug for 12-month periods beginning July 1, 1998. Median limits have been implemented for other Part B services (e.g., clinical diagnostic laboratory services and durable medical equipment). Carriers report the data to HCFA and the median is calculated for each code in HCFA Central Office. The median for each code is then furnished to all carriers to be used as part of the payment screens developed for the following January. We do not have dollar or FTE estimates for the costs of administering this policy, but since HCFA has

266

experience administering median caps, any administrative costs involved are likely to be very small.

**Q3. The proposal indicates that Medicare will pay the acquisition cost for these drugs. Will the physician receive any other payment to cover costs of acquiring, storing or associated costs of dispensing the drug, as under the Medicaid program?**

A3. These kinds of expenses are paid through the practice expense component of the physician fee schedule.

**Q4. What is your assessment of the effect that this new policy will have on physician treatment and/or prescribing practices, and the effect that this will have on patients? How do you plan to monitor this effect in the future?**

A4. We do not believe that this policy will have any negative effect on physician treatment or prescribing practices. This policy would pay physicians their costs for acquiring drugs but eliminate their mark-ups in furnishing them to beneficiaries. As we indicated, we believe that this policy would remove the current incentive to furnish the most profitable drugs, so that the decision to furnish a particular drug will be based on medical considerations.

**Q5a. In the year 2007, what do you expect will be the percentage of Medicare beneficiaries enrolled in a managed care system?**

A5a. HCFA's Office of the Actuary projects that in 2007, under current law 23 percent of Medicare beneficiaries would be enrolled in managed care plans, and under the Administration's proposal, 26% of beneficiaries would be enrolled in managed care plans.

**Q5b. Does the Department have any data now, or is the Department prepared to look into the issue, as to the number of seniors who, for whatever reason, decide to opt out of a Medicare managed care plan? Can the Department provide the Committee data on the extent of opt-outs from managed care systems as well as the reasons for these decisions? Are there any data on the prior coverage of seniors who opt for Medicare HMOs (e.g., other Medicare HMOs, Medicare fee-for-service, or new Medicare enrollees?)**

A5b. The Health Care Financing Administration (HCFA) collects data on disenrollments from Medicare managed care plans. Currently, HCFA uses plan-specific disenrollment data internally for monitoring purposes. A high disenrollment rate or a sudden surge in a plan's disenrollment may identify access, education, or quality problems, and will lead to an appropriate investigation. HCFA is in the process of reviewing different methods for analyzing disenrollment rates that may be helpful to consumers.

Research on disenrollment trends indicates that reasons for disenrollment are complex and that many beneficiaries reenroll in another HMO. Studies which have examined these issues

Hatch - 2

267

include:

(1) *Disenrollment Experience in the Medicare HMO and CMP Risk Programs (1993)*. Mathematica found that almost one-third of Medicare beneficiaries disenroll within two years of enrolling in a Medicare HMO and that of beneficiaries who disenrolled, roughly one-third joined another HMO. Mathematica concluded that high disenrollment rates may indicate that beneficiaries perceive quality-of-care problems or that there is competition between plans for Medicare enrollments.

(2) *Factors Associated with Disenrollment from Medicare HMOs (1992)*. This study conducted by Brandeis University found that 30 percent of disenrollments were solely associated with change-related experiences such as financially motivated switches to another HMO, household moves, physician contracting changes, or terminations of HMO contracts. About 20 percent of disenrollments were due to either perceived access restrictions or misunderstandings about HMO procedures and operations. The remainder of disenrollees were motivated by a mix of both kinds of reasons for disenrollment.

(3) *Disenrollment of Medicare Cancer Patients from HMOs (1994)*. This HCFA and NCI article concluded that a pattern of high disenrollment among cancer patients diagnosed before enrolling and low disenrollment among cancer patients diagnosed after enrolling suggests that factors other than encouragement by the HMO may be responsible for the decision to disenroll. Low disenrollment among persons diagnosed with cancer after enrollment may be due to a reluctance to break provider ties formed during the initial course of therapy and high disenrollment among persons diagnosed before enrollment may have several causes related to a low level of commitment to managed care.

(4) *Beneficiary Perspectives of Medicare Risk HMOs (1995)*. The Office of the Inspector General found that disenrollees reported a much greater decline in health status during their HMO stay and were much more likely to blame their HMO care for their declining health status.

(5) *Biased Selection and HMOs: Analysis of the 1989-1994 Experience (1995)*. A Physician Payment Review Commission (PPRC) study found that beneficiaries who disenrolled from managed care plans used more services after disenrollment than beneficiaries in Medicare fee-for-service. PPRC also found that beneficiaries who stayed in managed care had lower medical expenditures than fee-for-service beneficiaries.

(6) PPRC and PROPAC have also published some recent Reports to Congress that included analyses of disenrollment trends. An October 1995 Joint PPRC and

Hatch - 3

268

PROPAC Report to Congress concluded that aggregate disenrollments have been stable over a number of years and that plans with highest disenrollment are newer, for-profit IPAs. A June 1996 PROPAC Report to Congress reported that the proportion of first time enrollees who disenroll within three months of enrollment has been declining and that returns to fee-for-service are declining.

HCFA has not analyzed the prior utilization or enrollment experience of Medicare managed care enrollees. As mentioned earlier in this response, we review disenrollment data received from plans to determine trends that might reflect issues with the plan's quality of care.

A recent field test of HCFA's upcoming beneficiary satisfaction survey found that there was no relationship between prior experience in a managed care plans and the enrollees' level of satisfaction. Therefore, the survey does not include questions about Medicare managed care enrollees' previous enrollment status.

As managed care increases in the commercial sector, we anticipate that more and more newly-eligible beneficiaries will go directly into managed care. To make this transition easier, HCFA has established a workgroup to determine if any barriers exist to newly-eligible retirees who wish to enroll in Medicare managed care plans.

Q6a. I understand that you are proposing to submit to Congress separate legislation that will include, among other things, a repeal of the advisory opinions provision as well as a repeal of the anti-kickback clarification for managed care plans. Would you explain your intentions on this?

A6a. Yes, the President's budget proposes the repeal of three HIPAA provisions.

First, we would like the broad new exception to the anti-kickback statute when providers are at "substantial financial risk" eliminated. These terms are undefined and somewhat broad. CBO assigned a considerable cost to this provision because it could be easily abused by those wishing to profit from referrals.

Second, we would like the requirement eliminated that advisory opinions be issued in response to specific requests as to how certain business arrangements may or may not be considered to violate the anti-kickback laws. This provision would severely hamper the government's ability to prosecute fraud and would be impractical because it is difficult, if not impossible, to determine intent based on the submission of the requestor.

Third, we would like the reasonable diligence standard reinstated. HIPAA eliminated the current standard for use of reasonable diligence and made providers subject to civil monetary penalties only if they acted with deliberate ignorance or reckless disregard. This is a very difficult standard to prove in court and would permit providers with patterns of improper submission of claims to unsanctioned.

Hatch - 4

269

Q6b. With respect to the anti-fraud provisions in the Kennedy-Kassebaum bill would you give me a status report on the implementation of those provisions?

A6b. First, HIPAA established the Fraud and Abuse Control Program to be coordinated by the HHS-OIG and the Attorney General to fight Medicare, Medicaid, and private sector health care fraud. To implement the Control Program, the OIG has recently initiated Operation Restore Trust Plus (ORT Plus). ORT Plus will institutionalize the lessons learned, expand the geographical and program areas covered, and improve on the results of the two-year ORT demonstration project. The ORT Plus team includes the OIG, HCFA, and AoA (HRSA will also establish the national data bank to receive and report final adverse actions against health providers). Other governmental groups participating include DoJ, Medicare claims processing contractors, State agencies, Medicaid fraud control units, and ombudsmen. ORT Plus will use a coordinated team approach to develop and coordinate various anti-fraud and abuse activities. It will emphasize:

- new ways of manipulating data in targeting program areas and providers;
- covering all health care provider sectors but focusing on selected ones;
- targeting specific providers;
- identifying systemic problems and solutions;
- soliciting the help of beneficiaries in detecting fraud and abuse;
- encouraging the participation of providers to uncover and prevent fraud;
- publicizing the activities as a deterrent to potential wrongdoers; and
- conducting continuous follow-up to ensure problem resolution.

Second, HIPAA established the Medicare Integrity Program (MIP) to carry out Medicare payment integrity activities that are funded from the HI Trust Fund. HCFA has specific contracting authority for this purpose. Current fiscal intermediaries and carriers cannot duplicate activities under both a Medicare and a MIP contract.

MIP activities: These include review of provider activities, medical, utilization and fraud review, cost report audits, MSP determinations, provider and beneficiary education regarding payment integrity, and developing and updating a list of DME which are subject to prior authorization.

Regulations. Although not required, we are currently in the process of drafting a Notice of Proposed Rule Making to implement the MIP. These regulations will identify the characteristics of entities who can compete for contracts and

Hatch - 5

270

more clearly define when a conflict of interest exists.

Implementation. Maintaining good payment safeguard activities is not possible if we attempt implementation as a "big bang." We must coordinate with the introduction of the Medicare Transaction System (MTS), a new state-of-the-art consolidated claims processing system which will be implemented over a two-year period. Implementation of MIP requires (1) separation of benefit integrity activities from claims processing (including activities such as prepayment editing); (2) reduction of the number of contractors performing such activities and, thus, an increase in the workload of individual contractors; and (3) introduction of new contractors who may not have experience with Medicare. These are major changes and require thoughtful planning, experience, and incremental implementation. We are developing a "risk mitigation" plan to ensure that the Medicare program is fully protected during the course of implementation. We anticipate that as work on payment safeguards continues, features of the specific plan will evolve to reflect new thinking.

Third, the OIG has recently published the advisory opinion regulation. Several requests for advisory opinions on the Medicare and Medicaid exclusion provisions, civil money penalties, and on the criminal provisions have been submitted. However, these requests were returned to the senders because they did not meet the standards of the regulation.

Q7. Can you give me the status of Utah's 1115 waiver? Any idea when it will be approved?

A7. The latest round of discussions with Utah has centered on budget neutrality issues. HCFA made a counter offer to Utah on February 13, 1997, and we are awaiting the State's response. We also have programmatic issues such as the cost-sharing requirements that still need to be worked out, making it difficult to say exactly when to expect approval for the waiver.

Q8. The President's budget proposes deep cuts in payments to Medicare HMOs. Clearly these cuts will have an effect on the willingness of plan sponsors to expand to new areas or increase benefits. Has the Administration attempted to quantify the impact of these cuts on projected Medicare enrollment?

A8. While overall payments to managed care plans under the President's budget would be less than they would have been under current law, this is true for all providers as we reduce Medicare program growth.

Under the President's plan:

- Relative to 1997 rates, plans in three-fourths of counties would receive

Hatch - 6

271

increased rates in 1998 and 1999; no county would have its rate reduced in those two years.
- Including payments for teaching and disproportionate share hospitals made on behalf of HMO enrollees, all counties would receive an increase in 1998 and 1999.
- Two-thirds of counties get an increase in 2000, and the largest decrease in that year is only 3.37 percent.
- In 2001 and beyond, all counties get an increase in payments.

Under both current law and proposed law, the Department projects increased growth in Medicare managed care enrollment in the coming years. We project somewhat faster growth under the President's budget proposals because of the increased managed care options that would be made available to beneficiaries. Specifically, the President's budget includes provisions that would enable Provider-Sponsored Organizations (PSOs) and Preferred Provider Organizations (PPOs) to contract to enroll Medicare beneficiaries and would create annual open-enrollment periods for Medigap coverage. We project that in 2002 about 23 percent of the Medicare population will be enrolled in a managed care plan if the President's proposals are enacted. We project enrollment of Medicare beneficiaries in 2002 at about 19 percent under current law.

Q9. Many current Medicare HMO enrollees receive additional plan benefits, such as no deductibles and coverage of drug, dental, and vision expenses. Has the Administration attempted to quantify the impact of the proposed cuts on the ability of HMO plan sponsors to continue to offer these kind of expanded benefits? What effect will the changes have on plan enrollees?

A9. It is, of course, not possible to predict precisely the effect of changes to the payment methodology on plan and beneficiary decision making. We believe that the operation of market forces, the fact that the budget would not dramatically change rates, and the fact that plans can reduce their administrative costs and profits, will minimize the number of plans that actually reduce benefits.

- No county would receive a decrease in rates during the 5-year budget window, except in the year 2000. In 2000, almost 2/3 of counties (64 percent) would receive rate increases; the other counties would receive either no increase or a decrease no greater than 3.37 percent.

- Since the beginning of the risk contracting program, market competition has been the driving force in determining the level at which plans establish their premium (if any) and additional benefits. In recent years, individual plans entering a market with a zero premium product, or plans choosing to reduce or eliminate their premium, have caused competing plans to follow suit rather than risk loss of market share.

Hatch - 7

272

The budget would increase competition in two ways:

- **More Managed Care Choices** - Provider Sponsored Organizations (PSOs) and Preferred Provider Organizations (PPOs) would be able to offer plans to Medicare beneficiaries and compete directly with HMOs.

- **Medigap Reforms** - If beneficiaries are given real freedom of choice, managed care plans will have to become more competitive with FFS Medigap options, and preserve their ability to attract and hold beneficiaries. This is especially true for individuals who would otherwise be forced to remain in FFS coverage due to the concern that they could not pass the underwriting after the initial six-month open enrollment period (when they turn 65 or become eligible for the first time for Medicare). Medigap reforms would also expand coverage options for beneficiaries. Given how few individuals hold Medigap coverage with drug benefits, managed care plans can be competitive even for beneficiaries who might believe they are better off in FFS coverage. Additionally, vision and dental coverage is nonexistent in FFS plans, which has the effect of increasing the competitiveness of managed care plans.

- Plans can reduce their administrative costs and profits rather than reduce benefits. Part of Medicare's payment to plans is for the plan's administrative costs, including marketing costs and plan profits. In 1996, administrative costs ranged from less than 5 percent of total benefit costs to over 40 percent. Also in 1996, over 40 percent of plans showed administrative cost amounts in excess of 20 percent of benefit costs.

**Q10.** Background materials provided to us by your agency refer to an additional "significant structural reforms that will bring Medicare into the 21st century" and to "market-oriented reforms to assure quality and make the program more efficient" (page 13). Can you offer any details on these additional reform proposals?

**A10.** [Attachment A10]

**Q11.** The President's budget proposes to implement a per diem SNF prospective payment system beginning in FY 1998. An important element of this program will be the development of a reliable "case mix" adjuster to the SNF payments to the intensity of medical services required by Medicare eligible patients in a particular facility. How far along is HCFA in developing such a mechanism?

**A11.** HCFA currently has a reliable, operable case mix mechanism. HCFA has developed and implemented a case mix prospective payment system as part of the Multi-state Nursing Home Case Mix and Quality Demonstration. The case mix mechanism in

Hatch - 8

---

273

use is Resource Utilization Groups III (RUGs III); a 44 group resident classification system that is based on the Minimum Data Set (MDS) resident assessment instrument which all nursing homes are required to complete under OBRA '87. This case mix system has been in use for over two years in the six state demonstration and has been validated by several studies. HCFA is in the process of refining RUGs III through collection of new staff time data from a number of additional states (including New York, Florida and California) and doing other research that will be completed this year. In addition, many of the operational components necessary to implement a RUGs III system (e.g., vendor software, billing codes, claims pricer) have already been developed.

**Q11a.** Does HCFA intend to seek comments from industry and other outside sources?

**A11a.** HCFA has and will continue to seek comments from the industry and other outside sources. HCFA has had numerous academic and industry technical advisory panels as part of the development phase of the demonstration. In addition, HCFA has been regularly meeting with a number of industry groups to seek input on the case mix and other features of the payment system.

**Q12.** The President's budget proposes a prospective payment system (PPS) for home health services beginning in FY 1999. Documents provided by HHS state that the PPS is intended to be "budget neutral" after a 15 percent reduction from FY 1998 levels. Are you confident that needed home health services can be maintained in the face of so drastic a one-year reduction?

**A12.** It is necessary, when implementing a new prospective payment system, to establish a base period in which the system is budget-neutral. After the prospective rates have been established, it is then possible, in later years, to adjust them upward or downward to account for factors such as inflation, case mix "creep," forecasting errors, and additional expenditure controls. The base expenditure level, to which a PPS is made budget neutral, is critical for achieving necessary program savings.

We are confident that the cost and utilization experience of the country's HHAs in FY 1998 will be high enough that a 15 percent expenditure reduction immediately prior to the transition to PPS rates will have no adverse impact on the availability of home health services. This confidence comes from the steady growth in home health utilization and costs that we have experienced over the last decade or so. For example, the number of home health visits per user has grown steadily each year and tripled from 1986 to 1996. Medicare outlays per user are also growing steadily each year; spending between 1986 and 1996 represents a 285 percent increase. Charges per visit -- after adjustment by either the consumer price index or the HCFA market-basket index of home health input prices -- did not contribute significantly to the rise in HHA expenditures. While we are aware that much of this growth is due to changes in case mix, medical advances, consumer demand, and other forces, these factors do not account for all of the growth.

Hatch - 9

274

There is no question that some of this explosive growth in Medicare expenditures reflects generous profit margins for the providers. For many, home health care has become a lucrative business. We are confident that while a reduction in costs and expenditures across the industry will affect profit margins, it will not have an adverse impact on beneficiaries.

Q13. The President's budget proposes to transfer the costs of home health services which **do not follow a hospital stay, or which occur after 100 visits following a hospital stay**, to the Part B program. How long does the Administration propose to keep a moratorium in effect on Part B coinsurance and deductibles for such services?

A13. Our policy does not establish a time-limited moratorium. It reflects a principle that Medicare beneficiaries should not have to bear higher out-of-pocket expenses.

Q14. The President's budget does not propose to extend the freeze of SNF and home health cost limits. However, it proposes to recapture the savings that would have occurred in both programs had the freeze remained in place. How would this work?

A14. Actually, the President's budget proposes to recapture the savings that would have occurred had the update to the cost limits for FY 96 and subsequent years excluded inflation associated with FY 1994 and FY 1995 (the OBRA '93 mandated freeze years). These savings are achieved through the update methodology associated with the President's proposal for a SNF prospective payment system. Specifically, the historical cost data used for the development of the prospective payment rates will be trended forward to the first effective year of the payment system by an inflation factor. This factor will established at a level appropriate to provide the necessary savings.

HHA Cost Limits: Our proposal would preserve the savings the program recognized from the statutorily mandated freeze in updates to the HHA cost limits. We have proposed neither an extension of the freeze nor a retroactive "recapture" of outlays that have occurred since the freeze expired. Rather, our proposal would merely not recognize, on a *prospective* basis, inflationary increases in home health costs for the freeze period that would otherwise be reflected in the HHA cost limits. This would be accomplished by the simple expedient of excluding the inflation that occurred during the period the freeze was in force from that used in calculating the level of the limits in future periods.

Q15. The President's budget proposes to base payments for home health services on rates which apply where the service is **performed** rather than where it is **billed**. How will this work? Will it require payment to be based on the patient's place of residence or the location of the nearest branch office of the home health agency?

Hatch - 10

275

A15. We propose this change because the HHA per visit payment limitation under current law is based on the geographic location of the parent agency regardless of the location where the home health service is rendered. Some HHAs establish branches so that they can provide services in a rural or lower cost area and take advantage of the application of the higher cost limitations corresponding to the geographic location of the parent HHA.

The payment incentive to establish branches in rural areas appears to stimulate the growth of branches and promotes inappropriate payments to parent HHAs located in urban areas with rural branch offices. It also provides an unfair competitive advantage to urban agencies providing services in an area already served by a rural agency. Our proposal would require payment based on the county in which the beneficiary resides, i.e., payment would be based on where the services are rendered, not where the services are billed, thereby creating a level playing field for all agencies.

Q16a. The President's budget would require consolidated billing for Medicare services provided to patients of skilled nursing facilities beginning in FY 1998. Can you provide more detail on how this proposal would affect the way that services are currently provided to SNF patients?

A16a. From the patient's perspective, the most immediate impact would be that a beneficiary in a covered Part A stay would no longer be liable for cost-sharing expenses under Part B. This is because our proposal would require the SNF to include in its Part A bill the services that a beneficiary receives from an outside supplier, rather than allowing the supplier to submit bills for its services directly to Part B (which would entail payment of any applicable deductibles and coinsurance by the beneficiary). We also anticipate that establishing the SNF itself as the single point of billing responsibility for all services will ultimately serve to promote greater continuity of patient care and greater accountability since there will be a single point through which all bills for services must pass.

Q16b. Information you provided to the Committee appears to suggest that most, but not all, services would be subject to consolidated billing requirements. Which services would not be subject to the requirement and why?

A16b. A similar comprehensive Medicare billing requirement for hospitals (42 U.S.C. 1395y(a)(14)), which has been in effect for well over a decade, specifically exempts the services of certain types of medical practitioners (e.g., physicians, certified nurse-midwives, qualified psychologists, certified registered nurse anesthetists) that are not regarded as falling within the scope of the hospital benefit. Existing law (42 U.S.C. 1395x(h)), in the material following paragraph (7) defines the SNF benefit, in part, as excluding those types of services that would not be covered under the inpatient hospital benefit when furnished to a hospital inpatient. Accordingly, our SNF consolidated billing proposal would incorporate similar exceptions for medical practitioners, in order to

Hatch - 11

maintain consistency with long-standing hospital policy.

**Q16c. Why is the proposal scored as a net cost increase to the program?**

A16c. The proposal's scoring as a net cost increase reflects the projected short-term impact of reduced Part B cost-sharing payments from beneficiaries, since beneficiaries (as discussed previously) will no longer be responsible for paying Part B deductibles or coinsurance for outside services that are incorporated into the SNF's Part A bill. In the long run, we anticipate that these costs will be largely offset by the diminished potential for fraudulent and duplicative billing as well as the greater administrative efficiencies that are inherent in consolidating the responsibility for Medicare billing in a single source.

**Q16d. When will specific legislative language be available for this proposal?**

A16d. The budget bill was given to Congress on March 27.

**Q17. The President's budget envisions an interim cost control system for home health payments beginning in FY 1998 – presumably as a transition to a full prospective payment system in FY 1999. Can you provide additional details on how this interim system will work?**

Our interim system addresses the single greatest problem we currently face with the Medicare home health benefit – excessive utilization. The interim system would establish a ceiling on annual expenditures per beneficiary. This ceiling would be based on utilization in 1994, a year in which visits per beneficiary had already increased *153 percent* from 1989. Hence, such a ceiling provides more than adequate assurance that beneficiaries will have access to the medically necessary care they require, while providing agencies with an incentive to curtail excessive service delivery.

The interim system has the very attractive feature of administrative simplicity. The system uses currently available information that is routinely reported by all HHAs. It places no administrative burden on agencies, and a minimal burden (and cost) on our fiscal intermediaries. In contrast, some other current proposals would impose a massive administrative burden, in that agencies would be required to retroactively collect and report data that some (and possibly many) agencies will not have collected or kept. The administrative burden on our contractors to review and verify this data is far beyond any resources they have.

Because this interim system is based on each agency's individual utilization, it automatically takes into account the different medical needs of the beneficiaries that comprise each HHA's case mix. Since the ceiling is based on an annual average, it also provides agencies almost unlimited flexibility in changing both the type and number of visits provided to individual beneficiaries. Therefore, it avoids the massive disruption in service delivery that would be the inevitable consequence of the premature

276

---

implementation of a "prospective" payment system that relies on a system of adjusting for case mix that is unable to account for *90 percent* of the difference in cost per case.

Finally, this system will produce demonstrable, scorable savings for the Trust Fund. Both our actuaries and CBO are in substantial agreement on the reduction in outlays the interim system would generate. Given the alternatives available in the next two years, we find this system, with its guarantee of no disruption to either the industry or the beneficiaries, to be the only available and viable solution to the problems currently facing the Medicare home health benefit.

**Q18. Published reports on the President's budget indicate that HHS will propose a new definition of "homebound." Is this true? If so, how will the definition change?**

A18. We are proposing to clarify the "homebound" definition by adding several calendar month benchmarks to emphasize that home health coverage is only available to those who are truly homebound. The current definition of "confined to the home" uses terms such as "infrequent" and "short duration" that are vague and allow for considerable discretion in interpretation and encourage fraud and abuse. The March 1996 GAO report cites the problematic homebound definition as contributing to excessive spending and fraud and abuse.

The current provisions state that while an individual does not have to be bedridden to be considered "confined to the home," the condition of the individual should be such that there exists a normal inability to leave the home, that leaving the home requires a considerable and taxing effort by the individual, and that absences from the home are for an "infrequent" or of relatively "short duration," or attributable to the need to receive medical treatment. We would elaborate on this long-established policy by requiring that the beneficiary must have a condition due to an illness or injury that restricts the beneficiary's ability to leave the home for more than an average of 16 hours per calendar month for purposes other than to receive medical treatment that cannot be provided in the home. We would define "infrequent" to be an average of 5 or fewer absences per calendar month, excluding absences to receive medical treatment that cannot be furnished in the home. We would define "short duration" to be an absence from the home of 3 or fewer hours, on average per absence, within a calendar month excluding absences to receive medical treatment that cannot be furnished in the home. Medical treatment would also be defined to be any services that are furnished by the physician or furnished based on and in conformance with the physician's order, by or under the supervision of a licensed health professional; and for the purpose of diagnosis or treatment of an illness or injury. These clarifications are contained in our current instructions to fiscal intermediaries. Codifying them in the statute would make it easier for us to enforce the homebound definition.

277

278

Q19. Some of the information you have provided to us appears to indicate that payments to Medicare HMOs in high cost areas will be frozen for two years. Will this freeze preserve the entire current payment, including portions which are attributable to the GME, IME, and DSH programs?

A19. Under the President's proposal for setting rates for managed care plans, the rate in each county would be the greater of: (1) a minimum rate, in 1998 equal to the lesser of $350 or 150 percent of the 1997 rate, (2) a local/national blend, or (3) a minimum percentage increase, of 0 percent in 1998 and 1999, and 2 percent thereafter (sometimes called a hold harmless provision). Under the hold harmless provision, no county's rate would be reduced below its 1997 level (which includes IME/GME/DSH payments) in 1998 and 1999.

The President has also proposed that IME/GME/DSH payments be made directly to teaching and DSH hospitals for managed care enrollees, rather than incorporating amounts attributable to IME/GME/DSH into the county rates, as they are under current law. Both the Prospective Payment Assessment Commission and the Physician Payment Review Commission have recommended this policy change. In order to make these payments directly for managed care enrollees, the payment amounts attributable to GME/IME/DSH would be pulled out of the local component of the blend amount in all counties in 1998 and 1999.

While rates in counties subject to the hold harmless provision would not decline, their rates are lower than they would have been under current law since no update is received. The national update factor is 6.8 percent in 1998 and 5 percent in 1999 and is provided only to county rates based on the blend or the minimum payment amount. To the extent that the savings from the zero updates to hold harmless counties in 1998 and 1999 are not sufficient to cover the costs of the IME/GME/DSH carve out, county rates subject to the blended rates are adjusted by a budget neutrality factor. In 1998 and 1999, this budget neutrality adjustment would reduce the increase in the blended rates by 1.4 percent and 2 percent respectively. The budget neutrality adjustment is determined each year and only impacts on the rates for that year. After IME/GME/DSH payments are carved out of the local rates, the budget neutrality adjustment is negligible or positive.

Q20. The President's budget once again proposes to utilize competitive bidding for certain Medicare services and supplies. How have you addressed the administrative complexities and concerns about ensuring access to quality services and supplies which have caused such efforts to be delayed or abandoned in the past?

A20. The President's budget would permit the Secretary to establish payments for all Part B services and items (excluding physician services) based on a competitive bidding process.

Hatch - 14

279

- The Secretary could not contract with any bidder unless the Secretary finds that the entity meets quality standards specified by the Secretary.

- Prohibitions in regard to proposed competitive bidding demonstrations have been imposed by previous Congresses, not by this Administration.

- Given the widespread use of competitive bidding by other purchasers of health care services (e.g., Medicaid, Veterans' Administration, Department of Defense, managed care plans), we believe that we could both assure access and maintain quality.

Q21. I understand that the Office of the Inspector General has begun an audit of physicians at teaching hospitals. This audit is presumed to be intended to identify instances where teaching physicians have fraudulently billed the government for physician services.

I am concerned that the OIG may not be separating instances of true fraudulent billing from honest billing errors—and in the process is needlessly scaring a lot of very fine teaching institutions which are already undergoing some tough times. In addition, I am concerned about aggressive use of the False Claims Act, which may not be the way to go for some of these cases.

Can you give us the status of these "PATH" audits? I hope this is something you are taking a personal interest in, because I believe it has big implications for academic medicine.

A21: The OIG is identifying substantial billing problems at teaching hospitals. The OIG found noncompliance with a Medicare rule regarding physician services provided by residents, yet billed by teaching physicians, and improperly "upcoding" the level of service provided. (Upcoding means billing Medicare for a service that has a higher reimbursement level than the service that was actually provided.) The original review resulted in recovery and fines of more than $30 million. It became apparent from OIG work at additional hospitals that this was a somewhat widespread problem. The OIG then established a review protocol to be used by other hospitals and physician group practices to assess their own liability for this improper billing practice. This initiative is referred to as "PATH," an acronym for "physicians at teaching hospitals." Active participation includes arrangement, at the hospital's or group's expense, for an independent review conducted by a third party, using the OIG protocol. This provides an alternative to having the OIG conduct all the reviews and thereby leverages its audit impact. A number of voluntary settlements are expected from these reviews. The first settlement using this protocol resulted in an agreement to pay $11.9 million. The OIG carefully evaluates each case on its own merits and considers whether improper billings

Hatch - 15

280

were made in error. The OIG coordinates with the appropriate Assistant United States Attorney (AUSA) who assesses the facts in each review to determine whether appropriate legal intervention is warranted. The AUSA's are part of the PATH process from the beginning of each review.

Q22. Another area of concern is with respect to your initiative to assist children who currently are without health insurance. I want to get a better understanding of the problem and would appreciate your comments specifically about your proposal to enroll 1.6 million of the estimated three million children who are not eligible for Medicaid today, but who are not enrolled. Exactly who are these children? Can you give us some demographic information on these children? Are they the very young or are they teenagers? And why are they not enrolled? How do you intend to get them enrolled?

A22. All of these questions are pertinent to any success in enrolling the targeted population. We do not have demographic data on these children. We speculate that these children tend to be healthier -- otherwise they would have entered the system at some point, identified as Medicaid eligible and enrolled in the program.

We also speculate that these children are older rather than younger -- again due to the lack of interaction with the health care delivery system -- younger children have greater utilization rates due to well child visits, immunizations for school, etc. The Department is using existing surveys to develop more information on this issue.

As for why these children are not enrolled, again we can only speculate. We believe a large portion of these children reside in households where there is either no access to employer-sponsored insurance or no dependent coverage and the parents are unaware of their child's Medicaid eligibility status.

All of these questions need to be addressed in order to have any success in enrolling these children. We intend to work with the States to identify these children and the barriers to Medicaid enrollment. We intend to build upon current State and Federal outreach activities -- using best practices implemented by States and strengthening current Federal program relationships (e.g., Head Start and Medicaid).

Hatch - 16

---

281

FEB 13 1997

ATTACHMENT A10

# The President's FY 1998 Budget:
## Medicare Structural Reforms in the President's Budget

The President's Budget modernizes Medicare and brings it into the 21st century through a number of major structural changes.

### FEE-FOR-SERVICE PAYMENT REFORM

- Building on the success of prospective payment for inpatient hospital, the President's Budget would move to prospective payment systems for:

- **Skilled nursing facilities (SNFs).** Driven primarily by increases in intensity of services, SNF care is one of the fastest growing Medicare benefits. The budget would establish a per-diem SNF prospective payment system beginning in 1998, which would reimburse for all costs (routine, ancillary, and capital).

- **Home health services.** Medicare's current reimbursement system does not help control volume, contributing to the increasingly high expenditures in this area. The President's budget implements a prospective payment system in 1999, which pays home health agencies based on characteristics of the patients, not on how many services agencies provide. In the mean time, while the prospective payment system is being developed the President's budget improves the current system to reduce overutilization.

- **Hospital outpatient departments (OPDs).**

- Implements prospective payment system. OPDs are still paid, in part, on a cost basis. The President's budget would move to a prospective payment system for these services starting in 1999, which for the first time, would create incentives for efficiencies not present in a cost-based system.

- Addresses the current inequity in coinsurance for hospital outpatient fees. There is a significant flaw in the reimbursement methodology for OPDs involving the calculation of beneficiary coinsurance. Since coinsurance is a function of hospital charges and since charges are significantly greater than Medicare's payment rates, beneficiaries pay nearly a 50-percent copayment for outpatient department services, as oppose to the 20-percent rate beneficiaries typically pay for other Part B services. The President's proposal assures that by 2007, coinsurance will be reduced to the traditional 20-percent level.