# TAB I

| 106TH CONGRESS 1st Session | HOUSE OF REPRESENTATIVES | REPORT 106–479 |
|---|---|---|

# MAKING APPROPRIATIONS FOR THE GOVERNMENT OF THE DISTRICT OF COLUMBIA AND OTHER ACTIVITIES CHARGEABLE IN WHOLE OR IN PART AGAINST REVENUES OF SAID DISTRICT FOR THE FISCAL YEAR ENDING SEPTEMBER 30, 2000, AND FOR OTHER PURPOSES

## CONFERENCE REPORT

TO ACCOMPANY

## H.R. 3194



NOVEMBER 18 (legislative day, NOVEMBER 17), 1999.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
60-651                      WASHINGTON : 1999

868

In the proposed regulation, HCFA classified many different services with varying costs into a single payment group. In one example, brachytherapy has been placed in a group with other procedures that are much less costly. This could provide disincentives to use this technology. The Committee believes that while some level of variation is unavoidable, there should not be wide variation that could potentially restrict access to the most costly services. To address this problem, this agreement would place an upper limit on the variation of costs among services included in the same group. The most costly item or service in a group could not have a mean or median cost that was more than twice the mean or median cost of the least costly item or service in the group. To provide additional flexibility, the parties to the agreement give the Secretary the option to base the relative payment weights on either the mean or median cost of the items and services in a group. Further, in classifying drugs and biologicals into payment categories, the parties to the agreement expect that consideration will be given to products that are therapeutically equivalent.

The parties to the agreement recognize that there may be unusual cases, such as low volume items and services, and the Secretary is given discretion to exempt these exceptional cases from the limitation. The parties expect that the Secretary would not use this exception to include orphan drugs in a group that contains very different resources.

In the proposed regulation, HCFA stated its intention not to update the payment groups and rates annually. This is different from the agency's process of annually updating the inpatient prospective payment system. Given the rapid pace of technological change as well as changes in medical practice, the parties to the agreement require the Secretary to review the outpatient payment groups and amounts annually and to update them as necessary.

BBA 97 gave the Secretary the discretion to make additional payments (called outlier payments) to hospitals for particularly costly cases. The parties to the agreement require the Secretary to make outlier payments in a budget neutral manner and in a similar way as is currently done in the inpatient PPS. The outlier pool would be established at any level up to 2.5 percent of total payments for the first three years under the new system. After the third year, the pool could be set at any level up to 3 percent of total payments.

While the statutory provisions for the inpatient PPS require an outlier pool equal to a level between 5 and 6 percent of total inpatient PPS payments, the Committee believes that the lower levels of 2.5 and 3.0 percent are more appropriate for the outpatient PPS because the outpatient PPS will make separate payments for most individual services performed during an outpatient encounter. The allowed upper limit on the size of the pool is increased after the third year because the need for outlier payments may increase after the temporary add-on payments for drugs and biologicals, described below, are replaced with a transitional provision that applies only to new products.

The parties to the agreement are concerned that HCFA's proposed payment system does not adequately address issues pertaining to the treatment of drugs, biologicals and new technology.

869

The parties believe that these oversights could lead to restricted beneficiary access to drugs, biologicals and new technology. The provisions would establish transitional payments to cover the added costs of certain services involving the use of medical devices, drugs and biologicals. Hospitals using these drugs, biologicals and devices would be eligible for additional payments.

The duration of the transitional payment would be for a period of at least two years but not more than three years. For drugs, biologicals, and brachytherapy used in cancer therapy and orphan drugs, the period would begin with the implementation date of the outpatient PPS. This also would be the period applicable to medical devices first paid as an outpatient hospital service after 1996 but before implementation of the outpatient PPS (as well as for any other item or service eligible for the additional payments at the inception of the outpatient PPS because of insufficient data or use of the Secretary's discretion). For products first paid as an outpatient service after implementation of the outpatient PPS, the transitional payment would begin with the first date on which payment is made for the device, drug or biological as an outpatient hospital service and continue for at least two, but not more than three, years.

The parties to the agreement expect the Secretary to develop a process to address new devices, drugs and biologicals introduced after the outpatient fee schedule for a particular year has been set. This process should include assigning an appropriate code (or codes) to the product and establishing the amount of the add-on payment. New codes and add-on payment amounts should be made effective quarterly.

The amount of the additional payment to hospitals, before applying the limitation described below, should equal the amount specified for the new technology less the average cost included in the outpatient payment schedule for the existing technology. Specifically, for drugs and biologicals, the amount of the additional payment is the amount by which 95 percent of the Average Wholesale Price (AWP) exceeds the portion of the applicable outpatient fee schedule amount that the Secretary determines is associated with the drug or biological. Similarly, for new medical devices, the add-on payment is the amount by which the hospital's charges for the device, adjusted to cost, exceed the outpatient fee schedule amount associated with the device.

The total amount of additional pass-through payments in a year should not exceed a prescribed percentage of total projected payments under the outpatient prospective payment system. The applicable percentages are: (1) 2.5 percent for the first three years after implementation of the new outpatient payment system; and (2) up to 2.0 percent in subsequent years. In setting the hospital outpatient department (OPD) rates and add-on amounts for a particular year, the Secretary will estimate the total amount of additional payments that would be made based on the add-on amounts specified above and the expected utilization for each service. If the estimated total amount exceeds the percentage limitation, the Secretary will apply a pro rata reduction to the add-on payment amounts so that projected total payments are within the limitation.

The parties to the agreement believe that the current DMEPOS fee schedule is not appropriate for certain implantable

items, since their use in the hospital setting involves the provision of services by the hospital. It is the parties' intent that payment for implantable medical items (for example, pacemakers, defibrillators, cardiac sensors, venous grafts, drug pumps, stents, neurostimulators, and orthopedic implants), as well as for items that come into contact with internal human tissue during invasive medical procedures (but are not permanently implanted), will be made through the outpatient PPS system—regardless of how these products might be classified on current HCFA fee schedules.

The parties to the agreement understand that the Secretary is committed to creating separate payment categories for blood, blood products, and plasma-based and recombinant therapies. The parties to the agreement continue to be concerned that the inadequate payment for these products and therapies could represent a barrier to patient access. Accordingly, the parties to the agreement expect the Secretary to carefully analyze potential patient access issues and create sufficient payment categories to adequately differentiate these products.

The agreement also requires the Secretary to conduct a study of intravenous immune globulin (IVIG) services in settings other than hospital outpatient departments and physicians' offices to be completed within 1 year of enactment. In addition, the agreement requires the Secretary to make recommendations on the appropriate manner and settings under which Medicare should pay for these services in such settings.

The parties to the agreement encourage the Secretary to examine Medicare policies regarding outpatient rehabilitation services (including cardiac and pulmonary rehabilitation services) in hospital outpatient departments and other ambulatory settings in light of advances in medical technology.

SEC. 202. ESTABLISHING A TRANSITIONAL CORRIDOR FOR APPLICATION OF OPD PPS

*Current law*

The hospital outpatient PPS is to be implemented in full and simultaneously for all services and hospitals (estimated for July 2000).

*H.R. 3075, as passed*

Provides payments in addition to PPS payments to a hospital during the first 3 years of the PPS if its PPS payments are less than the payments that would have been made prior to the PPS. During the first year, a hospital would receive an additional amount equal to 80% of the first 10% of the difference between its payments under the prior system and under the PPS, 70% of the next 10% of reduced payments, and 60% of the next 10%. If PPS payments are less than 70% of prior levels, the additional sum is 21% of the pre-BBA amount. During the second year, the payments as a proportion of reduced payments would change to 70% of the first 10% and 60% of the second 10%. If PPS payments are less than 80% of prior amounts the additional sum is 13% of the pre-BBA amount. In the third year, the payment would be 60% of the first 10% of reduced payments, and if the PPS payments are less