**TAB P**

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)                                    Page 1
**(Cite as: 56 FR 25792)**

PROPOSED RULES

DEPARTMENT OF HEALTH AND HUMAN SERVICES

Health Care Financing Administration

42 CFR Parts 405 and 415

[BPD-2-P]

RIN 0938-AE91

Medicare Program;   Fee Schedule for Physicians' Services

Wednesday, June 5, 1991

Defendants' Exhibit
**1855**
01-12257 - PBS

**\*25792** AGENCY: Health Care Financing Administration (HCFA), HHS.

ACTION: Proposed rule.

SUMMARY: This proposed rule sets forth a fee schedule for payment for physicians' services beginning January 1, 1992.   Establishment of this fee schedule is required by section 6102(a) of the Omnibus Budget Reconciliation Act of 1989, as amended by the Omnibus Budget Reconciliation Act of 1990.   This proposed rule explains which services would be included in the fee schedule and sets forth the formula for computing payment amounts.   Application of transition rules during 1992 through 1995 is also described, as well as other adjustments to fee schedule payment amounts.

DATES: Comments will be considered if we receive them at the appropriate address, as provided below, no later than 5 p.m. on August 5, 1991.

ADDRESSES: Mail comments to the following address:

  Health Care Financing Administration, Department of Health and Human Services, Attention:  BPD-712-P, P.O. Box 26686, Baltimore, Maryland 21207.

  If you prefer, you may deliver your comments to one of the following addresses:

  Room 309-G, Hubert H. Humphrey Building, 200 Independence Avenue SW., Washington, DC, or

  Room 132, East High Rise Building, 6325 Security Boulevard, Baltimore, Maryland.

  Due to staffing and resource limitations, we cannot accept facsimile (FAX) copies of comments.   In commenting, please refer to file code BPD-712-P. Comments received timely will be available for public inspection as they are received, generally beginning approximately 3 weeks after publication of a document, in room 309-G of the Department's offices at 200 Independence Avenue SW., Washington, DC., on Monday through Friday of each week from 8:30 a.m. to 5 p.m. (phone:  202-245-7890).

  If you wish to submit comments on the information collection requirements contained in this proposed rule, you may submit comments to:  Allison Herron, HCFA

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)                                    Page 2
**(Cite as: 56 FR 25792)**

Desk Officer, Office of Information and Regulatory Affairs, Room 3002, New Executive Office Building, Washington, DC 20503.

 Copies: To order copies of the Federal Register containing this document, send your request to the Superintendent of Documents, U.S. Government Printing Office, Washington, DC 20402-9325.   Specify the date of the issue requested and enclose a check or money order payable to the Superintendent of Documents, or enclose your Visa or Master Card number and expiration date.   Credit card orders can also be placed by calling the order desk at (202) 783-3238 or by faxing to (202) 275-6802. The cost for each copy (in paper or microfiche form) is $1.50.   In addition, you may view and photocopy the Federal Register document at most libraries designated as U.S. Government Depository Libraries and at many other public and academic libraries throughout the country that receive the Federal Register. The order desk operator will be able to tell you the location of the Government Depository Library nearest to you.

FOR FURTHER INFORMATION CONTACT: Terrence L. Kay, (301) 966-4494.

SUPPLEMENTARY INFORMATION:

Overview

 In this proposed rule, we explain in detail the statutory authority for the physician fee schedule and the provisions of the regulations we propose under that authority.   Addenda to the rule provide technical documentation to the fee schedule tables, tables containing proposed relative values for physician services and geographic practice cost index values, and information to assist readers in obtaining documents referenced in the proposed rule.

 This proposed rule would add a new 42 CFR part 415 to apply to physicians' services furnished beginning on January 1, 1992.   Existing rules pertaining to reasonable charge payment at 42 CFR part 405 subpart E would be amended to reflect the narrower application of reasonable charge principles once the physician fee schedule becomes effective.

 The information in this proposed rule updates the information supplied September 4, 1990 in the model fee schedule notice (55 FR 36178).   Comments on the model fee schedule have been considered in developing the policies proposed here. (If commenters wish to have their comments summarized and responded to in the Federal Register, they should comment on this proposed rule and we will respond to them in the final rule.)

 To assist readers in referencing sections contained in this proposed rule, we are providing the following table of contents:

Table of Contents

Background

I. Legislative History

II. Early Development of the Fee Schedule

III. Future Implementation Steps

Description of Specific Statutory Requirements and Proposed Implementing

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01                                                                    Page 3
56 FR 25792-01, 1991 WL 299895 {F.R.)
**(Cite as: 56 FR 25792)**

Regulations

IV. Description of the Fee Schedule.

A Services to be Included in the Fee Schedule

1. Physicians' Services--General

2. Limited Licensed Practitioner Services

3. Services of Nonphysician Practitioners

a. Physical/Occupational Therapists (PT/OTs)

b. Physician Assistants (PAs)

c. Nurse Practitioners (NPs) and Clinical Nurse Specialists (CNSs)

d. Certified Registered Nurse Anesthetists (CRNAs)

e. Nurse Midwives (NMs)

f. Clinical Psychologists (CPs)

g. Clinical Social Workers (CSWs)

4. Services of Physicians to Patients in Provider Settings and Services of Teaching
Physicians

5. Payment for Supplies, Services, and Drugs Furnished Incident to a Physician's
Service

a. Supplies

b. Services Furnished Incident to a Physician's Service

c. Drugs

B. Formula for Computing Payment Amounts

C. Sources of Relative Value Units (RVUs)

1. Physician Work RVUs

2. Charge-based Relative Value Scale to Provide RVUs for Gaps

3. Unlisted Procedures and Local Codes

4. RVUs for Limited Licensed Practitioner Services

5. Radiology Services

a. Integration of Existing Radiologist Fee Schedule into Physician Fee Schedule

b. Rescaling Values for the Physician Fee Schedule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)                    Page 4
**(Cite as: 56 FR 25792)**

c. Portable X-ray

d. Other Radiology Issues

6. Anesthesia Services

a. Integration of Anesthesia Services into the Physician Fee Schedule

b. Elimination or Continuation of Recognition of Time Units

c. Method for Integrating Anesthesia Services

d. Payment for Specialized Services Furnished by Anesthesiologists

e. Monitored Anesthesia Care

f. Other Anesthesia Issues

7. Physician Pathology Services

8. Charge-based Computation of Practice Expense and Malpractice RVUs

9. Combining Work, Practice Expense, and Malpractice RVUs onto a Common Scale

**\*25793** 10. Periodic Review and Adjustments in RVUs

a. Proposed Policy for Review and Adjustments

b. Establishment of Interim RVUs for New or Revised Services

c. Options for Establishing and Revising RVUs for Existing, Revised, and New Services

d. Creation and Review of RVUs for New or Revised Services

e. Implementation of the $20 Million Limitation

D. Geographic Adjustment Factors (GAFs)

E. Conversion Factor (CF)

1. Computation of Budget-neutral CF

2. Accounting for Transition Payment Rules in CF Calculation

3. Determining the Initial CF

4. Future Updates of CF

F. Data Used to Develop the Fee Schedule

1. Sources of Data

2. Description of Data Files

a. Part B Medicare Annual Data (BMAD)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

b. National Claims History (NCH)

3. Data Validation

4. Aging of Data to Reflect 1991 Payment Rules and Expenditures

a. Pub. L. 101-239 Payment Provisions Requiring Data Adjustments for 1990

b. Pub. L. 101-508 Payment Provisions Requiring Data Adjustments

V. Definitions

A. Defining a Unit of Service

1. Coding of Medical Visit Services

a. Current Use of CPT Visit Codes

b. Variation in Coding of Medical Visit Services

c. HCFA Goals for New Visit Codes

d. Recent Studies to Support the Creation of New Visit and Consultation Codes

e. Harvard Study Phase II

f. CPT Panel Development of New Visit Codes

g. Pilot Test of New Visit Codes

h. Revising the Other Visit Codes

2. Scope of the Global Surgery Policy

a. Background and Current Carrier Procedures

b. Harvard Study Assumptions

c. Proposed Definitions

d. Computing RVUs for Global Surgery

3. Minor Surgery and Nonincisional Procedures

a. Minor Surgery

b. Nonincisional Procedures ("Scopies")

c. Preferred Approach

B. Defining Geographic Payment Localities

1. Current System

2. Localities under the Fee Schedule

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

VI. Adjustments to Fee Schedule Payments

A. Site of Service Differential

1. General

2. Options under a Fee Schedule

B. Professional/Technical Component Services

1. Radiology Services

2. Diagnostic Tests

a. General

b. Electrocardiograms

c. Technical component of cardiac catheterization services

d. Purchased diagnostic tests

3. Physician Pathology Services

4. Future Plans

C. Payment Modifiers

1. Multiple Surgery (CPT modifier 51)

2. Bilateral Surgery (CPT modifier 50)

3. Providers Furnishing Less Than the Global Fee Package (CPT modifiers 54, 55, and 56)

4. Physicians Who Assist at Surgery (CPT modifiers 80, 81, and 82)

5. Two Surgeons and Surgical Team (CPT modifiers 62 and 66)

6. Unusual Services (CPT modifier 22) or Reduced Services (CPT modifier 52)

7. Multiple Modifiers (CPT modifier 99)

8. Multiple Patients and Single Patient Modifiers on Nursing Home Visit Bills (HCPCS alpha-numeric modifiers MP and SP)

9. Modifiers That Would Not Affect Payment Levels

a. CPT Modifiers That Would Not Affect Payment

b. HCPCS Alpha-numeric Modifiers That Would Not Affect Fee Schedule Payment Amounts

c. Carrier Unique Local Modifiers (HCPCS Level 3 modifiers beginning with the letters w through z)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

10. Travel

D. New Physician/Practitioner Adjustment

1. General and to Whom It Applies

2. Exceptions

3. Amounts of Adjustments

4. Years of Practice

E. Participating Physician Differential

F. Health Manpower Shortage Area Bonus Payment

G. Comparability and Inherent Reasonableness Rules

1. Comparability Rule

2. Inherent Reasonableness Rule

VII. Limiting Charge on Nonparticipating Physicians

Other Information

VIII. Information Collection Requirements

IX. Responses to Comments

X. Regulatory Impact Analysis

A. Executive Order 12291 and Regulatory Flexibility Act

1. Effects on Physician Payments

a. Impact Estimation Methodology

b. Overall Fee Schedule Impact

c. Specialty Level Effects

d. State Level Effects

e. Effects of Separate Payment for Drugs

2. Effects on Beneficiaries' Costs and Access to Services

3. Effects on Carriers

B. Rural Hospital Impact Statement

Text of Proposed Regulations

Addenda

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A--Technical Documentation/Explanation and Guide to Use of Fee Schedule Tables

B--Relative Value Units by Service

C--Geographic Practice Cost Indices by Fee Schedule Areas

D--Information for Obtaining Sources of Data Underlying Fee Schedule

E--CPT Definitions for Visit Codes

In addition, because of the many agencies and terms to which we refer by acronym in this proposed rule, we are listing those acronyms and their corresponding terms in alphabetical order below:

AA--Anesthetist assistant

ACR--American College of Radiology

ACS--American College of Surgeons

AMA--American Medical Association

ASC--Ambulatory surgical center

BMAD--[Part] B Medicare Annual Data

CAT--Computerized axial tomography

CBO--Congressional Budget Office

CF--Conversion factor

CFR--Code of Federal Regulations

CHER--Center for Health Economics Research

CNIBM Laser--CoverageHPLAIID.PRSIition (copyrighted by the American Medical Association (1991))

CRNA--Certified registered nurse anesthetist

CSW--Clinical social worker

CWF--Common working file

CY--Calendar year

LHHS--Department of Health and Human Services

DME--Durable medical equipment

DO--Doctor of Osteopathy

DRG--Diagnosis-related group

EEG--Electroencephalogram

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

EKG--Electrocardiogram

EO--Executive Order

FY--Fiscal year

GAF--Geographic adjustment factor

GPCI--Geographic practice cost index

HHA--Home health agency

HCFA--Health Care Financing Administration

HCPCS--HCFA Common Procedure Coding System

HHS--Department of Health and Human Services

HI--Hospital Insurance (Part A of the Medicare Program)

HMO--Health maintenance organization

HMSA--Health Manpower Shortage Area

ICF--Intermediate care facility

ID--Identification

IIC--Inflation-indexed charge

MAAC--Maximum Allowable Actual Charge

MAC--Monitored Anesthesia Care

MCP--Monthly Capitation Payment

MD--Doctor of Medicine

MEI--Medicare Economic Index

MP--Multiple patient

MRI--Magnetic resonance imaging

MSA--Metropolitan statistical area

MVPS--Medicare volume performance standards

NAMCS--National Ambulatory Medical Care Survey

NCH--National Claims History

NCHS--National Center for Health Statistics

NF--Nursing facility

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

NM--Nurse midwife

NP--Nurse practitioner

OBRA--Omnibus Budget Reconciliation Act

OIG--Office of the Inspector General

OMB--Office of Management and Budget

OT--Occupational therapist

PA--Physician assistant

PBP--Provider-based physician

PET--Provider Education and Training

PHS--Public Health Service

Pub. L.--Public Law

PPRC--Physician Payment Review Commission

PPR--Physician Payment Reform

PROs--[Utilization and Quality Control] Peer Review Organizations

*25794 PT--Physical therapist

RFA--Regulatory Flexibility Act

RVU--Relative value unit

S&I--Supervision and interpretation (relates to coding of radiological services)

SMI--Supplementary Medical Insurance (Part B of the Medicare Program)

SNF--Skilled nursing facility

SP--Single patient

TEFRA--Tax Equity and Fiscal Responsibility Act of 1982

UI--Urban Institute

Background

I. Legislative History

 The Medicare program was established in 1965 by the addition of title XVIII to the
Social Security Act (the Act). The Social Security Amendments of 1965 created two
insurance programs:  Medicare Part A or Hospital Insurance and Medicare Part B or
Supplementary Medical Insurance.   These original statutory provisions established
the principles of reasonable charge payment for physicians' services and certain

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01                                                                    Page 11
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

other services under part B. The key provisions governing the reasonable charge payment methodology are set forth in sections 1833 and 1842(b) of the Act and in 42 CFR part 405, subpart E. While statutory amendments have moved certain part B services such as radiologists' services, durable medical equipment (DME) and clinical laboratory services from reasonable charge payment to a fee schedule, physicians' services have generally been paid based on reasonable charge principles throughout the first 25 years of the program's operation.

In general, the reasonable charge for a physician's service is the lowest of (1) the physician's actual charge, (2) the physician's customary charge, or (3) the prevailing charge in the locality for similar services. The customary charge is the median charge of the physician for the service during the July through June data collection period preceding the current calendar year. These charges are arrayed in ascending order and the median or midpoint of the charge data is selected as the customary charge. The prevailing charge limit for a particular service in a locality is an amount set high enough to cover the full customary charges of the physicians whose billings have accounted for at least 75 percent of the charges in the locality for that service. Since 1975, changes in prevailing charge limits from year to year have been constrained by statute to the amount of inflation in medical costs as measured by the Medicare Economic Index (MEI).

A major change in Medicare physician payment rules was enacted as part of the Omnibus Budget Reconciliation Act (OBRA) of 1989 (Pub. L. 101-239) on December 19, 1989. Section 6102 of Pub. L. 101-239 amended title XVIII of the Act by adding a new section 1848, "Payment for Physicians' Services". The new section contains three major elements: (1) Establishment of volume performance standard rates of increase for physician services expenditures; (2) replacement of the reasonable charge payment mechanism with a new fee schedule for physicians' services; and (3) replacement of the maximum actual allowable charge (MAAC), which constrains the total amounts that non-participating physicians can charge Medicare beneficiaries for covered services, with a new limiting charge.

On November 5, 1990, Congress enacted Public Law 101-508, the Omnibus Budget Reconciliation Act of 1990, which contained several modifications and clarifications to the Public Law 101-239 provisions establishing the physician payment fee schedule. These modifications have been taken into account throughout this proposed rule. Public Law 101-508 also made a number of revisions to physician payment amounts for 1991, which will affect payment amounts under the fee schedule, given the budget neutrality requirement for 1992 and the transition rules. (Budget neutrality is explained more fully below in the discussion of the conversion factor (CF).)

This proposed rule is being issued in accordance with section 1848(b)(1) of the Act as added by section 6102 of Public Law 101-239, which requires that: "Before January 1 of each year beginning with 1992, the Secretary shall establish, by regulation, fee schedules that establish payment amounts for all physicians' services furnished in all fee schedule areas * * *for the year * * *." Section 1848 requires that the fee schedule include national uniform relative values for all physicians' services. The relative value of each service must be the sum of relative value units (RVUs) representing physician work, practice expenses net of malpractice expenses, and the cost of professional liability insurance (malpractice insurance). Nationally uniform relative values are adjusted for each locality by a geographic adjustment factor (GAF). (Only one-fourth of the physician work relative value is subject to adjustment.) The CF (converting total RVUs into dollar payment amounts) is to be budget neutral, so that had the fee schedule been applied during 1991 it would have resulted in the same level of aggregate payments

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01                                                                Page 12
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

as would be made under the reasonable charge system.   The new fee schedule must be
phased in over 4 years, beginning in 1992, with the new rules fully effective in
1996. During 1992 through 1995, transition provisions generally blend the old
payment amounts with the new.   In addition, this proposed rule sets forth a limit
on amounts that nonparticipating physicians can charge beneficiaries under section
1848(g) of the Act.

II. Early Development of the Fee Schedule

 Development of the concepts and methodology underlying the new physician fee
schedule has been under way for a number of years.   Based on Congressional
mandates contained in Public Law 99-272 (Consolidated Omnibus Budget Reconciliation
Act of 1985), Public Law 99-509 (OBRA of 1986) and Public Law 100-203 (OBRA of
1987), we have devoted considerable effort to the development of a physician fee
schedule based on a relative value scale.   We have been assisted in this task by a
number of experts inside and outside of government, including the research team at
the Harvard University School of Public Health led by William Hsiao, Ph.D. The
Harvard research team produced "A National Study of Resource-Based Relative Value
Scales for Physician Services" (September 1988) and "A National Study of Resource-
Based Relative Value Scales for Physician Services Phase II" (November 1990) under
a cooperative agreement with us.   Other invaluable contributions were made by the
Physician Payment Review Commission (PPRC), whose analyses and recommendations have
been extremely helpful to us at every stage of fee schedule development.   The
Urban Institute and the Center for Health Economics Research (UI/CHER) were
instrumental in the creation and refinement of the geographic practice cost indices
(GPCIs), which were used to create the GAFs. CHER also provided assistance in
providing data and analyses in support of developing the global surgery and
anesthesia service payment policies.

 Under the statutory mandates listed above, we submitted three reports to Congress
in October of 1989 ("Volume and Intensity of Physician Services", "Relative Value
Scales for Physician Services", and "Implementation of a National Fee Schedule")
that summarized the results of extensive research and analysis relating to the
possible implementation of a Medicare physician fee schedule.   These reports
reviewed both the theoretical and practical ramifications of the transition to a
fee schedule and simulated the *25795 effects of the change under various
assumptions.

 When Public Law 101-239 was enacted 2 months after the submission of these
reports, the new law prescribed many of the procedures and methods to be used in
implementation of the fee schedule on January 1, 1992, but a number of key payment
policy and technical issues were left to the Secretary for resolution. Thus section
6102(f)(11) of Public Law 101-239 required the Secretary to submit to the Congress
and make available to the public a "model fee schedule" by September 1, 1990, in
order to provide an early opportunity for public review of the fee schedule
methodology.   The model fee schedule was to include "* * * as many services as the
Secretary concludes can be assigned valid relative values".

 The model fee schedule was published on September 4, 1990 as part of a notice with
comment period (55 FR 36178).   Its narrative portions described the statutory
requirements, listed and explained the technical and policy issues left to the
Secretary's discretion, and described steps that had been taken and that were
planned in order to resolve the outstanding issues.   Preferred options were
identified in some cases;  in other cases, options were discussed without
identification of a preferred approach.   The addenda to the model fee schedule
notice provided preliminary estimates of the relative values associated with the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)                              Page 13
**(Cite as: 56 FR 25792)**

approximately 1,400 services studied as part of the Harvard Phase I study as well
as preliminary values for GPCIs for all existing Medicare localities.   Using these
tables, readers could compute very preliminary estimates of payment amounts for
particular services in particular localities under the fee schedule.   A 60-day
public comment period was provided; comments received were considered carefully and
were helpful to us in developing this proposed rule.

III. Future Implementation Steps

 Since the publication of the model fee schedule on September 4, 1990, we have
received the Phase II final report of the Harvard research team, which contains
relative values for more than 4,000 services, representing about 95 percent of
Medicare payments for physicians' services for the included specialties.   In Phase
II, 15 additional medical and surgical specialties were studied that were not
studied in Phase I. In addition, seven Phase I specialties were restudied, with
four of these restudies funded by the specialty societies.   Not only did Phase II
almost triple the number of services for which RVUs have been produced, but it
refined the RVUs for the original 1,400 services.

 Phase III of the Harvard study is now in progress;   it is expected to produce RVUs
for most of the remaining Medicare-covered services.   In addition, use of small
groups of physicians to detect and correct anomalous values in the existing set of
RVUs (especially values based on extrapolation) is included in Phase III. Phase III
results are expected during the summer of 1991. (More detail on the Harvard study
is provided in section IV. C. 1. concerning physician work RVUs.)

 Section 1848(d)(1)(C) of the Act requires publication of the CF between October 16
and October 31 of 1991.   Publication of the final rule by this date will allow us
to incorporate almost all the Phase III results (that is, those received by June
1991) as well as more current data with respect to historical charges than was
available for this proposed rule.   This schedule for the final rule will also
allow time for incorporation of any changes in response to comments on the proposed
rule received during the 60-day comment period.   A 60-day comment period should
also allow adequate time for the Medicare carriers, which process claims for
physicians' services, to make final adjustments to their systems before
implementation on January 1, 1992.   We expect that the 1992 participating
physician enrollment will be conducted during the period November 16, 1991 through
December 31, 1991.   As has been our practice in the past, we intend to send
physicians a letter informing them of the program changes and the upcoming
participation decision.   With the letter, we expect to send them fee schedule
rates as specified in section 1848(h) of the Act.

Description of Specific Statutory Requirements and Proposed Implementing
Regulations

IV. Description of the Fee Schedule

A. *Services to be Included in the Fee Schedule*

1. Physicians' Services--General

 Section 1848(a)(1) of the Act (as added by section 6102 of Public Law 101-239)
requires that payment be made under a Medicare fee schedule for "* * * all
physicians' services (as defined in subsection (j)(3)) * * *" Subsection (j)(3) of
section 1848 of the Act defines "physicians' services" for purposes of the Medicare
fee schedule as including:

۰ 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)                                    Page 14
**(Cite as: 56 FR 25792)**

Items and services described in paragraphs (1), (2)(A), (2)(D), (3) and (4) of
section 1861(s) (other than clinical diagnostic laboratory tests and such other
items and services as the Secretary may specify).

The services identified in the law and the sections of the Act where they appear
follow:

1861(s)(1)--"physicians' services"--these services are defined as the professional
services of physicians as defined in sections 1861(q) and (r).

1861(s)(2)(A)--"services and supplies * * * furnished as an incident to a
physician's professional service * * *."

1861(s)(2)(D)--"outpatient physical therapy services and outpatient occupational
therapy services."

1861(s)(3)--"diagnostic X-ray tests * * *, diagnostic laboratory tests, and other
diagnostic tests."

1861(s)(4)--"X-ray, radium, and radioactive isotope therapy, including materials
and services of technicians."

If the service is one of the enumerated services and is currently paid based on
reasonable charges or on a fee schedule basis in the case of radiologist services,
payment would be made under the physician fee schedule regardless of whether a
physician or other entity (for example, an independently practicing physical
therapist (PT)) furnished the service.  If the service is currently paid on a
reasonable cost basis, payment would continue on a reasonable cost basis (for
example, physical therapy furnished by a home health agency (HHA) to an HHA patient
or the technical component of radiology services furnished in a hospital outpatient
department to a hospital patient).  Other nonphysician services not enumerated in
section 1848(j)(3) of the Act such as ambulance services and DME or services under
their own fee schedules such as clinical laboratory services would be excluded from
the physician fee schedule.

2. Limited Licensed Practitioner Services

Optometrists, dentists, oral and maxillofacial surgeons, podiatrists, and
chiropractors are considered to be physicians by Medicare according to section
1861(r) of the Act if they furnish services specified in section 1861(q) of the
Act. These types of physicians are often called "limited licensed practitioners".

Because they are defined as physicians by section 1861(r) for a limited range of
services, and because the fee schedule under section 1848 of the Act would apply to
"physicians' services," the fee schedule would apply to them if they furnish
specific services *25796 for which the law considers them to be physicians.

3. Services of Nonphysician Practitioners

There are seven categories of nonphysician practitioners for whom there is
separate coverage and payment under Medicare. (See section IV. A. 5. for a
discussion of services furnished incident to a physician's service.)  A
nonphysician practitioner includes the following:

- Physical/occupational therapist (PT/OT).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

- Physician assistant (PA).

- Nurse practitioner (NP) or clinical nurse specialist (CNS).

- Certified registered nurse anesthetist (CRNA).

- Nurse midwife (NM).

- Clinical psychologist (CP).

- Clinical social worker (CSW).

Medicare coverage and payment rules vary for each of these practitioners. They all have some payment made on the same basis as physician payments or are limited by physician payments and would, therefore, be affected by the physician fee schedule in 1992.

The coding of the services of nonphysician practitioners for which there is separate coverage and payment under Medicare is currently not uniform. Some carriers instruct nonphysician practitioners to use alpha-numeric HCFA Common Procedure Coding System (HCPCS) codes for the services for which they may bill and other carriers instruct nonphysician practitioners to use codes from the Current Procedural Terminology, 4th Edition (copyrighted by the American Medical Association (1991)) (CPT) for the services they furnish. The CPT is a listing of descriptive terms and numeric identifying codes and modifiers for reporting medical services and procedures performed by physicians. The HCPCS includes CPT descriptive terms and numeric identifying codes and modifiers for reporting medical services and procedures and other materials contained in the CPT, which are copyrighted by the AMA. As part of the standardization of carrier payment practices, we plan to instruct all carriers to have nonphysician practitioners use CPT codes to bill their services if there is an applicable CPT code for the service. We intend to delete the alpha-numeric HCPCS codes that duplicate CPT codes. We would continue to maintain alpha-numeric codes for those services not included in the CPT. Although we show RVUs for the physical therapy codes for physical therapy modalities and treatments that are contained in the CPT (97010 through 97145), we are considering basing payment upon the alpha-numeric HCPCS codes for physical therapy visits (M0005 through M0008), which bundle the payment for the treatments and modalities into payment for the physical therapy visit. We request comment upon these alternative approaches to payment for physical therapy services.

Carriers would determine the payment amount for the nonphysician practitioner's service as described below, based on the type of nonphysician practitioner and the amount contained in the physician fee schedule for the service as represented by the CPT code. For purposes of data collection, we intend to develop standard nonphysician practitioner specialty designations to be used by all nonphysician practitioners billing independently using either CPT or HCPCS codes.

When a nonphysician practitioner furnishes a service that is covered as "incident to a physician's service", the service will generally be billed and paid as though a physician furnished it. This will be true, for example, for the services of NPs, PAs, and registered nurses. However, for other services, such as physical therapy furnished incident to a physician's service, payment for the physical therapy will be at the same level as if furnished by an independently practicing PT. Further discussion of these services follows with discussion of payment for all

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

items and services that are covered as "incident to a physician's service."

Section 6102(e)(7) of Public Law 101-239 requires the PPRC to conduct a study of the effects of the physician fee schedule on nonphysician practitioners. The results of the study, which addressed payment levels for these services, were summarized in the PPRC's 1991 Report to Congress.

a. Physical/occupational therapists (PT/OTs). Section 1848(j) of the Act defines "physicians' services for payment under the physician fee schedule" as including outpatient physical and occupational therapy services covered under section 1861(s)(2)(D).   Section 1848(a)(1) states that the fee schedule applies only to physicians' services otherwise paid on a reasonable charge basis.

Outpatient physical therapy, occupational therapy, and speech pathology are covered when furnished by a provider of servces (for example, a hospital, skilled nursing facility (SNF), HHA, a clinic, a rehabilitation agency, or a public health agency).   These services are paid on a cost basis according to sections 1832(a)(2)(C) and 1833(a)(2)(B) of the Act and would not be affected by the physician fee schedule.

In addition, the services of PTs and OTs (but not speech pathologists) in independent practice are also covered by Medicare.   Because these services are currently paid on a reasonable charge basis (according to section 1833(a)(2)(C) of the Act), they would be included under the physician fee schedule.   We intend to provide relative values for these services and they would be paid like all other physicians' services under the fee schedule.   There would be no difference in payment amounts for these services whether performed by physicians, by their employees, or by PTs or OTs in independent practice. However, the annual coverage limitation of $750, as mandated by section 1833(g) of the Act, would continue to apply to the services of independently practicing PTs and OTs.

b. Physician assistants (PAs). Section 1861(s)(2)(K)(i) of the Act provides for coverage of the services of PAs who are legally authorized to furnish these services in their State, under the supervision of a physician if the services are (1) furnished in a hospital, SNF, or nursing facility (NF), or (2) assistant-at-surgery services, or (3) furnished in a Health Manpower Shortage Area (HMSA). Payments for the services of PAs are presently limited by the amounts paid to physicians for the same service in accordance with section 1842(b)(12)(A) of the Act. For assistant-at-surgery services, prevailing charges of PAs are limited to 65 percent of the amount that would otherwise be recognized if the service was performed by a physician.   This limit would be continued under the physician fee schedule.

For services furnished in a hospital, other than assistant-at-surgery services, PA prevailing charges are presently limited to 75 percent of nonspecialty physician prevailing charges.   Section 6102(f)(4) of Pub. L. 101-239 changes this limit to 75 percent of the fee schedule amount effective January 1, 1992.

For all other covered services, PA prevailing charges are presently limited to 85 percent of nonspecialty physician prevailing charges.   Section 6102(f)(4) of Public Law 101-239 changes this limit to 85 percent of the fee schedule amount effective January 1, 1992.

Even after implementation of the fee schedule on January 1, 1992, we would need to continue to compute customary and prevailing charges for services by PAs and NPs (as described below).   This is because section 6102(f)(4) of Public Law 101-239

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
(Cite as: 56 FR 25792)

only limits PA and NP payment amounts by the specified *25797 percentages of the
physician fee schedule, but does not replace the current reasonable charge system
for these services.   Thus, payments for PA and NP services would be the lower of
the actual charge, the customary charge submitted by the PA or NP, the area
prevailing charge for the PA or NP, the inflation-indexed charge (IIC), or the
specified percentage of the physician fee schedule (except for services of NPs in
rural areas newly covered under section 1861(s)(2)(K)(iii) of the Act as added by
section 4155 of Public Law 101-508;  see section IV. A. 3. c. for details).

  c. Nurse practitioners (NPs) and clinical nurse specialists (CNSs). The services
of NPs are covered under two provisions of the law.   First, in accordance with
sections 1861(s)(2)(K)(ii) and 1842(b)(12)(A) and (B) as amended by section 6114 of
Public Law 101-239, services of NPs are covered if furnished in SNFs and nursing
facilities (NFs) and are subject to the same payment limitations as PAs. Therefore,
NP prevailing charges for these services are presently limited to 85 percent of
nonspecialty physician prevailing charges and would be limited by 85 percent of the
fee schedule amount effective January 1, 1992.

  Second, in accordance with section 1861(s)(2)(K)(iii) of the Act, as added by
section 4155 of Public Law 101-508, the services of NPs and CNSs are covered in all
settings effective January 1, 1991 if furnished in rural areas as defined under
section 1886(d)(2)(D) for the hospital prospective payment system. Under sections
1833(a)(1)(M) and 1833(r) (as added by section 4155 of Public Law 101-508), allowed
amounts must be limited to the lower of the actual charge or 75 percent of the
physician prevailing charge (75 percent of the physician fee schedule amount for
services furnished beginning January 1, 1992) for services furnished in a hospital
(including assistant-at-surgery services), and 85 percent of the physician
prevailing charge (85 percent of the fee schedule amount for services furnished
beginning January 1, 1992) for all other services. (Services of NPs and CNSs
furnished in these rural areas under the rural health clinic benefit provided for
in section 1832(a)(2)(D) of the Act continue to be paid on a reasonable cost basis
under section 1833(a)(3) of the Act).

  d. Certified registered nurse anesthetists (CRNAs). With the exception of certain
rural hospitals, payments for the services of CRNAs are made under the CRNA fee
schedule in accordance with section 1833(a)(1)(H) of the Act. The initial CRNA fee
schedule legislation allowed us to develop an appropriate methodology for paying
CRNA services so that aggregate payments for the services of CRNAs under the fee
schedule would remain budget neutral with respect to pre-fee schedule payments.
Under the initial fee schedule, we developed State-specific CFs for both medically
directed and nonmedically directed CRNAs.   The initial fee schedule was effective
for CRNA services furnished after December 31, 1988.

  Under the CRNA fee schedule, payment for CRNA services is determined by
multiplying the appropriate CRNA CF by the sum of allowable base and time units.
The base units are the same as those used to determine payment for physician
anesthesia services.   The time units are calculated in 15 minute units with a
partial time unit for fractions of 15 minutes.

  We designed the CRNA fee schedule so that it is very similar to the payment system
for physician anesthesia services.   Since we are proposing to eliminate time as a
separate payment element for physician anesthesia services, we are proposing the
same policy for CRNA services furnished beginning January 1, 1992.

  Section 4160 of Public Law 101-508 specified the CFs for the CRNA fee schedule for
CRNA services furnished after December 31, 1990.   For nonmedically directed CRNAs,

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the CFs were set at $15.50 in 1991, $15.75 in 1992, $16 in 1993, $16.25 in 1994, $16.50 in 1995, and $16.75 in 1996.   For medically directed CRNAs, the CFs were set at $10.50 in 1991, $10.75 in 1992, $11 in 1993, $11.25 in 1994, $11.50 in 1995, and $11.75 in 1996.   For years after 1996, these CFs are increased by whatever update factor is applied to physician anesthesia services.   The statute also specified in section 1833(1)(4)(D) of the Act that CFs for CRNAs may not exceed CFs for physician anesthesia services in the locality.

We currently use the same relative value guide for payment of CRNAs and anesthesiologists.   We would prefer to continue to use the same relative value scale for anesthesia services furnished by anesthesiologists and CRNAs.   We believe that it would be simpler for physicians, CRNAs, hospitals, and carriers.

It is our understanding that the CRNA CFs were established by the Congress based on an estimate of anesthesiologist CFs under the fee schedule using data from Phase I of the Harvard study.   Further, there is an indication that Congress intended that the non-medically directed rate be approximately equal to the national average anesthesiologist rate and that the medically directed CRNA CF be approximately 70 percent of the non-medically directed CRNA CF. (See Joint Committee Report--House Committee on Ways and Means, House Committee on Energy and Commerce, Senate Committee on Finance; 101st Cong., 2nd Sess., p. 11 (1990)).

Based on our current estimates of payments to anesthesiologists under the fee schedule, payments for non-medically directed CRNA services would be higher than physician anesthesia rates unless an adjustment is made.   On average, the non-medically directed CRNA CFs would yield a payment level of about 30 percent higher than the amount we would pay to anesthesiologists who personally perform the procedure.   This is inconsistent with the law.   While the statutory language specifies that the CRNA CF may not exceed the CF for physician anesthesia services, it is clear that what is intended is that the CRNA payment level not exceed what is paid to anesthesiologists.   This point is critical since the relative value scale and CF for physician services can be scaled to any particular number.   Moreover, if we limit payments only to non-medically directed CRNAs, because only these payments exceed payment to anesthesiologists, we cannot preserve the relationship now reflected in section 4160 between medically directed and non-medically directed CRNA CFs and anesthesiologist rates.

There are three objectives that we would like to satisfy in determining relative values for physician anesthesia services and applying the necessary adjustments to payment amounts for CRNA services.   First, we would prefer to keep the same relative values for both physician anesthesia services and CRNA services.   Second, we would want to assure that payments to a non-medically directed CRNA are limited to the fee schedule amount for personally performed physician anesthesia services in the locality.   To accomplish this, we could apply an adjustment to the payment amount for non-medically directed CRNAs to assure that payments using the CRNA statutory CFs and the scale under the physician fee schedule do not exceed what we would pay for a personally performed physician anesthesia service.   Finally, we would note that under our current estimates, payments for medically directed CRNA services would be 95 to 100 percent of the payment level for physician anesthesia services.   If the adjustment were made only to the payment amount *25798 for non-medically directed CRNAs, the relationship between medically directed and non-medically directed CRNA services intended by the Congress would be lost.   We are continuing to explore how we can maintain that relationship.

We invite public comment on the issues of using the same relative value scale for CRNAs as for physicians and applying an adjustment factor to the payment amount for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

non-medically directed CRNA services to assure that payments are not in excess of
the payment for physician anesthesia services.   Finally, we invite comments on the
issue of how we could maintain the relationship between medically directed and non-
medically directed CRNA payments.

  e. Nurse midwives (NMs). Payments for the services of NMs are presently made under
a special fee schedule in accordance with section 1833(a)(1)(K) of the Act. The
allowed amounts under the NM fee schedule, set forth in section 5257 of the
Medicare Carriers Manual, are the lower of the actual charge or 65 percent of the
prevailing charges of obstetrician-gynecologists or, if no specialties are
recognized, 65 percent of the nonspecialists' prevailing charges.   Section
6102(f)(7) of Public Law 101-239 changes this limit to 65 percent of the physician
fee schedule amount effective January 1, 1992.

  f. Clinical psychologists (CPs). There are two types of services that can be
independently billed by CPs:  (1) Therapeutic services and (2) diagnostic tests.
Allowed amounts for the therapeutic services of CPs are presently limited to the
lower of the actual charge or 80 percent of the prevailing charges of
psychiatrists.   A CP is a psychologist who meets the requirements now in manual
instructions promulgated by the Secretary to implement section 6113(a) of Public
Law 101-239 (which eliminates a restriction on psychologists' services to services
furnished at community mental health centers).   We are developing a separate rule
for paying for the therapeutic services of clinical psychologists.   Diagnostic
tests furnished by psychologists--whether certified CPs or otherwise--have been
covered and paid for under the diagnostic test provision of section 1861(s)(3) of
the Act, even before the qualified psychologist benefit provision was enacted.
Diagnostic tests furnished by independent psychologists who are not CPs are paid
under the reasonable charge system;  diagnostic tests furnished by CPs are paid a
fee schedule amount equal to 90 percent of the locality prevailing charge for
psychologists who enlisted before the CP benefit was enacted. (The 90 percent
reflects the fact that the average allowance is about 90 percent of prevailing
charges.)   Section 1848(j)(3) of the Act defines "physicians' services" covered
under the physician fee schedule as including diagnostic services (other than
clinical diagnostic laboratory tests) described in section 1861(s)(3).   It is our
intention that diagnostic tests furnished by CPs would be paid under the physician
fee schedule like all other fee schedule services beginning on January 1, 1992.
Psychological diagnostic testing furnished by psychologists who are not CPs would
be covered under the fee schedule if the testing is furnished incident to a
physician's service.   The payment amount for a diagnostic service would be the
same whether the service was done by a psychologist or a physician.

  g. Clinical social workers (CSWs). In accordance with section 1833(a)(1)(F) of the
Act, allowed amounts for the services of CSWs are the lower of the actual charge or
75 percent of the allowed amounts for CPs. The same distinction between therapeutic
and diagnostic services that applies to CPs also applies to CSWs. The allowed
amounts for CSW therapeutic services would therefore be limited to 75 percent of
the CP fee schedule amount.   Any diagnostic services furnished by CSWs would be
paid like all other services under the physician fee schedule.

4. Services of physicians to patients in provider settings and services of teaching
physicians

  Services of physicians to patients in provider settings (for example, hospitals,
SNFs, or CORFs) are subject to a number of special requirements. These
requirements, which are presently contained in § § 405.550 through 405.556,
distinguish between:  (1) Services that benefit an individual patient and are

* 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

generally payable by the carrier on a reasonable charge basis; and (2) services that are considered related to general patient care by the provider and are payable by the intermediary through the prospective payment system or on a reasonable cost basis.

Converting from the current payment system to the fee schedule will affect the amount of payment to physicians who furnish services in provider settings, including teaching physicians.   However, it will not change the requirements that must be met for the services of provider-based physicians (PBPs) to qualify for payment as physicians' services under part B. That is, payment for physicians' services to patients in a provider setting would be payable under the fee schedule only if, as under the present system, the services are personally furnished for an individual patient by a physician;  the services contribute directly to the diagnosis or treatment of an individual patient; and the services ordinarily require the services of a physician (§ 405.550(b)).   Additional specific requirements apply for anesthesiology, radiology, and physician laboratory services (§ § 405.552, 405.554, 405.556, and 405.557).   While physicians' services to individual patients in provider settings are generally paid on a reasonable charge basis, there are currently two methods for determining payments for physicians who are compensated by non-teaching providers for their direct patient care services. Under one method, the carrier bases the customary charges on the amount of compensation the physician receives for the direct patient care services. These are referred to as compensation-related charges, and the methodology for their construction is set forth in § 405.551.

The second method presently available under § 405.551(d)(3) is the per diem or per visit method.   Under this method, payment for these physician services may be made directly to the provider on the basis of a single per diem, per visit, or other time-related rate, if the provider, or the particular department in which the services are furnished, has a uniform all-inclusive rate for services to patients. This method is not widely used and is mainly used by government hospitals.

For teaching physicians (that is, physicians who involve interns and residents in the care of their patients), there are special requirements for determining whether their services are covered as "attending physician" services and for determining customary charges.   Under the fee schedule, the payment level for teaching ("attending") physicians would be the same as for all other physicians since customary charges are no longer applicable.

In addition, section 1861(b)(7) of the Act and implementing regulations (§ § 405.465 and 405.521(d)) currently allow a hospital to be paid on a cost basis for the direct medical and surgical services of teaching physicians if certain conditions are met.   While Public Law 101-239 did not specifically repeal this cost election provision, continuation of the cost election option would appear inconsistent with the overall purpose of the physician fee schedule.   However, if no change in this law is enacted before implementation of the fee schedule in 1992, this cost election would continue **\*25799** to be available to certain qualified teaching hospitals.

Section 1848 of the Act requires that all physicians' services currently payable on a reasonable charge basis be paid under the fee schedule beginning January 1, 1992.   Therefore, the direct patient care services of PBPs-- including those in teaching hospitals with the exception of those under the cost election provision-- would be paid for under the fee schedule on the same basis as other physicians. There no longer would be any need for computation of compensation-related customary charges or per diem or per visit charges since reasonable charges no longer would

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)                               Page 21
**(Cite as: 56 FR 25792)**

be the basis for payment of physicians' services once the fee schedule becomes
effective.   Section 1848, rather than the reasonable charge rules established to
pay for the services of hospital-based and teaching physicians, controls payment
for these services, particularly anesthesiology, radiology, and physician
laboratory services.   As noted above, however, we are retaining the policies for
distinguishing physician services furnished to individual provider patients, which
would be paid under the fee schedule, from services furnished under the prospective
payment system or reasonable cost payment.   We have, therefore, revised § §
405.550 through 405.552, 405.554, and 405.556 and transferred them to subpart F. We
have removed obsolete § § 405.553, 405.555, and 405.557.

We are retaining the requirements in the regulations and operating instructions
for determining when a teaching physician is considered an attending physician and
can bill for services performed by an intern or resident under his or her
direction. (For a more detailed explanation of the attending physician criteria,
see § 405.521(b) and Intermediary Letter 372.)   These attending physician criteria
for teaching physicians would remain in effect under the fee schedule. (That is,
the fee schedule would change the amount that Medicare pays, but not the services
for which it pays.)

On February 7, 1989, we published a proposed rule (54 FR 5946) setting forth
changes in the requirements for determining when a teaching physician can bill for
services involving the supervision of interns and residents and changes in the
policies for determining the customary charge of a teaching physician.   The
payment aspects for this rule would largely be irrelevant since customary charges
would no longer be applicable under the fee schedule.   We have, therefore,
modified § § 405.521, 405.522, and 405.580 to reflect the change to the fee
schedule.   Those portions of the regulations for determining when a teaching
physician's services are covered (that is, when the attending physician requirement
is met) would be retained. With respect to the proposed changes in the attending
physician criteria that were the subject of the aforementioned proposed rule, we
plan to finalize this rule in the future.

5. Payment for supplies, services, and drugs furnished incident to a physician's
service.

a. Supplies. Section 415.32 sets forth the policies we are considering to address
payment for services and supplies incident to a physician's service. This proposed
policy on payment for supplies is consistent with our preferred approach to a site
of service differential explained later in section VI. A. Specifically, in §
415.32(a), we propose that, except for drugs and certain supplies, office medical
supplies are considered to be part of a physician's practice expense and payment
for them is included in the practice expense portion of the payment to the
physician for the medical or surgical service to which they are incidental.
Because some carriers have made separate payment for some of these supplies under
the current customary, prevailing, and reasonable charge system, in developing the
fee schedule, we are considering allocating dollars currently paid for these
supplies across all practice expense RVUs for office-based procedures.

In § 415.32(a), for certain facility-based services performed in office settings,
we propose to establish a separate fee schedule allowance for the following medical
supplies if they are used:

- Lumbar puncture trays.

- Venous access catheters.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01                                                           Page 22
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

- Thoracentesis trays.

- Cystoscopy trays.

- Surgical trays.

- Catheter insertion trays.

- Bone marrow aspiration trays.

These are relatively expensive, disposable supplies that are dedicated to the use of a single beneficiary and are essential to the performance of procedures that can usually be safely and effectively performed in a physician's office. The following list provides examples of services for which we might allow a separate fee schedule payment when the procedure is performed in a physician's office:

| CPT-4 code* | Procedure |
|---|---|
| 12020 ........ | Treatment of superficial wound dehiscence; simple closure. |
| 32000 ........ | Thoracentesis, puncture of pleural cavity for aspiration, initial or subsequent. |
| 36495 ........ | Insertion of implantable intravenous infusion pump or venous access port. |
| 62270 ........ | Spinal puncture, lumbar, diagnostic. |
| 85095 ........ | Bone marrow smear and/or cell block; aspiration only. |

*Copyright 1991 American Medical Association.

We considered several options for making payment for these expensive supplies under section 1848(c)(4) of the Act, which gives us authority to establish ancillary policies:

Option 1--Bundle these supplies into the payment for the relevant services. However, we are concerned that we could not properly identify all of the procedures for which some of these supplies could properly be used (for example, surgical trays).

Option 2--Exclude these supplies from the fee schedule and leave it to each carrier to pay for these items on a reasonable charge basis.

Option 3--Permit separate billing for these supplies, but pay a national fee schedule add-on for these supplies.

We are considering adopting Option 3.   We considered and rejected the idea of adjusting the fee schedule amount for these office medical supplies by the GPCI. Since we have no reason to believe that the prices for the items vary substantially by geographic area, we would base the fee schedule on the estimated national average allowed charge for the item.   We believe that making payment for disposable supplies used for ASC, inpatient hospital, and outpatient based procedures performed in the office setting may add an incentive to move these procedures to the office setting, when medically appropriate.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
(Cite as: 56 FR 25792)

Part B Medicare Annual Data (BMAD) files do not contain the detailed data needed to establish separate allowances for our proposed list of supplies. There are only 3 HCPCS codes under which these types of supplies are currently coded: A4550--"surgical tray", A4300--"implantable vascular access portal catheters" and 99070--"supplies and materials (except spectacles), provided by the physician over and above those usually included in the office visit or other services rendered."

Therefore, we sent a survey questionnaire to all carriers to collect data on their current allowances for the items included in our list.   From those carriers stating that they have a policy to pay separately for supplies, we *25800 propose to determine national average allowed charges for these supplies.   We are also in the process of obtaining catalogs from national surgical supply companies to review information on list prices for the supplies for which we are considering allowing a separate payment.   Based on our analysis of these data performed thus far, we expect to establish a fee schedule payment amount for selected supplies used for a facility-based procedure when it is performed in the physician's office.   We are also considering limiting this proposed policy to only ASC procedures or to some other subset of procedures.   We will continue to study this issue, and invite comments on the proposed policy.

We are especially interested in receiving comments on the issues of (1) our method of establishing fee schedule amounts for these office medical supplies, (2) the content of the list of office medical supplies for which we propose to provide separate payment, and (3) whether payment for such supplies, if made, should be limited to procedures on the ASC list or some other subset of procedures. Commenters who want additional office medical supplies to be placed on this list should provide a specific rationale for why the supply should not be considered to be routine practice expense and should provide supporting information on the cost of the office medical supply to physicians. Reference to items such as "trays" or "packs" should itemize the specific contents.

b. Services furnished incident to a physician's service. We propose in §415.32(b) that services of nonphysicians that are covered as incident to a physician's service would be paid under the fee schedule as if the physician had furnished the service.   This is a continuation of current practice under reasonable charge payment in which the physician bills reasonable charges for the services of staff that are incident to the care as if the physician had furnished the services personally.   These services and items typically include the services of health professionals such as nurses or PAs who furnish a service under the direct supervision of a physician, for which the physician bills.   For example, a registered nurse under the supervision of a physician may see a patient on the physician's behalf to administer an injection.   The physician would bill for the injection as if the physician had administered it.   Several CPT codes (for example, minimal established office visits and physical medicine codes) acknowledge these arrangements.

We request public comment on whether the policy of paying the same amount for the service whether furnished personally by a physician or by someone incident to a physician's service should continue.   The salary of the nonphysician staff is a practice expense and the physician work in these services is arguably non-existent or at least something less than if the physician furnished the service directly. Because physicians bill for these services as if they furnished them personally, we do not know to what extent these services furnished by physician staff without a patient encounter are billed and paid as physician services.  We are considering whether to require use of a modifier when these services are furnished by physician staff so that we can evaluate both their frequency and the amount of payments made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01                                                   Page 24
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

for them.

c. Drugs. The program currently pays for drugs furnished in physician's offices that are not self-administrable under the "incident to" provision set forth in section 1861(s)(2) of the Act. For the most part, drugs paid for under the "incident to" benefit consist of drugs furnished by injection or by infusion. This includes chemotherapy agents.   Generally, carriers base payment for the drug on the physician's estimated cost of the drug using one of the wholesale price guides such as the Red Book. However, some carriers base payment on actual acquisition costs determined on the basis of carrier surveys.

We considered the following options for paying for drugs under the fee schedule:

Option 1--Establish a fee schedule payment amount for each drug.

Option 2--Bundle the payment for the drug into payment for the visit or consultation service.

Option 3--Make a separate payment for a drug and leave the pricing of the drug to each carrier.

Option 4--Make a separate payment for a drug but require a consistent method in pricing to be used by the carriers.

We believe that ultimately there should be a national fee schedule allowance for all "incident to" drugs.   However, given the large number of different drugs and the myriad of dosage levels, we have decided that it is not practical for us to consider establishing a national drug fee schedule at this time. However, we will consider this issue in the future.   Section 1848(j)(3) of the Act gives us the authority to specify that items and services be excluded from the fee schedule. Thus, we have decided to exclude the cost of drugs from the national fee schedule and to continue to pay for them under the current "reasonable charge" system.   We believe, however, that there is a need for greater consistency in how drugs are paid for under the program and for this reason we have chosen Option 4.   For purposes of payment for drugs furnished incident to a physician's service, the term "drug" includes those covered drugs and biologicals that cannot be self-administered.   Also, we are proposing that we will instruct all carriers to base payment for drugs on 85 percent of the national average wholesale price of the drug (as published in the Red Book and similar price listings), but we welcome comments regarding the appropriate discount.

Medicare policy, since the beginning of the Medicare program, has been to base payment for "incident to" drugs on the estimated acquisition costs. However, based on studies by the Office of the Inspector General (OIG) ( "Changes to the Medicaid Prescription Drug Program Could Save Millions" (ACN 06-40216) and "Use of Average Wholesale Prices in Reimbursing Pharmacies in Medicaid and the Medicare Prescription Drug Program" (A-06-89-00037)) and other information, we believe that the Red Book and other wholesale price guides substantially overstate the true cost of drugs.   The OIG reports indicate that pharmacies are getting an average discount of 15.9 percent off the published wholesale price.   We have no reason to believe prices paid by physicians are any higher than pharmacies pay.   Moreover, we are proposing for very high volume drugs that payment for the drug would be limited to the lower of the estimated acquisition cost for the drug as determined by us and specified in instructions to carriers or 85 percent of the national average wholesale price for the drug.   The listing of the high volume drugs and payment limits for them will be included in the Medicare Carriers Manual.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

56 FR 25792-01
56 FR 25792-01, 1991 WL 299895 (F.R.)
**(Cite as: 56 FR 25792)**

 We propose this payment policy for drugs that are incident to physician services under the authority of section 1842(b)(8) of the Act, which permits us to establish limits on charges based on inherent reasonableness.   This provision of the law is implemented in regulations at § 405.502(g).   The regulations permit us to establish a limit on the reasonable charge for an item or service if we determine that charge is grossly lower than or in excess of acquisition or production costs for the item or service (§ 405.502(g)(1)(vi)).

 As indicated in our previous discussion, we base the payment *25801 limitation for drugs on the findings of the OIG with regard to the discounting of drugs to pharmacies below the average wholesale price.   We believe that physicians also have the opportunity to achieve these discounts from drug manufacturers and wholesalers, since drug sales are dependent upon the drugs a physician prescribes for his or her patients, not only for administration in the physician's office, but also for self-administration or administration in a hospital or other institution. Therefore, we believe that physicians are in an excellent position to demand discounts such as those that the OIG study finds are typically given to pharmacies.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.