UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) ) ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | ) ) ) ) |

**TRIAL OF CLASSES 2 & 3 CLAIMS**

### AFFIDAVIT OF BRIAN GAROFALO
### SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF
### OF DEFENDANTS BMS AND OTN IN TRIAL OF CLASSES 2 & 3 CLAIMS

DISTRICT OF COLUMBIA    )
                        )ss:
                        )

BRIAN GAROFALO, being duly sworn, deposes and says:

1. I am currently Director, Strategic Alliances and Ally Development at Amgen, Inc. From 1996 until April 2005, I worked in the oncology division of Bristol-Myers Squibb ("BMS") in Plainsboro, New Jersey.

2. I graduated with a BBA from St. Bonaventure University in 1982.

3. Prior to my employment with BMS, I was employed with Hoechst Roussel Pharmaceuticals for approximately ten years.

4. From 1996 until 1999, I worked at BMS in Franchise Business Development and Strategic Planning. One of my responsibilities included assembling the Oncology Division's strategic plans from components I received from the sales, marketing,

clinical (medical), finance and executive departments. In this role, I had frequent contact with the executives running the oncology group, including Rick Winningham and Frank Pasqualone. In 1999, I assumed a new role as an oncology Associate Director of Policy, functioning as a liaison between the oncology community (patients, physician professional societies and advocacy organizations) and various business groups within BMS. In 2002, I was promoted to Director of Patient Alliances, with many of the same responsibilities. In this role, my policy work primarily focused on issues relating to cancer patients' access to quality and innovative care that included BMS's and all oncology drugs. A major part of my job was communicating with various members of the oncology community, particularly groups representing office-based oncologists (such as The American Society of Clinical Oncologists (ASCO) and patient advocacy groups. I communicated what I learned about these issues to various people in BMS oncology, including Frank Pasqualone. Even after I assumed my role as Director of Patient Alliances, I continued to be involved with the oncology group's strategic planning process.

5. In these positions, I became familiar with reimbursement system for oncology drugs, including Medicare and Medicaid reimbursement. I was generally aware of the 1992 HFCA regulation regarding reimbursement for Medicare Part B drugs at AWP, the 1997 statute changing reimbursement to AWP minus 5% and the various OIG and other government reports regarding reimbursement, which disclosed that providers' acquisition cost was often below AWP. Through my work in the industry and the cancer community, I came to understand that reimbursement for oncology drugs was often based on AWP. I understood the AWPs on which reimbursement were based to be the amounts published in the industry publications (by First DataBank, Redbook and Medispan). I also understood that provider's acquisition cost may not be the same number as AWP and could be substantially lower than AWP in some cases. It

never occurred to me (or to my knowledge anyone else at BMS) that CMS, other government officials, or other people focused on reimbursement thought AWP meant something different than the AWPs the publications published.

    6.  BMS was interested in the reimbursement for oncology drugs because its customers, including office-based oncologists, were interested in that subject. Oncologists took the position that the reimbursement for practice expenses that include the service of administering the drug was completely inadequate, and there was considerable support for that position. We, as well as many in the cancer community, were concerned that if reimbursement for drugs was decreased without a concomitant increase in reimbursement for services, oncologists would decide that they could no longer treat patients in office-based clinics. This would cause a shift in the site of care to hospitals, which would not be good for patients and ultimately BMS. Patients would be displaced and the optimal care they were used to receiving would be jeopardized. The model that delivers highest quality cancer care and assures greatest patient access is predominately given in the community oncologist's office and BMS's oncology business operations was strongest under that model. We were also interested in the subject of reimbursement because there were a number of proposals floating around Congress to regulate the prices of drugs. We did not care whether AWP or some other standard was used for reimbursement so long as patients had access to care at office-based clinics and drug prices were determined by market factors.

7. BMS was most interested that a patient had the ability to receive and a physician had the ability to deliver the highest quality and most innovative care – of which BMS was a leader in developing.

*[signature]*
Brian Garofalo

Sworn to before me this
7th day of November 2006

*[signature]*
Notary Public

Gloria S. Yancey
Notary Public, District of Columbia
My Commission Expires 02-14-2009