UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL No. 1456 ) ) ) Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | ) ) ) ) ) |

**TRIAL OF CLASSES 2 & 3 CLAIMS**

AFFIDAVIT OF ZOLTAN SZABO
SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF
OF DEFENDANTS BMS AND OTN IN TRIAL OF CLASSES 2 & 3 CLAIMS

STATE OF NEW JERSEY   )
                     ) ss:
COUNTY OF            )

ZOLTAN SZABO, being duly sworn, testifies as follows:

1. I am currently and have been since June 2002 the Senior Director of Pricing and Reimbursement for the U.S. Pharmaceuticals Group of Bristol-Myers Squibb Company ("BMS"). The U.S. Pharmaceuticals Group includes virtually all drugs marketed by BMS in the United States including primary care, generics, oncology and virology. I report to Alan Medici, Vice-President of Business Operations; Mr. Medici reports to Tony Hooper, President of U.S. Pharmaceuticals. I, and the BMS employees who report to me, have responsibility for, among other things: (i) reporting BMS's wholesale list prices to industry publications and (ii) maintaining data on the company's contracts with customers and rebates to managed care and institutional entities.

2. I received an A.B. from Brown University in 1984 in applied mathematics and economics and an MBA in finance from New York University in 1988.

3. I have been employed at BMS since 1988 in a variety of finance and pricing positions. From July of 1997 to June of 1999, I was Director of Pricing and Economics. From July 1999 until August 2000, I was Director of Finance for BMS's Latin America/Canada Division. In September 2000, I became Director of Finance for BMS's Oncology/Virology Division. In June 2002, I assumed my current position.

4. While BMS has undergone a number of reorganizations during the period relevant to this litigation, its prescription drug business could be characterized as falling into three fundamental groups: (a) an oncology and virology group (including a wholly-owned subsidiary, Oncology Therapeutics Network, Inc.[1], that distributed BMS and other manufacturers' oncology products) with responsibility for physician-administered drugs; (b) a primary care group with responsibility for self-administered drugs; and (c) a separately-incorporated subsidiary, Apothecon, with responsibility for both physician-administered and self-administered generic drugs. BMS sold assets relating to Apothecon to Biochemie U.S., Inc. in 2001. All the drugs at issue in this trial were marketed by BMS's oncology and virology groups.

5. Pricing and Reimbursement contains four groups. There is a Managed Care Contract Operations Group, which supports the managed care group by developing contract proposals for HMOs, PBMs and insurance companies, and analyzing rebates to be paid to these companies. This group is primarily focused on BMS's primary care drugs, not the oncology drugs at issue in this trial. The Government and Public Programs Operations Group does

---

[1] BMS sold OTN in 2005.

reporting and negotiations with State Medicaid programs, reporting to CMS and contracting with the Veterans Administration and the Department of Defense. This is the group that reports AMP, ASP and Best Price to CMS. Another group is Pricing and Economics which has a strategic and analytical function and works with the BMS brand marketing teams regarding pricing, discounting and rebating. The fourth group reporting to me is Pricing and Institutional Operations. This group is responsible for reporting BMS list prices to the publications and negotiating contracts for oncology and other drugs with institutions such as hospitals, group purchasing organizations ("GPOs") and long-term care facilities. (*See* Defendants' Exhibit 2591 at Bates Numbered page BMS/AWP/00056955, an organization chart showing the organizational areas that report to me.)

BMS List Prices

    6.  The group within Pricing and Institutional Operations that reports pricing information to industry publications such as Red Book, First DataBank and MediSpan reports to me, and is headed by Denise Kaszuba, Associate Manager of Pricing Support, who has been in that position since 1991. It is my understanding that BMS has never reported average wholesale prices ("AWPs") to the publications. Rather, BMS has reported direct and list prices. Generally, the publications have calculated AWPs by multiplying BMS's list prices by a mark-up factor of 20% to 25%. BMS does not control the mark-up factor that the publications use to calculate AWPs. On one occasion, in 1992, when some of BMS's oncology drugs had a mark-up of 20.5% and others had a mark-up of 25%, Ms. Kaszuba asked the publications to standardize on 25%. One of the publications (Redbook) agreed to that request but the other two (MediSpan and First DataBank) did not. In addition, beginning in 1999, BMS made it clear in its communications to the publications that its list prices did not include discounts, but that had no

impact on the way that the publications calculated AWPs. (*See* Defendants' Exhibit 2627 at Bates Number FDB-AWP-18630.) BMS uses the AWPs calculated by the Publications for a variety of internal purposes, but BMS does not communicate them to payors such as Medicare or third party payors ("TPPs"). I understand that TPPs and other payors rely on the Publications for their AWP information.

7. For oncology drugs, BMS generally establishes an initial list price (called the WLP or Wholesale List Price) at launch that will enable BMS to cover its costs, including its research and development costs, and earn a profit, and yet be low enough to incentivize customers to purchase the product. The WLP is the price that appears on invoices to wholesalers, who in turn sell the products to medical providers such as doctors or pharmacies. BMS does not sell prescription drugs directly to consumers.

8. Most of the BMS oncology products at issue started out as branded single-source products. For most oncology products, at the time of launch, there is very little discounting, and most of BMS's sales are at or near, i.e., within 5%, of WLP.[2] In most cases, after launch, and while the product is protected by a patent, BMS periodically announces price increases, but we only do so if we believe that customers will be willing to pay the increased price. In most cases, substantial numbers of customers are willing to pay the increased price. To my knowledge, BMS has never increased its list prices unless it expected to achieve significant sales at the new, higher price and has not increased its list prices to create "spreads" for the drugs at issue in this case.

9. In some cases, even though a product is protected by a patent, it can face what is commonly referred to as "therapeutic competition". That is where other products, often

---

[2] For an analysis of the sales of BMS in relation to WLP, see the testimony of BMS's expert Gregory Bell.

patented products, can be used to treat the same illness. For time to time, to incentivize customers to purchase patented products that face competition, BMS offers discounts or rebates. Those discounts and rebates do not affect WLP. A list price, by definition, does not include discounts or rebates. Nevertheless, for most patented products, even where there have been discounts or rebates, there also have been significant sales at or near list price.

10. If the price concession is offered at the time of sale to the downstream customer, this is referred to as a "discount," and a chargeback will be paid to the wholesaler. If the downstream customer is entitled to a price concession after the original sale, this is called a rebate. Rebates are usually paid or credited directly to the downstream customer and do not affect the wholesaler.

11. When the patents expire for oncology products, BMS generally does not make further increases in WLP.

12. For oncology drugs, BMS often attempts to compete with generic versions that enter the marketplace by offering discounts, but in many cases there are still customers who are willing to pay list price at least during the period immediately following the entry of a generic product. Even if the average transaction price is going down, it would not make sense for BMS to lower list price because it would be losing revenue from those customers who are willing to pay the list price, since no customer would pay more than list price.

13. It is my understanding that if BMS did not report WLPs to the publications, its customers (physicians and institutions) could not obtain reimbursement for BMS drugs from Medicare, Medicaid and insurance companies, and, therefore, there would be virtually no demand for BMS's drugs.

BMS's Databases

14.     For the time period relevant to this case, BMS had a number of electronic databases, which contained sales and pricing information for its pharmaceutical products, including the oncology drugs at issue in this trial. None of these databases contained AWP pricing information. The BMS Prime Vendor (or "chargeback") system contained information relating to BMS sales through wholesalers. This system captured the discounts relating to sales to BMS's ultimate customers such as physicians, hospitals and HMOs. First, BMS entered into a contract with a customer such as a physician, hospital or HMO, which entitled the customers to acquire the drug at a reduced price. BMS then sold the drug to the wholesaler at WLP, usually less a 2% discount for prompt payment within 30 days; the wholesaler in turn sold the drug to the customer at the discounted price, and then received a "chargeback" from BMS, equal to the difference between the discounted price the customer paid and the WLP. The Prime Vendor system was maintained by the Prime Vendor Operations Group. There was no reference to AWP pricing in the Prime Vendor system. Defendants' Exhibit 2624 is an excerpt from the Prime Vendor database, as it existed during the period of time relevant to this case.

15.     The SHARP system was a sales subledger database, which tracked BMS's direct sales to wholesalers, including units sold at list price and various discounts from gross sales, to get to net price. This database was not customer specific. The SHARP database was maintained by BMS Finance. The SHARP database contained no reference to AWP pricing. BMS employees interfaced with the SHARP database through, among other software systems, a system called "COPS". Defendants' Exhibit 2625 is an excerpt from the COPS system that reflects data fields used in the SHARP database.

      16.    Another database BMS used was the List Price Master File, which contained list prices for all BMS drugs by NDC code. This system was used to create invoices for BMS direct buying customers. The List Price Master File did not contain AWPs. This database was maintained by Denise Kaszuba. Defendants' Exhibit 2623 is an excerpt of data displayed from the List Price Master File.

_____
                                   Zoltan Szabo

Sworn to before me this
16th day of November 2006

_____
         Notary Public

**STEPHANIE TRESSEL**
**NOTARY PUBLIC OF NEW JERSEY**
Commission Expires 11/18/2009