UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) ) ) ) ) ) ) | MDL No. 1456<br><br>Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | | |

**TRIAL OF CLASS 2 AND CLASS 3 CLAIMS**

**AFFIDAVIT OF MARSHA PETERSON SUBMITTED AS DIRECT TESTIMONY IN CASE-IN-CHIEF OF DEFENDANTS BMS AND OTN IN THE TRIAL OF CLASS 2 AND CLASS 3 CLAIMS**

STATE OF NEW JERSEY    )
                       ) ss:
COUNTY OF SOMERSET     )

MARSHA PETERSON, being duly sworn, deposes and says:

1. I am the former Western Manager of Sales for Oncology Therapeutics Network, J.V., a Delaware limited partnership ("OTN"). I submit this affidavit based on personal knowledge and files in the possession of OTN as direct testimony in the case-in-chief of defendants Bristol-Myers Squibb Company ("BMS") and Oncology Therapeutics Network Corporation ("OTN Corporation") in the trial of Class 2 and 3 claims in the above-captioned action.

*Educational and Employment Background*

2. I graduated from University of Wisconsin - LaCrosse in 1978 with a bachelor of science degree in medical technology. For the first ten years after college, I worked as a medical technologist for several different laboratories. Thereafter, I was a capital equipment salesperson for various diagnostic testing companies.

3.  In September 1999, I was hired by OTN as a Regional Business Development Manager. (The title later changed to "Territorial Business Development Manager." I will refer to the position by the original acronym "RBDM" or simply as a "sales representative.") As such, I was a sales representative for OTN in a territory comprised of 13 states in the Northwest region of the country. My job was to call on customers and prospective customers and to sell them OTN's product lines and services.

4.  At the end of 2001, I was promoted to Western Manager of Sales and my territory expanded to two-thirds of the nation. I supervised the six OTN sales representatives in my area and maintained relationship with top accounts. I also had responsibility for training sales representatives. I was laid off from OTN in August, 2006. I am currently employed as a District Sales Manager at Novaquest, a pharmaceutical company located in New Jersey.

*OTN And Its Sales Force*

5.  OTN is a specialty distributor of prescription drugs primarily to office-based oncology practices ("OBOs"), but also to rheumatology and urology practices – basically doctors who perform infusions. OTN does not sell to hospitals or managed healthcare organizations. OTN's competitors are other full-service specialty distributors, such as Oncology Supply, Florida Infusion and U.S. Oncology.

6.  OTN has two different types of salespeople assigned to a particular customer, commonly referred to as "inside" and "outside" representatives. The "inside" group, consisting of approximately twelve "Account Representatives" or "ARs" are physically located in OTN's offices. Their primary function is to sell our products and services over the phone. They also provided customer service. The "outside" group, consisting of me (before I became a manager) and eleven other RBDMs are in the "field" visiting the customers' in their offices. Each sales representative is responsible for a territory that consists of 1-13 states. Typically an outside representative would

have a minimum of three years sales experience and sometimes as much as twenty years. Annexed hereto at Tab A (Defs' Ex. 2605)[1] is a document that sets forth the "Roles and Responsibilities" of, among other jobs at OTN, the RBDM and the Account Representative. The "RBDM Education/Training Checklist" annexed at Tab B (Defs' Ex. 2606) provides a more detailed insight into how we train our outside sales representative to do their jobs.

7.      During most of my tenure at OTN, the Company was a wholly-owned subsidiary of BMS. However, OTN's salespeople – both outside and inside – did not promote BMS products over those of other manufacturers unless there was an advertised promotional program going on. We engaged in similar promotional programs for other manufacturers and their products as well. We could not have successfully distributed for other manufacturers or competed with other specialty distributors had we not treated all manufacturers equally.

8.      From the perspective of an OTN salesperson, the main benefit of OTN's corporate relationship with BMS was that BMS had a much bigger sales force than we did and their sales representatives had established contacts with their local medical communities. BMS sales representatives were helpful in introducing OTN "outside" representatives to potential customers in their territories, although other manufacturers' sales representatives would also extend this courtesy as well. (See "RBDM Education/Training Checklist," Tab B at BMS/AWP/001483057).

9.      The manufacturers' sales representatives and the OTN sales representative had different roles vis-a-vis medical practice customers. The manufacturer's sales representative role *was* to promote his or her company's product over that of another manufacturer by meeting with the doctors and nurses to discuss the clinical attributes of the drugs. The OTN RBDM, by contrast, was focused on selling products regardless of the identity of the manufacturer and the relative clinical attributes of the products. Our sales technique focused on two areas: (1)

---

[1] Each document attached hereto has been cross-referenced to its corresponding exhibit number on the joint-defendants' exhibit list as "Defs' Ex. __."

competitive price on drugs and supplies and (2) superior service and knowledge of customer needs, both as compared to other specialty distributors.

*OTN and Manufacturer Pricing*

10. The price that OTN charges a customer for a drug or supply depends on several criteria. Attached at Tab C (Defs' Ex. 2614) is a presentation entitled "Price Segments" that I co-authored as part of a training exercise for sales representatives that describes those criteria. Generally speaking, members of regional buying groups, such as the Midwest Oncology Practices, are eligible to receive their prices for drugs through contracts between the buying groups and manufacturers. OTN enters into separate contracts with these buying groups for terms other than price, such as service levels, returned good policies, payment terms and on occasion additional on-invoice discounts that OTN gives for purchases made on-line. In some cases, OTN's price to the customer is below what the manufacturer charges OTN for the drug. In those situations, OTN obtains a "chargeback" from the manufacturer to make it whole.

11. For customers who do not have manufacturer pricing negotiated through a buying group, OTN sets their prices based on factors such as whether the customer uses our Lynx machines (discussed below) and the customers' past and prospective purchase volumes. We divided the customers into "tiers" based on this last factor and each tier was quoted a price that corresponded to a "mark up" over the price at which OTN itself acquired the drug. These are general rules and OTN salespeople, with appropriate approvals from their superiors, could depart from them if competitive conditions (i.e., pricing from another distributor) warranted.

12. When OTN was a BMS subsidiary, BMS drugs were treated a little differently. OTN did not actually buy drugs from BMS or wholesalers, but rather acted more like a sales agent for BMS with office-based customers. OTN received a commission from BMS on our shipments of BMS products. For customers that did not have access to a GPO contract with BMS,

BMS authorized OTN to quote to different customers different prices, down to a "floor price." OTN salespeople needed to obtain permission from BMS personnel to offer any price below the prevailing "floor."

13.     Finally, customers that did not have access to manufacturer-GPO pricing might nevertheless be eligible for manufacturer rebates if the customer met the buying criteria for earning the rebate. Part of the OTN sales representative's job was to make our customers aware of such manufacturer programs in the marketplace.

14.     In all cases – whether a BMS drug or another manufacturers' drug – the OTN price to the customer was based on objective factors (such as the customer's status and buying history), manufacturer offerings, and the competition from other specialty distributors. The OTN sales representatives did not charge prices designed to achieve "spreads" from the customers' reimbursement rates with their third-party payors. As the Court will see from the document at Tab A, the role of the RBDM is to derive "profitable revenue" for *OTN* – not the customer – through sales. Further, the recommended sales technique does not focus merely on price of the goods but the "value of OTN and its service offerings."

*OTN Services*[2]

15.     One cornerstone of the OTN service offering was the "LYNX Station," a secure drug cabinet that could store both refrigerated and non-refrigerated products for use by oncology practices. The Lynx Station could communicate with OTN's computer system to facilitate drug ordering. The system also captures a practice's prescribing information and aggregates the data from OTN's clients to create reports that permit a physician to compare its own data to the prescribing patterns of the other oncology practices on both a national and regional level.

---

[2] I understand that another OTN employee, Mr. John Akscin, is providing an affidavit in this case that includes pictures of the Lynx machines and the Lynx-2-OTN AWP Price Report upon which I have touched below. I refer the Court to Mr. Akscin's affidavit for a more detailed discussion of those services.

Checklist (Tab B), under the headings "Travelbag" and "Planning/Strategies" emphasize some of the common areas of discussion with customers.

19. After meeting with a customer, the sales representative is required to submit "Site Notes" to their manager. (See Tab B at BMS/AWP/001483056.) These Site Notes summarize pre-meeting goals of the sales representative, the content of the meeting, and follow-up or "action" items for OTN. Generally, the notes were memos created with a word processing program, although later we developed a dedicated software system for such notes.

20. Annexed hereto at Tabs F-J (Defs' Exs. 2599, 2619-22) are examples of notes that I myself made or that sales representatives that I supervised made. I believe they provide the Court with a good flavor of what our interaction with clients was like, although I understand that they are somewhat "skewed" in that the plaintiffs requested only those site notes that made reference to specific terms like "reimbursement" or "AWP."

21. If one looked at all of the site notes that I made or received (not just the ones that mentioned the searched for words), one would see very few references to reimbursement issues as a proportion of total issues discussed. The topic of margins or spreads was even more rare, only a few practices raised this issue and even then only when one drug had generic or strong therapeutic competition with another drug. Sometimes a customer had a question about the price and/or AWP of one drug versus another. Sometimes a customer expressed more general concern about Medicare rules affecting their practices and the difficulties of dealing with payors.

22. In the former cases, we gave the customer basic price information, explaining any discounts or rebates that were available and AWPs. In the latter cases, the RBDM was instructed to give the customer the name of someone else who could better help. Our in-house resource on reimbursement issues was John Akscin, OTN's Vice President of Government Affairs, and we also referred customers to outside billing, coding and reimbursement consultants.

A practice could also connect the Lynx Station to its own computer system to assist in billing. OTN had employees in its sales department called "Lynx Customer Service Representatives" and "Application Specialists" that maintained the hardware and software for the Station and computers with which it was connected. See Tab A for a discussion of these persons' roles and responsibilities.

16. Another important service that OTN offered its customers was "Lynx-2-OTN," our web-site. Among many other things, it allowed customers to order on-line, to check their purchase history and to compare that history with published Average Wholesale Prices ("AWPs") – or a percentage thereof – that Medicare and some private payors used to reimburse our clients for the drugs they bought from us.

17. I do not view this web-site service as "marketing the spread." AWP information was an integral part of some of our customers' practices. The computerized information we provided simply allowed our customers to calculate their own spreads more easily than if they had to look through paper invoices and a telephone book-sized industry source like the Red Book. Annexed hereto at Tab D (Defs' Ex. 2593) is an example of what a customer invoice looked like. Annexed hereto at Tab E (Defs' Ex. 2618) is a memorandum from one of our sales representatives who reported a customer's expressed satisfaction with the web site. (See Tab E at BMS/AWP/01489216).

*Interaction With Customers*

18. Sales representatives discuss many topics with customers, including (i) whether a practice is receiving the drugs that it orders in a timely and efficient manner; (ii) OTN prices compared to that of other distributors; (iii) manufacturer rebates or other special offers applicable at the time of the visit; (iv) the use of or problems with the LYNX machine; and (iv) information available through OTN's website and web-linked third-party sources. The Training

*Conclusion*

23. I feel very strongly that I, and the sales representatives that I supervised, acted ethically, properly and within industry guidelines in our dealings with OTN's customers. I look forward to explaining to the Court how our industry worked and why, I believe, any allegations of improper spread marketing on the part of OTN or BMS are without merit.

_____<br>Marsha Peterson

Sworn to before me this _15_
day of _NOV_, 2006

_____
Notary Public

JAMES O'SHEA
NOTARY PUBLIC OF NEW JERSEY
COMMISSION EXPIRES JUNE 6, 2010