UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456<br><br>Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLASS ACTIONS ) ) ) ) ) | Judge Patti B. Saris |

## DECLARATION OF HARVEY J. WEINTRAUB

I, HARVEY J. WEINTRAUB, hereby declare:

### Background

1. I have personal knowledge of the facts stated in this Declaration, and they are true and correct. I am competent to testify relating to the matters contained herein.

2. I reside at 34 Woodcrest Drive, Convent Station, New Jersey. I am seventy-seven (77) years old. I was born on May 21, 1929 in Providence, Rhode Island.

3. I currently work part-time as a sales and marketing consultant for Midland Healthcare ("Midland"). I have been a consultant for Midland since early 2005. Midland sells generic pharmaceutical products.

4. From 1953 until 1993, I was employed by Schering Corporation ("Schering"). I retired from Schering as a Vice-President in 1993. I started working with Warrick in 1993, shortly before my retirement. I worked as a consultant in sales and marketing for Warrick Pharmaceuticals Corporation ("Warrick") from 1994 through the end of 2004.

### Education

5.     In 1952, I received my Bachelor of Science in Pharmacy from the University of Rhode Island College of Pharmacy. I then became a registered pharmacist, and I worked "behind the counter" in pharmacies in both Rhode Island and Massachusetts. To maintain my status as a registered pharmacist, I participated in continuing education programs every year until the early 1990s. Since then, I have been on inactive status.

6.     Since graduating from college, I have taken various graduate school courses. For example, while I was working as a sales representative for Schering in Massachusetts, I took graduate business courses at Boston University. Later, while working in Connecticut, I took graduate business courses at the University of Hartford. I took these courses in the evenings while working for Schering during normal business hours. Later in my career, I attended business education programs at the Harvard Business School, the Wharton School of Business, and the Syracuse University Graduate School of Business.

### Employment History

7.     During my forty years at Schering, I held various jobs. I started as a professional sales representative in Massachusetts calling on physicians, pharmacies, and hospitals. I was then promoted to Hospital Sales Representative. In that position, I called on major hospitals in Rhode Island and Massachusetts.

8.     In 1958, I was promoted to the Manager of the Albany District Field Sales Force, which covered the region from upstate New York to Ohio. I became Eastern Regional Sales Manager in 1967. In that position, I supervised a field force of 10 District Managers, 3 Regional Sales Specialists, 10 Hospital Representatives, and 115 Sales Representatives.

9.     In 1973, I was promoted to Director of Marketing Services, a home office

position in New Jersey. In this position, I provided Schering management with marketing information, analysis, and systems support. In 1975, I was promoted to Director of Marketing Planning and was responsible for the direction, planning, and coordination of Schering's new and established over-the-counter products. In 1979, I became Director of Marketing Planning for Schering prescription products.

10.     I was promoted to Vice President for Marketing Communications and Services for prescription and over-the-counter products in 1980. A year later, I became Vice President for Sales for Schering. I was responsible for managing Schering's entire U.S. sales operation. I supervised approximately 800 Schering employees.

11.     In 1991, I became Vice President for Marketing and Sales Services. In this position, I managed various aspects of the operations of Schering and Key Pharmaceuticals, a subsidiary of Schering. As noted above, I retired from Schering at the end of 1993.

12.     Following my retirement from Schering, I became a consultant for Warrick. I assisted the Warrick organization with various tasks relating to sales and marketing. For example, I contacted certain existing or prospective customers on behalf of Warrick, and I performed various analyses for Warrick with respect to its generic pharmaceutical product lines. Over time, I also worked with Warrick's sales force, and was involved in pricing decisions concerning Warrick products.

13.     Initially, my primary focus was to prepare Warrick to compete effectively in the generic market for albuterol sulfate. Schering had long been a market leader with its Proventil® brand of albuterol products. However, those products began to lose their patent protection in the early 1990s. As generic competition emerged, Schering would inevitably lose a substantial portion of the market. Warrick's business objective was to compete for market share in the

generic market.

## Creation of Warrick

14. Since it was created in 1993, Warrick has marketed and distributed exclusively generic products. These are products that are substitutable for drugs that are no longer subject to patent protection. Many of Warrick's generic products were first researched and developed by Schering and were once single-source products marketed under a Schering brand name. For example, Warrick marketed generic albuterol sulfate, the same chemical compound as Schering's Proventil®, both of which are used to treat asthma. Warrick also marketed some generic products under licenses from other manufacturers.

15. At the time Warrick was established, the use of generic drugs was growing rapidly, and it was clear that this trend was going to continue. Warrick was formed in an effort to compete for continued sales of Schering brand products, such as albuterol sulfate, that had lost patent protection. Warrick was created as a subsidiary to Schering to participate in this growing and competitive generic market.

16. Warrick was incorporated under the laws of Delaware, with its home offices in Union, New Jersey. Warrick is a wholly owned subsidiary of Schering. Schering's parent company is Schering-Plough Corporation, which is a holding company.

17. Warrick did not operate or do business under the Schering name. Warrick established sales prices for its products (generally on a customer-by-customer basis). Schering did not set, approve, or report Average Wholesale Prices for Warrick drugs. At the same time, Warrick shared certain resources with its parent company, Schering, pursuant to a number of contracts. For example, Schering provided financial services and human resources management for Warrick. In addition, Warrick used contract manufacturers to produce its products. This was

necessary because of the need to get to market quickly, and because pharmaceutical manufacturing is very complex and manufacturing plants are costly to build, license, and maintain. When a Warrick product was chemically identical to a Schering product, Warrick would contract with Schering to manufacture the product.

### Generic Marketplace

18.     The generic market in which Warrick operated differed greatly from the branded market. Prior to joining Warrick in 1993, I dealt exclusively with the brand side of the pharmaceutical business, and I did not have any experience selling generic drugs. In order to learn the generic drug business, I spoke with the customers I knew over my many years working at Schering. I asked them for information pertaining to the generic drug market.

19.     As a result of these efforts, I learned that there were several significant differences between brand and generic drugs. First, I learned that a generic drug was frequently preferred over its brand equivalent because it was a cheaper, substitutable version of the brand drug. Prices for generic drugs generally dropped over time due to vigorous competition in the generic drug market. This occurred in the generic market because usually numerous companies manufactured and distributed generic equivalents. In contrast, brand drugs tended to have prices that were stable or went up over time.

20.     Second, the prescribing physician didn't control which manufacturer's version of a generic drug was dispensed. Instead, any manufacturer's version of a generic drug could be dispensed as a substitute when a generic drug was prescribed. When prescribing albuterol, for example, the prescribing physician did not typically determine the manufacturer of the albuterol to be dispensed. As a result, the patient might receive any version of a generic stocked by the pharmacy.

21.     Third, whereas brand drugs typically had a single list price, generally referred to as wholesale acquisition cost ("WAC"), that was applicable to all customers, the prices of generic drugs varied from customer to customer and from class of trade to class of trade. This occurred because generics operated much like commodities, and generic manufacturers competed based on price. As other generic manufacturers sought to gain share by offering a lower price to Warrick customers, Warrick would usually meet the competition by matching the price. Thus, customer-by-customer prices would change as Warrick met competitive conditions.

### Albuterol Sulfate Solutions

22.     Warrick's albuterol sulfate solutions, both the 0.083% and 0.5% products, were used to treat the symptoms of asthma, chronic bronchitis, emphysema, and other lung diseases.

23.     Warrick's albuterol sulfate solutions were primarily self-administered. They were dispensed by pharmacies for patients to use at home with the help of a machine called a nebulizer. Warrick did not market or sell albuterol to physicians.

24.     Warrick launched both albuterol solutions in the early 1990s, at a time when several other branded and generic versions of albuterol sulfate had already been introduced to the market.

### Marketing Practices

25.     In order to sell its products, Warrick hired three experienced former Schering Sales Directors: Al Graf, Jerry Sherman, and Walter Gough. These individuals were called National Sales Directors, and they were the "outside" salesmen who called on Warrick's customers. Collectively, Mssrs. Graf, Sherman and Gough had over one hundred years of sales experience between them. Because they were so experienced, they generally called on national generic buyers for chains, wholesalers, and generic distributors. Mssrs. Graf, Sherman and

Gough covered the entire United States for Warrick, and the three of them continue to work as National Sales Directors for Warrick.

26. From the beginning, and through the time I left Warrick, Warrick had only about 60 to 70 customers for generic drugs in the United States. Because Warrick's customers generally stocked a single product for each bioequivalent, and because these customers commanded a significant share of the market, competition for each customer was intense.

27. Even though Warrick had a small number of customers, those few customers commanded a major share of the generic albuterol sulfate market and had a centralized purchasing process  For example, Walgreens had approximately 5,000 drug stores, but only one generic buyer decided which generic product to buy and stock in all those stores. Warrick thus pursued its interests by focusing on chain pharmacies, full-line wholesalers, and generic distributors that purchased generics on a national basis.

28. Warrick competed on a number of bases, including the breadth of its product portfolio, production capacity, customer service levels, reputation, and price. Warrick communicated these key sales points to its customers.

29. Warrick customers were advised that Warrick's albuterol generics were manufactured using the identical facilities, specifications, and personnel as those used to manufacture the well-known Schering brand Proventil® line of products. This helped Warrick's sales efforts because the customers were familiar with the Proventil® albuterol products that had been on the market for years.

30. Warrick customers were assured that Warrick had the ability to provide product in sufficient quantity and deliver it to customers consistently and reliably. Warrick also had another advantage: Warrick had a "full line" of albuterol products, i.e., syrup, tablets, solutions,

and aerosols. Because Warrick carried all forms of albuterol, the customer could do "one-stop shopping" at Warrick for all albuterol needs.

31. Finally, Warrick competed in the generic marketplace based on price. Usually, Warrick would match the price of its generic competitors in order to obtain and maintain business. Warrick offered customers certain discounts and rebates, including prompt-pay discounts, line-based rebates, market-share rebates, and stocking allowances. Warrick typically met lower prices offered by competitors to significant customers.

### Classes of Trade

32. Warrick sold primarily to three classes of trade: chain pharmacies, full-line wholesalers, and generic distributors.

### (1) Chain Pharmacies

33. The first class of trade was chain pharmacies. Chain pharmacies were required to have at least ten (10) stores and a free-standing warehouse, although most chain pharmacies had significantly more than ten (10) stores. Examples of chain pharmacies to which Warrick sold are Walgreens, Kroger, Wal-Mart, CVS and Rite-Aid. In contrast, retail or independent pharmacies were not affiliated with a large chain and might be described as "mom and pop" pharmacies. Warrick focused on the larger chains, since it would have been inefficient and uneconomical for Warrick to call on, ship to, and invoice thousands of individual independent/retail pharmacies. Chain pharmacies usually had one centrally located generic buyer that placed orders for the entire chain on a national basis. Warrick also sold to non-warehousing chains for delivery through a wholesaler. Warrick delivered its product to a chain warehouse or the chain pharmacy's wholesaler. Thus, Warrick was able to dispense a large volume of product by using a small sales staff (three salespersons) selling to large, national accounts.

34. In order to meet competition in the generic marketplace, Warrick offered chain pharmacies various discounts and rebates, including deferred and prompt pay discounts, product rebates, full line and market share rebates, and stocking allowances. Not all chains received the same price, rebates, and discounts from Warrick. These individual negotiations and transactions were conducted on a customer-by-customer basis and were driven by price competition at the individual customer level.

35. Warrick was not involved in chain pharmacies' resale of Warrick's products to their customers. Warrick never received any portion of the money that chains received from their customers in connection with the resale of Warrick products. In other words, Warrick received no commission or other compensation derived from subsequent or downstream sales of its products to end-consumers of chain pharmacies. Rather, Warrick's product sales revenue was limited to the price it negotiated with and received from the chain pharmacies' central office buyer.

### (2) Wholesalers

36. The second primary class of trade to which Warrick sold its generic products was wholesalers. The wholesaler acted as a "middleman": Warrick sold product to the wholesaler, which then sold that product to its customers under contracts negotiated between the wholesaler and its customers. The wholesaler's customers included pharmacies, hospitals, nursing homes, non-warehousing chains, hospital-buying groups, home health care facilities, assisted care facilities, physician buying groups, Health Maintenance Organizations ("HMOs"), buying groups, and others. Warrick did not sell its products directly to these customers. For example, Warrick sold product to McKesson, which maintained numerous warehouses across the country and sold to thousands of different customers on a national basis at different prices.

37.     Warrick negotiated contracts with its wholesaler customers, the pricing terms for which varied from customer to customer. In fact, although a particular wholesaler contract referenced a particular price, that price may not have remained in effect for the life of the contract. For example, if a competitor approached a Warrick customer with whom Warrick already had a contract and offered a competing generic product at a lower price, Warrick was required to respond by matching the competing price, or lose the business. In many instances, Warrick had as little as forty-eight (48) hours to respond to a competitor's price, or risk losing the business.

38.     Further, while Warrick would sell to a wholesaler at a particular price, and would receive that price from the wholesaler, the amount Warrick eventually recognized on that sale was subject to significant adjustments that would only be calculated and paid well after the original sale. For instance, Warrick would sell product to a wholesaler (or a chain for that matter) under a market share program. Under such programs, the wholesaler was entitled to a sliding-scale rebate depending on what market share of Warrick products was achieved in a quarter, as compared to a market basket of competing products. Such market share rebates were generally calculated and paid quarterly in arrears.

39.     Similarly, most wholesalers had one form or another of a "committed member" or "source" program. Under these programs, the wholesaler agreed to provide customers who joined the program the lowest cost generic available in exchange for the customer agreeing to take whatever manufacturer's FDA-approved generic was supplied by the wholesaler. These arrangements allowed wholesalers to group demand for a single low-priced generic and negotiate a better price with manufacturers, which wanted to have their product included in these high-volume programs. However, the proportion of a wholesaler's purchases that would then be

resold as part of a "committed member" or "source" program could not be determined until well after the sale from Warrick to the wholesaler. The adjustments to sales price from Warrick to the wholesaler required by these types of programs were generally handled by way of "chargebacks," which I describe below.

40.     Warrick, like many manufacturers, sometimes would pay a "chargeback" to a wholesaler. Warrick typically paid a "chargeback" when a wholesaler sold to an entity that happened to have a contract with the wholesaler or Warrick entitling it a lower price. For example, Warrick might have directly contracted with a chain pharmacy to sell its product for $3. Warrick might have directly contracted to sell the same product to a wholesaler for $5. If that chain pharmacy obtained Warrick's product from the wholesaler, perhaps for administrative or operational convenience, the chain pharmacy would pay $3 (plus an add-on charge agreed to between the wholesaler and the chain pharmacy), and Warrick would then pay that wholesaler the $2 differential in order to make the wholesaler "whole" on that particular transaction.

41.     This chargeback system was common throughout the pharmaceutical industry, and had been in place for decades. It allowed for more efficient product distribution in the pharmaceutical marketplace.

42.     Finally, the amount Warrick realized on a sale to a particular wholesaler (or chain) was often affected by a price reduction that occurred as a result of meeting competitive conditions. If Warrick chose to meet a competitor's price (which most of the times it did), it would be required to provide the customer with a credit for the difference between its old price and new price for all of Warrick's product that was currently on the customer's inventory. If Warrick did not meet a competitor's price, the customer would have the right to return all of Warrick's product in its inventory for a credit at the old price, and replace it with the competitor's

product at the new price.

43.     Generally, when Warrick sold to an intermediary, such as a wholesaler, Warrick did not know the price at which the wholesaler resold the product to a pharmacy or providers. For example, the wholesaler might have paid Warrick $5 for the generic product. Warrick then would have no idea when, where, or to whom the wholesaler resold the product. The wholesaler might have sold it to a single retail pharmacy in a rural town for $7, to a hospital for $6.50, or to a nursing home for $6. Warrick had no involvement in these transactions unless the wholesaler sold to a particular customer who happened to have a contract with Warrick.

44.     Similarly, Warrick did not obtain, or attempt to obtain, information pertaining to the ultimate customers who purchased or received Warrick's products. In fact, a particular product might have been resold several times after it left Warrick's hands. Warrick received nothing more than the price it negotiated with and received from its customers. Warrick did not receive any additional money based on subsequent resale of its products, if any, by wholesalers to their customers.

### (3) Generic Distributors

45.     The third class of trade to which Warrick sold its generic products was generic distributors. Since approximately 2001 or 2002, generic distributors have been referred to almost interchangeably with wholesalers, because many wholesalers have acquired generic distributors. The significant difference between the two was that a wholesaler carried brand drugs, generic drugs, and other related products, whereas generic distributors tended to carry only generic drugs.

46.     Prior to 2001 and 2002, generic distributors were generally in the business of selling product to independent retailers and to some small chains.

47. Because of my relative inexperience in the generic distributor segment of the industry, Warrick hired Bi-Coastal Pharmaceutical Corporation to act as Warrick's broker in dealing with generic distributors.

48. Warrick did not know or request information pertaining to the prices Warrick's generic distributor customers charged their customers for Warrick's generic products. Warrick also did not obtain information regarding how many times a particular Warrick drug was resold after it left Warrick's manufacturing facility. Warrick did not receive additional monies or compensation from its generic distributor customers in connection with any resale of Warrick's generic products.

### Wholesale Acquisition Cost

49. I am familiar with the pricing term "WAC" or "wholesale acquisition cost." Warrick, however, did not routinely use this term in its business.

50. Warrick did not regularly or routinely publish a list or catalog of Warrick's sales prices. Warrick did not have a single, list WAC price for its generic products. Instead, Warrick used the term "invoice price," which was the undiscounted price at which Warrick invoiced its wholesale customers for generic products. These prices varied from customer to customer, based upon circumstances and competition.

### Average Wholesale Price

51. In the pharmaceutical industry, AWP was generally understood to be a benchmark or reference price. I never understood AWP to have any relationship to a generic drug's actual price, average or otherwise. In my experience, this understanding was industry-wide. AWP was simply a reference price from which other prices were negotiated.

### (1) Establishment of AWP

52. When I joined Warrick in 1993, I did not know how AWPs were established in the generic drug industry. I learned from Ed Edelstein at First DataBank that in order for a generic drug to be listed as a "generic" in the First DataBank publication, its AWP should be set between 10-20% below its brand equivalent. At no time did Mr. Edelstein – or anyone else – tell me that AWP was or should be an average of marketplace transactions charged by wholesalers to their customers.

53. As a result, Warrick followed the general industry practice and generally set its AWPs at levels that were 10-20% below the branded version of the drug.

54. I was aware that other generic competitors had, from time to time, significantly higher AWPs listed in the pricing books. However, as I have stated previously, that was not relevant to how Warrick sold its generic drugs. I did not focus on the relative AWPs because my interactions with Warrick's customers told me that they were interested in obtaining our lowest competitive price.

55. Given the multiple classes of trade to which Warrick sold, the multiple prices at which its drugs sold, and post-sale price reductions, as described above, Warrick could not report a single AWP that would have had a uniform relationship to the multitude of changing prices at which it sold its drugs. Warrick simply suggested an AWP at the launch of a product and, in almost all instances, left it untouched for the life of the product.

56. Warrick did not receive any revenue from payors based on reported AWPs, and Warrick did not seek to increase its market share as a result of the AWP system. Warrick's albuterol solutions were highly attractive to customers because of their quality, availability, price, and service provided by Warrick.

## (2) Changes to AWP

57.     Warrick typically suggested an AWP at launch and, in almost all instances, left it untouched for the life of the product. The only changes in AWP on Warrick's albuterol that I am aware of occurred in 1993 and 1995, when I was new to the generic industry and did not understand the practice in the generic industry was to keep AWPs constant. In 1993, I lowered the AWP once on the 0.083% solution, and, in 1995, I raised the AWP twice on the 0.5% solution.

58.     With respect to the 1993 change, I notified First DataBank that Warrick was lowering the AWP on one of the package sizes of 0.083% solution. I did this in order to make the AWPs the same for all forms of the product on a per unit basis.

59.     With respect to the 1995 changes on the 0.5% product, Warrick had a rare opportunity to increase the price of its product. This was unusual because generic products typically went down in price over time due to price competition. In this instance, however, Warrick was the only producer of the 0.5% solution in the market because a competitor was having manufacturing problems. Consequently, Warrick twice increased the price it charged most of its customers for the 0.5% solution to take advantage of changed competitive dynamics. Based on my experience working at Schering with brand drugs and my inexperience in the generic business, I assumed that the AWP needed to be increased proportionately with the sales price, as was the custom in the brand industry. Therefore, I raised the AWP on the 0.5% albuterol solution twice in 1995 to correspond with actual increases in prices on that product to Warrick customers. I later learned that it was not the custom in the generic industry to change AWPs when actual prices changed, either up or down. Thus, I did not subsequently alter Warrick's AWPs.

60.	By increasing the AWP for the 0.5% albuterol solution in 1995, I did not intend to make this product more attractive to customers by increasing third-party reimbursement. In fact, the AWP increase was made simultaneously and in proportion with an actual increase in the price of the product.

61.	Warrick never changed the AWP on its largest selling product, the inhaler, even though generic competitors had higher AWPs. Warrick never raised the AWP for the 0.083% solution, which was a much bigger seller than the 0.5% solution.

62.	Warrick has not changed any AWPs on any of its generic products since 1995.

63.	At no time did I ever change any Warrick AWP in order to affect third-party reimbursement.

### (3) Marketing Practices

64.	Warrick did not sell its drugs by discussing spread, AWPs, or Medicare reimbursements. Warrick's sales personnel were not instructed to discuss spreads between AWP and acquisition costs with customers, pharmacies, or providers, and they did not make comparisons of any spreads on Warrick's products with its competitors. Warrick competed on price, reliability of supply, reputation, and contacts in the industry.

65.	No one at Warrick to my knowledge has ever sold or attempted to sell a Warrick drug by discussing Medicare reimbursement or relative reimbursement amounts. I never instructed anyone at Warrick to discuss AWP or reimbursement amounts in order to sell Warrick's drugs. I was never instructed by anyone to do so.

66.	Warrick did not provide calculations comparing its products with competitors' products based on the spread between acquisition cost and AWP. Warrick did not instruct customers to calculate the spread between the AWP and the customer's acquisition price and to

compare that to a competitor's spread. Between the nature of Warrick's customers and the small size of Warrick's sales force, it would have been difficult, if not impossible, to sell based on reimbursement. A Walgreens with 5,000 stores in states across the country would likely be getting reimbursed by thousands of providers in a multitude of ways. There was no way I or other members of my sales force could have known, much less marketed, based on reimbursement. What we could do – and did do – was market based on quality, availability, service, reputation, contacts, and price.

### (4) Knowledge of Reimbursement Rates

67. Warrick did not monitor the thousands of private and public reimbursement programs adopted by third party payors for its products, nor did it pay any attention to the various methods by which they reimbursed for drugs. These reimbursement methodologies, levels, and prices were irrelevant to Warrick's business. Warrick sold its generic products based on availability, reliability, and price competition. Accordingly, it would have been a waste of time and resources for Warrick to have attempted to track, monitor, and understand the varying and numerous reimbursement methodologies employed by the thousands of third-party payors in the United States drug market.

68. Warrick did not receive reimbursement from third-party payors or any revenue from payors based on reported AWPs. Warrick did not receive any additional monies or other compensation in connection with any federal Medicare program.

69. Warrick had contracts for direct sales to some third party payors, including Blue Cross Blue Shield of Massachusetts, going back to the early 1990s. Exhibit 2904 is a 1994 contract between Warrick and HMO Blue, Blue Cross & Blue Shield of Massachusetts for the purchase of both the 0.083% and 0.5% albuterol sulfate solutions at discounted prices. Exhibit

2906 is a 1995 contract between Warrick and HMO Blue, Blue Cross & Blue Shield of Massachusetts for the purchase of albuterol sulfate solution at discounted prices.  Exhibit 2905 is a 1996 contract between Warrick and HMO Blue, Blue Cross & Blue Shield of Massachusetts for the purchase of albuterol sulfate solution at discounted prices.  These are accurate and fair representations of contracts, kept in the regular course of business, that Warrick had with Blue Cross & Blue Shield of Massachusetts.

18

I declare under penalty of perjury that the foregoing is true.

_____
Harvey J. Weintraub

EXECUTED this 15th day of November, 2006 in Convent Station, NJ 07960