UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) <br> AVERAGE WHOLESALE PRICE ) <br> LITIGATION ) <br> ) | MDL NO. 1456 <br> Civil Action No. 01-12257-PBS |
| ) <br> THIS DOCUMENT RELATES TO ) <br> THE TRIAL OF CLASS 2 AND ) <br> CLASS 3 CLAIMS ) <br> ) <br> ) | Hon. Patti B. Saris |

**TRIAL DECLARATION OF WILLIAM C. PEARSON**

William C. Pearson, declares as follows:

1.  Prior to my retirement on February 28, 2005, I worked for Ortho Biotech Products, L.P. ("Ortho Biotech") for about 16 years. Ortho Biotech is a wholly-owned subsidiary of Johnson & Johnson.

2.  Ortho Biotech develops, manufactures and markets biotechnology-derived products. One of the products Ortho Biotech sells is Procrit®, which is a recombinant form of human erythropoietin used to treat anemia. I understand that Procrit is the only Ortho Biotech product that is at issue in this lawsuit.

3.  I joined Ortho Biotech in 1989 as a District Manager. The company was then setting up its initial marketing and sales infrastructure in contemplation of the Procrit launch, which eventually took place in January 1991. I was then promoted to a number of different positions, all of which involved continued responsibility for Procrit. From 1991 to 1993, I was a Regional Business Director with responsibility for the southern region of the United States. From 1993 to 1997, I was the Field Sales Director. In 1997, I was promoted first to National Sales Director and then to Executive Director of the Strategic Customer Group. In 1999, I was promoted to Vice President of the Strategic Customer Group, a position I held until my retirement. Starting in 2003, I was given added responsibilities and the additional title of Vice President of the Oncology Franchise, which I also held until retirement.

4.  Before coming to Ortho Biotech, I worked for Ortho Pharmaceuticals Corp. from 1974 to 1989. Ortho Pharmaceuticals was another subsidiary of Johnson & Johnson.

## SUMMARY

5. Ortho Biotech has sold Procrit since 1991. Throughout the time periods at issue in this case, the following key facts have remained true:

- Procrit's AWP was set at a formulaic 20% above its list price.
- Procrit was sold subject to modest rebates and discounts, which were offered to only certain market sectors. I have reviewed the calculations of Procrit "spreads" put forward by plaintiffs' expert and these appear generally accurate, i.e., the average differential between Procrit's selling price and AWP was less than 30%.
- The modest rebates and discounts Ortho Biotech offered on Procrit were public, advertised and fully disclosed in compliance with all legal requirements.
- Ortho Biotech adopted conservative marketing policies and directed its sales force not to promote Procrit on the basis of margin or profit. Ortho Biotech instructed its sales force to sell Procrit on its clinical merits.
- Ortho Biotech marketed Procrit to payors based on its lower cost to the health care system. Ortho Biotech encouraged CMS to adopt policies that would result in lower drug costs.
- Ortho Biotech has been actively involved in patient assistance and has donated about $205 million in drug and cash to ensure all patients who need Procrit receive it.

## DETAILED STATEMENT

### SECTION ONE
### THE TREATMENT OF ANEMIA

6. Erythropoietin ("EPO") is a natural human hormone produced in the kidneys that stimulates stem cells in the bone marrow to produce red blood cells. If the natural production of EPO is compromised due to conditions such as renal failure, AIDS or because of the effects of chemotherapy, the patient's body will not produce an adequate number of red blood cells. The resulting condition is known as anemia.

7. Anemia can be very debilitating. Patients with the condition can experience constant and extreme tiredness to the point of being rendered immobile. Other common symptoms include shortness of breath and dizziness. If the anemia is severe there is a risk of angina, headache and leg pains. The body's ability to fight infection is also compromised.

Anemic patients are often suffering from a larger malady giving rise to the anemia – such as renal failure, AIDS or cancer – but it is the anemia that often has the most immediate effect on the patients' quality of life.

8.  Until the 1980s, there was no effective treatment for anemia. The best doctors could do for patients suffering from the condition was to try and increase their red blood cell count through repeated blood transfusions. Transfusions were difficult for the patient, offered limited clinical efficacy, and exposed the patient to the risk of rejection and of contamination from the foreign blood.

9.  In the early 1980s, scientists at Amgen, Inc. ("Amgen") achieved a breakthrough in the treatment of anemia. They cloned the gene coding for production of EPO and developed genetically engineered cell lines capable of producing recombinant human EPO in pharmaceutically useful quantities. The generic name for this synthetic form of EPO is epoetin alfa.

10. Amgen developed epoetin alfa but did not have the resources at that time to pursue all potential indications for the cell line. Instead, it executed a Product License Agreement ("PLA") with a predecessor to Ortho Biotech in 1985, which split the development and marketing rights for epoetin alfa. Pursuant to the PLA, Amgen retained the exclusive right to market and sell epoetin alfa in the United States for use in end stage renal disease patients undergoing dialysis. The PLA gave Ortho Biotech an exclusive license to develop, market and sell epoetin alfa in the United States for use in patients with anemia associated with all other conditions. Amgen's epoetin alfa came to the market under the brand name Epogen®; Ortho Biotech's epoetin alfa came to the market under the brand name Procrit.

11. At the present time, Ortho Biotech markets Procrit in the United States for the following approved non-dialysis indications: anemia associated with complete or partial renal failure in pre-dialysis patients, anemia in AIDS patients receiving AZT therapy, anemia in cancer patients receiving chemotherapy, and anemia in patients undergoing elective surgery.

## SECTION II
## PROCRIT PRICES

12. Ortho Biotech launched Procrit in January 1991. At launch, Ortho Biotech forwarded its list (or WAC) prices and recommended AWPs to Procrit's distributors and to the independent price publishers (*i.e.*, *Drug Topics Red Book* published by Thompson Medical Economics, the *Blue Book* published by First Databank, and *Medi-Span Master Drug Data Base* published by Facts & Comparisons, Inc.). From the outset, Ortho Biotech recommended that Procrit's AWP should be 120% of the list price.

13. By the time Procrit launched in 1991, Epogen had already been on the market for about 18 months. Because Procrit and Epogen are the same drug, physicians were using Epogen to treat both dialysis and non-dialysis patients. To address this situation and reclaim the markets reserved to Ortho Biotech under the PLA, we offered targeted and modest price concessions, which were limited to non-dialysis physicians and to vial sizes that were generally used in Ortho Biotech's indications.

14. Between 1991 and 1997, Ortho Biotech did not increase Procrit's list prices on any of its different vial sizes or packaging configurations. Procrit's AWPs, which are fixed at 20% above the list prices, did not change during this period.

15. Ortho Biotech increased Procrit's list price for the first time in February 1997. The increase applied only to the 10,000 unit vial. The list price on the six vial package

increased from $570.00 to $589.80. The price of the 25 vial package increased from $2,375.00 to $2,475.50. The prices for all other Procrit NDCs remained the same.

16.  Following the first price increase on selected packages of the 10,000 unit vials in 1997, Ortho Biotech raised selected list prices seven times, in January 1998, in January 2000, in November 2000, in September 2001, in June 2004, in December 2004, and in April 2005. Several of these increases were limited to particular NDCs. As before, on those occasions when Ortho Biotech recommended an AWP, the recommended mark up over the list price was 20%. Ortho Biotech stopped submitting recommended AWPs altogether when it increased its list prices in June 2004.

17.  Whenever Ortho Biotech raised the list price on Procrit it did so because it expected to capture additional revenue by selling at the higher price. The majority of sales to all market sectors for the time at issue were at prices close to list price, because our rebates and discounts were modest. And roughly one-fifth of Procrit reaches patients through retail pharmacies, which typically purchase Procrit from wholesalers at or about list price. (Patients who obtain Procrit at a retail pharmacy typically self administer the drug.) Any price increase on Procrit, therefore, resulted in everyone in the market paying a higher price. Put differently, price increases on Procrit were just like price increases on any other product in any other market.

18.  Ortho Biotech openly promoted its price-related incentives in the market, and routinely advised physicians to report them to Medicare and Medicaid when making reimbursement claims. For example, the physician rebate was widely advertised and promoted. Sample promotional flyers for the physician rebate program in 1994 and 1995 are attached as Defendants' Exhibits 2757 and 2758. These promotional materials specifically advised

physicians to report the rebates to Medicare, Medicaid, and other third-party healthcare programs:

> This rebate represents a discount on PROCRIT for Medicare, Medicaid and certain other third party health care programs and as such should be properly disclosed and reflected when making claims.

19. Similarly, although competitive concerns dictate that the specific contract terms are confidential as between Ortho Biotech and the physician, the price incentives paid under rebate contracts established in 2001 are not confidential.

20. Defendants Exhibits 2763 and 2765 are examples of Ortho Biotech's physician rebate contracts specifically advising physicians that they must report any price incentives they receive to Medicare, Medicaid, and other health care programs, as follows:

> **Pricing and Discount Disclosure**
>
> Customer and Participating Physicians are hereby advised that they are obligated to:
>
> 1) fully and accurately disclose the cost of all Products purchased hereunder – including any discounts, rebates, or other price reductions – in cost reports or claims for reimbursement by Customer and Participants to Medicare, Medicaid, or other health care programs requiring such disclosure, and
>
> 2) provide such documentation to representatives of the Secretary of the Department of Health and Human Services and state agencies upon request.

21. Since passage of the Medicare Modernization Act, Ortho Biotech has been reporting its contracted physician price concessions to the Centers for Medicare & Medicaid Services. The discounts are reflected in the average selling price reported to CMS, which CMS publishes on a quarterly basis. And Ortho Biotech has always complied with other federal price reporting requirements, including Medicaid best price reporting.

## SECTION III
## ORTHO BIOTECH'S CONSERVATIVE MARKETING POLICIES

22. Ever since I have been at Ortho Biotech, the company has directed its sales force not to promote Procrit on the basis of margin or profit.

### 1991 To 2001

23. Ortho Biotech company policy was always that Procrit should not be marketed to physicians based on potential profit or margins. Ortho Biotech's direction to the sales force was very simple: to go out and sell Procrit on its clinical merits as a drug that could effectively treat patients suffering from anemia due to the side effects of chemotherapy and other conditions. The sales force was explicitly told that it should avoid any discussions relating to profit or margin.

24. Our corporate policy grew out of a focus on educating physicians about the merits of our drug, but it also had an economic rationale. Ortho Biotech offered very limited rebates and discounts to physicians. We were also increasing physician prices by eliminating price concessions through much of the late 1990s.

25. In 2000, when the launch of a competing product was imminent, we got some unique insight into how physicians viewed Procrit from visits with employees of U.S. Oncology, the nation's leading cancer care physicians' network. We learned that Procrit was classified by U.S. Oncology as a "red light" drug whose usage was disfavored in comparison to more profitable "yellow light" and "green light" drugs. We learned too that physicians in U.S. Oncology's network who elected to administer Procrit to their patients ran the risk of forfeiting the opportunity to participate in U.S. Oncology's "reward pool," because there were other oncology products that were more profitable. Indeed, it was reported to us that some of U.S. Oncology's physicians claimed that "when they use more Procrit, they lose more money." A

contemporaneous business record summarizing U.S. Oncology's negative assessment of Procrit's reimbursement position is annexed as Defendants' Exhibit 2761.

26. The primary focus of discussions with physicians in this period was on the need to treat anemia and the clinical benefits of Procrit. Procrit had no direct competitors. Therefore, the question of whether it was more or less profitable than its alternatives came up infrequently. There were no alternatives, other than blood transfusions, which were not comparable in terms of patient benefit or clinical efficacy.

27. Defendants' Exhibit 2866 is a 1998 sales training document educating prospective product specialists about the uses of Procrit in treating anemia patients. I attach this document as an example of our sales focus during this period. Nowhere in that training document does it mention marketing Procrit based on profit or financial incentives.

## 2001-Present

28. In 2001, Amgen received regulatory approval to sell a new drug called Aranesp® (darbepoetin alfa) for chronic kidney disease. Aranesp is marketed as being a longer-acting form of synthetic erythropoietin. It is formulated with a modified epoetin alfa molecule. Aranesp, however, is not subject to the PLA. Consequently, Aranesp, unlike Epogen, is able to compete with Procrit for use in the treatment of anemia in non-dialysis patients. Aranesp was Procrit's first and is still its only direct competitor.

29. We strongly believed, and continue to believe, that Procrit is clinically superior to Aranesp. But we recognized that physicians treating anemic patients now had a choice between different therapies.

30. Aranesp was introduced with an AWP that was 25% above its list price, compared to Procrit's 20% markup. This difference was relevant to oncologists and put Ortho

Biotech at a competitive disadvantage. We also received reports that certain Amgen sales representatives were promoting Aranesp to doctors on the grounds that it was more profitable than Procrit. Nevertheless, Ortho Biotech did not change the differential between its list price and its AWP to match that of its competitor.

31. From the time of Aranesp's launch onwards, our market share began to decline. Ortho Biotech responded with market driven rebating and discounting as well – a standard facet of competition in the market for pharmaceuticals – but Aranesp was always more profitable to doctors.

32. The direction we gave to our sales force remained where it had always been: explain to doctors the superior clinical merits of our drug. Discussions about profit or margin were not in our economic self-interest. They would only result in highlighting for doctors the fact that they would make more money using Aranesp than they would using Procrit.

33. Attached hereto as Exhibits DX 2767 and 2772 are examples of communications to the sales force and other sales force training pieces that memorialize and reflect our corporate policy forbidding any discussion with doctors of margin or profit. Defendants' Exhibit 2767 is a memorandum to the Nephrology Field Sales dated November 20, 2001 that says "In the event an account approaches you and wants to discuss 'profitability' you should address the issue with facts regarding the changing reimbursement environment and our continued support of Healthcare Compliance initiatives." It goes on to state that "[I]t is absolutely inappropriate to sell product based upon the difference between AWP and acquisition price." Defendants' Exhibit 2772 is a Reimbursement Review dated April 16, 2003, which says (at MDL-OBI 40756) "[D]uring your discussions, you should never discuss profit margins. If

you need additional guidance, please contact your District Manager or any member of the Reimbursement Team."

34.  I personally reemphasized this message at numerous meetings with the sales force during my tenure at Ortho Biotech.

### Contravention of Company Policy

35.  To be sure, there have been isolated instances where Ortho Biotech employees did not abide by Ortho Biotech's policy of focusing on the clinical benefits of Procrit. I am aware that a very small fraction of our sales representatives may have acted against company policy by engaging in discussions relating to the potential economic benefits of using Procrit. But these instances do not detract from the fact that our corporate policy discouraged these practices. To this day, the marketing strategy for Procrit remains centered on the clinical merits of our drug.

## SECTION IV
## PROCRIT WAS MARKETED TO PAYORS BASED ON LOWER COST

36.  In addition to focusing on Procrit's clinical merits, Ortho Biotech also sought to leverage with *payors* the fact that Procrit costs less to reimburse than Aranesp because it has a lower AWP. We discussed this issue with both government payors and private payors.

37.  In relation to government payors, Ortho Biotech sought to convince CMS and regional Medicare Carriers to adopt Least Costly Alternative ("LCA") policies. An LCA policy provides that two therapeutically similar drugs with different AWPs will only be reimbursed at the lower of their two AWPs. Since a comparable dose of Procrit always had a lower AWP than Aranesp, these changes would have resulted in reimbursement for both Procrit

and Aranesp in the Medicare context being pegged at 95% of Procrit's AWP. This change, if adopted, would have reduced Medicare's reimbursement costs.

38. I personally met with Tom Scully, the Administrator of CMS, and others at CMS on several occasions to discuss how the LCA polices could reduce payor reimbursement costs and curb any incentive that providers might have to choose between similar therapies based on economic considerations. In the end, however, our efforts to implement an LCA policy were unsuccessful. Only one regional carrier in Utah adopted such a policy, and even that policy was later reversed as a result of pressure from members of Congress.

39. Similarly, Ortho Biotech worked with private payors to illustrate the fact that Procrit was less costly to reimburse than Aranesp because it had a lower AWP. We even created a CD-ROM for use with payors illustrating this fact. I understand that at opening statements in this trial, plaintiffs' counsel showed the Court a printout from this CD and told the Court this was an example of a CD Ortho Biotech used with physicians to show how much money they can make using Procrit. In reality, that CD was used with <u>payors</u> to show they could save money when reimbursing for Procrit rather than Aranesp. It referenced AWP because that was one of the benchmarks payors used to calculate reimbursement. The separate presentations Ortho Biotech made to physicians did not reference AWP and did not show profits or margins.

## SECTION V
## WHAT SHOULD ORTHO BIOTECH HAVE DONE DIFFERENTLY?

40. I understand plaintiffs in this case have alleged that Ortho Biotech is guilty of fraud in relation to its pricing and marketing of Procrit. As someone who worked at Ortho Biotech at various levels of the company for almost sixteen years, I take this allegation very

...
...
...

seriously. As a first step to understanding the claims, I ask myself what it is that plaintiffs are saying we should have done differently?

41. As I understand it, plaintiffs contend that pharmaceutical companies, including Ortho Biotech, are guilty of fraud for three reasons. First, in relation to Medicare, plaintiffs contend drug companies should have set AWPs that were the same as their ASPs. Second, in relation to private payors, plaintiffs contend drug companies should have limited rebates and discounts such that AWPs were within 30% of ASPs. Third, in relation to marketing, plaintiffs contend manufacturers should not have talked to doctors about reimbursement or margins. I'd like to address these three points in turn from the perspective of Ortho Biotech.

42. <u>Pricing in relation to Medicare</u>: Procrit was launched before Medicare started reimbursing for drugs administered in office by express reference to AWP. When we launched the drug, we followed the practice of thousands of other drugs and suggested an AWP that was over our contemplated list price. In the years after Procrit was launched, Medicare adopted AWP as a basis for Part B reimbursement (at 100%, 95% and then 85% of AWP). But there was never a single indication or communication from anyone in government or the industry that led us to believe Medicare intended that AWP should be any different from what it had been for decades, i.e., a mathematical mark up over list price that did not reflect any rebates or discounts. Our view that nothing had changed in relation to AWP is reflected in a memorandum to the field sales force from November 2001, attached as DX 2767 (emphasis added):

> Recently, the United States General Accounting Office issued a report on behalf of the House Ways and Means Committee, the Senate Finance Committee and House Committee on Energy and Commerce making recommendations <u>to begin</u> reimbursing providers for Part B-covered drugs and related services at levels reflecting providers' acquisition costs.

> That would be <u>a departure from the current methodology</u> of using AWP pricing minus 5% as the benchmark for reimbursement.

Moreover, even if we had thought about changing our AWP to reflect an ASP, we could never have done that and survived in the market. The real world impact of Ortho Biotech making that change would have been physicians losing money every time they used Procrit. We would also have been the only drug on the market with an AWP that was equal to its ASP. And this is even leaving aside the question of what methodology we would have used to calculate "ASP" in the absence of any regulatory guidance.

43. <u>Pricing in relation to Private Payors</u>: There was only one AWP for Procrit, just as there was only one list price for Procrit. Moreover, Procrit rebates and discounts were modest in the time period at issue in this case. I have reviewed the calculations of these rebates and discounts submitted by plaintiffs' expert in this case and these appear generally correct.

44. <u>Marketing Policies</u>: Drug companies should be allowed to answer questions from their physician customers seeking truthful and honest information relevant to their ability to administer drugs in their offices. But regardless of the merits of plaintiffs' position, Ortho Biotech always discouraged its sales representatives from talking about profit or margin – it was simply not in our economic interest to do so.

## SECTION VI
## ORTHO BIOTECH PATIENT ASSISTANCE PROGRAMS

45.   Ortho Biotech has gone to great lengths to ensure that patients who need assistance meeting their co-payment obligations or otherwise paying for Procrit get that help. This includes donation of over $205 million since launch towards patient assistance programs. A large part of that contribution is comprised of drug valued at its list price and the balance consists of cash donations. I understand the company continues to make such contributions – in product and in cash – on a regular basis to ensure our drug reaches everyone who needs it.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 17, 2006

_____
William C. Pearson

-14-