**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| IN RE PHARMACEUTICAL INDUSTRY ) | |
| AVERAGE WHOLESALE PRICE ) | |
| LITIGATION ) | MDL No. 1456 |
| _____ ) | |
| ) | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ) | |
| ) | Judge Patti B. Saris |
| ALL CLASS ACTIONS ) | |
| ) | |
| _____ ) | |

**TRACK ONE DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**EMERGENCY MOTION TO AUTHORIZE SUBPOENAS**
**FOR CERTAIN FORMER GOVERNMENT EMPLOYEES**

On November 13, 2006, this Court expressed serious concerns about having to "make a decision in this incredibly important case and [not] have the key Government witnesses."  (Trial Tr. 7, Nov. 13, 2006.)  The Track One Defendants ("Defendants") agree with the Court and submit that the testimony of former Government employees has become even more critical as the trial has progressed.  Accordingly, Defendants have moved the Court to authorize subpoenas for the testimony of Ms. Nancy-Ann Min DeParle, Mr. Thomas A. Scully, Mr. Stanley Weintraub, and Mr. Christopher Jennings.

For the reasons set forth in this memorandum, this Court may properly authorize subpoenas to ensure this crucial testimony because (1) it has proper jurisdiction to disregard the Government's objections to the testimony, (2) the *Touhy* regulations do not give the Government authority to object, (3) the deliberative process privilege is not a blanket prohibition and the need for the testimony outweighs the justifications for the privilege, (4) the MDL court has broad

subpoena powers and may properly order deposition testimony or videoconferencing, and (5) the reasonable reimbursement of a fact witness's expenses is entirely proper.

## PRELIMINARY STATEMENT

Four days before the start of trial, the Court ruled that it would construe the statutory term Average Wholesale Price ("AWP") according to its plain meaning. *See In re Pharm. Indus. Average Wholesale Price Litig.*, M.D.L. No. 1456, Civ. No. 01-12257 (D. Mass. Nov. 2, 2006). Relying on that ruling, Plaintiffs shifted their theory of the case, arguing for the first time during opening statements that the Court should impose strict liability with respect to Class 2. (*See* Trial Tr. 45, Nov. 6, 2006.). In further reliance on that ruling, Plaintiffs hypothesized that the Government must have assumed that AWPs were an actual average of wholesale prices and used that unproven theory to argue that Defendants willfully deceived payors in violation of Mass. Gen. Laws Ch. 93A ("Ch. 93A). (*See id.* at 44-45.)

Since both arguments rise or fall depending on what the Government *actually* knew regarding the meaning and usage of the term AWP, it is imperative that this Court hear testimony from Defendants' proposed Government witnesses. These crucial witnesses can move the debate beyond baseless conjecture by establishing, based on their first-hand knowledge, what the Government truly believed with respect to AWPs and how the Government's awareness was well known throughout the industry.

Mr. Weintraub, for example, can establish "HCFA's complete awareness that AWP was not a true reflection of and exceeded physicians' actual acquisition cost[s]." (*See* Expert Report of Stanley Weintraub in *Stetser v. TAP Pharm. Prods., Inc.*, N.C. Civ. No. 5268, filed Apr. 15, 2004, attached hereto as Ex. A.) Similarly, Mr. Scully could share his view that "you can't blame [pharmaceutical] companies" for high AWPs because "if the government sets dumb policies,

people are going to follow them."  (*See* Declaration of Lyndon M. Tretter, Esq., dated Dec. 20, 2002, containing remarks by Mr. Scully on Sept. 9, 2002, attached hereto as Ex. B.).  Ms. DeParle could testify regarding her understanding that Medicare was "supposed to pay 95 percent of the average wholesale price . . . [and] rel[ied] on some industry published data, which . . . turns out to be not what is really the wholesale price."  (Testimony before House Ways and Means Committee regarding Medicare and Prescription Drug Coverage (Mar. 13, 2000).)

Notwithstanding the Court's desire to hear from these witnesses regarding that core issue, and notwithstanding Defendants' good-faith efforts to comply with such request, the Government has created roadblock upon roadblock to prevent such testimony.  The Government should not prevail, and there are ample grounds for the Court to overcome its objections (and those of the Plaintiffs).

## ARGUMENT

### I.   THIS COURT HAS JURISDICTION TO ADDRESS THE GOVERNMENT'S DECISION TO DENY DEFENDANTS' REQUEST FOR TESTIMONY OF FORMER AGENCY EMPLOYEES

Contrary to the Government's contentions, Defendants need not resort to an independent action under the Administrative Procedure Act ("APA") or a proceeding to enforce a Rule 45 subpoena for the Court to exercise jurisdiction over the Government's denial of the at-issue testimony.

As a threshold matter, CMS only has authority to prevent its former employees from testifying if the proposed testimony invokes DHHS's *Touhy* regulations.  *See* 45 C.F.R. § 2 *et. seq.*  These regulations only apply when the Government is not a party to the proceeding, *see id.* at 2.1(d)(1), and when the proposed testimony "concerns information [the former employee] acquired in the course of performing official duties or because of such person's official capacity

with DHHS," *see id.* at 2.1(a).  The preliminary questions of whether these conditions are met (and, thus, whether DHHS's *Touhy* regulations apply) are issues of law for the Court to decide, not matters of agency discretion.  *See COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 275 (2d Cir. 2000) (deciding whether regulations applied as matter of law before proceeding to jurisdictional inquiry); *Southmark Props. v. Charles House Corp.*, 742 F.2d 862, 970 (5th Cir. 1984); *Alexander v. FBI*, 186 F.R.D. 66, 70 (D.D.C. 1998) (ruling, as a matter of law, that *Touhy* did not apply).  Thus, the Court need not even consider the merits of the Government's *Touhy* decision because it has jurisdiction to determine that CMS lacks the power under *Touhy* to prevent the crucial testimony in the first instance.

Even if DHHS's *Touhy* regulations do apply, the Government's denial of Defendants' proper *Touhy* request constitutes a final decision that is immediately reviewable in this Court under the APA.  *See* 5 U.S.C. §§ 702, 704; *Yousuf v. Samantar*, 451 F.3d 248, 251 (D.C. Cir. 2006) (finding, in *Touhy* context, that "[a]n agency's denial of a request is [a reviewable] final agency action for the purpose of § 704").  When a federal court litigant follows the appropriate procedures for seeking documents or witness testimony under the applicable *Touhy* regulations, federal district courts have subject matter jurisdiction to review an agency's final decision to deny the request.  *See Ferreira v. United States*, 350 F. Supp. 2d 550, 558 (S.D.N.Y. 2004); *see also COMSAT*, 190 F.3d at 275 (finding "final agency action that is ripe for . . . review" when agency "advised [litigant] in writing" that it would not grant request).  Here, the Government has admitted that CMS has taken "final agency action" to disallow the requested testimony.[1]  (*See* United States Opp'n to Defs.' Mot. to Declare *Touhy* Regulation Inapplicable at 8-9 ("U.S.

---

[1] Regardless of the Government's own admission, its written indication and oral testimony that it would refuse to allow the testimony satisfy the "final decision" standard.  *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *COMSAT*, 190 F.3d at 275.  (*See* Trial Tr. 7, Nov. 13, 2006.)

Opp'n").)  Defendants' compliance with 45 C.F.R. § 2.4 and the Government's admission of the finality of its decision give this Court sufficient jurisdiction to review the decision.  *See Ferreira*, 350 F. Supp. 2d at 558.

The Government's assertion that review can be obtained only in an independent action under the APA is simply wrong.   (*See* U.S. Opp'n at 8-9.)  Indeed, its own cited authority makes clear that, in the context of ongoing litigation, an independent APA action is only required when the action originated in state court, as principles of sovereign immunity bar state courts from compelling agency action.  *See U.S. Envtl. Prot. Agency v. Gen. Elect. Co.*, 197 F.3d 592, 599 (2d Cir. 1999), *modified in part by* 212 F.3d 689 (2d Cir. 2000) (exercising jurisdiction after finding that a time-consuming "separate action . . . does not provide the exclusive opportunity for review); *Boron Oil Co. v. Downie*, 873 F.2d 67, 70 (4th Cir. 1989) (explaining that federal courts are only similarly barred if they have limited removal jurisdiction after inheriting a state court action).  Moreover, while the cited cases establish that an agency's refusal to comply with an issued subpoena may constitute one *example* of a final decision ripe for review, they in no way detract from the general principle that district courts have jurisdiction to consider *any* final agency decision that directly affects the underlying proceedings.  *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992); *Yousuf*, 451 F.3d at 251.

## II.    DHHS'S *TOUHY* REGULATIONS ARE INAPPLICABLE TO DEFENDANTS' PROPOSED GOVERNMENT WITNESS TESTIMONY

It is beyond dispute that DHHS's *Touhy* regulations do not apply in "[a]ny civil or criminal proceedings where the United States, the Department of Health and Human Services, and any agency thereof, or any other Federal agency is a party." 45 C.F.R. § 2.1(d)(1).  Moreover, "if the Government's participation has been the equivalent of a party's, [courts] should treat the Government as having been a party in the initial action."  Arthur F. Greenbaum,

*Government Participation in Private Litigation*, 21 Ariz. St. L.J. 853, 1004 n.601 (1989).  This rule is based on the principle that a "nonparty may participate in such a way as to become a de facto party, tacitly if not formally treated as such by all parties."  18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* §  4451 at 427 (2006) (collecting cases).  Thus, the Government can become a de facto party through its *extensive* involvement in a proceeding,[2] even without being named a party and without formally intervening.  *Id.*

Here, the Government's appearances as an interested amicus and a consolidated plaintiff on the docket have transformed it to a *de facto* party.[3]  As this Court recently recognized, "now they're part of it."  (Trial Tr. 7, Nov. 13, 2006.)  Moreover, although admitting a "gray area," the Court properly recognized that the *Ven-A-Care* action is "the exact same suit," and "it makes no sense [to the Court that it is] going to hear the same people in six months."  (*Id*. at 9.)  As such, a fact-specific inquiry of the Government's actions renders it a party to this proceeding and forecloses *Touhy*.  *See generally* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* §  4451 at 427 (2006).

Moreover, DHHS's *Touhy* regulations only apply when the agency's present or former employee is requested to testify "concerning information acquired in the course of performing official duties or because of such person's official capacity with DHHS."  45 C.F.R. § 2.1(a).

---

[2] The First Circuit cases the Government cites to find party status do not dictate a contrary result.  (*See* U.S. Opp'n at 7-8.)  In *Gonzalez*, for example, the Court observed – in the context of claim preclusion – that a nonparty who "either participated vicariously in the original litigation by exercising control over a named party or had the opportunity to exert such control" has "effectively enjoyed his day in court," and thus, has "legal attributes of party status for purposes of claim preclusion." *Gonzalez v. Banco Cent. Corp.*, 27 F.3d 751, 759 (1st Cir. 1994).  The Court, however, did not institute a "substantial control" requirement to find party status, and indeed emphasized that "[t]he inquiry must be case-specific."  *Id.* at 759.

[3] The United States has filed an amicus brief in the MDL class action on the meaning of AWP – hardly the "strict impartiality with respect to private litigants" that underlies the DHHS Touhy regulations.  45 C.F.R. § 2.1(b).  The United States also intervened as a party plaintiff in *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs.*, *et al.*, a matter that has been transferred with the consent of the United States into MDL No. 1456.  (*See* United States' and Relators' Notice of Transfer to MDL No. 1456 (Doc. No. 2494) (July 28, 2006).)

With respect to Mr. Jennings, Defendants do not seek any testimony that qualifies under that standard.  Given Mr. Jennings' short tenure with DHHS, his testimony will unlikely cross into that territory.  Therefore, DHHS's *Touhy* regulations are inapplicable, and Defendants were in no way required to send a separate *Touhy* request to CMS with respect to Mr. Jennings.

## III.    EVEN IF *TOUHY* WERE TO APPLY, THE GOVERNMENT'S ARBITRARY DECISION TO PROHIBIT THE ENTIRETY OF THE PROPOSED TESTIMONY CONTRADICTS ESTABLISHED LAW AND MUST BE OVERTURNED

If the Court decides that the *Touhy* regulations apply, it should exercise its jurisdiction to overturn the agency's decision to silence the Government witness testimony.  An agency's *Touhy* regulations "do not 'create an independent privilege' authorizing the [agency] to withhold information." *Kwan Fai Mak v. FBI*, 252 F.3d 1089, 1092 (9th Cir. 2001) (quoting *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 780 (9th Cir. 1994)).  As a result, a blanket refusal to allow crucial testimony must be overturned unless the agency presents adequate justifications for its complete denial.  *See, e.g.*, *Moore v. Armour Pharm. Co.*, 927 F.2d 1194, 1198 (11th Cir. 1991).  Here, the Government grossly overstates the scope of the deliberative process privilege in its effort to preclude the Government witness testimony.  Since the Government's interpretation of that privilege is not in accordance with law, it cannot adequately justify its refusal to allow the testimony under any applicable standard of review.[4]

---

[4] Contrary to the Government's view, there is some debate regarding the applicable standard of review when a district court reviews an agency's *Touhy* decision.  (*See* U.S. Opp'n at 9.)  While some courts have found that agency decisions are only reviewable under the APA's own standards of review, *see, e.g.*, *COMSAT*, 190 F.3d at 271; *see also* 5 U.S.C. § 706(2)(A) (establishing that, under the APA standard, agency decisions must be reversed if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"), others have suggested that the APA provisions are merely jurisdictional and that district courts should use ordinary standards for determining whether the agency correctly construed the law underlying its justification for denying the request, *see U.S. Envtl. Prot. Agency v. Gen. Elect. Co.*, 212 F.3d 689, 690 (2d Cir. 2000), *modifying* 197 F.3d 592 (2d Cir. 1999).  Regardless of which standard applies, however, CMS's blanket refusal to allow the witnesses to appear on the basis of the deliberative process privilege constitutes an arbitrary decision that contradicts established law and should be overturned.

As an initial matter, CMS's privilege claim is premature.  The Government's concern that the deliberative process privilege may bar certain testimony cannot serve as an independent ground for forbidding a witness from appearing for questioning altogether.  At most, it may limit the scope of the questioning *once the witness appears*.  *See, e.g.*, *United States v. Cunningham*, 672 F.2d 1064, 1073 n.8 (2d Cir. 1982); *cf. Better Gov't Bureau v. McGraw (In re Allen)*, 106 F.3d 582, 603 (4th Cir. 1997).  The deliberative process privilege only protects against disclosure of confidential, intra-governmental exchanges that are both (1) pre-decisional and (2) deliberative.  *See Texaco P.R., Inc. v. Dep't of Consumer Affairs*, 60 F.3d 867, 884 (1st Cir. 1995); *In re Grand Jury*, 821 F.2d 946, 959 (3d Cir. 1987).  It does not protect underlying factual material, outside communications, or statements explaining or justifying a decision that has already been made.  *See Texaco P.R.*, 60 F.3d at 885; *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997).

Here, the agency failed to confine its refusal to testimony that might satisfy the two-part test, but broadly asserted that the privilege completely precludes the witnesses from testifying about *any* matter concerning Part B drug reimbursement.  As this Court itself noted, "there may be a fair amount of [proposed testimony] which is carved out by the deliberative process privilege."  (Trial Tr. 5, Nov. 13, 2006).  When the witnesses appear, it is in the Court's discretion to determine – on a question-by-question basis – whether the testimony implicates the asserted privilege or is carved out from that narrow exception.  *See Cunningham*, 672 F.2d at 1073 & n.8; *see also In re Grand Jury Subpoena*, 826 F.2d 1166, 1168 (2d Cir. 1987).

Moreover, the importance of these testimonies and the Government's own disregard for the secrecy of HCFA's deliberative processes render the Government's deliberative process

justification contrary to established law, even if certain testimony would otherwise qualify as privileged.  The deliberative process privilege "is not absolute."  *Texaco P.R.*, 60 F.3d at 885.  Courts have broad discretion to decline to enforce it if the need for the evidence outweighs the justifications underlying the privilege.  *See id.; see also In re Sealed Case*, 121 F.3d at 738; *Redland Soccer Club*, 55 F.3d at 853.  In addition, the Government may waive its privilege if the agency has voluntarily disclosed the subject information of otherwise privileged testimony to outside parties.  *See Fla. House of Representatives v. U.S. Dep't of Commerce*, 961 F.2d 941, 946 (11th Cir. 1992); *see also In re Sealed Case*, 121 F.3d at 741; *Texaco P.R.*, 60 F.3d at 885 n.8.

Here, the Government cannot seriously question the compelling need for the testimony in these proceedings.  While it has always been highly relevant, Plaintiffs' eleventh-hour strict liability and Ch. 93A willful deception theories – both premised on their unproven theory that the Government thought AWP was an actual average of wholesale prices – now make this testimony imperative.  As this Court itself has recognized, it should not be forced to "make a decision in this incredibly important case [without hearing from] the key Government witnesses."  (Trial Tr. 7, Nov. 13, 2006).  Indeed, Ms. DeParle's and Mr. Scully's knowledge regarding HCFA's understanding of AWPs has already emerged as a key issue in these proceedings.  (*See* Trial Tr. 19-22, Nov. 16, 2006).  It is imperative that they be allowed to themselves describe what they actually believed.  Similarly, the Government cannot ignore the fact that it may have waived any right to assert the deliberative process privilege by itself putting at issue the deliberative process surrounding HCFA's 1991 decision to use AWPs as a reimbursement benchmark in its recent *amicus* brief.  (*See* Amicus Curiae United States Br. 13, 15.)  Nor can it escape the fact that it has already produced thousands of pages of documents in discovery relating to some of the very same subjects that it now claims are privileged.

Given the great need for the evidence and the Governments prior disrespect for the privileged nature of the subject matter, the Court should exercise its broad discretion and decline to enforce any deliberative process privilege claim that might otherwise apply.

## IV.   IN THE EVENT THE WITNESSES DECLINE TO TESTIFY VOLUNTARILY, THIS MDL COURT MAY PROPERLY EXERCISE ITS BROAD SUBPOENA POWERS TO ORDER DEPOSITIONS OR VIDEO CONFERENCING

Because the Government cannot rely on *Touhy* to completely block the Government witness testimony, this Court may properly exercise its subpoena powers under Fed. Civ. P. 45 to order depositions or video conferencing of those witnesses.  This rule accords with the principle that an "agency regulation may [not] curb the power of the Court to compel discovery under the Federal Rules of Civil Procedure."  *U.S. ex rel. Roby v. Boeing Co*., 189 F.R.D. 512, 516 (S.D. Ohio 1999).[5]

Although the Government properly concedes that a Rule 45 subpoena is an appropriate option for ensuring that an agency does not block witness testimony, it incorrectly asserts that these former employees are "beyond the geographic subpoena of Rule 45."  (*See* U.S. Opp'n at 9.)  Under the multidistrict statute, an MDL judge may "exercise the powers of a district judge *in any district* for the purpose of conducting pretrial depositions in such coordinated or consolidated pretrial proceedings."  28 U.S.C. § 1407(b) (emphasis added).  This is because an MDL judge's "powers as a transferee judge are nothing less than plenary."[6]  *In re San Juan*

---

[5]  "[T]he Federal Rules of Civil Procedure have been held to have the force and effect of a statute." *Id*. at 517 (citing *Sibbach v. Wilson & Co*., 312 U.S. 1, 13 (1941); 28 U.S.C. § 2072(b) (1999).  Indeed, the "housekeeping" statute authorizing the *Touhy* regulation "does not authorize withholding information from the public or limiting the availability of records to the public."  5 U.S.C. § 301.  Such statute does not provide "substantive" rules, *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 776 (9th Cir.1994), and therefore, does not have the "force and effect of law."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 301 (1979).  Finally, the "Government, as a litigant, is bound by the rules of discovery to the same extent as any other litigant."  *Roby*, 189 F.R.D. at 517 (citing *United States v. Procter & Gamble Co.*, 356 U.S. 677, 681 (1958)).

[6]  As such, courts have expanded an MDL judge's powers beyond § 1407(b)'s "pretrial depositions," finding such powers to extend to subpoena *duces tecum*, discovery of non-parties in other districts, subpoenas to non-parties, and other issues unrelated to "pretrial depositions" *per se*.  *See, e.g., United States ex rel. Pogue v. Diabetes Treatment*

*Dupont Plaza Hotel Fire Litig.*, 117 F.R.D. 30, 31 -33 (D.P.R. 1987) (citing *In re Multi-Piece Rim Products Liability Litig.*, 653 F.2d 671, 676-77 (D.C. Cir. 1981)).

As such, Courts have held that Rule 45's 100-mile limit does not restrict an MDL court's subpoena powers, remedying any potential conflict through video conferencing testimony.  *See*, *e.g.*, *In re San Juan Dupont Plaza Hotel Fire Litig*., 129 F.R.D. 424, 425 (D.P.R. 1989); *In re Washington Public Power Supply System Sec. Litig.*, MDL No. 551, 1988 WL 525314 (W.D. Wash. Aug. 9, 1988); *In re Vioxx Prods. Liability Litig.*, 439 F.Supp.2d 640, 640-44 (E.D. La. 2006).  In *In re San Juan Dupont Plaza Hotel Fire Litigation,* for example, a district court in the First Circuit allowed "witnesses beyond the 100 mile trial subpoena power" of the MDL court to testify "via a satellite hookup."  129 F.R.D. at 425.  The Court emphasized the large, multidistrict nature of the litigation, and reasoned that Rule 45 – which exists to "prevent undue inconvenience to witnesses" – does not "expressly prohibit" videoconferencing.[7]  *Id.* at 425-26 (citing *In re Washington Public*, MDL No. 551, 1988 WL 525314 at *5).

In fact, under longstanding First Circuit precedent, this Court may properly order the appearance of these witnesses through its "inherent powers."  *Brockton Savings Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 11 (1st Cir. 1985), *cert. denied*, 475 U.S. 1018 (1986) (recognizing court's authority to reach outside defined subpoena power because "the rules of civil procedure do not completely describe and limit the power of district courts").  The fact that the

---

*Ctrs. of Am., Inc*., 238 F. Supp. 2d 270, 274-75 (D.D.C. 2002);  *In re Sunrise Sec. Litig.*, 130 F.R.D. 560, 586 (E.D. Pa. 1989); *In re Corrugated Container Antitrust Litig.*, 662 F.2d 875, 880-81 (D.C. Cir. 1981);  *In Re Subpoenas Served on Wilmer, Cutler & Pickering & Goodwin Procter LLP*, 255 F. Supp. 2d 1 (D.D.C. 2003).

MDL courts have also exercised their broad subpoena powers beyond "pretrial proceedings" to trials themselves.  *See*, *e.g*., *In re San Juan Dupont Plaza Hotel Fire Litig*., 129 F.R.D. 424 (D.P.R. 1989); *In re Washington Public Power Supply System Sec. Litig.*, MDL No. 551, 1988 WL 525314 (W.D. Wash. Aug. 9, 1988).

[7]  Videoconferencing has since been sanctioned by Rule 43, so long as "good cause," "compelling circumstances," and "appropriate safeguards" exist.  *In re Vioxx Prods. Liability Litig.,* 439 F. Supp. 2d 640, 643 (E.D. La. 2006) (citing Fed. R. Civ. P. 43).

instant case involves a multidistrict court warrants an even broader reading of this Court's "inherent power." *See*, *e.g.*, *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colorado, On Nov. 15, 1987*, 720 F. Supp. 1433 (D. Colo. 1988).

Thus, this Court may properly exercise its inherent powers as an MDL court to order the testimony of the Government witnesses through videoconferencing or deposition if they become unavailable to testify.

## V.   DEFENDANTS MAY PROPERLY REIMBURSE THE WITNESSES FOR EXPENSES, INCLUDING LOST INCOME, ASSOCIATED WITH THEIR TESTIMONY

In a last-ditch effort to resist this vital testimony, the Government suggests that it would be inadmissible if the Government witnesses are compensated for the fair value of their time. (Trial Tr. 17, 21-22, Nov. 13, 2006).  Contrary to the Government's insinuations, Defendants have not offered to compensate any Government fact witness for the content of their testimony, which would undoubtedly violate federal law and Mass. R. Prof'l Conduct 3.4(b).  Rather, Defendants merely seek to offer these witnesses reimbursement authorized by existing law.

Mass. R. Prof'l Conduct 3.4(g)(2) expressly authorizes the payment of "reasonable compensation to a witness for loss of time in attending or testifying."  A lawyer may provide reasonable compensation to a fact witness for the time he spends preparing for and attending trial, so long as the payment is not conditioned on the content of his testimony and only compensates him for direct loss of income.  *See* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 96-402 (1996); *see also United States v. Davis*, 261 F.3d 1, 38-40 (1st Cir. 2001) (concluding that payments made to witness to compensate him for loss of time did not render him incompetent to testify); *Curley v. N. Am. Man Boy Love Ass'n*, No. Civ.A. 00-

10956-GAO, 2003 WL 21696550, at *5-6 (D. Mass. Mar. 31, 2003) (adopting ABA's stance with respect to Mass. R. Prof'l Conduct 3.4).

Under these authorities, receipt of reimbursement for lost income and other expenses associated with their testimony should in no way preclude the Government witnesses from testifying here.  *See United States v. Davis*, 261 F.3d 1, 38-39 (1st Cir. 2001) (refusing to exclude testimony solely because the witness was paid for his loss of time, and emphasizing instead the efficacy of thorough cross-examination on any payments).

## <u>CONCLUSION</u>

For all of the foregoing reasons, the Court should authorize subpoenas for the testimony of Ms. Nancy-Ann Min DeParle, Mr. Thomas A. Scully, Mr. Stanley Weintraub, and Mr. Christopher Jennings.

Respectfully Submitted,

TRACK ONE DEFENDANTS

/s/ John T. Montgomery
John T. Montgomery (BBO#352220)
Steven A. Kaufman (BBO#262230)
Eric P. Christofferson (BBO#654087)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation*

Dated:  November 17, 2006

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2006, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.


<u>/s/ Adam L. Wright</u>

# Exhibit A

STATE OF NORTH CAROLINA                    IN THE GENERAL COURT OF JUSTICE
NEW HANOVER COUNTY                               SUPERIOR COURT DIVISION
                                                            1 CV 5268

                                              :
Harry E. Stetser, Dale E. Nelson, and         :
Michael deMontbrun,                           :
                                              :
                    Plaintiffs,               :               EXPERT REPORT OF
                                              :               STANLEY WEINTRAUB
          v.                                  :
                                              :
TAP Pharmaceutical Products Inc., *et al.*    :
                                              :
                    Defendants.               :

---

     I, Stanley Weintraub, will testify as an expert on physician reimbursement under the

Supplementary Medical Insurance Benefits for the Aged and Disabled Program ("Medicare Part

B"). The bases for my opinions include my involvement in the development and implementation

of physician reimbursement policies under the Medicare program from 1984 to 1998, while a

Branch Chief and later Senior Policy Advisor at the Health Care Financing Administration

("HCFA"), and from 1999 to the present as a consultant at Health Policy Alternatives and an

Associate at Muse & Associates. My curriculum vitae is attached as Exhibit A. During the

course of my employment at HCFA, I reviewed many materials upon which my opinions are

based. Other materials that I have reviewed that support my opinions in this matter include those

identified on the list attached as Exhibit B. The subject matter of my expected testimony is set

forth more specifically below.

     1.  Historically, Medicare Part B was a charge-based reimbursement system, as reflected

in the law and regulation providing for reimbursement on a "reasonable charge" basis using a

physician's actual charge for performing a service to determine a "customary" and "prevailing"

charge. The lower of the actual charge, the customary charge or the prevailing charge was the Medicare Part B payment amount. It is my understanding that this system was implemented by Congress in order to retain many of the features used by the existing private health care insurance system.

2.   Medicare Part B payments were determined by private insurers that contracted with HCFA (now the Centers for Medicare and Medicaid Services ("CMS")) to administer claims processing and payment ("Carriers"). It was the Carriers that calculated the customary or prevailing charge and determined the payment amount for the physician seeking reimbursement.

3.   Effective in 1992, pursuant to a change by Congress in the statute, HCFA implemented a Resource Based Relative Value System ("RBRVS") to determine the Medicare Part B payment amount for physician services. In directing HCFA to establish the RBRVS in a budget neutral manner, Congress required that total charge-based payments made in 1991 were to be used as the basis for total payments under the RBRVS in 1992. RBRVS continues to be the basis for determining the Medicare Part B payment amount for physician services today. In 1991, however, HCFA, by regulation, excluded Part B-covered drugs from the RBRVS because it decided that, given the large number and different dosage levels of drugs and the extensive work required in developing the fee schedule for physician services, it was not practical to establish a fee schedule for Medicare Part B drugs at that time.

4.   Well before the RBRVS was adopted, the intention of the Medicare Part B program was to pay for covered drugs using the reasonable charge methodology employed to pay for all other physician services. However, it is my understanding that, because of the low volume of claims initially submitted by physicians for drugs, the Carriers had been instructed, well before I

2

assumed responsibility for Medicare Part B reimbursement for physician services in 1984, to use "gap-filling" procedures to determine the Medicare payment amount.

5.    One of the "gap-filling" techniques available to the Carriers, when there was a scarcity of charge data, was to employ price lists. For drugs, the prices that Carriers could use included the Average Wholesale Price ("AWP") provided in such sources as the *Red Book* and *Blue Book*. The instructions on "gap-filling" and use of Average Wholesale Prices were provided in the Medicare Carriers' Manual prepared by HCFA. This system was already in place when I became responsible for the payment policy of Medicare Part B covered drugs in 1984.

6.    Based upon my review of certain of the documents identified in Exhibit B, other agencies within the Department of Health and Human Services (or its predecessors) were already aware that AWP could not be an adequate estimate of the price providers generally pay for drugs. *See, e.g.*, HHS-OIG, "Changes to the Medicaid Prescription Drug Program Could Save Millions" (1984) (TAP 11031643) ("AWP cannot be the best -- or even an adequate -- estimate of the prices providers generally paying for drugs. AWP represents a list price and does not reflect several types of discounts, such as prompt payment discounts, total order discounts, end-of-year discounts and any other trade discounts, rebates, or free goods that do not appear on the pharmacists' invoices.").

7.    Following mounting concerns from the Department of Health and Human Services Office of the Inspector General ("OIG") and various Carrier Medical Directors about the excessive payments for certain Part B drugs, I was informed that a Carrier Medical Director was taking action to pay for drugs using actual acquisition costs instead of AWP. In the late 1980s, to get more information about this issue, as well as to provide us with a possible alternative

3

payment methodology for drugs, I met with Dr. Robert Zone, the Carrier Medical Director for the Carrier responsible for servicing Tennessee. Dr. Zone informed us that, in connection with payment procedures applied to certain drugs, he had used actual invoices obtained from physicians to calculate average acquisition cost for those drugs. I understood from our discussion that Dr. Zone had concluded that the AWP was significantly higher than the average acquisition cost to the physician.

8.  Subsequent reports submitted to HCFA by the OIG also concluded that pharmacies buy drugs at substantial discounts below AWP and that AWP "is not a meaningful payment level and that it should not be used in making reimbursements in either the Medicaid or the new Medicare drug program." *See, e.g.,* HHS-OIG, "OIG Report Concerning Medicaid and Medicare Reimbursement in Drugs" A-06-89-00037 (Oct. 3, 1989). (These reports and statements to and/or by HCFA, HHS, Congress and the White House regarding the relationship between a drug's AWP and its acquisition cost are referenced in Exhibit B.) As a result, the OIG recommended that HCFA consider a reimbursement method other than AWP, or a discounted AWP, to replace the then current system.

9.  I understand that Lupron was launched in its intra-muscular injectable form in 1989. As such, it would have been reimbursed based on the AWP methodology, at a time when the methodology was known to be faulty.

10. HCFA agreed with the OIG conclusions and recommendations and published a proposed rule in the Federal Register on June 5, 1991, (56 Fed. Reg. 25, 792, *et seq.*), proposing to pay for drugs at the lower of estimated acquisition cost of the drug or 85% of its AWP.

11. As a result of comments on the payment proposal for drugs, HCFA amended its proposal in a final rule published on November 25, 1991. (56 Fed. Reg. 25, 502, *et seq.*) That

4

rule provided for payment at the lower of the drug's AWP or its estimated acquisition cost. In addition, the rule noted that HCFA through the Carriers would request acquisition cost information from physicians to determine the payment amount for drugs.

12. On March 15, 1994, HCFA issued a memorandum to all Associate Regional Administrators for Medicare directing them to request each Carrier to ascertain the acquisition costs for certain high volume drugs for which expenditures exceeded $10 million in 1992. Some other "high profile" drugs were included in the request. A list totaling 15 specific drugs, including Lupron, was attached to the memorandum.

13. Several months after the memorandum to the Associate Regional Administrators was issued, HCFA was told by the Office of Management and Budget ("OMB") that it had not complied with the provisions of The Paperwork Reduction Act and therefore should immediately cease any data collection efforts requested of the Carriers to obtain drug acquisition cost information from physicians. The OMB was asked to stop HCFA's data collection by the national specialty society representing oncologists, who utilize significant amounts of Medicare-covered drugs in their practices. As a consequence, HCFA continued to pay for drugs at the AWP amount, despite its awareness that the amount represented by these drugs' AWPs far exceeded their average acquisition cost.

14. In 1996, OIG issued another report concluding that, if a methodology other than reimbursement at 100% AWP was employed, the Medicare program could have saved as much as $122 million on only 17 drugs. HHS-OIG, "Appropriateness of Medicare Prescription Drug Allowances" OEI-03-95-00420 (May 1996) (TAP 11028116). Lupron accounted for $63 million of these potential savings. *See id.*

5

15. Despite HCFA instructions to abandon surveys of physicians to acquire acquisition cost information, a Carrier Medical Director in 1996 took it upon himself to attempt to reimburse physicians at the lower of the acquisition cost or AWP for Lupron. (TAP 11028126). This effort was rebuffed by HCFA, and he was required to continue to allow payment on the basis of AWP.

16. Thus, through 1997, HCFA mandated that Carriers reimburse physicians based on 100% of AWP despite HCFA's complete awareness that AWP was not a true reflection of and exceeded physicians' actual acquisition cost for the drug.

17. The Balanced Budget Act of 1997 statutorily changed the payment method for Medicare-covered drugs to 95% of each drug's AWP, thereby eliminating estimated acquisition cost as an element in the calculation of the payment for drugs. Under this statutory framework, Medicare payment was based on the lower of the physician's actual charge for the drug or 95% of the drug's AWP.

18. The Committee Report accompanying the legislation, cited OIG findings that concluded that Medicare pays substantially more than most other payors for prescription drugs. Specifically the Report of the Committee on the Budget, House of Representatives, noted that the OIG "reports that Medicare reimbursement for the top 10 oncology drugs ranges from 20 percent to nearly 1000 percent per dosage more than acquisition cost." H. Rep. No. 105-149 at 1354 (1997).

19. On December 13, 1997, President Clinton announced to the American people what HCFA and other governmental agencies had long concluded: "Sometimes the waste and abuses aren't even illegal; they're just embedded in the practices of the system... [O]ur Medicare program has been systematically overpaying doctors and clinics for prescription drugs — overpayments that cost taxpayers hundreds of millions of dollars.... Now, these overpayments

6

occur because Medicare reimburses doctors according to the published average wholesale price — the so-called sticker price — for drugs. Few doctors, however, actually pay the full sticker price. In fact, some pay just one tenth of the published price."

20. I left HCFA in 1998 but continued to follow its activities regarding Medicare Part B reimbursement in connection with my consulting work.

21. Those activities included HCFA's issuing a program memorandum to the Carriers in September 2000 instructing them to use an alternative source for the average wholesale price, compiled from widely available drug price lists of various wholesalers around the country.

22. As a result of Congressional intervention, HCFA was forced to rescind the September 2000 instruction in December 2000. It directed the Carriers to continue reimbursing Medicare Part B drugs based on the statutory-mandated 95% of the drug's AWP as published in the Carriers' usual sources (*e.g., Red Book, Blue Book* or *Medispan*).

23. Despite additional reports to HCFA, Congress and others regarding the disparity between AWP and acquisition cost for Medicare Part B-covered drugs, this payment methodology continued to be employed until January 2004 following enactment of the Medicare Prescription Drug Improvement and Modernization Act of 2003. Since January 2004, payment for Lupron has been at 81% of the AWP published as of April 1, 2003.

24. I know of no instance where drug manufacturers were asked, much less required, to report any information to HCFA for the purpose of payment of Medicare claims for drugs. In my opinion, TAP had no statutory or regulatory obligation to report, or to advise physicians to report, their actual acquisition costs for drugs for purposes of the payment of claims.

25. In my view, it was not improper for TAP, or any other pharmaceutical company, to apprise physicians that the amount they would receive from Medicare in reimbursement would

7

exceed the physicians' acquisition cost for the drug. In fact, physicians would need access to this information in order to properly complete their Medicare claims forms for the drugs. This is particularly true for non-participating physicians, submitting unassigned claims, who would be in violation of the limiting charge were they to submit claims for the drugs in excess of the Medicare beneficiaries' statutorily-determined out-of-pocket expense limitations.

26. In my view, it was also not improper for TAP, or any pharmaceutical company, to compare Medicare reimbursement amounts for competitive drug products in connection with their marketing and/or sales of Medicare Part B-reimbursed drugs.

27. I reserve the right to supplement my opinions and/or this report based upon additional information or materials that may be made available to me or of which I may become aware.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 15, 2004

By: _Stanley Weintraub_

Stanley Weintraub

8

**Exhibit A**

6504 Steerforth Court
Baltimore, Maryland 21209

Phone (410) 486-3119
Fax (410) 484-6609
E-mail Stanw@erols.com

# Stanley Weintraub

|  |  |  |  |
|---|---|---|---|
| **Functional summary** | Currently consult on health care payment policy issues. | | |

Managed the development and implementation of the Medicare Physicians' Fee Schedule. Accounts for approximately $40 billion in payments to physicians, suppliers, and others participating in the Medicare program

Considered the national expert on the historical derivation of the Medicare payment system for physicians and suppliers.

Considered the national expert on the current methodology for paying physicians and others on the fee schedule.

Developed the Medicare coverage and payment policies for many of the procedure codes used in the fee schedule.

Made presentations and speeches to many groups on physician payment and coverage topics.

Prepared detailed and comprehensive briefing papers for senior officials and Congressional Committees on Medicare payment and coverage matters.

Developed and wrote Notices of Proposed Rules and Final Rules in the Federal Register.

Negotiated and presented policy issues with senior HCFA staff, Congressional Staff, physician specialty societies, the AMA and other major organizations.

| **Employment** | 2000 – 2001 | Muse and Associates | Washington, DC |
|---|---|---|---|
| | 1999 – 2000 **Associate** | Health Policy Alternatives | Washington, DC |
| | 1984 - 1998 **Senior Policy Advisor** | Health Care Financing Admin. | Baltimore, MD |
| **Education** | 1962 – 1966 **BS Accounting** | University of Maryland | College Park, MD |
| | 1971 – 1973 **MBA- Accounting Theory** | Loyola College | Baltimore, MD |
| **Accreditation** | Certified Public Accountant—Maryland | | |

**Exhibit B**

| Document | Bates Nos. |
|---|---|
| Respondent's Brief in the case *Louisiana v. United States Dep't of Health and Human Servs*, No. 89-4566 (5th Cir. Jan. 12, 1990) | |
| Centers for Medicare & Medicaid Services Jan. 7, 2004 Interim Final Rule | TAP 11036007-191 |
| Documents Produced by the Association of Community Cancer Centers | ACCC 0001-0061 |
| Documents Produced by the National Coalition for Cancer Survivorship | NCCS 0001-0702 |
| Documents Produced by the American Urological Association | AUA 1000-1158 |
| Documents Produced by the American Society of Clinical Oncology | AS 000001-00460 |
| Complaint filed in *Stetser v. TAP Pharmaceutical Products Inc., et al.* | |
| *Stetser* Consent Protective Order entered | |
| Volumes I and II of the Appendix of Authorities Cited in (1) Joint Memorandum in Support of Defendants' Motions to Dismiss Corrected Consolidated Amended Class Action Complaint and (2) Joint Memorandum in Support of Defendants' Motions to Dismiss the Blues Plans' Consolidated Amended Complaint (July 3, 2002) | TAP 11027820-8469 |
| HCFA Medicare Program Integrity Manual, § 2.2 (Rev. 3) | TAP 11027826-843 |
| Medicare Local Medical Review Policies for New York, Minnesota, Florida, Alabama, Pennsylvania, South Dakota, Louisiana, California, Virginia, Missouri, Nebraska and Tennessee | TAP 11027845-903 |
| Office of the Secretary, U.S. Dept. of Health, Education and Welfare, "The Drug Makers and the Drug Distributors: Task Force on Prescription Drugs" | TAP 11027905-999 |
| 39 Fed. Reg. 41,480 | TAP 11028001-003 |
| HHS-OIG, "OIG Report Concerning Medicaid and Medicare Reimbursement for Drugs" A-06-89-00037 | TAP 11028005-009 |
| Majority Staff Report, Special Committee on Aging, United States Senate, "Prescription Drug Prices: Are We Getting Our Money's Worth?" S. Prt. 101-49 | TAP 11028011-038 |
| 42 C.F.R. § 405.517 | TAP 11028040-041 |
| 56 Fed. Reg. 59,502 et seq. (selected pages) | TAP 11028043-048 |
| H.R. Rep. No. 25, 98th Cong., 1st Sess. at 132, *reprinted in* 1983 U.S.C.C.A.N. 219 (selected pages) | TAP 11028050-077 |
| H.R. Rep. No. 247, 101st Cong., 1st Sess. at 337, *reprinted in* 1989 U.S.C.C.A.N. 1906 (selected pages) | TAP 11028079-092 |
| 56 Fed. Reg. 25,792 et seq. (selected pages) | TAP 11028094-99 |
| Letter to the Honorable Tom Bliley, Chairman Commerce Committee, from the Honorable Donna E. Shalala, Secretary of Health and Human Services | TAP 11028101-104 |
| HHS-OIG, "Appropriateness of Medicare Prescription Drug Allowances" OEI-03-95-00420 (available at http://oig.hhs.gov/oei/reports/ 1182.pdf) | TAP 11028106-124 |
| Medicare B News, Issue No. 146 | TAP 11028126-129 |

**Exhibit B**

| Document | Bates Nos. |
|---|---|
| Medicare B News, Issue No. 148 | TAP 11028131-132 |
| HHS-OIG, "Physicians' Cost for Chemotherapy Drugs" A-02-91-01049 (available at http://oig.hhs.gov/oas/reports/region2/29101049.pdf) | TAP 11028134-156 |
| GAO, "Outpatient Drug Costs and Reimbursements for Selected Pharmacies in Illinois and Maryland" GAO/HRD-93-55FS (available at http://www.gao.gov/) | TAP 11028158-177 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the California Department of Health Services" A-06-95-00062 (available at http://oig.hhs.gov/oas/reports/region6/69500062.pdf) | TAP 11028184-202 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services" A-06-95-00068 (available at http://oig.hhs.gov/oas/reports/region6/69500068.pdf) | TAP 11028204-222 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration" A-06-95-00065 (available at http://oig.hhs.gov/oas/reports/region6/69500065.pdf) | TAP 11028224-242 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the North Carolina Department of Health Resources" A-06-95-00071 (available at http://oig.hhs.gov/oas/reports/region6/69500071.pdf) | TAP 11028244-262 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Delaware Department of Health and Social Services" A-06-95-00063 (available at http://oig.hhs.gov/oas/reports/region6/69500063.pdf) | TAP 11028264-281 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services" A-06-95-00072 (available at http://oig.hhs.gov/oas/reports/region6/69500072.pdf) | TAP 11028283-301 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the New Jersey Department of Human Services" A-06-95-00070 (available at http://oig.hhs.gov/oas/reports/region6/69500070.pdf) | TAP 11028303-321 |
| HHS-OIG, "Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Nebraska Department of Social Services" A-06-95-00069 (available at http://oig.hhs.gov/oas/reports/ region6/69500069.pdf) | TAP 11028323-340 |
| HCFA Program Memorandum - Intermediaries/ Carriers, Transmittal No. AB-97-25 | TAP 11028342-343 |
| HCFA Program Memorandum - Intermediaries/ Carriers, Transmittal No. AB-98-76 (amending Medicare Carriers Manual § 5202) (available at http://www.hcfa.gov/pubforms/ transmit/AB987660.htm) | TAP 11028345-346 |
| 63 Fed. Reg. 58,814 et seq. (selected pages) | TAP 11028348-353 |

IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT
WILLIAMSON COUNTY, ILLINOIS

| | | |
|---|---|---|
| ACIE C. CLARK, individually and on behalf of all other similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 01-L-132 |
| vs. | ) ) ) | |
| TAP PHARMACEUTICAL PRODUCTS INC., TAP PHARMACEUTICALS INC., and ABBOTT LABORATORIES, INC., | ) ) ) ) | **The Honorable Phillip Palmer** |
| Defendants. | ) ) | |

### AFFIDAVIT OF STANLEY WEINTRAUB

I, Stanley Weintraub, having been duly sworn, depose and state as follows:

1.          I am currently Director of Reimbursement Policy for Muse and Associates, a health care consulting and advisory firm.  Prior to my current position, I provided consulting services to Health Policy Alternatives, also a health care consulting firm.  Prior to that, I was employed from 1984 to 1998 as a Senior Policy Advisor, Health Care Financing Administration (the federal Medicare program).  In that position, I was responsible for establishing and overseeing the Medicare payment policies for physician and other practitioner services.  As a consequence, I am familiar with the reimbursement procedures under the Supplementary Medical Insurance Benefits for the Aged and Disabled Program ("Medicare Part B").  A copy of my resume is attached to this affidavit.

2. I have reviewed plaintiff's Second Amended Complaint in the action, *Clark v. TAP Pharmaceuticals Inc., et al., No. 01L132*, including the definition of the class proposed by plaintiff in paragraph 39. That definition is:

> all individuals or non-ERISA third party payor entities in the United States who paid any portion of the 20% co-payment or deductible amount for beneficiaries under the Medicare Part B for Lupron® during the period 1993 to the present . . .

By its terms, this class definition includes individuals who were prescribed Lupron® as a treatment for prostate cancer and other conditions for which Lupron® was prescribed and reimbursed under Medicare, and who paid any portion of the 20% co-payment for Medicare beneficiaries under Medicare Part B. It also includes insurers and state Medicaid agencies or organizations who paid any portion of the Medicare Part B co-payment for Lupron® users.

3. Based upon my understanding of Medicare Part B, those Lupron® users suffering from prostate cancer who are either 65 years of age or older or have suffered a disability, as that term is defined in the Social Security Act, for a period of twenty-five months or longer, are eligible for benefits related to their Lupron® use under Medicare Part B.

4. Without examining records of the physicians who prescribed Lupron® to each class member to determine the price at which each physician purchased Lupron® and subsequently billed each beneficiary for each Lupron® injection, along with the records of any third party payors who paid part or all of the 20% Medicare Part B co-payment for each individual patient, it is impossible to determine the relationship, if any, between the then published Average Wholesale Price ("AWP") for Lupron® and the amount each class member paid for Lupron®.

5. With respect to the determination of any relationship between the class member's Medicare Part B co-payment and the AWP for Lupron®, it is necessary to define the groups of possible Medicare Part B payors who may fall within the class plaintiff describes. These groups

2

include, for example: (a) individuals who were prescribed Lupron® by participating physicians; (b) individuals who were prescribed Lupron® by non-participating physicians; (c) individuals who reside in states where a "least costly alternative" reimbursement policy has been applied to Lupron® reimbursement; (d) individuals who are 65 years or older and still employed for whom Medicare is a secondary insurer; (e) insurers, both commercial (such as Medigap insurers) and non-commercial (such as state Medicaid agencies, including Medicaid Managed Care agencies), who paid claims for part or all of the 20% Medicare part B co-payment and/or deductible for Lupron®; and (f) individuals who are members of Medicare HMOs.

a.  *Non-participating and participating physicians*.  Participating physicians agree to accept the Medicare approved amount as the full payment for medical services provided to Medicare beneficiaries. Since 1992, Medicare has imposed a fee system on participating physicians that limits both the amounts physicians can charge, and the Medicare reimbursement for physician services. Participating physicians are reimbursed 80% of the Medicare approved amount for a particular service, and bill the remaining 20% of that amount to the patient or his insurer (the co-payment).  Non-participating physicians do not agree to accept the Medicare approved amount for any particular service, and therefore are permitted to bill beneficiaries up to 115% of the Medicare approved amount for non-participating physicians.  The amount that any beneficiary or insurer pays for a Medicare-covered service will vary depending upon the participation status of the physician.

b.  *Non-participating and participating physicians and LCA states*. Beginning in 1997, some states began adopting the requirement that Medicare

3

reimbursement for LHRH analogs such as Lupron®, be based upon the least costly alternative, or LCA, for the drug prescribed. Zoladex®, which has a published AWP less than that of Lupron®, is the lowest cost brand name LHRH analog. As a consequence of the LCA limitation upon Medicare reimbursement, in LCA states, Lupron's® AWP generally is irrelevant to the amount of the Medicare Part B co-payment made to any member of the proposed class in those states.

c.          *Medicare HMOs.* Certain individuals above the age of 65 are members of Medicare HMOs to which they pay a single yearly fee, for which they receive medical services throughout the year. To such individuals, the AWP for Lupron® generally is irrelevant to the amount the individuals pay to their HMOs.

d.          *Medicaid Managed Care.* Certain individuals above the age of 65 who are within a defined income range are eligible for Medicaid Managed Care through which a portion or all of their 20% Medicare Part B copayment is paid by a third party with which the state contracts. These payments are made based upon the fee schedule of the individual third party payors, which varies from payor to payor.

e.          *Individuals who are 65 years or older and still employed for whom Medicare is secondary payor.* Employed individuals above the age of 65 who are eligible for and do participate in their employers' health care plans may utilize Medicare as a secondary insurer which reimburses them for a portion of those

expenses not covered by their health care plans.  The amount these individuals

pay for Lupron® varies based on the terms of their employers' health care plan.

f.  *Insurers who paid claims for part or all of the 20% Medicare part B co-payment for Lupron®.*  To determine if the payments made by insurers (both

commercial and non-commercial) on claims for part or all of the 20% Medicare

part B co-payment for Lupron® bear any relationship to the AWP for Lupron®,

an assessment must be made of the requirements of each payor's plan, including

the amount, if any, the plan had contracted with each Medicare beneficiary OR health

care provider to reimburse for drugs such as Lupron®.

SW

FURTHER AFFIANT SAYETH NAUGHT.

_Stanley Weintraub_

Subscribed and sworn to before me this
7th day of January, 2002.

_Yun C. Kim_
Notary Public

My commission expires:
Yun C. Kim
Notary Public, Baltimore City, Maryland
My Commission Expires July 21, 2004

5

# Exhibit B



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| | ) |
| IN RE PHARMACEUTICAL INDUSTRY | )   MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE | ) |
| LITIGATION | )   CIVIL ACTION NO. 01-CV-12257-PBS |
| | ) |
| THIS DOCUMENT RELATES | )   Judge Patti B. Saris |
| TO ALL ACTIONS | ) |

## REPLY MEMORANDUM OF THE BRISTOL-MYERS SQUIBB
## DEFENDANTS IN SUPPORT OF THEIR MOTION TO DISMISS

Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc.[1] file this reply memorandum in support of their separate motion to dismiss.[2]

### Preliminary Statement

BMS's motion to dismiss the Class 1 claims does not depend on any exhibits and assumes (for purposes of the motion only) that AWPs are fictitious. BMS's motion depends on the critical fact -- set forth in the Complaint -- that reimbursement rates are set by the government. (Compl. ¶ 144.) Because the Court cannot grant relief without also deciding that governmentally-established reimbursement rates were wrong, the Class 1 claims are barred by the filed rate doctrine, the state action doctrine and the doctrine of preemption.

---

[1] Oncology Therapeutics Network Corp. and Apothecon, Inc. are wholly-owned subsidiaries of Bristol-Myers Squibb Co and are collectively referred to as "BMS". Abbreviated terms have the same meaning in this reply memorandum as in BMS's opening memorandum ("BMS Op. Mem.").

[2] In a one-sentence footnote in Plaintiffs' Consolidated Opposition To Defendants' Motions To Dismiss ("Pls.' Mem." ) plaintiffs state -- without any reasoning whatsoever -- that the filing of BMS's opening memorandum does not comply with this Court's November 6, 2002 briefing order. (Pls.' Mem. at 2 n.2.) By its terms, that order applies to a stipulation filed by the other defendants, to which BMS was not a party. Consistent with the Court's comments at the initial July 17, 2002 conference, BMS submitted its own motion raising non-duplicative issues in a brief that was well under this Court's regular page limits (and, co-incidentally, was also consistent with the five-page per defendant allowance in the other defendants' stipulation given that there are three BMS-related corporate defendants). To remove any doubt, after our brief was filed, we spoke with plaintiffs' counsel and offered to approach the Court on the issue. We heard nothing more on the subject.



BMS's motion to dismiss the Class 2 claims depends on the exhibits -- including the exhibits attached to BMS's memorandum -- which show that the "spread" between AWPs and provider costs was a matter of public knowledge.  BMS's point is simple:  Even if the AWPs were not "real average[s] of real prices" (Pls.' Mem at 14), no reasonable jury could infer an intent to defraud these plaintiffs when the truth was so well-known.  This is an issue that the Court can and should decide at the motion to dismiss stage.

Argument

I.

PLAINTIFFS FAIL TO ARTICULATE MERITORIOUS GROUNDS<br>FOR NOT APPLYING FILED RATE, STATE ACTION OR PREEMPTION.

A.      The Filed Rate Doctrine

Plaintiffs do not dispute that Medicare reimbursement rates were established by the government.  (Pls.' Mem. at 52.)  Rather, they claim that "the AWPs reported by Defendants were not filed with, approved or even reviewed by any regulatory body".  (Id.)  Plaintiffs completely misconstrue BMS's argument and the rationale for the filed rate doctrine.

The "rates" that are the subject of BMS's filed rate argument are the reimbursement rates established by the government, not the manufacturers' AWPs reported in the publications such as the Red Book.[3]  There can be no doubt that the reimbursement rates from which plaintiffs' co-payments were calculated were approved by a regulatory agency -- they were "determined" by Medicare.  (Compl. ¶ 145.)  The only real question is whether the filed rate doctrine should be deemed inapplicable because BMS did not "file" the reimbursement rates.

---

[3]      The government sets an "allowed amount" as the reimbursement rate for the services and drugs the Medicare provider supplies to the Part B beneficiary.  (Compl. ¶ 144.)  It is these allowed amounts, not the prices in the publications, against which Class 1's 20% co-payments are made.  (Id. ¶ 149.)

2



Plaintiffs cite no case that would render the filed rate doctrine inapplicable here. They refer to a footnote in <u>Town of Norwood v. New England Power Co.</u>, 23 F. Supp. 2d 109, 116 n.6 (D. Mass. 1998), <u>aff'd in part</u>, 202 F.3d 408 (1st Cir. 2000), which states that the doctrine applies to "any industry" in which the filing of rates is required by law.  (Pls.' Mem. at 52.)  In that footnote, however, the Court simply addressed a circumstance in which the filed rate doctrine applies; it did not purport to limit the doctrine or address circumstances in which it does not apply.[4]

The cases make clear that approval, without filing, can trigger the filed rate doctrine.  <u>See</u> <u>Wegoland Ltd v. NYNEX Corp.</u>, 27 F.3d 17, 18 (2d Cir. 1994) ("'filed rate' . . . is one approved by the governing agency.").  Noting that the filed rate doctrine applies to "power rates filed with FERC or fixed by FERC", the Supreme Court in <u>Nantahala Power. & Light Co. v. Thornburg</u>, 476 U.S. 953, 962 (1986) applied the doctrine to a power allocation scheme that had been approved by FERC.  <u>See</u> <u>also</u> <u>Montana-Dakota Utils. Co. v. Northwestern Pub. Serv. Co.</u>, 341 U.S. 246, 251-52 (1951) ("the right to reasonable rate is the right to the rate which the [agency] files or fixes".)  Similarly, in <u>Servais v. Kraft Foods, Inc.</u>, 631 N.W.2d 629 (Wis. Ct. App. 2001), <u>aff'd</u>, 643 N.W.2d 92 (2002) the court applied the filed rate doctrine to a federal program setting minimum prices for milk where no rates had been filed.[5]

---

[4] Plaintiffs also cite <u>Comsource Indep. Foodservice Co., Inc. v. Union Pac. Ry. Co.</u>,  102 F.3d 438 (9th Cir. 1996). (Pls.' Mem. at 52.)  In <u>Comsource</u> the court held that a shipper was not time-barred from suing its carrier for damaged goods because (i) the one-year limitations period relied on by the carrier was a non-mandatory term in the carrier's tariff filed with the ICC and thus did not place the shipper on constructive notice;  (ii) the shipper did not have actual notice of the carrier's proposed one-year period and (iii) the one-year period was otherwise inconsistent with the default two-year period under federal law.  The decision does not even mention the filed rate doctrine. <u>Comsource</u> is therefore inapposite.  In any event, even if notice were an issue,  the Complaint in this case admits that "Medicare and the Plaintiffs and the Class used the Red Book and other publications to determine the AWPs of the drugs."  (Compl. ¶ 160.)

[5] Arguably, there is a filing here.  Providers file claims with Medicare and are reimbursed at a rate determined by Medicare.  (Compl. ¶¶ 4, 149.)



Courts have also applied the filed rate doctrine to situations where an agency has created a formula and the rates charged pursuant to that formula are not filed.  Under those circumstances, "'the formula itself is the rate, not the particular components of the formula [and] periodic adjustments made in accordance with the . . . approved formula do not constitute changes in the rate itself and accordingly do not require . . . filings'". <u>Public Utils. Comm'n of State of California v. FERC,</u> 254 F.3d 250, 254 (D.C. Cir. 2001); <u>see also</u> <u>Transmission Agency of Northern California v. Sierra Pacific Power Co.</u>, 287 F.3d 771, 782-83 (9th Cir. 2002) (filed rate doctrine applies to situation where agency sets rules for allocating transmission capacity and rates are not filed).  Similarly, in this case, the government has created a formula for Medicare reimbursement based on AWPs reported in publications such as the Red Book, and it does not matter that this source information is not "filed".

In the same vein, courts have employed the filed rate doctrine to bar claims for conduct unrelated to any filed rate.  <u>See</u> <u>Nantahala</u>, 476 U.S. at 966 ("the filed rate doctrine is not related to rates per se").[6]  Thus, in <u>County of Suffolk v. Long Island Power Auth.</u>, 154 F. Supp. 2d 380 (E.D.N.Y. 2000), <u>aff'd</u> <u>sub nom.</u>, <u>Town of Huntington v. Long Island Power Auth.</u>, 11 Fed. Appx. 24, 2001 WL 604181 (2d Cir. 2001), the court applied the filed rate doctrine to claims alleging breach of a settlement agreement, unjust enrichment, excessive compensation and tortious interference because the alleged injury was caused by payment of a governmentally approved rate.  The court noted:  "Plaintiffs have paid nothing except their rates."  154 F. Supp. 2d at 386.  <u>See also</u> <u>Town of Norwood</u>, 23 F. Supp. 2d at 116 (filed rate doctrine applies "[e]ven if plaintiff's complaint refers to some underlying or distinct conduct" so long as the damages are measured by divining a rate that might have been approved absent the conduct in issue).

---

[6] Similarly, courts have applied the filed rate doctrine to bar claims against alleged co-conspirators even though they did not file the rate in question.  <u>Keogh v. Chicago & N.W. Ry. Co.</u>, 260 U.S. 156, 163 (1922).



Plaintiffs contend that "neither the HCFA nor the publishers of industry compendia review, even for accuracy, the AWPs reported by Defendants".  (Pls.' Mem. at 53.) That argument has been expressly rejected in numerous cases.  See e.g. Square D Co. v. Niagara Frontier Tariff Bureau, Inc., 476 U.S. 409, 412 (1986) ("respondents set and controlled NFTB rate levels without complying with the notice, publication, public hearing, and record keeping requirements of the NFTB agreement and ICC regulations"); Town of Norwood, 202 F.3d at 419 ("FERC now waives its requirement that filed rates and rate increases be accompanied and justified by cost-of-service data"); and Kline & Co. v. MCI Communications Corp., 98 F.Supp.2d 69, 73 (D. Mass. 2000) (agency need not conduct "meaningful review" of rates for filed rate doctrine to apply).  The test under the filed rate doctrine is not how well (or poorly) the regulatory agency performed its review, but whether the plaintiff is seeking to attack collaterally in court proceedings a rate -- or third-party conduct affecting a rate -- that can only be challenged directly through, in front of or against the regulatory agency.

Finally, plaintiffs assert that "no court ever has applied the filed rate doctrine to Medicare".  (Pls.' Mem. at 53.)  Plaintiffs have failed to articulate any substantive reason why the filed rate doctrine should not apply to Medicare.  If anything, this case is a stronger case than most for application of the doctrine.  Medicare is not merely a government regulated industry, it is a government industry.

B.  State Action Doctrine Applies To RICO Cases

Plaintiffs contend that the state action immunity doctrine "really is intended as an exemption from liability [only] in the antitrust  context."  (Pls.' Mem. at 55.)  That is not true.  In our opening memorandum, we cited several cases that dismissed RICO and state law claims where the defendants, like BMS, were alleged to have provided false information to an administrative agency, thereby causing harm to the plaintiffs.  (BMS Op. Mem. at 7-8 & n.7.)



Plaintiffs attempt to distinguish these cases by suggesting that immunity outside the antitrust context only applies to petitioning activities protected under <u>Noerr-Pennington</u>[7] and not the resulting governmental action protected under <u>Parker v. Brown</u>, 317 U.S. 341 (1943). (Pls.' Mem. at 55.)  It would not make sense, however, to hold that a RICO claim based on petitioning is barred, but a RICO claim based on the result of the petitioning is not.  <u>See</u> <u>City of Columbia v. Omni Outdoor Adver., Inc.</u>, 499 U.S. 365, 383 (1991) (<u>Noerr-Pennington</u> and <u>Parker</u> are companion principles.)  Nor would this distinction make sense in light of the numerous cases analogizing the RICO and antitrust statutory schemes.  <u>See</u> <u>Holmes v. Securities Investor Prot. Corp.</u>, 503 U.S. 258 (1992).

Plaintiffs also contend that neither <u>Noerr-Pennington</u> nor <u>Parker</u> applies because they have not alleged that the government decided to base reimbursement rates on the AWPs as a result of petitioning by BMS. (Pls.' Mem. at 55.)[8]  If anything, the fact that the government acted on its own presents a stronger case for application of state action immunity.  If plaintiffs' claims would be precluded if BMS had asked the government to base Medicare reimbursement rates on the AWPs in the Red Book, they are certainly barred where, as here, the government decided to do that on its own.

C.      <u>Preemption Doctrine Also Applies</u>

For the same reasons set forth above, this action is also barred by the doctrine of preemption.  In fact, some courts refer to the filed rate doctrine as "filed rate preemption".  <u>Sierra Pacific</u>, 287 F.3d at 785 & n.10.  As we pointed out in our opening brief, both the federal and

---

[7] <u>Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961); <u>United Mine Workers v. Pennington</u>, 381 U.S. 657 (1965).

[8] It is, however, quite clear from the legislative history and from the administrative record in the Federal Register that oncologists and other medical providers petitioned and lobbied government very strongly on the laws and regulations relating to the role of AWP in Medicare Part B reimbursements.



state claims in this case are barred by the doctrine of preemption because Medicare reimbursement rates are a creature of federal government.[9]

Plaintiffs rely on cases such as <u>Massachusetts Med. Soc'y v. Dukakis</u>, 815 F.2d 790 (1st Cir. 1987) to contend that Congress has not preempted the field of healthcare.  (Pls.' Mem. at 41-42.)  That may be true, but Congress clearly intended to preempt the field of Medicare reimbursement rates.  <u>Dukakis</u> and its progeny deal with the issue of balance billing -- <u>i.e.,</u> billing over and above the Medicare reimbursement rates -- and the courts in those cases expressly noted that state action in that area did not affect governmentally mandated reimbursement rates.  815 F.2d at 792-96.

II.

<u>PLAINTIFFS' RICO CLAIMS ARE INSUFFICIENT</u>.

Plaintiffs contend that, by alleging that BMS acted "intentionally", they make sufficient allegations as to BMS's fraudulent intent.  (Pls.' Mem. at 56.)  However, merely typing the word "intentionally" in a complaint is not enough.  Plaintiffs must allege facts from which a reasonable jury could infer fraudulent intent.  <u>See</u>, <u>e.g.</u>, <u>Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.</u>, 117 F.3d 655, 663 (2d Cir. 1997) ("plaintiffs are required to 'allege facts that give rise to a strong inference of fraudulent intent'".)

With specific reference to this case, the critical question is whether the Complaint establishes a permissible inference that, when BMS sent prices to the publications, it believed it was deceiving the government and health plans about what those prices represented.   Not only does the Complaint fail to plead facts to give rise to this inference, it is totally belied by decades of government reports and news articles, such as the <u>Barron's</u> article annexed to BMS's opening

---

[9] Plaintiffs do not contest the point made in our opening brief that preemption applies to federal as well as state claims.  (BMS Op. Mem. at 8-9.)

7



brief, which described AWP as "Ain't What's Paid".  No reasonable drug manufacturer could

have believed when it was reporting prices to the publications that the government or

sophisticated health plans were being duped into thinking that its AWPs were in fact – as

plaintiffs now contend – "a real average of real prices" paid by medical providers.  (Pls.' Mem.

at 14.)[10]

        Plaintiffs suggest that we are really arguing about reasonable reliance, which is

not an element of a mail fraud or wire fraud claim, and they suggest that one of cases we rely

upon, United States v. Brown, 79 F.3d 1550 (11th Cir. 1996), was based on reliance.  (Pls.' Mem.

at 57 n.47.)  The court in Brown relied on Pelletier v. Zweifel, 921 F.2d 1465, 1503 (11th Cir.

1991), where the court stated:  "While mail and wire fraud offenses are complete even before the

targeted victim relies on the scheme and is defrauded by it . . . the mens rea element of the

offense requires that the perpetrator of the scheme anticipate reliance."  (emphasis added).  That

is precisely the principle we are urging here.

        The only real question is whether this Court can decide this issue on a motion to

dismiss.  "In deciding [a] motion to dismiss, the Court may consider extra-record materials, such

as matters of public record and previous filings with the Court."  Jacobsen v. Oliver, 201 F. Supp.

2d 93, 110 (D. D.C. 2002).  Plaintiffs should not be permitted to ensnare BMS in years of

---

[10] In fact, far from accusing the drug companies of fraud in their price reporting, CMS Commissioner Scully has recently acknowledged, "to some degree, you can't blame the  companies" for high AWPs because they are reacting to the "incentive[s] in the system . . . [and] if the government sets dumb policies, people are going to follow them . . . ."  (Declaration of Lyndon M. Tretter, Esq., containing transcription of remarks by T. Scully at Town Hall Meeting on September 9, 2002, annexed hereto as Exhibit A.)



litigation, with millions of dollars of expense, over a fraud claim concerning a matter of public

knowledge.[11]


Conclusion

For the foregoing reasons, the Complaint should be dismissed.

Respectfully submitted,

BRISTOL-MEYERS SQUIBB COMPANY,
ONCOLOGY THERAPEUTICS
    NETWORK CORP. and
APOTHECON, INCORPORATED

By their attorneys,

[Original signature on file with the Court]

Steven M. Edwards (SE 2773)
Lyndon M. Tretter (LT 4031)
Admitted *pro hac vice*
**HOGAN & HARTSON L.L.P.**
875 Third Avenue
26th Floor
New York, NY  10022
(212) 918-3000

Thomas E. Dwyer, Jr. (BBO No. 139660)
Daniel J. Cloherty (BBO No. 565772)
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
(212) 371-1000

Dated:  December 20, 2002

---

[11] BMS adopts the arguments set forth in the Consolidated Reply and will not repeat them here except to say that a comparison of the enterprise allegation in this case to the enterprise allegation in Patrick demonstrates that one thing is missing:  an "ongoing organization" functioning as a "continuing unit".



## CERTIFICATE OF SERVICE

I, Lyndon M. Tretter, certify that a true and correct copy of the foregoing reply memorandum of law and annexed declaration of Lyndon M. Tretter, Esq., was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2 in the above-captioned proceeding by sending on December 20, 2002, a copy to Verilaw Technologies for posting and notification to all parties.

[Original signature on file with the Court]

_____
Lyndon M. Tretter



# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) ) |
| | MDL NO. 1456 |
| | CIVIL ACTION NO. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) ) ) ) |
| | Judge Patti B. Saris |

## <u>DECLARATION OF LYNDON M. TRETTER</u>

Lyndon M. Tretter, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am a member of Hogan & Hartson L.L.P., attorneys for Defendants Bristol-Myers Squibb Co., Oncology Therapeutics Network Corp. and Apothecon, Inc. (collectively, "BMS").  I submit this declaration of my own personal knowledge in support of BMS's separate motion to dismiss.

2.      I received from Marrianne Hulbert, an employee of the Bucks County Hospital Alliance, videotape recordings of a "town hall" meeting hosted by Congressman James C. Greenwood on September 9, 2002.  The meeting took place at the Community Center Auditorium of Pine Run Community, 777 Ferry Road in Doylestown, Pennsylvania (the "Town Hall Meeting") and was simultaneously broadcast on WBCB 1490 AM radio.



3.      Thomas A. Scully, Administrator of the Centers for Medicare and Medicaid Services, attended and participated in the Town Hall Meeting as a special guest.

4.      The Town Hall Meeting included a question and answer period, during which a member of the audience asked a question about the high cost under Medicare of a drug that his doctor administers to him.  In response, Congressman Greenwood discussed, among other things, the concept of average wholesale price ("AWP") and how drug companies are incentivized to compete for medical providers' business based on the difference between the AWP at which Medicare reimburses the providers and the price the companies charge providers for their drugs.  After Congressman Greenwood spoke, Mr. Scully added:

> " … it drives me crazy every day … when we sit there knowingly (sic) full well – there's an incentive in the system and to some degree you can't blame companies for following – if the government sets dumb policies, people are going to follow them …"

5.      I have viewed a videotape recording of the Town Hall Meeting and can state that the exchange and language quoted in paragraph 4 above is a true and correct summary and transcription of that portion of the Town Hall Meeting.

\\\NY875 - 58559/0059 - 1431647 v1



I declare the foregoing to be true under the penalty of perjury.


New York, New York
December 20, 2002

[Original Signature on File with the Court]

_____

Lyndon M. Tretter

3