# EXHIBITS REFERENCED IN DECLARATION OF CARTER L. DUTCH

# SCHERING CORPORATION

2000 GALLOPING HILL ROAD  KENILWORTH, N.J. 07033

TELEPHONE: (908) 298-4000

March 4, 2002

Patrick Reilly
Co-Director Pharmacy Services
Fallon Clinic
100 Hartwell St.
West Boylston, MA 01583

Re:  Staff Model HMO Purchase Agreement

Dear Mr. Reilly,

At the request of David Canepa, Managed Care Area Manager, Schering Corporation is pleased to send to you for your review and approval two originals of the above-referenced Purchase Agreement between Schering Corporation and Fallon Clinic Pilgrim Health Care, Inc. – Fallon Clinic Staff.

If this Purchase Agreement is acceptable to you, please arrange to have both enclosed originals executed by an authorized representative of Fallon Clinic and return same to my attention at the above address.  Upon receipt of the signed agreements, I will arrange for approval and execution of both documents by an authorized representative of Schering Corporation and return one fully executed original to your attention for your files.

This letter and the enclosed Purchase Agreement do not constitute an offer subject to acceptance and the enclosed Purchase Agreement shall not become effective unless and until the Purchase Agreement is signed by Schering Corporation.

Thank you for your continued interest in the Schering/Key product line.

Sincerely,

*Jerry Ken-Kwo Re/for Craig Masker*
Craig Masker
Manager, Contracts and Pricing

Enclosures

cc:  David Canepa

Defendants' Exhibit

**2900**

01-12257 - PBS

Highly Confidential



# Staff Model HMO Purchase Agreement Schering Corporation

# FALLON CLINIC

Prepared for:
Fallon Clinic
100 Hartwell St.
West Boylston, MA 01583

Prepared by:
David Canepa
Managed Care Account Manager
Schering Corporation
March 4, 2002

Highly Confidential

SW0143846

# PURCHASE AGREEMENT

This Purchase Agreement is between Fallon Clinic, ("Fallon Clinic"), having a place of business at 100 Hartwell St., West Boylston, MA 01583 and Schering Corporation ("Schering"), a Delaware corporation, having a place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033.

This Agreement sets forth the terms and conditions pursuant to which Schering will provide pricing to Fallon Clinic staff model health maintenance organization (the "Fallon Clinic Staff Model HMO") based, in part, on the actual dispensing of those Schering products specified in Exhibit B ("Products") to Eligible Members (as defined below) by the Fallon Clinic Staff Model HMO.

Fallon Clinic and Schering agree as follows:

## ARTICLE 1.        DEFINITIONS:

1.1    "Eligible Member" as used herein shall mean an individual enrolled in the Fallon Clinic Staff Model HMO; *provided, however*, that "Eligible Members" shall not include individuals who are also enrolled in other organizations that either (i) purchase any of the Products other than pursuant to this Agreement; or (ii) receive rebates based on utilization of the Products by any such individual.

1.2    "Formulary" as used herein shall mean a listing of the drugs Fallon Clinic  has reviewed, approved and recommended for use at the Fallon Clinic Staff Model HMO.

1.3    "Net Direct Price" as used herein shall mean the price published from time to time by Schering as its net direct price for each Product.

## ARTICLE 2.        PRODUCT SALE

2.1    **Sale of Product.**  Schering shall make the Products available to the Fallon Clinic Staff Model HMO through Cardinal Distribution, Inc. and Mckesson HBOC (the "Prime Vendors"). Fallon Clinic shall notify Schering in writing of any change to its Prime Vendor, which Prime Vendor shall be mutually acceptable to Fallon Clinic and Schering. Schering shall report to the Prime Vendor the pricing to which the Fallon Clinic Staff Model HMO is entitled for the Products pursuant to this Agreement. The actual price for the Products paid by the Fallon Clinic Staff Model HMO to the Prime Vendor shall be as agreed upon by Fallon Clinic and its Prime Vendor.

2.2    **Product Returns.**  All Product returns are subject to Schering's Institutional Returned Goods Policy attached hereto as **Exhibit A.**

2.3    **Schering Warranties and Covenants.**  Schering warrants that all Product sold to the Fallon Clinic Staff Model HMO pursuant to this Agreement conforms to the descriptions set forth in each such Product's respective labeling provided that such units of the Products are used by the Fallon Clinic Staff Model HMO in accordance with such labeling.

3

Highly Confidential

SW0143847

## ARTICLE 3.        OBLIGATIONS OF FALLON CLINIC STAFF:

3.1   **Formulary.**   In order to obtain the discounted pricing on each Product as detailed in **Exhibit B**, the Fallon Clinic Staff Model HMO must list such Product on its Formulary with the Formulary status for such Product detailed in **Exhibit B**.  In the event the Fallon Clinic Staff Model HMO fails to satisfy the Formulary listing requirements established pursuant to this **Section 3.1** for any Product, the Fallon Clinic Staff Model HMO will not be entitled to and shall not receive the discounted pricing for such Product detailed in **Article 4.**

3.2   **Own Use.**  Fallon Clinic hereby warrants and agrees that all Product purchased pursuant to this Agreement shall be utilized solely by the Fallon Clinic Staff Model HMO for the treatment of Eligible Members of the Fallon Clinic Staff Model HMO and not for resale or distribution. Fallon Clinic  acknowledges and agrees that Schering is not required to provide a discount for any Product sold or dispensed to anyone who is not an Eligible Member of the Fallon Clinic Staff Model HMO.

3.3   **Audit.**  Fallon Clinic agrees to institute and conduct on a regular basis random audits of the Fallon Clinic Staff Model HMO to ensure that actual dispensing of the Products complies with the terms of this Agreement, including the restrictions of **Section 3.2** hereof. Adjustments as a result of such audits shall be refunded to Schering no later than thirty (30) days after completion of such audit. Fallon Clinic shall at all times keep and maintain accurate books, records and files with respect to the Products, any reports submitted to Schering as part of the random audits completed pursuant to this Section, and all information relating to the purchase and dispensing of the Products pursuant to this Agreement.  Fallon Clinic agrees that Schering shall have the right to conduct inspections and/or audits of Fallon Clinic's and/or the Fallon Clinic Staff Model HMO's books, records, and files from time to time, and that within ten (10) days following Fallon Clinic's receipt of a written request from Schering, the Fallon Clinic Staff Model HMO and/or Fallon Clinic shall make such information (and such other information necessary to confirm such information) available in a manner satisfactory to Schering, for inspection and/or audit by Schering's representatives or its designated auditors during regular business hours.  Schering agrees that any such inspections and/or audits shall be subject to the requirements of state and federal law regarding the confidentiality of medical and prescription records.

## ARTICLE 4.      OBLIGATIONS OF SCHERING:

4.1   **Discount.**  Subject to compliance with all of the terms and satisfaction of all of the conditions set forth in this Agreement, and subject further to the provisions of **Section 4.2** hereof, Schering shall provide Fallon Clinic with the discounted pricing set forth on **Exhibit B** for each of the Products dispensed by the Fallon Clinic Staff Model HMO for the treatment of Eligible Members. All discounts pursuant to this Agreement shall be based on Schering's Net Direct Price for Products.

4.2   **Price Increases.** Anything to the contrary herein notwithstanding, Schering hereby reserves the right in its sole discretion to increase the prices for the Products set forth on Exhibit B at any time to reflect or account for comparable increases made to its published Net Direct Price list. If Fallon Clinic receives discounts in excess of the discount percentages off Net Direct Price listed in Exhibit B, Schering has the right to recover such excess discounts.

4

4.3 **Eligibility for Discounts.** The Fallon Clinic Staff Model HMO's continued access to the Product discount for each Product is contingent upon Fallon Clinic complying with all of its obligations and responsibilities pertaining to such Product as detailed in this Agreement. Failure on the part of Fallon Clinic to fulfill its responsibilities or satisfy the conditions as set forth herein for a Product shall be grounds for Schering to reduce the discount for such Product to zero percent.

4.4 **Ineligibility for Discounts.** No discounts will be provided hereunder for:

(a) any Product which is listed on the Formulary other than as set forth in this Agreement;

(b) any units of Product for which Schering is obligated to pay rebates or provide discounts or other price reductions to any other party or governmental entity or with respect to any government health program including, without limitation Medicaid, Medicare or similar programs; and/or

(c) any units of Product which are not used or dispensed as required by this Agreement.

4.5 **Excess Discounts.** If Schering reasonably determines as a result of an inspection and/or audit of Fallon Clinic (or the Fallon Clinic Staff Model HMO), any notice to Schering or other information that (i) Fallon Clinic has not satisfied all of the conditions in order to obtain the discounts set forth in this Agreement, (ii) any Product purchased hereunder shall have been sold, dispensed or administered for purposes other than the Fallon Clinic Staff Model HMO's own use as set forth in **Section 3.2**, or (iii) all or any part of the discounts previously granted by Schering to the Fallon Clinic Staff Model HMO hereunder are not required under this Agreement, then, in each such case, Fallon Clinic shall pay to Schering an amount equal to all or any portion of such excess discount granted hereunder with respect to the Product quantities purchased by the Fallon Clinic Staff Model HMO within thirty (30) days of being notified of such excess discount by Schering.

4.6 **Adjustment to Discounts.** Schering reserves the right to make adjustments to the discounted pricing available hereunder based on the introduction of generic competition, a new product entry, or implementation of a MAC (Maximum Allowable Cost) program. Should Schering cease marketing/manufacturing of any of the Products, or any package size of any of the Products, then this Agreement shall terminate with regard to the Product or such package size as the case may be.

4.7 **Product Availability.** Subject to the provisions of the following sentence, Schering will use its reasonable commercial efforts to make all Products available to Fallon Clinic during the term of this Agreement. It is understood that some Products may be discontinued or unavailable during the term of this Agreement. Schering use its reasonable commercial efforts to Notify Fallon Clinic of such discontinuance or unavailability at the earliest date possible.

## ARTICLE 5. TERM AND TERMINATION:

5.1 **Term.** The term of this Agreement shall commence thirty (30) days after execution by Schering . Unless sooner terminated as provided for herein, this Agreement shall remain in effect until March 31, 2004 (the "Term"). The Term may be extended only by a written amendment to this Agreement which is signed by both Fallon Clinic and Schering.

5

Highly Confidential

5.2 **Termination Without Cause/Termination for Cause.** This Agreement may be terminated by either party (a) without cause upon not less than 30 days' prior written notice to the other party, (b) if the other party is in breach of its obligations, representations or warranties set forth in this Agreement which breach is not cured within 10 days after receipt of written notice of such breach from the non-breaching party, (c) upon enactment of federal, state or local legislation, rules or regulations (collectively "Laws"), or the issuance of an interpretation of existing Laws, which, in the reasonable opinion of either party, could have a material adverse impact on such party and/or any of its affiliates (economic or otherwise) if the Agreement remained in effect unmodified or (d) upon the insolvency, dissolution, liquidation, receivership or other similar reorganization of either party, whether voluntary or involuntary.

5.3 **Survival.** Termination of this Agreement for whatever the reason shall not affect the rights and obligations of the parties accruing prior to the effective date of termination.

**ARTICLE 6.     GENERAL PROVISIONS:**

6.1 **Confidentiality:** Fallon Clinic shall maintain the confidentiality of all the terms and conditions of this Agreement throughout the duration hereof and for a period of three (3) years following the expiration or termination of this Agreement. It is agreed by both parties hereto that the confidentiality of an Eligible Member's personal identifying information and medical report must be protected. Fallon Clinic and Fallon Clinic Staff Model HMO are each prohibited from sending to Schering reports or other information which contain the names, address, telephone number or any other information that would, in the reasonable estimation of the parties hereto, enable Schering to establish the identity of an Eligible Member. Schering may review reports with full Eligible Member names for auditing purposes only if the report remains on Fallon Clinic's premises and no copies or transcript of the Eligible Member's report are made by Schering.

6.2 **Use of Health Plan Name:** Schering may not use the name of Fallon Clinic or the Fallon Clinic Staff Model HMO for any advertisement or publicity or any other reason unless such use has been reviewed and approved by Fallon Clinic prior to use or publication.

6.3 **Notices:** Any notice required or permitted hereunder shall be given in person or sent by first class, certified mail:

To Fallon Clinic at:                           To Schering at:

    Fallon Clinic                              Schering Corporation
    630 Plantation Street                      2000 Galloping Hill Road
    Worcester, MA 01605                        Kenilworth, New Jersey 07033
    ATTN: Patrick Reilly                       ATTN: Contracts & Pricing

or to such other address or to such other person as may be designated by written notice given from time to time during the term of this Agreement by one party to the other.

6.4 **Force Majeure:** Noncompliance with the obligations of this Agreement due to *force majeure*, laws or regulations of any government, war, civil commotion, destruction of production

6

SW0143850

facilities and materials, fire, earthquake or storm, labor disturbances, shortage of materials, failure of public utilities or common carriers, and any other causes beyond the reasonable control of the parties, shall not constitute breach of contract.

6.5 **Non-Assignment:** Neither party shall have the right to assign this Agreement to a third party without the prior written consent of the other party, which consent shall not be unreasonably withheld. Provided, however, that either party may assign its duties, rights and interests under this Agreement, in whole or in part, to its subsidiaries or affiliates without such prior written consent. Any permitted assignee shall assume all obligations of its assignor under this Agreement. No assignment shall relieve either party of responsibility for the performance of any obligations which have already accrued. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assigns.

6.6 **Invalidity/Governing Law:** If any provision of this Agreement is finally declared or found to be illegal or unenforceable by a court of competent jurisdiction, both parties shall be relieved of all obligations arising under such provision, but if capable of performance, the remainder of this Agreement shall not be affected by such declaration or finding. **This Agreement shall be governed by, and enforced and construed in accordance with, the laws of the State of New Jersey without giving effect to the conflicts of laws provision thereof.**

6.7 **Indemnification:** Each party hereto ("Indemnifying Party") shall indemnify and hold harmless the other party, its affiliates, and its and their respective officers, directors, agents and employees from and against any and all liability, loss, proceeding, action, damage, cost or expense of any kind, including without limitation reasonable attorneys' fees and expenses, arising out of or based upon the negligent or willful acts or omissions of the Indemnifying Party or its officers, directors, agents or employees in the performance of its or their obligations pursuant to this Agreement.

6.8 **Compliance With Laws:** Fallon Clinic shall, and shall cause the Fallon Clinic Staff Model HMO to, comply with all applicable laws in connection with this Agreement, including without limitation the reporting requirements and applicable provisions of 42 U.S.C. §1320a-7b (prohibiting illegal remuneration), by fully and accurately disclosing all discounts contained in this Agreement in any filings or claims made under any Federal healthcare program, including the Medicare and Medicaid programs.

6.9 **Entire Agreement; Amendment:** This Agreement, including the Exhibits attached hereto, contains a total integration of all rights, obligations and agreement of both parties with regard to the subject matter hereof. There are no extrinsic conditions, collateral agreements or undertakings of any kind regarding the subject matter hereof, and it is the express intentions of both parties that any and all prior or contemporaneous agreements, promises, negotiations or representations, either oral or written, relating to the subject matter hereof that are not expressly set forth herein are to have no force, effect, or legal consequences of any kind. This Agreement may only be amended by a writing signed by both parties hereto.

Highly Confidential

SW0143851

Schering Corporation:

By: _____
Craig Masker
Title: Manager, Contracts & Pricing

Date: _____5/19/02_____

Fallon Clinic:

By: _____Patrick Reilly_____

Title: _Co-Director, Pharmacy_

Date: _____3/7/02_____

8

Highly Confidential

SW0143852

## EXHIBIT A

### INSTITUTIONAL RETURNED GOODS POLICY/RX

All returns of merchandise for credit over $10,000 must have the prior approval of an authorized Representative and must be forwarded prepaid directly to Schering Corporation, 1011 Morris Avenue, Union, New Jersey 07083.

a.  Credit will be allowed on unopened and undamaged packages at current contract prices as of date of return (except merchandise sold on a special promotion offer, in which case the invoice price will apply) as follows:

1.  For prescription products not purchased on contract, returns made within 3 months after a price increase will be credited at the price prior to the price increase.
2.  Dated products will be given full credit up to one year after expiration.  No credit will be issued for products returned more than one year after expiration.
3.  Based on Schering's judgement, packages that are partially filled or show other evidence of being opened, will receive partial credit.

b.  The above adjustments will appear on Schering's credit memoranda as follows:

1.  Items given full credit will show as individual line extension.
2.  Items currently in the line for which only partial credit has been allowed will be shown as separate line extensions.
3.  Old discontinued items receiving partial credit will be included under "Miscellaneous Product".

c.  Manufacturers are expressly forbidden (under the Federal Food, Drug, and Cosmetic Act) from returning expired dated items to customers. Such items returned to Schering will be destroyed. Schering also reserves the right to destroy without credit packages that are unfit or unsafe for sale or do not comply with applicable law.

d.  Consideration will be given to adjustments for losses suffered in a natural disaster (flood, hurricane, tornado, etc.) not covered by insurance.  Your Schering representative will be glad to assist you in such emergencies.

e.  Schering representatives are not permitted to modify any of the above policies.

f.  Schering reserves the right to change, alter or amend this policy by giving (30) thirty days notice.

This returned goods policy does not apply to goods returned by persons other than the original wholesaler or hospital purchaser of the goods, or to goods which have been repacked in other than original Schering/Key containers.

Highly Confidential                                                                                       SW0143853

# EXHIBIT B - PRICING

| NDC | COMPANY PRODUCT | SIZE | % DISCOUNT FROM NDP | (1) CONTRACT PRICE | (2) FORMULARY STATUS |
|---|---|---|---|---|---|
| 00085126401 | CLARINEX TABLETS | 100 | 20.0% | $146.11 | LISTED |
| 00085126402 | CLARINEX TABLETS | 500 | 20.0% | $730.57 | LISTED |
| 00085126403 | CLARINEX TABLETS | 100 U/D | 20.0% | $146.11 | LISTED |
| 00085126404 | CLARINEX TABLETS | 30 | 20.0% | $43.83 | LISTED |
| 00085122301 | CLARITIN SYRUP | 16OZ | 26.0% | $96.56 | LISTED |
| 00085045803 | CLARITIN TABLETS | 100 | 20.0% | $186.70 | LISTED |
| 00085045804 | CLARITIN TABLETS | 100 U/D | 20.0% | $186.70 | LISTED |
| 00085045805 | CLARITIN TABLETS | 30 | 20.0% | $55.99 | LISTED |
| 00085045806 | CLARITIN TABLETS | 500 | 20.0% | $933.40 | LISTED |
| 00085057102 | INTRON A    10MIU | 2ML | 15.0% | $100.64 | LISTED |
| 00085118402 | INTRON A    3MIU SOL | 6 X 0.5ML | 15.0% | $181.17 | LISTED |
| 00085064705 | INTRON A    3MIU, Pak-3 | 6x1ML | 15.0% | $181.17 | LISTED |
| 00085012002 | INTRON A    5MIU | 1ML | 15.0% | $50.32 | LISTED |
| 00085012005 | INTRON A    5MIU | 1ML | 15.0% | $0.00 | LISTED |
| 00085119102 | INTRON A    5MIU SOL | 6 X  0.5ML | 15.0% | $301.95 | LISTED |
| 00085117902 | INTRON A    10MIU SOL | 6 X 1ML | 15.0% | $603.92 | LISTED |
| 00085111001 | INTRON A    18 MIU | 1ML | 15.0% | $181.17 | LISTED |
| 00085116801 | INTRON A    18MIU SOL | 6MIU/1ML | 15.0% | $181.17 | LISTED |
| 00085028502 | INTRON A    25MIU | 5ML | 15.0% | $251.63 | LISTED |
| 00085113301 | INTRON A    25MIU SOL | 10MIU/1ML | 15.0% | $251.63 | LISTED |
| 00085053901 | INTRON A    50MIU | 1ML | 15.0% | $503.26 | LISTED |
| 00085125401 | INTRON A    Solution Multidose Pens 10MIU | 6x10MIU/.2 ml | 15.0% | $603.92 | LISTED |
| 00085124201 | INTRON A    Solution Multidose Pens 3MIU | 6x3MIU/.2 ml | 15.0% | $181.17 | LISTED |
| 00085123501 | INTRON A    Solution Multidose Pens 5MIU | 6x5MIU/.2 ml | 15.0% | $301.95 | LISTED |
| 00085119701 | NASONEX NASAL SPRAY | 17GM | 35.0% | $33.38 | LISTED |
| 00085330535 | NITRO-DUR   INST  .1MG | 30 | 60.0% | $19.09 | LISTED |
| 00085331035 | NITRO-DUR   INST  .2MG | 30 | 60.0% | $19.09 | LISTED |
| 00085331535 | NITRO-DUR   INST  .3MG | 30 | 60.0% | $21.71 | LISTED |
| 00085332035 | NITRO-DUR   INST  .4MG | 30 | 60.0% | $21.71 | LISTED |
| 00085333035 | NITRO-DUR   INST  .6MG | 30 | 60.0% | $23.55 | LISTED |
| 00085081935 | NITRO-DUR   INST  .8MG | 30 | 60.0% | $23.55 | LISTED |

Highly Confidential

SW0143854

## EXHIBIT B – PRICING

| NDC | COMPANY PRODUCT | SIZE | % DISCOUNT FROM NDP | (1) CONTRACT PRICE | (2) FORMULARY STATUS |
|---|---|---|---|---|---|
| 00085061402 | PROVENTIL INHALATION AEROSOL | 17G | 15.0% | $25.66 | LISTED |
| 00085061403 | PROVENTIL INHALATION REFILL | 17G | 15.0% | $22.30 | LISTED |
| 00085020802 | PROVENTIL SOLUTION | 20ML | 15.0% | $15.94 | LISTED |
| 00085020901 | PROVENTIL SOLUTION | 25X3ML | 15.0% | $36.32 | LISTED |
| 00085123602 | REBETRON 1000/MDV | 1000 | 10.0% | $603.24 | LISTED |
| 00085124102 | REBETRON 1000/PAK-3 | 1000 | 10.0% | $603.24 | LISTED |
| 00085125802 | REBETRON 1000/PEN | 1000 | 10.0% | $603.24 | LISTED |
| 00085123601 | REBETRON 1200/MDV | 1200 | 10.0% | $666.57 | LISTED |
| 00085124101 | REBETRON 1200/PAK-3 | 1200 | 10.0% | $666.57 | LISTED |
| 00085125801 | REBETRON 1200/PEN | 1200 | 10.0% | $666.57 | LISTED |
| 00085123603 | REBETRON 600/MDV | 600 | 10.0% | $494.03 | LISTED |
| 00085124103 | REBETRON 600/PAK-3 | 600 | 10.0% | $494.03 | LISTED |
| 00085125803 | REBETRON 600/PEN | 600 | 10.0% | $494.03 | LISTED |
| 00085104901 | VANCENASE AQ DS | 19G | 27.5% | $34.87 | LISTED |
| 00085064902 | VANCENASE NASAL POCKETHALER | 7G | 25.0% | $29.47 | LISTED |
| 00085073602 | VANCERIL INHALER | 7G | 25.0% | $29.95 | LISTED |

(1) Contract Price represents the contract price calculated based upon the discount percentage listed above off Schering's Net Direct Price on March 1, 2002.  See **Article 4.2** with regards to commercial price increases.

(2) With respect to each Schering Product selected, non-formulary products shall be NDC blocked and/or in a third or higher tier with a co-pay arrangement differential of at least $15.

11

Highly Confidential

# AMENDMENT
## PURCHASE AGREEMENT

AMENDMENT (the "Amendment") to Purchase Agreement dated March 4, 2002, between Fallon Clinic, ("Fallon Clinic"), having a place of business at 100 Hartwell St., West Boylston, MA 01583 and Schering Corporation ("Schering"), a Delaware corporation, having a place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033.

1.   This Amendment supplements and amends the Purchase Agreement (Contract # 200219) as heretofore supplemented and amended ("the Agreement").

2.   This Amendment shall become effective thirty (30) days after execution by Schering. This Amendment will remain in effect through March 31, 2004, unless sooner terminated in accordance with the Agreement.

3.   The Agreement is hereby amended to add the Schering Products Peg-Intron and Rebetol to Exhibit B of the Agreement as set forth attached hereto.

4.   Except as modified in this Amendment, the Agreement and all of its terms and conditions shall remain in full force and effect.

SCHERING CORPORATION

By: _____

Craig Masker

Manager, Contracts and Pricing

Dated: 3/17/02

Fallon Clinic

By: _____

Name: Patrick Reilly

Title: Co-director, Pharmacy

Dated: 3/7/02

Defendants' Exhibit

**2901**

01-12257 - PBS

ighly Confidential

SW0143859

**EXHIBIT A**

(Intentionally left blank.  No change from Agreement)

Highly Confidential                                                    SW0143860

## EXHIBIT B - PRICING

| NDC | COMPANY PRODUCT | SIZE | % DISCOUNT FROM NDP | (1) CONTRACT PRICE | (2) FORMULARY STATUS |
|---|---|---|---|---|---|
| 00085136801 | PEG INTRON FOR INJ 0.7ML DILUENT | 100mcg | 2.0% | $202.43 | LISTED (a) |
| 00085129101 | PEG INTRON FOR INJ 0.7ML DILUENT | 160mcg | 2.0% | $212.55 | LISTED (a) |
| 00085130401 | PEG INTRON FOR INJ 0.7ML DILUENT | 240mcg | 2.0% | $223.18 | LISTED (a) |
| 00085127901 | PEG INTRON FOR INJ 0.7ML DILUENT | 300mcg | 2.0% | $234.33 | LISTED (a) |
| 00085132704 | REBETOL CAPS 200MG | 42 | 10.0% | $309.96 | LISTED (a) |
| 00085135105 | REBETOL CAPS 200MG | 56 | 10.0% | $413.28 | LISTED (a) |
| 00085138507 | REBETOL CAPS 200MG | 70 | 10.0% | $516.60 | LISTED (a) |
| 00085119403 | REBETOL CAPS 200MG | 84 | 10.0% | $619.92 | LISTED (a) |

(a)  Both Peg-Intron and Rebetol must be listed on Formulary.

**Terms:**

To be eligible for the Peg-Intron and Rebetol contract pricing set forth in Exhibit B, Fallon Clinic must provide unencumbered reimbursement for both Peg Intron and Rebetol. For the purposes of this Amendment unencumbered reimbursement for Peg Intron and Rebetol shall mean Peg Intron and Rebetol shall have an equivalent (or better) status as compared to other Hepatitis C therapies within this therapy class on Fallon Clinic's formulary or equivalent listing for injectable products.

Additionally, Fallon Clinic shall not subject Peg-Intron and Rebetol to a Restriction or Economic Penalty, whether by reason of its listing on Fallon Clinic's Formulary or otherwise. For the purposes of this Amendment and the Agreement, the term "Restriction and Economic Penalty" with respect to any product shall mean (a) making such product subject to NDC blocks or other pharmacy prompts that discourage the dispensing or prohibit reimbursement of such product, unless (i) such blocks or prompts are related to drug interactions with other prescription or over-the-counter drug products, (ii) such blocks or prompts are related to contraindications, or (iii) it becomes generally accepted in the US medical community that the use of the product should be restricted or curtailed for clinical reasons relating to patient safety.

**Counter Detailing:**

No contract pricing shall be provided for Peg Intron and Rebetol if during the Term of this Agreement Fallon Clinic engages in any counter-detailing or disincentivizing efforts against Peg Intron and Rebetol in favor of a competitive product within the same therapeutic class. This restriction shall apply to Fallon Clinic or any subsidiary and/or affiliate of Fallon Clinic entitled to discounts

Highly Confidential

under the terms and conditions of this Agreement.   For the purposes of this Agreement, counter-detailing and disincentivizing shall include, but will not be limited to, any effort by Fallon Clinic to actively replace prescriptions for Product(s) to competitive products whether generic or branded within the same therapy class. *Schering reserves the right to renegotiate discounts on Peg Intron and Rebetol if Fallon Clinic restricts utilization of Peg Intron or Rebetol more specifically than is outlined in the FDA approved package insert for these products.*

**In addition, Fallon Clinic must fulfill the following HCV Initiatives:**

- Fallon Clinic shall offer Be-In-Charge enrollment to all new eligible members treated with Schering HCV Products via written communication.

- Fallon Clinic shall communicate to all affiliated I.D.'s and G.E.'s within Fallon Clinic's physician network describing the value of the Be-In-Charge program via letter distribution or other commercially acceptable methods of communication.

Highly Confidential

# SCHERING CORPORATION

GALLOPING HILL ROAD                KENILWORTH, N. J. 07033

CABLES: SCHERING KENILWORTH
TELEX: 138316
138260
TELEPHONE: (908) 298-4000

November 16, 1998

RECEIVED
NOV 17 1998
TRADE FINANCIAL SERVICES

Edward S. Curran Jr., R.Ph.
Vice President, Pharmaceutical Relations
Aetna Pharmacy Management
400-1 Totten Pond Road
Waltham, MA  02154

Dear Mr. Curran:

Enclosed is your copy of the countersigned original of the Addendum to Agreement #SR4960055 between Aetna Pharmacy Management and Schering Corporation.

Thank you for your support of the Schering/Key product line. We look forward to a continued mutually beneficial relationship with Aetna Pharmacy Management.

Sincerely,

John A Cheslock

John Cheslock
Contracts and Pricing

c:Cathy Moriarty

Defendants' Exhibit
**2902**
01-12257 - PBS

HIGHLY CONFIDENTIAL

SW0676604

EXHIBIT A-1 — HMO

For the designated contract period, Company agrees to reimburse Aetna Pharmacy Management in accordance with this Agreement, based on actual dispensing of Company Products.

1. If listed by Aetna Pharmacy Management on the published Aetna Pharmacy Management Formulary of the Members which it represents, which is communicated to Participating Affiliate Health Plans and from time to time, then Company agrees to rebate to Aetna Pharmacy Management as follows:

<u>Base/Formulary Rebate</u> is calculated by multiplying Schering Product Volume by Base/Formulary Rebate Percentage. Schering Product Volume for a particular product is defined as utilization of that Product by Eligible Members in Participating Affiliate Health Plans multiplied by that Product's Net Direct Price.

<u>Market Share Rebate</u>
Market Share Rebate is calculated by multiplying Schering Product Volume times Additional Rebate (as identified in column 'c' of Formulary Rebate Schedule), times the number of Performance Tiers achieved.
A Performance Tier is achieved each time Schering product market share exceeds the applicable Base Market Share by the full number of market share points (as identified in column 'b' of Formulary Rebate Schedule).

In no event will the combination of Base Rebate (as identified in column 'a' of Formulary Rebate Schedule) plus Market Share Rebate (defined above), exceed the Maximum Rebate (as identified in column 'd' of Formulary Rebate Schedule).

If Schering Product Market Share does not exceed Base Market Share, the Base/Formulary Rebate will apply without penalty.

<u>Product Market Definition</u> which will be used in determining the Market Share Rebate is defined on Attachment D.

22

HIGHLY CONFIDENTIAL

SW0676605

*Tiers* (handwritten)

**EXHIBIT A-1**

**DISCOUNT SCHEDULE FOR HMO BUSINESS**

*o Tier*    *tier step*    *disc step* (handwritten annotations)

| Company Product | Base/Formulary Rebate | % Points Above Base Market Share | Additional Discount | Maximum Discount | | |
|---|---|---|---|---|---|---|
| DIPROLENE | 11% | 2% | 1% | 15% | 31 | 33 |
| ELOCON | 11% | 2% | 1% | 15% | 46 | 48 |
| LOTRISONE | 8% | 2% | 1% | 10% | 41 | 43 |
| IMDUR | 10% | 2% | 1% | 15% | 57 | 59 |
| INTRON | 3% | N/A | N/A | 3% | — | — |
| K-DUR 20 mEQ | 11% | 2% | 1% | 15% | 52 | 54 |
| NITRO-DUR | 20% | 2% | 1% | 25% | 53 | 55 |
| NORMODYNE | 21% | 2% | 1% | 25% | 73 | 75 |
| UNI-DUR | 11% | 2% | 1% | 15% | 1 | 3 |
| PROVENTIL Repetabs | 10% | 2% | 1% | 15% | 38 | 40 |

*(handwritten: 95-4, BASE ms, Tier min; "Flat" beside INTRON)*

\* Incremental discount is based on 1% additional discount points for each 2% increase in total Rx market share above Base Market Share.

If listed by Aetna Pharmacy Management on the published Aetna Pharmacy Management Formulary of the Members which it represents, which is communicated to Participating Affiliate Health Plans and from time to time, then Company agrees to rebate to Aetna Pharmacy Management as follows:

| DISCOUNT SCHEDULE FOR HMO BUSINESS | |
|---|---|
| COMPANY PRODUCT | % REBATE OFF NET DIRECT PRICE |
| THEO-DUR | 12% |

23

HIGHLY CONFIDENTIAL

SW0676606

EXHIBIT A-2    *Mng Choice*

For the designated contract period, Company agrees to reimburse Aetna Pharmacy Management in accordance with this Agreement, based on actual dispensing of Company Products.

1. If listed by Aetna Pharmacy Management on the published Aetna Pharmacy Management Formulary of the Members which it represents, which is communicated to Participating Affiliate Health Plans and from time to time, then Company agrees to rebate to Aetna Pharmacy Management as follows:

   Base/Formulary Rebate is calculated by multiplying Schering Product Volume by Base/ Formulary Rebate Percentage. Schering Product Volume for a particular product is defined as utilization of that Product by Eligible Members in Participating Affiliate Health Plans multiplied by that Product's Net Direct Price.

   Market Share Rebate
   Market Share Rebate is calculated by multiplying Schering Product Volume times Additional Rebate (as identified in column 'c' of Formulary Rebate Schedule), times the number of Performance Tiers achieved.
   A Performance Tier is achieved each time Schering product market share exceeds the applicable Base Market Share by the full number of market share points (as identified in column 'b' of Formulary Rebate Schedule).

   In no event will the combination of Base Rebate (as identified in column 'a' of Formulary Rebate Schedule) plus Market Share Rebate (defined above), exceed the Maximum Rebate (as identified in column 'd' of Formulary Rebate Schedule).

   If Schering Product Market Share does not exceed Base Market Share, the Base/Formulary Rebate will apply without penalty.

   Product Market Definition which will be used in determining the Market Share Rebate is defined on Attachment D.

   "Formulary" as used herein shall mean products which are reimbursed if included in a published formulary/prescribing guidelines and distributed to medical providers.

24

HIGHLY CONFIDENTIAL

SW0676607

*Tiers*

### EXHIBIT A-2

### DISCOUNT SCHEDULE FOR MANAGED CHOICE BUSINESS

| Company Product | Base/Formulary Rebate | % Points Above Base Market Share | Additional Discount | Maximum Discount | Base ms | min Tier |
|---|---|---|---|---|---|---|
| DIPROLENE | 9% | 2% | 0.5% | 15% 34 | 34 | 36 |
| ELOCON | 9% | 2% | 0.5% | 15% 44 | 44 | 46 |
| LOTRISONE | 5% | 2% | 0.5% | 10% 42 | 42 | 44 |
| IMDUR | 8% | 2% | 0.5% | 15% 62 | 62 | 64 |
| INTRON | 3% | N/A | N/A | 3% | – | – |
| K-DUR 20 mEQ | 9% | 2% | 0.5% | 15% 58 | 58 | 60 |
| NITRO-DUR | 15% | 2% | 0.5% | 25% 53 | 53 | 55 |
| NORMODYNE | 18% | 2% | 0.5% | 25% 68 | 68 | 70 |
| UNI-DUR | 9% | 2% | 0.5% | 15% 2 | 2 | 4 |
| PROVENTIL Repetabs | 8% | 2% | 0.5% | 15% 31 | 31 | 33 |

\*   Incremental discount is based on 0.5% additional discount points for each 2% increase in total Rx market share above Base Market Share.

If listed by Aetna Pharmacy Management on the published Aetna Pharmacy Management Formulary of the Members which it represents, which is communicated to Participating Affiliate Health Plans and from time to time, then Company agrees to rebate to Aetna Pharmacy Management as follows:

| DISCOUNT SCHEDULE FOR MANAGED CHOICE BUSINESS | |
|---|---|
| COMPANY PRODUCT | % REBATE OFF NET DIRECT PRICE |
| THEO-DUR | 12% |

HIGHLY CONFIDENTIAL

SW0676608

SR4960035

# EXHIBIT D

## MARKET DEFINITIONS

### A.  TOPICAL STEROID MEDIUM POTENCY

| | |
|---|---|
| ELOCON | 4. Kenalog |
| VALISONE | Topicort LP |
| Synalar | Cutivate |
| Aristocort | Aclovate |
| Hytone | Dermatop |
| Westcort | |

*Products X'd off are already included on a existing agreem.*

*SR 4950055*

### B.  ORALLY INHALED STEROID

| | |
|---|---|
| VANCERIL | Azmacort |
| Aerobid/M | Beclovent |
| Flovent | Budesonide* |
| Beclomethasone Dipropionate Oral 84 micrograms* | |

### C.  XANTHINE TABLET/CAPSULE

| | |
|---|---|
| THEO-DUR | |
| UNI-DUR | Slophylline |
| Slobid | Theolaire |
| Theo-24 | Theochron |
| Uniphyl | |

### D.  NASALLY INHALED STEROID

| | |
|---|---|
| VANCENASE AQ/POCKETHALER | |
| Beconase AQ/Inhaler | |
| Nasalide | Nasacort |
| Nasalcrom | Rhinocort |
| Flonase | Dexacort |
| Decadron | |
| Beclomethasone Dipropionate Nasal 84 micrograms* | |

### E.  ANTIHISTAMINE TABLET/CAPSULE

| | |
|---|---|
| CLARITIN/D | ZYRTEC |
| Hismanal | Allegra |
| Seldane/D | |
| NON-SEDATING ANTIHISTAMINES | |

### F.  TRANSDERMAL NITROGLYCERIN

| | |
|---|---|
| NITRO-DUR | Transdermal-Nitro |
| Nitrodisc | NTS |
| Deponit | Minitran |

34

HIGHLY CONFIDENTIAL

**G. LONG-ACTING NITRATES TABLET/CAPSULE**

IMDUR                                    Ismo
Monoket

**H. POTASSIUM CHLORIDE TABLET/CAPSULE**

K-DUR 10/20mEg                  Klotrix
K-Tab                                    Slow-K
Micro-K                                 Klor-Con 8/10
Ten-K                                    K-Lease
Koan-C1                               K-Norm
K-Lor

**I.  ALPHA/BETA BLOCKERS**

NORMODYNE                      Trandate

**J. TOPICAL STEROID HIGH POTENCY**

DIPROLENE                        Cyclocort
DIPROSONE                       Psorcon
Temovate                            Topicort
Ultravate                             Lidex/E
Maxivate

**K. TOPICAL ANTIFUNGAL SINGLE/COMBO**

LOTRISONE                       Nixoral
LOTRIMIN                          Nizoral
Spectazole                        Naftin
Monistat-Derm                  Loprox
Oxistat                              Mycelex
Exelderm                          Lamisil

*SHALL BE INCLUDED IN THE MARKET DEFINITION UPON FDA APPROVAL.

HIGHLY CONFIDENTIAL

SW0676610

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Elocon ✓ | 3,039 | 46.01% | 3,850 | 43.77% | 3,203 | 40.16% | 40% |
| Aclovate | 531 | 46 | 905 | 44 | 800 | | |
| Aristocort ✓ | 114 | | 65 | | 105 | | |
| Cutivate | 240 | | 471 | | 435 | | |
| Dermatop | 133 | | 169 | | 229 | | |
| Hytone | 232 | | 502 | | 577 | | |
| Kenalog | 54 | | 99 | | 187 | | |
| Synalar | 74 | | 139 | | 196 | | |
| Topicort ✓ | 39 | | 59 | | 89 | | |
| Valisone | 50 | | 184 | | 256 | | |
| Westcort | 2,099 | | 2,353 | | 1,898 | | |
| | 6,605 | | 8,796 | | 7,975 | | |

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Uni-Dur ✓ | 74 | 0.84% | 107 | 1.62% | 147 | 1.39% | 1% |
| Slobid | 2,007 | 1 | 1,410 | 2 | 2,030 | | |
| Slophylline | 51 | | 44 | | 69 | | |
| Theo-24 | 467 | | 484 | | 913 | | |
| Theochron | 1,371 | | 823 | | 1,421 | | |
| Theolaire | 213 | | 116 | | 363 | | |
| Theo-Dur | 3,456 | | 2,446 | | 4,346 | | |
| Uniphyl | 1,164 | | 1,161 | | 1,263 | | |
| | 8,803 | | 6,591 | | 10,552 | | |

not for HMO MC

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Claritin ✓ | 19,597 | 42.17% | 34,351 | 60.51% | 29,880 | 60.20% | 60% |
| Hismanal | 3,010 | | 4,047 | | 3,907 | | |
| Seldane | 23,869 | | 18,372 | | 15,847 | | |
| | 46,476 | | 56,770 | | 49,634 | | |

#2 - missing Claritin D

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Nitro-Dur ✓ | 2,135 | 52.53% | 845 | 52.98% | 4,475 | 43.63% | 44% |
| Deponit | 369 | | 194 | | 1,580 | | |
| Minitran | 684 | 53 | 236 | 53 | 1,756 | | |
| Nitrodisc | 13 | | 7 | | 65 | | |
| NTG | 43 | | 24 | | 128 | | |
| Transdermal-Nitro | 820 | | 289 | | 2,252 | | |
| | 4,064 | | 1,595 | | 10,256 | | |

Page 2

HIGHLY CONFIDENTIAL

SW0676611

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| **Imdur** ✓ | 565 | 57.48% | 1,118 | 62.21% | 3,510 | 51.50% |
| Ismo | 340 | *57* | 483 | *62* | 2,354 | *52%* |
| Monoket | 78 | | 196 | | 951 | |
| | 983 | | 1,797 | | 6,815 | |

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| **K-Dur** ✓ | 6,849 | 51.65% | 3,851 | 57.64% | 12,655 | 52.68% |
| K-Tab | 414 | *52* | 322 | *58* | 1,257 | *53%* |
| K-Lor | 14 | | 17 | | 68 | |
| K-Lease | 1 | | 2 | | 10 | |
| K-Norm | 9 | | 9 | | 34 | |
| Klor-Con 8/10 | 4,320 | | 1,063 | | 3,550 | |
| Klotrix | 99 | | 113 | | 408 | |
| Kaon-Cl | 94 | | 82 | | 539 | |
| Micro-K | 1,038 | | 791 | | 3,979 | |
| Slow-K | 349 | | 426 | | 1,484 | |
| Ten-K | 74 | | 5 | | 40 | |
| | 13,261 | | 6,681 | | 24,024 | |

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| **Normodyne** ✓ | 1,616 | 72.96% | 1,236 | 68.21% | 2,228 | 70.13% |
| Trandate | 599 | *73* | 576 | *68* | 949 | *70%* |
| | 2,215 | | 1,812 | | 3,177 | |

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| **Diprolene** ✓ | 2,063 | 30.96% | 3,199 | 34.46% | 2,841 | 28.11% |
| Cyclocort | 405 | *31* | 340 | *34* | 476 | *28%* |
| Diprosone | 41 | | 133 | | 171 | |
| Lidex | 464 | | 741 | | 921 | |
| Maxivate | 11 | | 35 | | 41 | |
| Psorcon | 886 | | 1,080 | | 1,119 | |
| Temovate | 1,606 | | 1,989 | | 2,344 | |
| Topicort | 578 | | 759 | | 1,026 | |
| Ultravate | 609 | | 1,007 | | 1,167 | |
| | 6,663 | | 9,283 | | 10,106 | |

HIGHLY CONFIDENTIAL

SW0676612

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| **Lotrisone** | 4,702 | 40.83% | 5,491 | 41.74% | 5,868 | 41.44% | 41% |
| Exelderm | 203 | | 290 | | 278 | | |
| Lamisil | 749 | 41 | 1,782 | 42 | 2,044 | | |
| Loprox | 901 | | 685 | | 911 | | |
| Lotrimin | 32 | | 118 | | 130 | | |
| Monistat-Derm | 28 | | 15 | | 97 | | |
| Mycelex | 74 | | 1 | | 45 | | |
| Oxistat | 263 | | 369 | | 446 | | |
| Naftin | 274 | | 344 | | 369 | | |
| Nizoral | 3,543 | | 3,143 | | 2,825 | | |
| Spectazole | 746 | | 917 | | 1,147 | | |
| | 11,515 | | 13,155 | | 14,160 | | |

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/Q 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| **Proventil Repetabs** | 1,790 | 37.72% | 1,394 | 30.54% | 2,039 | 35.63% | 36% |
| Alupent | 7 | 38 | 18 | 31 | 42 | | |
| Brethaire | 0 | | 0 | | 0 | | |
| Bricanyl | 1,142 | | 895 | | 973 | | |
| Metaprel | 78 | | 58 | | 69 | | |
| Proventil Tablets | 1,045 | | 727 | | 1,000 | | |
| Ventolin | 400 | | 758 | | 733 | | |
| Volmax | 284 | | 715 | | 866 | | |
| | 4,746 | | 4,565 | | 5,722 | | |

HIGHLY CONFIDENTIAL

SW0676613

*HMO* (handwritten)

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Elocon ✓ | 3,039 | 46.01% | 3,850 | 43.77% | 3,203 | 40.16% | 40% |
| Aclovate | 531 | *46* | 905 | *44* | 800 | | |
| Aristocort | 114 | | 65 | | 105 | | |
| Cutivate | 240 | | 471 | | 435 | | |
| Dermatop | 133 | | 169 | | 229 | | |
| Hytone | 232 | | 502 | | 577 | | |
| Kenalog | 54 | | 99 | | 187 | | |
| Synalar | 74 | | 139 | | 196 | | |
| Topicort | 39 | | 59 | | 89 | | |
| Valisone | 50 | | 184 | | 256 | | |
| Westcort | 2,099 | | 2,353 | | 1,898 | | |
| | 6,605 | | 8,796 | | 7,975 | | |

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Uni-Dur ✓ | 74 | 0.84% | 107 | 1.62% | 147 | 1.39% | 1% |
| Slobid | 2,007 | *1* | 1,410 | *2* | 2,030 | | |
| Slophylline | 51 | | 44 | | 69 | | |
| Theo-24 | 467 | | 484 | | 913 | | |
| Theochron | 1,371 | | 823 | | 1,421 | | |
| Theolaire | 213 | | 116 | | 363 | | |
| Theo-Dur | 3,456 | | 2,446 | | 4,346 | | |
| Uniphyl | 1,164 | | 1,161 | | 1,263 | | |
| | 8,803 | | 6,591 | | 10,552 | | |

*not for HMO, MC* (handwritten)

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Claritin ✓ | 19,597 | 42.17% | 34,351 | 60.51% | 29,880 | 60.20% | 60% |
| Hismanal | 3,010 | | 4,047 | | 3,907 | | |
| Seldane | 23,869 | | 18,372 | | 15,847 | | |
| | 46,476 | | 56,770 | | 49,634 | | |

*#2 - Missing Claritin D* (handwritten)

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share | |
|---|---|---|---|---|---|---|---|
| Nitro-Dur ✓ | 2,135 | 52.53% | 845 | 52.98% | 4,475 | 43.63% | 44% |
| Deponit | 369 | | 194 | | 1,580 | | |
| Minitran | 684 | *53* | 236 | *53* | 1,756 | | |
| Nitrodisc | 13 | | 7 | | 65 | | |
| NTG | 43 | | 24 | | 128 | | |
| Transdermal-Nitro | 820 | | 289 | | 2,252 | | |
| | 4,064 | | 1,595 | | 10,256 | | |

HIGHLY CONFIDENTIAL

SW0676614

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| Imdur ✓ | 565 | 57.48% * | 1,118 | 62.21% | 3,510 | 51.50% |
| Ismo | 340 | | 483 | | 2,354 | |
| Monoket | 78 | | 196 | | 951 | |
| | 983 | | 1,797 | | 6,815 | |

*(handwritten: 57, 62, 52%)*

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| K-Dur ✓ | 6,849 | 51.65% | 3,851 | 57.64% | 12,655 | 52.68% |
| K-Tab | 414 | | 322 | | 1,257 | |
| K-Lor | 14 | | 17 | | 68 | |
| K-Lease | 1 | | 2 | | 10 | |
| K-Norm | 9 | | 9 | | 34 | |
| Klor-Con 8/10 | 4,320 | | 1,063 | | 3,550 | |
| Klotrix | 99 | | 113 | | 408 | |
| Kaon-Cl | 94 | | 82 | | 539 | |
| Micro-K | 1,038 | | 791 | | 3,979 | |
| Slow-K | 349 | | 426 | | 1,484 | |
| Ten-K | 74 | | 5 | | 40 | |
| | 13,261 | | 6,681 | | 24,024 | |

*(handwritten: 52, 58, 53%)*

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| Normodyne ✓ | 1,616 | 72.96% | 1,236 | 68.21% | 2,228 | 70.13% |
| Trandate | 599 | | 576 | | 949 | |
| | 2,215 | | 1,812 | | 3,177 | |

*(handwritten: 73, 68, 70%)*

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| Diprolene ✓ | 2,063 | 30.96% | 3,199 | 34.46% | 2,841 | 28.11% |
| Cyclocort ✓ | 405 | | 340 | | 476 | |
| Diprosone | 41 | | 133 | | 171 | |
| Lidex ✓ | 464 | | 741 | | 921 | |
| Maxivate ✓ | 11 | | 35 | | 41 | |
| Psorcon ✓ | 886 | | 1,080 | | 1,119 | |
| Temovate ✓ | 1,606 | | 1,989 | | 2,344 | |
| Topicort ✓ | 578 | | 759 | | 1,026 | |
| Ultravate ✓ | 609 | | 1,007 | | 1,167 | |
| | 6,663 | | 9,283 | | 10,106 | |

*(handwritten: 31, 34, 28%)*

Page 3

HIGHLY CONFIDENTIAL

SW0676615

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| Lotrisone | 4,702 | 40.83% | 5,491 | 41.74% | 5,868 | 41.44% |
| Exelderm | 203 | | 290 | | 278 | |
| Lamisil | 749 | 41 | 1,782 | 42 | 2,044 | 41% |
| Loprox | 901 | | 685 | | 911 | |
| Lotrimin | 32 | | 118 | | 130 | |
| Monistat-Derm | 28 | | 15 | | 97 | |
| Mycelex | 74 | | 1 | | 45 | |
| Oxistat | 263 | | 369 | | 446 | |
| Naftin | 274 | | 344 | | 369 | |
| Nizoral | 3,543 | | 3,143 | | 2,825 | |
| Spectazole | 746 | | 917 | | 1,147 | |
| | 11,515 | | 13,155 | | 14,160 | |

| | HMO 4Q95 Rx's | Market Share | MC 4Q95 Rx' | Market Share | C/O 4Q95 Rx' | Market Share |
|---|---|---|---|---|---|---|
| Proventil Repetabs | 1,790 | 37.72% | 1,394 | 30.54% | 2,039 | 35.63% |
| Alupent | 7 | 38 | 18 | 31 | 42 | 36% |
| Brethaire | 0 | | 0 | | 0 | |
| Bricanyl | 1,142 | | 895 | | 973 | |
| Metaprel | 78 | | 58 | | 69 | |
| Proventil Tablets | 1,045 | | 727 | | 1,000 | |
| Ventolin | 400 | | 758 | | 733 | |
| Volmax | 284 | | 715 | | 866 | |
| | 4,746 | | 4,565 | | 5,722 | |

HIGHLY CONFIDENTIAL

SW0676616

**EXHIBIT A**

The following discounts for Claritin and Claritin D are contingent upon (a) Healthcare Organization listing Claritin and Claritin D along with, at Healthcare Organization's option, either Seldane and/or Seldane D or Hismanal, as the only products on the HMO and Managed Choice *closed National Formulary in the non-sedating antihistamine and antihistamine/decongestant categories, and (b) Healthcare Organization's HMO and Managed Choice plans adopting *closed National Formulary. If at any time during the term of this Agreement both (a) and (b) in the preceding sentence are not in effect, then such discounts shall not be available for Healthcare Organization, and the parties shall renegotiate such discounts in good faith.

| PRODUCT | %OF CURRENT NET DIRECT PRICE |
|---|---|
| Claritin | 12%. |
| Claritin D | 21% *Higher Dix* |

*Discount Base Share Tier*

*Didn't so get lower dix*

The following discounts for Proventil, Vancenase, Vancenase/AQ and Vanceril, are contingent upon @ Healthcare Organization listing these products as the exclusive albuterol inhaler, exclusive beclomethasone dipropionate/monohydrate nasal inhaler, and the exclusive beclomethasone dipropionate inhaler on the HMO and Managed Care *closed National Formulary in the corresponding therapeutic categories and (b) Healthcare Organization's HMO and Managed Choice plans adopting Healthcare Organization's *closed National Formulary. If at any time during the term of this Agreement (b) in the preceding sentence is not in effect, then such discounts shall not be available for Healthcare Organization, and the parties shall renegotiate such discounts in good faith. If at any time during the term of this Agreement only (b) in the first sentence of this paragraph is in effect and (a) is not, then the discounts available to Healthcare Organization for Proventil, Vancenase/AQ, and Vanceril, shall be set forth of the adjusted discount schedule.

| PRODUCT | %OF CURRENT NET DIRECT PRICE |
|---|---|
| Proventil Inhaler | 25% |
| Vancenase/AQ | 25% *Higher Disc.* |
| Vanceril Inhaler | 25% |

*Base Share Tier*

HIGHLY CONFIDENTIAL

SW0676617



## EXHIBIT A

 one or more of the following three conditions occurs, then the corresponding discounts will be adjusted as follows:

*LEFT MSG FOR BETSY. RE: IF MC 5 OR MORE BELOW 2Q BOTH SET LOWER DISCOUNT.*

| PRODUCT | ADJUSTED DISCOUNT |
|---------|-------------------|
| Claritin *see addendum as of 20% 20%* | 8% |
| Claritin D | 18% |
| Proventil Inhaler | 20% |
| Vancenase/AQ | 20% |
| Vanceril Inhaler *see addendum as of 1997* | 20% |

*OTHER DISCOUNTS 1/7/97*

*Lower Disc*

1) Healthcare Organization's market shares for the aforementioned Schering Products fall below Healthcare Organization's Base Market Share or the Market Share for the previous quarter for such Products (determined on a product by product basis).

2) Effective January 1, 1996, the Managed Choice market share for the aforementioned Schering Products is 5 or more market share points below the HMO market share.

*Don't have to update contract. Just review from qtr to qtr.*

3) Hard computer edits noting the non-reimbursable status of competitive non-formulary products are not in place by dates listed below:

*This applies only to Claritin/D. The others have to get the lower discount*

| HMO | MANAGED CHOICE |
|-----|----------------|
| 4 plans by 11/95 | 50% of membership by 3/97 |
| 50% of membership by 6/96 | 85% of membership by 12/97 |
| 70% of membership by 12/96 | |
| 100% of membership by 7/97 | |

If such hard computer edits are not in place by such date, then, at Healthcare Organization's request upon Health Organization demonstrating best efforts to achieve such hard computer edits, Company will consider, in its sole discretion, whether to modify such hard computer edit requirements. Company shall not be required to make any such modifications.

Healthcare Organization will communicate Formulary Status in the non-sedating antihistamine class through published formulary documents by 1/1/96.

Healthcare Organization will address Schering Corporation product positioning (specifically Claritin and Claritin D) in Health Partners-a Minnesota Health Plan organization for which Healthcare Organization provides prescription services.

*closed formulary means that non-formulary products are not reimbursed and plan members will have a 100% co-pay.
**computer edits will dictate no reimbursement for non-formulary products.

*9/24 Frank spoke to Brian L and he said*

bc50824a

-18-

HIGHLY CONFIDENTIAL

# PURCHASE AGREEMENT

This Purchase Agreement is between Harvard Pilgrim Health Care, Inc.-Harvard Staff, ("Harvard"), having a place of business at 93 Worcester Street, Wellesley, MA 02481 and Schering Corporation ("Schering"), a Delaware corporation, having a place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033.

This Agreement sets forth the terms and conditions pursuant to which Schering will provide pricing to Harvard staff model health maintenance organization (the "Harvard Staff Model HMO") based, in part, on the actual dispensing of those Schering products specified in Exhibit B ("Products") to Eligible Members (as defined below) by the Harvard Staff Model HMO.

Harvard and Schering agree as follows:

## ARTICLE 1.        DEFINITIONS:

1.1   "Eligible Member" as used herein shall mean an individual enrolled in the Harvard Staff Model HMO; *provided, however,* that "Eligible Members" shall not include individuals who are also enrolled in other organizations that either (i) purchase any of the Products other than pursuant to this Agreement; or (ii) receive rebates based on utilization of the Products by any such individual.

1.2   "Formulary" as used herein shall mean a listing of the drugs Harvard has reviewed, approved and recommended for use at the Harvard Staff Model HMO.

1.3   "Net Direct Price" as used herein shall mean the price published from time to time by Schering as its net direct price for each Product.

## ARTICLE 2.        PRODUCT SALE

2.1 **Sale of Product.** Schering shall make the Products available to the Harvard Staff Model HMO through Cardinal Distribution, Inc. and AmerisourceBergen (the "Prime Vendors"). Harvard shall notify Schering in writing of any change to its Prime Vendor(s), which Prime Vendor(s) shall be mutually acceptable to Harvard and Schering. Schering shall report to the Prime Vendor(s) the pricing to which the Harvard Staff Model HMO is entitled for the Products pursuant to this Agreement. The actual price for the Products paid by the Harvard Staff Model HMO to the Prime Vendor(s) shall be as agreed upon by Harvard and its Prime Vendor(s). See attached wholesaler sheet.

2.2   **Product Returns.**  All Product returns are subject to Schering's Institutional Returned Goods Policy attached hereto as **Exhibit A.**

2.3   **Schering Warranties and Covenants.**  Schering warrants that all Product sold to the Harvard Staff Model HMO pursuant to this Agreement conforms to the descriptions set forth in each such Product's respective labeling provided that such units of the Products are used by the Harvard Staff Model HMO in accordance with such labeling.

2

Defendants' Exhibit

**2903**

01-12257 - PBS

HIGHLY CONFIDENTIAL

SW0378909

### ARTICLE 3.   OBLIGATIONS OF HARVARD STAFF:

3.1 **Formulary.** In order to obtain the discounted pricing on each Product as detailed in **Exhibit B**, the Harvard Staff Model HMO must list such Product on its Formulary with the Formulary status for such Product detailed in **Exhibit B**. In the event the Harvard Staff Model HMO fails to satisfy the Formulary listing requirements established pursuant to this Section 3.1 for any Product, the Harvard Staff Model HMO will not be entitled to and shall not receive the discounted pricing for such Product detailed in **Article 4**.

3.2 **Own Use.** Harvard hereby warrants and agrees that all Product purchased pursuant to this Agreement shall be utilized solely by the Harvard Staff Model HMO for its "own use" as that term is defined by the United States Supreme Court in <u>Portland Retail Druggists' Association, Inc.</u> v. <u>Abbott Laboratories et. al</u>, 425 U.S. 1 (1976). Harvard acknowledges and agrees that Schering is not required to provide a discount for any Product sold, used or dispensed to other than for the Harvard Staff Model HMO's "own use" as described in this Section 3.2.

3.2 **Audit.** Harvard will use commercially reasonable efforts to institute and conduct on a regular basis random audits of the Harvard Staff Model HMO to ensure that actual dispensing of the Products complies with the terms of this Agreement, including the restrictions of Section 3.2 hereof. Adjustments as a result of such audits shall be refunded to Schering no later than thirty (30) days after completion of such audit. Harvard shall use commercially reasonable efforts to keep and maintain accurate books, records and files with respect to the Products, any reports submitted to Schering as part of the random audits completed pursuant to this Section, and all information relating to the purchase and dispensing of the Products pursuant to this Agreement. Harvard agrees that Schering shall have the right to conduct inspections and/or audits of Harvard's and/or the Harvard Staff Model HMO's books, records, and files ~~from time to time, and that within ten (10) days following Harvard's receipt of a written request from Schering, the Harvard Staff Model HMO and/or Harvard shall make such information (and such other information necessary to confirm such information) available in a manner satisfactory to Schering, for inspection and/or audit by Schering's representatives or its designated auditors during regular business hours. Schering agrees that any such inspections and/or audits shall be subject to the requirements of state and federal law regarding the confidentiality of medical and prescription records.~~ *in Accordance with the attached Staff Model Audit Rights* KPH

### ARTICLE 4.   OBLIGATIONS OF SCHERING:

4.1 **Discount.** Subject to compliance with all of the terms and satisfaction of all of the conditions set forth in this Agreement, and subject further to the provisions of Section 4.2 hereof, Schering shall provide Harvard with the discounted pricing set forth on Exhibit B for each of the Products dispensed by the Harvard Staff Model HMO for the treatment of Eligible Members. All discounts pursuant to this Agreement shall be based on Schering's Net Direct Price for Products.

4.2 **Price Increases.** Anything to the contrary herein notwithstanding, Schering hereby reserves the right in its sole discretion to increase the prices for the Products set forth on Exhibit B at any time to reflect or account for comparable increases made to its published Net Direct Price list.

3

HIGHLY CONFIDENTIAL

SW0378910

4.3   **Eligibility for Discounts.**  The Harvard Staff Model HMO's continued access to the Product discount for each Product is contingent upon Harvard complying with all of its obligations and responsibilities pertaining to such Product as detailed in this Agreement.  Failure on the part of Harvard to fulfill its responsibilities or satisfy the conditions as set forth herein for a Product shall be grounds for Schering to reduce the discount for such Product to zero percent.

4.4   **Ineligibility for Discounts.** No discounts will be provided hereunder for:

(a)   any Product which is listed on the Formulary other than as set forth in this Agreement;

(b)   any units of Product for which Schering is obligated to pay rebates or provide discounts or other price reductions to any other party or governmental entity or with respect to any government health program including, without limitation Medicaid, Medicare or similar programs; and/or

(c)   any units of  Product which are not used or dispensed as required by this Agreement.

4.5   **Excess Discounts.**  If Schering reasonably determines as a result of an inspection and/or audit of Harvard (or the Harvard Staff Model HMO), any notice to Schering or other information that (i) Harvard has not satisfied all of the conditions in order to obtain the discounts set forth in this Agreement, (ii) any Product purchased hereunder shall have been sold, dispensed or administered for purposes other than the Harvard Staff Model HMO's own use as set forth in **Section 3.2**, or (iii) all or any part of the discounts previously granted by Schering to the Harvard Staff Model HMO hereunder are not required under this Agreement, then, in each such case, Harvard shall pay to Schering an amount equal to all or any portion of such excess discount granted hereunder with respect to the Product quantities purchased by the Harvard Staff Model HMO within thirty (30) days of being notified of such excess discount by Schering.

4.6   **Adjustment to Discounts.**  Schering reserves the right to make adjustments to the discounted pricing available hereunder based on the introduction of generic competition, a new product entry, or implementation of a MAC (Maximum Allowable Cost) program. Should Schering cease marketing/manufacturing of any of the Products, or any package size of any of the Products, then this Agreement shall terminate with regard to the Product or such package size as the case may be.

**ARTICLE 5.**       **TERM AND TERMINATION:**

5.1   **Term.**  The term of this Agreement shall commence on January 1, 2002.  Unless sooner terminated as provided for herein, this Agreement shall remain in effect until December 31, 2002 (the "Term").  The Term may be extended only by a written amendment to this Agreement which is signed by both Harvard and Schering.

5.2   **Termination Without Cause/Termination for Cause.**  This Agreement may be terminated by either party (a) without cause upon not less than 30 days' prior written notice to the other party, (b) if the other party is in breach of its obligations, representations or warranties set forth in this Agreement which breach is not cured within 10 days after receipt of written notice of such breach from the non-breaching party, (c) upon enactment of federal, state or local legislation, rules or regulations (collectively "Laws"), or the issuance of an interpretation of existing Laws, which, in the reasonable opinion of either party, could have a material adverse impact on such party and/or

4

any of its affiliates (economic or otherwise) if the Agreement remained in effect unmodified or (d) upon the insolvency, dissolution, liquidation, receivership or other similar reorganization of either party, whether voluntary or involuntary.

5.3 **Survival.** Termination of this Agreement for whatever the reason shall not affect the rights and obligations of the parties accruing prior to the effective date of termination.

## ARTICLE 6.   GENERAL PROVISIONS:

6.1 **Confidentiality:** Harvard shall maintain the confidentiality of all the terms and conditions of this Agreement throughout the duration hereof and for a period of two (2) years following the expiration or termination of this Agreement. It is agreed by both parties hereto that the confidentiality of an Eligible Member's personal identifying information and medical report must be protected. Harvard and Harvard Staff Model HMO are each prohibited from sending to Schering reports or other information which contain the names, address, telephone number or any other information that would, in the reasonable estimation of the parties hereto, enable Schering to establish the identity of an Eligible Member.

6.2 **Use of Health Plan Name:** Schering may not use the name of Harvard or the Harvard Staff Model HMO for any advertisement or publicity or any other reason unless such use has been reviewed and approved by Harvard prior to use or publication.

6.3 **Notices:** Any notice required or permitted hereunder shall be given in person or sent by first class, certified mail:

To Harvard at:

    Harvard Pilgrim Health Care,Inc.-Harvard Staff
    Corporate Pharmacy Contracts-4th Floor
    93 Worcester Street
    Wellesley, MA 02481
    ATTN: Kenneth Kazarosian

To Schering at:

    Schering Corporation
    2000 Galloping Hill Road
    K-5-3 A270
    Kenilworth, New Jersey 07033
    ATTN: Contracts & Pricing

or to such other address or to such other person as may be designated by written notice given from time to time during the term of this Agreement by one party to the other.

6.4 **Force Majeure:** Noncompliance with the obligations of this Agreement due to *force majeure*, laws or regulations of any government, war, civil commotion, destruction of production facilities and materials, fire, earthquake or storm, labor disturbances, shortage of materials, failure of public utilities or common carriers, and any other causes beyond the reasonable control of the parties, shall not constitute breach of contract.

6.5 **Non-Assignment:** Neither party shall have the right to assign this Agreement to a third party without the prior written consent of the other party, which consent shall not be unreasonably withheld. Provided, however, that either party may assign its duties, rights and interests under this Agreement, in whole or in part, to its subsidiaries or affiliates without such

5

HIGHLY CONFIDENTIAL

SW0378912

prior written consent. Any permitted assignee shall assume all obligations of its assignor under this Agreement. No assignment shall relieve either party of responsibility for the performance of any obligations which have already accrued. This Agreement shall inure to the benefit of and be binding upon each party, its respective successors and permitted assigns.

6.6    **Invalidity/Governing Law:** If any provision of this Agreement is finally declared or found to be illegal or unenforceable by a court of competent jurisdiction, both parties shall be relieved of all obligations arising under such provision, but if capable of performance, the remainder of this Agreement shall not be affected by such declaration or finding. **This Agreement shall be governed by, and enforced and construed in accordance with, the laws of the Commonwealth of Massachusetts without giving effect to the conflicts of laws provision thereof.**

6.7    **Indemnification:** Each party hereto ("Indemnifying Party") shall indemnify and hold harmless the other party from and against any claims, demands, costs or expenses (including reasonable attorney's fees) arising from or based upon the negligent or willful acts or omissions of the Indemnifying Party or its agents or employees under this Agreement, provided that the Indemnifying Party will have no liability to the other party under this Section 6.7 unless the Indemnifying Party is promptly notified in writing by the other party of all claims asserted and actions instituted against the other party and is given the opportunity to defend the same at its own cost and expense.

6.8    **Compliance With Laws:** Harvard shall, and shall cause the Harvard Staff Model HMO to, comply with all applicable laws in connection with this Agreement, including without limitation the reporting requirements and applicable provisions of 42 U.S.C. §1320a-7b (prohibiting illegal remuneration), by fully and accurately disclosing all discounts contained in this Agreement in any filings or claims made under any Federal healthcare program, including the Medicare and Medicaid programs.

6.9    **Entire Agreement; Amendment:** This Agreement, including the Exhibits attached hereto, contains a total integration of all rights, obligations and agreement of both parties with regard to the subject matter hereof. There are no extrinsic conditions, collateral agreements or undertakings of any kind regarding the subject matter hereof, and it is the express intentions of both parties that any and all prior or contemporaneous agreements, promises, negotiations or representations, either oral or written, relating to the subject matter hereof that are not expressly set forth herein are to have no force, effect, or legal consequences of any kind. This Agreement may only be amended by a writing signed by both parties hereto.

Schering Corporation:

By: _____
Lawrence Ken-Kwofie
Title: Sr. Manager, Contracts & Pricing

Date: 4/3/02

Accepted for the (14) Harvard Pilgrim Health Care
Harvard Vangard (HPHC) Health Center Pharmacies
Please allow bid pricing on a direct basis

Harvard Pilgrim Health Care, Inc.-Harvard Staff:

By: _____

Title: _____
Kenneth J. Kazarosian, M.S., R.Ph.
Pharmacy Contracts Manager
Harvard Pilgrim Health Care
Pharmacy Operations
Corporate, Pharmacy Contracts
93 Worcester Street
Wellesley, MA  02481-0002

Date: _____

HIGHLY CONFIDENTIAL

**EXHIBIT A**

<u>INSTITUTIONAL RETURNED GOODS POLICY/RX</u>

All returns of merchandise for credit over $10,000 must have the prior approval of an authorized Representative and must be forwarded prepaid directly to Schering Corporation, 1011 Morris Avenue, Union, New Jersey 07083.

a.  Credit will be allowed on unopened and undamaged packages at current contract prices as of date of return (except merchandise sold on a special promotion offer, in which case the invoice price will apply) as follows:
    1. For prescription products not purchased on contract, returns made within 3 months after a price increase will be credited at the price prior to the price increase.
    2. Dated products will be given full credit up to one year after expiration.  No credit will be issued for products returned more than one year after expiration.
    3. Based on Schering's judgement, packages that are partially filled or show other evidence of being opened, will receive partial credit.

b.  The above adjustments will appear on Schering's credit memoranda as follows:
    1. Items given full credit will show as individual line extension.
    2. Items currently in the line for which only partial credit has been allowed will be shown as separate line extensions.
    3. Old discontinued items receiving partial credit will be included under "Miscellaneous Product".

c.  Manufacturers are expressly forbidden (under the Federal Food, Drug, and Cosmetic Act) from returning expired dated items to customers. Such items returned to Schering will be destroyed. Schering also reserves the right to destroy without credit packages that are unfit or unsafe for sale or do not comply with applicable law.

d.  Consideration will be given to adjustments for losses suffered in a natural disaster (flood, hurricane, tornado, etc.) not covered by insurance.  Your Schering representative will be glad to assist you in such emergencies.

e.  Schering representatives are not permitted to modify any of the above policies.

f.  Schering reserves the right to change, alter or amend this policy by giving (30) thirty days notice.

> This returned goods policy does not apply to goods returned by persons other than the original wholesaler or hospital purchaser of the goods, or to goods which have been repacked in other than original Schering/Key containers.

7

HIGHLY CONFIDENTIAL

**EXHIBIT B**
**PRICING**

| NDC | COMPANY PRODUCT | SIZE | CONTRACT PRICE | FORMULARY STATUS* |
|---|---|---|---|---|
| 00085087905 | CELESTONE PHOSPHATE INJ | 5ML | $ 14.50 | LISTED ON FORMULARY |
| 00085056605 | CELESTONE SOLUSPAN SUSP | 5ML | $ 18.55 | LISTED ON FORMULARY |
| 00085094205 | CELESTONE SYR .6MG 4OZ | 4 | $ 33.00 | LISTED ON FORMULARY |
| 00085001101 | CELESTONE TABLET PACK | 100 | $ 29.34 | LISTED ON FORMULARY |
| 00085001105 | CELESTONE TB .6MGX100 | 100 | $ 132.13 | LISTED ON FORMULARY |
| 00085051701 | DIPROLENE AF CREAM | 15GM | $ 27.71 | LISTED ON FORMULARY |
| 00085051704 | DIPROLENE AF CREAM | 50GM | $ 61.97 | LISTED ON FORMULARY |
| 00085063401 | DIPROLENE GEL | 15GM | $ 27.71 | LISTED ON FORMULARY |
| 00085063403 | DIPROLENE GEL | 50GM | $ 61.97 | LISTED ON FORMULARY |
| 00085096201 | DIPROLENE LOTION | 30ML | $ 31.79 | LISTED ON FORMULARY |
| 00085096202 | DIPROLENE LOTION | 60ML | $ 62.65 | LISTED ON FORMULARY |
| 00085057502 | DIPROLENE OINTMENT | 15GM | $ 27.71 | LISTED ON FORMULARY |
| 00085057505 | DIPROLENE OINTMENT | 50GM | $ 61.97 | LISTED ON FORMULARY |
| 00085085302 | DIPROSONE CREAM | 15GM | $ 23.27 | LISTED ON FORMULARY |
| 00085085303 | DIPROSONE CREAM | 45GM | $ 42.66 | LISTED ON FORMULARY |
| 00085002804 | DIPROSONE LOTION | 20ML | $ 28.61 | LISTED ON FORMULARY |
| 00085002806 | DIPROSONE LOTION | 60ML | $ 56.33 | LISTED ON FORMULARY |
| 00085051006 | DIPROSONE OINTMENT | 45GM | $ 41.41 | LISTED ON FORMULARY |
| 00085052503 | EULEXIN CAPSULES | UD | $ 190.38 | LISTED ON FORMULARY |
| 00085052505 | EULEXIN CAPSULES | 500 | $ 898.06 | LISTED ON FORMULARY |
| 00085052506 | EULEXIN CAPSULES | 180 | $ 323.24 | LISTED ON FORMULARY |
| 00085022803 | FULVICIN P/G    125MG | 100 | $ 48.11 | LISTED ON FORMULARY |
| 00085065403 | FULVICIN P/G    165MG | 100 | $ 69.46 | LISTED ON FORMULARY |
| 00085050703 | FULVICIN P/G    250MG | 100 | $ 94.39 | LISTED ON FORMULARY |
| 00085035203 | FULVICIN P/G    330MG | 100 | $ 119.87 | LISTED ON FORMULARY |
| 00085094803 | FULVICIN U/F    250MG | 60 | $ 49.25 | LISTED ON FORMULARY |
| 00085094806 | FULVICIN U/F    250MG | 250 | $ 194.31 | LISTED ON FORMULARY |
| 00085049603 | FULVICIN U/F    500MG | 60 | $ 78.66 | LISTED ON FORMULARY |
| 00085049606 | FULVICIN U/F    500MG | 250 | $ 310.25 | LISTED ON FORMULARY |
| 00085000805 | GARAMYCIN CR 1% 15GM | 15 | $ 19.10 | LISTED ON FORMULARY |
| 00085006904 | GARAMYCIN INJ 80MG 25X2ML VLS | 80 | $ 119.83 | LISTED ON FORMULARY |
| 00085460202 | INSPIREASE | 1 | $ 17.39 | LISTED ON FORMULARY |
| 00085460401 | INSPIREASE  MOUTHPIECE | 144 | $ 621.42 | LISTED ON FORMULARY |
| 00085460402 | INSPIREASE REPLACE M-PIECE | 1 | $ 12.59 | LISTED ON FORMULARY |
| 00085460270 | INSPIREASE REPLACEMENT BAG | 144 BAGS | $ 301.32 | LISTED ON FORMULARY |
| 00085460203 | INSPIREASE RESERVOIR BAG | 3 BAGS | $ 9.41 | LISTED ON FORMULARY |
| 00085057102 | INTRON A    10MIU | 2ML | $ 106.56 | LISTED ON FORMULARY |
| 00085118402 | INTRON A    3MIU SOL | 6 X 0.5ML | $ 191.83 | LISTED ON FORMULARY |
| 00085064705 | INTRON A    3MIU, Pak-3 | 6x1ML | $ 191.83 | LISTED ON FORMULARY |
| 00085012002 | INTRON A    5MIU | 1ML | $ 53.28 | LISTED ON FORMULARY |
| 00085119102 | INTRON A    5MIU SOL | 6 X 0.5ML | $ 319.72 | LISTED ON FORMULARY |
| 00085117902 | INTRON A    10MIU SOL | 6 X 1ML | $ 639.44 | LISTED ON FORMULARY |
| 00085111001 | INTRON A    18 MIU | 1ML | $ 191.83 | LISTED ON FORMULARY |
| 00085116801 | INTRON A    18MIU SOL | 6MIU/1ML | $ 191.83 | LISTED ON FORMULARY |
| 00085028502 | INTRON A    25MIU | 5ML | $ 266.44 | LISTED ON FORMULARY |
| 00085113301 | INTRON A    25MIU SOL | 10MIU/1ML | $ 266.44 | LISTED ON FORMULARY |
| 00085053901 | INTRON A    50MIU | 1ML | $ 532.86 | LISTED ON FORMULARY |
| 00085125401 | INTRON A    Solution Multidose Pens 10MIU | 6x10MIU/. 2ml | $ 639.44 | LISTED ON FORMULARY |

8

HIGHLY CONFIDENTIAL

| NDC | Product | Size | | Price | Status |
|---|---|---|---|---|---|
| 00085124201 | INTRON A  Solution Multidose Pens 3MIU | 6x3MIU/.2 ml | $ | 191.83 | LISTED ON FORMULARY |
| 00085123501 | INTRON A  Solution Multidose Pens 5MIU | 6x5MIU/.2 ml | $ | 319.72 | LISTED ON FORMULARY |
| 00085119701 | NASONEX NASAL SPRAY | 17GM | $ | 32.42 | LISTED ON FORMULARY |
| 00085330535 | NITRO-DUR  INST  .1MG | 30 | $ | 39.39 | LISTED ON FORMULARY |
| 00085331035 | NITRO-DUR  INST  .2MG | 30 | $ | 39.98 | LISTED ON FORMULARY |
| 00085331535 | NITRO-DUR  INST  .3MG | 30 | $ | 44.79 | LISTED ON FORMULARY |
| 00085332035 | NITRO-DUR  INST  .4MG | 30 | $ | 44.79 | LISTED ON FORMULARY |
| 00085333035 | NITRO-DUR  INST  .6MG | 30 | $ | 48.59 | LISTED ON FORMULARY |
| 00085081935 | NITRO-DUR  INST  .8MG | 30 | $ | 48.59 | LISTED ON FORMULARY |
| 00085028203 | OPTIMINE TABS | 100 | $ | 99.75 | LISTED ON FORMULARY |
| 00085082003 | POLARAMINE TABS        2MG | 100 | $ | 43.56 | LISTED ON FORMULARY |
| 00085061402 | PROVENTIL INHALATION AEROSOL | 17G | $ | 21.98 | LISTED ON FORMULARY |
| 00085113201 | PROVENTIL INHALATION AEROSOL | 6.7G | $ | 21.17 | LISTED ON FORMULARY |
| 00085061403 | PROVENTIL INHALATION REFILL | 17G | $ | 19.68 | LISTED ON FORMULARY |
| 00085123602 | REBETRON 1000/MDV | 1000 | $ | 603.24 | LISTED ON FORMULARY |
| 00085124102 | REBETRON 1000/PAK-3 | 1000 | $ | 603.24 | LISTED ON FORMULARY |
| 00085125802 | REBETRON 1000/PEN | 1000 | $ | 603.24 | LISTED ON FORMULARY |
| 00085123601 | REBETRON 1200/MDV | 1200 | $ | 666.57 | LISTED ON FORMULARY |
| 00085124101 | REBETRON 1200/PAK-3 | 1200 | $ | 666.57 | LISTED ON FORMULARY |
| 00085125801 | REBETRON 1200/PEN | 1200 | $ | 666.57 | LISTED ON FORMULARY |
| 00085123603 | REBETRON 600/MDV | 600 | $ | 494.03 | LISTED ON FORMULARY |
| 00085124103 | REBETRON 600/PAK-3 | 600 | $ | 494.03 | LISTED ON FORMULARY |
| 00085125803 | REBETRON 600/PEN | 600 | $ | 494.03 | LISTED ON FORMULARY |
| 00085046003 | SOLGANAL SUSPENSION | 10ML | $ | 118.79 | LISTED ON FORMULARY |
| 00085001204 | TRILAFON INJ 5MGAMP X100 | 100 | $ | 563.40 | LISTED ON FORMULARY |
| 00085104901 | VANCENASE AQ DS | 19G | $ | 35.11 | LISTED ON FORMULARY |
| 00085064902 | VANCENASE NASAL POCKETHALER | 7G | $ | 29.47 | LISTED ON FORMULARY |
| 00085073604 | VANCERIL INHALER | 16.8G | $ | 29.08 | LISTED ON FORMULARY |

*  With respect to each Schering Product selected, non-formulary products shall be NDC blocked and/or in a third or higher tier with a co-pay arrangement differential of at least $15.

9

HIGHLY CONFIDENTIAL

SW0378916

# SCHERING CORPORATION

GALLOPING HILL ROAD                    KENILWORTH, N.J. 07033

RECEIVED

JUN 2 4 1996

BIDS AND CONTRACTS

CABLES: SCHERING KENILWORTH
TELEX: 138316
        138260
TELEPHONE: (908) 298-4000

## CHARGEBACK AGREEMENT

**CHARGEBACK AGREEMENT**, dated as of July 1, 1996, by and among
**SCHERING CORPORATION**, a New Jersey corporation having a place of business at
2000 Galloping Hill Road, Kenilworth, New Jersey 07033 ("Schering"), ~~and HMO
Blue~~, a Massachusetts not-for-profit corporation having a place of business at 260
Cochituate Road, Framingham, MA 01701 ("Healthcare Organization).

## WITNESSETH:

Schering manufactures and sells pharmaceutical products and Healthcare
Organization is a staff model HMO providing medical, pharmacy and formulary
services to its patients; and

This Agreement sets forth the terms and conditions upon which Schering will
permit Healthcare Organization to purchase Schering products at a discount if the
conditions of this Agreement are satisfied;

NOW, THEREFORE, in consideration of the covenants and agreements set forth
herein, and for other good and valuable consideration, the receipt and sufficiency of
which are hereby acknowledged, the parties hereto hereby agree as follows:

## 1. DEFINITIONS.

1       "Formulary" means a reference book for physicians and pharmacists of
Healthcare Organization listing all of the drugs (including the Products) that
Healthcare Organization encourages them to prescribe and dispense to Eligible
Patients.

2       "Net Direct Price" of any Product shall mean the price of such Product
published by Schering from time to time as its Net Direct Price for such Product.

3       "Prime Vendor" means the relevant wholesale distributor listed as the
Prime Vendor for Healthcare Organization on the signature page of this Agreement, or
such other wholesale distributor of the Products specified in writing in a notice to
Schering by Healthcare Organization which has agreed to participate in Schering's
Prime Vendors Program and which is eligible to participate in chargeback
arrangements with Schering.

Defendants' Exhibit

**2937**

01-12257 - PBS

4    "Product Category" with respect to any Product means the category or grouping of pharmaceutical products identified as the "Product Category" for such Product on Exhibit A hereto.

5    "Products" means those Schering pharmaceutical products set forth on Exhibit A.

6    "Report" means a written report, in a format reasonably acceptable to Schering, setting forth the following information for each Product and each other product in each Product Category dispensed by Healthcare Organization grouped by product and Product Category:

a.    the National Drug Code number for each product dispensed;

b.    the brand name or description of each such product;

c.    the date such product was dispensed;

d.    the relevant prescription number;

e.    the physician number of the prescribing physician;

f.    the quantity of such product dispensed (e.g., the number of ounces, tablets, grams, etc.); and

g.    such other information as Schering shall reasonably request.

Each report shall also include a summary of utilization of the products in each Product Category which shall list, by Product Category and product, the name of each product, the National Drug Code of such product, the aggregate number of prescriptions written for each product, the aggregate number of units of each product dispensed and the utilization percentage of each product in each Product Category.

7    "Term" means the period commencing on July 1, 1996 and terminating on June 30, 1998 unless sooner terminated as provided by this Agreement.

## 2.   OBLIGATIONS OF HEALTHCARE ORGANIZATION.

1    **FORMULARY; UTILIZATION**:  Healthcare Organization agrees that at all times during the term of this Agreement, all of the Awarded Products shall be listed on the Formulary of Healthcare Organization, (ii) such Formulary shall be distributed by Healthcare Organization to all of its physicians and to all pharmacy departments at

2

all of Healthcare Organization's (iii) Healthcare Organization will implement Formulary compliance programs at its respective facilities (which may include co-pay incentives, written material, point-of-sale messages and other forms of communications to Healthcare Organization's physicians and pharmacists), (iv) Healthcare Organization shall not engage in any counterdetailing or disincentivizing efforts against any Products, and (v) Healthcare Organization shall promptly notify Schering and all of its physicians and pharmacists, of any additions or changes to the Formulary status of any of the Products and the addition of any new Schering products on the applicable Formulary. In the event and to the extent that discounts contained in Exhibit A are contingent upon exclusive formulary postion, Healthcare Organization further agrees to purchase sufficient quantities of such Product to satisfy not less than ninety percent (90%) of Healthcare Organization's needs of products in the appropriate Product Category for each such Product (i.e., "achieve a 90% utilization rate" for such Products).

**2    OWN USE:**  Healthcare Organization hereby represents and agrees that all Products purchased hereunder shall be solely for its "own use" as defined in <u>Kaiser v. DeModena</u>, 743 F2d 1388 (1984).

**3    REPORTING:** In the event and to the extent that discounts contained in Exhibit A are contingent upon market share performance, Healthcare Organization shall furnish to Schering within thirty (30) days after the end of each calendar quarter a Report for all Products, and all other products in each Product Category, used or dispensed during such quarter.

**4    AUDIT:** Healthcare Organization agrees to institute and conduct on a regular basis random audits of its physicians and facilities to ensure that actual dispensing of Products complies with the restrictions of Section 2.2 hereof. Adjustments as a result of such audits shall be refunded to Schering no later than thirty (30) days after completion of such audit. Healthcare Organization shall at all times keep and maintain accurate books, records and files with respect to its physicians and facilities (including name, address and telephone number), reports submitted to Schering, random audits under this Section, and all information (including information made available by or to physicians) relating to the prescribing, dispensing, sale, and reimbursement of the Products. Healthcare Organization agrees that Schering shall have the right to conduct inspections and/or audits of Healthcare Organization's books, records, and files from time to time, and that within ten (10) days following Healthcare Organization's receipt of written request from Schering, Healthcare Organization shall make such information (and such other information necessary to confirm such information) available in a manner satisfactory to Schering, for inspection and/or audit by Schering's representatives or its designated auditors during regular business hours.  Schering agrees that any such inspections and/or

3

audits shall be subject to the requirements of state and federal law regarding the confidentiality of medical and prescription records.

**5      EXCESS DISCOUNTS**:  If Schering reasonably determines as a result of an inspection and/or audit of Healthcare Organization its respective physicians and facilities, or any one or more of them, that all or any part of the discounts previously granted by Schering to Healthcare Organization is not required under this Agreement, then Healthcare Organization shall pay to Schering an amount equal to the excess discount granted hereunder to Schering within thirty (30) days of being notified of such excess discounts by Schering.

**3.   PRICES**.

**1      DISCOUNT**:  Schering hereby agrees that, subject to Healthcare Organization's satisfaction of the other terms and conditions of this Agreement, including without limitation the provisions of Section 2.1 hereof, and subject further to the provisions of Section 3.2 hereof, Healthcare Organization shall be entitled to purchase each of the Products at the price for such Product set forth on Exhibit A hereto.  All such purchases by Healthcare Organization shall be made through the appropriate Prime Vendor and shall be subject to such terms as shall be agreed to or otherwise in effect between Healthcare Organization and Prime Vendor.

**2      PRICE INCREASES**:  Anything to the contrary herein notwithstanding, Schering hereby reserves the right to increase the prices for the Products, or any one or more of them, not more often than once in each calendar year, or portion thereof, during the term of this Agreement, except that no increase shall exceed six percent (6%) over the then-current price.  5% ar CMK    FIVE CMK

**4.  TERMINATION**:  This Agreement may be terminated by any party for any reason or without reason upon thirty (30) days prior written notice.  This Agreement may also be terminated immediately by Schering upon written notice to Healthcare Organization:  (a) if either Healthcare Organization commits a material breach of this Agreement which is not cured within ten (10) days after receipt of written notice of same from Schering, (b) in the event of the insolvency, dissolution, liquidation, receivership, bankruptcy or similar reorganization of Healthcare Organization whether voluntary or involuntary, or (c) the enactment of federal, state or local legislation, rules or regulations, or the issuance of an interpretation of existing legislation, rules or regulations, which, in the reasonable opinion of Schering, could have a material adverse impact on Schering and/or any of its affiliates (economic or otherwise) if the Agreement remained in effect unmodified.  This Agreement may also be terminated immediately by Healthcare Organization upon written notice to Schering:  (a) if Schering commits a material breach of this Agreement which is not cured within ten

4

(10) days after receipt of written notice of same from Healthcare Organization, (b) in the event of the insolvency, dissolution, liquidation, receivership, bankruptcy or similar reorganization of Schering, whether voluntary or involuntary, or (c) the enactment of federal, state or local legislation, rules or regulations, or the issuance of an interpretation of existing legislation, rules or regulations, which, in the reasonable opinion of Healthcare Organization could have a material adverse impact on Healthcare Organization and/or any of its respective affiliates (economic or otherwise) if the Agreement remained in effect unmodified.  Upon any such termination, this Agreement shall terminate in its entirety with respect to all parties.

## 5. <u>GENERAL PROVISIONS</u>.

**1**    **CONFIDENTIALITY:** Healthcare Organization shall maintain the confidentiality of all of the terms and conditions of this Agreement throughout the duration hereof and for a period of five (5) years following the effective date of termination or expiration.  This covenant shall survive the expiration or termination of this Agreement.

**2**    **INDEMNIFICATION:**  Each party hereto ("Indemnifying Party") shall indemnify and hold harmless each other party, its affiliates, and its and their respective officers, directors, agents and employees from and against any and all liability, loss, proceeding, action, damage, cost or expense of any kind, including without limitation reasonable attorneys fees and expenses, arising out of or based upon the negligent or willful acts or omissions of the Indemnifying Party or its officers, directors, agents or employees.

**3**    **NOTICES:**  Any notice required or permitted hereunder shall be sent to the addresses set forth on page 1 hereof to the attention of the signatories hereof, by either (a) certified mail, return receipt requested, postage prepaid, or (b) recognized overnight courier service.  All notices shall be effective upon receipt.

**4**    **COMPLIANCE WITH LAWS:** Healthcare Organization shall comply with all applicable laws in connection with this Agreement, including without limitation the reporting requirements and applicable provisions of 42 U.S.C. 1320a-7b. Healthcare Organization represents and warrants that it is licensed as a health plan in each State where such licensure is required.

**5**    **FORCE MAJEURE:**  Noncompliance with the obligations of this Agreement due to <u>force majeure</u>, laws or regulations of any government, war, civil commotion, destruction of production facilities and materials, fire, earthquake or storm, labor disturbances, shortage of materials, failure of public utilities or common

carriers, and any other causes beyond the reasonable control of the parties, shall not constitute breach of contract.

6    **MISCELLANEOUS:**  No party shall have the right to assign this Agreement without the prior written consent of each non-assigning party.  This Agreement shall enure to the benefit of the successors and permitted assigns of each party.  This Agreement constitutes the entire Agreement between the parties relating to the subject matter hereof and supersedes all previous agreement between the parties relating to such subject matter.  This Agreement may only be changed by a writing executed by the parties.  **THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW JERSEY APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY WITHIN THAT STATE.**  This Agreement shall not apply to Products purchased for use, sale or distribution outside of the continental United States, Alaska and Hawaii.  Neither party may use any patented, trademarked, service-marked or copyrighted material or any trade name of the other party without prior written permission.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

SCHERING CORPORATION

By: _____
Name: Carolyn Heinl Coces
Title: Sr Mgr, Contracts; Pricing

HMO Blue

By: _____
Name:
Title:        Gary J. Kerr
              Director of Pharmacy, HCD

6



**BlueCross BlueShield of Massachusetts**

**The Health Services Company**

260 Cochituate Road
Framingham, MA 01701-4608

TEL (508) 370-3040

## BLUE CROSS BLUE SHIELD MA HEALTH CENTER DIVISION WHOLESALERS

James Brudnick Company
219 Medford Street
Malden, MA  02148
DEA # PJ 0115394
Phone: (617) 321-6800
Fax: (617) 397-9576
Contact: Scott Brody


Cardinal Health
11 Centennial Drive
P.O. Box 60411
Peabody, MA  01961-6041
DEA # PD 0025141
Phone: (508) 532-6900
Fax: (508) 532-6916
Contact: Joan Vaiknoras

An Independent Licensee of the
Blue Cross and Blue Shield Association

PRIME VENDOR:

(Primary)

Name:_____

Address:_____

_____

Telephone:_____

FAX:_____

(Secondary)

Name:_____

Address:_____

_____

Telephone:_____

FAX:_____

7

# HMO BLUE
## 7/1/96 THROUGH 6/30/98
## SCHERING OFFER# 0960131

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE CODE |
|---|---|---|---|---|
| **ALBUTEROL** | | | | |
| **PROVENTIL** | | | | |
| INHALER | 0614-02 | 17G | 18.95 | BN |
| INHALER REFILL | 0614-03 | 17G | 18.95 | BN |
| SYRUP | 0315-02 | 473ML | 29.57 | AA |
| **PROVENTIL TABLETS** | | | | |
| 2MG | 0252-02 | 100 | 32.99 | AB |
| | 0252-03 | 500 | 156.81 | AB |
| 4MG | 0573-02 | 100 | 49.23 | AB |
| | 0573-03 | 500 | 234.16 | AB |
| **PROVENTIL REPETABS** | | | | |
| 4MG | 0431-02 | 100 | 55.30 | |
| | 0431-03 | 500 | 268.41 | |
| | 0431-04 | U/D 100 | 69.25 | |
| **PROVENTIL SOL FOR INHALER** | | | | |
| 0.5% | 0208-02 | 20ML | 14.13 | AN |
| 0.083% UNIT DOSE | 0209-01 | 25 X 3ML | 32.28 | AN |
| **AUROTHIOGLUCOSE SUSPENSION** | | | | |
| SOLGANAL SUSPENSION | 0460-03 | 10ML | 105.23 | |
| **AZATADINE MALEATE, USP & PSEUDOPHERINE** | | | | |
| OPTIMINE TABLETS | 0282-03 | 100 | 79.37 | |
| **AZATADINE MALEATE & PSEUDOPHEDRINE SULFATE** | | | | |
| TRINALIN REPETABS | 0703-04 | 100 | 83.08 | |
| **BECLOMETHASONE DIPROPRIONATE** | | ** Pricing requires exclusive Formulary status | | |
| VANCENASE NASAL INHALER | 0041-06 | 16.8G | 2.95 ** | |
| VANCENASE AQ PUMP | 0259-02 | 25GM | 16.80 ** | BN |
| VANCERIL INHALER | 0736-04 | 16.8G | 22.06 | BN |
| **BETAMETHASONE** | | | | |
| **CELESTONE** | | | | |
| PHOSPHATE INJ. | 0879-05 | 5ML | 13.78 | AP |
| SOLUSPAN SUSP. | 0566-05 | 5ML | 17.63 | |

# HMO BLUE
## 7/1/96 THROUGH 6/30/98
## SCHERING OFFER# 0960131

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE CODE |
|---|---|---|---|---|
| **BETAMETHASONE DIPROPRIONATE (AUGMENTED)** *when available* | | | | |
| **DIPROLENE** | | | | |
| LOTION 0.05% | 0962-01 | 30ML | 23.15 | |
| | 0962-02 | 60ML | 45.63 | |
| OINT. 0.05% | 0575-02 | 15G | 20.18 | |
| | *0575-05* | *50G* | *47.45* | |
| GEL 0.05% | 0634-01 | 15G | 20.18 | |
| | *0634-03* | *50G* | *47.45* | |
| **DIPROLENE AF** | | | | |
| CREAM | 0517-01 | 15G | 20.18 | |
| | *0517-04* | *50G* | *47.45* | |
| **BETAMETHASONE DIPROPRIONATE** | | | | |
| **DIPROSONE** | | | | |
| AEROSOL 0.1% | 0475-06 | 85G | 18.46 | |
| CREAM 0.05% | 0853-02 | 15G | 18.46 | AB |
| | 0853-03 | 45G | 33.91 | AB |
| LOTION 0.05% | 0028-04 | 20ML | 22.73 | AB |
| | 0028-06 | 60ML | 44.80 | AB |
| OINT. 0.05% | 0510-04 | 15G | 18.46 | AB |
| | 0510-06 | 45G | 33.91 | AB |
| **CEFTIBUTEN** | | | | |
| **CEDAX** | | | | |
| ORAL SUSPENSION | | | | |
| 90MG/5ML | 0777-03 | 30ML | 17.48 | |
| 90MG/5ML | 0777-01 | 60ML | 22.72 | |
| 90MG/5ML | 0777-02 | 120ML | 45.82 | |
| **CEDAX** | | | | |
| CAPSULES | | | | |
| 400MG | 0691-01 | 20'S | 94.76 | |
| 400MG | 0691-02 | 100'S | 467.66 | |
| 400MG/(10X4) | 0691-03 | PKG 40 | 192.83 | |
| **CLOTRIMAZOLE** | | | | |
| **LOTRIMIN** | | | | |
| CREAM | 0613-02 | 15G | 9.71 | AT |
| | 0613-05 | 30G | 17.29 | AT |
| | 0613-04 | 45G | 20.99 | AT |

## HMO BLUE
### 7/1/96 THROUGH 6/30/98
### SCHERING OFFER# 0960131

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE CODE |
|---|---|---|---|---|
| LOTION | 0707-02 | 30ML | 18.61 | AT |
| SOLUTION | 0182-02 | 10ML | 8.55 | AT |
| | 0182-04 | 30ML | 17.78 | AT |

**CLOTRIMAZOLE & BETAMETHASONE DIPROPRIONATE**

| LOTRISONE CREAM | 0924-01 | 15G | 15.86 | |
|---|---|---|---|---|

**DEXCHLORPHENIRAMINE MALEATE, USP**

| POLARAMINE | | | | |
|---|---|---|---|---|
| EXPECTORANT | 0268-05 | 473ML | 47.38 | |
| REPETABS | | | | |
| 4MG | 0095-03 | 100 | 59.11 | |
| 6MG | 0148-03 | 100 | 82.63 | |
| SYRUP | 0016-05 | 473ML | 36.74 | AA |
| TABLETS (2MG) | 0820-03 | 100 | 34.63 | AA |

**DIAZOXIDE**

| HYPERSTAT | | | | |
|---|---|---|---|---|
| 300MG | 0201-05 | 20ML | 81.53 | AP |

**DRUG DELIVERY SYSTEM**

| INSPIREASE | | | | |
|---|---|---|---|---|
| Kit (1 Mthpc/3 Bags) | 4602-02 | 1 | 15.44 | |
| Replacement Bags | 4602-03 | 3 | 8.33 | |
| Replacement Bags | 4602-70 | 144 | 268.06 | |
| Replacement Mouthpieces | 4604-01 | 144 | 552.92 | |
| Replacement Mouthpiece | 4604-02 | 1 | 11.15 | |

**ETHINYL ESTRADIOL**

| ESTINYL TABLETS | | | | |
|---|---|---|---|---|
| .02MG | 0298-03 | 100 | 26.53 | |
| | 0298-06 | 250 | 62.45 | |
| .05MG | 0070-03 | 100 | 44.74 | BP |
| | 0070-06 | 250 | 104.48 | BP |
| .5MG | 0150-03 | 100 | 90.49 | |

## HMO BLUE
## 7/1/96 THROUGH 6/30/98
## SCHERING OFFER# 0960131

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE CODE |
|---|---|---|---|---|
| **FLUPHENAZINE** | | | | |
| | | | | |
| **PERMITIL** | | | | |
| CONCENTRATE | 0296-05 | 118ML | 64.78 | AA |
| TABLETS | | | | |
| 2.5MG | 0442-04 | 100 | 90.65 | |
| 5MG | 0550-04 | 100 | 121.03 | |
| 10MG | 0316-05 | 1000 | 1,436.57 | |
| | | | | |
| **FLUTAMIDE** | | | | |
| | | | | |
| EULEXIN CAPSULES | 0525-06 | 180 | 243.20 | |
| | 0525-05 | 500 | 675.84 | |
| | 0525-03 | 100 U/D | 143.19 | |
| **GRISEOFULVIN** | | | | |
| | | | | |
| **FULVICIN P/G (Ultramicrosize)** | | | | |
| 125MG | 0228-03 | 100 | 38.27 | AB |
| 165MG | 0654-03 | 100 | 55.26 | AB |
| 250MG | 0507-03 | 100 | 75.12 | AB |
| 330MG | 0352-03 | 100 | 95.39 | AB |
| | | | | |
| **FULVICIN U/F (Microsize)** | | | | |
| 250MG | 0948-03 | 60 | 39.15 | AB |
| | 0948-06 | 250 | 154.66 | AB |
| 500MG | 0496-03 | 60 | 62.58 | AB |
| | 0496-06 | 250 | 246.98 | AB |
| | | | | |
| **INTERFERON ALFA-2B** | | | | |
| | | | | |
| **INTRON A** | | | | |
| 3 MIL IU | 0647-03 | 1ML | 26.57 | |
| 3 MIL IU SYRINGE | 0647-04 | 1ML | 26.57 | |
| 3 MIL IU SYRINGE PAK | 0647-05 | 1ML X 6 | 159.63 | |
| 5 MIL IU | 0120-02 | 1ML | 44.31 | |
| 5 MIL IU SYRINGE PAK | 0120-05 | 1ML X 6 | 266.10 | |
| 10 MIL IU | 0571-02 | 2ML | 88.67 | |
| 10 MIL IU SYRINGE PAK | 0571-06 | 2ML X 6 | 532.25 | |
| 10 MIL IU SOLUTION | 0923-01 | 2ML | 88.67 | |
| 18 MIL IU | 1110-01 | 1ML | 159.63 | |
| 18 MIL IU SOLUTION | 0953-01 | 3ML | 159.63 | |
| 25 MIL IU | 0285-02 | 5ML | 221.75 | |
| 25 MIL IU SOLUTION | 0769-01 | 5ML | 221.75 | |
| 50 MIL IU | 0539-01 | 1ML | 443.52 | |

## HMO BLUE
## 7/1/96 THROUGH 6/30/98
## SCHERING OFFER# 0960131

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE CODE |
|---|---|---|---|---|
| **LABETALOL** | | | | |
| **NORMODYNE INJECTION** | | | | |
| 20ML VIAL | 0362-07 | 20ML | 26.80 | AP |
| 40ML VIAL | 0362-06 | 40ML | 51.91 | AP |
| 4ML SYRINGE | 0362-08 | 4ML | 11.57 | |
| 8ML SYRINGE | 0362-09 | 8ML | 17.36 | |
| **NORMODYNE TABLETS** | | | | |
| 100MG | 0244-04 | 100 | 36.90 | AB |
| | 0244-05 | 500 | 175.09 | AB |
| | 0244-07 | 1000 | 322.87 | AB |
| | 0244-08 | U/D 100 | 39.19 | AB |
| 200MG | 0752-04 | 100 | 52.35 | AB |
| | 0752-05 | 500 | 248.68 | AB |
| | 0752-07 | 1000 | 458.41 | AB |
| | 0752-08 | U/D 100 | 54.63 | AB |
| 300MG | 0438-03 | 100 | 69.63 | AB |
| | 0438-05 | 500 | 330.68 | AB |
| | 0438-06 | U/D 100 | 71.93 | AB |
| **LORATADINE** | | | | |
| **CLARITIN** | | | | |
| 10MG | 0458-01 | 14 | 28.87 | |
| | 0458-03 | 100 | 155.06 | |
| | 0458-04 | U/D 100 | 155.06 | |
| | 0458-06 | 500 | 775.27 | |
| | 0458-05 | 30 | 46.52 | |
| **MOMETASONE FUROATE** | | | | |
| **ELOCON** | | | | |
| CREAM | 0567-01 | 15G | 12.94 | |
| | 0567-02 | 45G | 24.89 | |
| LOTION | 0854-01 | 30ML | 14.02 | |
| | 0854-02 | 60ML | 26.76 | |
| OINTMENT | 0370-01 | 15G | 12.94 | |
| | 0370-02 | 45G | 24.89 | |
| **NETILMICIN SULFATE** | | | | |
| **NETROMYCIN INJECTION** | | | | |
| 150MG VIAL | 0264-02 | 10 x 1.5ML | 111.91 | |

## HMO BLUE
### 7/1/96 THROUGH 6/30/98
### SCHERING OFFER# 0960131

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE CODE |
|---|---|---|---|---|
| **NITROGLYCERIN** | | | | |
| **NITRO-DUR TRANSDERMAL** | | | | |
| .1MG/HR | 3305-35 | 30 patches | 33.83 | |
| .2MG/HR | 3310-35 | 30 patches | 34.34 | |
| .3MG/HR | 3315-35 | 30 patches | 38.48 | |
| .4MG/HR | 3320-35 | 30 patches | 38.48 | |
| .6MG/HR | 3330-35 | 30 patches | 41.73 | |
| .8MG/HR | 0819-35 | 30 patches | 41.73 | |
| **PERPHENAZINE** | | | | |
| **TRILAFON CONCENTRATE** | 0363-02 | 118ML | 31.77 | |
| **TRILAFON INJECTION 5MG/ML** | 0012-04 | 100 X 1ML | 473.44 | |
| **TRILAFON TABLETS** | | | | |
| 2MG | 0705-04 | 100 | 55.81 | AB |
| 4MG | 0940-05 | 100 | 76.37 | AB |
| 8MG | 0313-05 | 100 | 92.68 | AB |
| 16MG | 0077-05 | 100 | 124.69 | AB |
| **PERPHENAZINE & AMITRIPTYLINE** | | | | |
| **ETRAFON** | | | | |
| TABS (2-10) | 0287-04 | 100 | 58.66 | BP |
| | 0287-08 | U/D 100 | 61.86 | BP |
| **ETRAFON** | | | | |
| TABS (2-25) | 0598-04 | 100 | 74.61 | BP |
| | 0598-08 | U/D 100 | 77.74 | BP |
| **ETRAFON FORTE** | | | | |
| TABS (4-25) | 0720-04 | 100 | 81.04 | BP |
| | 0720-08 | U/D 100 | 84.23 | BP |
| **POTASSIUM CHLORIDE** | | | | |
| **K-DUR TABS** | | | | |
| 10MEQ | 0263-01 | 100 | 18.79 | |
| 10MEQ | 0263-81 | 100 U/D | 19.47 | |
| 20MEQ | 0787-01 | 100 | 32.56 | |
| 20MEQ | 0787-81 | 100 U/D | 35.28 | |

## HMO BLUE
## 7/1/96 THROUGH 6/30/98
## SCHERING OFFER# 0960131

| PRODUCT | NDC | DESCRIPTION | PRICE | THERAPEUTIC EQUIVALENCE CODE |
|---|---|---|---|---|
| **SULFACETAMIDE SODIUM** | | | | |
| | | | | |
| **SODIUM SULAMYD** | | | | |
| OPHTH. OINT. 10% | 0066-03 | 3.5G* | 13.72 | AT |
| OPHTH. SOL. 10% | 0946-03 | 25 X 5ML | 327.88 | AT |
| | 0946-06 | 15ML | 16.77 | AT |
| OPHTH. SOL. 30% | 0717-06 | 15ML | 17.79 | AT |
| *MAY BE PURCHASED ONLY IN MULTIPLES OF 6. | | | | |
| | | | | |
| **THEOPHYLLINE ANHYDROUS** | | | | |
| | | | | |
| **THEO-DUR S/A TABS** | | | | |
| 100MG | 0487-01 | 100 | 15.21 | AB |
| | 0487-05 | 500 | 71.69 | AB |
| | 0487-10 | 1000 | 138.81 | AB |
| | 0487-50 | 5000 | 655.98 | AB |
| | 0487-81 | U/D 100 | 22.79 | AB |
| | | | | |
| 200MG | 0933-01 | 100 | 22.65 | AB |
| | 0933-05 | 500 | 106.79 | AB |
| | 0933-10 | 1000 | 201.66 | AB |
| | 0933-50 | 5000 | 978.64 | AB |
| | 0933-81 | U/D 100 | 28.25 | AB |
| | | | | |
| 300MG | 0584-01 | 100 | 26.90 | AB |
| | 0584-05 | 500 | 126.83 | AB |
| | 0584-10 | 1000 | 245.42 | AB |
| | 0584-50 | 5000 | 1161.76 | AB |
| | 0584-81 | U/D 100 | 33.63 | AB |
| | | | | |
| 450MG | 0806-01 | 100 | 35.72 | |
| | 0806-81 | U/D 100 | 44.66 | |
| | | | | |
| **THEOPHYLLINE ANHYDROUS EXTENDED-RELEASE** | | | | |
| | | | | |
| **UNI-DUR TABS** | | | | |
| 400MG | 0694-01 | 100 | 78.63 | |
| 600MG | 0814-01 | 100 | 85.97 | |

