UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: | Judge Patti B. Saris |
| ALL CLASS ACTIONS | |

## DECLARATION OF DEBRA KANE

I, DEBRA KANE, hereby declare:

### Background

1. I have personal knowledge of the facts stated in this Declaration, and they are true and correct. I am competent to testify relating to the matters described below.

2. I reside at 10 Middlebury Lane in Cranford, New Jersey.

3. I am currently an Executive Finance Director supporting Strategic Alliances and Managed Markets Group within the Global Pharmaceutical Business Unit of Defendant Schering Corporation ("Schering"). I have worked at Schering since 1988.

### Education

4. I attended the College of St. Elizabeth and received a degree in business, with a concentration in accounting, in 1990.

### Employment History

5. I started working at Schering as an intern in the Finance Organization in 1988. For about seven years, I worked as a Financial Analyst in several different Divisions, including Manufacturing Finance, Health-Care Products, Financial Planning and Reporting, and Marketing

Finance.

6. In 1996, I became a manager within the Marketing-Finance Organization and in 1998, I became a Contract Manager for the group, a position in which I assisted Account Managers in negotiations with the Pharmaceutical Benefit Manager ("PBM"), Advance PCS, as well as with other account analyses. I became a Director within the Managed Markets Finance Group (then called Contracts & Pricing) in 1999. As a Director, I was responsible for planning and reporting, operational expenses for U.S. Managed Markets, and the rebate administration process for PBMs and Health Maintenance Organizations ("HMOs").

7. In 2001, I became Senior Director of U.S. Managed Markets Finance. My responsibilities included commercial and government contracting, as well as payment administration for related rebates. Over time, Directors of three contract areas – Commercial Contracting and Administration, Government Contracting and Administration, and Contracting and Chargeback Administration – came to report to me. In 2005, I became Executive Finance Director supporting Strategic Alliances and Managed Markets Group within the Global Pharmaceutical Business Unit.

8. The Managed Market Finance Group includes customer segments such as HMOs (including staff models), PBMs, Group Purchasing Organizations ("GPOs"), the Veteran's Administration, state programs, Medicaid, and Medicare. I interact with most entities with which Schering contracts to sell drugs. In addition, my Group is responsible for processing rebate and chargeback payments associated with wholesaler agreements.

## Schering's Customers and Contracts

9. Schering is a research-based pharmaceutical company that develops, licenses, manufactures, markets, and distributes innovative, brand-name-prescription and over-the-counter

products worldwide. Schering's products focus on several key areas: allergic and inflammatory disorders, infectious diseases, oncology, cardiovascular disease, and central-nervous-system disorders.

10. Schering has many different types of customers. These customers include those that purchase drugs directly from Schering. Such direct customers include wholesalers, some pharmacy chains, some (but not most) hospitals, some HMOs that own pharmacies, and specialty pharmacies (mainly for oncology drugs).

## Distribution Channels

11. More than 90 percent of Schering's products are sold by or, for charge-back customers, distributed through wholesalers. Schering generally does not sell directly to physicians.

## Wholesalers as Customers

12. When Schering sells a product to a wholesaler, standard industry practice has been to provide a discount of 2% for prompt payment. Schering has historically provided these customary prompt-pay discounts to wholesalers. Since early 2004, Schering has negotiated small additional rebates in the form of Inventory Management Agreements ("IMAs"). Even with an IMA, a full-line wholesaler receives less than a 5% discount. In other words, all of Schering's full-line wholesale customers generally receive less than a 5% discount off of Wholesale Acquisition Cost ("WAC").

13. Schering does not know the price at which the wholesaler resells the product to a pharmacy or other provider. Schering does not generally survey the prices wholesalers charge for Schering products.

### Wholesalers as Distribution Channels

14. Wholesalers, in addition to being direct purchasing customers, often serve as the distribution channel to the various other entities with which Schering contracts, including pharmacies, HMOs, and GPO members. Such customers may be charged lower prices than wholesalers. For example, Schering has offered rebates on its products to managed care organizations such as PBMs and HMOs. Schering has also had chargeback contracts with some entities, such as staff model HMOs, hospitals, nursing homes, and specialty pharmacies, that purchase Schering products through wholesalers.

15. When a wholesaler sells a Schering product to a customer under a chargeback arrangement, the wholesaler still would pay WAC (or less than 5% below WAC) for the product. It would then receive a chargeback payment from Schering as a result of fulfilling Schering's contract with the end customer. In other words, the wholesaler is made "whole" through the chargeback. While Schering knows the chargeback price for its contract customers, it does not know the price ultimately negotiated between the wholesaler and the contract customer.

### Pricing

16. Direct Price, formerly known as Net Direct Price and now known as WAC, is an undiscounted list price that Schering reports to its customers and to the pricing compendia. WAC (Direct Price) is the actual price paid by most Schering direct customers. For example, if a pharmacy chain or wholesaler purchases product directly from Schering, it pays Direct Price, subject to a customary prompt pay discount (plus an IMA rebate, in the case of a full-line wholesaler after 2004). Plaintiffs' Exhibit 403 is an example of a communication to a pricing service, First Data Bank, reporting Schering's WAC, which was – at the time of this document – referred to as Net Direct Price or "NDP."

17.     Schering also reports WAC (Direct Price) to its customers, including wholesalers, GPOs, and other direct purchasers, which could include hospitals and individual clinics.

18.     Schering calculated its suggested AWPs by adding a markup factor of 20% to WAC (Direct Price). This calculation was a mechanical process that worked the same for all Schering brand-name drugs.

### Third-Party Payors

19.     Based on my experience managing the contracting function for Schering, I believe that third-party payors are able to obtain reasonably accurate pricing information regarding Schering drugs. It is my experience that third-party payors have access to information through a number of channels.

20.     For example, third-party payors learn about the type of pricing available for Schering's products by putting the administration of their drug plan out to bid to various administrators, including PBMs. Through these competitive bids, third-party payors are able to make sure they are getting a competitive deal from their drug plan administrators.

21.     Another way that third-party payors gain information as to levels of drug prices is through direct contracts. Many third-party payors have direct contracts with Schering. These include health plans and union health and welfare plans. Schering decides whether to respond to a request for a direct contract based on the size of the group, the amount of control it exercises over prescriptions, and the geographic area. Insurers like Harvard Pilgrim or Blue Cross Blue Shield of Massachusetts have had direct contracts with Schering, as did health and welfare plans like Union Pacific Railroad and the New York Hotel and Trade Union.

22.     Schering has also had direct contracts with Massachusetts third-party payors. These contracts provided for discounted pricing. In 1996, for example, Schering had a

chargeback contract, covering Schering drugs like Intron A and Proventil, with Blue Cross Blue Shield of Massachusetts. Exhibit 2937 is a copy of this contract. Exhibit 2902 is a contract Schering had with Aetna Healthcare in 1998 for several Schering drugs, including Intron A. Exhibit 2903 is a contract Schering had with Harvard Pilgrim Healthcare in 2002, which covered numerous Schering drugs like Proventil solution and Intron A. Schering also had contracts with Fallon Clinic, covering numerous Schering drugs. Exhibits 2900 and 2901 are copies of those contracts. These are accurate representations of contracts Schering had with payors in Massachusetts, and these contracts were kept in the regular course of business.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Debra Kane

Executed this 17th day of November 2006 in Kenilworth, NJ