UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO. 1456<br>Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | Hon. Patti B. Saris |

**TRIAL DECLARATION OF JULIE MCHUGH**

I, Julie McHugh, declare as follows:

1. I am, and have been since July 1, 2006, the Company Group Chairman for Global Virology in Johnson & Johnson's Pharmaceuticals Group. From July 2004 to June 2006, I was the President of Centocor, Inc. I joined Centocor in 1996 as the Director of Marketing for the Immunology Business Unit.

2. I submit this declaration as my direct testimony for use at trial in this case.

## SUMMARY

3. I understand that plaintiffs assert that Centocor priced its drug Remicade, from 1998 through to 2003 (the "relevant period"), to cause payors to over-reimburse for Remicade administered by physicians in their offices. I strongly disagree with that assertion.

4. Centocor's pricing on Remicade has been entirely open and transparent to all industry participants during the relevant period. When Centocor launched Remicade in 1998, we recommended an Average Wholesale Price ("AWP") for Remicade that was 30% above its Wholesale Acquisition Cost ("WAC"). That ratio never changed. Whenever we made pricing recommendations to pricing compendia (such as Red Book and First DataBank), Centocor always recommended an AWP that was 30% above the recommended WAC. Both numbers were published side by side in the pricing compendia and, therefore, were readily available to the public and private insurers of Remicade.

5. The published WAC for Remicade was the price at which Centocor sold Remicade to wholesalers and specialty distributors (subject to an industry-standard 2% prompt-pay discount). The WAC also was the price at which physicians purchased Remicade (subject to any minor markup or markdown the specialty distributors may have unilaterally applied). That is, <u>Centocor did not provide discounts or rebates to physicians</u>. Other than the prompt-pay discount, the only discount or rebates we offered during the relevant period were to the

government or private insurers, including, e.g., Harvard Pilgrim and Fallon Community Health Plan.

6.    I understand plaintiffs contend that Centocor should have recommended an AWP that was (i) no greater than 30% above Remicade's average sales price to physicians (for private insurer reimbursement purposes) and (ii) the same as physicians' average sales price (for Medicare reimbursement purposes). Even assuming that the pricing compendia would have done so, we were not aware of any precedent for reporting two different AWPs – one for private insurers and another for Medicare. Accordingly, we followed the established industry practice and recommended one AWP for Remicade, which was set at a fixed markup above WAC.

7.    Moreover, insofar as plaintiffs claim Centocor should have offered Remicade for sale to physicians at acquisition prices within 30% of its AWP, it did so. In addition, the rebates Centocor paid to insurers further reduced their costs to provide the drug and, thereby, in effect reduced the so-called "spread" between the amount reimbursed by the insurer and amount paid by the insurer for the drug to less than 30%.

8.    Insofar as plaintiffs claim that Centocor should have set Remicade's AWP at the same price as its average sales price, that never was presented as a requisite, or contemplated as a viable, alternative. When Centocor launched Remicade in 1998, Medicare (and many private insurers) reimbursed physicians for Remicade administered in their offices at amounts calculated at a percentage off the published AWP. As a result, physicians would have incurred losses on the administration of Remicade to their patients had Centocor set its AWP at an amount equal to the physicians' acquisition costs (which for Remicade was at or close to WAC). I was not aware then and am not aware now of any drug that had an AWP equal to the acquisition cost. Indeed, the pricing compendia listings consistently disclosed different amounts

for the drugs' AWPs and WACs.

9.  As the former Director of Marketing and President for Centocor, it is my view that Centocor's pricing always was appropriate and consistent with our understanding of the governing rules and regulations. Our pricing has been transparent, public and straightforward. It was neither intended nor contemplated that the pricing would cause any "over-reimbursement" for Remicade administered in physicians' offices.

## DETAILED STATEMENT

10.  Today, Centocor is an established biotechnology firm that develops, manufactures and markets a number of biotechnology-derived products. These products include Remicade (infliximab), a monocolonal antibody that blocks the immune system's production of tumor necrosis factor-α (or "TNF"). When it launched Remicade in 1998, however, Centocor was a small, independent biotech company. Centocor was founded in 1979, but 1997 was its first full year of operating profitability.

11.  Centocor was acquired by Johnson & Johnson in 1999. Johnson & Johnson is a holding company. It does not manufacture, market, or sell pharmaceuticals or any other products.

### History of Indications

**Crohn's Disease**

12.  At its launch in 1998, Remicade was approved for the treatment of patients with moderate to severe Crohn's disease who had not responded adequately to conventional therapies.

13.  Crohn's disease is a chronic and serious inflammatory disease of the gastrointestinal tract that afflicts about 500,000 people in the United States. Crohn's disease frequently is debilitating, causing acute gastrointestinal ulcers and severe fistulae. It is typically

3

episodic, with high relapse rates. In addition to the gastrointestinal lesions, Crohn's disease patients also suffer from diarrhea, fever, fatigue, arthritis, eye inflammation, skin disorders, and significant weight loss. Crohn's disease afflicts the young as well as the old, with the most common incidence of treatment for patients between 20 and 30 years old.

14.     Before the introduction of Remicade, gastroenterologists' treatment for Crohn's disease consisted of anti-inflammatory medications (such as sulfasalazine and corticosteroids) and immunosuppressive medications (such as azathioprine, 6-mercaptopurine, methotrexate, and cyclosporine). These drugs frequently were ineffective in managing the clinical symptoms of Crohn's disease. In addition, the drugs have severe side effects and toxicity risks. Consequently, the large majority of patients were repeatedly admitted to the hospital to permit their bodies to rehydrate, their bowels to rest, or for the surgical removal of their intestines. Remicade was a breakthrough treatment that alleviated many of the debilitating effects of Crohn's disease and, thereby, avoided surgical interventions.

15.     Remicade was the first – and remains the only – biological therapy indicated in the treatment of Crohn's disease. It was the first new treatment for Crohn's disease of any kind in over thirty years and it revolutionized treatment of the condition. Unlike the other pharmacological treatments, Remicade is a highly targeted agent that goes to the cause of the disease – namely, it binds to and blocks the immune system's production of TNF-α. It has a rapid and profound clinical benefits, including healing the mucosal inflammation of the intestine caused by the disease and potentially saving the patient's bowel.

**Rheumatoid Arthritis**

16.     The FDA approved Remicade for the treatment of rheumatoid arthritis in November 1999. Rheumatoid arthritis is a chronic and painful inflammatory disorder that causes

4

a person's immune system to attack his or her own tissues. It is a progressive disease that, unless arrested, leads to structural damage in a person's cartilage, bone, tendons and ligaments. Unlike other forms of arthritis (e.g., osteoarthritis), rheumatoid arthritis is a disorder that also afflicts the young as well as the old, often manifesting when a patient is in his or her 20's. It attacks women about three times more frequently than men, and often leads to physical disability if not successfully treated.

17. Prior to Remicade's introduction, the treatment for rheumatoid arthritis typically involved the use of anti-inflammatory drugs, followed by steroids and DMARDs (e.g., methotrexate, gold salts). Those treatments frequently were ineffective for patients with moderate to severe rheumatoid arthritis, and did little to stop the disease activity. In contrast, Remicade has a relatively high response rate and prevents the disease from progressing and imposing further structural damage on a person's joints. In doing so, Remicade preserves a person's mobility and significantly enhances quality of life. Remicade remains a leading treatment for rheumatoid arthritis today.

**Other Approved Indications**

18. As a result of Centocor's on-going investment in clinical research, further uses for Remicade continue to emerge. In December 2004, Remicade was approved for the treatment of ankylosing spondylitis, a rheumatic disease that causes arthritis of the spine and sacroiliac joints and can cause inflammation of the eyes, lungs, and heart valves. In May 2005, Remicade was approved for the treatment of psoriatic arthritis, a chronic disease characterized by inflammation of the skin and joints. And in September 2005, Remicade was approved for the treatment of ulcerative colitis, which is a chronic inflammation of the colon that produces ulcers in its lining. The FDA approved Remicade for the treatment of pediatric Crohn's disease in May

2006, psoriatic arthritis (PsA) structural damage in August 2006, and severe psoriasis in September 2006. All of the conditions for which Remicade is indicated can be extremely debilitating.

### Remicade Administration and Reimbursement

19. Remicade is administered to patients via intravenous infusion, which most commonly takes place in a physician's office, but which may also take place in other settings, such as a hospital's outpatient department. The average patient receives between three and four vials of Remicade during an infusion session. An infusion of Remicade typically lasts about two and a half hours, including the time to prepare the patient for infusion and to monitor the patient's condition after the infusion is completed. Most patients receive an infusion about once every eight weeks. (The dosing for ankylosing spondylitis is dosed every six weeks.)

20. Remicade administered in physicians' offices is reimbursed under Medicare Part B. Remicade was introduced in 1998, shortly after Congress passed the Balanced Budget Act of 1997 ("BBA"), which directed Medicare to reimburse physicians under Part B at 95% of the drug's AWP. In 2004, pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), the Medicare reimbursement for Remicade was reduced to 85% of AWP. In 2005, also pursuant to the MMA, the reimbursement was set at 6% above Remicade's "Average Sales Price" or "ASP" as defined by statute and regulation.

21. Since its introduction in 1998, private insurers also have reimbursed Remicade administered in physicians' offices. Private insurers have used a number of different methodologies to reimburse Remicade, including capitation, percentage of charges, fee schedule, and as a percentage off Remicade's published AWP. My understanding is that most private insurers have not followed Medicare in adopting an ASP-based reimbursement methodology for

Remicade. To my knowledge, those insurers that have moved to an ASP-based methodology reimburse at amounts up to 12% above the reported ASPs.

22.  Remicade administered in the hospital outpatient setting also is reimbursed under Medicare and by private insurers. The costs to the patient of administration in the hospital outpatient setting have been far greater than in the physician's office under both public and private reimbursement regimes.

### Centocor's Understanding of the Reimbursement Regime

23.  As noted, shortly before we introduced Remicade, Congress enacted the BBA, which reduced reimbursement from 100 percent to 95 percent of the average wholesale prices. We certainly did not understand that the BBA was intended to require pharmaceutical manufacturers such as Centocor to alter what we were advised was the long-standing industry practice of recommending an AWP at a fixed markup over WAC. To the contrary, we believed that the industry practice remained the same, and that Medicare simply intended to reimburse at 5% less than it previously had reimbursed.

24.  I would have expected there to have been greater specification in the governing statutes or regulations had Congress intended to suddenly require pharmaceutical manufacturers to start reporting *actual* averages of wholesalers prices to the pricing compendia. To that point, when Congress explicitly required manufacturers to report their average sales prices or "ASP" under the MMA, there was – and continues to be – significant debate and regulatory guidance concerning how those ASPs were to be derived.

25.  Moreover, had Centocor recommended an AWP equal to the "actual" average of wholesalers prices when it launched in 1998, physicians would have incurred a loss on Remicade administration to Medicare patients. That is, virtually all physicians would have

7

received less reimbursement from Medicare (95% of the physicians' acquisition cost, which was about list) than they paid for the drug (list price). The physicians also would have incurred an incremental loss due to the inadequate administration fee afforded by Medicare. Under such circumstances it is virtually certain that physicians would not have administered Remicade in their offices. Rather, patients would have been compelled to go to hospitals to receive their drug administration, which is by far the more expensive and less convenient site of care.

### Remicade's Initial AWP and WAC

26. At the time we were bringing Remicade to market, Centocor had no experience in developing initial drug prices. Remicade was the first drug we had ever launched and priced ourselves. We therefore looked to and relied heavily on what we understood to be the standard industry practice. It was our understanding at the time that the standard industry practice was for manufacturers to recommend to the pricing compendia (such as Red Book and First Data Bank) an AWP and a WAC. We understood that (i) the published AWPs were benchmarks payors used to express their reimbursement and (ii) the published WACs were drug's list prices, or the prices the drug was sold to wholesalers and specialty distributors.

27. Consistent with our understanding of standard industry practice, we determined the initial AWP to recommend for Remicade primarily by asking private insurers what they would be willing to pay for the new therapy. We understood that the private insurers would be willing to reimburse Remicade at amounts that were less than or equal to the therapeutic alternatives. At the time there was no comparable drug on the market. The costs of the only alternative therapy for moderate to severe Crohn's disease – repeated surgeries – was large. At the time we calculated that the typical Remicade patient (i.e., patients with moderate to severe Crohn's disease) would undergo several hospitalizations at a cost of $25,000 to $30,000

*per* hospitalization. The insurers we surveyed confirmed that they would be willing to reimburse Remicade at levels that allowed them to reduce such costs. The research also showed, however, that Remicade would face greater price sensitivity as direct drug competition entered the market (which was imminent), particularly when Remicade was launched for rheumatoid arthritis. Accordingly, we decided to recommend an AWP of $585, which we expected would result in a cost to insurers below what our research showed they valued Remicade. But we also recognized that Remicade eventually would face direct drug competition and thus greater payor price sensitivity, particularly when Remicade was launched for rheumatoid arthritis.

28.     We determined the initial WAC to recommend primarily by looking at the difference between the published AWPs and the discounted list prices (not including rebates) for other biologics. Based on a small sample of hospital and retail pharmacy invoices, we determined that this difference ranged from 20% to 74%. We understood that the actual "spreads" on the drugs likely were greater since it was common to provide rebates to hospitals, which would not be reflected on the invoices because they are paid at the end of a period based on aggregate purchases (not up front like a discount). Nevertheless, we decided to limit the spread on Remicade to 30%. Accordingly, we set our WAC at $450.

29.     We believed that the pricing we set on Remicade was appropriate and fair. As to the payors, Remicade was significantly less costly than the therapeutic alternatives. As to the physicians, we believed the drug reimbursement afforded sufficient margin to cover the costs and the risk of loss associated with adopting a complex, new therapy such as a Remicade infusion. These costs include, among other things, the physician's time and expertise in overseeing the infusion; the capital and administrative investments required to set up an infusion suite; creating billing, purchasing and storage infrastructure; providing nursing coverage

throughout the duration of the infusion; and bad debt (i.e., the risk of non-collectible copays).

### Remicade's Post-Launch Pricing

30. Centocor never made or requested any revision to the "spread" between Remicade's published AWP and WAC. Thus, during the relevant period (and indeed through 2005), Remicade's published AWP was maintained at the same fixed markup of 30% over the published WAC. Moreover, Centocor did not grant discounts or rebates directly to physicians, and did not grant incentives to distributors to pass through to physicians. Consequently, aside from any markups or markdowns unilaterally afforded by the distributors, the physicians' acquisition cost was WAC. Thus, the "public" spread between the published AWP and WAC was the "actual" spread between the AWP and the physicians' actual acquisition costs.

31. In other words, the "spread" on Remicade has been fully transparent to public and private insurers. The WAC and AWP for Remicade have never been a secret. They are published side by side in pricing compendia. Moreover, during the relevant period the published AWP always bore a constant and predictable relationship to the published WAC (i.e., 30%).

32. From 1998 through to 2001, Centocor increased Remicade's WAC in an effort to raise it to a level comparable to the costs of competitive drugs that entered the market for the treatment of rheumatoid arthritis. In November 1998, Immunex introduced its anti-TNF drug Enbrel and, in December 2002, Abbot introduced its anti-TNF drug Humira; both of these drugs competed with Remicade only in the rheumatology market at that time. The drugs were priced at a premium to Remicade and, therefore, were more costly to private insurers and patients. Moreover, both Enbrel and Humira are self-administered drugs that, unlike Remicade, are not covered by Medicare Part B. As a result, patients otherwise eligible for Medicare

10

nevertheless had to pay for those drugs directly or through some supplemental insurance program at the higher costs.

33. Centocor did not respond to the introduction of the competitive products by increasing the "spread" on Remicade. Quite the contrary, the spread remained at the fixed and transparent 30%. Moreover, from 2001 through late 2005, Centocor froze its price (effectively taking a price decrease due to inflation) to demonstrate to payors that it remained less costly relative to the competition.

### Private Insurers Rebate Programs

34. While Centocor did not pay rebates to physicians on their Remicade purchases, it did pay rebates to private insurers based on the volume of Remicade the insurers purchased. Specifically, the rebates were calculated based on the "distributor list price" (or WAC) applied to the number of units the insurer reimbursed. The rebates paid to the insurers reduced their overall product costs, effectively reducing the "spread" between physician reimbursement and payor costs to well less than 30%.

35. In its contracts with insurers, Centocor paid two levels of rebates. The first level of rebate generally was 6%. The insurers were entitled to these rebates if they agreed to (a) afford Remicade formulary status equal to that of any other biologic approved for the same indications, (b) designate the physician office as a preferred site of care, which was in the insurers' and patients' best interests, and (c) provide the data to Centocor that it required to calculate the incentives.

36. The second level was for an additional 2% rebate over and above the first level (i.e., for a total of 8%). Under this "Level 2" contract, the insurer was entitled to this incremental rebate by agreeing to also establish a process for adopting a single payment rate for the physicians services – in lieu of the drug reimbursement and the administration fee. The

single payment rate contemplated that the physician would be supplied with Remicade from a specialty <u>pharmacy</u> on an as-needed basis (not from a specialty <u>distributor</u>). Under the specialty pharmacy route of distribution, the physician never takes title to the drug and is not reimbursed by the payors. In other words, Centocor actively encouraged insurers to move away from the buy-and-bill methodology that plaintiffs apparently contend was the mechanism of the alleged fraudulent scheme.

37.   A recent example of the successful implementation of this specialty pharmacy arrangement involved the private insurer Highmark Blue Cross Blue Shield, which serves western Pennsylvania. Highmark determined that a relatively high percentage of its Remicade reimbursement was for infusions performed in hospitals rather than in physicians offices. As noted, hospitals are the more expensive site of care for private payors and patients. About three years ago, at Highmark's request, Centocor helped Highmark to replace its buy-and-bill model with a mandatory specialty pharmacy program. The program made Remicade available to physicians through the specialty pharmacy on an as-needed basis. To encourage physicians to participate in the program, in lieu of sending their patients to hospitals, Highmark increased significantly the fee paid to physicians for their Remicade infusion. By providing a viable alternative to the buy-and-bill regime, the program removed much of the financial risk to the physician, and thereby allowed the physicians to resume administering Remicade in-office.

38.   Another example of Centocor's partnering with insurers to adjust physician reimbursement to encourage in-office administration involved a program it implemented with the large private insurer Aetna about four years ago. In an effort to move the site of care to the physicians office, where Aetna's reimbursement costs for Remicade were far less, Centocor worked with Aetna to identify the physicians who were referring their patients to

hospitals. In return, Aetna agreed to negotiate with these physicians to arrive at a reimbursement rate that would allow and encourage physicians to treat their patients in their offices, which is best for the patient and results in the lowest cost to Aetna.

39. The Centocor insurer rebate program was consistent with a specialty pharmacy program it implemented at the launch of Remicade in 1998. That program involved the sale of Remicade at a discounted price to the specialty pharmacy NovaFactor, which, in turn, supplied Remicade to physicians on an as-needed basis. As the entity holding title to the drugs, NovaFactor – not the physicians – was reimbursed for the Remicade administered in physicians' offices. Like the insurer rebate program, therefore, the NovaFactor arrangement provided physicians with the option not to purchase Remicade and, thereby, to avoid the buy-and-bill methodology at issue in this matter.

40. It is my understanding that earlier in this case one of plaintiffs' witnesses, Ms. Gina Alongi of the International Union of Operating Engineers (a Taft-Hartley plan), testified that the plan paid for Remicade administered to its members pursuant to a contract with Express Scripts, a managed care organization. Under the agreement, the plan reimbursed Express Scripts for certain "specialty injectables" (allegedly including Remicade) administered to its members. Under this arrangement, like the other specialty pharmacy arrangements described above, the physician that administers the drugs to the plan's members does not take title to Remicade and does not get reimbursed by Express Script. Rather, this is yet another example of a payor utilizing the specialty pharmacy arrangement as an alternative to the buy and bill methodology.

## Remicade's Physician Education Programs

41. While plaintiffs acknowledge that the difference between Remicade's reimbursement and costs (i.e., 30%) was known and within the insurers' "expectations", it is my

13

understanding that plaintiffs also take issue with certain Centocor programs implemented during the first few years after Remicade was introduced that were designed to educate physicians concerning the efficacy and reimbursement of the drug. The education programs, and our marketing focus for Remicade generally, always was first and foremost on educating physicians as to the remarkable clinical benefits of this breakthrough and life-changing drug. But we also were dealing with physician specialties (gastroenterologists and rheumatologists) that had very limited familiarity with infusing drugs in their offices, or the costs and risks associated with "buying and billing" for infused drugs. In fact, many rheumatologists were disinclined to infuse in their offices having experienced significant reimbursement issues with an earlier infused drug (the drug Synvisc marketed at the time by Wyeth).

42.    It was critical that Remicade be infused in-office for two reasons. First, the physician office setting was and is clinically the preferred site of care for this drug. As a drug that, in effect, suppresses certain aspects of the human immune system, it is vital that physicians closely monitor the patients to ensure the successful and appropriate utilization of the therapy. Related, patients prefer the convenience, comfort and personalized attention of the clinic setting. The patients' preference for the clinical setting translates into greater compliance (i.e., adherence to infusion schedules) when the drug is administered in the physician's office. Second, the administration of Remicade in-office was significantly less costly – to both the insurers and the patients – than the administration in hospitals.

43.    To ensure physicians would administer Remicade in their offices, Centocor had to arrange education for the physicians concerning the mechanics of billings and reimbursement, and respond to the physicians concerns about the financial risks and disincentives associated with the drug. We did so in an appropriate and truthful manner,

working together with private insurers that likewise recognized that the physician's office was the preferred site of care. Without the Centocor education programs – which plaintiffs apparently suggest should not have been conducted – physicians would have directed patients to the hospital for their treatment, to the detriment of the patients and the healthcare system as a whole.

44. Since our pricing was transparent and expected, I don't see how the fair and accurate discussion of the pricing in the education programs may be construed as improper. From our perspective, the market programs we implemented for Remicade were entirely appropriate and indeed necessary to ensure the valuable therapy was available and appropriately administered to patients.

### Centocor's Patient Assistant Programs

45. Centocor has a long-standing commitment to providing assistance to indigents and charitable causes. At or about the launch of Remicade, Centocor initiated a Patient Assistance Program that made Remicade available for free to indigent and uinsured patients. The list price value of the Remicade distributed under this program is well over $75 million. Centocor also has donated approximately $27 million over the last three years alone to various foundations that pay the out-of-pocket expenses for patients who cannot afford Remicade treatment but who do not qualify for the indigent patient program.

### Conclusion

46. As a senior Centocor executive during the entire period encompassed by plaintiffs' allegations, I can attest that it always was our view that we were operating appropriately within the confines of a reimbursement regimes established and maintained by payors, pursuant to well-known and standard industry practices established long before Remicade was introduced into the market. Moreover, in my opinion, the following undisputed

facts squarely refute plaintiffs' allegations:

- The fixed, published difference between Remicade's AWP and its list price was 30%.

- A "spread" of 30% was well within that which was known and readily determinable by the industry participants to be the difference between reimbursement and acquisition costs, including relatively inexperienced participants such as we were at the time.

- Centocor did not manipulate or change, or attempt to manipulate or change, the fixed ratio between Remicade's published AWP and its published list price.

- Centocor did not pay, or offer or pay rebates, discounts or other price incentives to physicians.

- Remicade's pricing to physicians was transparent to payors because in consisted solely of the published AWP and WAC.

- The only price incentives Centocor paid on Remicade (aside from those to government agencies) were rebates provided to private insurers, which effectively reduced their reimbursement costs.

- Prior to the implementation of the MMA, we never understood Medicare to require Centocor to report an AWP that was equal to physicians' acquisition costs.

47.     Validation of Centocor's positions comes from even the industry's harshest critics. It has been brought to my attention that even Zachary T. Bentley, President of Ven-A-Care of the Florida Keys – an entity that I am told initiated and has led AWP litigations throughout the country – has singled out Johnson & Johnson as one a handful of companies that do not abuse the AWP system.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 20, 2006

_____
Julie McHugh