# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO:<br><br>ALL CLASS ACTIONS | CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

### DECLARATION OF G. RAYMOND PIRONTI, JR.

1.   My name is G. Raymond Pironti, Jr. I reside at 19010 Cour Estates, Lutz, Florida.

2.   I am currently self-employed as a Partner/Owner in the following Florida companies: DSRP Consulting, LLC; JJ Ellis, LLC; and Mainsail Business Solutions, LLC. A brief description of these companies is included in the attached resume that outlines my background qualifications, professional experience, education and achievements.

3.   I was an employee of the Schering-Plough Corporation (SP) from October 1990 through December 1998. Prior to working for SP, I obtained a Bachelor of Science in Finance and Marketing (Dual Major) from Syracuse University, School of Management, in 1990.

4.   The facts set forth in this declaration are based upon my personal knowledge acquired in the regular course of business in my employment with SP in the positions I was assigned over the course of eight years. The positions of analyst or manager, time periods held, and a brief description of the duties and responsibilities of the positions I held at SP are described on page two of my attached resume. Generally, my experience allowed me to obtain

extensive and detailed knowledge as to the marketing, contracting, managerial, data systems, and
financial operations of SP in the managed care and disease management business units.

   5.   During the course of my employment with SP, I, along with two other SP employees (Beatrice Manning and Charles Alcorn), identified certain fraudulent practices involving SP's reporting of inflated "best prices" for SP drugs for the calculation of Medicaid rebates. In 1998 I met with Jim Sheehan from the Eastern District of Pennsylvania US Attorneys Office, and eventually filed a sealed complaint as a co-plaintiff with the US government under the qui tam provisions. I cooperated with the U.S. Attorney's Office investigation of SP's illegal marketing practices, including supplying copies of SP documents. Some of the previously supplied documents to the DOJ have now been produced in this case under Judge Saris' December 13, 2002 Protective Order, an order that I have signed onto by executing Exhibit A prior to seeing any documents produced by SP in this case. The qui tam action resulted in a global resolution during the summer of 2004 with the United States Attorney for the Eastern District of Pennsylvania that included the following components: (1) SP's wholly-owned subsidiary, Schering Sales Corp., pled guilty to a violation of the Anti-Kickback Statute for paying a kickback to two customers in exchange for preferred formulary treatment of Claritin and SP paid the fine of $52.5 million assessed for the criminal violation; (2) SP agreed to settle its False Claims Act liability and to pay to the United States, 50 Medicaid programs, and certain Public Health Service entities $292,969,482 for Schering's failure to report its true best price for Claritin; and (3) SP entered into a Corporate Integrity Agreement with DHHS to correct its government pricing reporting failures.

Case 1:01-cv-12257-PBS   Document 3274-14   Filed 10/27/2006   Page 4 of 11

6.  The underlying facts supporting the qui tam action were that SP had used an intricate scheme that involved its subsidiaries, including ITG, Schering Corporation and Warrick Pharmaceuticals, to cheat Medicaid out of hundreds of millions of dollars. SP evaded its responsibility to charge the U.S. government and its beneficiaries the lowest price it charged to the private sector, i.e., the best price required by federal law. Most of the scheme was carried out through ITG. The scheme, which centered on SP's blockbuster drug Claritin, involved "kick-backs", hidden rebates, hidden discounts, unreported free goods and nominally priced drugs.

7.  ITG provided free or well-below-cost health management services to HMOs that put Claritin on formulary. The value of these services were not included in the best-price calculation SP used to establish Medicaid pricing. ITG would sign a contract with the HMOs and this contract would be ostensibly totally separate from the rebate contracts that SP would sign with the managed care organizations. Medicaid auditors would review the rebate contracts with SP (not ITG) and thus would never see the additional "kick-backs" or hidden rebates/discounts SP gave through ITG. The role of ITG services are reflected in Exhibit 565, a draft memo from Linda Zhou, who was then the head of SP's Contracts and Pricing division. In this memo, Zhou is making the "business case" for further investment into ITG's computer capacity. On page 2, under Roman numeral I, Zhou states, "ITG's services complement and enhance Schering's pharmaceutical products and meaningfully differentiate them from the competition. Thus, they provide our primary means of implementing the strategy to *compete on a basis other than price.*" On the next page under the section of "Increased Profitability" Zhou stated, "By allowing us to compete on a basis other than price, ITG has increased Schering Lab's profitability. Total discounts as a % of contracted gross sales has declined in 1996 from 23% in 1996 to 17% currently. At 1998 LE sales levels, this equates to annual savings of $222 million."

In essence, the value of ITG services was a hidden discount to replace disclosed discounts on
Case 1:01-cv-12257-PBS   Document 3274-14   Filed 10/27/2006   Page 5 of 11
certain SP drugs.

8. SP either directly or through a subsidiary also made money payments (kickbacks) or gave unreported free goods, including Warrick albuterol inhalers and solution, to major PBMs and HMOs when added value was required to overcome a competitive disadvantage against other pharmaceutical companies' deals. The money payments were disguised for reporting purposes as "administrative fees" "partnership fees" or "data fees." This occurred during the years shortly after OBRA'90 became effective and continued, at least, until I left SP in December 1998. I have personal knowledge of the use of such free goods because of the positions I held in the managed care and finance departments of Schering Labs and my positions in ITG. The use of free goods would not be reflected in best price calculations and subsequently posted AWPs. It was also a standard practice at SP that it would there would be no documentation i.e. contracts that linked transactions using free goods and customer discounts/pricing.

9. SP also "gave" the managed care organizations (MCOs) nominally priced drugs, including SP Proventil and Warrick albuterol inhalers and solution, to equalize the difference between the "price" of an SP drug, such as Claritin, and the offered "price" of a competitor drug, such as Allegra, so that the SP drug would stay on a managed care organization's formulary. Nominal pricing of SP drugs was also used by SP to add value to deals with MCOs. "Nominal Prices" are steeply discounted drugs priced at 90% or more off of AMP. The value of nominally priced drugs to MCOs as a contract tool is premised on the fact that the MCO has a dispensing arm (pharmacy) and would sell the drug at full price or would be reimbursed as if acquired at

regular direct price by third party payers using AWP-based reimbursement factors, such as
Case 1:01-cv-12257-PBS   Document 3274-14   Filed 10/27/2006   Page 6 of 11
Medicare, plus any co-pays from the individual program beneficiary.

      10.     The nominal pricing strategy was first developed in October 1992 as shown by Exhibit 714. At that time I was a market analyst in managed care working under Ed Watson, an attendee to the nominal pricing meeting. Working in managed care, I was routinely briefed on contracting strategies and received a copy of Exhibit 714. The nominal pricing strategy was approved by senior management and thereafter implemented.

      11.     Another strategy SP implemented to reduce medicaid liability, leverage managed care accounts and keep branded prices inflated was the Schering/Generic strategy set forth in Exhibits 609 and 408. Exhibit 609 is an early strategy paper on developing a generic arm of SP by Jim Audibert. Exhibit 408 is a follow-up white paper written by a team led by Rich Zahn. I am familiar with these two exhibits because I received file copies while working at SP. From these strategies, Warrick was created. Warrick, like ITG and the other SP subsidiaries are "shared resource" entities, i.e., they share SP's assets, resources and management in their operations. This latter concept of Warrick using SP resources is reflected in Exhibit 408 at WAR0006053 by the phrase "backroom" services.

      12.     Nominal pricing, free goods, and generic drugs were tools utilized by SP to retain customers and formulary access without reducing the price or increasing the discount of selected high margin products such as Claritin. Typically SP would engage in the practice of "bundling" utilizing nominally priced product. The term "bundling" refers to grouping of different products regardless of class to achieve greater customer discounts and/or rebates. SP would analyze the customers historic drug utilization of all SP products. SP would then determine the impact of offering higher discounts or nominal prices for low margin mature multi-source heavily

discounted products without discounting high margin single source products such as Claritin.
The offer would be presented as a package and rescinded if the customer did not accept the price for Claritin and maintain formulary position and utilization. Because the offer was implied and not directly linked, the products never appeared to be bundled. In some cases the MCO was considered a mixed model HMO (this type of customer has both a staff model HMO and an IPA model). SP would offer nominal pricing and/or free goods (if free goods there would be no contract pricing) with multi-source products to the staff model and in a separate contract to the IPA model secure formulary access with low discounts for the single source drug. There was no reference in either contracts to the bundle, thus appearing to be poor business practice (in the case of nominal pricing) but allowable under the law to a government auditor. Bundling affects AMP and best price calculations. HCFA required that the value of the discounted (nominally priced) or free product be proportionately distributed among the other products in the bundle. The nominal pricing strategy as shown in Exhibit 714 was implemented utilizing bundling, but, to my knowledge SP did not proportionately distribute the value of the nominally priced discount or report such bundling in accordance with HCFA requirements. An example of an implied bundling is Exhibit 470 where SP is structuring a deal with Medco whereby Warrick would make up any value difference from competition by providing Medco with $2.16 million by providing discounted/nominal solution. Another example of bundling is Exhibit 418. Exhibit 418 is actually a copy from a file I maintained at SP and the handwriting on the first page "separate Warrick bid" is mine. The managed care with GeriMed included SP branded versions of albuterol products. The "deal" was that GeriMed would receive discounted Warrick generic albuterol solution under a separate contract so as to hide the "discounted" drugs so as not to

report the discount for the branded versions. The practice of nominal pricing in contracting

began in 1992 and continued, at least, up to the time I left SP in December 1998.

13. I have reviewed Exhibit 505 showing accounting of Intron-A and Proventil and Warrick solution as free goods for the years 1998 through 2003. Based on my experience in contracting at SP, there would not have been any reporting of those free goods to impact AMP, BP or AWP. Also based on my experience, the high volume entries at WAR 0072336 of free goods provided to Cardinal Health, a wholesaler, and Rite-Aid, a chain pharmacy, potentially indicate the giving of value in a bundling arrangement that would be structured so as to avoid reporting for best price. Likewise, such free goods would not be reflected in best price calculations.

14. I have reviewed Exhibit 497, authored by Brian Longstreet. The comments in said exhibit regarding creating favorable reimbursements spreads through manipulations of AWP and sales pricing for both branded and generic products reflect a well-known strategy by SP senior management in the marketing of SP products.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature]*
G. Raymond Pironti, Jr.

Dated: 10-27-06