# Attachment A

# 8

# Trial Affidavit of Sharon Faulkner

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: <br> ALL CLASS ACTIONS | CIVIL ACTION: 01-CV-12257-PBS <br> Judge Patti B. Saris |

## TRIAL AFFIDAVIT OF SHARON FAULKNER

I, Sharon Faulkner, pursuant to 28 U.S.C. § 1746, on oath, depose and state as follows:

1.  I am a resident of the State of Tennessee. I have personal knowledge of the facts stated below and would testify to them in court if called upon to do so.

2.  I am a Vice President of Southern Benefit Administrators, Inc. ("Southern Benefit"), the third party administrator ("TPA") for, among others, Sheet Metal Workers National Health Fund ("Health Fund" or "Fund"). I manage our Goodlettsville, Tennessee office and am responsible for the day-to-day administration of most of Southern Benefit's plans, including the Health Fund.

3.  Southern Benefit has acted as the Health Fund's TPA for ten years. By virtue of that long-standing relationship, I am familiar with the benefits offered by the Health Fund and how the claims of the Fund's beneficiaries are paid by the Health Fund. In particular, I am familiar with the Fund's administration of its Supplemental Medicare Wraparound Plus ("SMW+") program for retirees.

001534-16 135719 V1

4. It is our duty as its TPA to assist the Fund with attempting to provide the best benefits to its members (including its retirees), and to provide those benefits at the lowest possible cost. In addition, because the Health Fund's trustees do not necessarily have backgrounds in healthcare or in the pharmaceutical industry, they rely on Southern Benefit to provide them with information regarding items that may increase the costs of providing prescription drug coverage to their members and retirees.

5. I have been informed that Medicare's allowable amount is based on AWP. Based on that information and because the Health Fund's co-payment is, in all cases, a percentage payment of Medicare's allowable amount, the Fund's co-payment is likewise based on AWP.

6. Throughout the Class Period I had no idea that the published AWPs were not an average price. I was unaware of the various acts Defendants engaged in that had the effect of publishing a fraudulent AWP.

7. I am aware that the complaint alleges that, in order to help their customers make more money, and thus make money themselves, each of the defendants used AWP and the Medicare reimbursement payment process to create spreads between the cost at which a drug is acquired and the cost at which it is reimbursed. I am aware that the effect of this was to cause the AWP we use as a reimbursement benchmark to be inflated, *i.e.*, it was not a real number or a real average. No one at the Fund was aware of those practices and I think it was unfair for the drug companies to take advantage of the Health Fund in this fashion.

8. Until I was provided with Plaintiffs' Trial Exhibit 43 (attached as Ex. A hereto), I was unaware that AstraZeneca was offering physicians confidential discounts of 33% to 50% for their purchases of Zoladex.

001534-16 135719 V1

9.  I have also been supplied a copy of the transcript of Dr. Berkman's sentencing hearing, where the United States Attorney described AstraZeneca's return to practice strategy and its scheme to provide free samples which would be billed to insurers in order to induce physicians to prescribe Zoladex. *See* Plaintiffs' Ex. 5, at 8-9, Ex. B hereto. I was unaware of such practices.

10. I was unaware that AstraZeneca distributed the type of material in Plaintiffs' Exhibit 38 (Ex. C hereto), which tells doctors to "do the math" and compute the profit they will make by virtue of prescribing Zoladex. I was unaware that AstraZeneca was giving physicians discounts of up to 41% such that those doctors were making a profit of $150,794 on 700 depots of Zoladex.

11. I have been informed that in response to an interrogatory BMS has stated as follows: "The existence of a spread is not misleading to a person with even minimal experience in the sale and distribution of drugs" and does not result in "excessive reimbursement." I certainly believe it was misleading to publish an AWP that did not reflect BMS' discounts and now, having been told about them, believe they resulted in unfair payments by payors. If increasing the AWP for its drugs shifted the cost of its drugs to payors such as the Fund, how can those actions be anything but misleading?

12. I also understand that in response to a separate interrogatory (No. 8, Plaintiffs' Trial Ex. 177, Ex. D hereto), BMS has stated that any person making a copayment has "actual or constructive notice" of the difference between AWP and the prices at which BMS sold its drugs to the public. Although the Fund made copayments no one at our Fund had any knowledge of this.

- 3 -

001534-16 135719 V1

13. I was unaware that BMS was contracting with oncologists to provide them 61% discounts off its WLP (list price) for Blenoxane.

14. I was likewise unaware that BMS was giving discounts 73% off list price, as reported in Plaintiffs' Exhibit 203, Exhibit E to this Affidavit.

15. I understand that there are many more examples of this type of conduct of which both the Fund and I were unaware.

16. Since Sheet Metal's payments are tied to AWP, even if I, anyone at Southern Benefit, or the Fund's trustees had become aware of the true nature of AWPs, there is not much the Health Fund could do about it. The Health Fund is and was not in a position to change its payment systems unless Congress changed the payment formula.

I make the foregoing statements under penalty of perjury on the date written next to my name below.

Date: 10/27/06

*[signature]*
Sharon Faulkner