# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL NO.  1456 |
| | Judge Patti B. Saris |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS and 01-CV-339 | |

**TRIAL OF CLASS 2 AND CLASS 3 CLAIMS**

**AFFIDAVIT OF GREGORY K. BELL, Ph.D.,
SUBMITTED AS DIRECT TESTIMONY
ON BEHALF OF TRACK 1 DEFENDANTS**

**November 26, 2006**

Contains Highly Confidential Material – Subject to Protective Order

**Testimony Outline**

I.    INTRODUCTION ................................................................................................. 1

II.   SUMMARY OF OPINIONS ................................................................................ 2

III.  DISTRIBUTION OF PHYSICIAN-ADMINISTERED DRUGS ......................... 3
      A.   Classes of Trade ..................................................................................... 5

IV.   MANUFACTURER PRICING OF PHYSICIAN-ADMINISTERED DRUGS .............. 6
      A.   Determination of Price Concessions ....................................................... 7
      B.   Evidence of Differential Pricing................................................................ 8
      C.   Awareness and Encouragement of Price Concessions by the Federal Government ...... 10

V.    PROVIDER REIMBURSEMENT ..................................................................... 11
      A.   Identity of Major Payor Groups............................................................... 11
      B.   Payor Negotiations with Providers.......................................................... 11

VI.   TRANSPARENCY OF REIMBURSEMENT AND PRICING SYSTEMS.................. 14
      A.   Shared Enterprises................................................................................. 15
      B.   Public Information ................................................................................... 16
      C.   Consultants and Industry Experts .......................................................... 17
      D.   Summary and Application to Named Plaintiff .......................................... 18

VII.  THE SIGNIFICANCE OF PUBLISHED AWPS............................................... 18

VIII. EVOLUTION OF PRIVATE PAYOR REIMBURSEMENT .............................. 22
      A.   Managed Care Reimbursement Methodologies...................................... 24
      B.   Negotiating Reimbursement Rates ........................................................ 27

IX.   MEDICARE PART B ........................................................................................ 29

X.    MARKETING/MANIPULATION OF THE SPREAD ........................................ 36

XI.   RESPONSE TO REPORT OF PROF. BERNDT ............................................ 37

XII.  RESPONSE TO DIRECT TESTIMONY OF DR. HARTMAN ........................ 39

Contains Highly Confidential Material – Subject to Protective Order

## I.  INTRODUCTION

1.    I am a Group Vice President at CRA International, an economics and
      management consulting firm.  My education includes a master's of business
      administration and a doctorate in business economics, both from Harvard
      University.

2.    For the past twelve years, I have directed the Pharmaceuticals practice within the
      Business Consulting group at CRA.  In this capacity, I have led a broad range of
      projects for pharmaceutical manufacturers, many dealing with the issues
      confronted over the course of the lifecycle of a pharmaceutical—from an
      assessment of market potential, to the marketing strategy at launch, to competitive
      response concerns that arise with the launch of a therapeutic alternative or a
      generic.  Many of these projects, including those for BMS and J&J, have involved
      recommendations for pricing and contracting strategies that determine the
      acquisition cost and net reimbursement cost for different segments of providers
      and payors.  To gain insight into the decision-making processes of physicians and
      payors, I have used a variety of market research methods, including surveys,
      focus groups, and advisory boards.  I have also helped manufacturers present
      information regarding their pricing and contracting strategies to payors and
      providers.

3.    I have offered opinions in more than 60 matters involving antitrust, breach of
      contract, finance, intellectual property, and transfer pricing.  Many of the opinions
      I have offered involve matters relating to pharmaceutical pricing and the
      reimbursement of pharmaceuticals.

4.    As an expert for the Track 1 defendants, I presented a tutorial for the Court in
      December 2004 in connection with the class certification submissions.  This
      tutorial discussed the distribution, sale, and reimbursement of pharmaceuticals,
      but focused primarily on self-administered drugs.  With few exceptions, namely
      those that are eligible for reimbursement under Medicare Part B, self-
      administered drugs have since been excluded from consideration in this

proceeding.  Accordingly, I have been asked to provide a supplemental tutorial that provides a more extensive explanation of the distribution, pricing, and reimbursement of physician-administered drugs, including the use of the published AWPs in public and private payor reimbursement systems. Additionally, I have been asked to render opinions related to plaintiffs' claims based on my expertise and understanding of the distribution, pricing and reimbursement of physician-administered drugs.

## II.   SUMMARY OF OPINIONS

5.   First, AWP is not an artifice created and employed by pharmaceutical manufacturers to deceive or defraud insurers into over-reimbursing for physician-administered drugs.  Quite the contrary, it would appear that insurers created, and have certainly perpetuated, the use of AWP as a reimbursement benchmark. Further, no manufacturer could unilaterally change the system by reporting AWPs equal to average acquisition costs.  Given the systems of reimbursement, any manufacturer that reported an AWP equal to the average of acquisition costs would find that the vast majority of physicians could not afford to use the product to treat the vast majority of insured patients, whether insured by private payors or Medicare.

6.   Second, it is my opinion that throughout the class period and significantly before, public and private insurers understood that the published AWPs did not bear a predictable relationship to acquisition costs, with the possible exception of single-source drugs without therapeutic competition, and these payors were not deceived by the AWPs for physician-administered drugs.  The well-documented history of insurers understanding and use of AWP, as well as the testimony and documentation produced through discovery in this case, corroborates that AWP generally was understood by insurers to be a benchmark set at a formulaic markup over WAC rather than an average of actual wholesale prices.  As such, AWP could not be understood to bear a generally predictable relationship to acquisition costs in situations where there exists therapeutic or generic competition that would be expected to lead to price competition.

Contains Highly Confidential Material – Subject to Protective Order

7.     Third, reimbursement rates for physician services and physician-administered drugs are negotiated between payors and providers with conflicting incentives. Both sides understand that although the reimbursement rate for physician-administered drugs are typically in excess of the acquisition cost, the reimbursement rate for services rendered in administration of those drugs typically falls short of the costs incurred.  In my opinion, formal reporting of acquisition costs would not have led to lower negotiated reimbursement rates in total (physician-administered drugs and the services related thereto); after all, private payors were generally unable to negotiate rates as low as those paid by Medicare Part B and the Medicare Part B rates were widely known.  Further, despite the publication of ASPs, I note that BCBSMA continues to reimburse physician-administered drugs at 95 percent of AWP and is extending use of the AWP benchmark to the reimbursement of hospital outpatient procedures.

## III.     DISTRIBUTION OF PHYSICIAN-ADMINISTERED DRUGS

8.     There are three routes by which physician-administered drugs travel from a manufacturer to the physician:  direct sale, indirect sale, and through specialty pharmacy.  The direct and indirect routes of distribution are variants of the "buy and bill" model, whereby the physician buys the drug and bills the payor for the drug and the services related to dispensing the drug.  Specialty pharmacy is an alternative to the "buy and bill" model in which the specialty pharmacy bills the payor for the drug and the physician bills the payor for the services related to dispensing the drug.

9.     The first route is a direct sale from the manufacturer to the providers of physician-administered drugs, principally physicians and hospitals.  AstraZeneca's Zoladex is an example of a drug sold directly from the manufacturer to these providers.  In these instances, the provider purchases the pharmaceutical and bills a payor, generally making a profit on the difference between the acquisition cost and reimbursed amount, before consideration of ancillary costs.  Generally as a result of therapeutic or generic competition, some of the providers may be "preferred purchasers" from the manufacturer's perspective.  These are the providers who, in

general, have chosen to dispense one manufacturer's product over another. As a result, these "preferred purchasers" may be able to purchase one manufacturer's pharmaceutical at a net price which is below the "list" price, sometimes called the AWC (Average Wholesale Cost), WAC (Wholesale Acquisition Cost), or WLP (Wholesale List Price).

10.    The second route is an "indirect" path of distribution, which involves a sale by the manufacturer to an intermediary who tends to mark-up the product before offering it for sale to the providers of physician-administered drugs at a "wholesale" price. There are primarily two types of intermediaries for physician-administered drugs: (i) specialty distributors, and (ii) wholesalers. As a general matter, specialty distributors supply physicians, while wholesalers supply hospitals and retail pharmacies. The specialty distributors provide the distinctive services (e.g., refrigeration, overnight delivery) required to deliver perishable biologics and pharmaceuticals to widely dispersed physician offices. Again, in these instances, the provider purchases the pharmaceutical (this time from a specialty distributor or wholesaler) and bills a payor, generally making a profit on the difference between the acquisition cost and reimbursed amount, before consideration of ancillary costs.

11.    Due to the intermediary mark-up, in instances of indirect distribution, the provider often purchases the pharmaceutical at a wholesale price that is higher than the price paid to the manufacturer by the specialty distributor or wholesaler. Some of the ultimate physician or hospital purchasers, however, may be preferred providers from the manufacturers' perspective. The manufacturers compete for their business by offering a lower price for the pharmaceutical. The preferred provider receives such a lower price either through a chargeback (the provider purchases the product at the lower price from the specialty distributor or wholesaler who then "charges back" the amount of the price concession to the manufacturer) or a rebate (a price concession provided by the manufacturer directly to the provider).

12.     The third route of distribution involves a sale by the drug manufacturer to a specialty pharmacy, which then supplies the drug on an as-needed basis to physician offices.  Specialty pharmacies often have contractual relationships with one or more payors.  In these situations, the physician does not take title to the pharmaceuticals.  The physician bills for administering the drug, and the specialty pharmacy bills for supplying drug, presumably making a profit on the difference between its acquisition cost and its reimbursement from the payor.  Specialty pharmacy is thus an alternative to the traditional buy and bill model for physician-administered drugs.

## A.      Classes of Trade

13.     The ultimate purchasers of physician-administered drugs fall into several groups or classes of trade.  Pharmaceutical manufacturers compete for business, often leading to price concessions for preferred purchasers, within these classes of trade.  Excluding the intermediaries (specialty distributors and wholesalers) and governmental organizations, I discuss below some of the principal classes of trade at the end of the distribution channel.

14.     **Physicians:**  Within this class of trade are large nationwide organizations (such as U.S. Oncology) with hundreds of sites, physician group purchasing organizations, regional and local multi-office practices, and small physician practices.  Each different organization may contract with pharmaceutical manufacturers and realize different price concessions on different products.

15.     **Hospitals:**  Hospitals purchase physician-administered drugs for use in inpatient and outpatient clinic settings.  Hospitals often negotiate pricing through group purchasing organizations.  Each different organization, even each hospital, may contract with pharmaceutical manufacturers to realize different price concessions on different products.  Some hospitals are owned by third-party payors.

16.     **Staff-Model Health Maintenance Organizations:**  Staff-model HMOs own their own physician clinics, hospitals and pharmacies.  Physicians performing services in these facilities are the employees of the staff-model HMO, as opposed to

Contains Highly Confidential Material – Subject to Protective Order

doctors with privileges to use the facilities.  Staff-model HMOs purchase pharmaceuticals on behalf of their providers and may obtain price concessions. Most staff-model HMOs are owned by larger third-party payors.

17.   **Retail Pharmacies:**  Retail pharmacies purchase certain physician-administered drugs because (i) physician-administered drugs also may be self-administered (e.g., Procrit); and (ii) some (but not many) patients purchase physician-administered drugs and bring them to their physicians' offices for administration, a practice known as "brown-bagging."

18.   **Specialty Pharmacies:**  Specialty pharmacies are a relatively recent channel for physician-administered drugs, emerging in the mid to late 1990s.  Some specialty pharmacies are also owned by third-party payors or PBMs.  In general, either payors or physicians may choose to use a specialty pharmacy as an alternative to the "buy and bill" model.

## IV.   MANUFACTURER PRICING OF PHYSICIAN-ADMINISTERED DRUGS

19.   During the class period, specialty distributors and wholesalers generally paid a list price for brand name physician-administered drugs.  This list price was commonly referred to as the AWC, WAC, or WLP.  These list prices tend to be set based on market conditions:  the prices of therapeutic alternatives; the anticipated value of the therapy; and market research regarding payor, physician, and patient reaction to price.  To the extent there was therapeutic or generic competition, the pharmaceutical manufacturers involved would be expected to compete on price, offering price concessions to certain preferred purchasers, physicians, hospitals, and staff-model HMOs in particular.  The greater the degree of therapeutic or generic competition for the product, the higher the price concessions are likely to be as the manufacturers compete for a share of each physician's dispensing behavior.  This is standard price competition.

20.   Note that to the extent that price competition occurs through rebates, as is often the case, the rebates will not be reflected in a contemporaneous average of the

prices charged by wholesalers.  Rebates tend to be paid out quarterly and are often based on achievement of certain metrics, such as volume or the share of a physician office's dispensing behavior.  Furthermore, rebates are generally not paid through the wholesaler, but rather directly by the manufacturer to the provider.

## A.     Determination of Price Concessions

21.     The extent of price concessions offered to any individual provider with respect to any individual product depends on:  (i) where the drug is in its competitive lifecycle, and (ii) the provider profile.

22.     A drug that does not face competition requires few incentives or reductions from the list price to spur sales – demand for the therapy stems from its unique attributes.  Thus, manufacturers typically offer few price concessions on single-source, break-through drugs that are protected by patents.  For such drugs, prices are generally constrained by the cost of non-drug therapeutic alternatives and the payor's willingness to pay.

23.     Having set list prices at launch, manufacturers compete over the product lifecycle for a share of each physician's dispensing behavior.  As other single-source therapeutic alternatives enter the market manufacturers may begin to offer price concessions as they compete for a share of a prescriber's dispensing behavior.  This competition and the related price concessions typically increase as more single-source brand name drugs enter the therapeutic category.  Price competition may become even more heated upon the entry of generic competitors, generally perceived as direct substitutes for the original brand-name product.  This is standard price competition.

24.     The price concessions, the discounts and rebates, extracted from manufacturers by the providers vary based on the type of provider or class of trade to which the drug is sold.  The competition a drug faces in different classes of trade frequently varies, as different classes of providers vary in their ability to determine which drug will be administered.  For instance, as I noted in the tutorial with respect to

Contains Highly Confidential Material – Subject to Protective Order

self-administered drugs, retail pharmacies have little or no ability to determine which single-source drugs will be dispensed to a patient and, therefore, receive few price concessions.  Hospitals, staff-model HMOs, and physicians (with respect to physician-administered drugs) have far greater control over which single-source drugs will be administered and, to the extent there is therapeutic competition, will be able to extract price concessions from manufacturers.  With respect to generic competition, retailers do have the ability to determine which manufacturer's version of a multi-source drug will be sold and thus are able to extract the same types of price concessions as hospitals, staff-model HMOs, and physicians.

25.    As one would expect, the preferred purchasers are likely to pay a lower net price, reflecting the benefit of price competition.  In such situations, one might typically find that a physician's office which is receiving price concessions from one manufacturer may not be qualifying for price concessions from a competing manufacturer.  This might be because the price concession is in the form of a rebate based on the product's share of a physician's prescriptions.  As a result, the net price may decline for one preferred purchaser, due to an increase in realized price concessions, at the same time that the net price may increase for a non-preferred purchaser, due to an increase in the list price.  This is a standard outcome of the competitive process and constitutes rational economic behavior in response to varying degrees of competition across drug products and varying circumstances among providers.

**B.    Evidence of Differential Pricing**

26.    Differential pricing—different prices for different customers and different products, depending upon market conditions—is a standard practice in the pharmaceutical industry, as well as in many other industries.  In the pharmaceutical industry, the principle has been widely recognized for decades.

- Hospitals have been securing deep discounts on prescription drugs for decades.  The legality of this practice was challenged by retail drug stores

in the 1970s in a court case that went to the Supreme Court.[1]  In another highly publicized case litigated through the 1990s, the retail drug stores challenged the manufacturers' practice of providing rebates to managed care organizations.[2]

- Research reports published by the OIG and the GAO, among others, have shown "spreads" that vary widely, with many in excess of Dr. Hartman's stated threshold of 30 percent.[3]

- One of plaintiffs' own experts, Dr. Schondelmeyer, noted in 1991 that different classes of trade paid dramatically different prices for prescription drugs.[4]

- Dr. Berndt recognized this principle in his Report, when he included "class of trade purchaser (e.g., chain pharmacy, mass merchant pharmacy, food and drug pharmacy, independent pharmacy, mail order pharmacy, health plan pharmacy, clinic and physicians' office, long term care pharmacy, hospital, government facilities and other)" as one of "the medical and economic factors that the literature suggests affect the price schedule of single-source, brand name self-administered drugs during the product's life cycle…"[5]

- Popular media, including pharmaceutical trade press (e.g., *Cancer Letter/Cancer Economics, Drug Topics, The Pink Sheet,* and *Pharmaceutical Executive*), major national newspapers and magazines (e.g., *Barron's, The Wall Street Journal, The Washington Post, Newsday, The Los Angeles Times, The New York Times, The Chicago Tribune,* and *USA Today*), and local media (e.g., *Arkansas Democrat-Gazette, Lexington Herald-Leader,* and *The Seattle Times*) published articles regarding pharmaceutical discounting both before and during the class period.[6]

---

[1]   425 U.S. 1, decided March 24, 1976.

[2]   "In re Brand Name Prescription Drugs Antitrust Litigation," The United States Court of Appeals for the Seventh Circuit, MDL No. 997, decided August 15, 1997.

[3]   See Appendix A, "Information on Pharmaceutical Pricing from Government Sources," previously produced as Merits Report And Declaration Of Gregory K. Bell, Ph.D., On Behalf Of Track 1 Defendants, March 22, 2006 ("Bell Report"), Appendix A.

[4]   Figure 2.1 (compiled by PRIME Institute, University of Minnesota, 1991), Prescription Drug Study: A Report to the Minnesota Legislature on the Prescription Drug Market, Health Economics Program, Division of Health Care Delivery Systems, Minnesota Department of Health, April 1994.

[5]   See Report Of Independent Expert, Professor Ernst R. Berndt, February 9, 2005 ("Berndt Report"), ¶ 214.

[6]   See Appendix B, "Information on Pharmaceutical Pricing from Non-Government Sources," previously produced as Bell Report, Appendix C.

Contains Highly Confidential Material – Subject to Protective Order

27.     In fact, as far back as 1989, Congress held hearings on the cost of prescription
drugs, focusing on the degree to which certain providers could secure deep
discounts off of AWP and the prices paid by retail druggists.[7]  Although self-
administered drugs, as opposed to physician-administered drugs, were addressed
during these hearings, the economic principles were the same.  Net prices depend
on the power of the buyer to extract price concessions, which, in turn, depends on
the availability of competing drugs and the ability of the buyer to determine (or
dictate) which among the competing drugs will be used.  Further, as different
buyers may make different choices among competing products, they will pay
different prices.

### C.      Awareness and Encouragement of Price Concessions by the Federal Government

28.     In my opinion, both before and during the class period, the federal government
was well aware of the price concessions that were being granted.  In fact, from my
perspective as an advisor to market participants, it appeared that the government
has both endorsed and encouraged the practice of pharmaceutical discounts and
rebates.

29.     Throughout the class period, the federal government used its own purchasing
power to obtain discounts and rebates at least equal to or greater than those
available to the private sector.  For example, government agencies were able to
purchase from the Federal Supply Schedule, where prices were significantly
lower than AWP and the information regarding those prices was publicly
available.  Other government purchasers, such as the Veteran's Administration,
negotiated even lower prices.  One publication notes that contract prices for the
Veteran's Administration averaged only 34.6 percent of AWP (i.e., a 65.4 percent
discount, or a "spread" of 189 percent).[8]  Moreover, under the best price
provisions of the Medicaid rebate program, federal and state governments

---

[7]     "Prescription Drug Prices:  Are We Getting Our Money's Worth?" A Majority Staff Report of the
Special Committee on Aging, United States Senate, Finding 7 (August 1989).

[8]     See William H. von Oehsen, III, *Pharmaceutical Discounts Under Federal Law:  State Program
Opportunities*, Public Health Institute, May 2001, p. 15.

Contains Highly Confidential Material – Subject to Protective Order

received rebates based on the largest discounts and rebates manufacturers offered to the private sector.

## V.     PROVIDER REIMBURSEMENT

### A.     Identity of Major Payor Groups

30.     The major entities that pay for physician-administered drugs may be grouped into four categories:  (i) private insurers, (ii) Medicare, (iii) Medicaid, and (iv) other government agencies (e.g., the Veterans Administration).  I do not include union benefit funds on this list, because they typically contract with private insurers for coverage of physician-administered drugs.  That is, the union benefit funds generally rely on the private payors to negotiate competitive rates with providers, although the funds may themselves be responsible for payment of claims. Pipefitters 537 Trust Fund, for example, apparently has relied upon Blue Cross Blue Shield of Massachusetts ("BCBSMA") for pharmaceutical claims administration and reimbursement since 1979.[9]

### B.     Payor Negotiations with Providers

31.     Private insurers compete among one another for contracts with employers, other groups, and individuals.  In order to compete, payors have to offer strong networks of physicians and hospitals.  This may confer on some physicians and hospitals an ability to negotiate higher total reimbursement rates than others are able to negotiate.  In comparing different payors' rates, what matters to physicians is the total reimbursement across all drugs and services, not the reimbursement for an individual drug or service.[10]  On the other hand, certain payors, particularly those with large memberships, may be better situated to extract concessions from providers in return for access to their members.  This give and take explains why the same provider may have contracts with two (or more) payors that specify different reimbursement rates for the same procedures and drugs.

---

[9]     *In Re:  Pharmaceutical Industry Average Wholesale Price Litigation*, Transcript of Bench Trial, Before the Honorable Patti B. Saris, United States District Judge ("Trial Transcript"), Testimony of Charles Hannaford, November 6, 2006, pp. 166–168.

[10]     See, for example, Deposition of Jill Herbold, CIGNA, January 14, 2005, pp. 28-29.

Contains Highly Confidential Material – Subject to Protective Order

32.     There have been notable cases where negotiations between providers and payors have broken down.  For example, three Virginia oncology practices managed by U.S. Oncology, including the largest cancer specialist network in Virginia, left the Anthem Blue Cross network at the end of 2005 in a dispute over Anthem's proposed reductions to reimbursement for about 30 drugs.  Negotiations finally secured the participation of these three practices in Anthem's network, though it required 21 months of negotiation and maintains the contractual relationship only through 2007.[11]

33.     Additionally, I understand that BCBSMA decided not to shift to ASP, or reduce doctors' margins on physician-administered drugs, because BCBSMA was concerned that:  (a) it could lose physicians from its network, which would put it at a competitive disadvantage, and (b) that physicians would send their patients to hospital outpatient departments, which would generally be a more costly site of administration.[12]  The stated rationale for the BCBSMA decision does not surprise me—network management is a significant issue for payors.  The ability of BCBSMA to attract and retain accounts, such as the Pipefitters 537 Trust Fund, depends on their providing a broad network of physicians, which satisfies members' expectations and allows access to preferred physicians and hospitals.  Decreasing reimbursement rates could jeopardize the stability of that network and shifts in the site of care could consume any savings on physician reimbursement that might otherwise be realized.

34.     The Medicare Payment Advisory Commission ("MedPAC"), the independent federal body tasked with advising Congress on issues affecting Medicare is concerned about the shifting site of care.

---

[11]     See Elizabeth Simpson, "Virginia Oncology, Anthem Reach Terms on Contract," *The Virginian-Pilot*, April 6, 2006.

[12]     According to the testimony of Deborah Devaux, "The major concern that was being raised by the oncologists was that they would no longer afford to be able to provide this service in their office. They would move the location to an outpatient hospital.  If that had occurred, the savings of $6 million to Blue Cross would not have materialized."  (Trial Transcript, November 7, 2006, p. 153.) Ms. Devaux also testified, "I don't know specifically by type of drug, but it can be significantly more expensive to have a transfusion in an outpatient hospital [clinic]."  (Trial Transcript, November 7, 2006, p. 154.)

Contains Highly Confidential Material – Subject to Protective Order

> In 2004, the Commission found that in some markets, oncology practices had stopped treating Medicare patients without supplemental insurance in their offices. Patients were sent to hospital outpatient departments or safety-net facilities. When we returned to these practices in 2005, we found they were sending an increasing number of patients to the HOPD [hospital outpatient department].[13]

35.    Representative Nancy L. Johnson has reported having "received impressive reports from oncologists that they are shifting the site of care for Medicare beneficiaries without secondary insurance from the physician office to the hospital outpatient department because there is no longer the ability to absorb the 20% co-payment loss in the individual practice."[14]  A recent analysis of short-stay oncology admissions at Cedars-Sinai Medical Center in Los Angeles suggests that a similar shift in site of care from the physician clinic to the hospital is occurring. The analysis found "a trend in which if a physician's office did not obtain favorable reimbursement terms from a managed care contract, then the office-based patient was admitted to the hospital for treatment."[15]

36.    The experience of patients who require infusions of immune globulin to prevent life-threatening infections is also consistent with BCBSMA's concerns about shifts in the site of administrations.  Thousands of these patients have been forced to seek care in hospitals rather than treatment in physicians' offices in response to lower Medicare ASP-based reimbursement rates to physicians as a result of the MMA.[16]  For many patients, treatment has been delayed or refused by hospitals

---

[13]    MedPAC, Report to Congress:  Effects of Medicare Payment Changes on Oncology Services, January 2006, p. 12.

[14]    Letter from Nancy L. Johnson, Representative from Connecticut, to Mark McClellan, dated July 13, 2006, in *Medicare Reimbursement of Physician-Administered Drugs*, Hearing Before the Subcommittee on Health of the Committee on Ways and Means, U.S. House of Representatives, 109th Congress, Second Session, July 13, 2006.

[15]    Shane, Rita, "A Proactive Approach to MMA:  Improving Outpatient Revenue Cycle Management," *Pharmaceutical Reimbursement:  Keeping Up with Changing Times*, Proceedings of an educational symposium during the 39th ASHP Midyear Clinical Meeting, December 5, 2004.

[16]    Statement of Marcia Boyle, President, Immune Deficiency Foundation, in *Medicare Reimbursement of Physician-Administered Drugs*, Hearing Before the Subcommittee on Health of the Committee on Ways and Means, U.S. House of Representatives, 109th Congress, Second Session, July 13, 2006.

Contains Highly Confidential Material – Subject to Protective Order

that reportedly lack adequate treatment facilities or supplies of the drug.[17]  The
Immune Deficiency Foundation, in response to this crisis, suggested that a
solution would be for immune globulin to be treated like a blood product, in
which case its reimbursement would "revert to the traditional Average Wholesale
Price (AWP) methodology."[18]

37.     It is my impression that, due to concerns like those expressed by BCBSMA, most
payors have yet to adopt an ASP-based reimbursement regime.  Those that have
appear to be using a variety of rates.  For instance, Dr. Newcomer, Vice-President,
oncology services, at UnitedHealthcare, testified that when UnitedHealthcare
moved to ASP-based pricing, it chose to reimburse at "ASP plus 12 percent, which
would be 6 percent greater than Medicare reimbursement, for oncologists only.  The
other physicians were reimbursed at ASP plus 6 as a policy directive."[19]  I am aware
of other rates being considered, from ASP plus 6 to ASP plus 20 and above, other
plans are moving to proprietary fee schedules with different reimbursement
amounts for different products, sometimes making no explicit reference to AWP,
ASP, or any other benchmark.  With respect to changes in the reimbursement
rates, I believe that most payors are struggling with the same concerns that
BCBSMA has articulated:  a) How do we insure the integrity of our network,
particularly if we are the only payor in the region making a move; and b) How do
we ensure that the savings will be realized and not jeopardized by a shift in the
site of care that would actually result in an overall increase in costs?

## VI.     Transparency of Reimbursement and Pricing Systems

38.     In my opinion, private payors had a great deal of information regarding the
reimbursement and pricing of physician-administered drugs when they developed
and implemented their reimbursement systems.  This information arises from
payors sharing:  (i) enterprises, (ii) information sources, and (iii) consultants and

---

[17]     "Healthcare Crisis Hits Medicare Patients Needing Immune Globulin—Medicare Modernization
Act has unintended but devastating repercussions for seriously ill beneficiaries," Immune
Deficiency Foundation Media Release, May 16, 2005 ("IDF 2005"), p. 3.

[18]     IDF 2005, p. 4.

[19]     Deposition of Lee Newcomer, M.D., October 18, 2006 ("Newcomer Deposition"), p. 145.

Contains Highly Confidential Material – Subject to Protective Order

industry experts.  For example, three of every four insured patients in Massachusetts received their health insurance from a payor that had direct experience with pharmaceutical pricing and price concessions.[20]

## A.    Shared Enterprises

39.    Over time, there has been shared ownership, oversight, and management of many of the major insurers.  These forms of shared enterprise facilitated the free-flow and dissemination of information concerning pharmaceutical pricing and reimbursement practices.

- **Government agency programs:**  The federal government acts as both an insurer (e.g., paying claims under Medicare/Medicaid) and a provider (e.g., purchasing and dispensing drugs in VA hospitals).  CMS is responsible for prescription drug reimbursement for both Medicare and Medicaid.  The information obtained about reimbursement under other programs informs the policies and procedures for reimbursement for physician-administered drugs under Medicare.  For example, the numerous studies conducted for Medicaid to show the unreliability of AWP as an indicator of costs also informed CMS in connection with its Medicare reimbursement.

- **Public and private overlap:**  Private insurers, which managed commercial reimbursement, also acted as Medicare "carriers," charged with administering Medicare throughout the country.  As such they were in position to be aware of all of the reports that have been issued over the years regarding Medicare and pharmaceutical reimbursement.  In administering Medicare, the carriers were required to consider the reimbursement afforded under their private insurance policies and to ensure that Medicare reimbursement was comparable with private reimbursement.[21]

- **Payor and provider overlap:**  Many private insurers in Massachusetts own physician clinics, hospitals, retail pharmacies, mail order operations, specialty distributors, specialty pharmacies, and PBMs.  In each instance, through these operations, the payors become aware of pricing practices with respect to pharmaceuticals.

- **Physician-administered and self-administered drug reimbursement overlap:**  In particular, the private insurers in Massachusetts generally

---

[20]    See Appendix C, "Payor Vertical Integration," previously produced as Bell Report, Exhibit E.

[21]    SSA 1842(b)(3)(B).

Contains Highly Confidential Material – Subject to Protective Order

reimburse for both physician-administered drugs and self-administered drugs. As a result, their experiences with self-administered drug reimbursement and the rebates that were available in exchange for a preferred position on a formulary due to therapeutic competition were available to inform their awareness of price competition when they negotiated reimbursement rates for physician-administered drugs.

## B.   Public Information

40.   Payors had access to a wealth of information concerning the reimbursement and cost of physician-administered drugs. This information included: (a) public reports and surveys of acquisition costs, (b) publicly available pricing data, (c) public price schedules, (d) administrative, legislative, and regulatory disclosures and proposals, and (e) articles and literature in the general press, some of which summarized studies conducted by government agencies.

41.   Appendix D[22] summarizes the pharmaceutical price concessions documented in 31 studies available between 1984 and 2004 that commented on pharmaceutical acquisition cost, AWP, and reimbursement rates. These publicly available studies and articles provided 593 examples of price concessions for physician-administered drugs. I find that the publicly-reported distribution of acquisition costs for single-source physician-administered drugs ranged from a 13 percent discount to AWP to a 47 percent discount to AWP; I find that the acquisition costs for multi-source physician-administered drugs ranged from a 16 percent discount to AWP to an 85 percent discount to AWP.[23] In my opinion, such information does not give rise to a set of expectations that there would be a "reasonably predictable" relationship between the AWP for a drug and its acquisition cost. Further, such information does not give rise to expectations that the differences between AWP and acquisition costs would be less than 30 percent of the acquisition costs as Dr. Hartman posits. For instance, for these same products, the publicly-reported spread between acquisition cost and AWP for

---

[22]   Previously produced as Bell Report, Exhibit C.

[23]   These values are based on the 10th and 90th percentiles of discounts as a percentage of AWP that are reported in Appendix D. (The 10th percentile means that only 10 percent of the observations are at or below this level of price concession; similarly, the 90th percentile means that 90 percent of the observations are at or below this level of price concession.)

Contains Highly Confidential Material – Subject to Protective Order

single-source physician-administered drugs ranged from 15 percent of acquisition cost (10th percentile) to 88 percent of acquisition cost (90th percentile); for multi-source physician-administered drugs the spread ranged from 18 percent (10th percentile) of acquisition cost to 586 percent (90th percentile) of acquisition cost.

42.     Appendix E considers a subset of the information presented in Appendix D—only information from the studies published in 1997 or earlier.  The results from the 274 pre-1998 observations on physician-administered drugs are entirely consistent with the results from Appendix D as a whole.  The spread between acquisition cost and AWP for single-source physician-administered drugs ranged from 13 percent of acquisition cost (10th percentile) to 56 percent of acquisition cost (90th percentile); for multi-source physician-administered drugs the spread ranged from 27 percent (10th percentile) of acquisition cost to 488 percent (90th percentile) of acquisition cost.

## C.     Consultants and Industry Experts

43.     Healthcare benefit consultants are a source of information that may be tapped by industry participants.  Benefit consultants participate in payment and coverage negotiations, over time and across clients.  These experts include both large nationally recognized names, such as Ernst & Young, and the industry specialists, such as Segal & Company, William M. Mercer, Inc., and Towers Perrin.  It is common for smaller payors (such as employers and union benefit funds) to rely on such experts in connection with coverage and payment negotiations with private insurers.

44.     Benefit consultants typically have at least two sources of information with which they can advise their clients.  First, benefit consultants typically review industry literature, even amassing libraries for publications related to pharmaceutical issues (including reports from government agencies like the GAO).[24]  Second, consultants amass a wealth of experience as they participate in various industry

---

[24]     Deposition of Edward Kaplan, National Health Practice Leader, Segal, July 12, 2004 pp. 71–72.

Contains Highly Confidential Material – Subject to Protective Order

negotiations.  Exposure to other clients and members of the pharmaceutical marketplace provides these consultants with additional information.

## D.     Summary and Application to Named Plaintiff

45.     In summary, shared enterprises, shared information, and access to industry consultants has generated an environment that supports the flow of information between and among insurers that can establish an understanding of the term AWP and the extent that acquisition costs vary relative to AWP, for physician-administered drugs.  Further, even without such understanding, competition ensures that plan members ultimately receive the benefit of the price competition that occurs among the pharmaceutical manufacturers.

46.     Many of these elements that have allowed information flows are embodied in the named plaintiff, BCBSMA.  First, for years prior to the start of the class period and until 1997, BCBSMA was a Medicare carrier, responsible for reimbursing providers for services rendered to both its own members and Medicare beneficiaries in the state of Massachusetts.[25]  As a Medicare carrier, BCBSMA would have been aware of the government studies of the relationship between acquisition costs and AWP.  As a carrier, BCBSMA would have received transmittals concerning reimbursement issues directly from Medicare.  Second, for years prior to the start of the class period and through 1997, BCBSMA owned staff-model HMOs (Medical East and Medical West)[26] that purchased physician-administered drugs.  Third, BCBSMA reimbursed for both self-administered drugs and physician-administered drugs.

## VII.    THE SIGNIFICANCE OF PUBLISHED AWPS

47.     It is my understanding that the term AWP was first used in the 1960s in connection with the California Medicaid Program.  In lieu of reimbursing pharmacists at actual billed charges, which would have been administratively

---

[25]    Testimony of Michael Mulrey, Trial Transcript, November 8, 2006, p. 18; and Deposition of Kenneth Arruda, October 14, 2006, p. 17.

[26]    Testimony of Maureen Coneys, Trial Transcript, November 8, 2006, pp. 106-107.

Contains Highly Confidential Material – Subject to Protective Order

expensive due to the volume of claims, California implemented an average wholesale price (i.e., price from wholesalers to retailers) as a starting point for determining reimbursement amounts.[27]  Around that time, pricing compendia began publishing AWPs.

48.     As is the case for self-administered drugs, published AWPs are used by payors as reimbursement benchmarks for physician-administered drugs.  Initially, while the term AWP may have borne a connection to an average of prices wholesalers charged to their retail customers for prescription drugs, since at least the early 1980s, consolidation among wholesalers has decreased margins substantially.  As a result, the markups that publishers such as First DataBank apply to WAC in calculating AWP no longer come close to representing prices actually paid by retail pharmacies.

49.     Certainly during the class period, the published AWPs were not an average of actual wholesale prices determined by surveying wholesalers.  Rather, the published AWPs had been set at a formulaic markup over list for decades before the start of the class period.

50.     Furthermore, the published AWPs are not a signal for average acquisition costs of physician-administered drugs, but rather a signal for list price.  It had been well-recognized for decades before the class period that published AWPs are not reduced by discounts and rebates afforded in response to competition and therefore could not be reliable or predictable indicators of acquisition costs for pharmaceuticals confronting therapeutic or generic competition.[28]

---

[27]     Written Testimony of Edward H. Stratemeier, Esq. (Aventis), before the Subcommittee on Oversight and Investigation Committee on Energy and Commerce on AWP-Based Reimbursement for Prescription Drugs by Medicaid, December 7, 2004.

[28]     In fact, in its August 20, 2003 Proposed Rules, HCFA stated, "A review of Table 3 [omitted] shows that in general the 'spread,' in percentage terms is larger for the generic drugs examined in the [OIG and GAO] studies than for brand drugs.  This is consistent with our understanding that when actual market prices decline with the introduction of generic competition, the list AWPs do not usually experience a corresponding decline of the same magnitude." (See 68 FR 50428 (August 20, 2003) at 50431.)

Contains Highly Confidential Material – Subject to Protective Order

51.     Beginning in 1969, there have been many studies and commentaries addressing whether the published AWPs are reliable indicators of acquisition costs, and they uniformly conclude that AWP is not a reliable indicator.  These studies, which have continued through the present, encompass both self-administered and physician-administered drugs.  The following are just some of the examples of the more than 98 studies and articles I have reviewed that identify issues concerning the interpretation of AWP as a signal for or as an actual average of acquisition costs of pharmaceuticals.[29]

52.     One of the earliest mentions of the problems with using AWP comes from a 1969 report from the Health Education and Welfare ("HEW")Task Force on Prescription Drugs.[30]  In assessing alternative methods of reimbursement under Medicare, the task force concluded that listed wholesale prices "rarely have any realistic relationship with actual acquisition costs."[31]

53.     In December 1977, HHS sent state Medicaid agencies a transmittal that addressed whether states should use AWP as a means to determine estimated acquisition costs for Medicaid.  In addressing that issue, HHS stated "the Department is not convinced that those states which continue to reimburse at average wholesale price (AWP), or wholesale invoice price, have made a real effort to approach AAC [providers' actual acquisition cost]."[32]

54.     A 1984 OIG report highlighted the fact that AWP did not bear a predictable relationship to acquisition costs and, therefore, should not be used as a reimbursement benchmark.[33]  The OIG began this report by explaining that

---

[29]     See Appendices A, B, and D.

[30]     HEW was the predecessor of the Department of Health and Human Services ("HHS"), under which the agency responsible for administering the Medicare and Medicaid programs falls.

[31]     Final Report of the Task Force on Prescription Drugs, p. 1, *Prescription Drugs Under Medicare: The Legacy of the Task Force on Prescription Drugs*, Mickey C. Smith, Editor, The Haworth Press, Inc., 2001 ("1969 Task Force"), p. 148.

[32]     HCFA Action Transmittal, HCFA-AT-77-113, "Title XIX, Social Security Act Limitation on Payment or Reimbursement for Drugs' Estimated Acquisition Cost (EAC)," December 13, 1977.

[33]     OIG, Changes To The Medicaid Prescription Drug Program Could Save Millions, A-06-40216, 1984 ("1984 OIG Report").

Contains Highly Confidential Material – Subject to Protective Order

"Within the pharmaceutical industry, AWP means non-discounted list price. Pharmacies purchase drugs at prices that are discounted significantly below AWP or list."[34]   The OIG then disclosed the findings of its analyses of the actual acquisition costs of drugs purchased by pharmacies, which showed the differential between AWP and acquisition costs for the self-administered drugs varied widely, and that costs ran "as much as 41.78 percent below AWP;"[35] this would generate a spread as calculated by Dr. Hartman of 72 percent.   The report concluded by noting that

> [P]harmacies do not purchase drugs at the AWP published in the 'Bluebook,' 'Redbook,' or similar publications.   Thus, AWP cannot be the best – or an even adequate – estimate of the prices providers generally are paying for drugs.   AWP represents a list price and does not reflect several types of discounts, such as prompt payment discounts, total order discounts, end-of-year discounts and any other trade discounts, rebates, or free goods that do not appear on the pharmacists' invoices.[36]

55.   In 1992, the OIG published a study of physician-administered drugs, which determined that the difference between acquisition cost and published AWP of chemotherapy drugs varies widely and may be as much as nearly 500 percent.[37] Some of the drugs analyzed are at issue in this case, including bleomycin (Blenoxane), cyclophosphamide (Cytoxan), doxorubicin (Rubex), and etoposide (VePesid).[38]   The OIG concluded, as it had when analyzing self-administered drugs, that "AWP is not a reliable indicator of the cost of a drug to physicians;"[39]

---

[34]   1984 OIG Report, p. 3.

[35]   1984 OIG Report, p. 9.

[36]   1984 OIG Report, p. 22.

[37]   OIG, *Physicians' Costs For Chemotherapy Drugs*, A-02-91-01049, November 1992 ("1992 OIG Report"), Appendix III.

[38]   1992 OIG Report, Appendix III.   The "spreads" associated with these drugs are bleomycin (Blenoxane):  25 percent, cyclophosphamide (Cytoxan):  144 percent, doxorubicin (Rubex):  144 percent, and etoposide (VePesid):  25 percent.   Both Blenoxane and VePesid were reported as sole-source drugs in 1992.

[39]   1992 OIG Report, p. 5.   As part of their study, the OIG staff interviewed *Red Book* officials, who said that information from the *Red Book* was "… meant to approximate the cost to the retailers (pharmacists) only."   The officials also "… emphasized that their focus has always been the pharmacy sector."   (See *ibid.*, Appendix II.)

Contains Highly Confidential Material – Subject to Protective Order

and that "There is no single discount rate which can be applied to the AWP to provide a reasonably consistent estimate of the physician's acquisition cost."[40]

56.    In 1996, an article was published in Barrons titled "Hooked on Drugs: Why do insurers pay such outrageous prices for pharmaceuticals?"[41]  In the article, the author identifies many of the facts that form the basis of plaintiffs' fraud claims in this action, which commenced five years after the article was published.

57.    In December 1997, the OIG issued another report reiterating that AWP is not a reliable indicator of the acquisition cost of physician administered drugs.[42] Further, the report discussed how use of the published AWPs and J-codes led to significant discrepancies in the reimbursement of physician-administered drugs under Medicare Part B.  "For the first quarter of 1995, providers in one State were receiving 20 percent more in reimbursement than providers billing the same drug code in another State."[43]

## VIII.    EVOLUTION OF PRIVATE PAYOR REIMBURSEMENT

58.    It is interesting that BCBSMA is currently expanding its use of AWP as a reimbursement benchmark, extending it from the physician office to the hospital outpatient department.  This move would appear to be an improvement over reimbursing hospital outpatient procedures based on a percentage of idiosyncratic charges.[44]  What is happening in hospitals affiliated with BCBSMA is something that happened many years ago in physician offices, as I discuss below.

59.    For decades before the start of the class period and for several years during the class period, the predominant method used by private insurers to reimburse for

---

[40]    1992 OIG Report, Appendix II.

[41]    Alpert, Bill, "Hooked on Drugs:  Why do insurers pay such outrageous prices for pharmaceuticals?" *Barron's*, June 10, 1996, p. 15.

[42]    1997 OIG Report, p. ii.

[43]    *Ibid.*, p. 9.

[44]    I note that Medicare also shifted reimbursements for hospital outpatient department services from a billed charge method to a more uniform methodology, the outpatient prospective payment system ("OPPS"), implemented in August 2000.  See Bell Report, Appendix B ("History of Medicare Part B").

Contains Highly Confidential Material – Subject to Protective Order

physician services and physician-administered drugs was based on the physicians' "billed charges."  According to a survey of BCBS entities published in April 1992, 80 percent of the plans surveyed used "Billed Charges" as a basis for reimbursement under their major medical plans, which covered reimbursement for physician-administered drugs.[45]

60.     Billed charges were the basis of physician reimbursement under the "indemnity insurance" model, which was the standard of reimbursement in the 1960s and 1970s.  During that time, a patient who was administered a drug in a physician's office paid the physician whatever the physician "charged."  The "charge" included whatever margin above the acquisition cost of the pharmaceutical that the physician sought to recover.  The patient then submitted a reimbursement claim to his or her insurer.  The insurer "indemnified" the patient to the extent of the coverage under the patient's benefit plan.  The "allowed" indemnification generally was limited to a "reasonable" charge.  A charge was considered "reasonable" so long as it did not exceed the typical amount charged in the relevant geographic area.  At least through 1995, BCBSMA reimbursed physicians based on usual and customary charges.[46]

61.     Under the indemnity model, there were no contracts between the insurer and physicians, and patients could see whichever physician they chose without affecting their coverage.  As a consequence, however, there was little or no control over the amounts charged by and paid to the physician for physician services and physician-administered drugs.

62.     The indemnity model gradually gave way to the "managed care model," which evolved in the 1970s but gained real traction in the mid-1980s as: (i) healthcare costs rose significantly, and (ii) the competition among insurers inspired insurers to seek cost savings to pass on to their members.  While 73 percent of workers were covered by indemnity plans in 1988; by 1993, only 46 percent had such

---

[45]     BlueCross BlueShield Association, Prescription Drug Benefit Survey, April 1992, p. 5.

[46]     See Trial Affidavit of Michael Mulrey, ¶ 10; and Deposition of Michael Mulrey, January 5, 2006, pp. 57-59.

Contains Highly Confidential Material – Subject to Protective Order

plans; by 1998, only 14 percent had such plans; and by 2003, only 5 percent of workers were enrolled in indemnity plans.[47]

63.   A managed care reimbursement model simply is one where the insurer takes a role in managing reimbursement costs for its beneficiaries, typically by:  (1) entering into contracts with providers ("network contracts") and (2) restricting the coverage of services provided to members to those administered by providers in the contracted network.  Thus, under a managed care plan, the insurer plays a more active role in securing cost savings than in the passive indemnity model.

64.   Under the managed care model, the patient must to go to a physician in the contracted network to receive full coverage for the visit.  When a patient sees a network physician, typically he or she will pay a fixed co-payment amount.  The physician could then submit a claim to the patient's insurer for his "charges" related to the patient visit.  Again, the charges include whatever margin above the acquisition cost of the pharmaceutical that the physician seeks to recover.  But under the managed care model, the insurer reimburses the physician only at a negotiated "allowed amount" less the patient's co-payment, typically irrespective of the physician's billed charge.

65.   Under either the indemnity model or the managed care model, however, the physician generally receives payments for the drugs administered that exceed the acquisition costs of the drugs.

## A.   Managed Care Reimbursement Methodologies

66.   Within the managed care model, private insurers have used a number of reimbursement methodologies to implement their desired strategies.  Each of these methodologies involves contractual relationships between the insurer and physicians.  For physician-administered drugs, most insurers use "allowed amounts" based on AWP as a reimbursement benchmark.

---

[47]   See The Kaiser Family Foundation and Health Research and Educational Trust, *Employer Health Benefits 2005 Annual Survey*, Exhibit 5.1.

67.    Other reimbursement methodologies for physician-administered drugs do not rely on reimbursing physicians based on a common benchmark across products.  For instance, staff-model HMOs purchased physician-administered drugs for administration in physician offices owned by the HMOs.  As Mr. Edward Curran, a former director of pharmacy for BCBSMA, testified, he was responsible for purchasing all drugs for the pharmacies of Medical East and Medical West, the two BCBSMA staff-model HMOs, including self-administered and physician-administered drugs.[48]  Some private insurers paid physicians for drugs administered to the insurers' members on a capitated basis, i.e., the physician and the plan negotiate over a drug budget for each patient, with the physician bearing the risk that the payments received might not be adequate to cover his or her costs of services provided.  Harvard Pilgrim is an example of a Massachusetts insurer that reimbursed physicians using a capitated methodology.[49]  Still other insurers have moved to fee schedules that do not explicitly reference AWP or other benchmarks.

68.    Finally, some insurers have begun to use specialty pharmacies to deliver physician-administered drugs to physicians on an as-needed basis.  As the physician never takes title to the product, the physician never bills for product reimbursement.  The specialty pharmacy bills the payor for reimbursement, generally using an AWP-based methodology that has been negotiated between the payor and the specialty pharmacy.  As the physician does not benefit from a margin on the drug, negotiations that lead to the use of a specialty pharmacy generally include higher reimbursement rates for the drug administration services provided by the physician than might otherwise be observed.

69.    There was debate in the mid-1990s suggesting that the specialty pharmacy model should be used to address the perceived excess reimbursement of physician-administered drugs.[50]  Insurers continue to study whether to adopt a specialty

---

[48]    See Testimony of Edward Curran, Trial Transcript, November 9, 2006, pp. 21–42.

[49]    Deposition of John M. Killion, January 6, 2006 ("Killion Depostion"), pp. 32–34.

[50]    Killion Deposition, pp. 72-73.

Contains Highly Confidential Material – Subject to Protective Order

pharmacy model as an alternative to the buy-and-bill methodology.  For example, John Killion of BCBSMA explained that BCBSMA currently uses specialty pharmacies to supply drugs in four categories (drugs used for treatment of multiple sclerosis, hepatitis C, hemophilia, and infertility) and that implementing a specialty pharmacy model for physician-administered drugs is under consideration.[51]  Mr. Killion testified that BCBSMA will consider the oncologists' comments that:  (a) the specialty pharmacy model hampers same-day administration of drugs, (b) the specialty pharmacy model inhibits real-time changes in dosages, and (c) specialty pharmacy services are wasteful insofar as drugs are delivered to members of the group are unfit for use.[52]  He further testified that BCBSMA would need to consider increasing administration fees to physicians in order to offset the reimbursement that they would lose as a result of BCBSMA using a specialty pharmacy rather than permitting its network physicians to buy and bill for physician-administered drugs.[53]

70.  Given these issues, BCBSMA was concerned that it might lose physicians from its network if it imposed a mandatory specialty pharmacy model.  BCBSMA is not an isolated case.  According to Professor Berndt, insurers risked losing physicians from their networks if they implemented a specialty pharmacy model.[54]  As a result, many insurers have rationally elected not to implement mandatory specialty pharmacy programs for physician-administered drugs, particularly with respect to oncology.  The risk of losing network physicians over reimbursement disputes is not necessarily mitigated by the size of the insurer; in the Virginia Oncology Associates example noted above, physicians opted to leave Anthem BCBS, the largest health insurer in Virginia.

---

[51]     Killion Deposition, pp. 75 and 100–103.

[52]     Killion Deposition, pp. 90–92.

[53]     Killion Deposition, pp. 82–84.

[54]     "Specifically, with physician-administered drugs, health plans/insurers risk losing valued physicians from their specialty networks (with all the implications that has for the competitiveness and relative attractiveness of the plans they offer employers) if they move patients from medical to pharmacy benefits and contract through specialty pharmaceuticals or PBMs for purchasing these drugs, instead of letting physicians capture the benefits of purchasing the drugs themselves and implicitly reselling them to payors."  (Berndt Report, ¶ 108.)

Contains Highly Confidential Material – Subject to Protective Order

**B.      Negotiating Reimbursement Rates**

71.      Irrespective of the reimbursement approach used, payors and providers need to
negotiate over reimbursement levels.  These negotiations need to cover
reimbursement for physician services as well as for the pharmaceuticals that may
be dispensed in the physician's office.  For the very large number of physician-
administered drugs that need to be covered by a fee schedule, referencing a
common reimbursement benchmark, such as AWP or ASP, is an easier way to
manage the negotiation than trying to address reimbursement on a drug-by-drug
basis.  There are hundreds of payors, thousands of physicians, and thousands of
drugs—individual line-item reimbursement negotiations between specific payors
and specific physicians for specific drugs would be problematic.  AWP provided a
readily accessible benchmark to express negotiated reimbursement rates and to
process the hundreds of thousands of payment transactions.  As a result of using a
benchmark, such as AWP, the reimbursement for some drugs may be relatively
higher and the reimbursement for other drugs may be relatively lower with respect
to acquisition costs.  Nonetheless, it is the total reimbursement package, all drugs
and services, over which the parties would negotiate.

72.      The managed care model injected competitive negotiation into the reimbursement
setting process.  Insurers were competing for members and physicians were
competing for patients.  Insurers competed amongst each other for business on the
basis of lower rates and better services, including robust networks with quality
physicians.  Physicians competed for access to the members by providing services
for lower rates.  The two parties, payors and physicians, have conflicting
objectives.  Payors compete with each other for access to physician providers but
are interested in paying as little as possible, subject to the need to maintain the
quality of their provider networks.[55]  Physician providers compete with each other

---

[55]      Note that this applies to public as well as private payors.  For example, Medicare reimbursement
reforms and proposals frequently generate discussion of whether healthcare providers would
participate if reimbursements were lowered.  See, for example, the discussion following passage of
the MMA when some oncologists warned that "they may refuse altogether to treat Medicare
patients …."  (Harris, Gardner "Among Cancer Doctors, A Medicare Revolt," *The New York
Times*, March 11, 2004, pp. C1, C4).

Contains Highly Confidential Material – Subject to Protective Order

for access to the payors' members but are interested in being paid as much as possible, subject to the number of members to whom they have access. Thus, the fee schedules in contracts between insurers and physicians were negotiated in a marketplace subject to competitive forces.

73.   In these negotiations, some physicians had significant leverage. Physicians had leverage as a consequence of the physician-patient bond, likely to be particularly strong for patients being treated with physician-administered drugs, due to the serious nature of the diseases being treated. Physicians also gained leverage from the restrictive nature of their specialties, geographic location, and reputation. Insurers understood that they had to attract good physicians to their networks and retain them in order to attract and maintain members. As an example, Dr. Newcomer testified that UnitedHealthcare paid 200 percent of Medicare fees to a physician practice that was "the only practice available I think in two to three counties" in upstate New York.[56]  Dr. Rosenthal also noted these competitive advantages available to physicians in her trial affidavit.[57]

74.   As managed care organizations were competing with each other for the business of employers, union benefit funds, and other groups, there was pressure to control costs. One way to control costs was to move procedures from the high-cost hospital environment to the lower-cost more patient-friendly environment of the physician office. Accordingly, managed care organizations had a strong incentive to encourage physicians to administer drugs in the physicians' office where, even at the amounts "charged," the cost of care would be lower than in a hospital outpatient setting. This dynamic provided physicians with additional leverage in their reimbursement negotiations.

75.   Negotiated reimbursement rates also had to compensate for the non- and under-reimbursed costs and risks associated with physician-administered drugs. For years, physicians have argued that the margin on drugs was required to cover (i)

---

[56]   Newcomer Deposition, pp. 137–138.

[57]   "Direct Testimony of Dr. Meredith Rosenthal," October 27, 2006, pp. 28–32.

Contains Highly Confidential Material – Subject to Protective Order

inadequate reimbursement of drug administration services and (ii) costs not otherwise covered by reimbursement.[58]  The margin also provided a return for the physician assuming the risk of loss if the patient's costs could not be recovered, if the payor refused reimbursement for a claim after the drug had been dispensed, or if the payor was slow to update the database to reflect an increase in price of a pharmaceutical.  Reimbursement for drugs in excess of their acquisition costs thus represents a cross-subsidy against the costs of the other services and risks associated with physician-administered drugs.

76.   Thus, in my opinion, private insurers understood that drug reimbursement afforded physicians with a margin above their acquisition costs.  First, insurers recognize that physicians have leverage when negotiating reimbursement rates.  Second, margin is important if the insurer wants to retain incentives for the physician to appropriately treat patients outside the high-cost environment of the hospital.  Third, margin compensates for the non- and under-reimbursed costs and risks associated with physician-administered drugs.

## IX.   MEDICARE PART B

77.   Reimbursement for physician services and physician-administered drugs under Medicare began in 1965, with the passage of the Social Security Amendments of 1965 ("SSA"), which "created two insurance programs:  Medicare Part A or Hospital Insurance and Medicare Part B or Supplementary Medical Insurance."[59]  Under Part A, drugs and services provided by and in hospitals on an in-patient basis were to be reimbursed on a "reasonable-cost" basis.[60]

78.   With respect to Part B, the SSA "established the principles of reasonable charge payment for physicians' services and certain other services [such as physician-

---

[58]   Barton C. McCann and Julia A. James, *The Impact of Medicare Payment Policies on Patient Access to Quality Cancer Care*, Health Policy Alternatives, Washington, D.C., June 1999, p. 1.

[59]   56 FR 25792 (June 5, 1991).  A more extensive history of Medicare Part B, which emphasizes reimbursement for physician-administered drugs, can be found in Bell Report, Appendix B.

[60]   Section 1814(b), Social Security Amendments of 1965.

Contains Highly Confidential Material – Subject to Protective Order

administered drugs] under Part B."[61]  Medicare carriers, the private insurance

companies who administered Medicare on behalf of HCFA, adjusted their

reimbursement payments to providers according to market prices by gathering

pricing information from local markets.[62]

79.     In June 1991, as part of its implementation of the Resource Based Relative Value

System ("RBRVS") mandated by the Omnibus Reconciliation Act of 1989,

HCFA proposed to reimburse physician-administered drugs at 85 percent of

AWP.[63]  HCFA also proposed "for very high volume drugs that payment for the

drug would be limited to the lower of the estimated acquisition cost for the drug

as determined by us and specified in instructions to carriers or 85 percent of the

national average wholesale price for the drug."[64]

80.     This proposed rule was not adopted.  During the comment period, HCFA received

comments, "primarily from oncologists indicating that our 85 percent standard

was inappropriate.  The thrust of most of the comments was that many drugs

could be purchased for considerably less than 85 percent of AWP—particularly

multi-source drugs—while others were not discounted."[65]  In addition, "a number

of comments from the oncologists indicated that we should use an add-on to cover

the cost of breakage, wastage, shelf-life limitations, and inventory costs

associated with chemotherapy agents[,] and [s]ome commenters also suggested

that this add-on payment was needed to account for shortfalls in chemotherapy

administration payments."[66]  In fact, HCFA noted oncologist concerns in the

*Federal Register* on November 25, 1992, stating:  "We were also persuaded by

the data we received during the comment period that the practice expense RVUs

---

[61]     56 FR 25792 (June 5, 1991).

[62]     GAO, *Medicare—Challenges Remain in Setting Payments for Medical Equipment and Supplies and Covered Drugs*, Testimony of Leslie G. Aronovitz, GAO-02-833T, June 12, 2002, p. 5.

[63]     56 FR 25792 (June 5, 1991) at 25800.  I note that HCFA implicitly endorsed the use of price expectations based on self-administered drugs to inform proposed pricing for physician-administered drugs.

[64]     56 FR 25792 (June 5, 1991) at 25800.

[65]     56 FR 59502 (November 25, 1991).

[66]     56 FR 59502 (November 25, 1991).

Contains Highly Confidential Material – Subject to Protective Order

do not adequately cover the cost of supplies for these services."[67]  In other words, as in the private sector, physicians viewed Medicare drug reimbursement as a means to compensate for inadequate Medicare reimbursement of other services and costs.  To my knowledge, no manufacturer submitted comments regarding the proposed rule.

81.    In November 1991, HCFA adopted reimbursement for physician-administered drugs under Part B at the lower of AWP or estimated acquisition cost, effective January 1, 1992.  In its regulations, HCFA stated,

> Estimated acquisition costs would be based on individual carrier estimates of the costs that physicians, or other providers as appropriate, actually pay for the drugs.  Carriers could survey a sample of the physicians who furnish the drugs to obtain cost information.  As an alternative, carriers could request that physicians periodically provide cost information when they submit claims for payment for the drugs.[68]

82.    Consistently, HCFA also proposed including other costs not otherwise reimbursed, such as inventory costs, waste, and spoilage in the estimated drug acquisition costs, particularly for oncology drugs.[69]  Reimbursement for physician-administered drugs thus afforded physicians reimbursement that exceeded the acquisition costs of the drugs, which was the approach that had been followed since Medicare inception.

83.    During its consideration of the new rules for reimbursement of physician-administered drugs, HCFA asked the OIG to conduct a study of physician costs for 13 high-volume chemotherapy drugs.[70]  This request led to the 1992 OIG study I referred to previously, which showed a variety of "spreads" up to nearly

---

[67]    57 FR 55914 (November 25, 1992).

[68]    56 FR 59502 (November 25, 1991).

[69]    56 FR 59502 (November 25, 1991).

[70]    1992 OIG Report, p. 1.

Contains Highly Confidential Material – Subject to Protective Order

500 percent.  In this report, the OIG reported its conclusion that "AWP is not a reliable indicator of the cost of a drug to physicians."[71]

84.   Although HCFA had proposed conducting surveys of physician acquisition cost for physician-administered drugs, it did not do so.  Indeed, when one carrier attempted to base reimbursement on physician acquisition costs, HCFA directed it not to collect invoices from physicians in order to implement an acquisition cost survey.[72]

85.   The next major attempt to reform reimbursement for physician-administered drugs under Medicare Part B came when President Clinton's administration proposed that Congress modify Medicare reimbursement to require reimbursement at the physicians' actual costs.  Congress rejected that proposal.[73] Instead, in the Balanced Budget Act of 1997 ("BBA 1997"), Congress mandated that physician-administered drugs be reimbursed at 95 percent of AWP, effective January 1, 1998.[74]  Significantly, in maintaining the AWP-based reimbursement, Congress acknowledged that the reimbursement paid exceeded acquisition costs. A House Budget Committee report that observed that Medicare reimbursement for the top 10 oncology drugs "ranges from 20 percent to nearly 1000 percent per dosage more than acquisition costs."[75]

86.   In December 1997, the OIG issued another report reiterating that AWP is not a reliable indicator of the acquisition cost of physician administered drugs.[76]  After the release of this OIG report and a nationally broadcast radio address by President Clinton, in which he discussed the findings of this report,[77] Congress

---

[71]   1992 OIG Report, pp. 1–2.

[72]   Letter from Darlene Debus (HCFA) to Grant Steffen (BCBS North Dakota), July 25, 1996.

[73]   OIG, *Excessive Medicare Payments for Prescription Drugs*, OEI-03-97-00290, December 1997 ("1997 OIG Report"), Appendix D, p. 2.

[74]   1997 OIG Report, p. i.

[75]   "Balanced Budget Act of 1997, Report of the Committee on the Budget House of Representatives to Accompany H.R. 2015, …, together with Additional and Minority Views, June 24, 1997, p. 1354.

[76]   1997 OIG Report, p. ii.

[77]   Transcript of Address of President Clinton, December 13, 1997.

Contains Highly Confidential Material – Subject to Protective Order

considered proposals to set Medicare Part B drug payment rates at 83 percent of AWP, a compromise between the average discount found by the OIG and 95 percent of AWP, but ultimately did not change reimbursement rates.[78]

87.     HCFA had a threefold response to the mandated payment of 95 percent of AWP under BBA 1997.  First, in communicating the new policy to its carriers, HCFA noted that "the AWP is not a true discounted price and, therefore, does not reflect the cost to the physician or supplier furnishing the drug to the Medicare beneficiary."[79]  Second, in reporting to Congress in 1999 on the effect that the legislation had on AWP, the HHS Secretary explained that AWP was "used as a standard benchmark" and, at least for 22 of the top drugs reimbursed by Medicare, "not representative of any price that is actually changed by wholesalers to their customers."[80]  Third, without consulting Congress, the Secretary announced in 2000 that HCFA was "moving administratively to take advantage of the newly available, more accurate data on average wholesale prices developed for Medicaid as a result of Department of Justice investigations … for 400 national drug codes, representing about 50 different chemical compounds."[81]

88.     Use of the so-called DOJ AWPs was decried by members of Congress as an attempt to circumvent prior Congressional actions.[82]  Further, Congress noted that

---

[78]   Prepared Statement of Thomas A. Scully, Transcript of Hearing of the Subcommittee On Health Care Of The Committee On Finance, U.S. Senate, "Reimbursement And Access To Prescription Drugs Under Medicare Part B," March 14, 2002, p. 94.  President Clinton revived his proposal to reduce Medicare Part B drug reimbursement to 83 percent of AWP in 1999 and 2000, and Congress rejected both these proposals.  (See Pear, Robert, "Administration Plans Cuts in Some Drug Payments," *New York Times*, August 6, 2000, Section 1, p. 12.)

[79]   HCFA Program Memorandum, Transmittal No. AB-97-25, January 1998, "Implementation of the New Payment Limit for Drugs and Biologicals."

[80]   Donna E. Shalala, Secretary, Department of Health and Human Services ("DHHS"), *Report to Congress:  The Average Wholesale Price for Drugs Covered Under Medicare*, 1999, p. 2.

[81]   Letter from Donna E. Shalala to Representative Thomas Bliley, Chairman, Commerce Committee, U.S. House of Representatives, May 31, 2000, p. 2.

[82]   "We see no basis for such action in any of our previous legislation, and certainly the Department's unilateral declaration of a new definition of AWP, with no regulatory process, is inappropriate." (See Letter from Members of U.S. Congress to Donna E. Shalala, Secretary, DHHS, July 28, 2000, p. 2.)  Also, "As you know, Congress laid down very clear legislation regarding these [drug] reimbursements in the Balanced Budget Act of 1997, where it instructed HCFA to base these reimbursement rates at 95% of the average wholesale price (assumed to be an industry-accepted AWP, not one derived by government bureaucrats…).  This was done . . . to ensure that cancer

Contains Highly Confidential Material – Subject to Protective Order

the DOJ AWPs "do not take into account the fact that oncologists are chronically underpaid for their drug administration services in treating cancer patients a fact that is widely recognized" and that "many physicians will be unable to continue providing cancer care in their offices, and patients will be deprived of a humane, convenient and cost-effective treatment option."[83]

89.     After HCFA retracted its authorization regarding the use of these new AWPs in November 2000, Congress passed the Benefit Improvement and Protection Act of 2000, which prohibited the Secretary of HHS from implementing any payment reduction for drugs until GAO prepared, and the Secretary reviewed, a report on revised payment methodologies for drugs.[84]  In September 2001, the GAO released its report.[85]  This report found that:  (1) the average discount from AWP for physician-administered drugs ranged from 13 to 34 percent, equating to "spreads" of 15 to 52 percent; (2) two physician-administered drugs had discounts of 65 and 86 percent, equating to "spreads" of 186 and 614 percent; and (3) two drugs used with durable medical equipment had discounts of 78 and 85 percent, equating to "spreads" of 355 and 567 percent.[86]

90.     In 2002, the chairman of MedPAC wrote to the CMS Administrator about the series of GAO and OIG studies that "have provided ample evidence that Medicare pays far more than market price for the outpatient prescription drugs that it covers under Part B" and acknowledged the cross-subsidization of inadequate payments for some services with drug payments.[87]  In the same year, the Senate held hearings concerning reimbursement and access to prescription drugs under

---

care providers would receive adequate reimbursements for the care they provide."  (See Letter from Senator Spencer Abraham to The Honorable Donna E. Shalala, Secretary HHS, September 6, 2000. p. 2.)

[83]     Letter from Members of U.S. Congress to Donna E. Shalala, Secretary, DHHS, July 28, 2000, p. 1.

[84]     O'Sullivan, Jennifer, "Medicare:  Payments for Covered Prescription Drugs," Report for Congress, CRS, May 21, 2002 ("CRS 2002"), CRS-7.

[85]     GAO, Medicare Payments for Covered Outpatient Drugs Exceed Providers' Cost, GAO-01-1118, September 2001 ("2001 GAO Report").

[86]     2001 GAO Report, p. 4.

[87]     Letter from Glenn M. Hackbarth, Chairman of MedPAC, to Thomas Scully, Administrator of CMS, October 4, 2002, p. 5.

Contains Highly Confidential Material – Subject to Protective Order

Medicare Part B.  Thomas Scully, the CMS Administrator, discussed administration fees for oncologists, end-stage renal disease ("ESRD") clinics, hemophilia agencies, and DME providers, acknowledging that, "Many of these providers rely on cross subsidies to survive, basically, in the Medicare business."[88]  He also explained that while the Administration or Congress could reduce payments for Medicare Part B drugs, only Congress had the means to adjust drug administration fees in a non-budget neutral way.[89]

91.    The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA") established a new Medicare outpatient prescription drug benefit, effective in 2006, and changed the 2004 reimbursement percentages for most drugs under Medicare Part B to 85 percent of AWP.[90]  The MMA also changed the basis for reimbursement from AWP to the average sales price ("ASP") for 2005 onward, with reimbursement for physician-administered drugs provided under Medicare Part B set at 106 percent of the ASP.[91]

92.    Acknowledging the issue of cross-subsidization, Congress implemented a commensurate increase in drug administration fees to offset the reduction in drug payments under the MMA.[92]  Policymakers were aware of the potential consequences of ignoring this cross-subsidization in reducing Medicare Part B reimbursement rates—physicians might find it financially impractical to provide

---

[88]    Statement Of Hon. Thomas A. Scully, Administrator, CMS, Before the Subcommittee On Health Care Of The Committee On Finance, U.S. Senate, Hearing On "Reimbursement And Access To Prescription Drugs Under Medicare Part B," March 14, 2002 ("Scully Senate Testimony 2002"), pp. 6–7.

[89]    Scully Senate Testimony 2002, pp. 8–9.

[90]    Under the MMA, for 2004, most Part B drugs were to be reimbursed at 85 percent of the AWP in effect on April 1, 2003.  Blood clotting factors, drugs that were not available for Medicare payment as of April 1, 2003, several vaccines, and separately billed drugs for ESRD were to be reimbursed at 95 percent of AWP.  (69 FR 1083 (January 7, 2004) at 1086.)

[91]    Medicare Payment Advisory Committee, "Report to the Congress: Effects of Medicare Payment Changes on Oncology Services," January 2006, p. 3.

[92]    "[T]he MMA required CMS to decrease the Medicare payment for drugs and increase the payments for administering them, as outlined below.  New payments for drugs and their administration were published in January, and reflect an estimated increase of $510 million for drug administration and a reduction in drug reimbursement of $510 million—an exact offset." (Johnson, Kjel, "Medicare Reimbursement will Affect Specialty Payouts; MMA Pays Less for Drugs, but More for Administering Them," *Managed Healthcare Executive*, July 1, 2004.)

Contains Highly Confidential Material – Subject to Protective Order

physician-administered drugs in their offices, forcing patients to seek treatment in the hospital where the costs of care are higher.

## X.   MARKETING/MANIPULATION OF THE SPREAD

93.   With the advent of drug regimens that physicians could administer in their offices, it became vital for the physicians to understand whether and to what extent their reimbursement for the drugs they purchased exceeded the costs.  Many of the physician-administered drugs were expensive and required significant investments in infrastructure and staff to administer.  The survival of physician clinics that did not understand and properly manage their practice economics could be threatened.  Further, if physicians were uncertain of the financial consequences of administering drugs in their offices, anticipated cost reductions might not be realized as procedures remained in the hospital.  In many respects, the system depended on manufacturers to communicate to physicians the reimbursement they could expect to receive under various insurance plans, as well as which codes to use in order to secure that reimbursement.  The private insurers and Medicare often did not provide that information.  Thus, in general, it was in the interest of the insurers and patients alike that the physicians understood the financial ramifications of in-office administration and reimbursement.

94.   When competition for physician-administered drugs increased, physicians were faced with the option of selecting between two or more functionally equivalent drugs.  If physicians were to determine that different therapies could be of equal efficacy, it would not be unreasonable for the physician to purchase the drug that is more profitable to administer.  In that regard, the physicians engage in the same type of analysis that payors conduct in setting formularies for self-administered drugs.

95.   When faced with either of these two scenarios, e.g., (i) educating physicians on the ability to administer a therapy in their offices, or (ii) responding to physicians' inquiries regarding the financial implications of competing products, it is entirely reasonable for manufacturers to provide information regarding the economics of

their therapies.  In my opinion, providing physicians with more information about the financial implications of the therapies they administer does not impose any harm on payors.  It is generally more efficient for this type of information to be provided by the manufacturers than for each physician office to attempt to develop its own analysis.  Further, if it were the case that physicians could not be informed of the impact of reduced prices on the economics of their practices, it would reduce the incentives to lower pharmaceutical prices in the first place, thereby leading to higher healthcare costs.

## XI.    RESPONSE TO REPORT OF PROF. BERNDT

96.    I agree with many of the views expressed by Prof. Berndt in his expert report.  In particular, I find Prof. Berndt's explanation of the origin of the "spread" between WAC and AWP compelling,[93] as well as his discussion of why a single drug manufacturer, acting unilaterally, would be unable to report a value for AWP that was an actual average of the prices providers paid for that manufacturer's drug.[94] Prof. Berndt points out that, at least with respect to self-administered drugs, "retail pharmacies plausibly continued to expect their acquisition costs to be 20–25% below AWP, and thus in their contracts with third party payors and PBMs, retailers generally expected to be reimbursed at 10–15% below AWP."[95]  Due to the prevalence of third-party reimbursement formulas that applied a uniform discount to all drugs within a therapeutic class, "a single manufacturer marketing a newly FDA approved drug would find it challenging, if not impossible, to successfully set an AWP that was only, say, 2–5% above the WAC, for with that small a differential, retailers would be unable to recover their acquisition costs, unless they renegotiated and rewrote contracts with PBMs and other third party payers[.]"[96]

---

[93]    Berndt Report, ¶¶ 20–23.

[94]    Berndt Report, ¶¶ 24–26.

[95]    Berndt Report, ¶24.

[96]    Berndt Report, ¶24.

Contains Highly Confidential Material – Subject to Protective Order

97.     There are, however, a few areas in which I differ from the views expressed by Prof. Berndt with respect to physician-administered drugs, although I note that at the time of completing his report, Prof. Berndt noted that the case record with respect to physician-administered drugs was considerably less complete.[97] Nonetheless, Prof. Berndt opined that the potential for "mischief and abuse" existed with respect to physician-administered drugs because there was:  (i) insufficient transparency regarding the prices at which physician-administered drugs were being acquired, (ii) a lack of focus on controlling physician-administered drug costs (i.e., the "importance of being unimportant"), and (iii) an inability to control physician-administered drug costs (e.g., because of the J-Code issue).[98]

98.     In my opinion, no such mischief or abuse actually occurred for at least two reasons.

  •     First, payors were aware of the potential extent of price concessions offered on physician-administered drugs that faced therapeutic or generic competition, based both on the government reports and the payors' own direct knowledge of the prices at which providers purchased physician-administered drugs and/or their understanding of the extent of potential price concessions that could be offered, based on their experience with formulary setting for self-administered drugs.  I note that payors need not have considered every physician-administered drug for which they reimbursed, as most spending is concentrated in a handful of drugs.[99]

---

[97]    For instance, Prof. Berndt notes that "The record in this case is unsettled to date as to whether those payments to physicians for physician administered drugs and related services are based predominantly on AWP (as has been argued by Plaintiffs' experts Raymond Hartman and Professor Meredith Rosenthal) or instead are negotiated as part of the overall physician fee schedule involving both drugs and services, based on "charges" rather than on costs (as has been argued by Defendants' Expert Steven J. Young)."  (Berndt Report, ¶ 98.)

[98]    The Healthcare Common Procedure Coding System ("HCPCS") identifies the chemical name of a drug.  As a result, it is not possible to determine the manufacturer of a multi-source drug based solely on the J-code.

[99]    For example, HCFA noted that "Much of the current Medicare spending is concentrated in relative few of the approximately 450 covered drugs.  For example, of the $8.4 billion for carrier paid drugs, 7 drugs account for 49 percent of spending ($4.0 billion), 19 drugs account for 75 percent of spending ($6.2 billion) and 33 drugs account for 86 percent of spending ($4.0 billion.)"  (68 FR 50428 (August 20, 2003) at 50429.)

Contains Highly Confidential Material – Subject to Protective Order

- Second, the reimbursement rates at issue are the result of negotiations in the marketplace among payors and physicians with opposing interests regarding the magnitude of these reimbursement rates. Payors negotiated and controlled reimbursement at the aggregate level of drugs and services; there were no fewer controls over physician-administered drugs than over physician-rendered services.

99.    In addition, I disagree with Prof. Berndt's view that the dollar volume of physician-administered drugs was "unimportant" to payors during the class period and that their benign neglect allowed for manipulation and abuse. The sheer volume of reports produced by the OIG, the GAO, and other governmental agencies that discuss reimbursement for drugs under Medicare Part B belies any view that payors were unintererested in monitoring their spending on physician-administered drugs. It would not appear that government officials thought that spending on physician-administered drugs was "unimportant." Similarly, payor testimony in this case confirms that private payors were attempting to monitor and manage their drug spend.[100]

## XII.    RESPONSE TO DIRECT TESTIMONY OF DR. HARTMAN

100.    I have several disagreements with Dr. Hartman's direct testimony and the slides he has used at trial.[101] Many of these issues are discussed by Prof. McFadden and Dr. Gaier. Nonetheless, I would like to draw particular attention to Dr. Hartman's Slide 5, entitled "Medicare Part B Fraud in Payor System." The slide states: "The alleged fraud was possible in this case because of three simple facts and one observation …." I do not agree with any of Dr. Hartman's alleged facts.

- "Fact 1 is that Medicare reimbursement generally and for Part B drugs specifically was originally and formally designed to be cost-based and was believed by payors to be cost-based for a long period of time." This statement is contradicted by Dr. Hartman's Direct Testimony. For example, "In connection to supplementary benefits of the Act, it is stated in Part B § 1833 (a) that 'there shall be paid …[for] each individual who is covered … amounts equal to … 80 percent of the reasonable

---

[100]    See, for example, Deposition of Scott Wert, February 1, 2006, pp. 38–42.

[101]    Direct Testimony of Raymond S. Hartman ("Hartman Direct") and Slides for Oral Testimony of Raymond S. Hartman ("Hartman Slides").

Contains Highly Confidential Material – Subject to Protective Order

charges…'."[102]  Dr Hartman further quotes Robert M. Ball as saying, "Reimbursement was to be a 'reasonable' charge determined by the customary charges of the particular physician and the prevailing charges in the locality for similar services."[103]

- "Fact 2 is that CMS believed that AWPs were administratively efficient and sufficiently reliable indicators of relative costs to meet the requirements of a relative value scale reimbursement system."  While HCFA undoubtedly "believed that AWPs were administratively efficient," I do not believe that there is any support for the implication that HCFA intended to extend the relative value scale reimbursement system [sic] to "drugs paid for under the 'incident to' benefit."  In fact, in the proposed rules implementing the RBRVS for physician services, HCFA stated, "Thus, we have decided to exclude the cost of drugs from the national fee schedule and to continue to pay for them under the current 'reasonable charge' system."[104]

- "Fact 3 is that CMS rationally exhibited inertia with respect to the incrementally accumulating information on diverging spreads between AWP and provider acquisition costs."  This statement is equally without support.  In fact, as discussed above, HCFA proposed reducing reimbursement for physician-administered drugs to 85 percent of AWP in the very regulations that set up the RBRVS.  The Clinton Administration made several attempts to base physician reimbursement on actual acquisition costs.  In addition, HCFA proposed basing reimbursement for Part B drugs on the "DOJ AWPs" in 2000.

---

[102]    Hartman Direct, fn 7 to ¶ 11.

[103]    Hartman Direct, ¶ 12.

[104]    56 FR 25792 (June 5, 1991).

Contains Highly Confidential Material – Subject to Protective Order