UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION<br><br>THIS DOCUMENT RELATES TO ALL CLASS ACTIONS. | MDL No. 1456<br><br>CIVIL ACTION: 01-CV-12257-PBS<br><br>Judge Patti B. Saris |

**REVISED TRIAL AFFIDAVIT OF GLENN RANDLE**

*Formatted: Font: Times New Roman Bold, Font color: Red*

I, Glenn Randle, pursuant to 28 U.S.C. § 1746, on oath, depose and state as follows:

1. I am a resident of the State of Texas. I have personal knowledge of the facts stated below and will testify in court to the same if called upon to do so.

2. I have been on the Board of Trustees for the Sheet Metal Workers National Health Fund ("Fund") for over twenty years and presently act as Chairman of the Board. The purpose of the Fund is to provide health and welfare coverage for sheet metal workers throughout the United States.

3. As a trustee, I try to provide the best benefits to our members, including our retirees, but I also have to try to save the Fund money. However, in the case of the Supplemental Medicare Wraparound Plus ("SMW+") program for retirees, for which Sheet Metals seeks recovery in this litigation, because our payments are directly tied to what Medicare pays, we have little control over the cost of benefits. Therefore, though the retirees enrolled in the SMW+ Plan are usually on fixed incomes, in reality we have no power over the cost of benefits; for example, if drug costs increase and are paid by Medicare, we pay our portion. This means the increased cost may be passed on to the retiree who will be required to pay a higher amount to maintain SMW+ coverage.

4. There are over 15,000 retirees and covered beneficiaries who receive benefits under the SMW+ program. Under that program, the Fund provides coverage for twenty percent (20%) of Medicare's allowable amount.

5. Because the SMW+ program always pays behind Medicare, I never knew what Medicare's allowed amount was based on. I never had to know.

6. I have been told by the Fund's attorneys that the Fund reimbursed for Defendants' drugs at issue in this case and specifically that the Fund reimbursed Massachusetts residents for Defendants' drugs.

> **Deleted:** Based on our investigation, I know

> **Deleted:** In order to avoid overburdening the Court with paper, I have only attached the claims data for one drug from each Defendant. *See* Ex. A hereto: Sheet Metals' payment records for Paraplatin, SMWMASS 001240-47; for Cytoxan and Rubex, SMWMASS 000605; for Procrit, SMWMASS 000092-96; for Zoladex, SMWMASS 001174-76; and for Albuterol, SMWMASS 000576-80.

7. The Fund learned about this litigation through our attorneys in December 2004 and later that month decided to join the lawsuit. Although we obviously wanted to recover the money we overpaid for Defendants' drugs, we also wanted to represent other payors who were overcharged as we were.

8. The Fund was found to be an adequate class representative for Class 2 in this Court's January 30, 2006 Consolidated Order Re: Motion for Class Certification relating to Track I Defendants.

9. Other than my service to the Fund, I have no background in healthcare or the pharmaceutical industry. Aside from what I have learned during this case, I do not know what "WAC" or "AWP" mean. Instead, since 1996, the Fund has relied on its Third Party Administrator, Southern Benefits Administrators, Inc. ("Southern Benefits"), to handle the processing of claims. I am certain that Southern Benefits did not know and therefore did not tell us that Defendants were deliberately inflating their AWPs. Therefore, I had no idea that was occurring or that the Fund was so significantly overpaying for Defendants' drugs.

10. I am aware that the complaint alleges that, in order to help their customers make more money, and thus make money themselves, each of the defendants used AWP and the Medicare reimbursement payment process to create spreads between the cost at which a drug is acquired and the cost at which it is reimbursed. I am aware that the complaint alleges that the effect of this was to cause the AWP we use as a reimbursement benchmark to be inflated, *i.e.,* it was not a real number or a real average. No one at the Fund was aware of those practices and I think it was unfair for the drug companies to take advantage of us in this fashion.

11. Until I was provided with Plaintiffs' Trial Exhibit 43 (attached as Ex. B hereto) by the Fund's attorneys, I was unaware that AstraZeneca was offering physicians confidential discounts of 33% to 50% for their purchases of Zoladex.

12. I have been informed by the Fund's attorneys that in response to an interrogatory BMS has stated as follows: "The existence of a spread is not misleading to a person with even minimal experience in the sale and distribution of drugs" and does not result in "excessive reimbursement." I certainly believe it was misleading to publish an AWP that did not reflect BMS' discounts and now, having been told about them, believe they resulted in unfair payments by payors. If increasing the AWP for its drugs shifted the cost of its drugs to payors such as the Fund, how can those actions be anything but misleading?

13. I also understand from speaking with the Fund's attorneys that in response to a separate interrogatory (No. 8, Plaintiffs' Trial Ex. 177, Ex. C hereto), BMS has stated that any person making a copayment has "actual or constructive notice" of the difference between AWP and the prices at which BMS sold its drugs to the public. Although the Fund made copayments no one at our Fund had any knowledge of this.

14. I have also been supplied <u>by the Fund's attorneys with</u> a copy of the transcript of Dr. Berkman's sentencing hearing, where the United States Attorney described AstraZeneca's return to practice strategy and its scheme to provide free samples which would be billed to insurers in order to induce physicians to prescribe Zoladex. *See* Plaintiffs' Ex. 5, at 8-9, Ex. D hereto. I was unaware of such practices.

15. I was unaware, for example, that BMS was contracting with oncologists to provide them 61% discounts off its WLP (list price) for Blenoxane.

16. I was likewise unaware that BMS was giving discounts 73% off list price, as reported in Plaintiffs' Exhibit 203, Exhibit E to this Affidavit.

17. I was unaware that AstraZeneca distributed the type of material in Plaintiffs' Exhibit 38 (Ex. F hereto), which tells doctors to "do the math" and compute the profit they will make by virtue of prescribing Zoladex. I was unaware that AstraZeneca was giving physicians discounts of up to 41% such that those doctors were making a profit of $150,794 on 700 depots of Zoladex.

18. I understand that there are many more examples of this type of conduct of which both the Fund and I were unaware.

19. I believe that Defendants' acts not only hurt the Fund by forcing us to pay more for drugs, but it hurt our individual participants because they have to pay more for their benefits when the Fund has to pay more for drugs. I understand that Defendants have attempted to portray members of this Class as large sophisticated insurance companies. This is not true. Because the Fund cannot offset losses on other areas of business, when the Fund pays more for drugs our members and retirees have to pay more, too.

I make the foregoing statements under penalty of perjury on the date written next to my name below.

Date:____Nov. 27, 2006_____          _____/s/_____
                                                    Glenn Randle

Deleted: ___
Deleted: