

# PATIENT ASSISTANCE PROGRAM AGREEMENT

## HEALTHCARE DELIVERY SYSTEMS, INC.

## SCHERING CORPORATION

Defendants' Exhibit
**2965**
01-12257 - PBS

# HEALTHCARE DELIVERY SYSTEMS, INC.

# SCHERING CORPORATION

# PATIENT ASSISTANCE PROGRAM AGREEMENT

THIS AGREEMENT, dated _____, is by and between Schering Corporation, having its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey, 07033 ("**Schering**"), and Healthcare Delivery Systems, Inc., having its principal place of business at 9700 North 91st Street, Scottsdale, Arizona, 85258 ("**HDS**").

WHEREAS, Schering desires to provide an assistance program to provide prescription pharmaceuticals to needy patients (the "**Program**"), as more particularly described in Schedule 1 attached to this Agreement, for qualifying patients who would otherwise be unable to purchase certain of Schering's prescription drugs;

WHEREAS, Schering desires HDS to implement and operate the Program as set forth in this Agreement;

THEREFORE, in consideration of the mutual promises and agreements contained herein, the parties agree as follows:

1. **SERVICES**

    HDS will provide to Schering the services set forth in Schedule 2 (the "**Services**"). HDS will comply in all respects with the procedures included on such Schedule 2.

2. **PROJECT LEADERS**

    HDS and Schering shall each designate a person (the "**Project Leader**") who shall be responsible for supervising and coordinating the obligations of HDS and Schering and a person ("Financial Contact") who shall be responsible for coordinating the financial responsibilities of the parties under this Agreement. Until otherwise designated in writing to the other party under the notice procedures set out in Section 11 of this Agreement, the project leaders shall be:

For HDS:

        Julie Parmenter - Project Leader
        Gail Christiansen - Financial Contact
        Healthcare Delivery Systems, Inc.
        9700 N. 91st Street, Suite 232
        Scottsdale, AZ 85258-5036

For Schering:   *Ann-Marie Matheson*

        Jan Spinella - Project Leader
        ~~Carolyn Kent~~ Financial Contact
        Schering Corporation
        2000 Galloping Hill Road
        Kenilworth, NJ 07033-0530

3. **PAYMENT**.

    3.1. **Administrative Fees and Expenses**. In consideration of the performance by HDS of its duties and the services to be performed by it under this Agreement and as full compensation therefor, Schering hereby agrees to pay to HDS the fees ("**Administrative Fees**") listed on Schedule 3 attached hereto. Any Administrative costs for additional services incurred after execution of this Agreement, must be mutually agreed upon by Schering and HDS before the additional services are implemented. HDS shall prepare and send to Schering a detailed invoice at the end of each calendar month setting forth the Administrative Fees earned by it during such month together with supporting documentation to Schering documenting that the services to which the variable fees included in such invoice relate were performed by HDS. Schering shall have an opportunity to review each such invoice, which review shall not be unreasonably delayed. Schering shall promptly communicate any and all objections to each such invoice to HDS and Schering and HDS agree to negotiate in good faith to resolve such objections. Schering shall pay to HDS the amount of each invoice to which it has no objection within thirty (30) days (the "**Due Date**"). Schering shall advise HDS of invoices to which Schering objects within ten (10) days of receipt of such invoice and shall pay all agreed amounts in settlement of invoiced amounts objected to by Schering, if any, including late payments pursuant to Section 3.3 promptly after the parties have resolved Schering's objections thereto.

    3.2. **No Waiver of Objections**. The parties hereby agree that nothing in Section 3.1 hereof shall limit Schering's right to object to any or all of the amounts that Schering believes in good faith to have been improperly claimed by HDS pursuant to this Agreement or the time in which such objections may be made. If and to the extent that Schering objects to amounts previously billed to and paid by it hereunder, the parties agree to negotiate to resolve such objections in good faith.

    3.3. **Late Payments**. If Schering shall pay any amount after the date due hereunder, Schering shall pay interest on such overdue amount at the "Prime Rate" as published in the Wall Street Journal on the date the payment is due, or if the Wall Street Journal is not published on the Due Date, the "Prime Rate" as published in the Wall Street Journal on the business day most immediately preceding the Due Date. Invoices to which Schering objects which are ultimately paid will accrue late fees at the rate outlined above for each day after the Due Date is reached.

4. **PUBLIC ANNOUNCEMENTS**

    Neither party shall make any public announcements concerning the transactions contemplated in this Agreement, except as may be required by law or judicial order, without the consent of the other party, except that Schering may publicize the Program freely so long as such announcements do not refer to HDS. Neither party shall issue any press release or make any public announcement which includes the name of the other party or its affiliates or otherwise uses the name of the other party in any public statement or publicly released document except with the prior consent of the other party except with respect to information which has already been approved, in form or in substance, in a prior press release or public announcement.

## 5. PROPRIETARY AND CONFIDENTIAL INFORMATION

**5.1.** **Nondisclosure**. As used in this Section 5.1, ("**Confidential Information**") shall mean trade secrets, pricing, marketing plans, sales forecasts, customer/provider contracts, and information which a party identifies in writing as proprietary and confidential. HDS and Schering Laboratories: (i) shall not disclose Confidential Information of the other party to any third party without first obtaining the express written permission of the other party; (ii) shall use Confidential Information of the other party only as is necessary to fulfill their respective obligations pursuant to this Agreement; and (iii) shall limit such disclosure to any of their respective officers, employees or agents on a need-to-know basis for purposes of fulfilling its obligations under this Agreement. Notwithstanding anything to the contrary in this Section 5.1, Confidential Information shall not include:

**5.1.1.** information that is approved for public release by the written authorization of the supplying party;

**5.1.2.** information that was disclosed to the receiving party by a third party having the legal right to make such disclosure, or which the receiving party can establish was in its lawful possession prior to its receipt thereof from the supplying party;

**5.1.3.** information that is in the public domain prior to the receiving party's receipt thereof from the supplying party, or which subsequently becomes a part of the public domain other than by the receiving party's negligence or wrongful act; and

**5.1.4.** information that the receiving party can establish was independently developed without breach of this agreement.

Notwithstanding the foregoing, Confidential Information of the other party may be disclosed pursuant to a subpoena or court order, provided that the disclosing party gives prompt notice to the other party that it intends to make such disclosure so that the other party can take any appropriate steps it deems necessary to limit the extent of such disclosure or to seek protection from such disclosure. For purposes of this Agreement, the names and addresses of all Eligible Patients, Eligible Physicians and all persons who apply for enrollment in the Program shall be deemed to be Confidential Information of Schering and the disclosure thereof to HDS hereunder shall not exclude such information from being Confidential Information hereunder by reason of Section 5.1.2 or 5.1.3.

**5.2.** **Injunctive Relief**. Each party understands and agrees that the other party will be irrevocably injured by any breach of the confidentiality provisions of this Agreement, that money damages would not be a sufficient remedy for any such breach, and that the injured party shall be entitled to injunctive relief as a remedy for any such breach.

**5.3.** **Effect of Termination**. Promptly after the termination of this Agreement, each party shall return to the other any Confidential Information of the other party and provide a written verification of such return. Each party's obligation to maintain the confidentiality of Confidential Information shall survive for a period of five (5) years following termination of this Agreement.

### 6. OWNERSHIP AND USAGE OF TECHNOLOGY

Schering shall own all patient, payer and dispensing information collected, disclosed or obtained under this Agreement.

HDS shall own all physical property, technology, and software utilized by HDS in its performance under this Agreement unless specifically developed hereunder for the Program at the expense of Schering. Technology and software developed hereunder for Schering or the Program at Schering's expense shall be owned by Schering. Ownership rights shall include, but are not limited to, all rights associated with publication, trade secrets, copyrights, trademarks, patents and confidentiality.

### 7. AUDIT OF RECORDS

During the term of this Agreement, and for a period of four (4) years after its termination, HDS shall maintain full, accurate and complete records relating to the activities and services performed by it under the Program including without limitation, full records relating to all expenses incurred by it and all correspondence relating to the Program. Schering shall have the right, without charge to Schering but at Schering's own expense and upon reasonable notice to HDS, to perform reasonable periodic audits of and to copy such records during normal business hours of HDS, either by Schering's own personnel or through outside personnel designated by Schering. HDS shall also permit Schering and its representatives reasonable access to the premises and personnel of HDS to permit Schering to monitor the compliance by HDS with the terms of this Agreement.

### 8. SELECTION OF SUBCONTRACTORS

HDS shall be responsible for the selection, retention and compensation of any subcontractors engaged to perform services under this Agreement. The parties acknowledge that Schering shall have neither a contractual relationship with, nor a financial obligation to, any subcontractor in their capacity solely as a subcontractor to HDS.

### 9. TERM AND TERMINATION OF AGREEMENT

**9.1. Term.** Unless sooner terminated in accordance with the provisions of this Section, this Agreement shall be for a term of three years commencing on the date hereof. This Agreement may be terminated by either party hereto, with or without cause, on sixty (60) days prior written notice.

**9.2. Termination for Cause.** Notwithstanding the foregoing provision, this Agreement may be terminated for cause as follows:

**9.2.1.** By either party, if the other party shall default in the performance of any material obligation of this Agreement, on thirty (30) days' prior written notice to the other, specifying the nature of the default, unless such other party shall cure that default within the thirty-day period; or

**9.2.2.** Automatically, if either party shall make an assignment for the benefit of

creditors, shall file a petition in bankruptcy, is adjudicated insolvent or bankrupt, or if a receiver or trustee is appointed with respect to a substantial part of such other party's property or a proceeding is commenced against it which will substantially impair its ability to perform hereunder.

**9.3. Termination by Schering.** Schering shall have the right to terminate this Agreement at any time with or without cause, upon not less than thirty (30) days' prior written notice to HDS.

**9.4. Survival.** The rights and obligations of the parties under the provisions contained in Sections 4, 5, 6, 7, 10, and 12 shall survive termination of this Agreement.

**9.5. Limitation of Services.** In addition to Section 9.3, Schering shall have the right to direct HDS to limit services under this Agreement in connection with Schering limiting the Program or some portion thereof. HDS shall be entitled to an equitable adjustment in its compensation to fairly compensate HDS for providing or winding down services hereunder.

## 10. INDEMNIFICATION

**10.1. Definition of Claim.** As used in this Section 10, "Claim" shall mean claims, litigation, actions, suits, administrative proceedings, losses, liabilities, judgments, settlements, costs and expenses, including without limitation reasonable counsel fees, penalties, and compensatory, multiple, exemplary, and punitive damages.

**10.2. Indemnification by Schering Laboratories.** Schering agrees to defend, indemnify and hold HDS harmless against any and all Claims that may arise, be charged to, incurred by or recovered from HDS and that arise, or are alleged to arise, as a result of (i) injury to a patient resulting from the purchase, use or, consumption of a Covered Drug (as defined in Schedule 2), whether involving a defect in the Covered Drug, its labeling or packaging, or (ii) the availability of the Covered Drug, its allocation or non-allocation, or the means of determining allocation of the Covered Drug if and to the extent determined by Schering. Notwithstanding the foregoing, Schering shall have no liability to HDS under this Section 10.2 for Claims arising as a result of HDS' negligence, willful misconduct or acts by HDS that are a material breach of this Agreement.

**10.3. Indemnification by HDS.** HDS agrees to defend, indemnify and hold Schering harmless against any and all Claims that may arise, be charged to, incurred by or recovered from Schering and that arise as a result of HDS' gross negligence, willful misconduct or acts by HDS that are a material breach of this Agreement or any violation by HDS of applicable law.

**10.4. Procedure.**

**10.4.1.** Promptly after receipt by any indemnified party of notice of the assertion of any Claim with respect to any matter referred in Section 10.2 or 10.3, the indemnified party will give written notice thereof to the indemnifying party, under the notice procedures set out in Section 11 and will thereafter keep the indemnifying party reasonably informed with respect thereto, provided that failure to give the indemnifying party prompt notice as provided herein shall not relieve the indemnifying party of its obligations hereunder except to the extent, if any,



that they shall have been prejudiced thereby.

10.4.2. In case any such Claim is brought against any indemnified party, the indemnifying party shall be entitled to participate in (and, if they shall wish, to assume) the defense thereof with counsel reasonably satisfactory to the indemnified party at the sole cost and expense of the indemnified party. If the indemnifying party assumes the defense of any Claim or litigation as provided in this subsection, the indemnified party shall provide reasonable assistance to the indemnifying party in its efforts to investigate and defend the Claim, including, without limitation, providing reasonable access by the indemnifying party to such documentary evidence and witnesses as are available to the indemnified party. If the indemnifying party assumes the defense of any Claim provided in this subsection, the indemnifying party shall, subject to subsection 10.4.4, have the authority to settle or compromise the Claim. No compromise or settlement of a Claim by the indemnified party shall be binding on the indemnifying party without the consent of the indemnifying party.

10.4.3. If the indemnifying party fails to assume the defense of such Claim within 30 days after notice of such Claim or such shorter period of time as is necessary to avoid adversely affecting the defense of such Claim, the indemnified party against whom such Claim has been made shall have the right (upon further notice to the indemnifying party) to undertake the defense, compromise and settlement of such Claim on behalf of and for the account and risk, and at the expense of, the indemnifying party, subject to the right of the indemnifying party to assume the defense of such Claim at any time prior to settlement, compromise or final determination thereof.

10.4.4. Anything in this Section 10 to the contrary notwithstanding, neither party shall, without the written consent of the other party:

(a) settle or compromise such Claim without including as an unconditional term thereof the giving of an unconditional release with respect to all liability under such Claim, or consent to the entry of any judgment which does not include a dismissal with prejudice, of the indemnified party and indemnifying party; or

(b) settle or compromise any Claim in any manner that may adversely affect the other party other than as a result of monetary damages or other money payments.

11. **NOTICES**

All notices pertaining to this Agreement shall be delivered in person, sent by certified mail, delivered by air courier, or transmitted by facsimile and confirmed in writing (sent by air courier or certified mail) to a party at the address or facsimile number shown in this Agreement, or such other address or facsimile number as a party may notify the other party from time to time. Notices delivered in person, and notices dispatched by facsimile prior to 4:00 PM, recipient's time, Monday through Friday (legal holidays excepted), shall be deemed received on the day sent. All other facsimiles and notices shall be deemed to have been received on the business day following receipt; provided, however, if such day falls on a weekend or legal holiday, receipt shall be deemed to occur on the next business day. Notices may also be transmitted electronically between the parties provided that proper arrangements are made in advance to facilitate such communications and provide for their security and verification.

|  |  |
|---|---|
| If to HDS: | Healthcare Delivery Systems, Inc.<br>9700 N. 91st Street, Suite 232<br>Scottsdale, Arizona  85258-5036<br>Attention: President<br>Telephone:  (602) 314-7009<br>Telefax:  (602) 314-7021 |
| If to Schering Laboratories: | Schering-Plough Corporation<br>2000 Galloping Hill Road<br>Kenilworth, NJ  07033-0530<br>Attention:  Director, Drug Information Services<br>Telephone:  908-298-5038<br>Facsimile: 908-298-2188 |

## 12. LIABILITY; DISCLAIMERS

**12.1. Third Parties.** Nothing in this Agreement shall be construed or be deemed to create any rights or remedies in any third party, including, but not limited to, a patient or an HDS subcontractor.

**12.2. Force Majeure.** Neither party shall be liable, in any manner, for failure to meet its obligations pursuant to this Agreement to the extent that such failure is directly or indirectly caused by matters which are reasonably beyond the control of such party, including, without limitation any delay or failure due to: strikes or labor disputes; earthquakes, storms, floods or other extreme weather or acts of God; riots, fires, explosions, embargoes, war or other outbreak of hostilities; delay of carriers, suppliers or telecommunication providers; or government acts or regulations including any Change of Law applicable hereto. "**Change of Law**" means any change in, or binding change in the judicial or administrative interpretation of, or adoption of, any Law, which is implemented after the date hereof. "**Law**" means any federal, state, local or other constitution, charter, act, statute, law, ordinance, code, rule, regulation, order, specified standards or objective criteria contained in any applicable permit or approval, or other legislative or administrative action of the United States of America, or any state or any agency, department, authority, political subdivision or other instrumentality of either thereof, or a final decree, judgment or order of a court.

## 13. MISCELLANEOUS

**13.1. Amendment.** No amendment, modification or waiver of any of the terms of this Agreement shall be binding unless included in a written agreement signed by both parties.

**13.2. Assignment.** This Agreement may not be assigned by either party without the prior written consent of the other, and any such attempted assignment shall be without effect, except that either party may, without the consent of the other party assign this Agreement to a corporate affiliate. In addition, Schering shall be entitled to assign this Agreement to a third party in connection with a transfer, directly or indirectly, of assets to such third party.

**13.3. Applicable Law.** This Agreement shall be governed by and construed under the laws of the State of New Jersey, without regard to choice of law rules.

**13.4. Independent Contractor.** HDS' relationship with Schering hereunder shall be that of independent contractor, and neither party shall be considered the agent, partner or employee of or a joint venturer with the other party, in its performance of all duties under this Agreement.

**13.5. Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior oral or written agreements, commitments or understandings with respect thereto.

**13.6. Severability.** Whenever possible, each provision of this Agreement shall be interpreted so as to be effective and valid under applicable law, but if any provision of this Agreement should be prohibited or found invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the other of such provision or the remaining provisions of this Agreement, provided, however, that if any such invalid provision is material to an extent that a party would not have entered the Agreement absent such provision, that party may terminate the Agreement on thirty (30) days' written notice to the other party.

**13.7. Counterparts.** This Agreement may be executed in any number of multiple counterparts, each of which shall be deemed an original but all of which taken together shall be and constitute a single instrument. IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers or representatives duly authorized so to do.

| HEALTHCARE DELIVERY SYSTEMS | SCHERING CORPORATION |
|---|---|
| By: [signature] | By: [signature] |
| Title: President | Title: President, Schering Labs |
| Date: July 17, 1998 | Date: |

LEGAL REVIEW



SCHEDULE 1

Most Schering and Key prescription drugs are made available through the Schering Laboratories/Key Pharmaceuticals Patient Assistant Program.

The Program is designed to assist those patients who are truly in need – indigent – who are not eligible for private or public insurance reimbursement and who cannot afford treatment. Patient eligibility is determined on a case-by-case basis based upon economic and insurance criteria.

If eligible, a patient can receive up to a three-month supply of covered drugs prescribed by their physicians, free of charge. Repeat requests require a new application and review to be completed.

SCHEDULE 2

# SCHERING LABORATORIES

# PATIENT ASSISTANCE PROGRAM

## SERVICES

This Schedule 2 describes the services that will be performed by HDS and Schering under the Program.

1.  **PROGRAM DESIGN.** Schering shall be responsible for the Program design, as follows:

    **1.1.   Eligibility Criteria.** Schering will develop criteria for determining patient eligibility for receiving assistance under the Program (**"Eligibility Criteria"**).

    **1.2.   Patient Enrollment.** HDS will provide enrollment forms to physicians and/or patients who contact HDS through the Program Support Line (defined below) to request forms. Physicians and/or patients will be instructed to forward completed enrollment forms to HDS to enroll patients into the Program. Patient information ("**Eligibility Information**"), will be entered into HDS' patient management system to determine which patients will meet the Eligibility Criteria. All such data shall be owned by Schering. Patients denied access to the Program will be advised through written correspondence. Patients provided access to the Program will be required to confirm their continuing eligibility every three months. Patients who satisfy all of the eligibility criteria so established shall be herein referred to as "Eligible Patients".

    **1.3.   Physician Enrollment.** HDS and Schering will develop and implement a system for enrolling physicians who wish to participate in the Program (**"Enrolled Physicians"**). HDS will maintain an electronic data file (the **"Physician File"**) of Enrolled Physicians, which shall include the physician's name, address and an identifying number for each physician (the **"Physician Identifier"**). All such data shall be owned by Schering. Prior to shipment of a Covered Drug, HDS shall match the identifying information submitted by the dispensing physician against the information in the Physician File, including the Physician Identifier, and shall update the Physician File if there is a discrepancy.

    **1.4. Telephone Support Services.** HDS will provide a toll-free telephone line dedicated to the Program (the **"Program Support Line"**). The Program Support Line will be staffed from 9:00AM to 5:00PM Eastern Standard Time Monday through Friday excluding holidays and will provide to patients general Program information of the type specified in Exhibit A hereto. In no event will HDS permit the Program Support Line to provide information about any Schering product which is not on such product's labeling (as determined for purposes of the Food Drug and Cosmetic Act) or otherwise approved in advance by Schering. Persons placing calls after such hours will be able to record a message into a voice messaging system, and HDS will return such messages on the next business day.

SCHEDULE 2

**1.5. Product Matrix.** Schering shall from time to time provide HDS with a complete list of products available to eligible patients under the Program (the "**Product Matrix**"). The Product Matrix will define the following:

**a. Covered Drugs.** Schering shall provide HDS with a complete list of products, including NDC number, that Schering identifies as covered items under the Program ("**Covered Drugs**"). Schering may change the list of Covered Drugs at any time and from time to time provided that it gives HDS not less than two weeks written notice of any change in the list of Covered Drugs.

**b. Dispensing Limits.** Schering will provide HDS with any applicable supply quantity, days' supply limits and refill limits to be applied to each Covered Drug. Schering may change such limits any time and from time to time provided that it gives HDS two weeks written notice of any change in such information. Physicians whose prescriptions exceed the dispensing limits will receive correspondence generated by HDS advising that the maximum quantity of Covered Drug provided under the Program cannot exceed the dispensing limits. Prescribed quantities exceeding such amount shall not be provided under the Program.

**1.6. Mail Services.** HDS will perform the following mail services for the Program:

**1.6.1.** Maintain a post office box in Phoenix, Arizona to receive incoming mail;

**1.6.2.** Stamp all incoming mail with the time and date of receipt;

**1.6.3.** Enter all information from enrollment forms into enrollment system and review all such entries for accuracy and completeness;

**1.6.4.** Based on the Eligibility Criteria, enrollment forms will be approved, denied or incomplete.

**1.6.5.** HDS will return correspondence, approval, denial or incomplete letters, advising the appropriate party or parties of the status of the enrollment form. HDS will produce and mail a letter ("**Special Product Letter**") to the prescribing physician each time an order for specific Covered Drugs, identified in the Product Matrix, is received by HDS. The forms of all such letters shall be approved by Schering prior to use.

**1.6.6.** HDS will maintain files of enrollment forms and related correspondence for the length of the Program.

**1.7. Program Data.** Within thirty (30) days after the end of each calendar quarter, HDS will provide to Schering the following reports:

**1.7.1. Quarterly Summary Report.** The Quarterly Summary Report includes monthly, quarterly and year-to-date totals of approved applications, denied applications, appeals and a ratio of applications from new patients to existing patients. Each Quarterly Summary Report shall be in the form annexed hereto as Exhibit B.



SCHEDULE 2

**1.7.2. Products Shipped.** For each month of each quarter, HDS will produce a Products Shipped Report regarding the amounts of each Schering product provided to Eligible Patients under the Program. The Products Shipped Report shall provide a list of Covered Drugs shipped to Eligible Patients under the Program, NDC number, quantity, AWP, AWP total and year-to-date AWP totals for each of the Covered Drugs ordered by physicians and shipped by Schering in each of the months of a quarter. Each Products Shipped report shall be in the form annexed hereto as Exhibit C.

**1.7.2. Total Products Shipped.** The Total Products Shipped Report summarizes the combined monthly totals of products shipped to Eligible Patients under the Program in each of the months in the previous quarter. Each Total Products Shipped report shall be in the form annexed hereto as Exhibit D.

**1.7.3.** All reports will be provided electronically in a format and on a medium (or via a transmission method) mutually acceptable to the parties.

2. **PRODUCT DISTRIBUTION**

    **2.1. Product Distribution.** HDS will use a direct distribution method ("**Direct Ship Distribution**") to comply with the following procedures for shipping Covered Drugs under the Program.

    **2.1.1.** HDS will enter information from prescriptions received with the enrollment forms into HDS' system. HDS will transmit orders for Covered Drugs for Eligible Patients enrolled in the Program directly to Schering daily via facsimile transmission. HDS will record and store shipment confirmation information received via facsimile transmission from Schering (the **"Order Confirmation"**). Schering will package and ship the product to the physician, hospital or clinic.

    **2.1.2.** HDS shall be responsible for validating the DEA number or physician license number of the prescribing physician prior to sending the order to Schering for shipment of product.

SCHEDULE 3

# SCHERING LABORATORIES

# PATIENT ASSISTANCE PROGRAM

# ADMINISTRATIVE FEES

### Fixed Monthly Fees:

| | |
|---|---|
| Program Administration Fee[1] | $10,500.00 |
| System Maintenance[2] | $1,200.00 |

### Variable Fees:

| | |
|---|---|
| Enrollment Forms mailed | $.35 |
| Enrollment Forms received | $.35 |
| Approval letters (produced and mailed each) | $.65 |
| Denial letters (produced and mailed each) | $.35 |
| Incomplete Enrollment Form letters (produced and mailed each) | $.65 |
| Special Product letter (produced and mailed each) | $.65 |
| Order Confirmation | $.25 |

### Pass Through Costs:

| | |
|---|---|
| Telephone and Telecommunication | As Incurred |
| Postage Costs | As Incurred |
| Printing of Program Materials | Quoted Upon Request |

### Optional Fees:

| | |
|---|---|
| Custom Report Programming (per hour) | $85.00 |

---

1. The Program Administration Fee is based on the following volume assumptions: Enrollment Forms received average 1,425/month, Enrollment Forms mailed average 925/month, Approval letters average 750/month, Denial letters average 525/month, and Incomplete Enrollment Form letters average 700/month. Should the volume exceed these assumptions, the parties will, in good faith, negotiate an increase to the Program Administration Fee.
2. The System's Maintenance Fee includes, but is not limited to, the production of reports and facsimile transmissions for daily orders.

EXHIBIT A

# SCHERING PATIENT ASSISTANCE PROGRAM

# QUESTIONS AND ANSWER

1. Need for general information regarding the Program.

   The program is designed to assist those patients who are truly in need - - indigent - - who are not eligible for private or public insurance reimbursement and who cannot afford treatment. Patient eligibility is determined on a case-by-case basis based upon economic and insurance criteria. The company does not require indigent patients to participate in copayments or co-sharing.

2. How long can a patient be on the program?

   Physician/patient can reapply at the end of each three-month period as long as the patient meets the eligibility criteria.

3. How should the application be filled out if the patient is a child?

   We would need the patient/child's name and date of birth. All other information (i.e., social security number; marital status; health insurance; assets; gross monthly income for household; signature) would apply to the parent/guardian.

4. Does documentation regarding gross monthly income for household have to be provided each time?

   Yes. Updated information must be attached to the application with each renewal regardless of whether the information has changed or not.

5. Does this program cover products other than Schering or Key?

   No. The pharmacist would be able to provide the name and telephone number of the manufacturer of the drug. The patient, in turn, can call the manufacturer directly to inquire if they have a similar program.

6. *Phone calls and written requests for Intron-A and Eulexin should be sent/referred to:
   Assisted Care Partners (ACP)
   4161 Arlinggate Plaza
   Columbus, OH 43228

   1-800-521-7157

7. Any unanticipated questions regarding the program in the meantime can be referred to Jan Spinella at 1-800-526-4099.