**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION ) ) ) ) ) | MDL No. 1456 |
|  | Civil Action No. 01-12257-PBS |
| THIS DOCUMENT RELATES TO: ) ) CLASS 2 AND CLASS 3 TRIAL ) ) ) | Judge Patti B. Saris |

**TRACK ONE DEFENDANTS' PROFFER REGARDING TESTIMONY**
**FROM CERTAIN FORMER GOVERNMENT EMPLOYEES**

The Track One Defendants ("Defendants") hereby submit this proffer regarding testimony from four former Government employees – Nancy-Ann Min DeParle, Christopher C. Jennings, Thomas A. Scully, and Stanley Weintraub – who, had they been issued trial subpoenas from the Court, would have provided testimony relevant to this case. This proffer is based on Defendants' good-faith belief in the substance of testimony from Ms. DeParle, Mr. Jennings, Mr. Scully, and Mr. Weintraub.

**PROCEDURAL HISTORY**

Defendants have made diligent efforts to secure trial testimony from former Government employees regarding AWP, on the basis that such testimony is central to the resolution of issues in this action. (*See* Defs.' Mem. in Supp. of Emergency Mot. to Declare the *Touhy* Regulation Inapplicable and For Leave to Take Trial Deps. of Certain Former Government Employees (Oct. 20, 2006) (Docket No. 3240) ("Emergency Mot. to Declare the Touhy Regulation Inapplicable") at 2-4 (recounting efforts to secure testimony from former Government employees); *see also*

Defs.' Mem. in Supp. of Emergency Mot. to Authorize Subpoenas for Certain Former Government Employees (Nov. 17, 2006) (Docket No. 3384) at 1-3.)

The Government and Plaintiffs have resisted these efforts at every turn. (*See* Opp'n of United States to Emergency Mot. to Declare the Touhy Regulation Inapplicable (Oct. 31, 2006) (Docket No. 3281); Pls.' Opp'n to Emergency Mot. to Declare the Touhy Regulation Inapplicable (Nov. 20, 2006) (Docket No. 3398).) Without informing the Court or the parties, for example, the Department of Justice directly contacted two potential witnesses, Mr. Jennings and Mr. Weintraub, and, relying on an overbroad interpretation of the "deliberative process" privilege, informed these former employees that they could not and would not testify before this Court. (*See* Track One Defs.' Mem. of Points and Authorities Concerning Government Witness Test.) (Nov. 13, 2006) (Docket No. 3353).)

Despite this, the Court has repeatedly stated its belief in the relevance of testimony from these witnesses. As the Court explained to counsel to the Government, such testimony

> adds to the case about whether it's unfair and deceptive. It depends what they heard, what they didn't hear, what they knew, what they didn't know. If they gave a blank check to them, "Go ahead and do it," that helps them. If they just heard snippets of information here, there, and the other place and were sort of trying to figure out what to do with it, that helps your case. It's just that they were important to the unfair and deceptive piece of it.

(Trial Tr. (Nov. 21, 2006) at 6:17-25.) The Court further stated that such testimony was "heartland information." (*Id.* at 9:15-17.) Of course, this was not the first time the Court stated that such testimony would be critical to the resolution of issues in this case. (*See* Hr'g Tr. (Aug. 3, 2000) at 19:25-20:7 (stating that such testimony would be "worthwhile"); Pre-Trial Hr'g Tr. (Oct. 31, 2006) at 37:21-38:1, 39:16-20, 44:9-45:2 (stating that such testimony could be relevant to industry knowledge, unfairness, and deceptiveness); Trial Tr. (Nov. 13, 2006) at 7:8-14

(suggesting need for such testimony and that the Government's withholding of former employees was similar to "cat-and-mouse").)

Nevertheless, the Court ruled it would not issue subpoenas for any former Government employees for purposes of this trial.  (Trial Tr. (Nov. 21, 2006) at 4:12-6:6; Electronic Order (Nov. 27, 2006).)  Defendants objected to this ruling.  (Trial Tr. (Nov. 21, 2006) at 9:22-10:2.)  One of the bases for this objection was that, without trial subpoenas, Ms. DeParle, Mr. Jennings, Mr. Scully, and Mr. Weintraub would not testify before this Court.  (*Id*. at 10:24-11:5.)

## PROFFER OF TESTIMONY

Ms. DeParle, Mr. Jennings, Mr. Scully, and Mr. Weintraub have relevant testimony to provide to this Court.  The Court, despite its eventual ruling, previously expressed interest in hearing a proffer of what these witnesses would say.  (*See* Trial Tr. (Nov. 13, 2006) at 16:8-11; Trial Tr. (Nov. 21, 2006) at 10:20-11:5.)  In accordance with these requests, and in order to preserve the record regarding the potential testimony of these individuals had the Court subpoenaed them at this trial, Defendants submit the following proffer regarding testimony from each of these former Government employees.

This proffer reflects Defendants' good-faith belief in the substance of these witnesses' testimony, based on their statements in the public record and Defendants' prior conversations with these individuals.  However, as Defendants have informed the Court, the *ex parte* efforts of the Department of Justice to prevent these witnesses from testifying has complicated Defendants' communications with several of these individuals and, as such, has compromised Defendants' ability to provide a more detailed proffer.  (*See* Trial Tr. (Nov. 13, 2006) at 4:10-25, 16:8-11; Trial Tr. (Nov. 21, 2006) at 10:24-11:5.)

**I.     NANCY-ANN MIN DEPARLE**

From 1997 to 2000, Ms. DeParle was the Administrator of the Health Care Financing Administration ("HCFA"), the predecessor agency to the Centers for Medicare & Medicaid Services ("CMS").[1]  Based on this experience, Ms. DeParle has personal knowledge regarding HCFA's understanding and use of AWP, its communications – or lack thereof – with manufacturers regarding AWP, and its attempts to adopt a reimbursement system based on acquisition cost, as opposed to a system based on AWP.  More specifically, Defendants proffer that Ms. DeParle would provide the following testimony:

- HCFA understood that AWP-based reimbursement and acquisition price-based reimbursement were two distinct methods.  The acquisition price was similar to the invoice price of an item, whereas the AWP was similar to a sticker price on a vehicle.

- HCFA was well aware, from 1997 to 2000, that the published AWP did not reflect, or bear any predictable relationship to, actual wholesale prices available to physicians and providers that billed for these drugs.  HCFA decided to rely on published compendia, which HCFA knew did not reflect actual averages of wholesale prices.

- The Government had the ability to collect specific information relating to drug prices from manufacturers and other sources.  In 2000, for example, HCFA distributed "alternative" average wholesale price data compiled by the Department of Justice and the State Medicaid Fraud Control Units, but Congress rebuffed any attempt to use this data as a basis for reimbursement under Medicare Part B.

- HCFA understood that the Balanced Budget Act of 1997 did not impose any duty on manufacturers, such as a duty to survey and report to publishers the actual average wholesale prices available to physicians and supplier communities.  To impose such a duty, legislative action was necessary.  The Administration and HCFA proposed legislation to change the AWP-based system to one based on acquisition cost, but Congress rejected these proposals.

- The AWP-based reimbursement system was used, in part, to address inadequate reimbursement for services related to the provision of chemotherapy drugs and clotting factors used to treat hemophilia and similar disorders.

---

[1] As a former CMS Administrator, Ms. DeParle fits squarely in the category of witnesses "who ran the Medicare program," a category of witnesses that the Court has stated could provide particularly relevant testimony.  (Trial Tr. (Nov. 21, 2006) at 7:6-8 (also stating: "That's what I'm interested in, the people who ran it.").)  Mr. Scully, who was CMS Administrator from 2001 to 2003, and Mr. Weintraub, who was Branch Chief and then Senior Policy Advisor at CMS between 1984 to 1998, have similar experience.

4

## II.  CHRISTOPHER C. JENNINGS

Mr. Jennings was the President's Senior Health Policy Advisor from 1994 to 2001. In 1993 and 1994, he worked as Senior Advisor to the Administrator of HCFA, and, from 1983 to 1993, he worked as a committee staff member for three U.S. Senators. Based on this experience, Mr. Jennings would provide the Court with testimony about the extent of public knowledge and the nature of the political debate regarding AWP for virtually the entire class period. Defendants proffer that Mr. Jennings would provide the following testimony:

- From the late 1980s throughout the 1990s, there was extensive public information documenting very substantial differences between provider acquisition cost and AWP.

- After the passage of the Omnibus Budget Reconciliation Act of 1991 and throughout the 1990s, HCFA, Congress, and the White House understood that Medicaid and other payors were reimbursing far less for prescription drugs than Medicare, but Medicare continued to reimburse based on AWP.

- He was not aware of any interpretation that Medicare's adoption of AWP, either by way of regulation in 1991 or by way of statute in 1997, imposed an obligation on manufacturers to report an actual average of wholesale prices. To reduce expenditures for drugs, the Administration repeatedly proposed adopting a system that would base reimbursement on actual acquisition cost, as opposed to AWP. Congress rejected these efforts.

- The legislative debate throughout the 1990s regarding the use of AWP was dominated by oncologists who maintained that AWP-based reimbursement for drugs included a cross subsidy for inadequate reimbursement for service and administration fees. Largely as a result of political efforts by oncologists, there was no meaningful reform of the Part B reimbursement system during the Clinton Administration.

- He was unaware of any communication in the 1990s in which the Government told manufacturers that they should change longstanding industry practice concerning the reporting of AWPs.

## III.  THOMAS A. SCULLY

Mr. Scully was the CMS Administrator from 2001 to 2003, the period in which Congress adopted the "average sales price" methodology in the Medicare Modernization Act of 2003. Mr. Scully testified to Congress regarding the use of AWP – testimony that has been cited by both parties and relied upon by the Court in its statutory construction of AWP. *See In re Pharm.*

*Indus. Average Wholesale Price Litig.*, MDL No. 1456, Civ. No. 01-12257 (D. Mass. Nov. 2, 2006) at 10-11, 22.[2] Defendants proffer that Mr. Scully would provide the following testimony:

- The Government knew that AWP did not equal acquisition cost, or bear any predictable relationship to acquisition cost. It was never a secret that AWP was not an actual average of wholesale prices, nor was it a secret that there was a large discrepancy between AWP and provider acquisition costs.

- CMS was well informed about actual prices from various sources of data, including information on the actual spreads of drugs that had been studied by CMS and other agencies. Additional information about other individual drug spreads would not have made any difference to the AWP-based reimbursement system.

- CMS understood drug reimbursement provided a cross subsidy for inadequate reimbursement for services provided by physicians, providers, oncologists, hematologists, ESRD clinics, hemophiliac agencies, and others.

- Drug reimbursement was a political issue, and the AWP-based drug reimbursement system was maintained primarily because oncologists effectively lobbied Congress to preserve the system.

- Manufacturers did not have the ability to unilaterally change the system. The Government did not provide any guidance that setting the AWP at a level above acquisition cost was illegal or deceptive.

## IV.  STANLEY WEINTRAUB

Mr. Weintraub was a Branch Chief and later a Senior Policy Advisor at HCFA from 1984 to 1998. During his tenure at HCFA, Mr. Weintraub was directly involved in the development and implementation of physician reimbursement policies under the Medicare Part B program, and has personal knowledge concerning HCFA's use of AWP-based reimbursement

---

[2] As noted before the Court, a federal court in the Eastern District of California recently issued an opinion that relied on Mr. Scully's deposition testimony regarding the meaning of a term under the Medicaid statute. (Trial Tr. (Nov. 21, 2006) at 8:10-22.) Unlike in the instant case, the Government allowed Mr. Scully's deposition to be taken. *See* Tr. of Dep. of Thomas A. Scully (July 27, 2006) at 4:16-20 (stating testimony was "cleared" by CMS), Ex. 16 to Decl. of Christine Yip, *United States ex rel. Beverly Englund v. Los Angeles Co.*, No.S-4-282 (July 31, 2006) (Docket No. 202), attached hereto as Ex. A. The Court found Mr. Scully's deposition testimony central to its holding that the government's knowledge of the practice at issue negated the scienter necessary to find liability under the False Claims Act. *See* Order, *United States ex rel. Beverly Englund v. Los Angeles Co.*, No. S-4-282 (Oct. 30, 2002) (Docket No. 319) at 8-10, 27-35, attached hereto as Ex. B.

methodology. Specifically, Defendants proffer that Mr. Weintraub would provide the following testimony:

- Historically, Medicare Part B was a charge-based reimbursement system, as reflected in the law and regulation providing for reimbursement on a "reasonable charge" basis. "Reasonable charge" was determined by reference to physicians' actual billed charges, and was not related to physicians' costs. When HCFA implemented the Resource Based Relative Value Scale ("RBRVS") (effective in 1992) to determine the Medicare Part B payment amount for physician services, HCFA excluded drugs from the RBRVS fee schedule and continued to pay for drugs under the existing reasonable charge system.

- During the mid-to-late 1980s, HCFA began receiving information from the Department of Health and Human Services Office of the Inspector General ("OIG") as well as from Carrier Medical Directors that AWPs for certain drugs were significantly higher than physicians' acquisition costs.

- On June 5, 1991, HCFA published a proposed rule in the Federal Register, which Mr. Weintraub participated in drafting, proposing to pay for drugs at the lower of estimated acquisition cost or 85% of AWP. The final rule published on November 25, 1991, which Weintraub also participated in drafting, ultimately provided for payment at the lower of AWP or estimated acquisition cost.

- In 1994, Mr. Weintraub was involved in HCFA's efforts to conduct surveys of physician acquisition costs for certain high volume, high expenditure drugs, including Paraplatin, Rubex, Vepesid and Zoladex. The surveying effort was stopped by the Office of Management and Budget, however, due to HCFA's failure to comply with the provisions of the Paperwork Reduction Act. As a result, HCFA was unable to introduce estimated acquisition cost as a reimbursement mechanism, and so continued to reimburse for drugs at AWP through 1997, despite its awareness that AWP was not a true reflection of and far exceeded acquisition costs.

- From HCFA's perspective, the passage of the Balanced Budget Act of 1997 did not impose an obligation on manufacturers to report an actual average of wholesale prices. HCFA continued to reimburse based upon published AWPs despite its knowledge that AWP was not a reliable proxy for physician acquisition cost and that sizeable spreads continued to exist between reimbursement and provider acquisition costs for drugs.

          Respectfully submitted,

          THE TRACK ONE DEFENDANTS

          /s/ John T. Montgomery
          John T. Montgomery (BBO#352220)
          Steven A. Kaufman (BBO#262230)
          Eric P. Christofferson (BBO#654087)
          Ropes & Gray LLP
          One International Place
          Boston, Massachusetts 02110-2624
          (617) 951-7000

          *Attorneys for Schering-Plough Corporation and Warrick Pharmaceuticals Corporation*

Dated:  December 5, 2006

**CERTIFICATE OF SERVICE**

     I hereby certify that on December 5, 2006, I caused a true and correct copy of the foregoing to be served on all counsel of record by electronic service pursuant to Case Management Order No. 2 entered by the Honorable Patti B. Saris in MDL 1456.

                                        /s/ Adam Wright
                                        Adam Wright