# EXHIBIT A

# EXHIBIT 16

```
 1                 UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3

 4      - - - - - - - - - - - - - - -  X

 5      UNITED STATES OF AMERICA, ex rel.: No. CIV S-04-282

 6      BEVERLY ENGLUND,                 :    LKK/JFM

 7             Plaintiff,                :

 8      v.                               :

 9      LOS ANGELES COUNTY,              :

10             Defendant.                :

11      - - - - - - - - - - - - - - -  X

12                       Washington, D.C.

13                       Tuesday, June 27, 2006

14

15                  Deposition of THOMAS A. SCULLY, called

16      for examination by counsel for the Defendant in the

17      above-entitled matter, pursuant to notice, the witness

18      being duly sworn by CARLA L. ANDREWS, a Notary Public

19      in and for the District of Columbia, taken at the

20      offices of the Jones, Day, 51 Louisiana Avenue, N.W.,

21      Washington, D.C. 20004, at 4:15 p.m., Tuesday, June 27,

22      20006, and the proceedings being taken down by

23      Stenotype by CARLA L. ANDREWS and transcribed under her

24      direction.
```

Certified Copy

```
25
```

Page 4

```
 1                      P-R-O-C-E-E-D-I-N-G-S
 2          Thereupon,
 3                      THOMAS A. SCULLY
 4    was called as a witness and, after being duly sworn by
 5    the notary, was examined and testified as follows:
 6          EXAMINATION BY COUNSEL FOR THE DEFENDANT
 7              BY MR. MILLER:
 8          Q    Would you state your full name for the
 9    record, please?
10          A    Thomas Andrew Scully.
11          Q    Mr. Scully, you are here today for the taking
12    of your deposition in the matter of United States, ex
13    rel, Englund versus Los Angeles County.
14              Do you understand that?
15          A    Yes.
16          Q    And do you understand that the taking of your
17    deposition has been cleared by the Centers for Medicare
18    and Medicaid Services?
19          A    Yes, although it is -- to be clear, I am not
20    representing HHS or CMS obviously in this role.
21          Q    Right.  And I would like to mark --
22              MR. MILLER:  Do you know where they left
23    off?
24              MR. TAUGHER:  320.  We will start with 320.
25              MR. MILLER:  -- as Exhibit 320 the letter
```

Page 7

 1      Q    Did you call them or did they call you?

 2      A    They called me.

 3      Q    So you haven't solicited anyone in connection

 4   with this litigation?

 5      A    No.

 6      Q    I have in front of me, Mr. Scully, what

 7   purports to be the official HHS biography of Thomas A.

 8   Scully.  Have you seen that?

 9      A    No.

10      Q    Let me read from a portion of it.  It says

11   you were sworn in as administrator of the Centers for

12   Medicare and Medicaid Services (CMS) in May 2002.  Is

13   that -- excuse me, May 2001.  Is that accurate?

14      A    Yes.

15      Q    And how long did you stay in that position?

16      A    Technically until January 4, 2004.  As far as

17   payroll purposes effectively, I think my last real day

18   was December 20, 2003, something like that,

19   approximately.

20      Q    It also says in your biography that before

21   joining Patton & Boggs you worked at the White House as

22   a deputy assistant to the President and counsellor to

23   the director of the Office of Management and Budget

24   from 1992 to '93 and as associate director of OMB for

25   Human Resources Veterans and Labors Affairs from 1989

Page 8

1    to 1992.  Is that accurate?

2         A    Yes.

3         Q    It also indicates that in those positions you

4    oversaw fiscal and regulatory policy of the Department

5    of Health and Human Services, Education, Labor and

6    Veterans Affairs.  Is that also accurate?

7         A    Yes.

8         Q    And it also says he, that is you, advised

9    President Bush -- that's the original President Bush --

10   on health care policy, Medicare and Medicaid.  Is that

11   also correct?

12        A    Yes.

13        Q    One other thing.  It the indicates you hold a

14   juris doctorate from Catholic University and a

15   Bachelor's degree from the University of Virginia.  Is

16   that the extent of your advanced education?

17        A    Yes.

18        Q    Are you familiar today with the program in

19   California known as the Selective Provider Contracting

20   Program?

21        A    I am familiar with it.  I am not sure I

22   remember it precisely --

23        Q    SPCP.

24        A    -- which pieces of it are which.  But, yes, I

25   am very familiar with what California does on Medicaid.

 1    Financing Administration?

 2            MR. TAUGHER:  Object.  The question is vague

 3    and ambiguous.

 4            MR. COHEN:  The deponent already testified

 5    that he was unaware of them to begin with.

 6            BY MR. MILLER:

 7        Q    You should answer.

 8        A    I mean, I am aware of the relationships that

 9    hospitals and other providers, nursing homes, managed

10    care plans had, with the state for payment in which

11    they -- under their prepayment limits, which basically

12    created phantom match rates.  I am very familiar with

13    how they worked.  I don't believe I ever saw any

14    specific contracts.  But I used to run a large hospital

15    association that had probably 300 hospitals in

16    California.  So I was very familiar with how it worked.

17    I just never saw any of the contracts.

18        Q    Do you know if customary charges were the

19    upper payment limit in the state's contractual

20    arrangement?

21        A    Almost every state.  Every state that I am

22    aware of.  I know that costs went over the limit.  That

23    would have defeated the whole purpose of scamming the

24    Federal Government.

25            MR. TAUGHER:  Let me interrupt for a moment.

```
 1    When you give your answer, it will be hard for you to

 2    do, but you might want to pause just for a moment for

 3    either of us to object before giving your answer just a

 4    moment.  Thanks.

 5              BY MR. MILLER:

 6         Q    Was your last answer true of California as

 7    well -- customary charges were (check) the upper

 8    payment limit?

 9         A    Yes.

10              MR. TAUGHER:  Object.  The answer is -- the

11    question is leading and misstates the law, lacks

12    foundation.

13              BY MR. MILLER:

14         Q    Are you familiar with the concept

15    intergovernmental transfer, which is known under the

16    acronym IGT?

17         A    Yes, very familiar with it.

18         Q    When did you first become aware of the

19    concept of IGT's?

20         A    Probably 1989, 1990.  Earlier in my time in

21    OMB.

22         Q    Do you remember how you became aware of the

23    concept?

24         A    I believe multiple states -- I can't remember

25    which one -- West Virginia, Alabama, possibly
```

 1   California.  As we started to tighten up on

 2   disproportionate share taxes, states started using

 3   intergovernmental transfers to funds their Medicaid

 4   matches in multiple states.  It was a pretty common

 5   practice.

 6        Q    Do you remember attempting to do anything

 7   with regard to your perception?

 8        A    Oh, yes.

 9        Q    And what did you do?

10             MR. TAUGHER:  Object.  Vague as to time.

11             BY MR. MILLER:

12        Q    In this time frame of '89, '90 that you have

13   described?

14        A    I would say from 1990 -- late '89 through my

15   last breath in the White House in January of '93, in

16   which it was the last thing I discussed with President

17   Bush who left office.  I spent lots of time trying to

18   shut them down, largely unsuccessfully and push Gail

19   Lewinsky, who for most of that time was the HCFA

20   administrator, to do the same thing.  I probably met

21   with at least 25 governors personally about it and

22   spent a lot of time trying to limit what was a virus

23   among states to try to use intergovernmental transfers

24   disproportionate share taxes, upper payment limits to

25   basically fund bogus matches for Medicaid.

Thomas A. Scully

Washington, DC

June 27, 2006

Page 17

```
 1              MR. TAUGHER:  Object to the question as
 2      nonresponsive.
 3              MR. MILLER:  The answer?  You are objecting
 4      to the answer?
 5              MR. TAUGHER:  The answer to that.  Excuse me.
 6              BY MR. MILLER:
 7        Q     Do you recall that in 1991 Congressman Henry
 8      Waxman from the Los Angeles area successfully amended
 9      the Medicaid statute to create a statutory protection
10      for intergovernmental transfers?
11        A     Yes, I sadly do.
12              MR. TAUGHER:  Object to the question as
13      leading.
14              BY MR. MILLER:
15        Q     As you understand the concept of
16      intergovernmental transfers, how does it work?
17        A     Well, you know, the point of all of them is
18      basically the same, which is to put up phantom funds as
19      a state match.  So as we tightened up on -- these
20      existed.  Maybe that's by Congressman Waxman.  As we
21      tightened up on disproportionate share taxes, states
22      generally shifted to upper payment limits -- I'm
23      sorry -- to intergovernmental transfers.  And I believe
24      California was one of the first governments if I
25      remember back then.  And I tried to shut them down.
```

Page 18

1    And I was negotiating with Congressman Waxman the whole

2    time.  And he just -- he allowed me to shut down

3    everything but his California thing, which was IGT's.

4    And I tried to shut it down.  But at that time, it was

5    a Democratic majority in Congress and I couldn't.

6              Essentially what they did was the public

7    hospitals, I believe in most of the states at the time,

8    effectively began -- whatever their budget was, they

9    would transfer the entire value of their public

10   hospital budget to Sacramento for a split second.  It

11   would be recorded as a receipt to the Medicaid program.

12   It would then be put up as a match to draw down federal

13   funds and then be transferred back to the hospital.

14             So if the public hospital had a million

15   dollar a year budget, on January 1 for a split second

16   they transferred to Sacramento, deposit in the Medicaid

17   program, to put up as a Medicaid matching fund, draw

18   down whatever the match.  In California's case, there

19   was about $50 million of federal funds.  And so

20   California got a million of government funds without

21   putting up a nickel and then transferred the public

22   hospital's money back.  And they generate

23   100 percent federal match without putting up any money.

24             MR. TAUGHER:  They being the state?

25             THE WITNESS:  The state.

Page 19

```
 1              MR. TAUGHER:  Object to the response as

 2    non-responsive.

 3              BY MR. MILLER:

 4         Q    Do you recall there being a provision in the

 5    statutory protection of IGT's that what is now known as

 6    CMS cannot restrict the use of IGT's?

 7              MR. TAUGHER:  Object.  The question is vague,

 8    lacks foundation.

 9              THE WITNESS:  Do I remember that?  Yes.

10    Essentially at the time it was a virus spreading

11    quickly, and the biggest virus at the time was

12    disproportionate share of taxes which were worse.  And

13    upper payment limits had just gotten started and IGT

14    was pretty limited.  So I shut down what I could, which

15    was DSH taxes and let the IGT's to fight another day.

16              So Congressman Waxman kept us from shutting

17    it down by statute, yes.  I do remember that.

18              BY MR. MILLER:

19         Q    Are you familiar with the California Medi-Cal

20    Assistance Commission?  Do you know the acronym CMAC?

21         A    Very vaguely familiar with it.

22         Q    What do you understand them to be?

23         A    I don't know enough to know, to be honest.

24         Q    Do you know how -- let me ask you another

25    preliminary question.  Are you familiar with the term
```

Page 25

```
 1              MR. TAUGHER:  Object to the answer as
 2    non-responsive.
 3              BY MR. MILLER:
 4      Q    In your understanding of IGT's as they were
 5    used in the State of California and specifically in the
 6    County of Los Angeles, did you understand that once the
 7    money was returned from the state to the county that
 8    the Department of Health Services then returned the
 9    IGT's to the county's general fund?
10              MR. TAUGHER:  Object.  Lacks foundation,
11    vague, vague as to time, and leading.
12              THE WITNESS:  Yes, I did.  I wasn't happy
13    about it.  But I understood the money was fungible.
14              BY MR. MILLER:
15      Q    And when did you first understand that?  Was
16    this in this 2000, 2001 time frame or does that go as
17    far back as 1989 and '90.
18      A    Oh, I think I understood it the first day I
19    got involved in 1989.  As far as generically how it
20    worked in all the states, I don't think I got into the
21    weeds in the California situation specifically until I
22    got to CMS and then HCFA and CMS later on.  But every
23    state's process was the same.
24              MR. TAUGHER:  Object to the answer as
25    non-responsive.
```

Page 42

```
 1        A     We share your concerns?

 2        Q     Yes.

 3        A     We share your concerns about the financial

 4   health of safety net hospitals delivering care to

 5   Medi-Cal beneficiaries in California.

 6              MR. TAUGHER:  Object to the answer.  The

 7   document speaks for itself.

 8              BY MR. MILLER:

 9        Q     That's all I questions on that document,

10   Mr. Scully.  Do you recognize the name Sherry Rice?

11        A     Very well.

12        Q     Where do you know Ms. Rice?

13        A     She worked for me at OMB in the '89 to

14   probably '93 time period as a career staff analyst.

15   And then later on, worked in this capacity because she

16   ended up working for the State of California and was

17   very helpful in working out all of these issues.

18              MR. TAUGHER:  Object to -- I withdraw the

19   objection.

20              BY MR. MILLER:

21        Q     Do you remember having conversations with

22   Ms. Rice when you were, as you have described it,

23   trying to work out this situation?

24        A     Yes, many.

25              MR. TAUGHER:  Object to vague, vague as to
```

Page 43

1    time and leading.

2              THE WITNESS:  Yes, I had many conversations

3    with Sherry.

4              BY MR. MILLER:

5         Q    Let me ask you with reference to a specific

6    conversation.  Maybe we can avoid having to take a

7    break here.  Do you remember having conversations with

8    Ms. Rice in August of 2002 and specifically telling her

9    that you liked the hospital contracting program and

10   recognized that it saved real dollars?

11             MR. TAUGHER:  Object to the question as

12   leading.

13             THE WITNESS:  Yes.  And it did save real

14   dollars versus the traditional fee for service programs

15   in the state.

16             BY MR. MILLER:

17        Q    And do you remember telling her in that same

18   conversation that it appeared the state was using the

19   monies saved to help public hospitals?

20             MR. TAUGHER:  Same objection.

21             THE WITNESS:  Generally, yes.

22             BY MR. MILLER:

23        Q    And do you remember telling her also that

24   California's program appeared to benefit public

25   hospitals and not be a scheme like other state

Thomas A. Scully                                                June 27, 2006

Washington, DC

Page 50

1    Mr. Taugher happier.

2         A    Sorry.

3         Q    I would like to show you next a document,

4    dated September 23, 2002, which indicates it is a note

5    to Tom Scully from Richard Chambers, subject 9/24/02

6    meeting with California representatives on SPCP.  And I

7    will just note for Mr. Cohen on this, this has a CMS

8    Bates stamp on it.  And it does reflect the position of

9    the agency quite clearly.

10             MR. COHEN:  Two copies here?

11             MR. MILLER:  No, there is just one copy.  I

12   will get you another copy in a minute.

13             (Exhibit No. 329, marked for identification.)

14             BY MR. MILLER:

15        Q    Do you remember receiving this note,

16   Mr. Scully?

17        A    Uh-huh.

18        Q    Who is Richard Chambers?

19        A    He was the key -- one of the two key staffers

20   but probably the key staffer at CMS involved in working

21   on this with me.

22        Q    Was he in Baltimore --

23        A    In Baltimore.

24        Q    -- or one of the regions?

25        A    He was in Baltimore.

Page 52

1    that was referred to.  That's fine.  Does the sentence

2    you read into the record correctly reflect CMS's

3    position at the time of this memo?

4         A    At the time of this memo, yes.  What I was

5    beginning to coach Richard into doing, as I think this

6    memo reflects, was I was being hit with three totally

7    different requests for money.  California was trying to

8    get their SPCP waiver extended, LA County's hospitals

9    were struggling and I was getting pressured for money

10   from LA County, and I was getting pushed to settle a

11   lawsuit that we were probably going to lose.

12        Q    Orthopedic Hospital at Belshe, B-e-l-s-h-e?

13        A    Yes.  So all three of those were coming at

14   the same time.  And I was trying to coach Richard into

15   diverting some money from the hospital settlement as

16   well as some money from the state program to LA County

17   to bail out the LA County Hospital.  That's what the

18   beginning of this memo reflects.

19             MR. TAUGHER:  Object.

20             THE WITNESS:  These were Richard passing --

21   trying to weave my ideas together.

22             MR. TAUGHER:  Object to the answer as

23   nonresponsive.

24             BY MR. MILLER:

25        Q    Earlier in the deposition you said you

Thomas A. Scully

Washington, DC

June 27, 2006

 1    thought you may have gone or come to California prior

 2    to the election in November.  Do you remember that?

 3        A    I know I was there on Election Day.  That was

 4    to announce the deal with Grantland Johnson and the

 5    governor.  I made one trip out there and spent two or

 6    three days looking at the hospitals and talking to

 7    folks.  And I just don't know when it was in 2002.  And

 8    then I came back with Secretary Thompson to make the

 9    announcement a couple months later.  And I can't

10    remember what the dates of those were.  It has been a

11    couple of years.

12        Q    Was there more to the settlement with

13    California than the orthopedic hospital lawsuit?

14             MR. TAUGHER:  Object.  Vague.

15             THE WITNESS:  Yes.

16             BY MR. MILLER:

17        Q    What was involved in addition to the

18    settlement of the orthopedic -- in the way of dollars,

19    what was involved in addition to the orthopedic

20    hospital --

21             MR. TAUGHER:  Same objection.

22             BY MR. MILLER:

23        Q    -- lawsuit settlement?

24        A    I can't remember the specific numbers.  I

25    believe I was trying to get 50 -- I was trying to

Page 54

```
 1    get -- I can't remember all the numbers.  But the
 2    orthopedic hospital settlement was probably a couple
 3    hundred million dollars.  I was trying to divert a
 4    disproportionate share of that settlement to the LA
 5    County public hospitals.  I was trying to get some of
 6    the money out of the extended state waiver scraped off
 7    the top and directed to the LA Public County public
 8    hospitals.
 9          So I was trying to basically squeeze some of
10    the money out of the state's extension as well as some
11    of the money out of the orthopedic settlement and put
12    it in the LA County Public hospitals.  And I believe --
13    I just can't remember all the numbers.  But I believe
14    it was a couple hundred million dollars that I was
15    trying to put back into the LA County Public Hospitals
16    to keep any of them from closing.
17          MR. TAUGHER:  Objection to the answer as
18    nonresponsive.
19          THE WITNESS:  It's in addition to what --
20          BY MR. MILLER:
21    Q     Their regular reimbursement under the SB 1255
22    program?
23    A     Yes.
24    Q     I would like to show you now a document,
25    dated December 12, 2002, from Dennis Smith to Peter
```

Thomas A. Scully

Washington, DC

June 27, 2006

Page 55

 1    Harbage, subject, update of review of the SPCP UPL and

 2    concept paper.  And, again, this has a CMS Bates stamp

 3    on it.  Can we mark this as next in order, please.

 4          (Exhibit No. 330, marked for identification.)

 5          MR. COHEN:  Reflecting the discussions

 6    before, I mean, HHS would object to the document as it

 7    appears to reflect deliberative process, you know,

 8    internal discussions.  I can't attest -- I see the

 9    Bates stamp.  I don't know where the document came

10    from.  I don't discount the fact it came from CMS, but

11    I don't know for certain from where it came.

12          THE WITNESS:  Peter worked for the state, so

13    it could have come from the State of California.

14          MR. COHEN:  Peter worked for --

15          THE WITNESS:  The State of California.  Peter

16    used to be with HCFA and left and went at the end of

17    the quarter.

18          BY MR. MILLER:

19      Q   Let me ask you some foundational questions.

20    And then I will ask Mr. Cohen if he has additional

21    objections.

22          MR. TAUGHER:  Can we clarify that last

23    statement, though?  Did you mean that he worked

24    directly for the state or was he a consultant for the

25    state?

```
 1            THE WITNESS:  I believe he worked for the
 2    governor in the governor's office.
 3            MR. TAUGHER:  You think he worked directly
 4    for them?
 5            THE WITNESS:  I think he worked in the
 6    governor's office as a staffer.
 7            MR. COHEN:  This is a question for the
 8    witness.  He worked for CMS or HHS for a time?
 9            THE WITNESS:  Peter Harbage was a political
10    appointee who was one of Nancy Endoperal's special
11    assistants under Clinton.  I knew him reasonably well,
12    and he was very involved in these negotiations.  He
13    then left at the end of the Clinton Administration,
14    went to California, and worked for Governor Davis.  And
15    I believe he worked in Governor Davis' personal office
16    as a health care advisor.
17            MR. COHEN:  To the extent that during the
18    time of this letter --
19            THE WITNESS:  He was working for the state.
20            MR. COHEN:  The individual -- that it was
21    sent to an individual working for the state, then we
22    have no objection.
23            MR. TAUGHER:  Would that include someone
24    working as a consultant to the state?
25            THE WITNESS:  He wasn't a consultant.
```

1          MR. MILLER:  Mr. Taugher, you will get your

2     chance to do your examination, believe me.

3          BY MR. MILLER:

4     Q    Okay.  First, who is Dennis Smith to your

5     knowledge, Mr. Scully?

6     A    He is the Medicaid director.  He ran Medicaid

7     under CMS.

8     Q    At the time of this memo, which is

9     December 12, 2002?

10    A    Yes, and still is.

11    Q    And have you seen this memo before today?

12    A    Yes.

13    Q    Did you approve the sending of this memo?

14    A    Certainly conceptually.

15    Q    All right.  If you would look, then, at the

16    second page under Roman numeral two, California's

17    health safety net concept paper.  Will you read into

18    the record the first paragraph beginning, Utilize UPL

19    and SPCP payments.

20    A    Yes.  We are supportive of earmarking a

21    specific amount of SPCP supplement payments under the

22    SPCP waiver within the UPL for LA County.  This

23    earmarking must be within the overall SPCP approved

24    amounts and within the approved UPL amounts.

25         MR. TAUGHER:  Object.  The document speaks

Page 59

1      would have the effect of the LA County hospitals

2      receiving 25 million from the settlement, which is

3      already provided by the state and an additional

4      50 million in federal funding for a total of a

5      75 million.

6              MR. TAUGHER:  Object.  The document speaks

7      for itself.

8              MR. MILLER:  Thank you.

9              BY MR. MILLER:

10     Q     The next item I would like to show you is a

11     letter, dated February 4, 2003.

12             (Exhibit No. 331, marked for identification.)

13             THE WITNESS:  This is refreshing my memory of

14     the time frame if you want to ask that question.

15             MR. TAUGHER:  I do have to ask you to wait

16     until he asks you the question.

17             THE WITNESS:  I am familiar with this.

18             BY MR. MILLER:

19     Q     Okay.  There are actually two documents

20     here.  One is a February 4, 2003 letter to Grantland

21     Johnson over the signature of Thomas A. Scully.  Is

22     that your actual signature?

23     A     Yes, it is.

24     Q     And then there is an attached document called

25     the California Transition Agreement, dated February 4,

Page 60

1    2003, that is signed.  It appears to be your signature

2    again and that of Mr. Johnson?

3         A    Yes.

4         Q    Is that accurate?

5         A    Yep.

6              MR. TAUGHER:  Object to lack of foundation as

7    to Mr. Johnson's signature.

8              BY MR. MILLER:

9         Q    Were you present when Mr. Johnson signed the

10   transition agreement?

11        A    I was.

12        Q    Do you recognize what's on this copy as his

13   signature?

14        A    Yes.

15        Q    Would you look at page --

16        A    In fact, the date is my writing.

17             MR. MILLER:  And, again, Mr. Cohen, I note

18   that this has the CMS Bates stamp on it.  So it appears

19   that CMS has produced the majority of this.

20             THE WITNESS:  This was a very public

21   document.  We handed it out at a press conference.

22             BY MR. MILLER:

23        Q    We will get to the press conference in a

24   moment or two.  If you look at page three, item number

25   six.

Page 64

1    of a sudden decided it would put some of its money to

2    the tune of $100 million in the county program?

3              MR. TAUGHER:  Object.  Leading.

4              Vague as to time.

5              THE WITNESS:  Yes.  I was very irritated.

6    And the reason is that at the last second the night

7    before the thing, the governor in his usual way decided

8    to take a couple of shots at us.  And he was putting

9    his own money in and taking credit for this whole

10   thing, which was a little irritating since we basically

11   had given him a huge gift.  So I actually briefly

12   pulled the plug on the whole thing until he started

13   behaving better.

14             MR. TAUGHER:  Object to the answer as

15   nonresponsive.

16             BY MR. MILLER:

17        Q    I am handing you now --

18        A    It is true.

19        Q    -- two documents.  One is an HHS press

20   release, which will be 333.

21             (Exhibit No. 332 through 333, marked for

22   identification.)

23             BY MR. MILLER:

24        Q    Have you read the state press release,

25   Mr. Scully?

Case 2:04-cv-02257-KHV-JPM   Document 242-2   Filed 07/05/2006   Page 26 of 41

1       A    Yes.  I felt nauseous during the break.  Yes.

2       Q    There is a paragraph in here that purports to

3   be a quote from Grantland Johnson beginning, We have

4   worked closely.  Will you read that paragraph into the

5   record, please?

6       A    We have worked closely with our federal

7   partners in a very positive way to resolve their

8   questions and concerns, said California Health and

9   Human Services Secretary Grantland Johnson.  We have

10  continuously expressed the importance and value of the

11  SPCP for communities statewide.

12           MR. TAUGHER:  Object.  The document speaks

13  for itself.  Can we have a standing stipulation to any

14  of these readings?

15           MR. MILLER:  It seems we are down to the last

16  three or four documents.  Why don't you just continue

17  to make the objection.

18           BY MR. MILLER:

19      Q    And then the next quote from Diana Bonta, We

20  believe this waiver.  Will you read that into the

21  record?

22      A    We believe this waiver will help provide

23  health care to California's most vulnerable populations

24  while maintaining the fiscal stability of the Medi-Cal

25  program, said State Health Director Diana M. Bonta.

Page 66

```
1                MR. TAUGHER:  Same objection.

2                BY MR. MILLER:

3        Q    Did you agree with this statement by

4   Mr. Johnson?

5        A    I agree that they worked closely with our

6   federal partners, which is me.

7        Q    And do you agree with the statement by

8   Ms. Bonta?

9                MR. TAUGHER:  Object to compound, vague.

10               THE WITNESS:  Yes, generally.

11               BY MR. MILLER:

12       Q    The next document, 333, bears the title HHS

13   News.  Is that the form that Health and Human Services

14   press release took to your knowledge?

15       A    When the secretary was involved, yes.

16       Q    Did you review this press release before it

17   was issued?

18       A    Yes.

19       Q    Would you read into the record, please, the

20   second paragraph, This agreement?

21       A     This agreement will allow uninterrupted

22   funding for hospitals that provide critical services to

23   California's neediest citizens, Secretary Thompson

24   said.  The agreement also brings some stability to Los

25   Angeles safety net hospitals that treat the poor.
```

Page 67

1          MR. TAUGHER:  Objection.  The document speaks

2    for itself.

3          BY MR. MILLER:

4     Q    And then the last full paragraph on that page

5    starting at, As the condition?

6     A    As a condition of the agreement, HHS requires

7    that funding be directed to Los Angeles County public

8    hospitals of at least $150 million over the next two

9    years and the State of California has indicated that it

10   will allocate another $100 million from its federal

11   SPCP funds for a total of $250 million to LA County

12   Hospitals.  The sources of new funding include the

13   following.

14    Q    And then if you would read the first and

15   second bullet points?

16    A    A minimum $100 million from the Medi-Cal SPCP

17   waiver -- first bullet point.  The second bullet point

18   is $50 million from the proposed settlement of the

19   Orthopedic Hospital versus Belshe lawsuit, a suit by

20   all Medi-Cal hospitals against the state program that

21   has been pending for over 10 years.  HHS' payment will

22   be conditioned on the $50 million being directed to the

23   LA. County public health systems, and.

24          MR. TAUGHER:  Object.  Document speaks for

25   itself.

```
 1            BY MR. MILLER:
 2       Q    And then would you read into the record the
 3   paragraph Under its current agreement?
 4       A    Under its current agreement with HHS, Los
 5   Angeles County was to receive $135 million for fiscal
 6   year 2004 and $86 million for 2005.  The new agreement
 7   will provide $250 million in federal funds over the
 8   next two years to LA County hospitals, increasing
 9   federal funding levels to a total of approximately
10   $236 million for both 2004 and 2005.
11            MR. TAUGHER:  Object.  The document speaks
12   for itself.
13            MR. MILLER:
14       Q    You struck these agreements with Secretary
15   Johnson, correct?
16            MR. TAUGHER:  Object.  Leading.
17            THE WITNESS:  I crafted them and that I do
18   agree to them, yes.
19            BY MR. MILLER:
20       Q    And they were approved by the Department of
21   Health and Human Services -- Secretary Thompson
22   approved the agreement, right?
23       A    Yes.
24            MR. TAUGHER:  Object.  Leading.
25            BY MR. MILLER:
```

Thomas A. Scully
Washington, DC

June 27, 2006

Page 69

```
 1        Q    You understood that additional or enhanced
 2   funds were going to be paid through the SPCP program,
 3   correct?
 4             MR. TAUGHER:  Object.  Leading.
 5             THE WITNESS:  Yes.
 6             BY MR. MILLER:
 7        Q    And you understood that the county was going
 8   to draw down those funds by the use of IGT's, correct?
 9             MR. TAUGHER:  Object.  Leading, vague.
10             THE WITNESS:  Yes.
11             MR. TAUGHER:  Lacks foundation.
12             BY MR. MILLER:
13        Q    The answer was yes?
14        A    Yes.
15             MR. TAUGHER:  Same objection.
16             MR. MILLER:  I have no further questions at
17   this point.
18             MR. TAUGHER:  Okay.  Why don't we switch
19   around.
20        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
21             BY MR. TAUGHER:
22        Q    Just for clarification, Mr. Scully, I want to
23   make it clear that your testimony today has the same
24   effect as testimony in open court.
25             What is your current work?  I didn't have the
```

Page 71

1      Q      Between May of '01 and December of '03 while

2    you were there at CMS, what was your involvement with

3    Los Angeles County?  What were specific work projects

4    that you worked on that involved LA County?

5      A      The only one I can think of is this waiver

6    process.

7      Q      By this waiver, do you mean the 1115 waiver?

8      A      I mean the extension of the SPCP -- the whole

9    combined effort, which was first, I think, raised to me

10   by -- actually, I can't remember.  I think it was

11   Congresswoman Harmon.  It may have been at the same

12   time with Tom Garthway, who had just gone out to run

13   the county hospitals.  And I can't remember exactly how

14   it came up.

15          But in their process of understanding, the

16   Clinton administration's waiver LA County basically had

17   a very receding financing line in that they were going

18   to have a significant financing problem.  I got engaged

19   in first evaluating it and understanding it and then

20   trying to find various revenue sources and resources to

21   finance a way out of it.

22     Q      But are you referring to the extension of the

23   SPCP program?

24     A      The combined.  The extension of the SPCP

25   program for the state was one of the financing sources

Page 77

1    have to put up a match?

2        A    Yes.

3        Q    And when it does, does it use a particular

4    financial mechanism for doing that?

5        A    There are 50 different ways and plus the

6    territories.  They are all different.

7        Q    Are you familiar with a CMS Form 64?

8        A    Yes, vaguely.

9        Q    Let me show you -- I have limited number of

10   copies of several of these.  But let me show you two

11   forms here, which we will have marked as Exhibit 334?

12           (Exhibit Nos. 334 and 335 were marked for

13   identification.)

14           THE WITNESS:  Okay.

15           BY MR. TAUGHER:

16       Q    Here is the exhibit itself.  Do these look

17   familiar to you?

18       A    The basic forms, yes.

19       Q    Can you explain how a CMS 64 form is

20   generally used in your experience?

21       A    I don't think I actually dealt with them at

22   all.  I just know that they are filed.  This is a

23   certification that you had expenditures.

24       Q    Did the state have to certify on this form in

25   order to get matching federal funds?

Case 2:04-cv-02257-JKP-PBSM Document 2262 Filed 07/05/2006 Page 33 of 41

1        A    Yes.

2        Q    If federal funds were claimed by the state

3    for an improper purpose, would it be possible for the

4    Federal Government to get a refund?

5        A    Under a defined improper purpose, yes.

6        Q    In general did the state rely on the truth of

7    the CMS 64 certifications?

8        A    Did the CMS rely or the state?

9        Q    Did CMS -- did the government, the Federal

10   Government, rely on the truth of the CMS 64

11   certification?

12       A    I think in general, yes.  But obviously, they

13   are specific state by state how each program worked.

14       Q    Are you familiar with the acronym FMAP,

15   F-M-A-P?

16       A    Yes.

17       Q    What is it?

18       A    Federal Matching Assistance Payment, I think

19   it stands for.

20       Q    What was the FMAP for California between '01

21   and '03?

22       A    I am sure it was 50/50.  Fifty percent

23   federal and 50 percent state.

24       Q    Okay.  Have you ever heard of the term FFP?

25       A    Federal Financial Participation.  What was

Thomas A. Scully                                                        June 27, 2006

Washington, DC

Page 84

1    know, the Medi-Cal population, plus some very small

2    population in addition.

3        Q    Would it have been proper under the SPCP for

4    a hospital being funded through that program to claim

5    funds under that program if it was going to spend that

6    money to build roads?

7            MR. MILLER:  Calls for a legal conclusion.

8            THE WITNESS:  For the hospital to build

9    roads?

10           BY MR. TAUGHER:

11       Q    Uh-huh.

12       A    It would have been possible for the SPCP

13   waiver program to spend money on things other than

14   hospitals.  The actual reimbursements for the

15   hospital -- it is two different questions.  The issue

16   really for the Delta was, just for example, let's say

17   you were projecting to spend a billion dollars for

18   hospitals in a particular year in California.  And

19   instead of spending a billion dollars by contracting

20   with every hospital in the state, you said, We are

21   going to direct 70 percent of the volume to a set of

22   preferred hospitals and they are going to give us

23   cheaper rates.  So instead of spending a billion, we

24   are going to spend $950 million, thus saving the

25   Federal Government 50 million.  That's how the waiver

```
 1    worked when they saved money.  Redirecting the

 2    50 million in savings for other purposes was clearly

 3    allowable.

 4         Q    In the example you just gave, wasn't the

 5    50 million saved by the Federal Government?

 6         A    It was but we let the state use their savings

 7    and the federal savings for other purposes.

 8         Q    Would it have been permissible to spend that

 9    money on a jail or a prison?

10         A    In theory.

11         Q    Now, would it have been possible to make a

12    claim for that money based·upon an intent to spend the

13    money on jails and prisons?

14         A    Under the waiver theoretically.

15         Q    I'm sorry.  I don't understand.

16         A    I am saying, for example, the SPCP waiver, I

17  . believe the way it worked -- and I may be wrong be.

18    But in my recollection of it is the example again.  If

19    you contracted with that subset of hospitals for better

20    rates and you would have otherwise spent a billion

21    dollars in a year, funding regular care to any

22    certified provider in the state, which is the way most

23    states operated, then you would have spent a billion

24    dollars.  Instead, you came back with a subset of

25    30 percent of the state's hospital and said we could
```

1   negotiate better rates for these hospitals, we had

2   direct care of these hospitals and, as a result of

3   that, we are going to spend, let's say, hypothetically

4   900 million instead of a million, thereby saving the

5   State of California 50 million and the Federal

6   Government 50 million.

7           Under the waiver, we essentially let

8   California and other states with similar waivers not

9   just get their savings but the federal savings as well

10  and redirect it to theoretically health care programs.

11  But the direction was not itemized or certified and the

12  money was fungible in the state's budget.  So

13  theoretically any state -- we didn't necessarily like

14  it -- but any state could have spent that money because

15  it goes in the general fund.  It is impossible to track

16  which dollar in the general fund goes back to road

17  building and which one goes to mental hospitals.

18      Q    A subset of the SPCP program in California

19  was the SB 1255 program.  Are you familiar with that?

20      A    Not by that label, but I am probably familiar

21  with it by some other label.

22      Q    The SB 1255 program was a supplemental

23  payment program under the SPCP waiver.

24      A    Yes.

25      Q    And are you intimately familiar with the --

Washington, DC

1    A    Yes, that's how I funneled the -- I believe

2    that's the mechanism that we used to funnel the

3    settlement money from UFP settlement as well as the

4    state extra money under the SPCP back to the LA County

5    hospitals, I believe.  I believe that's how it worked.

6    I am not sure.

7    Q    Do you know whether the SB 1255 program, the

8    supplemental payments program, operates under a 1915-B

9    waiver?

10    A    I believe the supplemental hospitals program

11    worked through the entire state SPCP funding mechanism,

12    I believe.  And that's how the money was redirected.

13    Q    And, therefore, it would be a 1915-B waiver?

14    A    I can't remember all the code sections.  But

15    basically, under the state's waiver, local waiver,

16    including the SPCP program, I essentially used the

17    money that I redirected to direct it.  And I believe it

18    was through the mechanism to the LA County hospitals.

19    Q    Okay.  I want to show you a federal

20    regulation.

21        (Exhibit No. 336, marked for identification.)

22        THE WITNESS:  Uh-huh.

23        MR. MILLER:  May I see it before you ask

24    questions on it, please?

25        THE WITNESS:  I have a basic understanding of

Page 93

 1    Angeles.  Were you given to understand that Los Angeles

 2    was in a fiscal crisis with regard to its health care

 3    system at the time?

 4         A    It would have been if the $256 million a year

 5    they were getting under their waiver would have dropped

 6    down to 80, as was projected in the next couple of

 7    years.

 8         Q    And then going to the bottom, the third

 9    bullet point on that page?

10         A    Uh-huh.

11         Q    The first -- actually, the second sentence

12    that's not bolded, In recognition of LA County's --

13    LAC's critical role and needs, $100 million should be

14    earmarked for LAC for each of the three state fiscal

15    years to be covered by the pending SPCP waiver

16    request.

17         A    Uh-huh.  I think you have to understand the

18    context of this memo and E-mail.  Peter worked for the

19    state.

20         Q    I do understand that.

21         A    And the governor didn't want to do any of

22    this.  So they were writing in this response to me

23    putting the squeeze on them to direct the money to LA.

24    That's why he is saying he is gagging.  He didn't want

25    to do any of this.  They wanted to keep the money for

Thomas A. Scully

Washington, DC

June 27, 2006

Page 94

1    themselves.  I was telling him the only way you are

2    getting the deal with your SPCP waiver is if you divert

3    money.  So Peter's commenting about gagging and all the

4    B.S. he had to spend because he couldn't stand the fact

5    that I was making him do this.  So what they were

6    trying to do is justify what they were doing to the

7    other non-LA County providers --

8         Q    Let me just say you should answer only the

9    question that I am asking.

10        A    I know, but --

11        Q    It works a little bit better if we do that.

12   And I am going to ask to move to strike the answer as

13   nonresponsive.  And please do limit yourself to just

14   answering the questions that I ask you.

15        A    Okay.

16        Q    I did want to ask you one question about

17   the -- obviously startling sentence in the E-mail.  My

18   question is, whether you know what the reference to

19   Carolyn's recent Acuity slash NF missive --

20        A    Where is this?

21        Q    -- refers to?  In the sentence, And if I can

22   just say, we have spun some amazing bullshit over the

23   past several months.  Caroline's recent acuity slash NF

24   missive at the top of the list.

25             Do you know what that "recent acuity NF"

Page 96

1    specifically?

2         A    Not by that label.

3         Q    Were you aware that the non-federal share of

4    the SPP payments of the supplemental pool under the

5    1115 waiver were made in the form of IGT's in that

6    program?

7         A    I wasn't happy about it, but I was aware of

8    it.

9         Q    Were you aware that CMS's approval of the

10   waiver required the county to certify that the IGT's

11   used to finance the non-federal share were, quote,

12   eligible for use as the non-federal share of the

13   Medi-Cal expenditures under federal law, including

14   Section 1903-W of the Social Security Act and 42 CFR

15   433.50 et seq.

16        A    I am generally, yes.

17        Q    Why would CMS require the county to certify

18   the IGT's in that way?

19        A    Unfortunately, to my dismay, there was a long

20   track record of CMS -- of HCFA before it changed the

21   name to CMS certifying IGT's in that way as legitimate

22   Medicaid expenses.

23        Q    And you were attempting to prevent that?

24        A    I tried in the course of those three or four

25   years to phase it out and phase it down, but the

Page 98

1  Administration the funding that had been given to LA

2  County, the 250 million bucks a years, started to go

3  down from 250 down to 83.

4          And not given any other information on the

5  fact that every politician in the LA area, Republican

6  and Democrat in Congress and elsewhere, was telling me

7  it was going to cause a crisis.  And Tom Garthway, who

8  I knew relatively well and trusted from D.C., said the

9  same thing.  I thought I had a significant problem on

10  my hands.  So working out a deal, as I did that was

11  relatively complex, it took me six months to

12  straight-line the $250 million a year seemed to be a

13  reasonable result.

14      Q    Were you aware that LA County was

15  specifically taking back its IGT and transferring it to

16  its general fund in the DSH program, the SB 855

17  program?

18      A    The money is unfortunately totally fungible.

19  There is no way to track or know that.  So almost every

20  state was doing that to some degree.

21      Q    Were you aware that they were transferring

22  the money to the fund in Sacramento and then upon

23  receipt of the matched fund taking the exact amount out

24  that they had put into that --

25      A    Yes.