UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
IN RE PHARMACEUTICAL INDUSTRY           )   MDL No. 1456
AVERAGE WHOLESALE PRICE                 )
LITIGATION                              )
                                        )
_____  )   Judge Patti B. Saris
                                        )
THIS DOCUMENT RELATES TO                )
01-CV-12257-PBS and 01-CV-339           )
_____  )

**TRIAL OF CLASS 2 AND 3 CLAIMS**


**MEMORANDUM OF LAW IN RESPONSE TO PLAINTIFFS' MEMORANDUM
REGARDING DEFENDANTS' *PER SE* UNFAIR AND DECEPTIVE PRACTICES**

　　　　Plaintiffs advance one old and two entirely new arguments that Defendants are per se liable for unfair or deceptive conduct under Ch. 93A.  In each argument, Plaintiffs attempt to force-fit Defendants' conduct into a regulation issued by the Massachusetts Attorney General, 940 C.M.R. § 3.16 ("§ 3.16").  Plaintiffs' theory of per se liability would automatically attach liability under Ch. 93A to any pharmaceutical manufacturer who sold products at prices less than the published AWPs.  As Plaintiffs' expert, Dr. Rosenthal, admitted, this would embrace every single prescription drug sold in the United States for the past several decades.  Trial Tr. (Nov. 15, 2006) at 75-77.  As shown below, Plaintiffs' efforts to twist the law, let alone both the common sense and plain meaning of the materials they cite, do not work.[1]

---

[1] The Track 1 Defendants herein address the inadequacy of Plaintiffs' argument as a matter of law.  They do not address the factual errors in Plaintiffs' argument, which will be addressed in post-trial submissions.

Plaintiffs argue that Defendants have committed per se unfair or deceptive conduct by violating two Massachusetts regulations, 940 C.M.R. § 3.16(4) and § 3.16(3).[2]  As demonstrated below, 940 C.M.R. § 3.16(4) is inapplicable because Defendants have not violated the enumerated federal statutes.  Furthermore, the Balanced Budget Act of 1997 ("1997 Act") is not an "other Federal consumer protection statute[] within the purview of M.G.L. c. 93A, § 2" and, regardless, Defendants have certainly not "violated" the 1997 Act.  Plaintiffs' argument that Defendants violated 940 C.M.R. § 3.16(3) by virtue of violating two Massachusetts regulations, 940 C.M.R. § 3.04 and 940 C.M.R. § 3.05(1), is also unavailing, as these regulations concern advertising claims to the consumer public and are entirely inapplicable to the conduct at issue.

**ARGUMENT**

Massachusetts courts have repeatedly rejected invitations to convert any purported violation of any statute, regulation, or ordinance into an automatic violation of Chapter 93A.[3]  To accept such an invitation would constitute a "radical rewriting of Massachusetts jurisprudence," as "chapter 93A would immediately become the preeminent law of the Commonwealth,

---

[2] Notably, Plaintiffs acknowledge, as they must, that "per se liability" is a misnomer. (Plaintiffs' Memorandum of Law Regarding Defendants' Per Se Unfair and Deceptive Practices ("Pls.' Mem.") at 6 (conceding that a "plaintiff must still establish causation and injury under Ch. 93A")).  At most, Plaintiffs' per se theory would establish wrongful conduct; each Plaintiff would also have to establish the remaining elements of Ch. 93A § 11, including a business transaction with each Defendant, causation, and damages.  Plaintiffs would also have to surmount the statute of limitations on their claims.  None of this matters here, though, because as set out below, none of Plaintiffs' per se liability contentions has merit on its own terms.

[3] See Zabilansky v. Amer. Bldg. Restoration Products, Inc., 2004 WL 2550458, at *15 (Mass. Super. Oct. 13, 2004) ("Despite the sweeping language of the Attorney General regulation, courts have been hesitant to find automatic violations of Chapter 93A.  Rather, the court must take into account all the facts and circumstances and determine whether the statutory violation involves unfair or deceptive conduct."); Palochko v. Reis, 67 Mass. App. Ct. 103, 106, 852 N.E.2d 127, 130 (Mass. App. 2006) (finding that, even though defendant violated disclosure regulation, "transgressing the regulation is not in and of itself, an unfair or deceptive act."); Darviris v. Petros, 442 Mass. 274, 282 n.9, 812 N.E.2d 1188, 1195 n.9 (Mass. 2004) (raising, but not deciding, the "facial validity" of 940 C.M.R. § 3.16(3) and noting that the regulation could expand Chapter 93A to include "a violation of any statute in the Commonwealth.").

replacing all other forms of civil liability." Swenson v. Yellow Trans., Inc., 317 F. Supp. 2d 51, 57 (D. Mass. 2004) (stating that "despite the language of this regulation [940 C.M.R. § 3.16(3)], the case law is clear that a statutory violation is not a per se violation of ch. 93A") (internal citation omitted). There is no such thing as an "ipso facto" violation of Chapter 93A. J.E. Pierce Apothecary, Inc., v. Harvard Pilgrim Health Care, Inc., 365 F. Supp. 2d 119, 144 (D. Mass. 2005) (finding that plaintiffs "overstate" their claim based on a purported statutory violation and noting that "[j]ust as an act that is not otherwise unlawful may violate Chapter 93A, not every statutory violation constitutes a violation of Chapter 93A"). Indeed, this Court has consistently indicated that it has not adopted such a theory.[4]

## I.   DEFENDANTS HAVE NOT VIOLATED 940 C.M.R. § 3.16(4).

Plaintiffs contend that Defendants have committed per se "unfair" or "deceptive" practices under Ch. 93A because Defendants violated § 3.16(4). This contention is untenable.

Massachusetts Regulations Code tit. 940 § 3.16(4) provides:

> [A]n act or practice is a violation of M.G.L. c. 93A, § 2 if: . . . (4) It [the "act" or "practice"] violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes within the purview of M.G.L. c. 93A, § 2.

### A.   Defendants Have Not Violated the FTCA.

Plaintiffs make the unsupportable argument that the published AWPs are a per se violation of § 3.16(4) because published AWPs were not actual wholesale prices. Arguing that

---

[4] See Trial Tr. (Nov. 6, 2006) at 45:15-17, 91:17-92:8; Trial Tr. (Nov. 8, 2006) at 168:6-7 (stating "even if it's, I think, a statutory violation, that's different from unfair and deceptive acts."); Trial Tr. (Nov. 13, 2006) at 14:2-8 (stating "if in fact the industry understood they were being given the go-ahead, it may be a violation of a statute, but not unfair and deceptive in the commercial world."); Trial Tr. (Nov. 17, 2006) at 39:15-16 (stating that the strict liability approach "is not a legal theory I've adopted").

Defendants call published AWPs "list prices," Plaintiffs say that published AWPs give rise to per se liability because the FTC has "long held that fictitious list prices violate the FTCA." (See Pls.' Mem. at 2). Plaintiffs are simply wrong on the law.

Plaintiffs' argument rests upon a Pricing Guide issued by the FTC in 1967, and located at 16 C.F.R. § 233.3. The FTC issued Guides and Trade Practice Rules on November 8, 1967. 32 Fed. Reg. 15525. The Guide includes "Guides for Advertising Fallout Shelters," id. at 15529, "Guides for Advertising Shell Homes," id. at 15531, and "Guides for Shoe Content Labeling and Advertising," id. at 15522, together with "Guides Against Deceptive Pricing" ("Pricing Guide"), id. at 15534. These Guides possess two salient characteristics. First, the FTC only issued guidelines, *not* regulations with the force of law. See FTC v. Mary Carter Paint Co., 382 U.S. 46, 48 (1965) ("These, of course, were guides, not fixed rules as such, and were designed to inform businessmen of the factors which would guide Commission decision."); Wisconsin v. Amoco Oil Co., 97 Wis. 226 (1980) ("The guides 'do not purport to be a concise statement of the present state of the law which the courts are bound to follow.'") (quoting Allis-Chalmer Mfg. Co. v. White Consol. Indus. Inc., 414 F.2d 506, 524 (3d Cir. 1969)); In the Matter of John Surrey, Ltd et al., 1965 FTC LEXIS 42, 71 (1965) (discussing prior Guides Against Deceptive Pricing, and stating, "[t]hey are to be considered as *guides,* not as fixed rules of 'do's' and 'don'ts,' or detailed statements of the Commission's enforcement policies.") (emphasis in original).

Second, and more fundamentally, these guidelines address "advertising," and the dictionary (i.e., plain) meaning of "advertising" is "1. The action of drawing the public's attention to something to promote its sale. 2. The business of producing and circulating advertisements." BLACK'S LAW DICTIONARY (8th Ed. 2004). The Pricing Guide, 16 C.F.R. §

4

233.3, is entitled "Advertising retail prices which have been established or suggested by manufacturers (or other non-retail distributors)." The context of this Pricing Guide, therefore, is the chain of distribution where the manufacturer has sold the product – no longer has dominion and control over the product – yet "advertises" something about the product's price for a retail transaction.  On its face, the Pricing Guide does not concern a manufacturer's offer to sell a product that is within the manufacturer's possession.  The premise of the Pricing Guide, as explained in (a), is that "[m]any members of the purchasing public" may believe that "a manufacturer's list price, or suggested retail price" is the general retail price.  Advertising "a reduction from" list or suggested resale price may make the retail consumer believe he is getting a bargain.  Then, in (b), the Pricing Guide focuses on any means employed for placing such prices before the "consuming public," 16 C.F.R. § 233.3(b) (emphasis added), and states, "[t]here are many methods by which manufacturers' suggested retail or list prices are advertised: large scale (often nationwide) mass-media advertising; distribution of promotional material or price lists designed for display to the public."  Id.  The Pricing Guide goes on to remark that because retailers, who establish the price at which they sell to the public, do not follow a manufacturer's list or suggested retail price and engage in discounting, the propriety of a manufacturer or a retailer advertising such prices or reductions from such prices could, based on the factual circumstances, be either appropriate or misleading, depending upon the particular facts and circumstances, see id. at § 233.3(c)-(f), and provides an example of practices by Manufacturer Roe and Distributor Doe.  Id. at § 233.3(h).

      A review of the details of this specific FTC Pricing Guide, therefore, shows that it concerns forms of manufacturer or retailer advertising, directed at the average person ("purchasing public," "consumer"), concerning the retail prices at which the product is offered,

5

in specific areas. Plaintiffs have not established Ch. 93A "deception" by means of § 3.16(4). The FTC Pricing Guide, at best a guide to how the Commission might think of or evaluate a factual context, and choose to act, see Mary Carter Paint Co., 282 U.S. at 48, is not law or even applicable to the context before the Court. Much less so are the pre-Guide cases cited by Plaintiffs, which reflected pre-Guide FTC thinking.[5] Importantly, the FTC has never taken the position that AWPs are in violation of its guidance. The Plaintiffs cannot ask the Court to rely on the Pricing Guide to rule that Defendants violated Section 5(a) of the FTCA. The only entity authorized and entitled to make an "unfair" or "deceptive" determination under Section 5(a) of the FTCA is the Federal Trade Commission. 15 U.S.C. § 45; Holloway v. Bristol Myers Corp., 485 F.2d 986, 987 (D.C. Cir. 1973) ("The central ruling in this case holds that private actions to vindicate rights asserted under the Federal Trade Commission Act may not be maintained."). Plaintiffs here are asking the Court to declare that Defendants have violated § 5(a) of the FTC act. Yet, no Massachusetts court could make such a determination and no Massachusetts court has ever purported to do so because they lack such authority. See Niresk Indus., Inc. v. FTC,

---

[5] Unlike the conduct at issue in this case, all the cases cited by Plaintiffs pertain to individual FTC adjudications concerning advertising practices which the FTC determined were likely to confuse or deceive the unwary, individual consumer. See In the Matter of the Regina Corp., 61 F.T.C. 983, at *8-9 (1962) (complaint filed by the FTC against a manufacturer of vacuum cleaners and other household appliances who supplied retailers with "suggested list prices" which the retailers, in turn, presented to consumers as usual retail prices). In Regina, the FTC took issue with the fact "that in the areas where the advertisements appear, Regina's list prices are not the actual, normal, usual retail prices, and that this comparative type of advertising falsely represents . . . that a purchaser, by making a purchase at the offering price, will enjoy a saving equivalent to the difference between the two prices."); Niresk Indus., Inc. v. FTC, 278 F.2d 337, 342 (7th Cir. 1960) (mail order company advertising inaccurate price of cooker-fryer); Helbros Watch Co. v. FTC, 310 F.2d 868 (D.C. Cir. 1962) (watch manufacturers pre-ticketing watches with suggested prices in excess of prices at which the watches are usually sold at retail); cert. denied, 372 U.S. 976 (1963); In the Matter of John Surrey, Ltd., 67 F.T.C. 299 (1965) (reviewing FTC order against mail order catalog to cease and desist advertising its merchandise, pens, radios, typewriters, etc . . . by using comparative price claims such as "Half the usual price!" and "clearance sale price!"). All of these cases predate the FTC's issuance of the Guides.

The focus on the "gullible consumer" is evident in the appellate court's review in In re: Regina. See In re: Regina Corp. v. FTC, 322 F.2d 765, 767-68 (3d Cir. 1963) (stating that "[t]he vice inherent in the representations is the inability of the 'gullible' price-conscious consumer to control his urge to make what he erroneously may believe is a good buy") (citing Helbros Watch)).

278 F.2d 337, 342 (7th Cir. 1960) ("The meaning of advertisements or other representations to the public, and their tendency or capacity to mislead or deceive, are questions of fact to be determined by the Commission.") (quoting Kalwajtys v. Federal Trade Commission, 237 F.2d 651, 656 (7th Cir. 1956).[6]

### B.   The Balanced Budget Act of 1997 Cannot Be "Fit" Into § 3.16(4).

Plaintiffs advance a new argument that published AWPs violated § 3.16(4). In an attempt to "fit" their theory to the law, Plaintiffs claim that the Balanced Budget Act of 1997 (the "1997 Act"), as construed by this Court in its decision of November 2, 2006, results in a per se finding of unfair or deceptive conduct under Ch. 93A. In advancing this legal conclusion, Plaintiffs do not pretend to analyze the regulation, the 1997 Act, or authority.

For Plaintiffs to show that the Defendants have run afoul of § 3.16(4), Plaintiffs must show that the Defendants' acts: (1) violated; (2) a "Federal consumer protection statute[]"; (3) "within the purview of M.G.L. c. 93A, § 2." Plaintiffs cannot satisfy their burden.

#### 1.   The 1997 Act is not a "Federal consumer protection statute"

It strains credulity to suggest that the 1997 Act is a "Federal consumer protection statute[]." Section 3.16(4) applies to violations of "the Federal Trade Commission Act, the Federal Consumer Credit Protection Act, or *other Federal consumer protection statutes*." The phrase "other Federal consumer protection statutes" is limited to the kinds of legislative enactments exemplified by the Federal Trade Commission Act and the Federal Consumer Credit Protection Act, which statutes are specifically intended to safeguard consumers during marketplace transactions. See Harrison v. PPG Indus., 446 U.S. 578, 588 (1980) ("Under the

---

[6] The Court cannot find a violation of §5(a) of the FTCA in order to make a per se ruling under §3.16(4). The FTC guides and decisions, however, may be pertinent in evaluating a §§ 2, 11 claim.

rule of *ejusdem generis*, where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated."); Banushi v. Dorfman, 438 Mass. 242, 244, 780 N.E.2d 20 (2002) ("Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."). In accordance with this limitation, federal courts have restricted application of § 3.16(4) to the enumerated federal statutes and other statutes specifically designed for the purpose of consumer protection, such as the Truth in Savings Act, Truth In Lending Act, and Fair Debt Collection Practices Act.  See, e.g., Barnes v. Fleet Nat'l Bank, 370 F.3d 164 (1st Cir. 2004) (Truth In Savings Act); Dean v. Compass Receivables Mgmt. Corp., 148 F. Supp. 2d 116, 119 (D. Mass. 2001) (Fair Debt Collection Practices Act); Fidler v. Cent. Coop. Bank, 210 B.R. 411, 430 (Bankr. D. Mass. 1997) (Truth In Lending Act), rev'd on other grounds, 226 B.R. 734 (Bankr. D. Mass. 1998).

      These federal statutes share several salient characteristics: a textual statement that they are designed to protect "consumers" and/or repeated references in the federal statutes to "consumers"; provisions specifying what identified third-parties (credit providers, financial institutions) must do or must not do in their interactions with consumers; a private right of action by the "consumer" for damages; court jurisdiction to enforce; and in some, even statutory damages for the consumer.  For example, in Barnes, plaintiffs argued that a bank's letter notifying account holders of changes in account terms was misleading in violation of specific statutory obligations imposed on the institution by the Truth in Savings Act ("TISA").  In holding that the defendant's violation of TISA was per se deceptive conduct under § 3.16(4), the First Circuit pointed to specific language in the statute which characterized TISA as a consumer

8

protection statute. Id. at 176 (citing 12 U.S.C. § 4301(a) listing "the ability of consumers to make informed decisions regarding deposit accounts" as a reason for enacting TISA). The court also pointed out that the federal statute created a private right of action and provided for statutory damages. Id. at 169, 171.

In contrast, the 537-page 1997 Act, which includes provisions relating to such diverse topics as food stamps, revitalization of the District of Columbia, and competitive bidding for commercial television and radio stations, is a fiscal enactment.[7] The 1997 Act provides no rules, guidelines, or standards governing conduct between sellers and buyers of goods or services in interstate commerce. Even focusing on the single section the Court construed is unavailing. It does not create a private right of action, and does not provide for statutory or other damages; it does not authorize or provide any remedies (public or private, judicial or administrative). The 1997 Act, or the lone section, cannot be described as "like," "similar," or "comparable" to the Federal Trade Commission Act or the Federal Consumer Credit Protection Act, or other Federal statutes (such as the Federal Truth in Lending Act or the Federal Truth in Saving Act) that have been held to be an "other consumer protection statute" within the meaning of § 3.16(4).[8]

Plaintiffs provide scant argument for their contention that the 1997 Act is a "consumer protection statute." Plaintiffs state that the 1997 Act is like a consumer protection statute because it was, according to Plaintiffs, aimed at controlling federal spending on Medicare and would likely result in lower co-pays for beneficiaries. But the 1997 Act is not, nor does it purport to be, "price control" legislation. Similarly, Plaintiffs' claim that Medicare Part B aimed to provide

---

[7] The Balanced Budget Act of 1997 covers 537 pages in its original form. Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251.

[8] E.g., Barnes, 370 F.3d 164 (Truth In Savings Act); Dean, 148 F. Supp. 2d 116 (Fair Debt Collection Practices Act); Fidler, 210 B.R. 411 (Truth In Lending Act).

9

drug coverage while limiting government expenditures does not make it a consumer protection statute. See Sweeney v. Resolution Trust Corp., 16 F.3d 1, 5 (1st Cir. 1994) (finding violation of federal regulation regarding maximum loan-to-value ratios was not actionable under 940 C.M.R. 3.16(4), since the statute was "not a consumer protection statute but a 'means of protecting insured depositors, the [FDIC] fund, and ultimately federal taxpayers").[9]

Plaintiffs' contention essentially rewrites § 3.16(4), removing the "Federal consumer protection statute" requirement and replacing it with any federal statute. This they cannot do. Given the absurdity of this argument, the lack of any case law cited in support of Plaintiffs' position is unsurprising.

Nor does the 1997 Act meet the second requirement of § 3.16(4) that the "other Federal consumer protection statute" is "*within the purview* of M.G.L. c. 93A, § 2." 940 C.M.R. § 3.16(4) (emphasis added).[10] These words are not mere surplusage. See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 126 S. Ct. 2455, 2460 (2006) ("[I]t is generally presumed that statutory language is not superfluous."); United States v. Nason, 269 F.3d 10, 16 (1st Cir. 2001). Chapter 93A, § 2, provides: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." MASS. ANN. LAWS ch. 93A, § 2. Reading these two phrases in tandem, § 3.16(4) requires that the "other federal consumer protection statute" must regulate the type of conduct that would, but for its interstate character, fall within the range of conduct that Massachusetts could regulate for the

---

[9] The only case Plaintiffs cite, TAP Pharm. v. Dept. of Health & Human Services, 163 F.3d 199 (4th Cir. 1998), is inapposite. The decision considers the standing of a party seeking to challenge the AWP statute under the Administrative Procedure Act. Id. at 208. The decision does not consider consumer protection statutes, nor does it find that the Medicare Act intending to protect consumers. The word "consumer" does not appear anywhere in the opinion.

[10] "Purview" is defined as "the body of a statute," "the limit or scope of a statute; the whole extent of its intention or provisions." WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1934).

10

intrastate protection of consumers. Massachusetts could not purport to pass, in the name of protecting Massachusetts consumers, the entire 1997 Act or even the one provision the Court construed, directing what should be paid from the Medicare Trust Fund.

In addition to their argument concerning the 1997 Act, Plaintiffs also make several references to the "Medicare Act" generally, presumably referring to the series of statutes, in addition to the 1997 Act, providing Medicare Part B drug coverage.[11] Just like the 1997 Act specifically, the "Medicare Act" generally does not satisfy the requirements of § 3.16(4); it is not a consumer protection statute; it does not govern conduct between sellers and buyers in the marketplace; and it does not provide a private right of action for consumers.[12]

In sum, neither the 1997 Act nor the Medicare Act in general qualifies as an "other Federal consumer protection statute[] within the purview of M.G.L. c. 93A, § 2" as required by § 3.16(4).

---

[11] In fact, Plaintiffs try to remove the requirement that the offensive act violate a federal consumer protection *statute* altogether, suggesting that violation of the 1991 regulation is sufficient. According to Plaintiffs, "[t]hat [1991] regulation was a direct articulation of Congress's 1989 statutory directive to control Part B-spending, and, as such, *should be considered a federal law* meant for the protection of consumers within the meaning of Mass. Regs. Code tit. 940 § 3.16(4)." (Pls.' Mem. at 12). Plaintiffs' ipse dixit argument, which is not accompanied by any legal support, does not merit response. Suffice it to say that § 3.16 explicitly differentiates between statutes and regulations. Compare § 3.16(4), which requires that an act "violate" a federal consumer protection *statute*, with § 3.16(3), which requires that an act "fails to comply with" a state statute, rule, *regulation* or law. If the Massachusetts Legislature intended § 3.16(4) to cover violation of regulations, it was certainly capable of saying so. See United States v. Nason, 269 F.3d 10, 17 (1st Cir. 2001) ("After all, when Congress inserts limiting language in one section of a statute but abjures that language in another, closely related section, the usual presumption is that Congress acted deliberately and purposefully in the disparate omission.").

[12] Indeed, numerous courts have found that a purported violation of the Medicare Act does not provide a right of action under consumer protection statutes. In Action Ambulance Serv., Inc. v. Atlanticare Health Servs., Inc., a court in this district rejected a claim that a violation of an anti-kickback provision of the Medicare Act constituted a violation of Chapter 93A. 815 F. Supp. 33, 40 (D. Mass. 1993) (stating that to allow such a claim "would be to allow an end around the entire implied right of action inquiry"). Indeed, facing a similar claim under the Illinois consumer protection act, another court found that, through passage of the Medicaid Act, "Congress did not create a standard of conduct, which if breached gave rise to any claim." Carroll v. Butterfield Health Care, Inc., No. 02-C-4903, 2003 WL 22462604 (N.D. Ill. 2003) (finding purported violation of statutory definition in Medicaid Act did not violate public policy or give rise to claim under the Illinois consumer protection act.).

2.      Plaintiffs Do Not Establish That the Defendants "Violated" the 1997 Act

In order to satisfy § 3.16(4), Plaintiffs must also prove that Defendants "*violate[d]*" a "Federal consumer protection statute[]."  A "violation" is "[a]n infraction or breach of the law."[13] BLACK'S LAW DICTIONARY (8th ed. 2004).  There is no basis to conclude Defendants "violated" the 1997 Act or the Medicare Act.  Neither the 1997 Act nor the Medicare Act describes or directs how information must be or should be compiled, reported, published, or handled in any way.  In fact, these acts do not impose any affirmative requirement or negative prohibition on pharmaceutical manufacturers with respect to data, sales, or payment for Part B drugs.  No known form of statutory construction yields the conclusion Plaintiffs ask the Court to reach. Plaintiffs suggest none, only ipse dixit.[14]

---

[13] Compare § 3.16(4), which requires that an act "violate" a federal consumer protection statute, with § 3.16(3), which only requires that an act "fails to comply with" a state statute, rule, regulation or law.  See Nason, 269 F.3d at 17 ("After all, when Congress inserts limiting language in one section of a statute but abjures that language in another, closely related section, the usual presumption is that Congress acted deliberately and purposefully in the disparate omission.").

[14] The Court's construction of the term "average wholesale price" raises additional questions regarding the significance of this statutory construction.  Most salient for this case, the 1997 Act does not require or impose any standards of normative conduct (i.e., "Do X; Don't do Y") on pharmaceutical manufacturers whatsoever.  In fact, the Court's construction provides Track 1 Defendants with another defense: given the Court's plain meaning ruling and the reality of CMS's actions, this Court could find that the Secretary overpaid from the Medicare Trust Fund and thus authorized providers to overbill beneficiaries.  The Court, purposefully or otherwise, has not yet addressed what the Secretary's delegate (CMS) did when the 1997 Act was in effect: whether CMS' actions were in derogation of and unauthorized by the 1997 Act, as construed by the Court; or whether the Secretary's post-enactment actions were authorized notwithstanding the plain meaning construction adopted by the Court, as the United States contends in its so-called amicus brief.  Given CMS's post-1997 recognition that the continued reimbursement based on the AWPs published by the pricing services was, according to the Court, different from what Congress intended, the immediate logical conclusion is that the Secretary knowingly overpaid providers from the Medicare Trust Fund and authorized providers to overbill beneficiaries.  In addition, the Court has not addressed what the 1997 Act, as construed, does and does not do in terms of directing, regulating, or prohibiting primary conduct, by the Secretary or otherwise.

## II.     DEFENDANTS HAVE NOT VIOLATED 940 C.M.R. § 3.16(3).

Plaintiffs also claim that this Court should find <u>per se</u> deceptive and unfair conduct under § 3.16(3), which provides for a <u>per se</u> finding of unfair or deceptive conduct if an act or practice fails to comply with "existing statutes, rules, regulations or laws meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision thereof intended to provide the consumers of this Commonwealth protection." Plaintiffs claim that Defendants conduct falls under § 3.16(3) because Defendants allegedly violated two Massachusetts regulations, 940 C.M.R. § 3.04 and 940 C.M.R. § 3.05(1).

The Massachusetts regulations promulgated pursuant to 93A were created soon after the FTC regulations, discussed at pp. 3-7, <u>supra</u>, and modeled thereafter. Geared toward the protection of consumers in marketplace transactions, the regulations cover a gamut of typical consumer pitfalls, with provisions relating to false advertising, sales offered on an "easy credit" basis, door-to-door sales and home improvement transactions, advertising relating to correspondence schools, and lay-away plans. 940 C.M.R. § 3.01, <u>et seq</u>.

Plaintiffs cite two Massachusetts regulations that they claim Defendants' conduct violated, but provide little or no analysis of the regulatory text and no case law applying them. As demonstrated below, both of these provisions, like the FTC regulations discussed above, are inapplicable.[15]

---

[15] In addition, these regulations concern claims or representations that have the capacity or tendency or effect of deceiving <u>buyers</u>. Moreover, even where these regulations do apply, there can be no deceptive act or practice where the buyer is not deceived. These regulations consider whether a claim or representation has the "capacity, tendency or effect to deceive"— by extension, where a plaintiff is <u>not</u> deceived by a representation, the plaintiff cannot argue that the regulation was violated. See <u>Abruzzi Foods, Inc.</u>, 986 F.2d at 605 (construing 940 C.M.R. 3.05(1) and affirming summary judgment for defendant because plaintiff failed to show that the word "fresh" was deceptive in fact); <u>Augat, Inc. v. Collier</u>, 1996 WL 110074, at *19 (D. Mass. 1996) (Bowler, M.J.) (finding no actionable nondisclosure of excess freight charges under 93A where plaintiff had some knowledge of extent of charges, defendant did not prevent plaintiff from acquiring information, and both parties were commercial actors) (internal citations omitted); <u>Winlake II, Inc. v. Mercier</u>, 21 Mass. L. Rep. 166, 2006 WL 1360855, at *8 (…continued)

13

### A.     940 C.M.R. § 3.04 Is Inapplicable.

940 C.M.R. § 3.04 provides:

> No claim or representation shall be made by any means which has the capacity or tendency or effect of deceiving buyers or prospective buyers as to the value or the past, present, common or usual price of a product, or as to any reduction in price of a product, or any saving relating to a product. Savings or value claims utilized in connection with terms such as "originally," "formerly," "regularly," "usually," "comparable value," "list price" or other like terms, expressions or representations must be based on facts provable by the claimant or advertiser.

940 C.M.R. § 3.04. Section 3.04 is the state analog of the FTC guidance discussed above. Promulgated shortly after the FTC issued guides, § 3.04 addressed the same subject matter covered in the FTC's Pricing Guides, 16 C.F.R. § 233.3, and intended to provide Massachusetts' residents with a vehicle for consumer protection without needing to have the FTC first make a § 5(a) determination. As noted above, such consumer-directed regulations are inapplicable to this case.[16] Just like 16 C.F.R. § 233.3, the premise of § 3.04 is that members of the consuming public could be deceived by advertised "savings or value claims" associated with the term "list price" into believing they got a bargain. In order to prove a violation of § 3.04, Plaintiffs would have to first establish that the Defendants advertised "savings or value claims" in connection with "[the] term[ ] . . . list price," and then a causal connection between that advertisement and a

---

(continued…)
(Mass. Super. 2006) (court granted summary judgment for defendant where plaintiff "had plenty of opportunity to" –and, in fact, did—inspect the premises and consult with contractors in claim based on lease agreement); DiNunzio v. Jenkins, 19 Mass. L. Rep. 322, 1999 Mass. Super. LEXIS 300 (Mass. Super. 1999) (denying 93A claim based on seller's nondisclosure of proximity of house to interstate, which "was a readily observable, known physical condition").

[16] The only reported case applying § 3.04 concerns a product marked with an incorrect price that was purchased by a consumer. In Shipps v. Compass Group USA, Inc., a prisoner sued Compass, a company that supplied vending machines in the prison, because the price of toilet paper was marked as 89 cents but his prison account was charged 98 cents. 14 Mass. L. Rep. 236, 2002 Mass. Super. LEXIS 28 (2002). The court denied defendant's motion for summary judgment on Ch. 93A finding that Compass misstated the price of toilet paper in violation of § 3.04.

14

Plaintiff's conduct. Further, as with all claims of deception, context is highly relevant, because a knowledgeable market participant cannot claim to have been deceived by conduct of which he was well aware. In sum, the provision of AWPs for publication cannot be wedged into a regulation prohibiting deceptive "savings or value claims utilized in connection with" the term "list price."

### B. 940 C.M.R. § 3.05(1) is Inapplicable.

Plaintiffs also argue that Defendants' publication of AWPs violates 940 C.M.R. § 3.05(1) by deceiving market participants. (Pls.' Mem. at 11). Notably, Plaintiffs' entire argument based on this regulation is three sentences long and entirely devoid of any case law citations, likely because any analysis of the case law reveals that this regulation is simply not applicable to Plaintiffs' claims. Section § 3.05(1) prohibits claims, representations or non-disclosures "concerning a product" that have "the capacity or tendency or effect of deceiving buyers . . . in any material respect." The regulation goes on to list the types of claims envisioned under this section, enumerating "representations or claims relating to the construction, durability, reliability, manner or time of performance, safety, strength, condition, or life expectancy of such product, or financing relating to such product, or the utility of such product or any part thereof, or the ease with which such product may be operated, repaired, or maintained or the benefit to be derived from the use thereof."[17] Notably absent from this listing is any reference to the term "price," a term the Attorney General knew how to use. Accordingly, on its face, this regulation

---

[17] Also illustrative of the types of claims to which 940 C.M.R. 3.05 applies, (2) of that regulation provides, "No advertisement shall be used which would mislead or tend to mislead buyers or prospective buyers, through pictorial representations or in any other manner, as to the product being offered for sale. Where price is featured in advertising, any picture or depiction utilized in connection therewith, shall clearly indicate the exact product being offered for sale at the advertised price." 940 C.M.R. 3.05(2).

is inapplicable; Plaintiffs' claims arise with respect to <u>pricing</u>, whereas this regulation deals entirely with the <u>characteristics of products</u>, such as "safety" or "durability."

A review of the case law applying § 3.05 confirms that this regulation governs advertising claims, about <u>a product's characteristics</u>, directed at purchasers, a scenario entirely dissimilar from Plaintiffs' claims about publication of AWP. The claims in all the cases revolve around the characteristics of a product, not the prices.[18] In cases where the court does find a party's invocation of § 3.05(1) persuasive, courts largely base their analysis on whether the defendant failed to disclose "any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction" See <u>Homsi v. C.H. Babb Co., Inc.</u>, 10 Mass. App. Ct. 474, 479 (1980) (quoting 940 C.M.R. 3.16(2) (finding that defendants' failure to disclose that it meant propane gas when it used the term "necessary gas" caused plaintiffs to act differently than they otherwise would).[19]

---

[18] <u>Lawton v. Dracousis</u>, 14 Mass. App. Ct. 164, 437 N.E.2d 543 (1982) (purchaser of apartment building brought claim against vendor and real estate broker for not disclosing outstanding building code violations); <u>Homsi v. C.H. Babb Co., Inc.</u>, 10 Mass. App. Ct. 474, 409 N.E.2d 219 (1980) (seller of bread oven represented that seller would provide "necessary gas" for the oven, but only provided propane gas, not the natural gas necessary); <u>Roth v. Chrysler Corp.</u>, 11 Mass. L. Rep. 223, 2000 Mass. Super. LEXIS 11 (Mass. Super. 2000) (adjunct to product liability claim involving a breach of implied warranty of merchantability and fitness for use of car in amateur racing); <u>Abruzzi Foods, Inc. v. Pasta & Cheese, Inc.</u>, 986 F.2d 605 (1st Cir. 1993) (Breyer, C.J.) (claim involving company's marketing of pasteurized pasta as "fresh"); <u>Com. v. AmCan Enterprises, Inc.</u>, 47 Mass. App. Ct. 330, 712 N.E.2d 1205 (1999) (State alleged that advertiser solicited businesses to purchase listings in a yellow pages directory unconnected to phone company by using the New England Yellow Pages name and logo).

[19] <u>See also</u>, <u>Aspinall v. Philip Morris Co., Inc.</u>, 442 Mass. 381, 396, 813 N.E.2d 476, 488 (2004) (stating that interpretations of the term "deceptive," both under Federal and Massachusetts law, turn on whether the representation in an advertisement causes reasonable consumers to act differently than they would have, "i.e., to entice a reasonable consumer to purchase the product"). This analysis is completely inapplicable to the scenario confronting this Court. "[T]he disclosure aspects of the regulations in question were promulgated to heighten protection of consumers who may not be attuned to the harsh practices of the business world." <u>J.E. Apothecary, Inc.</u>, 365 F. Supp. 2d at 145 (finding that disclosure regulations did not apply under § 11).

16

### C.      The Attorney General Regulations Do Not Apply to a Section 11 Claim.

Plaintiffs also ignore the fact that § 3.16(4) and § 3.16(3) are not applicable to § 11 claims under Ch. 93A.  The Attorney General promulgated these regulations in 1970, before § 11 was enacted in 1971, and before Ch. 93A even applied to businesses.  In Knapp Shoes Inc. v. Sylvania Shoe Manufacturing Corp, 418 Mass. 732, 640 N.E.2d 1101 (1994), the Supreme Judicial Court of Massachusetts, stressing that fact and viewing the "bulk of the regulation" as "rooted in § 9" and nothing in the particular sub-section "suggesting it was meant to apply" more broadly, held that § 3.16 did not apply to claims brought under § 11 of Ch. 93A.  The District Court in First New England Dental Centers, Inc. v. Acquino, citing Knapp Shoes, held that the claimed liability under § 3.16 attaches only in § 9 actions, not § 11 actions, under Ch. 93A.  291 B.R. 229, 241 (D. Mass 2003) ("Although chapter 93A authorizes violation of the Attorney General's regulations – as in 940 C.M.R. 3.16 - liability under the regulation attaches only to transactions involving private consumers, and not to business to business transactions"); see also, Swenson, 317 F. Supp.2d at 57 (noting that "the Attorney General's regulation speaks in terms of the protection of 'consumers'"); see also M.C. Gilleran, THE LAW OF CHAPTER 93A §9:1, 234-35 (1989); Golann, "Evolution of Chapter 93A: National and Local Authority," CHAPTER 93A RIGHTS AND REMEDIES 1-1, 1-6 (J.M. Greaney, ed.1989, Supp. 1992) ("Indeed, the attorney general promulgated the General Regulations under Chapter 93A in 1971, before Section 11 was added to the Statute.  Those regulations were never intended to apply to Section 11 disputes, and they have never been revised to deal with commercial transactions.").  Businesses bringing suit under Ch. 93A § 11 cannot use 940 C.M.R. § 3.16(3) and (4) to assert a claim based on the

17

operation of a consumer protection regulation that incorporates other consumer protection statutes and regulations. It is not the function of this Court to expand radically § 11.[20]

## CONCLUSION

For all of the foregoing reasons, the Court should find that Defendants have not committed per se violations of Mass. Gen. Laws Ch. 93A, § 2(a).

Respectfully submitted,

THE FOLLOWING TRACK 1 DEFENDANTS

By: /s/ Katherine B. Schmeckpeper
Nicholas C. Theodorou (BBO # 496730)
Katherine B. Schmeckpeper (BBO #663200)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02110

D. Scott Wise
Michael Flynn
Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017

Attorneys for AstraZeneca Pharmaceuticals LP

---

[20] In J.E. Pierce Apothecary Inc. v. Harvard Pilgrim Health Care, 365 F. Supp. 2d 119 (D. Mass. 2005), the court stated in dicta that it might be possible to apply 3.16(3) to claims brought under § 11. 365 F. Supp. 119 (D. Mass. 2005). However, application of the Attorney General regulation at issue in J.E. Pierce Apothecary, involved a Massachusetts statute (the Any Willing Provider Law) which was specifically designed to benefit pharmacies, of which plaintiff was one. Id. at 146. Here, Plaintiffs are businesses evoking 940 C.M.R. 3.16(3) based on the purported violation of two regulations directed entirely at consumers.

Steven M. Edwards
Lyndon M. Tretter
Hogan & Hartson, LLP
875 Third Avenue, Suite 2600
New York, NY 10022

Attorneys for the Bristol-Myers Squibb Co.
and Oncology Therapeutics Network Corp.

William F. Cavanaugh, Jr.
Andrew D. Schau
Erik Haas
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Attorneys for the Johnson & Johnson Defendants

John T. Montgomery (BBO #352220)
Steven A. Kaufman (BBO #262230)
Eric P. Christofferson (BBO #654087)
Ropes & Gray LLP
One International Place
Boston, MA 02110

Attorneys for Schering-Plough Corp. and
Warrick Pharmaceuticals Corp.

Dated: December 11, 2006

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on December 11, 2006 to counsel for plaintiffs and to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, via LexisNexis File & Serve.


By:  /s/ Katherine B. Schmeckpeper
     Katherine B. Schmeckpeper