**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) ) MDL NO. 1456 ) ) CIVIL ACTION NO. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO ALL ACTIONS | ) ) Hon. Patti B. Saris ) ) ) |

## REBUTTAL TESTIMONY OF DR. MEREDITH ROSENTHAL

### I. INTRODUCTION

1.      I have been requested to provide rebuttal testimony in connection with several discrete issues in this matter.  Some matters for rebuttal were previously set forth in my written direct testimony, and therefore I incorporate my prior written direct testimony in this document. Below are the general topics of my rebuttal testimony, which may be amplified in Court during my live testimony.

### II. ALIGNING INCENTIVES AND AVOIDING CROSS-SUBSIDIES (REBUTTAL TO CROSS-SUBSIDY NOTIONS)

2.      As I previously testified, most economic models of physician behavior are based on the notion that physicians choose therapies in part based on the impact of these choices on their net revenues. *Direct Testimony*, ¶ 28.  This model is supported by empirical evidence with respect to influence of AWP-based reimbursement on chemotherapy treatment for cancer patients.[1]  For single source pharmaceuticals that are perceived by providers to have therapeutic

---

[1] Plaintiffs' Exhibit 4057. Jacobson. Mireille. O'Malley. James A.. Earle. Craig C.. Pakes. Juliana. Gaccione. Peter. and Newhouse. Joseph P.  "MarketWatch: Does Reimbursement Influence Chemotherapy Treatment For Cancer Patients?" *Health Affairs;* Volume 24. Number 2.

equivalents, significant financial incentives exist to provide the product with the more generous spread even if the providers' cost for acquiring the drug is greater than the cost of the perceived therapeutic alternative.

3.      Given this dynamic, there is (as I previously testified) the correlative observation that pharmaceutical companies compete for market share by positioning their products favorably from the physicians point of view. *Direct Testimony*, ¶33.

4.      Similar types of financial incentives exist with respect to drugs that are nebulized (reduced to a fine spray or vapor) and may be delivered either in an outpatient clinic or at the patient's home using durable medical equipment (DME).  These nebulized drugs such as Albuterol, are included in this matter because they are covered under Medicare Part B (and thus are included in Class Two).[2]

5.      Although under Medicare Part B single source and multi-source products had been reimbursed on the basis of different formulae, the dynamics for each provide financial rewards to the dispensers (whether they be physicians, clinics, DME suppliers or specialty pharmacies) to dispense products with higher spreads.

7.      I am of the opinion that the Medicare Part B system for the payment of physician services and the reimbursement of pharmaceutical costs was specifically designed to reimburse separately for physician services and for reimbursement of pharmaceutical costs.  The motivation for the Resource-Based Relative Value Scale (RBRVS), which is the current basis for physician reimbursement under Medicare, was to provide fair reimbursement relative to resource costs for each of thousands of diagnostic and therapeutic procedures and services.

---

[2] My understanding is that plaintiffs' counsel have not included Albuterol in the Class Three because, as a multi-source drug, Albuterol would typically (but perhaps not always) be reimbursed using a MAC maximal allowable cost methodology, and that the court has not certified a class for purposes of MAC reimbursements.

8.     Indeed, several policy makers have explained that Medicare never intended for overpayments on drugs to cross-subsidize drug administration costs. As an example, William J. Scanlon, Director for Health Care issues at the General Accounting Office, explained during a Congressional hearing that "we believe that it should be a principle of Medicare payment policy to pay for each service appropriately and not to rely on overpayments for some to offset inadequate payments for others."[3] As another example, George Grob, who was Deputy Inspector General of the HHS OIG stated during the same hearing:

> We agree that physicians need to be properly reimbursed for patient care. However, we do not believe that the payment of artificially inflated drug prices is an appropriate mechanism to compensate them. We do not think that the decision as to how much Medicare pays for physicians' practice costs should be made by them or by drug manufacturers. The Medicare program or the Congress should have responsibility for this calculation. We certainly do not believe that the basis for their compensation and medical practice expenses should be artificially inflated, misleading, and mis-named average wholesale prices.
>
> The Medicare program already has a procedure for determining and the amount of paying physicians for their practice costs. If the current calculations are incorrect, they should be modified. Physicians deserve fair reimbursement for their valuable services. There is no reason to resort to a make-believe process to accomplish this.[4]

9.     It also appears that there was a debate over whether oncology physicians in fact were incurring greater costs than other physicians reimbursed by Medicare. On this score, I refer the Court to a 2001 colloquy between Senator Nelson Rockefeller and Dr. Larry Norton, who was President of ASCO at the time. In response to pointed questioning from Senator Rockefeller, Dr. Norton explained that ASCO lacked "good" data on the issue:

---

[3] Exhibit 1099, *Medicare Drug Reimbursements: A Broken System for Patients and Taxpayers.* H.R. Rep. No. 107-65, at 32 (Sept. 21, 2001).

[4] *Id.* at 44.

It is a very, very serious issue.  These are out-of-pocket
expenses, expensive issues.  They are paying for it before the
patient even walks in the door.  And there are a lot of other costs,
hidden costs.

But I want to get to your point, really, which is that we do not
know a lot of those numbers.  We have been trying to get those
numbers.  I agree with you.  I do not think the data is good.  I am
just speaking as a scientist here in terms of what it actually costs.[5]

Dr. Norton later reinforced that conclusion in response to a question from Senator Snowe:

I think that we need more data, frankly.  I am just speaking as
somebody who looks at data professionally.  When I make a
decision to treat a patient with a drug, and I know the dose of the
drug, that dose for that drug is based on a lot of solid data.

I do not see enough data here to feel very confident that I know
what the real costs are and what the real reimbursement situation
is.  Nobody has really done a bottom's up approach where you
look at how many syringes and how much nursing time is
involved.  I think that is really what is needed here so that we
know what the true costs are.[6]

### III.    REBUTTAL TO GAIER POINTS

10.    I understand that Dr. Gaier testified that I misapplied the theory of "stickiness" in

connection with the difficulty to reduce provider payments.  More specifically, Dr. Gaier has

opined that the concept of "stickiness" does not apply to professionals.  I disagree.  As the record

of oncologist resistance to reform demonstrates, it has proven difficult to reduce the overall

compensation of oncologists within the Medicare system.  While the theory of "sticky wages"

was developed to explain labor market phenomena, the notion that there are rigidities that

prevent employers from reducing wages can be extended intuitively to third party payers and

fees to physicians.  Of course the economic result is different; in the classic case, unemployment

---

[5] Exhibit 4015, *Reimbursement and Access to Prescription Drugs under Medicare Part B*, S. Hrg. No. 107-684.
at 35 (Mar. 14, 2002).

[6] *Id.*, at 42-43.

ensues and output is reduced, but in the case of excessively high payments to physicians for injectable drugs, third party payers and Medicare simply pay more for the same quantity.

11.     I understand that Dr. Gaier testified that both Dr. Hartman and I (and apparently Dr. Berndt) misapplied the notion of the "importance of being unimportant". More specifically, Dr. Gaier testified that the magnitude of drug costs at issue should have been sufficient to engender research into cost savings. I disagree. Dr. Gaier's suggestion that the absolute magnitude of savings should have been enough completely ignores the opportunity costs to HCFA/CMS of identifying and resolving overpayments for outpatient prescription drugs. The basic point of Dr. Berndt's original reference to "the importance of being unimportant" was that HCFA/CMS has limited resources, including political capital, to address cost and quality problems that affect the program. Moreover, hospital spending dwarfed outpatient drug spending for Medicare during the class period and clearly even physician spending overall was much bigger than outpatient drugs alone. And in fact, during the Class period, HCFA was engaged in the process of extending the hospital prospective payment system to other settings (like outpatient departments and home health care) and implementing the RBRVS, both of which were significant undertakings.

## IV.     THE MMA WAS INTENDED TO, AND HAS HAD THE EFFECT OF, SAVING MEDICARE MONEY

12.     I am of the opinion that the provisions of the Medicare Modernization Act of 2003 governing changes to the reimbursement of drugs and biologicals under Medicare Part B were intended to, and have had the effect of, saving Medicare money even after consideration of the increases in service and/or dispensing fees for certain procedures.

13.    There have been a variety of estimates of savings under the MMA, some predictive and some based on actual experience.  Although I may cite additional examples in my oral testimony, the estimates include:

      a.    Plaintiffs' Exhibit 4040.  The Congressional Budget Office ("CBO") in November of 2003, estimated that the savings under Section 303, entitled "Competitive acquisition of covered outpatient drugs," would be $4.2 billion over the first 10 years; under Section 304, entitled "Application to certain specialties," an additional $7.3 billion; and under Section 305 relating to "Payment of inhalation drugs," an additional $4.2 billion.

      b.    Plaintiffs' Exhibit 1303.  The Centers for Medicare & Medicaid Services in November of 2004 estimated for two specialties at the center of this case – hemotology/ oncology and urology – a net reduction in costs given constant utilization of -6% and -14% respectively.

      c.    Plaintiffs' Exhibit 4074.  "Review of CMS's Preliminary Estimate of the Physician Update for 2005" MedPAC Report to the Congress dated June 2004, estimated that payments for administration of drugs covered by Medicare Part B would drop $200 million (after a one-time transitional increase of 32% for 2004);

      d.    Plaintiffs' Exhibit 4058.  MedPAC Report, "Effects of Medicare Payment Changes on Oncology Services," dated January 2006, found, among other things, that "Medicare's change to a payment system based on ASP has resulted in program savings, and most oncologists can purchase most drugs at prices below the payment rate," (at p. 14);[7]

      e.    Plaintiffs' Exhibit 4019.  MedPAC Testimony Before the Subcommittee on Health Committee on Ways and Means U.S. House of Representatives: "Medicare Part B drugs and Oncology" dated July 13, 2006, showing that Medicare spending for Part B drugs declined in 2005 despite increases in the volume of drugs used and the substitution of newer, more expensive drugs;

      f.    Plaintiffs' Exhibit 4073.  MedPAC comments dated October 11, 2006 to CMS's proposed rule, "Medicare program; Revisions to payment policies under the physician fee schedule for calendar year 2007 and other changes to payments under Part B," noting that the new ASP system produced "dramatic price decreases" for many products;

      g.    Plaintiffs' Exhibit 4020.  Testimony of Robert A. Vito, Regional Inspector General for Evaluation and Inspections, Office of Inspector General, U.S. Department of

---

[7] This report also noted that payment changes under the MMA did not affect beneficiary access to chemotherapy services and that total payments for drug administration services to date in 2005 equaled 2004 levels even though the volume of services to Medicare beneficiaries increased. (at pp. vii-viii).

Health and Human Services, House Committee on Ways & Means Subcommittee on Health dated July 13, 2006, noting that, despite rising utilization of Part B drugs, the MMA produced a savings on covered drugs of "close to $1 billion" in 2005 compared to 2004;

      h.     Plaintiffs' Exhibit 4018. PriceWaterhouseCoopers, "Estimate of Savings to the Medicare Program from Payment Changes for Covered Outpatient Drugs and Biologicals Under the Medicare Modernization Act of 2003," dated April 27, 2005, projecting $1 billion in savings after behavioral offsets;

      i.     Plaintiffs' Exhibit 4059. Statement of Frederick M. Schnell, M.D., President, Community Oncology Alliance before the Subcommittee on Health of the House Committee on Ways and Means, dated July 13, 2006, claiming that drug administration reimbursement has declined 20% since 2004; and

      j.     Plaintiffs' Exhibit 4053. Article in *Urology*, "Reimbursement Issues with Hormonal Therapies for Prostate Cancer" by M. Ray Painter, MD dated 2005, projecting 14% decrease in payments for LHRH agonists.

14.     Not only have savings been projected and confirmed under the MMA as discussed immediately above, it also appears that for drugs in this litigation the overall expenses paid by Medicare (both for drug costs and service fees) has declined.

15.     I have reviewed analyses prepared by Greylock McKinnon Associates comparing Medicare reimbursements for Zoladex, Taxol, Remicade, Procrit and Albuterol for the years 2002-2005. For each drug, the reimbursement for drug cost declined from 2003-2005. While the procedure codes associated with the administration of those drugs at times increased in service fees, the overall dollar reimbursement declined for each drug. *See* Plaintiffs' Exhibits 4069, 4070, 4071, 4072, and 4095.

## V.    IMPLEMENTATION OF THE NEW CMS ASP SYSTEM HAS CARRIED WITH IT PREDICTIBLE IMPLEMENATION ISSUES

16.     Like most major changes to healthcare payment systems, the new CMS ASP system has experienced predictable issues in implementation that have yet to be worked out, including issues regarding the proper reporting of the data. The following reports discuss them:

      a.     Plaintiffs' Exhibit 4063, "Monitoring Medicare Part B Drug Prices: A Comparison of Average Sales Prices to Average Manufacturer Prices" by Daniel R. Levinson, Inspector General (April 2006), finding that a number of J-Codes had ASPs that exceeded AMPs by at least 5 percent in the third quarter of 2004;

      b.     Plaintiffs' Exhibit 4064, "Comparison of Fourth-Quarter 2005 Average Sales Prices to Average Manufacturer Prices: Impact on Medicare Reimbursement for Second Quarter 2006" by Daniel R. Levinson, Inspector General (June 2006), finding that, for 46 of 341 J-Codes reviewed, the volume-weighted ASP exceeded the volume-weighted AMP by at least 5 percent, and that, for 13 of the 46 codes, volume-weighted ASPs exceeded volume-weighted AMPs by at least 20 percent, with ASPs for four exceeding AMPs by more than 50 percent;

      c.     Plaintiffs' Exhibit 4062, Todd Leeuwenburgh, *Medicare Drug Focus*, "OIG Targets 46 Part B Physician-Administered Drugs for Possible Rate Cut, Based on ASP Versus AMP Prices" (July 24, 2006), discussing the possibility that CMS could substitute a different reimbursement rate (the lower of AMP plus 3% or the "widely available market price");

      d.     Plaintiffs' Exhibit 4065, "Comparison of Fourth-Quarter 2005 Average Sales Prices to Average Manufacturer Prices: Impact on Medicare Reimbursement for Second Quarter 2006" by Daniel R. Levinson, Inspector General (July 2006), generally confirming results published in the prior month's report found at Exhibit 4064; and

      e.     Plaintiffs' Exhibit 4091, "Calculation of Volume-Weighted Average Sales Price for Medicare Part B Prescription Drugs" (OEI-03-05-00310) by Daniel R. Levinson, Inspector General (February 2006), reporting that CMS's method of calculating volume-weighted ASPs has been incorrect due to improper weighting, resulting in a net loss to Medicare in 2005 of $110 million.

17.     The issues raised in these materials highlight why, among other reasons, private payers considering a change to an ASP-based reimbursement formula for physician-administered drugs would want to wait and study Medicare's experience prior to instituting a similar revision in private payer relationships with physician networks.

## VI.    REFORM EFFORTS FOR THE REIMBURSEMENT OF OUTPATIENT DRUGS

18.     For private and government payers considering alternative reimbursement systems, it is noteworthy that ASP is not the only reimbursement system for payers to

consider and that academics and others have debated various alternative mechanisms.

The following documents exemplify the debates:

        a.      In Defendants' Exhibit 1110, Report to the Congress: "Variation and Innovation in Medicare" (June 2003), in addition to ASP, MedPAC briefly reviewed AMP, AAP, payments based on invoice prices and competitive bidding as alternative approaches for consideration; and

        b.      In Defendants' Exhibit 1923, "Alternative Strategies for Medicare Payment of Outpatient Prescription Drugs – Part B and Beyond," *The American Journal of Managed Care* by Patricia M. Danzon, PhD; Gail R. Wilensky, PhD; and Kathleen E. Means, BS (March 2005), the authors advocate the adoption of an AWP-based system that provides Medicare the flexibility to adjust the discount over time in accordance with the results of periodic audits, and to constrain AWP increases by the rate of increase in economic indexes.

      19.     The availability of alternative reimbursement mechanisms illustrates the point that there was no obvious single alternative to the current AWP-based system for payers seeking reform.   Payers would likely need time to identify and study their options as well as assess the operational and strategic implications of their choices before acting at substantial expense to modify existing systems and develop new data streams to replace the published AWPs.

Dec 12 06 08:15p      Meredith Rosenthal            617 868-8474              p.2

I declare that the foregoing is true and correct under penalty of perjury.

Meredith Rosenthal, Ph.D.

_Cambridge MA, December 12, 2006_
Date and Place of Execution

## CERTIFICATE OF SERVICE BY LEXISNEXIS FILE & SERVE
Docket No. MDL 1456

I, Steve W. Berman, hereby certify that I am one of plaintiffs' attorneys and that, on December 12, 2006, I caused copies of **REBUTTAL TESTIMONY OF DR. MEREDITH ROSENTHAL** to be served on all counsel of record by causing same to be posted electronically via Lexis-Nexis File & Serve.


 **/s/ Steve W. Berman**
Steve W. Berman