MARKETWATCH: Does Reimbursement Influence Chemotherapy Treatment For Cancer P...
Mireille Jacobson; A James O'Malley; Craig C Earle; Juliana Pakes; et al
Health Affairs; Mar/Apr 2006; 25, 2; ABI/INFORM Global
pg. 437

# MARKETWATCH

## Does Reimbursement Influence Chemotherapy Treatment For Cancer Patients?

Medicare reimbursement has little effect on who gets cancer treatment, but it does influence the kind of treatment received.

**by Mireille Jacobson, A. James O'Malley, Craig C. Earle, Juliana Pakes, Peter Gaccione, and Joseph P. Newhouse**

**ABSTRACT:** Before the Medicare Prescription Drug, Improvement, and Modernization Act (MMA) of 2003, Medicare reimbursed physicians for chemotherapy drugs at rates that greatly exceeded physicians' costs for those drugs. We examined the effect of physician reimbursement on chemotherapy treatment of Medicare beneficiaries older than age sixty-five with metastatic lung, breast, colorectal, or other gastrointestinal cancers between 1995 and 1998 (9,357 patients). A physician's decision to administer chemotherapy to metastatic cancer patients was not measurably affected by higher reimbursement. Providers who were more generously reimbursed, however, prescribed more-costly chemotherapy regimens to metastatic breast, colorectal, and lung cancer patients. [Health Affairs 25, no. 2 (2006): 437–443; 10.1377/hlthaff.25.2.437]

IN THE LATE 1990s, investigations by the Department of Health and Human Services, the Department of Justice, and the House Committee on Energy and Commerce revealed that Medicare payments for Part B–covered drugs, of which chemotherapy agents represent the vast majority, were much higher than physicians' costs of acquiring these drugs.[1] Before 2004, Medicare reimbursed for chemotherapy drugs at the lesser of the billed charge or 95 percent of the average wholesale price (AWP) (100 percent before 1998).[2] But oncologists and institutions purchased these drugs at prices well below the AWP. For example, in 1999 the average widely available discount to physicians was 12–30 percent of the AWP and reached as high as 86 percent.[3]

Although the Medicare Prescription Drug, Improvement, and Modernization Act (MMA) altered the structure of chemotherapy reimbursements, so that physicians are now paid based on manufacturers' average sales price (ASP) plus 6 percent and an administrative fee, data exploring the relationship between vari-

*Mireille Jacobson (mgjacobs@umich.edu) is a Robert Wood Johnson Foundation Research Fellow at the University of Michigan in Ann Arbor. She is on leave from the Department of Planning, Policy, and Design at the University of California, Irvine, where she is an assistant professor. James O'Malley is an assistant professor of statistics in the Department of Health Care Policy, Harvard Medical School, in Boston, Massachusetts. Craig Earle is an associate professor of medicine at the medical school and an oncologist at the Dana-Farber Cancer Institute in Boston. Juliana Pakes is a data analyst and project administrator in the Department of Health Care Policy, Harvard Medical School. Peter Gaccione is a programmer who worked as a consultant in the department. Joseph Newhouse is the John D. MacArthur Professor of Health Policy and Management at Harvard University.*

DOI 10.1377/hlthaff.25.2.437 ©2006 Project HOPE–The People-to-People Health Foundation, Inc.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Plaintiffs' Exhibit
4057
01-12257-PBS

ous reimbursement incentives and practice patterns are still important. First, they provide clues for how MMA might change chemotherapy treatment for Medicare beneficiaries. Second, since reimbursement rates for chemotherapy vary greatly within the private market, with many insurance companies basing their rates on the AWP, this research could uncover treatment distortions that persist in the private market. More generally, this work should help us understand the extent to which financial incentives—in this case, unintentional ones—can affect physicians' clinical decisions.

In this paper we analyze the relationship between physicians' prescribing decisions and Medicare reimbursement. An alternative would have been to analyze the spread between Medicare reimbursement and the prices at which oncologists purchased the drugs, but we could not observe purchase prices. Nonetheless, because chemotherapy drugs can be bought directly from manufacturers or through national group purchasing organizations, similar types of clinics or physicians in terms of bargaining power and volume of business should have been able to purchase drugs at similar prices.[4] Thus, variation in reimbursement—the variable we analyze—should track closely with variation in physicians' profit from dispensing drugs.

Specifically, we asked two questions: Were physicians who were more highly reimbursed or who experienced greater increases in their reimbursement more likely to prescribe chemotherapy? And, conditional on prescribing chemotherapy, were such physicians more likely to use expensive drugs?

## Study Methods And Data

■ **Study methods.** To assess how reimbursement affected treatment, we exploited differences in Medicare reimbursement rates across physicians at a point in time and for the same physician over time. Variation at a point in time stemmed from local carriers' discretion before October 2002 to determine the composition of the Healthcare Common Procedure Coding System (HCPCS), the basis for Medicare reimbursement. In particular, individual

carriers processing Part B claims chose the specific National Drug Code (NDC, corresponding to a unique chemical entity, form, strength, package size, manufacturer, and AWP) that determined the reimbursement rate for all NDCs in the HCPCS. Because their choices varied, the reimbursement for a HCPCS covering a multisource drug, or a single-source drug available in different forms or package sizes, varied across carriers.[5] Although such variation was typically on the order of 10 percent or less, it was much larger for some commonly prescribed chemotherapy drugs.[6] For example, in 1999 the spread between the highest and lowest reimbursement for 10 mg doxorubicin was about 27 percent ($52.44 versus $38.03). Moreover, these reimbursements changed differentially over time based on revisions to the AWP for specific NDCs.

■ **Data sources.** *Study cohort.* To study chemotherapy treatment, we analyzed the Surveillance, Epidemiology, and End Results (SEER) cancer registries and linked Medicare claims.[7] Our sample consisted of all Medicare-eligible patients older than age sixty-five with lung, breast, colorectal, or other gastrointestinal (GI—pancreatic, esophageal, liver, and stomach) cancers who had metastatic cancer between 1995 and 1998 and had filed Medicare claims during this period.[8]

We chose these cancers because they account for more than 60 percent of cancer deaths in North America and, when they are metastatic, chemotherapy is a primary component of their treatment.[9] We did not use data from before 1995 because of changes in recommended treatment. We defined *metastasis* as presentation with Stage IV disease, as documented by SEER abstractors within four months of diagnosis, or documentation of two or more Medicare claims separated by thirty days for a secondary cancer site.[10]

We studied only patients with metastatic disease because such patients have a relatively short expected survival time, regardless of treatment. In other words, we expected little effect on outcomes from any variation in treatment. Moreover, treatment options are less

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

standardized than in early stages, when cure is the goal. Thus, observed treatment differences across metastatic patients, in contrast to those at earlier stages of the disease, are more likely to result from physicians' decisions and patients' preferences than from unobservable differences in health. And since patients' preferences are unlikely to vary systematically with financial incentives, any relationship between treatment and reimbursement is most likely attributable to the physician's response.

*Outcomes studied.* We analyzed whether the patient received chemotherapy treatment in the three-month period after a metastatic cancer diagnosis, conditional on the patient's surviving at least twenty-eight days, not having been in chemotherapy treatment three months prior to this diagnosis, and not entering hospice. Patients were deemed to have received any chemotherapy if they had a single claim for a chemotherapy-related code.[11]

Specific agents (J9s) were identified from outpatient settings (Physician/Supplier [NCH] or Outpatient [OUTPT] files); drugs administered to inpatients are not recorded on the claim because they are bundled with the diagnosis-related group (DRG) payment. We included anti-emetics that could be administered intravenously and were thus reimbursed by Medicare, as well as calcium leucovorin, which is given intravenously with chemotherapy agents such as fluorouracil.[12]

In addition to analyzing whether reimbursement affected the likelihood of chemotherapy, we also analyzed the costliness of the agents used when chemotherapy was prescribed. Reimbursement amounts were garnered from the NCH files only, because drug payments cannot be identified in institutional claims. We excluded the roughly 15 percent of reimbursements for (J9) chemotherapy claims with unidentified agents (J9999) because we could not determine the drugs used or their standard dosages.

To remove variability in spending caused by patient-specific dosing—which is affected by the patient's height, weight, and organ functioning—and the number of doses a patient received—which is affected by therapy tolerance

and response—we defined the initial treatment regimen as the combination of chemotherapeutic agents, anti-emetics, and leucovorin administered to the patient within the first twenty-eight days after a metastatic cancer diagnosis. Each regimen was treated as if a standard quantity were administered by assuming that (1) each drug was given according to the most common dose and schedule recommended in the Dana-Farber Cancer Institute's Oncology Protocol System; and (2) each patient had a body surface area of 1.7 m². Anti-emetics were dosed in combination with the highest-frequency-dosed chemotherapy agent a patient received.

Each standardized dose was then priced using the average "national" (across all SEER regions) reimbursement for that agent within a tumor site and year and summed for all drugs a patient received.[13] Because we used national average prices to determine expenditure, any variation across patients is attributable to the drugs prescribed rather than the prices paid to physicians. Furthermore, by standardizing dosages, this measure captures a physician's initial regimen choice, rather than any adjustments dictated by a patient's tolerance of and response to treatment.

*Explanatory variables.* To measure how generously each physician was reimbursed, we defined a summary measure or index for the regimens prescribed for a given tumor site in a given year. The index was the sum of the weighted average difference between the physician's and the national mean reimbursement for each agent the physician prescribed, where the weights were the ratio of national spending on a regimen to total spending on all chemotherapy regimens for that tumor site.[14] In some analyses we deflated the index by Medicare's 1997 Geographic Practice Cost Index (GPCI) for the relevant region, to account for variation across regions in the cost of administration. In summary, this index captured how generously an individual physician was reimbursed relative to the national average for the set of agents that physician prescribed.

*Statistical analyses.* To model the impact of reimbursement generosity on a patient's likeli-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

H E A L T H   T R A C K I N G

hood of chemotherapy treatment, we used probit regressions with provider-specific random effects. Our models include year-indicator variables to control for national trends in treatment patterns.[15] We also controlled for patients' age and age squared, year of metastatic cancer diagnosis, sex, race (white, black, Asian, Hispanic, or other), marital status (single, married, separated/divorced, or widowed), tumor grade (well, moderately, or poorly differentiated; undifferentiated; or unknown), census tract per capita income or the state average if missing; and a dummy variable for whether the state average income was used. Comorbidities were identified from diagnostic billing codes in both inpatient and outpatient claims, assigned scores based on severity, and then summed to form an index, called the Deyo-Charlson score.[16] When we estimated results across all tumor sites, we also included indicator variables for tumor site.

To estimate the impact of the reimbursement generosity on the costliness of chemotherapeutic agents prescribed, we used linear regressions with provider-specific random effects. We conducted our analysis pooling across tumor sites as well as separately by site,

since the types and costs of regimens varied markedly by cancer site. We included year-indicator variables in all models and controlled for the same set of patient characteristics as in the probability-of-chemotherapy models.

## Results

■ **Chemotherapy use.** Almost half of the sample presented with Stage IV disease at diagnosis (SEER stage distant), although this proportion varied considerably across tumor sites. About 40 percent of the sample was treated with chemotherapy (Exhibit 1). Breast cancer patients were much less likely than others to receive chemotherapy, possibly because of the hormone therapy option, which we cannot observe in Medicare claims. Lung cancer patients also had relatively low chemotherapy rates, likely because chemotherapy was just gaining acceptance for this group during the study period.[17]

Overall and within tumor sites, we did not find measurable effects of variation in reimbursement on the likelihood of treatment (Exhibit 2). In fact, only in the case of breast cancer did the estimated effect of reimbursement generosity on the likelihood of chemotherapy treatment go in the expected positive direc-

**EXHIBIT 1**
**Characteristics Of End-Stage Cancer Patients, Overall And By Site Of Cancer, 1995–1998**

|  | Overall | Breast | Colorectal | Other GI | Lung |
|---|---|---|---|---|---|
| Index of physician reimbursement | 0.697 (15.4) | 0.014 (1.76) | 0.103 (0.113) | 3.43 (46.4) | 0.919 (11.5) |
| 28-day spending on chemotherapy | $2,103 ($2,215) | $848 ($767) | $733 ($661) | $1,443 ($1,423) | $3,675 ($2,421) |
| Chemo within 3 months | 41% | 25% | 53% | 50% | 42% |
| Age (years) | 74 (5.73) | 74 (5.99) | 75 (6.00 | 74 (5.50 | 74 (5.39) |
| Percent male | 39 | 0 | 46 | 56 | 54 |
| SEER stage[a] |  |  |  |  |  |
| Local | 20% | 46% | 15% | 14% | 10% |
| Regional | 34 | 40 | 48 | 28 | 24 |
| Distant | 46 | 14 | 37 | 59 | 66 |
| Deyo-Charlson score | .292 (.623) | .188 (.515) | .239 (.555) | .355 (.739) | .363 (.671) |
| Observations | 9,357 | 2,246 | 2,173 | 544 | 4,014 |

**SOURCE:** Surveillance, Epidemiology, and End Results (SEER) program. Coexisting illness and treatment came from both SEER and Medicare-linked claims, 1995–1998.

**NOTES:** Standard deviations are in parentheses. GI is gastrointestinal.

[a] SEER stage of tumor is given at first diagnosis.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

**EXHIBIT 2**
**Effect Of A One-Standard-Deviation Increase In The Mean Reimbursement Index On The Probability Of Chemotherapy Treatment**

| | Overall | Breast | Colorectal | Other GI | Lung |
|---|---|---|---|---|---|
| Excess reimbursement index | −0.008 [−.0013] (1.35) | 0.011 [.020] (1.06) | −0.15 [−.032] (1.08) | −0.025 [−.0016] (1.30) | −0.0008 [−.0002] (0.08) |
| Treatment rate | 0.411 | 0.253 | 0.525 | 0.496 | 0.418 |
| Sample size | 9,357 | 2,246 | 1,822 | 984 | 4.014 |

**SOURCE:** Surveillance, Epidemiology, and End Results (SEER) program. Coexisting illness and treatment came both from SEER and Medicare-linked claims, 1995–1998.

**NOTES:** The percentage increase in price associated with a one-standard-deviation increase in the reimbursement index is 0.114, 0.008, 0.866, and 0.223 for breast, colorectal, gastrointestinal (GI), and lung cancer patients, respectively. Probit coefficients for the estimated effect of a variable are in brackets. Z statistics from Probit coefficients are in parentheses.

tion, with a one-standard-deviation increase in the excess reimbursement index increasing the probability of chemotherapy treatment by an insignificant 0.011, or 1.1 percentage points off a base chemotherapy treatment rate of 25 percent. Based on the upper limit of a 95 percent confidence interval (CI) for the breast cancer effect, it is unlikely that the true effect exceeds 3.1 percentage points [0.031 = 0.011 + 1.96(0.011/1.06)]. For colorectal, GI, and lung cancer, the upper limits of the 95 percent CI imply effects no larger than 1.2, 1.3, and 1.9 percentage points, respectively.

Results were qualitatively similar when we deflated the reimbursement index by Medicare's GPCI. In all cases, we could rule out large effects of reimbursement on chemotherapy treatment, with the upper limits of the 95 percent CIs indicating effects no larger than 3.1 percentage points for breast cancer and less than 2.0 percentage points for the other cancer sites. Results were also similar when we restricted the sample to those who initially presented with Stage IV disease or considered the probability of chemotherapy treatment within twenty-eight days rather than three months of diagnosis (results not shown).

■ **Costliness of agents used.** Monthly chemotherapy spending varied markedly across tumor sites (Exhibit 1). Patients with metastatic breast and colorectal cancer, on average, received regimens that cost less than $1,000 per month, whereas the regimens prescribed to other GI cancer patients cost on av-

erage $1,400 per month and to lung cancer patients, more than $3,600 per month.

The reimbursement index had a clear effect on the costliness of chemotherapeutic agents prescribed (Exhibit 3). More generously reimbursed providers prescribed more-costly regimens to breast ($p < .038$), colorectal ($p < .079$), and lung ($p < .039$) cancer patients. In contrast, more generously reimbursed providers prescribed less costly regimens to metastatic GI cancer patients ($p < .038$). For breast cancer patients, a one-dollar increase in a physician's reimbursement resulted in the use of agents that cost twenty-three dollars more. Another way to interpret the values in the exhibit is to estimate the effect of a one-standard-deviation increase in the index. Among breast cancer patients receiving chemotherapy, a one-standard-deviation increase in the reimbursement index (2.89, data not shown) was associated with a $67 increase in spending on chemotherapeutic agents (evaluated by multiplying 2.89 by the regression coefficient of 23.1). For colon and lung cancer patients, a one-standard-deviation increase in physicians' reimbursement index (1.14 and 33.9, respectively) raised spending by $40 and $150, respectively. With average chemotherapy spending of $858, $705, and $3,772 for breast, colon, and lung cancer patients, respectively, such increases would raise spending 4–8 percent.

These results were even stronger and more precise when we used the GPCI to deflate the reimbursement index and projected chemo-

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

HEALTH TRACKING

**EXHIBIT 3**
**Effect Of Excess Reimbursement For Chemotherapy Drugs On Spending, By Site Of Cancer, 1995–1998**

| | Not deflated | | | | |
| --- | --- | --- | --- | --- | --- |
| | Overall | Breast | Colorectal | Other GI | Lung |
| Excess reimbursement index | 2.82 (1.16) | 23.1 (2.08) | 35.5 (1.76) | −6.33 (2.08) | 13.0 (2.06) |
| | Deflated using Medicare's 1997 practice expense GPCI | | | | |
| Excess reimbursement index | 2.90 (1.20) | 29.9 (3.19) | 44.1 (2.62) | −7.35 (2.58) | 15.4 (2.40) |
| Sample size | 3,170 | 492 | 919 | 375 | 1,384 |

**SOURCE:** Surveillance, Epidemiology, and End Results (SEER) program. Coexisting illness and treatment came both from SEER and Medicare-linked claims, 1995–1998.

**NOTES:** $T$ statistics are in parentheses. GI is gastrointestinal. GPCI is Geographic Practice Cost Index.

therapy spending (Exhibit 3). We could not know the administrative costs of each physician, but because any practice cost deflator should apply to only administrative costs and not the cost of the drug itself, the results with and without the practice cost deflator should bound the true effect of variation in reimbursement.

**Discussion**

We found no evidence that reimbursement incentives affected oncologists' decisions to administer chemotherapy to metastatic cancer patients. Once a decision to give chemotherapy was taken, however, physicians receiving more-generous Medicare reimbursements used more-costly treatment regimens. Except for the noncolorectal GI cancer site, which was so heterogeneous that such patients might not have been well characterized in our data, these results were similar whether aggregated or stratified by tumor site.

■ **Study limitations.** Our study has some limitations. To ascertain chemotherapy, we relied on claims data, which are not created for research and could be less accurate than desired. Claims-based comorbidity measurement is not the same as performance status, on which clinicians make treatment decisions.

The use of Medicare data limited us to elderly patients, and practice patterns and incentives might differ for younger, commercially insured patients. Nonetheless, many commercial insurance companies also base reimbursement rates on AWP. A survey of thirty-two health plans found that many reimbursed for chemotherapy drugs at 95 percent of AWP, but others reimbursed at rates as low as 75 percent, and still others at rates as high as 125 percent.[18] If our results generalize to the commercially insured, they suggest that the administration of chemotherapy to such patients should be little affected by such variation, but the mix of agents may well respond.

■ **Policy implications.** As noted in the introduction, Medicare no longer uses AWP as a basis for reimbursement. Our results suggest that rates of chemotherapy administration will not change much, provided that oncologists continue to accept Medicare patients. On the other hand, since physicians will no longer differentially profit from using particular agents, this new reimbursement method could modify the mix of chemotherapy drugs used.

Oncologists are loath to acknowledge that financial motives can affect treatment decisions. Although reimbursement seems to have little effect on the primary decision to administer palliative chemotherapy to patients with advanced solid tumors, it appears to affect the choice of drugs used.

Oncologists have maintained that in the past, the markup on the drugs compensated for Medicare's prior failure to reimburse for the cost of administering the drug. In response, Medicare now pays a fee for administration but, as noted above, reimburses the drug at a 6 percent markup over what the physician paid

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

for it. These changes should make choice of agents based more on clinical considerations and patients' preferences and less on reimbursement decisions.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*Earlier versions of this study were presented at the 2003 Annual American Economics Association Meetings, the 2003 National Bureau of Economic Research (NBER) Health Care Program Meeting, and the Harvard Medical School Department of Health Care Policy P01 Seminar. The authors thank the meeting participants and the anonymous referees for their many helpful comments. They also gratefully acknowledge research support from the Agency for Healthcare Research and Quality (Grant no. P01-HS-10803).*

## NOTES

1. U.S. Department of Health and Human Services, *Excessive Medicare Payment for Prescription Drugs*, Pub. no. OEI-03-97-00290 (Washington: U.S. Government Printing Office, December 1997); and DHHS, *Medicare Reimbursement of Prescription Drugs*, Pub. no. OEI-03-00-00310 (Washington: GPO, December 2001).

2. DHHS, "HCFA Program Memorandum," AB-99-63 (Washington: GPO, September 1999); and Medical Economics Company, *Drug Topics Red Book* (Montvale, N.J.: Medical Economics Co., various years).

3. U.S. Government Accountability Office, *Medicare: Payments for Covered Outpatient Drugs Exceed Provider's Cost*, Pub. no. GAO-01-1118 (Washington: GPO, September 2001).

4. DHHS, *Medicare Reimbursement*, 2001.

5. Ibid.

6. DHHS, "HCFA Program Memorandum."

7. L.A. Ries et al., *SEER Cancer Statistics Review, 1973–1994*, Pub. no. 97-2789 (Bethesda, Md.: National Cancer Institute, 1997); A.B. Nattinger, T.L. McAuliffe, and M.M. Schapira, "Generalizability of the Surveillance, Epidemiology, and End Results Registry Population: Factors Relevant to Epidemiologic and Health Care Research," *Journal of Clinical Epidemiology* 50, no. 8 (1997): 939–945; and A.L. Potosky et al., "Potential for Cancer Related Health Services Research Using a Linked Medicare-Tumor Registry Database," *Medical Care* 31, no. 8 (1993): 732–748. Also, see the online technical appendix at http://content.health affairs.org/cgi/content/full/25/2/437/DC1.

8. We excluded people age sixty-five and younger because their course of chemotherapy treatment might have been determined prior to their Medicare eligibility.

9. R.T. Greenlee et al., "Cancer Statistics, 2000," *Cancer Journal for Clinicians* 50, no. 1 (2000): 7–33.

10. C.C. Earle et al., "Identifying Cancer Relapse Using SEER-Medicare Data," *Medical Care* 40, no. 8 Supp. (2002): IV-75–IV-81.

11. J.L. Warren et al., "Utility of the SEER-Medicare Data to Identify Chemotherapy Use," *Medical Care* 40, no. 8 Supp. (2002): IV-55–IV-61; U.S. Public Health Service, *International Classification of Diseases*, Ninth Revision, Clinical Modification (ed. 5) (Los Angeles: Practice Management Information Corp., 1996); American Medical Association, *Physician's Current Procedural Terminology: CPT 94* (Chicago: AMA, 1993); Centers for Medicare and Medicaid Services, *HCFA Common Procedure Coding System (HCPCS): National Level II Medicare Codes* (Los Angeles: Practice Management Information Corp., 1994); and CMS, *HCFA Data Dictionary: Revenue Center Codes* (Baltimore: CMS, 17 June 1999). See also the online appendix, as in Note 7.

12. Advanced Colorectal Cancer Meta-Analysis Project, "Modulation of Fluorouracil by Leucovorin in Patients with Advanced Colorectal Cancer: Evidence in Terms of Response Rate," *Journal of Clinical Oncology* 10, no. 6 (1992): 896–903; and C.H. Kohne et al., "Effective Biomodulation by Leucovorin of High-Dose Infusion Fluorouracil Given as a Weekly Twenty-Four-Hour Infusion: Results of a Randomized Trial in Patients with Advanced Colorectal Cancer," *Journal of Clinical Oncology* 16, no. 2 (1998): 418–426.

13. See the online technical appendix, as in Note 7.

14. Ibid.

15. Ibid.

16. R.A. Deyo, D.C. Cherkin, and M.A. Ciol, "Adapting a Clinical Comorbidity Index for Use with ICD-9-CM Administrative Databases," *Journal of Clinical Epidemiology* 45, no. 6 (1992): 613–619; and M.E. Charlson et al., "A New Method of Classifying Prognostic Comorbidity in Longitudinal Studies: Development and Validation," *Journal of Chronic Diseases* 40, no. 5 (1987): 373–383.

17. Non–Small Cell Lung Cancer Collaborative Group, "Chemotherapy in Non–Small Cell Lung Cancer: A Meta-Analysis Using Updated Data on Individual Patients from Fifty-two Randomised Clinical Trials," *British Medical Journal* 311, no. 7010 (1995): 899–909.

18. Medicare Payment Advisory Commission, "Medicare Payments for Outpatient Drugs," in *Report to the Congress: Variation and Innovation in Medicare* (Washington: MedPAC, June 2003), chap. 9, Part B.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# MEDICARE DRUG REIMBURSEMENTS: A BROKEN SYSTEM FOR PATIENTS AND TAXPAYERS

## JOINT HEARING

BEFORE THE

### SUBCOMMITTEE ON HEALTH

AND THE

### SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

OF THE

## COMMITTEE ON ENERGY AND COMMERCE

## HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTH CONGRESS

FIRST SESSION

SEPTEMBER 21, 2001

### Serial No. 107–65

Printed for the use of the Committee on Energy and Commerce



Available via the World Wide Web: http://www.access.gpo.gov/congress/house

U.S. GOVERNMENT PRINTING OFFICE

75–756CC          WASHINGTON : 2001

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

Defendants' Exhibit
**1099**
01-12257 - PBS

TESTIMONY OF WILLIAM J. SCANLON, DIRECTOR, HEALTH
CARE ISSUES, GENERAL ACCOUNTING OFFICE; GEORGE F.
GROB, DEPUTY INSPECTOR GENERAL, DEPARTMENT OF
HEALTH AND HUMAN SERVICES; AND ZACHARY T. BENTLEY,
PRESIDENT, VEN-A-CARE, INC.

Thank you very much, Mr. Chairman, and members of the sub-
committees. I'm pleased to be here today to discuss this important
issue and wish to share with you some of the work that we've been
doing on the payment by Medicare for prescription drug coverage—
the prescription drugs that it covers. We are releasing today a
study that was requested in the Beneficiary Improvements and
Protection Act on Medicare's pricing of these drugs and will soon
release a related study on payments for drug administration serv-
ices under Medicare's physician fee schedule.

Today I'd like to provide highlights of these two studies, both of
which underscore the need for payment method modifications. Our
drug pricing study's findings echo those of the Inspector General,
the Justice Department, CMS and this committee's. All reveal that
Medicare's method, as we've heard, for establishing drug payments
is flawed. Simply put, tying Medicare's drug payment to AWP is a
recipe for inflation and excess payments.

Even though AWP is often labeled a retail or sticker price, it's
not even that. A price is what a purchaser pays for a product. AWP
is closer to just a number that manufacturers can specify without
rules or criteria, a number not constrained by the need to have a
purchaser willing to pay it.

Like the Inspector General, we found that in 2001, wholesalers'
catalog prices that would be available to any physician or phar-
macy or supplier involved sizable discounts from the AWP. These
conservative estimates of providers' acquisition costs indicated that
discounts on physician-billed drugs, mostly chemotherapy drugs,
ranged from 13 to 34 percent on most drugs and in some cases
were even higher. Discounts on two inhalation therapy drugs that
account for three-quarters of all the drugs billed to Medicare are
startling: 78 percent for one and 85 percent off of AWP for the
other.

Medicare's troubling experience in terms of drug pricing is often
contrasted with that of the Veterans Administration. As the VA is
essentially a health care provider and not a third-party payer like
Medicare, its approach cannot simply be transferred to the Medi-
care program, but key elements can be emulated.

The VA uses the leverage of its and other Federal purchasers'
volume to secure prices that are similar to those of other volume
purchasers' market prices that someone actually pays. To accom-
plish this, it uses its leverage to get verifiable data on actual mar-
ket transactions to establish price schedules. Furthermore, for se-
lected drugs, it has consolidated purchasing power even more and
used competition to secure even lower prices.

CMS is in a similar position in that it has available to it com-
parable information on market prices through the Medicare drug
rebate program. We are recommending that CMS assess how it can
use those data to ensure that Medicare's payments more closely re-
flect market prices and to explore how competitive procurements
might be effectively used.

31

Let me turn now to the issue of payments for drug administration. As has been indicated clearly, there is widespread agreement in terms of drug pricing. Our findings are not controversial. However, providers have indicated that underpayment in terms of drug administration needs to be made up for by overpayments in the drug purchase area.

Our second report looks at payments for drug administration under the physician fee schedule, which include the bulk of chemotherapy administration services provided by oncologists.

In the past, we have examined the then-named HCFA's development of the resource-based practice expense component of physicians' fees. That is the part of physician fees meant to reflect the cost of operating a practice, like nursing and administrative staff, equipment, rent and utilities. We concluded then that the Agency's basic method of computing these fees was sound. It achieves the goal laid out by the Congress; that is, to stop having the money Medicare pays physicians distributed according to what physicians historically charge for their services, and to have that money distributed according to the relative amounts of resources needed to provide each service.

The implementation of the revised fee schedule, though, has been controversial. Since Medicare payments in the aggregate were deemed adequate, the Congress required that the new fees be budget-neutral. Then if one specialty's fees increased on average, some others would have to decline. Such redistributions have occurred, and some are quite significant. Oncology is one of the specialties that gain under the new fee schedule. Its practice expense payments are 8 percent higher than they would have been if the prior method of setting fees stayed in place. However, that does not mean that we do not believe there is a problem in the way fees for services, like chemotherapy administration by nurses, are calculated.

HCFA modified its basic method in computing payments for services delivered without direct physician involvement, which include chemotherapy administration as well as some services provided by other specialties. The modifications were intended to correct for perceived low payments for these services, and while they did increase payments for some, they lowered them for many others. Moreover, the modifications increased payments on average for services that did involve physicians directly. Oncology payments were more affected by these modifications, because their services not involving direct physician participation constitute a bigger share of their billings than other services. These services for oncologists are about one-third of their billings compared to 5 percent for all physicians.

The payments for nonphysician chemotherapy administration are on average 15 percent lower than if HCFA used this basic method. On the other hand, practice expense payments for services provided by oncologists themselves are 1 percent higher because of these changes. Using the basic method, which we believe is correct, for all services would increase practice expense payments to oncologists by 6 percent.

We don't think that the HCFA's adjustments, as I've indicated, were appropriate, and our study will recommend that they use the

32

basic methodology—that CMS use the basic methodology to determine practice expense payments for all services.

Oncologists have raised other concerns about the physician fee schedule, including the representativeness of data used to estimate these practice expenses and whether the data reflects current practices in delivering services.

We are currently conducting another study to determine how CMS can improve and update the information used to estimate practice expenses; however, what impact improved data may have on payments is uncertain. Payments are based on the differences in expenses of one specialty compared to another. Some of the data concerns raised by oncologists may apply equally well to other specialties so that additional and many current data may reveal that the relative cost of different specialty services would only change modestly.

Overall, let me say in conclusion, we believe that it should be a principle of Medicare payment policy to pay for each service appropriately and not to rely on overpayments for some to offset inadequate payments for others. An efficiently operated Medicare program needs payments that reflect market prices so that it benefits from the discipline imposed by other payers. It also needs to judiciously use the buying power associated with its size to secure even greater efficiencies, though that must be balanced with its responsibilities to assure access for beneficiaries and to treat providers fairly.

Thank you very much, Mr. Chairman. I'll answer any questions you have.

[The prepared statement of William J. Scanlon follows:]

PREPARED STATEMENT OF WILLIAM J. SCANLON, DIRECTOR, HEALTH CARE ISSUES, UNITED STATES GENERAL ACCOUNTING OFFICE

Messrs. Chairmen and Members of the Subcommittees: I am pleased to be here as you discuss the pricing of Medicare's part B-covered prescription drugs. The pricing of these drugs—largely drugs that cannot be administered by patients themselves—has been under scrutiny for several years. Most of the part B drugs with the highest Medicare payments and billing volume fall into three categories: those that are billed for by physicians and typically provided in a physician office setting (such as chemotherapy drugs),[1] those that are billed for by pharmacy suppliers and administered through a durable medical equipment (DME) item (such as a respiratory drug given in conjunction with a nebulizer[2]), and those that are also billed by pharmacy suppliers but are patient-administered and covered explicitly by statute.[3] Studies by the Department of Justice, the Department of Health and Human Services' (HHS) Office of the Inspector General (OIG), and the House Committee on Commerce show that Medicare's payment for these drugs in some cases is significantly higher than the actual costs to the physicians and other providers who bill Medicare for these products.

In September 2000, the Health Care Financing Administration (HCFA)—now the Centers for Medicare and Medicaid Services (CMS)[4]—took steps to reduce Medicare's payment for part B-covered drugs by authorizing Medicare carriers, the contractors that pay part B claims, to use prices obtained in the Justice Department investigations of providers' drug acquisition costs. HCFA retracted this authority in November 2000 following concerns raised by providers. In December 2000, as part

---

[1] In the case of chemotherapy drugs, the common practice is for a nurse to provide the services to administer the drug and for the physician to bill Medicare accordingly.
[2] A nebulizer is a device driven by a compressed air machine. It allows the patient to take medicine in the form of a mist (wet aerosol).
[3] Medicare-covered drugs and biologicals that can be self-administered include such drugs as blood clotting factors and some oral drugs used in association with cancer treatment and immunosuppressive therapy.
[4] Our statement refers to HCFA when discussing actions it took under that name.

41

PREPARED STATEMENT OF GEORGE F. GROB, DEPUTY INSPECTOR GENERAL FOR EVALUATION AND INSPECTIONS, OFFICE OF INSPECTOR GENERAL, HHS

Good morning Mr. Chairman. I am George Grob, Deputy Inspector General for Evaluation and Inspections, Department of Health and Human Services. I am here today to discuss Medicare payments for prescription drugs.

Medicare pays too much for prescription drugs—more than most other payers. The method it uses to determine the amount to be paid is flawed. In fact, it makes no sense at all. It allows the price to be set arbitrarily by drug manufacturers, not the marketplace. Their published wholesale prices for many drugs are far above what suppliers and physicians actually pay for them. This allows physicians, for example, to make substantial profits from the drugs they administer during the course of treatment in their offices. For the year 2000 we found that Medicare's authorized payments for 24 leading drugs were $887 million more than actual wholesale prices available to physicians and suppliers and $1.9 billion more than prices available through the Federal Supply Schedule. Until the system is changed, Medicare and its beneficiaries will continue to pay excessive amounts for prescription drugs; and the amount of excessive payments will increase every year.

MEDICARE COVERAGE AND PAYMENTS FOR PRESCRIPTION DRUGS

Medicare's coverage of outpatient drugs is limited primarily to drugs used in dialysis, organ transplantation, and cancer treatment. Medicare also covers certain vaccines and drugs used with durable medical equipment such as infusion pumps and nebulizers. However, Medicare's total payments for prescription drugs have risen steadily over the past decade. In 1992, Medicare paid about $700 million for prescription drugs; by 2000, it paid $5 billion. Between 1999 and 2000 alone, payments increased by $1 billion. This rapid growth illustrates the necessity of ensuring that Medicare pays reasonable prices for the drugs it covers.

Physicians and suppliers purchase these drugs, administer or provide them to Medicare beneficiaries, and then submit a bill to Medicare for reimbursement. In general, Medicare reimburses physicians and suppliers for 95 percent of the average wholesale price (AWP) published by the drug manufacturers. Of this amount, Medicare beneficiaries are responsible for a 20 percent coinsurance payment.

EXCESSIVE PAYMENTS

Over the past 4 years, the Office of Inspector General has produced a number of reports, all of which have reached the conclusion that Medicare and its beneficiaries pay too much for prescription drugs. Although it might be sufficient for me to quote only from our most recent studies, I would like to summarize all of our work here, because it demonstrates the consistency of our findings and the relentless growth of the problem.

A table summarizing the results of our reports is provided on the next page, followed by a more detailed description.

Summary of OIG Medicare Prescription Drug Reports

| Year of Report | 1997 | 1998 | 2000 | 2000 | 2000 | 2001 | 2001 |
|---|---|---|---|---|---|---|---|
| Drugs Reviewed ... | 22 drugs | 34 drugs | 5 ESRD drugs | Albuterol | 24 drugs | Albuterol | 24 drugs |
| Year Reviewed ... | 1996 | 1997 | 1998 | 1999 | 1999 | 2000 | 2000 |
| Medicare Expenditures for Reviewed Drugs ... | $1.5 billion | $2.1 billion | $379 million | $246 million | $3.1 billion | $296 million | $3.7 billion |
| Excessive Payments Based On: | | | | | | | |
| VA ............. | | $1 billion | $162 million | $209 million | $1.6 billion $761 million | $264 million $245 million | $1.9 billion $887 million |
| Catalogs ......... | $447 million | | | | | | |
| Medicaid ......... | | | $42 million | $120 million | $425 million | | |
| Beneficiary Share of Excessive Payments ......... | $89 million | $780 million | $32 million $8 million | $42 million $74 million | $320 million $152 million $85 million | $53 million $49 million | $380 million $177 million |

42

*Drugs in general*

In December 1997, we released a report which compared Medicare payments for 22 drugs to actual wholesale prices available to the physician and supplier communities. These 22 drugs accounted for $1.5 billion of the $2.3 billion in Medicare payments for prescription drugs in 1996. The wholesale prices were computed using catalogs from drug wholesalers and group purchasing organizations which sell drugs to physicians and suppliers.

The report found that Medicare allowances for the 22 drugs exceeded wholesale prices by $447 million in 1996. Medicare paid more than the available wholesale price for all 22 drugs under review. For more than one-third of the drugs, Medicare reimbursement amounts were more than double the wholesale prices available to the physician and supplier community.

We followed up this report in November of 1998 by comparing Medicare allowances for prescription drugs to prices available to the Department of Veterans Affairs (VA) and several other Federal agencies through the Federal Supply Schedule (FSS). (The supply schedule provides agencies lie the VA with a simple process for purchasing commonly-used products in various quantities while still obtaining the discounts associated with volume buying. Using competitive procedures, contracts are awarded to companies to provide services and supplies at the FSS prices over a given period of time.) This report included 34 drugs which accounted for $2.1 billion of the $2.8 billion in Medicare spending for prescription drugs in 1997.

We found that Medicare and its beneficiaries would have saved $1 billion in 1998 if the allowed amounts for the 34 drugs were equal to prices obtained through the FSS. The potential savings for just one drug, leuprolide acetate, accounted for over $275 million. Medicare paid more than double the VA for 14 of the drugs. Overall, it paid between 15 percent and 1600 percent more than the VA for each of the 34 drugs. The biggest difference was for the drug leucovorin calcium, with a VA price of $1.18 and a Medicare price over $20.

In January of this year, we released another report comparing Medicare reimbursement to prices available to the physician/supplier community, the Department of Veterans Affairs, and Medicaid. This time, we studied the prices for 24 drugs which represented $3.1 billion of the $3.9 billion in Medicare drug expenditures in 1999.

We found that Medicare and its beneficiaries would have saved $1.6 billion for these 24 drugs by paying the VA's Federal Supply Schedule price. For half of the drugs, Medicare paid more than double the VA price. The savings would have been $761 million a year by paying the actual wholesale prices available to physicians and suppliers. For every drug in our review, Medicare paid more than the wholesale price available to physicians and suppliers and the VA Federal Supply Schedule price. For example, Medicare reimburses $43 for 10 mg of the drug doxorubicin, more than four times the wholesale price of $10. The VA pays even less, with a Federal Supply Schedule price of $6.29. We also found that Medicare would have saved over $425 million or almost 15 percent a year for the 24 drugs by obtaining rebates similar to the Medicaid program.

We have recently updated the findings of this report with more current drug pricing information. We found that Medicare would have saved $1.9 billion of the $3.7 billion it spent for 24 drugs in 2000 if the drugs were reimbursed at prices available to the VA. Over $380 million of this savings would directly impact Medicare beneficiaries in the form of reduced coinsurance payments. In some cases, the VA price for a drug was less than the amount a Medicare beneficiary would pay in coinsurance. More conservatively, Medicare and its beneficiaries would save $887 million a year by paying the actual wholesale prices available to physicians and suppliers for these 24 drugs. Beneficiaries would pay over $175 million less in coinsurance if Medicare paid for these drugs based on catalog prices. The potential savings to both Medicare and its beneficiaries is probably higher, assuming data for all Medicare drugs is similar to that for the 24 we analyzed.

*Nebulizer and End Stage Renal Disease (ESRD) Drugs*

In addition to our reports summarizing a number of drugs, we have also produced targeted reports on specific nebulizer and end stage renal disease (ESRD) drugs that Medicare covers.

In June 2000, we released a report which looked at Medicare's reimbursement of albuterol, a drug used with a nebulizer to treat asthma, emphysema, and other respiratory problems. Albuterol is one of the top drugs covered by Medicare, with more than $250 million per year in Medicare allowances. This report updated the findings of several of our prior albuterol studies, all of which noted that Medicare's reimbursement amount exceeded prices available through other sources.

43

We found that Medicare paid nearly double the Medicaid payment amount and almost seven times what the VA pays for one milligram of albuterol. Furthermore, nearly every pharmacy we contacted sold generic albuterol at prices less than Medicare paid for it. According to our survey results, consumers could go to popular drug stores across the country and buy a monthly supply of albuterol for around $95. For the same monthly supply, Medicare and its beneficiaries would pay a total of $118, with Medicare paying $94 and the beneficiary paying the remaining $24. The VA's entire monthly payment of $17.50 for albuterol is less than just the beneficiary's $24 coinsurance payment under Medicare. We calculated that Medicare could save between $47 million and $209 million per year by setting prices for albuterol equal to those available through these other sources.

Once again, we have recently updated this report with new pricing data. Preliminary findings show that VA prices for albuterol have decreased since last year. The VA price for albuterol has fallen by more than 50 percent over the last 3 years, from $0.11 per mg in 1998 to $0.05 per mg in 2001. During the same time period, Medicare's reimbursement amount (based on reported average wholesale prices) has remained constant at $0.47 per mg.

In 2000, published wholesale acquisition costs for albuterol ranged from $0.09 to $0.18 per mg. These wholesale acquisition costs were provided by manufacturers to drug compendiums such as Red Book. The Medicare reimbursement rate of $0.47 per mg was anywhere from three to five times the wholesale acquisition costs reported by manufacturers.

Recently, we have begun to look at who actually supplies albuterol to Medicare beneficiaries. We found that Medicare reimbursed more than 6,500 pharmaceutical suppliers for albuterol claims in 2000. However, less than 3 percent of these suppliers (184) accounted for approximately 80 percent of albuterol reimbursement. Each of these suppliers had over $150,000 in paid Medicare claims for albuterol last year. Thirty-four of these suppliers were each responsible for more than $1 million in Medicare reimbursement for albuterol in 2000, with five having between $11 million and $35 million in reimbursement. Thus, the vast majority of the albuterol supplied to Medicare beneficiaries was provided by suppliers that purchase and bill for a large quantity of the product. We believe that suppliers that purchase albuterol in such large quantities are likely to receive volume discounts similar to those provided to the VA and other large purchasers. Our work in this area is continuing.

Also in June 2000, we released a report comparing Medicare payments for ESRD drugs to those of the VA and Medicaid. We focused this inspection on five drugs used by renal dialysis facilities to help treat renal failure. These five drugs accounted for $379 million in total charges to Medicare in 1998.

We found that Medicare paid between 37 percent and 56 percent more than the VA for these drugs. Medicare would have saved up to $162 million in 1998 if they paid the same amount as the VA for the five drugs. Furthermore, Medicare paid between 5 percent and 38 percent more than Medicaid. Medicare would have saved as much as $42 million in 1998 by using Medicaid reimbursement amounts.

### FLAWED PAYMENT METHOD

Our reports have shown time after time that Medicare pays too much for drugs. Why does Medicare pay so much? We believe that it is because Medicare's payment methodology is fundamentally flawed. By statutory requirement, Medicare's payment for a drug is equal to 95 percent of the drug's average wholesale price (AWP). However, the AWPs which Medicare uses are not really wholesale prices.

For the most part, AWPs are reported by manufacturers to companies that compile drug pricing data, such as First DataBank and Medical Economics which publishes the Red Book. As our reports have indicated, the published AWPs that Medicare uses to establish drug prices bear little or no resemblance to actual wholesale prices available to physicians, suppliers, and large government purchasers.

Aside from the obvious problem of inflated AWPs resulting in inappropriate Medicare payments, the use of AWP also has other potential adverse side-effects. For instance, because physicians and suppliers get to keep the difference between the actual price they pay for the drug and 95 percent of its AWP, this "spread" can serve as an inducement for suppliers or physicians to use one brand of drug product over another. Thus, publishing an artificially high AWP can be used as a marketing device to increase a drug company's market share. Such a tactic would increase the profit of the suppliers or physicians who purchase the drug because, while not paying the artificially inflated AWP amount, they can bill Medicare for it and get paid at that inflated amount. While the published AWP does not increase the amount the manufacturer receives for each unit of the drug product, it may induce an increase in market share because of the higher profits made by physicians and sup-

44

pliers. This in turn increases the profits of the drug company. All of this occurs at the expense of the Medicare program and its beneficiaries.

For the drug Albuterol, the spread is so large and Medicare reimbursement so lucrative that mail-order pharmacies have been tempted to capitalize on the difference by making illegal kickback payments to durable medical equipment suppliers for patient referrals. A civil settlement totaling $10 million has been reached with one pharmacy that succumbed to this temptation.

PHYSICIANS' CONCERNS

Some physician groups have raised concerns about Medicare's attempts to lower reimbursement for prescription drugs. For example, some oncologists have stated that Medicare does not adequately reimburse physicians for the practice costs associated with providing treatment to cancer patients. These physician groups say that overpayments for prescription drugs simply make up for inadequate payments for their practice costs.

We agree that physicians need to be properly reimbursed for patient care. However, we do not believe that the payment of artificially inflated drug prices is an appropriate mechanism to compensate them. We do not think that the decision as to how much Medicare pays for physicians' practice costs should be made by them or by drug manufacturers. The Medicare program or the Congress should have responsibility for this calculation. We certainly do not believe that the basis for their compensation and medical practice expenses should be artificially inflated, misleading, and mis-named average wholesale prices.

The Medicare program already has a procedure for determining and the amount of paying physicians for their practice costs. If the current calculations are incorrect, they should be modified. Physicians deserve fair reimbursement for their valuable services. There is no reason to resort to a make-believe process to accomplish this.

OPTIONS FOR REFORMING THE PAYMENT SYSTEM

There are a number of options for revising Medicare's drug reimbursement methodology. We recognize that there may not be one perfect solution to solving all of Medicare's drug pricing issues. However, we believe these options provide reference points for considering how to reform the Medicare drug payment system.

A few general remarks are in order before discussing specific options. First, some of the options offer a way to calculate a base amount for Medicare reimbursement. These include using the Federal Supply Schedule, the average manufacturer's price, or the AWP, for example. For each such option, additional sub-options are possible. One would be to set Medicare prices at a fixed percentage above or below the base. For example, Medicare currently has its payment rate set at 95 percent of AWP. That percentage could be dropped. Alternatively, if the Federal Supply Schedule were used as a base, then Medicare's payment could be set at, say, 105 or 110 percent of this number.

Second, the options are not necessarily exclusive of one another. In the Medicaid program, most States set payment rates at a percentage below AWP, but they also get rebates from manufacturers. The same could be done for Medicare. Another example might be basing Medicare payment rates on average manufacturer prices (AMP) (used for calculating rebates in the Medicaid program), but making upward or downward adjustments on the basis of surveys of amounts paid by of large institutional health care providers such as hospitals or managed care organizations.

Each option has its own advantages and disadvantages. Some things to consider when comparing them are: the cost of gathering data to set the base, the reliability of the data, the time needed to collect and analyze it; how easily it can be gamed or misrepresented.

Logistical considerations are important too, such as: who will collect and analyze data, who will propose the Medicare payment rate, and how often this will be done; how will the underlying data be verified, by whom, and how often; what method will be used to periodically update the payment amounts, and how frequently will this be done.

Finally, some broader principles and concerns need to be addressed, such as: how proprietary data will be protected; the consequences of drug manufacturers, suppliers, wholesalers, and medical care providers not providing the needed data or misrepresenting it; ways to minimize the burden of public reporting associated with data collection; the need for, nature of, and length of a transitional phase in introducing the new payment method; and whether any adjustment is needed in the practice cost component of Medicare's physician payment rate.

Keeping these factors in mind, the following options may be considered for reforming Medicare's drug payment method:

86

People have proposed that we do a survey of market prices, which also might work. I talked to my staff about trying to do a survey of what nursing homes pay, for instance, because nursing home chains usually have—they're not as big as the Federal supply schedule, but large nursing homes, Manor Care, somebody like that frequently buys—you know, has a similar group of patients buying in large bulk volume.

The problem in doing that—and I think that's a possibility—is that you're looking back a year. And obviously, as you can see from the earlier testimony, the prices change by the day, and looking back and doing a snapshot looking back a year at anybody, for us to do a survey of 2000 prices to set 2001 prices is never going to be quite right. So I think that has its flaws as well.

There is a concept similar to average manufacturers' price called average sales price that you could possibly use, but I think a combination of these we certainly could work on legislatively, and I think the bottom line is that the manufacturers know at the end of the day how many units they're selling to Medicare. They know how many we're paying for.

If we can, in fact, require them, as we do in Medicaid, to tell us what the price is and calculate at the end of the year how many they sold to Medicare and what the price is and recover that price and there is a mechanism to do that, I think to find that balance that we end up getting the right price charged us by the manufacturer, while not limiting and denying access to the physicians that are actually out there in the market, potentially in a small town trying to get it, is the mix that we need to find, and I think it's very doable.

Can we do this administratively? I think we probably won't in the near term, because we probably would get sued. We'd certainly prefer to do it legislatively. I think we could. And if Congress doesn't act, it would probably take us a year to a year and a half to do it. It would take a long rulemaking process. I have zero doubt that we'd be sued, because of what the law says on 95 percent of AWP.

So I would strongly, strongly, strongly prefer to work with Congress hopefully in the next month to find a legislative solution that works, that is fair to the oncologists, that is fair to the dialysis clinics, that is fair to the other patient groups involved and that gets our payment back on the right track. Because it's clearly a very messy system we're in right now.

So I know you've had a long hearing already. That's about as fast as I can talk, and I skipped over a whole bunch of other things I was going to say, but I hope—it may be more valuable just to answer questions. But there is zero doubt that the administration, while we don't have the set solution, is extremely interested in working to fix this problem.

[The prepared statement of Thomas A. Scully follows:]

PREPARED STATEMENT OF THOMAS A. SCULLY, ADMINISTRATOR, CENTERS FOR MEDICARE & MEDICAID SERVICES

Chairman Greenwood, Chairman Bilirakis, Congressman Deutsch, Congressman Brown, distinguished Subcommittee members; thank you for inviting me to discuss Medicare payment for outpatient prescription drugs. As you know, prescription drugs are becoming an increasingly important component of modern health care,

87

particularly for Medicare beneficiaries. We are working with Congress to modernize Medicare to cover prescription drugs and provide relief to seniors from high drug costs. In addition, it is clear that the payment system for selected outpatient drugs that are now covered by Medicare is a mess. Medicare now pays more than many other purchasers for the drugs we cover due to the way that drug manufacturers report their prices and Medicare's payment policies. Medicare should pay appropriately for all Medicare benefits, including the drugs we currently cover, and it is unacceptable that the current system results in Medicare paying excessive prices. We also need to pay appropriately for the services required to furnish these drugs. I appreciate your dedication and leadership on this issue, and I look forward to working with you and your colleagues to ensure that Medicare beneficiaries have access to the drugs they need and that Medicare pays competitive prices for these prescription drugs.

By law, Medicare does not pay for most outpatient prescription drugs. However, there are some specific exceptions where Medicare covers pharmaceuticals, such as drugs furnished incident to a physician's covered services, and in these cases, the law mandates that we pay physicians and other providers based on the lower of the billed charge or 95 percent of the drugs' average wholesale price (AWP). Numerous studies have indicated that the industry's reported wholesale prices, the data on which Medicare payments are based, are vastly higher than the amounts that drug manufacturers and wholesalers actually charge providers. That means Medicare beneficiaries, through their premiums and cost sharing, and U.S. taxpayers are spending far more than the "average" price that we believe the law intended them to pay. Some affected physicians and providers have suggested that they need these Medicare "drug profits" to cross subsidize what they believe are inadequate Medicare payments for services related to furnishing the drugs, such as the administration of chemotherapy for cancer. I believe we need to pay appropriately for both the drugs and the services related to furnishing the drugs.

Clearly, Medicare drug pricing is a complex issue. Over the years, numerous legislative efforts have failed to develop an effective alternative to AWP and ensure that Medicare and its beneficiaries do not pay more than they should for the limited number of prescription drugs that Medicare covers. We are committed to working with Congress on a bipartisan basis to ensure that Medicare pays accurately for all of its benefits. As we look to the future, particularly in the context of developing a Medicare drug benefit that does not make the same mistakes, I think it might be important to review previous efforts to reform the AWP payments so that together we can develop a workable solution.

## MEDICARE'S LIMITED DRUG BENEFIT

The Centers for Medicare & Medicaid Services (CMS) pays most of the health care expenses of almost 40 million Medicare beneficiaries. If we were creating the Medicare program today, a prescription drug benefit certainly would be included. However, in 1965, prescription drugs played a less prominent role in health care, and the emphasis then was on ensuring access to inpatient hospital care in Medicare Part A and providing access to physicians in Medicare Part B. Today, Medicare beneficiaries rely on prescription drugs as an integral part of their health care. Although by law, Medicare does not generally cover over-the-counter or outpatient prescription drugs, currently Medicare does cover some drugs, including:

- Drugs that are not self-administered and furnished "incident to" a physician's service, such as prostate cancer drugs;
- Certain self-administered oral cancer and anti-nausea drugs;
- Certain drugs used as part of durable medical equipment or infusion devices, (e.g., the albuterol that is put into nebulizers, which are devices used by asthma patients);
- Immunosuppressive drugs, which are used following organ transplants;
- Erythropoietin (EPO), far and away the drug Medicare spends the most money on, is used primarily to treat anemia in end stage renal disease patients and in cancer patients; and
- Osteoporosis drugs furnished to certain beneficiaries by home health agencies.

These drugs are typically provided in the hospital outpatient setting, dialysis centers, or in the doctor's office, and are purchased directly by the physician or provider. Additionally, vaccines for diseases like influenza, pneumonia, and hepatitis are considered drugs, and are covered by Medicare.

By law, we generally pay for these drugs based on the actual charge or 95 percent of the AWP, whichever is lower. This adds up to more than $5 billion a year for currently covered drugs, approximately 80 percent of which is paid for by the Medicare program. In general, Medicare beneficiaries must also share in the cost of pur-

S. Hrg. 107–684

# REIMBURSEMENT AND ACCESS TO PRESCRIPTION DRUGS UNDER MEDICARE PART B

# HEARING

BEFORE THE

## SUBCOMMITTEE ON HEALTH CARE

OF THE

## COMMITTEE ON FINANCE

## UNITED STATES SENATE

ONE HUNDRED SEVENTH CONGRESS

SECOND SESSION

MARCH 14, 2002



Printed for the use of the Committee on Finance

U.S. GOVERNMENT PRINTING OFFICE

81–823—PDF                WASHINGTON : 2002

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail Stop SSOP, Washington, DC 20402–0001



34

A sudden change, without carefully thinking out the consequences, could be disastrous. When I started looking into the issue when I was elected to the presidency of the American Society of Clinical Oncology, I interviewed dozens of doctors in New York State and throughout the country, probably hundreds at this point. I have been doing this for 2 years.

The doctors and the patients—and I think you will be hearing from the patient side in a moment—are really terrified of the implications. Can you start reducing the costs of administering chemotherapy? You can give some of these drugs by direct injection rather than through IV tubing, but you risk extravasation of some of these drugs.

This means that the drug gets into the tissue and the tissue will die and actually turn black and fall off. It is a horrible consequence, and it can happen because of efforts to reduce the cost of administering the chemotherapy. We just cannot let that happen. The nursing time is essential to make sure that quality is being part of the system.

Senator ROCKEFELLER. With Senator Snowe's permission, can I just interrupt you to make this point? You indicated earlier that you have to pay for practice expense, nurses, space, all kinds of things.

Oncologists, insofar as I remember from my RBRVS days—and nothing, I do not think, has changed that much since then—along with anesthesiologists and some others, are still pretty well reimbursed. Does everybody else not have to pay pretty much those same costs?

Dr. NORTON. Well, the difference in oncology, is that it is most of the patients that require this very extensive system for administering chemotherapy, drug therapy.

Cardiology, rheumatology, nephrology. It would be a small percentage of the patients that would require this as opposed to the bulk of the practice of oncology. Oncology really is special among oncologic practices and has to be looked at that way.

Senator ROCKEFELLER. I would be interested—and I am going to apologize to my colleague—and would like to get some data on that.

Dr. NORTON. Sure.

Senator ROCKEFELLER. Because getting data, as Janet Rehnquist was saying, we can do it, audit it, and all the rest of it. But some of the rest of us are a little bit more skeptical about what data has been submitted. So, we more or less have to rely on the data we are given.

I think, without being audited, sometimes it just comes from physicians or pharmaceutical companies and is not necessarily audited as well as we think.

So, for me, without any pre-assumption here, I would like to get some information from you about the differences between you and, let us say, some other kinds of physicians in terms of practice expenses.

Dr. NORTON. Absolutely. In fact, that is a very important topic of conversation. Oncologists are telling me that if the system gets thrown out of whack here, that they are not going to be able to afford to do it.

35

Some have said that they refer the patients to hospitals. But I called hospitals all through New York State when I looked into this 2 years ago, and they cannot afford it either.

I can tell you, at Memorial Sloane-Kettering we have an obligation to our own patients. We could not take an influx of hundreds or thousands of patients to treat. We have the same economic pressures, the hospitals have, that the community-based oncologists have. So, it is a huge issue.

Senator ROCKEFELLER. Again, with apologies to my colleague, I hear so many doctors over so many years, both as a Governor and as a Senator, making statements like that.

If we do not get reimbursed when we start doing health care cost review in West Virginia, if we do not get reimbursement to a certain level, we are going to have to stop.

I have gotten a little, sort of, harder about my reaction to that. People go into a profession to do certain things and I am a little more skeptical about it.

Dr. NORTON. What they are saying is, they will do consultations and plan for the treatment, but not be able to afford the administration of it. These are out-of-pocket expenses for these doctors.

Senator ROCKEFELLER. So just leave the patients and then walk away.

Dr. NORTON. They are not going to walk away. They are going to try to see if they can arrange it. But I can tell you, calling cancer centers and hospitals, it is not going to be easily arranged. In fact, we could have a disaster here.

It is a very, very serious issue. These are out-of-pocket expenses, expensive issues. They are paying for it before the patient even walks in the door. And there are a lot of other costs, hidden costs.

But I want to get to your point, really, which is that we do not know a lot of those numbers. We have been trying to get those numbers. I agree with you. I do not think the data is good. I am just speaking as a scientist here in terms of what it actually costs.

Senator ROCKEFELLER. Then get good data and get it to us, for heaven's sake. For your own sake, and for ours.

Dr. NORTON. We actually have been trying to. The House asked us to work together with CMS to do this. We have been trying to. There have been discussions about methodology and differences of opinion. There are data out there.

There is a clinical practice expert panel that came up with that number—and this is back a few years—where doctors were only getting about 25 percent reimbursement for what they actually had to spend to treat a patient with chemotherapy. These are numbers that exist out there. I think it is worse today.

Senator ROCKEFELLER. That may be, Doctor. But if you are telling me that there is about to be a catastrophe, or there could be a catastrophe, and at the same time you are telling me that you do not have data because there is so many different kinds of data available, it is not very convincing.

Dr. NORTON. Mr. Chairman, we are trying to work to get you that data. We really are. We are trying to work with CMS. They do not agree with the methodology. GAO was asked to do this in 1999, and again in 2000. They did not give the data. We did not do it independently.

42

quisition costs? You have said it has come down to, 74 percent of all of the extra costs in providing this kind of therapy at home are not reimbursed. Is that correct?

Ms. GETSON. That is correct. The current methodology for durable medical equipment providers, under Part B, relies solely on the AWP minus 5 percent factor, plus a small dispensing fee. That is unlike other care settings.

The Lewin study does break down the 74 percent and provides both the committee, as well as other groups to whom we have submitted that data, the breakdown of nursing, respiratory therapy, overhead, pharmacy, and other costs.

Senator SNOWE. Is this an issue that your organization has pursued before with Health and Human Services or with Congress?

Ms. GETSON. In the past 18 months, since the former Secretary first issued notice that changes might occur, we have been working very proactively through the American Association for Home Care, with various committee members, and CMS, and also worked with the GAO as they prepared their study last summer.

Senator SNOWE. All right. So really it has just been in the last 2 years, essentially, that you have been working on making this change with respect to this issue.

Ms. GETSON. Yes.

Senator SNOWE. All right. What has been the response from the Department?

Ms. GETSON. I would say that they have acknowledged that they have not had enough time to adequately study this issue, that most of the time and attention has been spent on the physician component, since that is where the bulk of the spending for these drugs has actually occurred.

But they have been very receptive to our information. The GAO, for example, had staff visit a home infusion pharmacy to gain a better understanding of the various service components.

Senator SNOWE. For Dr. Norton and Ms. Dummit, since you both focus obviously on the same areas, and the GAO obviously examined the issues of oncology expenses. Dr. Norton, first of all, would you agree that some of the issues concerning reimbursement for oncology services started with the previous methodology changes under HCFA at that time? I am trying to get an understanding.

Is that when this problem manifested itself? Was it always present, but was exacerbated by the changes that were made by HCFA or the administration?

Dr. NORTON. It kind of grew around us. But, clearly, decisions were made by HCFA that brought us to the current state, yes.

Senator SNOWE. I see. And do you agree with the assessment that has been made by the General Accounting Office in terms of what could address the problems that are being faced by your group?

Dr. NORTON. I think that we need more data, frankly. I am just speaking as somebody who looks at data professionally. When I make a decision to treat a patient with a drug, and I know the dose of the drug, that dose for that drug is based on a lot of solid data.

I do not see enough data here to feel very confident that I know what the real costs are and what the real reimbursement situation is. Nobody has really done a bottom's up approach where you look

43

at how many syringes and how much nursing time is involved. I think that is really what is needed here so that we know what the true costs are.

Senator SNOWE. I see. So the basic methodology proposed by the General Accounting Office, combined, would yield an additional $51 million. You are not necessarily in agreement or disagreement?

Dr. NORTON. I think that you and I should both get an accounting of how they come up with that number to see if it is a satisfactory number.

Senator SNOWE. Ms. Dummit, can you respond to that?

Ms. DUMMIT. Yes. What we did in reaching that $50 million number, was we looked at the basic method that HCFA used in establishing the practice expense fees.

Our earlier analysis and our current analysis confirmed that that is a reasonable approach to setting practice expense payments for physician services.

CMS used the best available data that they had on both specialties' total practice expense costs, as well as CPAP data, which are physician groups that determine the resources that are used for each particular service.

I will add that CMS has stated that physician specialties can submit revised practice expense data, that is, data that sets the entire pool of payments for a particular specialty.

They have that specialties can submit those data, and if it meets particular requirements, they will use those data in setting the fees. Furthermore, CMS regularly updates the service-specific information it uses to set the fees.

As I said, GAO did a very detailed analysis of CMS's method for calculating fees for particular services. There were two variations from their specific basic methodology that, in particular, affected oncologists. One, is most chemotherapy services are performed by nurses. That is, they are non-physician services and do not include a physician work component.

CMS separated out those services and developed a different method for paying for those services, a methodology that is not resource-based as the Congress intended, but is rather based on the old charge-based system.

We believe that that is not the right way to go. We have recommended that CMS fix the underlying problems with those fees, which we believe have to do with overhead allocation, and pay for them using the basic methodology.

Furthermore, CMS reduced the practice expenses attributed to supplies that oncologists reported. Everyone acknowledges that oncology supply expense data included some numbers for drugs, which, as we know, are paid for separately.

CMS, rather than gathering the correct information, substituted the all physician average. This further lowered oncologists' payments. We believe if these two payment problems were fixed, that payments to oncologists in 2001 would have been about $50 million higher than they were now.

Senator SNOWE. Dr. Norton?

Dr. NORTON. I am really not sure of the number. I mean, I think it is the number. What we are hearing here, is there are some problems that have already been identified with the way these are

 **CONGRESSIONAL BUDGET OFFICE**
**U.S. Congress**
**Washington, DC  20515**

*Douglas Holtz-Eakin, Director*

November 20, 2003

Honorable William "Bill" M. Thomas
Chairman
Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

The Congressional Budget Office has estimated the effects on direct spending and revenues of the conference agreement on H.R. 1, the Medicare Prescription Drug, Improvement, and Modernization Act of 2003.  CBO estimates that enacting this legislation would result in direct spending outlays totaling $395 billion over the 2004-2013 period.  It would also lead to an increase in federal revenues totaling $0.5 billion over that 10-year period. The enclosed tables provide additional detail on these estimates.

CBO has not had an opportunity to review the final legislative language, and this estimate could change upon completion of that review.  Also, the estimate does not include the act's potential effects on discretionary spending.

If you wish further details on this estimate, we would be pleased to provide them.  The CBO staff contact is Tom Bradley, who can be reached at 226-9010.

Sincerely,

Douglas Holtz-Eakin

Enclosure *[The PDF version of this estimate includes the detailed tables on CBO's estimates mentioned in this letter.]*

cc:    Honorable Charles B. Rangel
       Ranking Member

Identical letters sent to Honorable Jim Nussle, Honorable Don Nickles, Honorable Charles E. Grassley, and Honorable W.J. "Billy" Tauzin.



November 20, 2003

## CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1

| | By Fiscal Year, in Billions of Dollars | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
| **CHANGES IN DIRECT SPENDING (Outlays)** | | | | | | | | | | | | |
| Prescription Drug Benefit (Title I) | 0.3 | 0.8 | 25.7 | 39.0 | 44.6 | 48.7 | 53.7 | 58.6 | 65.3 | 73.1 | 110.4 | 409.8 |
| Medicare Advantage (Title II) | 0.5 | 0.8 | 0.4 | 1.7 | 1.7 | 1.7 | 1.8 | 1.9 | 1.8 | 1.8 | 5.2 | 14.2 |
| Fee-for-Service Provisions (Titles III-VII) | 1.8 | 2.5 | 0.6 | -1.0 | -2.4 | -3.3 | -4.1 | -4.8 | -5.3 | -5.5 | 1.4 | -21.5 |
| Cost Containment (Title VIII) | 0 | * | * | -0.2 | -0.5 | -0.9 | -1.8 | -2.7 | -3.1 | -3.9 | -0.8 | -13.3 |
| Administrative Improvements (Title IX) | * | * | * | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.5 |
| Medicaid and Other Provisions (Title X) | 1.2 | 1.8 | 0.8 | 0.7 | 0.5 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 5.1 | 5.7 |
| Access to Affordable Pharmaceuticals (Title XI) | * | * | * | * | * | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.6 |
| Total, Direct Spending Changes | 3.8 | 6.0 | 27.5 | 40.2 | 44.0 | 46.5 | 49.8 | 53.0 | 58.7 | 65.5 | 121.4 | 394.8 |
| **CHANGES IN REVENUES** | | | | | | | | | | | | |
| Titles I and XI | * | * | 0.4 | 0.7 | 0.8 | 0.8 | 0.9 | 1.0 | 1.2 | 1.3 | 1.9 | 7.2 |
| Health Savings Incentives (Title XII) a | -0.2 | -0.5 | -0.6 | -0.6 | -0.7 | -0.7 | -0.8 | -0.8 | -0.9 | -0.9 | -2.5 | -6.7 |
| Total, Revenue Changes | -0.2 | -0.5 | -0.1 | * | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | -0.7 | 0.5 |
| **NET BUDGET IMPACT** | | | | | | | | | | | | |
| Net Increase in Deficits or Decrease in Surpluses | 4.0 | 6.5 | 27.6 | 40.2 | 43.9 | 46.4 | 49.6 | 52.8 | 58.4 | 65.1 | 122.1 | 394.3 |

NOTES:   Estimates are preliminary and are subject to further review of the legislative language.

* = costs or savings of less than $50 million.

a.  Estimate provided by the Joint Committee on Taxation.

**CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1: Detail**
by fiscal year, in billions of dollars

November 20, 2003
2:33 PM

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Changes in Direct Spending** | | | | | | | | | | | | |
| **Title I: Medicare Prescription Drug Benefit** /a | 0.3 | 0.8 | 25.7 | 39.0 | 44.6 | 48.7 | 53.7 | 58.6 | 65.3 | 73.1 | 110.4 | 409.8 |
| **Title II: Medicare Advantage** | | | | | | | | | | | | |
| 201-223 Medicare Advantage | 0.5 | 0.8 | 0.3 | 1.7 | 1.7 | 1.7 | 1.7 | 1.8 | 1.9 | 2.0 | 5.0 | 14.1 |
| 231-238 Additional reforms | * | * | 0.1 | 0.1 | * | * | * | * | * | * | 0.2 | 0.4 |
| 241 Application of Comparative Cost Adjustment | 0 | 0 | 0 | 0 | 0 | 0 | * | -0.1 | -0.1 | -0.2 | 0 | -0.3 |
| Subtotal, Title II | 0.5 | 0.8 | 0.4 | 1.7 | 1.7 | 1.7 | 1.8 | 1.9 | 1.8 | 1.8 | 5.2 | 14.2 |
| **Title III: Combating Waste, Fraud, and Abuse** | | | | | | | | | | | | |
| 301 Medicare secondary payer provisions | -0.4 | -0.6 | -0.8 | -0.8 | -0.9 | -0.9 | -1.0 | -1.1 | -1.2 | -1.3 | -3.4 | -8.9 |
| 302 Payment for durable medical equipment | * | -0.4 | -0.6 | -0.7 | -0.7 | -0.7 | -0.9 | -0.9 | -0.9 | -1.0 | -2.4 | -6.8 |
| 303 Competitive acquisition of covered outpatient drugs | (0.1) | (0.1) | (0.2) | (0.3) | (0.3) | (0.4) | (0.5) | (0.6) | (0.8) | (0.9) | (0.9) | (4.2) |
| 304 Application to certain specialties | (0.1) | (0.5) | (0.4) | (0.5) | (0.6) | (0.7) | (0.9) | (1.0) | (1.2) | (1.4) | (2.2) | (7.3) |
| 305 Payment for inhalation drugs | -0.1 | -0.2 | -0.3 | -0.3 | -0.4 | -0.4 | -0.5 | -0.6 | -0.7 | -0.8 | -1.3 | -4.2 |
| 306 Demonstration for recovery audit contractors | 0 | 0 | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 307 Background checks | 0 | * | * | * | 0 | 0 | 0 | 0 | 0 | 0 | * | * |
| Subtotal, Title III | -0.6 | -1.7 | -2.3 | -2.6 | -2.9 | -3.2 | -3.7 | -4.2 | -4.7 | -5.3 | -10.1 | -31.3 |

1

**CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1: Detail**
by fiscal year, in billions of dollars

November 20, 2003
2:33 PM

| Title IV: Rural Provisions | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subtitle A - Part A** | | | | | | | | | | | | |
| 401 Equalize standardized amount | 0.3 | 0.6 | 0.7 | 0.7 | 0.8 | 0.8 | 0.9 | 0.9 | 1.0 | 1.1 | 3.0 | 7.6 |
| 402 Disproportionate share adjustment | 0.1 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.3 | 0.4 | 1.1 | 2.7 |
| 403 Adjust wage index for labor share | * | 0.4 | 0.5 | 0.5 | 0.5 | 0.6 | 0.6 | 0.7 | 0.7 | 0.8 | 1.9 | 5.2 |
| 404 More frequent MB weight updates | * | 0 | 0 | 0 | * | * | * | * | * | * | 0 | 0 |
| 405 Critical access hospital Provisions | 0 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.4 | 0.9 |
| 406 Inpatient adjustment for low-volume hospitals | * | * | * | * | * | * | * | * | * | * | * | 0.1 |
| 407 SCH: missing cost reports | * | * | * | * | * | * | * | * | * | * | 0.1 | 0.1 |
| 408 Hospice: Authorization of nurse practitioners | * | * | * | * | * | * | * | * | * | * | * | 0.1 |
| 409 Rural hospice demonstration | * | * | * | * | * | * | * | * | * | * | * | * |
| 410 Exclude certain FQHCs from SNF PPS | 0 | * | * | * | * | * | * | * | * | * | * | 0.1 |
| 410A Rural community hospital demonstration program | 0 | * | * | * | * | * | 0 | 0 | 0 | 0 | * | * |
| | | | | | | | | | | | | |
| **Subtitle B - Part B** | | | | | | | | | | | | |
| 411 HOPD PPS: Two year extension of hold harmless | 0.1 | 0.2 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.3 | 0.3 |
| 412 Work GPCI floor for physicians | 0.2 | 0.3 | 0.3 | 0.1 | 0.1 | 0 | 0 | 0 | 0 | 0 | 1.0 | 1.0 |
| 413 Physician: incentive payments | * | 0.2 | 0.2 | 0.2 | 0.1 | 0 | 0 | 0 | 0 | 0 | 0.7 | 0.7 |
| 414 Payment for ambulance services | * | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | * | * | * | * | 0.5 | 0.6 |
| 415 Rural air ambulance | 0 | * | * | * | * | * | * | * | * | * | * | 0.1 |
| 416 Rural HOPD lab policy | * | 0.1 | 0.1 | * | * | * | * | * | * | * | 0.2 | 0.2 |
| 417 Telemedicine demo extension | * | * | * | * | * | * | * | * | * | * | * | * |
| 418 Report on SNF as telehealth sites | 0 | 0 | * | * | * | * | * | * | 0 | * | * | 0.1 |
| | | | | | | | | | | | | |
| **Subtitle C - Parts A & B** | | | | | | | | | | | | |
| 421 HH: 1 Year reinstatement of rural update | * | 0.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.1 | 0.1 |
| 422 Redistribution of unused resident positions | 0 | * | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.6 |
| | | | | | | | | | | | | |
| **Subtitle D - Other Provisions** | | | | | | | | | | | | |
| 431 FQHC: Safe harbor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 432 Office of Rural Health Policy | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 433 MedPAC study on rural payment adjustments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 434 Frontier extended stay clinic demonstration project | * | * | * | * | * | * | * | * | * | * | 0.1 | 0.2 |
| | | | | | | | | | | | | |
| Subtotal, Title IV | 0.8 | 2.2 | 2.3 | 2.1 | 1.9 | 1.9 | 2.0 | 2.1 | 2.2 | 2.4 | 9.3 | 19.9 |

2

**CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1: Detail**
*by fiscal year, in billions of dollars*

November 20, 2003
2:33 PM

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Title V: Provisions relating to Part A** | | | | | | | | | | | | |
| *Subtitle A: Inpatient Hospital Services* | | | | | | | | | | | | |
| 501 Acute care hospital updates | 0 | -0.1 | -0.1 | * | * | 0 | 0 | 0 | 0 | 0 | -0.2 | -0.2 |
| 502 Indirect Medical Education | 0.2 | 0.3 | 0.1 | * | * | 0 | 0 | 0 | 0 | 0 | 0.4 | 0.4 |
| 503 New technologies under PPS | 0 | * | * | -0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.5 |
| 504 Puerto Rico federal rates | 0 | * | * | 0.1 | 0.1 | * | * | * | * | * | 0.2 | 0.4 |
| 505 Wage index adjustment | * | * | * | * | * | * | * | * | * | * | 0.1 | 0.4 |
| 506 Limitation on charges to Indians | 0 | 0 | * | * | 0 | 0 | 0 | 0 | 0 | 0 | * | * |
| 507 Limitations on physician referrals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 508 One-time appeals process for hospital wage index | 0.2 | 0.2 | 0.2 | 0.2 | * | 0 | 0 | 0 | 0 | 0 | 0.9 | 0.9 |
| *Subtitle B: Other Provisions* | | | | | | | | | | | | |
| 511 Payments to skilled nursing facilities | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | * | * |
| 512 Coverage of hospice consultation services | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.1 | 0.3 |
| 513 Study on portable ultrasound in SNFs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtotal, Title V** | 0.4 | 0.5 | 0.4 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 1.7 | 2.7 |
| **Title VI: Provisions relating to Part B** | | | | | | | | | | | | |
| *Subtitle A: Physicians' Services* | | | | | | | | | | | | |
| 601 Update revisions | 0.6 | 1.2 | 0.8 | 0.2 | -0.4 | -0.6 | -0.6 | -0.7 | -0.5 | 0.3 | 2.4 | 0.2 |
| 602 Services in Alaska | * | * | * | 0 | 0 | * | * | * | * | * | 0.1 | 0.1 |
| 603 Private contracting for podiatrists et al. | * | * | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | * | * |
| 604 Study on access to physicians' services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 605 Report on geog. adj. of practice expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 605 MedPAC report on payments to physicians | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Subtitle B: Preventive Services* | | | | | | | | | | | | |
| 611 Preventive physical | 0 | 0.1 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.2 | 0.6 | 1.7 |
| 612 Cardiovascular screening tests | 0 | 0.1 | 0.1 | * | * | * | * | * | * | * | 0.2 | 0.3 |
| 613 Diabetes screening tests | 0 | * | * | * | * | * | * | * | * | * | * | * |
| 614 Mammography payments | 0 | * | * | * | * | * | * | * | * | * | 0.1 | 0.2 |

3

**CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1: Detail**
*by fiscal year, in billions of dollars*

November 20, 2003
2:33 PM

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Subtitle C: Other Provisions** | | | | | | | | | | | | |
| 621 HOPD PPS: Payment reform | 0.3 | 0.4 | 0.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.7 | 0.7 |
| 622 Functional equivalence | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 623 Payment for dialysis services | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 1.0 |
| 624 Therapy: 2 year moratorium on cap in 2004 | 0.3 | 0.4 | • | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.7 | 0.7 |
| 625 Waiver of Part B late enrollment penalty | • | • | • | • | • | • | • | • | • | • | 0.1 | 0.2 |
| 626 ASC: Payment adjustments | • | -0.1 | -0.1 | -0.2 | -0.3 | -0.4 | -0.4 | -0.5 | -0.5 | -0.5 | -0.8 | -3.1 |
| 627 Payments for shoes and inserts | 0 | 0 | • | • | • | • | • | • | • | • | • | • |
| 628 Payment for clinical diagnostic lab test | -0.1 | -0.2 | -0.4 | -0.6 | -0.8 | -0.9 | -1.0 | -1.1 | -1.2 | -1.3 | -2.2 | -7.8 |
| 629 Index Part B deductible | -0.2 | -0.2 | -0.5 | -0.7 | -0.9 | -1.2 | -1.5 | -1.8 | -2.2 | -2.6 | -2.3 | -11.6 |
| 630 Part B services provided by Indian hosps & clinics | 0 | • | • | • | • | • | • | 0 | 0 | 0 | 0.1 | 0.1 |
| **Subtitle D: Other Provisions** | | | | | | | | | | | | |
| 641 Demo: Coverage of certain drugs and biologics | 0.1 | 0.3 | 0.1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.5 | 0.5 |
| 642 Coverage of intravenous immune globulin | • | • | • | 0 | 0 | 0 | 0 | 0 | 0 | 0 | • | 0.1 |
| 643 Study: Nurses first assistants | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 644 Study: Cardio-thoracic surgeons | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 645 Study: Vision services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 646 Quality demonstration program | 0 | • | • | • | • | • | • | • | • | • | • | • |
| 647 Study: Direct access to physical therapy | 0 | • | 0 | 0 | 0 | • | • | • | • | • | • | • |
| 648 Demo: Chronic outpatient services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | • | 0.3 |
| 649 Demo: Care management | 0 | 0 | • | • | • | • | • | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 |
| 650 Study: Concierge care | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 651 Demo: Chiropractic services | 0 | 0 | • | • | • | • | • | • | 0 | 0 | • | • |
| **Subtotal, Title VI** | 1.1 | 2.1 | 0.5 | -0.9 | -2.0 | -2.7 | -3.2 | -3.7 | -3.9 | -3.7 | 0.8 | -16.3 |
| **Title VII: Provisions relating to Parts A and B** | | | | | | | | | | | | |
| **Subtitle A: Home Health Services** | | | | | | | | | | | | |
| 701 Update | -0.2 | -0.3 | -0.4 | -0.5 | -0.6 | -0.7 | -0.8 | -0.9 | -1.0 | -1.1 | -2.1 | -6.5 |
| 702 Homebound demonstration | 0 | 0.1 | • | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.1 | 0.1 |
| 703 Medical adult day care demonstration | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 704 Suspension of non-Medicare/Medicaid OASIS collection | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 705 MedPAC study | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 706 Religious nonmedical care | • | • | • | • | • | • | • | • | • | • | • | • |
| **Subtitle B: Graduate Medical Education** | | | | | | | | | | | | |

November 20, 2003
2:33 PM

# CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1: Detail
by fiscal year, in billions of dollars

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 711  Extension of update limitation | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.2 | -0.2 | -0.2 | -0.5 | -1.3 |
| 712  Geriatric residency/fellowship | 0 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1.0 |
| 713  Treatment of volunteer supervision | 0.1 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.1 | 0.1 |
| **Subtitle C: Chronic Care Improvement** | | | | | | | | | | | | |
| 721  Chronic care mgmt: fee for service | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.3 | 0.5 |
| 722  Chronic care mgmt: Medicare Advantage | * | * | * | * | * | * | * | * | * | * | 0.1 | 0.1 |
| 723  Research plan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Subtitle D: Other Provisions** | | | | | | | | | | | | |
| 731  National and local coverage determinations | 0 | * | * | * | * | * | * | * | * | * | * | * |
| 732  Extend treatment of physician pathology services | * | 0.1 | 0.1 | * | 0 | 0 | 0 | 0 | 0 | 0 | 0.2 | 0.2 |
| 733  Pancreatic islet cell transplants | * | * | * | * | * | * | * | * | * | * | 0.1 | 0.1 |
| 734  Restoration of Medicare trust funds | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 735  MedPAC modifications | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 736  Technical amendments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtotal, Title VII | -0.1 | -0.1 | -0.4 | -0.5 | -0.7 | -0.8 | -0.9 | -1.0 | -1.1 | -1.2 | -1.8 | -6.7 |
| **Title VIII: Cost Containment** | | | | | | | | | | | | |
| Subtitle A   Cost Containment | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Subtitle B   Income-related reduction in Part B Premium subsidy  /a | 0 | * | * | -0.2 | -0.5 | -0.9 | -1.8 | -2.7 | -3.1 | -3.9 | -0.8 | -13.3 |
| Subtotal, Title VIII | 0 | * | * | -0.2 | -0.5 | -0.9 | -1.8 | -2.7 | -3.1 | -3.9 | -0.8 | -13.3 |
| **Title IX: Administrative Improvements** | * | * | * | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 0.2 | 0.5 |
| Subtotal Gross Outlays | 2.5 | 4.6 | 26.7 | 38.8 | 42.4 | 45.0 | 48.2 | 51.2 | 56.7 | 63.5 | 114.9 | 379.5 |
| Premium & Cost-Sharing Interactions | 0.1 | -0.4 | 0.1 | 0.7 | 1.0 | 1.3 | 1.6 | 1.8 | 2.0 | 2.1 | 1.6 | 10.3 |
| **SUBTOTAL, Medicare provisions** | 2.6 | 4.2 | 26.8 | 39.5 | 43.5 | 46.3 | 49.7 | 53.0 | 58.7 | 65.5 | 116.5 | 388.7 |

November 20, 2003
2:33 PM

# CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1: Detail
by fiscal year, in billions of dollars

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Title X: Medicaid and Miscellaneous Provisions** | | | | | | | | | | | | |
| _Subtitle A: Medicaid Provisions_ | | | | | | | | | | | | |
| 1001  Increased Medicaid DSH payments | 0.7 | 0.6 | 0.5 | 0.4 | 0.3 | 0.1 | 0.1 | 0.1 | 0.1 | 0.1 | 2.5 | 3.0 |
| 1002  Section 340B amendment | O | O | O | O | O | O | O | O | O | O | O | O |
| 1003  Extension of IMD moratorium | * | * | * | * | * | * | * | * | * | * | * | * |
| _Subtitle B: Miscellaneous Provisions_ | | | | | | | | | | | | |
| 1011  Emergency services for undocumented aliens | O | 0.1 | 0.2 | 0.3 | 0.3 | 0.1 | * | O | O | O | 0.9 | 1.0 |
| 1012  Commission on Systemic Interoperability | O | O | O | O | O | O | O | O | O | O | O | O |
| 1013  Outcomes research | O | O | O | O | O | O | O | O | O | O | O | O |
| 1014  Citizens Health Care Working Group | O | O | O | O | O | O | O | O | O | O | O | O |
| 1015  Appropriation for Administrative Costs | 0.5 | 1.1 | O | O | * | O | O | O | O | O | 1.5 | 1.5 |
| 1016  Health care infrastructure improvement program | * | 0.1 | 0.1 | 0.1 | O | O | O | O | O | O | 0.2 | 0.2 |
| Subtotal, Title X | 1.2 | 1.8 | 0.8 | 0.7 | 0.5 | 0.2 | 0.1 | 0.1 | 0.1 | 0.1 | 5.1 | 5.7 |
| **Title XI: Access to Affordable Pharmaceuticals** | | | | | | | | | | | | |
| Subtitles | | | | | | | | | | | | |
| A&B  Revisions to Hatch-Waxman Act | * | * | * | * | * | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.6 |
| Subtitle C  Importation of Prescription Drugs | O | O | O | O | O | O | O | O | O | O | O | O |
| Subtotal, Title XI | * | * | * | * | * | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.1 | -0.6 |
| **TOTAL, Change in Direct Spending** | 3.8 | 6.0 | 27.5 | 40.2 | 44.0 | 46.5 | 49.8 | 53.0 | 58.7 | 65.5 | 121.4 | 394.8 |

**CBO Estimate of Effect on Direct Spending and Revenues of Conference Agreement on H.R. 1: Detail**
by fiscal year, in billions of dollars

November 20, 2003
2:33 PM

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2004-2008 | 2004-2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Changes in Revenues** | | | | | | | | | | | | |
| **Titles I and XI: Prescription Drug Benefit and Access to Affordable Pharmaceuticals** /b | | | | | | | | | | | | |
| Income and HI Payroll Taxes (on-budget) | * | * | 0.3 | 0.5 | 0.5 | 0.6 | 0.7 | 0.7 | 0.8 | 0.9 | 1.3 | 5.0 |
| Social Security Payroll Taxes (off-budget) | * | * | 0.1 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.6 | 2.2 |
| Subtotal | * | * | 0.4 | 0.7 | 0.8 | 0.8 | 0.9 | 1.0 | 1.2 | 1.3 | 1.9 | 7.2 |
| **Title XII: Tax Incentives for Health and Retirement Security** /b | | | | | | | | | | | | |
| Income and HI Payroll Taxes (on-budget) | -0.2 | -0.5 | -0.6 | -0.6 | -0.7 | -0.7 | -0.8 | -0.8 | -0.9 | -0.9 | -2.5 | -6.7 |
| Social Security Payroll Taxes (off-budget) | * | * | * | * | * | * | * | * | * | * | * | * |
| Subtotal | -0.2 | -0.5 | -0.6 | -0.6 | -0.7 | -0.7 | -0.8 | -0.8 | -0.9 | -0.9 | -2.5 | -6.7 |
| **TOTAL, Change in Revenues** | | | | | | | | | | | | |
| Income and HI Payroll Taxes (on-budget) | -0.2 | -0.5 | -0.2 | -0.2 | -0.2 | -0.2 | -0.1 | -0.1 | -0.1 | * | -1.2 | -1.7 |
| Social Security Payroll Taxes (off-budget) | * | * | 0.1 | 0.2 | 0.2 | 0.3 | 0.3 | 0.3 | 0.4 | 0.4 | 0.6 | 2.2 |
| **Total, Change in Revenues** | -0.2 | -0.5 | -0.1 | * | 0.1 | 0.1 | 0.2 | 0.2 | 0.3 | 0.4 | -0.7 | 0.5 |
| **MEMORANDUM: Net Increase in Deficit or Decrease in Surplus** | 4.0 | 6.5 | 27.6 | 40.2 | 43.9 | 46.4 | 49.6 | 52.8 | 58.4 | 65.1 | 122.1 | 394.3 |

**NOTES:**

ASC = ambulatory surgical center; DSH = disproportionate share hospital; FQHC = federally qualified health center; GPCI = geographic practice cost index; HH = home health; HOPD = hospital outpatient department; IMD = institution for mental disease; MB = market basket; OASIS = outcome and assessment information set; PPS = prospective payment system; SCH = sole community hospital; SNF = skilled nursing facility.

Estimates are preliminary and are subject to further review of the legislative language.

* = costs or savings of less than $50 million.

a.   Estimates include effects of expanded access to tax return information.
b.   Estimates provided by the Joint Committee on Taxation.



Monday,
November 15, 2004

Book 3 of 4 Books
Pages 66235–66916

Part III

# Department of Health and Human Services

## Centers for Medicare & Medicaid Services

42 CFR Parts 403, 405, 410, et al.
Medicare Program; Revisions to Payment
Policies Under the Physician Fee
Schedule for Calendar Year 2005; Final
Rule

Defendants' Exhibit
**1303**
01-12257 - PBS

Table 41:

Impact of Proposed Rule and Physician Fee Schedule Update
on Medicare Payment for Selected Drug Administration Services
Excluding the Effect of the 32 and 3% Transition Adjustments and Demonstration Project

| Old Code | New Code | Description | 2002 Payment | 2003 Payment | 2004 Payment without Transition | 2005 Payment without Transition |
|---|---|---|---|---|---|---|
| 90782 | G0351 | Therapeutic/diagnostic injec | $ 3.98 | $ 4.41 | $ 18.67 | $ 18.57 |
| 98400 | G0356 | Hormonal anti-neoplastic | $ 5.07 | $ 37.52 | $ 48.54 | $ 35.62 |
| 98408 | G0357 | IV push single/initial subst | $ 35.11 | $ 37.52 | $ 117.24 | $ 122.03 |
| N/A | G0358 | IV push each additional drug | N/A | N/A | $ 117.24 | $ 70.87 |
| 98410 | G0359 | Chemotherapy IV one hr initl. | $ 55.75 | $ 59.22 | $ 164.66 | $ 172.43 |
| 90780 | G0359 | Chemotherapy IV one hr initl | $ 40.54 | $ 42.67 | $ 89.24 | $ 172.43 |
| 98412 | G0360 | Each additional hr 1-8 hrs | $ 41.63 | $ 44.14 | $ 36.59 | $ 39.03 |
| 90781 | G0360 | Each additional hr 1-8 hrs | $ 20.27 | $ 21.70 | $ 25.02 | $ 39.03 |
| 96412 | G0362 | Each add sequential infusion | $ 41.63 | $ 44.14 | $ 36.59 | $ 84.13 |

BILLING CODE 4120-01-C

Table 42 below shows the impact of physician fee schedule changes for selected specialties that receive a significant portion of their total Medicare revenues from drugs. Table 43 that follows table 42 shows the combined impact of the physician fee schedule and drug payment changes on total Medicare revenues. Our estimates of changes in Medicare revenues for drugs and physician fee schedule services compare payment rates for 2005 with payment rates for 2004 using 2003 Medicare utilization for both years. For physician fee schedule services, we mapped the 2003 Medicare utilization to the code set in use for 2005 based on assumptions about how the new drug administration codes will be billed. These assumptions are based on our consultations with the American Society of Clinical Oncology and other physician specialty societies that participated in the CPT's Drug Administration workgroup. We are using 2003 Medicare claims processed and paid through June 30, 2004 that we

estimate are 98.5 complete and have adjusted the figures to reflect a full year of data. Thus, because we are using a single year of utilization, the estimated changes in revenues reflect payment changes only between 2004 and 2005. To the extent that there are year-to-year changes in the volume and mix of drugs and physician fee schedule services provided by physicians, the actual impact on total Medicare revenues will be different than those shown here.

The column labeled "NPRM Impacts" shows the impact of the practice expense and malpractice RVU changes described earlier. The refinements of the practice expense RVUs and 5-year review of malpractice will have little or no impact on physician fee schedule payments for the 5 specialties shown. The column labeled "Coding and RVU Changes" shows the impact of our adoption of the CPT/RUC recommended revisions to the codes and payment amount for drug administration services. We estimate that the changes from the CPT/RUC process will increase physician fee schedule payments for oncologists by 5 percent. This impact is generally attributable to higher permanent increases in payment for the administration of drugs by IV push (G0357), infusion (G0359 and G0360) and the ability to be paid at a higher rate for the initial hour of infusion of a subsequent drug administered. We estimate that the changes from the CPT/RUC process will increase payments to rheumatologists by 4 percent. This impact is due to the change in the definition of the chemotherapy that will allow rheumatologists to bill substances such as monoclonal antibody agents or other biologic response modifiers using the chemotherapy administration codes. The CPT/RUC changes will have little or no specialty level impact on other specialties that administer drugs.

The next column shows the effect of the drug administration transition on Medicare physician fee schedule revenues for the specialties shown. As explained earlier, section 303(a)(4) requires that the transition adjustment percentage be reduced from 32 percent in 2004 to 3 percent in 2005. The change to the transition payment percentage will reduce payments for the specialties that provide drug administration services. The reduction has a larger impact on oncologists than the other physician drug administration specialties shown because drug administration services represent a larger proportion of their physician fee schedule revenues.

The column labeled "Additional Payments for Injections" shows the effect of paying for injections (as well as non-chemotherapy drugs administered

by IV push) provided on the same day as other physician fee schedule services. We estimate that this policy change will increase payment an estimated 3 percent for oncologists and 1 percent for other specialties. This policy change will also modestly increase payment to other specialties that provide injections (primarily family practitioners and internists) and has been incorporated into the earlier impact tables.

The next column shows the impact of the 1.5 percent physician fee schedule update. The column labeled "One-Year Demonstration Project" shows the impact of our plan to establish a national demonstration project that will pay oncologists $130 for providing specific services to their patients and reporting patient quality data. If oncologists participate in this demonstration project and provide the required services and requested information, we estimate that their payments will increase by 15 percent. Taken together, we estimate that the coding and RVU changes, the change to the transition payment for drug administration, the additional payments for injections, the physician fee schedule update and the national demonstration project will increase physician fee schedule payments to oncologists by 10 percent. The combined impact of these factors (other than the national demonstration project) will increase physician fee schedule payments by 1 percent urologists, 5 percent for rheumatologists, 1 percent for obstetrics/gynecologists and 0 percent for infectious disease.

Table 43 shows the combined impact of changes we are making to Medicare drug and physician fee schedule payments for the same specialties shown in table 42. The payment impacts for drugs are based on the 2nd quarter ASP submissions from drug manufacturer's and reflect ¾ of an annualized increase in drug prices between the 2nd quarter of 2004 and the 1st quarter of 2005 of 3.39 percent or 2.54 percent. The drug payment impacts are based on ASP prices for drugs accounting for approximately 94 percent of Medicare's total drug payments. Of Medicare's total payments for drugs, at least 4 percent are paid under "not otherwise classified (NOC)" codes (*i.e.* J3490 and J0999). Thus, we based our impacts on ASP prices for drugs accounting for approximately 98 percent of Medicare revenues that are not in the NOC category.

The column labeled "% of Total Medicare Revenues from Fee Schedule" shows the proportion of total Medicare revenues received from physician fee schedule services. The following

column shows the physician fee schedule payment impact. All of the payment impacts are the same as those shown in Table 43. The following column shows the proportion of total Medicare revenues received from drugs, while the next column shows the payment impact from adoption of the ASP drug payment methodology. The next 3 columns show combined Medicare revenues from all sources and the combined Medicare payment impact from the earlier described changes being adopted for 2005.

Our estimates of changes in Medicare revenues for both drugs and drug administration services compare payment rates for 2005 with payment rates for 2004 using the same utilization in both years. We used 2003 utilization for these comparative impacts since they are the latest data available. Thus, the estimated changes in revenues reflect *purely* price changes between 2004 and 2005. We note that these impacts and percentages represent averages for each specialty or supplier. The percentages and impacts for any individual physician are dependent on the mix of drugs and physician fee schedule services they provide to Medicare beneficiaries. For this analysis, we are also supplementing the data showing the change in revenues with volume growth based on historical trends.

As indicated in Table 43, physician fee schedule services account for approximately 28 percent of oncology's 2004 Medicare revenues. The changes we are adopting in this final rule are estimated to increase Medicare payments for physician fee schedule services by 10 percent from 2004 to 2005. We estimate that approximately 69 percent of total 2004 Medicare revenues for oncologists are attributed to drugs and the adoption of the ASP pricing methodology would reduce these revenues by 13 percent. We based our analysis on drugs accounting for approximately 92 percent of total oncology drug revenues (and 99 percent of oncology drug revenues not paid under NOC codes). The actual impact on oncologists' total Medicare revenues will be different from these estimated impacts to the extent that utilization of drugs and drug administration services does increase. In recent years, increasing utilization, for example, drug spending growth in excess of 20 percent per year, has occurred. The weighted average of the drug and physician fee schedule changes assuming no change in utilization would decrease Medicare revenues to oncology by 6 percent. However, if the volume of drugs and physician fee schedule services

**66408**   Federal Register / Vol. 69, No. 219 / Monday, November 15, 2004 / Rules and Regulations

increased at historical rates, total Medicare revenues for oncologists are estimated to increase by 4 percent between 2004 and 2005, excluding the demonstration project. If we include the demonstration project, Medicare revenues to oncologists are estimated to increase by 8 percent between 2004 and 2005. We note that our actuaries' estimates of section 303 with the drug prices and policy changes in this final rule match earlier estimates of the FY 2005 and 10-year savings figures.

We estimate that urology receives approximately 57 percent of their 2004 total revenues from physician fee schedule services and 35 percent from drugs. We estimate that physician fee schedule revenues for urologists will increase by approximately 1 percent from 2004 to 2005. Based on ASP prices for drugs accounting for 100 percent of urologists' drug revenues, we estimate a 40 percent reduction assuming no growth in the volume of services provided. In this scenario, combined Medicare payments to urologists would decline approximately 14 percent. However, if the volume of physician fee schedule services and drugs were to

grow at historical rates, we estimate that Medicare revenues to urologists would decline by 8 percent.

We estimate that physician fee schedule revenues account for approximately 49 percent of rheumatology's total revenues. Drugs account for approximately 44 percent rheumatology's total revenues. Physician fee schedule revenues are estimated to increase 5 percent for rheumatology and revenues from drugs are estimated to decline by 8 percent. Assuming no growth in utilization, the combined reduction in rheumatologists' revenues would be 1 percent. If the volume of drugs and physician fee schedule services grew at historical rates, rheumatologists' revenues from Medicare would increase by 9 percent.

We estimate that physician fee schedule revenues account for approximately 87 percent of total revenues for obstetrics/gynecology. These revenues are anticipated to increase by 1 percent. Drug revenues represent 13 percent of total Medicare revenues for obstetrics/gynecology and are estimated to decline by 21 percent. Assuming no growth in utilization, we

estimated that obstetrics/gynecology's combined Medicare revenues would decline by 2 percent. Using the historical projected rates of growth for the volume of drugs and physician fee schedule services would make the estimated change in revenues equal an increase of 4 percent.

We estimate that physician fee schedule revenues account for approximately 94 percent of total revenues for infectious disease physicians. These payments are not estimated to change. The remainder of Medicare revenues for infectious disease physicians can be attributed to drugs. These payments are expected to decline by 25 percent. The weighted average change in infectious disease revenues from the changes we are adopting in this final rule is −2 percent assuming no growth in the volume of drugs and physician fee schedule services. If future growth in the volume of drugs and physician fee schedule services were to grow at historical rates, revenues to infectious disease physicians would increase would increase 7 percent.

**BILLING CODE 4120-01-P**

**Table 42:**
Impact of Drug and Physician Fee Schedule Payment Changes
on Total Medicare Allowed Charges
for Selected Specialties

| Specialty | Medicare Allowed Charges ($ In Millions) | Physician Fee Schedule | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | | NPRM Impacts | Coding and RVU Changes | Drug Administration Transition | Additional Payments for Injections | Physician Fee Schedule Update | One-Year Demonstration Project | |
| HEMATOLOGY/ONCOLOGY | $ 1,747 | 0% | 5% | -12% | 3% | 1.5% | 15% | 10% |
| UROLOGY | $ 1,696 | 0% | 0% | -1% | 0% | 1.5% | N/A | 1% |
| RHEUMATOLOGY | $ 582 | 0% | 4% | -2% | 1% | 1.5% | N/A | 5% |
| OBSTETRICS/GYNECOLOGY | $ 412 | 0% | 0% | -1% | 0% | 1.5% | N/A | 1% |
| INFECTIOUS DISEASE | $ 401 | 0% | 0% | -1% | 0% | 1.5% | N/A | 0% |

Table 43:
Combined Payment Impact -
Drug and Physician Fee Schedule Payment Changes
for Selected Specialties

| Specialty | Physician Fee Schedule | | Drugs | | Combined Medicare Revenues All Sources ($ in Millions) | All Revenues | |
|---|---|---|---|---|---|---|---|
| | % of Total Medicare Revenues from Fee Schedule | % Change Medicare Physician Fee Schedule Revenues | % of Total Medicare Revenues from Drugs | % Change Medicare Drug Revenues | | Combined % Change All Medicare Revenues Constant Utilization | Combined % Change All Medicare Revenues** w/Utilization Growth |
| HEMATOLOGY/ONCOLOGY | 28% | 10% | 69% | -13% | $ 6,346 | -6% | 8% |
| UROLOGY | 57% | 1% | 35% | -40% | $ 2,987 | -14% | -8% |
| RHEUMATOLOGY | 49% | 5% | 44% | -8% | $ 844 | -1% | 16% |
| OBSTETRICS/GYNECOLOGY | 87% | 1% | 13% | -21% | $ 667 | -2% | 5% |
| INFECTIOUS DISEASE | 94% | 0% | 6% | -25% | $ 428 | -2% | 7% |

** Note: We estimate that Medicare payments to oncologists would increase by 8% between 2004 and 2005 if growth in the volume of drugs and physician fee schedule services were to continue growing at historical rates and the effect of the demonstration project was included. Revenue projections including price and volume changes for the other specialties are shown as well.

BILLING CODE 4120-01-C

*B. Geographic Practice Cost Indices*

As discussed in section II.B, in this rule, we are proposing changes to the work and practice expense GPCIs based on new census data. The resulting geographic redistributions would not result in an overall increase in the current geographic adjustment indices by more than 3.5 percent or a decrease by more than 1.6 percent for any given locality in 2005. These geographic redistributions would not result in an overall increase in the current geographic adjustment indices by more than 7 percent or a decrease by more than 3.5 percent for any given locality in 2006. Addenda F and G illustrate the