## Competitive acquisition program

The MMA mandated the establishment of a competitive acquisition program in 2006 as an alternative way for providers to acquire physician-administered drugs. The goal of the program was to increase competition for Part B drugs. CAP vendors, who would purchase large quantities of drugs, could negotiate lower prices with pharmaceutical manufacturers and produce Medicare savings. The program also was designed to eliminate financial incentives for physicians to prefer one drug over another. Additionally, small practices unable to purchase drugs at the Medicare payment rate would have an alternative way of acquiring drugs and could continue to administer chemotherapy in their offices.

Under CAP, organizations like wholesalers or specialty pharmacies would submit bids to Medicare to become designated vendors for Part B drugs. Each year, physicians would choose whether to continue to purchase and bill for Part B drugs or to receive these drugs through a Medicare-designated vendor. Vendors would purchase and dispense drugs to physician offices on the basis of prescriptions written by physicians for their individual Medicare patients. Medicare would pay the vendors directly and the vendors would bill patients for required copayments. CMS delayed implementing this program in response to vendor and physician comments on the proposed rule. CMS issued an interim final rule on July 6, 2005, and a final rule on November 21, 2005.

None of the oncologists who we interviewed was willing to participate in CAP as described in CMS' interim final rule. Key criticisms of the rule by oncologists included the following:

- Vendors could stop supplying drugs for beneficiaries who did not pay their copayments in a timely fashion. If this happened, a beneficiary's treatment could end in the middle of a course of chemotherapy.

- Office administrative burden would increase. Physicians would have to write prescriptions for each patient's drugs, rather than purchasing drugs in bulk as required by the practice. There would be no payment to offset the administrative cost.

- Offices would have to maintain separate inventories for each patient covered through the CAP program.[14] If a patient could not receive treatment on a given day, as is frequently the case because of his medical condition, the office would have to return the drug to the vendor.

- Offices would be tied to a specific vendor for a year, even if they were not satisfied with the vendor's performance.

- Physicians would have to appeal all claim denials, even if they did not believe the time and effort required to mount the appeal constituted an effective use of practice resources.

- Physicians with satellite offices in rural areas could not participate in the program because they often cannot accept drug deliveries and mix drugs in their satellite offices.

In the physician fee schedule final rule, CMS announced that it would permit vendors to subcontract with physicians to collect beneficiary copayments. This decision might make the CAP program a more attractive alternative for some physicians. Physician offices could receive some payment to offset the administrative costs of participating in this program. They would also be aware of when beneficiaries could not pay their copayments and might be able to intervene before vendors stopped supplying necessary drugs. For example, they could encourage beneficiaries to apply for Medicaid or other programs that provide assistance with the costs of drugs.

Vendors are also likely to favor this decision because they believe it would be difficult to collect copayments from beneficiaries who do not know them or know what services they provide.

Potential vendors objected to the proposed rule for the CAP program because they did not believe it established the conditions for a profitable business. They argued they could not negotiate discounts with manufacturers because CAP prices are included in calculations of ASP. Since vendors must supply almost all physician-administered drugs requested by physicians and cannot encourage use of any one drug over another, manufacturers have little incentive to give them discounts, even though they would purchase a large volume of drugs. CMS did not receive any vendor bids before it decided to delay implementing the program.

In an interim final rule issued November 2, 2005, CMS exempted CAP prices from calculations of ASP for a period of up to three years. The agency then will reevaluate this policy and its effect on Medicare payment rates for Part B drugs.

### The CAP program in rural areas

The CAP rules require that drugs be delivered to the facility in which they will be administered. Oncologists in rural areas pointed out that they could not participate in the program because of this rule. Beneficiaries in rural areas tend to receive chemotherapy in satellite clinics. A group practice located in a central region provides chemotherapy services once or twice a week in small satellite clinics owned by the physicians or in cooperation with a community hospital. Sometimes the physicians see patients at these clinics but administer chemotherapy only in their central offices. In some cases, physicians and nurses travel up to four hours to see patients at the satellite clinics. Some practices reported that they lost money on the satellite clinics but consider it part of their mission in rural areas. In 2004, many physicians we interviewed said they might have to close these clinics because of the Medicare payment changes, but most remained open in 2005.

Sometimes nurses cannot mix drugs safely in these satellite offices because the office does not have the expensive equipment necessary for the safe handling of these toxic products. Nurses mix the drugs at the main facility and then travel to the satellite office to administer chemotherapy. Under these conditions, the practice cannot ensure anyone will be at the satellite office to accept delivery of a drug shipment, and staff working in the satellite office may not be able to mix the drugs even if they do receive them.

The CAP delivery rules were a response to concerns of potential vendors (Bassano 2005). Under the CAP system, physicians do not own the CAP drugs. Vendors maintain title until the product is administered. Vendors were concerned that they would be liable if the physician transported the drug and did not handle it properly. The safety and quality of the drug could be compromised.

These concerns are not unreasonable. Physicians and vendors must always ensure that these drugs are handled appropriately. Currently, many private payers have adopted systems of "brown bagging" for physician-administered drugs (MedPAC 2003). Vendors deliver drugs to the patient's home, and the patient is responsible for bringing the medication to the physician's office. Physicians have raised concerns about the safety of drugs shipped in this way. Unlike most patients, rural oncologists have experience storing drugs, preparing them, and transporting them safely to satellite offices. Liability issues should be minimal.

## R E C O M M E N D A T I O N   1

**The Secretary should allow an exception to the competitive acquisition program (CAP) delivery rules for rural satellite offices of providers.**

### Rationale:
Oncologists in rural areas provide chemotherapy to beneficiaries through satellite offices. If they can receive chemotherapy drugs in their main office, they will have the option of participating in the CAP program.

### Implications:
***Spending.*** Negligible.

***Beneficiary and provider.*** This would allow rural providers to participate in the CAP program. It could help preserve access for beneficiaries in rural areas.

### The CAP replacement model
Some potential vendors have suggested an alternative model to the CAP program, called the replacement model. Under this model, physicians would estimate the type and quantity of drugs they required for all of their Medicare patients for a week. The vendor would supply the drugs. When a drug was used, the physician would notify the vendor, who then would bill Medicare and the beneficiary for the drug and send a replacement for the administered drug to the practice.

This model would lessen the administrative burden on physicians and vendors. Physicians would not have to write separate prescriptions for each patient and would not have to separate inventory by patient (although they still would need to keep drugs for Medicare beneficiaries separate from drugs for their other patients).

## Chemotherapy and quality of care

The Congress directed the Commission to report whether quality of care was affected by Medicare payment changes for chemotherapy services. Not surprisingly, clinicians we interviewed think the quality of services they provide is quite high, and patients are generally satisfied with the quality of care they receive. We found no indication that quality of care has been affected by the payment changes. However, few consensus quality indicators for chemotherapy-related services exist, and data to evaluate indicators that do exist are limited. CMS initiated a one-year demonstration project in 2005 to measure the side effects of chemotherapy on patients' quality of life. Current public and private initiatives to define and measure quality of cancer care can provide the framework for a pay-for-performance oncology quality initiative.

We discussed perceptions of differences in quality of care with physicians and patients in the course of our site visits and focus groups. We found that physicians' evaluation of differences in quality of care across settings was subjective and seemed to be dictated by where they practiced. Oncologists in single-specialty practices felt they had more experience in educating patients about their condition and were more likely to hire oncology-certified nurses. They felt they provided more continuity of care and greater convenience for patients. By contrast, physicians practicing in hospital settings pointed to the availability of staff pharmacists to mix drugs, maintaining that this resulted in higher quality and fewer medication errors. They also pointed to greater use of safety guidelines and standard treatment protocols as indicators of higher-quality care.

Beneficiaries who participated in our focus groups received treatment in a variety of settings, including single-specialty oncology offices, outpatient departments of community hospitals, outpatient departments in university hospital cancer centers, and infusion centers of integrated health plans. Almost without exception, beneficiaries praised the quality of care they received.[15] None experienced changes in the quality of care received in the past year. Two focus group participants shifted site of chemotherapy administration from physician offices to HOPDs in 2005. Neither felt quality of care suffered, although both felt there was less coordination of care and greater out-of-pocket expense in the hospital.

## Measuring quality of care

It is difficult to measure the quality of care for Medicare patients with cancer. Cancer patients receive care from a variety of specialty physicians, including surgeons, radiologists, radiation oncologists, and medical oncologists. No single physician may be responsible for coordinating care. Typically, patients do not see a medical oncologist until after their cancer has been diagnosed. The patient might not be referred to an oncologist until surgery is completed. In addition, there are many varieties of cancer, each requiring its own treatment protocols and drug regimens. Physicians may find that treatment advances make last year's best practice obsolete. Many existing quality measures are related to screening guidelines, more relevant for primary care physicians and health plans than for medical oncologists. Others apply to a specific type of cancer and not to the patient population of all medical oncologists.

### CMS quality-of-life demonstration project

CMS initiated a one-year demonstration project designed to evaluate the severity of side effects experienced by chemotherapy patients. This was also a way to provide additional funds to oncologists. The project attempts to measure how chemotherapy affects the level of fatigue, nausea, and pain experienced by patients. In 2005, all oncologists were eligible to receive $130 per patient per day for asking chemotherapy patients three questions about how they had responded to treatment. Payment includes a 20 percent copayment by beneficiaries. Answers are coded on a 4-point scale.

The Commission and others (OIG 2005) have serious concerns about the validity and methodology of this project:

- It does not control for type of cancer, disease stage, or patient performance status. Performance status refers to how the cancer affects the daily living abilities of the patient.[16]

- It was announced and implemented without any period for comments by clinicians and researchers.

- There is no uniform data collection process. In some practices we visited, nurses were asking patients the three questions and coding the results based on their interpretation of the patients' answers. In other practices, patients were given a questionnaire and provided their own coded responses.

- In some cases, patients reported symptoms within the past week. In other cases, they reported on the basis of their condition at the time of the survey.

- No data are collected on what interventions were initiated to alleviate reported symptoms.

While all practices we visited were participating in this project, most oncologists did not believe it would lead to quality improvements for patients or produce any useful research findings. Many expressed concern that patients were charged copayments as part of the billing process.

CMS recently announced that the demonstration project will be continued in an altered form in 2006. The agency lowered payments to $23 and changed data requirements to provide information on patient care. The goal of the demonstration is to collect data on what physicians do for patients with different cancers at different disease stages. Physicians will use new codes to report on the purpose of the patient visit, the stage of the patient's cancer, and whether the physician used clinical guidelines in the treatment of the patient. Physicians will describe the purpose of the visit, such as evaluation, supervising therapy, monitoring the disease, and end-of-life care. For each visit, the physician will note whether or not they were following clinical guidelines. The physician can explain reasons for not following guidelines. For example, the physician might note that no guidelines exist, or the guidelines are not appropriate in the case of a particular patient. Physicians will be eligible to receive the demonstration payments in connection with higher level oncology evaluation and management visits by cancer patients. Only hematologists and medical oncologists are eligible to participate in the demonstration.

The CMS 2005 project did demonstrate that practices can collect and report quality data on claims in a timely manner without undue burden. Despite general agreement that the project was flawed, oncologists and public and private partners have initiated a variety of other initiatives to design and collect data that can be used to monitor and improve quality of care for chemotherapy patients. As these indicators are validated, they could form the basis of a pay-for-performance program for oncology.

### Oncology quality initiatives

The Institute of Medicine (IOM) report, *Crossing the Quality Chasm* (2001), outlined a framework for improving the nation's health care quality and called on all payers to align payment policies to encourage and support quality improvement. The IOM identified six goals for a quality health care system: safety, effectiveness, patient-centeredness, timeliness, efficiency, and equity. Physicians and researchers in a number of settings were encouraged by the report to continue ongoing efforts to measure and improve the quality of cancer care. The National Quality Forum (NQF) has implemented a cancer care quality measures project in collaboration with federal health agencies. The American Society of Clinical Oncology (ASCO) has developed a practice-based quality improvement initiative. The Community Oncology Alliance (COA) also has proposed pilot projects to improve measurement of quality of care.

### Quality of cancer care measures project

With funding from the National Cancer Institute, the Centers for Disease Control, CMS, and the Agency for Healthcare Research and Quality, NQF established the quality of cancer care measures project. NQF has brought together panels of experts to develop and review consensus standards for measuring quality cancer care. The technical panels are addressing measure sets for treatment of breast cancer, colorectal cancer, and symptom management/end-of-life cancer care. The steering committee has made recommendations for breast cancer consensus standards but has not yet addressed measure sets for colorectal cancer or symptom management.

### QOPI initiative

ASCO is sponsoring an ongoing, practice-based system of quality measurement called the Quality Oncology Practice Initiative (QOPI). Participating oncologists developed a set of quality measures based on clinical guidelines and consensus-supported indicators of quality care. Most measures are designed to be applicable for different types and stages of cancer although some relate to end-of-life care and several are specific to breast or colorectal cancer. For example, some measures relate to use of specific drug regimens for patients with breast cancer. The initial pilot project was tested on seven oncology groups located in seven states. Participation is voluntary. Twice yearly, practices report de-identified data from patient charts chosen retrospectively on the basis of a specified chart selection formula. Each practice reviewed medical records from the 25 most recent patients with invasive malignancies. Depending upon patient case mix, an additional 10 to 20 medical records were reviewed for patients with diagnoses of lymphoma, breast cancer, or colorectal cancer. Practices also reviewed records of 10 patients who had died of cancer. Each

| Table 4 | |
|---|---|

**Selected quality indicators from QOPI study**

| Indicator | Range in scores among groups (percent) |
|---|---|
| Was pain addressed? | 30–90% |
| Was G-CSF given per guideline? | 0–88 |
| Were serotonin antagonist antiemetics given per guideline? | 83–100 |
| Were corticosteroids added per guideline? | 60–97 |
| Were erythroid growth factors given per guideline? | 37–100 |
| Was a pathology report available? | 94–97 |
| Was staging completed? | 78–93 |
| Were flow sheets used when chemotherapy was given? | None* |
| Was a signed consent for chemotherapy in the chart? | 2–100 |

Note:   QOPI (Quality Oncology Practice Initiative), G–CSF (granulocytic growth factor). A perfect score is 100.
*Indicates all groups used flow sheets.

Source: Neuss 2005.

practice reviewed up to 85 medical records. Data are reported on a secure website developed for this purpose. In a published study on the results of the pilot project, researchers (Neuss et al. 2005) found statistically significant differences among the groups for a majority of the measures (Table 4). For example, there was wide variation in the extent to which practices addressed patient pain. Because of the small size of the original sample, we cannot use these data to draw conclusions about care provided by oncologists nationwide. However, the project is ongoing, with an increasing number of practices participating.

The National Committee for Quality Assurance (NCQA) is in preliminary talks with ASCO to conduct an independent assessment of cancer care quality based on the QOPI tool. The process for the development of performance thresholds and the mechanisms for data collection and transfer are undetermined. Physician practices who meet performance standards could get NCQA recognition as quality providers.

Four QOPI measures concern the use of ancillary drugs for chemotherapy patients. These drugs treat the side effects of chemotherapy, and their appropriate use is a crosscutting quality measure. Practices' use of serotonin antagonist antiemetics for treatment of nausea according to guidelines was quite high. Practices exhibited more variation in the appropriate use of other drugs. For example, practice use of granulocyte colony stimulating factor for neutropenia according to clinical guidelines ranged from 0 to 88 percent. Use of erythroid growth factors for anemia according to clinical guidelines varied from 37 to 100 percent overall, but average compliance with guidelines declined from 72 percent in round 1 to 60 percent in round 2. Although the sample size is very small, practice variation on these indicators suggests that CMS collection of

MEDPAC

data on the use of ancillary drugs according to clinical guidelines could lead to improved quality of care.

### Community Oncology Alliance pilot projects

COA has established a committee, the Quality, Safety, and P4P (QSP) Committee, to solicit recommendations from community oncologists, oncology nurses, and practice administrators on improving the documentation, safety, and quality of cancer care. QSP has recommended ways to improve the utility of the CMS quality-of-life demonstration including providing patient performance status information on claims. It has also suggested that CMS develop a pilot project in which oncology practices could develop and validate measures to collect staging information in a standard fashion. Currently, oncologists stage patients at diagnosis, determining how far the cancer has progressed. Oncologists use the staging to determine appropriate therapy. This initial stage continues to define the patient's cancer, even if the disease progresses and alternative treatments are initiated. QSP suggests that a pilot project could be used to develop and validate standardized measures for staging that reflect changes in patient condition over time. This measure then could be used to provide more comparable data on symptom management and treatment regimens.

In our March 2005 Report to Congress, the Commission (MedPAC 2005b) described the requirements necessary before pay-for-performance programs can be implemented to distinguish among health care providers.

- Consensus must exist on a core set of quality measures;

- Where necessary, adequate risk adjustment must be available;

- Data used to measure quality must be collectable without undue burden on providers or the program;

- There is room for improvement on the dimensions of quality we can measure.

In the case of chemotherapy, crosscutting measures that apply to a variety of different cancers also would be preferable.

Oncologists and both public and private institutions are undertaking a variety of initiatives to develop and implement measures that meet these criteria. The Commission supports these efforts.

## RECOMMENDATION 2

**The Secretary should use his demonstration authority to test innovations in the delivery and quality of health care. Demonstrations should not be used as a mechanism to increase payments.**

**Rationale:**

Medicare demonstration projects are designed to test innovative strategies for improving delivery and quality of care for beneficiaries without increasing program spending. To test innovations, CMS must design projects according to accepted research standards. Those standards include a strategy for evaluation. Most researchers do not believe that the quality-of-life demonstration program can be evaluated, and it is hard to see how the data generated can provide useful research findings.

Moreover, the Commission's and the Congress' ability to assess the impact of changes in payments for oncology drugs and drug administration services has been compromised by the two oncology demonstration projects. These projects are not budget neutral. They are designed to increase payments to specific specialties. In general, the Commission finds that if payment rates are not accurate, CMS and the Congress should address the issue with Medicare payment policies. It should not make payment policy through the creation of demonstration projects.

**Implications:**

*Spending.* This recommendation should have no effect on program spending.

*Beneficiary and provider.* Focusing the program's resources on projects designed to improve care delivery and quality should benefit beneficiaries and providers over the long run.

## Use of erythroid growth factors

In one case, use of erythroid growth factors according to clinical guidelines, CMS can begin collecting data and using them as part of a pay-for-performance initiative immediately. Erythropoeitin alpha and darbepoeitin alpha are used for the treatment of anemia following chemotherapy as well as some other indications. Medicare expenditures for erythroid growth factors account for the highest percentage of Medicare Part B drug spending. In 2001, non-end-stage renal disease (ESRD) erythropoietin accounted for over 12 percent of Part B drug spending (MedPAC 2003). Since a competing product, darbepoeitin alpha entered the market in 2002, combined spending for the two products has risen rapidly. Expenditures by oncologists increased 33 percent from 2001 to 2002 and 51 percent from 2002 to 2003. In addition, Medicare expenditures by internists for darbepoeitin alpha are the highest for any Part B drug.

At the same time, concerns have been raised about drug safety and potential under- and overuse of these products. As noted above, ASCO's QOPI project found wide variation in use of these growth factors according to clinical guidelines. In 2004, the Food and Drug Administration (FDA)(Steensma and Loprinzi 2005, Rizzo et al. 2002) responded to safety concerns about the use of these products by issuing new prescribing information. Although noting the need for individually based dosing, the agency recommended that the target hemoglobin level for cancer patients should not exceed 12 g/dL and that growth factor should be withheld if the hemoglobin level is 13 or higher. It also issued recommendations about the target rate of hemoglobin increase.

Some local carriers have attempted to limit the use of erythroid growth factors in accordance with FDA regulations and clinical guidelines. Although several carriers have issued local coverage decisions defining appropriate use of these products, carriers are hampered by their lack of access to all relevant clinical data. Carriers can use diagnosis codes to determine whether use of growth factor is warranted, but they cannot tell whether the product is being used appropriately for specific patients without access to the medical record. Hemoglobin level is variable. If the hemoglobin level is recorded on each claim, Medicare will be able to track whether the hemoglobin level falls within the target range. In the case of dialysis patients who require these drugs, providers must enter the patient's hematocrit level on claims forms to ensure that patients are receiving appropriate care. Medicare could require that all providers who submit claims for erythroid growth factors also provide hemoglobin levels on the claim form.

## R E C O M M E N D A T I O N   3

**The Secretary should require providers to enter patients' hemoglobin level on all claims for erythroid growth factors. This data should be used as part of Medicare's pay-for-performance initiative.**

### Rationale:

Measuring appropriate use of erythroid growth factors meets many of the Commission criteria for quality measures. Clinical guidelines exist. Use of growth factors is crosscutting, appropriate for many, although not all, types of cancer. Practices can provide hemoglobin levels on Medicare claims with minimum additional burden. CMS would not have to risk-adjust results. The initial QOPI study showed variation in use of the product and suggested room for improvement.

### Implications:

*Spending.* This recommendation should have no effect on program spending. It could reduce program spending if the data show that erythroid growth factor is being overused.

*Beneficiary and provider.* This recommendation could increase the quality of care for Medicare beneficiaries. It would create minimal additional provider burden. Researchers would have more data available to measure the effect of the medication on quality of life and survival of cancer patients.

## Conclusion

In the past couple of years, physician practices have been affected by new technologies and new treatment guidelines. These changes are likely to affect Medicare spending for chemotherapy and related services.

- New chemotherapy agents developed through biotechnology have been approved by the FDA. Manufacturers charge increasingly high prices for new drugs like Avastin and Erbitux. For example, one practice reported that a round of treatment with Avastin costs about $12,000 every two weeks. Patients continue to receive this treatment until their condition worsens. An increasing number of patients may have difficulty paying their coinsurance. This means that beneficiaries may not receive the most effective treatment for their condition or that physicians may not collect the full Medicare payment for some patients.

  In addition, physicians sometimes face uncertainty about whether these therapies will be covered by insurers, including Medicare, for a particular type of cancer. This uncertainty may affect treatment choice and site of care.

- PET scans have been found useful in helping physicians determine the stage of particular cancers and develop treatment plans. CMS has issued national coverage decisions approving the use of this technology for a number of different cancers. Some practices are purchasing this technology for use in their offices. The Commission is looking at ways to address the appropriateness of Medicare payments for imaging services.

- Clinical research has suggested improved patient outcomes when chemotherapy is used along with other forms of treatment. For example, chemotherapy may be used before or after surgery. As a result, the number of patients receiving chemotherapy and the duration of the treatment they receive is likely to continue increasing.

In general, the high cost of new chemotherapy agents, the increasing number of Medicare beneficiaries receiving chemotherapy, and the development of new treatment patterns that lead to the use of more drugs and more rounds of chemotherapy for individual patients are likely to result in a continuing increase in Medicare payments for Part B drugs and drug administration services. The Commission will continue to monitor access and quality of chemotherapy services provided to Medicare beneficiaries.

MEDPAC

# References

Bassano, Amy. 2005. E-mail message to author, November 18.

Institute of Medicine. 2001. *Crossing the quality chasm: A new health system for the 21ˢᵗ century.* Washington, DC: National Academy Press.

Lipscomb, J., M. S. Donaldson, A. K. Neeraj, et al. 2004. Cancer outcomes research. *Journals of the National Cancer Institute Monographs.* no. 33: 178–197

Medicare Payment Advisory Commission. 2005a. *A data book: Healthcare spending and the Medicare program.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2005b. *Report to the Congress: Medicare payment policy.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2004. *Report to the Congress: Benefit design and cost sharing in Medicare Advantage plans.* Washington, DC: MedPAC.

Medicare Payment Advisory Commission. 2003. *Report to the Congress: Variation and innovation in Medicare.* Washington, DC: MedPAC.

Neuss, Michael, et al. 2005. A process for measuring the quality of cancer care: the quality oncology practice initiative. *Journal of Clinical Oncology* 23, no. 25 (September 1): 6233–6239.

Office of Inspector General, Department of Health and Human Services. 2005. *Report to Congress: Adequacy of Medicare Part B Drug Reimbursement to Physician Practices for the Treatment of Cancer Patients.* No. A–06–05–00024. Washington, DC: OIG. September. http://oig.hhs.gov.

Patient Advocate Foundation. 2005. New Program for Insured Americans Assists with Co-Pays. March 24. http://www.copays.org/news/2005-03-24a.html.

Rizzo, D. J., A. E. Lichtin, et al. 2002. Use of Epoetin in patients with cancer: evidence-based clinical practice guidelines of the American Society of Clinical Oncology and the American Society of Hematology. *Blood, Journal of The American Society of Hematology and The American Society of Clinical Oncology* 100, no. 7 (October 1): 2303–2320.

Steensma, D. P. and C. L. Loprinzi. 2005. Erythropoietin use in cancer patients: A matter of life and death? *Journal of Clinical Oncology* 23, no. 25 (September 1): 5865–5868.

The National Quality Forum. 2005. 'Quality of Cancer Care Measures' Project Steering Committee Meeting. Washington DC, June 16. Meeting Summary.

## Endnotes

1.  The MMA also changed the way Medicare pays for outpatient drugs under the hospital outpatient department PPS, but those changes are outside the scope of this report.

2.  ASP represents the weighted average of prices charged for a product in the United States. It is based on data submitted quarterly by pharmaceutical manufacturers and is net of rebates and discounts offered to purchasers by the manufacturers. Some prices are excluded from calculation of ASP, including prices paid by the Department of Veterans Affairs and other federal purchasers.

3.  E&M visits must be coded level 2 or above.

4.  Throughout this report the terms oncology and medical oncology are defined as the specialties of hematology, hematology/oncology, and medical oncology. The specialty of radiation oncology is not included.

5.  CMS provided the Commission with all carrier-paid claims for a list of chemotherapy-related codes supplied by the Commission. The claims cover somewhat less than half of 2005 and include only those claims submitted and scheduled to be paid through June 22, 2005. To develop a comparable 2004 file, we used the same set of date cutoffs on the 2004 5 percent standard analytic file data. That is, we took claims incurred and paid through June 22, 2004. For both files, only claims lines allowed for payment (not denied) were included in the analysis.

    Variation in claims processing times between years should have a negligible effect on the totals. Carrier-processed claims are typically paid rapidly. For the chemotherapy administration and drug codes in question, the median lag between date of service and scheduled date of payment was 13 days for the 2004 claims sample and 15 days for the 2005 data. This suggests that the claims "tail" (services incurred in the period but not paid in time for inclusion in the analysis) was relatively small, and that we may slightly understate actual 2005 volume (relative to 2004), due to the slightly slower claims processing in 2005. The net result is that we are estimating the change in use from two (presumed) identical part-year files, both of which contain claims for roughly 40 to 45 percent of the full-year data.

6.  For our claims analysis, chemotherapy drugs are defined as those drugs included in the CMS Berenson-Eggers Type of Service (BETOS) category of chemotherapy drugs. Some drugs not included in this category are also used for the treatment of cancer.

7.  Using a slightly different cutoff date and different growth assumptions, OIG (2005) estimated that spending for the demonstration project would equal $270 million in 2005.

8. Hospitals in these markets also reported they were treating increasing numbers of patients with supplemental insurance who required expensive new drugs.

9. Some prices, including those paid by federal purchasers, are excluded from the calculations.

10. Denileukin diftitox is used to treat a form of lymphoma, a rare type of cancer that affects certain white blood cells and causes lesions to develop on the skin.

11. Our contract with the vendor does not allow us to present prices for specific drugs.

12. For this analysis we focused on prices paid by clinics and hospitals.

13. The range is calculated as the difference between the price at the 75th quartile and the 25th quartile.

14. In the interim final rule, CMS noted that participating CAP physicians could maintain an electronic or paper inventory rather than separate inventories for each patient. The agency also stated that when a CAP drug was not administered in the specified time frame, the participating physician must contact the CAP vendor to discuss what to do. If the drug was unopened and it was permissible under state law, the physician could retain the drug for administration to another Medicare beneficiary at a later date.

15. The one exception was a beneficiary dually eligible for Medicare and Medicaid who received treatment in the HOPD of a safety-net institution.

16. The Eastern Cooperative Oncology Group has developed a 6-point scale to measure performance status. This scale has been validated and is frequently used as a component of data collected in clinical trials.

APPENDIX A

## Mandate for report

## Mandate for report

**Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Section 303**

(5)　　(A) REVIEW.—The Medicare Payment Advisory Commission shall review the payment changes made under this section insofar as they affect payment under part B of title XVIII of the Social Security Act—

      i.　For items and services furnished by oncologist; and

      ii.　For drug administration services furnished by other specialists.

(B) OTHER MATTERS STUDIED.—In conducting the review under subparagraph (A), the Commission shall also review such changes as they affect—

      i.　The quality of care furnished to individuals enrolled in part B and the satisfaction of such individuals with that care;

      ii.　The adequacy of reimbursement as applied in, and the availability in, different geographic areas and to different physician practice sizes; and

      iii.　The impact on physician practices.

(C) REPORTS.—The Commission shall submit to the Secretary and Congress—

      i.　Not later than January 1, 2006, a report on the review conducted under subparagraph (A) (i), and

      ii.　Not later than January 1, 2007, a report on the review conducted under subparagraph (A) (ii).

Each such report may include such recommendations regarding further adjustments in such payments as the Commission deems appropriate.

APPENDIX B

## Methodology: Price and quantity of drugs

# Methodology: Price and quantity of drugs

Price and quantity (or volume) indices provide an aggregate measure of the average changes in price and quantity (Table B-1). The price index compares the cost of a fixed "basket" of drugs in different years. The difference in the total cost of that basket of drugs, evaluated at the two price levels, is the measure of price change. Similarly, the quantity index asks how much the 2004 and 2005 "baskets" of drugs would have cost if they had both used prices from a single year. The difference in the cost of the baskets, holding prices constant, is the measure of the change in the quantity of drugs.  If the basket of drugs remained the same, the difference would represent the number of units of drugs provided. However, if the basket of drugs changed, the measure of quantity would include the change in drug mix. Thus, if cheaper drugs are replaced by more expensive drugs, the change will be counted as an increase in the quantity or volume of drugs provided. Using this methodology, we consider the substitution of an expensive drug for a cheaper one as an increase in the *quantity* of drugs, not the *price* of drugs.

To determine the overall effect of pricing changes from 2004 to 2005, we estimated what Medicare would have paid if drugs billed in 2004 were paid for according to the Medicare payment rates (average sales price (ASP) + 6%) as of October 2005. Prices for 2004 were estimated using average allowed charge per unit as calculated from the claims. Prices for 2005 were based on Medicare payment rates for October 2005. Drugs were classified using Berenson-Eggers Type of Service (BETOS) categories to include chemotherapy drugs, erythroid growth factor, and other carrier-billed drugs. Using this methodology, we calculated that the same basket of chemotherapy drugs purchased in 2004 would cost 31 percent less in 2005. Chemotherapy drugs and erythroid growth factor together would cost 28 percent less in 2005. The entire market basket of carrier-billed drugs in 2004 would cost 22 percent less in 2005. These figures reflect changes in prices but do not account for changes in drug mix or the volume of drugs purchased.

## Table B-1

### Change in price and quantity indices for chemotherapy agents, 2004–2005

| Type of change | Percentage change |
| --- | --- |
| Quantity change, holding prices constant at: | |
|     2004 levels | 30% |
|     2005 levels | 20 |
| Price change, holding quantities constant at: | |
|     2004 levels | –28 |
|     2005 levels | –34 |

Source: Direct Research analysis of partial year, Medicare physicians/supplier claims files, 2004–2005.

**Table B-2**

## Number of claims lines for chemotherapy drugs, 2004–2005

| Cost per claim line | Number of lines | | Percentage change |
|---|---|---|---|
| | 2004 | 2005 | |
| $1000 and higher | 287,920 | 340,914 | 18% |
| $500–$1000 | 579,480 | 564,929 | –3 |
| $100–$500 | 358,240 | 347,166 | –3 |
| $100 and lower | 896,200 | 787,747 | –12 |
| **Total** | **2,121,840** | **2,040,756** | **–4** |

Note:    A claim line represents the Medicare payment rate for a drug unit multiplied by the number of units administered to a patient on a given day.

Source: Direct Research analysis of partial year, Medicare physicians/supplier claims files, 2004–2005.

This is an important consideration because the mix of chemotherapy agents shifted strongly toward higher-cost-per-dose agents in 2005. In Table B-2, we use the average cost per claim line as the estimate of the cost per dose. In other words, the claim line represents the Medicare payment rate for a drug, multiplied by the number of units of that drug provided in a particular chemotherapy session. One claim line may equal many units of an inexpensive drug or a smaller number of units of an expensive medication. Agents with average 2005 costs over $1,000 saw an 18 percent increase in the number of times they were billed. Agents costing under $100 per line saw a 12 percent decline in the number of claim lines billed. Overall, the number of claim lines for chemotherapy agents declined 4 percent between the years. This finding suggests that physicians may be using fewer combination therapies in a single session. (This appears to be part of an ongoing trend. The number of claims lines for chemotherapy agents declined 3 percent from 2003 to 2004.)



APPENDIX C

**Commissioners' voting
on recommendations**

## Commissioners' voting on recommendations

In the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000, the Congress required MedPAC to call for individual Commissioner votes on each recommendation, and to document the voting record in its report. The information below satisfies that mandate.

### Recommendation 1

The Secretary should allow an exception to the competitive acquisition program (CAP) delivery rules for rural satellite offices of providers.

*Yes:*      *Bertko, Crosson, DeBusk, DeParle, Durenberger, Hackbarth, Hansen, Kane,*
             *Milstein, Muller, Nelson, Reischauer, Scanlon, Smith, Stowers, Wolter*
*Absent:*   *Burke*

### Recommendation 2

The Secretary should use his demonstration authority to test innovations in the delivery and quality of health care.  Demonstrations should not be used as a mechanism to increase payments.

*Yes:*      *Bertko, Crosson, DeBusk, DeParle, Durenberger, Hackbarth, Hansen, Kane,*
             *Milstein, Muller, Nelson, Reischauer, Scanlon, Smith, Stowers, Wolter*
*Absent:*   *Burke*

### Recommendation 3

The Secretary should require providers to enter patients' hemoglobin level on all claims for erythroid growth factors. This data should be used as part of Medicare's pay-for-performance initiative.

*Yes:*      *Bertko, Crosson, DeBusk, DeParle, Durenberger, Hackbarth, Hansen, Kane,*
             *Milstein, Muller, Nelson, Reischauer, Scanlon, Smith, Stowers, Wolter*
*Absent:*   *Burke*

# More about MedPAC

## Commission members

**Glenn M. Hackbarth, J.D., chairman**
Bend, OR

**Robert D. Reischauer, Ph.D., vice chairman**
*The Urban Institute*
Washington, DC

*Term expires April 2006*

**Autry O.V. "Pete" DeBusk**
*DeRoyal*
Powell, TN

**Glenn M. Hackbarth, J.D.**

**Alan R. Nelson, M.D.**
*American College of Physicians*
Washington, DC

**Robert D. Reischauer, Ph.D.**

**David A. Smith, M.Ed.**
*Demos*
New York, NY

**Ray E. Stowers, D.O.**
*Lincoln Memorial University*
*College of Osteopathic Medicine*
Harrogate, TN

*Term expires April 2007*

**John M. Bertko, F.S.A., M.A.A.A.**
*Humana Inc.*
Louisville, KY

**Sheila P. Burke, M.P.A., R.N., F.A.A.N.**
*Smithsonian Institution*
Washington, DC

**Francis J. Crosson, M.D.**
*The Permanente Federation, LLC*
Oakland, CA

**Arnold Milstein, M.D., M.P.H.**
*Pacific Business Group on Health*
San Francisco, CA

**Ralph W. Muller**
*University of Pennsylvania*
*Health System*
Philadelphia, PA

**William J. Scanlon, Ph.D.**
*Health policy consultant*
Oak Hill, VA

*Term expires April 2008*

**Nancy-Ann DeParle, J.D.**
*JPMorgan Partners*
Washington, DC

**David F. Durenberger, J.D.**
*National Institute of Health Policy*
*University of St. Thomas*
Minneapolis, MN

**Jennie Chin Hansen, R.N., M.S.N., F.A.A.N.**
*AARP*
San Francisco, CA

**Nancy M. Kane, D.B.A.**
*Harvard School of Public Health*
Boston, MA

**Nicholas J. Wolter, M.D.**
*Billings Clinic*
Billings, MT

# Commission staff

**Mark E. Miller, Ph.D.**
*Executive director*

**Sarah Thomas, M.S.**
*Deputy director*

*Analytic staff*

Jack Ashby, M.H.A.

Jill Bernstein, Ph.D.

Cristina Boccuti, M.P.P.

Niall Brennan, M.P.P.

Sharon Bee Cheng, M.S.

David V. Glass, M.S.

Timothy F. Greene, M.B.A.

Scott Harrison, Ph.D.

Kevin J. Hayes, Ph.D.

Sally Kaplan, Ph.D.

Kathryn Linehan, M.P.H.

Craig K. Lisk, M.S.

Karen Milgate, M.P.P.

Jennifer Podulka, M.P.Aff.

Nancy Ray, M.S.

Rachel Schmidt, Ph.D.

Joan Sokolovsky, Ph.D.

Jeffrey Stensland, Ph.D.

Ariel Winter, M.P.P.

Daniel Zabinski, Ph.D.

*Research assistants*

Sarah Friedman

Sarah Kwon

*Special assistant to the executive director*

Annissa McDonald

*Administrative staff*

Reda H. Broadnax, B.S.,
 *Executive officer*

Wylene Carlyle

Diane E. Ellison

Timothy Gulley

Tina Jennings, MTESL

Plinie (Ann) Johnson

Jason McMahon

Cynthia Wilson



601 New Jersey Avenue, NW • Suite 9000 • Washington, DC 20001
(202) 220-3700 • Fax: (202) 220-3759 • www.medpac.gov





# Medicare Part B drugs and oncology

July 13, 2006

Statement of
Mark E. Miller, PhD

Executive Director
Medicare Payment Advisory Commission

Before the
Subcommittee on Health
Committee on Ways and Means
U.S. House of Representatives



4019

Glenn M. Hackbarth, J.D., Chairman • Robert D. Reischauer, Ph.D., Vice Chairman • Mark E. Miller, Ph.D., Executive Director
601 New Jersey Avenue, NW • Suite 9000 • Washington, DC 20001 • 202-220-3700 • Fax: 202-220-3759 • www.medpac.gov

Chairman Johnson. Ranking Member Stark, distinguished Subcommittee members. I am Mark Miller, executive director of the Medicare Payment Advisory Commission (MedPAC). I appreciate the opportunity to be here with you this morning to discuss MedPAC's work on Medicare Part B drugs and oncology.

Before 2006, Medicare covered few outpatient drugs but those medications that were covered under Part B were used to treat patients with very serious medical conditions like cancer, hemophilia, and rheumatoid arthritis. Medicare expenditures for these drugs were growing rapidly, rising from $2.8 billion in 1997 to $10.3 billion in 2003, representing about 4 percent of Medicare spending. Although policymakers agreed that payment rates for Part B drugs were too high, providers argued that the high rates were necessary to offset drug administration fees that were too low to cover the costs of administering those drugs to beneficiaries.

The Medicare Prescription Drug, Improvement, and Modernization Act (MMA) changed the way Medicare pays for both drugs and drug administration services under the physician fee schedule. As intended by the policy, payment rates for drugs were reduced to levels closer to the prices providers were paying while payment rates for drug administration increased. As a result of the payment changes, Medicare spending for Part B drugs declined in 2005 despite increases in the volume of drugs used and the substitution of newer drugs for older less expensive products.

The Congress directed MedPAC to study the effect of these changes on beneficiary access and quality of care. Our first report, completed January 2006, focused on services provided by oncologists. We found that, in general, beneficiary access to chemotherapy drugs remained good and we found no evidence that quality of care declined. For our second mandated report, due in January 2007, we are studying the effects of the payment changes on drug administration services provided by other specialties, such as urologists and rheumatologists.

Although no payment system is without drawbacks, the current system has resulted in Medicare payments that are closer to the price physicians pay and has reversed spending trends for Part B covered drugs. However, the Commission believes that it is important for the Secretary to continue monitoring physician acquisition costs to test the accuracy of Medicare drug payments as the new payment system evolves over time.

**Chart 1. Medicare spending and annual growth rates for Part B drugs**



Source: MedPAC analysis of CMS data, 1997-2004

## Background

Under Part B. Medicare covers drugs administered in physician offices. including drugs used for chemotherapy. drugs used as part of durable medical equipment. blood clotting factor. erythropoietin used to treat anemia in end-stage renal disease patients and cancer patients. and some oral medications such as immunosuppressive drugs used following organ transplants. These drugs are not usually purchased at retail pharmacies. Providers buy the products and then bill Medicare as they administer them to patients.  Physician claims account for the majority of Medicare expenditures for Part B outpatient drugs. Physicians in only two specialties—hematology oncology and medical oncology—submitted claims for almost 50 percent of total billing for Part B drugs in 2004. not including drugs provided in dialysis facilities.

Expenditures for Part B drugs increased rapidly. more than 25 percent every year from 1998 to 2003. One of the most significant factors driving spending growth was the payment method. Following the Balanced Budget Act (BBA) of 1997. the Medicare payment rate for covered drugs was set at 95 percent of the average wholesale price (AWP). Despite its name. AWP does not

2

represent the average wholesale price. Rather, it can be thought of as a manufacturer's suggested list price. It does not have to correspond to any transaction price or average transaction price, which often reflect substantial discounts. Every drug has its own AWP. Individual AWPs are compiled and reported in compendia like the Red Book and First Databank largely on the basis of information supplied by the manufacturers. A series of investigations by the Department of Health and Human Services Office of the Inspector General (OIG) and the Government Accountability Office (GAO) showed that Medicare payment rates were well above providers' acquisition costs.

Policymakers discussed a number of ways to reform the payment system, including continuing to pay based on AWP but requiring a steeper discount, setting payment to a different benchmark tied to transaction prices like the average sales price (ASP) or the average acquisition price (AAP), or using competitive bidding to lower prices. In its June 2003 Report to Congress, the Commission examined these policy options.

Our analysis suggested that continuing to use AWP as a benchmark but requiring steeper discounts would lead to limited savings for Medicare. In many cases, the additional discount would still result in payments substantially higher than acquisition costs. AWP would still not correspond to any transaction price and could not be audited. Providers would continue to have an incentive to switch to drugs with higher AWPs to maximize their profit.

Next, we examined the potential effects of a payment method based on a computed average transaction price such as the average sales price (ASP), or the average acquisition price (AAP). Both of these methods depend upon calculated average transaction prices for products. Although in theory calculations based on ASP and AAP should result in the same payment rate. ASP is based on data collected from pharmaceutical manufacturers while AAP data is collected from physicians and suppliers. Differences might reflect inclusion of the wholesalers' fees in AAP and differences in the way manufacturers and physicians would report the data. Since manufacturers are already reporting average price data to CMS in order to determine Medicaid drug payment rates, the data needed to calculate ASP is more readily available than the data needed to determine the average acquisition price.

We concluded that a competitive system or use of either benchmark (ASP or AAP) would reduce Medicare payments. We recognized that there were drawbacks to every proposed reform of the

3

payment system but that all options were likely to reduce Medicare payments compared to the AWP system then in place.

All proposals based on these benchmarks anticipated paying providers a specified percentage above the calculated price although they differed as to how high to set the additional payment. The Commission did not recommend that the payment rate be set at any specific percentage above the benchmark. We said that beneficiary access would not be affected as long as the payment rate was set high enough to meet the costs of efficient providers. We also said that payments set too high above the benchmark would encourage price increases and reduce Medicare savings.

Following passage of the MMA, Medicare significantly changed the way it pays providers for physician-administered drugs and drug administration services, generally reducing the payment rate for drugs while increasing payments for drug administration services. In 2005, Medicare began paying for Part B drugs based on 106 percent of the average sales price (ASP). ASP represents the weighted average of manufacturers sales prices for each product that falls within a Medicare billing code. (Medicare billing codes are used for multiple products.) It is based on data submitted quarterly by pharmaceutical manufacturers, net of price concessions such as rebates and discounts and is limited to sales in the United States. The ASP payment rate is set prospectively based on these transaction prices from two quarters prior. Thus, if manufacturers raise prices in the succeeding quarters, purchasers may have difficulty purchasing products at the Medicare payment rate until the ASP "catches up." On the other hand, if prices go down, either because of competition between therapeutically equivalent branded drugs or because a generic version of a branded drug becomes available, purchasers may buy products at prices significantly below the payment rate until the ASP "catches up."

## MedPAC study

Concerned that the payment changes not affect beneficiary access to needed medical care, the Congress directed the Commission to complete two studies on the effects of the new payment system on beneficiary access, quality of care, and physician practices. Our first report, delivered January 2006, analyzed the effect of the payment changes on beneficiary access to chemotherapy. We are currently conducting a second study on the effect of the payment changes on services provided by other specialties including urologists, rheumatologists, and infectious disease specialists.

Because the legislated changes had not yet been fully implemented and we only had partial data for 2005, the Commission had limited ability to analyze the impact of the changes. We undertook a series of qualitative and quantitative analyses to assess beneficiary access and quality of care.

- We analyzed expenditures and changes in volume for chemotherapy services using Medicare claims data.

- We analyzed a commercial database with prices for drugs used by oncologists to see if prices physicians paid were below the Medicare payment rates. and we measured the variation in prices different physician practices paid.

- We visited community oncologists. hospital outpatient departments. and health plans in five markets to discuss the effects of payment changes on practices.

- We conducted four focus groups with Medicare beneficiaries receiving chemotherapy during 2005 to see how the payment changes affected their experiences.

- We interviewed stakeholders to gain their perspective on how the payment changes affected the buying and selling of physician-administered drugs.

- Finally. we reviewed the literature on pricing for Part B drugs and studies of quality-of-care indicators for chemotherapy.

We found that the payment changes did not affect beneficiary access to chemotherapy services. Physicians provided more chemotherapy services and more Medicare beneficiaries received services in 2005 than in 2004. We saw no indication that quality of care was affected. and patients continue to be satisfied with the care they are receiving. We found no indication of access problems in any region of the country. In general. large practices were able to purchase chemotherapy drugs at lower prices than small practices. but all could buy most drugs at prices below the Medicare payment rate. However. there is one issue to report. In some areas. beneficiaries without supplemental insurance were receiving chemotherapy in hospital outpatient departments rather than physician offices.

## Medicare spending on chemotherapy drugs and services

To measure the impact of the 2005 Medicare payment change to ASP, we analyzed carrier claims for the first six months of 2005. We compared our results to spending and volume claims for the same period in 2003 and 2004. We found that beneficiaries received more drug administration services in 2005 than 2004, but that spending remained constant. Medicare expenditures for chemotherapy drugs declined in 2005 because of the change to payment based on ASP. The change to pricing based on ASP also narrowed the gap between the prices paid by the providers who negotiated the best and worst deals with drug manufacturers.

Preliminary estimates by CMS indicate that spending for all Part B drugs in 2005 declined by 3 percent. Drug spending is determined by volume, drug mix, and the payment rate for the drugs. In the case of Part B drugs, volume increases were offset by changes in the payment rate.

To demonstrate the effect of pricing changes from 2004 to 2005, we estimated what Medicare would have paid if the volume of all the specific Part B drugs billed in 2004 were paid according to the Medicare payment rates for October 2005. Using this methodology, we calculated that expenditures for all Part B drugs used in 2004 would have cost 22 percent less in 2005.

However, the spending decrease was not as great as the decrease in prices would have suggested because the mix of drugs used in 2005 was different from the mix used in 2004. In a continuation of previous trends, physicians substituted newer, more expensive single source drugs for older drugs. Many of the new drugs are produced through the use of biotechnology. Not only are these products expensive when initially marketed, they face only limited competition over time because the FDA does not yet have an approval process for generic versions of biologicals. Many of these biologicals are used in the treatment of cancer. Of the ten drugs that accounted for the largest share of Part B drug spending, four received FDA approval in 1996 or later. Additionally, spending on injectables too new to have received their own payment codes accounted for 3 percent of Part B drug spending.

Both the volume and payments for chemotherapy administration increased in 2005. We estimate that physicians provided 13 percent more chemotherapy sessions in 2005 than in 2004. CMS changed its rules to allow physicians to bill more codes for each chemotherapy session, so the

6

number of services has increased faster than the number of sessions, by 33 percent from 2003 to 2005. In addition, the Congress made two, one-year payment increases for drug administration: in 2004 it increased payments by 32 percent and in 2005 it increased payments by 3 percent over what would otherwise be paid under the fee schedule. Taken together, the volume and payment increases led spending for chemotherapy administration services to rise 182 percent from 2003 to 2005.

We also compared the number of Medicare beneficiaries receiving chemotherapy in physician offices in 2003, 2004, and 2005. We estimate that the number of beneficiaries receiving chemotherapy in physician offices increased 7.5 percent in 2005, based on the most conservative assumption. No matter what set of assumptions we used, Medicare beneficiaries received an increasing number of chemotherapy sessions in physician offices from 2003 to 2005.

In 2005, CMS provided another source of payments for chemotherapy in physician offices. In addition to paying for drugs and drug administration services, CMS implemented a one-year demonstration project to evaluate how chemotherapy affects the level of fatigue, nausea, and pain experienced by patients. All oncologists were eligible to receive $130 per patient per day for asking chemotherapy patients three questions about how they had responded to treatment. (Beneficiaries were charged $26 copayments for this demonstration.) We estimate that this demonstration project increased Medicare expenditures by more than $200 million, further increasing drug administration payments by more than 70 percent over 2003 levels. (In 2006, CMS implemented an alternative demonstration project. The agency required oncologists to provide information on treatment patterns for patients with different cancers at different disease stages. Physicians reporting the required data receive $23 per patient visit.) The addition of the demonstration project funds complicated MedPAC's ability to evaluate fully the effects of the payment changes.

**Payment adequacy**

In the course of our site visits, the Commission found that most oncologists could purchase most drugs at rates below the Medicare payment level, but profit margins on these drugs generally were low, as the policy change anticipated. Every practice reported that that they could not buy some drugs at the payment rate. A study by the Office of Inspector General (OIG) (September 2005)

indicated that oncologists could still purchase most drugs at rates below the payment level, although specific drugs posed a problem for some practices. In general, larger practices paid lower prices than smaller practices for the same drugs.

The Commission analyzed the data presented in the OIG report to determine what kinds of drugs provided higher or lower payment margins compared to the Medicare payment rates. We found that the highest payment margins occurred when generic alternatives, such as carboplatin and cisplatin, became available. Purchasers also were able to buy brand name drugs at prices well below Medicare payment rates if the drugs had therapeutic substitutes available. One example would be dolasetron mesylate, one of a number of drugs used to treat nausea in chemotherapy patients.

As providers moved to purchase less costly alternatives, competition between buyers and sellers resulted in lower Medicare payment rates in the following quarters. We found that when the January Medicare payment rate for a drug was more than 15 percent higher than the average price providers paid, the Medicare payment rate fell sharply by October. In particular, payment rates for chemotherapy drugs with high margins in January declined by as much as 72 percent in October.

Changes in both pricing and purchasing patterns may affect the accuracy of drug payments over time. For this reason, the Commission has recommended that the Secretary continue to monitor provider drug acquisition costs in both physician offices and dialysis facilities.

**Price variation**

Under the ASP method, pharmaceutical manufacturers might narrow the range of discounts offered to purchasers to ensure that all physicians could purchase their products at the Medicare payment rates. Since the market for chemotherapy drugs is limited, manufacturers would want to maximize their customer base. To track changes in oncology prices over time, the Commission acquired pricing information from a commercial data source. (Our contract with the vendor does not allow us to present prices for specific drugs.) Prices are net of discounts but do not include rebates provided by manufacturers after the sale. The database shows variation between the lowest and highest prices the purchaser paid. The Commission purchased data on 26 drugs billed by oncologists for one month of each of the first three quarters of 2005. Drugs include chemotherapy

agents and medications used to treat the side effects of chemotherapy. Many overlap with the drugs identified in the OIG report. The 26 drugs accounted for more than 50 percent of physician-administered Part B drug spending in 2004.

Our analysis of prices paid by physicians showed that price variation for our basket of drugs declined between the first and third quarters of 2005. Next, we looked to see if the decline in price variation was more pronounced for any particular types of drugs. We grouped our drugs in two ways. First, we classified them based on whether they were single source branded drugs or had generic alternatives. Next, we looked at whether the drugs were chemotherapy agents or prescribed to treat the side effects of chemotherapy. For all four categories, the range, defined as the variation between the best and worst price obtained by physicians, narrowed between the first and third quarters of 2005. The range for single source chemotherapy drugs—small to begin with—narrowed least, falling from 6.9 percent to 5.2 percent. The biggest change was in the range for drugs used to treat the side effects of chemotherapy. That range declined 25.3 percent in the first quarter to 10.3 percent third quarter (chart 2). In other words, for this group of drugs there was a difference of about 10 percent between the highest and lowest prices available to physicians.

**Chart 2.   Change in price variation by chemotherapy and non-chemotherapy drugs**



Note:   Two drugs have been excluded because generic alternatives become available during the four quarters. Two others have been excluded because of crosswalk problems. The range measures the percent of variability among the prices paid by clinics. It is measured by subtracting the price paid by the 25th percentile from the price paid by the 75th percentile, dividing by the price paid by the 50th percentile, and multiplying by 100. MedPAC's contract with IMS Health does not allow the prices of drugs be named individually.

Source:   MedPAC analysis of IMS Health data 2004–2005.

## Changes in physician practices

The Congress required the Commission to examine the effect of the payment changes on physician practices. During our site visits. we asked physicians how they responded to the Medicare payment changes. Of course. their answers were subjective. Physicians told us they considered the payment changes significant and changed their practices to get better drug prices. lower costs. and boost revenue. All practices changed their drug purchasing activities. Some also changed their use of drugs. office staffing. mix of services offered. and patient mix.

All the physicians we visited reported that they spent more time and resources shopping for lower prices for drugs than they did before the payment changes. Their choice of ancillary drugs for

10

treating chemotherapy side effects was more likely to be based on price. Many practice managers reported that they routinely purchased only one drug to treat nausea and one erythroid growth factor to treat anemia for all the physicians in the practice. Physicians also reported that they kept smaller inventories of drugs on hand than previously. This allowed them to respond quickly to price changes and avoid tying up large sums of capital.

Many offices have hired employees to work with patients when they begin treatment to ensure that they can pay their out-of-pocket expenses. This financial adviser estimates the beneficiary's potential liability based upon the treatment plan. If the beneficiary does not have supplemental insurance, the adviser determines whether she qualifies for other assistance, including Medicaid and assistance programs maintained by individual pharmaceutical manufacturers. The beneficiary may be given a payment schedule to make copayments over time.

Practices reported that differences in local coverage policies affected their treatment decisions. Physicians were reluctant to use expensive new therapies that they thought the local carrier might not cover. For example, a carrier might cover a new drug for treatment of one cancer while the physician wanted to use it to treat a patient with another type of cancer. One practice reported sending a patient to the hospital outpatient department for treatment because the local intermediary covered a particular drug and the carrier did not. Practices reported they were less likely to appeal local coverage decisions. They found the appeals process too expensive and time-consuming and the outcome of the appeal uncertain.

Physicians took other actions to reduce costs or improve efficiency. For example, some practices reduced costs by changing their mix of employees, replacing full-time employees with part-time employees or replacing nurses with pharmacy technicians. Similarly, many practices reported that they reduced health and pension benefits for their employees. One practice reported increasing efficiency by hiring workers to do the coding for oncology nurses and freed up their time for patient care. Several practices reported hiring a pharmacist to purchase and mix drugs as well as recommend drugs to the practice based on price and clinical effectiveness.

Some practices tried to increase revenues by providing more services in their offices. For example, some physician practices purchased positron emission tomography (PET) scanning technology in the past few years and increased imaging in their offices. However, this was only possible for

practices with large facilities. Many practices reported they did not have the space or capital to expand in this way.

No physician or office manager reported that the payment changes affected the quality of care in their office. No beneficiary who participated in our focus groups reported that she had seen a decline in the quality of care she was receiving.

## Beneficiaries without supplemental insurance

While the new Medicare payment system has reduced prices for existing drugs. it does not have any mechanism to affect prices for new single source branded drugs as they enter the market. New products have become increasingly expensive in the past few years. Beneficiary copayments for these drugs (20 percent of the total payment) are high. and physicians who cannot collect coinsurance from beneficiaries will receive only 80 percent of the Medicare payment rate. Medicare has no limit on the out-of-pocket costs that beneficiaries may face. Medicare beneficiaries without supplemental coverage may be transferred to hospital outpatient departments (HOPDs) and face higher copayments there. However. if beneficiaries who cannot pay cost sharing in physician offices go to HOPDs for chemotherapy infusion. they are unlikely to be able to pay the higher cost sharing there. Instead. their unpaid bills would become bad debt. Medicare pays 70 percent of hospitals' bad debt.

Although we did not find any cases in which beneficiaries could not get chemotherapy services. Medicare beneficiaries without supplemental insurance have more limited choices in some areas of the country. These individuals are more likely than other beneficiaries to receive chemotherapy in HOPDs. In 2004. the Commission found that in some markets. oncology practices had stopped treating Medicare patients without supplemental insurance in their offices. Patients were sent to hospital outpatient departments or safety-net facilities. When we returned to these practices in 2005. we found they were sending more patients to the HOPD. (Hospitals in these markets also reported they were treating more patients with supplemental insurance who required expensive new drugs.)

When patients are sent to the hospital for chemotherapy. the physician continues to manage their care. Physicians still provide evaluation and management visits. some lab work. and other services

in the office setting. The patient only receives the chemotherapy infusion in the hospital. Although quality of care may be equivalent in hospitals and physician offices, beneficiaries face higher copayments in HOPDs and treatment usually takes longer. For example, chemotherapy drugs must be mixed in the hospital pharmacy, where pharmacists are preparing medications for all the other hospital patients. The chemotherapy patient will wait longer until the medication is prepared. Only a few beneficiaries who participated in our focus groups had been referred to the HOPD from physician offices. They emphasized the duplication of tests and increased time commitments caused by the switch. One individual complained about the higher copayments.

As the price of new single source cancer drugs continues to rise, beneficiaries without supplemental insurance may have an increasingly hard time paying their 20 percent coinsurance. Although most physician practices have continued to treat all beneficiaries in their offices, beneficiary inability to meet cost-sharing requirements creates a financial liability for the practices. Many practices have begun to counsel beneficiaries on their estimated out-of-pocket liabilities before treatment begins. A few practices reported instances in which beneficiaries refused treatment because they did not want to travel to a hospital or leave her family with debts caused by her out-of-pocket liability.

We cannot quantify the number of beneficiaries who need help paying their coinsurance for chemotherapy. We have no source of data to determine the number of Medicare beneficiaries without supplemental insurance who are receiving chemotherapy services. Data on supplemental insurance are not captured on Medicare claims. The oncology practices we visited estimated between 5 and 20 percent of their Medicare patients have no source of supplemental coverage. Estimates varied depending on the demographic structure of the market and the availability of Medicare Advantage and retiree health insurance. The Commission (MedPAC 2005a) estimates that, in general, 9 percent of beneficiaries have no source of supplemental coverage. Beneficiaries without supplemental coverage are not the only individuals facing high copayments. Some cancer patients who participated in beneficiary focus groups were concerned that they might exceed lifetime caps on their retiree coverage.

Many pharmaceutical companies offer patient assistance programs to help patients with the cost of their medications. In 2003, pharmaceutical companies provided patients with medications valued at

$3.3 million. However, this assistance is not readily available for Medicare beneficiaries without supplemental insurance. Most of the assistance goes to patients without any insurance. Less aid is available for individuals needing help with copayments. Yet this cost may be beyond the means of many beneficiaries. For example, one new cancer drug costs Medicare an average of $12,000 every two weeks. Beneficiaries face copayments of $2,400 monthly for this medication. They continue taking the medication until the patient's condition worsens.

The Commission is concerned about the burden of cost sharing for beneficiaries with cancer and other catastrophic conditions. We intend to explore the general issue of unlimited beneficiary out-of-pocket liability, which can affect cancer patients and patients with other illnesses, in future work.

### Chemotherapy and quality of care

The Congress directed the Commission to report whether quality of care was affected by Medicare payment changes for chemotherapy services. Based on our interviews and site visits, we found no indication that quality of care has been affected by the payment changes. However, few consensus quality indicators for chemotherapy-related services exist and data to evaluate indicators that do exist are limited.

We discussed perceptions of differences in quality of care with physicians and patients in the course of our site visits and focus groups. Not surprisingly, clinicians we interviewed think the quality of services they provide is quite high. We found that physicians' evaluation of differences in quality across settings was subjective and seemed to be dictated by where they practiced. Oncologists in single-specialty practices felt they had more experience in educating patients about their condition and were more likely to hire oncology-certified nurses. They felt they provided more continuity of care and greater convenience for patients. By contrast, physicians practicing in hospital settings pointed to the availability of staff pharmacists to mix drugs, maintaining that this resulted in higher quality and fewer medical errors. They also pointed to greater use of safety guidelines and standard treatment protocols as indicators of higher-quality care.

Beneficiaries who participated in our focus groups received treatment in a variety of settings, including single-specialty oncology offices, outpatient departments of community hospitals,

14

outpatient departments in university hospital cancer centers, and infusion centers of integrated health plans. Almost without exception, beneficiaries praised the quality of care they received. (The one exception was a beneficiary dually eligible for Medicare and Medicaid who received treatment in the HOPD of a safety-net institution.) None experienced changes in the quality of care received in the past year. Two focus group participants had switched to HOPDs for chemotherapy administration from physician offices in 2005. Neither felt quality of care suffered, although both felt there was less coordination of care and greater out-of-pocket expense in the hospital.

In general, further work is needed to determine quality chemotherapy care. Current public and private initiatives to define and measure quality of cancer care can provide the framework for a pay-for-performance oncology quality initiative. However, there is one instance where the Commission finds that CMS can take action now to monitor the quality of care beneficiaries are receiving.

Erythroid growth factors (Erythropoeitin alpha and darbepoeitin alpha) are used for the treatment of anemia following chemotherapy as well as some other indications. Medicare expenditures for these products account for the highest percentage of Medicare Part B drug spending. Although the shift to ASP resulted in lower payment rates for both products, volume and expenditures continued to increase in 2005. At the same time, concerns have been raised about drug safety and potential under- and overuse of these products. In 2004, the Food and Drug Administration (FDA) responded to safety concerns about the use of growth factors by issuing new prescribing information. Although some local carriers have attempted to limit the use of erythroid growth factor in accordance with FDA regulations and clinical guidelines, carriers are hampered by their lack of access to all relevant clinical data. In our January 2006 report, the Commission recommended that the Secretary require providers to enter patients' hemoglobin level on all claims for erythroid growth factors. This data should be used as part of Medicare's pay-for-performance initiative.

### Conclusion

Policymakers had long agreed that Medicare did not pay accurately for Part B drugs or drug administration services and suggested different alternatives. Although the Commission did not

15

recommend any particular new payment method. our analysis showed that several of the proposed methods would improve the accuracy of the payment system. Following passage of the MMA, Congress reduced payments for drugs and increased payments for drug administration services. In 2005. Medicare began using ASP to set payment rates for Part B drugs. This change lowered the payment rate for most drugs and decreased Medicare spending for Part B drugs. Payment for drug administration services increased.

Part B drugs are used to treat patients with very serious medical conditions including cancer, hemophilia. and rheumatoid arthritis. The Congress directed MedPAC to study the effect of the payment changes to ensure that access and quality of care for individuals with these illnesses were not harmed. We found that that. in general. beneficiary access to chemotherapy services remained good. Physicians provided more chemotherapy services to Medicare beneficiaries in 2005 than in 2004.

The ASP payment method has generally lowered beneficiary cost sharing for Part B drugs. However. beneficiaries without supplemental insurance may face high out-of-pocket spending, particularly if they need new single source drugs. These drugs are expensive and Medicare has no limit on the out-of-pocket costs that beneficiaries may face. Some physicians are sending individuals without supplemental insurance to hospital outpatient departments for chemotherapy infusions where they face still higher copayments. The Commission is concerned about the burden of cost-sharing faced by beneficiaries with cancer and other catastrophic conditions and we intend to explore this issue in future work.

We found no evidence that the quality of care received by Medicare beneficiaries has declined. However. we are concerned that the continuing increase in use of erythroid growth factor should be monitored to make sure that use falls within accepted clinical guidelines. The Commission has recommended that the Secretary require providers to enter patients' hemoglobin level on all claims for erythroid growth factors. This data should be used as part of Medicare's pay-for-performance initiative.

Overall we found that access to care and quality of chemotherapy services were not harmed in 2005. However. we recognize that no payment system is without flaws. Changes in both pricing and purchasing patterns may affect the accuracy of drug payments over time. For this reason. we

16

have recommended that the Secretary continue to monitor provider drug acquisition costs in both physician offices and dialysis facilities.

As directed by the Congress, MedPAC is currently studying the effect of the Medicare payment changes on services provided by other specialties including urologists, rheumatologists, and infectious disease specialists. In this report, due January 1, 2007, we will analyze if beneficiary access, quality of care, or physician practices have been affected following an additional year of experience with the new payment system.