# Department of Health and Human Services

## OFFICE OF
## INSPECTOR GENERAL

# COMPARISON OF FOURTH-QUARTER 2005 AVERAGE SALES PRICES TO AVERAGE MANUFACTURER PRICES: IMPACT ON MEDICARE REIMBURSEMENT FOR SECOND QUARTER 2006



Daniel R. Levinson
Inspector General

July 2006
OEI-03-06-00370

Plaintiffs' Exhibit
4065
01-12257-PBS

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

► E X E C U T I V E   S U M M A R Y

## OBJECTIVE

To determine (1) whether average sales prices (ASP) for individual
Medicare Part B prescription drugs exceeded average manufacturer
prices (AMP) by at least 5 percent during the fourth quarter of 2005 and
(2) the impact of lowering reimbursement amounts for drugs that meet
the 5-percent threshold.

## BACKGROUND

In 2005, Medicare Part B began paying for most covered drugs using a
new methodology based on ASPs. Section 1847A(c) of the Social
Security Act (the Act) defines an ASP as a manufacturer's sales of a
drug to all purchasers in the United States in a calendar quarter
divided by the total number of units of the drug sold by the
manufacturer in that same quarter. The ASP is net of any price
concessions. Manufacturers report ASPs by national drug codes (NDC)
and must provide the Centers for Medicare & Medicaid Services (CMS)
with the ASP and volume of sales for each of their NDCs on a quarterly
basis.

Although manufacturers submit ASP data by NDCs, CMS does not
reimburse Medicare providers for drugs using NDCs. Instead, CMS
uses Healthcare Common Procedure Coding System (HCPCS) codes.
More than one NDC may meet the definition of a particular HCPCS
code; therefore, CMS uses NDC-level information submitted by the
manufacturers to calculate an ASP for each covered HCPCS code.
When CMS calculates payment amounts for HCPCS codes, it must
weight ASPs at the NDC level by the amount of the drug sold during the
quarter. Under the ASP pricing methodology, Medicare's allowance for
most Part B drug codes is equal to 106 percent of the volume-weighted
ASPs for those HCPCS codes.

Section 1847A(d)(2)(B) of the Act mandates that OIG compare ASPs
with AMPs. As defined in section 1927(k)(1) of the Act, an AMP is the
average price paid to the manufacturer for the drug in the United
States by wholesalers for drugs distributed to the retail pharmacy class
of trade, minus customary prompt pay discounts. As part of the
Medicaid drug rebate program, manufacturers must provide CMS with
the AMP for each of their NDCs on a quarterly basis, pursuant to
section 1927(b)(3) of the Act. If the ASP for a drug exceeds the AMP by
at least 5 percent, section 1847A(d)(3)(A) of the Act grants the Secretary

of the Department of Health and Human Services authority to disregard the ASP pricing methodology for that drug. Consistent with section 1847A(d)(3)(C) of the Act, the payment amount for the drug code may then be replaced with the lesser of the widely available market price for the drug (if any) or 103 percent of the AMP.

For this inspection, we obtained CMS's ASP data from the fourth quarter of 2005, which were used to establish volume-weighted ASPs and reimbursement amounts for the second quarter of 2006. We also obtained CMS's AMP data from the fourth quarter of 2005. We used these AMP data to calculate volume-weighted AMPs using the same method that CMS uses to calculate volume-weighted ASPs. Ultimately, we compared volume-weighted ASPs to volume-weighted AMPs for 341 HCPCS codes, and identified codes for which ASPs exceeded AMPs by at least 5 percent.

## FINDING

**For 46 of 341 HCPCS codes reviewed, the volume-weighted ASP exceeded the volume-weighted AMP by at least 5 percent.** Based on our analysis of data from the fourth quarter of 2005, a total of 46 HCPCS codes had an ASP that exceeded the AMP by at least 5 percent. For 13 of the 46 HCPCS codes, volume-weighted ASPs exceeded volume-weighted AMPs by at least 20 percent, with ASPs for 4 of these exceeding AMPs by more than 50 percent. If reimbursement amounts for these 46 codes had been based on 103 percent of the AMP during the second quarter of 2006, we estimate that Medicare expenditures would have been reduced by $16 million.

E X E C U T I V E   S U M M A R Y

## SUMMARY

For the purpose of monitoring new Medicare reimbursement amounts based on ASPs, and consistent with sections 1847A(d)(2)(B) and 1847A(d)(3) of the Act, OIG compared ASPs to AMPs to identify instances in which the ASP for a particular drug exceeded the AMP by a threshold of 5 percent.  This review is the second of such comparisons, and we identified 46 HCPCS codes that are eligible for price adjustment under authority of the Secretary.  Twenty of the 46 HCPCS codes were previously eligible for price adjustment as a result of OIG's first comparison between ASPs and AMPs, which was performed using data from the third quarter of 2004.

# ► T A B L E   O F   C O N T E N T S

**E X E C U T I V E   S U M M A R Y** .......................................... i

**I N T R O D U C T I O N** .............................................. 1

**F I N D I N G** ...................................................... 8

    Results of ASP to AMP Comparison........................ 8

**S U M M A R Y** ...................................................... 10

**A P P E N D I X E S** ................................................ 11

    A: Equation Used by CMS to Calculate Volume-Weighted ASPs  11

    B: Forty-Six HCPCS Codes With an ASP That Exceeded the
       AMP by at Least 5 Percent........................... 12

**A C K N O W L E D G M E N T S** ........................................ 14

# ► INTRODUCTION

## OBJECTIVE

To determine (1) whether average sales prices (ASP) for individual Medicare Part B prescription drugs exceeded average manufacturer prices (AMP) by at least 5 percent during the fourth quarter of 2005 and (2) the impact of lowering reimbursement amounts for drugs that meet the 5-percent threshold.

## BACKGROUND

### Medicare Part B Coverage of Prescription Drugs

Medicare Part B covers only a limited number of outpatient prescription drugs. Covered drugs include injectable drugs administered by a physician; certain self-administered drugs, such as oral anticancer drugs and immunosuppressive drugs; drugs used in conjunction with durable medical equipment; and some vaccines.

### Medicare Part B Payments for Prescription Drugs

The Centers for Medicare & Medicaid Services (CMS) contracts with private companies, known as carriers, to process and pay Medicare Part B claims, including those for prescription drugs. Claims for drugs that are used with medical equipment are typically processed by one of four durable medical equipment regional carriers. Claims for other types of covered drugs are processed by local carriers. To obtain reimbursement for covered outpatient prescription drugs, physicians and suppliers submit claims using procedure codes. CMS established the Healthcare Common Procedure Coding System (HCPCS) to provide a standardized coding system for describing the specific items and services provided in the delivery of health care. In the case of prescription drugs, each HCPCS code defines the drug name and dosage size but does not specify manufacturer or package size information.

Medicare and its beneficiaries spent almost $10 billion for Part B drugs in 2005. Although Medicare paid for almost 550 outpatient prescription drug HCPCS codes that year, the majority of spending for Part B drugs was concentrated on a relatively small subset of those codes. In 2005, 52 codes represented 90 percent of the expenditures for Part B drugs, with only 11 of these drugs representing half of the total Part B drug expenditures.

# I N T R O D U C T I O N

**Reimbursement Methodology for Part B Drugs and Biologicals**

In 2005, Medicare Part B began paying for most covered drugs using an entirely new methodology based on ASPs.[1] Section 1847A(c) of the Social Security Act (the Act), as added by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), P.L. 108-173, defines an ASP as a manufacturer's sales of a drug to all purchasers in the United States in a calendar quarter divided by the total number of units of the drug sold by the manufacturer in that same quarter. The ASP is net of any price concessions such as volume discounts, prompt pay discounts, and cash discounts; free goods contingent on purchase requirements; chargebacks; and rebates other than those obtained through the Medicaid drug rebate program.[2] Sales that are nominal in amount are exempted from the ASP calculation, as are sales excluded from the determination of "best price" in the Medicaid drug rebate program.[3,4]

Manufacturers report ASPs by national drug codes (NDC), which are 11-digit identifiers that indicate the manufacturer of the drug, the product dosage form, and the package size. Manufacturers must provide CMS with the ASP and volume of sales for each NDC on a quarterly basis, with submissions due 30 days after the close of each quarter.[5]

Given that Medicare Part B reimbursement for outpatient drugs is based on HCPCS codes rather than NDCs, and that more than one NDC may meet the definition of a particular HCPCS code, CMS has developed a file that "crosswalks" manufacturers' NDCs to HCPCS codes. CMS uses information in this crosswalk to calculate volume-weighted ASPs for covered HCPCS codes.

Fourth-quarter 2005 ASP submissions from manufacturers served as the basis for second-quarter 2006 Medicare allowances for most covered

---

[1] For 2004, the reimbursement amount for most covered drugs was based on 85 percent of the average wholesale price (AWP) as published in national pricing compendia such as the "Red Book." Prior to 2004, Medicare Part B reimbursed for covered drugs based on the lower of either the billed amount or 95 percent of the AWP.

[2] Section 1847A(c)(3) of the Act.

[3] Pursuant to section 1927(c)(1)(C)(i) of the Act, "best price" is the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, with certain exceptions.

[4] Section 1847A(c)(2) of the Act.

[5] Section 1927(b)(3) of the Act.

drug codes.  Under the ASP pricing methodology, the Medicare
allowance for most Part B drugs is equal to 106 percent of the ASP for
the HCPCS code.  Medicare beneficiaries are responsible for 20 percent
of this amount in the form of coinsurance.

### The Medicaid Drug Rebate Program and AMP

For Federal payment to be available for covered outpatient drugs
provided under Medicaid, sections 1927(a)(1) and (b)(1) of the Act
mandate that drug manufacturers enter into rebate agreements with
the Secretary of the Department of Health and Human Services and pay
quarterly rebates to State Medicaid agencies.  Under these rebate
agreements, and pursuant to section 1927(b)(3) of the Act,
manufacturers must provide CMS with the AMP for each of their NDCs
on a quarterly basis.  As defined in section 1927(k)(1) of the Act, the
AMP is the average price paid to the manufacturer for the drug in the
United States by wholesalers for drugs distributed to the retail
pharmacy class of trade, minus customary prompt pay discounts.  The
AMP is calculated as a weighted average of prices for all of a
manufacturer's package sizes of a drug sold during a given quarter, and
is reported for the lowest identifiable quantity of the drug
(e.g., 1 milligram, 1 milliliter, 1 tablet, 1 capsule).

### Office of Inspector General's Monitoring of ASP and AMP

Section 1847A(d)(2)(B) of the Act mandates that the Office of Inspector
General (OIG) compare ASPs with AMPs.  If the ASP for a drug exceeds
the AMP by at least 5 percent, section 1847A(d)(3) of the Act grants the
Secretary authority to disregard the ASP pricing methodology for that
drug.  Consistent with section 1847A(d)(3)(C) of the Act, the payment
amount for the drug code may then be replaced with the lesser of the
widely available market price for the drug (if any) or 103 percent of the
AMP.

In April 2006, OIG released the first of its reports comparing ASPs to
AMPs.  The study, entitled "Monitoring Medicare Part B Drug Prices:
A Comparison of Average Sales Prices to Average Manufacturer Prices"
(OEI-03-04-00430), identified a number of HCPCS codes with ASPs that
exceeded AMPs by at least 5 percent in the third quarter of 2004.
Overall, CMS indicated that the information in the report is helpful in
its continuing efforts to monitor payment adequacy under the ASP
methodology.  However, CMS noted that OIG's review was conducted
using data submitted during the initial implementation phase of the
ASP methodology.  Although CMS acknowledged the Secretary's
authority to adjust ASP payment limits when certain conditions are

met, it believes that other issues should be considered, including the timing and frequency of pricing comparisons, stabilization of ASP reporting, the effective date and duration of rate substitution, and the accuracy of ASP and AMP data.

### Related Work by the Office of Inspector General

In a February 2006 report entitled "Calculation of Volume-Weighted Average Sales Price for Medicare Part B Prescription Drugs" (OEI-03-05-00310), OIG stated that CMS's method for calculating volume-weighted ASPs is incorrect because CMS does not use billing units consistently throughout its equation. As a result, many HCPCS codes have a reimbursement amount that is higher or lower than the amount that would have been calculated if billing units were used consistently. OIG recommended that CMS change its calculation of volume-weighted ASPs. Although CMS indicated that it may consider altering the ASP methodology, it has yet to do so.

In September 2005, OIG issued a report in response to section 303(c)(3) of the MMA, which mandated that OIG determine whether physician practices in the specialties of hematology, hematology/oncology, and medical oncology could obtain drugs and biologicals for the treatment of cancer patients at 106 percent of the ASP. According to this report, "Adequacy of Medicare Part B Drug Reimbursement to Physician Practices for the Treatment of Cancer Patients" (A-06-05-00024), physician practices in these specialties could generally purchase drugs for the treatment of cancer patients at or below the reimbursement rate established under the ASP payment methodology.

## METHODOLOGY

We obtained CMS's NDC-level ASP data from the fourth quarter of 2005, which were used to establish Part B drug reimbursement amounts for the second quarter of 2006. In addition, we obtained the file that CMS used to crosswalk NDCs to their corresponding HCPCS codes. Both the ASP data and the crosswalk file were updated as of March 2006. We also obtained AMP data from CMS for the fourth quarter of 2005.

### Calculation of Volume-Weighted Average Sales Price

As mentioned previously, Medicare does not base reimbursement for covered drugs on NDCs; instead, it uses HCPCS codes. Therefore, CMS uses ASP information submitted by manufacturers for each NDC to calculate a volume-weighted ASP for each covered HCPCS code. When

INTRODUCTION

calculating these volume-weighted ASPs, CMS only includes NDCs with ASP submissions that are deemed valid. We did not examine the NDCs that CMS opted to exclude from its calculation, nor did we verify the accuracy of CMS's crosswalk files.

As of March 2006, CMS had established prices for 496 HCPCS codes based on the ASP reimbursement methodology. Reimbursement amounts for the 496 HCPCS codes were based on ASP data for 3,061 NDCs.

To calculate the volume-weighted ASPs for these 496 codes, CMS used an equation that involves the following variables: the ASP for the NDC as reported by the manufacturer, the volume of sales for the NDC as reported by the manufacturer, and the number of billing units in the NDC as determined by CMS. The amount of the drug contained in an NDC may differ from the amount of the drug specified by the HCPCS code that providers use to bill Medicare. Therefore, the number of billing units in an NDC describes the number of HCPCS code units that are in that NDC. For instance, an NDC may contain a total of 10 milliliters of Drug A, but the corresponding HCPCS code may be defined as only 5 milliliters of Drug A. In this case, there are two billing units in the NDC. CMS calculates the number of billing units in each 11-digit NDC when developing its crosswalk files. A more detailed description of CMS's method of calculating volume-weighted ASPs is provided in Appendix A.

**Analysis of Average Manufacturer Price Data**
An AMP is reported for the lowest identifiable quantity of the drug contained in the NDC (e.g., 1 milligram, 1 milliliter, 1 tablet, 1 capsule). In contrast, an ASP is reported for the entire amount of the drug contained in the NDC (e.g., for 50 milliliters, for 100 tablets). To ensure that the AMP would be comparable to the ASP, it was necessary to convert the AMP for each NDC so that it represented the total amount of the drug contained in that NDC.

In making these conversions, we examined AMPs only for those 3,061 NDCs that CMS used in its calculation of volume-weighted ASPs for the 496 codes. If AMP data were not available for one or more of these NDCs, we excluded the corresponding HCPCS code from our analysis. We excluded a total of 144 HCPCS codes using this conservative approach. The remaining 352 HCPCS codes had AMP data for every NDC that CMS used in its calculation of volume-weighted ASPs. These 352 HCPCS codes represented 1,659 NDCs.

**I N T R O D U C T I O N**

We then multiplied the AMPs for these 1,659 NDCs by the total amount of the drug contained in each NDC, as identified by sources such as the CMS crosswalk file, the "Red Book," manufacturer Web sites, and the Food and Drug Administration's NDC directory. We will refer to the resulting amounts as converted AMPs. For 23 NDCs, we could not successfully identify the amount of the drug reflected by the ASP and therefore could not calculate a converted AMP. These 23 NDCs were crosswalked to 11 HCPCS codes. We did not include these 11 HCPCS codes (126 NDCs) in our final analysis.

Using the converted AMPs for the remaining 1,533 NDCs, we then calculated volume-weighted AMPs for each of the codes using the same method that CMS uses to calculate volume-weighted ASPs. We calculated volume-weighted AMPs for a total of 341 HCPCS codes. We did not verify the accuracy of manufacturer-reported ASP and AMP data.

**Comparing Volume-Weighted ASPs to Volume-Weighted AMPs**
For each of the 341 HCPCS codes included in our study, we then compared the volume-weighted ASPs and AMPs and identified codes with ASPs that exceeded AMPs by at least 5 percent.

For those HCPCS codes that met or exceeded the 5-percent threshold, we conducted a review of the associated NDCs to verify the accuracy of the billing units information. According to our review, four of the codes that met the 5-percent threshold had associated NDCs with potentially inaccurate billing units.[6] Given that volume-weighted ASPs and AMPs were calculated using this billing unit information, we could not be certain that the results for these four codes were correct. Therefore, we did not include these four codes in our findings.

For the remaining HCPCS codes, we then estimated the monetary impact of lowering reimbursement to 103 percent of the AMP.[7] First we

---

[6] NDCs for these four codes had billing unit information in CMS's crosswalk file that may not have accurately reflected the number of billing units actually contained in the NDC.

[7] Pursuant to section 1847A(d)(3) of the Act, if the ASP for a drug exceeds the AMP by at least 5 percent, the Secretary has authority to disregard the ASP pricing methodology for that drug. Consistent with section 1847A(d)(3)(C) of the Act, the payment amount for the drug code may then be replaced with the lesser of the widely available market price for the drug (if any) or 103 percent of the AMP. For the purposes of this study, we used 103 percent of the AMP to estimate the impact of lowering reimbursement amounts. If widely available market prices had been available for these drugs and lower than 103 percent of the AMP, the savings estimate presented in this report would have been greater.

# I N T R O D U C T I O N

calculated 103 percent of the volume-weighted AMP and subtracted this amount from the second-quarter 2006 reimbursement amount for the HCPCS code, which is equal to 106 percent of the volume-weighted ASP. To estimate the financial effect for second quarter 2006, we then multiplied the difference by one-fourth of the number of services that were allowed by Medicare for each HCPCS code in 2005, as reported in CMS's Part B Extract and Summary System (BESS).[8] This estimate assumes that the number of services that were allowed by Medicare in 2005 remained consistent from one quarter to the next, and that there were no significant changes in utilization in 2006.

This study was conducted in accordance with the "Quality Standards for Inspections" issued by the President's Council on Integrity and Efficiency and the Executive Council on Integrity and Efficiency.

---

[8] At the time of extraction. BESS data were 98 percent complete.

▶ **F I N D I N G**

**For 46 of 341 HCPCS codes reviewed, the volume-weighted ASP exceeded the volume-weighted AMP by at least 5 percent**

Consistent with sections 1847A(d)(2)(B) and 1847A(d)(3) of the Act, OIG compared ASPs to AMPs to identify instances in which the ASP for a particular drug exceeded the AMP by a threshold of 5 percent. Forty-six of the 341 HCPCS codes included in our comparison met or surpassed this 5-percent threshold in the fourth quarter of 2005. Of these 46 HCPCS codes, 20 were identified in a previous OIG report as having ASPs that exceeded AMPs by at least 5 percent in the third quarter of 2004.[9] A list of all 46 HCPCS codes is presented in Appendix B.

Table 1 below describes the extent to which ASPs exceeded AMPs for the 46 HCPCS codes. For 13 of the 46 codes, volume-weighted ASPs exceeded volume-weighted AMPs by at least 20 percent, with ASPs for 4 of these exceeding AMPs by more than 50 percent.[10]

**Table 1: Extent to Which ASPs Exceeded AMPs for 46 HCPCS Codes**

| Percentage Difference Between ASP and AMP | Number of HCPCS Codes |
|---|---|
| 5–9% | 14 |
| 10–19% | 19 |
| 20–29% | 5 |
| 30–39% | 1 |
| 40–49% | 3 |
| 50–59% | 1 |
| 60–69% | 0 |
| 70–79% | 0 |
| 80–89% | 2 |
| 90–99% | 1 |
| **Total** | **46** |

Source: OIG analysis of fourth-quarter 2005 ASP and AMP data, 2006.

---

[9] This report, "Monitoring Medicare Part B Drug Prices: A Comparison of Average Sales Price to Average Manufacturer Price" (OEI-03-04-00430), found that 51 HCPCS codes met the 5-percent threshold when CMS's method was used to calculate volume-weighted ASPs and AMPs using data from the third quarter of 2004.

[10] Due to the confidential nature of ASP and AMP data, OIG is not publicly providing the exact percentages for each of the 46 HCPCS codes. However, OIG will provide CMS with detailed information regarding the codes identified in this report.

**F I N D I N G**

**Lowering reimbursement amounts for these 46 HCPCS codes to 103 percent of the average manufacturer price would have reduced Medicare allowances by an estimated $16 million in the second quarter of 2006.**

Sections 1847A(d)(3)(A) and (B) of the Act grant the Secretary authority to disregard the ASP pricing methodology for a drug with an ASP that exceeds the AMP by at least 5 percent. If that criterion is met, the Secretary has authority to lower the reimbursement amount for the drug to 103 percent of the AMP.[11] In this study, we identified 46 HCPCS codes that met or exceeded the 5-percent threshold specified in the Act. If reimbursement amounts for these 46 codes had been based on 103 percent of AMP during the second quarter of 2006, we estimate that Medicare expenditures would have been reduced by $16 million.[12]

Three of the 46 HCPCS codes accounted for almost 80 percent of the $16 million. If the reimbursement amounts for these 3 codes had been based on 103 percent of the AMP during the second quarter of 2006, Medicare expenditures would have been reduced by an estimated $13 million.

---

[11] Consistent with section 1847A(d)(3)(C) of the Act, the payment amount for the drug code may then be replaced with the lesser of the widely available market price for the drug (if any) or 103 percent of the AMP. For the purposes of this study, we used 103 percent of the AMP to estimate the impact of lowering reimbursement amounts. If widely available market prices had been available for these drugs and lower than 103 percent of the AMP, the savings estimate presented in this report would have been greater.

[12] This estimate is based on one-fourth of the number of services allowed by Medicare for each HCPCS code in 2005.

## ▶ S U M M A R Y

For the purpose of monitoring new Medicare reimbursement amounts based on ASPs, and consistent with sections 1847A(d)(2)(B) and 1847A(d)(3) of the Act, OIG compared ASPs to AMPs to identify instances in which the ASP for a particular drug exceeded the AMP by a threshold of 5 percent. This review is the second of such comparisons, and we identified 46 HCPCS codes that are eligible for price adjustment under authority of the Secretary. Twenty of the forty-six HCPCS codes were previously eligible for price adjustment as a result of OIG's first comparison between ASPs and AMPs, which was performed using data from the third quarter of 2004.

► A P P E N D I X  ~  A

### Equation Used by the Centers for Medicare & Medicaid Services to Calculate Volume-Weighted Average Sales Prices

In the following equation, a "unit" is defined as the entire amount of the drug contained in the National Drug Code (NDC):

$$\text{Volume-Weighted ASP for the Billing Unit of HCPCS Code} = \frac{\text{Sum of}\left[\dfrac{\text{ASP for NDC}}{\text{Billing Units in NDC}} \cdot \text{Number of NDCs Sold}\right]}{\text{Sum of Number of NDCs Sold}}$$

CMS's calculation of volume-weighted ASPs is discussed in greater detail in the Office of Inspector General (OIG) report, "Calculation of Volume-Weighted Average Sales Price for Medicare Part B Prescription Drugs" (OEI-03-05-00310). This report found that CMS's method for calculating volume-weighted ASPs is incorrect because CMS does not use billing units consistently throughout its equation. Therefore, OIG recommended that CMS adopt an alternate method for calculating volume-weighted ASPs.

# A P P E N D I X  ~  B

## Forty-Six HCPCS Codes With an ASP That Exceeded the AMP by at Least 5 Percent

| Code | Description |
|------|-------------|
| J0207 | Injection, amifostine, 500 mg |
| J0360* | Injection, hydralazine HCl, up to 20 mg |
| J0470* | Injection, dimercaprol, per 100 mg |
| J0610 | Injection, calcium gluconate, per 10 mL |
| J0640 | Injection, leucovorin calcium, per 50 mg |
| J0694 | Injection, cefoxitin sodium, 1 g |
| J0720 | Injection, chloramphenicol sodium succinate, up to 1 g |
| J0745 | Injection, codeine phosphate, per 30 mg |
| J1230 | Injection, methadone HCl, up to 10 mg |
| J1240* | Injection, dymenhydrinate, up to 50 mg |
| J1270 | Injection, doxercalciferol, 1 mcg |
| J1460* | Injection, gamma globulin, intramuscular, 1 cc |
| J1470* | Injection, gamma globulin, intramuscular, 2 cc |
| J1480* | Injection, gamma globulin, intramuscular, 3 cc |
| J1490* | Injection, gamma globulin, intramuscular, 4 cc |
| J1500* | Injection, gamma globulin, intramuscular, 5 cc |
| J1510* | Injection, gamma globulin, intramuscular, 6 cc |
| J1520* | Injection, gamma globulin, intramuscular, 7 cc |
| J1530* | Injection, gamma globulin, intramuscular, 8 cc |
| J1540* | Injection, gamma globulin, intramuscular, 9 cc |
| J1550* | Injection, gamma globulin, intramuscular, 10 cc |
| J1560* | Injection, gamma globulin, intramuscular, over 10 cc |
| J1670 | Injection, tetanus immune globulin, human, up to 250 units |
| J1850 | Injection, kanamycin sulfate, up to 75 mg |
| J2545* | Pentamidine isethionate, inhalation solution, per 300 mg |
| J2690* | Injection, procainamide HCl, up to 1 g |
| J2720 | Injection, protamine sulfate, per 10 mg |
| J3000 | Injection, streptomycin, up to 1 g |
| J3120 | Injection, testosterone enanthate, up to 100 mg |
| J3130 | Injection, testosterone enanthate, up to 200 mg |
| J3410* | Injection, hydroxyzine HCl, up to 25 mg |
| J3411 | Injection, thiamine HCl, 100 mg |
| J3420* | Injection, vitamin B-12 cyanocobalamin, up to 1,000 mcg |
| J3475 | Injection, magnesium sulfate, per 500 mg |
| J7501 | Azathioprine, parenteral, 100 mg |
| J7620 | Albuterol, up to 2.5 mg and ipratropium bromide, up to 0.5 mg, noncompounded inhalation solution, administered through DME |
| J7638 | Dexamethasone, inhalation solution administered through DME, unit dose form, per mg |

A P P E N D I X   ~   B

| Code | Description |
|------|-------------|
| J9000 | Doxorubicin HCl, 10 mg |
| J9130 | Dacarbazine, 100 mg |
| J9140 | Dacarbazine, 200 mg |
| J9190 | Fluorouracil, 500 mg |
| J9202* | Goserelin acetate implant, per 3.6 mg |
| J9211 | Idarubicin HCl, 5 mg |
| J9214 | Interferon, alfa-2b, recombinant, 1 million units |
| J9340 | Thiotepa, 15 mg |
| J9360* | Vinblastine sulfate, 1 mg |

*Codes marked with an asterisk were identified in a previous OIG report as having ASPs that exceeded AMPs by at least 5 percent in the third quarter of 2004.

Source: OIG analysis of fourth-quarter 2005 ASP and AMP data, 2006.

## ► A C K N O W L E D G M E N T S

This report was prepared under the direction of Robert A. Vito, Regional Inspector General for Evaluation and Inspections in the Philadelphia regional office, and David E. Tawes, Director of the Medicare and Medicaid Prescription Drug Unit. Other principal Office of Evaluation and Inspections staff who contributed include:

Lauren McNulty, *Team Leader*
Linda Boone Abbott, *Program Specialist*