**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: | CIVIL ACTION: 01-CV-12257-PBS |
| ALL ACTIONS | Judge Patti B. Saris |

## REBUTTAL TESTIMONY OF DR. RAYMOND HARTMAN

## I.      INTRODUCTION

1.      In this rebuttal testimony, I address particular issues raised by Defendants' witnesses or the Court.  Attached are exhibits which support my testimony.  I had my office provide to Defendants backup calculations for the attachments where appropriate.  I incorporate by reference my prior written direct testimony and the previous reports I have submitted in this litigation.

## II.      REBUTTAL TESTIMONY RELATING TO THE CALCULATION OF ASPs

2.      I believe that the following issues should be addressed in connection with calculation of ASPs.  ASPs are relevant for the damage calculations for Class 2 and Class 3 and for my liability opinion under Class 3.

### A.      Dr. Addanki's Analysis of ASP

3.      I understand that Dr. Addanki argues that for nebulizer drugs such as albuterol sulfate (and its brand Proventil), the ASP should be narrowly limited to include only those sales to wholesalers in which the manufacturer does not otherwise have a relationship to the wholesalers' buyers.  This argument is contradicted by the facts of this case.  Albuterol sulfate (and Proventil) is sold to a variety of classes of trade, and class members in this case reimbursed for albuterol sulfate (and Proventil) through these of classes of trade.  In these classes of trade, various rebates, discounts, chargebacks, timing arrangements, prompt pay allowances and other price concessions effectively reduced the average selling price to the dispensers (pharmacies, home health care agencies, physicians, etc.), and these dispensers are thereafter reimbursed for albuterol sulfate.  Put simply, these units sold and the price concessions on these units sold ***must be*** an integral part of the calculation of the average selling price.

4.      My position is endorsed by the current approaches of the Centers for Medicare and Medicaid Services ("CMS") and Office of the Inspector General for Health and Human Services ("OIG").  CMS does not narrowly limit the classes of trade as proposed by Dr. Addanki.  The OIG 2003 Compliance Program Guidance does not narrowly limit the classes of trade as proposed by Dr. Addanki.  Accordingly, I have not provided the Court with an alternative ASP calculation which strips out classes of trade and units reimbursed by the Classes, as proposed by Dr. Addanki.

**B.      Inclusion of Free Goods**

5.      In some circumstances, "sales" of "free goods" would be included in the calculation of average selling price (thereby, of course, driving the ASP down).  This occurs when, for example, "free goods" are in reality price concessions for quantity purchases, or when the "free goods" are part of a marketing plan which causes the "free goods" to be reimbursed by end payors.  As far as I understand, the issue of "free goods" arose in the case in two ways.

6.      First, as to AstraZeneca (in accordance with this Court's order striking the inclusion of "free goods" in the AstraZeneca ASP calculations), I have provided the recalculations that were admitted during my redirect examination.  My understanding from counsel is that there is evidence in the case from which this Court might conclude that AZ unlawfully distributed "thousands" of "free samples" under circumstances where those "free goods" should in fact be included in ASP calculations in order to reduce the ASP figure.  I point this out simply to observe that if the Court so concludes, my current ASP calculations for AstraZeneca are conservative because they do not account for the "thousands" of such "free samples."

7.     Second, as to Schering-Plough/Warrick, Dr. Addanki argues that certain "free goods" were included in my ASP calculations that should not have been.  In particular, when my office, Greylock McKinnon Associates ("GMA"), was provided with the invoice, chargeback and rebate data for Schering/Warrick, we were provided with a class of trade code that indicated free goods.  This class of trade code was eliminated from my ASP analyses.  Subsequent to that, however, Dr. Addanki identified that there were additional "free goods" that were encoded under the class of trade 999, or "miscellaneous," instead of the class of trade for free goods.[1]

8.     I directed my staff to recalculate the damages for Schering-Plough/Warrick so as to exclude those additional "free samples" included in the "miscellaneous" class of trade 999.  Those revisions are set forth in Attachment A.  Total National Class 2 damages through 2003 for Schering-Plough/Warrick decrease from $146,782,975 to $145,733,515 and total National Class 3 damages through 2003 for Schering-Plough decrease from $6,866,209 to $2,498,109.

## C.     Analysis of Units Dispensed Through Hospitals

9.     A question exists as to whether sales to hospitals should be included in the calculation of the average selling price for this litigation.  On the one hand, this Court might conclude that because the case does not involve reimbursements for hospital-based drug transactions, sales to hospitals *should be excluded* from the ASP.  On the other hand, this Court might conclude that because the ASP should reflect sales to all non-governmental classes of trade (the approach adopted by CMS for the current ASP system under the MMA and by the OIG Compliance Program Guidance), sales to hospitals *should be included* in the ASP.  Usually (but not always), inclusion of sales to hospitals reduces the ASP (because sales of

---

[1] The deposition testimony cited by Dr. Addanki does *not* in fact address these specific unidentified free samples (Deposition of Art Monaghan, June 21, 2005, p. 23); it identifies another type of free sample that I have also already excluded.  Nothing in this deposition, or any other information provided by Schering-Plough, of which I am aware, reveals that code 999 relates to free goods.

pharmaceutical products to hospitals tend to be lower priced than other private sales), and accordingly increases damages.

10.     In my original December 2005 damages report, I *excluded* hospitals from my ASP calculations, thereby making any damage calculations conservative.  Subsequently, at the request of counsel (under the hypothesis that the Court might adopt the CMS approach and seek to include hospitals in the ASP calculations), I recalculated the ASPs to *include* hospitals in the ASP calculations as set forth in my supplemental report of February 2006.  In my final written direct, I have continued with the original approach by *excluding* hospitals in order to approach damages for the case in the most conservative manner.

11.     I assume that because my final written direct excludes hospitals (and thereby results in more conservative damages), Defendants have not criticized my exclusion of hospitals from the calculation.  If the Court concludes that my ASP calculations should more closely follow the CMS approach (and thereby include hospitals as a class of trade for ASP calculations), such calculations could be run.

**D.     Data Interpretation Issues for Class of Trade**

12.     Even in situations where there are well-defined descriptions of the classes of trade, my experience is that there will always be data application issues unique to each pharmaceutical manufacturer (since manufacturers are maintaining voluminous information in varying ways).

13.     As to Johnson & Johnson, there were particular data interpretation issues.  Mr. Dukes, J&J's CPA, identified in his report a series of "assumptions" he had made in recalculating the ASPs for J&J based upon information that was represented by J&J counsel and employees to be true.

14.     In the final damage calculations set forth in my direct testimony, I incorporated almost every "assumption" made by Mr. Dukes in recalculating ASPs for J&J.  My understanding is that J&J does not now raise any issue regarding the ASP calculations for J&J.

15.     Although I have incorporated the assumptions used by Mr. Dukes, I cannot opine as to whether those assumptions are true.  Each of the assumptions works to increase the ASP (and thereby decrease the AWP to ASP spread), once again making my ASP and damage calculations conservative.  If the Court concludes that these assumptions are unwarranted, my office would recalculate ASPs for J&J.

**E.     NDC or J-Code Based ASPs**

16.     For branded single-source drugs, I calculate ASPs on an NDC basis for both liability (as to Class 3) and damages (as to Class 2 and Class 3).  Since a branded, single source drug NDC and its associated J-Code for reimbursement purposes do not generally pose any question, my understanding is that no issue has been raised regarding my use of NDC-based ASPs for single source drugs.

17.     Dr. Bell argued that an evaluation of the liability of BMS with respect to Taxol should be undertaken at a J-Code, rather than an NDC level.  I disagree.  Manufacturers strategically implement and differentiate their spreads on an NDC basis in order to promote certain presentations of the relevant drugs; they market their spreads on an NDC basis and provide promotional materials on an NDC basis.[2]  The ASP paid by the provider is the ASP of the NDC.  Given availability of NDC-based data to capture both provider and payor behaviors, there are absolutely no economic or statistical reasons to use weighted averages of such data. Such averaging merely blurs specific NDC strategies, thereby introducing aggregation bias.

---

[2]  This strategic behavior was employed by TAP for Lupron (See the *Lupron Sentencing Memorandum*), as TAP actively attempted strategically "move the market" from the one-month injection presentation to the three-month and four-month presentations.

18.     The evidence demonstrates that over the Class Period, Defendants recognized, exploited and increased Return-to-Practice in order to move market share.  Providers determined the Return-to-Practice (or profit earned) on any possible therapy by the difference between the reimbursement rate received and the cost paid.  That difference is an NDC-based measure. Reimbursement was determined by AWP (which is NDC based); acquisition cost was determined by ASP (which is NDC based).  Return-to-Practice of a promoted and dispensed drug therapy **was not** determined by **the average of the ASPs** for all formulations of a given drug. Indeed, even though Medicare reimbursement is defined by CMS as a weighted average ASP beginning in 2005, the provider's payment is still defined by what the provider pays, which is NDC-based.

19.     Dr. Addanki has argued that using a drug's own AWP for the determination of liability is "inconsistent" with using a multi-source drug's median AWP for the calculation of damages.  I disagree.

20.     The AWP inflation scheme alleges the artificial inflation of the difference between the AWP and the ASP for which it is a signal.  Hence, the appropriate measure of that behavior for a given manufacturer is its own AWP and its own ASP.  This difference determines liability.  For single source drugs, the scheme reveals itself in the inflation of the drug's own AWP relative to the ASP for which it is a signal.  As discussed above, since single-source manufacturers have revealed the strategy to vary spreads across NDCs to move market share of desired NDCs, the spreads must be calculated and liability determined at the NDC level. Determining conduct and liability for multi-source drugs is the same.  The only difference is that damages are calculated based on the median for Medicare-related damages.  Damages for multi-

source drugs for Class 3 are set to zero under the conservative assumption that MAC pricing is implemented.

**F.      Defendants' CMS Submissions**

21.      Since sometime in 2004, each Defendant began submitting quarterly ASP reports on an NDC basis for each of the drugs involved in this case.  These NDC-based ASP submissions to CMS are not publicly available.  CMS takes those NDC-based ASP quarterly calculations, converts them to a J-Code ASP based upon weighting of drugs in that J-Code (if there is more than one), multiplies that CMS J-Code ASP by 1.06, and publishes a Medicare Reimbursement Amount for each J-Code.  The Medicare Reimbursement Amount is published quarterly based upon the manufacturers' ASP submissions two quarters previously.

22.      I understand that Plaintiffs' counsel requested, but were not able to obtain, access to Defendants' calculations of ASPs during the litigation.  Accordingly, I did not have access to the *methodology* by which each manufacturer applied the CMS regulations to their particular databases to calculate ASPs by NDC.  Of course, if I had access to the methodology by which the manufacturers applied the CMS regulations to the calculation of ASPs (applicable since 2004 to the present), I could apply that methodology retrospectively to the calculation of ASPs during the class period (1991-2003).

23.      In comparing my estimated ASPs to current CMS ASPs (which are based upon the Defendant manufacturers' submission of NDC-based ASPs), my ASPs are conservative.  My ASPs excluded sales to hospitals (unlike CMS); they adopt representations made by Defendants regarding application of classes of trade;[3] and provide a "current" ASP as opposed to an ASP that always would be two quarters earlier.  For these and other reasons, my calculation of ASPs

---

[3] I do not know whether they are consistent or inconsistent with the manufacturers' current application of class of trade information to the ASPs calculated for submission to CMS.

is likely more conservative than those currently provided to CMS.  As a result, my damage calculations are more conservative.

### III.     THE AWP FOR JUNE OF A GIVEN YEAR

24.     During the course of the class period (1991 through 2003, a thirteen year period), I used the published AWP in June for each year.   Mr. Dukes claims that my calculations for the J&J drug Remicade are inaccurate due to my choice of using an AWP as of June 30th of each year.  I disagree.

25.     My use of this AWP is standard methodology.  In the calculation of aggregate damages, I estimate damages for the class as a whole.  In doing so, given data restraints, it is necessary to formulate a model that will best approximate damages.  Therefore, the use of a mid-point during this time is the standard methodology.  To the extent that the selection of the midpoint value might overstate damages for one period, it will understate damages for another, resulting in a fair estimate of aggregate damages.

### IV.     USE OF NAMCS AND NDTI DATA IS APPROPRIATE

26.     Dr. Kolassa incorrectly criticizes the use of NAMCS and NDTI data to allocate sales to Medicare.  The NDTI (National Disease and Therapeutic Index) as well as NAMCS (National Ambulatory Medical Care Survey) are physician office based surveys that track the type of insurance that the patient has.  NDTI is a slightly larger survey.  For AstraZeneca, Johnson & Johnson and Schering-Plough, NDTI data were used.  For BMS, NDTI was not provided by Defendants, and so NAMCS data were used.  Once the Medicare percentage was determined, the percentage of the copayment paid by Medicaid, private third-party payers or the beneficiaries themselves was determined by using the peer-reviewed research conducted by Eppig & Chulis, as cited in my Declaration.

27.     For each of the drugs at issue, I reviewed the NAMCS and NDTI data to determine whether there were other factors that should be considered in allocated quantities to Medicare.  I determined that other factors for albuterol must be considered.  It is known that albuterol sulfate for use with a nebulizer is administered to Medicare patients through DMERCs and home healthcare, not in the physician's office.  Therefore, even though the albuterol nebulizer appears in the NDTI (or NAMCS) data, it does not reflect all Medicare patients.  In other words, the percentage of Medicare patients captured in the NDTI survey is too low.  To remedy this, first an estimate of Medicaid reimbursements was calculated using CMS data and manufacturer sales data.  This percentage is excluded.  Of the remainder, it is assumed that since albuterol sulfate is primarily a Medicare drug, 75% is paid by Medicare and 25% is paid by non-Medicare.  This breaks down to approximately 22% of reimbursements paid by Medicaid, 58% paid by Medicare and 19% paid by non-Medicare.

28.     To confirm the 75/25 split (of the units remaining after Medicaid units are removed), an investigatory analysis was conducted as follows. Total Medicare units reimbursed were obtained from CMS data.  Then, total units (to the class) were taken from the available manufacturer data (i.e., from Schering-Plough's Proventil and Warrick's albuterol sulfate). Next, market share data provided by Dr. Addanki (based on IMS data) was gathered.  Using these market share data and the Schering-Plough/Warrick manufacturer data, total units sold in the market were derived.  Finally, CMS units divided by the total market units gave an estimate of the percentage of units reimbursed by Medicare.  From 2000 to 2003, we found that, in aggregate, the CMS units accounted for about 60% of our estimate of total market sales.  This confirmed our use of the 75/25 split after Medicaid was excluded which yielded a result of 58% for Medicare.

## V.      OTHER RELEVANT CALCULATIONS

29.     My understanding is that during the trial it has been observed that there is, of course, a difference between a "spread" expressed in percentage terms as opposed to a "spread" expressed in dollar terms.  Defendants' arguments have come in both ways – Schering-Plough/Warrick has argued that big spreads might mean "pennies", while J&J has argued that smaller spreads (i.e., for Procrit and Remicade) absolve it of liability (without reference to the dollars involved).

30.     In the event that the Court concludes that it is meaningful information for the Court to consider the dollars (as well as the percentages) of the "spread," I provide the following information.

31.     First, I provide a margin analysis for Remicade.  The Court may recall that J&J's Remicade had an overall 30% (and not 20% or 25%) difference between the published AWP and J&J's WAC for Remicade.  Attachment B is an analysis of the Remicade AWP spread over WAC which shows the amount of increased margin and dollars between a 25% v. 30% and between a 20% v. 30% AWP over WAC spread.  For example, between 1998 and 2003, the difference between a 25% v. 30% AWP over WAC spread for Remicade amounts to approximately $191 million.

32.     Second, Schering-Plough/Warrick has argued that the large spreads for albuterol sulfate are in the "pennies".  However, albuterol sulfate is not used at the fundamental billing unit level (which is terms of "pennies"); the typical administration amounts are significantly more.  For example, Schering/Warrick has argued that the spread for albuterol sulfate 0.083% was "only" $0.38/ml.  However, Schering-Plough/Warrick failed to acknowledge that the usual 30 day supply of albuterol sulfate is at least 225 mg (or 270 ml); thus, the spread for albuterol

sulfate is $102.60 every 30 days – a non-negligible sum of money for many Class members and even for large TPPs given the significant volume of sales for this widely used product.

33.     Finally, I also refer to my redirect testimony where I provided the Court with additional information regarding overall "return to practice" for each Defendant, i.e., the total amount of expenditures over providers' costs for each of the Defendants' drugs during the Class Period.

34.     Again, each of the above analyses are not offered as an alternative damages analysis; they are instead provided as financial information that the Court may conclude as relevant to the Court's determination as to whether any one or more of the Defendants' conduct violated the consumer protection laws.

## VI.     LIMITING REIMBURSEMENT RATES DOES NOT HURT CONSUMERS, IT HELPS THEM

35.     Several of Defendants' experts (Drs. McFadden, Gould, Bell and Addanki) have argued the imposition of a 30% spread threshold would injure consumer interests because manufacturers would respond by increasing ASPs.  I disagree and indeed have predicted that ASPs would decline in the "but-for" world (see footnote 95 in my December 16, 2004 Rebuttal Declaration).

36.     Fortunately,  we have a natural experiment to test Defendants' theory that ASPs will increase in response to a limitation on the allowable spread.  If Defendants' analyses were correct, when Medicare switched to reimbursement based on the ASP methodology (with a much more restrictive implied spread threshold of 6%), all prices would have increased.  The following is noted by MedPAC:

> "To demonstrate the effect of pricing changes from 2004 to 2005, we estimated what Medicare would have paid if the volume of all the specific Part B drugs billed in 2004 were paid according to the Medicare payment rates for October

2005.  Using this methodology, we calculated that expenditures for all Part B drugs used in 2004 would have cost 22 percent less in 2005."[4]

37.     In fact, as further discussed in Dr. Rosenthal's Rebuttal testimony, Medicare reimbursements for drugs in this matter have decreased.  In addition, despite increases in administration and dispensing fees, total reimbursements for drugs have decreased.  For example, the figures in Attachment C, for selected Defendants' drugs, demonstrate that total reimbursements have decreased since the inception of the ASP methodology.  This is in contrast to what Defendants are claiming would happen under this ASP methodology or any methodology which limited the spread between reimbursements based upon AWP and ASP.

## VII.   LACK OF PUBLIC KNOWLEDGE OF MARKETING THE SPREAD AND OF THE SPREAD MAGNITUDE

### A.     Bell's Slide 29

38.     Dr. Bell presented an analysis purporting to quantify certain "counts" contained in certain publications of single source spreads (see Bell Slide 29).  I disagree with his methodology and his conclusions.

39.     First, I point out that even if one accepts Dr. Bell's "counts" almost 75% of those "counts" reported spreads at or lower than my conservative 30% threshold.  Thus, even under Dr. Bell's version of the "counts," his analysis tends to corroborate, not undermine, my analysis.

40.     Second, a closer look at Dr. Bell's "counts" shows that his analysis of single source drugs corroborates my 30% threshold.  See Attachment D for a revision of his exhibit once all of these misspecifications are corrected.

---

[4] MedPac, "Medicare Part B Drugs and Oncology" July 13, 2006, p. 6

41.     Third, I have prepared a chronological analysis of reported observations of drug specific average spreads including those greater than 30%.  See Attachment E.  The number of observations of drug specific average spreads above 30% was insignificant.

**B.     AMPs**

42.     Defendants have argued that the existence of AMPs serves as a basis of knowledge for the government and/or private payors.  I disagree.

43.     The average manufacturer price, or "AMP," is a specific price point calculated solely for purposes of the Medicaid program.  In my years working with healthcare data, AMPs have never been publicly available to me.  I also understand from counsel that AMPs are required to be kept confidential and are limited to use by the federal government for purposes of the Medicaid program. See 42 USC § 1396r-8(b)(3)(D) and Sample Rebate Manufacturer Agreement between the Secretary of Health and Human Services and the manufacturer. (See Attachment F.)  This law and the Medicaid Rebate Agreement entered into by manufacturers confirms my experience – no one other than Medicaid regulators have access to AMPs, and they cannot be used for any other purposes.

**C.     Dr. Gould's Omitted Zoladex Chart**

44.     I note that data provided by AstraZeneca's expert Professor Gould also underscore my conclusions regarding lack of knowledge of significant spreads for physician administered drugs.  I understand that there is evidence from which this Court might conclude that AstraZeneca itself was unaware of marketing the spread for physician administered drugs during the years that it was seeking to market and sell Zoladex.  Professor Gould's analysis of AstraZeneca's alteration of spread demonstrates a radical change in pricing activity by AstraZeneca.  See Attachment G.

**D.     When Is Selected Reported Information Sufficient for Action?**

45.     Several of the Defendants' experts have argued that, through 20/20 hindsight, the identification of certain particular reports should be considered by this Court as "knowledge" sufficient to be acted upon by all public and private payors.  I disagree.

46.     There is a difference between information and knowledge and there is a slow progression from initial information and increasing information to systematic knowledge.  This insight is critical to understanding when Medicare and the TPPs actually *knew* that spreads were larger than the historically accepted amounts.  The information available can be summarized as follows:

- Most governmental reports in the 1980s through early 1990s found that acquisition costs were less than 15% of AWP; most of these reports were based on Medicaid data and self administered drugs;
- This information reflected notions of spreads for physician-administered drugs;
- First survey of physician-administered drug is in 1992 and it documents for a single source drug spreads of 20%;
- The preponderance of spreads for single-source drugs reported through 2003 were 20%; and
- Limited evidence of spreads exceeding 20% for a limited number of multi-source physician-administered drugs, particularly albuterol sulfate, began to appear with the first report in 1996.

47.     The fact that there were limited published documents after 1992 with larger spreads for multi-source physician-administered drugs, in particular for albuterol sulfate starting in 1996, only shows that some information was becoming available.  It does not demonstrate that this information was fully absorbed and understood to reflect systematic knowledge about spreads by Medicare or the TPPs.  To demonstrate this, consider the following examples:

- If an economist does a single survey or study finding certain results, those results do not constitute systematic information.  That information needs to be confirmed over time.

- For a non-pharmaceutical example, take events that occurred at the Love Canal. A housing development was built on a hazardous waste site. At the time of its construction there was no expectation that residual hazardous waste would systematically increase the risk of cancer. Over time it was reported that one person developed cancer. This was information. Was this enough information for people to believe that it was caused by the site and for the housing development to be closed? Then there was another report. And another. It was not until there were multiple and continued reports of individuals developing cancer that this information was systematic enough to constitute knowledge and actionable expectations.

- For another example, consider the auto industry. In the 1950s and 1960s the U.S. auto industry was dominated by the Big 3. During that period of time there were small amounts of imported autos. This initial information about foreign imports was not taken to constitute knowledge about the long-term viability regarding U.S. auto manufacturers. Only after two decades did specific information of import competitiveness become systematic enough to constitute knowledge about the non-competitiveness of U.S. autos.

- Finally, consider an example from Medicare. In September 2005, an OIG report was published indicating that the dispensing fees being paid by Medicare for inhalation drugs was excessive.[5] This presented a point of information. To counter this information, there were responses from Home Health Care Agencies. CMS, in its response to the original OIG report, did not just accept this information as a given and did not accept it as "knowledge." It accepted it as a point of information: "The OIG report provides helpful information on this topic. We will carefully consider the OIG report together with the public comments we receive, as we develop the final rule [for 2006] dispensing fee policy."[6] The final rule for 2006 kept the dispensing fee at $57 for the first prescription and lowered the dispensing fee for additional refills to $33 for a one-month supply.[7]

48.     Most of the reports merely claim that AWP is greater than AAC by a reasonable amount (i.e., 15%). There was no systematic information available to alter this expectation. What was not known is the egregious difference between AWP and ASP that developed over time.

49.     In summary, Defendants experts and I reviewed that same limited number of surveys. Defendants' experts use 20/20 hindsight and conclude that the information reflected in

---

[5] Office of Inspector General, "Review of Services Provided by Inhalation Drug Suppliers," September 2005, OEI-01-05-00090.

[6] OIG, op. cit., p. 26, CMS Response.

[7] See CMS Fact Sheet, November 2, 2005, "Appropriate Payments, High-Quality Care For Beneficiaries Using Inhalation Drugs."

the first surveys about multi-source drugs was sufficient to fundamentally alter systematic price expectations of Medicare. The fact is that the world does not work that way. There was too little information available and certainly not enough to reverse pre-existing expectations concerning spreads and preexisting institutional reliance upon AWP. As a result, accumulating information came to reflect knowledge by CMS of systematic spread exploitation with the passage of the MMA in 2003 and the OIG Compliance Guidance. Over the same period of time, it was impossible for private TPPs to defeat the AWP inflation scheme for the reasons discussed in my Direct Testimony.

## VIII.   ASTRAZENECA'S COMPARISON TO TAP'S LUPRON

50.      Professor McFadden argued that AstraZeneca should in some way be excused for the wrongful conduct it engaged in because consumers might have suffered more if they had been forced to switch to Lupron. I disagree.

51.      I was retained as an economic expert in connection with the matter, *In Re Lupron Sales and Marketing Litigation,* MDL 1430. In that case, I was asked to provide an opinion on class certification issues involving allegations of the wrongful inflation of the AWP for Lupron. That litigation settled for an aggregate amount of $150,000,000. See Attachments H and I.

52.      In my opinion, it makes no economic sense when evaluating the consequences of fraud and abuse to characterize (as professor McFadden does) the lesser harm perpetuated by one wrongdoer as a "savings" because the victim would have suffered a greater harm by the other wrongdoer.

## IX.   DEFENDANTS' MMA "CROSS SUBSIDY" ARGUMENT

53.     Dr. Gaier has argued that decreasing drug reimbursements but increasing service/dispensing fees end up being "a wash" under the MMA, or that determining savings is impossible.  I disagree.

54.     When examined on a drug-specific or overall level, the MMA is designed to, and is in fact accomplishing, substantial net savings to payors (including Medicare beneficiaries who are required to pay the 20% copayment).

55.     For example, Schering-Plough/Warrick argued, through Dr. Addanki, that the overall Medicare reimbursement between 2004 and 2005 for albuterol 0.5% went up.  This fact is misleading for several reasons.  First, the comparison of years he provides (2004 and 2005) simply compares one year under the MMA (the transition year 2004) to another year under the MMA (2005).  A more valid comparison is to compare pre-MMA years (2003 and before) to MMA years (2004 and onward).  Second, his choice of which albuterol to use (the 0.5%) is highly selective;  Medicare expenditures for the applicable J-code for the .5% formulation is significantly less than the J-code for the unit dose formulation (i.e., the .083%).  Instead, a more complete analysis would include comparison of the pre-MMA years to the post-MMA years for albuterol 0.083%.  Comparing those years, overall reimbursements for albuterol under the MMA have seen very drastic reductions.  See the albuterol figure in Attachment C.

56.     Under my direction, my office has prepared similar analyses for Taxol, Procrit, Remicade and Zoladex (see Attachment C).

## X.   DEFENDANTS' ARGUMENTS REGARDING ECONOMIC RATIONALITY

57.     Various of the Defendants' experts have argued that the Defendants' actions are "economically rational" and therefore should be excused.  I disagree.

58.     In my opinion, economic rationality does not trump the law.  The relevant question is whether such rational economic behavior is legal.

> • It may be economically rational for several large manufacturers that dominate a particular market to explicitly or tacitly collude to fix prices and increase profitability even though it is not legal.
>
> • It may be economically rational for a particular manufacturer to systematically discriminate against older members of its work force (who have greater seniority, larger salaries and higher health care costs) with respect to promotions, further salary increases and termination even though it is not legal.
>
> • It was certainly considered economically rational for TAP to engage in the RICO violations with respect to Lupron, violations to which they pled guilty since the violations were not legal.
>
> • During times of crisis such as Hurricane Katrina a variety of shortages arise, including gasoline, water and food shortages.  There certainly were gasoline shortages that were made public; more people wanted to buy gasoline than gasoline stations could serve.  Rational economic behavior argues that the gas station owners (and refiners) would rationally raise prices.  However, some states have laws against "unconscionably excessive" prices in times of emergency.
>
> • In all of these cases, economically rational business entities would weigh the advantages of the profit-maximizing but potentially illegal economic behavior against the costs and probability of being caught and punished.  In all four cases, if the fines for violation are deemed small and/or the probability of being caught is deemed low, then the economically rational yet illegal behavior could very well be a rational economic decision.

## XI.     COMPETITION IN THIS MARKET IS VERY DIFFERENT THAN IN OTHER RETAIL GOODS MARKETS

59.     Spread competition generally was strategically implemented by manufacturers once a drug manufacturer was confronted with competition from a new therapeutic or generic competitor.  This type of competition must not be confused with normal price competition.  While the spread competition in this matter may have involved competitive price reductions, it did not result in pro-competitive price reductions to consumers, as is usually the case when price competition occurs.  As a matter of economics, in a competitive market, consumer welfare is increased when costs are reduced; prices reflect those cost reductions and consumers switch to

those products with lower prices/costs.  In this industry, manufacturers' ASPs and actual

acquisition costs to providers and market intermediaries were reduced, but consumers/payors

were either steered or switched to those products that were priced higher (i.e., required higher

reimbursement rates), or they paid a higher price related to an inflated AWP, or they continued to

pay for drugs at the same prices that did not reflect cost reductions.  Such a market result is

diametrically opposite to a normally competitive market result.  Yes, spread competition

occurred in response to competitive entry; however, as in the Lupron matter, it was the manner

by which the competition was implemented that constituted fraudulent marketing practices.  The

spread competition exploited by the Track 1 drug manufacturers in this case is not normal pro-

consumer competition.  An attempt to characterize it as such is misleading.

60.     The markets and competition in the markets at issue in this litigation are not

analogous to the markets and competition in the markets for such consumer products as eggs,

soda pop or automobiles, as Defendants would like the Court to believe.  The markets for the

first two consumer products are sufficiently competitive that prices will be driven in equilibrium

toward costs, whether or not consumers have expectations about or knowledge of those costs.

### XII.   INTERPRETATION OF CMS REIMBURSEMENT REGULATIONS IS CORRECT

61.     As discussed in my Direct Testimony, the historical intent of CMS was to

reimburse for Part B drugs at the lesser of the provider acquisition cost or AWP (or percentage

off of AWP depending on the time period).  While this is clear in the regulations through 1997,

the wording for 1998-2003 changed to:

> "Payment for a drug or biological … is based on the lower of the actual charge on the
> Medicare claim for benefits or 95 percent of the national average wholesale price of the
> drug or biological. … For multiple-source drugs and biologicals, for purposes of this
> regulation, the average wholesale price is defined as the lesser of the median average
> wholesale price for all sources of the generic forms of the drug or biological or the lowest

average wholesale price of the brand name forms of the drug or biological. (Source: 42 CFR 405.517, Revised October 1, 2003)."

62.     Defendants claim that the actual charge is the amount "billed" by the provider and there is no indication that this should be the acquisition cost of the provider.  However, it is clear from a variety of sources, as noted in my previous testimony, that the actual charge is intended to be the acquisition cost.

63.     In addition to the support noted above, it is helpful to also note that a CMS Medicare Carriers Manual Transmittal Memo during the time of the 1998 – 2003 regulation (#1717, August 16, 2000) describes reimbursement for drugs as:

> "The payment rates for the vaccines must be determined by the standard method used by Medicare for reimbursement of drugs and biologicals which is based on the lower of cost, or 95 percent of the AWP."

Although this Transmittal is regarding immunosuppressive drugs, this statement is clearly regarding Medicare's general reimbursement practices for drugs and biologicals.

## XIII.   CLAIMS DATA SHOW RELIANCE ON AWP

64.     In Exhibit 37 of Dr. Gaier's Direct Testimony he purports to identify the number of claims reimbursements by BCBS MA that are not based on an AWP fee schedule.  He finds that 43% are not.  However, there are a number of flaws in his analysis.

65.     First, Dr. Gaier includes a number of records where the "PCC" field is blank. According to the letter from Stephen Coco to Adeel Mangi of September 11, 2006, (see Attachment J) records with a blank PCC field are rejected claims and therefore should not be included.  This accounts for over 10,000 records that should not have been included in this analysis.

66.     Second, Dr. Gaier includes the payment basis codes "cut check, apply HMO withhold" and "cut check, apply HMO incentive."  My understanding is that these are not

reimbursements at all, but are merely the disbursement of earned "withhold" amounts.  It is also possible that these withhold amounts are related to reimbursements that might have been based on an AWP schedule.  Regardless, they should not be a part of this analysis.

67.     These two errors alone account for a decrease in the number of reimbursements not based on AWP by over 7 percentage points, reducing his overall amount to 35%. Furthermore, in his attempt to determine if various reimbursements were paid based on an AWP fee schedule, Dr. Gaier calculated a median fee amount in a given month and compared that to the reimbursement.  It is not clear if this methodology provides accurate results.

68.     Finally, Dr. Gaier's findings are adverse to my own claims analyses.  Specifically, analyses of actual claims data confirm that both Medicare and third-party payers pay most claims at the maximum allowable amount, which is AWP-based.

69.     My December 15, 2005 Declaration analysis of Blue Cross Blue Shield of Kansas City claims data reported in Table 4 of that Declaration demonstrated that the majority of non-zero claims were directly related to AWP.  I have undertaken a similar but limited analysis of Blue Cross Blue Shield of Massachusetts Medigap payments. This analysis demonstrates that the majority of those payments were based on AWP.  These analyses for these drugs demonstrate that the amounts charged by physicians were almost always greater than the allowed amounts, which are statutorily based on AWP.[8]

---

[8]  In my 7/17/06 Declaration in Rebuttal of Dyckman, I used claims data provided by BCBS-MA and identified claims representing Medigap payments greater than zero dollars for two J-codes: J2916 (Watson's Ferrlecit) and J0880 (Amgen's Aranesp). This claim analysis showed:

- For Ferrlecit (J2926), the charged amount is greater than the allowed amount for 98% of the claims. The allowed amount is directly related to AWP in 94% of the claims, and the paid amount is directly related to AWP in 98% of claims. The paid amount equals 20% of the allowed amount in over 96% of the claims.

- For Aranesp (J0880), the charged amount is greater than or equal to the allowed amount for 98% of the claims. The allowed amount is directly related to AWP in 92% of the claims, and the paid amount is

70.     Furthermore, preliminary analysis of actual Medicare claims data for a randomly chosen year (1999) indicates that the amount charged by providers was greater than the maximum allowable amount for the preponderance of claims analyzed (87.3%). For the remaining 12.7%, the charged amount equals the allowed amount. This latter group seems to be composed of claims for which the charged amount is either equal to or less than the statutory allowed amount. Without further analysis of the latter group, I cannot ascertain the extent to which the provider billed at or less than the maximum allowed amount.[9]

I declare that the foregoing is true and correct under penalty of perjury.

/s/ Raymond S. Hartman

_____

Raymond S. Hartman

---

directly related to AWP in 89% of claims. The paid amount approximately equals 20% of the allowed amount in over 86% of the claims.

[9]  The Medicare data analysis was conducted in connection with a research study funded by the Federal Agency for HealthCare Research and Quality.  Professor Joseph Newhouse of Harvard University was the principal investigator on this study, which examined the impact of AWP-based reimbursement for cancer therapies on the likelihood that late-stage cancer patients receive chemotherapy and among those that do, on the selection of a particular drug regimen (Jacobson, *et al.*, *op. cit.*) To address these questions, Dr. Newhouse and his colleagues relied on the SEER-Medicare database, obtained from the National Cancer Institute under a data use agreement. The SEER Medicare data reflect the linkage of two sources of data: Medicare claims and the Surveillance, Epidemiology and End Results (SEER) program of cancer registries that collect clinical, demographic and cause of death information for persons with cancer. The linked files thus profile both the clinical characteristics and health care service utilization and spending for Medicare beneficiaries with cancer.

My analysis of Medicare allowed amounts and physician billed charges for Part B drugs administered to cancer patients relies upon data from the Carrier Files (formerly known as the Physician/Supplier Part B file) of the SEER-Medicare database. For simplicity, the claims included in the analysis were limited to those in which the HCPCS code was a J-code for one randomly chosen year, 1999. This restriction limited the data set to 1,225,794 claims.  To examine the proportion of Part B drug claims for cancer patients in which the Medicare allowance, which was based on AWP during the Class Period, was less than the billed charge, a simple comparison of two fields was made. Those two fields were the allowed amount (variable name: alowchrg) and the billed charge (variable name: sbmtchrg). Only claims with allowed amounts greater than zero were included in the analysis. For 1,070,000 claims (87.3%), the billed charge submitted by the physician was greater than the Medicare allowance. For 155,794 claims (12.7%), the billed charge submitted by the physician was equal to the Medicare allowance.