# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| IN RE PHARMACEUTICAL INDUSTRY | ) | MDL No. 1456 |
| AVERAGE WHOLESALE PRICE | ) | |
| LITIGATION | ) | |
| | ) | |
| _____ | ) | Judge Patti B. Saris |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | |
| 01-CV-12257-PBS and 01-CV-339 | ) | |
| _____ | ) | |
| TRIAL OF CLASS 2 AND 3 CLAIMS | | |

## TRACK 1 DEFENDANTS' MEMORANDUM OF LAW
## IN RESPONSE TO THE COURT'S QUESTIONS CONCERNING THE IMPLICATION
## OF EVIDENCE WITH RESPECT TO CLASS 3 NAMED REPRESENTATIVES
## FOR THE REMAINDER OF THE CLASS

Defendants submit this memorandum of law in response to the questions posed by the

Court regarding the class-wide implications of the evidence adduced at trial with respect to the

named Class representatives, Blue Cross Blue Shield of Massachusetts ("BCBS/MA") and

Pipefitters 537 Trust Fund ("Pipefitters").[1]

## PRELIMINARY STATEMENT

Class counsel selected, and this Court certified, BCBS/MA and Pipefitters as class

representatives for Class 3.  BCBS/MA is the largest third-party payor ("TPP") in Massachusetts.

Numerous other TPPs with insured lives in Massachusetts, including Pipefitters, relied on

BCBS/MA to administer their plans.

The evidence presented during Plaintiffs' case regarding BCBS/MA's conduct requires

entry of judgment in Defendants' favor with respect to Class 3.  Plaintiffs have not met their

---

[1] Defendants intend to file separate motions and memoranda for judgment on the merits.

burden of establishing that "but for" Defendants' alleged conduct payors would have stopped reimbursing physicians at 95% of AWP.  Rather, despite careful analysis of the margins physicians were receiving, as well as knowledge of spreads throughout the class period, BCBS/MA has continued to use 95% of AWP as the reimbursement benchmark for its own plans and the plans it administers on behalf of other class members.  Indeed, BCBS/MA is currently extending its usage of AWP to hospitals as a cost-saving mechanism.  And BCBS/MA is not alone.  As multiple Plaintiff witnesses admit, AWP remains a reimbursement benchmark for numerous TPPs, including, as the record reflects, TPPs in Massachusetts.

In light of this evidence, the Court has raised questions regarding the implications for the class as a whole resulting from this fundamental failure of proof.  Because BCBS/MA and Pipefitters are the certified class representatives for the class and are, as the record establishes, typical of class members, the claims of Class 3 must be dismissed.  Simply put, the class is not entitled to a "do-over" because the evidence adduced defeats the claims of its representatives.[2]

Nonetheless, to the extent the Court decides – contrary to the record and the law – that Class 3 should not be bound by the fundamental deficiencies of the claims of the class representatives, for the reasons discussed below, the Court should enter judgment against BCBS/MA and Pipefitters and decertify Class 3.

---

[2] We note that this Court has already granted preliminary approval of the GlaxoSmithKline ("GSK") Settlement, in which the Court found that BCBS/MA was an adequate and typical representative of a class consisting of all third-party payors in the United States who made reimbursements based on contracts expressly using AWP as a pricing standard for purchases of a physician-administered drug manufactured by GSK.  In re Pharmaceutical Indus. Average Wholesale Price Litigation, MDL No. 1456 (order granting preliminary approval of the GlaxoSmithKline settlement, certifying class for purposes of settlement, directing notice to the class and scheduling fairness hearing).  Certification of a class for settlement-only purposes requires even greater scrutiny of the requirements of Rule 23(b) relating to adequacy and typicality.  Amchem Prods. v. Windsor, 521 U.S. 591, 620-21 (U.S. 1997) (holding that certification of settlement-only class requires heightened scrutiny of all the requirements of Rule 23(b), except for trial manageability).

<u>**ARGUMENT**</u>

**I.    JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS ON CLASS 3
       CLAIMS BECAUSE PLAINTIFFS HAVE FAILED TO PROVE CAUSATION**

All parties to this action agree that Plaintiffs must prove causation to sustain a claim under Ch. 93A.  Indeed, the Massachusetts Supreme Judicial Court has recently emphasized that "proving a causal connection between a deceptive act and a loss . . . is an essential predicate for recovery" on a Ch. 93A claim.  <u>Hershenow v. Enterprise Rent-A-Car Co. of Boston</u>, 445 Mass. 790, 791, 840 N.E.2d 526, 528 (2006).   Plaintiffs here cannot establish causation.

> **A.    Causation Requires a Showing that Plaintiffs Would Have
>         Behaved Differently Had They Known of the Alleged Practice**

Under Ch. 93A, Plaintiffs must prove "but for" and proximate causation.  <u>Markarian v. Conn. Mut. Life Ins. Co.</u>, 202 F.R.D. 60, 68 (D. Mass. 2001).  To establish "but for" causation, Plaintiffs must show that the outcome would have been different if not for Defendants' allegedly unfair or deceptive conduct.  <u>See</u> <u>Hershenow</u>, 455 Mass. at 800-01 (finding no causation because "[t]he [illegal provision of car rental contract] made neither rental customer worse off during the rental period than he or she would have been had the [provision] complied in full with the requirements of [Massachusetts law]").[3]  Here, the fact that Defendants' alleged publication of allegedly "inflated" AWPs caused no harm to Plaintiffs is illustrated by the actions of named class representative BCBS/MA.

---

[3] <u>McCann v. Davis, Malm & D'Agostine</u>, 423 Mass. 558, 560, 669 N.E.2d 1077, 1079 (1996) (finding no causation because although defendant law firm was negligent in representation of plaintiff in stock transaction, "plaintiff would have lost his interest in the corporations in any event"); <u>compare</u> <u>Hershenow</u>, 455 Mass. at 801 (noting that causation was established in <u>Aspinall v. Philip Morris Cos.</u>, 442 Mass. 381, 394, 813 N.E.2d 476, 486 (2004) because "the deceptive advertising 'could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted'").

       i.        BCBS/MA Affirmatively Elected to Continue Using AWP
                          Rather Than Shift to ASP Because of Market Conditions

In 2004, BCBS/MA considered whether to shift from an AWP-based reimbursement for physician administered drugs to ASP-based reimbursement.  (11/7/06 Devaux Tr. 129:20-25). This issue was considered by BCBS/MA's "Provider Financial Strategies Workgroup" (PFSW), which was chaired by Senior Vice President for Health Care Contract Management Deborah Devaux.  (11/7/06 Devaux Tr. 126:23-24, 130:1-14).  A presentation prepared for the PFSW's consideration summarized the "Reasons for Reform" as including:

–       Physicians benefit from the "spread" between AWP and acquisition cost creating an overpayment for drugs and costs for Medicare.

–       According to GAO and CMS, in 2001 Medicare overpaid Part B drugs by over $1 billion.

–       In 2002, Oncologists collected approximately $600 million in overpayments.

–       Patients who pay a coinsurance are adversely affected by the inflated AWP.

(DX 990 at 2).

The PFSW noted that the estimated annual savings associated with a shift to ASP would be more than $6 million.  (11/7/06 Devaux Tr. 158:17-25; DX 990).  But BCBS/MA was concerned about resistance to the change from its network and understood that doctors consider reimbursement rates when determining whether to participate in a network.  (11/7/06 Devaux Tr. 159:8-14; 160:15-23).  Moreover, BCBS/MA was also concerned that oncologists would stop administering drugs to patients in their offices and would instead send patients to hospitals, which would end up costing BCBS/MA and the plans it represents more money.  (11/7/06 Devaux Tr. 153:20-154:16, 163:2-15).  In view of these concerns, BCBS/MA decided not to move away from AWP-based reimbursement.  (11/7/06 Devaux Tr. 158:2-5).  BCBS/MA did not

4

even lower the percentage discount off AWP, even though it recognized it had the ability to do so.  (11/7/06 Devaux Tr. 165:13-17).

Another BCBS/MA employee, Mr. Mulrey, echoed Ms. Devaux's acknowledgment that BCBS/MA cannot prove that "but for" the alleged misconduct of Defendants BCBS/MA would have done anything differently.  (11/8/06 Mulrey 29:9-23).  Mr. Mulrey also described BCBS/MA's analysis of the impact of changing to an 85% of AWP system in 2004.  That analysis carefully considered both the savings such a change would have for BCBS/MA as well as the impact on the physician network.  Despite Mr. Mulrey's conclusions that such a change would save BCBS/MA $6 million, the decision was made not to change the reimbursements from 95% of AWP to 85% of AWP.  (11/08/06 Mulrey 24:21-25:25).  Mr. Mulrey testified that this decision was made because BCBS/MA was "concerned with the changes that Medicare was putting in place and how it would affect our provider network . . . and the impact it would have on different specialties and such, in particular the oncologists, how it would adversely affect them."  (11/08/06/ Mulrey 26:1-8; see also DX 999).  As Ms. Devaux stated, BCBS/MA was concerned that "the savings of $6 million to Blue Cross would not have materialized.  (11/7/06 Devaux 153:8-19).  Further, the Court asked Mr. Mulrey whether, had BCBS/MA known earlier in the class period what they know now, BCBS/MA would have changed the reimbursement system.  In response, Mr. Mulrey stated, "If I had known at that point in time about the spreads? I would have been hard-pressed—I . . . I probably would have raised it to senior management ..." (11/8/06 Mulrey 29:9-30:14).  Indeed, the fact that, to this day, BCBS/MA continues to reimburse the drugs at issue in this case at 95% of AWP demonstrates that there is no causation.

     ii.     <u>BCBS/MA Is Extending Its Usage of AWP to Hospitals</u>

Until 2005, BCBS/MA reimbursed hospitals for drugs administered to patients using a billed-charge methodology. Starting in 2005, BCBS/MA began transitioning all of its contracted hospitals to 95% of AWP. BCBS/MA concluded that it would save money by moving to AWP, as well as acquire the benefits of using a standardized, predictable methodology. (11/7/06 Devaux 149:2-19). BCBS/MA emphasized at trial that moving to AWP – even while a Plaintiff in this case – is "a move in the right direction." (11/7/06 Devaux Tr. 164:22). And BCBS/MA is also extending AWP usage in other areas: earlier this year it transitioned a large physician practice called Riverbend from a capitated reimbursement arrangement to an AWP-based system. (11/8/06 Mulrey Tr. 37:23-28:8).

     iii.     <u>Plaintiffs Conduct Would Not Have Been Different with More Information</u>

Plaintiffs have failed to establish that the commercial considerations dictating BCBS/MA's actions would have caused a different result at any time during the class period if it had additional knowledge:

> THE COURT: Well, let me ask you this. Since you're a named plaintiff in this, if you had known early on when the suit started and before, if you had known that AWP was grossly inflated, would you have changed your practices at all.
>
> THE WITNESS: I don't know exactly what we would have done.

(11/7/06 Devaux Tr. 137:16-22). Named Plaintiffs' testimony reveals the absence of any causation, as required under Ch. 93A.

iii.   BCBS/MA's Approach Is Representative

BCBS/MA is the largest payor in Massachusetts, covering some 2.9 million lives.[4] It is not alone in having elected to continue using AWP despite full knowledge of what it is and is not.  The industry standard has remained to reimburse at 95% of AWP.

> THE COURT:  So you're knowingly paying a grossly inflated price.
>
> THE WITNESS:  We are paying 95 percent of AWP.
>
> THE COURT:  Why?
>
> THE WITNESS:  We have not reevaluated that payment.  It hasn't come up as a change in industry standard.  Industry hasn't followed Medicare to a change.

(11/7/06 Devaux Tr. 136:16-22).  Plaintiffs' expert Dr. Rosenthal confirmed that no Massachusetts-based TPP has moved to an ASP-based system.  (11/27/06 Rosenthal 22:8-11).

**B.   Causation Is Defeated by Actual or Constructive Knowledge**

The law confirms what logic demands—Plaintiffs cannot demonstrate causation where they knew or should have known of the allegedly deceptive conduct.  See Mass. Farm Bureau Fed'n v. Blue Cross of Mass., 403 Mass. 722, 730-31, 532 N.E.2d 660, 664-65 (Mass. 1989) (holding that no "causal relationship" existed between the alleged deception and the alleged loss because, although the language in the contract was arguably unfair, plaintiff nonetheless knew that failure to renew insurance contract would result in loss of money); see also Tagliente v. Himmer, 949 F.2d 1, 8 (1st Cir. 1991) (noting that any purchaser should have known about the wetlands on purchased property because "[t]he extent of the accessibility and visibility of the parcel of land . . . was an easily attainable fact").  When a plaintiff knows or should have known

---

[4]  See http://www.bluecrossma.com/common/en_US/aboutUsIndex.jsp?headerRepId=Repositories. Header Buttons.aboutUs.xml&levelOneCategory=GENERAL&targetTemplate=titleBody.jsp.

about a defendant's allegedly deceptive conduct but nonetheless enters into a transaction,

plaintiff's decision to continue the transaction, not defendant's conduct, is the cause of the

alleged loss.  See, e.g., R.E. Leveillee Woodworking v. Costello, 18 Mass. L. Rep. 446, 2004

Mass. Super. LEXIS 512 at *30 (2004) (dismissing plaintiff's Ch. 93A claim charging insurance

company with failure to specifically inform him of coverage change where plaintiff "had several

opportunities to inform himself" of changes in insurance coverage but "failed to avail himself of

the opportunity" to do so).[5]

The evidence of a lack causation early in the Class Period is also strong.  Here, the

evidence shows that for much of the class period, BCBS/MA operated a staff model HMO, i.e., it

owned physician clinics, employed the doctors who worked in those clinics and purchased the

drugs used in those clinics.  (11/8/06 Coneys Tr. 72:5-17, 79:22-24, 107:5-13).[6]  The patients at

those clinics included Medicare patients, uninsured cash-paying patients and members of other

health plans.  (11/8/06 Coneys Tr. 99:3-10, 103:10-17, 103:23-104:6).  BCBS/MA's staff model

purchased the drugs administered to those patients, but then received reimbursement from

Medicare and other plans based on AWP.  In other words, BCBS/MA not only knew that there

---

[5] Accord, Swanson v. Bankers Life Company, 389 Mass. 345, 349, 450 N.E.2d 577, 580 (1983) ("[A] plaintiff's conduct, his knowledge, and what he reasonably *should have known* may be factors in determining whether an act or practice is unfair.") (emphasis added); see also Winlake II, Inc. v. Mercier, 21 Mass. L. Rep. 166, 2006 Mass. Super. LEXIS 225 (2006) (holding that defendant was entitled to summary judgment on claim regarding leased premises where lessee should have been aware of the property's condition because he "had plenty of opportunity to inspect the Premises and consult with contractors"); Madan v. Royal Indemnity Co., 26 Mass. App. Ct. 756, 763-64, 532 N.E.2d 1214, 1218 (1989) (finding that plaintiff could not sustain a 93A claim where the plaintiff suing for breach of lease and unfair and deceptive practices was an attorney and should have known that an oral agreement for a lease was unenforceable); Dinjian v. Dinjian, 22 Mass. App. Ct. 589, 597, 495 N.E.2d 882, 888 (1986) (rejecting ch. 93A claim because the fact that "[defendants] did not explain to their co-lenders that they would receive a loan origination fee is of dubious weight where the lenders already understood that [defendants] had a financial interest in the loan, both as principals and as loan managers for a commission").

[6] Although BCBS/MA put forward Maureen Coneys in support of its claim that the parent organization did not have access to information regarding the prices of drugs purchased for use at the staff model HMO, Ms. Coneys testified that she was not in a position to know, stating that she had "no knowledge as to who purchased the drugs and at what prices those drugs were purchased that were administered in the clinics."  (11/08/06 Coneys Tr. 85:10-14).

was a spread between market acquisition costs and AWP, it was generating revenue from that differential just as physicians did in private practice.  (11/8/06 Coneys Tr. 99:18-100:6).  And Plaintiffs' expert Dr. Hartman concedes that BCBS/MA was purchasing drugs for its staff model HMO at prices close to their ASPs reflecting the spreads on those drugs in the market.  (See 11/21/06  Hartman Tr. at 31:10-15).

Not only did BCBS/MA have access to drug cost information from its own staff model HMO, it also had access to the substantial information regarding the meaning of AWP in the public domain.  And certainly all sides agree that the existence of a formulaic differential between WAC and AWP has long been well known to the industry.  (See 11/27/06 Rosenthal Tr. at 53:6-9, 71:1-1-72:3 (agreeing that it has long been well known AWP represents a formulaic mark up over WAC); 11/20/06 Hartman Tr. 117:4-6 ("I have said that anyone who looks at this market . . . knows that AWP is greater than ASP.")).  But even later, the evidence from BCBS/MA's recent study of the issue, and its continued use of AWP, demonstrates irrefutably the lack of causation.  Thus, a fact finder could not find that Plaintiffs were unaware that AWP exceeded ASP.  Because Plaintiffs knew that AWP was not a reasonable estimate of acquisition cost, but nonetheless chose to continue to use AWP as a benchmark for reimbursement, any causal link between the conduct and the loss is destroyed.  See, e.g., Mass. Farm Bureau Fed'n, 403 Mass. at 730-31.  This failure to establish causation is fatal to Plaintiffs' Ch. 93A claim.

### C.     Pipefitters' Similarly Cannot Prove Causation

As noted above, under Ch. 93A, Plaintiffs must prove causation in fact ("but for" causation) and proximate, or legal causation.  Markarian, 202 F.R.D. at 68.  "A defendant's breach of a legal duty is a cause in fact of the plaintiffs' harm if that harm would not have

occurred 'but for' the breach." Peckham v. Continental Casualty Ins. Co., 895 F.2d 830, 836 (1st Cir. 1990) (citing RESTATEMENT (SECOND) OF TORTS § 432 (l) (1965)). As for proximate or legal cause, "it must be remembered that where an independent, intervening event contributes in some unexpected and significant manner to the harm which eventuates, a defendant's conduct cannot be the legal cause of the injury." Id. at 838 (citing RESTATEMENT (SECOND) OF TORTS § 442 (1) (1965)).

Accordingly, if an intervening act or actor breaks the chain of causation between a defendant's conduct and a plaintiff's loss, there is no causation under 93A. See Brown v. Bank of Am., N.A., 2006 U.S. Dist. LEXIS 76418 (D. Mass. 2006) (noting that intervening act breaks the chain of causation between defendant's defective notice and plaintiff's payment of bank fee); State Resources Corp. v. Architectural Team, Inc., 433 F.3d 73, 85 (1st Cir. 2005) (affirming denial of motion to amend to add 93A claim as futile because plaintiff's lost proceeds, which resulted from defendant's refusal to accept a higher offer for property outside of the foreclosure auction context, was "not the result of [defendant mortgagee's] conduct, but is a consequence of the foreclosure process and its requirements"); RSA Media, Inc. v. AK Media Group, Inc., 260 F.3d 10, 14-16 (1st Cir. 2001) (affirming summary judgment based on finding that plaintiff's alleged harm was not caused by defendant's statements, but rather was the result of "the Massachusetts regulatory scheme that prevents new billboards from being built").

Defendants' conduct is neither the "but for" nor proximate cause of Pipefitters' alleged injury. Taft Hartley Funds, of which Pipefitters is a typical example, generally rely upon informed health insurers or benefits consultants in making their reimbursement determinations. As its Fund Administrator Charles Hannaford testified, the amount paid by Pipefitters for its beneficiaries use of the subject drugs is not the result of Defendants' conduct, but rather is based

on the reimbursement formula determined by BCBS/MA.  Hannaford testified that the fund

simply paid the rates as determined by BCBS/MA:

> A.   We -- and BlueCross BlueShield pays the average wholesale
> price, 95 percent of the average wholesale price, so it's less five
> percent . . .
>
> THE COURT:  Why is that the formula?  Who chose that
> formula?
>
> THE WITNESS:  BlueCross BlueShield.

(11/6/06 Hannaford  167:23-168:20).  Mr. Hannaford explained that Pipefitters cedes such

control to its administrator, BCBS/MA, because Pipefitters believes that it economically benefits

from BCBS/MA's bargaining power.  As Mr. Hannaford described:

> Q.   So the doctor has his or her normal bill charge and then there's
> the BlueCross contracted allowed amount, right?
>
> A.   Yes.
>
> Q.   And the allowed amount basically is the discount that
> BlueCross is giving to Pipefitters.
>
> A.   Yes.
>
> Q.   And what basically is happening is that your fund is buying
> the bargaining power that BlueCross has with the doctors.
>
> A.   Yes.

(11/6/06 Hannaford 185:5-21, 176:4-178:5).  Pipefitters reevaluated its decision to contract with

BCBS/MA as administrator on a yearly basis, and consistently chose to renew its contract.

(11/6/06 Hannaford 178:9-11).  The Administrative Services Account Agreements between

Pipefitters and BCBS/MA demonstrate that Pipefitters was contractually bound to the rates as

determined by BCBS/MA:

> Blue Cross and Blue Shield will administer health care benefits
> based on . . . contractual agreements with providers and/or
> vendors. . . . The Account acknowledges and agrees that it is
> entitled only to those claim payment rates and provider/vendor
> arrangements that Blue Cross and Blue Shield offers to self-
> insured plans, and that it approves the use of such rates and
> arrangements on behalf of its self-insured health benefit plans.

(DX 1121).  Even after learning about the dynamics of the AWP reimbursement system and

discussing it with an agent of BCBS/MA, Mr. Hannaford did not attempt to effectuate any

change in its contracts with physicians because he was reassured that 95% of AWP is the best

rate available in the marketplace:

> Q.      You talked about Chris May after you got this article, and
> you said you went to him and talked to him and said, "Hey, you
> know, I'm concerned about this AWP concept."  He said, "It's
> under control" –
>
> A.      Yeah, we talked back and forth.  He said he was checking
> on it and he went to his higher-ups and said -- because I asked
> specifically, "Are we getting the best value?  Are we getting the
> best discount on the average wholesale price?"  And he went to his
> higher-ups and they said yes.
>
> Q.      And basically you said, "BlueCross is a big firm.  I respect
> what they're doing."
>
> A.      Correct.

(11/6/06 Hannaford Tr. 197:4-21; see also 11/6/06 Hannaford Tr. 181:18-21 (Pipefitters has no

reason to believe BCBS/MA is not getting the best discount off AWP it can from specialists like

oncologists)).  Through its contractual arrangement with BCBS/MA, Pipefitters sought to realize

the benefits of BCBS/MA's bargaining power.  (11/06/06 Hannaford 177:4-18).

        In sum, Defendants' conduct was not the "but for" or proximate cause of Pipefitters'

alleged harm.  As both the trial testimony and contracts demonstrate without question, Pipefitters

paid whatever BCBS/MA directed and believed that it benefited through BCBS/MA's bargaining

power.  Put another way, because BCBS/MA would have done nothing differently, neither would

Pipefitters.

There is no evidence that other Funds which may be members of Class 3 are any

different.  In fact, counsel for Plaintiffs stated that Taft-Hartley funds must hire third party

payors like BCBS/MA and Harvard Pilgrim to administer their funds "because they don't have

the staff or facilities to do it themselves."  (12/07/06 Berman 60:21-61:22 (THE COURT: So

throughout the class period, they were hiring something either like a Harvard Pilgrim or the

predecessor or a Blue Cross-Blue Shield?  MR. BERMAN:  Yes, I believe so)).

Gina Alongi, the administrator of the Operating Engineers, Local 4 Health and Welfare

Fund ("Local 4"), and the only other member of Class 3 to testify, confirmed that the Local 4

similarly utilized BCBS/MA for its bargaining power.  (11/07/06 Alongi 52:25-53:15, 60:6-19).

Moreover, Ms. Alongi's testimony reveals that Local 4 is a sophisticated entity that made use of

outside consultants in order to negotiate contracts and choose which third party payors' contract

to adopt. (See 11/07/06 Alongi 48:1-12 (A: Well, the Caremark contract came through our

International in Washington.  They use the purchasing power of the entire country to negotiate

the contract Q: And in the process, so that if the international in Washington was doing this on

your behalf, the international in Washington was certainly using its consultants and lawyer to

review that contract on your behalf, correct? A: I assume so)).  Ms. Alongi testified that the

Coalition of Taft-Hartley Funds, of which the Local 4 is a member, employed consultants and

outside legal services, and spent up to $30,000 for such services, in order to obtain the best

contracts for their funds.  (11/07/06 Alongi 60:6-19).  Armed with the information it acquired,

Local 4 opted to use BCBS/MA to administer its fund, on the assumption that BCBS/MA would

provide access to the most economical contracts.  (11/07/06 Alongi 59:12-15 ("Q.  But in the

course of this, you negotiated what you thought was the best deal on behalf of the coalition members and in fact your union fund? A.   Yes)).  Further, Plaintiffs' expert testified that in her experience other Taft-Hartley Funds are "incredibly sophisticated," but similarly continue to use AWP.  (11/15/06 Rosenthal Tr. 32:17).  The evidence in the record thus establishes that BCBS/MA and Pipefitters are indeed typical of Class 3 members.  There is no evidence that they are not.

        **D.**      **The Class is Bound By the Certified Class Representatives**

Because Class 3 class members' claims rise and fall with those of the class representatives, the Class 3 claims should be dismissed in their entirety because Plaintiffs have failed to prove the essential elements of their Ch. 93A claim.  <u>Eisen v. Carlisle & Jacquelin</u>, 417 U.S. 156, 173 (1974) (noting that judgment in class action binds all class members who have not requested exclusion); <u>Cameron v. Tomes</u>, 990 F.2d 14, 17 (1st Cir. 1993) ("[T]he Supreme Court confirmed what common sense would suggest: a class action judgment . . . binds the classmembers as to matters actually litigated."); <u>Andrews v. Bechtel Power Corp.</u>, 780 F.2d 124, 130 (1st Cir. 1985) ("Adequate representation is particularly important because of the res judicata implications of a class judgment. . . . [E]ither plaintiffs or defendants or both will suffer the consequences of being bound by the resulting judgment."); <u>see also</u> <u>Rodriguez v. Banco Central</u>, 790 F.2d 172, 174 (1st Cir. 1986) (noting that decision on merits of case prior to class certification is problematic in opt-out class because potential class members would not yet be bound and could opt out on basis of outcome).

This Court certified Classes 2 and 3 with BCBS/MA as a class representative based on its acceptance of Plaintiffs' counsel's representation that BCBS/MA was an adequate representative and its claims were typical.  Presumably, Plaintiffs' counsel's representation to that effect was

14

based on an investigation by Plaintiffs' counsel – including talking to their own clients.  To the extent the Court now decides that Plaintiffs' counsel was incorrect and that BCBS/MA is not an appropriate class representative, Defendants should not be required to bear the cost to permit Plaintiffs and their counsel another try.

Indeed, there is no evidence in the record that BCBS/MA is atypical of other Massachusetts TPPs.  See supra at p. 6.  Plaintiffs' expert Dr. Rosenthal also conceded that private payors generally continue to use AWP as their reimbursement standard.  (11/27/06 Rosenthal Tr. at 19:2-6).  She was unable to name a single payor in Massachusetts that had even lowered the percentage off AWP it reimburses at -- let alone changed its methodology -- despite the glut of public information regarding AWP in the market today.  (Rosenthal 11/27/06 Tr. at 22:8-11).  Thus, there is no record evidence supporting the notion that BCBS/MA and Pipefitters are not typical of other class members.

## II.     THE ABOVE GROUNDS WARRANT DISMISSAL OF THE CLAIMS OF CLASS 3 IN THEIR ENTIRETY.  SHOULD THE COURT DISAGREE, THE MOST APPROPRIATE ALTERNATIVE IS JUDGMENT AGAINST BCBS/MA AND PIPEFITTERS AND DECERTIFICATION OF CLASS 3

To the extent the Court believes that BCBS/MA and Pipefitters, based on their sophistication and knowledge, are not proper class representatives for other TPPs, Health and Welfare Funds, and/or Class 3 consumers, the most appropriate alternative to the Court is to enter a judgment for Defendants as to the claims of BCBS/MA and Pipefitters, and then decertify the remainder of Class 3.

The Court has expressed concern about the possibility that absent class members may not possess the same degree of knowledge and sophistication as BCBS/MA and raised the possibility of creating different subclasses based on levels of knowledge and sophistication. (12/8/06 Tr.

15

79:5-12 ("THE COURT: If I thought that there was a difference in interest between Blue Cross-Blue Shield and the Taft-Hartley plans, I'm not sure what the ramifications of that are.  Do I just decertify -- I'm just thinking out loud, and I don't really know what that means.  Do I just throw that out as a class rep and carve off the big -- I'm just thinking out loud -- the big third-party payors?  I don't know.")).

As set forth above, the record does not support such a conclusion of atypicality—the fundamental issue of causation remains with respect to Class 3 members who continue to reimburse based on AWP as a result of their own business judgment or because they use a TPP like BCBS/MA to administer their plans.

In addition, even if the record supported the notion that BCBS/MA is an inappropriate class representative, it is not the function of the Court to resuscitate a "class" in the absence of a "typical" or "adequate" class representative.  Any subclass approach based on criteria relating to knowledge and sophistication of the class members is not possible under Federal Rule of Civil Procedure 23.[7]  FED. R. CIV. P. 23.  Rule 23 requires that a court should not certify a class unless "questions of law or fact common to the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Id.  The predominance inquiry is of utmost importance, because the necessity of individualized determinations obviates the utility of the class action device.  Accordingly, as many courts have noted, where a key element to liability involves the sophistication and knowledge of each class member, individual issues predominate

---

[7] This Court's comment with respect to the lack of information regarding the nature, knowledge and sophistication of Taft-Hartley plans at the class certification stage applies here:  "Plaintiffs assert that thousands of Taft-Hartley funds do not have the resources to devote to the preparation of the case on an individualized basis, but I have no 'sorting hat' to cluster the plans."  In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 95.

and preclude class certification.  Markarian, 202 F.R.D. at 69 (refusing to certify a class under 93A because individual issues of causation predominate where the "total mix of information" available to each class member was "distinctive, if not unique" and because "question of causation must be decided with regard to each purchaser in the context of the particular information" purchaser had).[8]

In fact, very recent circuit court authority speaks to the inappropriateness of creating classes or subclasses based on levels of knowledge.  On December 5, 2006, in In re Initial Public Offering Securities Litigation, 05-3349-CV, slip op. (2d Cir. Dec. 5, 2006), the Second Circuit overturned a Rule 23 certification order in part on the ground that individual issues of knowledge would predominate and would render the class unascertainable:

> Although it has been stated that class members must be
> ascertainable 'at some point in the case,' but not necessarily prior
> to class certification, . . . we point out the need for numerous
> individualized determinations of class membership in order to

---

[8] Accord, Robinson v. Texas Auto. Dealers Ass'n, 387 F.3d 416, 424 (5th Cir. 2004) (reversing district court's certification order because liability turned on individual inquiries into each plaintiffs' negotiation and expectations regarding final price of automobile); Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indemnity Ins. Co., 319 F.3d 205, 224 (5th Cir. 2003) (affirming district court's denial of class certification in part because defendant insurance company was entitled to show that an "individual plaintiff . . . negotiated a premium that varied from the filed rate, was aware that the insurer was charging more than what regulators had approved, and therefore was not a victim of fraud"); Gunnells v. Healthplan Servs., 348 F.3d 417, 436 (4th Cir. 2003) (finding district court abused discretion in certifying class because resolution "will depend upon the various circumstances involved, such as the form and materialty (sic) of the representations, the respective intelligence,  experience, age, and mental and physical condition of the parties, and the relation and respective knowledge and means of knowledge of the parties."); Zimmerman v. Bell, 800 F.2d 386, 390 (4th Cir. 1986) (affirming denial of shareholders' certification motion in case involving claim of directors' failure to disclose material facts, where "the extent of knowledge of the omitted facts or reliance on misrepresented facts will vary from shareholder to shareholder"); Simer v. Rios, 661 F.2d 655, 673 (7th Cir. 1981) (concluding that certification was improper where liability turned on proof of knowledge); Lewis Tree Service, Inc. v. Lucent Techs. Inc., No. 99 Civ. 8556, 2002 WL 31619022 at *7 (S.D.N.Y. Nov. 20, 2002) (declining to certify claim under state consumer fraud statute where liability turned on "the knowledge and sophistication of purchasers" and other individualized factors); Nagel v. ADM Investor Servs., 65 F. Supp. 2d 740, 746 (N.D. Ill. 1999), aff'd, 217 F.3d 436 (7th Cir. 2000) (denying certification of purported class of farmers who entered into "hedge-to-arrive" contracts with grain merchants and related parties, in part because some merchants negotiated terms individually with each farmer and, as a result, individualized issues predominated); In re Ford Co. Vehicle Paint Litig., 182 F.R.D. 214, 222 (E.D. La. 1998) (concluding that plaintiffs' fraud claim was inappropriate for certification where "various plaintiffs are in different positions with respect to their actual or constructive knowledge").

> provide further support for our basic conclusion that individual
> questions will permeate this litigation.  Although ascertainability
> of the class is an issue distinct from the predominance requirement
> for a (b)(3) class, the problems we have identified on this topic
> further indicate the obstacles to proceeding with the focus cases as
> class actions.

<u>Id.</u> at 51.[9]

Earlier in this litigation, this Court determined that common issues predominated in part

because one of the central contested issues was whether or not there was industry-wide

knowledge of the nature and use of AWP.  It is now undisputed that there was such industry-

wide knowledge.  (<u>See</u> 11/27/06 Rosenthal  Tr. at 53:6-9, 71:1-1-72:3 (agreeing that it has long

been well known AWP represents a formulaic mark up over WAC); 11/20/06 Hartman Tr.

117:4-6 ("I have said that anyone who looks at this market . . . knows that AWP is greater than

ASP.")).  If this Court were to decide now that BCBS/MA is not typical because Class 3 consists

of private payors with varying levels of sophistication and knowledge, the exercise of separating

the class members into sub-classes would embroil the Court in exactly the kind of individualized

inquires which are inappropriate under Rule 23.  <u>See</u> <u>Markarian</u>, 202 F.R.D. at 69.  The Court

would be required to determine each class member's level of sophistication, what that member

knew (or should have known), and when the member acquired that knowledge in order to

determine whether an entity is a member of any given class or subclass.  Even with respect to

Taft-Hartley Funds, individual inquiries are required because, as Plaintiffs' expert attested, the

Court cannot generalize with respect to the Taft-Hartley Funds, as the level of knowledge and

---

[9] Notably, in this Court's class certification opinion, the Court again made comments in the context of the self-administered side of the industry, which are particularly apt to the present circumstances and any contemplation of Taft-Hartley or consumer subclasses with respect to physician-administered drugs:  "plaintiffs have not adequately explained how each class member will show where its expectation as to the spread between AWP and ASP falls within the 18% to 33% range (and hence damages) absent an individual trial."  <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 230 F.R.D. 61, 91 (D. Mass. 2005).

sophistication those funds possess may vary greatly.  (See 11/15/06 Rosenthal Tr. 32:17

(testifying that some Taft Hartley Funds are "extremely sophisticated")).  Because, as discussed

above, there are important res judicata implications of a class ruling, it is imperative under the

law that those bound by a judgment were adequately represented at trial.  See Amchem Prods.,

521 U.S. 591, 621 (1997) (noting that the dominant concern of Rule 23(a) and (b) is that a

proposed class have sufficient unity so that absentees can fairly be bound by class

representatives' decisions).  In order to fulfill this charge, this Court would be required to make

individualized findings with respect to each absent class member – inquiries which are

unsuitable for the class action context.  Gunnells v. Healthplan Servs., 348 F.3d 417, 436 (4th

Cir. 2003).

## CONCLUSION

For the reasons described above, the Court should enter judgment for Defendants on

Class 3.  In the alternative, to the extent the Court does not believe that the Class 3 named

representatives are adequate, the Court should enter judgment against the class representatives

and decertify the remainder of Class 3.


Respectfully submitted,

THE FOLLOWING TRACK 1 DEFENDANTS


By: /s/ Katherine B. Schmeckpeper
Nicholas C. Theodorou (BBO # 496730)
Michael P. Boudett (BBO # 558757)
Katherine B. Schmeckpeper (BBO # 663200)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02110

D. Scott Wise
Michael Flynn
Kimberley Harris
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY  10017

Attorneys for AstraZeneca Pharmaceuticals LP

Steven M. Edwards
Lyndon M. Tretter
Hogan & Hartson, LLP
875 Third Avenue, Suite 2600
New York, NY 10022

Attorneys for the Bristol-Myers Squibb Co. and Oncology
Therapeutics Network Corp.

William F. Cavanaugh, Jr.
Andrew D. Schau
Erik Haas
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710

Attorneys for the Johnson & Johnson Defendants

John T. Montgomery (BBO #352220)
Steven A. Kaufman (BBO #262230)
Eric P. Christofferson (BBO #654087)
Ropes & Gray LLP
One International Place
Boston, MA 02110

Attorneys for Schering-Plough Corp. and
Warrick Pharmaceuticals Corp.

Dated: December 15, 2006

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of the foregoing was delivered on December 15, 2006 to counsel for plaintiffs and to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, via LexisNexis File & Serve.


By:      /s/ Catherine N. Karuga
         Catherine N. Karuga (BBO # 657445)