# TAB E

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456 |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | CIVIL ACTION: 01-CV-12257-PBS Judge Patti B. Saris |

## DIRECT TESTIMONY OF DR. MEREDITH ROSENTHAL



49.    Prior to the entry of Kytril, the ASP and AWP of Zofran track almost perfectly, with a 20% spread between them.  Thereafter, the AWP of Zofran continues to climb, while the transaction price declines, leading to much larger spreads.  As in the case of Zoladex, it cannot be argued here that the manufacturer simply neglected to alter the published AWP to reflect increasingly generous discounts but instead that AWPs were being pushed upwards at the same time as the ASP was falling.  Numerous memoranda and other communications obtained from GSK document the explicit and conscious nature of the competition between Zofran and Kytril based on inflating their respective AWPs.[47]

50.    For Remicade, a J&J drug, the average spreads over the Damage Period were approximately 30 percent.  These spreads created margins for providers and meant that the AWP was not representative of the real average price Remicade.

---

[47] See, for example, GSK-MDL-KY01-005532-36, GSK-MDL-ZN02-072192, GSK-MDL-ZN-06-007997, GSK-MDL-ZN-02-071651 and GSK-MDL-ZN-02-071790-1.

would not be reflected in the WLPs of BMS drugs.[60]  Many of the contracts that reflect the discounts with providers are marked confidential.[61]

69.    I have also not seen the "Return to Practice" type of documents used by certain of Defendants to market their products reported in the public record or in the peer-reviewed literature.  The type of pricing secrecy or lack of transparency common to this industry, aided by the lack of disclosure noted above, supports the notion that third-party payers were not aware of the spreads or spread marketing practice I have referred to in this report.

## XIII.    SUMMARY AND CONCLUSIONS

70.    AWP is the most widely used pricing benchmark in the industry. During the Class Period, AWP or a discount off of AWP was the basis for Medicare reimbursement for brand name drugs covered under Part B.  Likewise, multi-source drugs were reimbursed under Medicare based on the median AWP for generic versions or the lowest brand-name AWP.  Most private insurers have followed Medicare's lead and also reimburse for physician-administered drugs using a discount off of AWP.

71.    The system of third-party reimbursement and the large number of drugs, procedures, and other services covered by health insurers combined with the opaque discounting practices of the Defendants presented an opportunity for the alleged fraud to have occurred.

72.    Physicians and other providers of the drugs at issue in this matter could increase their net revenues (*i.e.*, reimbursement net of the acquisition costs of the drugs) under this system

---

[60] *Marre Deposition* at pp. 78-84.

[61] *See* MDL-OBI00054909-13 (1992 Ortho Biotech contract with Caremark, ¶ 7); MDL-OBI00055078-82 (1993 Ortho Biotech Inc. contract with Stadtlanders, ¶ 7); AZ0431262-71 (AZ form Urology Practice contract, ¶ 6 which states "Urology Practice and Participating Physicians shall keep confidential all of the terms and conditions of this Agreement, and the existence of this Agreement, throughout the duration hereof and for a period of three (3) years following the effective date of expiration or termination."); WAR0043141-48 (1995 Warrick contract with Fallon Clinic Pharmacy requiring "confidentiality of all pricing, marketing or other Warrick product information, including this agreement" during term of contract and three years afterward at WAR0043146).

by selecting drugs with larger spreads – *i.e.*, drugs where the AWP was relatively inflated in comparison to the acquisition cost of the drug.

73.     Manufacturers, in turn, could increase their unit sales not only by discounting their products, but also by raising or maintaining their reported AWPs.  Moreover, raising or maintaining the AWP would be a highly profitable strategy in that it could be expected to increase the number of units sold, but would have no negative impact on the manufacturers' profit margins.

74.     Analysis of Defendants' data suggests that spreads for Defendants' products were substantial and in many cases increasing over the Class Period.  Moreover, analysis of several natural experiments in which the competitive environment for a Class drug was altered support the theory that AWP inflation was a competitive strategy.

75.     Finally, because their payments to providers for the AWPIDs were a mathematical function of the AWPs, members of the three Classes would have been economically injured if the Defendants inflated those AWPs as alleged.  That is, members of the Classes paid more for these drugs than they would have in the absence of the alleged fraud.

76.     To arrive at these opinions, I have appealed to theory, data, and methods generally relied upon by experts in my field and I have appropriately applied standard approaches and analysis.

# TAB F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 10-1 - 10-149



BENCH TRIAL - DAY TEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 27, 2006, 9:10 a.m.




LEE A. MARZILLI
OFFICIAL COURT REPORTER
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 3

1                          I N D E X

2    WITNESS              DIRECT    CROSS     REDIRECT    RECROSS

3    Meredith Rosenthal             10-5      10-85
                                    10-22
4                                   10-50
                                    10-68
5
     Daniel McFadden     10-106    10-114    10-146
6
     EXHIBITS            PAGE
7
     1064                10-17
8
     2074                10-67
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    by Dr. Hartman and --

2              THE COURT:  Wait.  Now, where is this?

3              MR. CAVANAUGH:  Your Honor, I'll hand this up to

4    you.  This is what we did with Dr. Hartman the other day.

5              THE COURT:  I don't have a new binder here?

6              MR. CAVANAUGH:  No.

7              THE COURT:  All right.

8              MR. CAVANAUGH:  I'm making progress, your Honor.

9              THE COURT:  All right, so this is just

10   free-floating.

11             MR. CAVANAUGH:  Yes.  And actually, your Honor, to

12   the extent you marked it up, we showed this with Dr. Hartman

13   the other day.  These are his Procrit spreads.

14             THE WITNESS:  I'm sorry, could I have the hard copy

15   as well?

16             MR. CAVANAUGH:  Yes, you can.

17             THE WITNESS:  Thank you.

18   Q.   Now, we've provided in black summarizing Dr. Hartman's

19   spreads.  91 of them were between 25 and 25 percent, 16 were

20   between 25 and 30, and none were over 30.

21             Now, you've testified in your tutorial and in

22   response to a question by Mr. Montgomery that AWP works for

23   99 percent of the drugs, correct?

24   A.   That's correct.

25   Q.   And can we agree that from the period 1991 to 2003, the

1   class period, there were hundreds of physician-administered

2   drugs sold?

3   A.   That's correct.

4   Q.   And there were thousands of self-administered drugs

5   sold?

6   A.   Correct.

7   Q.   And would you also agree with me that for all of those

8   drugs for which AWP works, if we looked at the published

9   AWPs, not one of those would be the same as the actual

10   average selling price of the drug?

11   A.   I don't know that not one of them.  It's a very strong

12   statement.  But it would be my understanding that that would

13   not ever happen.  If it did, it would be very rare.

14   Q.   So there would always be a difference with respect to

15   thousands of drugs?

16   A.   I believe that to be true.

17   Q.   All right.  And so Procrit would fall within that

18   99 percent, correct?

19   A.   There is a difference between AWP and ASP for Procrit,

20   yes.

21   Q.   But it would fall into it with respect to your statement

22   that AWP works for 99 percent of the drugs, and Procrit would

23   be within that 99 percent, correct?

24   A.   Adopting Professor Hartman's liability threshold, that

25   would be true.

1   Q.   So, in your view, there's nothing inherently wrong with

2   a published AWP that is different from the actual selling

3   price of the drug, right?

4   A.   Well, again, I'm not an expert on right and wrong, but

5   the general issue is that they should track but not certainly

6   equal.

7   Q.   Your problem with it is when the spread becomes too big,

8   right?

9   A.   Yes.

10   Q.   But you don't have a specific opinion as to whether

11   Dr. Hartman's 30 percent spread is the right yardstick,

12   correct?

13   A.   That's correct.

14           THE COURT:   Do you believe that all the third-party

15   payors throughout the class period knew about the formulaic

16   20 to 25 percent markup between WAC and AWP?

17           THE WITNESS:   I believe the relationship between

18   those list prices, I believe that that was generally known.

19   I'm sure that not universally known, but I believe that that

20   information --

21           THE COURT:   I'm not talking about the consumers.

22           THE WITNESS:   Right, right, no, no, of course.

23           THE COURT:   But the third-party payors, was that

24   just universally known throughout the class period?

25           THE WITNESS:   I believe, for those that worked in

Page 77

1   to be different from all the other drugs is all I was

2   saying?

3            THE COURT:  So but at least for Remicade, you could

4   look in the book and see the 30 percent spread?

5            THE WITNESS:  Between WAC and AWP.  You still

6   didn't know ASP, but you knew that.

7   Q.   But as you've calculated the ASP, it was roughly,

8   approximately the same as the WAC, right?

9   A.   That appears to be true, and again that was the staff at

10  GMA.  I reviewed their calculations, but I didn't calculate

11  it myself.

12  Q.   So to the extent you're referring to opaque discounting

13  and lack of price transparency, with respect to Remicade,

14  those opinions wouldn't be relevant, correct?

15  A.   I believe, again, it's a different situation.  Clearly

16  the information was published, but it's in such a way that

17  it's not clear to me that the payors would have been aware of

18  that.

19  Q.   And you're also aware that Centocor didn't provide any

20  discounts or rebates to physicians, correct?

21  A.   That's what I understand, yes.

22  Q.   Okay.  Let me turn to the subject of price increases.

23  You've given the opinion that the overriding reason for price

24  increases was the ability to drive market share by increasing

25  the spread, correct?

1   stayed at approximately 30 percent, did it not?

2   A.   The spread does stay within a relatively narrow range

3   there.

4   Q.   And so would you agree, looking at the pricing history

5   of Remicade and looking at its average selling price and its

6   AWP, there's a fairly predictable relationship over the five

7   or six years we're talking about?

8   A.   I guess you mean within Remicade?

9   Q.   Yes.

10  A.   When I used the term "predictable," I meant sort of

11  looking at the market as a whole.

12  Q.   Well, I'm talking about Remicade, Dr. Rosenthal.

13  A.   So Remicade compared to itself, the spread is fairly

14  predictable.

15  Q.   Okay.  Now, your chart, as I mentioned, you used a

16  fairly small band for your Y axis of 26 to 33 percent.  And

17  would you agree with me that if I chose a Y axis that went

18  from zero to 70, your spread calculations would look a lot

19  flatter, wouldn't they?

20  A.   That would be true.

21  Q.   Why don't we just put up an illustrative example of

22  that, right?  It should be on your screen.

23  A.   Yes.  Again, the issue is not about consistency within

24  the drug but the drug in the context of the larger

25  marketplace, so --

1   Q.   And in the context of the larger marketplace, you're

2   talking about movements of spreads, at least as calculated by

3   Dr. Hartman, that range from 29 to 32 percent, correct?

4   A.   I'll take your word that that's the -- well, it looks

5   like a number just under 29 percent, yes.

6   Q.   Now, am I also correct that you don't believe that,

7   quote, "marketing the spread" is a relevant term for your

8   purposes?

9   A.   I don't believe that it's necessary, so a manufacturer

10  can offer a spread without marketing it and still be inducing

11  physicians to prescribe their drug.

12  Q.   But simply by the existence of the spread, right?

13  A.   That's correct.

14  Q.   So marketing the spread is irrelevant to you?

15  A.   I believe I used that term in the sense that it is,

16  again, not necessary.

17  Q.   It's the existence of the spread that generates the

18  behavior that you describe?

19  A.   That's correct.

20  Q.   And we agree that for the thousands of drugs that have

21  been sold between 1991 and 2003, there has always been some

22  spread, right?

23  A.   There has always been some difference between AWP and

24  transaction prices, right, yes.

25  Q.   And another word for that, at least as used by you and

Page 88

1    would not imagine that those oncologists would have access to

2    those Federal Supply Schedule prices, so they're just apples

3    and oranges.

4    Q.   Now, you mentioned that the VA system is a closed

5    system.  What do you mean by that concept?

6    A.   They have their own providers on staff.  They have their

7    own formularies.  They have dispensaries.  The drugs are

8    actually dispensed by the VA in effect.

9    Q.   And so what relevance, if any, is there to comparing VA

10   prices to the Medicare Part B reimbursement prices?

11   A.   Well, again, there's no real relevance.  They're a

12   direct purchaser, and so there's no relevance with regard to

13   using AWP or any other benchmark for reimbursing independent

14   physicians.

15   Q.   So then why would the OIG in some of the earlier

16   reports, at least one of the earlier reports -- my memory is

17   actually there are a couple of earlier reports -- undertake

18   an inquiry at least of doing a litmus test of comparison to

19   VA prices as compared to the AWP system?

20             MR. CAVANAUGH:  Objection, your Honor.

21             THE COURT:  Overruled.

22   A.   I believe that the reason for such an analysis would be

23   to give -- again, as a benchmark, as you said, it would be to

24   assess the extent to which Medicare prices were higher than

25   what manufacturers were charging for the drugs in another

# TAB G

# Department of Health and Human Services
## OFFICE OF
## INSPECTOR GENERAL

# EXCESSIVE MEDICARE PAYMENTS
# FOR PRESCRIPTION DRUGS



**JUNE GIBBS BROWN**
Inspector General

**DECEMBER 1997**
OEI-03-97-00290

Defendants' Exhibit
**1075**
01-12257 - PBS

AWP019-1251     F

# OFFICE OF INSPECTOR GENERAL

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, is to protect the integrity of the Department of Health and Human Services programs as well as the health and welfare of beneficiaries served by them. This statutory mission is carried out through a nationwide program of audits, investigations, inspections, sanctions, and fraud alerts. The Inspector General informs the Secretary of program and management problems and recommends legislative, regulatory, and operational approaches to correct them.

## Office of Evaluation and Inspections

The Office of Evaluation and Inspections (OEI) is one of several components of the Office of Inspector General. It conducts short-term management and program evaluations (called inspections) that focus on issues of concern to the Department, the Congress, and the public. The inspection reports provide findings and recommendations on the efficiency, vulnerability, and effectiveness of departmental programs.

OEI's Philadelphia Regional Office prepared this report under the direction of Robert A. Vito, Regional Inspector General. Principal OEI staff included:

**REGION**                                      **HEADQUARTERS**

Linda M. Ragone, *Project Leader*              Lisa A. Foley, *Program Specialist*
David Tawes
Nancy J. Molyneaux
Lauren McNulty
Amy Sernyak
Cynthia R. Hansford
Brijen Shaw

**To obtain copies of this report, please call the Philadelphia Regional Office at (800) 531-9562.**

# EXECUTIVE SUMMARY

## PURPOSE

To compare Medicare allowances for prescription drugs with drug acquisition prices currently available to the physician and supplier communities.

## BACKGROUND

Medicare allowances for prescription drugs increased 25 percent from $1.8 billion in 1995 to $2.3 billion in 1996. However, the number of services allowed increased only 9 percent between the 2 years.

Medicare does not pay for over-the-counter or many prescription drugs that are self-administered. However, the program does pay for certain categories of drugs used by Medicare beneficiaries.

On January 1, 1998, Medicare Part B will begin to reimburse covered drugs at 95 percent of the average wholesale price. Currently, Medicare carriers may determine the amounts that Medicare will pay for these drugs based on either the lower of the Estimated Acquisition Cost (EAC) or the national Average Wholesale Price (AWP). The EAC is determined based on surveys of the actual invoice prices paid for the drug. The AWP is reported in *The Red Book* and other pricing publications and databases used by the pharmaceutical industry. Historically, it has been the AWP that carriers have used to develop Medicare reimbursement for prescription drugs.

To determine if average wholesale prices paid by Medicare truly represent wholesale prices available to physicians and prescription drug suppliers, we focused on 22 drug codes representing the largest dollar outlays to the program in 1995. We then compared the Medicare allowances for these drug codes with prices available to the physician and supplier communities.

## FINDINGS

### *Medicare allowances for 22 drugs exceeded actual wholesale prices by $447 million in 1996.*

Medicare and its beneficiaries payments for the 22 drugs would have been reduced by an estimated 29 percent ($447 million of $1.5 billion) if actual wholesale prices rather than AWP's were the basis for Medicare reimbursement. Similar savings of $445 million were also identified for 1995. If the savings percentage for just the 22 drugs was applied to Medicare's allowances for all drugs, the program and its beneficiaries would have saved an estimated $667 million in 1996.

***For more than one-third of the 22 drugs reviewed, Medicare allowed amounts were more than double the actual wholesale prices available to physicians and suppliers.***

Medicare allowed between 2 and 10 times the actual average wholesale prices offered by drug wholesalers and group purchasing organizations for 8 of the 22 drugs reviewed. Medicare allowed at least 20 percent more than the actual average wholesale price for over 80 percent of the 22 drugs. For every one of the 22 drugs reviewed, Medicare allowed amounts were more than the actual average wholesale price in both 1995 and 1996. Not only did Medicare pay more than the actual average wholesale price, the program allowed more than the highest average wholesale price for every drug.

***There is no consistency among carriers in establishing and updating Medicare drug reimbursement amounts.***

Although Medicare's reimbursement methodology for prescription drugs does not provide for different payment rates based on geographical factors, the allowed amounts for individual drug codes varied among the carriers. Medicare guidelines allow carriers to update prescription drug reimbursement on a quarterly basis. However, not only did some carriers update yearly rather than quarterly but carrier allowed amounts for the same drug code differed within a single quarter.

## RECOMMENDATIONS

The findings of this report provide evidence that Medicare and its beneficiaries are making excessive payments for prescription drugs. The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physician and supplier communities that bill for these drugs.

We believe the information in this report provides further support for a previous recommendation made by the Office of Inspector General. **We recommended that HCFA reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments as appropriate.** Beginning in January 1998, Medicare reimbursement for prescription drugs will be 95 percent of average wholesale price. We believe that the 5 percent reduction is not a large enough decrease and that further options to reduce reimbursement should be considered.

We also believe that the variance of Medicare reimbursement for individual drug codes among carriers is inappropriate. The rate at which physicians and suppliers are paid for drugs should not depend on which carrier the providers bill. **We, therefore, recommend that HCFA require all carriers to reimburse a uniform allowed amount for each HCFA Common Procedural Coding System (HCPCS) drug code.** The HCFA could choose to supply all carriers with a list of average wholesale prices that it has determined represent each drug code. The carriers could then use the uniform prices to calculate payment. The HCFA could also designate one single entity to perform all

necessary calculations to determine reimbursement for each drug code on a quarterly basis. All carriers would then use this standard reimbursement amount.

## AGENCY COMMENTS

The HCFA concurred with our recommendations. The HCFA's proposal in the President's 1998 budget that would have required physicians to bill Medicare the actual acquisition cost for drugs was not adopted by Congress. However, the agency states that it will continue to pursue this policy in other appropriate ways.

We support HCFA's continued pursuance of reducing drug payments where appropriate. We do not believe that the reimbursement methodology for prescription drugs recently adopted by Congress will curtail the excessive drug payments we've identified in the Medicare program. In this report we've identified Medicare allowances that were 11 to 900 percent greater than drug prices available to the physician and supplier communities.

To address the issue of uniformity among carriers, HCFA has convened a workgroup to develop an electronic file consisting of the average wholesale prices for drugs covered by Medicare. The agency reports it will distribute this file to Medicare contractors for their use in paying drug claims.

# TABLE OF CONTENTS

PAGE

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

   • Estimated savings based on actual wholesale drug prices . . . . . . . . . . . . . . . . . .  7

   • Medicare allowed amounts more than double the average actual price  . . . . . . .  8

   • Lack of consistency in reimbursement rates for drug codes . . . . . . . . . . . . . . .  9

RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

APPENDICES

A:  Description of 22 HCPCS Codes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  A-1

B:  Summary of Wholesale Prices and Estimated Savings for 1995 and 1996  . . . .  B-1

C:  Individual Drug Allowances and Savings Percentages for 1995 and 1996  . . . .  C-1

D:  Health Care Financing Administration Comments . . . . . . . . . . . . . . . . . . . . . .  D-1

# INTRODUCTION

**PURPOSE**

To compare Medicare allowances for prescription drugs with drug acquisition prices currently available to the physician and supplier communities.

**BACKGROUND**

Medicare allowances for prescription drugs increased 25 percent from $1.8 billion in 1995 to $2.3 billion in 1996. However, the number of services allowed increased only 9 percent between the two years.

*Medicare Coverage and Payment for Prescription Drugs*

While Medicare does not pay for over-the-counter or many prescription drugs that are self-administered, it does pay for certain categories of drugs used by Medicare beneficiaries. Under certain circumstances, Medicare Part B covers drugs that are used with durable medical equipment or infusion equipment. Medicare will cover certain drugs used in association with dialysis or organ transplantation. Drugs used for chemotherapy and pain management in cancer treatments are also covered. The program also covers certain types of vaccines such as those for flu and hepatitis B.

Depending on the type of drug, both local carriers and four Durable Medical Equipment Regional Carriers (DMERCs) are responsible for processing claims for drugs covered under Part B of the Medicare program. The carriers are responsible for determining the allowance that Medicare will pay for these drugs.

Carriers base their current allowance rates on the regulations established in 42 Code of Federal Regulation 405.517. According to the regulations, Medicare computes an allowed amount for drugs based on either the lower of the Estimated Acquisition Cost (EAC) or the national Average Wholesale Price (AWP). The allowed amount is the price that Medicare and its beneficiaries pay a drug supplier. The EAC is determined based on surveys of the actual invoice prices paid for the drug. The AWP is determined through *The Red Book* or similar pricing publications and databases used by the pharmaceutical industry. The AWPs are mainly provided to these sources by pharmaceutical manufacturers. If a drug has multiple sources (more than one brand or generic version), the price is based on the lower of the EAC or the median of the national AWP for all generic sources. Historically, carriers have utilized AWP and not estimated acquisition cost to develop Medicare reimbursement for prescription drugs.

Drugs are billed to the Medicare program based on codes developed by the Health Care Financing Administration (HCFA). These codes are developed as part of the HCFA Common Procedure Coding System (HCPCS). The codes define the type of drug and, in most cases, a dosage amount. The codes do not indicate whether a brand

or generic version of the drug was administered; nor do the codes provide information on the manufacturer or distributor of the drug provided.

### Change in Medicare Reimbursement for Prescription Drugs

In recent legislation, Congress established reimbursement for prescription drugs at 95 percent of a drug's average wholesale price. This change will be implemented on January 1, 1998.

A different proposal to change the Medicare reimbursement methodology for prescription drugs was included in the President's FY 1998 budget. The proposal provided for the amendment of 42 U.S.C. 1395u(o) to set payment for drugs not otherwise paid on a cost or prospective payment basis. The revision set payment at the lowest of: actual acquisition cost to the provider, AWP, median actual acquisition cost, or an amount otherwise determined under the Code. The actual acquisition cost was defined to include all discounts, rebates, or any other benefit in cash or in kind. This proposal was supported by HCFA but was not the version eventually adopted by Congress.

### Related Work by the Office of Inspector General

This report is one of several Office of Inspector General reports concerning Medicare payments for prescription drugs. In 1996, we released a report entitled *Appropriateness of Medicare Prescription Drug Allowances* (OEI-03-96-00420) which compared Medicare drug reimbursement mechanisms with Medicaid payment mechanisms for 17 drugs and found that Medicare could achieve significant savings by adopting reimbursement strategies similar to those used by Medicaid. The OIG has also produced several reports focusing on inhalation drugs paid for by Medicare. In *Medicare Payments for Nebulizer Drugs* (OEI-03-94-00390), we found that Medicaid reimbursed albuterol sulfate and other nebulizer drugs at significantly lower prices than Medicare. In a companion report called *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392), we found that many retail and mail-order pharmacies charge customers less for generic albuterol sulfate than Medicare's allowed price. *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393) found that Medicare's allowances for albuterol sulfate substantially exceeded suppliers' acquisition costs.

The Office of Inspector General also recently issued a report on acquisition costs of brand name drugs by Medicaid pharmacies. In *Medicaid Pharmacy - Actual Acquisition Costs of Prescription Drug Products for Brand Name Drugs* (A-06-96-00030), the Office of Audit Services estimated that the actual acquisition cost for brand name drugs was 18 percent below AWP.

## METHODOLOGY

To determine if average wholesale prices paid by Medicare truly represent wholesale prices available to physicians and prescription drug suppliers, we focused on drug

codes representing the largest dollar outlays to the program in 1995. We then compared the Medicare allowances for these drug codes with prices available to the physician and supplier communities.

We collected from three sources the data needed to compare Medicare allowed amounts to actual wholesale prices. For information on Medicare allowances for prescription drugs, we compiled statistics from HCFA's National Claims History (NCH) File. We then collected Medicare reimbursement rates for specific drugs from contracted carriers. Lastly, we analyzed wholesale prices from drug wholesalers and group purchasing organizations.

*Medicare Allowance Data for Prescription Drugs*

We decided to review the 30 drug codes with the highest Medicare allowances for 1995. We chose 1995 since the Medicare claims data was 98 percent complete at the commencement of the inspection. To determine the Medicare allowances for prescription drugs in 1995, we compiled a list of HCPCS codes that represent all of the drugs which Medicare reimburses. The drug code list primarily contained HCPCS codes beginning with a J (known as J codes) which represent mainly injectable drugs or drugs used in conjunction with durable medical equipment. Also included in our list of drugs were K codes which usually represent immunosuppressive drugs, Q codes which represent mainly drugs used for End Stage Renal Disease, several A codes that represent drugs used for diagnostic imaging, and immunization or vaccine codes that are represented by a five digit numeric code.

We then retrieved NCH allowance and utilization data using HCFA's Part B Extract and Summary System (BESS). We aggregated the allowances for each code to calculate Medicare's total prescription drug allowance for 1995. We then determined the 30 drug codes with the highest individual allowances for that year.

Using NCH data, we calculated the Medicare allowances for all drugs in 1996. We also determined the 1996 allowances for the 30 drug codes with the highest allowances in 1995. At the time of our inspection, the NCH data for 1996 was 95 percent complete.

*Carrier Allowances for Prescription Drugs*

We sent requests for carrier drug reimbursement rates to Medicare's 26 fraud information specialists. The fraud information specialists coordinate work among all HCFA contractors in the regions they represent. There are a total of 61 geographical regions that local carriers cover. We received drug allowances from 50 of the 61 areas. We also received responses from two of the four DMERCS.

We requested allowed amounts for prescription drug codes with the highest total allowances in 1995. The allowed amount reflects the dollar reimbursement that Medicare will allow for the specific dosage defined by the HCPCS drug code. We

asked the carriers to provide allowed amounts by quarter for calendar years 1995, 1996, and 1997. However, some carriers provided us with data on a yearly basis and others only for certain quarters.

Some carriers also furnished allowed amounts for both participating and non-participating physicians. Physicians participating in the Medicare program agree to accept Medicare allowed amounts as total reimbursement for their services. Participating physicians receive 5 percent more in Medicare reimbursement for services. In the instances where both participating and non-participating allowed amounts were provided, we used the participating physician allowed amounts. More than three-quarters of physicians across the nation now participate in the Medicare program.

Utilizing the data provided by carriers, we calculated an average Medicare allowed amount for each drug code by year. These allowed amounts were used to compare Medicare reimbursement with drug acquisition costs for physicians and suppliers.

### Prescription Drug Costs for Physicians and Suppliers

In order to determine acquisition costs for the top drugs, we reviewed 1995 and 1996 prices offered by wholesale drug companies and group purchasing organizations (GPOs). We obtained pricing lists/catalogs for seven wholesale drug companies and seven group purchasing organizations. Group purchasing organizations provide members with lower cost products by negotiating prices for specific drugs from manufacturers. The member can then purchase drugs at the negotiated price either directly from the manufacturer or a drug wholesaler that agrees to accept the negotiated price. For the GPOs we reviewed, most of the major drug wholesalers accept the GPO contracted price.

The 14 pricing sources we used provided pharmaceutical products mainly to physician practices and specialized or closed pharmacies. Depending on individual State licensing practices, specialized or closed pharmacies normally do not provide retail prescription drug dispensing to walk-in customers. Instead, they often provide prescription drugs for home infusion or inhalation therapy.

After beginning our review of wholesale drug costs, we determined that 2 of the top 30 drugs codes we identified for 1995 could not be used for the inspection. Code J7699 represents not-otherwise-classified inhalation drugs and Code J7190 for Factor VIII (human anti-hemophilic factor) has a dosage requirement that is difficult to determine. Therefore, obtaining wholesale prices for these two codes would not be possible.

For the remaining 28 drug codes identified for our analysis, 17 were used for the treatment of cancer/leukemia, 5 were inhalation drugs, 2 were vaccines, and 2 were used for organ transplantation or valve replacement complications. There was also a drug used for immunodeficiencies and another for severe infections. The majority of

these drugs would most likely be purchased and administered by physicians or other health care practitioners. The inhalation drugs or drugs used for home infusion would most likely be provided by a specialized pharmacy or supplier.

For the 28 drug codes, we collected 1995 and 1996 prices from the 14 drug pricing lists/catalogs. We decided not to present prices for drugs where fewer than two different pricing sources could be identified per year. There were 6 codes that did not meet the two source minimum. These codes were: vaccine codes 90724 and 90732, inhalation codes J7645 and J7660, and codes K0121 and J1245 used for transplants/valve replacements. A list of the HCPCS codes' descriptions and dosages for the final 22 drugs used for our evaluation is provided in Appendix A.

The 22 drug codes represented 10 single-source, 9 multiple-source, and 3 multiple-brand drugs. A single-source drug has only one brand of drug available. A multiple-source drug has both brand and generic forms of the drug available. There were no drug products manufactured in the dosage defined by the HCPCS code for five drugs (J7620, Q0136, J2405, J9181, J9293). We selected all the drugs with higher dosages that met the drug description and applied a conversion factor to achieve prices for the HCPCS-specified dosage. For an additional code (J1561), we found that out of the multitude of prices we could find for the drug only three met the exact dosage requirement. Since the higher dosage products seemed to be the more prevalent way of purchasing this drug, we included them in our analysis.

We searched the 14 price lists for both brand and generic prices during 1995 and 1996. For nine drug codes, we obtained between 5 and 8 separate prices. Eight of the nine were single-source drugs. For another eight codes, we found between 12 and 29 separate prices. We found between 30 and 70 separate prices for the remaining five drug codes.

### *Calculation of Potential Medicare Savings for Prescription Drugs*

To determine the potential savings to Medicare if acquisition costs rather than published AWPs were used for reimbursement, we compared Medicare's allowed amounts to the wholesale prices we collected. To do this, we compiled all the pricing information from the sources reviewed and calculated an average price by year for all 22 codes. We believe that the pricing information supplied by the drug wholesalers and group purchasing organizations provides factual evidence of acquisition costs available to physicians and suppliers.

The average price or average acquisition cost for each drug code was then compared to the average Medicare allowed amount that we calculated from the carrier data. For each drug code, the difference between the average price and the Medicare allowed amount was computed. We then applied this amount to the number of services paid by Medicare for each drug in 1995 and 1996. The resulting dollar amounts were aggregated to determine the total estimated savings to Medicare if acquisition costs rather than AWP had been used to determine reimbursement.

Appendix B provides the average Medicare allowed amounts and actual average wholesale prices computed for the 22 drug codes reviewed. Although we utilized the actual average wholesale price to report savings in the findings section of this report, the appendices also contains the potential savings to Medicare if the lowest and highest wholesale prices found were compared to the Medicare allowed amount.

# FINDINGS

## MEDICARE ALLOWANCES FOR 22 DRUGS EXCEEDED ACTUAL WHOLESALE PRICES BY $447 MILLION IN 1996.

Medicare carriers now base prescription drug reimbursement on published average wholesales price of drugs. However, physicians and suppliers are often able to purchase drugs for prices that are much lower than the official AWPs provided by manufacturers.

After reviewing wholesale drug catalogs and group purchasing organizations' prices for the 22 drugs, we estimated that $447 million would have been saved by Medicare and its beneficiaries if Medicare had based reimbursement on actual wholesale prices rather than published AWPs in 1996. These wholesale prices are available to physicians, specialized pharmacies, and other suppliers. These wholesale prices represent the actual acquisition costs to physicians and suppliers that bill Medicare for these drugs.

Total allowed charges for the 22 drugs would have been reduced by 29 percent ($447 million of $1.5 billion) if actual wholesale prices rather than AWP were the basis for Medicare reimbursement. The 22 drugs represented 67 percent of the $2.3 billion in total Medicare drug allowances for 1996. If the savings percentage for just the 22 drugs was applied to Medicare's reimbursement for all drugs, the program and its beneficiaries would have saved an estimated $667 million in 1996.

The savings for individual drugs ranged from 13 percent of allowances for three drugs (J9202, Q0136, J9185) to a high of 92 percent for leucovorin calcium (J0640). Almost half of the drugs (10 of 22) had estimated savings greater than 40 percent of allowances. A table provided in Appendix C lists the 1996 allowances and estimated savings for the 22 drugs. The table also lists the percentage of allowance saved for each individual drug if reimbursement had been based on the actual average wholesale prices available for the drug.

### *Similar savings of $445 million were identified for 1995.*

If Medicare had based reimbursement on actual wholesale costs in 1995, the program and its beneficiaries would have saved an estimated 35 percent in payments for the 22 drugs. This would have amounted to savings of $445 million on $1.3 billion in total 1995 program expenditures for these drugs. The $1.3 billion in expenditures for the 22 drugs represented 70 percent of the $1.8 billion in Medicare total drug allowances for 1995.

The percentage of allowance saved for individual drugs ranged from 15 percent for carboplatin (J9405) and fludarabine phosphate (J9185) to 95 percent for leucovorin calcium (J0640). Half of the drugs (11 of 22) had estimated savings greater than 40

percent of their 1995 allowances.  Individual drug allowances and savings for 1995 are
presented in Appendix C.

**FOR MORE THAN ONE-THIRD OF THE 22 DRUGS REVIEWED, MEDICARE
ALLOWED AMOUNTS WERE MORE THAN DOUBLE THE ACTUAL
AVERAGE WHOLESALE PRICE AVAILABLE TO PHYSICIANS AND
SUPPLIERS.**

Medicare allowed between 2 and 10 times the actual average wholesale prices offered
by drug wholesalers and group purchasing organizations for 8 of the 22 drugs
reviewed.  For one drug, Medicare allowed 900 percent more than the average price
available for the drug in 1995 and 673 percent more in 1996.  The chart below
provides the percentage of the Medicare allowed amount that is greater than the
actual average wholesale price for each of the eight drugs.



MEDICARE ALLOWED MORE THAN DOUBLE
THE WHOLESALE PRICE FOR EIGHT DRUGS

Medicare allowances were also significantly higher than acquisition costs for the
remaining 14 drugs reviewed.  Medicare allowed 60 to 95 percent more than the
actual average wholesale price for 3 drugs in 1995 and 2 drugs in 1996.  Medicare
allowed amounts were higher by 20 to 50 percent for 9 drugs in 1995 and 8 drugs in
1996.  Reimbursement was between 11 and 18 percent more for the remaining 2 drugs
in 1995 and 4 drugs in 1996.

Medicare and its beneficiaries paid at least 20 percent more than the actual average wholesale price for over 80 percent of the 22 drugs. For every one of the 22 drugs reviewed, Medicare allowed more than the average actual price in both 1995 and 1996. Not only did Medicare pay more than the average price, the program allowed more than even the highest wholesale price obtained for every drug. Appendix B provides information on the highest and lowest wholesale price available for each drug in 1995 and 1996.

Based on the differences found between Medicare allowed amounts and actual wholesale prices, it is apparent that the current Medicare reimbursement methodology is based on an significantly inflated AWP statistic which bears little resemblance to actual wholesale prices available in the marketplace.

## THERE IS NO CONSISTENCY AMONG CARRIERS IN ESTABLISHING AND UPDATING MEDICARE DRUG REIMBURSEMENT AMOUNTS.

Although Medicare's reimbursement methodology for prescription drugs does not provide for different payment rates based on geographical factors, the allowed amounts for individual drug codes varied among the carriers. Medicare guidelines allow carriers to update prescription drug reimbursement on a quarterly basis. However, not only did some carriers update yearly rather than quarterly but carrier allowed amounts for the same drug code differed within a single quarter.

For some drug codes, the differences in allowed amounts were significant. Carriers' allowed amounts varied even for single-source drugs where the reimbursement rate is based on only one AWP. A carrier reimbursed code J9217 (leuprolide acetate, a single-source drug) at $496.25 for all of 1995. Another carrier allowed $412.29 for the first quarter of 1995, $439.30 for the second and third quarters, and $477.50 for the fourth. For the first quarter of 1995, providers in one State were receiving 20 percent more in reimbursement than providers billing the same drug code in another State. The second carrier eventually paid $496.26 for this code in the first quarter of 1996. However, the first carrier increased reimbursement to $515.63 in the same quarter.

Little uniformity was found among carriers when comparing changes in reimbursement from the first quarter of 1995 to the second quarter of 1997. One carrier's reimbursement for code J9000 (doxorubicin hcl, 10 mg.) increased 128 percent from $20 to $45.50. Another carrier's rate for the same code decreased 19 percent from $48.20 to $39.10.

Since Medicare does not allow geographical differences to effect drug reimbursement, variations would seem to be caused by carriers' decisions regarding when to update reimbursement, what sources to use for documenting AWPs, and in the case of multiple-source drugs which generic drugs to include in calculating the median statistic.

# RECOMMENDATIONS

The findings of this report provide evidence that Medicare and its beneficiaries are making excessive payments for prescription drugs. The published AWPs that are currently being used by Medicare-contracted carriers to determine reimbursement bear little or no resemblance to actual wholesale prices that are available to the physicians and suppliers that bill for these drugs. By basing reimbursement on published AWPs rather than more appropriate acquisition or wholesale prices, we estimate that Medicare and its beneficiaries paid nearly one billion dollars more for 22 drugs in 1995 and 1996.

We believe the information in this report provides further support for a previous recommendation made by the Office of Inspector General. **We recommended that HCFA reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments as appropriate.** The HCFA concurred with the recommendation. We urge readers to review our prior report, *Medicare Payments for Nebulizer Drugs*, which provided the full text of HCFA's comments on our recommendation.

For our readers' convenience, the options for changing Medicare's reimbursement methodology that appeared in the recommendation are presented below. We have modified the original discounted AWP and acquisition cost options in response to the evidence presented in this report concerning the large disparity between published AWPs and actual average wholesale prices available for prescription drugs.

***Options for Changing Medicare's Reimbursement Methodology for Prescription Drugs***

Discounted Wholesale Price

Beginning in January 1998, Medicare will reimburse prescription drugs at 95 percent of AWP. Many State Medicaid agencies use greater discounted AWPs to establish drug prices. Medicare could also base its drug payments on this larger discounted average wholesale prices. We believe that the 5 percent discount that will soon be implemented is not a large enough decrease. Upon implementation of this option, some type of general limit should be applied to the prices to ensure that inappropriate increases in average wholesale prices that could occur in subsequent years do not adversely affect Medicare payments. In addition, the Secretary should be granted the authority to conduct sample surveys of actual wholesale prices to determine the amount of difference between actual average wholesale prices and published AWPs. The percentage difference found in the sample could then be applied to all AWPs used by the program to determine drug reimbursement.

Acquisition Cost

Medicare could base the payment of drugs on either actual or estimated acquisition costs. Although Medicare currently has the authority to use EAC, carriers have yet to

successfully implement the option. Upon implementation of either the actual or estimated method, we believe that some type of general limit should be applied to ensure that inappropriate increases in drug prices do not occur in subsequent years.

Manufacturers' Rebates

Medicare could develop a legislative proposal to establish a mandated manufacturers' rebate program similar to Medicaid's rebate program. We recognize that HCFA does not have the authority to simply establish a mandated manufacturers' rebate program similar to the program used in Medicaid. Legislation was required to establish the Medicaid rebate program, and would also be required to establish a Medicare rebate program. We have not thoroughly assessed how a Medicare rebate program might operate, what administrative complexities it might pose, or how a Medicare rebate program might differ from a Medicaid rebate program. We believe, however, the legislative effort would be worthwhile. The same manufacturers that provide rebates to Medicaid make the drugs that are used by Medicare beneficiaries and paid for by the Medicare program.

To implement this option, HCFA would have to revise Medicare's claims coding system which does not identify the manufacturer or indicate if the drug is a brand name or a generic equivalent, information that is needed to discount the AWP and obtain a rebate for a specific drug. Medicaid uses National Drug Codes (NDC) in processing drug claims. The NDC identifies the manufacturer and reflects whether the drug is a brand name or a generic equivalent.

Competitive Bidding

Medicare could develop a legislative proposal to allow it to take advantage of its market position. While competitive bidding is not appropriate for every aspect of the Medicare program or in every geographic location, we believe that it can be effective in many instances, including the procurement of drugs. Medicare could ask pharmacies to compete for business to provide Medicare beneficiaries with prescription drugs. All types of pharmacies could compete for Medicare business, including independents, chains, and mail-order pharmacies.

Inherent Reasonableness

Since Medicare's guidelines for calculating reasonable charges for drugs result in excessive allowances, the Secretary can use her "inherent reasonableness" authority to set special reasonable charge limits. If this option is selected, however, it will not be effective unless the Secretary's authority to reduce inherently unreasonable payment levels is streamlined. The current inherent reasonableness process is resource intensive and time consuming, often taking two to four years to implement. Medicare faces substantial losses in potential savings--certainly in the millions of dollars--if reduced drug prices cannot be placed into effect quickly.

11

We also believe that the variance of Medicare reimbursement for individual drug codes among carriers is inappropriate. The rate at which physicians and suppliers are paid for drugs should not depend on which carrier providers bill. **We, therefore, recommend that HCFA require all carriers to reimburse a uniform allowed amount for each HCPCS drug code.** The HCFA could choose to supply all carriers with a list of average wholesale prices that it has determined represent each drug code. The carriers could then use the uniform prices to calculate payment. The HCFA could also designate one single entity to perform all necessary calculations to determine reimbursement for each drug code on a quarterly basis. All carriers would then use this standard reimbursement amount.

## AGENCY COMMENTS

The HCFA concurred with our recommendations. The HCFA's proposal in the President's 1998 budget that would have required physicians to bill Medicare the actual acquisition cost for drugs was not adopted by Congress. However, the agency states that it will continue to pursue this policy in other appropriate ways. The full text of HCFA's comments are provided in Appendix D.

We support HCFA's continued pursuance of reducing drug payments where appropriate. We do not believe that the reimbursement methodology for prescription drugs recently adopted by Congress will curtail the excessive drug payments we've identified in the Medicare program. In this report we've identified Medicare allowances that were 11 to 900 percent greater than drug prices available to the physician and supplier communities.

To address the issue of uniformity among carriers, HCFA has convened a workgroup to develop an electronic file consisting of the average wholesale prices for drugs covered by Medicare. The agency reports it will distribute this file to Medicare contractors for their use in paying drug claims.

# APPENDIX A

## Description of 22 HCPCS Codes

| Code | Description |
|------|-------------|
| J9217 | Leuprolide Acetate (for depot suspension), 7.5 mg. |
| J7620 | Albuterol Sulfate, 0.083%, per ml., inhalation solution administered through DME |
| J9265 | Paclitaxel, 30 mg. |
| J9202 | Goserelin Acetate Implant, per 3.6 mg. |
| J0640 | Injection, Leucovorin Calcium, per 50 mg. |
| J9045 | Carboplatin, 50 mg. |
| J1440 | Injection, Filgrastim (G-CSF), per 300 mcg. |
| Q0136 | Injection, Epoetin Alpha, (For Non-ESRD Use), per 1000 units |
| J2405 | Injection, Ondansetron Hydrochloride, per 1 mg. |
| J1625 | Injection, Granisetron Hydrochloride, per 1 mg. |
| J1561 | Injection, Immune Globulin, Intravenous, per 500 mg. |
| J7670 | Metaproterenol Sulfate, 0.4%, per 2.5 ml., inhalation solution administered through DME |
| J1441 | Injection, Filgrastim (G-CSF), per 480 mcg. |
| J9182 | Etoposide, 100 mg. |
| J9000 | Doxorubicin HCL, 10 mg. |
| J9031 | BCG (Intravesical) per instillation |
| J9181 | Etoposide, 10 mg. |
| J7672 | Metaproterenol Sulfate, 0.6%, per 2.5 ml., inhalation solution administered through DME |
| J9293 | Injection, Mitoxantrone Hydrochloride, per 5 mg. |
| J9185 | Fludarabine Phosphate, 50 mg. |
| J9010 | Doxorubicin HCL, 50 mg. (code discontinued 12/31/96) |
| J3370 | Injection, Vancomycin HCL, up to 500 mg. (code discontinued for infusion 9/1/96) |

A - 1

# APPENDIX B

**SUMMARY OF WHOLESALE PRICES AND ESTIMATED SAVINGS
FOR 1995 AND 1996**

## SUMMARY OF WHOLESALE PRICES AND ESTIMATED SAVINGS FOR 1995

| HCPCS Code | Average Medicare Allowed Amount | Actual Average Wholesale Price | Savings Based on Actual Average Wholesale Price | Lowest Wholesale Price Found | Savings Based on Lowest Wholesale Price | Highest Wholesale Price Found | Savings Based on Highest Wholesale Price |
|---|---|---|---|---|---|---|---|
| J9217 | $474.67 | $394.33 | $83,728,802 | $391.00 | $87,202,882 | $396.00 | $81,991,762 |
| J7620 | $0.42 | $0.15 | $106,352,439 | $0.12 | $119,040,331 | $0.21 | $85,081,951 |
| J9265 | $180.82 | $148.70 | $14,425,220 | $146.10 | $15,592,891 | $150.00 | $13,841,385 |
| J9202 | $353.82 | $292.95 | $11,716,412 | $286.84 | $12,891,775 | $296.00 | $11,128,731 |
| J0640 | $23.27 | $2.33 | $61,175,769 | $1.89 | $62,449,291 | $2.90 | $59,499,161 |
| J9045 | $78.01 | $66.67 | $7,226,520 | $64.90 | $8,352,014 | $67.55 | $6,663,773 |
| J1440 | $149.46 | $124.47 | $8,620,001 | $124.20 | $8,711,972 | $125.00 | $8,436,058 |
| Q0136 | $11.92 | $9.92 | $7,942,246 | $8.84 | $12,246,366 | $10.70 | $4,850,833 |
| J2405 | $5.65 | $4.33 | $10,591,319 | $3.91 | $14,012,161 | $5.31 | $2,712,031 |
| J1625 | $165.29 | $123.58 | $9,709,625 | $117.00 | $11,240,029 | $132.80 | $7,562,405 |
| J1561 | $42.21 | $16.12 | $23,339,871 | $9.33 | $29,422,374 | $32.11 | $9,036,521 |
| J7670 | $1.22 | $0.32 | $23,986,743 | $0.26 | $25,544,703 | $0.40 | $21,872,652 |
| J1441 | $234.96 | $195.50 | $5,256,151 | $188.90 | $6,135,284 | $198.80 | $4,816,584 |
| J9182 | $131.25 | $76.70 | $11,660,930 | $56.00 | $16,085,515 | $113.55 | $3,783,570 |
| J9000 | $42.14 | $13.12 | $11,445,719 | $10.90 | $12,319,556 | $14.70 | $10,821,019 |
| J9031 | $155.20 | $120.54 | $3,659,236 | $94.28 | $6,430,898 | $138.44 | $1,769,236 |
| J9181 | $14.03 | $7.80 | $6,688,786 | $5.60 | $9,052,665 | $11.36 | $2,872,584 |
| J7672 | $1.22 | $0.31 | $11,560,517 | $0.26 | $12,175,863 | $0.40 | $10,400,217 |
| J9293 | $206.69 | $127.49 | $6,846,261 | $123.23 | $7,214,694 | $132.01 | $6,456,006 |
| J9185 | $173.03 | $149.08 | $1,890,949 | $145.25 | $2,193,648 | $152.00 | $1,660,634 |
| J9010 | $204.21 | $64.86 | $9,942,878 | $52.00 | $10,860,640 | $73.50 | $9,326,551 |
| J3370 | $10.07 | $3.69 | $7,235,171 | $2.02 | $9,122,193 | $6.99 | $3,491,965 |
| TOTAL | | | $445,001,565 | | $498,297,745 | | $368,075,629 |

# SUMMARY OF WHOLESALE PRICES AND ESTIMATED SAVINGS FOR 1996

| HCPCS Code | Average Medicare Allowed Amount | Actual Average Wholesale Price | Savings Based on Actual Average Wholesale Price | Lowest Wholesale Price Found | Savings Based on Lowest Wholesale Price | Highest Wholesale Price Found | Savings Based on Highest Wholesale Price |
|---|---|---|---|---|---|---|---|
| J9217 | $499.72 | $414.73 | $104,365,435 | $409.27 | $111,066,902 | $421.00 | $96,663,201 |
| J7620 | $0.41 | $0.19 | $92,199,355 | $0.16 | $105,604,026 | $0.25 | $67,530,255 |
| J9265 | $181.32 | $148.56 | $22,757,465 | $140.26 | $28,526,148 | $155.43 | $17,986,896 |
| J9202 | $378.29 | $329.43 | $11,215,983 | $317.00 | $14,067,894 | $341.85 | $8,364,073 |
| J0640 | $21.70 | $2.81 | $52,514,021 | $2.39 | $53,670,253 | $3.45 | $50,724,087 |
| J9045 | $82.76 | $67.64 | $12,539,724 | $64.90 | $14,814,584 | $70.55 | $10,128,000 |
| J1440 | $154.65 | $123.39 | $11,592,740 | $121.56 | $12,271,393 | $126.00 | $10,624,824 |
| Q0136 | $11.93 | $10.37 | $10,399,198 | $9.31 | $17,440,772 | $10.70 | $8,195,663 |
| J2405 | $6.08 | $4.28 | $14,319,348 | $3.92 | $17,172,050 | $4.73 | $10,776,959 |
| J1625 | $170.02 | $125.71 | $13,399,842 | $122.90 | $14,250,690 | $128.00 | $12,708,277 |
| J1561 | $42.21 | $16.65 | $24,808,622 | $12.50 | $28,833,317 | $34.00 | $7,967,739 |
| J7670 | $1.23 | $0.41 | $9,935,367 | $0.32 | $10,965,079 | $0.51 | $8,658,040 |
| J1441 | $246.34 | $196.76 | $8,470,488 | $191.99 | $9,285,542 | $202.25 | $7,532,512 |
| J9182 | $137.57 | $70.91 | $13,362,365 | $37.06 | $20,147,028 | $112.57 | $5,011,200 |
| J9000 | $44.19 | $13.65 | $12,480,751 | $10.87 | $13,616,851 | $17.95 | $10,723,475 |
| J9031 | $157.53 | $133.13 | $2,682,097 | $112.00 | $5,004,749 | $148.95 | $943,131 |
| J9181 | $14.14 | $8.02 | $5,909,155 | $3.71 | $10,077,601 | $11.26 | $2,784,899 |
| J7672 | $1.23 | $0.44 | $4,805,175 | $0.32 | $5,492,908 | $0.55 | $4,117,563 |
| J9293 | $172.81 | $142.40 | $2,712,650 | $139.91 | $2,935,141 | $145.38 | $2,447,586 |
| J9185 | $179.45 | $156.50 | $2,049,320 | $152.00 | $2,451,148 | $161.00 | $1,647,493 |
| J9010 | $207.12 | $65.46 | $10,513,722 | $54.00 | $11,364,260 | $76.00 | $9,731,464 |
| J3370 | $9.44 | $4.42 | $4,213,709 | $3.45 | $5,027,227 | $6.45 | $2,509,417 |
| TOTAL | | | $447,246,532 | | $514,085,563 | | $357,776,754 |

B - 3

# APPENDIX C

### INDIVIDUAL DRUG ALLOWANCES AND SAVINGS PERCENTAGES
### FOR 1995 AND 1996

### Estimated Medicare Savings if Acquisition Costs
### Were Used for 1995 Prescription Drug Reimbursement

| HCPCS Code | Drug Description | 1995 Allowances | Estimated Savings | Percent Saved |
|---|---|---|---|---|
| J9217 | Leuprolide Acetate | $455,238,461 | $83,728,802 | 18% |
| J7620 | Albuterol Sulfate 0.083% | $166,901,971 | $106,352,439 | 64% |
| J9265 | Paclitaxel | $79,672,417 | $14,425,220 | 18% |
| J9202 | Goserelin Acetate Implant | $65,806,263 | $11,716,412 | 18% |
| J0640 | Leucovorin Calcium | $64,687,013 | $61,175,769 | 95% |
| J9045 | Carboplatin | $49,306,732 | $7,226,520 | 15% |
| J1440 | Filgrastim, per 300 mcg. | $47,401,344 | $8,620,001 | 18% |
| Q0136 | Epoetin Alpha (Non-ESRD Use) | $47,324,218 | $7,942,246 | 17% |
| J2405 | Ondansetron Hydrochloride | $45,279,311 | $10,591,319 | 23% |
| J1625 | Granisetron Hydrochloride | $33,013,314 | $9,709,625 | 29% |
| J1561 | Immune Globulin | $31,646,866 | $23,339,871 | 74% |
| J7670 | Metaproterenol Sulfate 0.4% | $30,822,456 | $23,986,743 | 78% |
| J1441 | Filgrastim, per 480 mcg. | $29,865,814 | $5,256,151 | 18% |
| J9182 | Etoposide, 100 mg. | $25,713,304 | $11,660,930 | 45% |
| J9000 | Doxorubicin HCL, 10 mg. | $16,017,009 | $11,445,719 | 71% |
| J9031 | BCG (Intravesical) | $15,494,267 | $3,659,236 | 24% |
| J9181 | Etoposide, 10 mg. | $14,510,938 | $6,688,786 | 46% |
| J7672 | Metaproterenol Sulfate 0.6% | $13,876,217 | $11,560,517 | 83% |
| J9293 | Mitoxantrone Hydrochloride | $13,271,172 | $6,846,261 | 52% |
| J9185 | Fludarabine Phosphate | $12,725,400 | $1,890,949 | 15% |
| J9010 | Doxorubicin HCL, 50 mg. | $12,515,401 | $9,942,878 | 79% |
| J3370 | Vancomycin HCL | $12,051,885 | $7,235,171 | 60% |
| TOTAL | | $1,283,141,773 | $445,001,565 | 35% |

## Estimated Medicare Savings if Acquisition Costs Were Used for 1996 Prescription Drug Reimbursement

| HCPCS Code | Drug Description | 1996 Allowances | Estimated Savings | Percent Saved |
|---|---|---|---|---|
| J9217 | Leuprolide Acetate | $577,547,780 | $104,365,435 | 18% |
| J7620 | Albuterol Sulfate 0.083% | $175,399,846 | $92,199,355 | 53% |
| J9265 | Paclitaxel | $125,093,980 | $22,757,465 | 18% |
| J9202 | Goserelin Acetate Implant | $84,187,487 | $11,215,983 | 13% |
| J0640 | Leucovorin Calcium | $57,323,221 | $52,514,021 | 92% |
| J9045 | Carboplatin | $67,530,797 | $12,539,724 | 19% |
| J1440 | Filgrastim, per 300 mcg. | $54,460,250 | $11,592,740 | 21% |
| Q0136 | Epoetin Alpha (Non-ESRD Use) | $79,558,670 | $10,399,198 | 13% |
| J2405 | Ondansetron Hydrochloride | $47,331,513 | $14,319,348 | 30% |
| J1625 | Granisetron Hydrochloride | $49,691,403 | $13,399,842 | 27% |
| J1561 | Immune Globulin | $35,104,622 | $24,808,622 | 71% |
| J7670 | Metaproterenol Sulfate 0.4% | $14,203,070 | $9,935,367 | 70% |
| J1441 | Filgrastim, per 480 mcg. | $40,592,257 | $8,470,488 | 21% |
| J9182 | Etoposide, 100 mg. | $25,739,111 | $13,362,365 | 52% |
| J9000 | Doxorubicin HCL, 10 mg. | $17,410,833 | $12,480,751 | 72% |
| J9031 | BCG (Intravesical) | $16,544,398 | $2,682,097 | 16% |
| J9181 | Etoposide, 10 mg. | $13,381,243 | $5,909,155 | 44% |
| J7672 | Metaproterenol Sulfate 0.6% | $6,595,854 | $4,805,175 | 73% |
| J9293 | Mitoxantrone Hydrochloride | $14,522,607 | $2,712,650 | 19% |
| J9185 | Fludarabine Phosphate | $15,462,970 | $2,049,320 | 13% |
| J9010 | Doxorubicin HCL, 50 mg. | $14,541,250 | $10,513,722 | 72% |
| J3370 | Vancomycin HCL | $8,234,140 | $4,213,709 | 51% |
| TOTAL | | $1,540,457,302 | $447,246,532 | 29% |

C - 3

# APPENDIX D

### HEALTH CARE FINANCING ADMINISTRATION COMMENTS



DEPARTMENT OF HEALTH & HUMAN SERVICES                                    Health Care Financing Administration

Deputy Administrator
Washington, D.C. 20201

**DATE:**       OCT - 1 1997

**TO:**         June Gibbs Brown
                Inspector General

**FROM:**       Nancy-Ann Min DeParle  NMD
                Deputy Administrator

**SUBJECT:**    Office of Inspector General (OIG) Draft Report: "Excessive Medicare
                Payments for Prescription Drugs," (OEI-03-97-00290)

We reviewed the above-referenced report that examines Medicare payments for
prescription drugs. Medicare allowances for prescription drugs increased 25 percent from
$1.8 billion in 1995 to $2.3 billion in 1996. However, the number of services allowed
increased only 9 percent between the 2 years.

Medicare does not pay for over-the-counter drugs or many prescription drugs that are
self-administered. However, the program will pay for certain categories of drugs used by
its beneficiaries. Contracted carriers determine the amounts that Medicare will pay for the
drugs based on the lower of the estimated acquisition cost (EAC) or the national average
wholesale price (AWP). The allowed amount is the price that Medicare and its
beneficiaries pay a drug supplier. OIG findings indicate that at present, it is the AWP
that carriers use to develop Medicare reimbursement for prescription drugs. The AWP is
reported in The Red Book and other pricing publications and databases used by the
pharmaceutical industry. The EAC is determined based on surveys of the actual invoice
prices paid for the drug.

The findings contained in the report indicate that Medicare is making excessive payments
for prescription drugs. The published AWPs currently used by Medicare carriers to
determine reimbursement do not resemble the actual wholesale prices which are available
to the physician and supplier communities that bill for these drugs.

---

2

OIG suggests that the Health Care Financing Administration (HCFA): (1) reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments; and (2) require all carriers to reimburse a uniform allowed amount for each HCFA Common Procedural Coding System (HCPCS) drug code.

HCFA concurs with OIG's recommendations.  Our detailed comments are as follows:

OIG Recommendation 1

HCFA should require all carriers to reimburse a uniform allowed amount for each HCPCS drug code.

HCFA Response

We concur.  HCFA agrees with OIG's findings and recommendations contained in this report.  HCFA convened a workgroup to develop an electronic file consisting of the AWPs for drugs covered by Medicare. HCFA will then distribute this file to Medicare contractors for their use in paying claims for drugs.

OIG Recommendation 2

HCFA should reexamine its Medicare drug reimbursement methodologies, with the goal of reducing payments as appropriate.

HCFA Response

We concur.  We agree with OIG's findings and recommendations. We included a provision in the President's 1998 budget bill that would have eliminated the markup for drugs billed to Medicare by requiring physicians to bill the program the actual acquisition cost for drugs.  Unfortunately, this provision was not enacted, but we will pursue this policy in other appropriate ways.

# TAB H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 7-1 - 7-156



BENCH TRIAL - DAY SEVEN

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 16, 2006, 9:15 a.m.




LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 3

1                          I N D E X

2   WITNESS                 DIRECT    CROSS    REDIRECT    RECROSS

3   Cathleen Dooley         7-10      7-48     7-87        7-91

4   G. Raymond Pironti, Jr. 7-99      7-139

5   EXHIBITS                        PAGE

6   2629                            7-4
    976                             7-15
7   339                             7-23
    259                             7-28
8   979                             7-29
    365                             7-33
9   262                             7-37
    318                             7-43
10  334                             7-45
    1075                            7-63
11  1098                            7-69
    1059, 1060, 2774,               7-86
12  2775, 2777
    714                             7-130
13  408                             7-131, 7-135
    470                             7-130
14  609                             7-133
    57, 4003, 4004                  7-145
15  2131, 2151, 2103                7-145

16

17

18

19

20

21

22

23

24

25

1   subject of this report.

2   A.   Sure.  The report said that they analyzed wholesale

3   prices from drug wholesalers and group purchasing

4   organizations.

5   Q.   And did they report on those wholesale prices in this

6   report for all of the drugs that were studied?

7   A.   They didn't.

8   Q.   Can you take a look at Page B-2 of the report which is

9   in the appendix.

10  A.   I have that.

11  Q.   And what is Page B-2?

12  A.   It's a summary of wholesale prices and the estimated

13  savings for 1995.

14  Q.   Okay.  Is Q Code 0136 one of the HCFA code drugs that is

15  looked at in this table?

16  A.   It is.

17  Q.   And does this table show an average Medicare allowed

18  amount for 1995?

19  A.   It does.

20  Q.   Does this table also show the actual average wholesale

21  price for 1995?

22  A.   It does.

23  Q.   Does it show the lowest wholesale price for that year?

24  A.   It does.

25  Q.   And does it show the highest wholesale price for that

Page 65

1    year?

2    A.    It does.

3    Q.    And is that true for Procrit and every other drug on

4    this table?

5    A.    That's true.

6    Q.    If you could look at Page B-3, please.

7    A.    I have that.

8    Q.    Does that page show the same information with respect to

9    1996?

10   A.    It does.

11          THE COURT:  Excuse me.  What does "actual average

12   wholesale price" mean, what's been published or what it

13   really was?

14          THE WITNESS:  In this chart, the actual average

15   wholesale is what they found when they went to the

16   wholesalers and what it cost, so from their survey.

17          THE COURT:  This is their survey as opposed to

18   what's published?

19          (Witness examining document.)

20          THE COURT:  That looks right just based on doing

21   rough math, but I just want to make sure I understand it.

22          THE WITNESS:  That's my understanding, your Honor.

23   Q.    In fact, Ms. Dooley, the "Medicare allowable amount" in

24   the second column, that's based on the AWP figure?

25   A.    That's correct.

# TAB I

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 5-1 - 5-167



BENCH TRIAL - DAY FIVE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 14, 2006, 9:20 a.m.






LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

Page 3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Steve Buckanavage | 5-4 | 5-32 | 5-48 | |
| John Hoffman | 5-52 | 5-88 | 5-123 | 5-124 |
| Christof Marre | 5-125 | 5-146 | 5-165 | |

| EXHIBITS | PAGE |
|----------|------|
| 14 | 5-14 |
| 2127 | 5-27 |
| 133 | 5-31 |
| 261, 285, 2835, | 5-88 |
| 252, 254, 289, 825 | |
| 2822 | 5-100 |
| 2804 | 5-114 |
| 206 | 5-139 |
| 207 | 5-149, 5-166 |
| 234 | 5-166 |
| 213 | 5-167 |
| 215 | 5-167 |

Page 88

1    Plaintiffs' Exhibit 252, Plaintiffs' Exhibit 289, and

2    Plaintiffs' Exhibit 825.

3              THE COURT:  Are those all that you read on your --

4              MR. MACORETTA:  These were all the exhibits I

5    referred to and talked about with Mr. Hoffman.

6              THE COURT:  You're not shoveling in because it

7    looks interesting?

8              MR. MACORETTA:  If you want me to, your Honor, the

9    book is much bigger and --

10             THE COURT:  All right.  So that's what you've

11   actually referred to.

12             MR. MACORETTA:  Yes.

13             THE COURT:  Fine.

14             MR. CAVANAUGH:  No objection.

15             THE COURT:  Okay.  Go for it.

16             MR. CAVANAUGH:  Thank you, your Honor.

17                      CROSS-EXAMINATION

18   BY MR. CAVANAUGH:

19   Q.   Mr. Hoffman, let's pick up where Plaintiffs left off.

20   They were referring to a submission to HCFA in order to

21   secure a J-Code for Remicade.  In this submission, did

22   Centocor disclose Remicade's AWP and Remicade's list price?

23   A.   Yes, they did.

24   Q.   So Medicare had both pieces.  They had the AWP and they

25   knew what Remicade's list price was.

Page 89

1   A.    That's correct.

2   Q.    And I believe the judge asked you this question:  Were

3   any discounts offered to physicians off of Remicade's list

4   price?

5   A.    No.

6   Q.    Would you consider Remicade's pricing to be transparent

7   then?

8   A.    Yes.

9   Q.    Let me turn to --

10          THE COURT:  Well, this is confusing.

11          MR. CAVANAUGH:  It is, your Honor.

12          THE COURT:  As I'm looking at -- I'm glad you

13   flagged answer 12, 11 and 12.

14          So you're saying here that the retail cost is less

15   than the wholesale cost.

16          THE WITNESS:  And that's illogical, as I'm sure

17   you're ascertaining.

18          THE COURT:  I'm just noticing.

19          THE WITNESS:  So I think as Mr. Cavanaugh is

20   pointing out in his question to me, the intention of this

21   document is to provide HCFA with both the WAC and the AWP,

22   and the AWP is obviously the reference price that's used for

23   the reimbursement by law and so we provided both.  The

24   questions were a little confusing as to where you provided

25   each one, but both were provided in the document.

Page 117

1    costs.  We make significant contributions to independent

2    foundations who then help provide financial support to

3    patients with their out-of-pocket costs.  And these

4    foundations, they don't have to give it for even our product.

5    They can -- they're done on a disease-state basis, so it

6    might be a rheumatoid arthritis foundation and they can

7    provide support whether they're on our products, or

8    competitors' products, whatever, but we just give an

9    unrestricted contribution to help do that.

10             THE COURT:  When did that start?

11             THE WITNESS:  We've been doing that for the last

12   several years.  I'm not sure exactly when it started.

13             THE COURT:  Two or three?

14             THE WITNESS:  At least three.

15             THE COURT:  And how much do you give annually?

16             THE WITNESS:  I don't have that figure with me off

17   the top of my head, but --

18             THE COURT:  Thousands, millions?

19             THE WITNESS:  Millions.  Tens of millions.

20   BY MR. CAVANAUGH:

21   Q.  Have the sales of Remicade been growing each year?

22   A.  Yes, they have.

23   Q.  At roughly what?

24   A.  Three to $400 million per year.

25   Q.  Let me take you to -- when did you first start working