# TAB J



**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) AVERAGE WHOLESALE PRICE ) LITIGATION ) | MDL NO. 1456 Civil Action No. 01-12257-PBS |
| ) | |
| ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO ) ALL CLASS ACTIONS ) | |

**PLAINTIFFS' SUPPLEMENTAL RESPONSE TO THE J&J DEFENDANTS'**
**REQUESTS FOR ADMISSION AND INTERROGATORIES CONCERNING**
**REMICADE®**

Plaintiffs submit this Supplemental Response to the Johnson & Johnson Defendants' Requests for Admissions and Interrogatories as follows.

## OBJECTIONS

1. This Supplemental Response is made while Plaintiffs' Objections to the November 9, 2005 ruling of Magistrate Judge Bowler are pending. Plaintiffs reserve the right to withdraw this Supplemental Response based on the disposition of the Objections.

2. The Responses contained herein are based on the data available to Plaintiffs as of this date. Plaintiffs reserve the right to amend or modify these Responses if additional data becomes available.

3. Plaintiffs object to the J&J Defendants' "definitions" to the extent they create obligations broader than what is required by the Federal Rules of Civil Procedure.

4. Plaintiffs object to the J&J Defendants' Requests and Interrogatories to the extent they seek information which is the subject of expert analysis and opinion.

DEFENDANT'S EXHIBIT 2782

PENGAD 800-631-6989

5.   Plaintiffs object to the J&J Defendants' Interrogatories to the extent they seek the factual basis for any denial, when such denial is based on the absence of facts or information.

### REQUEST TO ADMIT NO. 1:

Admit that Centocor began selling Remicade® in 1998.

### RESPONSE TO REQUEST TO ADMIT NO. 1:

Admitted.

### INTERROGATORY NO. 1:   If your response to Request to Admit No. 1 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

### RESPONSE TO INTERROGATORY 1:

Not Applicable.

**REQUEST TO ADMIT NO. 2:**  Admit that from 1998 to the present, the published AWP for Remicade® has been 130% of the published WAC for Remicade®.

**RESPONSE TO REQUEST TO ADMIT NO. 2:**

Admitted.

**INTERROGATORY NO. 2:**  If your response to Request to Admit No. 2 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

**RESPONSE TO INTERROGATORY NO. 2:**

Not applicable.

-3-

**REQUEST TO ADMIT NO. 3**:  Admit that from 1998 to the present, Centocor, Inc. has not paid rebates on Remicade® to physicians who purchase or dispense Remicade®.

**RESPONSE TO REQUEST TO ADMIT NO. 3:**

Admitted.  This Response is based on the definition of rebates articulated at the November 9, 2005 hearing, see transcript pages 10-11, and based on the rebate data produced by Centocor to date.

**INTERROGATORY NO. 3**:  If your response to Request to Admit No. 3 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

**RESPONSE TO INTERROGATORY NO. 3:**

Not applicable.

-4-

**REQUEST TO ADMIT NO. 4**:  Admit that from 1998 to the present, Centocor, Inc. has not paid rebates on Remicade® to pharmacy benefit managers.

**RESPONSE TO REQUEST TO ADMIT NO. 4**:

Admitted.  This admission is based on the definition of rebates articulated at the November 9, 2005 hearing, see transcript pages 10-11.  This admission is also based on the rebate data produced by Centocor to date.

**INTERROGATORY NO. 4**:  If your response to Request to Admit No. 4 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

**RESPONSE TO INTERROGATORY NO. 4**:

Not applicable.

**REQUEST TO ADMIT NO. 5**:  Admit that from 1998 to the present, the only rebates that Centocor, Inc. has paid on Remicade® have been rebates paid to persons or entities that reimburse for Remicade®, such as Health Maintenance Organizations and Preferred Provider Organizations.

**RESPONSE TO REQUEST TO ADMIT NO. 5**:

Denied.  This Response is based on the definition of rebates articulated at November 9, 2005 hearing, see transcript pages 10-11.  This response is based on the rebate data produced by Centocor to date.

**INTERROGATORY NO. 5**:  If your response to Request to Admit No. 5 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

**RESPONSE TO INTERROGATORY NO. 5**:

The electronic rebate data produced by Centocor does not show payments to HMOs, but does show rebate payments to hospitals and others that are apparently not Preferred Provider Organizations.  Some of these payments appear to be called "VOO" by Centocor.  Centocor's electronic data was discussed at the deposition of Centocor's Michelle Murphy.  This Response is based on the definition of rebates articulated at the hearing of November 9, 2005.

-6-

**REQUEST TO ADMIT NO. 6**:  Admit that from 1998 to the present, the rebates that Centocor, Inc. has paid on Remicade® have reduced the net reimbursement cost of Remicade® for those payors that have received rebates.

**RESPONSE TO REQUEST TO ADMIT NO. 6**:

Admitted in part, denied in part.  Admitted that, in theory, those payors who actually received rebates from Centocor incurred a reduction in the Net Reimbursement Cost of Remicade, as that term is defined by Centocor.  It is denied that payors actually received any rebates on Remicade.  This response is based on the limitations of the Request for Admissions as stated by the parties at the November 9, 2005 hearing.

**INTERROGATORY NO. 6**:  If your response to Request to Admit No. 6 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

**RESPONSE TO INTERROGATORY NO. 6**:

The electronic rebate data produced by Centocor does not indicate what rebates, if any, were ultimately paid to payors.  This response is based on the limitations of the Request for Admissions as stated by the parties at the November 9, 2005 hearing.

**REQUEST TO ADMIT NO. 7**:  Admit that from 1998 to the present, the rebates that Centocor, Inc. has paid on Remicade® have reduced the spread.

**RESPONSE TO REQUEST TO ADMIT NO. 7**:

Objection. The term "spread" as defined by Centocor is vague and ambiguous, and differs substantially from the definition of spread used by Plaintiffs in this litigation.  Further, the Request is objectionable as a burdensome contention interrogatory that would require plaintiffs to research sources of documents in the possession of J&J, when J&J could just as easily collected this information and presented the basis for the RFA. This Request also seeks an admission which is not relevant.

**INTERROGATORY NO. 7**:  If your response to Request to Admit No. 7 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

**RESPONSE TO INTERROGATORY NO. 7**:

Objection. The term "spread" as defined by Centocor is vague and ambiguous, and differs substantially from the definition of spread used by Plaintiffs in this litigation. Further, this Interrogatory also seeks information which is not relevant.

-8-

**REQUEST TO ADMIT NO. 8**: Admit that from 1998 to the present, the spread on Remicade® has not exceeded the difference between its published WAC and its published AWP for all persons or entities that reimbursed Remicade at or below its AWP.

**RESPONSE TO REQUEST TO ADMIT NO. 8**:

Denied.

**INTERROGATORY NO. 8**: If your response to Request to Admit No. 8 contains a denial, in whole or in part, describe the basis for your denial, and identify all documents and testimony that you rely on to support your denial.

**RESPONSE TO INTERROGATORY NO. 8**:

Objection. The term "spread" as defined by Centocor is vague and ambiguous, and differs substantially from the definition of spread used by Plaintiffs in this litigation. Further, this Interrogatory also seeks information which is not relevant. The Court ruled on November 9, 2005 that Plaintiffs did not have to provide their calculation of the "net acquisition cost" for Remicade, which is a component of the "spread" as defined by Centocor. Plaintiffs have provided herein the WAC and AWP prices for Remicade as well as an aggregate calculation of "net reimbursement cost", which is another component of "spread".

**INTERROGATORY NO. 9**: From 1998 to the present, state each published WAC and each published AWP for Remicade®, and the effective date of each change in Remicade®'s WAC and AWP.

**RESPONSE TO INTERROGATORY NO. 9**:

A listing of the WAC and AWP pricing for Remicade, based on the information currently available to Plaintiffs, is attached as Exhibit A.

-10-

**INTERROGATORY NO. 10**:  State the ASP for Remicade® for each of the time intervals between the changes in Remicade®'s WAC and AWP identified in response to Interrogatory No. 9.

**RESPONSE TO INTERROGATORY NO. 10**:

A listing of the ASP for Remicade, calculated annually, is attached as Exhibit B.  These calculations are based on the best available data provided to Plaintiffs by defendant and subject to all caveats and qualifications relating to such calculations as set forth more fully in Plaintiffs' forthcoming expert report.  Plaintiffs reserve the right to supplement these calculations in light of any additional information that is provided to Plaintiffs.

-11-

**INTERROGATORY NO. 11**: State the average net reimbursement cost and the average net acquisition cost for Remicade® for each of the time intervals between the changes in Remicade®'s WAC and AWP identified in response to Interrogatory No. 9.

**RESPONSE TO INTERROGATORY NO. 11**:

Objection. This Interrogatory seeks information which is not relevant, nor calculated to lead to the discovery of admissible evidence. The Court ruled on November 9, 2005 that Plaintiffs did not have to provide their calculation of the "net acquisition cost" for Remicade.

Without waiving such objections, Plaintiffs state that the average net reimbursement cost for all drugs in this litigation, including Remicade, for private, non-governmental payors, is 97.5% of AWP. The net reimbursement cost for governmental payors is determined by statute.

Dated: December 13, 2005.

·By _____ /s/ John A. Macoretta
John A. Macoretta
Spector, Roseman & Kodroff, P.C.
1818 Market Street
Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611

Steve W. Berman
Sean R. Matt
Hagens Berman Sobol Shapiro LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594

Elizabeth Fegan
Hagens Berman Sobol Shapiro LLP
60 W. Randolph Street, Suite 200
Chicago, IL 60601
Telephone: (312) 762-9235

Facsimile: (312) 762-9286

Thomas M. Sobol (BBO#471770)
Edward Notargiacomo (BBO#567636)
Hagens Berman Sobol Shapiro LLP.
One Main Street, 4th Floor
Cambridge, MA 02142
Telephone: (617) 482-3700
Facsimile: (617) 482-3003

Marc H. Edelson
Allan Hoffman
Hoffman & Edelson
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Kenneth A. Wexler
Jennifer F. Connolly
The Wexler Firm LLP
One North LaSalle Street, Suite 2000
Chicago, Il 60602
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Samuel D. Heins
Alan I. Gilbert
Susan E. MacMenamin
Heins, Mills & Olson, P.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 338-4605
Facsimile: (612) 338-4692
**CO-LEAD COUNSEL FOR
PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2005 I caused a true and correct copy of the Plaintiffs' Supplemental Response to J&J Defendants' Requests for Admission and Interrogatories Concerning Remicade® to be served on all counsel of record by electronic service via Lexis/Nexis, pursuant to Case Management Order No. 2.

/s/John Macoretta
John Macoretta

## EXHIBIT A

## REMICADE PRICING HISTORY

| Date | AWP | WAC |
|------|-----|-----|
| At Launch – September 1998 | $585.00 | $450.00 |
| Price Increase – June 18, 1999 | $611.33 | $470.25 |
| Price Increase – April 1, 2000 | $641.28 | $493.29 |
| Price Increase – November 3, 2000 | $665.65 | $512.04 |
| Price Increase – June 6, 2001 | $691.61 | $532.00 |

# EXHIBIT "B"

## Remicade Annual ASPs

| NDC | Description | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|-----|-------------|------|------|------|------|------|------|
| 57894003001 | C16SJ REMICADE 1PCK US PD | $447.26 | $458.23 | $486.17 | $509.25 | $516.65 | $514.98 |

# TAB K

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

In Re:                          )
PHARMACEUTICAL INDUSTRY         ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE         ) MDL No. 1456
LITIGATION                      ) Pages 2-1 - 2-204

BENCH TRIAL - DAY TWO

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE

United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 7, 2006, 9:15 a.m.

LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617)345-6787

2-3

Page 3

1                               I N D E X

2    WITNESS                    DIRECT    CROSS    REDIRECT    RECROSS

3    Sharon Faulkner                      2-4

4    Gina Alongi                 2-24     2-34     2-63        2-68

5    Anna Choice                 2-71     2-76

6    Rebecca Hopkins             2-91     2-110

7    Deborah Devaux             2-126     2-144    2-178
                                          2-174
8
     Michael Mulrey            2-184
9

10   EXHIBITS                             PAGE

11   957                                  2-21

12   957-A                                2-23

13   3000, 3001, 3002, 1502               2-43

14   3003                                 2-83

15   3004                                 2-84

16   4000                                 2-110

17   873                                  2-131

18   1149                                 2-177

19   990                                  2-177

20

21

22

23

24

25

1   A.   BlueCross wants to pay rates that are not considered to

2   be inconsistent with the marketplace, so where we do make a

3   change in rate, we like to use a methodology that's generally

4   accepted in the industry.

5   Q.   Well, does BlueCross BlueShield consider the cost of

6   drugs to physicians an important factor when it chooses to

7   reimburse?

8   A.   The cost of drugs in an individual physician contract?

9   Q.   Not to a contract, just in general.

10          MR. NOTARGIACOMO:  Withdraw the question.

11   Q.   Doesn't BlueCross BlueShield consider it important

12   whenever it reimburses to use whatever information it has

13   about the actual cost to the provider?

14   A.   Yes.  We don't have information about the actual costs

15   of these drugs to the physician.

16          THE COURT:  Well, let me ask you this.  Since

17   you're a named plaintiff in this, if you had known early on

18   when the suit started and before, if you had known that AWP

19   was grossly inflated, would you have changed your practices

20   at all.

21          THE WITNESS:  I don't know exactly what we would

22   have done.  The ideal would be to know what the actual costs

23   of the drug to the physician is.  We don't have that

24   knowledge and we didn't have that knowledge.

25          THE COURT:  Well, the concern I have is now that

Page 152

1    A.    That wasn't the only change that Medicare made.

2    Q.    I simply asked you -- we're talking about the reasons

3    why CMS was considering ASP and what you folks at BlueCross

4    BlueShield understood.

5    A.    I just don't want to give an incomplete answer about

6    what we understood.  We certainly --

7    Q.    I'm certainly asking you about the first item here.  So

8    you were aware about physician spreads and overpayment for

9    drugs.

10   A.    We were aware that the change that Medicare was making

11   would reduce the payment for drugs, yes.

12   Q.    Now -- and you were aware that, according to CMS and

13   GAO, there had been a billion-dollar overpayment for Part B

14   drugs, correct?

15   A.    Yes.

16   Q.    And again, according to whatever your source was, that

17   there had been an allegation of a $600 million overpayment to

18   oncologists in 2002, correct?

19   A.    Yes.

20   Q.    And there was concern about patients being adversely

21   affected by an inflated AWP.  That's in your document, right?

22   A.    It is.

23   Q.    And if we could go to the next page, your group was able

24   to compile information as to how CMS intended to calculate

25   ASP, correct?

# TAB L

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


In Re:                        )
PHARMACEUTICAL INDUSTRY        ) CA No. 01-12257-PBS
AVERAGE WHOLESALE PRICE        ) MDL No. 1456
LITIGATION                     ) Pages 3-1 - 3-171


BENCH TRIAL - DAY THREE

BEFORE THE HONORABLE PATTI B. SARIS
UNITED STATES DISTRICT JUDGE




United States District Court
1 Courthouse Way, Courtroom 19
Boston, Massachusetts
November 8, 2006, 9:15 a.m.




LEE A. MARZILLI and TIMOTHY J. WILLETTE
OFFICIAL COURT REPORTERS
United States District Court
1 Courthouse Way, Room 3205
Boston, MA  02210
(617) 345-6787

Page 3

```
 1

 2

 3                            I N D E X

 4
     WITNESS                  DIRECT    CROSS    REDIRECT    RECROSS
 5
     Michael Mulrey                     3-5      3-57        3-67
 6                                      3-44                 3-68
                                        3-51
 7
     Maureen Coneys           3-70      3-79     3-104       3-106
 8
     Kenneth J. Arruda        3-116     3-127
 9

10

11

     EXHIBITS                 PAGE
12
     999                      3-28
13   1020                     3-44
     1497                     3-44
14   1231                     3-157

15

16

17

18

19

20

21

22

23

24

25
```

1    they're being reasonably compensated?

2               THE WITNESS:  Yes, in the analysis that we did in

3    this PowerPoint presentation.  If we're going to move to the

4    Medicare reimbursement where they were going to scale down

5    the drug pricing and increase the drug administration, there

6    was still a negative impact to our provider community.

7               THE COURT:  Right, because they make fewer profits.

8               THE WITNESS:  Yes.

9               THE COURT:  Now, you're a plaintiff in this case,

10   right --

11              THE WITNESS:  Yes.

12              THE COURT:  -- Blue Cross-Blue Shield?  So

13   essentially, now that you know everything, the decision was

14   made not to change anyway.  Is that the bottom line?

15              THE WITNESS:  The decision was made not to change

16   because we didn't know with Medicare moving to the ASP

17   pricing what the acceptance would be in the industry.  And

18   we've all the time when these -- you know, we try to use

19   industry standards in setting, you know, a lot of our

20   reimbursement methodologies.  And, you know, Medicare moving

21   to this new pricing methodology, we kind of wanted to take a

22   wait-and-see attitude to see what, if any, disruption may be

23   caused by providers back towards Medicare.

24              THE COURT:  All right.  So if ten years ago --

25   well, maybe not, but let's say after Congress passed the

1   statute.   If you had known in the late nineties or early

2   2000s about these kinds of spreads, would you have done

3   anything about it?

4                THE WITNESS:   If I had known at that point in time

5   about the spreads?   I would have been hard-pressed-

6                THE COURT:   In other words, if you had this data in

7   the late nineties, early 2000s, because now you know, right?

8                THE WITNESS:   Yes.

9                THE COURT:   Now you know.   So would you have done

10  anything about it?

11               THE WITNESS:   I -- I probably would have raised it

12  to senior management to say, okay, what do we want to do?

13  How can we address this situation and what alternatives could

14  we have other than relying on AWP pricing?

15               THE COURT:   Okay.

16  BY MR. MANGI:

17  Q.   Now, Mr. Mulrey, we were just looking at the potential

18  impact of a shift from 95 percent of AWP to 85 percent of

19  AWP, right?

20  A.   Yes.

21               MR. MANGI:   And I'd like to move into evidence,

22  your Honor, DX 999, which is the document we just looked at.

23  Q.   And, Mr. Mulrey, I'd like to draw your attention now to

24  another exhibit.   That's DX 1497.   It'll appear on your

25  screen.   I'd like to draw your attention to the third page of

# TAB M

ORiginAL

 Centocor

November 5, 1998

C. Kaye Riley, HCPCS Coordinator
Health Care Financing Administration
CS-08-27
7500 Security Blvd.
Baltimore, Maryland  21233-1850

Dear Ms. Riley:

I am pleased to submit the enclosed application for an alpha-numeric code in the Health Care Financing Administration Common Procedure Coding System (HCPCS) for Remicade™ (infliximab), a breakthrough drug for the treatment of Crohn's disease.

Remicade™ is indicated for the treatment of moderately to severely active Crohn's disease or the reduction of the signs and symptoms, in patients who have an inadequate response to conventional therapy. It is also indicated as a treatment for patients with fistulizing Crohn's disease for reduction in the number of draining enterocutaneous fistula(s).

Following an expedited review, Remicade™ was approved by the FDA on August 24, 1998 and became available for wholesale purchase on October 5. Rapid and widespread adoption is expected of this new drug by gastroenterologists and other physicians who treat patients with Crohn's disease. To date, there have been 85 Medicare orders written for Remicade™. Therefore, I have included in the application a request for the assignment of a temporary code to be used pending approval of a new code for use beginning January 1, 2000.

A temporary code will facilitate claims processing and reduce the administrative burden with J3490 "Unclassified drugs". Specifically, a temporary code will eliminate the unnecessary and costly submission by physicians and review by carriers of written documentation regarding the drug administered, the dosage, the route of administration and the charge.

If you have any questions or require any additional information, please do not hesitate to contact me. In particular, if there is anything missing that would preclude consideration of the application at your next HCPCS meeting I would appreciate hearing from you as soon as possible.

I look forward to working with you on the development of the temporary and permanent codes needed to promptly and accurately report the use of this important advance in the treatment of Crohn's disease.

Sincerely,

Valerie Asbury, Director
Centocor, Inc.

Plaintiffs' Exhibit
261
01-12257-PBS

Centocor, Inc. · 200 Great Valley Parkway · Malvern, Pennsylvania 19355-1307 · Telephone (610) 651-6000 · Facsimile (610) 651-6100

enc- 2

**HIGHLY CONFIDENTIAL**

MDL-CEN00108051

Health Care Financing Administration                                    1
Common Procedure Coding System (HCPCS)
Alpha-Numeric Coding Recommendation Format

Submitted by Centocor, Inc.
November 4, 1998

INFORMATION SUPPORTING CODING MODIFICATION RECOMMENDATION

1.  Item trade/brand name:          REMICADE™
    Generic name:                    Infliximab
    FDA Classification:              Chimeric (Human Murine) Monoclonal Antibody to
                                     Tumor Necrosis Factor (BB-IND 5389/ODA 95-924)

2.  Describe the item in general terminology.

    Description
    Remicade is indicated in the treatment of patients with Crohn's disease, a chronic and debilitating
    disorder of the gastrointestinal tract that can greatly affect a patient's quality of life. The chronic
    inflammation of Crohn's disease is attributed to an imbalance between pro- and anti-inflammatory
    mediators. Pro- and anti-inflammatory mediators called cytokines regulate inflammation in
    Crohn's disease. Tumor necrosis factor-α and other pro-inflammatory cytokines predominate in
    Crohn's disease, resulting in chronic mucosal inflammation. Crohn's disease is neither medically
    or surgically curable. The goal of treatment is to induce and maintain remission, maintain quality
    of life, and minimize the toxicity of therapy.

    Indication
    REMICADE is indicated for treatment of moderately to severely active Crohn's disease or the
    reduction of the signs and symptoms, in patients who have an inadequate response to conventional
    therapy. It is also indicated as a treatment for patients with fistulizing Crohn's disease for
    reduction in the number of draining enterocutaneous fistula(s).

    Action
    REMICADE is the first of a new class of agents that blocks activity of a key biologic response
    mediator called tumor necrosis factor alpha (TNF-α). It is believed that REMICADE reduces
    intestinal inflammation in patients with Crohn's disease by binding to and neutralizing TNF-α on
    the cell membrane and in the blood and by destroying TNF-α producing cells. This action may
    explain why REMICADE is a particularly effective inhibitor of TNF-α and why REMICADE has
    a rapid and substantial clinical benefit.

    Dosage and Route of Administration
    The recommended dose of Infliximab is 5 mg/kg given as a single intravenous infusion for
    treatment of moderately to severely active Crohn's disease in patients who have had an inadequate
    response to conventional therapy. In patients with fistulizing disease, an initial 5 mg/kg dose
    should be followed with additional 5mg/kg doses at 2 and 6 weeks after the first infusion.

    How Supplied
    Remicade (infliximab) lyophilized concentrate for injection is supplied individually-boxed single-
    use vials in the following strength: NDC 57894-030-01, 100 mg infliximab in a 20-ml vial.

3.  Why are the current code categories inadequate to describe the item?

    There are no current code categories that describe this item. Remicade™ is the first anti-
    TNF inhibitor to receive FDA approval.

HIGHLY CONFIDENTIAL                                    MDL-CEN00108052

Health Care Financing Administration
Common Procedure Coding System (HCPCS)
Alpha-Numeric Coding Recommendation Format

2

Submitted by Centocor, Inc.
November 4, 1998

4.  List any local codes used by any third party payor to process the item.

We are unaware of any local codes in use by third party payers.

5.  If specific codes are not being used, how are you currently billing for the item.

Code J3490 *Unclassified drugs* is being used.  In addition, documentation of the drug administered, the dosage, route of administration and charge is submitted with the claim.

6.  How long has this item been on the market?

Remicade™ was commercially available October 5, 1998.

The review timetable is listed below:

- December 30, 1997:  Infliximab application submitted
- May 28, 1998:  FDA voted unanimously to recommend approval of infliximab
- June 30, 1998:  FDA issues a Complete Review letter for infliximab
- August 24, 1998:  Centocor receives approval for Remicade™ from the FDA
- October 5, 1998:  Product available for wholesaler purchase

➢ Although a time span of 6 months has not elapsed since the approval of Remicade™, Centocor is requesting with this application, that Remicade™ be granted a temporary J-code.  Clinical data accumulated over the past 5 years was substantial enough for the FDA to grant Remicade™ an expedited review, resulting in product approval. Remicade™ is the first agent in its class (anti-TNF inhibitor) to be approved by the FDA.  In addition, Remicade™ is the only FDA approved therapy for the treatment of Crohn's Disease.

7.  How are you currently marketing this product or service?

Centocor sells direct to wholesalers and specialty distributors.  Remicade™ is distributed nationally through these vendors.

8.  Are Medicare carriers currently paying for this item?

Initial claims are just beginning to be filed. Discussions with Medicare carriers suggest that this product will be covered since Remicade™ is the only FDA approved therapy for Crohn's disease.

9.  What is the total Medicare, medicaid and private business annual volume in sales and or rental for the six months of marketing experience prior to submitting the request for coding consideration?  (Do not estimate or provide projections – the information provided must represent actual volume of sales for the drug/product for the specific period of time indicated.)

Six months worth of data is not available.   However, between October 5 and November 3, 1998 eighty-five (85) Medicare orders for Remicade™ have been received.

10.  Of the volume identified in #9, what is the percent of use in the following settings?

3

Health Care Financing Administration
Common Procedure Coding System (HCPCS)
Alpha-Numeric Coding Recommendation Format

Submitted by Centocor, Inc.
November 4, 1998

- Physician office
- Ambulatory Care Clinic
- Patient Home
- Inpatient Facility
- Other

(Based on discussions with clinicians, Remicade™ will be predominantly delivered as an outpatient infusion, either in the physician office or other ambulatory site: infusion center, endoscopy suite, or hospital outpatient department.)

11.  What is the wholesale cost of the item?

Remicade™ AWP:  $585.00 per 100mg vial

12.  What is the retail cost of the item?

Remicade™ List Price:  $450.00 per 100mg vial

13.  List any manufacturers or suppliers of similar items.

None

14.  Identify the difference between this item and that of competitors.

There are no competitors for Remicade™.  Remicade™ is the first agent in its class (anti-TNF inhibitor) to be approved, and the only agent approved by the FDA for use in Crohn's disease.

Recommendation submitted by:

Valerie Asbury, RN, BSN
Director, Corporate Accounts
Centocor, Inc.
200 Great Valley Parkway
Malvern, PA 19355-1307
Phone: (610) 651-6551
Fax: (610) 889-4769
Email: asburyv@centocor.com

_Valerie Asbury_                    11/4/98
Valerie Asbury, Director, Corporate Accounts          Date

**HIGHLY CONFIDENTIAL**                    MDL-CEN00108054

# TAB N

**Alternative Thresholds per Court Discussion, Trial Day 3, November 8, 2006**

ERROR! UNKNOWN DOCUMENT PROPERTY NAME.



Alternative Thresholds per Court Discussion, Trial Day 3, November 8, 2006:
Class 2 Damages from 1991 to 2003

**NOMINAL**

| Drugs by Defendant | Liability Threshold = 0% | | Liability Threshold = 10% | | Liability Threshold = 20% | | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|---|---|---|---|---|---|
| | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts |
| Zoladex | $153,211,134 | $4,049,834 | $139,875,712 | $3,697,339 | $126,540,289 | $3,344,843 | $120,038,886 | $3,172,991 | $113,811,751 | $3,008,389 |
| AstraZeneca Total | $153,211,134 | $4,049,834 | $139,875,712 | $3,697,339 | $126,540,289 | $3,344,843 | $120,038,886 | $3,172,991 | $113,811,751 | $3,008,389 |
| Blenoxane | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cytoxan | $7,059,881 | $186,617 | $5,797,613 | $153,248 | $4,759,753 | $125,815 | $4,333,395 | $114,618 | $4,136,280 | $109,335 |
| Etopophos | $125,498 | $3,317 | $56,671 | $1,498 | $20,175 | $533 | $8,244 | $218 | $2,563 | $68 |
| Paraplatin | $44,366,279 | $1,172,709 | $27,240,232 | $720,043 | $10,117,641 | $267,440 | $3,712,558 | $98,134 | $455,402 | $12,038 |
| Rubex | $300,908 | $7,954 | $279,177 | $7,379 | $257,445 | $6,805 | $246,652 | $6,520 | $225,674 | $5,965 |
| Taxol | $54,357,691 | $1,436,838 | $31,308,057 | $827,567 | $9,391,681 | $248,251 | $3,923,959 | $103,681 | $2,388,762 | $63,142 |
| Vepesid | $22,225,910 | $587,498 | $15,499,807 | $409,707 | $10,893,954 | $287,960 | $9,575,218 | $253,102 | $8,945,797 | $236,412 |
| Bristol-Myers Squibb Total | $128,435,264 | $3,394,933 | $80,181,616 | $2,119,443 | $35,440,649 | $936,804 | $21,805,025 | $576,373 | $16,152,489 | $426,959 |
| Procrit | $116,502,601 | $3,079,517 | $56,513,508 | $1,493,823 | $2,177,938 | $57,570 | $139,556 | $3,689 | $0 | $0 |
| Remicade | $30,910,660 | $817,062 | $17,880,855 | $472,645 | $4,851,051 | $128,228 | $86,895 | $2,297 | $0 | $0 |
| Johnson & Johnson Total | $147,413,262 | $3,896,579 | $74,394,364 | $1,966,468 | $7,028,989 | $185,797 | $226,451 | $5,986 | $0 | $0 |
| Albuterol | $133,534,557 | $3,529,723 | $123,591,304 | $3,425,491 | $125,648,051 | $3,321,269 | $123,676,425 | $3,269,143 | $121,704,798 | $3,217,026 |
| Intron | $4,272,629 | $112,939 | $2,518,288 | $66,595 | $809,792 | $21,405 | $331,549 | $8,764 | $137,583 | $3,637 |
| Proventil | $5,909,052 | $192,627 | $4,226,679 | $111,724 | $2,318,851 | $61,294 | $1,792,981 | $47,393 | $1,322,513 | $34,988 |
| Temodar | $2,066,737 | $54,630 | $944,046 | $24,954 | $100,250 | $2,650 | $23,547 | $622 | $12,623 | $334 |
| Schering-Plough Total | $145,782,975 | $3,879,919 | $137,280,287 | $3,628,734 | $128,876,944 | $3,406,608 | $125,824,481 | $3,325,922 | $123,177,517 | $3,255,985 |

**WITH PREJUDGMENT INTEREST (2005$)**

| Drugs by Defendant | Liability Threshold = 0% | | Liability Threshold = 10% | | Liability Threshold = 20% | | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|---|---|---|---|---|---|
| | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts |
| AstraZeneca Total | $232,767,210 | $6,152,742 | $210,656,693 | $5,568,285 | $188,546,175 | $4,983,847 | $177,892,382 | $4,702,235 | $167,957,621 | $4,439,629 |
| Bristol-Myers Squibb Total | $226,450,710 | $5,959,345 | $139,866,198 | $3,697,097 | $61,223,230 | $1,618,315 | $38,468,208 | $993,965 | $28,765,705 | $707,469 |
| Johnson & Johnson Total | $215,436,196 | $5,694,631 | $109,038,730 | $2,882,224 | $10,895,033 | $287,989 | $382,242 | $10,104 | $0 | $0 |
| Schering-Plough Total | $242,433,774 | $6,408,259 | $224,609,936 | $5,937,121 | $209,005,019 | $5,524,636 | $203,349,982 | $5,375,156 | $198,372,744 | $5,243,593 |

Alternative Thresholds per Court Discussion, Trial Day 3, November 8, 2006:
Class 2 Damages from 1991 to 2004

| NOMINAL | Liability Threshold = 0% | | Liability Threshold = 10% | | Liability Threshold = 20% | | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|---|---|---|---|---|---|
| Drugs by Defendant | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts |
| Zoladex | $180,882,758 | $4,781,279 | $165,704,642 | $4,380,076 | $150,526,526 | $3,978,872 | $143,103,777 | $3,782,666 | $135,955,295 | $3,593,710 |
| AstraZeneca Total | $180,882,758 | $4,781,279 | $165,704,642 | $4,380,076 | $150,526,526 | $3,978,872 | $143,103,777 | $3,782,666 | $135,955,295 | $3,593,710 |
| Blenoxane | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Cytoxan | $7,644,622 | $202,071 | $6,300,343 | $166,749 | $5,231,164 | $138,276 | $4,784,792 | $126,477 | $4,569,733 | $120,782 |
| Etopophos | $127,720 | $3,376 | $56,671 | $1,498 | $20,175 | $533 | $8,244 | $218 | $2,563 | $68 |
| Paraplatin | $52,594,954 | $1,390,244 | $32,767,731 | $866,150 | $12,942,844 | $342,119 | $5,186,644 | $137,099 | $610,852 | $16,147 |
| Rubex | $311,821 | $8,242 | $288,607 | $7,634 | $235,792 | $6,236 | $254,394 | $6,724 | $232,813 | $6,154 |
| Taxol | $54,357,691 | $1,436,838 | $31,308,057 | $827,567 | $9,391,681 | $248,261 | $3,920,958 | $103,881 | $2,386,762 | $63,142 |
| Vepesid | $22,225,910 | $587,498 | $15,499,807 | $409,707 | $10,893,954 | $287,980 | $9,575,218 | $253,102 | $8,943,797 | $236,412 |
| Bristol-Myers Squibb Total | $137,282,718 | $3,628,269 | $86,229,415 | $2,279,305 | $38,745,611 | $1,024,194 | $23,739,249 | $627,500 | $16,748,520 | $442,714 |
| Procrit | $138,548,961 | $3,662,269 | $67,185,793 | $1,775,924 | $2,177,938 | $57,570 | $139,556 | $3,689 | $0 | $0 |
| Remicade | $46,069,498 | $1,217,756 | $26,598,024 | $703,066 | $7,126,549 | $188,376 | $86,895 | $2,297 | $0 | $0 |
| Johnson & Johnson Total | $184,618,460 | $4,880,025 | $93,783,816 | $2,478,990 | $9,304,487 | $245,946 | $226,451 | $5,986 | $0 | $0 |
| Albuterol | $139,506,263 | $3,687,673 | $135,527,905 | $3,582,413 | $131,549,547 | $3,477,253 | $129,560,368 | $3,424,673 | $127,571,189 | $3,372,093 |
| Intron | $4,855,142 | $128,336 | $2,902,548 | $76,723 | $948,809 | $25,106 | $379,488 | $10,031 | $137,583 | $3,637 |
| Proventil | $6,009,052 | $158,827 | $4,226,679 | $111,724 | $2,316,851 | $61,294 | $1,792,981 | $47,393 | $1,322,513 | $34,958 |
| Temodar | $2,944,499 | $77,832 | $1,416,531 | $37,443 | $207,717 | $5,491 | $49,894 | $1,295 | $25,247 | $667 |
| Schering-Plough Total | $154,214,957 | $4,076,388 | $144,073,664 | $3,808,303 | $135,025,925 | $3,569,144 | $131,781,801 | $3,483,392 | $129,056,632 | $3,411,355 |

| WITH PREJUDGMENT INTEREST (2005$) | Liability Threshold = 0% | | Liability Threshold = 10% | | Liability Threshold = 20% | | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|---|---|---|---|---|---|
| Drugs by Defendant | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts | National | Massachusetts |
| AstraZeneca Total | $264,456,743 | $6,990,393 | $240,285,874 | $6,350,165 | $216,015,205 | $5,709,936 | $204,308,286 | $5,400,434 | $193,316,399 | $5,109,936 |
| Bristol-Myers Squibb Total | $235,559,906 | $6,226,582 | $146,792,134 | $3,880,161 | $65,008,070 | $1,718,360 | $39,683,282 | $1,022,516 | $27,449,290 | $725,541 |
| Johnson & Johnson Total | $258,043,574 | $6,820,673 | $131,243,524 | $3,469,164 | $13,500,933 | $356,871 | $382,242 | $10,104 | $0 | $0 |
| Schering-Plough Total | $250,944,878 | $6,633,233 | $232,389,708 | $6,142,764 | $216,046,829 | $5,710,772 | $210,172,302 | $5,555,491 | $205,105,390 | $5,421,557 |

**Alternative Thresholds per Court Discussion, Trial Day 3, November 8, 2006: Class 3 Damages from 1991 to 2003**

| NOMINAL | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|
| Drugs by Defendant | National | Massachusetts | National | Massachusetts |
| Zoladex | $237,932,098 | $6,289,266 | $226,683,514 | $5,991,332 |
| AstraZeneca Total | $237,932,098 | $6,289,266 | $226,683,514 | $5,991,332 |
| Blenoxane | $4,785,782 | $126,503 | $93,493 | $2,471 |
| Cytoxan | $0 | $0 | $0 | $0 |
| Etoppophos | $118,410 | $3,130 | $16,577 | $491 |
| Paraplatin | $89,328,076 | $2,361,212 | $31,980,864 | $845,346 |
| Rubex | $0 | $0 | $0 | $0 |
| Taxol | $71,049,499 | $1,876,053 | $6,942,080 | $183,500 |
| Vepesid | $5,444,875 | $143,919 | $2,716,549 | $71,807 |
| Bristol-Myers Squibb Total | $170,726,441 | $4,512,817 | $41,751,363 | $1,103,615 |
| Procrit | $16,512,634 | $438,479 | $0 | $0 |
| Remicade | $120,742,388 | $3,191,597 | $8,958,183 | $236,791 |
| Johnson & Johnson Total | $137,255,022 | $3,628,066 | $8,958,183 | $236,791 |
| Albuterol | $0 | $0 | $0 | $0 |
| Intron | $14,423,931 | $381,268 | $5,526,601 | $146,143 |
| Proventil | $2,183,124 | $57,707 | $1,337,408 | $35,352 |
| Temodar | $0 | $0 | $0 | $0 |
| Schering-Plough Total | $16,607,055 | $438,975 | $6,866,209 | $181,495 |

| WITH PREJUDGMENT INTEREST (2006$) | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|
| Drugs by Defendant | National | Massachusetts | National | Massachusetts |
| AstraZeneca Total | $302,123,405 | $7,986,037 | $287,176,936 | $7,590,956 |
| Bristol-Myers Squibb Total | $226,423,789 | $5,985,067 | $50,640,054 | $1,338,570 |
| Johnson & Johnson Total | $163,317,057 | $4,316,985 | $11,155,261 | $294,868 |
| Schering-Plough Total | $24,398,497 | $644,926 | $10,648,653 | $281,474 |

**Alternative Thresholds per Court Discussion, Trial Day 3, November 8, 2006: Class 3 Damages from 1991 to October 2006:**

| NOMINAL | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|
| Drugs by Defendant | National | Massachusetts | National | Massachusetts |
| Zoladex | $375,630,746 | $9,929,059 | $359,455,174 | $9,501,489 |
| AstraZeneca Total | $375,630,746 | $9,929,059 | $359,455,174 | $9,501,489 |
| Blenoxane | $4,785,762 | $128,503 | $93,493 | $2,471 |
| Cytoxan | $0 | $0 | $0 | $0 |
| Etopophos | $118,410 | $3,130 | $18,577 | $491 |
| Paraplatin | $115,165,017 | $3,043,896 | $47,199,646 | $1,247,630 |
| Rubex | $0 | $0 | $0 | $0 |
| Taxol | $71,049,499 | $1,878,053 | $8,942,080 | $183,500 |
| Vepesid | $5,444,675 | $143,919 | $2,716,549 | $71,807 |
| Bristol-Myers Squibb Total | $196,553,383 | $5,195,501 | $56,970,345 | $1,505,899 |
| Procrit | $32,604,732 | $881,842 | $0 | $0 |
| Remicade | $247,089,038 | $6,531,312 | $8,958,163 | $238,791 |
| Johnson & Johnson Total | $279,693,770 | $7,393,154 | $8,958,163 | $238,791 |
| Albuterol | $0 | $0 | $0 | $0 |
| Intron | $21,469,804 | $667,512 | $8,953,949 | $236,680 |
| Proventil | $2,183,124 | $57,707 | $1,337,408 | $35,352 |
| Temodar | $0 | $0 | $0 | $0 |
| Schering-Plough Total | $23,652,928 | $625,219 | $10,291,358 | $272,032 |

| WITH PREJUDGMENT INTEREST (2005$) | Liability Threshold = 25% | | Liability Threshold = 30% | |
|---|---|---|---|---|
| Drugs by Defendant | National | Massachusetts | National | Massachusetts |
| AstraZeneca Total | $445,922,342 | $11,787,078 | $425,829,199 | $11,255,958 |
| Bristol-Myers Squibb Total | $254,504,160 | $6,727,316 | $67,186,909 | $1,775,964 |
| Johnson & Johnson Total | $312,289,442 | $8,254,766 | $11,155,281 | $294,868 |
| Schering-Plough Total | $31,774,022 | $839,884 | $14,249,904 | $376,688 |

# TAB O



Nov 16 2006
4:15PM

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY ) | MDL NO. 1456 |
| AVERAGE WHOLESALE PRICE  ) | Civil Action No. 01-12257-PBS |
| LITIGATION  ) |  |
|  ) |  |
|  ) | Hon. Patti B. Saris |
| THIS DOCUMENT RELATES TO  ) |  |
| TRIAL OF CLASS 2 AND  ) |  |
| CLASS 3 CLAIMS  ) |  |

## TRIAL DECLARATION OF JAYSON S. DUKES

## I.    QUALIFICATIONS AND COMPENSATION

1.  I am a Managing Director in the Forensic and Litigation Consulting Practice of FTI Consulting ("FTI"). FTI is a multi-disciplinary consulting firm with practices in financial restructuring, forensic and litigation consulting, and economic consulting.

2.  I am a Certified Public Accountant and I received a Bachelor's Degree in Accounting from the University of Georgia.

3.  I have assisted in resolving disputes across a wide variety of industries for nearly 15 years. I have advised healthcare providers, pharmaceutical companies, and other life sciences clients on financial, accounting, and economic matters. My current clients include Bristol-Myers Squibb, Wyeth, Johnson & Johnson, and HCA.

4.  I have particular expertise in the analysis of pharmaceutical pricing practices, including rebating, discounting, and other commonly used financial incentives. My curriculum vitae is annexed to this Declaration as DX 2784A.

5.  While I have directed all of the work connected with this engagement, I have been assisted by several other FTI employees.

6.  FTI's fees for this engagement are based upon time expended and expenses incurred. My billing rate is $424 per hour. The rates charged by the other FTI employees who have assisted me in this engagement range from $195 per hour to $495 per hour.

## II.   SCOPE OF ASSIGNMENT

7.  FTI was retained by Patterson, Belknap, Webb & Tyler LLP, attorneys for the Johnson & Johnson Defendants, to perform data analyses and financial calculations relating to Procrit®, a product sold by Ortho Biotech Products, L.P., and Remicade, a product sold by Centocor, Inc.

### A.    Initial Assignment

8.  FTI was asked to calculate the average selling price ("ASP") for Procrit and Remicade, based on units sold at each price point, by product National Drug Code ("NDC"), by year. We were asked to calculate ASPs excluding the same classes of trade purportedly excluded by plaintiffs' expert, Dr. Raymond S. Hartman, as described in his reports dated December 15, 2005 and February 3, 2006.[1]

9.  Based on these ASP calculations, FTI was asked to calculate the "spreads" between

---

[1] The methodologies used by Dr. Hartman and FTI to calculate ASPs for purposes of this litigation differ from the methodology that CMS requires manufacturers to use to calculate the ASPs that they submit pursuant to the Medicare Modernization Act.

the above-described ASPs and the published AWPs for Procrit and Remicade, again using Dr. Hartman's methodologies for calculating the "spread".

**B.     Subsequent Assignment**

10. Dr. Hartman submitted his Direct Testimony in this case on November 1, 2006. Dr. Hartman's Direct Testimony includes revised ASP and "spread" calculations that differ from those within his reports dated December 15, 2005 and February 3, 2006. FTI was asked to examine and comment on Dr. Hartman's revised calculations.

**III.    SUMMARY OF PRIOR REPORTS AND OPINIONS**

11. Dr. Hartman's theory of liability is based on the size of the "spread" between a drug's ASP and its AWP. In order to determine liability, Dr. Hartman proposed a definition of ASP, and then attempted to calculate ASPs in accordance with his definition. He then determined the difference between the ASP and the AWP, to determine the size of the "spread." Finally, he expressed the "spread" as a percentage, calculated as the difference between the ASP and the AWP, divided by the ASP.

12. In order for Dr. Hartman's "spread" calculations to be reflect a true average, he must correctly calculate the drug's ASP, and he must determine the difference between that ASP and the correct AWP. If either the ASP or the AWP is incorrect, the resulting "spread" will also be incorrect.

13. My review of the ASP and "spread" calculations in Dr. Hartman's December 15, 2005 and February 3, 2006 reports uncovered numerous calculation errors resulting from Dr. Hartman's failure to correctly apply his intended methodology. That methodology required him to comprehensively identify and remove from his calculations all sales transactions pertaining to units of Procrit and Remicade distributed to hospitals, managed care entities, and the government. As a result of these and other errors, many of Dr. Hartman's original calculations <u>understated</u> the ASPs for Procrit and Remicade, and therefore <u>overstated</u> the size of their "spreads."

14. Specifically, in his December 15, 2005 report, Dr. Hartman examined 116 Procrit NDCs during the period 1991 to 2003, and concluded that the "spread" on 16 Procrit NDCs exceeded 30% in particular years. He also concluded that the "spread" on Remicade exceeded 30% in each year from 1998 to 2003.

15. I submitted a responsive report in which I pointed out numerous errors in Dr. Hartman's December 15, 2005 calculations and observations, which resulted in inaccurate reporting of "spreads" for Procrit and Remicade.[2]

---

[2] <u>See</u> Number 30 and Number 32 within Declaration of Jayson S. Dukes in Support of the Johnson & Johnson Defendants' Motion for Summary Judgment as to Class 1 and Class 2 (Corrected) (May 8, 2006), detailing errors in Dr. Hartman's ASP and "spread" calculations.

## IV.    COMMENTS ON DR. HARTMAN'S DIRECT TESTIMONY

16.   As part of his Direct Testimony dated November 1, 2006, Dr. Hartman revised his ASP and "spread" calculations for Procrit and Remicade.  These revised calculations differ from the calculations in his reports dated December 15, 2005 and February 3, 2006.[3]

### A.    Dr. Hartman's Revised Procrit Calculations

17.   Based on his revised ASP and "spread" calculations for Procrit, Dr. Hartman has now concluded that none of the "spreads" on any of Procrit's NDCs ever exceeded 30%.[4] While I have not reviewed Dr. Hartman's revised Procrit calculations in detail, they appear generally consistent with my calculations.

18.   Based on his revised ASP and "spread" calculations, Dr. Hartman finds no liability or damages for Procrit for Class 3.[5]

19.   Dr. Hartman finds liability and damages for Procrit for Class 2 based on a legal theory that Medicare and Massachusetts law required a "spread" of "zero." Inasmuch as this is a legal theory, I am unable to comment further.

### B.    Dr. Hartman's Revised Remicade Calculations

20.   I was advised by Centocor that during the period at issue in this case, Centocor did not extend discounts or rebates to physicians for purchases of Remicade.  Nevertheless, in his December 15, 2005 report, Dr. Hartman calculated the following ASPs and "spreads" on Remicade:

| Remicade "ASPs" Per Hartman Dec. 2005 Report | | | | | |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| $447.26 | $458.23 | $486.17 | $508.25 | $516.65 | $514.98 |

| Remicade "Spreads" Per Hartman Dec. 2005 Report | | | | | |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| 30.8% | 33.4% | 31.9% | 36.1% | 33.9% | 34.3% |

---

[3] See Direct Testimony of Raymond S. Hartman (Nov. 1, 2006) ("Hartman Direct") at Attachment G.3.a ("Johnson & Johnson Annual Average Sales Price") and Attachment G.3.c ("Johnson & Johnson Annual Spreads").

[4] See Hartman Direct at Attachment G.3.c (Johnson & Johnson Annual Spreads).

[5] See Hartman Direct at Attachment I.3 ("Johnson & Johnson Drugs Subject to Liability") and Attachment J.3.a ("Summary of Johnson & Johnson Massachusetts Damages by Class and By Drug").

21. In his November 1, 2006 Direct Testimony, Dr. Hartman revised his ASP and "spread" calculations for Remicade as follows[6]:

| Revised Remicade "ASPs" Per Hartman Nov. 2006 Testimony | | | | | |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| $450.68 | $462.77 | $499.15 | $524.32 | $532.24 | $532.18 |

| Revised Remicade "Spreads" Per Hartman Nov. 2006 Testimony | | | | | |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| 29.8% | 32.1% | 28.5% | 31.9% | 29.9% | 30.0% |

## C.   Dr. Hartman's Revised "Spread" Calculations Used the Wrong AWPs

22. As discussed below, Dr. Hartman's revised calculations of Remicade's "spreads" in 1999 and 2001 are incorrect because he used the wrong AWPs. Correcting for this error, I conclude that the Remicade "spreads" in 1999 and 2001 were less than 30%.

23. As noted above, in order to accurately calculate the "spread" in a given year, Dr. Hartman must accurately calculate the ASP and must also select the appropriate AWP, since the "spread" is simply the difference between the ASP and the AWP. In calculating the "spreads" for Remicade, Dr. Hartman used the following AWPs[7]:

| Remicade "AWPs" Per Hartman Nov. 2006 Testimony | | | | | |
|---|---|---|---|---|---|
| 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
| $585.00 | $611.33 | $641.28 | $691.61 | $691.61 | $691.61 |

24. Selecting the right AWP to use in the "spread" calculation is seemingly non-controversial given that AWPs are published. Indeed, in a year where the AWP does not change, there would only be one AWP to choose from. That was the case in three out of four years in which Dr. Hartman concludes that Remicade's "spread" was at/less than 30% (i.e., in 1998, 2002, and 2003).

25. However, that was not the case in either of the two years in which Dr. Hartman concludes that Remicade's "spread" was greater than 30% (i.e., in 1999 and 2001). In those years, Remicade's list price and AWP changed during the year, because Centocor increased the list price. Consequently, in each of those years, Dr. Hartman had to select which AWP, if either, to use in calculating Remicade's "spread."

---

[6] See Hartman Direct at Attachment G.3.a ("Johnson & Johnson Annual Average Sales Price") and Attachment G.3.c ("Johnson & Johnson Annual Spreads").

[7] See Hartman Direct at Attachment G.3.b ("Johnson & Johnson Annual AWPs").

26. In 1999, Remicade's AWP was $585.00 for part of the year (from January 1, 1999 through June 17, 1999), and $611.33 during the rest of the year (from June 18, 1999 through December 31, 1999). In 2001, Remicade's AWP was $665.65 for part of the year (from January 1, 2001 through June 13, 2001), and $691.61 during the rest of the year (from June 14, 2001 through December 31, 2001). In performing his "spread" calculations, Dr. Hartman chose to use the AWPs in effect on June 30th during those years, (i.e., $611.33 in 1999, and $691.61 in 2001).[8]

27. Dr. Hartman's finding that Remicade's spread was 32.1% 1999 and 31.9% in 2001 is driven by his decision to compare his ASP figures to the AWPs in effect on June 30th, which were the higher of the two AWPs in effect during each of those years, as follows:[9]

|  | 1999 | 2001 |
|---|---|---|
| Higher AWP | $611.33 | $691.61 |
| ASP | $462.77 | $524.32 |
| Difference (% Spread) | $148.56 (32.1%) | $167.29 (31.9%) |

28. Alternatively, instead of choosing the AWPs in effect on June 30th 1999 and 2001, Dr. Hartman should have based his calculations on a "weighted average" of the AWPs. Since Dr. Hartman's ASPs are based on units sold at each price point and he is in effect calculating a weighted average selling price, it is logical and appropriate that a weighted average ASP should be compared to a weighted average AWP. The effect on the "spreads" of using a weighted average AWP is illustrated in the following table:

|  | 1999 | 2001 |
|---|---|---|
| Weighted Average AWP | $598.47 | $679.89 |
| ASP | $462.77 | $524.32 |
| Difference (% Spread) | $135.70 (29.3%) | $155.57 (29.7%) |

29. A table showing all Procrit and Remicade "spreads" from 1991 through 2003, based on a comparison of Dr. Hartman's November 1, 2006 ASPs with the weighted average AWPs FTI calculated, is attached as DX 2873.

---

[8] According to Plaintiffs' counsel, Dr. Hartman picked whichever AWP was in effect as of June 30th. See Letter from Thomas M. Sobel to Andrew D. Schau (Nov. 7, 2006).

[9] Had he elected to compare his ASPs to the lower of the AWPs in effect during those years, he would have concluded that Remicade's spread was 26.4% in 1999 and 27.0% 2001.

### D.    Remicade "Damages" Analysis

30. Based on his conclusion that the Remicade "spread" was 32.1% in 1999 and 31.9% in 2001, Dr. Hartman finds damages for Class 3 of $27,868 in 1999 and $208,923 in 2001[10]. Dr. Hartman does not find damages for Class 3 in 1998, 2000, 2002, and 2003.

31. Based on my conclusion that Remicade's "spreads" in 1999 and 2001 were less than 30%, I conclude, contrary to Dr. Hartman, that there is no liability or damages for Class 3 in 1999 and 2001, even assuming that Dr. Hartman's liability and damages theories are accepted.

32. Dr. Hartman finds liability and damages for Remicade for Class 2 in all years based on a legal theory that Medicare and Massachusetts law required a "zero" spread. Inasmuch as this is a legal theory, I am unable to comment further.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   11 | 16         , 2006

Jayson S. Dukes

---

[10] See Hartman Direct at Attachment J.3.a ("Summary of Johnson & Johnson Massachusetts Damages by Class and by Drug").

7

**Attachment 1**

**Curriculum Vitae**

**Name:**        Jayson S. Dukes

**Addresses:**

**Business:**   FTI Consulting, Inc.                    **Home:** 755 East Morningside Drive
                One Atlantic Center                            Atlanta, Georgia 30324
                1201 West Peachtree Street
                Suite 500
                Atlanta, Georgia 30309

**Telephone:**  (404) 460-6221                                   (404) 873-3735

**Birth:**      September 7, 1969
                Laramie, Wyoming

**Education:**  B.B.A. University Georgia, June 1991
                Major in Accounting

**Professional Certifications:**

- Certified Public Accountant – 1996





# Attachment 1

**Relevant Work Experience**

**FTI Consulting, Inc.**
**Managing Director**                                          2005 - Present
**Director**                                                   2003 - 2004

Manage engagements occurring in the Atlanta Office of FTI's Dispute Advisory Services Practice. This Practice regularly conducts Dispute Advisory Services and Investigative Advisory Services.

**KPMG, LLP**
**Director**                                                   2002 – 2003

Managed engagements occurring in the Atlanta Office of KPMG's Forensics Practice. This Practice regularly conducts Dispute Advisory Services and Investigative Advisory Services.

**Arthur Andersen**
**Director**                                                   1999 - 2002
**Manager**                                                    1995 – 1999
**Sr. Consultant**                                             1993 – 1995

Managed engagements occurring in the Atlanta and Los Angeles Offices of Arthur Andersen's Value Solutions Practice. This Practice regularly conducted Legal Consulting Services, Corporate Recovery Services and Bankruptcy Consulting Services.

**Arthur Andersen**
**Staff Accountant**                                           1991 – 1993

Performed audit, and management consulting services for clients including banks, manufacturers, and not-for-profit organizations.

*Annual Spread Calculations based on Hartman's Direct Testimony Dated November 1,2006 and FTI's Weighted Average AWPs*

| NDC | Product | Description | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 00062740003 | Procrit | PROCRIT 4000U/ML AMG | 22.6% | 23.7% | 21.8% | | | | | | | | | | |
| 00062740103 | Procrit | PROCRIT 10000U/ML AMG | 22.8% | 23.0% | 22.8% | | | | | | | | | | |
| 00062740201 | Procrit | PROCRIT 20000U/ML AMG | 24.4% | 24.8% | 22.3% | | | | | | | | | | |
| 00062740501 | Procrit | PROCRIT 30000U/ML AMG | 21.0% | 25.2% | 21.4% | | | | | | | | | | |
| 59676030201 | Procrit | PROCRIT 2000 U/ML 6S | | | | 22.4% | 21.6% | 21.9% | 21.5% | 21.4% | 22.8% | 20.5% | 22.2% | 19.8% | 17.6% |
| 59676030202 | Procrit | PROCRIT 2000 U/ML, INSTITUTIO | | | 20.5% | 21.4% | 22.0% | 23.2% | | 24.7% | 22.7% | 19.4% | 25.3% | 27.6% | 21.8% |
| 59676030301 | Procrit | PROCRIT 3000 U/ML 6S | | | | 22.7% | 22.1% | 22.1% | | 21.5% | 22.5% | 21.2% | 22.7% | 20.5% | 18.6% |
| 59676030302 | Procrit | PROCRIT 3000 U/ML 25S | | | 21.5% | 22.5% | 23.4% | 24.4% | 21.7% | 23.6% | 22.1% | 19.7% | 24.1% | 24.6% | 20.8% |
| 59676030401 | Procrit | PROCRIT 4000 U/ML 6S | | | | 22.7% | 21.6% | 21.7% | 21.2% | 21.0% | 22.2% | 21.3% | 22.7% | 20.9% | 19.1% |
| 59676030402 | Procrit | PROCRIT 4000 U/ML 25S | | | 23.8% | 23.4% | 24.2% | 25.3% | | 23.0% | 22.6% | 19.8% | 24.1% | 21.1% | 20.7% |
| 59676031001 | Procrit | PROCRIT 10000 U/ML 6S | | | 22.8% | 22.5% | 21.8% | 22.1% | 22.2% | 21.5% | 23.2% | 22.0% | 23.3% | 21.4% | 21.1% |
| 59676031002 | Procrit | PROCRIT 10000 U/ML 25S | | | 24.4% | 22.4% | 22.3% | 24.2% | | 25.6% | 25.5% | 23.0% | 26.8% | 23.5% | 24.4% |
| 59676031201 | Procrit | PROCRIT 10,000 U/ML, MULTIDOS | | | | | 20.5% | 23.4% | 26.4% | 24.9% | 25.0% | 22.7% | 25.8% | 23.7% | 24.3% |
| 59676032001 | Procrit | PROCRIT 20,000 U/ML - 1ML | | | | | | | 23.4% | 25.0% | 25.6% | 25.7% | 27.3% | 25.6% | 26.0% |
| 59676034001 | Procrit | PROCRIT 40000 U/ML 4S | | | | | | | | 25.0% | 24.4% | 25.3% | 27.2% | 25.5% | 26.0% |
| 57894000001 | Remicade C16SI | REMICADE 1PCK US PD | | | | | | | | 29.8% | 29.3% | 28.5% | 29.7% | 29.9% | 30.0% |



DEFENDANT'S
EXHIBIT
2813

PENGAD 800-631-6989

Contains Confidential Information
Subject to Protective Order

# TAB P

1                  IN THE UNITED STATES DISTRICT COURT

                   FOR THE DISTRICT OF MASSACHUSETTS

2

3

       In Re:                        )

4      PHARMACEUTICAL INDUSTRY       ) CA No. 01-12257-PBS

       AVERAGE WHOLESALE PRICE       ) MDL No. 1456

5      LITIGATION                    ) Pages 17-1 - 17-132

6

7

                   BENCH TRIAL - DAY SEVENTEEN

8

                BEFORE THE HONORABLE PATTI B. SARIS

9                   UNITED STATES DISTRICT JUDGE

10

11

12

13

                              United States District Court

14                            1 Courthouse Way, Courtroom 19

                              Boston, Massachusetts

15                            December 11, 2006, 9:15 a.m.

16

17

18

19

20

21

22

                   TIMOTHY J. WILLETTE, RDR, CRR

23                    OFFICIAL COURT REPORTER

                   United States District Court

24                 1 Courthouse Way, Room 3205

                      Boston, MA  02210

25                      (617) 345-6787

4

1

2

3

4

I N D E X

5

6

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Raymond Hartman (Resumed) | | 17-6 | 17-51 | 17-76 |
| | | | | 17-94 |
| Jayson Dukes | 17-99 | 17-109 | 17-129 | |

7

8

9

10

11

12

| EXHIBITS | PAGE |
|----------|------|
| 2961 | 17-43 |
| 4007 | 17-52 |
| 4012 | 17-58 |
| 4028, 4029, 4030, | |
| 4032, 4033, 4034 | 17-65 |
| 4008 | 17-68 |
| 4009 | 17-70 |
| 4010 | 17-72 |
| 4011 | 17-75 |
| 2658, 2655, 2656 | 17-91 |
| 2784-A, 2873 | 17-109 |

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  And where does that put you.

2          THE WITNESS:  It puts you around -- let me see.

3     Q.   Is it still below 30 percent?

4     A.   Yes.

5          THE COURT:  That's all that matters.

6     Q.   And in his direct testimony, Dr. Hartman was asked some

7     questions about the year 2000 when there were two price

8     increases in effect that year.  Did you look at the effect of

9     the price increases in 2000 on the calculation of the spread?

10    A.   Yes.

11    Q.   Okay.  And if you can take a look at slide 9, please.

12    Did you find that in 2000, there was any effect on the

13    calculation of the spread?

14    A.   Not as it is rounded to one decimal point, no.

15    Q.   Lastly, can you take a look at slide 10, please?  And

16    can you explain to the Court what's shown on slide 10?

17    A.   Slide 10 are -- the first line are Hartman's spread

18    calculation based on his November 1 declaration.

19    Q.   That's for Remicade?

20    A.   That's for Remicade, yes.

21    Q.   And what's on line 2?

22    A.   The line 2 is taking Hartman's ASP calculations per his

23    November 1 declaration and comparing those to a weighted

24    average AWP in order to calculate the spread.

25    Q.   And is it fair to say when you compare Dr. Hartman's

1    ASPs to a weighted average AWP, all of the spreads for

2    Remicade are equal to or less than 30 percent?

3    A.   Yes.

4            THE COURT:  Is that still true if you just average?

5            THE WITNESS:  I believe so, yes.

6            MR. SCHAU:  Your Honor, I offer Defendants' Exhibit

7    2784-A, which is his curriculum vitae attached to his direct

8    testimony, and 2873, which is a calculation of weighted

9    average spreads for all Procrit and Remicade NDCs.

10           THE COURT:  Okay, fine.  Thank you.

11           Any cross?  We can finish this by 1.

12           MR. SOBOL:  Gee, thanks.

13           THE COURT:  I mean, this is really just identical

14    to what his direct was, so --

15           MR. SOBOL:  Right.

16                    CROSS-EXAMINATION

17    BY MR. SOBOL:

18    Q.   Good afternoon.  Before you prepared your report in this

19    case, you had been working on the AWP case, correct?

20    A.   Yes.

21    Q.   And by the time that you had sat down to prepare your

22    report for the direct testimony, before you had done that,

23    your firm had billed the lawyers in this case more than

24    $2.5 million for the work you had already done even before

25    you did this report, correct?