**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | ) ) ) MDL No. 1456 ) |
| THIS DOCUMENT RELATES TO 01-CV-12257-PBS AND 01-CV-339 | ) Civil Action No. 01-CV-12257 PBS ) ) Judge Patti B. Saris ) Chief Magistrate Judge Marianne B. Bowler ) |

**THE BMS DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. P. 52(c)**

**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, Massachusetts
(617) 371-1000

*Of Counsel*:
  Thomas E. Dwyer, Jr.

**HOGAN & HARTSON L.L.P.**
875 Third Avenue
New York, New York 10022
(212) 918-3000

*Of Counsel*:
  Steven M. Edwards, Esq.
  Lyndon M. Tretter, Esq.

*Attorneys for Defendants Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.*

The BMS defendants move for judgment pursuant to Rule 52(c) on the grounds set forth in the memorandum filed on behalf of all defendants and set forth the following additional grounds that apply to BMS only:[1]

1.  For most years, most of the drugs at issue in the case either (1) satisfy Dr. Hartman's 30% yardstick or (2) are multi-source drugs as to which plaintiffs have failed to demonstrate that any class representatives made reimbursements for the version manufactured by BMS.  Of the 320 spreads depicted by Dr. Hartman in Attachment G.2.c of his direct testimony for subject drug NDCs from 1993-2002, the period for which BMS data was available and produced, 111 are for single source drugs where Dr. Hartman has calculated spreads of 30% or less.[2]  Dr. Hartman has testified that those spreads were within the expectations of both Medicare and TPPs.[3]  For the 191 multi-source NDCs for the years at issue in the case, plaintiffs have conceded that they cannot identify the source of the drug, and they therefore have no claim under Mass. G.L. c. 93A.  Roberts v. Enterprise Rent-A-Car of Boston, Inc., 840 N.E.2d 541, 543-44 (Mass. 2006) (plaintiff must have purchased defendant's product or service to state a claim under Chapter 93A).[4]  This leaves only 18 spreads remaining in the case.[5]

2.  Plaintiffs have failed to demonstrate that BMS engaged in deceptive or unfair acts or practices.  The testimony of Denise Kaszuba, who plaintiffs called as a witness in

---

[1] This motion relies on plaintiffs' evidence only.

[2] Hartman Direct Test. Attach. G.2.c.

[3] 11/20/06 (Hartman) Tr. 119.

[4] 12/11/06 (Hartman) Tr. 60.

[5] They are Cytoxan Tablets (NDC 00015050301 -- 30.8% in 1999; NDC 00015050401 -- 31% in 1999); Paraplatin (NDC 00015329 -- 35.2% in 1998, 67.5% in 1999, 46.9% in 2001; NDC 00015321330 -- 45.8% in 1997; NDC 00015321330 – 35.6% in 2002; NDC 00015321429 -- 35.3% in 1998, 39.5% in 2001; NDC 00015321430 -- 36% in 2002; NDC 00015321529 -- 33.6% in 1998, 30.2% in 1999, 65.4% in 2001; NDC 00015321530 -- 38% in 2002); Taxol (NDC 00015347527 -- 30.2% in 1999; NDC 00015347627 -- 30.7% in 1998); Vepesid (NDC 00015306220 -- 41.7% in 1993; and Vepesid Capsules (NDC 00015309145 -- 30.1% in 1999).   BMS of course does not accept that Dr. Hartman's 30% expectation theory has any scientific basis at all or that his theory of payor expectation of an AWP/ASP relationship (even if one existed, which it does not) could plausibly be based on expectations about individual NDCs.

their case, demonstrates that BMS did not report AWPs to industry publications and did not control the way those publications establish AWPs.[6] In addition, plaintiffs have failed to demonstrate that the list prices that BMS submitted to the publications were themselves deceptive or unfair or that BMS's act of providing those list prices to the publications was deceptive or unfair in any way.[7] Plaintiffs called former BMS employee Christof Marre as a witness in their case, and he testified that even after the products at issue lost exclusivity, there were still substantial sales at or near list price.[8] Furthermore, plaintiffs have conceded that it is common knowledge that the industry publications mark-up BMS's list prices to establish AWPs.[9] In addition, BMS has no duty under Mass. G.L. ch. 93A to control the conduct of publications vis-a-vis payors, with whom BMS does not have any direct relationship.[10]

       3.    Plaintiffs have not demonstrated causation. Plaintiffs have conceded that "during the 1990s, the relevant Medicare agencies were presented with increasingly compelling and consistent information sufficient to make it clear that AWP was no longer the reliable benchmark it has been and had been believed to be," and they do not dispute that in October 1996 Medicare received a letter from Ven-A-Care that identified all of the spreads on BMS drugs then in existence.[11] Nor do plaintiffs dispute that in 1992, the OIG concluded in a published report that "AWP is not a reliable indicator of the cost of drugs to physicians" and identified spreads in excess of 400%.[12] In addition, in 1996 an article appeared in Barron's

---

[6] 11/13/06 (Kaszuba) Tr. 110.
[7] 11/27/06 (Rosenthal) Tr. 53, 56.
[8] 11/14/06 (Marre) Tr. 158.
[9] 11/27/06 (Rosenthal) Tr. 53.
[10] See e.g., John Boyd co. v. Boston Gas Co., 777 F. Supp. 435, 440 (D. Mass. 1991) (even where a subsequent purchaser is foreseeable, "some business connection between the parties is an essential element of liability under the statute.")
[11] 11/21/06 (Hartman) Tr. 14-16, 22.
[12] 11/20/06 (Hartman) Tr. 123; DX 1053 at 2 and App. III.

which publicly disclosed that multi-source drugs had spreads exceeding 400% (using Dr. Hartman's methodology), and in 1997 the OIG published another report showing that spreads for multi-source drugs were as high as 900%.[13] Notwithstanding this publicly available information, neither Medicare nor TPPs changed their reimbursement rates for physician administered drugs. In fact, Medicare expressly told its carriers in 2000 to use published AWPs instead of lower Department of Justice prices for BMS drugs.[14] This demonstrates that in the "but for" world -- i.e., a world in which there was no allegedly deceptive conduct -- reimbursement rates would not have been any different. This is also confirmed by the decision of Blue Cross/Blue Shield of Massachusetts and other TPPs not to change their reimbursement rates even after ASPs became publicly available.[15]

4.  Plaintiffs have also failed to demonstrate that, for multi-source drugs, the AWP of the BMS drug had any bearing on reimbursement amounts. Once multi-source competition occurs, reimbursement was based on the median of the generic AWPs (prior to 1998) or the lower of the brand or the median of the generic AWP, (after 1998). Since generic AWPs were always below brand AWPs, and BMS did not change its list prices after its drugs lost exclusivity,[16] the reimbursement amount could not have been based on the AWP for the BMS drug.

5.  Most of plaintiffs' claims are barred by the statute of limitations. Plaintiffs commenced this litigation in December 2001 and therefore cannot demonstrate that they were deceived after that date. Plaintiffs were on notice of the alleged deception as of

---

[13] DX 2641; DX 1075.

[14] DX 1091. This document was offered during BMS's case, but it is a public record of which the Court can take judicial notice.

[15] DX 990.

[16] 11/14/06 (Marre) Tr. at 155.

December 1997 and therefore cannot demonstrate that the statue of limitations should be tolled for damages allegedly suffered by them prior to that date.  Accordingly, plaintiffs' damages, if any, must be limited to the time period December 1997 through December 2001.

6.     Plaintiffs have failed to prove damages with the requisite degree of certainty.[17]  Plaintiffs' witnesses have admitted that in the "but for" world reimbursement for services would be higher than they were.[18]  Nevertheless, plaintiffs' damages expert, Dr. Hartman, has failed to take that into account.[19]  He testified that he was instructed by plaintiffs not to do so.[20]

### Conclusion

All of the foregoing demonstrates that plaintiffs have failed to establish a claim under Mass. G.L. ch. 93A and judgment should be entered for BMS.

Dated:    December 14, 2006

Respectfully Submitted,

By:   /s/ Jacob T. Elberg
Thomas E. Dwyer (BBO No. 139660)
Jacob T. Elberg (BBO No. 657469)
**DWYER & COLLORA, LLP**
600 Atlantic Avenue
Boston, MA  02210
Tel: (617) 371-1000
Fax: (617) 371-1037
tdwyer@dwyercollora.com
jelberg@dwyercollora.com

Steven M. Edwards (SE 2773)
Lyndon M. Tretter ((LT 4031)
Admitted *pro hac vice*
**HOGAN & HARTSON LLP**
875 Third Avenue

---

[17] Damon v. Sun Co., 87 F.3d 1467, 1472 (1st Cir. 1996) (damages must be proven with "a fair degree of certainty").

[18] 11/7/06 (Deveaux) Tr. at 153.

[19] 11/21/06 (Hartman) Tr. 47, 58, 59.

[20] 11/21/06 (Hartman) Tr. 50.

New York, NY  10022  
Tel: (212) 918- 3000

*Attorneys for Defendants Bristol-Myers Squibb Company and Oncology Therapeutics Network Corporation*

Case 1:01-cv-12257-PBS   Document 3495   Filed 12/14/06   Page 7 of 7

## CERTIFICATE OF SERVICE BY LEXIS-NEXIS FILE & SERVE

      I, Lyndon M. Tretter, hereby certify that I am one of Bristol-Myers Squibb Co. and Oncology Therapeutics Network Corp.'s attorneys and that, on December 14, 2006, I caused a copy of **THE BMS DEFENDANTS' MEMORANDUMD IN SUPPORT OF THEIR MOTION FOR JUDGMENT PURSUANT TO FED. R. CIV. P. 52(C)** to be served on all counsel of record by electronic service pursuant to Paragraph 11 of CMO No. 2 by sending a copy to Lexis-Nexis File & Serve for posting and notification to all parties.

                                      /s/ Lyndon M. Tretter
                                          Lyndon M. Tretter

\\\NY - 058559/000059 - 968807 v2      7