# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

In re:  **PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION**

**THIS DOCUMENT RELATES TO:**

*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS

**MDL No. 1456**
**Master File No. 01-CV-12257-PBS**

**Hon. Patti B. Saris**

---

## DEY DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE UNITED STATES' COMPLAINT

Martin F. Murphy (BBO # 363250)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02110
Telephone:  (617) 832-1000
Facsimile:  (617) 832-7000

Paul F. Doyle (BBO # 133460)
Sarah L. Reid
William Escobar (*pro hac vice*)
Neil Merkl (*pro hac vice*)
Christopher C. Palermo (*pro hac vice*)
Philip D. Robben (*pro hac vice*)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7897

*Attorneys for Defendants*
*Dey, Inc., Dey L.P., Inc. and Dey L.P.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF ARGUMENT ................................................................................. 1

STATEMENT OF FACTS ....................................................................................... 5

    A.    Dey Reports AWP and WAC Prices ................................................... 5

    B.    Dey Complies With Regulations Governing The Medicare And Medicaid Programs ................................................................................. 6

        1.    Medicare ................................................................................. 6

        2.    Medicaid ................................................................................. 7

    C.    Dey Entered Into A Rebate Agreement With CMS That Required Dey To Report Average Manufacturer Price To CMS ....................................... 7

    D.    Publicly Released Statements By The Government Acknowledge That "AWP" Is An Undiscounted Universal "List" Price ............................... 10

ARGUMENT ......................................................................................................... 11

I.    ALL CAUSES OF ACTION ALLEGED IN THE U.S. COMPLAINT ARE BARRED BY THE APPLICABLE STATUTES OF LIMITATION ............................. 11

    A.    All Claims Based On Payment Requests Submitted To The Government Accruing Before August 24, 2000 Are Time Barred ............................ 12

    B.    All Post-2000 Claims Should Also Be Deemed To Have Accrued Against Dey By 1996 At The Latest ............................................................... 12

    C.    The U.S. Complaint Does Not "Relate Back" To Ven-A-Care's Original Complaints Against Dey ................................................................... 15

    D.    The Continuous Tort Doctrine Does Not Save The Government's Claims ........ 18

II.    THE REBATE AGREEMENT AND 42 U.S.C. § 1396r-8 BAR THE GOVERNMENT'S CLAIMS ................................................................................. 19

    A.    The Terms Of The Rebate Agreement Bar The Unjust Enrichment Claim ........ 19

    B.    The Rebate Agreement Bars The Government's Fraud-Based Claims ............... 21

III.    THE U.S. COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY .......................................................... 23

    A.    The Failure To Adequately Allege False Claims Submitted For Payment Requires Dismissal Of The FCA Claims ............................................. 23

    B.    The Common Law Claims Also Fail To Meet The Rule 9(b) Standard .............. 27

**TABLE OF CONTENTS**
**(continued)**

Page

IV.   THE COMPLAINT SHOULD BE DISMISSED UNDER FED R. CIV. P.
12(b)(6) BECAUSE NONE OF THE COUNTS STATE A CLAIM FOR WHICH
RELIEF CAN BE GRANTED ................................................................................ 28

    A.   The Complaint Does Not Allege The Necessary Elements of The FCA
Causes Of Action .................................................................................... 29

        1.   The FCA Claim Must Be Dismissed Pursuant to
Rule 12(b)(6) Because The Government Cannot Allege
That AWPs and WACs Were "False" ..................................... 29

        2.   There Is No "Falsity" Because Relevant Government
Officials and Agencies Knew that AWPs and WACs
Did Not Represent Actual Acquisition Cost............................ 31

        3.   The Government's Knowledge Also Precludes Any Finding
That Dey "Knowingly" Submitted or Caused the Submission
of False Claims ........................................................................ 32

        4.   The Complaint Does Not Allege That Dey "Presented" Or
"Caused To Be Presented" A False Claim For Payment ......... 33

      5.   Publishing AWPs Is Not An Implied Certification............................. 34

      6.   The Complaint Does Not Adequately Allege A Kickback .................. 36

    B.   None Of The Essential Elements of An Unjust Enrichment Claim Are
Alleged .................................................................................................... 37

    C.   The Common Law Fraud Count Also Fails to State a Claim under 12(b)(6) ...... 38

CONCLUSION...................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page**

## CASES

*Alt. Energy, Inc. v. St. Paul Fire and Marine Insurance Co.*, 267 F.3d 30 (1st Cir. 2001)...........19

*Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F. Supp. 683 (D. Mass. 1991) ...................38

*Biby v. Kansas City Life Insurance Co.*, 629 F.2d 1289 (8th Cir. 1986) .......................17

*Boston Children's Heart Foundation, Inc. v. Nadel-Ginard*, 1994 WL 16011252 (D. Mass. Dec. 15, 1994) .........................................................................18

*Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13 (2d. Cir. 1996) ..........22

*Cement and Concrete Workers District Council Welfare Fund v. Lollo*, 148 F.3d 194 (2d Cir. 1998) ...................................................................................39

*Cooperman v. Individual, Inc.*, 171 F.3d 43 (1st Cir. 1999)....................................................28

*Damon v. Sun Co., Inc.*, 87 F.3d 1467 (1st Cir. 1996)..................................................21, 38

*Diva's Inc. v. City of Bangor*, 411 F.3d 30 (1st Cir. 2005)......................................................19

*Florida v. Tenet Healthcare Corp.*, 420 F. Supp.2d 1288 (S.D. Fla. 2005) ................................38

*Graham v. Renbrook Sch.*, 692 F. Supp. 102 (D. Conn. 1988) ......................................................39

*Hayduk v. Lanna*, 775 F.2d 441 (1st Cir. 1985) ................................................................23, 27

*Hindo v. University of Health Sciences*, 65 F.3d 608 (7th Cir. 1995) ......................................32

*In re Cardiac Services*, 221 F.R.D. 318 (D. Conn. 2004) ...............................................16

*In re Lupron Marketing and Sales Practices Litigation*, 2004 WL 2070883 (D. Mass. Sept. 16, 2004) ..............................................................................................27, 28

*In re New England Life Insurance Co. Sales Practices Litigation*, 346 F.3d 218 (1st Cir. 2003) ...............................................................................................18

*In re Pharmaceutical Industry Average Wholesale Price Litig.*, 339 F. Supp.2d 165 (D. Mass. 2004)...............................................................................................39

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Pharmaceutical Industry Average Wholesale Price Litig.*, 2006 WL 3102998 (D. Mass. Nov. 2, 2006)......................................................................................................30

*In re Vertex Pharm., Inc., Sec. Litig.*, 357 F. Supp.2d 343 (D. Mass. 2005)................................10

*Kling v. Fidelity Management Trust Co.*, 270 F. Supp.2d 121 (D. Mass. 2003)..........................19

*Krieger v. Gast*, 2000 WL 288442 (W.D. Mich. Jan. 21, 2000) ...................................................28

*LaChapelle v. Berkshire Life Insurance Co.*, 142 F.3d 507 (1st Cir. 1998) ................................11

*Mass. Laborers Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp.2d 236 (D. Mass. 1999)........................................................................................................22, 23, 28

*McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226 (1st Cir.1980)..........................................23

*Micromuse, Inc. v. Micromuse, PLC*, 304 F. Supp.2d 202 (D. Mass. 2004)...................20, 21, 37

*Mosko v. Defilippo*, 1991 WL 191211 (D. Mass. Sept. 10, 1991).................................................27

*Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999)............................17

*Murphy v. U.S.*, 45 F.3d 520 (1st Cir. 1995)................................................................................28

*Nova Information System, Inc. v. Greenwich Insurance Co.*, 365 F.3d 996 (11th Cir. 2004) ...................................................................................................................................37

*Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 162 (1st Cir. 2005)............................20

*Pamela Amusement Co., Inc. v. Scott Jewelry Co.*, 190 F. Supp. 465 (D. Mass. 1960), *aff'd*, 286 F.2d 497 (1st Cir. 1960) ................................................................................. 39-40

*Paul v. Farmland Ind.*, Inc., 37 F.3d 1274 (8th Cir. 1994)..........................................................22

*Ramapo Land  Co. v. Consolidated Rail Corp.*, 918 F. Supp. 123 (S.D.N.Y. 1996) ...................28

*Rapaport v. Department of Treasury*, 59 F.3d 212 (D.C. Cir. 1995) ............................................37

*Riccio v. Ford Motor Credit Co.*, 238 F.R.D. 44 (D. Mass. 2006)................................................29

*Rodi v. Southern New England Sch. Of Law*, 389 F.3d 5 (1st Cir.2004).......................................29

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp.2d 23 (D. Mass. 2006) ..........................20

*Sanderson v. HCA-The Healthcare Company*, 447 F.3d 873 (6th Cir. 2006) ........................ 24-25

*Street v. Vose*, 936 F.2d 38 (1st Cir. 1991) .................................................................................11

*Taylor Woodrow Blitman Construction Corp. v. Southfield Gardens, Co.*, 534 F. Supp. 340, (D. Mass. 1982) ......................................................................................................20

*Triforo v. New York Life Insurance Co.*, 845 F.2d 30 (1st Cir. 1988) ....................................22, 23

*U.S. ex rel. Becker v. Westinghouse Savannah River*, 305 F.3d 284 (4th Cir. 2002) ...................32

*U.S. ex rel. Bidani v. Lewis*, 264 F. Supp.2d 612 (N.D. Ill. 2003) ..................................................36

*U.S. ex rel. Butler v. Hughes Helicopters*, 71 F.3d 321 (9th Cir. 1995).........................................33

*U.S. ex rel. Clausen v. Laboratories Corp. of America, Inc.*, 290 F.3d 1301 (11th Cir.2002), *cert. denied*, 537 U.S. 1105 (2003) ........................................................................24

*U.S. ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883 (8th Cir. 2003).........................31, 32

*U.S. ex rel. Cox v. Iowa Health System*, 29 F. Supp.2d 1022 (S.D. Iowa 1998) ......................................................................................30

*U.S. ex rel. Englund v. Los Angeles County*, 2006 WL 3097941 (E.D. Cal. Oct. 31, 2006).........33

*U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001) ....................................26

*U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374 (7th Cir. 2003)................................39

*U.S. ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605 (8th Cir. 1992)................................................30

*U.S. ex rel. Gublo v. Novacare, Inc.*, 62 F. Supp.2d 347, 354 (D. Mass. 1999) ...........................25

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220 (1st Cir. 2004) ............ *passim*

*U.S. ex rel. Kinney v. Hennepin County Medical Center*, 2001 WL 964011 (D. Minn. Aug. 22, 2001) ............................................................................................ 14-15, 34

**TABLE OF AUTHORITIES**
(continued)

**Page**

*U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999) ..............................30, 32

*U.S. ex rel. Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001) ............................................................35

*U.S. ex rel. Pogue v. Diabetes Treatment Centers of America, Inc.*, 238 F. Supp.2d 258
   (D.D.C. 2002) ...........................................................................................................................35, 36

*U.S. ex rel. Quinn v. Omnicare, Inc.*, 2003 WL 24296532 (D. N.J. Mar. 28, 2003)..............29, 30

*U.S. ex rel. Rost v. Pfizer Inc.*, 446 F. Supp.2d 6 (D. Mass. 2006).....................................24, 25-26

*U.S. ex rel. Sanders v. North American Bus Industries, Inc.*, 2006 WL 361337 (D. Md.
   Feb. 15, 2006) .....................................................................................................................13, 14, 15

*U.S. ex rel. Shaver v. Lucas W. Corp.*, 237 F.3d 932 (8th Cir. 2001).....................................33-34

*U.S. ex rel. Thompson v. Columbia HCA/Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1998)... 34-35

*U.S. ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp.2d 141 (D. Mass. 2000) ..........................25

*U.S. v. Baylor University*, --F.3d--, 2006 WL 3317695 (2d Cir. Nov. 16, 2006).................. *passim*

*U.S. v. Bornstein*, 423 U.S. 303 (1976)..........................................................................3, 13, 14, 15

*U.S. v. Buckley*, 2005 WL 164287 (D. Mass. Jan. 25, 2005)........................................................38

*U.S. v. EER Systems Corp.*, 950 F. Supp. 130 (D. Md. 1996) ..........................................20, 22, 38

*U.S. v. Erie County Medical Center*, 2002 WL 31655004 (W.D.N.Y. Oct. 30, 2002) .................12

*U.S. v. Hallmark Health System Inc.*, 409 F. Supp.2d 43 (D. Mass. 2006) ..................................17

*U.S. v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973) ..................................................................31

*U.S. v. Napco International, Inc.*, 835 F. Supp. 493 (D. Minn. 1993) ...........................................31

*U.S. v. Prabhu*, 442 F. Supp.2d 1008 (D. Nev. 2006) ..................................................................29

*U.S. v. President & Fellows of Harvard College*, 323 F. Supp.2d 151 (D. Mass 2004)..............34

*U.S. v. Rivera*, 55 F.3d 703 (1st Cir. 1995)....................................................................2, 12, 14, 15

**TABLE OF AUTHORITIES**
(continued)

Page

*U.S. v. Ruttenberg*, 625 F.2d 173 (7th Cir. 1980) ........................................................36

*U.S. v. St. Joseph's Reg'l Health Center*, 240 F. Supp.2d 882 (W.D. Ark 2002) ..................16, 17

*UST Charter National Life Insurance Co.*, 684 F. Supp. 757 (D. Mass. 1986) ...........................18

*Williams v. Edelman*, 408 F. Supp.2d 1261 (S.D. Fla. 2005) ........................................................10

*Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559 (6th Cir. 2003) ......................................................26

*Zurich Capital Markets, Inc. v. Cogliarese*, 2005 WL 1950653 (N.D. Ill. Aug. 12, 2005)..........27

## STATUTES, RULES & REGULATIONS

28 U.S.C. § 2415(a),(b)..............................................................................................1, 12

28 U.S.C. § 2416(c) .......................................................................................................18

31 U.S.C. § 3729(a)(1),(2) ...............................................................................1, 29, 32

31 U.S.C. § 3730(c)(4)..................................................................................................17

31 U.S.C. § 3731(b)(1),(2).................................................................................1, 2, 11, 18

42 U.S.C. § 1320a-7b(b)(2) ..................................................................................2, 36

42 U.S.C. § 1395, *et seq.*...............................................................................................6

42 U.S.C. § 1395u...............................................................................................7, 27, 30

42 U.S.C. § 1396(a) .......................................................................................................7

42 U.S.C. § 1396a(30)(A).............................................................................................11

42 U.S.C. § 1396d(b) .....................................................................................................7

42 U.S.C. § 1396r-8 ............................................................................................. *passim*

42 C.F.R. § 405.517.............................................................................................6, 7, 27

## TABLE OF AUTHORITIES
### (continued)

**Page**

42 C.F.R. § 410.26 ............................................................................................6

42 C.F.R. § 414.701 ..........................................................................................6

42 C.F.R. § 414.707 ..........................................................................................7

42 C.F.R. § 447.301 ....................................................................................7, 26

42 C.F.R. §§ 447.331-447.333 ....................................................................7, 26

Fed. R. Civ. P. 7 .........................................................................................17-18

Fed. R. Civ. P. 9(b) .................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) ........................................................................... *passim*

Fed. R. Civ. P. 15(c) ......................................................................................15

Fed. R. Evid. 201(b), (d) .................................................................................10

## SECONDARY AUTHORITY

H.R. Rep. 881, 101st Cong., 2d Sess. 96 (1990), *reprinted in* U.S. Code Congressional
and Administrative News, vol. 5 (1990) ...........................................................8

**Preliminary Statement**

The United States (the "Government") has brought this action on behalf of the Department of Health and Human Services ("HHS") and the Centers for Medicare and Medicaid Services ("CMS"), formerly known as the Health Care Financing Administration ("HCFA"), pursuant to the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"). Defendants Dey, Inc., Dey L.P., Inc., and Dey L.P. (together "Dey") move to dismiss the United States' Complaint ("U.S. Complaint" or "Compl.") pursuant to (i) the federal statutes of limitations, 31 U.S.C. § 3731(b) and 28 U.S.C. § 2415(a) and (b), and (ii) Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The relator in this action, Ven-A-Care of the Florida Keys, Inc. (the "Relator" or "Ven-A-Care"), filed a separate pleading joining the U.S. Complaint, entitled "Plaintiff Ven-A-Care's Complaint Adopting United States' Complaint In Intervention Against Dey, Inc., Dey L.P., Inc., and Dey L.P. and Requesting Additional Relief," dated October 31, 2006 (the "Ven-A-Care Complaint"). This motion seeks dismissal of the Ven-A-Care Complaint as well on the same grounds.

**Summary of Argument**

The U.S. Complaint alleges four causes of action against Dey: (i) presentation of false claims in violation of the FCA, 31 U.S.C. § 3729(a)(1); (ii) making false statements to cause claims to be paid in violation of 31 U.S.C. § 3729(a)(2); (iii) unjust enrichment; and (iv) common law fraud. The Government claims Dey falsely represented to third-party publishing companies (the "Publishers") the "AWP" and "WAC" prices of Dey drugs to be higher than the actual acquisition cost of Dey's drugs. Dey's drugs at issue in this action are Albuterol Inhalation Aerosol Inhaler, Albuterol Inhalation Aerosol Refill, Albuterol Sulfate Inhalation Solution Multi-dose, Albuterol Sulfate Inhalation Solution Unit Dose, Cromolyn Sodium Inhalation Solution, and Ipratropium Bromide Inhalation Solution (the "Dey Generics").

The Government alleges that CMS and the States relied on these purportedly overstated AWP and WAC prices to pay more for the Dey Generics than they otherwise would have and should have paid.  Dey is not alleged to have received any of these payments.  The payments were made to non-parties, such as pharmacies that sell drugs directly to consumers (the "Providers").  The Government alleges that setting AWP and WAC prices to allow for the "overpayments" violates the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) and other unspecified laws, and seeks to recover the amounts of these alleged overpayments under the FCA.  The Government also asserts claims for unjust enrichment and fraud.  All of the Government's claims should be dismissed.

The Government's FCA causes of action are barred by the six-year statute of limitations in 31 U.S.C. § 3731(b)(1).  Under the rule in *U.S. v. Baylor University*, --F.3d--, 2006 WL 3317695 (2d Cir. Nov. 16, 2006), this action is deemed to have been commenced against Dey for statute of limitations purposes when the U.S. Complaint was filed on August 24, 2006.  A cause of action under the FCA ordinarily accrues when the allegedly false claim is submitted. *See United States v. Rivera*, 55 F.3d 703, 707 (1st Cir. 1995).

All causes of action accruing in connection with claims submitted for payment more than 6 years before – *i.e.*, before August 24, 2000 – are barred, therefore, under any analysis.  Moreover, under the circumstances of this case, any cause of action against Dey arising from claims submitted to the Government after 2000 also should be barred.  The U.S. Complaint does not allege that Dey submitted a single false claim.  Rather, the U.S. Complaint alleges that Dey reported allegedly false AWPs and WACs to third parties, and "marketed the spread" between those reported numbers and the alleged acquisition cost, and that this allowed unspecified Providers to file allegedly false claims with the Government (Medicare) or the States

- 2 -

(Medicaid).  Dey is alleged to have set its AWPs – which the Government concedes were not

changed – in or before 1996.  (*See* Compl. ¶¶ 50-59.)  Dey is only responsible under the FCA for

its own acts, and not the acts of others.  *See United States v. Bornstein*, 423 U.S. 303, 311-13

(1976).  Since Dey's allegedly wrongful conduct – *i.e.*, Dey's creation and first reporting of

AWPs for Dey's Generics and the "marketing of the spread" conduct alleged in the U.S.

Complaint (*see* Compl. ¶¶ 50-59) – occurred before 2000, the Government's claims against Dey

for claims submitted by Providers after that date are also time barred.  The common law claims

are likewise untimely for the same reasons.  *See, infra*, Point I.

The Government's unjust enrichment and fraud-based claims must also be

dismissed under Rule 12(b)(6) because they are barred by the existence of a written contract

between Dey and the Government.  Paragraph 23 of the U.S. Complaint alleges that by

"becoming a participating supplier in Medicaid," Dey agreed to abide by the applicable laws and

regulations.  (Compl. ¶ 23.)  That agreement is in writing pursuant to 42 U.S.C. § 1396r-8, and

takes the form of a Rebate Agreement between the United States and Dey.  The Rebate

Agreement requires Dey to report AMP – an average of the discounted unit price of a drug – and

remit quarterly rebates to the States based on AMP.  The Rebate Agreement defines Dey's

obligations to the Government concerning price reporting.  Since Dey and the Government are

parties to an agreement which concerns and delineates the scope of Dey's obligation to report

prices, the Government cannot maintain an unjust enrichment claim covering the same subject

matter, and, therefore, the unjust enrichment claim should be dismissed.  The Rebate Agreement

also bars the Government's FCA and common law fraud claims, which rely on the notion that

the Government did not know the discounted prices of Dey's Generics.  The Government's

fraud-based claims can succeed only by ignoring the fact that the Rebate Agreement required

Dey to report an average of discounted unit prices for each drug at issue. Allowing the Government to now proceed on its fraud-based claims would impose on Dey – by litigation – reporting obligations with respect to Dey's AWP and WAC prices that are not found in the Rebate Agreement or the relevant statutes and regulations. A fraud claim, moreover, may not be asserted to vary the terms of the Agreement.

        All counts of the U.S. Complaint should also be dismissed on the additional ground that those claims, all subject to Fed. R. Civ. 9(b), are not alleged with sufficient particularity. Rule 9(b) requires the Government to plead details concerning the allegedly false claims and fraud-based claims at issue, such as the date of the claim, the form by which the claim was submitted, the claim's identification number, the amount of the claim, and other details. The U.S. Complaint does not allege a single allegedly false claim made by Dey. The Government's failure to identify even one instance of the United States making a single overpayment that can be directly tied to the actual sale of a particular Dey Generic, on a particular day in a particular time and place, is fatal to the U.S. Complaint. The failure is all the more objectionable because these details are exclusively within the Government's possession and the Government spent 10 years supposedly investigating this matter. The Government cannot satisfy its obligations under Rule 9(b) merely by pleading a complex theoretical scheme without any details regarding the alleged claims at issue, and without delineating the who, what, when, where or how Dey's conduct caused the Government to overpay an actual claim.

        In addition, none of the causes of action in the U.S. Complaint state a claim upon which this Court can grant relief. First, on the fundamental issue of AWP and WAC, the Government fails to allege that Dey's AWP or WAC prices were false as measured against a defined statutory or regulatory standard. No statutory or regulatory definition of AWP or WAC

is alleged at all, much less one that obliged Dey to report an "actual" price to wholesalers.  The public record, moreover, demonstrates that the Government knew that AWPs were simply an undiscounted benchmark that did not approximate wholesalers' actual acquisition costs.  In fact, the Government took particular interest in the AWPs of albuterol and several of the other nebulizer drugs, and concluded, as early as 1996, that the AWP-based reimbursement widely paid for these drugs was at least double the acquisition cost.  The AMPs called for under Dey's Rebate Agreement with the Government were defined as an average of the discounted unit price.  All the Government had to do here was to review its own audit reports and the price information Dey was required to report quarterly to know whatever it felt it needed concerning the "spread" between AWPs or WACs and actual acquisition costs.  Thus, there was no falsity and Dey could not have "knowingly" misled the Government.  The U.S. Complaint also fails to allege that Dey submitted a single false claim, or caused the submission of a false claim, under the FCA.  The common law fraud claims with respect to Medicaid, moreover, cannot be based on alleged misrepresentations made to third parties – *i.e.*, the States.  The Government alleges that the Providers submitted all claims to the States and pocketed all the money.  These Providers did so with full knowledge of their actual acquisition costs, and with the acquiescence of the States and the Government.  Again, Dey did not submit any claims for payment and did not cause the submission of these claims.

## STATEMENT OF FACTS

### A.    Dey Reports AWP and WAC Prices

Dey is a small, specialty pharmaceutical company located in Napa, California that has traditionally focused on manufacturing and marketing generic drugs used to treat respiratory ailments, such as asthma and chronic obstructive pulmonary disease (also known as "COPD").  The Government has alleged the NDC number, specific package sizes, and formulations of these

drugs in the U.S. Complaint. (*See* Compl.[1] ¶ 29). Dey's albuterol, cromolyn and ipratropium products are alleged to have been launched in 1992, 1993 and 1996, respectively. (Compl. ¶ 51.)

Dey reports average wholesale price – AWP – to First DataBank and other price reporting services (*id.* ¶ 40); the Government alleges that, once set, the AWPs for Dey Generics did not change. (*Id.* ¶ 56.) Dey also reports wholesale acquisition cost – WAC – to First DataBank and other price reporting services. WAC is alleged to be the price that a drug company "typically" charges wholesalers. (*Id.* ¶ 40.) The U.S. Complaint does not allege any of Dey's WACs, nor does it allege that Dey, in fact, did not charge its wholesalers WAC prices – although it alleges, without providing any specifics, that the WACs were "inflated." The U.S. Complaint does not allege a regulatory or statutory definition of either AWP or WAC, or that Dey represented what its AWPs or WACs signified.

**B.     Dey Complies With Regulations Governing
        The Medicare And Medicaid Programs**

**1.     Medicare**

Medicare is a health insurance program created by the federal government for the elderly and disabled and other eligible persons. (Compl. ¶ 24); *see also* 42 U.S.C. § 1395, *et seq*. CMS administers the Medicare program. (Compl. ¶ 25.) Part B of Medicare provides coverage for drugs which are provided either: (a) incident to a physician's service and cannot usually be self-administered; or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other DME device payable under Medicare's DME benefit equipment. (*See id.* ¶ 26); *see also* 42 C.F.R. § 410.26; 42 C.F.R. §§ 405.517 and 414.701. With the exception of Dey's albuterol MDI product, at all relevant times, all of the Dey Generics at issue in this action were eligible for Medicaid Part B reimbursement because they are administered through a

---

[1]     A copy of the U.S. Complaint is annexed as Exhibit A to the accompanying Declaration of Philip D. Robben ("Robben Decl."), dated December 22, 2006.

nebulizer.  Medicare reimbursement under the Part B program is determined by federal statutes and regulations.  (*See* Compl. ¶¶ 45-48); 42 U.S.C. § 1395u; 42 C.F.R. §§ 405.517 (1992-2004), 414.707 (2005).  The U.S. Complaint alleges that, from 1992 through January 1, 2005, these reimbursement statutes and regulations provided reimbursement based, in part, on AWPs allegedly set by manufacturers, such as Dey.  (Compl. ¶ 45-47.)

### 2.   Medicaid

The Medicaid program is a joint federal and state program that provides medical coverage for the indigent and disabled, regardless of age.  (*See* Compl. ¶¶ 17, 18); *see also* 42 U.S.C. §§ 1396(a) and 1396d(b).  Although not required to do so, the States provide coverage for prescription pharmaceutical products, including all of the Dey Generics, as part of the Medicaid program.  (*See* Compl. ¶ 21.)

Under federal supervision, and within limits set by the federal Medicaid regulations, reimbursement for prescription drugs dispensed to Medicaid beneficiaries is set individually by the States pursuant to formulas adopted by each State.  *See* 42 C.F.R. §§ 447.301, 447.331-447.333; (*see also* Compl. ¶¶ 37-38.)  The U.S. Complaint notes that the States make their own decisions and choose their own reimbursement schemes.  (Compl. ¶¶ 37-39); s*ee also* "Medicaid Prescription Reimbursement Information by State – Quarter Ending September 2006," *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram/Downloads/ RxReimbursementRateSeptember2006Qtr.pdf.  (Annexed hereto as Tab 1.)

### C.   Dey Entered Into A Rebate Agreement With CMS That Required Dey To Report Average Manufacturer Price To CMS

As the Government explained in its March 18, 2004 *amicus* brief, in 1990, Congress reviewed the prices that Medicaid was paying for prescription drugs.  Finding that "Medicaid was routinely paying more for prescription drugs than other large drug purchasers,

Congress passed legislation providing for a mandatory rebate to the States for all Medicaid drug

reimbursements."  Brief of the United States as *Amicus Curiae*, MDL No. 1456, Civil 01-

012257-PBS, Docket Entry No. 743; *see also* H.R. Rep. 881, 101st Cong., 2d Sess. 96 (1990),

*reprinted in* U.S. Code Congressional and Administrative News, v. 5 (1990), at 2232.

Effective January 1, 1991, Dey entered into a Rebate Agreement, identical in all

material respects to the Form agreement required of all manufacturers, with the Secretary of

HHS acting through CMS.  In order for a manufacturer's drugs to be eligible for Medicaid

reimbursement, the manufacturer must enter into a non-negotiable rebate agreement with CMS.

*See* 42 U.S.C. § 1396r-8; (*see also* Rebate Agreement,[2] § II (preamble).)  The Dey Rebate

Agreement conforms to the model Form agreement available at the CMS website.[3]

The Rebate Agreement requires Dey to report to the Government the "average

manufacturer price" – AMP – for each Dey product supplied to Medicaid beneficiaries.  The

Rebate Agreement sets forth a comprehensive definition of AMP as an average of the discounted

unit price of a drug:

> (a) "Average Manufacturer Price (AMP)" means, with respect to a
> Covered Outpatient Drug of the Manufacturer for a calendar
> quarter, the average unit price paid to the Manufacturer for the
> drug in the States by wholesalers for drugs distributed to the retail
> pharmacy class of trade (excluding direct sales to hospitals, health
> maintenance organizations and to wholesalers where the drug is
> relabeled under that distributor's national drug code number).
> Federal Supply Schedule prices are not included in the calculation
> of AMP.  AMP includes cash discounts allowed and all other price
> reductions (other than rebates under section 1927 of the Act),
> which reduce the actual price paid.  It is calculated as a weighted
> average of prices for all the Manufacturer's package sizes for each
> Covered Outpatient Drug sold by the Manufacturer during that

---

[2]     A copy of the Rebate Agreement is annexed as Exhibit E to the Robben Decl..  This Court may consider
the Rebate Agreement on this Rule 12(b)(6) motion.  *See, infra*, n.9.

[3]     A sample Form agreement is *available at* http://www.cms.hhs.gov/MedicaidDrugRebateProgram/
downloads/rebateagreement.pdf.

> quarter. Specifically, it is calculated as Net Sales divided by
> numbers of units sold, excluding free goods (i.e. drugs or any other
> items given away, but not contingent on any purchase
> requirements). For Bundled Sales, the allocation of the discount is
> made proportionately to the dollar value of the units of each drug
> sold under the bundled arrangement. The Average Manufacturer
> Price for a quarter must be adjusted by the Manufacturer if
> cumulative discounts or other arrangements subsequently adjust
> the prices actually realized.

(Rebate Agreement, § I(a).) Each of the capitalized terms incorporated in the AMP definition set

forth above is further defined by the Rebate Agreement.

The Rebate Agreement requires Dey to report to Plaintiff, on a quarterly basis, the

AMPs for each of the Dey Generics. (*Id.*, § II(a).) Moreover, the terms of the Rebate

Agreement require Dey to pay quarterly rebates to each of the State Medicaid programs based on

its reported AMPs and the quantity of each product for which the States paid Medicaid

reimbursements. (*Id.*, § II(b).) Notably, while the U.S. Complaint alleges that Dey's reported

AWPs and WACs were much higher than the "actual costs," (*see* Compl. ¶ 51), there is no

allegation that Dey failed to report or inaccurately reported AMP price information to the

Government. There is also no allegation in the U.S. Complaint that Dey ever failed to make the

rebate payments called for under the terms of the Rebate Agreement.

There is no requirement that manufacturers, such as Dey, pay rebates for products

reimbursed under Medicare. However, as early as February 1996, the HHS Office of Inspector

General – noting that the Medicare program was paying significantly more for the same

nebulizer drugs than was the Medicaid program – recommended at least the consideration of the

implementation of a Medicare rebate program. (*See* Robben Decl. ¶ 21; *see also* HHS-OIG

Report, *Medicare Payments for Nebulizer Drugs* (OEI-03-94-00390) (February 1996), at ii,

Robben Decl., Ex. H.)

Section IV of the Rebate Agreement is a penalty provision that provides for

- 9 -

penalties in the event Dey "refuses requests for information about charges or prices by the Secretary in connection with a survey or knowingly provides false information." (Rebate Agreement, § IV(a).) Section V provides a mechanism for resolution of disputes in connection with rebate amounts arising under the Agreement. (*Id.*, § V.)

**D.      Publicly Released Statements By The Government Acknowledge That "AWP" Is An Undiscounted Universal "List" Price**

This Court may, of course, take judicial notice of public records on a Rule 12(b)(6) motion. *See Williams v. Edelman,* 408 F. Supp.2d 1261, 1264 (S.D. Fla. 2005); *In re Vertex Pharm., Inc., Sec. Litig.,* 357 F. Supp.2d 343, 352 n.4 (D. Mass. 2005); *see generally* Fed. R. Evid. 201(b), (d). Publicly available reports by Plaintiff, dating back as early as 1968, acknowledge that the Government has always known AWP is not a reflection of actual market prices but, rather, is a benchmark used as a starting point for reimbursement.[4]

In the particular case of the Dey Generics, moreover, the Government audited the actual prices paid by Providers for drugs, such as albuterol, and compared them to published AWPs. In June 1996, OIG released a report outlining a survey OIG performed concerning albuterol reimbursement under Medicare. (*See* Robben Decl. ¶22; *see also* HHS-OIG Report, *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393) (June 1996), at i-ii, Robben Decl., Ex. I.) OIG performed the survey by selecting approximately 500 albuterol claims at random and then obtaining background information regarding the claims from those involved with dispensing the drug, including pharmacies and regional Medicare contractors.

---

[4]      Annexed to the accompanying Robben Decl., as Exhibit G, is Appendix A to Abbott Laboratories, Inc.'s Motion to Dismiss (the "Abbott Appendix"), filed in *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs, Inc. et al.,* Civil Action No. 06-11337-PBS (D. Mass.). The Abbott Appendix contains no fewer than twenty-five reports prepared by the Government over a period spanning 34 years (1968-2002) which leave no doubt that the Government was fully aware that AWP did not equal an actual average of acquisition prices. (*See* Robben Decl., Ex. G, at Tab Nos. 1-11, 13-22, 24, and 26-28; *see also* Robben Decl. ¶¶ 23-24, Exs. J – O (several reports by the Government comparing pharmacy acquisition costs with AWP-based reimbursement under several State Medicaid programs).)

(*Id.*, at p. 4.)  OIG concluded that Medicare's allowance for albuterol sulfate, based on reported

AWP, "substantially exceed[s] suppliers acquisition costs…." (*Id.*, at p. 6.)  The 1996 report

disclosed that, in some cases albuterol AWPs were more than double what thousands of

pharmacies actually paid.[5]  (*Id.*)  The reports, moreover, provide that the States favored using

AWPs for policy reasons, such as allowing a spread to encourage Providers to participate in the

State Medicaid programs and compensate pharmacies for inadequate dispensing fees.  (*See*

Robben Decl. ¶ 24, Ex. G., at Tab Nos. 2, 12-14, 26, 30, Ex. J, Appendix 4, at 1; Ex. K,

Appendix 4, at 1, Ex. L, Appendix 4, at 1); *see also* 42 U.S.C. § 1396a(30)(A).

## ARGUMENT

I.    **ALL CAUSES OF ACTION ALLEGED IN THE U.S. COMPLAINT ARE BARRED BY THE APPLICABLE STATUTES OF LIMITATION**

A time-barred complaint should be dismissed pursuant to Rule 12 "when the

pleader's allegations leave no doubt that an asserted claim is time-barred." *LaChapelle v.*

*Berkshire Life Ins. Co.*, 142 F.3d 507, 509 (1st Cir. 1998); *Street v. Vose*, 936 F.2d 38, 39 (1st

Cir. 1991).  The U.S. Complaint was not filed until August 24, 2006, and was not unsealed until

September 9, 2006.[6]  In *United States v. Baylor University*, -- F.3d --, 2006 WL 3317695 (2d Cir.

Nov. 16, 2006), the United States Court of Appeals for the Second Circuit held that, under the

FCA, the Government's action is deemed to have commenced on the date the complaint-in-

intervention was filed; in this case, August 24, 2006.  Section 3731(b)(1) prescribes a six year

statute of limitations period for FCA claims.  *See* 31 U.S.C. § 3731(b)(1).  The six year period

---

[5]    In all, between 1996 and 1998, the Government issued five reports analyzing the market price of albuterol and other nebulizer drugs as compared to their reported AWPs.  Each report noted the substantial disparity between AWP and acquisition cost for these drugs.  (*See, e.g.*, Robben Decl., Exs. H, I; HHS-OIG Report, *A Comparison of Albuterol Sulfate Prices* (OEI-03-94-00392) (Jun. 1996); HHS-OIG Report, *Excessive Medicare Payments for Prescription Drugs* (OEI-03-97-00290) (Dec. 1997); HHS-OIG Report, *Are Medicare Allowances for Albuterol Sulfate Reasonable?* (OEI-03-97-00292) (Aug. 1998).)

[6]    The United States sent a waiver of service of the summons on or about September 22, 2006, which Dey signed and returned on October 25, 2006.

begins to run from "when the violation was committed." *Id.*

### A.   All Claims Based On Payment Requests Submitted To The Government Accruing Before August 24, 2000 Are Time Barred

The First Circuit has held that FCA claims accrue against a party who submits a claim when the allegedly false claims are submitted for payment, because this "in effect completes the perpetrator's violation of the FCA." *United States v. Rivera*, 55 F.3d 703, 707 (1st Cir. 1995). The U.S. Complaint seeks recovery for certain "violations" occurring at unspecified times between 1992 and the present. (Compl. ¶ 50.) The allegations that Dey "marketed the spread" in the U.S. Complaint describe conduct that occurred during 1992-1996. (Compl. ¶¶ 53-60.) If the claims are deemed to accrue against Dey each time a claim for payment was presented to the States by a Provider, all claims for payment submitted prior to August 24, 2000 are barred under the rule in *Rivera* since they are more than six years old. All claims arising from the "marketing the spread" allegations before 2000 are likewise barred. In addition, the unjust enrichment claim, which has a six-year limitations period, pursuant to 28 U.S.C. § 2415(a), and generally accrues "upon the occurrence of the wrongful act giving rise to the duty of restitution," *see U.S. v. Erie County Medical Center*, 2002 WL 31655004, *6 (W.D.N.Y. Oct. 30, 2002), is similarly barred. The common law fraud claim fares worse, as it is subject to the three year limitations period under 28 U.S.C. § 2415(b), thus barring all claims prior to August 24, 2003.

### B.   All Post-2000 Claims Should Also Be Deemed To Have Accrued Against Dey By 1996 At The Latest

The Government does not contend that Dey itself submitted any claims for payment. Rather, the United States alleges that Dey reported certain "false or fraudulent" prices to the Publishers and "marketed the spread." (Compl. ¶¶ 50-61.) Dey's alleged misreporting of AWP is alleged to have originally occurred between 1992 and 1996, when Dey prepared the

launch plans for its Generics and first reported the AWPs. (*Id.* ¶¶ 50-54, 59.) As the U.S. Complaint alleges, Dey has not changed these AWPs during the relevant time period. (*Id.* ¶ 60.) Dey's alleged misconduct, therefore, occurred before 2000. (*Id.* ¶¶ 50, 57.) For this reason, claims against Dey for false claims to the Government made by the Providers in or after 2000 also should be dismissed. As the United States Supreme Court held in *United States v. Bornstein*, 423 U.S. 303 (1976), the "focus in each case [should] be upon the specific conduct" of the defendant because the FCA "penalizes a person for his own acts, not for the acts of someone else." *Id.*, at 311-313. In *Bornstein*, the Supreme Court held that the number of civil penalties alleged must be based on the number of the defendant's acts, and not on the number of false claims submitted by the third party. *Id.* The same principle should apply to the statute of limitations. The date on which Dey is alleged to have created and first reported its AWPs should be the operative date for limitations purposes, because that is when Dey's allegedly wrongful conduct was completed.

In *United States ex rel. Sanders v. North American Bus Industries, Inc.*, 2006 WL 361337 (D. Md. Feb. 15, 2006), the court applied the principle from *Bornstein* to the FCA statute of limitations context and dismissed the plaintiff's FCA claims. In that case, Deloitte & Touche USA LLP ("Deloitte") filed a written "protest" with U.S. Customs, claiming that bus shells should be reclassified by Customs as "motor vehicles" on behalf of its client NABI. *Id.* The plaintiffs sued NABI and Deloitte, alleging that Deloitte had made false statements in the protest, and, therefore, NABI's claiming the imported bus shells as "motor vehicles" constituted false claims under the FCA. *Id.* Relying on the reasoning in *Bornstein*, the court held that, for statute of limitations purposes, Deloitte's violation occurred when it filed the protest containing allegedly false statements, and not when NABI later claimed subsequent imports as "motor

vehicles." *Id.*, at \*2.   The court reasoned:

> By claiming the limitations period as to Deloitte renews again
> every time NABI, Inc. imports a bus shell, Sanders essentially asks
> me to hold Deloitte liable in perpetuity based on Deloitte's pre-
> limitations period advice.  Sanders would have Deloitte assume the
> risk that NABI, Inc. might forever rely on Deloitte's contribution,
> a proposition rejected in *Bornstein*.

*Id.*, at \*3.  The Government is similarly asking this Court to hold Dey liable in perpetuity based

upon claims made by Providers over whom Dey had no control.  The Providers who submitted

the claims knew AWPs were higher than what they had paid for the drugs.  The Providers, and

not Dey, received the reimbursement money.  As *Bornstein* held, the focus in this case should be

on Dey's acts, not those of the Providers, and claims against Dey should be barred because

the allegedly wrongful conduct is alleged to have occurred before 2000.

The First Circuit's holding in *Rivera* that claims accrue when they are presented

for payment, does not foreclose dismissal of the post-2000 claims against Dey.  *See Rivera*, 55

F.3d at 705.  In *Rivera*, the defendants completed a portion of a HUD loan form, which they then

forwarded to Merrill Lynch, a third-party lender, who completed the form and submitted it to

HUD.  *See id*.  When the defendants defaulted on the loan, Merrill Lynch applied for

reimbursement to HUD.  The court held that the HUD submission by Merrill Lynch commenced

the running of the statute of limitations.  *See id*., at 707.  However, unlike Dey in this case and

Deloitte in *Sanders*, the defendants in *Rivera* were the ultimate recipients of the money for the

false claims.  The defendants in *Rivera* controlled the allegedly false claim that was later filed

because they were involved in completing the forms to obtain the loan proceeds and responsible

for procuring the insurance contract which obligated the United States to reimburse Merrill

Lynch in the event of default.  *See id*., at 705; *U.S. ex rel. Kinney v. Hennepin County Medical

Center*, 2001 WL 964011, \*9 (D. Minn. Aug. 22, 2001) (defendant held not liable because it had

"no control over the content of the claims" and no "apparent right to review the claim forms

being submitted"). Thus, there was no risk that the defendants' conduct could cause them to be

held liable for an unknown number of claims or amount, for an unknown period into the future.

Further, unlike the defendant in *Rivera*, neither the subcontractor in *Bornstein*, Deloitte in

*Sanders*, nor Dey in this case were paid or enriched each time an intermediary's allegedly false

claim was presented and paid for by the Government. (*See* Compl. ¶ 61.)

### C.   The U.S. Complaint Does Not "Relate Back" To Ven-A-Care's Original Complaints Against Dey

The Government alleges that its claims are timely based on the unspecified filing

date of the Relator's original sealed complaint, and that its claims against Dey "relate back" to

the "original pleadings" under Rule 15(c) of the Federal Rules of Civil Procedure. (Compl. ¶¶ 7,

13-14). In *Baylor*, the Second Circuit refused to allow the United States' complaint-in-

intervention to relate back to the original sealed complaint, filed by the relator 8 years prior,

pursuant to Rule 15(c)(2):

> The secrecy required by § 3730(b) is incompatible with Rule
> 15(c)(2), because (as is well-settled) the touchstone of relation
> back pursuant to Rule 15(c)(2) is notice, *i.e.*, whether the original
> pleading gave a party "adequate notice of the conduct, transaction,
> or occurrence that forms the basis of the claim or defense".... By
> design, the seal provision of § 3730(b) deprives the defendant in an
> FCA suit of the notice usually given by a complaint. Because any
> relation back of subsequent filings to the original complaint is
> incompatible with the core requirement of notice under Rule
> 15(c)(2), the continued running of the statute of limitations is
> warranted.

2006 WL 3317695, at *5. In *Baylor*, much like here, the United States obtained repeated

extensions of the 60-day period in which the original complaint remained under seal, and waited

approximately eight years before filing its complaint-in-intervention. *Id.* The Second Circuit

acknowledged that some defendants received partial informal notice of the complaint while it

was still under seal, but, nevertheless, held that neither the United States' FCA nor its common law claims related back to the relator's original complaint. *Id.* The Second Circuit reversed the district court judge who relied on *In re Cardiac Services*, 221 F.R.D. 318, 355 (D. Conn. 2004), a case in which defendants were put on notice of the potential claims when OIG subpoenas were issued. The Second Circuit also rejected the reasoning that other district courts have used to justify relation back under Rule 15(c). *See Baylor*, 2006 WL 3317695, at *6, n.8.

In a similar case, *United States v. St. Joseph's Reg'l Health Center*, 240 F. Supp.2d 882, 893 (W.D. Ark 2002), the district court criticized the Government's conduct where, like here, it used the seal for tactical litigation purposes and not to simply undertake a *bona fide* investigation:

> The multiple interventions in this case appear to the Court to have no other justification than to allow the government to investigate and settle the multiple claims at its own pace, selectively carving out those claims that were easiest to settle while keeping the remaining defendants in limbo until it chose to act against them.

240 F. Supp.2d at 888.

The U.S. Complaint does not allege any "good cause" or justification for the Government waiting 10 years to finally allow Dey to defend against allegations of misconduct occurring in 1992 to 1996. (*See* Compl. ¶¶ 50-59.) The statute of limitations should not be ignored to allow the Government an unfair litigation advantage:

> Statutes of limitation exist to protect defendants from stale claims, lost evidence, and disappearing witnesses.... [T]his matter was completely within the control of plaintiff and relator – where and when to file the complaint, how long to investigate, when and whether to intervene, and when to request severance and transfer. Here, defendant was powerless to act until it was served.

240 F. Supp.2d at 893. Nor may Dey's awareness of the Government's investigation be used to toll the limitations period. As long as this action remained under seal, Dey was deprived of the

ability to fully prepare its defense:

> The mere requirement to produce records, without more, cannot be considered as notice of a claim arising from specific conduct and preparation to defend that claim… [M]ere awareness of the investigation would not have enable [defendant] to preserve testimony of witnesses by depositions; to compel production of documents; or to seek to prevent destruction of documents in the hands of third parties over whom it had no control.  Those are the types of actions that can only be taken within the context of litigation, and the inability to take them is…prejudicial to defendant.

*Id.*; *see also Murphy Brothers, Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999)

("[s]ervice of process, under longstanding tradition in our system of justice, is fundamental to

any procedural imposition on a named defendant").

Even those courts prior to *Baylor* allowing relation back to an unsealed complaint

would not do so under these circumstances.  A complaint may not "relate back" when the

original pleading to which it refers is defective.  *See, e.g.*, *United States v. Hallmark Health

System Inc.*, 409 F. Supp.2d 43, 49-50 (D. Mass. 2006).  A defective complaint cannot serve as a

"place holder" for statute of limitations purposes.  *See, e.g.*, *Biby v. Kansas City Life Ins. Co.*,

629 F.2d 1289, 1294 (8th Cir. 1986).  The Government cannot simultaneously assert "relation

back" to unspecified prior pleadings in the action, while concealing the entirety of the prior

pleadings from Dey and redacting the pleadings.  (*See* Robben Decl. ¶¶ 8-9.)  The record as a

whole remains sealed, and there are no allegations demonstrating that the Government acted with

the "diligence" required by 31 U.S.C. § 3730(c)(4).[7]  Dey, moreover, should not be put in the

position of addressing the merits of the multiple prior complaints filed by the Relator that the

Government chose not to join.  Rule 7 of the Federal Rules of Civil Procedure provides:  "There

---

[7]     Further investigation of the *ex parte* proceedings in which the United States obtained repeated extensions of the 60-day period will also confirm that Dey has been prejudiced as a result of United States' inordinate delay in intervening in this action, and, thus, that this case should be dismissed on laches and failure to prosecute grounds.

shall be *a* complaint…," and not a grab bag of seven different pleadings from which the Government can pick and choose theories. *See* Fed. R. Civ. P. 7 (emphasis added). It is the Government's obligation to affirmatively plead its case in a succinct single complaint.[8]

### D.    The Continuous Tort Doctrine Does Not Save The Government's Claims

The Government cannot use a "continuous tort" or "concealment" argument to evade the statute of limitations based on the allegation that "Dey did not update its AWP pricing information to any of the price reporting services." (*See* Compl. ¶ 60.) First, in order to toll the statute for "suppression" or "concealment," the defendant must have breached a "fiduciary duty of full disclosure." *Boston Children's Heart Foundation, Inc. v. Nadel-Ginard*, 1994 WL 16011252, *33 (D. Mass. Dec. 15, 1994). Here, Dey owed no duty, statutory, fiduciary or otherwise, that would require it to update its AWP pricing information to any Publisher. The continuing tort doctrine "cannot be employed where the plaintiff's injury is 'definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress.'" *In re New England Life Ins. Co. Sales Practices Litigation*, 346 F.3d 218, 222 (1st Cir. 2003); *see also UST Charter Nat'l Life Ins. Co.*, 684 F. Supp. 757, 758 (D. Mass. 1986). Although the Government alleges that Dey "usually reported prices" on an annual basis (see Compl. ¶ 34), there was nothing that prevented the Government from seeking redress prior to 2000.[9]

---

[8]    The tolling provision under 31 U.S.C. § 3731(b)(2), which allows the U.S. to bring claims within three years of "the date the facts material to the rights of action are known or reasonably should have been known by the official of the United States charged with responsibility to act," does not save the FCA claims because the United States "should reasonably have had knowledge" when it first received the Relator's complaint or, at the latest, in 1996 when the OIG audit reports were published. *See, e.g, Baylor*, 2006 WL 3317695, at *3. For these reasons, there is also no basis to toll the unjust enrichment and common law fraud claims under 28 U.S.C. § 2416(c).

[9]    The Government had or should have had knowledge of all the essential elements of its claims that it now alleges by that time. Instead, the Government accepted and continued to accept the albuterol AWPs reported before 2000 with full knowledge of the potential claims they can allege.

II.     **THE REBATE AGREEMENT AND 42 U.S.C. § 1396r-8 BAR THE GOVERNMENT'S CLAIMS**

A.     **The Terms Of The Rebate Agreement Bar The Unjust Enrichment Claim**

Paragraph 23 of the Complaint alleges that by "becoming a participating supplier in Medicaid," suppliers, including Dey, "agreed" to abide by the applicable laws and regulations. (Compl. ¶ 23.) That "agreement" is in writing; it is the Rebate Agreement that Dey executed on February 28, 1991 as a precondition to its drugs being eligible for Medicaid reimbursement. The Rebate Agreement defines the rights and obligations of the parties with respect to Dey's price reporting to the Government and sales under the Medicaid Program.[10] The Rebate Agreement specifies the price information Dey was required to report in order to participate in the Medicaid program, and provides that the Medicaid program is entitled to rebates calculated from Dey's sales of products for which the States paid reimbursements. These rebates included payments ranging from 10% to 11% of the AMP for the Dey Generics. (*See* Rebate Agreement, at pp. 2-3.) The Rebate Agreement, therefore, is an express contract that controls the subject matter of the Government's unjust enrichment claim that it allegedly overpaid for the Dey Generics. The existence of a binding contract precludes the Government from seeking legal relief on an implied contract theory such as unjust enrichment. The Government cannot use a claim for unjust enrichment to retroactively rewrite the Rebate Agreement to give itself a better deal.

The Government alleges that Dey was unjustly enriched by an increase in sales caused by the States' reimbursement of Dey products at prices based on "inflated AWPs and

---

[10]     The Rebate Agreement may be considered on this motion to dismiss because it is central to the Government's allegations, susceptible to judicial notice, and its authenticity is not in doubt. *See Alt. Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2001) (affirming consideration of settlement contract on a motion to dismiss because the "alleged liability under the complaint depends directly upon whether the…claims…have been released…"); *Kling v. Fidelity Management Trust Co.*, 270 F. Supp.2d 121, 128 (D. Mass. 2003). Dey's status as a supplier to the Medicaid program requires the existence of a valid rebate agreement under 42 U.S.C. § 1396r-8(a)(1). *See also, e.g., Diva's Inc. v. City of Bangor*, 411 F.3d 30, 37-38 (1st Cir. 2005) (affirming district court's consideration of written contract).

WACs [that]…far exceeded the actual costs of the drugs." (Compl. ¶ 51.) The Government alleges that the AWPs and WACs were inflated because Dey "arrang[ed]" for the actual costs to be lower. (*Id.*) The alleged arrangements are the same discounts, rebates, and other incentives that are covered by the definition of AMP in the Rebate Agreement. (*See* Rebate Agreement, § I(a) ("[t]he [AMP] …must be adjusted [for] …cumulative discounts or other arrangements [which] subsequently adjust the prices actually realized").) AMP is effectively what the Government alleges was concealed. In effect, the Government is alleging that Dey was unjustly enriched by increased sales of its products caused by the difference between AWPs and WACs versus AMPs, or the so-called "spread."[11]

A plaintiff must allege and prove that "the defendant was enriched to the plaintiff's detriment without justification or an adequate legal remedy." *Ruiz v. Bally Total Fitness Holding Corp.*, 447 F. Supp.2d 23, 29 (D. Mass. 2006). A claim for unjust enrichment may not be based on subject matter governed by a valid, express contract between the parties, because such a contract governing the parties' relationship "provides the measure of the plaintiff's right."[12] *Micromuse, Inc. v. Micromuse, PLC*, 304 F. Supp.2d 202, 209, n.8 (D. Mass. 2004); *U.S. v. EER Systems Corp.*, 950 F. Supp. 130, 133 (D. Md. 1996). If the contract covers the subject matter of an unjust enrichment claim, then the express contract governs, rather than the implied contract. *See Ruiz*, 447 F. Supp.2d at 29 (*citing Okmyansky v. Herbalife Int'l of Am., Inc.*, 415 F.3d 154, 162 (1st Cir. 2005)). The Rebate Agreement provides the Government with an agreed upon rebate and remedies at law for overcharges. *See also Micromuse*, 304 F. Supp.2d

---

[11]     According to the allegations in the U.S. Complaint, Dey itself never received any portion of the "spread"; rather, Providers, such as Ven-A-Care, profited from the "spread." (*See* Compl. ¶ 55-57.)

[12]     Actions involving contract disputes with the United States, whether the contract is express or implied, are governed by federal common law. *See, e.g., Taylor Woodrow Blitman Construction Corp. v. Southfield Gardens. Co.*, 534 F. Supp. 340, 346, n.13 (D. Mass. 1982).

at 209, n.8.  The Agreement sets a cost-based percentage to be paid to the Government  and

contractually provides the Government with a remedy.  (Rebate Agreement, §§ II(a), IV,

VIII(c).)  The Government cannot use an unjust enrichment claim to give itself a greater

percentage based on Dey's AMPs than the parties agreed, or rewrite the remedy provision of the

Agreement.

**B.**       **The Rebate Agreement Bars The Government's Fraud-Based Claims**

The U.S. Complaint alleges that Dey's AWP and WAC information was inflated

because they did not did not reflect the "far lower prices" paid by Dey's customers.  (Compl ¶

51.)  The Rebate Agreement required Dey to report the "far lower prices" to the Government in

the form of AMPs for the Dey Generics.[13]  *See* 42 U.S.C. § 1396r-8(b)(3).  AMP is the "average

unit price paid" by wholesalers including "cash discounts allowed…and all other price

reductions."  (*Compare* Rebate Agreement § I(a) *with* Compl. ¶ 51.)  The Rebate Agreement

provided the Government with entitlement to receive the "average unit price" taking into account

discounts.  There is no allegation of any misrepresentation under the Rebate Agreement.

A fraud claim must allege "false representation of a material fact with knowledge

of its falsity [made] for the purpose of inducing the plaintiff to act thereon, and that the plaintiff

relied upon the representation as true and acted upon it to his [or her] damage."  *Damon v. Sun

Co., Inc.*, 87 F.3d 1467, 1471-72 (1st Cir. 1996) (quotations and citations omitted).  The

Government's fraud based claims fail because Dey owed no duty to report prices outside the

Rebate Agreement; in other words, to the extent Dey had an obligation to report to the

Government information concerning "cash discounts allowed" and "all other price reductions"

for the Dey Generics, the source and scope of that obligation is set forth in the Rebate Agreement

---

[13]       The U.S. Complaint does not allege that Dey failed, at any time, to report AMP and Best Price information
to the Government.

and only the Rebate Agreement.  (*See* Rebate Agreement, §§ I(a), II(e).)  The Rebate Agreement,

moreover, has its own Penalty Provision and Dispute Resolution Provisions.  (*See id.*, §§ IV-VI.)

Accordingly, any claim that Dey was not properly furnishing the Government with correct

information as to Dey's discounts and price reductions is a claim that is covered by the Rebate

Agreement, and must be brought pursuant to the terms of that Agreement.  There is no allegation

that Dey breached the Rebate Agreement.

Moreover, tort-based claims cannot be used to evade the terms of a contract.  *See*

*EER Systems*, 950 F. Supp. at 133.  A fraud claim, however, may be permitted if it arises

independently of the contract.  *See, e.g.*, *Paul v. Farmland Ind., Inc.*, 37 F.3d 1274, 1276 (8th

Cir. 1994); *Bridgestone/Firestone, Inc. v. Recovery Credit Services, Inc.*, 98 F.3d 13, 19-20 (2d

Cir. 1996).  To allege an independent fraud claim, the Government must allege or establish an

affirmative misrepresentation by Dey outside the Rebate Agreement, or an independent legal

duty to provide the information independent of the Agreement.  *Id.*  The U.S. Complaint,

however, does not allege any statute or regulation requiring Dey to report its discounts and price

reductions independent of the Rebate Agreement.  (*See, e.g.*, Compl. ¶ 73.)  The U.S. Complaint

also does not allege any affirmative misrepresentation made by Dey to the effect that its AWP or

WAC was, in fact, a price that reflected all discount and price reductions.

There is also no reasonable reliance, as a matter of law, "[w]hen a person acts in a

way contrary to his [or her] own acknowledged understanding of the facts...."  *Triforo v. New*

*York Life Ins. Co.*, 845 F.2d 30, 33 (1st Cir. 1988).  A plaintiff "confronted with inconsistent or

contradictory representations may not reasonably rely on one side of the controversy without

attempting to resolve the inconsistency or contradiction."  *Mass. Laborers Health & Welfare*

*Fund v. Philip Morris, Inc.*, 62 F. Supp.2d 236, 242-43 (D. Mass. 1999) (citations omitted).  The

Government's entitlement to receive Dey's AMP information, therefore, vitiates the reliance element of the Government's common law fraud claim because the Government had access to the allegedly missing "far lower price" information. The Government could not have reasonably believed that AWP and WAC were the acquisition costs of the Dey Generics as it has claimed. *See, e.g., Triforo*, 845 F.2d at 33. Indeed, the Government had available the actual acquisition costs of the Dey Generics, taking into account discounts and all price reductions, in the form of AMPs. Even if it is assumed that Dey directly represented to the Government that AWP and WAC were actual prices – which is not alleged in the U.S. Complaint – the Government could not have reasonably relied on such representations given the terms of the Rebate Agreement. *See, e.g., Mass Laborers*, 62 F. Supp.2d at 242-43.

Similarly, the FCA Causes of Action are barred by the Rebate Agreement because the Government's entitlement to receive and knowledge of Dey's AMPs would contravene any allegation that Dey's AWPs and WACs were "false," and the Rebate Agreement bars the Government's after-the-fact attempt to create a duty to report AWP and WAC prices alleged by the U.S. Complaint. *See, infra*, Point IV(a)(1), (2).

## III.   THE U.S. COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO PLEAD FRAUD WITH PARTICULARITY

### A.   The Failure To Adequately Allege False Claims Submitted For Payment Requires Dismissal Of The FCA Claims

Rule 9(b)'s particularity requirement requires the Government to allege the "specification of the time, place and content of an alleged false representation" for each FCA violation. *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) (*quoting McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir.1980)); *see also* Fed. R. Civ. P. 9(b). The U.S. Complaint must also furnish the following information:

[D]etails concerning the dates of the claims, the content of the

> forms or bills submitted, their identification numbers, the amount
> of money charged to the government, the particular goods or
> services for which the government was billed, the individuals
> involved in the billing, and the length of time between the alleged
> fraudulent practices and the submission of claims based on those
> practices....

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004) (*citing*

*United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir.2002),

*cert. denied*, 537 U.S. 1105 (2003)).  None of this information appears in the U.S. Complaint.

The 75-paragraph U.S. Complaint does not identify a single false claim for

reimbursement actually submitted by any Provider for Dey Generics to any of the various States'

Medicaid programs.  No claims by the States to CMS for reimbursement are identified; no

instance of any reimbursement amount actually paid by CMS or any of the various States'

Medicaid programs based on the Provider's claim for payment is alleged.  The U.S. Complaint

does not identify any Providers, the amounts paid, or how much the Government supposedly

overpaid.  The U.S. Complaint does not identify any Federal Medical Assistance Percentage (the

"FMAP") amount paid by the Government that can be traced to the sale of a Dey Generic.  (*See*,

*e.g.*, Compl. ¶ 19.)  The U.S. Complaint does not say whether the Government seeks all amounts

paid by all fifty States, or some subset of the States.

Allegations of Dey's reporting allegedly "inflated" AWPs or WACs without these

details are insufficient as a matter of law, in the absence of any identification of any actual false

claims that Dey (or anyone) submitted to the Government.  *See Karvelas*, 360 F.3d at 235.  The

FCA count must "identify…specific claims that were submitted to the United States [and]

identify the dates on which those claims were presented to the government"; plaintiff cannot

"rel[y] exclusively on conclusory allegations of fraudulent billing." *Clausen*, 290 F.3d at 1311;

*see also U.S. ex rel. Rost v. Pfizer Inc.*, 446 F. Supp.2d 6, 27-28 (D. Mass. 2006); *Sanderson v.*

*HCA-The Healthcare Company*, 447 F.3d 873, 877-78 (6th Cir. 2006) (same).

In *U.S. ex rel. Walsh v. Eastman Kodak Co.*, 98 F. Supp.2d 141, 147-48 (D. Mass. 2000) (Saris, J.), this Court dismissed a relator's FCA claims against various hospital vendors that allegedly issued false invoices to hospitals that, in turn, would submit cost reports to Medicare for reimbursement. *Id.* The relator's complaint did not satisfy Rule 9(b) because it did not "identify or describe any specific hospital cost reports or transactions that allegedly give rise to violations of the FCA." *Id.*, at 147. Merely describing a "methodology by which the vendors might have produced false invoices, which in turn could have led to false claims," is not enough. *Id.* "Without citing a false claim arising from an allegedly false invoice, Relator has not met even a bare-bones Rule 9(b) test." *Id.*, at 147-48 (*citing U.S. ex rel. Gublo v. Novacare, Inc.*, 62 F. Supp.2d 347, 354 (D. Mass. 1999)).

The allegations concerning Dey's allegedly improper attempts to "market the spread" are insufficient as a matter of law to sustain an FCA claim. In *U.S. ex rel. Rost v. Pfizer, Inc.*, 446 F. Supp.2d 6 (D. Mass. 2006), the complaint alleged "in great detail, the framework of Defendants' illegal marketing, promotion, and distribution of [subject drug]…bribes, kickbacks, and other financial incentives given from Defendants to various drug distributors and physicians…[and] very serious violations of federal regulations regarding the marketing, distribution, and sale of pharmaceuticals." *Id.* The court dismissed the complaint on Rule 9(b) grounds because "FCA liability flows solely from the existence of a false claim for payment that has been submitted to the government," and the relator failed to "identify actual false claims submitted to the government." *Id.*, at 27.

The Government also cannot evade its Rule 9(b) obligation in the hope that the alleged "scheme" it painted is of an "exceedingly complex nature" over an "extensive time-line."

*Pfizer*, 446 F. Supp.2d at 26.   The First Circuit recognizes no exception to the heightened pleading requirements for "complex, numerous, and lengthy schemes."  *Id.* (*citing Karvelas*, 360 F.3d at 231, n.14).  In *Karvelas*, the First Circuit observed that it could not "find any basis in the history or requirements of the FCA, or in most of the precedents, for relieving [plaintiff] of his burden of pleading fraud with particularity because he chose to allege sixteen complex schemes." *Karvelas*, 360 F.3d at 231, n.14; *accord, Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 564 (6th Cir. 2003) ("a plaintiff should not be able to avoid specificity requirements of Rule 9(b) by relying upon the complexity of the edifice which he created").  The Government alleges a general "scheme" beginning from 1992 and continuing to 2004 for Medicare, and from 1992 to present for Medicaid (*see* Compl. ¶ 50), without even attempting to specify a single false claim for payment, submitted to or paid by Medicare or any States' Medicaid program, for any Dey Generic during any year within that extensive time period.  Such information, to the extent there are any, would be within the exclusive control of the Government.[14]

        The Government has also failed to explain "how" Dey's reporting of the AWPs and WACs for the Dey Generics caused either the submission of false claims or any overpayments by the Government based on these prices.  As the U.S. Complaint alleges, State Medicaid programs generally pay the "*lowest* of (a) the EAC as set by the states, (b) the maximum allowable cost ("MAC") ... or (c) the providers' usual and customary charge." (Compl. ¶ 38 (emphasis added)); *see also* 42 C.F.R. §§ 447.301, 447.331, 447.332, 447.333 (2005).  The federal upper limit ("FUL") may also impose Medicaid payment limits for multiple source drugs, including the Dey Generics.  (Compl. ¶ 38.)  During the alleged time period,

---

[14]     To the extent this Court's decision in *U.S. ex rel. Franklin v. Parke-Davis*, 147 F. Supp.2d 39 (D. Mass. 2001) permits an FCA plaintiff to generally plead a complex fraudulent scheme without the requisite specific allegations as to any false claims submitted and paid by the Government, that decision is not controlling here given the facts of this case, as well as the stricter standard imposed by *Karvelas*.  *See also Pfizer*, 446 F. Supp.2d at 26.

Medicare reimbursed the *lower* of the EAC, median published AWP of all generic forms of a

drug, or the AWP of the least expensive brand-name drug.  (*See id.* ¶¶ 45-47); 42 U.S.C. §

1395u(o); 42 C.F.R. § 405.517 (1992-2004).  As it stands, the U.S. Complaint utterly fails to

articulate how the Medicare and the States' Medicaid reimbursement methodologies resulted in

reimbursements based on an AWP or WAC associated with a Dey Generic, rather than some

other benchmark such as the MAC, FUL, or some other manufacturer's AWP.[15]  It does not

identify a single instance where the Government reimbursement was for a Dey Generic because

AWP was used as a benchmark.  Dey had no way of knowing how the Providers were actually

reimbursed on any single claim.

**B.**       **The Common Law Claims Also Fail To Meet The Rule 9(b) Standard**

The common law fraud and unjust enrichment causes of action are deficient for

the same reason.  *See Hayduk*, 775 F.2d at 443; *Mosko v. Defilippo*, 1991 WL 191211, *2 (D.

Mass. Sept. 10, 1991).  In *In re Lupron Marketing and Sales Practices Litigation*, 2004 WL

2070883, *4 (D. Mass. Sept. 16, 2004), the court dismissed Aetna's common law fraud claim

against TAP and others because it failed to allege that the "defendants intended that the

individual plaintiffs be deceived by [alleged false statements] or that any plaintiff actually relied

on the defendants' misrepresentations."  *Id.*, at *4 ("[i]t is not enough to simply aver that

plaintiffs 'reasonably relied upon the veracity of [d]efendants regarding the AWP").  Even

though the plaintiff "ritually recite[d] 'reasonable reliance] and a purpose on the part of

[defendant] 'to induce [plaintiff] to make higher payments,' no concrete facts [were] plead in

support of these generic allegations."  *Id.*  In other words, there were "no factual allegations

explaining how Aetna came to rely on [defendant's reported AWPs] or the extent to which they

---

[15]       The Government's Medicare claims also cannot withstand scrutiny because, as the Government alleges, Medicare payments were based on the "median" AWP for all generic forms of a drug, which may not even correspond to Dey's AWPs.

influenced the actual payment of claims." *Id.*, at *4, n.9. Similarly, as noted above, the Government has failed to plead any actual claims made to the United States for payment by Providers based on Dey's reported AWPs, any actual payments that the Medicare program or the various State Medicaid programs made due to Dey's reporting of its AWPs, or any reporting duty independent of the Rebate Agreement.

The unjust enrichment claim is similarly defective to the extent the Government seeks to rely on a fraud based theory for restitution or disgorgement, because the Government's fraud allegations fail to satisfy the heightened pleading requirements of 9(b). *See, e.g., Zurich Capital Markets, Inc. v. Coglianese*, 2005 WL 1950653, *10, n.12 (N.D. Ill. Aug. 12, 2005) ("[t]o the extent the [plaintiff's] unjust enrichment claims rely on theories of fraud, its averments of fraud must comply with Rule 9(b)"); *Krieger v. Gast*, 2000 WL 288442, *6 (W.D. Mich. Jan. 21, 2000) (Rule 9(b) applies to unjust enrichment claims "grounded in fraud"); *Ramapo Land Co. v. Consolidated Rail Corp.*, 918 F. Supp. 123, 128 (S.D.N.Y. 1996) (same). The U.S. Complaint fails to allege a single instance where a Provider was incentivized by the "spread" to dispense the Dey Generics.

## IV. THE COMPLAINT SHOULD BE DISMISSED UNDER FED. R. CIV. P. 12(b)(6) BECAUSE NONE OF THE COUNTS STATE A CLAIM FOR WHICH RELIEF CAN BE GRANTED

Dismissal of a complaint pursuant to the Federal Rule of Civil Procedure 12(b)(6) is appropriate "if the complaint, so viewed, presents no set of facts justifying recovery." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 46 (1st Cir. 1999). Conclusions that are not supported by the facts that are alleged in the complaint "deserve no deference" and summary legal conclusions that are contradicted or "belied by the facts alleged" may be disregarded. *See Murphy v. U.S.*, 45 F.3d 520, 522 (1st Cir. 1995); *Mass. Laborers Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp.2d 236, 240 (D. Mass. 1999). The Court need not accept as true

allegations of fact "which have since been conclusively contradicted by plaintiff's concessions or otherwise." *Riccio v. Ford Motor Credit Co.*, 238 F.R.D. 44, 46 (D. Mass. 2006). The Court "must consider the complaint, documents annexed to it, and other materials fairly incorporated within it. This sometimes includes documents referred to in the complaint but not annexed to it. Finally, the jurisprudence of Rule 12(b)(6) permits courts to consider matters that are susceptible to judicial notice." *Riccio*, 238 F.R.D. at 46 (D. Mass. 2006) (*quoting Rodi v. Southern New England Sch. Of Law*, 389 F.3d 5, 12 (1st Cir.2004)).

### A.      The Complaint Does Not Allege The Necessary Elements Of The FCA Causes Of Action

Even if the pleading requirements of *Karvelas* are ignored, the FCA claims must be dismissed under Rule 12(b)(6) because the necessary elements of the FCA are not alleged. A cause of action under § 3729(a)(1) must allege that Dey "knowingly present[ed], or caused to be present[ed], to an officer of employee of the United States Government…a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). A cause of action under § 3729(a)(2), must allege that Dey "knowingly ma[de], use[d] or cause[d] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2).

### 1.      The FCA Claim Must Be Dismissed Pursuant To Rule 12(b)(6) Because The Government Cannot Allege That AWPs And WACs Were "False"

It is well settled that "claims are not 'false' under the FCA unless they are furnished in violation of some controlling rule, regulation or standard." *United States v. Prabhu*, 442 F. Supp.2d 1008, 1026 (D. Nev. 2006). Although the Government alleges its own self-serving definition of AWP (Compl. ¶ 40), no statute, regulation or standard so defining it is identified. In *U.S. ex rel. Quinn v. Omnicare, Inc.*, 2003 WL 24296532 (D. N.J. Mar. 28, 2003),

the relator claimed that defendants violated the FCA and defrauded the New Jersey Medicaid program by failing to credit New Jersey Medicaid the full amount it paid for medications provided to Medicaid beneficiaries but later returned and redispensed. *Id.* The court dismissed the relator's FCA and unjust enrichment counts because, *inter alia*, there was no "federal or New Jersey statute or regulation governing Medicaid [that] specifically addresse[d] the issue of credits for returned medication." *Id.*, at \*7. The Government in this case has not alleged any regulation or statute that required Dey to set its AWP at the actual cost to wholesalers, as the U.S. Complaint alleges it should have.[16] (*See* Compl. ¶ 40.)  Similarly, in *U.S. ex rel. Cox v. Iowa Health Sys.*, 29 F. Supp.2d 1022 (S.D. Iowa 1998), the plaintiff alleged that defendants submitted false claims for air ambulance mileage because defendants improperly converted "nautical miles" into "statute miles" for reimbursement. The court dismissed the case because "no controlling authority required [the] parties to submit claims in nautical rather than statute miles." *Id.*, at 1026; *see also U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019 (7th Cir. 1999).

A statement cannot be "false" or "fraudulent" under the FCA when the statement is consistent with regulations governing the program. *See United States ex rel. Glass v. Medtronic, Inc.*, 957 F.2d 605, 608 (8th Cir. 1992). The only relevant price reporting regulation applicable to Dey are the AMP regulations it agreed to under the Rebate Agreement. *See* 42

---

[16]     This Court's November 2006 decision on the meaning of "AWP" cannot supply the "controlling rule, regulation or standard" to save the Government's FCA claims. *See In re Pharmaceutical Industry Average Wholesale Price Litig.*, 2006 WL 3102998 (D. Mass. Nov. 2, 2006). First, this decision was not issued until November 2, 2006, which is nearly 10 years after Dey set the AWPs for the Dey Generics. Second, this Court's definition, which defines AWP as an "average," is far different from the Government's allegation that "AWP is...*the price* at which a pharmaceutical firm or wholesaler sells a drug to a retail Customer who then administers it to a patient." (*See* Compl. ¶ 40 (emphasis added).)  Third, this Court only considered the meaning of "AWP" in the context of the Medicare statute, 42 U.S.C. § 1395u(o), and did not find this to be the "controlling rule, regulation or standard" independently used by each of the fifty States with respect to Medicaid reimbursement. Finally, the definition, if anything, resembles the AMP, which Dey did furnish to the Government.

U.S.C. § 1396r-8. There is no allegation Dey violated these regulations. Public admissions establish that the Government used AWPs for purposes of administrative convenience, as well as its concern for maintaining access to care and subsidizing Providers for inadequate dispensing fees. (*See* Robben Decl., Ex. G, at Tab Nos. 12-14, 23, 26, 30; *see also* Robben Decl. ¶ 24). The Government cannot now complain that it was somehow misled by Dey during all this time. Dey was permitted to rely on the Government's public statements that it knew AWP was not an actual price to wholesalers. *See, e.g., U.S. v. Lazy FC Ranch*, 481 F.2d 985, 988-89 (9th Cir. 1973). This Court should not accept the "interpretative afterthought" as to what the U.S. Complaint now alleges AWP and WAC represent, when the definitions diverge from its historical public record. *See U.S. v. Napco Int'l, Inc.*, 835 F. Supp. 493, 497-98 (D. Minn. 1993).

### 2. There Is No "Falsity" Because Relevant Government Officials and Agencies Knew That AWPs and WACs Did Not Represent Actual Acquisition Cost

HHS's, CMS's, and the OIG's prior public admissions establish that the Government and the States knew since 1968 that AWPs did not represent actual acquisition costs to wholesalers, and, more particularly, since 1996 with respect to albuterol once the audit reports were completed. (*See* Robben Decl. ¶¶ 19-24; *see also* Robben Decl., Ex. G, at Tab Nos 1, 3, 6-8, Exs. H – O.) The Government also knew about the alleged "fraud" once it was served with the Relator's complaint. The Government, as a matter of law, cannot sustain the FCA claim after 1996 because it depends on the allegation that it believed Dey's "actual prices" were "far less than the prices reported by Dey." (Compl., at p. 1.)

When the Government knows of the alleged misconduct or misrepresentation but nevertheless decides to pay the claim, there can be no FCA liability. In *U.S. ex rel. Costner v. URS Consultants, Inc.*, 317 F.3d 883 (8th Cir. 2003), defendants contracted with the Environmental Protection Agency to clean up a contaminated industrial site, and allegedly

concealed operational problems and committed numerous regulatory violations during the course

of its contract, and continued submitting claims for payment. *Id.*, at 887. The Eight Circuit held

that no false claims were submitted, because the EPA was "informed" of the operation problems

and nonetheless continued to approve monthly payments to defendants. *Id.* The Eighth Circuit

held: "there [was] no false claim because [the agency's action] would have occurred regardless

of [the defendant's] actions." *Id.* (citations omitted).

The public record of prior admissions by the Government states that HHS, CMS,

and OIG knew AWP was not the price charged to wholesalers for albuterol and other Generics.

(*See* Robben Decl. ¶¶ 19-24.) In *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1019

(7th Cir. 1999), the Seventh Circuit held that defendant was not liable for receiving bus

transportation subsidies while fraudulently representing that it was in compliance with federal

statute and regulations, because the relevant government agency "was fully apprised of the

[defendant's] route designs and never complained about them in the past." *Id.*, at 1019.

### 3.   The Government's Knowledge Also Precludes Any Finding That Dey "Knowingly" Submitted Or Caused The Submission Of False Claims

The FCA requires that the Government demonstrate that Dey knowingly

presented AWP's Dey knew to be false. *See Hindo v. University of Health Sciences*, 65 F.3d

608, 617 (7th Cir. 1995). This is not possible when the defendant knows that the Government

approved and paid the claim when it knew of the relevant facts. *See U.S. ex rel. Becker v.*

*Westinghouse Savannah River*, 305 F.3d 284, 289 (4th Cir. 2002). The Government's

knowledge vitiates the scienter element of the FCA when it is publicly known that the

responsible Government officials have been fully apprised of all relevant information. *See*

*Costner*, 317 F.3d at 887; *U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d

284, 289 (4th Cir. 2002). Dey reported quarterly its prices, after discounting, in the form of

AMPs. The audit reports publicly established that the Government knew that AWP did not approximate what Providers were actually paying for albuterol, but continued to pay the claims anyway. Dey, therefore, could not have believed it was intentionally misleading the Government concerning its prices. In *U.S. ex rel. Englund v. Los Angeles County*, 2006 WL 3097941, *12 (E.D. Cal. Oct. 31, 2006), for example, even though the alleged practice engaged by defendant Los Angeles County was "controversial," the court found no intent to defraud because the "Federal government knew what the County was doing and implicitly approved of the County's actions," and the "alleged 'scheme' was well known and public...." *Id.*, at *12; *see also U.S. ex rel. Butler v. Hughes Helicopters*, 71 F.3d 321, 326-29 (9th Cir. 1995).

### 4. The Complaint Does Not Allege That Dey "Presented" Or "Caused To Be Presented" A False Claim For Payment

One of the essential elements of an FCA cause of action is the actual filing of a false or fraudulent claim with the Government: "[A] defendant violates the FCA only when he or she has presented to the government a false or fraudulent claim." *See Karvelas*, 360 F.3d at 225. The U.S. Complaint fails to allege that Dey "presented" or filed any claim with the Government. The Government concedes Dey did not submit a claim for payment, and alleges only that Providers file claims for payment, without identifying any particulars of those claims. (*See* Compl. ¶ 30.) The Providers, moreover, submitted their Medicaid claims to the States, and not to the Government.

Causation is not adequately alleged because the Providers made their own independent decisions with full knowledge that AWP was not their actual acquisition cost. The U.S. Complaint, therefore, does not properly plead that Dey "caused to be presented" any claim for payment to the Government, or that Dey "caused" the presentation of false claims by Providers. To plead this element, the Government must allege that Dey had some degree of

participation in the claims process. *See US ex rel. Shaver v. Lucas W. Corp.*, 237 F.3d 932, 933

(8th Cir. 2001). Dey did not control the actions of Providers or "cause" them to submit claims.

Even knowledge that a Provider might be submitting false claims does not constitute "causation"

under the FCA. *See U.S. v. President & Fellows of Harvard Coll.*, 323 F. Supp.2d 151, 186-87

(D. Mass 2004) (in order "[t]o 'cause' the presentation of false claims under the FCA, some

degree of participation in the claims process is required"); *see also U.S. ex rel. Kinney v.*

*Hennepin County Medical Center*, 2001 WL 964011, at *9-10 (FCA claims dismissed because

defendant had no control over the contents of the claims provider submitted to Medicare or

Medicaid and did not instruct the provider on what codes to use for billing to Medicare or

Medicaid). Moreover, there is no allegation that Dey's AWPs or WACs are included on the

claim forms submitted by Providers. Accordingly, reimbursements based on Providers' claim

forms do not establish that Dey made, or caused to be made, any claims to the States or the

Government.

### 5.   Publishing AWPs Is Not An Implied Certification

Publishing AWPs and WACs for the Dey Generics that the Providers allegedly

may have relied on to present claims is not a legal certification. Some courts have allowed an

FCA claim when the filed claims themselves were not false, if the defendant has made a false

representation about some necessary prerequisite to the Government paying a claim, such as

compliance with a statute. *See United States ex rel. Thompson v. Columbia HCA/Healthcare*

*Corp.*, 125 F.3d 899 (5th Cir. 1998) This does not help the Government here, however. The

court in *Thompson* held:

> [W]here the government has conditioned payment of a claim upon
> a claimant's certification of compliance with, for example, a
> statute or regulation, a claimant submits a false or fraudulent claim
> when he or she falsely certifies compliance with that statute.

125 F.3d at 902.  The U.S. Complaint does not identify a single such certification on the part of

Dey (or anyone), nor does the Government identify any Medicare or Medicaid statute with which

Dey failed to comply.  While the U.S. Complaint alleges that Dey caused to be published AWPs

and WACs that did not reflect the actual acquisition costs for its products to Providers and

wholesalers (see Compl. ¶ 51), it fails to identify a specific instance where Dey made any kind of

certification to the Government that its AWP or WAC did, in fact, represent acquisition costs.

(Id. ¶ 66.)

          Although certification may be implied, the facts as alleged by the Government fail

to satisfy that theory as well.  This theory was explained in *United States ex rel. Pogue v.*

*Diabetes Treatment Centers of America, Inc.*, 238 F. Supp.2d 258, 264 (D.D.C. 2002):

> The theory of implied certification ...is that where the government
> pays funds to a party, and would not have paid those funds had it
> known of a violation of  a law or regulation, the claim submitted
> for those funds contained an implied certification of compliance
> with the law or regulation and was fraudulent.

The Government's claims fail this test for two reasons.  First, as noted above, the U.S. Complaint

alleges that the Providers, and not Dey, filed the claims at issue.  The U.S. Complaint does not

allege, moreover, that the Providers were unaware of the difference between their acquisition

costs and Dey's AWPs or WACs.  Second, even if the Providers' claims could be attributed to

Dey, the U.S. Complaint has not identified any statute, regulation, or contractual obligation

requiring Dey to publish AWPs and WACs that reflect the actual acquisition costs for its

products.  *See U.S. ex rel. Mikes v. Straus*, 274 F.3d 687, 700 (2d Cir. 2001) ("implied false

certification is appropriately applied only when the underlying statute or regulation upon which

the plaintiff relies expressly states the provider must comply in order to be paid").  In the absence

of an identified legal obligation to report AWP or WAC, Dey could not have falsely certified

compliance.  Since the Government has failed to allege the existence of a false claim, the first

and second causes of action must be dismissed.

<h3>6.     <u>The Complaint Does Not Adequately Allege A Kickback</u></h3>

FCA Count I must be dismissed for the further reason that, to the extent the Government is relying on an "implied certification" theory using the Anti-Kickback Statute to establish the "falseness" of submitted claims, that theory cannot apply to the allegations here because there was no illegal "kickback."  The Government alleges that the "spread" paid to Providers constituted an illegal "kickback" or "illegal remuneration," so as to violate the Anti-Kickback Statute.  (*See, e.g.*, Compl. ¶ 63.)   However, the U.S. Complaint utterly fails to allege that Dey paid anything to Providers in exchange for their dispensing of the Dey Generics.[17]  Second, an FCA claim based on implied certification may arise only in Medicare, if at all, as there is not one federal certification that Providers must sign in the Medicaid context.[18]  *See Pogue*, 238 F. Supp.2d at 264, n.2. Third, courts endorsing an "implied certification" theory require that the Government plead and prove that had it known of the violation of the statute or regulation, it would not have paid the claim.  *See id*, at 265; *U.S. ex rel. Bidani v. Lewis*, 264 F. Supp.2d 612, 615 (N.D. Ill. 2003).  The Government has failed to adequately plead this, since it knew that AWPs were not actual acquisition costs, but yet repeatedly refused to change its reimbursement system.  Moreover, the drugs at issue here are multi-source and Medicare reimbursement was allegedly based on a "median" AWP for all sources rather than the AWPs

---

[17]     To the contrary, the U.S. Complaint merely pleads that reimbursement to Providers came from the Government.  It does not plead that Government reimbursement for drugs actually dispensed constitutes "illegal remuneration."  Indeed, the only allegation of wrongdoing by Dey is that Dey reported prices for its drugs that were "inflated."  That, however, is not an "offer" or "pay[ment]," either "direct[] or indirect[]," within the meaning of the Anti-Kickback Statute.  *See* 42 U.S.C. § 1320a-7b(b)(2).  Thus, there is simply no properly pleaded "kickback."  *See, e.g., U.S. v. Ruttenberg*, 625 F.2d 173, 177 (7th Cir. 1980) (a "kickback" is generally understood "to mean the transfer back to one having control of the original payment").

[18]     Nor has the Government pleaded the signing of any certification form for Medicaid by any particular Provider who dispensed a Dey Generic.

published for the Dey Generics.  (*See* Compl. ¶¶ 45-47.)  Thus, the Government would have paid

this median amount regardless of Dey's AWP.

**B.      None Of The Essential Elements Of An Unjust Enrichment Claim Are Alleged**

            To prevail on a claim for unjust enrichment, "a plaintiff must show:  '(1) an

enrichment, (2) an impoverishment, (3) a relation between the enrichment and the

impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by

law.'"  *Micromuse*, 204 F. Supp.2d at 209 n.8 (citations omitted).  Dey was not enriched by, and

the Government was not impoverished by, the sales of Dey Generics.  Assuming the truth of the

allegations in the U.S. Complaint, Dey did not receive any portion of the "spread" alleged in the

U.S. Complaint and the Government does not seek to recover the "spread."  Indeed, this "spread"

was received by the Providers that dispensed the drugs, and not by Dey.  Nor can the "increased

market share" provide a basis for the "benefit" element of the unjust enrichment claim, because

the U.S. Complaint does not allege that Dey's alleged increase in market share hurt the

Government.[19]  Moreover, as the Government alleges, the "sales prices" for the Dey Generics

decreased during the relevant time period.  (Compl. ¶ 55.)  Thus, as the "spread" increased for

the Dey Generics, the price paid by Providers necessarily decreased.

---

[19]      Indeed, there can be no unjust enrichment where the "benefit" conferred is too remotely connected to the "detriment" incurred. *See Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1007 (11th Cir. 2004); *Rapaport v. Dep't of Treasury*, 59 F.3d 212, 217 (D.C. Cir. 1995) ("the fundamental characteristic of unjust enrichment is that the defendant has been unjustly enriched by receiving something...that properly belongs to plaintiff, [thereby] forcing restoration to plaintiff") (quotations omitted).  For the Medicare program, reimbursements to Dey's customers were based on median AWPs for *all* sources of the drug in question. (*See* Compl. ¶ 45-47.)  The Government has not alleged how Dey's publication of an allegedly inflated AWP caused reimbursement based on a *median* AWP, which included the AWPs of Dey's competitors, to confer a benefit upon Dey.  In the case of Medicaid, many reimbursement methods are used for multi-source drugs, and in many cases these methodologies were subject to specified upper limits. (*See id.* ¶¶ 37-38, 43.)  The Government alleges, in a conclusory fashion, that reporting inflated AWPs or WACs somehow conferred a direct benefit to Dey by way of the various complex reimbursement methodologies used by the Medicaid program. (*See id.* ¶¶ 37, 38, 43, 50.)  Thus, the benefit to Dey alleged in the U.S. Complaint is far too remote from the alleged detriment to state a valid claim for unjust enrichment. *See, e.g., Nova Info.*, 365 F.3d at 1007.

The unjust enrichment claim must also be dismissed because it is not an independent claim but premised on alleged "violations of federal and state law," and therefore premised on the same underlying wrong alleged for Counts 1, 2, and 4. (Compl. ¶ 70.)  Because unjust enrichment is concerned solely with enrichments that are unjust "independently of [alleged] wrongs," the unjust enrichment claim has no application where Government relies on a "wrong" of some kind to support the "unjust" factor; in such cases, "the right on which [the plaintiff] relies arises from that wrong, and not from unjust enrichment." *Florida v. Tenet Healthcare Corp.*, 420 F. Supp.2d 1288, 1309 (S.D. Fla. 2005) (an unjust enrichment theory predicated on providers' "inflated and improper costs" submitted for Medicare reimbursement dismissed for failure to state a claim) (citations omitted); *see also United States v. Buckley*, 2005 WL 164287, *1 (D. Mass. Jan. 25, 2005); *EER Systems*, 950 F. Supp. at 133; *Ben Elfman & Son, Inc. v. Criterion Mills, Inc.*, 774 F. Supp. 683, 687 (D. Mass. 1991).

### C.      The Common Law Fraud Count Also Fails To State A Claim Under 12(b)(6)

The Government also fails to allege facts establishing the "falsity" of the AWPs and WACs published by Dey.  A valid cause of action for common law fraud requires allegations of a false representation of fact, reliance, and scienter.  *See Damon*, 87 F.3d at 1471-72.  The Government alleges that Dey's AWPs and WACs were "false" because they did not represent the "actual acquisition costs" of its products.  The Government knew the "actual acquisition costs" all along and knew that these actual acquisition costs were calculated, as the Government directed, as AMP rather than AWP or WAC.  *See* 42 U.S.C. § 1396r-8; (Rebate Agreement I(a).) Dey's AWPs and WACs, therefore, could not constitute false representations of actual acquisition costs because Dey reported actual acquisition costs, in the form of AMPs, and reported AMPs in accordance with the Rebate Agreement and section 1396r-8.

The U.S. Complaint is also devoid of any allegations of any false representation

made by Dey to the Government.  In order to plead a false statement or representation, there

must be an objective truth and that the statement made is inconsistent with that truth.  *See U.S. ex*

*rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 377-78 (7th Cir. 2003); *Graham v. Renbrook*

*Sch.*, 692 F. Supp. 102, 108 (D. Conn. 1988).  The U.S. Complaint references alleged prices

charged to Ven-A-Care at various times (*see* Exhibit A to Compl.), but does not allege any

statements made by Dey to Ven-A-Care conveying or characterizing their prices.  Ven-A-Care

does not allege that it was misled by Dey, nor does it allege that it relied on Dey to pass along a

false representation to the Government.  The U.S. Complaint, therefore, does not adequately

allege common law fraud.[20]

       The common law fraud cause of action, based on Medicaid reimbursement,

should further be dismissed because the Government alleges that only third-parties – *i.e.*, the

States – relied on Dey's published AWPs and WACs in determining reimbursement amounts

with respect to the Medicaid program.  (*See* Compl. ¶¶ 41-43.)  The Government does not allege

that it calculates Medicaid reimbursement; rather, the States perform this function.  *See, e.g.,*

*Cement and Concrete Workers District Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d

Cir. 1998) ("a plaintiff does not establish the reliance element of fraud…by showing only that a

third party relied on a defendant's false statements"); *In re Pharmaceutical Industry Average*

*Wholesale Price Litig.*, 339 F. Supp.2d 165, 180 (D. Mass. 2004) (a county, which was billed by

the state for 25 percent of the state's Medicaid expenditures, could not bring a fraud claim

against pharmaceutical companies based on alleged misrepresentations which were relied upon

by the state, when the state, and not the plaintiff, set reimbursement procedures); *Pamela*

*Amusement Co., Inc. v. Scott Jewelry Co.*, 190 F. Supp. 465, 468 (D. Mass. 1960) (rejecting a

---

[20]     Indeed, the U.S. Complaint fails to allege what the AWPs and WACs for each of the Dey Generics "should
have been" during the alleged time period.

claim for fraud under Massachusetts common law where the plaintiff established only reliance by a third party guarantor), *aff'd*, 286 F.2d 497 (1st Cir. 1960).  Indeed, the Government alleges that it brings this action only on behalf of HHS and CMS, and not on behalf of the States to recover alleged damages suffered by the States.  (*See* Compl. ¶ 10.)

## CONCLUSION

For the foregoing reasons, Dey respectfully requests that the Court dismiss the United States' Complaint, with prejudice, and grant Dey such other, further, and different relief as the Court deems to be just and proper.

Respectfully submitted,

Of Counsel:

By:___/s Philip D. Robben_____
Paul F. Doyle (BBO # 133460)
Sarah L. Reid
William Escobar (*pro hac vice*)
Neil Merkl (*pro hac vice*)
Christopher C. Palermo (*pro hac vice*)
Philip D. Robben (*pro hac vice*)
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
Telephone:  (212) 808-7800
Facsimile:  (212) 808-7897

-and-

By:___/s Martin F. Murphy_____
Martin F. Murphy (BBO # 363250)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02110
Telephone:  (617) 832-1000
Facsimile:  (617) 832-7000

Dated: December 22, 2006

*Attorneys for Defendants*
*Dey, Inc., Dey L.P., Inc. and Dey L.P.*