UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: PHARMACEUTICAL INDUSTRY AVERAGE WHOLESALE PRICE LITIGATION | MDL No. 1456<br>Master File No. 01-CV-12257-PBS |
| THIS DOCUMENT RELATES TO:<br><br>*United States of America ex rel. Ven-A-Care of the Florida Keys, Inc., et al. v. Dey, Inc., et al.*, Civil Action No. 05-11084-PBS | Hon. Patti B. Saris |

## DECLARATION OF PHILIP D. ROBBEN IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS

**PHILIP D. ROBBEN** declares, pursuant to 28 U.S.C. § 1746, that:

1. I am a member of the law firm of Kelley Drye & Warren LLP, counsel for defendants Dey, Inc., Dey L.P., Inc., and Dey L.P. (together "Dey") in this action. I am admitted *pro hac vice* for the purposes of this action. I make this declaration in support of Dey's motion to dismiss all of the claims in this action pursuant to (i) Fed. R. Civ. P. 9(b) and 12(b)(6) and (ii) 31 U.S.C. § 3731(b) and 28 U.S.C. § 2415(a)(b).

2. Dey moves to dismiss both the complaint in this action ("U.S. Complaint" or "Compl."), filed by the United States (the "Government"), and the complaint, filed by the relator, Ven-A-Care of the Florida Keys, Inc. (the "Relator" or "Ven-A-Care"), which adopts and incorporates the U.S. Complaint.

3. I make this declaration from my own personal knowledge of the facts and circumstances as stated below. The source of my knowledge is my review of Kelley Drye & Warren LLP's file on this litigation, including my review of the pleadings and documents set forth herein and annexed as exhibits hereto, and documents furnished to me by my client.

**Dey and the Products at Issue**

4. Dey is a small, specialty pharmaceutical company located in Napa, California that has traditionally focused on manufacturing and marketing generic drugs used to treat respiratory ailments, such as asthma and chronic obstructive pulmonary disease (also known as "COPD").

5. The U.S. Complaint sets forth the Dey drugs at issue in this action (the "Dey Generics") and specifies, by NDC number, specific dosages and formulations of those drugs. (See Compl. ¶ 29; a true and correct copy of the U.S. Complaint is annexed hereto as Exhibit A.) The Dey Generics include Dey's Albuterol Inhalation Aerosol Inhaler, Albuterol Inhalation Aerosol Refill, Albuterol Sulfate Inhalation Solution Multi-dose, Albuterol Sulfate Inhalation Solution Unit Dose, Cromolyn Sodium Inhalation Solution, and Ipratropium Bromide Inhalation Solution. (*Id.*)

**Prior Proceedings**

6. The Government brought this *qui tam* action against Dey pursuant to an Order entered by this Court (Lasker, J.) on September 9, 2006, granting, *inter alia*, the motion of the Government to intervene, lift the seal and serve the U.S. Complaint on Dey. A copy of the U.S. Complaint was delivered to Dey's counsel in Boston via email on September 11, 2006.

7. On October 25, 2006, Dey waived formal service of the U.S. Complaint pursuant to Fed. R. Civ. P. 4(d)(2). Judge Lasker transferred the action to this multidistrict litigation on November 20, 2006 for pretrial proceedings. *See* Electronic Order, Nov. 20, 2006, Docket No. 198.

8. According to the U.S. Complaint and docket sheet, there are prior pleadings (including multiple complaints) filed in this action under seal. At Dey's request, seven

NY01/POLDK/1153398.5

pleadings in redacted form were delivered to Dey by the Government after Dey accepted service of the U.S. Complaint, although they remain under seal and Dey may not publicly disclose them. Some of these pleadings were filed (by the Relator) in the 1990s.

9.  The Government has declined to furnish Dey with complete unredacted copies of all the pleadings and all other filings – including any motions – made prior to service of the U.S. Complaint on Dey.

10. The U.S. Complaint alleges that it "relates back to the dates of the original pleadings in the consolidated cases" against Dey L.P. and Dey L.P. Inc.. (Ex. A ¶¶ 14-15.) Apparently, there were two such cases: one in the District of Massachusetts and the other in the Southern District of Florida. They were consolidated at some point in this proceeding for reasons and on grounds unknown to Dey.

**Dey's Involvement in Other MDL-Related Litigation**

11. Dey is a Track II defendant in the class action pending before the Court.

12. The following States also commenced actions now pending against Dey arising from the same transactions and occurrences alleged in the U.S. Complaint: Alabama, Alaska, Arizona, California, Florida, Hawaii, Illinois, Kentucky, Massachusetts, Mississippi, Montana, Nevada, Pennsylvania, South Carolina, Wisconsin and several New York Counties (the "State Actions"). The California and Florida actions are state law *qui t*am actions initiated by the same Relator, Ven-A-Care.

13. Texas, West Virginia, Arkansas, Missouri, Connecticut and Ohio also brought actions against Dey. Those cases have been settled.

14. The State Actions seek to recover, among other things, the same alleged damages on similar legal theories for the same alleged Medicaid overpayments that the

NY01/POLDK/1153398.5

Government appears to claim in this action. (Annexed hereto as Exhibits B, C, and D are true and correct copies of the operative complaints in the Florida, Illinois (without exhibits), and Mississippi actions referenced above.) These complaints present a representative sampling of the claims asserted in the State Actions.

15.     Dey removed the State Actions not already in Federal Court in October 2006, based on the jurisdictional grant in 31 U.S.C. § 3732(b). After removal, Dey sought the transfer of the newly-removed actions to this Court to be consolidated with the Government's action here (the cases brought by Arizona, California, Massachusetts, Montana, and many of the NY counties are already before the Court).

16.     The Alabama and Hawaii actions were remanded on the motions of those States. Although remand motions have been filed in most of the other newly-removed State Actions, none of those motions has been decided.

17.     On November 28, 2006, the Judicial Panel on Multi-District Litigation (the "JPML") transferred the Florida, Mississippi and Nevada actions to this Court. Those transfers were final on December 14, 2006. The Illinois action was transferred to this Court on December 14, 2006. In the other state actions, the parties are still litigating the JPML's transfer order and, in some cases, still briefing remand motions or other issues raised by Dey's removal.

**Dey's Rebate Agreement With CMS**

18.     Annexed hereto as Exhibit E is a true and correct copy of a rebate agreement ("the Rebate Agreement") provided to me by Dey which states it became effective January 1, 1991. Dey entered into this Rebate Agreement with the Secretary of HHS acting through the CMS. The Rebate Agreement signed by Dey conforms in all material respects to the Form agreement maintained by CMS. Compare Exhibit E (Dey Rebate Agreement) with Exhibit

F (a true and correct copy of the sample Form rebate agreement available from the CMS website which is annexed hereto).

**Prior Publicly Released Government Reports**
**Discuss AWP and AWP-Based Reimbursement**

19.  On or about July 7, 2006, in *United States ex rel. Ven-A-Care of the Florida Keys, Inc. v. Abbott Labs., Inc. et al.*, Civil Action No. 06-11337-PBS (D. Mass.), the defendants in that action filed Appendix A to Abbott Laboratories, Inc.'s Motion to Dismiss (the "Abbott Appendix"). The Abbott Appendix contains thirty-one Government reports and other documents published and publicly released by the Government, between 1968 and 2004, that contain a discussion of AWP or AWP-based pharmaceutical reimbursement under the Medicare and Medicaid programs. (A true and correct copy of the Abbott Appendix is annexed hereto as Exhibit G.)

**HCFA's 1996 Nebulizer Drug Reports**

20.  The Government has also released written audit reports not found in the Abbott Appendix that relate directly to the cost of albuterol and other inhalation drugs.

21.  In February 1996, the HHS-OIG publicly released a report that stated:

> [I]f Medicare had revised its drug pricing methodology and implemented a manufacturers' rebate program, it and its beneficiaries could have saved about $58 million of the $226 million allowed for nebulizer drugs…in 1994.

*See* HHS-OIG Report, *Medicare Payments for Nebulizer Drugs* (OEI-03-94-00390) (February 1996), at ii. (A true and correct copy of this report is annexed hereto as Exhibit H.)

22.  In June 1996, the HHS-OIG publicly released another report concerning the AWP-based reimbursement of albuterol under the Medicare program. The report stated that AWP was significantly higher than the wholesale price paid by "thousands" of pharmacies and that Medicare's allowed reimbursement amount for albuterol, which was based on AWP, was

- 5 -

more than double what thousands of pharmacies actually paid for the drug. *See* HHS-OIG Report, *Suppliers' Acquisition Costs for Albuterol Sulfate* (OEI-03-94-00393) (June 1996), at i-ii. (A true and correct copy of this report is annexed hereto as Exhibit I.)

**HHS-OIG's 1996 Medicaid Pharmacy Acquisition Cost Reports**

23. Also in 1996, at the request of HCFA, the HHS-OIG conducted a review of pharmacy acquisition costs for albuterol, among other generic drugs, reimbursed under the Medicaid programs of several States. The publicly released reports – concerning pharmacy acquisition costs in Montana, North Carolina, Virginia, Delaware, Florida, and Nebraska – concluded that AWPs "overstated" the prices actually paid for drugs. *See* HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Montana Department of Public Health and Human Services* (A-06-95-00068) (July 1996), at 1; HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the North Carolina Department of Human Services* (A-06-05-00071) (September 1996), at 1; HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Virginia Department of Medical Assistance Services* (A-06-95-00072) (November 1996), at 1; HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Delaware Department of Health and Social Services* (A-06-95-00063) (September 1996), at 1; HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Florida Agency for Health Care Administration* (A-06-95-00065) (August 1996), at 1; HHS-OIG Report, *Review of Pharmacy Acquisition Costs for Drugs Reimbursed Under the Medicaid Prescription Drug Program of the Nebraska Department of Social Services* (A-06-95-

00069) (December 1996), at 1. (True and correct copies of the foregoing reports are annexed hereto as Exhibits J – O, respectively.)

24. The published reports concluded that, on average, AWPs for generic drugs exceeded the actual cost of the same generics by 42.5 percent. (*See* Exs. J - O, at i.) In their written responses to the reports, certain States acknowledged the difference between AWP and acquisition cost, but stated that the spread between the actual acquisition cost and the reimbursement amount was necessary to compensate pharmacies for dispensing fees that were too low. (*See* Ex. J, Appendix 4, at 1; Ex. K, Appendix 4, at 1, Ex. L, Appendix 4, at 1.)

**The Government's Published Reports Concerning WAC**

25. Several government reports discuss WAC and WAC-based reimbursement under Medicaid.

26. In 1977, HCFA advised the States that it was "not convinced that those states which continue to reimburse at…wholesale invoice cost [*i.e.*, WAC] have made a real effort to approach AAC [actual acquisition cost]." *See Title XIX, Social Security Act: Limitation on Payment of Reimbursement for Drugs: Estimated Acquisition Cost (EAC)*, HFCA Action Transmittal No. 77-13 (MMB), Abbott Appendix, at Tab 6.

27. In 1994, the United States General Accounting Office ("GAO") stated that WAC "does not capture manufacturers' discounts and price reductions provided to certain buyers." *See Prescription Drugs[:] Companies Typically Charge More in the United States Than in the United Kingdom* 19, n.16 (Jan. 1994) (GAO/HEHS-94-29). (A true and correct copy of this report is annexed hereto as Exhibit P.)

28. In 2000, the GAO stated that, "[W]holesale acquisition cost (WAC) . . . is the actual selling price charged by the manufacturer before discounts to the wholesaler . . . ." *See*

NY01/POLDK/1153398.5

GAO, *Prescription Drugs[:] Drug Company Programs Help Some People Who Lack Coverage* 7 n.8 (Nov. 2000) (GAO-01-137). (A true and correct copy of this report is annexed hereto as Exhibit Q.)

29. In July 2001, the HHS-OIG defined WAC as follows: "Wholesale Acquisition Cost (WAC) – the price paid by the wholesaler for drugs purchased from the manufacturer. Publicly listed WAC amounts may not reflect all available discounts." *See* HHS-OIG, *Cost Containment of Medicaid HIV/AIDS Drug Expenditures* 29 (July 2001) (OEI-05-99-00611). (A true and correct copy of this report is annexed hereto as Exhibit R.)

30. In September 2001, the GAO stated that "WAC is the list price a wholesaler pays to a manufacturer, but it does not include discounts that may affect the net price." *See Medicare Payments for Covered Outpatient Drugs Exceed Providers' Cost* 23 (Sept. 2001) (GAO-01-1118). (A true and correct copy of this report is annexed hereto as Exhibit S.)

31. A 2002 HHS-OIG report found that in 1999, based on national averages, actual acquisition cost for generic drugs was approximately 31% below WAC. *See* HHS-OIG, *Medicaid Pharmacy – Actual Acquisition Cost of Generic Prescription Drug Products* 6-7 (Mar. 2002) (A-06-01-00053). (A true and correct copy of this report is annexed hereto as Exhibit T.)

32. In 2003, the GAO stated that, "WAC does not include rebates or discounts manufacturers may offer to wholesalers." *See* GAO, *Federal Employees' Health Benefits: Effects of Using Pharmacy Benefit Managers on Health Plans, Enrollees, and Pharmacies* 21 n.24 (Jan. 10, 2003) (GAO-03-196). (A true and correct copy of this report is annexed hereto as Exhibit U.)

**WHEREFORE**, I respectfully request that this Court grant Dey's motion to dismiss in its entirety and grant Dey such other, further, and different relief as the Court deems to be just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed December 22, 2006.

                                                /s/ Philip D. Robben
                                                **PHILIP D. ROBBEN**

NY01/POLDK/1153398.5

## CERTIFICATE OF SERVICE

      I certify that a true and correct copy of the foregoing was delivered to all counsel of record by electronic service pursuant to Paragraph 11 of Case Management Order No. 2, by sending on December 22, 2006, a copy to LexisNexis File & Serve for posting and notification to all parties.

                                                  /s/ Philip D. Robben

NY01/POLDK/1153398.5