# EXHIBIT  B

DOCKETED

IN THE COURT OF THE SECOND JUDICIAL CIRCUIT IN AND FOR
LEON COUNTY, FLORIDA

IMAGED

| | |
|---|---|
| THE STATE OF FLORIDA | ) |
| | ) |
| ex rel. | ) |
|      VEN-A-CARE OF THE | ) |
|      FLORIDA KEYS, INC., | ) |
|      a Florida Corporation, by and | ) |
|      through its principal | ) |
|      officers and directors, | ) |
|      ZACHARY T. BENTLEY and | ) |
|      T. MARK JONES, | ) |
| | ) |
|           Plaintiffs | ) |
| | )    CIVIL ACTION NO. 98-3032A |
| v. | ) |
| | ) |
| BOEHRINGER INGELHEIM | ) |
| CORPORATION; BOEHRINGER | ) |
| INGELHEIM INTERNATIONAL GmbH, | ) |
| a/k/a BOEHRINGER INGELHEIM | ) |
| AUSLANDSBETEILIGUNGS GmbH; | ) |
| BOEHRINGER INGELHEIM | ) |
| PHARMACEUTICALS, INC.; C.H. | ) |
| BOEHRINGER SOHN;  DEY, INC.; | ) |
| DEY, L.P.; EMD PHARMACEUTICALS | ) |
| INC.; LIPHA, S.A.; MERCK, KgaA; | ) |
| MERCK-LIPHA, S.A.; PHARMA- | ) |
| INVESTMENT LIMITED; SCHERING | ) |
| CORPORATION;  SCHERING- | ) |
| PLOUGH CORPORATION;  ROXANE | ) |
| LABORATORIES, INC., n/k/a | ) |
| BOEHRINGER INGELHEIM ROXANE, | ) |
| INC.; and WARRICK | ) |
| PHARMACEUTICALS | ) |
| CORPORATION, | ) |
| | ) |
|           Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiff, the STATE OF FLORIDA, acting by and through its Attorney General,

Charles J. Crist, Jr., brings this cause of action against Defendants, BOEHRINGER

INGELHEIM CORPORATION; BOEHRINGER INGELHEIM INTERNATIONAL GmbH,

a/k/a BOEHRINGER INGELHEIM AUSLANDSBETEILIGUNGS GmbH; BOEHRINGER

INGELHEIM PHARMACEUTICALS, INC.; C.H. BOEHRINGER SOHN;  DEY, INC.;

DEY, L.P.; EMD PHARMACEUTICALS INC.;  LIPHA, S.A.; MERCK, KgaA;  MERCK-

LIPHA, S.A.; PHARMA-INVESTMENT LIMITED;  SCHERING CORPORATION;

SCHERING-PLOUGH CORPORATION;  ROXANE LABORATORIES, INC., n/k/a

BOEHRINGER INGELHEIM ROXANE, INC.; and WARRICK PHARMACEUTICALS

CORPORATION.

## I.  INTRODUCTION

1.    This a civil action to recover damages in excess of Seventy Five Million

Dollars ($75,000,000) plus all applicable civil penalties and other relief from Defendants

for making or causing to be made, false or fraudulent statements, representations and

claims to the State of Florida's Medicaid Program for the specified dispensed

pharmaceuticals during the period on or before July 1, 1994 through the present.  The

specified pharmaceuticals at issue in this Complaint are attached as Exhibit "A."

2.    Plaintiffs seek recovery against Defendants pursuant to the Florida False

Claims Act §§ 68.081, Fla.Stat., *et seq.* ("the Act"), and for common law fraud.

## II.  JURISDICTION & VENUE

3.    This Court has jurisdiction of the causes of action set forth herein

pursuant to the provisions of Art. V, § 20(3), Fla.Const., § 26.012, Fla.Stat., and

§68.081 et seq., Fla. Stat.

4.    Venue is proper in Leon County pursuant to § 68.083(3), Fla.Stat.

## III. PARTIES

5.     The STATE OF FLORIDA, Office of the Attorney General, Department of Legal Affairs, is acting on behalf of the Florida Agency for Health Care Administration ("AHCA"), which administers the Florida Medicaid Program pursuant to § 409.902, Fla.Stat., and pursuant to the Attorney General's own authority under §§ 409.920 and 68.083, Fla.Stat.

6.     Private person Plaintiff/Relator VEN-A-CARE OF THE FLORIDA KEYS, INC. ("Relator" or "Ven-A-Care") originally provided information to the STATE OF FLORIDA which is the basis for this suit pursuant to § 68.083(3), Fla.Stat., and is included as a named party Plaintiff in this case pursuant to the provisions of § 68.083(2) and (3), Fla.Stat.

7.     Defendant DEY, INC., formerly known as Dey Laboratories, Inc., is a corporation organized under the laws of the State of Delaware with its principal offices in Napa, California.  DEY, INC. is the general partner of DEY, L.P., a limited partnership organized and existing under the laws of the State of Delaware.  At all times material hereto, all acts committed by or on behalf of DEY, INC. were also committed by or on behalf of DEY, L.P., a limited partnership.  DEY, INC. and DEY L.P. are referred to herein collectively as "DEY."  At all times material to this complaint, DEY has transacted business in the State of Florida by, including but not limited to, manufacturing, selling and distributing pharmaceutical products to purchasers in the State of Florida that are the subject of this action.  The DEFENDANT EMD PHARMACEUTICALS, INC. ("EMD") is a corporation whose headquarters are located in Durham, North Carolina.  EMD is the sole shareholder of DEY.  DEFENDANT LIPHA, S.A. ("LIPHA") is a corporation

based in Lyon, France. LIPHA is the sole shareholder of EMD. DEFENDANT MERCK-LIPHA, S.A. ("MERCK-LIPHA") is a corporation based in Lyon, France. MERCK-LIPHA is the sole shareholder of LIPHA. DEFENDANT MERCK KGaA ("MERCK") is a German company based in Darmstadt, Germany. MERCK is the sole shareholder of MERCK-LIPHA. To the extent the acts of DEY at issue herein were performed by or otherwise attributable to EMD, LIPHA, MERCK-LIPHA or MERCK, or to any subsidiary or affiliate of any of these four defendants, then judgment should be entered against EMD, LIPHA, MERCK-LIPHA or MERCK where appropriate.

8. At all times material hereto, the senior management and officers of EMD, LIPHA, MERCK and MERCK-LIPHA had knowledge of the false price and cost representations of DEY and possessed the managerial ability and duty to intervene and cause DEY to cease making the false price and cost representations. However, rather than take such action, the senior management and officers EMD, LIPHA, MERCK and/or MERCK-LIPHA permitted and encouraged DEY to continue making its false representations in order to increase the economic benefit of the ownership interests in DEY of EMD, LIPHA, MERCK and MERCK-LIPHA.

9. Defendant ROXANE LABORATORIES, INC., n/k/a BOEHRINGER INGELHEIM ROXANE, INC., ("ROXANE") is a corporation organized under the laws of the State of Delaware with its principal offices in Cleveland, Ohio. On April 5, 2005, ROXANE changed its name from ROXANE LABORATORIES, INC., to BOEHRINGER INGELHEIM ROXANE, INC. and filed the appropriate certificate of amendment of its certificate of incorporation with the Secretary of State for the State of Delaware. BOEHRINGER INGELHEIM CORPORATION ("BOEHRINGER"), a corporation

organized under the laws of Nevada, with its principal offices in Ridgefield, Connecticut
is the corporate parent of ROXANE. BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.("BIPI"), a corporation organized under the laws of
Delaware, with its principal offices in Ridgefield, Connecticut, is a subsidiary of
BOEHRINGER. BOEHRINGER is a wholly owned subsidiary of PHARMA-
INVESTMENT LIMITED ("PHARMA-INVESTMENT"), a Canadian company
headquartered in Burlington, Ontario. PHARMA-INVESTMENT is a wholly owned
subsidiary of BOEHRINGER INGELHEIM INTERNATIONAL GmbH ("BGmbH"), a/k/a
BOEHRINGER INGELHEIM AUSLANDSBETEILIGUNGS GmbH, a German
Corporation headquartered in Ingelheim, Germany. BGmbH is a wholly owned
subsidiary of C.H. BOEHRINGER SOHN ("CHBS") a German corporation
headquartered in Am Rhein, Germany.

10. At all times material to this complaint, ROXANE has transacted business in
the State of Florida by, including but not limited to, manufacturing, selling and
distributing pharmaceutical products to purchasers in the State of Florida that are the
subject of this action. At all times material hereto, senior management and officers of
BOEHRINGER, BIPI, PHARMA-INVESTMENT, BGmbH, and CHBS had knowledge of
the false price and cost representations of ROXANE and possessed the managerial
ability and duty to intervene and cause ROXANE to cease making the false price and
cost representations. However, rather than take such action, the senior management
and officers of BOEHRINGER, BIPI, PHARMA-INVESTMENT, BGmbH, and CHBS
permitted and encouraged ROXANE to continue making its false representations in
order to increase the economic benefit of the ownership interests in ROXANE,

BOEHRINGER, BIPI, PHARMA-INVESTMENT, BGmbH, and CHBS.  Furthermore,

BOEHRINGER, PHARMA-INVESTMENT, BGmbH, and CHBS, ROXANE'S corporate

parents, aided and abetted ROXANE'S actions.  To the extent that the acts of ROXANE

are at issue herein were performed by or otherwise attributable to BOEHRINGER, BIPI,

PHARMA-INVESTMENT, BGmbH, CHBS, or any subsidiary or affiliate of it, then

judgment should be entered against to BOEHRINGER, BIPI, PHARMA-INVESTMENT,

BGmbH or CHBS  where appropriate.

     11.  Defendant WARRICK PHARMACEUTICALS CORPORATION ("Warrick") is

a corporation organized under the laws of the State of Delaware with its principal offices

in Reno, Nevada, although on information and belief its principal offices are actually in

the State of New Jersey.  Defendant SCHERING-PLOUGH CORPORATION

("Schering-Plough") is a corporation organized under the laws of the State of New

Jersey with its principal offices in Madison, New Jersey, and is the corporate parent of

Warrick.  Schering-Plough conducts much of its pharmaceutical business through

"Schering Laboratories," described by it as "the U.S. pharmaceutical arm of Schering-

Plough Corporation." At all times material to this complaint, Warrick has transacted

business in the State of Florida by, including but not limited to, manufacturing, selling

and distributing pharmaceutical products to purchasers in the State of Florida that are

the subject of this action.

     12.  To the extent that the acts of Warrick at issue herein were performed by or

otherwise attributable to Schering-Plough, or any subsidiary or affiliate of it, then

judgment should be entered against Schering-Plough Corporation where appropriate.

At all times material hereto, the senior management and officers of SCHERING-

PLOUGH had knowledge of the false price and cost representations of WARRICK and possessed the managerial ability and duty to intervene and cause WARRICK to cease making the false price and cost representations. However, rather than take such action, the senior management and officers of SCHERING-PLOUGH permitted and encouraged WARRICK to continue making its false representations in order to increase the economic benefit of the ownership interests in WARRICK, SCHERING and SCHERING-PLOUGH.

13.  Defendant SCHERING CORPORATION ("Schering") is a corporation organized under the laws of the State of New Jersey with its principal offices in Kenilworth, New Jersey.[1]  Schering maintains an office in Florida at 13900 N.W. 57th Court, Miami Lakes, Florida 33014.  At all times material to this complaint, Schering has transacted business in the State of Florida by, including but not limited to, manufacturing, selling and distributing pharmaceutical products to purchasers in the State of Florida that are the subject of this action.  Schering-Plough is the corporate parent of Schering.

14. To the extent the acts of Schering were performed by, or were otherwise attributable to, Schering-Plough, Warrick or any subsidiary or affiliate of it, then judgment should be entered against Schering-Plough where appropriate.  At all times material hereto, the senior management and officers of SCHERING had knowledge of the false price and cost representations of WARRICK and possessed the managerial ability and duty to intervene and cause WARRICK to cease making the false price and

---

[1]  Schering is listed as also maintaining a corporate address at 12125 Moya Boulevard, Reno, Nevada 89506-2600, the same corporate address claimed by Warrick.

cost representations.  However, rather than take such action, the senior management and officers of SCHERING permitted and encouraged WARRICK to continue making its false representations in order to increase the economic benefit of the ownership interests in WARRICK, SCHERING and SCHERING-PLOUGH.

15.  Whenever reference is made in this complaint to any representation, act or transaction of any of the Defendants, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents or representatives, while actively engaged in the course and scope of their employment, did or authorized such representations, acts, or transactions on behalf of said Defendants.

### IV.  THE FLORIDA MEDICAID PHARMACEUTICAL PROGRAM

16.  The Medicaid Program provides funding for health care for indigent individuals pursuant to § 409.901, Fla.Stat., *et seq.*

17.  The State of Florida Medicaid Program is administered by AHCA pursuant to § 409.902, Fla.Stat.

18.  The Office of the Attorney General conducts a program of Medicaid fraud control through its Medicaid Fraud Control Unit.

19.  Prescribed drug services are a benefit for Medicaid recipients under the Florida Medicaid Program pursuant to § 409.906(20), Fla.Stat.

20.  The ultimate providers of pharmaceuticals to Medicaid recipients, including physicians, hospitals, nursing homes, and pharmacies, purchase drugs from manufacturers or wholesalers[2] and in turn dispense or administer the drugs to Medicaid

---

[2] Including re-packagers and re-labelers.

recipients.

21.  AHCA awarded contracts to private companies to evaluate and process Medicaid recipients' claims for payment.  These contractors are referred to as "fiscal agents" and are agents and instrumentalities of AHCA.  The providers submit claims for reimbursement of their costs incurred in purchasing and dispensing the drugs to AHCA's "fiscal agent", acting as an agent of AHCA, under a Medicaid provider contract pursuant to Fla. Stat. § 409.907.  The fiscal agent accomplishes claims adjudication under contract with AHCA on AHCA's behalf.  From 1994 until 1996, AHCA's fiscal agent was Consultec, Inc.  From 1996 until 1998, AHCA's fiscal agent was the Unisys Corporation.  From 1998 through the present, Consultec, Inc., was AHCA's fiscal agent. In 2001, Consultec, Inc. changed its name to ACS, Inc.

22.  Pharmacy claims are submitted in one of two ways.  The first is by submitting a completed hard copy pharmacy claim form to the fiscal agent.  The second is through an electronic claims filing procedure where the same information required by the hard copy form is transmitted electronically to the fiscal agent.  Pharmaceuticals are identified on Florida Medicaid claims and the Florida Medicaid computer system drug file by means of unique identification numbers commonly known as "National Drug Codes ("NDCs").  *See, Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-1.*  This handbook is available on AHCA's website. *See, http://floridamedicaid.acs-inc.com/index.jsp?display=handbooks.*

23.  AHCA's current reimbursement to the provider of the drug under the pharmacy program is based on AHCA's best estimate of acquisition cost ("EAC") to the provider for the drug.  From July 1, 1994 through and including June 30, 2004, the EAC

was the lower of the "Average Wholesale Price" ("AWP") less 13.25 percent or "Wholesaler Acquisition Cost" ("WAC") plus 7 percent. Pursuant to a legislative change effective July 1, 2004, the EAC is the lower of AWP minus 15.4 percent or WAC plus 5.75 percent whichever is less. *See, Fla. Stat. § 409.908 (14)*[3]

24. AHCA has established other safeguards to ensure it is a prudent purchaser of drugs. From July 1, 1994, through and including June 30, 2004, AHCA reimbursed the least of:

      a). "Average Wholesale Price" ("AWP") less 13.25 percent, plus a dispensing fee;

      b). "Wholesaler Acquisition Cost" ("WAC") plus 7 percent, plus a dispensing fee;

      c). "Federal Upper Limit" ("FUL"), plus a dispensing fee;

      d). "State Maximum Allowable Cost" ("SMAC"), plus dispensing fee; or

      e). provider's "usual and customary charge" to the public.

*See* Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-2, July 2001, as incorporated into law at Rule 59G-4.250, Fla.Admin.Code; *See also*, §409.908(14), Fla. Stat.

25. After § 409.908 (14), Florida Statutes, was amended, AHCA reimburses the least of:

      a). "Average Wholesale Price" ("AWP") minus 15.4 percent, plus a dispensing fee;

---

[3] From July 2000 through April 2002, the Florida Medicaid Program reimbursed Providers at AWP minus 13.25 percent.

b). "Wholesaler Acquisition Cost" ("WAC"), plus 5.75 percent, plus a dispensing fee;

c). the "Federal Upper Limit" ("FUL"), plus a dispensing fee;

d). the "State Maximum Allowable Cost" ("SMAC"), plus a dispensing fee; or

e). the providers' "usual and customary" charge to the public.

*See, Fla. Stat. § 409.908 (14).*

26. The Florida Medicaid dispensing fee is currently $4.23 per prescription. *See* Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-3, *supra*. An additional $0.015 per unit is paid to pharmacies who prepare in-house unit dose packaging of tablets or capsules. *Id.*

27. The AHCA fiscal agent reimburses pharmaceutical provider claims based on the current Florida Medicaid computer system drug file prices, and such prices are derived from pricing information, including AWPs and WACs, supplied and updated weekly by the First DataBank, Inc. ("First DataBank") National Drug Data file electronic service. *See* Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-3, *supra*. First DataBank, a division of The Hearst Corporation, is a nationally-recognized company that specializes in gathering and disseminating prescription drug pricing information, including AWPs and WACs, to public and private health insurers.

28. AHCA's fiscal agent has at all times relevant to this complaint contracted with First DataBank to provide National Drug Data file prices to establish Florida Medicaid provider drug reimbursement. The Florida Medicaid Program has utilized First

DataBank as its primary reference source and has utilized representations of AWP and WAC supplied by First DataBank to establish provider reimbursement prices.

29.  The manufacturers of the drugs directly supply AWP and WAC on a continual basis to First DataBank.  First DataBank uses the AWPs and WACs, supplied by the manufacturers, to compile the National Drug Data file price list, which in turn is utilized by the Florida Medicaid Program for its computer system drug file prices.  The manufacturers annually certify to First DataBank that the pricing information they report to First DataBank is true and accurate.

30. The Florida Medicaid Program cannot reimburse a provider for any drug not listed in the National Drug Data file.  *See* Prescribed Drug Services Coverage, Limitations and Reimbursement Handbook, p. 6-2, *supra*. Drug manufacturers, including the Defendants, voluntarily report AWP and WAC pricing information to First DataBank to ensure their products are included in the National Drug Data file and their customers will be reimbursed by the Florida Medicaid Program.

## V.  SUMMARY OF DEFENDANTS' FRAUD SCHEME

31.  The Florida Medicaid Program reimburses providers for the drugs they dispense to Medicaid recipients at EAC, estimated acquisition cost.  Florida Medicaid determines EAC by using the AWPs and WACs supplied by pharmaceutical manufacturers to First DataBank.  The Defendants knowingly misrepresented AWP and WAC prices solely for the purpose of illicit financial gain in an attempt to manipulate and control market share of the Subject Drugs.

32. The Defendants knowingly and intentionally made false representations of prices and costs for certain of their drugs to the Florida Medicaid Program. The

Defendants reported, and caused First DataBank to report, prices for the Subject Drugs that substantially exceeded the market prices known to the Defendants from their own business information. The Defendants knew that reporting false, inflated AWP and WAC prices for the Subject Drugs would cause the Florida Medicaid Program's estimates of the acquisition costs of the Subject Drugs to substantially exceed any reasonable estimates of the acquisition costs of those drugs .

33. The Defendants knowingly and intentionally created an inflated price spread for several of their drugs by supplying to First DataBank prices for those drugs far in excess of the prices for which the drugs were reasonably and currently available in the marketplace. A "spread" is the difference between the purchase price and the amount reimbursed by the Florida Medicaid Program. The Defendants intended the Florida Medicaid Program to use those false, inflated prices in setting provider reimbursement rates, and in fact the Florida Medicaid Program did use those false inflated prices to set Medicaid reimbursement rates. As a direct result of its utilization of the false prices supplied by the Defendants, the Florida Medicaid Program paid provider claims for the Subject Drugs in amounts far in excess of the prices and costs generally or currently available in the marketplace for the Subject Drugs.

34. After creating inflated spreads for their drugs, Defendants enlarged those inflated spreads by reducing acquisition costs to providers without disclosing the reductions to First DataBank or to the Florida Medicaid Program. Price reductions were accomplished by giving providers financial incentives such as discounts, rebates, off-invoice pricing, free goods, and cash payments. Price reductions were granted to some retail pharmacy chains, wholesalers, buying groups, or pharmacy benefit managers at

the request of those chains, wholesalers, buying groups, or pharmacy benefit managers. Defendants knowingly utilized these financial incentives to reduce the effective acquisition prices of their drugs, while knowingly reporting AWPs and WACs to First DataBank that were not reflective of the price reductions.

35. After maximizing the inflated spread on their drugs, Defendants engaged in a tactic commonly referred to as "marketing the spread," for the purpose of increasing their market share and profits. Providers were induced to buy the Subject Drugs because the Medicaid reimbursements for such drugs, unlike otherwise-identical competing drugs with little or no price spread, far exceeded the providers' acquisition cost generally or currently available in the marketplace. The Defendants actively marketed the inflated spread through sales presentations, bid proposals, telemarketing, advertising, and various pharmacy inventory software, specifically to increase their market share and earnings.

36. The Defendants sold the Subject Drugs to providers, typically retail pharmacies, with full knowledge that the profits realized upon distribution of such drugs to Medicaid recipients far exceeded any commercially reasonable profits that would otherwise be obtained had prices and costs representative of the prices and costs generally and currently available in the marketplace been reported by the Defendants.

37. The goals of this fraudulent business plan include: maximized demand for the drugs at issue, domination of the market for the Subject Drugs, and illegal over-reimbursement of Medicaid provider claims for the Subject Drugs. The Defendants inflated their reported prices and marketed the resulting inflated spread, with the purpose and intent of increasing sales of the Subject Drugs to Providers. As a direct,

foreseeable, and proximate result of this conduct, they caused false claims for

excessive reimbursement to be made to the Florida Medicaid Program.  But for each of

the Defendants' actions, the Florida Medicaid Program would not have paid the

excessive reimbursement amounts which were paid for the Subject Drugs.

Consequently, each Defendant is liable for Florida Common Law Fraud for each

Medicaid reimbursement claim for the Subject Drugs which resulted in payment of a

falsely inflated reimbursement amount.

38.  Defendants' knowing misrepresentation of drug prices to First DataBank

caused each and every claim paid by the Florida Medicaid Program for the Subject

Drugs to be a false claim under § 68.081, Fla.Stat., et seq.[4]  The Florida Medicaid

Program is also entitled to be reimbursed for all payments made in excess of what the

State of Florida Medicaid Program should have paid in pharmacy claims for

Defendant's drugs in accordance with the legal remedies for common law fraud.

39. The manufacturers virtually control what price information the payers,

including the Florida Medicaid Program, can obtain.  Defendants have taken undue

advantage of the resulting disparity in status, power and knowledge by knowingly

reporting prices for Medicaid reimbursement purposes that bear no relationship

whatsoever to prices generally and currently available in the marketplace.

40.  The Defendants were in a position to mislead the Florida Medicaid Program,

in part, because other drug manufacturers typically report prices representative of

prices and costs generally and currently available in the marketplace for other drugs.

---

[4]Plaintiffs estimate that in excess of 2,000,000 claims were submitted by Defendants from 7/1/94 through 12/31/02.  Plaintiffs reserve the right to revise this estimate after further investigation.

The Defendants knew that the Florida Medicaid Program uses manufacturer-supplied prices to reimburse providers for 30,000 of the approximately 300,000 NDCs in the Florida Medicaid drug database in any given month.  The Defendants knew that AHCA, with a handful of pharmacy employees, would never have the manufacturers' insider knowledge, resources, or opportunity necessary to discover and remedy the Defendants' drug pricing fraud.

41. The Defendants were fully capable of making representations about AWP and WAC prices of the Subject Drugs that fairly represented the prices and costs generally and currently available in the marketplace.

## VI.  THE ACTIONABLE CONDUCT OF DEFENDANTS

42.  The Defendants acted knowingly as defined by Fla. Stat. § 68.082(1)(c), in presenting or causing to be presented to the Florida Medicaid Program false claims for payment or approval in violation of § 68.082(2)(a), Fla.Stat. by:

a).   Submitting false, inflated prices and costs, including AWPs and WACs, for specified pharmaceuticals to First DataBank initially;

b).   Concealing or failing to disclose decreases in prices and costs of such pharmaceuticals to First DataBank;

c).   Concealing or failing to disclose that the prices of specified pharmaceuticals were decreasing by reporting price reductions much smaller than price reductions generally and currently available in the marketplace;

d).   Concealing or failing to disclose financial incentives such as discounts, rebates, off-invoice pricing, free goods, cash payments,

and charge backs, that decreased the effective prices of the specified pharmaceuticals;

e).   Reporting that the price or cost of a specified drug was increasing, when in fact it was increasing in a lesser proportion, remained the same, or was decreasing; and

f).   Reporting that the price or cost of a specified drug was the same when in fact it was falling.

43.   The Defendants acted knowingly as defined by Fla. Stat. § 68.082(1)(c), in making, using, or causing to be made false records or statements to get claims paid or approved by the Florida Medicaid Program in violation of § 68.082(2)(b), Fla.Stat. by:

a).   Submitting false, inflated prices and costs, including AWPs and WACs, for specified pharmaceuticals to First DataBank initially;

b).   Concealing or failing to disclose decreases in prices and costs of such pharmaceuticals to First DataBank;

c).   Concealing or failing to disclose that the prices of specified pharmaceuticals were decreasing by reporting price reductions much smaller than price reductions generally and currently available in the marketplace; and

d).   Concealing or failing to disclose financial incentives such as discounts, rebates, off-invoice pricing, free goods, cash payments, and charge backs, that decreased the effective prices of the specified pharmaceuticals;

e).   Reporting that the price or cost of a specified drug was increasing,

when in fact it was increasing in a lesser proportion, remained the same, or was decreasing; and

f). Reporting that the price or cost of a specified drugs was the same when in fact it was falling.

44. The Defendants conspired to submit false claims or deceive the Florida Medicaid Program for the purpose of getting false or fraudulent claims allowed or paid in violation of § 68.082(2)(c), Fla.Stat. by:

a). Submitting false, inflated prices and costs, including AWPs and WACs, for specified pharmaceuticals to First DataBank initially;

b). Concealing or failing to disclose decreases in prices and costs of such pharmaceuticals to First DataBank;

c). Concealing or failing to disclose that the prices of specified pharmaceuticals were decreasing by reporting price reductions much smaller than price reductions generally and currently available in the marketplace;

d). Concealing or failing to disclose financial incentives such as discounts, rebates, off-invoice pricing, free goods, cash payments, and charge backs, that decreased the effective prices of the specified pharmaceuticals;

e). Conspiring to market, promote, or otherwise use illegal inflated spreads in order to maximize the number and dollar volume of false claims presented to the Florida Medicaid Program for reimbursement;

    f).    Reporting that the price or cost of a specified drug was increasing, when in fact it was increasing in a lesser proportion, remained the same or was decreasing; and

    g).    Reporting that the price or cost of a specified drug was the same when in fact it was falling.

45.  The impact of the Defendants' pricing misrepresentations for the pharmaceuticals described in the attached "Exhibit A" was enormous.  The following charts illustrate with particularity the per unit inflated spread available to the Relator Ven-A-Care for Defendants' inhalation drugs since 1994:[5]

**DEFENDANT DEY**
**ALBUTEROL SULFATE 0.083%**
**3 ml, 25s**
**NDC # 49502-0697-03**

| YEAR | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ ÷ relator cost) |
|------|------|------|------|------|
| 1994 | $ 20.27 | $ 8.50 | $ 11.77 | 139 % |
| 1995 | $ 26.48 | $ 8.50 | $ 17.98 | 212 % |
| 1996 | $ 26.48 | $ 7.75 | $ 18.73 | 242 % |
| 1997 | $ 26.48 | $ 7.75 | $ 18.73 | 242 % |
| 1998 | $ 26.48 | $ 9.50 | $ 16.98 | 179 % |

---

[5] As a very small infusion pharmacy, Ven-A-Care often did not receive the lowest prices available to volume purchasers; therefore, these representations of inflated spread are  especially conservative.

DEFENDANT DEY
ACETYLCYSTEINE SOLUTION 10%
4 ml, 12s
NDC # 49502-0181-04

| YEAR | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ ÷ relator cost) |
|------|------|------|------|------|
| 1996 | $ 27.60 | $ 12.48 | $ 15.12 | 121 % |

DEFENDANT DEY
ACETYLCYSTEINE SOLUTION 20%
4 ml, 12s
NDC # 49502-0182-04

| YEAR | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ ÷ relator cost) |
|------|------|------|------|------|
| 1994 | $ 33.25 | $ 12.60 | $ 20.65 | 164 % |
| 1995 | $ 33.25 | $ 12.60 | $ 20.65 | 164 % |
| 1996 | $ 33.25 | $ 12.60 | $ 20.65 | 164 % |
| 1997 | $ 33.25 | $ 12.60 | $ 20.65 | 164 % |
| 1998 | $ 33.25 | $ 12.60 | $ 20.65 | 164 % |

**DEFENDANT DEY**
**CROMOLYN SODIUM USP**
**20 mg/2 ml, 60s**
**NDC # 49502-0689-02**

| YEAR | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ + relator cost) |
|------|------|------|------|------|
| 1994 | $ 36.59 | $ 24.50 | $ 12.09 | 49 % |
| 1995 | $ 36.59 | $ 24.50 | $ 12.09 | 49 % |
| 1996 | $ 36.59 | $ 18.15 | $ 18.44 | 102 % |
| 1997 | $ 36.59 | $ 18.15 | $ 18.44 | 102 % |
| 1998 | $ 36.59 | $ 18.15 | $ 18.44 | 102 % |

**DEFENDANT WARRICK**
**ALBUTEROL SULFATE 0.083%**
**3 ml, 25s**
**NDC # 59930-1500-08**

| YEAR | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ + relator cost) |
|------|------|------|------|------|
| 1995 | $ 26.92 | $ 15.79 | $ 11.13 | 71 % |
| 1996 | $ 26.92 | $ 12.00 | $ 14.92 | 124 % |
| 1997 | $ 26.92 | $ 7.99 | $ 18.93 | 237 % |
| 1998 | $ 26.48 | $ 6.88 | $19.60 | 285 % |

## Defendant ROXANE
## FUROSEMIDE
## 40 mg Tablets 1,000s
## 00054-4299-31

| YEAR | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ ÷ relator cost) |
|------|------|------|------|------|
| 1995 | $31.04 | $7.29 | $23.75 | 326% |
| 1996 | $31.04 | $7.29 | $23.75 | 326% |
| 1997 | $31.04 | $7.29 | $23.75 | 326% |

## Defendant ROXANE
## MEPERIDINE
## 50MG TABLETS 100s
## 00054-4595-25

| YEAR | FIRST DATABANK AWP | FIRST DATABANK WAC | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" OR "AWP" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ ÷ relator cost) |
|------|------|------|------|------|------|------|
| 2000 | $68.63 | Not reported | $59.54 | $28.76 | $30.78 | 107% |
| 2001 | $68.63 | Not reported | $59.54 | $28.76 | $30.78 | 107% |
| 2002 | $68.63 | Not reported | $59.54 | $28.76 | $30.78 | 107% |
| 2003 | $68.63 | Not reported | $59.54 | $26.39 | $30.78 | 107% |

## Defendant ROXANE
## MEPERIDINE
## 100MG TABLETS 100s
## 00054-4596-25

| YEAR | FIRST DATABANK AWP | FIRST DATABANK WAC | FLORIDA MEDICAID PER UNIT REIMBURSEMENT BASED ON FALSE REPORTED "WAC" OR "AWP" | PER UNIT PRICE PAID BY RELATOR | SPREAD IN $ | SPREAD IN % (spread $ ÷ relator cost) |
|------|------|------|------|------|------|------|
| 2000 | $130.55 | Not reported | $113.25 | $59.28 | $53.97 | 91% |
| 2001 | $130.55 | Not reported | $113.25 | $59.28 | $53.97 | 91% |
| 2002 | $130.55 | Not reported | $113.25 | $45.40 | $67.85 | 149% |
| 2003 | $130.55 | Not reported | $113.25 | $44.95 | $68.30 | 152% |

46.  The Defendants' illegal pricing scheme created strong anti-competitive effects in the entire market for inhalant pharmaceuticals.  As demonstrated in the following chart, the highest-price albuterol of Defendants Warrick and Dey dominate the market, due to illegal inflated spreads, while the low-priced albuterols marketed by Zenith/Goldline and Geneva corporations cannot compete.  Only in a marketplace where a few competitors lie about the prices generally and currently available in the marketplace would a Warrick marketed albuterol sell at a ratio of 593 to 1 over a Geneva-manufactured albuterol whose price is half that of the Warrick drug.

Page 23 of 28

**FLORIDA MEDICAID REIMBURSEMENT**
**FOR 1st QUARTER 1997 FOR ALBUTEROL SULFATE 0.083%**

| MANUFACTURER | RELATOR'S COST PER ml | FLORIDA MEDICAID REIMBURSEMENT PER ml | SPREAD | # OF CLAIMS | FLORIDA MEDICAID REIMBURSEMENT in $ |
|---|---|---|---|---|---|
| Warrick | $0.1065 | $0.3590 | $0.2525 | 11283 | $645,056.22 |
| Dey | $0.1125 | $0.3531 | $0.2406 | 5901 | $357,830.88 |
| Zenith/Goldline | N/A | $0.2138 | -- | 102 | $4,981.56 |
| Geneva | N/A | $0.1787 | -- | 19 | $1,278.08 |
| TOTAL | | | | | $1,009,146.60 |

## VII.  DAMAGES

47.  Because of the Defendants' conduct as set forth in this Complaint, The
State of Florida suffered actual damages in excess of Seventy-Five Million Dollars
($75,000,000) and statutory damages in excess of Two Hundred Twenty-Five Million
Dollars ($225,000,000).

## VIII.  CAUSES OF ACTION
### COUNT I
### VIOLATION OF THE FLORIDA FALSE CLAIMS ACT

48.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 47 as
though fully set forth herein.

49.  Defendants knowingly presented or caused to be presented false claims for
payment to the Florida Medicaid Program creating liability for a false claims action
pursuant to § 68.081, Fla.Stat., *et seq.*

50.  As a result of Defendants' conduct set forth in this count, the State of
Florida, AHCA or its fiscal intermediary paid the improper Medicaid claims and has
suffered actual damages in excess of Seventy-Five Million Dollars ($75,000,000).

51.  Pursuant to §§ 68.082(2) and 68.086, Fla.Stat., the Plaintiffs are entitled to treble the actual damages sustained, not less than $5,000 and not more than $10,000 penalty per claim, all other relief set forth in said statutes, prejudgment interest, attorneys' fees and court costs.

## COUNT II
## COMMON LAW FRAUD

52.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 47 as though fully set forth herein.

53.  The elements of common law fraud in Florida are:  a false statement concerning a material fact;  knowledge by the person making the statement that the representation is false; the intent by the person making the statement that the representation will induce another to act on it; and reliance on the representation to the injury of the other party.  *See e.g., Tucker v. Mariani*, 655 So.2d 221, 225 (Fla. 1st DCA 1995);  *Lance v. Wade*, 457 So.2d 1008, 1011 (Fla.1984).

54.  Defendants made false statements of material fact regarding drug prices to First DataBank;  Defendants knew that the submitted prices were false and significantly exceeded actual prices;  Defendants knew that the Florida Medicaid Program relied on First DataBank prices and intended that the Florida Medicaid Program rely upon the false prices Defendants submitted to First DataBank;  and, the Florida Medicaid Program did in fact rely upon such false price representations and was injured by paying provider reimbursements far in excess of reasonable estimates of provider acquisition cost as required by law.

55.  Pursuant to the common law of fraud in Florida, the Plaintiffs are entitled to

a remedy for the State's damages; to wit, the difference between what the Florida Medicaid Program should have paid in pharmacy claims for Defendants' drugs and what was in fact paid, as well as any other relief the Court deems appropriate, to include, prejudgment interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand that judgment be entered in favor of the State of Florida and the Relátor against Defendants as follows:

A.   On Count I, Plaintiffs demand judgment for treble the amount of the State of Florida's damages during the period on or before July 1, 1994 to the present time, pursuant to § 68.082(2), Fla.Stat. In addition, Plaintiffs demand that Defendants be assessed a civil penalty of $10,000 for each and every false claim submitted to the Florida Medicaid Program identified herein, as well as for any and all false claims subsequently discovered during discovery. Plaintiffs further demand payment of prejudgment interest, attorneys' fees, expenses, investigatory costs, and for such other and further relief as the Court deems just and equitable pursuant to § 68.086, Fla.Stat.

B:   On Count II, Plaintiffs demand judgment for the return of the difference between the amounts paid and the amounts that should have been paid for Defendants' drugs named herein by the State of Florida, AHCA or its fiscal intermediary during the period under review described herein, and for prejudgment interest, costs, and for such other and further relief as the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

The STATE OF FLORIDA respectfully demands trial by jury of all issues so

triable.

Respectfully submitted this 3rd day of December, 2005.

> CHARLES J. CRIST, JR.
> ATTORNEY GENERAL
> STATE OF FLORIDA
>
> By: _Mark S. k_____
> MARK S. THOMAS
> Florida Bar No. 0001716
> MARY S. MILLER
> Florida Bar No. 0780420
> Assistant Attorneys General
> OFFICE OF THE ATTORNEY
> GENERAL
> MEDICAID FRAUD CONTROL UNIT
> PL-01, The Capitol
> Tallahassee, Florida 32399-1050
> Telephone:   850-414-3600
> Facsimile:    850-410-2673

JAMES J. BREEN, ESQ.
Florida Bar Number 297178
ALISON W. SIMON, ESQ.
Florida Bar Number 0109568
The Breen Law Firm, P.A.
P.O. Box 297470
Pembroke Pines, Florida 33029-7470
954-874-1653 (telephone)
954-874-1705 (facsimile)
Counsel for Ven-A-Care of the Florida Keys, Inc.

SHERRIE SAVETT, ESQ.
Pennsylvania Bar Number 17646
GARY AZORSKY, ESQ.
Pennsylvania Bar Number 38924
SUSAN SCHNEIDER THOMAS, ESQ.
Pennsylvania Bar Number 32799
JEANNE A. MARKEY, ESQ.
Pennsylvania Bar Number 40175
JOY P. CLAIRMONT, ESQ.

Pennsylvania Bar Number 82775
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
215-875-3000 (telephone)
215-875-4636 (facsimile)
Counsel for Ven-A-Care of the Florida Keys, Inc.

JOHN E. CLARK, ESQ.
Texas Bar Number 04287000
Goode Casseb Jones Riklin Choate & Watson
2122 North Main Avenue
P.O. Box 120480
San Antonio, Texas 78212-9680
210-733-6030 (telephone)
210-733-0330 (facsimile)
Counsel for Ven-A-Care of the Florida Keys, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing via U.S. mail been furnished to: Dana G. Toole, Esquire, Dunlap & Toole, P.A., 2057 Delta Way, Tallahassee, Florida, 32303-4227; Christopher Palermo, Esquire, Kelley, Drye & Warren, LLP, 101 Park Avenue, New York, New York, 10178, Kelly Overstreet Johnson, Esquire, Broad and Cassel, 215 South Monroe Street, Suite 400, Tallahassee, Florida 32301, Crystal Talley, Esquire, John R. Therien, Esquire, John T. Montgomery, Esquire, Christopher Dillion, Ropes & Gray, LLC, One International Plaza, Boston, MA 02110-2624, John McDonald, Esquire, Locke, Liddell & Sapp, L.L.C., 2200 Ross Avenue, Suite 2200, Dallas, Texas 75201 and Bill Bryant, Esquire, Akermen Senterfitt 106 East College Avenue, 12th Floor, Tallahassee, Florida 32301, and that service of process was commenced on Boeheringer Ingelheim International GmbH, a/k/a Boehringer Ingelheim Auslandesbeteiligungs GmbH; Boehringer Ingelheim Pharmaceuticals, Inc.; C.H. Boehringer Sohn; and Pharma-Investment Limited; this 20th day of December, 2005.

Attorney

F:\USERS\MCF\Team 103 (Thomas - Miller)\MaryM\Venacare\Pleadings\Complaints\Draft amended Complaint final-.wpd