# EXHIBIT  C



IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 CH 2474 |
| | ) | |
| ABBOTT LABORATORIES; ALPHARMA BRANDED | ) | The Honorable Peter Flynn |
| PRODUCTS DIVISION INC.; ALPHARMA USPD | ) | |
| INC.; ALPHA THERAPEUTIC CORP.; AMGEN INC.; | ) | Calendar 4 |
| ASTRAZENECA PHARMACEUTICALS LP; | ) | |
| ASTRAZENECA LP; AVENTIS | ) | |
| PHARMACEUTICALS INC.; AVENTIS BEHRING, | ) | |
| LLC, n/k/a ZLB BEHRING; B. BRAUN MEDICAL | ) | |
| INC.; BARR LABORATORIES, INC.; BAXTER | ) | |
| HEALTHCARE CORP.; BEN VENUE | ) | |
| LABORATORIES, INC.; BOEHRINGER INGELHEIM | ) | |
| PHARMACEUTICALS, INC.; BRISTOL-MYERS | ) | |
| SQUIBB CO.; CHIRON CORP.; DEY, INC.; | ) | |
| DURAMED PHARMACEUTICALS, INC.; ELKINS- | ) | |
| SINN, INC.; FOREST LABORATORIES, INC.; | ) | |
| IMMUNEX CORP.; IVAX CORP.; IVAX | ) | |
| PHARMACEUTICALS, INC.; JANSSEN | ) | |
| PHARMACEUTICAL PRODUCTS, LP; JOHNSON & | ) | |
| JOHNSON; McNEIL-PPC, INC.; MERCK & CO., INC.; | ) | |
| MYLAN LABORATORIES, INC.; MYLAN | ) | |
| PHARMACEUTICALS, INC.; NOVARTIS | ) | |
| PHARMACEUTICALS CORP.; ORTHO BIOTECH | ) | |
| PRODUCTS, LP; ORTHO-McNEIL | ) | |
| PHARMACEUTICAL, INC.; PAR | ) | |
| PHARMACEUTICAL COS., INC.; PFIZER INC.; | ) | |
| PHARMACIA CORP.; PUREPAC | ) | |
| PHARMACEUTICAL CO., ROXANE, INC., n/k/a | ) | |
| BOEHRINGER INGELHEIM, ROXANE, INC.; | ) | |
| SANDOZ, INC., f/k/a GENEVA | ) | |
| PHARMACEUTICALS, INC.; SCHERING-PLOUGH | ) | |
| CORP.; SICOR, INC., f/k/a SICOR | ) | |
| PHARMACEUTICALS, INC., f/k/a GENSIA SICOR; | ) | |
| SMITHKLINE BEECHAM CORP., d/b/a | ) | |
| GLAXOSMITHKLINE; TAP PHARMACEUTICAL | ) | |
| PRODUCTS, INC.; TEVA PHARMACEUTICALS | ) | |
| USA, INC.; WARRICK PHARMACEUTICALS | ) | |
| CORPORATION; WATSON PHARMA, INC., f/k/a | ) | |
| SCHEIN PHARMACEUTICALS, INC.; and WATSON | ) | |
| PHARMACEUTICALS, INC.; | ) | |
| | ) | |
| Defendants. | ) | |

FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

The plaintiff, People of the State of Illinois, by Lisa Madigan, Attorney General for the State of Illinois, brings this action complaining of the above-captioned defendants as follows:

## NATURE OF THE ACTION

1. This action is brought in the public interest for and on behalf of the People of the State of Illinois, by Lisa Madigan, Illinois Attorney General, pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, the Illinois Public Assistance Fraud Act, the Illinois Whistleblower Reward and Protection Act, and the common-law authority of the Attorney General to represent the People of the State of Illinois.

2. The Attorney General brings this lawsuit on behalf of the State of Illinois for itself and in her *parens patriae* capacity on behalf of Illinois citizens to recover damages and obtain injunctive relief from defendants, who are manufacturers of prescription drugs. As described in this complaint, defendants have taken advantage of the enormously complicated and non-transparent market for prescription drugs to engage in an unlawful scheme to cause the State of Illinois and its citizens to pay inflated prices for prescription drugs. The scheme involves the publication by defendants of phony "average wholesale prices" ("AWPs"), which then become the basis for calculating the cost at which "providers" -- the physicians and pharmacies who provide these prescription drugs to patients -- are reimbursed by the State of Illinois and its citizens. Defendants reinforce this basic tactic with other deceptive practices described in this complaint, including the use of secret discounts and rebates to providers and the use of various devices to keep secret the prices of their drugs currently available in the marketplace to other purchasers. By engaging in this unlawful scheme, defendants have succeeded in having Illinois and its citizens finance windfall profits to these providers. Defendants attempt to profit from their scheme by using the lure of these windfall profits competitively to encourage providers to buy more of their drugs instead of competing in the

marketplace solely on the basis of legitimate factors such as price and the medicinal value of their drugs.

## AUTHORITY

3. Lisa Madigan is the Attorney General of Illinois, and in that capacity is authorized and empowered to enforce the Illinois Consumer Fraud and Deceptive Business Practices Act by §7 of the Act, which provides:

(a)     Whenever the Attorney General or a State's Attorney has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this Act to be unlawful, and that proceedings would be in the public interest, he or she may bring an action in the name of the People of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice.  The Court, in its discretion, may exercise all powers necessary, including but not limited to:  injunction; revocation, forfeiture or suspension of any license, charter, franchise, certificate or other evidence of authority of any person to do business in this State; appointment of a receiver; dissolution of domestic corporations or association suspension or termination of the right of foreign corporations or associations to do business in this State; and restitution.

(b)     In addition to the remedies provided herein, the Attorney General or State's Attorney may request and the Court may impose a civil penalty in a sum not to exceed $50,000 against any person found by the Court to have engaged in any method, act or practice declared unlawful under this Act.  In the event the court finds the method, act or practice to have been entered into with the intent to defraud, the court has the authority to impose a civil penalty in a sum not to exceed $50,000 per violation.

(c)     In addition to any other civil penalty provided in this Section, if a person is found by the court to have engaged in any method, act, or practice declared unlawful under this Act, and the violation was committed against a person 65 years of age or older, the court may impose an additional civil penalty not to exceed $10,000 for each violation.

815 ILCS §505/7.

4. Lisa Madigan is the Attorney General of Illinois, and in that capacity is authorized and empowered to enforce the Illinois Public Assistance Fraud Act by §8A-7 of the Act, which provides:

> (b)    Any person, firm, corporation, association, agency, institution or other legal entity, other than an individual recipient, that willfully, by means of a false statement or representation, or by concealment of any material fact or by other fraudulent scheme or device on behalf of himself or others, obtains or attempts to obtain benefits or payments under this Code to which he or it is not entitled, or in a greater amount than that to which he or it is entitled, shall be liable for repayment of any excess benefits or payments received and, in addition to any other penalties provided by law, civil penalties consisting of (1) the interest on the amount of excess benefits or payments at the maximum legal rate in effect on the date the payment was made to such person, firm, corporation, association, agency, institution or other legal entity for the period from the date upon which payment was made to the date upon which repayment is made to the State, (2) an amount not to exceed 3 times the amount of such excess benefits or payments, and (3) the sum of $2,000 for each excessive claim for benefits or payments.  Upon entry of a judgment for repayment of any excess benefits or payments, or for any civil penalties assessed by the court, a lien shall attach to all property and assets of such person, firm, corporation, association, agency, institution or other legal entity until the judgment is satisfied.

> (c)    Civil recoveries provided for in this Section may be recoverable in court proceedings initiated by the Attorney General....

305 ILCS §5/8A-7.

5. Lisa Madigan is the Attorney General of Illinois, and in that capacity is authorized and empowered to enforce the Illinois Whistleblower Reward and Protection Act by §§3 and 4 of the Act, which provide:

Sec. 3.  False claims.

> (a)    Liability for certain acts.  Any person who:

>> (1)    knowingly presents, or causes to be presented, to an officer or employee of the State or a member of the Guard a false or fraudulent claim for payment or approval;

>> (2)    knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or

fraudulent claim paid or approved by the
State;...or

(7)     knowingly makes, uses, or causes to be made or
used, a false record or statement to conceal, avoid
or decrease an obligation to pay or transmit money
or property to the State,

is liable to the State for a civil penalty of not less than $5,000 and not
more than $10,000, plus 3 times the amount of damages which the State
sustains because of the act of that person.  A person violating this
subsection (a) shall also be liable to the State for the costs of a civil
action brought to recover any such penalty or damages.

Sec. 4.  Civil actions for false claims.

(a)     ...The Attorney General may bring a civil action under
this Section against any person that has violated or is
violating Section 3.

740 ILCS §§175/3 and 175/4.


## PARTIES AND JURISDICTION

6.  Lisa Madigan, Attorney General for the State of Illinois, brings this action on
behalf of the State of Illinois and its citizens.  As described in this complaint, defendants'
unlawful scheme has resulted in higher prices for prescription drugs being paid by Illinois
itself (as payer under the Medicaid program), and by citizens who pay for part of the cost of
drugs under the Medicare program.  The Attorney General has reason to believe that
defendants have used and continue to use the methods, acts, and practices set forth in this
complaint and which, among other violations, are illegal under the Illinois Consumer Fraud
and Deceptive Business Practices Act, the Illinois Public Assistance Fraud Act, and the
Illinois Whistleblower Reward and Protection Act, and that these proceedings are in the public
interest.

7.  Defendants are pharmaceutical companies whose fraudulent schemes, including the
publication of excessive and inflated prices for prescription drugs as described in this

complaint, have caused to be presented to officers and/or employees of the State of Illinois false or fraudulent claims for payment or approval of certain drugs to get these false or fraudulent claims paid or approved by the State of Illinois Medicaid program, and have resulted in Illinois and its citizens paying for drugs at inflated prices, as detailed below.

8.  At all times material to this civil action, each defendant has transacted business in the State of Illinois by, including but not limited to, selling directly or through wholesalers its drugs, including those identified in this complaint, to purchasers within the State of Illinois.

9.  Defendant Abbott Laboratories ("Abbott") is an Illinois corporation with its principal place of business at 100 Abbott Park Rd., Abbott Park, IL 60064-6400.

10.  Defendant Alpha Therapeutic Corp. ("Alpha") is a California corporation with its principal place of business at 2410 Lillyvale Ave., Los Angeles, CA 90032.

11.  The following three defendants are hereinafter referred to as the Alpharma group:

(a)  defendant Alpharma Branded Products Division Inc. is a Delaware corporation with its principal place of business located at 1 New England Avenue, Piscataway, NJ 08854.  Alpharma Branded Products Division Inc. manufactures and markets pharmaceutical products, including Kadian.  Alpharma Branded Products Division Inc. is a wholly-owned subsidiary of Alpharma Inc.;

(b)  defendant Alpharma USPD Inc. ("Alpharma USPD") is a Maryland corporation with its principal place of business located in Baltimore, Maryland.  Alpharma USPD Inc. manufactures and markets pharmaceutical products under its own name under Labeler Code 00472; and

(c)  defendant Purepac Pharmaceutical Co. ("Purepac") is a Delaware corporation in the business of manufacturing and selling pharmaceuticals.  Purepac's principal place of business is 14 Commerce Dr., Suite 301, Cranford, NJ 07016.

Until December 19, 2005, defendants Alpharma USPD Inc. and Purepac were wholly-owned subsidiaries of Alpharma Inc.  On that date, Alpharma USPD and Purepac were purchased by Actavis Group hf and became wholly-owned subsidiaries of Actavis Inc., a wholly-owned subsidiary of Actavis Group hf.

12. The following two defendants are hereinafter referred to as the Amgen group:

(a)     defendant Amgen Inc. ("Amgen") is a Delaware corporation with its principal place of business at One Amgen Dr., Thousand Oaks, CA 91320-1799; and

(b)     defendant Immunex Corp. ("Immunex"), a wholly-owned subsidiary of Amgen since July, 2002, is a Washington state corporation engaged in the business of manufacturing and selling pharmaceuticals. Immunex's principal place of business is located at 51 University St., Seattle, WA 98101. Immunex is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Lederle Oncology Corp.

13. Defendants AstraZeneca Pharmaceuticals LP and AstraZeneca LP ("AstraZeneca") are related Delaware corporations with their principal place of business at 1800 Concord Pike, Wilmington, DE 19850.

14. The following two defendants are hereinafter referred to as the Aventis group:

(a)     defendant Aventis Pharmaceuticals Inc. is a Delaware corporation with its principal place of business located at 300-400 Somerset Corporate Blvd., Bridgewater, NJ 08807-2854; and

(b)     defendant Aventis Behring, LLC, n/k/a ZLB Behring, is headquartered at 1020 First Ave., King of Prussia, PA 19406-0901.

15. The following two defendants are hereinafter referred to as the Barr group:

(a)     defendant Barr Laboratories, Inc. ("BLI") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. BLI's principal place of business is located at 400 Chestnut Ridge Rod, Woodcliff Lake, NJ 07677. BLI is a subsidiary of Barr Pharmaceuticals, Inc. ("BPI"); and

(b)     defendant Duramed Pharmaceuticals, Inc. ("Duramed") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Duramed's principal place of business is located at 5040 Duramed Circle, Cincinnati, OH 45213. Duramed is a subsidiary of BPI.

16. Defendant Baxter Healthcare Corp. ("Baxter") is a Delaware corporation in the business of manufacturing and selling pharmaceuticals with its principal place of business located at One Baxter Pkwy., Deerfield, IL 60015. Baxter is a subsidiary of Baxter International, Inc.

-6-

17. The following three defendants are hereinafter referred to as the Boehringer group:

    (a)    defendant Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer Pharm"), a wholly-owned subsidiary of Boehringer Ingelheim Corp., is a Connecticut corporation engaged in the business of manufacturing and selling pharmaceuticals. Boehringer Pharm's principal place of business is located at 900 Ridgebury Rd., Ridgefield, CT 06877;

    (b)    defendant Roxane, Inc., n/k/a Boehringer Ingelheim Roxane, Inc. ("Roxane"), a wholly-owned subsidiary of Boehringer Ingelheim Corp., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Roxane's principal place of business is located at 1809 Wilson Rd., Columbus, OH 43216-6532; and

    (c)    defendant Ben Venue Laboratories, Inc. ("Ben Venue"), a wholly-owned subsidiary of Boehringer Ingelheim Corp., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Ben Venue's principal place of business is located at 300 Northfield Rd., Bedford, OH 44146. Ben Venue is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Bedford Laboratories.

18. Defendant B. Braun Medical Inc. ("B. Braun Medical") is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals. B. Braun Medical's principal place of business is located at 824 12th Ave., Bethlehem, PA 18018-0027. B. Braun Medical is the successor in interest to McGaw, Inc., which was acquired by B. Braun Medical in 1997 and subsequently merged into B. Braun Medical.

19. Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Bristol-Myers' principal place of business is located at 345 Park Ave., New York, NY 10154-0037. Westwood-Squibb ("Westwood") is a division of Bristol-Myers. Bristol-Myers is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Apothecon, Inc.

20. Defendant Chiron Corp. ("Chiron") is a corporation organized under the laws of Delaware with its principal place of business at 4560 Horton St., Emeryville, CA 94608-2916.

Chiron is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Cetus Oncology Corp.

21. Defendant Dey, Inc. ("Dey") is a Delaware corporation with its principal place of business at 2751 Napa Valley Corporate Dr., Napa, CA 94558.

22. Defendant Elkins-Sinn, Inc. ("Elkins") is a New Jersey corporation with its principal place of business at Two Esterbrook Ln., Cherry Hill, NJ 08003-4009.

23. Defendant Forest Laboratories, Inc. ("Forest") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Forest's principal place of business is located at 909 Third Ave., New York, NY 10022.

24. The following five defendants are hereinafter referred to as the Johnson & Johnson group:

(a)    defendant Johnson & Johnson ("J&J") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. J&J's principal place of business is located at One Johnson & Johnson Plaza, New Brunswick, NJ 08933;

(b)    defendant Janssen Pharmaceutical Products, LP ("Janssen"), a wholly-owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals. Janssen's principal place of business is located at 1125 Trenton-Harbourton Rd., Titusville, NJ 08560;

(c)    defendant Ortho Biotech Products, LP ("Ortho Biotech"), a wholly-owned subsidiary of J&J, is a New Jersey limited partnership engaged in the business of manufacturing and selling pharmaceuticals. Ortho Biotech's principal place of business is located at 700 U.S. Hwy. 202, Raritan, NJ 08869;

(d)    defendant Ortho-McNeil Pharmaceutical, Inc. ("Ortho-McNeil"), a wholly-owned subsidiary of J&J, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Ortho-McNeil's principal place of business is located at 1000 U.S. Rte. 202 S., Raritan, NJ 08869; and

(e)    defendant McNeil-PPC, Inc. ("McNeil"), a wholly-owned subsidiary of J&J, is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. McNeil's principal place of business is located at 7050 Camp Hill Rd., Ft. Washington, PA 19034.

McNeil Consumer & Specialty Pharmaceuticals ("McNeil Cons") is a division of McNeil.

25. Defendant Merck & Co., Inc. ("Merck") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Merck's principal place of business is located at One Merck Dr., Whitehouse Station, NJ 08889-0100.

26. The following two defendants are hereinafter referred to as the Mylan group:

(a)     defendant Mylan Laboratories, Inc. ("Mylan") is a Pennsylvania corporation engaged in the business of manufacturing and selling pharmaceuticals, mainly through its subsidiaries. Mylan's principal place of business is located at 1500 Corporate Dr., Ste. 400, Canonsburg, PA 15317; and

(b)     defendant Mylan Pharmaceuticals, Inc. ("Mylan Pharm"), a wholly-owned subsidiary of Mylan, is a West Virginia corporation engaged in the business of manufacturing and selling pharmaceuticals. Mylan Pharm's principal place of business is located at 1500 Corporate Dr., Ste. 400, Canonsburg, PA 15317.

27. The following two defendants are hereinafter referred to as the Novartis group:

(a)     defendant Novartis Pharmaceuticals Corp. ("Novartis") is a New Jersey corporation engaged in the business of manufacturing and selling pharmaceuticals. Novartis' principal place of business is located at One Health Plaza, East Hanover, NJ 07936; and

(b)     defendant Sandoz, Inc. ("Sandoz"), formerly known as Geneva Pharmaceuticals, Inc., is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Sandoz's principal place of business is located at 506 Carnegie Ctr., Princeton, NJ 08540.

28. Defendant Par Pharmaceutical Cos., Inc. ("Par") is a Delaware corporation with its principal place of business located at One Ram Ridge Rd., Spring Valley, NY 10977. Par is also being sued for the conduct of its subsidiaries and/or divisions, including but not limited to Par Pharmaceutical, Inc.

29. The following two defendants are hereinafter referred to as the Pfizer group:

(a)     defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 E. 42nd St., New York, NY 10017. In April, 2003, Pfizer acquired Pharmacia Corp. Pfizer is also being sued for the conduct of its subsidiaries and/or divisions, including but

-9-

not limited to Warner-Lambert, Pfizer-Warner-Lambert, Division, Parke-Davis Group, and Greenstone, Ltd.; and

(b)    defendant Pharmacia Corp. ("Pharmacia") is a Delaware corporation with its principal place of business located at 100 Rte. 206 N., Peapack, NJ 07977. Pharmacia was created through the merger of Pharmacia and Upjohn, Inc., and Monsanto Co. on March 31, 2000. Pharmacia was acquired by defendant Pfizer in 2003.

30.  The following two defendants are hereinafter referred to as the Schering group:

(a)    defendant Schering-Plough Corp. ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Rd., Kenilworth, NJ 07033-0530. Schering-Plough has engaged in the practices described in this complaint under its own name and through its wholly-owned subsidiary, Warrick Pharmaceuticals Corporation; and

(b)    defendant Warrick Pharmaceuticals Corporation ("Warrick"), is a Delaware corporation with its principal place of business at 12125 Moya Blvd., Reno, NV. Warrick is a wholly-owned subsidiary of defendant Schering-Plough and has been since its formation in 1993. Warrick manufactures generic pharmaceuticals.

31.  Defendant SmithKline Beecham Corp., d/b/a GlaxoSmithKline ("GlaxoSmithKline"), is a Delaware corporation with its principal place of business at One Franklin Plaza, Philadelphia, PA 19102.

32.  Defendant TAP Pharmaceutical Products, Inc. ("TAP") is a Delaware corporation headquartered at Bannackburn Lake Office Plaza, 2355 Waukegan Rd., Deerfield, IL 60015. TAP is jointly owned by Abbott Laboratories and Takeda Chemical Industries, Ltd.

33.  The following four defendants are hereinafter referred to as the Teva group:

(a)    defendant Teva Pharmaceuticals USA, Inc. ("Teva US") is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Teva USA's principal place of business is located at 650 Cathill Rd., Sellersville, PA 18960. Teva US is a subsidiary of an Israeli corporation, Teva Pharmaceutical Industries, Ltd. ("Teva Ltd."). Teva USA is also being sued for the conduct of Novopharm USA, Inc., a subsidiary of Novopharm Ltd. Novopharm Ltd. was acquired by Teva Pharmaceutical Industries Ltd. and Novopharm USA, Inc. was subsequently merged into Teva US;

(b)    defendant Ivax Corp. ("Ivax"), which became a wholly-owned subsidiary of Teva Ltd. on January 26, 2006, is a Florida (formerly Delaware)

corporation engaged in the business of manufacturing and selling pharmaceuticals. Ivax's principal place of business is located at 4400 Biscayne Blvd., Miami, FL 33137;

(c)     defendant Ivax Pharmaceuticals Inc. ("Ivax Pharm"), a wholly-owned subsidiary of Ivax, is a Florida corporation engaged in the business of manufacturing and selling pharmaceuticals. Ivax Pharm's principal place of business is located at 4400 Biscayne Blvd., Miami, FL 33137; and

(d)     defendant Sicor, Inc., f/k/a Sicor Pharmaceuticals, Inc., f/k/a Gensia Sicor Pharmaceuticals, Inc., is a Delaware corporation with its principal place of business located at 19 Hughes, Irvine, California. In January, 2004, Sicor, Inc. was acquired by Teva Ltd. and is now a wholly-owned subsidiary of that entity.

34.   The following two defendants are hereinafter referred to as the Watson group:

(a)     defendant Watson Pharma, Inc., f/k/a Schein Pharmaceuticals, Inc. ("Watson Pharma"), a wholly-owned subsidiary of Watson Pharmaceuticals, Inc. since 2000, is a Delaware corporation engaged in the business of manufacturing and selling pharmaceuticals. Watson Pharma's principal place of business is located at 311 Bonnie Cir., Corona, CA 92880; and

(b)     defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada corporation engaged in the business of manufacturing and selling pharmaceuticals. Watson's principal place of business is located at 311 Bonnie Cir., Corona, CA 92880.

35.   This Court has jurisdiction over plaintiff's claims as they involve claims arising exclusively under Illinois statutes and the *parens patriae* authority of the Attorney General to act on behalf of the State of Illinois and its citizens.

36.   Venue is proper in Cook County, Illinois because injuries to plaintiff occurred in Cook County, Illinois and because defendants committed unlawful, acts and/or practices in Cook County, Illinois.

## FACTUAL BACKGROUND

A.  The market for prescription drugs.

37.  The market for prescription drugs is enormously complex and non-transparent.  It is composed of over 65,000 separate national drug codes ("NDCs") (there is a separate NDC number for each quantity of each drug manufactured by each defendant).  The essential structure of the market is as follows.  The drugs are manufactured by enormous and hugely-profitable companies such as defendants.  Defendants sell the drugs (usually with intermediaries and agents involved in the process) to physicians, hospitals, and pharmacies.  These physicians, hospitals, and pharmacies are commonly known referred to as "providers."  The providers then, in essence, resell the drugs to their patients when the drugs are prescribed for, administered, or dispensed to those patients.  Most patients have private or public health insurance coverage.  Where a patient has such insurance, the payment that is made for the patient's prescribed drug ultimately will be made, in whole or in large part, by a private insurance company, a self-insured entity, or a government entity (in the case of the Medicare and Medicaid programs).  These private insurance companies, self-insured entities, and government entities are commonly known as "payers."  More often than not, the payer makes the reimbursement payment directly to the provider, not to the patient.

38.  This market structure means that the market for prescription drugs differs in two crucial respects from most markets.

39.  First, in most markets, the ultimate consumers of the product determine the demand for a product.  This is not the case for prescription drugs.  In the prescription drug market, the decision to use a prescription drug is overwhelmingly made not by the consumer of the drug -- the patient -- but by physicians, hospitals in which the patient is treated, home health-care agencies, long-term care facilities, or (with respect to the decision to use generic drugs versus brand-name drugs) pharmacies.  Because prescription drugs are dispensed only on a physician's order, the physician has the principal say as to what drug will be chosen for

the patient.  However, hospitals, particularly teaching hospitals, also have considerable influence over this choice.  If a hospital decides to put one drug as opposed to a competing drug on its "formulary" (the list of drugs that the hospital stocks), physicians (particularly residents and attending physicians who are employed by the hospital) likely will choose the drug on the formulary rather than a competing drug.  Likewise, although pharmacies do not prescribe drugs, pharmacies can exert important influence over the choice of which drug the patient will purchase if there is a choice between a generic version or brand-name version of the drug the physician has prescribed.

40.  A second difference between the prescription drug market and ordinary markets is that in ordinary markets, the ultimate consumer of the product pays for it directly.  In the prescription drug market, however, most payments for drugs are made by "payers" through private or public insurance programs.

41.  This structure of the prescription drug market produces the following fundamental fact that underlies defendants' unlawful scheme.  If a defendant drug manufacturer can cause a "payer" to reimburse the provider for defendant's drug at a higher price than the price the provider paid to buy the drug from the defendant, there will be a "spread" between the two prices, and that "spread" is retained by the provider as additional profit.  The larger the "spread" that can be created for a particular drug, the greater the incentive the provider has to choose, or influence the choice of, that drug rather than a drug of a competing manufacturer.

B.  The purpose of the Medicaid program and how it
    responds to the complexity of the drug market.

42.  The purpose of the Illinois Medicaid program is to provide medical assistance to the state's neediest citizens.

43.  Illinois, through its Medicaid program, is an enormous purchaser of drugs, purchasing over $610 million annually.  Although defendants' participation in the Illinois Medicaid program is purely voluntary, all defendants have chosen to participate and sell drugs

-13-

to Illinois Medicaid participants because of the size of the Illinois Medicaid program.  Thus, Illinois may at any given time have to reimburse a provider for any of the drugs of any of the defendants -- a universe of many thousands of drugs.

44.  Illinois' task is further complicated in that federal law places limits on what Illinois may pay providers for any particular drug.  Specifically, Illinois must not reimburse providers more than "the lower of the -- (1) estimated acquisition costs plus reasonable dispensing fees established by the agency; or (2) providers' usual and customary charges to the general public."  42 C.F.R. §447.331.  "Estimated acquisition cost" is defined as "the agency's best estimate of the price generally and currently paid by providers for a drug marketed or sold by a particular manufacturer or labeler in the package size of drug most frequently purchased by providers."  42 C.F.R. §447.301.  Thus, pursuant to federal law, the highest price Illinois can pay for a drug is the provider's cost to acquire that drug.

45.  Because defendants have hidden both the prices at which they sell their drugs to wholesalers, and their knowledge about the prices at which wholesalers sell their drugs to providers (as described in more detail herein), Illinois has no access to the pricing information it needs to estimate accurately the providers' acquisition cost of defendants' drugs.  Because neither Illinois nor any other state has sufficient personnel or knowledge required to compile complete and accurate lists of defendants' drug prices, entire businesses have grown up to provide pricing information to the states and others.  Three of these are of particular importance in this case.  They are First DataBank, the Red Book, and Medispan.  These compendia purport to supply accurate price information on defendants' drugs through surveys of wholesalers and information obtained from defendants themselves.

46.  Illinois, like most other states, has chosen First DataBank as its primary cost source.  First DataBank purports to supply the states with accurate information about the AWP of all drugs, information it receives from the drug manufacturers themselves.  As First DataBank explained AWP to its customers in September, 1991:

> Average Wholesale Price (AWP) is perhaps the most misunderstood concept in the pharmaceutical industry.  The purpose of this article is to describe what is

meant by AWP and to explain some of the underlying concepts involved in the acquisition, determination and maintenance of First DataBank's AWP.

AWP represents an average price which a wholesaler would charge a pharmacy for a particular product. The operative word is *average*. AWP never means that every purchase of that product will be exactly at that price. There are many factors involved in pricing at the wholesale level which can modify the prices charged even among a group of customers from the same wholesaler. AWP was developed because there had to be some price which all parties could agree upon if machine processing was to be possible.

At First DataBank, all pricing information is received in hard copy from the manufacturers. Catalogs, price updates, and other information reach us by fax, Federal Express, or U.S. mail. In the past two years, fax transmission has streamlined the acquisition of data to a large extent.

*See* Exh. A.

47. For virtually the entire time period relevant hereto, First DataBank has represented that its published AWPs reflect actual average wholesale prices.

48. Because Illinois, like most states, has no source of comprehensive information about providers' acquisition cost for defendants' drugs, Illinois has relied on the prices defendants reported to First DataBank. Consistent with First DataBank's suggestion that some providers were paying less than AWP, Illinois agreed to pay providers an amount consisting of AWP minus a certain percentage (originally 7.5%; currently 12% for brand name drugs and 25% for generic drugs). Illinois has continued to pay a separate dispensing fee to providers to reimburse them for the service provided in dispensing drugs to customers. Discounting from AWP in light of such information represented the only practical way for Illinois to estimate the average prices that providers were paying to acquire drugs. At no time did Illinois intend systematically to reimburse providers, on the average, at prices higher than the providers' average acquisition costs. Illinois was unaware until recently that discounting in this fashion was an entirely ineffective method of achieving this goal. Like other states, Illinois did not appreciate until recently that defendants were reporting AWPs that were not only higher than actual acquisition costs, but were higher than any discount percentage that Illinois or any other state was using to estimate providers' acquisition costs.

49.  As a practical matter, Illinois, like with most other states, is dependent on the First DataBank pricing reports for the maintenance of its Medicaid claims processing system. When a pharmacy fills a prescription and dispenses a drug to a Medicaid patient, information regarding that prescription is communicated electronically to the Illinois Department of Healthcare and Family Services ("DHFS") (formerly known as the Department of Public Aid) through the Point-of-Sales claim processing system.  On a weekly basis, First DataBank electronically sends its updated AWPs for the thousands of NDC-numbered drugs listed in its database to DHFS.  These prices become the basis for Illinois' reimbursements to providers. There is no other electronic source for this information.  Accordingly, Illinois is functionally dependent on the accuracy of the data defendants supply to First DataBank in meeting its obligation to pay providers no more than their actual acquisition cost of defendants' drugs.

C.  Defendants' corruption of the government Medicaid assistance programs.

50.  Defendants have defeated the intent of the Medicaid program to pay providers no more than their acquisition cost by reporting false and inflated AWPs to First DataBank and/or by reporting prices that they knew, because of the manner of First DataBank's operations, would misrepresent defendants' true wholesale prices.  One purpose of this scheme was and is to create the spread between a drug's true wholesale price and the false and inflated AWP published by First DataBank and thereby increase the incentive for providers to choose the drug for their patients, or, at a minimum, to counteract the same tactic used by a competitor.

51.  The higher the spread between the AWP and the true wholesale price, the more profit a provider can make.  Defendants often market their products by pointing out (explicitly and implicitly) that their drug's spread is larger than the spread of a competing drug.

52.  All of the defendants have inflated their drugs' reported AWPs to levels far beyond any real average wholesale price for their drugs.  One high-ranking industry executive has described it as the industry practice to do so.

-16-

53. In 2004, high-ranking executives of defendants Roxane, Dey, Aventis and Barr testified before Congress that their AWPs do not reflect the actual selling prices of their drugs. When asked why Dey doesn't lower its AWP on generic drugs, Dey's chief financial officer testified: "The simple answer is that given the system that now exists our customers won't buy from us if we lower our AWP."

54. Dey sued First DataBank because it published the *actual* AWP of Dey's drugs instead of the false AWP that Dey reported to First DataBank. Dey's principal allegation in that lawsuit was that the publication of the actual prices for its drugs was inconsistent with the practice in the industry of accepting and publishing reported, inflated AWPs, and that such publication put Dey at a competitive disadvantage because it had no "spread" to advertise.

55. Attached as Exh. B to this complaint is a list of drugs manufactured by the defendants and/or their subsidiaries that the U.S. Department of Justice, after an extensive investigation, found to have inflated AWPs. The U.S. Department of Health and Human Services concluded, with respect to all drugs utilized in the Medicare program that "[a] general conclusion reached in reviewing GAO [General Accounting Office] and OIG [Office of Inspector General] data is that there is a level of overstatement in the listed AWP for *all* drugs...." Payment Reform for Part B Drugs, 68 Fed. Reg. 50,430 (August 20, 2003) (emphasis added).

56. Plaintiff has obtained the false prices defendants caused to be published by FirstData Bank. Plaintiff has also obtained data showing the true AWPs of defendants' drugs from two of the largest national drug wholesalers: Cardinal and AmerisourceBergen. Attached as Exh. C to this complaint is a chart containing additional examples of defendants' drugs that have false and inflated AWPs. For each defendant, Exh. C identifies (a) the NDC; (b) the name of the drug; (c) the false AWP published by First DataBank as of the end of each year from 2001 to 2003; (d) the average AWP published by First DataBank for each year from 2001 to 2003; (e) a market price for the NDC for each year from 2001 to 2003; and (f) the spread between the market price and the AWP. The AWPs and market prices are unit prices. The source of the market prices is AmerisourceBergen. The market price is the

-17-

average price at which AmerisourceBergen sold the NDC numbered drug to the classes of trade that are reimbursed by the Illinois Medicaid program, *i.e.*, retail pharmacies, chain pharmacies, and long-term care facilities.  The spread, expressed as a percentage, is calculated as (average AWP minus market price) / market price.  The NDC numbered drugs on Exh. C are those for which the Illinois Medicaid program paid more than $100,000.00 between 1993 and 2005.  Plaintiff has similar data for years prior to 2001 and after 2003, which data will be produced to defendants upon request during discovery.  The NDC numbered drugs identified in Exh. C constitute most, but not necessarily all, of the NDC numbered drugs upon which the state is seeking damages.

57.  As they have done with their AWPs, defendants have illegally and deceptively misrepresented and inflated the wholesale acquisition cost ("WAC") of their drugs.  WAC is the price at which defendants sell their drugs to wholesalers.  Defendants have made it appear that any reduction in the purchase price below the listed WAC would result in a loss to the wholesaler and was, hence, unachievable, when in fact defendants secretly discounted the WAC to purchasers other than the Medicaid and Medicare programs through an elaborate charge back system (as described in more detail below).

## DEFENDANTS' EXACERBATION OF THE COMPLEXITIES OF THE MARKET AND AFFIRMATIVE CONCEALMENT OF THEIR WRONGDOING

58.  Defendants have been able to succeed in their drug pricing scheme for more than a decade by exacerbating the complexities of the huge and complex drug market, and by purposely concealing their pricing scheme from Illinois and other payers, as set forth below.

59.  The published wholesale price of any of the thousands of NDC numbered drugs might, and often does, change at any time.  As a consequence, just to track the current published prices of drugs utilized by a state's citizens requires resources and expertise that most states do not have.

60.  Defendants have further exacerbated the inherent complexities of the drug market by utilizing marketing schemes that conceal the true price of their drugs in the following different ways.

61.  First, defendants sell their drugs in a unique manner that hides the true prices. This scheme works as follows.  Upon agreeing on a quantity and price of a drug with a provider or group of providers, a defendant purports to sell the agreed-upon drugs at the WAC price to a wholesaler with whom the defendant has a contractual arrangement.  The wholesaler then ships the product to the provider, charging the provider the price originally agreed upon by the drug manufacturer and the provider, which price is lower than the WAC. When the wholesaler receives payment from the provider, it sends a bill to the defendant, called a "charge back," for the difference between the WAC and the lower price actually paid by the provider.  These charge backs (or "shelf adjustments" or economic inducements with varying names) are kept secret from the payers, including the State of Illinois, so that it appears that the wholesaler actually purchased the drug at the higher WAC price.  The effect of this practice is to create the impression of a higher than actual wholesale price paid by the wholesaler and passed on to the provider.  Defendants hide other actual price reductions by directly paying providers market share rebates and other off-invoice rebates and discounts that are calculated long after the actual purchase date of the drugs.

62.  Second, defendants further inhibit the ability of Illinois and other payers and ultimate purchasers to learn the true cost of their drugs by wrapping the sales agreements they negotiate with providers in absolute secrecy, terming them trade secrets and proprietary, to preclude providers from telling others the actual price they paid.

63.  Third, defendants further obscure the true prices for their drugs through their policy of treating so-called classes of trade differently.  Thus, for the same drug, pharmacies are given one price, hospitals another, and doctors yet another.

64.  Fourth, some defendants have hidden their real drug prices by providing free drugs and phony grants to providers as a further means of discounting the overall price of their drugs.  For example, defendant TAP has pled guilty to a federal criminal indictment for

-19-

engaging in such conduct, and paid $875 million in fines and damages, and defendant AstraZeneca paid $355 million to settle federal fraud charges that it induced doctors to falsely bill Medicare and Medicaid.

65.   Defendants have hidden from the public their motives for utilizing an inflated AWP.  Indeed, one official, a high-ranking employee of Dey, even went so far as to lie under oath about Dey's marketing of their spreads.  Only with the disclosure of materials secured by litigants in recent discovery has it become apparent that one reason defendants have intentionally manipulated the nation's drug reimbursement system is to compete for market share on the basis of a phony price spread, instead of the true selling price or the medicinal efficacy of their drugs.

66.   Defendants have further concealed their conduct by making sure that all of the entities that purchase drugs directly from the defendants (and thus know the true price of their drugs) have had an incentive to keep defendants' scheme secret.  Defendants' scheme permits all providers -- pharmacies, physicians, and hospitals/clinics -- to make some profit off defendants' inflated spread, because all of them are reimbursed in some manner on the basis of the AWP for at least some of the drugs they sell or administer.  For providers, therefore, the greater the difference between the actual price and the published AWP, the more money they make.  Thus, providers willingly sign drug sales contracts requiring them to keep secret the prices they pay for drugs.

67.   Defendants themselves have continuously concealed the true price of their drugs and have continued to report and cause to be published false and inflated AWPs and WACs as if they were real, representative prices.  Indeed, in the 2000 edition of Novartis' Pharmacy Benefit Report, an industry trade publication, the glossary defines AWP as follows:

> Average wholesale price (AWP) -- A published suggested wholesale price for a drug, based on the average cost of the drug to a pharmacy from representative sample of drug wholesalers.  There are many AWPs available within the industry, AWP is often used by pharmacies to price prescriptions.  Health plans also use AWP -- usually discounted -- as the basis for reimbursement of covered medications.

*Novartis Pharmacy Benefit Report: Facts and Figures*, 2000 edition, East Hanover, NJ, Novartis Pharmaceuticals Corporation, p. 43.

68.   Defendants' unlawful scheme has completely corrupted the market for prescription drugs.  Instead of competing on price and medicinal value alone, defendants have deliberately sought to create a powerful financial incentive for providers to prescribe drugs based primarily on the spread between the true price of a drug and its published AWP or WAC. Creating incentives for providers to prescribe drugs based on such a spread is inconsistent with Illinois law and public policy.  Large price spreads on higher priced drugs encourage providers to prescribe more expensive drugs instead of their lower priced substitutes, thereby increasing the cost of healthcare.  Competition on the basis of such spreads also has the potential to influence providers (consciously or unconsciously) to prescribe less efficacious drugs over ones with greater medicinal value.  Because of defendants' concealment of their scheme, Illinois and its citizens have unknowingly underwritten this perversion of competition in the drug market.  In sum, defendants have been, and continue to be, engaged in an insidious, deceptive scheme that is causing Illinois and its citizens to pay scores of millions of dollars a year more than they should for their prescription drugs, and may well be inducing some providers to prescribe less efficacious drugs.

## THE GOVERNMENTAL INVESTIGATIONS OF DEFENDANTS' CONDUCT

69.   The first governmental investigation of defendants' conduct began in 1995 when a small infusion pharmacy, Ven-a-Care of the Florida Keys, filed a sealed *qui tam* action with the Federal Government alleging that certain of the defendants were intentionally inflating the reported AWPs of certain drugs, primarily physician administered drugs.

70.   In 1997, in response to the Ven-a-Care complaint, the Federal Government issued subpoenas to certain of the defendants, including Dey, Abbott, and Warrick, seeking pricing information from them.

71.  In 2000, Congress began its investigation of the pricing practices of some of the defendants in connection with the Medicare Part B program based on the materials it received through its subpoenas.  On September 28, 2000, as part of this investigation, U.S. representative Pete Stark wrote to the president of the Pharmaceutical Research and Manufacturers of America (the main pharmaceutical trade association of which most of the defendants are members) as follows:

> Drug company deception costs federal and state governments, private insurers and others billions of dollars per year in excessive drug costs.  This corruptive scheme is perverting the financial integrity of the Medicare program and harming beneficiaries who are required to pay 20% of Medicare's current limited drug benefit.  Furthermore, these deceptive, unlawful practices have a devastating financial impact upon the states' Medicaid Program....

> The evidence I have obtained indicates that at least some of your members have knowingly and deliberately falsely inflated their representations of the average wholesale price ("AWP"), wholesaler acquisition cost ("WAC") and direct price ("DP") which are utilized by the Medicare and Medicaid programs in establishing drug reimbursements to providers.  The evidence clearly establishes and exposes the drug manufacturers themselves that were the direct and sometimes indirect sources of the fraudulent misrepresentation of prices.  Moreover, this unscrupulous "cartel" of companies has gone to extreme lengths to "mask" their drugs' true prices and their fraudulent conduct from federal and state authorities.  I have learned that the difference between the falsely inflated representations of AWP and WAC versus the true prices providers are paying is regularly referred to in your industry as "the spread....

> The evidence is overwhelming that this "spread" did not occur accidentally but is the product of conscious and fully informed business decisions by certain PhRMA members....

146 Cong. Rec. E1622 (daily ed. September 28, 2000) (September 28, 2000 letter from House Committee on Ways and Means, Subcommittee on Health, to Alan F. Holmer, President, Pharmaceutical Research and Manufacturers of America, Washington, D.C.).

72.  On December 21, 2000, Congress passed the Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA"), Pub. L. No. 106-554, § 429(c) (2000), which required a comprehensive study of drug pricing.

73. Continuing Congress' investigation of Medicare Part B pricing in 2001, Congressman Stark wrote to defendant Bristol-Myers on February 22, 2001 outlining numerous apparently illegal pricing practices:

> The evidence clearly shows that Bristol has intentionally reported inflated prices and has engaged in other improper business practices in order to cause its customers to receive windfall profits from Medicare and Medicaid when submitting claims for certain drugs. The evidence further reveals that Bristol manipulated prices for the express purpose of expanding sales and increasing market share of certain drugs where the arranging of a financial benefit or inducement would influence the decisions of healthcare providers submitting the Medicare and Medicaid claims.

147 Cong. Rec. E244-45 (daily ed., February 28, 2001).

74. In 2003, the House Committee on Energy and Commerce expanded Congress' Medicare investigation into pricing practices in the state Medicaid program. On June 26, 2003, Chairman Billy Tauzin (R.-La.) and Oversight and Investigations Subcommittee Chairman James Greenwood (R.-Pa.) wrote as follows to 26 drug companies, including many of the defendants here:

> The Committee on Energy and Commerce is conducting an investigation into pharmaceutical reimbursements and rebates under Medicaid. This inquiry builds upon the earlier work by this Committee on the relationship between the drug pricing practices of certain pharmaceutical companies and reimbursements rates under the Medicare program. In that investigation, the Committee uncovered significant discrepancies between what some pharmaceutical companies charged providers for certain drugs and what Medicare then reimbursed those providers for dispensing those drugs. This price difference resulted in profit incentives for providers to use the drugs of specific companies as well as higher costs to the Medicare system and the patients it serves. For example, we learned that one manufacturer sold a chemotherapy drug to a health care provider for $7.50, when the reported price for Medicare was $740. The taxpayer therefore reimbursed the doctor almost $600 for dispensing the drug and the cancer patient had a $148 co-payment. Such practices are unacceptable in the view of the Committee, which is why we are in the process of moving legislation to address these abuses.

> The Committee has similar concerns regarding drug prices in Medicaid, which has a substantially larger pharmaceutical benefit than Medicare.

House Committee on Energy and Commerce Press Release, Tauzin, Greenwood Expand

Medicaid Fraud Investigation (June 26, 2003), available at http://energycommerce.

house.gov/108/News/06262003_1002.htm.

75.   The Congressional investigation is continuing.   On December 7, 2004, the House

Subcommittee of Oversight and Investigation of the Commerce and Energy Committee

conducted a hearing on "Medicaid Prescription Drug Reimbursement:   Why the Government

Pays Too Much."   In his opening remarks, Chairman Joe Barton (R-TX) stated:

> Data obtained by the committee from five of the largest retail pharmacy chains
> reveals that during the period of July 1, 2002 to June 20, 2003, the average
> acquisition costs for seven widely prescribed generic drugs was 22 cents, while
> the average Medicaid reimbursement just for those drugs alone was 56 cents,
> more than double the cost....

"Medicaid Prescription Drug Reimbursement:   Why the Government Pays Too Much,"

Hearing Before the House Subcomm. on Oversight and Investigations, No. 108-126, at 5

(2004), available at http://frwebgate.access.gpo.gov/cgi-bin/ useftp.cgi?IPaddress=

162.140.64.52&filename=97275.pdf&directory=/disk2/wais/data/108_house_hearings.

76.   The importance to Illinois and the other states of the information being sought by

this investigation was explained by Henry Waxman during the December, 2004 House

Committee on Energy and Commerce hearings on Medicaid pricing practices.   Congressman

Waxman explained that even though the federal government had access to the manufacturers'

actual average manufacturers prices ("AMPs"), the states did not:

> the drug industry was powerful, and they succeeded in securing a provision in
> the basic legislation that kept the Best Price and the AMP information a secret.
> Can you imagine that?   *The federal government knew this information, but we
> kept it a secret from the states.*   This has proved to be a costly error.   Without
> this crucial piece of information, states who were, after all, responsible for
> establishing the reimbursement rate for prescription drugs could not set their
> reimbursement rates appropriately.   As a result, [the states] continued to rely on
> the average wholesale price minus the arbitrary amount because they did not
> have the information needed to set a more appropriate reimbursement rate.

*Id.*, at 23 (emphasis added).

77.   Concomitant with Congress' investigation, the United States Department of Justice

and the National Association of Medicaid Fraud Control Units (NAMFCU) conducted their

own much more limited investigation into 400 of the 50,000 NDCs that state Medicaid programs reimbursed in 2000, concluding that some drug manufacturers were reporting inflated average wholesale prices for certain of these drugs.

78.   As a result of all these investigations, many states began to investigate defendants' drug pricing practices on their own, leading to lawsuits in some 20 separate states, including Illinois.  Notwithstanding these investigations and lawsuits, defendants continue to publish, or participate in the publication of, inflated wholesale prices, and continue to hide the true prices of their drugs, including opposing in litigation discovery of the actual prices of these drugs.

## THE INJURY TO GOVERNMENTAL HEALTH PLANS
## CAUSED BY DEFENDANTS' FALSE WHOLESALE PRICES

A.   The Illinois Medicaid program.

79.   Medicaid is a joint federal and state health-care entitlement program authorized by federal law, with mandatory and optional provisions for eligibility and benefits covered, including pharmacy.  Illinois Medicaid has several major programs including:  (a) Medicaid, which provides for very low-income children, parents, pregnant women, and elderly and disabled adults; (b) SeniorCare, which provides for certain senior citizens; and (c) KidCare, which provides for certain children.  Illinois' Medicaid program is administered by the Illinois Department of Healthcare and Family Services (formerly the Illinois Department of Public Aid).

80.   Illinois Medicaid drug expenditures have increased dramatically.  In fiscal year 1999 (covering the period July 1, 1998 to June 30, 1999), Illinois Medicaid drug expenditures totaled approximately $600 million.  In fiscal year 2005 (covering the period July 1, 2004 to June 30, 2005), Illinois Medicaid drug expenditures are projected to total $2.1 billion, which constitutes approximately 16% of the overall Medicaid budget.  As of December, 2004, the number of Illinois citizens enrolled in Medicaid is approximately 1.8 million, which represents approximately 14% of the state population.

81.  During the relevant time period, with some exceptions, reimbursement to pharmacies, physicians, and hospitals for drugs covered by the Illinois Medicaid program has been made at defendants' published AWP minus a percentage (originally 7.5%; currently 12% for brand name drugs and 25% for generic drugs), plus a dispensing fee.

82.  For a minority of the drugs purchased by Illinois, the state sets its reimbursement rate at either the federal upper limit ("FUL") or at a rate established by the state maximum allowable cost ("MAC") program.  For multi-source drugs that have at least three suppliers, the Center for Medicaid Services ("CMS") generally establishes FULs, defined as 150% of the least costly therapeutic equivalent (using all national compendia) that can be purchased by pharmacies in quantities of 100 tablets or capsule or, in the case of liquids, the commonly listed size.  42 C.F.R. § 447.332.  As a practical matter, CMS has relied on the published AWPs to set most of its FULs.  The states also may set reimbursement rates for these drugs at rates lower than the FUL pursuant to the state MAC program and Illinois has done so in a number of instances.  Had defendants reported truthful prices, the FULs and state MACs would have been lower.

83.  At all relevant times, each defendant was aware of the reimbursement formula used in the Illinois Medicaid program and the dependence of the Medicaid program on defendants' reported AWPs.

84.  By reporting false and inflated wholesale prices, and by keeping their true wholesale prices secret, defendants have knowingly enabled providers of drugs to Medicaid recipients to charge Illinois false and inflated prices for these drugs, and interfered with Illinois' ability to set reasonable reimbursement rates for these drugs.

85.  As a consequence, the Illinois Medicaid program has paid more for prescription drugs than it would have if defendants had reported their true wholesale prices.

B. Medicare.

86. Medicare is a health insurance program created by the federal government for the elderly and disabled and other eligible persons. 42 U.S.C. §1395, *et seq.* Typically, individuals become eligible for Medicare health insurance benefits if they are over 65 years of age, disabled, or have end-stage renal disease. There are two major components of the Medicare program -- Part A and Part B.

87. Medicare Part B is an optional program that provides coverage for some health-care services for Illinois' participating elderly and disabled citizens not covered by Part A. 42 U.S.C. §§1395j-1395w-4. Medicare Part B is supported by government funds and premiums paid by eligible individuals who choose to participate in the program.

88. At issue here is Medicare Part B's limited benefit for drugs that are provided to patients either: (a) incident to a physician's service and that cannot generally be self-administered; or (b) in conjunction with the medical necessity of an infusion pump or nebulizer or other durable medical equipment ("DME") payable under Medicare's DME benefit.

89. In order to calculate the portion Medicare recipients must pay for Part B benefits, the Medicare program has looked to defendants' AWPs. The starting point is the calculation of the "allowable cost." From 1992 until 1997, the methodology for calculating the allowable cost of Medicare Part B drugs was 100% of the published AWP. From January 1, 1998 until January 1, 2004, the methodology for calculating the allowable cost of brand name (single-source) drugs was the lower of the actual charge on the Medicare claim for benefits or 95% of the published AWP. During this same time period, for multiple-source drugs, the allowable cost was calculated as 95% of the lower of: (a) the median AWP for all sources of the generic forms of the drug; or (b) the lowest brand-name product AWP. 42 U.S.C. §1395u(o)(1); 42 C.F.R. §405.517. From January 1, 2004 until January 1, 2005, the methodology for calculating the allowable cost was the lesser of the actual charge on the Medicare claim for benefits or 85% of the published AWP. 42 C.F.R. §414.707. Medicare

-27-

pays 80% of the allowable cost.  The remaining 20% is paid as a co-payment by the Medicare Part B beneficiary, or for individuals eligible for Medicaid (known as "dual eligibles"), by the Medicaid program.  In addition, Medicare Part B beneficiaries are required to pay an annual deductible amount before Part B benefits are payable.

90.  Because Medicare Part B beneficiaries must pay 20% of the allowable cost for their medications, which cost is based on the published AWPs, and because defendants have published false and inflated AWPs for their drugs, Medicare Part B beneficiaries have paid substantially more for their co-pays -- either directly or through higher insurance premiums defraying the cost of the co-pays -- than they would have if defendants had published their true wholesale prices.  Indeed, with respect to at least some drugs, the 20% co-pay for the Medicare Part B beneficiaries is greater than the entire true cost of the drug.

## DEFENDANTS' CONDUCT WAS INTENTIONALLY IN DISREGARD OF ESTABLISHED LAW

91.  Defendants had a duty to deal truthfully and honestly with the State of Illinois and they so knew.

92.  Moreover, it has uniformly been the law for over 60 years that it is unlawful for a seller to cause to be circulated a price at which no, or few, sales are actually expected, whether it is called a list price, suggested price, or benchmark price.  *E.g., FTC v. Colgate-Palmolive Co.*, 380 U.S. 372 (1965); *FTC v. The Crescent Publishing Group, Inc.*, 129 F.Supp.2d. 311 (S.D.N.Y. 2001).  Defendants either knew of this law or acted in reckless and willful disregard of it.

93.  Illinois has specifically declared that it is a deceptive practice to represent directly or by implication that a person offers to or sells a particular article of merchandise at a wholesale price unless that person can substantiate significant savings on this price as compared to identical merchandise offered for sale by retailers in the trade area.  815 ILCS §505/2-CC.

94. Congress has, in its hearings on the subject, excoriated the pharmaceutical industry for causing untrue AWPs to be published.

95. Defendants have willfully ignored, and continue to ignore: (a) their duty to Illinois to behave with scrupulous honesty; (b) case law uniformly holding that their pricing practices are unlawful; (c) Illinois' clear statutory prohibition of their conduct; and (d) the reprimands of Congress.

96. As a result, penalties and forfeitures, consistent with Illinois' statutory scheme, are mandated in this case.

## HARM TO ILLINOIS AND ITS CITIZENS

97. Defendants' unlawful activities have significantly and adversely impacted Illinois and its citizens. Illinois has paid more for the drugs it purchases through its Medicaid program, and Illinois Medicare Part B participants, who are primarily elderly and disabled citizens, have paid higher co-pays for their prescriptions drugs, than they would have, if defendants had reported the true wholesale prices of their drugs.

### COUNT I

Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act ("CFA"),
815 ILCS §505/2 (Unlawful Practices)

98. Plaintiff hereby realleges all previous paragraphs.

99. Section 2 of the Illinois CFA declares unlawful any

[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact...in the conduct of any trade or commerce... whether any person has in fact been misled, deceived or damaged thereby.

100. By committing the acts alleged above, defendants have violated §2 of the Illinois CFA by engaging in unfair and/or deceptive practices, including, but not limited to, the

misrepresentation, concealment, suppression, or omission of material facts, while participating in trade or commerce with the knowledge and/or intent that the State of Illinois and others would rely on their deceptive conduct.

101. Illinois and its citizens participating in the Medicare Part B program have been harmed by defendants' unfair and/or deceptive conduct in that they have paid far more for defendants' drugs than they would have paid had defendants truthfully reported the AWPs of their drugs.

WHEREFORE, plaintiff prays that this Court:

(a) declare that defendants' conduct as described above constitutes unfair and/or deceptive acts or practices within the meaning of §2 of the Illinois CFA;

(b) grant judgment for plaintiff;

(c) permanently enjoin defendants and their employees, officers, directors, agents, successors, assigns, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and any and all persons acting in concert or participation with defendants, from continuing the unlawful conduct, acts, and practices described above;

(d) award plaintiff State of Illinois and its citizens who have been harmed by defendants' practices, restitution and actual damages for all excessive prescription-drug payments and co-payments paid as a result of defendants' unlawful conduct;

(e) award penalties for each violation found by the Court to have been committed by a defendant with the intent to defraud in the amount of $50,000.00 pursuant to 815 ILCS §505/7(b), and penalties in the amount of $10,000.00 for each violation found by the Court to have been committed against a person 65 years of age or older pursuant to 815 ILCS §505/7(c);

(f) award plaintiff its costs and attorneys' fees; and

(g) award any other relief to which plaintiff is entitled or the Court deems appropriate and just.

## COUNT II

Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act ("CFA")
<u>815 ILCS §505/2-CC (Wholesale Advertising)</u>

102.  Plaintiff hereby realleges all previous paragraphs.

103.  Section 2-CC(b) of the Illinois CFA declares it an unlawful practice to represent
directly or by implication in any advertising that a person offers to or sells a particular article
of merchandise at a wholesale price unless that person can substantiate significant savings on
his price as compared to identical merchandise offered for sale by retailers in the trade area.

104.  Defendants' conduct in causing to be published wholesale prices that were and
are significantly greater than the true AWPs paid by pharmaceutical retailers (pharmacists and
health-care providers) without any significant savings on the price, as compared to identical
merchandise offered by retailers in the trade area was, and is, an unfair and/or deceptive act
within the meaning of §2-CC(b) of the Illinois CFA.

105.  Illinois and its citizens participating in the Medicare Part B program have been
harmed by defendants' unfair and/or deceptive conduct in that they have paid far more for
defendants' drugs than they would have paid had defendants truthfully reported the AWPs of
their drugs.

WHEREFORE, plaintiff prays that this Court:

(a)    declare that defendants' conduct as described above constitutes unfair
       and/or deceptive acts or practices within the meaning of §2-CC(b) of the
       Illinois CFA;

(b)    grant judgment for plaintiff;

(c)    permanently enjoin defendants and their employees, officers, directors,
       agents, successors, assigns, affiliates, merged or acquired predecessors,
       parent or controlling entities, subsidiaries, and any and all persons acting
       in concert or participation with defendants, from continuing the
       unlawful conduct, acts, and practices described above;

-31-

(d)     award plaintiff State of Illinois and its citizens who have been harmed
by defendants' practices, restitution and actual damages for all excessive
prescription-drug payments and co-payments paid as a result of
defendants' unlawful conduct;

(e)     award penalties for each violation found by the Court to have been
committed by a defendant with the intent to defraud in the amount of
$50,000.00 pursuant to 815 ILCS §505/7(b), and penalties in the amount
of $10,000.00 for each violation found by the Court to have been
committed against a person 65 years of age or older pursuant to 815
ILCS §505/7(c);

(f)     award plaintiff its costs and attorneys' fees; and

(g)     award any other relief to which plaintiff is entitled or the Court deems
appropriate and just.

## COUNT III

### Violation of the Illinois Public Assistance
### Fraud Act ("IPAFA"), 305 ILCS §5/8A-7(b)

106.  Plaintiff hereby realleges all previous paragraphs.

107.  Section 7(b) of the IPAFA declares it an unlawful act for any person or business
"willfully, by means of a false statement or representation, or by concealment of any material
fact or by other fraudulent scheme" to "obtain[] or attempt[] to obtain benefits or payments
under this Code to which he or it is not entitled, or in a greater amount than that to which he
or it is entitled."

108.  Defendants' conduct in causing (a) the publication of wholesale prices that were
and continue to be significantly greater than the true AWPs paid by pharmaceutical retailers
(pharmacists and health-care providers); and (b) the utilization of marketing schemes to
conceal the true price of their drugs; was, and continues to be, an unlawful act within the
meaning of §7(b) of the IPAFA.

-32-

109.  As a direct result of defendants' conduct, defendants have caused damages to the Illinois Medicaid program in that plaintiff has paid far more for defendants' drugs than they would have paid had defendants truthfully reported the AWPs of their drugs.

WHEREFORE, plaintiff prays that this Court:

(a)   declare that defendants' conduct as described above violates §7(b) of the IPAFA;

(b)   grant judgment for plaintiff;

(c)   permanently enjoin defendants and their employees, officers, directors, agents, successors, assigns, affiliates, merged or acquired predecessors, parent or controlling entities, subsidiaries, and any and all persons acting in concert or participation with defendants, from continuing the unlawful conduct, acts, and practices described above;

(d)   award plaintiff an amount equal to the excess benefits or payments received by each defendant plus (1) penalties equal to interest on the amount of excess benefits or payments at the maximum legal rate in effect on the date the payment was made; (2) an amount not to exceed three times the amount of such excess benefits or payments; and (3) the sum of $2,000.00 for each excess claim for benefits or payment;

(e)   award plaintiff its reasonable and necessary costs of investigation and prosecution of this case, including actual attorneys' fees; and

(f)   award any other relief to which plaintiff is entitled or the Court deems appropriate and just.


COUNT IV

Violation of the Illinois Whistleblower Reward
and Protection Act, 740 ILCS §175/1, et seq.

110.  Plaintiff hereby realleges all previous paragraphs.

111.  Sections 3(a)(1), (2), and (7) of the Illinois Whistleblower Reward and Protection Act declare it an unlawful act for any person to (a) "knowingly present[], or cause[] to be presented, to an officer or employee of the state...a false or fraudulent claim for payment or approval"; (b) "knowingly make[], use[], or cause[] to be made or used, a false

-33-

record or statement to get a false or fraudulent claim paid or approved by the state"; or (c) "knowingly make[], use[], or cause[] to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state," respectively.

112.  Defendants' conduct in causing (a) the publication of wholesale prices that were significantly greater than the true AWPs paid by pharmaceutical retailers (pharmacists and health-care providers), false AWPs on which defendants knew the State of Illinois would base its reimbursement formula for prescription drugs; (b) the State of Illinois, in reliance on the falsely-inflated AWPs, to pay out sums of money to the providers and suppliers of defendants' drugs, significantly in excess of the amounts permitted by law; and (c) preventing the State of Illinois from recouping state funds paid in excess of the amounts the state would have paid had defendants truthfully reported the AWPs of their drugs, violated §3(a) of the Illinois Whistleblower Reward and Protection Act.

113.  As a direct result of defendants' conduct, defendants caused the State of Illinois to pay out sums of money to providers and suppliers of defendants' drugs grossly in excess of the amounts they would have paid had defendants truthfully reported the AWPs of their drugs, resulting in great financial loss to the State of Illinois.

WHEREFORE, plaintiff prays that this Court:

(a)    declare that the conduct of each defendant, as described above, violates §§3(a)(1), (2), and (7) of the Illinois Whistleblower Reward and Protection Act;

(b)    grant judgment for plaintiff and against each defendant;

(c)    award plaintiff State of Illinois from each defendant civil penalties equal to three times the amount of damages which the State of Illinois sustained because of defendants' violations, plus no more than $10,000.00 and no less than $5,000.00 for each false or fraudulent claim pursuant to 740 ILCS §175/3(a);

(d)    award plaintiff State of Illinois all fees and costs of this civil action, including attorneys' fees; and

-34-

(e)    award any other relief to which the State of Illinois is entitled or the Court deems appropriate and just.

                Respectfully submitted,

                LISA MADIGAN
                Attorney General of the State of Illinois

By:     Robert S. Libman
        Special Assistant Attorney General
        of the State of Illinois

Judson H. Miner
Charles Barnhill, Jr.
George F. Galland, Jr.
Jeffrey I. Cummings
Robert S. Libman
Special Assistant Attorneys General
Miner, Barnhill & Galland
14 W. Erie St.
Chicago, IL 60610
(312) 751-1170
Atty No. 21402

Benjamin C. Weinberg
Brent D. Stratton
David F. Buysse
Assistant Attorneys General
100 W. Randolph St.
Chicago, IL 60601
(312) 814-6141

## CERTIFICATE OF SERVICE

Lisa Mecca Davis certifies that she caused a copy of the foregoing Notice and Motion to be served upon all counsel of record, by LexisNexis File & Serve, as specified in this Court's June 2, 2006 Case Management Order No. 1, this second day of August, 2006.

_Lisa Mecca Davis_
Lisa Mecca Davis